# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: Nexium (Esomeprazole Magnesium) Antitrust Litigation | : : : | MDL No. 2409 |
|  | : | Civil Action No. 1:12-md-02409-WGY |
| This Document Relates To: All Actions | : : : : | |

## PROOF OF SERVICE OF TEVA PHARMACEUTICAL INDUSTRIES, LTD.

Pursuant to Rule 4(f)(1) of the Federal Rules of Civil Procedure, Plaintiff CVS Pharmacy, Inc. files the attached Proof of Service of Summons and Complaint upon Teva Pharmaceutical Industries, Ltd., 5 Basel Street, Petach Tikva 49131 Israel. The Summons and Complaint were served in conformity with the Hague Convention of 15th November, 1965. The documents were served on June 9, 2014 upon Teva Pharmaceutical Industries, Ltd., Legal Department, as more fully set forth in the attached Proof of Service and accompanying documents.

Respectfully submitted,

Dated: September 3, 2014

/s/ Monica L. Rebuck
Monica L. Rebuck
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
4400 Deer Path Road, Suite 200
Harrisburg, PA 17110
Phone: (717) 364-1030
Fax: (717) 364-1020
mrebuck@hangley.com

*Counsel for Plaintiff CVS Pharmacy, Inc.*

## CERTIFICATE OF SERVICE

I, Monica L. Rebuck, hereby certify that on this 3rd day of September, 2014, the foregoing document was electronically filed using the CM/ECF system, which will automatically send a Notice of Electronic Filing to all registered participants.

*/s/ Monica L. Rebuck*
Monica L. Rebuck



**LEGAL LANGUAGE SERVICES**

*A Division of ALS International, Inc.*
8014 State Line Road
Suite 110
Leawood, KS 66208

Telephone  (913) 341-3167
Toll Free    (800) 755-5775
Telefax      (913) 341-3168
www.legallanguage.com

August 7, 2014

To whom it may concern:

This is to certify that the attached translation from Hebrew into English is an accurate representation of the documents received by this office.  These documents are designated as:

**Proof of International Service of Process in Israel upon the Defendant:**
**Teva Pharmaceutical Industries Ltd.**

Maria Victoria Portuguez, Manager of this company, certifies that Eve Hecht, who translated this document, is fluent in Hebrew and standard North American English and qualified to translate.  She attests to the following:

"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document".

Signature of Maria Victoria Portuguez

Subscribed and sworn to before me this August 7, 2014.

Vicki Farron
Notary Public, State of Kansas
Qualified in Johnson County
My commission expires December 9, 2016

Sincerely,

Victor J. Hertz
President

## Appendix to Certificate of Service No. 319/14 – 1

## Affidavit

I, the undersigned, **Eitan Neumann, identity no. 58615667**, after having been cautioned that I must state the truth and that I will be subject to the penalties set forth by law if I do not do so, hereby affirm as follows:

I hereby give this affidavit in support of service that was made by me upon Teva Pharmaceutical Industries Ltd. whose office is located at Basel Street 5, Petach Tikva.

On June 9, 2014 I visited at the aforementioned address and served court papers on the secretary of the Legal Department, Ms. Aviva Osher, who affirmed to me that she is authorized to receive legal documents in the name of the company.

The certificate of service that is attached to this Affidavit constitutes an inseparable part thereof.

My name is Eitan Neumann, the signature below is my signature, and the contents of my affidavit are true and accurate.

*[signature]*
Signature of affidavit witness

I, the undersigned, *Yaakov Muzikant*, Adv., hereby certify that on *June 10, 2014*

Mr. Eitan Neumann, ID no. *058615667*, appeared before me, and after I cautioned him that he must state the truth and that he will be subject to the penalties set forth by law if he does not do so, he confirmed the accuracy of the above declaration, and signed it.

June 10, 2014
Date

*[signature]*
[illegible]

YAAKOV
MUZIKANT,
Attorney
License No.
55594

Subscribed and sworn to before
me this ___ 8/7 ___ 20 14

Notary Public _____

**VICKI FARRON**
Notary Public, State of Kansas
Qualified in Johnson County
Commission Expires December 9, 2016

נספח לאישור מסירה מס' 319/14 - 1

# ת צ ה י ר

אני הח"מ **איתן נוימן מ.ז. 58615667,** לאחר שהוזהרתי כי עלי לומר את האמת וכי אהיה צפוי לעונשים הקבועים בחוק אם לא אעשה כן  מצהיר בזה כדלקמן :

הנני נותן תצהיר זה בתמיכה לאישור מסירה אשר בוצע על ידי לחברת :
**טבע תעשיות פרמצבטיות בע"מ** (TEVA PHARMACEUTICAL INDUSTRIES, LTD)
שמשרדם ברחוב בזל 5 פתח-תקווה.

בתאריך 9 ביוני 2014 ביקרתי בכתובת הרשומה לעיל ומסרתי את כתבי בית הדין לידי מזכירת המחלקה המשפטית – הגב' אביבה אושר – שהצהירה בפני כי הינה מוסמכת לקבל מסמכים משפטיים בשם החברה.

אישור המסירה המצורף לתצהיר זה, מהווה חלק בלתי נפרד ממנו.

שמי **איתן נוימן,** החתימה מטה היא חתימתי ותוכן תצהירי אמת ונכון.

_____
חתימת המצהיר

אני הח"מ _____ עו"ד, מאשר בזה כי ביום 10/06/2014

הופיע בפני מר איתן נוימן ת.ז. __58615667__  ואחרי שהזהרתיו כי עליו להצהיר את האמת וכי יהיה צפוי לעונשים הקבועים בחוק אם יעשה כן חתם בפני על הצהרה הנ"ל וחתם עליה.

10/06/2014
_____
תאריך

מס' רישיון
55594
License No:
YAAKOV MUZIKANT, Advocate

*Reverse of the request*
CERTIFICATE

The undersigned authority has the honor to certify, in conformity with Article 6 of the Convention,

1) That the documents directed to **Teva Pharmaceutical Industries Ltd.** have been served*

- o The 9/6/2014

- o At 5 Basel St. ,Petach Tikva 49131

- In one of the following methods authorized by Article 5:

*a)* In accordance with the provisions of sub-paragraph *(a)* of the first paragraph of Article 5 of the Convention*.

The documents referred to in the request have been delivered to:

- o identity and description of person:

- o relationship to the addressee: Authorized Signer

In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.

*Annexes*

Documents returned: .........................................................................

In appropriate cases, documents establishing the service:

..........................................................................

Done at Jerusalem, the

Signature and/or stamp.

## נספח לאישור מסירה מס' 319/14 - 1

# ת צ ה י ר

אני הח"מ **איתן נוימן מ.ז. 58615667**, לאחר שהוזהרתי כי עלי לומר את האמת וכי אהיה צפוי
לעונשים הקבועים בחוק אם לא אעשה כן  מצהיר בזה כדלקמן :

הנני נותן תצהיר זה בתמיכה לאישור מסירה אשר בוצע על ידי לחברת :
**טבע תעשיות פרמצבטיות בע"מ** (TEVA PHARMACEUTICAL INDUSTRIES, LTD)
שמשרדם ברחוב בזל 5 פתח-תקוה.

בתאריך 9 ביוני 2014 ביקרתי בכתובת הרשומה לעיל ומסרתי את כתבי בית הדין לידי מזכירת
המחלקה המשפטית – הגב' אביבה אושר – שהצהירה בפני כי הינה מוסמכת לקבל מסמכים
משפטים בשם החברה.

אישור המסירה המצורף לתצהיר זה, מהווה חלק בלתי נפרד ממנו.

שמי **איתן נוימן**, החתימה מטה היא חתימתי ותוכן תצהירי אמת ונכון.

_____
חתימת המצהיר

אני הח"מ _עו"ד יעקב מוזיקנט_ עו"ד, מאשר בזה כי ביום 10/06/2014

הופיע בפני מר _איתן נוימן_ ת.ז. _58615667_ ואחרי שהזהרתיו כי עליו
להצהיר את האמת וכי יהיה צפוי לעונשים הקבועים בחוק אם יעשה כן חתם בפני על
ההצהרה הנ"ל וחתם עליה.

_10/06/2014_
תאריך



# LEGAL LANGUAGE SERVICES

A Division of ALS International, Inc.
8014 State Line Road
Suite 110
Leawood, KS 66208

Telephone  (913) 341-3167
Toll Free   (800) 755-5775
Telefax     (913) 341-3168
www.legallanguage.com

June 2, 2014

**VIA FEDERAL EXPRESS**

Mr. Ezer Shafir
HAGUE CENTRAL AUTHORITY FOR ISRAEL
Directorate of Courts
22 Kanfei Nesherim St.
Jerusalem, 95464
P.O.B. 34142
ISRAEL

| | |
|---|---|
| Re: | *International Service of Process through the Israeli Central Authority pursuant to Article 5 of the Hague Service Convention* |
| Matter: | *IN RE NEXIUM (ESOMERPRAZOLE) ANTITRUST LITIGATION*<br>*CVS PHARMACY, INC. v. ASTRAZENECA AB, et al.*<br>**Civil Action No. 14-CV-11788-WGY**<br>**Master File No.: 12-md-02409-WGY** |

Dear Sirs:

On behalf of our client and the United States District Court, District of Massachusetts, I have the honor to transmit to you a *Request* pursuant to the 1965 *Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters:*

| | |
|---|---|
| Applicant: | Karina J. Shreefer, Esq. and Aaron D. Lukken, Esq.<br>LEGAL LANGUAGE SERVICES |
| IN RE | NEXIUM (ESOMERPRAZOLE) ANTITRUST LITIGATION |
| Plaintiff: | CVS PHARMACY, INC. |
| Defendants: | ASTRAZENECA AB, et al.<br>**(International Service of Process upon the Defendant: TEVA**<br>**PHARMACEUTICAL INDUSTRIES, LTD.)** |
| Civil Action No. | 14-CV-11788-WGY |
| Master File No.: | 12-md-02409-WGY |
| Method: | Personal service by a private agent authorized to serve process by the Israeli Directorate of Courts |

The *Request* is being forwarded to you in duplicate. Ms. Shreefer and Mr. Lukken are requesting service of process pursuant to Article 5, paragraph 1, sub-paragraph (a) of the *Hague Service Convention.*

The persons and entities within the United States competent to forward service requests pursuant to Article 3 include any court official, any attorney, or any other person or entity authorized by the rules of the court. (See U.S. declarations to the 1965 Convention at the Hague Conference website: http://www.hcch.net/index_en.php?act=authorities.details&aid=279)

**Because the plaintiff is under tight deadline to serve the documents, I ask that you authorize Eitan Newman, a licensed Israeli detective, to effect service on your behalf. Legal Language Services has made private arrangements to pay for Mr. Newman's fees for this service.** Mr. Newman will be contacting you directly for your further instruction.

The Hague Certificate may be returned by Mr. Newman to my offices, and I will then arrange to have it filed it with the United States District Court, District of Massachusetts.

Please note that I stand ready to reimburse the United States District Court, District of Massachusetts as well as the Israeli Central Authority for any costs which may be incurred in executing this Request in accordance with Article 12 of the Hague Service Convention.

I hope you will not hesitate to contact me by telephone at 01.913.341.3167, by fax at 01.913.341.3168 or by email at **vportuguez@legallanguage.com** if you have questions or concerns about any aspect of this request.

