JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:   (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S NOTICE OF MOTION AND MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(2), 12(B)(6), AND 12(B)(7); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   May 13, 2020<br>Time:   9:00 a.m.<br>Ctrm:   3<br><br>Action Filed:   10/29/2019 |

# **TABLE OF CONTENTS**

**Page(s)**

NOTICE OF MOTION ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

I.      BACKGROUND .................................................................................... 2

    A.      Defendants' Technology and Its Use in Preventing Terrorism and
        Other Crimes ................................................................................... 2

    B.      Use of Plaintiffs' Services in Committing Terrorism and Other
        Crimes .............................................................................................. 4

    C.      Alleged Use of Plaintiffs' Services ................................................ 6

II.     THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF SUBJECT-
    MATTER JURISDICTION BECAUSE DEFENDANTS HAVE DERIVATIVE
    FOREIGN SOVEREIGN IMMUNITY ......................................................... 8

    A.      This Court Lacks Subject-Matter Jurisdiction Under the FSIA ..... 8

    B.      This Court Also Lacks Subject-Matter Jurisdiction Under the
        Doctrine of Derivative Foreign Sovereign Immunity ..................... 9

III.    THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE IT LACKS
    PERSONAL JURISDICTION OVER DEFENDANTS .......................................... 11

    A.      Defendants Did Not Consent to Personal Jurisdiction in
        California ........................................................................................ 11

    B.      The Court Lacks General Jurisdiction Over Defendants ............... 12

    C.      The Court Lacks Specific Jurisdiction Over Defendants ............... 13

        1.      Plaintiffs Do Not Allege That Defendants Purposefully
            Directed Their Alleged Activities Toward California ...... 13

        2.      Plaintiffs Do Not Allege That Defendants Purposefully
            Availed Themselves of the Privilege of Conducting
            Activities in California ..................................................... 16

        3.      Exercising Jurisdiction Over Defendants in California
            Would Be Unreasonable ................................................... 16

IV.     THE COURT SHOULD DISMISS THE CASE UNDER RULE 12(B)(7) FOR
    FAILURE TO JOIN A NECESSARY PARTY ....................................... 18

V.      THE COURT SHOULD DISMISS PLAINTIFFS' CFAA AND TRESPASS TO CHATTELS CLAIMS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6) ................................................................................................ 20

        A.      Plaintiffs Cannot State a CFAA Claim ........................................... 20

                1.      Plaintiffs Cannot State a Claim Based on Defendants' Alleged Access to Plaintiffs' Servers Because They Cannot Plead That Defendants Accessed the Servers Without Authorization ............................................................ 20

                2.      Plaintiffs Cannot State a Claim Based on Defendants' Alleged Access to WhatsApp Users' Phones Because It Did Not Harm Plaintiffs.................................................... 22

                3.      Plaintiffs Cannot State a Claim for Conspiracy Because They Do Not Plead Any Conduct That Would Violate Section 1030(a) ............................................................. 23

        B.      Plaintiffs Cannot State a Claim for Trespass to Chattels Because the Alleged Actions Did Not Damage WhatsApp's Servers ........................ 23

VI.     CONCLUSION.................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ackerson v. Bean Dredging LLC*,
    589 F.3d 196 (5th Cir. 2009) ...............................................................................................10

*Alicog v. Kingdom of Saudi Arabia*,
    860 F. Supp. 379 (S.D. Tex. 1994) ......................................................................................10

*Amberson Holdings LLC v. Westside Story Newspaper*,
    110 F. Supp. 2d 332 (D.N.J. 2000) ......................................................................................15

*Amoco Egypt Oil Co. v. Leonis Navigation Co.*,
    1 F.3d 848 (9th Cir. 1993) ...................................................................................................18

*Andrews v. Sirius XM Radio Inc.*,
    932 F.3d 1253 (9th Cir. 2019) .............................................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................................24

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
    874 F.3d 1064 (9th Cir. 2017) .......................................................................................13, 14

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008) .............................................................................................16

*Broidy Capital Mgmt., LLC v. Qatar*,
    2018 WL 6074570 (C.D. Cal. Aug. 8, 2018)........................................................................9

*Estate of Burkhart v. United States*,
    2008 WL 4067429 (N.D. Cal. Aug. 26, 2008) ....................................................................19

*Butters v. Vance Int'l, Inc.*,
    225 F.3d 462 (4th Cir. 2000) ...............................................................................................10

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015) ...............................................................................................10

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016).......................................................................................................9, 10

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) ...............................................................................................15

*Core-Vent Corp. v. Nobel Indust. AB*,
    11 F.3d 1482 (9th Cir. 1993) ...............................................................................................18

    iii     

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ......................................................................................12

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) .....................................................................19

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) .........................................................................7

*DEX Sys., Inc. v. Deutsche Post AG*,
    727 F. App'x 276 (9th Cir. 2018) ................................................................15

*DNC v. Russian Fed'n*,
    392 F. Supp. 3d 410 (S.D.N.Y. 2019) ...........................................................9

*Doğan v. Barak*,
    2016 WL 6024416 (C.D. Cal. Oct. 13, 2016) ...............................................9

*Doğan v. Barak*,
    932 F.3d 888 (9th Cir. 2019) .........................................................................9

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) .....................................................................22

*Friends of Amador Cty. v. Salazar*,
    2011 WL 4709883 (E.D. Cal. Oct. 4, 2011) ...............................................19

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
    284 F.3d 1114 (9th Cir. 2002) .....................................................................17

*GreatFence.com, Inc. v. Bailey*,
    726 F. App'x 260 (5th Cir. 2018) ................................................................15

*Hungerstation LLC v. Fast Choice LLC*,
    2020 WL 137160 (N.D. Cal. Jan. 13, 2020) ...............................................14

*IAM v. OPEC*,
    649 F.2d 1354 (9th Cir. 1981) .....................................................................11

*Intel Corp. v. Hamidi*,
    30 Cal. 4th 1342 (2003) ..........................................................................23, 24

*Interface Partners Int'l Ltd. v. Hananel*,
    575 F.3d 97 (1st Cir. 2009) ..........................................................................18

*In re iPhone App. Litig.*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......................................................24

*Israel Discount Bank Ltd. v. Schapp*,
    505 F. Supp. 2d 651 (C.D. Cal. 2007) .........................................................18

*Ivey v. Lynch,*
    2018 WL 3764264 (M.D.N.C. Aug. 8, 2018) ..................................................................10

*Joseph Saveri Law Firm, Inc. v. Criden,*
    696 F. App'x 189 (9th Cir. 2017) ..................................................................15

*LVRC Holdings LLC v. Brekka,*
    581 F.3d 1127 (9th Cir. 2009) ..................................................................21

*Martinez v. Aero Caribbean,*
    764 F.3d 1062 (9th Cir. 2014) ..................................................................12

*Moriah v. Bank of China Ltd.,*
    107 F. Supp. 3d 272 (S.D.N.Y. 2015) ..................................................................10, 19

*Mount v. PulsePoint, Inc.,*
    2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016) ..................................................................24

*Myers v. United States,*
    323 F.2d 580 (9th Cir. 1963) ..................................................................10

*Otani Props., L.P. v. Centerline Tool, Inc.,*
    2016 WL 10999268 (C.D. Cal. Mar. 28, 2016) ..................................................................19

*Pam Int'l, Inc. v. James,*
    2006 WL 8455280 (S.D. Cal. Aug. 3, 2006) ..................................................................12

*Perkins v. Benguet Consolidated Mining Co.,*
    342 U.S. 437 (1952) ..................................................................12

*Picot v. Weston,*
    780 F.3d 1206 (9th Cir. 2015) ..................................................................16

*Rep. of the Philippines v. Pimentel,*
    553 U.S. 851 (2008) ..................................................................19

*Rosen v. Terapeak, Inc.,*
    2015 WL 12724071 (C.D. Cal. Apr. 28, 2015) ..................................................................14

*Royal Wulff Ventures LLC v. Primero Mining Corp.,*
    938 F.3d 1085 (9th Cir. 2019) ..................................................................11

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ..................................................................8

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) ..................................................................11, 12, 13, 16

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.,*
    2016 WL 8648638 (C.D. Cal. Aug. 18, 2016) ..................................................................11

