UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHATSAPP INC., et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>NSO GROUP TECHNOLOGIES LIMITED, et al.,<br><br>        Defendants. | Case No. 19-cv-07123-PJH<br><br>**ORDER DENYING MOTION TO DISQUALIFY**<br><br>Re: Dkt. No. 59-4 |

Before the court is plaintiff WhatsApp, Inc.'s ("WhatsApp" or "plaintiff")[1] motion to disqualify. The matter is fully briefed and suitable for decision without oral argument. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES plaintiff's motion for the following reasons.

## BACKGROUND

On October 29, 2019, plaintiffs WhatsApp and Facebook, Inc. filed a complaint ("Compl.") alleging that defendants NSO Group Technologies, Ltd. ("NSO Group") and Q Cyber Technologies Ltd. ("Q Cyber," and together with NSO Group, "defendants") sent malware to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of conducting surveillance of specific WhatsApp users. Dkt. 1, ¶ 1. On or about February 1, 2020, defendants hired King & Spalding, LLP ("K&S") to represent them in the current matter. Dkt. 79-24, Declaration of M. Robert Thornton

---

[1] Only plaintiff WhatsApp moves to disqualify King & Spalding and, therefore, references to "plaintiff" are only to WhatsApp.

("Thornton Decl."), ¶ 13.

The present motion does not directly involve defendants, rather, plaintiff WhatsApp contends that K&S should be disqualified from representing defendants based on a prior representation during which K&S served as counsel to WhatsApp. More specifically, from approximately December 15, 2015 to July 6, 2016, K&S represented WhatsApp in a matter that remains under seal in a separate federal district court. See Dkt. 67 at 3 (discussing sealing standard and the sealed matter); Thornton Decl. ¶¶ 17, 20.

In the prior sealed matter, WhatsApp retained K&S to serve as local counsel for WhatsApp's primary outside counsel on the matter, ZwillGen, PLLC ("ZwillGen"). Opp. at 3. Attorneys at K&S worked with ZwillGen to draft correspondence and court submissions on behalf of WhatsApp and K&S attorney O'Neil participated in face-to-face meetings with WhatsApp personnel as WhatsApp prepared for an in-person meeting related to the sealed matter. Id. at 4. That meeting occurred on February 6, 2016 during which O'Neil represented WhatsApp in person and another partner, Wray, participated by phone. Id. Two other K&S attorneys, Oldham and Mezzina, represented WhatsApp on the matter but did not attend the meeting—Oldham oversaw the filing of court correspondence when O'Neil was not available and Mezzina provided research and analysis on a potential legal issue. Id.

K&S's involvement in the prior representation formally ended on July 6, 2016. Since then all four attorneys who billed time on the prior representation have left the firm.[2] One attorney, Mezzina, has since returned to the firm, rejoining in January 2020. Id. at 6. As stated, K&S began the current representation on or about February 1, 2020. Thornton Decl. ¶ 13. On March 18, 2020, plaintiff's counsel sent correspondence to K&S requesting that they withdraw from this case. Mtn. at 5. After requesting an interval to investigate the circumstances of the prior representation, K&S's general counsel communicated that K&S did not intend to withdraw from the current representation. Id. at

---

[2] Wray was nominated and continues to serve as director of the FBI, Oldham is in-house counsel at Equifax, and Ms. O'Neil passed away.

6; Thornton Decl. ¶ 33.

## DISCUSSION

**A.   Legal Standard**

Motions to disqualify counsel are decided under state law. Radcliffe v. Hernandez, 818 F.3d 537, 543 (9th Cir. 2016) (citing In re Cty. of Los Angeles, 223 F.3d 990, 995 (9th Cir. 2000)).  The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers.  Visa U.S.A., Inc. v. First Data Corp., 241 F. Supp. 2d 1100, 1103 (N.D. Cal. 2003) (citing United States v. Wunsch, 84 F.3d 1110, 1114 (9th Cir. 1996)); accord Metro–Goldwyn–Mayer, Inc. v. Tracinda Corp., 36 Cal. App. 4th 1832, 1837–38 (Ct. App. 1995) ("A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in the furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every manner pertaining thereto.'" (alteration in original) (quoting Cal. Code of Civ. P. § 128)).

