JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
*jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
*acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:   (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**REPLY IN SUPPORT OF DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S MOTION TO DISMISS PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF**<br><br>Date:   Under Submission<br>Ctrm:   3<br>Judge:   Hon. Phyllis J. Hamilton<br><br>Action Filed:   10/29/2019 |

I.      INTRODUCTION

Plaintiffs lack standing to seek an injunction because there are no facts to establish that Plaintiffs face any "imminent" or "certainly impending" harm from NSO. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Their opposition confirms that their request for injunctive relief is both based on pure speculation and untethered to any allegation in the Complaint. Plaintiffs concede that they "stopped" the "one particular attack" that gives rise to their claims and which, according to Plaintiffs' allegations, occurred in April and May 2019. (Opp. 3.) Plaintiffs do not dispute that they have not identified any instance where NSO allegedly targeted Plaintiffs' servers before that time, nor have they made any allegation or identified any evidence that NSO attempted to target their servers since then. Plaintiffs agree that Pegasus can no longer be used on WhatsApp's servers, and they do not contest that they have not alleged or identified any technology that NSO has or is developing that could replace Pegasus.

In place of facts, Plaintiffs substitute conjecture. They speculate, based on NSO's alleged business model and marketing statements unrelated to Plaintiffs, that NSO may someday in the future try to target WhatsApp again. (Opp. 6.) But such guesswork falls far short of the individualized showing of future harm needed for an injunction. Nor does it suffice to allege a single past harm. (Opp. 7.) Plaintiffs must instead make a concrete showing that NSO either has or is developing the means to harm Plaintiffs in the imminent future. Plaintiffs do not even attempt that showing. Plaintiffs therefore lack "Article III standing to seek an injunction as a remedy for the claim arising out of [past] events," and the equitable remedy of an injunction "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S., 488, 502 (1974) ("Respondents have failed, moreover, to establish the basic requisites of the issuance of equitable relief in these circumstances," including "the likelihood of substantial and immediate irreparable injury . . . .").

Plaintiffs' other arguments are even weaker. They argue first that because NSO is defending itself in this lawsuit, it will repeat the misconduct alleged by Plaintiffs. (Opp. 9.) But

1  that argument would punish NSO for exercising its due process right to defend itself in court. A
2  defendant's choice to contest false allegations of past misconduct does not support a conclusion
3  that it will commit misconduct in the future. Second, Plaintiffs argue that they should get a thumb
4  on the scale in favor of an injunction because of their size. (Opp. 11.) But there is no "too-big-to-
5  fail" exception in Article III. Plaintiffs must satisfy the same standing requirements as any other
6  litigant. If anything, Plaintiffs' resources make it all the more important that this Court enforce
7  the boundaries of its jurisdiction. Otherwise, Plaintiffs will continue to use their limitless coffers
8  to abuse the federal courts as a weapon against perceived rivals.

9  **II.    PLAINTIFFS CONCEDE THE CONDUCT CHALLENGED IN THE
         COMPLAINT HAS ENDED, AND THEY HAVE NO ALLEGATIONS OR
10       EVIDENCE THAT SIMILAR CONDUCT WILL BE REPEATED**

11         The most important aspect of Plaintiffs' opposition is what they do not dispute. They do
12  not dispute that their claims arise out of allegations of NSO's alleged use of a "spyware program
13  to target approximately 1,400 devices" in April and May 2019. (Opp. 3.) Plaintiffs agree that they
14  "closed [the] vulnerability" NSO allegedly exploited, which "stopped" the "one particular attack"
15  described in the Complaint. (*Id.*) And they do not claim that NSO has any repeat practice of
16  targeting Plaintiffs' servers. They do not claim that NSO targeted their servers before April 2019
17  or has done so after May 2019. Given Plaintiffs' claimed ability to tie the alleged 2019 conduct
18  to NSO, they would surely inform the Court if any other similar conduct has occurred. Their
19  failure to allege that NSO ever repeated its alleged conduct must be taken as an admission that
20  there is no such evidence.

