1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
      *jakro@kslaw.com*
2   AARON S. CRAIG (Bar No. 204741)
      *acraig@kslaw.com*
3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1700
4   Los Angeles, CA 90071
    Telephone:   (213) 443-4355
5   Facsimile:    (213) 443-4310

6   Attorneys for Defendants NSO GROUP TECHNOLOGIES
    LIMITED and Q CYBER TECHNOLOGIES LIMITED

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  WHATSAPP INC., a Delaware corporation,        Case No. 4:19-cv-07123-PJH
    and FACEBOOK, INC., a Delaware
12  corporation,                                   **AMENDED MOTION OF DEFENDANTS
                                                    NSO GROUP TECHNOLOGIES
13                 Plaintiffs,                      LIMITED AND Q CYBER
                                                    TECHNOLOGIES LIMITED FOR A
14          v.                                      PROTECTIVE ORDER**

15  NSO GROUP TECHNOLOGIES LIMITED                 **REDACTED VERSION OF DOCUMENT
    and Q CYBER TECHNOLOGIES LIMITED,              SOUGHT TO BE SEALED**
16
                   Defendants.                     *[Filed Concurrently with Declarations of
17                                                 Joseph N. Akrotirianakis and Yaron Shohat
                                                   and [Proposed] Order]*
18
                                                   Date:      May 25, 2023
19                                                 Time:      9:00 a.m.
                                                   Ctrm:      3
20                                                 Judge:     Hon. Phyllis J. Hamilton
21
22                                                 Action Filed:   10/29/2019
23
24
25
26
27
28

1   TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

2   PLEASE TAKE NOTICE that on May 25, 2023, at 9:00 a.m., or as soon thereafter as the

3   matter may be heard, Defendants NSO Group Technologies Limited ("NSO") and Q Cyber

4   Technologies Limited ("Q Cyber") will bring on for hearing in before the Honorable Phyllis J.

5   Hamilton, Judge for the United States District Court for the Northern District of California,

6   Oakland Division, Courtroom 3, this amended motion under Rule 26(c) for a protective order

7   against Plaintiffs' Requests for Production 1-29.  In bringing this application, Defendants do not

8   concede that they are subject to the personal jurisdiction of this Court and reserve all rights to

9   contest personal jurisdiction.

10  This amended motion is based on this Notice of Motion and Motion, the Memorandum of

11  Points and Authorities submitted herewith, the accompanying declarations and exhibits, the

12  pleadings, papers and records on file in this case, and such oral argument as may be presented at

13  any hearing.

14

15  DATED: April 10, 2023                          KING & SPALDING LLP

16                                                By:  */s/Joseph N. Akrotirianakis*
                                                       JOSEPH N. AKROTIRIANAKIS
17                                                     AARON S. CRAIG
                                                       Attorneys for Defendants NSO GROUP
18                                                     TECHNOLOGIES LIMITED and Q
                                                       CYBER TECHNOLOGIES LIMITED
19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

I.      BACKGROUND ....................................................................................... 3

        A.    Plaintiffs' Allegations ................................................................ 3

        B.    Defendants' Obligations under Israeli Law ................................ 3

        C.    Procedural History ..................................................................... 5

II.     LEGAL STANDARDS ........................................................................... 6

III.    ARGUMENT ........................................................................................... 8

        A.    The Court Should Issue a Protective Order Because Israeli Law
              Prohibits Defendants from Complying with Plaintiffs' RFPs. ............ 8

              1.    Plaintiffs' Overbroad RFPs Do Not Seek Important
                    Information and Are Not Specific........................................... 9

              2.    All of the Information Sought by Plaintiffs Originated
                    Abroad.................................................................................... 14

              3.    Plaintiffs Can Seek Discovery Through Alternative Means................ 14

              4.    Israel's Interests Outweigh the United States' Interests. ..................... 15

              5.    Defendants Face Extreme Hardship in the Form of Criminal
                    Prosecution and Civil Penalties. ............................................. 16

        B.    The Court Should Issue a Protective Order Because Plaintiffs'
              Overbroad RFPs Seek Irrelevant Information That Is
              Disproportionate to Their Claims. ................................................. 18

IV.     CONCLUSION........................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcon Ent., LLC v. Automobiles Peugeot SA,*
    2021 WL 8055689 (C.D. Cal. May 7, 2021) ..........................................................19

*Bennett-Martin v. San Bernardino Valley Cmt. Coll.,*
    2018 WL 5919212 (C.D. Cal. May 15, 2018) .........................................12, 18, 19

*BenQ Am. Corp. v. Forward Elec. Co.,*
    2005 WL 3445629 (N.D. Cal. Dec. 15, 2005) .........................................................6

*Bluestone Innovations LLC v. LG Elecs. Inc.,*
    2013 WL 6354419 (N.D. Cal. Dec. 5, 2013) ...........................................................6

*Campbell v. Facebook Inc.,*
    2015 WL 4463809 (N.D. Cal. July 21, 2015) ..................................................6, 16

*Costella v. Clark,*
    2009 WL 4730856 (N.D. Cal. Dec. 7, 2009) ...........................................................6

*In re CRT Antitrust Litig.,*
    2014 WL 6602711 (N.D. Cal. Nov. 20, 2014) ...........................................6, 14, 15

*Dai v. U.S. Citizenship & Immigration Servs.,*
    2017 WL 11634511 (C.D. Cal. Sept. 12, 2017) ....................................................19

*Gap, Inc. v. Stone Int'l Trading, Inc.,*
    1994 WL 38651 (S.D.N.Y. Feb. 4, 1994) .............................................................14

*U.S. ex rel. Jacobs v. CDA, P.A.,*
    2016 WL 4146077 (D. Idaho Aug. 3, 2016) .........................................................19

*Manuf. Automation & Software Sys., Inc. v. Hughes,*
    2017 WL 5641120 (C.D. Cal. Sept. 21, 2017) ..........................................12, 19, 20

*Quiroz v. Praetorian Ins. Co.,*
    2014 WL 3845418 (N.D. Cal. Aug. 5, 2014) ...................................................6, 12

*Richmark Corp. v. Timber Falling Consultants,*
    959 F.2d 1468 (9th Cir. 1992) ........................................................................ *passim*

*Rivera v. NIBCO, Inc.,*
    364 F.3d 1057 (9th Cir. 2004) ................................................................................6

*In re Rubber Chems. Antitrust Litig.,*
    486 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................................ *passim*

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
  2013 WL 4525226 (E.D. Pa. Aug. 27, 2013) ...................................................................19

*Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*,
  2019 WL 6134958 (N.D. Cal. Nov. 19, 2019) .............................................................. *passim*

*Terpin v. AT&T Inc.*,
  2022 WL 3013153 (C.D. Cal. June 13, 2022) .......................................................................19

*In re TFT-LCD Antitrust Litig.*,
  2011 WL 13147214 (N.D. Cal. Apr. 26, 2011) ............................................................. *passim*

*TIBCO Software Inc. v. GAIN Cap. Grp.*,
  2018 WL 4176622 (N.D. Cal. Aug. 31, 2018) .......................................................................19

*Tiffany (NJ) LLC v. Qi Andrew*,
  276 F.R.D. 143 (S.D.N.Y. 2011) ................................................................................. *passim*

