EXHIBIT A

# KING & SPALDING

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Tel: +1 213 443 4355
Fax: +1 213 443 4310
www.kslaw.com

Joseph N. Akrotirianakis
Partner
Direct Dial: +1 213 443 4313
jakro@kslaw.com

**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY**

February 1, 2023

**VIA ELECTRONIC TRANSMITTAL ONLY**

Antonio Perez-Marques, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

Re:     WhatsApp and Letter of January 27, 2023

Dear Counsel:

This letter is in response to your letter of January 27, 2023.

As we have discussed, █████████████████████████████████████████

Very truly yours,

Joseph N. Akrotirianakis

cc:     A. Craig, Esq.
        C. Christofferson, Esq.
        L. Marzorati, Esq.

# EXHIBIT B

Pages 1 - 52

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton
United States Chief District Judge

WHATSAPP, INC., *ET AL.*,       )
                                )
          Plaintiffs,           )
                                )
     vs.                        )        **Case No. 4:19-CV-07123-PJH**
                                )
NSO GROUP                       )
TECHNOLOGIES, LTD., *ET AL.*,   )
                                )
          Defendants.           )
_____)

Oakland, California
Thursday, February 16, 2023

**<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>**

APPEARANCES ON NEXT PAGE.

TRANSCRIPTION SERVICE BY:      Dipti Patel, CET-997
                               Liberty Transcripts
                               7306 Danwood Drive
                               Austin, Texas 78759
                               (847) 848-4907

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiffs:

                DAVIS POLK & WARDWELL LLP
                450 Lexington Avenue
                New York, New York 10017
        BY:  **GREG D. ANDRES, ATTORNEY AT LAW**
             **ANTONIO J. PEREZ-MARQUES, ATTORNEY AT LAW**
             **CRAIG CAGNEY, ATTORNEY AT LAW**

                DAVIS POLK & WARDWELL LLP
                1600 El Camino Real
                Menlo Park, California 94025
        BY:  **MICAH G. BLOCK, ATTORNEY AT LAW**

For the Defendants:
                KING AND SPALDING LLP
                633 West Fifth Street, Suite 1700
                Los Angeles, California 90071
        BY:  **JOSEPH N. AKROTIRIANAKIS, ATTORNEY AT LAW**
             **AARON S. CRAIG, ATTORNEY AT LAW**

3

| | |
|---|---|
| 1 | **Thursday - February 16, 2023**                    **12:00 P.M.** |

2                    **P R O C E E D I N G S**

3                            ---oOo---

4        **THE CLERK:**  U.S. District Court is now in session; the

5    Honorable Phyllis J. Hamilton presiding.

6        Calling Civil Case 19-7123-PJH, WhatsApp Inc., *et al.* versus

7    NSO Group Technologies Limited, *et al.*

8        Counsels, please state your appearances, beginning with

9    plaintiffs' counsel.

10        **MR. ANDRES:**  Good afternoon, Your Honor.

11        Greg Andres.  I'm here with my colleagues, Mr. Perez, and

12    Mr. Block, and Mr. Cagney, and we represent the plaintiff

13    WhatsApp and Meta.

14        **THE COURT:**  Good afternoon.

15        **MR. AKROTIRIANAKIS:**  Good afternoon, Your Honor.

16        Joe Akrotirianakis and Aaron Craig, in behalf of the

17    defendants.

18        **THE COURT:**  All right.  Good afternoon.  And shall I say

19    welcome back.  It's been a while.

20        All right.  There are four issues that I would like to spend

21    our time together talking about today.  The motions that you all

22    anticipate, I'm obviously going to attempt to streamline those

23    and narrow them.  You've included in your case management

24    statement just a whole host of motions, and I do want to talk

4

1   about them before you go ahead and file them.

2       I want to talk about the discovery that's at issue.  And

3   related to that issue is the administrative motion to seal that

4   was filed in conjunction with this case management statement that

5   we should discuss, and then we'll end up talking about scheduling

6   at the end.

7       All right.  So let's start first then with the motions that

8   you all mentioned in your case management statement.  You refer

9   to the motions that I had administratively terminated while the

10  immunity issue was being litigated.

11      And I have just a vague recollection of those motions that

12  were filed, I believe, along with the motion that I dealt with,

13  with regard to the sovereign immunity.  But I just didn't reach

14  those at that time, or -- because I'm pretty sure after I granted

15  the motion to stay, they weren't filed, right?

16      **MR. AKROTIRIANAKIS:**  No, Your Honor.

17      Joe Akrotirianakis.

18      The Court resolved the Rule 12(b) motions, and we filed a

19  subsequent motion relative to the request for injunctive relief.

20  So that was filed after the Court ruled on the 12(b) motions, but

21  before the Court ruled on the motion to stay.  And then in that

22  same period --

23      **THE COURT:**  Okay.

24      **MR. AKROTIRIANAKIS:**  In that same period, we also answered

25  following the Court's ruling on the motions to dismiss and then

5

1    plaintiffs filed a motion to strike certain affirmative defenses.

2    So those were the two motions.

3        **THE COURT:**  Okay.  All right.  So let's start first, then

4    with the motions that both sides have mentioned in the case

5    management statement.  There is a motion that defendant

6    anticipates with respect to plaintiffs request for injunctive

7    relief, and administrative motion to seal.

8        Is that in conjunction with the request for injunctive

9    relief motion, or something else?

10       **MR. AKROTIRIANAKIS:**  I think that one was a vestige of

11   something else.  I think the Court may have ruled on the motion

12   to stay, but didn't in the course of that ruling rule on this

13   motion to seal, Your Honor.

14       **THE COURT:**  It was some document used in support or in

15   opposition to the motion to stay.

16       **MR. AKROTIRIANAKIS:**  I'm just going from memory, Your Honor.

17       **THE COURT:**  Yeah.  I don't have any recollection of it.  Is

18   it something that still is outstanding that I need to deal with?

19       **MR. AKROTIRIANAKIS:**  Not from our perspective, Your Honor.

20       **THE COURT:**  How about from plaintiffs' perspective?

21       **MR. PEREZ:**  No, Your Honor.  I believe that was defendants'

22   motion.  And my recollection, although I'm also going from

23   memory, is that I thought it related to materials related to

24   what's been filed in the sealed addendum to the case management

25   statement for this conference.

6

1     **THE COURT:**  Well, it's Docket Number 139.  So it would have

2     been a little while ago.  All right.  We'll take another look at

3     that.  No one seems to think that we need to deal with it now.

4     The administrative motion to seal gets filed in conjunction with

5     this particular conference is Docket 169.

6          And what you all have referred to in your statement is at

7     Docket 139 which was terminated.  It's going to remain terminated

8     unless somebody believes that it needs to be refiled, okay?

9     **MR. PEREZ:**  Thank you, Your Honor.

10    **MR. AKROTIRIANAKIS:**  Thank you, Your Honor.

11    **THE COURT:**  All right.  And so that's Docket 105 was the

12    original or perhaps -- yeah, one of the original motions that was

13    terminated.  That was the motion, going to plaintiffs' request

14    for injunctive relief.  And then Docket 140 was plaintiffs'

15    motion, and that was to strike affirmative defenses.

16         So with respect to those two motions, both sides have

17    entered different positions on how the Court should resolve

18    those.  They have been administratively terminated.  So the

19    question is whether or not they simply need to be re-noticed, or

20    whether or not they should be refiled.

21         I believe plaintiffs' position is they should be read

22    notice, but there would need to be some supplementation.  And the

23    defendants' position is that they need to be refiled and updated

24    so that the Court doesn't have to look to two sets of briefs

25    instead of one set each.  Now, I imagine you all know which one I

7

1    think is the most efficient way to proceed.

2         **MR. ANDRES:**  Yes, Your Honor.  We do.

3         And just with respect to that, I think one issue that we

4    were hoping to do is to the extent that motions are just refiled

5    that we might be able to expedite the briefing process a little.

6    We've had some discussions with the defendants about that to

7    propose a schedule.

8         But given the fact that really all that needs to be done is

9    some refresh of the law and not a substantial amount of work with

10   respect to those briefs, we're hoping to do that a little

11   quicker.  And we'll take direction from Your Honor, but we're

12   also happy to work with the defendants to propose a schedule for

13   that.

14        **THE COURT:**  Okay.  Well, I agree with the defendant.  I want

15   one set of briefs on each motion.  I don't want to have to look

16   at supplemental briefs on each motion.  So if you want me to

17   consider them, first of all, think hard about whether or not you

18   need to have these two motions filed.

19        With regard to the defendants' motion, I haven't looked at

20   it.  Is it a motion to dismiss to strike the plaintiffs request

21   for injunctive relief?  Why is that a motion that shouldn't wait

22   for a merits determination?

23        **MR. AKROTIRIANAKIS:**  I'm sorry, Your Honor.  Do you want me

24   to respond to that now?  Or is that something you --

25        **THE COURT:**  Yes, please.

8

1       **MR. AKROTIRIANAKIS:**  -- want me to think about?  Okay.

2  Because it affects the proportionality of discovery in this case,

3  which I think the Court will see.  Actually, the Court wouldn't

4  see because initial disclosures are not filed with the Court.

5  But in their initial disclosures, the plaintiffs detail their --

6  the amount in controversy, if you will, Your Honor.  And in

7  response to the questions that you need to answer in initial

8  disclosures, and the actual damages are minimal what they claim,

9  and we dispute even those.

10      But they really amount to, you know, the salaries and

11  payroll burden of some folks that work at WhatsApp or Facebook,

12  and who have as their job to detect and remediate vulnerabilities

13  in their software.  That's their claim for actual damages.  And

14  then they have a separate claim for reputational harm to

15  Facebook, that really is sort of something that can -- you could

16  ring fence, and in any event is going to largely involve

17  discovery flowing from plaintiffs to defendants.

18      The rest of the case is a claim in terms of the amount in

19  controversy.  And I realize that that's not the only factor in

20  proportionality, but it's a big factor.  The rest of the case is

21  a claim for injunctive relief that we think, based on the

22  pleading, where they say this vulnerability that they allege is

23  remediated, and we put a stop to this, and there's no ongoing

24  harm of any kind, let alone irreparable harm.

25      And then a claim that also relates to disgorgement.  We

9

1    think that the disgorgement claim, not getting into that, but I

2    think that that has some issues in and of itself.  But the

3    injunctive relief is really the driver of their amount in

4    controversy.  That was how it was explained to us during the

5    initial case management conference some two or three years ago.

6    And we think that there's a constitutional standing problem with

7    that in light of their allegations in the complaint that there is

8    no ongoing harm.

9         And so if we didn't have that in the case, it really limits

10   what is proportional to the needs of the case.  It really limits

11   a lot of things, including the ability to potentially resolve the

12   case at an earlier stage than the merit stage that Your Honor

13   refers to.

14        **THE COURT:**  We don't generally look at the remedy sought

15   before liability.

16        **MR. AKROTIRIANAKIS:**  It's true, Your Honor.  But --

17        **THE COURT:**  And I wonder if there are factual issues with

18   regard to the amount in controversy?

19        **MR. AKROTIRIANAKIS:**  Well, when I say amount in controversy,

20   Your Honor, there's not a factual issue, for example, in respect

21   of a $75,000 limit under 1332, or something like that.  What I'm

22   talking about is that the value to the plaintiff of the claim and

23   the amount in controversy in that sense, is entirely tied up in

24   the injunctive relief claim from our perspective.

25        And in terms of factual issues, I think this can be resolved

10

1   by the Court based on the pleadings, considering that they plead.

2   And now they have judicially admitted that the vulnerability that

3   they are -- that is the basis of the complaint is something that

4   is not subject to any sort of ongoing harm, let alone irreparable

5   harm, that being the standard for injunctive relief, of course,

6   and that this should be -- there could be dealt with at this

7   stage.  And it would -- you know, it would not be the tail

8   wagging the dog on a going forward basis.

9       Now, if there are true fact issues about it, I would agree

10  with Your Honor, that it can't be resolved.  But I will say that

11  the Court has the power to and should because it does go to the

12  Court's subject matter jurisdiction to examine this issue at this

13  or at any stage of the proceedings.

14      **THE COURT:**  I just had a recent hearing involving similar

15  issues, and it was much easier to see the full picture on a full

16  factual record, and not on the pleadings.  I'm not likely to make

17  a determination just on the pleadings.  What is the -- what does

18  plaintiffs' counsel have to say about this?

19      I'm trying to decide whether or not the motions at Docket

20  105 and 140 should even be entertained by me at this juncture.  I

21  am interested in streamlining the motion practice in this case,

22  given how long it has been pending.  So gentlemen, what's your

23  response to defense counsel's argument?

24      **MR. PEREZ:**  Yes, Your Honor.  This is Mr. Perez in case it's

25  difficult to see who is speaking.

11

1       **THE COURT:**  Right.

2       **MR. PEREZ:**  We agree with Your Honor that it is putting the

3   cart before the horse to think that the injunctive relief should

4   be adjudicated now on the pleadings.  I do agree with defense

5   counsel, in that the injunctive relief is central to this case.

6   It's critically important to our clients.  There is absolutely an

7   ongoing risk of harm.  That should be clear even from defendants'

8   own statements in the press and elsewhere, touting the extent to

9   which how quickly they could work around our client's efforts to

10  remedy the vulnerability at issue here.

11      There is absolutely an ongoing intent by defendants to

12  engage in precisely the same conduct going forward.  And as the

13  Court indicated, this is an issue on which there will absolutely

14  will be factual disputes with respect to the ongoing risk of

15  harm.  That's something that should be examined through

16  discovery, and the injunctive relief should be determined on the

17  merits, not on the pleadings.  So we agree with Your Honor that

18  that's an issue for another day, not something that should be

19  adjudicated now.

20      **THE COURT:**  Okay.  Yeah, I'm not inclined to entertain this

21  motion.  So if you want to bring a motion with respect to the

22  injunctive relief, you're going to have to do so during the

23  summary judgment stage.  You may not reactivate 105, essentially,

24  is what I'm saying.

25      All right.  Let's turn to 140.  And that was plaintiffs'

12

1    motion to strike affirmative defenses.  Same question.  How I --

2    I understand that there are oftentimes a lot of affirmative

3    defenses that ultimately don't stick, but how much of it will

4    result in additional discovery?

5        **MR. PEREZ:**  Your Honor, with the benefit of the Court's

6    guidance with respect to Docket number 105, I think we may be

7    able to forego refiling that motion.  I would like to just

8    confirm with my client if I could have that luxury that they

9    agree with that position.

10       The issue is precisely the one that Your Honor has zeroed in

11   on, which is to what extent it actually impacts the scope of

12   discovery.  My inclination sitting here today is that it is

13   likely something that could be -- those defenses could be

14   explored and then addressed on the merits.  But if I could get

15   the opportunity, I would love to be able to consult with my

16   client and confirm that I'm authorized to take that position.

17       **THE COURT:**  Okay.  The position I'm taking today is you may

18   not reactivate it.  However, if you've got a very good reason,

19   you may put that in writing in the form of, let's call it an

20   administrative motion, which is, under our local rules permitted

21   for a pretty much administrative or administerial type matter.

22   You're limited to five pages.  The opposing party gets four days

23   to respond.  And then there are no replies and I will just issue

24   a ruling on it, if you think there's some good faith reason to go

25   forward with that now, given everything else that this case is

13

1   going to entail.

2        Okay.  So for now, the previously filed motions at Dockets

3   105, 139, and 140, which were administratively terminated during

4   the course of the stay, may not be reactivated.  Number 140, I

5   will give you leave to file an administrative request to

6   reactivate if you can show some good cause for doing so.

7        All right.  Let's move to the next part of the motions.

8   Now, let's look at what you all anticipate needing to do in this

9   case going forward.  The plaintiffs' entry in the case management

10  statement is simply that you'd like a -- under the anticipated

11  motion section, you indicate that you anticipate a discovery

12  motion to resolve the defendants' omnibus objections to the

13  discovery requests that have been propounded by plaintiff.

14       **MR. PEREZ:**  Yes, Your Honor.  And let me if I can -- I'm

15  sorry, Your Honor, were you finished with the question?

16       **THE COURT:**  Yeah.

17       **MR. PEREZ:**  If I may put a finer point on it, because we're

18  mindful that the defendants have committed to file amended

19  responses and objections by the end of February, by February

20  28th.  The reason for that, as I understand it, is that many of

21  their objections in their initial responses and objections were

22  premised on their immunity defense, which has now been

23  adjudicated and rejected, as well as their desire to have a stay

24  while that was being adjudicated.  And so that's now off the

25  table.

14

1        There have been developments, including the developments

2    that are referred to in the sealed addendum, which I'll be

3    circumspect in referring to, but generally relate to purported

4    restrictions on their ability to participate in discovery under

5    Israeli law, that I believe they want to flesh out a bit further

6    in amended responses and objections.

7        We haven't received those responses and objections.  We

8    haven't met and conferred regarding those responses and

9    objections.  And we're mindful of the Court's standing order with

10   respect to not only our obligation to meet and confer as would be

11   typical, as well as the five-page letter.

12       What we did want to be very transparent and upfront with the

13   Court about is that this issue of the purported Israeli law

14   restrictions on discovery is in our view, inevitably going to be

15   a substantive issue that will need to be presented to and

16   adjudicated by the Court.

17       It's not a matter of custodians or date ranges are other

18   issues.  It's a real, as we understand it, substantive issue as

19   to purported conflicting legal obligations under two systems as

20   to which, as the Court knows, there's a developed body of law.

21   And I think both sides will have quite a bit to say on that.

22       And so we -- that issue will, it's not yet fully ripe.  We

23   all see it coming down the pike.  It will become ripe once we've

24   received their amended responses and objections and have met and

25   conferred regarding them.  And then the question that we did want

15

1    to raise for the Court is how the Court would like us to proceed

2    at that point, where as I said, we're mindful of the five-page

3    letter procedure that the Court has in place.

4         We could also -- we could tee up the issue of through such a

5    letter, or we could dispense with that letter phase because I

6    think the parties agree that this is going to require a bit more

7    briefing and a bit more analysis in order to really be

8    adjudicated, than a five-page joint letter would allow the Court

9    to have.

10        **THE COURT:**  Okay.  I can tell you I'm not interested in

11   having to preside over picayune objections having to do with, you

12   know, all the stuff that attorneys fight over discovery.  And

13   that's primarily what the abbreviated procedures are designed to

14   avoid is to -- what I want is the big issue.  I want the issue

15   that -- you've described two; one having to do with the immunity

16   which has been decided by the Ninth Circuit, and one having to do

17   with the international law aspect of the dispute.

18        So what I would permit is a regular motion on a 35-day

19   briefing schedule with all of our Local Rule 7-2 requirements,

20   which simply limit the brief to 25 pages.  We won't go with the

21   truncated procedure, if what you're presenting to me is the

22   international law question, which should dispose a number of the

23   anticipated objections as I understand it.  Am I correct?

24        **MR. PEREZ:**  That's exactly right, Your Honor.  And what Your

25   Honor is laying out is effectively what we favor. That strikes us

16

1   as a very orderly and efficient way of addressing this.

2       **THE COURT:**  Well, what would occur is that you would receive

3   the responses and objections from the defendants by the agreed

4   upon deadline in February.  And if you are not satisfied, it

5   would be incumbent upon plaintiff to file a motion to compel

6   further responses or to overrule the objections.

7       And at that particular juncture, you can raise the

8   international law issue, although I -- as I do understand that

9   it's the defendants that's claiming, right, some sort of a bar or

10  preclusion by virtue of the origin of these documents.  So maybe

11  we should flip it.

12      **MR. PEREZ:**  Yes, Your Honor.

13      I was going to suggest the same thing.  Ordinarily, the

14  process the Court laid out would be the traditional one.  But in

15  this case, because we do really need a little more clarity from

16  defendants as to the nature of their international law-based

17  objections, it would be we believe, more orderly to have them

18  file first and us file in opposition.

19      **THE COURT:**  Okay.  So that would not be a motion to compel.

20  That would be a motion for a protective order, essentially, based

21  upon the -- I don't know, the bar that's been set by the Israeli

22  courts, I guess, on the release of certain documentation.  Am I

23  characterizing that correctly?  Your names very difficult for me.

24      **MR. AKROTIRIANAKIS:**  That's okay, Your Honor.

25      **THE COURT:**  I have to think about how you pronounce it.

17

1      **MR. AKROTIRIANAKIS:**  Yeah.  It's if you're just looking at

2    it, it's Akrotirianakis.

3      **THE COURT:**  Akrotirianakis.

4      **MR. AKROTIRIANAKIS:**  It is foreign, but it's also phonetic.

5    So I think that there's sort of two levels.  And I think that the

6    framework that you've described, generally speaking as a motion

7    for protective order is fine.  There is an export control

8    restriction.

9      And then there is separate to that restrictions that are

10   described in the sealed addendum, and some other documents under

11   seal, which are Docket Number 133 and it's, you know, appendages.

12   And we can address both of those, I think, in the context of a

13   motion for a protective order.

14     **THE COURT:**  Okay.

15     **MR. AKROTIRIANAKIS:**  And I think that the way, you know, I

16   guess, my thoughts on how it's best put forward to the Court

17   would be that we update our objections and responses, meet and

18   confer, and then thereafter, you know, narrow what issues we can

19   and then thereafter present that to the Court without the -- I

20   forget how the Court put it, but the things that would ordinarily

21   be referred, for example to the magistrate judge, just these sort

22   of larger issues.  And then the response by response, or request

23   by request type of objections would be raised separately in the

24   form of a motion to compel.

25     **THE COURT:**  Okay.  You know, I'm not fond of

18

1   request-by-request reviews of discovery.  I mean, I don't know

2   what judge is.  If you all really think that you're going to need

3   -- that you're not going to be able to resolve with once the

4   Court gives you a ruling or guidance on the larger question as to

5   what has to be produced, I don't know why we would need to

6   additionally look at question after question that's been

7   propounded to determine if it's within the proper scope.

8        You all have been practicing law long enough to know what's

9   appropriate discovery and what isn't.  I'm not even anticipating

10  at this time needing to refer it to a magistrate judge for that

11  kind of oversight.  Are you all suggesting that you need that?

12  And if you are, I would suggest that you consider whether or not

13  your clients want to hire a special master to hold your hands to

14  that extent.  I would think that you'd be able to do it

15  yourselves.

16       **MR. AKROTIRIANAKIS:**  I think that probably the Court's

17  ruling on these issues that we are discussing makes sense to not

18  sort of look too far past that, because I think that they will

19  guide us on the appropriate scope of the case and so on.  So I

20  didn't mean to imply that I don't think we're going to be able to

21  work things out.  I'm just saying that, should we not be able to

22  work things out about proportionality and the like, that we would

23  raise those separately.

24       So all I'm saying, Your Honor, is that in our motion for a

25  protective order, we would not anticipate addressing anything

19

1   other than the export control restrictions, and separately, on

2   the matters that are outlined in the sealed addendum to the case

3   management statement.

4       **THE COURT:**  Okay.  Okay.  Well, that sounds fine to me.  So

5   after the responses are served on plaintiffs' counsel, and they

6   have an opportunity to review them, you all will meet and confer

7   and to the extent that you cannot resolve the larger issues then

8   the defendant shall file -- there are two defendants, right?

9       **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

10      **THE COURT:**  The defendants shall file a motion for a

11  protective order.  At this particular juncture, I don't know that

12  I need to set any time line for that.  You all are eager to get

13  going on discovery, right?  I would anticipate that you would

14  file it within, say two weeks of your meet and confer.  Is that

15  problematic?

16      **MR. AKROTIRIANAKIS:**  Without having my entire professional

17  schedule in mind at the moment, Your Honor, I think that's

18  probably fine.

19      **THE COURT:**  Okay.

20      **MR. AKROTIRIANAKIS:**  But I will say that we will, of course,

21  work with counsel as to their professional schedules.  And

22  likewise, I know there's also some holidays in April and so on,

23  so.

24      **THE COURT:**  Okay.  All right.  So you agreed on February

25  23rd or 28th?

20

1       **MR. AKROTIRIANAKIS:**  28th, Your Honor.

2       **THE COURT:**  28th.  All right.  Then how about two weeks

3    thereafter?  Meet and confer within that two-week period.  And

4    then two weeks thereafter, file the motion for a protective

5    order.  So we're talking about roughly four weeks from the

6    February 28th response deadline?

7       **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

8       **THE COURT:**  Okay.  And plaintiffs' counsel, are you

9    agreeable?

10      **MR. PEREZ:**  Yes, Your Honor.

11      **THE COURT:**  Okay.  All right.  So that takes care of that

12   one.  And then we turn to the defendants' anticipated motions.

13   And you indicate -- let's see, a motion related to changes in the

14   law on personal jurisdiction.  Okay.  What's anticipated there?

15      **MR. AKROTIRIANAKIS:**  Yeah.  I think that during the pendency

16   of this case, the law as it relates to personal jurisdiction,

17   based on server location, and things like that, which were, you

18   know, the Court's order, Docket Number 111, on our motion to

19   dismiss, have been in flux.

20      And I don't believe that they have flux such that right now,

21   I would have a well-taken motion to reconsider the motion to

22   dismiss.  But that doesn't mean that the law won't change yet

23   again.  So that's all I'm referring to here, Your Honor.

24      Should the law change, we would, depending on how it

25   changed, perhaps ask the Court to reconsider its ruling on our

21

1   12(b)(2) motion.

2       **THE COURT:** All right. But wasn't the personal jurisdiction

3   motion? I think you point out, I mean, wasn't that a fact-based

4   motion?

5       **MR. AKROTIRIANAKIS:** So what it was, Your Honor --

6       **THE COURT:** Based upon the contacts with California?

7       **MR. AKROTIRIANAKIS:** Yeah. What the Court --

8       **THE COURT:** So isn't is not so much a matter of changing the

9   law. But what are the facts? Have you uncovered additional

10  facts that would support your position that your contacts are

11  insufficient?

12      **MR. AKROTIRIANAKIS:** So the Court interpreted the -- I was

13  reading this earlier this morning. The Court interpreted the

14  allegations in the complaint to be an allegation that the

15  defendants had sought out WhatsApp's California based servers for

16  the purpose of routing malicious code through those servers to

17  ultimately reach individual users' phones. And on that basis,

18  the Court held that the plaintiffs have demonstrated that

19  defendants expressly aimed their intentional act at the forum

20  state. That's from pages 24 and 25 of the motion to dismiss.

21      And based on the current state of the law, the Court's

22  analysis is correct. And those allegations, or that allegation,

23  if proved, would appear sufficient to establish personal

24  jurisdiction over the defendants. However, the defendants do not

25  believe that the plaintiffs' allegation, as interpreted by the

22

1   Court is true, or that plaintiffs would be able to prove it

2   following discovery or at trial.

3       And as the Court knows, you know, sometimes these personal

4   jurisdiction issues are dealt with in the context of an

5   evidentiary hearing.  Sometimes they're ruled upon based on cross

6   papers, and then the allegations in the complaint, which is how

7   the Court ruled on the issue of personal jurisdiction in this

8   case, but they now need to prove the allegations.

9       And I don't know that they will be able to because I don't

10  think that the basis for the Court's assertion of personal

11  jurisdiction is in fact the case, Your Honor.

12      **THE COURT:**  My whole point was that, wouldn't it be better

13  to deal with this on summary judgment, when you actually have a

14  factual record that establishes that there -- they can't prove --

15  they don't have sufficient evidence to prove the context that

16  they asserted or alleged in their complaint?

17      **MR. AKROTIRIANAKIS:**  I agree with that, Your Honor.

18      The motion for reconsideration that I referenced here in the

19  case management statement would be only based on a change in the

20  law.  For example, if the Ninth Circuit were to decide that even

21  as phrased by the Court, it would be insufficient based on server

22  location to assert jurisdiction over a defendant in the forum

23  state, then we would want to bring that to the Court's attention.

24      **THE COURT:**  Sure, sure.  Okay.  But you don't have anything

25  now at this point.

23

1      **MR. AKROTIRIANAKIS:**   That's right, Your Honor.

2      **THE COURT:**   Okay.   The second thing that you raised was a

3  motion going to the order of proof in the availability of

4  injunctive relief and disgorgement.   I think we already talked

5  about that.

6      **MR. AKROTIRIANAKIS:**   Yes, Your Honor.

7      **THE COURT:**   And then lastly, you mentioned something about

8  motion for judgment on the pleadings, motion for summary

9  judgment, motion for partial summary judgment.   Well, I

10  anticipate there will be a motion for summary judgment or a

11  motion for partial summary judgment.   I don't anticipate a motion

12  for judgment on the pleadings.   But if you have a different view,

13  tell me, and what would that be about?

14      **MR. AKROTIRIANAKIS:**   I would think that would be for

15  example, a place where you could raise a challenge to subject

16  matter jurisdiction or personal jurisdiction in a case like this,

17  Your Honor.

18      **THE COURT:**   Okay.   Okay.   All right.   But nothing specific

19  right now?

20      **MR. AKROTIRIANAKIS:**   No, Your Honor.

21      **THE COURT:**   Okay.   Great.   Thank you.   All right.   So we've

22  talked about the anticipated motions and the discovery.   And

23  we're going to start first with the big discovery issues in the

24  procedure that I've just outlined.   So that leaves the scheduling

25  of the case and the sealing motion that's currently pending.   I

24

1    looked at that motion, and I'm not exactly sure what's going on

2    here.  So I thought you all could tell me and make it easier for

3    me to understand?

4         **MR. AKROTIRIANAKIS:**  If I may, Your Honor.

5         **THE COURT:**  Sure.

6         **MR. AKROTIRIANAKIS:**  So before the Court is, of course, the

7    case management statement, and then there was this other --

8    originally when we started meeting and conferring about the case

9    management statement, we had an addendum to it that we were going

10   to ask the Court to have filed under seal.  And I think our

11   evolution of our thinking, we're the proponent of the sealing

12   order, was that that would better be presented to the Court, you

13   know, by way of reference in the case management statement, but

14   then appended to a declaration in support of a motion to seal.

15        Generally speaking, and this is at Docket 164, you know, we

16   have matters of foreign law that require us to seek sealing of

17   what we consider to be nontraditionally public information.  And

18   for the reasons that are set forth in the motion to seal and in

19   the declaration, I would ask the Court to seal the addendum to

20   the case management statement, as well as paragraphs three

21   through nine of my declaration in support of the motion to seal.

22        **THE COURT:**  The addendum is --

23        **MR. AKROTIRIANAKIS:**  It's Exhibit A.  It's Docket Number

24   164-3.  It's Exhibit A to my declaration, Your Honor.

25        **THE COURT:**  Okay.

25

1      **MR. AKROTIRIANAKIS:**  And it describes the second of the

2   foreign law aspects that I mentioned.

3      **THE COURT:**  I think that the difficulty that I'm having with

4   this is, it's not clear to me if you're seeking to seal the

5   nature of the proceedings in Israel, or the evidence that's

6   before the court in Israel.  Of course, that court can designate,

7   as I could, items that are subject to being sealed, and I would

8   expect another court to defer to that determination.  But it

9   seems to me that you are also trying to seal the proceedings.  I

10  mean, just aren't they public proceedings?

11     **MR. AKROTIRIANAKIS:**  These proceedings, Your Honor?

12     **THE COURT:**  Yeah.

13     **MR. AKROTIRIANAKIS:**  No, no, no.  I am not, nor do I believe

14  in a sealed court system, Your Honor, as an American.  But I am

15  asking the Court to seal exactly and no more than this, Docket

16  Number 164-3.

17     **THE COURT:**  Right.

18     **MR. AKROTIRIANAKIS:**  And then my declaration in support of

19  the motion to seal limited to paragraphs three, four, five, six,

20  seven, eight, and nine of that document, and nothing more, Your

21  Honor.  To the extent that other matters are before -- that are

22  brought before this Court that we think, for example, fall within

23  the category, the Court has just now identified whereas a matter

24  of comity, the Court would expect deference from a foreign court

25  or something like that, and we will raise that by way of a

26

1    separate request.  So this request deals only with those six

2    paragraphs.  Actually, it's also paragraph 11.

3        **THE COURT:**  No, I understood that from the motion.  It's

4    just that when I look at the material that you want to have

5    sealed, some of it seems like it's substantive information, but

6    some of it just describes the process.  And I don't quite

7    understand why that should be sealed.

8        **MR. AKROTIRIANAKIS:**  It all is really sort of wrapped up in

9    what's on page 3 of Docket 164-3, which itself is subject to

10   sealing and the rest of it is just context that we've provided so

11   that the Court can kind of understand what we're talking about.

12       **THE COURT:**  Okay.  We're talking -- okay, 163-3 and --

13       **MR. AKROTIRIANAKIS:**  I'm sorry, 164-3.

14       **THE COURT:**  164-3.  And you're looking at what page in

15   particular?  The one that has been translated?

16       **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  So that is something

17   that I would not be at liberty, for example, to file before this

18   Court so that I can provide that information to your Court -- to

19   this Court, but to do so not with a request that this Court seal

20   that translation.

21       **THE COURT:**  Okay.

22       **MR. AKROTIRIANAKIS:**  And then the rest of what's on the page

23   before that, Your Honor.  And then the responding statement by

24   plaintiffs on the page following is all I think just context to

25   help the Court understand why this is pertinent.

27

1     **THE COURT:**  Okay.  And that context needs to be sealed I

2     understand with regard to the translated document, okay?

3     **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

4     **THE COURT:**  But the context is equally subject to sealing?

5     **MR. AKROTIRIANAKIS:**  Well, I mean --

6     **THE COURT:**  I'm sure you are aware that there is public

7     interest in this case?

8     **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  Of course.  And for

9     that reason, I didn't ask, for example, the Court to seal

10    anything more than, you know, seven specific paragraphs of my

11    declaration that refer, for example, to the content here.  I

12    didn't ask for it to -- you know, I've tried to be circumspect.

13    If you want me to go through line -- you know, line by line on

14    the sealed addendum and to see if there's something that

15    appropriately should be filed publicly, I'm happy to do that.

16        For example, the very line 3 on page 2 of Docket Number

17    164-3.  I think that the entire first clause of that sentence

18    possibly could be unsealed.  I don't know what sort of public

19    value there would be in that fact, which also appears in the case

20    management statement anyway, being unsealed in this document, but

21    I would be happy if the Court so requested to submit a redacted,

22    if you will, like blacked over or a redacted box over I guess is

23    the way we do it now, parts of this statement in order to address

24    that concern.

25        **THE COURT:**  Yeah.  I think any sealing should be as narrow

28

1    as possible.  I mean, when we look at paragraph on the second

2    paragraph starting at line 9.

3         **MR. AKROTIRIANAKIS:**  Yes.

4         **THE COURT:**  Why is that subject to sealing?

5         **MR. AKROTIRIANAKIS:**  Well, the very first clause, for

6    example, is refers to a sealed matter.  So I think that should be

7    sealed.  The next one, two, three, four -- four words probably

8    could be unsealed.  But then after that, it refers again --

9         **THE COURT:**  Are you looking at the line starting at 9?

10        **MR. AKROTIRIANAKIS:**  Yeah.  It starts with the word under.

11        **THE COURT:**  Yeah.

12        **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  I think that the

13   first clause there before the first comma refers to sealed

14   matter, and it should be sealed.  And then the next, you know,

15   two words are probably okay to be unsealed.  But they don't make

16   any sense without the rest of the sentence.  And I think the rest

17   of that sentence refers to the content of sealed matter, and it

18   should itself be sealed.

19        So I'm happy to submit something like that to Your Honor.

20   Really, I am.  And I understand the concern.  And I frankly agree

21   that as much of these or any court proceedings that take place in

22   the United States should be public, but there are, you know, some

23   restrictions around that.

24        **THE COURT:**  Okay.  Why don't you take a stab at it, and also

25   go through your declaration again.

29

1      **MR. AKROTIRIANAKIS:**  If I might direct the Court just to one

2  thing that I think would maybe make this make more sense, if I

3  could have just a moment, Your Honor.  In my declaration -- if I

4  could direct the Court to page 3 of my declaration.

5      **THE COURT:**  Okay.

6      **MR. AKROTIRIANAKIS:**  Which is --

7      **THE COURT:**  Which paragraph?

8      **MR. AKROTIRIANAKIS:**  Paragraph seven.

9      **THE COURT:**  Okay.

10      **MR. AKROTIRIANAKIS:**  And on line 25.

11      **THE COURT:**  Okay.

12      **MR. AKROTIRIANAKIS:**  There's a reference to an order there.

13      **THE COURT:**  Yeah.

14      **MR. AKROTIRIANAKIS:**  And that order, and what its direction

15  is to my client, is what makes me have to be as circumspect as

16  I'm being in describing all of this, Your Honor.

17      **THE COURT:**  Yeah.  I don't understand it.  I don't

18  understand why that which gives away no secrets.

19      **MR. AKROTIRIANAKIS:**  It is itself sealed, Your Honor.  If I

20  may, Your Honor, I'll just -- I'll take a stab through this

21  declaration and see if there are words and sentences and things

22  that I've -- that are highlighted in the unredacted part of it

23  that I would ask the Court to have be unsealed.  And I'll do the

24  same with respect to the sealed addendum.

30

1      **THE COURT:**  I mean, it's one thing to seal the evidence.

2  It's another thing to seal the process that describes how the

3  evidence is handled without giving away any of the secrets.  I

4  don't get it.  Why don't you take a better -- a closer look at it

5  and try to give me something that's just a little narrower, a

6  little more narrowly tailored to cover only the words that need

7  -- absolutely need to be sealed?

8      **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

9      **THE COURT:**  Okay.  Okay.  Then let's talk about the

10  schedule, then.  And I think that will be about the last thing

11  because you all aren't interested at this juncture participating

12  in any ADR, right?  Not until after you've finished some

13  discovery?

14      **MR. PEREZ:**  That's correct for plaintiffs, Your Honor.  We

15  don't see any reasonable prospect of settlement at this time.

16      **THE COURT:**  I'm just going through to make sure there's

17  nothing else that I need to talk to you about.

18      **MR. PEREZ:**  Your Honor, if I could make just one point about

19  the ceiling issues that is defendants' motion and we -- as they

20  reflected in their submission, we have not opposed that motion.

21  But in communicating the fact that we did not oppose that motion

22  for purposes of this conference, we did also say very

23  specifically that we reserve the right to revisit the propriety

24  of sealing going forward.

25      And I just wanted to make that clear on the record today,

31

1  because, as the Court noted, this is a matter of intense public

2  interest.   There is a strong presumption of public access.   And

3  it's clear, even from the discussion we've had today, that

4  defendants will be seeking judicial intervention in the form of

5  their discovery obligations on the basis of these sealed

6  materials, which makes the presumption of public access even

7  stronger.

8      So I just wanted to flag and be clear on the record that we

9  do anticipate that there may be further discussion as to the

10  propriety of sealing, as that issue remains a factor in the case.

11      **THE COURT:**   All right.   I did understand that.   I did

12  understand that.

13      Okay.   Now, let's look at the schedules that you all

14  proposed.   I believe the biggest distinction is between on the

15  proposed pretrial schedule is whether or not there needs to be --

16  I think there were two things interjected that I'd never heard of

17  before, or that I've never granted, I should say.

