Greg D. Andres
Antonio J. Perez-Marques
Craig T. Cagney
   (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
        antonio.perez@davispolk.com
        craig.cagney@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC, and<br>META PLATFORMS INC.,<br><br>                Plaintiffs,<br><br>      v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>            Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PROTECTIVE ORDER**<br><br>Date:   May 25, 2023<br>Time:   9:00 a.m.<br>Ctrm:  3<br>Judge:  Hon. Phyllis J. Hamilton |

**REDACTED VERSION**

1

## **TABLE OF CONTENTS**

2

PRELIMINARY STATEMENT ......................................................................1

3

STATEMENT OF FACTS AND ALLEGATIONS.............................................3

4

     A.    WhatsApp Brings Claims Against NSO .......................................3

5

6

     B.    NSO Refuses to Participate in Discovery ███████
        █████████████████████ .....................3

7

     C.    NSO Continues Conducting its Spyware Business ████
        ███████████ ...............................................5

8

9

     D.    The Court Agrees to Resolve NSO's Israeli Law Objections......................5

10

     E.    NSO Renews Its Objections and Files This Motion ....................6

11

LEGAL STANDARD......................................................................................7

12

ARGUMENT...................................................................................................8

13

   I.    NSO Has Not Carried Its Burden of Showing Israeli Law Prohibits
     "Any" Production..........................................................................8

14

15

   II.   The *Richmark* Factors Favor Compliance With NSO's U.S.
     Discovery Obligations ...................................................................9

16

     A.    The United States Has a Vital Interest in Allowing for This
        Discovery ...........................................................................10

17

18

     B.    The Israeli Interest Does Not Outweigh the U.S. Interest ........12

19

        1.    Israel's Interest is Adequately Addressed by a
           Protective Order.............................................................13

20

21

        2.    There Are Reasons to Discount Israel's Interest in
           Secrecy ...........................................................................14

22

     C.    The Remaining *Richmark* Factors Also Favor Disclosure ........17

23

24

        1.    The Information Sought Is Important and Specific ........17

25

        2.    There Is No Alternative Means of Obtaining the
           Information Sought .........................................................19

26

27

        3.    NSO Has Not Established Hardship from
           Compliance .....................................................................20

28

ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PROTECTIVE ORDER
CASE NO. 4:19-CV-07123-PJH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        4.     A Discovery Order Is Enforceable and Necessary to Deter Future Misconduct ...............................................................21

        5.     The Origin of the Documents Is Not a Material Hindrance to Disclosure.........................................................22

III.    NSO's Relevance and Proportionality Objections Are Baseless and Premature .............................................................................23

CONCLUSION.......................................................................................................25

1

## TABLE OF AUTHORITIES

2

P<small>AGE(S)</small>

3

C<small>ASES</small>

4   *Adlerstein v. United States Customs & Border Prot.*,

5       2021 WL 6133955 (D. Ariz. Dec. 20, 2021) ..................................................... 2, 13

6   *In re Air Crash at Taipei, Taiwan on Oct. 31, 2000*,

7       211 F.R.D. 374 (C.D. Cal. 2002) ..................................................................... 13

8   *Asea, Inc. v. S. Pac. Transp. Co.*,

9       669 F.2d 1242 (9th Cir. 1981) ......................................................................... 17

10  *Blankenship v. Hearst Corp.*,

11      519 F.2d 418 (9th Cir. 1975) ............................................................................. 7

12  *BrightEdge Techs., Inc. v. Searchmetrics, GmbH*,

13      2014 WL 3965062 (N.D. Cal. Aug. 13, 2014) ................................................. 14

14  *Campos v. San Francisco State Univ.*,

15      1999 WL 35140127 (N.D. Cal. Mar. 19, 1999) ............................................... 25

16  *Connex R.R. LLC v. AXA Corp. Sols. Assurance*,

17      2017 WL 3433542 (C.D. Cal. Feb. 22, 2017) ................................................. 17

18  *In re CRT Antitrust Litig.*,

19      2014 WL 5462496 (N.D. Cal. Oct. 23, 2014) ............................................. 17, 19

20  *In re CRT Antitrust Litig.*,

21      2014 WL 6602711 (N.D. Cal. Nov. 20, 2014) ............................................. 15, 23

22  *In re Facebook, Inc. Internet Tracking Litig.*,

23      956 F.3d 589 (9th Cir. 2020) ........................................................................... 24

24  *In re Facebook PPC Advert. Litig.*,

25      2011 WL 1324516, at *3 (N.D. Cal. Apr. 6, 2011) ......................................... 14

26  *Fenerjian v. Nong Shim Co., Ltd.*,

27      2016 WL 245263 (N.D. Cal. Jan. 21, 2016) ................................... 10, 13, 18, 19

28  *Finjan, Inc. v. Zscaler, Inc.*,

iv

2019 WL 618554 (N.D. Cal. Feb. 14, 2019) ............................................................... 10, 13, 22

*Foster Poultry Farms, Inc. v. SunTrust Bank*,
 377 F. App'x 665 (9th Cir. 2010) ........................................................................ 24

*Ibrahim v. Dep't of Homeland Sec.*,
 2013 WL 1703367 (N.D. Cal. Apr. 19, 2013) ................................................... 2, 13

*Long v. Hewlett-Packard, Co.*,
 2006 WL 3751447 (N.D. Cal. Dec. 19, 2006) ........................................................ 25

*Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*,
 285 F.R.D. 481 (N.D. Cal. 2012) ........................................................................ 1, 7

*Masimo Corporation v. Mindray DS USA, Inc.*,
 2014 WL 12589321 (C.D. Cal. May 28, 2014) ........................................... 13, 16, 18

*Meggitt (Orange Cnty.), Inc. v. Yongzhong*,
 2014 WL 12967458 (C.D. Cal. Mar. 21, 2014) ...................................................... 19

*Munoz v. China Expert Technology, Inc.*,
 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011) ......................................................... 19

*NSO Grp. Techs. Ltd. v. WhatsApp Inc.*,
 143 S. Ct. 562 (Jan. 9, 2023) .............................................................................. 4, 5

*Optrics, Inc. v. Barracuda Networks, Inc.*,
 2019 WL 5485890 (N.D. Cal. Oct. 25, 2019) ....................................................... 10

*Proofpoint, Inc., v. Vade Secure, Inc.*,
 2020 WL 504962 (N.D. Cal. Jan. 31, 2020) ......................................................... 22

*Reece v. Basi*,
 2014 WL 2565986 (E.D. Cal. June 6, 2014) ........................................................... 7

*Richmark Corp. v. Timber Falling Consultants*,
 959 F.2d 1468 (9th Cir. 1992) ..................................................................... *passim*

*In re Rubber Chems. Antitrust Litig.*,
 486 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................... 15

*Société Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*,

    357 U.S. 197 (1958) ............................................................................................. 21

*Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,

    482 U.S. 522 (1987) ................................................................................... 7, 8, 14

*Stackla, Inc. v. Facebook Inc.*,

    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ........................................... 10

*In re Subpoena to Third Party Sentieon, Inc.*,

    2022 WL 17477092 (N.D. Cal. Dec. 6, 2022) ........................................... 14

*Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*,

    2019 WL 6134958 (N.D. Cal. Nov. 19, 2019) ....................................... 8, 16, 19, 23

*Tiffany (NJ) LLC v. Qi Andrew*,

    276 F.R.D. 143 (S.D.N.Y. 2011) ............................................................... 23

*In re TFT-LCD Antitrust Litig.*,

    2011 WL 13147214 (N.D. Cal. Apr. 26, 2011) ......................................... 15

*United States v. Vetco, Inc.*,

    691 F.2d 1281 (9th Cir. 1981) ................................................... 7, 8, 13, 22

*Vallabharpurapu v. Burger King Corp.*,

    276 F.R.D. 611 (N.D. Cal. 2011) .............................................................. 25

*Wagafe v. Trump*,

    2018 WL 1737939 (W.D. Wash. Apr. 11, 2018) ..................................... 13

*WhatsApp, Inc. v. NSO Grp. Techs. Ltd.*,

    17 F.4th 930 (9th Cir. 2021) ..................................................................... 4


## STATUTES & RULES

86 Fed. Reg. 60759 (Nov. 4, 2021) ..................................................... 11, 12

Fed. R. Civ. P. 26 ................................................................................ 24, 25

Restatement (Third) of Foreign Relations Law § 442 cmt. c .................... 10

S. Rep. No. 99-432, 1, 1986 U.S.C.C.A.N. 2479 ...................................... 10

vi

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PROTECTIVE ORDER
CASE NO. 4:19-CV-07123-PJH

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

In their motion,[1] Defendants NSO Group Technologies Ltd. and Q Cyber Technologies Ltd. (together, "NSO") once again seek to place themselves beyond the authority of this Court, and exempt themselves from U.S. accountability.  It's not the first time.  First, NSO contended that it was immune from suit and therefore, also discovery.  Now, NSO argues that Israeli law precludes it from producing *any* documents requested by Plaintiffs WhatsApp LLC and Meta Platforms, Inc.  NSO's position is meritless, and a protective order should be denied.

