# Exhibit B

# COURT OF APPEAL FOR ONTARIO

CITATION: Actava TV, Inc. v. Matvil Corp., 2021 ONCA 105
DATE: 202102019
DOCKET: C68521

Fairburn A.C.J.O., Pepall and Roberts JJ.A.

BETWEEN

Actava TV, Inc., Master Call Communications, Inc., Master Call Corporation and
Rouslan Tsoutiev

Applicants (Respondents)

and

Matvil Corp.

Respondent (Appellant)

Clifford Cole and Alex D. Zavaglia for the appellant

Kevin O'Brien, Lauren Harper and Carla Breadon for the respondents

Heard: November 10, 2020 by video conference

On appeal from the order of Justice Barbara A. Conway of the Superior Court of
Justice, dated July 6, 2020.

**Pepall J.A.:**

2021 ONCA 105 (CanLII)

**INTRODUCTION**

[1]    This appeal addresses the enforcement of a letter of request ("LoR"). The enforcement order compels a non-party to produce its confidential and proprietary financial and valuation documents for one purpose: to assist the expert of parties to an action in the United States calculate their damages using comparative industry data.

[2]    The application judge in the case under appeal granted such an order to the respondents, Actava TV, Inc. ("Actava") and other Actava-related parties, the plaintiffs in the U.S. action, against the appellant, Matvil Corp. ("Matvil"), an Ontario company that is a non-party in that action. One of the defendants in the U.S. action, Kartina Digital GmbH ("Kartina"), is Matvil's main competitor.

[3]    For the reasons that follow, I would allow the appeal.

**FACTS**

**(1)    Russian TV Channels' First U.S. Lawsuit**

[4]    On February 19, 2016, various Russian owners, operators, and producers of television channels that are broadcast in Russian (the "Russian TV Channels") sued Actava, the other Actava-related respondents in this appeal, and Matvil in the United States District Court, Southern District of New York, for allegedly broadcasting content without proper licences.

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

[5]     Although its business has now changed, at the time of the lawsuit, Actava was in the business of streaming Russian-language TV channels to customers in North America. The other Actava respondents, Rouslan Tsoutiev, Master Call Communications, Inc. and Master Call Corporation, are the Chief Executive Officer of Actava and two other companies he controls.

[6]     Matvil is a private, Ontario-based global streaming service that broadcasts television content, predominantly from Russia, Ukraine, and former Commonwealth of Independent States countries, to customers around the world. It re-transmits content from the Russian TV Channels to subscribers. It has operated for two decades and has approximately 32 employees in Canada.

[7]     Shortly after the commencement of the Russian TV Channels' U.S. action, Matvil established that it did have the necessary licences, and the Russian TV Channels withdrew their claims against it. In contrast, Actava did not have the necessary licences and, together with the other Actava respondents, entered into a settlement of the lawsuit. As part of that settlement, Actava and the other Actava respondents agreed to be bound by injunctions that prohibited certain broadcasting absent consent of the Russian TV Channels.

**(2)     Referral Agreement**

[8]     In September of 2016, Actava and Matvil entered into a 24-month referral agreement, whereby Actava was to provide Matvil with marketing services and refer customers to Matvil from five states in the northeastern U.S. From September

Page:  4

2016 to August 2018, Actava referred some customers to Matvil. Actava's referrals represented a very small percentage of Matvil's customers. Matvil terminated the referral agreement in August 2018.

**(3)    Russian TV Channels' Second U.S. Lawsuit Against Actava**

[9]    On December 13, 2016, the Russian TV Channels sued Actava and the other Actava respondents for contempt, alleging that they had breached the injunctions entered into as part of the parties' settlement of the first action. This second action was dismissed in the fall of 2017. During the lifespan of this lawsuit, Actava continued to refer new clients to Matvil but placed its advertising services on pause.

**(4)    Actava's U.S. Lawsuit Against Russian TV Channels and Kartina**

[10]    On July 23, 2018, Actava and the other Actava respondents sued the Russian TV Channels in the United States District Court, Southern District of New York. They later added Kartina as a defendant.

[11]    In their lawsuit, Actava and the other Actava respondents allege that the Russian TV Channels and Kartina engaged in an unlawful campaign to interfere with Actava's business. They assert that the Russian TV Channels and Kartina's actions prevented Actava from performing its referral agreement with Matvil for approximately 10 months and that they pressured Matvil to terminate the referral agreement. Actava and the other Actava respondents claim damages for tortious interference, malicious prosecution, breach of contract, and unfair and deceptive

2021 ONCA 105 (CanLII)

business practices in violation of s. 349 of the New York General Business Law. The damages requested include Actava's lost revenue and profits arising from the termination of the referral agreement.

[12]   Matvil is not a party to Actava's U.S. action nor do any of the parties to that action make any allegations of wrongdoing against it. Its conduct is not in issue and it has no interest in the U.S. action.

[13]   Actava has in its possession all documents concerning Actava that were exchanged between any Russian TV Channel and Matvil between June 1, 2016 and December 31, 2018 and all documents concerning Matvil's termination or prospective termination of the referral agreement.[1]

**(5)   The LoR**

**(a)   The Request for Matvil's Financial Information**

[14]   To calculate Actava's damages in the U.S. action, Actava's U.S. damages expert, Sidney Blum, was of the view that he would like to calculate Actava's damages using the "yardstick" method of assessment. This looks at Actava's actual growth during the subject period and compares it to the financial results of "other 'comparable' companies in the same industry".[2] There are no publicly-traded companies that carry on business similar to that of Actava and, although there is

---

[1] This was confirmed in oral argument.
[2] In contrast, Matvil's expert opines that both the "sales projection" and the "before-and-after" methodologies could be used to calculate Actava's damages and that neither methodology requires Matvil's documents to do so.

2021 ONCA 105 (CanLII)

illegal activity, only two other companies legally provide Russian broadcasting services in North America: Kartina and Matvil.

[15]   Actava hypothesizes that its own revenues would have followed an upward trajectory similar to Matvil's. That said, there is no evidence that Matvil's profits were on an upward trajectory, a fact acknowledged by Actava's counsel in oral submissions before us. Indeed, the affidavit of Actava's general counsel speculates that "[i]f Matvil's market share in the United States and Canada grew, Actava's position is that its profits would have followed a similar upward trajectory."

[16]   Actava attempted unsuccessfully to get the documents it desired from Matvil some months before it commenced its action against the Russian TV Channels and Kartina. Later, Actava and the other respondents moved before the U.S. court for an LoR. The proceeding was in writing and summary in nature. The only evidence filed in support was a declaration from the Actava respondents' U.S. litigation counsel. He described the U.S. action and stated that it was Actava's intention to argue at trial a theory of damages that linked Actava's growth (but for the tortfeasors) to the growth of other streaming entertainment services. In the recitals, the LoR repeats Actava's allegation that its business would have grown at a trajectory similar to that of other providers, "including but not limited to Matvil". Actava advised Matvil that it would be bringing a motion and provided a copy of the draft request, however no consent was forthcoming from Matvil. Matvil was not

2021 ONCA 105 (CanLII)

given notice of the motion or served with the motion material, nor did it participate in the motion.

