# Exhibit C

**National Post, Matthew Fraser and Andrew McIntosh** *Appellants*

*v.*

**Her Majesty The Queen** *Respondent*

and

**Attorney General of Canada, Attorney General of New Brunswick, Attorney General of Alberta, Bell GlobeMedia Inc., Canadian Broadcasting Corporation, British Columbia Civil Liberties Association, Canadian Civil Liberties Association, and Canadian Newspaper Association, Ad IDEM/Canadian Media Lawyers Association, Canadian Journalists for Free Expression, Canadian Association of Journalists, Professional Writers Association of Canada, RTNDA Canada/Association of Electronic Journalists, Magazines Canada, Canadian Publishers' Council, Book and Periodical Council, Writers' Union of Canada and PEN Canada ("Media Coalition")** *Interveners*

Indexed as: R. *v.* National Post

**2010 SCC 16**

File No.: 32601.

2009: May 22; 2010: May 7.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Constitutional law — Charter of Rights — Freedom of expression — Journalist and confidential source — Document received by confidential source from anonymous sender given to journalist on condition of confidentiality — Document alleged to be forged — Search warrant and assistance order compelling production of document and envelope — Protection of confidential*

**National Post, Matthew Fraser et Andrew McIntosh** *Appelants*

*c.*

**Sa Majesté la Reine** *Intimée*

et

**Procureur général du Canada, procureur général du Nouveau-Brunswick, procureur général de l'Alberta, Bell GlobeMedia Inc., Société Radio-Canada, Association des libertés civiles de la Colombie-Britannique, Association canadienne des libertés civiles, et Association canadienne des journaux, Ad IDEM/Canadian Media Lawyers Association, Journalistes canadiens pour la liberté d'expression, Association canadienne des journalistes, Professional Writers Association of Canada, ACDIRT Canada/Association des journalistes électroniques, Magazines Canada, Canadian Publishers' Council, Book and Periodical Council, Writers' Union of Canada et PEN Canada (« Coalition des médias »)** *Intervenants*

Répertorié : R. *c.* National Post

**2010 CSC 16**

Nᵒ du greffe : 32601.

2009 : 22 mai; 2010 : 7 mai.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Droit constitutionnel — Charte des droits — Liberté d'expression — Journaliste et source confidentielle — Document reçu par une source confidentielle d'un expéditeur anonyme et transmis au journaliste sous une condition de confidentialité — Document prétendu contrefait — Mandat de perquisition et ordonnance d'assistance exigeant la production du document et de*

*source — Whether guarantee of freedom of expression creates constitutionally entrenched immunity to protect journalists against compelled disclosure of confidential source — Canadian Charter of Rights and Freedoms, s. 2(b).*

*Constitutional law — Charter of Rights — Search and seizure — Journalist and confidential source — Document received by confidential source from anonymous sender given to journalist on condition of confidentiality — Document alleged to be forged — Search warrant and assistance order compelling production of document and envelope — Protection of confidential source — Whether search warrant and assistance order reasonable within meaning of s. 8 of Canadian Charter of Rights and Freedoms — Whether newspaper should have been given notice of warrant application to search its premises.*

*Evidence — Privilege — Journalist and confidential source — Document received by confidential source from anonymous sender given to journalist on condition of confidentiality — Document alleged to be forged — Search warrant and assistance order compelling production of document and envelope — Protection of confidential source — Whether guarantee of freedom of expression creates constitutionally entrenched immunity to protect journalists against compelled disclosure of confidential source — Whether confidential source protected by common law of privilege — If so, whether journalist-confidential source privilege constituted on case-by-case basis — What elements must be established and who bears burden of proof.*

*Criminal law — Search warrants — Search of newspaper office — Whether newspaper should be given notice of application for search warrant.*

The *National Post* employed M as a journalist. M investigated whether C, then Prime Minister of Canada, was improperly involved with a loan from a federally funded bank to a hotel in C's riding which allegedly owed a debt to C's family investment company. X, a secret source, provided M with relevant information in exchange for a blanket, unconditional promise of confidentiality. In 2001, M received a sealed envelope in the mail that contained a document which appeared to be the bank's authorization of its loan to the hotel. If genuine, it could show that C had a conflict of interest in relation to the loan. M faxed copies of the document

*l'enveloppe — Protection de la source confidentielle — La garantie de la liberté d'expression accorde-t-elle aux journalistes une immunité constitutionnelle contre la divulgation forcée de leur source confidentielle? — Charte canadienne des droits et libertés, art. 2b).*

*Droit constitutionnel — Charte des droits — Fouilles, perquisitions et saisies — Journaliste et source confidentielle — Document reçu par une source confidentielle d'un expéditeur anonyme et transmis au journaliste sous une condition de confidentialité — Document prétendu contrefait — Mandat de perquisition et ordonnance d'assistance exigeant la production du document et de l'enveloppe — Protection de la source confidentielle — Le mandat de perquisition et l'ordonnance d'assistance sont-ils abusifs au sens de l'art. 8 de la Charte canadienne des droits et libertés? — Le journal aurait-il dû être avisé de la demande de mandat de perquisition visant ses locaux?*

*Preuve — Privilège — Journaliste et source confidentielle — Document reçu par une source confidentielle d'un expéditeur anonyme et transmis au journaliste sous une condition de confidentialité — Document prétendu contrefait — Mandat de perquisition et ordonnance d'assistance exigeant la production du document et de l'enveloppe — Protection de la source confidentielle — La garantie de la liberté d'expression accorde-t-elle aux journalistes une immunité constitutionnelle contre la divulgation forcée de leur source confidentielle? — La source confidentielle est-elle protégée par les règles de common law régissant le privilège? — Dans l'affirmative, le privilège du secret des sources confidentielles des journalistes est-il reconnu au cas par cas? — Quels éléments doivent être établis et à qui en incombe le fardeau?*

*Droit criminel — Mandats de perquisition — Perquisition dans les bureaux d'un journal — Le journal aurait-il dû être avisé de la demande de mandat de perquisition visant ses locaux?*

Le *National Post* employait M à titre de journaliste. M a mené une enquête visant à savoir si C, le premier ministre du Canada de l'époque, était impliqué dans un prêt consenti par une banque fédérale à un hôtel, situé dans le comté de C, qui paraissait avoir une dette envers la société d'investissement de la famille de C. X, une source secrète, a transmis des renseignements pertinents à M en échange d'une promesse générale et inconditionnelle de confidentialité. En 2001, M a reçu par la poste une enveloppe scellée contenant un document qui semblait être la copie de l'autorisation par la banque du prêt à l'hôtel. Si le document était authentique, il

R. *c.* NATIONAL POST

to the bank, to the Prime Minister's office, and to a lawyer for the Prime Minister. All three said that the document was a forgery. Shortly thereafter, X met M. X described receiving the document anonymously in the mail, discarding the original envelope, and passing the document on to M in the belief that it was genuine. M was satisfied that X was a reliable source who did not believe that the document was a forgery when he or she forwarded it to M. X feared that fingerprint or DNA analysis might reveal his or her identity and asked M to destroy the document and the envelope. M refused but told X that his undertaking of confidentiality would remain binding as long as he believed that X had not deliberately misled him.

The bank complained to the RCMP and an officer asked the appellants to produce the document and the envelope as physical evidence of the alleged crimes i.e. the forgery itself and the "uttering" (or putting into circulation) of the doctored bank records. They refused and M declined to identify his source.

The officer applied for a search warrant and an assistance order compelling M's editor to assist the police in locating the document and the envelope. He intended to submit them for forensic testing to determine if they carried fingerprints or other identifying markings (including DNA) which might assist in identifying the source of the document. Although the Crown informed the judge that the *National Post* had requested notification of the application, the hearing proceeded *ex parte* and a search warrant and an assistance order were issued.

The warrant and the order provided the appellants with one month before the RCMP could search the *National Post*'s premises and included other terms intended to accommodate the needs of the *National Post* as a media entity. The appellants applied to quash the warrant and assistance order. The reviewing judge held that there was sufficient information to conclude the document was a forgery but that there was only a remote and speculative possibility that disclosure of the document and the envelope would advance a criminal investigation. She set aside the search warrant and the assistance order. The Court of Appeal reversed that decision and reinstated the search warrant and the assistance order. In this Court, the appellants and supporting interveners argued that the warrant and the order should be quashed because they infringe s. 2(*b*) or s. 8 of the

pourrait démontrer que C se trouvait en conflit d'intérêts par rapport au prêt. M a transmis des copies du document par télécopieur à la banque, au Cabinet du premier ministre et à un avocat du premier ministre. Tous trois ont répondu que le document était contrefait. Peu après, X a rencontré M. X a dit avoir reçu le document par la poste d'une source anonyme, avoir jeté l'enveloppe originale et, le croyant authentique, l'avoir transmis à M. M était convaincu que X était une source fiable qui ne croyait pas le document contrefait au moment où il ou elle l'a transmis à M. X, craignant que des empreintes digitales ou une analyse génétique ne révèlent son identité, a demandé à M de détruire le document et l'enveloppe. M a refusé, mais a dit à X que son engagement de confidentialité demeurerait valide tant qu'il croirait que X ne l'avait pas induit en erreur délibérément.

La banque a porté plainte à la GRC, et un agent a demandé aux appelants de produire le document et l'enveloppe comme éléments de preuve matérielle des prétendues infractions, soit fabrication du faux lui-même et emploi (ou mise en circulation) de documents bancaires contrefaits. Ils ont refusé, et M n'a pas révélé l'identité de sa source.

L'agent a demandé un mandat de perquisition et une ordonnance d'assistance enjoignant au rédacteur en chef de M d'aider la police à trouver le document et l'enveloppe. Il avait l'intention de soumettre ces pièces à une analyse criminalistique afin de déterminer s'ils portaient des empreintes digitales ou d'autres marques distinctives (y compris de l'ADN) pouvant servir à identifier la source du document. Bien que le ministère public ait informé le juge que le *National Post* avait demandé d'être avisé de la demande, le juge a entendu la demande *ex parte* et a décerné un mandat de perquisition et une ordonnance d'assistance.

Le mandat et l'ordonnance prévoyaient un délai d'un mois avant la perquisition par la GRC dans les locaux du *National Post* et d'autres modalités visant à tenir compte des besoins du *National Post* comme organe de presse. Les appelants ont demandé l'annulation du mandat et de l'ordonnance d'assistance. La juge siégeant en révision a conclu qu'il y avait suffisamment de renseignements pour conclure qu'il s'agissait d'un document contrefait, mais il n'existait qu'une faible possibilité hypothétique que la divulgation du document et de l'enveloppe fasse progresser une enquête criminelle. Elle a annulé le mandat de perquisition et l'ordonnance d'assistance. La cour d'appel a infirmé sa décision et rétabli le mandat de perquisition et l'ordonnance d'assistance. Devant notre Cour, les appelants et les intervenants qui les appuient ont fait valoir que le mandat

2010 SCC 16 (CanLII)

*Canadian Charter of Rights and Freedoms*, or because the secret sources are protected by the common law of privilege.

*Held* (Abella J. dissenting): The appeal should be dismissed.

*Per* McLachlin C.J. and Binnie, Deschamps, Fish, Charron, Rothstein and Cromwell JJ.: It is well established that freedom of expression protects readers and listeners as well as writers and speakers. It is in the context of the public right to information about matters of public interest that the legal position of the confidential source or whistleblower must be located. The public has an interest in effective law enforcement. The public also has an interest in being informed about matters of public importance that may only see the light of day through the cooperation of sources who will not speak except on condition of confidentiality. The role of investigative journalism has expanded over the years to help fill what has been described as a democratic deficit in the transparency and accountability of our public institutions. There is a demonstrated need, as well, to shine the light of public scrutiny on the dark corners of some private institutions. The appellants and their expert witnesses make a convincing case that unless the media can offer anonymity in situations where sources would otherwise dry-up, freedom of expression in debate on matters of public interest would be badly compromised. Important stories will be left untold, and the transparency and accountability of our public institutions will be lessened to the public detriment.

In appropriate circumstances, accordingly, the courts will respect a promise of confidentiality given to a secret source by a journalist or an editor. The public's interest in being informed about matters that might only be revealed by secret sources, however, is not absolute. It must be balanced against other important public interests, including the investigation of crime. In some situations, the public's interest in protecting a secret source from disclosure may be outweighed by other competing public interests and a promise of confidentiality will not in such cases justify the suppression of the evidence.

This case involves an attempt by person(s) unknown to dupe the appellants into publishing a document which, on its face, implicated a former Prime Minister

et l'ordonnance devraient être annulés au motif qu'ils portent atteinte à l'al. 2*b*) ou à l'art. 8 de la *Charte canadienne des droits et libertés* ou que les sources secrètes sont protégées par un privilège issu de la common law.

*Arrêt* (la juge Abella est dissidente) : Le pourvoi est rejeté.

*La* juge en chef McLachlin et les juges Binnie, Deschamps, Fish, Charron, Rothstein et Cromwell : Il est bien reconnu que la liberté d'expression protège tant les lecteurs et les auditeurs que les rédacteurs et les orateurs. C'est dans le contexte du droit du public d'être informé des affaires d'intérêt public que doit être envisagée la situation juridique de la source confidentielle ou du dénonciateur d'irrégularités. Le public a un intérêt à l'application effective de la loi. Il a aussi un intérêt à ce que lui soit communiquée l'information sur des sujets importants susceptibles de ne pas être mis au jour sans la collaboration de sources qui ne parleront que sous le couvert de la confidentialité. Le rôle du journalisme d'enquête s'est élargi au fil des ans pour combler ce qui a été décrit comme un déficit démocratique dans la transparence et l'obligation redditionnelle de nos institutions publiques. Il a aussi été démontré qu'il est nécessaire de mettre au jour, à la faveur d'un examen public, les facettes obscures de certaines institutions privées. Les appelants et leurs témoins experts présentent des arguments convaincants pour démontrer que, si les médias ne peuvent assurer l'anonymat dans des situations où les sources se tariraient autrement, la liberté d'expression dans les débats sur des questions d'intérêt public sera grandement compromise. Des faits importants ne seront jamais relatés, et la transparence et l'obligation redditionnelle de nos institutions publiques s'en trouveront amoindries au détriment de l'intérêt public.

Par conséquent, lorsque les circonstances le requièrent, les tribunaux respectent la promesse de confidentialité faite à une source secrète par un journaliste ou un directeur de la rédaction. L'intérêt du public à ce que lui soit communiquée l'information sur des sujets susceptibles de n'être mis au jour qu'avec la collaboration de sources secrètes n'est toutefois pas absolu. Il doit être mis en balance avec d'autres intérêts publics importants, comme la conduite d'enquêtes criminelles. Dans certaines situations, des intérêts publics opposés l'emporteront sur l'intérêt public à protéger la source secrète contre toute divulgation et, en pareil cas, une promesse de confidentialité ne justifiera pas la rétention de la preuve.

L'affaire porte sur une tentative, par une ou plusieurs personnes dont on ne connaît pas l'identité, de berner les appelants pour les amener à publier un document

2010 SCC 16 (CanLII)

of Canada in a serious financial conflict of interest. The appellants were unable to confirm the document's authenticity and the police have reasonable grounds to believe that the document is a forgery. The document and envelope that came into M's possession constitute physical evidence reasonably linked to a serious crime. The police seek to subject this material to forensic analysis. A search to retrieve the physical instrumentality by which the offence was allegedly committed would likely satisfy the test in s. 487 of the *Criminal Code*, even if (as the reviewing judge predicted) forensic analysis of the document and the envelope do not shed light on the identity of the offender. The document and the envelope are not merely pieces of evidence tending to show that a crime has been committed. They constitute the *actus reus* or *corpus delicti* of the alleged offences.

Freedom to publish the news necessarily involves a freedom to gather the news, but each of the many important news gathering techniques, including reliance on secret sources, should not itself be regarded as entrenched in the Constitution. The protection attaching to freedom of expression is not limited to the "mainstream media", but is enjoyed by "everyone" (in the words of s. 2(*b*) of the *Charter*) who chooses to exercise his or her freedom of expression on matters of public interest. To throw a constitutional immunity around the interactions of such a heterogeneous and ill-defined group of writers and speakers and whichever "sources" they deem worthy of a promise of confidentiality and on whatever terms they may choose to offer it (or, as here, choose to amend it with the benefit of hindsight) would blow a giant hole in law enforcement and other constitutionally recognized values such as privacy. The law needs to provide solid protection against the compelled disclosure of secret sources in appropriate situations, but the history of journalism in this country shows that the purpose of s. 2(*b*) can be fulfilled without the necessity of implying a constitutional immunity. Accordingly, a judicial order to compel disclosure of a secret source in accordance with the principles of common law privilege would not in general violate s. 2(*b*).

Although the common law does not recognize a class privilege protecting journalists from compelled disclosure of secret sources, a journalist's claim for protection of secret sources can be assessed properly using the case-by-case model of privilege. The Wigmore criteria provide a workable structure within which to assess,

qui, à première vue, impliquait le premier ministre du Canada de l'époque dans un grave conflit d'intérêts financiers. Les appelants n'ont pas pu confirmer l'authenticité du document et la police a des motifs raisonnables de croire qu'il s'agit d'un faux. Le document et l'enveloppe qui se sont retrouvés en la possession de M constituent des éléments de preuve matérielle raisonnablement liés à un crime grave. La police veut soumettre ces éléments à une analyse criminalistique. Une perquisition visant à découvrir l'instrument matériel de la perpétration de l'infraction reprochée respecterait probablement le critère établi à l'art. 487 du *Code criminel*, même si — comme la juge siégeant en révision l'a prédit — l'analyse criminalistique du document et de l'enveloppe ne révèle pas l'identité du contrevenant. Le document et l'enveloppe ne sont pas de simples éléments de preuve tendant à démontrer qu'un crime a été commis. Ils constituent l'*actus reus* même ou le *corpus delicti* des crimes reprochés.

La liberté de diffuser les informations emporte nécessairement la liberté de recueillir les informations, mais chacune des nombreuses techniques importantes de collecte d'information, dont le recours à des sources secrètes, ne doit pas être considérée en soi comme protégée par la Constitution. La protection accordée à la liberté d'expression ne se limite pas aux « médias traditionnels », mais elle est accordée à « chacun » (aux termes de l'al. 2*b*) de la *Charte*), soit à quiconque décide d'exercer sa liberté d'expression sur des questions d'intérêt public. Conférer une immunité constitutionnelle aux interactions entre un groupe de rédacteurs et d'orateurs aussi hétérogène et mal défini et toute « source » que ces derniers estiment digne d'une promesse de confidentialité, assortie des conditions qu'ils déterminent (ou, comme en l'espèce, modifient par la suite), aurait pour effet de miner considérablement l'application de la loi et d'autres valeurs constitutionnelles, comme le respect de la vie privée. Le droit doit offrir une solide protection contre la divulgation forcée de l'identité des sources secrètes dans les situations qui le requièrent, mais l'histoire du journalisme au pays démontre que l'objectif de l'al. 2*b*) peut être atteint sans qu'il soit nécessaire de reconnaître implicitement une immunité constitutionnelle. Par conséquent, une ordonnance judiciaire visant à forcer la divulgation d'une source secrète en conformité avec le privilège de common law ne va généralement pas à l'encontre de l'al. 2*b*).

Bien que la common law ne reconnaisse pas l'existence d'un privilège générique qui soustrairait les journalistes à l'obligation de divulguer leurs sources secrètes, la revendication par un journaliste d'une protection de ses sources secrètes peut être évaluée à bon droit selon le modèle du privilège fondé sur les circonstances de

in light of society's evolving values, the sometimes-competing interests of free expression and the administration of justice and other values that promote the public interest. This will provide the necessary flexibility and an opportunity for growth that is essential to the proper function of the common law.

The scope of the privilege will depend, as does its very existence, on a case-by-case analysis, and may be total or partial. It is capable, in a proper case, of being asserted against the issuance or execution of a search warrant. A promise of confidentiality will be respected if: the communication originates in a confidence that the identity of the informant will not be disclosed; the confidence is essential to the relationship in which the communication arises; the relationship is one which should be sedulously fostered in the public good; and the public interest in protecting the identity of the informant from disclosure outweighs the public interest in getting at the truth. This approach properly reflects *Charter* values and balances the competing public interests in a context-specific manner.

The media party asking the court to uphold a promise of confidentiality must prove all four criteria and no burden of proof shifts to the Crown. This includes, under the fourth criterion, proving that the public interest in protecting a secret source outweighs the public interest in a criminal investigation. The weighing up under this criterion will also include the nature and seriousness of the offence under investigation, and the probative value of the evidence sought to be obtained measured against the public interest in respecting the journalist's promise of confidentiality. The underlying purpose of the investigation is relevant as well. Until the media have met all four criteria, no privilege arises and the evidence is presumptively compellable and admissible. Therefore, no journalist can give a secret source an absolute assurance of confidentiality.

In this case, the first three of the four criteria are met. The communication originated in confidence and neither the journalist-source relationship nor the communication would have occurred without confidentiality. This type of journalist-source relationship ought to be sedulously fostered given the importance of investigative journalism exploring potential conflicts of interest at the highest levels of government. The appellants,

chaque cas. Le test de Wigmore fournit un cadre pratique pour l'appréciation des intérêts, parfois opposés, à la liberté d'expression et à l'administration de la justice, ainsi que d'autres valeurs d'intérêt public, au gré des changements de la société. Il offre ainsi la souplesse nécessaire et une occasion propice à l'évolution, qui est indispensable au bon fonctionnement de la common law.

Le privilège peut être absolu ou partiel et sa portée dépend, comme son existence même, d'une analyse effectuée au cas par cas. Il peut, dans certains cas, être opposable à la délivrance ou à l'exécution d'un mandat de perquisition. Une promesse de confidentialité sera honorée si : la communication a été transmise confidentiellement avec l'assurance que l'identité de l'informateur ne serait pas divulguée; le caractère confidentiel est essentiel aux rapports dans le cadre desquels la communication est transmise; ces rapports devraient, dans l'intérêt public, être entretenus assidûment; et l'intérêt public à protéger l'identité de l'informateur contre la divulgation l'emporte sur l'intérêt public à la découverte de la vérité. Cette façon de procéder reflète bien les valeurs consacrées dans la *Charte* et met les intérêts publics opposés en balance en fonction du contexte.

Le média qui fait valoir une promesse de confidentialité devant le tribunal doit satisfaire aux quatre critères et il n'y a pas inversion du fardeau de la preuve, qui n'incombe en rien au ministère public. Cela vaut notamment à l'égard du quatrième critère qui exige la preuve que l'intérêt public à la protection de la source secrète l'emporte sur l'intérêt public à la conduite d'une enquête criminelle. La pondération requise par ce critère englobe aussi notamment, d'un côté, la nature et la gravité de l'infraction faisant l'objet de l'enquête et la valeur probante des éléments qu'on cherche à obtenir et, de l'autre côté, l'intérêt public à ce que la promesse de confidentialité faite par un journaliste soit respectée. Le but sous-jacent de l'enquête est aussi un facteur pertinent. Jusqu'à ce que le média ait satisfait aux quatre volets, aucun privilège ne s'applique; il y a présomption que la preuve est admissible et que le tribunal peut en ordonner la production. Par conséquent, aucun journaliste ne peut donner une garantie de confidentialité absolue à l'une de ses sources.

En l'espèce, les trois premiers des quatre critères sont remplis. La communication s'est faite sous le sceau du secret et il n'y aurait eu ni relation entre le journaliste et sa source ni communication sans garantie de confidentialité. Ce type de relation entre un journaliste et sa source devrait être entretenue assidûment, car il importe que les journalistes d'enquête puissent s'enquérir des conflits d'intérêts potentiels des décideurs au

however, have failed to establish the fourth criterion. The alleged offences are of sufficient seriousness to justify the decision of the police to investigate the criminal allegations. The physical evidence is essential to the police investigation and likely essential as well to any future prosecution. While it is appropriate under this criterion to assess the likely probative value of the evidence sought, the reviewing judge ought not to have pre-empted the forensic investigation by seemingly prejudging the outcome without first considering all the relevant factors in her assessment. DNA analysis is capable of producing results even under exceptionally unpromising circumstances. The police should not be prevented from pursuing well-established modes of forensic analysis of relevant physical evidence on the basis that in the end such analysis may prove to be unsuccessful.

The argument that there is a "fatal disconnect between the envelope, the document, the identity of X and the alleged forgery" hinges on the credibility of X's story that he or she was not the perpetrator of the forgery, but an innocent recipient, who passed it on to M in good faith. However a denial of criminal involvement is not a sufficient ground to put an end to a serious criminal investigation, even where the intermediate (though not the ultimate) intended victim of the alleged crime happens to be a media organization. The police need not accept X's anonymous, uncorroborated and self-exculpatory statements to a third party (M) as a reason to terminate their investigation of the physical evidence any more than they need accept the disclaimers of any other potential witness to a crime, especially when the witness may also be the perpetrator.

The media's ss. 2(*b*) and 8 *Charter* interests are clearly implicated when the police seek to seize documents in their possession. Even where no privilege is found to exist, warrants and assistance orders against the media must take into account their "special position" and be reasonable in the "totality of circumstances". It is not sufficient for the Crown merely to establish that the requirements set out in ss. 487.01 and 487.02 of the *Criminal Code* were met. In this case, the conditions governing the search ensured that the media organization would not be unduly impeded by a physical search in the publishing or dissemination of the news. The order contained the usual clause directing that any documents seized be sealed on request. The police had reasonable grounds to believe that criminal offences had been committed and that relevant information would be

plus haut niveau du gouvernement. Les appelants n'ont toutefois pas réussi en l'espèce à établir que le quatrième critère était rempli. Les infractions reprochées sont suffisamment graves pour justifier amplement la décision de la police d'enquêter sur les allégations criminelles. La preuve matérielle est essentielle à l'enquête de la police et probablement essentielle à toute poursuite à venir. Bien qu'il soit approprié, en appliquant ce critère, d'évaluer la valeur probante de la preuve recherchée, la juge siégeant en révision n'aurait pas dû anticiper l'enquête criminalistique en en préjugeant apparemment le résultat sans d'abord tenir compte de tous les facteurs pertinents dans son évaluation. L'analyse génétique peut produire des résultats même dans des circonstances très peu prometteuses. La police ne devrait pas être empêchée d'appliquer des méthodes d'analyse bien établies à des éléments de preuve matérielle pertinents simplement parce que l'analyse pourrait, au bout du compte, se révéler infructueuse.

L'argument selon lequel il n'existe « aucun lien entre l'enveloppe, le document, l'identité de X et le prétendu faux, et cette absence de lien est fatale » dépend de la crédibilité du récit de X, qui nie être l'auteur du faux et prétend plutôt avoir reçu le document en toute innocence et l'avoir transmis à M de bonne foi. Toutefois, la dénégation de toute participation à une activité criminelle ne constitue pas une raison suffisante pour mettre un terme à une enquête sur une infraction grave, même si c'est un organe de presse qui est la cible intermédiaire (et non la cible ultime) du prétendu crime. La police n'est pas plus tenue de mettre fin à son enquête sur un élément de preuve matérielle sur la foi des déclarations anonymes, non corroborées et disculpatoires de X à un tiers (M) qu'elle n'est tenue d'ajouter foi aux dénégations de tout autre témoin potentiel, à plus forte raison quand ce dernier pourrait être aussi l'auteur du crime.

Les droits que l'al. 2*b*) et l'art. 8 de la *Charte* garantissent aux médias sont manifestement en jeu lorsque la police veut saisir des documents en leur possession. Même si l'on ne conclut pas à l'existence d'un privilège, les mandats de perquisition et les ordonnances d'assistance visant les médias doivent tenir compte de leur « situation très particulière » et être raisonnables compte tenu de « l'ensemble des circonstances ». Il ne suffit pas pour le ministère public d'établir que les exigences formelles énoncées aux art. 487.01 et 487.02 du *Code criminel* ont été respectées. En l'espèce, les conditions de la perquisition garantissaient au média qu'il ne serait pas indûment empêché par la perquisition de publier ou de diffuser les informations. L'ordonnance contenait la condition habituelle prévoyant la mise sous scellés sur demande de tout document saisi. Les policiers avaient

2010 SCC 16 (CanLII)

obtained. The search warrant was reasonable within the meaning of s. 8 of the *Charter*.

On the facts of this case, the *ex parte* nature of the issuing judge's order is not a ground for setting the warrant aside. There is no jurisdictional requirement to give notice to a media entity of an application for a warrant to search its premises. The media should have an opportunity to argue against a warrant at the earliest reasonable opportunity, but whether and when to provide prior notice remain matters of judicial discretion. Where, as here, a court proceeds *ex parte*, adequate terms must be inserted in the warrant to protect the special position of the media, and to permit the media ample time and opportunity to challenge the warrant.

In this case, the issuing judge was aware that the secret source issue lay at the heart of the controversy, and the appellants' position was fully protected by the terms of the warrant. They have not demonstrated any prejudice on that account. The assistance order also was reasonable. Given the concerted action between M and his editor, it was appropriate to enlist the editor's assistance in locating and producing the concealed documents.

Accordingly, the warrant and assistance order were properly issued and must be complied with even if the result is to disclose the identity of the secret source who, the police have reasonable cause to believe, uttered (and may indeed have created) a forged document.

*Per* LeBel J.: Claims of journalist-source privilege should be resolved on a case-by-case basis applying the Wigmore criteria, and there is agreement with the majority's weighing of the relevant rights and interests under the fourth criterion of the analysis.

There is agreement with Abella J. that when an application for a search warrant is made against a media organization, there is a presumptive requirement to give notice of the application to the affected organization. The media play a key role in disseminating information and triggering debate on public issues. The process of applying for search warrants should be sensitive to the need to prevent undue or overly intrusive interference in media operations and affected media organizations should be able to raise their concerns at the first

des motifs raisonnables de croire que des infractions criminelles avaient été commises et que des renseignements pertinents seraient obtenus. L'ordonnance de perquisition n'était pas abusive au sens de l'art. 8 de la *Charte*.

Le caractère *ex parte* de l'ordonnance ne justifie pas l'annulation du mandat au vu des faits de l'affaire. Il n'existe pas d'exigence juridictionnelle d'aviser un média d'une demande de mandat de perquisition visant ses locaux. Les médias devraient avoir la possibilité de faire valoir leurs arguments contre la délivrance d'un mandat à la première occasion raisonnable, mais l'absence ou l'existence et le moment d'un préavis relèvent du pouvoir discrétionnaire du juge. Lorsque, comme en l'espèce, un tribunal entend une demande *ex parte*, il doit assortir le mandat de conditions adéquates pour protéger la situation très particulière du média et lui donner amplement le temps et la possibilité de justifier l'annulation du mandat.

En l'espèce, le juge qui a décerné le mandat savait que la question des sources secrètes était au cœur de la controverse et la situation des appelants était entièrement protégée par les conditions du mandat. Ils n'ont démontré aucun préjudice à cet égard. L'ordonnance d'assistance était elle aussi raisonnable. Étant donné que M et le rédacteur en chef ont agi de concert, il était approprié de requérir l'assistance du rédacteur en chef pour la recherche et la production des documents cachés.

Par conséquent, le mandat et l'ordonnance d'assistance ont été délivrés régulièrement et doivent être respectés, même au risque que soit dévoilée l'identité de la source secrète dont la police a des motifs raisonnables de croire qu'elle a mis en circulation (et peut-être effectivement créé) un document contrefait.

*Le* juge LeBel : La revendication du privilège du secret des sources des journalistes doit être tranchée au cas par cas par l'application du test de Wigmore. Il y a accord avec les juges majoritaires sur la pondération des droits et des intérêts pertinents au quatrième critère de l'analyse.

Il y a accord avec la juge Abella selon laquelle une demande de mandat de perquisition contre une organisation médiatique devrait être présumée emporter l'obligation de donner un préavis au média visé. Les médias jouent un rôle essentiel en diffusant l'information et en suscitant des débats sur des questions d'intérêt public. La procédure de demande de mandats de perquisition doit donc tenir compte de la nécessité d'éviter les perturbations indues ou trop envahissantes des activités des médias et permettre à ces derniers d'exprimer leurs

R. *c.* NATIONAL POST

opportunity. The requirement to give notice may be waived in urgent situations, in which case the issuing judge should craft conditions to limit interference with the media organization's operations. In this case, since the lack of notice did not make the search unreasonable and the issuing judge proceeded on the basis of established law, the search warrant should not be quashed.

*Per* Abella J. (dissenting): Journalist-source privilege should be assessed on a case-by-case basis. The balancing of the interests of the press against other societal interests, such as crime prevention, prosecution and investigation, should be done in accordance with the four Wigmore criteria, infused with *Charter* values. In this case, the search warrant and assistance order should be quashed. The criteria are met, including the fourth criterion, which requires the claimant to demonstrate that the injury that would inure to the relationship by the disclosure of the communications is greater than the benefit thereby gained for the correct disposal of the litigation. The harm caused by the disclosure of the identity of the confidential source in this case is far weightier on the scales than any benefit to the investigation of the crime.

The media's role in disseminating information is pivotal in its contribution to public debate, and the use of confidential sources can be an integral part of the responsible gathering of the news and the communication of matters of public interest. Several jurisdictions have already recognized the importance of confidential sources by granting, legislatively or judicially, some form of qualified privilege to journalists. The chilling effect that could result from the compelled exposure of confidential journalistic sources also cannot be ignored. In the case before us, X's confidentiality was crucial to M's ability to write on a subject of public interest. M had prior positive experiences with X where he had been able to confirm the authenticity of information provided by X via an intermediary. He also took steps to assure himself of X's credibility and integrity in connection with the latest document by asking for a confidential affidavit and telling X that his/her confidentiality would only be protected if M were satisfied that he was not being misled. Where a journalist has taken credible and reasonable steps to determine the authenticity and reliability of a source, one should respect his or her professional judgment and pause before trespassing on the confidentiality which is the source of the relationship. In this case, demonstrable and profound injury to the journalist/source relationship

préoccupations à la première occasion. L'obligation de donner un préavis peut être levée dans des situations urgentes, auquel cas le juge saisi de la demande devrait assortir le mandat de conditions limitant les perturbations dans les activités du média visé. En l'espèce, puisque l'absence de préavis n'a pas rendu la perquisition abusive, et que le juge a appuyé sa décision sur des règles de droit établies, le mandat de perquisition ne doit pas être annulé.

*La* juge Abella (dissidente) : Le privilège du secret des sources des journalistes devrait être examiné au cas par cas. Il faut soupeser les intérêts de la presse par rapport à d'autres intérêts sociétaux comme la prévention, les poursuites et les enquêtes en matière criminelle en fonction des quatre critères énoncés par Wigmore, de manière à refléter les valeurs consacrées par la *Charte*. En l'espèce, le mandat de perquisition et l'ordonnance d'assistance devraient être annulés. Les critères sont remplis, y compris le quatrième, où le demandeur doit démontrer que le préjudice que la divulgation des communications causerait aux rapports entre le journaliste et sa source est plus considérable que l'avantage à retirer d'une juste décision. Le préjudice causé par la divulgation de l'identité de la source confidentielle en l'espèce pèse beaucoup plus dans la balance que n'importe quel avantage dont pourrait bénéficier l'enquête criminelle.

En tant que diffuseurs de l'information, les médias jouent un rôle capital par leur contribution au débat public, et le recours à des sources confidentielles peut faire partie intégrante du journalisme responsable dans la collecte d'informations et la communication touchant les questions d'intérêt public. Dans plusieurs États, l'importance des sources confidentielles a été confirmée par des mesures législatives ou des décisions judiciaires reconnaissant une forme quelconque de privilège du secret des sources des journalistes. L'effet de dissuasion qui pourrait découler de la divulgation forcée des sources confidentielles des journalistes ne peut non plus être ignoré. Dans la présente affaire, l'anonymat de X était crucial pour les articles de M sur un sujet d'intérêt public. M avait eu des expériences antérieures positives avec X où il avait été en mesure de confirmer l'authenticité de renseignements fournis par X par le truchement d'un intermédiaire. Il a également pris des mesures pour s'assurer de la crédibilité de X et de son intégrité à l'égard du dernier document reçu en lui demandant de signer un affidavit confidentiel et en lui disant qu'il ne garderait son identité secrète que s'il était convaincu de ne pas avoir été induit en erreur. Lorsqu'un journaliste a pris des mesures raisonnables et crédibles pour vérifier l'authenticité et la fiabilité de sa source, il faut respecter son jugement professionnel et hésiter à compromettre

will result from disclosure of the documents and potentially of the identity of the source.

