# Exhibit D

2010 SCC 41 (CanLII)

| | |
|---|---|
| **Globe and Mail, a division of CTVglobemedia Publishing Inc.**   *Appellant* | **Globe and Mail, une division de CTVglobemedia Publishing Inc.**   *Appelante* |
| *v.* | *c.* |
| **Attorney General of Canada and Groupe Polygone Éditeurs inc.**   *Respondents* | **Procureur général du Canada et Groupe Polygone Éditeurs inc.**   *Intimés* |
| and | et |
| **Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc., Canadian Broadcasting Corporation and Canadian Civil Liberties Association**   *Interveners* | **Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc., Société Radio-Canada et Association canadienne des libertés civiles**   *Intervenantes* |
| - and - | - et - |
| **Globe and Mail, a division of CTVglobemedia Publishing Inc.**   *Appellant* | **Globe and Mail, une division de CTVglobemedia Publishing Inc.**   *Appelante* |
| *v.* | *c.* |
| **Attorney General of Canada and Groupe Polygone Éditeurs inc.**   *Respondents* | **Procureur général du Canada et Groupe Polygone Éditeurs inc.**   *Intimés* |
| and | et |
| **Barreau du Québec, Gesca ltée, Joël-Denis Bellavance and Canadian Civil Liberties Association**   *Interveners* | **Barreau du Québec, Gesca ltée, Joël-Denis Bellavance et Association canadienne des libertés civiles**   *Intervenants* |
| - and - | - et - |
| **Globe and Mail, a division of CTVglobemedia Publishing Inc.**   *Appellant* | **Globe and Mail, une division de CTVglobemedia Publishing Inc.**   *Appelante* |
| *v.* | *c.* |
| **Attorney General of Canada and Groupe Polygone Éditeurs inc.**   *Respondents* | **Procureur général du Canada et Groupe Polygone Éditeurs inc.**   *Intimés* |
| and | et |
| **Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media** | **Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media** |

Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc. and Canadian Broadcasting Corporation   *Interveners*

INDEXED AS: GLOBE AND MAIL *v.* CANADA (ATTORNEY GENERAL)

**2010 SCC 41**

File Nos.: 33114, 33097, 32975.

2009: October 21; 2010: October 22.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE SUPERIOR COURT OF QUEBEC AND THE COURT OF APPEAL FOR QUEBEC

*Constitutional law — Canadian Charter — Human rights — Quebec Charter of human rights and freedoms — Evidence — Journalist-source privilege — Freedom of expression — Access to information — Professional secrecy — Newspaper journalist receiving information from confidential unauthorized government source concerning company retained by federal government under Sponsorship Program — Newspaper publishing information alleging misuse and misdirection of public funds — Journalist compelled on cross-examination to answer questions possibly leading to identity of source — Newspaper objecting — Whether relationship protected by class-based journalist-source privilege — Whether basis for privilege constitutional or quasi-constitutional rooted in Canadian Charter and Quebec Charter rights — Whether common law framework to recognize case-by-case privilege relevant for civil litigation proceedings under Quebec law — Canadian Charter of Rights and Freedoms, s. 2(b) — Charter of human rights and freedoms, R.S.Q., c. C-12, ss. 3, 9, 44.*

*Constitutional law — Charter of Rights — Freedom of expression — Publication ban — Newspaper journalist receiving information from confidential unauthorized government source concerning company retained*

Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc. et Société Radio-Canada   *Intervenantes*

RÉPERTORIÉ : GLOBE AND MAIL *c.* CANADA (PROCUREUR GÉNÉRAL)

**2010 CSC 41**

Nᵒˢ du greffe : 33114, 33097, 32975.

2009 : 21 octobre; 2010 : 22 octobre.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR SUPÉRIEURE DU QUÉBEC ET DE LA COUR D'APPEL DU QUÉBEC

*Droit constitutionnel — Charte canadienne — Droits de la personne — Charte québécoise des droits et libertés de la personne — Preuve — Privilège du secret des sources des journalistes — Liberté d'expression — Accès à l'information — Secret professionnel — Renseignements obtenus par un journaliste d'un quotidien auprès d'une source gouvernementale confidentielle non autorisée à l'égard d'une entreprise retenue par le gouvernement fédéral dans le cadre du Programme de commandites — Publication par le quotidien d'informations faisant état d'allégations d'usage abusif et de détournement de fonds publics — Journaliste contraint en contre-interrogatoire de répondre à des questions susceptibles de permettre l'identification de la source des informations — Objections formulées par le quotidien — Les rapports entre le journaliste et la source sont-ils protégés par un privilège générique du secret des sources des journalistes? — Le privilège possède-t-il un fondement constitutionnel ou quasi constitutionnel découlant de la Charte canadienne et de la Charte des droits québécoise? — Le cadre d'analyse appliqué en common law pour reconnaître au cas par cas l'existence du privilège est-il pertinent dans une instance civile régie par le droit québécois? — Charte canadienne des droits et libertés, art. 2b) — Charte des droits et libertés de la personne, L.R.Q., ch. C-12, art. 3, 9, 44.*

*Droit constitutionnel — Charte des droits — Liberté d'expression — Interdiction de publication — Renseignements obtenus par un journaliste d'un quotidien auprès d'une source gouvernementale confidentielle*

*by federal government under Sponsorship Program — Information published including details about confidential settlement negotiations between government and company — Court making order prohibiting journalist from reporting and publishing further details concerning settlement negotiations — Whether order having effect of limiting journalist's freedom of expression rights under Canadian Charter — Whether publication ban necessary to prevent serious risk to proper administration of justice — Whether salutary effects of publication ban outweigh deleterious effects — Canadian Charter of Rights and Freedoms, s. 2(b).*

*non autorisée à l'égard d'une entreprise retenue par le gouvernement fédéral dans le cadre du Programme de commandites — Publication d'informations donnant notamment des détails sur des négociations confidentielles entre le gouvernement et l'entreprise en vue de la conclusion d'un règlement — Ordonnance du tribunal interdisant au journaliste d'écrire et de publier d'autres articles concernant ces négociations — Cette ordonnance avait-elle pour effet de limiter la liberté d'expression garantie au journaliste par la Charte canadienne? — L'interdiction de publication était-elle nécessaire afin d'écarter un risque sérieux pour la bonne administration de la justice? — Les effets bénéfiques de l'ordonnance de non-publication sont-ils plus importants que ses effets préjudiciables? — Charte canadienne des droits et libertés, art. 2b).*

These three appeals have as their origin the litigation flowing from what is known as the Sponsorship Scandal. In March 2005, the Attorney General of Canada filed a motion in the Quebec Superior Court seeking to recover the money paid by the federal government under the Sponsorship Program. The proceedings were instituted against several of the companies and individuals retained by the Program and implicated in the Scandal, including Groupe Polygone. In response, Groupe Polygone advanced a defence of prescription under the *Civil Code of Québec*. As the litigation proceeded, and in support of its prescription defence, Groupe Polygone obtained orders requiring that certain persons, including several federal government employees, answer questions aimed at identifying the source of a journalist's information. Based primarily on information received from a confidential unauthorized government source, L, a Globe and Mail journalist, had written a series of articles about the Sponsorship Program, alleging the misuse and misdirection of public funds. The Globe and Mail brought a revocation motion in respect of the orders issued by the Superior Court judge, arguing that their effect would be to breach journalist-source privilege. L testified on the motion and was cross-examined by counsel for Groupe Polygone. Counsel for the Globe and Mail objected to a number of questions posed to L, on the basis that they were either irrelevant, or that his answering them would lead to a breach of journalist-source privilege. The judge refused to recognize the existence of a journalist-source privilege and the objections were dismissed. Leave to appeal was denied by the Court of Appeal ("journalist-source privilege appeal"). Rather than have its journalist answer the questions, the Globe and Mail sought to discontinue the revocation proceedings. The judge refused to allow the discontinuance, and the Quebec Court of Appeal dismissed the appeal ("discontinuance

Les trois pourvois tirent leur origine du litige découlant de ce qu'on appelle le scandale des commandites. En mars 2005, le procureur général du Canada a présenté devant la Cour supérieure du Québec une requête en vue de recouvrer les sommes payées par le gouvernement fédéral dans le cadre du Programme de commandites. La poursuite a été intentée contre plusieurs entreprises et particuliers commandités dans le cadre du programme et impliqués dans le scandale, notamment le Groupe Polygone. En réponse, le Groupe Polygone a invoqué la prescription sur le fondement du *Code civil du Québec*. Pendant le déroulement de l'instance, et à l'appui de sa défense de prescription, le Groupe Polygone a obtenu des ordonnances enjoignant à certaines personnes, notamment plusieurs employés du gouvernement fédéral, de répondre à des questions destinées à identifier la source des renseignements obtenus par un journaliste. S'appuyant principalement sur les renseignements reçus d'une source confidentielle non autorisée du gouvernement, L, un journaliste du *Globe and Mail*, avait écrit une série d'articles sur le Programme de commandites, alléguant l'usage abusif de fonds publics et leur détournement. Le *Globe and Mail* a présenté une requête en rétractation des ordonnances rendues par le juge de la Cour supérieure, affirmant qu'elles entraîneraient la violation du privilège du secret des sources des journalistes. L a témoigné relativement à cette requête et a été contre-interrogé par l'avocat du Groupe Polygone. L'avocat du *Globe and Mail* s'est opposé à de nombreuses questions posées à L, au motif qu'elles manquaient de pertinence ou que le fait d'y répondre contreviendrait au privilège du secret des sources des journalistes. Le juge a rejeté ces objections et a refusé de reconnaître l'existence d'un tel privilège. Une demande d'autorisation d'appel de cette décision a été rejetée par la Cour d'appel (« pourvoi relatif au privilège du secret des sources des journalistes »).

appeal"). Meanwhile, during the hearing of the discontinuance proceedings, Groupe Polygone complained about leaks dealing with the content of confidential settlement negotiations in which it was engaged with the Attorney General, the details of which were reported by L and published by the Globe and Mail. In response, and on his own motion, the Superior Court judge made an order prohibiting L from further reporting and publishing on the state of the negotiations. While the Globe and Mail objected to what it insisted was a publication ban, and one issued without the benefit of hearing from either party, the judge maintained that the order was not a publication ban, providing no further written or oral reasons for his decision. The Quebec Court of Appeal again rejected the Globe and Mail's application for leave to appeal ("publication ban appeal").

In the journalist-source privilege appeal in this Court, the Globe and Mail argued that a class-based journalist-source privilege is rooted in the *Canadian Charter* and the *Quebec Charter*. In the alternative, it contended that the common law Wigmore doctrine to establish privilege on a case-by-case basis, but modified to account for the civil law tradition, is applicable. The Globe and Mail also challenged the order prohibiting the publication of information related to the settlement negotiations, as well as the order denying the discontinuance.

*Held*: The journalist-source privilege appeal should be allowed and the matter remitted to the Superior Court of Quebec for consideration in accordance with the reasons for judgment. The publication ban appeal should be allowed and the order prohibiting the publication of information relating to the settlement negotiations quashed. The discontinuance appeal should be dismissed as moot.

There is no basis for recognizing a class-based constitutional or quasi-constitutional journalist-source privilege under either the *Canadian Charter* or the *Quebec Charter*. For reasons set out in *R. v. National Post*, 2010 SCC 16, [2010] 1 S.C.R. 477, and in particular the difficulty in defining such a heterogenous and ill-defined group of writers and speakers with the necessary degree of certainty, freedom of expression under

Pour soustraire son journaliste à l'obligation à répondre aux questions, le *Globe and Mail* a tenté de se désister de sa requête en rétractation. Le juge n'a pas autorisé le désistement, et la Cour d'appel du Québec a rejeté l'appel de ce refus (« pourvoi relatif au désistement »). Entre-temps, durant l'audience relative au désistement, le Groupe Polygone s'est plaint des fuites concernant le contenu des négociations confidentielles auxquelles il participait avec le procureur général et dont les détails avaient été communiqués par L et rendus publics par le *Globe and Mail*. En réponse, et de sa propre initiative, le juge de la Cour supérieure a rendu une ordonnance interdisant à L d'écrire et de publier des articles sur l'état des négociations. Bien que le *Globe and Mail* se soit opposé à ce qu'il qualifiait d'ordonnance de non-publication — une ordonnance prononcée avant même d'entendre les parties sur cette question —, le juge a maintenu que l'ordonnance n'était pas une ordonnance de non-publication et n'a pas motivé davantage sa décision, ni par écrit ni de vive voix. La Cour d'appel du Québec a une fois de plus rejeté la demande d'autorisation d'appel du *Globe and Mail* (« pourvoi concernant l'interdiction de publication »).

Dans le pourvoi relatif au privilège du secret des sources des journalistes formé devant la Cour, le *Globe and Mail* a plaidé qu'un tel privilège, à caractère générique, découle de la *Charte canadienne* et de la *Charte québécoise*. Il a soutenu, à titre subsidiaire, que la doctrine de Wigmore élaborée en common law, mais modifiée pour tenir compte de la tradition civiliste, s'applique pour établir au cas par cas l'existence d'un privilège. Le *Globe and Mail* a contesté aussi l'ordonnance interdisant la publication de renseignements sur les négociations en vue d'un règlement ainsi que l'ordonnance refusant le désistement.

*Arrêt* : Le pourvoi relatif au privilège du secret des sources des journalistes est accueilli, et l'affaire renvoyée à la Cour supérieure du Québec pour nouvel examen conformément aux motifs de jugement. Le pourvoi concernant l'interdiction de publication est accueilli et l'ordonnance interdisant la publication de tout renseignement relatif aux négociations en vue d'un règlement entre les parties est annulée. Le pourvoi relatif au désistement est rejeté en raison de son caractère théorique.

Rien dans la *Charte canadienne* ou la *Charte québécoise* ne permet de reconnaître un privilège générique, constitutionnel ou quasi constitutionnel, du secret des sources des journalistes. Pour les motifs exposés dans *R. c. National Post*, 2010 CSC 16, [2010] 1 R.C.S. 477, et en particulier en raison de la difficulté à définir avec le degré de certitude nécessaire un groupe de rédacteurs et d'orateurs aussi hétérogène et mal défini, la liberté

the *Canadian Charter* and the *Quebec Charter* cannot constitute the basis for recognizing journalist-source privilege. Similarly, s. 44 of the *Quebec Charter*, which protects access to information, does not broaden the scope of the right beyond what is defined by the provision itself. While the s. 44 right can inform the protection of the confidential relationship between journalists and their sources, it cannot constitute the basis for recognizing the privilege. Finally, because journalists are not bound to professional secrecy by law, s. 9 of the *Quebec Charter*, which protects professional secrecy, cannot ground a quasi-constitutional right to the protection of media sources. There is, however, a basis in the laws of Quebec for a journalist-source privilege or an exemption from the general obligation to give evidence in civil cases. Despite its common law origins, the use of a Wigmore-like framework to recognize the existence of case-by-case privilege in the criminal law context is equally relevant for civil litigation matters subject to the laws of Quebec; recognition would result in consistency across the country, while preserving the distinctive legal context under the *Civil Code of Québec*. This case-by-case approach is consistent with the overarching principles set out in the *Civil Code*, the *Quebec Charter* and the *Canadian Charter*, and conforms with the law of evidence in Quebec as found in the *Civil Code* and the *Code of Civil Procedure*. It is also sufficiently flexible to take into account the variety of interests that may arise in any particular case.

Therefore, under the proposed test, to require a journalist to answer questions in a judicial proceeding that may disclose the identity of a confidential source, the requesting party must demonstrate first that the questions are relevant. If the questions are relevant, the court must then consider the four Wigmore factors: (1) the relationship must originate in a confidence that the source's identity will not be disclosed; (2) anonymity must be essential to the relationship in which the communication arises; (3) the relationship must be one that should be sedulously fostered in the public interest; and (4) the public interest served by protecting the identity of the informant must outweigh the public interest in getting at the truth. At the crucial fourth Wigmore factor, the court must balance the importance of disclosure to the administration of justice, against the public interest in maintaining journalist-source confidentiality. This balancing must be conducted in a context specific manner, having regard to the particular demand for disclosure at issue. The considerations relevant at

d'expression garantie par la *Charte canadienne* et la *Charte québécoise* ne peut servir de fondement pour reconnaître un privilège du secret des sources des journalistes. De même, l'art. 44 de la *Charte québécoise* — qui protège l'accès à l'information —, n'élargit pas la portée du droit au-delà de celle définie par cette disposition elle-même. Bien que le droit garanti par l'art. 44 puisse influencer la protection des rapports confidentiels entre un journaliste et sa source, il ne peut servir de fondement à la reconnaissance de ce privilège. Enfin, puisque les journalistes ne sont pas tenus au secret professionnel par la loi, l'art. 9 de la *Charte québécoise*, qui protège le secret professionnel, ne peut justifier la reconnaissance d'un droit quasi constitutionnel à la protection des sources des journalistes. Le droit du Québec peut toutefois servir de fondement à un privilège de protection du secret des sources des journalistes ou pour reconnaître une exception à l'obligation générale de fournir des éléments de preuve ou de témoigner dans une instance civile. Même s'il découle de la common law, le recours à un cadre d'analyse semblable au test de Wigmore pour reconnaître au cas par cas l'existence du privilège en droit criminel s'avère tout aussi valable dans le contexte d'un litige civil régi par le droit du Québec; la reconnaissance de ce cadre permettrait d'adopter une approche uniforme dans l'ensemble du pays tout en préservant le caractère distinct du milieu juridique régi par le *Code civil du Québec*. Cette approche au cas par cas est conforme aux principes généraux énoncés dans le *Code civil*, la *Charte québécoise* et la *Charte canadienne*, ainsi qu'au droit de la preuve au Québec, à savoir le *Code civil* et le *Code de procédure civile*. Elle est aussi suffisamment souple pour prendre en compte la diversité des intérêts en jeu dans un cas donné.

Par conséquent, selon le test proposé, pour exiger qu'un journaliste, dans une instance judiciaire, réponde à des questions susceptibles de permettre d'identifier une source confidentielle, la partie requérante doit démontrer leur pertinence. Si les questions sont pertinentes, le tribunal examinera ensuite les quatre volets du test de Wigmore : (1) les communications doivent avoir été transmises confidentiellement avec l'assurance que l'identité de la source ne sera pas divulguée; (2) l'anonymat doit être essentiel aux rapports dans le cadre desquels la communication est transmise; (3) les rapports doivent être, dans l'intérêt public, entretenus assidûment; et (4) l'intérêt public protégé par le refus de la divulgation de l'identité doit l'emporter sur l'intérêt public dans la recherche de la vérité. À l'importante quatrième étape de l'analyse, le tribunal doit mettre en balance l'importance de la divulgation pour l'administration de la justice et l'intérêt public à préserver la confidentialité de la source du journaliste. Cet exercice de mise en balance s'effectuera en fonction du contexte, compte tenu de la

GLOBE AND MAIL *c.* CANADA (P.G.)

the fourth Wigmore stage include: the stage of the proceeding when a claim of privilege is raised; the centrality of the issue to the dispute; whether the journalist is a party to the litigation, or simply a witness; whether the facts, information or testimony are available by any other means; the degree of public importance of the journalist's story; and whether the story has been published and therefore already in the public domain. In this case, the Superior Court judge erred in concluding that it was preferable to compel L's answers on cross-examination. L was entitled to have the questions put to him challenged for relevancy, and his claim for privilege rigorously tested against the Wigmore criteria. In particular, if the judge concluded that the first three factors favoured disclosure, he was then required to ask whether, on balance, the public interest in maintaining journalist-source confidentiality outweighed the importance of disclosure to the administration of justice. The public interest here, is based largely on whether the questions would tend to reveal the identity of L's confidential source. Ultimately, these matters are for the judge to determine, but in this case they were never considered because neither party was permitted to make submissions or tender evidence on the issue.

With respect to the publication ban appeal, the Superior Court's order must be assessed for what it is: a court-ordered publication ban which had the effect of limiting L's s. 2(*b*) freedom of expression *Canadian Charter* rights. The Superior Court judge therefore erred in not applying the *Dagenais/Mentuck* framework. The order was made without notice, without application and without the benefit of formal submissions from either party. By proceeding in this manner, in a case where there was no suggestion of urgency or delay inherent in hearing submissions that would prejudice either party, the Superior Court violated one of the fundamental rules of the adversarial process: it denied the parties an opportunity to be heard before deciding an issue that affected their rights. This, in itself, is sufficient to allow the appeal. Considering the publication ban on its merits, maintaining the confidentiality of settlement negotiations is a public policy goal of the utmost importance. However, confidentiality undertakings bind only the parties and their agents. Neither L nor the Globe and Mail was a party to the settlement negotiations. The wrong was committed by the government source who provided L with the information. Nothing in the record suggests that L was anything other than a beneficiary of

demande de divulgation particulière en cause. Les facteurs pertinents au quatrième volet du test de Wigmore comprennent : l'étape de la procédure où le privilège est revendiqué; le caractère essentiel de la question dans le cadre du différend; la question de savoir si le journaliste est une partie à l'instance ou simplement un témoin; la question de savoir si les faits, les renseignements ou les témoignages peuvent être connus par d'autres moyens; le degré d'importance de la nouvelle du journaliste pour le public et la question de savoir si elle a été publiée et relève donc déjà du domaine public. En l'espèce, le juge de la Cour supérieure a commis une erreur en concluant qu'il était préférable d'obliger L à répondre aux questions posées en contre-interrogatoire. L avait le droit de contester la pertinence des questions qu'on lui avait posées, et le juge aurait dû examiner rigoureusement sa revendication du privilège en fonction du test de Wigmore. Plus particulièrement, si le juge avait conclu que les trois premiers facteurs favorisaient la divulgation, il aurait été tenu de se demander si, tout bien considéré, l'intérêt public à préserver la confidentialité de la source du journaliste l'emportait sur l'importance de la divulgation pour l'administration de la justice. En l'espèce, l'intérêt public est largement fondé sur le risque que les réponses aux questions posées dévoilent l'identité de la source confidentielle de L. En dernière analyse, ces questions doivent être réglées par le juge, mais en l'espèce, elles n'ont jamais été analysées, puisqu'aucune des parties n'a été autorisée à présenter des observations ou des éléments de preuve à leur égard.

Quant au pourvoi concernant l'interdiction de publication, l'ordonnance de la Cour supérieure doit être évaluée en fonction de sa véritable nature : une ordonnance de non-publication qui a eu pour effet de limiter les droits de L et du *Globe and Mail* à la liberté d'expression que leur garantit l'al. 2*b*) de la *Charte canadienne*. Le juge de la Cour supérieure a donc commis une erreur en n'appliquant pas le test de *Dagenais/Mentuck*. L'ordonnance a été rendue sans préavis et sans que les parties ne le demandent ni n'aient l'occasion de présenter des observations en bonne et due forme à cet égard. En procédant ainsi, dans une affaire où rien ne suggérait qu'il y avait urgence ni que les parties subiraient un préjudice à cause des délais inhérents à la présentation de plaidoiries devant un tribunal, la Cour supérieure a enfreint une des règles fondamentales du processus accusatoire : elle a privé les parties de la possibilité de se faire entendre avant de trancher une question affectant leurs droits. Cela constitue un motif suffisant pour accueillir le pourvoi. Lorsqu'on examine l'interdiction de publication sur le fond, la préservation de la confidentialité des négociations en vue d'un règlement constitue un objectif d'ordre public d'une importance capitale. Toutefois, les engagements de confidentialité ne lient que les parties et leurs

the source's desire to breach confidentiality. L was not required to ensure that the information was provided to him without the source breaching any of her legal obligations and he was under no obligation to act as her legal adviser. In any event, Groupe Polygone offered no tangible proof that its ability to effectively engage in settlement negotiations with the government has been irreparably harmed, nor has it offered any evidence of a serious risk to the administration of justice. At the time L's article was published, the fact that the parties were engaged in settlement negotiations was already a matter of public record. Even if the ban were necessary to prevent a serious risk to the administration of justice, its salutary effects do not outweigh its deleterious effects which are serious. Upholding the order would prevent the story from coming to light, stifling the media's exercise of their constitutionally mandated role to report stories of public interest, such as one where the federal government is seeking to recover a considerable amount of public money because of an alleged fraud against a government program. Given the result in the journalist-source privilege and publication ban appeals, the discontinuance appeal is moot.

mandataires. Ni L ni le *Globe and Mail* n'étaient parties aux négociations en vue d'un règlement. Le délit a été commis par la source gouvernementale qui a fourni l'information à L. Rien dans le dossier n'indique que L a fait autre chose que de profiter de la volonté de la source de communiquer des renseignements confidentiels. L n'était pas tenu de s'assurer que sa source ne violait aucune obligation juridique en lui fournissant les renseignements, et il n'était pas tenu d'agir comme conseiller juridique auprès de cette source. Quoi qu'il en soit, le Groupe Polygone n'a pas démontré que sa capacité d'engager des négociations avec le gouvernement en vue d'un règlement a été irréparablement compromise et il n'a pas non plus établi l'existence d'un risque sérieux pour l'administration de la justice. Les négociations en vue d'un règlement relevaient déjà du domaine public au moment de la publication de l'article de L. Même si l'ordonnance était nécessaire pour écarter un risque sérieux pour l'administration de la justice, ses effets bénéfiques ne l'emportent pas sur ses effets préjudiciables, lesquels sont graves. Confirmer l'ordonnance empêcherait l'information d'être communiquée au public et reviendrait à museler les journalistes dans l'exercice du rôle qui leur appartient, en vertu de la Constitution, de publier des récits d'intérêt public, comme celui où le gouvernement fédéral cherche à recouvrer une importante somme d'argent appartenant aux contribuables, sur le fondement d'une fraude présumée contre un de ses programmes. Étant donné l'issue du pourvoi relatif au privilège du secret des sources des journalistes et de celui concernant l'interdiction de publication, le pourvoi relatif au désistement a un caractère théorique.

