# Exhibit E

**Parent c. R.**                                                    **2014 QCCS 132**

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No:      500-36-006329-125

DATE:   January 23, 2014
_____

**IN THE PRESENCE OF  THE HONOURABLE SOPHIE BOURQUE, J.S.C.**
_____

**DR. COLETTE PARENT**
and
**DR. CHRISTINE BRUCKERT**
        Petitioners
v.
**HER MAJESTY THE QUEEN**
        Respondent
and
**LUKA ROCCO MAGNOTTA**
        Mis en cause
_____

JUDGMENT ON A CERTIORARI APPLICATION TO QUASH A SEARCH WARRANT
(Rectified judgment)
_____

[1] Considering that there is a reference error in paragraph 154 in the January 21, 2014 judgment;

[2] Considering that paragraph 154 reads as follows: "As opposed to the document and envelope in litigation in *Groupe Polygone*, the Jimmy Interview (tape and transcript) is not the very *actus reus* of the alleged crime.", while it should read as follows: "As opposed to the document and envelope in litigation in <u>National Post</u>, the Jimmy Interview (tape and transcript) is not the very *actus reus* of the alleged crime."

2014 QCCS 132 (CanLII)

500-36-006329-125                                                      PAGE: 2

[3] Considering that this error should be corrected;

FOR THIS REASON, THE COURT:

[4] **RECTIFIES** the January 21, 2014 judgment for paragraph 154 to read as follows:

> [154] As opposed to the document and envelope in litigation in _National Post_, the Jimmy Interview (tape and transcript) is not the very _actus reus_ of the alleged crime.

_____
SOPHIE BOURQUE, J.S.C.

**Me Peter M. Jacobsen**
**Me Tae Mee Park**
**Bersenas Jacobsen Chouest Thomson Blackburn LLP**
**Me Nadine Touma**
**Les avocats Poupart, Dadour, Touma et associés**
Counsels for the Petitioners

**Me Louis Bouthillier**
**Me Alexandre Boucher**
**Office of the Director of criminal and penal prosecutions**
Counsels for the Respondent

**Me Vanessa Sadler**
**Chalifoux, Montpetit, Vaillancourt, Paradis & Ass.**
**Me Luc Leclair**
Counsels for the Mis en cause

Date of hearing:      April 3 and 4, 2013

2014 QCCS 132 (CanLII)

**Parent c. R.**                                                    **2014 QCCS 132**

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No:        500-36-006329-125

DATE:    January 21, 2014

---

**IN THE PRESENCE OF  THE HONOURABLE SOPHIE BOURQUE, J.S.C.**

---

**DR. COLETTE PARENT**
and
**DR. CHRISTINE BRUCKERT**
        Petitioners
v.
**HER MAJESTY THE QUEEN**
        Respondent
and
**LUKA ROCCO MAGNOTTA**
         Mis en cause

---

JUDGMENT ON A CERTIORARI  APPLICATION TO QUASH A SEARCH WARRANT

---

## I-INTRODUCTION

[1] To find the truth is what an adversarial trial process aims for. If requested, all must testify before the courts about facts and events in the realm of their knowledge or expertise. In order that justice be rendered, the public in general and the judicial organization have the right to any

2014 QCCS 132 (CanLII)

JB 3851

and all relevant information[1]. That is the general rule: relevant information is presumptively admissible.

[2]      Exceptions were developed "to exclude evidence that is irrelevant, unreliable, susceptible to fabrication, or which would render the trial unfair". The search for truth can also be restricted "by excluding probative, trustworthy and relevant evidence to serve some overriding social concern or judicial policy"[2]. From the latter derive privileges for certain private communications, amongst which we find the police-informer, and the solicitor-client privileges: see respectively *R v Leipert*, [1997] 1 SCR 281 and *Solosky v The Queen*, [1980] 1 SCR 821.

[3]      The main question raised by this *certiorari* application is whether the Petitioners can exempt themselves from this obligation of disclosure on the basis of a researcher-participant confidentiality privilege rooted in the common law in order to protect their confidential, academic research work product.

## II- ISSUES AND POSITIONS OF THE PARTIES

[4]      The Petitioners submit that, under the Wigmore[3]  anatycal framework for case-by-case privilege, the items that were seized under Search Warrant No. 500-26-071828-127 ("the Search Warrant") are protected by researcher-participant confidentiality privilege and therefore not compellable by or be admitted by a court.

[5]      In their claim for case-by-case privilege, the Petitioners seek to establish that:

   a) the communication between the research participant Jimmy and the Petitioners (the items seized) originated in confidence;
   b) confidentiality was essential to the maintenance of the relation between them;
   c) the relationship between researcher and participant is one that should be diligently, deliberately and consciously fostered;
   d) the public interest in protecting researcher-participant confidentiality in general, and in the specific circumstances of this case, clearly outweighs what minimal contribution, if any, the release of the seized items will make to the prosecution of the accused in the criminal proceeding.

[6]      The Petitioners submit that the evidence establishes that all four criteria of the Wigmore test (see above) have been met in this *certiorari* application.

[7]      With respect to the fourth criterion the Petitioners submit that the weighing exercise favours the public interest in upholding the promise of confidentiality and preventing the disclosure of the seized items.

---

[1]      Justice L'Heureux-Dubé  in *R v Gruenke*, [1991] 3 SCR 263 at page 295.
[2]      *Ibid.*
[3]      Wigmore, *Evidence in Trials at Common Law*, vol 8, McNaughton Revision 1961, para 2285.

500-36-006329-125                                                    PAGE: 3

[8]     The Petitioners submit that the researcher-participant relationship is an important relationship, the maintenance of which is vital to this type of research, and that the circumstances of the case support the recognition of this privileged relationship.

[9]     They submit that the public interest in disclosure is minimal since it is reasonable to assume that the Service de Police de la Ville de Montréal (SPVM) and the Respondent have a great amount of evidence to prosecute the alleged crime.

[10]    Furthermore, both Petitioners submit the seized items would likely be of minimal assistance to the prosecution of Magnotta because the information they contain would be of minimal assistance to an assessment of his mental condition in the eventuality that a defence of not criminally responsible due to a mental disorder ("NCR defence") is raised.

[11]    Accordingly, the Petitioners request an order that the Search Warrant be quashed on the basis of the existence of a case-by-case researcher-participant confidentiality privilege.

[12]    In her written submissions, the Respondent, Her Majesty the Queen, agrees with the Petitioners that the application must be settled under the Wigmore framework for case-by-case privilege, but submits that the Petitioners have failed to demonstrate the existence of a researcher-participant privilege, the first and fourth criteria of the Wigmore test not being met. As for the second and third criteria, the Respondant did not take position.

[13]    The Respondent acknowledges the importance of research in social science and criminology in general, but submits the Petitioners do not satisfy the fourth criterion, namely that  the public interest in protecting researcher-participant confidentiality, in this particular case,  clearly outweighs the public interest in discovering the truth and correctly disposing of the litigation. The Respondent states that the weighing of the competing interests under the fourth criterion favors the disclosure of the interview content.

[14]    In challenging the Petitioners' application, the Respondent, given the circumstances and the nature of the crimes for which Magnotta is charged, anticipates a NCR defence under s. 16 of the *Criminal Code* or a denial of the accused's *mens rea* at trial. The Respondent submits that the interview content could provide valuable information on the accused's mental state and personality.

[15]    It is the Respondent's opinion that the Petitioners ignore the importance of the public interest in the suppression of crimes in their analysis under Wigmore's fourth criterion, especially regarding the seriousness of the accusations faced by Magnotta. The seized items are related to the crimes Magnotta allegedly committed because they likely focus on issues relative to the accused mental health and sexuality.

2014 QCCS 132 (CanLII)

[16]     Furthermore, the Respondent submits that there is no clear evidence regarding the negative impact a disclosure of the seized items would have on the applicant's research projects and on scientific research in general.

[17]     Accordingly, the Respondent requests that the *certiorari* application be rejected, and that the SPVM and the Crown be allowed to access the seized items.

[18]     Following oral hearing of this application, the Respondent admitted that the Petitioners have met their burden on the first three criteria. Therefore, the sole issue to be decided by the Court is whether the Petitioners have satisfied the fourth criterion of the Wigmore test by demonstrating the injury that would inure to the researcher-participant relationship by the disclosure of the communications in this particular case is greater than the benefit gained for the correct disposal of the litigation.

[19]     Despite these admissions, since the question of the existence of a researcher-participant confidentiality privilege seems hitherto not to have been decided by a Canadian court, the Court will analyse all four criteria of the Wigmore framework for case-by-case privilege.

## III- BACKGROUND

[20]     On June 21, 2012, in executing the Search Warrant, detectives from the SPVM seized a confidential audio recording and a confidential paper transcript of that audio recording ("the seized items").

[21]     The seized items were derived from a confidential interview held on March 29, 2007 with a male individual named "Jimmy" (the "Confidential Interview").

[22]     The Confidential Interview was part of a large-scale academic study titled "Sex Work and Intimacy: Escorts and Their Clients" (the "Research Project") conducted by the Petitioners over a four year period (2004-2008).

[23]     It was conducted by Adam McLeod ("McLeod") employed by the Petitioners as a research assistant for the Research Project between October 30, 2006 and May 31, 2007. McLeod was an upper level undergraduate student at the University of Ottawa, with whom Dr. Bruckert (co-petitioner) had primary contact.

[24]     McLeod was hired to collect primary and secondary data, interview individuals and analyse data and he conducted some 15 interviews with male escorts in the greater Toronto, Ottawa and Montreal region.

[25]     The Search Warrant was granted after McLeod had voluntarily, and without Petitioners' knowledge, communicated on May 31, 2012 with the SPVM to give information about the interview he conducted in 2007. McLeod told the SPVM that the interview focused on all aspects of the accused's personal and professional life,

2014 QCCS 132 (CanLII)

specifying it was audio recorded and then transcribed on paper. McLeod alleged that Luka Rocco Magnotta was behind the pseudonym Jimmy, as revealed by Magnotta himself in email exchanges following the interview.

