# KING & SPALDING

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
www.kslaw.com

June 14, 2024

The Honorable Phyllis J. Hamilton, Senior United States District Judge
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street, Courtroom 3
Oakland, California 94612

Re:   Discovery Matter in *WhatsApp LLC, et al. v. NSO Group et al.*, 4:19-CV-07123-PJH

**FILED UNDER SEAL**

Dear Judge Hamilton:

Pursuant to the Court's May 2, 2024 Order denying without prejudice NSO's Motion for Issuance of Letter Rogatory [the "Order", Dkt. No. 305], Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (together, "NSO") hereby renew their motion for issuance of a letter rogatory to Citizen Lab. Pursuant to the Order, NSO has provided Plaintiffs with evidence that a substantial number of individuals on Citizen Lab's "civil society" and "VIP" lists are appropriate targets for law enforcement operations due to their involvement with criminal or terrorist activities, or are appropriate targets for intelligence operations due to their positions in government or the military. Plaintiffs and Citizen Lab do not consent to the issuance of a letter rogatory.

## I.   NSO'S POSITION

The Court ruled that information about Citizen Lab's categorization of individuals as civil society or VIPs may be discoverable because Plaintiffs "may argue that any purported law enforcement or national security justifications [for the use of Pegasus] were pretextual." (Order at 5:13-16.) Citizen Lab analyzed information about the targets whose devices were allegedly accessed by Pegasus and placed ███████████████████████████████ on a list of "civil society" targets or a separate list of "VIP targets."[1] The Court recognized that discovery from Citizen Lab could be relevant to Defendants' Sixth Affirmative Defense (Good Faith/Legitimate Justification), but asked Defendants to respond to Plaintiffs' assertion that "NSO has not produced a single document showing that any of the target users were criminals or terrorists." (Order at 3:4-6, 7:2-14.)

Specifically, the Court ruled that the motion for letter rogatory could be renewed "if NSO were to come forward with evidence that specific individuals on Citizen Lab's 'civil society' or

---

[1] As to the approximately 1,263 targets found on neither of Citizen Lab's lists, Plaintiffs apparently do not dispute that the use of Pegasus by sovereign governments, pursuant to those sovereigns' own laws, was legitimate.

Page 2

'VIP lists were involved with criminal/terrorist activity.  To be clear, NSO is not required to definitively prove its affirmative defense at this stage of the case." (*Id.* at 6:25-28.)  The Court further instructed NSO as follows:  "Before seeking to renew its motion, NSO must first provide any such discovery (i.e. evidence showing alleged criminal/terrorist activity by the 'civil society' or 'VIP' individuals) to plaintiffs, along with notice that it intends to renew this motion for issuance of a letter rogatory as to those individuals, and plaintiff shall then have seven (7) days to provide notice to NSO as to whether they concede the relevance of the requested discovery from Citizen Lab as to those individuals, or whether they continue to dispute the discovery's relevance." (*Id.* at 7:8-14.)

On May 30, 2024, and again on June 7, 2024, Defendants provided Plaintiffs with the notice required by the Court, as well as the evidence summarized below that multiple individuals on Citizen Lab's lists were associated with criminal or terrorist activities or otherwise misclassified.  Discovery from Citizen Lab about the targets, and about Citizen Lab's and Plaintiffs' contacting of such targets, is relevant to Defendants' Sixth Affirmative Defense as noted by the Court.  But it is also relevant to Defendants' Fifth Affirmative Defense of waiver, estoppel, and unclean hands, wherein Defendants have alleged that Plaintiffs "unreasonably hindered law enforcement and intelligence operations around the world" by their response to learning about the vulnerability, which included not only closing the vulnerability but also notifying the targets that their mobile phones may have been compromised, and providing tips for how to ensure that no further information could be collected from their phones by law enforcement groups.  Plaintiffs have also conceded that Citizen Lab's information about the targets is also relevant to whether Defendants' conduct was "oppressive" or "malicious," elements Plaintiffs must prove to recover punitive damages.  (Dkt. 300 at 4.)  The more Pegasus was used for legitimate law enforcement and intelligence purposes, the less likely it is that Defendants' development of Pegasus could be fairly viewed as oppressive or malicious.  For the same reasons, Citizen Lab's information about the targets is also relevant to whether an injunction would be in the public interest.  Discovery from Citizen Lab is also important because, as to many of the individuals, Plaintiffs have only produced military rank and surnames (*see, e.g.*, Exh. B at WA-NSO-00017174-176), and Plaintiffs have refused to provide Defendants with additional source information about the targets that could enable Defendants to ascertain their actual identities.

