Greg D. Andres
Antonio J. Perez-Marques
Craig T. Cagney
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
         antonio.perez@davispolk.com
         craig.cagney@davispolk.com
         luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs WhatsApp LLC and
Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC, and META PLATFORMS INC.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>                    Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ISSUANCE OF A LETTER ROGATORY PURSUANT TO THE HAGUE CONVENTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:     August 1, 2024<br>Time:     1:30 p.m.<br>Ctrm:     3<br>Judge     Hon. Phyllis J. Hamilton<br><br>Action Filed: October 29, 2019 |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 1, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard, Plaintiffs WhatsApp LLC and Meta Platforms Inc. ("Plaintiffs"), will bring on for hearing before the Honorable Phyllis J. Hamilton, in Courtroom 3 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, Cali-fornia, a Motion for an Issuance of a Letter Rogatory Pursuant to the Hague Convention.

The Motion is based on this Notice of Motion and Motion and the Memorandum of Points and Authorities herein, the pleadings and papers on file in this action, the arguments of counsel, and any other matter that the Court may properly consider.

1

2   Dated:  June 26, 2024

3                                           DAVIS POLK & WARDWELL LLP

4
                                        By:  /s/ Micah G. Block
5                                            Greg D. Andres
                                             Antonio J. Perez-Marques
6                                            Craig T. Cagney
                                             Luca Marzorati
7                                            (admitted *pro hac vice*)
                                             DAVIS POLK & WARDWELL LLP
8                                            450 Lexington Avenue
                                             New York, New York 10017
9                                            Telephone: (212) 450-4000
                                             Facsimile: (212) 701-5800
10                                           Email:  greg.andres@davispolk.com
11                                                    antonio.perez@davispolk.com
                                                      craig.cagney@davispolk.com
12                                                    luca.marzorati@davispolk.com

13                                           Micah G. Block (SBN 270712)
14                                           DAVIS POLK & WARDWELL LLP
                                             1600 El Camino Real
15                                           Menlo Park, California 94025
                                             Telephone: (650) 752-2000
16                                           Facsimile:  (650) 752-2111
                                             Email:  micah.block@davispolk.com
17

18                                           *Attorneys for Plaintiffs WhatsApp LLC and*
                                             *Meta Platforms, Inc.*
19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ISSUANCE OF LETTER ROGATORY
CASE NO. 4:19-CV-07123-PJH

# TABLE OF CONTENTS

_____

Page

TABLE OF CONTENTS...................................................................................................... i

BACKGROUND ................................................................................................................ 2

    A.    Plaintiffs' Claims Against NSO.............................................................. 2

    B.    Plaintiffs Obtain Documents Showing the Relevance of the
NSO Witnesses From Third Parties....................................................... 3

    C.    Plaintiffs Seek To Depose the NSO Witnesses..................................... 3

ARGUMENT ...................................................................................................................... 5

    I.    The NSO Witnesses Can Provide Testimony on Issues Important
to Proving  Plaintiffs' Claims ............................................................... 6

    II.    The Information from the NSO Witnesses Cannot Be Obtained
From Another Source............................................................................. 10

    III.    Potential Israeli Law Restrictions Should Not Impede Granting
This Motion............................................................................................ 11

CONCLUSION................................................................................................................... 12

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLFS' MOTION FOR ISSUANCE OF LETTER ROGATORY
CASE NO. 4:19-CV-07123-PJH

# TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE</small>(S)

*Barnes & Noble, Inc. v. LSI Corp.*,
  2012 WL 1808849 (N.D. Cal. May 16, 2012) ........................................................ 5

*Campos v. S.F. State Univ.*,
  1999 WL 35140127 (N.D. Cal. Mar. 19, 1999) ...................................................... 6

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 3:07-CV-05944SC, 2015 WL 13655172 (N.D. Cal. Sept. 18, 2015),
  *report and recommendation adopted*, No. C-07-5944-SC, 2015 WL 13653877
  (N.D. Cal. Oct. 28, 2015) ...................................................................................... 10

*Elasticsearch, Inc. v. floragunn GmbH*,
  No. 19-cv-05553-YGR (AGT), 2021 WL 1753796 (N.D. Cal. May 4, 2021) ........................ 3

*Gardner v. Starkist Co.*,
  No. 19-cv-02561-WHO, 2021 WL 303426 (N.D. Cal. Jan. 29, 2021) ................................ 5

*Huntzinger v. Aqua Lung Am., Inc.*,
  No. 3:15-cv-1146 WQH (KSC), 2016 WL 11783766 (S.D. Cal. Nov. 23, 2016) .................. 6

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ............................................................................................. 5

*MGI Digit. Tech. S.A. v. Duplo U.S.A.*,
  No. 8:22-cv-00979-DOC-KESx, 2023 WL 6814579 (C.D. Cal. Aug. 24, 2023) ........... 11, 12

*Omnitracs, LLC v. Platform Sci., Inc.*,
  No. 20-cv-958-CAB-DDL, 2023 WL 2626273 (S.D. Cal. Mar. 24, 2023) .......................... 11

*Radware, Ltd. v. A10 Networks, Inc.*,
  No. C-13-02021, 2014 WL 631537 (N.D. Cal. Feb. 18, 2014) ........................................ 6

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992) ..................................................................... 6, 11, 12

*SEC v. Leslie*,
  No. C 07-03444 JF (PVT), 2009 WL 688836 (N.D. Cal. Mar. 16, 2009) ............................ 5

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
  482 U.S. 522 (1987) ............................................................................................. 11

*Synthes v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*,
  CIV No. 07-CV-309-L(AJB), 2008 WL 81111 (S.D. Cal. Jan. 8, 2008) ............................ 6

ii

*United States v. Staples*,
   256 F.2d 290 (9th Cir. 1958) ............................................................................. 5

*Viasat, Inc. v. Space Sys./loral, Inc.*,
   No. 12-CV-0260-H (WVG), 2013 WL 12061801 (S.D. Cal. Jan. 14, 2013) ........................ 11

*Zoho Corp. PVT. Ltd v. Freshworks, Inc.*,
   No. 20-cv-01869-VC (TSH), 2021 WL 2769009 (N.D. Cal. July 2, 2021) ........................ 5, 6

<u>Statutes & Rules</u>

18 U.S.C. § 1030(a)(2)(C) ....................................................................................... 2

18 U.S.C. § 1030(a)(4) ........................................................................................... 2

28 U.S.C. § 1781(a)(2) ........................................................................................... 5

Cal. Penal Code § 502(c)(1) ..................................................................................... 2

Fed. R. Civ. P. 26 ................................................................................................. 6

Fed. R. Civ. P. 26(b) ....................................................................................... 1, 5, 6

Fed. R. Civ. P. 28(b)(1)(B) ...................................................................................... 5

Fed. R. Civ. P. 30(a)(2)(A)(i) ................................................................................... 1

Fed. R. Civ. P. 30(b)(1) ..................................................................................... 3. 4

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Rule 28(b) of the Federal Rules of Civil Procedure, Plaintiffs WhatsApp LLC and Meta Platforms, Inc. ("Plaintiffs") respectfully request this Court issue a letter rogatory to the Central Authority of the State of Israel pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") to assist Plaintiffs with obtaining testimony from several current and former employees (together, the "NSO Witnesses")[1] of Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited ("NSO").[2]  The NSO Witnesses all have relevant information regarding the allegations in Plaintiffs' complaint, including NSO's access and use of Plaintiffs' servers without authorization, and violations of Plaintiffs' Terms of Service, but they reside in Israel and NSO has refused to make them available for depositions.  To the extent that NSO or the NSO Witnesses may argue—either in opposition to this motion or in Israeli courts—that they are precluded from testifying on these topics due to any Israeli law restrictions, this Court has already held that these topics are "important" to proving Plaintiffs' claims at trial, and should be produced under the comity analysis in *Richmark Corp. v. Timber Falling Consultants*, notwithstanding any foreign law restrictions.  Accordingly, Plaintiffs respectfully request that this Court issue the letter rogatory informing the Israeli courts of its determination that the requested testimony is highly relevant and important to proving the issues in this case, and requesting their assistance in procuring that testimony from the NSO Witnesses.

---

[1]   The NSO Witnesses are Ory Samorodnitzky, Tomer Timor, Nir Peisakhov, Michael Herman, Yossi Mosingo, Alon Yudis, Shalev Hulio, Tami Mazel, Avi Itzhak, Guy Molho, and Sarit Bizinsky Gil.

[2]   Because NSO has thus far refused to make any substantive document productions, Plaintiffs have identified the 11 NSO Witnesses as individuals likely to have personal knowledge of facts relevant to the case based on a combination of publicly available information and on information obtained from third parties.  Given that the Hague Convention process can be lengthy and uncertain, Plaintiffs have sought a letter rogatory as to all the individuals they have currently identified as having material information relevant to the claims and defenses in this case, but in all events, Plaintiffs will not take more than 10 depositions without seeking leave of Court.  *See* Fed. R. Civ. P. 30(a)(2)(A)(i).

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLFS' MOTION FOR ISSUANCE OF LETTER ROGATORY
CASE NO. 4:19-CV-07123-PJH

**BACKGROUND**

A.       **Plaintiffs' Claims Against NSO**

Plaintiffs allege that NSO manufactures, distributes, and operates spyware designed to intercept and extract information from mobile phones—including WhatsApp messages and other communications after they are decrypted on a device.  Dkt. No. 1 ¶¶ 1, 24–29.  The complaint alleges that NSO reverse-engineered the WhatsApp app and accessed WhatsApp's computers (including computers located in California) without authorization between April and May 2019, in order to transmit malicious code to approximately 1,400 mobile devices, and cause them to download additional NSO spyware from malicious servers.  *Id.* ¶¶ 1, 11, 32, 35, 42.

Plaintiffs' claims are under the federal Computer Fraud and Abuse Act (the "CFAA") and the California Comprehensive Computer Data Access and Fraud Act (the "CCDAFA"), as well as for breach of the WhatsApp Terms of Service.  *Id.* ¶¶ 49–78.  The CFAA requires Plaintiffs to show, among other things, that NSO intentionally accessed computers without authorization or exceeded authorized access and "obtain[ed] . . . information from any protected computer," *see* 18 U.S.C. § 1030(a)(2)(C), and that NSO knowingly and with intent to defraud accessed computers without authorization or exceeded authorized access and, by means of its conduct, "obtain[ed] anything of value," *see id.* § 1030(a)(4).  California law also prohibits "[k]nowingly access[ing] and without permission . . . us[ing] any data, computer, computer system, or computer network in order to . . . wrongfully control or obtain money, property, or data."  Cal. Penal Code § 502(c)(1)(B).  Similarly, the WhatsApp Terms of Service prohibit "interfere[nce] with or disrupt[ing] the safety, security, or performance of [WhatsApp] Services," as well as violations of users' privacy, including "collect[ing] the information of or about users in any impermissible or unauthorized manner."  Dkt. No. 1 ¶ 22.

On July 16, 2020, this Court denied NSO's motion to dismiss the complaint.  Dkt. No. 111.  Among other things, the Court held that Plaintiffs stated a claim for a violation of the CFAA.  *Id.* at 35–40.  The Ninth Circuit affirmed that NSO had no claim to sovereign immunity, *see* Dkt. No. 157, and the Supreme Court denied certiorari, *see* Dkt. No. 162.  On November 15, 2023, the Court denied NSO's motion to dismiss for *forum non conveniens*.  *See* Dkt. No. 233.

**B.      Plaintiffs Obtain Documents Showing the Relevance of the NSO Witnesses From Third Parties**

Plaintiffs obtained discovery from third parties that shows the NSO Witnesses have information highly relevant and important to this case.[3]  This third-party discovery has revealed that NSO Witnesses possess critical information regarding such topics as: ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ .

**C.      Plaintiffs Seek To Depose the NSO Witnesses**

On January 26, 2024, Plaintiffs sent a letter to counsel for NSO, seeking to depose certain individuals that Plaintiffs understood to be employed by NSO.  *See* Declaration of Craig T. Cagney in Support of Motion for Issuance of Letters Rogatory ("Cagney Decl.") ¶ 4.  These employees included Shalev Hulio, Sarit Gil, Avi Itzhak, and Tamir Gazneli, all of whom had been identified in NSO's February 15, 2023 initial disclosures, *see id.*, Ex. A, as well as Nir Lifshitz (also known as Nir Peisakhov) and CEO Yaron Shohat.[5]  Counsel for NSO responded on February 7, 2024, indicating that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ .[6]  *Id.* ¶ 5.

---

[3]    By contrast, NSO has only produced 17 internal documents of its own, and has otherwise refused to produce responsive discovery.  NSO's limited productions have given Plaintiffs minimal information on the events relevant to the case.  In fact, NSO has produced an organizational chart that itself provides outdated and incomplete information regarding its employees.

[4]    Here, "relevant spyware" has the same definition as set forth in Plaintiffs' Motion to Compel, Dkt. No. 236 at 13, and as adopted by this Court in its February 23, 2024 Order.  *See* Dkt. No. 292 at 3 ("[A]ny NSO spyware targeting or directed at WhatsApp servers, or using WhatsApp in any way to access [the approximately 1,400 mobile phones and devices at issue].").

[5]    Plaintiffs also requested to depose Nachum Falek.  Plaintiffs currently have no intention to pursue a deposition of Mr. Falek, but reserve the right to seek his deposition in the event that additional information regarding Mr. Falek emerges during the course of discovery.

[6]    Plaintiffs seek these individuals' depositions via the Hague Convention without prejudice to arguments that they are "officer[s], director[s], or managing agent[s]" that Plaintiffs may depose via notice under Fed. R. Civ. P. 30(b)(1).  *See Elasticsearch, Inc. v. floragunn GmbH*,

3

By letter, Plaintiffs requested to meet and confer regarding the scheduling of depositions for NSO's employees on February 13, 2024, and again on March 3, 2024. *Id.* ¶ 6. Plaintiffs conferred with NSO on March 7, 2024 to discuss deposition scheduling, but counsel for NSO did not provide their position on the availability of any NSO employees, and instead asked for authority requiring them to produce officers, directors, or managing agents. Plaintiffs agreed to provide case law in support of their position, and on March 12, 2024, the parties reconvened and Plaintiffs provided authority establishing that NSO would be obligated to provide officers, directors, or managing agents in response to a Rule 30(b)(1) deposition notice. *See id.* ¶ 7.

On April 5, 2024, Plaintiffs again sent a letter to counsel for NSO, requesting NSO's position on whether it would make Mr. Hulio, Ms. Gil, Mr. Itzhak, Mr. Gazneli, Mr. Peisakhov, and Mr. Shohat available for a deposition, and requesting its position on nine other employees, including Ory Samorodnitzky, Tomer Timor, Michael Herman, Yossi Mosingo, Alon Yudis, Tami Mazel, Ramon Eshkar, and Guy Molho.[7] *Id.* ¶ 8. Counsel for NSO responded on April 18, 2024, ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████. *Id.* ¶ 9.

On April 29, 2024, Plaintiffs once again requested that NSO provide its position, by May 1, 2024, on whether it would make any of the employees noticed in its April 5, 2024 letter available for a deposition. *Id.* ¶ 10. Counsel for NSO responded on May 10, 2024, agreeing to make available only Mr. Shohat, Mr. Eshkar, and Mr. Gazneli for a deposition, while failing to provide its position on whether any of the outstanding NSO Witnesses would be produced. *Id.* ¶ 11. Plaintiffs now move for issuance of a letter rogatory to the Israeli courts requesting the depositions of the

---

2021 WL 1753796, at *1 (N.D. Cal. May 4, 2021) ("[I]f a foreign witness is an officer, director, or managing agent of a corporate opponent, they may be deposed via notice."). Plaintiffs nonetheless seek these individuals' depositions via the Hague Convention in the event that they are not made available via notice, as required under the Federal Rules of Civil Procedure.

[7] Plaintiffs also requested NSO's position on whether it would make Omri Lavie available. Plaintiffs are not currently seeking to depose Mr. Lavie through the Hague Convention, as he has also been noticed by subpoena. Plaintiffs nonetheless reserve the right to proceed with the Hague Convention process in the event that NSO refuses to make Mr. Lavie available.

NSO Witnesses, each of whom holds specific roles of key relevance and importance to Plaintiffs' claims and defenses.

## ARGUMENT

Federal Rule of Civil Procedure 28(b)(1)(B) allows parties to take depositions in a foreign country upon the issuance of a letter rogatory from a federal court. *Zoho Corp. Pvt. Ltd v. Fresh-works, Inc.*, 2021 WL 2769009, at *2 (N.D. Cal. July 2, 2021).  "[A] letter rogatory is the request by a domestic court to a foreign court to take evidence from a certain witness."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 n.1 (2004) (citation omitted). "This Court, like all courts of the United States, has inherent power to issue Letters Rogatory."  *United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958).  Federal law recognizes this inherent power, and ena-bles the U.S. State Department to "receive a letter rogatory issued, or request made, by a tribunal in the United States, to transmit it to the foreign or international tribunal, officer, or agency to whom it is addressed, and to receive and return it after execution."  28 U.S.C. § 1781(a)(2).  In issuing a letter rogatory, a court can request the testimony of a witness residing in a foreign coun-try, and can also request that the witness produce documents.  *See Barnes & Noble, Inc. v. LSI Corp.*, 2012 WL 1808849, at *1 (N.D. Cal. May 17, 2012).  Both Israel and the United States have signed the Hague Convention, which authorizes a judicial tribunal in the United States to issue letters rogatory to the designated authority in Israel.  *See SEC v. Leslie*, 2009 WL 688836, at *3 (N.D. Cal. Mar. 16, 2009) (noting that the Hague Convention "provides [for member countries] the mechanism for the taking of evidence abroad in civil or commercial matters").

Judges in this district have held that motions requesting issuance of a letter of request or letter rogatory should generally be granted, and that "'[t]he opposing party must show good reason for a court to deny an application for a letter rogatory.'"  *Gardner v. Starkist Co.*, 2021 WL 303426, at *2 (N.D. Cal. Jan. 29, 2021) (quoting *Leslie*, 2009 WL 688836, at *2).  In determining whether to grant a request for issuance of letters rogatory, courts employ the familiar standard of Rule 26(b), under which "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible

evidence." *See Radware, Ltd. v. A10 Networks, Inc.*, 2014 WL 631537, at *2 (N.D. Cal. Feb. 18, 2014) (quoting Fed. R. Civ. P. 26(b)) (granting defendants' request for a letter rogatory to take deposition of witness located in Israel, while noting that defendant's request "easily passes the basic Rule 26 relevance test"); *see also Campos v. S.F. State Univ.*, 1999 WL 35140127, at *2 (N.D. Cal. Mar. 19, 1999) (Hamilton, J.) ("Courts will rarely reject discovery requests on the ground the information sought is not 'relevant to the subject matter' of the action.").

Additional factors include considerations of comity, the relative interests of the parties (including the interest in avoiding abusive discovery), and the ease and efficiency of alternative formats for discovery. *Radware*, 2014 WL 631537, at *2. In conducting a comity analysis under *Richmark*, courts have held that discovery that is "*directly* relevant" to the case—such that there is no evidence that the discovery would be cumulative or could be obtained by other means—is also sufficiently "important" to override arguments that foreign law restrictions should bar the discovery. *Synthes (U.S.A.) v. G.M. dos Reis Jr. Ind. Com. De Equip. Medico*, 2008 WL 81111, at *5 (S.D. Cal. Jan. 8, 2008) (quoting *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992)) (emphasis added). Courts have drawn from these same principles in finding that letters rogatory should issue over any comity concerns. *See Huntzinger v. Aqua Lung Am., Inc.*, 2016 WL 11783766, at *1 (S.D. Cal. Nov. 23, 2016) (granting motion for letter of request where plaintiff asserted that "the requested documents are *highly relevant and important* to determine critical aspects of the alleged Dive Computer defect") (emphasis added).

## I.      The NSO Witnesses Can Provide Testimony on Issues Important to Proving Plaintiffs' Claims

Plaintiffs easily meet their burden of satisfying the "liberal standard for issuance" of a letter rogatory, which mirrors the Rule 26 relevance standard, *see Zoho*, 2021 WL 2769009, at *3, because each of the NSO Witnesses has relevant knowledge about issues in this case that this Court has already deemed "important" to proving Plaintiffs' claims. *See* Dkt. No. 292 at 3–5 (citing *Richmark*, 959 F.2d at 1475). The NSO Witnesses possess highly relevant knowledge on various important issues relating to NSO's development, distribution, testing, use, and for causing the use of relevant spyware against Plaintiffs and their users. *See id.*; *see also* Dkt. No. 1 ¶¶ 49–73.

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLFS' MOTION FOR ISSUANCE OF LETTER ROGATORY
CASE NO. 4:19-CV-07123-PJH

- **Ory Samorodnitzky** ▮▮▮▮▮▮, NSO's former Chief Technical Officer, purportedly left the company in 2019, but has highly relevant and important information regarding ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Cagney Decl., Ex. B. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Ex. C.

- **Tomer Timor**, Head of Sales for NSO until 2020, possesses highly relevant and important information regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see id.*, Ex. D, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see id.*, Ex. E, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see id.*, Ex. F; *see also* Dkt. No. 1 ¶ 44.

- **Nir Peisakhov** was part of NSO's Research and Development ("R&D") department, and purportedly left the company in 2021 after three years.  Mr. Peisakhov, who is identified in Plaintiffs' complaint as "Employee 1," conceded in communications with one of Plaintiffs' employees that WhatsApp had successfully "closed [NSO's] biggest remote for cellular."  *See* Dkt. No. 1 ¶ 45.

- **Michael Herman** was, according to publicly available sources, the Product Manager at NSO from 2013 and 2018.  According to his public LinkedIn profile, he managed the R&D team that "develop[ed] the main company's product [Pegasus]."  *See* Cagney Decl., Ex. G.

- **Yossi Mosingo** was, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████ For example, ███████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████ *See id.*, Ex. H.  Moreover, Mr. Mosingo possesses knowledge ██
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████ *See id.*, Ex. I. ████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████.

- **Alon Yudis** held various roles at NSO from at least as early as February 2018 through October 2022 when, according to public sources, his last known title was Manager of Technical Solutions and Delivery. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████ *See id.*, Ex. J.  Mr. Yudis is therefore very likely to have highly relevant and important knowledge regarding ████
████████████████████████████████████████████████████████████████████████
████████████████████████████

- **Shalev Hulio**, NSO's cofounder and CEO from 2019 through 2022 is very likely to have highly relevant and important knowledge about NSO's business model, its customer relationships, and the operation of its spyware.  NSO's own initial disclosures indicate he has knowledge regarding several directly relevant issues to this litigation, including the "policies, procedures and practices of NSO Group insofar as they relate to the claims and defenses in this matter."  *See id.*, Ex. A.  Moreover, Mr. Hulio provided the central declaration in support of NSO's motion to dismiss this action, in which Mr. Hulio made various factual assertions about NSO's business and products, including, for example, that NSO's Pegasus technology "cannot be used against U.S. mobile phone numbers" and that "Defendants do not operate NSO's Pegasus technology."  *See* Dkt. No. 45-11 ¶¶ 13–14.

- **Tami Mazel**, former Co-President of NSO, left the company in May 2019, but third-party discovery has demonstrated that she has highly relevant and important knowledge of ███████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Plaintiffs understand that Ms. Mazel ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *See* Cagney Decl., Ex. K. ██████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████ *Id.*, Ex. L.  And beyond her role as a key driver of business decisions, documents also suggest that ████████████████████████████████████ *See id.*, Ex. M.  Ms. Mazel thus possesses highly relevant and important knowledge related to NSO's finances and decision-making that even other employees such as Mr. Samorodnitzky and Mr. Timor will not possess.

9

- **Avi Itzhak**, identified in publicly available sources as a Vice President of Success at NSO, was the only witness identified by NSO in its initial disclosures as having knowledge of "NSO client relations; research and development of Pegasus; [and] customer support of Pegasus." *See id.*, Ex. A.

- **Guy Mohlo**, former Product Management Director at NSO, purportedly left the company in 2018.  He has highly relevant and important information related to NSO's products and efforts in the United States.  Plaintiffs identified Mr. Molho, former Product Management Director of NSO, as the author of the "Pegasus Product Description."  *See* Dkt. No. 1-1. ███████████ ████████████████████████████████████████████████████

- **Sarit Bazinsky Gil**, identified in publicly available sources as a Vice President of Global Business Operations at NSO, was the only witness identified by NSO in its initial disclosures as having knowledge regarding "NSO Group's contracts with its customers."  *See* Cagney Decl., Ex. A.

## II.     The Information from the NSO Witnesses Cannot Be Obtained From Another Source

In addition, the NSO Witnesses are likely to possess relevant and important information that Plaintiffs cannot obtain from any other source.  *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 13655172, at *4 (N.D. Cal. Sept. 18, 2015), *report and recommendation adopted*, 2015 WL 13653877 (N.D. Cal. Oct. 28, 2015) (finding that "it is reasonable to expect" that the founder and chief executive officer of one of the parties "will possess unique, first-hand knowledge" due to his responsibility for "the overall strategic direction of the company").  For one, several of the NSO Witnesses—unlike the few NSO employees that NSO has agreed to let sit for depositions—were actually employed by NSO during April and May 2019, when Plaintiffs detected and stopped NSO's unlawful conduct, ████████████████████████████████ ███████████████████████████████████  For example, Mr. Hulio was the chief executive officer, Mr. Samorodnitzky was the chief technical officer, and Mr. Timor was the head of sales during those times.  By contrast, Mr. Shohat—NSO's current chief executive officer— had no role at the company during the relevant time period.  Issuance of a letter rogatory will

ensure that Plaintiffs can obtain discovery from the individuals who are most knowledgeable about and actually involved in the events at the heart of this case.  *See Omnitracs, LLC v. Platform Sci., Inc.*, 2023 WL 2626273, at *1 (S.D. Cal. Mar. 24, 2023) (granting motion for letter rogatory to obtain deposition testimony and documents from former employee who possessed unique knowledge regarding development of products developed by company during former employee's employment); *see also MGI Digit. Tech. S.A. v. Duplo U.S.A.*, 2023 WL 6814579, at *3 (C.D. Cal. Aug. 24, 2023) (granting motion for letter rogatory to obtain discovery from former employees who developed parties' technology).

### III.   Potential Israeli Law Restrictions Should Not Impede Granting This Motion

To the extent the Court grants Plaintiffs' request for issuance of a letter rogatory, this also would be consistent with considerations of international comity.  *See Viasat, Inc. v. Space Sys./loral, Inc.*, 2013 WL 12061801, at *4 (S.D. Cal. Jan. 14, 2013) (evaluating "whether considerations of comity warrant the requested discovery").  The Supreme Court has identified a five-factor test for courts to consider when determining whether to grant a request for issuance of a letter rogatory: (1) the importance to the litigation of the documents requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987).

Here, the Court has already engaged in this comity analysis and concluded that it favors production.  As the Court is well aware, NSO previously moved for a protective order relying on the Ninth Circuit's decision in *Richmark*, which employs the same five-factor test that courts use in evaluating motions for letters rogatory.  *See* 959 F.2d at 1475.  Under that standard, the Court concluded that the following topics of discovery were both important to the litigation and specific within the meaning of factors (1) and (2): Documents pertaining to "'all relevant spyware' for a period of one year before the alleged attack to one year after the alleged attack" and "information concerning the full functionality of the relevant Spyware."  *See* Dkt. No. 292 at 3–5.  These are

11

the same topics on which Plaintiffs now seek testimony from the NSO Witnesses.[8]  Given the NSO

Witnesses are best positioned to provide testimony on these topics, factors (1) and (2) weigh in

favor of Plaintiffs.  *See MGI Digit. Tech. S.A.*, 2023 WL 6814579, at *3–4, 6 (granting motion for

letters of request as to two former employees, under *Richmark*, due to the "directly relevant" nature

of the employees' testimony).[9]  As such, Plaintiffs' motion for letter rogatory precisely tracks the

contours of the Court's previous decisions on the scope of relevance in the face of comity consid-

erations, and thus issuing the letter rogatory does not offend international comity.

**CONCLUSION**

Plaintiffs respectfully request that the Court sign the attached letter rogatory and grant the

proposed order so that Plaintiffs may transmit the letter of request to the Central Authority of the

State of Israel and seek discovery from the NSO Witnesses in Israel.

---

[8]  To the extent that Plaintiffs seek to depose the NSO Witnesses on other topics, including NSO's financial information and contacts with the United States, NSO has already admitted that these topics are relevant and raise no concerns under Israeli law.

[9]  In evaluating factors (3), (4), and (5), the Court found that these factors do not favor NSO to any significant extent, and that NSO would be forced to produce the important and specific discovery that Plaintiffs sought.  Dkt. No. 233 at 9–10.

12

Dated:  June 26, 2024

DAVIS POLK & WARDWELL LLP

By:  /s/ Micah G. Block
        Greg D. Andres
        Antonio J. Perez-Marques
        Craig T. Cagney
        Luca Marzorati
        (admitted *pro hac vice*)
        DAVIS POLK & WARDWELL LLP
        450 Lexington Avenue
        New York, New York 10017
        Telephone: (212) 450-4000
        Facsimile: (212) 701-5800
        Email:  greg.andres@davispolk.com
                    antonio.perez@davispolk.com
                    craig.cagney@davispolk.com
                    luca.marzorati@davispolk.com

        Micah G. Block (SBN 270712)
        DAVIS POLK & WARDWELL LLP
        1600 El Camino Real
        Menlo Park, California 94025
        Telephone: (650) 752-2000
        Facsimile:  (650) 752-2111
        Email:  micah.block@davispolk.com

        *Attorneys for Plaintiffs WhatsApp LLC and Meta Platforms, Inc.*

# Appendix A

**Request for International Judicial Assistance pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters**

TO THE APPROPRIATE JUDICIAL AUTHORITY IN ISRAEL:

| | | |
|---|---|---|
| 1. | Sender | The Honorable Phyllis J. Hamilton<br>U.S. District Court for the Northern District of California<br>Oakland Courthouse, Courtroom 3 – 3rd Floor<br>1301 Clay Street, Oakland, CA 94612 |
| 2. | Central Authority of the Requested State | Administration of Courts<br>Legal Assistance to Foreign Countries<br>22 Kanfei Nesharim<br>POB 34142<br>Jerusalem 95464<br>Israel<br>Email: mispatit@court.gov.il<br>Tel.: +972 (74) 748 1836<br>Fax: +972 (74) 748 1836 |
| 3. | Person to whom the expected request is to be returned | Micah Block<br>Davis Polk & Wardwell LLP<br>1600 El Camino Real<br>Menlo Park, CA 94025<br>micah.block@davispolk.com<br>Tel.: (650) 752-2000<br>Fax: (650) 752-2111 |
| 4. | Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request | |
| Date | | As soon as reasonably practicable consistent with the Court's calendar. |
| Reason for urgency* | | The information sought is necessary for discovery in the proceeding.  Fact discovery is scheduled to close on September 13, 2024, necessitating that this request be executed before that date if at all possible. |
| 5. | a. Requesting judicial authority (Article 3, *a*)) | The Honorable Phyllis J. Hamilton<br>U.S. District Court for the Northern District of California<br>Oakland Courthouse, Courtroom 3 – 3rd Floor<br>1301 Clay Street, Oakland, CA 94612 |
| | b. To the competent authority of (Article 3, *a*)) | State of Israel |
| | c. name of the case and any identifying number | *WhatsApp Inc. et al v. NSO Group Technologies et al.*, Case No. 4:19-cv-07123-PJH (N.D. Cal.) |

1

| | | |
|---|---|---|
| 6. | Names and addresses of the parties and their representatives (including representatives in requested State*) (Article 3, *b*) | |
| | a.   Plaintiffs | WhatsApp LLC; Meta Platforms Inc. |
| | Representatives | Micah Block<br>Davis Polk & Wardwell LLP<br>1600 El Camino Real<br>Menlo Park, CA 94025<br><br>Greg Andres<br>Antonio J. Perez-Marques<br>Craig T. Cagney<br>Luca Marzorati<br>Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br><br>Ronald Arthur Lehmann<br>Fischer (FBC & Co.)<br>146 Menachem Begin Road<br>Tel Aviv, Israel |
| | b.   Defendants | NSO Group Technologies Limited; Q Cyber Technologies Limited |
| | Representatives | Joseph N. Akrotirianakis<br>Aaron S. Craig<br>King & Spalding LLP<br>633 West Fifth Street, Suite 1600<br>Los Angeles, CA 90071 |
| 7. | a. Nature of proceedings (divorce, paternity, breach of contract, product liability, etc.) (Article 3, *c*)) | Civil suit for violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030) and California Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502), and for breach of contract |
| | b. Summary of complaint | Plaintiffs allege, among other things, that Defendants accessed WhatsApp servers in California without authorization to send spyware to infect approximately 1,400 target devices. |
| | c.   Summary of defense and counterclaim | Defendants argue, among other things, that they did not access WhatsApp servers without authorization and did not violate federal or state law. |
| | d.   Other necessary information or documents | Exhibit 1: Complaint (Dkt. No. 1)<br>Exhibit 2: Order Granting in Part and Denying in Part Motion to Dismiss (Dkt. No. 111)<br>Exhibit 3:  Order Denying Motion to Dismiss, Motion for Protective Order, and Joint Discovery Letter Brief (Dkt. No. 233)<br>Exhibit 4:  Order re Motions to Compel and Motion for Relief from Case Management Order (Dkt. No. 292) |

| 8.  a. Evidence to be obtained or other judicial act to be performed (Article 3, *d*) | Plaintiffs seek testimonial evidence on the following matters: |
|---|---|
|  | 1.  Defendants' development, testing, deployment, installation, distribution, use, maintenance, troubleshooting, and operation of any NSO spyware targeting or directed at WhatsApp servers, or using WhatsApp in any way to access the devices of WhatsApp users (the "Relevant Spyware"). |
|  | 2.  Third parties' use of Relevant Spyware. |
|  | 3.  Defendants' identification of network vulnerabilities on Plaintiffs' systems. |
|  | 4.  Defendants' development and testing of Relevant Spyware to access the devices of WhatsApp users. |
|  | 5.  The processes, methods, and technology used by the Relevant Spyware to monitor mobile devices and exfiltrate data. |
|  | 6.  The mobile phone and device operating system vulnerabilities used to install the Relevant Spyware. |
|  | 7.  Defendants' processes, methods, and technology used to install the Relevant Spyware on the mobile phones and devices of WhatsApp users. |
|  | 8.  Defendants' analysis, reverse engineering, disassembling, or emulating of any version of the WhatsApp application. |
|  | 9.  The technology used in the Relevant Spyware to communicate with WhatsApp. |
|  | 10. Defendants' use of WhatsApp accounts to develop, test, transmit, install, distribute, or use any NSO spyware. |
|  | 11. The technology used to transmit any data or information from any device containing or infected with any Relevant Spyware. |
|  | 12. The design and operation of Defendants' Pegasus spyware. |
|  | 13. Defendants' possession, custody, access to, or control of servers containing Relevant Spyware. |
|  | 14. The data and information Defendants or Defendants' customers obtained by using Relevant Spyware. |
|  | 15. Defendants' knowledge of the attacks described in the complaint. |

|  | 16. Defendants' marketing, sale, and promotion of Relevant Spyware, including information about pricing, revenue and profits.<br>17. Defendants' attempts to sell Relevant Spyware in the United States and its relationship with Westbridge Technologies, Inc.<br>18. Defendants' compliance with WhatsApp and Meta terms of service, and applicable state and federal laws. |
| b. Purpose of the evidence or judicial act sought | The testimonial evidence is sought to determine whether NSO Group and Q Cyber Technologies violated with WhatsApp's terms of service and terms of use, interfered with their contractual relations, and violated federal and state law. |

| 9. Identity and address of any person to be examined (Article 3, *e*))* | (1) Ory Samorodnitzky<br>Current address unknown<br><br>(2) Tomer Timor<br>Current address unknown<br><br>(3) Nir Peisakhov<br>Current address unknown<br><br>(4) Michael Herman<br>Current address unknown<br><br>(5) Yossi Mosingo<br>Current address unknown<br><br>(6) Alon Yudis<br>Current address unknown<br><br>(7) Shalev Hulio<br>Current address unknown<br><br>(8) Tami Mazel<br>Current address unknown<br><br>(9) Avi Itzhak<br>Current address unknown<br><br>(10) Guy Molho<br>Current address unknown<br><br>(11) Sarit Bizinsky Gil<br>Current address unknown |
|---|---|
| 10. Questions to be put to the persons to be examined or statement of the subject-matter about which they are to be examined (Article 3, *f*)) | All persons are to be examined about topics listed in 8.a above. |

| 11. Any requirement that the evidence be given an oath or affirmation and any special form to be used (Article 3, *h*))* | It is requested that at the beginning of the deposition of each witness, the witness affirmatively respond to the following: "Do you solemnly swear or affirm that you will tell the truth, the whole truth, and nothing but the truth?"<br><br>In the event that evidence cannot be taken in the manner requested, the evidence is to be taken in such manner as is provided by local law for the formal taking of evidence. |
|---|---|

| | |
|---|---|
| 12. Specific methods or procedure to be followed (e.g. oral or in writing, verbatim, transcript or summary, cross-examination, etc.) (Article 3, *i*) and 9)* | Plaintiffs request that Micah Block, Greg Andres, Antonio J. Perez-Marques, Craig T. Cagney, Luca Marzorati, and Ronald Arthur Lehmann be appointed as the attorneys or juridical officers to preside over the testimony given at the deposition.  Their contact information is as follows:<br><br>Micah Block<br>1600 El Camino Real<br>Menlo Park, California 94025<br>micah.block@davispolk.com<br>Tel. (650) 752-2000<br>Fax: (650) 752-2111<br><br>Greg Andres<br>Antonio J. Perez-Marques<br>Craig T. Cagney<br>Luca Marzorati<br>greg.andres@davispolk.com<br>antonio.perez@davispolk.com<br>craig.cagney@davispolk.com<br>luca.marzorati@davispolk.com<br>Tel.: (212) 540-4000<br>Fax: (212) 701-5800<br><br>Ronald Arthur Lehmann<br>Fischer (FBC & Co.)<br>146 Menachem Begin Road<br>Tel Aviv, Israel<br><br>Mr. Block is attorney permitted to practice in the state of California, and admitted to the bar of the U.S. District Court for the Northern District of California.  Mr. Andres, Mr. Perez-Marques, Mr. Cagney, and Mr. Marzorati are all attorneys permitted to practice in the state of New York, and admitted *pro hac vice* to the U.S. District Court for the Northern District of California.<br><br>Mr. Lehmann is an attorney admitted to practice in Israel, and has been practicing law at FBC for 25 years.<br><br>The examinations shall be conducted pursuant to the discovery rules as provided for in the Federal Rules of Civil Procedure of the United States, except to the extent such procedure is incompatible with the laws of Israel. This Court further requests: (1) that the examination be taken orally; (2) that the examination be taken before a |

| | |
|---|---|
| | commercial stenographer and videographer selected by Plaintiffs; (3) that a videographer be permitted to record the examination by audiovisual means; (4) that the stenographer be allowed to record a verbatim transcript of the examination; (5) that the examination be conducted in English, or, if necessary, with the assistance of an interpreter selected by Plaintiffs; (6) that, if the examination is conducted through an interpreter, verbatim transcripts of the proceeding in English be permitted; (7) that the witness be examined for no more than ten and a half (10.5) hours if the witness requires an interpreter or seven (7) hours if the witness does not require an interpreter.<br><br>Subject to Israel's Declarations and Reservations regarding the Hague Evidence Convention and any other requisites of Israeli law or legal procedures, the parties will engage in any examination permitted by United States law or custom, including but not limited to direct examination, cross-examination, re-direct examination, and re-cross examination.  Pursuant to customary United States deposition practice, as the requesting party, counsel for Plaintiffs will examine each witness first.  Defendants' counsel will then have an opportunity to examine the witnesses, followed by any re-examination by Plaintiffs' counsel, etc.  Pursuant to customary United States deposition practice, each witness will be permitted to bring his personal attorney to the deposition as well.<br><br>In the event that testimonial evidence cannot be taken in the manner requested, testimonial evidence is to be taken in such manner as is provided by local law for the formal taking of evidence. |
| 13. Request for notification of the time and place for the execution of the Request and identity and address of any person to be identified (Article 7)* | This Court requests that the legal representatives for the parties (listed in Section 6 above) be informed as soon as practicable of the time and place for the deposition of the witnesses. |
| 14. Request for attendance or participation of judicial personnel of the requesting authority in the execution of the Letter of Request (Article 8)* | None. |

| 15. Specification of privilege or duty to refuse to give evidence under the law of the State of origin (Article 11, b))* | All testimonial evidence to be taken by oral deposition will be subject to any applicable assertions of privilege under United States law and/or law of the State of Israel. Any legal privilege to refuse to give evidence under United States law is contained in the United States Federal Rules of Civil Procedure, Federal Rules of Evidence, and other applicable United States laws. Specifically, the witness must answer all questions unless the witness is appropriately directed by counsel not to answer the question. Such an instruction is appropriate only when necessary to preserve a legal privilege, to enforce a limitation directed by a court, or to support a motion to cease testimony due to harassment of the witness. |
| --- | --- |
| 16. The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by* | Counsel for Plaintiffs respectfully requests that The Directorate of Courts of the State of Israel notify them if reimbursement is to be sought for any costs or fees that may be incurred. |
| DATE OF REQUEST | June 26, 2024 |

SIGNATURE AND SEAL OF
THE REQUESTING AUTHORITY

_____
Honorable Phyllis J. Hamilton
United States District Court Judge

EXHIBIT 1

COOLEY LLP
TRAVIS LEBLANC (251097) (tleblanc@cooley.com)
JOSEPH D. MORNIN (307766) (jmornin@cooley.com)
101 California Street, 5th floor
San Francisco, CA   94111-5800
Telephone:   (415) 693-2000
Facsimile:   (415) 693-2222

DANIEL J. GROOMS (D.C. Bar No. 219124) (*pro hac vice* forthcoming)
(dgrooms@cooley.com)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004-2400
Telephone:   (202) 842-7800
Facsimile:   (202) 842-7899

Attorneys for Plaintiffs
WHATSAPP INC. and FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | Case No. |
| | **COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | |
| Defendants. | |

Plaintiffs WhatsApp Inc. and Facebook, Inc. (collectively, "Plaintiffs") allege the following against Defendants NSO Group Technologies Ltd. ("NSO Group") and Q Cyber Technologies Ltd. ("Q Cyber") (collectively, "Defendants"):

## INTRODUCTION

1.     Between in and around April 2019 and May 2019, Defendants used WhatsApp servers, located in the United States and elsewhere, to send malware to approximately 1,400 mobile phones and devices ("Target Devices").  Defendants' malware was designed to infect the Target Devices for the purpose of conducting surveillance of specific WhatsApp users ("Target Users").  Unable to break WhatsApp's end-to-end encryption, Defendants developed their malware in order to access messages and other communications after they were decrypted on Target Devices.  Defendants' actions were not authorized by Plaintiffs and were in violation of WhatsApp's Terms of Service.  In May 2019, Plaintiffs detected and stopped Defendants' unauthorized access and abuse of the WhatsApp Service and computers.

