# Exhibit 5

**PUBLIC REDACTED VERSION**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHATSAPP INC. and<br>META PLATFORMS, INC.,<br><br>  Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES<br>LIMITED and Q CYBER<br>TECHNOLOGIES LIMITED,<br><br>  Defendants. | Case No. 19-cv-07123-PJH |

**EXPERT REPORT OF DANA TREXLER, CPA/CFF**

August 30, 2024

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Generally Accepted Auditing Standards ("GAAS") or with attest standards established by the AICPA.

11. My firm is being compensated at a rate of $795 per hour for my time in this matter, regardless of the outcome of this litigation.

### III. SUMMARY OF OPINIONS

12. Assuming Defendants are found liable, it is my opinion that the Plaintiffs' expenditure of resources for their response totals ▮▮▮▮ and a reasonable estimation of Defendants' profits earned in connection with the targeting of 1,500 devices through Defendants' Exploit ranges from $4.3 million to $13.9 million (at a 29% operating profit margin) or $9.5 million to $30.3 million (at a 63% operating profit margin).

**Table 1: Summary of Plaintiffs' Claimed Damages and Available Equitable Recoveries[6]**

| Category | Amount |
|---|---|
| Plaintiffs' Response Expenses | ▮▮▮▮ |
| Defendants' Profits Subject to Disgorgement | |
| At 29% Operating Profit Margin | $4.3 million - $13.9 million |
| At 63% Operating Profit Margin | $9.5 million - $30.3 million |

13. Plaintiffs' response costs reflect labor expenditures related to internal efforts to identify, evaluate and remediate Defendants' improper use of WhatsApp servers and targeting of select WhatsApp users.[7] The estimate for Plaintiffs' response expense is conservative, as the calculations only consider the low-end of employee estimates, exclude certain employees who worked on the response for whom I do not have estimated hours, and while employees expressed that they worked

---

[6] **EXHIBIT 1.1; EXHIBIT 1.2.** I reserve the right to supplement or amend this report to account for damages to which Plaintiffs assert they are entitled for Defendants' use of Plaintiffs' computers beyond the 1,500 targeted devices discussed in this report. At this time, it is my understanding Defendants have provided insufficient information from which to calculate profits subject to disgorgement that are attributable to Defendants' use of Plaintiffs' computers beyond the 1,500 targeted devises discussed in this report. I understand Plaintiffs reserve any and all rights to seek damages relating to Defendants' use of their servers, including the period during, before, and after 2019.

[7] This report does not calculate or express an opinion on litigation or other legal costs to which Plaintiffs may be entitled and which Plaintiffs may seek to recover from Defendants. I am informed that Plaintiffs do not waive any rights with regard to seeking such costs or others from Defendants.

A.  PLAINTIFFS' EXPENDITURE OF RESOURCES FOR RESPONSE

51. I understand that on or around April 23, 2019, Plaintiffs began logging activity on servers in connection with a security review.[98] On May 2, 2019, one of WhatsApp's engineers discovered in that logging a malformed and potentially malicious message.[99] Over the following days, WhatsApp and Meta engineers and others investigated the source of the malicious message and its impact on Plaintiffs' systems.[100] Between May 10, 2019 and May 13, 2019, Plaintiffs applied software patches to their relay servers and signaling servers and published a security patch for users' WhatsApp client applications to successful resolve the exploit.[101] On May 13, 2019, Plaintiffs publicly announced their discovery and remediation of the exploit.[102] I understand that Plaintiffs continued to perform ongoing work related to the exploit after the security patch was implemented on May 13, 2019.[103]

52. I understand that Plaintiffs' employees investigated Defendants' Exploit, determined its impact on Plaintiffs' systems, developed and implemented the security patches to resolve the exploit, and performed ongoing work to fully understand the source of the attack, the methods used and full nature of the vulnerability, and the impact on WhatsApp users.[104] As such, the cost incurred by Plaintiffs response to the exploit includes the labor cost associated with certain of Plaintiffs' employees involved in the investigation, remediation, and ongoing efforts surrounding Defendants' alleged conduct, which occurred beginning on or around April 23, 2019, and continued through the latter part of 2019.

