1    JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
       *jakro@kslaw.com*
2    AARON S. CRAIG (Bar No. 204741)
       *acraig@kslaw.com*
3    KING & SPALDING LLP
     633 West Fifth Street, Suite 1700
4    Los Angeles, CA 90071
     Telephone: (213) 443-4355
5    Facsimile: (213) 443-4310

6    Attorneys for Defendants NSO GROUP TECHNOLOGIES
     LIMITED and Q CYBER TECHNOLOGIES LIMITED
7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                              OAKLAND DIVISION

11   WHATSAPP INC., a Delaware corporation,        Case No. 4:19-cv-07123-PJH
     and FACEBOOK, INC., a Delaware
12   corporation,                                  **DECLARATION OF YARON SHOHAT
                                                   IN SUPPORT OF DEFENDANTS NSO
13             Plaintiffs,                          GROUP TECHNOLOGIES LIMITED
                                                   AND Q CYBER TECHNOLOGIES
14        v.                                        LIMITED'S NOTICE OF MOTION AND
                                                   MOTION FOR SUMMARY JUDGMENT
15   NSO GROUP TECHNOLOGIES LIMITED                OR PARTIAL SUMMARY JUDGMENT**
     and Q CYBER TECHNOLOGIES LIMITED,
16
               Defendants.                         Action Filed:   10/29/2019
17

18

19

20

21

22                    **REDACTED VERSION OF DOCUMENT PROPOSED
23                           TO BE FILED UNDER SEAL**

24

25

26

27

28

I, Yaron Shohat, declare as follows:

1.      I am a citizen and resident of Israel. I am the Chief Executive Officer ("CEO") of Defendant NSO Group Technologies Limited ("NSO") and Defendant Q Cyber Technologies Limited ("Q Cyber") (collectively "Defendants").  Q Cyber is NSO's sole director and shareholder. As Defendants' CEO, I am an employee of Q Cyber.

2.      I have personal knowledge of the facts set forth herein and, except as otherwise stated, could testify competently to each of those facts.

3.      NSO is a technology company that designs and licenses technology solely to governments and government agencies for national security and law enforcement purposes. Among those products are a suite of different technologies and functions that are collectively branded and marketed as "Pegasus."

4.      Each of Defendants is incorporated and has a principal place of business in Israel. Defendants have no presence in any other country. Defendants do no business in California and have no offices or employees in California or elsewhere in the United States.  Defendants have not performed any actions relevant to Plaintiffs' lawsuit in California or the United States, and they have not targeted any activities relevant to the lawsuit towards California or the United States.

5.      Sales of NSO's Pegasus technology are strictly monitored and regulated by the Government of Israel.  The export of NSO's Pegasus technology is regulated under Israel's Defense Export Control Law ("ECL"), with which I am familiar as Defendants' CEO.

6.      To export its Pegasus technology, NSO is required to register with the Israeli Ministry of Defense ("MoD") and to seek and obtain a license for each export of the Pegasus technology.  The required export licenses include a marketing license that must be obtained before the technology can be marketed to a potential end-user and a separate export license for any proposed end user of the technology.  Under the ECL, the MoD is empowered to investigate NSO and its business, refuse or cancel NSO's registration, or deny NSO's license requests, taking into account factors including the intended use of NSO's Pegasus technology and the identity of NSO's customers. The MoD can (and does) ask NSO to provide documentation about its customers and prospective customers and their intended uses of NSO's Pegasus technology. The MoD requires

this documentation from NSO for each license to market or export NSO's Pegasus technology.

7. The MoD requires, prior to the licensing of any Pegasus technology, that NSO provide the MoD with signed certificates from the end-users of NSO's Pegasus technology. In the end-user certificate, the end-user declares to the MOD that NSO's Pegasus technology will be used only for prevention and investigation of crimes and terrorism, in compliance with privacy and national security laws.

8. As part of its contracting process, NSO requires proposed Pegasus end-user customers to demonstrate that they are a government or an authorized governmental national security or law enforcement agency and to provide any other necessary documentation for approval by the MoD.

9. NSO markets and licenses its Pegasus technology exclusively to sovereign governments and authorized agencies for national security and law enforcement purposes, and it does so only after receiving the necessary export control licenses from the MoD. NSO does not now market or sell, and has never marketed or sold, its Pegasus technology for use by any private entity.

10. Attached hereto as **Exhibit A** and **Exhibit B** are █████████████████ ████████████████████ with which I am familiar as Defendants' CEO. Exhibit A is an example of █████████████████████████████████████ █████████. Exhibit B is an example of ███████████████████████ █████████████████████████ ████████████████████████ Exhibits A and B accurately ████████████████ ████████████████████████████████████ █ ████ and ████. Exhibit A was produced in this litigation at Bates range NSO_WHATSAPP_00000179–00000199, and Exhibit B was produced at Bates range NSO_WHATSAPP_00000200–00000222.

11. In seeking permission to license or market its Pegasus technology, NSO takes into account U.S. and European Union export control restrictions. NSO conducts due diligence of potential customers, including examining publicly-available information, evaluating

1  questionnaires, and considering the potential customer's record of respecting rule-of-law concerns.