Sincerely yours,

LEGAL LANGUAGE SERVICES
*A Division of ALS International, Inc.*

Victoria Portuguez
International Litigation Support

Enclosures

Civil Action No. 14-CV-11788-WGY
Master File No.: 12-md-02409-WGY

## REQUEST
## FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS
### *DEMANDE*
### *AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER*
### *D'UN ACTE JUDICIARE OU EXTRAJUDICIAIRE*

**Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, November 15, 1965.**
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciares en matière civile
ou commerciale, signée à La Haye, le 15 Novembre 1965.*

| Identity and address of the applicant<br>*Identité et adresse du requérant* | Address of receiving authority<br>*Adresse de l'autorité destinataire* |
|---|---|
| Karina J. Shreefer, Esq. and Aaron D. Lukken, Esq.<br>LEGAL LANGUAGE SERVICES<br>8014 State Line Road, Suite 110<br>Leawood, Kansas 66208<br>UNITED STATES OF AMERICA<br>Tel. 1.913.341.3167 | HAGUE CENTRAL AUTHORITY FOR ISRAEL<br>Directorate of Courts<br>22 Kanfei Nesherim St.<br>Jerusalem, 95464<br>P.O.B. 34142<br>ISRAEL |

The undersigned applicant has the honour to transmit -in duplicate- the document listed below and, in conformity with article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.,
(identity and address)
*Le requérant soussigné a l'honneur de faire parvenir—en double exemplaire—à l'autorité destinataire les documents ci-dessous énumérés, en la priant conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, savoir:*
(identité et adresse) TEVA PHARMACEUTICAL INDUSTRIES, LTD.

5 Basel Street, Petach Tikva 49131

ISRAEL     -OR-     wherever the Defendant may be found in ISRAEL

[X] (a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*
*(a) selon les formes légales (article 5, alinéa premier, lettre a).*

[ ] (b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:
*(b) selon la forme particulière suivante (article 5, alinéa premier, lettre b) :* _____

_____

[ ] (c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*:
*(c) le cas échéant, par remise simple (article 5, alinéa 2).*
The authority is requested to return or to have returned to the applicant a copy of the documents—and of the annexes*--with a certificate as provided on the reverse side.
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte—et de ses annexes—avec l'attestation figurant au verso.*

**THE PERSONS AND ENTITIES WITHIN THE UNITED STATES COMPETENT TO FORWARD SERVICE REQUESTS PURSUANT TO ARTICLE 3 INCLUDE ANY COURT OFFICIAL; <u>ANY ATTORNEY</u>; OR ANY OTHER PERSON OR ENTITY AUTHORIZED BY THE RULES OF THE COURT.** (See U.S. declarations to the 1965 Convention at the Hague Conference website: http://www.hcch.net/index_en.php?act=authorities.details&aid=279)

List of documents
*Enumération des pièces*

Executed "Request," in duplicate

"Certificate" (unexecuted), in duplicate     Done at <u>Leawood, Kansas, U.S.A.</u>, the <u>2ND JUNE 2014</u>

"Summary," in duplicate     *Fait à* _____, *le* _____

"Notice," in duplicate     **Signature and/or stamp.**

Summons in a Civil Action, in duplicate     *Signature et/ou cachet.*

Complaint and Demand for Jury Trial, in duplicate

_____

_____

*Delete if inappropriate
*Rayer les mentions inutiles.*

1

(Formerly OBD-116 which was formerly LAA-116,
both of which may still be used)

USM-94
(Est. 11/22/77)

Civil Action No. 14-CV-11788-WGY
Master File No.: 12-md-02409-WGY

# SUMMARY OF THE DOCUMENT TO BE SERVED
## *ELEMENTS ESSENTIELS DE L'ACTE*

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudiciares en matière civile ou commerciale, signée à La Haye, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa 4)*

| | |
|---|---|
| Name and address of the requesting authority: | Karina J. Shreefer, Esq. and Aaron D. Lukken, Esq. |
| *Nom et adresse de l'autorité requérante :* | LEGAL LANGUAGE SERVICES |
| | 8014 State Line Road, Suite 110, Leawood, Kansas 66208, U.S.A. |
| | Tel. 1.913.341.3167 |

| | |
|---|---|
| Particulars of the parties*: | |
| *Identité des parties :* | IN RE NEXIUM (ESOMERPRAZOLE) ANTITRUST LITIGATION |
| | CVS PHARMACY, INC., *Plaintiff* |
| | ASTRAZENECA AB, AKTIRBOLAGET HASSLE, et al., *Defendants* |

## JUDICIAL DOCUMENT**
### *ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte :*   To give notice to the Defendant of the commencement of a civil claim against it and to summon it to answer or otherwise respond.

**Nature and purpose of the proceedings and, where appropriate, the amount in dispute:**
*Nature et objet de l'instance, le cas échéant, le montant du litige :*   A civil action has been commenced against the Defendant.

**Date and place for entering appearance**:**
*Date et lieu de la comparution :*   Within twenty-one (21) days after service of the Summons (not counting day of receipt), Defendant must serve upon Plaintiff's Attorney an Answer to the attached Complaint or a Motion under Rule 12 of the Federal Rules of Civil Procedure.  Defendant also must file its Answer or Motion with the United States District Court, District of Massachusetts located at:  John Joseph Moakley U.S. Courthouse, 1 Courthouse Way, Suite 2300, Boston, Massachusetts 02210, U.S.A.

**Court which has given judgment**:**
*Juridiction qui a rendu la décision :*   N/A

**Date of judgment**:**
*Date de la décision :*   N/A

**Time limits stated in the document**:**
*Indication des délais figurant dans l'acte :*   Within twenty-one (21) days after service of the Summons (not counting day of receipt), Defendant must serve upon Plaintiff's Attorney an Answer to the attached Complaint or a Motion under Rule 12 of the Federal Rules of Civil Procedure.  If Defendant fails to respond, Judgment by Default will be entered against it for the relief demanded in the Complaint.  Defendant also must file its Answer or Motion with the Court.

## EXTRAJUDICIAL DOCUMENT**
### *ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte :*   N/A

**Time limits stated in the document**:**
*Indication des délais figurant dans l'acte :*   N/A

---

\*   If appropriate, identity and address of the person interested in the transmission of the document.
   *S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.*
\*\*   Delete if inappropriate.
   *Rayer les mentions inutiles.*

★U.S. Government Printing Office: 1990-262-211/15302

## NOTICE

*(recommended by the Fourteenth Session of
Hague Conference of October, 1980)*

**identité et adresse du destinataire**
*identity and address of the addressee*

> TEVA PHARMACEUTICAL INDUSTRIES, LTD.
> 5 Basel Street
> Petach Tikva 49131
> ISRAEL
> -OR-
> wherever the Defendant may be found in ISRAEL

### TRÈS IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS.  LES "ELÉMENTS ESSENTIELS DE L'ACTE" VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET.  IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT.  IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES :

Volunteer Lawyers Project of the Boston Bar Association
99 Chauncy Street, Suite 400
Boston, Massachusetts 02111
U.S.A.
Tel. 1.617.423.0648

### IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS.  THE "SUMMARY OF THE DOCUMENT TO BE SERVED" WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE.  YOU SHOULD, HOWEVER, READ THE DOCUMENT ITSELF CAREFULLY.  IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

Volunteer Lawyers Project of the Boston Bar Association
99 Chauncy Street, Suite 400
Boston, Massachusetts 02111
U.S.A.
Tel. 1.617.423.0648

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

|  |  |  |
|---|---|---|
| CVS PHARMACY INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No.  14CV11788-WGY |
| ASTRAZENECA BIOTECH AB, ET AL | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
   Teva Pharmaceutical Industries, Ltd.
   5 Basel Street, PO Box 3190
   Petach Tikva 49131
   Israel

   A lawsuit has been filed against you.

   Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

   If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____05/23/2014_____                    _____
                                                                        *Signature of Clerk or Deputy Clerk*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION | : : : | MDL No. 2409<br>Civil Action No. 12-md-02409 (WGY) |
| ——————————————— | : : | |
| CVS PHARMACY, INC., | : : | |
| Plaintiff, | : : : | Civil Action No.<br><br>COMPLAINT AND |
| vs. | : : : : | DEMAND FOR JURY TRIAL |
| ASTRAZENECA AB, AKTIEBOLAGET HASSLE, ASTRAZENECA LP, RANBAXY PHARMACEUTICALS, INC., RANBAXY INC., RANBAXY LABORATORIES LTD., TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., DR. REDDY'S LABORATORIES LTD. and DR. REDDY'S LABORATORIES, INC., | : : : : : : : : : | |
| Defendants. | : : | |
| ——————————————— | : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff CVS Pharmacy, Inc. ("CVS") brings this civil action against Defendants

AstraZeneca AB, Aktiebolaget Hassle and AstraZeneca LP (collectively, "AstraZeneca"),

Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc. and Ranbaxy Laboratories Ltd. (collectively,

"Ranbaxy"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc.

(collectively, "Teva"), and Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc.

(collectively, "Dr. Reddy's").   For its Complaint, CVS alleges as follows:

## NATURE OF THE ACTION

1.      This a civil antitrust action seeking treble damages and injunctive relief arising out

of Defendants' overarching scheme to monopolize the market for delayed-release esomeprazole

magnesium, sold by AstraZeneca under the brand name Nexium.   Nexium is a proton pump

inhibitor prescribed to patients for the healing of erosive esophagitis, maintenance of erosive

esophagitis, and treatment of symptomatic gastroesophageal reflux disease.   AstraZeneca

monopolized the market by entering into illegal market allocation conspiracies with, between, and

among three generic manufacturers and potential competitors -- Ranbaxy, Teva, and Dr. Reddy's

(the "Generic Defendants") -- that were disguised as patent litigation settlements.   In reality, the

settlements were payoffs by AstraZeneca to keep the generic drug makers, and potential

competitors, off the market.

2.      To protect over $3 billion in annual Nexium sales from the threat of generic

competition, AstraZeneca entered into non-competition agreements with each of the Generic

Defendants, agreeing to pay the Generic Defendants substantial sums in exchange for their

agreement to delay marketing their less expensive generic versions of Nexium for as long as six

years or more, *i.e.,* until May 27, 2014 (the "Exclusion Payment Agreements" or simply the

"Agreements").   The Generic Defendants did, in fact, delay marketing their less-expensive

versions of Nexium; but for the Agreements, generic versions of Nexium would have been

marketed in the United States by December 1, 2008, after the 30-month stay of FDA approval of

Ranbaxy's generic Nexium product expired.

3.      Generic versions of brand name drugs contain the same active ingredient, and are

determined by the FDA to be just as safe and effective, as their brand name counterparts.   The

only difference between generic and brand name drugs is their price: generics typically enter the

market at a discount of at least 25% compared to their brand counterparts when there is a single

generic competitor, and the discount typically increases to 50% to 80% (or more) when there are

multiple generic competitors on the market for a given brand.   The launch of a generic drug thus

usually brings huge cost savings to all drug purchasers.

      4.      Those same savings pose a grave threat to the monopoly profits of brand name

drug companies such as AstraZeneca.   FDA-approved, AB-rated generic versions of brand drugs

typically take 80% or more of the unit sales of the brand product soon after generic entry.   The

Federal Trade Commission estimates that about one year after market entry, the generic version

takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.

      5.      In order to delay the dramatic loss of its monopoly profits from Nexium,

AstraZeneca engineered an overarching scheme whereby it purchased freedom from competition

with the Generic Defendants and reduced the likelihood that its Nexium patents would be

invalidated.   Specifically, AstraZeneca agreed to pay the Generic Defendants to delay entering

the market until May 27, 2014 and to drop their challenges to the Nexium patents.   AstraZeneca

and the Generic Defendants attempted to disguise or conceal these payments (frequently called

"exclusion payments" or "reverse payments") as (i) compensation for supplying AstraZeneca

with a portion of its requirements of esomeprazole magnesium, the active pharmaceutical

ingredient ("API"); (ii) payments for distributing authorized generic versions of two other

AstraZeneca drugs, felodipine capsules (brand name, Plendil) and 40 mg omeprazole tablets

(brand name, Prilosec) (with respect to Ranbaxy); and/or (iii) forgiveness of contingent patent

infringement liabilities as a result of the at-risk launches of other products (with respect to Teva

and Dr. Reddy's). AstraZeneca further effectuated a substantial reverse payment by agreeing not to launch its own authorized generic version of Nexium in competition with Ranbaxy's product for a substantial period of time. Defendants intentionally concealed the true purpose and nature of these exclusion payments to avoid liability under the antitrust laws.