*Siderman de Blake v. Rep. of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ......................................................................................9

*Stewart v. Screen Gems–EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) ........................................................................14

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
    313 F. Supp. 3d 1056 (N.D. Cal. 2018) ....................................................................24

*Theofel v. Farey-Jones*,
    359 F.3d 1066 (9th Cir. 2004) ..................................................................................22

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012) ....................................................................................22

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................13, 14, 15

*Walenco, Inc. v. Corbell*,
    126 F. Supp. 3d 1154 (E.D. Cal. 2015) ....................................................................23

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) ......................................................................................................9

**Statutes and Rules**

18 U.S.C.
    § 1030(a)(2)(C) ..............................................................................................20, 21, 23
    § 1030(a)(4) ..........................................................................................................20, 21
    § 1030(b) ..............................................................................................................20, 23
    § 1030(e)(11) ........................................................................................................22, 23
    § 1030(g) ..............................................................................................................22, 23

28 U.S.C.
    § 1604 ..........................................................................................................................9
    § 1605(a)(2) ..................................................................................................................9
    § 1605(a)(5) ..................................................................................................................9

Fed. R. Civ. P.
    12(b)(7) ......................................................................................................................18
    19 ................................................................................................................................18
    19(1)(A) ......................................................................................................................19
    19(b)(1) ......................................................................................................................19

**Other Authorities**

Dan Sabbagh, *Call for Backdoor Access to WhatsApp as Five Eyes Nations Meet*,
    The Guardian (July 30, 2019, 3:32 p.m.) ....................................................................5

Dipesh Gadher, *London Bridge Terror Attack Planned on WhatsApp*, Sunday
    Times (May 12, 2019) ..................................................................................................5

Dov Lieber et al., *Police Tracked a Terror Suspect—Until His Phone Went Dark After a Facebook Warning*, Wall St. J. (Jan. 2, 2020, 3:29 pm)..................................6

Facebook, *Join Us in Facebook Israel as We Bring the World Closer Together*, https://bit.ly/3dkyhoC ....................................................................................18

Gordon Rayner, *WhatsApp Accused of Giving Terrorists 'A Secret Place to Hide' as It Refuses to Hand over London Attacker's Messages*, The Telegraph (Mar. 27, 2017, 1:54 p.m.)...............................................................................................5

Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook over Encryption Plans*, N.Y. Times (Feb. 5, 2020) ..........................................................5

NSPCC, *Facebook Must Be Stopped from Creating Hiding Places for Child Abuse* (Dec. 5, 2019), https://bit.ly/2TxrtfH ................................................................5

Ryan Sabey, *Tool of Terror: Social Media Giants Will Be Made to Hand Over Encrypted WhatsApp Messages in Fight Against Terrorism*, The Sun (Sept. 29, 2019, 7:45 a.m.) ....................................................................................................5

TO THE COURT AND PLAINTIFFS AND THEIR COUNSEL:

PLEASE TAKE NOTICE that on May 13, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, Defendants NSO Group Technologies Limited ("NSO") and Q Cyber Technologies Limited ("Q Cyber") will bring on for hearing before the Honorable Phyllis J. Hamilton, Chief United States District Judge, in Courtroom 3 of the United States Courthouse located in the Ronald V. Dellums Federal Building & United States Courthouse, 1301 Clay Street, Oakland, California, a Motion to Dismiss the Complaint of Plaintiffs WhatsApp Inc., and Facebook, Inc., under Rules 12(b)(1), 12(b)(2), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure. This motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the concurrently-filed Declarations of NSO Chief Executive Officer Shalev Hulio, NSO Chief Financial Officer Nachum Falek, and Joseph N. Akrotirianakis, the pleadings, papers and records on file in this case, and such oral argument as may be presented.

By this Motion, Defendants ask the Court to dismiss the Complaint with prejudice.

## **POINTS AND AUTHORITIES**

Seeking to extend the Computer Fraud and Abuse Act and other causes of action well beyond existing precedent, Plaintiffs bring this action to prevent Defendants from licensing NSO's Pegasus technology that enables sovereign governments to investigate and combat terrorism, child exploitation, and other heinous crimes.

Encrypting communications, like locking doors, serves important goals. As a collateral consequence, however, terrorists and criminals take advantage of Plaintiffs' services to plan and execute illegal schemes, while Plaintiffs disclaim all responsibility for the consequences. NSO supplies governments with a technology they can use to enforce their laws and protect their citizens, much as a manufacturer of a Slim Jim tool outfits police to unlock doors. In this case, however, NSO takes precautions so that only government agencies, not criminals, can use NSO Pegasus technology.

This Court should dismiss the Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(1) and (2). Plaintiffs cannot establish the Court's subject matter jurisdiction— because the conduct alleged in the Complaint was performed by governments protected by the

Foreign Sovereign Immunities Act—or personal jurisdiction over Defendants,

Moreover, this case should be dismissed under Rule 12(b)(7) because Defendants' sovereign customers are necessary parties who cannot be joined under Rule 19. Finally, the allegations, even if accepted as true as required in a challenge under Rule 12(b)(6), do not adequately plead several of the claims alleged.

## I.   BACKGROUND

### A.   Defendants' Technology and Its Use in Preventing Terrorism and Other Crimes

Defendant NSO is an Israeli technology company that designs and markets a highly-regulated technology to government agencies for uses such as counterterrorism and investigating child exploitation and other serious crimes.[1] (Compl. ¶ 5; Declaration of Shalev Hulio ("Hulio Decl.") ¶¶ 5-9.) Defendant Q Cyber, also an Israeli corporation, is NSO's sole director and majority shareholder. (Compl. ¶ 6; Hulio Decl. ¶ 1.) Defendants' customers are exclusively government agencies. (Hulio Decl. ¶ 9; Declaration of Nachum Falek ("Falek Decl.") Exh. 1.) Plaintiffs erroneously allege in their Complaint that Defendants' customers include private entities, citing three newspaper articles. (Compl. ¶ 43 & n.2.) None of the cited articles makes that assertion, however, and it is false. NSO licenses its Pegasus technology only to sovereign government agencies and not to any private entity.[2] (Hulio Decl. ¶ 9, Falek Decl., Exh. 1.)

---

[1] The exhibits to the Complaint demonstrate this. They include a purported email to the Drug Enforcement Agency discussing intelligence applications of NSO's technology (Exh. 2); a document entitled "Our Technology: Helping Governments Maintain Public Safety," which describes NSO's Pegasus technology as "best-in-class technology to help government agencies detect and prevent a wide-range of local and global threats" and to "help government intelligence and law-enforcement agencies use technology to meet the challenges of encryption to prevent and investigate terror and crime." (Exh. 8); a "Product Description" document that describes NSO's Pegasus technology as "a world-leading cyber intelligence solution that enables law enforcement and intelligence agencies to remotely and covertly extract valuable intelligence from virtually any mobile device." (Exh. 10 at 31); and a purported NSO customer agreement from 2015 with a foreign government's communications authority. (Exh. 11).

[2] Facebook once tried to obtain a license from NSO to use certain capabilities of the Pegasus program, the software at issue in this case, in order to circumvent privacy restrictions imposed on it by third party(ies).  (Hulio Decl. ¶ 10.)  Facebook is, of course, not a government agency that conducts counterterrorism and criminal investigations, and NSO declined the sale. (*Id.*)

1    The export of NSO's Pegasus technology is regulated under Israel's Defense Export

2  Control Law ("ECL"). (Hulio Decl. ¶ 5 and Exh. A.) To export its Pegasus technology, NSO is

3  required to register with the Israeli Ministry of Defense ("MoD") and obtain appropriate export

4  licenses. (Hulio Decl. ¶ 6.) Under the ECL, the MoD may investigate NSO and its business and to

5  refuse or cancel NSO's registration. (*Id.*) The MoD is also authorized to grant or deny NSO's

6  licenses, taking into account several factors, including the intended use of NSO's technology and

7  the identity of its customers, as well as to revoke NSO's licenses entirely. (ECL, Hulio Decl. Exh.