Because a motion to disqualify is often tactically motivated and can be disruptive to the litigation process, disqualification is a drastic measure that is generally disfavored and should only be imposed when absolutely necessary. Concat LP v. Unilever, PLC, 350 F. Supp. 2d 796, 814–15 (N.D. Cal. 2004) (citations omitted).  The issue of disqualification

> ultimately involves a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility.  The paramount concern, though, must be the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.  The recognized and important right to counsel of one's choosing must yield to considerations of ethics that run to the very integrity of our judicial process.

Metro–Goldwyn–Mayer, 36 Cal. App. 4th at 1838 (emphasis omitted) (quoting In re Complex Asbestos Litig., 232 Cal. App. 3d 572, 586 (Ct. App. 1991)); see also People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc., 20 Cal. 4th 1135, 1145 (1999).

/ / /

**B.     Analysis**

Plaintiff contends that K&S engaged in an impermissible successive representation in violation of California Rule of Professional Conduct 1.9 and, therefore, the court should disqualify K&S from representing defendants. Mtn. at 8. In support of its motion, plaintiff advances two broad arguments, either sufficient to warrant disqualification. First, the two representations are substantially related such that K&S is presumed to have acquired confidential material. Id. Second, K&S has, in fact, obtained confidential material. Id. at 13.

In determining matters of disqualification, this court follows the standards articulated in the California Rules of Professional Conduct. Visa, 241 F. Supp. 2d at 1103; see Civ. L.R. 11–4. Rule 1.9 provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent." Cal. R. Prof'l Conduct 1.9(a). Also relevant is Rule 1.10(b), which applies when a lawyer has terminated his or her association with a firm. That rule provides:

> When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
>    (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
>    (2) any lawyer remaining in the firm has information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter.

Cal. R. Prof'l Conduct 1.10(b).

In applying Rule 1.9, California courts distinguish between successive representations and simultaneous representations. See Flatt v. Superior Court, 9 Cal.

4

4th 275, 283–84 (1994).³  Where the potential conflict is one that arises out of successive representation of clients with adverse interests, the chief fiduciary value jeopardized is that of client confidentiality.  Id. at 283.  The test used for disqualification in those instances is whether there is a "substantial relationship" between the subjects of the former and current representations.  Id. at 283–84.  Once the substantial relationship is established, access to confidential information by the attorney in the course of the first representation is presumed and disqualification of the attorney's representation of the second client is required; "indeed, the disqualification extends vicariously to the entire firm."  Id. at 283 (citations omitted); see also SpeeDee Oil, 20 Cal. 4th at 1139 ("When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm.").

> This is the rule by necessity, for it is not within the power of the former client to prove what is in the mind of the attorney.  Nor should the attorney have to "engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation."

Global Van Lines, Inc. v. Superior Court, 144 Cal. App. 3d 483, 489 (Ct. App. 1983) (citations omitted).

Here, the parties dispute whether Rule 1.9 or Rule 1.10 provides the applicable standard.  Mtn. at 6; Opp. at 9–10.  There is no question that three of the four K&S attorneys that represented WhatsApp in the prior representation are no longer associated with K&S, which might suggest that Rule 1.10 applies.  One attorney, Mezzina, represented WhatsApp during the prior representation, then departed the firm after the prior representation concluded, and has since rejoined K&S one month prior to K&S's current representation of defendants.  Thornton Decl. ¶¶ 11, 13.  This fact suggests that application of Rule 1.10 may not be on point because if Mezzina gained confidential client

---

³ On November 1, 2018, California adopted new rules of professional conduct and renumbered the prior rules such that current Professional Rule 1.9 was formerly known as Rule 3-310(E).  See Marshall v. Northrop Grumman Corp., No. 216CV06794ABJCX, 2019 WL 4143300, at *4 (C.D. Cal. July 23, 2019) (describing change).

information, there is no reason to think the mere fact of his disassociation would cure his previously gained knowledge.

However, the court need not resolve this quandary because <u>both</u> Rules 1.9 and 1.10(b) require an analysis into whether the prior and current representations are substantially related. If the two matters are substantially related, then Rule 1.10(b)'s exception is not applicable and Rule 1.9(a)'s prohibition on successive representation applies. Conversely, if the two matters are not substantially related, then Rule 1.9's prohibition does not apply and there is no basis to disqualify K&S. Therefore, the court first examines whether the two representations are substantially related and then resolves plaintiff's alternative argument that K&S actually obtained confidential material.