21         As NSO explained in its motion, Plaintiffs' concessions on these points doom their request
22  for injunctive relief. (Mot. 5-7.) To seek an injunction, Plaintiffs must allege sufficient facts to
23  show that some "threatened injury is certainly impending." *Munns v. Kerry*, 782 F.3d 402, 409
24  (9th Cir. 2015) (quoting *Clapper*, 568 U.S. at 409). But Plaintiffs cannot make that showing
25  without allegations or evidence that NSO, despite its inability to use the only alleged "spyware
26  program" described in the Complaint (Opp. 3), has the means to use some other technology against
27  Plaintiffs in the near future. Plaintiffs misrepresent NSO's correct statement of the law by claiming
28  that it amounts to a requirement that they allege a future use "of the *exact same* spyware or

exploitation of the *exact same* vulnerability." (Opp. 8.) What the law actually would require them to allege, at a minimum, is the existence of *some* spyware or *some* vulnerability that NSO is likely to develop or use against Plaintiffs in the imminent future.

Plaintiffs cannot make even that modest showing. Instead, (Opp. 8) they speculate that an NSO employee's alleged remark that Plaintiffs "closed our biggest remote for cellular" (Compl. ¶ 45) means that some other, smaller vulnerability exists in Plaintiffs' services. But that statement does *not* say that any other WhatsApp vulnerability exists. The most plausible reading is that—due to "the sheer scale of Plaintiffs' platforms" (Opp. 11)—the WhatsApp vulnerability described in the complaint was bigger than vulnerabilities in services other than WhatsApp. In any event, Plaintiffs' imaginative reading of a single ambiguous statement cannot substitute for actual allegations or evidence that NSO has any present means to access WhatsApp's servers. Plaintiffs do not offer any such allegations or evidence.

Perhaps recognizing this failure, Plaintiffs argue that NSO's alleged one-time access to WhatsApp's servers alone justifies an injunction. (Opp. 7-8.) That argument is contrary to all existing law. As the Supreme Court held decades ago, "[p]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). As a result, "past exposure to harm is *largely irrelevant* when analyzing claims of standing for injunctive relief." *Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990) (emphasis added). Plaintiffs thus cannot seek an injunction solely based on allegations "that NSO has *already* deliberately identified and aggressively exploited a vulnerability." (Opp. 7.) *Bates v. UPS, Inc.*, 511 F.3d 974 (2007) (en banc), cited by Plaintiffs, does not hold otherwise. Although that case acknowledged that "past wrongs are evidence," it still required a "real and immediate threat of repeated injury" beyond the "past wrongs . . . themselves." *Id.* at 985 (cleaned up). The court in *Bates* ultimately found standing because the plaintiff was challenging a "written policy" that the defendant continued to enforce. *Id.* at 986. Here, in contrast, Plaintiffs do not allege that NSO is now engaging in any unlawful actions against them.[1]

---

[1] Plaintiffs say, without reference to any paragraph of the Complaint, they have alleged that NSO "intends to [hack Plaintiffs' servers] again." (Opp. 6.) That is false. The Complaint is entirely

The Court should grant NSO's motion because a single alleged instance of past harm cannot support an injunction. *Lyons*, 461 U.S. at 105; *see Munns*, 782 F.3d at 411–12 ("Despite being harmed in the past, the [plaintiffs] must still show that the threat of injury in the future is 'certainly impending' or that it presents a 'substantial risk' of recurrence for the court to hear their claim for prospective relief.").

### III.  PLAINTIFFS' SPECULATION ABOUT NSO'S BUSINESS CANNOT SUPPORT AN INJUNCTION

In the absence of any concrete risk of imminent harm, Plaintiffs rely instead on speculation based on incomplete, isolated statements in NSO's alleged marketing materials. (Opp. 6-7.) But those materials do not reveal any ongoing or imminent attempt by NSO to access Plaintiffs' servers. These vague marketing statements do not reflect any conduct by NSO, let alone conduct targeting Plaintiffs.