*U.S. ex rel. Uchytil v. Avande, Inc.*,
  2018 WL 4150889 (W.D. Wash. Feb. 27, 2018) ............................................................18, 19

*Woodard v. Labrada*,
  2018 WL 6930767 (C.D. Cal. Jan. 11, 2018) .......................................................................19

**Statutes and Rules**

Israeli Defense Export Control Law ..................................................................................... *passim*

Fed. R. Civ. P. 26 ..............................................................................................................6, 18, 20

Fed. R. Civ. P. 26(b)(1) ...............................................................................................................2, 6

**Other Authorities**

Ability Inc., SEC Form 6-K (Sept. 16, 2019), https://bit.ly/42lLs2h ...........................................17

Gili Cohen, *Dozens of Israeli Defense Firms Suspected of Export Law Violations*,
  Haaretz (Dec. 31, 2013), https://bit.ly/408bTHe ....................................................................17

Hague Conference Service Convention, *Israel*, https://bit.ly/3lu8raG .........................................15

Idan Zonshine, *Two Israeli Security Tech Firms Investigated on Suspicion of
  Fraud*, Jerusalem Post (Sept. 15, 2019), https://bit.ly/3yT8Vdw .............................................17

Jerusalem Post Staff, *Israeli Companies Exported Cruise Missiles to China
  Without Permit*, Jerusalem Post (Dec. 20, 2021), https://bit.ly/3JxMf7l ..............................17

Jonathan Aronson, *Export Control Laws: Playing It Smart*, Israel Defense (June
  25, 2013), https://bit.ly/3ySPHos............................................................................................17

4 L. Marc Zell et al., *World Intellectual Prop. Rights & Remedies* § 79:20 (Jan. 2023 update)......................................................................................................................4

Shlomi Diaz and Avi Cohen, *Israeli Defense Firms Suspected of Illegally Exporting Missiles to China*, Israel Hayom (Dec. 21, 2021), https://bit.ly/40pS91r ...............................................................................................17

U.S. Department of State, *Israel, the West Bank, and Gaza Judicial Assistance Information*, https://bit.ly/3JvMwIf; .....................................................................15

Yoram Evron, *Between Beijing & Washington: Israel's Technology Transfers to China*, 13 J. E. Asian Studies 503 (2013) ............................................................4

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2   Plaintiffs ask this Court to bless a fishing expedition designed not to advance their claims

3   in this lawsuit but to harm Defendants NSO Group Technologies Limited and Q Cyber

4   Technologies Limited by exposing them to criminal prosecution in their home country of Israel

5   and burying them in costly, irrelevant, unjustified discovery.  The Court should reject Plaintiffs'

6   tactic and grant Defendants a protective order against Plaintiffs' abuse of the discovery process.

7   Defendants are Israeli companies that export defense technology extensively regulated

8   under Israeli law, subject to close oversight by the Government of Israel, and used solely by foreign

9   governments in foreign countries.   NSO licenses its technology exclusively to government

10   agencies that have committed to use it only for the lawful investigation and prevention of terrorism

11   and other crimes.   In contrast, Plaintiffs' business model depends in part on protecting from

12   exposure criminals and terrorists who use Plaintiffs' encrypted messaging services to victimize the

13   innocent.  Facebook often acts as a nation unto itself, immune from all regulation and unchecked

14   by any government or competitor.  Plaintiffs view Defendants as a threat to this business model.

15   Indeed, Defendants exist in part *because* Plaintiffs devote massive resources to their goal of

16   defeating the investigative capacities of most governments, all in the name of promoting "privacy"

17   (but only when convenient for Plaintiffs) to the exclusion of all other interests.

18   Now, Plaintiffs aim to shut Defendants down—not by legitimately prevailing in this

19   lawsuit, but by wielding discovery as a tool to attempt to force Defendants to take actions Plaintiffs

20   know will expose Defendants to criminal prosecution in Israel.  Israel's Defense Export Control

21   Law ("DECL") regulates Defendants' business and, as relevant here, prohibits Defendants from

22   making any unauthorized transfer to Plaintiffs of any information about NSO's technology.

23   Violations of that prohibition will expose Defendants and their individual officers to criminal

24   prosecution, civil penalties, and a termination of their license to do business in Israel.  In addition,

25   the ███████████████ specifically recognizing that discovery in this action ████████

26   ███████████████████████████████████████████████████████████████

27   ████████████████████████████████████████

28   Despite these clear prohibitions, Plaintiffs' Requests for Production ("RFPs") seek a

breathtakingly broad amount of information related to Defendants' operations and technology that Defendants cannot produce without becoming criminals under Israeli law.

That is, in fact, exactly what Plaintiffs want—but U.S. law prohibits them from getting it. The Ninth Circuit has held that when a foreign defendant will face criminal prosecution for producing documents in the United States, that is "a weighty excuse for nonproduction." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992). In those circumstances, a foreign defendant should not be required to violate foreign law unless the requested discovery is essential to the plaintiff's claims and narrowly tailored to those claims, seeks information that originated in the United States, cannot be sought through other means, and advances the United States' sovereign interests more than it interferes with a foreign nation's interests. *Id.* at 1475. Here, those considerations overwhelmingly favor Defendants. Plaintiffs' overbroad RFPs seek irrelevant information that is neither important to their claims nor narrowly tailored. Moreover, the RFPs seek exclusively information that originated in Israel or other foreign countries. Plaintiffs have several alternative means of seeking relevant discovery. And Israel's interest in preventing disclosure of sensitive national-security information outweighs the United States' generalized interest in a lawsuit challenging the foreign conduct of foreign actors that allegedly accessed the mobile devices of exclusively foreign citizens. For all these reasons, the Court should enter a protective order relieving Defendants from having to violate Israeli law by responding to Plaintiffs' RFPs.

All that aside, the Court should grant Defendants a protective order for the simple reason that Plaintiffs' RFPs violate the requirement that discovery requests in federal court be "relevant" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Plaintiffs' Complaint challenges a single use of a specific NSO technology on a narrowly defined set of WhatsApp users' devices over a limited time period of twelve days in 2019 and the damages Plaintiffs now seek are minimal: approximately one million dollars by their own estimation. Plaintiffs' RFPs, in contrast, seek information unrelated to WhatsApp or its users, unrelated to the conduct described in the Complaint, unrelated to the only NSO technology Plaintiffs allege has ever harmed them, and unrelated to the only relevant time period. Plaintiff's requests are overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the case, and this Court should reject them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     BACKGROUND

### A.     Plaintiffs' Allegations

In this lawsuit, Plaintiffs allege that "[b]etween in and around April 2019 and May 2019, Defendants used WhatsApp servers . . . to send malware to approximately 1,400 mobile phones and devices ('Target Devices')."  (Compl. ¶ 1.)  As this Court has explained, Plaintiffs "allege that [NSO] created a data program, termed Pegasus," to access the Target Devices.  (Dkt. No. 111 at 2-3; *see* Compl. ¶¶ 24–43.)  Plaintiffs allege that someone accessed the 1,400 Target Devices "[b]etween April 29, 2019 and May 10, 2019."  (Dkt. No. 111 at 4 (citing Compl. ¶ 42).)  Plaintiffs closed the vulnerability allegedly exploited by Pegasus "around" May 13, 2019.  (*Id.* (citing Compl. ¶ 44).)  Plaintiffs do not identify any other NSO technology that has been or could be used against Plaintiffs.  Nor do they allege Defendants have done anything to injure Plaintiffs other than allegedly designing Pegasus and allowing it to be used against the 1,400 Target Devices during a twelve-day period four years ago.