18      And that's the initial expert disclosures, which is sort of

19  a preview of expert disclosures, and the substantial completion

20  of document discovery, neither of which are things that I

21  typically order in the case, in any case.   In fact, I don't know

22  that I've ever ordered either of those things.   Parties can agree

23  to those things, and I sign off on agreements all the time.   But

24  typically, I follow the standard procedures that are set forth in

25  the federal rules and our local rules.

32

1    So it's plaintiff that wants those two things, right?

2       **MR. PEREZ:**  Yes, Your Honor.  And I can address them.

3       And we understand Your Honor's practices and obviously,

4    we'll proceed as the Court directs.  With respect to the

5    substantial completion, our concern is that in this case, as the

6    Court well knows, the discovery process has been very

7    challenging.  There have been a number of obstacles that have

8    been interposed with our effectual immunity.

9

10      Now, with respect to foreign law, it's not only the matter

11   of the sealed records, there's also issues as they've indicated,

12   they believe under export control laws.  And we want to make sure

13   that we get document discovery on a timely basis, before the last

14   day of fact discovery in a time period that allows the case to

15   move forward expeditiously, and gives us a realistic time period

16   to conduct depositions, particularly in a case where the

17   depositions may well involve international travel, may be time

18   consuming to arrange, may have their own purported restrictions

19   as to how they can proceed and in what manner they can proceed.

20      So we just think in this case, it makes very good sense in

21   order to get the litigation up and running again, to have a

22   prompt deadline for substantial completion of document discovery,

23   so that we get documents in hand and can proceed to a realistic

24   deposition discovery window before the fact discovery cut off.

25      **THE COURT:**  How do you define substantial completion?

33

1      **MR. PEREZ:**  It's a term that, you know, we have found a

2    couple instances in which the Court has entered those.  I think

3    it's probably correct that in at least some, if not all of those,

4    it's been agreed by the parties.

5          But it just -- it's a recognition that there may be

6    stragglers.  There may be documents that come off privilege logs

7    or individual pockets of documents that haven't been produced

8    yet, but that by and large, document discovery is complete.  That

9    you have completed producing documents in response to the other

10   party's requests, and likely there would be some discussion

11   between the parties as to what remains outstanding.  But it would

12   mean we have -- for all intents and purposes, we have document

13   discovery in hand, and we're ready to proceed to depositions.

14      **THE COURT:**  I think I don't like that.  It seems too

15   subjective.  And it's the kind of thing where I anticipate you

16   will be -- one side or the other will be contacting the Court.

17   They haven't complied, even though it's not the discovery cutoff

18   date.

19          Why don't we do something different.  Why don't we just set

20   a discovery cutoff date, and let's just check in 60 or 90 days

21   before.  We will have a conference, some sort of a status

22   conference or a case management conference and figure out what's

23   left.  And if need be, talk about an actual schedule for making

24   sure it gets done on time.

25      **MR. PEREZ:**  That would suit our needs perfectly, Your Honor.

34

1  Thank you.

2       **THE COURT:**  Okay.  60 or 90 days in advance?

3       **MR. PEREZ:**  We would favor 90 days, Your Honor, just to have

4  a realistic deposition discovery window if possible.

5       **THE COURT:**  Okay.  All right.  We'll do that instead.  And

6  then with regard to the initial expert disclosure versus the

7  final expert disclosure.

8       **MR. PEREZ:**  Yes, Your Honor.  And what we're anticipating

9  here is not sort of a -- some sort of abridged version of an

10  expert report.  What we're really talking about is just

11  identification of experts, so the parties can have transparency

12  among themselves as to what the anticipated areas of expert

13  testimony are.

14       This is a case that has very technical aspects.  And it will

15  be helpful to having an orderly expert discovery period, just to

16  have an indication of from each side, here are the topics on

17  which we anticipate expert testimony and who our experts are.

18  Then we also have the overlay here of these highly confidential

19  matters and sealed records, which may create additional

20  complexity around expert discovery, which would be another reason

21  to just have the experts identified a bit sooner than when their

22  actual reports are filed.

23       **THE COURT:**  Okay.  So essentially, you just want to sort of

24  separate the identification from the disclosure of the reports?

25       **MR. PEREZ:**  Exactly.  We just have in mind, you know, name

35

1    and basically anticipated area of testimony.  A couple sentences.

2         **THE COURT:**  Okay.  Well, that makes sense.

3         **MR. AKROTIRIANAKIS:**  Your Honor, that --

4         **THE COURT:**  That doesn't mean -- hold on.  That doesn't

5    mean, however, that between the time of the identification and

6    the time of disclosure, a party couldn't change their mind and

7    decide not to use the expert, right?

8         **MR. AKROTIRIANAKIS:**  Or to supplement the disclosure, Your

9    Honor.  If we're -- I mean, with due respect, I don't really see

10   how any of the concerns that Mr. Perez raised, would be addressed

11   by having this extra requirement.  And as the Court I think

12   intuits to your -- based on your comments to the earlier idea of

13   a substantial completion of document discovery, also not a thing

14   under the federal rules or the local rules.  It's just one more

15   thing to fight about.

16        I think that, you know, we -- I'm all for an orderly expert

17   discovery period, and for that matter a fact discovery period and

18   everything else that has to deal with this case.  But I don't

19   think that this request for an extra requirement actually

20   addresses any of the concerns that it's purportedly intended to

21   address.

22        And if we were agreeable to it, if the parties are agreeable

23   to having 100 different case dates in a schedule, as they

24   apparently have been in at least one matter before Your Honor

25   that Your Honor signed off on and is in the -- in their part of

36

1    the case management statement, okay, fine.  But this is just,

2    again, more deadlines.  You know, don't necessarily make for a

3    more orderly discovery period.  That just make for more things to

4    fight about.

5        **THE COURT:**  All right.  I think it's a -- I think it would

6    probably be a fine idea, but only if both sides agree.  And

7    there's simply not the -- I don't impose that many deadlines in

8    cases.  I expect you all to litigate the case at your pace.  But

9    simply, my job is simply to give you enough time, but no more

10   time than you need to get this case to trial.

11       **MR. PEREZ:**  Your Honor, and again, it's in that spirit, we

12   understand where the Court is leaning on this.  But it's really

13   in that spirit that we propose this deadline.  That rather than

14   have a situation where we end up pressed for time on the expert

15   discovery, we just have this interim step.  The deadline is at

16   the close of fact discovery.  By the close of fact discovery, the

17   parties will know who their experts are, and what they're

18   planning to put forth expert testimony on.

19       There is no reason in the world for the parties not to

20   exchange that information in the spirit of an orderly process.

21   So that's the reason.  You know, there shouldn't be litigation by

22   surprise, or to be put in some time pressure, where we are forced

23   to -- either side is forced to respond to unanticipated areas of

24   expert testimony.

25       **THE COURT:**  Have you all agreed that in fact, the experts

1  will be known by the time of fact discovery?

2      **MR. PEREZ:**  No, Your Honor.  That was not an agreement.  It

3  was more just a statement as to how these cases tend to progress.

4      And I would expect that roughly a year from now, when we're

5  at the conclusion of fact discovery subject to what deadline the

6  Court sets, I expect both sides will have a very good idea of

7  what expert testimony they expect to be putting forward.  And

8  there is, as I said, no reason I believe for the parties not to

9  exchange that information in the spirit of an orderly process and

10  avoiding litigation by surprise.

11      **THE COURT:**  Okay.

12      **MR. AKROTIRIANAKIS:**  Your Honor, there's no -- I mean, if

13  there was a real reason for extra deadlines like that, I'm sure

14  that Congress would have found fit to have the Rules Committee

15  include them in the rules.  I mean, if we have a deadline --

16      **THE COURT:**  Well, if not Congress, the group that publishes

17  the manual on complex litigation would have come up with it.

18      **MR. AKROTIRIANAKIS:**  Sure, Your Honor.

19      **THE COURT:**  If not Congress.

20      All right.  I'm inclined to just follow the regular

21  procedures, even though I do think that it's a good idea, but

22  only if both sides agree.  So let's talk about the deadlines.  On

23  page 20, you all have proposed some deadlines and then -- and

24  given different proposed dates.  Page 21, you have agreed upon

25  dates.  And then, what is the thing on page 24?

38

1      **MR. AKROTIRIANAKIS:**   On pages --

2      **THE COURT:**   You excerpted the dates that are agreed upon and

3  put them on page 24?

4      **MR. AKROTIRIANAKIS:**   Yes, Your Honor.

5      And the only as to those dates, which I think includes all

6  of the dates that are ordinarily set following these conferences,

7  there's only just the one that we have a disagreement about.   I

8  can explain it if you like, but these are all the dates that are

9  ordinarily part of that order.   And we agree on all of them

10  except for the one.

11      **THE COURT:**   Okay.   So let's look -- if you agree on all

12  these dates, then it's fine with me, except for the trial date,

13  and I'll talk to you about that.

14      **MR. AKROTIRIANAKIS:**   Oh, I'm sorry, Your Honor.   I misspoke.

15  There is one more, too.   It's the deadline to amend the

16  pleadings.

17      **THE COURT:**   Okay.   I have a standard procedure.   And that

18  is --

19      Is it 90 days, Kelly, or 60?

20      **THE CLERK:**   It's 90 days.

21      **THE COURT:**   Ninety days.

22      My standard case management order is pleadings can be

23  amended up till 90 days before the close of fact discovery.   If

24  you need to take further discovery, based upon the amendment,

25  then you still have 90 days to do so.

39

1      Is there any reason why that wouldn't work in this case?

2      **MR. PEREZ:**  Your Honor?

3      **MR. AKROTIRIANAKIS:**  Your Honor, it would depend on what the

4  amendment was.  If there was like, some new claim, for example,

5  that was amended or a new party.

6      I mean, a new party would say like, well, wait a minute.

7  You've taken all of this discovery.  I haven't been here for

8  this.  Then we end up with, you know, who could it be used

9  against and so on.  But if there's new claims, and there may be

10 motion practice related to those claims that would consume all or

11 a lot of that 90 days.

12     **THE COURT:**  Okay.  And what's plaintiff --

13     **MR. PEREZ:**  And Your Honor -- excuse me, Your Honor, if you

14 were speaking.

15     **THE COURT:**  Okay.

16     **MR. PEREZ:**  I was just going to say that we have a little

17 bit of a different concern, which is that our concern with

18 amendment is that we want to have documents in hand and have

19 meaningfully dug into discovery before our deadline to amend

20 comes and goes.

21     And it relates back to the issue about substantial

22 completion that if we're in as in a schedule where 90 days from

23 the close of fact discovery, we may not have received meaningful

24 document discovery.  I hope that's not where we're going to end

25 up.  But then that would be problematic for us from a perspective

40

1   -- from the perspective of amending.

2       **THE COURT:**  All right.  So neither one of you like my

3   standard procedure, and neither one -- neither side agrees with

4   the other.  So how are we supposed to come up with a deadline?

5       I suggest that you all meet and confer and come up with the

6   deadline.  The default is going to be 90 days before fact

7   discovery.  But if you all agree to something else, that would be

8   fine with me.  You are pretty far apart.

9       I mean, the defendant is proposing April 1st of this year.

10  That's just a few months from now.  I don't see how that possibly

11  takes into account that anything that you might learn during

12  discovery.  The plaintiffs' position of November 30th seems to me

13  to be more realistic.

14      **MR. PEREZ:**  Your Honor, the November 30th date that we

15  proposed actually isn't far off from 90 days before the close of

16  fact discovery.  And that was part of the reason we selected that

17  date.  The only distinction is that we had coupled that with the

18  substantial completion of document discovery deadline, so that we

19  would have 30 days after the substantial completion of documents

20  in which to amend.

21      But I understand that issue has already been addressed, and

22  I'm not revisiting it.  But if we're going to be having a

23  discovery conference 90 days out from the close of fact

24  discovery, perhaps we could address amendment of the pleadings at

25  that time, based on where we are in document discovery.

41

1      **THE COURT:**  We could, but I don't see any reason to not set

2  a date today.

3      **MR. AKROTIRIANAKIS:**  Well, honestly, Your Honor, I think

4  maybe I just have a different -- I'm thinking about it

5  differently than what Your Honor is -- if Your Honor wants to

6  have the pleadings amended 90 days before --

7      **THE COURT:**  No later than 90 days.

8      **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  And should that then

9  require additional time for discovery because of those

10  amendments, then I mean, for example, if the complaint were

11  amended, then we may need to amend the answer to raise

12  affirmative defenses to new claims.  And then we may need to

13  pursue discovery in support of those affirmative defenses.

14      I don't know.  I'm just sort of conceiving of this.  But if

15  it's not going to be a problem to move the discovery cut off to

16  allow us to do that, then it kind of doesn't matter to me, apart

17  from if new parties are brought into the case late in the day,

18  that often causes all kinds of problems.

19      **THE COURT:**  So what do you want?

20      **MR. AKROTIRIANAKIS:**  Well, my early date that I had proposed

21  was based on counsel's representation in this statement that they

22  don't anticipate there being any amendments needed to the

23  pleadings.  And that the only amendments that they foresaw were,

24  for example, if you took up our motion to strike the injunctive

25  relief, and then they'd need to amend around that or something

42

1    like that.  So I didn't think that this was -- that having an

2    early deadline of having the pleadings cooked, so we know what

3    the target is that we're aiming at was that big of a deal.  But

4    if --

5        **THE COURT:**  Okay.  But the pleadings are cooked now, so to

6    speak, right?

7        **MR. AKROTIRIANAKIS:**  Yes.

8        **THE COURT:**  And if no one anticipates filing, or needing to

9    file a motion to amend, chances are that won't happen.  And keep

10   in mind that an amendment has to be either with the consent of

11   the opposing party or by motion.  So everyone will be given an

12   opportunity to be heard as to whether or not the opposing party

13   can amend.  It's just that I think it would be in a case such as

14   this, I think it's sort of unworkable to have an amendment date

15   in April, and to not permit amendment if something is discovered

16   in discovery that needs to be explored.

17       I mean, I couldn't do that.  I would not preclude a party

18   from doing that.  So they're just -- there has to be in a

19   reasonable date.  So you guys need to meet and confer.  I'm going

20   to impose my default date unless you all agree to another date

21   that's somewhere in between.

22       **MR. AKROTIRIANAKIS:**  Understanding that the court requires

23   either consent or a motion.  And if we can be heard on the need,

24   if any that exists at that time for further discovery based on

25   granting of an order, Your Honor, I don't have any problem with

43

1   the -- with Your Honor's default.

2       **THE COURT:**  Right.  The default date is the last date.  And

3   obviously if you discover something next month, that would

4   suggest an amendment is appropriate, that would be the time to go

5   forward with it.  And not wait until the -- till the actual

6   deadline.

7       **MR. AKROTIRIANAKIS:**  Yeah.  Honestly, Your Honor, my only

8   concern is that if someone were waiting, and I make no

9   accusation, but if someone did wait up until, you know, the end,

10  more or less -- not the end, but three months before the end, and

11  now all of a sudden, we're going to change what the case looks

12  like, well, then I may need to take discovery.  And if I'm going

13  to have the opportunity to do that, then I'm fine.

14      **THE COURT:**  Well, that person, that side, that party

15  wouldn't be permitted to amend if they sat on the information if

16  they learned -- and I've denied motions on that basis, because

17  parties weren't diligent in moving to add a party that they

18  discovered in discovery previously.  So I think you're protected

19  in that way.

20      **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  Thank you.

21      **MR. PEREZ:**  And Your Honor, we're fine with the default

22  rule, just recognizing that if we do end up at that 90-day

23  deadline, and discovery hasn't progressed in the way we had

24  anticipated, we may just wish to raise to the Court whether that

25  deadline should be extended, to the extent --

44

1        **THE COURT:**  How about if I enlarge that deadline to 120 days

2    instead of 90?

3        **MR. PEREZ:**  That would be preferable from our perspective.

4        **THE COURT:**  And that would give you an earlier deadline too.

5        **MR. AKROTIRIANAKIS:**  Yeah, that's fine, Your Honor.

6        **MR. PEREZ:**  I'm sorry.  So I'm sorry.  I thought I thought

7    you meant later on in the discovery period.  But that would

8    actually be earlier in the discovery period.

9        **THE COURT:**  Right.

10        **MR. PEREZ:**  Correct?  Yeah.  So it might be preferable for

11   us to have the conference a bit earlier, and then the deadline

12   for amendment a bit later.  So if we did the conference 100 days

13   out from the close of fact discovery, and a deadline for

14   amendment two weeks or so after that, that would work well from

15   our perspective.  Just to ensure that discovery has progressed

16   before our deadline to amend is upon us.

17        **THE COURT:**  Okay.  So we'll go with the 90 days then, the

18   90-day deadline in advance of the fact discovery cut off, and we

19   will set the status conference for 100 -- 120 days, 30 days

20   before that.  All right.

21        **MR. PEREZ:**  Thank you, Your Honor.

22        **THE COURT:**  So you said that there was no agreement though

23   as to fact discovery.

24        **MR. AKROTIRIANAKIS:**  Yeah.  I mean, it's -- we're not far

25   apart.  It's like seven weeks, I think.  It might be six weeks.

45

1   But it's not super far apart, Your Honor.

2        And I think there's a -- I mean, I -- one, I don't think

3   that really is just all that far apart.  But also, you know,

4   there's a number of sort of complications in this case that don't

5   exist in almost any other case, Your Honor.  I tried to explain

6   them on the bottom of page 23 of the last paragraph there that

7   things are just I expect going to take longer than they

8   ordinarily would.

9        **THE COURT:**  Sure.  Well, you all have requested a trial

10  date.  If you don't think that you're going to have sufficient

11  time to litigate the case, you can always ask for one that's

12  later.

13       Well, I'm going to impose one a little later anyway.  I

14  require a 120-day period between dispositive motions being heard

15  and the trial date.  The first 60 days of that period gives me as

16  much time as I need to get an order out.

17       Most parties like to have an order out on dispositive

18  motions and Daubert motions that are heard at the same time,

19  before they start their pretrial preparation.  In our Court,

20  pretrial preparation starts roughly 60 days before trial, with

21  your meet and confer, followed by the filing of your papers.  So

22  you need to account for 60 days.

23       There aren't 60 days between July 29th and late October

24  2024.  I believe that's just 90 days.  So we're actually looking

25  at a trial late November.  You all have estimated ten days, two

46

1    weeks, so we probably start trying the case --

2        Kelly, do you have our trial calendar up?  We'd probably

3    start trying the case the week --

4        **THE CLERK:**  Yes, I have it up.

5        **THE COURT:**  -- the week after Thanksgiving, first two weeks

6    of December.

7        **MR. PEREZ:**  And Your Honor, to be clear, the ten days was

8    defendants estimate.  Our position has been that at this point

9    prior to discovery, we're really not in a position to estimate

10   the length of trial.

11       **THE COURT:**  Okay.  I can't imagine more than ten days, two

12   full court weeks.  So we'll set it at that.  And it can be

13   adjusted if indeed we need to do so at a later conference.

14       **MR. AKROTIRIANAKIS:**  Your Honor, did I hear you correctly to

15   say that there must be at least 120 days between --

16       **THE COURT:**  Trial and dispositive motion hearing date.

17       **MR. AKROTIRIANAKIS:**  Right.  Would the Court entertain just

18   moving the trial date back just a little bit?  The reason I ask

19   is this.  I'm on the board of my law firm and I have a

20   substantial amount of administrative responsibility that takes

21   place right there in that period of the year and that is just a

22   horrible time to have to also try the case.

23       **THE COURT:**  So what are you asking for?

24       **MR. AKROTIRIANAKIS:**  Instead of late November, could we have

25   late December?

47

1      **THE COURT:**  Christmas?

2      **MR. AKROTIRIANAKIS:**  Well, it's not my preferred, Your

3    Honor.  I would rather be with my family at Christmas.  And it's

4    probably hard to get a jury then, but --

5      **THE COURT:**  It's impossible to get a jury at the end of

6    December.  So no, I can't move it to the end of December.

7      **MR. AKROTIRIANAKIS:**  But what about the beginning of January

8    then?

9      **THE COURT:**  What do the -- what's plaintiffs' position?

10     **MR. PEREZ:**  We're always courteous with respect to other

11   people's obligations.  But just as a calendar matter, we would

12   have a very strong preference for the beginning of December.

13   Both in order to get this case moving more quickly, and because,

14   you know, an early January trial date is also quite problematic

15   in terms of the holidays, as compared with early December.

16     **THE COURT:**  Right.  I don't generally hold trials between

17   mid-December to mid-January.  I mean, no juror wants to come in

18   the week after -- on New Year's.  I mean, everybody's trying to

19   get back to work.  Maybe we could do it right before Thanksgiving

20   in November.

21     Can you look up that, Kelly, and go forward a little bit and

22   just push up the dates a few weeks.

23     **THE CLERK:**  So the 11th is Veterans Day.  So if you do it

24   the 12th --

25     **THE COURT:**  Is that a Monday?

48

1      **THE CLERK:**  That's a Monday.  Yes.  So it would be the 12th

2   to the 22nd is --

3      **THE COURT:**  And Thanksgiving is the last week?

4      **THE CLERK:**  Thanksgiving is the 28th.

5      **THE COURT:**  Okay.  So that might work, right?  Okay.  Let me

6   see what we're looking at.  November of 2024.  Okay.  So if we

7   did it -- yeah, that would be done before Thanksgiving.  Right?

8      **THE CLERK:**  Yeah.  Right.  November 12th, 2024 to November

9   22nd, 2024.  And then Thanksgiving is that following week.

10      **THE COURT:**  Right.  And we could go over to that Monday if

11   we needed to, for deliberations, for instance.  Okay.  Okay.

12   November 22nd.  Okay.  Let's see how that impacts the rest of the

13   dates.  If we do November 22nd, the dispositive motions -- yeah,

14   we could do it a week or two before the 29th of July.  I think

15   120 days would be like July --

16      **MR. AKROTIRIANAKIS:**  Your Honor.

17      **THE COURT:**  Yeah.  Like July 18.  So that's only 11 days,

18   July 18th.  That's only 11 days before your current schedule.

19   All right.  I could give you that November 12th date, instead of

20   late October.

21      **MR. AKROTIRIANAKIS:**  Or early December.  The late November

22   is actually worse for me than early December would be, Your

23   Honor.

24      **THE COURT:**  Who's speaking?

25      **MR. AKROTIRIANAKIS:**  I'm sorry.  Joe Akrotirianakis.  I had

49

1    raised earlier that I have some admin --

2        **THE COURT:**  Well, you pick.  Those are the two dates that

3    are available.  You pick.  Which of those are the two dates that

4    are available.  I'm not going over till January.

5        **MR. AKROTIRIANAKIS:**  Right.  So November 12th, or some date

6    early in December?

7        **THE COURT:**  November 12th, or let's give them a specific

8    date, Kelly.

9        **THE CLERK:**  December 2nd through and the week of December

10   2nd and December 9th.

11       **THE COURT:**  Okay.  You can have either time slot.

12       **MR. AKROTIRIANAKIS:**  Yeah.  I mean, the 2nd would be better,

13   Your Honor.

14       **THE COURT:**  Okay.  December 2nd, then.

15       The pretrial conference, Kelly?

16       **THE CLERK:**  November 7th.

17       **THE COURT:**  Okay.  And the dispositive motions hearing date

18   would be -- we could keep it on the 29th.

19       **THE CLERK:**  That's a Monday.

20       **THE COURT:**  Okay.  So --

21       **THE CLERK:**  So it would be July 25th or August 8th.

22       **THE COURT:**  What about August 1st?

23       **THE CLERK:**  I'm sorry, August 1st.

24       **THE COURT:**  Right.  It would be August 1st.  Okay.  So here

50

1  are the dates.  Expert disclosures, February 24th -- 26 -- I'm

2  sorry -- 2024.  Rebuttal expert disclosures, April 8th, 2024.

3  Expert discovery cutoff, May 27th, 2024.  Hearing on dispositive

4  motions, August 1st, 2024.  Pretrial conference, November 7th,

5  2024.  And trial would be December 2nd, 2024.  And with regard to

6  fact discovery cut off, what did we agree to?

7      **MR. AKROTIRIANAKIS:**  We didn't, Your Honor.  That's the one

8  we don't agree on.

9      **THE COURT:**  Oh, okay.  And that's between -- I'm going to

10  pick an arbitrary date, and unless you all -- in between the two

11  dates you've suggested, unless you all want to meet and confer

12  and to submit something.

13      **MR. AKROTIRIANAKIS:**  Well, in light of the slightly later

14  trial date, Your Honor, could I ask that we confer and see if we

15  can agree on something?

16      **THE COURT:**  Okay.

17      **MR. AKROTIRIANAKIS:**  Thank you.

18      **THE COURT:**  All right.  Let me know within a week.  Just

19  file an informal letter on the docket indicating what date you

20  agree to fact discovery cut off.  And then the settlement

21  conference on or before February 12th, 2024.

22      You know, I usually hear -- would like you to go to

23  settlement before you expend the resources on your dispositive

24  motions.  And I guess -- let's see.  I guess that date would --

25  that would work.  Okay, on or before.  I'm going to say February

51

1   2024.

2       The magistrate judges need -- I can't guarantee you a

3   specific date.  So we'll give them a month, whoever is assigned.

4   Did you all have anybody in mind, or do you want me to just

5   assign it randomly?

6       **MR. PEREZ:**  We have not discussed particular candidates,

7   Your Honor.

8       **THE COURT:**  Okay.

9       **MR. PEREZ:**  But with respect to the date, I would just note

10  that that February date comes after our proposed date for the

11  close of fact discovery, but it comes before their proposed date

12  for the close of fact discovery.  And we would suggest that it

13  would probably make sense to have the settlement conference after

14  fact discovery.

15      **THE COURT:**  After.  Yes.  Why don't you then when you submit

16  your stipulation within a week as to the discovery cutoff date,

17  also include the settlement date.  Include the month in the year

18  of 2024 that you would agree to submitting to a settlement

19  conference.

20      **MR. PEREZ:**  Yes, Your Honor.

21      **THE COURT:**  Okay.  All right.  All right.  It's been more

22  than an hour.  We've taken care of a number of matters.  We will

23  have the status conference to go over discovery.  We'll have that

24  around 120 days, I guess before the close of fact discovery.

25      So why don't you in your stipulation include that date.  And

52

1    we will hold off on issuing a case management and pretrial order

2    until we get your stipulation next week, and we'll incorporate

3    all the dates in that one order.

4         **MR. AKROTIRIANAKIS:**  Thank you, Your Honor.

5         **MR. PEREZ:**  Yes, Your Honor.  Thank you.

6         **THE COURT:**  Okay.  Now, before we conclude, is there

7    anything else?

8         **MR. AKROTIRIANAKIS:**  Not at this time, Your Honor.

9         **MR. PEREZ:**  Not from plaintiffs, Your Honor.

10        **THE COURT:**  All right.  All right.  Thank you.  And I'll see

11   you in the future.

12        **MR. PEREZ:**  Thank you, Your Honor.

13        **MR. AKROTIRIANAKIS:**  Thank you, Your Honor.

14        **THE COURT:**  All right.  You're welcome.  We're adjourned.

15             (Proceedings adjourned at 12:00 p.m.)

16                         ---oOo---

17             **C E R T I F I C A T E**

18        I, DIPTI PATEL, court-approved transcriber, certify that the

19   foregoing is a correct transcript from the official electronic

20   sound recording of the proceedings in the above-entitled matter.

21

22   *Dipti Patel*
     _____

23   DIPTI PATEL, CET-997

24   LIBERTY TRANSCRIPTS                Date:  March 18, 2023

25

EXHIBIT C

1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
     *jakro@kslaw.com*

2   AARON S. CRAIG (Bar No. 204741)
     *acraig@kslaw.com*

3   KING & SPALDING LLP
     633 West Fifth Street, Suite 1700

4   Los Angeles, CA 90071
     Telephone:   (213) 443-4355

5   Facsimile:    (213) 443-4310

6   Attorneys for Defendants NSO GROUP TECHNOLOGIES
     LIMITED and Q CYBER TECHNOLOGIES LIMITED

7

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                  OAKLAND DIVISION

| | |
|---|---|
| 12  WHATSAPP INC., a Delaware corporation,<br>and FACEBOOK, INC., a Delaware<br>13  corporation, | Case No. 4:19-cv-07123-PJH |
| 14            Plaintiffs, | **DEFENDANTS' AMENDED**<br>**OBJECTIONS AND RESPONSES TO**<br>**PLAINTIFFS' FIRST REQUESTS FOR**<br>**PRODUCTION** |
| 15      v. | |
| 16  NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br>17 | Action Filed:  10/29/2019 |
| 18         Defendants. | |

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Rule 45 of the Federal Rules of Civil Procedure and the Court's February 16,

2   2023, directives, Defendants hereby serve amended objections and responses to Plaintiffs' First

3   Requests for Production.

4                                    **PRELIMINARY STATEMENT**

5    Nothing in this response should be construed as an admission with respect to the

6   admissibility or relevance of any fact or document, or of the truth or accuracy of any

7   characterization or statement of any kind contained in Plaintiffs' First Requests for Production.

8   Defendants have not completed their discovery and investigation of the facts relating to this case

9   and have not completed preparation for trial.  The responses contained herein are based only upon

10  such information and documents which are currently available, and specifically known, to

11  Defendants.

12   It is anticipated that further discovery, independent investigation, legal research, and

13  analysis may supply additional facts, add meaning to known facts, and establish entirely new

14  factual conclusions and legal contentions, all of which may lead to substantial additions to, changes

15  in, and variations from the responses set forth herein.

16   The following objections and responses are given without prejudice to Defendants' right

17  to produce evidence, at trial or otherwise, regarding any subsequently discovered facts or

18  information.  Defendants reserve the right to modify and amend any and all responses herein as

19  additional facts are ascertained, as analysis and contentions are made, or as research is completed.

20  The responses contained herein are made in a good faith effort to supply as much factual

21  information and as much specification of legal contentions as are presently known but should in

22  no way prejudice Defendants in relation to further discovery, research, or analysis.

23   By submitting these responses and objections, Defendants do not consent to jurisdiction of

24  the Court and do not waive their defenses that the Court lacks subject-matter and personal

25  jurisdiction.  To the contrary, Defendants hereby preserve those defenses.

26   Any representation that Defendants will produce documents responsive to any Request, in

27  whole or in part, is expressly conditioned upon entry of a complete protective order governing the

28

AMENDED OBJECTIONS AND RESPONSES      1      Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

1 │ uses that may be made of documents produced in litigation and the persons to whom they may be

2 │ disclosed.

3 │      Defendants reserve the right to redact information from certain documents as may be

4 │ necessary to comply with Israeli or other foreign law or contractual obligation.

5 │ **GENERAL OBJECTIONS**

6 │      Defendants interpose the following general objections into each of the specific objections

7 │ that follow as if the general objections were set forth in full in each specific objection.

8 │      1.    Defendants object to the Requests to the extent they seek information that exceeds

9 │ the scope of permissible discovery under the Federal Rules of Civil Procedure or seeks to impose

10 │ upon Defendants obligations beyond those required by the Federal Rules of Civil Procedure.

11 │      2.    Defendants object to the Requests to the extent they seek information that is not

12 │ related or relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus"

13 │ with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7).

14 │      3.    Defendants object to the Requests to the extent they seek information already in the

15 │ possession, custody, or control of Plaintiffs; information that is available from public sources; or

16 │ information that is as readily available to Plaintiffs as to Defendants on the grounds that it would

17 │ be unduly burdensome and oppressive to require Defendants to obtain, process, and reproduce

18 │ such documents.

19 │      4.    Defendants object to the Requests to the extent they assert and/or assume unproven

20 │ conclusions as established facts.

21 │      5.    Defendants object to the Requests to the extent they seek information protected

22 │ from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any

23 │ other privilege or protection against disclosure.

24 │      6.    Defendants object to the Requests to the extent they seek information that would

25 │ disclose trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive

26 │ business information, or that may be protected by a right of privacy under the United States

27 │ Constitution, Article I, Section 1 of the Constitution of the State of California, Israeli privacy laws,

28 │

1    or any other applicable law.

2        7.    Defendants object to the Requests to the extent they seek information that

3    Defendants are prohibited from disclosing by Israeli law, regulation, or governmental order or

4    directive, or any other applicable law, regulation, or governmental order or directive.  Defendants

5    intend to withhold documents and communications they are not permitted to produce pursuant to

6    Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation,

7    or governmental order or directive.

8        8.    Defendants object to the Requests to the extent they seek information that is not

9    within Defendants' custody and control.  To the extent that Defendants produce materials in

10   response to the Requests, Defendants will produce materials that are within Defendants' custody

11   and control and identified after a reasonable investigation.

12       9.    Defendants object to the Requests on the ground that they purport to require

13   Defendants to participate in this lawsuit despite that Plaintiffs have not established personal

14   jurisdiction over Defendants.  Nothing herein should be interpreted as a waiver of the burden

15   Plaintiffs have to prove that Defendants are subject to personal jurisdiction in California.

16       10.   Defendants object to the defined term "EXPLOITS" because the phrases "take

17   advantage of" and "to cause unauthorized, unintended or unanticipated behavior to occur" are

18   vague and ambiguous.

19                              **SPECIFIC OBJECTIONS**

20   **REQUEST FOR PRODUCTION NO. 1:**

21       ALL DOCUMENTS and COMMUNICATIONS CONCERNING the development,

22   testing, deployment, installation, distribution, use, maintenance, troubleshooting, and/or operation

23   of any NSO SPYWARE targeting or directed at WHATSAPP servers or USERS.

24   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

25       Defendants incorporate their General Objections.  Defendants object to this Request as

26   overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation.

27   Among other reasons, the Request seeks information related to technologies other than the Pegasus

28

1  technology that was used with respect to the "Target Devices" described in the Complaint (Dkt.

2  No. 1 at 2:6-7), which has no relevance to Plaintiffs' allegations or any issue in this case.

3  Defendants further object that the terms "deployment," "use," and "operation," as well as the

4  phrase "targeted or directed at," are vague and ambiguous.  Defendants further object that

5  documents and communications relating to the deployment, installation, distribution, use and

6  operation of Pegasus by Defendants' sovereign customers are third-party information that

7  Defendants are prohibited from disclosing by contractual obligations or foreign law, regulation,

8  governmental order or directive.  Responsive materials are being withheld on the basis of these

9  objections.

10      Subject to and without waiving these objections, and subject to the Court's entry of a

11  complete protective order, Defendants will produce responsive and nonprivileged documents and

12  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

13  through May 13, 2019, related to the development, testing, maintenance and troubleshooting of

14  the Pegasus technology alleged to have been used with respect to the "Target Devices" described

15  in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

16  proportional search, provided that Defendants are not prohibited from disclosing such documents

17  and communications by Israeli law, regulation, or governmental order or directive, or any other

18  applicable law, regulation, or governmental order or directive.  Defendants intend to withhold

19  documents and communications they are not permitted to produce pursuant to Israeli law,

20  regulation, or governmental order or directive, or any other applicable law, regulation, or

21  governmental order or directive.  If Defendants are not otherwise prohibited from making such a

22  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

23  completion of their responsive production within approximately 180 days.

24  **REQUEST FOR PRODUCTION NO. 2:**

25      DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, teams,

26  groups, divisions, or sections at NSO responsible for developing, testing, deploying, using,

27  distributing, maintaining, troubleshooting, and/or operating NSO SPYWARE targeting or directed

28

AMENDED OBJECTIONS AND RESPONSES      4      Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

1    at WHATSAPP servers or USERS.

2    **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

3        Defendants incorporate their General Objections. Defendants object to this Request as

4 overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

5 because it seeks information related to technologies other than the Pegasus technology alleged to

6 have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

7 7), which has no relevance to Plaintiffs' allegations or any issue in this case. Defendants further

8 object that the terms "deploying," "using," and "operating," as well as the phrase "targeted or

9 directed at," are vague and ambiguous. Defendants further object to this Request to the extent

10 that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use,

11 distribute, or operate Pegasus or any other technology within the definition of "NSO SPYWARE."

12 Responsive materials are being withheld on the basis of these objections.

13        Subject to and without waiving these objections, and subject to the Court's entry of a

14 complete protective order, Defendants will produce responsive and nonprivileged documents and

15 communications, in Defendants' possession, custody, and control, dated January 2018 through

16 May 13, 2019, sufficient to identify teams, groups, divisions, or sections responsible for the

17 development, testing, maintenance and troubleshooting of the Pegasus technology alleged to have

18 been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7),

19 that Defendants are able to locate after a reasonable and proportional search, provided that

20 Defendants are not prohibited from disclosing such documents and communications by Israeli law,

21 regulation, or governmental order or directive, or any other applicable law, regulation, or

22 governmental order or directive. Defendants intend to withhold documents and communications

23 they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

24 directive, or any other applicable law, regulation, or governmental order or directive. If

25 Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

26 reasonable and proportional search and anticipate substantial completion of their responsive

27 production within approximately 180 days.

28

**REQUEST FOR PRODUCTION NO. 3:**

ALL DOCUMENTS and COMMUNICATIONS CONCERNING the use of NSO SPYWARE by third-parties, including but not limited to marketing materials, licensing agreements, user complaints, and training manuals or documents.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Defendants incorporate their General Objections. Defendants object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation because it seeks information related to technologies other than the Pegasus technology alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), and uses of NSO technologies other than the conduct described in the Complaint, which have no relevance to Plaintiffs' allegations or any issue in this case. Defendants further object to this Request to the extent that it seeks documents and communications in the custody and control of third parties, not Defendants. Defendants further object to the extent this Request seeks third-party information that Defendants are prohibited from disclosing by contractual obligations or foreign law, regulation, governmental order or directive. Defendants further object that the term "user complaints" is vague and ambiguous. Defendants further object that the term "use" is vague and ambiguous, as is evidenced by the listing of "marketing materials" as an example of documents that supposedly concern the use of Defendants' technology by third parties; Defendants disagree that marketing materials about a technology, generally speaking, would be documents concerning the use of that technology by third parties. Responsive materials are being withheld on the basis of these objections.

Subject to and without waiving these objections and subject to the Court's entry of a complete protective order, Defendants will produce responsive and nonprivileged marketing materials, licensing agreements, and training manuals or documents, in Defendants' possession, custody, and control, if any exist, dated January 2018 through May 13, 2019, related to the Pegasus technology alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

1   proportional search, provided that Defendants are not prohibited from disclosing such documents

2   and communications by Israeli law, regulation, or governmental order or directive, or any other

3   applicable law, regulation, or governmental order or directive.   Defendants intend to withhold

4   documents and communications they are not permitted to produce pursuant to Israeli law,

5   regulation, or governmental order or directive, or any other applicable law, regulation, or

6   governmental order or directive.  If Defendants are not otherwise prohibited from making such a

7   disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

8   completion of their responsive production within approximately 180 days.

9   **REQUEST FOR PRODUCTION NO. 4:**

10        DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, and the

11   teams, groups, divisions, or sections at NSO responsible for installation, maintenance, or training

12   of NSO SPYWARE.