First, NSO has failed to meet its threshold burden to show that either the Israeli Defense Export Control Law ("DECL") ███████████████████████████████████████████████████ even applies here.  *See Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (the moving party "has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence").  NSO has not addressed—much less established—which portions (if any) of the materials sought by Plaintiffs are subject to the restrictions under DECL.  Moreover, ███ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████  NSO's contention that Israeli law comprehensively bars it from sharing *any* information is belied by its own conduct, including its selective public sharing of information about its suite of spyware to the press when it suits NSO's wishes and in support of this very motion.

Even if NSO had established that the DECL ████████████ applied, NSO's motion should be denied under the multifactor balancing test adopted by the Ninth Circuit in *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992).  Under that analysis, the balance of national interests is the "most important factor."  *Id.* at 1476.  The U.S. interest predominates, not only because this case seeks to vindicate the rights of U.S. companies, but also

---

[1]   "Mot." shall refer to NSO's Amended Motion for a Protective Order, Dkt. No. 179-2.  Unless otherwise noted, all emphasis has been added.

because it seeks to hold NSO accountable for its sale and use of powerful commercial spyware that the United States has explicitly and formally condemned.  Just last month, President Biden reiterated that such commercial spyware is contrary to the United States' "***fundamental national security and foreign policy interest***" and its "***core interests***" in defending democracy and human rights.[2]  The strength of the U.S. interest is clear and overwhelming.  Any competing Israeli interest in preventing NSO from participating in discovery warrants less weight, not just because the DECL seems to pose no obstacle to NSO gaining new customers abroad, but also given ███████

███████████████████  Any legitimate Israeli interest can, in any event, be duly pro-tected with a strict confidentiality order like the one entered in this case, just as such orders suffice in countless other cases involving information of the utmost sensitivity, including matters of the United States' national security.[3]

As shown below, the remaining *Richmark* factors likewise support disclosure.  The discov-ery sought is crucial to the case and specific; it cannot be obtained by other means; and NSO has not substantiated a credible risk of hardship.  Any such hardship would moreover be of NSO's own making.  And an order of this Court requiring discovery would be enforceable and "send a message," in the words of *Richmark*, to other foreign companies who reach into the United States unlawfully that they will be held accountable in U.S. courts.

Unable to satisfy the *Richmark* test, NSO resorts to several proportionality arguments that it concedes are "independent of Israeli law."  The Court has already made clear, and NSO already agreed, that such objections are not properly part of this motion.[4]  But that argument is in any event

---

[2]   Declaration of Antonio J. Perez-Marques in Support of Plaintiffs' Opposition to Defendants' Motion for Protective Order ("Perez-Marques Decl.") Ex. R.

[3]   *See, e.g.*, *Adlerstein v. United States Customs & Border Prot.*, 2021 WL 6133955, at *3 (D. Ariz. Dec. 20, 2021) ("highly sensitive information and documents . . . that [] may endanger or jeopardize the safety of law enforcement personnel and public safety"); *Ibrahim v. Dep't of Homeland Sec.*, 2013 WL 1703367, at *5 (N.D. Cal. Apr. 19, 2013) ("sensitive security infor-mation" that might "provide terrorists and would-be terrorists insight into how to avoid the [security] procedures described in the documents").

[4]   As NSO's counsel rightly noted at the February 16, 2023 case management conference, "the Court's ruling on these [Israeli law] issues we are discussing . . . will guide us on the appropri-ate scope of the case," and "should we not be able to work things out about proportionality and the like, …we would raise those separately" through the default process for such run-of-the-mill discovery disputes.  Perez-Marques Decl. Ex. B, at 18:16–19:3.

2

a red herring, given NSO's position that "[t]here are . . . *no* RFPs" with which they can comply under Israeli law, even if Plaintiffs narrowed certain Requests.  Mot. at 8.

For the foregoing reasons and as otherwise set forth herein, the Court should deny NSO's request for a blanket protective order relieving them of their discovery obligations and direct the parties to resolve any disputes regarding the relevance or proportionality of individual requests through meet-and-confer discussions, and if necessary, before the Magistrate Judge.

## STATEMENT OF FACTS AND ALLEGATIONS

### A.  WhatsApp Brings Claims Against NSO

NSO manufactures, distributes, and operates spyware designed to intercept and extract information and communications from mobile phones—including messages sent via WhatsApp.  *See* Dkt. No. 1 ¶¶ 24–29.  In 2019, NSO engaged in the unauthorized use of WhatsApp servers, located in the United States and elsewhere, to transmit their spyware and to hack approximately 1,400 mobile phones and devices belonging to attorneys, journalists, human rights activists, government officials, and others.  *Id*. ¶ 42.

NSO's public statements and the nature of its business model make clear that its suite of spyware remains an ongoing threat to Plaintiffs and their users.  For example, following Apple's discovery and remediation of a different NSO exploit, an NSO employee boasted that it would require only "two weeks to come up with a mitigation on our side, some work-around" and that "***the next exploit is an inevitability***."  Perez-Marques Decl. Ex. J.  According to recent reports, NSO developed ***three*** new Apple exploits.  Perez-Marques Decl. Ex. T.  In connection with this motion, NSO acknowledged that its technology "changes frequently," and declined to say whether its spyware still operates on Plaintiffs' platforms or targets Plaintiffs' users.  Dkt. No. 179-3.

### B.  NSO Refuses to Participate in Discovery ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

Plaintiffs served their first Requests for Production on June 2, 2020.  Perez-Marques Decl. ¶ 2; Dkt. No. 116-2.  In response, NSO proactively "notified the State of Israel of the discovery requests" and of NSO's *own* belief that the information sought was "either confidential or detrimental to the national security of the State of Israel."  Dkt. No. 95 at 3.  Prompted by NSO, Israel

1    then began "considering its position," *id*., ███████████████████████████████

2    ██████████████████████████████ Dkt. No. 133-4 ¶ 2.

3            On June 16, 2020, NSO filed a motion to stay discovery until its motion to dismiss was

4    resolved.  Dkt. No. 95.  On July 6, 2020, NSO served its responses and objections to the Requests,

5    taking the position that it would not produce *any* discovery until its motion to dismiss was resolved.

6    *See* Dkt. No. 116-3.  NSO also contended discovery should be limited to spyware under the "Peg-

7    asus" brand, and to the 1,400 specific victims that Plaintiffs had identified through pre-litigation

8    investigation, and stated that any productions would be limited by alleged obligations under Israeli

9    law.  *Id.* at 2–3.  On July 16, 2020, this Court denied NSO's motions to dismiss and to stay dis-

10   covery.  Dkt. No. 110 at 45.  Just three days after the Court authorized discovery to go forward,

11   ███████████████████████████████████ NSO's attorneys.  *See* Dkt. No. 133-6 Ex. F.