### (b)    The Issuance of the LoR

[17]   The U.S court granted Actava's motion and issued the LoR. The LoR originally sought the production by Matvil of all documents, including communications, between the Russian TV Channels and Matvil concerning either Actava or Mr. Tsoutiev between June 1, 2016 and December 31, 2018; and all documents, excluding communications, concerning Matvil's termination or prospective termination of the referral agreement, including correspondence between Matvil, on the one hand, and either Actava or Mr. Tsoutiev on the other. Matvil agreed to provide this information and, as mentioned, has done so. This information is not in issue.[3]

[18]   Before the application judge and on appeal, only two categories of documentation sought in the LoR are in issue. The LoR seeks: (i) yearly reports, from 2015 to present, of the revenue and/or profits derived by Matvil; and (ii) all documents, from 2015 to present, containing or constituting an appraisal of Matvil's valuation.

[19]   Thus, the contested production sought both pre-dates and post-dates the period of time (2016 to 2018) during which the referral agreement was in effect; it

---

[3] The issue in dispute is production of documents although the LoR also requested that a representative from Matvil attend a deposition.

is not limited to business carried on under the referral agreement but extends to Matvil's entire global business; and it includes not just raw data but also Matvil's work product, that is, documents that summarize, review, analyze, value, or comment on Matvil's financial performance, including, for example, financial statements and valuation reports prepared by external advisors. It would also require disclosure of operating expenses, including the licensing fees Matvil paid for content with different licensors, including the Russian TV Channels. The information sought is private, proprietary, and not publicly available. Other than the subset of information relating to Actava's referrals which Matvil has already provided and which is not in issue, there is no factual nexus between Matvil's materials and the alleged wrongful conduct on the part of the defendants to the U.S. action.

[20]   In summary, the information in issue is sought not because of Matvil's involvement in the factual matrix but because it is a comparator company. Put differently, the documents are desired to assist the expert in his calculation of Actava's damages, nothing more.

**(6)    Actava's Application to Enforce the LoR**

[21]   Actava and the other Actava respondents then brought an application in the Ontario Superior Court of Justice to enforce the LoR. Matvil contested the application, asserting that it has a legitimate interest in protecting the information

2021 ONCA 105 (CanLII)

sought from competitors. In an affidavit sworn November 27, 2019, Matvil's Chief

Executive Officer explained some of its concerns:

> Even if Kartina is excluded from the parties who are
> provided access to the disclosure, Kartina has a close
> relationship with many of the Channels. The Channels
> operate primarily in Russia. Even with a confidentiality
> order in place, I believe there is a real risk of persons
> sharing Matvil's financial information with Kartina and the
> Channels which can prove to be detrimental to the future
> operation of Matvil. I believe based on my experiences
> Canadian or US confidentiality orders are not a sufficient
> deterrent because of the difficulty in enforcing such
> orders in Russia and the importance placed there on
> personal relationships in business over legal obligations.
>
> I am also concerned that Actava may attempt to resume
> its former business of broadcasting foreign language
> programming in the future, and thus may resume being
> one of Matvil's main competitors. Disclosing our
> confidential financial information to Actava may put us at
> a significant competitive disadvantage if, for example,
> Actava settles the litigation with the Channels and the
> injunction is lifted.

[22]    Actava had obtained the LoR prior to completing its discovery process in the

U.S. action and before it had sought comparable information from Kartina who, as

mentioned, carries on a business comparable to that of Matvil. Actava admitted

that it is "impossible" and "simply not believable" that Kartina, a party to the U.S.

action, does not have the sort of information Actava is seeking. It did not conduct

an oral examination of Kartina. The application judge gave Actava an opportunity

to seek equivalent information from Kartina, which it did. Actava's expert then said

that the productions he received were insufficient for him to opine on the damages.

2021 ONCA 105 (CanLII)

For its part, Matvil continued to express concern about producing the information sought and protecting its financial information.

[23]   On May 17, 2019, a generic protective order was issued in the U.S. action independent of the LoR. Among other things, the order provides that a producing party may designate material as "confidential", "attorneys' eyes only" ("AEO") or "experts' eyes only" ("EEO"). Where the material is designated confidential, other persons subject to the order may disclose the information to various persons, including the parties, various counsel, various witnesses, and stenographers. Where the information is designated for AEO or EEO, other persons subject to the order may disclose such information only to experts and various persons, including various counsel and stenographers. A party can object to the designation. Although the order is generic in nature, it would encompass Matvil's productions.

[24]   The protective order further provides that it applies only to the pretrial phase of the action. Moreover, the parties may refer to documents marked confidential, AEO or EEO in support of written or oral argument, subject to certain requirements. To the extent any designated material is contained or reflected in any filing, counsel must make a motion to file the submission under seal. If the motion is granted, a redacted version of the sealed submission must be filed together with the sealed submission so that the public may access the redacted version. The protective order can also be amended or modified.

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

[25]   Unchallenged expert evidence from a U.S. attorney filed by Matvil on Actava's application to enforce the LoR stated that the protective order falls short of adequately protecting Matvil's financial information. He noted that the confidentiality designation may be challenged by a party and left to the discretion of the U.S. court. It does not apply to oral testimony or oral submissions. It does not preclude publication by anyone reporting on the trial.

[26]   Significantly, as Actava's expert seeks to use Matvil's information as a single-source comparator analysis, the identity of Matvil as the comparator will be self-evident despite the terms of any protective order. As the U.S. attorney opined, redacting or anonymizing Matvil in public filings would do little to protect Matvil's sensitive business information.

[27]   On July 6, 2020, the application judge granted Actava's application to enforce the LoR.

**THE APPLICATION JUDGE'S REASONS FOR DECISION**

[28]   The application judge noted that the parties were satisfied that the statutory preconditions for enforcing the LoR had been met. She also observed that the U.S. court's decision is entitled to considerable deference and she was not sitting on appeal from that decision. She considered the six factors identified in *Presbyterian Church of Sudan v. Taylor* (2006), 215 O.A.C. 140 (C.A.), at para. 20.

[29]   She discussed the issue of relevance, the first factor from *Presbyterian Church*, noting that Actava's expert considered Matvil's financial information to be

highly relevant to his calculation of damages as "it is to be used as a comparator to Actava's actual performance under the yardstick approach." Matvil did not dispute that it would be relevant for these purposes, but its expert suggested that different valuation methods, such as the "before-and-after" method or the "sales projection" method, could be used. The application judge stated that Actava's financial prospects were tied to Matvil's through the referral agreement and hence the documents were relevant to the calculation of damages.