On the other side of the balancing exercise, the benefits of disclosure range from speculative to negligible. While it is undisputed that the investigation of crime is an important public objective, the evidence sought by the state is of only questionable assistance in this case. The police hoped to find DNA and fingerprint evidence on the envelope and the document which they thought might reveal the identity of the source of the alleged forgery. However, there is a fatal disconnect between the envelope, the document, the identity of X and the alleged forgery. X received the document anonymously and discarded the original envelope in which he/she received the document. Since X does not know the identity of the sender, learning X's identity will yield virtually no evidence that could assist in determining who was responsible for the alleged forgery. Moreover, the more documents are manipulated, the less likely the chances of obtaining fingerprints. Both the document and the envelope had been extensively handled. X is therefore in no position to provide any information of assistance to the investigation and is, in any event, under no legal obligation to speak to the police. The benefit to the forgery investigation of getting the documents is, therefore, at best marginal. The only remaining purpose for learning the confidential source's identity is to discover who created this public controversy. This by itself is not an acceptable basis for interfering with freedom of the press. Lastly, the remote possibility of resolving the debt forgery — a crime of moderate seriousness — is far from sufficiently significant to outweigh the public benefit in protecting a rigorously thorough and responsible press.

A search warrant of media premises is a particularly serious intrusion, and a decision should not be made about its propriety without submissions from the party most affected. The operating presumption should be that the media's unique institutional character entitles it to notice when a search warrant is sought against it unless there are urgent circumstances justifying an *ex parte* hearing. No such notice was given to the *National Post* and there was no such urgency. It therefore lost the opportunity to make timely submissions on the confidential nature of the source and the serious informational gaps in the Information to Obtain. Had the fuller record and their arguments been

la confidentialité à l'origine de la relation. En l'espèce, un préjudice démontrable et grave aux rapports entre le journaliste et sa source résultera de la divulgation des documents et, éventuellement, de l'identité de la source.

De l'autre côté de la balance, les avantages à retirer de la divulgation sont négligeables, voire hypothétiques. Bien qu'il soit incontesté que la conduite d'enquêtes criminelles constitue un objectif public important, les éléments de preuve que l'État cherche à obtenir ne sont que d'une utilité discutable en l'espèce. La police espérait relever sur l'enveloppe et sur le document des empreintes digitales et génétiques susceptibles de révéler l'identité de la source du prétendu faux. Toutefois, il n'y a aucun lien entre l'enveloppe, le document, l'identité de X et le prétendu faux, et cette absence de lien est fatale. X a reçu le document par la poste d'une source anonyme et a jeté l'enveloppe originale dans laquelle il/elle avait reçu le document. Comme X ne connaît pas l'identité de l'expéditeur du document, apprendre l'identité de X ne fournira pratiquement aucune preuve pouvant aider à déterminer qui était responsable du prétendu faux. En outre, plus les documents sont manipulés, moins on a de chances d'y relever des empreintes digitales. Le document et l'enveloppe avaient été tous les deux largement manipulés. Par conséquent, X n'est pas en mesure de fournir de renseignements utiles pour l'enquête et, de toute façon, X n'a pas l'obligation, en droit, de parler à la police. L'obtention des documents représenterait donc tout au plus un avantage minime pour l'enquête sur le faux. L'identification de la source confidentielle n'aurait plus pour but que de découvrir l'identité de la personne à l'origine de cette controverse publique, ce qui ne justifie pas en soi d'entraver la liberté de la presse. Finalement, la faible possibilité de résoudre la question du faux — un crime de gravité modérée — est loin d'être suffisamment importante pour l'emporter sur les avantages pour le public de protéger une presse rigoureusement responsable, qui va au fond des choses.

La perquisition dans les locaux d'un média constitue une intrusion particulièrement grave, et la décision sur l'opportunité de l'autoriser ne devrait pas être rendue sans que le principal intéressé puisse présenter ses observations. Une présomption devrait s'appliquer selon laquelle le caractère institutionnel unique des médias leur donne le droit d'être avisés du dépôt d'une demande de mandat de perquisition les visant à moins de circonstances urgentes justifiant une audience *ex parte*. Le *National Post* n'a bénéficié d'aucun préavis, et de telles circonstances n'existaient pas en l'espèce. Il a par conséquent perdu l'occasion de présenter des observations en temps opportun en ce qui concerne la

known, the outcome of the hearing might have been different.

## Cases Cited

By Binnie J.

**Referred to:** *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199; *Canadian Broadcasting Corporation v. Lessard*, [1991] 3 S.C.R. 421; *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459; *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835; *R. v. McClure*, 2001 SCC 14, [2001] 1 S.C.R. 445; *Grant v. Torstar Corp.*, 2009 SCC 61, [2009] 3 S.C.R. 640; *R. v. Gruenke*, [1991] 3 S.C.R. 263; *Moysa v. Alberta (Labour Relations Board)*, [1989] 1 S.C.R. 1572; *Ashworth Hospital Authority v. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033; *McGuinness v. Attorney-General of Victoria* (1940), 63 C.L.R. 73; *John Fairfax & Sons Ltd. v. Cojuangco* (1988), 165 C.L.R. 346; *Branzburg v. Hayes*, 408 U.S. 665 (1972); *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157; *Slavutych v. Baker*, [1976] 1 S.C.R. 254; *RWDSU v. Dolphin Delivery Ltd.*, [1986] 2 S.C.R. 573; *O'Neill v. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389; *R. v. Murray* (2000), 144 C.C.C. (3d) 289; *Financial Times Ltd. v. The United Kingdom*, [2009] ECHR 2065 (BAILII); *Financial Times Ltd. v. Interbrew*, [2002] EWCA Civ 274 (BAILII), leave to appeal to the House of Lords denied, 9 July 2002; E.C.H.R., *Goodwin v. The United Kingdom* judgment of 27 March 1996, *Reports of Judgments and Decisions* 1996-II; *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487; *John v. Express Newspapers*, [2000] 3 All E.R. 257; *Sanoma Uitgevers B.V. v. The Netherlands*, E.C.H.R., No. 38224/03, 31 March 2009 (online: http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc.en); *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (2005); *R. v. Canadian Broadcasting Corp.* (2001), 52 O.R. (3d) 757, leave to appeal dismissed, [2001] 2 S.C.R. vii; *R. v. Serendip Physiotherapy Clinic* (2004), 73 O.R. (3d) 241; *Descôteaux v. Mierzwinski*, [1982] 1 S.C.R. 860.

By Abella J. (dissenting)

*Moysa v. Alberta (Labour Relations Board)*, [1989] 1 S.C.R. 1572; *Branzburg v. Hayes*, 408 U.S. 665 (1972); *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (2005); *New York Times Co. v. Gonzales*, 459 F.3d 160 (2006); *X Ltd. v. Morgan-Grampian Ltd.*, [1991] 1 A.C. 1; *Ashworth Hospital Authority v. MGN Ltd.*, [2002]

---

nature confidentielle de la source et les graves lacunes informationnelles dans la dénonciation en vue d'obtenir un mandat. Si le dossier amplifié et ses arguments avaient été présentés, l'issue de l'audience aurait pu être tout autre.

## Jurisprudence

Citée par le juge Binnie

**Arrêts mentionnés :** *St. Elizabeth Home Society c. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199; *Société Radio-Canada c. Lessard*, [1991] 3 R.C.S. 421; *Société Radio-Canada c. Nouveau-Brunswick (Procureur général)*, [1991] 3 R.C.S. 459; *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835; *R. c. McClure*, 2001 CSC 14, [2001] 1 R.C.S. 445; *Grant c. Torstar Corp.*, 2009 CSC 61, [2009] 3 R.C.S. 640; *R. c. Gruenke*, [1991] 3 R.C.S. 263; *Moysa c. Alberta (Labour Relations Board)*, [1989] 1 R.C.S. 1572; *Ashworth Hospital Authority c. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033; *McGuinness c. Attorney-General of Victoria* (1940), 63 C.L.R. 73; *John Fairfax & Sons Ltd. c. Cojuangco* (1988), 165 C.L.R. 346; *Branzburg c. Hayes*, 408 U.S. 665 (1972); *M. (A.) c. Ryan*, [1997] 1 R.C.S. 157; *Slavutych c. Baker*, [1976] 1 R.C.S. 254; *SDGMR c. Dolphin Delivery Ltd.*, [1986] 2 R.C.S. 573; *O'Neill c. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389; *R. c. Murray* (2000), 144 C.C.C. (3d) 289; *Financial Times Ltd. c. The United Kingdom*, [2009] ECHR 2065 (BAILII); *Financial Times Ltd. c. Interbrew*, [2002] EWCA Civ 274 (BAILII), autorisation d'appel refusée, Chambre des lords, 9 juillet 2002; C.E.D.H., arrêt *Goodwin c. Royaume-Uni* du 27 mars 1996, *Recueil des arrêts et décisions* 1996-II; *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487; *John c. Express Newspapers*, [2000] 3 All E.R. 257; *Sanoma Uitgevers B.V. c. Pays-Bas*, C.E.D.H., nº 38224/03, 31 mars 2009 (en ligne : http://cmiskp.echr.coe.int/tkp197/search.asp?skin=hudoc-fr); *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (2005); *R. c. Canadian Broadcasting Corp.* (2001), 52 O.R. (3d) 757, autorisation d'appel rejetée, [2001] 2 R.C.S. vii; *R. c. Serendip Physiotherapy Clinic* (2004), 73 O.R. (3d) 241; *Descôteaux c. Mierzwinski*, [1982] 1 R.C.S. 860.

Citée par la juge Abella (dissidente)

*Moysa c. Alberta (Labour Relations Board)*, [1989] 1 R.C.S. 1572; *Branzburg c. Hayes*, 408 U.S. 665 (1972); *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (2005); *New York Times Co. c. Gonzales*, 459 F.3d 160 (2006); *X Ltd. c. Morgan-Grampian Ltd.*, [1991] 1 A.C. 1; *Ashworth Hospital Authority c. MGN Ltd.*, [2002]

2010 SCC 16 (CanLII)

UKHL 29, [2002] 1 W.L.R. 2033; E.C.H.R., *Goodwin v. The United Kingdom* judgment of 27 March 1996, *Reports of Judgments and Decisions* 1996-II; *Slavutych v. Baker*, [1976] 1 S.C.R. 254; *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157; *Grant v. Torstar Corp.*, 2009 SCC 61, [2009] 3 S.C.R. 640; *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199; *John v. Express Newspapers*, [2000] 3 All E.R. 257; *Reynolds v. Times Newspapers Ltd.*, [2001] 2 A.C. 127; *Ernst v. Belgium* (2004), 39 E.H.R.R. 724; *Voskuil v. Netherlands* (2007), 24 B.H.R.C. 306; *Prosecutor v. Brdjanin and Talic*, ICTY, No. IT-99-36-AR73.9, 11 December 2002; *Van den Biggelaar v. Dohmen/Langenberg*, Hoge Raad der Nederlanden, Judgment of 10 May 1996, NJ 1996/578; *British Steel Corp. v. Granada Television Ltd.*, [1981] 1 All E.R. 417; *Financial Times Ltd. v. The United Kingdom*, [2009] ECHR 2065 (BAILII); *R. v. Hebert*, [1990] 2 S.C.R. 151; *R. v. Chambers*, [1990] 2 S.C.R. 1293; *R. v. Turcotte*, 2005 SCC 50, [2005] 2 S.C.R. 519; *O'Neill v. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389; *Canadian Broadcasting Corporation v. Lessard*, [1991] 3 S.C.R. 421; *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459; *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487.

## Statutes and Regulations Cited

28 C.F.R. § 50.10(a) (2009).

*Canadian Charter of Rights and Freedoms*, ss. 1, 2(*b*), 3, 7, 8, 24(2).

*Contempt of Court Act 1981* (U.K.), 1981, c. 49, s. 10.

*Criminal Code*, R.S.C. 1985, c. C-46, ss. 487, 487.01, 487.02.

*Criminal Procedure Act* (S. Afr.), No. 51 of 1977, ss. 189, 205.

*Free Flow of Information Act of 2009*, H.R. 985, 111th Congr. (2009).

## Treaties and Other International Instruments

*Convention for the Protection of Human Rights and Fundamental Freedoms*, 213 U.N.T.S. 221, art. 10.

## Authors Cited

Abramowicz, David. "Calculating the Public Interest in Protecting Journalists' Confidential Sources" (2008), 108 *Colum. L. Rev.* 1949.

Article 19 and Interights. *Briefing Paper on Protection of Journalists' Sources: Freedom of Expression Litigation Project*, May 1998 (online: www.article19.org/pdfs/publications/right-to-protect-sources.pdf).

Bartlett, Peter. "Australia", in Charles J. Glasser Jr., ed., *International Libel and Privacy Handbook*, 2nd ed. New York: Bloomberg, 2009.

Brabyn, Janice. "Protection Against Judicially Compelled Disclosure of the Identity of News Gatherers' Confidential Sources in Common Law Jurisdictions" (2006), 69 *Mod. L. Rev.* 895.

Canadian Association of Journalists. *Guidelines for Investigative Journalism*, approved at the 2004 Annual General Meeting (online: http://www.eagle.ca/caj/principles/principles-statement-investiga tive-2004.htm).

Editorial. "Shielding a Basic Freedom", *The New York Times*, September 12, 2005, p. A20.

Freedman, Eric M. "Reconstructing Journalists' Privilege" (2008), 29 *Cardozo L. Rev.* 1381.

Gora, Joel M. "The Source of the Problem of Sources: The First Amendment Fails the Fourth Estate" (2008), 29 *Cardozo L. Rev.* 1399.

*New Shorter Oxford English Dictionary on Historical Principles*, 6th ed., vol. 2. Oxford: Clarendon Press, 2007, "sedulous".

Paciocco, David M., and Lee Stuesser. *The Law of Evidence*, 5th ed. Toronto: Irwin Law, 2008.

*Sopinka, Lederman & Bryant: The Law of Evidence in Canada*, 3rd ed. by Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst. Markham, Ont.: Lexis-Nexis, 2009.

United States. Congressional Research Service. CRS Report for Congress. *Journalists' Privilege to Withhold Information in Judicial and Other Proceedings: State Shield Statutes*, June 27, 2007.

Wigmore, John Henry. *A Treatise on the Anglo-American System of Evidence in Trials at Common Law*, 2nd ed. Boston: Little, Brown and Co., 1923.

Wigmore, John Henry. *Evidence in Trials at Common Law*, vol. 8. Revised by John T. McNaughton. Boston: Little, Brown & Co., 1961.

Youm, Kyu Ho. "International and Comparative Law on the Journalist's Privilege: The *Randal* Case as a Lesson for the American Press" (2006), 1 *J. Int'l Media & Ent. L.* 1.

Association canadienne des journalistes. *Guidelines for Investigative Journalism*, approved at the 2004 Annual General Meeting (online: http://www.eagle.ca/caj/principles/principles-statement-investiga tive-2004.htm).

Bartlett, Peter. « Australia », in Charles J. Glasser Jr., ed., *International Libel and Privacy Handbook*, 2nd ed. New York : Bloomberg, 2009.

Brabyn, Janice. « Protection Against Judicially Compelled Disclosure of the Identity of News Gatherers' Confidential Sources in Common Law Jurisdictions » (2006), 69 *Mod. L. Rev.* 895.

Editorial. « Shielding a Basic Freedom », *The New York Times*, September 12, 2005, p. A20.

États-Unis. Congressional Research Service. CRS Report for Congress. *Journalists' Privilege to Withhold Information in Judicial and Other Proceedings : State Shield Statutes*, June 27, 2007.

Freedman, Eric M. « Reconstructing Journalists' Privilege » (2008), 29 *Cardozo L. Rev.* 1381.

Gora, Joel M. « The Source of the Problem of Sources : The First Amendment Fails the Fourth Estate » (2008), 29 *Cardozo L. Rev.* 1399.

*New Shorter Oxford English Dictionary on Historical Principles*, 6th ed., vol. 2. Oxford : Clarendon Press, 2007, « sedulous ».

Paciocco, David M., and Lee Stuesser. *The Law of Evidence*, 5th ed. Toronto : Irwin Law, 2008.

*Sopinka, Lederman & Bryant : The Law of Evidence in Canada*, 3rd ed. by Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst. Markham, Ont. : Lexis-Nexis, 2009.

Wigmore, John Henry. *A Treatise on the Anglo-American System of Evidence in Trials at Common Law*, 2nd ed. Boston : Little, Brown and Co., 1923.

Wigmore, John Henry. *Evidence in Trials at Common Law*, vol. 8. Revised by John T. McNaughton. Boston : Little, Brown & Co., 1961.

Youm, Kyu Ho. « International and Comparative Law on the Journalist's Privilege : The *Randal* Case as a Lesson for the American Press » (2006), 1 *J. Int'l Media & Ent. L.* 1.

APPEAL from a judgment of the Ontario Court of Appeal (Laskin, Simmons and Gillese JJ.A.), 2008 ONCA 139, 230 C.C.C. (3d) 472, 290 D.L.R. (4th) 655, 56 C.R. (6th) 163, 168 C.R.R. (2d) 193, 234 O.A.C. 101, 89 O.R. (3d) 1, [2008] O.J. No. 744 (QL), 2008 CarswellOnt 1104, setting aside a decision of Benotto J. (2004), 69 O.R. (3d) 427, 19 C.R. (6th) 393, 115 C.R.R. (2d) 65, [2004] O.T.C. 50,

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (les juges Laskin, Simmons et Gillese), 2008 ONCA 139, 230 C.C.C. (3d) 472, 290 D.L.R. (4th) 655, 56 C.R. (6th) 163, 168 C.R.R. (2d) 193, 234 O.A.C. 101, 89 O.R. (3d) 1, [2008] O.J. No. 744 (QL), 2008 CarswellOnt 1104, qui a annulé la décision de la juge Benotto (2004), 69 O.R. (3d) 427, 19 C.R. (6th) 393, 115 C.R.R. (2d) 65, [2004] O.T.C.

*2010 SCC 16 (CanLII)*

R. *v.* NATIONAL POST   *Binnie J.*                    [2010] 1 S.C.R.

[2004] O.J. No. 178 (QL), 2004 CarswellOnt 173. Appeal dismissed, Abella J. dissenting.

*Marlys A. Edwardh*, *John Norris* and *Jessica Orkin*, for the appellants.

*Robert Hubbard* and *Susan Magotiaux*, for the respondent.

*Cheryl J. Tobias*, *Q.C.*, *Jeffrey G. Johnston* and *Robert J. Frater*, for the intervener the Attorney General of Canada.

Written submissions only by *Gaétan Migneault*, for the intervener the Attorney General of New Brunswick.

*Jolaine Antonio*, for the intervener the Attorney General of Alberta.

*Peter M. Jacobsen* and *Tae Mee Park*, for the intervener Bell GlobeMedia Inc.

*Daniel J. Henry*, for the intervener the Canadian Broadcasting Corporation.

*Tim Dickson*, for the intervener the British Columbia Civil Liberties Association.

*Jamie Cameron* and *Matthew Milne-Smith*, for the intervener the Canadian Civil Liberties Association.

*Brian MacLeod Rogers* and *Iain A. C. MacKinnon*, for the interveners the Canadian Newspaper Association, Ad IDEM/Canadian Media Lawyers Association, the Canadian Journalists for Free Expression, the Canadian Association of Journalists, the Professional Writers Association of Canada, RTNDA Canada/Association of Electronic Journalists, Magazines Canada, the Canadian Publishers' Council, the Book and Periodical Council, the Writers' Union of Canada and PEN Canada.

The judgment of McLachlin C.J. and Binnie, Deschamps, Fish, Charron, Rothstein and Cromwell JJ. was delivered by

[1]   BINNIE J. — The public has the right to every person's evidence. That is the general rule. The

50, [2004] O.J. No. 178 (QL), 2004 CarswellOnt 173. Pourvoi rejeté, la juge Abella est dissidente.

*Marlys A. Edwardh*, *John Norris* et *Jessica Orkin*, pour les appelants.

*Robert Hubbard* et *Susan Magotiaux*, pour l'intimée.

*Cheryl J. Tobias*, *c.r.*, *Jeffrey G. Johnston* et *Robert J. Frater*, pour l'intervenant le procureur général du Canada.

Argumentation écrite seulement par *Gaétan Migneault*, pour l'intervenant le procureur général du Nouveau-Brunswick.

*Jolaine Antonio*, pour l'intervenant le procureur général de l'Alberta.

*Peter M. Jacobsen* et *Tae Mee Park*, pour l'intervenante Bell GlobeMedia Inc.

*Daniel J. Henry*, pour l'intervenante la Société Radio-Canada.

*Tim Dickson*, pour l'intervenante l'Association des libertés civiles de la Colombie-Britannique.

*Jamie Cameron* et *Matthew Milne-Smith*, pour l'intervenante l'Association canadienne des libertés civiles.

*Brian MacLeod Rogers* et *Iain A. C. MacKinnon*, pour les intervenants l'Association canadienne des jounaux, Ad IDEM/Canadian Media Lawyers Association, les Journalistes canadiens pour la liberté d'expression, l'Association canadienne des journalistes, Professional Writers Association of Canada, ACDIRT Canada/Association des journalistes électroniques, Magazines Canada, Canadian Publishers' Council, Book and Periodical Council, Writers' Union of Canada et PEN Canada.

Version française du jugement de la juge en chef McLachlin et des juges Binnie, Deschamps, Fish, Charron, Rothstein et Cromwell rendu par

[1]   LE JUGE BINNIE — Le public a droit à la preuve émanant de toutes les sources. Voilà la règle

question raised by this appeal is whether the appellants can exempt themselves from this obligation on the basis of a journalistic privilege rooted either in s. 2(*b*) of the *Canadian Charter of Rights and Freedoms* which guarantees freedom of expression, "including freedom of the press and other media of communication", or in the common law.

[2]   Specifically, the *National Post*, its editor-in-chief and one of its journalists apply to set aside a search warrant obtained from the Ontario Court of Justice authorizing the police to seize what are alleged to be forged bank records and the envelope in which the appellants received the records from secret source(s). The police believe that seizure of the physical documents is essential to proof of the forgery, and that forensic analysis may lead them directly or indirectly to the identity of the perpetrators. The appellants, for their part, seek to protect the identity of their secret source(s), who may or may not be directly implicated in the forgery. If the police are correct, therefore, the documents in the control of the *National Post* and its co-appellants are not merely links in the chain of criminal investigation but constitute in themselves the essential physical evidence of alleged crimes — the forgery itself and the "uttering" (or putting into circulation) of the doctored bank records in the plain brown envelope.

[3]   The courts should strive to uphold the special position of the media and protect the media's secret sources where such protection is in the public interest, but this is not the usual case of journalists seeking to avoid testifying about their secret sources. This is a physical evidence case. It involves what is reasonably believed to be a forged document. Forgery is a serious crime. For the reasons that follow I agree with the Ontario Court of Appeal that the media claim to immunity from production of the physical evidence is not justified in the circumstances disclosed in the evidence before the court even if the end result proves to be information that may lead to the identification

générale. La question soulevée dans le présent pourvoi est celle de savoir si les appelants peuvent se soustraire à leur obligation de fournir un élément de preuve en invoquant un privilège journalistique fondé sur l'al. 2*b*) de la *Charte canadienne des droits et libertés* — qui garantit la liberté d'expression, « y compris la liberté de la presse et des autres moyens de communication » — ou issu de la common law.

[2]   Plus précisément, le *National Post*, son rédacteur en chef et l'un de ses journalistes demandent l'annulation d'un mandat de perquisition décerné par la Cour de justice de l'Ontario qui autorise les policiers à saisir des documents bancaires qui seraient contrefaits et l'enveloppe dans laquelle une ou des sources secrètes ont transmis ces documents aux appelants. La police estime que la saisie des documents matériels est essentielle pour la preuve de l'infraction de faux et qu'une analyse criminalistique est susceptible de révéler, directement ou indirectement, l'identité des contrevenants. Les appelants, pour leur part, cherchent à protéger l'identité de leur ou leurs sources secrètes, dont on ne sait pas si elles sont directement impliquées dans la commission du faux. Par conséquent, si la police a raison, les documents détenus par le *National Post* et ses co-appelants ne constituent pas seulement un chaînon dans l'enquête criminelle; ils constituent la preuve matérielle essentielle des crimes reprochés — le faux et l'emploi (ou la mise en circulation) des documents bancaires falsifiés dans l'enveloppe brune ordinaire.

[3]   Les tribunaux devraient s'efforcer de reconnaître la situation très particulière des médias et protéger leurs sources secrètes lorsqu'une telle protection sert l'intérêt public. Toutefois, il ne s'agit pas en l'espèce d'une affaire typique où des journalistes cherchent à éviter de témoigner sur leurs sources secrètes. Il s'agit d'une affaire portant sur les éléments de preuve matérielle d'une infraction, soit sur un document que l'on a des motifs raisonnables de croire contrefait. Commettre un faux est un crime grave. Pour les motifs qui suivent, je conviens avec la Cour d'appel de l'Ontario que la revendication par les médias d'une immunité les soustrayant à l'obligation de produire la

of the secret source(s). I would dismiss the appeal.

## I.   Overview

[4]   This dispute is a controversy of undoubted public importance. It involves an attempt by a person or persons unknown to dupe the *National Post* into publishing an allegedly forged bank document which, on its face, implicated the then Prime Minister of Canada, Jean Chrétien, in a serious financial conflict of interest. The courts below concluded that the police possess reasonable and probable grounds to believe that the inculpatory entries on the "leaked" document are false. The document, if authentic, would have suggested that at the same time the Prime Minister was said to be exerting influence on the federal Business Development Bank of Canada ("BDBC") to grant a $615,000 loan to the Auberge Grand-Mère, a private business in his riding, the Auberge Grand-Mère allegedly owed the Chrétien family investment company $23,040. Unless the Auberge Grand-Mère could be saved from insolvency, the story went, the debt would likely go unpaid. The Prime Minister's private financial interest, on this theory of events, conflicted with his public duty. Some in the media referred to cluster of events around the loan controversy as "Shawinigate".

[5]   The public interest in freedom of expression is of immense importance but it is not absolute and in circumstances such as the present it must be balanced against other important public interests, including the investigation and suppression of crime. The courts understand the need in appropriate circumstances to protect from disclosure the identity of secret sources who provide the media, on condition of confidentiality, with information of public interest, but even the journalist Andrew

preuve matérielle n'est pas justifiée dans les circonstances telles qu'elles ont été établies en preuve, même si sa production a pour effet de révéler de l'information susceptible de permettre d'identifier la ou les sources secrètes. Je suis d'avis de rejeter le pourvoi.

## I.   Aperçu

[4]   Le litige dont nous sommes saisis est une controverse d'une importance indéniable pour le public. Une ou plusieurs personnes dont on ne connaît pas l'identité auraient tenté de berner le *National Post* pour l'amener à publier un document bancaire qui aurait été contrefait et qui, à première vue, impliquait le premier ministre du Canada de l'époque, Jean Chrétien, dans un grave conflit d'intérêts financiers. Les juridictions inférieures ont conclu que les policiers ont des motifs raisonnables et probables de croire que les renseignements incriminants figurant dans le document « divulgué clandestinement » sont faux. Le document, s'il était authentique, donnait à croire que le premier ministre aurait cherché à influencer la Banque de développement du Canada (« BDC ») pour qu'elle accorde un prêt de 615 000 $ à l'Auberge Grand-Mère, une entreprise privée de son comté, à un moment où cette même auberge devait 23 040 $ à la société d'investissement de la famille Chrétien. On disait aussi que cette dette allait probablement demeurer impayée, à moins qu'on parvienne à préserver l'Auberge Grand-Mère de l'insolvabilité. Selon cette version des faits, les intérêts financiers privés du premier ministre entraient en conflit avec la charge publique qu'il occupait. Certains médias ont employé le terme « Shawinigate » pour désigner les faits entourant le prêt controversé.

[5]   L'intérêt public à la liberté d'expression est d'une importance considérable, mais il n'est pas absolu et, dans une situation comme celle-ci, il doit être mis en balance avec d'autres intérêts publics importants, comme la conduite d'enquêtes criminelles et la répression du crime. Les tribunaux reconnaissent la nécessité, dans certaines circonstances, de préserver l'anonymat des personnes qui fournissent des renseignements d'intérêt public aux médias à la condition d'être protégées par une

2010 SCC 16 (CanLII)

McIntosh recognized that if his source had provided the document "to deliberately mislead me" the source would no longer be worthy of protection (A.R., vol. 4, p. 1, McIntosh Affidavit, at para. 227). It is true that Mr. McIntosh believed his source to be sincere. Nevertheless, according to Mr. McIntosh, the source acknowledged participation (he or she says innocently) in forwarding the alleged forgery. There would not be many successful criminal investigations if the police were required to accept at face value protestations of innocence by unknown persons relayed at third hand.

[6]   The reviewing judge, Benotto J., quashed the warrant in part because she considered it unlikely that the outcome of the forensic analysis of the appellants' documents would be successful ((2004), 69 O.R. (3d) 427). With respect, I do not think the possibility of failure is a reason to prevent the police from undertaking forensic inquiry by well-established techniques such as DNA analysis of documents which the appellants concede are reasonably linked to the alleged criminal offences. A search to retrieve the physical instrumentality by which the offence was allegedly committed would likely satisfy the test in s. 487 of the *Criminal Code*, R.S.C. 1985, c. C-46, even if the documents did not shed light on the identity of the offender. Moreover, if Benotto J. is correct, and the envelope is unlikely to identify the confidential source, then there is little public interest in refusing its production to the police.

[7]   In terms of the *Charter*, the appellants go too far in claiming a broad immunity from production of physical evidence. A claim that secret sources may be disclosed is not a complete answer to a criminal investigation. I conclude that the warrant in question does not infringe the appellants' s. 2(*b*) *Charter* freedom of expression. Nor, in my view, are the documents in question protected by a common law journalistic privilege. Nor, for the reasons to be discussed, does the warrant at issue in this case give rise to an unreasonable search or seizure within the meaning of s. 8 of the *Charter*.

entente de confidentialité. Toutefois, même le journaliste, Andrew McIntosh, a reconnu que sa source ne mériterait plus d'être protégée si elle lui avait fourni le document [TRADUCTION] « dans le but délibéré de [l]'induire en erreur » (d.a., vol. 4, p. 1, affidavit de M. McIntosh, par. 227). M. McIntosh croyait en la sincérité de sa source. Cependant, aux dires de ce dernier, la source a admis avoir participé (en toute innocence, à ce qu'elle dit) à la transmission du prétendu document contrefait. Peu d'enquêtes criminelles aboutiraient si les policiers étaient tenus d'ajouter foi d'emblée aux protestations d'innocence d'une personne inconnue qui leur sont transmises de troisième main.

[6]   La juge Benotto, siégeant en révision, a annulé le mandat notamment parce qu'elle doutait du succès d'une analyse criminalistique des documents détenus par les appelants ((2004), 69 O.R. (3d) 427). Avec égards, je ne crois pas que la possibilité d'un échec soit une raison valable d'empêcher la police de procéder à une analyse criminalistique par des techniques reconnues comme l'analyse génétique d'échantillons prélevés sur des documents dont les appelants ne nient pas le rapport raisonnable avec les infractions reprochées. Une perquisition visant à découvrir l'instrument matériel de la perpétration de l'infraction reprochée respecterait probablement le critère établi à l'art. 487 du *Code criminel*, L.R.C. 1985, ch. C-46, et ce, même si les documents ne révélaient pas l'identité du contrevenant. En outre, si la juge Benotto a vu juste et qu'il est peu probable que l'enveloppe permette d'identifier la source confidentielle, l'intérêt public ne justifie guère le refus de la remettre à la police.

[7]   Au regard de la *Charte*, les appelants vont trop loin en revendiquant une immunité générale les soustrayant à l'obligation de produire des éléments de preuve matérielle. La prétention que des sources secrètes risquent d'être divulguées ne constitue pas une parade complète à une enquête criminelle. Je conclus que le mandat contesté ne porte pas atteinte à la liberté d'expression conférée aux appelants par l'al. 2*b*) de la *Charte*. De plus, les documents ne sont protégés selon moi par aucun privilège journalistique issu de la common law. Enfin, pour les motifs que j'expliquerai, le mandat en l'espèce n'a

Journalistic privilege is very context specific. The appellants have not, in my view, made out their claim on the facts. The warrant is valid.

## II.  Facts

[8]  The appellant Andrew McIntosh was employed by the *National Post* from August 1998 until February 2005. He took an interest in then Prime Minister Jean Chrétien's involvement with the Grand-Mère Golf Club located in Mr. Chrétien's home riding of St-Maurice, Quebec. His investigation led him to suspect Mr. Chrétien's involvement with a 1997 loan from the BDBC to the Auberge Grand-Mère, a hotel located next to the golf club, and with other federal grants in the riding. During his investigations, Mr. McIntosh contacted a person known to us only as X, but at that time X was unwilling to talk to Mr. McIntosh, even on a confidential basis.

## A.  *The Secret Source*

[9]  However, in the Fall of 2000, another individual known only as Y contacted Mr. McIntosh and indicated that he or she had important information but would only disclose it in return for a promise of confidentiality. Mr. McIntosh was generally authorized by the then editor-in-chief of the *National Post* to give promises of confidentiality and he routinely did so. The editor-in-chief testified that he considers himself a party to such promises of confidentiality. Indeed, the reviewing judge found that "[a]ll of Mr. McIntosh's work was done with the support of the then Editor-in-Chief" (para. 8).

[10]  Mr. McIntosh testified that "[t]he condition I agreed to in order to gain access to these materials was that I would . . . give a blanket, unconditional promise of confidentiality to protect the identity of both X and Y" (McIntosh Affidavit, at para. 156).

entraîné aucune fouille, perquisition ni saisie abusive au sens de l'art. 8 de la *Charte*. Le privilège journalistique est étroitement lié au contexte. Au vu des faits de l'affaire, j'estime que les appelants n'ont pas établi le bien-fondé de leur revendication. Le mandat est donc valide.

## II.  Les faits

[8]  L'appelant, Andrew McIntosh, était employé par le *National Post* du mois d'août 1998 au mois de février 2005. Il s'est alors intéressé au rapport entre le premier ministre de l'époque, Jean Chrétien, et le club de golf Grand-Mère situé dans le comté de M. Chrétien, St-Maurice (Québec). Son enquête l'a amené à soupçonner M. Chrétien d'avoir joué un rôle dans un prêt consenti en 1997 par la BDC à l'Auberge Grand-Mère, un hôtel situé à côté du club de golf, et dans l'octroi d'autres subventions fédérales dans son comté. Au cours de son enquête, M. McIntosh a communiqué avec X, une personne dont nous ne connaissons pas l'identité, mais X ne voulait pas lui parler à cette époque, même à titre confidentiel.

## A.  *La source secrète*

[9]  Toutefois, à l'automne 2000, une autre personne connue seulement comme Y a communiqué avec M. McIntosh et lui a dit détenir des renseignements importants, qu'elle ne divulguerait qu'en échange d'une promesse de confidentialité. Le rédacteur en chef du *National Post* de l'époque avait donné à M. McIntosh l'autorisation générale de promettre la confidentialité et ce dernier le faisait régulièrement. Dans son témoignage, le rédacteur en chef a dit qu'il se considérait lié par ces promesses de confidentialité. En effet, la juge siégeant en révision a conclu que [TRADUCTION] « [t]out le travail de M. McIntosh avait l'aval du rédacteur en chef de l'époque » (par. 8).

[10]  M. McIntosh a déclaré ce qui suit : [TRADUCTION] « Afin d'avoir accès à ces documents, j'ai consenti à donner une promesse générale et inconditionnelle de confidentialité pour protéger l'identité de X et de Y » (affidavit de M. McIntosh, par. 156).