## Cases Cited

**Referred to:** *R. v. National Post*, 2010 SCC 16, [2010] 1 S.C.R. 477; *Gesca ltée v. Groupe Polygone Éditeurs inc. (Malcom Média inc.)*, 2009 QCCA 1534, [2009] R.J.Q. 1951, rev'g 2009 QCCS 1624 (CanLII); *Quebec (Commission des droits de la personne et des droits de la jeunesse) v. Montréal (City)*, 2000 SCC 27, [2000] 1 S.C.R. 665; *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; *Lac d'Amiante du Québec Ltée v. 2858-0702 Québec Inc.*, 2001 SCC 51, [2001] 2 S.C.R. 743; *Gosselin v. Quebec (Attorney General)*, 2002 SCC 84, [2002] 4 S.C.R. 429; *Foster Wheeler Power Co. v. Société intermunicipale de gestion et d'élimination des déchets (SIGED) inc.*, 2004 SCC 18, [2004] 1 S.C.R. 456; *Bisaillon v. Keable*, [1983] 2 S.C.R. 60; *Société d'énergie de la Baie James v. Lafarge Canada Inc.*, [1991] R.J.Q. 637; *Boiler Inspection and Insurance Company of Canada v. Corporation municipale de la paroisse de St-Louis de France*, [1994] R.D.J. 95; *Grenier v. Arthur*, [2001] R.J.Q. 674; *Centre de réadaptation en déficience intellectuelle de Québec v. Groupe TVA inc.*, [2005]

## Jurisprudence

**Arrêts mentionnés :** *R. c. National Post*, 2010 CSC 16, [2010] 1 R.C.S. 477; *Gesca ltée c. Groupe Polygone Éditeurs inc. (Malcom Média inc.)*, 2009 QCCA 1534, [2009] R.J.Q. 1951, inf. 2009 QCCS 1624 (CanLII); *Québec (Commission des droits de la personne et des droits de la jeunesse) c. Montréal (Ville)*, 2000 CSC 27, [2000] 1 R.C.S. 665; *Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862; *Lac d'Amiante du Québec Ltée c. 2858-0702 Québec Inc.*, 2001 CSC 51, [2001] 2 R.C.S. 743; *Gosselin c. Québec (Procureur général)*, 2002 CSC 84, [2002] 4 R.C.S. 429; *Société d'énergie Foster Wheeler ltée c. Société intermunicipale de gestion et d'élimination des déchets (SIGED) inc.*, 2004 CSC 18, [2004] 1 R.C.S. 456; *Bisaillon c. Keable*, [1983] 2 R.C.S. 60; *Société d'énergie de la Baie James c. Lafarge Canada Inc.*, [1991] R.J.Q. 637; *Boiler Inspection and Insurance Company of Canada c. Corporation municipale de la paroisse de St-Louis de France*, [1994] R.D.J. 95; *Grenier c. Arthur*, [2001] R.J.Q. 674; *Centre de réadaptation en déficience intellectuelle de Québec c. Groupe*

R.J.Q. 2327; *Drouin v. La Presse ltée*, [1999] R.J.Q. 3023; *Tremblay v. Hamilton*, [1995] R.J.Q. 2440; *Landry v. Southam Inc.*, 2002 CanLII 20587; *Marks v. Beyfus* (1890), 25 Q.B.D. 494; *D. v. National Society for the Prevention of Cruelty to Children*, [1978] A.C. 171; *R. v. Gruenke*, [1991] 3 S.C.R. 263; *Frenette v. Metropolitan Life Insurance Co.*, [1992] 1 S.C.R. 647; *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 89 O.R. (3d) 81; *Charkaoui (Re)*, 2008 FC 61, [2009] 1 F.C.R. 507; *Attorney-General v. Mulholland*, [1963] 2 Q.B. 477; *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487; *Secretary of State for Defence v. Guardian Newspapers Ltd.*, [1985] 1 A.C. 339; *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985*, [1988] 1 A.C. 660; *Globe and Mail v. Canada (Procureur général)*, 2008 QCCA 2516 (CanLII); *Toronto Star Newspapers Ltd. v. Canada*, 2010 SCC 21, [2010] 1 S.C.R. 721; *Kosko v. Bijimine*, 2006 QCCA 671 (CanLII); *Waldridge v. Kennison* (1794), 1 Esp. 143, 170 E.R. 306; *Histed v. Law Society of Manitoba*, 2005 MBCA 106, 195 Man. R. (2d) 224; *Canadian Broadcasting Corp. v. Paul*, 2001 FCA 93, 198 D.L.R. (4th) 633; *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979); *Bartnicki v. Vopper*, 532 U.S. 514 (2001); *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835; *R. v. Mentuck*, [2001] 3 S.C.R. 442; *Vancouver Sun (Re)*, 2004 SCC 43, [2004] 2 S.C.R. 332; *Peat Marwick Thorne v. Canadian Broadcasting Corp.* (1991), 5 O.R. (3d) 747; *Amherst (Town) v. Canadian Broadcasting Corp.* (1994), 133 N.S.R. (2d) 277; *Canada (Canadian Transportation Accident Investigation and Safety Board) v. Canadian Press*, [2000] N.S.J. No. 139 (QL); *Calgary Regional Health Authority v. United Western Communications Ltd.*, 1999 ABQB 516, 75 Alta. L.R. (3d) 326; *K. v. K. (E.)*, 2004 ABQB 847, 37 Alta. L.R. (4th) 118.

*TVA inc.*, [2005] R.J.Q. 2327; *Drouin c. La Presse ltée*, [1999] R.J.Q. 3023; *Tremblay c. Hamilton*, [1995] R.J.Q. 2440; *Landry c. Southam Inc.*, 2002 CanLII 20587; *Marks c. Beyfus* (1890), 25 Q.B.D. 494; *D. c. National Society for the Prevention of Cruelty to Children*, [1978] A.C. 171; *R. c. Gruenke*, [1991] 3 R.C.S. 263; *Frenette c. Métropolitaine (La), cie d'assurance-vie*, [1992] 1 R.C.S. 647; *St. Elizabeth Home Society c. Hamilton (City)*, 2008 ONCA 182, 89 O.R. (3d) 81; *Charkaoui (Re)*, 2008 CF 61, [2009] 1 R.C.F. 507; *Attorney-General c. Mulholland*, [1963] 2 Q.B. 477; *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487; *Secretary of State for Defence c. Guardian Newspapers Ltd.*, [1985] 1 A.C. 339; *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985*, [1988] 1 A.C. 660; *Globe and Mail c. Canada (Procureur général)*, 2008 QCCA 2516 (CanLII); *Toronto Star Newspapers Ltd. c. Canada*, 2010 CSC 21, [2010] 1 R.C.S. 721; *Kosko c. Bijimine*, 2006 QCCA 671, [2006] R.J.Q. 1539; *Waldridge c. Kennison* (1794), 1 Esp. 143, 170 E.R. 306; *Histed c. Law Society of Manitoba*, 2005 MBCA 106, 195 Man. R. (2d) 224; *Société Radio-Canada c. Paul*, 2001 CAF 93, [2001] A.C.F. nº 542 (QL); *Smith c. Daily Mail Publishing Co.*, 443 U.S. 97 (1979); *Bartnicki c. Vopper*, 532 U.S. 514 (2001); *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835; *R. c. Mentuck*, 2001 CSC 76, [2001] 3 R.C.S. 442; *Vancouver Sun (Re)*, 2004 CSC 43, [2004] 2 R.C.S. 332; *Peat Marwick Thorne c. Canadian Broadcasting Corp.* (1991), 5 O.R. (3d) 747; *Amherst (Town) c. Canadian Broadcasting Corp.* (1994), 133 N.S.R. (2d) 277; *Canada (Canadian Transportation Accident Investigation and Safety Board) c. Canadian Press*, [2000] N.S.J. No. 139 (QL); *Calgary Regional Health Authority c. United Western Communications Ltd.*, 1999 ABQB 516, 75 Alta. L.R. (3d) 326; *K. c. K. (E.)*, 2004 ABQB 847, 37 Alta. L.R. (4th) 118.

## Statutes and Regulations Cited

*Alberta Rules of Court*, Alta. Reg. 390/68, r. 173.
*Canadian Charter of Rights and Freedoms*, ss. 2(*b*), 32.
*Charter of human rights and freedoms*, R.S.Q., c. C-12, ss. 3, 4, 5, 9, 9.1, 44, 52.
*Civil Code of Lower Canada*, art. 1206.
*Civil Code of Québec*, R.S.Q., c. C-1991, preliminary provision, arts. 3, 35, 36(2), 2803 to 2874.
*Civil Procedure Rules* (Nova Scotia), rr. 10.13(4)(a), 10.14(4)(a), 10.16.
*Code of Civil Procedure*, R.S.Q., c. C-25, arts. 20, 46, 151.14, 151.16, 151.21, 398.1.
*Constitution Act, 1867*, s. 96.
*Professional Code*, R.S.Q., c. C-26, Sch. I.
*Queen's Bench Rules*, Man. Reg. 553/88, rr. 49.06(1), (2), 50.01(9), (10).

## Lois et règlements cités

*Alberta Rules of Court*, Alta. Reg. 390/68, règle 173.
*Charte canadienne des droits et libertés*, art. 2*b*), 32.
*Charte des droits et libertés de la personne*, L.R.Q., ch. C-12, art. 3, 4, 5, 9, 9.1, 44, 52.
*Civil Procedure Rules* (Nouvelle-Écosse), règles 10.13(4)a), 10.14(4)a), 10.16.
*Code civil du Bas Canada*, art. 1206.
*Code civil du Québec*, L.R.Q., ch. C-1991, disposition préliminaire, art. 3, 35, 36(2), 2803 à 2874.
*Code de procédure civile*, L.R.Q., ch. C-25, art. 20, 46, 151.14, 151.16, 151.21, 398.1.
*Code des professions*, L.R.Q., ch. C-26, ann. I.
*Loi constitutionnelle de 1867*, art. 96.
*Règles de la Cour du Banc de la Reine*, Règl. du Man. 553/88, règles 49.06(1), (2), 50.01(9), (10).

GLOBE AND MAIL *v.* CANADA (A.G.) [2010] 2 S.C.R.

*Queen's Bench Rules* (Saskatchewan), rr. 181(3), 191(14), (15).
*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, rr. 24.1.14, 49.06, 50.09, 50.10.
*Supreme Court Civil Rules*, B.C. Reg. 168/2009, rr. 9-1(2), 9-2(1), (3).

**Authors Cited**

*Cross and Tapper on Evidence*, 11th ed. by Colin Tapper. New York: Oxford University Press, 2007.
Ducharme, Léo. *L'administration de la preuve*, 3ᵉ éd. Montréal: Wilson & Lafleur, 2001.
Ducharme, Léo. *Précis de la preuve*, 6ᵉ éd. Montréal: Wilson & Lafleur, 2005.
Jutras, Daniel. "Culture et droit processuel: le cas du Québec" (2009), 54 *McGill L.J.* 273.
Leblanc, Daniel. *Nom de code: MaChouette: l'enquête sur le scandale des commandites.* Outremont, Qué.: Libre Expression, 2006.
Leblanc, Daniel. "Sponsorship firm moves to settle with Ottawa", *The Globe and Mail*, October 21, 2008, p. A11.
Québec. Assemblée nationale. Commission permanente de la Justice. Étude du projet de loi nº 50 — Loi concernant les droits et les libertés de la personne. *Journal des débats: Commissions parlementaires*, 3ᵉ sess., 30ᵉ lég., nº 6, 22 janvier 1975, p. B-322.
Quebec. Ministry of Justice. *Justice Today*, by Jérôme Choquette. Québec: Ministry of Justice, 1975.
Royer, Jean-Claude, et Sophie Lavallée. *La preuve civile*, 4ᵉ éd. Cowansville, Qué.: Yvon Blais, 2008.
Vallières, Nicole. "Le secret professionnel inscrit dans la Charte des droits et libertés de la personne du Québec" (1985), 26 *C. de D.* 1019.

[33114] APPEAL from an order of the Superior Court of Quebec (de Grandpré J.) dismissing objections to evidence. Appeal allowed.

[33097] APPEAL from a judgment of the Quebec Court of Appeal (Pelletier, Doyon and Duval Hesler JJ.A.), 2009 QCCA 235, [2009] J.Q. nº 713 (QL), dismissing an application for leave to appeal from an order of de Grandpré J. prohibiting the publication of information. Appeal allowed.

[32975] APPEAL from a judgment of the Quebec Court of Appeal (Otis, Forget and Côté JJ.A.), 2008 QCCA 2464, [2008] J.Q. nº 13554 (QL), 2008

*Règles de procédure civile*, R.R.O. 1990, Règl. 194, règles 24.1.14, 49.06, 50.09, 50.10.
*Règles de procédure de la Cour du Banc de la Reine* (Saskatchewan), règles 181(3), 191(14), (15).
*Supreme Court Civil Rules*, B.C. Reg. 168/2009, règles 9-1(2), 9-2(1), (3).

**Doctrine citée**

*Cross and Tapper on Evidence*, 11th ed. by Colin Tapper. New York: Oxford University Press, 2007.
Ducharme, Léo. *L'administration de la preuve*, 3ᵉ éd. Montréal : Wilson & Lafleur, 2001.
Ducharme, Léo. *Précis de la preuve*, 6ᵉ éd. Montréal : Wilson & Lafleur, 2005.
Jutras, Daniel. « Culture et droit processuel : le cas du Québec » (2009), 54 *R.D. McGill* 273.
Leblanc, Daniel. *Nom de code : MaChouette : l'enquête sur le scandale des commandites.* Outremont, Qué. : Libre Expression, 2006.
Leblanc, Daniel. « Sponsorship firm moves to settle with Ottawa », *The Globe and Mail*, October 21, 2008, p. A11.
Québec. Assemblée nationale. Commission permanente de la Justice. Étude du projet de loi nº 50 — Loi concernant les droits et les libertés de la personne. *Journal des débats : Commissions parlementaires*, 3ᵉ sess., 30ᵉ lég., nº 6, 22 janvier 1975, p. B-322.
Québec. Ministère de la Justice. *La justice contemporaine*, par Jérôme Choquette. Québec : Ministère de la Justice, 1975.
Royer, Jean-Claude, et Sophie Lavallée. *La preuve civile*, 4ᵉ éd. Cowansville, Qué. : Yvon Blais, 2008.
Vallières, Nicole. « Le secret professionnel inscrit dans la Charte des droits et libertés de la personne du Québec » (1985), 26 *C. de D.* 1019.

[33114] POURVOI contre une ordonnance de la Cour supérieure du Québec (le juge de Grandpré) ayant rejeté des objections à la preuve. Pourvoi accueilli.

[33097] POURVOI contre un arrêt de la Cour d'appel du Québec (les juges Pelletier, Doyon et Duval Hesler), 2009 QCCA 235, [2009] J.Q. nº 713 (QL), qui a rejeté la demande d'autorisation d'appeler d'une ordonnance du juge de Grandpré ayant interdit la publication de toute information. Pourvoi accueilli.

[32975] POURVOI contre un arrêt de la Cour d'appel du Québec (les juges Otis, Forget et Côté), 2008 QCCA 2464, [2008] J.Q. nº 13554 (QL),

CarswellQue 12763, dismissing an application for leave to appeal from an order of de Grandpré J. refusing to grant a discontinuance of proceedings. Appeal dismissed.

*William Brock*, *Guy Du Pont*, *David Stolow* and *Brandon Wiener*, for the appellant.

*Claude Joyal*, for the respondent the Attorney General of Canada.

*Patrick Girard*, *Louis P. Bélanger*, *Q.C.*, and *Frédéric Pierrestiger*, for the respondent Groupe Polygone Éditeurs inc.

*Christian Leblanc*, *Marc-André Nadon* and *Chloé Latulippe*, for the interveners Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc., the Canadian Broadcasting Corporation, Gesca ltée and Joël-Denis Bellavance.

*Jamie Cameron*, *Christopher D. Bredt* and *Cara F. Zwibel*, for the intervener the Canadian Civil Liberties Association.

*Michel Paradis*, *François-Olivier Barbeau*, *Gaston Gauthier* and *Sylvie Champagne*, for the intervener Barreau du Québec.

The judgment of the Court was delivered by

LeBel J. —

I.   Introduction

[1]   It is a general and well-accepted rule of evidence that witnesses who are called to testify are obliged to answer the questions put to them, so long as they are relevant. *The Globe and Mail* ("Globe and Mail") seeks an exception to this rule for the benefit of one of its journalists, Mr. Daniel Leblanc, on the basis that his testimony would reveal the identity of a confidential source and thereby infringe his s. 2(*b*) rights under the *Canadian Charter of Rights and Freedoms*. The Globe and Mail also asks this

2008 CarswellQue 12763, qui a rejeté la demande d'autorisation d'appeler d'une ordonnance du juge de Grandpré ayant refusé la demande de désistement. Pourvoi rejeté.

*William Brock*, *Guy Du Pont*, *David Stolow* et *Brandon Wiener*, pour l'appelante.

*Claude Joyal*, pour l'intimé le procureur général du Canada.

*Patrick Girard*, *Louis P. Bélanger*, *c.r.*, et *Frédéric Pierrestiger*, pour l'intimé le Groupe Polygone Éditeurs inc.

*Christian Leblanc*, *Marc-André Nadon* et *Chloé Latulippe*, pour les intervenants la Fédération professionnelle des journalistes du Québec, Ad IDEM/Canadian Media Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc., Société Radio-Canada, Gesca ltée et Joël-Denis Bellavance.

*Jamie Cameron*, *Christopher D. Bredt* et *Cara F. Zwibel*, pour l'intervenante l'Association canadienne des libertés civiles.

*Michel Paradis*, *François-Olivier Barbeau*, *Gaston Gauthier* et *Sylvie Champagne*, pour l'intervenant le Barreau du Québec.

Version française du jugement de la Cour rendu par

Le juge LeBel —

I.   Introduction

[1]   Une règle générale bien établie en matière de preuve oblige les témoins appelés à répondre aux questions pertinentes qui leur sont posées. Le quotidien *The Globe and Mail* (« *Globe and Mail* ») prie la Cour de soustraire un de ses journalistes, M. Daniel Leblanc, à cette obligation au motif que son témoignage révélerait l'identité d'une source confidentielle et porterait ainsi atteinte aux droits que lui garantit l'al. 2b) de la *Charte canadienne des droits et libertés*. Le *Globe and Mail* demande également

2010 SCC 41 (CanLII)

Court to quash an order prohibiting it from publishing any information, however obtained, regarding confidential settlement negotiations involving the Government of Canada and Groupe Polygone Éditeurs inc.

[2]   These appeals all have as their origin the litigation flowing from what is now known as the "Sponsorship Scandal". More broadly, however, these appeals raise questions concerning access to the information provided by sources to journalists, and the confidentiality of their relationship, in the context of civil litigation subject to the law of Quebec. While some of these questions are analogous to those recently considered by this Court in *R. v. National Post*, 2010 SCC 16, [2010] 1 S.C.R. 477, which also dealt with the confidentiality of the journalist-source relationship, although in the context of a criminal investigation, these appeals also require this Court to consider the propriety of ordering a ban on the publication of settlement negotiations. A related procedural issue, in respect of an attempted discontinuance of procedures before the Superior Court of Quebec, is also before our Court in a third appeal.

[3]   For the reasons that follow, the appeals dealing with the confidentiality of the journalist-source relationship and the publication ban are allowed. Because this result renders the discontinuance appeal moot, that appeal is dismissed.

## II.  Source of the Litigation and Its Procedural History

[4]   Following the results of the 1995 referendum on Quebec sovereignty, the federal Cabinet created the Sponsorship Program ("Program"), which was designed to counteract the sovereignty movement and increase the visibility of the federal government in Quebec. Based primarily on information

à la Cour d'annuler l'ordonnance lui interdisant de publier tout renseignement, peu importe la façon dont il a été obtenu, concernant les négociations confidentielles en vue d'un règlement engagées entre le gouvernement du Canada et le Groupe Polygone Éditeurs inc.

[2]   Les présents pourvois tirent tous leur origine du litige découlant de ce qu'on appelle désormais le « scandale des commandites ». Toutefois, d'un point de vue plus général, ils soulèvent des questions relatives à l'accès aux renseignements que des sources fournissent aux journalistes et à la confidentialité de leurs rapports, dans le contexte d'un litige civil régi par les lois du Québec. Bien que certaines de ces questions soient semblables à celles examinées récemment par la Cour dans *R. c. National Post*, 2010 CSC 16, [2010] 1 R.C.S. 477 — arrêt qui portait également sur la confidentialité de la relation entre un journaliste et sa source, quoique dans le contexte d'une enquête criminelle — les présents pourvois exigent en outre que la Cour examine le bien-fondé des ordonnances de non-publication visant des négociations en vue d'un règlement. La Cour est également saisie, dans le troisième pourvoi, d'une question procédurale connexe à propos d'une tentative de désistement d'une procédure intentée devant la Cour supérieure du Québec.

[3]   Pour les motifs qui suivent, les pourvois portant sur la confidentialité de la relation entre un journaliste et sa source et sur l'ordonnance de non-publication sont accueillis. Puisque ma conclusion dans les autres pourvois le rend théorique, le pourvoi à l'encontre du refus d'autoriser le désistement est rejeté.

## II.  Source du litige et historique des procédures

[4]   À la suite du résultat du référendum de 1995 sur la souveraineté du Québec, le Cabinet fédéral a créé le Programme de commandites (« Programme »), qui visait à contrecarrer le mouvement souverainiste et à augmenter la visibilité du gouvernement fédéral au Québec. S'appuyant principalement

2010 SCC 41 (CanLII)

GLOBE AND MAIL *c.* CANADA (P.G.)   *Le juge LeBel*

he received from a confidential source — who later became known by the alias MaChouette — a Globe and Mail journalist, Daniel Leblanc, wrote a series of articles on the Program. Mr. Leblanc focussed primarily on several problematic activities relating to the Program's administration. His most significant allegations targeted the misuse and misdirection of public funds. Throughout the course of his communication with MaChouette, Mr. Leblanc agreed to protect her confidentiality and anonymity.

[5]   In response to the articles written by Mr. Leblanc and others who picked up the story, considerable media and public interest was directed toward the Sponsorship Program. Following a scathing report from the Auditor General, a Royal Commission (the "Gomery Inquiry") was struck to investigate what had become known colloquially as the "Sponsorship Scandal".

[6]   In 2006, Mr. Leblanc took an unpaid leave of absence from the Globe and Mail in order to author a book about the Sponsorship Scandal, which he eventually published under the title *Nom de code: MaChouette: l'enquête sur le scandale des commandites* (2006). While the Globe and Mail authorized the reproduction of articles that it had published and for which it held the copyright, it was not Mr. Leblanc's book publisher. Nor did the Globe and Mail have any financial stake in the book's publication.

[7]   In March 2005, the Attorney General of Canada filed a motion, in the Quebec Superior Court, seeking to recover the money paid by the federal government under the impugned Program, which amounted to over $60 million. The proceedings were instituted against several of the companies and individuals retained by the Program and implicated in the Sponsorship Scandal, including the entities that collectively form Groupe Polygone. Since these proceedings were initiated, the Attorney General has maintained that it was not until May 2002 — after receiving the Auditor

sur les renseignements reçus d'une source confidentielle — connue ultérieurement sous le pseudonyme MaChouette — un journaliste du *Globe and Mail*, Daniel Leblanc, a écrit une série d'articles sur le programme. Ceux-ci portaient principalement sur plusieurs activités problématiques reliées à l'administration du programme. Ses allégations les plus importantes portaient sur l'usage abusif de fonds publics et leur détournement. Tout au long de ses communications avec MaChouette, M. Leblanc a accepté de protéger l'anonymat de son interlocuteur et la confidentialité de leurs échanges.

[5]   Les articles écrits par M. Leblanc ainsi que par d'autres journalistes ayant repris la nouvelle ont suscité auprès des médias et du public un intérêt considérable à l'égard du Programme de commandites. À la suite d'un rapport cinglant de la vérificatrice générale, une commission d'enquête (la « commission Gomery ») a été créée pour enquêter sur ce qui est désormais surnommé familièrement le « scandale des commandites ».

[6]   En 2006, M. Leblanc a pris un congé sans solde du *Globe and Mail* pour écrire un livre sur ce scandale. Cet ouvrage a été publié sous le titre *Nom de code : MaChouette : l'enquête sur le scandale des commandites* (2006). Bien que le *Globe and Mail* ait autorisé la reproduction d'articles qu'il avait publiés et pour lesquels il détenait les droits d'auteur, il n'était pas l'éditeur du livre de M. Leblanc. Le *Globe and Mail* ne détenait plus aucun intérêt financier dans la publication du livre.

[7]   En mars 2005, le procureur général du Canada a présenté une requête devant la Cour supérieure du Québec en vue de recouvrer les sommes payées par le gouvernement fédéral dans le cadre du programme contesté, soit plus de 60 millions de dollars. La poursuite a été intentée contre plusieurs entreprises et particuliers commandités dans le cadre du programme et impliqués dans le scandale des commandites, notamment les entités formant collectivement le Groupe Polygone. Depuis le début de l'instance, le procureur général soutient qu'il n'avait pas commencé à soupçonner une

General's report — that the government began to suspect fraud. The full extent of the fraud and the identity of its perpetrators, the government says, crystallized only with the revelations disclosed by the Gomery Inquiry.

[8]   In response, Groupe Polygone, maintaining that the Government of Canada had earlier knowledge of the scandal, sought to advance a defence of prescription under the *Civil Code of Québec*, R.S.Q., c. C-1991 ("*Civil Code*" or "*C.C.Q.*"). As the litigation proceeded, and in support of its prescription defence, Groupe Polygone applied for an order requiring that certain persons, including several federal government employees, answer questions aimed at identifying Mr. Leblanc's source. In a series of orders, Hébert J. instructed the individuals identified by Groupe Polygone to answer the questions in writing and to keep the matter confidential. At the request of the Attorney General, he also appointed counsel to act as advisor to those named individuals. Hébert J. then extended his initial order to answer questions to an additional group of individuals.

[9]   Almost a year later, the Globe and Mail brought a revocation motion in respect of the orders issued by Hébert J., arguing that their effect would be to breach journalist-source privilege. It asked that these orders be quashed. Mr. Leblanc testified on the motion, argued before de Grandpré J., and he was cross-examined by counsel for Groupe Polygone. Counsel for the Globe and Mail objected to a number of questions posed to Mr. Leblanc, on the basis that they were either irrelevant, or that his answering them would lead to a breach of journalist-source privilege (the "objection motion"). De Grandpré J. dismissed these objections, orally, and refused to recognize the existence of a journalist-source privilege. Leave to appeal was denied by a single judge of the Court of Appeal, on the basis that the court lacked jurisdiction to hear the appeal. Rather than have its journalist answer the questions, the Globe and Mail sought to discontinue the revocation proceedings.

fraude avant mai 2002, c'est-à-dire après la réception du rapport de la vérificatrice générale. Selon le gouvernement, ce n'est d'ailleurs qu'à la suite des révélations issues de la commission Gomery qu'on aurait appris l'ampleur de la fraude et l'identité de ses auteurs.