[26]     When McLeod communicated with the SPVM, the audio recording and the paper transcript of the audio recording were in Petitioners' possession.

[27]     Magnotta is presently charged with first degree murder on the person of Lin Jun, interfering with a dead body, mailing obscene matter, publication of obscene material, and criminal harassment and has pleaded not guilty to all charges. The murder is alleged to have occurred on or around May 25, 2012. His trial is set to begin in September 2014.

[28]     The seized items have been kept under seal pending the decision on this application.

## IV- EVIDENCE

[29]     The burden of proof, based on the balance of probabilities rests on the Petitioners.

[30]     The Petitioners' evidence presented by affidavits covers the issues of their professional qualifications, the relevant aspects of the Research Project, the relevant component of the Confidential Interview, the nature and importance of the confidentiality requirement, and the potential relevancy of the items seized.

[31]     The Respondent adduced no evidence.

### 1. The Petitioners

[32]     The Petitioners are both distinguished professors of Criminology at the University of Ottawa. Dr. Parent's research interest lies primarily in the areas of feminism and criminology, violence against wives, sex work, feminist theory and alternative to the penal system. Dr. Bruckert's research expertise lies mainly in sex work, erotic dance, release and reintegration from prison, and criminological theory.

[33]     Each Petitioner has an extensive record of awards, publications, presentations and significant research grants.

[34]     The Petitioners have collaborated on several research projects involving the sex work industry since 2001.

[35]     They have been awarded research funds on multiple occasions by several government-related organizations, including the RCMP, Status of Women Canada, and the Law Commission of Canada.

2014 QCCS 132 (CanLII)

[36]   Both Petitioners have testified in front of the Parliamentary Subcommittee on the Prostitution Laws in 2003 and 2004.

[37]   Both Petitioners, in particular Dr. Bruckert, have a long and significant history of working closely with various sex workers rights groups as part of their research endeavors and through their engagement with the sex workers community. These organizations include Stella in Montreal and Maggie's in Toronto.

[38]   Furthermore, Dr. Bruckert has provided expert evidence by way of a written submission before the British Columbia Supreme Court on behalf of Pivot Legal Society. Pivot brought a *Charter* challenge to certain *Criminal Code* sections relating to prostitution. Dr. Bruckert was also the point person on behalf of POWER (Prostitutes of Ottawa Work, Educate and Resist), an intervener before the Ontario Court of Appeal in *Canada v Bedford* 2012 ONCA 186. She was cited in one of the Respondent's factum before the Supreme Court of Canada in this case (see *Canada (Attorney General) v Bedford* 2013 SCC 72).

## 2. The Research Project

[39]   The Research Project addresses sex work from the perspective of the sociology of work (instead of the perspective of exploitation or oppression of marginalized individuals). It focuses on a distinct sector of the sex industry, namely indoor male and female workers or escorts, and their clients. All of these aspects were under-developed in the academic literature prior to the Research Project, as most studies have focused on adult female sex workers, and on street based sex workers.

[40]   The Research Project involved interviewing 60 French or English speaking individuals (20 female escorts, 20 male escorts, and 20 clients of escorts) in Toronto, Ottawa and Montreal. The participants agreed to be interviewed on a confidential basis.

### a) Funding

[41]   The Research Project was funded by the Social Sciences and Humanities Research Council of Canada ("SSHRC"), a federal agency. The process to obtain a grant requires Petitioners to submit a detailed description of the project, including methodology.

[42]   In order to be eligible for funding from the three national granting councils, amongst which, the SSHRC, universities must establish research ethics boards and administer an institutional research ethics policy that follows the principles set out in the

2014 QCCS 132 (CanLII)

*Tri-Council Policy Statement* on Ethical Conduct for Research Involving Humans ("the *Tri-Council Policy Statement*")[4].

[43]     Given that it involved human participants, the Research Project was subject to detailed evaluation and monitoring throughout its course by the Research Ethics Board ("REB") at the University of Ottawa.

[44]     The Petitioners submitted a detailed ethics application to the REB, which described, *inter alia*, the training of interviewers (notably, training in the importance of issues of confidentiality and anonymity), and the central importance of the principles of free and informed consent, privacy of research participants and confidentiality of data to the Research Project. Free and informed consent, and privacy and confidentiality are two specific topics addressed by the *Tri-Council Policy Statement*.

[45]     The procedure approved by the REB stated that the participant must be asked to provide consent verbally but would not be required to sign a consent form.

### b) Recruitment

[46]     Participants were recruited with the assistance of community groups (e.g. Stella) that provide support and advocacy for sex workers. They were also recruited via the Petitioners' social and professional networks and by posting recruitment flyers on escort websites.

[47]     Both the recruitment flyer and the recruitment letter sent to potential participants made explicit reference to the promise of confidentiality and anonymity attached to the research process. The recruitment letter stated:

> Confidentiality and anonymity will be respected at all times throughout the research process and all identifying names, places and events will be changed in the transcripts and in any subsequent documents.

[48]     The recruitment flyer stated "study will be held in confidence".

### c) Interviewers

[49]     Most interviewers were researchers who had some contact with sex workers rights groups. A few students at the University of Ottawa were also hired to assist with the Research Project including the conducting of interviews[5].

---

[4]     Canadian Institutes of Health Research, Natural Sciences and Engineering Research Council of Canada, and Social Sciences and Humanities Research Council of Canada, *Tri-Council Policy Statement: Ethical Conduct for Research Involving Humans*, December 2010.
[5]     Dr Parent Affidavit at paras 85-86.

2014 QCCS 132 (CanLII)

[50]    Interviewers were trained by the Petitioners in technique and ethics from a theoretical and practical aspect. Training was extensive and ongoing. Interviewers were trained to specifically advise the participant that "all your comments will remain anonymous and confidential"[6].

[51]    The Petitioners stressed the importance of anonymity, confidentiality and trust to the interviewers during training and throughout the Research project[7].

[52]    The interviewers were required to obtain informed consent from all participants and were trained to do so in the following manner: (a) reviewing the consent form; (b) the interviewer would assure the participant that all comments would remain anonymous and confidential and that all names and places would be changed; (c) the interviewer would ask for consent to have the interview recorded by tape; (d) the participant would give his or her consent orally and the interviewer would sign the consent form for the participant with an agreed-upon pseudonym; (e) a copy of the consent form would be given to the participant[8].

[53]    There was no limitation to the promise of confidentiality given by the interviewers to the participants[9].

[54]    The interviewers and the Petitioners were bound by all promises of confidentiality made by the interviewers to the participants[10].

[55]    Dr. Bruckert trained McLeod on the research protocol, the ethics component, the interview process and the critical importance of the promise of anonymity and confidentiality. This training continued throughout the Research Project[11].

[56]    Dr. Bruckert had numerous discussions with McLeod about the vulnerability of the research participants, the significant risk of harm they face if confidentiality and anonymity were not upheld and the critical importance of safeguarding confidentiality and anonymity[12].

[57]    It was and still is Dr Bruckert's belief that "McCleod thoroughly understood the importance of confidentiality and its essential nature to the conduct of interviews for the Research Project"[13].

---

[6]   *Ibid* at paras 87-88.
[7]   *Ibid.*
[8]   *Ibid* at para 89.
[9]   *Ibid* at para 90.
[10]  *Ibid* at para 91.
[11]  Dr Brukert Affidavit  at para 46.
[12]  *Ibid* at para 48-51.
[13]  *Ibid* at para 51.

2014 QCCS 132 (CanLII)

### d) Interview content

[58]     The Informed Consent Letter, signed by all participants, describes the content of the interview as follows:

> During the interview, I will be asked a series of questions regarding my experiences in the escort trade including my work history, current work situation, relationships with clients, and employers, the requisite skills and competencies, and my reconciliation of work and personal life including my sexual and emotional (intimate) life. I will also be asked about my opinion of sex work and of clients, as well as my experiences of discrimination and stigma, as well as my understanding of laws/regulation.

### e) The Jimmy Interview

[59]     McLeod conducted the interview with Jimmy on March 29, 2007 in Montreal.

[60]     McLeod went over the consent form with Jimmy. In accordance with the Research Protocol, the signature of Jimmy on the consent form dated March 29, 2007 was written by McLeod after he received the verbal consent of Jimmy to participate in the interview and to have the interview recorded.

[61]     The Jimmy Letter, which contents and form are identical to the blank consent form pre-approved by the REB, specifically states:

> I understand that my confidentiality will be respected and that during the process of collection and analysis the interview data will in the sole possession of Colette Parent, Chris Bruckert and Maria Nengeh Mensah or one of the research assistants. During transcription the typist will have access to the data but not to my name or any personal information that may identify me.
>
> […]
>
> I have received assurance from the researchers that the information I will share will remain strictly confidential. Anonymity will be assured by keeping the personal information collected to a minimum; immediately upon transcription changing any personal or potentially identifiable information including names, agencies, towns/cities, or geographic area and events/stories; and altering any atypical (and therefore potentially identifiable) speech patterns or idiosyncratic use of words/phrases.
>
> Tapes recordings, interview notes, transcripts and any other data collected will be kept in a secure manner.
>
> […]
>
> The goals of the research have been explained to me, this consent letter has been reviewed orally and I have had the opportunity to ask questions and receive

2014 QCCS 132 (CanLII)

clarifications regarding research goals, methods, researchers' obligations and the rights of the participants or any other concerns. I have been given a copy of the letter.

[62]    After the Interview, McLeod deposited the audio recording of the Interview with Dr. Bruckert.

[63]    To date, neither Dr. Parent nor Dr. Bruckert have been advised by Jimmy that he wishes to release the Petitioners from the promise of confidentiality made by McLeod on their behalf[14].