<u>Citizen Lab's VIP List Comprises Legitimate Intelligence and Law Enforcement Targets</u>

It should be noted that Defendants have not received *any* information from their sovereign customers about the identity of the targets.  Moreover, because Plaintiffs designated the Citizen Lab lists as "Highly Confidential - Attorneys' Eyes Only," Defendants have been prohibited from sharing the lists with any government customers.  Plaintiffs refused to amend the confidentiality designation and have even refused the very reasonable request that a legal intern working for NSO be granted access to their Attorneys' Eyes Only information.  As a result, Defendants have been limited to having a handful of people searching English-language public sources of information about the individuals on Citizen Lab's lists.  And yet, even with Plaintiffs' efforts to hamper NSO's research, Defendants have found substantial information about terrorism and criminal activity on the VIP List. ████████████████████████████ leads a group of 23 individuals who have been publicly reported to be involved or associated with terrorism, sedition, war crimes, leading illegal secessionist movements, narcotics trafficking, espionage, extortion, corruption, and human

rights violations.  (*See* Exh. A.)  A quarter of the "VIPs" are affiliated with criminals and terrorists based on readily available public sources alone.

Moreover, the VIP list is almost entirely comprised of persons who, by virtue of their positions in government or military organizations, are the subject of legitimate intelligence investigations.  Of the 102 total names on the VIP list, 93 have been categorized by Citizen Lab as "Official," all of whom are high-ranking government or military officials.  (*See* Exh. B at WA-NSO-00017170 through 00017178).  These include



Aside from the 93 "Officials," the 9 other names on the VIP list include

All the VIPs are legitimate intelligence targets, and the Court should grant the letter rogatory as to Citizen Lab's information about the entirety of the VIP list.

### Citizen Lab's Civil Society List Largely Comprises Legitimate Law Enforcement Targets Engaged in Criminal Activity, and/or Political Figures Belonging on the VIP List

Of the 103 individuals on Citizen Lab's civil society list,[2] 30 of them are Members of Parliament or otherwise high-ranking government officials.  (*See* Exh. A.)  Citizen Lab appears to have drawn a distinction between politicians whose parties are in power (VIPs) versus politicians belonging to opposition parties (civil society).  For purposes of determining whether an individual was legitimately surveilled (e.g., as part of an intelligence operation) using Pegasus, Defendants submit that this distinction is unjustified and all senior political operatives should be classified as VIPs.  (Would anyone argue that Mitch McConnell is a member of "civil society" and not a political official because his party is in the minority in the Senate?)  The letter rogatory should include these individuals, either because they are properly VIPs, or because the job descriptions provided by Citizen Lab identify them as appropriate targets for intelligence/national security operations.

Of the 73 remaining individuals on the civil society list, even the limited resources currently available to Defendants reveal that at least 26 of them are involved in criminal activity, including terrorism, sedition, secession, espionage, kidnapping, rape, extortion, murder, massive financial fraud, insurrection, gang activity, treason, and a conspiracy to assassinate Prime Minister Modi of India.  (*See* Exh. A.)  For example, ████████, described by Citizen Lab as a "journalist and columnist," has been accused by India of being a Chinese spy, passing sensitive information about India's border strategy and army deployment to Chinese intelligence in exchange for remuneration.  (Exh. A at 14.)  Another supposed Indian "journalist," ████████, was sentenced to life imprisonment for "sedition and waging war against the nation."  (*Id.* at 15-16)  ████████, whom Citizen Lab describes as a lawyer, has been arrested for gang activities, including being tasked to carry out target killings of rival gangsters.  (*Id.* at 16.)  The civil society

---

[2] The civil society list (Exh. B at WA-NSO-00017162 to 17169 and 17179 to 17180) has 105 entries, but there are two sets of duplicates:  Abdulnabi Salman (Bahrain) appears on pages WA-NSO-00017163 and 164, and Citizen Lab believes that "Faustin" (France) is likely the same as "Faustin M. Rukundo" (Great Britain).