2.     Plaintiffs bring this action for injunctive relief and damages pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502, and for breach of contract and trespass to chattels.

## PARTIES

3.     Plaintiff WhatsApp Inc. ("WhatsApp") is a Delaware corporation with its principal place of business in Menlo Park, California.

4.     Plaintiff Facebook, Inc. ("Facebook") is a Delaware corporation with its principal place of business in Menlo Park, California.  Facebook acts as WhatsApp's service provider for security-related issues.

5.     Defendant NSO Group was incorporated in Israel on January 25, 2010, as a limited liability company.  Ex. 1.  NSO Group had a marketing and sales arm in the United States called WestBridge Technologies, Inc.  Ex. 2 and 3.  Between 2014 and February 2019, NSO Group obtained financing from a San Francisco–based private equity firm, which ultimately purchased a controlling stake in NSO Group.  Ex. 4.  In and around February 2019, NSO Group was reacquired by its founders

and management.  *Id.*  NSO Group's annual report filed on February 28, 2019, listed Defendant Q Cyber as the only active director of NSO Group and its majority shareholder.  Ex.  5.

6.     Defendant Q Cyber was incorporated in Israel on December 2, 2013, under the name L.E.G.D. Company Ltd.  Ex. 6 and 7.  On May 29, 2016, L.E.G.D. Company Ltd. changed its name to Q Cyber.  Ex. 7.  Until at least June 2019, NSO Group's website stated that NSO Group was "a Q Cyber Technologies company."  Ex. 8.  Q Cyber's annual report filed on June 17, 2019, listed OSY Technologies S.A.R.L. as the only Q Cyber shareholder and active Director.  Ex. 9

7.     At all times material to this action, each Defendant was the agent, partner, alter ego, subsidiary, and/or coconspirator of and with the other Defendant, and the acts of each Defendant were in the scope of that relationship.  In doing the acts and failing to act as alleged in this Complaint, each Defendant acted with the knowledge, permission, and consent of each other; and, each Defendant aided and abetted each other.

## JURISDICTION AND VENUE

8.     The Court has federal question jurisdiction over the federal causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1331.

9.     The Court has supplemental jurisdiction over the state law causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1367 because these claims arise out of the same nucleus of operative fact as Plaintiffs' federal claims.

10.    In addition, the Court has jurisdiction over all the causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332 because complete diversity between the Plaintiffs and each of the named Defendants exists, and because the amount in controversy exceeds $75,000.

11.    The Court has personal jurisdiction over Defendants because they obtained financing from California and directed and targeted their actions at California and its residents, WhatsApp and Facebook.  The claims in this Complaint arise from Defendants' actions, including their unlawful access and use of WhatsApp computers, several of which are located in California.

12.    The Court also has personal jurisdiction over Defendants because Defendants agreed to WhatsApp's Terms of Service ("WhatsApp Terms") by accessing and using WhatsApp.  In relevant part, the WhatsApp Terms required Defendants to submit to the personal jurisdiction of this Court.

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), as the threatened and actual harm to WhatsApp and Facebook occurred in this District.

14.     Pursuant to Civil L.R. 3-2(d), this case may be assigned to either the San Francisco or Oakland division because WhatsApp and Facebook are located in San Mateo County.

## FACTUAL ALLEGATIONS

### A.     Background on Facebook

15.     Facebook is a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices. As of June 2019, Facebook daily active users averaged 1.59 billion and monthly active users averaged 2.41 billion.

16.     In October 2014, Facebook acquired WhatsApp.  At all times relevant to this action, Facebook has served as WhatsApp's service provider, which entails providing both infrastructure and security for WhatsApp.

### B.     Background on WhatsApp

#### 1.     The WhatsApp Service

17.      WhatsApp provides an encrypted communication service available on mobile devices and desktop computers (the "WhatsApp Service").  Approximately 1.5 billion people in 180 countries use the WhatsApp Service.  Users must install the WhatsApp app to use the WhatsApp Service.

18.     Every type of communication (calls, video calls, chats, group chats, images, videos, voice messages, and file transfers) on the WhatsApp Service is encrypted during its transmission between users.  This encryption protocol was designed to ensure that no one other than the intended recipient could read any communication sent using the WhatsApp Service.

#### 2.     WhatsApp's Terms of Service

19.     Every WhatsApp user must create an account and agree and consent to WhatsApp's Terms (available at https://www.whatsapp.com/legal?eea=0#terms-of-service).

20.     The WhatsApp Terms stated that "You must use our Services according to our Terms and policies" and that users agreed to "access and use [WhatsApp's] Services only for legal, authorized, and acceptable purposes."

21.     The WhatsApp Terms prohibited using the WhatsApp services in ways that (a) "violate, misappropriate, or infringe the rights of WhatsApp, our users, or others, including privacy;" (b) "are illegal, intimidating, harassing, . . . or instigate or encourage conduct that would be illegal, or otherwise inappropriate;" [or] . . . (e) "involve sending illegal or impermissible communications."

22.     The WhatsApp Terms prohibited users from "exploiting [WhatsApp's] Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm us, our Services, systems, our users, or others."  The Terms also required users to agree <u>not</u> to: "(a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services; (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the safety, security, or performance of our Services; [or] . . . (f) collect the information of or about our users in any impermissible or unauthorized manner."

23.     The WhatsApp Terms prohibited users not just from personally engaging in the conduct listed above, but also from assisting others in doing so.

**C.     Background on NSO Group and Pegasus**

24.     Defendants manufactured, distributed, and operated surveillance technology or "spyware" designed to intercept and extract information and communications from mobile phones and devices.  Defendants' products included "Pegasus," a type of spyware known as a remote access trojan.  Ex. 10 and 11.  According to Defendants, Pegasus and its variants (collectively, "Pegasus") were designed to be remotely installed and enable the remote access and control of information—including calls, messages, and location—on mobile devices using the Android, iOS, and BlackBerry operating systems.  *Id.*

25.     On information and belief, in order to enable Pegasus' remote installation, Defendants exploited vulnerabilities in operating systems and applications (e.g., CVE-2016-4657) and used other malware delivery methods, like spearphishing messages containing links to malicious code.  *Id.*

26.     According to media reports and NSO documents, Defendants claimed that Pegasus could be surreptitiously installed on a victim's phone without the victim taking any action, such as

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**COMPLAINT**

clicking a link or opening a message (known as remote installation).[1] *Id.* Defendants promoted that Pegasus's remote installation feature facilitated infecting victims' phones without using spearphishing messages that could be detected and reported by the victims.

27. According to NSO Group, Pegasus could "remotely and covertly extract valuable intelligence from virtually any mobile device." *Id.* Pegasus was designed, in part, to intercept communications sent to and from a device, including communications over iMessage, Skype, Telegram, WeChat, Facebook Messenger, WhatsApp, and others. *Id.* On information and belief, Pegasus was modular malware, which meant that it could be customized for different purposes, including to intercept communications, capture screenshots, and exfiltrate browser history and contacts from the device. *Id.*

28. Defendants used a network of computers to monitor and update the version of Pegasus implanted on the victims' phones. *Id.* These Defendant-controlled computers relayed malware, commands, and data between a compromised phone, Defendants, and Defendants' customers. This network served as the nerve center through which Defendants supported and controlled their customers' operation and use of Pegasus. In some instances, Defendants limited the number of concurrent devices that their customers could compromise with Pegasus to 25. Ex. 11.

29. Defendants profited by licensing Pegasus and selling support services to their customers, which included Pegasus installation, monitoring, and training. Ex. 10 and 11. Defendants also offered technical support to customers using Pegasus to infect victims' phones, including: (a) technical support by email and phone; and (b) remote troubleshooting by Defendants' engineers through remote desktop software and a virtual private network. *Id.*

---

[1] *See* Financial Times, "Israel's NSO: the business of spying on your iPhone" (May 14, 2019), *available at* https://www.ft.com/content/7f2f39b2-733e-11e9-bf5c-6eeb837566c5; Vice, "They Got Everything" (September 20, 2018), *available at* https://www.vice.com/en_us/article/qvakb3/inside-nso-group-spyware-demo.

**D.     Defendants Agreed to the WhatsApp Terms**

30.     Between January 2018 and May 2019, Defendants created and caused to be created various WhatsApp accounts and agreed to the WhatsApp Terms.  Defendants' employees and agents accepted and agreed to be bound by the Terms on behalf of Defendants.

31.     At all times relevant to this Complaint, Defendants were bound by the WhatsApp Terms.

**E.     Defendants Accessed and Used Plaintiffs' Servers Without Authorization and Infected Target Users' Devices With Malware**

**1.     Overview**

32.     Defendants took a number of steps, using WhatsApp servers and the WhatsApp Service without authorization, to send discrete malware components ("malicious code") to Target Devices. *First*, Defendants set up various computer infrastructure, including WhatsApp accounts and remote servers, used to infect the Target Devices and conceal Defendants' identity and involvement.  *Second*, Defendants used and caused to be used WhatsApp accounts to initiate calls through Plaintiffs' servers that were designed to secretly inject malicious code onto Target Devices.  *Third*, Defendants caused the malicious code to execute on some of the Target Devices, creating a connection between those Target Devices and computers controlled by Defendants (the "remote servers").  *Fourth*, on information and belief, Defendants caused Target Devices to download and install additional malware—believed to be Pegasus or another remote access trojan developed by Defendants—from the remote servers for the purpose of accessing data and communications on Target Devices.

**2.     Defendants Set Up Computer Infrastructure Used to Infect the Target Devices**

33.     Between approximately January 2018 and May 2019, Defendants created WhatsApp accounts that they used and caused to be used to send malicious code to Target Devices in April and May 2019.  The accounts were created using telephone numbers registered in different counties, including Cyprus, Israel, Brazil, Indonesia, Sweden, and the Netherlands.

34.     Beginning no later than 2019, Defendants leased and caused to be leased servers and internet hosting services in different countries, including the United States, in order to connect the

Target Devices to a network of remote servers intended to distribute malware and relay commands to the Target Devices. This network included proxy servers and relay servers (collectively, "malicious servers"). The malicious servers were owned by Choopa, Quadranet, and Amazon Web Services ("AWS"), among others. The IP address of one of the malicious servers was previously associated with subdomains used by Defendants.

### 3. Defendants' Unauthorized Access of Plaintiff's Servers

35. On information and belief, Defendants reverse-engineered the WhatsApp app and developed a program to enable them to emulate legitimate WhatsApp network traffic in order to transmit malicious code—undetected—to Target Devices over WhatsApp servers. Defendants' program was sophisticated, and built to exploit specific components of WhatsApp network protocols and code. Network protocols generally define rules that control communications between network computers, including protocols for computers to identify and connect with other computers, as well as formatting rules that specify how data is packaged and transmitted.

36. In order to compromise the Target Devices, Defendants routed and caused to be routed malicious code through Plaintiffs' servers—including Signaling Servers and Relay Servers— concealed within part of the normal network protocol. WhatsApp's Signaling Servers facilitated the initiation of calls between different devices using the WhatsApp Service. WhatsApp's Relay Servers facilitated certain data transmissions over the WhatsApp Service. Defendants were not authorized to use Plaintiffs' servers in this manner.

37. Between approximately April and May 2019, Defendants used and caused to be used, without authorization, WhatsApp Signaling Servers, in an effort to compromise Target Devices. To avoid the technical restrictions built into WhatsApp Signaling Servers, Defendants formatted call initiation messages containing malicious code to appear like a legitimate call and concealed the code within call settings. Disguising the malicious code as call settings enabled Defendants to deliver it to the Target Device and made the malicious code appear as if it originated from WhatsApp Signaling Servers. Once Defendants' calls were delivered to the Target Device, they injected the malicious code into the memory of the Target Device—even when the Target User did not answer the call.

38.     For example, on May 9, 2019, Defendants used WhatsApp servers to route malicious code, which masqueraded as a series of legitimate calls and call settings, to a Target Device using telephone number (202) XXX-XXXX.  On information and belief, the malicious code concealed within the calls was then installed in the memory of the Target Device.

39.     Between April and May 2019, Defendants also used and caused to be used WhatsApp's Relay Servers without authorization to send encrypted data packets designed to activate the malicious code injected into the memory of the Target Devices.  When successfully executed, the malicious code caused the Target Device to send a request to one of the malicious servers controlled by Defendants.

40.     On information and belief, the malicious servers connected the Target Devices to remote servers hosting Defendants' malware.  The malicious code on the Target Devices then downloaded and installed Defendants' malware from those servers.

41.     On information and belief, after it was installed, Defendants' malware was designed to give Defendants and their customers access to information and data stored on the Target Devices, including their communications.

42.     Between approximately April 29, 2019, and May 10, 2019, Defendants caused their malicious code to be transmitted over WhatsApp servers in an effort to infect approximately 1,400 Target Devices.  The Target Users included attorneys, journalists, human rights activists, political dissidents, diplomats, and other senior foreign government officials.

43.     The Target Users had WhatsApp numbers with country codes from several countries, including the Kingdom of Bahrain, the United Arab Emirates, and Mexico.  According to public reporting, Defendants' clients include, but are not limited to, government agencies in the Kingdom of Bahrain, the United Arab Emirates, and Mexico as well as private entities.[2]

---

[2] *See* Fast Company, "Israeli cyberweapon targeted the widow of a slain Mexican journalist" (March 20, 2019), *available at* https://www.fastcompany.com/90322618/nso-group-pegasus-cyberweapon-targeted-the-widow-of-a-slain-mexican-journalist; New York Times, "Hacking a Prince, and Emir and a Journalist to Impress a Client" (August 31, 2018), *available at* https://www.nytimes.com/2018/08/31/world/middleeast/hacking-united-arab-emirates-nso-group.html; The Guardian, "Israeli firm linked to WhatsApp spyware attack faces lawsuit" (May 18, 2019), *available at* https://www.theguardian.com/world/2019/may/18/israeli-firm-nso-group-linked-to-whatsapp-spyware-attack-faces-lawsuit.

44. On or about May 13, 2019, Facebook publicly announced that it had investigated and identified a vulnerability involving the WhatsApp Service (CVE-2019-3568). WhatsApp and Facebook closed the vulnerability, contacted law enforcement, and advised users to update the WhatsApp app.

45. Defendants subsequently complained that WhatsApp had closed the vulnerability. Specifically, NSO Employee 1 stated, "You just closed our biggest remote for cellular . . . It's on the news all over the world."

## F. Defendants' Unlawful Acts Have Caused Damage and Loss to WhatsApp and Facebook

46. Defendants' actions and omissions interfered with the WhatsApp Service and burdened Plaintiffs' computer network.

47. Defendants' actions injured Plaintiffs' reputation, public trust, and goodwill.

48. Defendants have caused Plaintiffs damages in excess of $75,000 and in an amount to be proven at trial.

## FIRST CAUSE OF ACTION

### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

49. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

50. At various times between April 29, 2019, and May 10, 2019, Defendants accessed, used, or caused to be accessed or used Plaintiffs' Signaling Servers and Relay Servers without authorization in an effort to compromise approximately 1,400 Target Devices.

51. Plaintiffs' Signaling Servers and Relay Servers and the Target Devices were "computers" as defined by 18 U.S.C. § 1030(e)(1).

52. Plaintiffs' Signaling Servers and Relay Servers and the Target Devices were "protected computers" as defined by 18 U.S.C. § 1030(e)(2)(B) because they are "used in or affecting interstate or foreign commerce or communication."

53. Defendants violated 18 U.S.C. § 1030(a)(2) because they intentionally accessed and caused to be accessed (a) Plaintiffs' computers, and (b) Target Devices, without authorization and, on information and belief, obtained data from the Target Devices.

54.     Defendants violated 18 U.S.C. § 1030(a)(4) because they knowingly and with intent to defraud accessed and caused to be accessed (a) Plaintiffs' protected computers and (b) Target Devices without authorization, and by means of such conduct furthered the intended fraud and obtained something of value.  Defendants' fraud included falsely agreeing to the WhatsApp Terms, sending unauthorized commands to Plaintiffs' computers and concealing the commands as legitimate network traffic, in order to gain access of the Target Devices without the Target Users' knowledge or consent.  As a result of the fraud, Defendants obtained money, customers, remote access and control of the Target Devices, data from the Target Devices, and unauthorized use of the WhatsApp service, the value of which exceeds $5,000.

55.     Defendants violated 18 U.S.C. § 1030(b) by conspiring and attempting to commit the violations alleged in the preceding paragraphs.

56.     Defendants' conduct caused a loss to Plaintiffs and the Target Users in excess of $5,000 during a one-year period.

57.     Defendants' actions caused Plaintiffs to incur a loss as defined in 18 U.S.C. § 1030(e)(11), including the expenditure of resources to investigate and remediate Defendants' fraud and unauthorized access.  Plaintiffs are entitled to be compensated for losses and damages, and any other amount to be proven at trial.

## SECOND CAUSE OF ACTION

(California Comprehensive Computer Data Access and Fraud Act,
California Penal Code § 502)

58.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

59.     Defendants knowingly accessed and without permission altered and used Plaintiffs' data, computer, computer system, and computer network in order to (a) devise and execute a scheme and artifice to defraud and deceive, and (b) wrongfully control and obtain money, property, and data in violation of California Penal Code § 502(c)(1).

60.     Defendants knowingly and without permission used and caused to be used WhatsApp Signaling Servers and Relay Servers, including servers located in California, in violation of California Penal Code § 502(c)(3).

61.     Defendants knowingly and without permission provided and assisted in providing a means of accessing Plaintiffs' computers, computer systems, and computer networks, including those located in California, in violation of California Penal Code § 502(c)(6).

62.     Defendants knowingly and without permission accessed and caused to be accessed Plaintiffs' computers, computer systems, and computer networks, including those located in California, in violation of California Penal Code § 502(c)(7).

63.     Defendants knowingly introduced a computer contaminant into Plaintiffs' computers, computer systems, and computer networks in violation of California Penal Code § 502(c)(8).

64.     Defendants' actions caused Plaintiffs to incur losses and damages, including, among other things, the expenditure of resources to investigate and remediate Defendants' conduct, damage to Plaintiffs' reputation, and damage to the relationships and goodwill between Plaintiffs and their users and potential users. Plaintiffs have been damaged in an amount to be proven at trial.

65.     Because Plaintiffs suffered damages and a loss as a result of Defendants' actions and continue to suffer damages as result of Defendants' actions, Plaintiffs are entitled to compensatory damages, attorneys' fees, and any other amount of damages to be proven at trial, as well as injunctive relief under California Penal Code §§ 502(e)(1) and (2).

66.     Because Defendants willfully violated California Penal Code § 502, and there is clear and convincing evidence that Defendants acted with malice and oppression and committed "fraud" as defined by section 3294 of the Civil Code, Plaintiffs are entitled to punitive and exemplary damages under California Penal Code § 502(e)(4).

## THIRD CAUSE OF ACTION

### (Breach of Contract)

67.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

68.     Access to and use of WhatsApp is governed by the WhatsApp's Terms and related WhatsApp policies.

69.     Defendants agreed to and became bound by the WhatsApp's Terms when they used WhatsApp and the WhatsApp Service.

70.     WhatsApp and Facebook have performed all conditions, covenants, and promises required of it in accordance with the WhatsApp's Terms.

71.     Defendants' violations of the WhatsApp's Terms have directly and proximately caused and continue to cause harm and injury to WhatsApp.

72.     When Defendants agreed to and became bound by the WhatsApp Terms, both Plaintiffs and Defendants knew or could have reasonably foreseen that the harm and injury to Plaintiffs was likely to occur in the ordinary course of events as a result of Defendants' breach.

73.     Defendants' actions caused Plaintiffs to incur losses and other economic damages, including, among other things, the expenditure of resources to investigate and remediate Defendants' conduct, damage to Plaintiffs' reputation, and damage to the relationships and goodwill between Plaintiffs and their users and potential users. Plaintiffs have been damaged in an amount to be proven at trial, and in excess of $75,000.

## FOURTH CAUSE OF ACTION

### (Trespass to Chattels)

74.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

75.     At all times mentioned in this Complaint, Plaintiffs had legal title to and actual possession of their computer systems.

76.     Defendants intentionally and without authorization interfered with Plaintiffs' possessory interest in their computer systems, including by accessing and using Plaintiffs' servers to transmit malicious code for the purpose of unlawfully compromising Target Users' devices, all without authorization from Plaintiffs and Target Users.

77.     Defendants' access to Plaintiffs' computer systems exceeded the scope of the conditional access that Plaintiffs grant to legitimate users of the WhatsApp Service.

78.     Defendants' actions caused Plaintiffs to incur losses and other economic damages, including, among other things, the expenditure of resources to investigate and remediate Defendants' conduct, damage to Plaintiffs' reputation, and damage to the relationships and goodwill between Plaintiffs and their users and potential users. Plaintiffs have been damaged in an amount to be proven at trial, and in excess of $75,000.

# REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment against Defendants as follows:

1. That the Court enter judgment against Defendants that Defendants have:

    a. Violated the Computer Fraud and Abuse Act, in violation of 18 U.S.C. § 1030;

    b. Violated the California Comprehensive Computer Data Access and Fraud Act, in violation California Penal Code § 502;

    c. Breached their contracts with WhatsApp in violation of California law;

    d. Wrongfully trespassed on Plaintiffs' property in violation of California law.

2. That the Court enter a permanent injunction enjoining and restraining Defendants and their agents, servants, employees, successors, and assigns, and all other persons acting in concert with or conspiracy with any of them or who are affiliated with Defendants from:

    a. Accessing or attempting to access WhatsApp's and Facebook's service, platform, and computer systems;

    b. Creating or maintaining any WhatsApp or Facebook account;

    c. Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Plaintiffs' service, platform, and computer systems; and

    d. Engaging in any activity, or facilitating others to do the same, that violates WhatsApp's or Facebook's Terms;

3. That WhatsApp and Facebook be awarded damages, including, but not limited to, compensatory, statutory, and punitive damages, as permitted by law and in such amounts to be proven at trial.

4. That WhatsApp and Facebook be awarded their reasonable costs, including reasonable attorneys' fees.

5. That WhatsApp and Facebook be awarded pre- and post-judgment interest as allowed by law.

6. That the Court grant all such other and further relief as the Court may deem just and proper.

**PLAINTIFFS RESPECTFULLY DEMAND A JURY TRIAL.**

Dated:  October 29, 2019                    Respectively submitted,

                                            COOLEY LLP


                                            /s/ Travis LeBlanc
                                            Travis LeBlanc
                                            Daniel J. Grooms
                                            Joseph D. Mornin

                                            Attorneys for Plaintiffs
                                            WHATSAPP INC. and FACEBOOK, INC.

                                            Platform Enforcement and Litigation
                                            Facebook, Inc.
                                            Jessica Romero
                                            Tyler Smith
                                            Michael Chmelar
                                            Bridget Freeman

EXHIBIT 1

| Ministry of Justice | [emblem] | Registrar of Companies |
|---|---|---|

**State of Israel**
**Companies Law, 5760-1999**

# <u>Company Incorporation Certificate</u>

**This is to certify that**

> **N.S.O. GROUP TECHNOLOGIES LTD**
> [bilingual text]

**got incorporated and registered according to the Companies Law as a Limited Liability Company**

25/01/2010
10th of Sh'vat, 5770

**Company no. 514395409**

[stamp:]
Ministry of Justice
Registrar of Companies
[emblem:] State of Israel
[signature]
Einat Messika, Adv.
Registrar of Companies

[stamp:]
[logo]
Corporations Authority
A confirmation that this document has
been signed electronically, it is a copy of
the document (original or copy) that is in
the file of the Corporations Authority on
the day of the signature

[emblem:] State of Israel
Ministry of Justice
This document is a copy scanned in its entirety on the indicated day and hour, via trusted digital scanning of the document found in the file, in accordance to the inspection regulation at the Ministry of Justice.


Signed by
Ministry of Justice (institutional signature).

| |
|---|
| [stamp:] |
| [logo] |
| Corporations Authority |
| A confirmation that this document has been signed electronically, it is a copy of the document (original or copy) that is in the file of the Corporations Authority on the day of the signature |

EXHIBIT 2

09/25/2019 - Screenshot from https://www.documentcloud.org/documents/6401851-NSO-Emails-with-DEA.html



**From:** ▮
**Sent:** Wednesday, June 04, 2014 8:35 AM
**To:** ▮
**Subject:** FW: Meeting request from ▮

▮ Attached is the information ▮ provided us with the other day. Please stop by after today's 8:30 meeting so we can discuss this and the AG/DAG heroin briefing tasks. Thanks.

**From:** ▮
**Sent:** Friday, May 30, 2014 10:14 AM
**To:** Benson, Rodney G.
**Cc:** ▮
**Subject:** Meeting request from ▮

Mr. Benson;

Hope you are well. Thank you for your service at DEA. I have a special appreciation for your work. ▮

▮ I have been a Senior Advisor at Dickstein, Shapiro. One of my clients is a company called Westbridge. It is an American owned company associated with an Israeli company called NSO. I have attached a company brochure; product presentation and company profile. I think if you will look at the product presentation you will agree that their technology has remarkable intelligence applications.

The co-founder of the company, Omri Lavie, will be in DC on June 11th and the morning of June 12th. I would respectfully request that if your schedule permits that you grant a meeting to Mr. Lavie.

While I have a previous out of town appointment on those days, my colleague, ▮ would be able to accompany Mr. Lavie.

I know your schedule is packed but it would be a great favor if you can find an opening to meet with the Westbridge folks.

High regards- ▮

▮
**Senior Advisor** ▮
**Dickstein Shapiro LLP**
**1825 Eye Street NW | Washington, DC 20006**
**Tel (202** ▮ **/ Fax (202)** ▮
▮

* All Materials included in this email are property of NSO Group Ltd. and are strictly confidential  * 2014 *
[cid:image001.jpg@01CF4DCA.CCACE850]

2

Page 33

EXHIBIT 3



November 2014

Dear all,

I want to take this opportunity to thank you for investing your time with us. The numerous meetings and exchanges we had with your team have provided us with valuable feedbacks and information as Westbridge further establishes itself in the US market.

As previously discussed, we are confident that there could be a great value to a future partnership between your organization and Westbridge with its unique solution.

The Westbridge team and myself are available at any time, should you have any inquiries.

Best regards,

Omri Lavie |Co-Founder, CEO

Westbridge Technologies Inc.

Copyright 2014 WestBridge. All rights reserved.       info@westbrg.com

Page 162

EXHIBIT 4



**FP**
FRANCISCO PARTNERS

Transformational Capital
*for technology companies*

about / **team** / investments / *news* / contact

*Press Release*

← Back to News

# NSO Group Acquired by its Management

PRESS RELEASE - FEBRUARY 14 2019

• The founders and management team of NSO Group, a cyber-technology company headquartered in Luxembourg, acquire the company

• The management team is supported by European private equity firm Novalpina Capital

The management team and founders of NSO Group today announced the acquisition of the company from global private equity firm Francisco Partners.

NSO Group develops technology that helps government intelligence and law enforcement agencies prevent and investigate terrorism and crime to save lives. Established from the combination of Israeli and European cyber technology companies, NSO Group has since become a global leader in providing cyber intelligence and analytics solutions to governments. The company has grown rapidly and finished 2018 with revenues of $250 million, and dozens of licensed customers.

The acquisition is led by NSO Group co-founders Shalev Hulio and Omri Lavie, together with members of the company's senior executive team. A significant number of employees will participate in the acquisition. The founders and management team are supported in the acquisition by Novalpina Capital, a European private equity firm. Jefferies Group LLC is advising and leading the financing.

**Shalev Hulio, Founder and Chief Executive Officer of NSO Group,** said: "This is an important and significant milestone for NSO. I am proud of what the company and our employees have achieved since we were founded in 2010. Together we have built an amazing technology company that is making the world a safer place. As we look forward, we are delighted that Novalpina is joining as our equity partner. Together we can take NSO Group to the next level, launching new cutting-edge products that help our customers reduce the threats from terrorism and crime. I want to thank Francisco Partners for its tremendous support over the past few years. Its guidance has been instrumental to the success of the company."

**Eran Gorev, Operating Partner at Francisco Partners and Chairman of NSO Group,** said: "We are very proud of the company's contribution to the global war against terrorism and crime, and the many thousands of lives that have been saved thanks to the company's technology. Since our investment in NSO Group, the company has continued to develop its outstanding technological capabilities and has more than quadrupled in size, while implementing a best-in-class business ethics framework and bringing in independent experts to ensure the company was operating in accordance with the highest ethical standards. We would like to thank all the amazing employees of NSO Group for their incredible contribution to the company and to making the world a safer place, and to wish them a highly successful future."

**Stefan Kowski, Partner at Novalpina Capital,** said: "NSO Group has an impressive management team that has developed best-in-class, proprietary technologies sold to

management team that has developed best-in-class, proprietary technologies sold to approved governments and intelligence agencies to help tackle terrorism and organised crime. We look forward to supporting NSO's leadership as they continue to grow the business."

**About NSO Group**

NSO Group is a global leader in the world of cyber-intelligence, data acquisition and analysis. The company's mission is to equip select intelligence agencies and law enforcement organizations around the world with strategic, tactical and analytical technological capabilities required to ensure the success of their operations in fighting crime and terrorism.

NSO Group solutions are developed and maintained by a team of cyber-intelligence and cellular-communication experts who operate at the forefront of their fields. Their designs constantly evolve to keep pace with an ever-changing cyber world.

NSO Group is committed to the proper use of its technology to help governments strengthen public safety and protect against major security threats. NSO Group's advanced intelligence solutions are used globally and play a major role in preventing terror activities, combating human trafficking and the war on drugs.

**About Francisco Partners**

Francisco Partners is a leading global private equity firm that specializes in investments in technology and technology-enabled services businesses. Since its launch over 18 years ago, Francisco Partners has raised over $14 billion in capital and invested in more than 200 technology companies, making it one of the most active and longstanding investors in the technology industry. The firm invests in opportunities where its deep sectoral knowledge and operational expertise can help companies realize their full potential. For more information on Francisco Partners, please visit www.franciscopartners.com

**About Novalpina Capital**

Novalpina Capital is an independent European private equity firm that invests in middle market companies. The Firm was founded by Stephen Peel, Stefan Kowski and Bastian Lueken in 2017. The founding partners bring more than 50 years of combined experience in private equity investing, having held senior positions in the European operations of firms including TPG, Centerbridge and Platinum Equity, and worked together for nearly a decade at TPG.

---

Francisco Partners

©2019 All Rights Reserved
Sitemap
Legal
Privacy Policy

**San Francisco Office**

One Letterman Drive
Building C - Suite 410
San Francisco, CA 94129
+1 (415) 418 2900 Telephone
Google Maps

**London Office**

207 Sloane Street, 2nd Floor
London, SW1X 9QX
+44 (020) 7907 8600 Telephone
Google Maps

**New York Office**

1114 Avenue Of The Americas,
15th Floor
New York, NY 10110
+1 (646) 434 1343 Telephone
Google Maps

**General Inquiries**

Email Us
Directory

**Client Login**

Login →

a **FINE** site

Transformational Capital *for technology companies*

EXHIBIT 5

[emblem:]
State of Israel

**State of Israel**
**Ministry of Justice**
**Corporations Authority**
**Registrar of Companies**

[logo:]
[text cut off]
[barcode:] 17042-905

## Private Company Annual Report

(Section 141 of the Companies Law 5759-1999 (hereinafter: "the Law"))

**The data can be typed in or filled out in clear handwriting <u>without using black ink.</u>**

| Company name<br>NSO Group Technologies Ltd. | Company number<br>514395409 | Address of the registered office[1]<br>22 Galgalei Haplada, Hertsliya, Israel 4672222 |
|---|---|---|
| **Telephone** | | **Company Email (if any)** |
| **The report is updated as of (state the date of signing the report in order to submit it to the Registrar of Companies)**<br>[hw:] *7/1/19* | | **Annual meeting was conducted on the day[2]**<br><br>7.1.2019 |

## Share Capital Distribution

| Total registered capital of the company<br><br>10,000 | Share name and its set value<br>(for shares with set value)<br>Ordinary, set value – 0.01<br>Ordinary A, set value – 0.01<br>Preferred A, set value – 0.01 | Share type<br><br>Ordinary<br>Ordinary A<br>Preferred A |
|---|---|---|
| **Number of shares in the registered capital**<br><br>Ordinary – 548,940<br>Ordinary A – 26,290<br>Preferred A – 424,770 | **Number of allotted shares**<br><br>Ordinary – 185,716<br>Ordinary A – 8,936<br>Preferred A – 295,170 | **Share value**<br><br>0.01 |

## Shareholders and their shares

| Shareholder name<br>Q Cyber Technologies Ltd<br><br>**Type of shares**<br>Ordinary<br>Ordinary A<br>Preferred A | ID number[3]<br>514971522<br><br>**Number of shares**<br>118,263<br>8,936<br>295,170 | Address (city, street, house no., zip code)<br>22 Galgalei Haplada, Hertsliya, Israel Zip Code<br>4672222<br>**Unpaid amount in exchange for the shares** |
|---|---|---|
| **Shareholder name**<br>NSO Group Technologies Ltd.<br><br>**Type of shares**<br>Ordinary | **ID number[3]**<br>514395409<br><br>**Number of shares**<br>67,453 | **Address (city, street, house no., zip code)**<br>22 Galgalei Haplada, Hertsliya, Israel Zip Code<br>4672222<br>**Unpaid amount in exchange for the shares** |

[stamp:]
State of Israel, Corporations Authority
Ministry of Justice, Corporations Authority
Public Service – Jerusalem Region

28-02-2019

RECEIVED

---

[1] Listing a P.O. Box as the company's address is not enough.

[2] The last date on which the annual meeting was conducted, indicate below in the appropriate place whether the company is exempt from conducting annual meetings according to Section 61 of the Law.

[3] A non-holder of the Israeli ID shall indicate his passport number and the country it was issued in, and in the first report of this person, a copy shall be attached, as stated in Regulation 16 of the Companies Regulations (reporting, registration details and forms), 5760-1999. If the shareholder is a corporation, a registration number of the corporation shall be indicated, and if it is a foreign corporation, the copy of incorporation certificate and the required certificates as stated in Regulation 16, shall be attached in the first report of the corporation.

[stamp:]
Corporations Authority
A confirmation that this document has been signed electronically, it is a copy of the document (original or copy) that is in the file of the Corporations Authority on the day of the signature

| State of Israel | Ministry of Justice | Corporations Authority |
|---|---|---|
| | Corporations Authority | |
| | Registrar of Companies | |

## Bearer Shares for the period

**\* Fill out if bearer shares have been issued before 17.09.2016, and the update has not been performed as stated below:**

In accordance with the Amendment no. 28 to the Companies Law 5759-1999, which came into force on 17.09.2016, bearer shares can be no longer issued. A holder of bearer shares issued on the eve of the law coming into force shall be entitled to return the banknote to the company, and the company shall cancel it and issue a share for him that is registered in the Registry of Shareholders of the Company. A bearer share that is not returned as stated shall become a frozen share, as stated in Section 308 of the Law, and it shall not grant him rights until the date stated on the share, which will be recorded in the Registry of Shareholders of the Company.

| Total bearer shares for the period | No. of shares in each note | Note no. |
|---|---|---|
| | | |
| | | |

## Details of active directors

| Director name | ID number | Starting date as a director (year, month, day) |
|---|---|---|
| Q Cyber Technologies Ltd | 514971522 | 19/3/2014 |

| Address (city, street, house no., zip code) |
|---|
| 22 Galgalei Haplada, Hertsliya, Israel 4672222 |

## Details of directors who stopped their activity (since the date of the previous annual report)

| Director name | ID number | End date as a director (year, month, day) |
|---|---|---|
| Director name | ID number | End date as a director (year, month, day) |
| Director name | ID number | End date as a director (year, month, day) |
| Director name | ID number | End date as a director (year, month, day) |

<u>Mark the appropriate option with X:</u>

   No change has occurred in the details that were reported regarding the foreign directors according to Regulation 16 from the mentioned regulations.