53. In the following sections, I describe and quantify select labor hours and associated costs for this work.

---

[98] *See e.g.*, WA-NSO-00018457-463.
[99] *See* WA-NSO-00017583-604 at 593. S*ee also* WA-NSO-00166464.
[100] *See* WA-NSO-00017583-604 at 593-601. *See also* WA-NSO-00164559-566.
[101] *See* WA-NSO-00017583-604 at 601-603.
[102] https://www.cbsnews.com/sanfrancisco/news/whatsapp-reveals-major-security-flaw-that-could-let-hackers-access-phones/ (accessed February 2024).
[103] Discussion with Cortney Padua, Michael Scott, Drew Robinson, Aashin Guatam, Otto Ebeling, Jesus Palau, Claudiu Gheorghe, and YuanYuan Wang. *See also* WA-NSO-00164559-566.
[104] Discussion with Cortney Padua, Michael Scott, Drew Robinson, Aashin Guatam, Otto Ebeling, Jesus Palau, Claudiu Gheorghe, and YuanYuan Wang. *See also* WA-NSO-00018457-463.

*1. Plaintiffs' Employee Labor*

54. To determine Plaintiffs' labor costs incurred in connection with investigating Defendants' Exploit, determining its impact on Plaintiffs' systems, developing and implementing the security patch to resolve it, and any associated ongoing work after implementing the security patch, I relied on information from discussions with the following individuals, who were involved with these efforts:

- Cortney Padua, Security Engineer within the Cross-Meta Security Detection and Response Team at Meta;[105]

- Michael Scott, Threat Investigator within the Espionage Team at Meta;

- Drew Robinson, Security Engineer at Meta;

- Aashin Guatam, Director of Product Management at WhatsApp;

- Otto Ebeling, former Security Engineer at Meta (UK);

- Jesus Barcons Palau, Software Engineer at Meta;

- Claudiu Gheorghe, former Software Engineering Manager at Meta; and

- Yuan Yuan Wang, Software Engineering Manager at Meta.

55. My discussions with each of these individuals include an overview of each of their then-in-effect positions and responsibilities, a description of the work they performed in connection with Defendants' Exploit when they performed this work, and an estimation of the amount of time spent in connection with this work. I describe the information represented to me by these individuals in more detail in the following sections.

   *a. Cortney Padua*[106]

56. Cortney Padua is currently a Security Engineer on the Cross-Meta Security Detection and Response Team at Meta.[107] At the time of Defendants' Exploit, Ms. Padua was a Security Engineer on the Computer Emergency Response Team at Meta.

---

[105] Deposition of Cortney Padua, August 20, 2024, pp. 114, 120-121.
[106] Discussion with Cortney Padua; Deposition of Cortney Padua, August 20, 2024, pp. 24-25, 49-52, 60-61.
[107] Deposition of Cortney Padua, August 20, 2024, pp. 114, 120-121.

57. Ms. Padua described her role in the process as including:[108]

    - General coordination and support of the response team and strategizing remediation steps and timelines.[109]

    - Reviewing WhatsApp logs to gather evidence of Defendants' Exploit and determine population of targeted users.[110]

    - Formatting data contained in these WhatsApp logs for further review and analysis by internal data teams.[111]

    - Ongoing review of WhatsApp logs to monitor for potential ongoing exploitation of WhatsApp servers.[112]

    - Assisting with eDiscovery preservation of WhatsApp logs obtained during the investigation and remediation.[113]

    - Supporting reporting efforts, including drafting summaries and presentations of the subject incident.

58. Ms. Padua estimates that she worked approximately the following number of hours during the noted periods on these tasks:

    - May 2 through May 7, 2019 - 24 hours.

    - May 8 through May 16, 2019 - 36 hours.

    - May 20 through May 28, 2019 - 24 hours.