2  NSO's government customers must provide due diligence materials before receiving NSO's

3  Pegasus technology.

4      12.    As a condition of the licensing of its Pegasus technology, NSO requires that each

5  of its government customers agrees that it will ██████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████  (Exh. A

11  ¶ 18.5; Exh. B ¶ 19.5.)  NSO contractually can suspend or terminate service to customers engaged

12  in any improper use of its Pegasus technology outside these parameters, and NSO has done so.

13  Moreover, the State of Israel may deny or revoke export licenses if it becomes aware that the terms

14  of the export license have been violated, including, for example, that the Pegasus technology has

15  been used to violate human rights.

16      13.    NSO's Pegasus technology includes technical safeguards, such as general and

17  customer-specific geographic limitations.  One of the limitations relevant to this case is that NSO's

18  Pegasus technology cannot be used by any foreign customer against U.S. mobile phone numbers.

19  Another such limitation is that the Pegasus technology cannot be used by any foreign customer

20  against a device within the geographic bounds of the United States. ████████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████

25      14.    Defendants do not operate NSO's Pegasus technology and are forbidden from doing

26  so.  Instead, NSO markets and licenses the Pegasus technology to its government customers, which

27  then operate the Pegasus technology themselves, to advance their own sovereign interests of

28  fighting terrorism and serious crime.  Each of the Pegasus licenses NSO has been granted provides

that ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████.

(Exh. A ¶ 2.4; Exh. B ¶ 2.4.)  Defendants do not participate in any governmental customer's installation of the Pegasus technology on any target device.

15.    Defendants' role is limited to NSO providing advice and technical support to assist governmental customers in setting up and maintaining—but not operating—the Pegasus technology.  (Exh. A at 9, 14-15; Exh. B at 9, 14-15.) ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████.  Maintaining Pegasus requires continuous research and development by NSO.

16.    Defendants have never installed Pegasus on any device without the knowledge and consent of the device owner, and Defendants have never installed Pegasus on any device for any operational purpose (as opposed to sales demonstrations or research and development, which installations are always done with the consent of the device owner).  I do not have knowledge regarding the use of WhatsApp messages, by Defendants' sovereign customers, to install Pegasus on any particular device. If one or more of Defendants' sovereign customers did that, however, then that sovereign would have been acting on its own behalf to advance its own sovereign interests of fighting terrorism and serious crime, and it would have been without Defendants' involvement.

17.    Defendants have no control over, or knowledge of, where Plaintiffs' servers are located or of which of their server(s) would be used to send any message.

18.    In 2018 and 2019, an independent U.S. company called Westbridge Technologies Inc. marketed NSO's products, among other products, to potential government customers in the United States.  At that time, Westbridge was in the same broad corporate family as Defendants but was not Defendants' parent or subsidiary.  Attached hereto as **Exhibit C** is a true and correct copy of an organization chart for Defendants' corporate family as of December 31, 2019.  As Defendants' CEO, I am familiar with Exhibit C and Defendants' corporate "family tree."  Exhibit C accurately reflects the relationships among the members of Defendants' corporate family in

2018 and 2019.  Exhibit C was produced in this action and introduced as Exhibit 2009 in my deposition in this matter.

19.    Attached hereto as **Exhibit D** is a true and correct copy of ███████████ ██████████████████████████████████████  with which I am familiar as Defendants' CEO.  Exhibit D was produced in this action at Bates range NSO_WHATSAPP_00046360–00046368.  This ████████████████████████████ ██████████████████████████.

20.    As Exhibit D provides, ████████████████████████████████ ████████  (Exh. D ¶ 12.)  I understand that Westbridge was an independent corporate entity, with its own corporate existence, founding documents, board of directors, executives, employees, offices, and bank accounts, and that it followed all other corporate formalities.  Although Defendants, one of which (NSO) owns the technology and both of which supply it, occasionally provided assistance to Westbridge's marketing efforts in the form of information about the technology, Defendants never directed or controlled those marketing efforts in any way. Westbridge made all its own decisions about how, where, when, and to which potential government customers it would market Defendants' products in the United States, with no direction or control by Defendants.  One of the reasons Westbridge was established (by Westbridge's parent company, OSY Technologies S.à.r.l.) was because Defendants lacked the knowledge or expertise to successfully make inroads into the United States market.

21.    Westbridge also marketed products designed by a company called CS Circles Solutions Ltd. ("Circles"), which was within the same corporate family as Defendants but was a distinct corporate entity.  Attached hereto as **Exhibit E** is a true and correct copy of an ████████████████████████████████████████████████████████████ ██ ██ ████████ ████.  Exhibit E was produced in this action at Bates range NSO_WHATSAPP_00046351–00046359.

22.    In my position as CEO of Defendants, I am not aware of any contract between Defendants and any company called QuadraNet.  In response to Plaintiffs' allegations in this action, Defendants performed a diligent investigation into whether Defendants have ever entered

---

DECLARATION OF YARON SHOHAT                5                Case No. 4:19-cv-07123-PJH

1  into a contract with QuadraNet.  That investigation confirmed my understanding that neither

2  Defendant has ever entered into any contract with QuadraNet.

3          I declare under the penalty of perjury and the laws of the United States that the foregoing

4  is true and correct this 26th day of September 2024, at Sde Warburg, Israel.

5

6

7  _____
   YARON SHOHAT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit B

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit C

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit D

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit E

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**