6.       Although the Exclusion Payment Agreements purported to settle patent infringement suits that AstraZeneca filed against the Generic Defendants with respect to patents that purportedly cover Nexium, AstraZeneca used the strength of its wallet as opposed to the strength of its patents to obtain the agreement of the Generic Defendants not to launch their generic Nexium products. In light of the substantial possibility that AstraZeneca's Nexium patents would be invalidated and/or that the Generics' products would be adjudged non-infringing -- in which case AstraZeneca would have been unable to keep generic versions of Nexium from swiftly taking the vast majority of sales of Nexium -- AstraZeneca agreed to share its monopoly rents with the Generic Defendants as a *quid pro quo* for the Generic Defendants' agreement not to compete with AstraZeneca in the delayed-release esomeprazole magnesium market until May 27, 2014.

7.       The Generic Defendants knew that it would be more profitable to be paid not to compete than to enter the market. Had the Generic Defendants all launched generic versions of Nexium, as they were preparing and poised to do, the competition among them would have driven down the price of generic Nexium. Once there are multiple generic versions of the same brand drug available, the generic becomes a commodity, with little to distinguish one generic from another except price. By agreeing to delay entry in exchange for a portion of AstraZeneca's

monopoly profits from Nexium paid as a Exclusion Payment, the Generic Defendants knew that they could earn a greater profit than by simply selling generic Nexium.

8.  AstraZeneca and Ranbaxy also knew and intended that their Exclusion Payment Agreement would prevent other generic companies from launching their own generic Nexium before Ranbaxy, thereby creating a bottleneck.  As the first-filer of an ANDA for generic Nexium, Ranbaxy is entitled to market its generic Nexium for 180 days free of competition from other generic Nexium products (except a generic version authorized by AstraZeneca pursuant to its NDA).  The operation of the Exclusion Payment Agreement between AstraZeneca and Ranbaxy blocked all other generic Nexium products from coming to market until 180 days after May 27, 2014 because, absent circumstances discussed below, the FDA will not approve subsequently-filed ANDAs until Ranbaxy's exclusivity period has run, which will not occur until 180 days after Ranbaxy launches.  It also blocked an authorized generic version of Nexium until that same time, because as primary consideration for Ranbaxy's agreement to delay launch of generic Nexium, AstraZeneca agreed not to launch an authorized generic version of Nexium until 180 days after Ranbaxy launched.

9.  Although it is possible that Ranbaxy could forfeit its 180 day exclusivity by failing to commence commercial marketing of its generic Nexium products within 75 days of a court decision that all of the patents for Nexium listed in the FDA's list of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book," are invalid or not infringed, AstraZeneca made sure that the second and third ANDA-filers for Nexium -- Teva and Dr. Reddy's -- would not break the bottleneck caused by its Exclusion Payment Agreement with Ranbaxy by obtaining such a court decision.  When Teva and Dr.

Reddy's were about to obtain a court determination on the issue of the invalidity and/or non-infringement of the Nexium patents, AstraZeneca paid them too, pursuant to the Exclusion Payment Agreements, to drop their patent challenges and stay out of the market until after Ranbaxy could enter the market pursuant to its Exclusion Payment Agreement with AstraZeneca.

10.     But for one or more of the unlawful Agreements at issue here, generic versions of Nexium would have entered the market by December 1, 2008.   The FDA granted tentative approval to Ranbaxy's generic Nexium products on February 5, 2008, which, absent the illegal Agreements complained of herein, would have been converted to a final approval in approximately November 2008.   Thus, absent Defendants' illegal Agreements, CVS would have already been able to purchase its delayed-release esomeprazole magnesium requirements at significantly lower prices.   Because of Defendants' illegal agreements in restraint of trade, however, CVS has been forced to pay high prices for branded Nexium.

11.     Defendants' unlawful Exclusion Payment Agreements were designed to and did: (a) block the entry of less expensive generic versions of delayed-release esomeprazole magnesium in the United States; (b) fix or raise the prices of delayed-release esomeprazole magnesium products; (c) permit AstraZeneca to maintain a monopoly in the United States for delayed-release esomeprazole magnesium; (d) allocate 100% of the United States delayed-release esomeprazole magnesium market to AstraZeneca; and (e) allocate 100% of United States generic Nexium sales to Ranbaxy during the first 180 days of generic sales.

12.     As alleged in more detail below, through their overarching anticompetitive scheme, Defendants violated § 1 and § 2 of the Sherman Act through their conspiracy to

improperly maintain their market power by foreclosing competition from lower-priced generic versions of delayed-release esomeprazole magnesium.

## JURISDICTION AND VENUE

13.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover threefold damages, injunctive relief, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' unlawful foreclosure of the United States market for delayed-release esomeprazole magnesium (Nexium and its AB-rated generic equivalents).   The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), 1407.

14.     Defendants transact business within this district and/or have an agent and/or can be found in this district.   Venue is appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. §§ 22, 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1407.

## PARTIES

15.     Plaintiff CVS Pharmacy, Inc. is a corporation organized and existing under the laws of the State of Rhode Island with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895 ("CVS").   CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through its mail service dispensing pharmacies and more than 7,600 retail drugstores operated by its affiliates.   CVS brings this action on its own behalf and as the assignee of McKesson Corporation and Cardinal Health, Inc., both of which purchased Nexium directly from AstraZeneca during the relevant period for resale to CVS.   With respect to the claims asserted in this Complaint, CVS opted out of the two classes certified by the Court in *In re Nexium (Esomeprazole) Antitrust Litigation*, No.

12-md-02409-WGY (DE 714-2), by sending letters to the claims administrators of both classes in January 2014 in accordance with the procedures approved by the Court.

16.     Defendant AstraZeneca AB is a company organized and existing under the laws of Sweden, having its principal place of business in Sodertalje, Sweden.

17.     Defendant Aktiebolaget Hassle is a company organized and existing under the laws of Sweden, having its principal place of business in Molndal, Sweden.

18.     Defendant AstraZeneca LP is a limited partnership organized under the laws of Delaware, having its principal place of business in Wilmington, Delaware.   AstraZeneca LP holds an approved New Drug Application from the FDA for a delayed-release esomeprazole magnesium formulation that it sells throughout the United States under the brand name Nexium.

19.     Defendants AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP are referred to collectively herein as "AstraZeneca."

20.     Defendant Ranbaxy Pharmaceuticals, Inc., is a company organized and existing under the laws of Florida, with its principal place of business at 9431 Florida Mining Blvd. East, Jacksonville, Florida, and having a place of business at 600 College Road East, Suite 2100, Princeton, New Jersey.   This defendant is a wholly-owned subsidiary of Ranbaxy Laboratories Limited.

21.     Defendant Ranbaxy Laboratories Limited is a public limited liability company organized and existing under the laws of India, with a principal place of business located at Plot 90, Sector 32, Gurgaon-122001 (Haryana), India.

22.     Defendant Ranbaxy, Inc. is a Delaware corporation, having a place of business at 600 College Road East, Suite 2100, Princeton, New Jersey.

24.     Defendants Ranbaxy Pharmaceuticals, Inc., Ranbaxy Laboratories Limited, and

Ranbaxy, Inc. (collectively "Ranbaxy") are engaged in the worldwide marketing, production and

distribution of generic pharmaceutical products.

25.     Defendant Teva Pharmaceutical Industries, Ltd. is an Israeli corporation, having

its principal place of business at 5 Basel St, P.O. Box. 3190, Petach Tikva 49131, Israel.

26.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation, having a

principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania

19454.

27.     Defendants Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA,

Inc. (collectively "Teva") are the largest generic manufacturers of pharmaceuticals in the world.

28.     Defendant Dr. Reddy's Laboratories, Ltd. is an Indian pharmaceutical company

with its principal place of business at Door No 8-2-337, Road No 3, Banjara Hills, Hyderabad

500034, Andhra Pradesh, India.

29.     Defendant Dr. Reddy's Laboratories, Inc. is a New Jersey corporation with its

principal place of business at 200 Somerset Corp. Blvd., Bridgewater, New Jersey.   On

information and belief Dr. Reddy's Laboratories, Inc. is a wholly owned subsidiary of Dr.

Reddy's Laboratories, Ltd.   Both entities are referred to collectively herein as "Dr. Reddy's."

30.     All of Defendants' actions described in this complaint are part of, and in

furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by

Defendants' various officers, agents, employees, or other representatives while actively engaged

in the management of Defendants' affairs (or that of their predecessors-in-interest) within the

course and scope of their duties and employment, and/or with the actual, apparent, and/or

ostensible authority of Defendants.

## REGULATORY BACKGROUND

**A.** **The Regulatory Structure for Approval of Generic Drugs**
**and Substitution of Generic Drugs for Brand Name Drugs**

31.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who

create a new drug product must obtain the approval of the FDA to sell the new drug by filing a

New Drug Application ("NDA").   21 U.S.C. §§ 301-392.   An NDA must include submission of

specific data concerning the safety and effectiveness of the drug, as well as any information on

applicable patents.   21 U.S.C. § 355(a) and (b).

32.     When the FDA approves a brand name manufacturer's NDA, the brand

manufacturer may list in the Orange Book any patents that the brand manufacturer believes could

reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version

of the brand name drug prior to the expiration of the listed patents.   Patents issued after NDA

approval that claim an approved drug or its approved use must be listed in the Orange Book within

30 days of issuance.   21 U.S.C. § 355(b)(1) and (c)(2).

33.     The FDA relies completely on the brand name manufacturer's truthfulness about

patent validity and applicability, as it does not have the resources or authority to verify the

manufacturer's patents for accuracy or trustworthiness.   In listing patents in the Orange Book,

the FDA merely performs a ministerial act.

### 1.     The Hatch-Waxman Amendments

34.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory

hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and

costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L.

No. 98-417, 98 Stat. 1585 (1984). Pursuant to Hatch-Waxman, a generic manufacturer seeking

approval to sell a generic version of a brand name drug may file an abbreviated new drug

application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness

included in the brand name drug manufacturer's original NDA, and must further show that the

generic drug contains the same active ingredient(s), dosage form, route of administration, and

strength as the brand name drug, and is absorbed at the same rate and to the same extent as the

brand drug -- that is, that the generic drug is pharmaceutically equivalent and bioequivalent to the

brand name drug.

     35.    The FDCA and Hatch-Waxman Amendments permit generic products to be

substituted for brand products if they are bioequivalent. The products must contain identical

amounts of the same active ingredients, have the same route of administration and dosage form,

and meet applicable standards of strength, quality, purity and identity. Bioequivalence

demonstrates that the active ingredient of the proposed generic drug would be present in the blood

of a patient to the same extent and for the same amount of time as the branded counterpart. 21

U.S.C. § 355(j)(8)(B).

     36.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of

non-infringing generic competitors, thereby reducing healthcare expenses nationwide. Congress

also sought to protect pharmaceutical companies' incentives to create new and innovative

products.

     37.    The Hatch-Waxman Amendments achieved both goals, advancing substantially

the rate of generic product launches, and ushering in an era of historic high profit margins for

brand name pharmaceutical companies. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion, with generic drugs accounting for only 18.6% of prescription revenue. By 2009, total prescription drug revenue had soared to $300 billion, with generic drugs accounting for 75% of prescription revenue.

### 2. Paragraph IV Certifications

38.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book

39.     Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

     a.    that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification");

     b.    that the patent for the brand name drug has expired (a "Paragraph II certification");

     c.    that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

     d.    that the patent for the brand name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

40.     If a generic manufacturer files a Paragraph IV certification, a brand name manufacturer has the ability to delay FDA approval of its ANDA simply by suing the ANDA applicant for patent infringement. If the brand name manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until

the earlier of (a) the passage of thirty months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market with its product. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

41.     As an incentive to spur generic companies to challenge weak and invalid patents, the first generic manufacturer to file an ANDA containing a Paragraph IV certification receives 180 days of marketing exclusivity during which the FDA will not approve any other ANDA. For Paragraph IV certifications made after December 2003, the 180 days of marketing exclusivity may be forfeited under certain circumstances described below.