8  A, Ch. C (3-4)). The MoD may also request declarations from NSO and information about its

9  customers, and their intended uses of its Pegasus technology. (ECL, *Id*. Ch. D 6 (b)(1-4)). As

10  Plaintiffs' own submissions to the Court demonstrate, the requirements that NSO customers

11  demonstrate their identities and provide any other necessary documentation for approval by the

12  MoD are built directly into NSO customer contracts. (Compl. Exh. 11 § 5.1; Hulio Decl. ¶¶ 6-7.)

13  MoD also requires NSO to have Pegasus' end users sign end-use certificates declaring that NSO's

14  Pegasus technology "will be used only for prevention and investigation of terrorism and criminal

15  activity." (Hulio Decl. ¶ 8.)

16    In addition, NSO has voluntarily undertaken additional steps to ensure that its Pegasus

17  technology is used responsibly by authorized public safety authorities. NSO takes into account

18  U.S. and European Union export control restrictions in addition to the ECL. (Hulio Decl. ¶ 11.) It

19  conducts due diligence on all potential customers, examining publicly available information, rule-

20  of-law considerations, questionnaires, and other items. (*Id.*) As is shown in the exhibits to the

21  Complaint, government customers contractually must provide these due diligence materials before

22  receiving NSO technology. (Compl. Exh. 11 § 2.2.)[3]

23    NSO requires its customers—the government agencies that license NSO's Pegasus

24

25  _____

26  [3] NSO follows an internal process for investigating any misuse. If NSO suspects any improper use of its Pegasus technology by a customer other than in conformity with the customer's contract with

27  NSO, service to that customer would be suspended pending NSO's investigation, and if that investigation revealed ongoing misuse, that customer's license would be terminated.  (Hulio Decl.

28  ¶ 17.)

technology—to agree that they (1) will use NSO technology "only for the prevention or investigation of crimes and terrorism and ensure that the [technology] will not be used for human rights violations" and (2) will immediately notify NSO of any potential misuse. (Hulio Decl. ¶ 12; Compl. Exh. 11, Sec. 2.1 (obligating customer to use NSO technology solely for its intended purpose).) Defendants contractually can suspend—and have suspended, and would terminate—service to customers engaged in any improper use of NSO's Pegasus technology outside these parameters. (Hulio Decl. ¶ 12; Compl. Exh. 11, Sec. 7). Israel may itself deny or revoke export licenses if the Israeli government learns of an abuse of the Pegasus technology or non-compliance with the intended use, such as a use of the technology to violate human rights. (Hulio Decl. ¶ 12.)

Moreover, Defendants' technology is designed with technical safeguards, such as general and customer-specific geographic limitations. (Compl. Exh. 11 at Exhibit A [Dkt. No., 1-1 at p. 74].) One of the limitations is that NSO's technology *cannot* be used against U.S. mobile phone numbers or devices within the United States.. (Compl. Exh. 11 at Exhibit D [Dkt. No. 1-1 at p. 111]; Hulio Decl. ¶ 13.)

In summary, as NSO's Chief Executive Officer and auditor state, and as Plaintiffs' pleading corroborates, Defendants (1) license Pegasus exclusively to government agencies, (2) are regulated by Israeli export control law, (3) voluntarily impose informational and other due diligence requirements on all Pegasus customers, (4) license their Pegasus technology only for national security and law enforcement purposes such as the prevention and investigation of terrorism and other serious criminal activity, and (5) can cancel or suspend service for misuse of NSO's Pegasus technology and have done so.

**B.    Use of Plaintiffs' Services in Committing Terrorism and Other Crimes**

Plaintiff WhatsApp, which is owned by Plaintiff Facebook, alleges it offers an "encrypted communication service" for mobile phones and computers. (Compl. ¶¶ 16-17.) Plaintiffs provide communications services globally through WhatsApp, Facebook Messenger, and Instagram, and allege that "1.5 billion people in 180 countries" use their services. (*Id.*)

Violent criminals and some of the world's most brutal and dangerous terrorists use Plaintiffs' services to plan and execute their crimes, while Plaintiffs disclaim responsibility and

leave it to others—sovereign governments and innocent victims—to deal with the horrendous crimes facilitated by WhatsApp. For example, the Islamic State terrorist who attacked London's Westminster Bridge in 2017 used WhatsApp "two minutes before killing five" in the attack. Ryan Sabey, *Tool of Terror: Social Media Giants Will Be Made to Hand Over Encrypted WhatsApp Messages in Fight Against Terrorism*, The Sun (Sept. 29, 2019, 7:45 a.m.), https://bit.ly/2TuLNhK. Facebook refused to reveal the terrorist's message to authorities, a decision the United Kingdom's Home Secretary called "completely unacceptable." Gordon Rayner, *WhatsApp Accused of Giving Terrorists 'A Secret Place to Hide' as It Refuses to Hand over London Attacker's Messages*, The Telegraph (Mar. 27, 2017, 1:54 p.m.), https://bit.ly/38uHkjl.

Three months later, terrorists used WhatsApp to plan a "knife rampage" on London Bridge. Dipesh Gadher, *London Bridge Terror Attack Planned on WhatsApp*, Sunday Times (May 12, 2019, 12:01 a.m.), https://bit.ly/38xG2Uy. Their use of WhatsApp "may have prevented the authorities from identifying the plot." *Id.* But Plaintiffs again refused to give authorities access to the terrorists' messages. Dan Sabbagh, *Call for Backdoor Access to WhatsApp as Five Eyes Nations Meet*, The Guardian (July 30, 2019, 3:32 p.m.), https://bit.ly/2InSNpZ.

It is no surprise that Plaintiffs dislike Defendants' technology, because it enables sovereign governments to expose how Plaintiffs' platform is used as a safe space for terrorists and other criminals to operate without fear of detection by law enforcement.[4] In May 2019, for example, Facebook notified 1,400 users that their WhatsApp accounts may have been compromised by

---

[4] In one survey of 32 police forces in the United Kingdom and Wales, the National Society for the Prevention of Cruelty to Children ("NSPCC") found that Plaintiffs' products were used repeatedly in crimes against children, including "2,009 instances reported on Instagram, 1,719 on Facebook or Facebook Messenger, and almost 300 on WhatsApp." According to the NSPCC, "Facebook, Instagram and WhatsApp were used in child abuse image and online child sexual offences . . . an average of 11 times a day." NSPCC, *Facebook Must Be Stopped from Creating Hiding Places for Child Abuse* (Dec. 5, 2019), https://bit.ly/2TxrtfH. NSPCC is not alone: a coalition of 129 child-protection services recently confronted Facebook about its decision to "allow child predators to operate with impunity across the company's apps." Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook over Encryption Plans*, N.Y. Times (Feb. 5, 2020), https://nyti.ms/2Isrn2t.

government actors relying on NSO's technology. (Compl. ¶ 44.) At least one of the users Facebook alerted was an Islamic State terrorist who was using WhatsApp to plan an attack during the winter holiday season. Dov Lieber et al., *Police Tracked a Terror Suspect—Until His Phone Went Dark After a Facebook Warning*, Wall St. J. (Jan. 2, 2020, 3:29 pm), https://on.wsj.com/38uXk5s. Facebook's warning "killed" an investigation into the terrorist by a "team of European law-enforcement officials" who had been monitoring the terrorist's WhatsApp messages with NSO's technology. *Id.*

### C. Alleged Use of Plaintiffs' Services

Plaintiffs mistakenly allege in their Complaint that Defendants obtained "unauthorized access [to] and abuse[d] . . . the WhatsApp Service and computers." (Compl. ¶ 1.) Those allegations are false in two fundamental respects: Defendants did not commit the alleged acts, and the alleged acts did not involve unauthorized access to WhatApp computers.