**1. Whether the Two Representations Are Substantially Related**

In determining whether a "substantial relationship" exists a court should consider the similarities between the two factual situations, similarities in legal questions posed, and the nature and extent of the attorney's involvement with the case and whether he was in a position to learn of the client's policy or strategy. <u>Adams v. Aerojet–General Corp.</u>, 86 Cal. App. 4th 1324, 1332 (Ct. App. 2001). In addition, it must be shown that the information from the prior representation is material to the current representation. <u>Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft</u>, 69 Cal. App. 4th 223, 234 (Ct. App. 1999). Information acquired during the first representation is "material" to the second if "it must be found to be directly at issue in, or have some critical importance to, the second representation." <u>Farris v. Fireman's Fund Ins. Co.</u>, 119 Cal. App. 4th 671, 680 (Ct. App. 2004) (citing <u>Jessen v. Hartford Casualty Ins. Co.</u>, 111 Cal. App. 4th 698, 712–13 (Ct. App. 2003)).

Successive representations are substantially related where the facts support a "rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." <u>Jessen</u>, 111 Cal. App. 4th at 713

6

(citations omitted). "[W]hether an attorney should be disqualified in a successive representation case turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." Id. at 709.

### a. Nature of K&S's Prior Representation of WhatsApp

"[W]hen ruling upon a disqualification motion in a successive representation case, the trial court must first identify where the attorney's former representation placed the attorney with respect to the prior client." Id. at 710.

> If the relationship between the attorney and the former client is shown to have been direct—that is, where the lawyer was personally involved in providing legal advice and services to the former client—then it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship.

Id. at 709.

Here, K&S began its prior representation on or about December 15, 2015 and last recorded time on March 16, 2016. Thornton Decl. ¶ 17. During that time, O'Neil and Wray engaged in the majority of the substantive representation concerning WhatsApp. For example, O'Neil and Wray personally participated in both internal and external in-person meetings with WhatsApp and assisted ZwillGen in reviewing and drafting documents. They recorded the majority of time that K&S billed WhatsApp (77.9 hours out of 93.6 total hours). Opp. at 5. Oldham billed 7.4 hours in February 2016 in preparation for a court filing on WhatsApp's behalf. Id. at 4. Mezzina researched appellate-related issues in connection with the prior representation, billing 7.9 hours in February 2016. Id. at 4–5. These facts clearly indicate a direct relationship between K&S attorneys and WhatsApp, even though K&S served as local counsel to ZwillGen.

### b. Factual and Legal Similarities

The second part of the substantial relationship inquiry asks whether the "subjects"

7

1  of the prior and current representations "are linked in some rational manner." Jessen,
2  111 Cal. App. 4th at 711 (citing Flatt, 9 Cal. 4th at 283).  Subjects and subject matter
3  "mean more than the strict facts, claims, and issues involved in a particular action." Id.
4  Thus, courts "ascribe to the word 'subjects' a broader definition than the discrete legal
5  and factual issues involved in the compared representations.  [Courts] consider the
6  'subject' of a representation as including information material to the evaluation,
7  prosecution, settlement or accomplishment of the litigation or transaction given its
8  specific legal and factual issues." Id. at 712–13 (quoting Flatt, 9 Cal. 4th at 283).  "[T]he
9  Jessen evaluation of whether the two representations are substantially related centers
10  precisely upon the factual and legal similarities of the two representations." Farris, 119
11  Cal. App. 4th at 679.

   Beginning with the factual content, WhatsApp contends that its technology and
systems are at the heart of both the prior and current representations.  Mtn. at 10.  K&S
responds that simply because two matters involve a company's core service does not
necessarily mean that the factual content is similar and that a sufficient factual distinction
exists here.  Opp. at 11.