The core of Plaintiffs' misguided argument is their claim that "NSO is in the business of discovering and exploiting vulnerabilities like the one that Plaintiffs closed." (Opp. 6.) Set aside that Plaintiffs here again concede that they have closed the only alleged vulnerability in WhatsApp. A general description of NSO's alleged business model is not an "individualized showing that there is 'a very significant possibility' that the future harm will ensue." *Nelsen*, 895 F.2d at 1250.[2] If it were, every technology company in the United States could sue companies like NSO and seek injunctive relief, arguing that the "very business model" (Opp. 7) creates a risk of future hacking. Article III requires more, and the one case Plaintiffs cite is not to the contrary. *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798 (N.D. Cal. Aug. 2, 2012). For starters, *Kerbel* did not analyze standing at all, so it is entirely irrelevant. But even if it had addressed standing, the defendant in *Kerbal* was actively operating a website that sold tools "designed to enable illegitimate uses of craigslist," and had *continued to do so* "despite receiving multiple cease and desist letters from craigslist." *Id.* at *2. The court thus did not grant an injunction because of the defendant's "business model"

---

backward-looking; it does not allege anything about NSO's future intentions.

[2] Even when Plaintiffs quote their allegations about NSO's business model, they are all in the past tense. (Opp. 6.) The Complaint says nothing about NSO's present or future conduct.

(Opp. 7), but because the defendant was actively committing the challenged acts. *Id.* at *16. Here, in contrast, Plaintiffs have no allegations or evidence that NSO is currently targeting Plaintiffs or selling technology allowing others to do so. (Mot. 5-7.)[3]

This gap in Plaintiffs' allegations is not filled by the alleged NSO statements they cite. Plaintiffs cite two statements—one a press release from a third party (Compl. Exh. 4), the other a one-page screenshot from NSO's website (Compl. Exh. 8)—but they both contain the same innocuous language: NSO allegedly claims its technologies "evolve to keep pace" with "the ever-changing cyber world." (Opp. 8.)[4] Those vague marketing buzzwords do not explain what "changes" in the "cyber world" are being addressed or what any "evolutions" would entail. They do not say that NSO tries to find new WhatsApp vulnerabilities when previous WhatsApp vulnerabilities are closed. They certainly do not claim that NSO has discovered, is trying to discover, or will discover a new vulnerability in Plaintiffs' servers after Plaintiffs eliminated the old one. They do not even mention Plaintiffs at all.[5] Vague marketing statements that are not about Plaintiffs' services cannot possibly show an "individualized"—that is, specific to Plaintiffs—risk of imminent harm. *Nelsen*, 895 F.2d at 1250-52.[6]

The Supreme Court's decision in *Clapper* forecloses Plaintiffs' reliance on such general

---

[3] Plaintiffs reference "NSO's ongoing efforts to *seek* a way to attack Plaintiffs" (Opp. 6), but they cite no allegations or evidence of any such "ongoing efforts." The alleged "probing [of] Plaintiffs' servers and software" and "selling products designed to exploit them" all occurred in the past and are not alleged to be ongoing. (*Id.*)

[4] Plaintiffs also cite a brochure related to Pegasus. (Compl. Exh. 10.) But Plaintiffs concede that they closed the vulnerability allegedly exploited by Pegasus, such that Pegasus can no longer be used on WhatsApp's servers. Their arguments in favor of an injunction rely on a prediction that NSO will create a new technology, other than Pegasus, to target Plaintiffs. Documents about Pegasus thus show no risk of future injury to Plaintiffs.

[5] The only document Plaintiffs cite that mentions Plaintiffs is the Pegasus brochure (Opp. 11), which is irrelevant to future injury (*supra* n.4).

[6] Plaintiffs' own marketing materials say that WhatsApp "messages, photos, videos, voice messages, documents, and calls are secured from falling into the wrong hands," so "third parties can't read them." https://www.whatsapp.com/security/. If marketing materials were relevant to standing, then Plaintiffs' own marketing materials would suggest that there is no known risk of future harm.

marketing statements. The plaintiffs in *Clapper* challenged a government program authorizing warrantless surveillance of individuals "reasonably believed to be a member or agent of al Qaeda or an affiliated terrorist organization." 568 U.S. at 403. The plaintiffs were U.S. citizens who regularly communicated with "likely targets of surveillance" under the challenged program. *Id.* at 406. They wrongly claimed standing because, given the program's purpose and their clients' identities, there was an "objectively reasonable likelihood that their communications will be intercepted at some time in the future." *Id.* at 407. The Supreme Court rejected that argument, holding that an "objectively reasonable likelihood" of harm does not establish standing. *Id.* at 410. And it held that the plaintiffs' arguments based on the purpose of the government program and their clients' identities could not show the necessary "certainly impending" injury. *Id.* at 410–11. Instead, the plaintiffs would need to offer "specific facts demonstrating that the communications of their foreign contacts *will* be targeted." *Id.* at 412 (emphasis added).