Defendants are Israeli corporations that operate exclusively in Israel.  (Dkt. No. 45-11 ¶ 4.)  They have no offices, employees, presence, or business operations in the United States.  (*Id.*)  NSO licenses its technology exclusively to foreign government agencies, which then use the technology in their own investigations.  (Dkt. No. 45-11 ¶¶ 9, 14-18; Dkt. No. 111 at 11.)  Foreign government agencies control their own use of Pegasus for surveillance.  (Dkt. No. 45-11 ¶¶ 14-18.)

### B.     Defendants' Obligations under Israeli Law

As Israeli corporations, Defendants are subject to numerous restrictions and obligations under Israeli law.  To export its Pegasus technology, NSO must register with the Israeli Ministry of Defense, which can investigate NSO, refuse or cancel NSO's registration, or deny NSO's license to do business.  (Dkt. No. 45-11 ¶ 6.)  The Ministry of Defense also requires NSO to provide documentation about its customers, prospective customers, and their intended uses of NSO's Pegasus technology.  (*Id.*)  The Ministry of Defense requires this documentation from NSO for each export of NSO's Pegasus technology.  (*Id.*)  Israel may deny or revoke export licenses if it becomes aware the terms of the export license have been violated.  (*Id.* ¶ 12.)

Israel's strict regulation of the export of NSO's Pegasus technology results from Israel's

Defense Export Control Law.  (Dkt. 45-12; Declaration of Yaron Shohat ("Shohat Decl.") ¶ 7.)  The DECL "regulat[es] state control of the export of defense equipment, the transfer of defense know-how and the provision of defense services, for reasons of national security considerations, foreign relations considerations, international obligations and other vital interests of the State [of Israel]." (DECL § 1.)  The DECL is "highly detailed."  Yoram Evron, *Between Beijing & Washington: Israel's Technology Transfers to China*, 13 J. E. Asian Studies 503, 513 (2013).  Among other restrictions, it prohibits any Israeli citizen from "[e]xport[ing] defense equipment" or "[t]ransfer[ring] defense know-how through any means, including orally[,] from Israel to outside of Israel, or in Israel to a person who is neither an Israeli citizen or an Israeli resident, or to a foreign corporation," unless the Israeli citizen has "received a license for such activity." (*Id.* § 15(a)); *see generally* 4 L. Marc Zell et al., *World Intellectual Prop. Rights & Remedies* § 79:20 (Jan. 2023 update).  The DECL contains no exception for information that is transferred pursuant to a court order.

The DECL broadly defines the terms used in these restrictions.  (DECL § 2.)  It defines "[d]efense export" as any "[e]xport of defense equipment," "[t]ransfer of defense know-how," or "[p]rovision of defense services."  (*Id.*)  It defines "[e]xport of defense equipment" as any "[t]ransfer outside of Israel."  (*Id.*)  And it defines "[d]efense know-how" as including any "[i]nformation that is required for the development or production of defense equipment or its use, including information referring to design, assembly, inspection, upgrade and modification, training, maintenance, operation and repair of defense equipment or its handling in any other way," including "technical data or technical assistance."  (*Id.*[1])

The DECL imposes "extremely grave penalties," including criminal penalties, for violations.  Evron, *supra*, at 513; (*see* DECL §§ 32-34.)  The DECL criminalizes the act of "[c]arr[ying] out a defense export"—which covers both an "[e]xport of defense equipment" and a "[t]ransfer of defense know-how" (*id.* § 2)—"without holding a defense export license or not

---

[1] "Technical data" are "[p]rototypes, plans, sketches, models, formulas, tables, engineering content and specifications, written operating instruction manuals or manuals documented on magnetic, optic or any other media."  (DECL § 2.)  "Technical assistance" is "[i]nstruction, qualification, training, consultation, [or] transmission of proficiency or technical data."  (*Id.*)

pursuant to the conditions of the license" (*id.* § 32(a)).  A violation of this restriction results in "three years' imprisonment or a fine."  (*Id.*)  And when a corporation or its employees violate this provision, any "officer in [the] corporation" is also subject to prosecution.  (*Id.* § 34.)  The government may also impose civil penalties.  (*Id.* §§ 35-43.)  These restrictions apply to NSO's Pegasus technology.  (Shohat Decl. ¶ 7; Dkt. No. 45-11 ¶ 5.)

In addition, the ███████████                                ███████████ that discovery in this litigation would result in the ███████

████████████████████████                                (Dkt. 133-6, Exh. F ¶ 3; Dkt. 133-4 ¶ 2; *see* Dkt. 133-6, Exhs. B, D.)

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ (Dkt. 133-6, Exh. F ¶ 3; *see* Dkt. 133-6, Exhs. B, D.)  Defendants ████

████████████████████████ covered by ████████ (Dkt. 133-6, Exh. F ¶ 7.)[2]

### C.   Procedural History

Plaintiffs served their RFPs on June 2, 2020.  (Akro. Decl. Exh. A.)  The RFPs are staggeringly broad, and they seek materials not limited to WhatsApp, the relevant NSO technology, the 1,400 Target Devices, or the time period described in the Complaint. The RFPs also seek broad swaths of information covered by Israel's DECL and ████████████.

This Court stayed discovery shortly after Plaintiffs served their RFPs.  (Dkt. No. 155.) After the stay ended, the Court held a status conference at which it instructed the parties to meet and confer over the effect of Israeli law on Plaintiffs' RFPs.  The parties have done so.  (Akro. Decl. ¶ 3.)  During the parties' discussions, Plaintiffs' counsel took the position that the relevance and specificity of their RFPs are irrelevant to whether Defendants should receive a protective order

---

[2] Defendants' undersigned counsel understands that the ██████████████████████ ████ following Passover, which runs from April 5 through April 13.  If that occurs, Defendants will promptly update the Court.

to protect Defendants from violating Israeli law.  (*Id.*)  Although Plaintiffs' counsel stated that Plaintiffs might consider narrowing their RFPs in the future, he refused to do so before Defendants filed this motion.  (*Id.*)  Plaintiffs' counsel agreed that this motion should address Plaintiffs' RFPs "as drafted."  (*Id.*)

## II.   LEGAL STANDARDS

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  For good cause, the Court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  *Id.* R. 26(c)(1).  In fashioning a protective order, the court may forbid the discovery or limit the scope of discovery, among other remedies.  *Id.* R. 26(c)(1)(A), (D).

Rule 26 mandates proportionality and thus prohibits "fishing expeditions."  *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004); *see also Quiroz v. Praetorian Ins. Co.*, 2014 WL 3845418, at *2 (N.D. Cal. Aug. 5, 2014) ("[D]iscovery cannot be used as a fishing expedition for evidence of claims that have not been asserted."); *accord Costella v. Clark*, 2009 WL 4730856, at *2 (N.D. Cal. Dec. 7, 2009) (Hamilton, J.); *BenQ Am. Corp. v. Forward Elec. Co.*, 2005 WL 3445629, at *10 (N.D. Cal. Dec. 15, 2005) (Hamilton, J.).  As the text of Rule 26(b)(1) confirms, the scope of "relevant" discovery depends on a plaintiff's "claim[s]."  *Id.* R. 26(b)(1).  A plaintiff, therefore, "bears the burden of demonstrating [that] the information sought is relevant" to the claims in their Complaint, not "that it might conceivably become" relevant to claims they have not yet asserted. *Bluestone Innovations LLC v. LG Elecs. Inc.*, 2013 WL 6354419, at *2 (N.D. Cal. Dec. 5, 2013).