13   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

14        Defendants incorporate their General Objections.  Defendants object to this Request as

15   overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

16   because it seeks information related to technologies other than the Pegasus technology alleged to

17   have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

18   7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Responsive materials

19   are being withheld on the basis of these objections.

20        Subject to and without waiving these objections and subject to the Court's entry of a

21   complete protective order, Defendants will produce responsive and nonprivileged documents and

22   communications dated January 2018 through May 13, 2019, sufficient to identify the persons

23   responsible for installation, maintenance or training related to the Pegasus technology alleged to

24   have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

25   7), in Defendants' possession, custody, or control, if any exist, that Defendants are able to locate

26   after a reasonable and proportional search, provided that Defendants are not prohibited from

27   disclosing such documents and communications by Israeli law, regulation, or governmental order

28

AMENDED OBJECTIONS AND RESPONSES      7      Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

or directive, or any other applicable law, regulation, or governmental order or directive. Defendants intend to withhold documents and communications they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. If Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a reasonable and proportional search and anticipate substantial completion of their responsive production within approximately 180 days.

**REQUEST FOR PRODUCTION NO. 5:**

ALL DOCUMENTS and COMMUNICATIONS between January 2014 and December 2019 CONCERNING the identification of WhatsApp or Facebook application or network vulnerabilities, including but not limited to any payments for bounties for WhatsApp or Facebook vulnerabilities, contracts for services by vendors, or analyst work product and reports.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Defendants incorporate their General Objections. Defendants object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation because it seeks information related to Facebook vulnerabilities, which has no relevance to Plaintiffs' allegations or any issue in this case. Defendants further object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation to the extent it seeks information related to vulnerabilities other than the vulnerability allegedly exploited by the Pegasus technology alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), which has no relevance to Plaintiffs' allegations or any issue in this case. Defendants further object to the time period of this Request as arbitrary, overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation. Plaintiffs' allegations relate to the period from January 2018, when Plaintiffs allege that Defendants first created WhatsApp accounts, to May 2019, when Plaintiffs "closed the vulnerability" that allegedly allowed Pegasus to function over WhatsApp. Seeking documents from four years before Plaintiffs allege that Defendants' alleged illegal conduct began and seven months after it ended is arbitrary and improper. Responsive materials are being withheld on the

1   basis of these objections.

2       Subject to and without waiving these objections and subject to the Court's entry of a

3 complete protective order, Defendants will produce responsive and nonprivileged documents and

4 communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

5 through May 13, 2019, related to the identification of the specific WhatsApp vulnerability

6 allegedly exploited by the Pegasus technology alleged to have been used with respect to the

7 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to

8 locate after a reasonable and proportional search, provided that Defendants are not prohibited from

9 disclosing such documents and communications by Israeli law, regulation, or governmental order

10 or directive, or any other applicable law, regulation, or governmental order or directive.

11 Defendants intend to withhold documents and communications they are not permitted to produce

12 pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law,

13 regulation, or governmental order or directive.  If Defendants are not otherwise prohibited from

14 making such a disclosure, Defendants will make a reasonable and proportional search and

15 anticipate substantial completion of their responsive production within approximately 180 days.

16 **REQUEST FOR PRODUCTION NO. 6:**

17       DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, teams,

18 groups, or divisions at NSO, as well as vendors, agents, or bounties that assisted in the

19 identification and analysis of WhatsApp vulnerabilities.

20 **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

21       Defendants incorporate their General Objections.  Defendants object to this Request as

22 overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation to the

23 extent it seeks information related to vulnerabilities other than the vulnerability allegedly exploited

24 by the Pegasus technology alleged to have been used with respect to the "Target Devices"

25 described in the Complaint (Dkt. No. 1 at 2:6-7), which has no relevance to Plaintiffs' allegations

26 or any issue in this case.  Defendants further object that the term "bounties" is vague and

27 ambiguous.  Responsive materials are being withheld on the basis of these objections.

28

1    Subject to and without waiving these objections and subject to the Court's entry of a

2   complete protective order, Defendants will produce responsive and nonprivileged documents and

3   communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

4   through May 13, 2019, sufficient to identify the persons that assisted in identifying the specific

5   WhatsApp vulnerability allegedly exploited by the Pegasus technology alleged to have been used

6   with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that

7   Defendants are able to locate after a reasonable and proportional search, provided that Defendants

8   are not prohibited from disclosing such documents and communications by Israeli law, regulation,

9   or governmental order or directive, or any other applicable law, regulation, or governmental order

10  or directive.  Defendants intend to withhold documents and communications they are not permitted

11  to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

12  applicable law, regulation, or governmental order or directive.  If Defendants are not otherwise

13  prohibited from making such a disclosure, Defendants will make a reasonable and proportional

14  search and anticipate substantial completion of their responsive production within approximately

15  180 days.

16  **REQUEST FOR PRODUCTION NO. 7:**

17    ALL DOCUMENTS and COMMUNICATIONS CONCERNING the development and

18  testing of any EXPLOIT or TECHNOLOGY targeting or directed at WHATSAPP servers or

19  USERS.

20  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

21    Defendants incorporate their General Objections.  Defendants object to this Request as

22  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

23  because it seeks information related to technologies other than the Pegasus technology alleged to

24  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

25  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Defendants further

26  object that the phrase "targeting or directed at" are vague and ambiguous.  Responsive materials

27  are being withheld on the basis of these objections.

28

1    Subject to and without waiving these objections and subject to the Court's entry of a

2    complete protective order, Defendants will produce responsive and nonprivileged documents and

3    communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

4    through May 13, 2019, related to the development and testing of the Pegasus technology alleged

5    to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at

6    2:6-7), that Defendants are able to locate after a reasonable and proportional search, provided that

7    Defendants are not prohibited from disclosing such documents and communications by Israeli law,

8    regulation, or governmental order or directive, or any other applicable law, regulation, or

9    governmental order or directive.  Defendants intend to withhold documents and communications

10   they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

11   directive, or any other applicable law, regulation, or governmental order or directive.    If

12   Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

13   reasonable and proportional search and anticipate substantial completion of their responsive

14   production within approximately 180 days.

15   **REQUEST FOR PRODUCTION NO. 8:**

16   DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, teams,

17   groups, divisions, or sections at NSO that assisted in the development, testing, or maintenance of

18   any EXPLOIT or TECHNOLOGY directed at WHATSAPP servers or USERS.

19   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

20   Defendants incorporate their General Objections.  Defendants object to this Request as

21   overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

22   because it seeks information related to technologies other than the Pegasus technology alleged to

23   have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

24   7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Responsive materials

25   are being withheld on the basis of these objections.

26   Subject to and without waiving these objections and subject to the Court's entry of a

27   complete protective order, Defendants will produce responsive and nonprivileged documents and

28

1 communications, dated January 2018 through May 13, 2019, sufficient to identify the persons

2 responsible for development, testing, or maintenance of the Pegasus technology alleged to have

3 been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7),

4 in Defendants' possession, custody, and control, if any exist, that Defendants are able to locate

5 after a reasonable and proportional search, provided that Defendants are not prohibited from

6 disclosing such documents and communications by Israeli law, regulation, or governmental order

7 or directive, or any other applicable law, regulation, or governmental order or directive.

8 Defendants intend to withhold documents and communications they are not permitted to produce

9 pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law,

10 regulation, or governmental order or directive.  If Defendants are not otherwise prohibited from

11 making such a disclosure, Defendants will make a reasonable and proportional search and

12 anticipate substantial completion of their responsive production within approximately 180 days.

13 **REQUEST FOR PRODUCTION NO. 9:**

14      ALL DOCUMENTS and COMMUNICATIONS CONCERNING the processes, methods,

15 and TECHNOLOGY used by NSO SPYWARE to monitor TARGET DEVICES and exfiltrate

16 data, including but not limited to any command and control software or payloads.

17 **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

18      Defendants incorporate their General Objections.  Defendants object to this Request as

19 overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

20 because it seeks information related to technologies other than the Pegasus technology alleged to

21 have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

22 7), and devices other the Target Devices, which has no relevance to Plaintiffs' allegations or any

23 issue in this case.  Defendants further object that the phrases "processes [and] methods,"

24 "monitor," "exfiltrate data," and "command and control software or payloads" are vague and

25 ambiguous.  Responsive materials are being withheld on the basis of these objections.

26      Subject to and without waiving these objections and subject to the Court's entry of a

27 complete protective order, Defendants will produce responsive and nonprivileged documents and

28

1    communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

2    through May 13, 2019, concerning the processes, methods and technology used by the Pegasus

3    technology alleged to have been used with respect to the "Target Devices" described in the

4    Complaint (Dkt. No. 1 at 2:6-7) and export data from such Target Devices, that Defendants are

5    able to locate after a reasonable and proportional search, provided that Defendants are not

6    prohibited from disclosing such documents and communications by Israeli law, regulation, or

7    governmental order or directive, or any other applicable law, regulation, or governmental order or

8    directive.  Defendants intend to withhold documents and communications they are not permitted

9    to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

10   applicable law, regulation, or governmental order or directive.  If Defendants are not otherwise

11   prohibited from making such a disclosure, Defendants will make a reasonable and proportional

12   search and anticipate substantial completion of their responsive production within approximately

13   180 days.

14   **REQUEST FOR PRODUCTION NO. 10:**

15        ALL DOCUMENTS and COMMUNICATIONS CONCERNING mobile phone and

16   device operating system vulnerabilities used to install NSO SPYWARE on mobile phones and

17   devices of WHATSAPP USERS.

18   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

19        Defendants incorporate their General Objections.  Defendants object to this Request as

20   overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

21   because it seeks information related to technologies other than the Pegasus technology alleged to

22   have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

23   7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Responsive materials

24   are being withheld on the basis of these objections.

25        Subject to and without waiving these objections and subject to the Court's entry of a

26   complete protective order, Defendants will produce responsive and nonprivileged documents and

27   communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

28

1   through May 13, 2019, concerning mobile phone and device operating system vulnerabilities used

2   to install the Pegasus technology alleged to have been used with respect to the "Target Devices"

3   described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a

4   reasonable and proportional search, provided that Defendants are not prohibited from disclosing

5   such documents and communications by Israeli law, regulation, or governmental order or directive,

6   or any other applicable law, regulation, or governmental order or directive.  Defendants intend to

7   withhold documents and communications they are not permitted to produce pursuant to Israeli law,

8   regulation, or governmental order or directive, or any other applicable law, regulation, or

9   governmental order or directive.  If Defendants are not otherwise prohibited from making such a

10  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

11  completion of their responsive production within approximately 180 days.

12  **REQUEST FOR PRODUCTION NO. 11:**

13          DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, and the

14  teams, groups, divisions, or sections at NSO responsible for identifying mobile phone and device

15  vulnerabilities used by NSO.

16  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

17          Defendants incorporate their General Objections.  Defendants object to this Request as

18  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

19  because it seeks information related to technologies other than the Pegasus technology alleged to

20  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

21  7), and devices other than the Target Devices, which has no relevance to Plaintiffs' allegations or

22  any issue in this case.  Responsive materials are being withheld on the basis of these objections.

23          Subject to and without waiving these objections and subject to the Court's entry of a

24  complete protective order, Defendants will produce responsive and nonprivileged documents and

25  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

26  through May 13, 2019, sufficient to identify the persons responsible for identifying any mobile

27  phone and device vulnerabilities used by the Pegasus technology alleged to have been used with

28

AMENDED OBJECTIONS AND RESPONSES        14                      Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

1   respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants

2   are able to locate after a reasonable and proportional search, provided that Defendants are not

3   prohibited from disclosing such documents and communications by Israeli law, regulation, or

4   governmental order or directive, or any other applicable law, regulation, or governmental order or

5   directive. Defendants intend to withhold documents and communications they are not permitted

6   to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

7   applicable law, regulation, or governmental order or directive. If Defendants are not otherwise

8   prohibited from making such a disclosure, Defendants will make a reasonable and proportional

9   search and anticipate substantial completion of their responsive production within approximately

10  180 days.

11  **REQUEST FOR PRODUCTION NO. 12:**

12      ALL DOCUMENTS and COMMUNICATIONS CONCERNING the development and

13  testing of EXPLOITS against the mobile phones and devices of WHATSAPP USERS.

14  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

15      Defendants incorporate their General Objections. Defendants object to this Request as

16  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation to the

17  extent it seeks information related to technologies other than the Pegasus technology alleged to

18  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

19  7), which has no relevance to Plaintiffs' allegations or any issue in this case. Responsive materials

20  are being withheld on the basis of these objections.

21      Subject to and without waiving these objections and subject to the Court's entry of a

22  complete protective order, Defendants will produce responsive and nonprivileged documents and

23  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

24  through May 13, 2019, related to the development and testing of the Pegasus technology alleged

25  to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at

26  2:6-7), that Defendants are able to locate after a reasonable and proportional search, provided that

27  Defendants are not prohibited from disclosing such documents and communications by Israeli law,

28

1  regulation, or governmental order or directive, or any other applicable law, regulation, or

2  governmental order or directive.  Defendants intend to withhold documents and communications

3  they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

4  directive, or any other applicable law, regulation, or governmental order or directive.  If

5  Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

6  reasonable and proportional search and anticipate substantial completion of their responsive

7  production within approximately 180 days.

8  **REQUEST FOR PRODUCTION NO. 13:**

9         DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, and the

10  teams, groups, divisions, or sections at NSO responsible for developing and testing EXPLOITS

11  against the mobile phone and devices of WHATSAPP USERS.

12  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

13         Defendants incorporate their General Objections.  Defendants object to this Request as

14  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

15  because it seeks information related to technologies other than the Pegasus technology alleged to

16  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

17  7), and devices other than the Target Devices, which has no relevance to Plaintiffs' allegations or

18  any issue in this case.

19         Subject to and without waiving these objections and subject to the Court's entry of a

20  complete protective order, Defendants will produce responsive and nonprivileged documents and

21  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

22  through May 13, 2019, sufficient to identify the persons responsible for developing and testing the

23  Pegasus technology alleged to have been used with respect to the "Target Devices" described in

24  the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

25  proportional search, provided that Defendants are not prohibited from disclosing such documents

26  and communications by Israeli law, regulation, or governmental order or directive, or any other

27  applicable law, regulation, or governmental order or directive.  Defendants intend to withhold

28

1  documents and communications they are not permitted to produce pursuant to Israeli law,

2  regulation, or governmental order or directive, or any other applicable law, regulation, or

3  governmental order or directive.  If Defendants are not otherwise prohibited from making such a

4  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

5  completion of their responsive production within approximately 180 days.

6  **REQUEST FOR PRODUCTION NO. 14:**

7  ALL DOCUMENTS and COMMUNICATIONS CONCERNING the processes, methods,

8  and TECHNOLOGY used to install NSO SPYWARE on the mobile phones and devices of

9  WHATSAPP USERS, including but not limited to computer code, commands, data, or payloads

10  transmitted or received during the installation of NSO SPYWARE.

11  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

12  Defendants incorporate their General Objections.  Defendants object to this Request as

13  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

14  because it seeks information related to technologies other than the Pegasus technology alleged to

15  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

16  7), and WhatsApp users other than the 1,400 users described in the Complaint, which has no

17  relevance to Plaintiffs' allegations or any issue in this case.  Defendants further object that the

18  terms "processes" and "methods" are vague and ambiguous.  Defendants further object to this

19  Request to the extent that it seeks documents and communications concerning conduct by

20  Defendants' sovereign customers in their use of Pegasus, which Defendants are prohibited from

21  disclosing by contractual obligations or foreign law, regulation, governmental order or directive.

22  Responsive materials are being withheld on the basis of these objections.

23  Subject to and without waiving these objections and subject to the Court's entry of a

24  complete protective order, Defendants will produce responsive and nonprivileged documents and

25  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

26  through May 13, 2019, concerning the processes, methods and technology used to install the

27  Pegasus technology alleged to have been used with respect to the "Target Devices" described in

28

1  the Complaint (Dkt. No. 1 at 2:6-7) on such Target Devices, that Defendants are able to locate

2  after a reasonable and proportional search, provided Defendants are not prohibited from disclosing

3  such documents and communications by Israeli law, regulation, or governmental order or directive,

4  or any other applicable law, regulation, or governmental order or directive.  Defendants intend to

5  withhold documents and communications they are not permitted to produce pursuant to Israeli law,

6  regulation, or governmental order or directive, or any other applicable law, regulation, or

7  governmental order or directive.  If Defendants are not otherwise prohibited from making such a

8  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

9  completion of their responsive production within approximately 180 days.

10  **REQUEST FOR PRODUCTION NO. 15:**

11  ALL DOCUMENTS and COMMUNICATIONS CONCERNING the analysis, reverse

12  engineering, disassembling, or emulating of any version of the WhatsApp application, including

13  but not limited to its TECHNOLOGY, application programming interfaces (APIs), decompiled

14  code, binaries, executables, designs, specifications, or analyses of the WhatsApp application,

15  APIs, or network protocols.

16  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

17  Defendants incorporate their General Objections.  Defendants object to the phrases

18  "analysis, reverse engineering, disassembling, or emulating" and "application programming

19  interfaces (APIs), decompiled code, binaries, executables, designs, specifications or analyses of

20  the WhatsApp application, APIs, or network protocols" as vague and ambiguous. Defendants

21  further object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional

22  to the needs of the litigation to the extent it seeks information related to conduct related to

23  technologies other than the Pegasus technology alleged to have been used with respect to the

24  "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), which has no relevance to

25  Plaintiffs' allegations or any issue in this case.  Responsive materials are being withheld on the

26  basis of these objections.

27  Subject to and without waiving these objections and subject to the Court's entry of a

28

AMENDED OBJECTIONS AND RESPONSES      18                          Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

1  complete protective order, Defendants will produce responsive and nonprivileged documents and

2  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

3  through May 13, 2019, concerning the analysis, reverse engineering, disassembling, or emulating

4  of the WhatsApp application to the extent related to the Pegasus technology alleged to have been

5  used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that

6  Defendants are able to locate after a reasonable and proportional search, provided that Defendants

7  are not prohibited from disclosing such documents and communications by Israeli law, regulation,

8  or governmental order or directive, or any other applicable law, regulation, or governmental order

9  or directive.  Defendants intend to withhold documents and communications they are not permitted

10  to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

11  applicable law, regulation, or governmental order or directive.  If Defendants are not otherwise

12  prohibited from making such a disclosure, Defendants will make a reasonable and proportional

13  search and anticipate substantial completion of their responsive production within approximately

14  180 days.

15  **REQUEST FOR PRODUCTION NO. 16:**

16      ALL DOCUMENTS and COMMUNICATIONS CONCERNING the TECHNOLOGY or

17  NSO SPYWARE used by NSO to communicate with WhatsApp, including WhatsApp servers,

18  endpoints, computers and computer networks, other than the official WhatsApp application.

19  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

20      Defendants incorporate their General Objections.  Defendants object to this Request as

21  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

22  because it seeks information related to technologies other than the Pegasus technology alleged to

23  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

24  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Responsive materials

25  are being withheld on the basis of these objections.

26      Subject to and without waiving these objections and subject to the Court's entry of a

27  complete protective order, Defendants will produce responsive and nonprivileged documents and

28

1  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

2  through May 13, 2019, concerning the aspects, used by NSO to communicate with WhatsApp, of

3  the Pegasus technology alleged to have been used with respect to the "Target Devices" described

4  in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

5  proportional search, provided that Defendants are not prohibited from disclosing such documents

6  and communications by Israeli law, regulation, or governmental order or directive, or any other

7  applicable law, regulation, or governmental order or directive.  Defendants intend to withhold

8  documents and communications they are not permitted to produce pursuant to Israeli law,

9  regulation, or governmental order or directive, or any other applicable law, regulation, or

10  governmental order or directive.  If Defendants are not otherwise prohibited from making such a

11  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

12  completion of their responsive production within approximately 180 days.

13  **REQUEST FOR PRODUCTION NO. 17:**

14      ALL DOCUMENTS and COMMUNICATIONS CONCERNING any WHATSAPP

15  ACCOUNTS used to develop, test, transmit, install, distribute, or use any NSO SPYWARE.

16  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

17      Defendants incorporate their General Objections.  Defendants object to this Request as

18  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

19  because it seeks information related to technologies other than the Pegasus technology alleged to

20  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

21  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Defendants further

22  object to "use" as vague and ambiguous. As Defendants have repeatedly explained, they do not

23  "use" Peagsus; their sovereign customers do. Defendants further object to this Request to the extent

24  that it seeks documents and communications concerning WhatsApp Accounts used by Defendants'

25  sovereign customers in their use of Pegasus, which Defendants are prohibited from disclosing by

26  contractual obligations or foreign law, regulation, governmental order or directive.  Responsive

27  materials are being withheld on the basis of these objections.  Defendants further object to this

28

1   Request to the extent it implies that Defendants "use" Pegasus, which is not the case.

2          Subject to and without waiving these objections and subject to the Court's entry of a

3   complete protective order, Defendants will produce responsive and nonprivileged documents and

4   communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

5   through May 13, 2019, concerning any WhatsApp accounts used by Defendants to develop, test,

6   transmit, install, or distribute the Pegasus technology alleged to have been used with respect to the

7   "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to

8   locate after a reasonable and proportional search, provided that Defendants are not prohibited from

9   disclosing such documents and communications by Israeli law, regulation, or governmental order

10  or directive, or any other applicable law, regulation, or governmental order or directive.

11  Defendants intend to withhold documents and communications they are not permitted to produce

12  pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law,

13  regulation, or governmental order or directive.  If Defendants are not otherwise prohibited from

14  making such a disclosure, Defendants will make a reasonable and proportional search and

15  anticipate substantial completion of their responsive production within approximately 180 days.

16  **REQUEST FOR PRODUCTION NO. 18:**

17         DOCUMENTS and COMMUNICATIONS sufficient to identify the PERSONS, and the

18  teams, groups, divisions, or section at NSO that assisted in creating, using, or accessing each of

19  the WHATSAPP ACCOUNTS responsive to REQUEST FOR PRODUCTION NO. 17.

20  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

21         Defendants incorporate their General Objections.  Defendants object to this Request as

22  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

23  because it seeks information related to technologies other than the Pegasus technology alleged to

24  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

25  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  To the extent this

26  Request incorporates a separate Request (i.e., Request No. 17), Defendants object to responding

27  to it beyond the scope of their response to that separate request.  Responsive materials are being

28

AMENDED OBJECTIONS AND RESPONSES     21     Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

1  withheld on the basis of these objections.

2      Subject to and without waiving these objections and subject to the Court's entry of a

3  complete protective order, Defendants will produce responsive and nonprivileged documents and

4  communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

5  through May 13, 2019, sufficient to identify the persons who created and used the WhatsApp

6  accounts used by Defendants to develop, test, transmit, install, or distribute the Pegasus technology

7  alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt.

8  No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and proportional search,

9  provided that Defendants are not prohibited from disclosing such documents and communications

10  by Israeli law, regulation, or governmental order or directive, or any other applicable law,

11  regulation, or governmental order or directive.  Defendants intend to withhold documents and

12  communications they are not permitted to produce pursuant to Israeli law, regulation, or

13  governmental order or directive, or any other applicable law, regulation, or governmental order or

14  directive.  If Defendants are not otherwise prohibited from making such a disclosure, Defendants

15  will make a reasonable and proportional search and anticipate substantial completion of their

16  responsive production within approximately 180 days.

17  **REQUEST FOR PRODUCTION NO. 19:**

18      ALL DOCUMENTS and COMMUNICATIONS CONCERNING the TECHNOLOGY

19  used to transmit any data or information from any device containing or infected with any NSO

20  SPYWARE, including but not limited to the TARGET DEVICES, to NSO or to NSO

21  CUSTOMERS.

22  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

23      Defendants incorporate their General Objections.  Defendants object to this Request as

24  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

25  because it seeks information related to technologies other than the Pegasus technology alleged to

26  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

27  7), and WhatsApp users other than the 1,400 users described in the Complaint, which has no

28

1    relevance to Plaintiffs' allegations or any issue in this case.  Defendants further object to the extent

2    this Request seeks third-party information that Defendants are prohibited from disclosing by

3    contractual obligations or foreign law, regulation, governmental order or directive.  Responsive

4    materials are being withheld on the basis of these objections.

5            Subject to and without waiving these objections and subject to the Court's entry of a

6    complete protective order, Defendants will produce responsive and nonprivileged documents and

7    communications, in Defendants' possession, custody, and control, if any exist, dated January 2018

8    through May 13, 2019, concerning the Pegasus technology that was used to transmit data or

9    information from the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) that

10   Defendants are able to locate after a reasonable and proportional search, provided that Defendants

11   are not prohibited from disclosing such documents and communications by Israeli law, regulation,

12   or governmental order or directive, or any other applicable law, regulation, or governmental order

13   or directive.  Defendants intend to withhold documents and communications they are not permitted

14   to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

15   applicable law, regulation, or governmental order or directive.  If Defendants are not otherwise

16   prohibited from making such a disclosure, Defendants will make a reasonable and proportional

17   search and anticipate substantial completion of their responsive production within approximately

18   180 days.

19   **REQUEST FOR PRODUCTION NO. 20:**

20           DOCUMENTS sufficient to describe the design and operation of PEGASUS, including but

21   not limited to the "layers" described in Exhibit 10 of the COMPLAINT: installation, data

22   collection, data, transmission, presentation and analysis, and administration.

23   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

24           Defendants incorporate their General Objections.  Defendants object to the terms

25   "operation," "layers," "presentation and analysis," and "administration" as vague and ambiguous.

26   Defendants further object to the phrase "data, transmission" as vague and ambiguous; Defendants

27   will interpret that phrase as "data transmission."

28

1      Subject to and without waiving these objections and subject to the Court's entry of a

2  complete protective order, Defendants will produce responsive and nonprivileged documents, in

3  Defendants' possession, custody, and control, if any exist, dated January 2018 through May 13,

4  2019, sufficient to describe the design and operation of the Pegasus technology alleged to have

5  been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7),

6  that Defendants are able to locate after a reasonable and proportional search, provided that

7  Defendants are not prohibited from disclosing such documents and communications by Israeli law,

8  regulation, or governmental order or directive, or any other applicable law, regulation, or

9  governmental order or directive.  Defendants intend to withhold documents and communications

10  they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

11  directive, or any other applicable law, regulation, or governmental order or directive.  If

12  Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

13  reasonable and proportional search and anticipate substantial completion of their responsive

14  production within approximately 180 days.

15  **REQUEST FOR PRODUCTION NO. 21:**

16      DOCUMENTS sufficient to describe the design and operation of PEGASUS' system

17  architecture and TECHNOLOGY, as described in Exhibit 10 of the COMPLAINT.

18  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

19      Defendants incorporate their General Objections.  Defendants object that the terms

20  "operation" and "system architecture" are vague and ambiguous.

21      Subject to and without waiving these objections and subject to the Court's entry of a

22  complete protective order, Defendants will produce responsive and nonprivileged documents, in

23  Defendants' possession, custody, and control, if any exist, dated January 2018 through May 13,

24  2019, sufficient to describe the design and operation of system architecture and technology of the

25  Pegasus technology alleged to have been used with respect to the "Target Devices" described in

26  the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

27  proportional search, provided that Defendants are not prohibited from disclosing such documents

28

1 and communications by Israeli law, regulation, or governmental order or directive, or any other

2 applicable law, regulation, or governmental order or directive.  Defendants intend to withhold

3 documents and communications they are not permitted to produce pursuant to Israeli law,

4 regulation, or governmental order or directive, or any other applicable law, regulation, or

5 governmental order or directive.  If Defendants are not otherwise prohibited from making such a

6 disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

7 completion of their responsive production within approximately 180 days.

8 **REQUEST FOR PRODUCTION NO. 22:**

9       DOCUMENTS sufficient to describe the PEGASUS Anonymizing Transmission Network,

10 as described in Exhibit 10 of the COMPLAINT.

11 **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

12       Defendants incorporate their General Objections.  Defendants further object to the phrase

13 "Anonymizing Transmission Network" as vague and ambiguous.

14       Subject to and without waiving these objections and subject to the Court's entry of a

15 complete protective order, Defendants will produce responsive and nonprivileged documents, in

16 Defendants' possession, custody, and control, if any exist, dated January 2018 through May 13,

17 2019,  sufficient to describe the Pegasus Anonymizing Transmission Network to the extent related

18 to the Pegasus technology alleged to have been used with respect to the "Target Devices" described

19 in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants are able to locate after a reasonable and

20 proportional search, provided that Defendants are not prohibited from disclosing such documents

21 and communications by Israeli law, regulation, or governmental order or directive, or any other

22 applicable law, regulation, or governmental order or directive.  Defendants intend to withhold

23 documents and communications they are not permitted to produce pursuant to Israeli law,

24 regulation, or governmental order or directive, or any other applicable law, regulation, or

25 governmental order or directive.  If Defendants are not otherwise prohibited from making such a

26 disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

27 completion of their responsive production within approximately 180 days.

28 AMENDED OBJECTIONS AND RESPONSES   25   Case No. 4:19-cv-07123-PJH
TO PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION

**REQUEST FOR PRODUCTION NO. 23:**

ALL DOCUMENTS and COMMUNICATIONS CONCERNING the servers identified in response to REQUESTS FOR PRODUCTION NOS. 16, 19, 21, and 22 above, including but not limited to COMMUNICATIONS with the third-party providers from whom those servers were leased, and the locations of those servers.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Defendants incorporate their General Objections.  Defendants object to this Request as vague, ambiguous, and unintelligible because Requests Nos. 16, 19, 21, and 22 do not mention servers or ask Defendants to identify specific servers.  Defendants further object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation to the extent it seeks information related to technologies other than the Pegasus technology alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Defendants further object that this Request seeks irrelevant information because the location of any third-party servers is irrelevant as a matter of law to any issue in this case.

The requested discovery, to the extent any exists, is withheld on these bases.

**REQUEST FOR PRODUCTION NO. 24:**

DOCUMENTS sufficient to describe all of the data and information NSO or NSO CUSTOMERS obtained from the TARGET USERS or the TARGET DEVICES.

**AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Defendants incorporate their General Objections.  Defendants object to this Request as overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation because it seeks information related to technologies other than the Pegasus technology alleged to have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), and WhatsApp users other than the 1,400 users described in the Complaint, which has no relevance to Plaintiffs' allegations or any issue in this case.  Defendants further object to the extent this Request seeks information that is not within Defendants' custody or control and/or third-party

1  information that Defendants are prohibited from disclosing by contractual obligations or foreign

2  law, regulation, governmental order or directive. Responsive materials are being withheld on the

3  basis of these objections.

4       Subject to and without waiving these objections and subject to the Court's entry of a

5  complete protective order, Defendants respond that as a general matter, NSO does not have access

6  to the information NSO's customers obtain from target users or target devices, including through

7  use of the Pegasus technology alleged to have been used with respect to the "Target Devices"

8  described in the Complaint (Dkt. No. 1 at 2:6-7), and NSO may only come into such information

9  if it is provided to NSO by NSO's customer; to the extent Defendants have any responsive and

10  nonprivileged documents in their possession, custody, and control, Defendants will produce

11  documents dated January 2018 through May 13, 2019, sufficient to describe whatever information

12  NSO has obtained from the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7),

13  that Defendants are able to locate after a reasonable and proportional search, provided that

14  Defendants are not prohibited from disclosing such documents and communications by Israeli law,

15  regulation, or governmental order or directive, or any other applicable law, regulation, or

16  governmental order or directive. Defendants intend to withhold documents and communications

17  they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

18  directive, or any other applicable law, regulation, or governmental order or directive. If

19  Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

20  reasonable and proportional search and anticipate substantial completion of their responsive

21  production within approximately 180 days.

22  **REQUEST FOR PRODUCTION NO. 25:**

23       ALL DOCUMENTS and COMMUNICATIONS sufficient to identify all NSO

24  CUSTOMERS referenced in Defendants' Opposition to the Motion to Dismiss.

25  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

26       Defendants incorporate their General Objections. Defendants object to this Request as

27  vague, ambiguous, and unintelligible because there is no such document as "Defendants'

28

1   Opposition to the Motion to Dismiss."  Defendants cannot discern the information this Request

2   seeks.

3         Responsive materials, to the extent any exist, is withheld on these bases.

4   **REQUEST FOR PRODUCTION NO. 26:**

5         ALL DOCUMENTS used to market, sell, or promote NSO SPYWARE, including but not

6   limited to any DOCUMENTS or COMMUNICATIONS that refer to WhatsApp or Facebook in

7   any way.

8   **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

9         Defendants incorporate their General Objections.  Defendants object to this Request as

10  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

11  because it seeks information related to technologies other than the Pegasus technology alleged to

12  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

13  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Responsive materials

14  are being withheld on the basis of these objections.

15        Subject to and without waiving these objections and subject to the Court's entry of a

16  complete protective order, Defendants will produce marketing, sales and promotional materials,

17  in Defendants' possession, custody, and control, if any exist, dated January 2018 through May 13,

18  2019, related to the Pegasus technology alleged to have been used with respect to the "Target

19  Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) and which refer to WhatsApp or

20  Facebook, that Defendants are able to locate after a reasonable and proportional search, provided

21  that Defendants are not prohibited from disclosing such documents and communications by Israeli

22  law, regulation, or governmental order or directive, or any other applicable law, regulation, or

23  governmental order or directive.  Defendants intend to withhold documents and communications

24  they are not permitted to produce pursuant to Israeli law, regulation, or governmental order or

25  directive, or any other applicable law, regulation, or governmental order or directive.  If

26  Defendants are not otherwise prohibited from making such a disclosure, Defendants will make a

27  reasonable and proportional search and anticipate substantial completion of their responsive

28

1  production within approximately 180 days.

2  **REQUEST FOR PRODUCTION NO. 27:**

3  DOCUMENTS sufficient to describe NSO's corporate structure, including all parents,

4  subsidiaries, and affiliates.

5  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

6  Defendants incorporate their General Objections.

7  Subject to and without waiving these objections and subject to the Court's entry of a

8  complete protective order, Defendants will produce nonprivileged documents, in Defendants'

9  possession, custody, and control, if any exist, sufficient to describe NSO's corporate structure

10  during the period January 2018 through May 2019, that Defendants are able to locate after a

11  reasonable and proportional search, provided that Defendants are not prohibited from disclosing

12  such documents and communications by Israeli law, regulation, or governmental order or directive,

13  or any other applicable law, regulation, or governmental order or directive. Defendants intend to

14  withhold documents and communications they are not permitted to produce pursuant to Israeli law,

15  regulation, or governmental order or directive, or any other applicable law, regulation, or

16  governmental order or directive. If Defendants are not otherwise prohibited from making such a

17  disclosure, Defendants will make a reasonable and proportional search and anticipate substantial

18  completion of their responsive production within approximately 180 days.

19  **REQUEST FOR PRODUCTION NO. 28:**

20  ALL COMMUNICATIONS with Westbridge Technologies relating to WhatsApp and

21  Facebook and the surveillance of Facebook and WhatsApp users.

22  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

23  Defendants incorporate their General Objections. Defendants object to this Request as

24  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

25  because it seeks information related to technologies other than the Pegasus technology alleged to

26  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

27  7), which has no relevance to Plaintiffs' allegations or any issue in this case, and "surveillance of

28

1  Facebook . . . users," which does not relate to any claim or defense, which has no relevance to

2  Plaintiffs' allegations or any issue in this case.  Responsive materials are being withheld on the

3  basis of these objections.

4     Subject to and without waiving these objections and subject to the Court's entry of a

5  complete protective order, Defendants will produce nonprivileged and responsive communications

6  with Westbridge Technologies, in Defendants' possession, custody, and control, if any exist, dated

7  January 2018 through May 13, 2019, related to WhatsApp and the use of the Pegasus technology

8  to monitor the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7), that Defendants

9  are able to locate after a reasonable and proportional search, provided that Defendants are not

10  prohibited from disclosing such documents and communications by Israeli law, regulation, or

11  governmental order or directive, or any other applicable law, regulation, or governmental order or

12  directive.  Defendants intend to withhold documents and communications they are not permitted

13  to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other

14  applicable law, regulation, or governmental order or directive.  If Defendants are not otherwise

15  prohibited from making such a disclosure, Defendants will make a reasonable and proportional

16  search and anticipate substantial completion of their responsive production within approximately

17  180 days.

18  **REQUEST FOR PRODUCTION NO. 29:**

19     DOCUMENTS sufficient to show NSO's financial statements, balance sheets, gross

20  profits, cost of goods sold, and net profits related to NSO SPYWARE and WHATSAPP USERS

21  for calendar years 2014-2019.

22  **AMENDED RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

23     Defendants incorporate their General Objections.  Defendants object to this Request as

24  overbroad, irrelevant, unduly burdensome, and not proportional to the needs of the litigation

25  because it seeks information related to technologies other than the Pegasus technology alleged to

26  have been used with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-

27  7), which has no relevance to Plaintiffs' allegations or any issue in this case.  Defendants further

28

1  object to the time period of this Request as arbitrary and overbroad because Plaintiffs' allegations

2  relate to the period from January 2018, when Plaintiffs allege that Defendants first created

3  WhatsApp accounts, to May 2019, when Plaintiffs "closed the vulnerability" that allegedly

4  allowed Pegasus to function over WhatsApp. Defendants further object that this Request seeks

5  irrelevant information because Defendants' "financial statements, balance sheets, gross profits,

6  cost of goods sold, and net profits" related to Pegasus are irrelevant to any issue in this case.  At a

7  minimum, such information is premature before liability is established and damages must be

8  calculated.

9       The requested discovery, to the extent any exists, is withheld on these bases.

10

11  Dated:  February 28, 2023                **KING & SPALDING LLP**

12

13                                           By: */s/ Joseph N. Akrotirianakis*

14                                              JOSEPH N. AKROTIRIANAKIS
                                                Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

      I am a citizen of the United States and resident of the State of California.  I am employed

3

in the County of Los Angeles, State of California, in the office of a member of the bar of this

Court, at whose direction this service was made.  I am over the age of eighteen years and not a

4

party to the within action.

5

      On February 28, 2023, I served the following documents in the manner described below:

6

**AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUESTS**

7

**FOR PRODUCTION**

8

   ☑    (BY ELECTRONIC SERVICE):  By electronically mailing a true and

9

          correct copy through King & Spalding LLP's electronic mail system to

10

          the email addresses set forth in the attached list.

11

12

I declare under penalty of perjury under the laws of the State of California that the foregoing is

13

true and correct.  Executed on February 28, 2023, at Los Angeles, California.

14

                     _Christine Choi_

15

                       CHRISTINE B. CHOI

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SERVICE LIST**

2

Greg D. Andres
DAVIS POLK & WARDWELL LLP
3  450 Lexington Avenue
New York, New York 10017
4  Telephone: (212) 450-4724
Email: greg.andres@davispolk.com
5

6  Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
7  450 Lexington Avenue
New York, New York 10017
8  Telephone: (212) 450-4559
Email: antonio.perez@davispolk.com
9

10  Craig T. Cagney
DAVIS POLK & WARDWELL LLP
11  450 Lexington Avenue
New York, New York 10017
12  Telephone: (212) 450-3162
Email: craig.cagney@davispolk.com
13

14  Micah G. Block
DAVIS POLK & WARDWELL LLP
15  1600 El Camino Real
Menlo Park, California 94025
16  Telephone: (650) 752-2000
Email: michah.block@davispolk.com
17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D



<span style="color:teal">**Press Release**</span>

<span style="color:teal">**Thursday 14th February 2019**</span>

# NSO Group Acquired by its Management

- **The founders and management team of NSO Group, a cyber-technology company headquartered in Luxembourg, acquire the company**

- **The management team is supported by European private equity firm Novalpina Capital**

The management team and founders of NSO Group today announced the acquisition of the company from global private equity firm Francisco Partners.