12   Having ██████████████████████████████ NSO █████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████ Dkt. No. 133-4 ¶ 4.  ████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ███  NSO has represented that █████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ███████████████████  *See* Dkt. No. 133-6 Ex. B.  Similarly, it is apparent that NSO has not

19   ████████████████████████████████  For example, █████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22           After this Court entered a stay pending appeal, the Ninth Circuit unanimously affirmed this

23   Court's denial of NSO's motion to dismiss.  *See WhatsApp, Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th

24   930 (9th Cir. 2021).  Just days after the Ninth Circuit voted to deny NSO's petition for rehearing

25   and rehearing *en banc*, *see* Order, *WhatsApp, LLC v. NSO Grp. Techs. Ltd.*, No. 20-16408 (9th

26   Cir. Jan. 6, 2022), Dkt. No. 87, ██████████████████████████████████████████

27   ████  Dkt. No. 170 at 3.  The Ninth Circuit then stayed its mandate pending NSO's petition for

28   writ of certiorari, which the Supreme Court denied on January 9, 2023.  *NSO Grp. Techs. Ltd. v.*

*WhatsApp Inc.*, 143 S. Ct. 562 (Jan. 9, 2023).   This Court then scheduled a case management conference for February 16, 2023.  *See* Dkt. No. 161.  According to NSO, one week before that conference, ███████████████████████████████████████████████████████

███████████ Dkt. No. 164-1 ¶ 8.  NSO ████████████████████████████████████████

███████████████

### C.  NSO Continues Conducting its Spyware Business ███████████████

Notwithstanding the alleged limitations of the DECL ████████████, NSO has continued to carry on its spyware business over the last three years.  NSO reportedly has become "cash-flow positive" again as a result of obtaining new customers.  Perez-Marques Decl. Ex. P.  In January 2023, NSO's CEO told the *Wall Street Journal* that the Company had "recently attracted new deals" from "governments around the world."  Perez-Marques Decl. Ex. O.

### D.  The Court Agrees to Resolve NSO's Israeli Law Objections

At the February 16, 2023 case management conference, counsel for Plaintiffs flagged that "this issue of the purported Israeli law restrictions on discovery" was "inevitably going to be a substantive issue that will need to be presented to and adjudicated by the Court."  Perez-Marques Decl. Ex. B, at 14:13–16.  In response, the Court allowed NSO to file a motion for a protective order "based upon . . . ███████████████████████████████████████████████████████

███████████ "  *Id*. at 16:20–22.  In doing so, the Court instructed counsel that it was "not interested in having to preside over picayune objections having to do with . . . all the stuff that attorneys fight over discovery."  *Id*. at 15:10–12; *see also id.* at 17:25–18-1: ("I'm not fond of request-by-request reviews of discovery.").  The Court expressed its understanding that what would be presented in NSO's forthcoming motion would be "the international law question which should dispose a number of the anticipated objections."  *Id*. at 15:21–23; *see also id.* at 23:23–24 ("We're going to start first with the big discovery issues in the procedure I just outlined.").

Counsel for NSO acknowledged that the Court's ruling on this umbrella issue would "guide [NSO] on the appropriate scope of the case," and represented that NSO "would not anticipate addressing anything other than the export control restrictions, and separately, on the matters that are outlined in the sealed addendum to the case management statement," and that "should we not

be able to work things out about proportionality and the like, that we would raise those separately."
*Id*. at 18:16–19:3.

### E.  NSO Renews Its Objections and Files This Motion

NSO served its amended responses and objections to the Requests on February 28, 2023.
Perez-Marques Decl. Ex. C.  There, NSO included a general objection that it "object[ed] to the
Requests to the extent they seek information that Defendants are prohibited from disclosing by
Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation,
or governmental order or directive." *Id*. at 3.  In response to nearly every request, NSO added that
"Defendants intend to withhold documents and communications they are not permitted to produce
pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law,
regulation, or governmental order or directive." *E.g., id*. at 4.[5]  In NSO's view, only a few narrow
requests would not implicate the DECL—but ███████████████████████████████████████
███████████  *See* Mot. at 8.

Plaintiffs conferred with NSO on March 13, 2023 and March 16, 2023.  In those confer-
ences, counsel for NSO confirmed its position that it believed it was prohibited from producing
any documents, including otherwise responsive and non-privileged documents, based on limita-
tions imposed by Israeli law.  Perez-Marques Decl. ¶ 6.  NSO also agreed ████████████████
██████████████████████████ certain limited information (such as identification of
personnel) █████████████████████, but indicated that they were unwilling ██████████
██████████████████ the remainder (and overwhelming majority) of Plaintiffs' requests, or
█████████████████████████  *See* Mot. at 8 n.4.  And while NSO invited Plaintiffs to
narrow their requests, it conceded that any narrowing would not resolve the overarching Israeli
law issue.  Perez-Marques Decl. ¶ 6.

NSO filed its motion for a protective order on March 30, 2023, and amended it on April
10, 2023.  Although NSO has not submitted ████████████████████████, it contends that ███

---

[5]    On April 17, 2023, NSO served its responses and objections to Plaintiffs' first set of requests
for admissions.  *See* Perez-Marques Decl. Ex. S.  In those responses and objections, NSO raised
the same Israeli law objections that it made in response to the Requests.

1  ████████████████████████████████████████████████  *See* Perez-Marques

2  Decl. Ex. A.  NSO's brief claims for the first time that ███████████████████████

3  ████████████████████  Mot. at 5 n.2, but does not provide any context ███████████

4  ██████████████████████████████  Moreover, although NSO's motion is ostensibly

5  oriented around two Israeli law limitations, a large portion is dedicated to the "request-by-request"

6  objections that the Court signaled were not appropriate.  *Id.* at 9–14.  Indeed, NSO dedicates the

7  entire final section of its brief to the commonplace objections of breadth, relevance, and propor-

8  tionality—issues that it admits are "independent of Israeli law."  *Id.* at 18–20.

9  ## LEGAL STANDARD

10  As the party resisting discovery, NSO "has the burden of showing that discovery should

11  not be allowed, and also has the burden of clarifying, explaining and supporting its objections with

12  competent evidence."  *Louisiana Pacific*, 285 F.R.D. at 485; *see also Reece v. Basi*, 2014 WL

13  2565986, at *2 (E.D. Cal. June 6, 2014), *aff'd*, 704 F. App'x 685 (9th Cir. 2017) ("The part[y]

14  opposing discovery is 'required to carry a heavy burden of showing' why discovery should be

15  denied." (quoting *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975))).  Further, NSO

16  "has the burden of showing such [foreign] law bars production."  *United States v. Vetco, Inc.*, 691

17  F.2d 1281, 1288 (9th Cir. 1981).

18  It is well-settled that foreign blocking laws do not automatically "deprive an American

19  court of the power to order a party subject to its jurisdiction to produce evidence even though the

20  act of production may violate that statute."  *Richmark*, 959 F.2d at 1474 (quoting *Société Nationale*

21  *Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987)).

22  Instead, if a foreign blocking law is found to apply, the Ninth Circuit has adopted a balancing test

23  to determine whether foreign legal restrictions should excuse noncompliance with discovery or-

24  ders, based on the following non-exhaustive factors[6]:

25  > [1] the importance to the . . . litigation of the documents or other
26  > information requested; [2] the degree of specificity of the request;

---

27  [6]  NSO misstates the standard in suggesting that discovery may not be ordered "unless" all the
28  *Richmark* factors favor production.  Mot. at 2.  *Richmark* expressly sets forth a "balancing test," and indeed ordered production despite finding that certain factors favored the party opposing discovery.  *See* 959 F.2d at 1474–79.

7

[3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; . . . [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located . . . . [6] the extent and the nature of the hardship that inconsistent enforcement would impose upon the person, . . . [and] [7] the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state."

*Id.* at 1474–75.  The fifth factor listed above—the interest of each nation in the discovery—is the "most important factor" in the *Richmark* analysis.  *Id.* at 1476.

## ARGUMENT

### I.    NSO Has Not Carried Its Burden of Showing Israeli Law Prohibits "Any" Production

As a threshold matter, NSO has not met its initial burden to show that Israeli law bars production of any discovery that Plaintiffs seek here, let alone all of it.  *See Vetco*, 691 F.2d at 1288; *see also Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp. Ltd.*, 2019 WL 6134958, at *1 (N.D. Cal. Nov. 19, 2019) (requiring party opposing discovery to "prove that [foreign law] bars it from producing the discovery that Plaintiff[s] seek[]").  Though NSO claims that it is "undeniable" that ▮▮▮▮▮▮▮▮▮ the DECL prohibit production of information, Mot. at 8, it fails to substantiate any such restriction.  This Court should not "adhere blindly" to NSO's self-serving interpretation of Israeli law, especially when it is undermined by the documents that NSO has filed in this action.  *Aerospatiale*, 482 U.S. at 544 n.29.