[30]   She also concluded that the second factor in *Presbyterian Church* was met. The evidence was necessary for and would be used at trial, if admissible.

[31]   Turning to the third *Presbyterian Church* factor as to whether the evidence was otherwise obtainable, Matvil had argued before the application judge that Kartina, whom Actava had named as a defendant in the U.S. action, operated in the same industry as Matvil and Actava, and that the necessary information could be obtained from Kartina. The application judge concluded, at para. 39, that "the evidence sought from Matvil is of greater value to Actava in preparing its damages calculation than the productions obtained or sought from Kartina. Even if Actava pursues Kartina for further and better productions, Actava's damages expert, Mr. Blum, makes it clear that the nexus between Matvil and Actava provides an additional dimension that does not exist with the Kartina financial information."

[32]   The application judge then turned to the issue of public policy, the fourth factor from *Presbyterian Church*. Matvil submitted that requiring a non-party to

2021 ONCA 105 (CanLII)

disclose confidential financial information for purposes of a single-source comparator analysis was contrary to public policy. Its concern was heightened by the fact that Kartina was a competitor and Actava could be too. The application judge stated that Matvil was part of the factual matrix, and that concerns about confidentiality could be addressed by the terms of the U.S. protective order and additional conditions proposed by Actava. These were that the order would be conditional on the U.S. court ordering that: Actava's general counsel would not receive or review the financial data; the financial data would not be provided to Actava, Kartina, or the other U.S. defendants, but only to their experts and external legal counsel subject to the terms of the protective order; and the financial data would be treated as for attorneys' and experts' eyes only throughout the entirety of the proceeding.

[33]   She considered Matvil's concern that the use of its confidential information would necessarily be revealed in a single-source comparator damages calculation. She dismissed this risk as speculative and overstated.

[34]   Lastly, she was satisfied that the information sought was specified and identifiable, and that the order sought was not unduly burdensome.[4]

---

[4] At para. 57 of her reasons, the application judge stated that Actava had already received the data from Matvil in the course of their previous business relationship. However, counsel for Actava candidly advised the panel on appeal that this was a misstatement. It may be that the application judge was confusing the documentation relating to Matvil's and Actava's short-term relationship that had been produced with Matvil's financial and valuation data that was unrelated to Actava and that was in dispute.

2021 ONCA 105 (CanLII)

[35]   The application judge accordingly granted the order requested.

**THE APPEAL**

[36]   Matvil appealed from the application judge's order. The order has been stayed pending disposition of the appeal.

[37]   Matvil advances numerous grounds of appeal, but in oral argument focused its submissions on relevance and public policy within the construct of principles of sovereignty and the applicable case law. At its most fundamental, Matvil submits that the order under appeal is the first and only order in any commonwealth jurisdiction, including Ontario, to direct a non-party to produce documentation and information for the sole purpose of informing an expert to assist a party in calculating damages. It argues that the order failed to satisfy the test for enforcement of an LoR and that the application judge erred in her application of the test and in her relevance and public policy analyses.

[38]   To place the dispute in context, I will first address the evolution of LoRs and the governing legal principles. I will then turn to how those principles apply to this case.

**(1) Legal Principles**

**(a)   Definition of an LoR**

[39]   An LoR (sometimes also known as a letter rogatory) is the medium whereby one country, speaking through its court, seeks foreign judicial assistance that

2021 ONCA 105 (CanLII)

allows for the taking of evidence for use in legal proceedings: *The Signe*, 37 F. Supp. 819 (E.D. La. 1941), at p. 820. In Ontario, evidence may be provided voluntarily, in which case an LoR is not required. However, absent agreement, an order from an Ontario court is required to compel the production of evidence. Put differently, an LoR is unenforceable standing on its own and an Ontario court must give effect to the request by granting an order enforcing the LoR.

### (b)   Statutory Requirements

[40]   The authority to enforce an LoR is found in both s. 46 of the *Canada Evidence Act*, R.S.C. 1985, c. C-5 and s. 60 of the *Ontario Evidence Act*, R.S.O. 1990, c. E.23. Although there is some debate on whether the authority is the subject matter of federal or provincial jurisdiction, as a practical matter, this is of no moment, as the statutory requirements are the same. The statutory preconditions to enforcement of an LoR are: (i) a foreign court has authorized the obtaining of evidence; (ii) the witness whose evidence is sought is within Ontario's jurisdiction; (iii) the evidence sought relates to a proceeding pending before the foreign court; and (iv) the foreign court is a court of competent jurisdiction. The decision to grant or refuse enforcement is a discretionary one and a court may refuse to enforce LoRs even if the statutory conditions have been met.

### (c)   Supreme Court Jurisprudence

[41]   The statutory requirements for enforcing LoRs have been augmented by jurisprudence. The leading decision on LoRs in Canada is the 1981 decision of the

2021 ONCA 105 (CanLII)

Supreme Court in *R. v. Zingre*, [1981] 2 S.C.R. 392, a case involving a request for assistance from Switzerland. There, at pp. 400-1, Dickson J. (as he then was), wrote:

> As that great jurist, U.S. Chief Justice Marshall, observed in *The Schooner Exchange v. M'Faddon & Others* [(1812), 7 Cranch's Reports 116] , at pp. 136-37, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an interchange of good offices with each other.
>
> It is upon this comity of nations that international legal assistance rests. Thus the courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see *Gulf Oil Corporation v. Gulf Canada Limited et al.* [[1980] 2 S.C.R. 39]) or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction.

[42]   Thus, three elements were said to animate the enforcement of an LoR: comity, public policy of the jurisdiction to which the request is directed, and absence of prejudice to the sovereignty or the citizens of that jurisdiction.

[43]   The first element, comity, is a flexible concept that "must be adjusted in light of a changing world order": *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at p. 1097. In *Morguard*, a case about the recognition by the courts of one province of a judgment of the courts of another province, the Supreme Court

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

of Canada adopted, at p. 1097, the Supreme Court of the United States' definition of comity from *Hilton v. Guyot*, 159 U.S. 113 (1895), at pp. 163-64:

> "Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, <u>having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws</u>[.] [Emphasis added.]

[44]   In doing so, the court in *Morguard*, at p. 1097, suggested that the modern system of private international law is grounded in principles of order and fairness, and that the content of comity must adapt to a changing world order.