2010 SCC 16 (CanLII)

[11]   Y told Mr. McIntosh that he was acting on X's behalf and explained that X was willing to provide McIntosh with documents and information concerning the Auberge Grand-Mère loan. Based on materials received from Y, including what appeared to be copies of original documents from BDBC files and information received from other sources, Mr. McIntosh reported in the *National Post* that Mr. Chrétien had called the president of the BDBC and urged approval of the bank loan to Auberge Grand-Mère. When asked by reporters to comment, Mr. Chrétien acknowledged that the story was accurate. Numerous articles followed.

B.  *The Plain Brown Envelope*

[12]   On April 5, 2001, Mr. McIntosh received a sealed plain brown envelope at the Ottawa Bureau of the *National Post.* The envelope contained a document that appeared to be a copy of a BDBC internal loan authorization for a $615,000 mortgage to Les Entreprises Yvon Duhaime Inc. (Auberge Grand-Mère) in August 1997. On the face of it, the document purported to show that, at the time it applied for and received the loan, Auberge Grand-Mère listed an outstanding debt of $23,040 to "JAC Consultants", a Chrétien family investment company. Mr. McIntosh concluded that if the document were genuine, it would represent a major escalation in the Shawinigate story.

[13]   To check the authenticity of the document, Mr. McIntosh faxed copies to the BDBC, the Prime Minister's office, and to a lawyer for the Prime Minister. All three said that the document was a forgery. The BDBC sent two letters to the *National Post* on April 6, 2001. The first claimed that the BDBC's records showed no indication of a debt owed to JAC Consultants. In the second letter, the BDBC warned the *National Post* that bank documents were confidential and should not be disclosed. A short time after receiving these letters, Mr. McIntosh put the document and its envelope somewhere, he claims, only he is able to access them.

[11]   Y a dit à M. McIntosh qu'il agissait au nom de X et a expliqué que X était disposé à donner à M. McIntosh des documents et des renseignements relatifs au prêt consenti à l'Auberge Grand-Mère. Sur la foi des documents fournis par Y, notamment ce qui semblait être des copies de documents originaux provenant des dossiers de la BDC et des renseignements fournis par d'autres sources, M. McIntosh a écrit dans le *National Post* que M. Chrétien avait téléphoné au président de la BDC et l'avait exhorté à approuver le prêt à l'Auberge Grand-Mère. Questionné par des journalistes à ce propos, M. Chrétien a reconnu la véracité de l'information. De nombreux articles sont parus par la suite.

B.  *L'enveloppe brune ordinaire*

[12]   Le 5 avril 2001, M. McIntosh a reçu, au bureau du *National Post* à Ottawa, une enveloppe brune ordinaire scellée. L'enveloppe contenait un document qui semblait être la copie d'une autorisation de prêt de la BDC concernant un emprunt hypothécaire de 615 000 $ consenti à Les Entreprises Yvon Duhaime Inc. (Auberge Grand-Mère) en août 1997. À première vue, le document paraissait démontrer que, au moment où elle a demandé et reçu le prêt, l'Auberge Grand-Mère devait 23 040 $ à « JAC Consultants », une société d'investissement de la famille Chrétien. M. McIntosh a conclu que, si le document était authentique, il ferait prendre un tournant significatif à l'affaire Shawinigate.

[13]   Pour vérifier l'authenticité du document, M. McIntosh en a transmis des copies par télécopieur à la BDC, au Cabinet du premier ministre et à un avocat du premier ministre. Tous ont répondu que le document était contrefait. Le 6 avril 2001, la BDC a envoyé deux lettres au *National Post.* Dans la première, elle indiquait que ses dossiers ne révélaient l'existence d'aucune dette envers JAC Consultants. Dans la seconde, elle avertissait le *National Post* que les documents bancaires étaient confidentiels et ne devaient pas être divulgués. Peu de temps après avoir reçu ces lettres, M. McIntosh a rangé le document et l'enveloppe dans un endroit où, dit-il, lui seul peut y avoir accès.

2010 SCC 16 (CanLII)

[14]   The Bloc Quebecois also received a copy of the BDBC "document" which it photocopied and distributed to its members and others. The story was picked up by some news sources. The police believe, however, that only the *National Post* has an envelope and document that could disclose fingerprint or DNA evidence that might in turn lead to identification of the perpetrator(s) and provide physical evidence of the alleged crime(s).

[15]   Since it was unable to confirm the document's authenticity, the *National Post* hesitated to publish the allegations. However, other news organizations published details about the leaked document and the reference to the alleged $23,040 loan and eventually the *National Post* picked up the story and reported that the *Globe and Mail*, SunMedia and CTV had already published some details of the alleged bank document, as had the *Ottawa Citizen*.

### C.   *The Modified Undertaking of Confidentiality*

[16]   Sometime during the week after the receipt of the document, X sought a meeting with Mr. McIntosh, who then consulted legal counsel and editors. X confirmed that it was he or she who had sent the envelope and asked that it be destroyed. X expressed concern that the police might try to use it to identify him or her through fingerprint or DNA analysis, and feared that the envelope might link him or her to the bank document now alleged to be a forgery. Mr. McIntosh testified that he told X "that I would not dispose of them. I said this would be both improper and highly unethical given the serious allegation that the document had been forged" (McIntosh Affidavit, at para. 225).

[17]   However, as stated earlier, Mr. McIntosh also told X that so long as "I believed that [X] had not provided the document to deliberately mislead me, my undertaking of confidentiality would remain binding. I also told Confidential Source X that

[14]   Une copie du « document » de la BDC a également été envoyée au Bloc québécois. Le document a été photocopié et distribué à ses membres et à d'autres personnes. La nouvelle a été reprise par quelques médias. La police croit toutefois que seul le *National Post* détient une enveloppe et un document susceptibles de fournir des éléments de preuve — empreintes digitales ou génétiques — qui pourraient permettre d'identifier le ou les contrevenants et servir de preuve matérielle du crime ou des crimes reprochés.

[15]   N'étant pas en mesure de confirmer l'authenticité du document, le *National Post* a hésité à publier les allégations. Toutefois, d'autres organes de presse ont publié certains détails à propos du document divulgué clandestinement et de la mention du prétendu prêt de 23 040 $. Finalement, le *National Post* a repris la nouvelle et relaté que le *Globe and Mail*, SunMedia et CTV avaient déjà publié certains détails du prétendu document bancaire, tout comme l'*Ottawa Citizen*.

### C.   *L'engagement de confidentialité modifié*

[16]   Au cours de la semaine suivant la réception du document, X a demandé à rencontrer M. McIntosh, lequel a ensuite consulté un avocat et des directeurs de la rédaction. X a confirmé avoir envoyé l'enveloppe et a demandé qu'elle soit détruite. X a dit craindre que la police tente de l'utiliser pour l'identifier par des empreintes digitales ou une analyse génétique et que l'enveloppe puisse le ou la relier au document bancaire que l'on disait maintenant contrefait. Dans son témoignage, M. McIntosh a déclaré : [TRADUCTION] « [J'ai dit à X] que je ne m'en débarrasserais pas. Je lui ai dit que ce serait inapproprié et tout à fait contraire à l'éthique compte tenu de la grave allégation, à savoir que le document était contrefait » (affidavit de M. McIntosh, par. 225).

[17]   Rappelons toutefois que M. McIntosh a également dit : [TRADUCTION] « J'ai affirmé [à X] qu'aussi longtemps que je croirais qu'il/elle n'avait pas fourni le document dans le but délibéré de m'induire en erreur, mon engagement de

should irrefutable evidence to the contrary emerge, our agreement of confidentiality would become null and void. X agreed to these terms" (McIntosh Affidavit, at para. 227).

[18]  Mr. McIntosh testified that X explained that he or she had received the document in the mail anonymously and had passed it on to Mr. McIntosh in the belief that it was genuine. On at least one other occasion, Mr. McIntosh had been able to confirm the authenticity of documents that X claimed to have received in the same way. In his evidence, Mr. McIntosh said he was satisfied that X was a reliable source and that the loan authorization was genuine. If the loan authorization was a forgery, Mr. McIntosh did not believe X knew that.

### D. *The Police Investigation*

[19]  In the meantime, the BDBC had complained to the RCMP about the alleged forgery. On June 7, 2001, RCMP Corporal Roland Gallant met with Mr. McIntosh, his editor-in-chief, another editor of the *National Post*, and its legal counsel. Counsel for the *National Post* refused Corporal Gallant's request to produce the documents. The police officer was told that before becoming aware of the police investigation, Mr. McIntosh had placed the document and envelope in a secure location not on *National Post* premises. Mr. McIntosh declined to identify the secret source.

[20]  Corporal Gallant indicated that he would have to apply for a search warrant and assistance order in relation to two offences — forgery (creation of a false document with the intent that it be acted upon as genuine) and uttering a forged document (attempting to cause Mr. McIntosh and the *National Post* to act on the forged loan authorization as if it were genuine). The *National Post* expressed "grave concerns" about the constitutionality of a warrant to disclose a confidential source and requested an *inter partes* hearing on the warrant application.

confidentialité demeurerait valide. J'ai ajouté que si une preuve contraire irréfutable devait apparaître, notre entente de confidentialité serait nulle et sans effet. X a accepté ces conditions » (affidavit de M. McIntosh, par. 227).

[18]  Selon la déposition de M. McIntosh, X a expliqué avoir reçu le document par la poste d'une source anonyme et, le croyant authentique, l'avoir ensuite transmis à M. McIntosh. Ce dernier avait déjà pu, au moins une fois, confirmer l'authenticité de documents que X affirmait avoir reçus de la même façon. M. McIntosh a affirmé être convaincu que X était une source fiable et que l'autorisation de prêt était authentique. Si l'autorisation de prêt était un document contrefait, M. McIntosh ne croyait pas que X le savait.

### D. *L'enquête policière*

[19]  Entre-temps, la BDC avait porté plainte à la GRC au sujet du prétendu document contrefait. Le 7 juin 2001, le caporal Roland Gallant de la GRC a rencontré M. McIntosh, son rédacteur en chef, un autre directeur de la rédaction et l'avocat du *National Post*. L'avocat a refusé de communiquer les documents que le caporal Gallant demandait. Le policier a été informé que M. McIntosh, avant d'apprendre qu'une enquête policière était en cours, avait mis le document et l'enveloppe en lieu sûr, hors des locaux du *National Post*. M. McIntosh a refusé de révéler l'identité de la source secrète.

[20]  Le caporal Gallant a indiqué qu'il devrait demander un mandat de perquisition et une ordonnance d'assistance relativement à deux infractions — faux (fabrication d'un faux document avec l'intention qu'on y donne suite comme authentique) et emploi d'un document contrefait (tentative de faire agir M. McIntosh et le *National Post* à l'égard de l'autorisation de prêt contrefaite comme si elle était authentique). Le *National Post* a exprimé « d'importantes réserves » à propos de la constitutionnalité d'un mandat l'obligeant à révéler l'identité d'une source confidentielle et a demandé l'audition *inter partes* de la demande de mandat.

2010 SCC 16 (CanLII)

E.   *The Search Warrant and Assistance Order*

[21]   On July 4, 2002, Corporal Gallant applied to the Ontario Court of Justice for a warrant assistance order stating that the evidence he wished to seize was not available from any other source because the document and envelope formed part of the *actus reus* of these offences and would be required to substantiate any charges. He intended to submit the document and envelope for forensic testing to determine if they had "fingerprints or other identifying markings which might assist in identifying the source of the document". These other possible identifying markers included saliva, from which a DNA sample could be obtained.

[22]   Khawly J. was advised of the desire of the *National Post* for notice and a hearing but decided to proceed *ex parte*. The search warrant and assistance order were issued without written reasons. The intended effect of the assistance order was to require the editor-in-chief of the *National Post* to assist in locating the two documents in question and to make them available to Corporal Gallant.

[23]   In relation to procedural protection, the terms of the orders attempted to accommodate the special position of the media. It was provided that the orders were to be served on July 5, 2002. The appellants would thereafter be given a month to consider their position. On August 9, 2002 (or such earlier date as the appellants agreed to) Corporal Gallant was again to attend at the offices of the *National Post* and request production of the BDBC loan authorization and the "associated" brown envelope. The warrant then provided that after waiting two hours (to give the appellants an opportunity for voluntary compliance without prejudice to any subsequent challenge they might see fit to make to the issuance or execution of the warrant) the police officer would then be free to search the *National Post* premises. The police were directed to interfere "as little as possible with the operations of the place being searched and avoid, to the extent

E.   *Le mandat de perquisition et l'ordonnance d'assistance*

[21]   Le 4 juillet 2002, le caporal Gallant a présenté une demande à la Cour de justice de l'Ontario en vue d'obtenir un mandat et une ordonnance d'assistance, affirmant qu'il ne pouvait obtenir d'une autre source la preuve qu'il désirait saisir parce que le document et l'enveloppe faisaient partie de l'*actus reus* des infractions et étaient nécessaires pour prouver les accusations. Il avait l'intention de soumettre le document et l'enveloppe à une analyse criminalistique afin de déterminer s'ils portaient [TRADUCTION] « des empreintes digitales ou d'autres marques distinctives pouvant servir à identifier la source du document ». Ces autres marques distinctives comprenaient la salive, susceptible de contenir de l'ADN.

[22]   Le juge Khawly savait que le *National Post* souhaitait être avisé de la tenue de l'audience et être entendu, mais il a décidé d'entendre la demande *ex parte*. Le mandat de perquisition et l'ordonnance d'assistance ont été décernés sans motifs écrits. L'ordonnance visait à enjoindre au rédacteur en chef du *National Post* d'aider à trouver les deux documents en question et de permettre au caporal Gallant d'y avoir accès.

[23]   En fait de protection procédurale, le juge a tenté de tenir compte de la situation très particulière des médias en rédigeant les modalités des ordonnances. Les ordonnances devaient être signifiées le 5 juillet 2002. Les appelants avaient ensuite un mois pour décider comment ils y réagiraient. Le 9 août 2002 (ou à une date antérieure convenue par les appelants), le caporal Gallant devait de nouveau se présenter aux bureaux du *National Post* et demander la production de l'autorisation de prêt de la BDC et de l'enveloppe brune s'y rapportant. Le mandat permettait au policier, après avoir attendu deux heures (pour donner aux appelants la possibilité de se conformer volontairement aux ordonnances sans qu'il soit porté atteinte à leur droit de contester la délivrance ou l'exécution du mandat comme ils le jugeraient indiqué), de fouiller librement les locaux du *National Post*. Les policiers avaient reçu la directive d'entraver [TRADUCTION]

possible, examining any notes, documents, records or lists unconnected with securing the location of the things subject to seizure". If found, the documents would on request be marked for identification and sealed in a package and delivered for safekeeping to the Ontario Court of Justice. The appellants would then have 14 days to apply "for the continued sealing and return of any things sealed".

[24]   The appellants duly applied to quash the warrant and assistance order. Relying upon a considerably amplified record which included the cross-examination of Mr. McIntosh and the filing of 15 affidavits from experienced journalists on the use and importance of secret sources, Benotto J., the reviewing judge, concluded that while there was "sufficient information to conclude the document was a forgery" (para. 22), there was "only a remote and speculative possibility that the fingerprints were those of the alleged forgerer" and "[d]isclosure of the document will minimally, if at all, advance the investigation while at the same time damage freedom of expression" (para. 79). Accordingly, she set aside the search warrant and assistance order. Her decision was reversed by the Ontario Court of Appeal on February 29, 2008 in reasons jointly authored by Justices Laskin and Simmons (2008 ONCA 139, 89 O.R. (3d) 1). References will be made in what follows to the reasons of the reviewing judge and the Court of Appeal.

III.   Statutory Provisions

[25]   *Canadian Charter of Rights and Freedoms*

   **2.**  Everyone has the following fundamental freedoms:

. . .

   (*b*)  freedom of thought, belief, opinion and expression, including freedom of the press and other media of communication;

. . .

« le moins possible les activités du lieu de la perquisition et [d']éviter, dans la mesure du possible, d'examiner des notes, documents, dossiers ou listes sans rapport avec la recherche des objets à saisir ». Sur demande, les documents trouvés devaient être identifiés, placés dans un paquet scellé et confiés à la Cour de justice de l'Ontario. Les appelants disposaient ensuite d'un délai de 14 jours pour demander [TRADUCTION] « que la mise sous scellés soit maintenue et que les objets mis sous scellés soient retournés ».

[24]   Les appelants ont demandé en bonne et due forme l'annulation du mandat et de l'ordonnance d'assistance. Après une amplification considérable du dossier, notamment par le contre-interrogatoire de M. McIntosh et le dépôt de 15 affidavits de journalistes d'expérience sur l'utilisation et l'importance de sources secrètes, la juge Benotto, siégeant en révision, a conclu qu'il y avait [TRADUCTION] « suffisamment de renseignements pour conclure qu'il s'agissait d'un document contrefait » (par. 22), mais qu'il n'existait « qu'une faible possibilité hypothétique que les empreintes digitales soient celles de l'auteur du prétendu faux » et que « [l]a divulgation du document ne fera que très peu, voire aucunement, progresser l'enquête, tout en portant atteinte à la liberté d'expression » (par. 79). Par conséquent, elle a annulé le mandat de perquisition et l'ordonnance d'assistance. Sa décision a été infirmée le 29 février 2008 par la Cour d'appel de l'Ontario, dont les motifs ont été rédigés par les juges Laskin et Simmons (2008 ONCA 139, 89 O.R. (3d) 1). Je me reporterai ci-après aux motifs de la juge siégeant en révision et à ceux de la Cour d'appel.

III.   Dispositions législatives

[25]   *Charte canadienne des droits et libertés*

   **2.**  Chacun a les libertés fondamentales suivantes :

. . .

   *b*)  liberté de pensée, de croyance, d'opinion et d'expression, y compris la liberté de la presse et des autres moyens de communication;

. . .

**8.** Everyone has the right to be secure against unreasonable search or seizure.

*Criminal Code*, R.S.C. 1985, c. C-46

**487.01** (1) [Information for general warrant] A provincial court judge, a judge of a superior court of criminal jurisdiction or a judge as defined in section 552 may issue a warrant in writing authorizing a peace officer to, subject to this section, use any device or investigative technique or procedure or do any thing described in the warrant that would, if not authorized, constitute an unreasonable search or seizure in respect of a person or a person's property if

   (*a*)  the judge is satisfied by information on oath in writing that there are reasonable grounds to believe that an offence against this or any other Act of Parliament has been or will be committed and that information concerning the offence will be obtained through the use of the technique, procedure or device or the doing of the thing;

   (*b*)  the judge is satisfied that it is in the best interests of the administration of justice to issue the warrant; and

   (*c*)  there is no other provision in this or any other Act of Parliament that would provide for a warrant, authorization or order permitting the technique, procedure or device to be used or the thing to be done.

**487.02** [Assistance Order] Where an authorization is given under section 184.2, 184.3, 186 or 188, a warrant is issued under this Act or an order is made under subsection 492.2(2), the judge or justice who gives the authorization, issues the warrant or makes the order may order any person to provide assistance, where the person's assistance may reasonably be considered to be required to give effect to the authorization, warrant or order.

## IV.  Analysis

[26]   The investigation and punishment of crime is vital in a society based on the rule of law but so is the freedom of the press and other media of communication. The general principle that the public has the right to every person's evidence is not absolute. Narrow exceptions have been recognized as necessary to further precisely defined and overriding public interests. Thus the identity of the police informant is shielded from an accused. A civil litigant has no right to know what the opposing party

**8.**  Chacun a droit à la protection contre les fouilles, les perquisitions ou les saisies abusives.

*Code criminel*, L.R.C. 1985, ch. C-46

**487.01** (1) [Dénonciation pour mandat général] Un juge de la cour provinciale, un juge de la cour supérieure de juridiction criminelle ou un juge au sens de l'article 552 peut décerner un mandat par écrit autorisant un agent de la paix, sous réserve du présent article, à utiliser un dispositif ou une technique ou une méthode d'enquête, ou à accomplir tout acte qui y est mentionné, qui constituerait sans cette autorisation une fouille, une perquisition ou une saisie abusive à l'égard d'une personne ou d'un bien :

   *a*)  si le juge est convaincu, à la suite d'une dénonciation par écrit faite sous serment, qu'il existe des motifs raisonnables de croire qu'une infraction à la présente loi ou à toute autre loi fédérale a été ou sera commise et que des renseignements relatifs à l'infraction seront obtenus grâce à une telle utilisation ou à l'accomplissement d'un tel acte;

   *b*)  s'il est convaincu que la délivrance du mandat servirait au mieux l'administration de la justice;

   *c*)  s'il n'y a aucune disposition dans la présente loi ou toute autre loi fédérale qui prévoie un mandat, une autorisation ou une ordonnance permettant une telle utilisation ou l'accomplissement d'un tel acte.

**487.02** [Ordonnance d'assistance] Le juge ou le juge de paix qui a accordé une autorisation en vertu des articles 184.2, 184.3, 186 ou 188, décerné un mandat en vertu de la présente loi ou rendu une ordonnance en vertu du paragraphe 492.2(2) peut ordonner à toute personne de prêter son assistance si celle-ci peut raisonnablement être jugée nécessaire à l'exécution des actes autorisés, du mandat ou de l'ordonnance.

## IV.  Analyse

[26]   La conduite d'enquêtes criminelles et la sanction des crimes sont essentielles dans une société fondée sur la primauté du droit, mais la liberté de la presse et des autres moyens de communication l'est tout autant. Le principe général selon lequel le public a droit à la preuve émanant de toutes les sources n'est pas absolu. Des exceptions restreintes ont été jugées nécessaires au nom d'intérêts publics rigoureusement définis et prépondérants. Par exemple, l'identité de l'indicateur

R. *c.* NATIONAL POST *Le juge Binnie*

privately confided to its lawyer. Spouses cannot generally be compelled to testify against each other. Information pertaining to national security and Cabinet confidences may be withheld on the basis of what is called public interest immunity.

[27]   The appellants say that the public interest in getting the Shawinigate story before Canadians, which in part relied on the use of confidential sources, outweighs the public interest in pursuing this particular criminal investigation which they imply may have more to do with avenging political embarrassment than vindicating the rule of law. They ask that this Court quash the general warrant and assistance order issued against them, either because it infringes their freedom of expression under s. 2(*b*) of the *Charter*, or because it is otherwise unreasonable under s. 8, which guarantees "the right to be secure against unreasonable search or seizure". In any event, they say, the secret sources are protected by the common law of privilege.

A.   *The Importance of Confidential Sources*

[28]   It is well established that freedom of expression protects readers and listeners as well as writers and speakers. It is in the context of the *public* right to knowledge about matters of public interest that the legal position of the confidential source or whistleblower must be located. The public has an interest in effective law enforcement. The public also has an interest in being informed about matters of importance that may only see the light of day through the cooperation of sources who will not speak except on condition of confidentiality. Benotto J. accepted the evidence that many important controversies were unearthed only because of secret sources (often internal whistleblowers) including:

1.   The tainted tuna scandal, that led to the resignation of the Minister of Fisheries in Canada.

de police n'est pas communiquée à un accusé. Une partie à une instance civile n'a pas le droit de savoir ce que la partie adverse a confié à son avocat. En général, les conjoints ne peuvent être contraints à témoigner l'un contre l'autre. L'exception d'intérêt public permet de refuser de divulguer des renseignements relatifs à la sécurité nationale et des documents confidentiels du Cabinet.

[27]   Les appelants prétendent que l'intérêt public à ce que l'affaire Shawinigate soit révélée aux Canadiens, ce qui a été fait en partie grâce à des sources confidentielles, l'emporte sur l'intérêt public à la conduite de l'enquête criminelle qui, selon eux, tient peut-être davantage des représailles pour une situation politique embarrassante que de la défense de la primauté du droit. Ils demandent à la Cour d'annuler le mandat général ainsi que l'ordonnance d'assistance délivrés contre eux parce qu'ils portent atteinte à leur liberté d'expression protégée par l'al. 2*b*) de la *Charte* ou parce qu'ils sont par ailleurs abusifs au sens de l'art. 8, qui leur garantit le « droit à la protection contre les fouilles, les perquisitions ou les saisies abusives ». Quoi qu'il en soit, à leur avis, les sources secrètes sont protégées par un privilège issu de la common law.

A.   *L'importance des sources confidentielles*

[28]   Il est bien reconnu que la liberté d'expression protège tant les lecteurs et les auditeurs que les rédacteurs et les orateurs. C'est dans le contexte du droit du *public* d'être informé des affaires d'intérêt public que doit être envisagée la situation juridique de la source confidentielle ou du dénonciateur d'irrégularités. Le public a un intérêt à l'application effective de la loi. Il a aussi un intérêt à ce que lui soit communiquée l'information sur des sujets importants susceptibles de n'être mis au jour qu'avec la collaboration de sources qui ne parleront que sous le couvert de la confidentialité. La juge Benotto a retenu la preuve selon laquelle plusieurs controverses importantes ont été mises au jour uniquement grâce à des sources secrètes (souvent, des employés dénonciateurs), notamment :

1.   Le scandale du thon avarié, qui a entraîné la démission du ministre des Pêches du Canada.

2010 SCC 16 (CanLII)

2.  The story that Airbus Industrie paid secret commissions in the sale of Airbus aircraft.

3.  The book *For Services Rendered* about the search for a suspected KGB mole in the RCMP Security Service, and CBC's *The Fifth Estate* program on that mole, code-named "Long Knife".

4.  Stories dealing with the City of Toronto's health inspection system for restaurants.

5.  A story describing the operation of an illegal slaughterhouse that created a major health hazard.

6.  Stories about the fall of Nortel Networks that contrasted optimistic public forecasts by Nortel executives with internal Nortel discussions warning of a potential devastating market downturn.

7.  Stories about wrongdoing by members of the RCMP security service in early 1977, including a break-in to obtain documents from a left-wing news agency in Montreal, Agence Presse Libre du Québec, illegal wiretaps in Vancouver and pen-registers.

It is important, therefore, to strike the proper balance between two public interests — the public interest in the suppression of crime and the public interest in the free flow of accurate and pertinent information. Civil society requires the former. Democratic institutions and social justice will suffer without the latter.

[29]   The media perspective was forcefully put in a 2005 editorial in *The New York Times*:

In such [whistleblowing] cases, press secretaries and public relations people are paid not to give out the

2.  L'information selon laquelle Airbus Industrie a payé des commissions secrètes dans le cadre de la vente d'appareils Airbus.

3.  Le livre intitulé *For Services Rendered* relatant l'enquête sur un employé du Service de sécurité de la GRC soupçonné d'être un espion au service du KGB et l'émission *The Fifth Estate* à CBC sur cet espion, dont le nom de code était « Long Knife ».

4.  Les informations concernant le système d'inspection sanitaire des restaurants de la ville de Toronto.

5.  L'information décrivant les activités d'un abattoir illégal qui représentait de graves risques pour la santé.

6.  Les informations sur la chute de Nortel Networks, lesquelles opposaient les prévisions publiques optimistes des dirigeants de Nortel et les discussions au sein de l'entreprise qui appréhendait un repli éventuel dévastateur du marché.

7.  Les informations sur le comportement répréhensible de membres du Service de sécurité de la GRC au début de 1977, notamment sur une introduction par effraction dans les locaux d'une agence de presse de gauche située à Montréal, l'Agence Presse Libre du Québec, dans le but de découvrir des documents et sur l'utilisation illégale de dispositifs d'écoute à Vancouver et d'enregistreurs de numéros.

Il est donc important de trouver le juste équilibre entre deux intérêts publics — l'intérêt public à la répression du crime, qu'exige la société civile, et l'intérêt public à la libre circulation d'informations exactes et pertinentes, sans laquelle les institutions démocratiques et la justice sociale seraient affectées.

[29]   Le point de vue des médias a été vigoureusement exprimé dans un article du *New York Times* daté de 2005 :

[TRADUCTION] En pareil cas [de dénonciation d'irrégularités], les attachés de presse et les agents des relations

whole story. Instead, inside sources trust reporters to protect their identities so they can reveal more than the official line. Without that agreement and that trust between reporter and source, the real news simply dries up, and the whole truth steadily recedes behind a wall of image-mongering, denial and even outright lies.

(Editorial, "Shielding a Basic Freedom", *The New York Times*, September 12, 2005, at p. A20)

[30]   If a reporter, usually in consultation with an editor, gives an assurance of confidentiality, professional journalistic ethics understandably command that the promise be kept. The courts have long accepted the desirability of avoiding where possible putting a journalist in the position of breaking a promise of confidentiality or being held in contempt of court. See, e.g., *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199. Nevertheless, most journalistic codes of ethics recognize that the promise of confidentiality cannot be absolute, see, e.g., the Canadian Association of Journalists' *Guidelines for Investigative Journalism* regarding "[u]se of confidential and anonymous sources".

[31]   Our Court has previously recognized the special position of the news media in two search warrant cases that did not involve secret sources, namely *Canadian Broadcasting Corporation v. Lessard*, [1991] 3 S.C.R. 421, and *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459. In these cases, Cory J., for the majority, emphasized that a justice of the peace or judge must "consider all of the circumstances in determining whether to exercise his or her discretion to issue a warrant" (*Lessard*, at p. 445 (emphasis added)). The majority of the Court laid down nine principles applicable to media cases, and in particular:

The justice of the peace should ensure that a balance is struck between the competing interests of the state in the investigation and prosecution of crimes and the right to privacy of the media in the course of their news

publiques sont payés pour ne pas dévoiler toute l'information. À l'inverse, les sources internes comptent sur les journalistes pour protéger leur identité de façon à pouvoir faire des révélations qui vont au-delà de la version officielle. Sans cette entente et sans la confiance qui unit un journaliste et sa source, les vraies nouvelles se tarissent, et la vérité cède de plus en plus le pas au jeu de l'image, au déni et même aux mensonges éhontés.

(Éditorial, « Shielding a Basic Freedom », *The New York Times*, 12 septembre 2005, p. A20)

[30]   Lorsqu'un journaliste s'engage à préserver la confidentialité, habituellement après avoir consulté le rédacteur en chef, la déontologie journalistique exige naturellement qu'il honore sa promesse. Les tribunaux reconnaissent depuis longtemps l'opportunité d'éviter, si possible, au journaliste le choix délicat de violer une promesse de confidentialité ou d'être reconnu coupable d'outrage. Voir p. ex. *St. Elizabeth Home Society c. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199. Néanmoins, la plupart des codes de déontologie des journalistes reconnaissent que la promesse de confidentialité ne peut être absolue, voir p. ex. *Guidelines for Investigative Journalism* de l'Association canadienne des journalistes à propos du [TRADUCTION] « [r]ecours à des sources confidentielles et anonymes ».

[31]   La Cour a déjà reconnu la situation très particulière des médias dans deux affaires concernant des mandats de perquisition auxquelles n'était mêlée aucune source secrète, à savoir *Société Radio-Canada c. Lessard*, [1991] 3 R.C.S. 421, et *Société Radio-Canada c. Nouveau-Brunswick (Procureur général)*, [1991] 3 R.C.S. 459. Dans ces arrêts, le juge Cory, au nom de la majorité, a souligné qu'un juge de paix ou un juge doit « examiner toutes les circonstances pour déterminer s'il doit exercer son pouvoir discrétionnaire de décerner un mandat » (*Lessard*, p. 445 (je souligne)). Les juges majoritaires de la Cour ont énoncé neuf principes applicables aux affaires concernant les médias, dont les suivants :

Le juge de paix doit s'assurer qu'on a bien pondéré l'intérêt de l'État à découvrir et à poursuivre les criminels et le droit des médias à la confidentialité des renseignements dans le processus de collecte et de diffusion

gathering and news dissemination. It must be borne in mind that the media play a vital role in the functioning of a democratic society. Generally speaking, the news media will not be implicated in the crime under investigation. They are truly an innocent third party. This is a particularly important factor to be considered in attempting to strike an appropriate balance, including the consideration of imposing conditions on that warrant.

.   .   .

. . . Although it is not a constitutional requirement, the affidavit material should ordinarily disclose whether there are alternative sources from which the information may reasonably be obtained and, if there is an alternative source, that it has been investigated and all reasonable efforts to obtain the information have been exhausted. [p. 445]

[32]   The appellants and their media supporters argue that these principles are too general. The media interest, they say, is not just one of many factors to be taken into account in "all of the circumstances". The *Charter*, they contend, entitles them to greater protection than *Lessard* and *New Brunswick* provide. Thus, armed with ss. 2(*b*) and 8 of the *Charter*, the appellants seek a re-examination of the existing law. The Court of Appeal in this case, they say, focussed too narrowly on the needs of law enforcement while downplaying, if not effectively ignoring, the broader public interest in the media being able to play its important role as public watchdog. This skewed perspective led the court, the appellants argue, to relieve the Crown of the usual and appropriate onus of establishing that compelled disclosure in this case was a demonstrable limit on the constitutionally guaranteed freedom of expression in a free and democratic society.

[33]   In *Lessard* and *New Brunswick*, the Court accepted that freedom to publish the news necessarily involves a freedom to gather the news. We should likewise recognize in this case the further step that an important element in the news gathering function (especially in the area of investigative

des informations. Il faut se rappeler que les médias jouent un rôle primordial dans le fonctionnement d'une société démocratique. En règle générale, les médias ne sont pas impliqués dans l'acte criminel faisant l'objet de l'enquête. Ils sont vraiment des tiers innocents. C'est un facteur tout particulièrement important à prendre en considération pour essayer de trouver un bon équilibre, notamment en étudiant la possibilité d'assortir ce mandat de certaines conditions.

.   .   .

. . . Bien qu'il ne s'agisse pas d'une exigence constitutionnelle, l'affidavit devrait ordinairement indiquer s'il y a d'autres sources de renseignements raisonnables et, le cas échéant, qu'elles ont été consultées et que tous les efforts raisonnables pour obtenir les renseignements ont été épuisés. [p. 445]

[32]   Les appelants et les médias qui les appuient soutiennent que ces principes sont trop généraux. Selon eux, l'intérêt des médias ne constitue pas seulement l'un des nombreux facteurs parmi « toutes les circonstances » à prendre en considération. Ils prétendent que la *Charte* leur donne droit à une protection supérieure à celle qui leur est accordée suivant *Lessard* et *Nouveau-Brunswick*. Par conséquent, invoquant l'al. 2*b*) et l'art. 8 de la *Charte*, les appelants demandent le réexamen du droit en vigueur. Selon eux, la Cour d'appel a trop centré son examen sur les exigences de l'application de la loi et a minimisé, voire ignoré dans les faits, l'intérêt public général à ce que les médias puissent jouer leur important rôle d'observateur critique. Les appelants affirment que cette vision tronquée a amené la cour, en l'espèce, à relever le ministère public de la charge qui lui revient habituellement et à juste titre de démontrer que la divulgation forcée, qui porte atteinte à la liberté d'expression garantie par la Constitution, est justifiée dans le cadre d'une société libre et démocratique.

[33]   Dans *Lessard* et *Nouveau-Brunswick*, la Cour a reconnu que la liberté de diffuser les informations emporte nécessairement la liberté de recueillir les informations. Dans la présente affaire, nous devrions faire un pas de plus et reconnaître, de la même façon, que la capacité des médias de

R. *c.* NATIONAL POST   *Le juge Binnie*

journalism) is the ability of the media to make use of confidential sources. The appellants and their expert witnesses make a convincing case that unless the media can offer anonymity in situations where sources would otherwise dry-up, freedom of expression in debate on matters of public interest would be badly compromised. Important stories will be left untold, and the transparency and accountability of our public institutions will be lessened to the public detriment.

[34]   Viewed in this light, the law should and does accept that in some situations the public interest in protecting the secret source from disclosure outweighs other competing public interests — including criminal investigations. In those circumstances the courts will recognize an immunity against disclosure of sources to whom confidentiality has been promised.