[8]   En réponse, le Groupe Polygone, soutenant que le gouvernement du Canada avait connaissance du scandale avant 2002, a tenté d'invoquer une défense de prescription sur le fondement du *Code civil du Québec*, L.R.Q., ch. C-1991 (« *Code civil* » ou « *C.c.Q.* »). Pendant le déroulement de l'instance, et à l'appui de sa défense de prescription, le Groupe Polygone a demandé à la Cour d'ordonner que certaines personnes, notamment plusieurs employés du gouvernement fédéral, répondent à des questions destinées à identifier la source de M. Leblanc. Dans une série d'ordonnances, le juge Hébert a enjoint aux personnes désignées par le Groupe Polygone de répondre aux questions par écrit et de préserver la confidentialité de l'affaire. À la demande du procureur général, il a également nommé un avocat pour conseiller ces personnes désignées. Le juge Hébert a ensuite élargi l'application de cette première ordonnance à un autre groupe de personnes.

[9]   Près d'un an plus tard, le *Globe and Mail* a présenté une requête en rétractation des ordonnances du juge Hébert, parce qu'elles provoqueraient une violation du privilège du secret des sources des journalistes. Il a réclamé l'annulation de ces ordonnances. Par la suite, M. Leblanc a témoigné relativement à cette requête, a articulé ses prétentions devant le juge de Grandpré. Puis l'avocat du Groupe Polygone l'a contre-interrogé. L'avocat du *Globe and Mail* s'est opposé à de nombreuses questions posées à M. Leblanc. Il a argumenté leur manque de pertinence ou que le fait d'y répondre contreviendrait au privilège du secret des sources des journalistes (les « objections »). Le juge de Grandpré a rejeté ces objections oralement et a refusé de reconnaître l'existence d'un tel privilège. Une demande d'autorisation d'appel de cette décision a été rejetée par un juge de la Cour d'appel siégeant seul, parce que la cour n'avait pas compétence pour entendre l'appel. Pour soustraire son journaliste à l'obligation à

De Grandpré J. refused to allow the discontinuance, and the Quebec Court of Appeal dismissed the appeal (2008 QCCA 2464 (CanLII)).

[10]   In October 2008, Mr. Leblanc, in an article entitled "Sponsorship firm moves to settle with Ottawa", *The Globe and Mail*, October 21, 2008, at p. A11, reported that Groupe Polygone had made a $5 million offer to settle its portion of the lawsuit. He also reported that the federal government had rejected the offer, and was in negotiations to obtain an additional $10 million from Groupe Polygone. Mr. Leblanc obtained the information at the heart of this article from an unauthorized government source.

[11]   During the hearing of the discontinuance proceedings, counsel for Groupe Polygone complained intently about the leaks dealing with the content of the confidential settlement negotiations, and about repeatedly finding Groupe Polygone the subject of news articles and stories. In response, and on his own motion, de Grandpré J. made an order prohibiting Mr. Leblanc from further reporting and publishing on the state of the confidential settlement negotiations between the Attorney General and the defendants in the principal litigation. While the Globe and Mail objected vigorously to what it insisted was a publication ban, and one issued without the benefit of hearing from either party, de Grandpré J. maintained that the order was not a publication ban. He provided no further written or oral reasons for his decision, and the Quebec Court of Appeal again rejected the Globe and Mail's application for leave to appeal (2009 QCCA 235 (CanLII)).

[12]   A few months later, de Grandpré J. ordered a similar publication ban against *La Presse* and one of its journalists, Joël-Denis Bellavance. It forbade the publication of any information related to the confidential settlement negotiations. On this occasion,

répondre aux questions, le *Globe and Mail* a tenté de se désister de sa requête en rétractation. Le juge de Grandpré n'a pas autorisé le désistement, et la Cour d'appel du Québec a rejeté l'appel de ce refus (2008 QCCA 2464 (CanLII)).

[10]   En octobre 2008, dans un article intitulé « *Sponsorship firm moves to settle with Ottawa* » (Une société de commandites négocie un règlement avec Ottawa), *The Globe and Mail*, 21 octobre 2008, p. A11, M. Leblanc a affirmé que le Groupe Polygone avait offert une somme de cinq millions de dollars pour régler la partie de l'action en justice qui le concernait. Il a également rapporté que le gouvernement fédéral avait rejeté cette offre, et qu'il cherchait, par des négociations supplémentaires avec le Groupe Polygone, à ce que celui-ci lui verse dix millions de dollars de plus. M. Leblanc a obtenu les renseignements à la base de cet article d'une source gouvernementale non autorisée.

[11]   Durant l'audience relative au désistement, l'avocat du Groupe Polygone s'est vigoureusement plaint des fuites concernant le contenu des négociations confidentielles en vue d'un règlement et du fait que son client faisait constamment les manchettes. En réponse, et de sa propre initiative, le juge de Grandpré a rendu une ordonnance interdisant à M. Leblanc d'écrire et de publier des articles sur l'état des négociations confidentielles en vue d'un règlement menées entre le procureur général et les défendeurs dans le litige principal. Bien que le *Globe and Mail* se soit vivement opposé à ce qu'il qualifiait d'ordonnance de non-publication — une ordonnance prononcée avant même d'entendre les parties sur cette question —, le juge de Grandpré a maintenu que l'ordonnance n'était pas une ordonnance de non-publication. Il n'a pas motivé davantage sa décision, ni par écrit ni de vive voix, et la Cour d'appel du Québec a une fois de plus rejeté la demande d'autorisation d'appel du *Globe and Mail* (2009 QCCA 235 (CanLII)).

[12]   Quelques mois plus tard, le juge de Grandpré a rendu une ordonnance de non-publication semblable contre *La Presse* et un de ses journalistes, Joël-Denis Bellavance. L'ordonnance interdisait la publication de tout renseignement relatif aux

he provided written reasons (2009 QCCS 1624 (CanLII)). The Quebec Court of Appeal quashed this decision (*Gesca ltée v. Groupe Polygone Éditeurs inc. (Malcom Média inc.)*, 2009 QCCA 1534, [2009] R.J.Q. 1951), and an application for leave to appeal is currently before this Court.

[13]   The legal issues raised by the appeals concerning journalist-source privilege in the civil litigation context and the publication ban warrant their own consideration. I will consider each appeal in its own right.

### III.  The Objections and Questions Relating to the Confidentiality of Sources

#### A.  *Nature of the Appeal*

[14]   The first appeal (33114) deals with the questions put to Mr. Leblanc in the course of his examination with respect to the revocation matter. The issue raised by this appeal is whether the relationship between Mr. Leblanc and MaChouette is protected by journalist-source privilege, and thereby exempts Mr. Leblanc from answering any questions that would lead to her identification.

[15]   The Globe and Mail argues that the basis of the journalist-source privilege is a constitutional one, rooted in s. 2(*b*) of the *Canadian Charter* and s. 3 of the Quebec *Charter of human rights and freedoms*, R.S.Q., c. C-12 ("*Quebec Charter*"). The privilege will arise when a person (1) is engaged in newsgathering; and (2) has provided an undertaking of confidentiality to his or her source, without which it is reasonable to assume that the source would not have come forward. Recognizing that no constitutional right is absolute, the Globe and Mail argues that s. 9.1 of the *Quebec Charter* requires a weighing of the right not to disclose the identity of a confidential source, against the "democratic values, public order and the general well-being of the citizens of Québec". In the absence of a competing *Quebec Charter* right to obtain all relevant

négociations confidentielles en vue d'un règlement. Cette fois, le juge a motivé sa décision par écrit (2009 QCCS 1624 (CanLII)). La Cour d'appel du Québec a annulé cette décision (*Gesca ltée c. Groupe Polygone Éditeurs inc. (Malcom Média inc.)*, 2009 QCCA 1534, [2009] R.J.Q. 1951), et cette annulation fait présentement l'objet d'une demande d'autorisation d'appel devant la Cour.

[13]   Il convient d'examiner séparément les questions soulevées en appel concernant, d'une part, le privilège du secret des sources des journalistes dans le contexte d'un litige civil et, d'autre part, l'ordonnance de non-publication. J'examinerai aussi chacun des pourvois individuellement.

### III.  Les objections et les questions relatives à la confidentialité des sources

#### A.  *Nature du pourvoi*

[14]   Le premier pourvoi (33114) porte sur les questions posées à M. Leblanc au cours de son interrogatoire relatif à la requête en rétractation. Dans ce pourvoi, notre Cour doit décider si les rapports entre M. Leblanc et MaChouette sont protégés par le privilège du secret des sources des journalistes et dispensent ainsi M. Leblanc de répondre à toute question susceptible de permettre d'identifier sa source.

[15]   Le *Globe and Mail* plaide que le privilège du secret des sources des journalistes possède un caractère constitutionnel, et qu'il découle de l'al. 2*b*) de la *Charte canadienne* et de l'art. 3 de la *Charte des droits et libertés de la personne* (du Québec), L.R.Q., ch. C-12 (« *Charte québécoise* »). Pour lui, le privilège s'applique lorsqu'une personne (1) participe à des activités de cueillette de nouvelles et (2) s'est engagée à préserver la confidentialité de sa source, et qu'en l'absence de celle-ci on peut raisonnablement présumer que l'informateur ne se serait pas présenté. Tout en admettant qu'aucun droit constitutionnel n'est absolu, le *Globe and Mail* argumente que l'art. 9.1 de la *Charte québécoise* exige que le droit de ne pas divulguer l'identité d'une source confidentielle soit mis en balance avec les « valeurs démocratiques, [. . .] l'ordre public et

evidence in civil proceedings, the balancing must tip in favour of freedom of the press. The Globe and Mail argues that a wide range of factors are relevant to this balancing exercise: whether the cause of action is patrimonial or extra-patrimonial; whether the action is for damages, or some other form of relief; whether the journalist is a party to the proceedings; whether the issue is central to the resolution of the dispute; whether the story was published, and if so, its degree of public importance; and the potential consequences of disclosure.

[16]    According to the Globe and Mail, the party seeking to pierce the privilege must then demonstrate (1) that the identity of the source is necessary to establish a particular fact; and (2) that establishing that particular fact is necessary for disposing of an issue in the dispute. Requiring a journalist to reveal the identity of a confidential source, under testimonial compulsion, should be a matter of last resort, not one of mere convenience. A recognition of the privilege, the Globe and Mail argues, translates into an evidentiary privilege, and thereby operates in a manner analogous to the right to professional secrecy under s. 9 of the *Quebec Charter*. However, if this Court rejects the existence of a stand-alone right, then the Globe and Mail argues, in the alternative, that the Wigmore doctrine, developed under the common law, however modified so as to account for the civil law tradition, is appropriate.

[17]    Groupe Polygone argues ardently against the recognition of constitutional protection for the journalist-source relationship. Rather, the Wigmore test or a similar test developed under the civil law, and more specifically a recognition of the privilege on a case-by-case basis, is preferable. For the privilege to be recognized in a particular case, a journalist must demonstrate, on the facts, that the benefits of maintaining the privilege outweigh the

[le] bien-être général des citoyens du Québec ». En l'absence d'un droit opposé garanti par la *Charte québécoise* d'obtenir tous les éléments de preuve pertinents dans une instance civile, la balance doit pencher en faveur de la liberté de presse. Selon le *Globe and Mail*, cet exercice de mise en balance doit être mené en tenant compte d'un vaste éventail de facteurs pertinents : La cause d'action concerne-t-elle des droits patrimoniaux ou extra-patrimoniaux? L'action vise-t-elle le paiement de dommages-intérêts ou une autre forme de réparation? Le journaliste est-il partie à l'instance? La question est-elle essentielle au règlement du différend? La nouvelle a-t-elle été publiée et, si oui, quel est son degré d'importance pour le public? Quelles sont les conséquences potentielles de la divulgation?

[16]    Selon le *Globe and Mail*, la partie qui demande la levée du privilège doit dans un tel cas démontrer (1) que l'identité de la source est nécessaire pour établir un fait particulier; et (2) que l'établissement de ce fait particulier est requis pour trancher une question en litige. L'obligation de révéler l'identité d'une source confidentielle, en le contraignant à témoigner, ne devrait être imposée à un journaliste qu'en dernier recours et non pour de simples raisons de commodité. De plus, le *Globe and Mail* affirme que s'il était reconnu, le privilège équivaudrait à un privilège relatif à la preuve et fonctionnerait donc d'une manière semblable au droit au secret professionnel garanti par l'art. 9 de la *Charte québécoise*. Toutefois, si la Cour rejetait l'existence d'un droit autonome, le *Globe and Mail* soutient, à titre subsidiaire, que la doctrine de Wigmore, élaborée en common law et modifiée d'une manière ou d'une autre pour tenir compte de la tradition civiliste, conviendrait.

[17]    Le Groupe Polygone s'oppose ardemment à la reconnaissance d'une protection constitutionnelle de la relation entre un journaliste et sa source. À son avis, il conviendrait mieux d'appliquer le test de Wigmore ou un test semblable établi en vertu du droit civil et, plus précisément, de reconnaître l'existence d'un privilège fondé sur les circonstances de l'espèce. Pour que le privilège soit reconnu dans un cas donné, le journaliste aurait à démontrer

prejudicial effects on the rights of parties to civil litigation, and those of society in the quest for truth and the proper administration of justice. Pursuant to this approach, Groupe Polygone says, disclosure should be the rule and testimonial immunity the exception.

[18]   The Attorney General of Canada argues that, prior to determining whether a privilege of any kind exists, a court must first consider whether the proposed questions are relevant. If they are not, then there is no need to consider the existence of a privilege. As to the nature of journalist-source privilege, the Attorney General advances that, in the context of civil proceedings under the *Civil Code*, the court cannot resort to the Wigmore framework. The applicable framework must be grounded in the *Civil Code* and the *Quebec Charter*, and involve an assessment and balancing of competing interests. A journalist seeking to have the privilege recognized must demonstrate: that he or she was performing the work of a journalist; that the source requested anonymity and the journalist agreed to protect the source's identity; that the protection has not been waived; that the questions put to the journalist, if answered, would disclose the identity; and that the prejudice caused to freedom of the press outweighs any prejudice to the fairness of the trial. By contrast, a party seeking disclosure must demonstrate: that the questions are relevant, and not simply a fishing expedition; that there is no other means of obtaining the information; that the cause of action or defence is well-founded in law; that the questions do not infringe unnecessarily on the right to privacy; and that the failure to answer the questions will necessarily jeopardize the fairness of the trial.

## B.   *The Scope and Reach of R. v. National Post*

[19]   In *R. v. National Post*, this Court recently addressed the question of whether journalist-source privilege exists in Canada and, more importantly, the methodological framework through which it

que, selon les faits, les avantages du maintien du privilège l'emportent sur des effets préjudiciables sur les droits des parties à un litige civil et sur ceux de la société à la recherche de la vérité et à la bonne administration de la justice. Pour le Groupe Polygone, selon cette approche, la divulgation deviendrait la règle, et l'immunité testimoniale l'exception.

[18]   Le procureur général du Canada argumente que, avant de déterminer si un privilège existe, le tribunal doit examiner la pertinence des questions proposées. Dans la négative, il n'y aurait pas lieu d'examiner la question de l'existence d'un privilège. À propos de la nature du privilège du secret des sources des journalistes, le procureur général ajoute que, dans le contexte d'une instance civile régie par le *Code civil*, le tribunal ne peut avoir recours au test de Wigmore. Pour lui, le cadre applicable doit être ancré dans le *Code civil* et la *Charte québécoise* et suppose l'évaluation et la mise en balance d'intérêts opposés. Le journaliste qui demande la reconnaissance du privilège devrait démontrer : qu'il effectuait le travail d'un journaliste; que la source a demandé l'anonymat et qu'il a accepté de protéger son identité; que la source n'a pas renoncé à la protection; que les questions posées au journaliste, s'il y répond, permettraient de divulguer l'identité de la source; et que le préjudice causé à la liberté de presse l'emporte sur toute atteinte à l'équité du procès. Pour sa part, la partie qui tente d'obtenir la divulgation devrait établir : que les questions sont pertinentes et qu'elles ne constituent pas simplement une recherche d'informations à l'aveuglette; qu'aucun autre moyen ne permet d'obtenir les renseignements; que la cause d'action ou la défense est bien fondée en droit; que les questions ne portent pas atteinte inutilement au droit à la vie privée; et que le défaut de répondre aux questions compromettrait forcément l'équité du procès.

## B.   *La portée de l'arrêt R. c. National Post*

[19]   Dans *R. c. National Post*, la Cour s'est récemment penchée sur la question de l'existence du privilège du secret des sources des journalistes au Canada et, surtout, sur celle du cadre

2010 SCC 41 (CanLII)

should be assessed. *R. v. National Post* involved the sending to the *National Post* newspaper, and its investigative reporter Andrew McIntosh, of a document that appeared to implicate then Prime Minister Jean Chrétien in a serious financial conflict of interest. The document in question, upon further investigation, appeared to be a forgery. The *National Post* found itself in possession of physical evidence, which in the view of the Crown was reasonably linked to a serious crime, and possibly the *actus reus* or *corpus delicti* of the alleged offences. The RCMP sought and obtained a search warrant and assistance order, which compelled the *National Post* to assist in locating the document, in order to conduct forensic and DNA testing on it and, it was hoped, identify the alleged forger. The *National Post* applied to have the warrant and assistance order quashed, partly on the basis that its disclosure, and the subsequent forensic testing, would "out" Mr. McIntosh's confidential source.

[20]   The Court was presented with three possibilities for recognizing the journalist-source privilege in the context of a criminal investigation: a constitutional privilege rooted in s. 2(*b*) of the *Canadian Charter*; a class-based privilege, analogous to solicitor-client privilege; or a privilege recognized on a case-by-case basis according to the four-factored Wigmore framework. The Court, unanimously, rejected the first two options. With respect to a constitutional privilege, Justice Binnie, writing for the majority, found that it carried the argument too far to suggest that specific newsgathering techniques are constitutionally entrenched. Furthermore, this Court had avoided conferring constitutional status on testimonial immunities more generally. Finally, the Court was unprepared "[t]o throw a constitutional immunity around the interactions of such a heterogeneous and ill-defined group of writers and speakers and whichever 'sources' they deem worthy of a promise of confidentiality and on whatever terms they may choose to offer it" (para. 40). The Court also held that, while there was a need for the law to protect the identity of confidential sources in some

méthodologique destiné à régir sa mise en œuvre. Cet arrêt concernait l'envoi au quotidien *National Post*, et à son journaliste d'enquête Andrew McIntosh, d'un document qui semblait impliquer le premier ministre d'alors, Jean Chrétien, dans un grave conflit d'intérêts financiers. Une enquête plus approfondie a permis de conclure que le document en question paraissait être un faux. Le *National Post* s'est retrouvé alors en possession d'un élément de preuve matériel qui, selon le ministère public, était raisonnablement lié à un crime grave et peut-être à l'*actus reus* ou au *corpus delicti* des crimes reprochés. La GRC a demandé et obtenu un mandat de perquisition et une ordonnance d'assistance qui enjoignait au *National Post* d'aider à trouver le document afin de le soumettre à des analyses criminalistique et génétique et, avec un peu de chance, d'identifier le présumé faussaire. Le *National Post* a réclamé l'annulation du mandat et de l'ordonnance d'assistance, entre autres parce que la divulgation du document et l'analyse criminalistique subséquente révéleraient l'identité de la source confidentielle de M. McIntosh.

[20]   On a proposé à la Cour trois options pour reconnaître le privilège du secret des sources des journalistes dans le contexte d'une enquête criminelle : un privilège constitutionnel qui découlerait de l'al. 2*b*) de la *Charte canadienne*, un privilège générique semblable au secret professionnel ou un privilège fondé sur les circonstances de l'espèce selon les quatre volets du test de Wigmore. La Cour a unanimement rejeté les deux premières options. S'agissant du privilège constitutionnel, le juge Binnie, au nom de la majorité, a conclu que la thèse selon laquelle certaines méthodes de cueillette de l'information seraient protégées par la Constitution pousse l'argument trop loin. De plus, la Cour a voulu éviter d'élever les immunités testimoniales au rang de protections constitutionnelles plus généralement. Enfin, la Cour n'était pas disposée à « [c]onférer une immunité constitutionnelle aux interactions entre un groupe de rédacteurs et d'orateurs aussi hétérogène et mal défini et toute "source" que ces derniers estiment digne d'une promesse de confidentialité, assortie de conditions qu'ils déterminent » (par. 40). La Cour a également conclu que, bien que le droit doive protéger l'identité

circumstances, the purpose of free expression guaranteed in s. 2(*b*) could be met without granting a broad constitutional immunity to journalistic sources. Therefore, an order compelling a journalist to identify a source would generally not violate s. 2(*b*) (para. 41).

[21]   The Court also rejected the existence of a class-based privilege, on the basis that there is no formal accreditation or licensing process for journalists in place, as there is for lawyers for example, and no professional organization regulates the profession and maintains professional standards (para. 43). Nor is it clear, when dealing with this type of privilege, whether the journalist or the source is the "holder" of the privilege (para. 44), and no one had been able to suggest "workable criteria for the creation or loss of the claimed immunity" (para. 45). Finally, because a class-based privilege is more rigid than a privilege recognized on a case-by-case basis, it would "not lend itself to the same extent to be tailored to fit the circumstances" (para. 46) as they arise in individual cases.

[22]   The Court concluded that the case-by-case approach, based on the Wigmore criteria and infused with *Canadian Charter* values, provided "a mechanism with the necessary flexibility to weigh and balance competing public interests in a context-specific manner" (para. 51), and would allow the "opportunity for growth that is essential to the proper function of the common law" (para. 55). Therefore, in order for journalist-source privilege to be recognized in a particular case, the claimant must satisfy all four Wigmore factors: (1) the relationship must originate in a confidence that the source's identity will not be disclosed; (2) anonymity must be essential to the relationship in which the communication arises; (3) the relationship must be one that should be sedulously fostered in the public interest; and (4) the public interest served by protecting the identity of the informant must outweigh the public interest in getting at the truth (para. 53).

des sources confidentielles dans certaines circonstances, l'objectif de la liberté d'expression garantie par l'al. 2*b*) pourrait être atteint sans qu'il devienne nécessaire de reconnaître une immunité constitutionnelle générale aux sources des journalistes. Par conséquent, en règle générale, une ordonnance enjoignant à un journaliste de divulguer sa source ne violerait pas l'al. 2*b*) (par. 41).

[21]   La Cour a également rejeté la thèse de l'existence d'un privilège générique parce que les journalistes ne sont assujettis à aucun processus d'agrément officiel, contrairement aux avocats par exemple, et qu'aucune organisation professionnelle ne régit la profession et ne veille au respect des normes professionnelles (par. 43). De plus, dans le cas de ce type de privilège, il est difficile de déterminer qui se trouve titulaire du privilège, le journaliste ou la source (par. 44), et aucun « critère pratique n'a été proposé pour définir les circonstances entraînant la création ou la perte de l'immunité revendiquée » (par. 45). Enfin, comme un privilège générique est plus rigide qu'un privilège reconnu au cas par cas, il ne serait « pas possible de le redéfinir aussi librement pour l'adapter aux circonstances » (par. 46) particulières de chaque cas.

[22]   La Cour a conclu que l'approche fondée sur les circonstances de chaque cas, basée sur le test de Wigmore et imprégnée des valeurs de la *Charte canadienne* fournissait « un mécanisme suffisamment flexible pour soupeser et mettre en balance les intérêts publics contradictoires, selon le contexte » (par. 51), et offrirait « une occasion propice à l'évolution, qui est indispensable au bon fonctionnement de la common law » (par. 55). Par conséquent, pour que le privilège du secret des sources des journalistes soit reconnu dans un cas donné, le demandeur doit satisfaire aux quatre volets du test de Wigmore : (1) les communications doivent avoir été transmises confidentiellement avec l'assurance que l'identité de la source ne sera pas divulguée; (2) l'anonymat doit être essentiel aux rapports dans le cadre desquels la communication est transmise; (3) les rapports doivent être, dans l'intérêt public, entretenus assidûment; et (4) l'intérêt public protégé par le refus de la divulgation de l'identité doit l'emporter sur l'intérêt public dans la recherche de la vérité (par. 53).

[23]   Justice Binnie put particular emphasis on the significance of the third and fourth factors, in the journalist-source context. The third factor, whether the relationship is one that the community should sedulously foster (para. 57), introduces a certain degree of flexibility in the evaluation of the different types of sources and different types of journalists. He suggested that whether the relationship is between a source and a blogger, or between a source and a professional journalist, will impact upon the court's weighing exercise. But, according to Justice Binnie, the fourth factor does the lion's share of the work, and the court's task is to "achieve proportionality in striking a balance among the competing interests" (para. 59).

[24]   As in this case, the Court in *National Post* was presented with an argument that, after a journalist has established the first three Wigmore criteria, the onus ought to shift to the party seeking disclosure to demonstrate, on a balance of probabilities, why it should be ordered. The Court rejected this argument. Given that the evidence is presumptively compellable and admissible, the burden of persuasion remains on the media to show that the public interest in protecting a secret source outweighs the public interest in criminal investigations. The Court ultimately concluded that every claim to journalist-source privilege — be it in the face of testimonial compulsion or the production of documents — is situation specific, with the public's interest in the freedom of expression always weighing heavily in the court's balancing exercise.

[25]   While this appeal raises issues similar to those addressed in *National Post*, the context is nevertheless different. This case involves civil litigation, not the criminal investigative process. It involves testimonial compulsion, and not the production of documents or other physical evidence. The parties' dispute is subject to the laws of Quebec and the *Quebec Charter*. These factors must be

[23]   Le juge Binnie a porté une attention particulière à la portée des troisième et quatrième volets, dans le contexte d'une relation entre un journaliste et sa source. Le troisième volet, celui selon lequel les rapports doivent être entretenus assidûment (par. 57), introduit un certain degré de souplesse dans l'évaluation des différents types de sources et de journalistes. Par exemple, il a suggéré que la différence dans la nature des rapports entre une source et un blogueur, d'une part, ou entre un informateur et un journaliste professionnel pourrait influencer l'exercice du pouvoir d'appréciation du tribunal. Toutefois, selon le juge Binnie, le quatrième volet est le plus déterminant et la tâche du tribunal est guidée par « l'objectif d'une certaine proportionnalité dans la recherche d'un équilibre entre les intérêts qui s'opposent » (par. 59).