### 3. Luka Rocco Magnotta Affidavit

[64]    The affidavit, dated July 11, 2012 and signed by Magnotta in Montreal, states:

> [...]
>
> 2. I gave an interview as "Jimmy" in relation to a study on prostitution and (sic) the University of Ottawa.
>
> 3. I was assured by the people making the interview that it would be private and confidential.
>
> 4. I want the interview and notes, if such exist, to remain private and confidential.

### 4. Dr. John Lowman Affidavit

[65]    Dr. Lowman is a full Professor of Criminology at Simon Fraser University. By affidavit, he has been asked to provide his independent opinion in this proceeding.

[66]    Dr. Lowman research interests lie primarily in critical criminology, prostitution, prostitution law and its enforcement, the sociology of punishment and research confidentiality. Dr. Lowman has conducted several in-depth research studies on prostitution, including studies on behalf of the Department of Justice Canada and the British Columbia Ministry of the Attorney General.

[67]    He specializes in prostitution, the history of prostitution law and prostitution law enforcement.

[68]    Dr. Lowman has provided expert evidence in *Canadian Charter of Rights and Freedoms* (the "*Charter*") challenges to the prostitution law brought before the courts of British Columbia and Ontario. Dr. Lowman was cited by the Supreme Court of Canada and interveners in the *Bedford Charter* challenge to certain *Criminal Code* sections relating to prostitution (*Canada (Attorney General) v Bedford*).

---

[14]    Dr Parent Affidavit at para 128; Dr Bruckert Affidavit at para 70.

[69]     Over the years, Dr. Lowman has developed an interest in research confidentiality. He has authored numerous publications on the topic and was involved in the only Canadian case to date involving researcher-participant confidentiality privilege in a proceeding (the Ogden case[15]).

[70]     The Court thereby acknowledges Dr. Lowman is a distinguished scholar in the areas of prostitution, research confidentiality and researcher-participant confidentiality privilege. His qualifications were uncontested at trial.

[71]     The Court will refer in detail to his affidavit later. Suffice to say at this point that his opinion is relevant for the analysis of Wigmore's third and fourth criteria.

### 5. Dr. Scott Woodside Affidavit

[72]     Dr. Woodside is a psychiatrist practicing in the area of forensic psychiatry since 1997. He has been asked to provide his independent opinion in this proceeding.

[73]     At the time he filed his affidavit, Dr. Woodside was the Clinic Head at The Sexual Behaviours Clinic of the Centre for Addiction and Mental Health, Canada's largest mental health and addiction teaching hospital, as well as one of the world's largest research centers in the area of addiction and mental health.

[74]     Since 2011, Dr. Woodside has been a member of the Ontario Board Review which annually reviews the status of every person who has been found to be not criminally responsible or unfit to stand trial for criminal offences on account of mental disorder.

[75]     Over the past fifteen years, Dr. Woodside has conducted between 500 to 600 assessments of individuals to determine whether or not they would have a NCR defence due to a mental disorder pursuant to s. 16 of the *Criminal Code.*

[76]     NCR assessments are part of Dr. Woodside's professional duties. An NCR assessment requires the determination of four elements, which will be detailed later on.

[77]     The Court acknowledges Dr. Woodside is a distinguished specialist in the areas of forensic psychiatry, and particularly in NCR assessments. His qualifications were uncontested at trial.

[78]     Again, at this point, it is sufficient to say that it is his opinion that the possible answers to the interview questionnaire refered to in this case could have some remote relevance to the determination of one of the four elements to be determined in an NCR assessment. Those answers would be extremely unlikely to be of use for the purposes of determining the three other elements.

---

[15]     *Re Inquest of Unknown Female*, Oral Reasons for Judgment of Coroner L.W. Campbell, dated October 20, 2004.

## V- THE LAW

[79]    Three kinds of privilege are recognized in Canadian law: constitutional privilege, class privilege and case-by-case privilege, see *R v National Post* [2010] 1 SCR 477 at para 39 and 42; *Globe and Mail v Canada (Attorney General)* [2010] 2 SCR 592 at para 20 ("*Groupe Polygone*").

[80]    The Petitioners have not filed their application on the basis of a constitutional privilege. Moreover, the courts have hesitated over the years to confer constitutional status on testimonial immunities. Even the solicitor-client privilege, supported by and impressed with the values underlying s. 7 of the *Charter*, is generally seen as a "fundamental and substantive rule of law" (*R v McClure*, [2001] 1 SCR 445 at para 17), rather than as "constitutional", see *National Post* at para 39.

[81]    At common law, privilege is classified as either relating to a class (e.g. solicitor and client privilege, police informer privilege) or established on a case-by-case basis (journalistic privilege). As Justice Binnie observed in rejecting the existence of a class privilege for communications between a journalist and its source in *National Post*   at para 42:

> In a class privilege what is important is not so much the content of the particular communication as it is the protection of the type of relationship. Once the relevant relationship is established between the confiding party and the party in whom the confidence is placed, privilege presumptively cloaks in confidentiality matters properly within its scope without regard to the particulars of the situation. Class privilege necessarily operates in derogation of the judicial search for truth and is insensitive to the facts of the particular case. Anything less than this blanket confidentiality, the cases hold, would fail to provide the necessary assurance to the solicitor's client or the police informant to do the job required by the administration of justice. The law recognizes very few "class privileges" and as Lamer C.J. observed in rejecting the existence of a class privilege for communications passing between pastor and penitent in *R v Gruenke*, [1991] 3 SCR 263:
>
> > *Unless it can be said that the policy reasons to support a class privilege for religious communications are as compelling as the policy reasons which underlay the class privilege for solicitor-client communications, there is no basis for departing from the fundamental "first principle" that all relevant evidence is admissible until proven otherwise. [page 288].*
>
> It is likely that in future such "class" privileges will be created, if at all, only by legislative action.

[82]    There could be several reasons for rejecting the existence of a researcher-participant class privilege (see *National Post* at paras 43-46, given the necessary modifications), but as the question has not been raised by the Petitioners in this

2014 QCCS 132 (CanLII)

application, the Court will not pronounce itself on the subject. The Court nevertheless endorses Justice Binnie's remark on one of the reasons behind the Supreme Court of Canada's refusal to recognize a journalistic-confidential source class privilege in *National Post* at para 46:

> Fourthly, while the result of any privilege is to impede the search for truth, and thereby to run the risk of an injustice to the persons opposed in interest to the claimant, a class privilege is more rigid than a privilege constituted on a case-by-case basis. It does not lend itself to the same extent to be tailored to fit the circumstances.

[83]     Since privileged communications are very limited – highly probative and reliable evidence must not be excluded from scrutiny without compelling reasons – it must be demonstrated that an external social policy is of such unequivocal importance that it demands protection against the general disclosure rule[16]. Confidentiality alone does not make a communication privileged from disclosure.

[84]     It is now accepted that the common law permits privilege in new situations where reason, experience and application of the principles underlying the traditional privileges so dictate: *Slavutych v Baker* [1976] 1 SCR 254; *Gruenke* at page 286, *M (A) v Ryan* [1997] 1 SCR 157 at para 20. The applicable principles are derived from those set forth in Wigmore:

1.  The communications must originate in a confidence that they will not be disclosed.
2.  This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
3.  The relation must be one which in the opinion of the community ought to be sedulously fostered.
4.  The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit gained for the correct disposal of litigation.

[85]     In *M (A) v Ryan*, the Supreme Court of Canada stated that "the law of privilege may evolve to reflect the social and legal realities of our time" (para 21). One of the elements to be considered in connection with new claims for privilege is the *Canadian Charter*. Ensuring that the common law of privilege develops in accordance with "*Charter* values" requires that the existing rules be scrutinized to ensure that they reflect the values the *Charter* enshrines: *RWDSU v Dolphin Delivery Ltd.*, [1986] 2 SCR 573 at page 603; M (A) *Ryan* at paras 21 and 23.

[86]     As academic researchers whose research depends on confidential communications from human subjects as a primary and essential source of information, the Petitioners themselves advocate a balancing of interests based on the Wigmore

---

[16]     Justice L'Heureux-Dubé in *Gruenke* at page 296, citing Sopinka's and Lederman's *The Law of Evidence in Civil Cases* at page 157.

framework for establishing confidentiality at common law as set out in *McClure* at para 29, *M (A) v. Ryan* at para 30, *Gruenke* at pages 289-90, and *Slavutych v Baker* at p 261.

[87]     The Petitioners rely on the principles set out by the Supreme Court of Canada in *National Post* and *Groupe Polygone*. The holding in *National Post* was summarized by Justice Lebel in *Groupe Polygone* (para 22):

> The Court concluded that the case-by-case approach, based on the Wigmore criteria and infused with Canadian Charter values, provided "a mechanism with the necessary flexibility to weigh and balance competing public interests in a context-specific manner" (para. 51), and would allow the "opportunity for growth that is essential to the proper function of the common law" (para. 55).

[88]     Courts have also applied the Wigmore analysis in cases involving confidential communications in other contexts: between a pastor and a penitent *(Gruenke* ), in a setting involving university tenure *(Slavutych v Baker)* and in the context of a hiring decision at a hospital *(Straka v Humber River Regional Hospital* (2000) 51 OR (3d) 1; 193 DLR (4th) 680 (CA)).

[89]     Nevertheless, to the knowledge of the Court, researcher-participant privilege has never been recognized by a Canadian court[17]. The only case addressing the issue of researcher-participant confidentiality is a Vancouver Regional Coroner's inquest into the death of the *Unknown Female* pursuant to section 20(2) of the *Coroners Act*, 1979, RSBC c 68. In this case, the coroner, justice L.W. Campbell, released Russel Ogden, a Simon Fraser University student who mastered on the topic of assisted suicides among persons suffering from HIV/AIDS, from having to answer questions that would breach his promise of "absolute confidentiality" he would offer to his research participants, and in particular to two interviewees which shared information about the unknown female's death. Ogden invoked the Wigmore criteria in support of his assertion that the information shared by the interviewees was subject to researcher-participant privilege[18].