Page 4

list also includes senior officers in the Rwandan National Congress, which the U.S. Department of State describes as a "group reported to have carried out armed attacks against Rwanda." (*Id.* at 18, 22.) The letter rogatory should also include these criminals.

Finally, the Court should issue a letter rogatory as to the 47 remaining "Civil Society" targets. The examples listed above and on Exhibit A demonstrate that Citizen Lab has hugely overreached in assembling its "civil society" list, in an effort to further its agenda that the use of Pegasus against civil society targets is widespread and commonplace. The fact that Defendants have not yet located information linking the remaining individuals to terrorism or serious crime may well be a function of (1) the limited public access to sources of information about the criminal justice system in many countries, (2) the limited access to English-language sources, and (3) Plaintiffs' use of the stipulated protective order to limit NSO's ability to research the individuals. Discovery should be permitted as to the entirety of the civil society list, including through the issuance of a letter rogatory to Citizen Lab. [3]

## II.       PLAINTIFFS' POSITION

NSO's submission of Internet-search results about certain victims does not justify its request for letters rogatory. NSO, which has largely failed to participate in discovery, has produced no evidence regarding the reasons why it targeted any of the individuals identified by Citizen Lab as members of "civil society" or "VIPs" with its spyware—and in fact has averred that it lacks and will not produce any such evidence. At most, NSO's hearsay submission shows that some of its victims have been accused of wrongdoing. But that showing falls short of the hurdle the Court required NSO to clear before burdening Citizen Lab with further discovery requests. Moreover, it returns the spotlight to the infirmities in NSO's legal theory, because there is no defense or exception to the CFAA or any other claim in this case that allows hacking of victims who have been accused of wrongdoing in blog posts and the like. To be sure, the CFAA has an exception that applies to legitimate U.S. law enforcement activity (18 U.S.C. § 1030(f)). But NSO does not and cannot invoke that U.S. law-enforcement exception. And NSO confirms that it will not even seek to prove the bases on which it actually targeted its victims, working (according to NSO) with unnamed foreign government entities whose reasons for using spyware in any event are not relevant to any claim or defense. Moreover, NSO's submission does nothing to show why it needs any additional information from Plaintiffs or Citizen Lab about its victims, as to whom NSO has shown its ability conduct its own research (however irrelevant). NSO's victim-blaming is a red herring. Its renewed motion should be denied. In addition, Plaintiffs respectfully submit that the Court should consider the viability of the affirmative defenses NSO invokes, in order to streamline the case.

---

[3] Defendants have directed this briefing to the Court's statement that it "simply requires NSO to make some initial showing" that any of the 207 individuals identified by Citizen Lab are legitimate targets of criminal/intelligence operations such that discovery from Citizen Lab would be relevant (Dkt. 305 at 7), and Defendants have specifically avoided belaboring the briefing with argument about the sufficiency of their Sixth Affirmative Defense, which the Court already ruled would not be stricken at this stage or addressed through the letter briefing format—and which in any event is not the only issue to which the discovery sought is relevant.

Page 5

### A. NSO Has Failed to Produce Any Specific Evidence To Support Its Affirmative Defenses

In its May 2, 2024 order denying NSO's motion for a letter rogatory, the Court noted that it was unrebutted that "NSO has not produced a single document showing that any of the target users were criminals or terrorists" and made clear that "[i]n the absence of any specific evidence of criminal/terrorist activity (or other law enforcement justification), the court fails to see the relevance of scrutinizing the categorization of each of the approximately 200 names on Citizen Lab's spreadsheet." Dkt. No. 305 at 6. The Court then required NSO to "provide . . . discovery (i.e., evidence showing alleged criminal/terrorist activity by the 'civil society' or 'VIP' individuals)." *Id*. at 7.