   Change has occurred in the details that were reported regarding the foreign directors, and the documents required under Regulation 16 have been attached to the annual report.

## Authorized party to report to the registrar on behalf of the company, according to Section 39 of the Law

**Filling out the details of the authorized party to report according to Section 39 in this Form will allow the party whose details are entered here to relay updates about the company in a digital manner.**
**For more information, see:** http://www.justice.gov.il/Units/RasutHataagidim/units/RashamHachvarot/TfasimNew/Pages/Online.aspx

| Full name | ID number | Position in the company |
|---|---|---|
| [hw:] [illegible] *Idisis* | *032063521* | *Financial director* |

| [stamp:] |
|---|
| [logo] |
| Corporations Authority |
| A confirmation that this document has been signed electronically, it is a copy of the document (original or copy) that is in the file of the Corporations Authority on the day of the signature |

EXHIBIT 6

[emblem:]                    **State of Israel**                    [logo:]
**State of Israel**    **Ministry of Justice – Corporations Authority**    **Corporations Authority**
                  **Registrar of Companies and Partnerships**

# <u>Company Incorporation Certificate</u>

This is to certify that the company:

---

### L.E.G.D. COMPANY LTD

[bilingual text]

**whose number is 514971522**

---

got incorporated and registered on 02/12/2013 - 29th of Kislev 5774,
according to the Companies Law, 5760-1999, as a Limited Liability Company.

**Issued in Jerusalem on:**

02/12/2013
29th of Kislev 5774

[signature]
Zohar Horan
**Corporations Authority**
**Registrar of Companies and Partnerships**

[stamp:]
Ministry of Justice
Registrar of Companies
and Partnerships
[emblem:] State of Israel

[stamp:]
[logo]
Corporations Authority
A confirmation that this document has
been signed electronically, it is a copy of
the document (original or copy) that is in
the file of the Corporations Authority on
the day of the signature

[emblem:] State of Israel

Ministry of Justice

This document is a copy scanned in its entirety on the indicated day and hour, via trusted digital scanning of the document found in the file, in accordance to the inspection regulation at the Ministry of Justice.

Signed by
Ministry of Justice (institutional signature).

| |
|---|
| [stamp:]<br>[logo]<br>Corporations Authority<br>A confirmation that this document has been signed electronically, it is a copy of the document (original or copy) that is in the file of the Corporations Authority on the day of the signature |

PUBLIC0637849

EXHIBIT 7

[emblem:]                      **State of Israel**                      [logo:]
**State of Israel**   **Ministry of Justice – Corporations Authority**   **Corporations Authority**
                    **Registrar of Companies and Partnerships**

[stamp:]
**Document Start**

# **Company Name Change Certificate**

This is to certify that the company

**L.E.G.D. COMPANY LTD**

[bilingual text]

**whose number is 514971522**

has changed its name, and it shall be called from now on

**Q CYBER TECHNOLOGIES LTD**

[bilingual text]

**Issued in Jerusalem on**

29/05/2016
21st of Iyyar, 5776

[stamp:]
[emblem:] State of Israel
**Ministry of Justice**
**Registrar of Companies and**
**Partnerships**

[signature]
Eyal Globus, Adv.
Registrar of Companies and Partnerships
Head of Corporations Authority

[stamp:]
[logo]
Corporations Authority
A confirmation that this document has
been signed electronically, it is a copy of
the document (original or copy) that is in
the file of the Corporations Authority on
the day of the signature

Issued by Eyal Goldring

EXHIBIT 8

06/26/19 - web.archive.org screenshot of nsogroup.com

https://www.nsogroup.com/    Go

100 captures
5 Jan 2011 ~ 31 Aug 2019

MAY    JUN    JUL
26
2012   2019   2020

About this capture

## OUR TECHNOLOGY

# Helping Governments Maintain Public Safety

NSO Group, a Q Cyber Technologies company, develops best-in-class technology to help government agencies detect and prevent a wide-range of local and global threats.

Our products help government intelligence and law-enforcement agencies use technology to meet the challenges of encryption to prevent and investigate terror and crime.

NSO technology is designed by telecommunications and intelligence experts who, positioned at the forefront of their fields, are dedicated to keeping pace with the ever-changing cyber world.

**LEARN MORE**

EXHIBIT 9

[emblem:]
State of Israel

State of Israel
Ministry of Justice
Corporations Authority
Registrar of Companies

[text cut off]
[barcode:] 17903-560

## Private Company Annual Report

(Section 141 of the Companies Law 5759-1999 (hereinafter: "the Law"))

**The data can be typed in or filled out in clear handwriting without using black ink.**

| Company name | Company number | Address of the registered office[1] |
|---|---|---|
| Q Cyber Technologies Ltd | 514971522 | 22 Galgalei Haplada, Hertsliya, Israel 4672222 |

| Telephone | Company Email (if any) |
|---|---|
| **The report is updated as of (state the date of signing the report in order to submit it to the Registrar of Companies)** [hw:] *16/6/19* | **Annual meeting was conducted on the day[2]** 7.1.2019 |

## Share Capital Distribution

| Total registered capital of the company | Share name and its set value (for shares with set value) | Share type |
|---|---|---|
| 100,000 | Ordinary, set value – 0.01 | Ordinary |
| **Number of shares in the registered capital** | **Number of allotted shares** | **Share value** |
| Ordinary – 10,000,000 | Ordinary – 100,000 | 0.01 |

## Shareholders and their shares

| Shareholder name | ID number[3] | Address (city, street, house no., zip code) |
|---|---|---|
| OSY TECHNOLOGIES S.A.R.L. | B184226 | Luxembourg |
| **Type of shares** Ordinary | **Number of shares** 100,000 | **Unpaid amount in exchange for the shares** |

## Bearer Shares for the period*

**\* Fill out if bearer shares have been issued before 17.09.2016, and the update has not been performed as stated below:**

In accordance with the Amendment no. 28 to the Companies Law 5759-1999, which came into force on 17.09.2016, bearer shares can be no longer issued. A holder of bearer shares issued on the eve of the law coming into force shall be entitled to return the banknote to the company, and the company shall cancel it and issue a share for him that is registered in the Registry of Shareholders of the Company. A bearer share that is not returned as stated shall be come a frozen share, as stated in Section 308 of the Law, and it shall not grant him rights until the date stated on the share, which will be recorded in the Registry of Shareholders of the Company.

---

[1] Listing a P.O. Box as the company's address is not enough.

[2] The last date on which the annual meeting was conducted. Indicate below in the appropriate place whether the company is exempt from conducting annual meetings according to Section 61 of the Law.

[3] A non-holder of the Israeli ID shall indicate his passport number and the country it was issued in, and in the first report of the corporation, copies of the required certificates as stated in Regulation 16, shall be attached in the first report of the corporation.

[stamp:]
[logo]
Corporations Authority
confirmation that this document has been signed electronically, this a copy of the document (original or copy) and is in the file of the Corporations Authority on the day of the signature

[diagonal stamp:] Ministry of Justice ~ Corporations Authority ~ Jerusalem Region 17-06-2019 RECEIVED

| Total bearer shares for the period | No. of shares in each note | Note no. |
|---|---|---|
| | | |
| | | |

## Details of active directors

| Director name | ID number | Starting date as a director (year, month, day) |
|---|---|---|
| OSY TECHNOLOGIES S.A.R.L. | B184226 | 17/3/2014 |

| Address (city, street, house no., zip code) |
|---|
| Luxembourg |

## Details of directors who stopped their activity (since the date of the previous annual report)

| Director name | ID number | End date as a director (year, month, day) |
|---|---|---|
| Director name | ID number | End date as a director (year, month, day) |
| Director name | ID number | End date as a director (year, month, day) |
| Director name | ID number | End date as a director (year, month, day) |

**Mark the appropriate option with X:**

    No change has occurred in the details that were reported regarding the foreign directors according to Regulation 16 from the mentioned regulations.

    Change has occurred in the details that were reported regarding the foreign directors, and the documents required under Regulation 16 have been attached to the annual report.

## Authorized party to report to the registrar on behalf of the company, according to Section 39 of the Law

**Filling out the details of the authorized party to report according to Section 39 in this Form will allow the party whose details are entered here to relay updates about the company in a digital manner.**
**For more information, see:** http://www.justice.gov.il/Units/RasutHataagidim/units/RashamHachvarot/TfasimNew/Pages/Online.aspx

| Full name | ID number | Position in the company |
|---|---|---|
| Yifa Idisis | 032063521 | Financial director |

**Fulfillment of the instructions of Section 171 (C) of the Law**
    The Board of Directors has approved the financial reports __ (mark **X** if done).

**Fulfillment of the instructions of Section 173 of the Law** – (mark the appropriate option with **X**)
    The financial documents have been presented at the last annual meeting as required.
    If the company is not required to conduct annual meetings according to Section 61 (A) of the Law, indicate whether the financial reports have been sent to the shareholders according to Section 61 (A) of the Law.
    The company is not required to submit financial reports at the annual meeting, as stated in Section 172 (G) of the Law.

**Controlling accountant** (mark the appropriate option with **X**).
    The company has a controlling accountant, as stated in Section 154 of the Law.

| |
|---|
| [stamp:]<br>[logo]<br>Corporations Authority<br>A confirmation that this document has been signed electronically, it is a copy of the document (original or copy) that is in the file of the Corporations Authority on the day of the signature |

EXHIBIT 10

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html



# Pegasus – Product Description

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Contents

Introduction ................................................................................................ 1
    Overcoming Smartphone Interception Challenge ................................. 1
    Standard Interception Solutions Are Not Enough ................................. 1
Cyber Intelligence for the Mobile World .................................................. 3
    Benefits of Pegasus ........................................................................... 3
    Technology Highlights ......................................................................... 3
    High Level Architecture ....................................................................... 4
Agent Installation ...................................................................................... 6
    Agent Purpose .................................................................................... 6
    Agent Installation Vectors ................................................................... 6
    Agent Installation Flow ........................................................................ 7
    Supported Operating Systems & Devices ........................................... 8
    Installation Failure .............................................................................. 8
    Remote Installation Benefits ............................................................... 9
Data Collection ......................................................................................... 10
    Initial Data Extraction ......................................................................... 11
    Passive Monitoring ............................................................................. 11
    Active Collection ................................................................................. 11
    Description of Collected Data .............................................................. 12
    Collection Buffer ................................................................................. 15
Data Transmission ................................................................................... 16
    Data Transmission Security ................................................................ 17
    Pegasus Anonymizing Transmission Network .................................... 17
Data Presentation & Analysis ................................................................. 18
    Rules & Alerts .................................................................................... 21
    Data Export ........................................................................................ 22
Agent Maintenance .................................................................................. 23
    Agent Upgrade ................................................................................... 23
    Agent Settings .................................................................................... 23
    Agent Uninstall ................................................................................... 23
Solution Architecture .............................................................................. 25
    Customer Site .................................................................................... 25
    Public Networks ................................................................................. 26
    Target Devices ................................................................................... 27
Solution Hardware ................................................................................... 28
    Operators Terminals .......................................................................... 28
    System Hardware ............................................................................... 28
System Setup and Training ..................................................................... 31
    System Prerequisites .......................................................................... 31
    System Setup ..................................................................................... 31
    Training .............................................................................................. 31
    High Level Deployment Plan ............................................................... 32
    System Acceptance Test (SAT) .......................................................... 33

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

**Maintenance, Support and Upgrades** ......................................................................... **34**

    Maintenance and Support ................................................................ 34

    Upgrades   ........................................................................................ 34

# List of Tables

Table 1: Collection Features Description ........................................................................ 12
Table 2: Presentation of Collected Data ....................................................................... 20
Table 3: Pegasus Deployment Plan .............................................................................. 32

# List of Figures

Figure 1: Pegasus High Level Architecture .................................................................... 5
Figure 2: Agent Installation Flow ................................................................................... 7
Figure 3: Agent Installation Initiation ............................................................................. 8
Figure 4: Collected Data ................................................................................................ 10
Figure 5: Data Transmission Process ............................................................................ 16
Figure 6: Data Transmission Scenarios ......................................................................... 16
Figure 7: Calendar Monitoring ....................................................................................... 18
Figure 8: Call Log & Call Interception ........................................................................... 19
Figure 9: Location Tracking............................................................................................ 19
Figure 10: Solution Architecture .................................................................................... 25
Figure 11: Pegasus Hardware ....................................................................................... 29

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Introduction

Pegasus is a world-leading cyber intelligence solution that enables law enforcement and intelligence agencies to remotely and covertly extract valuable intelligence from virtually any mobile device. This breakthrough solution was developed by veterans of elite intelligence agencies to provide governments with a way to address the new communications interception challenges in today's highly dynamic cyber battlefield. By capturing new types of information from mobile devices, Pegasus bridges a substantial technology gap to deliver the most accurate and complete intelligence for your security operations.

## Overcoming Smartphone Interception Challenge

The rapidly growing and highly dynamic mobile communications market - characterized by the introduction of new devices, operating systems and applications on virtually a daily basis – requires a rethinking of the traditional intelligence paradigm. These changes in the communications landscape pose real challenges and obstacles that must be overcome by intelligence organizations and law enforcement agencies worldwide:

- **Encryption:** Extensive use of encrypted devices and applications to convey messages

- **Abundance of communication applications:** Chaotic market of sophisticated applications, most of which are IP-based and use proprietary protocols

- **Target outside interception domain:** Targets' communications are often outside the organization's interception domain or otherwise inaccessible (e.g., targets are roaming, face-to-face meetings, use of private networks, etc.)

- **Masking:** Use of various virtual identities which are almost impossible to track and trace

- **SIM replacement:** Frequent replacement of SIM cards to avoid any kind of interception

- **Data extraction:** Most of the information is not sent over the network or shared with other parties and is only available on the end-user device

- **Complex and expensive implementation:** As communications become increasingly complex, more network interfaces are needed. Setting up these interfaces with service providers is a lengthy and expensive process, and requires regulation and standardization

## Standard Interception Solutions Are Not Enough

Until the above mentioned challenges are addressed and resolved, criminal and terrorist targets are likely "safe" from standard and legacy interception systems, meaning that valuable intelligence is being lost. These standard solutions (described in the sections below) deliver only partial intelligence, leaving the organizations with substantial intelligence gaps.

### Passive Interception

Passive interception requires very deep and tight relationships with local service providers (cellular, Internet and PSTN providers) and traditionally has allowed for proper monitoring of text messages and voice calls. However, most contemporary communications is comprised of IP-based traffic, which is extremely difficult to monitor with passive interception due to its use of encryption and proprietary protocols.

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

Even when this traffic is intercepted, it typically carries massive amounts of technical data that is not related to the actual content and metadata being communicated. Not only does this result in frustrated analysts and wasted time wading through irrelevant data, it also provides a partial snapshot (at best) of the target's communications. In addition, the number of interfaces required to cover the relevant service providers broadens the circle of entities exposed to sensitive information and increases the chance of leakage.

## Tactical GSM Interception

Tactical GSM interception solutions effectively monitor voice calls and text messages in GSM networks. When advanced cellular technologies are deployed (3G and LTE networks), these solutions become less efficient. In such cases, it is required to violently downgrade the target to a GSM-based network, which noticeably impacts the user experience and functionality.

These solutions also require a well-trained field tactical team located near the monitored target. Thus, in the majority of cases where the target location is unknown, these solutions become irrelevant. In other cases, placing a tactical team close to the target may pose serious risk both to the team and to the entire intelligence operation.

## Malicious Software (Malware)

Malware presumably provides access to the target's mobile device. However, it is not completely transparent and requires the target's involvement to be installed on their devices. This type of engagement usually takes the form of multiple confirmations and approvals before the malware is functional. Most targets are unlikely to be fooled into cooperating with malware due to their high level of sensitivity for privacy in their communications.

In addition, such malware is likely to be vulnerable to most commercially available anti-virus and anti-spyware software. As such, they leave traces and are fairly easily detected on the device.

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Cyber Intelligence for the Mobile World

Pegasus is a world-leading cyber intelligence solution that enables law enforcement and intelligence agencies to remotely and covertly extract valuable intelligence from virtually any mobile device. This breakthrough solution was developed by veterans of elite intelligence agencies to provide governments with a way to address the new communications interception challenges in today's highly dynamic cyber battlefield.

By capturing new types of information from mobile devices, Pegasus bridges a substantial technology gap to deliver the most accurate and complete intelligence for your security operations. This solution is able to penetrate the market's most popular smartphones based on BlackBerry, Android, iOS and Symbian operating systems.

Pegasus silently deploys invisible software ("agent") on the target device. This agent then extracts and securely transmits the collected data for analysis. Installation is performed remotely (over-the-air), does not require any action from or engagement with the target, and leaves no traces whatsoever on the device.

## Benefits of Pegasus

Organizations that deploy Pegasus are able to overcome the challenges mentioned above to achieve unmatched mobile intelligence collection:

- **Unlimited access to target's mobile devices:** Remotely and covertly collect information about your target's relationships, location, phone calls, plans and activities – whenever and wherever they are

- **Intercept calls:** Transparently monitor voice and VoIP calls in real-time

- **Bridge intelligence gaps:** Collect unique and new types of information (e.g., contacts, files, environmental wiretap, passwords, etc.) to deliver the most accurate and complete intelligence

- **Handle encrypted content and devices:** Overcome encryption, SSL, proprietary protocols and any hurdle introduced by the complex communications world

- **Application monitoring:** Monitor a multitude of applications including Skype, WhatsApp, Viber, Facebook and Blackberry Messenger (BBM)

- **Pinpoint targets:** Track targets and get accurate positioning information using GPS

- **Service provider independence:** No cooperation with local Mobile Network Operators (MNO) is needed

- **Discover virtual identities:** Constantly monitor the device without worrying about frequent switching of virtual identities and   replacement of SIM cards

- **Avoid unnecessary risks:** Eliminate the need for physical proximity to the target or device at any phase

## Technology Highlights

The Pegasus solution utilizes cutting-edge technology specially developed by veterans of intelligence and law enforcement agencies. It offers a rich set of advanced features and sophisticated intelligence collection capabilities not available in standard interception solutions:

- Penetrates Android, BlackBerry, iOS and Symbian based devices

- Extracts contacts, messages, emails, photos, files, locations, passwords, processes list and more
- Accesses password-protected devices
- Totally transparent to the target
- Leaves no trace on the device
- Minimal battery, memory and data consumption
- Self-destruct mechanism in case of exposure risk
- Retrieves any file from the device for deeper analysis

# High Level Architecture

The Pegasus system is designed in layers. Each layer has its own responsibility forming together a comprehensive cyber intelligence collection and analysis solution.

The main layers and building blocks of the systems are:

- **Installations:** The Installation layer is in charge of issuing new agent installations, upgrading and uninstalling existing agents.
- **Data Collection:** The Data Collection layer is in charge of collecting the data from the installed device. Pegasus offers comprehensive and complete intelligence by employing four collection methods:
  - **Data Extraction:** Extraction of the entire data that exists on the device upon agent installation
  - **Passive Monitoring:** Monitor new arrival data to the device
  - **Active Collection:** Activate the camera, microphone, GPS and other elements to collect real-time data
  - **Event-based Collection:** Define scenarios that automatically triggers specific data collection
- **Data Transmission:** The Data Transmission layer is in charge of transmitting the collected data back to the command and control servers, using the most efficient and safe way.
- **Presentation & Analysis:** The Presentation & Analysis component is a User Interface that is in charge of presenting the collected data to the operators and analysts, turning the data into actionable intelligence. This is done using the following modules:

  - **Real-Time Monitoring:** Presents real-time collected data from specific or multiple targets. This module is highly important when dealing with sensitive targets or during operational activities, where each piece of information that arrives is crucial for decision making.
  - **Offline Analysis:** Advanced queries mechanism that allows the analysts to query and retrieve any piece of information that was collected. The advanced mechanism provides tools to find hidden connections and information.
  - **Geo-based Analysis:** Presents the collected data on a map and conduct geo-based queries.
  - **Rules & Alerts:** Define rules that trigger alerts based on specific data that arrives or event that occurred.
- **Administration:** The administration component is in charge of managing the entire system permission, security and health:

– **Permission:** The permissions mechanism allows the system administrator to manage the different users of the system. Provide each one of them the right access level only to the data they are allowed to. This allows to define groups in the organization that handle only one or more topics and other groups which handles different topics.

– **Security:** The security module monitors the system security level, making sure the collected data is inserted to the system database clean and safe for future review.

– **Health:** The health component of the Pegasus solution monitor the status of all components making sure everything is working smoothly. It monitors the communication between the different parts, the system performance, the storage availability and alerts if something is malfunction.

The system layers and components are shown in Figure 1.

**Figure 1: Pegasus High Level Architecture**



# Agent Installation

In order to start collecting data from your target's smartphone, a software based component ("Agent") must be remotely and covertly installed on their device.

## Agent Purpose

The "Agent", a software based component, resides on the end point devices of the monitored targets and its purpose is to collect the data it was configured to. The agent is supported on the most popular operating systems: BlackBerry, Android, iOS (iPhone) and Symbian based devices.

Each agent is independent and is configured to collect different information from the device and to transmit it via specific channels in defined timeframes. The data is sent back to the Pegasus servers in a hidden, compressed and encrypted manner.

The agent continuously collects the information from the device and will transmit it once reliable internet connection becomes available.

Communications encryption, the use of many applications and other communications concealing methods are no longer relevant when an agent is installed on the device.

## Agent Installation Vectors

Injecting and installing an agent on the device is the most sensitive and important phase of intelligence operation conducted on the target device. Each installation has to be carefully planned to ensure it is successful. The Pegasus system supports various installation methods. The installation methods variety answers the different operational scenarios which are unique to each customer, resulting in the most comprehensive and flexible solution. Following are the supported installation vectors:

### Remote Installation (range free):

- **Over-the-Air (OTA):** A push message is remotely and covertly sent to the mobile device. This message triggers the device to download and install the agent on the device. During the entire installation process no cooperation or engagement of the target is required (e.g., clicking a link, opening a message) and no indication appears on the device. The installation is totally silent and invisible and cannot be prevented by the target.   This is NSO uniqueness, which significantly differentiates the Pegasus solution from any other solution available in the market.

- **Enhanced Social Engineering Message (ESEM):** In cases where OTA installation method is inapplicable[1], the system operator can choose to send a regular text message (SMS) or an email, luring the target to open it. Single click, either planned or unintentional, on the link will result in hidden agent installation. The installation is entirely concealed and although the target clicked the link they will not be aware that software is being installed on their device.

The chances that the target will click the link are totally dependent on the level of

---

1 e.g., some devices do not support it; some service providers block push messages; target phone number in unknown.

content credibility. The Pegasus solution provides a wide range of tools to compose a tailored and innocent message to lure the target to open the message.

NOTE: Both OTA and ESEM methods require only a phone number or an email address that is used by the target. Nothing else is needed in order to accomplish a successful installation of the Pegasus agent on the device.

## Close to the target (range limited):

- **Tactical Network Element:** The Pegasus agent can be silently injected once the number is acquired using tactical network element such as Base Transceiver Station (BTS). The Pegasus solution leverages the capabilities of such tactical tools to perform a remote injection and installation of the agent. Taking a position in the area of the target is, in most cases, sufficient to accomplish the phone number acquisition. Once the number is available, the installation is done remotely.

- **Physical:** When physical access to the device is an option, the Pegasus agent can be manually injected and installed in less than five minutes. After agent installation, data extraction and future data monitoring is done remotely, providing the same features of any other installation method.

NOTE: Tactical and Physical installations are usually used where no target phone number or email address are available.

## Agent Installation Flow

Remote agent installation flow is shown in Figure 2.

**Figure 2: Agent Installation Flow**



In order to initiate a new installation, the operator of the Pegasus system should only insert the target phone number. The rest is done automatically by the system, resulting in most cases with an agent installed on the target device.

Agent installation initiation is shown in Figure 3.

**Figure 3: Agent Installation Initiation**



# Supported Operating Systems & Devices

| Operating System (OS) | OS Version | Device | Comments |
|---|---|---|---|
| Android | 2.1 – 4.2 | ▪ Samsung Galaxy series<br>▪ Sony Ericsson Xperia series<br>▪ Others (refer to note below) | Support is based on local firmware versions, which must be defined with the customer |
| iOS | 4.x – 6.1.4 | ▪ iPhone 4<br>▪ iPhone 4S<br>▪ iPhone 5 | |
| BlackBerry | 5.0 – 7.1 | ▪ Curve (8520, 9300, 9350, 9360)<br>▪ Bold (9000, 9700, 9780, 9790, 9900, 9930)<br>▪ Torch (9800, 9810, 9850, 9860)<br>▪ Pearl (9100) | |
| Symbian | Version S60 OS9 3rd edition FP1, FP2, 5th edition and Symbian^3 | Variety of devices | Support is based on local firmware versions, which must be defined with the customer |

NOTE: Android-based devices are often added to the supported list. An updated list can be sent upon customer request.

# Installation Failure

The installation can sometimes fail due to following reasons:

1. Unsupported device: the target device is not supported by the system (which appears above).

2. Unsupported OS: the operating system of the target device is not supported by the system.

3. Unsupported browser: the default browser of the device was previously replaced by the target. Installation from browsers other than the device default (and also Chrome for Android based devices) is not supported by the system.

In any of the above mentioned cases, if the operator initiates a remote installation to a non-supported device, operating system or browser, the injection will fail and the installation will be aborted. In these cases the process is finished with an open browser on the target device pointing and showing the URL page which was defined by the operator prior the installation.

The device, OS and browser are identified by the system using their HTTP user agent. If by any reason the user agent was manipulated by the target, the system might fail to correctly identify the device and OS and provide the wrong installation payload. In such case, the injection will fail and the installation will be aborted, showing again the above mentioned URL page.

# Data Collection

Upon successful agent installation, a wide range of data is monitored and collected from the device:

- **Textual:** Textual information includes text messages (SMS), Emails, calendar records, call history, instant messaging, contacts list, browsing history and more. Textual information is usually structured and small in size, therefore easier to transmit and analyze.

- **Audio:** Audio information includes intercepted calls, environmental sounds (microphone recording) and other audio recorded files.

- **Visual:** Visual information includes camera snapshots, photos retrieval and screen capture.

- **Files:** Each mobile device contains hundreds of files, some bear invaluable intelligence, such as databases, documents, videos and more.

- **Location:** On-going monitoring of the device location (Cell-ID and GPS).

The variety of data that is collected by the Pegasus system is shown in Figure 4.

**Figure 4: Collected Data**



The data collection is divided into three levels:

- Initial data extraction
- Passive monitoring
- Active collection

# Initial Data Extraction

Once the agent is successfully injected and installed on the device, the following data that resides and exists on the device can be extracted and sent to the command and control center:

- SMS records
- Contacts details
- Call history (call log)
- Calendar records
- Emails
- Instant Messaging
- Browsing history

As opposed to other intelligence collection solutions which provide only future monitoring of partial communications, Pegasus allows the extraction of all existing data on the device. As a result the organization benefits from accessing historical data about the target, which assists in building a comprehensive and accurate intelligence picture.

NOTE: Initial data extraction is an option and not a must. If the organization is not allowed to access historical data of the target, such option can be disabled and only new arrival data will be monitored by the agent.

# Passive Monitoring

From the point the agent was successfully installed it keeps monitoring the device and retrieves any new record that becomes available in real-time (or at specific condition if configured differently). Below is the full list of data that is monitored by the agent:

- SMS records
- Contacts details
- Call history (call log)
- Calendar records
- Emails
- Instant Messaging
- Browsing history
- Location tracking (Cell-ID based)

# Active Collection

In addition to passive monitoring, upon successful agent installation a wide set of active collection features becomes available. Active collection refers to active requests sent by the operator to collect specific information from the installed device. These set of features are called active, as they carry their collection upon explicit request of the operator. Active collection allows the operator to perform real-time actions on the target device, retrieving unique information from the device and from the surrounding area of the target, including:

- Location tracking (GPS based)

- Voice calls interception
- File retrieval
- Environmental sound recording (microphone recording)
- Photo taking
- Screen capturing

Active collection differentiates Pegasus from any other intelligence collection solution, as the operator controls the information that is collected. Instead of just waiting for information to arrive, hoping this is the information you were looking for, the operator actively retrieves important information from the device, getting the exact information he was looking for.

# Description of Collected Data

The different types of data available for extraction, passive monitoring and active collection with their respective features are listed in Table 1.

Table 1: Collection Features Description

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| Instant Messaging (IM): <br> 1. WhatsApp <br> 2. Viber <br> 3. Skype <br> 4. BlackBerry Messenger (BBM) | Agent extracts and monitors all the incoming and outgoing instant messages to/from the device. <br> Full 1-on-1 conversation extraction and monitoring including group chat. <br> Indication for file transfer (file name). | ✔ | ✔ |
| Location Tracking | The system provide two types of location information about the device: <br> GPS: <br> 1. Upon user request, a defined timeframe for sampling location is opened. GPS data is retrieved when applicable (available reception). In case GPS signal is not accessible, Cell-ID is retrieved. <br> 2. If GPS is disabled by the target, the system enable it for sampling and immediately turn it off <br><br> Cell-ID: <br> Devices constantly transmit their location (Cell-ID) every time they communicate with the server. <br> The retrieved location data is analyzed at the server and placed on map. Location-based queries and alerts are easily set. | ✔ | ✔ |
| Calendar | Agent extracts all the calendar records from the device and monitors any change or new event added to the calendar. | ✔ | ✔ |
| Contact details | Agent extracts all contacts available on the device. From this point the agent monitors any change/deletion of existing contacts and the addition of new contact. | ✔ | ✔ |

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| | The agent extracts and monitors all values assigned in each contact field that is available (based on vCard fields), including photo if assigned. | | |
| Environmental sound recording (microphone recording) | The user can request to turn on the device microphone and listen in real-time to the surrounding sounds. The surrounding sounds are recorded and can be analyzed and replayed at a later stage.<br><br>Turning on the microphone is based on an incoming silent call to the device from the server (PBX). Such call is allowed only after the agent assured that the device is in idle mode (device is not in active use and the screen is turned off).<br><br>Any action by the target that turns on the screen will result in immediate call hang-up and cease of capturing surrounding sounds.<br><br>No indication of the recording or the incoming silent call appears on the device at any point.<br><br>The quality of the recording depends on the device's microphone sensitivity, the surrounding noise and the device model. This sensitivity varies between the different mobile phone models and is set by the phone manufacturer.<br><br>Usually the content of a conversation held a few meters next to the device can be heard. | N/A[2] | ✔ |
| SMS | Agent extracts and monitors all the incoming and outgoing text messages (SMS). | ✔ | ✔ |
| Call Interception (call recording) – Android only | The user can request to record incoming and outgoing calls of the target device.<br><br>The calls are recorded locally on the device and then sent to the system servers upon completion. | N/A | ✔ |
| Email:<br>1. Main email application in all platforms<br>2. Gmail application in Android | Agent extracts and monitors all the emails that reside on the device.<br><br>The main email application (stock) on the device is monitored, thus all accounts which are defined there are monitored (e.g., exchange, Gmail, etc.).<br><br>For Android-based devices both the main email stock application and the Gmail application are monitored. | ✔ | ✔ |
| File retrieval | Upon user request a full list of files and folders is extracted from the device (internal storage and SD card). When the operator spots a file of interest he can immediately request to retrieve it. | N/A | ✔ |
| Photo taking | Upon user request snapshots using the front and rear camera are taken from the device and sent to the servers. The snapshots are taken only after the agent assured that the | N/A | ✔ |

2 For active collection features, initial data is not extracted before a request is initiated by the user.

| Application Type | Features Description | Data Extraction | Passive / Active Collection |
|---|---|---|---|
| | device is in idle mode. During photo taking no indication appears on the device and flash is never used. The quality of the photo can be chosen by the operator to reduce data usage and faster photo transmission. Since flash is not used and the phone might be in motion or inside rooms with low light, the photos are sometimes out of focus. | | |
| Screen capturing | Upon user request a screen capture is taken and sent to the Pegasus servers. The device screenshots can provide insights on the applications used by the target, wallpaper image used and more intimate information about the target. | N/A | ✔ |
| Browsing history | Agent extracts and monitors the history of browsed websites from the default browser of the device. | ✔ | ✔ |
| Browsing favorites | Agent extracts and monitors the favorites websites saved in the default browser of the device. | ✔ | ✔ |
| Call history (call log) | Agent extracts the history of all incoming/outgoing calls made to/from the device. The data includes the caller and callee numbers and the duration of the call. Calling attempts which did not result with a conversation will show duration of 0 (zero) seconds. | ✔ | ✔ |
| Device information | Upon agent installation all device, network and connection details are extracted to monitor the general information of the device, including battery level. This provides a summarized view to help understand at-a-glance the device status. | ✔ | ✔ |

The above mentioned data is the potential data that could be collected by an agent. The agent will collect the data that is applicable and available on the device. If one or more of the above mentioned applications does not exist and/or removed from the device, the agent will operate in the same manner. It will collect the data from the rest of the services and applications which are in use in the device. Also, all the collected data from the removed application will still be saved on the servers or at the agent, if it was not yet transmitted back to the servers.

In addition, the above mentioned data that is collected by the agent covers the most popular applications used worldwide. Since applications popularity differs from country to country, we understands that data extraction and monitoring of other applications will be required as time evolves and new applications are adopted by targets. When such requirement is raised, we can fairly easily extract the important data from virtually any application upon customer demand and release it as a new release that will become available to the customer.

## Collection Buffer

The installed agent monitors the data from the device and transmits it to the servers. If transmission is not possible[3] the agent will collect the new available information and transmits it when connection will become available. The collected data is stored in a hidden and encrypted buffer. This buffer is set to reach no more than 5% of the free space available on the device. For example – if the monitored device has 1GB of free space, the buffer can store up to 50MB. In case the buffer has reached its limit, the oldest data is deleted and new data is stored (FIFO). Once the data has been transmitted, the buffer content is totally deleted.

---

[3] No data channels are available; Device is roaming; Device is shut down.

# Data Transmission

By default, the collected data (initial data extraction, passive monitoring and active collection) is sent back to the command and control center in real-time. The data is sent via data channels, where Wi-Fi is the preferred connection to use when it is available. In other cases data is transmitted via cellular data channels (GPRS, 3G and LTE). Extra thought was put into compression methods and focusing on textual content transmission whenever possible. The data footprints are very small and usually take only few hundred bytes. This is to make sure that the collected data is easily transmitted, ensuring minimal impact on the device and on the target cellular data plan.

If data channels are not available, the agent will collect the information from the device and store it in a dedicated buffer, as explained in Data Collection section.

Data transmission is automatically ceased in the following scenarios:

- **Low battery:** When the device battery level is below the defined threshold (5%) all data transmission processes are immediately ceased until the device is recharged.

- **Roaming device:** When the device is roaming, cellular data channels become pricy, thus data transmission is done via only Wi-Fi. If Wi-Fi does not exist, transmission will be ceased.

When no data channels are available, and no indication for communication is coming back from the device, the user can request the device will communicate and/or send some crucial data using text messages (SMS).

---

CAUTION: Communication and/or data transmission via SMS may incur costs by the target and appear in his billing report thus should be used sparingly.

---

The communication between the agent and the central servers is indirect (through anonymizing network), so trace back to the origin is non-feasible.

The Pegasus system data transmission process is shown in Figure 5.

**Figure 5: Data Transmission Process**



The channels and scenarios for transmitting the collected data are shown in Figure 6.

**Figure 6: Data Transmission Scenarios**



https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

## Data Transmission Security

All connections between the agents and the servers are encrypted with strong algorithms and are mutually authenticated. While data encryption is probably the most urging issue, extra care was given to ensure minimal data, battery and memory are consumed within the agents requirements. This is meant to make sure that no concerns are raised by the target.

Detecting an operating agent by the target is almost impossible. The Pegasus agent is installed at the kernel level of the device, well concealed and is untraceable by antivirus and antispy software.

The transmitted data is encrypted with symmetric encryption AES 128-bit.

## Pegasus Anonymizing Transmission Network

Agent transparency and source security are the guiding principles of the Pegasus solution. To assure that trace back to the operating organization is impossible, the Pegasus Anonymizing Transmission Network (PATN), a network of anonymizers is deployed to serve each customer. The PATN nodes are spread in different locations around the world, allowing agent connections to be redirected through different paths prior to reaching the Pegasus servers. This ensures that the identities of both communicating parties are highly obscured.

# Data Presentation & Analysis

Successful data collection from hundreds of targets and devices generates massive amounts of data for visualization, presentation and analysis. The system provides a set of operational tools to help the organization to transform data into actionable intelligence. This is to view, sort, filter, query and analyze the collected data. The tools include:

- **Geographical analysis:** Track target's real-time and historical location, view several targets on map

- **Rules and alerts:** Define rules to generate alerts upon important data arrival

- **Favorites:** Mark important and favorite events for subsequent review and deeper analysis

- **Intelligence dashboard:** View highlights and statistics of target's activities

- **Entity management:** Manage targets by groups of interest (e.g., drugs, terror, serious crime, location, etc.)

- **Timeline analysis:** Review and analyze collected data from a particular time frame

- **Advanced search:** Conduct search for terms, names, code words and numbers to retrieve specific information

The collected data is organized by groups of interest (e.g., drugs group A, terror group B, etc.) and each group consists of targets. Each target consists of several devices which some have installed agents on them.

The collected data is displayed in an easy-to-use intuitive user interface and when applicable emulates popular display of common applications. The intuitive user interface is designed for a day-to-day work. Operators can easily customize the system to fit their preferred working methods, define rules and alerts for specific topics of interest.

The operator can choose to view the entire collected data from specific target or only specific type of information such as location information, calendar record, emails or instant messages.

Pegasus calendar monitoring screen is shown in Figure 7.

**Figure 7: Calendar Monitoring**



Pegasus call log and call interception screen is shown in Figure 8.

**Figure 8: Call Log & Call Interception**



Pegasus location tracking screen is shown in Figure 9.

**Figure 9: Location Tracking**



The presentation fields of the collected data are listed in Table 2.