    - Mid-June - 12 hours.

59. Based on my discussion with Ms. Padua, she estimates that she worked a total of 96 hours in relation to Defendants' Exploit. Using Ms. Padua's estimates, 44 hours are allocated to the period May 2 through May 13,[114] and 52 hours are allocated to the period after May 13.[115]

---

[108] Discussion with Cortney Padua.
[109] See also Deposition of Cortney Padua, August 20, 2024, pp. 24-25, 60-61.
[110] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52, 60-61.
[111] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52, 60-61.
[112] See also Deposition of Cortney Padua, August 20, 2024, p. 105.
[113] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52.
[114] 60 hours during the 11-workday period May 2 through May 16 = 5.5 hours per workday x 8 workdays between May 2 and May 13.
[115] 96 total hours less 44 hours between May 2 and May 13.

### b. Michael Scott[116]

60. Michael Scott is currently a Threat Investigator on the Espionage Team at Meta, which was also his title at the time of Defendants' Exploit.

61. Mr. Scott described his role as including:

- Analyzing data to assist in understanding the exploit and determining how it was conducted.

- Reviewing and analyzing WhatsApp logs to obtain information such as IP addresses and phone numbers that could help identify targeted WhatsApp users. The identification of targeted users also considered research of publicly available information and other profile information maintained by Meta (e.g., Facebook and Instagram profile information).

- Efforts related to determining the source of the exploit, including cross referencing current information from WhatsApp logs (e.g., IP addresses, domains, and phone numbers) with previously identified information for suspected "test accounts" used by attackers prior to the exploit, which included suspected accounts associated with NSO. Identifying the source of the exploit and related accounts to assist in disabling accounts and preventing those accounts from accessing WhatsApp.

- Attempting to map attackers with victims, including the determination of countries of origin for attacker accounts.

62. Mr. Scott represented that in relation to Defendants' Exploit, he spent nearly all his working time on these efforts over a 2 to 3-month period beginning in or around April/May 2019. Mr. Scott further stated that ongoing work continued for "months and months," but did not provide an estimate of the portion of his time spent on these ongoing efforts. Using the low end of Mr. Scott's estimate (i.e., 2 months), 64 hours are allocated to the period May 2 through May 13,[117] and 256 hours are allocated to the period after May 13[118] in relation to Defendants' Exploit.

### c. Drew Robinson[119]

63. Drew Robinson is currently a Security Engineer at Meta. At the time of Defendants' Exploit, Mr. Robinson was a Security Investigator at Meta.

---

[116] Discussion with Michael Scott.
[117] 8 hours per workday x 8 workdays between May 2 and May 13.
[118] 320 hours over a 2-month period (160 work hours in a month [40 hours per week x 4 weeks] x 2 months) less 64 hours between May 2 and May 13.
[119] Discussion with Drew Robinson.

*WhatsApp, et al. v. NSO, et al.*

64. Mr. Robinson described his role as including:

    - Serving as the "on call" for malware analysis and working with WhatsApp engineers to immediately analyze WhatsApp logs to evaluate the "payload" used to deliver the malware to victims.

    - Performing various analyses of WhatsApp logs and server information to extract the payloads that had been deployed to help identify the source of the payload (i.e., the orchestrator of the attack).

    - Assisting with identification of targeted WhatsApp users and map them back to the malware users. This included analyzing country codes associated with targeted accounts and the nature of the accounts (based in part on publicly available information and Facebook and Instagram profile information).

    - Assisting WhatsApp engineers in developing and deploying the security patch.

    - Ongoing monitoring for future attacks/exploits and further analysis of ways that NSO was targeting Plaintiffs' services.

    - Continued assistance with victim identification.

    - Supporting Plaintiffs' legal department and responding to requests for information.