42.     Brand name manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to thirty months. Brand-name manufacturers often sue generics under Hatch-Waxman simply to delay generic competition -- as opposed to enforcing a valid patent that is actually infringed by the generic. Historically, generic firms have prevailed in Paragraph IV Litigation, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in 73% of the cases studied.

43.     The first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic

manufacturers. By agreeing not to begin marketing its generic drug, the first generic applicant can delay the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking." This tactic creates a "bottleneck," because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

### 3. Forfeiture Provisions under the MMA

44. On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic pharmaceutical companies to conspire to delay the start of the first-filer's 180-day period of generic market exclusivity. The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, allowing subsequent ANDA filers to launch their products.

45. Under the "failure to market" provision, a first ANDA applicant will forfeit its 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval, or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that qualified the first applicant for exclusivity (*i.e.,* as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement, (ii) a settlement order entering final judgment that includes a finding that the patent is invalid or not infringed, or (iii) the NDA holder delists the patent from the FDA Orange Book.

46. Brand name manufacturers and first-filing generics are able to structure their settlements to intentionally avoid the failure-to-market provisions and keep the 180-day

exclusivity bottleneck in place.   For example, they may achieve such a result by settling their

litigation before a final judgment of invalidity or non-infringement can be entered with respect to

each of the patents for which the first applicant submitted a Paragraph IV certification, or seeking

a consent judgment settling the litigation that does not include a finding that all of the patents for

which the first applicant submitted a Paragraph IV certification were invalid or not infringed.   In

either case, in order to trigger a forfeiture and gain access to the market, subsequent ANDA

applicants must obtain a judgment that all patents for which the first filing generic company filed

Paragraph IV certifications are invalid or not infringed.   This may require the subsequent ANDA

applicant to initiate a declaratory judgment action over patents that the brand company did not

assert against it in a Paragraph IV Litigation.

    **B.**    **Authorized Generics, No-Authorized Generic Agreements, and Exclusive Licenses**

    47.    In an increasing number of cases, brand companies disguise an exclusion payment

to a first-filing generic company by agreeing not to launch an "authorized generic" version of the

branded drug during the first-filing generic company's initial 180-day marketing exclusivity

period.   An authorized generic is the branded drug, manufactured in exactly the same way as the

branded product, but sold as a generic product under the same approval as the brand product's

original NDA.   Because the brand manufacturer already has approval to sell its branded drug, it

does not need to file an ANDA, or obtain any additional approvals, to market a chemically

identical generic version of the drug.

    48.    For the brand company, an authorized generic launch during the 180-day period

provides a low cost, low risk means to preserve some of the monopoly revenue that would

otherwise be lost to the generic first-filer.   For the generic manufacturer holding a 180-day

exclusivity period, however, an authorized generic launch has a substantial impact on revenue. Generic companies generally make about 80% of their total income on a given generic product during the 180-day exclusivity period, and an authorized generic, when launched during the 180-day exclusivity period, captures a substantial portion of total generic sales during that period. Freedom from an authorized generic during the initial 180-day period is thus exceedingly valuable to the generic company holding that exclusivity -- it doubles the revenues and profits of that generic company.

49.     A generic company holding a 180-day exclusivity period may be willing to delay its entry in return for a brand company's agreement to forgo its own revenue stream and forbear from launching an authorized generic during the 180-day exclusivity period.   In such a case, a brand company sacrifices authorized generic product revenue and profits by making a no-authorized generic agreement, but retains far more in branded profits and sales by using the no-authorized generic agreement to compensate the generic company to delay market entry.   In effect, the branded company compensates the generic company by ensuring higher post-entry sales and profits (which are paid for by CVS and other purchasers of the generic).

50.     No-authorized generic agreements can take a variety of forms.   Most commonly, they are structured as an "exclusive license," in which the brand company licenses the first-filing generic to sell a generic drug and agrees not to compete with the generic during the statutory 180-day exclusivity period.   These are not genuine exclusive licenses because the brand company retains the right to sell the branded drug (*i.e.*, it retains the right to sell the drug so long as it does so at the higher, branded, price).

51.     In a report by the Federal Trade Commission issued at the request of Congress in 2011 entitled *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* the FTC concluded that no-authorized generic agreements can provide significant value to a first-filer generic company and have become a common form of payment from brands to generics to induce delayed generic entry.   The FTC analyzed documents and empirical data covering more than 100 companies and found that the presence of authorized generic competition can reduce the first-filer generic's revenues by more than 50 percent during the 180-day exclusivity period.   The FTC found that a generic company makes significantly less when competing with an authorized generic because the authorized generic takes a significant share of generic sales away from the first-filer, and wholesale and retail prices decrease when the first-filer faces an authorized generic.

52.     For a first-filer generic, like Ranbaxy, of a $3 billion (or more) branded product like Nexium, the difference between selling the only generic product and competing against an authorized generic during the exclusivity period can amount to hundreds of millions if not billions of dollars.   These economic realities are well known in the pharmaceutical industry, and the FTC's authorized generic report cites numerous documents from industry participants confirming the financial impact of an authorized generic.   No-authorized generic agreements like the one between AstraZeneca and Ranbaxy thus allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

C. **Generic Versions of Brand-Name Drugs are Significantly Less Expensive and Take Significant Sales Directly from the Corresponding Brand-Name Versions**

53.     Typically, AB-rated generics are priced significantly below their branded counterparts.   Because of the price differentials, and other institutional features of the pharmaceutical industry, generic versions are liberally and substantially substituted by pharmacists presented with a prescription for the brand-name counterpart.   In particular, generic drugs that are bioequivalent to their brand name counterparts are given an "AB" rating by the FDA.   In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for the brand-name product prescribed, unless the doctor has indicated that the prescription for the brand-name product must be "dispensed as written."   Similarly, insurance plans often require or incentivize such substitution.   As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers, and pharmacy substitution, and thus the loss of sales volume by the brand-name drug to the corresponding generic, accelerates.

54.     Generic competition enables all direct purchasers to: (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand-name drug at a reduced price.   However, until a generic manufacturer enters the market, there is no bioequivalent generic drug to substitute for and otherwise compete with the brand-name drug, and therefore the brand-name manufacturer can continue to charge supracompetitive prices profitably without losing all or a substantial portion of its brand-name sales.

55.     Consequently, brand-name drug manufacturers have a strong incentive to use various tactics, including exclusion payment agreements such as the Agreements alleged above and below, to delay the introduction of generic competition into the market.

- 18 -

## OPERATIVE FACTS

**A.     Defendants' Unlawful Conduct**

> **1.     AstraZeneca Files Paragraph IV Litigation Against Ranbaxy, Teva
> and Dr. Reddy's in a Scheme to Monopolize the Relevant Market**

56.     Nexium is a prescription proton pump inhibitor (PPI) used to treat heartburn and related conditions.   The active ingredient in Nexium is esomeprazole magnesium.   Its pharmacological profile, and thus its side effect and efficacy profile, is different from those of other PPIs, H2 blockers and non-prescription antacids that are used to treat the same or similar conditions.   Those other drugs are not AB-rated to Nexium, cannot be automatically substituted for Nexium by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Nexium, and thus are not economic substitutes for, nor reasonably interchangeable with, Nexium.

57.     On December 3, 1999, AstraZeneca submitted NDA 21-153 seeking FDA approval to market esomeprazole magnesium delayed-release capsules in 20 mg and 40 mg strengths under the brand name Nexium for the healing of erosive esophagitis, maintenance of healing of erosive esophagitis, and treatment of symptomatic gastroesophageal reflux disease. The FDA approved AstraZeneca's NDA for Nexium on February 20, 2001.

58.     In connection with its Nexium NDA, AstraZeneca listed fourteen patents in the FDA Orange Book as covering Nexium or a method of using Nexium (the "Nexium patents"):

| Patent | Expiry |
|---|---|
| U.S. Patent No. 4,786,505 ("the '505 patent") | April 20, 2007 |
| U.S. Patent No. 4,853,230 ("the '230 patent") | April 20, 2007 |

| U.S. Patent No. 4,738,974 ("the '974 patent") | September 1, 2007 |
| --- | --- |
| U.S. Patent No. 5,877,192 ("the '192 patent") | May 27, 2014 |
| U.S. Patent No. 6,875,872 ("the '872 patent") | May 27, 2014 |
| U.S Patent No. 5,690,960 ("the '960 patent") | November 25, 2014 |
| U.S. Patent No. 5,714,504 ("the '504 patent") | February 3, 2015 |
| U.S. Patent No. 5,900,424 ("the '424 patent") | May 4, 2016 |
| U.S. Patent No. 6,369,085 ("the '085 patent") | May 25, 2018 |
| U.S. Patent No. 7,411,070 ("the '070 patent") | May 25, 2018 |
| U.S. Patent No. 6,147,103 ("the '103 patent") | October 9, 2018 |
| U.S. Patent No. 6,191,148 ("the '148 patent") | October 9, 2018 |
| U.S. Patent No. 6,166,213 ("the '213 patent") | October 9, 2018 |
| U.S. Patent No. 6,428,810 ('the '810 patent") | November 3, 2019 |

59. Although the Nexium patents purport to cover, among other things, compounds and pharmaceutical compositions comprised of magnesium salts of esomeprazole, and methods of using those compounds and compositions, there existed a substantial risk that the patents would be invalidated or adjudicated non-infringed upon a challenge from generic manufacturers.

60. Among other reasons for this substantial risk, the Nexium patents are inherently weak because the esomeprazole "invention" described in the various Nexium patents is *prima facie* obvious in light of the prior art, including, but not limited to, AstraZeneca's predecessor PPI drug, Prilosec.

61.     The active ingredient in Prilosec is omeprazole.   Omeprazole is a "racemate," which is a substance consisting of equal parts of two different isomers of the same molecule. The different isomers, known as "enantiomers," are non-superimposable mirror images of one another that are otherwise identical.   Human hands are commonly used to illustrate this principle. A person's left hand and right hand are non-superimposable mirror images of each other.   Pairs of enantiomers share many chemical and physical properties, though they may exhibit very different biologic activity.   For example, it is commonly known that one enantiomer of a pair will be more biologically active than the other.

62.     A 20 mg dose of the racemate omeprazole contains 10 mg of the left-handed or "S" (for *sinister,* the Latin word for "left-handed") enantiomer and 10 mg of the right-handed or "R" enantiomer.   Nexium, which contains esomeprazole, the S-enantiomer of omeprazole, is simply Prilosec without the less active R-enantiomer.

63.     Under well-settled patent law principles, a prima facie case of obviousness exists when there is a structural similarity between the claimed compound and prior art compounds, and the prior art gives reason or motivation to make the claimed compound.   In the case of Nexium, esomeprazole was clearly prima facie obvious in view of the admittedly prior art racemic omeprazole.   And, the evidence establishes that the claims of the Nexium enantiomer patents were invalid as obvious.

64.     AstraZeneca faced substantial risk that its Nexium patents would be invalidated through patent litigation.   In fact, the European Patent Office ruled, first in 2006 and then again in 2011 that two European Nexium patents -- which are similar to U.S. Nexium patents -- were invalid for failing to satisfy the "inventive step" requirement, which is analogous to obviousness

- 21 -

under U.S. patent law. The rulings were made in connection with opposition proceedings brought by generic manufacturers, including at least Generic Defendant Teva.