Most significantly, Plaintiffs conflate the actions of Defendants with the actions of NSO's sovereign customers (as other portions of the Complaint recognize, *e.g.*, ¶ 29). Plaintiffs' pleadings show that Defendants license NSO's Pegasus technology to government law enforcement and intelligence agencies and assist with the training, setup, and installation of the Pegasus technology. Defendants do not operate the Pegasus technology—their government customers do that, making all decisions about how to use the Pegasus technology. (Compl. Exh. 10 at 55 ("NSO is responsible to deploy and configure the Pegasus hardware and software at the customer premises"), 58 ("All the necessary hardware is supplied with the system upon deployment and may require local customization that has to be handled by the customer"), 61 ("We [NSO] are responsible for the system setup and training before its hand-over to the customer"); Hulio Decl. ¶ 14)

If anyone installed Pegasus on any alleged "Target Devices" (Compl. ¶ 1) it was not Defendants. It would have been an agency of a sovereign government. (Hulio Decl. ¶ 15.) Defendants' business model consists of selling NSO's Pegasus technology to governments and providing basic technical support for them. All support activities by NSO are performed entirely at NSO's customers' direction. (Hulio Decl. ¶ 14; Compl. ¶ 29 (describing Defendants' role as licensing, selling support services and offering technical support).) Contrary to Plaintiffs' salacious

1   allegations (Compl. ¶ 42), any government agencies that used NSO's Pegasus technology acted

2   within the scope of their sovereign authority to investigate crimes and prevent acts of terror. (Hulio

3   Decl. ¶¶ 14-15); *see* Lieber et al., *supra*.

4   Defendants did not target anyone, and in fact contractually prohibit their customers from

5   using NSO's Pegasus technology against people who are not suspected terrorists or criminals.

6   (Hulio Decl. ¶ 17.) If a government ever misused NSO's Pegasus technology to monitor WhatsApp

7   users other than criminals or terrorists, Defendants have no knowledge of that misuse, which would

8   be a violation of that government's contract with NSO. (*Id.*)

9   In short, all of the alleged conduct Plaintiffs challenge was conducted by sovereign

10   governments outside of the United States. (Hulio Decl. ¶¶ 13-14; *see* Compl. ¶ 43). To challenge

11   that conduct, Plaintiffs must ask this Court to declare illegal the sovereign acts of those

12   governments. For that reason, permitting this litigation to proceed would infringe critical national

13   security and foreign policy concerns of sovereign governments.

14   Even if Defendants (as opposed to government agencies) had sent messages to WhatsApp

15   users in the manner alleged by Plaintiffs,[5] it would have been within the scope of conduct

16   authorized by Plaintiffs. Plaintiffs allege that Defendants' employees used WhatsApp subject to

17   WhatsApp's Terms of Service ("TOS"). (Compl. ¶ 30.) The TOS grant users a "license to use

18   [WhatsApp's] Services,"[6] which requires sending messages through WhatApp's servers. (*See*

19   Compl. ¶ 36 (explaining that WhatsApp's servers "facilitate[] the initiation of calls between

20   different devices" and "facilitate[] certain data transmissions over the WhatsApp Service").)

21   Plaintiffs do not contend that Defendants had no right to use WhatsApp's servers. Instead,

22   Plaintiffs claim that Defendants "were not authorized to use [the] servers in the[] manner" that

23   they allegedly used them. (Compl. ¶ 36; *see id.* ¶¶ 21–23.)

24

25   [5] This allegation is false, but the Court is required to indulge it as true for purposes of Defendants'

26   Rule 12(b)(6) motion. *Depot, Inc. v. Caring for Montanas, Inc.*, 915 F.3d 643, 653 (9th Cir. 2019).

27   [6] https://www.whatsapp.com/legal?eea=0#terms-of-service. Plaintiffs incorporate the TOS by

28   reference in the Complaint. (Compl. ¶ 19.)

1   Yet Plaintiffs do not allege Defendants used the servers for anything other than to send

2   messages. Plaintiffs do not allege Defendants stole data from Plaintiffs, altered data on Plaintiffs'

3   servers, or obtained information from the servers. And Plaintiffs do not allege Defendants have

4   done anything since May 2019, when Plaintiffs contend they closed the "vulnerability" that

5   Defendants allegedly used to send messages. (Compl. ¶ 44.)

## II.   THE COURT SHOULD DISMISS THE COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE DEFENDANTS HAVE DERIVATIVE FOREIGN SOVEREIGN IMMUNITY

8   Plaintiffs seek to hold Defendants liable for alleged national-security and law enforcement

9   operations performed by sovereign governments. Plaintiffs mistakenly allege that Defendants

10   performed those operations, but that is contradicted by the Plaintiffs' own pleadings, and it is false.

11   Because the alleged conduct was carried out by sovereign governments, the Foreign Sovereign

12   Immunities Act divests this Court of subject-matter jurisdiction.

13   Even if the Court accepts Plaintiffs' allegations as true,[7] the Court would still lack subject-

14   matter jurisdiction because Defendants are protected by derivative foreign sovereign immunity. If

15   Plaintiffs were suing the sovereign governments directly, those governments would be immune.

16   Defendants, as agents of those governments who acted at their direction, are derivatively immune.

17   ### A.   This Court Lacks Subject-Matter Jurisdiction Under the FSIA

18   Defendants did not conduct any of the activities that form the basis of Plaintiffs' claims.

19   Most importantly, Defendants did not use WhatsApp's servers to install NSO's Pegasus

20   technology on any WhatsApp user's device. (Hulio Decl. ¶¶ 14-15, 17.) As described above and

21   in the accompanying declaration of NSO CEO Shalev Hulio, if any entity did so, it was a sovereign

22   government acting to protect its own interests. *Supra* Part I.C; (Hulio Decl. ¶ 15).[8]

23   Those sovereign governments, however, cannot be sued in this Court. The FSIA "sets forth

---

[7] The Court may consider extrinsic evidence in support of Defendants' Rule 12(b)(1) motion and need not accept the allegations in the Complaint as true. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[8] All of Defendants' customers are sovereign governments. (Hulio Decl. ¶ 9; Falek Decl. Exh. 1.) Plaintiffs make no credible allegation that any customer was not a sovereign government; nor could they.

the general rule that foreign states are immune from the jurisdiction of both federal and state courts in the United States." *Siderman de Blake v. Rep. of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992). Unless one of the FSIA's exceptions apply, "[a] federal court lacks subject matter jurisdiction over a claim against a foreign state." *Id.*; *see* 28 U.S.C. § 1604.

There is no plausible argument that any of the FSIA's exceptions apply in this case. The "commercial activity" exception, 28 U.S.C § 1605(a)(2), does not apply because using technology in the manner alleged in the complaint is not "the type of action by which private, commercial enterprises typically engage in trade or commerce." *Broidy Capital Mgmt., LLC v. Qatar*, 2018 WL 6074570, at *8–9 (C.D. Cal. Aug. 8, 2018); *see DNC v. Russian Fed'n*, 392 F. Supp. 3d 410, 429 (S.D.N.Y. 2019) (holding hacking by foreign government not commercial activity). And the "noncommercial tort" exception, 28 U.S.C § 1605(a)(5), does not apply because it requires "one entire tort"—"not only the injury but also the act precipitating that injury"—to have occurred in the United States. *Broidy*, 2018 WL 6074570, at *4–5. Plaintiffs do not and cannot allege that any entire tort occurred in the United States.

Because sovereign governments were the operators of NSO technology and no FSIA exception applies, the FSIA bars this action.[9] *Siderman de Blake*, 965 F.2d at 706; 28 U.S.C. § 1604.

**B.    This Court Also Lacks Subject-Matter Jurisdiction Under the Doctrine of Derivative Foreign Sovereign Immunity**

It is well-settled that private agents of the United States have derivative sovereign immunity when they are acting within the scope of their employment. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21–22 (1940);

---

[9] To the extent Plaintiffs challenge actions by foreign government officials, this Court lacks jurisdiction under common-law sovereign immunity, which "extends to individual foreign officials for 'acts performed in [their] official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state[.]'" *Doğan v. Barak*, 932 F.3d 888, 893–94 (9th Cir. 2019). That is the case here because foreign countries use Defendants' technology "to advance their own sovereign interests of fighting terrorism and serious crime." (Hulio Decl. ¶ 14.) Those are "irrefutably 'official public acts.'" *Doğan v. Barak*, 2016 WL 6024416, at *9 (C.D. Cal. Oct. 13, 2016), *aff'd*, 932 F.3d 888.

1   *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 206 (5th Cir. 2009); *Myers v. United States*, 323

2   F.2d 580, 583 (9th Cir. 1963). The same principle applies to private agents acting on behalf of

3   foreign sovereigns. *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).