   With respect to the prior representation, K&S's representation of WhatsApp
involved a ███████████████████████████████████████████
████████████████████████████████████████████████
███.  According to an attorney at ZwillGen, this included a ████████████
████████ providing



Dkt. 59-6, Declaration of Jacob Sommer ("Sommer Decl."), ¶ 6; see also Thornton Decl.,
Ex. 7 (████████████████████████).  ████████████████████
████████████████████████████████████████

|   |   |
|---|---|
| 1 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 2 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 3 | ▓▓▓▓▓▓▓▓▓  Sommer Decl. ¶ 7.  WhatsApp's then-▓▓▓▓▓▓ |
| 4 | ▓▓▓ attended an in-person meeting with the ▓▓▓▓▓, which was also attended by |
| 5 | O'Neil (in person) and Wray (by telephone).  Id. ¶ 8. |



12  Id. ¶ 9.

13  With regard to the current representation, in their complaint, plaintiffs allege that
14  defendants created a program, termed Pegasus, that could "remotely and covertly extract
15  valuable intelligence from virtually any mobile device."  Compl. ¶ 27.  Broadly speaking,
16  Pegasus is alleged to operate by first sending malicious code through WhatsApp's
17  servers to a user's device.  Id. ¶ 36.  Then, defendants caused encrypted data packets to
18  be sent to a user's device, designed to activate the malicious code residing on the
19  memory of the target devices.  Id. ¶ 39.  Once activated, the malicious code caused the
20  target device to connect to a remote server hosting defendants' malware, which was then
21  downloaded and installed on the target devices.  Id. ¶ 40.  The malware was designed to
22  give defendants and their customers access to information and data stored on the target
23  devices.  Defendants and their customers could customize the malware for different
24  purposes including intercepting communications, capturing screenshots, or exfiltrating
25  browser history and contacts from a user's device.  Id. ¶¶ 27, 41.
26  Assessing the two matters is not a straightforward affair considering that the prior
27  representation is entirely under seal and that WhatsApp's platform involves technical
28  coding and language of the sort unfamiliar to most lay people.  With that caution in mind,

the issue here can best be described as what level of generality is used to define the factual similarities between the two matters.  At a high level of generality both cases involve WhatsApp's technology and systems, as plaintiff suggests.  At a more granular level, there are clear distinctions between the two matters.  As K&S points out, Pegasus is not used to decrypt messages sent over WhatsApp's servers or platform.  Instead, it is alleged to be used to view and exfiltrate content from a user's device and the WhatsApp platform is merely a conduit to send malicious code and malware.  In comparison, the ███████████████████████████████████████████████████████████. To defendants, WhatsApp is a trojan horse that allowed them to install malware and then send information through means other than WhatsApp.  ███████████████████████████████████████████████████████████.

Plaintiff cites SC Innovations, Inc. v. Uber Techs., Inc., No. 18-cv-07440-JCS, 2019 WL 1959493, (N.D. Cal. May 2, 2019), as on point.  There, Uber sought to disqualify its former counsel, Quinn Emanuel, from representing the plaintiff, SC Innovations.  Id. at *1.  Both Uber and SC Innovations offered smartphone applications to users to allow them to hail rides from drivers, but Uber was alleged to have lowered their prices to supra-competitive levels in an effort to drive competitors, including SC Innovations, out of business.  Id.  SC Innovations was in fact forced out of business and brought suit against Uber, alleging various anti-trust violations.  Quinn Emanuel had previously represented Uber in anti-trust actions brought against Uber by local taxi and limousine operators.  Id. at *2.

The district court rejected SC Innovations' arguments that the representations were distinct, reasoning that the SC Innovation representation and Quinn Emanuel's prior representation of Uber in taxi operator disputes had a common factual predicate: they all related to the same services provided by Uber, specifically "the provision or facilitation of ride-hailing for passenger transportation."  Id. at *7.  The court noted that there might be a different outcome if the "earlier cases addressed Uber's 'Uber Eats' food delivery service

1  while the current case addressed its passenger services." Id.  The court also found
2  persuasive arguments that the prior and subsequent representations "where a necessary
3  element of [SC Innovations'] claims was also at issue in [the prior representation] with
4  respect to the same Uber product or products, an overlapping time period, and an
5  overlapping (or at least immediately neighboring) geographic market." Id. at *9.
6    While SC Innovations' reasoning is persuasive, the facts in this case suggest a
7  different outcome.  There, the service provided by Uber, ride-hailing for passenger
8  transportation, was the same in both the prior and subsequent representations.  Here,
9  two different functions of WhatsApp are at issue: on the one hand, using WhatsApp's
10 platform as a conduit to transmit malicious code; on the other, efforts to decrypt or access
11 messages using WhatsApp's service as the means to do so.  Plaintiff argues that both
12 the prior and current representation involve efforts to circumvent WhatsApp's encryption.
13 To an extent this is true, but how the encryption was to be circumvented matters.  ▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The
16 Pegasus program is alleged to have circumvented the encryption not by decrypting
17 WhatsApp's messages but by exfiltrating information after it had been decrypted by
18 WhatsApp's app and stored on a user's device.
19   As noted at the outset, there is some potential overlap in factual matter.  For
20 example, in the prior representation ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Sommer Decl. ¶¶ 7–9.  As alleged in the complaint, the
23 Pegasus program using WhatsApp's platform sent malicious code and encrypted data
24 packets to user's phones.  The potential overlap in factual matter could lie in the way in
25 which WhatsApp's platform encrypts its data.  That is, knowledge of how WhatsApp's
26 encryption and/or platform works was likely helpful in designing the Pegasus program.
27   Therefore, this case is unlike TWiT, LLC v. Twitter Inc., No. 18-cv-00341-JSC,
28 2018 WL 2470942 (N.D. Cal. June 1, 2018), cited by K&S.  There, the prior matter