As in *Clapper*, Plaintiffs rely on general assertions about the nature of NSO's alleged surveillance business without any allegations or evidence that Plaintiffs' servers "will be targeted." *Id.* Even if NSO's marketing materials were read as Plaintiffs implausibly prefer – to show a "reasonable likelihood" that *some* technology company could be targeted "at some time in the future," *Id.* at 407, there is no evidence that Plaintiffs would be the target. Plaintiffs' assertion that they might be targeted again is not sufficient to confer standing for a prospective injunction. *Id.* at 410. It does not show a risk of harm that is "imminent," *Munn*, 782 F.3d at 410. And it does not show an "individualized" risk to Plaintiffs. *Nelsen*, 895 F.2d at 1250.

Plaintiffs contend that they are a likely target because of the "sheer scale of [their] platforms and users." (Opp. 11.) But that sort of "probabilistic" reasoning—that Plaintiffs may be more likely targets than other, smaller companies—has no place in the standing analysis. *Nelsen*, 895 F.2d at 1250. For one thing, it is inconsistent with Plaintiffs' allegations. Facebook is huge, but Plaintiffs do not claim that NSO has ever unlawfully accessed Facebook's servers. Their argument would allow standing without any particularized showing of harm. If Plaintiffs' argument were deemed sufficient, then any large company could sue NSO and similar businesses that support government agencies in law enforcement and national security investigations that

require access to electronic data, based on nothing more than its unsubstantiated fear that a company's size makes it a "prominent target for . . . exploits." (Opp. 11.) But – given that Facebook has not quite achieved a complete monopoly over social media – how big is big enough to create fact-free standing? And if a company falls below Plaintiffs' unstated size cutoff, does it still need to meet the traditional constitutional standard and introduce credible evidence of potential future harm? These questions illustrate why a plaintiff may not create standing merely by arguing, as Plaintiffs do, "that the general circumstances . . . may produce future harm." *Nelsen*, 895 F.2d at 1250.

Finally, Plaintiffs erroneously cite *Tagged Inc. v. Does 1 through 10*, 2010 WL 370331 (N.D. Cal. Jan. 25, 2010) (cited at Opp. 8-9), in support of their standing claim. In *Tagged Inc.*, the court entered a default judgment order without analyzing standing. Moreover, the defendant had repeatedly "circumvented" multiple rounds of updated "security measures" to send spam to the plaintiff's users. *Id.* at *2. At first, the plaintiff had no defenses against the defendant's conduct. *Id.* at *1. After the defendant began sending spam, the plaintiff enacted two security measures, each of which the defendant circumvented. *Id.* at *2. And the defendant maintained his course of conduct until shortly before the plaintiff filed suit. *Id.* at *2-3. The injunction in *Tagged Inc.* was thus based on the defendant's ongoing conduct and repeat evasions of the plaintiff's security measures. *Id.* at *12. Here, in contrast, Plaintiffs allege that NSO exploited one vulnerability, which Plaintiffs closed. (Opp. 3.) Unlike in *Tagged Inc.*, they do not allege or submit any evidence that NSO has circumvented Plaintiffs' new security measures or made any attempt to do so. Indeed, there is no claim that NSO engaged in any alleged misconduct involving Plaintiffs since they closed the vulnerability.

### IV. NSO'S DEFENSE OF PLAINTIFFS' LAWSUIT CANNOT SUPPORT AN INJUNCTION

Plaintiffs also ask this Court to punish NSO for exercising its right to defend itself against Plaintiffs' lawsuit. (Opp. 8.) Because NSO is defending itself, Plaintiffs claim that it *must* intend to target Plaintiffs again in the future. By that reasoning, the mere fact that NSO disputes Plaintiffs' allegations creates cause for an injunction. But if that were true, an injunction could

1  issue any time a defendant denies liability for alleged past conduct—in other words, in almost
2  every federal lawsuit.  That is not the law.  The government in *Clapper* defended its conduct, but
3  the Supreme Court still held that the plaintiffs lacked standing.  *See Amnesty Int'l USA v.*
4  *McConnell*, 646 F. Supp. 2d 633, 635 (S.D.N.Y. 2009) (district court decision in *Clapper*) ("The
5  Government contends as a threshold matter that the plaintiffs lack standing to challenge the FAA.
6  The Government also contends that the lawsuit lacks merit in any event because the FAA is
7  constitutional on its face.").  Similarly, the Ninth Circuit denied standing in *Munns* despite "the
8  government's ongoing assertion that the policy [challenged by the plaintiff] was legal." 782 F.3d
9  at 410.