Courts may also protect foreign residents from discovery when foreign law prohibits them from producing such discovery.  *E.g.*, *In re CRT Antitrust Litig.*, 2014 WL 6602711, at *3 (N.D. Cal. Nov. 20, 2014); *In re TFT-LCD Antitrust Litig.*, 2011 WL 13147214, at *4-6 (N.D. Cal. Apr. 26, 2011); *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1082-84 (N.D. Cal. 2007).[3]

---

[3] Facebook itself sought and received protection against discovery on this ground in litigation related to its violations of Facebook users' privacy rights.  *Campbell v. Facebook Inc.*, 2015 WL 4463809, at *3-5 (N.D. Cal. July 21, 2015).

In deciding whether to grant a foreign resident protection against discovery, courts in the Ninth Circuit apply the multi-factor test from *Richmark*.  Under that test, the court considers:

> [i] [T]he importance to the investigation or litigation of the documents or other information requested; [ii] the degree of specificity of the request; [iii] whether the information originated in the United States; [iv] the availability of alternative means of securing the information; [v] and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

959 F.2d at 1475.

The first two factors address the importance of the discovery and the specificity of the requests at issue.  Under the first factor (importance), "courts have generally been unwilling to override foreign secrecy laws" when "the outcome of litigation does not stand or fall on the present discovery order."  *Id.* at 1475.  Under the second factor (specificity), courts consider "how burdensome it will be to respond to th[e] request" and will not approve a "[g]eneralized search[] for information."  *Id.*

The third, fourth, and fifth factors address the interests of the foreign resident, the party seeking discovery, and the countries at issue.  The third factor (location) necessarily "weighs against disclosure" when "all the information to be disclosed (and the people who will be deposed or who will produce the documents) are located in a foreign country."  *Id.*  Under the fourth factor (alternative sources), "a request for discovery by way of the Hague Convention [on the Taking of Evidence Abroad]" is often "an alternative means of securing the evidence at issue."  *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 152-56 (S.D.N.Y. 2011); *accord Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*, 2019 WL 6134958, at *3 (N.D. Cal. Nov. 19, 2019).  The fifth factor (sovereign interests) considers the "interest [of] the foreign state, the significance of disclosure in the regulation of the activity in question, and indications of the foreign state's concern for confidentiality prior to the controversy."  *Richmark*, 959 F.2d at 1476.

Courts may also consider "the extent and the nature of the hardship that inconsistent enforcement would impose upon the person" and "the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that

1    state." *Id.* at 1475 (cleaned up).

2    **III.    ARGUMENT**

3         Plaintiffs' RFPs are a quintessential fishing expedition, seeking a breathtaking array of

4    materials—essentially every document Defendants have—with no attempt to tailor the requests to

5    Defendants' obligations under Israeli law or even to Plaintiffs' actual claims.  Because production

6    in response to Plaintiffs' RFPs would expose Defendants to criminal prosecution in Israel and the

7    RFPs do not comply with the Federal Rules' limits on relevant discovery, this Court should grant

8    Defendants' motion and issue a protective order against Plaintiffs' RFP Nos. 1-29.  At a minimum,

9    the Court should order Defendants to seek their discovery in Israel through the Hague Convention.

10        **A.    The Court Should Issue a Protective Order Because Israeli Law Prohibits**

11            **Defendants from Complying with Plaintiffs' RFPs.**

12        It is undeniable that Plaintiffs' RFPs seek information that Israel's DECL and ▮▮▮▮

13    ▮▮ prohibit Defendants from producing.  In the DECL's terms, almost every RFP (Nos. 1, 3, 5,

14    7, 9, 10, 12, 14-17, 19-26, and 28) would require Defendants to transfer "defense know-how"—

15    that is, "information referring to [the] design, assembly, inspection, upgrade and modification,

16    training, maintenance, operation[,] repair," and "handling" of NSO's defense technology"—

17    "outside of Israel" and "to a foreign corporation."  (DECL §§ 2, 15(a).)  Defendants have not

18    "received a license" to provide that information to Plaintiffs.  (*Id.* § 15(a).)  Therefore, producing

19    that information would be a crime under the DECL.  (*Id.* § 32(a).)

20        In addition, every RFP would cause Defendants to violate ▮▮▮▮▮▮▮▮.  Although

21    a few RFPs seek some information Defendants would not otherwise oppose producing—such as

22    requests to identify certain employees or produce certain organization charts or financial

23    information—the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮▮  (Dkt. 133-6, Exh. F ¶ 2; *see* Dkt. 133-6, Exhs. B, D.)[4]  There are, therefore, no RFPs with

26

27    ───────────────
     [4] Defendants are currently in the process of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ subject to Defendants'

28    objections as to scope. In addition, as discussed in note 2 *supra*,

     DEFENDANTS' AMENDED MOTION                    8                    Case No. 4:19-cv-07123-PJH
     FOR PROTECTIVE ORDER

1    which Defendants could comply without exposing themselves to criminal prosecution in Israel.

2         Therefore, whether Defendants can be compelled to produce that information—and face

3    criminal prosecution in Israel for doing so—depends on the *Richmark* factors. Here, those factors

4    favor Defendants. Plaintiffs' RFPs are wildly overbroad, so they do not seek sufficiently

5    "important[t]" or "specifi[c]" categories of information to justify overriding Israeli law. *Richmark*,

6    959 F.2d at 1475. All of the information Plaintiffs seek "originated" outside the United States. *Id.*

7    Plaintiffs may have "alternative means of securing the information," namely the Hague

8    Convention and third-party subpoenas. *Id.* Israel's interest in preventing the disclosure of

9    ██████████████████████████████████████████████████████████████████

10   (Dkt. 133-6, Exh. F ¶ 3; Dkt. 133-4 ¶ 2), exceeds the United States' interest in a lawsuit involving

11   alleged conduct committed by foreign governments in foreign countries. And requiring

12   Defendants to violate Israeli law would impose extreme "hardship" on Defendants by exposing

13   them to a very real risk of criminal prosecution in Israel. *Richmark*, 959 F.3d at 1476.

14        For these reasons, the Court should issue a protective order sparing Defendants from

15   violating Israeli law by responding to Plaintiffs' RFPs. At a minimum, the Court should require

16   Plaintiffs to seek their discovery through the Hague Convention before proceeding in this Court.

17              1.    **Plaintiffs' Overbroad RFPs Do Not Seek Important Information and**

18                    **Are Not Specific.**

19        The Court should not require Defendants to respond to Plaintiffs' RFPs because they are

20   wildly overbroad, and "generalized searches for information whose disclosure is prohibited under

21   foreign law are discouraged." *In re Rubber Chems.*, 486 F. Supp. 2d at 1083. Plaintiffs' RFPs can

22   be categorized in different ways, but however they are categorized, they "go beyond what is

23   necessary to litigate the disputed issues in this case." *Sun Grp.*, 2019 WL 6134958, at *3. That

24   weighs heavily against production.