NSO Group develops technology that helps government intelligence and law enforcement agencies prevent and investigate terrorism and crime to save lives. Established from the combination of Israeli and European cyber technology companies, NSO Group has since become a global leader in providing cyber intelligence and analytics solutions to governments. The company has grown rapidly and finished 2018 with revenues of $250 million, and dozens of licensed customers.


The acquisition is led by NSO Group co-founders Shalev Hulio and Omri Lavie, together with members of the company's senior executive team. A significant number of employees will participate in the acquisition. The founders and management team are supported in the acquisition by Novalpina Capital, a European private equity firm, and financed and advised by Jefferies Group LLC.



**Shalev Hulio, Founder and Chief Executive Officer of NSO Group**, said: "This is an important and significant milestone for NSO. I am proud of what the company and our employees have achieved since we were founded in 2010. Together we have built an amazing technology company that is making the world a safer place. As we look forward, we are delighted that Novalpina is joining as our equity partner. Together we can take NSO Group to the next level, launching new cutting-edge products that help our customers reduce the threats from terrorism and crime. I want to thank Francisco Partners for its tremendous support over the past few years. Its guidance has been instrumental to the success of the company."

**Eran Gorev, Operating Partner at Francisco Partners and Chairman of NSO Group**, said: "We are very proud of the company's contribution to the global war against terrorism and crime, and the many thousands of lives that have been saved thanks to the company's technology. Since our investment in NSO Group, the company has continued to develop its outstanding technological capabilities and has more than quadrupled in size, while implementing a best-in-class business ethics framework and bringing in independent experts to ensure the company was operating in accordance with the highest ethical standards. We would like to thank all the amazing employees of NSO Group for their incredible contribution to the company and to making the world a safer place, and to wish them a highly successful future."

**Stefan Kowski, Partner at Novalpina Capital**, said: "NSO Group has an impressive management team that has developed best-in-class, proprietary technologies sold to approved governments and intelligence agencies to help tackle terrorism and organised



crime. We look forward to supporting NSO's leadership as they continue to grow the business."

**About NSO Group**

NSO Group is a global leader in the world of cyber-intelligence, data acquisition and analysis. The company's mission is to equip select intelligence agencies and law enforcement organizations around the world with strategic, tactical and analytical technological capabilities required to ensure the success of their operations in fighting crime and terrorism.

NSO Group solutions are developed and maintained by a team of cyber-intelligence and cellular-communication experts who operate at the forefront of their fields. Their designs constantly evolve to keep pace with an ever-changing cyber world.

NSO Group is committed to the proper use of its technology to help governments strengthen public safety and protect against major security threats. NSO Group's advanced intelligence solutions are used globally and play a major role in preventing terror activities, combating human trafficking and the war on drugs.

**About Francisco Partners**

Francisco Partners is a leading global private equity firm that specializes in investments in technology and technology-enabled services businesses. Since its launch over 18 years ago, Francisco Partners has raised over $14 billion in capital and invested in more than 200 technology companies, making it one of the most active and longstanding investors in the technology industry. The firm invests in opportunities where its deep sectoral knowledge and operational expertise can help companies realize their full potential. For more information on Francisco Partners, please visit www.franciscopartners.com



**About Novalpina Capital**

Novalpina Capital is an independent European private equity firm that invests in middle market companies. The Firm was founded by Stephen Peel, Stefan Kowski and Bastian Lueken in 2017. The founding partners bring more than 50 years of combined experience in private equity investing, having held senior positions in the European operations of firms including TPG, Centerbridge and Platinum Equity, and worked together for nearly a decade at TPG.

EXHIBIT E

4/24/23, 12:09 PM
Case 4:19-cv-07123-PJH Document 189-2 Filed 05/16/23 Page 97 of 249
Exclusive: FBI probes use of Israeli firm's spyware in personal and government hacks - sources | Reuters

U.S. LEGAL NEWS

JANUARY 30, 20206:20 PMUPDATED 3 YEARS AGO

# Exclusive: FBI probes use of Israeli firm's spyware in personal and government hacks - sources

By Joseph Menn, Jack Stubbs



(Reuters) - The FBI is investigating the role of Israeli spyware vendor NSO Group Technologies in possible hacks on American residents and companies as well as suspected intelligence gathering on governments, according to four people familiar with the inquiry.



FILE PHOTO: Activists and journalists protest outside the Attorney General's Office (PGR) after a criminal complaint following a report that their smartphones had been infected with spying software sold to the government to fight criminals and terrorists in Mexico City, Mexico June 23, 2017. REUTERS/Carlos Jasso/File Photo

The probe was underway by 2017, when Federal Bureau of Investigation officials were trying to learn whether NSO obtained from American hackers any of the code it needed to infect smartphones, said one person interviewed by the FBI then and again last year.

NSO said it sells its spy software and technical support exclusively to governments and that those tools are to be used in pursuing suspected terrorists and other criminals. NSO has long maintained that its products cannot target U.S. phone numbers, though some cybersecurity experts have disputed that.

The FBI conducted more interviews with technology industry experts after Facebook filed a lawsuit in October accusing NSO itself of exploiting a flaw in Facebook's WhatsApp messaging service to hack 1,400 users, according to two people who spoke with agents or Justice Department officials.

NSO said it was not aware of any inquiry.

"We have not been contacted by any U.S. law enforcement at all about any such matters," NSO said in a statement provided by Mercury Public Affairs strategy firm. NSO did not answer additional questions about its employees conduct but previously said government customers are the ones who do the hacking.

A spokeswoman for the FBI said the agency "adheres to DOJ's policy of neither confirming nor denying the existence of any investigation, so we wouldn't be able to provide any further comment."

Reuters could not determine which suspected hacking targets are the top concerns for investigators or what phase the probe is in. But the company is a focus, and a key issue is how involved it has been in specific hacks, the sources said.

Part of the FBI probe has been aimed at understanding NSO's business operations and the technical assistance it offers customers, according to two sources familiar with the inquiry.

Suppliers of hacking tools could be prosecuted under the Computer Fraud and Abuse Act (CFAA) or the Wiretap Act, if they had enough knowledge of or involvement in improper use,

said James Baker, general counsel at the FBI until January 2018.

The CFAA criminalizes unauthorized access to a computer or computer network, and the Wiretap Act prohibits use of a tool to intercept calls, texts or emails.

NSO is known in the cybersecurity world for its "Pegasus" software other tools that can be delivered in several ways. The software can capture everything on a phone, including the plain text of encrypted messages, and commandeer it to record audio.

A business strategy firm retained on behalf of Amazon.com Inc Chief Executive Jeff Bezos, FTI Consulting, said this month that NSO could have supplied the software it said Saudi Arabia used to hack Bezos' iPhone.

The phone began sending out more data hours after it received a video from a WhatsApp account associated with Crown Prince Mohammed bin Salman, FTI said. Saudi Arabia called the FTI allegation "absurd," and NSO said it was not involved. Other security experts said the data was inconclusive.

The FBI is investigating and has met with Bezos, a member of his team told Reuters. A Bezos spokesman did not respond to a request for comment.

FBI leaders have indicated that they are taking a hard line on spyware vendors.

At a briefing at FBI Washington headquarters in November, a senior cybersecurity official said that if Americans were being hacked, investigators would not distinguish between criminals and security companies working on behalf of government clients.

"Whether you do that as a company or you do that as an individual, it's an illegal activity," the official said.

In the counterintelligence aspect of the probe, the FBI is trying to learn if any U.S. or allied government officials have been hacked with NSO tools and which nations were behind those attacks, according to a Western official briefed on the investigation.

Case 4:19-cv-07123-PJH Document 188-2 Filed 05/16/23 Page 100 of 249

Outside of government, journalists, human rights activists and dissidents in several countries have been victims of attacks using NSO spyware, according to the University of Toronto's Citizen Lab researchers.

In the past, NSO has denied involvement in some of those instances and declined to discuss others, citing client confidentiality requirements.

Reporting by Joseph Menn in San Francisco and Jack Stubbs in London; additional reporting by Raphael Satter and Chris Bing in Washington; editing by Greg Mitchell and Grant McCool

*Our Standards: The Thomson Reuters Trust Principles.*

# EXHIBIT F

# Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities

The Commerce Department's Bureau of Industry and Security (BIS) has released a final rule adding four foreign companies to the Entity List for engaging in activities that are contrary to the national security or foreign policy interests of the United States. The four entities are located in Israel, Russia, and Singapore.

NSO Group and Candiru (Israel) were added to the Entity List based on evidence that these entities developed and supplied spyware to foreign governments that used these tools to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers.  These tools have also enabled foreign governments to conduct transnational repression, which is the practice of authoritarian governments targeting dissidents, journalists and activists outside of their sovereign borders to silence dissent.  Such practices threaten the rules-based international order.

Positive Technologies (Russia), and Computer Security Initiative Consultancy PTE. LTD. (Singapore) were added to the Entity List based on a determination that they traffic in cyber tools used to gain unauthorized access to information systems, threatening the privacy and security of individuals and organizations worldwide.

U.S. Secretary of Commerce Gina M. Raimondo released the following statement: "The United States is committed to aggressively using export controls to hold companies accountable that develop, traffic, or use technologies to conduct malicious activities that threaten the cybersecurity of members of civil society, dissidents, government officials, and organizations here and abroad."

The End-User Review Committee (ERC) which is chaired by the Department of Commerce and includes the Departments of Defense, State, Energy, and where appropriate, Treasury, determined that the conduct of these four entities raises sufficient concerns to place them on the Entity List pursuant to § 744.11(b) of the Export Administration Regulations (EAR).

The Entity List is a tool utilized by BIS to restrict the export, reexport, and in-country transfer of items subject to the EAR to persons (individuals, organizations, companies) reasonably believed

**FOR IMMEDIATE RELEASE**
Wednesday, November 3, 2021

Office of Public Affairs

publicaffairs@doc.gov

to be involved, have been involved, or pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. For the four entities added to the Entity List in this final rule, BIS imposes a license requirement that applies to all items subject to the EAR.  In addition, no license exceptions are available for exports, reexports, or transfers (in-country) to the entities being added to the Entity List in this rule.  BIS imposes a license review policy of a presumption of denial for these entities.

Today's action is a part of the Biden-Harris Administration's efforts to put human rights at the center of U.S. foreign policy, including by working to stem the proliferation of digital tools used for repression. This effort is aimed at improving citizens' digital security, combatting cyber threats, and mitigating unlawful surveillance and follows a recent interim final rule released by the Commerce Department establishing controls on the export, reexport, or in-country transfer of certain items that can be used for malicious cyber activities.

For more information, visit www.bis.doc.gov.


BUREAUS AND OFFICES
Bureau of Industry and Security

# EXHIBIT G



Learn more about REFINITIV

REUTERS®

🔍  ☰

🔲 My View    👤 Following    🔖 Saved

---

United States

3 minute read · December 15, 2021 5:13 PM EST · Last Updated a year ago

## U.S. lawmakers call for sanctions against Israel's NSO, other spyware firms

By Joseph Menn and Joel Schectman



[1/2] The logo of Israeli cyber firm NSO Group is seen at one of its branches in the Arava Desert, southern Israel July 22, 2021. REUTERS/Amir Cohen/File Photo


‹  1  2  ›



WASHINGTON, Dec 15 (Reuters) - A group of U.S. lawmakers is asking the Treasury Department and State Department to sanction Israeli spyware firm NSO Group and three other foreign surveillance companies they say helped authoritarian governments commit human rights abuses.

Their letter sent late Tuesday also asks for sanctions on top executives at NSO, the United Arab Emirates cybersecurity company DarkMatter, and European online bulk surveillance companies Nexa Technologies and Trovicor.

The lawmakers asked for Global Magnitsky sanctions, which punishes those who are accused of enabling human rights abuses by freezing bank accounts and banning travel to the United States.

The letter was signed by the Senate Finance Committee Chairman Ron Wyden, House Intelligence Committee Chairman Adam Schiff and 16 other Democratic lawmakers. Along with other reporting on the industry, they cite a recent Reuters article this month showing that NSO spyware was used against State Department employees in Uganda.

The lawmakers said the spyware industry relies on U.S. investment and banks. "To meaningfully punish them and send a clear signal to the surveillance technology industry, the U.S. government should deploy financial sanctions," they wrote.

Trovicor wrote back to Wyden, denying that it engaged in bulk surveillance and suggesting that his office had confused its work with that of another company.

"Trovicor's products are not 'spyware' and are designed to be used for targeted investigations against identified individuals (as opposed to 'Bulk' surveillance)," it wrote.

DarkMatter could not be reached for comment, while NSO and Nexa did not respond to questions.

The letter says the companies facilitated the "disappearance, torture and murder of human rights activists and journalists." Surveillance firms have drawn increasing scrutiny from Washington as a barrage of media reports have tied them to human rights abuses.

"These surveillance mercenaries sold their services to authoritarian regimes with long records of human rights abuses, giving vast spying powers to tyrants," Wyden told Reuters. "Predictably, those nations used surveillance tools to lock up, torture and murder reporters and human rights advocates. The Biden administration has the chance to turn off the spigot of American dollars and help put them out of business for good."

Spokespeople for State and Treasury did not immediately respond to questions about the request.

In November, the Commerce Department put NSO on the so-called Entity List, prohibiting U.S. suppliers from selling software or services to the Israeli spyware maker without getting special permission.

A number of legal challenges also threaten the industry. Last week a prominent Saudi activist and the non-profit Electronic Frontier Foundation sued DarkMatter, alleging the group hacked into her phone.

Apple sued NSO Group in November, saying that it violated U.S. laws by breaking into the software installed on iPhones.

A 2019 Reuters investigation, cited in the letter, also exposed a secret hacking unit within DarkMatter, known as Project Raven, that helped the UAE spy on its enemies. In a September settlement with the Justice Department, three members of that unit, all former U.S. intelligence operatives, admitted to breaking hacking laws.

Reporting by Joseph Menn in San Francisco and Joel Schectman and Christopher Bing in Washington; Editing by Christopher Sanders and Lisa Shumaker



Our Standards: The Thomson Reuters Trust Principles.

**Read Next**

---

United States
**Exclusive: Biden to veto legislation to block solar tariff waivers -officials**
an hour ago

---

United States
**Biden's domestic policy adviser Susan Rice departs**
10:12 AM EDT

---

Business
**Fox News and Tucker Carlson part ways after Fox settles Dominion lawsuit**
12 min ago

Legal
**US says Proud Boys were 'thirsting for violence' as Jan. 6 trial wraps up**
19 min ago

---

Newsletter | Every weekday.

## Reuters Daily Briefing

The day's top news in your inbox. We cover the world, from front lines to boardrooms. (This includes the Reuters Weekend Briefing.)

**Sign up**

## More from Reuters

Mass protests against Israel's judicial reform hit 16th week (0:30) - April 22, 2023
Watch more videos



**Mass protests against Israel's judicial reform hit**
00:30

**DeSantis stumbles stoke anti-Trump Republicans' fear**
02:35

**Kamala Harris defends abortion rights ahead of top**
01:15

**Biden mulling launching re-election bid on Tuesday -**
01:41



## World



### Biden's domestic policy adviser Susan Rice departs

United States · April 24, 2023 · 10:12 AM EDT

White House domestic policy adviser Susan Rice is departing after two years, U.S. President Joe Biden said in a statement on Monday praising her efforts on healthcare and immigration while noting her historic role serving as a top domestic and national security aide in two administrations.

---

World
**S.Korea's Yoon to meet Biden as doubts grow over nuclear umbrella**
5:51 AM EDT

---

EXPLAINER
**Explainer: Why are Ecuador lawmakers trying to impeach President Lasso?**
10:11 AM EDT

---

United Kingdom
**UK parliament's standards watchdog expands PM Sunak investigation**
8:09 AM EDT

---

World
**Factbox: What's on the agenda at the South Korea-US summit?**
3:15 AM EDT

Latest

Home

Media

 Videos ⧉

 Pictures ⧉

 Graphics ⧉

About Reuters

About Reuters ⧉

Careers ⧉

Reuters News Agency ⧉

Brand Attribution Guidelines ⧉

Reuters Leadership ⧉

Reuters Fact Check ⧉

Reuters Diversity Report ⧉

Stay Informed

Download the App ⧉

Newsletters ⧉

Browse

World

Business

Legal

Markets

Breakingviews

Technology

Investigations ⧉

Lifestyle

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

  

Thomson Reuters Products

**Westlaw** ⧉

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⧉

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉

The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Refinitiv Workspace** ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue** ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ↗    **Advertising Guidelines** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ↗    **Terms of Use** ↗    **Privacy** ↗    **Digital Accessibility** ↗    **Corrections** ↗    **Site Feedback** ↗

© 2023 Reuters. All rights reserved

4/24/23, 12:04 PM
Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 112 of 249
US lawmakers call for sanctions against Israel's NSO, other spyware firms | Reuters

# EXHIBIT H

Technology

# Spyware Firm NSO Discussing Sale to U.S. Fund Integrity

- NSO says it's talking with multiple U.S.-based funds
- Company hired advisers last year for restructuring or sale

By Eliza Ronalds-Hannon and Liana Baker
January 25, 2022 at 9:27 PM EST *Updated on January 26, 2022 at 10:47 AM EST*

NSO Group, the Israeli developer of a phone-hacking tool that allegedly allowed governments to spy on political dissidents and journalists, is discussing a sale of its assets to the U.S. venture capital firm Integrity Partners, according to people with knowledge of the negotiations.

Herzliya-based NSO, which has seen its revenue plunge amid the controversy and after the U.S. Commerce Department put the company on its export blacklist, has been in danger of defaulting on the debt it issued to fund a buyout in 2019. It hired advisers last year to help it pursue a restructuring or sale, Bloomberg previously reported 🖵. Israeli newspaper Haaretz was first to report the talks with Integrity on Tuesday.

Discussions with potential buyers continue and terms haven't been finalized, said one of the people, who asked not to be named because the talks are private. The company has been focusing on proposals that would turn the know-how behind its Pegasus spyware product into strictly defensive cyber security services, Bloomberg has previously reported.

"The company generates great interest with a few US based funds, and the company is in talks with them all," a representative for NSO said in a statement. A representative for Integrity Partners declined to comment.

NSO's Pegasus hacking tool, which allows clients to gain access to a target's mobile phone, was pitched to investors and sold to governments as a foil against terrorism and drug trafficking. But in the last few years, the company has come under fire for licensing it to nations that have been accused of spying on dissidents, journalists and human-rights activists.

Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 115 of 249

Pegasus was reported to have been used to hack the mobile phones of at least nine U.S. State Department employees. Poland's government last year was accused of hacking 🖵 the mobile phone of a lawyer representing top opposition officials during the 2019 parliamentary election campaign. The government has denied the accusations.

*— With assistance by Yaacov Benmeleh and Davide Scigliuzzo*

*(Adds company comment in fourth paragraph.)*



Terms of Service  Do Not Sell or Share My Personal Information   Trademarks  Privacy Policy
©2023 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices ▷  Help

# EXHIBIT I

**The New York Times Magazine** | https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html

# The Battle for the World's Most Powerful Cyberweapon

A Times investigation reveals how Israel reaped diplomatic gains around the world from NSO's Pegasus spyware — a tool America itself purchased but is now trying to ban.

 

**By Ronen Bergman and Mark Mazzetti**
Published Jan. 28, 2022    Updated Jan. 31, 2022

*To hear more audio stories from publications like The New York Times, download Audm for iPhone or Android.*

In June 2019, three Israeli computer engineers arrived at a New Jersey building used by the F.B.I. They unpacked dozens of computer servers, arranging them on tall racks in an isolated room. As they set up the equipment, the engineers made a series of calls to their bosses in Herzliya, a Tel Aviv suburb, at the headquarters for NSO Group, the world's most notorious maker of spyware. Then, with their equipment in place, they began testing.

The F.B.I. had bought a version of Pegasus, NSO's premier spying tool. For nearly a decade, the Israeli firm had been selling its surveillance software on a subscription basis to law-enforcement and intelligence agencies around the world, promising that it could do what no one else — not a private company, not even a state intelligence service — could do: consistently and reliably crack the encrypted communications of any iPhone or Android smartphone.

Since NSO had introduced Pegasus to the global market in 2011, it had helped Mexican authorities capture Joaquín Guzmán Loera, the drug lord known as El Chapo. European investigators have quietly used Pegasus to thwart terrorist plots, fight organized crime and, in one case, take down a global child-abuse ring, identifying dozens of suspects in more than 40 countries. In a broader sense, NSO's products seemed to solve one of the biggest problems facing law-enforcement and intelligence agencies in the 21st century: that criminals and terrorists had better technology for encrypting their communications than investigators had to decrypt them. The criminal world had gone dark even as it was increasingly going global.

But by the time the company's engineers walked through the door of the New Jersey facility in 2019, the many abuses of Pegasus had also been well documented. Mexico deployed the software not just against gangsters but also against journalists and political dissidents. The United Arab Emirates used the software to hack the phone of a civil rights activist whom the government threw in jail. Saudi Arabia used it against women's rights activists and, according to a lawsuit filed by a Saudi dissident, to spy on communications with Jamal Khashoggi, a columnist for The Washington Post, whom Saudi operatives killed and dismembered in Istanbul in 2018.

None of this prevented new customers from approaching NSO, including the United States. The details of the F.B.I.'s purchase and testing of Pegasus have never before been made public. Additionally, the same year that Khashoggi was killed, the Central Intelligence Agency arranged and paid for the government of Djibouti to acquire Pegasus to assist the American ally in combating terrorism, despite longstanding concerns about human rights abuses there, including the persecution of journalists and the torture of government opponents. The D.E.A., the Secret Service and the U.S. military's Africa Command had all held discussions with NSO. The F.B.I. was now taking the next step.

As part of their training, F.B.I. employees bought new smartphones at local stores and set them up with dummy accounts, using SIM cards from other countries — Pegasus was designed to be unable to hack into American numbers. Then the Pegasus engineers, as they had in previous demonstrations around the world, opened their interface, entered the number of the phone and began an attack.

This version of Pegasus was "zero click" — unlike more common hacking software, it did not require users to click on a malicious attachment or link — so the Americans monitoring the phones could see no evidence of an ongoing breach. They couldn't see the Pegasus computers connecting to a network of servers around the world, hacking the phone, then connecting back to the equipment at the New Jersey facility. What they could see, minutes later, was every piece of data stored on the phone as it unspooled onto the large monitors of the Pegasus computers: every email, every photo, every text thread, every personal contact. They could also see the phone's location and even take control of its camera and microphone. F.B.I. agents using Pegasus could, in theory, almost instantly transform phones around the world into powerful surveillance tools — everywhere except in the United States.

Ever since the 2013 revelations by Edward Snowden, a former National Security Agency contractor, about U.S. government surveillance of American citizens, few debates in this country have been more fraught than those over the proper scope of domestic spying. Questions about the balance between privacy and security took on new urgency with the parallel development of smartphones and spyware that could be used to scoop up the terabytes of information those phones generate every day. Israel, wary of angering Americans by abetting the efforts of other countries to spy on the United States, had required NSO to program Pegasus so it was incapable of targeting U.S. numbers. This prevented its foreign clients from spying on Americans. But it also prevented Americans from spying on Americans.

NSO had recently offered the F.B.I. a workaround. During a presentation to officials in Washington, the company demonstrated a new system, called Phantom, that could hack any number in the United States that the F.B.I. decided to target. Israel had granted a special license to NSO, one that permitted its Phantom system to attack U.S. numbers. The license allowed for only one type of client: U.S. government agencies. A slick brochure put together for potential customers by NSO's U.S. subsidiary, first published by Vice, says that Phantom allows American law enforcement and spy agencies to get intelligence "by extracting and monitoring crucial data from mobile devices." It is an "independent solution" that requires no cooperation from AT&T, Verizon, Apple or Google. The system, it says, will "turn your target's smartphone into an intelligence gold mine."

**The Phantom** presentation triggered a discussion among government lawyers at the Justice Department and the F.B.I. that lasted two years, across two presidential administrations, centering on a basic question: Could deploying Phantom inside the United States run afoul of long-established wiretapping laws? As the lawyers debated, the F.B.I. renewed the contract for the Pegasus system and ran up fees to NSO of approximately $5 million. During this time, NSO engineers were in frequent contact with F.B.I. employees, asking about the various technological details that could change the legal implications of an attack.

The discussions at the Justice Department and the F.B.I. continued until last summer, when the F.B.I. finally decided not to deploy the NSO weapons. It was around this time that a consortium of news organizations called Forbidden Stories brought forward new revelations about NSO cyberweapons and their use against journalists and political dissidents. The Pegasus system currently lies dormant at the facility in New Jersey.

An F.B.I. spokeswoman said that the bureau examines new technologies "not just to explore a potential legal use but also to combat crime and to protect both the American people and our civil liberties. That means we routinely identify, evaluate and test technical solutions and services for a variety of reasons, including possible operational and security concerns they might pose in the wrong hands." The C.I.A., the D.E.A., the Secret Service and Africa Command declined to comment. A spokesman for the government of Djibouti said the country had never acquired or used Pegasus.

In November, the United States announced what appeared — at least to those who knew about its previous dealings — to be a complete about-face on NSO. The Commerce Department was adding the Israeli firm to its "entity list" for activities "contrary to the national security or foreign policy interests of the United States." The list, originally designed to prevent U.S. companies from selling to nations or other entities that might be in the business of manufacturing weapons of mass destruction, had in recent years come to include several cyberweapons companies. NSO could no longer buy critical supplies from American firms.

It was a very public rebuke of a company that had in many ways become the crown jewel of the Israeli defense industry. Now, without access to the American technology it needed to run its operations — including Dell computers and Amazon cloud servers — it risked being unable to function. The United States delivered the news to Israel's Ministry of Defense less than an hour before it was made public. Israeli officials were furious. Many of the headlines focused on the specter of an out-of-control private company, one based in Israel but largely funded offshore. But authorities in Israel reacted as if the ban were an attack on the state itself. "The people aiming their arrows against NSO," said Yigal Unna, director general of the Israel National Cyber Directorate until Jan. 5, "are actually aiming at the blue and white flag hanging behind it."

The Israelis' anger was, in part, about U.S. hypocrisy: The American ban came after years of secretly testing NSO's products at home and putting them in the hands of at least one country, Djibouti, with a record of human rights abuses. But Israel also had its own interests to protect. To an extent not previously understood, Israel, through its internal export-licensing process, has ultimate say over who NSO can sell its spyware to. This has allowed Israel to make NSO a central component of its national-security strategy for years, using it and similar firms to advance the country's interests around the world.

A yearlong Times investigation, including dozens of interviews with government officials, leaders of intelligence and law-enforcement agencies, cyberweapons experts, business executives and privacy activists in a dozen countries, shows how Israel's ability to approve or deny access to NSO's cyberweapons has become entangled with its diplomacy. Countries like Mexico and Panama have shifted their positions toward Israel in key votes at the United Nations after winning access to Pegasus. Times reporting also reveals how sales of Pegasus played an unseen but critical role in securing the support of Arab nations in Israel's campaign against Iran and even in negotiating the Abraham Accords, the 2020 diplomatic agreements that normalized relations between Israel and some of its longtime Arab adversaries.

The combination of Israel's search for influence and NSO's drive for profits has also led to the powerful spying tool's ending up in the hands of a new generation of nationalist leaders worldwide. Though the Israeli government's oversight was meant to prevent the powerful spyware from being used in repressive ways, Pegasus has been sold to Poland, Hungary and India, despite those countries' questionable records on human rights.

The United States has made a series of calculations in response to these developments — secretly acquiring, testing and deploying the company's technology, even as it has denounced the company in public and sought to limit its access to vital American suppliers. The current showdown between the United States and Israel over NSO demonstrates how governments increasingly view powerful cyberweapons the same way they have long viewed military hardware like fighter jets and centrifuges: not only as pivotal to national defense but also as a currency with which to buy influence around the world.



Photo illustration by Cristiana Couceiro

**Selling weapons for** diplomatic ends has long been a tool of statecraft. Foreign-service officers posted in American Embassies abroad have served for years as pitchmen for defense firms hoping to sell arms to their client states, as the thousands of diplomatic cables released by WikiLeaks in 2010 showed; when American defense secretaries meet with their counterparts in allied capitals, the end result is often the announcement of an arms deal that pads the profits of Lockheed Martin or Raytheon.

Cyberweapons have changed international relations more profoundly than any advance since the advent of the atomic bomb. In some ways, they are even more profoundly destabilizing — they are comparatively cheap, easily distributed and can be deployed without consequences to the attacker. Dealing with their proliferation is radically changing the nature of state relations, as Israel long ago discovered and the rest of the world is now also beginning to understand.

For Israel, the weapons trade has always been central to the country's sense of national survival. It was a major driver of economic growth, which in turn funded further military research and development. But it also played an important role in forging new alliances in a dangerous world. In the 1950s, when the nation was still young and essentially powerless, its first prime minister, David Ben-Gurion, established covert links with countries and organizations that lay just outside the ring of hostile Arab states that surround Israel. He called this approach "the periphery doctrine," and his foreign intelligence agency, the Mossad, began weaving a network of secret contacts inside countries throughout the Middle East, Asia and Africa, including many that publicly sided with Arabs. Offering advanced weapons was a key to making those connections.

By the mid-1980s, Israel had firmly established itself as one of the world's top arms exporters, with an estimated one in 10 of the nation's workers employed by the industry in some way. All of this bought good will for Israel from select foreign leaders, who saw the military aid as essential to preserving their own power. In turn, those countries often voted in Israel's favor at the United Nations General Assembly, the Security Council and other international forums. They also allowed the Mossad and the Israel Defense Forces to use their countries as bases to launch operations against Arab nations.

As cyberweapons began to eclipse fighter jets in the schemes of military planners, a different kind of weapons industry emerged in Israel. Veterans of Unit 8200 — Israel's equivalent of the National Security Agency — poured into secretive start-ups in the private sector, giving rise to a multibillion-dollar cybersecurity industry. As with purveyors of conventional weapons, cyberweapons makers are required to obtain export licenses from Israel's Ministry of Defense to sell their tools abroad, providing a crucial lever for the government to influence the firms and, in some cases, the countries that buy from them.

---

## 'This issue is not about Israel's security. It's about something that got out of control.'

---

None of these firms have been as wildly successful, or as strategically useful to the Israeli government, as NSO. The firm has its roots in a former chicken coop in Bnai Zion, an agricultural cooperative just outside Tel Aviv. In the mid 2000s, the building's owner, realizing that coders might deliver a better profit than chickens, gave the space a light makeover and began renting it to technology start-ups looking for cheap office space. Among the start-up founders there, Shalev Hulio stood out from the veteran programmers around him: He was charismatic and easy to spend time with, but he also gave the impression — at least initially — of being somewhat naïve. He and his partner, Omri Lavie, an old friend from school, had each done their mandatory military service in combat units, rather than intelligence or technology, and for years they struggled to find a product that would connect. They developed a video marketing product, which briefly took off but then crashed with the 2008 global recession. They then started another company, called CommuniTake, that offered cellphone tech-support workers the ability to take control of their customers' devices — with permission.

That idea met with little enthusiasm, so the two friends pivoted to a very different kind of customer. "A European intelligence agency found out about our innovation and contacted me," Hulio recalled in an interview. What quickly emerged was that their product could solve a much bigger problem than customer service.

For years, law-enforcement and intelligence agencies had been able to intercept and understand communications in transit, but as powerful encryption became widely available, that was no longer the case. They could intercept a communication, but they could no longer understand what it said. If they could control the device itself, though, they could collect the data before it was encrypted. CommuniTake had already figured out how to control the devices. All the partners needed was a way to do so without permission.

And so NSO was born. Hulio and Lavie, lacking the contacts they would need to scale their product, brought in a third partner, Niv Karmi, who had served both in military intelligence and in the Mossad. They took the company name from their first initials (Niv, Shalev and Omri) — that it sounded a little like "N.S.A." was a happy coincidence — and began hiring. Recruitment was the essential ingredient of their business plan. The company would eventually employ more than 700 people in offices around the world and a sprawling headquarters in Herzliya, where individual labs for Apple and Android operating systems are filled with racks of smartphones undergoing constant testing by the firm's hackers as they seek and exploit new vulnerabilities.

Nearly every member of NSO's research team is a veteran of the intelligence services; most of them served with AMAN, the Israeli Military Intelligence Directorate, the largest agency in the Israeli espionage community — and many of them in AMAN's Unit 8200. The company's most valuable employees are all graduates of elite training courses, including a secretive and prestigious Unit 8200 program called ARAM that accepts only a handful of the most brilliant recruits and trains them in the most advanced methods of cyberweapons programming. There are very few people with this kind of training anywhere in the world, and soon enough, few places would have a higher concentration of them than NSO's headquarters in Herzliya — where there were not just a few top specialists but hundreds. This would provide NSO with an incredible competitive advantage: All of those engineers would work daily to find "zero days," i.e., new vulnerabilities in phone software that could be exploited to install Pegasus. Unlike rival firms, which generally struggled to find even a single zero day and therefore could be shut down if it were made public, NSO would be able to discover and bank multitudes of them. If someone locked one back door, the company could quickly open another.

> **Sign up for The New York Times Magazine Newsletter**  The best of The New York Times Magazine delivered to your inbox every week, including exclusive feature stories, photography, columns and more. Get it sent to your inbox.

**In 2011, NSO** engineers finished coding the first iteration of Pegasus. With its powerful new tool, NSO hoped to quickly build a stable of clients in the West. But many countries, especially those in Europe, were initially wary of buying foreign intelligence products. There was a particular concern about Israeli companies that were staffed by former top intelligence officials; potential customers feared that their spyware might be contaminated with even deeper spyware, allowing the Mossad access to their internal systems.

Reputation mattered, both for sales and for holding onto the well-trained coders who had made Pegasus a reality. Hulio appointed Maj. Gen. Avigdor Ben-Gal, a Holocaust survivor and a highly respected combat officer, as NSO's chairman, and established what he said would be the company's four main pillars: NSO would not operate the system itself. It would sell only to governments, not to individuals or companies. It would be selective about which governments it allowed to use the software. And it would cooperate with Israel's Defense Export Controls Agency, or DECA, to license every sale.

The decisions NSO made early on about its relationship with regulators ensured that it would function as a close ally, if not an arm, of Israeli foreign policy. Ben-Gal saw that this oversight was crucial to NSO's growth — it might restrict which countries the company could sell to, but it would also protect the company from public blowback about what its clients did. When he informed the Defense Ministry that NSO would voluntarily be subject to oversight, the authorities also seemed happy with this plan. One former military aide to Benjamin Netanyahu, at the time Israel's prime minister, explained the advantages quite clearly. "With our Defense Ministry sitting at the controls of how these systems move around," he said, "we will be able to exploit them and reap diplomatic profits."

The company quickly got its first major break. Mexico, in its ongoing battle against drug cartels, was looking for ways to hack the encrypted BlackBerry messaging service favored by cartel operatives. The N.S.A. had found a way in, but the American agency offered Mexico only sporadic access. Hulio and Ben-Gal arranged a meeting with Mexico's president, Felipe Calderón, and arrived with an aggressive sales pitch. Pegasus could do what the N.S.A. could do, and it could do so entirely at the command of Mexican authorities. Calderón was interested.

Israel's Ministry of Defense informed NSO that there was no issue with selling Pegasus to Mexico, and a deal was finalized. Soon after, investigators at an office of the Center for Investigation and National Security, or CISEN — now called the Center for National Investigation — went to work with one of the Pegasus machines. They fed the mobile phone number of a person connected to Joaquín Guzmán's Sinaloa cartel into the system, and the BlackBerry was successfully attacked. Investigators could see the content of the messages, as well as the locations of different BlackBerry devices. "Suddenly we started to see and hear anew," says a former CISEN leader. "It was like magic." In his view, the new system had revitalized their entire operation — "Everyone felt like maybe for the first time we could win." It was also a win for Israel. Mexico is a dominant power in Latin America, a region where Israel for years has waged a kind of diplomatic trench warfare against anti-Israeli groups supported by the country's adversaries in the Middle East. There is no direct evidence that Mexico's contracts with NSO brought about a change in the country's foreign policy toward Israel, but there is at least a recognizable pattern of correlation. After a long tradition of voting against Israel at United Nations conferences, Mexico slowly began to shift "no" votes to abstentions. Then, in 2016, Enrique Peña Nieto, who succeeded Calderón in 2012, went to Israel, which had not seen an official visit from a Mexican president since 2000. Netanyahu visited Mexico City the following year, the first visit ever by an Israeli prime minister. Shortly after, Mexico announced that it would abstain from voting on several pro-Palestinian resolutions that were being considered by the United Nations.

In a statement, Netanyahu's spokesman said that the former prime minister never sought a quid pro quo when other countries wanted to buy Pegasus. "The claim that Prime Minister Netanyahu spoke to foreign leaders and offered them such systems in exchange for political or other measures is a complete and utter lie. All sales of this system or similar products of Israeli companies to foreign countries are conducted with the approval and supervision of the Ministry of Defense, as outlined in Israeli law."

The Mexico example revealed both the promise and the perils of working with NSO. In 2017, researchers at Citizen Lab, a watchdog group based at the University of Toronto, reported that authorities in Mexico had used Pegasus to hack the accounts of advocates for a soda tax, as part of a broader campaign aimed at human rights activists, political opposition movements and journalists. More disturbing, it appeared that someone in the government had used Pegasus to spy on lawyers working to untangle the massacre of 43 students in Iguala in 2014. Tomás Zerón de Lucio, the chief of the Mexican equivalent to the F.B.I., was a main author of the federal government's version of the event, which concluded that the students were killed by a local gang. But in 2016 he became the subject of an investigation himself, on suspicion that he had covered up federal involvement in the events there. Now it appeared that he might have used Pegasus in that effort — one of his official duties was to sign off on the procurement of cyberweapons and other equipment. In March 2019, soon after Andrés Manuel López Obrador replaced Peña Nieto after a landslide election, investigators charged that Zerón had engaged in torture, abduction and tampering with evidence in relation to the Iguala massacre. Zerón fled to Canada and then to Israel, where he entered the country as a tourist, and where — despite an extradition request from Mexico, which is now seeking him on additional charges of embezzlement — he remains today.

**The American reluctance** to share intelligence was creating other opportunities for NSO, and for Israel. In August 2009, Panama's new president, Ricardo Martinelli, fresh off a presidential campaign grounded on promises of "eliminating political corruption," tried to persuade U.S. diplomats in the country to give him surveillance equipment to spy on "security threats as well as political opponents," according to a State Department cable published by WikiLeaks. The United States "will not be party to any effort to expand wiretaps to domestic political targets," the deputy chief of mission replied.