First, the only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. No. 133-6
Ex. B.  NSO claims ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. at 5
n.2, but is silent as to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Even if ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as NSO claims, NSO has failed to explain
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

1 ███████████████████████████████████████████████████████

2 ██████████████████ Moreover, NSO has demonstrated the ability ████████████

3 ███████████████████████████████████████████████████████

4 ████████████████████████████████████████████ so that it

5 may comply with its U.S. discovery obligations.  Indeed, NSO's counsel confirmed NSO is un-

6 willing ████████████████████████████████████████████████████

7 ██████ for example, the identification of relevant personnel.  Perez-Marques Decl. ¶ 6.  NSO's

8 inaction is unsurprising, as ████████████████████████████████████████████

9 ████████████████████████████ *See* Dkt. No. 133-6 Ex. F ¶ 10.

10      Second, NSO has not explained what portions of the Requests, if any, implicate material

11 covered by the DECL.  It stands to reason that, if the DECL itself constituted a comprehensive bar

12 on discovery in this case, ████████████████████████████████████████████

13 ████████████████████████████ In fact, NSO acknowledges that at least eight Requests do

14 not implicate information covered by the DECL.  Mot. at 8.  And NSO has not even asked Israel

15 for an export license allowing it to honor its U.S. discovery obligations.

16      NSO has fallen short of meeting its burden to establish that Israeli law, through either the

17 DECL ████████████████ bars any discovery here.  Therefore, application of the *Richmark* factors

18 is unnecessary and NSO's motion for a protective order should be denied.

## II.   The *Richmark* Factors Favor Compliance With NSO's U.S. Discovery Obligations

20      Even if NSO had carried its burden to establish an applicable foreign law restriction (which

21 it has not), on balance, NSO has failed to show that a protective order is justified under the *Rich-*

22 *mark* factors.  On the most important factor, the balance of sovereign interests, the Israeli interest

23 is simply outweighed by the U.S. interests, which include not only the "substantial" interest in

24 allowing U.S. plaintiffs to vindicate their rights but also what President Biden has described as a

25 "fundamental national security and foreign policy interest" in combating the proliferation of com-

26 mercial spyware.  Perez-Marques Decl. Ex. R.  The remaining factors reinforce that conclusion,

27 because the discovery is directly relevant; there is no alternative means of obtaining that infor-

28 mation; NSO has not substantiated any realistic risk of hardship from complying with its discovery

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PROTECTIVE ORDER
CASE NO. 4:19-CV-07123-PJH

obligations; an order requiring it to do so is fully enforceable; and NSO has disseminated the type of information that Plaintiffs seek all over the world whenever it suits its business interests, all without any apparent repercussions under Israeli law (and presumably with Israel's permission).

### A.  The United States Has a Vital Interest in Allowing for This Discovery

The "most important factor" in the *Richmark* analysis is each nation's interest in the discovery.  959 F.2d at 1476.  The Court "must assess the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would 'affect important substantive policies or interests' of either the United States or the [other country]," which are discerned from "'expressions of interest by the foreign state,' 'the significance of disclosure in the regulation . . . of the activity in question,' and 'indications of the foreign state's concern for confidentiality *prior to the controversy*.'"  *Id*. (emphasis in original) (quoting Restatement (Third) of Foreign Relations Law § 442 cmt. c (Am. L. Inst. 1987)).

The United States' interest in this case is exceptional.  As an initial matter, the U.S. interest in allowing U.S. litigants to vindicate their rights under U.S. law is on its own "substantial." *Richmark*, 959 F.2d at 1476–77; *Fenerjian v. Nong Shim Co., Ltd*., 2016 WL 245263, at *5 (N.D. Cal. Jan. 21, 2016).  This is especially true for a suit brought to protect the interests of WhatsApp users. *See Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) (Hamilton, J.) ("[T]he public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy").[7]  But NSO errs in suggesting that is the full extent of the U.S. interest at stake.  Mot. at 16.  The U.S. interest in this case is far more acute and entitled to far greater weight—focused on the very conduct at issue in this litigation and implicating the United States' own national security interests and its

---

[7]    As a general matter, courts have recognized the U.S. interest in upholding the legal rights of American companies, such as the right of WhatsApp to operate its technology without unauthorized intrusions.  *See, e.g.*, *Optrics, Inc. v. Barracuda Networks, Inc.*, 2019 WL 5485890, at *2 (N.D. Cal. Oct. 25, 2019) ("This is a case alleging violations of United States trademark laws, which the United States has a compelling interest in enforcing."); *Finjan, Inc. v. Zscaler, Inc.*, 2019 WL 618554, at *3 (N.D. Cal. Feb. 14, 2019) ("Courts have found that there is a strong American interest in protecting American patents."); S. Rep., 99-432, 1, 1986 U.S.C.C.A.N. 2479, 2479 (discussing intent of Computer Fraud and Abuse Act to protect American businesses from computer crimes).

10

1    bedrock principles of individual liberty and human rights.  NSO's suggestion that the U.S. interest

2    is "minimal," *id.*, is contradicted by the facts.

3        This action arises from NSO's development, manufacturing, distribution, and operation of

4    commercial spyware to surveil members of civil society.  The United States has expressly and

5    repeatedly identified NSO's actions as contrary to its own national security interests.  Just last

6    month, President Biden issued an Executive Order prohibiting the U.S. government from using

7    commercial spyware like that at issue in this case, reiterating that "[t]he United States has a ***fun-***

8    ***damental national security and foreign policy interest in countering and preventing the prolif-***

9    ***eration of commercial spyware*** that has been or risks being misused for [improper] purposes, in

10   light of the ***core interests of the United States*** in protecting United States Government personnel

11   and United States citizens around the world; upholding and advancing democracy; promoting re-

12   spect for human rights; and defending activists, dissidents, and journalists against threats to their

13   freedom and dignity."  Perez-Marques Decl. Ex. R.

14       Even before this most recent rebuke, in November 2021, a committee composed of repre-

15   sentatives of the Departments of Commerce, State, Defense, Energy, and Treasury added NSO to

16   the Entity List, a list of "entities for which there is reasonable cause to believe, based on specific

17   and articulable facts, that . . . [they] have been involved, are involved, or pose a significant risk of

18   being or becoming involved in ***activities contrary to the national security or foreign policy inter-***

19   ***ests of the United States***."  86 Fed. Reg. 60759 (Nov. 4, 2021).  In making this determination, the

20   committee stated that "investigative information has shown that" NSO "developed and supplied

21   spyware to foreign governments that used this tool to ***maliciously target government officials,***

22   ***journalists, businesspeople, activists, academics, and embassy workers***."  *Id.*  At that time, the

23   U.S. Department of Commerce issued a statement saying that NSO Group's "tools have also ena-

24   bled foreign governments to conduct ***transnational repression***, which is the practice of authori-

25   tarian governments targeting dissidents, journalists and activists outside of their sovereign borders

26   to ***silence dissent***" and that "[s]uch practices ***threaten the rules-based international order***."  Pe-

27   rez-Marques Decl. Ex. F.

28       U.S. lawmakers have echoed these concerns while pushing for even stricter penalties.  In

11

December 2021, 18 members of Congress wrote to the Secretary of the Treasury and the Secretary of State, calling for increased sanctions on NSO and other commercial spyware companies that have "*enabled human rights abuses*," saying that they should receive the same treatment as individuals "responsible for gross violations of internationally recognized human rights."  Perez-Marques Decl. Ex. G.  In particular, the legislators noted that NSO had provided spyware that allowed for "*hacking into the devices of journalists and human rights activists*."  *Id.*

The United States has even expressed an interest in holding NSO accountable in this very litigation.  In its *amicus* brief filed in the Supreme Court, the United States opposed NSO's petition for writ of certiorari because it believed "*NSO plainly is not entitled to immunity here*," and flagged that the U.S. State Department had not suggested otherwise.  Perez-Marques Decl. Ex. N, at 7.  The United States also noted that NSO's status on the Entity List made it a particularly unsuitable candidate to claim immunity from suit in U.S. courts.  *Id.* at 15–16.