[45]   An example of such adaptation is found in *Pro Swing Inc. v. Elta Golf Inc.*, 2006 SCC 52, [2006] 2 S.C.R. 612, a case that involved a request to enforce a U.S. non-monetary award. The whole court agreed that an appropriate understanding of comity suggested revising the traditional common law rule against enforcing non-monetary judgments.[5] At para. 27, Deschamps J., for the majority, wrote: "Comity is a balancing exercise. The relevant considerations are respect for a nation's acts, international duty, convenience and protection of a nation's citizens." She noted that courts must take care not to emphasize the factor of respect for a nation's acts to the point of imbalance.[6]

---

[5] The court split on whether the judgment in the case ought to be enforced, with Deschamps J. writing for the majority holding that it ought not to and McLachlin C.J. writing to the contrary.
[6] Deschamps J. was referring to equitable orders. Presumably, her comment would apply to an order made against a non-party.

[46]   In *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17, [2012] 1 S.C.R. 572, the Supreme Court noted, at para. 74, that comity is "a very flexible concept" and that while fairness and justice were necessary characteristics of a legal system, they could not be divorced from the requirement of predictability and stability which assure order in the conflicts system.

[47]   Of course, although each of *Van Breda*, *Pro Swing*, and *Morguard* addressed the concept of comity, none of them involved enforcement of an LoR. In any event, I do not conclude from a reading of those cases that there has been a retreat from the principles espoused by the court in *Zingre*.

[48]   Importantly, in *Zingre*, the Supreme Court recognized that the principles underlying the enforcement of LoRs may at times come into conflict. Notably, Dickson J. explained, at p. 401, that where sovereignty has conflicted with comity, Canadian courts have refused to order testimony for use in foreign proceedings in a number of situations. Examples given included where: (i) a request for production of documents was vague and general; (ii) discovery was sought against a non-party to the litigation, in violation of local laws of civil procedure; and (iii) the main purpose of the examination was to serve as a "fishing expedition", a procedure which was not allowed in Canadian courts.

[49]   I take from these examples the need for Canadian courts to carefully consider the principles underlying the enforcement of LoRs. There is no doubt that, with globalization, the world's community of nations, and Canada's relationships

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

within that community, look very different in 2021 than they did 40 years earlier in 1981 when *Zingre* was decided. Moreover, it must be remembered that the process for enforcement of an LoR in Canada is the same regardless of the identity of the foreign court. In my view, these considerations further reinforce the need to apply the *Zingre* principles rigorously.

### (d)  Ontario Jurisprudence

[50]   Following *Zingre*, courts in Ontario have applied and supplemented the principles espoused by Dickson J. concerning the enforcement of LoRs. In 1986, in *Re Friction Division Products, Inc. and E.I. Du Pont de Nemours & Co. Inc. et al. (No. 2)* (1986), 56 O.R. (2d) 722 (H.C.), at p. 732, Osborne J. (as he then was) stated that for enforcement, the evidence (including the LoR) had to establish that: (i) the evidence sought is relevant; (ii) the evidence sought is necessary for trial and will be adduced at trial, if admissible; (iii) the evidence is not otherwise obtainable; (iv) the order sought is not contrary to public policy; (v) the documents sought are identified with reasonable specificity; and (vi) the order sought is not unduly burdensome, having in mind what the relevant witnesses would be required to do, and produce, were the action to be tried here. In *Fecht v. Deloitte & Touche* (1996), 28 O.R. (3d) 188 (Gen. Div.) ("*Fecht (Gen. Div.)*"), aff'd (1997), 32 O.R. (3d) 417 (C.A.) *("Fecht (C.A.)"*), Blair J. (as he then was) adopted these factors. So did this court in *Presbyterian Church*, at para. 20, and in *Connecticut Retirement Plans and Trust Funds v. Buchan*, 2007 ONCA 462, 225 O.A.C. 106,

at para. 7. In *Lantheus Medical Imaging Inc. v. Atomic Energy of Canada Ltd.*, 2013 ONCA 264, 115 O.R. (3d) 161, at para. 61, and most recently in *Glegg v. Glass*, 2020 ONCA 833, at para. 51, this court described the factors, with the exception of public policy, as "useful guideposts".

[51]     In *Connecticut Retirement Plans*, having listed the six factors, Weiler J.A. for this court stated, at para. 7, that "[i]n addition, the court is required to balance two broad considerations in deciding whether to exercise its discretion to enforce the Letter Rogatory. Those considerations are the impact on Canadian sovereignty and whether justice requires the taking of commission evidence." In *Lantheus*, at para. 59, Hoy J.A. for this court quoted from Doherty J.A. in *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991), 3 O.R. (3d) 705 (C.A.), at para. 37, stating:

> The test requires that the court,
>
>> consider whether the request imposes any limitation or infringement on Canadian sovereignty, and whether justice requires an order for the taking of commission evidence. The considerations encompassed by the phrase "Canadian sovereignty"… include a[n] assessment of whether the request would give extra-territorial authority to foreign laws which violate relevant Canadian or provincial laws…; whether granting the request would infringe on recognized Canadian moral or legal principles…; and whether the request would impose an undue burden on, or do prejudice to, the individual whose evidence is requested.

2021 ONCA 105 (CanLII)

See also *Glegg*, at para. 49. Thus "Canadian sovereignty" was framed as including a consideration of whether the LoR would: (i) violate relevant Canadian or provincial law; (ii) infringe on recognized Canadian moral or legal principles; (iii) impose an undue burden on the entity of whom the request is made; or (iv) do prejudice to that entity. In addition, the justice of the enforcement request must be weighed in the balance.

[52]   To sum up, the principles of comity, public policy, and the absence of prejudice to the sovereignty or the citizens of Canada described by Dickson J. in *Zingre* are elements that continue to animate the enforcement of LoRs. In applying these principles, courts have developed a number of factors to help guide their decisions. The six non-exclusive guideposts first identified in *Friction Division* assist in making that determination.[7] They are not rigid preconditions: *Lantheus*, at para. 61; *Perlmutter v. Smith*, 2020 ONCA 570, 152 O.R. (3d) 185, at para. 25; and a court is not required to systematically examine each. *De Havilland* is an example where the court did not systematically examine each *Friction Division* factor. However, a court must not lose sight of the principles described in *Zingre*. Ultimately, this requires a court to step back and balance Canadian sovereignty considerations with the justice of the enforcement request: *Connecticut Retirement*

---

[7] I will discuss in more detail later in these reasons the factors of relevance and public policy.

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

*Plans*, at para. 7; *Glegg*, at para. 49. The six *Friction Division* guideposts are not mere proxies for those considerations.