[35]   In light of these preliminary observations I propose to address the relevant questions with respect to the claim of journalist-confidential source privilege in this case in the following order:

– Firstly, how should the journalists' claim for protection of secret sources be characterized in law? In particular, does s. 2(*b*) of the *Charter* create a constitutionally entrenched immunity to protect journalists against the compelled disclosure of secret sources, and if so, in what circumstances may breaches of such an immunity be justified under s. 1?

– Secondly, if there is no such s. 2(*b*) immunity, is there nevertheless a common law privilege, to be applied in light of the important public interest in freedom of expression, and if so, is it properly conceived of as a class privilege or a case-by-case privilege?

recourir à des sources confidentielles constitue un élément important de la collecte de l'information (surtout dans le domaine du journalisme d'enquête). Les appelants et leurs témoins experts présentent des arguments convaincants pour démontrer que, si les médias ne peuvent assurer l'anonymat dans des situations où les sources se tariraient autrement, la liberté d'expression dans les débats sur des questions d'intérêt public sera grandement compromise. Des faits importants ne seront jamais relatés, et la transparence et l'obligation redditionnelle de nos institutions publiques s'en trouveront amoindries au détriment du public.

[34]   Compte tenu de ce qui précède, le droit devrait accepter — et accepte effectivement — que, dans certaines situations, l'intérêt public à protéger la source secrète contre toute divulgation l'emporte sur les autres intérêts publics — y compris la conduite d'enquêtes criminelles. Dans de telles situations, les tribunaux reconnaissent l'existence d'une immunité contre la divulgation des sources auxquelles on a garanti la confidentialité.

[35]   À la lumière de ces observations préliminaires, je propose d'aborder dans l'ordre suivant les questions pertinentes concernant la revendication du privilège du secret des sources des journalistes dans le présent dossier :

– Premièrement, comment doit-on caractériser sur le plan juridique le droit revendiqué par les journalistes de protéger leurs sources secrètes? En particulier, l'al. 2*b*) de la *Charte* accorde-t-il aux journalistes une immunité constitutionnelle contre la divulgation forcée de leurs sources secrètes et, dans l'affirmative, dans quelles circonstances une atteinte à cette immunité serait-elle justifiée au sens de l'article premier?

– Deuxièmement, si l'al. 2*b*) ne confère aucune immunité de la sorte, existe-t-il néanmoins en common law un privilège applicable en raison de l'importance de l'intérêt public à la liberté d'expression et, dans l'affirmative, s'agit-il d'un privilège générique ou d'un privilège fondé sur les circonstances de chaque cas?

– Thirdly, if the journalist-confidential source privilege is constituted on a case-by-case basis, what are the elements that must be established, and who has the onus to do so? This was the main battleground of this appeal.

– Fourthly, were the elements of a case-by-case privilege established on the expanded record before the reviewing judge here in relation to suppression of the physical evidence described in the general warrant and assistance order?

### B. *How Should Journalists' Claims for Protection of Secret Sources Be Characterized in Law?*

[36] The appellants and supporting interveners put forward a number of conceptual models by which to protect the identity of secret sources. None of the parties or interveners asserts an *absolute* protection of sources, but there is a difference of opinion about the provenance of a qualified privilege and its limitations.

#### (1) The Constitutional Model

[37] The broadest conception was put forward by the intervener Canadian Civil Liberties Association ("CCLA") supported in part by the intervener the British Columbia Civil Liberties Association ("BCCLA"). In their view, the applicable concept is not a common law privilege but some form of constitutional immunity against compelled disclosure of secret sources. The CCLA argues that a s. 2(*b*) immunity is established by a claimant showing (i) that he or she is a journalist; (ii) engaged in news gathering activity; (iii) who has acquired information under a promise of confidentiality (transcript, at p. 42). At that point, the CCLA submits, testimonial immunity against disclosure of the source is constitutionally guaranteed subject to the Crown being able to show a countervailing and fact-specific overriding public interest through what the CCLA called "a full press

– Troisièmement, si le privilège du secret des sources confidentielles des journalistes est reconnu au cas par cas, quels éléments doivent être établis et à qui en incombe le fardeau? Il s'agit là de la principale question en litige dans le pourvoi.

– Quatrièmement, les éléments d'un privilège fondé sur les circonstances de chaque cas ont-ils été établis au vu du dossier amplifié dont disposait la juge siégeant en révision relativement à la rétention des éléments de preuve matérielle décrits dans le mandat général et l'ordonnance d'assistance?

### B. *Comment doit-on caractériser sur le plan juridique le droit revendiqué par les journalistes de protéger leurs sources secrètes?*

[36] Les appelants et les intervenants qui les appuient ont présenté plusieurs modèles conceptuels pour la protection de l'identité des sources secrètes. Aucune des parties ni aucun des intervenants ne prétend que les sources bénéficient d'une protection *absolue*, mais les opinions diffèrent sur le fondement et les limites d'une immunité relative.

#### (1) Le modèle constitutionnel

[37] La conception la plus large a été présentée par l'Association canadienne des libertés civiles (« ACLC »), appuyée en partie par l'Association des libertés civiles de la Colombie-Britannique (« ALCCB »), intervenantes en l'espèce. À leur avis, le concept applicable n'est pas un privilège issu de la common law, mais une forme d'immunité constitutionnelle contre la divulgation forcée des sources secrètes. L'ACLC fait valoir qu'une immunité fondée sur l'al. 2*b*) est établie lorsque celui qui la revendique démontre (i) qu'il est journaliste; (ii) qu'il recueille de l'information; (iii) qu'il a obtenu de l'information en promettant la confidentialité (transcription, p. 42). Selon elle, l'immunité testimoniale contre la divulgation de la source est alors garantie par la Constitution, à moins que le ministère public réussisse à démontrer, par ce que l'ACLC appelle [TRADUCTION] « une analyse

R. *c.* NATIONAL POST   *Le juge Binnie*

Section 1 analysis" (p. 45). Reliance is placed on *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835, which recognized the importance of free expression even in the context of ensuring trial fairness. The BCCLA advances a similar series of propositions derived, it argues, from the dissent of McLachlin J. (now Chief Justice) in *Lessard*.

[38] The position of the CCLA and the BCCLA is built on the premise that protection of confidential sources should be treated as if it were an enumerated *Charter* right or freedom. But this is not so. What is protected by s. 2(*b*) is freedom of expression. News gathering, while not specifically mentioned in the text of s. 2(*b*) is implicit in news publication, but there are many techniques of news gathering and it carries the argument too far, in my view, to suggest that each of those news gathering techniques (including reliance on secret sources) should itself be regarded as entrenched in the Constitution. Chequebook journalism is also a routine method of gathering the news, but few would suggest that this too should be constitutionalized. Journalists are quick to use long-range microphones, telephoto lenses or electronic means to hear and see what is intended to be kept private (as in the case of then Finance Minister Marc Lalonde whose budget had to be amended because a cameraman captured parts of what were intended to be secret budget documents on Mr. Lalonde's desk). Such techniques may be important for journalists (who, unlike prosecutors, have to get along without the power of subpoena), but this is not to say that just because they *are* important that news gathering techniques as such are entrenched in the Constitution.

[39] The courts have leaned against conferring constitutional status on testimonial immunities. Even solicitor-client privilege, one of the most ancient and powerful privileges known to our jurisprudence, is generally seen as a "fundamental and substantive rule of law" (*R. v. McClure*, 2001 SCC

de fond en comble en application de l'article premier » (p. 45), qu'un intérêt public prépondérant lié aux faits s'y oppose. Elle s'appuie sur *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835, qui a reconnu l'importance de la liberté d'expression même lorsque la garantie d'un procès équitable est en cause. L'ALCCB fait valoir des arguments semblables, qui découlent selon elle des motifs dissidents de la juge McLachlin (maintenant Juge en chef) dans *Lessard*.

[38] La position de l'ACLC et de l'ALCCB repose sur la prémisse que la protection des sources confidentielles devrait être traitée comme s'il s'agissait d'un droit ou d'une liberté expressément visé par la *Charte*. Or, ce n'est pas le cas. C'est la liberté d'expression qui est garantie à l'al. 2*b*). Même si elle n'est pas expressément mentionnée à l'al. 2*b*), la collecte de l'information fait implicitement partie de la publication de l'information. Cependant, il existe de nombreuses façons de recueillir l'information et j'estime que la thèse selon laquelle chacune d'elles (y compris le recours à des sources secrètes) serait protégée par la Constitution pousse l'argument trop loin. La pratique qui consiste à rémunérer les sources est aussi une méthode courante de collecte de l'information, mais rares sont ceux qui diraient que cette méthode devrait également être consacrée dans la Constitution. Les journalistes n'hésitent pas à utiliser des micros longue portée, des téléobjectifs ou des appareils électroniques permettant d'entendre et de voir ce qui est censé être privé (comme le budget du ministre des Finances de l'époque, M. Marc Lalonde, qui avait dû être modifié parce qu'un caméraman avait filmé des extraits de documents budgétaires secrets sur le bureau du ministre). De telles techniques sont peut-être importantes pour les journalistes (qui, contrairement aux poursuivants, ne disposent pas du pouvoir de sommation), mais ce n'est pas parce qu'elles le *sont* qu'elles sont protégées par la Constitution.

[39] Les tribunaux ont hésité à élever les immunités testimoniales au rang de protections constitutionnelles. Même le secret professionnel de l'avocat, l'un des privilèges les plus anciens et les plus puissants reconnus dans notre jurisprudence, est en général considéré comme une « règle de droit

14, [2001] 1 S.C.R. 445, at para. 17), rather than as "constitutional" even though solicitor-client privilege is supported by and impressed with the values underlying s. 7 of the *Charter*.

[40]   There are cogent objections to the creation of such a "constitutional" immunity. As recently pointed out in *Grant v. Torstar Corp.*, 2009 SCC 61, [2009] 3 S.C.R. 640, the protection attaching to freedom of expression is not limited to the "traditional media", but is enjoyed by "everyone" (in the words of s. 2(*b*) of the *Charter*) who chooses to exercise his or her freedom of expression on matters of public interest whether by blogging, tweeting, standing on a street corner and shouting the "news" at passing pedestrians or publishing in a national newspaper. To throw a constitutional immunity around the interactions of such a heterogeneous and ill-defined group of writers and speakers and whichever "sources" they deem worthy of a promise of confidentiality and on whatever terms they may choose to offer it (or, as here, choose to amend it with the benefit of hindsight) would blow a giant hole in law enforcement and other constitutionally recognized values such as privacy.

[41]   The law needs to provide solid protection against the compelled disclosure of secret source identities in appropriate situations but the history of journalism in this country shows that the purpose of s. 2(*b*) can be fulfilled without the necessity of implying a constitutional immunity. Accordingly, a judicial order to compel disclosure of a secret source would not in general violate s. 2(*b*). There is thus no need on this branch of the case to consider a s. 1 justification.

### (2) Class Privilege Model

[42]   At common law, privilege is classified as either relating to a class (e.g. solicitor and client privilege) or established on a case-by-case basis. In

fondamentale et substantielle » (*R. c. McClure*, 2001 CSC 14, [2001] 1 R.C.S. 445, par. 17), plutôt que comme une règle « constitutionnelle », et ce, même si le secret professionnel de l'avocat découle et est empreint des valeurs qui sous-tendent l'art. 7 de la *Charte*.

[40]   La reconnaissance d'une telle immunité « constitutionnelle » suscite des objections convaincantes. Comme l'a récemment souligné la Cour dans *Grant c. Torstar Corp.*, 2009 CSC 61, [2009] 3 R.C.S. 640, la protection accordée à la liberté d'expression ne se limite pas aux « médias traditionnels », mais elle est accordée à « chacun » (aux termes de l'al. 2*b*) de la *Charte*), soit à quiconque décide d'exercer sa liberté d'expression sur des questions d'intérêt public, que ce soit en bloguant ou en microbloguant, en criant les « nouvelles » aux passants ou en publiant un article dans un journal national. Conférer une immunité constitutionnelle aux interactions entre un groupe de rédacteurs et d'orateurs aussi hétérogène et mal défini et toute « source » que ces derniers estiment digne d'une promesse de confidentialité, assortie des conditions qu'ils déterminent (ou, comme en l'espèce, modifient rétrospectivement), aurait pour effet de miner considérablement l'application de la loi et d'autres valeurs constitutionnelles, comme le respect de la vie privée.

[41]   Le droit doit offrir une solide protection contre la divulgation forcée de l'identité des sources secrètes dans les situations qui le requièrent, mais l'histoire du journalisme au pays démontre que l'objectif de l'al. 2*b*) peut être atteint sans qu'il soit nécessaire de reconnaître implicitement une immunité constitutionnelle. Ainsi, une ordonnance judiciaire visant à forcer la divulgation d'une source secrète ne va généralement pas à l'encontre de l'al. 2*b*). Par conséquent, point n'est besoin, pour trancher cet aspect du pourvoi, d'examiner la question de la justification au sens de l'article premier.

### (2) Le modèle du privilège générique

[42]   En common law, un privilège est soit générique (p. ex. le secret professionnel de l'avocat) soit reconnu au cas par cas. Dans le cas d'un privilège

a class privilege what is important is not so much the content of the particular communication as it is the protection of the type of relationship. Once the relevant relationship is established between the confiding party and the party in whom the confidence is placed, privilege presumptively cloaks in confidentiality matters properly within its scope without regard to the particulars of the situation. Class privilege necessarily operates in derogation of the judicial search for truth and is insensitive to the facts of the particular case. Anything less than this blanket confidentiality, the cases hold, would fail to provide the necessary assurance to the solicitor's client or the police informant to do the job required by the administration of justice. The law recognizes very few "class privileges" and as Lamer C.J. observed in rejecting the existence of a class privilege for communications passing between pastor and penitent in *R. v. Gruenke*, [1991] 3 S.C.R. 263:

Unless it can be said that the policy reasons to support a class privilege for religious communications are as compelling as the policy reasons which underlay the class privilege for solicitor-client communications, there is no basis for departing from the fundamental "first principle" that all relevant evidence is admissible until proven otherwise. [p. 288]

It is likely that in future such "class" privileges will be created, if at all, only by legislative action.

[43] Journalistic-confidential source privilege has not previously been recognized as a class privilege by our Court (*Moysa v. Alberta (Labour Relations Board)*, [1989] 1 S.C.R. 1572), and has been rejected by courts in other common law jurisdictions with whom we have strong affinities. The reasons are easily stated. First is the immense variety and degrees of professionalism (or the lack of it) of persons who now "gather" and "publish" news said to be based on secret sources. In contrast to the legal profession there is no formal accreditation process to "licence" the practice of journalism, and no professional organization (such as a law society) to regulate its members and attempt

générique, l'important n'est pas tant le contenu de la communication que la protection du genre de relation. En principe, une fois que la relation nécessaire est établie entre la partie qui se confie et celle à qui elle se confie, les renseignements ainsi confiés sont présumés confidentiels par application du privilège, sans égard aux circonstances. Le privilège générique déroge nécessairement à la recherche judiciaire de la vérité et ne dépend pas des faits de l'espèce. Suivant la jurisprudence, sans cette confidentialité générale, il serait impossible de donner au client de l'avocat ou à l'indicateur de police la garantie nécessaire pour qu'il puisse faire ce que l'administration de la justice exige de lui. Le droit reconnaît très peu de « privilèges génériques » et le juge en chef Lamer a dit ce qui suit en rejetant l'existence d'un privilège générique relatif aux communications entre ministre du culte et fidèle dans *R. c. Gruenke*, [1991] 3 R.C.S. 263 :

À moins que l'on puisse dire que les raisons de principe justifiant l'existence d'un privilège générique en matière de communications religieuses sont aussi sérieuses que les raisons de principe qui sous-tendent le privilège générique en matière de communications entre l'avocat et son client, il n'y a aucun motif de s'écarter du « principe premier » fondamental selon lequel tous les éléments de preuve pertinents sont admissibles jusqu'à preuve du contraire. [p. 288]

Il est probable qu'à l'avenir, tout nouveau privilège « générique » sera créé, le cas échéant, par une intervention législative.

[43] La Cour n'a jamais reconnu le privilège du secret des sources des journalistes comme un privilège générique (*Moysa c. Alberta (Labour Relations Board)*, [1989] 1 R.C.S. 1572) et des tribunaux d'autres ressorts de common law avec lesquels nous avons de grandes affinités l'ont rejeté. Les raisons en sont simples. La première tient à l'immense diversité et au niveau variable de professionnalisme (ou de non-professionnalisme) des personnes qui, de nos jours, « recueillent » et « publient » des informations qu'elles disent avoir obtenues de sources secrètes. Contrairement aux avocats, les journalistes ne sont assujettis à aucun processus d'agrément officiel pour exercer leur

to maintain professional standards. Nor, given the scope of activity contemplated as journalism in *Grant v. Torstar*, could such an organization be readily envisaged.

[44]   A second problem arises in determining the respective rights and immunities of the journalist and the source to whom confidentiality has been promised. In the past, secret sources have voluntarily stepped out from the shadows to reveal themselves (as in the *St. Elizabeth Home* case) with or without the journalist's consent. Is the journalist now to be given the right to object because, for example, disclosure might reveal "journalist methods" and "journalistic networks"? I do not think such a restriction would in general serve the public interest in the search for truth. On the other hand, the source cannot be said to be the holder of the privilege if, as here, the journalist reserves the right to "out" the secret source unilaterally if, in the journalist's personal view, the conditions on which anonymity were offered have not been met. In the case of solicitors and their clients, the privilege clearly belongs to the client. Are we to say that journalistic privilege attaches both to the journalist and the secret source? If so, what happens if they fall into disagreement? It is particularly important in the case of class privilege that the rules be clear in advance to all participants so that they may govern themselves accordingly.

[45]   Thirdly, no one has suggested workable criteria for the creation or loss of the claimed immunity. The evidence shows that journalistic practice varies considerably as to when promises of confidentiality are properly made. Many news organizations require the journalist to consult with an editor before making such a promise. Others, including the *National Post*, do not. What would be the criteria for such a class privilege to apply? The various media codes of ethics are themselves in disagreement. In the present case, Mr. McIntosh's original

profession et ils n'appartiennent à aucune organisation professionnelle (comme le barreau) ayant pour fonction de régir la conduite de ses membres et de veiller au respect de normes professionnelles. De plus, compte tenu de la fourchette d'activités définies dans l'arrêt *Grant c. Torstar* comme relevant du journalisme, une telle organisation pourrait difficilement voir le jour.

[44]   Une deuxième difficulté consiste à déterminer quels sont les droits et les immunités dont bénéficient respectivement le journaliste et la source à laquelle on a promis la confidentialité. Il est déjà arrivé que des sources secrètes sortent de l'ombre de leur propre gré (comme dans l'affaire *St. Elizabeth Home*) avec ou sans le consentement du journaliste. Doit-on accorder au journaliste le droit de s'y opposer au motif, par exemple, que des « méthodes » et des « réseaux journalistiques » risquent d'être révélés? Je ne crois pas qu'une telle restriction servirait en général l'intérêt public à la recherche de la vérité. En revanche, la source ne saurait être considérée comme le bénéficiaire du privilège si, comme en l'espèce, le journaliste se réserve unilatéralement le droit de révéler son identité dans le cas où, à ses yeux, les conditions de la promesse de confidentialité n'auraient pas été respectées. En ce qui a trait au secret professionnel de l'avocat, le client est sans contredit le bénéficiaire du privilège. Faut-il conclure que le privilège journalistique est l'apanage à la fois du journaliste et de la source secrète? Dans l'affirmative, qu'arrive-t-il s'ils ont un différend? Il est particulièrement important, lorsqu'il s'agit d'un privilège générique, que tous les participants connaissent les règles dès le départ pour pouvoir agir en conséquence.

[45]   Troisièmement, aucun critère pratique n'a été proposé pour définir les circonstances entraînant la création ou la perte de l'immunité revendiquée. La preuve révèle des pratiques journalistiques qui varient considérablement quant aux conditions relatives à la conclusion d'ententes de confidentialité valables. En effet, de nombreux organes de presse exigent de leurs journalistes qu'ils consultent un directeur de la rédaction avant de faire une telle promesse. D'autres, comme le *National Post*, ne l'exigent pas. Quels critères serviraient à déterminer

R.  c.  NATIONAL POST   *Le juge Binnie*

"blanket, <u>unconditional</u> promise of confidentiality to protect the identity of both X and Y" (McIntosh Affidavit, at para. 156 (emphasis added)) became burdened with an important condition. It was retroactively modified by Mr. McIntosh to last only so long as Mr. McIntosh personally "believed that [X] had not provided the document to deliberately mislead me" (para. 227). Mr. McIntosh says his secret source agreed to this modification, but at that point he or she was not in much of a bargaining position having already delivered up the documents to the appellants. What are the limits to retroactive modification of the journalist's undertaking? Must the secret source consent to the modification? The media argument raises more questions about the scope and operation of the claimed class privilege than it provides solutions.

[46]   Fourthly, while the result of any privilege is to impede the search for truth, and thereby to run the risk of an injustice to the persons opposed in interest to the claimant, a class privilege is more rigid than a privilege constituted on a case-by-case basis. It does not lend itself to the same extent to be tailored to fit the circumstances.

[47]   In the United Kingdom, no class privilege attached to journalists at common law: *Ashworth Hospital Authority v. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033. The same is true in Australia, see *McGuinness v. Attorney-General of Victoria* (1940), 63 C.L.R. 73, and *John Fairfax & Sons Ltd. v. Cojuangco* (1988), 165 C.L.R. 346. In the United States, the concurring judgment of Powell J. in *Branzburg v. Hayes*, 408 U.S. 665 (1972), which from the media perspective put the best face on the majority's rejection of any First Amendment journalistic privilege, rejected a class privilege but held open the possibility of a case-by-case privilege:

si un privilège générique s'applique? Les différents codes d'éthique des médias se contredisent. En l'espèce, M. McIntosh avait d'abord consenti [TRADUCTION] « une promesse générale et <u>inconditionnelle</u> de confidentialité pour protéger l'identité de X et de Y » (affidavit de M. McIntosh, par. 156 (je souligne)), mais il a par la suite assorti cette promesse d'une condition importante. Il l'a modifiée rétroactivement de sorte qu'elle soit valide tant qu'il croirait personnellement « que [X] n'avait pas fourni le document dans le but délibéré de [l']induire en erreur » (par. 227). Selon M. McIntosh, sa source secrète a acquiescé à cette modification, mais elle ne jouissait pas d'un grand pouvoir de négociation à ce moment-là, puisqu'elle avait déjà transmis les documents aux appelants. Quelles limites restreignent la modification rétroactive de la promesse donnée par le journaliste? La source secrète doit-elle consentir à la modification? L'argument des médias soulève plus de questions qu'il n'apporte de solutions à propos de l'étendue et de l'application du privilège générique revendiqué.

[46]   Quatrièmement, bien qu'un privilège, quel qu'il soit, ait pour effet de nuire à la recherche de la vérité, et de créer de ce fait un risque d'injustice pour les personnes dont l'intérêt est opposé à l'intérêt de celui qui l'invoque, un privilège générique est plus rigide qu'un privilège reconnu au cas par cas. Il n'est pas possible de le redéfinir aussi librement pour l'adapter aux circonstances.

[47]   Au Royaume-Uni, les journalistes ne jouissent d'aucun privilège générique issu de la common law : *Ashworth Hospital Authority c. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033. Il en est de même en Australie, voir *McGuinness c. Attorney-General of Victoria* (1940), 63 C.L.R. 73, et *John Fairfax & Sons Ltd. c. Cojuangco* (1988), 165 C.L.R. 346. Aux États-Unis, le juge Powell, dans son opinion concordante dans l'affaire *Branzburg c. Hayes*, 408 U.S. 665 (1972), qui a présenté le rejet par la majorité d'un privilège journalistique fondé sur le Premier Amendement sous son jour le plus positif du point de vue des médias, a rejeté l'argument du privilège générique sans toutefois écarter la possibilité d'un privilège fondé sur les circonstances de chaque cas :

. . . if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. <u>The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.</u> [Emphasis added; p. 710.]

[48]   In the United Kingdom, journalistic-secret source privilege is now covered by the *Contempt of Court Act 1981* (U.K.), 1981, c. 49. The U.K. Parliament has created a presumptive immunity in defined circumstances, subject to being overridden on enumerated grounds. Section 10 provides that:

No court may require a person to disclose, nor is any person guilty of contempt of court for refusing to disclose, the source of information contained in a publication for which he is responsible, unless it be established to the satisfaction of the court that disclosure is necessary in the interests of justice or national security or for the prevention of disorder or crime.

Statutes offering similar protections exist in a number of states of the United States. In Australia there exists a "shield law" both at the federal level and in New South Wales. New Zealand enacted such a law in 2006.

[49]   In Canada a number of legislative proposals have been considered both at the federal and provincial level but none has received legislative approval.

### (3)   The Case-by-Case Model of Privilege

[50]   The appellants themselves advocate a balancing of interests based on Professor Wigmore's

[TRADUCTION] . . . si le journaliste est appelé à fournir des renseignements qui n'ont qu'un lien indirect et ténu avec l'objet de l'enquête, ou s'il a d'autres raisons de croire que son témoignage met en cause ses relations avec des sources confidentielles sans qu'il y ait nécessité légitime en ce qui concerne l'application de la loi, il pourra présenter une requête en annulation au tribunal, et une ordonnance de confidentialité pourrait être rendue. La revendication du privilège devrait être appréciée en fonction des faits, par la recherche d'un juste équilibre entre la liberté de la presse, d'une part, et l'obligation pour tous les citoyens de témoigner sur un comportement criminel, d'autre part. <u>La conciliation au cas par cas de ces intérêts constitutionnels et sociétaux d'importance capitale concorde avec la méthode éprouvée traditionnellement utilisée pour statuer sur de telles questions.</u> [Je souligne; p. 710.]

[48]   Au Royaume-Uni, le privilège relatif aux sources secrètes des journalistes est maintenant régi par la *Contempt of Court Act 1981* (R.-U.), 1981, ch. 49. Le législateur y a créé une présomption d'immunité qui s'applique dans certaines circonstances, mais qui peut être réfutée pour des motifs précis. L'article 10 prévoit ce qui suit :

[TRADUCTION] Aucun tribunal ne peut ordonner à une personne de dévoiler, et nul ne peut être reconnu coupable d'outrage au tribunal pour avoir refusé de dévoiler, l'identité de la source des renseignements contenus dans une publication dont il est responsable, à moins qu'il ne soit établi, de l'avis du tribunal, que la divulgation est nécessaire dans l'intérêt de la justice, de la sécurité nationale ou de la prévention des troubles et du crime.

Des lois offrant des protections semblables ont été adoptées par plusieurs États américains. En Australie, une loi fédérale et une loi de la Nouvelle-Galles du Sud garantissent la confidentialité des sources. La Nouvelle-Zélande a adopté une loi de ce genre en 2006.

[49]   Au Canada, un certain nombre de projets de loi ont été étudiés tant au fédéral qu'au provincial, mais aucun n'a été adopté.

### (3)   Modèle du privilège fondé sur les circonstances de chaque cas

[50]   Les appelants eux-mêmes préconisent une pondération des intérêts fondée sur le test du

R. *c.* NATIONAL POST *Le juge Binnie*

criteria for establishing confidentiality at common law as set out in *McClure*, at para. 29, *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157, at para. 30, *Gruenke*, at pp. 289-90, and *Slavutych v. Baker*, [1976] 1 S.C.R. 254, at p. 261, but is informed by the *Charter* guarantee of freedom of expression and the rights "of the press and other media of communication". It is well established that the common law may properly be developed to reflect *Charter* values: *RWDSU v. Dolphin Delivery Ltd.*, [1986] 2 S.C.R. 573, at p. 603; *Ryan*, at para. 21.

[51]   As mentioned, *Gruenke* dealt with a claim for confidentiality for communications passing between priest and penitent or, more broadly, "religious communications" (pp. 290-91). Just as the claim here is said to grow out of the s. 2(*b*) *Charter* guarantee of freedom of expression, the claim in *Gruenke* was said to be required by the s. 2(*a*) *Charter* guarantee of freedom of religion and conscience. Despite the constitutional protection for freedom of religion, the Court rejected the existence of a class privilege but adopted instead Professor Wigmore's distillation and synthesis of a wide range of situations where privilege has been recognized on a case-by-case basis. Here the law finds a mechanism with the necessary flexibility to weigh up and balance competing public interests in a context-specific manner.

[52]   When applied to journalistic secret sources, the case-by-case privilege, if established on the facts, will not necessarily be restricted to testimony, i.e. available only at the time that testimony is sought from a journalist in court or before an administrative tribunal. The protection offered may go beyond a mere rule of evidence. Its scope is shaped by the public interest that calls the privilege into existence in the first place. It is capable, in a proper case, of being asserted against the issuance or execution of a search warrant, as in *O'Neill v. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389 (Ont. S.C.J.). The scope of the case-by-case privilege will depend, as does its very existence, on a case-by-case analysis, and may be total or partial (*Ryan*, at para. 18).

professeur Wigmore pour établir la confidentialité en common law, comme il est énoncé dans *McClure*, par. 29, *M. (A.) c. Ryan*, [1997] 1 R.C.S. 157, par. 30, *Gruenke*, p. 289-290, et *Slavutych c. Baker*, [1976] 1 R.C.S. 254, p. 261. Ce privilège s'inspirerait de la liberté d'expression garantie par la *Charte* et des droits « de la presse et des autres moyens de communication ». Il est bien établi que la common law peut évoluer pour refléter les valeurs consacrées dans la *Charte* : *SDGMR c. Dolphin Delivery Ltd.*, [1986] 2 R.C.S. 573, p. 603; *Ryan*, par. 21.

[51]   Comme je l'ai déjà signalé, l'arrêt *Gruenke* portait sur la confidentialité des communications entre ministre du culte et fidèle ou, en termes plus généraux, sur les « communications religieuses » (p. 290-291). Tout comme la liberté d'expression garantie par l'al. 2*b*) de la *Charte* est invoquée à l'appui du présent pourvoi, la liberté de conscience et de religion garantie par l'al. 2*a*) servait de fondement à la revendication dans *Gruenke*. Malgré la protection que la Constitution accorde à la liberté de religion, la Cour a nié l'existence d'un privilège générique, mais elle a retenu la synthèse faite par le professeur Wigmore de situations très diverses dans lesquelles un privilège a été reconnu au cas par cas. Le droit y trouve un mécanisme suffisamment flexible pour soupeser et mettre en balance les intérêts publics contradictoires, selon le contexte.

[52]   Dans le cas de la protection des sources secrètes des journalistes, le privilège fondé sur les circonstances de chaque cas, s'il est établi au vu des faits, ne s'applique pas nécessairement qu'au témoignage, c.-à-d. au moment où le journaliste est contraint à témoigner devant un tribunal judiciaire ou administratif. La protection offerte peut déborder la simple règle de preuve. Sa portée dépend de l'intérêt public auquel elle doit son existence. Elle peut, dans certains cas, être opposable à la délivrance ou à l'exécution d'un mandat de perquisition, comme dans l'affaire *O'Neill c. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389 (C.S.J. Ont.). Le privilège fondé sur les circonstances de chaque cas peut être absolu ou partiel et sa portée dépend, comme son existence même, d'une analyse effectuée au cas par cas (*Ryan*, par. 18).

R. *v.* NATIONAL POST   *Binnie J.*

[53]   The "Wigmore criteria" consist of four elements which may be expressed for present purposes as follows. First, the communication must originate in a confidence that the identity of the informant will not be disclosed. Second, the confidence must be essential to the relationship in which the communication arises. Third, the relationship must be one which should be "sedulously fostered" in the public good ("Sedulous[ly]" being defined in the *New Shorter Oxford English Dictionary on Historical Principles* (6th ed. 2007), vol. 2, at p. 2755, as "diligent[ly] . . . deliberately and consciously"). Finally, if all of these requirements are met, the court must consider whether in the instant case the public interest served by protecting the identity of the informant from disclosure outweighs the public interest in getting at the truth. See *Wigmore on Evidence* (McNaughton Rev. 1961), vol. 8, at § 2285; *Sopinka, Lederman & Bryant: The Law of Evidence in Canada* (3rd ed. 2009), at paras. 14.19 *et seq.*; D. M. Paciocco and L. Stuesser, *The Law of Evidence* (5th ed. 2008), at pp. 254-59. Further, as Lamer C.J. commented in *Gruenke*:

This is not to say that the Wigmore criteria are now "carved in stone", but rather that these considerations provide a general framework within which policy considerations and the requirements of fact-finding can be weighed and balanced on the basis of their relative importance in the particular case before the court. [p. 290]

[54]   It is of passing interest that Professor Wigmore himself was not a supporter of journalistic-secret source privilege. He described an early legislative attempt to craft a shield law (Maryland, 1923) "as detestable in substance as it is crude in form". He predicted (wrongly) that it "will probably remain unique" (*Wigmore on Evidence* (2nd ed. 1923), vol. 5, at § 2286, n. 7).

[53]   Le test ou « critère de Wigmore » comporte quatre volets qui peuvent se résumer comme suit dans le contexte qui nous occupe. Premièrement, les communications doivent avoir été transmises confidentiellement avec l'assurance que l'identité de l'informateur ne serait pas divulguée. Deuxièmement, le caractère confidentiel doit être essentiel aux rapports dans le cadre desquels la communication est transmise. Troisièmement, les rapports doivent être des rapports qui, dans l'intérêt public, devraient être « entretenus assidûment », adverbe qui évoque l'application constante et la persévérance (selon le *New Shorter Oxford English Dictionary on Historical Principles* (6ᵉ éd. 2007), vol. 2, p. 2755, le terme anglais « *sedulously* » utilisé par Wigmore signifie : « *diligent[ly] [. . .] deliberately and consciously* »). Enfin, si toutes ces exigences sont remplies, le tribunal doit déterminer si, dans l'affaire qui lui est soumise, l'intérêt public que l'on sert en soustrayant l'identité à la divulgation l'emporte sur l'intérêt public à la découverte de la vérité. Voir *Wigmore on Evidence* (rév. McNaughton 1961), vol. 8, § 2285; *Sopinka, Lederman & Bryant : The Law of Evidence in Canada* (3ᵉ éd. 2009), par. 14.19 et suiv.; D. M. Paciocco et L. Stuesser, *The Law of Evidence* (5ᵉ éd. 2008), p. 254-259. De plus, le juge en chef Lamer, dans *Gruenke*, a fait le commentaire suivant :

Cela veut dire non pas que le critère de Wigmore est maintenant « gravé dans la pierre », mais plutôt que ces considérations constituent un cadre général à l'intérieur duquel des considérations de principe et les exigences en matière de recherche des faits peuvent être évaluées et comparées en fonction de leur importance relative dans l'affaire particulière soumise à la cour. [p. 290]

[54]   Il est intéressant de noter que le professeur Wigmore lui-même n'était pas en faveur d'un privilège du secret des sources des journalistes. Une mesure législative visant à prévoir une telle protection dès 1923 au Maryland lui semblait [TRADUCTION] « tout aussi déplorable sur le plan du fond que grossière sur le plan de la forme ». À l'égard de cette mesure, il a prédit (à tort) : [TRADUCTION] « elle demeurera sans doute un cas isolé » (*Wigmore on Evidence* (2ᵉ éd. 1923), vol. 5, § 2286, nᵒ 7).

[55]   However, the world of journalism has moved on since Professor Wigmore's day. The role of investigative journalism has expanded over the years to help fill what has been described as a democratic deficit in the transparency and accountability of our public institutions. The need to shine the light of public scrutiny on the dark corners of some private institutions as well is illustrated by Benotto J.'s reference to corporate delinquencies in the list reproduced above at para. 28. Professor Wigmore's criteria provide a workable structure within which to assess, in light of society's evolving values, the sometimes-competing interests of free expression and the administration of justice and other values that promote the public interest. This will provide the necessary flexibility and an opportunity for growth that is essential to the proper function of the common law.