[24]   Comme en l'espèce, on a plaidé dans *National Post* que lorsqu'un journaliste a établi les trois premiers volets du test de Wigmore, il incombe ensuite à la partie cherchant à obtenir la divulgation de démontrer, selon la prépondérance des probabilités, les raisons justifiant cette divulgation. Cependant, notre Cour a rejeté cet argument. En raison de la présomption selon laquelle on peut imposer la production de la preuve et que celle-ci est admissible, il incombe aux médias de démontrer que l'intérêt public à la protection de la source l'emporte sur celui qui veut que les enquêtes criminelles soient menées à bonne fin. La Cour a finalement conclu que chaque revendication du privilège du secret des sources des journalistes — que ce soit au sujet d'une obligation de témoigner ou de la production de documents — est liée aux faits de l'espèce, et que l'intérêt du public à l'égard de la liberté d'expression pèse toujours lourd dans l'exercice de mise en balance du tribunal.

[25]   Bien que le présent pourvoi soulève des questions similaires à celles examinées dans l'arrêt *National Post*, le contexte diffère. En effet, la présente affaire concerne un litige civil, non un processus d'enquête criminelle. Elle porte sur l'obligation de témoigner et non sur la production de documents ou d'autres éléments de preuve matériels. Finalement, les lois du Québec et la *Charte*

considered in determining how, and to what extent, the majority reasons in *National Post* are equally applicable to the issues raised by this appeal.

### C.  *National Post and the Law of Civil Procedure and Evidence in the Context of the Civil Law of Quebec*

[26]  There is no question that the Wigmore case-by-case approach to journalist-source privilege applies in the context of ordinary civil litigation subject to the laws of the common law provinces. However, it was argued before us that, given the civil law tradition in the province of Quebec, it would be inappropriate for this Court to introduce into the Quebec law of civil procedure and evidence a framework for considering journalist-source privilege which originates entirely in the common law.

[27]  The question of how to address the problem of the relationship between the media and their sources, in the context of civil litigation in Quebec, raises difficult issues and warrants careful consideration. It requires yet another examination of the sources of the law of civil procedure and evidence in the province of Quebec. At issue is the relationship between Quebec's civil law, its *Civil Code*, its system of procedure and its *Code of Civil Procedure*, R.S.Q., c. C-25 ("*C.C.P.*"), the *Quebec Charter* and, in some instances, the *Canadian Charter*. An added dimension of the problem is that Quebec's rules of procedure and evidence are nevertheless applied by a court system that reflects the British common law tradition, and is largely similar to the court organization in the common law provinces of Canada.

[28]  As in the criminal law, the relationship between journalists and their sources in the context of civil litigation may engage basic constitutional and societal values relating to freedom of expression and the right to information in a democratic society. A proper framework to address them must be established, which is consistent with the

*québécoise* régissent le différend. Ces facteurs doivent donc être examinés pour déterminer comment et dans quelle mesure les motifs particuliers de la majorité dans l'arrêt *National Post* s'appliquent également aux questions soulevées en l'espèce.

### C.  *L'arrêt National Post et le droit de la procédure civile et de la preuve dans le contexte du droit civil du Québec*

[26]  Il ne fait aucun doute que l'approche au cas par cas de Wigmore à l'égard du privilège du secret des sources des journalistes s'applique dans le contexte d'un litige civil ordinaire régi par le droit des provinces de common law. Toutefois, on a argumenté devant la Cour que, compte tenu de la tradition civiliste au Québec, notre Cour devait se garder d'introduire un cadre d'analyse issu uniquement de la common law dans le droit de la procédure civile et de la preuve du Québec, pour examiner le privilège du secret des sources des journalistes.

[27]  La question de la solution du problème des rapports entre les médias et leurs sources, dans le contexte d'un litige civil au Québec, s'avère complexe et mérite un examen attentif. Elle nécessite, elle aussi, une étude des sources du droit de la procédure civile et de la preuve au Québec. Sont en cause la relation entre le droit civil québécois, son *Code civil*, son régime procédural et son *Code de procédure civile*, L.R.Q., ch. C-25 (« *C.p.c.* »), la *Charte québécoise* et, dans certains cas, la *Charte canadienne*. Toutefois, les règles de procédure et de preuve appliquées au Québec, bien qu'elles lui demeurent propres, sont toujours mises en œuvre par un système judiciaire empreint de la tradition de la common law britannique et très semblable à celui des provinces de common law du Canada.

[28]  De plus, comme en droit criminel, les rapports entre les journalistes et leurs sources dans le contexte d'un litige civil peuvent mettre en jeu des valeurs constitutionnelles et sociétales fondamentales relatives à la liberté d'expression et au droit à l'information dans une société démocratique. Il faut donc concevoir un bon cadre d'analyse

normative structure of Quebec law and with its civil tradition. But it must be acknowledged that the law of procedure and civil evidence in the province of Quebec reflects a hybrid legal tradition and culture, with rules and principles originating in both the common law and the civil law (D. Jutras, "Culture et droit processuel: le cas du Québec" (2009), 54 *McGill L.J.* 273). This is also an area of the law which is deeply influenced by constitutional and quasi-constitutional instruments.

[29]   Section 2(*b*) of the *Canadian Charter* applies in the province of Quebec, within the scope of s. 32. The *Quebec Charter* enjoys quasi-constitutional status (s. 52) (see *Quebec (Commission des droits de la personne et des droits de la jeunesse) v. Montréal (City)*, 2000 SCC 27, [2000] 1 S.C.R. 665, at paras. 27-28), and protects several important rights that may be at stake in a claim of journalist-source privilege: s. 3, freedom of expression; ss. 4 and 5, the protection of the dignity of the person and of his private life; and s. 9, professional secrecy. Under the *Quebec Charter*, these rights are both public and private. In addition, the *Civil Code*, in force since 1994, constitutes a fundamental component of the legal structure. Its preliminary provision affirms that it is the "*jus commune*" of Quebec:

The Civil Code comprises a body of rules which, in all matters within the letter, spirit or object of its provisions, lays down the *jus commune*, expressly or by implication.

(See also *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862.)

Several provisions of the *Civil Code* itself protect aspects of the fundamental rights of the person, such as the right to life and integrity of the person (art. 3) and his reputation (art. 35). It also includes a whole book, Book Seven, arts. 2803 to 2874, on the law of civil evidence.

pour examiner ces rapports, un cadre conforme à la structure normative du droit québécois et à sa tradition civiliste. On doit cependant reconnaître que le droit de la procédure civile et de la preuve au Québec provient d'une tradition et d'une culture juridiques mixtes, dont les règles et les principes sont issus tant de la common law que du droit civil (D. Jutras, « Culture et droit processuel : le cas du Québec » (2009), 54 *R.D. McGill* 273). Ce domaine du droit se trouve en outre fortement influencé par les instruments constitutionnels et quasi constitutionnels.

[29]   L'alinéa 2*b*) de la *Charte canadienne* s'applique au Québec dans le domaine d'application visé par son art. 32. Par ailleurs, la *Charte québécoise* bénéficie d'un statut quasi constitutionnel (art. 52) (voir *Québec (Commission des droits de la personne et des droits de la jeunesse) c. Montréal (Ville)*, 2000 CSC 27, [2000] 1 R.C.S. 665, par. 27-28) et protège plusieurs droits importants susceptibles d'entrer en jeu lorsque le privilège du secret des sources des journalistes est invoqué : la liberté d'expression (art. 3), la protection de la dignité d'une personne et de sa vie privée (art. 4 et 5), et le secret professionnel (art. 9). Suivant la *Charte québécoise*, ces droits sont à la fois publics et privés. De plus, le *Code civil* du Québec, en vigueur depuis 1994, constitue un élément fondamental de la structure juridique de cette province. Sa disposition préliminaire indique qu'il établit le « droit commun » au Québec :

Le code est constitué d'un ensemble de règles qui, en toutes matières auxquelles se rapportent la lettre, l'esprit ou l'objet de ses dispositions, établit, en termes exprès ou de façon implicite, le droit commun.

(Voir également *Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862.)

Ainsi, plusieurs dispositions du *Code civil* protègent certains aspects des droits fondamentaux de la personne, comme le droit à la vie et à l'intégrité de sa personne (art. 3) et le droit au respect de sa réputation (art. 35). Il comprend également un livre entier sur le droit de la preuve (livre septième, art. 2803-2874).

[30]   Civil procedure is also codified. Civil procedure in Quebec is primarily made up of the laws adopted by the National Assembly, found in the *C.C.P.*, and not of judge-made rules. In *Lac d'Amiante du Québec Ltée v. 2858-0702 Québec Inc.*, 2001 SCC 51, [2001] 2 S.C.R. 743, this Court confirmed the fundamental importance of the *C.C.P.* It is the primary source of the principles and rules of the law of civil procedure in Quebec. But the codification of civil procedure does not mean that civil procedure, as administered by the courts of Quebec, is completely detached from the common law model. The structure of the court system itself remains basically the same, as I mentioned above. Superior courts enjoy the constitutional protection of s. 96 of the *Constitution Act, 1867.* Moreover, as this Court indicated in *Lac d'Amiante,* not everything is found in the *C.C.P.* It leaves room for rules of practice. It also allows for targeted judicial intervention, and the authority to issue orders that address the particular context of court cases, particularly under arts. 20 and 46 of the *C.C.P.*

[31]   The law of evidence is applied by the Quebec courts in this context. With respect to the problems raised by freedom of expression and the right to information, the judges of the province of Quebec must address the same challenge of reconciling conflicting values and interests as their colleagues in other provinces. The *Civil Code* sets out the legal framework and the essential rules of the law of civil evidence. But it does not resolve every issue that the application of the laws of evidence and procedure may ultimately give rise to. General principles and rules that belong to other areas of the law, particularly constitutional law, may have to be considered or should inform the solution crafted by the courts. A solution to the complex problem of the existence, nature and scope of journalist-source privilege will have to be found within this complex environment, bringing together its many strands.

[30]   La procédure civile est également codifiée. Au Québec, elle est composée principalement de dispositions adoptées par l'Assemblée nationale, et figurant dans le *C.p.c.*, et non de règles établies par les tribunaux. Dans l'arrêt *Lac d'Amiante du Québec Ltée c. 2858-0702 Québec Inc.*, 2001 CSC 51, [2001] 2 R.C.S. 743, la Cour a confirmé l'importance fondamentale du *C.p.c.* Il s'agit de la principale source des principes et des règles du droit de la procédure civile au Québec. La codification de la procédure civile, appliquée par les cours du Québec n'a pas pour autant détaché complètement celle-ci du modèle de common law. Comme je l'ai déjà rappelé, la structure du système judiciaire demeure pratiquement la même. Les cours supérieures bénéficient de la protection constitutionnelle de l'art. 96 de la *Loi constitutionnelle de 1867.* De plus, comme notre Cour l'a indiqué dans *Lac d'Amiante,* le *C.p.c.* ne contient pas toute la procédure civile. Il laisse place aux règles de pratique. Il permet également aux tribunaux d'intervenir de manière ciblée et leur confère le pouvoir de rendre des ordonnances adaptées au contexte particulier des causes dont ils sont saisis, notamment en vertu des art. 20 et 46 du *C.p.c.*

[31]   Les tribunaux du Québec appliquent le droit de la preuve dans ce contexte. S'agissant des questions soulevées par la liberté d'expression et le droit à l'information, les juges du Québec doivent relever le même défi de concilier des valeurs et des intérêts opposés que leurs collègues des autres provinces. Pour sa part, le *Code civil* prévoit le cadre législatif et les règles essentielles du droit de la preuve civile. Cependant, il ne résout pas toutes les questions que pourrait ultimement soulever l'application des règles de preuve et de procédure. De plus, les tribunaux peuvent juger nécessaire l'étude des règles et des principes généraux appartenant à d'autres domaines de droit, particulièrement au droit constitutionnel, ou de s'en inspirer pour élaborer des solutions aux problèmes qu'ils sont appelés à résoudre. Il faudra dégager de ce cadre complexe, en rattachant ses composantes diverses les unes aux autres, la solution au problème également complexe que posent l'existence, la nature et la portée du privilège du secret des sources des journalistes.

D. *Journalist-Source Privilege Under the Quebec Charter*

[32]   It was argued before us that ss. 3, 9 and 44 of the *Quebec Charter* can constitute the basis for a class-based, quasi-constitutional journalist-source privilege in the province of Quebec, analogous to the claim of a constitutional class privilege rooted in the *Canadian Charter* that was argued in *National Post*.

[33]   Section 3 of the *Quebec Charter* protects, among other rights, freedom of expression:

Every person is the possessor of the fundamental freedoms, including freedom of conscience, freedom of religion, freedom of opinion, <u>freedom of expression</u>, freedom of peaceful assembly and freedom of association.

However, for the reasons set out in *National Post*, and in particular the difficulty in defining such a "heterogeneous and ill-defined group of writers and speakers" subject to the privilege in the province of Quebec with the necessary degree of certainty, freedom of expression under the *Quebec Charter* cannot constitute the basis for recognizing a class-based, quasi-constitutional journalist-source privilege. It can, of course, inform the analysis.

[34]   But the Globe and Mail also suggests that another provision of the *Quebec Charter* is relevant to the analysis. It argues that unlike the *Canadian Charter*, s. 44 of the *Quebec Charter* expressly protects access to information: "Every person has a right to information to the extent provided by law." However, s. 44 does not confer a fundamental right. Rather, it belongs to a class of social and economic rights, the scope of which is defined by the law itself (*Gosselin v. Quebec (Attorney General)*, 2002 SCC 84, [2002] 4 S.C.R. 429). This right is limited to the extent that access to information is already provided for by law. Section 44 does not broaden the scope of the right, and cannot be the source of a quasi-constitutional right to the protection of journalists' sources. While the s. 44 right

D. *Le privilège du secret des sources des journalistes fondé sur la Charte québécoise*

[32]   On a plaidé devant notre Cour que les art. 3, 9 et 44 de la *Charte québécoise* peuvent constituer le fondement d'un privilège générique et quasi constitutionnel du secret des sources des journalistes au Québec. Ce privilège serait semblable au privilège générique constitutionnel fondé sur la *Charte canadienne* dont la reconnaissance a été proposée dans l'affaire *National Post*.

[33]   L'article 3 de la *Charte québécoise* protège notamment la liberté d'expression :

Toute personne est titulaire des libertés fondamentales telles la liberté de conscience, la liberté de religion, la liberté d'opinion, <u>la liberté d'expression</u>, la liberté de réunion pacifique et la liberté d'association.

Toutefois, pour les motifs exposés dans *National Post*, et en particulier en raison de la difficulté à définir avec le degré de certitude nécessaire un « groupe de rédacteurs et d'orateurs aussi hétérogène et mal défini » jouissant du privilège au Québec, la liberté d'expression garantie par la *Charte québécoise* ne peut servir de fondement pour reconnaître un privilège générique et quasi constitutionnel du secret des sources des journalistes. Bien entendu, elle demeure néanmoins capable d'en influencer l'analyse.

[34]   Cela dit, le *Globe and Mail* plaide également qu'une autre disposition de la *Charte québécoise* est pertinente dans l'analyse. En effet, selon lui, contrairement à la *Charte canadienne*, l'art. 44 de la *Charte québécoise* protège expressément l'accès à l'information : « Toute personne a droit à l'information, dans la mesure prévue par la loi. » Or, l'article 44 ne confère pas un droit fondamental. Il appartient plutôt à une catégorie de droits sociaux et économiques, dont la portée est définie par la loi elle-même (*Gosselin c. Québec (Procureur général)*, 2002 CSC 84, [2002] 4 R.C.S. 429). L'étendue de ce droit demeure limitée à celle du droit d'accès que reconnaît déjà la loi. Ainsi, l'article 44 n'élargit pas la portée du droit et ne peut servir de fondement à un droit quasi constitutionnel à la protection des

can also inform the protection of the confidential relationship between journalists and their sources, it cannot constitute the basis for recognizing that privilege.

[35]   That leaves a consideration of s. 9, which protects professional secrecy:

> Every person has a right to non-disclosure of confidential information.
>
> No person bound to professional secrecy by law and no priest or other minister of religion may, even in judicial proceedings, disclose confidential information revealed to him by reason of his position or profession, unless he is authorized to do so by the person who confided such information to him or by an express provision of law.
>
> The tribunal must, *ex officio*, ensure that professional secrecy is respected.

Professional secrecy applies only to those professionals bound to it by law, and is currently restricted to the 45 professional orders subject to the Quebec *Professional Code*, R.S.Q., c. C-26 (see, e.g., N. Vallières, "Le secret professionnel inscrit dans la Charte des droits et libertés de la personne du Québec" (1985), 26 *C. de D.* 1019, at pp. 1022-23). This list does not include journalists, even though their inclusion was contemplated, but yet ultimately rejected, by the National Assembly (see *Journal des débats: Commissions parlementaires*, 3rd Sess., 30th Leg., No. 6, January 22, 1975, at p. B-322; Ministry of Justice, *Justice Today*, by J. Choquette (1975), at pp. 232-35). Accordingly, professional secrecy cannot ground a quasi-constitutional right to the protection of media sources.

[36]   In my view, there is no basis for drawing an analogy between professional secrecy and journalist-source privilege. Firstly, the associations of journalists are not regulated. Any person can become a member, and importantly not all journalists are members of the associations that exist, like the Fédération professionnelle des journalistes du Québec (see online: www.fpjq.org). The Fédération has no monopoly over the practice and regulation

sources des journalistes. Bien que le droit garanti par l'art. 44 puisse aussi influencer la protection des rapports confidentiels entre un journaliste et sa source, il ne peut servir de fondement à la reconnaissance de ce privilège.

[35]   Je passerai maintenant à l'étude de l'art. 9, qui protège le secret professionnel :

> Chacun a droit au respect du secret professionnel.
>
> Toute personne tenue par la loi au secret professionnel et tout prêtre ou autre ministre du culte ne peuvent, même en justice, divulguer les renseignements confidentiels qui leur ont été révélés en raison de leur état ou profession, à moins qu'ils n'y soient autorisés par celui qui leur a fait ces confidences ou par une disposition expresse de la loi.
>
> Le tribunal doit, d'office, assurer le respect du secret professionnel.

Le secret professionnel s'applique seulement aux professionnels qui y sont tenus par la loi et son application se limite actuellement aux 45 ordres professionnels régis par le *Code des professions*, L.R.Q., ch. C-26 (voir, p. ex., N. Vallières, « Le secret professionnel inscrit dans la Charte des droits et libertés de la personne du Québec » (1985), 26 *C. de D.* 1019, p. 1022-1023). Cette liste de professions ne vise pas les journalistes, puisque même si leur inclusion avait été envisagée, elle a finalement été rejetée par l'Assemblée nationale (voir *Journal des débats* : *Commissions parlementaires*, 3e sess., 30e lég., no 6, 22 janvier 1975, p. B-322; Ministère de la justice, *La justice contemporaine*, par J. Choquette (1975), p. 261-263). Ainsi, le secret professionnel ne peut justifier la reconnaissance d'un droit quasi constitutionnel à la protection des sources des journalistes.

[36]   À mon avis, il n'existe aucun fondement à l'établissement d'une analogie entre le secret professionnel et le privilège du secret des sources des journalistes. Tout d'abord, les associations de journalistes ne sont pas réglementées. Toute personne peut devenir membre et, fait important, les journalistes n'appartiennent pas tous aux associations existantes, comme la Fédération professionnelle des journalistes du Québec (voir en ligne :

of journalism in the province. Nor is journalism a profession which the legislature has, in the public interest, sought to regulate directly or to which it has sought to delegate the authority of self-regulation.

[37]   More importantly, journalism is not a profession of the type that professional secrecy traditionally purports to protect. Professor Ducharme has described the two criteria that must be satisfied before a professional will be made subject to professional secrecy:

[TRANSLATION] First, there must be a law that imposes an obligation of silence on an individual and, second, that obligation must be rooted in a helping relationship. In our view, only members of professional orders governed by the *Professional Code* meet this twofold condition. [Emphasis added.]

(*L'administration de la preuve* (3rd ed. 2001), at p. 94)

The second criterion is an important one: that the obligation of silence be rooted in a relationship where the beneficiary of the privilege seeks out the professional for personal help or assistance. In other words, the obligation of confidentiality is [TRANSLATION] "in the exclusive interest of the person who disclosed [the information], and in the context of a helping relationship" (Ducharme, at p. 97). Given this emphasis on "helping relationship", and the fact that some 45 professions are already by law subject to s. 9, Ducharme suggests that [TRANSLATION] "no member of any other profession would meet this twofold condition" (p. 97).

[38]   The relationship between journalists and their sources is not one that would often result in such a "helping relationship". What is more, the legislature has not seen fit to include journalists in the list of professions subject to professional secrecy. It has spoken, and done so clearly.

[39]   In my view, there is no basis for recognizing journalist-source privilege in the rest of the *Quebec*

www.fpjq.org). La Fédération ne détient aucun monopole sur la pratique et la réglementation de la profession de journaliste dans la province. De plus, le législateur n'a pas, au nom de l'intérêt public, cherché à réglementer directement la profession de journaliste ou à lui déléguer un pouvoir d'autoréglementation.

[37]   De plus, le journalisme ne correspond pas au type de profession habituellement visé par le secret professionnel. Le professeur Ducharme a décrit les deux conditions auxquelles il faut satisfaire avant qu'un professionnel ne soit tenu au secret professionnel :

Il faut, d'une part, qu'une loi vienne imposer à une personne une obligation au silence et, d'autre part, que cette obligation prenne sa source dans une relation d'aide. Seuls, à notre avis, les membres des ordres professionnels régies par le *Code des professions* sont en mesure de satisfaire à cette double condition. [Je souligne.]

(*L'administration de la preuve* (3ᵉ éd. 2001), p. 94)

La deuxième condition — soit que l'obligation au silence doit résulter d'une relation où le bénéficiaire du privilège demande l'aide du professionnel — est importante. Autrement dit, l'obligation de confidentialité vise l'information obtenue « dans l'intérêt exclusif de celui qui l'a communiquée et dans le cadre d'une relation d'aide » (Ducharme, p. 97). Compte tenu de l'accent mis sur la notion de « relation d'aide » et du fait que 45 professions sont déjà visées par l'art. 9 en application de diverses lois, le professeur Ducharme estime qu'« aucun membre d'une autre profession ne satisfait à cette double condition » (p. 97).

[38]   Les rapports entre un journaliste et sa source seront rarement de nature à établir une telle « relation d'aide ». De plus, le législateur n'a pas jugé opportun d'inclure le journalisme dans la liste des professions dont les membres sont tenus au secret professionnel. Il s'est exprimé, et l'a fait clairement.

[39]   À mon avis, rien dans le reste de la *Charte québécoise* ne permet de reconnaître le privilège

2010 SCC 41 (CanLII)

*Charter.* The basis for recognizing the privilege must be found in other parts of the law.

### E.   *Testimonial Privilege Under the Civil Law of Quebec*

[40]   This Court has on many occasions recognized the mixed nature of Quebec procedural law (see, e.g., *Foster Wheeler Power Co. v. Société intermunicipale de gestion et d'élimination des déchets (SIGED) inc.*, 2004 SCC 18, [2004] 1 S.C.R. 456; *Lac d'Amiante*; *Bisaillon v. Keable*, [1983] 2 S.C.R. 60). Generally speaking, the sources of the *Civil Code*'s substantive evidentiary rules are derived from the French law tradition (see J.-C. Royer and S. Lavallée, *La preuve civile* (4th ed. 2008), at pp. 22-23 and 39). However, many of the procedural and evidentiary rules — those dealing with testimony, the administration of justice, and the exclusion of evidence, for example — have their source in the old common law rules (see Royer, at pp. 317-18; *Bisaillon*; *Foster Wheeler*, at paras. 28-29). As was noted in *Foster Wheeler*, "[t]hese mixed origins are without doubt at the root of the semantic, if not conceptual problems that continue to affect this field of law" (para. 23).

[41]   Article 1206 of the *Civil Code of Lower Canada* ("*C.C.L.C.*") explicitly allowed Quebec judges, in commercial matters, to resort to common law rules and principles of evidence when there was no otherwise applicable Code provision relating to the proof of a particular fact. When the *C.C.L.C.* was repealed and replaced with the *C.C.Q.*, no substantive equivalent to art. 1206 was included. The parties all argue that the effect of the repeal of the *C.C.L.C.*, and its replacement with the *C.C.Q.*, is that it is now impossible to resort to common law legal principles to fill any gaps present in the *Civil Code*. It is on this basis, primarily, that they argue that the Wigmore framework cannot be imported into the law of Quebec as a basis for recognizing journalist-source privilege.

du secret des sources des journalistes. Il faudra examiner d'autres lois pour déterminer si on peut y trouver le fondement nécessaire à sa reconnaissance.

### E.   *Le privilège du témoin en droit civil québécois*

[40]   La Cour a reconnu à plusieurs reprises la mixité du droit procédural québécois (voir, p. ex., *Société d'énergie Foster Wheeler ltée c. Société intermunicipale de gestion et d'élimination des déchets (SIGED) inc.*, 2004 CSC 18, [2004] 1 R.C.S. 456; *Lac d'Amiante*; *Bisaillon c. Keable*, [1983] 2 R.C.S. 60). En général, les règles de preuve essentielles du *Code civil* découlent du droit français (voir J.-C. Royer et S. Lavallée, *La preuve civile* (4e éd. 2008), p. 22-23 et 39). Toutefois, bon nombre de règles de procédure et de preuve — comme celles portant sur les témoignages, l'administration de la justice et l'exclusion de la preuve, par exemple — trouvent leur origine dans les règles anciennes de common law (voir Royer, p. 317-318; *Bisaillon*; *Foster Wheeler*, par. 28-29). Comme le constate l'arrêt *Foster Wheeler*, « [c]ette mixité explique sans doute les difficultés sémantiques, sinon conceptuelles qui continuent de marquer la vie de ce secteur du droit » (par. 23).