[90]     In *National Post*, the Supreme Court of Canada ruled that the protection offered by a case-by-case privilege, if established on the facts, could be asserted against the issuance or execution of a search warrant, thus not being necessarily restricted to testimony in court or before an administrative tribunal. The scope of the privilege is "shaped by the public interest that calls the privilege into existence in the first place" depending on the circumstances of each case; it may be total or partial[19].

[91]     In appropriate circumstances, a privilege could protect information and evidence from being compelled and admitted in a criminal investigation and trial or civil action. In

---

[17]   Dr Lowman Affidavit  at para.40.
[18]   *Re Inquest of Unknown Female*, Oral Reasons for Judgment of Coroner L.W. Campbell, dated October 20, 2004. See also Dr. Lowman Affidavit, at para 39.
[19]   *National Post* at para 52; *M (A) v Ryan* at para 18.

describing the balancing exercise at issue in criminal cases in which journalist-source privilege is raised, Justice Binnie stated[20]:

> It is well established that freedom of expression protects readers and listeners as well as writers and speakers.  It is in the context of the *public* right to knowledge about matters of public interest that the legal position of the confidential source or whistleblower must be located.  The public has an interest in effective law enforcement.  The public also has an interest in being informed about matters of importance that may only see the light of day through the cooperation of sources who will not speak except on condition of confidentiality. […] It is important, therefore, to strike the proper balance between two public interests — the public interest in the suppression of crime and the public interest in the free flow of accurate and pertinent information.  Civil society requires the former.  Democratic institutions and social justice will suffer without the latter.

## VI- ANALYSIS

### First criterion: The communications must originate in a confidence that they will not be disclosed

[92]     The evidence establishes that the communications originated in confidence and that the identities of the participants and the contents of the interviews conducted during the Research Project would not be disclosed.

[93]     The granting and maintenance of the confidentiality was integral to the Research Project. It is a condition stated in the recruitment literature (recruitment flyer, recruitment letter) sent to potential participants, and the consent form signed by the interviewers for the participants. It was an essential part of the extensive and on-going training of the interviewers, the approval of the ethics application by the REB at the University of Ottawa, and the SSHRC funding approval.

[94]     Furthermore, the Consent Form (Jimmy letter) indicates that Jimmy agreed to be interviewed explicitly in exchange for the promise of confidentiality. The fact that the consent form was signed by McLeod on behalf of Jimmy after they have been through its content is an additional proof that Jimmy's participation was conditional on the promise that his identity would remain anonymous and that all the information shared would remain strictly confidential. It is to be reminded that the Ethic Application Form, submitted for research project evaluation to the REB, specifically stated that to ensure anonymity, participants would be asked to provide consent verbally and would not be required to sign a consent form. This condition was included in the Research protocol, which has been approved by the REB prior to Jimmy interview.

[95]     The Respondent argues that McLeod did not feel bound by the promise of confidentiality because he has himself communicated with SPVM to mention the

---

2014 QCCS 132 (CanLII)

existence of the Jimmy Interview's recording and transcription. On the basis of an affirmation made by McLeod to SPVM investigators, the Respondent also argues that, as Jimmy revealed its real identity to McLeod in email exchanges following the Interview, Jimmy would not expect the material derived from it to be confidential. Therefore, there would be no such confidence from both parties that the communications between Jimmy and McLeod, acting on behalf of the Petitioners, would not be disclosed. However, these assertions are not supported by evidence as McLeod has neither testified in court nor produced an affidavit on the matter.

[96]    In any event, confidentiality was necessary to protect Jimmy's identity and to make sure that he would not suffer any prejudice from his participation in the Research Project. McLeod could not unilaterally revoke the confidentiality promise.

[97]    The fact that Jimmy contacted McLeod later on with his real identity cannot be considered as a renunciation to confidentiality. McLeod already knew his identity. Nothing indicates that Jimmy sent those e-mails to a third party or that he authorized McLeod to do so. As far as Jimmy's identity is concerned, those e-mails were also covered by the promise of confidentiality.

[98]    As previously stated, according to Dr. Bruckert, she discussed on numerous occasions with McLeod the critical importance of the promise of confidentiality and anonymity for the participants, particularly the male escorts. It was Dr. Bruckert's belief, and still is, that McLeod thoroughly understood the importance of confidentiality and its essential nature to the conduct of interviews for the Research project.

[99]    The production of the Magnotta's affidavit before the Court on April 9, 2013 sealed the fate of the Respondent's arguments on Wigmore's first criterion. During the application hearing, the Respondent, in fairness, admitted that the Petitioners met the first criterion.

### *Second criterion: This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties*

[100]    The granting and maintenance of the promise of confidentiality to the participants as a condition of participation in the Research Project was an essential part of the SSHRC funding approval, the approval of the REB at the University of Ottawa, the training of the interviewers, the recruitment literature (recruitment flyer, recruitment letter) sent to potential participants, and the consent form signed by the interviewers for the participants. Without the promise of confidentiality and anonymity to participants, the Research Project would not have been approved by the REB at University of Ottawa, and could not have proceeded[21].

---

[21]    Dr Parent Affidavit, Exhibit "C".

500-36-006329-125                                                    PAGE: 17

[101]    Petitioners' evidence establishes that confidentiality is essential to the full and satisfactory maintenance of the relation between the parties both during and after the Research Project. Research participants such as Jimmy would not participate if confidentiality could not be guaranteed. Sex workers are difficult to reach and to recruit, especially those who do not operate out in the open (e.g. indoor sex workers)[22].

[102]    Even though the Petitioners have sedulously cultivated relationships in the sex worker community (Stella, Maggie's, and POWER) for over a decade, Dr. Parent's evidence establishes that it took both Petitioners almost four years to complete the Research Project, the majority of their time being spent recruiting and interviewing participants. Due to the risk of harm they face, sex workers are reluctant to provide information about themselves, being a vulnerable population that works in a clandestine and stigmatized sector[23].

[103]    The participants in the Research Project, including Jimmy, could face multiple risks of harm if the promise of confidentiality granted to them is not upheld. The risks of harm  that have been reported to the Petitioners and have been observed by them throughout  their academic experience include[24]:

a) exposing participants to risk of legal harm, such as Criminal Code charges[25] or seizure of one's children;

b) exposing participants to risk of personal harm (discrimination, ostracism) by possibly endangering their relationships with family members, neighbors, service providers, employers, landlords, etc.;

c) exposing participants to safety hazard, especially if their names and personal information are disclosed to their clients;

d) exposing participants to financial risk and risk of not being able to continue to work as a sex worker, should their relationships with their clients, which forms the basis of their livelihood, dissolve, as discretion is the very foundation of the participants' work, and participating in interviews risks identifying clients;

e) exposing participants to risk of exclusion from the sex worker community for their failure to uphold the professional code of conduct, as participating in interviews often results in sharing information about other members of the industry; and

f) exposing male escorts to the risk of additional stigmatization based on homophobia.

[104]    Dr. Lowman reports other risks related to the disclosure of sex workers' identities and their confidential communications such as being cut off welfare or

---

[22]    Dr Bruckert Affidavit at paras 72-74.
[23]    Dr Parent Affidavit at paras 128-129, 133.
[24]    Dr Parent Affidavit at paras 129-130; Dr Bruckert Affidavit at paras 71-73.
[25]    To be read in context with the conclusions of the *Canada (Attorney General) v Bedford* judgment of the Supreme Court of Canada on three *Criminal Code* provisions criminalizing various activities related to prostitution, and with Parliament's future legislative approach on the matter.

2014 QCCS 132 (CanLII)

2014 QCCS 132 (CanLII)

unemployment insurance benefits, being pursued by Revenue Canada for unpaid taxes, or having their children harassed or bullied by other children at school[26].

[105]    The areas in which the Petitioners conduct research are peculiarly sensitive, involving gathering confidential information about research participants' very identities (i.e. lifestyles, intimate relations).

[106]    Dr. Bruckert's evidence establishes that in order to protect themselves from the risks of harm they are facing, sex workers do not disclose their labor activity to everyone. In deciding whether they will participate or not in such a research project, the participants often do a cost-benefit analysis. The inherent risks attached to participating in an interview are weighed against the possibility for the participant to contribute to knowledge without being harmed, the most vital consideration being whether the participant trusts the researcher to uphold his or her promise of confidentiality in exchange of his or her story[27].

[107]    Dr. Bruckert's evidence also establishes that the Petitioners were able to recruit and interview 60 participants for the Research Project on the basis of their credibility as researchers within the sex worker community, and as researchers who can be trusted to uphold their promise of confidentiality and anonymity. Indeed, when receiving approval for SSHRC funding for a subsequent large scale project ("The Management Project") involving 75 so-called third parties (pimps, madams, managers, receptionists), it was mentioned by one of the funding reviewers that the Petitioners were uniquely positioned to conduct innovative research on the basis of their reputations for trustworthiness and respectfulness within the sex worker community, gained from earlier research projects[28].

[108]    In her affidavit, Dr. Bruckert stated that much of the recruitment in the type of research Dr. Parent and herself conduct is done via sex worker community groups who disseminate the call for participants, and by "snowball sampling" through which participants pass on the information about the project to their acquaintances and vouch for the researchers' reputation as being trustworthy[29].

[109]    As a result of the Search Warrant, Dr. Bruckert has been advised by one of her contacts in the sex worker community that she is regarded by this contact as having failed in her duty to uphold the promise of confidentiality in this case. Dr. Bruckert has also been advised by several of her contacts in the sex worker community that confidentiality is critical to their decision to participate in a research project: the majority of her contacts would not participate in the absence of a binding promise of confidentiality[30].

---

[26]    Dr. Lowman  Affidavit  at para 54.
[27]    Dr Bruckert Affidavit  at paras 72-73.
[28]    Dr Bruckert Affidavit  at paras 60-67.
[29]    *Ibid* at para 79.
[30]    *Ibid* at paras 80-81.