NSO's submission falls far short of the Court's requirement. NSO has not *produced* any specific evidence showing that NSO's unauthorized access to WhatsApp's servers in May 2019 was made "in good faith and pursuant to legitimate law enforcement, national security, intelligence and business justifications," Dkt. No. 128 at 10, which under the CFAA is an exception that only applies to U.S. law enforcement, 18 U.S.C. § 1030(f). Instead, relying on publicly available information, NSO conjectures that certain victims identified in Citizen Lab's report might have been "appropriate targets" for surveillance. NSO's reliance on public information about certain victims, often from questionable or biased sources, says nothing about whether NSO's unauthorized access was actually pursuant to any legitimate and authorized law enforcement, national security, or intelligence investigation, or that any investigation was even conducted by a legitimate law enforcement agency.

Moreover, NSO signals that it will *never* be able to produce any evidence regarding the actual reasons why these victims were targeted. In its letter to Plaintiffs renewing this motion, NSO acknowledged that it did "not have access to any information known to its customers about the individuals on Citizen Lab's 'civil society' and 'VIP' lists." And here, NSO again admits that it has "not received *any* information from [its] sovereign customers about the identity of the targets." By admitting that it will never have any information about the real reasons that any of these victims were targeted, NSO concedes that it will never have the factual base on which to build its law enforcement defense. *Cf. Smith v. Haynes*, 2020 WL 4195026, at *8 (W.D. Wash. May 11, 2020) (invoking CFAA's law enforcement exception when police produced search warrant); *Smith v. Aldridge*, 2018 WL 1434813, at *6 (D. Or. Mar. 22, 2018) (same). In addition, even if NSO's foreign customers had a lawful reason to target victims' phones under foreign law, that does not justify NSO's violations of U.S. law by accessing Plaintiffs' U.S.-based computers without authorization.

Having admitted that it is and will be unable to produce information of its own about why any victim was targeted, NSO does not need more information *from Plaintiffs and Citizen Lab* about the victims. The Court indicated that Citizen Lab's categorizations may become relevant if Plaintiffs argue that NSO's "law enforcement or national security justifications" were pretextual. Dkt. No. 305 at 5. But NSO's submission makes clear that it has no information to support any "law enforcement or national security justifications," so Plaintiffs have no occasion to challenge these justifications as pretextual. NSO's submission confirms that the productions to date were sufficient to enable NSO to offer its own recategorization of Citizen Lab's victims. *See id*. at 6 ("To the extent that NSO chooses to rely on more generalized evidence that its software was

Page 6

licensed for law enforcement purposes, the already-produced evidence from plaintiffs regarding Citizen Lab is more than sufficient for the parties to present their arguments on NSO's affirmative defense.").

Even if the Court were to look past NSO's failure to *produce* evidence about these individuals' involvement in criminal or terrorist activity and that the law enforcement exception does not apply to NSO, NSO's submission fails on its own terms. Having repeatedly asserted that Pegasus technology is used only to combat terrorism and criminal activity, *see* Dkt. No. 45 at 4, NSO now claims that anyone in any government or military organization is a valid target. Other "legitimate" victims are terrorists-by-association, with NSO apparently only able to muster information about family members of victims. Finally, as NSO admits, it was unable to find any publicly available information casting doubt about 45 victims that Citizen Lab described as members of civil society. Because NSO has disclaimed its ability to obtain any evidence that these (or any) individuals *were actually* the subject of law enforcement investigations, it should not receive the benefit of the doubt to obtain more sensitive discovery to the extent it even exists.

### B. NSO's Law Enforcement Defenses Should Be Stricken

Tellingly, NSO devotes much of its joint letter to defending the legitimacy of its affirmative defenses. But as the Court has previously recognized, neither the information NSO presented nor the information it seeks from Citizen Lab are relevant to the claims or defenses to be presented at trial. *See* Dkt. No. 299 at 3. Citizen Lab's categorization of the victims of NSO's attack says nothing about whether victims were targeted for legitimate law enforcement purposes, whether user notifications disrupted legitimate law enforcement activity, or whether NSO's conduct was malicious.