Table 2: Presentation of Collected Data

| Service / Application Type | Extracted data | Display method |
|---|---|---|
| Instant Messaging (IM):<br>1. WhatsApp<br>2. Viber<br>3. Skype<br>4. BlackBerry Messenger (BBM) | ▪ Chat participants (Names & phones)<br>▪ Conversation content<br>▪ Date & Time<br>▪ Attachments metadata (without the attachment) | ▪ Grid<br>▪ Conversation mode |
| Location Tracking | ▪ Data source (GPS/Cell-ID)<br>▪ Latitude<br>▪ Longitude<br>▪ Date & Time | ▪ Grid<br>▪ Map:<br>  - On map display<br>  - Full trail<br>  - Type of location data (GPS or Cell-ID based) |
| Calendar | ▪ Meeting subject<br>▪ Event date and start time | ▪ Grid<br>▪ Monthly calendar view (emulates popular calendar clients) |
| Contact details | ▪ Entire values stored in the contact entry including photo if available | ▪ Grid<br>▪ Contact card with the entire details |
| Environmental sound recording (microphone recording) | ▪ Recorded audio<br>▪ Recording Date & Time<br>▪ Duration | ▪ Grid<br>▪ Playback interface |
| SMS | ▪ Direction (incoming, outgoing)<br>▪ Contact name<br>▪ Phone number<br>▪ Message content<br>▪ Date & Time | ▪ Grid |
| Call Interception | ▪ Direction<br>▪ Contact name<br>▪ Phone number<br>▪ Duration<br>▪ Date & Time | ▪ Grid<br>▪ Playback interface |
| Email:<br>1. Main email application in all platforms<br>2. Gmail application in Android | ▪ From<br>▪ To<br>▪ CC<br>▪ BCC<br>▪ Subject<br>▪ Folder<br>▪ Account<br>▪ Message content<br>▪ Date & Time | ▪ Grid<br>▪ HTML (emulates popular email clients) |
| File retrieval | ▪ List of folders (tree)<br>▪ List of files (grid):<br>▪ Filename | ▪ Grid<br>▪ Tree view |

| Service / Application Type | Extracted data | Display method |
|---|---|---|
| | ▪ Modified date<br>▪ File size | |
| Photo taking | ▪ Date & Time<br>▪ Photo | ▪ Grid<br>▪ Photo viewer |
| Screen capturing | ▪ Date & Time<br>▪ Screen capture image | ▪ Grid<br>▪ Photo viewer |
| Browsing history | ▪ Website name (as saved by the target, usually the default website name)<br>▪ Website URL address | ▪ List |
| Browsing favorites | ▪ Website name (as saved by the target, usually the default website name)<br>▪ Website URL address | ▪ List |
| Call history (call log) | ▪ Direction<br>▪ Contact name<br>▪ Phone number<br>▪ Duration<br>▪ Date & Time | ▪ Grid |
| Device information | ▪ Battery level<br>▪ Connection type (e.g., 3G, WiFi)<br>▪ MSISDN<br>▪ IMEI<br>▪ IMSI<br>▪ Device Manufacturer<br>▪ Device model<br>▪ Operating System version<br>▪ Installation date<br>▪ Last communication time<br>▪ Device current country<br>▪ Device home country<br>▪ Serving network<br>▪ Home serving network | ▪ Dashboard |

## Rules & Alerts

The Rules & Alerts module in the system alerts when important event takes place. Rules must be defined in advance and they help the operators to review and take actions in real-time, for example:

▪ Geo-fencing:
  ○ Access hot zone - Alert when target reached an important location
  ○ Leave hot zone - Alert when target left a certain location
  Geo-fence alerts are based on a perimeter around a certain location, where the operator defines the size of the perimeter.

▪ Meeting detection: Alert when two targets meet (share the same location)

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

- Connection detection:
  - Alert when a message is sent from/to a specific number
  - Alert when a phone call is performed from/to a specific number
- Content detection: Alert when a defined word/term/code word is used in a message

## Data Export

The system is designed as an end-to-end system, providing its users with collection and analysis tools. However, we understands that there are advanced analysis capabilities and data fusion requirements from other sources, therefore the system allows the exporting of the collected information and seamless integration with $3_{rd}$ party backend or analysis systems available.

# Agent Maintenance

Once agent is installed on a certain device, it has to be maintained in order to support new features and change its settings and configurations or to be uninstalled when it is no longer providing valuable intelligence to the organization.

## Agent Upgrade

When agents' updates are released they become available to install. These new agents are now ready for installation on new targets' devices or as upgrades for existing agents installed on target's devices. These updates provide new functionalities, bug fixing, support for new services or improve the agents overall behavior. Such updates are crucial to keep the agent functional and operational in the endless progress of the communication world and especially the smartphone arena.

There are two types of agent upgrades:

- Optional upgrade: agent upgrade is not mandatory by the system. The user decides when, if at all, to upgrade the agent.
- Mandatory upgrade: agent upgrade is mandatory by the system. The supervisor must upgrade the agent otherwise no new information will be monitored from the device.

Upgrade sometimes requires an installation of a new agent and sometimes just a small update of the existing agent. In both cases the user is the only one to decide when to conduct the upgrade, and therefore should plan this accordingly.

Once the command for upgrade was sent by the user, the process should take only few minutes. The process might take longer if the device is turned off or has bad data connection. In either case, the upgrade will be accomplished once a decent data connection becomes available.

## Agent Settings

Agent settings are set for the first time during its installation. From this point, these settings serve the agent, but can always be changed if required. The settings include the IP address for transmitting the collected data, the way commands are sent to the agent, the time until the agent is automatically uninstall itself (see self-destruct mechanism for more details) and more.

## Agent Uninstall

When the intelligence operation is done or in case where the target is no longer with interest to the organization, the software based component ("Agent") on the target's device can be removed and uninstalled. Uninstall is quick, requires a single user request and has no to minimal effect on the target device. The user issues a request for agent uninstall which is sent to the device.

Once agent is uninstalled from a certain device it leaves no traces whatsoever or indications it was ever existed there[4]. As long as the agent is operational on the device and a connection exists between him and the servers it can be easily and remotely uninstalled.

Uninstall can always be done remotely no matter what was the method used for installation. Physical uninstall is also an option, if needed.

Uninstalling an agent does not mean losing the entire collected data – the entire data that was collected during the time that the agent was installed on the device will be kept in the servers for future analysis.

## Self-Destruct Mechanism

The Pegasus system contains self-destruct mechanism for the installed agents. In general, we understand that it is more important that the source will not be exposed and the target will suspect nothing than keeping the agent alive and working. The mechanism is activated in the following scenarios:

- **Risk of exposure:** In cases where a great probability of exposing the agent exists, a self-destruct mechanism is automatically being activated and the agent is uninstalled. Agent can be once again installed at a later time.
- **Agent is not responding:** In cases where the agent is not responding and did not communicate with the servers for a long time[5], the agent will automatically uninstall itself to prevent being exposed or misused.

---

4 In some cases, uninstall can result in device reboot. If reboot takes place, it happens once agent removal is done. The device comes up clean with no agent installed.
5 The default time is 60 days, but can be reconfigured for any period of time required

# Solution Architecture

The Pegasus system's major architectural components are shown in Figure 10.

Figure 10: Solution Architecture



# Customer Site

NSO is responsible to deploy and configure the Pegasus hardware and software at the customer premises, making sure the system is working and functioning properly. Below are the main components installed at the customer site:

## WEB Servers

Residing at the customer's premises, the servers are responsible for the following:

- Agent installation and monitoring
- Agent maintenance: Remotely control, configure and upgrade installed agents
- Data transmission: Receive the collected data transmitted from the installed agents
- Serve the operators' terminals

## Communications Module

The communications module allows interconnectivity and internet connection to the servers.

## Cellular Communication Module

The cellular communication module enables remote installation of the Pegasus agent to the target device using cellular modems and/or SMS gateways.

## Permission Module

The Pegasus permission management module defines and controls the features and available content allowed for each user based on their role, rank and hierarchy.

## Data Storage

The collected data that was extracted and monitored by the agents is stored on an external storage device. The data is well backed-up and with full resiliency and redundancy to prevent failures and downtime.

## Servers Security

All the servers reside inside the customer's trusted network, behind any security measures it may deploy as well as security measures that we supply specifically for the system.

## Hardware

The system standard hardware is deployed on several servers connected together on couple of racks. The equipment takes care of advanced load balancing, content compression, connection management, encryption, advanced routing, and highly configurable server health monitoring.

## Operator Consoles

The operator's end-point terminals (PC) are the main tool which the operators activate the Pegasus system, initiate installations and commands, and view the collected data.

## Pegasus Application

The Pegasus application is the user interface that is installed on the operator terminal. It provides the operators with range of tools to view, sort, filter, manage and alert to analyze the large amount of data collected from the targets' agents.

# Public Networks

Apart from local hardware and software installation at the customer premises, the Pegasus system does not require any physical interface with the local mobile network operators. However, since agent installations and data are transferred over the public networks, we makes sure it is transferred in the most efficient and secured way, all the way back to the customer servers:

## Anonymizing Network

Pegasus Anonymizing Transmission Network (PATN) is built from anonymizing connectivity nodes which are spread in different locations around the world, allowing agent connections to be directed through different paths prior to reaching the Pegasus servers. The anonymized nodes serve only one customer and can be set up by the customer if required.

See more information in Pegasus Anonymizing Transmission Network section.

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Target Devices

The above mentioned architecture allows the operators to issue new installations, extract, monitor and actively collect data from targets' devices. See more details in Supported Operating Systems & Devices.

---

NOTE: The Pegasus is an intelligence mission-critical system, therefore it is fully redundant to avoid malfunctions and failures. The system handles large amounts of data and traffic 24 hours a day and is scalable to support customer growth and future requirements.

---

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Solution Hardware

The hardware specifications for operating the Pegasus system depends on the number of concurrent installed agents, the number of working stations, the amount of data stored and for how long should it be stored.

All the necessary hardware is supplied with the system upon deployment and may require local customization that has to be handled by the customer based on we directions. If required, hardware can be purchased by the customer based on the specifications provided by we.

## Operators Terminals

The operator terminals are standard desktop PCs, with the following specifications:

- **Processor:** Core i5
- **Memory:** 3GB RAM
- **Hard Drive:** 320GB
- **Operating System:** Windows 7

## System Hardware

To fully support the system infrastructure, the following hardware is required:

- Two units of 42U cabinet
- Networking hardware
- 10TB of storage
- 5 standard servers
- UPS
- Cellular modems and SIM cards

The system hardware scheme is shown in Figure 11.

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

Figure 11: Pegasus Hardware



42 U

12 U — Storage Array FS

12 U — Storage Array FS

12 U — Storage Array FS

7 U — UPS

# System Setup and Training

We are responsible for the system setup and training before its hand-over to the customer.

## System Prerequisites

Successful installation of the Pegasus system requires the following preparations of the servers' room:

- Sufficient room to contain two 42U racks cabinet, 5x5x2.5m (LxWxH)
- Air conditioned (18°C) room
- Access restriction
- Routing from end-point terminals to servers room
- Reliable cellular network reception (at least -95 dBm)
- 2 x Electrical outlets (20A) per rack
- 2 x Symmetric ATM lines from different ISP's. Each line with a bandwidth of 10MB containing 8 external static IP addresses:
  - ISP #1: Fiber optic-based network
  - ISP #2: Ethernet category-7 cable-based network

  The mission-critical system requires two parallel networks to ensure system resilience and downtime is kept to an absolute minimum.

- 2 x E1 PRI connections, each contains 10 extensions (two different service providers is recommended)
- 2 x anonymous SIM cards for each local Mobile Network Operator
- 3rd party services registration as required

## System Setup

- The solution will be deployed at the customer site by we personnel
- Deployment duration usually requires 10-15 working weeks
- Operating environment prerequisites must be met
- System setup includes hardware and software installation, and in addition integration to local environment and systems
- Support and adaptations to the different local device firmware versions

## Training

Upon system installation, we personnel will conduct full training sessions. Training can take place onsite or in any other location required by the customer, including we headquarters. Training session includes the following:

- Basic system usage
- System architecture
- Advanced system usage and roles

▪ Real-world simulation exercises

The recommended number of attendees is with respect to the number of installed operator consoles.

# High Level Deployment Plan

The process of adapting, installing and testing the system in a new customer site in listed in Table 3.

**Table 3: Pegasus Deployment Plan**



# Phase 1 – Preparations:

▪ Requirements for an Acceptance Test Procedure (ATP) are defined together with the customer
▪ Hardware and software acquisition and customization to answer customer requirements and needs

▪ When required, the Pegasus system is integrated with local infrastructures and systems

▪ System adaptations to the local mobile networks

# Phase 2 – Implementation:

▪ System testing

▪ Hardware installation

▪ System adaptations to local device firmware versions

### Phase 3 – Training and Completion:

- Detailed system training, real-life scenarios practicing and simulation
- Customer ATP as defined during phase 1

## System Acceptance Test (SAT)

We have gained substantial experience in installing and implementing the Pegasus system. The following acceptance test plan verifies that the system works as required and validates that the correct functionality has been delivered. It describes the scope of the work to be performed and the approach taken to execute the proper tests to validate that the system functions as mutually agreed with the customer.

The tests are divided in 3 stages:

- Functionality tests
- Network and providers tests
- Customer tailor specific tests

An official system hand-over from we to the customer is done once the system has been deployed, tested and demonstrated.

https://www.documentcloud.org/documents/4599753-NSO-Pegasus.html

# Maintenance, Support and Upgrades

We provides, as default, one year of maintenance, support and upgrades services. These services include:

## Maintenance and Support

We provides maintenance services and three-tier level support that includes:

- **Tier-1:** Standard system operations problems
    - Email and phone support
- **Tier-2:** Proactive resolving of technical problems
    - Dedicated engineers will inspect, examine and resolve common technical issues, putting their best efforts
    - Remote assistance using remote desktop software and a Virtual Private Network (VPN) where requested
- **Tier-3:** Bug fixing and system updates of substantial system malfunctions
- **Phone support:** In addition to the above mentioned, we provide phone and email support to any question and problem that is raised.

In addition, the customer will be able to add the following support:

- Planned or emergency onsite assistance
- Health monitoring system

## Upgrades

We have releases major upgrades to the Pegasus system few times a year. Such upgrades usually include:

- New features
- New devices/operating system support
- Tailored features based on customer requirements
- Bugs fix

EXHIBIT 11

dtd 16-01-18

129

79

CONTRACT

IDL x NCA

ExHS

21-2-19

SCANNED

CERTIFIED TRUE COPY

REGISTRAR
HIGH COURT
CRIMINAL COURT
LAW COURT COMPLEX

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

B 123

ℬ 123

## AGREEMENT

This Agreement (the "**Agreement**") is entered into on December 17th, 2015 (the "**Effective Date**") between Infraloks Development Limited, a company incorporated under the laws of the Republic of Ghana (company registration number CA-66,115), having its registered offices at HSE number 1 plot 50, 7th Avenue Extension, North Ridge ACCRA, P.O. Box 30712 KIA, ACCRA (the "**Company**") and the National Communication Authority of the Republic of Ghana (the "**End-User**").

**Whereas,** the Company is engaged in the business of reselling and supplying cyber intelligence solutions developed, integrated and supplied by the NSO Group Technologies Ltd. (company registration number 514395409), an Israeli Company, having its registered offices at 9 Hamada St., Herzliya, Israel (the "**System Provider**") which has developed the System (as defined below); and

**Whereas,** the End-User is interested to purchase from the Company a License (as defined below) to use the System (as defined below), and obtain services related to it, solely for the use of the End-User as further set forth herein, and the Company has agreed to provide a License to use the System and related services to the End-User; and

**Whereas,** the parties wish to set forth the terms under which such sale and purchase shall be made.

**Now, therefore,** in consideration of the foregoing premises and the mutual covenants herein contained, and for other good and valuable consideration, the parties agree as follows:

1. Definitions and Exhibits.

    1.1. In this Agreement, unless the context otherwise requires, terms defined in the preamble and the recitals shall have the same meaning when used elsewhere in this Agreement and the following terms shall have the meanings ascribed thereto below:

    "**Agreement**" has the meaning ascribed to it in the preamble.

    "**Approval**" has the meaning ascribed to it in Section 5.1.

    "**Business Day**" means a day (other than a Friday, Saturday or Sunday) on which banks are generally open in Israel and in the Republic of Ghana for normal business.

    "**Certificate**" has the meaning ascribed to it in Section 5.1.

    "**Commissioning Notice**" has the meaning ascribed to it in Exhibit B.

    "**Company**" has the meaning ascribed to it in the preamble.

    "**Confidential Information**" means any information provided by the Company to the and/or the End-User.

    "**Deployment**" has the meaning ascribed to it in Exhibit A.

    "**Effective Date**" has the meaning ascribed to it in the preamble.

    "**End-User**" has the meaning ascribed to it in the preamble.

    "**First Installment**" has the meaning ascribed to it in Exhibit B.

    "**Force Majeure**" has the meaning ascribed to it in Section 14.

    "**Hardware Equipment**" has the meaning ascribed to it in Exhibit A.

    "**IMOD**" means the Israeli Ministry of Defense.

    "**License**" has the meaning ascribed to it in Section 2.1.

    "**Reseller**" N/A.

    "**Reseller Representative**" N/A.

    "**Reseller Appointment Letter**" N/A.



Agreement 100/2015                   Page **1** of 46

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

"**Reseller Appointment Letter**" N/A.

"**End-User Responsibilities**" has the meaning ascribed to it in Section 4.

"**Services**" has the meaning ascribed to it in Exhibit A.

"**SLA**" has the meaning ascribed to in Section 6.2

"**Support Period**" has the meaning ascribed to it in Section 6.1.

"**Support Period Consideration**" has the meaning ascribed to it in Exhibit B.

"**Support Services**" has the meaning ascribed to it in Section 6.

"**System**" has the meaning ascribed to it in Exhibit A.

"**System Consideration**" has the meaning ascribed to it in Exhibit B.

"**System Provider**" has the meaning ascribed to it at the preamble.

"**Training**" has the meaning ascribed to it in Exhibit A.

"**Warranty**" has the meaning ascribed to it in Exhibit A.

"**Warranty Period**" has the meaning ascribed to it in Exhibit A.

1.2. The following are the exhibits in this Agreement:

Exhibit A – Description of System and Services

Exhibit A-1 – Features and Capabilities

Exhibit A-2 – List of Hardware Equipment and Software

Exhibit B – Consideration

Exhibit C – Installation Requirements

Exhibit D – Service Level Agreement

2. Provision of License and Services.

2.1. Subject to the terms of this Agreement and the payment of the System Consideration in full, the System Provider shall provide the End-User a limited, exclusive, non-transferable, non-pledgeable and non-assignable license to use the System solely for the End-User's internal use, and for the purpose that it is intended for (the "**License**").

2.2. Subject to provisions of Sections 2.3 and 5.2 below, within one-hundred (100) Business Days following the occurrence of the later of (i) receipt by the System Provider of the Approval, (ii) the completion of the Due-Diligence Process, and (iii) the receipt by the Company of the First Installment, in full, the System Provider shall complete the Deployment and shall conduct the Training.

2.3. The provision of the System, the License and the Services by the System Provider in accordance with the time schedule set forth in Section 2.2 above and the performance by the Company of all its obligations under this Agreement is conditioned upon (i) the fulfillment by the End-User of all of the End-User Responsibilities when due, and (ii) the actual receipt by the Company of each payment of the System Consideration when due, in full.

It is hereby clarified that the Company shall not be held responsible or liable for any delay in the provision of the System, the License and/or the Services, if such delay was due to any miss-performance or delay in the fulfillment of any of the End-User Responsibilities and/or payment obligations and/or due to a delay in the performance or achievement of the pre-requisite conditions set forth in Section 5 below. In the event of a delay in the performance of any of the End-User Responsibilities and/or payment obligations and/or the performance or achievement of the pre-requisite conditions set



forth in Section 5 below, the Company's obligations shall be postponed by such number of days equal to number of days by which the time schedule was delayed due to acts or omissions caused by the End-User.

2.4.    If any sum payable pursuant to this Agreement shall not have been paid to the Company by its due date, then, without prejudice to any other right or remedy available to the Company in accordance with the terms of this Agreement or by law, the End-User shall pay interest thereon at a daily rate of 0.04%, accumulated on a daily basis, in respect of the period starting on the due date of the delayed payment and ending on the date of the actual payment. In addition, the Company reserves the right to suspend contractual performance or the use of the System or the Services until the End-User has made payment of the overdue amount together with interest that has accrued thereupon, in full.

2.5.    So long as the System Consideration is not received by the Company, in full, and so long as the Company has not provided the Commissioning Notice, the End-User shall not be entitled to use the System and no license to use the System shall be deemed granted.

3.    Consideration; Payment Terms.

3.1.    In consideration for the provision of the License, the System and the Services, the End-User shall pay the Company the System Consideration as set forth in Exhibit B.

3.2.    The System Consideration shall be paid by the End-User to the Company in installments as set forth in Exhibit B.

3.3.    The System Consideration, the Support Period Consideration and any other payments made to the Company under this Agreement are exclusive of all state, provincial, municipal or other government, excise, use, sales, VAT or like taxes, tariffs, duties or surcharges, now in force or as may be enacted in the future, which shall be borne by the Company, provided, however that the Company shall bear all income taxes imposed on the Company in connection with this Agreement. Each payment under this Agreement shall be paid by the End-User against an invoice to be issued by the Company.

3.4.    Any and all amounts paid to the Company under this Agreement are non-refundable, and may not be claimed or reclaimed by the End-User.

4.    The End-User's Responsibilities. The End-User undertakes to perform all of the following obligations in a timely manner (the "**End-User Responsibilities**"):

4.1.    fulfillment of all of the technical and installation requirements listed in Exhibit C at the End-User's site, prior to the delivery of the Hardware Equipment;

4.2.    obtainment and maintenance of all permits and approvals required to be obtained from any regulatory and governmental authority relating to the End-User, under any and all applicable legal requirements for the performance of this Agreement;

4.3.    delivery of the Certificate to the Company;

4.4.    provision of any and all applicable information and documents required by the System Provider for the performance of the Due-Diligence Process, on a timely manner; and

4.5.    provision of any and all additional required conditions to enable the performance of the Company's obligations under this Agreement when due, including without limitation, release of the Hardware Equipment from custom (if required) and assuring availability of the End-User's personnel for participation in the Training.

5.    Pre-Conditions.

5.1.    The provision of the License, the System and the Services and the performance by the Company of its obligations under this Agreement are subject to (i) the receipt by the System Provider of the original certificate indicating the identity of the End-User, in accordance with the requirements of the IMOD (the "**Certificate**"), (ii) the receipt by the System Provider of the approval of the IMOD for the provision of the License, System



and the Services as set forth herein (the "**Approval**"), (iii) the completion of a due-diligence process to the Company by the System Provider (the "**Due-Diligence Process**").

5.2. For the avoidance of any doubt, no products, licenses, equipment or services shall be provided by the Company under this Agreement until the Certificate is delivered to the System Provider and the Approval is obtained. In the event that the Certificate is not received by the System Provider and/or the Approval is not obtained within six (6) months as of the date hereof, or in the event that the System Provider receives, earlier, a formal notice from the IMOD that the application for the Approval is denied, or in the event that the Approval is canceled, terminated or suspended, the Company shall have the right to terminate this Agreement by providing the End-User a written notice, and such termination shall not be considered a breach of this Agreement, and the Company shall not be held responsible or liable in connection with such termination. Further, the Company hereby acknowledges and agrees that the actual performance of the activities contemplated herein is conditioned upon the completion of the Due Diligence Process to the System Provider's full satisfaction which otherwise may terminate this Agreement at its sole discretion, by providing the Company a written notice, and such termination shall not be considered a breach of this Agreement, and the Company shall not be held responsible or liable in connection with such termination.

6. <u>Technical Support and Maintenance Services</u>. Following the expiration of the Warranty Period, the End-User shall be entitled to purchase technical support and maintenance services (the "**Support Services**") under the following terms:

6.1. The End-User may purchase Support Services for periods of twelve (12) month each (each such period – a "**Support Period**").

6.2. The Support Services shall be provided in accordance with the System Provider's standard services level agreement, as may be amended from time to time. A copy of the System Provider's current service level agreement is attached hereto as Exhibit D (the "**SLA**").

6.3. The consideration for the Support Services for each Support Period and the payment terms of such consideration are as set forth in Exhibit B.

7. <u>Additional Remedy</u>. In the event a breach has occurred, in addition to the Company's rights and remedies under applicable law and this Agreement, the Company may suspend or cancel the License or the provision of any of the Services, or take such actions necessary to prevent access to the System until such time as it has received confirmation to its satisfaction that such breach was cured. The Company shall not be liable towards the End-User for any claim, losses or damages whatsoever related to its decision to suspend or cancel the provision of any of the Services, the License, or to prevent access to the System under this section.

8. <u>Intellectual Property Rights</u>. All the rights pertaining to the System, the Services and the License, including, but not limited to, all patents, trademarks, copyrights, service marks, trade names, technology, know how, moral rights and trade secrets, all applications for any of the foregoing, and all permits, grants and licenses or other rights relating to the System and the Services are and shall remain the sole property of the System Provider.

The End-User hereby acknowledges that, other than as set forth in Section 2.1, no title to the System (including the software embedded therein) is transferred to it under this Agreement or in connection hereof and it is not granted any right in the System, including without limitation, intellectual property right.

The End-User shall not, whether directly or indirectly either by themselves or through any other person, reproduce, modify, disassemble or reverse-engineer the System (including any software contained therein).

9. <u>Confidentiality</u>. The End-User undertakes to keep the Confidential Information in strict confidence and not to disclose it to any third party without the prior written consent of the

System Provider; provided, however, that the End-User may disclose such information to its respective employees and consultants having a need to know such information in order to carry out the provisions of this Agreement. The End-User warrants that any such employees and consultants to which Confidential Information is disclosed will be bound and will abide by terms no less onerous than those contained herein and shall be responsible for any breach of confidentiality by such employees and consultants.

Following the termination of this Agreement for any reason, or upon the Company's first written demand, the End-User shall return to the Company all Confidential Information, including all records, products and samples received, and any copies thereof, whether in its possession or under its control, and shall erase all electronic records thereof, and shall so certify to the Company in writing

10.  Limited Warranty. It should be noted that the System Provider does not warrant that the License, the System and the Services provided hereunder will be uninterrupted, error-free, or completely secure. The System Provider does not make, and hereby disclaims, any and all implied warranties, including implied warranties of merchantability, fitness for a particular purpose and non-infringement. Except as otherwise expressly set forth in this Agreement (including any exhibits), the System Provider does not make and hereby disclaims all express warranties. All products, the System and Services provided pursuant to this Agreement are provided or performed on an "as is", "as available" basis.

11.  Limitation of Liability. In no event shall the Company be liable for any consequential, incidental, special, indirect or exemplary damages whatsoever, including lost profits, loss of business, loss of revenues, or any other type of damages, whether arising under tort, contract or law. The Company's aggregate liability under this Agreement shall be limited to the consideration actually received by the Company under this Agreement.

12.  Governing Law and Jurisdiction. This Agreement shall be governed, construed and enforced in accordance with the laws of the Republic of Ghana.
Any controversy or claim arising under, out of, or in connection with this Agreement, its validity, its interpretation, its execution or any breach or claimed breach thereof, are hereby submitted to the sole and exclusive jurisdiction of the competent courts in the Republic of Ghana.

13.  Assignment. This Agreement and the rights and obligations hereunder are not transferable, pledgeable or assignable, by either party without the prior written consent of the other party. However, the System Provider may assign its rights and obligations to a parent, affiliate or subsidiary company and, in the case of a merger or acquisition, to a successor company upon notice to the Company, and provided that the rights of the Company shall not be derogated pursuant to such assignment.

14.  Force Majeure. The System Provider and the Company shall not be liable for any failure to perform its obligations under this Agreement due to any action beyond its control, including without limitation: (i) acts of God, such as fires, floods, electrical storms, unusually severe weather and natural catastrophes; (ii) civil disturbances, such as strikes and riots; (iii) acts of aggression, such as explosions, wars, and terrorism; (iv) acts of government, including, without limitation, the actions of regulatory bodies which significantly inhibits or prohibits the System Provider and the Company from performing its obligations under this Agreement (each, a "**Force Majeure**").
In the event of a Force Majeure, the performance of the Company's obligations shall be suspended during the period of existence of such Force Majeure as well as the period reasonably required thereafter to resume the performance of the obligation.

15.  No Third Party Beneficiary. This Agreement shall not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

16.  Complete Agreement. This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subject matters hereof and

thereof and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

17. <u>Representations</u>. N/A.

18. <u>No Set-Off</u>. Notwithstanding any right available to the End-User under law, the End-User shall not be entitled to set-off any amounts due to the Company under this Agreement.

19. <u>Severability</u>. Should any court of competent jurisdiction declare any term of this Agreement void or unenforceable, such declaration shall have no effect on the remaining terms hereof.

20. <u>Interpretation</u>. The titles and headings of the various sections and paragraphs in this Agreement are intended solely for reference and are not intended for any other purpose whatsoever or to explain, modify, or place any construction on any of the provisions of this Agreement.

21. <u>No Waiver</u>. The failure of either party to enforce any rights granted hereunder or to take action against the other party in the event of any breach hereunder shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

22. <u>Notices</u>. All notices and demands hereunder shall be in writing and shall be served by personal service or by mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be certified or registered mail, return receipt requested, by nationally-recognized private express courier, or sent by electronic transmission, with confirmation received, to the telecopy numbered specified below, and shall be deemed complete upon receipt.

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

**In Witness Whereof,** the parties hereto have executed this Agreement the day and year first above written.

_____ 17-12-2015

**Infraloks Development Limited**

By:

Mr. George Derek Oppong

Position: Director, Business Development

_____ 17-12-2015

**National Communication Agency**

By:

Mr. William Tevie

Position: Director General

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

## Exhibit A

### Description of the System and Services

The System:

The System Provider's Pegasus system is comprised of the following (the "**System**"):

(a) the features and capabilities detailed in the table attached hereto as <u>Exhibit A-1</u>, operational with respect to the Republic of Ghana mobile numbers (residing in the Republic of Ghana), using the System Provider's supported devices running the System Provider's certified versions of Blackberry, Android and iOS operating systems, including **25** concurrent targets; and

(b) the hardware equipment (the "**Hardware Equipment**") and software which are required for the installation of the System, including **5** control stations, as listed in <u>Exhibit A-2</u> attached hereto.

The Services:

The services related to the System include the following (the "**Services**"):

(a) Deployment of the System at the End-User's site for use with respect to the Republic of Ghana mobile numbers residing in the Republic of Ghana (as set forth in Section (a) above) (the "**Deployment**");

(b) **Two (2)** week training course and one (1) week on-site handover, which shall be held in English (the "**Training**");

(c) 12 months warranty (the "**Warranty Period**") commencing at the date of the provision of the Commissioning Notice, which shall be provided in accordance with the Company's SLA.

No warranty is provided by the System Provider with respect to the hardware components of the System. To the extent permissible, Hardware Equipment warranty will be provided by the System Provider back to back with the warranty provided by the suppliers of the Hardware Equipment.

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

## Exhibit A-1

### Features and Capabilities

## Supported OS:

| Operating System | Versions | Supported Browsers for Installation |
|---|---|---|
| iOS | 7.x – 9.1 | Safari<br>• Clicking on a link will always result in Safari browser |
| Android | 4.x – 5 | • Native browser (Webkit based)<br>• Chrome versions 18 up to 45 (excl. 18.0.1025.166)<br>• Focus mainly on Samsung Galaxy devices |
| BlackBerry | 5.x – 7.1 | Native browser (Webkit based) |

## Installation:

| Feature | | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| Remote Installation | Push Message | Infection is done by silently pushing an installation to the device.<br>This method does not require the target engagement. | • Works on most BlackBerry devices<br>• Works on a variety of Android devices (OS 4.x). Depends on the local ROM settings | V | V | |
| | Crafted Message (SMS, Email and other 3rd party applications) | An innocent message is sent to the target device which contains text and link.<br>The message content and link lure the target to click (only once) and browse to an innocent website.<br>Clicking the link triggers a silent installation which runs in the background. | | V | V | V |
| Infection Assisting Tools | MMS Fingerprint | Reveal the target device and OS version by sending an MMS to the device.<br>No user interaction, engagement or message opening is required to receive the device fingerprint. | This feature may be blocked by the local mobile network operator.<br>Feature implementation subjects to site survey results.<br>Note: MMS content appears on the target device. | V | V | V |
| | Sender ID Spoofing | Set an alphanumeric sender identification for SMS and MMS. | This feature may be blocked by the local mobile network operator.<br>Feature implementation subjects to site survey results. | V | V | V |
| | Control link URL | Set any DNS to be used as the installation link | Domains to be defined and purchased by the customer | V | V | V |

| | Feature | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| **Agent Survivability** | Persistency | The installed collection tool survives device reboot. | Device reboot refers to:<br>• Device restart<br>• Device turn off<br>• Device battery drain | V | V | V |
| | **Factory Reset** | The agent collection tool endures device factory reset. | Factory reset, also known as master reset, restores the device original manufacturer settings resulting in permanent erasing all of the information stored on the device. | | V | |
| | **Blocking OS Upgrade** | The agent collection tool blocks the user from upgrading the OS version. | The device acts like it has the latest OS version or is not allowed to perform off-the-air OS upgrade. Note: Physical OS upgrade is still available. | V | V | V |
| **Agent Uninstall** | Uninstall | Permanently remove the agent collection tool | Done remotely without any user interaction | V | V | V |

## Collection:

| Feature[1] | Description | Comments | Supported in | | |
|---|---|---|---|---|---|
| | | | BlackBerry | Android | iOS |
| **Historical Data Extraction:** Extract all existing data from the device. Gain access to historical data. | **Contact details** Extracts all contacts available on the device including their assigned photos | Extraction is done for all available (non-empty) fields. | V | V | V |
| | **SMS** Extracts all incoming and outgoing text messages (SMS) from the device | | V | V | V |
| | **iMessage** Extracts all incoming and outgoing iMessages from the device | Messages sent only between iOS devices | | | V |
| | **Emails** Extracts all emails that exist on the device | Extracts only from the device stock application and Gmail application. Emails are presented in HTML format. | V | V | V |
| | **Call Log** Extracts the history of all incoming/outgoing calls made to/from the device | | V | V | V |
| | **WhatsApp Call Log** Extracts the history of all incoming/outgoing calls made to/from the device using WhatsApp | | | V | |
| | **Skype Call Log** Extracts the history of all incoming/outgoing calls made to/from the device using Skype | | | V | V |

---

[1] Due to some limitations and restrictions of the operating system, certain devices might not support all listed features.

| | Feature | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| | Calendar | Extracts all calendar records that exist on the device | | V | V | V |
| | Browsing History | Extract the entire list of browsed websites that exists on the device | Extracts only from the device native browser application | | V | V |
| | BBM (BlackBerry messenger) | Extracts all existing incoming and outgoing instant messages from the device, including personal and group chat | Extracts only instant messages (text) | V | | |
| | WhatsApp | | | V | | |
| | Viber | | | | V | V |
| | Skype | | | | V | V |
| | Facebook Messenger | | | | V | V |
| | Kakao Talk | | | | V | V |
| | Telegram | | | V | V | V |
| | Line | | | | | V |
| | Odnoklassniki | | | V | V | V |
| | WeChat | | | | V | V |
| | Tango | | | V | V | V |
| | VKontakte | | | | V | V |
| | Mail.Ru | | | | V | V |
| Data Monitoring: Real-time monitor of new data that arrives/sent to/from the | Contact details | Monitors addition, deletion and editing of contacts on the device | | V | V | V |
| | SMS | Monitors incoming and outgoing text messages | | V | V | V |
| | iMessage | Monitors incoming and outgoing iMessages | Messages sent only between iOS devices | | | V |

| | Feature | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| device | Emails | Monitors incoming and outgoing emails | Monitors only the device stock application and Gmail application. Emails are presented in HTML format. | V | V | V |
| | Call Log | Monitors incoming and outgoing call records | | V | V | V |
| | WhatsApp Call Log | Monitors incoming and outgoing call records of WhatsApp application | | | V | |
| | Skype Call Log | Monitors incoming and outgoing call records of Skype application | | | V | V |
| | Calendar | Monitors addition and editing of calendar records on the device | | V | V | V |
| | Browsing History | Monitors new browsed websites | Monitors only the device native browser application | | V | V |
| | BBM (BlackBerry Messenger) | Monitors incoming and outgoing instant messages, including personal and group chat | Monitors only instant messages (text). Indication for file transfer appear and their retrieval is possible using file retrieval feature. | V | | |
| | WhatsApp | | | V | V | V |
| | Viber | | | V | V | V |
| | Skype | | | | V | V |
| | Facebook Messenger | | | | V | V |
| | Kakao Talk | | | | V | V |
| | Telegram | | | V | V | V |
| | Line | | | | | V |
| | Odnoklassniki | | | V | V | V |
| | WeChat | | | | V | V |
| | | | | V | V | V |

| | Feature | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| | Tango | | | | V | V |
| | VKontakte | | | | V | V |
| | Mail.Ru | | | | V | V |
| | surespot | | | | V | V |
| | USSD | Monitors incoming network messages from the device | | V | V | V |
| | Call recording (call interception) | Record incoming and outgoing voice calls made to/from the device | Calls are recorded locally on the device and then sent to the system servers. | V | V | V |
| | Device Information | Monitors general details about the device, network and connection | | V | V | V |
| | Cell-ID Location | Monitors the device cell-ID within every connection to the command and control servers | | V | V | V |
| | Keystroke logging | Monitors keystroke typing by the regular keyboard | Helps monitoring texting in unsupported applications and even usernames and passwords for sensitive accounts. | | V | |
| Active Data Collection: User request's real-time actions on target device | Front Camera Snapshot | Take a snapshot using the device front camera | No indication appears on the device and flash is never used. | | V | V |
| | Back Camera Snapshot | Take a snapshot using the device rear camera | No indication appears on the device and flash is never used. | V | V | V |
| | Screenshot capturing | Capture a screenshot of the device | | V | V | V |
| | File System listing | Retrieve a full list of files and | | V | V | V |

| | Feature | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| | | folder in target device | | | | |
| | File retrieval | Retrieve any file from the target device including photos, documents, audio and video | File retrieval is allowed from the device internal storage and SD card. | V | V | V |
| | GPS Location | Locate device using the device GPS chip | | V | V | V |
| | Room Tap (environmental sound recording) | Turn on the microphone and listen in real-time to the surrounding sounds of the device. The surrounding sounds are recorded and saved for later playback and analysis. | Turning on the microphone is done by issuing an incoming silent call to the device. No indication of the recording or the silent call appears on the device at any point. The quality of the recording depends on the device's microphone sensitivity, the surrounding noise and the device model. | V | V | V |

## Data Transmission:

| Feature | | Description | Comments | Supported in | | |
|---|---|---|---|---|---|---|
| | | | | BlackBerry | Android | iOS |
| Data Transmission: Channels used to exfiltrate the collected data back to the command and control servers | GPRS/UTMS/LTE | Transmit collected data using cellular data channels | Data is sent in very small packets. This has very small impact on target's data plan. | V | V | V |
| | Wi-Fi | Transmit collected data using Wi-Fi | Has no impact on target's data plan at all. | V | V | V |

## Presentation:

| Feature | Collected Data | Displayed As |
|---|---|---|
| Contact details | Entire values stored in the contact entry including photo if available | • Grid<br>• Contact card with the entire details |
| SMS | • Type (SMS / USSD)<br>• Direction (incoming, outgoing)<br>• Contact name<br>• Phone number<br>• Message content<br>• Date & Time | • Grid |
| USSD | | |
| iMessage | | |
| Emails | • From<br>• To<br>• CC<br>• Subject<br>• Folder<br>• Account<br>• Message content<br>• Date & Time | • Grid<br>• Full HTML presentation (emulates popular email clients) |
| Call Log (Cellular calls, WhatsApp, Skype) | • Direction<br>• Contact name<br>• Phone number<br>• Duration<br>• Date & Time | • Grid |
| Calendar | • Meeting subject<br>• Location<br>• Event date and start time | • Grid<br>• Monthly calendar view (emulates popular calendar clients) |

| Feature | Collected Data | Displayed As |
|---|---|---|
| Browsing History | • Website name (as saved by the target, usually the default website name)<br>• Website URL address | • List |
| BBM (BlackBerry Messenger) | • Type of application<br>• Chat participants (Names & phones)<br>• Conversation content<br>• Date & Time<br>• Attachments metadata (without the attachment) | • Grid<br>• Conversation mode |
| WhatsApp | | |
| Viber | | |
| Skype | | |
| Facebook Messenger | | |
| Kakao Talk | | |
| Telegram | | |
| Line | | |
| Odnoklassniki | | |
| WeChat | | |
| Tango | | |
| VKontakte | | |
| Mail.Ru | | |
| surespot | | |
| Call recording<br>(call interception) | • Direction<br>• Contact name<br>• Phone number<br>• Duration<br>• Date & Time | • Grid<br>• Playback interface |

SCANNED

| Feature | Collected Data | Displayed As |
|---|---|---|
| Device and Network Information | • Battery level<br>• Last location<br>• Connection type (e.g., 3G, WiFi)<br>• MSISDN<br>• IMEI<br>• IMSI<br>• Device Manufacturer<br>• Device model<br>• Operating System version<br>• Installation type (remote, physical or other)<br>• Installation date<br>• Last communication time<br>• Next communication expected<br>• Device current country<br>• Device home country<br>• Serving network<br>• Home serving network | • Dashboard |
| GPS/Cell-ID Location | • Data source (GPS/Cell-ID)<br>• Latitude<br>• Longitude<br>• Enter Time & Date<br>• Leave Time & Date | • Grid<br>• Map:<br>  - On map display<br>  - Full trail<br>  - Type of location data (GPS or Cell-ID based) |
| Keystroke logging | Text typed using the keyboard | • List |
| Front Camera Snapshot | • Date & Time<br>• Photo<br>• Source of photo | • Grid<br>• Photo viewer |
| Back Camera Snapshot | | |
| Screenshot capturing | | |



| Feature | Collected Data | Displayed As |
|---|---|---|
| File System listing | • List of folders (tree)<br>• List of files (grid):<br>  – Filename<br>  – Modified date<br>  – File size<br>  – Retrieval status | • Grid<br>• Tree view |
| File retrieval | | |
| Room Tap (environmental sound recording) | • Recorded audio<br>• Recording Date & Time<br>• Duration | • Grid<br>• Playback interface |
| | | |

B141

100

Agreement 100/2015

## Rules & Alerts:

| Rule Type | Alert When | Alert Description |
|---|---|---|
| Geo Fence - Access hotspot | Alert when target entered an important area | Geo-fence alerts are based on a perimeter around a certain location, where the operator defines the size of the perimeter. |
| Meeting detection | Alert when two targets meet | The alert occurs in two target are at the same perimeter as defined by the user. The alert will take place also if targets visited the same location in different times. |
| Connection detection | Alert when a message is sent from/to a specific number | Alert when target is corresponding with a certain number as defined by the user. |
| | Alert when a phone call is performed from/to a specific number | Alert when target conducts/receives a phone call to/from a certain number as defined by the user. |

## Exhibit A-2

### List of Hardware Equipment and Software

The System Provider shall supply the following hardware equipment and software, or similar, to enable the commissioning of the system.