65. Mr. Robinson represented that he initially worked full time on the exploit for 3 weeks up to the deployment of the security patch, which he conservatively estimated to approximate 120 hours. Mr. Robinson estimated that he worked another 150-200 hours after the security patch was implemented. Using Mr. Robinson's estimates, 64 hours are allocated to the period May 2 through May 13,[120] and 150 hours are allocated to the period after May 13 in relation to Defendants' Exploit.

    d. Aashin Guatam[121]

66. Aashin Guatam is currently a Director of Product Management at WhatsApp. At the time of Defendants' Exploit, Mr. Guatam was a Director of Customer Operations at WhatsApp.

67. Mr. Guatam described his role as including:

---

[120] 8 hours per workday x 8 workdays between May 2 and May 13.
[121] Discussion with Aashin Guatam.

- Overall project management of the plan implemented by Plaintiffs to resolve Defendants' Exploit, including post-fix identification of and communication with targeted users, external communication strategy, and legal pursuits.

- Working with and guiding technical teams, operations teams, legal teams, and others to understand the attack and identify the victims of the exploit. This included identifying the targeted accounts and mapping them to the real-life users. The accounts were mapped to real-life users using information from WhatsApp accounts, associated social media accounts, and other publicly available information.

- Developing a victim outreach strategy and working with technical teams, operations teams, legal teams, and others to notify the identified victims of the exploit.

68. Mr. Guatam represented to me that he spent, on average, 50% of his working hours from May/June to November 2019 working on this matter. As such, I have considered the low end of Mr. Guatam's estimate (i.e., beginning in June) that he worked 480 hours (6 months [June through November] multiplied by 160 working hours per month multiplied by 50%). Using Mr. Guatam's estimate, all 480 hours are allocated to the period after May 13 in relation to Defendants' Exploit.

    e. *Otto Ebeling*[122]

69. Otto Ebeling currently owns a cyber security consulting company that is sometimes contracted by Plaintiffs. At the time of responding to Defendants' Exploit, Mr. Ebeling was a Security Engineer at Meta, based in the United Kingdom.

70. Mr. Ebeling described his role as including:

- Investigating initial reports relayed to him from WhatsApp engineers to ascertain if a vulnerability existed. This included determining whether the suspicious activity was benign or malicious.

- Understanding Defendants' Exploit and how it worked.

- Determining how to respond to and prevent Defendants' Exploit. Mr. Ebeling consulted with WhatsApp engineers that ultimately created and implemented the security patch.

- Monitoring applicable information to confirm the security patches were working as intended after they were implemented by Plaintiffs' employees.

---

[122] Discussion with Otto Ebeling.

- Determining if Defendants were exploiting any other unknown vulnerabilities. This included reviewing and analyzing certain software code.

71. Mr. Ebeling represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours for 3 weeks on this project. Mr. Ebeling also informed me that he spent one-third (33%) to one-half (50%) of his working time for the second half of 2019 working on ongoing matters associated with Defendants' Exploit. Using Mr. Ebeling's estimates, 64 hours are allocated to the period May 2 through May 13,[123] and 320 hours[124] are allocated to the period after May 13 in relation to Defendants' Exploit.

    *f.   Jesus Barcons Palau*[125]

72. Jesus Barcons Palau is currently a Software Engineer at Meta, which was also his title at the time of Defendants' Exploit in May 2019.

73. Mr. Palau described his role as including:

- Consulting with security professionals to investigate abnormal "stanzas"[126] in data passing through WhatsApp servers. This included identifying and investigating stanzas that did not conform with specifications established by WhatsApp. After certain abnormal stanzas were identified, Mr. Palau worked to implement processes to detect other non-conforming and potentially malicious stanzas in data.

- Implementing code to detect malicious stanzas not adhering to WhatsApp specifications.

- Implementing measures to assure that invalid stanzas were blocked from WhatsApp servers.

74. Mr. Palau informed me that during the initial response efforts, he spent all his working time, and additional overtime hours, on this project. Mr. Palau represented to me that he spent more than 100% of his working hours from April 29 through May 10 on response efforts. Using Mr. Palau's estimates, 56 hours are allocated to the period May 2 through May 10[127] in relation to Defendants' Exploit.