65. A Canadian Court likewise ruled in 2010 that a patent claiming esomeprazole "having an optical purity of 99.8% or greater" was invalid for lack of sound prediction and obviousness. The Court observed as a basis for its ruling that as of the claim date of May 1993, it was known that omeprazole could be separated into its S- and R- enantiomers, that they would be desirable to use in the treatment of gastric illnesses, that they could be processed in salt form with a magnesium salt, and that a purity of 95.6% (ee) for esomeprazole had been reported as having been achieved in the prior art.

66. By listing the '974 patent, the '505 patent, and the '230 patent in the Orange Book, all of which were first generation Prilosec patents, AstraZeneca took the formal position that these three patents covered Nexium. By making these Orange Book submissions, AstraZeneca implicitly admitted that the original omeprazole patents taught the enantiomer, one skilled in the art would have the knowledge from the Prilosec patents to make the enantiomer, and it would be desirable to make the enantiomer.

67. Because the Nexium patents are particularly susceptible to attack on validity grounds, generic companies were eager to apply for FDA approval to market generic versions of Nexium prior to the expiration of the Nexium patents.

### 2. AstraZeneca Patent Litigation against Ranbaxy

68. On or about October 14, 2005, Generic Defendant Ranbaxy notified AstraZeneca that it had filed ANDA No. 77-830, seeking to market generic versions of Nexium containing 20 mg and 40 mg of esomeprazole magnesium in delayed-release capsules. Ranbaxy's notice letter

included a Paragraph IV certification that the commercial manufacture, use and/or sale of its

generic Nexium product would not infringe any valid claim of any patent that expired after

October 2007 listed in the FDA Orange Book as covering Nexium or a method of using Nexium.

69.     On November 21, 2005, AstraZeneca filed suit against Ranbaxy in the United

States District Court for the District of New Jersey pursuant to Hatch-Waxman (the "Ranbaxy

Litigation"), alleging that Ranbaxy's generic Nexium product would infringe six patents, five of

which were listed in the Orange Book: the '504 patent; the '192 patent; the '872 patent; the '810

patent; the '085 patent; and U.S. Patent No. 5,948,789 ("the '789 patent").

70.     The '789 patent, as a process patent, could not be listed in the Orange Book.

Because AstraZeneca did not list the '789 patent in the Orange Book, it was never included in any

generic manufacturers' Paragraph IV certification, including Ranbaxy's, and AstraZeneca could

not obtain the Hatch-Waxman 30-month stay by bringing an infringement claim on this patent

alone.

71.     Each of the patents was weak and likely to be adjudicated invalid, unenforceable

or non-infringed during the Ranbaxy Litigation.

### 3.     The Asserted Nexium Patents were Likely to be Ruled Invalid, Unenforceable, or Not Infringed

72.     Recall that omeprazole is a racemic mixture of two optically active molecules, the

S-enantiomer and the R-enantiomer.   The '504 patent claims a pharmaceutical formulation

comprised of solid state alkaline salts of the S-enantiomer, which is also referred to as

(-)-omeprazole or esomeprazole.   Importantly, not only is racemic omeprazole prior art to the

'504 patent, but so are the S-enantiomer and the R-enantiomer.   Indeed, the '504 patent itself

concedes that these two enantiomers were known and separated no later than 1990 in the *Journal*

*of Chromatography* 532 (1990) at 305-19.   Not surprisingly, in reviewing the patent application

that would issue as the '504 patent, the examiner at the U.S. Patent and Trademark Office

("PTO") concluded that the salts of the individual enantiomers were invalid as "obvious variants

[sic] over the corresponding racemate because of their presence in the racemate."

73.     To overcome this objection, AstraZeneca represented to the PTO that "the (-)

omeprazole enantiomer, as administered in the form of its alkaline salts, unexpectedly exhibits a

different and more advantageous pharmacokinetic profile than the racemic mixture or the

(+)-enantiomer of omeprazole," citing a declaration of one of its scientists that it submitted in

support of this argument.   Unable to challenge the accuracy of these representations, the PTO

allowed the '504 patent.   Specifically, the PTO relied on AstraZeneca's claim that "the present

application and the Anderson declaration prove" that salts of the S-enantiomer demonstrate

surprising activity.

74.     The FDA, unlike the PTO, had the resources to challenge AstraZeneca's scientific

assertions.   The FDA later reviewed AstraZeneca's data from its clinical studies and concluded

the S-enantiomer not only fails to exhibit surprising activity relative to the racemate, but also fails

to achieve any statistically significant improvement over the racemate.   Reviewing

AstraZeneca's data, the FDA concluded: "Since the difference between the esomeprazole 20

mg/qd and the omeprazole 20 mg/qd observed in study 172 was not reproduced in study 174, the

observed differences in healing rates and symptom relief for esomeprazole 40 mg and omeprazole

20 mg may reflect differences in *dose* rather than *metabolic or pharmacologic differences.*   No

clinical comparisons of 40 mg of esomeprazole with 40 mg of omeprazole were performed to

quantify the effect of metabolic differences of this dose."

75.     The FDA's conclusion is consistent with the findings of other researchers, who concluded that there was no significant difference in the activity of the single enantiomers of omeprazole as compared to each other and the racemate.  *See* Erlandsson, P., *et al., Resolution of the Enantiomers of Omeprazole and Some of its Analogues by Liquid Chromotology on a Triphenylcarbomoylcellulose-based Stationary Phase: The Effect of the Enantiomers of Omeprazole on Gastric Glands.  J. Chromatogr.* 532 (1990) at 305-19 ("Erlandsson"); *see also* Cairns *et al., J. of Chromatogr.* 666 (1995) at 323-28, discussing (+)-omeprazole and (-)-omeprazole.  In fact, AstraZeneca itself admitted "Erlandsson teaches that the omeprazole racemate is equal in potency to the (-)-enantiomer."

76.     Because the S-enantiomer of omeprazole fails to demonstrate sufficiently surprising results, the claims of the '504 patent are obvious in view of the prior art, including various patents directed to the omeprazole racemate.

77.     In addition, German patent application DE 4,035,455 renders the '504 patent invalid under §§ 102 and/or 103.  This application disclosed a method for producing "optically pure compounds from diastereomers" of a class of compounds which included omeprazole and described their use as active ingredients to treat gastric problems.

78.     The claims of the '192 and the '872 patents share the same substantial weaknesses as the '504 patent, and for the same reasons.  Both patents are so closely related to the '504 patent that the PTO rejected the claims of the former patents as merely obvious variants of the latter.  To overcome this rejection, AstraZeneca filed a terminal disclaimer, conceding the similarity of the claims and disclaiming any patent term for the '192 and the '872 patents that would extend beyond the patent term of the '504 patent.

79.     The '192 patent and the '872 patent were also likely to be invalid under 35 U.S.C. §§ 102 and/or 103 in view of, *inter alia,* WO 94/27988 (Example 10), which AstraZeneca itself admitted discloses "[n]ovel salts of the single enantiomers of omeprazole." *See, e.g.,* U.S. Patent No. 5,817, 338, Col. 1, Lines 23-23.

80.     The '085 patent and '810 patent were highly specific and narrow formulation patents that, on that basis alone, likely never would have been infringed.   Further, they were likely to be adjudicated invalid or unenforceable in view of AstraZeneca's disclosures of the hydrates in the '960 patent and the '424 patent.

81.     In addition, Ranbaxy maintained, even in settlement of AstraZeneca's litigation against it, that the '085 patent and the '810 patent would never be infringed by its product.

82.     The '789 patent provided little protection against would-be generic entrants. Numerous prior references -- both for omeprazole products and for esomeprazole itself -- taught processes by which to isolate the omeprazole enantiomers.   At most, the '789 patent ostensibly teaches only one particular asymmetric process to create an isolated omeprazole enantiomer, and that particular process still had a yield of less than 50%.   (An asymmetric process means going right to making the isolated enantiomer without first making the racemic compound.)   And other claims in the '789 patents were simply for other structurally-related sulphoxide compounds that provide no utility to support the claimed inventions.

83.     In short, the '789 patent was likely to either be declared invalid or unenforceable, or non-infringed by Ranbaxy.

84.     AstraZeneca never brought litigation against Ranbaxy on the other nine Nexium Patents it had listed in the Orange Book: the '974 patent, the '505 patent, the '230 patent, the '960

patent, the '424 patent, the '103 patent, the '213 patent, the '148 patent and the '070 patent. Thus, these nine patents would not have barred Ranbaxy's entry into the market in 2008.

85.     There was a substantial chance that AstraZeneca would fail on the infringement claims that it asserted against Ranbaxy.   Absent the unlawful agreement, it is unlikely that the Nexium patents would have barred Ranbaxy's entry into the market in 2008.

### 4.     AstraZeneca Patent Litigation against Teva

86.     On or about January 26, 2006, Generic Defendant Teva notified AstraZeneca that it had filed ANDA No. 78-003, seeking to market generic versions of Nexium containing 20 mg and 40 mg of esomeprazole magnesium in delayed-release capsules.   Teva's notice letter included a Paragraph IV certification that the commercial manufacture, use, and/or sale of its generic product would not infringe any valid claim of any patent listed in the FDA Orange Book as covering Nexium or a method of using Nexium.

87.     On March 8, 2006, AstraZeneca filed suit against Teva in the United States District Court for the District of New Jersey pursuant to Hatch-Waxman, alleging that Teva's generic Nexium product would infringe five of the patents listed in the Orange Book for Nexium: the '504, '192, '872, '810, and '085 patents (the "Teva Litigation").   Subsequently, AstraZeneca amended its complaint by dropping its allegation that Teva infringed the '810 patent and adding an allegation that Teva infringed the '789 patent and the '070 patent.

88.     For reasons previously stated, the '504, '872, '085, '192 and '789 patents were weak and likely to be to be adjudicated invalid, unenforceable or non-infringed during the Teva Litigation.

89.     The '070 patent -- a continuation of the '085 patent -- was so closely related to the '085 patent that the PTO initially rejected the '070 patent on the basis of obviousness and statutory double patenting (35 U.S.C. § 101) because certain claims of the '070 patent were identical to claims in the '085 patent.   The '070 patent was also subject to the same weaknesses and basis for invalidity or non-infringement as the '085 patent.

90.     AstraZeneca never brought litigation against Teva on the other eight Nexium patents it had listed in the Orange Book:   the '974 patent, the '505 patent, the '230 patent, the '960 patent, the '424 patent, the '103 patent, the '213 patent, and the '148 patent.   Thus, these eight patents were not a bar to Teva's entering the market by 2009.

91.     There was a substantial chance that AstraZeneca would fail on the infringement claims that it asserted against Teva.   Absent the unlawful agreement, it is unlikely that the Nexium patents would have barred Teva's early entry into the market.

## 5.     AstraZeneca Patent Litigation against Dr. Reddy's

92.     On August 17, 2006, Generic Defendant Dr. Reddy's notified AstraZeneca that it had filed ANDA No. 78-279, seeking to market generic versions of Nexium containing 20 mg and 40 mg of esomeprazole magnesium in delayed-release capsules. Dr. Reddy's notice letter included a Paragraph IV certification that the commercial manufacture, use, and/or sale of its generic product would not infringe any valid claim of seven of the fourteen Orange Book-listed patents, including the '085 and '810 patents.   On December 4, 2007, Dr. Reddy's amended its ANDA to assert that its proposed generic Nexium product would not infringe the '504, '192 or '872 patents, or that those patents were invalid.

93.     On January 17, 2008, AstraZeneca filed suit against Dr. Reddy's in the United States District Court for the District of New Jersey pursuant to Hatch-Waxman, alleging that Dr. Reddy's generic Nexium product would infringe three of the patents listed in the Orange Book for Nexium: the '504, '872, and '085 patents (the "Dr. Reddy's Litigation").   In reply to Dr. Reddy's answer, AstraZeneca also asserted that Dr. Reddy's proposed generic Nexium product would infringe the '192 patent.