4          The Ninth Circuit has yet to address derivative foreign sovereign immunity, but the Fourth

5   Circuit held in *Butters* that private actors are derivatively immune for actions that they take at the

6   direction of foreign sovereigns. *Id.* at 466. The plaintiff in that case was employed by a company

7   hired by Saudi Arabia. Saudi Arabian officials ordered the company not to promote the plaintiff,

8   and the company complied with the order. The plaintiff sued for gender discrimination, and the

9   Fourth Circuit held that the company was immune because it "was following Saudi Arabia's

10  orders." *Id.* at 466. The court relied on the rule that domestic contractors enjoy derivative immunity

11  when acting for the United States, finding that "[i]t is but a small step to extend this privilege to

12  the private agents of foreign sovereigns." *Id.*[10]

13         Here, Defendants are entitled to derivative sovereign immunity under *Butters*. To the extent

14  they have any role in sovereign governments' use of NSO's technology, such as by setting up the

15  Pegasus technology for their sovereign customers and providing support services, Defendants act

16  "entirely at the direction of their government customers," and "follow those directions

17  completely." (*See* Hulio Decl. ¶ 14; *see also* Compl. ¶ 29 (describing Defendants' role as licensing,

18  selling support services and offering technical support).)[11] Therefore, Defendants are derivatively

19  immune. *Butters*, 255 F.3d at 466.[12]

20

---

21  [10] Other courts have reached the same conclusion. *E.g.*, *Ivey v. Lynch*, 2018 WL 3764264, at *6-

22  *7 (M.D.N.C. Aug. 8, 2018) (following *Butters* to find private agent of foreign official immune); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015) (holding that foreign

23  sovereign immunity "extends beyond current and former government officials to individuals acting as an agent for the government"); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 384 (S.D.

24  Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) (affirming district court holding that agents enjoy derivative immunity when following commands of foreign sovereign employer).

25  [11] For that reason, the exception to derivative immunity for agents who do not follow a

26  government's instructions, *Campbell-Ewald*, 136 S. Ct. at 672; *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015), does not apply.

27  [12] In addition, Plaintiffs' claims would eventually have to be dismissed under the act of state

28  doctrine, which bars lawsuits that "question the legality of the sovereign acts of foreign states."

### III.   THE COURT SHOULD DISMISS THE COMPLAINT BECAUSE IT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

This Court may exercise personal jurisdiction over Defendants only if they would be subject to personal jurisdiction in California under both California's long-arm statute and federal due process. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004). California's long-arm statute "is coextensive with federal due process requirements," so "the jurisdictional analyses under state law and federal due process are the same." *Id.* As a matter of federal due process, jurisdiction exists only if Defendants' alleged contacts with California support either general or specific personal jurisdiction, *id.* at 801–02, or if Defendants consented to personal jurisdiction in California. Plaintiffs have the burden to prove that personal jurisdiction exists. *Id.* at 800. Plaintiffs cannot carry that burden here because Defendants did not consent to jurisdiction, and Plaintiffs do not plead sufficient contacts between Defendants and California. This Court therefore should dismiss for lack of personal jurisdiction under Rule 12(b)(2).

### A.   Defendants Did Not Consent to Personal Jurisdiction in California

Plaintiffs wrongly contend that Defendants consented to personal jurisdiction by accepting the WhatsApp TOS. (Compl. ¶ 12.) At the time Plaintiffs allege Defendants joined WhatsApp, however, the TOS did not require users to consent to personal jurisdiction in California in lawsuits filed by WhatsApp. The TOS provided only that users must consent to jurisdiction in California if a user sues WhatsApp. Between August 2016 and January 2020, the TOS's "Forum and Venue" provision provided:

> [Y]ou agree that *you will resolve any Claim you have with us* … exclusively in the United States District Court for the Northern District of California or a state court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes.

(Declaration of Joseph N. Akrotirianakis ("Akro. Decl') Exh. 6 at 8 (emphasis added).) The

---

*IAM v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981). The alleged actions challenged by Plaintiffs were conducted by sovereign governments acting under their own law. (Hulio Decl. ¶ 14.) Although the Court may not consider declarations or other extrinsic evidence on a motion to dismiss based on the act of state doctrine, *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 2016 WL 8648638, at *2 (C.D. Cal. Aug. 18, 2016), the doctrine will later pose an insurmountable bar for Plaintiffs, *see Royal Wulff Ventures LLC v. Primero Mining Corp.*, 938 F.3d 1085, 1092-95 (9th Cir. 2019).

provision unambiguously applies only to "any Claim *you* have with *us*"—meaning claims by a user *against* WhatsApp. It does not apply to claims by WhatsApp against its users.[13]

**B.    The Court Lacks General Jurisdiction Over Defendants**

General personal jurisdiction, which allows "a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world," *Schwarzenegger*, 374 F.3d at 801, exists only when the defendant's contacts with the forum state "are so constant and pervasive as to render it essentially at home" there, *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (cleaned up). The "'paradigm' fora for general jurisdiction are a corporation's place of incorporation and principal place of business. Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (citations omitted).

Defendants are not subject to general jurisdiction because Defendants are incorporated and have their principal places of business in Israel. (Compl. ¶¶ 5–6; Hulio Decl. ¶ 4.) And this is not the kind of "exceptional case" in which Defendants could be subject to general jurisdiction outside of Israel.[14] Defendants have no offices or employees in California and do no business of any kind there. (Hulio Decl. ¶ 4); see *Martinez*, 764 F.3d at 1070 (finding no general jurisdiction over corporation with "no offices, staff, or other physical presence in California" despite corporation doing some business in California). Plaintiffs do not and could not allege otherwise. Defendants are not "at home" in California.

---

[13]   Even if the TOS's forum-selection clause were ambiguous, any ambiguity in a consent-to-jurisdiction clause must be "construed against the drafter." *Pam Int'l, Inc. v. James*, 2006 WL 8455280, at *4 (S.D. Cal. Aug. 3, 2006). "Unless the document signed by the defendant clearly informs him that his signature subjects him to the jurisdiction of California courts, the courts will not infer that he consented to jurisdiction." *Id.* (quoting *Hunt v. Super. Ct.*, 81 Cal. App. 4th 901, 908 n.5 (2000)) (cleaned up). WhatsApp drafted its TOS, so any ambiguities must be resolved in Defendants' favor. So construed, the TOS does not clearly provide that users consent to personal jurisdiction in California for claims brought by WhatsApp.

[14]   The only case the Supreme Court has described as sufficiently "exceptional" is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952). *Daimler*, 571 U.S. at 139 n.19. The defendant in *Perkins* was a Philippines company that transferred its principal place of business to Ohio during World War II. *Id.* at 129-30.

### C.     The Court Lacks Specific Jurisdiction Over Defendants

To establish specific jurisdiction, "the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail[] himself of the privileges of conducting activities in the forum.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). The "purposeful direction analysis" applies in tort cases, while the "purposeful availment analysis" applies in contract cases. *Schwarzenegger*, 374 F.3d at 802. Even if the defendant has sufficient contacts with the forum state, specific jurisdiction does not exist unless the plaintiff's claim "arises out of or relates to the defendant's forum-related activities." *Id.* And in all events, a court cannot exercise specific jurisdiction if "the exercise of jurisdiction would not be reasonable." *Id.* (internal quotation marks omitted).

Plaintiffs assert claims that sound in both tort and contract, but they cannot establish specific jurisdiction under either the "purposeful direction" or "purposeful availment" tests. Plaintiffs do not plead any case-related actions by Defendants within or targeted toward California. Even if they had, exercising jurisdiction over Defendants would not be reasonable.

### 1.     Plaintiffs Do Not Allege That Defendants Purposefully Directed Their Alleged Activities Toward California

To satisfy the purposeful direction test, also known as the "effects" test, Plaintiffs must show that Defendants "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that [they] kn[ew] [wa]s likely to be suffered in the forum state." *Axiom Foods*, 874 F.3d at 1069. This analysis focuses on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). As a result, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* In this case, there is no claim that any relevant conduct occurred in California, which is convenient for Plaintiffs only because it is their home base.

Plaintiffs allege that Defendants "targeted their actions at . . . [California] residents, WhatsApp and Facebook" (Compl. ¶ 11), but "targeting" a forum resident alone is not sufficient

to show purposeful direction. *Axiom Foods*, 874 F.3d at 1069–70. So even if Defendants targeted Plaintiffs, and even if Defendants knew Plaintiffs are California residents, that would not show that Defendants targeted *California*. *Id.*; *Walden*, 571 U.S. at 288-89.