1  involved a patent infringement dispute involving audio and video streaming technology.
2  Id. at *5.  The subsequent matter involved whether the defendant "made an oral and
3  written promise to stay out of the audio and video streaming market and whether [the
4  defendant] infringes [the plaintiff's] [trade]mark."  Id.  The court noted that while the fact
5  that the plaintiff utilized video and audio streaming was relevant to both matters, the
6  "actual audio and video technology" was not relevant.  Id. (emphasis omitted).  Here,
7  unlike TWiT, the technology is relevant to both the prior and current representations
8  because, at some level, the Pegasus program purportedly sought to compromise the
9  same platform and servers to which the government sought access.

        Any potential overlap in the factual matter is circumscribed by the distinct nature of the legal claims between the prior and current representations.  In SC Innovations, the court relied not just on the overlap in the factual matter but also on the fact that at least one of the prior representations involved allegations that Uber violated antitrust law. 2019 WL 1959493, at *7; see also Beltran v. Avon Prod., Inc., 867 F. Supp. 2d 1068, 1082 (C.D. Cal. 2012) (noting that prior case and "present case involves legal claims for false advertising and unfair competition").  No such overlap of legal claims exist in this case.  In the prior representation, K&S represented WhatsApp ███████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████.  In the current representation, plaintiffs bring civil claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, a breach of contract claim, and a trespass to chattels claim.

        Finally, the information acquired during the first representation must be "material" to the second;

> that is, it must be found to be directly at issue in, or have some critical importance to, the second representation.  Thus, for example, the attorney's acquisition during the first representation of general information about the first client's "overall structure and practices" would not of itself require disqualification unless it were found to be "material"—i.e., directly in issue or of critical importance—in the second

12

1 representation.

2 Farris, 119 Cal. App. 4th at 680 (citations omitted).

3 Here, plaintiff has not demonstrated that the information acquired during the first representation is material to resolving the claims alleged in the complaint.  In the prior representation, how WhatsApp's application, encryption, platform design, server infrastructure, and protocols were material to the ██████████ into how to decrypt messages sent on WhatsApp's platform.  The technical aspects of whether or how an actor can circumvent the platform might constitute relevant background information, but plaintiff has not demonstrated how such general information is "directly in issue or of critical importance" in reference to the claims at issue in this case.

11 In sum, plaintiff has not demonstrated that the two matters are substantially related and absent such a relationship, there is no presumption that K&S acquired material confidential information.

14 **2.    Whether K&S In Fact Retains Material Confidential Information**

15 "If the former client fails to demonstrate the successive representations are substantially related, 'the moving party must prove the lawyer in fact obtained such information—i.e., some showing of the nature of the communications or a statement of how they relate to the current representation.'"  TWiT, 2018 WL 2470942, at *5 (internal quotation marks and citations omitted); see also H.F. Ahmanson & Co., 229 Cal. App. 3d at 1452.  "[T]he information acquired during the first representation [must] be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation."  Farris, 119 Cal. App. 4th at 680.

23 Here, plaintiff has identified documents that could be both material and in K&S's possession.  Specifically, WhatsApp submitted a declaration from a ZwillGen attorney stating that



13

1
2
3
4
5
6

7 Sommer Decl. ¶¶ 6, 12.  As part of its documents submitted with the opposition brief,

8 K&S produced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that was referenced in the Sommer

10 Declaration, which plaintiff also cites in its reply brief.  Thornton Decl., Ex. 7; Reply at 10.

11 Mezzina's billing record reflects an entry that he reviewed the documents in question and

12 Oldham later asked him to revisit his work in light of the facts in the documents.  Id.

13 (citing Thornton Decl., Ex. 18).