10  In an unsuccessful effort to bolster their claim, Plaintiffs persist in misrepresenting NSO's
11  response to their lawsuit.  NSO does not "stand[] by . . . unlawful hacking." (Opp. 9.)  NSO denies
12  that it *committed* any such "hacking." (Dkt. No. 45 at 6-7.)  Nor has NSO expressed any intent in
13  this lawsuit to "continue the challenged conduct" (Opp. 9), since NSO denies that it carried out the
14  challenged conduct in the first place (Dkt. No. 45 at 6-7).  And while NSO does argue that it is
15  "immune from suit" (Opp. 9), doing so is its right as an agent of foreign sovereigns (Dkt. No. 62
16  at 10).  States, police officers, prosecutors, and foreign entities all routinely claim immunity.  *E.g.*,
17  *Allen v. Cooper*, 140 S. Ct. 994, 999 (2020) (sovereign immunity); *Kisela v. Hughes*, 138 S. Ct.
18  1148, 1152 (2018) (qualified immunity); *Van de Kamp v. Goldstein*, 555 U.S. 335, 340 (2009)
19  (prosecutorial immunity); *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015) (foreign
20  sovereign immunity).  Doing so does not expose them to injunctive relief.

21  It is no wonder, then, that Plaintiffs do not cite a single case adopting their novel theory of
22  standing.  None of the cases they cite (Opp. 9-10) imposed an injunction based on a party's defense
23  of a lawsuit.  Instead, they enjoined "present misconduct," *Orantes-Hernandez v. Thornburgh*, 919
24  F.2d 549, 564 (9th Cir. 1990), or "continued" wrongful acts, *Planned Parenthood Fed'n of Am.,*
25  *Inc. v. Ctr. for Med. Progress*, 2020 WL 2065700, at *17 (N.D. Cal. Apr. 29, 2020); *see also Doe*
26  *1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1109 (N.D. Cal. 2010) (finding standing because plaintiffs
27  alleged the defendant was "continu[ing]" its unlawful conduct); *City & Cty. of S.F. v. Tutor-Saliba*
28  *Corp.*, 2005 WL 645389, at *1 (N.D. Cal. Mar. 17, 2005), at *15 (finding likelihood that defendant

"will again bid for and obtain public works contracts" because it was actively bidding for a "current contract"). Plaintiffs, in contrast, have not alleged or identified any current or ongoing misconduct by NSO.

In *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782-83 (N.D. Cal. 2017), the court found "it is very likely that Facebook will suffer irreparable harm again," given that the defendants had "frequently exhibited bad faith conduct," including by ignoring cease-and-desist letters and evading technological restrictions imposed after they began their alleged misconduct. In this case, there is no claim that NSO has engaged in bad faith conduct, repeated its alleged misconduct, or tried to circumvent Plaintiffs' closure of WhatsApp's vulnerability. Instead, Plaintiffs offer only "allegations of *possible* future injury." *Munns*, 782 F.3d at 409 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. at 409). Such a claim is "not sufficient" for an injunction. *Id.*

## V.    CONCLUSION

Plaintiffs' request for an injunction amounts to a claim that because NSO allegedly targeted WhatsApp one time in the past, it must be deemed likely to do so again in the near future. That is not the test for standing. Plaintiffs want the Court to discard decades of precedent and hold that a plaintiff may seek an injunction without any allegations or evidence of imminent future harm. The Court should reject that request because Plaintiffs lack standing to seek injunctive relief.

DATED: July 15, 2020                                KING & SPALDING LLP

                                                    By: /s/ *Joseph N. Akrotirianakis*
                                                        JOSEPH N. AKROTIRIANAKIS
                                                        AARON S. CRAIG
                                                        Attorneys for Defendants NSO GROUP
                                                        TECHNOLOGIES LIMITED and Q
                                                        CYBER TECHNOLOGIES LIMITED