25            *a. RFPs That Are Not Limited to WhatsApp (RFP Nos. 3-5, 9, 11, 19-26, 28, 29).*

26

27   ████████████  following Passover. Defendants will promptly notify the Court of any

28   developments.

Plaintiffs' claims against Defendants relate only to the alleged use of NSO's Pegasus technology to access *WhatsApp* servers and *WhatsApp* users' devices. (*E.g.*, Compl. ¶¶ 32, 53, 60.) But many of Plaintiffs' RFPs seek information about all of Defendants' technologies and business, regardless of whether they have any connection to WhatsApp, its servers, or its users. For example, RFP No. 3 seeks "all DOCUMENTS and COMMUNICATIONS concerning the use of NSO SPYWARE by third-parties," regardless of whether the technology or its use have any relation to WhatsApp. Similarly, RFP No. 9 seeks "ALL DOCUMENTS and COMMUNICATIONS" about "TECHNOLOGY used by NSO SPYWARE to monitor TARGET DEVICES," regardless of whether the technology or "target devices" have any relation to WhatsApp. Other RFPs (Nos. 5, 28) seek information related to Facebook, even though the Complaint asserts no claim based on any alleged access to Facebook computers or users. All of the requests in this category (Nos. 3-5, 11, 19-26, 28, 29) seek information unrelated to WhatsApp, its servers, or its users.[5]

Requests that seek information unrelated to WhatsApp have no conceivable relevance to Plaintiffs' claims, which are limited to alleged access to WhatsApp servers and WhatsApp users' devices. Discovery related to any other computer, company, or user is irrelevant to Plaintiffs' claims, and "the outcome of litigation does not stand or fall" on that discovery. *Richmark*, 959 F.2d at 1475; *accord In re TFT-LCD*, 2011 WL 13147214, at *3 (holding court should not require disclosure "where the disputed documents are . . . not 'outcome-determinative' or 'directly relevant'"). Plaintiffs' RFPs are overbroad, "generalized" requests that are not sufficiently important or specific to override Defendants' obligations under Israeli law. *Richmark*, 959 F.3d at 1475; *In re Rubber Chems.*, 486 F. Supp. 2d at 1083.

**b. RFPs That May Not Be Limited to WhatsApp (RFP Nos. 1, 8, 10, 12-14, 28).** These RFPs are drafted in such a way that it is unclear whether they are appropriately limited to WhatsApp. Specifically, they seek information related to the alleged targeting of "WHATSAPP

---

[5] During the parties' meet-and-confer discussions, Plaintiffs' counsel said Plaintiffs *might* consider narrowing these RFPs *after* the Court resolves this motion. (Akro Decl. ¶ 3.) Plaintiffs' counsel refused to consider any limitations before that time, so any hypothetical future limitations have no bearing on whether Plaintiffs' RFPs, "as drafted," satisfy *Richmark*. (*Id.*)

USERS," which is defined to encompass "any WhatsApp user."  As a result, these RFPs, as drafted, seek information about WhatsApp users whose devices were allegedly accessed with Defendants' technology, *whether or not that alleged access had anything to do with WhatsApp*.  WhatsApp is the most popular messaging application in the world, and most people with mobile devices are "WhatsApp users."  Even if a user's device was allegedly accessed through a means other than WhatsApp—for example, through Apple iOS—that user and that access would fall under these requests simply because the targeted user happens to have a WhatsApp account.  Evidence related to the targeting of such users is irrelevant to Plaintiffs' claims, which are limited to the alleged access of WhatsApp's users' devices via WhatsApp servers, *through a vulnerability in WhatsApp*. (*E.g.*, Compl. ¶¶ 1, 32, 53, 60.)  Requests for that evidence, therefore, are unimportant and not sufficiently specific.

      ***c. RFPs Covering "Target Devices" or "Target Users" Other Than the 1,400 Users and Devices Described in the Complaint (RFPs 9, 19, 24).***  The Complaint's very first paragraph explains that Plaintiffs' claims challenge the alleged "use[] [of] WhatsApp servers . . . to send malware to approximately 1,400 mobile phones and devices."  (Compl. ¶ 1.)  The Complaint expressly defines "Target Devices" as limited to those 1,400 devices and "Target Users" as limited to the users of those 1,400 devices.  (*Id.*)  And Plaintiffs' claims expressly challenge only the alleged access to the 1,400 Target Devices owned by Target Users.  (*E.g.*, *id.* ¶¶ 50-54, 56.) Evidence related to any of Defendants' other versions of Pegasus, which were not used against those Target Devices and Target Users, or any of Defendants' non-Pegasus technologies, is therefore irrelevant to Plaintiffs' claims. (*See* Shohat Decl. ¶¶ 5-6, 8.) But the RFPs define "Target Devices" and "Target Users" as encompassing *all* "computers and servers, including but not limited to mobile phones or devices, that NSO or its customers targeted, transmitted, routed, or installed with any NSO SPYWARE, including *but not limited to* the 1,400 Target Users who are referenced in the COMPLAINT."[6]  RFP Nos. 9, 19, and 24 seek broad categories of information related to all such devices and users.  By covering devices and users well beyond the 1,400 Target

---

[6] These definitions are further improper because they are not limited to WhatsApp users.

Devices and Target Users expressly defined in the Complaint, these RFPs seek irrelevant information, are not important to Plaintiffs' claims, and are not sufficiently specific.

Plaintiffs have argued that their claims extend beyond the 1,400 Target Devices and Target Users, but the Complaint forecloses that argument. As explained, the Complaint expressly limits "Target Devices" and "Target Users" to the 1,400 users allegedly targeted "in and around April 2019 and May 2019." (Compl. ¶ 1.) And Plaintiffs' claims are expressly limited to those 1,400 Target Devices and Users. (*Id.* ¶¶ 50-54, 56.) Plaintiffs cannot use discovery into technologies used to access other devices of other users to expand their claims beyond the express scope of the Complaint. *Quiroz*, 2014 WL 3845418, at *2; *Bennett-Martin v. San Bernardino Valley Cmt. Coll.*, 2018 WL 5919212, at *8 (C.D. Cal. May 15, 2018); *Manuf. Automation & Software Sys., Inc. v. Hughes*, 2017 WL 5641120, at *4 (C.D. Cal. Sept. 21, 2017). And even if discovery into such devices and users had some minimal relevance to Plaintiffs' claims, it is not sufficiently important to override Defendants' obligations under Israeli law because it is not "outcome-determinative." *In re TFT-LCD*, 2011 WL 13147214, at *3. Plaintiffs can pursue their claims based on evidence limited to the 1,400 Target Devices and Users described in the Complaint, so "the outcome of litigation does not stand or fall" on broader discovery. *Richmark*, 959 F.2d at 1475.