Martinelli tried a different approach. In early 2010, Panama was one of only six countries at the U.N. General Assembly to back Israel against a resolution to keep the Goldstone Commission report on war crimes committed during the 2008-9 Israeli assault on Gaza on the international agenda. A week after the vote, Martinelli landed in Tel Aviv on one of his first trips outside Latin America. Panama will always stand with Israel, he told the Israeli president, Shimon Peres, in appreciation of "its guardianship of the capital of the world — Jerusalem." He said he and his entourage of ministers, businesspeople and Jewish community leaders had come to Israel to learn. "We came a great distance, but we are very close because of the Jewish heart of Panama," he said.

Behind closed doors, Martinelli used his trip to go on a surveillance shopping spree. In a private meeting with Netanyahu, the two men discussed the military and intelligence equipment that Martinelli wanted to buy from Israeli vendors. According to one person who attended the meeting, Martinelli was particularly interested in the ability to hack into BlackBerry's BBM text service, which was very popular in Panama at that time.

Within two years, Israel was able to offer him one of the most sophisticated tools yet made. After the installation of NSO systems in Panama City in 2012, Martinelli's government voted in Israel's favor on numerous occasions, including to oppose the United Nations decision to upgrade the status of the Palestinian delegation — 138 countries voted in favor of the resolution, with just Israel, Panama and seven other countries opposing it.

According to a later legal affidavit from Ismael Pitti, an analyst for Panama's National Security Council, the equipment was used in a widespread campaign to "violate the privacy of Panamanians and non-Panamanians" — political opponents, magistrates, union leaders, business competitors — all "without following the legal procedure." Prosecutors later said Martinelli even ordered the team operating Pegasus to hack the phone of his mistress. It all came to an end in 2014, when Martinelli was replaced by his vice president, Juan Carlos Varela, who himself claims to have been a target of Martinelli's spying. Martinelli's subordinates dismantled the espionage system, and the former president fled the country. (In November, he was acquitted by Panamanian courts of wiretapping charges.)

NSO was doubling its sales every year — $15 million, $30 million, $60 million. That growth attracted the attention of investors. In 2014, Francisco Partners, a U.S.-based global investment firm, paid $130 million for 70 percent of NSO's shares, then merged another Israeli cyberweapons firm, called Circles, into their new acquisition. Founded by a former senior AMAN officer, Circles offered clients access to a vulnerability that allowed them to detect the location of any mobile phone in the world — a vulnerability discovered by Israeli intelligence 10 years earlier. The combined company could offer more services to more clients than ever.

Through a series of new deals, Pegasus was helping to knit together a rising generation of right-wing leaders worldwide. On Nov. 21, 2016, Sara and Benjamin Netanyahu welcomed Prime Minister Beata Szydlo of Poland and her foreign minister, Witold Waszczykowski, for dinner at their home. Shortly after, Poland signed an agreement with NSO to purchase a Pegasus system for its Central Anti-Corruption Bureau. Citizen Lab reported in December 2021 that the phones of at least three members of the Polish opposition were attacked by this spy machine. Netanyahu did not order the Pegasus system to be cut off — even when the Polish government enacted laws that many in the Jewish world and in Israel saw as Holocaust denial, and even when Prime Minister Mateusz Morawiecki, at a conference attended by Netanyahu himself, listed "Jewish perpetrators" among those responsible for the Holocaust.

In July 2017, Narendra Modi, who won office on a platform of Hindu nationalism, became the first Indian prime minister to visit Israel. For decades, India had maintained a policy of what it called "commitment to the Palestinian cause," and relations with Israel were frosty. The Modi visit, however, was notably cordial, complete with a carefully staged moment of him and Prime Minister Netanyahu walking together barefoot on a local beach. They had reason for the warm feelings. Their countries had agreed on the sale of a package of

Case 4:19-cv-07123-PJH Document 188-2 Filed 05/16/23 Page 127 of 249

sophisticated weapons and intelligence gear worth roughly $2 billion — with Pegasus and a missile system as the centerpieces. Months later, Netanyahu made a rare state visit to India. And in June 2019, India voted in support of Israel at the U.N.'s Economic and Social Council to deny observer status to a Palestinian human rights organization, a first for the nation.

The Israeli Defense Ministry also licensed the sale of Pegasus to Hungary, despite Prime Minister Viktor Orban's campaign of persecution against his political opponents. Orban deployed the hacking tools on opposition figures, social activists, journalists who conducted investigations against him and families of former business partners who had become bitter enemies. But Orban has been Israel's devoted supporter in the European Union. In 2020, Hungary was one of the few countries that did not publicly speak out against Israel's plan at the time to unilaterally annex swaths of the West Bank. In May of that year, European Union foreign ministers tried to reach unanimity when calling for a cease-fire between Israel and the Palestinian Islamic group Hamas, as well as for increased humanitarian aid for Gaza. Hungary declined to join the other 26 countries.



Photo illustration by Cristiana Couceiro

**Arguably the most** fruitful alliances made with Pegasus's help have been those between Israel and its Arab neighbors. Israel first authorized the sale of the system to the U.A.E. as something of an olive branch, after Mossad agents poisoned a senior Hamas operative in a Dubai hotel room in 2010. It was not the assassination itself that infuriated Crown Prince Mohammed bin Zayed, the de facto Emirati leader, so much as it was that the Israelis had carried it out on Emirati soil. The prince, widely known as M.B.Z., ordered that security ties between Israel and the U.A.E. be severed. In 2013, by way of a truce, M.B.Z. was offered the opportunity to buy Pegasus. He readily agreed.

The Emirates did not hesitate to deploy Pegasus against its domestic enemies. Ahmed Mansoor, an outspoken critic of the government, went public after Citizen Lab determined that Pegasus had been used to hack his phone. When the vulnerability was made public, Apple immediately pushed out an update to block the vulnerability. But for Mansoor, the damage had already been done. His car was stolen, his email account was hacked, his location was monitored, his passport was taken from him, $140,000 was stolen from his bank account, he was fired from his job and strangers beat him on the street several times. "You start to believe your every move is watched," he said at the time. "Your family starts to panic. I have to live with that." (In 2018, Mansoor was sentenced to 10 years in prison for posts he made on Facebook and Twitter.)

The messy outcome of the Dubai assassination aside, Israel and the U.A.E. had, in fact, been growing closer together for years. The calcified animosities between Israel and the Arab world that for years drove Middle East politics had given way to a new uneasy alliance in the region: Israel and the Sunni states in the Persian Gulf lining up against their archenemy, Iran, a Shia nation. Such an alliance would have been unheard-of decades ago, when Arab kings proclaimed themselves to be the protectors of the Palestinians and their struggle for independence from Israel. The Palestinian cause has less of a hold on some of the next generation of Arab leaders, who have shaped much of their foreign policy to address the sectarian battle between Sunni and Shia, and they have found common cause with Israel as an important ally against Iran.

No leader represents this dynamic more than Saudi Arabia's Crown Prince Mohammed bin Salman, the son of the ailing king and the kingdom's de facto ruler. In 2017, Israeli authorities decided to approve the sale of Pegasus to the kingdom, and in particular to a Saudi security agency under the supervision of Prince Mohammed. From this point on, a small group of senior members of the Israeli defense

establishment, reporting directly to Netanyahu, took a lead role in the exchanges with the Saudis, all "while taking extreme measures of secrecy," according to one of the Israelis involved in the affair. One Israeli official said that the hope was to gain Prince Mohammed's commitment and gratitude. The contract, for an initial installation fee of $55 million, was signed in 2017.

Years prior, NSO had formed an ethics committee, made up of a bipartisan cast of former U.S. foreign-policy officials who would advise on potential customers. After the Khashoggi killing in 2018, its members requested an urgent meeting to address the stories circulating about NSO involvement. Hulio flatly denied that Pegasus had been used to spy on the Washington Post columnist. Pegasus systems log every attack in case there is a complaint, and — with the client's permission — NSO can perform an after-the-fact forensic analysis. Hulio said his staff had done just that with the Saudi logs and found no use of any NSO product or technology against Khashoggi. The committee nonetheless urged NSO to shut off the Pegasus system in Saudi Arabia, and it did. The committee also advised NSO to reject a subsequent request by the Israeli government to reconnect the hacking system in Saudi Arabia, and it stayed off.

Then, the following year, the company reversed course. Novalpina, a British private-equity firm, acting in cooperation with Hulio, purchased Francisco Partners' shares of NSO, with a valuation of $1 billion — more than five times more than it was when the American fund acquired it in 2014. In early 2019, NSO agreed to turn the Pegasus system in Saudi Arabia back on.

Keeping the Saudis happy was important for Netanyahu, who was in the middle of a secret diplomatic initiative he believed would cement his legacy as a statesman — an official rapprochement between Israel and several Arab states. In September 2020, Netanyahu, Donald Trump and the foreign ministers of the United Arab Emirates and Bahrain signed the Abraham Accords, and all the signatories heralded it as a new era of peace for the region.

But behind the scenes of the peace deal was a Middle East weapons bazaar. The Trump administration had quietly agreed to overturn past American policy and sell F-35 joint strike fighters and armed Reaper drones to the U.A.E., and had spent weeks assuaging Israel's concerns that it would no longer be the only country in the region with the sophisticated F-35. Pompeo would later describe the aircraft deals in an interview as "critical" to obtaining M.B.Z.'s consent to the historic move. And by the time the Abraham Accords were announced, Israel had provided licenses to sell Pegasus to nearly all the signatories.

Things hit a snag a month later, when the Saudi export license expired. Now it was up to the Israeli Defense Ministry to decide whether or not to renew it. Citing Saudi Arabia's abuse of Pegasus, it declined to do so. Without the license, NSO could not provide routine maintenance on the software, and the systems were crashing. Numerous calls among Prince Mohammed's aides, NSO executives, the Mossad and the Israeli Defense Ministry had failed to resolve the issue. So the crown prince placed an urgent telephone call to Netanyahu, according to people familiar with the call. He wanted the Saudi license for Pegasus renewed.

Prince Mohammed had a significant amount of leverage. His ailing father, King Salman, had not officially signed on to the Abraham Accords, but he offered the other signatories his tacit blessing. He also allowed for a crucial part of the agreement to move forward: the use of Saudi air space, for the first time ever, by Israeli planes flying eastward on their way to the Persian Gulf. If the Saudis were to change their mind about the use of their airspace, an important public component of the accords might collapse.

Netanyahu apparently had not been updated on the brewing crisis, but after the conversation with Prince Mohammed his office immediately ordered the Defense Ministry to have the problem fixed. That night, a ministry official called NSO's operations room to have the Saudi systems switched back on, but the NSO compliance officer on duty rebuffed the request without a signed license. Told that the orders came directly from Netanyahu, the NSO employee agreed to accept an email from the Defense Ministry. Shortly afterward, Pegasus in Saudi Arabia was once again up and running.

The next morning, a courier from the Defense Ministry arrived at NSO headquarters delivering a stamped and sealed permit.

**In December 2021,** just weeks after NSO landed on the American blacklist, the White House national security adviser, Jake Sullivan, arrived in Israel for meetings with Israeli officials about one of the Biden administration's top foreign-policy priorities: getting a new nuclear pact with Iran three years after President Trump scuttled the original deal.

The visit carried historical weight. In 2012, Sullivan was one of the first American officials to talk with Iranian officials about a possible nuclear deal — meetings that President Obama chose to keep secret from the Israelis out of fear they might try to blow up the negotiations — and Israeli officials were furious when they found out. Now, years later, Sullivan arrived in Jerusalem to make his case for a united front in the next round of Iran diplomacy.

But there was another matter that Israeli officials — including the prime minister, the minister of defense and the foreign minister — wanted to discuss: the future of NSO. The Israelis pressed Sullivan about the reasons behind the blacklist decision. They also warned that if NSO went bankrupt, Russia and China might fill the vacuum and expand their own influence, by selling their own hacking tools to nations that could no longer buy from Israel.

Unna, the former head of the Israel National Cyber Directorate, says he believes the move against the Israeli firms, which was followed by Facebook's blacklisting of more Israeli cyberweapons and intelligence companies, is part of something bigger, a plan to neuter Israel's advantage in cyberweapons. "We have to prepare for a battle to defend the good name that we earned honestly," he says.

Biden administration officials dismiss this talk of a deep conspiracy, saying the decision about NSO has everything to do with reining in a dangerous company and nothing to do with America's relationship with Israel. There is far more at stake in the decades-old alliance, they say, than the fate of a hacking firm. Martin Indyk, a former American ambassador to Israel, agrees. "NSO was providing the means for states to spy on their own people," he says. "From my point of view it's straightforward. This issue is not about Israel's security. It's about something that got out of control."

Under the ban, NSO's future is in doubt, not just because of its reliance on American technology but also because its presence on an American blacklist will probably scare away prospective clients — and employees. One Israeli industry veteran says that the "sharks in the water smell blood," and Israeli officials and industry executives say there are currently a handful of American companies, some with close ties to intelligence and law-enforcement agencies, interested in buying the company. Were that to happen, the new owner could potentially bring the company in line with U.S. regulations and start selling its products to the C.I.A., the F.B.I. and other American agencies eager to pay for the power its weapons offer.

Israeli officials now fear a strategic takeover of NSO, in which some other company — or country — would take command over how and where the weapon is used. "The State of Israel cannot allow itself to lose control of these types of companies," a senior Israeli official said, explaining why such a deal was unlikely. "Their manpower, the knowledge they've gathered." Foreign ownership was fine, but Israel had to maintain control; a sale was possible "only under conditions that preserve Israel's interests and freedom of action."

But the days of Israel's near monopoly are over — or soon will be. The intense desire inside the United States government for offensive hacking tools has not gone unnoticed by the company's potential American competitors. In January 2021, a cyberweapons firm called Boldend made a pitch to Raytheon, the defense-industry giant. According to a presentation obtained by The Times, the company had developed for various American government agencies its own arsenal of weapons for attacking cellphones and other devices.

One slide in particular underscored the convoluted nature of the cyberweapons business. The slide claimed that Boldend had found a way to hack WhatsApp, the popular messaging service owned by Facebook, but then lost the capability after a WhatsApp update. This claim is especially remarkable because, according to one of the slides, a major Boldend investor was Founders Fund — a company run by Peter Thiel, the billionaire who was one of Facebook's first investors and remains on its board. The capability to hack WhatsApp, according to the presentation, "doesn't currently exist" in the United States government, and the intelligence community was interested in acquiring that capability.

In October 2019, WhatsApp sued NSO, arguing that NSO tools had exploited a vulnerability in its service to attack approximately 1,400 phones around the world. Beyond the question of who controls the weapons, at stake in that lawsuit is who is responsible for the damage they do. NSO's defense has always been that the company only sells the technology to foreign governments; it has no role in — or responsibility for — targeting specific individuals. This has long been the standard P.R. line of weapons manufacturers, whether Raytheon or Remington.

Facebook is out to prove that this defense, at least in NSO's case, is a lie. In its lawsuit, the tech giant argues that NSO was an active participant in some of the hacks, pointing to evidence that it leased some of the computer servers used to attack WhatsApp accounts. Facebook's argument is essentially that without NSO's constant involvement, many of its clients would not be able to aim the gun.

When they first presented their case against NSO, Facebook's lawyers thought they had evidence to disprove one of the Israeli company's longtime claims — that the Israeli government strictly prohibits the firm from hacking any phone numbers in the United States. In court documents, Facebook asserted it had evidence that at least one number with a Washington area code had been attacked. Clearly someone was using NSO spyware to monitor an American phone number.

But the tech giant didn't have the entire picture. What Facebook didn't appear to know was that the attack on a U.S. phone number, far from being an assault by a foreign power, was part of the NSO demonstrations to the F.B.I. of Phantom — the system NSO designed for American law-enforcement agencies to turn the nation's smartphones into an "intelligence gold mine."

---

Source photographs: Dennis Cooper/Getty Images; Library of Congress, Geography and Map Division; Jorg Greuel/Getty Images; Dave Pattison/Alamy; Nicholas Kamm/Agence France-Presse, via Getty Images.

EXHIBIT J

How Democracies Spy on Their Citizens | The New Yorker

A REPORTER AT LARGE  APRIL 25 & MAY 2, 2022 ISSUE

# HOW DEMOCRACIES SPY ON THEIR CITIZENS

*The inside story of the world's most notorious commercial spyware and the big tech companies waging war against it.*

**By Ronan Farrow**

**April 18, 2022**



*NSO Group's software has been linked to repressive regimes, but now "all types of governments" use it, an observer said.* Illustration by Timo Lenzen

 **Listen to this story**

▶                                                                          0:00 / 56:54

To hear more, download the Audm app.

The parliament of Catalonia, the autonomous region in Spain, sits on the edge of Barcelona's Old City, in the remains of a fortified citadel constructed by King Philip V to monitor the restive local population. The citadel was built with forced labor from hundreds of Catalans, and its remaining structures and gardens are for many a reminder of oppression. Today, a majority of Catalan parliamentarians support independence for the region, which the Spanish government has deemed unconstitutional. In 2017, as Catalonia prepared for a referendum on independence, Spanish police arrested at least twelve separatist politicians. On the day of the referendum, which received the support of ninety per cent of voters despite low turnout, police raids of polling stations injured hundreds of civilians. Leaders of the independence movement, some of whom live in exile across Europe, now meet in private and communicate through encrypted messaging platforms.

One afternoon last month, Jordi Solé, a pro-independence member of the European Parliament, met a digital-security researcher, Elies Campo, in one of the Catalan parliament's ornate chambers. Solé, who is forty-five and wore a loose-fitting suit, handed over his cell phone, a silver iPhone 8 Plus. He had been getting suspicious texts and wanted to have the device analyzed. Campo, a soft-spoken thirty-eight-year-old with tousled dark hair, was born and raised in Catalonia and supports independence. He spent years working for WhatsApp and Telegram in San Francisco, but recently moved home. "I feel in a way it's a kind of duty," Campo told me. He now works as a fellow at the Citizen Lab, a research group based at the University of Toronto that focusses on high-tech human-rights abuses.

Campo collected records of Solé's phone's activity, including crashes it had experienced, then ran specialized software to search for spyware designed to operate invisibly. As they waited, Campo looked through the phone for evidence of attacks that take varied forms: some arrive through WhatsApp or as S.M.S. messages that seem to come from known contacts; some require a click on a link,

and others operate with no action from the user. Campo identified an apparent notification from the Spanish government's social-security agency which used the same format as links to malware that the Citizen Lab had found on other phones. "With this message, we have the proof that at some point you were attacked," Campo explained. Soon, Solé's phone vibrated. "This phone tested positive," the screen read. Campo told Solé, "There's two confirmed infections," from June, 2020. "In those days, your device was infected—they took control of it and were on it probably for some hours. Downloading, listening, recording."

Solé's phone had been infected with Pegasus, a spyware technology designed by NSO Group, an Israeli firm, which can extract the contents of a phone, giving access to its texts and photographs, or activate its camera and microphone to provide real-time surveillance—exposing, say, confidential meetings. Pegasus is useful for law enforcement seeking criminals, or for authoritarians looking to quash dissent. Solé had been hacked in the weeks before he joined the European Parliament, replacing a colleague who had been imprisoned for pro-independence activities. "There's been a clear political and judicial persecution of people and elected representatives," Solé told me, "by using these dirty things, these dirty methodologies."

In Catalonia, more than sixty phones—owned by Catalan politicians, lawyers, and activists in Spain and across Europe—have been targeted using Pegasus. This is the largest forensically documented cluster of such attacks and infections on record. Among the victims are three members of the European Parliament, including Solé. Catalan politicians believe that the likely perpetrators of the hacking campaign are Spanish officials, and the Citizen Lab's analysis suggests that the Spanish government has used Pegasus. A former NSO employee confirmed that the company has an account in Spain. (Government agencies did not respond to requests for comment.) The results of the Citizen Lab's investigation are being disclosed for the first time in this article. I spoke with more than forty of the targeted individuals, and the conversations revealed an

atmosphere of paranoia and mistrust. Solé said, "That kind of surveillance in democratic countries and democratic states—I mean, it's unbelievable."

[*Support The New Yorker's award-winning journalism. <u>Subscribe today »</u>*]

Commercial spyware has grown into an industry estimated to be worth twelve billion dollars. It is largely unregulated and increasingly controversial. In recent years, investigations by the Citizen Lab and Amnesty International have revealed the presence of Pegasus on the phones of politicians, activists, and dissidents under repressive regimes. An analysis by Forensic Architecture, a research group at the University of London, has linked Pegasus to three hundred acts of physical violence. It has been used to target members of Rwanda's opposition party and journalists exposing corruption in El Salvador. In Mexico, it appeared on the phones of several people close to the reporter Javier Valdez Cárdenas, who was murdered after investigating drug cartels. Around the time that Prince Mohammed bin Salman of Saudi Arabia approved the murder of the journalist Jamal Khashoggi, a longtime critic, Pegasus was allegedly used to monitor phones belonging to Khashoggi's associates, possibly facilitating the killing, in 2018. (Bin Salman has denied involvement, and NSO said, in a statement, "Our technology was not associated in any way with the heinous murder.") Further reporting through a collaboration of news outlets known as the Pegasus Project has reinforced the links between NSO Group and anti-democratic states. But there is evidence that Pegasus is being used in at least forty-five countries, and it and similar tools have been purchased by law-enforcement agencies in the United States and across Europe. Cristin Flynn Goodwin, a Microsoft executive who has led the company's efforts to fight spyware, told me, "The big, dirty secret is that governments are buying this stuff—not just authoritarian governments but all types of governments."

NSO Group is perhaps the most successful, controversial, and influential firm in a generation of Israeli startups that have made the country the center of the spyware industry. I first interviewed Shalev Hulio, NSO Group's C.E.O., in 2019, and

How Democracies Spy on Their Citizens | The New Yorker

since then I have had access to NSO Group's staff, offices, and technology. The company is in a state of contradiction and crisis. Its programmers speak with pride about the use of their software in criminal investigations—NSO claims that Pegasus is sold only to law-enforcement and intelligence agencies—but also of the illicit thrill of compromising technology platforms. The company has been valued at more than a billion dollars. But now it is contending with debt, battling an array of corporate backers, and, according to industry observers, faltering in its long-standing efforts to sell its products to U.S. law enforcement, in part through an American branch, Westbridge Technologies. It also faces numerous lawsuits in many countries, brought by Meta (formerly Facebook), by Apple, and by individuals who have been hacked by NSO. The company said in its statement that it had been "targeted by a number of politically motivated advocacy organizations, many with well-known anti-Israel biases," and added that "we have repeatedly cooperated with governmental investigations, where credible allegations merit, and have learned from each of these findings and reports, and improved the safeguards in our technologies." Hulio told me, "I never imagined in my life that this company would be so famous. . . . I never imagined that we would be so successful." He paused. "And I never imagined that it would be so controversial."

Hulio, who is forty, has a lumbering gait and pudgy features. He typically wears loose T-shirts and jeans, with his hair in a utilitarian buzz cut. Last month, I visited him at his duplex in a luxury high-rise in Park Tzameret, the fanciest neighborhood in Tel Aviv. He lives with his three small children and his wife, Avital, who is expecting a fourth. There's a pool on the upper level of Hulio's apartment, and downstairs, in the double-height living room, is a custom arcade cabinet stocked with retro games and bearing a cartoon portrait of him, wearing shades, next to the word "Hulio" in large eight-bit font. Avital attends to the children, frequent renovations, and an ever-shifting array of pets: rabbits remain, a

Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 137 of 249

parrot does not. The family has a teacup poodle named Marshmallow Rainbow Sprinkle.

Hulio, Omri Lavie, and Niv Karmi founded NSO Group in 2010, creating its name from the first letters of their names and renting space in a converted chicken coop on a kibbutz. The company now has some eight hundred employees, and its technology has become a leading tool of state-sponsored hacking, instrumental in the fight among great powers.



*"Your résumé looks terrific, but I'm just not sure we can deal with the shedding."*

Cartoon by Elisabeth McNair

    Open cartoon gallery

The Citizen Lab's researchers concluded that, on July 26 and 27, 2020, Pegasus was used to infect a device connected to the network at 10 Downing Street, the office of Boris Johnson, the Prime Minister of the United Kingdom. A government official confirmed to me that the network was compromised, without specifying the spyware used. "When we found the No. 10 case, my jaw dropped," John Scott-Railton, a senior researcher at the Citizen Lab, recalled. "We suspect this included the exfiltration of data," Bill Marczak, another senior researcher there, added. The official told me that the National Cyber Security Centre, a

branch of British intelligence, tested several phones at Downing Street, including Johnson's. It was difficult to conduct a thorough search of phones—"It's a bloody hard job," the official said—and the agency was unable to locate the infected device. The nature of any data that may have been taken was never determined.

The Citizen Lab suspects, based on the servers to which the data were transmitted, that the United Arab Emirates was likely behind the hack. "I'd thought that the U.S., U.K., and other top-tier cyber powers were moving slowly on Pegasus because it wasn't a direct threat to their national security," Scott-- Railton said. "I realized I was mistaken: even the U.K. was underestimating the threat from Pegasus, and had just been spectacularly burned." The U.A.E. did not respond to multiple requests for comment, and NSO employees told me that the company was unaware of the hack. One of them said, "We hear about every, every phone call that is being hacked over the globe, we get a report immediately"—a statement that contradicts the company's frequent arguments that it has little insight into its customers' activities. In its statement, the company added, "Information raised in the inquiry indicates that these allegations are, yet again, false and could not be related to NSO products for technological and contractual reasons."

According to an analysis by the Citizen Lab, phones connected to the Foreign Office were hacked using Pegasus on at least five occasions, from July, 2020, through June, 2021. The government official confirmed that indications of hacking had been uncovered. According to the Citizen Lab, the destination servers suggested that the attacks were initiated by states including the U.A.E., India, and Cyprus. (Officials in India and Cyprus did not respond to requests for comment.) About a year after the Downing Street hack, a British court revealed that the U.A.E. had used Pegasus to spy on Princess Haya, the ex-wife of Sheikh Mohammed bin Rashid al-Maktoum, the ruler of Dubai, one of the Emirates. Maktoum was engaged in a custody dispute with Haya, who had fled with their two children to the U.K. Her attorneys, who are British, were also targeted. A source directly involved told me that a whistle-blower contacted NSO to alert it

to the cyberattack on Haya. The company enlisted Cherie Blair, the wife of former Prime Minister Tony Blair and an adviser to NSO, to notify Haya's attorneys. "We alerted everyone in time," Hulio told me. Soon afterward, the U.A.E. shut down its Pegasus system, and NSO announced that it would prevent its software from targeting U.K. phone numbers, as it has long done for U.S. - numbers.

Elsewhere in Europe, Pegasus has filled a need for law-enforcement agencies that previously had limited cyber-intelligence capacity. "Almost all governments in Europe are using our tools," Hulio told me. A former senior Israeli intelligence official added, "NSO has a monopoly in Europe." German, Polish, and Hungarian authorities have admitted to using Pegasus. Belgian law enforcement uses it, too, though it won't admit it. (A spokesperson for the Belgian federal police said that it respects "a legal framework as to the use of intrusive methods in private life.") A senior European law-enforcement official whose agency uses Pegasus said that it gave an inside look at criminal organizations: "When do they want to store the gas, to go to the place, to put the explosive?" He said that his agency uses Pegasus only as a last resort, with court approval, but conceded, "It's like a weapon. . . . It can always occur that an individual uses it in the wrong way."

The United States has been both a consumer and a victim of this technology. Although the National Security Agency and the C.I.A. have their own surveillance technology, other government offices, including in the military and in the Department of Justice, have bought spyware from private companies, according to people involved in those transactions. The *Times* has reported that the F.B.I. purchased and tested a Pegasus system in 2019, but the agency denied deploying the technology.

Establishing strict rules about who can use commercial spyware is complicated by the fact that such technology is offered as a tool of diplomacy. The results can be chaotic. The *Times* has reported that the C.I.A. paid for Djibouti to acquire Pegasus, as a way to fight terrorism. According to a previously unreported

investigation by WhatsApp, the technology was also used against members of Djibouti's own government, including its Prime Minister, Abdoulkadar Kamil Mohamed, and its Minister of the Interior, Hassan Omar.

Last year, as the Washington *Post* reported and Apple disclosed in a legal filing, the iPhones of eleven people working for the U.S. government abroad, many of them at its embassy in Uganda, were hacked using Pegasus. NSO Group said that, "following a media inquiry" about the incident, the company "immediately shut down all the customers potentially relevant to this case, due to the severity of the allegations, and even before we began the investigation." The Biden Administration is investigating additional targeting of U.S. officials, and has launched a review of the threats posed by foreign commercial hacking tools. Administration officials told me that they now plan to take new, aggressive steps. The most significant is "a ban on U.S. government purchase or use of foreign commercial spyware that poses counterintelligence and security risks for the U.S. government or has been improperly used abroad," Adrienne Watson, a White House spokesperson, said.

In November, the Commerce Department added NSO Group, along with several other spyware makers, to a list of entities blocked from purchasing technology from American companies without a license.

I was with Hulio in New York the next day. NSO could no longer legally buy Windows operating systems, iPhones, Amazon cloud servers—the kinds of products it uses to run its business and build its spyware. "It's outrageous," he told me. "We never sold to any country which is not an ally with the U.S., or an ally of Israel. We've never sold to any country the U.S. doesn't do business with." Deals with foreign clients require "direct written approval from the government of Israel," Hulio said.

"I think that it is not well understood by American leaders," Eva Galperin, the director of cybersecurity at the watchdog group Electronic Frontier Foundation,

told me. "They keep expecting that the Israeli government will crack down on NSO for this, whereas, in fact, they're doing the Israeli government's bidding." Last month, the Washington *Post* reported that Israel had blocked Ukraine from purchasing Pegasus, not wanting to alienate Russia. "Everything that we are doing, we got the permission from the government of Israel," Hulio told me. "The entire mechanism of regulation in Israel was built by the Americans."

N SO sees itself as a type of arms dealer, operating in a field without established norms. Hulio said, "There is the Geneva Conventions for the use of a weapon. I truly believe that there should be a convention of countries that should agree between themselves on the proper use of such tools" for cyber warfare. In the absence of international regulation, a battle is taking place between private companies: on one side, firms like NSO; on the other, the major technology platforms through which such firms implement their spyware.

On Thursday, May 2, 2019, Claudiu Dan Gheorghe, a software engineer, was working at Building 10 on Facebook's campus in Menlo Park, where he managed a team of seven people responsible for WhatsApp's voice- and video-calling infrastructure. Gheorghe, who was born in Romania, is thirty-five, with a slight frame and dark, close-cropped hair. In a photograph he used as a professional head shot during his nine years at Facebook, he wears a black hoodie and looks a little like Elliot Alderson, the protagonist of the hacking drama "Mr. Robot." Building 10 is a two-story structure with open-plan workspaces, brightly colored accent walls, and whiteboards. Engineers, most of them in their twenties and thirties, hunch over keyboards. The word "focus" is written on a wall and stamped on magnets scattered around the office. "It often felt like a church," Gheorghe recalled. WhatsApp, which Facebook bought for nineteen billion dollars in 2014, is the world's most popular messaging application, with about two billion monthly users.

Facebook had presented the platform, which uses end-to-end encryption, as ideal for sensitive communications; now the company's security team was more than two years into an effort to reinforce the security of its products. One task entailed looking at "signalling messages" automatically sent by WhatsApp users to the company's servers, in order to initiate calls. That evening, Gheorghe was alerted to an unusual signalling message. A piece of code that was intended to dictate the ringtone contained, instead, code with strange instructions for the recipient's phone.

In a system as vast as Facebook's, anomalies were routine, and usually innocuous. Unfamiliar code can stem from an older version of the software, or it can be a stress test by Facebook's Red Team, which conducts simulated attacks. But, as engineers in Facebook's international offices awoke and began to scrutinize the code, they grew concerned. Otto Ebeling, who worked on Facebook's security team in London, told me that the code seemed "polished, slick, which was alarming." Early on the morning after the message was discovered, Joaquin Moreno Garijo, another member of the London security team, wrote on the company's internal messaging system that, owing to how sophisticated the code was, "we believe that attacker may have found a vulnerability." Programmers who work on security issues often describe their work in terms of vulnerabilities and exploits. Ivan Krstić, an engineer at Apple, compared the concept to a heist scene in the film "Ocean's Twelve," in which a character dances through a hall filled with lasers that trigger alarms. "In that scene, the vulnerability is that there exists a path through all the lasers, where it's possible to get across the room," Krstić said. "But the exploit is that somebody had to be a precise enough dancer to actually be able to do that dance."

By late Sunday, a group of engineers working on the problem had become convinced that the code was an active exploit, one that was attacking vulnerabilities in their infrastructure as they watched. They could see that data were being copied from users' phones. "It was scary," Gheorghe recalled. "Like the

world is sort of shaking under you, because you built this thing, and it's used by so many people, but it has this massive flaw in it."

The engineers quickly identified ways to block the offending code, but they debated whether to do so. Blocking access would tip off the attackers, and perhaps allow them to erase their tracks before the engineers could make sure that any solution closed all possible avenues of attack. "That would be like chasing ghosts," Ebeling said. "Made a decision to not roll out the server-side fix," Andrey Labunets, a WhatsApp security engineer, wrote, in an internal message, "because we don't understand the root cause the impact for users and other possible attacker numbers / techniques."

On Monday, at crisis meetings with WhatsApp's top executive, Will Cathcart, and Facebook's head of security, the company told its engineers around the world that they had forty-eight hours to investigate the problem. "What would the scale of the victims be?" Cathcart recalled worrying. "I mean, how many people were hit by this?" The company's leadership decided not to notify law enforcement immediately, fearing that U.S. officials might tip off the hackers. "There's a risk of —you might go to someone who's a customer," he told me. (Their concerns were valid: weeks later, the *Times* has reported, the F.B.I. hosted NSO engineers at a facility in New Jersey, where the agency tested the Pegasus software it had purchased.) Cathcart alerted Mark Zuckerberg, who considered the problem "horrific," Cathcart recalled, and pressed the team to work quickly. For Gheorghe, "it was a terrifying Monday. I woke up at like 6 A.M., and then I worked until I couldn't stay awake anymore."

N SO's headquarters are in a glass-and-steel office building in Herzliya, a suburb outside Tel Aviv. The area is home to a cluster of technology firms from Israel's thriving startup sector. The beach is a twenty-minute walk away. The world's most notorious commercial hacking enterprise is remarkably unprotected: at times, a single security guard waved me through.



THE WRIGHT BROTHERS DISCOVER THE FIRST NIGHTMARE FLIGHT

Cartoon by Tim Hamilton

Open cartoon gallery

---

On the building's fourteenth floor, programmers wearing hoodies gather in a cafeteria outfitted with an espresso machine and an orange juicer, or sit on a terrace with views of the Mediterranean. A poster reads "LIFE WAS MUCH EASIER WHEN APPLE AND BLACKBERRY WERE JUST FRUITS." Stairs descend to the various programming groups, each of which has its own recreational space, with couches and PlayStation 5s. The Pegasus team likes to play Electronic Arts' football game, FIFA.

Employees told me that the company keeps its technology covert through an information-security department with several dozen experts. "There is a very large

department in the company which is in charge of whitewashing, I would say, all connection, all network connection between the client back to NSO," a former employee said. "They are purchasing servers, V.P.N. servers around the world. They have, like, this whole infrastructure set up so none of the communication can be traced."

Despite these precautions, WhatsApp engineers managed to trace data from the hack to I.P. addresses tied to properties and Web services used by NSO. "We now knew that one of the biggest threat actors in the world has a live exploit against WhatsApp," Gheorghe recalled. "I mean, it was exciting, because it's very rare to catch some of these things. But, at the same time, it was also extremely scary." A picture of the victims began to emerge. "Likely there are journalists human rights activists and others on the list," Labunets, the security engineer, wrote on the company's messaging system. (Eventually, the team identified some fourteen hundred WhatsApp users who had been targeted.)

By midweek, about thirty people were working on the problem, operating in a twenty-four-hour relay, with one group going to sleep as another came online. Facebook extended the team's deadline, and they began to reverse engineer the malicious code. "To be honest, it's brilliant. I mean, when you look at it, it feels like magic," Gheorghe said. "These people are very smart," he added. "I don't agree with what they do, but, man, that is a very complicated thing they built." The exploit triggered two video calls in close succession, one joining the other, with the malicious code hidden in their settings. The process took only a few seconds, and deleted any notifications immediately afterward. The code used a technique known as a "buffer overflow," in which an area of memory on a device is overloaded with more data than it can accommodate. "It's like you're writing on a piece of paper and you go beyond the bounds," Gheorghe explained. "You start writing on whatever the surface is, right? You start writing on the desk." The overflow allows the software to overwrite surrounding sections of memory freely. "You can make it do whatever you want."

I spoke with a vice-president for product development at NSO, whom the firm requested I identify only by his first name, Omer—citing, without apparent irony, privacy concerns. "You find the nooks and crannies enabling you to do something that the product designer didn't intend," Omer told me. Once in control, the exploit loaded more software, allowing the attacker to extract data or activate a camera or a microphone. The entire process was "zero click," requiring no action from the phone's owner.

The software was designed by NSO's Core Research Group, made up of several dozen software developers. "You're looking for a silver bullet, a simple exploit that can cover as much mobile devices around the world," Omer told me. Gheorghe said, "A lot of people, you know, would think about the hackers as being, like, just one person in a dark room, like, typing on a keyboard, right? That's not the reality —these people are just, like, another tech company." It is common for tech companies to hire people with backgrounds in hacking, and to offer bounties to outside programmers who identify vulnerabilities in their systems. Facebook's headquarters have the vanity address 1 Hacker Way. At both NSO and WhatsApp, the engineers closest to the coding are often described by colleagues as quirky introverts, resembling the hacker archetypes of fiction. "They are special people. Not all of them can communicate clearly with other human beings," Omer said, of the programmers who work on Pegasus. "Some of them don't sleep for two days. They get crazy when they don't sleep."

Late in the week, Facebook's security team devised an act of subterfuge: they would simulate an infected device, to get NSO's servers to send them a copy of the code. "But their software was smart enough to basically not be tricked by this," Gheorghe said. "We never really were able to get our hands on that."

Omer told me, "It's a cat-and-mouse game." Although NSO says that its customers control the use of Pegasus, it does not dispute its direct role in these

exchanges. "Every day, things are being patched," Hulio said. "This is the routine work here."

At times, WhatsApp users received repeated missed calls, but the malware wasn't successfully installed. Once the engineers learned about these incidents, they were able to study what it looked like when Pegasus failed. Toward the end of the week, Gheorghe told me, "we said, O.K., we don't have a full understanding at this point, but I think we captured enough." On Friday morning, Facebook notified the Department of Justice, which is developing a case against NSO. Then the company updated its servers to block the malicious code. "Ready to roll," Gheorghe wrote on the internal messaging service that afternoon. The fix was constructed to look like routine server maintenance, so that NSO might continue to attempt attacks, providing Facebook with more data.