The United States could not have made its interest any clearer:  NSO's illegal spyware is contrary to fundamental U.S. security interests and violates core American values.  NSO is not above the law, and the United States has an exceptionally significant interest in holding NSO to account for its violations of U.S. law against U.S. companies in this litigation.

**B.  The Israeli Interest Does Not Outweigh the U.S. Interest**

This strong U.S. interest outweighs whatever interest Israel may have in secrecy.  In essence, ████████████████████████████████████████████████████████████ ████████████████████████████  ████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████  No representative of the Israeli government has appeared in this Court to provide any authoritative information about the application of the DECL ████████████████  nor has NSO ███████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████  Dkt. No. 133-6 Ex. B, at 2, 4.  The blanket and unadorned assertions that any disclosure will harm Israel's interests is entitled to little weight.  Any legitimate, general interest that Israel

has in protecting sensitive national security information is adequately addressed by the existing

protective order in this case, and vastly outweighed by the U.S. interest in vindicating Plaintiffs'

rights and deterring NSO's misconduct.

### 1. Israel's Interest is Adequately Addressed by a Protective Order

To whatever extent that ██████████ the DECL represent an applicable and legiti-

mate national security interest, the confidentiality order already entered in this case—or any further

order the Court deems appropriate to ensure confidentiality—suffices to protect that interest.  A

foreign state's interest in enforcing its secrecy laws "is diminished where the court has entered a

protective order preventing disclosure of the secret information."  *Masimo Corp. v. Mindray DS*

*USA, Inc.*, 2014 WL 12589321, at *3 (C.D. Cal. May 28, 2014); *accord In re Air Crash at Taipei,*

*Taiwan on Oct. 31, 2000*, 211 F.R.D. 374, 379 (C.D. Cal. 2002); *see also Vetco*, 691 F.2d at 1289

("This interest is further diminished where the party seeking the records . . . is required by law to

keep the information confidential.").

This Court has already entered a Stipulated Protective Order allowing for a heightened

degree of protection (Highly Confidential – Attorney's Eyes Only).  This provision has been used

for the production ████████████████████████████████████████████████

████   There is no reason that the same protective order in this case should be insufficient to

protect any legitimate Israeli interest in the confidentiality of discovery materials.  *Finjan*, 2019

WL 618554, at *3 (finding that United Kingdom's interest in protecting the privacy of its citizens

was diminished by highly confidential provision of protective order); *Fenerjian*, 2016 WL 245263,

at *5 (finding that protective order adequately addressed the privacy concerns expressed in South

Korean privacy law).  Courts routinely rely on similar confidentiality orders to permit disclosure

of matters of the utmost secrecy, including details of sensitive technology and matters bearing on

U.S. national security.[8]  There is no reason why this well-honed tool should not suffice for a private

---

[8]   *See, e.g.*, *Adlerstein*, 2021 WL 6133955, at *3 (holding "attorneys' eyes only" provision suf-
ficed to allow production of "highly sensitive information and documents . . . that [] may en-
danger or jeopardize the safety of law enforcement personnel and public safety"); *Wagafe v.*
*Trump*, 2018 WL 1737939, at *4 (W.D. Wash. Apr. 11, 2018) (concluding protective order
sufficed for production of documents that defendants—including two U.S. Presidents—argued
would "risk[] prejudice to national security and intelligence interests"); *Ibrahim*, 2013 WL

Israeli company's documents, which Israel allows NSO to share all over the world for its own commercial interests.

### 2.   There Are Reasons to Discount Israel's Interest in Secrecy

Numerous factors moreover diminish the weight to be afforded to the alleged Israeli interest in this case.  The Court need not accede to NSO's telling of Israel's interest in this matter.  *See* Mot. at 15–16.  *Richmark* makes clear that the "court is . . . empowered to look beyond the [foreign state's] assertion of its interest in preventing disclosure to determine the strength of that interest," as well as the "depth and nature" of the foreign state's interest.  959 F.2d at 1476 n.10.  For example, in *Richmark*, the Ninth Circuit discounted a similar secrecy interest because the foreign country "did not express interest in the confidentiality of this information prior to the litigation in question," asserted the interest only "when disclosure will have adverse consequences" for the foreign defendant, and did not "identif[y] any way in which disclosure of the information requested here will significantly affect [its] interests in confidentiality."  *Id.* at 1476–77.

Like the order in *Richmark*, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  *See* Dkt. No. 133-6 Ex. F.  ██████████  "need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States."  *Aerospatiale*, 482 U.S. at 544 n.29; *see also BrightEdge Techs., Inc. v. Searchmetrics, GmbH.*, 2014 WL 3965062, at *5 (N.D. Cal. Aug. 13, 2014) (giving less weight to German statute with the primary purpose of protecting German citizens from discovery in foreign courts).

---

1703367, at *4–5 (concluding protective order sufficed for production of "sensitive security information" that defendants argued might "provide terrorists and would-be terrorists insight into how to avoid the [security] procedures described in the documents"); *see also In re Subpoena to Third Party Sentieon, Inc.*, 2022 WL 17477092, at *2 (N.D. Cal. Dec. 6, 2022) (concluding protective order sufficed to produce trade secret-protected and highly confidential source code); *In re Facebook PPC Advert. Litig.*, 2011 WL 1324516, at *3 (N.D. Cal. Apr. 6, 2011) (same).

1    Further, NSO has provided only limited and self-serving information ████████
2    ██ , and not enough to establish an interest that outweighs the compelling U.S. interest described
3    above. ████████████████████████████████████████████████████████
4    ████████████████████████████████████████  Dkt. No. 133-6 Ex. B, at 1.  Although
5    ████████████████████████████████████████████████████████████████████
6    Israel has never appeared in this case to state any interest directly, despite multiple opportunities
7    to do so, including during briefing on NSO's failed invocation of foreign sovereign immunity.

8    NSO's acknowledged ██████████████████████████ further diminishes its weight.
9    Upon receiving the Requests, NSO unilaterally determined that the information Plaintiffs sought
10   was "either confidential or detrimental to the national security of the State of Israel," and notified
11   Israeli officials of that determination.  Dkt. No. 95 at 3.  Though it was "considering its position
12   with respect to the requests" as early as June 2020, ████████████████████████████
13   ██████████  *Id*.  It was only when this Court denied NSO's motions to dismiss and to stay dis-
14   covery ██████████████████████  Dkt. No. 133-6 Ex. D.  NSO was ████████████
15   ████████████████████████████████████████  *id.* Ex. F, which NSO
16   promptly did before seeking a new stay of discovery.  And while ████████████████████
17   ████████████████████████  NSO does not say ████████████████████████
18   ████████████████████████████████████████████████████████████████████
19   ████████████████████████████  Instead, ████████████████████████████
20   ████████████████████████████  *See* Dkt. No. 170 at 3 ¶ 2. The situation is
21   entirely different than the cases NSO relied upon, where foreign regulators prevented disclosure
22   of regulatory submissions and decisions that might interfere with their active investigations, not a
23   litigant's own underlying documents.  Mot. at 15–16.[9]

24   District courts in the Ninth Circuit have been rightly skeptical of ████████████████

25
26   [9]  *See, e.g.*, *In re CRT Antitrust Litig.*, 2014 WL 6602711, at *3 (N.D. Cal. Nov. 20, 2014) (de-
     clining to compel disclosure of unredacted EU agency decision that could undermine other
27   investigations); *In re TFT-LCD Antitrust Litig.*, 2011 WL 13147214, at *4–6 (N.D. Cal. Apr.
     26, 2011) (declining to compel disclosure of foreign regulatory submissions that could under-
28   mine ongoing investigation when defendants had already produced the underlying documents);
     *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1082-84 (N.D. Cal. 2007) (same).