### (e)    Distinctions Between U.S. and Ontario

[53]    As mentioned, the law on LoRs in Canada applies to LoRs from all foreign jurisdictions. Given that the U.S. is Canada's largest trading partner and neighbour, the opportunity for engagement in each other's courts is high. As Bradley J. Freedman and Gregory N. Harney stated in their oft-quoted 1987 article "Obtaining Evidence from Canada: The Enforcement of Letters Rogatory by Canadian Courts" (1987) 21 UBC L. Rev. 351, at p. 351, "[t]he increasingly extensive business and social interaction between Canadian and foreign individuals and business entities, especially those of the United States of America, has resulted in Canadian residents becoming involved with increasing frequency in foreign civil and criminal proceedings." Further, "a liberal approach by Canadian courts to the enforcement of foreign letters rogatory serves … to maintain harmonious international relations in general": at p. 353. The authors noted the foundational principle of international comity and that "[i]mplicit in a request for international judicial assistance is a pledge of reciprocity: a promise that the courts of the requesting state will, in the future, provide similar assistance to the courts of the state to which the request is directed": at p. 353.

[54]    Similar assistance is a laudable objective. That said, as the parties acknowledged on this appeal, while the U.S. and Canada have somewhat

comparable justice systems, the rules relating to discovery are significantly dissimilar. This is highlighted in the "Sedona Canada Commentary on Enforcing Letters Rogatory Issued by an American Court in Canada: Best Practices & Key Points to Consider", a June 2011 publication of The Sedona Conference. As the title suggests, the commentary reviews discovery in Canada and the U.S. The points raised include the following:

– The rules governing discovery in the two countries differ including the scope of discovery, the ability to obtain discovery from non-parties, subsequent use of the evidence, objections to questions on discovery, and the availability of any implied undertaking rule. (Differences were also noted by the Supreme Court in *Zingre*, at p. 402.)

– The U.S. court issuing the LoR may have done so in a perfunctory manner without consideration of the matters at issue or testing the evidence relied on in support of the request and without notice to a non-party. (I do not read this observation as a criticism; rather, it reflects the very broad discovery rules that exist in the U.S.)

– Blocking statutes or legal issues such as privilege may prevent the Canadian court from enforcing an LoR.

[55]   On the issue of scope of discovery in the U.S., the Sedona authors point out, at p. 5, that if there is "*any possibility* the information sought *may be* relevant" (emphasis in original), it is discoverable. Ontario's regime is very different. On

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

January 1, 2010, the Ontario *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, were amended to limit the scope of relevance to evidence that is "relevant to a matter in issue" from the former broader test of "semblance of relevance" that had developed in the jurisprudence in Ontario: The Sedona Conference, at pp. 5-6; see O. Reg. 438/08, ss. 26, 27, and 30; O. Reg. 453/09, ss. 1, 2. As the Sedona authors state, at p. 6, "[t]he evidence must be relevant to matters actually in issue, and does not include evidence that is only sought because it could lead to other matters, or 'may' be relevant, or may be relevant to other matters that *could* be in issue" (emphasis in original). Similarly, as Pamela D. Pengelley wrote in "A Compelling Situation: Enforcing American Letters Rogatory in Ontario" (2006) 85 Can. Bar. Rev. 345, at p. 353, "[c]ourts may be extremely reluctant to enforce letters rogatory that prove only that the evidence is 'marginally relevant' or 'potentially relevant'" (footnotes omitted).

[56]   In addition, as stated in *Riverview-Trenton Railroad Company v. Michigan Department of Transportation*, 2018 ONSC 2124, 13 L.C.R. (2d) 95, at para. 35, discovery from non-parties is the norm in U.S. civil litigation. This is not the case in Ontario. Indeed, unlike in the U.S., in Ontario, an order of the court is required to examine a non-party[8] or to compel a non-party to produce documents: see *Rules*

---

[8] Rule 31.10 of the *Rules of Civil Procedure* was enacted in 1985 to permit such an examination.

*of Civil Procedure*, rr. 31.10, 30.10. Thus, examination of, and production from, a non-party is the exception, not the rule, in Ontario.

[57]   Given the vastly more permissive rules governing discovery in the U.S., it is fair to conclude that reciprocity is not an even balance. However, as this court observed in *Appeal Enterprises Ltd. v. First National Bank of Chicago* (1984), 10 D.L.R. (4th) 317 (Ont. C.A.), at p. 319, "the comity of nations upon which international legal assistance rests does not require precise reciprocity" between the laws of Canada and the laws of the requesting state: see also *Perlmutter*, at para. 63. That said, differences in discovery between Canada and the U.S. highlight the need to be attentive to all of the elements in the LoR analysis including sovereignty and the justice of the request.

[58]   Finally, in the interest of comprehensiveness, I will briefly touch upon the issue of blocking statutes identified by the Sedona authors. The relevant statute in Ontario is the *Business Records Protection Act*, R.S.O. 1990, c. B.19. It is a very short statute concerning the sending and removal of certain business records out of the province. It consists of only two provisions. Section 1 states:

> No person shall, under or under the authority of or in a manner that would be consistent with compliance with any requirement, order, direction or summons of any legislative, administrative or judicial authority in any jurisdiction outside Ontario, take or cause to be taken, send or cause to be sent or remove or cause to be removed from a point in Ontario to a point outside Ontario, any account, balance sheet, profit and loss statement or inventory or any resume or digest thereof or any other record, statement, report, or material in any way

relating to any business carried on in Ontario, unless such taking, sending or removal,

> (a) is consistent with and forms part of a regular practice of furnishing to a head office or parent company or organization outside Ontario material relating to a branch or subsidiary company or organization carrying on business in Ontario;

> (b) is done by or on behalf of a company or person as defined in the *Securities Act*, carrying on business in Ontario and as to a jurisdiction outside Ontario in which the securities of the company or person have been qualified for sale with the consent of the company or person;

> (c) is done by or on behalf of a company or person as defined in the *Securities Act*, carrying on business in Ontario as a dealer or salesperson as defined in the *Securities Act*, and as to a jurisdiction outside Ontario in which the company or person has been registered or is otherwise qualified to carry on business as a dealer or salesperson, as the case may be; or

> (d) is provided for by or under any law of Ontario or of the Parliament of Canada.

[59]   In *De Havilland*, in *obiter*, Doherty J.A. reasoned that an order enforcing an LoR did not fall within the parameters of s. 1 and in any event, s. 46 of the *Canada Evidence Act* triggered the exception set out in s. 1(d). This *obiter* was adopted by Lax J. and affirmed by this court in *Local Court of Stuttgart of the Federal Republic of Germany v. Canadian Imperial Bank of Commerce* (1997), 31 O.R. (3d) 684 (Gen. Div.), aff'd 1998 CarswellOnt 1999 (C.A.).

[60]   For the purposes of this appeal, I would add that it is of note that business records receive express legislative protection, no doubt in recognition of the sensitivity of the nature of such information and its vulnerability to misuse or misappropriation.

2021 ONCA 105 (CanLII)

[61]   This then is the legal context within which the present appeal is to be decided.