C.   *Proceeding on a Case-by-Case Basis, What Are the Elements That Must Be Established, and Who Bears the Burden of Proof?*

[56]   There is little disagreement about the first two Wigmore criteria. The media accepts that privilege can only be claimed where the communication is made *explicitly* in exchange for a promise of confidentiality. Wigmore was concerned with the confidentiality of the *contents* of the communication itself (which is not the issue here because it was the mutual intention of the journalist and the source to make the content of the communication public). However, I think the rationale underlying the Wigmore criteria may be applied equally to a new role, namely the maintenance of the confidentiality of the *identity* of the source. Secondly, the necessity for confidentiality is the *raison d'être* for the existence of the privilege. If the source does not insist on confidentiality as a condition precedent to the disclosure then no promise of confidentiality will be made and no privilege arises. Journalists prefer in any event to have a source on the record to enable their readers or listeners to evaluate its likely credibility.

[57]   The third criterion (that the source-journalist relationship is one that should be "sedulously

[55]   Toutefois, la presse a bien évolué depuis l'époque du professeur Wigmore. Le rôle du journalisme d'enquête s'est élargi au fil des ans pour combler ce qui a été décrit comme un déficit démocratique dans la transparence et l'obligation redditionnelle de nos institutions publiques. La nécessité de mettre aussi au jour, à la faveur d'un examen public, les facettes obscures de certaines institutions privées ressort de l'allusion aux délits commis par des entreprises, faite par la juge Benotto, dans la liste reproduite précédemment au par. 28. Le test du professeur Wigmore fournit un cadre pratique pour apprécier, au gré des changements de la société, les intérêts à la liberté d'expression et à l'administration de la justice, qui s'opposent parfois, ainsi que d'autres valeurs d'intérêt public. Il offre ainsi la souplesse nécessaire et une occasion propice à l'évolution, qui est indispensable au bon fonctionnement de la common law.

C.   *Dans une analyse au cas par cas, quels éléments doivent être établis et à qui en incombe le fardeau?*

[56]   Les deux premiers volets du test de Wigmore ne suscitent guère de débat. Les médias conviennent qu'un privilège ne peut être invoqué que si la communication est faite *expressément* sous le sceau de la confidentialité. Le professeur Wigmore s'intéressait au caractère confidentiel du *contenu* même de la communication (qui n'est pas en jeu en l'espèce, car le journaliste et sa source souhaitaient tous les deux rendre public le contenu de la communication). Or, je pense que le raisonnement qui sous-tend le test de Wigmore pourrait s'appliquer tout autant à une nouvelle fin, c'est-à-dire lorsqu'il s'agit de maintenir secrète l'*identité* de la source. Deuxièmement, l'exigence de confidentialité est la raison d'être de l'existence du privilège. Si la source n'insiste pas pour faire de la confidentialité une condition préalable à la divulgation, aucune promesse de confidentialité n'est faite et le privilège n'existe pas. Les journalistes préfèrent de toute façon pouvoir citer leurs sources pour que les lecteurs ou les auditeurs puissent en apprécier la crédibilité.

[57]   Le troisième volet du test (selon lequel les rapports source-journaliste devraient, dans l'intérêt

fostered" in the public good) introduces some flexibility in the court's evaluation of different sources and different types of "journalists". The relationship between the source and a blogger might be weighed differently than in the case of a professional journalist like Mr. McIntosh, who is subject to much greater institutional accountability within his or her own news organization. These distinctions need not be canvassed in detail here since the appellants have made out on their evidence, in my opinion, that in general the relationship between professional journalists and their secret sources is a relationship that ought to be "sedulously" fostered and no persuasive reason has been offered to discount the value to the public of the relationship between Mr. McIntosh and his source(s) in this particular case.

[58]  The fourth Wigmore criterion does most of the work. Having established the value to the public of the relationship in question, the court must weigh against its protection any countervailing public interest such as the investigation of a particular crime (or national security, or public safety or some other public good).

[59]  Underlying this analysis is the need to achieve proportionality in striking a balance among the competing interests.

[60]  The appellants argue that once the first three Wigmore criteria are established the onus should switch to the Crown (or other party seeking disclosure) to show why, on a balance of probabilities, disclosure should be ordered (Factum, at para. 62). This is particularly so in the search warrant context, they argue, because the court is dealing with the state as a prosecutorial antagonist and the media as a bystander to the crime. Indeed, in this case, the media is in a sense the intermediate *victim* of the alleged crime (but has made no complaint). The eventual intended victim was the then Prime Minister. This three steps forward one step backward argument with respect to onus is unpersuasive because it presupposes that a privilege arises after the third step and is then subject to rebuttal by the opposing party at the fourth step. However,

public, être « entretenus assidûment ») offre une certaine souplesse à la cour appelée à évaluer le cas de différentes sources et de différents types de « journalistes ». Ainsi, il se peut qu'on accorde un poids différent à la relation entre une source et un blogueur qu'à celle qu'entretiennent une source et un journaliste professionnel comme M. McIntosh, qui est tenu à une obligation redditionnelle beaucoup plus rigoureuse au sein de son organe de presse. Nul besoin d'analyser ces distinctions en détail puisque les appelants ont, à mon avis, prouvé que le rapport entre un journaliste professionnel et ses sources secrètes est une relation qui doit généralement être « assidûment » entretenue, et aucune raison convaincante n'a été avancée pour atténuer l'importance, pour le public, des rapports entre M. McIntosh et sa ou ses sources dans la présente affaire.

[58]  C'est donc le quatrième volet du test de Wigmore qui sera le plus déterminant. Une fois établie l'importance pour le public des rapports en question, le tribunal doit mettre en balance la protection de ces rapports et tout autre intérêt public opposé, comme la tenue d'une enquête sur un crime précis (ou la sécurité nationale, la sécurité publique ou une autre considération intéressant le bien collectif).

[59]  Cette analyse est guidée par l'objectif d'une certaine proportionnalité dans la recherche d'un équilibre entre les intérêts qui s'opposent.

[60]  Les appelants font valoir qu'une fois les trois premiers volets du test de Wigmore établis, il revient au ministère public (ou à toute autre partie cherchant à obtenir la divulgation) de démontrer pourquoi, suivant la prépondérance des probabilités, il y a lieu d'ordonner la divulgation (mémoire, par. 62). D'après eux, cela est d'autant plus vrai dans le contexte d'une demande de mandat de perquisition parce que, devant le tribunal, l'État agit à titre de poursuivant et le média à titre de simple observateur du crime. En fait, en l'espèce, le média est en un sens la *victime* intermédiaire du crime reproché (mais il n'a pas porté plainte). La véritable cible du crime était le premier ministre de l'époque. Cet argument relatif au fardeau de la preuve, qui nous fait faire trois pas en avant, puis un pas en arrière, n'est pas convaincant parce qu'il suppose que le

this is not the case. Until the media have met all *four* Wigmore criteria no journalistic source privilege arises. The evidence is presumptively compellable and admissible. It is the media that advances the proposition that the public interest in protecting its secret source outweighs the public interest in the criminal investigation. The burden of persuasion therefore lies on the media. That said, I expect that onus will rarely play a pivotal role at the fourth step, where "[t]he exercise is essentially one of common sense and good judgment" (*Ryan*, at para. 32).

[61]   The weighing up will include (but of course is not restricted to) the nature and seriousness of the offence under investigation, and the probative value of the evidence sought to be obtained, measured against the public interest in respecting the journalist's promise of confidentiality. The Crown argues that the existence of any crime is sufficient to vitiate a privilege but that is too broad a generalization. The *Pentagon Papers* case originated in circumstances amounting to an offence, yet few would now argue that the publication of the true facts in that situation was not in the greater public interest.

[62]   The underlying purpose of the investigation, as inferred from the objective circumstances, is also relevant at the fourth stage. When investigative reporting strikes at those in power it would not be unexpected that those in power including the police may wish to strike back. There may be circumstances where the criminal investigation appears to be contrived to silence improperly the secret source, and in such cases the court may decline to order production. Thus, in *O'Neill*, an investigation was launched under the *Security of Information Act* to identify the secret source of a leak to a reporter for the *Ottawa Citizen*. The reviewing judge, Ratushny J. found that the RCMP sought the warrant with the intent to intimidate the reporter into giving up her sources. The result, the police might have expected,

privilège prend naissance après la troisième étape et que son existence peut ensuite être réfutée par la partie adverse à la quatrième étape. Or, ce n'est pas le cas. Jusqu'à ce que le média ait satisfait aux *quatre* volets du test de Wigmore, aucun privilège ne protège la source du journaliste. Il existe une présomption selon laquelle toute preuve est admissible et le tribunal peut en ordonner la production. C'est le média qui affirme que l'intérêt public à ce que sa source soit protégée l'emporte sur l'intérêt public à ce qu'une enquête criminelle soit menée à bien. Il lui incombe donc d'en faire la preuve. Cela étant dit, à mon avis, le fardeau de la preuve jouera rarement un rôle décisif à la quatrième étape où « [i]l s'agit essentiellement de faire preuve de bon sens et de discernement » (*Ryan*, par. 32).

[61]   On mettra en balance (entre autres, bien sûr), d'un côté, la nature et la gravité de l'infraction faisant l'objet de l'enquête et la valeur probante des éléments que l'on cherche à obtenir et, de l'autre côté, l'intérêt public à ce que la promesse de confidentialité faite par un journaliste soit respectée. Le ministère public soutient que la seule existence d'un crime suffit pour annuler un privilège, mais il s'agit là d'une généralisation outrancière. L'affaire des documents du Pentagone (*Pentagon Papers*) découle de circonstances constituant une infraction et pourtant, de nos jours, rares sont ceux qui douteraient qu'il n'était pas dans le plus grand intérêt public de faire connaître la vérité.

[62]   Le but sous-jacent de l'enquête, qui ressort objectivement des circonstances, est aussi un facteur pertinent à la quatrième étape. Lorsque le reportage d'enquête vise des gens au pouvoir, il ne serait pas surprenant que ces derniers, y compris la police, souhaitent riposter. Dans certaines circonstances, par exemple, il se peut que l'enquête criminelle vise à faire taire la source secrète de façon injustifiée et, dans de tels cas, le tribunal peut refuser d'ordonner la communication. Ainsi, dans *O'Neill*, une enquête a été menée sous le régime de la *Loi sur la protection de l'information* pour identifier la source secrète ayant divulgué clandestinement des renseignements à une journaliste de l'*Ottawa Citizen*. La juge Ratushny, qui siégeait en révision, a conclu que la GRC avait demandé le mandat de perquisition

might well have been to disincline the journalist to publish further material on a story that was embarrassing to both the police and to the government (para. 154). In such a case, the demand to deliver up even physical evidence that would disclose the identity of the secret source might well be refused. That is not this case. The alleged forgery is distinct from whistleblowing. In terms of getting out the truth, the "leak" of a forged document undermines rather than advances achievement of the *purpose* of the privilege claimed by the media in the *public* interest.

[63]   In a test of balancing the public interest in disclosure versus the public interest in confidentiality neither the journalist nor the secret source "owns" the privilege. Thus, where a secret source decides for whatever reason to cast aside the cloak of anonymity the public interest no longer "sedulously fosters" the continuation of the confidential relationship in preference to openness and the search for the truth. In such a case, the journalist would have no basis to seek to restrain the self-outing of the secret source. On the other hand, where a journalist decides that the confidentiality arrangement no longer binds (as for example, in this case, if Mr. McIntosh had concluded that the forged bank records had been provided by the source to mislead the *National Post* deliberately, and had thereby, in his view, forfeited its protection), the balance would again tilt in favour of disclosure. The role and function of the privilege is to facilitate the freedom of expression of the media and their readers and listeners. Where the journalist concludes that the relationship in a particular case should no longer be "sedulously" fostered, the substratum of the claimed privilege is eliminated. The *public* interest would no longer be served in the particular case by suppression of the identity, but of course in the event of such disclosure, the source might have some sort of *private* law claim for breach of contract or breach of confidence or other private common law cause of action. Such private law remedies are not before us in this appeal.

dans le but d'intimider la journaliste et de l'inciter à divulguer ses sources. Les policiers s'attendaient peut-être à ce que l'exécution du mandat puisse avoir pour effet de décourager la journaliste de publier d'autres renseignements sur une affaire gênante tant pour la police que pour le gouvernement (par. 154). Dans une situation comme celle-là, même une demande de remise d'éléments de preuve matérielle mettant au jour l'identité de la source secrète pourrait bien être refusée. Ce n'est pas le cas en l'espèce. Le prétendu faux n'a rien à voir avec la dénonciation d'irrégularités. Sur le plan de la découverte de la vérité, la « divulgation clandestine » d'un document contrefait compromet, au lieu d'aider, la réalisation de l'*objectif* du privilège revendiqué par les médias dans l'intérêt *public.*

[63]   Dans le cadre de la mise en balance de l'intérêt public à la divulgation et de l'intérêt public à la confidentialité, ni le journaliste, ni la source secrète ne « possède » pour ainsi dire le privilège. Par conséquent, lorsqu'une source secrète décide de lever le voile de l'anonymat, pour quelque raison que ce soit, l'intérêt public ne justifie plus que les rapports confidentiels soient « entretenus assidûment » et leur préfère la transparence et la recherche de la vérité. En pareil cas, le journaliste ne disposerait d'aucun moyen pour empêcher la source de révéler sa propre identité. Par ailleurs, lorsqu'un journaliste détermine qu'il n'est plus lié par l'entente de confidentialité (comme si, en l'espèce, M. McIntosh avait conclu que la source avait transmis les documents bancaires contrefaits dans le but délibéré d'induire le *National Post* en erreur et ne pouvait ainsi plus, selon le journaliste, bénéficier d'une protection), la balance penche également en faveur de la divulgation. Le privilège a pour fonction de faciliter la liberté d'expression des médias ainsi que de leurs lecteurs et auditeurs. Dès que le journaliste est d'avis que les rapports avec une certaine source ne devraient plus être entretenus « assidûment », le fondement du privilège invoqué disparaît. Dans ce cas, il n'est plus dans l'intérêt *public* que l'identité demeure secrète. Toutefois, il se peut bien sûr que la source dispose d'un recours de droit *privé* en common law, notamment pour rupture de contrat ou abus de confiance. De tels recours n'ont pas été plaidés dans le présent pourvoi.

2010 SCC 16 (CanLII)

[64]   In summary, at the fourth stage, the court will weigh up the evidence on both sides (supplemented by judicial notice, common sense, good judgment and appropriate regard for the "special position of the media"). The public interest in free expression will *always* weigh heavily in the balance. While confidential sources are not constitutionally protected, their role is closely aligned with the role of the "freedom of the press and other media of communication", and will be valued accordingly but, to repeat, at the end of the analysis the risk of non-persuasion rests at all four steps on the claimant of the privilege.

[65]   At this point it is important to remind ourselves that there is a significant difference between testimonial immunity against compelled disclosure of secret sources and the suppression by the media of relevant physical evidence. If a client walks into a lawyer's office and leaves a murder weapon covered with fingerprints and DNA evidence on the lawyer's desk the law would not allow the lawyer to withhold production of the gun on the basis of solicitor-client confidentiality, notwithstanding the thoroughgoing protection that the law affords that relationship. In *R. v. Murray* (2000), 144 C.C.C. (3d) 289 (Ont. S.C.J.), the court affirmed this principle in the case of a lawyer charged with suppressing sexual abuse tapes. Journalists, too, have no blanket right to suppress physical evidence of a crime, even where its production may disclose the identity of a confidential source. The immunity, where it exists, is situation specific.

[66]   After the hearing of this appeal, counsel for the appellants provided us with a copy of the recent decision of the European Court of Human Rights in *Financial Times Ltd. v. The United Kingdom*, [2009] ECHR 2065 (BAILII), where a corporate plaintiff was ultimately denied access to confidential source documents. In that case the plaintiff Interbrew, a Belgian brewing company, brought civil proceedings in the United Kingdom to obtain from the media leaked documents that, it claimed,

[64]   En résumé, à la quatrième étape, le tribunal soupèse la preuve appuyant les deux thèses (complétée par les faits admis d'office et ceux qui relèvent du bon sens, du discernement et de la prise en compte de la « situation très particulière des médias »). L'intérêt public à la liberté d'expression joue *toujours* un grand rôle dans la pondération. Bien que les sources confidentielles ne jouissent pas d'une protection constitutionnelle, leur rôle est étroitement lié à celui de la « liberté de la presse et des autres moyens de communication » et l'importance qu'on lui accorde est à l'avenant. Cependant, je le répète, c'est la partie qui revendique le privilège qui assume en définitive le risque de non-persuasion à chacune des quatre étapes.

[65]   À ce stade-ci, il est important de se rappeler qu'il y a une grande différence entre l'immunité testimoniale contre la divulgation forcée des sources secrètes et la rétention d'éléments de preuve matérielle et pertinente par les médias. Si un client entre dans le cabinet d'un avocat et dépose sur son bureau l'arme du crime couverte d'empreintes digitales et génétiques, l'avocat n'est pas autorisé en droit à ne pas la remettre au nom du secret professionnel et ce, malgré la protection exhaustive que le droit accorde aux rapports entre un avocat et son client. La cour a confirmé ce principe dans l'affaire *R. c. Murray* (2000), 144 C.C.C. (3d) 289 (C.S.J. Ont.), concernant un avocat accusé d'avoir caché l'existence des bandes vidéo montrant des agressions sexuelles. Les journalistes ne bénéficient pas eux non plus d'un droit général de retenir un élément de preuve matérielle, même si la production de cet élément risque de révéler l'identité d'une source confidentielle. L'immunité, lorsqu'elle s'applique, est liée aux faits de l'espèce.

[66]   Après l'audition du présent pourvoi, l'avocat des appelants nous a fourni une copie de la décision récente de la Cour européenne des droits de l'homme dans l'affaire *Financial Times Ltd. c. The United Kingdom*, [2009] ECHR 2065 (BAILII), où une société s'est finalement vu nier l'accès à des documents provenant d'une source confidentielle. Dans cette affaire, la demanderesse Interbrew, une brasserie belge, a intenté des poursuites civiles au Royaume-Uni en vue d'obtenir des médias

R. *v.* NATIONAL POST   *Binnie J.*

2010 SCC 16 (CanLII)

had been doctored with false information to suggest Interbrew was on the brink of making a takeover bid for South African Breweries. The allegedly misleading information was published by the media. Thereafter Interbrew suffered a drop in the value of its shares. Interbrew sought production of the documents from the *Financial Times* and other newspapers on the basis that it needed to identify the "source" in order to launch a proposed civil action for breach of confidence against the person or persons unknown. The English Court of Appeal upheld the disclosure order on the ground that the "relatively modest leak" was nevertheless intended to "maximize the mischief" ([2002] EWCA Civ. 274 (BAILII), at paras. 54-55 (leave to appeal denied, House of Lords, 9 July 2002)) and thus fell within the "interests of justice" exception to journalistic source privilege under the U.K. *Contempt of Court Act 1981.* The European Court of Human Rights disagreed. Unlike the plaintiff in the earlier case of *Goodwin v. The United Kingdom*, judgment of 27 March 1996, *Reports of Judgments and Decisions* 1996-II, Interbrew had not sought an injunction in the U.K. to prevent publication (i.e. did not avail itself of alternate means to avert the damage). Interbrew had also failed to demonstrate that information about the identity of the person who leaked the documents was unavailable from other sources (para. 69). The "alternate sources" principle has been part of Canadian law since *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (B.C.S.C.), as it has been in the U.K. See, e.g., *John v. Express Newspapers*, [2000] 3 All E.R. 257 (C.A.). It was not even clear in the *Financial Post* case that the leaked documents were, in fact, "doctored".

[67]   On the other hand in *Sanoma Uitgevers B.V. v. The Netherlands*, E.C.H.R., No. 38224/03 of 31 March 2009, the court upheld the police

des documents divulgués clandestinement et qui, disait-elle, avaient été falsifiés de manière à laisser entendre qu'elle était sur le point de faire une offre publique d'achat visant South African Breweries. Les renseignements qualifiés de trompeurs ont été publiés dans les médias. La valeur des actions d'Interbrew a par la suite chuté. Interbrew a cherché à obtenir une ordonnance enjoignant au *Financial Times* et à d'autres journaux de communiquer les documents en question parce qu'il était nécessaire qu'elle en identifie la « source » pour intenter une action civile pour abus de confiance contre la ou les personnes inconnues. La Cour d'appel d'Angleterre a confirmé l'ordonnance de communication au motif que la [TRADUCTION] « fuite relativement peu importante » avait néanmoins pour objectif de « causer un maximum de dégâts » ([2002] EWCA Civ. 274 (BAILII), par. 54-55 (autorisation d'appel refusée, Chambre des lords, 9 juillet 2002)) et donc qu'il s'agissait manifestement d'un cas où l'« intérêt de la justice » écartait l'application du privilège du secret des sources des journalistes selon la loi du Royaume-Uni intitulée *Contempt of Court Act 1981.* La Cour européenne des droits de l'homme était de l'avis contraire. À l'opposé du demandeur visé dans l'arrêt antérieur de la Cour européenne des droits de l'homme *Goodwin c. Royaume-Uni* du 27 mars 1996, *Recueil des arrêts et décisions* 1996-II, la demanderesse Interbrew n'avait pas demandé d'injonction au Royaume-Uni pour empêcher la publication (c.-à-d. qu'elle n'avait pas exercé les autres recours dont elle disposait pour prévenir le préjudice). Interbrew n'avait pas non plus réussi à démontrer qu'elle ne pouvait compter sur d'autres sources pour obtenir des renseignements sur l'identité de l'auteur de la fuite (par. 69). Le principe des « autres sources » est reconnu en droit canadien depuis l'arrêt *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (C.S.C.-B.), tout comme il l'est au Royaume-Uni. Voir également *John c. Express Newspapers*, [2000] 3 All E.R. 257 (C.A.). Dans l'affaire *Financial Post*, il n'avait même pas été clairement établi que les documents divulgués clandestinement avaient été « falsifiés ».

[67]   Par contre, dans *Sanoma Uitgevers B.V. c. Pays-Bas*, C.E.D.H., n° 38224/03, 31 mars 2009, la cour a confirmé la saisie par la police d'un

2010 SCC 16 (CanLII)

seizure of a CD-ROM from the Dutch magazine *Autoweek* which had photographed an illegal street race on a promise of confidentiality to the participants. The court recognized the potential chilling effect of the seizure and breach of confidentiality but said:

> . . . it does not follow *per se* that the authorities are in all such cases prevented from demanding such handover; whether this is so will depend on the facts of the case. In particular, the domestic authorities are not prevented from balancing the conflicting interests served by prosecuting the crimes concerned against those served by the protection of journalistic privilege; relevant considerations will include the nature and seriousness of the crimes in question, the precise nature and content of the information demanded, the existence of alternative possibilities of obtaining the necessary information, and any restraints on the authorities' procurement and use of the materials concerned. [para. 57]

This all sounds very much like the fourth Wigmore step.

[68]   Accordingly, in my view, the Strasbourg jurisprudence is not of much assistance to the appellants. Both *Goodwin* and *Financial Times* concerned a leak to the media by corporate whistleblowers of confidential internal documents. Neither involved criminal proceedings. Both involved private actions in the U.K. courts where the corporate plaintiffs, in the view of the European Court of Human Rights, had failed to demonstrate a public interest that outweighed the public interest in free expression. *Sanoma* is closer to our case. It is true that the European Court locates journalist-source privilege in art. 10 of the *Convention for the Protection of Human Rights and Fundamental Freedoms*, 213 U.N.T.S. 221, but that is necessarily so because the Convention is the source of its jurisdiction. For the reasons already stated I would not locate journalist-source protection in s. 2(*b*) of the *Charter* but in the common law of privilege that is supportive of it.

CD-ROM auprès du magazine néerlandais *Autoweek* qui avait photographié une course de rue illégale après avoir promis la confidentialité aux participants. La cour a reconnu l'effet potentiellement paralysant d'une saisie et de la rupture de la promesse de confidentialité, mais elle a néanmoins dit :

> Il n'en résulte toutefois pas forcément que les autorités se trouvent dans tous les cas empêchées de requérir pareille remise; la réponse à cette question dépend des faits de la cause. En particulier, il n'est pas interdit aux autorités internes de mettre en balance les intérêts servis par la poursuite des infractions et ceux servis par la protection des sources journalistiques; parmi les éléments à prendre en compte à cet égard figurent la nature et la gravité des infractions en cause, la nature et le contenu précis des informations demandées, la disponibilité d'autres moyens d'obtenir les informations en question et les modalités selon lesquelles les autorités peuvent se procurer et utiliser les éléments concernés. [par. 57]

Cette interprétation s'apparente tout à fait à la quatrième étape du test de Wigmore.

[68]   Je suis donc d'avis que la jurisprudence de Strasbourg n'aide guère les appelants en l'espèce. Tant l'arrêt *Goodwin* que l'arrêt *Financial Times* concernaient des documents internes confidentiels divulgués clandestinement aux médias par des dénonciateurs d'irrégularités. Ni l'un ni l'autre ne portaient sur des poursuites criminelles. Il s'agissait dans les deux cas d'actions privées intentées devant les tribunaux du Royaume-Uni, dans lesquelles, selon la Cour européenne des droits de l'homme, les sociétés demanderesses n'avaient pas établi l'existence d'un intérêt public l'emportant sur l'intérêt public à la liberté d'expression. L'affaire *Sanoma* se rapproche davantage de celle dont nous sommes saisis. Certes, aux yeux de la Cour européenne, le privilège du secret des sources des journalistes tire son origine de l'art. 10 de la *Convention de sauvegarde des droits de l'homme et des libertés fondamentales*, 213 R.T.N.U. 221, mais il ne saurait en être autrement puisque c'est cette dernière qui lui confère sa compétence. Pour les raisons déjà mentionnées, j'estime que la protection des sources des journalistes repose non pas sur l'al. 2*b*) de la *Charte*, mais plutôt sur le privilège de common law qui le sous-tend.

R.  *v.*  NATIONAL POST  *Binnie J.*                    [2010] 1 S.C.R.

[69]   The bottom line is that no journalist can give a source a total assurance of confidentiality. All such arrangements necessarily carry an element of risk that the source's identity will eventually be revealed. In the end, the extent of the risk will only become apparent when all the circumstances in existence at the time the claim for privilege is asserted are known and can be weighed up in the balance. What this means, amongst other things, is that a source who uses anonymity to put information into the public domain maliciously may not in the end avoid a measure of accountability. This much is illustrated by recent events in the United States involving *New York Times* reporter Judith Miller and the subsequent prosecution of her secret source, vice-presidential aide Lewis "Scooter" Libby, arising out of proceedings subsequent to his "outing" of CIA agent Valerie Plame: *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir. 2005), at pp. 968-72. The simplistic proposition that it is always in the public interest to maintain the confidentiality of secret sources is belied by such events in recent journalistic history.

D.  *Were the Elements of a Case-by-Case Privilege Established on the Expanded Record Placed Before the Reviewing Judge in Relation to Suppression of the Physical Evidence?*

[70]   The evidence shows that the communication between Mr. McIntosh and source Y respecting the relationship between the Prime Minister and the BDBC originated in confidence. Had confidentiality not been assured the initial information about Mr. Chrétien's contacts with the BDBC would not have been provided. Secondly, confidentiality was essential to the relationship because without the confidentiality there would have been no disclosure and no relationship. Thirdly, given the importance of investigative journalism in exploring potential conflicts of interest in decision making at the highest levels of government, the relationship between the appellants and their secret sources ought in general to be "sedulously fostered". Mr. McIntosh testified to a belief that his source is sincere in denying

[69]   En définitive, aucun journaliste ne peut donner une garantie de confidentialité absolue à l'une de ses sources. Une telle entente est toujours assortie d'un risque que l'identité de la source soit dévoilée. Il ne sera possible de connaître l'étendue véritable du risque qu'au moment où le privilège sera revendiqué, lorsque toutes les circonstances seront connues et pourront être soupesées. Cela signifie notamment qu'une source qui profite de l'anonymat pour verser de façon malveillante des renseignements dans le domaine public pourrait être tenue de rendre des comptes. On en trouve un bon exemple dans les faits récents survenus aux États-Unis concernant la journaliste du *New York Times*, Judith Miller, et les poursuites engagées par la suite contre sa source secrète, le secrétaire général du vice-président, Lewis « Scooter » Libby, après qu'il eut « divulgué » l'identité de l'agente de la CIA, Valerie Plame : *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir. 2005), p. 968-972. Le principe simpliste selon lequel il est toujours dans l'intérêt public de préserver la confidentialité des sources secrètes est démenti par de telles affaires survenues récemment dans le domaine journalistique.

D.  *Les éléments d'un privilège fondé sur les circonstances de chaque cas ont-ils été établis au vu du dossier amplifié dont disposait la juge siégeant en révision relativement à la rétention des éléments de preuve matérielle?*

[70]   La preuve montre que la communication entre M. McIntosh et la source Y portant sur les rapports entre le premier ministre et la BDC s'est faite sous le sceau de la confidentialité. Sans garantie de confidentialité, les renseignements initiaux concernant les échanges entre la BDC et M. Chrétien n'auraient pas été fournis. Deuxièmement, la garantie de confidentialité était un élément essentiel de la relation : n'eût été de celle-ci, il n'y aurait eu ni divulgation ni relation. Troisièmement, comme il importe que les journalistes d'enquête puissent s'enquérir des conflits d'intérêts potentiels des décideurs au plus haut niveau du gouvernement, la relation entre les appelants et leurs sources secrètes devrait, de façon générale, être « entretenue assidûment ». Dans son témoignage, M. McIntosh a dit

R. *c.* NATIONAL POST   *Le juge Binnie*

2010 SCC 16 (CanLII)

involvement in any offences. The transparency and accountability of government are issues of enormous public importance. The disclosures related to a public controversy over the Prime Minister's relationship to private promoters seeking loans from a federally funded bank. The public ventilation of this controversy, whatever its ultimate merits, was clearly in the public interest.

[71]  Coming now to the "weighing up" at the fourth stage of the Wigmore analysis, the alleged crime was described by Mr. McIntosh himself as "serious". Certainly, the dissemination of forged bank entries designed to "prove" an egregious conflict of personal financial interest on the part of the Prime Minister involving public funds is of sufficient seriousness to justify amply the decision of the police to investigate the criminal allegations within the limits of their ability and resources.

[72]  The real possibility of obtaining DNA evidence or other identification from the envelope was first raised as plausible by the source himself or herself in conversation with Mr. McIntosh. This suggests that even X believed that forensic testing could advance the investigation to his or her detriment. Apart from anything else, we do not know what other evidence (if any) the police possess or to whom they are attempting to find a DNA match. While it is appropriate under the fourth Wigmore criterion to assess the likely probative value of the evidence sought, the reviewing judge ought not to have pre-empted the forensic investigation by seemingly prejudging the outcome when she wrote that "[d]isclosure of the document will minimally, if at all, advance the investigation" (para. 79) without first considering all the relevant factors in her assessment.

croire à la sincérité de sa source qui nie être impliquée dans les infractions. La transparence et l'obligation redditionnelle du gouvernement sont des questions d'une importance fondamentale pour le public. En l'espèce, les divulgations concernaient une controverse publique portant sur les rapports du premier ministre avec des promoteurs privés qui cherchaient à obtenir des prêts d'une banque fédérale. Il ne fait pas de doute qu'il était dans l'intérêt public que cette controverse soit révélée, peu importe que, tout compte fait, elle s'avère fondée ou non.

[71]  Passons maintenant à la « pondération » de la quatrième étape du test de Wigmore. Selon M. McIntosh lui-même, le prétendu crime était « grave ». Certes, le fait de divulguer des écritures bancaires falsifiées dans le but d'« établir » l'existence d'un conflit flagrant d'intérêts financiers impliquant le premier ministre personnellement et mettant en jeu des fonds publics est suffisamment grave pour justifier amplement la décision de la police d'enquêter sur les allégations criminelles dans les limites de sa compétence et de ses ressources.

[72]  La source elle-même, lors d'une conversation avec M. McIntosh, a été la première à qualifier de plausible la possibilité concrète d'obtenir, à partir de l'enveloppe, des éléments de preuve, notamment sous forme d'empreinte génétique, qui permettraient de l'identifier. Cela laisse croire que la source elle-même pensait qu'une analyse criminalistique risquait de faire avancer l'enquête à son détriment. En dépit de tout le reste, nous ne savons pas quels autres éléments de preuve la police détient (si elle en détient) ni quelle est la personne dont elle tente d'associer l'ADN à l'échantillon prélevé. Bien qu'il soit approprié à la quatrième étape du test de Wigmore d'évaluer la valeur probante éventuelle de la preuve recherchée, la juge siégeant en révision n'aurait pas dû anticiper l'enquête criminalistique en en préjugeant apparemment le résultat en ces termes : [TRADUCTION] « La divulgation ne fera que très peu, voire aucunement, progresser l'enquête » (par. 79) sans d'abord tenir compte de tous les facteurs pertinents dans son évaluation.

[73]   My colleague Abella J. shares Benotto J.'s pessimism regarding the fruitfulness of forensic analysis in this case. However, the reviewing judge Benotto J. seemed to focus on fingerprint evidence and did not canvass the merits of DNA analysis, yet DNA analysis is capable of producing results even under exceptionally unpromising circumstances (as was shown in the exoneration of Guy Paul Morin). It cannot be correct that the RCMP forensic lab should be prevented from applying well-established modes of analysis to pieces of physical evidence that have been directly linked to a serious crime simply on the basis that in the end such analysis *may* prove to be unsuccessful. I agree with the Ontario Court of Appeal that the reviewing judge's exercise of discretion was, in these circumstances, unreasonable.

[74]   Moreover, let us suppose that Benotto J. and my colleague Abella J. are correct in their scepticism about the outcome of the forensic analysis, and that the envelope is extremely unlikely to disclose the identity of Mr. McIntosh's secret source(s). The court in that event would have to balance the weak public interest in protecting an identity that is not likely to be disclosed against the strong public interest in the production of physical evidence of the offense. On this alternative view, as well, the injury that is likely to result from disclosure does not outweigh the public interest in correctly disposing of the criminal investigation.

[75]   In her reasons Abella J. refers to the "fatal disconnect between the envelope, the documents, the identity of X and the alleged forgery" (para. 134). This conclusion hinges on the credibility of X's story that he or she was not the perpetrator of the forgery, but an innocent recipient, who passed it on to Mr. McIntosh in good faith. I do not think the police are required to accept as true the version of events told by X as relayed through Mr. McIntosh, who has his own interest in the outcome of this litigation. The police believe, and all three courts below accepted, that there *are* reasonable grounds to believe that entries had been forged on

[73]   Ma collègue, la juge Abella, partage le pessimisme de la juge Benotto à l'égard du résultat de l'analyse criminalistique en l'espèce. Toutefois, la juge Benotto, siégeant en révision, semble s'être surtout intéressée aux empreintes digitales, et non au bien-fondé d'une analyse génétique. Or, l'analyse génétique peut produire des résultats même dans des circonstances très peu prometteuses (comme l'a démontré l'affaire de Guy Paul Morin, qui a été innocenté). Il ne saurait être acceptable que le laboratoire judiciaire de la GRC soit empêché d'appliquer des méthodes d'analyse bien établies à des éléments de preuve matérielle directement liés à un crime grave simplement parce que l'analyse *pourrait*, au bout du compte, se révéler infructueuse. Je souscris à l'opinion de la Cour d'appel de l'Ontario selon laquelle la juge siégeant en révision a exercé son pouvoir discrétionnaire de façon déraisonnable dans les circonstances.

[74]   De plus, supposons que la juge Benotto et ma collègue, la juge Abella, ont raison d'être sceptiques au sujet du résultat de l'analyse criminalistique et que l'enveloppe ne révélera très probablement pas l'identité de la ou des sources secrètes de M. McIntosh. Le tribunal devrait alors mettre en balance le faible intérêt public à la protection d'une identité qui ne sera vraisemblablement pas divulguée et le fort intérêt public à la production d'un élément de preuve matérielle de l'infraction. Même de ce point de vue différent, le préjudice qui risque de résulter de la divulgation ne l'emporte pas sur l'intérêt public à ce que l'enquête criminelle soit menée à bien.