[41]   L'article 1206 du *Code civil du Bas Canada* (« *C.c.B.C.* ») permettait expressément aux juges du Québec, en matière commerciale, de recourir aux règles et aux principes de la preuve de common law lorsqu'aucune autre disposition du Code relative à la preuve d'un fait particulier n'était applicable. Lors de l'abrogation du *C.c.B.C.* et de son remplacement par le *C.c.Q.*, aucune disposition équivalente à l'art. 1206 n'a été prévue. Toutes les parties soutiennent que, en raison de l'abrogation du *C.c.B.C.* et de son remplacement par le *C.c.Q.*, il est devenu désormais impossible de recourir aux principes juridiques de common law pour combler les lacunes du *Code civil*. C'est principalement sur cette base qu'elles prétendent que le cadre d'analyse fondé sur le test de Wigmore ne peut être importé dans le droit québécois pour reconnaître le privilège du secret des sources des journalistes.

2010 SCC 41 (CanLII)

[42]   There is an academic and jurisprudential divide on this particular issue. On the one hand, Ducharme is of the view that [TRANSLATION] "when it came into force, the Code repealed the old French law and English law as the suppletive law of evidence" (*Précis de la preuve* (6th ed. 2005), at p. 5). By contrast, Royer states that [TRANSLATION] "[t]he new provisions of the *Civil Code of Québec* that apply to such matters do not alter the former law. They merely restate it and clarify it. They are therefore interpretive rules that can apply even to juridical acts from before January 1, 1994" (p. 41).

[43]   From a jurisprudential perspective, the Quebec Court of Appeal has accepted Wigmore as the appropriate framework for dealing with claims of privilege raised on a case-by-case basis: *Société d'énergie de la Baie James v. Lafarge Canada Inc.*, [1991] R.J.Q. 637 (litigation privilege); *Boiler Inspection and Insurance Company of Canada v. Corporation municipale de la paroisse de St-Louis de France*, [1994] R.D.J. 95 (litigation privilege). However, these cases predate the coming into force of the *Civil Code*.

[44]   The Superior Court is divided on whether Wigmore is applicable in Quebec, in a number of judgments rendered since the coming into force of the *Civil Code*. The doctrine was explicitly rejected in *Grenier v. Arthur*, [2001] R.J.Q. 674, *Centre de réadaptation en déficience intellectuelle de Québec v. Groupe TVA inc.*, [2005] R.J.Q. 2327, and *Drouin v. La Presse ltée*, [1999] R.J.Q. 3023. In each case the court preferred to rely on the *Civil Code* and a balancing of applicable *Quebec Charter* rights. By contrast, Wigmore was expressly used to recognize a case-by-case privilege in *Tremblay v. Hamilton*, [1995] R.J.Q. 2440, and *Landry v. Southam Inc.*, 2002 CanLII 20587. *Tremblay* dealt specifically with the recognition of journalist-source privilege.

[45]   When the mixed source of the Quebec law of procedure and evidence, and in particular the

[42]   La doctrine et les tribunaux ne s'entendent pas sur cette question. D'une part, M. Ducharme est d'avis que « l'entrée en vigueur de ce Code a eu pour effet d'abroger l'ancien droit français et le droit anglais en tant que droits supplétifs en matière de preuve » (*Précis de la preuve* (6e éd. 2005), p. 5). D'autre part, M. Royer affirme que « [l]es nouvelles dispositions du *Code civil du Québec* dans ces matières ne modifient pas le droit antérieur. Elles ne font que le préciser et le clarifier. Ce sont donc des règles interprétatives qui peuvent s'appliquer même à des actes juridiques antérieurs au 1er janvier 1994 » (p. 41).

[43]   D'un point de vue jurisprudentiel, la Cour d'appel du Québec a reconnu qu'il convient d'appliquer le cadre d'analyse établi par le test de Wigmore pour traiter au cas par cas, les revendications de privilège : *Société d'énergie de la Baie James c. Lafarge Canada Inc.*, [1991] R.J.Q. 637 (privilège relatif au litige); *Boiler Inspection and Insurance Company of Canada c. Corporation municipale de la paroisse de St-Louis de France*, [1994] R.D.J. 95 (privilège relatif au litige). Ces décisions sont toutefois antérieures à l'entrée en vigueur du *C.c.Q.*

[44]   Un grand nombre de jugements rendus depuis l'entrée en vigueur du *Code civil* mettent en lumière les divergences des juges de la Cour supérieure quant à l'applicabilité du test de Wigmore au Québec. Cette thèse a été expressément rejetée dans *Grenier c. Arthur*, [2001] R.J.Q. 674, *Centre de réadaptation en déficience intellectuelle de Québec c. Groupe TVA inc.*, [2005] R.J.Q. 2327, et *Drouin c. La Presse ltée*, [1999] R.J.Q. 3023. Dans ces décisions, le tribunal a préféré s'en remettre au *Code civil* et à une appréciation des droits applicables garantis par la *Charte québécoise*. Par contre, d'autres juges ont expressément eu recours au test de Wigmore pour reconnaître un privilège fondé sur les circonstances de l'espèce dans *Tremblay c. Hamilton*, [1995] R.J.Q. 2440, et *Landry c. Southam Inc.*, 2002 CanLII 20587. La décision *Tremblay* portait précisément sur la reconnaissance du privilège du secret des sources des journalistes.

[45]   Si la mixité du droit de la procédure et de la preuve au Québec, et en particulier la source de

common law source of many exclusionary rules of evidence, is properly recognized, it becomes difficult to accept the argument that there is no residual role for common law legal principles in the development of this part of Quebec law. Quebec is, after all, a mixed jurisdiction. If the ultimate source of a legal rule is the common law, then it would be only logical to resort to the common law, in the process of interpreting and articulating that same rule in the civil law. Even if the rule was transplanted and naturalized in the civil law context, it remains interesting and relevant to consider how the rule is evolving in the Canadian common law system, in order to frame an appropriate interpretation in the civil law system:

[TRANSLATION] However, the rules set out in the *Civil Code of Québec* are rooted in French law and in the common law, which means that French law and the common law can continue to be used to interpret those rules.

.   .   .

This could justify maintaining certain common law privileges associated with the accusatorial and adversarial nature of trials even though those privileges are not formally recognized in the articles of the *Code of Civil Procedure*.

(Royer, at p. 39)

This is, of course, premised on the fact that the interpretation and articulation of such a rule would not otherwise be contrary to the overarching principles set out in the *C.C.Q.* and the *Quebec Charter*.

F.   *Development of an Analytical Framework*

[46]   Neither the *Civil Code* nor the *Code of Civil Procedure* explicitly provides for the recognition in the civil litigation context of journalist-source privilege, which now exists in the common law jurisdictions. A gap in the codified law exists, and the question becomes one of determining the appropriate way of filling it. Of course, the judiciary's authority to go beyond the written codes and legislation, in the event of a gap, is far more

common law de diverses règles d'exclusion de la preuve, est dûment reconnue, il est difficile d'admettre que les principes juridiques de common law ne sauraient jouer aucun rôle résiduel dans l'évolution de cet aspect du droit québécois. Après tout, le Québec est une province de droit mixte. Si une règle juridique découle en définitive de la common law, il demeure logique de recourir à celle-ci dans l'interprétation et l'élaboration de cette même règle en droit civil. Même si une règle a été transplantée et adaptée dans le contexte du droit civil, l'examen de son évolution dans le système de common law du Canada reste pertinent et intéressant pour établir l'interprétation correcte de la règle en question dans le contexte du système de droit civil :

Par ailleurs, les règles contenues dans le *Code civil du Québec* ont leur source dans le droit français et la common law. Aussi, le droit français et la common law peuvent continuer d'être utilisés pour interpréter ces règles.

.   .   .

Cela pourrait justifier le maintien de certains privilèges de la common law, qui sont liés au caractère accusatoire et contradictoire du procès et ce, même s'ils ne sont pas formellement reconnus dans des articles du *Code de procédure civile*.

(Royer, p. 39)

Cette conclusion doit cependant reposer sur le principe fondamental selon lequel l'interprétation et l'élaboration d'une telle règle doivent rester conformes aux principes généraux énoncés dans le *C.c.Q.* et dans la *Charte québécoise*.

F.   *Élaboration d'un cadre d'analyse*

[46]   Ni le *Code civil* ni le *Code de procédure civile* ne prévoient expressément, dans le domaine de la justice civile, la reconnaissance du privilège relatif aux sources des journalistes qui existe maintenant dans les provinces de common law. Cependant, ce droit codifié comporte des lacunes, et il s'agit maintenant de déterminer comment il convient de les remplir. Bien entendu, le pouvoir des tribunaux de statuer au-delà des codes écrits

circumscribed under the civil law tradition than it is under the common law:

> A Quebec court may not create a positive rule of civil procedure simply because it considers it appropriate to do so. In this respect, a Quebec court does not have the same creative power in relation to civil procedure as a common law court, although intelligent and creative judicial interpretation is often able to ensure that procedure remains flexible and adaptable. Although Quebec civil procedure is mixed, it is nonetheless codified, written law, governed by a tradition of civil law interpretation. (See J.-M. Brisson, "La procédure civile au Québec avant la codification: un droit mixte, faute de mieux", in *La formation du droit national dans les pays de droit mixte* (1989), 93, at pp. 93 to 95; also by the same author: *La formation d'un droit mixte: l'évolution de la procédure civile de 1774 à 1867*, *supra*, at pp. 32-33.) In the civil law tradition, the Quebec courts must find their latitude for interpreting and developing the law within the legal framework comprised by the Code and the general principles of procedure underlying it. The dissenting opinion written by Biron J.A. quite correctly reminds us of these characteristics of a codified legal system and accurately identifies the nature of the method of analysis and examination that applies in this case.

(*Lac d'Amiante*, at para. 39; see also *Foster Wheeler*.)

[47]  The only provision in the *C.C.Q.* dealing with the discretion of a judge to exclude otherwise relevant evidence is art. 2858:

> The court shall, even of its own motion, reject any evidence obtained under such circumstances that fundamental rights and freedoms are breached and that its use would tend to bring the administration of justice into disrepute.

> The latter criterion is not taken into account in the case of violation of the right of professional privilege.

Because journalist-source privilege is not a quasi-constitutional privilege under the *Quebec Charter*, a judge cannot exempt a journalist from testifying as to the identity of a confidential source, on the basis that doing so would constitute a violation of either s. 3 or s. 44 of the *Quebec Charter*.

et de la législation, lorsque des vides apparaissent demeure beaucoup plus limité dans la tradition civiliste que dans la common law :

> Un tribunal québécois ne peut décréter une règle positive de procédure civile uniquement parce qu'il l'estime opportune. À cet égard, dans le domaine de la procédure civile, le tribunal québécois ne possède pas le même pouvoir créateur qu'une cour de common law, quoique l'intelligence et la créativité de l'interprétation judiciaire puissent souvent assurer la flexibilité et l'adaptabilité de la procédure. Bien que mixte, la procédure civile du Québec demeure un droit écrit et codifié, régi par une tradition d'interprétation civiliste. (Voir J.-M. Brisson, « La procédure civile au Québec avant la codification : un droit mixte, faute de mieux », dans *La formation du droit national dans les pays de droit mixte* (1989), 93, p. 93-95; aussi du même auteur : *La formation d'un droit mixte : l'évolution de la procédure civile de 1774 à 1867*, *op. cit.*, p. 32-33.) Suivant la tradition civiliste, les tribunaux québécois doivent donc trouver leur marge d'interprétation et de développement du droit à l'intérieur du cadre juridique que constituent le Code et les principes généraux de procédure qui le sous-tendent. La dissidence du juge Biron rappelle à juste titre ces caractéristiques d'un régime de droit codifié et souligne pertinemment la nature de la méthode d'analyse et d'examen applicable en l'espèce.

(*Lac d'Amiante*, par. 39; voir également *Foster Wheeler*.)

[47]  Dans le *C.c.Q.*, seul l'art. 2858 traite du pouvoir discrétionnaire d'un juge d'exclure des éléments de preuve par ailleurs pertinents :

> Le tribunal doit, même d'office, rejeter tout élément de preuve obtenu dans des conditions qui portent atteinte aux droits et libertés fondamentaux et dont l'utilisation est susceptible de déconsidérer l'administration de la justice.

> Il n'est pas tenu compte de ce dernier critère lorsqu'il s'agit d'une violation du droit au respect du secret professionnel.

Comme le privilège du secret des sources des journalistes ne constitue pas un privilège quasi constitutionnel reconnu par la *Charte québécoise*, le juge ne peut dispenser un journaliste de témoigner sur l'identité d'une source confidentielle parce qu'un tel témoignage constituerait un manquement à l'art. 3 ou à l'art. 44 de la *Charte québécoise*.

[48]   Nevertheless, constitutional rights under the *Canadian Charter* and quasi-constitutional rights under the *Quebec Charter* are engaged by a claim of journalist-source privilege. Some form of legal protection for the confidential relationship between journalists and their anonymous sources is required. Conflicting rights and interests arise under the *Quebec Charter* and must be addressed and reconciled. This case also raises important questions related to the development of human rights in Quebec. The creation of a framework to address these issues represents a legitimate and necessary exercise of the power of the court to interpret and develop the law.

[49]   In my view, a helpful analogy can be drawn between the journalist-source privilege at issue in this case, and police-informer privilege, which is also a judicially created "rule of public policy" (*Bisaillon*, at p. 90, citing *Marks v. Beyfus* (1890), 25 Q.B.D. 494 (C.A.), at p. 498). Indeed, I find that, admittedly in a very broad sense, police-informer privilege is more analogous to journalist-source privilege than is the professional secrecy contemplated by s. 9 of the *Quebec Charter*, although it arose in the context of criminal procedure within the common law.

[50]   Police-informer privilege, like professional secrecy and solicitor-client privilege, is a class-based privilege. In this sense, it is unlike journalist-source privilege, which is clearly a case-by-case privilege. However, it has its roots as a common law rule of public policy, aimed at facilitating the investigation of crime. As Beetz J. noted in *Bisaillon*:

        The rationale of the rule as it applies to police informers is plain. If their identity were liable to be disclosed in a court of law, these sources of information would dry up and the police would be hindered in their duty of preventing and detecting crime. So the public interest

[48]   Néanmoins, les droits constitutionnels garantis par la *Charte canadienne* et les droits quasi constitutionnels garantis par la *Charte québécoise* sont visés par la revendication du privilège du secret des sources des journalistes. Les rapports confidentiels entre les journalistes et leurs sources anonymes doivent bénéficier d'une certaine forme de protection juridique. Le présent pourvoi soulève des droits et des intérêts opposés sur le fondement de la *Charte québécoise* qui doivent être examinés et conciliés. Il soulève également des questions importantes liées à l'évolution des droits de la personne au Québec. La création d'un cadre permettant de répondre à ces questions représente un exercice légitime et nécessaire par les tribunaux de leur pouvoir d'interpréter le droit et de le faire évoluer.

[49]   À mon avis, on peut établir une analogie entre le privilège du secret des sources des journalistes en cause en l'espèce et le privilège relatif aux indicateurs de police, qui constitue également une « règle d'intérêt public » créée par les tribunaux (*Bisaillon*, p. 90, citant *Marks c. Beyfus* (1890), 25 Q.B.D. 494 (C.A.), p. 498). J'estime en effet, certes dans un sens très général, que le privilège du secret des sources des journalistes ressemble davantage au privilège relatif aux indicateurs de police qu'au secret professionnel garanti par l'art. 9 de la *Charte québécoise*, même si ce privilège s'est développé dans le contexte de la procédure criminelle en common law.

[50]   Le privilège relatif aux indicateurs de police, comme le secret professionnel et le privilège avocat-client, constitue un privilège générique. En ce sens, il diffère du privilège du secret des sources des journalistes, qui est sans contredit un privilège fondé sur les circonstances de l'espèce. Cependant, le privilège relatif aux indicateurs de police trouve son fondement dans une règle d'intérêt public de common law, apparue pour faciliter les enquêtes criminelles. Comme le juge Beetz l'a indiqué dans *Bisaillon* :

        La raison d'être de la règle dans son application aux indicateurs de police est évidente. Si leur identité pouvait être divulguée devant une cour de justice, ces sources de renseignements tariraient, ce qui entraverait la police dans l'exercice de ses fonctions de prévention et

in preserving the anonymity of police informers had to be weighed against the public interest that information which might assist a judicial tribunal to ascertain facts relevant to an issue upon which it is required to adjudicate should be withheld from that tribunal. [pp. 91-92]

(Quoting *D. v. National Society for the Prevention of Cruelty to Children*, [1978] A.C. 171 (H.L.), at p. 218, *per* Lord Diplock.)

[51]   In *Bisaillon*, Beetz J. also took note of the structure of the privilege: ". . . at common law the secrecy rule regarding police informers' identity has chiefly taken the form of rules of evidence based on the public interest . . ." (p. 93). When police-informer privilege is successfully established, "relevant evidence is excluded in the name of a public interest regarded as superior to that of the administration of justice" (p. 96). Therefore, the manner in which the exclusionary rule operates is also analogous to journalist-source privilege.

[52]   Importantly, for the purposes of this appeal, this Court held in *Bisaillon* that the common law rule of police-informer privilege applies in the province of Quebec. An issue in that case, among others, was whether the Commissioner investigating aspects of police conduct during the F.L.Q. crisis could compel the disclosure of an informant's identity, contrary to the common law rule. It had been argued that the *C.C.P.* was comprehensive, and because a testimonial exception for police informants was not included, the Commissioner could compel the disclosure. Beetz J., for a unanimous Court, disagreed. Notably, the *C.C.P.* provision relied upon as displacing police-informer privilege was not nearly specific enough:

However, in my opinion the scope of this codification is limited to these two aspects which it mentions expressly: it does not extend to the secrecy rule regarding police informers' identity, as to which it is silent. In other words, the codification of art. 308 applies only to the part of the common law which is included in the law

de dépistage du crime. Il a donc fallu évaluer l'intérêt public à la préservation de l'anonymat des indicateurs de police par rapport à l'intérêt public au refus de communiquer à un tribunal judiciaire les renseignements susceptibles de l'aider à déterminer les faits se rapportant à un litige qu'il doit trancher. [p. 91-92]

(Citant les propos de lord Diplock dans *D. c. National Society for the Prevention of Cruelty to Children*, [1978] A.C. 171 (H.L.), p. 218.)

[51]   Dans l'arrêt *Bisaillon*, le juge Beetz a également pris note de la structure du privilège : « [E]n *common law* le principe du secret relatif à l'identité des indicateurs de police s'est manifesté principalement par des règles de preuve que dicte l'intérêt public . . . » (p. 93). Lorsque ce privilège est établi avec succès, « il y a exclusion d'une preuve pertinente au nom d'un intérêt public considéré supérieur à celui de l'administration de la justice » (p. 96). Par conséquent, le mode d'application de la règle de l'exclusion est également similaire à celui du privilège du secret des sources des journalistes.

[52]   Fait important pour le présent pourvoi, la Cour a conclu dans *Bisaillon* que la règle de common law relative au privilège relatif aux indicateurs de police s'applique au Québec. En particulier, notre Cour devait décider si le commissaire chargé d'une enquête sur la conduite de la police durant la crise du F.L.Q. pouvait obtenir la divulgation forcée de l'identité d'un informateur, contrairement à la règle de common law. On avait soutenu que le *C.p.c.* constituait un ensemble législatif complet par lui-même. Parce que ce code ne dispensait pas expressément les indicateurs de police de l'obligation de témoigner, on avait plaidé que le commissaire pouvait exiger la divulgation de leur identité. Le juge Beetz, au nom de la Cour unanime, ne partageait pas cette opinion. Il estimait, notamment, que la disposition du *C.p.c.* invoquée pour écarter le privilège relatif aux indicateurs de police n'était pas suffisamment explicite :

Mais, à mon avis, la portée de cette codification s'arrête à ces deux aspects sur lesquels elle statue expressément et elle ne s'étend pas au principe du secret relatif à l'identité de l'indicateur de police à propos duquel elle reste silencieuse. En d'autres termes, la codification de l'art. 308 porte uniquement sur cette partie de

on Crown privilege, but not to the specific legal system relating to the secrecy rule regarding police informers.

The law had itself decided that it is always contrary to the public interest for a peace officer to be required to disclose the identity of a police informer, and that this aspect of the public interest must always take precedence over the need to do more complete justice, subject to a single exception in criminal law. To decide as the Court of Appeal did would mean that by adopting such a general provision as art. 308, the legislator intended simply to obliterate this final judgment made by the law and the absolute rule which results from it . . . . [pp. 102-3]

Beetz J. concluded that, because the origin of police-informer privilege is the common law, the rule remained a part of Quebec law unless it had been overturned by a validly adopted statutory provision:

Unless overturned by validly adopted statutory provisions, these common law rules must be applied in an inquiry into the administration of justice, which is thus a matter of public law. Moreover, the point at issue concerns the power to compel a witness to answer, by contempt of court proceedings if necessary, the source for which is also the common law . . . . [p. 98]

Beetz J. then turned to a consideration of whether the common law rule had been altered by the *C.C.P.* Having found that it had not, Beetz J. concluded that the common law rule remained a part of Quebec law in its original form.

[53]   There is therefore a basis in the laws of Quebec for a journalist-source privilege or an exemption from the general obligation to give evidence in civil cases. Despite its common law origins, the use of a Wigmore-like framework to recognize the existence of the privilege in the criminal law context, as established in *National Post*, is equally relevant for litigation subject to the laws of Quebec. This approach conforms both with s. 2(*b*) of the *Canadian Charter* and ss. 3 and 44 of the *Quebec Charter*. Indeed, I reject the submission of the intervener Canadian Civil Liberties Association that the Wigmore framework cannot

la *common law* qui est comprise dans le droit relatif au privilège de la Couronne, mais non pas sur le régime juridique spécifique réservé au principe du secret relatif à l'indicateur de police.

Le droit lui-même avait jugé qu'il est toujours contraire à l'intérêt public qu'un agent de la paix soit contraint de divulguer l'identité d'un indicateur de police et que cet aspect de l'intérêt public doit toujours l'emporter sur la nécessité de rendre une meilleure justice, sous réserve d'une seule exception en droit criminel. Décider comme la Cour d'appel l'a fait signifierait que par l'adoption d'une disposition aussi générale que l'art. 308, le législateur a voulu anéantir purement et simplement ce jugement définitif porté par le droit ainsi que la règle absolue qui en est la conséquence . . . [p. 102-103]

Le juge Beetz a conclu que, comme le privilège relatif aux indicateurs de police découle de la common law, la règle faisait toujours partie du droit québécois, à moins d'avoir été écartée par une disposition législative validement adoptée :

À moins d'être écartées par des dispositions législatives validement adoptées, ces règles de la *common law* doivent être appliquées dans une enquête qui porte sur l'administration de la justice et qui est donc de droit public. Au surplus, la question en litige porte sur le pouvoir de contraindre un témoin à répondre, au besoin par des procédures en outrage au tribunal, dont la source est également la *common law* . . . [p. 98]

Le juge Beetz s'est ensuite penché sur la question de savoir si la règle de common law avait été affectée par le *C.p.c.* Ayant conclu par la négative, il a estimé que la règle de common law demeurait une partie du droit du Québec avec ses caractéristiques originales.

[53]   Par conséquent, le droit du Québec peut servir de fondement à un privilège de protection du secret des sources des journalistes ou pour reconnaître une exception à l'obligation générale de fournir des éléments de preuve ou de témoigner dans une instance civile. Même s'il découle de la common law, le recours à un cadre d'analyse semblable au test de Wigmore — qui permet de reconnaître l'existence du privilège en droit criminel, comme il a été établi dans *National Post* — s'avère tout aussi valable dans le contexte d'un litige régi par le droit du Québec. Cette approche respecte tant l'al. 2*b*) de la *Charte canadienne* que les art. 3 et 44 de la *Charte*

differentiate between relationships that have a con-
stitutional dimension and those that do not. It is
clear that it does so already (*R. v. Gruenke*, [1991]
3 S.C.R. 263; *National Post*). This approach also
accords with the law of evidence in Quebec. The
*C.C.Q.* grants judges the authority to exclude evi-
dence or testimony in the event of a breach of the
*Quebec Charter*. It is not inconsistent, either in
principle or in fact, to give judges the authority to
exempt a journalist from testifying, when his s. 2(*b*)
*Canadian Charter* and s. 3 *Quebec Charter* rights
are found to be paramount. Indeed, I would add
that art. 46 of the *C.C.P.*, which provides for the
general powers of the Superior Court, appears to
provide its judges with the necessary authority to
do so on a case-by-case basis:

> The courts and judges have all the powers necessary
> for the exercise of their jurisdiction.
>
> They may, at any time and in all matters, whether in
> first instance or in appeal, issue orders to safeguard the
> rights of the parties, for such time and on such condi-
> tions as they may determine. As well, they may, in the
> matters brought before them, even on their own initia-
> tive, issue injunctions or reprimands, suppress writings
> or declare them libellous, and make such orders as are
> appropriate to deal with cases for which no specific
> remedy is provided by law.

[54]   Whether they rely explicitly on the Wigmore
framework or not, what the lower court decisions
ultimately demonstrate is the need for a balanc-
ing exercise between the competing rights or inter-
ests at stake. To paraphrase my colleague Justice
Binnie in *National Post*, this all sounds very much
like Wigmore where, at the crucial fourth step, the
question is whether the public interest served by
protecting the identity of the informant outweighs
the public interest in getting at the truth. Indeed,
the Wigmore framework itself, when stripped to its
core, is simply a taking into account of competing
interests. The Wigmore criteria can therefore shape
the structure of the analysis and the elements to be

*québécoise*. En effet, je rejette la prétention de l'in-
tervenante, l'Association canadienne des libertés
civiles, d'après laquelle le cadre d'analyse fondé sur
le test de Wigmore ne permet pas de différencier les
relations qui possèdent une dimension constitution-
nelle de celles qui n'en revêtent pas. En effet, il ne fait
aucun doute qu'il permet déjà de distinguer ces rela-
tions (*R. c. Gruenke*, [1991] 3 R.C.S. 263; *National
Post*). Cette approche est également conforme au
droit de la preuve au Québec. Le *C.c.Q.* confère aux
juges le pouvoir d'exclure des éléments de preuve
ou un témoignage en cas de violation de la *Charte
québécoise*. En principe ou en fait, il paraît logique
de reconnaître aux juges le pouvoir de dispenser
un journaliste de témoigner lorsqu'on conclut que
les droits garantis pour l'al. 2*b*) de la *Charte cana-
dienne* et l'art. 3 de la *Charte québécoise* doivent
primer. D'ailleurs, j'ajouterais que l'art. 46 du *C.p.c.*
qui énonce les pouvoirs généraux de la Cour supé-
rieure, semble conférer à ses juges le pouvoir néces-
saire d'accorder une telle exemption à un journaliste
selon les circonstances de l'espèce :

> Les tribunaux et les juges ont tous les pouvoirs
> nécessaires à l'exercice de leur compétence.
>
> Ils peuvent, en tout temps et en toutes matières, tant
> en première instance qu'en appel, prononcer des ordon-
> nances de sauvegarde des droits des parties, pour le
> temps et aux conditions qu'ils déterminent. De plus, ils
> peuvent, dans les affaires dont ils sont saisis, pronon-
> cer, même d'office, des injonctions ou des répriman-
> des, supprimer des écrits ou les déclarer calomnieux,
> et rendre toutes ordonnances appropriées pour pourvoir
> aux cas où la loi n'a pas prévu de remède spécifique.