A

2014 QCCS 132 (CanLII)

[110]    Is it therefore reasonable to believe that the Petitioners' ability to conduct this type of research in general, and their ability to conduct the interview with Jimmy in particular, required that the Petitioners hold Jimmy's interview content and Jimmy's real identity in confidence.

[111]    Jimmy also sees confidentiality as essential to his relationship with both Petitioners and the interviewers. Jimmy's consent to participating in the Confidential Interview was conditional on the promise that his identity would remain anonymous and that all of the information he would share would remain strictly confidential. Hitherto, Jimmy has not advised Dr. Parent or Dr. Bruckert that he wished to release them from the promise of confidentiality made by McLeod on behalf of the Petitioners[31].

[112]    Wigmore's second criterion is clearly satisfied in the case at bar: Jimmy's Interview could not have been conducted without a solemn initial promise of confidentiality and anonymity, and the subsequent, continued fulfillment of this promise.

[113]    Again, during the application hearing, the Respondent was well advised to admit that the Petitioners met the second criterion.

### Third criterion: The relation must be one which in the opinion of the community ought to be sedulously fostered

[114]    The third criterion is about the relationship itself and not about the content of the impugned communication. The court ought to examine the relationship and determine if it should be deliberately and consciously fostered and protected in the public interest (See *1654776 Ontario v Stewart and The Globe and Mail*, 2012 ONSC 1991 at para 36)[32].

[115]    The third criterion does not require any evaluation of the specific content of the communication between participant and researcher. The specific content of the impugned communication must rather be analyzed at the fourth criterion of the Wigmore test. The Court quotes with approval the following passage from the Ontario Superior Court of Justice in *Ontario v Stewart* at para 66:

> [A]ny evaluation of the specific content of the impugned communication between source and journalist is not part of the step three "relationship" analysis. The extent to which the impugned communication triggers allegations of criminality or other wrong-doing, or indeed criminal investigations, is a matter for step four of the Wigmore test, where such factors are taken into consideration as part of the required balancing exercise. If the content of the impugned communication and evidence of criminality or other wrong-doing was made part of the step three "relationship" analysis, then any evidence of any crime would automatically vitiate

---

[31]    Dr Parent Affidavit at para 128; Dr Bruckert Affidavit at para 70.
[32]    Upheld by the Ontario Court of Appeal in *1654776 Ontario v Stewart and The Globe and Mail*, 2013 ONCA 184.

the journalist-source privilege even before you got to step four because these would not be relationships that should be sedulously fostered in the public interest.

[116]   The Supreme Court of Canada prescribed in *National Post* (para 53) and *Groupe Polygone* that the importance of the confidential relationship *per se* would be examined under the third step of the Wigmore test while any damaging aspect of the impugned communication would be left to the balancing exercise at the fourth step. Under the third step, the court will consider whether the type of relationship is, in general, one that should be deliberately and consciously fostered in the public good (See *National Post* at para 57).

[117]   Courts have applied the Wigmore test (third criterion) as such in other cases involving confidential communications, for example in: a college tenure (*Slavutych v Baker* at page 261 (*obiter dictum*)), a hospital hiring setting *(Straka v Humber River Regional Hospital* at para 61), or a psychiatric treatment *(M( A) v Ryan* at para 27).

[118]   The Supreme Court of Canada ruled in *National Post* (at para 57) that the third criterion introduces a certain flexibility in the court's evaluation of the different parties which could be involved in a source-journalist relationship:

> The third criterion (that the source-journalist relationship is one that should be "sedulously fostered" in the public good) introduces some flexibility in the court's evaluation of different sources and different types of "journalists". The relationship between the source and a blogger might be weighed differently than in the case of a professional journalist like Mr. McIntosh, who is subject to much greater institutional accountability within his or her own news organization.

[119]   In this particular case, the distinctions between different types of researchers (for example, academics, undergraduate and graduate university students, college or high school students, professional non-academic research workers, or non-academic individuals with interests in specific topics) need not be discussed in detail since the Petitioners have made out on their evidence that, in general, the relationship between academic researchers and their secret sources is one which in the opinion of the community ought to be sedulously fostered. As professional journalists, academic researchers are subject to great institutional accountability especially towards REB which approve and monitor all research at universities where human subjects are involved.

[120]   The Petitioners submitted that the relationship between an academic researcher and a participant, in general, ought to be deliberately and consciously fostered on the basis of the importance of academic research to society. Key components of academic research are at stake in this particular case: academic freedom, which in turn includes the pursuit of knowledge, and the free flow of ideas in our society.

[121]   In *McKinney v University of Guelph* [1990] 3 SCR 229 at page 282, Justice LaForest noted that academic freedom, necessary to allow "free and fearless search for knowledge and the propagation of ideas" is "essential to our continuance as a lively democracy". In her dissent in the same case, Justice Wilson wrote that the primary intent of academic freedom is "the protection and encouragement of the free flow of ideas"[33].

[122]   The Supreme Court of Canada has been very cautious over the years in intervening in university affairs, recognizing the importance of academic freedom in safeguarding the role of universities as self-governing centers of research, teaching and learning[34].

[123]   In other words, academic freedom and the importance of institutions of higher learning and academic research are key components of a democracy that values freedom of thought and expression.

[124]   The Petitioners produced in evidence the *Tri-Council Policy Statement* that emphasizes the importance of academic freedom and research in our society and the responsibility, and the responsibility this puts on researchers and research institutions[35]:

> The search for knowledge about ourselves and the world around us is a fundamental human endeavour. Research is a natural extension of this desire to understand and to improve the world in which we live.
>
> […]
>
> Significant advances in human understanding in the social sciences, humanities, natural sciences, engineering and health sciences have been made as a result of research involving humans. A fundamental premise of this Policy is that research can benefit human society. In order to maximize the benefits of research, researchers must have academic freedom. Academic freedom includes freedom of inquiry, the right to disseminate the results of that inquiry, freedom to challenge conventional thought, freedom to express one's opinion about the institution, its administration or the system in which one works, and freedom from institutional censorship. With academic freedom comes responsibility, including the responsibility to ensure that research involving humans meets high scientific and ethical standards that respect and protect the participants. Thus, researchers' commitment to the advancement of knowledge also implies duties of honest and thoughtful inquiry, rigorous analysis, commitment to the dissemination of research results, and adherence to the use of professional standards. There is a corresponding responsibility on the part of institutions to defend researchers in their efforts to uphold academic freedom and high ethical, scientific and professional standards.

---

[33] *McKinney v University of Guelph* at page 374.
[34] *Dickason v University of Alberta* [1992] 2 SCR 1103 at page 1129.
[35] Cited note 4 at page 7.

[125]   The *Tri-Council Policy Statement* also emphasizes the importance of the researcher-participant relationship. It puts a heavy ethical onus on academics to protect to the best of their ability their relationships with participants, the participants' anonymity and privacy, and the confidentiality of the information gathered[36]:

> There is widespread agreement about the interests of participants in protection of privacy, and the corresponding duties of researchers to treat personal information in a confidential manner. Indeed, the respect for privacy in research is an internationally recognized norm and ethical standard. Fundamental rights and freedoms in the Canadian Constitution have been interpreted by the courts to include privacy protections. Privacy rights are protected in federal and provincial/territorial legislation.
>
> […]
>
> Privacy risks in research relate to the identifiability of participants, and the potential harms they, or groups to which they belong, may experience from the collection, use and disclosure of personal information. Privacy risks arise at all stages of the research life cycle, including initial collection of information, use and analysis to address research questions, dissemination of findings, storage and retention of information, and disposal of records or devices on which information is stored.
>
> […]
>
> Privacy refers to an individual's right to be free from intrusion or interference by others. It is a fundamental right in a free and democratic society. Individuals have privacy interests in relation to their bodies, personal information, expressed thoughts and opinions, personal communications with others, and spaces they occupy. Research affects these various domains of privacy in different ways, depending on its objectives and methods. An important aspect of privacy is the right to control information about oneself. The concept of consent is related to the right to privacy. Privacy is respected if an individual has an opportunity to exercise control over personal information by consenting to, or withholding consent for, the collection, use and/or disclosure of information
>
> […]
>
> The ethical duty of confidentiality refers to the obligation of an individual or organization to safeguard entrusted information. The ethical duty of confidentiality includes obligations to protect information from unauthorized access, use, disclosure, modification, loss or theft. Fulfilling the ethical duty of confidentiality is essential to the trust relationship between researcher and participant, and to the integrity of the research project
>
> […]

---

[36]   *Ibid* at pages 55-58.

2014 QCCS 132 (CanLII)

> Researchers shall safeguard information entrusted to them and not misuse or wrongfully disclose it. Institutions shall support their researchers in maintaining promises of confidentiality.
>
> [...]
>
> When researchers obtain information with a promise of confidentiality, they assume an ethical duty that is central to respect for participants and the integrity of the research project. Breaches of confidentiality may harm the participant, the trust relationship between the researcher and the participant, other individuals or groups, and/or the reputation of the research community. Research that probes sensitive topics (e.g., illegal activities) generally depends on strong promises of confidentiality to establish trust with participants.
>
> [...]
>
> The ethical duty of confidentiality must, at times, be balanced against competing ethical considerations or legal or professional requirements that call for disclosure of information obtained or created in a research context. For example, in exceptional and compelling circumstances, researchers may be subject to obligations to report information to authorities to protect the health, life or safety of a participant or a third party. Researchers are expected to be aware of ethical codes (such as professional codes of conduct) or laws (e.g., those requiring the reporting of children in need of protection) that may require disclosure of information they obtain in a research context. In other situations, a third party may seek access to information obtained and/or created in confidence in a research context. An access request may seek voluntary disclosure of information, or may seek to compel disclosure through force of law (e.g., by subpoena).
>
> [...]
>
> Researchers shall avoid being put in a position of becoming informants for authorities or leaders of organizations.

[126]   The *Tri-Council Policy Statement* supports the Petitioners' position that researcher-participant relationships ought to be diligently fostered in the opinion of the community.