Plaintiffs therefore seek leave to renew their motion to strike these defenses. *See* Dkt. No. 305 at 6–7 (noting that "the affirmative defense will not be stricken in the absence of a fully-briefed motion on that issue"). Plaintiffs first moved to strike NSO's affirmative defenses in September 2020, *see* Dkt. No. 139, and Plaintiffs' motion was nearly fully briefed before the case was stayed. When the case resumed, the Court asked Plaintiffs not to refile their motion, based on an "interest[] in streamlining the motion practice in this case, given how long it has been pending." Dkt. No. 182-1 at 13. But having NSO's affirmative defenses lingering in this case has continued to sidetrack the litigation. NSO continues to manufacture disputes—including two filed on the same day—to obtain more victim-related information. *See, e.g.*, Dkt. Nos. 306, 308. Plaintiffs are concerned that, without a ruling from the Court, NSO will continue to burden Plaintiffs and third parties for more discovery based on its meritless defenses, and will continue to burden the Court with more discovery disputes.

For these reasons, Plaintiffs respectfully ask the Court to deny NSO's motion and grant Plaintiffs leave to file a motion to strike NSO's pertinent affirmative defenses.

### III.   THE CITIZEN LAB'S POSITION

The Citizen Lab opposes Defendants' motion to renew their request for the issuance of a letter rogatory. The information provided by Defendants does not support discovery about any individual on The Citizen Lab's list, much less discovery concerning literally *everyone* on the

Page 7

list. The core rationale for Defendants' request—their disagreement with The Citizen Lab's categorization of listed individuals as civil society or VIP targets—is irrelevant to the law enforcement defense that Defendants wish to assert. Whether or not The Citizen Lab mischaracterized individuals on the list, **Defendants' affirmative defense requires a showing that individuals were lawfully targeted by a U.S. law enforcement or intelligence agency**. Defendants have made no such showing. Moreover, the information they already possess provides them with an ample basis to attempt to challenge The Citizen Lab's categorizations should such a challenge become relevant. The discovery that Defendants seek from The Citizen Lab is irrelevant, unduly burdensome, and disproportionate to the needs of the case. *See* Dkt. 305 at 8 ("the relevant standard is whether the discovery sought falls within the scope of discovery authorized by Federal Rule of Civil Procedure 26").[4]

Defendants have not alleged, much less provided evidence supporting, a plausible "legitimate law enforcement" defense under the Computer Fraud and Abuse Act (CFAA). The CFAA defense is limited to "*lawfully authorized* investigative, protective, or intelligence activity of *a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States*." 18 U.S.C. § 1030(f) (emphasis added). Under that clear statutory language, the investigative, protective, or intelligence activities in question must have been both (a) carried out by a *domestic* law enforcement or intelligence agency and (b) in fact "lawfully authorized." Defendants' submission provides no information indicating that either of these requirements is satisfied with respect to the targeting of any of the individuals in this case. They are, therefore, not entitled to discovery in support of a defense under Section 1030(f). *See*, *e.g.*, *Dodson v. Munirs Co.*, 2013 WL 3146818, at *5 (E.D. Cal. June 18, 2013) ("If a defendant cannot articulate the reasons that affirmative defenses apply to a dispute, it is costly, wasteful, and unnecessary to force plaintiffs to conduct discovery into those defenses.").

Defendants appear to concede that the customers responsible for the intrusion activity alleged in the complaint were foreign sovereigns. *See*, *e.g.*, *supra*, Note 1; Dkt. 305 at 3. But the activities of foreign governments are not covered by Section 1030(f), which provides a defense for certain investigative, protective, or intelligence activities of a government agency "*of the United States, a State, or a political subdivision of a State.*"[5] Defendants have never claimed that the alleged intrusions were undertaken by any domestic government or agency, and the information they proffer in support of their renewal provides no indication of any domestic

---

4   Defendants' request for a letter rogatory should also be denied for the additional reasons stated in The Citizen Lab's previous filings. *See* Dkt. 294-2 at 9-19; Dkt. 302 at 3-5.