Disclaimer: This list may change per Network\Regulation\System\Country feature support changes.

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| PowerEdge R730xd Server<br>Intel Xeon E5-2643 v3 3.4GHz,20M Cache,9.60GT/s QPI,Turbo,HT,6C/12T (135W)<br>Max Mem 2133MHz<br>R730/xd PCIe Riser 2, Center<br>R730/xd PCIe Riser 1, Right<br>PowerEdge R730xd Shipping EMEA1<br>(English/French/German/Spanish/Russian/Hebrew)<br>Bezel<br>Chassis with up to 24, 2.5" Hard Drives<br>DIMM Blanks for System with 2 Processors<br>Performance Optimized<br>2133MT/s RDIMMs<br>8 X 8GB RDIMM, 2133MT/s, Dual Rank, x8 Data Width<br>2 X Standard Heatsink for PowerEdge R730/R730xd<br>Upgrade to Two Intel Xeon E5-2643 v3 3.4GHz,20M Cache,9.60GT/s<br>QPI,Turbo,HT,6C/12T (135W)<br>iDRAC8 Enterprise, integrated Dell Remote Access Controller, Enterprise<br>2 X 300GB 15K RPM SAS 6Gbps 2.5in Hot-plug Hard Drive,13G<br>16 X 500GB 7.2K RPM NLSAS 6Gbps 2.5in Hot-plug Hard Drive,13G<br>PERC H730 Integrated RAID Controller, 1GB Cache<br>Performance BIOS Settings<br>Dual, Hot-plug, Redundant Power Supply (1+1), 750W<br>2 X C13 to C14, PDU Style, 10 AMP, 0.6m Power Cord<br>PowerEdge Server FIPS TPM<br>Intel Ethernet i350 QP 1Gb Network Daughter Card<br>Intel Ethernet I350 QP 1Gb Server Adapter | Dell | 1 | R730XD |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| PowerEdge R730/R730xd Motherboard<br>No Media Required<br>No Operating System<br>OpenManage Essentials, Server Configuration Management<br>Electronic System Documentation and OpenManage DVD Kit, PowerEdge R730/xd<br>OEM Order<br>Not Selected in this Configuration<br>Asset Service - System & Shipbox Label (Model, Svc Tag, Order Information, Basic Config Details)<br>ReadyRails Sliding Rails With Cable Management Arm<br>RAID 1+RAID 5 for H330/H730/H730P (2 + 3-22 HDDs or SSDs)<br>Base Warranty<br>1Yr Parts Only Warranty (Emerging Only)<br>INFO 1Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>3Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>Consolidation Fee<br>EX-Works | | | |
| PowerEdge R730 Server<br>Intel Xeon E5-2620 v3 2.4GHz,15M Cache,8.00GT/s QPI,Turbo,HT,6C/12T (85W)<br>Max Mem 1866MHz<br>R730/xd PCIe Riser 2, Center<br>R730 PCIe Riser 3, Left<br>R730/xd PCIe Riser 1, Right<br>PowerEdge R730 Shipping EMEA1<br>(English/French/German/Spanish/Russian/Hebrew)<br>Bezel<br>Chassis with up to 8, 3.5" Hard Drives<br>DIMM Blanks for System with 2 Processors<br>Performance Optimized<br>2133MT/s RDIMMs<br>2 X 8GB RDIMM, 2133MT/s, Dual Rank, x8 Data Width<br>2 X Standard Heatsink for PowerEdge R730/R730xd<br>Upgrade to Two Intel Xeon E5-2620 v3 2.4GHz,15M Cache,8.00GT/s QPI,Turbo,HT,6C/12T (85W) | Dell | 2 | R730 |



| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| iDRAC8 Enterprise, integrated Dell Remote Access Controller, Enterprise<br>2 X 300GB 10K RPM SAS 6Gbps 2.5in Hot-plug Hard Drive,3.5in HYB CARR<br>PERC H730 Integrated RAID Controller, 1GB Cache<br>Performance BIOS Settings<br>DVD+/-RW, SATA, Internal<br>Dual, Hot-plug, Redundant Power Supply (1+1), 750W<br>C13 to C14, PDU Style, 10 AMP, 0.6m Power Cord<br>European Power Cord 220V<br>PowerEdge Server FIPS TPM<br>Intel Ethernet i350 QP 1Gb Network Daughter Card<br>Intel Ethernet I350 QP 1Gb Server Adapter<br>PowerEdge R730/R730xd Motherboard<br>No Media Required<br>No Operating System<br>OpenManage Essentials, Server Configuration Management<br>Electronic System Documentation and OpenManage DVD Kit, PowerEdge R730/xd<br>OEM Order<br>Not Selected in this Configuration<br>Asset Service - System & Shipbox Label (Model, Svc Tag, Order Information, Basic Config Details)<br>ReadyRails Sliding Rails With Cable Management Arm<br>RAID 1 for H330/H730/H730P (2 HDDs or SSDs)<br>Base Warranty<br>1Yr Parts Only Warranty (Emerging Only)<br>INFO 1Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>3Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>Consolidation Fee<br>EX-Works | | | |
| PowerEdge R730 Server<br>Intel Xeon E5-2650 v3 2.3GHz,25M Cache,9.60GT/s QPI,Turbo,HT,10C/20T (105W)<br>Max Mem 2133MHz<br>R730/xd PCIe Riser 2, Center<br>R730 PCIe Riser 3, Left<br>R730/xd PCIe Riser 1, Right | Dell | 2 | R730 |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| PowerEdge R730 Shipping EMEA1 | | | |
| (English/French/German/Spanish/Russian/Hebrew) | | | |
| Bezel | | | |
| Chassis with up to 8, 3.5" Hard Drives | | | |
| DIMM Blanks for System with 2 Processors | | | |
| Performance Optimized | | | |
| 2133MT/s RDIMMs | | | |
| 8 X 16GB RDIMM, 2133 MT/s, Dual Rank, x4 Data Width | | | |
| 2 X Standard Heatsink for PowerEdge R730/R730xd | | | |
| Upgrade to Two Intel Xeon E5-2650 v3 2.3GHz,25M Cache,9.60GT/s | | | |
| QPI,Turbo,HT,10C/20T (105W) | | | |
| iDRAC8 Enterprise, integrated Dell Remote Access Controller, Enterprise | | | |
| VFlash, 8GB SD Card for iDRAC Enterprise | | | |
| 2 X 300GB 10K RPM SAS 6Gbps 2.5in Hot-plug Hard Drive,3.5in HYB CARR | | | |
| PERC H730 Integrated RAID Controller, 1GB Cache | | | |
| Emulex LPE12002 Dual Channel 8Gb PCIe Host Bus Adapter, Low Profile | | | |
| Performance BIOS Settings | | | |
| DVD+/-RW, SATA, Internal | | | |
| Dual, Hot-plug, Redundant Power Supply (1+1), 750W | | | |
| C13 to C14, PDU Style, 10 AMP, 0.6m Power Cord | | | |
| PowerEdge Server FIPS TPM | | | |
| Intel Ethernet i350 QP 1Gb Network Daughter Card | | | |
| Intel Ethernet I350 QP 1Gb Server Adapter | | | |
| PowerEdge R730/R730xd Motherboard | | | |
| No Media Required | | | |
| No Operating System | | | |
| Electronic System Documentation and OpenManage DVD Kit, PowerEdge R730/xd | | | |
| OEM Order | | | |
| Not Selected in this Configuration | | | |
| Asset Service - System & Shipbox Label (Model, Svc Tag, Order Information, Basic | | | |
| Config Details) | | | |
| ReadyRails Sliding Rails With Cable Management Arm | | | |
| RAID 1 for H330/H730/H730P (2 HDDs or SSDs) | | | |
| Base Warranty | | | |
| 1Yr Parts Only Warranty (Emerging Only) | | | |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| INFO 1 Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>3Yr ProSupport and Next Business Day On-Site Service (Emerging Only)<br>Consolidation Fee<br>EX-Works | | | |
| PowerEdge KVM 1081AD - 8 Port Keyboard/Video/Mouse Analog Switch, EUCEM 8x USB Server Interface Pod, includes 2 CAT 5 Cables, TAA | Dell | 1 | 1081AD |
| 1U KMM (Touchpad, US/International Keyboard and Widescreen 18.5" LED) with ReadyRails - Kit | Dell | 1 | |
| FAS8020A-001-R6  FAS8020 High Availability System  7-Mode  2<br>X6226-R6-C  Chassis,FAS8020,AC PS,-C     1<br>X6554-R6-C  Cable,Cntlr-Shelf/Switch,15m,LC/LC,Op,-C  4<br>X6559-R6-C  Cable,SAS Cntlr-Shelf/Shelf-Shelf/HA,5m,-C  8<br>X6562-R6-C  Cable,Ethernet,5m RJ45 CAT6,-C   4<br>X6585-R6-C  Cable,Ethernet,3m RJ45 CAT6,-C   1<br>X2065A-EN-R6-C  HBA SAS 4-Port Copper 3/6 Gb QSFP PCIe,EN,-C  2<br>X5515A-R6-C  Rackmount Kit,4N2,DS14-Middle,-C,R6  1<br>X5526A-R6-C  Rackmount Kit,4-Post,Universal,-C,R6  2<br>X6596-R6-C  SFP+ FC Optical 16Gb,-C  4<br>DOC-8020-C  Documents,8020,-C   1<br>X1973A-R6-C  Flash Cache 512GB PCIe Module 2,-C  2<br>X800-42U-R6-C  Power Cable,In-Cabinet,C13-C14,-C  6<br>DS2246-1014-24S-0P-R6-C  DSK SHLF,24x600GB,10K,0P,-C  2<br>SW-2-8020A-CIFS-C  SW-2,CIFS,8020A,-C   2<br>SW-2-8020A-FCP-C  SW-2,FCP,8020A,-C   2<br>SW-2-8020A-ISCSI-C  SW-2,iSCSI,8020A,-C   2<br>SW-2-8020A-NFS-C  SW-2,NFS,8020A,-C   2<br>OS-ONTAP-CAP2-0P-C  OS Enable,Per-0.1TB,ONTAP,Perf-Stor,0P,-C  288 | NetApp | 1 | FAS8020 |



| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| Digi PortServer TS 16 port rackmountable RJ-45 Serial to Ethernet Terminal Server | Digium | 2 | TS 16 |
| One (1) span digital T1/E1/J1/PRI PCI-Express x1 card | Digium | 2 | |
| Cisco 2921<br>Cisco 2921 Security Bundle w/SEC license PAK<br>SMARTNET 8X5XNBD Cisco 2921 Security<br>Four port 10/100/1000 Ethernet switch interface card<br>Cisco 2901-2921 IOS UNIVERSAL<br>Data Paper PAK for Cisco 2901-2951<br>Cisco 2921/2951 AC Power Supply<br>Console Cable 6ft with RJ45 and DB9F<br>Cisco Config Pro Express on Router Flash<br>Insert Packout - PI-MSE<br>IP Base License for Cisco 2901-2951<br>Blank faceplate for HWIC slot on Cisco ISR<br>512MB DRAM for Cisco 2901-2921 ISR (Default)<br>256MB Compact Flash for Cisco 1900 2900 3900 ISR<br>Security License for Cisco 2901-2951<br>Blank faceplate for DW slot on Cisco 2951 and 3925<br>Removable faceplate for SM slot on Cisco 290039004400 ISR | Cisco | 3 | 2921 |
| Cisco 3750X<br>Catalyst 3750X 48 Port Data IP Base<br>SMARTNET 8X5XNBD Catalyst 3750X 48 Port Data IP Base for 36 Months<br>Catalyst 3K-X 350W AC Secondary Power Supply<br>CAT 3750X IOS UNIVERSAL WITH WEB BASE DEV MGR<br>Cisco StackWise 50CM Stacking Cable<br>Catalyst 3750X and 3850 Stack Power Cable 30 CM<br>Catalyst 3K-X 10G Network Module<br>Catalyst 3K-X 350W AC Power Supply<br>Insert Packout - PI-MSE | Cisco | 2 | Cisco 3750X |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| Catalyst 2960-X 48 GigE 4 x SFP LAN Base SMARTNET 8X5XNBD Cat 2960-X Stk 24 GigE4xSFP LAN Base (36 Months) Insert Packout - PI-MSE | Cisco | 2 | Cisco 2960-X |
| Cinterion MC55i Modem | Cinterion | 9 | MC55i |
| Optiplex 7010 MT · OptiPlex 7010 MT : Mini-Tower · Windows 8 · 3rd Gen Intel Core i7-3770 (Quad Core, 3.40GHz Turbo, 8MB, w/ HD4000 Graphics · 8GB (2X4GB) 1600 MHz DDR3 Non-ECC · UK/Irish (QWERTY) Dell KB212-B QuietKey USB Keyboard Black · 1TB 3.5inch Serial ATA III (7.200 Rpm) Hard Drive · Dell Optical (Not Wireless), Scroll USB (3 buttons scroll) Black Mouse · 16XDVD+/-RW Drive · Internal Dell Business Audio Speaker · 3Yr ProSupport and Next Business Day On-Site Service (Emerging Only) | Dell | 15 | |
| Dell Professional P2314H 58.4cm(23") LED monitor VGA,DVI-D,DP (1920x1080) Black UK | Dell | 30 | |
| APC NetShelter SX 42U Deep Enclosure 1200X600 with Roof and Sides Black | APC | 2 | AR3300 |
| Rack PDU 2G, Metered, ZeroU, 32A, 230V, (36) C13 & (6) C19 | APC | 4 | AP8853 |
| PDU Cord Retention Kit for Full-Height & 48U, Basic & LCD-Metered PDU (1 per PDU | APC | 4 | AP9569 |
| Horizontal Cable Organizer 1U w/brush strip | | 10 | AR8429 |
| Cat7 patch cord,0.5m,BLue | | 20 | |
| Cat7 patch cord,1m,BLue | | 40 | |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| Cat7 patch cord,2m,BLue | | 60 | |
| Cat 7 patch cord,5m,BLACK | | 20 | |
| Cat 7 patch cord,10m,Grey | | 10 | |
| 48 port Cat 6 patch Panel HD Netkey | | 4 | |
| duplex patch cord,10m - Patch cord Fiber OM3 LC LC 10m | | 10 | |
| Console Cable 6ft with RJ45 and DB9F | | 2 | |
| Blank plate 1U(10 per pack total 4 packs) | | 40 | |
| Power Cord, C13 to C14, 5m | | 20 | |
| Power Cord, C13 to C14, 3m | | 40 | |
| APC Smart-UPS SRT 5000VA RM 230V | APC | 4 | SRT5KRMXLI |
| APC Smart-UPS SRT 5kVA Output HW Kit | APC | 4 | SRT001 |
| SRT001 Kit installation | APC | 4 | |
| power cable 3 meters for ups + Sicon 32A | APC | 4 | |
| APC Smart-UPS SRT 192V 5kVA and 6kVA RM Battery Pack | APC | 4 | SRT192RMBP |
| Office Pro Plus 2013 | Microsoft | 15 | |
| VPP L3 VMware vSphere 5 Enterprise for 1 processor Production Support/Subscription for VMware vSphere 5 Enterprise for 1 processor | Vmware | 4 processors | |
| VPP L3 VMware vCenter Server 5 Standard for vSphere 5 (Per Instance) | Vmware | 1 Instances | |

| Item Description | Manufacturer | QTY | Device Model |
|---|---|---|---|
| Veeam Backup & Replication Enterprise for Vmware and Hyper-V per Socket License | Veeam | 6 Sockets | |
| Microsoft Windows Server 2012 R2 Standard Edition 2 Socket License | Microsoft | 2 | |
| MS SQL 2014 Server Standard core 2 socket License | Microsoft | 2 | |
| Nagios XI (Enterprise version with 100 Nodes license) | Nagios | 1 | |

Exhibit B

Considerations

## Considerations Amounts

| Definition | Consideration for | Amount in USD |
|---|---|---|
| "System Consideration" | provision of the License, System and Services. | 8,000,000 (eight million) |
| "Support Period Consideration" | any one Support Period. | 22 % of the System Consideration. |

## Payment Terms

System Consideration

The System Consideration shall be paid by the End-User to the Company in three (3) installments as follows:

(a) 50% of the System Consideration shall be paid by January 28th, 2016 (the "First Installment").

(b) 35% of the System Consideration shall be paid upon the provision of the Hardware Equipment to the End-User's site.

(c) 15% of the System Consideration shall be paid upon the provision of a written notice by the Company to the End-User confirming that the Deployment of the System at the End-User's site was completed (the "Commissioning Notice").

Support Period Consideration

The Support Period Consideration shall be paid in one payment, in advance of each Support Period.

## Exhibit C

### Installation Requirements

The End-User shall ensure that the following pre-requisites are ready 2 weeks prior to the System installation (aligned to SW version).

Disclaimer: This list may change per Network\Regulation\System feature support changes.

| Pre-requisite | Equipment | Remarks |
|---|---|---|
| Internet Connection | 2 symmetric ATM lines each 20MB (from 2 different ISP's) with static IP's of 8 external addresses | 2 lines are required for redundancy. The minimum requirement might be even lower - depends on the number and type of end stations. |
| Cellular Reception | Stable Cellular Reception | ~-95 db |
| Air Condition | 18 Degrees | None |
| Electricity | 4 power socket - 220V | Server room and operational room drawings are required to accurately specify all wall outlets location. Power generator and Facility environment against hazard dangers are optional |
| Area needed for server room | 5X5M, Height 2.5 M | There are 2 48U racks with the following dimensions: Height 2258.00 mm, Width 600.00 mm, Depth 1070.00 mm |
| Area needed for operator room | 10X10M, Height 2.5 M | Can be divided into separate rooms |
| Patch panel | Depends on the number of stationary stations. Wires from the end stations to the patch panel in the rack | |
| SIMs | 2 SIM cards for each network | It is mandatory to use a 3rd party to order the SIMs, also use a postpaid account |
| Security | Lockable doors | |
| Untraceable payment method | 1 X named credit card with 4000$ balance<br>1 X Passport scan on the same name as a credit card<br>1 X Prepaid no name local SIM card<br>1 X Utility bill with address on the same name as Passport | It is recommended to use a 3rd party, The passport, credit card and utility bill should not be related to the organization |

JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA JUDICIAL SERVICE OF GHANA

## Exhibit D

### Service Level Agreement

1.    Introduction

This Service Level Agreement (the "**SLA**") is an agreement between NSO Group Technologies Ltd. (hereinafter the "**Company**") and Infralok Development Limited (hereinafter the "**Reseller**").

The purpose of this SLA is to specify the services and commitments with respect to the software technical support, location support and/or hardware replacement services for the purchased products.

1.1.   Objectives of the Service Level Agreement

To create an environment which is conducive to a co-operative and productive relationship between the Company, the End User, and the Reseller to ensure effective support for the End User.

To document the responsibilities of all the parties involved in the SLA.

To ensure the Company provides high quality service to the Reseller and the End User.

To define the service to be delivered by the Company and the level of service which can be expected by the End User, thereby reducing the risk of misunderstandings.

To institute a formal system of objective service level monitoring ensuring that reviews of the SLA are based on factual data.

To provide a common understanding of service requirements/capabilities and of the principals involved in the measurement of service levels.

To provide for all parties to this SLA a single, easily referenced document, which caters for all objectives as listed above.





2.      Definitions

**Hardware Replacement** means a HW replacement service for the hardware products purchased by the Reseller from the Company, whereby the Company delivers a replacement to the End User's site before the End User returns the faulty hardware.

All Hardware Replacements shall take effect after the Company receives relevant alerts and all required information, and determines that the hardware issue is related to a malfunction of one of the hardware components.

**Business Day** means a normal working day in the time zone where the End User is located.

**Device Number** means a unique identifier of a hardware device, which can be located on a label on a Hardware product:

- Media Access Control (**MAC**) Address,
- Serial Number (**S/N**),
- Service Tag Number (**STN**)
- International Mobile Station Equipment Identity (**IMEI**)

**Documentation** means the User and Technical manuals provided by the Company for use with the purchased software and hardware products.

**Enhancement** means all software changes, including new releases, new versions, product improvements, system modifications, updates, upgrades and service packs.

**Error** means an error in one or more of the Company's products, which degrades the product functionality in accordance with the Severity definitions, as compared to the product functionality and performance specifications described in the official user guides provided by the Company.

**Hardware** means a computing device and/or its component with a specific function and limited configuration ability. The Hardware is sold by the Company to the Reseller for the sole purpose of executing the specific Software product/s supplied with it.

**Information** means any idea, data and program, technical, business or other intangible information, however conveyed.

**Problem Resolution** means the use of reasonable commercial efforts to resolve the reported problem. These methods may include, but are not limited to: configuration changes, patches that fix an issue, replacing a failed hardware component, reinstalling the software, etc.

**Force Majeure** has the meaning ascribed to it in the Agreement between the parties.

**Response** means addressing the initial request and commencement of work pertaining to the issue.

**Response Time** means the amount of time elapsed between the initial contact by the Reseller or the End User with the Company's Technical Support Team and the returned response to the Reseller or the End User by the Company's support staff.

**Resolution Time** means the amount of time elapsed between the initial contact by the Reseller or the End User with the Company's Technical Support Team till the issue reported is resolved wither by permanent fix or a workaround till a permanent fix would be available.

**Security Code** means a specific code dedicated to the End User's account in the Company's Technical Support Center. This code must be provided by the End User each time the End User approaches the Company's support staff.

**Support** means the technical Support and Hardware replacement services provided by the Company to the End User as set forth in this SLA.

**Support case** means a single issue opened in the Company's Case Management System. The case number identifies the Service Request.

**Field Service Engineer** means an engineer that provides the following onsite services: installation, field configuration, operates system to demonstrate equipment on test devices and to analyze malfunctions, interprets maintenance manuals, schematics, and diagrams, and repairs electronic equipment, such as computer, computing device or component, utilizing knowledge of electronics and using standard test instruments and hand tools.

**System** means the Hardware, Software and Documentation that have been provided to the Reseller and/or the End User by the Company.

**Workaround** means a change in the followed procedures or data to avoid error without substantially impairing use of the product.

3.      Company's Obligations

3.1.    Maintenance and Support

The Services shall include warranty, support and maintenance of the System as further detailed below, via support center.

The Company shall provide the End User with technical support for the System, consisting of: (a) first level to fourth level ("**Tier1 to Tier4**" as described in section 6.2) support via the Company's support center, and (b) SW updates and SW upgrades of the System, which, for the avoidance of any doubt, shall not be specifically adjusted to comply with any End-User Adjustments (as such term is defined in the Agreement which this SLA is attached to). The Services shall only be provided to the End User

System support and maintenance covers both SW and HW provided by the company. In case of 3rd party HW supplier, the company will contact the 3rd party and ensure proper support provided to the End User.

Maintenance will cover the following:

a. **SW upgrades** – periodical SW releases to add new features and bug fixes. Installing a new SW upgrade is communicated in advance to schedule the best time for the end-user and minimize the system downtime

b. **SW updates** – special SW packages provided to fix specific critical bug outside the periodical SW release. SW updates are also provided when a new OS version is introduced for a specific platform (e.g new iOS version).

c. **Monitoring system** – connected to our 24/7 NOC room and monitored around the clock. The monitoring system is configured to do the following:

   a. Connected to all the major HW components in the system, providing real-time status of the system.

   b. Monitors SW components such as tunnels, VPS servers alerting when any component goes down

   c. Checks for white accounts balances and alerts when it is below a predefined threshold

   For further details, see the enclosed "System monitoring capabilities and requirements" appendix.

d. **24/7 support** – A dedicated NOC center is operated to provide 24/7 support. Tickets can be submitted via phone call, dedicated website or email. The NOC representatives follow our support procedures to ensure each ticket is being handled according to the SLA.

End user should report issues with the system, using an agreed form or tool specifying all predefined data and providing all the required operational and technical information

The Company shall not be obligated to provide the Services in case of misuse, abuse, neglect, alteration, modification, improper installation of the System, use of the System for purposes other than those authorized by the Company, or repairs by anyone other than the Company or its authorized representatives without the Company prior written approval. The Company shall not be obligated to provide the Services in connection with the End-User Adjustments.

3.2.    Software Support

For End Users covered under a valid Support offering, Software Support will be provided pursuant to the terms of **Section 6 "Software Support Procedure"**. The scope of commitment



in case of System failure requiring a software repair or fix is to preserve the System at the fully functional condition as per the acceptance data of the System by the End User.

Software fixes are generally delivered in a secure format, delivered by the Company or in special occasions by the Reseller and/or the End User or third party partner if it is agreed for a particular case. In addition, permanent fixes are developed for known non-critical issues. These are incorporated into service pack updates that are periodically distributed. The version updates may include additional features, bug fixes and/ or services.

The Company agrees to provide Support, where appropriate to the End User, which may include but is not limited to, the following actions:

(a) Provide the End User with access to product update releases and related Documentation, upon general commercial release.

(b) Provide the End User with access to Technical Support Team representatives, who will work with the End User to diagnose issues, and provide Problem Resolutions, including escalating the issue as needed.

3.3.     Hardware Replacement

For End Users covered under a valid Support offering, the Company will use commercially reasonable efforts to provide Hardware replacement in accordance with the terms set forth in **Section 5 "Hardware Replacement Procedure"**. Provision of hardware Replacement is subject to the following limitations:

(a) The Company will provide Hardware Replacement for up to three (3) years after hardware installation at the End User's Site or according to standard Hardware in case of a 3rd party supplier.

(b) Hardware shall be repaired or replaced with same or similar products when needed, at the Company's discretion.

3.4.     On-site Hardware Support

For End Users covered under a valid Support offering, upon the End User's request, after the Company determines that the hardware issue is related to a malfunction of one of the hardware components, the Company will decide whether to dispatch a representative to the site.

**Provision of on-site support is subject to the following limitations:**

(a) On-site Hardware Support does not include on-site service for Software troubleshooting or any Software or training related issues.

(b) On-site Hardware Support service may not dispatch a representative on-site to perform Hardware replacement outside of the End User's Site address for the Hardware.

(c) On-site service response times may be dependent upon the End User's Site address for the Hardware, the timely arrival of replacement parts at the End User's Site, and accessibility to the Site.

3.5.     On-site Software Support

On-site Software Support applies only in cases of Severity 1 issues which can't be solved remotely (based on the Company's customer support staff judgment). After the Company confirms that the matter is a Severity 1 issue, the Company and the End User will work diligently, with highly skilled engineers to resolve the critical situation and to restore operation.



In case the criticality of the issue remains or no progress is made, the Company will decide whether to dispatch a representative to the End User's Site or use a partner Support representative.

3.6.    Exclusions

**Support does not include the following items or actions:**

(a) Step-by-step installation of Software or Service Packs.

(b) On-site services (outside the ones described in this SLA), Professional Services, Managed Services, or Educational Services.

(c) Modification of software code, IT Network architecture changes, Security-policy configuration, Audits, or Security design.

**The Company shall have no obligation to Support:**

(a) An altered, damaged, or modified product or any portion of the product incorporated with or into other software, hardware, or products not specifically approved in advance in writing by the Company.

(b) Product problems caused by the Reseller's and/or the End User's negligence, misuse, misapplication, or use of the product in a way other than as specified in the System user manual, or any other causes beyond the control of the Company.

(c) Product installed on any computer hardware that is not supported by the Company.

(d) Product not purchased from the Company.

(e) Products subjected to unusual physical or electrical stress, misuse, negligence or accident, or used in ultra-hazardous activities.

**The Company shall have no obligation to Support the End User if:**

(a) Appropriate payment for Support has not been received by the Company and the Reseller and/or the End User is unable to show reasonable proof of such payment; or

(b) The End User's annual Support term has expired without renewal.

5.  Hardware Replacement Procedure

The Company uses equipment from leading vendors, surveillance, network servers and software remedies. With each manufacturer, the Company has a contract for Service and Customer technical support.

For End Users covered under a valid Support offering, the Company will provide the following Hardware Support:

(a) The Company will attempt to diagnose and resolve Hardware problems over the phone or via remote access. Upon determination that an issue is related to a malfunction of one of the Hardware components, the Hardware Replacement process will be initiated by the Company.

(b) The Company will either issue a replacement for the faulty part or a full Hardware product replacement.

(c) The Company will send the required hardware to the End User's Site location within thirty (30) business days of Hardware Replacement process initiation. The time to ship the required hardware is dependent also on the export procedures that the Company must comply with, as well as the import procedures on the End User's side.

(d) The End User must ship back the faulty Hardware product (or replaceable unit) suitably packaged, as specified by the Company in a letter shipped with the replacement, to a location designated by the Company.

(e) Return shipment of the faulty Hardware should be made within five (5) business days of the arrival of the replacement. Transportation costs for return shipment shall be borne by the End User.

(f) Transportation costs incurred in connection with the delivery of a repaired or replacement item to the End User by the Company shall be borne by the Company; provided, however, that if the Company determines, in its sole discretion, that the allegedly defective item is not covered by the terms and conditions of the Hardware Support described in this SLA or that a claim is made after the Hardware Support period expired, the cost of the repair or replacement by the Company, including all shipping expenses, shall be reimbursed by the End User.

(g) The Company shall have no obligation to Support and Replace Hardware not monitored by Monitoring Client installed on the System and connected to the Company's Technical Support Center.

**The Company shall have no obligation to Support:**

(a) An altered, damaged, or modified product or any portion of the product incorporated with or into other software, hardware, or products not specifically approved in writing by the Company.

(b) Product problems caused by the End User's negligence, misuse, misapplication, or use of the product other than as specified in the System user manual, or any other causes beyond the control of the Company.

(c) Products subjected to unusual physical or electrical stress, misuse, negligence or accident, or used in ultra-hazardous activities.

(d) Untrained personnel from the End User are operating the system.

6. Software Support Procedure

(a) Upon initiation of initial contact with the Company's Technical Support Center, the End User must authenticate its identity by providing a valid **Security Code**. The Company shall have no obligation to provide Support if the End User does not provide the code.

(b) A Technical Support representative will validate the **Security Code** and start gathering details relevant to the question or issue. The Company shall have no obligation to provide Support services if the End User does not provide the relevant information.

(c) A unique Support Case number [**Trouble Ticket**] will be assigned and delivered to the End User either verbally or via email. This number will be used to track any given issue from initial contact to final Problem Resolution.

(d) If appropriate, an issue will be reproduced in the Company's labs. Additional testing and problem duplication may take place in a network laboratory environment. Further investigation, including additional troubleshooting or debugging activity may be required. Based on the results of the Test Lab investigation, an issue may be resolved, or, if an anomaly is identified, elevated to the appropriate Company's Team for final Problem Resolution.

(e) The Company agrees to use commercially reasonable efforts to work with the End User on Problem Resolution for an issue in accordance with the specifications of this SLA. Timely efforts must be made by all parties involved. If communication from the End User ceases without notice, after five (5) business days, the Company may, upon notice, close a Support Case due to inactivity on the part of the End User.

(f) The End User agrees to grant access via dedicated secured VPN tunnel, upon receiving a request from the Company for addressing issues reported by the End User. Thus, the Company will have access to the System for a limited period of time in order to reach Problem Resolution. The Company shall have no obligation to provide Support services if the End User does not provide the VPN connection to the System.

(g) The End User agrees to grant access via dedicated secured VPN tunnel, upon the Company's request, for the purpose of Software updates and upgrades or for fixing problems detected during the system operation. Thus, the Company will have access to the System for a limited period of time in order to update/upgrade the System. The Company shall have no obligation to apply any updates/upgrades if the End User does not provide the VPN connection to the System.

(h) The Company shall have no obligation to provide Support services if Internet access / 3G issues occur at the End User's Site.

**Exceptions**:

In some cases, the Company may not be able to resolve the issue until the access network is stable (for example when the service provider installs firewalls over a period of time or there is a poor 3G coverage or poor Internet access). In these cases, the Problem Resolution period will be paused until the network is stable again.

Opening a support ticket regarding authentication of an inbound roamer identity, will require the customer to provide a valid (activated) IMSI and MSISDN of the specific MNO from the specific country.

*Note:* System will present targets' information only if such information is available, based on global roaming agreements. SAI (Send Authentication Info) and MSISDN by IMSI, information may not be retrieved if target is hosted by an operator that blocks such queries or in lack of roaming agreements with the telecom gateway.

**Technical Support Center:**

For End Users covered under a valid Support offering, the Company will provide the following Software Support:

(a) The Company will provide the End User with access to the Company's Technical Support Center 24 hours a day, 7 days a week, 365 days a year.

(b) The Company will provide the End User with assistance in operating, managing and configuring the System as well as resolving any Software technical issues.

(c) The End User is able to submit an unlimited number of support cases by phone, email, and web (Case Management System).

6.1.    Support Levels and Support Level activities:

**Tier 1 Support** – Technical support that is provided by an Engineer trained by the Company. Support activities at this level should include basic software and hardware installations, upgrades, basic troubleshooting, configuration changes and/or operation optimization.

**Tier 2 Support** – Technical support level that is provided by a Field Service Engineer. Support activities at this level should include all Tier 1 activities, customization management, configuration changes and diagnostics or advanced troubleshooting.

**Tier 3 Support** – Technical support level that is provided by a Technical Support Specialist. Support activities at this level should include all Tier 1 and Tier 2 activities, in-depth System instructions, advanced diagnostics, and troubleshooting at R&D level. This level of support shall be initiated by a request to the System Support Team.

**Activities:**

(a) Providing initial client contact

(b) Establishing problem logs and tracking

(c) Providing "how to" support

(d) Determining if an issue is documented

(e) Maintaining configuration knowledge

(f) Working with the End User to duplicate and reproduce problems

(g) Providing internal problem determination and verification

(h) Performing remote diagnosis

**Tier 4 Support** – Technical support level that is provided by an R&D Engineer. Support activities at this level should include design level consultation and solutions, software R&D diagnostics, and high level of software and hardware fixes and solutions. This level support shall be initiated by a request to the Technical Support Team.

**Activities:**

(a) Isolating, tracking and fixing operational issues

(b) Working with the End User to duplicate and reproduce problems

(c) Technical evaluation and allocation of defect reports within R&D

(d) Providing system fixes if and when deemed necessary

(e) Performing remote diagnosis

(f) System upgrades

6.2.    Severity Levels

**Severity Level 1 - Critical Business Impact:** Complete System failure in which no field procedure resolves the reported issue. A problem has made a critical application function unusable or unavailable and no workaround exists.

**Severity Level 2 - Serious Business Impact:** The System is able to work, but is producing major errors in certain requests sent. A problem has made a critical application function unusable or unavailable but a workaround exists.



**Severity Level 3 - Minor Business Impact**: The system has problems, which do not affect its main functions. A problem has diminished critical or important application functionality or performance but the functionality still performs as specified in the user documentation.

(a) **For Severity Level 1**: the Company's System Support Team and the End User agree to dedicate full time and all the necessary resources to solve the case. Top priority is to restore/improve service, not to debug the problem.

(b) **For Severity Level 2 and 3**: the Company's System Support Team and the End User agree to use their technical resources in order to restore an acceptable level of service or bring relevant information

6.3.    Contacting the Technical Support Center

**Service Availability**: The services of the helpdesk shall be available by way of CRM tool, email, telephone at all times 24 hours a day, 7 days a week.

**Report of System failure:** The End User shall notify the Company in writing (via e-mail or CRM tool) using the "Customer Support Ticket" form, or by telephone promptly following the discovery of any verifiable and reproducible failure of the System. This SLA does not apply to bug reports or feature requests that are cosmetic or do not otherwise impair the operation of the System. Such bugs reports or feature requests are typically prioritized for handling in some future regularly scheduled product release.

**Email Support**

The Company's Technical Support Center responds to all support requests sent via email. Generally, this is used as a backup in case the End User is unable to access the Case Management System. Email: helpdesk@globalhelp.support

**Telephone Support**

The Company's support engineers are available by telephone to receive support requests.

Phone: +44-20-3695-4101

**Skype**

NOC-HelpDesk

**Contact Support via the web portal**

The end user can also open a ticket to the Company's Technical Support Center via a dedicated web portal that is connected to a CRM tool. Access is secured with a username and password which the Company will provide.

6.4.    Response Time and Resource Commitment

**Severity 1**

(a) Response Time: 1 hour
(b) Commitment – the Company and the End User will commit the necessary resources around the clock for Problem Resolution to obtain workaround or reduce the severity. Top priority is to

restore/improve service, not to debug the problem. If a workaround could not be provided, the task will be transferred to Supplier's R&D Team for further investigation.

**Severity 2**

(a) Response Time – 1 hour
(b) Commitment - the Company and the End User will commit the necessary resources during normal business hours for Problem Resolution to obtain workaround or reduce the severity. Top priority is to restore/improve service, not to debug the problem.