---

[123] 8 hours per workday x 8 workdays between May 2 and May 13.
[124] 6 months multiplied by 160 working hours in a month multiplied by 1/3 of his working time.
[125] Discussion with Jesus Palau.
[126] Stanza is "a general term in WhatsApp for metadata -- for a type of metadata that is sent from a client to a server." Claudiu Gheorghe Deposition, 24:19-24.
[127] 8 hours per workday x 7 workdays between May 2 and May 10.

  g. *Claudiu Gheorghe*[128]

75. Claudiu Gheorghe was a Software Engineering Manager at Meta at the time of Defendants' Exploit in May 2019.

76. Mr. Gheorghe described his role as including:

- Coordinating the investigation and remediation of Defendants' Exploit. Mr. Gheorghe orchestrated efforts among engineering teams, security teams, and legal teams.

- Supervising Meta engineers to execute the investigation and remediation of Defendants' Exploit. This included effectively allocating staffing resources to execute this project. Mr. Gheorghe performed a managerial role in connection with leading coordination for the investigation and remediation of Defendants' Exploit.

- Identifying victims of Defendants' Exploit.

- Assisting in drafting a white paper regarding Defendants' Exploit.

77. Mr. Gheorghe represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours from May 2, 2019 through May 13, 2019 on this project. After the patch was implemented on May 13, 2019, Mr. Gheorghe informed me that he spent 50% of his time on this project for two more weeks. Using Mr. Gheorghe's estimates, 64 hours are allocated to the period May 2 through May 13,[129] and 40 hours are allocated to the period after May 13[130] in relation to Defendants' Exploit.

  h. *YuanYuan Wang*[131]

78. YuanYuan Wang is currently a Software Engineering Manager at Meta, which was also his title at the time of Defendants' Exploit in May 2019.

79. Mr. Wang described his role as including:

- Confirming that the exploit was occurring. This included identifying abnormal patterns through his knowledge of the WhatsApp architecture.

---

[128] Discussion with Claudiu Gheorghe.
[129] 8 hours per workday x 8 workdays between May 2 and May 13.
[130] 80 hours over a 2-week period (2 weeks x 40 hours per week) x 50%.
[131] Discussion with YuanYuan Wang.

*WhatsApp, et al. v. NSO, et al.*

- Organizing and providing applicable information regarding Defendants' Exploit to security teams at Meta.

- Consulting with security teams at Meta to identify the software code permitting Defendants' Exploit.

- Understanding the software code relevant to Defendants' Exploit.

- Consulting with security teams at Meta to improve and secure the applicable software code. This fixed the software code permitting Defendants' Exploit.

80. Mr. Wang represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours from May 2, 2019 through May 13, 2019 on this project. Using Mr. Wang's estimate, 64 hours are allocated to the period May 2 through May 13[132] in relation to Defendants' Exploit.

    *i. Other Employees Identified by Claudiu Gheorghe*[133]

81. In addition to the discussions I had with the above-noted individuals, Claudiu Gheorghe identified 14 other Meta professionals that participated in the investigation and response efforts.[134] As discussed, Mr. Gheorghe was a Software Engineering Manager at Meta who performed a managerial role leading coordination across multiple teams in connection with addressing Defendants' Exploit in May 2019.

82. Mr. Gheorghe provided descriptions of roles and estimates of hours worked for each of the Meta employees he identified as participating in the investigation and response efforts from May 2, 2019 through May 13, 2019. This is reflected in **EXHIBIT 2.2** to my report.

    *2. Plaintiffs' Employee Labor Cost*

83. After identifying the employees involved in responding to Defendants' Exploit, and their respective estimated labor hours, I determined the cost of this labor. To determine the cost of labor of each applicable employee, I multiplied each applicable employee's burdened labor rate by the number of hours worked on responding to Defendants' Exploit.