94.     Subsequently, AstraZeneca dropped its claim of infringement against Dr. Reddy's for the '085 patent and entered into a Consent Agreement stating that Dr. Reddy's "ANDA Products do not infringe any claim of the '085 patent and accordingly judgment is entered in favor of [Dr. Reddy's] on Astra's Third Claim For Relief."

95.     On May 19, 2008, Dr. Reddy's filed a complaint for a declaratory judgment against AstraZeneca in the United States District Court for the District of New Jersey seeking a declaratory judgment that its "commercial manufacture, use, offer for sale, sale or importation of its generic equivalent of Nexium or the active ingredient thereof would not infringe" the '960 patent, the '424 patent, the '103 patent, the '213 patent, the '148 patent, or the '810 patent -- patents for which AstraZeneca did not assert infringement against Dr. Reddy's within the 45 days following Dr. Reddy's notice of Paragraph IV certification.   In its Answer, AstraZeneca admitted that Dr. Reddy's proposed esomeprazole magnesium delayed release capsule products "do not infringe the '148 patent" and "do not infringe the '810 patent."

96.     The '504, '872, and '192 patents were weak and likely to be adjudicated invalid, unenforceable, or non-infringed.

97.     AstraZeneca never brought suit against Dr. Reddy's on ten Nexium Patents that it had listed in the Orange Book: the '974 patent, the '505 patent, the '230 patent, the '960 patent, the '424 patent, the '103 patent, the '213 patent, the '148 patent, the '810 patent, and the '070 patent.   Thus, these ten patents were not a bar to Dr. Reddy's entry into the market.

98.     There was a substantial chance that AstraZeneca would fail on the infringement claims that it asserted against Dr. Reddy's.   Absent the unlawful agreement, it is unlikely that the Nexium patents would have barred Dr. Reddy's early entry into the market.

### 6.     AstraZeneca Avoided Likely Patent Litigation Losses by Buying Off its Competition

99.     AstraZeneca's actions against the Generic Defendants were consolidated, and the Generic Defendants conducted discovery focusing on: (1) the enforceability of the Nexium patents; (2) the validity of the Nexium patents' claims; and (3) the strength of AstraZeneca's infringement allegations.   AstraZeneca and the Generic Defendants entered into the Exclusion Payment Agreements before any dispositive motions relating to the Generic Defendants' substantive challenges to the patents were decided.

100.    To prevent generic entry using just its patents (rather than pay-offs), AstraZeneca would have had to show that each of the generic Nexium products infringed its patents and defeat each of the Generic Defendants' invalidity arguments.   Instead, AstraZeneca decided to protect its monopoly by paying all of the Generic Defendants to withdraw their challenges to the validity and enforceability of its patents and delay their introduction of generic Nexium.

101.    As described below, these settlement agreements constituted not only an agreement to delay generic entry between AstraZeneca and each individual Generic Defendant but also an agreement not to compete between and among the Generic Defendants as brokered by

AstraZeneca. Each of the agreements contained the same agreed upon delayed entry date as well as a provision enabling a settling Generic Defendant to enter earlier if one of its generic competitors continued to litigate and established that the Nexium patents were invalid or not infringed.

### 7. AstraZeneca and Ranbaxy Enter an Exclusion Payment Agreement

102. On or about April 14, 2008, shortly after discovery ended and before the court could issue any substantive rulings, AstraZeneca and Ranbaxy entered into the AstraZeneca/Ranbaxy Exclusion Payment Agreement. Pursuant to that Agreement, AstraZeneca ended its litigation against first-filer Ranbaxy, and a consent judgment was entered on the exact same day that the 30-month stay of FDA approval of Ranbaxy's generic Nexium product expired.

103. Under the Exclusion Payment Agreement, Ranbaxy agreed to (a) admit that the '504, '192, '789, '085, '810, and '872 patents were enforceable and valid; (b) admit that its generic Nexium products would infringe the '504, '192, '789, and '872 patents (but not the '810 or '085 patents); and (c) delay launching its generic Nexium product until May 27, 2014 unless otherwise specifically authorized by the Agreement (which included earlier entry by another generic).

104. As the *quid pro quo* for Ranbaxy's agreement to drop its challenge to the Nexium patents listed above and to delay entry of its generic Nexium product until May 27, 2014, AstraZeneca agreed, pursuant to the Agreement, to provide Ranbaxy with consideration worth over a billion dollars.

105.    Shortly after the settlement, Ranbaxy's Chief Executive Officer, Malvinder Singh, boasted that the Agreement would give Ranbaxy as much as *$1.5 billion* in revenue between the date of the Agreement and the end of its 180-day marketing exclusivity in 2014.    Singh characterized the Agreement as "the biggest and most comprehensive settlement to date by any generic company globally."    Upon information and belief, under their Agreement, AstraZeneca has already provided compensation to Ranbaxy worth millions of dollars.

106.    Although AstraZeneca's consideration to Ranbaxy under the Agreement is characterized as compensation for Ranbaxy's performance of manufacturing and distribution services for AstraZeneca, those characterizations are pretextual.    In particular, AstraZeneca licensed Ranbaxy to market generic delayed-release esomeprazole magnesium during Ranbaxy's first-filer 180-day period of generic market exclusivity and agreed not to sell an authorized generic in competition with Ranbaxy -- *i.e.*, it agreed to a no-authorized generic agreement.    This agreement constituted a payment of substantial consideration from AstraZeneca to Ranbaxy, nearly one billion dollars.    In a press statement issued at the time the Exclusion Payment Agreement was publicly disclosed, Ranbaxy stated that the bulk of the revenues from the Exclusion Payment Agreement would accrue in 2014, when Ranbaxy would be able to launch a generic version of Nexium in the United States with a 180-day exclusivity period.

107.    This and other payments from AstraZeneca to Ranbaxy were for Ranbaxy's agreement to delay generic Nexium for over 6 years.    Absent Ranbaxy's agreement to delay generic Nexium, AstraZeneca would not have made the no-authorized generic agreement, agreed to designate Ranbaxy as a supplier of Nexium and Nexium API, made Ranbaxy the authorized generic distributor for Plendil or Prilosec, and/or agreed to the price and/or terms that it did under

- 32 -

those provisions of the Agreement.   AstraZeneca paid Ranbaxy for delayed market entry of generic Nexium.

**8.      AstraZeneca Delays Legitimate Effects to "Uncork" the Bottleneck**

108.    On April 30, 2008, shortly after AstraZeneca and Ranbaxy entered their Agreement, Generic Defendant Teva filed a declaratory judgment action against AstraZeneca seeking a ruling of invalidity and non-infringement regarding the remaining Orange Book-listed patents that AstraZeneca did not assert against Teva in connection with its generic Nexium ANDA.   Teva filed its declaratory judgment action to obtain a favorable judgment regarding all Orange Book-listed Nexium patents and thus uncork the FDA approval bottleneck caused by AstraZeneca's settlement with first-filer Ranbaxy, which (absent a forfeiture event) ensured that Ranbaxy's 180-day marketing exclusivity would not be triggered until May 27, 2014.   Dr. Reddy's followed in May 2008 with its own declaratory judgment action seeking a ruling of non-infringement with respect to the unasserted Orange Book-listed patents.

109.    In response to AstraZeneca's motion to dismiss its declaratory judgment action for lack of jurisdiction, Teva accused AstraZeneca of gaming the system "to take advantage of what [Teva] contends is an *invalid and illegitimate patent monopoly.*"   According to Teva, as a result of the exclusion payment agreement between AstraZeneca and Ranbaxy, if it could not "challenge the patents in suit, the patents will represent a six-year barrier to anyone entering the market, regardless of whether they are valid or would be infringed.   In those circumstances, [Teva] would be precluded from marketing its product and the public would not have access to lower-priced esomeprazole *even though no legitimate patent rights protect defendants' monopoly.*"

- 33 -

110.    The court denied in substantial part AstraZeneca's motion to dismiss the
declaratory actions, but granted AstraZeneca's motion to stay the declaratory actions pending
resolution of the main infringement action.   While the court permitted the declaratory actions to
proceed on reconsideration, AstraZeneca succeeded in delaying by approximately six months
Teva's and Dr. Reddy's efforts to obtain a court judgment that could allow them to enter the
market ahead of May 27, 2014.

### 9.    AstraZeneca and Teva Enter an Exclusion Payment Agreement

111.    Eventually AstraZeneca was able to buy off Teva's patent challenges.

112.    Although claim construction was briefed during the summer of 2009, AstraZeneca
and Teva, pursuant to that Agreement, repeatedly asked the court to postpone construing the
contested claims of the Nexium patents.   As a result, as of January 7, 2010, the court had issued
no substantive rulings.   On or about that date, AstraZeneca and Teva entered into the
AstraZeneca/Teva Exclusion Payment Agreement, which ended the litigation between
AstraZeneca and Teva.

113.    Under the Exclusion Payment Agreement, Teva agreed to: (a) admit that all
patents then listed in the Orange Book as covering Nexium were "all enforceable and valid with
respect to certain products;" (b) admit that its generic Nexium product would infringe the '504,
'192, '789, '085, '872 and '070 patents; and (c) delay launching its generic Nexium until May 27,
2014 unless otherwise specifically authorized by the Agreement (which included earlier entry by
another generic).

114.    As the *quid pro quo* for Teva's agreement to drop its challenge to the Nexium
patents and to delay entry of its generic Nexium products until May 27, 2014, pursuant to the

AstraZeneca/Teva Exclusion Payment Agreement, AstraZeneca agreed to compensate Teva by forgiving a contingent patent infringement liability to AstraZeneca that Teva faced as a result of its "at risk" launch of generic Prilosec.

115.  Teva's contingent liability with respect to Prilosec was enormous.  On September 9, 2004, Teva had commenced an "at risk" launch of generic Prilosec, which was manufactured by its marketing partner, Impax.  In 2008, the Federal Circuit affirmed the district court's ruling that the Prilosec patents were valid and infringed by Impax's generic Prilosec product.  Because Teva and Impax shared the risk with respect to any damages associated with the sale of the generic Prilosec product, Teva faced the potential of owing massive infringement damages to AstraZeneca resulting from years of infringing generic Prilosec sales.  As part of their Exclusion Payment Agreement, Teva and AstraZeneca agreed that Teva would pay only a non-financially material part of the total potential damages from generic Prilosec.  By forgiving virtually all of Teva's contingent liability to AstraZeneca with respect to a different drug, AstraZeneca paid Teva.

116.  The true purpose and effect of the payment to Teva was to delay generic Nexium until May 27, 2014.  Absent Teva's agreement to delay generic Nexium, AstraZeneca would not have forgiven Teva substantially all of the contingent liability on Prilosec and/or would not have done so on the terms that it did.  AstraZeneca paid Teva for delayed market entry of generic Nexium.

### 10.  AstraZeneca and Dr. Reddy's Enter an Exclusion Payment Agreement

117.  On or about January 28, 2011, before the court could issue any dispositive decision regarding the validity or infringement of the Nexium patents, AstraZeneca and Dr. Reddy's

Case 3:19-cv-02409-WGY   Document 39-1   Filed 03/09/20   Page 51 of 70
Case 1:12-md-02409-WGY   Document 976-1   Filed 09/03/14   Page 48 of 67
Case 1:14-cv-11788-WGY   Document 1   Filed 04/11/14   Page 36 of 55

entered the AstraZeneca/Dr. Reddy's Exclusion Payment Agreement, which ended the litigation between AstraZeneca and Dr. Reddy's and delayed entry of Dr. Reddy's generic Nexium products until May 27, 2014, unless specifically authorized by the Agreement (which included earlier entry by another generic). Dr. Reddy's made no admissions regarding validity or infringement.

118.   As the *quid pro quo* for Dr. Reddy's agreement to drop its challenge to the Nexium patents and to stay out of the Nexium market until May 27, 2014, AstraZeneca agreed to compensate Dr. Reddy's by forgiving a contingent patent infringement liability to AstraZeneca that Dr. Reddy's faced as a result of its "at risk" launch of generic Accolate.