Plaintiffs also claim that Defendants "targeted their actions at California" (Compl. ¶ 11), but none of their factual allegations support that conclusion. As an initial matter, none of the actions Plaintiffs' challenge was committed by Defendants. Those alleged actions were committed (if at all) solely by sovereign governments using a technological tool licensed from Defendants. (Hulio Decl. ¶ 14).[15] Defendants' only involvement would have been licensing NSO's technology to those governments and helping to install it for their use. (Hulio Decl. ¶ 14). All of that conduct would have occurred in foreign countries.

Even if the Court assumes the truth of Plaintiffs' allegations (which it is not required to do, *Stewart*, 81 F. Supp. 3d at 951), Plaintiffs do not allege that any of Defendants' relevant conduct occurred in or was targeted at California.

Plaintiffs allege that Defendants' WhatsApp "accounts were created using telephone numbers registered in different count[r]ies, including Cyprus, Israel, Brazil, Indonesia, and the Netherlands." (Compl. ¶ 33.) Plaintiffs also allege that Defendants "leased servers and internet hosting services in different countries, including the United States" (*id.* ¶ 34), but they do not allege that any of those servers were in California. In any event, courts have uniformly "rejected the notion that the mere location of a server may give rise to personal jurisdiction." *Rosen v. Terapeak, Inc.*, 2015 WL 12724071, at *9 (C.D. Cal. Apr. 28, 2015) (citing cases); *accord Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020). Nothing in the Complaint suggests that Defendants knew or cared where the alleged servers were located, so the presence of a server in California would be entirely "fortuitous." *Rosen*, 2015 WL 12724071, at *9.

The same is true of the alleged use of Plaintiffs' servers to distribute Pegasus code. Plaintiffs do not allege that any code was routed through Plaintiffs' California servers. (*Id.* ¶¶ 1,

---

[15] The Court can consider extrinsic evidence on Defendants' motion to dismiss for lack of personal jurisdiction. *Stewart v. Screen Gems–EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015).

32, 36–42.) Plaintiffs do not even allege that they *have* California servers. But even if Plaintiffs do have California servers that Pegasus code happened to pass through, that still would not show that Defendants purposefully targeted California. A "server's location" cannot establish personal jurisdiction "where there is no allegation, argument, or evidence that the defendants played any role in selecting the server's location—or that its location was selected with the purpose or intent of facilitating the defendants' business in the forum." *GreatFence.com, Inc. v. Bailey*, 726 F. App'x 260, 261 (5th Cir. 2018).[16] That is the case here, since Plaintiffs decide where to put their servers and which servers WhatsApp messages pass through. Plaintiffs do not allege that Defendants had any knowledge of or control over those decisions. (*See* Hulio Decl. ¶ 16.) Such "'unilateral activity' of a plaintiff" cannot support specific jurisdiction. *Walden*, 571 U.S. at 286.

Furthermore, "the level of contact created by the connection between an out-of-state defendant and a web server located within a forum" is "de minimis." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). The transfer of information from one phone to another, via a server, is "analogous to forwarding calls to a desired phone number through a switchboard." *Amberson Holdings LLC v. Westside Story Newspaper*, 110 F. Supp. 2d 332, 336 (D.N.J. 2000). And the Ninth Circuit has held that "use of the mails, telephone, or other international communications simply do not qualify as purposeful activity" sufficient to create specific jurisdiction. *Joseph Saveri Law Firm, Inc. v. Criden*, 696 F. App'x 189, 192 (9th Cir. 2017) (quoting *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985)). So, even if some of Defendants' WhatsApp messages were transferred through servers in California, and even if Defendants knew that, such contact with California would still be too insignificant to establish purposeful direction. *Carefirst*, 334 F.3d at 402; *Amberson Holdings*, 110 F. Supp. 2d at 336.

Finally, the Defendants' alleged intrusion upon WhatsApp users' devices does not show

---

[16] Cases have upheld specific jurisdiction based on a defendant's use of a plaintiff's servers *when the defendant controlled the location of the server*. *See DEX Sys., Inc. v. Deutsche Post AG*, 727 F. App'x 276, 278 (9th Cir. 2018) (approving specific jurisdiction because defendant's "software was located on California servers pursuant to an agreement reached by the parties"). If a defendant cannot control which server it uses, the server's location is irrelevant to specific jurisdiction. *GreatFence.com*, 726 F. App'x at 261.

that Defendants targeted California. (Compl. ¶¶ 37–42.) Plaintiffs allege that the targeted users were located in foreign countries, not in California. (*Id.* ¶ 43.) Indeed, NSO's technology *cannot* be used to monitor U.S. devices or any device within the geographic bounds of the United States. (Compl. Exh. 11 at Exhibit D [Dkt. No. 1-1 at p. 111]; Hulio Decl. ¶ 13.)

### 2.   Plaintiffs Do Not Allege That Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in California

Plaintiffs cannot satisfy the purposeful availment test because they cannot show that Defendants took any "actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. As already noted, Plaintiffs do not allege that Defendants have any offices or employees in California or conduct any business in this state. None of Defendants' alleged conduct took place in California. *Supra* Part III.B.1. And while Plaintiffs allege that NSO once "obtained financing from California" (Compl. ¶ 11), that cannot support specific jurisdiction because Plaintiffs' claims do not "arise[] out of or relate[] to" this alleged financing. *Schwarzenegger*, 374 F.3d at 802.

Nor did Defendants "execut[e] or perform[] a contract" in California. *Id.* Plaintiffs allege that Defendants agreed to WhatsApp's TOS (Compl. ¶ 30), but "a contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008) (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Instead, Plaintiffs must allege that Defendants "performed some type of affirmative conduct which allow[ed] or promote[d] the transaction of business within the forum state." *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (internal quotation marks omitted). Plaintiffs have not done so. They do not allege that creating a WhatsApp account "created any ongoing obligations with [Plaintiffs] in California" or "require[d] the Defendants to engage in any substantial business in California." *Boschetto*, 539 F.3d at 1017. Without such allegations, Plaintiffs cannot show purposeful availment.

### 3.   Exercising Jurisdiction Over Defendants in California Would Be Unreasonable

Even if Defendants' alleged contacts with California were sufficient to support specific jurisdiction, exercising jurisdiction over Defendants in California would be unreasonable. The

Ninth Circuit analyzes seven factors to assess reasonableness: "(1) the extent of a defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's home state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interests in convenient and effective relief; and (7) the existence of an alternative forum." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002). Here, "[e]ven a cursory glance at the factors reveals the unreasonableness of exercising jurisdiction" over Defendants. *Id.*

First, for the reasons given above, Defendants' "purposeful interjection into [California's] affairs" is negligible at best. *Id.*

Second, the burden on Defendants to litigate in California would be "great, given that it is incorporated in [Israel], owns no property in the forum, and has no employees or persons authorized to act on its behalf there." *Id.* at 1125-26 (Hulio Decl. ¶ 4); and "its potential witnesses and evidence" are "half a world away." *Id.* at 1126 (Hulio Decl. ¶ 4).

Third, any exercise of personal jurisdiction over an Israeli corporation that conducts no operations in California conflicts with Israel's sovereignty. The Ninth Circuit has held that when "the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction." *Id.* at 1126 (quoting *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 852 (9th Cir. 1993)). The conflict is even greater here, where the conduct alleged to have been committed by Defendants was conducted by governments to advance their sovereign interests. (Hulio Decl. ¶ 14.)

Fourth, while California may have a form of interest in hearing claims brought by companies that operate in this state, this case's only connection with California is that Plaintiffs have their principal places of business there. Defendants did not target California as a state in any way, and any effect Defendants' alleged conduct had on California-based servers was incidental. None of the WhatsApp users Defendants allegedly targeted are California residents. In contrast, Israel has a strong interest in this dispute because Defendants are Israeli corporations regulated under Israeli law. (Hulio Decl. ¶¶ 4-5.)

Fifth, the most efficient place to resolve a dispute about NSO's conduct would be in Israel, where Defendants are based and all of their witnesses and evidence located. (Hulio Decl. ¶¶ 4, 19.)