14      For its part, K&S does not directly dispute that it retains some information relating

15 to the prior representation because it has, of course, produced them in response to

16 plaintiff's motion and further disclosed that the physical documents pertaining the prior

17 representation were stored at the firm's offsite storage facility until they were moved to

18 the GC's office, where they are currently stored.  Opp. at 7 & n.4.  The GC has blocked

19 access for everyone other than him and his office to the electronic document

20 management files relating to the prior representation.  Id. at 8.  The email data for the

21 attorneys who worked on the prior representation were archived and cannot be accessed

22 by anyone other than the GC's office.  Thornton Decl. ¶ 24.

23      Initially, it is helpful to pinpoint with specificity the confidential information that

24 plaintiff contends is both actually obtained by K&S and material to the current

25 representation.  See H. F. Ahmanson & Co., 229 Cal. App. 3d at 1459 (assessing specific

26 declarations to determine whether firm "in fact possesses such confidential information").

27 Both the reply and the Sommer Declaration only identify one document at issue.  See

28

also Thornton Decl., Ex. 7 at 128–37.[4]  Otherwise, plaintiff identifies information actually acquired by Wray and O'Neil in the course of drafting and revising correspondence and their presence at the in-person meetings.

A few points stand out when assessing the client information and, taken together, demonstrate that K&S does not in fact possess material confidential information.  First, the document makes clear that its technical descriptions of the WhatsApp security measures are based on "███████████████████████████."  Thornton Decl., Ex. 7 at 129.  The letter even goes so far as to provide ████████████████████ ████████ which indicates the letter provides less detail than what is publicly available.  Id.  The remainder of the letter does not contain technical descriptions of how WhatsApp's app and servers work, but rather arguments as to why particular courses of action would be impractical.

The court does not discount that some nugget of information contained in the letter could be confidential and material, but the technical aspects of the document clearly refer to security features that are based on open source software and described in even greater detail on publicly available websites.  Under Rule 1.9(c)(1), a lawyer whose present firm has formerly represented a client shall not use confidential information except "when the information has become generally known."  The document appears to summarize information that is already public.  These facts undermine plaintiff's claim that the information in K&S's possession is confidential.

Second, WhatsApp authorized ZwillGen to share the information with a third party, which would have removed that information from the realm of attorney-client privilege.  Cal. Evid. Code § 952.  Of course, attorney-client privilege is narrower than the duty of confidentiality, but the Ahmanson court found the presence of a third party persuasive in determining why an attorney did not actually acquire confidential information.  See 229 Cal. App. 3d at 1460 (citing Cal. Evid. Code § 952; and Ver Bryck v. Luby, 67 Cal. App.

---

[4] Pin citations for the Thornton Declaration exhibits are to the CM/ECF page numbers electronically stamped atop docket entry 79-24.

2d 842, 844 (Ct. App. 1945)).

Third, no attorney at K&S, other than the GC and his staff, have access to any of the client files or communications relating to the prior representation. While the firm retains the files, no attorney has access to those files. Thus, plaintiff has not demonstrated that a K&S attorney actually has confidential documents in his or her possession.

Fourth, as with the court's substantial relationship analysis, it is not clear the documents in K&S's possession are material. Even assuming the documents contain information that is not publicly known and thus confidential, plaintiff has not demonstrated how the technical information is material—i.e., directly in issue or of critical importance—to its current claims, as opposed to general knowledge.

In sum, plaintiff has not carried its burden to demonstrate that the two matters are substantially related or that K&S actually retains confidential material. Disqualifying counsel is a high bar because "disqualification is a drastic measure that is generally disfavored and should only be imposed when absolutely necessary." Concat, 350 F. Supp. 2d at 814–15. This circumstance does not rise to the level necessitating disqualification.

### 3. Motions to File Under Seal

Both K&S and plaintiff seek to seal portions of, respectively, their opposition and reply briefs. Dkts. 79, 88. Plaintiff previously moved to file portions of its motion and supporting documents under seal, (Dkts. 47, 59, 63), which this court eventually granted, (Dkt. 67).