**d. RFPs Covering Technology Other Than the Relevant Pegasus Technology (RFP Nos. 1-5, 7-10, 12-14, 16, 17, 19, 24-26, 28).** In addition to being limited to 1,400 specific devices, Plaintiffs' claims are limited to the single technology allegedly used to access those devices: the ████████ an NSO program called Pegasus, which was in effect between April and May 2019. (Compl. ¶¶ 24-29, 38; *see* Dkt. No. 111 at 2-4; Shohat Decl. ¶¶ 6, 8.) The Complaint does not allege the existence of any other technology that has been or could be used against Plaintiffs or their users. (*See* Compl. ¶ 35 ("Defendants reverse-engineered the WhatsApp app and developed *a program*"—singular—"to enable them to emulate legitimate WhatsApp traffic" (emphasis added)). Plaintiffs' RFPs, however, seek discovery into *all* NSO technology, expressly "not limited to Pegasus." (RFPs at 3; *see* RFP Nos. 1-5, 7-10, 12-14, 16, 17, 19, 26.) These RFPs, because they seek discovery into supposed technologies that the Complaint does not allege exist or have ever been used against WhatsApp or WhatsApp users, are irrelevant, unimportant,

1    and not sufficiently specific.

2           To challenge this reading of the Complaint, Plaintiffs have only ever cited one allegation:

3    a claim that the NSO technology allegedly used in April and May 2019 is "Pegasus or another

4    remote access trojan developed by Defendants." (Compl. ¶ 32.)  In context, however, Plaintiffs

5    clearly allege that the relevant "remote access trojan" is ███████████ Pegasus.  (*Id.* ¶¶

6    24–29.)  That is how the Court has understood Plaintiffs' claims. (Dkt. No. 111 at 2-4.)  Nothing

7    in the Complaint can reasonably be read as alleging that Defendants have ever used any technology

8    other than a single version of Pegasus to harm Plaintiffs.  But again, even if evidence of

9    technologies other than that version of Pegasus had some minimal relevance to Plaintiffs' claims,

10   "the outcome of litigation does not stand or fall" on that evidence.  *Richmark*, 959 F.2d at 1475.

11   As the Complaint's allegations show, Plaintiffs believe they can establish their claims with

12   evidence limited to ███████████ Pegasus in use between April and May 2019.

13          **e. RFPs That Are Overbroad as to Time (RFP Nos. 3, 5, 7, 9, 10, 12, 14, 15-17, 19-26,**

14   **28, 29).**  Just as Plaintiffs' RFPs exceed the substantive scope of their claims, their RFPs also

15   exceed the relevant time period for their claims.  The Complaint is explicit that Plaintiffs challenge

16   conduct beginning no earlier than January 2018, when Defendants allegedly "created WhatsApp

17   accounts" (Compl. ¶ 33; *see id.* ¶ 30), and ending no later than May 2019, when Plaintiffs "closed

18   the vulnerability" allegedly exploited by Pegasus (*id.* ¶ 44).  Plaintiffs do not claim they were

19   injured by any unlawful conduct before January 2018 or after May 2019.  Their RFPs, however,

20   include two requests reaching back to January *2014* (RFP Nos. 5, 29), and many others with no

21   temporal limitation of any kind.  These RFPs, because they seek discovery from time periods other

22   than those at issue in Plaintiffs' claims, are irrelevant, unimportant, and not sufficiently specific.

23   *See Sun Grp.*, 2019 WL 6134958, at *3 (holding requests dating to "January 1, 2010" were not

24   important or specific under *Richmark* because plaintiff's "claims concern an agreement made in

25   April 2014").  Even if evidence from other time periods were minimally relevant, "the outcome of

26   litigation does not stand or fall" on that evidence.  *Richmark*, 959 F.2d at 1475.

27          **f. Requests to Identify Employees and to Produce Corporate Information (RFP Nos. 2,**

28   **4, 6, 8, 11, 13, 18, 27, 29).**  These RFPs ask Defendants to identify certain employees (RFP Nos.

2, 4, 6, 8, 11, 13, 18) and seek discovery into Defendants' corporate structure and finances (RFP Nos. 27, 29). Other than to the extent these requests are overbroad for the reasons given above, Defendants ordinarily would not oppose them. But ███████████ prohibits Defendants from producing the requested information, *supra* at 5, 8-9, and that information is not important enough to override Defendants' obligations under Israeli law. Requests for "general information about [the defendant's] corporate structure, the identity of [defendant]-related employees, and general sales and market share data" are not important under *Richmark*. *In re TFT-LCD*, 2011 WL 13147214, at *3. Even if that information could "make it easier" for Plaintiffs to receive or understand other evidence, that "does not render such documents substantively important to the case." *Id.* at *4.

### 2. All of the Information Sought by Plaintiffs Originated Abroad.

None of the information Plaintiffs seek through their RFPs "originated in the United States." *Richmark*, 959 F.2d at 1475. All of the information originated in, and is located in, Israel or other foreign countries. (Dkt. 45-11 ¶ 4.) Defendants have no operations, offices, employees, or documents in the United States. (*Id.*) Because "all the information to be disclosed (and the people who will be deposed or who will produce the documents) are located in a foreign country," that strongly "weighs against disclosure." *Richmark*, 959 F.2d at 1475 (finding "[t]his factor weighs against requiring disclosure" when party "ha[d] no United States office" and "[a]ll of its employees, and all of the documents . . . requested" were located in China); *see Sun Grp.*, 2019 WL 6134958, at *3 (holding presence of documents in China favored nondisclosure); *In re CRT*, 2014 WL 6602711, at *2 (holding "the fact that the [evidence] originated in the EU still weighs against production"); *In re Rubber Chems.*, 486 F. Supp. 2d at 1083 (holding "this factor weigh[ed] against production" of documents "created, transmitted, and used only in Europe"); *Tiffany*, 276 F.R.D. at 152 (holding "[t]he overseas location of th[e] information weights" against production).

### 3. Plaintiffs Can Seek Discovery Through Alternative Means.

Plaintiffs have "alternative means of securing the evidence at issue" because they can submit "a request for discovery" in Israel "by way of the Hague Convention." *Tiffany*, 276 F.R.D. at 152-56; *accord Sun Grp.*, 2019 WL 6134958, at *3. Israel is a party to the Hague Convention, and it will accept discovery requests from parties to litigation in the United States. *Gap, Inc. v.*

1    *Stone Int'l Trading, Inc.*, 1994 WL 38651, at *1 (S.D.N.Y. Feb. 4, 1994); *see* U.S. Department of

2    State, *Israel, the West Bank, and Gaza Judicial Assistance Information*, https://bit.ly/3JvMwIf;

3    Hague Conference Service Convention, *Israel*, https://bit.ly/3lu8raG.  In addition, Plaintiffs have

4    served dozens of third-party subpoenas through which they can receive (and likely already have

5    received) enormous amounts of discovery.  Finally, because Plaintiffs allegedly conducted a

6    thorough investigation into Defendants' alleged conduct, they should already possess most of the

7    information they need to litigate their claims.  (Compl. ¶¶ 44, 57, 64, 73).  This factor therefore

8    favors Defendants.

9              **4.      Israel's Interests Outweigh the United States' Interests.**

10           This factor also favors Defendants because Israel, an important U.S. ally, has a strong

11   national-security interest in preventing the disclosure of the information sought by Plaintiffs.  To

12   analyze a foreign country's interest under *Richmark*, courts consider "expressions of interest by

13   the foreign state, the significance of disclosure in the regulation of the activity in question, and

14   indications of the foreign state's concern for confidentiality prior to the controversy." *Richmark*,

15   959 F.2d at 1476.  All three of these considerations weigh against disclosure here. ▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that discovery in this case ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. 133-6, Exh. F ¶ 3; Dkt. 133-4 ¶ 2;

18   *see* Dkt. 133-6, Exhs. B, D.)