The next day, WhatsApp engineers said, NSO began to send what looked like decoy data packets, which they speculated were a way to determine whether NSO's activities were being watched. "In one of the malicious packets, they actually sent a YouTube link," Gheorghe told me. "We were all laughing like crazy when we saw what it was." The link was to the music video for the Rick Astley song "Never Gonna Give You Up," from 1987. Ambushing people with a link to the song is a popular trolling tactic known as Rickrolling. Otto Ebeling recalled, "Rickrolling is, I don't know, something my colleague might do to me, not some sort of semi-state-sponsored people." Cathcart told me, "There was a message in it. They were saying, We know what you did, we see you." (Hulio and other NSO employees said they could not recall Rickrolling WhatsApp.)

In the months that followed, WhatsApp began notifying users who had been targeted. The list included numerous government officials, including at least one French ambassador and the Djiboutian Prime Minister. "There wasn't, you know, overlap between this list and, like, legitimate law-enforcement outreach," Cathcart said. "You could see, wow, there's a lot of countries all around the world. This isn't just one agency or organization in one country targeting people." WhatsApp also

began working with the Citizen Lab, which warned victims of the risk that they might be hacked again, and helped them secure their devices. John Scott-Railton said, "It really was interesting how many people were upset and saddened, but in a deep way not surprised, almost relieved, as if they were getting a diagnosis for a mystery ailment they had suffered for many years."

Five people in the initial group identified by WhatsApp were Catalans, including elected lawmakers and an activist. Campo, the Catalan security researcher, realized that the cases "were probably just the tip of the iceberg." He added, "That's when I found myself in the intersection of technology—a product that I contributed to building—and my home country."

WhatsApp continued sharing information with the Department of Justice, and, that fall, the company sued NSO in federal court. NSO Group "breached our systems, damaged us," Cathcart told me. "I mean, do you just do nothing about that? No. There have to be consequences."

Hulio said, "I just remember that one day the lawsuit happened, and they shut down the Facebook account of our employees, which was a very bully move for them to do." He added, referring to scandals about Facebook's role in society, "I think it's a big hypocrisy." NSO has pushed for the suit to be dismissed, arguing that the company's work on behalf of governments should grant it the same immunity from lawsuits that those governments have. So far, the U.S. courts have rejected this argument.

WhatsApp's aggressive posture was unusual among big technology companies, which are often reluctant to call attention to instances in which their systems have been compromised. The lawsuit signalled a shift. The tech companies were now openly aligned against the spyware venders. Gheorghe described it as "the moment the whole thing just exploded."

Microsoft, Google, Cisco, and others filed a legal brief in support of WhatsApp's suit. Goodwin, the Microsoft executive, helped to assemble the coalition of companies. "We could not let NSO Group prevail with an argument that, simply because a government is using your products and services, you get sovereign immunity," she told me. "The ripple effect of that would have been so dangerous." Hulio argues that when governments use Pegasus they're less likely to lean on platform holders for wider "back door" access to users' data. He expressed exasperation with the lawsuit. "Instead of them, like, actually saying, 'O.K., thank you,'" he told me, "they are going to sue us. Fine, so let's meet in court."

Microsoft, too, has a security team that engages in combat with hackers. Although Pegasus is not designed to target users through Microsoft platforms, at least four people in Catalonia running Microsoft Windows on their computers have been attacked by spyware made by Candiru, a startup founded by former NSO employees. (A spokesperson for Candiru said that it requires its products to be used for the "sole purpose of preventing crime and terror.") In February, 2021, the Citizen Lab identified evidence of an active infection—a rarity for spyware of this calibre—on a laptop belonging to Joan Matamala, an activist closely connected to separatist politicians. Campo called Matamala and instructed him to wrap the laptop in aluminum foil, a makeshift way of blocking the malware from communicating with servers. The Citizen Lab was able to extract a copy of the spyware, which Microsoft dubbed DevilsTongue. Several months later, Microsoft released updates blocking DevilsTongue and preventing future attacks. By then, the list of activists and journalists targeted "made the hairs on the back of our neck stand on end," Goodwin said. Matamala has been targeted more than sixteen times. "I still have the aluminum paper stored here, in case we ever have a suspicion of having another infection," he told me.

Last November, after iPhone users were allegedly targeted by NSO, Apple filed its own lawsuit. NSO has filed a motion to dismiss. "Apple is a company that does not believe in theatrical lawsuits," Ivan Krstić, the engineer, told me. "We have this

entire time been waiting for a smoking gun that would let us go file a suit that is winnable."



*"You still have to choose which chef you want to prepare your food."*

Cartoon by Frank Cotham

  Open cartoon gallery

Apple created a threat-intelligence team nearly four years ago. Two Apple employees involved in the work told me that it was a response to the spread of spyware, exemplified by NSO Group. "NSO is a big pain point," one of the employees told me. "Even before the stuff that hit the news, we had disrupted NSO a number of times." In 2020, with the launch of its iOS 14 software, Apple had introduced a system called BlastDoor, which moved the processing of iMessages—including any potentially malicious code—into a chamber connected

to the rest of the operating system by only a single, narrow pipeline of data. But Omer, the NSO V.P., told me that "newer features usually have some holes in their armor," making them "more easy to target." Krstić conceded that there was "a sort of an eye of a needle of an opening still left."

In March, 2021, Apple's security team received a tip that a hacker had successfully threaded that needle. Even cyber warfare has double agents. A person familiar with Apple's threat-intelligence capabilities said that the company's team sometimes receives tips from informants connected to spyware enterprises: "We've spent a long time and a lot of effort in trying to get to a place where we can actually learn something about what's going on deeply behind the scenes at some of these companies." (An Apple spokesperson said that Apple does not "run sources" within spyware companies.) The spyware venders, too, rely on intelligence gathering, such as securing pre-release versions of software, which they use to design their next attacks. "We follow the publications, we follow the beta versions of whatever apps we're targeting," Omer told me.

That month, researchers from the Citizen Lab contacted Apple: the phone of a Saudi women's-rights activist, Loujain al-Hathloul, had been hacked through iMessage. Later, the Citizen Lab was able to send Apple a copy of an exploit, which the researcher Bill Marczak discovered after months of scrutinizing Hathloul's phone, buried in an image file. The person familiar with Apple's threat-intelligence capabilities said that receiving the file, through an encrypted digital channel, was "sort of like getting a thing handed to you in a biohazard bag, which says, 'Do not open except in a Biosafety Level 4 lab.'"

Apple's investigation took a week and involved several dozen engineers based in the United States and Europe. The company concluded that NSO had injected malicious code into files in Adobe's PDF format. It then tricked a system in iMessage into accepting and processing the PDFs outside BlastDoor. "It's borderline science fiction," the person familiar with Apple's threat-intelligence capabilities said. "When you read the analysis, it's hard to believe." Google's

security-research team, Project Zero, also studied a copy of the exploit, and later wrote in a blog post, "We assess this to be one of the most technically sophisticated exploits we've ever seen, further demonstrating that the capabilities NSO provides rival those previously thought to be accessible to only a handful of nation states." In the NSO offices, programmers in the Core Research Group printed a copy of the post and hung it on the wall.

Apple shipped updates for its platforms that rendered the exploit useless. Krstić told me that this was "a massive point of pride" for the team. But Omer told me, "We saw it coming. We just counted the days until it happened." He and others at the company said the next exploit is an inevitability. "There might be some gaps. It could take two weeks to come up with a mitigation on our side, some work-around."

D uring interviews in NSO's offices last month, employees exchanged nervous glances with hovering public-relations staffers as they answered questions about morale in the midst of the scandals, lawsuits, and blacklisting. "To be honest, not every time the mood is actually good," Omer said. Others claimed loyalty to the company and belief in the power of its tools to catch criminals. "The company has a very strong narrative that it tries to sell internally to the employees," the former employee told me. "You're either with them or against them."

Israel has become the world's most significant source of private surveillance technology in part because of the quality of talent and expertise produced by its military. "Because of the compulsory service, we can recruit the best of the best," the former senior intelligence official told me. "The American dream is going from M.I.T. to Google. The Israeli dream is to go to 8200," the Israeli military-intelligence unit from which spyware venders often recruit. (Hulio, who describes himself as a mediocre student whose upbringing was "nothing fancy," often emphasizes that he did not serve in Unit 8200.) NSO has historically been

regarded as an appealing job prospect for young veterans. But the former NSO employee, who quit after becoming concerned that Pegasus had facilitated Jamal Khashoggi's murder, told me that others had become disillusioned, too. "Many of my colleagues decided to leave the company at that stage," the former employee said. "This was one of the major events that I think caused many of the employees to, like, wake up and understand what's going on." In the past few years, the departures have been "like a snowball." Hulio, in response to questions about the company's problems, said, "What worries me is the vibes of the employees."

In 2019, NSO was saddled with hundreds of millions of dollars in debt as part of a leveraged-buyout deal in which a London-based private-equity firm, Novalpina, acquired a seventy-per-cent stake. Recently, Moody's, the financial-services firm, downgraded NSO's credit rating to "poor," and Bloomberg described it as a distressed asset, shunned by Wall Street traders. Two top NSO executives have left, and relations between the company and its backers have deteriorated. Infighting among Novalpina's partners led to the transfer of control of its assets, including NSO, to a consulting firm, Berkeley Research Group, which pledged to increase oversight. But a BRG executive recently claimed that coöperation with Hulio had become "virtually non-existent." Agence France-Presse has reported that tensions emerged because NSO's creditors have pressed for continued sales to countries with dubious human-rights records, while BRG has sought to pause them. "We indeed have some disputes with them," Hulio said, of BRG. "It's about how to run the business."

NSO's troubles have complicated its close alliance with the Israeli state. The former senior intelligence official recalled that, in the past, when his unit turned down European countries seeking intelligence collaboration, "Mossad said, Here's the next best thing, NSO Group." Several people familiar with those deals said that Israeli authorities provided little ethical guidance or restraint. The former official added, "Israeli export control was not dealing with ethics. It was dealing with two things. One, Israeli national interest. Two, reputation." The former NSO

employee said that the state "was well aware of the misuse, and even using it as part of its own diplomatic relationships." (Israel's Ministry of Defense said in a statement that "each licensing assessment is made in light of various considerations including the security clearance of the product and assessment of the country toward which the product will be marketed. Human rights, policy, and security issues are all taken into consideration.") After the blacklisting of NSO, Hulio sought to enlist Israeli officials, including Prime Minister Naftali Bennett and Defense Minister Benny Gantz. "I sent a letter," he told me. "I said that as a regulated company, you know, everything that we have ever asked was with the permission, and with the authority, of the government of Israel." But a senior Biden Administration official said that the Israelis raised only "pretty mild complaints" about the blacklisting. "They didn't like it, but we didn't have a standoff."

In Israel's legislature, Arab politicians are leading a modest movement to examine the state's relationship with NSO. The Arab party leader Sami Abou Shahadeh told me, "We tried to discuss this in the Knesset twice . . . to tell the Israeli politicians, You are selling death to very weak societies that are in conflict, and you've been doing this for too long." He added, "It never worked, because, first and morally, they don't see any problem with that." Last fall, an investigation by the watchdog group Front Line Defenders identified Pegasus infections on the phones of six Palestinian activists—including one whose Jerusalem residency status had been revoked. Abou Shahadeh argued that the history of Israel's spyware technology is tied to the surveillance of Palestinian communities in the West Bank, East Jerusalem, and Gaza. "They have a huge laboratory," he told me. "When they were using all the same tools for a long time to spy on Palestinian citizens, nobody cared." Asked about the targeting of Palestinians, Hulio said, "If Israel is using our tools to fight crime and terror, I would be very proud of it."

"I know there have been misuses," Hulio said. "It's hard for me to live with that. And I obviously feel sorry for that. Really, I'm not just saying that. I never said it, but I'm saying it now." Hulio said that the company has turned down

ninety customers and hundreds of millions of dollars of business out of concern about the potential for abuse. But such claims are difficult to verify. "NSO wanted Western Europe mainly so they can tell guys like you, Here's a European example," the former Israeli intelligence official, who now works in the spyware sector, said. "But most of their business is subsidized by the Saudi Arabias of the world." The former employee, who had knowledge of NSO's sales efforts, said, "For a European country, they would charge ten million dollars. And for a country in the Middle East they could charge, like, two hundred and fifty million for the same product." This seemed to create perverse incentives: "When they understood that they had misuse in those countries that they sold to for enormous amounts of money, then the decision to shut down the service for that specific country became much, much harder."

Asked about the extreme abuses ascribed to his technology, Hulio invoked an argument that is at the heart of his company's defense against WhatsApp and Apple. "We have no access to the data on the system," he told me. "We don't take part in the operation, we don't see what the customers are doing. We have no way of monitoring it." When a client buys Pegasus, company officials said, an NSO team travels to install two racks, one devoted to storage and another for operating the software. The system then runs with only limited connection to NSO in Israel.

But NSO engineers concede that there is some real-time monitoring of systems to prevent unauthorized tampering with or theft of their technology. And the former employee said, of Hulio's assurances that NSO is technically prevented from overseeing the system, "That's a lie." The former employee recalled support and maintenance efforts that involved remote access by NSO, with the customer's permission and live oversight. "There is remote access," the former employee added. "They can see everything that goes on. They have access to the database, they have access to all of the data." The senior European law-enforcement official

told me, "They can have remote access to the system when we authorize them to access the system."

NSO executives argue that, in an unregulated field, they are attempting to construct guardrails. They have touted their appointment of a compliance committee, and told me that they now maintain a list of countries ranked by risk of misuse, based on human-rights indicators from Freedom House and other groups. (They declined to share the list.) NSO also says that customers' Pegasus systems maintain a file that records which numbers were targeted; customers are contractually obligated to surrender the file if NSO starts an investigation. "We have never had a customer say no," Hulio told me. The company says that it can terminate systems remotely, and has done so seven times in the past few years.

The competition, Hulio argued, is far more frightening. "Companies found themselves in Singapore, in Cyprus, in other places that don't have real regulation," he told me. "And they can sell to whoever they want." The spyware industry is also full of rogue hackers willing to crack devices for anyone who will pay. "They will take your computers, they will take your phone, your Gmail," Hulio said. "It's obviously illegal. But it's very common now. It's not that expensive." Some of the technology that NSO competes with, he says, comes from state actors, including China and Russia. "I can tell you that today in China, today in Africa, you see the Chinese government giving capabilities almost similar to NSO." According to a report from the Carnegie Endowment for International Peace, China supplies surveillance tools to sixty-three countries, often through private firms enmeshed with the Chinese state. "NSO will not exist tomorrow, let's say," Hulio told me. "There's not going to be a vacuum. What do you think will happen?"

NSO is also competing with Israeli firms. Large-scale hacking campaigns, like the one in Catalonia, often use tools from a number of companies, several founded by NSO alumni. Candiru was started in 2014, by the former NSO employees Eran Shorer and Yaakov Weizman. It was allegedly linked to recent attacks on Web

sites in the U.K. and the Middle East (Candiru denies the connection), and its software has been identified on the devices of Turkish and Palestinian citizens. Candiru has no Web site. The firm shares its name with a parasitic fish, native to the Amazon River basin, that drains the blood of larger fish.

QuaDream was founded two years later, by a group including two other former NSO employees, Guy Geva and Nimrod Reznik. Like NSO, it focusses on smartphones. Earlier this year, Reuters reported that QuaDream had exploited the same vulnerability that NSO used to gain access to Apple's iMessage. QuaDream, whose offices are behind an unmarked door in the Tel Aviv suburb of Ramat Gan, appears to share with many of its competitors a reliance on regulation havens: its flagship malware, Reign, is reportedly owned by a Cyprus-based entity, InReach. According to *Haaretz*, the firm is among those now employed by Saudi Arabia. (QuaDream could not be reached for comment.)

Other Israeli firms pitch themselves as less reputationally fraught. Paragon, which was founded in 2018 by former Israeli intelligence officials and includes former Prime Minister Ehud Barak on its board, markets its technology to offices within the U.S. government. Paragon's core technology focusses not on seizing complete control of phones but on hacking encrypted messaging systems like Telegram and Signal. An executive told me that it has committed to sell only to a narrow list of countries with relatively uncontroversial human-rights records: "Our strategy is to have values, which is interesting to the American market."



*"If you win, the game is rigged, but if I win it's flawless and beyond critique."*

**Cartoon by Suerynn Lee**



Open cartoon gallery

I n Catalonia, Gonzalo Boye, an attorney representing nineteen people targeted by Pegasus, is preparing criminal complaints to courts in Spain and other European countries, accusing NSO, as well as Hulio and his co-founders, of breaking national and E.U. laws. Boye has represented Catalan politicians in exile, including the former President Carles Puigdemont. Between March and October of 2020, analysis by the Citizen Lab found, Boye was targeted eighteen times with text messages masquerading as updates from Twitter and news sites. At least one attempt resulted in a successful Pegasus infection. Boye says that he now spends as much time as possible outside Spain. In a recent interview, he wondered, "How can I defend someone, if the other side knows exactly everything I've said to my client?" Hulio declined to identify specific customers but suggested that Spain's

4:19-cv-07123-PJH

use of the technology was legitimate. "Spain definitely has a rule of law," he told me. "And if everything was legal, with the approval of the Supreme Court, or with the approval of all the lawful mechanisms, then it can't be misused." Pere Aragonès, the current President of Catalonia, told me, "We are not criminals." He is one of three people who have served in that role whose phones have been infected with Pegasus. "What we want from the Spanish authorities is transparency."

Last month, the European Parliament formed a committee to look into the use of Pegasus in Europe. Last week, Reuters reported that senior officials at the European Commission had been targeted by NSO spyware. The investigative committee, whose members include Puigdemont, will convene for its first session on April 19th. Puigdemont called NSO's activities "a threat not only for the credibility of Spanish democracy, but for the credibility of European democracy itself."

NSO Group also faces legal consequences in the U.K.: three activists recently notified the company, as well as the governments of Saudi Arabia and the U.A.E., that they plan to sue over alleged abuses of Pegasus. (The company responded that there was "no basis" for their claims.)

NSO continues to defend itself in the WhatsApp suit. This month, it filed an appeal to the U.S. Supreme Court. "If we need to go and fight, we will," Shmuel Sunray, NSO's general counsel, told me. Lawyers for WhatsApp said that, in their fight with NSO, they have encountered underhanded tactics, including an apparent campaign of private espionage.

On December 20, 2019, Joe Mornin, an associate at Cooley L.L.P., a Palo Alto law firm that was representing WhatsApp in its suit against NSO, received an e-mail from a woman who identified herself as Linnea Nilsson, a producer at a Stockholm-based company developing a documentary series on cybersecurity.

Nilsson was cagey about her identity but so eager to meet Mornin that she bought him a first-class plane ticket from San Francisco to New York. The ticket was paid for in cash, through World Express Travel, an agency that specialized in trips to Israel. Mornin never used the ticket. A Web site for the documentary company, populated with photos from elsewhere on the Internet, soon disappeared. So did a LinkedIn profile for Nilsson.

Several months later, a woman claiming to be Anastasia Chistyakova, a Moscow-based trustee for a wealthy individual, contacted Travis LeBlanc, a Cooley partner working on the WhatsApp case, seeking legal advice. The woman sent voice-mail, e-mail, Facebook, and LinkedIn messages. Mornin identified her voice as belonging to Nilsson, and the law firm later concluded that her e-mail had come from the same block of I.P. addresses as those sent by Nilsson. The lawyers reported the incidents to the Department of Justice.

The tactics were similar to those used by the private intelligence company Black Cube, which is run largely by former officers of Mossad and other Israeli intelligence agencies, and is known for using operatives with false identities. The firm worked on behalf of the producer Harvey Weinstein to track women who had accused him of sexual abuse, and last month three of its officials received suspended prison sentences for hacking and intimidating Romania's chief anti--corruption prosecutor.

Black Cube has been linked to at least one other case involving NSO Group. In February, 2019, the A.P. reported that Black Cube agents had targeted three attorneys involved in another suit against NSO Group, as well as a London-based journalist covering the case. The lawyers—Mazen Masri, Alaa Mahajna, and Christiana Markou—who represented hacked journalists and activists, had sued NSO and an affiliated entity in Israel and Cyprus. In late 2018, all three received messages from people who claimed to be associated with a rich firm or individual, repeatedly suggesting meetings in London. NSO Group has denied hiring Black Cube to target opponents. However, Hulio acknowledged the connection to me,

saying, "For the lawsuit in Cyprus, there was one involvement of Black Cube," because the lawsuit "came from nowhere, and I want to understand." He said that he had not hired Black Cube for other lawsuits. Black Cube said that it would not comment on the cases, though a source familiar with the company denied that it had targeted Cooley lawyers.

"People can survive and can adapt to almost any situation," Hulio once told me. NSO Group must now adapt to a situation in which its flagship product has become a symbol of oppression. "I don't know if we'll win, but we will fight," he said. One solution was to expand the product line. The company demonstrated for me an artificial-intelligence tool, called Maestro, that scrutinizes surveillance data, builds models of individuals' relationships and schedules, and alerts law enforcement to variations of routine that might be harbingers of crime. "I'm sure this will be the next big thing coming out of NSO," Leoz Michaelson, one of its designers, told me. "Turning every life pattern into a mathematical vector."

The product is already used by a handful of countries, and Hulio said that it had contributed to an arrest, after a suspect in a terrorism investigation subtly altered his routine. The company seemed to have given little consideration to the idea that this tool, too, might spur controversy. When I asked what would happen if law enforcement arrested someone based on, say, an innocent trip to the store in the middle of the night, Michaelson said, "There could be false positives." But, he added, "this guy that is going to buy milk in the middle of the night is in the system for a reason."

Yet the risk to bystanders is not an abstraction. Last week, Elies Campo decided to check the phones of his parents, scientists who are not involved in political activities, for spyware. He found that both had been infected with Pegasus when he visited them during the Christmas holiday in 2019. Campo told me, "The idea that anyone could be at risk from Pegasus wasn't just a concept anymore—it was

my parents sitting across the table from me." On his mother's phone, which had been hacked eight times, the researchers found a new kind of zero-click exploit, which attacked iMessage and iOS's Web-browsing engine. There is no evidence that iPhones are still vulnerable to the exploit, which the Citizen Lab has given the working name Homage. When the evidence was found, Scott-Railton told Campo, "You're not going to believe this, but your mother is patient zero for a previously undiscovered exploit."

During a recent visit to NSO's offices, windows and whiteboards across the space were dense with flowcharts and graphics, in Hebrew and English text, chronicling ideas for products and exploits. On one whiteboard, scrawled in large red Hebrew characters and firmly underlined, was a single word: "War!" ♦

*Georgia Gee conducted additional research for this piece.*

An earlier version of this story misstated the time of a Pegasus infection on a device connected to the network at 10 Downing Street.

*Published in the print edition of the <u>April 25 & May 2, 2022</u>, issue, with the headline "The Surveillance States."*

---

# NEW YORKER FAVORITES

- The climate solutions <u>we can't live without</u>

- Saving the climate will depend on blue-collar workers. Can we train enough of them <u>before time runs out</u>?

- Andy Warhol obsessively documented his life, but he also lied constantly, <u>almost recreationally</u>.

- A writer insisted that his novel was fiction, but a detective was sure it could <u>help solve a murder</u>.

4/24/23, 11:58 AM          Case 4:19-cv-07123-PJH     Document 188-2 on TheirFiled 05/16/23 The New Yorker Page 164 of 249

- A major Black novelist made a remarkable début. <u>Why did he disappear</u>?

- Fiction by Upton Sinclair: "<u>How to Be Obscene</u>."

<u>Sign up for our daily newsletter</u> to receive the best stories from *The New Yorker*.

---



*<u>Ronan Farrow</u>, a contributing writer to The New Yorker, is the author of "<u>Catch and Kill</u>" and "<u>War on Peace</u>." His reporting for The New Yorker won the 2018 Pulitzer Prize for public service.*

---

More:    **Surveillance    Technology    Tech Companies    Cybersecurity    Israel    Spain    Intelligence    Hacking    WhatsApp    Facebook    Apple    Software**

---

## THIS WEEK'S ISSUE

Never miss a big *New Yorker* story again. Sign up for This Week's Issue and get an e-mail every week with the stories you have to read.

**E-mail address**

Your e-mail address

Sign up

By signing up, you agree to our <u>User Agreement</u> and <u>Privacy Policy & Cookie Statement</u>.

---

Read More

---

https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens                                      34/37

Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 165 of 249



A REPORTER AT LARGE

# CROOKS' MISTAKEN BET ON ENCRYPTED PHONES

Drug syndicates and other criminal groups bought into the idea that a new kind of phone network couldn't be infiltrated by cops. They were wrong—big time.

**By Ed Caesar**



How Democracies Spy on Their Citizens | The New Yorker

OUR COLUMNISTS

## HOW PUTIN CRIMINALIZED JOURNALISM IN RUSSIA

The case of Evan Gershkovich, a Wall Street Journal reporter being held in Moscow on espionage charges, is only the most recent example of the Kremlin's crackdown on reporters.

**By Masha Gessen**



A REPORTER AT LARGE

## THE DIRTY SECRETS OF A SMEAR CAMPAIGN

Rumors destroyed Hazim Nada's company. Then hackers handed him terabytes of files exposing a covert campaign against him—and the culprit wasn't a rival but an entire country.

**By David D. Kirkpatrick**





Cookies Settings

# EXHIBIT K

Jun 8, 2022 - World

# Scoop: Israelis push U.S. to remove NSO from blacklist

 Barak Ravid, author of <u>Axios from Tel Aviv</u>

f  🐦  in  ✉



Photo: Menahem Kahana/AFP via Getty Images

Israeli officials are pushing the Biden administration to remove Israeli cyber spying company NSO from the <u>Department of Commerce blacklist</u>, two Israeli officials and one U.S. official told Axios.

**Why it matters:** Removing NSO from the U.S. blacklist would be a dramatic reversal by the Biden administration and would likely be criticized by progressives in the Democratic Party and Congress, as well as many in the cybersecurity community.

**Driving the news:** A U.S. official and the two Israeli officials said the Biden administration is considering the Israeli request.

- But another U.S. official denied the administration is considering it.

**Flashback:** In November last year, the Commerce Department added Israeli cyber intelligence companies NSO and Candiru to its blacklist of companies it says are engaging in activities contrary to the national security or foreign policy interests of the United States.

- It was the first time the U.S. government targeted Israeli cyber companies, which receive their export licenses from the Israeli Ministry of Defense.

**The Commerce Department** said its decision was based on evidence that both companies developed and supplied spyware to foreign governments who in turn used it "to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers."

- An international consortium of investigative journalists reported last July that NSO's Pegasus software — designed to track terrorists and criminals — had become a valuable tool for governments to spy on journalists and critics.

- Hungary, India, Mexico, Morocco and Saudi Arabia are among the countries listed in the report as NSO clients.

**Behind the scenes:** After NSO was sanctioned, there was a debate inside the Israeli government on whether it should lobby the Biden administration on behalf of the company, Israeli officials said.

- Initially, Israeli officials decided against it, but this decision later changed, and the Israeli government started pressing the Biden administration over the issue.

- "We told the U.S. that they can't destroy NSO and that several bad clients doesn't mean the company's products and capabilities are no longer needed," a senior Israeli official told me.

- The Israeli government also told the Biden administration it should have stated clearly in advance what needed to be fixed before sanctioning NSO and given the company an opportunity to make the changes.

**NSO hired two U.S. law firms** to work on the blacklist issue independently from the Israeli government.

- The lawyers sent a request for an appeal to the Department of Commerce and asked for a hearing, which hasn't taken place. The correspondence continues in writing, an NSO official told me.

- A U.S. official said the White House is not interfering in the regulatory process through which NSO Group is appealing the listing decision.

**Go deeper:** NSO Group's spyware is everywhere

# EXHIBIT L



**Surveillance**

🕐 This article is more than **10 months old**

## US defence contractor in talks to take over NSO Group's hacking technology

**Deal – which would require approval from US and Israel – would
give L3Harris control over controversial Pegasus tool**

**Stephanie Kirchgaessner** *in Washington*
🐦 @skirchy
Tue 14 Jun 2022 16.25 EDT

The US defence contractor L3Harris is in talks to take over NSO Group's surveillance technology, in a possible deal that would give an American company control over one of the world's most sophisticated and controversial hacking tools.

Multiple sources confirmed that discussions were centred on a sale of the Israeli company's core technology – or code – as well as a possible transfer of NSO personnel to L3Harris. But any agreement still faces significant hurdles, including requiring the blessing of the US and Israeli governments, which have not yet given the green light to a deal.

In a statement, a senior White House official said: "Such a transaction, if it were to take place, raises serious counterintelligence and security concerns for the US government."

This story was jointly reported by the Guardian, the Washington Post and Haaretz.

If agreed, the deal would mark an astounding turnaround for NSO, less than a year after the Biden administration placed the company on a US blacklist and accused it of acting "contrary to the foreign policy and national security interests of the US".

NSO's government clients are known to have used the surveillance technology to target journalists, human rights activists, senior government officials in US-allied countries, and lawyers around the world.

The Guardian and other media outlets have also detailed how NSO's surveillance technology, Pegasus, has been used by the company's government clients to target American citizens, including Carine Kanimba, daughter of the Rwandan dissident Paul Rusesabagina, as well as journalists, activists and US state department officials working abroad.

Asked to comment on the talks, an L3Harris spokesperson said: "We are aware of the capability and we are constantly evaluating our customers' national security needs. At this point, anything beyond that is speculation."

The talks between L3 and NSO were first reported by Intelligence Online.

The White House said that it had not been involved in "any way in this reported potential transaction".

The senior White House official also said the US government "opposes efforts by foreign companies to circumvent US export control measures or sanctions, including placement on the US Department of Commerce's Entity List for malicious cyber activity".

The official said that any US company – particularly a cleared US defence contractor – should be aware that a transaction with a blacklisted company would "not automatically remove a designated entity from the Entity List, and would spur intensive review to examine whether the transaction poses a counterintelligence threat to the US Government and its systems and information, whether other US equities with the defense contractor may be at risk, to what extent a foreign entity or government retains a degree of access or control, and the broader human rights implications".

One person familiar with the talks said that if a deal were agreed, it would probably involve selling NSO's capabilities to a drastically curtailed customer base that would include the US government, the UK, Australia, New Zealand and Canada – which comprise the "five eyes" intelligence alliance – as well as some Nato allies.

The person also said that the deal faced several unresolved issues, including whether the technology would be housed in Israel or the US and whether Israel would be allowed to continue to use the technology as a customer.

The person said it was also too soon to confirm the price of any possible deal. The transaction would require US government approval since NSO is on the commerce department's so-called entity list. Experts said that any such transaction would probably require the creation of a new entity in order to get US approval.

Any deal would also face hurdles in Israel. One assumption in the Israeli cyber industry is that it would have to keep oversight of the Israeli-made technology in Israel, and keep all development of Pegasus and personnel in Israel.

NSO is regulated by the Israeli ministry of defence, which has had ultimate say over the company's government clients. Israel has faced intense criticism in the past for agreeing to sell the surveillance technology to countries with poor human rights records, including Saudi Arabia and the United Arab Emirates.

NSO, which is being sued by Apple and WhatsApp in US courts, has in the past said it takes all allegations of abuse of its tools seriously, and that it investigates such claims.

The Israeli ministry of defence and NSO declined to comment.

Any takeover of NSO's hacking technology would add to L3Harris's current suite of surveillance tools, which are already sold to US government and law enforcement clients. The company, which is based in Florida and reports about $18bn in annual sales, includes the FBI and Nato as clients.

Any potential deal faces stiff opposition from digital rights advocates and human rights groups.

John Scott-Railton, a senior researcher at Citizen Lab at the Munk School at the University of Toronto, said he was doubtful that US agencies, and the agencies of the US's closest allies, would trust NSO technology for their most sensitive operations, and it would therefore more likely be sold to local authorities.

"So where would the big market be? I fear the logical consumers would be US police departments. This would be an unprecedented threat to our civil liberties," he said.

The deal would also raise serious questions about the Biden administration's commitment to holding "bad actors" accountable, Scott-Railton said.

"All eyes are on NSO right now. If the White House doesn't stop this deal, many will conclude that the administration is weak on enforcement, or that they're cynical and helped a US company pick up NSO at fire-sale prices because it was sanctioned," he said, adding that any such deal would show that US sanctions did not have teeth and would encourage more investment in the "mercenary hacking space".

*Additional reporting by Omer Benjakob from Haaretz, Gur Megiddo from TheMarker, and Ellen Nakashima and Craig Timberg from the Washington Post*

Article count **off**

Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 175 of 249

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics - one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone - whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | **Monthly** | Annual |
|---|---|---|
| $5 per month | $7 per month | Other |

**Continue** →   **Remind me in June**     

---

## Related stories





**Israel and Saudi Arabia 'in talks over joint defence against Iran'**

🕐 27 Jun 2022



**Key Democrat warns of major security risk if US firm acquires NSO hacking code**

🕐 16 Jun 2022



**Victim's iPhone hacked by Pegasus spyware weeks after Apple sued NSO**

🕐 5 Apr 2022



**NSO Group spyware used to hack at least nine US officials' phones - report**

🕐 3 Dec 2021



**US blacklistin Group shows technology co grave threat**

🕐 3 Nov 2021

4/24/23, 12:07 PM    US defence contractor in talks to take over NSO Group's hacking technology | Surveillance | The Guardian

Case 4:19-cv-07123-PJH   Document 188-2   Filed 05/16/23   Page 176 of 249

## More from **Headlines**

● ○ ○ ○ ○ ○ ○ ○ ○ ○



**Herbicides**
EPA accused of failing to
regulate use of toxic
herbicides despite court
order
🕐 7h ago



● **Live**
Tucker Carlson leaves Fox
News, network announces
🕐 20m ago



**Idaho**
Republicans 'glorify
political violence' by
embracing extreme gun
culture
🕐 10h ago



**Abortion**
Pilot who offered flights to
women for medical care
fired from seminary job
🕐 10h ago



**Antisemitism**
UN urged to re
controversial
over 'misuse' t
Israel
🕐 1h ago

## Most viewed

Case 4:19-cv-07123-PJH   Document 188-20   Filed 05/16/23   Page 177 of 249

Case 4:19-cv-07123-PJH    Document 188-2    Filed 05/16/23    Page 178 of 249

EXHIBIT M

# Pegasus Spyware Maker NSO Is Conducting a Lobbying Campaign to Get Off U.S. Blacklist

The cybersecurity firm has invested heavily in top lobbyists and law firms in an effort to lift restrictions on doing business in America. NSO is hoping the Israeli prime minister will raise the issue with Joe Biden when the two meet this week.

by Uri Blau
July 12, 2022, 6 a.m. EDT
**Co-published with Shomrim**

*This article is co-published with Shomrim. Shomrim is an Israel-based nonprofit and nonpartisan independent news organization.*

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

Israeli cybersecurity company NSO Group, the company behind the notorious Pegasus spyware, has been conducting a broad campaign in the United States to get off the U.S. government's blacklist.

Pegasus is a hacking tool that could be used to vacuum up a phone's contents remotely without the target having to fall into a phishing trap by clicking on a deceptive link. The spyware can even use the phone to remotely track and record its user.

The Biden administration added NSO to a Commerce Department list of restricted companies last November after a series of investigations revealed that Pegasus had been used by foreign governments against journalists and human rights activists. A forensic analysis from last July, for example, revealed that two people close to journalist Jamal Khashoggi were targeted by the spyware before and after his assassination in October 2018. Khashoggi, an exiled Saudi Arabian journalist and American resident, was murdered in Turkey by Saudi authorities. The NSO Group has said its technology "was not associated in any way with the heinous murder of Jamal Khashoggi."

NSO has invested hundreds of thousands of dollars in the past year in payments to lobbyists, public relations companies and law firms in the U.S., in the hope of reversing the Biden administration's November decision, according to public records filed under the Foreign Agent Registration Act and conversations with people familiar with the effort. These firms have approached members of the U.S. House and Senate, as well as various media outlets and think tanks across the U.S., on NSO's behalf.

Companies on the Commerce Department's blacklist, officially called the "Entity List," are not completely prohibited from doing business in the U.S. However, they are subject to licensing and other trade restrictions, making it more difficult to conduct business in the country or with Americans. NSO's business has reportedly suffered since the designation.

NSO is trying to get the matter raised during a meeting between U.S. President Joe Biden and Israeli Prime Minister Yair Lapid when the former visits Israel this week. In addition, NSO lobbyists unsuccessfully tried to set up a meeting between representatives of the company and U.S. National Security Adviser Jake Sullivan, but it did not take place.

Asked for comment, an NSO spokesperson declined to comment on the campaign but "thanked" Shomrim for publishing an article on its efforts, which he described as "supportive."

The American military contractor L3Harris also held talks to try to purchase NSO, with backing from the Defense Department, according to The New York Times. L3Harris has abandoned the effort, the paper said.

Placement on the Entity List is a serious sanction but less significant than being placed on the Specially Designated Nationals list. In the past, companies have won removal from the Entity List after settling charges with the U.S. government and promising reforms.

NSO said at the time of the U.S. administration's decision to add it to the list that it would work to have the move reversed. Public records show that the firm started recruiting various North American consultants even before it was blacklisted. In July last year, it hired the Pillsbury Winthrop Shaw Pittman law firm to advise it on tenders and various compliance requirements in the United States. The firm was initially hired for six months at a cost of about $75,000 per month. NSO continued to retain its services at least into the first half of 2022.

Pillsbury then hired strategic advisory group Chartwell for six months at a cost of $50,000 to $75,000 per month, according to public records. Chartwell met with representatives of the House Intelligence Committee, whose members called last year for more serious sanctions of NSO under the Magnitsky Act. The lobbying firm also approached, among others, Senators Mitt Romney, R-Utah, and Mike Rounds, R-S.D., as well as Reps. Tom Malinowski, D-N.J. and Mike Turner, R-Ohio. Romney, Rounds, Malinowsky and Turner did not respond to a request for comment. Chartwell has also reached out to various media outlets on behalf of NSO, and distributed material in which the company reiterated its assurances that it would investigate any misuse of its products.

In January 2022, the company hired the services of the Paul Hastings law firm for $10,000 a month. Hastings then had a call with Sen. Ron Wyden, D-Ore., on behalf of NSO. Moreover, less than four months ago, NSO signed an agreement with Washington, D.C.-based public relations and media consulting firm Bluelight Strategies, which has strong ties with the Democratic Party. The firm's managing director, Aaron Keyak, went on unpaid leave to join Biden's campaign staff in July 2020 and currently serves as the State Department's deputy special envoy to combat and monitor antisemitism. NSO paid Bluelight $100,000 in February for two months of work, with an option to extend the contract for $50,000 a month.

The contract between the parties, signed by NSO founder Shalev Hulio and Bluelight President Steve Rabinowitz, also allows Bluelight to hire a subconsultant at a cost of up to $20,000 a month. "NSO's tools provide limited and specifically targeted intelligence capabilities that have been repeatedly used for instance to help rescue scores of children from human trafficking as well as stopping numerous terrorist attacks," wrote Brian E. Finch, a partner at Pillsbury, to Rep. Malinowski

earlier this year. "NSO's Pegasus customers are solely law enforcement and intelligence agencies, and by far are mainly democratic allies of the U.S. and Israel in Western Europe," he added.