████████████████████████████████████████   For example, in *Masimo*, after
being forced to produce documents, the defendant had submitted a "piece of advocacy" to a local
Chinese government agency, which then issued an order stating that the defendant's impending
production constituted state secrets.  2014 WL 12589321, at *1.  The magistrate judge found that
this official request was not a "real" indication that the documents were a state secret, especially
because the agency had issued its order without actually reviewing the underlying documents.  *Id*.
The district court agreed that the *Richmark* factors favored disclosure.  *Id.* at *2–3.  Similarly, in
*Sun Group*, a Chinese corporation resisted discovery based on a general civil statute prohibiting
disclosure in foreign litigation, as well as "China's interest in the subject matter of this litigation
and how the contract is interpreted, and the current trade war between the United States and
China."  2019 WL 6134958, at *4.  The court refused to credit China's interest in favoring a local
corporation in a U.S. dispute or the country's larger geopolitical interests.  *Id.*  In fact, the court
expressed concern "that an entity funded by the Chinese government is pursuing business in the
United States but then seeking and obtaining assistance from the Chinese government to evade
discovery that arises out of that business in the United States." *Id.*

It is moreover difficult to afford any weight to the unelaborated assertions that complying
with discovery endangers Israel's national security, or that the DECL completely forecloses any
discovery in this case, when █████████████████████████████████████
█████  NSO is granted licenses under the DECL to export its goods and information to sover-
eign clients around the world—including, presumably, licenses allowing the known misconduct
directed at U.S. persons and computer systems that is described in the complaint.  Indeed, in Jan-
uary 2023, NSO's CEO told the *Wall Street Journal* that the company had "recently attracted new
deals" from foreign governments, all while ██████████████████████████   Perez-
Marques Decl. Ex. O.  It stands to reason that attracting new customers, and servicing existing
ones, would entail providing those customers with many of the same types of materials and infor-
mation Plaintiffs seek in discovery.  Likewise, NSO's reported efforts to attract new investors (or
even purchasers) would reasonably require sharing the type of financial information Plaintiffs seek
about NSO's profits and financial results.  *See* Perez-Marques Decl. Exs. H, L.  Tellingly, NSO

refused to admit or deny that "since July 19, 2020," it has "shared information concerning [NSO's] finances with a Person located outside Israel."  Perez-Marques Decl. Ex. S, at 9.  This "evasive denial . . . that does not specifically deny the matter . . . may be deemed an admission." *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981).

Even in its motion, NSO selectively discloses information about how Pegasus functions that is contrary to its position that it can share no "information" or "documents" under ████ ████ the DECL.  *See* Dkt. No. 179-3 ¶¶ 4–7.  NSO attaches a declaration from its chief executive officer, who claims that the specific type of Pegasus technology ████████████ involves sending WhatsApp messages to a target device, while the type of Pegasus technology ██████████████████████████ *Id*. ¶¶ 6, 8.  This is part of a pattern of NSO publicly sharing carefully curated details about its technology whenever NSO believes it will advance its interests.  *See, e.g.*, Perez-Marques Decl. Exs. C, M.

Each of these considerations calls into question the legitimacy of Israel's interest in anything other than shielding NSO from ordinary discovery which, as the *Richmark* court stated, is "something [Israel] has no legitimate state interest in preventing."  959 F.2d at 1477.

### C.  The Remaining *Richmark* Factors Also Favor Disclosure

With the "most important" *Richmark* factor favoring denial of NSO's motion, NSO cannot show that any other *Richmark* factor warrants a different conclusion.  And in fact, contrary to NSO's arguments, the remaining factors on balance favor disclosure and a denial of its motion.

#### 1.  *The Information Sought Is Important and Specific*

The party discovery sought in the Requests is not just "directly relevant," "it is crucial" to Plaintiffs' claims about how NSO designed, used, and distributed spyware that misused WhatsApp's computers and violated its Terms of Service.  *Richmark*, 959 F.2d at 1475.  All the Requests are directly relevant and sufficiently specific, tethered to the elements of Plaintiffs' claims and targeted to potentially disputed fact issues.  Because NSO's responses "should directly show or disprove some of Plaintiffs' primary allegations," this factor favors disclosure and provides yet another reason to deny NSO's motion.  *Connex R.R. LLC v. AXA Corp. Sols. Assurance*, 2017 WL 3433542, at *12 (C.D. Cal. Feb. 22, 2017); *see also In re CRT*, 2014 WL 5462496, at

17

1    *5 (N.D. Cal. Oct. 23, 2014) (favoring disclosure where information was "crucial" to case);

2    *Masimo*, 2014 WL 12589321, at *3 (favoring disclosure where information was "substantially

3    necessary" to proving claim).

4           This case concerns attacks on WhatsApp users via WhatsApp servers and the WhatsApp

5    application in violation of U.S. and California law and the WhatsApp Terms of Service, and seeks

6    injunctive relief based on the risk of future attacks.  *See* Dkt. No. 1 ¶¶ 30–48; Dkt. No. 111 at 39–

7    40.  The Requests seek information precisely targeted to those claims and that relief.  *See, e.g.*,

8    Dkt. No. 180-1 at 7 (requesting "All Documents and Communications Concerning any WhatsApp

9    Accounts used to develop, test, transmit, install, distribute, or use any NSO Spyware").  Other than

10   a handful of Requests seeking the identification of responsible personnel, the Requests are limited,

11   or were intended to be limited, to NSO's spyware that targets WhatsApp's servers or WhatsApp

12   users by means of the WhatsApp application.  *See* Dkt. No. 180-1.[10]

13          The Court has already held that Plaintiffs can pursue claims based on NSO's unauthorized

14   access to both WhatsApp's servers and victim devices.  Dkt. No. 111 at 39–40.  Such requests are

15   thus "very specific," which "favors production."  *Fenerjian*, 2016 WL 245263, at *4.  In addition,

16   the Requests serve the crucial function of testing a host of assertions NSO has made in this case,

17   including with respect to its role in deploying spyware and its deliberate targeting of U.S. servers.[11]

18   NSO's own documents, including the source code showing how its spyware operates, are the best,

19   if not the only, way for Plaintiffs to get the information that they need.

20          Unable to deny the importance of the discovery at the core of the Requests, NSO quibbles

21   with their breadth.  These arguments are a red herring.  NSO admitted that narrowing the Requests

22   would not resolve its Israeli law objections, and it does not demonstrate any exemptions from the

---

[10]  To the extent that NSO misconstrues any of the Requests as seeking information concerning
spyware with no connection to WhatsApp merely because victims happened to also use
WhatsApp, Plaintiffs have already clarified their intention for NSO and indicated their will-
ingness to expressly revise the Requests to avoid any ambiguity.

[11]  Although NSO has admitted that its "business model" is based on developing, marketing, and
distributing spyware capable of collecting information from Target Devices, it maintains,
among other things, that it played only a limited direct role in the attacks and that the operation
of its spyware complied with WhatsApp's terms and conditions.  *See* Dkt. No. 45 at 21.

18

1   DECL ███████████ that could guide any narrowing required to comply with those legal

2   restrictions.  NSO's own motion makes clear that it maintains it cannot respond to "any" of Plain-

3   tiffs' requests.  Mot. at 8 ("[E]very RFP would cause Defendants ██████████████████").

4   That is not a position turning on the relevance, specificity, or proportionality of individual requests.

5         NSO's request-by-request challenges thus cannot (and do not) justify the sweeping relief

6   that it seeks: an order completely exempting it from producing any of the information sought in

7   the Requests due to Israeli law restrictions.  *See* Dkt. No. 176-4 Ex. C ¶ 3.  As explained below,

8   any narrowing of the Requests based on NSO's run-of-the-mill burden and proportionality objec-

9   tions can be addressed through the ordinary discovery dispute process.

10                    *2.   There Is No Alternative Means of Obtaining the Information Sought*

11         The lack of any other means of obtaining the information also favors disclosure.  The bur-

12   den of demonstrating an alternative mechanism falls upon NSO, as the party invoking the foreign

13   law prohibition.  *Fenerjian*, 2016 WL 245263, at *4.  It must show that "the information sought

14   can *easily be obtained* elsewhere" and is "substantially equivalent to the requested discovery."