**(2)      Standard of Review**

[62]   Given the discretionary nature of the decision to grant or refuse an application to enforce an LoR, absent reviewable error, this court will give deference to the lower court's decision: *Perlmutter*, at para. 26; *Presbyterian Church*, at paras. 19, 30. As the Supreme Court noted in *British Columbia (Minister of Forests) v. Okanagan Indian Band*, 2003 SCC 71, [2003] 3 S.C.R. 371, at para. 43, the definition and misapplication of the criteria for the exercise of a judicial discretion raise questions of law which are subject to appellate review.

[63]   The Supreme Court cases involving LoRs have not expressly addressed the standard for appellate intervention. Other cases involving discretionary decisions suggest that an appellate court will defer to a discretionary decision absent an error in principle, a misapprehension of or failure to take into account the evidence, or a clearly wrong or unreasonable result. See for example: *Éditions Écosociété Inc. v. Banro Corp.*, 2012 SCC 18, [2012] 1 S.C.R. 636, at para. 41; *Cowper Smith v. Morgan*, 2017 SCC 61, [2017] 2 S.C.R. 754, at para. 46; *Bessette v. British Columbia (Attorney General)*, 2019 SCC 31, 433 D.L.R. (4th) 631, at para. 35; *Penner v. Niagara (Regional Police Services Board)*, 2013 SCC 19, [2013] 2 S.C.R. 125, at para. 27; and *Elsom v. Elsom*, [1989] 1 S.C.R. 1367, at p. 1375. This would include the wrongful exercise of discretion arising from a failure to give

2021 ONCA 105 (CanLII)

any or insufficient weight to a relevant consideration: see *Penner*, at para. 27; *Friends of the Oldman River Society v. Canada (Minister of Transport)*, at pp. 76-77; and *Harelkin v. University of Regina*, [1979] 2 S.C.R. 561, at p. 588.

[64]    There are numerous examples of the application of the appropriate standard of review for the discretionary decision to enforce LoRs. In *Presbyterian Church*, at para. 30, the court held that the failure to "meaningfully address" the *Friction Division* factors constituted an error in principle. See also *Liu v. Zhi*, 2019 BCCA 427, at para. 22. In *Lantheus*, this court reversed a lower court decision in circumstances where the application judge set out the *Friction Division* factors but treated the factors as preconditions and misapplied them: at paras. 67-71, rev'g 2012 ONSC 3582, 25 C.P.C. (7th) 256. Further, appellate intervention may be warranted where the application judge fails to give sufficient consideration to sovereignty as a factor in the exercise of discretion. As the Supreme Court observed in *Zingre*, at p. 403, courts "must balance the possible infringement of Canadian sovereignty with the natural desire to assist the courts of justice of a foreign land."

**(3)    Analysis**

[65]    Applying the principles I have discussed, I would allow the appeal. Following the parties' submissions, the application judge identified the *Friction Division* factors but failed to keep in mind the principles underlying the enforcement of LoRs. Below, I discuss how considerations of relevance, public policy, and

2021 ONCA 105 (CanLII)

sovereignty lead me to conclude that the application judge fell into error and that appellate intervention is therefore warranted.

### (a)    Relevance

[66]   As mentioned, Matvil submits that the application judge erred in her relevance analysis particularly given that the financial data that is the subject matter of the LoR merely serves to inform an expert about the business in which the parties to the U.S. action are engaged. Actava states that Matvil's financial performance is relevant to Actava's damages due to Matvil's and Actava's contractual relationship and common industry.

[67]   "Evidence is relevant if, as a matter of logic and human experience, it renders the existence or absence of a material fact in issue more or less likely": *R. v. Truscott* (2006), 216 O.A.C. 217 (C.A.), at para. 22; see also *R. v. J.-L.J.*, 2000 SCC 51, [2000] 2 S.C.R. 600, at para. 47; *Girao v. Cunningham*, 2020 ONCA 260, 2 C.C.L.I. (6th) 15, at para. 94. As a result, in assessing the relevance of evidence sought through an LoR, the issues in the underlying litigation should be examined: see *Presbyterian Church*, at para. 34. Pengelley's observation, at p. 353, bears repeating:

> The evidence sought by letters rogatory should be directly relevant to issues raised in the foreign proceedings. Courts may be extremely reluctant to enforce letters rogatory that prove only that the evidence is "marginally relevant" [citing *Pecarsky v. Lipton Wiseman Altbaum & Partners* (1999), 38 C.P.C. (4th) 170 (Ont. S.C.)] or "potentially relevant," [citing *Fecht* (C.A.),

aff'g *Fecht (Gen. Div.)*] and may narrow their orders accordingly. [Footnotes omitted.]

[68]   In considering whether to enforce an LoR from a U.S. court, the broader scope of discovery permitted in the U.S. compared to Canada may be a relevant consideration: *Aker Biomarine AS et al. v. KGK Synergize Inc.*, 2013 ONSC 4897, 47 C.P.C. (7th) 284, at para. 27; The Sedona Conference, at pp. 5-6. And, as we have seen, not only is the term "relevant" in the context of discovery interpreted more narrowly in Canada than in the U.S., discovery of non-parties is more limited: *Aker Biomarine AS*, at para. 27; The Sedona Conference, at pp. 5-6. The broader scope of discovery in the U.S. is not *per se* a bar to the enforcement of LoRs, but to give effect to the request, the Ontario court must be satisfied that the requirements of Ontario law are met: see *Presbyterian Church*, at para. 32. If the request seeks "evidence in terms so wide that they go well beyond" the issues in the litigation, the relevance requirement will not have been met: *Presbyterian Church*, at para. 35.

[69]   The parameters of relevance are determined by the U.S. pleadings. To recap, in the underlying U.S. action, Actava and the other respondents claim that the defendants — various owners, operators, and producers of TV channels that are broadcast in Russia and elsewhere, and Kartina, a licensed distributor of these channels — engaged in an unlawful campaign to interfere with Actava's business by initiating frivolous contempt proceedings against it, which were ultimately dismissed but which resulted in losses to Actava's business, including the

termination of the referral agreement with Matvil. Actava and the Actava respondents seek financial information from Matvil not to establish that the Russian TV Channels and Kartina interfered with Actava's business, but rather to assist its expert to calculate damages.

[70]   In my view, the application judge erred in her relevance analysis for several reasons.

[71]   First, even though it is the case that Actava and Matvil had a short-term referral agreement, the documents requested have nothing to do with the referral agreement. Actava has all the documents, including all financial documents, in Matvil's possession that concern that relationship. These documents have already been produced and were not the subject matter of the issues before the application judge. Actava does not suggest otherwise.