[75]   De l'opinion de la juge Abella, il n'existe « aucun lien entre l'enveloppe, les documents, l'identité de X et le prétendu faux, et cette absence de lien est fatale » (par. 134). Cette conclusion dépend de la crédibilité du récit de X, qui nie être l'auteur du faux et prétend plutôt avoir reçu le document en toute innocence et l'avoir transmis à M. McIntosh de bonne foi. Je ne pense pas que la police doive tenir pour avérée la version des faits donnée par X et rapportée par M. McIntosh, qui est aussi une partie intéressée dans l'issue du litige. La police estime qu'il *existe* des motifs raisonnables de croire que des écritures sur le document

the alleged bank document. In my view the police need not accept X's anonymous, uncorroborated and self-exculpatory statements as a reason to terminate their investigation of the physical evidence any more than they need accept the disclaimers of any other potential witness to a crime, especially when the witness may also be the perpetrator.

[76]   I accept, of course, that the problematic transmission from X must be assessed in light of a history of providing information and documents that turned out to be authentic. Nevertheless, it appears from Corporal Gallant's statement in a passage cited by Abella J. (para. 137), that he had no reason to believe that what X said on this particular occasion was true. Nor was he obliged to proceed on the basis that it was true. A denial of criminal involvement, whether communicated directly or indirectly, is not a sufficient ground to put an end to a serious criminal investigation, even where the intermediate (though not the ultimate) intended victim of the alleged crime happens to be a media organization.

[77]   Recognizing the seriousness of the situation Mr. McIntosh says he told the source that notwithstanding his earlier "blanket, unconditional promise of confidentiality to protect the identity of both X and Y" (McIntosh Affidavit, at para. 156), he would not now consider himself bound by that promise "should irrefutable evidence" emerge that the document had been provided "to deliberately mislead me" (para. 227). It is the courts, however, and not individual journalists or media outlets, that must ultimately determine whether the public interest requires disclosure. Mr. McIntosh's belief in the good faith of his source cannot prevent the courts from reaching a different conclusion. Moreover, as Laskin and Simmons JJ.A. noted, "[t]he document and the envelope are not merely pieces of evidence tending to show that a crime has been committed. They are the very *actus reus* [or *corpus delicti*] of the alleged crime" (para. 115). In such circumstances the identity of the individual who shipped Mr. McIntosh the forged document

bancaire ont été contrefaites et les trois tribunaux d'instance inférieure ont retenu cette hypothèse. À mon avis, la police n'est pas plus tenue de mettre fin à son enquête sur un élément de preuve matérielle sur la foi des déclarations anonymes, non corroborées et disculpatoires de X qu'elle n'est tenue d'ajouter foi aux dénégations de tout autre témoin potentiel, à plus forte raison quand ce dernier pourrait être aussi l'auteur du crime.

[76]   Je reconnais, bien sûr, qu'il faut examiner la transmission problématique d'un document par X en tenant compte du fait qu'il avait déjà transmis une série de renseignements et de documents qui se sont avérés authentiques. Malgré tout, il ressort d'un passage de la déclaration du caporal Gallant cité par le juge Abella, au par. 137, qu'il n'avait aucune raison de croire que ce que X avait dit cette fois était vrai. Il n'était pas non plus tenu d'agir comme si c'était vrai. La dénégation de toute participation à une activité criminelle, reçue directement de son auteur ou rapportée par quelqu'un d'autre, ne constitue pas une raison suffisante pour mettre un terme à une enquête sur une infraction grave, même si c'est un organe de presse qui est la cible intermédiaire (et non la cible ultime) du prétendu crime.

[77]   Reconnaissant la gravité de la situation, M. McIntosh dit avoir mentionné à sa source qu'en dépit du fait qu'il avait préalablement consenti [TRADUCTION] « une promesse générale et inconditionnelle de confidentialité pour protéger l'identité de X et Y » (affidavit de M. McIntosh, par. 156), il ne s'estimerait plus lié par sa promesse si [TRADUCTION] « une preuve contraire irréfutable » devait démontrer que le document lui avait été fourni « dans le but délibéré de [l']induire en erreur » (par. 227). Toutefois, il incombe aux tribunaux, et non aux journalistes ou aux médias, de déterminer si l'intérêt public exige la divulgation. Même si M. McIntosh croit en la bonne foi de sa source, les tribunaux peuvent arriver à une conclusion différente. De plus, comme les juges d'appel Laskin et Simmons l'ont fait remarquer, [TRADUCTION] « [l]e document et l'enveloppe ne sont pas de simples éléments de preuve tendant à démontrer qu'un crime a été commis. Ils constituent l'*actus reus* même [ou le *corpus delicti*] du crime reproché » (par. 115).

2010 SCC 16 (CanLII)

R. *v.* NATIONAL POST   *Binnie J.*

has no continuing claim to the protection of the law.

E. *Notwithstanding a Finding That the Appellants Have Not Established Secret Source Privilege on the Facts of This Case, Were the Court Orders Nevertheless "Unreasonable" Within the Meaning of Section 8 of the Charter?*

[78]   Even where no privilege is found to exist, warrants and assistance orders against the media must take into account their "special position" and be reasonable in the "totality of circumstances" as required by s. 8 of the *Charter* ("Everyone has the right to be secure against unreasonable search and seizure"). It is not sufficient for the Crown to establish that the formal statutory requirements of ss. 487.01 and 487.02 were met. Physical searches of media premises may be highly disruptive. Searches may cause temporary or even permanent suspension of print publication or broadcasting. Search warrant cases like this one constitute a head-to-head clash between the government and the media, and the media's ss. 2(*b*) and 8 interests are clearly implicated. As McLachlin J. observed in her dissenting reasons in *Lessard*:

The ways in which police search and seizure may impinge on the values underlying freedom of the press are manifest. First, searches may be physically disruptive and impede efficient and timely publication. Second, retention of seized material by the police may delay or forestall completing the dissemination of the news. Third, confidential sources of information may be fearful of speaking to the press, and the press may lose opportunities to cover various events because of fears on the part of participants that press files will be readily available to the authorities. Fourth, reporters may be deterred from recording and preserving their recollections for future use. Fifth, the processing of news and its dissemination may be chilled by the prospect that searches will disclose internal editorial deliberations. Finally, the press may resort to self-censorship to conceal the fact that it possesses information that may be of interest to the police in an effort to protect its sources

Dans de telles circonstances, le droit ne saurait continuer à protéger l'identité de la personne qui a transmis le document contrefait à M. McIntosh.

E. *Malgré la conclusion que les appelants n'ont pas établi l'existence d'un privilège protégeant les sources secrètes au vu des faits de l'espèce, les ordonnances étaient-elles néanmoins « abusives » au sens de l'art. 8 de la Charte?*

[78]   Même si l'on ne conclut pas à l'existence d'un privilège, les mandats de perquisition et les ordonnances d'assistance visant les médias doivent tenir compte de leur « situation très particulière » et être raisonnables compte tenu de « l'ensemble des circonstances » comme le requiert l'art. 8 de la *Charte* (« Chacun a droit à la protection contre les fouilles, les perquisitions ou les saisies abusives »). Il ne suffit pas pour le ministère public d'établir que les exigences formelles énoncées aux art. 487.01 et 487.02 ont été respectées. Les perquisitions dans les locaux des médias peuvent entraîner de très graves perturbations. Elles peuvent avoir pour effet la suspension temporaire — ou même permanente — de la publication ou de la diffusion. Les affaires concernant des mandats de perquisition comme celle qui nous occupe opposent ouvertement le gouvernement et les médias, et mettent manifestement en jeu les droits que l'al. 2*b*) et l'art. 8 garantissent aux médias. Comme le dit la juge McLachlin dans ses motifs de dissidence dans l'arrêt *Lessard* :

Les façons dont les perquisitions et les saisies effectuées par la police peuvent empiéter sur les valeurs qui sous-tendent la liberté de la presse sont manifestes. Premièrement, les perquisitions peuvent entraîner des perturbations sur le plan matériel et empêcher la publication efficace et opportune du journal. Deuxièmement, la retenue par les policiers d'objets saisis peut retarder ou empêcher la diffusion complète des informations. Troisièmement, les sources confidentielles de renseignements peuvent craindre de parler aux journalistes, et la presse peut ainsi perdre des chances d'assurer la couverture de différents événements en raison des craintes des participants que les autorités puissent facilement prendre connaissance des dossiers de la presse. Quatrièmement, cela peut dissuader les journalistes d'enregistrer et de conserver les renseignements recueillis pour s'en servir ultérieurement. Cinquièmement, le traitement et la diffusion des informations peuvent être gênés par

and its ability to gather news in the future. All this may adversely impact on the role of the media in furthering the search for truth, community participation and self-fulfillment. [p. 452]

[79]   As previously observed, *Lessard* laid down nine conditions to provide a suitable framework to assess s. 8 reasonableness in a s. 2(*b*) context. The first requirement, of course, is that the statutory prerequisites of s. 487.01 are met. Here the issuing judge held, and both the reviewing judge (Benotto J.) and the Court of Appeal have affirmed, that the police established reasonable grounds to believe that criminal offences have been committed and that information relevant to those offences will be obtained through the use of the search warrant and the supporting assistance order. Nevertheless, the appellants have raised a number of issues in addition to journalistic-confidential source privilege which, they argue, are fatal to the reasonableness of the general warrant and assistance order.

### (1)   The Issue of Notice to the Media

[80]   The reviewing judge, Benotto J., concluded that "[g]iven the public interest at stake, this is one of the rare instances where failure on the part of the justice to give notice amounts to a jurisdictional error" (para. 84 (emphasis added)). It is true that different standards govern before and after a warrant is issued. On the warrant application, the burden is on the police to show reasonable and probable grounds. Once the warrant has been issued, however, the burden shifts to the media applicant on the motion to quash to establish that there was no reasonable basis for its issuance. Moreover, the reviewing judge is generally bound, in deciding this issue, to afford a measure of deference to the determination of the issuing justice.

l'éventualité que les délibérations internes de la rédaction soient rendues publiques à la suite de perquisitions. En dernier lieu, la presse peut recourir à l'auto-censure pour cacher le fait qu'elle est en possession de renseignements qui peuvent intéresser les policiers, dans le but de protéger ses sources et sa capacité de recueillir des informations à l'avenir. Tout cela peut avoir des répercussions néfastes sur le rôle joué par les médias pour favoriser la recherche de la vérité, la participation au sein de la collectivité et l'accomplissement personnel. [p. 452]

[79]   Comme je l'ai déjà souligné, l'arrêt *Lessard* a établi neuf conditions pour encadrer convenablement l'analyse du caractère abusif au sens de l'art. 8 dans le contexte de l'application de l'al. 2*b*). La première veut, évidemment, que les prescriptions de l'art. 487.01 soient respectées. En l'espèce, le juge ayant décerné le mandat a conclu que les policiers avaient démontré l'existence de motifs raisonnables de croire que des infractions criminelles avaient été commises et que le mandat de perquisition ainsi que l'ordonnance d'assistance permettraient d'obtenir des renseignements pertinents, conclusion que tant la juge siégeant en révision (la juge Benotto) que la Cour d'appel ont confirmée. Les appelants ont quand même soulevé, outre la question du privilège du secret des sources des journalistes, un certain nombre d'arguments qui, prétendent-ils, établissent le caractère abusif du mandat de perquisition général et de l'ordonnance d'assistance.

### (1)   La question de l'avis au média

[80]   La juge Benotto, qui siégeait en révision, a statué que [TRADUCTION] « [c]ompte tenu de l'intérêt public en jeu, il s'agit de l'un de ces rares cas où l'omission du juge de donner un avis constitue une erreur juridictionnelle » (par. 84 (je souligne)). Certes, des normes différentes s'appliquent avant et après la délivrance d'un mandat. À l'étape de la demande de mandat, il incombe à la police de démontrer l'existence de motifs raisonnables et probables. Toutefois, une fois le mandat décerné, il revient au média demandeur, dans la requête en annulation, de démontrer l'absence de motifs raisonnables. De plus, le juge siégeant en révision est habituellement tenu, à cet égard, de faire preuve d'une certaine retenue à l'égard de la décision du juge qui a entendu la demande de mandat.

[81]   In *R. v. Canadian Broadcasting Corp.* (2001), 52 O.R. (3d) 757 (Ont. C.A.), leave to appeal dismissed, [2001] 2 S.C.R. vii, Moldaver J.A. noted that failure to give notice to the media *could* constitute jurisdictional error in some instances, but he considered such a possibility to be "remote in the extreme" (para. 5).

[82]   However, in *New Brunswick* the majority of this Court held that the special position of the media did not "import any new or additional [procedural] requirements" (p. 475). McLachlin J., dissenting in *Lessard*, observed that "[i]n some cases", a justice *may* wish to hear from media representatives on whether a warrant should issue (p. 457). In her view, notice was a matter of discretion and did not rise to a constitutional requirement. See also *R. v. Serendip Physiotherapy Clinic* (2004), 73 O.R. (3d) 241 (C.A.).

[83]   I agree with the appellants that the media should have the opportunity to put their case against the warrant at the earliest reasonable opportunity, but the timing is generally a matter within the discretion of the issuing judge. There may be circumstances where the best course of action will be to proceed as Khawly J. did here. Given the broad definition of "media" and "journalists" covered by a potential claim for privilege, the issuing judge may conclude that an outstanding warrant will help ensure that the evidence is not made to disappear while the merits of issuing a warrant are debated. An issued and outstanding warrant may discourage such misconduct. There will be cases of urgency or other circumstances supporting the need to proceed *ex parte*. In the absence of such circumstances the issuing judge may well conclude that it is desirable to proceed on notice to the media organization rather than *ex parte*.

[84]   Morever, where the issuing judge does proceed *ex parte*, adequate terms must be inserted in

any warrant to protect the special position of the media, and to permit the media ample time and opportunity to point out why, on the facts, the warrant should be set aside. The warrant and assistance order made by Khawly J. in this case allowed a period of a month between its issuance and its execution to ensure the appellants' ability to move to quash it before any seizure occurred. This procedure allowed the appellants to assemble an evidentiary record more ample than would have been possible on short notice. The appellants took full advantage of the opportunity thus provided. The record in this case fills 16 volumes. The review procedure lasted from the filing of an application to quash the warrant dated July 30, 2002 until its disposition by Benotto J. by judgment dated January 21, 2004. In these circumstances I do not believe the issues of onus and deference can or should play a significant role in the outcome, especially given the court's concern for the special position of the media in the context of the public interest.

[85]  The appellants contend that the secret source issue was not adequately brought to Khawly J.'s attention. However, even a cursory reading of the affidavit and the attached correspondence included in the Information to Obtain made clear that the secret source issue lay at the heart of the controversy. In an appended letter to Crown counsel dated December 19, 2001, counsel for the *National Post* stated: "The search for this plain brown envelope is justified, if at all, by the belief that it could identify a confidential source . . . we are gravely concerned about the seriousness of the constitutional violation that is about to occur" (emphasis added). Counsel made similar statements in several of the other documents appended to the Information to Obtain. Given the disclosure of these facts, Khawly J. undoubtedly realized that his decision would simply be a stepping stone to a constitutional battle in the higher courts and proceeded accordingly.

assortir ce dernier de conditions adéquates pour protéger la situation très particulière du média et lui donner amplement le temps et la possibilité de justifier l'annulation du mandat, au vu des faits. Le mandat de perquisition et l'ordonnance d'assistance accordés par le juge Khawly en l'espèce prévoyaient un délai d'un mois avant leur exécution de sorte que les appelants puissent demander leur annulation avant toute saisie. Cette façon de procéder leur permettait de constituer un dossier de preuve plus complet que celui qu'ils auraient pu présenter s'ils avaient obtenu un court préavis. Les appelants ont pleinement profité de l'occasion qui leur était ainsi fournie. Leur dossier compte seize volumes. La procédure de révision a débuté au moment du dépôt d'une demande en annulation datée du 30 juillet 2002 et s'est terminée le 21 janvier 2004, date à laquelle la juge Benotto a rendu sa décision. Dans ces circonstances, je ne pense pas que les questions de fardeau et de retenue puissent ou doivent influer sur le résultat, surtout compte tenu de l'attention que le tribunal a portée à la situation très particulière des médias dans le contexte de l'intérêt public.

[85]  Les appelants prétendent que la question de la source secrète n'a pas été bien présentée au juge Khawly. Toutefois, il ressort clairement d'une lecture même rapide de l'affidavit et de la correspondance qui y est jointe, reproduite dans la dénonciation en vue d'obtenir un mandat de perquisition, que la question des sources secrètes est au cœur de la controverse. Dans une lettre datée du 19 décembre 2001 jointe en annexe et destinée à l'avocat du ministère public, l'avocate du *National Post* a écrit ce qui suit : [TRADUCTION] « La perquisition en vue de trouver l'enveloppe brune ordinaire est justifiée, le cas échéant, par la conviction qu'elle permettra éventuellement d'identifier une source confidentielle [. . .] nous sommes très préoccupés par la gravité de la violation constitutionnelle qui est sur le point de se produire » (je souligne). L'avocate a tenu des propos similaires dans plusieurs autres documents annexés à la dénonciation. Compte tenu de ces faits, le juge Khawly a certainement compris que sa décision ne serait qu'une étape d'une bataille constitutionnelle qui se livrerait devant les tribunaux supérieurs et il a agi en conséquence.

R. *v.* NATIONAL POST   *Binnie J.*

2010 SCC 16 (CanLII)

[86]   Khawly J. gave no reasons for proceeding *ex parte* but the appellants' position was fully protected by the terms of his order and they have not demonstrated any prejudice on that account. I agree with the Court of Appeal that the *ex parte* nature of Khawly J.'s order is not a ground for setting the warrant aside on the facts of this case.

#### (2)   Other *Lessard* Conditions

[87]   Apart from the issue of confidential sources, already dealt with, the general warrant in this case complied with other *Lessard* conditions designed to respect the special position of the media. A detailed affidavit established that the search of a newspaper office was a necessity of last resort, as required by *Re Pacific Press*; *Descôteaux v. Mierzwinski*, [1982] 1 S.C.R. 860, and the cases that followed. This affirmative finding under s. 487.01 established the grounds for the search and compelled the appellants to invoke confidential source privilege by meeting the Wigmore test, which they failed to do, in my opinion. The order of Khawly J. set out conditions governing the search to ensure "that the media organization will not be unduly impeded [by a physical search] in the publishing or dissemination of the news" (*Lessard*, at p. 445). Perhaps most importantly, the order contained the usual clause directing that any documents seized be sealed on request.

[88]   The appellants have not established any deficiency in the procedure laid out in the order.

#### (3)   The Assistance Order

[89]   The appellants strongly object to the issuance of an assistance order that directed the editor-in-chief of the *National Post* "to take such steps as are necessary" to give effect to the search warrant (A.R., vol. 1, at p. 7). On the evidence before Khawly J., both Mr. McIntosh and other representatives of the *National Post* had made statements

[86]   Le juge Khawly n'a pas motivé sa décision d'entendre la demande *ex parte*, mais la situation des appelants était entièrement protégée par les conditions de l'ordonnance; du reste, ils n'ont démontré aucun préjudice à cet égard. Je souscris à l'opinion de la Cour d'appel selon laquelle le caractère *ex parte* de l'ordonnance rendue par le juge Khawly ne justifie pas l'annulation du mandat au vu des faits de l'affaire.

#### (2)   Autres conditions énoncées dans *Lessard*

[87]   Outre la question des sources confidentielles, dont nous avons traité précédemment, le mandat général respectait les autres conditions énoncées dans l'arrêt *Lessard*, qui visent à tenir compte de la situation très particulière des médias. Un affidavit détaillé a permis d'établir que la perquisition dans les locaux d'un journal était une mesure de dernier recours, ce qu'il faut démontrer suivant *Re Pacific Press*; *Descôteaux c. Mierzwinski*, [1982] 1 R.C.S. 860, et les jugements ultérieurs. Cette conclusion tirée en application de l'art. 487.01 établit l'existence des motifs justifiant une perquisition et a forcé les appelants à invoquer le privilège du secret des sources en appliquant le test de Wigmore, auquel ils n'ont pas satisfait, à mon avis. L'ordonnance du juge Khawly assortissait la perquisition de conditions visant à garantir « que le média ne soit pas indûment empêché [par une perquisition] de publier ou de diffuser les informations » (*Lessard*, p. 445). Fait peut-être plus important encore, l'ordonnance contenait la condition habituelle prévoyant la mise sous scellés sur demande de tout document saisi.

[88]   Les appelants n'ont pas établi que la procédure prévue dans l'ordonnance comportait des vices.

#### (3)   L'ordonnance d'assistance

[89]   Les appelants s'opposent énergiquement au prononcé d'une ordonnance d'assistance qui enjoint au rédacteur en chef du *National Post* de prendre [TRADUCTION] « toute mesure jugée nécessaire » pour donner effet au mandat de perquisition (d.a., vol. 1, p. 7). Il ressort de la preuve soumise au juge Khawly que tant M. McIntosh que d'autres

R.  *c.*  NATIONAL POST   *Le juge Binnie*

suggesting that while the items described in the search warrant had been deliberately hidden they were within the control of the *National Post.* For instance, on December 13, 2001 counsel for the *National Post* advised Corporal Gallant that "the newspaper does not intend to deliver up to you the 'plain brown envelope with no return address' as referred to by Andrew McIntosh . . . at the Toronto meeting" (A.R., vol. 2, at p. 27). Correspondence from counsel for the *National Post* treated the protection of the source's confidentiality as a *National Post* issue not just a McIntosh issue (A.R., vol. 2, at pp. 27-30). Given the concerted action between Mr. McIntosh and his editor-in-chief, it was entirely reasonable for the issuing judge to enlist the assistance of the editor-in-chief in locating and producing the concealed document.

[90]  The appellants claim that the assistance order turns the editor-in-chief into an "agent of the police" in the collection of evidence. This is overly dramatic. Editors, journalists and sources do not, by reason of the important roles they play, cease to be members of the community in which they live. The claim for privilege in this case is rejected. The editor-in-chief, as every other member of the community, is required in the ordinary way to respect the law. From the media perspective, assistance orders requiring the surrender of the document are surely preferable to a physical search of the media premises. In my view, the assistance order was reasonable within the meaning of s. 8 of the *Charter.*

V.   Conclusion

[91]   I conclude that in the facts of this case the appellants have not established that the public interest in the protection of their secret source(s) outweighs the public interest in the production of the physical evidence of the alleged crimes. For this reason, and also because the warrant as issued was entirely respectful of the special position of the media, I conclude that the warrant and assistance order were properly issued and must be complied with even if the result is to disclose the identity of

représentants du *National Post* ont fait des déclarations selon lesquelles, bien que les éléments dont il est fait mention dans le mandat de perquisition aient été cachés de façon délibérée, le *National Post* en a le contrôle. Ainsi, le 13 décembre 2001, l'avocat du *National Post* a écrit au caporal Gallant : [TRADUCTION] « . . . le journal n'a pas l'intention de vous remettre "l'enveloppe brune ordinaire sans adresse de retour" qu'Andrew McIntosh a mentionnée [. . .] lors de l'entretien tenu à Toronto » (d.a., vol. 2, p. 27). La lettre de l'avocat du *National Post* montre que la question de la protection de la confidentialité de la source touche le *National Post* et pas seulement M. McIntosh (d.a., vol. 2, p. 27-30). Étant donné que M. McIntosh et le rédacteur en chef ont agi de concert, il était tout à fait raisonnable que le juge qui a décerné le mandat ordonne au rédacteur en chef de prêter son assistance en vue de trouver et de produire le document caché.

[90]   Les appelants soutiennent que l'ordonnance d'assistance fait du rédacteur en chef un « mandataire de la police » dans la collecte des éléments de preuve. Ils dramatisent indûment la situation. Les rédacteurs en chef, les journalistes et les sources ne cessent pas d'être des membres de leur collectivité en raison du rôle important qu'ils jouent. La revendication du privilège est rejetée dans le présent dossier. Le rédacteur en chef, à l'instar de tout autre membre de la collectivité, doit respecter la loi de la manière ordinaire. Pour les médias, une ordonnance d'assistance exigeant la remise du document est sans doute préférable à une perquisition dans leurs locaux. Selon moi, l'ordonnance d'assistance n'était pas abusive au sens de l'art. 8 de la *Charte.*

V.   Conclusion

[91]   Compte tenu des faits de la présente affaire, je conclus que les appelants n'ont pas établi que l'intérêt public à la protection de la ou des sources secrètes l'emporte sur l'intérêt public à la production des éléments de preuve matérielle des crimes reprochés. Pour cette raison, et également parce que le mandat de perquisition décerné tenait parfaitement compte de la situation très particulière des médias, j'estime que le mandat et l'ordonnance d'assistance ont été délivrés régulièrement et doivent être

R. *v.* NATIONAL POST   *Binnie J.*

the "secret source" who, on the evidence, "uttered" a forged document. The appeal will therefore be dismissed without costs.

[92]   The constitutional questions will be answered as follows:

1.   In the context of a relationship between a journalist and a confidential source, when the state seeks to compel the production of information that could identify the source, does the common law Wigmore framework of case-by-case privilege infringe the principle of freedom of the press guaranteed by s. 2(*b*) of the *Canadian Charter of Rights and Freedoms*?

Answer:   No.

2.   If so, is the infringement a reasonable limit prescribed by law as can be demonstrably justified in a free and democratic society under s. 1 of the *Canadian Charter of Rights and Freedoms*?

Answer:   It is unnecessary to answer this question.

3.   Does s. 487.02 of the *Criminal Code*, R.S.C. 1985, c. C-46, when employed to compel a media organization or journalist to assist in giving effect to an authorization, warrant or order, infringe the principle of freedom of the press guaranteed by s. 2(*b*) of the *Canadian Charter of Rights and Freedoms*?

Answer:   No.

4.   If so, is the infringement a reasonable limit prescribed by law as can be demonstrably justified in a free and democratic society under s. 1 of the *Canadian Charter of Rights and Freedoms*?

Answer:   It is unnecessary to answer this question.

5.   Does s. 487.02 of the *Criminal Code*, R.S.C. 1985, c. C-46, when employed to compel a media organization or journalist to assist in giving effect to an authorization, warrant or order, infringe s. 8 of the *Canadian Charter of Rights and Freedoms*?

respectés même au risque que soit dévoilée l'identité de la « source secrète » qui, au vu de la preuve, a « mis en circulation » un document contrefait. L'appel est donc rejeté sans dépens.

[92]   Les questions constitutionnelles doivent recevoir les réponses suivantes :

1.   Dans le contexte des relations entre un journaliste et une source confidentielle, lorsque l'État cherche à contraindre à la production de renseignements susceptibles de permettre l'identification de la source, le cadre du privilège fondé sur les circonstances de chaque cas selon le critère de Wigmore en common law porte-t-il atteinte au principe de liberté de presse garanti par l'al. 2*b*) de la *Charte canadienne des droits et libertés*?

Réponse : Non.

2.   Dans l'affirmative, s'agit-il d'une atteinte constituant une limite raisonnable, établie par une règle de droit et justifiée dans le cadre d'une société libre et démocratique au sens de l'article premier de la *Charte canadienne des droits et libertés*?

Réponse : Il n'est pas nécessaire de répondre à cette question.

3.   L'article 487.02 du *Code criminel*, L.R.C. 1985, ch. C-46, lorsqu'il est invoqué pour contraindre un organe de presse ou un journaliste à prêter son assistance pour l'exécution d'une autorisation, d'un mandat ou d'une ordonnance, porte-t-il atteinte au principe de liberté de presse garanti par l'al. 2*b*) de la *Charte canadienne des droits et libertés*?

Réponse : Non.

4.   Dans l'affirmative, s'agit-il d'une atteinte constituant une limite raisonnable, établie par une règle de droit et justifiée dans le cadre d'une société libre et démocratique au sens de l'article premier de la *Charte canadienne des droits et libertés*?

Réponse : Il n'est pas nécessaire de répondre à cette question.

5.   L'article 487.02 du *Code criminel*, L.R.C. 1985, ch. C-46, lorsqu'il est invoqué pour contraindre un organe de presse ou un journaliste à prêter son assistance pour l'exécution d'une autorisation, d'un mandat ou d'une ordonnance, porte-t-il atteinte à l'art. 8 de la *Charte canadienne des droits et libertés*?

Answer:   No.

6.  If so, is the infringement a reasonable limit pre-scribed by law as can be demonstrably justified in a free and democratic society under s. 1 of the *Canadian Charter of Rights and Freedoms*?

Answer:   It is unnecessary to answer this ques-tion.

The following are the reasons delivered by

[93]   LEBEL J. — I have read the reasons of my colleagues Binnie and Abella JJ. I agree with Binnie J. that there should be no class privilege to protect communications between journalists and their sources, and that claims of journalist-source privilege should be resolved on a case-by-case basis applying the Wigmore criteria. I am in par-ticular agreement with his weighing of the relevant rights and interests at the last stage of the Wigmore analysis.

[94]   However, and with respect for the contrary view of Binnie J., I agree with Abella J. that notice should have been given to the *National Post* in this case. In my opinion, when an application for a search warrant is made, there should, as Abella J. recommends, be a presumptive requirement of notice to the affected media organization. While valid questions may remain as to what constitutes a media organization for the purpose of giving notice, there can be no dispute in the present appeal that a large news media business like the *National Post* belongs to this class.

[95]   Even in the most traditional format, the print media, such organizations play a key role in dis-seminating information and triggering debate on public issues. The process of applying for a search warrant should be sensitive to the need to prevent undue or overly intrusive interference in their oper-ations, regardless of whether the activity in ques-tion is investigation, reporting or commentary. The presumption of a notice requirement would allow media organizations to raise their concerns at the

Réponse :  Non.

6.  Dans l'affirmative, s'agit-il d'une atteinte consti-tuant une limite raisonnable, établie par une règle de droit et justifiée dans le cadre d'une société libre et démocratique au sens de l'article premier de la *Charte canadienne des droits et libertés*?

Réponse :  Il n'est pas nécessaire de répondre à cette question.

Version française des motifs rendus par

[93]   LE JUGE LEBEL — J'ai pris connaissance des motifs de mes collègues les juges Binnie et Abella. Je conviens avec le juge Binnie qu'aucun privi-lège générique ne devrait protéger les communica-tions entre les journalistes et leurs sources et que la revendication du privilège du secret des sources des journalistes doit être tranchée au cas par cas par l'application du test de Wigmore. Je souscris tout particulièrement à la pondération par mon collègue des droits et des intérêts pertinents au dernier volet de cette analyse.

[94]   Cependant, avec égard pour l'opinion contraire du juge Binnie, je partage l'avis de la juge Abella selon laquelle le *National Post* aurait dû recevoir un préavis en l'espèce. Selon moi, et comme le recommande la juge Abella, une demande de mandat de perquisition devrait être présumée emporter l'obligation de donner un pré-avis au média visé. Bien qu'on puisse s'interroger avec raison sur ce qui constitue un média aux fins de la communication d'un préavis, il ne fait aucun doute en l'espèce qu'une importante entreprise de presse comme le *National Post* entre dans la défi-nition d'un média.

[95]   Même dans leur manifestation la plus tradi-tionnelle, soit la presse écrite, les médias jouent un rôle essentiel en diffusant l'information et en sus-citant des débats sur des questions d'intérêt public. La procédure de demande d'un mandat de perqui-sition doit donc tenir compte de la nécessité d'évi-ter des interventions indues ou trop envahissantes dans leurs activités, que ces dernières tiennent du journalisme d'enquête, du reportage ou du com-mentaire. L'obligation présumée d'aviser les médias

2010 SCC 16 (CanLII)

first opportunity, thereby precluding or minimizing unnecessary intrusions into their activities.

[96]   I emphasize that this requirement should be presumptive. If the applicant feels that notice should not be given because the situation is urgent or because the information or documents being sought might be lost, the application should state this and explain why the notice requirement should be waived. It would then fall to the authorizing judge to determine whether the requirement should in fact be waived and to craft conditions that would, so far as possible, limit interference with the operations of the affected media organization.

[97]   In the circumstances of this case, however, I do not think that the lack of notice rendered the search unreasonable. Moreover, since the authorizing judge proceeded on the basis of established law, I would not quash the search warrant. For these reasons, I would dismiss the appeal.

The following are the reasons delivered by

[98]   ABELLA J. (dissenting) — The media's role in disseminating information is pivotal in its contribution to public debate and thoughtful decision-making. Where there is a potential impediment to the responsible performance of this role, a careful weighing of interests must be undertaken.

[99]   It is also undisputed that the investigation of crime is an important public objective, and that the gathering of relevant evidence is integral to this pursuit. But our justice system has always recognized that not all evidence, however relevant, is necessarily available. The laws of hearsay, informer and solicitor-client privilege, as well as the constitutionally mandated exclusion of evidence under s. 24(2) of the *Canadian Charter of Rights and Freedoms*, are all examples of the way the legal system is engaged in a constant balancing of competing interests, eschewing absolutes and mandating that in each case, a judgment must be

permettrait à ces derniers d'exprimer leurs préoccupations à la première occasion, ce qui réduirait, voire préviendrait, les intrusions inutiles dans leurs activités.

[96]   Je souligne que l'existence de cette obligation devrait être présumée. Si, de l'avis du demandeur, l'urgence de la situation ou le risque de perte de l'information ou des documents recherchés le dispense du préavis, il devrait le mentionner dans la demande et expliquer pourquoi il convient de lever l'obligation de donner un préavis. Il reviendra alors au juge saisi de la demande de déterminer si l'exigence doit effectivement être levée et d'assortir le mandat de conditions limitant, dans la mesure du possible, les perturbations dans les activités du média visé.

[97]   Toutefois, en l'espèce, je ne crois pas que l'absence de préavis rend la perquisition abusive. De plus, puisque le juge a appuyé sa décision sur des règles de droit établies, je n'annulerais pas le mandat de perquisition. Pour les motifs qui précèdent, je suis d'avis de rejeter l'appel.

Version française des motifs rendus par

[98]   LA JUGE ABELLA (dissidente) — En tant que diffuseurs de l'information, les médias jouent un rôle capital par leur contribution au débat public et à la prise de décisions réfléchies. Lorsqu'ils risquent d'être empêchés de s'acquitter de leur rôle de façon responsable, les intérêts en jeu doivent être soupesés avec soin.

[99]   Il est en outre incontesté que la réalisation d'enquêtes criminelles constitue un objectif public important et que la collecte d'éléments de preuve pertinents fait partie intégrante du processus d'enquête. Cependant, notre système de justice a toujours reconnu que le recours à certains éléments de preuve, si pertinents soient-ils, peut être exclu. Les règles du ouï-dire, les privilèges relatifs aux indicateurs et au secret professionnel de l'avocat et l'obligation constitutionnelle d'exclure des éléments de preuve imposée par le par. 24(2) de la *Charte canadienne des droits et libertés* constituent autant d'exemples de la façon dont le système juridique

R. *c.* NATIONAL POST   *La juge Abella*

made about which of several significant interests should prevail.

[100]   In this case, the state seeks to obtain evidence that is of only questionable assistance in connection with a crime of moderate seriousness. It is information that could, theoretically, identify a journalist's confidential source, a person who may not even be in a position to provide information of any utility whatever to the investigation. When both sides of the scales are weighed in this light, there is, in my view, no contest. I would refuse to order disclosure and quash both the search warrant and assistance order.

## Background

[101]   In April 2001, Andrew McIntosh, an investigative reporter at the *National Post*, received a sealed brown envelope with no return address. Inside the envelope was a document which, Mr. McIntosh later confirmed, was sent to him by "X", a confidential source. X told Mr. McIntosh that the document was received in the mail from another person whose identity X did not know. X also said that he/she had discarded the envelope the document came in, then mailed the document to Mr. McIntosh in a fresh envelope.

[102]   The document appeared to be a copy of a loan authorization prepared by the Business Development Bank of Canada in connection with a loan application by a hotel in Quebec, the Auberge Grand-Mère. One of the document's footnotes included a debt to "JAC Consultants", a Chrétien family investment company.