[54]   Qu'elles aient eu recours explicitement ou
non au cadre d'analyse fondé sur le test de Wigmore,
les décisions rendues par le tribunal inférieur ont
démontré, en définitive, la nécessité de mettre en
équilibre les droits et les intérêts alors en conflit.
Pour paraphraser mon collègue le juge Binnie dans
*National Post*, cette méthode s'apparente tout à fait
à l'approche de Wigmore lorsque, à la quatrième
étape cruciale, le tribunal doit déterminer si l'inté-
rêt public que servirait le refus de divulguer l'iden-
tité de l'informateur l'emporte sur l'intérêt public
à la découverte de la vérité. En effet, le test de
Wigmore se résume essentiellement à un examen et
à une mise en équilibre des intérêts opposés. Il peut

considered, in claims of journalist-source privilege brought in matters engaging the laws of Quebec.

[55]   It is also a framework that is sufficiently flexible to take into account the variety of interests that may arise in any particular case, and those that are certain to arise in civil proceedings taking place in the common law provinces. The overarching issues raised by this appeal are of course not unique to the province of Quebec. The news media's reach is borderless. This is further support for an approach that would result in consistency across the country, while preserving the distinctive legal context under the *Civil Code*.

[56]   As mentioned at the outset, this case deals with testimonial compulsion and not, as in *National Post*, with the production of documents or other physical evidence. Nevertheless, in civil litigation proceedings, the presumption is that all relevant evidence is admissible and that all those called to testify with respect to relevant evidence are compellable. On this point, art. 2857 of the *Civil Code* is relevant: "All evidence of any fact relevant to a dispute is admissible and may be presented by any means." It therefore goes almost without saying that if the party seeking disclosure of the identity of the source cannot establish that this fact is relevant, then there will be no need to go on to consider whether the privilege exists. The threshold test of relevance plays, as it does in many other contexts, an important gatekeeping role in the prevention of fishing expeditions. (See, e.g., *Frenette v. Metropolitan Life Insurance Co.*, [1992] 1 S.C.R. 647 (holding that the production of medical records must be inextricably linked to the ability to prepare a full defence and go to the central issue in the proceeding, and that there must be no other means for proving the case). See also *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 89 O.R. (3d) 81, at para. 3, *per* Sharpe J.A.; *Charkaoui (Re)*, 2008 FC 61, [2009] 1 F.C.R. 507, at paras. 70-71 and 74, *per* Noël J.; *Tremblay*, at p. 2442.) It also constitutes an added buffer against

donc former la structure de l'analyse et des facteurs à examiner lorsque le privilège du secret des sources des journalistes est invoqué dans un litige régi par le droit du Québec.

[55]   De plus, ce cadre s'avère suffisamment souple pour prendre en compte la diversité des intérêts en jeu dans un cas donné comme ceux qui seront assurément mis en jeu dans une instance civile engagée dans une province de common law. Les questions fondamentales que soulève le présent pourvoi ne sont évidemment pas propres au Québec. La portée du rôle des médias ne connaît pas de frontière. C'est pourquoi il convient d'adopter une approche capable d'assurer une protection similaire aux intérêts en cause dans l'ensemble du pays tout en préservant le caractère distinct du milieu juridique régi par le *Code civil*.

[56]   Comme je l'ai souligné au début de mes motifs, le présent pourvoi porte sur l'obligation de témoigner et non, comme dans *National Post*, sur la production de documents ou d'autres éléments de preuve matériels. Cependant, dans une instance civile, il faut présumer que l'ensemble des éléments de preuve pertinents sont recevables et que toutes les personnes appelées à témoigner à leur sujet peuvent être contraintes à rendre témoignage. À cet égard, l'art. 2857 du *Code civil* est pertinent : « La preuve de tout fait pertinent au litige est recevable et peut être faite par tous moyens. » Par conséquent, il paraît évident que si la partie désirant obtenir la divulgation de l'identité de la source ne peut établir la pertinence de ce fait, il sera inutile d'examiner si le privilège existe. Comme dans beaucoup d'autres contextes, l'exigence minimale de pertinence joue un rôle important pour prévenir le recours à des interrogatoires menés à l'aveuglette. (Voir, p. ex., *Frenette c. Metropolitaine (La), cie d'assurance-vie*, [1992] 1 R.C.S. 647, où la Cour a conclu que l'obligation de produire des dossiers médicaux doit être inextricablement liée à la capacité de préparer une défense pleine et entière, dans une situation se rattachant à la principale question en litige et où une partie ne saurait prouver ses allégations par un autre moyen. Voir également *St. Elizabeth Home Society c. Hamilton (City)*, 2008 ONCA 182, 89 O.R. (3d) 81, par. 3, le juge Sharpe; *Charkaoui (Re)*,

any unnecessary intrusion into aspects of the s. 2(*b*) newsgathering rights of the press.

[57]   As Justice Binnie noted in *National Post*, it is the fourth Wigmore factor that will do most of the grunt work in the analysis of any claim for journalist-source privilege. He set out a number of relevant considerations in the determination of whether physical evidence must be disclosed in the criminal context (see paras. 61-62). It is therefore helpful, particularly given that this issue is being remitted to the Superior Court for reconsideration, to highlight some of the considerations that will be relevant to the court's balancing exercise at the fourth Wigmore stage, in claims arising in the context of civil litigation.

[58]   The first two considerations are related: the stage of the proceedings, and the centrality of the issue to the dispute between the parties. With respect to the stage of the proceedings, several points may be observed. On the one hand, the early stage of the proceedings — such as the examination for discovery stage in this case — might militate in favour of recognizing the privilege. The case will be at its preliminary stages only, and will yet to have reached the stage of determining the liability or the rights of the parties. This is a variation on the U.K. "newspaper rule" (*Attorney-General v. Mulholland*, [1963] 2 Q.B. 477), whereby journalists are allowed to protect their sources during the discovery stage, because at this point the procedural equities do not outweigh the freedom of the press, but may be required to disclose at trial. On the other hand, given the overall exploratory aims of examinations for discovery and the confidentiality with which they are cloaked, in principle, the testimony may be capable of providing a more complete picture of the case and have the potential to resolve certain issues prior to going to trial.

2008 CF 61, [2009] 1 R.C.F. 507, par. 70-71 et 74, le juge Noël; *Tremblay*, p. 2442.) Cette exigence de pertinence constitue en outre une protection additionnelle contre toute atteinte inutile à la liberté de la presse de recueillir des nouvelles garantie à celle-ci par l'al. 2*b*).

[57]   Comme le juge Binnie l'a affirmé dans *National Post*, le quatrième volet du test de Wigmore en constitue la partie la plus importante pour l'analyse de toute revendication du privilège du secret des sources des journalistes. Ses motifs ont énuméré un certain nombre de facteurs pertinents qui devront être examinés pour déterminer si des éléments de preuve matériels doivent être communiqués dans le contexte du droit criminel (voir les par. 61-62). Par conséquent, en particulier en raison du renvoi de cette question à la Cour supérieure pour nouvel examen, il devient utile d'attirer l'attention sur certains facteurs pertinents à l'exercice de mise en balance prescrit par le quatrième volet du test de Wigmore, lors de l'étude des revendications de privilèges présentées à l'occasion de litiges civils.

[58]   Les deux premiers facteurs sont connexes : l'étape de l'instance et le caractère essentiel de la question dans le cadre du différend entre les parties. Au sujet de l'étape de l'instance, plusieurs remarques s'avèrent pertinentes. D'une part, le fait de se trouver en début d'instance — par exemple à l'étape de l'interrogatoire préalable en l'espèce — pourrait militer en faveur de la reconnaissance du privilège. Le débat judiciaire vient de s'engager. Il n'a pas encore atteint l'étape de la détermination de la responsabilité ou des droits des parties. Il s'agirait d'une nuance apportée à la « règle relative aux journaux » appliquée au R.-U. (*Attorney-General c. Mulholland*, [1963] 2 Q.B. 477). Selon cette règle, les journalistes sont autorisés à protéger leurs sources durant l'étape de l'interrogatoire préalable — parce que l'équité procédurale ne l'emporte pas sur la liberté de presse à cette étape — mais peuvent être contraints de divulguer leur identité lors du procès. Toutefois, la nature exploratoire des interrogatoires préalables et leur confidentialité peuvent en principe permettre aux parties de mieux concevoir le litige et de régler certaines questions avant

This would militate in favour of not recognizing the privilege at this stage.

[59]   I recognize that, pursuant to art. 398.1 *C.C.P.*, the party conducting the discovery may file the transcript in evidence. Therefore, should a situation arise where a court orders the journalist to answer questions on examination for discovery, and the opposing party later in fact decides to file the transcript pursuant to art. 398.1, then, given that the testimony would no longer be confidential, the journalist should be entitled to again raise the issue of privilege before the court and highlight any change in circumstances that the filing of the transcript would have made.

[60]   The centrality of the question to the dispute will also be a relevant consideration. While the identity of a confidential source may be relevant to the dispute, particularly given the broad definition of relevancy in civil proceedings, that fact may nevertheless be so peripheral to the actual legal and factual dispute between the parties that the journalist ought not to be required to disclose the source's identity.

[61]   Another consideration, related to the centrality of the question to the dispute, is whether the journalist is a party to the litigation, or simply an ordinary witness. For example, whether it is in the public interest to require a journalist to testify as to the identity of a confidential source will no doubt differ if the journalist is a defendant in a defamation action, for example, as opposed to a third party witness, compelled by subpoena to testify in a matter in which he or she has no personal stake in the outcome. In the former context, the identity of the source is more likely to be near the centre of the dispute between the parties. When a journalist is called as a third party witness, there is likely to be more of a question whether the source's identity is central to the dispute.

[62]   A crucial consideration in any court's determination of whether the privilege has been made out will be whether the facts, information or

le procès. Cet argument inciterait à ne pas reconnaître le privilège à cette étape.

[59]   Je reconnais, de plus, que suivant l'art. 398.1 du *C.p.c.*, la partie qui a procédé à un interrogatoire peut introduire en preuve la transcription des dépositions. En conséquence, si un tribunal ordonnait à un journaliste de répondre à des questions lors d'un interrogatoire au préalable et que l'autre partie décidait ensuite de déposer la transcription comme le lui permet l'art. 398.1, le témoignage perdrait son caractère confidentiel. En pareil cas, le journaliste devrait pouvoir soulever de nouveau la question du privilège devant la cour et souligner les changements de circonstances causés par le dépôt de la transcription.

[60]   Le caractère essentiel de la question pour le débat judiciaire représentera aussi l'un des facteurs pertinents dans le cadre du différend. En effet, la question de l'identité peut être tellement secondaire par rapport à l'objet véritable du débat judiciaire en fait et en droit que l'on devra se garder de forcer le journaliste à témoigner au sujet de sa source, bien que l'identité de celle-ci puisse être pertinente au litige, en raison de la conception large de la pertinence applicable dans les affaires civiles.

[61]   Toujours à propos du caractère essentiel de la question pour le litige, il faut aussi se demander si le journaliste est une partie à l'instance ou simplement un témoin ordinaire. Par exemple, le problème de l'existence d'un intérêt public à contraindre un journaliste à témoigner sur l'identité d'une source confidentielle se réglera sans doute différemment si le journaliste se trouve un défendeur dans une action en diffamation, plutôt que d'être un tiers assigné à témoigner dans une affaire où il n'a aucun intérêt personnel. L'identité de la source se situera plus probablement au cœur du litige qui oppose les parties dans le premier de ces cas, mais non dans le second.

[62]   Lorsqu'un tribunal est appelé à déterminer si le privilège a été établi, il doit vérifier si les faits, les renseignements ou les témoignages peuvent

testimony are available by any other means. As the Court recognized in *National Post*, "[t]he 'alternate sources' principle has been part of Canadian law since *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (B.C.S.C.), as it has been in the U.K." (para. 66). Indeed, courts in the United Kingdom have endorsed this necessity requirement, and held that mere administrative convenience is insufficient (*Secretary of State for Defence v. Guardian Newspapers Ltd.*, [1985] 1 A.C. 339; *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985*, [1988] 1 A.C. 660; *Cross and Tapper on Evidence* (11th ed. 2007), at p. 501).

[63]   This, of course, makes perfect sense. If relevant information is available by other means and, therefore, could be obtained without requiring a journalist to break the undertaking of confidentiality, then those avenues ought to be exhausted. The necessity requirement, like the earlier threshold requirement of relevancy, acts as a further buffer against fishing expeditions and any unnecessary interference with the work of the media. Requiring a journalist to breach a confidentiality undertaking with a source should be done only as a last resort.

[64]   Other considerations that may be relevant in a particular case include the degree of public importance of the journalist's story, and whether the story has been published and is therefore already in the public domain. This list is, of course, not comprehensive. In the end, context is critical.

G.  *Summary of the Proposed Test*

[65]   In summary, to require a journalist to answer questions in a judicial proceeding that may disclose the identity of a confidential source, the requesting party must demonstrate that the questions are relevant. If the questions are irrelevant, that will end the inquiry and there will be no need to consider the issue of journalist-source privilege. However, if the questions are relevant, then the court must go on to consider the four Wigmore factors and determine whether the journalist-source privilege

être connus par d'autres moyens. Comme la Cour l'a reconnu dans *National Post*, « [l]e principe des "autres sources" est reconnu en droit canadien depuis l'arrêt *Re Pacific Press Ltd. and The Queen* (1977), 37 C.C.C. (2d) 487 (C.S.C.-B.), tout comme au Royaume-Uni » (par. 66). En effet, selon les tribunaux du Royaume-Uni l'exigence de nécessité s'impose et ont conclu que la simple commodité administrative ne suffit pas (*Secretary of State for Defence c. Guardian Newspapers Ltd.*, [1985] 1 A.C. 339; *In re An Inquiry under the Company Securities (Insider Dealing) Act 1985*, [1988] 1 A.C. 660; *Cross and Tapper on Evidence* (11ᵉ éd. 2007), p. 501).

[63]   Ce principe est tout à fait logique. Si des renseignements pertinents peuvent être obtenus par d'autres moyens, il faut recourir à ces derniers avant de contraindre un journaliste à briser sa promesse de confidentialité. L'exigence de nécessité, tout comme la condition préalable de pertinence, agit comme une protection additionnelle contre les interrogatoires à l'aveuglette et les ingérences inutiles dans le travail des médias. Les tribunaux ne devraient contraindre un journaliste à rompre une promesse de confidentialité faite à une source qu'en dernier recours.

[64]   D'autres facteurs, comme le degré d'importance de la nouvelle du journaliste pour le public et la question de savoir si elle a été publiée et relève donc déjà du domaine public, peuvent être pertinents dans un cas donné. Cette liste n'est évidemment pas exhaustive. En définitive, l'examen de tout le contexte demeure crucial.

G.  *Résumé du test proposé*

[65]   En résumé, pour exiger qu'un journaliste, dans une instance judiciaire, réponde à des questions susceptibles de permettre d'identifier une source confidentielle, la partie requérante doit démontrer leur pertinence. À défaut, l'enquête s'arrêtera là et il ne sera pas nécessaire d'examiner la question du privilège du secret des sources des journalistes. Toutefois, si les questions sont pertinentes, le tribunal examinera ensuite les quatre volets du test de Wigmore et déterminera si le privilège

2010 SCC 41 (CanLII)

should be recognized in the particular case. At the crucial fourth factor, the court must balance (1) the importance of disclosure to the administration of justice against (2) the public interest in maintaining journalist-source confidentiality. This balancing must be conducted in a context-specific manner, having regard to the particular demand for disclosure at issue. It is for the party seeking to establish the privilege to demonstrate that the interest in maintaining journalist-source confidentiality outweighs the public interest in the disclosure that the law would normally require.

[66]   The relevant considerations at this stage of the analysis, when a claim to privilege is made in the context of civil proceedings, include: how central the issue is to the dispute; the stage of the proceedings; whether the journalist is a party to the proceedings; and, perhaps most importantly, whether the information is available through any other means. As discussed earlier, this list is not comprehensive. I will now consider whether a claim of privilege could be established in this case.

## H.  *Application of the Framework*

[67]   After a cursory mention of the four Wigmore factors, de Grandpré J. rejected the Globe and Mail's claim of journalist-source privilege. His oral reasons on this issue, in their entirety, are as follows (A.R. (32975 and 33114), at pp. 13-14):

[TRANSLATION]

MARK BANTEY:

   But . . . so, you're dismissing them only . . .

THE COURT:

   On the basis that the answers to the questions will be relevant, regardless of the . . .

MARK BANTEY:

   Regardless of the privilege.

THE COURT:

   . . . the privilege invoked by the witness. Are we agreed? So, I have very quickly (*vite, vite, vite*) analysed the four (4) criteria from . . .

---

devrait être reconnu dans ce cas particulier. À l'importante quatrième étape de l'analyse, le tribunal mettra en balance (1) l'importance de la divulgation pour l'administration de la justice et (2) l'intérêt public à préserver la confidentialité de la source du journaliste. Cet exercice de mise en balance s'effectuera en fonction du contexte, compte tenu de la demande de divulgation particulière en cause. Il incombera à la partie qui invoque le privilège de démontrer que l'intérêt à préserver la confidentialité de la source du journaliste l'emporte sur l'intérêt public à la divulgation, que la loi impose normalement.

[66]   À cette étape de l'analyse, lorsque le privilège est invoqué dans le contexte d'une instance civile, il faut tenir compte notamment des facteurs suivants : le caractère essentiel de la question dans le cadre du litige, l'étape de l'instance, ensuite si le journaliste est partie à l'instance et, ce qui est le plus important peut-être, si les renseignements peuvent être obtenus par un autre moyen. Je le répète, cette liste n'est pas exhaustive. J'examinerai maintenant si le privilège peut être établi en l'espèce.

## H.  *Application du cadre d'analyse*

[67]   Après avoir brièvement fait mention des quatre volets du test de Wigmore, le juge de Grandpré a rejeté la revendication du privilège du secret des sources des journalistes du *Globe and Mail*. Je reproduis intégralement les motifs qu'il a prononcés de vive voix sur cette question (d.a. (32975 et 33114), p. 13-14) :

Mᵉ MARK BANTEY :

   Mais [. . .] donc, vous les rejetez seulement . . .

LA COUR :

   Sur la base que c'est pertinent d'obtenir les réponses aux questions, peu importe le . . .

Mᵉ MARK BANTEY :

   Peu importe le privilège.

LA COUR :

   . . . le privilège qui est invoqué par le témoin. D'accord? Alors, j'ai fait vite, vite, vite l'analyse des quatre (4) critères de . . .

SYLVAIN LUSSIER:

   *Wigmore*.

THE COURT:

   . . . from <u>*Wigmore*, and I conclude that, in the circumstances, it would be preferable that the evidence be entered in the record</u>. Is that all right? [Emphasis added.]

[68]   I agree with the Globe and Mail that de Grandpré J. erred in concluding, [TRANSLATION] "very quickly", that it was "preferable" to compel Mr. Leblanc's answers on cross-examination. Mr. Leblanc was entitled to have the questions put to him challenged for relevancy, and his claim for privilege rigorously tested against the Wigmore criteria, rather than having his claims left to the simple determination that it would be "preferable" that the questions be answered (*St. Elizabeth Home Society*, at paras. 38 and 52). In particular, if de Grandpré J. concluded that the first three factors favoured disclosure, he was then required to ask whether, on balance, the public interest in maintaining journalist-source confidentiality outweighed the importance of disclosure to the administration of justice.

[69]   In the present case, it appears that the public interest in confidentiality would be based largely on the degree to which specific questions would tend to reveal the identity of MaChouette. It therefore follows that Mr. Leblanc could not refuse to answer a question that could materially advance Groupe Polygone's prescription defence, but which could not threaten the identity of MaChouette. Accordingly, evidence as to the likelihood that an answer to a particular question would tend to reveal MaChouette's identity would be of assistance. Only where there would be a real risk that Mr. Leblanc's answer would disclose MaChouette's identity, should the judge ask himself whether, after an assessment of the relevant considerations, the balance of interests favours privilege over disclosure. For example, at the far end of the spectrum, if Mr. Leblanc's answers were almost certain to identify MaChouette then, bearing in mind the high societal interest in investigative journalism, it might

Mᶜ SYLVAIN LUSSIER :

   *Wigmore*.

LA COUR :

   . . . de <u>*Wigmore* puis j'en viens à la conclusion que, dans les circonstances, c'est préférable que la preuve entre dans le dossier</u>. Ça va? [Je souligne.]

[68]   Je conviens avec le *Globe and Mail* que le juge de Grandpré a commis une erreur en concluant, « vite, vite, vite », qu'il était « préférable » d'obliger M. Leblanc à répondre aux questions posées en contre-interrogatoire. M. Leblanc avait le droit de contester la pertinence des questions qu'on lui avait posées, et le juge de Grandpré aurait dû examiner rigoureusement sa revendication du privilège en fonction du test de Wigmore plutôt que de simplement décider qu'il serait « préférable » que le journaliste réponde aux questions (*St. Elizabeth Home Society*, par. 38 et 52). Plus particulièrement, si le juge de Grandpré avait conclu que les trois premiers facteurs favorisaient la divulgation, il aurait été tenu de se demander si, tout bien considéré, l'intérêt public à préserver la confidentialité de la source du journaliste l'emportait sur l'importance de la divulgation pour l'administration de la justice.

[69]   En l'espèce, il semble que l'intérêt public à préserver la confidentialité de MaChouette soit largement fondé sur le risque de dévoilement de l'identité de celle-ci, que créeraient des réponses précises aux questions posées. Par conséquent, M. Leblanc ne pourrait refuser de répondre à une question capable d'étayer significativement la défense de prescription du Groupe Polygone et qui ne révélerait pas l'identité de MaChouette. Dans ce contexte, une preuve établissant la probabilité qu'une réponse à une question particulière puisse révéler l'identité de MaChouette serait utile. Ce n'est que dans le cas où la réponse de M. Leblanc risquerait réellement de divulguer l'identité de MaChouette que le juge devrait se demander, après avoir analysé les considérations pertinentes, si la balance des intérêts penche en faveur du privilège plutôt que de la divulgation. Par exemple, à cette extrémité du spectre où les réponses de M. Leblanc permettraient presque assurément d'identifier MaChouette, le

be that he could only be compelled to speak if his response was vital to the integrity of the administration of justice. Ultimately, these matters will be for the judge to determine, but he must consider them.

[70]   I would therefore allow the appeal, with costs throughout, and quash the decision of the Superior Court. Given that neither party was permitted to make submissions or tender evidence on the issue of journalist-source privilege, particularly with respect to the balancing of interests at the fourth stage, I would remit the matter to the Superior Court for a consideration of Mr. Leblanc's claim, in accordance with these reasons.

## IV. The Publication Ban (33097)

### A.  *Overview*

[71]   During the course of the discontinuance proceedings incidental to the revocation motion, counsel for Groupe Polygone provided de Grandpré J. with a copy of an article written by Mr. Leblanc and published by the Globe and Mail on October 21, 2008, entitled "Sponsorship firm moves to settle with Ottawa". Counsel for Groupe Polygone then proceeded with the following complaint, in respect of the breach of confidentiality with respect to the negotiations between his client and the federal government (reproduced in *Globe and Mail v. Canada (Procureur général)*, 2008 QCCA 2516 (CanLII), at para. 9, *per* Bich J.A.):

[TRANSLATION] Not only do I not have the right to defend myself, but now I also have a problem even negotiating because, as you and I both know, when . . . the very principle of confidentiality of negotiations, it's to allow parties to discuss things freely, saying things to each other that they would not say in public, to explain their positions, which they would not necessarily state in public. And that is also why mediation is strictly confidential, and why agreements to that effect must be signed.

juge, gardant à l'esprit que le public a un intérêt élevé dans le journalisme d'enquête, ne pourrait l'obliger à témoigner que si sa réponse s'avérait essentielle à l'intégrité de l'administration de la justice. En dernière analyse, ces questions devront être réglées par le juge, mais il doit les examiner auparavant.

[70]   Par conséquent, je suis d'avis d'accueillir le pourvoi, avec dépens dans toutes les cours, et d'annuler la décision de la Cour supérieure. Puisqu'aucune des parties n'a été autorisée à présenter des observations ou des éléments de preuve sur la question du privilège du secret des sources des journalistes, particulièrement au sujet de la mise en balance des intérêts à la quatrième étape du test, je renverrais l'affaire à la Cour supérieure pour qu'elle procède à un nouvel examen de la revendication de M. Leblanc, conformément aux présents motifs.

## IV. L'ordonnance de non-publication (33097)

### A.  *Aperçu*

[71]   À l'occasion de la requête en rétractation, l'avocat du Groupe Polygone a remis au juge de Grandpré une copie d'un article écrit par M. Leblanc, publié par le *Globe and Mail* le 21 octobre 2008 et intitulé : « *Sponsorship firm moves to settle with Ottawa* » (Une société de commandites négocie un règlement avec Ottawa). L'avocat du Groupe Polygone s'est alors plaint de la publication de cet article qui portait atteinte à la confidentialité des négociations entre son client et le gouvernement fédéral (ses propos sont reproduits au par. 9 de la décision *Globe and Mail c. Canada (Procureur général)*, 2008 QCCA 2516 (CanLII), la juge Bich) :

Non seulement je n'ai pas le droit de me défendre, mais maintenant, j'ai un problème même à négocier, parce que vous savez comme moi que lorsque [. . .] le principe même de la confidentialité des négociations, c'est pour permettre aux parties de discuter librement, de se dire des choses qu'elles ne diraient pas en public, de se raconter leurs positions, qu'elles n'émettraient pas nécessairement en public. C'est pour ça, d'ailleurs, que la médiation est absolument confidentielle et qu'on doit signer des ententes à cet effet-là.