[127]   Another example supporting the recognition, in general, of a researcher-participant privilege is found in the absolute statutory protection granted to Statistics Canada researchers, who may not to be compelled to testify or produce information in any proceeding[37].

[128]   The Supreme Court of Canada recognized in *National Post* (para 33) that "unless the media can offer anonymity in situations where sources would otherwise dry-

---

[37]   Dr. Lowman  Affidavit  at para 38. See s. 18 of the *Statistics Act*, RCS 1985, c S-19.

2014 QCCS 132 (CanLII)

up, freedom of expression in debate on matters of public interest would be badly compromised".

[129]    Similarly, research involving human subjects in the health and social sciences will often delve into sensitive areas such that few people, if any, would agree to participate in a given study without a promise of confidentiality. According to Dr. Lowman, research on sensitive topics "involves participants divulging information that could cause them serious harm or embarrassment if it became known that it pertained to them – especially when it involves vulnerable and marginalized communities"[38]. Examples of sensitive research topics that are eligible for confidentiality certificate protection in United States[39] include: research on HIV/AIDS and other STDs; studies on sexual attitudes, preferences, or practices; studies on the use of alcohol and drugs; studies on illegal conduct; research involving information that might lead to social stigmatization or discrimination if it were disclosed; research on participant's psychological well-being or mental health; genetic studies; research on behavioral interventions and epidemiologic studies; and certain kinds of research on members of the criminal justice community.

[130]    If investigative journalism (along with confidential sources) could help "fill what has been described as a democratic deficit in the transparency and accountability of our public institutions"[40], the Court agrees with the proposition that much academic research, especially that which explores the areas outlined above, provides useful information on certain aspects of the human condition that are normally kept silent. This information is essential to understand and improve the social condition of vulnerable and marginalized communities.

[131]    According to Dr. Lowman, confidentiality is very important in research on sex work[41]:

> Interview research with sex workers, street pimps, and owners and managers of escort services and massage parlours usually involves them disclosing their own criminal activity. Sex workers may disclose their sexual attitudes, preferences and practices, their use of alcohol and other addictive and/or illicit drugs, crimes

---

[38]    Dr. Lowman Affidavit at para 52.
[39]    Dr. Lowman Affidavit at para 34: "At its strongest, research confidentiality in the U.S. is protected by statute. […] The *Public Health Services Act* (42 USC 241(d)) authorizes the US Secretary of Health and Human Services (DHHS) to issue confidentiality certificates to researchers involved in any health research where confidentiality is deemed to be essential for producing valid and reliable information, regardless of whether DHHS funds it. These certificates allow investigators and others who have access to research records to refuse to disclose identifying information on research participants in any civil, criminal, administrative, legislative, or other proceeding, whether at the federal, state, or local level. The policy objective of this system is to help achieve research objectives and promote research participation by helping assure confidentiality and privacy to participants."
[40]    *National Post* at para 55.
[41]    Dr. Lowman Affidavit at para 53.

2014 QCCS 132 (CanLII)

committed against them, and their experience with sexually transmitted diseases – all of which, if confidentiality were violated, could harm them.

[132]    The evidence demonstrates that much of the research involving vulnerable people can only be conducted if human participants are given a guarantee that their identities and the information that they share will remain confidential[42]. Is it necessary to remind that sex workers have little or nothing to gain from participating in a study.

[133]    Dr. Lowman stated in his affidavit that in his experience, the condition of confidentiality not only encourages sex workers to come forward and be interviewed, but also encourages the clients of sex workers and law enforcement officials to come forward and be interviewed. These persons could share valuable information on the sex industry, but face various risks if their confidentiality is not respected, for example ostracism, punishment by members of criminal subcultures or disciplinary sanctions for practices crossing legal or deontological boundaries. Without a strong promise of confidentiality, clients and law enforcement officials do not usually participate in this kind of research[43].

[134]    Confidentiality is thus sometimes essential to a researcher's ability to pursue a line of inquiry and search for knowledge and truth, if not often or always in studies involving vulnerable and marginalized communities such as sex workers.

[135]    It is likely that if researchers studying sensitive topics cannot give enforceable guarantees of confidentiality, many prospective participants would decline to participate in research, even when topics being studied do not relate directly to criminal or illegal behavior.

[136]    General disclosure of confidential communications for the benefit of prosecutors would likely have a negative effect on research involving topics on potentially criminal or illegal activities. Only a small pool of potential participants who believe they have nothing to lose by disclosing potentially criminal or discreditable conduct would participate in research. This would result in a dry-up of reliable sources[44].

[137]    Dr. Bruckert has been advised by one of her contact in the sex industry that, if the promise of confidentiality was not binding, this individual would be very guarded in his or her answers so as to protect him- or herself from any potential legal consequences, and be, most likely, less then completely forthright in others[45].

---

[42]    Dr. Parent Affidavit at paras 126-137; Dr. Bruckert Affidavit at paras 68-86; Dr. Lowman Affidavit at paras 55-58.
[43]    Dr. Lowman Affidavit at para 56.
[44]    Dr. Lowman Affidavit at paras 60-61.
[45]    Dr. Bruckert Affidavit at para 81.

500-36-006329-125                                                                      PAGE: 26

[138]   Confidentiality promise has the potential to not only encourage vulnerable and marginalized people to come forward and be interviewed, but to maintain the quality, accuracy, and scientific value of the information collected by researchers.

[139]   Disclosure of researcher-participant confidential communications could have a chilling effect on prostitution research in Canada, or on very sensitive topics such as non-physician assisted suicide. Research opportunities in such topics become available under specific conditions, the most important being a strong confidentiality and anonymity promise[46].

[140]   In *In re Cusumano*, the United States Federal Court of Appeals for the First Circuit stated[47]:

> Courts afford journalists a measure of protection from discovery initiatives in order not to undermine their ability to gather and disseminate information. Journalists are the personification of a free press, and to withhold such protection would invite a "chilling effect on speech", and thus destabilize the First Amendment. The same concerns suggest that courts ought to offer similar protection to academicians engaged in scholarly research. After all, scholars too are information gatherers and disseminators. If their research materials were freely subject to subpoena, their sources likely would refuse to confide in them. As with reporters, a drying-up of sources would sharply curtail the information available to academic researchers and thus would restrict their output. Just as journalist, stripped of sources, would write fewer, less incisive articles, an academician, stripped of sources, would be able to provide fewer, less cogent analyses. Such similarities of concern and function militate in favor of a similar level of protection for journalists and academic researchers.

[141]   Information gathered by the Petitioners and academic researchers in general is incorporated into evidence presented to the courts and law-makers (evidence based on social facts). The specific information gathered by the Petitioners in their research projects forms the basis for information toolkits for sex workers and those that provide services to them, informs the public dialogue on the lives of sex workers, public and health policy, and informs programs to assist sex workers[48]. The aforementioned information is useful and essential to the public in general, policy-makers, academics, and sex workers.

[142]   Academic freedom is even of greater importance when the work product of university researchers was obtained and/or created, and could only have been obtained and/or created, through a promise of confidentiality.

[143]   During the application hearing, the Respondent admitted that Petitioners met the third criterion.

---

[46]   Dr. Lowman Affidavit at paras 41 and 59.
[47]   *In re Cusumano*, 162 F.3d 708 (1st Cir. 1998) at para 714.
[48]   Dr. Bruckert Affidavit at para 85.

2014 QCCS 132 (CanLII)

[144]    The third criterion of the Wigmore test – that the relation must be one which in the opinion of the community ought to be sedulously fostered – is thus satisfied.

**The fourth criterion: The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit gained for the correct disposal of litigation**

[145]    The fourth criterion requires the weighing of the protection of the relationship in question with any countervailing public interest such as national security, public safety, or investigation of a particular crime. The balancing exercise relies on "common sense and good judgment". Elements to be considered at this stage include the probative value of the evidence sought to be obtained and the nature and seriousness of the alleged wrong-doing, measured against the public interest in respecting the promise of confidentiality established at the third criterion (See *National Post* at paras 58, 32, and 61).

[146]    Underlying the analysis of the fourth criterion is "the need to achieve proportionality in striking a balance among the competing interests" (See *National Post* at para 59).

[147]    It has been decided in *National Post (para 60)* and *Groupe Polygone* (para 24) that the burden of persuasion at the fourth criterion remains on the party opposed to disclosure. Until the party invoking a case-by-case privilege meets all four Wigmore criteria there is no such privilege given that evidence is presumptively compellable and admissible.

[148]    The burden of persuasion thus remains on the Petitioners to show that the public interest in protecting the Jimmy-researchers relationship outweighs the public interest in investigating and prosecuting the alleged crime. Every claim to researcher-participant privilege is situation specific, with the public's interest in academic freedom, including the pursuit of knowledge and the free flow of ideas in our society, weighing heavily in the court's balancing exercise (*National Post* at para 64, given the necessary modifications).

[149]    The public interest in academic freedom is of great importance, but not absolute. In this case, it must be balanced against other important public interests such as the investigation and suppression of crime (*National Post* at para 5). The Court cannot but agree with Justice McLachlin in *M (A) v Ryan* (at para 32) when stating that she "cannot accept the proposition that "occasional injustice" should be accepted as the price of the privilege".

[150]    However, the existence of a crime is not sufficient to annihilate a case-by-case privilege claim (*National Post* at para 61).

2014 QCCS 132 (CanLII)

[151]     The delicate balance exercise a court must carry on at the fourth criterion is well illustrated by the following passage in *National Post* (at para 28):

> The public has an interest in effective law enforcement. The public also has an interest in being informed about matters of importance that may only see the light of day through the cooperation of sources who will not speak except on condition of confidentiality. […]It is important, therefore, to strike the proper balance between two public interests — the public interest in the suppression of crime and the public interest in the free flow of accurate and pertinent information. Civil society requires the former. Democratic institutions and social justice will suffer without the latter.

[152]     One of the elements a court must consider in the weighing up is whether the information for which a privilege claim exists is available by any other means[49]. One must exhaust possibilities of obtaining the information before requiring a researcher to break his or her promise of confidentiality.