5   It is obvious why Congress would not give foreign officials carte blanche to authorize computer intrusions that would otherwise violate U.S. law. Law enforcement and intelligence collection standards and practices vary greatly among governments. And many governments around the world use their criminal laws and surveillance capabilities as tools for suppressing dissent and persecuting political opponents. *See* Paul Bischoff, "Data privacy laws & government surveillance by country: Which countries best protect their citizens?," *comparitech* (Mar. 25, 2022), *available at* https://www.comparitech.com/blog/vpn-privacy/surveillance-states/.

government involvement.  That deficiency undermines Defendants' attempt to invoke Section 1030(f) and their request for discovery in support of such a defense.

Defendants fare no better on the second Section 1030(f) requirement.  Even assuming the law enforcement or intelligence activities of foreign governments could support a defense under Section 1030(f), they also must have been "lawfully authorized."  The only decisions applying the 1030(f) defense have, consistent with the unambiguous statutory language, applied it to activities that were *in fact authorized* under applicable (domestic) law.  *See, e.g.*, *Naicom Corp. v. Dish Network Corp.*, 2024 WL 1363781, at *28 (D.P.R. Mar. 29, 2024) (conduct lawfully authorized under federal search warrants), *appeal filed*, 2024 WL 1363772 (1st Cir. Apr. 26, 2024); *Smith v. Aldridge*, 2018 WL 1434813, at *6 (D. Or. Mar. 22, 2018) (same), *appeal dismissed*, 2018 WL 7953931, at *1 (9th Cir. Apr. 26, 2018).  Defendants have cited no decision supporting the notion that the Section 1030(f) defense applies where a defendant merely identifies conduct that *might have* justified otherwise illegal intrusions by unnamed governments pursuant to unspecified legal authorities.  And Defendants have provided no evidence that the intrusions alleged in the complaint were in fact lawfully authorized, even by a foreign sovereign.

Although Defendants attribute their lack of targeting information to Plaintiffs' designation of The Citizen Lab's list as "Highly Confidential–Attorneys' Eyes Only," this explanation does not pass superficial scrutiny.  Defendants' customers do not need discovery from a non-party to show whom they targeted with Pegasus via the WhatsApp vulnerability and their authority for doing so, if such authorization exists.  If Defendants were not provided with evidence of lawful authorization by their clients at the time of the surveillance, they have had years to obtain such information from their customers.  Defense counsel could then have used it to provide the actual reasons why the subset of WhatsApp users on The Citizen Lab's list were targeted.  As such, Defendants have failed to make even a minimally plausible case that the Section 1030(f) defense could apply, and, for that reason, their request for discovery from The Citizen Lab in support of such a speculative and unsupported defense is unwarranted.[6]

Finally, even if the Court were to avoid presently deciding that Defendants' affirmative defense is implausible as a matter of law, whether The Citizen Lab correctly characterized the targets as VIP or Civil Society members is wholly irrelevant to that defense.  Regardless of The Citizen Lab's views on the issue, Defendants must eventually prove that the targeted persons were lawfully targeted with domestic government authorization.  Discovery from The Citizen Lab cannot advance that cause.  Whether The Citizen Lab thinks the targets were journalists, political

---

[6]  Equally unavailing is Defendants' claim—raised for the first time in this letter—that their unclean hands, waiver, and estoppel defense supports the renewal of their letter rogatory request.  Defendants allege in connection with that defense that Plaintiffs "unreasonably hindered law enforcement and intelligence operations around the world."  But Defendants' information does not show that any of the individuals on The Citizen Lab's list were in fact targeted via WhatsApp for legitimate law enforcement or intelligence gathering purposes, much less that Plaintiffs knew that.  Defendants' speculation, based on public source information, that some of the listed individuals *could have been targeted* by unnamed governments for such purposes does not support their request for discovery from The Citizen Lab.

Page 9

figures, criminals or even baseball players is entirely beside the point.  The Citizen Lab's categorizations, whether right or wrong, do not make Defendants' purported defense more or less applicable.  Defendants' persistent refusal to take "no" for an answer on the peripheral issue of The Citizen Lab's characterization of the targets strongly suggests that their true purpose is to harass and chill the activities of The Citizen Lab.

Sincerely,

Aaron Craig, Counsel for Defendants

Craig Cagney, Counsel for Plaintiffs

Steve Lane, Counsel for The Citizen Lab

# Exhibit A

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit B

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**