**Severity 3**

(a) Response Time – 4 hours
(b) Commitment – the Company's Technical Support Team and the End User agree to use their technical resources during normal business hours for Problem Resolution to obtain workaround or reduce the severity. Top priority is to restore an acceptable level of service or bring relevant information.

**NOTE**: In case of Hardware problems, the faulty parts will be shipped and time for shipment will be defined for each specific case. In case of severe software problems, the time for resolution will be defined on a case-by-case basis. The Company will use commercially reasonable efforts to provide Hardware replacement in accordance with the terms set forth in **Section 5 "Hardware Replacement Procedure"**.

6.5.    Resolution Time and Resource Commitment

**Severity 1**

(a) Resolution Time: 2 business days
(b) Commitment – the Company and the End User will commit the necessary resources around the clock for Problem Resolution to obtain workaround or reduce the severity. Top priority is to restore/improve service.

**Severity 2**

(a) Resolution Time – 10 business days
(b) Commitment - the Company and the End User will commit the necessary resources during normal business hours for Problem Resolution to obtain workaround or reduce the severity. Top priority is to restore/improve service.

**Severity 3**

(c) Resolution Time – the 2nd scheduled SW release
(d) Commitment – the Company's Technical Support Team and the End User agree to use their technical resources during normal business hours for Problem Resolution to resolve the issue in the next scheduled SW release. This will be communicated by the Company to the End user.

7.    Clarifications

- The System will extract target 3G keys only if such information is available, based on global roaming agreements. This information may not be retrieved if the target is hosted by an operator that blocks such queries or in lack of roaming agreements with the telecom gateway.

- The System will not extract targets 3G keys from and in specific countries such as the USA and Israel.

- The installation of the system may involve the deployment of a dedicated SS7 telecom gateway at one or more of the mobile operators in the country. The End User shall be responsible for providing access and permissions to the sites where the equipment is to be installed, including the allocation of necessary space, power and ventilation required for the installation of the equipment.

- In case of a cloud-based implementation, i.e., no SS7 gateway implemented at a local telecom operator, billing records of targets may be affected and interception of incoming SMS will be restricted.

- Operating-wise, it is recommended that system queries be used with caution and on highly important cases, this in order to minimize risk of exceeding acceptable threshold in the foreign network for such activity.

The Company reserve the right to end the System's life upon a six months prior notice, with effect not before the lapse of 5 (five) years of a sale of a license to the System to the Reseller and/or the End User. Operation of the System during its life period is conditioned upon timely and full payment of maintenance and support fees during the entire period.

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br>WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation | **DEFENDANTS**<br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED |
| **(b)** County of Residence of First Listed Plaintiff<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  ISRAEL<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Cooley LLP, Travis LeBlanc (251097)<br>101 California Street, 5th floor, San Francisco, CA   94111<br>415-693-2000 | Attorneys *(If Known)* |

## II.   BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U S  Government Plaintiff

☐ 2 U S  Government Defendant

☒ 3   Federal Question
        *(U.S. Government Not a Party)*

☐ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.   NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC § 881 | ☐ 422 Appeal 28 USC § 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury – Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC § 157 | ☐ 376 Qui Tam (31 USC § 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel    Slander | Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment of Veteran's Benefits | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| | ☐ 340 Marine | | ☐ 720 Labor/Management Relations | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 740 Railway Labor Act | ☐ 835 Patent–Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 751 Family and Medical Leave Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced & Corrupt Organizations |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 790 Other Labor Litigation | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Medical Malpractice | ☐ 385 Property Damage Product Liability | | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | | | **IMMIGRATION** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 462 Naturalization Application | ☐ 864 SSID Title XVI | |
| ☐ 196 Franchise | ☐ 440 Other Civil Rights | **HABEAS CORPUS** | ☐ 465 Other Immigration Actions | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U S  Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease    Ejectment | ☐ 445 Amer  w/Disabilities– Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC § 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 446 Amer w/Disabilities-Other | **OTHER** | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 448 Education | ☐ 540 Mandamus    Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.   ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI.   CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1030

Brief description of cause:
Computer Fraud and Abuse Act

## VII.   REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**
Permanent Injunction and Damages

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes  ☐ No

## VIII.   RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE                                                    DOCKET NUMBER

## IX.   DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*        ☒ SAN FRANCISCO/OAKLAND        ☐ SAN JOSE        ☐ EUREKA-MCKINLEYVILLE

DATE  10/29/2019            SIGNATURE OF ATTORNEY OF RECORD            /s/ Travis LeBlanc

American LegalNet, Inc.
www.FormsWorkFlow.com

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

               Plaintiffs,

     v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

               Defendants.

Case No. 19-cv-07123-PJH

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS AND DENYING MOTION TO
STAY DISCOVERY**

Re: Dkt. Nos. 45, 95

Before the court is defendants NSO Group Technologies, Ltd. ("NSO") and Q Cyber Technologies Ltd.'s ("Q Cyber," and together with NSO, "defendants") motion to dismiss. The matter is fully briefed and suitable for decision without oral argument. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court rules as follows.

## BACKGROUND

On October 29, 2019, plaintiffs WhatsApp Inc. ("WhatsApp") and Facebook, Inc. ("Facebook" and together with WhatsApp, "plaintiffs") filed a complaint ("Compl.") alleging that defendants sent malware, using WhatsApp's system, to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of surveilling the users of those phones and devices. Dkt. 1, ¶ 1. The complaint alleges four causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; (3) breach of contract; and (4) trespass to chattels.

Plaintiff WhatsApp is a Delaware corporation with its principal place of business in

United States District Court
Northern District of California

Menlo Park, California and is owned by plaintiff Facebook, which is also a Delaware corporation with its principal place of business in Menlo Park, California. Compl. ¶¶ 3–4. WhatsApp provides an encrypted communication service that is accessed through the WhatsApp application ("app") that users must download to their personal devices. Id. ¶ 17. Defendant NSO is an Israeli limited liability company and defendant Q Cyber is an Israeli corporation and NSO's only active director and the majority shareholder. Id. ¶¶ 5–6. Defendants are alleged to manufacture, distribute, and operate surveillance technology "designed to intercept and extract information and communications from mobile phones and devices" Id. ¶ 24.

In order to use the WhatsApp app and service, WhatsApp users consent to WhatsApp's terms of service in which they agree to "use [WhatsApp's] Services according to [WhatsApp's] Terms and policies" and further agree to "access and use [WhatsApp's] Services only for legal, authorized, and acceptable purposes." Id. ¶¶ 19–20. WhatsApp's terms prohibit users from using services in ways that "violate, misappropriate, or infringe the rights of WhatsApp, [its] users, or others," "are illegal, intimidating, harassing, . . . or instigate or encourage conduct that would be illegal, or otherwise inappropriate;" or "involve sending illegal or impermissible communications." Id. ¶ 21. Additionally, users are not permitted to:

> (a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services, (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the safety, security, or performance of our Services; [or] . . . (f) collect the information of or about our users in any impermissible or unauthorized manner.

Id. ¶ 22.

Plaintiffs allege that defendants created a data program, termed Pegasus, that could "remotely and covertly extract valuable intelligence from virtually any mobile device." Id. ¶ 27. Defendants licensed Pegasus and sold support services to customers. Id. ¶ 29. According to public reporting and as alleged, defendants' customers include

2

sovereign nations such as the Kingdom of Bahrain, the United Arab Emirates, and Mexico.  Id. ¶ 43.  Defendants could customize Pegasus for different purposes such that, once installed on a user's device, they could intercept communications, capture screenshots, or exfiltrate browser history and contacts from that user's device.  Id. ¶¶ 27, 41.  Defendants used a network of computers to monitor and update the version of Pegasus implanted on a user's phone as well as control the number of devices that a customer could compromise using Pegasus.  Id. ¶ 28.

Between January 2018 and May 2019, defendants are alleged to have created WhatsApp accounts that could be used to send malicious code to personal devices in April and May 2019.  Id. ¶ 33.  Defendants also leased servers and internet hosting services from third parties such as Choopa, QuadraNet, and Amazon Web Service; the leased servers were used to distribute malware and relay commands to users' devices.  Id. ¶ 34.  Defendants reverse engineered the WhatsApp app and developed Pegasus to emulate legitimate WhatsApp network traffic.  Id. ¶ 35.

Pegasus is alleged to operate by first routing malicious code through WhatsApp's relay servers to a user's device.  Id. ¶ 36.  Defendants formatted certain messages containing the malicious code to appear like a legitimate call and concealed the code within the call settings.  Id. ¶ 37.  To avoid technical restrictions built into the WhatsApp signaling servers, defendants formatted call initiation messages that contained the malicious code to appear as a legitimate call.  Id.  The call would inject the malicious code into a device's memory whether or not the user answered the call.  Id.  After the malicious code was delivered to a device, defendants caused encrypted data packets to be sent to a user's device via WhatsApp's relay servers, designed to activate the malicious code residing on the memory of the target devices.  Id. ¶ 39.  Once activated, the malicious code caused the target device to connect to one of the leased, remote servers hosting defendants' malware, which was then downloaded and installed on the target devices.  Id. ¶ 40.  The malware would then give defendants and their customers access to information on the target devices.  Id. ¶ 41.

United States District Court
Northern District of California

Between April 29, 2019 and May 10, 2019, defendants caused their malicious code to be transmitted over WhatsApp's servers reaching approximately 1,400 devices used by "attorneys, journalists, human rights activists, political dissidents, diplomats, and other senior foreign government officials." Id. ¶ 42. On May 13, 2019, Facebook announced that it had investigated the vulnerability and WhatsApp and Facebook closed the vulnerability around that time. Id. ¶ 44.

## DISCUSSION

### A. Legal Standard

#### 1. Rule 12(b)(1)

A federal court may dismiss an action under Federal Rule of Civil Procedure 12(b)(1) for lack of federal subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Because "[a] federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears," the burden to prove its existence "rests on the party asserting federal subject matter jurisdiction." Pac. Bell Internet Servs. v. Recording Indus. Ass'n of Am., Inc., No. C03-3560 SI, 2003 WL 22862662, at *3 (N.D. Cal. Nov. 26, 2003) (quoting Gen. Atomic Co. v. United Nuclear Corp., 655 F.2d 968, 969 (9th Cir. 1981); and citing Cal. ex rel. Younger v. Andrus, 608 F.2d 1247, 1249 (9th Cir. 1979)). A jurisdictional challenge may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)). When the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction. Id. Where the attack is factual, however, "the court need not presume the truthfulness of the plaintiff's allegations." Id.

When resolving a factual dispute about its federal subject matter jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a motion to dismiss into one for summary judgment. McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"); see also Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's

4

1  jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as

2  they exist.").  "Once the moving party has converted the motion to dismiss into a factual

3  motion by presenting affidavits or other evidence properly brought before the court, the

4  party opposing the motion must furnish affidavits or other evidence necessary to satisfy

5  its burden of establishing subject matter jurisdiction."  Safe Air for Everyone, 373 F.3d at

6  1039.

7        **2.**     **Rule 12(b)(2)**

8        A federal court may dismiss an action under Federal Rule of Civil Procedure

9  12(b)(2) for lack of personal jurisdiction.  When resolving a motion to dismiss under Rule

10  12(b)(2) on written materials, the court accepts uncontroverted facts in the complaint as

11  true and resolves conflicts in affidavits in the plaintiffs' favor.  Mavrix Photo, Inc. v. Brand

12  Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011).  The party seeking to invoke a federal

13  court's jurisdiction bears the burden of demonstrating jurisdiction.  Picot v. Weston, 780

14  F.3d 1206, 1211 (9th Cir. 2015).  "Federal courts ordinarily follow state law in determining

15  the bounds of their jurisdiction over persons."  Daimler AG v. Bauman, 571 U.S. 117, 125

16  (2014); see Fed. R. Civ. P. 4(k)(1)(a).  California's long arm statute permits exercise of

17  personal jurisdiction to the fullest extent permissible under the U.S. Constitution,

18  therefore, the court's inquiry "centers on whether exercising jurisdiction comports with

19  due process."  Picot, 780 F.3d at 1211; see Cal. Code Civ. P. § 410.10.

20        The Due Process Clause of the Fourteenth Amendment "limits the power of a

21  state's courts to exercise jurisdiction over defendants who do not consent to jurisdiction."

22  Martinez v. Aero Caribbean, 764 F.3d 1062, 1066 (9th Cir. 2014).  Due process requires

23  that the defendant "have certain minimum contacts with it such that the maintenance of

24  the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe

25  Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  Under

26  the "minimum contacts" analysis, a court can exercise either "general or all-purpose

27  jurisdiction," or "specific or conduct-linked jurisdiction."  Daimler, 571 U.S. at 121–22

28  (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).

A court may exercise specific jurisdiction over a defendant if its less-substantial contacts with the forum give rise to the claim or claims pending before the court—that is, if the cause of action "arises out of" or has a substantial connection with that activity. Hanson v. Denckla, 357 U.S. 235, 250–53 (1958); see also Goodyear, 564 U.S. at 924–25. The inquiry into whether a forum state may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. Walden v. Fiore, 571 U.S. 277, 283–84 (2014) (citation omitted).

To determine whether a defendant's contacts with the forum state are sufficient to establish specific jurisdiction, the Ninth Circuit employs a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1142 (9th Cir. 2017). A plaintiff bears the burden of satisfying the first two prongs. Id. If the plaintiff does so, then the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1076 (9th Cir. 2011) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477–78 (1985)).

**3.  Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock Inc., 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

United States District Court
Northern District of California

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999), superseded by statute on other grounds as stated in In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130 (9th Cir. 2017)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document." (citation omitted)). The court may also consider matters that are properly the subject of judicial notice (Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001)), and exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)).

### 4. Rule 12(b)(7)

Federal Rule of Civil Procedure 12(b)(7) permits a party to move for dismissal for

7

failure to join a party recognized as indispensable by Federal Rule of Civil Procedure 19.
Fed. R. Civ. P. 12(b)(7); Quileute Indian Tribe v. Babbitt, 18 F.3d 1459, 1458 (9th Cir.
1994). Federal Rule of Civil Procedure 19 "governs compulsory party joinder in federal
district courts." E.E.O.C. v. Peabody W. Coal Co. ("Peabody I"), 400 F.3d 774, 778 (9th
Cir. 2005). When determining whether dismissal is appropriate under Rule 12(b)(7), the
court undertakes "three successive inquiries." Id. at 779.

"First, the court must determine whether a nonparty should be joined under Rule
19(a)"—that is, whether a nonparty is "necessary." Id. A nonparty is "necessary" if
joinder is "'desirable' in the interests of just adjudication." Id. (quoting Fed. R. Civ. P. 19
Advisory Committee Note (1966)). "There is no precise formula for determining whether
a particular nonparty should be joined under Rule 19(a). . . . The determination is heavily
influenced by the facts and circumstances of each case." E.E.O.C. v. Peabody W. Coal
Co. ("Peabody II"), 610 F.3d 1070, 1081 (9th Cir. 2010) (quoting N. Alaska Envtl. Ctr. v.
Hodel, 803 F.2d 466, 468 (9th Cir. 1986)).

A nonparty can be necessary under Rule 19(a)(1)(A) or Rule 19(a)(1)(B). A
nonparty is necessary under Rule 19(a)(1)(A) if "in that person's absence, the court
cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). A
nonparty is necessary under Rule 19(a)(1)(B) if that person "claims a legally protected
interest in the subject of the suit such that a decision in its absence will (1) impair or
impede its ability to protect that interest; or (2) expose [an existing party] to the risk of
multiple or inconsistent obligations by reason of that interest." Dawavendewa v. Salt
River Project Agr. Imp. & Power Dist., 276 F.3d 1150, 1155 (9th Cir. 2002).

Second, if a nonparty is necessary, the court determines "whether it is feasible to
order that the absentee be joined." Peabody I, 400 F.3d at 779. Joinder is not feasible
"when venue is improper, when the absentee is not subject to personal jurisdiction, and
when joinder would destroy subject matter jurisdiction." Id. Third, if joinder is not
feasible, the court must determine whether the party is "indispensable" under Rule 19(b),
that is, whether "in equity and good conscience, the action should proceed among the

existing parties or should be dismissed." Fed. R. Civ. P. 19(b). "The inquiry is a practical one and fact specific and is designed to avoid the harsh results of rigid application." Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990) (citations omitted).

When considering a motion to dismiss under Rule 12(b)(7), the court accepts as true the allegations in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles, 637 F.3d 993, 996 n.1 (9th Cir. 2011). But the court may consider evidence outside of the pleadings. See McShan v. Sherrill, 283 F.2d 462, 464 (9th Cir. 1960). "The moving party has the burden of persuasion in arguing for dismissal" for failure to join. Makah Indian Tribe, 910 F.2d at 558.

**B.     Analysis**

**1.     Subject Matter Jurisdiction**

As an initial observation, plaintiffs' complaint pleads a cause of action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, invoking the court's federal question jurisdiction. See Gully v. First Nat'l Bank, 299 U.S. 109, 111 (1936). Defendants' attack on the court's subject matter jurisdiction is, therefore, not facial, but factual.

Defendants contend that the court lacks subject matter jurisdiction because the conduct giving rise to the complaint was performed by foreign sovereigns and the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1602–11, bars any lawsuit on that basis. Mtn. at 8–9. Defendants also assert that the court should extend the doctrine of derivative sovereign immunity to them because defendants were contractors of the foreign sovereigns acting within the scope of their employment. Id. at 9–10.

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except as provided in the FSIA. 28 U.S.C. § 1604. The parties agree that defendants, as private foreign entities, do not qualify as foreign states and cannot directly avail themselves of the FSIA. Opp. at 3; Reply at 9. More pertinent is whether defendants may avail themselves of some sort of derivative sovereign immunity. There are two relevant doctrines implicated by defendants'

9

argument: foreign official immunity and derivative sovereign immunity. The court addresses each in turn.

### a. Foreign Official Immunity

In <u>Samantar v. Yousuf</u>, 560 U.S. 305, 308 (2010), the Supreme Court addressed whether the FSIA afforded a former Somali vice president and defense minister with immunity from suit based on actions taken in his official capacity. While the Court ultimately concluded that the FSIA did not extend to foreign officials, the Court separately discussed the common law doctrine of foreign sovereign immunity, which potentially applies to the acts of foreign officials not covered by the FSIA. See <u>id.</u> at 311 (citing <u>Schooner Exchange v. McFaddon</u>, 7 Cranch 116, 3 L.Ed. 287 (1812)). Over time, courts formulated a "two-step procedure developed for resolving a foreign state's claim of sovereign immunity." <u>Id.</u> The first step involves requesting a "suggestion of immunity" from the U.S. State Department. <u>Id.</u> If the State Department declines to issue the suggestion, then a district court "ha[s] authority to decide for itself whether all the requisites for immunity exist[ ]." <u>Id.</u> (quoting <u>Ex parte Peru</u>, 318 U.S. 578, 587 (1943)). At this second step, the court will grant immunity if "the ground of immunity is one which it is the established policy of the [State Department] to recognize." <u>Id.</u> at 312 (quoting <u>Republic of Mex. v. Hoffman</u>, 324 U.S. 30, 36 (1945)).

At the second step of foreign official immunity, courts distinguish between status-based immunity and conduct-based immunity. "Status-based immunity is reserved for diplomats and heads of state and attaches 'regardless of the substance of the claim.'" <u>Lewis v. Mutond</u>, 918 F.3d 142, 145 (D.C. Cir. 2019) (quoting Chimène I. Keitner, <u>The Common Law of Foreign Official Immunity</u>, 14 Green Bag 2d 61, 64 (2010)). "Conduct-based immunity is afforded to "any [ ] [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'" <u>Id.</u> (alterations in original) (quoting Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("Restatement")); <u>accord</u> <u>Dogan v. Barak</u>, 932 F.3d 888, 894 (9th Cir. 2019). While the Supreme Court "expressed

no view on whether Restatement § 66 correctly sets out the scope of common-law immunity applicable to current or former foreign officials," Samantar 560 U.S. at 321 n.15, in Doğan v. Barak, 932 F.3d at 893–94, the Ninth Circuit cited with approval Restatement § 66 to determine conduct-based immunity.  Restatement § 66 provides a three factor test for such immunity: "First, whether the actor is a public minister, official, or agent of the foreign state.  Second, whether the acts were performed in her official capacity.  And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state."  Lewis, 918 F.3d at 146.

Here, defendants do not argue that the U.S. State Department has issued them a suggestion of immunity or that status-based immunity is available to them.  Instead, they contend that conduct-based foreign sovereign immunity applies to a foreign sovereign's private agents when the agent acts on behalf of the state and that this standard applies to their conduct on behalf of foreign sovereigns.[1]  Reply at 10.

With respect to the first factor, plaintiffs do not contest that defendants are agents of foreign governments; indeed, the complaint alleges that defendants' customers include the Kingdom of Bahrain, the United Arab Emirates, and Mexico.  Compl. ¶ 43.  With respect to the second factor, defendants argue that foreign states used defendants' technology to fight terrorism and serious crime, which are official public acts.  Mtn. at 9 n.9.  Plaintiffs do not contend that defendants were acting outside the scope of their contracts with their customers, though they take issue with the idea that attacks on journalists and attorneys is consistent with fighting terrorism and crime.  Opp. at 4 n.2.  Regardless of the character of the governments' actions, no argument is made that defendants operated outside their official capacity.

With regard to the third factor, plaintiffs argue that a judgment enjoining NSO from

---

[1] Defendants suggest that derivative immunity is grounded in the common law of foreign sovereign immunity and that Butters v. Vance International, Inc., 225 F.3d 462 (4th Cir. 2000), applied the common law of foreign sovereign immunity.  Reply at 10.  Defendants appear to be merging two distinct doctrines, foreign official immunity and derivative sovereign immunity.  For clarity, the court only addresses foreign official immunity in this section and then addresses derivative immunity, as discussed in Butters.

1    creating or using accounts with WhatsApp would bind only NSO and that a monetary

2    judgment would not be paid from a foreign state's coffers.  Opp. at 6.  Defendants do not

3    directly address whether exercising jurisdiction would enforce a rule of law against a

4    foreign state.  However, in the context of their Rule 12(b)(7) motion to dismiss for failure

5    to join necessary parties, defendants argue that, because defendants' customers were

6    the entities that accessed plaintiffs' services, injunctive relief would necessarily bind

7    those sovereign nations.  Mtn. at 19.

8          In Lewis, 918 F.3d at 147, the D.C. Circuit, in evaluating the third factor, reasoned

9    that the defendants in that case failed to demonstrate that the plaintiff sought "to draw on

10   the [foreign state's] treasury or force the state to take specific action, as would be the

11   case if the judgment were enforceable against the state.  Defendants in this case are

12   being sued in their individual capacities and Plaintiff [did] not seek[] compensation out of

13   state funds."  Applying here, defendants have not argued that any of their foreign

14   sovereign customers would be forced to pay a judgment against defendants if plaintiffs

15   were to prevail in this lawsuit.  Plaintiffs also request injunctive relief against defendants

16   "and all other persons acting in concert or conspiracy with any of them or who are

17   affiliated with" defendants.  Compl., Request for Relief.  This issue is addressed in

18   greater depth with respect to defendants' 12(b)(7) motion, but, briefly, the court can craft

19   injunctive relief that does not require a foreign sovereign to take an affirmative action.

20   Thus, plaintiffs do not seek to enforce a rule of law against defendants' customers.

21         For the foregoing reasons, defendants do not qualify as foreign officials under the

22   content-based prong of the foreign official immunity test.

23         **b.      Derivative Sovereign Immunity**

24         Next, defendants argue that the court should apply the derivative sovereign

25   immunity doctrine articulated by the Fourth Circuit in Butters v. Vance International, Inc.,

26   225 F.3d at 466.  That case involved a suit by a U.S. employee against her employer, a

27   U.S. corporation.  Id. at 464.  The employer provided "security services to corporations

28   and foreign sovereigns," specifically to the wife of the king of Saudi Arabia while she was

United States District Court
Northern District of California

1    undergoing medical treatment in California.  Id.  The employee was employed to provide

2    security services but, because of the religious beliefs of the Saudi entourage, was not

3    permitted to work in the command post and eventually filed a gender discrimination suit

4    against her employer.  Id.

5        On appeal, the Fourth Circuit determined that the U.S. company could assert

6    derivative sovereign immunity.  Id. at 466.  The court cited Yearsley v. W.A. Ross

7    Construction Co., 309 U.S. 18, 21–22 (1940), for the proposition that "contractors and

8    common law agents acting within the scope of their employment for the United States

9    have derivative sovereign immunity."  Id. (emphasis added).  The court then extended the

10   rule of derivative sovereign immunity to American private agents of foreign governments:

> It is but a small step to extend this privilege to the private agents of foreign governments.  All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions.  This is especially true for foreign sovereigns given their lack of human resources while operating within the United States.  To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts.

16   Id.

17       Plaintiffs argue that the court should not apply Butters because no court in this

18   circuit has extended derivative domestic sovereign immunity to work performed for

19   foreign sovereigns.  Opp. at 4.  They also argue that Samantar effectively abrogated

20   Butters' holding because Butters cited and relied on the FSIA to extend sovereign

21   immunity to a private entity working for a foreign sovereign.  Id. at 6.  In response,

22   defendants contend that Butters remains good law and compare the facts here to

23   Yearsley where a contractor's performance was "authorized and directed" by the

24   government.  Reply at 10–11 (quoting Yearsley, 309 U.S. at 20).

25       The court need not decide whether Samantar abrogated Butters because Butters

26   is neither controlling nor persuasive authority.  Significantly, as plaintiffs note, the Ninth

27   Circuit has not held that the doctrine of derivative sovereign immunity applies to the

28

United States District Court
Northern District of California

United States District Court
Northern District of California

foreign contractors of foreign sovereigns.[2]  Nor is it clear that the circuit would do so because, as the district court in <u>Broidy Capital Management LLC v. Muzin</u>, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *7 (D.D.C. Mar. 31, 2020), pointed out, there are different rationales underlying domestic and foreign sovereign immunity.  Foreign sovereign immunity is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution."  <u>Verlinden B.V. v. Central Bank of Nigeria</u>, 461 U.S. 480, 486 (1983).  Conversely, domestic derivative sovereign immunity stems from a valid exercise of constitutional authority where the contractor does not exceed such authority.  <u>Yearsley</u>, 309 U.S. at 20–21 ("[I]t is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will.").  Moreover, the Supreme Court has cautioned that while "'government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States[,]' . . . [t]hat immunity, . . . unlike the sovereign's, is not absolute."  <u>Campbell-Ewald Co. v. Gomez</u>, 136 S. Ct. 663, 672 (2016) (quoting <u>Brady v. Roosevelt S.S. Co.</u>, 317 U.S. 575, 583 (1943)).  In light of these divergent doctrines and the lack of controlling authority, there is no compelling reason to extend derivative sovereign immunity to a foreign entity working on behalf of a foreign sovereign.

Even if the court were to apply <u>Butters</u> as persuasive authority, defendants fail to meet its standard because they are not incorporated or formed in the United States.  In

---

[2] Other circuits are split on the issue of whether <u>Yearsley</u> constitutes a rule of jurisdictional immunity.  <u>Compare</u> <u>Adkisson v. Jacobs Eng'g Grp., Inc.</u>, 790 F.3d 641, 647 (6th Cir. 2015) ("<u>Yearsley</u> immunity is, in our opinion, closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction." (citing <u>Filarsky v. Delia</u>, 566 U.S. 377, 389–92 (2012)); <u>Ackerson v. Bean Dredging LLC</u>, 589 F.3d 196, 207 (5th Cir. 2009) ("<u>Yearsley</u> does not discuss sovereign immunity or otherwise address the court's power to hear the case . . . ."), <u>with</u> <u>Cunningham v. Gen. Dynamics Info. Tech., Inc.</u>, 888 F.3d 640, 650 (4th Cir. 2018) (reaffirming holding that "<u>Yearsley</u> doctrine operates as a jurisdictional bar to suit and not as a merits defense to liability").  Because the court can resolve the derivative sovereign immunity question on other grounds, it need not wade into the circuit split concerning whether a <u>Yearsley</u> defense is jurisdictional.

Butters, the defendant asserting derivative sovereign immunity was a U.S. corporation and the Fourth Circuit's reasoning indicated that the U.S. citizenship of the company was necessary to its holding.  225 F.3d at 466 ("To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts." (emphasis added)).  None of the other cases cited by defendants involve the application of derivative sovereign immunity to foreign entities.[3]  E.g., Ivey for Carolina Golf Dev. Co. v. Lynch, No. 1:17CV439, 2018 WL 3764264, at *7 (M.D.N.C. Aug. 8, 2018) (applying Butters to find that United States citizen acting as agent of foreign sovereign was immune); see also Broidy Capital Mgmt. LLC v. Muzin, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *6 (D.D.C. Mar. 31, 2020) (recognizing Butters, Ivey, and Alicog v. Kingdom of Saudi Arabia, 860 F. Supp. 379, 384 (S.D. Tex. 1994), as cases "in which courts have extended foreign sovereign immunity to U.S. citizens").

Accordingly, the doctrine of derivative domestic sovereign immunity is not applicable to defendants.  For the foregoing reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED.

### 2. Personal Jurisdiction

#### a. Consent

Defendants argue that they have not consented to personal jurisdiction by accepting WhatsApp's terms of service.  Mtn. at 11.  The Ninth Circuit has recognized that accepting a forum selection clause evidences consent to personal jurisdiction in that forum.  SEC v. Ross, 504 F.3d 1130, 1149 (9th Cir. 2007) (citing Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 315–16 (1964); and Dow Chem. Co. v. Calderon, 422 F.3d

---

[3] In a case cited by defendants, Moriah v. Bank of China Ltd., 107 F. Supp. 3d 272, 277 n.4 (S.D.N.Y. 2015), the district court cited Butters while discussing derivative foreign sovereign immunity as applied to a foreign official.  However, the court's reasoning applied the "'two-step procedure' to assess common-law claims of foreign sovereign immunity" required by Samantar.  Id. at 276 & n.27 (quoting Samantar, 560 U.S. at 312).  Thus, the court's citation of Butters was not necessary to its finding and did not discuss the distinction between derivative sovereign immunity and foreign official immunity.

United States District Court
Northern District of California

827, 831 (9th Cir. 2005)). Forum selection clauses are presumptively valid, M/S Bremen v. Zapata Off–Shore Co., 407 U.S. 1, 10 (1972), and courts "apply federal law to the interpretation of the forum selection clause." Doe 1 v. AOL LLC, 552 F.3d 1077, 1081 (9th Cir. 2009) (citing Manetti–Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 513 (9th Cir. 1988)).

"Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first." Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999). A contract is interpreted as a whole and each part is interpreted with reference to the whole. Id. "A primary rule of interpretation is '[t]hat the common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it.'" Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 77 (9th Cir. 1987) (quoting 4 Williston, A Treatise on the Law of Contracts, § 618 (W. Jaeger 3d ed. 1961)).

Here, the forum selection clause in WhatsApp's terms of service that were in effect at the time of the alleged conduct provided:

> If you are not subject to the "Special Arbitration Provision for United States or Canada Users" section below, you agree that you will resolve any Claim you have with us relating to, arising out of, or in any way in connection with our Terms, us, or our Services (each, a "Dispute," and together, "Disputes") exclusively in the United States District Court for the Northern District of California or a state court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes.

Declaration of Joseph N. Akrotirianakis ("Akro. Decl."), Ex. 6, Dkt. 45-7, at 9; Declaration of Michael P. Duffy ("Duffy Decl."), Ex. 1, Dkt. 55-4, at 4. As defined earlier in the terms of service, "us" is defined as WhatsApp and "you" is not defined but appears to refer to the counterparty accepting the terms of service, i.e., the user. Duffy Decl., Ex. 1 at 2.

Defendants do not argue that the terms of service are unreasonable, unjust, or

16

otherwise inapplicable to them. Instead, they contend that the present litigation does not fall within the defined term "Dispute" because a dispute involves "any Claim you have with us," which would not apply to claims WhatsApp has with its users. Mtn. at 11–12. Plaintiffs contend that the better reading of that phrase would include any claim between WhatsApp and its users, regardless of who initiated the claim. Opp. at 11.

The question here is whether the parties to the terms of service intended for the definition of the term "Dispute" to apply as a one-way street, i.e., a user filing a claim against WhatsApp, or a two-way street, either a user or WhatsApp filing a claim against the other. By creating a parenthetical with the word "Dispute," WhatsApp defined that term in reference to the sentence preceding the parenthetical. In relevant part, the term "Dispute" means "any Claim you have with us relating to, arising out of, or in any way in connection with our Terms, us, or our Services." The common or normal meaning of the word "have" in the phrase "any Claim you have with us" is as a transitive verb meaning "to hold or maintain as a possession, privilege, or entitlement." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/have (last visited June 22, 2020). In the phrase "any Claim you have with us," the subject that has "any Claim" is "you," not "us." Thus, the entity holding or maintaining the claim as a possession, privilege, or entitlement is the user not WhatsApp. Reading the foregoing together, the ordinary meaning of the term "Dispute" is that a user holds in possession any claim against WhatsApp and not that WhatsApp possesses a claim against a user.

Plaintiffs argue that the court should read the choice of law provision to interpret the way in which the term "Dispute" is read in the forum selection clause. The choice of law provision states: "The laws of the State of California govern our Terms, as well as any Disputes, whether in court or arbitration, which might arise between WhatsApp and you, without regard to conflict of law provisions." Duffy Decl., Ex. 1 at 4. The phrase "any Disputes . . . between WhatsApp and you" indicates that it applies to a dispute shared by or common to the parties. It is notable that WhatsApp chose to use "between" in the choice of law provision but not the forum selection clause. Had WhatsApp

17

intended to provide for claims initiated by either a user or by WhatsApp, WhatsApp could have (but did not) use the term "between" when defining the term "dispute." Additionally, the choice of law provision uses the defined term "Disputes," which indicates that the definition from the forum selection clause should simply be applied in the choice of law provision but not that the term accumulates an additional meaning (i.e., between) because of the choice of law provision.

Accordingly, the terms of service's forum selection clause do not apply to claims initiated by WhatsApp against its users and, therefore, defendants did not consent to personal jurisdiction.

### b. Specific Jurisdiction

Plaintiffs contend that the court should exercise specific jurisdiction over defendants under both a purposeful direction theory (based on their tort claims) and a purposeful availment theory (based on their contract claim). Opp. at 12.

### i. Purposeful Direction

Under the Calder effects test, plaintiffs must show that defendants (1) committed an intentional act, (2) expressly aimed at the forum state, (3) caused harm that the defendant knew was likely to be suffered in the forum state. Calder v. Jones, 465 U.S. 783, 789–90 (1984).

With regard to the first element, plaintiffs have identified the intentional act as the targeting of WhatsApp's systems and servers by defendants to disseminate malicious code and malware. Opp. at 14. Defendants contend that they did not commit the intentional act in question; instead, foreign governments committed the intentional acts and have submitted a declaration to that effect. Mtn. at 14. Plaintiffs respond that the court cannot accept defendants' contention at the pleading stage. Opp. at 14 n.11.

For purposes of personal jurisdiction, there does not appear to be any dispute that someone sent malicious code and malware through WhatsApp's servers, accessed WhatsApp's servers without authorization, and sent unauthorized commands to WhatsApp's computers. Rather the dispute concerns whether defendants' evidence

United States District Court
Northern District of California

demonstrates that someone other than defendants committed the intentional act. Plaintiffs allege that defendants accessed WhatsApp's computers and servers and user's devices without authorization.  Compl. ¶¶ 54, 60.  To rebut those allegations, defendants offer the declaration of Shalev Hulio, NSO's CEO and co-founder, wherein he declares that "NSO markets and licenses the Pegasus technology to its sovereign customers, which then operate the technology themselves . . . ."  Hulio Decl. ¶ 14.  "Defendants role is limited to NSO providing advice and technical support to assist customers in setting up—not operating—the Pegasus technology."  Id.

Two points limit the persuasiveness of the declaration.  First, the declaration itself leaves open the possibility of defendants' involvement in the intentional act because Hulio qualifies his statement on defendants' limited advice and technical support role by stating "[w]hen Defendants provide those support services, they do so entirely at the direction of their government customers, and Defendants follow those directions completely."  Id.  Thus, it appears defendants retained some role in conducting the intentional act, even if it was at the direction of their customers.  Second, the complaint goes beyond the statements in the Hulio declaration because plaintiffs allege that defendants designed and manufactured a program to exploit WhatsApp's app, servers, and infrastructure.  At this stage, the boundary between defendants' conduct and their clients' conduct is not clearly delineated or definitively resolved by the Hulio declaration. Because the court resolves conflicts in affidavits in plaintiffs' favor and plaintiffs only need to demonstrate that they have established a prima facie showing of jurisdictional facts, Mavrix Photo, 647 F.3d at 1223, plaintiffs have sufficiently demonstrated that defendants committed an intentional act.

The second element "asks whether the defendant's allegedly tortious action was 'expressly aimed at the forum.'"  Picot, 780 F.3d at 1214 (quoting Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1129 (9th Cir. 2010), abrogated on other grounds by Walden, 571 U.S. 277).  "The 'express aiming' analysis depends, to a significant degree, on the specific type of tort at issue."  Schwarzenegger v. Fred Martin Motor Co.,

374 F.3d 797, 807 (9th Cir. 2004). The alleged torts in the complaint center on the improper access to and misuse of WhatsApp's application, servers, and network.

Defendants advance several arguments why plaintiffs fail to show express aiming, including a lack of allegations that the leased, third-party servers are located in California and, if they are in California, courts have rejected the argument that the mere location of a server may give rise to personal jurisdiction. Mtn. at 14. Further, the complaint does not allege that any of defendants' code was routed through WhatsApp's servers located in California or that they even have California servers. Id. at 14–15. Defendants also argue that the contact created between an out-of-state defendant and a server is de minimis. Id. at 15. In response, plaintiffs argue that defendants' acts targeted a California-based company and used WhatsApp's and third-party QuandraNet's California-based servers. Opp. at 14–15. Plaintiffs distinguish the cases cited by defendants on the grounds that they dealt with incidental access to third-party servers rather than intentional targeting of WhatsApp's California-based servers. Id. at 15. Plaintiffs also point to marketing by a U.S.-based advertising arm that advertised defendants' ability to target WhatsApp. Id.

Much of the express aiming argument centers on the role of computer servers. There are two categories of servers at issue in the personal jurisdiction analysis: third-party servers that were leased by defendants for the alleged purpose of transmitting malware from the leased server to a user's phone (Compl. ¶ 34) and WhatApp's signaling and relay servers through which defendants routed malicious code to a user's phone (id. ¶ 36). The servers leased by defendants were owned by third parties such as Choopa, QuadraNet, and Amazon Web Services and located in different countries, including the United States. Id. ¶ 34. The complaint does not allege any of these third-party servers are located in California, but declarations attached to plaintiffs' opposition brief aver that QuadraNet is a California-based company with California-based servers. Dkt. 55-1 ¶¶ 3–5; Dkt. 55-6 ¶¶ 2–4, Exs. 1–5.