---

[132] 8 hours per workday x 8 workdays between May 2 and May 13.
[133] Discussion with Claudiu Gheorghe.
[134] **EXHIBIT 2.2.**

84. The calculation of an employee's burdened labor rate not only considers the employee's salary, but also considers other expenditures paid by an employer to, or on behalf of, an employee. These additional expenditures can be paid directly to an employee (e.g., performance bonus or retirement contributions) or paid on behalf of an employee (e.g., the employer's share of healthcare insurance premiums or payroll taxes). In addition to base salary, the inclusion of an employer's additional expenditures to, or on behalf of, an employee reflects the employer's total economic cost incurred in connection with the subject employee's time.

85. To calculate each employee's burdened labor rate, I relied on data provided by Plaintiffs detailing payroll information for specific employees which included wages, employee and employer payroll taxes, and certain employer-paid benefits. I also obtained employee bonus information and the amount of employer-paid health benefits. For purposes of determining a compensation rate for individual employees, I considered the following costs incurred by Plaintiffs:

    - Salary
    - Performance bonus
    - Employer payroll taxes
    - Employer portion of health benefits
    - Restricted Stock Unit ("RSU") grants

86. As detailed in **EXHIBIT 3.1**, I considered the above amounts and determined an hourly-equivalent compensation rate for each of the individuals discussed in the preceding section. I determined Plaintiffs' relevant expenditures by multiplying each applicable employee's hours spent on resolving Defendants' Exploit and for related ongoing work by their burdened labor rate. As summarized in the following table, Plaintiffs' expenditures to respond to Defendants' Exploit total █████.

Table 3: Plaintiffs' Labor Expenses to Respond to Defendants' Exploit [135]

| Employee Name | 2019 Title | Hours Worked | Hourly Rate | Cost of Labor |
|---|---|---|---|---|
| Cortney Padua | Security Engineer | 96 | █ | █ |
| Michael Scott | Threat Investigator | 320 | █ | █ |
| Drew Robinson | Security Investigator | 214 | █ | █ |
| Aashin Guatam | Director of Customer Ops. | 480 | █ | █ |
| Otto Ebeling | Security Engineer | 384 | █ | █ |
| Jesus Palau | Software Engineer | 56 | █ | █ |
| Claudiu Gheorghe | Software Engineering Manager | 104 | █ | █ |
| YuanYuan Wang | Software Engineering Manager | 64 | █ | █ |
| | | | **Cost of Labor** | █ |
| | | Cost of Labor (Additional Employees Identified by Mr. Gheorghe) | | █ |
| | | | **Total Cost of Labor** | █ |

87. The estimate included in Table 3 is conservative, as the calculations only consider the low-end of employee estimates, exclude certain employees who worked on the response for whom I do not have estimated hours, and while employees expressed that they worked extended hours and weekends, I do not include such extended hours and weekends in my calculations.

88. While these individuals were salaried employees and were not paid on an hourly basis, the hourly equivalent labor rate provides a means to determine the cost of their respective time to Plaintiffs with respect to responding to Defendants' Exploit. While some of these individuals perform security-related tasks in the ordinary course of their employment by Plaintiffs, they would have directed this time to other efforts in the absence of Defendants' alleged conduct. Accordingly, these efforts and associated cost are reflective of an "opportunity cost" to Plaintiffs. Further, as this was a required effort in light of Defendants' Exploit, in the absence of these employees, Plaintiffs would have needed to expend resources to obtain these types of services from third parties.

### B. DEFENDANTS' ILL-GOTTEN GAINS SUBJECT TO DISGORGEMENT

89. In this instance, Defendants' ill-gotten gains subject to disgorgement reflect the profit that Defendants derived from their unauthorized access to Plaintiffs' systems, including the use of Defendants' Exploit. I understand that Plaintiffs allege that Defendants' Exploit for the WhatsApp Service was the Android zero-click installation vector for Pegasus or similar spyware in use from

---

[135] EXHIBITS 1.1, 2.1, AND 2.2.

*WhatsApp, et al. v. NSO, et al.*