119.   Dr. Reddy's contingent liability with respect to Accolate was substantial. Dr. Reddy's launched its generic version of AstraZeneca's Accolate product "at risk" in November of 2010, following the entry of a summary judgment opinion in Dr. Reddy's favor. At the time of Dr. Reddy's launch, however, that opinion was on appeal. AstraZeneca agreed, as part of and simultaneously with the Exclusion Payment Agreement, to compensate Dr. Reddy's by dropping that appeal, thereby removing the risk that Dr. Reddy's would have to pay substantial damages with respect to its generic Accolate sales.

120.   The true purpose and effect of the payment to Dr. Reddy's was to delay generic Nexium until May 27, 2014. Absent Dr. Reddy's agreement to delay generic Nexium, AstraZeneca would not have forgiven the contingent liability against Dr. Reddy's and/or would not have done so on the terms that it did. AstraZeneca paid Dr. Reddy's for delayed market entry of generic Nexium.

- 36 -

121. By paying Teva and Dr. Reddy's not to market their generic Nexium products before May 27, 2014, and by doing so before the court could rule on the validity or infringement of the Nexium patents, AstraZeneca ensured that the second and third ANDA-filers could not dislodge the FDA approval bottleneck created by its Agreement with first-filer Ranbaxy.

**B.      Anticompetitive Purpose and Effect of the Agreements**

122. The Agreements have enabled AstraZeneca and the Generic Defendants to: (a) delay the entry of less expensive generic versions of Nexium products in the United States; (b) fix, raise, maintain, or stabilize the price of Nexium products; (c) preserve AstraZeneca's monopoly in the U.S. market for Nexium products; (d) allocate 100% of the U.S. market for delayed-release esomeprazole magnesium to AstraZeneca; and (e) allocate 100% of United States generic Nexium sales to Ranbaxy during the first 180 days of generic sales.

123. But for the Agreements: (i) Ranbaxy (and/or another ANDA filer) would have received final marketing approval from the FDA in November 2008, Ranbaxy and/or another ANDA filer would have begun selling AB-rated versions of Nexium by December 1, 2008, and AstraZeneca would have simultaneously launched an authorized generic version of Nexium; and (ii) an increasingly competitive market for delayed-release esomeprazole magnesium would have thereafter emerged as additional generic manufacturers entered the market.

124. Defendants' unlawful concerted action has delayed or prevented the sale of generic Nexium in the United States, and unlawfully enabled AstraZeneca to sell Nexium at artificially inflated, supracompetitive prices. But for Defendants' illegal conduct, generic competition to Nexium would already have occurred. One or more of the Generic Defendants

- 37 -

would have already entered with its generic version of Nexium, and AstraZeneca would have
simultaneously entered with an authorized generic version of Nexium.

## INTERSTATE COMMERCE

125.   Defendants' efforts to monopolize and restrain competition in the market for
delayed-release esomeprazole have occurred in and have substantially affected interstate
commerce.

126.   At all material times, AstraZeneca manufactured, promoted, distributed, and sold
substantial amounts of branded Nexium in a continuous and uninterrupted flow of commerce
across state and national lines and throughout the United States.

## MONOPOLY POWER AND MARKET DEFINITION

127.   At all relevant times, AstraZeneca had monopoly power with respect to
delayed-release esomeprazole magnesium because it had the power to maintain the price of the
drug it sold as Nexium at supracompetitive levels without losing substantial sales to other
products.

128.   A small but significant, non-transitory price increase for Nexium by AstraZeneca
would not have caused a significant loss of sales.

129.   Nexium does not exhibit significant, positive cross-elasticity of demand with
respect to price with any product currently for sale.

130.   Because of, among other reasons, its use and varying ability to heal erosive
esophagitis, maintain the healing of erosive esophagitis, and treat symptomatic gastroesophageal
reflux disease, Nexium is differentiated from all products currently for sale.

131.    AstraZeneca needed to control only Nexium and prevent the entry of its AB-rated generic equivalents, to maintain the price of Nexium profitably at supracompetitive prices.   Only the market entry of a competing, AB-rated generic version of Nexium would render AstraZeneca unable to profitably maintain its current prices of Nexium without losing substantial sales.

132.    AstraZeneca sold Nexium at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

133.    Defendants have had, and exercised, the power to exclude and restrict competition to Nexium and its AB-rated bioequivalents.

134.    To the extent that CVS is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, CVS alleges that the relevant market is delayed-release esomeprazole magnesium (*i.e.,* Nexium and its AB-rated generic equivalents).   During the period relevant to this case, AstraZeneca has been able to profitably maintain the price of delayed-release esomeprazole magnesium well above competitive levels.

135.    AstraZeneca, at all relevant times, enjoyed high barriers to entry with respect to competition in the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

136.    The relevant geographic market is the United States and its territories.

137.    At all relevant times, AstraZeneca's market share in the relevant market was and remains 100%.

## MARKET EFFECTS

138.    Ranbaxy's ANDA was in approvable condition as of February 5, 2008, when it received tentative approval.   The FDA issues tentative approval only when it determines that an

- 39 -

ANDA would otherwise be ready for final approval but for a 30-month stay. Were it not for the AstraZeneca/Ranbaxy Agreement, Ranbaxy would have received final FDA approval in November, 2008, after the expiration of the 30-month stay of FDA approval. Generic Nexium products would have entered the market shortly thereafter.

139. The FDA has not given Ranbaxy's Nexium ANDA final approval solely because the FDA knows that the AstraZeneca/Ranbaxy Exclusion Payment Agreement prevents Ranbaxy from selling generic Nexium until May 27, 2014. By practice, the FDA organizes its priorities around "rate limiters," and the AstraZeneca/Ranbaxy Agreement is a rate limiter that has caused the FDA to wait to issue formal, written approval to Ranbaxy's ANDA. Defendants' Exclusion Payment Agreements had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Nexium from generic competition. Defendants' actions allowed AstraZeneca to maintain a monopoly and to exclude competition in the market for delayed-release esomeprazole magnesium, to the detriment of CVS and other purchasers of the drug.

140. Defendants' Exclusion Payment Agreements have delayed generic competition and unlawfully enabled AstraZeneca to sell Nexium without generic competition. But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Nexium by December 1, 2008, and AstraZeneca would have simultaneously launched an authorized generic version of Nexium.

141. The generic manufacturers seeking to sell generic Nexium had extensive experience in the pharmaceutical industry, including experience obtaining approval for ANDAs, marketing generic pharmaceutical products, manufacturing commercial launch quantities

adequate to meet market demand, and, where appropriate, paying and receiving consideration for selective waiver and/or relinquishment of 180-day first-to-file marketing exclusivities.

142.     Defendants' Exclusion Payment Agreements, which delayed the introduction of generic Nexium in the United States, have caused CVS to pay more than it would have paid for delayed-release esomeprazole magnesium absent Defendants' illegal conduct.

143.     But for the Exclusion Payment Agreements, CVS would have paid less for delayed-release esomeprazole magnesium by (a) substituting purchases of less-expensive generic Nexium for its purchases of more-expensive branded Nexium, and/or (b) receiving discounts on its remaining branded Nexium purchases.

144.     Moreover, due to Defendants' Exclusion Payment Agreements, other generic manufacturers were discouraged from and/or delayed in (a) developing generic versions of Nexium, and/or (b) challenging the validity or infringement of the Nexium patents in court.

145.     Thus, Defendants' unlawful conduct and overarching scheme deprived CVS of the benefits of competition that the antitrust laws were designed to ensure.

146.     During the relevant period, CVS or its assignors purchased substantial amounts of Nexium directly from AstraZeneca.   As a result of Defendants' illegal Exclusion Payment Agreements as alleged herein, CVS was compelled to pay, and did pay, artificially inflated prices for their delayed-release esomeprazole magnesium requirements.   This injury is of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' acts unlawful.

147. As a consequence of Defendants' unlawful conduct and overarching scheme, CVS has sustained substantial losses and damage to its business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

148. Defendants' unlawful conduct threatens continuing loss and damage to CVS unless enjoined by this Court.

149. The limitations period applicable to CVS' claims was tolled by the filing of the first direct purchaser class action on behalf of a class of purchasers that includes CVS or its assignors. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n. 13 (1974) ("commencement of a class action tolls the applicable statute of limitations as to all members of the class").

## CLAIMS FOR RELIEF

### CLAIM I: VIOLATION OF 15 U.S.C. § 2
### (Conspiracy to Monopolize)

(Against AstraZeneca and Ranbaxy)

150. CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

151. At all relevant times, AstraZeneca possessed substantial market power *(i.e.,* monopoly power) in the relevant market. AstraZeneca possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

152. Through the overarching anticompetitive scheme, including the Exclusion Payment Agreement with Ranbaxy, AstraZeneca and Ranbaxy conspired to maintain AstraZeneca's monopoly power in the relevant market in order to block and delay market entry of delayed-release esomeprazole magnesium, *i.e.,* AB-rated generic versions of Nexium. The unlawful Exclusion Payment Agreement between AstraZeneca and Ranbaxy (a) allocated 100%

- 42 -

of the market for delayed-release esomeprazole magnesium in the United States prior to May 27, 2014 to AstraZeneca; (b) prevented the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 6 years or more; (c) fixed the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels; and (d) allocated 100% of United States generic Nexium sales to Ranbaxy during the first 180 days of generic sales.

153.    The goal, purpose, and/or effect of the Exclusion Payment Agreement was to maintain and extend AstraZeneca's monopoly power in the United States market for delayed-release esomeprazole magnesium in violation of Sherman Act Section 2, 15 U.S.C. § 2. The Exclusion Payment Agreement prevented and/or delayed generic Nexium competition and enabled AstraZeneca to continue charging supracompetitive prices for Nexium without a substantial loss of sales.

154.    AstraZeneca and Ranbaxy knowingly and intentionally conspired to maintain and enhance AstraZeneca's monopoly power in the relevant market.

155.    AstraZeneca and Ranbaxy specifically intended that their Exclusion Payment Agreement would maintain AstraZeneca's monopoly power in the relevant market, and injured CVS thereby.

156.    AstraZeneca and Ranbaxy each committed at least one overt act in furtherance of the conspiracy.

157.    As a direct and proximate result of Defendants' concerted conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

## CLAIM II: VIOLATION OF 15 U.S.C. § 2
### (Conspiracy to Monopolize)

(Against AstraZeneca and Teva)

158.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

159.    At all relevant times, AstraZeneca possessed substantial market power *(i.e.,* monopoly power) in the relevant market.   AstraZeneca possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

160.    Through the overarching anticompetitive scheme, including the Exclusion Payment Agreement with Teva, AstraZeneca and Teva conspired to maintain AstraZeneca's monopoly power in the relevant market in order to block and delay entry of delayed-release esomeprazole magnesium, *i.e.,* AB-rated generic versions of Nexium.   The unlawful Exclusion Payment Agreement between AstraZeneca and Teva (a) allocated 100% of the market for delayed-release esomeprazole magnesium in the United States prior to May 27, 2014 to AstraZeneca; (b) prevented the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 6 years or more; and (c) fixed the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels.

161.    The goal, purpose and/or effect of the Exclusion Payment Agreement was to maintain and extend AstraZeneca's monopoly power in the United States market for delayed-release esomeprazole magnesium in violation of Sherman Act Section 2, 15 U.S.C. § 2. The Exclusion Payment Agreement prevented and/or delayed generic Nexium competition and

enabled AstraZeneca to continue charging supracompetitive prices for Nexium without a substantial loss of sales.

162.    AstraZeneca and Teva knowingly and intentionally conspired to maintain and enhance AstraZeneca's monopoly power in the relevant market.

163.    AstraZeneca and Teva specifically intended that their Exclusion Payment Agreement would maintain AstraZeneca's monopoly power in the relevant market, and injured CVS thereby.