Sixth, Plaintiffs do not require a home-court forum to achieve effective relief. While Plaintiffs may be able to litigate more easily in California, the convenience of plaintiffs is an "insignificant" factor in deciding whether to find jurisdiction. *Core-Vent Corp. v. Nobel Indust. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993). Although Plaintiffs' businesses are based in California, they are massive international corporations with offices in other countries, including Israel. *See* Facebook, *Join Us in Facebook Israel as We Bring the World Closer Together*, https://bit.ly/3dkyhoC. Defendants, in contrast, are Israeli corporations with no presence in any country other than Israel. (Hulio Decl. ¶ 4.)

Seventh, Israel is an available alternative forum. Plaintiffs "ha[ve] the burden of proving the unavailability of an alternative forum," *Leonis*, 1 F.3d at 853, and they have not tried to satisfy that burden. "Courts routinely hold that Israel is a proper forum and dismiss cases on the grounds that it would be more appropriate to hear a case in Israel." *Israel Discount Bank Ltd. v. Schapp*, 505 F. Supp. 2d 651, 659 (C.D. Cal. 2007) (citing cases); *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97, 103 (1st Cir. 2009) (same, finding Israel provided adequate remedy for breach of contract). Moreover, Plaintiffs are presently litigating a case against NSO employees in Israel, (Dkt. No. 18 at 9) and can likewise pursue their claims in this case in Israel. *See Leonis*, 1 F.3d at 853 (finding alternative forum adequate where plaintiffs were defending related case in forum).

The seven reasonableness factors, therefore, overwhelmingly favor a finding that exercising jurisdiction over Defendants would be unreasonable.

## IV.   THE COURT SHOULD DISMISS THE CASE UNDER RULE 12(B)(7) FOR FAILURE TO JOIN A NECESSARY PARTY

The Court should dismiss the Complaint because Plaintiffs did not join Defendants' foreign-sovereign customers under Rule 19. A Court must dismiss an action for failure to join a "required party" when the party cannot be joined and the action, "in equity and good conscience, . . . should be dismissed." Fed. R. Civ. P. 19; *see* Fed. R. Civ. P. 12(b)(7). Defendants' customers are required parties, they cannot be joined, and the action should not proceed without them.

Defendants' customers are required parties because, in their absence, "the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(1)(A). Plaintiffs seek an injunction against Defendants "and all other persons acting in concert with or conspiracy with any of them" from accessing WhatsApp or Facebook, impairing their systems, or violating their TOS. (Compl. Request for Relief ¶ 2.) But Defendants' customers, not Defendants, are the entities that accessed Plaintiffs' services.[17] If the customers are not parties, this Court cannot issue an injunction that binds them, and Plaintiffs cannot receive the injunctive relief they seek. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1155-56 (9th Cir. 2002) (holding parties are required if injunction will be ineffective without them); *Otani Props., L.P. v. Centerline Tool, Inc.*, 2016 WL 10999268, at *1 (C.D. Cal. Mar. 28, 2016) (same); *Friends of Amador Cty. v. Salazar*, 2011 WL 4709883, at *2 (E.D. Cal. Oct. 4, 2011) (same).

Defendants' customers cannot be joined because they are foreign sovereigns immune from suit. *Rep. of the Philippines v. Pimentel*, 553 U.S. 851, 865 (2008). That immunity also requires dismissal. Under *Pimentel*, "[a] case may not proceed when a required-entity sovereign is not amenable to suit." 553 U.S. at 867. That is the case here. Defendants' customers use NSO's technology to advance their own sovereign interests. They are entitled to have the legality of their actions determined in their own courts. *Pimentel*, 553 U.S. at 866. Litigating Plaintiffs' claims in the United States would thus prejudice Defendants' customers by ignoring "their sovereign status" and "bypass[ing] [their] courts without right or just cause." *Id.* at 866-67; *see also* Fed. R. Civ. P. 19(b)(1) (suggesting dismissal when judgment "might prejudice" the absent "person or the existing parties").[18]

---

[17] The Court may consider extrinsic evidence under Rule 12(b)(7). *Estate of Burkhart v. United States*, 2008 WL 4067429, at *2 (N.D. Cal. Aug. 26, 2008).

[18] Proceeding without Defendants' customers as parties would also prejudice Defendants. Defendants do not know which if any of their customers used NSO's technology to monitor the alleged 1,400 WhatsApp users mentioned in the Complaint (Hulio Decl. ¶ 15), and any discovery into that question would be barred by the customers' sovereign immunity, *see Moriah*, 107 F. Supp. 3d at 277–78. Without that discovery, Defendants will not be able to defend themselves at trial by proving they did not monitor the allegedly targeted WhatsApp users.

## V. THE COURT SHOULD DISMISS PLAINTIFFS' CFAA AND TRESPASS TO CHATTELS CLAIMS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)

Defendants did not operate NSO technology to monitor any WhatsApp users. (Hulio Decl. ¶ 14). Plaintiffs' allegations to that effect are contradicted by other information in their own Complaint. But even if the Court assumes that NSO did use the technology in the manner Plaintiffs allege, Plaintiffs do not state a claim for relief under the CFAA or for trespass to chattels. So even if the Court does not dismiss the entire Complaint on jurisdictional grounds, it should still dismiss those claims under Rule 12(b)(6).

### A. Plaintiffs Cannot State a CFAA Claim

Plaintiffs assert claims under three provisions of the CFAA. (Compl. ¶¶ 53–55.) First, they sue under 18 U.S.C. § 1030(a)(2)(C), which applies to defendants who "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." (*Id.* ¶ 53.)[19] Second, they sue under 18 U.S.C. § 1030(a)(4), which applies to defendants who "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value." (*Id.* ¶ 54.) Third, they sue under 18 U.S.C. § 1030(b), which prohibits conspiracies and attempts. (*Id.* ¶ 55.)

Plaintiffs cannot state a CFAA claim under any of these provisions. They cannot state any claim based on Defendants' alleged access to WhatsApp's servers because Defendants had authorization to access those servers. Plaintiffs also cannot state a claim based on Defendants' alleged access to WhatsApp users' phones because that did not cause *Plaintiffs*' alleged injury. Because Plaintiffs cannot plead a violation, they cannot plead a conspiracy or attempt to violate the CFAA.

#### 1. Plaintiffs Cannot State a Claim Based on Defendants' Alleged Access to Plaintiffs' Servers Because They Cannot Plead That Defendants Accessed the Servers Without Authorization

Plaintiffs claim that that Defendants violated the CFAA by accessing WhatsApp's servers

---

[19] For the purposes of this motion only, Defendants assume without conceding that WhatsApp's servers and its users' devices are "protected computers" under the CFAA. (Compl. ¶¶ 51–52.)

"without authorization," (Compl. ¶¶ 53–54), but WhatsApp's TOS explicitly authorized Defendants to access those servers. Because Defendants had authority to access the servers, they did not violate the CFAA by allegedly using the servers in a way forbidden by the TOS.

The Ninth Circuit has held that "a person uses a computer 'without authorization' under §§ 1030(a)(2) and (4) when the person has not received permission to use the computer *for any purpose*." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009) (emphasis added). As long as a defendant "is authorized to use a computer for certain purposes," its access to the computer cannot be "without authorization"—even if the defendant violates limits the computer's owners placed on the defendant's access. *Id.* at 1133.

That rule forecloses Plaintiffs' claims. The TOS expressly grant users a "license to use [WhatsApp's] Services." (Akro. Decl. Exh. 6 at 6.) To use WhatsApp's services, users must send information through WhatsApp's servers. (Compl. ¶ 36). Defendants were, therefore, "authorized to use [WhatsApp's servers] for certain purposes," and their alleged access to those servers was not "without authorization" under the CFAA." *Brekka*, 581 F.3d at 1133-35.

Plaintiffs do not allege that Defendants lacked authorization to use WhatsApp's servers. Instead, they allege that Defendants "were not authorized to use Plaintiffs servers *in th[e] manner*" they used them, *i.e.,* in violation of the TOS. (Compl. ¶ 36 (emphasis added); *see id.* ¶¶ 21–22 (quoting allegedly violated terms).) But *Brekka* is clear that the violation of a company's terms of service does not render access to a computer "unauthorized." When a company "authorizes [a person] to use a company computer subject to certain limitations, the [person] remains authorized to use the computer even if the [person] violates those limitations." *Brekka*, 581 F.3d at 1133. So even if Defendants violated the TOS's limits on their access to WhatsApp's servers, they still did not access the servers "without authorization" under the CFAA.