There is a general presumption in favor of public access to federal court records. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003). "[T]he proponent of sealing bears the burden with respect to sealing. A failure to meet that burden means that the default posture of public access prevails." Kamakana v. City & Cty. of Honolulu, 447 F.3d 1172, 1182 (9th Cir. 2006). When a request to seal documents is made in connection with a

1   motion, the court must determine whether the parties are required to overcome that
2   presumption with "compelling reasons" or with "good cause."  A party seeking to seal
3   materials submitted with a motion that is "more than tangentially related to the merits of
4   the case"—regardless whether that motion is "technically dispositive"—must demonstrate
5   that there are compelling reasons to keep the documents under seal.  Ctr. for Auto Safety
6   v. Chrysler Grp., LLC, 809 F.3d 1092, 1101–02 (9th Cir. 2016).  Conversely, if the motion
7   is only tangentially related to the merits, "a 'particularized showing," under the 'good
8   cause' standard of Rule 26(c) will 'suffice[] to warrant preserving the secrecy of sealed
9   discovery material attached to non-dispositive motions."  Kamakana, 447 F.3d at 1180
10  (alteration in original) (quoting Foltz, 331 F.3d at 1135, 38).

11        Here, the underlying motion to disqualify is only tangentially related to the merits of
12  the case.  Moreover, the court previously found good cause to grant plaintiff's motion to
13  file under seal.  See Dkt. 67.  The opposition and reply briefs are "narrowly tailored to
14  seek sealing only of sealable material."  Civ. L.R. 79-5(b).  The same good cause to grant
15  plaintiff's prior motion to file under seal exists with regard to K&S's and plaintiff's present
16  motions.

17        For the foregoing reasons, plaintiff's and K&S's motions to file under seal are
18  GRANTED.

19      **4.**    **Plaintiff's Motion for Protective Order**

20        Finally, plaintiff filed an ex parte motion for protective order, concurrent with its
21  original motion to file under seal.  Dkt. 47-12.  The court deferred ruling on the motion for
22  protective order until it dealt with the motion to disqualify (Dkt. 68), and now addresses
23  the motion for protective order.

24        Federal Rule of Civil Procedure 26(c) provides that "[t]he court may, for good
25  cause, issue an order to protect a party or person from annoyance, embarrassment,
26  oppression, or undue burden or expense, including . . . requiring that a trade secret or
27  other confidential research, development, or commercial information not be revealed or
28  be revealed only in a specified way."  A court has "broad discretion . . . to decide when a

17

1  protective order is appropriate and what degree of protection is required." Seattle Times
2  Co. v. Rhinehart, 467 U.S. 20, 36 (1984).  "For good cause to exist, the party seeking
3  protection bears the burden of showing specific prejudice or harm will result if no
4  protective order is granted."  Phillips ex rel. Estates of Byrd v. Gen. Motors Corp., 307
5  F.3d 1206, 1210–11 (9th Cir. 2002) (citing Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d
6  470, 476 (9th Cir.1992)

Here, plaintiff argues that a limited protective order is warranted because the prior litigation remains under seal and the parties will need to refer to documents when discussing the motion to disqualify.  Dkt. 47-12 at 1–2.  Plaintiff requests the protective order cover any information related to the sealed proceedings before the other federal district court.  Dkt. 47-13.

This court previously found that good cause exists to seal certain documents related to plaintiff's motion to disqualify.  See Dkt. 67.  The motion for protective order is a logical extension of that finding because the subject matter of the proposed protective order derives from the same underlying sealed case as this court's sealing order.  It is also likely there is a significant overlap between the contents of the protective order and the sealing order.  Additionally, K&S has not objected to the motion for protective order, despite being put on notice that the court would defer ruling on the motion.  See Dkt. 68. Finally, K&S has already committed to screening its NSO Group litigation team from the material related to the prior representation (both by restricting access and by hiring outside counsel for the purposes of the motion to disqualify).  Thus, the court understands that the limited protective order would simply codify that internal restriction.

For the foregoing reasons, plaintiff's motion for protective order is GRANTED.

## CONCLUSION

For the foregoing reasons, plaintiff WhatsApp Inc.'s motion to disqualify is DENIED.

/ / /

/ / /

1    Additionally, the parties' motions to file under seal and plaintiff's motion for
2 protective order are GRANTED.
3    **IT IS SO ORDERED.**
4 Dated: June 16, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

19