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Israel has expressed this interest long

20   before this lawsuit.  Through the DECL, enacted in 2007, Israel legislated—and enforced through

21   criminal penalties—strong protections against the disclosure against information exactly like that

22   Plaintiffs seek.  The DECL "explicitly prohibits disclosure of th[at] information." *Tiffany*, 276

23   F.R.D. at 157.  And Israel has consistently enforced the DECL's provisions against Defendants by

24   reviewing, and separately approving, every transfer of NSO's technology and information to any

25   foreign government.  (Dkt. No. 45-11 ¶ 5.)

26           This all confirms Israel has a strong interest in preventing disclosure because it is significant

27   to Israel's national security, foreign relations, and regulation of Defendants' technology. *Cf. In re*

28   *CRT*, 2014 WL 1247770, at *2-3 (denying production of "important" evidence when production

would undermine enforcement of foreign antitrust laws); *In re TFT-LCD*, 2011 WL 13147214, at *5-6 (same); *In re Rubber Chems.*, 486 F. Supp. 2d at 1084 (same); *Campbell*, 2015 WL 4463809, at *5 (finding production of evidence of Facebook's activities in Ireland would "obstruct effective regulation" of Facebook by Ireland).

In contrast, the United States' interest in this lawsuit is minimal.  This case's only connection to the United States is that Plaintiffs happen to be based in California.  Otherwise, all of the alleged conduct challenged by Plaintiffs was committed by foreign actors, in foreign countries, against foreign residents. ███████████  the United States has expressed no interest in discovery in this case.  The United States thus has only a "generalized interest" in "'vindicating the rights of American plaintiffs,'" which is "present in any civil litigation in the United States." *Sun Grp.*, 2019 WL 6134958, at *4.  In these circumstances, that generalized interest pales in comparison to Israel's substantial, case-specific interest in preventing ███████████ ███████████████████████████████████████████████ (Dkt. 133-6, Exh. F ¶ 3; Dkt. 133-4 ¶ 2); *see Tiffany*, 276 F.R.D. at 158 (holding "the Chinese interest in protecting [bank] account holders' confidentiality" was "more significant" than the United States' "interest in enforcing its orders and protecting trademark rights"); *In re TFT-LCD*, 2011 WL 13147214, at *6 (finding that foreign agencies' "interest in maintaining the confidentiality of materials obtained or generated in connection with ongoing antitrust investigations outweighs the United States' interest in allowing discovery").

Defendants are not aware of any case in which a U.S. court has required a foreign defendant to produce information when one of the United States' key allies has prohibited the disclosure of that information for national-security reasons.  This Court should not be the first.

### 5.  Defendants Face Extreme Hardship in the Form of Criminal Prosecution and Civil Penalties.

Finally, Defendants and their officers will face extreme hardship if they are ordered to produce the requested discovery because they will face "criminal prosecution," *Richmark*, 959 F.2d at 1477, for violating the DECL and ███████████ (DECL § 32).  This is "a weighty excuse for nonproduction." *Richmark*, 959 F.2d at 1477.  In addition, Defendants will also face civil penalties

(DECL §§ 35-43), and Israel can terminate Defendants' license to do business (Dkt. 45-11 ¶ 6).

These risks are not hypothetical.  Between 2008 and 2011, Israel's Ministry of Defense criminally prosecuted at least three companies for DECL violations and imposed administrative sanctions against at least 29 more.  Gili Cohen, *Dozens of Israeli Defense Firms Suspected of Export Law Violations*, Haaretz (Dec. 31, 2013), https://bit.ly/408bTHe.  In 2013, the Ministry of Defense "conducted 14 hearings for companies engaged in military exports and imposed fines totaling more than 4 million shekels ($1.2 million)" for DECL violations.  *Id.*; *see* Jonathan Aronson, *Export Control Laws: Playing It Smart*, Israel Defense (June 25, 2013), https://bit.ly/3ySPHos (discussing 2013 enforcement).  And, according to Israeli officials, "enforcement efforts" have now "stepped up substantially."  Cohen, *supra*.  The head of Israel's Department of Defense Export Controls "warned that the ministry would not tolerate [DECL] violations" and that Israel would "apply 'the full extent of the punishment available' against offending companies."  *Id.*  He warned that would include "penalties against individuals in key positions at offending companies."  *Id.*

As a result, Israel has prosecuted multiple companies under the DECL in recent years.  In 2019, Israel "suspend[ed] the licenses" of two security technology companies as a penalty for DECL violations.  Ability Inc., SEC Form 6-K (Sept. 16, 2019), https://bit.ly/42lLs2h; Idan Zonshine, *Two Israeli Security Tech Firms Investigated on Suspicion of Fraud*, Jerusalem Post (Sept. 15, 2019), https://bit.ly/3yT8Vdw.  In 2021, Israel criminally charged three companies and ten individuals for DECL violations.  Shlomi Diaz & Avi Cohen, *Israeli Defense Firms Suspected of Illegally Exporting Missiles to China*, Israel Hayom (Dec. 21, 2021), https://bit.ly/40pS91r; Jerusalem Post Staff, *Israeli Companies Exported Cruise Missiles to China Without Permit*, Jerusalem Post (Dec. 20, 2021), https://bit.ly/3JxMf7l.  These prosecutions show that "Israeli authorities treat any violation of its defense exports law very seriously."  Diaz & Cohen, *supra*; *see Tiffany*, 276 F.R.D. at 160 (holding "potentially harsh sanctions and narrow exceptions to [Chinese] regulations indicate that China's interests . . . are more significant than those at issue for the United States").

Because Israel has prosecuted companies for DECL violations "in the past, and the

1    potentially harsh sanctions are applicable to both [Defendants] and their personnel, the potential

2    for hardship places this factor in favor of [Defendants]." *Tiffany*, 276 F.R.D. at 159.

3          **B.**     **The Court Should Issue a Protective Order Because Plaintiffs' Overbroad**

4                  **RFPs Seek Irrelevant Information That Is Disproportionate to Their Claims.**

5         Even independent of Israeli law, the Court should still issue a protective order because, as

6    explained above, Plaintiffs' RFPs are grossly overbroad.  Plaintiffs' Complaint clearly cabins the

7    scope of their claims to a single past event: the alleged use of a specific Pegasus technology to

8    access the 1,400 Target Devices in April and May 2019.  (Compl. ¶¶ 1, 24-29, 32, 38, 50, 55, 57,

9    59-63, 64, 73.)  The alleged conduct challenged in the Complaint allegedly began in January 2018

10   and ended in May 2019.  (*Id.* ¶¶ 1, 30, 33, 44.)  Yet Plaintiffs seek information about all of NSO's

11   technology (including all versions of Pegasus, including totally irrelevant ones) and customers,

12   and all devices allegedly accessed by those technologies and customers, whether or not the

13   information has anything to do with WhatsApp, ▆▆▆▆▆▆▆▆ Pegasus, the 1,400 Target

14   Devices, or the time period described in the Complaint.  Those requests are neither relevant nor

15   proportional to Plaintiffs' claims.  They are, instead, a speculative fishing expedition designed to

16   burden Defendants and manufacture new claims that Plaintiffs have essentially admitted they