NSO Group "worries about improper or otherwise abusive use of its tools against journalists, human rights advocates, and others," wrote Finch. "NSO has strict protocols in place to avoid misuse of its products and to terminate access to such products in cases where misuse has been alleged." The attorney wrote that "NSO stands ready and willing to work with the U.S. government to identify and develop global standards that reflect shared values — protecting citizens of the United States and safeguarding human rights and privacy concerns."

In a different letter distributed by the firm this year, NSO states it has "developed a human rights governance compliance program," saying it would conduct a review of all users to see whether they might use the technology used to "violate human rights."

Pillsbury, Chartwell, Paul Hastings and Bluelight did not respond to a request for comment. The Department of Commerce did not respond to a request for comment.

NSO representatives have approached various people within the administration in order to get a clear understanding of what steps the company could and should take to be taken off the blacklist. They presented NSO's "kill switch," which allows the company to terminate contracts when their product is misused, and have warned that if NSO shuts down, Chinese and Russian companies will take its place. So far, the lobbying campaign has generated little response. NSO has not been told what it needs to do to remove itself from the list, according to the people familiar with the campaign.

EXHIBIT N

No. 21-1338

# In the Supreme Court of the United States

NSO Group Technologies Limited, et al.,
PETITIONERS

*v.*

WhatsApp Inc., et al.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

Brian H. Fletcher
  *Acting Solicitor General
    Counsel of Record*
Brian M. Boynton
  *Principal Deputy Assistant
    Attorney General*
Edwin S. Kneedler
  *Deputy Solicitor General*
Erica L. Ross
  *Assistant to the Solicitor
    General*
Sharon Swingle
Lewis S. Yelin
  *Attorneys*

Richard C. Visek
  *Acting Legal Adviser
  Department of State
  Washington, D.C. 20520*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTION PRESENTED**

Whether a nongovernmental corporation that does not come within the definition of a "foreign state" under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. 1603(a) and (b), may nevertheless be entitled to immunity from suit as a matter of federal common law based on conduct it claims to have engaged in as an agent of a foreign state.

(I)

## TABLE OF CONTENTS

Page

Statement ...................................................................................... 1
Discussion ..................................................................................... 6
   A.  The court of appeals correctly held that NSO is not
       immune from suit ............................................................. 7
   B.  Review by this Court is not warranted ......................... 14
Conclusion .................................................................................. 22

## TABLE OF AUTHORITIES

Cases:

*American Elec. Power Co.* v. *Connecticut*,
   564 U.S. 410 (2011).............................................................. 10
*Arrest Warrant of 11 Apr. 2000, In re*
   *(Dem. Rep. Congo* v. *Belg.)*, 2002 I.C.J. 3,
   2002 WL 32912040, No. 121 (Feb. 14, 2002)..................... 14
*Barnhart* v. *Peabody Coal Co.*, 537 U.S. 149 (2003)............. 9
*Broidy Capital Mgmt. LLC* v. *Muzin*:
     No. 19-cv-150, 2020 WL 1536350
       (D.D.C. Mar. 31, 2020), aff'd,
       12 F.4th 789 (D.C. Cir. 2021) .................................... 18
     12 F.4th 789 (D.C. Cir. 2021)............................. 14, 18, 19
*Butters* v. *Vance Int'l, Inc.*, 225 F.3d 462
   (4th Cir. 2000)...................................................... 5, 19, 20, 21
*Campbell-Ewald Co.* v. *Gomez*, 577 U.S. 153 (2016).......... 21
*Dutra Grp.* v. *Batterton*, 139 S. Ct. 2275 (2019) ................. 12
*Greenspan* v. *Crosbie*, No. 74-Civ.-4734,
   1976 WL 841 (S.D.N.Y. Nov. 23, 1976) ............................ 12
*Marx* v. *General Revenue Corp.*,
   568 U.S. 371 (2013)............................................................ 8, 9
*Pablo Star Ltd.* v. *Welsh Gov't*, 961 F.3d 555
   (2d Cir. 2020), cert. denied, 141 S. Ct. 1069 (2021)............ 6

(III)

IV

Cases—Continued:                                                    Page

*Republic of Arg.* v. *NML Capital, Ltd.*,
   573 U.S. 134 (2014)........................................................ 1, 2, 3
*Republic of Austria* v. *Altmann*, 541 U.S. 677 (2004) ......... 6
*Republic of Mex.* v. *Hoffman*, 324 U.S. 30 (1945) ................ 1
*Samantar* v. *Yousuf*, 560 U.S. 305 (2010) ................. *passim*
*Verlinden B. V.* v. *Central Bank of Nigeria*,
   461 U.S. 480 (1983)............................................................ 2, 6
*Yearsley* v. *W. A. Ross Constr. Co.*,
   309 U.S. 18 (1940) ......................................................... 20, 21
*Yousuf* v. *Samantar*, 699 F.3d 763 (4th Cir. 2012),
   cert. denied, 571 U.S. 1156 (2014) .................................... 21

Treaty and statutes:

United Nations Convention on Jurisdictional
   Immunities of States and Their Property, *opened*
   *for signature* Jan. 17, 2005, art. 2,
   ¶ 1(b)(iii), U.N. Doc. A/RES/59/38 .................................... 10
Foreign Sovereign Immunities Act of 1976,
28 U.S.C. 1330, 1602 *et seq.*...................................................... 1
   28 U.S.C. 1330(a) ................................................................. 2
   28 U.S.C. 1330(b) ................................................................. 2
   28 U.S.C. 1602...................................................................... 7
   28 U.S.C. 1603(a) ...................................................... 2, 8, 17
   28 U.S.C. 1603(b)...................................................... 2, 8, 9
   28 U.S.C. 1603(b)(1) ......................................................... 17
   28 U.S.C. 1603(b)(2) ......................................................... 17
   28 U.S.C. 1604...................................................................... 2
   28 U.S.C. 1605-1607............................................................ 2
   28 U.S.C. 1605(a)(2).................................................... 6, 12
   28 U.S.C. 1606...................................................................... 2
   28 U.S.C. 1609...................................................................... 3

V

Statutes—Continued:                                                    Page

    28 U.S.C. 1610.......................................................................3

    28 U.S.C. 1610(a) ..............................................................13

    28 U.S.C. 1610(b)...............................................................13

    28 U.S.C. 1611.......................................................................3

Miscellaneous:

    *Addition of Certain Entities to the Entity List,*
      86 Fed. Reg. 60,759 (Nov. 4, 2021) ...................................15

    122 Cong. Rec. 17,465 (1976) ...................................................8

    H.R. Rep. No. 1487, 94th Cong., 2d Sess. (1976).................8

    Press Release, U.S. Department of Commerce, *Com-*
      *merce Adds NSO Group and Other Foreign Com-*
      *panies to Entity List for Malicious Cyber Activi-*
      *ties* (Nov. 3, 2021), https://www.commerce.
      gov/news/press-releases/2021/11/commerce-adds-
      nso-group-and-other-foreign-companies-entity-list .......16

    Restatement (Second) of the Foreign Relations Law
      of the United States (1965) ..................................................4

    S. Rep. No. 1310, 94th Cong., 2d Sess. (1976)......................8

# In the Supreme Court of the United States

————

No. 21-1338

NSO GROUP TECHNOLOGIES LIMITED, ET AL.,
PETITIONERS

*v.*

WHATSAPP INC., ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

————

This brief is submitted in response to the Court's order inviting the Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

## STATEMENT

1. For much of our Nation's history, principles adopted by the Executive Branch, which were binding on the courts, determined the immunity of foreign states and their officials in civil suits in courts of the United States. See, *e.g.*, *Republic of Mex.* v. *Hoffman*, 324 U.S. 30, 34-36 (1945). In 1976, Congress replaced that "executive-driven * * * immunity regime," *Republic of Arg.* v. *NML Capital, Ltd.*, 573 U.S. 134, 141 (2014), with the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. 1330, 1602 *et seq.* The FSIA provides a "comprehensive set of legal standards governing

(1)

2

claims of immunity in every civil action against a foreign state." *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 488 (1983); see, *e.g.*, *NML Capital*, 573 U.S. at 141-143.

The FSIA defines a "foreign state" to include not only the state itself, but also "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. 1603(a). The statute defines an "agency or instrumentality of a foreign state" as "any entity—"

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. 1603(b).

The FSIA provides (subject to certain international agreements) that a "foreign state shall be immune" from suit, except as provided in Sections 1605 through 1607. 28 U.S.C. 1604. If a suit comes within a statutory exception to foreign sovereign immunity, the FSIA provides for subject-matter jurisdiction in federal district court, 28 U.S.C. 1330(a), as well as for personal jurisdiction over the foreign state if service has been made in accordance with the FSIA's provisions, 28 U.S.C. 1330(b). When a statutory exception to immunity applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. 1606. The FSIA also

3

makes foreign-state-owned property in the United
States "immune from attachment[,] arrest[,] and execu-
tion," 28 U.S.C. 1609, subject to exceptions that are
"narrower" than those applicable to jurisdictional im-
munity. *NML Capital*, 573 U.S. at 142; see 28 U.S.C.
1610, 1611.

In *Samantar* v. *Yousuf*, 560 U.S. 305 (2010), this
Court held that the FSIA did not displace the common-
law immunity regime that applies to individual officials
of a foreign state. *Id.* at 323-325.  Under that common-
law framework, if the State Department informs a court
that a foreign official is entitled to immunity in a partic-
ular suit, "the district court surrender[s] its jurisdic-
tion." *Id*. at 311 (describing pre-FSIA practice).  If the
State Department does not participate in the litigation,
the court determines whether the official is immune by
applying principles articulated by the Executive
Branch. *Id*. at 311-312 (same).

2. Petitioner NSO Group Technologies Ltd. (NSO)
is an Israeli company that produces surveillance tech-
nology, which it licenses to governments and govern-
ment agencies. Pet. App. 3.  Respondent WhatsApp
provides a communications service that allows its users
to send encrypted communications. *Id*. at 4.

In October 2019, WhatsApp sued NSO in the U.S.
District Court for the Northern District of California,
alleging that NSO had unlawfully used a spyware pro-
gram called Pegasus to bypass WhatsApp's encryption
and to install malicious code on the devices of WhatsApp
users, which allowed NSO's customers to access infor-
mation on the targeted WhatsApp users' devices.  Pet.
App. 4; see *id*. at 23-24.  WhatsApp asserted violations
of federal and state law, and it sought injunctive relief
and damages. *Id*. at 4.

4

NSO moved to dismiss the suit on immunity grounds. Pet. App. 32. The parties agreed that as a private foreign entity, NSO did not "qualify as [a] foreign state[]" and could not "directly avail" itself of sovereign immunity under the FSIA. *Ibid.* But NSO contended that it was immune because it was a contractor of foreign governments and the suit involves conduct NSO allegedly undertook as an agent of those sovereigns. *Ibid.* The district court recognized that NSO's argument implicated two different doctrines, *ibid.*, and it determined that neither one applied, *id.* at 33-41.

First, the district court held that NSO is not immune under the common-law doctrine of foreign official immunity, which "potentially applies to the acts of foreign officials not covered by the FSIA." Pet. App. 33 (citing *Samantar*, 560 U.S. at 311); see *id.* at 33-36. NSO argued that "a foreign sovereign's private agent[]" enjoys "conduct-based" immunity "when the agent acts on behalf of the state." *Id.* at 34. The court determined that in the absence of a suggestion of immunity by the State Department, it should assess NSO's contention under Section 66(f) of the Restatement (Second) of the Foreign Relations Law of the United States (1965) (Second Restatement). Pet. App. 34. The court determined, however, that NSO would not be entitled to conduct-based immunity under the Second Restatement. *Id.* at 35-36.[1]

---

[1] The Second Restatement provides that a foreign state's immunity extends to "any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." Second Restatement § 66(f) (emphasis omitted). This Court has not decided whether the Second Restatement "correctly" articulates common-law official immunity

5

Second, the district court held that NSO is not entitled to "derivative sovereign immunity." Pet. App. 37. The court explained that in *Butters* v. *Vance Int'l, Inc.*, 225 F.3d 462 (2000), the Fourth Circuit relied on the FSIA to recognize such an immunity in a suit against a U.S. company acting within the scope of an agency relationship with a foreign sovereign. *Id.* at 466; see Pet. App. 37-38. But the district court declined to follow the Fourth Circuit because the Ninth Circuit has not accepted a derivative foreign sovereign immunity doctrine. Pet. App. 38-40. The district court further explained that even if it were to apply *Butters* "as persuasive authority," NSO would not "meet its standard" because NSO was "not incorporated or formed in the United States." *Id.* at 40; see *ibid.* ("None of the other cases cited by [NSO] involve the application of derivative sovereign immunity to foreign entities.").

3. The court of appeals affirmed on alternative grounds, but likewise rejected NSO's argument that it is protected by a common-law immunity comparable to the immunity for foreign officials. Pet. App. 1-19. The court held that the FSIA "categorically forecloses extending immunity to any entity that falls outside the FSIA's broad definition of 'foreign state.'" *Id.* at 2-3. The court stated that "the FSIA's text, purpose, and history demonstrate that Congress displaced common-law sovereign immunity doctrine as it relates to entities." *Id.* at 3.

---

principles. *Samantar*, 560 U.S. at 321 n.15. The United States, however, has taken the position that "[r]eliance on the Second Restatement's provisions on foreign-official immunity as a conclusive statement of current law is misplaced." U.S. Amicus Br. at 14, *Mutond* v. *Lewis*, 141 S. Ct. 156 (2020) (No. 19-185).

6

The court of appeals reasoned that "[i]n creating a 'comprehensive set of legal standards governing claims of immunity' * * * , Congress defined the types of foreign entities—including, specifically, foreign corporate entities—that may claim immunity." Pet. App. 14 (quoting *Verlinden B. V.*, 461 U.S. at 488) (footnote omitted). The court concluded that the statute's specific delineation of the entities entitled to foreign sovereign immunity "forecloses immunity for any entity falling outside" the FSIA definition. *Id.* at 15.

The court of appeals found it "odd * * * to think that by not including a category of entity within its definition of 'foreign state,' Congress intended for such entities to have the ability to seek immunity outside its 'comprehensive' statutory scheme." Pet. App. 14 (quoting *Republic of Austria* v. *Altmann*, 541 U.S. 677, 699 (2004)). The court also observed that extending the conduct-based immunity for individual officials to foreign private entities would be incongruous because it could give them immunity for some conduct, such as certain commercial conduct, for which foreign state enterprises would be subject to suit. *Id.* at 16 (discussing *Pablo Star Ltd.* v. *Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020), cert. denied, 141 S. Ct. 1069 (2021); 28 U.S.C. 1605(a)(2)). The court further contrasted what it regarded as Congress's comprehensive regulation of immunity for entities with its silence as to foreign officials, emphasizing that this Court had relied on that silence in *Samantar* in concluding that the FSIA did not displace the common-law immunity of individual foreign officials. *Id.* at 12.

### DISCUSSION

The court of appeals held that the FSIA entirely forecloses the adoption of any form of immunity under the common law for an entity that acted as an agent of

a foreign state.  The United States is not prepared at this time to endorse that categorical holding, which is not necessary to resolve this case—and which would foreclose the Executive Branch from recognizing the propriety of an immunity in a particular context in the future even if such a recognition were found to be warranted, including by developments in international law or practice in foreign courts.

Nonetheless, the court of appeals reached the correct result in this case:  Whether or not common-law immunity for an entity acting as the agent of a foreign state might be appropriate in some circumstances, NSO plainly is not entitled to immunity here.  The State Department has not filed a suggestion of immunity in this case.  There is no established practice—or even a single prior instance—of the State Department suggesting an immunity for a private entity acting as an agent of a foreign state.  And no foreign state has supported NSO's claim to immunity; indeed, NSO has not even identified the states for which it claims to have acted as an agent.

Nor does the court of appeals' decision otherwise warrant review.  It does not conflict with any decision of this Court.  The question presented has not divided the courts of appeals—indeed, it has seldom arisen at all.  And this unusual case would be a poor vehicle for considering that question in any event.  The petition for a writ of certiorari should be denied.

**A. The Court Of Appeals Correctly Held That NSO Is Not Immune From Suit**

1. The FSIA provides that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity" with the statute.  28 U.S.C. 1602.  The FSIA defines a "foreign state" to include not just the "body politic" itself,

8

but also the state's agencies and instrumentalities. *Samantar* v. *Yousuf*, 560 U.S. 305, 314 (2010); see 28 U.S.C. 1603(a). NSO acknowledges that it does not satisfy that statutory definition because it is neither an organ of a foreign state nor majority owned by a foreign state. Pet. App. 32; see 28 U.S.C. 1603(b). But NSO contends that it is nonetheless entitled to a common-law immunity, which it asserts would be analogous to the common-law immunity of foreign officials, for actions NSO allegedly took as an agent of foreign governments.[2]

The court of appeals rejected that contention, concluding that the FSIA's specification of the entities (including corporations) that have a sufficient nexus to a foreign state to be covered by the statute's conferral of sovereign immunity categorically forecloses recognition of any common-law immunity for any other entities. The FSIA's grant of immunity to entities in those specified circumstances could be understood to create such a "negative implication" that immunity for entities is "unavailable in any other circumstances." *Marx* v. *General Revenue Corp.*, 568 U.S. 371, 381 (2013). That negative implication also finds some support in the FSIA's legislative history: Both the House and Senate Reports reprinted a section-by-section analysis prepared by the Departments of State and Justice stating that "[a]n entity which does not fall within the definition of Sections 1603(a) or (b) would not be entitled to sovereign immunity in any case before a Federal or State court." H.R. Rep. No. 1487, 94th Cong., 2d Sess. 15 (1976); S. Rep. No. 1310, 94th Cong., 2d Sess. 15 (1976); 122 Cong. Rec. 17,465, 17,466 (1976).

---

[2] The United States takes no position on whether NSO in fact acted as such an agent.

9

This Court has cautioned, however, that "[t]he force of any negative implication" to be drawn from a statute "depends on context." *Marx*, 568 U.S. at 381. In particular, the presumption that Congress's inclusion of some circumstances implies the exclusion of others "does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'" *Ibid.* (quoting *Barnhart* v. *Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). And here, there is reason to question whether Congress, in enacting the FSIA, considered and intended to categorically foreclose any immunity for an entity that acts as an agent of a foreign state, but that does not meet the FSIA's definition of an "agency or instrumentality" of a foreign state.

The FSIA's text and the legislative history cited above specifically address only entities that Congress determined should be covered by a foreign state's *sovereign* immunity because they are so closely connected with the foreign state that they are deemed to be part of the state itself for these purposes. That is a *status-based* determination: An entity that satisfies the "agency or instrumentality" definition in 28 U.S.C. 1603(b) is treated as a foreign state for purposes of immunity from suit under the FSIA, regardless of the involvement (or non-involvement) of the foreign state itself in the events giving rise to the suit.

The question whether an entity should be treated as a foreign state for sovereign immunity purposes under the FSIA is distinct from the question whether a more limited form of *conduct-based* immunity could be recognized for specific acts undertaken on behalf of a foreign state by an entity that does not meet the statutory definition of an "agency or instrumentality." And neither the court of appeals nor WhatsApp has pointed to any

10

specific textual or contextual evidence that Congress considered that specific issue in enacting the FSIA. Cf. *American Elec. Power Co.* v. *Connecticut*, 564 U.S. 410, 424 (2011) ("The test for whether congressional legislation excludes the declaration of federal common law" is "whether the statute 'speaks directly to the question' at issue.") (brackets and citation omitted).

2. Viewed in that light, the FSIA does not necessarily resolve the question whether or to what extent a conduct-based immunity could be recognized for such an entity under the common law—much as this Court has interpreted the FSIA to leave conduct-based immunity for individual foreign officials to be governed by the pre-FSIA common-law regime. See *Samantar*, 560 U.S. at 311-313. There is, however, a significant difference between the immunity for individual officials addressed in *Samantar* and any comparable immunity for entities: Before the FSIA, the State Department and the courts had recognized a conduct-based immunity for "individual foreign officials." *Id.* at 312. In contrast, NSO has not identified—and the United States is not aware of—any history of State Department suggestions of immunity on behalf of private entities acting as agents of foreign states. Nor has any United States court "ever applied foreign official immunity to a foreign private corporation under the common law." Pet. App. 18.[3]

---

   [3] NSO thus errs in asserting that the United States has already endorsed what NSO describes as an international "consensus" that private entities enjoy conduct-based immunity from suit when they "'are entitled to perform and are actually performing acts in the exercise of sovereign authority of the State.'" Pet. 7 (quoting United Nations Convention on Jurisdictional Immunities of States and Their Property (Immunities Convention), art. 2, ¶ 1(b)(iii), *opened*

11

Unlike in *Samantar*, therefore, the question here is not whether the FSIA should be read to displace a common-law immunity that was recognized at the time of the statute's enactment.  Instead, it is whether the FSIA should be read to foreclose the State Department (and the courts) from recognizing an immunity for an entity acting as an agent of a foreign state now or in the future.  In deciding whether to recognize an immunity for an entity acting as the agent of a foreign state, the State Department could consider such factors as the nature of the conduct involved; the purpose and scope of the possible immunity; relevant practice in other nations; international-law principles; any assertion by the foreign state involved that the entity was its agent and should in its view be immune; and the foreign policy interests of the United States.

In addition, Congress's enactment of the FSIA means that before recognizing any conduct-based immunity for entities, the State Department and then the courts would at a minimum need to carefully consider the statute's text, structure, context, and purpose.

---

*for signature* Jan. 17, 2005, U.N. Doc. RES/59/38).  The Immunities Convention on which NSO relies has not entered into force, and the United States has neither signed nor ratified it.  And contrary to NSO's broad assertion (Pet. 7), in the Statement of Interest NSO cites, the United States stated only that the Immunities Convention is "consistent with customary international law *to the extent* that it clothes *individual officials* with the immunity of the state" for acts taken in an official capacity.  U.S. Statement of Interest at 21, *Matar* v. *Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007) (No. 05-10270) (emphasis added).  In addition, although a few foreign courts have addressed whether a private entity acting as an agent of the state can benefit from immunity, there is not a well-developed international practice on affording immunity to private entities acting as agents of a foreign state.

12

Even where Congress has not completely displaced the common law in a particular area, its "legislative enactments" may supply instructive "policy guidance" for any future consideration of an immunity. *Dutra Grp.* v. *Batterton*, 139 S. Ct. 2275, 2278 (2019) (citation omitted).

Those considerations—including the implications to be drawn from the FSIA—may not lend themselves to a uniform answer to the question whether entities that do not satisfy the FSIA's definition of an agency or instrumentality of a foreign state can nonetheless claim a conduct-based immunity similar to that available to individual foreign officials.  For example, the State Department has recognized the immunity of foreign officials in suits involving commercial acts for which a foreign state would not be immune under the FSIA. *Greenspan* v. *Crosbie*, No. 74-Civ.-4734, 1976 WL 841, at *1-*2 (S.D.N.Y. Nov. 23, 1976) (pre-FSIA suit); see 28 U.S.C. 1605(a)(2).  If a private entity (such as one in which the state owned only 49% of the shares) were similarly entitled to conduct-based immunity when acting as an agent for a foreign state in a commercial transaction, it would enjoy an immunity Congress chose to deny entities that are agencies and instrumentalities of the state itself.  Such a result could create an incentive for foreign states to attempt to use private entities to undertake activities for which their agencies or instrumentalities would be subject to suit under the FSIA.[4]

---

[4] In some litigation, it might be possible to substitute the foreign state for the private entity, or to deem the suit as being against the foreign state. Cf. *Samantar*, 560 U.S. at 325 ("[I]t may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest.").  But other issues might then arise. The

13

In contrast, a case in which a private entity acted as the agent of a foreign state in connection with the exercise of certain core sovereign authority may not raise similar issues in relation to the FSIA.  And in the view of the United States, the FSIA need not be read to entirely foreclose the recognition of such an immunity in the future if the Executive—after considering the nature of the entity and its role as an agent and other relevant considerations such as those identified above—determined that a suggestion of immunity was appropriate in a particular context or circumstance.

3.  There is no occasion in this case, however, for the Court to consider whether a private corporation or other entity acting as an agent of a foreign state could be protected by some form of immunity outside the FSIA in certain circumstances, because the prerequisites for any such immunity are not present here.  Under the common law, courts surrendered their jurisdiction when the State Department filed a suggestion of immunity, or the courts applied the established principles accepted by the State Department if the United States did not participate in the case.  See *Samantar*, 560 U.S. at 311-312.  Here, however, the State Department has not filed a suggestion of immunity for NSO, and there are no established principles accepted by the State Department affirmatively recognizing a conduct-

_____

FSIA permits execution against a foreign state's assets in more limited circumstances than it does against the assets of a foreign state's agencies or instrumentalities.  Compare 28 U.S.C. 1610(a), with 28 U.S.C. 1610(b).  Thus, the remedies available to a prevailing party in a suit against a private entity in such circumstances would be significantly circumscribed as compared to those available in a suit against a foreign state agency or instrumentality.

14

based immunity for a private entity acting as an agent of a foreign state.

In addition, whether a foreign government has requested that the United States recognize a defendant's immunity can be an important consideration for the Executive in determining whether a suggestion of immunity would be appropriate. See *Broidy Capital Mgmt. LLC* v. *Muzin*, 12 F.4th 789, 800 (D.C. Cir. 2021); cf. *In re Arrest Warrant of 11 Apr. 2000 (Dem. Rep. Congo* v. *Belg.)*, 2002 I.C.J. 3, 2002 WL 32912040, at *25-*26, No. 121 (Feb. 14, 2002). But despite NSO's claim to have acted on behalf of multiple foreign states, no foreign government has requested that the State Department recognize an immunity of NSO from this suit on the rationale that NSO was acting as its agent, or on any other basis.

**B. Review By This Court Is Not Warranted**

The decision below does not warrant this Court's review for multiple independent reasons.

1. First, this case would be an exceptionally poor vehicle in which to consider the question NSO seeks to raise. As just explained, the prerequisites for recognition of a common-law conduct-based immunity are not present in this case, whether or not recognition of such an immunity for a private entity that allegedly acted as the agent of a foreign government could ever be consistent with the FSIA. In the government's view, the Court should take up that important and difficult question only if and when, at a minimum, the United States has supported a claim of immunity on behalf of an entity and articulated the principles on which it rests. That would allow the Court to address the issue based on the considered judgment of the Executive Branch that recognition of an immunity would be appropriate—

15

rather than by asking in the abstract whether the FSIA should be read to categorically displace any such common-law immunity, without regard to its contours or justification.

At a minimum, the Court should not take up the question presented here, in a case where neither the United States nor any foreign sovereign has supported NSO's claim to immunity; where NSO itself has not even identified the foreign sovereigns for which it claims to have acted as an agent; and where the record thus includes scant details about the nature and contours of those purported agency relationships.

We note as well that while the appeal in this case was pending, the United States added NSO to the "Entity List," a list of "entities for which there is reasonable cause to believe, based on specific and articulable facts, that the entities have been involved, are involved, or pose a significant risk of being or becoming involved in activities contrary to the national security or foreign policy interests of the United States." *Addition of Certain Entities to the Entity List*, 86 Fed. Reg. 60,759, 60,759 (Nov. 4, 2021). The United States determined that NSO met that standard based on information that it "developed and supplied spyware to foreign governments that used this tool to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers." *Ibid.* The United States noted its commitment to using available policy tools to "hold companies accountable that develop, traffic, or use technologies to conduct malicious activities that threaten the cybersecurity of members of civil society, dissidents, government officials, and organizations

16

here and abroad."[5]  That NSO has been the subject of such a determination for the very type of activities allegedly at issue in this case provides a further complication that distinguishes NSO from other entities that might seek a conduct-based immunity in the future.[6]

2. NSO contends that review is warranted because the court of appeals' reliance on the FSIA in rejecting its claim of immunity is inconsistent with this Court's decision in *Samantar*.  See Pet. 10-11, 19-21; Pet. Reply Br. 11.  That is incorrect.

According to NSO, *Samantar* held that "the FSIA does not 'supersede' the common-law with respect to defendants other than 'foreign states.'"  Pet. 19 (quoting *Samantar*, 560 U.S. at 325); see Pet. 4.  Because a private entity acting as an agent of a foreign state is not a "foreign state" within the meaning of the FSIA, NSO contends, the court of appeals' rejection of NSO's claim of common-law "conduct-based immunity" is inconsistent with *Samantar*.  Pet. 10-11, 19-21.

---

[5] Press Release, U.S. Department of Commerce, *Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities* (Nov. 3, 2021), https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list.

[6] NSO contends (Pet. 14-18; Pet. Reply Br. 5-7) that the court of appeals' decision threatens the United States' ability to rely on private contractors abroad.  The United States does not agree.  This case does not involve the question whether the United States can argue that a contractor should be sheltered by some form of immunity or a government-contractor defense to liability (see p. 20 n.7, *infra*) in an adjudication in a foreign tribunal pursuant to applicable law.  And as addressed above, it does not involve a situation in which the United States, taking account of relevant considerations, has determined that a private entity acting as an agent of a foreign state should be protected by some form of conduct-based immunity in a particular context.

17

*Samantar* did not address the specific issue presented here. "The question" the Court faced in that case was "whether an *individual* sued for conduct undertaken in his official capacity is a 'foreign state' within the meaning of the Act." 560 U.S. at 314 (emphasis added). In holding that a foreign official is not a foreign state, the Court rejected the contention that an individual official qualifies as an "agency or instrumentality" of a foreign state. *Id.* at 315. That was because the FSIA defines an "agency or instrumentality" using terms like "'entity,'" "'separate legal person,'" and "'organ'" that "simply do not evidence the intent to include individual officials." *Id.* at 315-316 (quoting 28 U.S.C. 1603(b)(1) and (2)) (emphasis omitted). The Court also rejected the argument that the FSIA's definition of "foreign state" encompasses individual officials because it "sets out a nonexhaustive list that 'includes' political subdivisions and agencies or instrumentalities but is not so limited." *Id.* at 317 (quoting 28 U.S.C. 1603(a)). The Court found that contention flawed, in part "because the types of defendants listed [in the statute] are all entities." *Ibid. Samantar*'s textual analysis thus turned in substantial part on the distinction between natural persons and entities.

In light of that distinction, *Samantar* determined that suits against individual officials would continue to be governed by the common law. See 560 U.S. at 311-313, 323-325. "Although Congress clearly intended to supersede the common-law regime for claims against foreign states," the Court found "nothing in the statute's origin or aims to indicate that Congress similarly wanted to codify the law of foreign official immunity." *Id.* at 325.

18

*Samantar* thus determined the FSIA's effect on claims of immunity from suit by foreign states (which are governed exclusively by the statute) and by individual officials (which remain governed by the common-law). But the Court did not address the distinct category of claims presented here—claims to conduct-based immunity by entities that do not qualify as agencies or instrumentalities of a foreign state. Whether or not the court of appeals correctly interpreted the FSIA to foreclose such claims, its holding does not conflict with *Samantar*.

3. NSO also errs in asserting (Pet. 11-13) that the decision below conflicts with decisions of other courts of appeals. Neither of the decisions on which NSO relies (*ibid.*) holds that private entities may invoke common-law immunity with respect to actions taken on behalf of foreign states.

a. NSO contends (Pet. 12-13) that the court of appeals' decision conflicts with the D.C. Circuit's decision in *Broidy Capital Management*, *supra*. In *Broidy*, the plaintiffs alleged that the defendants—three individuals and a company formed by two of them—hacked into the plaintiffs' computers and disseminated stolen information in an attempt to discredit the plaintiffs' public criticisms of Qatar. *Broidy Capital Mgmt. LLC* v. *Muzin*, No. 19-cv-150, 2020 WL 1536350, at *1 (D.D.C. Mar. 31, 2020), aff'd, 12 F.4th 789 (D.C. Cir. 2021); see *Broidy*, 12 F.4th at 792. The court of appeals affirmed the district court's order rejecting the defendants' claim that although the FSIA "by its term does not apply," "residual common-law immunity protects them as agents of Qatar acting at its behest." *Broidy*, 12 F.4th at 792. In so holding, the D.C. Circuit did not separately address whether a private entity acting as an agent of a

19

foreign state could be entitled to immunity.  Instead, it rejected the defendants' immunity argument because it was not supported by any principles accepted by the State Department.  *Id*. at 799-802.

The D.C. Circuit explained that because the State Department had not filed a suggestion of immunity, the court would look to "the State Department's past practice."  *Broidy*, 12 F.4th at 799.  But the court determined that "[p]ast expressions of State Department policy do not support immunity for private individuals in the defendants' circumstances."  *Id.* at 800.  In other litigation, the State Department had indicated that a foreign state's request for immunity is an important consideration in the immunity analysis.  *Ibid*.  But in *Broidy*, Qatar had not requested immunity on the defendants' behalf.  *Ibid.*  And the contract between Qatar and the company—"the only written agreement between a defendant and Qatar that [wa]s available for [the court's] review—expressly disclaim[ed] the creation of an agency relationship."  *Ibid*.  The court concluded that no State Department policy supported immunity for private parties with that type of limited relationship with a foreign state.  *Id*. at 801.

Because *Broidy* did not specifically address whether a common-law immunity should be recognized for a private entity acting as an agent of a foreign state, the decision is best construed to hold that the company-defendant in that case was not entitled to a common-law immunity even assuming *arguendo* that such an immunity would be available to private entities.  Nothing in the decision below conflicts with that holding.

b. The Fourth Circuit's pre-*Samantar* decision in *Butters* v. *Vance Int'l, Inc.*, 225 F.3d 462 (2000), also does not create a conflict warranting this Court's

20

review.  In *Butters*, a former employee of Vance Inter-
national, an American security services company, sued
the company for gender discrimination.  *Id.* at 464.
Vance argued that it was entitled to "derivative" foreign
sovereign immunity under the FSIA because its em-
ployment actions were taken at the behest of the King-
dom of Saudi Arabia.  *Id.* at 465.  The Fourth Circuit
affirmed the district court's judgment for Vance on that
ground.  *Id.* at 464; see *id.* at 465-466.

NSO's reliance on *Butters* is misplaced.  NSO con-
tends (Pet. 10) that, like Vance, it may be entitled to
"common-law sovereign immunity in U.S. courts."  See
Pet. i.  But *Butters* did not hold that Vance was entitled
to a common-law immunity.  Instead, it held that Vance
was entitled to immunity "under the Foreign Sovereign
Immunities Act."  *Butters*, 225 F.3d at 464.  Indeed, the
court considered and rejected the plaintiff's contention
that Vance was not immune from suit because its ac-
tions came within the FSIA's commercial-activity ex-
ception.  *Id.* at 465.  Although *Butters*' holding is incon-
sistent with the decision of the court of appeals in this
case (Pet. App. 17) that an entity not identified in the
FSIA may not claim immunity under the statute, that
disagreement does not implicate the question pre-
sented.  NSO acknowledges that it is not entitled to im-
munity under the FSIA, *id.* at 32; it seeks this Court's
consideration only of whether the FSIA "displaces
common-law immunity for entities"—*i.e.*, whether it can
obtain immunity *outside* the statute. Pet. i.  The Fourth
Circuit did not consider that issue in *Butters*.[7]

_____

[7]  In *Butters*, the Fourth Circuit relied in part on an extension of
the domestic *Yearsley* doctrine.  225 F.3d at 466; see *Yearsley* v.
*W. A. Ross Constr. Co.*, 309 U.S. 18 (1940).  Under that doctrine, a
contractor cannot be held liable for exercising authority "validly

21

NSO nevertheless asserts that *Butters* is "instructive" in considering questions of common-law immunity. Pet. Reply Br. 4 (quoting *Yousuf* v. *Samantar*, 699 F.3d 763, 774 (4th Cir. 2012), cert. denied, 571 U.S. 1156 (2014)). But the court of appeals decision on which it relies did not cite *Butters*, and it concerned common-law conduct-based immunity for individual officials, not entities. See *Yousuf*, 699 F.3d at 774. At a minimum, the different content and sources of the derivative sovereign immunity and common-law conduct-based immunity doctrines undermine NSO's assertion of a direct disagreement between *Butters* and the decision below that would warrant this Court's review.

---

conferred" by the United States. *Yearsley*, 309 U.S. at 20; see *id.* at 20-21. Although the doctrine is sometimes referred to as "derivative sovereign immunity," *e.g.*, *Butters*, 225 F.3d at 466, that is a misnomer because the doctrine provides a merits defense; federal contractors do not "share the Government's unqualified immunity from liability and litigation," *Campbell-Ewald Co.* v. *Gomez*, 577 U.S. 153, 166 (2016). This case does not provide an opportunity for the Court to consider whether a private entity acting as an agent of a foreign state may be entitled to prevail on the merits of a claim against it involving conduct that was required or authorized, and acknowledged, by the foreign state.

22

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted.

BRIAN H. FLETCHER
  *Acting Solicitor General*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
ERICA L. ROSS
  *Assistant to the Solicitor*
  *General*

RICHARD C. VISEK                    SHARON SWINGLE
  *Acting Legal Adviser*           LEWIS S. YELIN
  *Department of State*              *Attorneys*

NOVEMBER 2022

No. 21-1338

IN THE SUPREME COURT OF THE UNITED STATES

_____

NSO GROUP TECHNOLOGIES LIMITED, ET AL., PETITIONERS

v.

WHATSAPP, INC., ET AL.

_____

**CERTIFICATE OF SERVICE**

It is hereby certified that all parties required to be served have been served with copies of the **BRIEF FOR THE UNITED STATES AS AMICUS CURIAE,** via email and by first-class mail, postage prepaid, this 21ST day of November, 2022.

**[See Attached Service List]**

**As required by Supreme Court Rule 33.1(h), I certify that the document <u>5851</u> words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d). I declare under penalty of perjury that the foregoing is true and correct. Executed on <u>November 21, 2022</u>.**

_____

**Elizabeth B. Prelogar**

<u>**Solicitor General**</u>

<u>**Counsel of Record**</u>

<u>**Department of Justice**</u>

<u>**Washington, D.C. 20530-0001**</u>

**(202) 514-2218**

**November 21, 2022**

Due to the continuing delay in receiving incoming mail at the Department of Justice, in addition to mailing your brief via first-class mail, we would appreciate a fax or email copy of your brief. If that is acceptable to you, please fax your brief to Charlene Goodwin, Supervisor, Case Management Specialist, Office of the Solicitor General, at (202) 514-8844, or email at SupremeCtBriefs@USDOJ.gov. Ms. Goodwin's phone number is (202) 514-2218. Thank you for your consideration of this request.

21-1338
NSO GROUP TECHNOLOGIES LIMITED, ET AL.
WHATSWAPP INC., ET AL.