15   *Richmark*, 959 F.2d at 1475.

16         While NSO suggests the Hague Convention is another way Plaintiffs could *seek* the infor-

17   mation, it stops short of saying Plaintiffs will *obtain* the information through this mechanism,

18   much less do so "easily."  Any such suggestion would be contrary to NSO's principal contention,

19   that ████████████ Israeli law would strictly *prohibit* discovery.  NSO's own cases, Mot. at 14,

20   make clear the Hague Convention is not an alternative where it would be futile or ineffective.[12]

21         NSO's references to third-party discovery and information within Plaintiffs' control, Mot.

22

23   ─────────────────
    [12]   *See Sun Group*, 2019 WL 6134958, at *3 ("[I]f Plaintiff is not actually able to obtain docu-
24   ments necessary to litigate its claims, then this factor would shift towards favor of disclosure
     through the Federal Rules of Civil Procedure."); *see also In re CRT*, 2014 WL 5462496, at *6
25   (finding Hague Convention practically unavailable because "France is particularly slow to ex-
     ecute Hague Convention requests, and when they are executed, often the results are unsatis-
26   factory"); *Meggitt (Orange Cnty.), Inc. v. Yongzhong*, 2014 WL 12967458, at *2 (C.D. Cal.
     Mar. 21, 2014) (recognizing "that the procedures of the Hague Convention 'are slow and cum-
27   bersome, and subject discovery to the law of the country where the producing party is located'"
     (quoting *Munoz v. China Expert Technology, Inc.*, 2011 WL 5346323, at *1 (S.D.N.Y. Nov.
28   7, 2011))).

                                                   19

at 15, fare no better.  NSO admitted during the parties' discussions that, while certain third parties may have responsive information, they would not be an alternative source for the materials sought from NSO.  Perez-Marques Decl. ¶ 6.  Documents from third parties could in any event never substitute for NSO's own documents and communications regarding its own role with respect to the claimed violations.  *See, e.g.*, Dkt. No. 180-1 at 6 (requesting documents and communications concerning NSO's "analysis, reverse engineering, disassembling, or emulating of any version of the WhatsApp application" and the "NSO Spyware used by NSO to communicate with WhatsApp.").

### 3. NSO Has Not Established Hardship from Compliance

NSO has not established any hardship that would result unless it is excused from its U.S. discovery obligations.  In evaluating this factor, courts consider "[t]he effect that a discovery order is ***likely*** to have on the foreign company" and if it "is ***likely*** to face criminal prosecution . . . for complying."  *Richmark*, 959 F.2d at 1477.

As an initial matter, NSO has not established that it (or its employees) will likely face criminal prosecution or any similar hardship in Israel if ordered to comply with its U.S. discovery obligations.  NSO fails to identify a comparable example of Israel prosecuting a company for producing documents pursuant to a foreign court order under a strict confidentiality order—whose sufficiency ███████████████████████████████████████████████████████ ████████████████  Instead, the exemplar prosecutions it references involve the unauthorized export of actual weapons and defense equipment.  Mot. at 16–17.

Moreover, NSO's purported fear of serious sanctions in Israel is dubious given its admittedly close relationship with Israel.  For example, public reports indicate that Israel has lobbied to remove NSO from the Entity List.  Perez-Marques Decl. Ex. K.  It is difficult to credit NSO's fears of criminal prosecution for merely complying with its U.S. legal obligations when, at the same time, Israel is lobbying the United States to allow NSO to do business here again.  NSO's close relationship to Israel is also underscored ███████████████████████████████████

Any risk of criminal prosecution in Israel should also be discounted in light of NSO's apparent failure to seek permissions or accommodations in Israel in order to comply with its U.S.

discovery obligations.  As the Ninth Circuit has cautioned, "'if the hardship is self-imposed, or if [the company] could have avoided it, the fact that it finds itself in an undesirable position will not work against disclosure of the requested information.'"  *Richmark*, 959 F.2d at 1477.  As noted below, in all likelihood, ordering NSO to comply with its U.S. discovery obligations will not subject NSO to criminal prosecution but will instead appropriately incentivize NSO to maximize its ability to lawfully comply.  Finally, to the extent any threat of Israeli criminal prosecution were to remain after such efforts, that would not preclude issuing an order compelling production.  *See Société Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212 (1958).

NSO thus has not demonstrated any likely hardship that is different or greater than the hardship faced by the countless international companies routinely ordered to produce discovery in the United States despite conflicting foreign law obligations.  That commonplace hardship is not enough reason for a U.S. court to decline to enforce its own laws.

### 4.   A Discovery Order Is Enforceable and Necessary to Deter Future Misconduct

NSO does not dispute that an order compelling discovery "can reasonably be expected to achieve compliance with the rule prescribed" by this Court.  *Richmark*, 959 F.2d at 1475.  Nor could it, because the Court has already found that it has personal jurisdiction over NSO as a result of its deliberate targeting of Plaintiffs' U.S.-based servers,[13] and NSO's significant interests in the United States indicate it is likely to comply with this Court's orders.  For example, NSO was previously owned by U.S.-based venture capital firm Francisco Partners, had a "North-American branch" called Westbridge that NSO used to sell its spyware in the United States, Perez-Marques Decl. Ex. U, has engaged U.S.-based public relations firms and financial advisers, *id*., Exs. D, E, and its current majority owner Omri Lavie has lived in the United States, *id.* Ex. Q.  NSO's conduct since being placed on the Entity List in November 2021 suggests that NSO hopes to do business in or with the United States again in the future.  *Id.* Ex. M.

Moreover, NSO's appearance in this Court to set aside its default, and its efforts to dismiss

---

[13]   It is quaint that NSO continues to dispute that assertion as an evidentiary matter, but also seeks to be excused from producing any of the evidence that would prove (or disprove) it.

Plaintiffs' claims for injunctive relief, all indicate that NSO takes the risk of an adverse order from this Court very seriously.  All of NSO's actions suggest that it will be responsive to an order compelling NSO to provide discovery, or at least to any sanctions enforcing that order.

Even if NSO opts not to comply, compelling discovery would not be fruitless, because it could still materially advance the litigation and further the interests of justice.  For instance, the *Richmark* court concluded it was appropriate to issue discovery and contempt orders even though the Chinese entity was unlikely to comply, because it had "in the past done substantial business in this country" and "[s]hould it wish to do business here in the future, it would have to pay the judgment or risk having its assets seized and its business interrupted."  *Id*. at 1478.  A similar order would "send a message to companies who wished to do business in the United States in the future." *Id*.  It would also incentivize NSO (and Israel) to accommodate the U.S. interests here to the extent possible, and there is no evidence any such effort has yet occurred.  If NSO ultimately elects not to comply, an appropriate sanction can be tailored that takes into account NSO's refusal to disclose information directly relevant to Plaintiffs' allegations.

### 5.   The Origin of the Documents Is Not a Material Hindrance to Disclosure

Although many of the materials Plaintiffs have requested may have originated in Israel, where NSO is based, *see Richmark*, 959 F.2d at 1475, a non-U.S. origin is not an absolute bar to production, *see, e.g.*, *Vetco*, 691 F.2d at 1290 (allowing production from Switzerland to United States); *Finjan*, 2019 WL 618554, at *2 (allowing production from United Kingdom to United States).  This factor actually favors disclosure where, as here, at least some of the documents have been transmitted to the United States in the past.  *See Proofpoint, Inc. v. Vade Secure, Inc.*, 2020 WL 504962, at *2 (N.D. Cal. Jan. 31, 2020) (finding that factor favored disclosure when "any information kept by Defendant . . . is either accessible from this district or easily transmitted or transported here").  For example, NSO must have shared some of the information with its California-based former owner, or with U.S.-based intermediaries when marketing NSO's suite of spyware in the United States.  The FBI also has admitted that it once licensed NSO's spyware and installed it in a U.S. facility, Perez-Marques Decl. Ex. I, confirming that NSO must have received a license under the DECL to export its technology and some of the information Plaintiffs seek to

the United States.  In addition, NSO continues to sell its spyware, and thus disseminate relevant information to potential clients, all over the world.  There is little reason why the Israeli origin of these well-traveled documents should be given much weight or prevent disclosure in this litigation.