[72]   Second, the scope of the request in the LoR is extraordinarily broad. Actava seeks production of yearly reports, from 2015 to present, of Matvil's revenues and profits as well as all documents, from 2015 to present, containing or constituting an appraisal of Matvil's valuation. Notably, the request encompasses all of Matvil's global business, not simply the small part that relates to Actava or the business lines in which Actava operates. Moreover, it extends to the work product of Matvil personnel and external service providers on the company's valuation. It is difficult to see how financial statements and valuation reports, prepared by Matvil for its own internal purposes and involving parts of its business unrelated to Actava,

2021 ONCA 105 (CanLII)

could possibly be relevant to the U.S. action. The application judge did not address the relevance of the requested information as it related to the breadth of the request.

[73]   Third, the relevance of the requested evidence is entirely speculative. In oral argument, counsel confirmed that Actava has no knowledge of what the evidence will reveal. There is no evidence that Matvil's revenues, profits, and value increased during the time period requested, and it is hard to imagine that evidence showing a decrease would be advanced in support of Actava's claim for substantial damages. Evidence anchored in speculation is incompatible with a characterization of relevance.

[74]   Fourth, the purpose of the production request also undercuts the request. The existence of damages and the calculation of those damages are separate matters. Actava does not seek production of the evidence to establish that it suffered damages. Nor does it plead that its damages are linked to Matvil's financial performance, profitability or valuation. The production is sought for the sole purpose of potentially assisting the damages expert with his preferred methodology so as to quantify the extent of any loss.

[75]   Relevance is not simply a matter of determining whether there is any possibility that the financial information sought from Matvil will assist Actava in calculating its damages. As Matvil's valuation expert, Andrew Freedman, explained, it is important to distinguish between "want" and "need", and that in

2021 ONCA 105 (CanLII)

essentially any loss quantification and business valuation engagement, the incumbent financial expert will "want" to obtain data on the financial performance of comparable businesses and/or industry information. Often, such comparable industry data is not publicly available. This does not render it "relevant" for the purposes of obtaining its production from a disinterested non-party such as Matvil. Although the financial performance of unrelated comparable companies may be useful to an expert, this does not mean that the documentation is both relevant to the issues in dispute in the U.S. action and producible. If it were otherwise, an argument could be made that proprietary financial performance and valuation evidence be produced by an innocent corporate bystander in every case involving a claim for loss of profits by a player in a comparable industry. This is not, and ought not to be, the law.

[76]   In sum, the application judge was not alive to the issues of breadth and purpose, the absence of any true linkage between the referral agreement and the productions sought, the relevance to the material issues in the U.S. pleadings, and the speculative nature of the request. The application judge erred in her determination of relevance. The failure to meaningfully address the relevance of the evidence sought constitutes an error in principle warranting appellate intervention.

2021 ONCA 105 (CanLII)

2021 ONCA 105 (CanLII)

### (b)   Public Policy

[77]   Matvil also argues that the application judge erred in not finding that public policy precluded enforcement of the LoR. Actava and the other Actava respondents reject the argument that public policy prohibited production of Matvil's financial information.

[78]   The court will decline to enforce an LoR if enforcement is contrary to public policy: *Perlmutter*, at para. 25; *Treat America Limited v. Nestlé Canada Inc.*, 2011 ONCA 560, 282 O.A.C. 311, at para. 12. There is no defined list of the various public policy considerations that may lead a court to refuse to enforce an LoR. That said, the focus is on whether granting the request, not the underlying foreign proceeding, contravenes Canadian public policy: *Presbyterian Church*, at para. 23.

[79]   As recognized by this court in *Glegg*, public policy considerations include interference with solicitor-client privilege and confidentiality concerns. See also *De Havilland* on business confidentiality concerns,[9] *Westinghouse Electric Corp. v. Duquesne Light Co.* (1977), 16 O.R. (2d) 273 (H.C.) on Crown privilege, and *Optimight Communications Inc. v. Innovance Inc.* (2002), 155 O.A.C. 202 (C.A.), on trade secrets.[10]

---

[9] Although the court in *De Havilland* could not conclude that legitimate confidentiality concerns would be compromised by the request in issue in the LoR in that case, it did not conclude that it was an error to consider them as part of the public policy analysis.
[10] Although public policy was not explicitly referred to, the court in *Optimight* recognized that a non-party had a privacy interest in its trade secrets.

[80]   Accordingly, confidentiality concerns may be considered as part of the public policy analysis.

[81]   As a starting proposition it is contrary to public policy in the circumstances of this case to require Matvil to disclose the information sought given its sensitive nature. Matvil is a privately-held corporation. According to the affidavit filed by Matvil's Chief Executive Officer in opposition to the application to enforce the LoR, the financial documents and records Actava seeks are highly sensitive. They include information about the value of the company, its profitability, and the licensing fees paid for content with different licensors, information that Matvil has not ever knowingly or voluntarily made public.

[82]   It is important to stress the nature of the information sought from Matvil. Financial performance and valuation evidence strike at the heart of a corporation. Nothing could be more confidential and open to abusive use.

[83]   Although there is a protective order in the U.S. action, it falls short of effectively protecting Matvil's financial information. As mentioned, the order, which was issued prior to and independently of the LoR, allows Matvil to mark the confidential documents or information it produces so that it is accessible only to the lawyers and experts in the U.S. action. In addition, Actava agreed to additional conditions to limit the sharing of Matvil's financial information, including that: (i) Actava's general counsel not receive or review it; (ii) it not be provided to Actava, Kartina, or any of the other defendants in the action, except for their experts and

2021 ONCA 105 (CanLII)

external legal counsel, and (iii) it be treated as for attorneys' and experts' eyes only throughout the entirety of the action. The application judge granted Actava's application to enforce the LoR subject to the U.S. court making an order incorporating these additional conditions, which it now has.

[84]   Nevertheless, notwithstanding the expanded protections, the protective order and additional conditions do not really address the confidentiality concerns that arise in this case. First, while Matvil may mark materials as confidential, its designation is not necessarily controlling, as the protective order provides a mechanism for parties in the U.S. action to challenge a producing party's confidentiality designation. Of course, Matvil is not a party and at best would have to attend in the U.S. and attorn to the jurisdiction of the U.S. court to even attempt to seek relief.

[85]   Second, because Actava seeks to use Matvil's financial information as part of a single-source comparator analysis, redacting or anonymizing the information in public filings or court proceedings will not protect Matvil's sensitive business information. The application judge stated that this risk was speculative and overstated. However, anyone viewing the filings or proceedings and the expert's opinion will readily identify Matvil as the source of the information. The fact that Kartina already knows that Matvil is the comparator does not alleviate this concern as suggested by the application judge; on the contrary, it exacerbates it.

2021 ONCA 105 (CanLII)

[86]   Third, the protective and additional orders do not relieve Matvil from the prospect of overly broad, irrelevant, and unduly burdensome production. See *Optimight*, at para. 31.