[103]   Mr. McIntosh had taken an interest in the relationship between the then Prime Minister and the owner of the Auberge in the late 1990s. He wrote several articles about it in the *National*

requiert constamment la mise en balance d'intérêts divergents, évite les absolus et oblige le tribunal à décider, dans chaque cas, lequel de divers intérêts importants doit l'emporter.

[100]   En l'espèce, l'État cherche à obtenir des éléments de preuve qui sont d'une utilité discutable en rapport avec un crime de gravité modérée. Il s'agit de renseignements qui pourraient permettre, en théorie, d'identifier la source confidentielle d'un journaliste, alors que cette source ne serait peut-être même pas en mesure de fournir des renseignements d'une quelconque utilité pour l'enquête. Dans ce contexte, le résultat de la mise en balance des intérêts opposés me paraît d'une évidence implacable. Je suis d'avis de refuser d'ordonner la divulgation et d'annuler le mandat de perquisition et l'ordonnance d'assistance.

## Contexte

[101]   En avril 2001, Andrew McIntosh, journaliste d'enquête au *National Post*, a reçu une enveloppe brune scellée, qui ne portait pas l'adresse de l'expéditeur. À l'intérieur de l'enveloppe se trouvait un document qui, comme M. McIntosh l'a confirmé par la suite, lui avait été envoyé par « X », une source confidentielle. X a dit à M. McIntosh qu'il/elle avait reçu le document par la poste d'une autre personne dont il/elle ne connaissait pas l'identité. X a également indiqué avoir jeté l'enveloppe dans laquelle se trouvait le document et avoir ensuite transmis ce dernier à M. McIntosh dans une nouvelle enveloppe.

[102]   Le document semblait être une copie d'une autorisation de prêt préparée par la Banque de développement du Canada relativement à une demande d'emprunt par un hôtel du Québec, l'Auberge Grand-Mère. L'une des notes de bas de page du document faisait état d'une dette envers « JAC Consultants », une société d'investissement appartenant à la famille Chrétien.

[103]   M. McIntosh s'était intéressé au rapport entre le premier ministre de l'époque et le propriétaire de l'Auberge à la fin des années 1990. Il avait publié plusieurs articles à ce sujet dans le *National*

*Post*, relying heavily on confidential sources whose information he was able to authenticate.

[104]   Mr. McIntosh contacted both the Prime Minister's office and the Bank to verify the latest document. Both said the document was a forgery, and the Bank complained to the RCMP about it. This launched an investigation into the forgery claim. At a meeting with Mr. McIntosh and senior *National Post* personnel on June 7, 2001, the RCMP, through Corporal Roland Gallant, asked for the document and the envelope it came in. Corporal Gallant also asked for the identity of the sender. These requests were refused.

[105]   Without notice to the *National Post* or Mr. McIntosh, Corporal Gallant obtained a search warrant and an assistance order. Both were quashed by Benotto J. ((2004), 69 O.R. (3d) 427), but were subsequently reinstated by the Ontario Court of Appeal (2008 ONCA 139, 89 O.R. (3d) 1).

[106]   With respect, I do not share the view of the majority that the Court of Appeal was correct in concluding that the documents should be disclosed. In my view, the harm caused by the possible disclosure of the identity of the confidential source in this case is far weightier than any benefit to the investigation of the crime. Moreover, unlike the majority, I am of the view that the *National Post* ought to have received notice of the application for a search warrant. As a result, I would allow the appeal.

## Analysis

### *Journalist-Source Privilege*

[107]   While the nature and extent of a journalist-source privilege have received extensive judicial consideration in the United States, the United Kingdom, and Europe, they have received little evaluation in this Court (see *Moysa v. Alberta*

*Post*, en grande partie grâce à des renseignements, dont il avait pu vérifier l'authenticité, provenant de sources confidentielles.

[104]   M. McIntosh a communiqué avec le Cabinet du premier ministre et la Banque afin de vérifier le dernier document reçu. Dans les deux cas, on lui a répondu que le document était un faux. La Banque a porté plainte à la GRC, qui a ouvert une enquête sur l'allégation de faux. Le 7 juin 2001, lors d'une rencontre avec M. McIntosh et des cadres supérieurs du *National Post*, la GRC a demandé, par l'intermédiaire du caporal Roland Gallant, qu'on lui remette le document et l'enveloppe dans laquelle il était arrivé. Le caporal Gallant a également demandé qu'on lui révèle l'identité de l'expéditeur. Ces demandes ont essuyé un refus.

[105]   Sans préavis au *National Post* ni à M. McIntosh, le caporal Gallant a obtenu un mandat de perquisition et une ordonnance d'assistance, qui ont été tous les deux annulés par la juge Benotto ((2004), 69 O.R. (3d) 427), mais rétablis par la suite par la Cour d'appel de l'Ontario (2008 ONCA 139, 89 O.R. (3d) 1).

[106]   En toute déférence, je ne partage pas le point de vue des juges majoritaires selon lequel la Cour d'appel a eu raison de conclure que les documents doivent être divulgués. À mon avis, le préjudice causé par la divulgation éventuelle de l'identité de la source confidentielle en l'espèce pèse beaucoup plus dans la balance que n'importe quel avantage dont pourrait bénéficier l'enquête criminelle. En outre, contrairement aux juges majoritaires, j'estime que le *National Post* aurait dû être avisé de la demande de mandat de perquisition. En conséquence, je suis d'avis d'accueillir le pourvoi.

## Analyse

### *Privilège du secret des sources des journalistes*

[107]   Bien que la nature et l'étendue de la protection des sources des journalistes aient été abondamment examinées par les tribunaux aux États-Unis, au Royaume-Uni et en Europe, notre Cour ne s'est guère prononcée à leur égard (voir *Moysa c.*

2010 SCC 16 (CanLII)

2010 SCC 16 (CanLII)

(*Labour Relations Board*), [1989] 1 S.C.R. 1572). It is, as a result, instructive to explore briefly how other jurisdictions have approached the issue.

[108]  Its inherent complexity is perhaps best exposed by the opinions in *Branzburg v. Hayes*, 408 U.S. 665 (1972). In this landmark decision, the Supreme Court of the United States dealt with journalist-source privilege for the first time, refusing to recognize any constitutional or common law privilege that would allow a reporter to refuse to reveal confidential information to a grand jury. The grand jury in the United States reviews all relevant evidence to determine whether someone should be charged with a crime and, accordingly, has broad investigatory powers.

[109]  In the context of this mandate, White J. unequivocally favoured protecting the ability to investigate crime over protecting the media (p. 695). In concurring reasons, Powell J. qualified White J.'s reasons by advocating a more nuanced approach that would require the examination of each case on its own merits (pp. 709-10).

[110]  Stewart J. wrote strong dissenting reasons that reflect unambiguous and overriding support for the protection of an independent media and its ability to disseminate news, including the protection of a journalist's confidential sources (p. 725). His three-part test (at p. 743) for deciding whether such a source should be disclosed can be paraphrased as follows:

•    Is there probable cause to believe that the journalist has information that is clearly relevant to a specific probable violation of law?

•    Can the information be obtained by alternative means that are less destructive of First Amendment rights? and

*Alberta (Labour Relations Board)*, [1989] 1 R.C.S. 1572). Il est donc instructif de regarder brièvement comment cette question a été traitée ailleurs.

[108]  Ce sont peut-être les opinions exprimées dans *Branzburg c. Hayes*, 408 U.S. 665 (1972), qui illustrent le mieux la complexité inhérente de la question. Cet arrêt de principe est le premier dans lequel la Cour suprême des États-Unis s'est prononcée sur le privilège du secret des sources des journalistes, en refusant de reconnaître quelque privilège constitutionnel ou de common law que ce soit qui permettrait à un journaliste de refuser de révéler des renseignements confidentiels à un grand jury. Aux États-Unis, le grand jury examine tous les éléments de preuve pertinents pour déterminer si une personne devrait être inculpée d'un crime et il dispose, en conséquence, de vastes pouvoirs d'enquête.

[109]  Dans le contexte de ce rôle du grand jury, le juge White a clairement accordé priorité à la protection de la capacité d'enquêter sur un crime plutôt qu'à la protection des médias (p. 695). Dans ses motifs concordants, le juge Powell a apporté une réserve aux motifs du juge White en préconisant une approche plus nuancée qui obligerait les tribunaux à examiner chaque affaire en fonction des faits qui lui sont propres (p. 709-710).

[110]  Le juge Stewart a rédigé une forte dissidence qui témoigne d'un appui prépondérant et non équivoque à la protection de médias indépendants et à leur capacité à diffuser des nouvelles, et notamment à la protection des sources confidentielles des journalistes (p. 725). Le test en trois volets qu'il propose (p. 743) pour décider s'il y a lieu de divulguer une telle source peut être paraphrasé ainsi :

•    Existe-t-il un motif probable de croire que le journaliste possède des renseignements manifestement pertinents concernant la perpétration probable d'une violation précise de la loi?

•    Peut-on obtenir ces renseignements en ayant recours à d'autres moyens qui porteraient moins atteinte aux droits garantis par le Premier amendement?

R. *v.* NATIONAL POST   *Abella J.*

- Is there a compelling and overriding interest in the information?

[111]   American cases decided after *Branzburg* appear to have preferred Stewart J.'s case-by-case approach, balancing the interests of the press against other societal interests such as crime prevention, prosecution and investigation (see *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir. 2005); *New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006); Eric M. Freedman, "Reconstructing Journalists' Privilege" (2008), 29 *Cardozo L. Rev.* 1381, at pp. 1384-85; Joel M. Gora, "The Source of the Problem of Sources: The First Amendment Fails the Fourth Estate" (2008), 29 *Cardozo L. Rev.* 1399, at p. 1405).

[112]   This balancing is the approach that has been adopted by the Department of Justice in the United States in its policy on the issuance of subpoenas to the news media, as codified in the *Code of Federal Regulations*:

. . . the approach in every case [of determining whether to request issuance of a subpoena to a member of the news media] must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice. [28 C.F.R. § 50.10(a) (2009)]

[113]   The United Kingdom, Europe, Australia and South Africa are at various stages of development in terms of recognizing a journalist-source privilege but, like the United States, appear to apply a balancing approach (see *X Ltd. v. Morgan-Grampian Ltd.*, [1991] 1 A.C. 1 (H.L.); *Ashworth Hospital Authority v. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033; E.C.H.R., *Goodwin v. The United Kingdom*, judgment of 27 March 1996, *Reports of Judgments and Decisions* 1996-II; Peter Bartlett, "Australia", in Charles J. Glasser Jr., ed., *International Libel and Privacy Handbook* (2nd ed. 2009), 66, at p. 77; South Africa, *Criminal Procedure Act*, No. 51 of 1977, ss. 189 and 205; Janice Brabyn, "Protection Against Judicially Compelled Disclosure of the

- Les renseignements présentent-ils un intérêt impérieux et prépondérant?

[111]   La jurisprudence américaine postérieure à l'arrêt *Branzburg* semble avoir privilégié la méthode d'examen au cas par cas proposée par le juge Stewart, en soupesant les intérêts de la presse par rapport à d'autres intérêts sociétaux comme la prévention, les poursuites et les enquêtes en matière criminelle (voir *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C. Cir. 2005); *New York Times Co. c. Gonzales*, 459 F.3d 160 (2d Cir. 2006); Eric M. Freedman, « Reconstructing Journalists' Privilege » (2008), 29 *Cardozo L. Rev.* 1381, 1384-1385; Joel M. Gora, « The Source of the Problem of Sources : The First Amendment Fails the Fourth Estate » (2008), 29 *Cardozo L. Rev.* 1399, à la p. 1405).

[112]   C'est cette méthode de mise en balance qu'a retenue le département de la Justice des États-Unis dans sa politique relative à l'assignation des médias d'information, codifiée dans le *Code of Federal Regulations* :

[TRADUCTION] . . . la façon de procéder dans chaque cas [pour décider s'il y a lieu de demander l'assignation d'un membre des médias d'information], consiste à trouver un juste équilibre entre l'intérêt du public à la libre diffusion des idées et de l'information et l'intérêt du public à l'application efficace de la loi et à une saine administration de la justice. [28 C.F.R. § 50.10(a) (2009)]

[113]   Le Royaume-Uni, l'Europe, l'Australie et l'Afrique du Sud n'en sont pas au même point pour ce qui est de la reconnaissance d'un privilège du secret des sources des journalistes, mais, à l'instar des États-Unis, ils semblent se livrer à un exercice de pondération (voir *X Ltd. c. Morgan-Grampian Ltd.*, [1991] 1 A.C. 1 (H.L.); *Ashworth Hospital Authority c. MGN Ltd.*, [2002] UKHL 29, [2002] 1 W.L.R. 2033; C.E.D.H., arrêt *Goodwin c. Royaume-Uni* du 27 mars 1996, *Recueil des arrêts et décisions* 1996-II; Peter Bartlett, « Australia », dans Charles J. Glasser Jr., dir., *International Libel and Privacy Handbook* (2ᵉ éd. 2009), 66, p. 77; Afrique du Sud, *Criminal Procedure Act*, nᵒ 51 de 1977, art. 189 et 205; Janice Brabyn, « Protection

R. *c.* NATIONAL POST   *La juge Abella*

Identity of News Gatherers' Confidential Sources in Common Law Jurisdictions" (2006), 69 *Mod. L. Rev.* 895, at pp. 925-27).

[114]   This international perspective leads me to agree with Binnie J. that journalist-source privilege should be assessed on a case-by-case basis. I accept the criticism that this approach can create some imprecision, but judges rarely have the luxury of applying absolute rules and adjudicate of necessity in fields of law bounded by designated borders within which discretion is exercised based on the particular circumstances of the case. In other words, balancing competing interests, with all its inherent nuance and imprecision, is a core and routine judicial function.

[115]   Like Binnie J. too, I think that this balancing should be done in accordance with the four Wigmore criteria infused with *Charter* values (*Slavutych v. Baker*, [1976] 1 S.C.R. 254; *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157, at para. 30). And finally, I agree that the first three Wigmore criteria are met in this case.[*]

[116]   Where I respectfully part company with Binnie J. is at the fourth and final stage of the

_____

[*]   The first three Wigmore criteria are:

   (1)   The communications must originate in a *confidence* that they will not be disclosed.

   (2)   This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

   (3)   The *relation* must be one which in the opinion of the community ought to be sedulously *fostered*.

(*Wigmore on Evidence* (McNaughton Rev. 1961), vol. 8, at § 2285 (emphasis in original))

Against Judicially Compelled Disclosure of the Identity of News Gatherers' Confidential Sources in Common Law Jurisdictions » (2006), 69 *Mod. L. Rev.* 895, p. 925-927).

[114]   Cette perspective internationale m'amène à souscrire à la conclusion du juge Binnie selon laquelle le privilège du secret des sources des journalistes devrait être examiné au cas par cas. J'accepte la critique selon laquelle cette façon de procéder peut engendrer une certaine imprécision, mais les juges ont rarement le luxe d'appliquer des règles absolues et rendent jugement, par la force des choses, dans des domaines du droit circonscrits par des limites bien définies à l'intérieur desquelles ils exercent leur pouvoir discrétionnaire en fonction des circonstances propres à chaque affaire. Autrement dit, la pondération d'intérêts divergents, avec les nuances et l'imprécision qui la caractérisent, représente une fonction judiciaire courante et essentielle.

[115]   J'estime aussi, comme le juge Binnie, que la pondération doit s'effectuer en fonction des quatre critères énoncés par Wigmore, de manière à refléter les valeurs consacrées par la *Charte* (*Slavutych c. Baker*, [1976] 1 R.C.S. 254; *M. (A.) c. Ryan*, [1997] 1 R.C.S. 157, par. 30). Enfin, je reconnais que les trois premiers critères énoncés par Wigmore sont remplis en l'espèce[*].

[116]   En toute déférence, cependant, je ne partage pas l'avis du juge Binnie en ce qui concerne

_____

[*]   Voici les trois premiers critères de Wigmore :

[TRADUCTION]

   (1)   Les communications doivent avoir été transmises *confidentiellement* avec l'assurance qu'elles ne seraient pas divulguées.

   (2)   Le *caractère confidentiel doit être* un élément *essentiel* au maintien complet et satisfaisant des relations entre les parties.

   (3)   Les *relations* doivent être de la nature de celles qui, selon l'opinion de la collectivité, doivent être *entretenues* assidûment.

(*Wigmore on Evidence* (rév. McNaughton 1961), vol. 8, § 2285 (en italique dans l'original))

Wigmore test. This is the step at which the claimant has the burden of demonstrating that "[t]he *injury* that would inure to the [relationship] by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation" (emphasis in original).

[117]  This means looking first at what injury is caused by disclosing the material and potentially the identity of the confidential source. The context for considering the *particular* harm in this case is the role of confidential sources generally in the responsible performance of the media's role. In my view, those sources represent a significant and legitimate journalistic tool, and where reasonable, good faith efforts have been made to confirm the reliability of the information from those sources, their confidentiality ought to be protected.

[118]  In *Grant v. Torstar Corp.*, 2009 SCC 61, [2009] 3 S.C.R. 640, this Court recognized that the use of confidential sources could be an integral part of responsible journalism in communicating matters of public interest:

It may be responsible to rely on confidential sources, depending on the circumstances; a defendant may properly be unwilling or unable to reveal a source in order to advance the defence. [para. 115]

(See also *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199.)

[119]  In the United States, approximately three dozen states have enacted press "shield laws" protecting the relationship between a news reporter and his or her source. All but one of the remaining states judicially recognize some form of journalist-source privilege. While the scope of the protection varies from state to state, most of these protective laws offer some form of qualified privilege to reporters consistent with the three-part test suggested by Stewart J. in *Branzburg*, that is, source

le quatrième et dernier volet du test proposé par Wigmore. Il s'agit de l'étape à laquelle le demandeur a le fardeau de démontrer qu'il a satisfait au critère selon lequel [TRADUCTION] « [l]e *préjudice* que subiraient les rapports par la divulgation des communications doit être *plus considérable que l'avantage* à retirer d'une juste décision » (en italique dans l'original).

[117]  Ceci nous amène à déterminer en premier lieu quel préjudice est causé par la divulgation des documents et, éventuellement, de l'identité de la source confidentielle. En l'espèce, il faut envisager *ce* préjudice sous l'angle de l'importance générale des sources confidentielles dans l'exercice responsable du rôle des médias. À mon avis, ces sources représentent un outil journalistique important et légitime. Par conséquent, lorsque des mesures raisonnables ont été prises de bonne foi en vue de confirmer la fiabilité des renseignements transmis par de telles sources, la confidentialité de ces dernières mérite d'être protégée.

[118]  Dans l'arrêt *Grant c. Torstar Corp.*, 2009 CSC 61, [2009] 3 R.C.S. 640, la Cour a reconnu que le recours à des sources confidentielles pourrait faire partie intégrante du journalisme responsable dans la communication touchant les questions d'intérêt public :

Se fier à des sources confidentielles peut, selon les circonstances, constituer une conduite responsable; un défendeur peut légitimement refuser [ou être incapable] de révéler l'identité d'une source pour se prévaloir de la défense . . . [par. 115]

(Voir également *St. Elizabeth Home Society c. Hamilton (City)*, 2008 ONCA 182, 230 C.C.C. (3d) 199.)

[119]  Aux États-Unis, une trentaine d'États environ ont protégé la presse par des mesures législatives visant à préserver la relation entre un journaliste et sa source. Dans tous les autres États sauf un, les tribunaux reconnaissent une forme quelconque de privilège du secret des sources des journalistes. Bien que l'étendue de la protection varie d'un État à l'autre, la plupart de ces mesures législatives offrent aux journalistes une forme quelconque d'immunité relative compatible avec le test en trois

information is protected unless the party seeking disclosure can establish that (i) the information is relevant; (ii) the information is unavailable through other sources; and (iii) a compelling public interest exists for the disclosure of the information (CRS Report for Congress, *Journalists' Privilege to Withhold Information in Judicial and Other Proceedings: State Shield Statutes*, June 27, 2007, at pp. CRS-1 and CRS-2). A bill to provide such protection at the federal level (the *Free Flow of Information Act of 2009*, H.R. 985) was passed by the House of Representatives in March 2009 and is currently before the Senate. Similar legislative protection exists in the United Kingdom, Australia, Austria, France, Germany, Japan, Norway and Sweden (see Kyu Ho Youm, "International and Comparative Law on the Journalist's Privilege: The *Randal* Case as a Lesson for the American Press" (2006), 1 *J. Int'l Media & Ent. L.* 1; Article 19 and Interights, *Briefing Paper on Protection of Journalists' Sources: Freedom of Expression Litigation Project*, May 1998 (online)).

[120]   The importance of confidential sources has also been judicially recognized in *John v. Express Newspapers*, [2000] 3 All E.R. 257 (C.A.), at p. 266; *Reynolds v. Times Newspapers Ltd.*, [2001] 2 A.C. 127 (H.L.), at p. 200; *Ernst v. Belgium* (2004), 39 E.H.R.R. 724, at paras. 91-93 and 102-5; *Voskuil v. Netherlands* (2007), 24 B.H.R.C. 306 (E.C.H.R.), at para. 65; *Prosecutor v. Brdjanin and Talic*, International Criminal Tribunal for the former Yugoslavia, Appeals Chamber, Case No. IT-99-36-AR73.9, 11 December 2002, at paras. 43-44; *Van den Biggelaar v. Dohmen/Langenberg*, Hoge Raad der Nederlanden (Supreme Court of the Netherlands), 10 May 1996, NJ 1996/578; Bartlett, at p. 77; *Goodwin* and *Ashworth*.

[121]   In the case before us, the information provided by X — and other confidential sources — was crucial to Mr. McIntosh's ability to write about the relationship between the then Prime Minister and the Auberge. And the record in the case before us contains affidavits from several journalists stressing the importance of protecting confidential sources

volets proposé par le juge Stewart dans *Branzburg*, en protégeant l'information fournie par la source à moins que la partie qui en demande la divulgation puisse établir que : (i) l'information est pertinente; (ii) l'information ne peut être obtenue d'autres sources; et (iii) un intérêt public impérieux milite en faveur de la divulgation de l'information (rapport du CRS au Congrès, *Journalists' Privilege to Withhold Information in Judicial and Other Proceedings : State Shield Statutes*, 27 juin 2007, p. CRS-1 et CRS-2). Un projet de loi visant à offrir une telle protection à l'échelle fédérale (*Free Flow of Information Act of 2009*, H.R. 985) a été adopté par la Chambre des représentants en mars 2009 et est actuellement à l'étude au Sénat. Il existe une protection législative semblable au Royaume-Uni, en Australie, en Autriche, en France, en Allemagne, au Japon, en Norvège et en Suède (voir Kyu Ho Youm, « International and Comparative Law on the Journalist's Privilege : The *Randal* Case as a Lesson for the American Press » (2006), 1 *J. Int'l Media & Ent. L.* 1; Article 19 and Interights, *Briefing Paper on Protection of Journalists' Sources : Freedom of Expression Litigation Project*, mai 1998 (en ligne)).

[120]   Les tribunaux ont eux aussi reconnu l'importance des sources confidentielles dans *John c. Express Newspapers*, [2000] 3 All E.R. 257 (C.A.), p. 266; *Reynolds c. Times Newspapers Ltd.*, [2001] 2 A.C. 127 (H.L.), p. 200; *Ernst c. Belgique*, C.E.D.H., no 33400/96, 15 juillet 2003, par. 91-93 et 102-105; *Voskuil c. Netherlands* (2007), 24 B.H.R.C. 306 (C.E.D.H.), par. 65; *Procureur c. Brdjanin et Talic*, Tribunal pénal international pour l'ex-Yougoslavie, no IT-99-36-AR73.9, 11 décembre 2002, par. 43-44; *Van den Biggelaar c. Dohmen/Langenberg*, Hoge Raad der Nederlanden (Cour suprême néerlandaise), jugement du 10 mai 1996, NJ 1996/578; Bartlett, p. 77; *Goodwin* et *Ashworth*.

[121]   Dans l'affaire qui nous occupe, l'information fournie par X — et d'autres sources confidentielles — était cruciale pour les articles de M. McIntosh au sujet du rapport entre le premier ministre de l'époque et l'Auberge. Le dossier en l'espèce contient des affidavits de plusieurs journalistes qui soulignent l'importance de protéger les sources

in their ability to gather and report the news. Peter Desbarats, former Dean of the Graduate School of Journalism at the University of Western Ontario, stressed the importance of such sources to "investigative journalists [in seeking] to serve the public interest by bringing to public attention matters that people in authority are less than anxious to have subjected to public scrutiny". In his view:

Given my experience in the world of journalism, it is my opinion that the interests of a free press require the court to recognize the special relationship between a journalist and a confidential source who has been given a promise of secrecy. The giving of promises of secrecy is essential to a free and vigorous press, which in turn is essential to ensuring a well informed citizenry and a vibrant democracy.

As Mr. McIntosh himself stated in his affidavit, echoing the experiences expressed by other journalists in the various affidavits submitted in these proceedings:

. . . sometimes a source will share either confidential information and/or documents with me for use in a story on the explicit condition that under no circumstances is their identity as the source of the information or documents ever to be publicly disclosed to anyone, particularly in the event of a legal proceeding, public hearing or official inquiry of any kind that may result from the publication of the subsequent story . . . .

.  .  .

. . . my effectiveness as an investigative reporter would be seriously impaired because key sources would no longer trust me to keep their identities confidential, thereby preventing me from getting the sensitive information I need to do my job and reveal matters of public interest that might otherwise remain unknown to the Canadian public.

[122] Nor can the chilling effect that could result from the compelled disclosure of confidential journalistic sources be ignored as a consequential harm. This concern was expressed nearly three decades ago by the House of Lords in *British Steel Corp. v. Granada Television Ltd.*, [1981] 1 All E.R. 417:

confidentielles pour qu'ils puissent recueillir et rapporter l'information. Peter Desbarats, l'ancien doyen de l'école supérieure de journalisme de l'Université Western Ontario, a souligné l'importance de ces sources pour les [TRADUCTION] « journalistes d'enquête [lorsqu'ils cherchent] à servir l'intérêt public en mettant en lumière des sujets que les gens au pouvoir sont loin d'être enchantés de voir soumis à un examen public approfondi ». À son avis :

[TRADUCTION] Compte tenu de mon expérience dans le monde du journalisme, j'estime que les intérêts d'une presse libre exigent des tribunaux qu'ils reconnaissent le rapport particulier entre un journaliste et la source à qui l'anonymat a été promis. De telles promesses sont essentielles à une presse libre et dynamique, qui est elle-même essentielle à l'information des citoyens et à une robuste démocratie.

M. McIntosh, se faisant l'écho de l'expérience décrite par d'autres journalistes dans les différents affidavits déposés en l'espèce, a lui-même déclaré dans le sien :

[TRADUCTION] . . . une source me donne parfois des documents ou des renseignements confidentiels pour un article, à la condition expresse que son identité en tant que source des renseignements ou des documents ne soit jamais divulguée publiquement à qui que ce soit, quelles que soient les circonstances, particulièrement dans l'éventualité d'une procédure judiciaire, d'une audience publique ou d'une enquête officielle, de quelque nature que ce soit, qui pourrait découler de la publication de l'article . . .

.  .  .

. . . mon efficacité en tant que journaliste d'enquête serait gravement compromise parce que mes sources essentielles ne me feraient plus confiance pour garder leur identité secrète, ce qui m'empêcherait d'obtenir les renseignements sensibles dont j'ai besoin pour faire mon travail et révéler des faits d'intérêt public qui risqueraient autrement de rester inconnus de la population canadienne.

[122] L'effet de dissuasion qui pourrait découler de la divulgation forcée des sources confidentielles des journalistes ne peut non plus être ignoré comme préjudice en résultant. La Chambre des lords a exposé ce problème il y a près de trois décennies dans *British Steel Corp. c. Granada Television Ltd.*, [1981] 1 All E.R. 417 :

[T]he newspapers should not in general be compelled to disclose their sources of information. Neither by means of discovery before trial. Nor by questions or cross-examination at the trial. Nor by subpoena. The reason is because, if they were compelled to disclose their sources, they would soon be bereft of information which they ought to have. Their sources would dry up. Wrongdoing would not be disclosed. . . . Misdeeds in the corridors of power, in companies or in government departments would never be known. Investigative journalism has proved itself as a valuable adjunct of the freedom of the press. [p. 441]

[123]  Similarly, in the recent case of *Financial Times Ltd. v. The United Kingdom*, [2009] ECHR 2065 (BAILII), the European Court of Human Rights warned:

While . . . the applicants in the present case were not required to disclose documents which would directly result in the identification of the source but only to disclose documents which might, upon examination, lead to such identification, the Court does not consider this distinction to be crucial. In this regard, the Court emphasises that a chilling effect will arise wherever journalists are seen to assist in the identification of anonymous sources. In the present case, it was sufficient that information or assistance was required under the disclosure order for the purpose of identifying X. [Emphasis added; para. 70.]

[124]  There is no doubt that caution must be exercised in ensuring the quality and veracity of the confidentially received information (see David Abramowicz, "Calculating the Public Interest in Protecting Journalists' Confidential Sources" (2008), 108 *Colum. L. Rev.* 1949, at pp. 1966-70), but in the case before us, Mr. McIntosh had a sound basis for his confidence in X's reliability.

[125]  Although this was X's first direct contact with Mr. McIntosh, X's reliability had been previously confirmed. Through another confidential source, "Y", Mr. McIntosh had ascertained that the Prime Minister had made several telephone calls to the Bank in connection with loans to the Auberge. Y had received this information from X, including:

2010 SCC 16 (CanLII)

R. *v.* NATIONAL POST  *Abella J.*

- a letter from the manager of the Trois-Rivières Bank branch to a senior vice-president of the Bank expressing concern about the risky nature of the loan applied for by the Auberge and recommending the application's referral to a credit committee at the Bank;

- a letter from the owner of the Auberge to the Prime Minister urging him to intervene to ensure he got the loan he needed; and

- a Bank document containing "media lines" — "politically acceptable" responses — to respond to anticipated questions from reporters about the Prime Minister's telephone calls to the Bank to ensure the approval of the loans to the Auberge.

Y also showed Mr. McIntosh documents detailing the dates of telephone calls by the Prime Minister to the Bank.

[126]   Several separate and independent confidential sources provided information to Mr. McIntosh that corroborated these telephone calls, both before and after Mr. McIntosh viewed the documents shown to him by Y. And despite originally denying any involvement in the Bank's decision to grant a loan to the Auberge, the Prime Minister later confirmed that he had indeed made the telephone calls to the Bank, but denied that there was anything improper or unusual about requesting the Bank to "settle" a file that "was not moving".

[127]   In addition to relying on this prior and positive experience with X, Mr. McIntosh explained in his affidavit that he sought to test X's credibility in connection with this latest document by asking for an affidavit from him/her:

I asked X whether he/she would be prepared to swear a confidential affidavit confirming that he/she did not alter or forge the loan authorization document. I used this approach to test X's integrity. As X agreed without hesitation to swear such an affidavit, I did not proceed further with this request.

- une lettre de la directrice de la succursale de Trois-Rivières de la Banque à un premier vice-président de la Banque soulevant des réserves à propos du risque présenté par le prêt sollicité par l'Auberge et recommandant le renvoi de la demande à un comité de crédit de la Banque;

- une lettre du propriétaire de l'Auberge adressée au premier ministre dans laquelle il exhorte ce dernier à intercéder pour faire en sorte que le prêt demandé lui soit consenti;

- un document de la Banque présentant des « infocapsules » — des réponses « politiquement acceptables » — destinées aux questions attendues des journalistes à propos des appels du premier ministre à la Banque ayant pour objet l'approbation des prêts demandés par l'Auberge.

Y a également montré à M. McIntosh des documents énumérant les dates des appels téléphoniques du premier ministre à la Banque.

[126]   Plusieurs autres sources confidentielles indépendantes ont fourni des renseignements à M. McIntosh corroborant l'information sur les appels téléphoniques, avant et après la consultation par ce dernier des documents présentés par Y. Même s'il avait d'abord nié toute ingérence dans la décision prise par la Banque de consentir un prêt à l'Auberge, le premier ministre a par la suite reconnu avoir fait ces appels téléphoniques à la Banque. Toutefois, selon lui, demander à la Banque de « régler » un dossier qui « ne bougeait pas » n'avait rien d'irrégulier ni d'inusité.

[127]   En plus de se fier à cette expérience antérieure avec X, qui avait été positive, M. McIntosh, comme il l'a expliqué dans son affidavit, a tenté de tester la crédibilité de X à l'égard du dernier document reçu en lui demandant de signer un affidavit :

[TRADUCTION] J'ai demandé à X s'il/elle accepterait de signer un affidavit confidentiel confirmant qu'il/elle n'avait pas modifié ou falsifié l'autorisation de prêt. J'ai utilisé cette approche pour tester l'intégrité de X. Comme X a accepté sans hésitation de signer un tel affidavit, je ne me suis pas allé plus loin.

2010 SCC 16 (CanLII)

R. *c.* NATIONAL POST    *La juge Abella*

[128]   And to protect his own integrity, Mr. McIntosh told X that he would only protect his/her confidentiality if he were satisfied that he was not being misled:

   I stated to Confidential Source X that as long as I believed that he/she had not provided the document to deliberately mislead me, my undertaking of confidentiality would remain binding. I also told Confidential Source X that should irrefutable evidence to the contrary emerge, our agreement of confidentiality would become null and void. X agreed to these terms.

[129]   Given Mr. McIntosh's reputation, it strikes me as counterintuitive to conclude that he would protect the identity of a source whom he suspects of *knowingly* providing him with false information. Mr. McIntosh should not be taken to have intended to risk his reputation or his livelihood so easily.

[130]   Where, as here, the journalist has taken credible and reasonable steps to determine the authenticity and reliability of his source, one should respect his professional judgment and pause, it seems to me, before trespassing on the confidentiality which is the source of the relationship.

[131]   Having identified what I see as demonstrable and profound injury to the journalist/source relationship resulting from disclosure of the documents and potentially the identity of the source in this case, the other side of the Wigmore balancing exercise requires consideration of the countervailing benefits of disclosure. For the reasons that follow, I see those benefits as ranging from speculative to negligible.

[132]   Corporal Gallant said that he wanted the loan authorization document as well as the envelope it came in, in the hopes that these materials would reveal the identity of the source of the alleged forgery. As he said in his Information to Obtain:

   The brown envelope that contained the documents and that was received by the National Post can contain

[128]   De plus, afin de protéger sa propre intégrité, M. McIntosh a expliqué à X qu'il ne garderait son identité secrète que s'il était convaincu de ne pas avoir été induit en erreur :

   [TRADUCTION] J'ai assuré à la source confidentielle X que, tant que je croirais qu'il/elle ne m'avait pas remis le document afin de m'induire délibérément en erreur, je demeurerais lié par mon engagement de confidentialité. Je lui ai également dit que si une preuve contraire irréfutable était portée à ma connaissance, notre entente de confidentialité deviendrait nulle. X a accepté ces conditions.

[129]   Étant donné la réputation de M. McIntosh, il me semble illogique de conclure qu'il protégerait l'identité d'une source qu'il soupçonne de lui avoir *sciemment* communiqué de faux renseignements. Il n'y a pas lieu de présumer qu'il était dans l'intention de M. McIntosh de risquer de ternir sa réputation ou de compromettre son gagne-pain aussi facilement.

[130]   Lorsque, comme en l'espèce, le journaliste a pris des mesures raisonnables et crédibles pour vérifier l'authenticité et la fiabilité de sa source, il faut respecter son jugement professionnel et hésiter, il me semble, à compromettre la confidentialité à l'origine de la relation.

[131]   Je viens de présenter le préjudice démontrable et grave, à mes yeux, que porterait aux rapports entre le journaliste et sa source la divulgation des documents et, éventuellement, de l'identité de la source en l'espèce. Il est maintenant temps de se tourner vers l'autre volet de l'exercice de mise en balance établi par Wigmore et de soupeser les avantages à retirer de la divulgation. Pour les motifs qui suivent, j'estime que ces avantages sont négligeables, voire hypothétiques.