So I can't defend myself, and I can no longer negotiate because Mr. Leblanc still has a source in the government who is leaking information whose truth I can neither confirm nor deny, but, you know, we don't even have the right to put it before a judge. The trial judge shouldn't even see it. In your case, it's a bit different, you aren't the trial judge.

But can you see the sort of prejudice – and this is something I must bring to your attention – the sort of prejudice that my client has to suffer in the circumstances? At some point, we have to put our foot down and draw the line. To what extent can journalist-source privilege, when anonymous sources are quoted, prevent parties from defending themselves, throwing a wrench in the works when they try to negotiate? How far can it go before it tears the basic fabric of the proper administration of justice?

And I think I have a serious problem with what's happening here, especially with the way my colleague's client is exercising its right to journalist-source privilege. It's doing so in such a way as to trample on my client's rights, whether the right to defend itself or the right to negotiate in confidence.

[72]   Counsel for Groupe Polygone made no specific request, and appeared content at this point simply to voice his obvious frustration. Counsel for the Globe and Mail offered no response, and the discontinuance proceedings proceeded accordingly. At its conclusion, de Grandpré J. made the following order, which included a complete publication ban on all proceedings then pending before the court (A.R. (33097), at p. 55):

[TRANSLATION] So, although I am most reluctant to let cases be managed through procedural wrangling, I'm going to let you go across the street. And as for Mr. Leblanc, I'm going to prohibit you from publishing anything whatsoever regarding the proceedings pending before the Court.

[73]   The order was made without notice, without an application, and without the benefit of formal submissions from either party. Moreover, de Grandpré J. insisted that it was not a publication ban. Both the fact of the order and its characterization were met with understandable surprise by counsel for the Globe and Mail. The transcript

Alors, je ne peux plus me défendre puis je ne peux plus négocier, parce que monsieur Leblanc a encore une source au gouvernement qui coule de l'information dont je ne peux pas ni confirmer ni infirmer la véracité, mais, vous savez, on n'a même pas le droit de mettre ça devant un juge. Le juge du procès ne devrait même pas voir ça. Dans votre cas, c'est un peu différent, vous n'êtes pas le juge du procès.

Mais voyez-vous le genre de préjudice – puis ça, j'ai le mandat de porter ça à votre attention – le genre de préjudice que ma cliente subit dans les circonstances? À un moment donné, il va falloir qu'on mette notre pied à terre puis qu'on tire la ligne. Jusqu'où le privilège journalistique citant des sources anonymes peut-il empêcher une partie de se défendre, lui mettre des bâtons dans les roues quand elle cherche à négocier? Jusqu'à quel point est-ce que ça, ça ne détruit par la fibre fondamentale, de la bonne administration de la justice?

Et je pense que j'ai un sérieux problème avec la façon dont se déroulent les événements ici et surtout la façon dont la cliente de mon confrère exerce son droit au privilège journalistique. Elle le fait de façon à détruire les droits de ma cliente, que ce soit le droit de se défendre, le droit de négocier de façon confidentielle.

[72]   Toutefois, l'avocat du Groupe Polygone n'a présenté aucune demande précise, semblant à ce stade se contenter de manifester un mécontentement évident. L'avocat du *Globe and Mail* n'a pas répondu aux propos de son confrère, et l'audience sur le désistement a donc été entendue. Au terme de l'audience sur cette requête, le juge de Grandpré a prononcé une ordonnance de non-publication complète visant toutes les procédures alors en suspens devant le tribunal (d.a. (33097), p. 55) :

Alors, malgré toute la réticence que j'ai à voir que les dossiers se gèrent à coups de procédures, je vais vous permettre de traverser l'autre côté de la rue. Et, quant à monsieur Leblanc, je vais vous interdire de publier quoi que ce soit en rapport avec les procédures qui sont pendantes devant le tribunal.

[73]   L'ordonnance a été rendue sans préavis et sans que les parties ne la demandent ni n'aient l'occasion de présenter des observations en bonne et due forme à cet égard. De plus, le juge de Grandpré a affirmé avec insistance qu'il ne s'agissait pas d'une ordonnance de non-publication. L'avocat du *Globe and Mail* a eu raison de se sentir pris par

reveals the following exchange (A.R. (33097), at pp. 55-56):

[TRANSLATION]

MARK BANTEY:

Then, Mr. Justice, before that, I'm going to have some submissions to make. That . . .

THE COURT:

No, no. That, I . . .

MARK BANTEY:

. . . you're issuing -- Mr. Justice, pardon me, with respect, you're issuing a publication ban. Before issuing a publication ban, you have to . . .

THE COURT:

It is not a publication ban.

MARK BANTEY:

Mr. Justice, before issuing a publication ban, you have to give us a chance to make submissions.

THE COURT:

What I don't want to hear and what I don't want to read in the newspapers is an article like the one that appeared in *The Globe and Mail* on October 21.

MARK BANTEY:

Mr. Leblanc has an absolute right to publish what he did, Mr. Justice.

THE COURT:

If he does it, he must do it in accordance with the strict letter of the law. In that regard, you'll inform me when the Court of Appeal has made its decision.

MARK BANTEY:

So, Mr. Justice, just to make sure I understand, you've issued a publication ban?

THE COURT:

Yes.

[74]   By proceeding in this manner, in a case where there was no suggestion of urgency or delay inherent in hearing submissions that would prejudice either

surprise, tant par la nature de l'ordonnance que par la manière dont elle a été rendue. Voici la transcription de l'échange qui a alors eu lieu (d.a. (33097), p. 55-56) :

Mᶜ MARK BANTEY :

Alors, Monsieur le juge, avant de faire ça, j'aurai des représentations à faire. Ça . . .

LA COUR :

Non, non. Ça je . . .

Mᶜ MARK BANTEY :

. . . vous rendez -- là, Monsieur le juge, je m'excuse, avec respect, vous rendez une ordonnance de non-publication. Avant de rendre une ordonnance de non-publication, vous devez . . .

LA COUR :

C'est pas une ordonnance de non-publication.

Mᶜ MARK BANTEY :

Monsieur le juge, avant de rendre une ordonnance de non-publication, vous devez nous donner la chance de faire des représentations.

LA COUR :

Ce que je veux pas entendre et ce que je veux pas lire dans les journaux, c'est l'article comme celui qui a paru le 21 octobre dans le *Globe and Mail*.

Mᶜ MARK BANTEY :

Monsieur Leblanc a le droit absolu de publier ce qu'il a publié, Monsieur le juge.

LA COUR :

S'il le fait, il le fera avec toute la rigueur que la loi pourra lui imposer. Là-dessus, vous m'informerez quand la Cour d'appel aura décidé.

Mᶜ MARK BANTEY :

Alors, Monsieur le juge, juste pour ma compréhension, vous avez rendu une ordonnance de non-publication?

LA COUR :

Oui.

[74]   En procédant ainsi, dans une affaire où rien ne suggérait qu'il y avait urgence ni que les parties subiraient un préjudice à cause des délais inhérents

2010 SCC 41 (CanLII)

party, de Grandpré J. violated one of the fundamental rules of the adversarial process: he denied the parties an opportunity to be heard before deciding an issue that affected their rights. In so concluding, I should not be taken as departing from *Toronto Star Newspapers Ltd. v. Canada*, 2010 SCC 21, [2010] 1 S.C.R. 721, and *National Post*, where it was held that, in some cases, the question of journalist-source privilege may be determined without hearing from the media in advance of making the order. However, as I stated at the outset of these reasons, the Globe and Mail, which was representing Mr. Leblanc's interests, was already a party to these proceedings. The circumstances for the exemption from notice and hearing contemplated by *Toronto Star* and *National Post* are simply not present in this appeal.

[75]   Given these circumstances, the fact that de Grandpré J. made the impugned order on his own motion and without having heard submissions from either party is sufficient to allow the appeal. While I recognize that art. 46 of the *C.C.P.* gives Superior Court judges the authority to make orders *ex proprio motu*, it is incumbent on the judge to do so to "safeguard the rights of the parties". A publication ban, which by its very nature infringes the constitutional rights of the party against whom it is imposed, cannot, absent extraordinary circumstances not present here, be imposed *ex proprio motu*. However, because the question of the publication ban has yet to be considered on its merits, I will proceed with a complete analysis.

B.   *Fundamental Questions Raised by This Appeal*

   (1)   The Importance of Confidentiality at the Pre-Trial Stage

[76]   It is important to pause and reiterate here the importance placed, by both the judiciary and the

à la présentation de plaidoiries devant un tribunal, le juge de Grandpré a enfreint une des règles fondamentales du processus accusatoire : il a privé les parties de la possibilité de se faire entendre avant de trancher une question affectant leurs droits. En concluant ainsi, je ne voudrais pas que l'on pense que je me dissocie des arrêts *Toronto Star Newspapers Ltd. c. Canada*, 2010 CSC 21, [2010] 1 R.C.S. 721, et *National Post*, où notre Cour a conclu que, dans certains cas, la question du privilège du secret des sources des journalistes peut être tranchée sans que le juge n'entende le journaliste avant de rendre son ordonnance. De toute manière, comme je l'ai noté au début des présents motifs, le *Globe and Mail*, qui représentait les intérêts de M. Leblanc, était déjà partie à l'instance. Les circonstances donnant lieu à l'exception aux exigences de préavis et d'audience prévues dans les arrêts *Toronto Star* et *National Post* ne se présentent tout simplement pas en l'espèce.

[75]   Compte tenu des circonstances, le prononcé de l'ordonnance contestée par le juge de Grandpré, *ex proprio motu* sans avoir entendu les observations des parties, constitue un motif suffisant pour accueillir le pourvoi. Certes, je reconnais que l'art. 46 du *C.p.c.* confère aux juges de la Cour supérieure le pouvoir de rendre des ordonnances *ex proprio motu*. Il est toutefois nécessaire que ces dernières soient des « ordonnances de sauvegarde des droits des parties ». Une ordonnance de non-publication, dont la nature même violerait les droits constitutionnels de la partie à l'égard de laquelle elle est imposée, ne saurait, en l'absence de circonstances extraordinaires qui ne se présentaient pas en l'espèce, être imposée *ex proprio motu*. Toutefois, puisque la question de l'ordonnance de non-publication n'a pas encore été examinée sur le fond, j'en ferai une analyse complète.

B.   *Questions fondamentales soulevées par le présent pourvoi*

   (1)   L'importance de la confidentialité à l'étape préparatoire au procès

[76]   Il est important de s'arrêter et de réitérer ici l'importance accordée, tant par les tribunaux que

legislature, on confidentiality at the pre-trial stage, whether the proceedings are examinations for discovery, mediation or settlement negotiations. It is also important to note that the rationale animating the confidentiality undertaking in all of these contexts is the same.

[77]   In *Lac d'Amiante*, this Court concluded that there was an implied undertaking of confidentiality concerning the evidence obtained or provided in examinations on discovery. This undertaking is meant to allow the parties to obtain as full a picture of the case as possible, without the fear that disclosure of the information will be harmful to their interests, privacy-related or otherwise:

It appears that the preferred approach is a far-reaching and liberal exploration that allows the parties to obtain as complete a picture of the case as possible. In return for this freedom to investigate, an implied obligation of confidentiality has emerged in the case law, even in cases where the communication is not the subject of a specific privilege. . . . The aim is to avoid a situation where a party is reluctant to disclose information out of fear that it will be used for other purposes. The aim of this procedure is also to preserve the individual's right to privacy.

.   .   .

. . . the purpose of the examination is to encourage the most complete disclosure of the information available, despite the privacy imperative. On the other hand, if a party is afraid that information will be made public as a result of an examination, that may be a disincentive to disclose documents or answer certain questions candidly, which would be contrary to the proper administration of justice and the objective of full disclosure of the evidence. [paras. 60 and 74]

It is difficult for the parties, at the examination on discovery stage, to assess the relevancy of the evidence, and the confidentiality undertaking helps to ensure that the parties will be full and frank in exercising their examination on discovery obligations.

[78]   This same rationale applies in the context of pre-trial settlement negotiations and mediation. In

par le législateur, à la confidentialité durant les étapes de la procédure préparatoire au procès, qu'il s'agisse de l'interrogatoire préalable, de la médiation ou des négociations en vue d'un règlement. Il importe aussi de souligner que la raison d'être de l'engagement de confidentialité est la même pour toutes ces étapes.

[77]   Dans *Lac d'Amiante*, la Cour a conclu qu'un engagement implicite de confidentialité s'appliquait à la preuve obtenue ou fournie lors des interrogatoires préalables. Cet engagement vise à permettre aux parties d'obtenir une vue aussi complète que possible du litige, sans craindre que la divulgation de ces renseignements porte préjudice notamment à leurs droits à la vie privée :

On semble privilégier une exploration étendue et libérale pour permettre aux parties d'obtenir une vue aussi complète que possible du litige. En contrepartie de cette liberté d'investigation est apparue en jurisprudence une obligation implicite de confidentialité, même dans les cas où la communication ne fait pas l'objet d'un privilège spécifique [. . .] On veut éviter qu'une partie hésite à dévoiler une information par crainte de l'usage accessoire qui en serait fait. Par cette procédure, on entend également préserver le droit des individus à la vie privée.

.   .   .

. . . [M]algré l'impératif de protection de la vie privée, à cette occasion, cette finalité de l'interrogatoire favorise le dévoilement le plus complet des informations disponibles. Par contre, lorsqu'une partie redoute que des informations soient rendues publiques à la suite d'un tel interrogatoire, cette situation peut l'inciter à ne pas dévoiler des documents ou à ne pas répondre franchement à certaines questions, au détriment de la bonne administration de la justice et de l'objectif de communication complète de la preuve. [par. 60 et 74]

À l'étape de l'interrogatoire préalable, il est difficile pour les parties d'évaluer la pertinence de la preuve. L'engagement de confidentialité favorise la communication franche et complète des renseignements dont elles disposent à cette étape de l'instance.

[78]   Ce même facteur joue à l'égard des négociations en vue d'un règlement et de la médiation avant

*Kosko v. Bijimine*, 2006 QCCA 671 (CanLII), the Quebec Court of Appeal commented on the rationale animating confidentiality undertakings — similar to those in the context of examination on discovery — in the context of judicial mediation:

The protection of the confidentiality of these "settlement discussions" is the most concrete manifestation in the law of evidence of the importance that the courts assign to the settlement of disputes by the parties themselves. This protection takes the form of a rule of evidence or a common law privilege, according to which settlement talks are inadmissible in evidence.

The courts and commentators have unanimously recognized that, first, settlement talks would be impossible or at least ineffective without this protection and, second, that it is in the public interest and a matter of public order for the parties to a dispute to hold such discussions. [paras. 49-50]

[79]   In Quebec, the *C.C.P.* provides a mechanism for settlement conferencing presided over by a judge of the Superior Court (art. 151.14). Article 151.16 provides that those conferences are meant to facilitate a dialogue, aimed at exploring mutually satisfactory solutions to the dispute, and are to be held in private. Article 151.21 more specifically provides that "[a]nything said or written during a settlement conference is confidential". Similar rules exist in the common law provinces (*Supreme Court Civil Rules*, B.C. Reg. 168/2009, r. 9-1(2) (offers to settle), r. 9-2(1) and (3) (settlement conferences); *Alberta Rules of Court*, Alta. Reg. 390/68, r. 173 (compromise using court process); Saskatchewan, *The Queen's Bench Rules*, r. 181(3) (offer to settle), r. 191(14) and (15) (judicial pre-trials); *Queen's Bench Rules*, Man. Reg. 553/88, r. 49.06(1) and (2) (offer to settle), r. 50.01(9) and (10) (judicial pre-trials); *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 24.1.14 (mandatory mediation), r. 49.06 (offer to settle), rr. 50.09 and 50.10 (judicial pre-trial); Nova Scotia *Civil Procedure Rules*, r. 10.13(4)(a) (ordinary settlement), r. 10.14(4)(a) (judicial pre-trial), and r. 10.16).

l'instruction. Dans *Kosko c. Bijimine*, 2006 QCCA 671, [2006] R.J.Q. 1539, la Cour d'appel du Québec a formulé des observations sur la raison d'être des engagements de confidentialité — semblables à ceux pris dans le contexte d'un interrogatoire préalable — dans le contexte de la médiation :

La protection du caractère confidentiel de ces « échanges de règlement » est la manifestation la plus concrète, en droit de la preuve, de l'importance qu'accordent les tribunaux au règlement des différends par les parties elles-mêmes. Cette protection prend la forme d'une règle de preuve ou d'un privilège en common law, par lequel les pourparlers de règlement ne sont pas admissibles en preuve.

Les tribunaux et la doctrine reconnaissent unanimement, d'une part, que sans cette protection aucun pourparler de règlement ne serait possible ou à tout le moins efficace et, d'autre part, qu'il y a de l'intérêt et de l'ordre public que les parties à un litige puissent procéder à de telles discussions. [par. 49-50]

[79]   Au Québec, le *C.p.c.* prévoit qu'un juge de la Cour supérieure peut présider une conférence de règlement à l'amiable (art. 151.14). L'article 151.16 indique que cette conférence vise à aider les parties à communiquer et à explorer des solutions mutuellement satisfaisantes, et qu'elle a lieu à huis clos. L'article 151.21 dispose plus précisément que « [t]out ce qui est dit ou écrit au cours de la conférence est confidentiel ». Des règles semblables s'appliquent dans les provinces de common law (*Supreme Court Civil Rules*, B.C. Reg. 168/2009, r. 9-1(2) (offres de règlement), r. 9-2(1) et (3) (conférences en vue d'un règlement); *Alberta Rules of Court*, Alta. Reg. 390/68, r. 173 (règlement avec intervention judiciaire); *Règles de la Cour du Banc de la Reine* de la Saskatchewan, r. 181(3) (offre de règlement), r. 191(14) et (15) (conférences préparatoires au procès); *Règles de la Cour du Banc de la Reine*, Règl. du Man. 553/88, r. 49.06(1) et (2) (offre de règlement), r. 50.01(9) et (10) (conférences préparatoires avec le juge); *Règles de procédure civile*, R.R.O. 1990, Règl. 194, r. 24.1.14 (médiation obligatoire), r. 49.06 (offre de règlement), r. 50.09 et 50.10 (conférences préparatoires au procès); *Civil Procedure Rules* de la Nouvelle-Écosse, r. 10.13(4)(a) (règlement ordinaire), r. 10.14(4)(a) (conférence préparatoire au procès) et r. 10.16).

[80]   Even in the absence of a legislated rule of procedure, the common law has long recognized that, in order to encourage parties to resolve their disputes through settlement negotiations, those negotiations must remain confidential. Indeed, the privilege dates back to at least the 1790s when, in *Waldridge v. Kennison* (1794), 1 Esp. 143, 170 E.R. 306, Lord Kenyon C.J. observed:

. . . any admission or confession made by the party respecting the subject matter of the action, obtained while a treaty was depending, under faith of it, and into which the party might have been led, by the confidence of a compromise taking place, could not be admitted to be given in evidence to his prejudice . . . .

This approach has translated into a rule of evidence, whereby the contents and substance of settlement negotiations are, should a dispute ultimately proceed to trial, inadmissible (*Histed v. Law Society of Manitoba*, 2005 MBCA 106, 195 Man. R. (2d) 224, at para. 44; *Canadian Broadcasting Corp. v. Paul*, 2001 FCA 93, 198 D.L.R. (4th) 633). In Quebec, the Court of Appeal in *Gesca* held recently that settlement negotiations held outside the framework provided by the *C.C.P.* — in other words those not presided over by a judicial mediator — similarly benefit from the protection of confidentiality (para. 47).

[81]   Maintaining the confidentiality of settlement negotiations is a public policy goal of the utmost importance, and nothing in these reasons should be interpreted as derogating from that position. However, it must be noted that these confidentiality undertakings bind only the parties to settlement negotiations and their agents.  Provided a journalist has not participated in the breach of confidentiality, a publication ban will only be appropriate in cases where the balancing test otherwise favours non-publication.

### (2)   Preliminary   Questions   and   Legal Framework

[82]   As a preliminary matter, I must address Groupe Polygone's submission that Mr. Leblanc,

[80]   Même en l'absence d'une règle de procédure adoptée par voie législative, la common law a reconnu depuis longtemps que, pour inciter les parties à régler leurs différends au moyen de négociations en vue d'un règlement, celles-ci doivent demeurer confidentielles. En effet, ce privilège de confidentialité remonte au moins aux années 1790, lorsque le lord juge en chef Kenyon a affirmé dans *Waldridge c. Kennison* (1794), 1 Esp. 143, 170 E.R. 306 :

[TRADUCTION] . . . les confessions ou les aveux faits par une partie concernant l'objet du litige, obtenus en vue d'un règlement et sur la foi de celui-ci, et que cette partie a pu être amenée à faire sur la foi d'un compromis imminent, ne peuvent être admis en preuve contre elle . . .

Les propos du juge sont à l'origine d'une règle de preuve suivant laquelle le contenu et l'essence des négociations en vue d'un règlement sont inadmissibles en preuve si l'affaire débouche sur un procès (*Histed c. Law Society of Manitoba*, 2005 MBCA 106, 195 Man. R. (2d) 224, par. 44; *Société Radio-Canada c. Paul*, 2001 CAF 93, [2001] A.C.F. n° 542 (QL)). Dans l'arrêt *Gesca*, la Cour d'appel du Québec a récemment conclu que les négociations en vue d'un règlement tenues en dehors du cadre législatif prévu par le *C.p.c.* — autrement dit, celles qui ne sont pas présidées par un juge qui agit à titre de médiateur — bénéficiaient également de la protection de la confidentialité (par. 47).

[81]   La préservation de la confidentialité des négociations en vue d'un règlement constitue un objectif d'ordre public d'une importance capitale, et rien dans les présents motifs ne devrait être interprété comme dérogeant à ce principe. Toutefois, il convient de souligner que les engagements de confidentialité ne lient que les parties aux négociations en vue d'un règlement et leurs mandataires. À condition qu'un journaliste n'ait pas manqué à une promesse de confidentialité, une interdiction de publication ne se justifiera que dans les cas où le test de mise en balance favorise par ailleurs la non-publication.

### (2)   Questions préliminaires et cadre législatif

[82]   Je dois d'abord me pencher sur la prétention de Groupe Polygone selon laquelle M. Leblanc

in publishing the content of the confidential settlement negotiations between itself and the federal government, committed a civil fault. Groupe Polygone relies on art. 36(2) of the *C.C.Q.*:

**36.** The following acts, in particular, may be considered as invasions of the privacy of a person:

.   .   .

(2)  intentionally intercepting or using his private communications;

Groupe Polygone argues that the Globe and Mail and its journalist "interfered" with its privacy rights, and have therefore committed the civil wrong contemplated by art. 36(2). I cannot accept this submission.

[83]  The wrong contemplated by art. 36(2) in this case was committed by the government source, whoever he or she may be, who provided Mr. Leblanc with the information that ultimately made its way into the article published on October 21, 2008. Nothing in the record suggests that Mr. Leblanc was anything other than a beneficiary of the source's desire to breach confidentiality. There is no "interference", as suggested by Groupe Polygone, on the part of Mr. Leblanc in the confidential negotiations and communications of the parties. No proof was made of any illegal acts on the part of the Globe and Mail or Mr. Leblanc leading to the discovery of the information. Groupe Polygone's remedy, in terms of the commission of a civil fault, is more properly viewed as being against the source, or its negotiating partner more generally.

[84]  Moreover, there are sound policy reasons for not automatically subjecting journalists to the legal constraints and obligations imposed on their sources. The fact of the matter is that, in order to bring to light stories of broader public importance, sources willing to act as whistleblowers and bring these stories forward may often be required to breach legal obligations in the process. History is riddled with examples. In my view, it would also be

aurait commis une faute civile en publiant le contenu des négociations confidentielles en vue d'un règlement engagées entre le Groupe et le gouvernement fédéral. Le Groupe Polygone s'appuie sur le par. 36(2) du *C.c.Q.* :

**36.**  Peuvent être notamment considérés comme des atteintes à la vie privée d'une personne les actes suivants :

.   .   .

2º  Intercepter ou utiliser volontairement une communication privée;

Le Groupe Polygone argumente que le *Globe and Mail* et son journaliste « ont porté atteinte » à ses droits à la vie privée et ont par conséquent commis la faute civile visée au par. 36(2). Je ne peux souscrire à cette prétention.

[83]  En l'espèce, la source gouvernementale — quelle que soit l'identité de l'informateur — aurait commis le délit visé par le par. 36(2) lorsqu'elle a fourni à M. Leblanc les renseignements visés par l'article publié le 21 octobre 2008. Rien dans le dossier n'indique que M. Leblanc a fait autre chose que de profiter de la volonté de la source de communiquer des renseignements confidentiels. Contrairement à ce qu'affirme le Groupe Polygone, M. Leblanc n'a pas « porté atteinte » aux droits des parties que soit préservé le caractère confidentiel de leurs négociations et communications. Rien n'indique que les renseignements ont été obtenus par suite d'agissements illégaux de la part du *Globe and Mail* ou de M. Leblanc. Dans le cas de la commission d'une faute civile, un recours contre la source ou contre l'autre partie engagée dans la négociation paraîtrait plus approprié.

[84]  De plus, de solides raisons de principe militent en faveur du rejet de l'assujettissement automatique des journalistes aux contraintes et obligations juridiques auxquelles leurs sources sont tenues. Force est de constater que, pour mettre au jour des nouvelles d'une grande importance pour le public, les sources désireuses de révéler ces informations doivent souvent violer des obligations juridiques. Les exemples abondent dans l'histoire. À mon sens,

2010 SCC 41 (CanLII)

a dramatic interference with the work and operations of the news media to require a journalist, at the risk of having a publication ban imposed, to ensure that the source is not providing the information in breach of any legal obligations. A journalist is under no obligation to act as legal adviser to his or her sources of information.

[85]   Such a legal policy is consistent with what has come to be known as the U.S. "*Daily Mail* principle". In *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), the United States Supreme Court held that if a newspaper obtains truthful information about a matter of public importance, and does so in a lawful manner, then, absent a higher order public interest, the state cannot punish the publication of that information. This principle was extended, in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), to situations where the published information about an important public issue had been unlawfully intercepted, and where the press knew or ought to have known that the information had been intercepted by a third party, but had not participated in the interception. Justice Stevens, for the majority, held that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern" (p. 535).