[153]     Nevertheless, the Petitioners submit the evidence sought to be obtained by the Respondent has no probative value when it comes to assist the Respondent in proving any essential elements of the offences which Magnotta allegedly committed in 2012.

[154]     As opposed to the document and envelope in litigation in *National Post*, the Jimmy Interview (tape and transcript) is not the very *actus reus* of the alleged crime.

[155]     In his affidavit, Magnotta recognized he had participated in 2007 in the Research project under the pseudonym Jimmy.

[156]     The Respondent submits that the Jimmy Interview contains information on Jimmy's prostitution activities, which are related to the first degree murder Magnotta allegedly committed because they both have a sexual dimension.

[157]     Respondent has produced no evidence indicating that the murder occurred in the context of Magnotta's work as an indoor escort. Consequently the Court cannot reasonably conclude that for a sex worker, both professional and personal sexual activities are the same. Also this proposition may lead to an insinuation that a sex worker is the type of person more likely to commit murder.  Thus this argument cannot convince the Court.

[158]     The Respondent argues that McLeod had advised the SPVM of the existence of the Interview transcripts because he felt there was something interesting for the police in his work product. However, as already stated, McLeod has not testified in Court nor produced any affidavit, so any inference on his motivation is pure speculation and it cannot serve as a ground to determine if transcripts are of probative value for the upcoming murder trial.

---

[49]     *Groupe Polygone* at paras 62-63.

500-36-006329-125                                                    PAGE: 29

[159]   The Respondent argues that the circumstances under which the criminal offenses Magnotta is charged with were committed raise questions about his mental state at the time of perpetuation.

[160]   The Respondent anticipates a NCR defence of mental disorder under s. 16 of the *Criminal Code* or a denial of the accused *mens rea* at trial, and since the interview Magnotta gave contained information on his personal and professional life as an escort and the sexual nature of the murder, the material could shed light on the accused mental state.

[161]   The Petitioners have produced Dr. Woodside's professional opinion on the "degree of likelihood that the information derived from a confidential interview in 2007 (the interview being part of a sociology research project into the escort profession as described above) could assist, from a forensic psychiatry perspective, in the psychiatric assessment of an individual, as it would relate to a defence of not criminally responsible on account of mental disorder, for the purpose of a trial for a murder allegedly committed in 2012.[50]

[162]   In his professional experience, the determination of the NCR defence requires the assessment of four specific elements[51]:

1.   the presence or absence of the diagnosis of a mental disorder in the individual;

2.   the determination of the mental state of the individual at the time the alleged crime was committed (material time), or whether the presence or absence of a mental disorder led to the individual experiencing any psychiatric symptoms at material time;

3.   the impact of the symptoms of the mental disorder on the individual's ability at the material time to appreciate the nature and quality of the acts or omissions that constituted the alleged crimes; and

4.   the impact of the symptoms of the mental disorder on the individual's ability at material time to know the wrongfulness of the acts or omissions that constituted the alleged crimes.

[163]   Although Dr. Woodside has not been retained to conduct an NCR assessment of Magnotta[52], he was advised that[53]:

---

[50]   Dr. Woodside Affidavit at para 14.
[51]   *Ibid* at para 15.
[52]   Dr. Woodside Affidavit at para 16: Dr. Woodside could therefore not complete a psychiatric interview of Magnotta, nor obtain all available records relating to Magnotta's physical and mental health history. He did not conduct interviews of Magnotta's friends, family, intimates, employers or other contacts for the purpose of assessing Magnotta's state of mind prior to, at, and after the material time. Dr. Woodside did not review the full Crown disclosure and did not arrange for psychological testing.

2014 QCCS 132 (CanLII)

500-36-006329-125                                                             PAGE: 30

1.  Magnotta has a history of taking medication and is taking prescription medication during his incarceration;

2.  Magnotta may have suffered at some point from depression; and

3.  there exists a significant trail on the internet about Magnotta including his alleged use of multiple online identities and his alleged posting of videos in which he is depicted torturing and killing kittens.

[164]    At the date Dr. Woodside filed his affidavit, the police investigation had revealed the identity of the accused, material evidence of the commission of the infraction of murder, and the fact that a video of the alleged murder had been posted on the internet. Dr. Woodside was well informed of all of those elements[54].

[165]    In Dr. Woodside's professional opinion, answers to the type of social science questions contemplated in the Confidential Interview (of which he has a knowledge of from the Informed Consent Letter) could have some remote relevance to the determination of the first element of an NCR assessment, namely the assessment of the presence or absence of the diagnosis of a mental disorder in the individual[55].

[166]    In his opinion, any information that may be contained in the Confidential Interview would be extremely unlikely to be of use for the purposes of determining elements (2), (3), and (4) of an NCR assessment, as these elements require the assessment of the impact of any mental disorder at the material time[56].

[167]    As an NCR assessment requires the assessment of all four elements described above, it is Dr. Woodside's opinion that the degree to which the Confidential Interview may be of meaningful assistance to the psychiatric assessment of an individual in 2012 or 2013, as it would relate to a defence of NCR on account of mental disorder, for the purpose of a trial of a murder allegedly committed in 2012, is likely to be minimal[57].

[168]    Furthermore, it is Dr. Woodside's professional opinion that the likelihood the information derived from the Confidential Interview would add to the assessment of criminal responsibility is likely minimal, assuming that the Crown and those assessing the accused possess a significant amount of information pertaining to Magnotta's prior social, physical and mental health history, and an extensive internet trail of his activities[58].

[169]    In other words, there exists more useful contemporary material that could be used in an NCR assessment.

---

53    Dr. Woodside Affidavit at para 17.
54    Dr. Woodside Affidavit at para 18.
55    Dr. Woodside Affidavit at paras 11(f) and 19.
56    Dr. Woodside Affidavit at para 20.
57    Dr. Woodside Affidavit at para 21.
58    Dr. Woodside Affidavit at para 22.

2014 QCCS 132 (CanLII)

[170]    Here the Court must strike the proper balance between two public interests —
the public interest in the suppression of crime and the public interest in the free flow of
accurate and pertinent information.

### a) Public interest in the suppression of crime

[171]    The public interest in the suppression of crime is of great importance. In its
analysis, a Court may consider the relevance of the document or testimony to a defence
or claim, the existence of alternative sources containing the information sought-after by
one party, the interest in privacy one might have, and the seriousness of the criminal
offense or wrong-doing one allegedly committed (*M (A) v Ryan* at paras 36-37).

[172]    In *M (A) v Ryan* (para 37), the Supreme Court of Canada stated that "fishing
expeditions are not appropriate where there is a compelling privacy interest at stake".
Unnecessary intrusion into aspects of academic freedom should be avoided.

[173]    The present case also raises issues about Magnotta's interest in privacy. Where
research involves gathering confidential information about research participants' very
identities, the participants' reasonable expectation of privacy should be protected.

[174]    On that matter, the Court quotes the Supreme Court of Canada in *R v Mills*
[1999] 3 SCR 668 (paras 80-82, references omitted):

> [80] This interest in being left alone by the state includes the ability to control the
> dissemination of confidential information. As La Forest J. stated in R. v. Duarte:
>
> > *. . . it has long been recognized that this freedom not to be
> > compelled to share our confidences with others is the very
> > hallmark of a free society.*
> >
> > *It is certain every man has a right to keep his own sentiments, if he
> > pleases: he has certainly a right to judge whether he will make
> > them public, or commit them only to the sight of his friends.*
>
> These privacy concerns are at their strongest where aspects of one's individual
> identity are at stake, such as in the context of information "about one's lifestyle,
> intimate relations or political or religious opinions": Thomson Newspapers.
>
> [81] The significance of these privacy concerns should not be understated. Many
> commentators have noted that privacy is also necessarily related to many
> fundamental human relations. As C. Fried states in "Privacy":

> *To respect, love, trust, feel affection for others and to regard ourselves as the objects of love, trust and affection is at the heart of our notion of ourselves as persons among persons, and privacy is the necessary atmosphere for these attitudes and actions, as oxygen is for combustion.*

This Court recognized these fundamental aspects of privacy in R. v. Plant:

> *In fostering the underlying values of dignity, integrity and autonomy, it is fitting that s. 8 of the Charter should seek to protect a biographical core of personal information which individuals in a free and democratic society would wish to maintain and control from dissemination to the state. This would include information which tends to reveal intimate details of the lifestyle and personal choices of the individual.*

> [82] That privacy is essential to maintaining relationships of trust was stressed to this Court by the eloquent submissions of many interveners in this case regarding counselling records. The therapeutic relationship is one that is characterized by trust, an element of which is confidentiality. Therefore, the protection of the complainant's reasonable expectation of privacy in her therapeutic records protects the therapeutic relationship.

[175]   The Confidential Interview regards Magnotta's experiences in the escort trade including his work history, current work history, relationships with clients, and employers, his reconciliation of work and personal life including his sexual and emotional (intimate) life, his opinion of sex work and of clients, as well as his experiences of discrimination and stigma.

[176]   The Interview involved gathering confidential information about Magnotta's very identity (i.e. lifestyle, intimate relations), for which he has a reasonable expectation of privacy.

[177]   The fact that more relevant contemporary material in regards to his mental state do exist, that Magnotta has a reasonable expectation of privacy, and that Dr. Woodside's opinion that the 2007 material is likely to be of minimal assistance to a NCR assessment militate in favor of recognizing a privilege at this stage.

[178]   However, the possibility remains that the information derived from the Confidential Interview could be of use to an NCR assessment. This possibility cannot be excluded, even in the light of Dr. Woodside's evidence.

[179]   The criminal offenses Magnotta has been charged with are very serious. The public interest in investigating these crimes is of great importance.