With respect to the leased third-party servers, plaintiffs have not demonstrated that

defendants expressly aimed their conduct at the forum state.  As other district courts have noted, "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."  Hungerstation LLC v. Fast Choice LLC, No. 19-CV-05861-HSG, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (collecting cases).  Plaintiffs have identified one third party, QuadraNet, that allegedly leased servers, located in California, to defendants.[4]  Defendants filed a supplemental declaration[5] with their reply brief that expressly denies that defendants contracted with QuadraNet for use of servers.  Dkt. 62-1, ¶ 3.  This supplemental declaration casts doubt on the fact that defendants used the QuadraNet servers in California.  Even without the declaration, the connection between defendants and any leased server located in California is fortuitous.  Neither party controlled where the third parties placed their servers and the servers were not the ultimate target of the intentional act.  The leased servers were utilized to send malware and other commands to users' devices but not WhatsApp's servers.  Yet, these users are not alleged to be located in California.

With respect to the location of WhatsApp's relay and signaling servers, two critical facts are relevant.  First, the servers in question are not owned by third parties but are WhatsApp's own servers and, contrary to defendants' contention in their motion, plaintiffs allege that at least some of those servers were located in California.  Compl. ¶ 60 ("Defendants knowingly and without permission used and caused to be used WhatsApp Signaling Servers and Relay Servers, including servers located in California, in violation

---

[4] Plaintiffs request the court judicially notice information from nonparty QuadraNet's website.  Dkt. 56.  Specifically, plaintiffs request the court notice QuadraNet's terms of service as it appeared on its website on January 29, 2019 and the current version of the terms of service, which became effective March 4, 2020.  Id. at 2–3.  The request is unopposed.  Generally, when considering whether to grant a request for judicial notice, a court may consider factual information from the internet as long as the facts are not subject to reasonable dispute.  See, e.g., Perkins v. LinkedIn Corp., 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014).  Accordingly, the court **GRANTS** plaintiffs' request for judicial notice.

[5] Civil Local Rule 7-3(c) permits declarations to be submitted with a reply brief.  Civil Local Rule 7-3(d)(1) permits an opposing party to file an objection to "new evidence [that] has been submitted in the reply . . . ."  Plaintiffs did not file an objection (timely or otherwise) to the supplemental declaration.

United States District Court
Northern District of California

of California Penal Code § 502(c)(3)." (emphasis added)).  Defendants have not controverted the allegation that WhatsApp's servers were located in California and the court accepts the allegation as true.  Second, defendants are alleged to have targeted WhatsApp's signaling and relay servers and caused malicious code to be routed through those servers.  Id. ¶ 36 ("WhatsApp's Signaling Servers facilitated the initiation of calls between different devices using the WhatsApp Service.  WhatsApp's Relay Servers facilitated certain data transmissions over the WhatsApp Service.").  These allegations indicate that defendants' program sought out specific servers—including servers in California—in order to transmit malicious code through those servers.

Because defendants are alleged to have targeted WhatsApp's own servers, this case is distinguishable from Hungerstation LLC, 2020 WL 137160, at *5, and Rosen v. Terapeak, Inc., No. CV-15-00112-MWF (EX), 2015 WL 12724071, at *9 (C.D. Cal. Apr. 28, 2015), where the servers in question were incidental to the alleged conduct and owned by third parties.  Instead, this case is similar to Seattle Sperm Bank, LLC v. Cryobank Am., LLC, No. C17-1487 RAJ, 2018 WL 3769803, at *1 (W.D. Wash. Aug. 9, 2018), where former employees, located in Phoenix, of the Seattle-based plaintiff were alleged to have "copied 10 folders onto a removable hard drive . . . . contain[ing] more than 1,500 documents . . . . These materials were housed on a server in Seattle, Washington."  The court went on to reason that

> [d]efendants worked for a company whose principal place of business in Seattle, Washington, a fact that they had knowledge of, as Defendants attest that Blaine interviewed for his job there and Kumar had his initial training there.  [The defendant employees] downloaded the allegedly misappropriated information from servers located in Seattle, Washington.  Not only is Plaintiff headquartered in Seattle, but Defendants' actions allegedly caused harm likely to be suffered in Washington.

Id. at *2 (citation omitted).

Here, similar to Seattle Sperm Bank, defendants sought out and accessed

plaintiffs' servers.[6]  Defendants are alleged to have reverse-engineered the WhatsApp app and developed a program that emulated legitimate WhatsApp network traffic in order to transmit malicious code over WhatsApp servers.  Compl. ¶ 35.  This indicates a knowledge of how WhatsApp's servers worked and where they were located such that defendants could exploit WhatsApp's servers for their own use and the use of their customers.

In their reply brief, defendants argue that, even if WhatsApp had servers in California and NSO sent messages through those servers, there is no allegation or argument that NSO selected the location of the server.  Reply at 6.  In other words, defendants contend the location of the server is fortuitous and their claims would have been the same if the servers were located in Cleveland, Paris, or Timbuktu.  Id. at 7.  The express aiming prong depends on the type of tort alleged, Picot, 780 F.3d at 1214, and here plaintiffs allege that defendants targeted and accessed WhatsApp's servers without authorization.  The location of the servers is, therefore, not a fortuity but central to the alleged tortious conduct.  For example, courts have analogized a CFAA cause of action to digital "breaking and entering" and a "trespass offense" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 1001 (9th Cir. 2019) (citations omitted), similar to the common law trespass to chattels offense alleged.  By sending malicious code to the California based servers, defendants allegedly caused a digital transmission to enter California, which then effectuated a breaking and entering of a server in California.  Cf. Picot, 780 F.3d at 1215 (concluding personal jurisdiction not appropriate in California where the defendant interfered with a contract "without entering California, contacting any person in California, or otherwise reaching out to California").

---

[6] Defendants would distinguish Seattle Sperm Bank on the grounds that the plaintiff in that case intentionally stole data from the servers, which defendants are not alleged to have done here.  Reply at 7 n.9.  The difference between the misappropriation of trade secrets tort alleged in Seattle Sperm Bank, 2018 WL 3769803, at *2, and the trespass to chattels and unauthorized access torts alleged here is not material for purposes of express aiming.  Both cases involve an intentional tort that seeks access to a computer system without permission.

United States District Court
Northern District of California

Finally, defendants argue that even if defendants targeted plaintiffs and knew plaintiffs to be California residents, plaintiffs have not shown defendants targeted California. Mtn. at 13–14. Defendants are correct to note that plaintiffs cannot rely on a theory of individualized targeting. Prior to Walden v. Fiore, courts in this circuit found the express aiming element to be satisfied where a defendant knew of the plaintiff's connection to the forum and there was a foreseeable harm to the plaintiff. See, e.g., Amini Innovation Corp. v. JS Imports, Inc., 497 F. Supp. 2d 1093, 1105 (C.D. Cal. 2007). As the Ninth Circuit's opinion in Axiom Foods, Inc. v. Acerchem International, Inc., 874 F.3d 1064, 1069–70 (9th Cir. 2017), held, Walden requires more than knowledge of a plaintiff's forum connections combined with the foreseeable harm that plaintiffs suffered in the forum. This holding effectively abrogated any individualized targeting theory. Rather, a court "must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." Id. at 1070 (quoting Walden, 571 U.S. at 289). "Calder made clear that mere injury to a forum resident is not a sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[7] Walden, 571 U.S. at 290.

Applying here, it is clear that the alleged conduct goes beyond defendants' knowledge that plaintiffs are located in California and would suffer harm in California. The complaint avers that defendants sought out WhatsApp's California-based servers for the purpose of routing malicious code through those servers to ultimately reach individual users' phones. By sending the malicious code, defendants electronically entered the

---

[7] While Walden reaffirmed that a defendant's conduct remains the touchstone of specific jurisdiction, the Court expressly reserved deciding the amount of minimum contacts "where intentional torts are committed via the Internet or other electronic means (e.g., fraudulent access of financial accounts or 'phishing' schemes)." Walden, 571 U.S. at 290 n.9. The Court characterized intentional torts committed using electronic means as "present[ing] the very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State." Id. This footnote reinforces the court's conclusion that where a defendant enters a forum state with malicious code and seeks out servers owned by a plaintiff in that forum state and then commits an intentional tort, such conduct is sufficient to find personal jurisdiction.

United States District Court
Northern District of California

forum state seeking out plaintiffs' servers, which were a necessary component to transmit the malicious code to the users. Defendants created a connection with the forum beyond an individualized targeting theory. Accordingly, plaintiffs have demonstrated that defendants expressly aimed their intentional act at the forum state.

The third element of the <u>Calder</u> effects test is whether the defendants caused harm that they knew would likely be suffered in the forum state. Defendants do not offer any argument as to this element. Plaintiffs have alleged that defendants harmed them by interfering with the WhatsApp service and burdening their network and have injured plaintiffs' reputation, public trust, and goodwill. Compl. ¶¶ 46–47. If defendants did access plaintiffs' servers without authorization (or exceeded authorized access), then they would have known they were harming plaintiffs. <u>See</u> <u>id.</u>, Ex. 10 at 33 (product description naming Facebook and WhatsApp as applications to be monitored). Defendants also knew that such harm would be suffered in California; for example, the Hulio declaration states that Facebook contacted NSO to inquire about certain capabilities of Pegasus, indicating that defendants were well aware of plaintiffs and their principal place of business in California. Hulio Decl. ¶ 10. Therefore, plaintiffs have demonstrated the purposeful direction element of specific jurisdiction. For that reason, the court does not reach plaintiffs' argument that the court has jurisdiction under Rule 4(k)(2).

### ii. Purposeful Availment

A prima facie showing of purposeful availment "typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. By taking such actions, a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" <u>Schwarzenegger</u>, 374 F.3d at 802 (quoting <u>Hanson</u>, 357 U.S. at 253). When analyzing purposeful availment, the court must "use a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of

the business transaction." <u>Burger King</u>, 471 U.S. at 479 (internal quotation marks and citation omitted). Generally, an individual's contract with an out-of-state party alone cannot establish sufficient minimum contracts. <u>Id.</u> at 478. "To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" <u>Boschetto v. Hansing</u>, 539 F.3d 1011, 1016 (9th Cir. 2008) (quoting <u>Sher v. Johnson</u>, 911 F.2d 1357, 1362 (9th Cir. 1990)). Courts examine the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" that "determin[e] whether the defendant purposefully established minimum contacts with the forum." <u>Burger King</u>, 471 U.S. at 479.

Defendants argue that plaintiffs cannot demonstrate purposeful availment because defendants did not take any actions in the forum, such as executing or performing a contract in California. Mtn. at 16. While defendants acknowledge they accepted the terms of service, they contend a contract alone does not establish minimum contacts and there are no other allegations of affirmative conduct in California. <u>Id.</u> Plaintiffs argue that defendants purposefully availed themselves of California's benefits for three reasons. First, the terms of service included a California choice-of-law clause, which shows an intent by defendants to avail themselves of California law. Opp. at 12. Second, defendants continuously performed under the terms of service. <u>Id.</u> at 12–13. Third, defendants engaged in activities directed at California such as developing Pegasus with financing from a California-based private equity firm and contracting with a California-based technology company, QuadraNet. <u>Id.</u> at 13.

Beginning with prior negotiations, there is no allegation or evidence that the parties engaged in prior negotiations. Nor would one expect there to be any negotiations because terms of service are contracts of adhesion that users choose to either accept or reject based on whether they desire to use a company's service. Next, the contemplated performance does not center on California. WhatsApp's terms of service apply to every

26

1  user no matter where they are located.  As plaintiffs point out, the terms of service

2  committed defendants to continuously perform under the contract, but nothing about that

3  performance had anything to do with California—especially in this instance where

4  defendants are not alleged to have traveled to or otherwise performed in California after

5  they agreed to the terms of service.

6      With respect to the terms of the contract, plaintiffs point to the choice-of-law

7  provision in the terms of service.  That provision stated: "[t]he laws of the State of

8  California govern our Terms, as well as any Disputes, whether in court or arbitration,

9  which might arise between WhatsApp and you, without regard to conflict of law

10  provisions."  Duffy Decl., Ex. 1.  WhatsApp's choice of law provision would be relevant if it

11  were combined with other facts to demonstrate that defendants purposefully availed

12  themselves of California law.  In Google, Inc. v. Eolas Technologies Inc., No. 13-cv-

13  05997-JST, 2014 WL 2916621, at *3 (N.D. Cal. June 24, 2014), the court found the

14  choice of law provision persuasive in the context of a 20-year licensing agreement

15  whereby the defendant entered into the agreement in California, was formerly a California

16  entity, and agreed to ongoing marketing, litigation, and bookkeeping obligations as part of

17  a patent royalty agreement.  Similarly, in Facebook, Inc. v. Rankwave Co., No. 19-cv-

18  03738-JST, 2019 WL 8895237, at *6 (N.D. Cal. Nov. 14, 2019), the court assumed that

19  the defendant, as a "sophisticated entity . . . consented to the [terms of service] and its

20  choice-of-law provision for seven of the years during which it created and operated apps

21  on Facebook's platform."  Thus, the choice of law provision may be relevant but only

22  when combined with other facts that defendants intended to avail themselves of

23  California law.

24      There are no such facts here.  This case involves a contract of adhesion where

25  defendants, despite being sophisticated entities, had no ability to negotiate the terms of

26  service.  Unlike Eolas (licensing agreement) and Rankwave (creating apps), defendants

27  were only using WhatsApp's service as any individual consumer might.  If the court were

28  to accept plaintiffs' argument, then any user simply by accepting the terms of service and

27

1 | otherwise having no interaction with California could be said to have purposefully availed
2 | him or herself of California's laws.

3 |   Plaintiffs advance a few other arguments that involve conduct outside the four
4 | corners of the terms of service. First, defendants are alleged to have received financing
5 | from a California-based private equity firm. From 2014 to February 2019, a San
6 | Francisco-based entity owned a controlling interest in NSO. Compl. ¶ 5 & Ex. 4. This
7 | fact represents a potential connection with California, but plaintiffs have not connected it
8 | to the WhatsApp terms of service, the alleged conduct (which occurred after Q Cyber
9 | acquired NSO), or that the funding was instrumental to the alleged conduct. Second,
10 | plaintiffs argue that defendants intentionally exploited WhatsApp's California-based
11 | infrastructure. This allegation is relevant to the purposeful direction test but is not
12 | relevant to purposeful availment. Third, plaintiffs point to defendants' contract with
13 | QuadraNet to use QuadraNet's servers to direct malware to WhatsApp's users.
14 | Defendants have denied this fact in a supplemental declaration. Nor is it clear how a
15 | contract with a third party informs the purposeful availment analysis concerning the terms
16 | of service agreed to by WhatsApp and defendants.

17 |   In sum, plaintiffs have not met their burden to demonstrate purposeful availment.
18 | Because, however, plaintiffs have met their burden with respect to purposeful direction,
19 | the court turns to whether exercising personal jurisdiction would comport with fair play
20 | and substantial justice.

21 |     **iii.**   **Reasonableness and Pendent Jurisdiction**

22 |   The factors that are relevant to the fair play and substantial justice evaluation are:
23 | "(1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the
24 | burden on the defendant of defending in the forum; (3) the extent of the conflict with the
25 | sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the
26 | dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of
27 | the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence
28 | of an alternative forum." <u>CollegeSource</u>, 653 F.3d at 1079. No one factor is dispositive

United States District Court
Northern District of California

28

and the court must balance all of the factors.  Core-Vent Corp. v. Nobel Indus., AB, 11

F.3d 1482, 1488 (9th Cir. 1993).  The more attenuated the contacts with the forum state,

the less a defendant must show in terms of unreasonableness to defeat the court's

exercise of jurisdiction.  Id.  At this step of the specific jurisdiction analysis, the burden

shifts to defendants to present a compelling case that jurisdiction would be unreasonable.

Burger King, 471 U.S. at 477.

First, the purposeful injection factor is analogous to the purposeful direction

analysis.  Corp. Inv. Bus. Brokers v. Melcher, 824 F.2d 786, 790 (9th Cir. 1987) ("Ninth

Circuit cases give the 'purposeful interjectment' factor no weight once it is shown that the

defendant purposefully directed its activities to the forum state . . . ." (citations omitted)).

Because plaintiffs demonstrated purposeful direction, defendants injected themselves

into the forum state.

Second, courts "examine the burden on the defendant in light of the corresponding

burden on the plaintiff."  Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir.

1988) (quoting Brand v. Menlove Dodge, 796 F.2d 1070, 1075 (9th Cir. 1986)).  Here, the

burden on defendants to litigate in California is substantial given that their witnesses and

evidence are located in Israel.  However, the burden on plaintiffs to litigate in Israel would

be similarly burdensome as their witnesses and evidence are located in California.

Defendants have also secured U.S.-based outside counsel and a U.S.-based public

relations firm for the express purpose of this lawsuit (Dkt. 20-6), which indicates the

burden is somewhat mitigated.  Further, given the advances in technology, it is not clear

that the burden of litigating is so great as to violate due process.  See Sinatra, 796 F.2d

at 1199 (observing, in 1988, that "modern advances in communications and

transportation have significantly reduced the burden of litigating in another country"

(citations omitted)).  In sum, this factor is in equipoise.

Third, "conflict with the sovereignty of the defendant's state 'is not dispositive

because, if given controlling weight, it would always prevent suit against a foreign

national in a United States court.'"  Id. (quoting Gates Learjet Corp. v. Jensen, 743 F.2d

1325, 1333 (9th Cir. 1984)).  "The Supreme Court, though, has cautioned against extending state long arm statutes in an international context."  Id. (citing Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty., 480 U.S. 102, 115 (1987)).  Here, while defendants have presented no evidence as to a particular interest, the state of Israel has some presumable interest in adjudicating conflicts concerning their corporate citizens.  See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd., 328 F.3d 1122, 1133 (9th Cir. 2003) ("While [defendant] has presented no evidence of the United Kingdom's particular interest in adjudicating this suit, we may presume for present purposes that there is such an interest.").  This factor cuts in favor of defendants.

Fourth, California maintains a strong interest in providing an effective means of redress for its residents tortuously injured in California.  Sinatra, 854 F.2d at 1200.  Here, plaintiffs' principal places of business are Menlo Park, California and they were allegedly harmed in California.  This factor militates in favor of exercising jurisdiction.

Fifth, in considering which forum could most efficiently resolve this dispute, courts "focus on the location of the evidence and witnesses."  Harris Rutsky, 328 F.3d at 1133 (citing Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 129 (9th Cir. 1995)).  Here, defendants' evidence and witnesses are located in Israel and plaintiffs' evidence and witnesses are in California.  This factor is neutral especially given the advances of modern technology.  See Panavision Int'l v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998) (noting factor is "no longer weighed heavily given the modern advances in communication and transportation" (citation omitted)).

Sixth, "[i]n evaluating the convenience and effectiveness of relief for the plaintiff, we have given little weight to the plaintiff's inconvenience."  Id. at 1324 (citing Ziegler v. Indian River Cty., 64 F.3d 470, 476 (9th Cir. 1995)).  Here, the maintenance of this suit in a foreign country would be inconvenient for plaintiffs.  This factor tips in plaintiffs' favor, though only slightly.

Seventh, the parties dispute which party has the burden to show Israel is inadequate as an alternative forum.  Defendants cite Ballard v. Savage, 65 F.3d 1495,

1    1502 (9th Cir. 1995), where the Ninth Circuit stated that the defendant "Royal claims that

2    an Austrian court could hear [the plaintiff's] claims, but it presents absolutely no evidence

3    on this issue, erroneously assuming that the burden is on [the plaintiff] to prove the lack

4    of an alternate forum." Ballard cites no authority for the proposition that the defendant

5    must prove lack of alternate forum. In contrast, defendants cite Amoco Egypt Oil Co. v.

6    Leonis Navigation Co., where the court stated that the plaintiff "Amoco has the burden of

7    proving the unavailability of an alternative forum." 1 F.3d 848, 853 (9th Cir. 1993) (citing

8    Pac. Atl. Trading Co. v. M/V Main Exp., 758 F.2d 1325, 1331 (9th Cir. 1985)). Both

9    Sinatra, 854 F.2d at 1201, and Harris Rutsky, 328 F.3d at 1134, cases decided before

10   and after Ballard, hold that the burden is on plaintiffs to prove unavailability. The weight

11   of authority holds that plaintiffs have the burden on this factor and they have not cited any

12   evidence that Israel is not an available alternative forum whereas defendants cite several

13   cases finding Israel to be an available forum. E.g., Israel Discount Bank Ltd. v. Schapp,

14   505 F. Supp. 2d 651, 659 (C.D. Cal. 2007). This factor points towards defendants.

15        In sum, some factors tip in defendants' favor and others tip in plaintiffs' favor. The

16   Ninth Circuit has indicated that, in such an instance, a defendant has not carried its

17   burden to present a compelling case that exercising jurisdiction would be unreasonable.

18   See Harris Rutsky, 328 F.3d at 1134 ("The balance is essentially a wash, since some of

19   the reasonableness factors weigh in favor of [defendant], but others weigh against it.");

20   see also Roth v. Garcia Marquez, 942 F.2d 617, 625 (9th Cir. 1991) (finding exercise of

21   jurisdiction was reasonable even though only two reasonableness factors favored

22   plaintiff, while three favored defendant). Accordingly, exercising personal jurisdiction

23   over defendants comports with fair play and substantial justice.

24        Finally, plaintiffs argue that, if the court finds personal jurisdiction is appropriate

25   over some but not all claims, the court should exercise pendent jurisdiction over the

26   remaining claims. Opp. at 18. They contend that NSO's unauthorized use of

27   WhatsApp's infrastructure underpins each of plaintiffs' claims. Id. at 19. Defendants do

28   not address pendent jurisdiction.

United States District Court
Northern District of California

"Personal jurisdiction must exist for each claim asserted against a defendant."[8]
Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004)
(citing Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1289 n.8 (9th Cir.
1977)). "[A] court may assert pendent personal jurisdiction over a defendant with respect
to a claim for which there is no independent basis of personal jurisdiction so long as it
arises out of a common nucleus of operative facts with a claim in the same suit over
which the court does have personal jurisdiction." Id. In this case, the breach of contract
claim involves the same common nucleus of operative facts as the tort claims and
pendent jurisdiction is appropriate.

For the foregoing reasons, defendants' motion to dismiss the complaint for lack of
personal jurisdiction is DENIED.

### 3. Failure to Join Necessary Parties

Defendants move to dismiss the complaint because plaintiffs failed to join
defendants' foreign sovereign customers under Rule 19. Mtn. at 18. As an initial matter,
defendants argue only that their customers are required parties under Rule 19(a)(1)(A),
(id. at 19), and the court focuses its analysis on that provision.

Finding a party to be necessary under Rule 19(a)(1)(A) requires the court to

---

[8] The court uses the term "pendent personal jurisdiction" to distinguish the concept from
the supplemental jurisdiction statute, 28 U.S.C. § 1367. As explained by a leading
treatise:

> In recent years, there has been some debate about whether
> Section 1367 of Title 28, the supplemental jurisdiction statute,
> should be read to include the doctrine of pendent personal
> jurisdiction. Neither the plain meaning of this statute, which
> shows it to be a subject matter jurisdiction provision, nor its
> legislative history supports the conclusion that Congress
> intended Section 1367 to include personal jurisdiction . . . . [I]f
> pendent personal jurisdiction exists, it must be properly
> understood to be a federal common law doctrine. For the sake
> of clarity, this section will refer to "pendent personal jurisdiction"
> rather than "supplemental personal jurisdiction" to highlight the
> fact that Section 1367 should not be read to subsume personal
> as well as subject matter jurisdiction.

4A Wright & Miller, Federal Practice & Procedure, § 1069.7 (4th ed. 2020).

determine that "complete relief" cannot be accorded between the existing parties absent the joinder of the nonparty.  "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action."  Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir. 1983) (citing Advisory Committee's Note, 39 F.R.D. 89, 91 (1966)).  In conducting a Rule 19(a)(1)(A) analysis, courts ask whether the absence of the nonparty party would preclude the court from fashioning meaningful relief as between the parties.  Id. at 1044.  This prong only concerns current parties to the action.  Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 879 (9th Cir. 2004); see also NGV Gaming, Ltd. v. Upstream Point Molate, LLC, 355 F. Supp. 2d 1061, 1068 (N.D. Cal. 2005) ("The effect a decision may have on the absent party is not material." (internal quotation marks and citation omitted)).

Here, the parties focus on whether the court can issue an injunction that would afford plaintiffs complete relief.  The complaint requests the following:  "[t]hat the Court enter a permanent injunction enjoining and restraining Defendants and their agents, servants, employees, successors, and assigns, and all other persons acting in concert with or conspiracy with any of them or who are affiliated with Defendants from" various actions including accessing or attempting to access WhatsApp's service or platform.  Compl., Request for Relief.  There are two possible readings of the underlined language.  On the one hand "all other persons acting in concert with or conspiracy with any of them" could be read as seeking an injunction against defendants' customers who both parties acknowledge are sovereign nations.  On the other hand, the language could be read as standard boilerplate drawn from Rule 65(d)(2)(C) that does not necessarily bind the sovereign nations by requiring them to take an affirmative action.

In EEOC v. Peabody Western Coal Co., 610 F.3d 1070, 1079 (9th Cir. 2010), the Ninth Circuit encountered a similar Rule 19 challenge concerning the scope of potential injunctive relief.  There, the defendant argued that a sovereign entity (previously a defendant to the suit but dismissed by an earlier appellate decision) was a necessary

1    party because of the plaintiff's request for injunctive relief, using language drawn from

2    Rule 65.  Id.  The court reasoned that the "better reading of the boilerplate language in

3    the complaint" was that the plaintiff was not seeking injunctive relief against a non-party

4    sovereign entity.  This reasoning indicates that the better reading of plaintiffs' relief, which

5    involves similar boilerplate language from Rule 65, is that plaintiffs are not seeking

6    injunctive relief against defendants' foreign sovereign customers.  Such reasoning is not

7    a complete answer because Peabody Western relied, in part, on the fact that an earlier

8    Ninth Circuit opinion in that case determined that the sovereign entity could not be sued.

9    No such finding has been made in this case.

10       More importantly, defendants' customers are not required parties because the

11   court can craft injunctive relief that excludes or carves out any sovereign nation.

12   Peabody Western recognized as much stating, "the district court nonetheless erred in

13   dismissing EEOC's suit.  Because we had held in Peabody II that joinder of the Nation

14   was feasible despite the unavailability of injunctive relief against it, the proper response of

15   the district court would have been simply to deny EEOC's request for injunctive relief.

16   610 F.3d at 1080 (emphasis added).  The district court in Broidy Capital Management,

17   LLC v. Qatar, No. CV 18-2421-JFW(Ex), 2018 WL 6074570, at *10 (C.D. Cal. Aug. 8,

18   2018), arrived at a similar conclusion in a CFAA case involving the sovereign nation of

19   Qatar.  The district court determined that Qatar was a necessary party under Rule

20   19(a)(1)(A) because "[p]laintiffs seek injunctive relief prohibiting all defendants including

21   Qatar, from accessing Plaintiffs' protected computers without authorization . . . ."  Id. at

22   *9.  However, the court determined that Qatar was not an indispensable party because

23   relief could be effected without Qatar.  Id. at *10 ("[A]ny potential prejudice by Qatar's

24   absence from this action can be lessened or avoided entirely by crafting injunctive relief

25   that would affect only the remaining defendants, and not Qatar.").  Though the court

26   resolved the Rule 19 analysis at the subdivision (b) step, the reasoning is applicable to

27   the Rule 19(a) analysis.

28       Defendants rely on the holding from Republic of Philippines v. Pimentel, 553 U.S.

34

851, 867 (2008), that "[a] case may not proceed when a required-entity sovereign is not amenable to suit." In Pimentel, "[t]he application of subdivision (a) of Rule 19 [was] not contested" and the foreign sovereigns in that case were "required entities." Id. at 863–64. Pimentel's analysis proceeds from the starting point that the sovereign is a necessary (or required party) under Rule 19(a). Thus, Pimentel is distinguishable because Rule 19(a) is contested in this case and Peabody Western controls the Rule 19(a)(1)(A) analysis and outcome. Because defendants' foreign sovereign customers are not necessary parties, Pimentel's holding does not apply.

For the foregoing reasons, defendants' motion to dismiss the complaint for failure to join necessary parties is DENIED.

### 4. Failure to State a Claim

#### a. First Claim: CFAA

"The CFAA prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use." Facebook, Inc. v. Power Ventures, Inc., 844 F.3d 1058, 1065 (9th Cir. 2016). "It creates criminal and civil liability for whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." Id. at 1065–66 (alteration in original) (quoting 18 U.S.C. § 1030(a)(2)(C)). "The statute thus provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) obtaining access with authorization but then using that access improperly." Musacchio v. United States, 136 S. Ct. 709, 713 (2016). "[T]he CFAA is best understood as an anti-intrusion statute and not as a 'misappropriation statute.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 1000 (9th Cir. 2019) (quoting United States v. Nosal ("Nosal I"), 676 F.3d 854, 857–58 (9th Cir. 2012) (en banc)). The operative question is whether "the conduct at issue is analogous to 'breaking and entering.'" Id. at 1001 (citation omitted).

#### i. WhatsApp's Servers

Defendants argue that the allegations in the complaint are analogous to LVRC

35

Holdings LLC v. Brekka, 581 F.3d 1127 (9th Cir. 2009), because, as WhatsApp users, they had authorization, pursuant to the terms of service, to access WhatsApp's computers and servers to send messages over the WhatsApp app. Mtn. at 21. Plaintiffs respond that whether access to a computer is "authorized" depends on actions by the computer's owner to grant or deny permission. Opp. at 20. In this case, no WhatsApp user had permission to access the technical call settings or evade WhatsApp's security and, thus, there was no authorization. Id. at 21.

In Brekka, 581 F.3d at 1129, an employee was given permission by his employer to access the employer's website using an administrative login that gave the employee broad access to the data on the website. During this time, the employee emailed documents he obtained to his personal computer. Id. The employee eventually ceased working for the employer but continued to use his administrative login, which had not been revoked by the employer, to access the employer's website. Id. at 1130.

The court first determined that because the employer gave the employee permission to access a company computer, the employee could not have been acting "without authorization." Id. at 1133. Further, an employee is not acting "without authorization" simply because the "employee resolves to use the computer contrary to the employer's interest." Id. In support of that conclusion, the court examined the difference between the "without authorization" and "exceeds authorized access" prongs of the CFAA. The CFAA defines the term "exceeds authorized access" as meaning "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

> As this definition makes clear, an individual who is authorized to use a computer for certain purposes but goes beyond those limitations is considered by the CFAA as someone who has "exceed[ed] authorized access." . . . In other words, for purposes of the CFAA, when an employer authorizes an employee to use a company computer subject to certain limitations, the employee remains authorized to use the computer even if the employee violates those limitations.

1    Brekka, 581 F.3d at 1133 (first alteration in original).  The court then summarized the two

2    prongs as follows: "a person who 'intentionally accesses a computer without

3    authorization,' accesses a computer without any permission at all, while a person who

4    'exceeds authorized access,' has permission to access the computer, but accesses

5    information on the computer that the person is not entitled to access."  Id. (citing 18

6    U.S.C. § 1030(a)(2), (a)(4)).

7         Applying here, the complaint confirms that "[d]efendants created WhatsApp

8    accounts that they used and caused to be used to send malicious code to Target Devices

9    in April and May 2019."  Compl. ¶ 33.  By creating WhatsApp accounts and accepting the

10   terms of service, defendants, as is true of any WhatsApp user, had authorization to send

11   messages using the WhatsApp app, which would be transmitted over WhatsApp's

12   servers.  For that reason, this case is similar to the Brekka employee's conduct prior to

13   his termination because defendants here had at least some level of authorized access to

14   the protected computers in question.  Therefore, the facts alleged are not an instance

15   where a person accesses a computer without any permission at all.  With regard to the

16   WhatsApp servers, plaintiffs have not stated a claim for a violation of 18 U.S.C.

17   § 1030(a)(2) and (a)(4) by intentionally accessing information on a protected computer

18   "without authorization."

19        This is not the end of the inquiry because the factual allegations detail conduct that

20   meets the "exceeds authorized access" prong of 18 U.S.C. § 1030(a)(2) and (a)(4).

21   WhatsApp imposes certain limitations on accessing portions of its servers, such as

22   prohibiting access to the technical call settings.  Defendants are alleged to have created

23   a program that went beyond those restrictions by evading WhatsApp's security features

24   and manipulating the technical call settings.  For example, plaintiffs allege that

25   defendants used their program to "avoid the technical restrictions built into WhatsApp

26   Signaling Servers" and "formatted call initiation messages containing malicious code to

27   appear like a legitimate call and concealed the code within call settings."  Compl. ¶ 37.

28   Defendants' program would then use "WhatsApp servers to route malicious code, which

United States District Court
Northern District of California

masqueraded as a series of legitimate calls and call settings, to a Target Device using telephone number (202) XXX-XXXX." Id. ¶ 38. Defendants also are alleged to have used "WhatsApp's Relay Servers without authorization to send encrypted data packets designed to activate the malicious code injected into the memory of the Target Devices." Id. ¶ 39. These factual allegations meet the definition of exceeds authorized access because defendants had permission to access a portion of the computer in question (the WhatsApp servers) but did not have permission to access other portions. See Nosal I, 676 F.3d at 857 ("[A]ssume an employee is permitted to access only product information on the company's computer but accesses customer data: He would "exceed [ ] authorized access" if he looks at the customer lists." (second alteration in original)).

Defendants offer two rejoinders to the exceeds authorized access prong. Neither is persuasive. First, defendants argue that even if the court applies the "exceeds authorized access" prong of the CFAA, the Ninth Circuit has held that the CFAA does not apply to "violations of corporate computer use restrictions." Mtn. at 21–22 (quoting Nosal I, 676 F.3d at 862. Defendants are correct that "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." Power Ventures, 844 F.3d at 1067. Plaintiffs' allegations go beyond any restrictions imposed by WhatsApp's terms of service because they allege that defendants' program "avoid[ed] the technical restrictions built into WhatsApp Signaling Servers." Compl. ¶ 37. Avoiding technical restrictions goes beyond any contractual limits imposed by the terms of service. See Nosal I, 676 F.3d at 863 (purpose of CFAA is "to punish hacking—the circumvention of technological access barriers").

Second, defendants cite hiQ Labs for the proposition that technical restrictions imposed by plaintiffs cannot state a "without authorization" theory. Reply at 13. That case involved a data scraping company that scraped LinkedIn's servers for information that was publicly available. hiQ Labs, 938 F.3d at 992. The court summarized:

> it appears that the CFAA's prohibition on accessing a computer "without authorization" is violated when a person circumvents a computer's generally applicable rules regarding access

38

> permissions, such as username and password requirements, to gain access to a computer. It is likely that when a computer network generally permits public access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA. The data hiQ seeks to access is not owned by LinkedIn and has not been demarcated by LinkedIn as private using such an authorization system.

Id. at 1003–04. hiQ Labs turned on the fact that the data in question was publicly available, not owned by LinkedIn, and the servers in question were not protected by generally applicable access permissions. Those facts are not present here. The information defendants are alleged to have accessed is private and WhatsApp's servers are protected from access by generally applicable access permissions.

In sum, plaintiffs have stated a claim for violation of 18 U.S.C. § 1030(a)(2) and (a)(4) under the exceeds authorized access prong.

### ii. Harm Based on Access to Users' Devices

Next, defendants argue that, with regard to alleging a claim based on accessing individual users' devices without authorization, plaintiffs did not suffer a loss as defined by the CFAA. This argument stems from plaintiffs' allegations that defendants accessed "Target Devices" (i.e., individual user's devices) without authorization. Compl. ¶¶ 53–54. As plaintiffs point out, the Ninth Circuit has held that a plaintiff can recover for violation of the CFAA when a defendant accesses a third party's device as long as the plaintiff is harmed by such an act, particularly if the plaintiff has a right to data stored on the third party device. Theofel v. Farey-Jones, 359 F.3d 1066, 1078 (9th Cir. 2004).

With respect to harm, "[t]he statute permits a private right of action when a party has suffered a loss of at least $5,000 during a one-year period." Power Ventures, 844 F.3d at 1066 (citing 18 U.S.C. § 1030(c)(4)(A)(i)(I)). CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." § 1030(e)(11).

Here, plaintiffs' alleged losses include the expenditure of resources to investigate

1  and remediate defendants' conduct.  This type of loss is described by the statute's

2  reference to "the cost of responding to an offense."  18 U.S.C. § 1030(e)(11).

3  Defendants do not quarrel with this interpretation but instead contend that plaintiffs' loss

4  derived from responding to a <u>vulnerability</u> in the WhatsApp system and not to the

5  accessing of information on individual users' devices.  Mtn. at 22.  Citing <u>Theofel</u>,

6  defendants argue that a plaintiff would be injured by a defendant's access to a third

7  party's device if the plaintiff had rights to data stored on the device.  <u>Id.</u>

8  However, as plaintiffs point out, they have alleged rights to at least some data on

9  users' devices.[9]  Moreover, they have alleged that they incurred costs responding to the

10  unauthorized access to users' phones by upgrading the WhatsApp system in response to

11  defendants' intrusion.  <u>See</u> <u>Multiven, Inc. v. Cisco Sys., Inc.</u>, 725 F. Supp. 2d 887, 895

12  (N.D. Cal. 2010) ("It is sufficient to show that there has been an impairment to the

13  integrity of data . . . and the rightful computer owner must take corrective measures 'to

14  prevent the infiltration and gathering of confidential information.'" (quoting <u>Shurgard</u>

15  <u>Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.</u>, 119 F. Supp. 2d 1121, 1126–27 (W.D.

16  Wash. 2000))).  These allegations are sufficient to state a claim for loss based on

17  responding to an offense on a third party's device.

18  Finally, assuming the court determines that plaintiffs' CFAA § 1030(a)(2) and

19  (a)(4) claims survive the motion to dismiss, then the conspiracy claim under § 1030(b)

20  would also survive because the only argument defendants make as to the conspiracy

21  claim is that plaintiffs cannot state a claim under § 1030(a)(2) or (a)(4).

22  For the foregoing reasons, defendants' motion to dismiss plaintiffs' first cause of

23  action for violation of the Computer Fraud and Abuse Act is DENIED.

24  **b.**  **Fourth Claim: Trespass to Chattels**

25  "Under California law, trespass to chattels 'lies where an intentional interference

26

27  _____

28  [9] Plaintiffs assert that the WhatsApp terms of service, which are referenced in the
complaint, provide for WhatsApp to retain intellectual property rights on a user's device.
Opp. at 23 (citing Compl. ¶ 19).  Defendants do not appear to contest this point.

United States District Court
Northern District of California

1   with the possession of personal property has proximately caused injury." <u>Intel Corp. v.</u>

2   <u>Hamidi</u>, 30 Cal. 4th 1342, 1350–51 (2003) (emphasis omitted) (quoting <u>Thrifty-Tel, Inc. v.</u>

3   <u>Bezenek</u>, 46 Cal. App. 4th 1559, 1566 (Ct. App. 1996)). A plaintiff may only recover "the

4   actual damages suffered by reason of the impairment of the property or the loss of its

5   use." <u>Id.</u> (emphasis omitted) (quoting <u>Zaslow v. Kroenert</u>, 29 Cal. 2d 541, 551 (1946)).

6   To state a trespass to chattels claim, a plaintiff must plead that "(1) the defendant

7   intentionally and without authorization interfered with plaintiff's possessory interest in the

8   computer system; and (2) defendant's unauthorized use[ ] proximately caused damage."