164.    AstraZeneca and Teva each committed at least one overt act in furtherance of the conspiracy.

165.    As a direct and proximate result of Defendants' concerted conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

### CLAIM III: VIOLATION OF 15 U.S.C. § 2
### (Conspiracy to Monopolize)

(Against AstraZeneca and Dr. Reddy's)

166.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

167.    At all relevant times, AstraZeneca possessed substantial market power *(i.e.,* monopoly power) in the relevant market.   AstraZeneca possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

168.    Through the overarching anticompetitive scheme, including the Exclusion Payment Agreement with Dr. Reddy's, AstraZeneca and Dr. Reddy's conspired to maintain AstraZeneca's monopoly power in the relevant market in order to block and delay entry of delayed-release esomeprazole magnesium, *i.e.,* AB-rated generic versions of Nexium.   The

unlawful Exclusion Payment Agreement between AstraZeneca and Dr. Reddy's (a) allocated

100% of the market for delayed-release esomeprazole magnesium in the United States prior to

May 27, 2014 to AstraZeneca; (b) prevented the sale of generic versions of Nexium in the United

States, thereby protecting Nexium from any generic competition for 6 years or more; and (c) fixed

the price direct purchasers would pay for delayed-release esomeprazole magnesium at

supracompetitive levels.

169.    The goal, purpose and/or effect of the Exclusion Payment Agreement was to

maintain and extend AstraZeneca's monopoly power in the United States market for

delayed-release esomeprazole magnesium in violation of Sherman Act Section 2, 15 U.S.C. § 2.

The Exclusion Payment Agreement prevented and/or delayed generic competition to Nexium and

enabled AstraZeneca to continue charging supracompetitive prices for Nexium without a

substantial loss of sales.

170.    AstraZeneca and Dr. Reddy's knowingly and intentionally conspired to maintain

and enhance AstraZeneca's monopoly power in the relevant market.

171.    AstraZeneca and Dr. Reddy's specifically intended that their Exclusion

Payment Agreement would maintain AstraZeneca's monopoly power in the relevant market, and

injured CVS thereby.

172.    AstraZeneca and Dr. Reddy's each committed at least one overt act in furtherance

of the conspiracy.

173.    As a direct and proximate result of Defendants' concerted conduct, as alleged

herein, CVS has suffered antitrust injury as alleged above.

- 46 -

### CLAIM IV: VIOLATION OF 15 U.S.C. § 1
### (Agreement Restraining Trade)

(Against AstraZeneca and Ranbaxy)

174.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

175.    In or about April 2008, AstraZeneca and Ranbaxy entered into the AstraZeneca/Ranbaxy Exclusion Payment Agreement, a continuing illegal contract, combination, and conspiracy in restraint of trade pursuant to which AstraZeneca agreed to pay Ranbaxy substantial consideration in exchange for Ranbaxy's agreement to delay bringing generic Nexium to the market, the purpose and effect of which were to: (a) allocate 100% of the market for delayed-release esomeprazole magnesium in the United States prior to May 27, 2014 to AstraZeneca; (b) prevent the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 6 years or more; (c) fix the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels; and (d) allocate 100% of United States generic Nexium sales to Ranbaxy during the first 180 days of generic sales.

176.    The Agreement harmed CVS as set forth above.

177.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

178.    AstraZeneca and Ranbaxy are *per se* liable for the Agreement and/or are liable under a "quick look" and/or rule of reason standard.

179.    There is and was no legitimate, nonpretextual, procompetitive business justification for the Exclusion Payment that outweighs its harmful effect.   Even if there were

some conceivable such justification, the payment was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

180.    As a direct and proximate result of AstraZeneca's and Ranbaxy's anticompetitive conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

## CLAIM V: VIOLATION OF 15 U.S.C. § 1
### (Agreement Restraining Trade)

(Against AstraZeneca and Teva)

181.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

182.    In or about January 2010, and at times prior to the formal execution thereof, AstraZeneca and Teva entered into the AstraZeneca/Teva Exclusion Payment Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which AstraZeneca agreed to pay Teva substantial consideration in exchange for Teva's agreement to delay bringing its generic version of Nexium to the market, the purpose and effect of which were to: (a) allocate 100% of the market for delayed-release esomeprazole magnesium in the United States to AstraZeneca; (b) prevent the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 4 years or more; and (c) fix the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels.

183.    The Agreement harmed CVS as set forth above.

184.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

185.    AstraZeneca and Teva are *per se* liable for the Agreement and/or are liable under a "quick look" and/or rule of reason standard.

186.    There is and was no legitimate, nonpretextual, procompetitive business justification for the Exclusion Payment that outweighs its harmful effect.   Even if there were some conceivable such justification, the payment was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

187.    As a direct and proximate result of AstraZeneca's and Teva's anticompetitive conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

### CLAIM VI: VIOLATION OF 15 U.S.C. § 1
### (Agreement Restraining Trade)

(Against AstraZeneca and Dr. Reddy's)

188.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

189.    Beginning in January 2011, and at times prior to the formal execution thereof, AstraZeneca and Dr. Reddy's entered into the AstraZeneca/Dr. Reddy's Exclusion Payment Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which AstraZeneca agreed to pay Dr. Reddy's substantial consideration in exchange for Dr. Reddy's agreement to delay bringing its generic version of Nexium to the market, the purpose and effect of which were to: (a) allocate 100% of the market for delayed-release esomeprazole magnesium in the United States to AstraZeneca; (b) prevent the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 3 years or more; and (c) fix the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels.

190.    The Agreement harmed CVS as set forth above.

191.    The Agreement covered a sufficiently substantial percentage of the relevant

market to harm competition.

192.    AstraZeneca and Dr. Reddy's are *per se* liable for the Agreement and/or are liable

under a "quick look" and/or rule of reason standard.

193.    There is and was no legitimate, nonpretextual, procompetitive business

justification for the Exclusion Payment that outweighs its harmful effect.   Even if there were

some conceivable such justification, the payment was not necessary to achieve such a purpose,

nor was it the least restrictive means of achieving any such purported justification.

194.    As a direct and proximate result of AstraZeneca's and Dr. Reddy's anticompetitive

conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

## CLAIM VII: VIOLATION OF 15 U.S.C. § 2
### (Monopolization and Monopolistic Scheme)

(Against AstraZeneca)

195.    CVS hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

196.    At all relevant times, AstraZeneca possessed monopoly power in the relevant

market.

197.    Through an overarching scheme, as alleged extensively above, AstraZeneca

willfully maintained its monopoly in the relevant market using restrictive or exclusionary

conduct, rather than by means of greater business acumen, including but not limited to, executing,

implementing, and otherwise complying with the Agreements with Ranbaxy, Teva, and Dr.

Reddy's, in violation of Section 2 of the Sherman Act.

198.    It was AstraZeneca's conscious object to control prices and exclude competition in the relevant market by and through the overarching anticompetitive scheme.

199.    As a direct and proximate result of AstraZeneca's illegal and monopolistic conduct, as alleged herein, CVS has suffered antitrust injury as alleged above.

## CLAIM VIII: VIOLATION OF 15 U.S.C. § 2
### (Attempt to Monopolize)

(Against AstraZeneca)

200.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

201.    AstraZeneca possesses monopoly power in the relevant market, or possesses a dangerous probability of success in achieving monopoly power in the relevant market.

202.    With the specific intent to achieve a monopoly, AstraZeneca willfully maintained its monopoly in the relevant market by its overarching scheme as described herein, including, but not limited to, executing, implementing, and otherwise complying with the Agreements with Ranbaxy, Teva, and Dr. Reddy's, in violation of Section 2 of the Sherman Act.

203.    As a result of AstraZeneca's unlawful exclusionary conduct, generic competition has been suppressed and CVS has been overcharged for delayed-release esomeprazole magnesium, as alleged above.

204.    As a direct and proximate result of AstraZeneca's anticompetitive conduct, CVS has suffered antitrust injury as alleged above.

- 51 -

## CLAIM IX: VIOLATION OF 15 U.S.C. § 1
### (Agreement Restraining Trade)

(Against All Defendants)

205.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

206.    By entering into the Exclusion Payment Agreements, AstraZeneca orchestrated and brokered an agreement between and among the Generic Defendants not to compete with each other or with AstraZeneca, which constituted a continuing illegal contract, combination, and conspiracy in restraint of trade.   AstraZeneca agreed to pay each of the Generic Defendants substantial consideration in exchange for their agreement with AstraZeneca, and between and among each other, to delay generic Nexium until May 27, 2014, the purpose and effect of which was to: (a) allocate 100% of the market for delayed-release esomeprazole magnesium in the United States to AstraZeneca; (b) prevent the sale of generic versions of Nexium in the United States, thereby protecting Nexium from any generic competition for 6 years or more; and (c) fix the price direct purchasers would pay for delayed-release esomeprazole magnesium at supracompetitive levels.

207.    This agreement harmed CVS as set forth above.

208.    This agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

209.    There is and was no legitimate, nonpretextual, procompetitive business justification for this agreement that outweighs its harmful effect.   Even if there were some conceivable such justification, this agreement was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

- 52 -

210.    As a direct and proximate result of Defendants' agreements, CVS has suffered antitrust injury as alleged above.

## CLAIM X: VIOLATION OF 15 U.S.C. § 2
### (Conspiracy to Monopolize)

(Against All Defendants)

211.    CVS hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

212.    At all relevant times, AstraZeneca had monopoly power in the relevant market.

213.    Through the overarching anticompetitive scheme, including the Exclusion Payment Agreements between AstraZeneca, on the one hand, and Ranbaxy, Teva, and Dr. Reddy's, on the other, Defendants conspired to maintain AstraZeneca's monopoly power in the relevant market in order to block and delay market entry of delayed-release esomeprazole magnesium, *i.e.,* AB-rated generic Nexium.   The unlawful Exclusion Payment Agreements between AstraZeneca and the Generic Defendants allocated all sales of delayed-release esomeprazole magnesium in the United States prior to May 27, 2014 to AstraZeneca; delayed the sales of generic Nexium products; and fixed direct purchasers' price for delayed-release esomeprazole magnesium at supracompetitive levels.

214.    The goal, purpose, and/or effect of the conspiracy was to maintain and extend AstraZeneca's monopoly power in the United States market for delayed-release esomeprazole magnesium in violation of Sherman Act Section 2.   The conspiracy prevented and/or delayed generic Nexium competition and enabled AstraZeneca to continue charging supracompetitive prices for Nexium without a substantial loss of sales.

215.   Defendants knowingly and intentionally conspired to maintain and enhance AstraZeneca's monopoly power in the relevant market.

216.   Defendants specifically intended that their conspiracy would maintain AstraZeneca's monopoly power in the relevant market.

217.   As a direct and proximate result of Defendants' concerted conduct, CVS has suffered antitrust injury as alleged above.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A.   A judgment for three times Plaintiff's actual damages, as determined by a jury at trial;

B.   Permanent injunctive relief enjoining Defendants from continuing their unlawful conduct and requiring them to take affirmative steps to dissipate the effects of their prior conduct;

C.   The costs of this suit, including reasonable attorneys' fees as provided by law; and

D.   Such other and further relief as the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated:   April 11, 2014                    Respectfully submitted,


                                            /s/ Douglas H. Patton
                                           _____

                                           Douglas H. Patton
                                           Kenny Nachwalter P.A.
                                           100 Miami Center
                                           201 South BiscaynE Boulevard
                                           Miami, FL 33131
                                           Telephone: (305) 373-1000
                                           Facsimile: (305) 372-1861
                                           dpatton@knpa.com
                                           Attorneys for Plaintiff CVS Pharmacy, Inc.


*Of counsel:*
Barry L. Refsin
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, PA   19103
(215) 568-6200
brefsin@hangley.com

Monica L. Rebuck
Hangley Aronchick Segal Pudlin & Schiller
4400 Deer Path Road, Suite 200
Harrisburg, PA   17110
(717) 364-1007
mrebuck@hangley.com