Nor can Plaintiffs argue that Defendants "exceed[ed] authorized access" to WhatsApp's servers. 18 U.S.C. § 1030(a)(2)(C), (a)(4). The Complaint does not allege that Defendants exceeded authorized access. (Compl. ¶¶ 53–54 (alleging only that Defendants accessed computers "without authorization").) Even if it did, the Ninth Circuit has held that the CFAA's prohibition on "exceed[ing] authorized access" does not apply to "violations of corporate computer use

restrictions." *United States v. Nosal*, 676 F.3d 854, 862–63 (9th Cir. 2012). Such violations are "governed by tort and contract law," not the CFAA. *Id.* at 860; *see Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("[A] violation of the terms of use of a website—without more—cannot establish liability under the CFAA.").

### 2. Plaintiffs Cannot State a Claim Based on Defendants' Alleged Access to WhatsApp Users' Phones Because It Did Not Harm Plaintiffs

Plaintiffs have no basis under the CFAA to challenge anyone's alleged access to foreign cell phones. The CFAA limits its private right of action to "[a]ny person who suffers damage or loss by reason of a violation," 18 U.S.C. § 1030(g), and defines loss as "any reasonable cost to any victim," *id.* § 1030(e)(11). This "is a narrow conception of 'loss,'" and a plaintiff's "theory of loss must conform to the limited parameters of the CFAA's definition." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262–63 (9th Cir. 2019). In particular, the loss must be "caused by computer intrusions, not general injuries unrelated to the hacking itself." *Id.* at 1263.

The losses alleged by Plaintiffs—"expenditure of resources to investigate and remediate Defendants' conduct, damage to [their] reputation, and damage to the relationships and goodwill between [them] and their users and potential users" (Compl. ¶ 73)—were not caused by anyone's access to WhatsApp users' devices. If WhatsApp users' devices had been accessed through some other messaging service, like Signal or Apple iMessage, the effect on the devices would have been identical without any injury to Plaintiffs. Contrast that with a case in which a plaintiff *would* be injured by a defendant's access to a third party's device, such as if the plaintiff "ha[d] rights to data stored on [the device]." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004). That is not what Plaintiffs allege happened here.

According to Plaintiffs' theory of the case, they incurred losses because Defendants allegedly exploited a "vulnerability" in WhatsApp's product. (*Id.* ¶ 44.) That vulnerability—not anything to do with the devices of WhatsApp's users—is what Plaintiffs had to "investigate and remediate." (*Id.* ¶ 73.) And the disclosure of that vulnerability—not merely access to user's devices—was responsible for any loss to Plaintiffs. Plaintiffs' alleged losses, therefore, were not "caused by" Defendants' alleged intrusions into WhatsApp's users' devices. *Andrews*, 932 F.3d at

1263. Plaintiffs were not "victim[s]" of that alleged access, and they cannot sue Defendants for it. 18 U.S.C. § 1030(e)(11), (g).

### 3.   Plaintiffs Cannot State a Claim for Conspiracy Because They Do Not Plead Any Conduct That Would Violate Section 1030(a)

Because Plaintiffs do not adequately plead violations of sections 1030(a)(2)(C) or 1030(a)(4), their claim that Defendants "conspir[ed] and attempt[ed]" to violate those sections necessarily fails. (Compl. ¶ 55.) Section 1030(b) applies only when there is an underlying "offense under subsection (a)." 18 U.S.C. § 1030(b). Plaintiffs do not plead any such "offense under subsection (a)," so their claim under section 1030(b) should be dismissed. *See Walenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176 (E.D. Cal. 2015) (granting summary judgment on section 1030(b) claim because plaintiff did not introduce evidence that defendant "exceeded or attempted to exceed his authorized access" under section 1030(a)).

### B.   Plaintiffs Cannot State a Claim for Trespass to Chattels Because the Alleged Actions Did Not Damage WhatsApp's Servers

Plaintiffs' claim that Defendants committed trespass to chattels against WhatsApp's servers should be dismissed because Plaintiffs do not plead an essential element: that Defendants' conduct damaged Plaintiffs' servers. *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347 (2003).

In *Hamidi*, the California Supreme Court held that a defendant's use of a company's email system to send mass emails did not "damage" the company's computer system or "interfere[] with its ordinary and intended operation." *Id.* at 1353. To state a claim for trespass to chattels based on an electronic communication, the Court held, the plaintiff must show the communication "damage[d] the recipient computer system" or "interfere[d] with the intended functioning of the system, as by significantly reducing its available memory and processing power" or by "prevent[ing]" the owner "from using its computers for any measurable length of time." *Id.* at 1347, 1353, 1356.

Here, Plaintiffs do not allege that Defendants' access to WhatsApp's servers damaged the servers or interfered with their operation. Their alleged "expenditure of resources to investigate and remediate Defendants' conduct" (Compl. ¶ 78) is not damage to their *servers*. Neither is the alleged harm to their reputation, relationships, or goodwill. (*Id.*); *see Hamidi*, 30 Cal. 4th at 1357-

58 (rejecting company's argument that defendant's conduct harmed its goodwill).

Plaintiffs allege, in passing, that Defendants' alleged conduct "burdened Plaintiffs' computer network" (Compl. ¶ 46), but such a "conclusory statement[]," unsupported by any specific factual allegations, should be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs do not quantify the alleged "burden" or allege facts showing, as *Hamidi* requires, that they were "dispossessed" of WhatsApp's servers or that Defendants "prevent[ed]" them from using the servers "for any measurable length of time" or "significantly reduce[d]" the servers' "available memory and processing power." 30 Cal. 4th at 1353, 1356; *see Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at *9 (S.D.N.Y. Aug. 17, 2016) (dismissing trespass to chattels claim in absence of "particularized allegations of diminished device performance" because "plaintiffs must do more than simply claim an unspecified demand on their devices' resources"); *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1069 (N.D. Cal. 2012) (dismissing trespass to chattels claim because allegations that defendants "have taken up valuable bandwidth and storage space" on devices and "shortened [their] battery life" did not "plausibly establish a significant reduction in service constituting an interference with the intended functioning of the system").

In any event, the allegation that Defendants' conduct "burdened" WhatsApp's servers should be disregarded as implausible. *See Iqbal*, 556 U.S. at 679 (allowing courts to use "common sense" to disregard implausible allegations). Plaintiffs allege WhatsApp's servers support "1.5 billion people in 180 countries" (Compl. ¶ 17), and Defendants allegedly used them to send "approximately 1,400" messages (*id.* ¶ 42). The idea that 1,400 messages could significantly impair servers designed to support *1.5 billion* users is fanciful. *See Hamidi*, 30 Cal. 4th at 1356 (rejecting idea that plaintiff sending "thousands of copies of the same message on six occasions" could burden company's computers because "that number is miniscule compared to the amounts of mail sent by commercial operations").

Plaintiffs thus do not allege any harm to or interference with WhatsApp servers. Their trespass-to-chattels claim should be dismissed. *See Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1080 (N.D. Cal. 2018) (dismissing trespass to chattels counterclaim because defendant did not allege plaintiffs' access "impaired the intended functioning of [their] systems");

1  *Hiossen, Inc. v. Kim*, 2016 WL 10987365, at *10 (C.D. Cal. Aug. 17, 2016) (dismissing trespass

2  to chattels claim because plaintiff did not allege that defendants' hacking of plaintiff's servers

3  "interfer[ed] with the intended functioning of the system").

4  **VI.    CONCLUSION**

5          The Court should dismiss Plaintiffs' claims with prejudice.

6

7  Dated:  April 2, 2020                          KING & SPALDING LLP

8

9                                         By:     */s/Joseph N. Akrotirianakis*

10                                                 JOSEPH N. AKROTIRIANAKIS
                                                   AARON S. CRAIG
11                                                 Attorneys for Defendants NSO GROUP
                                                   TECHNOLOGIES LIMITED and Q
12                                                 CYBER TECHNOLOGIES LIMITED

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28