17   currently lack any basis to assert.  (*See* Dkt. 116 at 19 (speculating the RFPs "*may* identify spyware

18   other than Pegasus" (emphasis added))).[7]

19        Rule 26's "proportionality requirement" is "directed at preventing just this type of

20   sweeping, unfocused discovery."  *Bennett-Martin*, 2018 WL 5919212, at *8.  Plaintiffs cannot file

21   a lawsuit and use it as part of a strategy to extract general information from and impose large costs

---

[7] Plaintiffs have argued that the scope of their *factual allegations* dictates the bounds of relevance but not the scope of their *claims*, but that ignores the central point.  Plaintiffs' *claims*—not just their allegations—are based exclusively on the alleged use of Pegasus to access the 1,400 "Target Devices" and "Target Users" described in the Complaint.  The only way in which Plaintiffs claim NSO harmed them was by using Pegasus to access 1,400 Target Devices in Spring 2019.  In any event, "[t]he pleadings logically shape the scope of discovery." *U.S. ex rel. Uchytil v. Avande, Inc.*, 2018 WL 4150889, at *1 (W.D. Wash. Feb. 27, 2018) (internal quotation marks omitted).  When Plaintiffs allege only facts related to ▆▆▆▆▆▆▆ Pegasus, the 1,400 Target Users, and Spring 2019, those factual allegations necessarily inform the scope of Plaintiffs' claims.

on a commercial adversary.  *E.g.*, *Hughes*, 2017 WL 5641120, at *4.  In *Hughes*, for instance, the plaintiff brought claims for copyright infringement, breach of contract, and violations of CFAA and CDAFA based on allegations that the defendants copied a specific software called the "MASS Software."  *Id.* at *1-2.  During discovery, the plaintiff sought "information related to *all* communications between Defendants and *any* person regarding Defendants' services or products" and "documents related to *any and every* agreement or license entered into . . . between Defendants and *any other person*."  *Id.* at *4 (emphasis in original).  The Court rejected those requests, holding they were overbroad because they were "not limited to communications or agreements related to the M[ASS] Software that is the subject of the litigation."  *Id.*; *see also Alcon Ent., LLC v. Automobiles Peugeot SA*, 2021 WL 8055689, at *1-2 (C.D. Cal. May 7, 2021) (rejecting RFPs seeking discovery into products and conduct "divorced from the claims and defenses of this case"); *TIBCO Software Inc. v. GAIN Cap. Grp.*, 2018 WL 4176622, at *2 (N.D. Cal. Aug. 31, 2018) (limiting discovery into defendant's software to "the specific software identified in the . . . complaint" because plaintiff's claims were "limited to th[at] specific software"); *Bennett-Martin*, 2018 WL 5919212, at *7 (rejecting RFPs that were not "tie[d]" to "the allegations or circumstances described in the [complaint]"); *Woodard v. Labrada*, 2018 WL 6930767, at *3, 5, 7 (C.D. Cal. Jan. 11, 2018) (rejecting discovery into "products" other than "the specific products implicated in this action" or "alleged to be at issue").  Here too, Plaintiffs improperly seek discovery far beyond the specific technology and conduct described in the Complaint.

Courts similarly have rejected RFPs, like Plaintiffs', that seek "discovery for a 'broader time period than that detailed in the complaint.'"  *Uchytil*, 2018 WL 4150889, at *1 (quoting *U.S. ex rel. Jacobs v. CDA, P.A.*, 2016 WL 4146077, at *2 (D. Idaho Aug. 3, 2016)); *see Terpin v. AT&T Inc.*, 2022 WL 3013153, at *3-5 (C.D. Cal. June 13, 2022); *Bennett-Martin*, 2018 WL 5919212, at *8; *Dai v. U.S. Citizenship & Immigration Servs.*, 2017 WL 11634511, at *5-6 (C.D. Cal. Sept. 12, 2017); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 2013 WL 4525226, at *2-3 (E.D. Pa. Aug. 27, 2013).  "Discovery under the federal rules, while broad and not limited to admissible evidence, does not countenance such sweeping requests that are untethered to the actual claims and defenses at issue."  *Bennett-Martin*, 2018 WL 5919212, at *8.

1        This Court should likewise reject Plaintiffs' RFPs, which are not limited to the alleged

2   conduct or time period "that is the subject of the litigation."  *Hughes*, 2017 WL 5641120, at *4.

3   Rather than seek discovery related to the aspects of the Pegasus technology allegedly used against

4   the 1,400 Target Users in April and May 2019, Plaintiffs seek discovery into NSO's entire

5   business, including technologies, conduct, and time periods unrelated to Plaintiffs' claims.  Those

6   requests are overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the

7   case.  That is particularly true in light of Plaintiffs' recent strategic and tactical decision to abandon

8   their claim for reputational damages.  (Akro. Decl. ¶ 4 & Exh. B.)  Without a claim for reputational

9   damages, Plaintiffs (by their own calculation) will be seeking compensatory damages of only

10  "approximately $1 million."   (Akro. Decl. Exh. C.)[8]  Such a minimal amount of damages does

11  not justify the astonishing scope of discovery sought in Plaintiffs' RFPs.

12       For these reasons, the Court should reject Plaintiffs' overbroad RFPs.  To the extent that

13  the Court permits any discovery about Defendants' technology, it should make clear that such

14  discovery may be had *only* to the extent it relates to the alleged use of the specific version of

15  Pegasus that allegedly was used to target 1,400 specific Target Users between April and May 2019,

16  and not as to other versions of Pegasus or Defendants' other non-Pegasus technologies, which have

17  no bearing on Plaintiffs' claims.

18  **IV.   CONCLUSION**

19       For good cause shown, the Court should grant Defendants' motion and issue a protective

20  order against Plaintiffs' RFPs.  At a minimum, the Court should order Defendants to seek their

21  discovery through the Hague Convention.  If the Court finds that any details of Defendants'

22  technology are discoverable notwithstanding Israeli law, the Israeli court order, and the *Richmark*

23

24  [8] Plaintiffs have also claimed to seek disgorgement of Defendants' profits, but Plaintiffs are not

25  entitled to that equitable relief because they cannot establish that compensatory damages are not "an adequate remedy at law" for their alleged losses.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  Plaintiffs' Complaint does not allege that they lack an adequate remedy

26  at law.  To the contrary, they allege they suffered purely "economic damages" that could be fully addressed through legal relief.  (*E.g.*, Compl. ¶ 73.)  Plaintiffs also are not entitled to an injunction

27  because they allege they have closed the WhatsApp vulnerability allegedly exploited by the

28  relevant Pegasus technology and thus face no risk of future injury.  (*See* Dkt. Nos. 105, 110.)

---

DEFENDANTS' AMENDED MOTION          20          Case No. 4:19-cv-07123-PJH
FOR PROTECTIVE ORDER

factors, the Court should limit discovery to the single specific version of Pegasus allegedly used against the 1,400 Target Users in April and May 2019.  However, the *Richmark* factors militate in favor of granting the motion in its entirety and entering the proposed protective order sought by Defendants and filed concurrently herewith.

DATED:  April 10, 2023

KING & SPALDING LLP

By:  */s/Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG
Attorneys for Defendants NSO GROUP
TECHNOLOGIES LIMITED and Q
CYBER TECHNOLOGIES LIMITED