JEFFREY S. BUCHOLTZ
KING & SPALDING LLP
1700 PENNSYLVANIA AVENUE, NW
SUITE 900
WASHINGTON, DC 20006
202-737-0500
JBUCHOLTZ@KSLAW.COM

MICHAEL R. DREEBEN
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006
2023835400
MDREEBEN@OMM.COM

EXHIBIT O


This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/head-of-israeli-cyber-firm-nso-group-reaffirms-company-commitment-to-spyware-11674738269

◆ WSJ NEWS EXCLUSIVE

# Head of Israeli Cyber Firm NSO Group Reaffirms Company Commitment to Spyware

Yaron Shohat acknowledges mistakes but defends the technology as vital

*By Byron Tau* Follow *and Dustin Volz* Follow

Jan. 26, 2023 9:00 am ET

WASHINGTON—Embattled Israeli technology firm NSO Group acknowledged that its clients had sometimes misused the company's high-powered hacking tools but defended the need to give law-enforcement and intelligence agencies the ability to digitally break into and monitor smartphones.

In his first media interview since taking over as chief executive in 2022, Yaron Shohat said NSO Group has lost customers since the Biden administration levied stiff measures against the company in late 2021, but has stabilized itself financially and recently attracted new deals. Mr. Shohat didn't specify how many customers NSO Group currently has but said it was around a few dozen.

"NSO products are in high demand, and I really believe this kind of technology is necessary for any law-enforcement agency or intelligence agency," he said.

Mr. Shohat, 52, said NSO Group was committed to its core business of supplying governments around the world who are allies of the U.S. and Israel with hacking tools despite recent struggles that have forced the company to downsize.

The Wall Street Journal and others last year reported that NSO had been considering a pivot to cyber defense or other markets, but Mr. Shohat said the company is now committed to its core Pegasus spyware product.

Advertisement - Scroll to Continue

"NSO is in the business of cyber intelligence," he said. "That's the focus. That's my mission, to make sure that our products are the best in the market."

Unlike most cyber intrusion methods, Pegasus allows users to infiltrate phones using "zero click" malware that doesn't require a target to click on any link or attachment. Once installed, Pegasus can turn the smartphone into a silent spying device by gaining access to its files, messages, microphone and camera, according to researchers. Such tools are considered rare, expensive and powerful, though Apple Inc. and others have taken steps to interfere with their deployment.

Independent security researchers have said they have found evidence of NSO Group's Pegasus spyware on devices belonging to politicians, human-rights

activists, journalists and other high-profile people in more than a dozen countries over the past several years. The U.S. government made a similar assessment when it blacklisted NSO Group in 2021.

Mr. Shohat said NSO Group had terminated 10 customers because of alleged misuse of its technology, adding that the spyware vendor had learned lessons from those experiences. He didn't name the customers.

Advertisement - Scroll to Continue

"I will not tell you that we never had mistakes, but we act responsibly," he said. "We make sure that all of our customers understand what abuse means; understand what are the legitimate use cases for the tool."



NSO Group is facing legal challenges from American tech companies in U.S. federal court. Photo: AMIR COHEN/REUTERS

Mr. Shohat said NSO's customer base now consists largely of members of the U.S.-led North Atlantic Treaty Organization and other allies of the U.S. and Israel. He declined to say whether all of NSO's clients were democracies, but said "all the customers or countries that the U.S. would sell weapons to, and all of them according to the regulation and the law."

He said Saudi Arabia isn't a current customer but refused to discuss any other specific country.

John Scott-Railton, a senior researcher at Citizen Lab, a cyber-research group at the University of Toronto that has closely monitored NSO Group, dismissed the idea that selling Pegasus, even to allies, was the same as other types of weapons exports.

Advertisement - Scroll to Continue



"If I went around selling ICBMs to all the countries that the U.S. sells various weapons to, I'd imagine the U.S. would be pretty upset, too," Mr. Scott-Railton said. "Pegasus is a cyber weapon with no logical limitation on range."

NSO Group, founded in 2010 by three Israelis, has found itself at the center of a global debate about the selling of cyberintelligence capabilities that give governments tools to remotely break into smartphones and extract data from them.

A series of articles published by a global consortium of journalism organizations in 2021 alleged that NSO Group's Pegasus has been used by dozens of law-enforcement and intelligence customers globally to target and break into cellphones belonging to politicians, human-rights activists and journalists.

NSO Group has disputed the list of phone numbers said to include targets of Pegasus spyware. Mr. Shohat said the total universe of devices targeted by its technology was an "order of magnitude" smaller than the list, which was reported to have roughly 50,000 numbers worldwide attached to it.

Advertisement - Scroll to Continue



U.S. agencies, including the Federal Bureau of Investigation, held talks and in some cases purchased NSO Group products, according to people familiar with the matter. FBI Director Chris Wray has said in congressional testimony the FBI bought NSO Group technology to test it and didn't use it for operational purposes. Mr. Shobat declined to discuss any U.S. customers.

## 'We make sure that all of our customers understand what abuse means; understand what are the legitimate use cases for the tool.'

— NSO Group CEO Yaron Shohat

In 2021, the Biden administration placed NSO Group on an export-prohibition list that restricted the firm from obtaining some types of technology from the U. S.—imperiling the company's ability to do business across the world. The Commerce Department also blacklisted three other similar vendors based in Israel, Russia and Singapore in a coordinated crackdown on private companies selling such services.

EXHIBIT P

Case 4:19-cv-07123-PJH    Document 188-2    Filed 05/16/23    Page 220 of 249

Jan 27, 2023 - Technology

# Spyware company NSO Group tries to makes its case in Washington

 Sam Sabin, author of [Axios Codebook](Axios Codebook)



NSO chief executive Yaron Shohat. Photo illustration: Sarah Grillo/Axios. Photo courtesy of NSO

Embattled Israeli spyware company NSO Group is trying to make a crime-fighting case in Washington, but it faces a near-impossible challenge to get skeptical U.S. lawmakers and human rights activists on board.

**Driving the news:** NSO chief executive Yaron Shohat spoke with Axios this week during a trip to Washington to push the narrative that the company's spyware tools are a boon in the fight against terrorism and crime.

- But during the three-day trip, NSO representatives said they didn't plan to meet with any Biden administration officials. At least one skeptical Democratic congressional office told Axios they didn't get any outreach from the company.

**Zoom out:** NSO's Pegasus phone-hacking spyware gained widespread attention in 2021 following an investigation from a consortium of news organizations detailing the ways governments have used the tool to spy on journalists, human rights activists and high-ranking politicians.

- Unlike typical forms of malware, Pegasus is "zero-click," meaning it can sneak onto a target's device without them even having to click on a malicious phishing link.

- Since 2021, the company has been placed on a U.S. trade blacklist, inspired a UN call for a global moratorium on spyware sales, and was nearly the subject of a Supreme Court case.

**The big picture:** NSO's Washington tour comes as the administration pieces together a forthcoming spyware executive order, and shortly after lawmakers gave the intelligence community new powers to protect against certain commercial spyware.

- But Shohat told Axios that he believes NSO can still win over skeptics with a simple argument: "Our product saves lives around the world," he said.

**Catch up quick:** Shohat started as CEO in August as part of a larger company restructuring following years of scrutiny of the Israeli spyware firm's product use.

- When Shohat started, NSO had just laid off 100 employees and was eagerly seeking a buyer to pull it out of financial ruin.

**Details:** Shohat told Axios that NSO is now cash-flow positive due to its mostly Western European government customers that use the tool to track down terrorists, child sex abusers and other criminals.

- NSO has now terminated 10 customer contracts for abusing the tool following internal investigations, he said, and the company will continue to investigate any other reports claiming its customers are spying on journalists and dissidents.

- NSO, which claims to sell only to government customers, says it has tweaked its products and internal auditing programs to better flag abusive use, although the company declined to say how it has done so to protect the product from hackers and criminals.

**Between the lines:** NSO argues that its tools are preferable to alternatives that are far more dangerous, like mercenary hacking firms and spyware coming out of Russia and China.

- "The government that buys it, they are the ones operating it, they're the ones deciding who to target, they are the one who is getting the intelligence gathered from the devices," Shohat told Axios.

- "We are not a part of it; we are not exposed to it. That's part of the misconception that exists," he added.

**The other side:** Without specifics about how exactly NSO is preventing abuse or providing retribution to victims, the new CEO's arguments aren't budging human rights activists and researchers.

- "The cat is out of the bag: The world now knows that a major use of Pegasus is to monitor journalists and human rights groups," John Scott-Railton, a senior researcher at the University of Toronto's Citizen Lab who closely monitors NSO's work, told Axios. "It's a tool of espionage that has nothing to do with crime or terror."

- Brett Solomon, the head of Access Now, agreed that governments have started to recognize the threats posed by spyware and begun to take action. "Spyware has not been solved, but I do think we have been able to collectively put this issue much more on the global agenda," he told Axios at the World Economic Forum in Davos, Switzerland, last week.

- "If we look at the direct record of the company, that's just patently untrue," said Roman Gressier, an American journalist working for Salvadorian outlet El Faro who was targeted with Pegasus, about NSO's claims that it focuses solely on crime and terrorism. "How can anyone take them at their word?"

**Yes, but:** The U.S. isn't completely averse to using commercial spyware. The New York Times reported last month that the Drug Enforcement Administration is using spyware from a different Israeli company.

**What they're saying:** "This kind of technology is a must to provide public safety and protect it," Shohat said.

*Sign up for Axios' cybersecurity newsletter Codebook here.*



# EXHIBIT Q



**Technology**

🕐 This article is more than **1 month old**

# NSO Group co-founder emerges as new majority owner

**Omri Lavie appears to have gained control of blacklisted spyware company's shares**

**Stephanie Kirchgaessner** *in Washington*

🐦 @skirchy
Wed 1 Mar 2023 14.54 EST

One of NSO Group's founders appears to have gained control of the blacklisted spyware company's shares after a legal fight over the group's future, according to corporate filings in Luxembourg.

Omri Lavie – the "O" in NSO Group, who in recent years has stepped back from day-to-day management – appears to have emerged as the company's new majority owner.

The Luxembourg filings show that Lavie's investment firm, Dufresne Holding, is – for now – the sole owner of a Luxembourg-based holding company that ultimately owns NSO Group.

The move comes at a time when NSO, which sells one of the world's most sophisticated cyber weapons, is facing lawsuits by Apple and Facebook in the US and remains on a US blacklist, which prohibits the sale of any US technology to the Israeli group.

The Biden administration placed NSO on the so-called "entities list" in 2021, after it said it had found evidence the company had developed and supplied spyware to foreign governments that used the tool to maliciously target government officials, journalists, businesspeople, activists, academics and embassy workers.

The move followed publication by the Guardian and other media organisations of the Pegasus Project, an investigation into the company that found dozens of incidents of abuse of the company's surveillance software by government clients around the world. The project was organised by Forbidden Stories, the French non-profit, and focused on the way the surveillance software has been used by NSO's clients against journalists.

NSO, which is closely regulated by the Israeli ministry of defence, has said it only sells its key surveillance product – a suite of software called Pegasus – to government clients for the purpose of fighting serious crime, such as terrorism, and that it has no control

over how a government client uses the surveillance tool once it is sold. The company has also said it investigates serious allegations of abuse by government clients and has said it has cut off clients in the past.

When used by a government agency, Pegasus can hack into any phone without leaving an obvious trace, enabling users to gain access to a person's encrypted calls and chats, photographs, emails, and any other information held on a phone. It can also be used to turn a phone into a remote listening device by controlling its recorder.

Surveillance experts at the Citizen Lab at the University of Toronto and Amnesty International have led efforts to track use of the group's spyware, detecting incidents of abuse against individuals living in Mexico, Morocco, India, Rwanda, Spain, Saudi Arabia, Canada, the United Arab Emirates, France and the UK, among other countries.

Sources familiar with the company say Lavie, who has lived in the US, took a back seat at the company in recent years even though he was one of the company's initial founders. One person familiar with the group's history said Lavie had argued for the company to have a more US-centric approach and favoured selling the company's surveillance tools to fewer clients - in the US and Europe.

Lavie did not respond to questions from the Guardian.

While NSO has faced intense scrutiny in recent years, the company is still considered to be sitting on a lucrative product that is coveted by intelligence agencies and governments around the world. Even the FBI acquired a limited licence for Pegasus in 2019, though it has said it never used Pegasus in its investigations and was merely seeking to study the surveillance software.

The Guardian and media partners also reported that talks over a possible sale of NSO to the US defence contractor L3 Harris fell apart last year after the White House said any potential deal would raise "serious counterintelligence and security concerns for the US government".

Lavie's move follows in the wake of multiple legal fights between NSO and a US-based financial company that is now known as Treo, which controls the equity fund that owns a majority stake in NSO.

A person familiar with the matter said Treo had been alerted to the change in ownership of the company's shares in a recent letter by Lavie, which appears to have caught the financial group by surprise. The person said Treo was still trying to figure out the financial mechanism that Lavie had used to assume control of the shares, but that it believed the company's financial lenders had, in effect, ceded control of the group to the Israeli founder.

A copy of the Lavie letter, which was included in legal filings in Israel, stated that an administrative agent of a 2019 credit agreement involving the Luxembourg holding company (called Northpole) had moved to appropriate the shares in the company to Dufresne - Lavie's company - on 17 February 2023. "This notice is provided to you for the sake of good order," said the letter, which was signed by Lavie and sent to representatives of Treo.

In a statement to the Guardian, Treo said the lenders had "seemingly organised a foreclosure under their loan agreements". "This follows NSO's failure to meet its financial obligations since 2021, the need by lenders to provide additional financing to keep the company afloat in 2022, and repeated attempts to sell the company that have all failed," Treo said.

Treo also said its fund had "consistently been denied even basic corporate information by NSO and its founders, including information related to the company's compliance with US laws; whether Pegasus spyware continued to be sold to elevated risk customers; and what the company had done to address allegations of widespread misuse of its products".

NSO did not immediately respond to a request for comment.

The Israeli news outlet Calcalist first broke the story. It reported that a district court in Tel Aviv had been alerted that the spyware company's lenders had transferred the company's shares to a new holding company, whose sole shareholder was Lavie. It also suggested, however, that additional directors would be named once a new group of investors were fully onboard.

---

Article count **off**

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible.

And as a global news organization, we're able to provide a fresh, outsider perspective on US politics – one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone – whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | **Monthly** | Annual |
|---|---|---|
| $5 per month | $7 per month | Other |

Continue →   Remind me in June    

## More on this story

    

**Experts warn of new spyware threat targeting journalists and political figures**
🕐 11 Apr 2023

**US supreme court lets WhatsApp pursue Pegasus spyware lawsuit**
🕐 9 Jan 2023

**Management of five firms linked to Pegasus maker NSO is moved to London**
🕐 4 Jan 2023

**No safe haven? The Bahraini dissident still menaced after gaining UK asylum**
🕐 6 Dec 2022

**Pegasus spyw targeted by di campaign, say**
🕐 28 Nov 2022

## More from Headlines

    

**Herbicides**
EPA accused of failing to regulate use of toxic herbicides despite court order
🕐 7h ago

**●Live**
Tucker Carlson leaves Fox News, network announces
🕐 23m ago

**Idaho**
Republicans 'glorify political violence' by embracing extreme gun culture
🕐 10h ago

**Abortion**
Pilot who offered flights to women for medical care fired from seminary job
🕐 10h ago

**Antisemitism**
UN urged to re controversial over 'misuse' t Israel
🕐 1h ago

## Most viewed

# EXHIBIT R

MARCH 27, 2023

# Executive Order on Prohibition on Use by the United States Government of Commercial Spyware that Poses Risks to National Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1.  Policy.  Technology is central to the future of our national security, economy, and democracy.  The United States has fundamental national security and foreign policy interests in (1) ensuring that technology is developed, deployed, and governed in accordance with universal human rights; the rule of law; and appropriate legal authorization, safeguards, and oversight, such that it supports, and does not undermine, democracy, civil rights and civil liberties, and public safety; and (2) mitigating, to the greatest extent possible, the risk emerging technologies may pose to United States Government institutions, personnel, information, and information systems.

To advance these interests, the United States supports the development of an international technology ecosystem that protects the integrity of international standards development; enables and promotes the free flow of data and ideas with trust; protects our security, privacy, and human rights; and enhances our economic competitiveness.  The growing exploitation of Americans' sensitive data and improper use of surveillance technology, including commercial spyware, threatens the development of this ecosystem.  Foreign governments and persons have deployed commercial spyware against United States Government institutions, personnel, information, and information systems, presenting significant counterintelligence and security risks to the United States Government.  Foreign governments and persons have also used commercial spyware for improper purposes, such as to target and intimidate perceived opponents; curb dissent; limit freedoms of expression, peaceful assembly, or association; enable other human rights abuses or suppression of civil liberties; and track or target United States persons without proper legal authorization, safeguards, or oversight.

The United States has a fundamental national security and foreign policy interest in countering and preventing the proliferation of commercial spyware that has been or risks

being misused for such purposes, in light of the core interests of the United States in protecting United States Government personnel and United States citizens around the world; upholding and advancing democracy; promoting respect for human rights; and defending activists, dissidents, and journalists against threats to their freedom and dignity.  To advance these interests and promote responsible use of commercial spyware, the United States must establish robust protections and procedures to ensure that any United States Government use of commercial spyware helps protect its information systems and intelligence and law enforcement activities against significant counterintelligence or security risks; aligns with its core interests in promoting democracy and democratic values around the world; and ensures that the United States Government does not contribute, directly or indirectly, to the proliferation of commercial spyware that has been misused by foreign governments or facilitate such misuse.

Therefore, I hereby establish as the policy of the United States Government that it shall not make operational use of commercial spyware that poses significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person.  In furtherance of the national security and foreign policy interests of the United States, this order accordingly directs steps to implement that policy and protect the safety and security of United States Government institutions, personnel, information, and information systems; discourage the improper use of commercial spyware; and encourage the development and implementation of responsible norms regarding the use of commercial spyware that are consistent with respect for the rule of law, human rights, and democratic norms and values.  The actions directed in this order are consistent with the policy objectives set forth in section 6318 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (NDAA FY 2023) (Public Law 117-263) and section 5502 of the National Defense Authorization Act for Fiscal Year 2022 (NDAA FY 2022) (Public Law 117-81).

Sec. 2.  Prohibition on Operational Use.  (a)  Executive departments and agencies (agencies) shall not make operational use of commercial spyware where they determine, based on credible information, that such use poses significant counterintelligence or security risks to the United States Government or that the commercial spyware poses significant risks of improper use by a foreign government or foreign person.  For the purposes of this use prohibition:

(i)   Commercial spyware may pose counterintelligence or security risks to the United States Government when:

(A)  a foreign government or foreign person has used or acquired the commercial

spyware to gain or attempt to gain access to United States Government computers or the computers of United States Government personnel without authorization from the United States Government; or

(B) the commercial spyware was or is furnished by an entity that:

(1) maintains, transfers, or uses data obtained from the commercial spyware without authorization from the licensed end-user or the United States Government;

(2) has disclosed or intends to disclose non-public United States Government information or non-public information about the activities of the United States Government without authorization from the United States Government; or

(3) is under the direct or effective control of a foreign government or foreign person engaged in intelligence activities, including surveillance or espionage, directed against the United States.

(ii) Commercial spyware may pose risks of improper use by a foreign government or foreign person when:

(A) the commercial spyware, or other commercial spyware furnished by the same vendor, has been used by a foreign government or foreign person for any of the following purposes:

(1) to collect information on activists, academics, journalists, dissidents, political figures, or members of non-governmental organizations or marginalized communities in order to intimidate such persons; curb dissent or political opposition; otherwise limit freedoms of expression, peaceful assembly, or association; or enable other forms of human rights abuses or suppression of civil liberties; or

(2) to monitor a United States person, without such person's consent, in order to facilitate the tracking or targeting of the person without proper legal authorization, safeguards, and oversight; or

(B) the commercial spyware was furnished by an entity that provides commercial spyware to governments for which there are credible reports in the annual country reports on human rights practices of the Department of State that they engage in systematic acts of political repression, including arbitrary arrest or detention, torture, extrajudicial or politically

motivated killing, or other gross violations of human rights, consistent with any findings by the Department of State pursuant to section 5502 of the NDAA FY 2022 or other similar findings.

(iii)  In determining whether the operational use of commercial spyware poses significant counterintelligence or security risks to the United States Government or poses significant risks of improper use by a foreign government or foreign person, such that operational use should be prohibited, agencies shall consider, among other relevant considerations, whether the entity furnishing the commercial spyware knew or reasonably should have known that the spyware posed risks described in subsections (a)(i) or (ii) of this section, and whether the entity has taken appropriate measures to remove such risks, such as canceling relevant licensing agreements or contracts that present such risks; taking other verifiable action to prevent continuing uses that present such risks; or cooperating in United States Government efforts to counter improper use of the spyware.

(b)  An agency shall not request or directly enable a third party to make operational use of commercial spyware where the agency has determined that such use poses significant counterintelligence or security risks to the United States Government or that the commercial spyware poses significant risks of improper use by a foreign government or foreign person, as described in subsection (a) of this section.  For purposes of this order, the term "operational use" includes such indirect use.

(c)  To facilitate effective interagency coordination of information relevant to the factors set forth in subsection (a) of this section and to promote consistency of application of this order across the United States Government, the Director of National Intelligence (DNI) shall, within 90 days of the date of this order, and on a semiannual basis thereafter, issue a classified intelligence assessment that integrates relevant information — including intelligence, open source, financial, sanctions-related, and export controls-related information — on foreign commercial spyware or foreign government or foreign person use of commercial spyware relevant to the factors set forth in subsection (a) of this section.  The intelligence assessment shall incorporate, but not be limited to, the report and assessment required by section 1102A(b) of the National Security Act of 1947, 50 U.S.C. 3001 *et seq*., as amended by section 6318(c) of the NDAA FY 2023.  In order to facilitate the production of the intelligence assessment, the head of each agency shall, on an ongoing basis, provide the DNI all new credible information obtained by the agency on foreign commercial spyware vendors or foreign government or foreign person use of commercial spyware relevant to the factors set forth in subsection (a) of this section.  Such information shall include intelligence, open source, financial, sanctions-related, export controls-related, and due diligence information, as well as information relevant to the development of the list of covered contractors developed or maintained pursuant to

section 5502 of the NDAA FY 2022 or other similar information.

(d)  Any agency that makes a determination of whether operational use of a commercial spyware product is prohibited under subsection (a) of this section shall provide the results of that determination and key elements of the underlying analysis to the DNI.  After consulting with the submitting agency to protect operational sensitivities, the DNI shall incorporate this information into the intelligence assessment described in subsection (c) of this section and, as needed, shall make this information available to other agencies consistent with section 3(b) of this order.

(e)  The Assistant to the President for National Security Affairs (APNSA), or a designee, shall, within 30 days of the issuance of the intelligence assessment described in subsection (c) of this section, and additionally as the APNSA or designee deems necessary, convene agencies to discuss the intelligence assessment, as well as any other information about commercial spyware relevant to the factors set forth in subsection (a) of this section, in order to ensure effective interagency awareness and sharing of such information.

(f)  For any commercial spyware intended by an agency for operational use, a relevant official, as provided in section 5(k) of this order, shall certify the determination that the commercial spyware does not pose significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person based on the factors set forth in subsection (a) of this section.  The obligation to certify such a determination shall not be delegated, except as provided in section 5(k) of this order.

(g)  If an agency decides to make operational use of commercial spyware, the head of the agency shall notify the APNSA of such decision, describing the due diligence completed before the decision was made, providing relevant information on the agency's consideration of the factors set forth in subsection (a) of this section, and providing the reasons for the agency's determination.  The agency may not make operational use of the commercial spyware until at least 7 days after providing this information or until the APNSA has notified the agency that no further process is required.

(h)  Within 90 days of the issuance of the intelligence assessment described in subsection (c) of this section, each agency shall review all existing operational uses of commercial spyware and discontinue, as soon as the head of the agency determines is reasonably possible without compromising ongoing operations, operational use of any commercial spyware that the agency determines poses significant counterintelligence or security risks to the United States

Government or significant risks of improper use by a foreign government or foreign person, pursuant to subsection (a) of this section.

(i)  Within 180 days of the date of this order, each agency that may make operational use of commercial spyware shall develop appropriate internal controls and oversight procedures for conducting determinations under subsection (a) of this section, as appropriate and consistent with applicable law.

(j)  At any time after procuring commercial spyware for operational use, if the agency obtains relevant information with respect to the factors set forth in subsection (a) of this section, the agency shall determine whether the commercial spyware poses significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person, and, if so, shall terminate such operational use as soon as the head of the agency determines is reasonably possible without compromising ongoing operations, and shall notify the DNI and the APNSA.

(k)  The Federal Acquisition Security Council shall consider the intelligence assessment described in subsection (c) of this section in evaluating whether commercial spyware poses a supply chain risk, as appropriate and consistent with applicable law, including 41 C.F.R. Part 201-1 and 41 U.S.C. 1323.

(l)  The prohibitions contained in this section shall not apply to the use of commercial spyware for purposes of testing, research, analysis, cybersecurity, or the development of countermeasures for counterintelligence or security risks, or for purposes of a criminal investigation arising out of the criminal sale or use of the spyware.

(m)  A relevant official, as provided in section 5(k) of this order, may issue a waiver, for a period not to exceed 1 year, of an operational use prohibition determined pursuant to subsection (a) of this section if the relevant official determines that such waiver is necessary due to extraordinary circumstances and that no feasible alternative is available to address such circumstances.  This authority shall not be delegated, except as provided in section 5(k) of this order.  A relevant official may, at any time, revoke any waiver previously granted.  Within 72 hours of making a determination to issue or revoke a waiver pursuant to this subsection, the relevant official who has issued or revoked the waiver shall notify the President, through the APNSA, of this determination, including the justification for the determination.  The relevant official shall provide this information concurrently to the DNI.

Sec. 3.  <u>Application to Procurement</u>.  An agency seeking to procure commercial spyware for

any purpose other than for a criminal investigation arising out of the criminal sale or use of the spyware shall, prior to making such procurement and consistent with its existing statutory and regulatory authorities:

   (a)  review the intelligence assessment issued by the DNI pursuant to section 2(c) of this order;

   (b)  request from the DNI any additional information regarding the commercial spyware that is relevant to the factors set forth in section 2(a) of this order;

   (c)  consider the factors set forth in section 2(a) of this order in light of the information provided by the DNI; and

   (d)  consider whether any entity furnishing the commercial spyware being considered for procurement has implemented reasonable due diligence procedures and standards — such as the industry-wide norms reflected in relevant Department of State guidance on business and human rights and on transactions linked to foreign government end-users for products or services with surveillance capabilities — and controls that would enable the entity to identify and prevent uses of the commercial spyware that pose significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person.

  Sec. 4.  <u>Reporting Requirements</u>.  (a)  The head of each agency that has procured commercial spyware, upon completing the review described in section 2(h) of this order, shall submit to the APNSA a report describing the review's findings.  If the review identifies any existing operational use of commercial spyware, as defined in this order, the agency report shall include:

   (i)  a description of such existing operational use;

   (ii)  a determination of whether the commercial spyware poses significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person, along with key elements of the underlying analysis, pursuant to section 2(a) of this order; and

   (iii)  in the event the agency determines that the commercial spyware poses significant risks pursuant to section 2(a) of this order, what steps have been taken to terminate its operational use.

(b)  Within 45 days of an agency's procurement of any commercial spyware for any use described in section 2(l) of this order except for use in a criminal investigation arising out of the criminal sale or use of the spyware, the head of the agency shall notify the APNSA of such procurement and shall include in the notification a description of the purpose and authorized uses of the commercial spyware.

(c)  Within 6 months of the date of this order, the head of each agency that has made operational use of commercial spyware or has procured commercial spyware for operational use shall submit to the APNSA a report on the actions that the agency has taken to implement this order, including the internal controls and oversight procedures the agency has developed pursuant to section 2(i) of this order.

(d)  Within 1 year of the date of this order, and on an annual basis thereafter, the head of each agency that has procured commercial spyware for operational use shall provide the APNSA a report that identifies:

(i)  any existing operational use of commercial spyware and the reasons why it does not pose significant counterintelligence or security risks to the United States Government or significant risks of improper use by a foreign government or foreign person, pursuant to section 2(a) of this order;

(ii)  any operational use of commercial spyware that was terminated during the preceding year because it was determined to pose significant risks pursuant to section 2(a) of this order, the circumstances under which this determination was made, and the steps taken to terminate such use; and

(iii)  any purchases made of commercial spyware, and whether they were made for operational use, during the preceding year.

Sec. 5.  Definitions.  For purposes of this order:

(a)  The term "agency" means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

(b)  The term "commercial spyware" means any end-to-end software suite that is furnished for commercial purposes, either directly or indirectly through a third party or subsidiary, that

provides the user of the software suite the capability to gain remote access to a computer, without the consent of the user, administrator, or owner of the computer, in order to:

    (i)   access, collect, exploit, extract, intercept, retrieve, or transmit content, including information stored on or transmitted through a computer connected to the Internet;

    (ii)  record the computer's audio calls or video calls or use the computer to record audio or video; or

    (iii)  track the location of the computer.

  (c)  The term "computer" shall have the same meaning as it has in 18 U.S.C. 1030(e)(1).

  (d)  The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization.

  (e)  The term "foreign entity" means an entity that is not a United States entity.

  (f)  The term "foreign government" means any national, state, provincial, or other governing authority, any political party, or any official of any governing authority or political party, in each case of a country other than the United States.

  (g)  The term "foreign person" means a person that is not a United States person.

  (h)  The term "furnish," when used in connection with commercial spyware, means to develop, maintain, own, operate, manufacture, market, sell, resell, broker, lease, license, repackage, rebrand, or otherwise make available commercial spyware.

  (i)  The term "operational use" means use to gain remote access to a computer, without the consent of the user, administrator, or owner of the computer, in order to:

    (i)   access, collect, exploit, extract, intercept, retrieve, or transmit the computer's content, including information stored on or transmitted through a computer connected to the Internet;

    (ii)  record the computer's audio calls or video calls or use the computer to otherwise record audio or video; or

(iii)  track the location of the computer.

The term "operational use" does not include those uses described in section 2(l) of this order.

(j)  The term "person" means an individual or entity.

(k)  The term "relevant official," for purposes of sections 2(f) and 2(m) of this order, refers to any of the following:  the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, the DNI, the Director of the Central Intelligence Agency, or the Director of the National Security Agency.  The Attorney General's obligation under section 2(f) of this order and authority under section 2(m) of this order may be delegated only to the Deputy Attorney General.

(l)  The term "remote access," when used in connection with commercial spyware, means access to a computer, the computer's content, or the computer's components by using an external network (e.g., the Internet) when the computer is not in the physical possession of the actor seeking access to that computer.

(m)  The term "United States entity" means any entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches).

(n)  The term "United States person" shall have the same meaning as it has in Executive Order 12333 of December 4, 1981 (United States Intelligence Activities), as amended.

(o)  The term "United States Government personnel" means all United States Government employees as defined by 5 U.S.C. 2105.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  Nothing in this order shall be construed to limit the use of any remedies available to the

head of an agency or any other official of the United States Government.

(c)  This order shall be implemented consistent with applicable law, including section 6318 of the NDAA FY 2023, as well as applicable procurement laws, and subject to the availability of appropriations.

(d)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
  March 27, 2023.

# EXHIBIT S

EXHIBIT FILED UNDER SEAL

EXHIBIT T




**24/7    Buzz    Startups    VC    @work    Innovation    Opinions    Events**    Search

by **CALCALIST**          Homepage  >  News

# NSO's Pegasus spyware found new ways to hack iPhones

Citizen Lab at the University of Toronto found that phones of Mexican human rights activists were infected with Pegasus by exploiting vulnerabilities in Apple's operating system

Omer Kabir  19:00, 18.04.23

   

🏷 TAGS:  Pegasus    NSO    Spyware

Israel-based NSO's Pegasus spyware has developed three new ways to hack into iPhones by exploiting vulnerabilities in the latest version of Apple's operating system, says a report by Citizen Lab, an interdisciplinary laboratory based at the University of Toronto.

Citizen Lab's report found that iPhones belonging to several members of Mexican civil society, including two human rights activists, were infected with Pegasus. One infected device belongs to Jorge Santiago Aguirre Espinoza, the director of human rights organization Centro PRODH. Aguirre was previously the target of an attempted Pegasus infection in 2017. According to the report's findings, the spyware was active on his device between June 22 and July 13, 2022.



NSO Pegasus. (Photo: Getty)

Another infected device belonged to another employee of the organization, Maria Luisa Aguillar Rodriguez, whose device was previously targeted on June 23, 2022. Forensic analysis of these devices identified indicators of three new zero-click exploitations that exploit security vulnerabilities in a variety of iPhone apps and features.

These findings prove that U.S. sanctions against the company were ultimately unsuccessful. Citizen Lab shared their findings with Apple, which made several changes to address the issue in the iOS 16.3.1 update, released in February of this year. Apple is already in the midst of a high-profile lawsuit, filed following the zero-click attack identified by Citizen Lab in September 2021.

**Related articles:**
- Israeli spyware used to hack journalists, opposition figures, Microsoft and watchdog say
- After cutbacks and CEO departure, what's next for the controversial NSO?
- NSO lays off 100 employees, CEO Shalev Hulio to step down



In November 2021, NSO was blacklisted by the U.S. Department of Commerce, preventing U.S. companies from conducting business with the spyware developer without receiving special permission from the department. The goal of the blacklist was to reduce the company's ability to conduct business, and was largely successful. According to reports it caused NSO to encounter major financial difficulties.

Another goal was to prevent the company from gaining access to devices and operating systems of U.S. companies, including Apple, Microsoft and Intel, and thus prevent it from exploiting loopholes to develop its spyware.

Citizen Lab's report proves that this was goal was ultimately not achieved. The report found that throughout 2022, NSO successfully exploited at least three zero-click loopholes (loopholes that do not require active action on the part of the victim) in iOS 15 and 16. iOS 16 is the latest version of the operating system and was launched in the fall of 2022.

"I don't think there was a real expectation that being on the blacklist would prevent NSO from accessing Apple's iPhones or software," Dr. Bill Marczak of Citizen Lab told Calcalist. "Anyone can easily go to an Apple store and buy a phone, or download the updated software from Apple, without revealing who his employer is. But that doesn't mean the move failed. The way I see it, it led the Israeli government to limit the export of spyware, which made it difficult for companies in the industry to acquire new customers." Dr. Marczak led the compilation of Citizen Lab's report, alongside John Scott-Railton, Bahr Abdul-Razzak and Ron Deibert.

The latest vulnerability and the one which researchers possess the most information on is "PWNYOURHOME," which was detected in iOS 15 and 16. "This is a two-step breach," Dr. Marczak said. "The first step targets the HomeKit functionality built into phones. We don't know exactly what HomeKit was used for, but we saw evidence that the attackers sent messages through it to the victim, which were decoded by his phone. After that, the attackers targeted iMessage. When the victim's phone decoded the image, it ran malicious code. The attackers were able to break through protections and install Pegasus on the phone."

In the case of PWNYOURHOME, the attacked device was able to detect the exploitation in real time, thanks to the Lockdown Mode feature. This feature, launched last year, is intended for users who fear they are under attack from spyware such as Pegasus. When activated, many device capabilities, including those especially vulnerable to exploitation by spyware, are limited. Devices attacked through this vulnerability while in Lockdown Mode display a notification about the intrusion attempt.

A second zero-click, 'FINDMYPWN,' was identified in the report. It was deployed against iOS 15 beginning in June, 2022. It also appears to be a two-step attack, in this case, using the Find My feature instead of HomeKit followed by iMessage.

The least information is known about the third zero-click, 'LATENTIMAGE,' which was found to be active in January 2022 on iOS 15. "We saw that the Find My app crashed when the phone was hacked, but we saw no evidence of a second step through iMessage. The Find My and HomeKit applications are built-in applications. Even if the user doesn't use them, they are installed on the phone and run on it," Dr. Marczak said.

In response to Citizen Lab's report, NSO commented that Citizen Lab has repeatedly published reports that failed to determine the technology in use and "refused to share its underlying data."

"NSO adheres to strict regulation, and its technology is used by its governmental customers to fight terror and crime around the world," they added.

TAGS  Pegasus   NSO   Spyware



# EXHIBIT U



# PHANTOM

## Turn Your Target's Smartphone into an Intelligence Gold Mine



Phantom is an end-to-end cyber intelligence software which remotely and covertly extracts all data from any smartphone. Installation is performed remotely (over the air) with either minimal or no engagement from the target, requires no third party involvement from cell phone carriers, and leaves no traces whatsoever on the device. Covertly gather all data on a target smartphone including: contact list, text messages, call history, emails, instant messaging, call interception, room wiretap, camera snapshots, calendar, GPS tracking, browser history and app data such as Skype and Facebook. Created to answer a void in law enforcement data gathering ability, this field-proven solution is used by intelligence agencies around the world, helping to reduce crime, prevent terrorism and maintain public safety.



## Westbridge Technologies

Westbridge Technologies is the North-American branch of NSO Group, a world-leading cyber intelligence company which provides cutting edge technology in the field of cyber intelligence gathering. Westbridge's product line enables law enforcement and intelligence agencies to remotely and covertly extract crucial intelligence from the most commonly used mobile devices. These breakthrough systems were developed in order to provide governments with a way to address the communications interception challenges in today's highly dynamic cyber battlefield.

What makes Westbridge unique is the combination of technical expertise with a strong operational and intelligence background, combined with an understanding of the legal framework. These powerful synergies are reflected in the creativity of our solutions and drive unmatched value for our customers.

- Based in Bethesda, MD, Westbridge Technologies was founded in 2014 as the North American branch of the international company NSO Group.
- NSO Group was founded in 2010. The company is privately owned, with the majority ownership held by an American private equity firm.
- NSO Group is the provider of a variety of unique cyber intelligence systems, focused on extracting critical information from mobile devices.
- The company has a strong global customer base, which includes leading intelligence organizations and law enforcement agencies throughout Asia, Africa, Europe and Latin America.
- 85% of the company's resources are focused on research and development

## THE PHANTOM ADVANTAGE

The Phantom system enables intelligence organizations and law enforcement agencies to produce invaluable intelligence by extracting and monitoring crucial data from mobile devices:

- **Unlimited access to the target's mobile devices** - Installation is performed remotely (over-the-air) with either minimal or no engagement from the target.
- **Independent solution -** No cooperation with third party is required (AT&T, Verizon, Apple, Google)
- **Voice interception** – Monitor voice and VoIP calls in real-time.
- **Application monitoring** – Monitor a multitude of applications including Skype, WhatsApp, Viber, Facebook and Blackberry Messenger (BBM.)
- **Bridge the intelligence gap** – Collect unique types of information (Photos, Instant Messaging, Passwords, etc.) which assist in building an accurate and comprehensive intelligence panorama.
- **Handle encrypted content and devices** - Overcome encryption, SSL, proprietary protocols and any hurdle introduced by the complex communications world.
- **Supports the most popular smartphones today –** iPhone, Samsung, Motorola, LG, Blackberry, Sony, etc.
- **Superior Geo-location** – Track targets and get accurate positioning information using GPS. **Persistent tracking** – Identify and warn against the use of multiple SIM cards with a single target, Phantom can endure the mobile device factory reset.
- **Modular capabilities** – Phantom's capabilities can be customized to the client's specific needs and regulations

We welcome your questions, inquires and feedback.