In any event, NSO does not assert that all its documents originated from and are currently located in Israel.  It acknowledges that some documents originated from "other foreign countries," Mot. at 14—which might include relevant documents about any illicit use of NSO spyware by NSO's sovereign clients.  Some documents likely also originated in the United States.  For example, Plaintiffs allege that NSO used WhatsApp servers to route malicious code to a Target Device using a U.S. number, and may have done so from the United States.  *See* Dkt. No. 1 ¶ 38.  None of the cases that NSO cites support the idea that NSO can refuse to produce documents located outside of Israel just because other responsive documents have an Israeli origin.[14]  Accordingly, NSO has failed to show that any of the *Richmark* factors defeat Plaintiffs' right to discovery.

## III.    NSO's Relevance and Proportionality Objections Are Baseless and Premature

NSO dedicates a large portion of its submission to challenging the relevance and specificity of individual Requests, Mot. at 9–14—including in support of a generic argument under Rule 26 that it concedes is "independent of Israeli law," *id*. at 18–20.  NSO's objections are precisely the types of request-by-request challenges that the Court instructed NSO not to raise in this motion, and that NSO's counsel indicated it would reserve for the magistrate judge in the first instance. *See* Perez-Marques Decl. Ex. B, at 17:15–24.  While Plaintiffs consider such matters beyond the scope of what the Court agreed to entertain and what is properly addressed on this motion, Plaintiffs address briefly two of NSO's threshold objections to the Requests, both of which were extensively briefed in Plaintiffs' previous motion to compel.  *See* Dkt. No. 116.[15]

---

[14]    *See Sun Group*, 2019 WL 6134958, at *3 (finding that this factor favors using the Hague Convention only "to the extent the responsive documents are in the PRC"); *In re CRT*, 2014 WL 6602711, at *3 (noting potential alternative of using documents provided in parallel U.S. litigation); *Tiffany*, 276 F.R.D. at 152 n.6 ("[M]y decision addresses only the production of documents from the Banks' China branches.").

[15]    Plaintiffs' motion to compel was denied without prejudice after the Court entered the stay pending appeal, Dkt. No. 155 at 15, and has not been renewed, given the Court's guidance that the threshold Israeli law issue should be addressed first.  Should the Court decide to hear these objections at this stage, Plaintiffs request the opportunity to respond in full.

***Time Period.*** NSO argues that Plaintiffs are only entitled to discovery from between January 2018 and May 2019. Mot. at 13. In doing so, NSO ignores that Plaintiffs are entitled to discover the full scope of NSO's misconduct relevant to Plaintiffs' claims, including their claim for injunctive relief based on the clear risk of ongoing harm. *See* Dkt. No. 109 at 6 (arguing that NSO's "admitted 'business model' entails ongoing violations of law" that "on its own establishes a substantial risk of future harm"). Plaintiffs' concern with respect to ongoing and future attacks is more than well-founded, given NSO's own admissions that selling spyware and providing related support is its "business model," Dkt. No. 45 at 6, and that "the next exploit is an inevitability," Perez-Marques Decl. Ex. J. NSO further acknowledges that Plaintiffs' apps are used by over one billion people worldwide, *see, e.g.*, Dkt. No. 45 at 4, making WhatsApp users a natural (if not inevitable) target for NSO's admittedly ongoing efforts to market and deploy commercial spyware.

NSO has already sought unsuccessfully to narrow the case in this way. NSO moved to dismiss Plaintiffs' claim for injunctive relief, but the Court administratively terminated that motion during the duration of the stay, and prohibited NSO from refiling it after the stay was lifted. *See* Perez-Marques Decl. Ex. B, at 13:2–6. That ruling reflected the Court's guidance that the question of injunctive relief should be determined based on "the full picture on a full factual record, and not on the pleadings." *See id.* at 10:15–16; *see also id.* at 11:21–23 ("[I]f you want to bring a motion with respect to the injunctive relief, you're going to have to do so during the summary judgment stage."). It follows that discovery into the risk of ongoing harm caused by NSO's current activities and its continuing development of its suite of spyware is an indispensable issue for discovery, precluding any limitation to only the time period of 2018 and 2019. Such discovery is plainly proportional to Plaintiffs' need to prove a basis for injunctive relief, and NSO's focus on only Plaintiffs' remediation costs is meritless.[16]

***Limitation to Pegasus Spyware.*** Similarly, NSO contends that discovery should be limited

---

[16] NSO seeks a premature ruling that disgorgement is unavailable. NSO is not only incorrect, *see, e.g.*, *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 669 (9th Cir. 2010) (disgorgement for breach of contract); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (same under California law), but the Court made clear that "[w]e don't generally look at the remedy sought before liability." Perez-Marques Decl. Ex. B, at 9:14–15.

to a particular brand of spyware—Pegasus—used in a specific attack Plaintiffs were able to iden-
tify in 2019, and even more limited to the 1,400 victims Plaintiffs identified in their pre-suit inves-
tigation.  Mot. at 12.  NSO's position reflects a misreading of the complaint, and is inconsistent
with the law governing civil discovery.  *See Campos v. San Francisco State Univ.*, 1999 WL
35140127, at *2 (N.D. Cal. Mar. 19, 1999) (Hamilton, J.) ("Courts will rarely reject discovery
requests on the ground the information sought is not 'relevant to the subject matter' of the action.").
The complaint makes clear that Plaintiffs' claims are not limited to Pegasus.  It alleges that NSO
"caused Target Devices to download and install additional malware—believed to be Pegasus *or
another remote access trojan developed by Defendants*."  Dkt. No. 1 ¶ 24.  It explicitly refers to
NSO's entire suite of spyware products.  *See id.* (defining "Pegasus and its variants" as "collec-
tively, 'Pegasus'").  And it alleges NSO's pattern of targeting Plaintiffs' servers using its "spy-
ware," not just Pegasus.  *See, e.g., id.* (NSO "manufactured, distributed, and operated surveillance
technology or 'spyware' designed to intercept and extract information and communications from
mobile phones and devices").

NSO's position is also incorrect legally.  Plaintiffs are entitled to take "discovery regarding
their claims generally, not just the specific factual claims pled in their Complaint."  *Vallabharpu-
rapu v. Burger King Corp.*, 276 F.R.D. 611, 615 (N.D. Cal. 2011).  Given that Plaintiffs' claims
include claims for prospective injunctive relief, discovery cannot be cabined to the particular vic-
tims identified by Plaintiffs through pre-suit investigation, or a specific brand of NSO's spyware
used in those attacks, especially if NSO is continuing to infiltrate Plaintiffs' platforms with either
other products or an upgraded version of the same spyware.  *See Long v. Hewlett-Packard, Co.*,
2006 WL 3751447, at *2–3 (N.D. Cal. Dec. 19, 2006) (granting motion to compel and rejecting
argument that discovery should be limited to facts contained in the complaint concerning two spe-
cific computer models owned by defendants).  Discovery would be a limited process indeed if
parties were limited to seeking to learn only what they already knew.

## CONCLUSION

For the foregoing reasons, NSO's motion for a protective order should be denied.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PROTECTIVE ORDER
CASE NO. 4:19-CV-07123-PJH

Dated:  April 24, 2023

DAVIS POLK & WARDWELL LLP

By:  /s/ Antonio J. Perez-Marques
       Greg D. Andres
       Antonio J. Perez-Marques
       Craig T. Cagney
       (admitted *pro hac vice*)
       DAVIS POLK & WARDWELL LLP
       450 Lexington Avenue
       New York, New York 10017
       Telephone: (212) 450-4000
       Facsimile: (212) 701-5800
       Email: greg.andres@davispolk.com
            antonio.perez@davispolk.com
            craig.cagney@davispolk.com

       Micah G. Block (SBN 270712)
       DAVIS POLK & WARDWELL LLP
       1600 El Camino Real
       Menlo Park, California 94025
       Telephone: (650) 752-2000
       Facsimile:  (650) 752-2111
       Email: micah.block@davispolk.com

       *Attorneys for Plaintiffs WhatsApp LLC and Meta Platforms, Inc.*

26