[87]   Lastly, although not determinative, such production by a non-party would be unparalleled in Ontario. Actava cites no case in which LoRs have been enforced requiring a non-party to disclose confidential and proprietary information for the sole purpose of assisting a party to calculate damages. Indeed, even with the broader discovery rules in the U.S., counsel for Actava was unable to refer this court to any U.S. authority to that effect either.

[88]   It must also be recalled that, at a minimum, Kartina is a competitor of Matvil. The risks associated with any such order for Matvil, a non-party to the U.S. litigation, far outweigh any hypothetical benefit to Actava. In my view, this incursion into Matvil's confidential proprietary financial performance and valuation information is clearly wrong and contrary to public policy.

### (c)   Sovereignty

[89]   This brings me to the issue of sovereignty. As the Supreme Court observed in *Pro Swing*, at para. 27, "[c]omity is a balancing exercise". As explained, comity requires the court to engage in an analysis that takes into account the impact of the proposed order on Canadian sovereignty and whether justice requires that the LoR be enforced and the evidence requested be produced: *Zingre*, at p. 403; *Connecticut Retirement Plans*, at para. 7; and *Lantheus*, at para. 59.

[90]   Here, with respect, the application judge did not engage in any real balancing exercise and gave no consideration to Canadian sovereignty or whether justice required that the LoR be enforced and the evidence requested be produced. Indeed, the application judge's reasons do not mention sovereignty or justice at all, and they fail to focus on the prejudice to Matvil — apart from, without any true explanation, summarily dismissing its concerns as overstated and speculative. In fairness, although sovereignty and the justice of the request permeate the case law relied upon by the parties, they were not the dominant focus of the parties' submissions. However, LoRs are not simply an enabling mechanism for the requesting party; there must be some balancing and consideration of whether the order is "prejudicial to the sovereignty or the citizens" of the receiving state: *Zingre*, at p. 401.

[91]   As we have seen from *De Havilland* and *Lantheus*, the phrase "Canadian sovereignty" encompasses: whether the LoR gives extra-territorial authority to foreign laws that violate Canadian or provincial laws; whether granting the request would infringe on recognized Canadian moral or legal principles; whether the order would impose an undue burden on the individual whose evidence is requested; and whether the order would do prejudice to that individual.

[92]   Although the *Business Records Protection Act*, a blocking statute, highlights the importance of confidential financial records to corporations in Ontario, based on the *De Havilland* and *Canadian Imperial Bank of Commerce* decisions,

2021 ONCA 105 (CanLII)

enforcing the LoR in this case does not expressly violate a Canadian or provincial law. Rule 30.10 of the *Rules of Civil Procedure*, which addresses the need for an order for the production of documents from non-parties in proceedings in Ontario, also does not contain an outright prohibition.

[93]   However, r. 30.10 can provide guidance on whether the other examples, identified in *De Havilland* and *Lantheus* as being encompassed by the term "Canadian sovereignty", have been met.[11] Indeed, it is reasonable to consider r. 30.10 in addressing the impact of the requested order on Canadian sovereignty: *Pecarsky*, at para. 21, citing *Fecht (C.A.)*, at p. 420. The application of the rule is not determinative but provides assistance in the assessment of whether the requested order is prejudicial to Canadian sovereignty.

[94]   As noted, r. 30.10 provides that an order of the court is required for an order for production from a non-party. The moving party must establish that the documents requested are relevant to a material issue in the action and that it would be unfair to require the moving party to proceed to trial without having discovery of them.

[95]   In *Morse Shoe (Canada) Ltd. v. Zellers Inc.* (1997), 100 O.A.C. 116 (C.A.), at para. 19, this court stated that orders under r. 30.10 should not be made as a

---

[11] These examples are whether granting the request would infringe on recognized Canadian moral or legal principles, and whether the request would impose an undue burden on, or do prejudice to, the individual whose evidence is requested.

matter of course but only in exceptional cases. And in *Ontario (Attorney General) v. Ballard Estate* (1995), 129 D.L.R. (4th) 52 (Ont. C.A.), at p. 56, this court affirmed that "[s]ave in the circumstances specifically addressed by the rules, non-parties are immune from the potentially intrusive, costly and time-consuming process of discovery and production." As the court observed, "[b]y its terms, rule 30.10 assumes that requiring a party to go to trial without the forced production of relevant documents in the hands of non-parties is not *per se* unfair": *Ballard Estate*, at p. 56.

[96]    In *Castel & Walker: Canadian Conflict of Laws*, loose-leaf (2020-Rel. 4), 6th ed. (Markham, Ont.: LexisNexis Canada, 2004), Professor Walker writes, at para. 6.2(c): "Particularly in the case of non-parties, the court will be guided by the principle of proportionality, and will be disinclined to permit an order that does not reflect the local standards for examining non-parties" (footnote omitted). See also *Optimight*, at paras. 28-31.

[97]    In this case, I have no hesitation in concluding that had a comparable request for production been made in a proceeding in Ontario under r. 30.10, the order would not have been granted. As mentioned, the LoR is extraordinarily broad, capturing, among other things, the yearly reports of Matvil's revenues and profits and all documents on Matvil's valuation since 2015.

[98]    The application judge did not properly distinguish between evidence relevant to the issues in dispute, which Actava already possesses, and evidence for

2021 ONCA 105 (CanLII)

quantification of damages using a comparative indicator. The request is speculative in nature and the risks associated with Matvil being the obvious single-source comparator are significant. Although the application judge offered recourse to the U.S. court as a mechanism available to Matvil to protect its interests, that would involve Matvil, a non-party against whom no allegations of wrongdoing are asserted, having to attorn to the jurisdiction of a foreign court in a foreign land. The application judge failed to recognize Matvil's sovereignty interest and neglected to consider the justice of the case. She was not alive to the breadth and purpose of the request, its speculative nature, and the absence of linkage between the referral agreement and the productions sought. Sanctioning an order of this nature constitutes a reviewable error.

### (d)    Other

[99]   In light of my proposed disposition, there is no need to address the two procedural and evidentiary arguments raised in Matvil's factum, neither of which was pressed in oral submissions.

**DISPOSITION**

[100]  For these reasons, I would allow the appeal.

[101]  As agreed by the parties, Actava and the other Actava respondents shall pay Matvil its costs of the appeal and the stay motion, fixed in the amounts of $15,000 and $10,000 respectively, each inclusive of disbursements and applicable

2021 ONCA 105 (CanLII)

Page:  42

tax, and the costs below of $90,000 in favour of the respondents are reversed and

made in favour of the appellant.

Released: February 19, 2021 ("J.M.F.")

"S.E. Pepall J.A."
"I agree. Fairburn A.C.J.O."
"I agree. L.B. Roberts J.A."

2021 ONCA 105 (CanLII)