[132]   Aux dires du caporal Gallant, il voulait l'autorisation de prêt et l'enveloppe dans laquelle elle était arrivée dans l'espoir que ces documents révèlent l'identité de la source du prétendu faux. Voici ce qu'il a dit dans sa dénonciation en vue d'obtenir un mandat :

   [TRADUCTION] L'enveloppe brune qui contenait les documents et qu'a reçue le National Post peut renfermer

information. I wish to submit it for forensic examination to determine whether it, or the false document, has fingerprints or other identifying markings which might assist in identifying the source of the document. As the forged object it will be required as evidence to substantiate any charge arising out of this investigation.

[133]   Corporal Gallant had consulted a document examiner at the RCMP Central Forensic Laboratory in Ottawa to determine what forms of evidence an examination of the materials could yield:

She . . . confirmed for me that <u>it may be possible</u> to acquire biological material (saliva) left on a stamp or seal of an envelope, if the person placing the stamp or closing the seal licked the stamp/seal to engage the adhesive. Finally, she confirmed that <u>it may be possible</u> to fingerprint the documents to identify who had handled them. [Emphasis added.]

[134]   At best, then, "it may be possible" to acquire identifying information. Based on the record, however, there is a fatal disconnect between the envelope, the documents, the identity of X and the alleged forgery, regardless of the fruits of the forensic testing.

[135]   As previously noted, X told Mr. McIntosh that he/she received the document anonymously in the mail, had discarded the envelope, and forwarded the document to Mr. McIntosh in a different envelope. It also appears from the record that X did not know the document might be a forgery when it was sent to Mr. McIntosh. Since X did not know the identity of the person from whom he/she had received the document, learning X's identity would yield virtually no evidence that could assist in determining who was responsible for the alleged forgery.

[136]   Secondly, Corporal Gallant said in cross-examination that "[t]he more documents are manipulated, the least likely the chances of getting fingerprints off of it", and acknowledged that there was a "far more remote and speculative possibility that that same document [had] the prints

des renseignements. Je désire la soumettre à une expertise criminalistique pour vérifier si cette enveloppe ou le faux document portent des empreintes digitales ou d'autres marques d'identification susceptibles d'aider à l'identification de la source du document. Comme le faux document, elle sera requise comme élément de preuve pour étayer toute accusation découlant de la présente enquête.

[133]   Le caporal Gallant avait consulté une experte en écritures du Laboratoire judiciaire central de la GRC à Ottawa afin de déterminer le genre de preuve qu'un examen des documents pourrait générer :

[TRADUCTION] Elle [. . .] m'a confirmé <u>qu'il pourrait être possible</u> de trouver une matière biologique (salive) laissée sur un timbre ou sur le rabat d'une enveloppe si, en affranchissant ou en cachetant l'enveloppe, la personne a léché le timbre ou le rabat pour les coller. Enfin, elle a confirmé <u>qu'il pourrait être possible</u> de relever les empreintes digitales sur les documents pour identifier les personnes qui les ont manipulés. [Je souligne.]

[134]   Au mieux, « il pourrait être possible », dans ce cas, de relever de l'information permettant d'identifier la source. Toutefois, le dossier ne révèle aucun lien entre l'enveloppe, les documents, l'identité de X et le prétendu faux, et cette absence de lien est fatale, quel que soit le résultat de l'analyse criminalistique.

[135]   Comme je l'ai mentionné précédemment, X a dit à M. McIntosh qu'il/elle avait reçu le document d'une source anonyme par la poste, avait jeté l'enveloppe et envoyé le document à M. McIntosh dans une autre enveloppe. De plus, il ressort du dossier que X ne savait pas que le document pouvait être faux lorsqu'il/elle l'a envoyé à M. McIntosh. Comme X ne connaissait pas l'identité de la personne de qui il/elle avait reçu le document, apprendre l'identité de X ne fournirait pratiquement aucune preuve pouvant aider à déterminer qui était la personne responsable du prétendu faux.

[136]   Deuxièmement, le caporal Gallant a dit en contre-interrogatoire que [TRADUCTION] « [p]lus les documents sont manipulés, moins on a de chances d'y relever des empreintes digitales » et a reconnu qu'il y avait une [TRADUCTION] « possibilité beaucoup plus faible et hypothétique que ce document

of the forger". Both the document and the envelope had been extensively handled. Mr. McIntosh took the document and envelope with him from Ottawa to Toronto, where they were handled by the lawyer for the *National Post*, the editor-in-chief and the deputy editor. It is therefore possible that even forensic testing, including DNA testing of the materials, would not be of any assistance in identifying the alleged forger.

[137]   And this brings us to another factor limiting the benefit to the criminal investigation of learning X's identity. On cross-examination, Corporal Gallant explained that he wanted to learn X's identity because he wanted to question X about X's source, whose identity, it should be remembered, was unknown to X:

A   We knew that that person could potentially open other avenues for the investigation, and we could possibly determine from where that person obtained that information. So our role in this was in fact to find this person, but also to speak to this person to see if we could find -- to go backward in order to find the person that might have sent the document in the first place, and this person could potentially help us in our investigation, and this person could potentially be considered as a suspect or a witness, but at that time we did not know.

Q   And assuming if you accept what Mr. McIntosh has said, and you don't have evidence to the contrary, "X" who sent the document to Mr. McIntosh also received the document anonymously; isn't that correct?

A   That is in fact what Mr. McIntosh wrote, but, myself, I have not had an opportunity to speak to that person.

Q   And you have no information to the contrary that would indicate other than what Mr. McIntosh has said?

A   No, Your Honour.

Q   So, do you agree, Corporal Gallant, that as the matter is now known to stand, the person who sent the document is not -- there is no evidence that that person is the forger? No suggestion that he or she is the forger?

[porte] les empreintes du faussaire ». Le document et l'enveloppe avaient été tous les deux largement manipulés. M. McIntosh a apporté le document et l'enveloppe avec lui d'Ottawa à Toronto, où ils ont été manipulés par l'avocat du *National Post*, le rédacteur en chef et le rédacteur adjoint. En conséquence, il est possible que même une analyse criminalistique, notamment une analyse génétique, des documents ne soit d'aucune utilité pour identifier le prétendu faussaire.

[137]   Ce qui nous amène à un autre facteur minimisant l'avantage que représente pour l'enquête criminelle le dévoilement de X. Lors du contre-interrogatoire, le caporal Gallant a expliqué qu'il voulait connaître l'identité de X parce qu'il souhaitait l'interroger sur sa source, dont l'identité, faut-il le rappeler, était inconnue de X :

[TRADUCTION]

R   Nous savions que cette personne pourrait peut-être nous orienter vers d'autres pistes d'enquête et que nous pourrions peut-être découvrir d'où cette personne tenait ces renseignements. Notre rôle consistait donc à trouver cette personne, mais aussi à lui parler pour voir si nous pourrions trouver -- à revenir en arrière afin de trouver la personne qui pourrait avoir envoyé le document en premier lieu, et cette personne pourrait peut-être nous aider dans notre enquête, et cette personne pourrait peut-être être considérée comme un suspect ou un témoin, mais à ce moment-là nous ne le savions pas.

Q   En supposant, si vous reconnaissez la véracité des propos tenus par M. McIntosh, et vous n'avez aucune preuve du contraire, que « X », qui a envoyé le document à M. McIntosh, a aussi reçu le document d'une source anonyme; est-ce exact?

R   C'est en effet ce que M. McIntosh a écrit, mais, pour ma part, je n'ai pas eu l'occasion de parler à cette personne.

Q   Et vous ne disposez d'aucun renseignement contraire qui indiquerait autre chose que ce qu'a dit M. McIntosh?

R   Non, Votre Honneur.

Q   Alors, caporal Gallant, êtes-vous d'accord pour dire que, compte tenu de ce que vous savez de la situation, la personne qui a envoyé le document n'est pas -- rien ne prouve que cette personne est le faussaire? Rien n'indique qu'il s'agit du faussaire?

R. *v.* NATIONAL POST   *Abella J.*

A   Yes, Your Honour. Well, to date, Your Honour, I had not had an opportunity to speak to that person, and to date I have no reason to believe or evidence to support that what Mr. McIntosh writes on that would be true.

[138]   But in light of the right to remain silent, X, even if identified, would be under no legal obligation to speak to the police, a critical fact which was acknowledged by the Crown (*R. v. Hebert*, [1990] 2 S.C.R. 151; *R. v. Chambers*, [1990] 2 S.C.R. 1293, at pp. 1315-16; and *R. v. Turcotte*, 2005 SCC 50, [2005] 2 S.C.R. 519, at paras. 41-46).

[139]   Since X is under no obligation to respond to questions from the police, since the evidence is that X received the document from an anonymous source whose identity he/she did not know, and since the envelope in which X received the document is not the envelope in the *National Post*'s possession, the benefit *to the forgery investigation* of getting the documents is, at best, marginal. Based on all of this, it seems to me to be clear that X is in no position to provide any information of assistance in the investigation of the alleged forgery, even if he/she agreed to be questioned by the police.

[140]   The only possible evidence the envelope could yield, and that only remotely, is the identity of X, not of the alleged forger. This would mean that the only purpose for learning the confidential source's identity is to discover who had created this public and awkward controversy. Corporal Gallant's Information to Obtain appears to confirm this purpose when he says:

. . . this investigation seeks to determine the identify [*sic*] of someone who has maliciously attempted to mislead the press with a view to the publication of false information. It is not intended to identify a person providing truthful information to a news outlet.

Curiosity about the identity of a confidential source may be understandable, but is never, by itself, an acceptable basis for interfering with freedom of the press (*O'Neill v. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389 (Ont. S.C.J.)).

R   Oui, Votre Honneur. Bien, jusqu'ici, Votre Honneur, je n'ai pas eu l'occasion de parler à cette personne et, pour l'instant, je n'ai aucune raison de croire ni aucune preuve que ce que M. McIntosh écrit à ce sujet serait vrai.

[138]   Vu le droit de garder le silence, même si l'identité de X était connue, X n'aurait pas l'obligation, en droit, de parler à la police, un fait crucial qu'a reconnu le ministère public (*R. c. Hebert*, [1990] 2 R.C.S. 151; *R. c. Chambers*, [1990] 2 R.C.S. 1293, p. 1315-1316; et *R. c. Turcotte*, 2005 CSC 50, [2005] 2 R.C.S. 519, par. 41-46).

[139]   Étant donné que X n'a pas l'obligation de répondre aux questions de la police, que la preuve indique que X a reçu le document d'une source anonyme dont l'identité lui était inconnue et que l'enveloppe dans laquelle X l'a reçu n'est pas l'enveloppe que le *National Post* a en sa possession, l'obtention des documents représenterait tout au plus un avantage minime *pour l'enquête sur le faux*. Compte tenu de tout ce qui précède, il me semble évident que X n'est pas en mesure de fournir de renseignements utiles pour l'enquête sur le prétendu faux, même s'il/elle acceptait que la police l'interroge.

[140]   L'identité de X, et non celle du prétendu faussaire, est le seul élément de preuve susceptible d'être tiré de l'enveloppe, et encore, cette possibilité est faible. Ainsi, l'identification de la source confidentielle n'aurait pour but que de découvrir l'identité de la personne à l'origine de cette controverse publique et embarrassante, et la dénonciation du caporal Gallant en vue d'obtenir un mandat semble confirmer ce but en ces termes :

[TRADUCTION] . . . la présente enquête vise à déterminer l'identité de quelqu'un qui, par malveillance, a tenté d'induire la presse en erreur en vue de faire publier de faux renseignements. Elle ne vise pas à identifier une personne qui communique des renseignements véridiques à un média d'information.

La curiosité à l'égard de l'identité d'une source confidentielle, quoique peut-être compréhensible, ne justifie jamais en soi d'entraver la liberté de la presse (*O'Neill c. Canada (Attorney General)* (2006), 213 C.C.C. (3d) 389 (C.S.J. Ont.)).

R. *c.* NATIONAL POST  *La juge Abella*

[141]   And that brings us to consider the seriousness of the crime at issue in this case, a factor that seems to me to be relevant in balancing the competing interests. As Professor Gora argues:

Have we solved or deterred important crimes that would not have been otherwise interdicted by law enforcement? Have journalists ever provided the smoking gun to help catch a killer or a terrorist, or just a leaker? . . . Has the gain to law enforcement been worth the loss to the First Amendment? A proper respect for the First Amendment requires that we at least ask these questions. [pp. 1420-21]

We must remember that what we are dealing with here is an alleged forgery. On a continuum of serious criminality, it strikes me as unhelpful to compare a possible forgery of a possible debt, as in our case, with the Paul Bernardo murder scenario the majority's reasons invoke by relying on *R. v. Murray* (2000), 144 C.C.C. (3d) 289 (Ont. S.C.J.). The remote possibility of resolving the debt forgery is far from sufficiently significant to outweigh the public benefit in protecting a rigorously thorough and responsible press.

[142]   So on one side of the balance we have the slightest possible benefit to an investigation of an alleged forgery, and on the other we have the far weightier injury to the press interests at stake in revealing X's identity. Even if there is only a remote prospect of being able to identify X from the documents, the remoteness of this possibility hardly argues for disclosure, as the majority suggests. There may be no consequential harm to X, but neither will there be any consequential benefit to the investigation. This means that the harm and benefit of disclosure *in this particular case* is speculative at best. The major demonstrable harm, with no countervailing benefit, is to the ability of the press to carry out its public mandate.

[141]   Ce qui nous amène à l'examen de la gravité du crime dont il est ici question, un facteur pertinent, à mon avis, dans la mise en balance des intérêts opposés. Comme l'affirme le professeur Gora :

[TRADUCTION] Avons-nous élucidé ou découragé d'importants crimes qui n'auraient pas été autrement empêchés par l'application de la loi? Les journalistes ont-ils déjà fourni une preuve irréfutable permettant d'arrêter un meurtrier ou un terroriste, ou tout simplement le responsable d'une fuite? [. . .] Le gain réalisé en ce qui concerne l'application de la loi justifiait-il la perte subie en ce qui concerne le Premier amendement? Le respect dû au Premier amendement exige qu'à tout le moins nous posions ces questions. [p. 1420-1421]

Il importe de rappeler que nous sommes ici en présence d'une allégation de faux. À mon avis, dans le spectre des crimes graves, la comparaison d'un prétendu faux faisant état d'une prétendue dette, comme en l'espèce, avec le scénario des meurtres commis par Paul Bernardo auquel les juges majoritaires font allusion dans leurs motifs en se reportant à l'arrêt *R. c. Murray* (2000), 144 C.C.C. (3d) 289 (C.S.J. Ont.), n'est d'aucune utilité. La faible possibilité de résoudre la question du faux est loin d'être suffisamment importante pour l'emporter sur les avantages pour le public de protéger une presse rigoureusement responsable, qui va au fond des choses.

[142]   Ainsi, l'identification de X engendrerait, d'un côté, un avantage éventuel des plus minimes pour une enquête sur un prétendu faux et, de l'autre côté, un préjudice beaucoup plus important pour les intérêts de la presse qui sont en jeu. Même s'il existe une infime possibilité que l'on puisse se servir des documents pour identifier X, cette infime possibilité ne milite guère en faveur de la divulgation, comme le laissent entendre les juges majoritaires. Il n'en résultera peut-être aucun préjudice pour X, mais il n'en résultera non plus aucun avantage pour l'enquête. Donc, le préjudice et l'avantage de la divulgation *dans ce cas précis* relèvent au mieux de la conjecture. Le principal préjudice démontrable est une atteinte à la capacité de la presse d'exercer son mandat public, et il n'y correspond aucun avantage.

[143]   The fourth and final Wigmore criterion for protecting the confidentiality of Mr. McIntosh's source has therefore been satisfied and the documents should not be disclosed.

*Notice*

[144]   I have a remaining concern about the procedure followed in this case, namely, the failure to give notice to the *National Post* that a search warrant was being requested. The operating presumption should be that the media's unique institutional character entitles it to notice when a search warrant is sought against it. A search warrant of media premises is a particularly serious intrusion, and a decision should not be made about its propriety without submissions from the party most affected.

[145]   The Crown informed the Justice of the Peace that the *National Post* had requested notification of the application, but he decided to proceed without notice. This is regrettable, since there were serious informational gaps in the Information to Obtain that were substantially narrowed by the *National Post* after the search warrant had been issued. Had the fuller record and arguments been known, the outcome of the hearing might well have been different.

[146]   In *Canadian Broadcasting Corporation v. Lessard*, [1991] 3 S.C.R. 421, and *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459, this Court dealt with search warrants involving the media. As Cory J. stated for the majority in *Lessard*, these are circumstances that warrant caution and accommodation:

. . . the media are entitled to particularly careful consideration, both as to the issuance of a search warrant and as to the conditions that may be attached to a warrant to ensure that any disruption of the gathering and dissemination of news is limited as much as possible. The media are entitled to this special consideration because

[143]   Par conséquent, le quatrième et dernier volet du test de Wigmore auquel il faut satisfaire pour que la confidentialité de la source de M. McIntosh soit protégée a été rempli, et les documents ne devraient pas être divulgués.

*Préavis*

[144]   J'ai une dernière réserve concernant la procédure suivie en l'espèce, soit l'omission d'aviser le *National Post* qu'un mandat de perquisition allait être demandé. Une présomption devrait s'appliquer selon laquelle le caractère institutionnel unique des médias leur donne le droit d'être avisés du dépôt d'une demande de mandat de perquisition les visant. La perquisition dans les locaux d'un média constitue une intrusion particulièrement grave, et la décision sur l'opportunité de l'autoriser ne devrait pas être rendue sans que le principal intéressé puisse présenter ses observations.

[145]   Le ministère public a informé le juge de paix que le *National Post* avait demandé à être avisé de la demande, mais le juge de paix a décidé d'instruire l'affaire sans préavis. C'est regrettable, étant donné que les graves lacunes informationnelles de la dénonciation en vue d'obtenir un mandat ont été grandement comblées par le *National Post* après la délivrance du mandat de perquisition. Si le dossier amplifié et les arguments avaient été présentés, l'issue de l'audience aurait très bien pu être tout autre.

[146]   Dans les arrêts *Société Radio-Canada c. Lessard*, [1991] 3 R.C.S. 421, et *Société Radio-Canada c. Nouveau-Brunswick (Procureur général)*, [1991] 3 R.C.S. 459, la Cour a examiné des mandats de perquisition concernant les médias. Dans l'affaire *Lessard*, le juge Cory a indiqué, au nom des juges majoritaires, que la prudence et des mesures d'adaptation s'imposent dans de telles circonstances :

. . . [les] médias ont droit à une attention toute particulière en ce qui concerne tant l'attribution d'un mandat de perquisition que les conditions dont peut être assorti un mandat afin que toute perturbation de la collecte et de la diffusion des informations soit le plus possible limitée. Les médias ont droit à cette attention particulière

R.   c.   NATIONAL POST   *La juge Abella*

2010 SCC 16 (CanLII)

of the importance of their role in a democratic society. [p. 444]

[147]   In her dissenting reasons in *Lessard*, McLachlin J. was alert to the potential for interference with freedom of the press. She pointed out that the "prospect of seizure of press material in future cases without the imposition of conditions to protect press freedom and the identity of informants . . . creates the chilling effect" (p. 453). Her proposed approach, like the balancing suggested by Stewart J. in *Branzburg* and in complete harmony with the fourth criterion in Wigmore, required that there be an absence of available alternative sources for the required information sought, and sufficient significance to that information to justify the interference with press freedom.

[148]   Cory J. recognized that the media was usually an innocent third party in connection with a crime being investigated, and that the supporting affidavit should therefore contain the appropriate information, including whether alternative sources for obtaining the information sought by the warrant had been reasonably investigated and exhausted (*Lessard*, at p. 445; see also La Forest J.'s concurring reasons at pp. 431-32, and *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (B.C.S.C.), at p. 495). He warned that search warrants could be invalidated if it subsequently came to light that pertinent information that could have affected the decision to issue the warrant was not disclosed. The absence of such relevant information, it seems to me, is precisely what happened in the case before us.

[149]   On the cross-examination of Corporal Gallant, for example, it emerged that alternative sources of the document had not been seriously investigated, despite Corporal Gallant's statement in his Information to Obtain, that:

The evidence I wish to seize — the forged document and the envelope in which it was delivered — is not available from any other source. This evidence is unique and

en raison de l'importance de leur rôle dans une société démocratique. [p. 444]

[147]   Dans ses motifs dissidents dans l'arrêt *Lessard*, la juge McLachlin était sensible à la possibilité d'atteinte à la liberté de la presse. Elle a indiqué que « l'éventualité d'une saisie de documents de presse à l'avenir sans l'imposition de conditions qui protègent la liberté de la presse et l'identité des informateurs [. . .] crée cet effet de dissuasion » (p. 453). L'approche qu'elle a proposée, semblable à l'exercice de pondération prôné par le juge Stewart dans *Branzburg* et en parfaite harmonie avec le quatrième critère de Wigmore, exigeait que les renseignements nécessaires recherchés ne puissent être obtenus d'aucune autre source et que l'information soit suffisamment importante pour justifier l'atteinte à la liberté de la presse.

[148]   Le juge Cory a reconnu que les médias sont habituellement des tiers innocents en rapport avec le crime visé par une enquête et que l'affidavit produit à l'appui de la demande de mandat devrait donc contenir les renseignements nécessaires, et notamment indiquer si des mesures raisonnables ont été prises pour obtenir l'information auprès d'autres sources et si ces sources ont été épuisées (*Lessard*, p. 445; voir également les motifs concordants du juge La Forest, p. 431-432, et *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (C.S.C.-B.), p. 495). Il a précisé qu'un mandat de perquisition pourrait être invalidé si l'on découvrait après coup que des renseignements pertinents qui auraient pu influer sur la décision de décerner le mandat n'ont pas été communiqués. L'absence de tels renseignements pertinents, il me semble, est exactement ce qui s'est produit en l'espèce.

[149]   Le contre-interrogatoire du caporal Gallant a révélé, par exemple, qu'aucun effort sérieux n'avait été fait pour vérifier si le document pouvait être obtenu d'autres sources, malgré l'affirmation suivante faite par le caporal Gallant dans sa dénonciation en vue d'obtenir un mandat :

[TRADUCTION] Les éléments de preuve que je souhaite saisir — le faux document et l'enveloppe dans laquelle il a été expédié — ne peuvent être obtenus d'une autre

central to this investigation. The evidence is the *actus reus* of the offence.

[150]  He confirmed that the Bloc Québecois had anonymously received a document identical to the one the *National Post* had, yet said he had not been able to get forensic evidence from it because the Bloc had distributed several copies of the document to members of the party and it was unclear which of them was the original.

[151]  Nor did Corporal Gallant inquire into whether any other members of Parliament or other media outlets may have received the document:

Q   . . . did you make inquiries of the other political parties, such as the Conservative party and the Alliance party, because they clearly were reviewing the documents? Did you make such inquiries before you got the search warrants in this case?

A   At this time, no, Your Honour. I have not started anything with respect to political parties, whether it be the PC or the Alliance.

.   .   .

Q   And just to complete this area, I also understand that you made no inquiries of other major media outlets like the Canadian Broadcasting Corporation or The Globe and Mail, to see whether they received such a document?

A   No. That's correct, Your Honour. The complaint we got here at the RCMP related to The National Post, and we have not directed our attention to other media organizations.

[152]  And although the information he gave in the Information to Obtain was that there was no outstanding debt from the Auberge to JAC Consultants, Corporal Gallant admitted on cross-examination that he had not examined the books of JAC Consultants prior to filing his request for the search warrant. This was of some significance because the cross-examination also revealed that

source. Il s'agit d'éléments de preuve uniques et essentiels pour la présente enquête. Les éléments de preuve constituent l'*actus reus* de l'infraction.

[150]  Il a confirmé que le Bloc Québecois avait reçu d'une source anonyme un document identique à celui que le *National Post* avait en main, mais il a affirmé qu'il n'avait pas été en mesure d'en tirer de preuve criminalistique parce que le Bloc avait distribué plusieurs copies du document aux membres du parti et qu'on ignorait quel document était l'original.

[151]  Le caporal Gallant n'a pas non plus vérifié s'il était possible que d'autres députés ou d'autres médias aient reçu le document :

[TRADUCTION]

Q   . . . avez-vous effectué des vérifications auprès des autres partis politiques, comme le Parti conservateur et l'Alliance canadienne, étant donné qu'ils ont manifestement examiné le document? Avez-vous effectué ces vérifications avant d'obtenir les mandats de perquisition dans la présente affaire?

R   À ce moment-ci, non, Votre Honneur. Je n'ai rien entrepris en ce qui concerne les partis politiques, que ce soit le PC ou l'Alliance.

.   .   .

Q   Et juste pour vider cette question, je crois également comprendre que vous n'avez effectué aucune vérification auprès des autres principaux médias d'information, comme la Société Radio-Canada ou le Globe and Mail, afin de savoir s'ils avaient reçu ce document?

R   Non. C'est exact, Votre Honneur. La plainte que nous avons reçue à la GRC concernait le National Post et nous ne nous sommes pas intéressés à d'autres médias.

[152]  Par ailleurs, bien qu'il ait déclaré dans la dénonciation en vue d'obtenir un mandat que l'Auberge n'avait aucune dette en souffrance envers JAC Consultants, le caporal Gallant a admis en contre-interrogatoire qu'il n'avait pas examiné les livres de JAC Consultants avant de déposer sa demande de mandat de perquisition. Cela avait une certaine importance étant donné que le

2010 SCC 16 (CanLII)

there were problems with some of the corroborating documents provided by the Bank.

[153]   The original suppliers' list that the Bank gave to Corporal Gallant, which he had reviewed at the start of the investigation, was missing the page where, alphabetically, "JAC Consultants" would have appeared. The Bank requested and received a new suppliers' list from the accountant for the owner of the Auberge, which did not show any debt to JAC Consultants. Through the cross-examination of Corporal Gallant, it was revealed that these two lists had different dates on them, and that they differed in some of the supplier names and amounts. By itself, this information might not have made a difference in the outcome, but when blended with the other missing pieces in the Information to Obtain, it arguably assumes some potential relevance.

[154]   But the most notable fact missing from the narrative that was revealed by the cross-examination of Corporal Gallant, was that the document came from a confidential source:

Q   From your perspective, did you or did you not believe it was important to tell the judge that the material you sought may have emanated from a confidential source?

A   Well, the information I had at the time . . . was that the documents we were seeking came from an anonymous source. It was not described to us as a confidential source.

Counsel for the *National Post* then drew Corporal Gallant's attention to a letter he had received prior to seeking the warrant, in which the *National Post* had voiced its concern that what was being sought emanated from a confidential source:

Q   And I take it, sir, that at no time did you draw, especially to the Justice of the Peace, that the document and envelope that you sought from The Post's

contre-interrogatoire a également révélé que certains documents corroborants fournis par la Banque posaient un problème.

[153]   Il manquait à la liste initiale de fournisseurs que la Banque a remise au caporal Gallant, et qu'il a examinée au début de l'enquête, la page où « JAC Consultants » aurait dû figurer selon l'ordre alphabétique. Après en avoir fait la demande, la Banque a reçu du comptable du propriétaire de l'Auberge une nouvelle liste de fournisseurs, sur laquelle ne figurait aucune dette envers JAC Consultants. Au cours du contre-interrogatoire du caporal Gallant, il s'est avéré que ces deux listes portaient des dates différentes et que certains noms de fournisseurs et montants qui y figuraient étaient différents. À elle seule, cette information aurait pu ne rien changer au résultat, mais combinée aux autres pièces manquantes dans la dénonciation en vue d'obtenir un mandat, elle pourrait sans doute présenter une certaine pertinence.

[154]   Toutefois, l'omission la plus flagrante dans l'exposé révélée par le contre-interrogatoire du caporal Gallant, était la provenance du document, soit qu'il émanait d'une source confidentielle :

[TRADUCTION]

Q   Selon vous, vous pensiez ou vous ne pensiez pas qu'il était important de dire au juge que les documents que vous vouliez pouvaient provenir d'une source confidentielle?

R   Bien, l'information que j'avais alors [. . .] était que les documents que nous voulions provenaient d'une source anonyme. On ne nous a pas dit que c'était une source confidentielle.

L'avocate du *National Post* a ensuite attiré l'attention du caporal Gallant sur une lettre qu'il avait reçue avant de demander le mandat de perquisition, dans laquelle le *National Post* s'était dit inquiet de ce que l'objet de la demande provenait d'une source confidentielle :

[TRADUCTION]

Q   Je présume, Monsieur, que vous n'avez jamais précisé, en particulier au juge de paix, que le document et l'enveloppe que vous vouliez obtenir provenaient,

perspective emanated from a confidential source? You did not draw that to his attention? Beyond putting this letter in the appendix?

A   No. That is not included in the search warrant . . . except for the fact that it's written here.

This information, if disclosed, would logically have led to an inquiry into whether the confidentiality of the source ought to be protected.

[155]   It seems logical to me that given the inherent legal complexities in authorizing a search warrant against the media, any problems with the Information to Obtain should be canvassed *prior* to deciding whether to issue the warrant. The *National Post* lost the opportunity to make *timely* submissions not only on the confidential nature of the source, but also about the deficiencies in the information. Taken together, the information elicited through cross-examination might well have resulted in the search warrant not being issued at all.

[156]   The media will always be in the best position to provide relevant information about the particular context, including whether a confidential relationship is at stake. As a general rule, therefore, it is entitled to notice of a request for a search warrant unless there are exceptional and urgent circumstances justifying an *ex parte* hearing.

[157]   Here there were no such circumstances. The Bank complained to the RCMP about the forgery by telephone on April 7, 2001, and formally complained by letter on April 11, 2001. Mr. McIntosh was interviewed on June 7, 2001, and the search warrant was issued over a year later on July 4, 2002. Clearly there was ample time for the *National Post* to receive notice of the application for a search warrant, to cross-examine Corporal Gallant, and to make its submissions.

[158]   The Crown argued that the one-month delay between the granting of the search warrant and its

selon The Post, d'une source confidentielle? Vous n'avez pas attiré son attention sur ce point? Si ce n'est qu'en joignant cette lettre en annexe?

R   Non. Ce n'est pas inclus dans le mandat de perquisition [. . .] mis à part le fait que c'est écrit ici.

Ce fait, eût-il été révélé, aurait en toute logique suscité des questions visant à déterminer s'il fallait protéger la confidentialité de la source.

[155]   Étant donné les complexités juridiques inhérentes à la décision d'autoriser un mandat de perquisition contre des médias, il m'apparaît logique que tout problème concernant la dénonciation en vue d'obtenir le mandat soit examiné en profondeur *avant* que cette décision soit rendue. Le *National Post* a perdu l'occasion de présenter des observations *en temps opportun*, non seulement en ce qui concerne la nature confidentielle de la source, mais aussi en ce qui a trait aux lacunes informationnelles. Pris ensemble, les renseignements révélés lors du contre-interrogatoire auraient bien pu conduire à la décision de ne pas délivrer le mandat de perquisition.

[156]   Les médias seront toujours les mieux placés pour fournir des renseignements pertinents sur le contexte particulier en cause, notamment pour ce qui est de savoir si une relation confidentielle est en jeu. Par conséquent, en règle générale, ils ont le droit d'être avisés lorsqu'un mandat de perquisition est demandé, à moins de circonstances exceptionnelles et urgentes justifiant une audience *ex parte*.

[157]   De telles circonstances n'existaient pas en l'espèce. La Banque a porté plainte à la GRC relativement au faux document par téléphone le 7 avril 2001, puis formellement par lettre le 11 avril 2001. M. McIntosh a été interrogé le 7 juin 2001 et le mandat de perquisition a été délivré plus d'un an plus tard, le 4 juillet 2002. De toute évidence, le *National Post* aurait eu amplement le temps de recevoir un préavis de la demande de mandat de perquisition, de contre-interroger le caporal Gallant et de présenter ses observations.

[158]   Le ministère public a allégué que le délai d'un mois entre la délivrance du mandat

execution gave the *National Post* time to respond to the issuance of the warrant with a *certiorari* application. This, with respect, is an untimely — and needless — public expense. The *National Post* should have had the opportunity to make its submissions *before* the warrant was issued.

**Conclusion**

[159]   I would therefore allow the appeal, set aside the judgment of the Ontario Court of Appeal, and restore the judgment of Benotto J. quashing the search warrant and the assistance order.

*Appeal dismissed,* ABELLA J. *dissenting.*

*Solicitors for the appellants: Marlys Edwardh Barristers Professional Corporation, Toronto.*

*Solicitor for the respondent: Crown Law Office — Criminal, Toronto.*

*Solicitor for the intervener the Attorney General of Canada: Department of Justice, Vancouver.*

*Solicitor for the intervener the Attorney General of New Brunswick: Office of the Attorney General, Fredericton.*

*Solicitor for the intervener the Attorney General of Alberta: Alberta Justice, Calgary.*

*Solicitors for the intervener Bell GlobeMedia Inc.: Bersenas Jacobsen Chouest Thomson Blackburn, Toronto.*

*Solicitor for the intervener the Canadian Broadcasting Corporation: Canadian Broadcasting Corporation, Toronto.*

*Solicitors for the intervener the British Columbia Civil Liberties Association: Farris, Vaughan, Wills & Murphy, Vancouver.*

*Solicitors for the intervener the Canadian Civil Liberties Association: Osgoode Hall Law School of York University, North York; Davies Ward Phillips & Vineberg, Toronto.*

de perquisition et son exécution avait laissé au *National Post* le temps de répondre à la délivrance du mandat par une demande de *certiorari*. Soit dit avec égards, il s'agit d'une dépense inopportune — et inutile — des fonds publics. Le *National Post* aurait dû avoir l'occasion de présenter ses observations *avant* la délivrance du mandat.

**Conclusion**

[159]   Par conséquent, je suis d'avis d'accueillir le pourvoi, d'annuler la décision de la Cour d'appel de l'Ontario et de rétablir la décision de la juge Benotto annulant le mandat de perquisition et l'ordonnance d'assistance.

*Pourvoi rejeté, la juge* ABELLA *est dissidente.*

*Procureurs des appelants : Marlys Edwardh Barristers Professional Corporation, Toronto.*

*Procureur de l'intimée : Bureau des avocats de la couronne — Droit criminel, Toronto.*

*Procureur de l'intervenant le procureur général du Canada : Ministère de la Justice, Vancouver.*

*Procureur de l'intervenant le procureur général du Nouveau-Brunswick : Cabinet du procureur général, Fredericton.*

*Procureur de l'intervenant le procureur général de l'Alberta : Justice Alberta, Calgary.*

*Procureurs de l'intervenante Bell GlobeMedia Inc. : Bersenas Jacobsen Chouest Thomson Blackburn, Toronto.*

*Procureur de l'intervenante la Société Radio-Canada : Société Radio-Canada, Toronto.*

*Procureurs de l'intervenante l'Association des libertés civiles de la Colombie-Britannique : Farris, Vaughan, Wills & Murphy, Vancouver.*

*Procureurs de l'intervenante l'Association canadienne des libertés civiles : Osgoode Hall Law School of York University, North York; Davies Ward Phillips & Vineberg, Toronto.*

R. *v.* NATIONAL POST

*Solicitor for the interveners the Canadian Newspaper Association, Ad IDEM/Canadian Media Lawyers Association, the Canadian Journalists for Free Expression, the Canadian Association of Journalists, the Professional Writers Association of Canada, RTNDA Canada/ Association of Electronic Journalists, Magazines Canada, the Canadian Publishers' Council, the Book and Periodical Council, the Writers' Union of Canada and PEN Canada: Brian MacLeod Rogers, Toronto.*

*Procureur des intervenants l'Association canadienne des journaux, Ad IDEM/Canadian Media Lawyers Association, les Journalistes canadiens pour la liberté d'expression, l'Association canadienne des journalistes, Professional Writers Association of Canada, ACDIRT Canada/Association des journalistes électroniques, Magazines Canada, Canadian Publishers' Council, Book and Periodical Council, Writers' Union of Canada et PEN Canada : Brian MacLeod Rogers, Toronto.*

2010 SCC 16 (CanLII)