[86]   I must also address Groupe Polygone's submission that de Grandpré J.'s order was not a publication ban and, therefore, the *Dagenais/Mentuck* framework is both inapplicable and inappropriate (see *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835; *R. v. Mentuck*, 2001 SCC 76, [2001] 3 S.C.R. 442). Groupe Polygone says that the remedy sought was a ceasing of a serious violation of privacy and reputation, caused by the media. I cannot accept this submission.

[87]   De Grandpré J.'s order must be assessed for what it looks like, sounds like and in fact is: a court-ordered publication ban. As this Court held in *Vancouver Sun (Re)*, 2004 SCC 43, [2004] 2

le travail et les activités des médias seraient par ailleurs dramatiquement perturbés si on obligeait un journaliste, au risque de lui imposer une ordonnance de non-publication, à s'assurer que sa source ne viole aucune obligation juridique en lui fournissant des renseignements. Le journaliste n'est pas tenu d'agir comme conseiller juridique auprès de ses sources de renseignements.

[85]   Cette règle est conforme à ce qu'on appelle aujourd'hui le « principe du *Daily Mail* » américain. Dans *Smith c. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), la Cour suprême des États-Unis a conclu que si un journal obtient légalement des renseignements véridiques sur une question importante pour le public, en l'absence d'un intérêt public supérieur, l'État ne peut interdire la publication de ces renseignements. La portée de ce principe a été étendue dans *Bartnicki c. Vopper*, 532 U.S. 514 (2001), aux situations où les renseignements publiés concernant une question importante pour le public avaient été interceptés illégalement et où la presse savait ou aurait dû savoir que les renseignements avaient été interceptés par un tiers, mais n'avait pas participé à l'interception. S'exprimant au nom de la majorité, le juge Stevens a conclu que [TRADUCTION] « la conduite illégale d'un étranger ne suffit pas à révoquer la protection du Premier amendement à l'égard d'un discours sur une question d'intérêt public » (p. 535).

[86]   Je dois également examiner l'argument du Groupe Polygone selon lequel l'ordonnance du juge de Grandpré n'était pas une ordonnance de non-publication et que, par conséquent, le test *Dagenais/Mentuck* était inapplicable et inopportun (voir *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835; *R. c. Mentuck*, 2001 CSC 76, [2001] 3 R.C.S. 442). Le Groupe Polygone affirme que l'ordonnance visait en fait à faire cesser une atteinte grave à sa vie privée et à sa réputation dont les médias portaient la responsabilité. Je ne peux souscrire à cette prétention.

[87]   L'ordonnance du juge de Grandpré doit être évaluée en fonction de sa véritable nature : une ordonnance de non-publication. Comme notre Cour l'a conclu dans *Vancouver Sun (Re)*, 2004 CSC 43,

S.C.R. 332, the *Dagenais/Mentuck* framework "is equally applicable to all discretionary actions by a trial judge to limit freedom of expression by the press during judicial proceedings" (para. 31). In my view, Groupe Polygone takes too narrow a view of "judicial proceedings". The impugned order in this case was made in the context of discontinuance proceedings incidental to a revocation motion. While its target or substance — the content of the parties' settlement negotiations — is indeed not a judicial proceeding, that is no matter. The order itself was made in the context of a judicial proceeding, and had the effect of infringing on the Globe and Mail's and Mr. Leblanc's respective s. 2(*b*) rights. The order was issued in a civil proceeding, is a publication ban and therefore engages s. 2(*b*) *Canadian Charter* rights.

[88]   Groupe Polygone cites a number of trial level cases from across the country, which it says demonstrate that the *Dagenais/Mentuck* framework is both inappropriate and inapplicable in this context. Using *Dagenais/Mentuck* in this case, Groupe Polygone says, would be unprecedented. I disagree. All of the jurisprudence cited by Groupe Polygone is distinguishable on the basis of having been decided before the release of *Dagenais* (*Peat Marwick Thorne v. Canadian Broadcasting Corp.* (1991), 5 O.R. (3d) 747 (Gen. Div.); *Amherst (Town) v. Canadian Broadcasting Corp.* (1994), 133 N.S.R. (2d) 277 (C.A.)); the nature of the legal issue (*Canada (Canadian Transportation Accident Investigation and Safety Board) v. Canadian Press*, [2000] N.S.J. No. 139 (QL) (S.C.): the media breached a statutory confidentiality obligation, and challenged the constitutionality of the provision itself); or the facts (*Calgary Regional Health Authority v. United Western Communications Ltd.*, 1999 ABQB 516, 75 Alta. L.R. (3d) 326: the media were in physical possession of confidential hospital records, of which the hospital sought the return, and the case involved the safety and security concerns of doctors who performed abortions). *K. v. K. (E.)*, 2004 ABQB 847, 37 Alta. L.R. (4th) 118,

[2004] 2 R.C.S. 332, le test de *Dagenais/Mentuck* « s'applique également chaque fois qu'un juge de première instance exerce son pouvoir discrétionnaire de restreindre la liberté d'expression de la presse durant les procédures judiciaires » (par. 31). De plus, à mon avis, le Groupe Polygone interprète trop restrictivement les « procédures judiciaires ». L'ordonnance contestée en l'espèce a été prononcée dans le contexte du débat sur le désistement relatif à la requête en rétractation. Le fait que son objet ou son essence — le contenu des négociations en vue d'un règlement entre les parties — ne soit effectivement pas une procédure judiciaire reste sans importance. L'ordonnance elle-même a été prononcée dans le contexte d'une procédure judiciaire et a porté atteinte aux droits respectifs du *Globe and Mail* et de M. Leblanc que leur garantit l'al. 2*b*). L'ordonnance, rendue dans une instance civile, constitue alors une ordonnance de non-publication et, par conséquent, met en jeu les droits garantis par l'al. 2*b*) de la *Charte canadienne*.

[88]   Le Groupe Polygone cite diverses décisions de première instance rendues un peu partout dans notre pays. Selon lui, ces décisions démontrent que le test de *Dagenais/Mentuck* est inopportun et inapplicable en l'espèce. Il affirme que l'application de ce test en l'espèce n'aurait aucun précédent. Je ne suis pas d'accord. Il est possible d'établir une distinction entre le présent dossier et toutes les décisions citées par le Groupe Polygone puisqu'elles ont été rendues avant la publication de l'arrêt *Dagenais* (*Peat Marwick Thorne c. Canadian Broadcasting Corp.* (1991), 5 O.R. (3d) 747 (Div. gén.); *Amherst (Town) c. Canadian Broadcasting Corp.* (1994), 133 N.S.R. (2d) 277 (C.A.)); puisque la nature de la question en litige différait (*Canada (Canadian Transportation Accident Investigation and Safety Board) c. Canadian Press*, [2000] N.S.J. No. 139 (QL) (C.S.) : parce que les médias ont enfreint une obligation de confidentialité imposée par la loi et ont contesté la constitutionnalité de la disposition même); puisque les faits sont différents (*Calgary Regional Health Authority c. United Western Communications Ltd.*, 1999 ABQB 516, 75 Alta. L.R. (3d) 326 : parce que les médias étaient en possession physique de dossiers médicaux confidentiels que l'hôpital désirait ravoir, et

involved the review of a previously ordered publication ban, and did in fact analyse the issue by way of the *Dagenais/Mentuck* framework.

[89]   De Grandpré J.'s order was a discretionary one, made pursuant to his authority under art. 46 of the *C.C.P.*, and had the effect of limiting the s. 2(*b*) rights of Mr. Leblanc and the Globe and Mail. He therefore erred in not applying the *Dagenais/Mentuck* framework prior to making the order.

(3)   Application of the *Dagenais/Mentuck* Framework

[90]   I now move on to a consideration of the *Dagenais/Mentuck* framework:

(a)   Is the order necessary in order to prevent a serious risk to the proper administration of justice because reasonably alternative measures will not prevent the risk?

(b)   Do the salutary effects of the publication ban outweigh the deleterious effects on the rights and interests of the parties and the public, including the right to free expression and the efficacy of the administration of justice?

I will assess each of these elements in turn.

[91]   The article that prompted de Grandpré J. to order the publication ban was published on October 21, 2008. However, on August 27, 2008, lawyers for Groupe Polygone filed with the Registrar of the Quebec Superior Court a motion requesting a change in the trial dates. The trial between Groupe Polygone and the Attorney General had originally been set to run between September and December 2008. The principal reason given for the requested postponement was that the parties wanted to attempt

le litige portait sur la sécurité de médecins pratiquant l'avortement et sur les préoccupations quant à leur sécurité. Enfin, l'arrêt *K. c. K. (E.)*, 2004 ABQB 847, 37 Alta. L.R. (4th) 118, visait l'examen d'une ordonnance de non-publication déjà rendue et, en fait, le juge a analysé la question en appliquant le cadre d'analyse établi par *Dagenais/Mentuck*.

[89]   L'ordonnance du juge de Grandpré était discrétionnaire, et il l'a prononcée en vertu du pouvoir que lui confère l'art. 46 du *C.p.c.* Elle a eu pour effet de limiter les droits de M. Leblanc et du *Globe and Mail* que leur garantit l'al. 2*b*). Par conséquent, le juge de Grandpré a commis une erreur en n'appliquant pas le test de *Dagenais/Mentuck* avant de prononcer l'ordonnance.

(3)   Application du test de *Dagenais/Mentuck*

[90]   J'examinerai maintenant le test de *Dagenais/Mentuck* :

a)   L'ordonnance est-elle nécessaire pour écarter un risque sérieux pour la bonne administration de la justice, vu l'absence d'autres mesures raisonnables pouvant écarter ce risque?

b)   Les effets bénéfiques de l'ordonnance de non-publication sont-ils plus importants que ses effets préjudiciables sur les droits et les intérêts des parties et du public, notamment sur le droit à la libre expression et sur l'efficacité de l'administration de la justice?

J'examinerai chacun de ces éléments à tour de rôle.

[91]   L'article à l'origine de l'ordonnance de non-publication prononcée par le juge de Grandpré a été publié le 21 octobre 2008. Or, le 27 août 2008, les avocats du Groupe Polygone ont déposé auprès du greffier de la Cour supérieure du Québec une requête sollicitant la modification des dates du procès. Le procès entre le Groupe Polygone et le procureur général devait initialement se dérouler entre septembre et décembre 2008. Cette requête a été présentée principalement parce que

settlement negotiations. It was anticipated that the negotiations would be long and complex, and therefore not likely to be completed before September 2008. The motion was granted on October 14, 2008, by Wery A.C.J., [TRANSLATION] "[f]or the reasons set out in the motion". Therefore, when the impugned article was published on October 21, 2008, the *fact* that Groupe Polygone and the Attorney General were engaged in settlement negotiations was already a matter of public record, by virtue of the public court file. It is only the contents of those negotiations — the amount being discussed and the federal government's position with respect to it — that could be said to be confidential. Furthermore, the Attorney General has authorized disclosure, by virtue of publication on the Public Works and Government Services Canada website, of the full terms of any settlement that it reaches in Sponsorship Scandal-related litigation.

[92]    Groupe Polygone also argues that its reputation has been irreparably harmed in the eyes of the public, who will interpret Groupe Polygone's willingness to engage in settlement negotiations as an admission of fault or liability. Again, this submission cannot be supported by the record. Firstly, Groupe Polygone offers no evidence of this specific harm. Secondly, and more importantly, the fact that the parties intended to pursue settlement negotiations was already a matter of public record, by virtue of Groupe Polygone's own motion in the Superior Court to postpone the trial dates.

[93]    I am not prepared to accept Groupe Polygone's bald assertions, without more, that its ability to negotiate a settlement with the federal government has been irreparably harmed. That it is now in the public domain that the parties are attempting to negotiate a settlement cannot affect the discussions between the parties themselves. Moreover, as I indicated above, at the time when Mr. Leblanc's article was published, the fact that the parties were engaged in settlement negotiations was already a matter of public record, because it was the reason given by Groupe Polygone as the basis for a request

les parties voulaient tenter de négocier un règlement. Il était prévu que les négociations seraient longues et complexes et qu'elles ne seraient probablement pas terminées avant septembre 2008. La requête a été accueillie le 14 octobre 2008 par le juge en chef adjoint Wery, « [p]our les motifs contenus à la requête ». Par conséquent, lorsque l'article contesté a été publié le 21 octobre 2008, le *fait* que le Groupe Polygone et le procureur général étaient en train de négocier un règlement était déjà connu du public, en raison du dossier public de la cour. Seule la teneur de ces négociations — soit la somme dont il était question ainsi que la position du gouvernement fédéral à l'égard de celle-ci — pouvait être considérée ecomme confidentielle. De plus, le procureur général avait autorisé la divulgation, puisque les modalités des règlements conclus dans les litiges visant le scandale des commandites étaient publiées sur le site Web de Travaux publics et Services gouvernementaux Canada.

[92]    Le Groupe Polygone prétend également que sa réputation a été irréparablement entachée aux yeux du public, qui interprétera son désir de négocier un règlement comme un aveu de faute ou de responsabilité. Là encore, la preuve au dossier ne supporte pas cette prétention. Tout d'abord, le Groupe Polygone n'a présenté aucune preuve de ce préjudice en particulier. Ensuite, et surtout, le fait que les parties avaient l'intention de négocier un règlement était déjà connu du public puisque le Groupe Polygone avait lui-même présenté une requête devant la Cour supérieure en vue d'ajourner le procès.

[93]    Je ne suis pas disposé à accepter les simples affirmations du Groupe Polygone offertes, sans plus de détails ni de justification, voulant que la publication de l'article ait irréparablement nui à sa capacité de négocier un règlement avec le gouvernement fédéral. En effet, la divulgation du fait que les parties avaient entrepris des négociations en vue d'un règlement ne pouvait avoir d'incidence sur leurs échanges. De plus, comme je l'ai déjà souligné, les négociations en vue d'un règlement relevaient déjà du domaine public au moment de la publication de l'article de M. Leblanc, car

to postpone the trial dates. Groupe Polygone suspended its negotiations on its own initiative.

[94]   Groupe Polygone has offered no tangible proof that its ability to effectively engage with the government has been irreparably harmed. Nor has it offered any evidence or proof of a serious risk to the administration of justice. Groupe Polygone's failure to do so is not surprising, given that it did not specifically apply for the ban imposed by de Grandpré J. But even if the parties did not ask for the production of evidence and did not apply for a remand of the case to the motion judge, the positions of both the Globe and Mail and Groupe Polygone with respect to the propriety of the ban were prejudiced by the manner in which de Grandpré J. chose to proceed. The conduct of the matter by de Grandpré J. deprived them of the opportunity, at the time, to make argument about the application of the *Dagenais/Mentuck* test.

[95]   I note again that the breach of confidentiality in this case was made not by Mr. Leblanc, but by someone bound by the undertaking. Other avenues available to Groupe Polygone, which would not have any effect on freedom of the press, could have been directed against its negotiating partner, in the form of an injunction or an order for costs. Some other form of relief could also have been directed against the party directly responsible for the breach in this case, if its identity could be accurately established. Finally, the ban imposed by de Grandpré J. is, if nothing more, clearly overbroad. It is a blanket prohibition, and no indication was given as to when it would expire.

[96]   Even if I were convinced that the publication ban was necessary to prevent a serious risk to the administration of justice, I would not be convinced that its salutary effects outweigh its deleterious effects. The salutary effects of the ban are, primarily, a cessation of the breach of Groupe Polygone's s. 5 *Quebec Charter* privacy rights and, indirectly,

le Groupe Polygone avait présenté une requête en ajournement du procès, en invoquant l'ouverture de ces négociations. Le Groupe Polygone a suspendu les négociations de sa propre initiative.

[94]   Le Groupe Polygone n'a pas démontré que la publication de l'article a irréparablement compromis sa capacité de discuter avec le gouvernement. Il n'a pas non plus établi ou prouvé que la publication entraînait un risque sérieux pour l'administration de la justice. Son échec à cet égard n'est pas surprenant puisqu'il n'a pas spécifiquement demandé l'interdiction prononcée par le juge de Grandpré. Cela dit, même si les parties n'ont pas demandé à produire des éléments de preuve ni à ce que l'affaire soit renvoyée au juge des requêtes, la procédure suivie par le juge de Grandpré a nui aux positions tant du *Globe and Mail* que du Groupe Polygone au sujet de l'opportunité de l'interdiction. De fait, la façon dont le juge de Grandpré a mené l'affaire les a privés de la chance, à l'époque, de présenter leurs observations quant à l'application du test de *Dagenais/Mentuck*.

[95]   Là encore, je souligne que le manquement à la confidentialité en l'espèce n'a pas été commis par M. Leblanc, mais bien par une personne liée par l'engagement. Le Groupe Polygone aurait pu intenter d'autres recours qui n'auraient eu aucune incidence sur la liberté de presse, par exemple contre son partenaire de négociation, par voie d'injonction, ou une demande d'attribution de dépens. Un autre recours aurait également pu être exercé contre la partie directement responsable du manquement en l'espèce, si son identité avait pu être correctement établie. Enfin, la portée de l'interdiction imposée par le juge de Grandpré est pour le moins clairement excessive. Il s'agit d'une interdiction générale, et rien n'indiquait à quel moment elle prendrait fin.

[96]   Même si j'étais convaincu de la nécessité de l'ordonnance de non-publication pour écarter un risque sérieux pour l'administration de la justice, je ne serais pas pour autant persuadé que ses effets bénéfiques l'emporteraient sur ses effets préjudiciables. Les effets bénéfiques de l'ordonnance sont principalement les suivants : la cessation des atteintes

a breach of its right to negotiate a settlement confidentially. I say indirectly, of course, because the media are not the party responsible for the breach of confidentiality. However, I am not convinced that such a breach, in the circumstances of this case, led to a failure in the negotiations and can therefore justify a publication ban.

[97]   On the other hand, the deleterious effects of the ban are serious. The *Globe and Mail* received information about settlement negotiations involving, as a party, the Government of Canada, which is seeking to recover a considerable amount of taxpayer money, on the basis of an alleged fraud against a government program. There is clearly an overarching public interest in the outcome of this dispute, and barring the Globe and Mail from publishing the information that it obtained in this regard would prevent the story from coming to light. In other words, upholding de Grandpré J.'s order would be to stifle the media's exercise of their constitutionally mandated role.

[98]   While not in any way wanting to diminish the importance that this Court places on the confidentiality of settlement negotiations, I again emphasize that the confidentiality undertakings are a binding only on the parties to negotiation. The obligation does not, and cannot, extend to the media. Neither Mr. Leblanc nor the Globe and Mail did anything — illegal or otherwise — to obtain the information published in the article. Mr. Leblanc did not even have to make any requests in this regard. As discussed earlier in these reasons, I am reluctant to endorse a situation where the media or individual journalists are automatically prevented from publishing information supplied to them by a source who is in breach of his or her confidentiality obligations. This would place too onerous an obligation on the journalist to verify the legality of the source's information. It would also invite considerable interference by the courts in the workings of the media. Furthermore, such an approach ignores

au droit à la vie privée que lui garantit l'art. 5 de la *Charte québécoise* et, indirectement, à son droit de négocier un règlement en toute confidentialité. Bien entendu, j'écris indirectement parce que les médias ne sont pas la partie responsable du manquement à la confidentialité. Toutefois, je ne crois pas qu'un tel manquement, dans les circonstances de l'espèce, a nui aux négociations et peut par conséquent justifier une ordonnance de non-publication.

[97]   En revanche, les effets préjudiciables de l'ordonnance sont graves. Le *Globe and Mail* a reçu des renseignements sur des négociations en vue d'un règlement visant, en tant que partie à cette instance, le gouvernement du Canada, qui cherche à recouvrer une importante somme d'argent appartenant aux contribuables, sur le fondement d'une fraude présumée contre un de ses programmes. Il ne fait aucun doute que le public possède un intérêt général à connaître l'issue du présent litige. Le fait d'empêcher le *Globe and Mail* de publier les renseignements qu'il a obtenus à cet égard empêcherait l'information d'être communiquée au public. Autrement dit, confirmer l'ordonnance du juge de Grandpré reviendrait à museler les journalistes dans l'exercice du rôle qui leur appartient, en vertu de la Constitution.

[98]   Bien que je n'entende aucunement minimiser l'importance que la Cour accorde à la confidentialité des négociations en vue d'un règlement, je répète que les engagements de confidentialité lient uniquement les parties aux négociations. L'obligation ne s'applique pas, et ne peut s'appliquer, aux médias. Ni M. Leblanc ni le *Globe and Mail* n'ont fait quoi que ce soit — d'illégal ou non — pour obtenir les renseignements publiés dans l'article. M. Leblanc n'a même pas eu besoin de faire une demande à cet égard. Comme je l'ai indiqué plus tôt dans les présents motifs, je ne saurais accepter une situation où les médias et les journalistes seraient automatiquement empêchés de publier de l'information communiquée par une source, laquelle aurait violé des obligations de confidentialité. L'imposition d'une obligation de vérifier la légalité des renseignements fournis par leurs informateurs imposerait un fardeau trop lourd aux journalistes. Cette solution inciterait en outre les tribunaux à intervenir fréquemment

2010 SCC 41 (CanLII)

the fact that the breach of a legal duty on the part of a source is often the only way that important stories, in the public interest, are brought to light. Imposing a publication ban in this case would be contrary to all these interests.

[99]   As we have seen, on the factual record before us, the ban was not necessary to prevent a serious risk to the proper administration of justice. Moreover, the salutary effects of the publication ban imposed in the court below do not outweigh its deleterious effects. I would thus allow the appeal and quash the publication ban imposed by de Grandpré J.

[100]   For all these reasons, the Globe and Mail's appeal is allowed, with costs throughout, and the order prohibiting the publication of anything relating to the settlement negotiations between the parties is quashed, with costs throughout.

## V.   The Discontinuance Proceedings (32975)

[101]   Given the appellant's success in the other two appeals, it is unnecessary to consider this issue. The appeal from the dismissal of the discontinuance proceeding is moot and is dismissed, without costs.

## VI.   Disposition

[102]   For these reasons, the appeals with respect to the confidentiality of journalist sources (33114) and the publication ban (33097) are allowed, with costs throughout. The issue of journalist-source privilege is remitted to the Superior Court for consideration in light of these reasons. The order prohibiting the publication of information relating to the settlement negotiations is quashed. The appeal concerning the discontinuance proceeding (32975) is dismissed as moot, without costs.

dans le travail des médias et ne tiendrait pas compte du fait que pour rendre publiques des informations importantes, les sources ne peuvent souvent le faire sans enfreindre une obligation juridique de confidentialité. Imposer une ordonnance de non-publication en l'espèce ne tiendrait aucun compte de tous ces intérêts.

[99]   Comme nous l'avons vu, en raison du dossier factuel dont nous sommes saisis, l'ordonnance n'était pas nécessaire pour écarter un risque sérieux pour la bonne administration de la justice. En outre, les effets bénéfiques de l'ordonnance de non-publication rendue par le tribunal inférieur ne l'emportent pas sur ses effets préjudiciables. Par conséquent, je suis d'avis d'accueillir le pourvoi et d'annuler l'ordonnance de non-publication rendue par le juge de Grandpré.

[100]   Pour tous ces motifs, le pourvoi du *Globe and Mail* est accueilli, avec dépens dans toutes les cours, et l'ordonnance interdisant la publication de tout renseignement relatif aux négociations en vue d'un règlement entre les parties est annulée, avec dépens dans toutes les cours.

## V.   La procédure en désistement (32975)

[101]   Comme l'appelant a eu gain de cause dans les deux autres pourvois, il n'est pas nécessaire d'examiner cette question. Le pourvoi à l'encontre de la décision de rejeter la procédure en désistement est théorique et est rejeté, sans dépens.

## VI.   Dispositif

[102]   Pour ces motifs, les pourvois concernant la confidentialité des sources des journalistes (33114) et l'ordonnance de non-publication (33097) sont accueillis, avec dépens dans toutes les cours. La question du privilège du secret des sources des journalistes est renvoyée à la Cour supérieure pour nouvel examen à la lumière des présents motifs. L'ordonnance interdisant la publication de tout renseignement relatif aux négociations en vue d'un règlement entre les parties est annulée. Le pourvoi concernant la requête en désistement (32975) est rejeté en raison de son caractère théorique, sans dépens.

*Appeals 33114 and 33097 allowed with costs. Appeal 32975 dismissed without costs.*

*Solicitors for the appellant: Davies Ward Phillips & Vineberg, Montréal.*

*Solicitor for the respondent the Attorney General of Canada: Attorney General of Canada, Montréal.*

*Solicitors for the respondent Groupe Polygone Éditeurs inc.: Stikeman Elliott, Montréal.*

*Solicitors for the interveners Fédération professionnelle des journalistes du Québec, Ad IDEM/ Canadian Media Lawyers Association, Astral Media Radio Inc., Groupe TVA inc., La Presse ltée, Médias Transcontinental inc., the Canadian Broadcasting Corporation, Gesca ltée and Joël-Denis Bellavance: Fasken Martineau DuMoulin, Montréal.*

*Solicitors for the intervener the Canadian Civil Liberties Association: Osgoode Hall Law School of York University, North York, Ontario.*

*Solicitors for the intervener Barreau du Québec: Joli-Cœur, Lacasse, Geoffrion, Jetté, Saint-Pierre, Québec.*

*Pourvois 33114 et 33097 accueillis avec dépens. Pourvoi 32975 rejeté sans dépens.*

*Procureurs de l'appelante : Davies Ward Phillips & Vineberg, Montréal.*

*Procureur de l'intimé le procureur général du Canada : Procureur général du Canada, Montréal.*

*Procureurs de l'intimé le Groupe Polygone Éditeurs inc. : Stikeman Elliott, Montréal.*

*Procureurs des intervenants la Fédération professionnelle des journalistes du Québec, Ad IDEM/ Canadian Media Lawyers Association, Astral Media Radio Inc., le Groupe TVA inc., La Presse ltée, Médias Transcontinental Inc., Société Radio-Canada, Gesca ltée et Joël-Denis Bellavance : Fasken Martineau DuMoulin, Montréal.*

*Procureurs de l'intervenante l'Association canadienne des libertés civiles : Osgoode Hall Law School of York University, North York, Ontario.*

*Procureurs de l'intervenant le Barreau du Québec : Joli-Cœur, Lacasse, Geoffrion, Jetté, Saint-Pierre, Québec.*

2010 SCC 41 (CanLII)