2014 QCCS 132 (CanLII)

2014 QCCS 132 (CanLII)

[180]   To avoid unnecessary intrusion into Petitioners' academic freedom and Magnotta's privacy, the Court asked at trial for the production of the interview guide McLeod used for the Confidential Interview. As already stated, the questions asked focused on the dimensions of intimacy and sexuality in terms of the individual (escort) work, and their possible impact on the individual's personal life. The interviews also focused on the individual's relationships with his or her colleagues, clients and others[59].

[181]   The Court examined the questions McLeod would have likely asked Magnotta if he followed the Interview Guide provided by the Petitioners. Because the questions asked were broad in their formulation, the Court could not determine if answers Magnotta could possibly have given would contain information of meaningful assistance to an NCR assessment.

[182]   If "a judge does not necessarily err by proceeding on affidavit material indicating the nature of the information and its expected relevance without inspecting each document individually", the minute examination of a document must be undertaken "where necessary to the proper determination of the claim for privilege". (See *M (A) v Ryan* at para 39.)

[183]   Therefore, the Court felt it was necessary to examine the Confidential Interview transcripts kept under seal.

[184]   Before deciding on the relevance of the Confidential Interview to an NCR assessment or to an assessment of the accused *mens rea* at trial, the Court wants to remind that the balancing exercise made under Wigmore's fourth criterion may allow disclosure of confidential information even if the claim for privilege is otherwise well-founded. In that case, a court must order disclosure only to the extent necessary for the interest of getting at the truth to be satisfied[60]:

> It must be conceded that a test for privilege which permits the court to occasionally reject an otherwise well-founded claim for privilege in the interests of getting at the truth may not offer patients a guarantee that communications with their psychiatrists will never be disclosed. On the other hand, the assurance that disclosure will be ordered only where clearly necessary and then only to the extent necessary is likely to permit many to avail themselves of psychiatric counselling when certain disclosure might make them hesitate or decline.
>
> […]
>
> Finally, where justice requires that communications be disclosed, the court should consider qualifying the disclosure by imposing limits aimed at permitting the opponent to have the access justice requires while preserving the confidential nature of the documents to the greatest degree possible.

---

[59]   Interview Guide with Escorts.

[60]   *M (A) v Ryan* at paras 35 and 37.

### b) Jimmy's Confidential Interview content

[185]   In examining the content of the Confidential Interview, the Court kept in mind that the Petitioners' request has been made via a *certiorari* application, not at trial. The Court also took in consideration the possibility that a NCR defence will be raised and the essential elements of the crimes Magnotta is charged.

[186]   After consulting Jimmy's Confidential Interview, the Court concludes that none of its content is relevant to the first element of the determination of the NCR defence, i.e. the presence or absence of the diagnosis of a mental disorder in 2007. Considering the content of the Confidential Interview, this is a conclusion that can be made even by someone without any medical or psychiatric training.

[187]   In regards to the three remaining elements of the NCR defence, not surprisingly, nothing in the Confidential Interview is relevant to assess Magnotta's state of mind at the time of the events, in 2012.

[188]   In regards of the essential element of the crimes Magnotta is charged with, other than his state of mind, the conclusion is the same.

[189]   The only potential relevancy of the Confidential Interview is that, like any such evidence, it is a previous statement of the accused that can be used in cross-examination if Magnotta decides to testify. But this potential relevancy is weakened by the facts that any contradiction can only be on collateral matters and that it is already known that Magnotta was a sex worker.

[190]   For these reasons, the Court concludes that the potential relevancy of the Confidential Interview is minimal at most and marginal.

[191]   Moreover, after examining the content of the Confidential Interview, the Court concludes that the Respondent could obtain that type of evidence by other means. Indeed, the Respondent stated in his written submissions that the SPVM, by interviewing Magnotta's acquaintances, has gathered such evidence about Magnotta's personality and life-style, thus confirming the existence of other means by which the Respondent could obtain that evidence.

[192]   The Respondent has asked the Court to provide a resume of the content of the Confidential Interview, as it was proposed in *R. c. O'Connor* [1995] 4 S.C.R.411 and *M(A) v Ryan*. This is not a situation where this procedure is neither feasible nor necessary.

[193]   It is not possible to resume the content of the Confidential Interview more than by making reference to the subjects covered without breaching the confidentiality.

2014 QCCS 132 (CanLII)

2014 QCCS 132 (CanLII)

### c) Public interest in respecting the promise of confidentiality

[194]   In its analysis of the fourth criterion, the Court has already ruled that the researcher-participant relation is one which in the opinion of the community ought to be sedulously fostered.

[195]   The Court recognizes the importance of the Research Project in shedding light on the indoor sex industry (especially the male and female escort industry), supported by the award of a significant funding by the SSHRC and numerous subsequent publications and presentations authored by the Petitioners and other academics. The outcomes of the Research Project led to another substantial grant by the SSHRC for the Management Project, which focuses on third parties in the same industry.

[196]   Research into sex work invariably involves several sensitive and intimate topics.

[197]   The recently-concluded *Canada (Attorney General) v Bedford* case and Missing Women Commission of Inquiry in British Columbia, as well as the Pivot's *Charter* challenge all demonstrate that prostitution and the society's response to the purchase and sale of sexual services are of public importance.

[198]   The *Bedford* case has taught us that the issues raised by such a constitutional challenge could be decided primarily because of a rich evidentiary record, comprising data derived from academic research on various prostitution aspects (safety, poverty, housing, morality, and economics), criminal law, ethics and public health.

[199]   The Petitioners' work contributes not only to the academic community's understanding of the sale and purchase of sexual services, but also to the broader public policy and society-wide discussions on this important, and controversial, aspect of Canadian life.

[200]   Promises of confidentiality are integral to the Petitioners' work because it involves acquiring essential information from a marginalized population working in a stigmatized sector. Most participants like Jimmy would not agree to be interviewed in the absence of a promise of confidentiality and anonymity.

[201]   The evidence has shown that the Petitioners' success as researchers in this field is a result of the high level of trust they have established within the sex worker community.

[202]   The Respondent argues it has not been demonstrated that the disclosure of the Confidential Interview transcripts could have a real negative impact on the Petitioners' research projects, by distorting their results or otherwise.

[203]   The Court does not agree with the Respondent on this. The evidence shows that Dr. Bruckert has been advised by one of her contacts in the sex worker community that she is regarded by this contact as having failed in her duty to uphold the promise of

confidentiality in this case. Dr. Bruckert has also been advised by several of her contacts in the sex worker community that confidentiality is critical to their decision to participate in a research project: the majority of her contacts would not participate in the absence of a binding promise of confidentiality. There is a non-negligible risk that if Petitioners are forced to violate their promise of confidentiality in this case, their ability to continue to conduct research into sex work would be harmed.

[204]   As previously stated, Dr. Bruckert has been advised by one of her contact in the sex industry that, if the promise of confidentiality was not binding, this individual would be very guarded in his or her answers so as to protect him- or herself from any potential legal consequences, and be, most likely, less then completely forthright in others. The data derived from such an interview would be of no, or minimal, use.

[205]   The evidence supports the conclusion that both Petitioners ability to undertake a similar research project in the future would be jeopardized if the promise of confidentiality is not upheld in this application.

[206]   The evidentiary record demonstrates a compelling interest in protecting the Confidential Interview from disclosure. However, this does not mean that such consequences allow one to automatically recognize the existence of a privilege when it comes to researcher-participant communications. The fourth criterion of the Wigmore test requires that a court weighs against the protection of the relationship in question any countervailing public interest such as national security, public safety, or investigation of a particular crime.

[207]   The Court agrees with the following passage of *M (A) v Ryan*[61]:

> It must be conceded that a test for privilege which permits the court to occasionally reject an otherwise well-founded claim for privilege in the interests of getting at the truth may not offer patients a guarantee that communications with their psychiatrists will never be disclosed.

[208]   For privilege to exist, it must be shown that the benefit from the recognition of a case-by-case privilege, however great it may seem, outweighs the interest in the correct disposal of the litigation.

### d) The balance of the interests

[209]   Respondent argues that the search for truth and the investigation of Lin Jun's murder outweighs the public interest in respecting the promise of confidentiality in the case at bar.

[210]   The evidence demonstrates that the public interest in respecting the promise of confidentiality is high.

---

[61]   *M (A) v Ryan* at para 35.

2014 QCCS 132 (CanLII)

500-36-006329-125                                                    PAGE: 37

[211]   On the other hand, the interest of society in the investigation of serious crimes such as the one contemplate in this case is high,but the probative value, if any, of the Confidential Interview in the pursuit of that interest is, at best, minimal and marginal both theoretically and factually.

[212]   Consequently, the Court concludes the Petitioners have met their burden on Wigmore fourth criterion and that the Confidential Interview is covered by the researcher-participant confidentiality privilege and that it should not be disclosed to the Respondent and return to the Petitioners.

## VII- CONCLUSIONS

[213]   For these reasons, the Court:

[214]   **GRANTS** the application;

[215]   **QUASHES** the search warrant number 500-26-071828-127;

[216]   **ORDERS** the Clerk of the Superior Court to give to the Petitioners the sealed envelope containing the documents seized June 22, 2012 by search warrant number 500-26-071828-127, when the delay to appeal has expired;

[217]   **Without cost.**

 

 

 

_____

SOPHIE BOURQUE, J.S.C.

 

 

**Me Peter M. Jacobsen**
**Me Tae Mee Park**
**Bersenas Jacobsen Chouest Thomson Blackburn LLP**
**Me Nadine Touma**
**Les avocats Poupart, Dadour, Touma et associés**
Counsels for the Petitioners

 

 

**Me Louis Bouthillier**
**Me Alexandre Boucher**
**Office of the Director of criminal and penal prosecutions**
Counsels for the Respondent

2014 QCCS 132 (CanLII)

500-36-006329-125

PAGE: 38

**Me Vanessa Sadler**
**Chalifoux, Montpetit, Vaillancourt, Paradis & Ass.**
**Me Luc Leclair**
Counsels for the Mis en cause

Date of hearing:    April 3 and 4, 2013

2014 QCCS 132 (CanLII)