9   <u>Brodsky v. Apple Inc.</u>, — F. Supp. 3d —, No. 19-CV-00712-LHK, 2020 WL 1694363, at

10  *6 (N.D. Cal. Apr. 7, 2020) (alteration in original) (quoting <u>In re Facebook Internet</u>

11  <u>Tracking Litig.</u>, 263 F. Supp. 3d 836, 842 (N.D. Cal. 2017)).

12      In this case, defendants argue that plaintiffs cannot state a claim for trespass to

13  chattels because they have not alleged that defendants' conduct caused actual damage

14  to plaintiffs' servers. Mtn. at 23. Defendants contend that plaintiffs' allegations

15  concerning investigating and remediation of defendants' conduct is not harm to their

16  servers. <u>Id.</u> While plaintiffs allege that the conduct burdened plaintiffs' computer

17  network, defendants argue that such an allegation is unsupported by any factual

18  allegations. <u>Id.</u> at 24. Plaintiffs respond that trespass to chattels includes claims that a

19  defendant interfered with the intended functioning of a system and defendants have done

20  so in here. Opp. at 24. Plaintiffs aver that the value of their system is based on their

21  ability to securely and accurately transmit communications between users and argue that

22  NSO's misuse of that system interfered with its intended functioning. <u>Id.</u> Plaintiffs focus

23  not on the quantity of messages sent but the effect of those messages in impairing the

24  integrity, quality, and value of WhatsApp's services. <u>Id.</u> at 25.

25      The leading California case on electronic trespass to chattels is <u>Intel Corp. v.</u>

26  <u>Hamidi</u>, 30 Cal. 4th at 1347, where the California Supreme Court held that trespass to

27  chattels "does not encompass . . . an electronic communication that neither damages the

28  recipient computer system nor impairs its functioning." In <u>Hamidi</u>, Intel alleged that the

1    defendant used Intel's email system to send six mass email to Intel's employees that

2    criticized Intel's employment practices, urged Intel's employees to find other employment,

3    and other anti-Intel messaging.  Id. at 1348–49.  The mass emails did not involve the

4    defendant breaching Intel's security and did not damage, slow, or impair Intel's computer

5    system.  Id. at 1349.  The court reasoned that "the undisputed evidence revealed no

6    actual or threatened damage to Intel's computer hardware or software and no

7    interference with its ordinary and intended operation."  Id. at 1352–53.

8        The following passage from the opinion succinctly summarizes the key issues

9    relevant here:

> [W]e conclude that under California law the tort does not
> encompass, and should not be extended to encompass, an
> electronic communication that neither damages the recipient
> computer system nor impairs its functioning.  Such an
> electronic communication does not constitute an actionable
> trespass to personal property, i.e., the computer system,
> because it does not interfere with the possessor's use or
> possession of, or any other legally protected interest in, the
> personal property itself.  The consequential economic damage
> Intel claims to have suffered, i.e., loss of productivity caused by
> employees reading and reacting to Hamidi's messages and
> company efforts to block the messages, is not an injury to the
> company's interest in its computers—which worked as
> intended and were unharmed by the communications—any
> more than the personal distress caused by reading an
> unpleasant letter would be an injury to the recipient's mailbox,
> or the loss of privacy caused by an intrusive telephone call
> would be an injury to the recipient's telephone equipment.

20   Id. at 1347 (citations omitted).

21       This case is similar to Hamidi because the alleged actions did not degrade or

22   damage WhatsApp's servers.  Nor do plaintiffs advance the argument that approximately

23   1,400 messages out of the 1.5 billion people in 180 countries who use the WhatsApp

24   service (Compl. ¶ 17) impaired the physical functioning of WhatsApp's servers.  In fact,

25   defendants' program was reliant on WhatsApp's servers to function exactly as intended.

26   Defendants' program is alleged to emulate legitimate WhatsApp network traffic in order to

27   transmit malicious code, undetected, to a user's device over WhatsApp's servers.  Id.

28   ¶ 35.

Nonetheless, plaintiffs contend that defendants impaired the value and quality of WhatsApp's servers by designing a program that concealed malicious code and made it appear that WhatsApp, rather than defendants, sent the code.  Opp. at 24.  This argument conflates the impairment of the value and quality of WhatsApp's servers with the impairment to "the integrity, quality, and value of WhatsApp's <u>services</u>."  Id. at 25 (emphasis added).  Plaintiffs have not alleged that the value of the servers were degraded as a result defendants' actions.  Instead, they only plead consequential economic damages, such as the expenditure of resources[10] responding to the breach, and the loss of goodwill in WhatsApp's business due to a perceived weakness in WhatsApp's encryption or its services.  Compl. ¶ 78.  <u>Hamidi</u> forecloses consequential economic damages, 30 Cal. 4th at 1347, and questioned whether the "loss of business reputation and customer goodwill" is cognizable under an action for trespass to chattels. <u>Id.</u> at 1358.  Arguing that goodwill is cognizable, plaintiffs only cite out of circuit cases that did not apply <u>Hamidi</u>, <u>Microsoft Corp. v. Does 1–18</u>, No. 13cv139 (LMB/TCB), 2014 WL 1338677, at *10 (E.D. Va. Apr. 2, 2014); <u>CompuServe Inc. v. Cyber Promotions, Inc.</u>, 962 F. Supp. 1015, 1023 (S.D. Ohio 1997), but district courts applying <u>Hamidi</u> and addressing similar financial injuries have found that a financial injury resulting from a trespass to a computer is not an actual harm actionable, <u>see</u> <u>Hiossen, Inc. v. Kim</u>, No. CV1601579SJOMRWX, 2016 WL 10987365, at *11 (C.D. Cal. Aug. 17, 2016); <u>Fields v. Wise Media, LLC</u>, No. C 12-05160 WHA, 2013 WL 5340490, at *4 (N.D. Cal. Sept. 24, 2013).

Plaintiffs are correct in pointing out that <u>Hamidi</u> did not explicitly foreclose a goodwill argument and the court considered such economic injuries as an alternative

---

[10] In support of harm due to responding to a digital attack, plaintiffs cite <u>Twitch Interactive, Inc. v. Does 1 Through 100</u>, No. 19-CV-03418-WHO, 2019 WL 3718582, at *4 (N.D. Cal. Aug. 7, 2019), where the plaintiff asserted that the "defendants' breach caused it lost profits and led it to expend resources to combat the attack."  <u>Twitch</u> is not persuasive because the court cited that harm in its analysis concerning the plaintiff's breach of contract claim, not its trespass to chattels claim.  Further, due to the procedural posture of that case, the court did not engage at length with the actual harm argument advanced by defendants in this case.

1    argument. 30 Cal. 4th at 1358. The court went on to reject such an argument because

2    the complaint did not concern the functioning of the computer system, but the content of

3    the emails. Id. Even if this court were to follow a similar course and consider plaintiffs'

4    allegations concerning goodwill, plaintiffs have not alleged that they have lost goodwill or

5    customers because of the impairment to WhatsApp's servers as opposed to impairment

6    of WhatsApp's service. Cf. CompuServe Inc., 962 F. Supp. at 1023 ("Many subscribers

7    have terminated their accounts specifically because of the unwanted receipt of bulk e-

8    mail messages. Defendants' intrusions into CompuServe's computer systems, insofar as

9    they harm plaintiff's business reputation and goodwill with its customers, are actionable

10   under Restatement § 218(d)." (emphasis added) (citations omitted)).

11           Finally, plaintiffs cite several cases, including Craigslist Inc. v. 3Taps Inc., 942 F.

12   Supp. 2d 962, 981 (N.D. Cal. 2013), Coupons, Inc. v. Stottlemire, No. CV 07-03457 HRL,

13   2008 WL 3245006, at *6 (N.D. Cal. July 2, 2008), and Thrifty-Tel, 46 Cal. App. 4th at

14   1564, 1566, for the proposition that courts routinely find cognizable injury when the

15   defendant impaired the ability of a plaintiff's equipment to serve customers as intended.

16   Craigslist and Coupons, Inc. only stand for the proposition that whether the defendants

17   caused actual damage or impairment to the computer systems was a question of fact

18   more appropriate for summary judgment or trial than for a motion to dismiss. This point is

19   true, assuming plaintiffs can allege actual harm. Thrifty-Tel, 46 Cal. App. 4th at 1564,

20   involved a computer hack that "den[ied] some subscribers access to phone lines."

21   Plaintiffs in this case have not alleged that any WhatsApp customer was deprived or

22   denied access to the WhatsApp system. The lack of an allegation similar to Thrifty-Tel

23   only reinforces the conclusion that, as currently alleged, the complaint does not detail any

24   actual harm caused by defendants' program or access to WhatsApp's computers or

25   servers.

26           For the foregoing reasons, plaintiffs' fourth cause of action for trespass to chattels

27   is DISMISSED WITH LEAVE TO AMEND.

28   / / /

United States District Court
Northern District of California

**5.** **Motion to Stay Discovery**

While the present motion to dismiss was pending, defendants subsequently filed a motion to stay discovery pending final resolution of their motion to dismiss. Dkt. 95. Defendants argue that because their motion is based in part on a foreign sovereign immunity argument, they should be free from all burdens of litigation. Id. at 2. They also argue that good cause exists to stay discovery pending disposition of the motion beyond the sovereign immunity argument. Id. at 3–4.

Defendants advance no reason to stay discovery other than the pending motion to dismiss. Because this order adjudicates their pending motion, defendants' request to stay discovery is moot. Accordingly, the court DENIES AS MOOT defendants' motion to stay discovery.

### CONCLUSION

For the foregoing reasons, the court GRANTS defendants' Rule 12(b)(6) motion to dismiss plaintiffs' fourth cause of action for trespass to chattels but DENIES their motion in all other respects. The court further DENIES AS MOOT defendants' motion to stay discovery. Because plaintiffs have not alleged actual harm, the court is skeptical that the fourth cause of action can be amended to state a claim. That said, it is not clear that amendment would be futile. Plaintiffs shall file any amended complaint within 21 days of the date of this order to amend only the fourth cause of action. No new parties or causes of action may be pleaded without leave of court or the agreement of defendants. Upon the filing of any amended complaint, plaintiffs must also file a redline clearly demarcating their changes from the existing complaint.

**IT IS SO ORDERED.**

Dated: July 16, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WHATSAPP INC., et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>NSO GROUP TECHNOLOGIES LIMITED, et al.,<br><br>        Defendants. | Case No. 19-cv-07123-PJH<br><br>**ORDER DENYING MOTION TO DISMISS, MOTION FOR PROTECTIVE ORDER, AND JOINT DISCOVERY LETTER BRIEF**<br><br>Re: Dkt. No. 186, 208, 215, 220, 225 |

        Before the court are defendants' NSO Group Technologies, Ltd. and Q Cyber Technologies Ltd. ("defendants") motion to dismiss and motion for protective order.  The motions came on for hearing on November 2, 2023.  Plaintiffs WhatsApp Inc. and Facebook, Inc. ("plaintiffs") appeared through their counsel, Greg Andres, Craig Cagney, Micah Block, Jeffrey Kopczynski, and Antonio Perez-Marques.  Defendants appeared through their counsel, Joseph Akrotirianakis and Aaron Craig.  Also before the court is the parties' joint discovery letter brief.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court rules as follows.

## BACKGROUND

        On October 29, 2019, plaintiffs filed this lawsuit, alleging that defendants sent malware, using WhatsApp's system, to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of surveilling the users of those phones and devices.  Dkt. 1, ¶ 1.  The complaint alleges four causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) violation of the California

Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; (3) breach of contract; and (4) trespass to chattels.[1]  The allegations underlying the complaint are set forth in detail in the court's previous order on defendants' motion to dismiss.  See Dkt. 111.

Before the court are defendants' motion for protective order and motion to dismiss for forum non conveniens.  Although the motion for protective order was filed first, the court will first consider the motion to dismiss, because if it is granted it would moot the motion for protective order.

And as an initial matter, as stated at the hearing, the parties' motions to seal (Dkt. 220, 225) are GRANTED.

**DISCUSSION**

A.    Motion to dismiss

1.    Legal standard

Under the doctrine of forum non conveniens, the district court has discretion to dismiss an action, even if jurisdiction and venue are properly established, when (1) a foreign country also has jurisdiction to hear the case, and either (2) trial in the chosen American forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience; or (3) the chosen American forum is inappropriate because of considerations affecting the court's own administrative and legal problems. See American Dredging Co. v. Miller, 510 U.S. 443, 447-49 and n.2 (1994)

More generally, "[a] district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties." Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142 (9th Cir. 2001) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947)).

Courts employ a two-step analysis in determining whether to dismiss based on

---

[1] The court dismissed plaintiffs' fourth cause of action under Rule 12(b)(6), and no amended complaint was filed.  See Dkt. 111.  That leaves only the first three causes of action as operative claims in this case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  forum non conveniens. The defendant must first "satisfy a heavy burden of proof" to

2  establish that there is an adequate alternative forum where the case can be litigated.

3  Lueck, 236 F.3d at 1143; Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n. 22 (1981).

4  Then, the defendant must show that the balance of the applicable private and public

5  factors "is strongly in favor of the defendant." Cheng v. Boeing Co., 708 F.2d 1406, 1410

6  (9th Cir. 1983) (quoting Gulf Oil, 330 U.S. at 508).

7        Courts consider the following private interest factors: (1) the residence of the

8  parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to

9  physical evidence and other sources of proof; (4) whether unwilling witnesses can be

10  compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the

11  judgment; and (7) all other practical problems that make trial of a case easy, expeditious,

12  and inexpensive. Lueck, 236 F.3d at 1145 (internal citations omitted).

13        Courts also consider the following public interest factors: (1) local interest of

14  lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries;

15  (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this

16  forum. Lueck, 236 F.3d at 1147.

17        2.      Legal Analysis

18              a.      Adequacy of Israel as an alternative forum

19        The Ninth Circuit has held that the test for determining the adequacy of an

20  alternative forum is "easy to pass," and that "typically, a forum will be inadequate only

21  where the remedy provided is 'so clearly inadequate or unsatisfactory, that it is no

22  remedy at all.'" Carijano v. Occidental Petroleum Corp., 643 F.3d 1216, 1226 (9th Cir.

23  2011) (internal citations omitted).

24        Defendants cite numerous cases in which Israel was determined to be adequate

25  as an alternative forum. See, e.g., Corrie v. Caterpillar, Inc., 403 F.Supp.2d 1019, 2016

26  (W.D. Wash. 2005) (aff'd 503 F.3d 974 (9th Cir. 2007); Israel Discount Bank Ltd. v.

27  Snapp, 505 F.Supp.2d 651, 659 (C.D. Cal. 2007) (aff'd sub nom. 321 Fed App'x 700

28  (9th Cir. 2009)).

1    Overall, the court concludes that defendants have provided sufficient authority to

2    conclude that Israel is adequate as an alternative forum.

3         b.    Private factors

4    The court then analyzes the private factors: (1) the residence of the parties and

5    the witnesses; (2) the forum's convenience to the litigants; (3) access to physical

6    evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to

7    testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment;

8    and (7) all other practical problems that make trial of a case easy, expeditious, and

9    inexpensive. Lueck, 236 F.3d at 1145.

10                    (1) the residence of the parties and the witnesses

11   This factor is largely neutral. Plaintiffs and their witnesses are more likely to be

12   located in close proximity to this district, while defendants and their witnesses are more

13   likely to be in Israel. There is some merit to the argument that defendants' witnesses

14   may make up a larger share of the witness group, given that it is defendants' conduct at

15   issue in this case, but this factor overall does not strongly favor either party.

16                         (2) the forum's convenience to the litigants

17   This factor is similarly neutral. California is more convenient for the plaintiffs,

18   Israel more convenient for the defendants. This factor does not favor either party.

19                    (3) access to physical evidence and other sources of proof

20   Much of the parties' arguments centers around this factor. Defendants argue that

21   litigating in California would restrict the parties' access to evidence, due to Israel's

22   Defense Export Control Law ("DECL") and other Israeli restrictions. See Dkt. 215 at 17-

23   18. Defendants argue that, if the case were to be litigated in Israel, then the DECL's

24   restrictions on exports would no longer be applicable. However, as the court stated at

25   the hearing, defendants have provided no basis for concluding that the other Israeli

26   restrictions would apply with any less force if the case were to be litigated in Israel. In

27   other words, on the record before the court, the Israeli restrictions would impose similar

28   limits on the parties' access to evidence regardless of whether the case is litigated in

4

United States District Court
Northern District of California

1  California or in Israel.  For that reason, the court finds that this factor does not favor

2  dismissal.

3       In addition, the parties' papers also make reference to U.S.-based restrictions

4  imposed by the Department of Commerce's Bureau of Industry and Security ("BIS"),

5  placing defendants on an "entity list" to which certain items, including hardware and

6  software, cannot be exported.  See, e.g., Dkt. 215 at 11.  However, defendants

7  acknowledge that the BIS restrictions require "the same export license in this litigation"

8  that would be needed "in connection with any Israeli proceedings."  Dkt. 226 at 12-13.

9  The court agrees that the BIS restrictions would apply equally in either country, as would

10  the aforementioned Israeli restrictions.  For that reason, the court concludes that this

11  factor does not support dismissal.

12                      (4) whether unwilling witnesses can be compelled to testify

13       Defendants argue that "16 of the 23 document custodians are Israelis who are no

14  longer employed by NSO and could not be compelled to testify."  Dkt. 215 at 19.

15  Defendants further argue that "the parties would thus be unable to compel the attendance

16  of key trial witnesses or effectively preserve their testimony for presentation at trial."  Id.

17       Plaintiffs respond by arguing that none of the claimed Israeli document custodians

18  were identified in defendants' initial disclosures, and that defendants' motion "fails to

19  explain who those witnesses are, why they are significant witnesses, or why the

20  substance of their testimony could not be covered by a Rule 30(b)(6) deposition by NSO

21  if necessary."  Dkt. 221 at 27.

22       While "[a] defendant need not specify in great detail the contents of each witness's

23  testimony," that defendant "must provide enough information to enable the District Court

24  to balance the parties' interests."  Boston Telecom. Group, Inc. v. Wood, 588 F.3d 1201,

25  1210 (9th Cir. 2009) (citing Piper Aircraft, 454 U.S. at 258).  Overall, the court concludes

26  that defendants' arguments regarding unwilling witnesses are largely speculative, and

27  thus this factor is neutral as to dismissal.

28

1   (5) the cost of bringing witnesses to trial

2   The court analyzes this factor very similarly to the way it analyzed factors (1) and

3   (2).  Plaintiffs incur fewer costs if the trial is in this court, defendants incur fewer costs if it

4   is in Israel.   This factor does not favor either party.

5   (6) the enforceability of the judgment

6   Defendants argue that any judgment against them would be "more easily enforced

7   in Israel," but provide no reason why a judgment from this court would be less easily

8   enforced.  As plaintiffs point out, this court has already concluded that defendants are

9   subject to personal jurisdiction in this court, and thus are bound by the judgments of this

10  court.  The court finds that this factor does not favor dismissal.

11  (7) all other practical problems that make trial of a case easy,

12  expeditious, and inexpensive

13  Defendants' argument here focuses on the U.S. Department of Commerce's BIS

14  restrictions, which were discussed above in the context of factor (3).  However, as stated

15  above, defendants have acknowledged that the BIS restrictions would apply equally

16  regardless of whether the case is litigated in California or in Israel.  See Dkt. 226 at 12-13

17  ("Plaintiffs already need the same export license in this litigation" that they would need "in

18  connection with any Israeli proceedings.").  Thus, this factor does not favor dismissal.

19  c.    Public factors

20  The next step is balancing the public factors: (1) local interest in the lawsuit; (2)

21  the court's familiarity with governing law; (3) burden on local courts and juries; (4)

22  congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum.

23  Lueck, 236 F.3d at 1147.

24  (1) local interest in the lawsuit

25  Defendants argue that Israel's interest in the lawsuit "substantially outweighs" local

26  interest.  Dkt. 215 at 22-23.  Plaintiffs respond by arguing that California has an interest in

27  providing a means of redress to tortiously injured citizens, and that the U.S. public in

28  general has an interest in ensuring online safety and security.  Dkt. 221 at 30.  The court

United States District Court
Northern District of California

6

1   concludes that both California and Israel have substantial interests in the lawsuit, and

2   that this factor, at most, slightly favors defendants.

3   (2) the court's familiarity with governing law

4   This case is brought under US federal law and California state law. This court will

5   be far more familiar with the governing law than any Israeli court. In their reply,

6   defendants argue that they "do not necessarily agree that California law applies," but

7   provide no basis for concluding that foreign law should apply, nor do they argue against

8   this court's familiarity with the laws cited in the complaint's causes of action. Accordingly,

9   the court concludes that this factor counsels strongly against dismissal.

10   (3) burden on local courts and juries and (4) congestion in the court

11   Defendants group these factors together, arguing that "this district should not bear

12   the burden of this dispute." Dkt. 215 at 24. Defendants correctly point out the high

13   caseload in this district, but provide no basis for concluding that any court burden or

14   congestion would be decreased if the case were transferred to Israel. Similarly, while

15   defendants invoke "the complications involved in managing discovery under potentially

16   conflicting Israeli and U.S. legal regimes" (see id.), they provide no reason why it would

17   be any less complicated to manage discovery if the case were to proceed in Israel.

18   Moreover, a trial date has already been scheduled in this case for December 2024, and

19   defendants have provided no indication of when a trial would be held in Israel, or whether

20   a trial would be held at all. So, overall, the court finds no basis for concluding that trying

21   the case here would be any more burdensome than in Israel, or that this court is more

22   congested than courts in Israel, and thus concludes this factor is neutral.

23   (5) the costs of resolving a dispute unrelated to this forum

24   Defendants' motion does not mention this factor, and plaintiffs argue that this

25   factor does not apply because there is no "dispute unrelated to this forum." (emphasis

26   added). The court agrees that this factor is inapplicable to the present motion.

27   Having considered all of the private and public factors, the court concludes that

28   defendants have not met their burden on this motion of "show[ing] that the balance of the

7

United States District Court
Northern District of California

1    applicable private and public factors 'is strongly in favor of the defendant[s].'" See

2    Cheng, 708 F.2d at 1410 (quoting Gulf Oil, 330 U.S. at 508). As discussed above, the

3    bulk of the factors are neutral, and the only factor that strongly points in one direction is

4    public factor (2), the court's familiarity with governing law, which strongly cuts against

5    dismissal. Most importantly, while defendants do identify bona fide restrictions that will

6    limit the parties' access to evidence, they provide no basis for concluding that those

7    restrictions would provide less of an obstacle if the case were to proceed in Israel. Thus,

8    for the reasons set forth above, defendants' motion to dismiss based on forum non

9    conveniens is DENIED. Because the motion to dismiss is denied on the merits, the court

10   need not consider plaintiffs' alternative argument that the motion is untimely.

11        2.    Motion for protective order

12        As stated at the hearing, defendants' motion for protective order is DENIED in its

13   present form, which seeks near-total insulation against producing any discovery in this

14   case. Instead, the court finds that the effect of the various U.S. and Israeli restrictions

15   must be analyzed under Richmark Corp. v. Timber Falling Consultants, which sets forth

16   the circumstances under which a foreign defendant should (or should not) be excused

17   from discovery compliance based on foreign laws. See 959 F.2d 1468, 1475 (9th Cir.

18   1992).

19        Specifically, the Richmark court set forth the following factors for a court to

20   consider "in deciding whether or not foreign statutes excuse non-compliance with

21   discovery orders:" (1) the importance to the investigation or litigation of the documents or

22   other information requested, (2) the degree of specificity of the request, (3) whether the

23   information originated in the United States, (4) the availability of alternative means of

24   securing the information, (5) and the extent to which noncompliance with the request

25   would undermine important interests of the United States, or compliance with the request

26   would undermine important interests of the state where the information is located. 959

27   F.2d at 1475.

28        As discussed at the hearing, the first two factors are most properly analyzed as

8

part of a motion to compel responses to specific discovery requests[2], rather than as an anticipatory motion for protective order seeking blanket protection against all discovery requests.  However, the third, fourth, and fifth factors can be analyzed on a broader basis, as the relevant arguments apply equally to nearly all of the discovery sought by plaintiffs.

Starting with factor (3), plaintiffs concede that "many of the materials plaintiffs have requested may have originated in Israel," but argue that "a non-U.S. origin is not an absolute bar to production."  Dkt. 189 at 28.

As to factor (4), defendants argue that The Hague Convention provides an alternative means of obtaining discovery, while plaintiffs argue that option is "practically unavailable" given the slow and unreliable nature of pursuing discovery through those means.  See Dkt. 186 at 21-22, Dkt. 189 at 25-26.

Finally, as to factor (5), the parties' arguments somewhat overlap with the arguments made in connection with defendants' motion to dismiss.  Specifically, defendants argue that the existence of the DECL and other Israeli restrictions show that Israel has a strong interest in preventing disclosure, such that it outweighs any U.S. interest.

Considering factors (3), (4), and (5) together, the court concludes that factors (3) and (5) do slightly favor defendants, but not to the extent that they argue.  To the extent that plaintiffs are able to identify discovery that is sufficiently specific and important to the asserted claims in this case, the court will not excuse non-production of that discovery.

As to (3), the court agrees with plaintiffs that the foreign origin of discovery is not an absolute bar against production.  See, e.g., Richmark, 959 F.2d at 1478 ("The only factors weighing against compelling disclosure are that Beijing has the information in the PRC and may choose not to disclose it in spite of the court's order.  Were these factors alone sufficient, a foreign corporation could avoid its discovery obligations in almost every

---

[2] Plaintiffs have moved to compel regarding one discovery request, in the form of a discovery letter brief, which will be discussed below.  See Dkt. 208.

United States District Court
Northern District of California

instance.").

As to (5), while Israel has a demonstrated interest in limiting discovery, the United States has an interest in ensuring online safety and security and that viable claims are fully and fairly litigated. See also, e.g., Richmark, 959 F.2d at 1477 (Foreign state's interest in confidentiality "must be weighed against the United States' interests in vindicating the rights of American plaintiffs and in enforcing the judgments of its courts.").

And as to (4), the court concludes that the cumbersome nature of The Hague Convention's process renders it something less than a true alternative means of seeking discovery in this case. See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig., 2014 WL 5462496, at *6 (N.D. Cal. Oct. 23, 2014) ("while these documents are nominally available through Hague Convention procedures, at this stage they may be unavailable as a practical matter.").

Accordingly, to the extent that discovery disputes arise between the parties, the court's analysis will focus on factors (1) and (2), and in instances where the requested discovery is sufficiently important and specific, the court will order compliance with those discovery requests despite the DECL and other Israeli restrictions.

As briefly mentioned above, plaintiffs have moved to compel on one discovery request, in the form of a joint discovery letter brief regarding request for production no. 30. See Dkt. 208. However, the letter brief was filed in August, without the benefit of the court's guidance on this motion, and thus does not focus its arguments on Richmark factors (1) and (2). Accordingly, the discovery letter brief is DENIED without prejudice, and may be re-presented to the court under the streamlined discovery procedure described below.

As discussed at the hearing, the court anticipates that plaintiffs will move to compel responses to certain discovery requests, and that the parties will make arguments as to whether the Richmark factors weigh in favor of ordering compliance or excusing non-compliance. And the court has stated, at the hearing and in this order, that the outcome of any motion to compel will be largely dependent on factors (1) and (2) of

the <u>Richmark</u> test.  Thus, to facilitate the efficient resolution of any discovery disputes, the court sets forth the following streamlined briefing schedule for any upcoming motions to compel: the moving party shall file its opening motion, not to exceed fifteen (15) pages; then the opposing party shall file a response within seven (7) days, not to exceed fifteen (15) pages; then the moving party shall have three (3) days to file a reply, not to exceed ten (10) pages.  After briefing is complete, the court will determine whether a hearing is necessary and will set a hearing by videoconference if so.

Alternatively, if the parties do not wish to file sequential briefs and would prefer to file a single joint letter brief, they may do so, with the letter not to exceed ten (10) pages.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (Dkt. 215) is DENIED, defendants' motion for protective order (Dkt. 186) is DENIED, the parties' motions to seal (Dkt. 220, 225) are GRANTED, and the joint discovery letter brief (Dkt. 208) is DENIED without prejudice.

**IT IS SO ORDERED.**

Dated:  November 15, 2023

_____
     /s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

        Plaintiffs,

    v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

        Defendants.

Case No. 19-cv-07123-PJH

**ORDER RE MOTIONS TO COMPEL
AND MOTION FOR RELIEF FROM
CASE MANAGEMENT ORDER**

Re: Dkt. No. 235, 236, 239, 240, 249,
257, 260, 264, 265, 272, 276, 279, 280

Before the court are plaintiffs' motion to compel discovery, defendants' motion to compel discovery, and defendants' motion for relief from the case management schedule. The motions came on for hearing on February 15, 2024.  Plaintiffs WhatsApp Inc. and Facebook, Inc. appeared through their counsel, Antonio Perez-Marques, Craig Cagney, Micah Block, and Greg Andres.  Defendants appeared through their counsel, Joseph Akrotirianakis and Aaron Craig.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court rules as follows.

## BACKGROUND

On October 29, 2019, plaintiffs filed this lawsuit, alleging that defendants sent spyware, using WhatsApp's system, to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of surveilling the users of those phones and devices.  Dkt. 1, ¶ 1.  The complaint alleges four causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) violation of the California

United States District Court
Northern District of California

Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; (3) breach of contract; and (4) trespass to chattels.[1]

Defendants previously filed a motion for protective order, seeking an order excusing it from compliance with discovery obligations due to various U.S. and Israeli restrictions. <u>See</u> Dkt. 186. The court denied defendants' motion to the extent that it sought a blanket order excusing it from all discovery, but also concluded that defendants may be partially excused from certain discovery obligations based on the framework set forth by <u>Richmark Corp. v. Timber Falling Consultants</u>, 959 F.2d 1468, 1475 (9th Cir. 1992). <u>See</u> Dkt. 233.

The <u>Richmark</u> court set forth the following factors for a court to consider "in deciding whether or not foreign statutes excuse non-compliance with discovery orders:" (1) the importance to the investigation or litigation of the documents or other information requested, (2) the degree of specificity of the request, (3) whether the information originated in the United States, (4) the availability of alternative means of securing the information, (5) and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located. 959 F.2d at 1475.

After considering <u>Richmark</u> as applied to this case, the court concluded that "to the extent that discovery disputes arise between the parties, the court's analysis will focus on factors (1) and (2), and in instances where the requested discovery is sufficiently important and specific, the court will order compliance with those discovery requests." Dkt. 233 at 10.

Plaintiffs' motion to compel discovery now raises a dispute where the discovery requests must be analyzed as to factor (1) and (2), i.e., the importance of the requests to the litigation, and the degree of specificity of the requests.

---

[1] The court dismissed plaintiffs' fourth cause of action under Rule 12(b)(6), and no amended complaint was filed. <u>See</u> Dkt. 111. That leaves only the first three causes of action as operative claims in this case.

United States District Court
Northern District of California

Defendants have also filed a motion to compel discovery that does not relate to the Richmark factors, as well as a motion for relief from the case management schedule. Those motions will be addressed after addressing plaintiffs' discovery motion. The parties have also filed a number of motions to seal (Dkt. 235, 239, 249, 257, 260, 264, 272, 276), which are GRANTED.

**DISCUSSION**

A.     Plaintiffs' motion to compel discovery (Dkt. 236)

As an initial matter, as stated at the hearing, defendants have already conceded that some of plaintiffs' requests do seek information that is sufficiently important and specific under Richmark, and those documents must indeed be produced. See Dkt. 252 at 5. As to the remaining discovery sought by plaintiffs' motion, the court will address those requests with reference to the four categories set forth in the parties' briefs: (1) what versions of the alleged spyware must be produced, (2) what functionality of the alleged spyware must be produced, (3) whether defendants' clients must be disclosed, and (4) whether defendants' server architecture information must be disclosed. See Dkt. 236 at 12.

As to category (1), as stated at the hearing, the court adopts plaintiffs' definition of "all relevant spyware" as set forth in their motion: "any NSO spyware targeting or directed at Whatsapp servers, or using Whatsapp in any way to access Target Devices." See Dkt. 236 at 13. As also stated at the hearing, defendants have not identified a basis for limiting its production to the Pegasus program, or to any particular single operating system. The complaint alleges that "Pegasus or another remote access trojan developed by defendants" was responsible for the data breaches, and that the programs were used "on mobile devices using the Android, iOS, and Blackberry operating systems." See Dkt. 1, ¶¶ 24, 32. Accordingly, the definition of "all relevant spyware" shall not be read to include only Pegasus, or only a single operating system's program. Under Richmark, those documents are sufficiently important and specific such that compliance with discovery obligations may not be excused.

3

As to the timeframe of documents that must be produced, the court concludes that, at this stage of the case, the <u>Richmark</u> factors weigh in favor of production for "all relevant spyware" for a period of one year before the alleged attack to one year after the alleged attack; in other words, from April 29, 2018 to May 10, 2020. <u>See</u> Dkt. 1, ¶ 42. If, after reviewing the relevant spyware from that timeframe, plaintiffs are able to provide evidence that any attack lasted beyond that timeframe, plaintiffs may seek further discovery at that time. At the hearing, the parties discussed the possibility of stipulating to a timeframe for the production of "all relevant spyware," and may substitute their own stipulation for the timeframe set forth in this order.

As to category (2), the court rejects defendants' argument that their production should be limited to the installation layer of the alleged spyware, and instead concludes that defendants must produce information concerning the full functionality of the relevant spyware. As discussed at the hearing, the complaint contains numerous instances alleging not only that spyware was installed on users' devices, but also that information was accessed and/or extracted from those devices. <u>See, e.g.</u>, Dkt. 1, ¶ 27 ("Pegasus could 'remotely and covertly extract valuable intelligence from virtually any mobile device,'" . . . "intercept communications sent to and from a device, including communications over iMessage, Skype, Telegram, WeChat, Facebook Messenger, Whatsapp, and others," and could be "customized for different purposes, including to intercept communications, capture screenshots, and exfiltrate browser history."); ¶ 32 ("Pegasus or another remote access trojan" was used "for the purpose of accessing data and communications on target devices."); ¶ 41 ("Defendants' malware was designed to give defendants and their customers access to information and data on the target devices, including their communications.").

Plaintiffs also pointed out at the hearing that their first cause of action under 18 U.S.C. § 1030 expressly includes as an element that the defendant "accesses a computer" and "thereby obtains information." 18 U.S.C. § 1030(a)(2).

Defendants' proposal of producing information showing the functionality of only the

United States District Court
Northern District of California

installation layer of the relevant spyware would not allow plaintiffs to understand how the

relevant spyware performs the functions of accessing and extracting data, and thus, the

court directs defendants to provide information sufficient to show the full functionality of

all relevant spyware.  Under <u>Richmark</u>, that information is sufficiently important and

specific such that compliance with discovery obligations may not be excused.

As to category (3), the court concludes that defendants need not disclose the

identities of their third-party clients.  Plaintiffs are indeed correct in arguing that

defendants have raised the actions of those third-party clients as a defense, and plaintiffs

are permitted to discover information about what <u>actions</u> were taken by those third

parties, but plaintiffs need not discover the specific <u>identities</u> of the third parties in order

to discover what role defendants played in any use of alleged spyware.  Here, the court

also notes that defendants have "offered to stipulate that Pegasus has been used by its

government customers to obtain information from target devices."  Dkt. 252 at 14.

As to category (4), the court concludes that defendants need not provide specific

information regarding the server architecture at this time.  At the hearing, the court asked

plaintiffs' counsel to identify what information could be gleaned from this category of

information, and plaintiffs pointed to the ability to understand the fuller picture of how the

alleged spyware functioned.  Based on the information presented the court, it appears

that plaintiffs would be able to glean the same information from the full functionality of the

alleged spyware, as discussed in category (2) above.

Thus, overall, plaintiffs' motion to compel discovery is GRANTED in part and

DENIED in part.

B.     Defendants' motion to compel discovery (Dkt. 240)

Defendants' motion seeks two categories of documents: (1) plaintiffs'

communications with third-party witness Citizen Lab, and (2) plaintiffs' internal documents

relating to their identification of the users allegedly targeted by defendants' software.  As

to (2), plaintiffs produced documents after the filing of this motion, and as stated at the

hearing, while the parties may still have disputes about individual documents that may be

5

1  resolved through the meet-and-confer process, there is no ripe dispute for the court to

2  resolve at this time.

3        As to (1), defendants argue that the Citizen Lab communications are relevant to

4  the claims and defenses asserted in this case because "plaintiffs' central theme in this

5  case is that Pegasus is misused by NSO's customers against 'civil society,' and plaintiffs

6  have specifically identified Citizen Lab as having relevant information about that core

7  allegation." Dkt. 240 at 11.

8        Plaintiffs argue that they "have produced all communications between plaintiffs

9  and Citizen Lab relevant to Citizen Lab's role related to the case, which occurred entirely

10 before the complaint was filed." Dkt. 250 at 8. To the extent that defendants seek post-

11 complaint communications with Citizen Lab, plaintiffs argue that defendants have "fail[ed]

12 to explain why plaintiffs' post-complaint communications with Citizen Lab are likely to

13 have any connection to the case." Id.

14       The court concludes that defendants have not shown how the requested discovery

15 is warranted under Rule 26(b)(1). Defendants argue that the "core allegation" of the

16 complaint is that "Pegasus is misused by NSO's customers against 'civil society,'" but

17 defendants have not explained how the "civil society" allegation relates to any of the

18 specific three causes of action that remain operative in the case, or any of the specific

19 affirmative defenses asserted in response. In fact, in a footnote in their reply, defendants

20 offer that "[i]f plaintiffs would agree to withdraw from their case Citizen Lab's contention

21 that Pegasus was used against members of 'civil society' rather than to investigate

22 terrorism and serious crime, there would be much less need for this discovery." See Dkt.

23 258 at 4, n.1. It appears from that representation that the "civil society" allegation

24 appears to be an ancillary part of this case – rather than relating to one of the elements of

25 the asserted claims or defenses in this case. On that basis, the court fails to see the

26 relevance of the requested discovery, and thus, denies defendants' motion to the extent

27 that it seeks post-complaint communications between plaintiffs and Citizen Lab.

28

United States District Court
Northern District of California

C.    Defendants' motion for relief from case management schedule (Dkt. 265)

Defendants have filed a motion for relief from the case management schedule, seeking approximately a six-month extension for discovery deadlines, as well as extended deadlines for summary judgment and trial.  At the hearing, the court stated that defendants' motion was granted in large part.  As stated at the hearing, expert disclosures shall be due by August 30, 2024, the start of trial shall be continued to March 3, 2025, and the parties shall submit a stipulation as to the remaining dates.  The parties' stipulation shall conform with this court's standing order and allow at least 120 days between the summary judgment hearing and the start of trial.

Also, as stated at the hearing, by granting defendants' motion, the additional two motions filed by plaintiffs – namely, the motion for interim schedule relief (Dkt. 279) and administrative motion to shorten time (Dkt. 280) are denied as moot.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel discovery (Dkt. 236) is GRANTED in part and DENIED in part, defendants' motion to compel discovery (Dkt. 240) is DENIED, and defendants' motion for relief from the case management schedule (Dkt. 265) is GRANTED.  Plaintiffs' motion for interim schedule relief (Dkt. 279) and administrative motion to shorten time (Dkt. 280) are denied as moot.  The parties' motions to seal (Dkt. 235, 239, 249, 257, 260, 264, 272, 276) are also GRANTED.

**IT IS SO ORDERED.**

Dated:  February 23, 2024

_____/s/ Phyllis J. Hamilton_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California