# EXHIBIT 1

## FILED UNDER SEAL

# EXHIBIT 2

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 3 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3385
JONATHAN LEE on 09-25-2024              {{Attorneys Eyes Only}}            Page 1

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

   WHATSAPP INC., a Delaware      )
5  corporation, and FACEBOOK,     )
   INC., a Delaware corporation,)
6                                 )
                 Plaintiffs,      )
7                                 )
         vs.                      )   Case No.
8                                 )   4:19-cv-07123-PJH
   NSO GROUP TECHNOLOGIES         )
9  LIMITED and Q CYBER            )
   TECHNOLOGIES LIMITED,          )
10                                )
                 Defendants.      )
11 _____  )

12

13

14

15      HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

16   VIDEOTAPED 30(B)(6) DEPOSITION OF JONATHAN LEE

17             LOS ANGELES, CALIFORNIA

18           WEDNESDAY, SEPTEMBER 25, 2024

19

20

21

22

23

24 SWIVEL LEGAL SOLUTIONS
   JOB NO.: 3385
25 DORIEN SAITO, CSR 12568, CLR

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 4 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3385
JONATHAN LEE on 09-25-2024              {{Attorneys Eyes Only}}                    Pages 174..177

Page 174

1   how did decompiler work, so I also don't know how it
2   would work prior to registration.
3   BY MR. AKROTIRIANAKIS:
4        Q.   Okay.  So you download the app.  Then
5   what's the next step if you wanted to register for
6   an WhatsApp account?
7            MR. BLOCK:  Objection to scope.
8            **THE WITNESS:  You would download the app.**
9   **You would open the app, and you'd be shown a welcome**
10  **screen.  The welcome screen includes links to the**
11  **term of service and the privacy policy.  The user is**
12  **then given the opportunity to agree to the terms of**
13  **services and continue with the registration flow.**
14           **If the user chooses to agree to the terms**
15  **of service and continue, they're given the**
16  **opportunity to enter their phone number that they'll**
17  **be associating with the WhatsApp account.  There's a**
18  **verification process for that phone number, most**
19  **commonly done by an SMS message sent to that phone**
20  **number, after which the account is created, if the**
21  **verification is successful.**
22  BY MR. AKROTIRIANAKIS:
23       Q.   Have you done this yourself?
24       **A.   I use WhatsApp, and in order to use**
25  **WhatsApp, I had to register my account.**

Page 175

1        Q.   Right.
2            But you're not testifying from your memory
3   from the time when you registered a WhatsApp
4   account; am I; right?
5        **A.   Correct.  As we discussed earlier, I spoke**
6   **with two internal experts about the process to do**
7   **this.**
8        Q.   And those are the steps that they explained
9   to you?
10       **A.   They are.**
11       Q.   Okay.  So at what point do you -- after
12  downloading the app and before or during the process
13  that you have now described would you, for example,
14  select a language?
15           MR. BLOCK:  Objection to form and scope.
16           **THE WITNESS:  I don't know specifically**
17  **when that happens.  My recollection from the**
18  **conversations that I had yesterday were that the app**
19  **looks to the language settings of the phone in order**
20  **to surface the -- the language -- the relevant**
21  **language.**
22  BY MR. AKROTIRIANAKIS:
23       Q.   So is your testimony on behalf of WhatsApp
24  and Facebook that you don't have to select a
25  language?  It selects it for you?

Page 176

1            MR. BLOCK:  Objection to form.  And this is
2   outside the scope of the topic.
3            But you can answer in personal capacity.
4            Hang on one second.
5            Sorry for the -- I think I objected on form
6   and scope.
7            And if you have knowledge in your personal
8   capacity, you can answer.
9            **THE WITNESS:  I don't know whether or not a**
10  **user has the opportunity to select their language in**
11  **WhatsApp is part of their registration flow.**
12  BY MR. AKROTIRIANAKIS:
13       Q.   Now earlier, when you testified about the
14  explanations you were given yesterday -- well, let
15  me back up.
16           The explanations that you were given
17  yesterday, is that the sole basis for your -- your
18  ability to testify today as to the process by which
19  users in Israel could accept terms of service in
20  2018, 2019, 2020?
21       **A.   In my capacity answering these questions,**
22  **yes.**
23       Q.   Okay.  And do you recall, you know, did you
24  review any, like, progression of screens or anything
25  like that during your -- during your preparation to

Page 177

1   testify?
2        **A.   In my preparations for this, on this issue,**
3   **these were described to me verbally.**
4        Q.   Okay.  So some person just told you, and
5   now you're doing your best to parrot what you were
6   told yesterday?
7            MR. BLOCK:  Objection to form.
8            **THE WITNESS:  As part of the preparations I**
9   **spoke with two people, one of whom is the product**
10  **manager who leads this particular set of product**
11  **experiences for WhatsApp.  He described them to me,**
12  **and I am describing them to the best of my**
13  **recollection based on my preparation.**
14  BY MR. AKROTIRIANAKIS:
15       Q.   All right.  Is there any, like, depiction
16  of the terms and service in any of the screens that
17  you have to go through in order to register a
18  WhatsApp account?
19           MR. BLOCK:  Foundation.  Scope.
20           You can answer, if you know.
21           **THE WITNESS:  The terms of service are**
22  **presented -- are presented by a link -- a hyperlink**
23  **which a user could choose to click through in order**
24  **to read the terms of service.**
25  ///

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 5 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                          Job 3385
JONATHAN LEE on 09-25-2024            {{Attorneys Eyes Only}}              Pages 178..181

Page 178

1  BY MR. AKROTIRIANAKIS:
2      Q.  And not to click through.
3          MR. BLOCK:  And sorry.  I had misunderstand
4  the previous question.  I think it was fairly in
5  scope.
6          THE WITNESS:  It's not a requirement that a
7  user click through the terms of service in order to
8  decide whether or not to accept and continue.
9  BY MR. AKROTIRIANAKIS:
10     Q.  And there's no separate box to check "I
11 accept terms of service."
12     Correct?
13         MR. BLOCK:  Objection to form.
14         THE WITNESS:  I believe the box is
15 accept --
16         MR. CRAIG:  (Sneezing.)
17 BY MR. AKROTIRIANAKIS:
18     Q.  But you think there's a box?
19     A.  That is what I recall from my preparation.
20     Q.  Have you used other apps in your lifetime
21 other than WhatsApp?
22         MR. BLOCK:  This is outside the scope.
23         But you can answer in your personal
24 capacity.
25         THE WITNESS:  I have used apps other than

Page 179

1  WhatsApp.
2  BY MR. AKROTIRIANAKIS:
3      Q.  Yeah.  Hundreds, probably.  At least
4  dozens?
5      A.  I have used a number of apps that are not
6  WhatsApp.
7      Q.  And you know that in some cases, the
8  click -- the clickwrap accepting of terms of service
9  requires you to scroll through the terms of service,
10 and at least pretend you're reading it; right?
11         MR. BLOCK:  Foundation.  Scope.  Calls for
12 a legal conclusion.
13         THE WITNESS:  In my experience using other
14 apps, I have experienced apps or other online
15 services where I have, as part of the registration
16 flow or the flow to access the app, been required to
17 scroll through a document before it enabled me to
18 click "accept."
19 BY MR. AKROTIRIANAKIS:
20     Q.  Okay.  And there's nothing like that with
21 WhatsApp; right?
22         MR. BLOCK:  Object to form.
23 Mischaracterizes.
24         THE WITNESS:  As I say earlier, the
25 WhatsApp registration flow does not require the user

Page 180

1  to click through the terms of service, or to scroll
2  through a document after clicking through it.
3  BY MR. AKROTIRIANAKIS:
4      Q.  But you think that in 2018, 2019, and 2020,
5  it did require clicking a box?
6      A.  My understanding based on the preparation
7  is that in order to proceed with the registration
8  flow, you have to click a button of some sort --
9  whether that's a box or a button, I don't know the
10 specific shape -- but in order to demonstrate
11 agreement of the terms of service, and to continue
12 with the registration process.
13     Q.  Could it just be clicking on a link?
14         MR. BLOCK:  Objection to form.
15         THE WITNESS:  Could you clarify what you
16 mean by "link" there?
17 BY MR. AKROTIRIANAKIS:
18     Q.  Well, like, a box would be a little square,
19 maybe, that you have to put a checkmark in or click
20 your pointer in that box; right?
21         MR. BLOCK:  Objection to form.
22         THE WITNESS:  Yeah.  Again, as I said, I
23 don't know the shape of the particular box or button
24 that a user had to -- would have to click in order
25 to proceed, but the user would have to click to

Page 181

1  demonstrate acceptance of the terms in order to
2  continue the registration flow.
3  BY MR. AKROTIRIANAKIS:
4      Q.  So for all you know, it could say, "Click
5  here," and "here" is underscored, and it's a link to
6  accept the terms of service?
7          MR. BLOCK:  Objection to form.
8          THE WITNESS:  Link wouldn't be the -- the
9  term that we would use in that context.  If you are
10 clicking something to proceed in a flow, for
11 instance, we would generally call that a "button."
12 BY MR. AKROTIRIANAKIS:
13     Q.  Okay.  The entirety of your knowledge of
14 what you're testifying to is -- is based 100 percent
15 on these conversations you had with other WhatsApp
16 employees yesterday, September 24, 2024; correct?
17         MR. BLOCK:  Objection to form.
18         THE WITNESS:  As I mentioned, I personally
19 use WhatsApp, although it's been quite some time
20 since I registered for the service.  So I'm basing
21 this testimony almost entirely on the preparation
22 that I conducted yesterday.
23 BY MR. AKROTIRIANAKIS:
24     Q.  Well, you never registered for WhatsApp in
25 Israel, I take it; right?

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 6 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3385
JONATHAN LEE on 09-25-2024          {{Attorneys Eyes Only}}          Pages 182..185

Page 182

1    A.  That's true.  So in that respect, I agree
2  it would be more accurate to say that I am basing it
3  off of the conversations that I had yesterday.
4    Q.  Okay.  Which is --
5    A.  However, I don't -- the experience in
6  Israel is -- is consistent with many other
7  jurisdictions.
8    Q.  Has the process changed over time, the
9  process for registering for a WhatsApp account?
10        MR. BLOCK:  Objection to scope to the
11  extent it seeks testimony outside the timeframe of
12  the designation.
13        THE WITNESS:  I'm not aware of ways in
14  which it has changed.  I am aware, as -- excuse
15  me -- that in some jurisdictions, we are -- WhatsApp
16  is starting to require a user to enter age
17  information as part of the registration flow.
18  BY MR. AKROTIRIANAKIS:
19    Q.  Didn't you earlier testify that there were
20  changes to opt in to at least parts of the terms of
21  service?
22        MR. BLOCK:  Objection to form.
23        THE WITNESS:  What I described earlier was
24  in relation to the 2016 terms of service.  And as
25  mentioned, this was implemented prior to my joining

Page 183

1  the company, but from what I have been told and what
2  I understand is that users who are registering --
3  excuse me -- users who had already been on the
4  service prior to 2016 were given the opportunity to
5  opt out of certain provisions of the updated terms
6  of service for a limited period of time.
7  BY MR. AKROTIRIANAKIS:
8    Q.  But that didn't have to do with the
9  registration of a WhatsApp account?
10    A.  My -- from what I understand, in that time
11  period, that was the users who were registering
12  subsequent to the issuance of the 2016 terms of
13  service did not have the opportunity to opt out.
14        It -- I don't know the specifics.  It may
15  have been that there was a brief period of time
16  where users who were registering on the order of
17  30 days would have had that opt out option, but that
18  would have been for a limited amount of time.
19  BY MR. AKROTIRIANAKIS:
20    Q.  When did you register your WhatsApp
21  account?
22        MR. BLOCK:  Objection to scope.
23        THE WITNESS:  I use --
24        MR. AKROTIRIANAKIS:  Well, hold on.
25        That is not a fair objection.  He testified

Page 184

1  that he was drawing on the experience of setting up
2  his own WhatsApp account, and not 100 percent
3  relying on these two people he spoke to yesterday.
4        If you want to stipulate that what he is
5  100 percent relying on what he was told yesterday,
6  then we can move on.  But if he's going to -- if
7  he's going to purport to draw on his own -- his own
8  experience as part of his preparation to testify,
9  then I think that's a totally fair question and
10  within the scope.
11  BY MR. AKROTIRIANAKIS:
12    Q.  So which is it, Mr. Lee?
13        MR. BLOCK:  I object to the form of that
14  question.
15        THE WITNESS:  Could you --
16  BY MR. AKROTIRIANAKIS:
17    Q.  When did you -- when did you sign up your
18  own personal WhatsApp account?
19    A.  Is there --
20        MR. BLOCK:  Same objections.
21        (Simultaneous speakers.)
22        THE WITNESS:  -- a prior question that you
23  wanted me to answer?
24        MR. BLOCK:  Just answered the question he
25  asks when he asks it.

Page 185

1        THE WITNESS:  Thank you.
2  BY MR. AKROTIRIANAKIS:
3    Q.  When did you sign up your own personal
4  WhatsApp account?
5        MR. BLOCK:  Same objections.
6        THE WITNESS:  I don't remember specifically
7  when I signed up for WhatsApp, but I believe it was
8  at least -- what year is it now -- maybe we will
9  over ten years ago.
10  BY MR. AKROTIRIANAKIS:
11    Q.  Okay.  So even before Facebook owned
12  WhatsApp, then?
13    A.  I believe it was prior to 2014.
14    Q.  So it sounds like you are entirely relying
15  on your two conversations that you had yesterday in
16  order to testify on behalf of the company today.
17        MR. BLOCK:  Objection to the form.
18        THE WITNESS:  I -- that would be fair -- a
19  fair thing to say.
20  BY MR. AKROTIRIANAKIS:
21    Q.  Okay.  Thank you.
22        In Exhibit 1412, could you turn, please, to
23  the page that has the document control number ending
24  in -94?  This is in the middle of a Q and A section
25  of the document.  Do you see that?

Page 318

1  PAGE   LINE   CHANGE/ADD/DELETE
2  _____  _____ _____
3  _____  _____ _____
4  _____  _____ _____
5  _____  _____ _____
6  _____  _____ _____
7  _____  _____ _____
8  _____  _____ _____
9  _____  _____ _____
10 _____  _____ _____
11 _____  _____ _____
12 _____  _____ _____
13 _____  _____ _____
14 _____  _____ _____
15 _____  _____ _____
16 _____  _____ _____
17 _____  _____ _____
18 _____  _____ _____
19 _____  _____ _____
20 _____  _____ _____
21 _____  _____ _____
22 _____  _____ _____
23 _____  _____ _____
24 _____  _____ _____
25 Deponent's Signature _____ Date

Page 319

1                   CERTIFICATE OF REPORTER
2        I, DORIEN SAITO, CSR 12568, CLR, a certified
3   Shorthand reporter in and for the State of
4   California, County of Los Angeles, do hereby
5   certify;
6        That JONATHAN LEE, the witness named in the
7   foregoing deposition, was, before the commencement
8   of the deposition, duly administered an oath in
9   accordance with CCP 2094;
10       That said deposition was taken down in
11  stenograph writing by me and thereafter transcribed
12  into typewriting under my direction.
13       That before completion of the deposition,
14  review of the transcript [ ] was [x] was not
15  requested.  If requested any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18       I further certify that I am neither counsel
19  for nor related to any party to said action, nor in
20  any way interested in the outcome thereof.
21       Dated this 26th day of September, 2024.
22
23                 _Dorien Saito_
                 CERTIFIED SHORTHAND REPORTER
24                  IN AND FOR THE COUNTY OF
                 LOS ANGELES, STATE OF CALIFORNIA
25

# EXHIBIT 3

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 9 of 112

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024                {{Attorneys Eyes Only}}

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4    _____

5    WHATSAPP INC., a Delaware          )
     corporation, and FACEBOOK, INC.,   )
6    a Delaware corporation,            )
     a Delaware corporation,            )
7                                       )
                   Plaintiffs,          )
8       v.                              ) Case No.
                                        ) 4:19-cv-07123-PJH
9    NSO GROUP TECHNOLOGIES LIMITED     )
     and Q CYBER TECHNOLOGIES LIMITED,  )
10                                      )
                                        )
11                 Defendants.          )
     _____)

12

13       HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14         VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                   DEPOSITION OF

16    WHATSAPP INC., by and through its Designated

17                  Representative,

18                    CARL WOOG

19            Palo Alto, California 94304

20            Wednesday, August 14, 2024

21

22

23   Reported Stenographically by:
     MARY J. GOFF
24   CSR No. 13427
     WA CSR No. 21030779
25   Job No. 3226
     PAGES 1-384

1 working with great intensity to identify what was
2 going on.
3      Q   So you have never spoken to ▇▇▇▇
4 ▇▇▇, as far as you know?
5      A   Sorry. I don't believe so, but I don't
6 recall if I have.
7      Q   Do you know at all what his
8 responsibilities with respect to either WhatsApp or
9 Facebook were?
10     A   Not that I recall.
11     Q   Do you know whether Mr. Robinson was
12 attributing the exploitation of this vulnerability
13 to NSO as of May 5, 2019?
14     A   Sir I do not know what Mr. Robinson
15 determined at that -- at that point in time.
16     Q   Do you know if WhatsApp more generally was
17 attributing anything to NSO as of May 5, 2019?
18     A   I believe that was our -- our -- our
19 strongest hypothesis that the team was working to
20 validate and confirm.
21     Q   And do you know what that was based on?
22     A   Sir, I -- my recollection, I recall
23 security engineers telling me that they believed
24 that NSO was attacking our users.
25         And this was an attack that was underway,

1 and they were working to put to stop.
2      Q   And do you know what that was based on,
3 that attribution to NSO?
4      A   Sir, based on their technical expertise.
5      Q   So you don't know?
6      A   I'm not a technical expert, no, sir.
7      Q   Okay. So you don't know?
8      A   No, sir.
9          ATTORNEY ANDRES:  Objection, asked and
10 answered.
11     Q   (BY ATTORNEY AKROTIRIANAKIS) Are all
12 WhatsApp chats end-to-end encrypted?
13     A   Sir, we have a distinction between what we
14 refer to as "personal WhatsApp chats" and chats that
15 are with businesses that use a technology service
16 called an "API."We have a White Paper that explains
17 this. Generally.
18         I think the way we think of WhatsApp is
19 kind of how people like you and me would chat with
20 one another, but we also have these business
21 services.
22         Those business services using the API, we
23 do not designate those at end-to-end encrypted.  But
24 what people are thinking of when they are using
25 their WhatsApp in their handset on their -- on their

1 phones app to app, those are indeed end-to-end
2 encrypted.  We usually refer to those as personal
3 images.
4      Q   All right.  So all WhatsApp personal
5 messages are end-to-end encrypted?
6      A   Yes, sir.
7      Q   And all WhatsApp calls are end-to-end
8 encrypted?
9      A   Yes, sir.
10     Q   Is that true both with respect to voice
11 calls and video calls?
12     A   Yes, voice and video calls are both
13 protected by end-to-end encryption on an
14 application-to-application basis.
15     Q   Does a WhatsApp user have to pay extra for
16 the end-to-end encryption or is that a standard
17 feature?
18     A   That's a standard feature, sir, and it
19 cannot be turned off.
20     Q   So it's impossible to have a WhatsApp
21 account -- a personal WhatsApp account without
22 end-to-end encryption, correct?
23     A   That is how our service works, sir.
24     Q   So yes?
25     A   Yes.

1      Q   How much does it cost for a user to
2 establish a WhatsApp account?
3      A   Sir --
4          ATTORNEY ANDRES:  Objection, relevance.
5      A   -- sir, accounts are free to establish.
6 There's no cost.
7      Q   (BY ATTORNEY AKROTIRIANAKIS) So what --
8 what does a person need in order to set up a
9 WhatsApp account?
10     A   Sir, you need a mobile phone, and you need
11 the ability to download the app from either the
12 Apple App Store or the Google Play Store.
13         Or you can also download the app directly
14 from our website, if you're having trouble accessing
15 those stores.  And then you download that
16 application onto your phone.
17         And then from there you open the app.
18 There'll be some information there about our Terms
19 of Service that you would need to agree to prior to
20 using our service.
21         And then there's just some initial setup
22 questions that -- that we have.  And then from there
23 you're pretty much off and running.
24     Q   Well, what are the initial setup
25 questions?

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 11 of 112

WhatsApp Inc. vs NSO Group Technologies Limited et al.                          Job 3226
CARL WOOG on 08-14-2024                    {{Attorneys Eyes Only}}              Pages 178..181

Page 178

1    A   Well --
2        ATTORNEY ANDRES:  Objection, relevance.
3    A   -- well -- so you have to enter your phone
4  number in order to effectively activate your
5  account.
6        So you enter your phone number, and that
7  will send an SMS message to you, which you -- you
8  type in a code for that, and then that allows you to
9  start your account.
10       I think we also ask for a name, which is
11 optional.  You can choose your actual name.  You can
12 choose a nickname.  I think there's an option to put
13 in a photo and things like that, which you can do,
14 if you chose.
15       And after that, you're able to chat freely
16 and securely.
17   Q   (BY ATTORNEY AKROTIRIANAKIS) So the "Name
18 Field" is not required?
19   A   I don't believe so, sir.  I think you have
20 to enter something in that name, but you don't have
21 to chose your actual name.
22       Does that --
23   Q   Could --
24   A   -- distinction make sense?
25   Q   Okay.  It could be literally anything?

Page 179

1    A   I believe so.
2    Q   It could be symbols?  It doesn't even have
3  to be letters?
4    A   I don't know if you can use symbols.
5  That -- sometimes apps have trouble with symbols.
6        But perhaps. I don't know for sure.  You
7  have to put in something, I believe, in that field.
8    Q   But it doesn't have to be your name?
9    A   It does not have to be your name, sir.
10   Q   Other than what you have described right
11 now, is there any other vetting that WhatsApp does
12 prior to granting a user account to someone?
13   A   Sir, I'm not an expert in this, but we do
14 have quite a talented group of people that are
15 looking for signals of inauthenticity and perhaps
16 abuse right from the setup time.
17       So what we're looking for there is
18 potentially accounts that may be intended to be set
19 up for spam or automation or other account setup
20 that is inauthentic in some way.
21       I'm drawing to draw a distinction between
22 that and a normal person who is just trying to use
23 WhatsApp for private and secure calls.
24   Q   So like a -- you're trying to ferret out
25 whether it's an actual person or a bot that's

Page 180

1  setting the account?
2    A   I think that's fair to say, sir, yes.
3    Q   Okay.  But assuming that somebody is an
4  actual person, literally anybody could sign up for a
5  WhatsApp account, as long as they have a mobile
6  phone and the ability to download the WhatsApp app,
7  correct?
8    A   Right.  And then that text message
9  authentication that I mentioned.  Those basic steps.
10   Q   Right.  But you don't, like, say:  Like,
11 well, is this a person who we really want using our
12 system?
13       They just decide themselves, right?
14   A   That's right.
15   Q   Can a person have multiple WhatsApp
16 accounts with different phone numbers?
17   A   Yes.  But basically a phone number -- an
18 easier way of thinking of it is that an account is
19 tied to a phone number.
20       So if you have two phones, then you could
21 have a WhatsApp on one phone and a WhatsApp on the
22 other phone.  That would be two accounts, but you
23 may be the same -- the same person.  We have that.
24       And then we also have the ability to
25 have -- we have multiple -- the ability to install

Page 181

1  multiple apps on one phone.
2        So for example, we have the WhatsApp app
3  and we have WhatsApp Business app.
4        And you could use your phone and download
5  both instances of WhatsApp on your phone.
6        And the reason why some people want to do
7  that is because they're a small business and they
8  like to separate their chats from their personal use
9  and their business use.  So it effectively gives
10 them two Inboxes to do so.
11       And the Business app has some of its
12 own -- different policies and rules that I'm less
13 familiar with.  But effectively that's designed for
14 the small business owner that relies on WhatsApp to,
15 you know, run their business, respond to customer
16 inquiries, and hopefully run a successful business
17 that -- for their customers.
18   Q   So let's go back to the names.
19       You said that -- that you have to -- that
20 your belief is that you have to put in something in
21 the -- in the "Setup" field that requests a name,
22 but it's incons -- inconsequential what it is that's
23 put into that field; is that fair?
24   A   That's fair.  It's a user choice.
25   Q   And that's permitted by the WhatsApp Terms

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 12 of 112

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3226
CARL WOOG on 08-14-2024                {{Attorneys Eyes Only}}                    Pages  382..384

Page 382

```
 1
 2
 3
 4       I, CARL WOOG, do hereby declare under penalty
 5  of perjury that I have read the foregoing
 6  transcript; that I have made any corrections as
 7  appear noted, in ink, initialed by me, or attached
 8  hereto; that my testimony as contained herein, as
 9  corrected, is true and correct.
10       EXECUTED this_____ day of_____,
11  20_____, at_____, _____.
             (City)                (State)
12
13
14       _____
              CARL WOOG
15
16
17
18
19
20
21
22
23
24
25
```

Page 383

```
 1       I, MARY J. GOFF, CSR No. 13427, Certified
 2  Shorthand Reporter of the State of California,
 3  certify;
 4       That the foregoing proceedings were taken
 5  before me at the time and place herein set forth, at
 6  which time the witness declared under penalty of
 7  perjury; that the testimony of the witness and all
 8  objections made at the time of the examination were
 9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14       That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:   (   ) that the witness has failed or
17  refused to approve the transcript.
18       I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22       I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of      , 2024.
25       _____
                 Mary Goff
             MARY J. GOFF
```

Page 384

```
 1              ERRATA SHEET
 2              SWIVEL LEGAL
 3          560 W Main Street, C163
 4        Alhambra, California 91801
 5              213-788-2327
 6       CASE:  WhatsApp v. NSO Group
 7  PAGE  LINE  FROM              TO
 8  ____|_____|_____|_____
 9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18
19       _____
20          CARL WOOG
21  Subscribed and sworn to before me
22  this _____ day of _____, 2024.
23  _____
24          Notary Public
25
```

# EXHIBIT 4

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 1

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4  _____

5  WHATSAPP INC., a Delaware          )
   corporation, and FACEBOOK, INC.,   )
6  a Delaware corporation,            )
   a Delaware corporation,            )
7                                     )
                Plaintiffs,           )
8       v.                            ) Case No.
                                      ) 4:19-cv-07123-PJH
9  NSO GROUP TECHNOLOGIES LIMITED     )
   and Q CYBER TECHNOLOGIES LIMITED,  )
10                                    )
                                      )
11             Defendants.            )
   _____)

12

13      HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14        VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                  DEPOSITION OF

16   WHATSAPP INC., by and through its Designated

17                 Representative,

18               CLAUDIU GHEORGHE

19          Palo Alto, California 94304

20             Friday, August 16, 2024

21

22 Reported Stenographically by:
   MARY J. GOFF
23 CSR No. 13427
   WA CSR No. 21030779
24 Job No. 3296
   PAGES 1-295
25

1    A  I'm confused.

2    Q   Let me rephrase.  Scratch that.

3    A  Yeah.

4    Q   Are the stanzas in XML?

5    A  I believe it was an XML protocol, yes.

6    Q   Okay.  And so the format of the stanzas is

7 defined somewhere?

8    A  Like right now?

9    Q   In 2019.  All of my questions will be

10 about how the system was in May of 2019.

11    A   Okay.  I believe there was a -- like a

12 text document that described the stanzas in the

13 protocol.

14       In one of the repositories that we had, it

15 was called "the common repo" that was referenced by

16 all the client and the server engineers.

17       And at that time we actually had a formal

18 representation of the protocol in another system

19 that actually led to the discovery of the attack --

20    Q   All right.

21    A  -- so there was -- yeah.

22    Q   So a stanza, which you said is an

23 XML-defined message --

24    A  Yes.

25    Q   -- has a certain -- certain structure to

1 it?

2    A   Yes.

3    Q   And so that structure would involve some

4 parameters and parameter values -- sort of parameter

5 names and parameter values?

6       ATTORNEY BLOCK:  Objection to form.

7    A  It involves that, but not just that.

8    Q   (BY ATTORNEY WEINBERG) What else does it

9 involve?

10    A   It involves other types of stanzas as well

11 that are child stanzas.  So there's like a hierarchy

12 of stanzas, essentially.

13    Q   All right.  So it's XML, so it's a

14 hierarchical --

15    A  Yeah.

16    Q   -- structure?

17    A  Yeah.

18    Q   And so an offer stanza, for example, is a

19 kind of VoIP stanza?

20    A  It's a type of stanza, yeah.

21    Q   Okay.  And so the structure for that kind

22 of stanza is defined in this common repo?

23    A  Yeah.

24    Q   Okay.  Let me put a document in front of

25 you.  1167.

1       (Exhibit 1167 was marked for

2 identification and is attached to the transcript.)

3    Q   (BY ATTORNEY WEINBERG) I want to chat with

4 you a bit about the stanzaming.  Is that how you

5 pronounced it, stanzaming?

6    A  Stanzaming.

7    Q   Got it.

8       Do you recognize this document?

9    A  Yes.

10    Q   What is it?

11    A  It displays a SEV that was filed for the

12 incident.

13    Q   Okay.  What is an SEV?

14    A  Yeah, so a SEV or S-E-V is a formal

15 document used by Facebook to track the operational

16 or security incidents within the company.

17    Q   Okay.  And what would I call this kind of

18 document?  Is this a chat?  Is this -- what kind of

19 a system is this kept in?

20       ATTORNEY BLOCK:  Objection to form.

21    A   So I'm trying -- like, I don't know

22 exactly how to explain this as a concept.  Outside

23 it -- it's kind of like a task, but it's really not

24 like a task.  It's more like a project, like, if I

25 would have to explain it in a different way.

1    Q   (BY ATTORNEY WEINBERG) And so what's

2 reflected here in this document is the actions and

3 messages -- actions taken and messages sent for this

4 SEV project, the stanzaming project?

5       ATTORNEY BLOCK:  Objection to form.

6    A  Yes.

7    Q   (BY ATTORNEY WEINBERG) Okay.  I would like

8 you to take a quick look at page 3.  Towards the

9 bottom it says that -- there's a message from

10 ██████████████ on Monday, May 6, at -- 2019,

11 at 12:27 p.m.?

12    A  Yes.

13    Q   And he says that the WhatsApp engineering

14 work for this SEV investigation is coordinated by

15 you; is that accurate?

16    A  Yes.

17    Q   And what does that mean, it was

18 "coordinate -- well, what is "engineering work" that

19 he is referring to?

20    A  It is the engineering work required to

21 investigate and remediate the attack.

22    Q   And the engineering work comprises what?

23    A  It involved a lot of steps and a lot of

24 work from -- not just from me, but from a larger

25 group of people.

Page 30

1    Q   Okay.  I guess I'm just trying to get a
2  sense of what distinguishes engineering work from
3  some other category of work that you may have not
4  been responsible for.
5        Would you be able to shed some light on
6  that?
7        ATTORNEY BLOCK:  Objection to form.
8    A   Like, what was the nonengineering work?
9    Q   (BY ATTORNEY WEINBERG) Well, if you're
10  coordinating the engineering work, was there other
11  kinds of work that you weren't coordinating or were
12  you coordinating all the work?
13       ATTORNEY BLOCK:  Objection to form and --
14   A   I was coordinating just the engineering at
15  WhatsApp.
16       ATTORNEY BLOCK:  -- just pause and give me
17  a chance to object before you start your answer,
18  please.
19   Q   (BY ATTORNEY WEINBERG) Okay.  And so what
20  does "coordinating network" mean?
21   A   Coordination in this case means scoping
22  work that needs to be done in order to achieve the
23  goal.
24   Q   And monitoring its progress as well, I
25  assume?

Page 31

1    A   Ensuring progress in monitoring, yes.
2    Q   It lists five tasks that were -- that you
3  were coordinating here.
4        Would you be able to just introduce us to
5  each of these five tasks and what they entailed?
6    A   So Number 1 -- and by the way, I don't
7  remember all the details of these tasks right now,
8  so I'll do my best to say it based on what I
9  remember.
10       Number 1, "logging packets from attackers
11  in EdgeRay," this task was about logging data from
12  the relay servers for the calls that we flagged at
13  "suspicious" and as part of the attack.
14   Q   What are the relay servers?
15   A   The relay servers are the servers
16  responsible for handling the realtime traffic
17  between devices during a call on WhatsApp.
18   Q   So they're a proxy between WhatsApp
19  clients?
20       ATTORNEY BLOCK:  Objection to form.
21   A   They're not just proxy.  They are -- they
22  have an essential role in establishing the realtime
23  channel between the devices.
24   Q   (BY ATTORNEY WEINBERG) The relay servers
25  also work in establishing the connection between

Page 32

1  the --
2    A   They --
3    Q   -- clients?
4    A   -- facilitate the connection -- the
5  realtime connection between the devices.
6    Q   What's difference between facilitating and
7  establishing?
8    A   In some cases there's direct
9  communication -- realtime communication between the
10  devices.
11       So if I call you, in some scenarios the
12  packets will actually not go through the relay.  But
13  in order to establish -- to -- like, in order to
14  establish that channel, you have to go through the
15  relay first.  But the actual packets are not proxied
16  in that case.
17       So in about 50 percent of the cases, the
18  relay acts as a proxy; but in the rest of them, it
19  does not act as a proxy.
20   Q   How do you determine -- or how does the
21  system determine whether the relay will be acting as
22  a proxy between clients and when it will not?
23   A   It is based on heuristics and whether
24  we -- we can establish a direct connection between
25  the devices or not.

Page 33

1        In some scenarios, it's not possible.  The
2  network configuration does not allow that to -- to
3  happen.
4    Q   So the relay servers will proxy
5  information between the clients whenever it's not
6  possible for the clients to communicate with each
7  other directly; is that accurate?
8        ATTORNEY BLOCK:  Objection to form.
9    A   Yes.
10   Q   (BY ATTORNEY WEINBERG) I have seen a lot
11  of references to "signaling servers" in the
12  documents.
13       What's the difference between the relay
14  servers and the signaling servers?
15   A   There are two main flows in establishing
16  the call on WhatsApp.  The first part that happens
17  at the beginning when you set up the call is called
18  signaling.
19       And the second part that happens -- that
20  transfers the real -- makes the realtime
21  communication between the devices is the relay.
22   Q   I guess I need some clarification.  The --
23  you said earlier that the relay servers facilitate
24  the creation of the connection?
25   A   Of the realtime channel.

Page 34

1    Q    Of the realtime channel.
2         So could you clarify what's the difference
3    between establishing the creation of the realtime
4    channel versus initiating -- setting up a call,
5    which is done by the signaling servers?
6         ATTORNEY BLOCK: Objection to form.
7    **A   So just to clarify, the difference between**
8    **the -- yeah.**
9    Q    (BY ATTORNEY WEINBERG) Yeah, sorry.  The
10   signaling servers, you said, set up the call.
11        And then you said that the relay servers
12   will help establish the realtime channel and then
13   sometimes proxy data from one client to the other;
14   is that accurate?
15   **A   Yes.**
16        ATTORNEY BLOCK: Objection, misstates the
17   testimony.
18   Q    (BY ATTORNEY WEINBERG) Could you expound a
19   little bit on that -- those two different functions?
20   **A   Yes.  So the setup of the call always**
21   **starts with the signaling server.  And the signaling**
22   **server is the same server that we use for chat, so**
23   **it's synonymous with chatserver.**
24   Q    Is that what's referred to as the
25   chatdservers --

Page 35

1    **A   Yes.**
2    Q    -- in the --
3    **A   The VoIP signaling is a module within**
4    **chatd.**
5    Q    And so the voice signaling uses the chat
6    functionality of WhatsApp to establish calls?
7    **A   To start the call.**
8    Q    To start the call.
9         And once it starts the call, the -- the
10   relay server establishes the realtime channel?
11   **A   Exactly.**
12   Q    And then half the time -- or some portion
13   of the time that relay server will then proxy data
14   between the two clients and in other instance it
15   will -- the two clients will access -- will
16   communicate directly in a peer-to-peer fashion?
17        ATTORNEY BLOCK: Objection to form.
18   **A   Yes.**
19   Q    (BY ATTORNEY WEINBERG) So we will get into
20   all of this in detail in a little bit.  I just
21   wanted to close the loop on this resume.
22        In 2019, shortly after the stanzaming
23   investigation, your title changed to software
24   engineering manager for application security; is
25   that correct?

Page 36

1    **A   Yes.**
2    Q    And that was a position you held from 2019
3    to 2021?
4    **A   Yes.**
5    Q    Could you describe your work and
6    responsibilities in that position?
7    **A   So the main responsibility that I had for**
8    **the WhatsApp application security team is to drive**
9    **the roadmap for hardening and improving security**
10   **across WhatsApp.**
11   Q    And was this a new position created in
12   response to the stanzaming incident?
13        ATTORNEY BLOCK: Objection to form;
14   foundation.
15   **A   I'm not sure what you mean by -- like, in**
16   **response to that.**
17   Q    (BY ATTORNEY WEINBERG) Was there a
18   security team before you took over as the security
19   engineering manager?
20        ATTORNEY BLOCK: Objection to form.
21   **A   There were people working on security, but**
22   **it was not a team dedicated to it.**
23   Q    (BY ATTORNEY WEINBERG) What's the
24   difference?
25   **A   So we had, for instance, a security**

Page 37

1    **partner that was assigned to WhatsApp.**
2    **And part of the security team was not**
3    **just -- not just hiring new people that worked full**
4    **time for WhatsApp, but it was also working**
5    **cross-functionally with other teams in Facebook like**
6    **the Facebook security team.**
7    **And there were already people assigned to**
8    **WhatsApp before we had the team.  It was just not**
9    **organized in the same way that we did it after.**
10   Q    Do you remember in 2019, when you became
11   the software engineering manager for application
12   security, who you reported to?
13   **A   The first manager that I had was** ████
14   ██.
15   Q    And you had another manager after that,
16   evidently?
17   **A   Yeah, he left the company.  And then the**
18   **next manager that I had was** ████████.
19   Q    And then how big was your team by the end
20   of 2019?
21   **A   By the end of 2019, I have to remember,**
22   **but I think we only had three years, I believe, in**
23   **the team.**
24   Q    And who were they?
25   **A   I believe** ████████████ **and** ████

1 ████.
2    Q   Can I grab Exhibit 11 -- actually, it's
3 1083, but it'll be Document Exhibit 1149.  This was
4 used yesterday or two days ago.
5        ATTORNEY WEINBERG:  1083.
6        (Exhibit 1083 was marked for
7 identification and is attached to the transcript.)
8    Q   (BY ATTORNEY WEINBERG) Do you recognize
9 this document?
10   A   Oh. It's a presentation.  Yes, I
11 recognize this document.
12   Q   What is Exhibit 1083?
13   A   It is a presentation of the technical
14 details of the attack that we found and remediated
15 in May 2019.
16       It was presented internally inside
17 Facebook. It was not an external document.
18   Q   When was it presently internally?  Do you
19 remember?
20   A   I don't remember the exact date.
21 Somewhere between September and November 2019, I
22 believe.
23       ATTORNEY BLOCK:  I'm going to take this
24 opportunity before I forget to designate the
25 transcript for confidentiality with the designation

1 of "Highly Confidential, Attorneys' Eyes Only."
2    Q   (BY ATTORNEY WEINBERG) Who wrote this or
3 created this PowerPoint?  Do you know?
4    A   It was a collaboration between multiple
5 people. I collaborated with.  Otto Ebeling
6 collaborated as well.  Brendon Tiszka, I believe,
7 collaborated, and Andrey Labunets.
8    Q   Who is Otto Ebeling?
9    A   Otto Ebeling is a security engineer.  He
10 used to be in the Facebook security team at the end
11 of the investigation, and he worked closely with us
12 on the investigation.
13   Q   At the tail end of this Exhibit 1083, it
14 says -- on page 25, is a slide entitled "Going
15 Forward. And it says:
16       The WhatsApp security team is
17       hiring.
18       Do you see that?
19   A   Yes.
20   Q   It says:
21       The WhatsApp security team has
22       been created and will be focusing
23       on engineering work to improve the
24       security of WhatsApp.  Reach out to
25       Claudiu Gheorghe if you want to

1        join WhatsApp security.
2        Do you see that?
3    A   Yes.
4    Q   So I was hoping you could tell me a little
5 bit more about this team and whether it was created,
6 it appears, in response to the stanzaming incident.
7        ATTORNEY BLOCK:  Objection to the form of
8 the question.  Mischaracterizes the evidence;
9 assumes facts.
10   A   This team -- the scope of this team and
11 the plan to build a team like that existed prior to
12 the incident.
13   Q   (BY ATTORNEY WEINBERG) Oh.  When --
14   A   Every product team inside Facebook had a
15 security team at that moment, so I remember talking
16 about what -- about having a security team
17 beforehand.  I don't remember exactly the details of
18 the conversations.  I -- it's been a while since
19 then.
20       But the idea of having a security team
21 already existed.  We already had security partners
22 championing that idea internally.
23       The reason why we thought it was a good
24 thing to do is because we got so many ideas after
25 the incidents about what we can do, and it became --

1 there was a lot of awareness.  And a lot of people
2 were -- a lot of the engineers were really
3 interested and passionate to make security better
4 after we had -- we -- we started talking about the
5 details of the attack and how sophisticated these
6 attacks are.
7        So there was a lot of interest from
8 engineers and from leaders to do more of this type
9 of work to prevent...
10   Q   Understood.
11       Why did you leave WhatsApp?
12   A   There's a long list of reasons.  I was --
13 primarily -- there's some personal stuff that I
14 don't want to talk about.  I mean, I could, if you
15 really want to.
16       But the primary one was I was there -- it
17 was my first full-time job.  I had never worked at
18 any other company before -- before Facebook.
19       It was -- I was closing in on almost,
20 like, 10 years.  I was actually planning to leave
21 around, like, the time of the attack.
22       And after this attack, I just became so
23 interested and fascinated by what happened that I
24 continued my tenure.
25       So it was really just -- in my career, if

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 19 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024                {{Attorneys Eyes Only}}         Pages 74..77

Page 74

1    A   I don't know the reason for that.
2    Q   There's four authors listed on the front
3 of this paper. I just want to run through who each
4 of these people are.
5        Who is Andrey Labunets?
6    A   Andrey.
7    Q   Andrey Labunets.
8    A   He's a member of the incident response
9 team -- security incident response team at Facebook.
10   Q   And what was his relationship to this
11 project?
12   A   He was one of the main coordinators of the
13 project on the security side. Me and him were
14 basically the main coordinators for the project.
15   Q   When you say "on the security side," what
16 do you mean by that?
17   A   So in order to fulfill the investigation
18 and the remediation, it was a collaboration between
19 experts in WhatsApp and also WhatsApp en -- also
20 experts outside of the WhatsApp team like Andrey and
21 Otto and all the other members of this presentation.
22   Q   All right. So we spoke about Otto Ebeling
23 before. You said that he was highly involved with
24 this project? That's correct?
25   A   Yes.

Page 75

1    Q   Who is Ibrahim Mohamed?
2    A   He is a team member of Otto working from
3 London on understanding the attack. He's a security
4 engineer.
5    Q   So he reported to Otto?
6    A   I don't think so. Otto was not a manager.
7 He was a senior IC on his team. And Ibrahim was
8 another individual contributor on the same team with
9 Otto.
10   Q   So Ibrahim and Otto would be peers within
11 the organization?
12   A   Yes.
13   Q   And who is Brendon Tiszka?
14   A   He is a security engineer, a member of the
15 Facebook security team in Menlo Park.
16   Q   Do you know why or -- scratch that -- how
17 WhatsApp chose who would be the authors of this
18 report?
19       ATTORNEY BLOCK: Objection to form.
20   A   WhatsApp did not choose the authors of
21 this report.
22   Q   (BY ATTORNEY WEINBERG) You contributed to
23 this report, didn't you?
24   A   My contribution was limited only with the
25 review of the document and making suggestions on it,

Page 76

1 but I did not contribute it, like, actual content.
2    Q   You didn't author it?
3    A   I did not author it.
4    Q   But you reviewed it and provided feed --
5    A   Feedback.
6    Q   -- back?
7        THE COURT STENOGRAPHER: I didn't hear the
8 answer.
9    A   I'm sorry.
10       And provided feedback.
11   Q   (BY ATTORNEY WEINBERG) And so this is the
12 official account of WhatsApp's technical analysis of
13 the stanzaming episode?
14       ATTORNEY BLOCK: Objection to form.
15   A   What do you mean by "official"?
16   Q   (BY ATTORNEY WEINBERG) This document
17 reflects WhatsApp's internal technical analysis of
18 the stanzaming incident?
19       ATTORNEY BLOCK: Objection to form.
20   A   Especially given the list of authors, I
21 would characterize it as the un -- it's the document
22 that reflects the understanding of Facebook security
23 about the attack against WhatsApp.
24   Q   (BY ATTORNEY WEINBERG) And since you're
25 one of the reviewers of this paper, you believe that

Page 77

1 what's in here is accurate?
2    A   Yes.
3    Q   All right. We spoke earlier about Exhibit
4 1083, the PowerPoint. Do you have that?
5        And I think you said that was an internal
6 PowerPoint that was a collaboration between multiple
7 employees, including you; is that correct?
8    A   Yes.
9    Q   And this PowerPoint corresponds to this --
10 to the White Paper at 1148?
11       ATTORNEY BLOCK: Objection to form.
12   A   These documents are related, but I
13 wouldn't say they correspond -- like, it corresponds
14 to the other one.
15       They're different contexts that they were
16 written and authored, so I would treat them as
17 separate documents.
18   Q   (BY ATTORNEY WEINBERG) But they -- are you
19 aware of any inconsistencies in their technical
20 analysis of the incidents between these two
21 documents?
22       ATTORNEY BLOCK: Objection to form.
23   A   I'm not aware right now of any
24 inconsistency between them.
25   Q   (BY ATTORNEY WEINBERG) All right. Because

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 20 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                          Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}                              Pages  78..81

Page 78

1 it just seems like it's a PowerPoint presentation of
2 this paper, so --
3     **A   I don't think it was that.**
4     Q   No.
5     **A   They were done in different contexts.  I**
6 **mean, they're related.  They're on the same topic,**
7 **but I don't think we wrote them together,**
8 **essentially.**
9     Q   Okay.  So the White Paper starts, if you
10 turn to page -- page 4, with a section
11 entitled "WhatsApp VoIP Architecture."
12       Do you see that?
13    **A   Yes.**
14    Q   So I just want to talk about the VoIP
15 architecture, the fun stuff, what -- what it looked
16 like, in 2019.  Or more specifically how it existed
17 on May 1, 2019.
18       The document here says the WhatsApp VoIP
19 architecture has server and a client application.  I
20 think we touched on this earlier.
21       Do you recall?
22    **A   Yes.**
23    Q   And so what is the client application?
24    **A   The client application is an official**
25 **application built by WhatsApp to run on mobile**

Page 79

1 **devices or --**
2     Q   So it runs on?
3     **A   -- on mobile devices or as a web client.**
4     Q   So the client application is not something
5 that runs on WhatsApp servers?
6     **A   That is correct.**
7     Q   It's like the app that I download off --
8     **A   Exactly.**
9     Q   -- the store?
10       What is the server application?
11    **A   The server application is the server that**
12 **is used between -- for clients to send messaging or**
13 **other types of messages between each other.**
14    Q   Okay.  The White Paper says here:
15         The server functions as an
16       intermediary between the WhatsApp
17       applications.
18       Do you see that part?
19    **A   Yes.**
20    Q   I'm trying to get a sense of what that
21 means.  So the job of the server as an intermediary
22 is to transit messages from one client application
23 to another.
24       Is that what this is referring to?
25       ATTORNEY BLOCK:  Objection to form.

Page 80

1     **A   Yes.**
2     Q   (BY ATTORNEY WEINBERG) So we spoke about
3 two different kinds of messaging earlier, the
4 signaling servers and the relay servers.
5       I just want to make sure that we
6 distinguish those and talk a little bit about the
7 functionality of each of them.  So the White Paper
8 says that the application -- I'm sorry --
9         The server application helps
10       the clients establish a call.
11       Is this referring to the signaling server?
12 Let me --
13       ATTORNEY BLOCK:  I object -- I'm going to
14 object to the question.
15    Q   (BY ATTORNEY WEINBERG) -- let me withdraw
16 and rephrase.  I'm just trying to get a sense of --
17 when this paper -- White Paper is talking about the
18 server application, I'm trying to figure out if it's
19 talking about both of those kinds of servers or just
20 one.
21       So my first question is:  For establishing
22 a call, that's the signaling server, from my
23 understanding; is that correct?
24       ATTORNEY BLOCK:  Object to form.
25    **A   It is partially correct.  So a starting of**

Page 81

1 **the call -- the initiation of the call starts with**
2 **the signaling server, but there's -- there's some**
3 **parts of the communication between the phone that**
4 **also the relay is facilitating at the beginning.  So**
5 **it's --**
6     Q   (BY ATTORNEY WEINBERG) So --
7     **A   -- a shared responsibility between**
8 **signaling and the relay server.**
9     Q   Okay.  Can you explain to me how that
10 works?
11    **A   What part of it?**
12    Q   You said that there was a shared
13 responsibility for initiating calls; the signaling
14 server performed some functions the relay server
15 performs some attended functions as well?
16    **A   Yes.**
17    Q   I just wanted you to break that out for me
18 so I understand what functions they perform and how
19 they perform them.
20       ATTORNEY BLOCK:  Objection to form.
21    **A   The signaling server is used to initiate**
22 **the voice or video call.  Everything starts with the**
23 **signaling server.**
24       **It is using a previously authenticated**
25 **channel that is also used for messaging to initiate**

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 21 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}                        Pages  90..93

Page 90

1  but it's the same system that Facebook uses for all
2  the other products like Instagram and other things.
3       Q   Can a request specify that it has to go to
4  a particular edge load balancer?
5           ATTORNEY BLOCK: Objection to form.
6       A   Not that I'm aware of.
7       Q   (BY ATTORNEY WEINBERG) Where are -- I'm
8  sorry.  Scratch that.
9           You said the edge load balancer is a
10 logical server; is that correct?
11      A   Yes.
12      Q   How many are there -- or were there in
13 2019?
14      A   How many logical servers?
15      Q   How many logical -- how many logical
16 servers implemented the edge load balancing layer in
17 2019?
18          ATTORNEY BLOCK: Objection to form.
19      A   So how many locations across the globe?
20      Q   (BY ATTORNEY WEINBERG) No.  So there -- we
21 spoke about logical servers and the physical
22 servers --
23      A   Yes.
24      Q   -- behind them?
25      A   Yeah.

Page 91

1       Q   So when we're at the logical layer, the
2  WhatsApp DNS resolver is sending out this request to
3  its chosen edge load balancer, which it chooses on
4  its own?
5       A   Which is a logical, yes.
6       Q   So what I'm asking is:  How many choices
7  does the WhatsApp DNS resolver have?
8       A   Yes.  More than hundred.
9       Q   Over a hundred.
10          And so behind those 100 logical servers
11 that implement the edge load balancer, there are
12 also physical servers, correct?
13      A   Yes, at every layer of the load balancing
14 there are -- so every layer has its own logical and
15 physical set of servers.
16          In one PoP in one edge location there's
17 typically, like, either four or four racks of
18 servers, which is, like, somewhere between, like,
19 32 and 128, I think, servers for each edge location.
20      Q   So are all the physical servers of any
21 given logical server of the edge load balancer in
22 the same location?  Maybe I'll rephrase the question
23 for you.
24      A   Yes, please.
25      Q   You said that there's over a hundred

Page 92

1  logical servers that implement edge load balancing?
2           ATTORNEY BLOCK: Objection to form.
3       A   There are hundred -- more than a hundred
4  locations across the globe that are edge locations.
5       Q   (BY ATTORNEY WEINBERG) Okay.  And so each
6  one of these locations will have one or more logical
7  servers there that can be addressed by requests
8  coming from the WhatsApp DNS resolver?
9           ATTORNEY BLOCK: Objection --
10      A   Yes.
11          ATTORNEY BLOCK:  -- to form.
12      Q   (BY ATTORNEY WEINBERG) Is it typically one
13 logical server per location or were there some
14 locations that had multiple logical servers?
15          ATTORNEY BLOCK: Objection to form.
16      A   What I understand as a logical server in
17 this case is what we call a virtual IP.
18          And every edge location has a lot of
19 virtual IPs for every Facebook service.  So this is
20 shared infrastructure that all of Facebook services
21 use.
22          Instagram will have their own IP.
23 WhatsApp has their own IP.  And behind that IP is --
24 it's a virtual IP, so it'll have a bunch of servers
25 behind it.

Page 93

1       Q   (BY ATTORNEY WEINBERG) All right.  So just
2  to be clear -- I just want to make sure that the --
3  once a request is sent to a logical server at a
4  particular edge location, the physical server that
5  will handle that request is going to be at that same
6  location at a particular location, the edge
7  location?
8           ATTORNEY BLOCK: Objection to form.
9       A   What do you mean by "handling"?
10      Q   (BY ATTORNEY WEINBERG) Well, requests are
11 handled -- in a client server architecture, clients
12 send requests to servers and servers handle the
13 requests, right?
14          ATTORNEY BLOCK: Objection to form.
15      A   So my understanding of the handling, it
16 depends on the layer of -- in the software stack.
17          The edge location will only do minimal
18 handling.  Like, it does some handling of the
19 request with regards to routing.
20          So it will unpack the header of the
21 request and look for some information in that header
22 to see to -- to see what data center it has to route
23 the request to, but it doesn't do more than that.
24      Q   (BY ATTORNEY WEINBERG) So there's two
25 different layers of load balancing that you

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 22 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}                      Pages  114..117

Page 114

1    A   So these are concurrent.  So as soon as
2 the caller receives -- the -- the callee receives
3 the offer, as soon as it's processed and it starts
4 ringing in the same time, it also sends back a
5 confirmation to the server that it started ringing.
6        And I don't recollect specifically the
7 name of that stanza, but I think it's a -- I think
8 it's an offer ACK that is being sent.
9    Q   (BY ATTORNEY WEINBERG) Okay.  What then
10 does the chatdserver do once it receives this offer
11 ACK?
12   A   I think what it does is it forwards the
13 ACK to the call so that the caller can also start
14 the ring -- the ringing process.
15   Q   Have you heard the term "offer" --
16 sorry -- "Answer stanza"?
17   A   Yes.
18   Q   I saw it in some of the documents.
19       What is it the Answer stanza?
20   A   The Answer stanza, I believe, is the
21 stanza that is sent from the callee at the moment
22 the user presses the "Answer" button and accepts the
23 call.
24   Q   All right.  So at our current step, the
25 chatdserver sent the offer ACK back to the -- to the

Page 115

1 caller; and now if the callee picks up the phone,
2 his device will send an Answer stanza somewhere?
3    A   To the chatd.
4        ATTORNEY BLOCK:  Objection to form.
5    Q   (BY ATTORNEY WEINBERG) The caller, once
6 the caller picks up the phone, the caller's phone
7 will send an Answer stanza back to the chatdserver,
8 right?
9        ATTORNEY BLOCK:  Object to form.
10   A   The caller will send back an answer when
11 the user presses the "Answer" button, yes.
12       ATTORNEY BLOCK:  Did you say "caller" or
13 "callee" on that one?  I got confused.
14   Q   (BY ATTORNEY WEINBERG) The callee would
15 send the answer?
16       ATTORNEY BLOCK:  I think we have got
17 testimony about the "caller" sending an answer
18 stanza.
19       ATTORNEY AKROTIRIANAKIS:  I'm sure she is
20 going to have to listen when she goes through it, I
21 hope.
22   A   Yeah, that's not accurate.  So the answer
23 is only sent by the callee.
24   Q   (BY ATTORNEY WEINBERG) Got it.  All right.
25 At that point is there a peer-to-peer connection

Page 116

1 established?
2    A   No.
3        ATTORNEY BLOCK:  Objection to form.
4    Q   (BY ATTORNEY WEINBERG) Okay.  So what
5 happens next?
6    A   Even before the answer happens, there's a
7 negotiation process between the caller and the
8 callee about the latency, about the bandwidth that
9 is going to be used.  So all that negotiation
10 happens before there's any -- any answer.
11   Q   Okay.  So then I'll go back one step.
12       The chatdserver sent the offer ACK to the
13 caller and now a negotiation process begins, you
14 say?
15       ATTORNEY BLOCK:  Objection to form.
16   A   Sorry.  So the -- the caller -- can you
17 repeat the last part?
18   Q   (BY ATTORNEY WEINBERG) The callee sends an
19 acknowledgment back to the chatdserver, the offer
20 acknowledgment, and what happens next?
21       You talked about a negotiation process.
22       ATTORNEY BLOCK:  Objection to form.
23   A   The chat server will forward the offer ACK
24 or send another stanza that I don't remember its
25 name.  But it would signal to the callee, the fact

Page 117

1 that the caller has been reached and the offer was
2 ACK'd by the callee.
3        And once they both know that -- both --
4 they know about each other, that they're aware that
5 there's a call happening, this is when the -- the
6 relay and bandwidth negotiation starts happening.
7    Q   (BY ATTORNEY WEINBERG) Okay.  Tell me
8 about what you mean by "the relay and bandwidth
9 negotiation."
10       ATTORNEY BLOCK:  Objection to form.
11   A   About each of them or --
12   Q   (BY ATTORNEY WEINBERG) I just want to know
13 the steps that are involved in the negotiation
14 process that you just mentioned.
15       ATTORNEY BLOCK:  Objection to form.
16       Wait for a question.
17   Q   (BY ATTORNEY WEINBERG) What are the steps
18 of the negotiation process you just mentioned?
19       ATTORNEY BLOCK:  Objection to form.
20   A   About what negotiation?
21   Q   (BY ATTORNEY WEINBERG) You testified that
22 the chatdserver sends the offer ACK back to the
23 caller.
24       And after that happens and the two -- the
25 caller and the callee know that they are now ready

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}                        Pages 118..121

Page 118

1 to communicate, a negotiation process begins wherein
2 the caller and callee negotiate the relay and
3 bandwidth parameters.
4          I would like to understand, if you could
5 explain to me, what that negotiation entails.
6          ATTORNEY BLOCK:  Objection to form;
7 misstates.
8     A   So this negotiation, the relay
9 negotiation, starts by every -- both caller and
10 callee probing -- reaching all the relays in the
11 list of relays that were distributed by the chat
12 server.
13    Q   (BY ATTORNEY WEINBERG) Sorry.  Say that
14 again.
15    A   So both caller and callee will attempt
16 connecting to every relay in the list of relays that
17 they both -- they were both given by the signaling
18 server.
19    Q   Okay.  What's next?
20    A   This process is done not just by the
21 IP address, but also by an authorization token that
22 is unique to the call.  So both caller and callee
23 will be passed a unique authorization token to use
24 only those specific relays.
25          And using the token, both the caller and

Page 119

1 callee attempt to connect to every relay in that
2 list using the authorization token.
3    Q   Okay.  So to rephrase what you said, the
4 chatdserver provides a list to the two clients of
5 relay servers and provides them authentication
6 credentials, and each one tries to connect to the --
7 to all of the relay servers provided to them by the
8 chatdserver?
9    A   Authorization token.
10          ATTORNEY BLOCK:  Objection to the form;
11 misstates.
12    A   Authorization token.  It's only
13 authorization.  It's not authentication.
14    Q   (BY ATTORNEY WEINBERG) Okay.  Tell me --
15 what is that authorization token?
16    A   So the relay server is designed in a way
17 that it does not perform advanced authentication of
18 the devices that send data to it.
19          It operates at a lower security level
20 where the only thing that it does is validates an
21 authorization token that has a low expiration time.
22          So as long as you have a valid token, you
23 can use the relay.  So that is authorization for
24 authentication, but we don't -- we don't
25 authenticate the users of the relay.

Page 120

1    Q   (BY ATTORNEY WEINBERG) Okay.  What is the
2 purpose of trying to connect to all those relays?
3    A   The purpose of connecting to the relays is
4 firstly to see which one is available; and second,
5 to measure the latency to each of them.
6    Q   Let me ask: How does the chatdserver
7 decide which relay servers to give to these two
8 clients?
9          ATTORNEY BLOCK:  Object to form.
10    A   The decision to pick -- to select the list
11 of relays is based on latency measurements.  And the
12 information that it uses is the caller IP address
13 and the last seen IP of the callee.
14          The algorithm that we used at that time
15 was essentially to find the top three of each --
16 based on each IP address, and we merged the list so
17 that the sum of the latency is -- is the lowest.
18          So we choose the top lowest latency sum in
19 that merged list of the relays, and that's the one
20 that we delivered to both of them.
21    Q   (BY ATTORNEY WEINBERG) Okay.  So the
22 chatdserver chooses which relay servers the clients
23 should attempt to connect to?
24          ATTORNEY BLOCK:  Object to form.
25    Q   (BY ATTORNEY WEINBERG) I think you just

Page 121

1 got done saying that?
2    A   Yes, the chatdservers decide that.  Yes.
3    Q   Okay.  And then there's a second choice,
4 evidently, that you talked about just before this
5 where the clients connect to this list of relay
6 servers and then they -- each one decides which one
7 of the connections to then use; is that --
8    A   I think it's a little confusing -- there's
9 some confusion in there, so let me clarify.
10    Q   Sure.
11    A   Both the server -- both the signaling
12 server and the clients make a decision in this
13 process.  It's a hybrid decision.
14          So the server picks the top five, let's
15 say, or three.  But in the end, each client picks
16 its own, like, relay to use, and that's just one.
17 But the client decides that based on the short list.
18    Q   Do the two clients have to agree on a
19 specific relay server to use?
20    A   They don't.  The -- the network paths are
21 completely asynchronous and, like, they don't need
22 to be the same.
23          So the packets -- if I initiate a voice
24 video call to you, the packets that I sent to you
25 don't need to take the same network path that

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 24 of 112

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 130..133

Page 130

1    A   I'm not sure what you mean by "the parts
2 of the server."
3    Q   (BY ATTORNEY WEINBERG) Areas in storage.
4        ATTORNEY BLOCK:  Same objection.
5    A   What storage?
6    Q   (BY ATTORNEY WEINBERG) Well, computers
7 have computer storage, right?  Memory?  Hard drives?
8    A   So the chat servers do not store
9 information on, like, themselves.
10   Q   When a computer operates, it accesses
11 memory, right?
12   A   Yes.
13   Q   Okay.  The chatservers have memory that
14 they access?
15   A   Yes.
16   Q   And when they execute, they access that
17 memory?
18   A   Yes.
19   Q   And so when they execute code written by
20 WhatsApp, they access only those parts of the memory
21 that WhatsApp had programmed them to access?
22       ATTORNEY BLOCK:  Objection to form.
23   A   Yes.
24       ATTORNEY BLOCK:  I just want to do a time
25 check.  You had talked about --

Page 131

1        ATTORNEY WEINBERG:  Do you want to do
2 lunch?
3        ATTORNEY BLOCK:  -- it's 12:45 now.
4    A   Yeah, I can probably -- I mean, it's up to
5 guys as well.
6        ATTORNEY BLOCK:  Do you mind if we break?
7        ATTORNEY MARZORATI:  Yeah, let's do lunch.
8    A   No.
9        ATTORNEY WEINBERG:  Let's go off the
10 record.
11       THE VIDEOGRAPHER:  12:45 p.m.
12       (A break was taken from 12:45 p.m. to
13 1:49 p.m.)
14       THE VIDEOGRAPHER:  We are back on the
15 record at 1:49 p.m.
16   Q   (BY ATTORNEY WEINBERG) All right.  Thanks.
17 Welcome back from lunch.  Just a few cleanup items
18 of some of the topics we spoke about earlier today.
19       The -- we spoke about the servers, the
20 physical and logical servers and the whole
21 infrastructure for routing messages in WhatsApp's
22 VoIP infrastructure.  You spoke about the edge load
23 balancers.
24       I just want to confirm:  How many -- in
25 2019, how many servers were there that were

Page 132

1 performing this edge load balancing?
2    A   Are you referring to how many locations,
3 like, clusters or logical servers or how many
4 physical servers?
5    Q   So let's start with the locations.
6    A   From my understanding, it was somewhere --
7 the number of locations was around a hundred.
8    Q   And where were those locations?
9    A   So the locations are basically Internet
10 exchange points on the Internet.  And they're
11 geographically distributed, so they're essentially
12 in many countries, continents, all over the globe.
13   Q   And how many servers were implementing
14 that edge load balancing layer?
15       ATTORNEY BLOCK:  Objection to form.
16   A   I don't remember exactly how many servers
17 we had in total in all these edge locations.  I just
18 know that in general the number was somewhere
19 between 32 and a 120.
20       Like, some of them even had 200 servers in
21 them, so I don't know the total number.
22   Q   (BY ATTORNEY WEINBERG) Okay.  And these
23 hundreds of locations, were any of them in
24 California?
25   A   Some of them are in California -- were in

Page 133

1 California.
2    Q   In 2019?
3    A   In 2019, yes.
4    Q   Do you have an approximation of about how
5 many?
6    A   Two.
7    Q   Two.
8        Two total locations in California out of
9 the 100?
10   A   Yes.
11   Q   Okay.  Are those data center locations?
12   A   Edge locations.  Not data centers.
13   Q   Okay.  So as far as the data centers, how
14 many data centers did WhatsApp utilize in 2019?
15   A   From my recollection, we had -- WhatsApp
16 had three data centers all located in the United
17 States in 2019 for chat.
18   Q   And where were they?
19   A   One of them was Altoona.  The other one
20 was in Virginia.  And then there was another one in
21 New Mexico, I believe.
22   Q   Altoona, that's --
23   A   That's in Iowa.
24   Q   -- Iowa?
25   A   Yeah.

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 25 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024                   {{Attorneys Eyes Only}}                 Pages  134..137

Page 134

1    Q   Any others?
2    A   **Not from what I remember.**
3    Q   Okay.  So we spoke about the chatdservers
4  and the relay servers.  I'll start with the
5  chatdservers.
6        Where were they implemented?  The
7  computers that executed the chatd functionality,
8  where were they located?
9    A   **They were located in the data centers that**
10  **we just mentioned.**
11   Q   Okay.  And the relay servers, were they
12  also located in the data centers we just mentioned?
13   A   **No.**
14   Q   Okay.  Where were they located?
15   A   **The relay servers were located in the edge**
16  **locations that we talked about earlier.**
17   Q   And those edge locations are the 100
18  locations, including the two in California?
19   A   **Yes.**
20   Q   Okay.  In order to access one of these
21  servers, for example, the chatdserver or the relay
22  servers or one of these load balancing servers,
23  there is presumably some kind of either
24  authorization or authentication that occurs?  Yes?
25        ATTORNEY BLOCK:  Object to form.

Page 135

1    A   **Would you want to be more specific with**
2  **regards to, like, what authorization --**
3    Q   (BY ATTORNEY WEINBERG) Sure.  Let's start
4  with the load balancers.  All right.
5        The edge load balancers, when it receives
6  a request, will it process it automatically or will
7  it check for some kind of authorization?
8        ATTORNEY BLOCK:  Object to form.
9    A   **The edge location, in case of the relay,**
10  **it will check the author -- authorization token in**
11  **the STUN message that is sent by the client.**
12        **And if that token is not valid, it will**
13  **not allow the use of the relay.**
14   Q   (BY ATTORNEY WEINBERG) And that's those
15  temporary tokens that don't do authorization -- I'm
16  sorry -- that don't do authentication --
17   A   **Exactly.**
18   Q   -- but instead do authorization?
19   A   **Exactly.**
20   Q   And what about the chatdservers?  What
21  kind of credentials are required for accessing the
22  functionality implemented by the chatdservers?
23        ATTORNEY BLOCK:  Objection to form.
24   A   **The chatdservers -- and just to be clear,**
25  **we're talking about the servers in the data centers**

Page 136

1  now, not in the edge locations?
2    Q   (BY ATTORNEY WEINBERG) Are the
3  chatdservers in the edge locations?
4    A   **No.**
5    Q   So then the chatdservers in the data
6  centers?
7    A   **In the data centers, which is only load**
8  **balancers in the edge locations.**
9        **And those will not perform authentication**
10  **for the chat traffic.  The authentication happens on**
11  **the chat servers inside the data centers.**
12        **And it's based on -- it's a proprietary**
13  **protocol -- it's the noise protocol that essentially**
14  **provides both encryption and authentication at the**
15  **same time.**
16   Q   Okay.  Tell me about this authentication
17  protocol for accessing the chatdservers.
18        ATTORNEY BLOCK:  Object to form.
19   A   **What specifically do you want to know**
20  **about it?**
21   Q   (BY ATTORNEY WEINBERG) What is the form of
22  the credentials?
23   A   **In a simplified way, the credential is**
24  **essentially an identity key that's stored on the**
25  **client device.**

Page 137

1    Q   And the client passes it along with every
2  request that it makes to the chatdserver?
3    A   **It doesn't.  It's more complicated.**
4    Q   Okay.  Tell me --
5    A   **It's -- it's part of the handshake -- the**
6  **initial handshake that it does with the chatd.  But**
7  **from that point on, it uses a preshared key to -- it**
8  **uses a negotiated shared key to encrypt the rest of**
9  **the traffic.**
10   Q   Got it.  How are the original credentials
11  obtained?
12   A   **The credentials are obtained through the**
13  **registration process to WhatsApp.**
14   Q   And what does WhatsApp then send
15  the user that constitutes these credentials?
16        ATTORNEY BLOCK:  Object to form.
17   A   **I'm not sure what you mean by "what does**
18  **it send to users."**
19   Q   (BY ATTORNEY WEINBERG) When the user needs
20  to authenticate the chatdservers, it needs to
21  provide some kind of authenticating information, so
22  I'm asking:  What does WhatsApp provide the client
23  to help it authenticate those requests?
24        ATTORNEY BLOCK:  Object to form.
25   A   **So in order to validate -- to**

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 26 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                              Job 3296
WHATSAPP INC. on 08-16-2024            {{Attorneys Eyes Only}}            Pages 138..141

Page 138

1  authenticate, the WhatsApp server sends an
2  activation code to verify that the person who
3  initiates the registration process has ownership
4  over the phone number.
5          And it's over SMS.  So we'll send the code
6  over SMS.  In using that code, the client can finish
7  the registration process.  And after that is
8  finished, the credentials are being admitted.
9          But just to be clear, that identity key
10  that I was talking about is never seen by the
11  server.  It's the basis of the internal encryption.
12  So the identity key -- identity key is never -- does
13  not -- does never leave the client device.
14      Q   I'm not sure that I followed all of that.
15          The identity key is -- how does it arrive
16  at the client device?
17          ATTORNEY BLOCK:  Objection to form.
18      A   It is generated -- like, it is generated
19  locally by the client device before the registration
20  starts and when someone installs the app on their
21  phone.
22      Q   (BY ATTORNEY WEINBERG) So the client
23  creates its own identity key kind of like a private
24  key?
25          ATTORNEY BLOCK:  Object to form.

Page 139

1      A   You can refer to it as a private key, yes.
2      Q   (BY ATTORNEY WEINBERG) Okay.  And how does
3  it use that private key to authenticate to the
4  chatdserver?
5      A   It is a complex protocol which is part of
6  what noise does, but it's essentially a key to
7  there.
8          So there's a public key and a private key.
9  The public key is what is sent to the server so the
10  server can verify that the client is indeed who --
11  who they claim they are.
12          So there's multiple keys involved.  And
13  this protocol is fairly complex.  So I'm not an
14  encryption expert, by the way, so I can talk to some
15  aspects of it, but I don't know, like, the -- very
16  little details of, like, how -- how, like -- all the
17  steps involved and all the types of keys.  There are
18  multiple keys involved in this process.
19          But the idea is that the identity key is
20  something that -- or the private key does never
21  leave the client device.
22      Q   Okay.  So client device uses this private
23  key to obtain a negotiated key with a chatdserver
24  for each session?
25          ATTORNEY BLOCK:  Object to form.

Page 140

1      A   Yes.
2      Q   (BY ATTORNEY WEINBERG) Okay.  And that
3  negotiated key is what gets passed to -- from the
4  client to the chatdserver upon each request to the
5  chatdserver?
6      A   The shared key not passed.  The shared key
7  is only used an encryption key for the -- as a block
8  cipher encryption key for the traffic.
9          And the server uses that shared key to
10  decrypt the -- that payload.
11      Q   And that same shared key is used to
12  encrypt it?
13      A   By the client, yes.
14      Q   Okay.
15      A   And this is only metadata, by the way.  It
16  does not include, like, the actual content of the
17  messages.  That's a different -- a different thing.
18      Q   I'm sorry.  The key is used to encrypt
19  only metadata?
20      A   The -- yes, it's used to encrypt the data
21  that is sent between the client and the server over
22  the Internet so that someone cannot just look at the
23  traffic and understand what the client is talking
24  with the server.
25      Q   When that message arrives at the

Page 141

1  chatdserver, the server then decrypts it using the
2  same shared key.
3          How does it decide that it's an authentic
4  message?
5          ATTORNEY BLOCK:  Object to form.
6      A   It would not be able to decrypt the
7  content.  And it would not pass all the -- the
8  checks on the -- so the -- basically, the -- there's
9  a verification process that checks whether the --
10  the message was tampered with, it was modified.
11          And it will do all of that upon receival.
12  The chatdserver will do that before using the
13  payload.
14      Q   (BY ATTORNEY WEINBERG) And that's just
15  based on the shared key?
16      A   Yes.
17      Q   Okay.  You told us a moment ago about the
18  server locations for the chat features.  And I think
19  that you testified earlier today that the VoIP uses
20  the -- those chat servers.
21          So I just want to confirm that the --
22  those server locations we discussed just now are for
23  the -- are the servers being used for voice over IP.
24          ATTORNEY BLOCK:  Object to the form of the
25  question.

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 27 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}          Pages 202..205

Page 202

1 factual basis for Plaintiffs' contention that
2 Defendants purposely directed their conduct at
3 California, including conduct at this QuadraNet
4 server, which I believe is this "220 server" in
5 paragraph 4?
6        ATTORNEY BLOCK:  I object to the form of
7 the question.  And that's not the witness's
8 designation.
9        ATTORNEY WEINBERG:  He's not designated on
10 Topic 1?
11       ATTORNEY BLOCK:  He's not designated on
12 what you read.
13       ATTORNEY WEINBERG:  Okay.  What is he
14 designated on for Topic 1?
15       ATTORNEY BLOCK:  He is designated to:
16          Provide relevant nonprivileged
17       information as to matters known or
18       reasonably available to Plaintiffs
19       regarding Plaintiffs' understanding
20       of the operation of the NSO spyware
21       involved in NSO's unauthorized
22       access to Plaintiffs' computers in
23       May and April 2019, including the
24       contact of such spyware with
25       California-based infrastructure,

Page 203

1       including a QuadraNet server in
2       California.
3        And I will refer generally to Responses
4 and Objections that we served shortly after
5 receiving your amended notice.
6        ATTORNEY WEINBERG:  All right.  So I'm
7 asking about any factual basis that Plaintiffs have
8 to contend that Pegasus or NSO had access -- had
9 contact with this QuadraNet server.
10    Q   (BY ATTORNEY WEINBERG) And is your
11 contention that the analysis by Andrew Robinson was
12 simply that the user's target phone accessed this
13 QuadraNet server?
14       ATTORNEY BLOCK:  I object to the form of
15 the question.
16       The witness is here to provide testimony,
17 not contentions.  And the question misstates the
18 record.
19    Q   (BY ATTORNEY WEINBERG) Okay.  I think we
20 may have exhausted your knowledge about these -- the
21 nature of the contact with these servers.
22       Do you know anything about the QuadraNet
23 server, which is this Server 220 in paragraph 4?
24    **A   I reviewed a document that showed that**
25 **this IP was assigned to QuadraNet as an**

Page 204

1 **organization.  It was part of an IP range that was**
2 **assigned to QuadraNet.**
3    **So that's a document that I reviewed, and**
4 **I can confirm that that's accurate.**
5    Q   (BY ATTORNEY WEINBERG) Okay.  What
6 document did you review that said that?
7    **A   It was a document provided by -- I don't**
8 **remember the name of the person who provided the**
9 **document.**
10    **It was based on the MaxMind database, a**
11 **public IP -- GeoIP database that showed an IP range**
12 **that contained this IP address, and it was assigned**
13 **to QuadraNet.**
14    Q   Was it the Mornin declaration, Joseph D.
15 Mornin?
16    **A   That does not sound familiar, but...**
17    Q   Okay.  You said that you confirmed it
18 yourself.  And that -- you may have just answered
19 this, but how did you confirm it yourself that this
20 IP address in 2019 was assigned to a physical server
21 in California?
22       ATTORNEY BLOCK:  Objection, vague;
23 misstates.
24    **A   I did not confirm it.  I did not do any**
25 **work to confirm it.  I just reviewed the document**

Page 205

1 that showed that this IP was part of an IP range
2 assigned to QuadraNet in -- at that time.
3    Q   (BY ATTORNEY WEINBERG) Part of an IP range
4 assigned to QuadraNet?
5    **A   Yes.**
6    Q   And so this range is encompassing how many
7 IP addresses?
8    **A   I don't remember the -- like, how large**
9 **was the IP range.**
10    Q   Do you know whether this particular IP in
11 paragraph 4 was assigned to a server physically
12 located in California?
13    **A   I know it was assigned to QuadraNet, but I**
14 **did not video QuadraNet data centers to verify that**
15 **myself.  I...**
16    Q   What about the second IP address, the one
17 in paragraph 5 of your declaration, the 200 server?
18 What do you know about that IP address?
19    **A   Unfortunately, I don't know anything about**
20 **that IP.**
21    Q   Okay.  Do Plaintiffs know anything about
22 any server in California that was specifically
23 targeted by -- they believe was specifically
24 targeted by Pegasus software?
25       ATTORNEY BLOCK:  Object to form.

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 28 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 206..209

Page 206

1    A   What kind of server?
2    Q   (BY ATTORNEY WEINBERG) Any server
3  physically located in California.
4        ATTORNEY BLOCK:  Same objection.
5    A   Any server owned by Facebook?
6    Q   (BY ATTORNEY WEINBERG) Any server in
7  California owned by anybody.
8        The question is:  Does -- do Plaintiffs
9  know about any server physically located in
10  California that was specifically targeted by Pegasus
11  software?
12        ATTORNEY BLOCK:  Objection to form.
13    A   The only thing that I know is that during
14  the attack that we observed, there were some servers
15  located in the edge locations in the San Jose and
16  Los Angeles metro areas that were involved in those
17  attacks, relay servers.
18        That's the only thing -- the only
19  information that I have.
20    Q   (BY ATTORNEY WEINBERG) Okay.  But do
21  you --
22        ATTORNEY BLOCK:  Can we take a short
23  break?
24        ATTORNEY WEINBERG:  Just one second.
25    Q   (BY ATTORNEY WEINBERG) The relay server

Page 207

1  can't be targeted by client requests, right?
2        ATTORNEY BLOCK:  Object to form.
3    Q   (BY ATTORNEY WEINBERG) It's -- WhatsApp
4  decides to how to route the relay servers -- how to
5  write requests to the relay servers?
6        ATTORNEY BLOCK:  Object to form.
7    A   So the signaling server picks the relay
8  servers from all the available edge locations.
9    Q   (BY ATTORNEY WEINBERG) And the signaling
10  server is programmed by WhatsApp?
11    A   By -- yes.
12    Q   And the user can't select the relay server
13  to use?
14    A   The user can select the relay server.
15        What the signaling server does is selects
16  from the hundred, it selects the top three or five.
17        But ultimately any of the clients can
18  decide on each -- like, what relay server can you
19  use from the set of three or five.
20    Q   And the relay servers, remind me, are
21  located in -- can you confirm that a user cannot
22  purposely direct requests at a particular relay
23  server?
24        ATTORNEY BLOCK:  Object to form.
25    A   That's not entirely correct.  So a user

Page 208

1  a -- a client is given a lister of relays.
2        And as part of the relay negotiation
3  process, every client conducts all the relays they
4  were given.  But ultimately, the data packets that
5  are being sent is up in the decision of each client.
6  So they decide on their own which relay server to
7  use.
8    Q   (BY ATTORNEY WEINBERG) Okay.
9        ATTORNEY BLOCK:  Can we take that short
10  break?
11        ATTORNEY WEINBERG:  Sure.
12        THE VIDEOGRAPHER:  Off the record at
13  4:11 p.m.
14        (A break was taken from 4:11 p.m. to
15  4:30 p.m.)
16        THE VIDEOGRAPHER:  We were on the record
17  at 4:30 p.m.
18    Q   (BY ATTORNEY WEINBERG) Thank you.
19        So just before we left off you were
20  talking about the investigation that WhatsApp
21  conducted for -- I guess it's about -- around the
22  week of May 2, 2019?
23    A   What investigation about the attack?
24    Q   The stanzaming investigation.  From what I
25  understand, WhatsApp studied traffic for about a

Page 209

1  week or so before closing the vulnerability to see
2  if they could gain some insight into -- into the
3  incident; is that correct?
4        ATTORNEY BLOCK:  Object to form.
5    A   Yes, we firstly detected the suspicious
6  activity.  I don't remember exactly the day.  I
7  think it was Thursday or Friday.
8        And the following Friday -- until the
9  following Friday, we did logging of the activity of
10  the attack in order to gain an understanding of how
11  the attack works.
12        ATTORNEY BLOCK:  I don't want to interrupt
13  you, but I probably should have done it before you
14  started.  I thought you were going to go there
15  first.
16        As I mentioned to you off the record,
17  during the break Mr. Gheorghe did some rereview of
18  some of the prep that he did for his incorporate
19  representative topics, including with respect to
20  QuadraNet, so I commend to you revisiting those
21  topics when you wish to do so.
22        ATTORNEY WEINBERG:  All right.  Thank you.
23    Q   (BY ATTORNEY WEINBERG) If you could take a
24  quick look at 1167.  That's Exhibit 1167.  It's the
25  stanzaming chat.  Just at page -- I'll remind you

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 29 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 210..213

Page 210

1 that at the bottom of page 1, there was this --
2 actually, I guess, the -- yeah, at the top of page 2
3 where it says that the suspicious stanza received in
4 this incident was being sent on May 2, 2019.  That's
5 the second and third line of that.
6        So this instance sort of began it -- on
7 May 2, 2019, correct?
8    A   Yes.
9    Q   And then if you go down to the next line
10 where you have got Joaquin speak -- writing on
11 Friday, May 3, at 4:49 a.m., he says:
12        Here is a "diff" -- with the
13        name of a "diff" -- that will
14        enforce our servers to only accept
15        valid stanzas.  This could mitigate
16        the impact, but we would like to
17        first identify the vulnerability,
18        if there is, before modifying this.
19        My understanding of the "diff" in this
20 context is that there's a code change that's
21 available to push to the server?
22    A   That's exactly right.
23    Q   And once that gets pushed to the server,
24 it will modify the servers to only accept valid
25 stanzas; is that correct?

Page 211

1        ATTORNEY BLOCK:  Object to form.
2    A   I haven't reviewed that "diff" for, like,
3 years, so I don't know about all the details in it,
4 but it's likely a change that enforces the
5 validation -- like, the blocking -- it does
6 enforcement for the stanza validation --
7    Q   (BY ATTORNEY WEINBERG)  Got it.
8    A   -- for the signaling server.
9    Q   Understood.  And it says:
10        This can mitigate the impact,
11        but we would like to first identify
12        the vulnerability, if there is,
13        before modifying this.
14        And so what he is saying there is:  Hey,
15 let's not push this valid -- this enforcement out to
16 the server just yet; let's leave it open for a
17 while, observe some traffic, and see what we can
18 learn about this incident?
19        Is that what you guys ended up doing?
20    A   Yes.  That is -- and by the way, this is
21 an industry standard practice.  We're not -- like,
22 we're just following the process, basically.
23    Q   I see.
24        So going through all these materials,
25 there were a lot of logs with different names.  And

Page 212

1 I just want to go through some of them to figure out
2 which ones of them refer to what and whether there's
3 repeats and -- just for nomenclature sake.
4    A   Sure.
5    Q   "Server trace logs," what does that
6 typically refer to in these documents?  And I can
7 show you a document, if you're confused about it,
8 but server trace logs.
9    A   Refreshing my memory right now, I think
10 server trace log -- can I see the document?  I think
11 that'll be easier.
12    Q   Sure.  It's in 1105, the "stanza
13 validation project task."
14        Let's see if I can find exactly where.  So
15 May 4, 2019 is page 13 of the document.
16    A   What page?  Sorry.
17    Q   Page 13 of the document is -- there's a
18 comment from Jesus on May 4, 2019.  He says:
19        Adding server trace logs for
20        some number, sending the malicious
21        stanza.
22        ATTORNEY BLOCK:  Object to form.
23    Q   (BY ATTORNEY WEINBERG)  The question is:
24 What is the trace log?
25    A   The server trace log is a log from the

Page 213

1 chat server about -- at different points in handling
2 stanzas.
3        So once the trace log -- it's a tool.
4 It's an internal tool where we would, for a
5 particular number, enable trace logs.  And we
6 would -- once that's enabled, we would see in
7 realtime all the activity from that number
8 throughout the chat servers.
9    Q   Did you also have server trace logs for
10 the relay servers?
11    A   Those are called differently.  Those are
12 called EdgeRay logs.
13    Q   EdgeRay logs.
14        And what kind of information is contained
15 in the EdgeRay log?
16    A   In the EdgeRay log, we did some custom
17 logging regarding the source IP of the packet, the
18 destination IP, the size of the packet, and the
19 content of the packet, I believe.
20        We were changing that logging format quite
21 a lot, so I don't know off the top of my head, like,
22 all the fields that we were logging.
23        But at a high level, that's -- those are
24 the ones that I remember right now.
25    Q   Okay.  Validation log?

Page 270

1  of the C2 servers was located on AW -- was hosted by
2  AWS.  And we tried to reach out to AWS to give us
3  whatever they had on that machine that had that IP.
4        I don't know what he means by "payload" in
5  this case.  Payload is kind of a generic name, so I
6  don't know what he means by "payload."  But that's
7  what I know that we tried to get from AWS.
8     Q   (BY ATTORNEY WEINBERG) I would presume
9  that the payload from a C2 server is whatever it is
10 that the C2 server is programmed to deliver to a
11 client, right?
12       ATTORNEY BLOCK:  Object to form; calls for
13 speculation.
14    A   Yeah, I don't know what he meant.
15    Q   (BY ATTORNEY WEINBERG) All right.  All
16 right.  So just about the fixes then.
17       In this document, do you see on page --
18 the second page in that same Aby John comment that
19 we just spoke about, it discusses server fixes and
20 client fixes.
21       So can you tell me about the remediation
22 work that WhatsApp did in response to this -- to
23 this incident?
24    A   Yeah, I can talk about that.
25       So the remediation -- the immediate

Page 271

1  remediation of the attack entailed three fixes.  Two
2  of them were server side, and one of them --
3     Q   Two server side?
4     A   -- two server-side fixes and one client
5  side fix that was rolled out with all the
6  applications, all the platforms that use WhatsApp,
7  the Android, iPhone, whatever.  Like, all the
8  phones.
9     Q   The client-side fixes were for Android and
10 iPhone?
11    A   Yes.  It was a cross -- cross-platform
12 fix.  It was the same fix that would apply to both
13 platforms.
14    Q   Okay.  So the vulnerability on the client
15 was both an Android and an iOS exploit?
16       ATTORNEY BLOCK:  Object to form.
17    A   So the vulnerability was in the C code
18 responsible for handling voice and video calling
19 logic, and it was the same code running on both of
20 these platforms.
21    Q   (BY ATTORNEY WEINBERG) Okay.  Did WhatsApp
22 have any evidence that any iOS devices were
23 compromised using this vulnerability?
24    A   From what I remember, yes, we had some
25 iOS -- some samples of the attacks that were

Page 272

1  targeting iOS devices, but a majority of the
2  samples, from what I remember, was all Android.
3     Q   I'll have you take a look at Exhibit 1119.
4        (Exhibit 1119 was marked for
5  identification and is attached to the transcript.)
6     A   Yeah.
7     Q   (BY ATTORNEY WEINBERG) Just -- my only
8  questions on this is:  This is a WorkChat that you
9  received on May 14, 2019?
10    A   Yeah.
11    Q   I think that's it.
12    A   Okay.
13    Q   What was the client-side fix that you
14 talked about?
15    A   The client-side fix was preventing the
16 buffer overflow that was used in the remote code
17 execution.
18       So we limited the buffer size sent -- that
19 is sent from the remote end.  We limited it to the
20 size of the buffer that we have locally.  So after
21 that fix, memory corruption could not occur anymore.
22    Q   Was the buffer overflow vulnerability in a
23 piece of third-party software?
24    A   No.
25    Q   And you -- to roll out this

Page 273

1  server-side fix -- sorry -- the client-side fix, you
2  rolled out an update to the Android Google store?
3     A   The Play Store.
4     Q   The Play Store; is that correct?
5     A   Yes.
6        ATTORNEY BLOCK:  Objection to form.
7  Sorry.  Belated.
8     Q   (BY ATTORNEY WEINBERG) Did you send the
9  same update to the Apple Store -- App Store?
10       ATTORNEY BLOCK:  Objection to form.
11    A   Yes, we did.
12    Q   (BY ATTORNEY WEINBERG) Tell me about the
13 server-side fixes.
14    A   The first fix we rolled out on the server
15 side was for the relay.  And we rolled that out on
16 Friday.  I don't remember the actual date, that
17 week.
18    Q   Okay.  So what did you do to the relay
19 server --
20    A   The relay server --
21    Q   -- software?
22    A   -- sorry?
23    Q   The relay server software.
24    A   Yes.  So the relay server fix was about
25 limiting the messages that were used, the SRTPSR and

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 31 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024            {{Attorneys Eyes Only}}                        Pages 274..277

Page 274

1  RR.
2        The messages that were used to do -- to
3  exploit the buffer overflow were being kept and
4  dropped by the -- by the server.  So a normal
5  WhatsApp application would not send these really
6  large SR and RR SRTP packets.  So it was very easy
7  for us to identify the ones sent by a malicious --
8  by a fake client.
9        In this case it was the fake client that
10 was attacking the victim, so it was very easy for us
11 to basically put some logic in place that would
12 basically -- that would just drop those SRTPRR
13 messages.
14       And as an effect, we observed immediately
15 a different behavior in the pattern of the attacks,
16 so we knew for sure that -- that we -- we broke
17 their exploit.
18       It seemed kind of like it was broken, but
19 it wasn't clear.  It seemed broken, but it wasn't
20 clear that we actually found it.  And we did it --
21 that intentionally to monitor their behavior.
22    Q   So this change to the relay server
23 enhanced the security of the relay server beyond
24 what it was before the fix?
25    A   No, it did not.  It was actually a

Page 275

1  temporary change that we made only for this.  We
2  pulled it out after we rolled out the client fix.
3  We did it just to break their exploit, basically.
4        From a protocol perspective, the
5  message -- like, you -- it wasn't -- it was just
6  very -- something very specific that only those
7  clients were sending, so that's why we could do it.
8     Q   And in that respect, the change to the
9  relay server created an additional barrier to -- to
10 the exploit that didn't exist before; so it,
11 therefore, enhanced the security of the relay server
12 beyond what it was?
13    A   It -- it did not enhance the security of
14 the relay server at all.  It -- the only reason why
15 we put that change is to break that specific
16 exploit, yes.
17    Q   Did the change restore the server to a
18 previous condition?
19       ATTORNEY BLOCK:  Objection to form.
20    A   Restore the server to a previous
21 condition?  I'm not sure what that means.
22    Q   (BY ATTORNEY WEINBERG) The client-side
23 vulnerability, I think that's the one that was
24 reported in the CVE, right?
25       ATTORNEY BLOCK:  Object to form.

Page 276

1     A   What CVE?
2     Q   (BY ATTORNEY WEINBERG) It's this -- the
3  number is listed on the White Paper, if you want to
4  look at it, but CVE-2019-3568.
5     A   Can I get that?
6     Q   And 1148 is the exhibit number.
7        ATTORNEY BLOCK:  You're looking for --
8     A   Yeah, got it.  3568.  Yes, that's the one.
9     Q   (BY ATTORNEY WEINBERG) So just for the
10 record, you have identified the same CVE number on
11 the CVE list at Exhibit 1163?
12    A   Yes.
13    Q   So this says that the buffer overflow --
14 I'm looking at Exhibit 1163 at page 4.  And I am
15 looking at the entry here for CVE-2019-3568.
16       And that's the vulnerability that was
17 closed with the client-side fix, right?
18    A   Yes.
19    Q   So this is -- the description of that
20 vulnerability, it says:
21       A buffer overflow
22       vulnerability in WhatsApp VoIP
23       stack allowed remote code execution
24       via a specially crafted series of
25       RTCP packets sent to a target phone

Page 277

1        number.  The issue affects WhatsApp
2        for Android prior to
3        Version 2.19.134, WhatsApp Business
4        for Android prior to
5        Version 2.19.44, WhatsApp for iOS
6        prior to Version 2.19.51, and so
7        on.
8        All right.  So this only refers to the
9  client-side vulnerability, right?  And this -- this
10 CVE refers to the client-side vulnerability?
11       ATTORNEY BLOCK:  Object to form.
12    A   Yes.
13    Q   (BY ATTORNEY WEINBERG) And that
14 vulnerability existed in WhatsApp's code as WhatsApp
15 wrote the code, right?
16       ATTORNEY BLOCK:  Objection to form.
17    A   So the way -- the way I look at the
18 vulnerability is it's a -- the vulnerability exists
19 in the moment when you have an attack that exploits
20 it.
21    Q   (BY ATTORNEY WEINBERG) I don't know if
22 that's right.  What's the difference between a
23 vulnerability and an exploit?
24       ATTORNEY BLOCK:  Objection to form; scope.
25    Q   (BY ATTORNEY WEINBERG) Isn't it the case

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 32 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}                    Pages 278..281

Page 278

1  that a vulnerability is a potential for
2  exploitation, and an exploit is when the
3  vulnerability is actually exploited?
4        ATTORNEY BLOCK:  Objection to form; and
5  scope.
6     A   So the way I see a vulnerability is in --
7  like, that exists in the moment you have an attack
8  that -- that uses it.
9     Q   (BY ATTORNEY WEINBERG) Don't you have a
10  vulnerability the moment you write a code that has a
11  vulnerability?
12       Like, if I make a fence and the fence has
13  a gap in it, the fence has a vulnerability.  And if
14  somebody walks through that fence -- that gap in the
15  fence, that's -- that's an exploit of the
16  vulnerability?
17    A   No, I don't --
18       ATTORNEY BLOCK:  Object to -- sorry.
19  Objection to form; scope; vagueness; incomplete
20  hypothetical, et cetera.
21    A   -- yeah, I don't agree with that.
22       So software has virtually, like, always
23  some flaws in it.
24    Q   (BY ATTORNEY WEINBERG) What would you call
25  those flaws?

Page 279

1        ATTORNEY BLOCK:  Huh?
2     A   They're just flaws.  The moment you build
3  an attack --
4        ATTORNEY BLOCK:  Can you just let the
5  witness finish his answer before you interrupt?
6        ATTORNEY WEINBERG:  He paused.
7     Q   (BY ATTORNEY WEINBERG) Go ahead.
8     A   So there's always going to be flaws in --
9  in the software.  Like, it's always there.  There's
10  always -- any software that exists today has some
11  flaws in it.
12       The moment that becomes a vulnerability
13  and becomes relevant is when someone is able to
14  exploit it and have an attack that uses it.
15       Until then, it's -- it's just software.
16    Q   (BY ATTORNEY WEINBERG) Okay.  I think we
17  are just having a semantic discussion.  So we want
18  to call the hole in the software that is
19  exploitable, a flaw?
20       ATTORNEY BLOCK:  Objection to form.
21    A   I think a vulnerability is -- is a flaw.
22  My point is that an attack is the one that validates
23  that you can use that flaw to do something bad with
24  it.
25    Q   (BY ATTORNEY WEINBERG) And I guess my only

Page 280

1  question is that:  That flaw existed in WhatsApp's
2  software as WhatsApp wrote it, right?  It wasn't
3  created by anybody else?
4        ATTORNEY BLOCK:  Objection to form.
5     A   So we -- we wrote the software for the
6  VoIP stack having in mind all the -- like, we
7  designed it and we wrote it, assuming that the
8  messages being sent are a part of the WhatsApp
9  network and that they're official clients built by
10  the WhatsApp team.
11       So with that regards, there was no flaw.
12  Voice calling was working perfectly fine.
13    Q   (BY ATTORNEY WEINBERG) Nobody changed
14  WhatsApp's code, right?
15       ATTORNEY BLOCK:  Object to form.
16    Q   (BY ATTORNEY WEINBERG) No -- pegasus
17  didn't change WhatsApp's code, correct?
18    A   I --
19       ATTORNEY BLOCK:  Object to form and scope.
20    A   -- I actually don't agree with that.
21  Because they changed the memory layout of the
22  application and they actually did change the
23  WhatsApp code.
24       They made the --
25    Q   (BY ATTORNEY WEINBERG) On the client?

Page 281

1     A   -- on the client, yes.  They changed the
2  WhatsApp client on -- they changed the WhatsApp code
3  running on the victim's phone.
4     Q   But the flaw or vulnerability they used to
5  do that, which is the vulnerability disclosed at
6  CVE-2019-3568, was a vulnerability that existed in
7  WhatsApp's code as WhatsApp had released it?
8        ATTORNEY BLOCK:  Objection to form.  It's
9  asked and answered.  And I think it's time to move
10  on.
11       ATTORNEY WEINBERG:  All right.  Let's go
12  off the record for a bit.
13       THE VIDEOGRAPHER:  It's 6:59 p.m.
14       (A break was taken from 6:59 p.m. to
15  7:06 p.m.)
16       THE VIDEOGRAPHER:  Back on the record at
17  7:06 p.m.
18    Q   (BY ATTORNEY WEINBERG) All right.  You
19  said that there were two server changes that were
20  precipitated by this.  The first one was this relay
21  server change.
22       What was the second?
23    A   The second fix was on the signaling server
24  that enforced the validation of the stanza -- of the
25  offer stanzas and dropped them.

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 33 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 294..295

Page 294

1      I, MARY J. GOFF, CSR No. 13427, Certified
2   Shorthand Reporter of the State of California,
3   certify;
4       That the foregoing proceedings were taken
5   before me at the time and place herein set forth, at
6   which time the witness declared under penalty of
7   perjury; that the testimony of the witness and all
8   objections made at the time of the examination were
9   recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14      That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:   (   ) that the witness has failed or
17  refused to approve the transcript.
18      I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22      I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this    day of      , 2024.
25              *Mary Goff*

                MARY J. GOFF

---

Page 295

1              ERRATA SHEET
2              SWIVEL LEGAL
3           560 W Main Street, C163
4          Alhambra, California 91801
5              213-788-2327
6       CASE:  WhatsApp v. NSO Group
7   PAGE  LINE  FROM                    TO
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18
19      _____
20      CLAUDIU GHEORGHE
21  Subscribed and sworn to before me
22  this _____ day of _____, 2024.
23  _____
24      Notary Public
25

# EXHIBIT 5

FILED UNDER SEAL

# EXHIBIT 6

## FILED UNDER SEAL

# EXHIBIT 7

## FILED UNDER SEAL

# EXHIBIT 8

## FILED UNDER SEAL

# EXHIBIT 9

## FILED UNDER SEAL

# EXHIBIT 10

## FILED UNDER SEAL

EXHIBIT 11

You are currently viewing an archived version of the Terms of Service. View the current version or all past versions.

Last modified: August 25, 2016

# WhatsApp Terms Of Service

WhatsApp Inc. ("WhatsApp," "our," "we," or "us") provides messaging, Internet calling, and other services to users around the world. Please read our Terms of Service so you understand what's up with your use of WhatsApp. You agree to our Terms of Service ("Terms") by installing, accessing, or using our apps, services, features, software, or website (together, "Services").

**NO ACCESS TO EMERGENCY SERVICES: There are important differences between WhatsApp and your mobile and fixed-line telephone and SMS services. Our Services do not provide access to emergency services or emergency services providers, including the police, fire departments, or hospitals, or otherwise connect to public safety answering points. You should ensure you can contact your relevant emergency services providers through a mobile, fixed-line telephone, or other service.**

**IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, OUR TERMS CONTAIN A BINDING ARBITRATION PROVISION, WHICH STATES THAT, EXCEPT IF YOU OPT OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES, WHATSAPP AND YOU AGREE TO RESOLVE ALL DISPUTES THROUGH BINDING INDIVIDUAL ARBITRATION, WHICH MEANS THAT YOU WAIVE ANY RIGHT TO HAVE THOSE DISPUTES DECIDED BY A JUDGE OR JURY, AND THAT YOU WAIVE YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS, CLASS ARBITRATIONS, OR REPRESENTATIVE ACTIONS. PLEASE READ THE "SPECIAL ARBITRATION PROVISION FOR UNITED STATES OR CANADA USERS" SECTION BELOW TO LEARN MORE.**

## About our services

CONFIDENTIAL                                                                                                    WA-NSO-00014825

**Registration.** You must register for our Services using accurate data, provide your current mobile phone number, and, if you change it, update this mobile phone number using our in-app change number feature. You agree to receive text messages and phone calls (from us or our third-party providers) with codes to register for our Services.

**Address Book.** You provide us the phone numbers of WhatsApp users and your other contacts in your mobile phone address book on a regular basis. You confirm you are authorized to provide us such numbers to allow us to provide our Services.

**Age.** You must be at least 13 years old to use our Services (or such greater age required in your country for you to be authorized to use our Services without parental approval). In addition to being of the minimum required age to use our Services under applicable law, if you are not old enough to have authority to agree to our Terms in your country, your parent or guardian must agree to our Terms on your behalf.

**Devices and Software.** You must provide certain devices, software, and data connections to use our Services, which we otherwise do not supply. For as long as you use our Services, you consent to downloading and installing updates to our Services, including automatically.

**Fees and Taxes.** You are responsible for all carrier data plan and other fees and taxes associated with your use of our Services. We may charge you for our Services, including applicable taxes. We may refuse or cancel orders. We do not provide refunds for our Services, except as required by law.

## Privacy policy and user data

WhatsApp cares about your privacy. WhatsApp's Privacy Policy describes our information (including message) practices, including the types of information we receive and collect from you and how we use and share this information. You agree to our data practices, including the collection, use, processing, and sharing of your information as described in our Privacy Policy, as well as the transfer and processing of your information to the United States and other countries globally where we have or use facilities, service providers, or partners, regardless of where you use our Services. You acknowledge that the laws, regulations, and standards of the country in which your information is stored or processed may be different from those of your own country.

CONFIDENTIAL                                                                                    WA-NSO-00014826

## Acceptable use of our services

**Our Terms and Policies.** You must use our Services according to our Terms and posted policies. If we disable your account for a violation of our Terms, you will not create another account without our permission.

**Legal and Acceptable Use.** You must access and use our Services only for legal, authorized, and acceptable purposes. You will not use (or assist others in using) our Services in ways that: (a) violate, misappropriate, or infringe the rights of WhatsApp, our users, or others, including privacy, publicity, intellectual property, or other proprietary rights; (b) are illegal, obscene, defamatory, threatening, intimidating, harassing, hateful, racially, or ethnically offensive, or instigate or encourage conduct that would be illegal, or otherwise inappropriate, including promoting violent crimes; (c) involve publishing falsehoods, misrepresentations, or misleading statements; (d) impersonate someone; (e) involve sending illegal or impermissible communications such as bulk messaging, auto-messaging, auto-dialing, and the like; or (f) involve any non-personal use of our Services unless otherwise authorized by us.

**Harm to WhatsApp or Our Users.** You must not (or assist others to) access, use, copy, adapt, modify, prepare derivative works based upon, distribute, license, sublicense, transfer, display, perform, or otherwise exploit our Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm us, our Services, systems, our users, or others, including that you must not directly or through automated means: (a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services; (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the integrity or performance of our Services; (e) create accounts for our Services through unauthorized or automated means; (f) collect the information of or about our users in any impermissible or unauthorized manner; (g) sell, resell, rent, or charge for our Services; or (h) distribute or make our Services available over a network where they could be used by multiple devices at the same time.

**Keeping Your Account Secure.** You are responsible for keeping your device and your WhatsApp account safe and secure, and you must notify us promptly of any unauthorized use or security breach of your account or our Services.

CONFIDENTIAL    WA-NSO-00014827

## Third-party services

Our Services may allow you to access, use, or interact with third-party websites, apps, content, and other products and services. For example, you may choose to use third-party data backup services (such as iCloud or Google Drive) that are integrated with our Services or interact with a share button on a third party's website that enables you to send information to your WhatsApp contacts. Please note that when you use third-party services, their own terms and privacy policies will govern your use of those services.

## Licenses

**Your Rights.** WhatsApp does not claim ownership of the information that you submit for your WhatsApp account or through our Services. You must have the necessary rights to such information that you submit for your WhatsApp account or through our Services and the right to grant the rights and licenses in our Terms.

**WhatsApp's Rights.** We own all copyrights, trademarks, domains, logos, trade dress, trade secrets, patents, and other intellectual property rights associated with our Services. You may not use our copyrights, trademarks, domains, logos, trade dress, patents, and other intellectual property rights unless you have our express permission and except in accordance with our Brand Guidelines. You may use the trademarks www.facebookbrand.com/trademarks of our affiliated companies only with their permission, including as authorized in any published brand guidelines.

**Your License to WhatsApp.** In order to operate and provide our Services, you grant WhatsApp a worldwide, non-exclusive, royalty-free, sublicensable, and transferable license to use, reproduce, distribute, create derivative works of, display, and perform the information (including the content) that you upload, submit, store, send, or receive on or through our Services. The rights you grant in this license are for the limited purpose of operating and providing our Services (such as to allow us to display your profile picture and status message, transmit your messages, store your undelivered messages on our servers for up to 30 days as we try to deliver them, and otherwise as described in our Privacy Policy).

**WhatsApp's License to You.** We grant you a limited, revocable, non-exclusive, non-sublicensable, and non-transferable license to use our Services, subject to and in accordance with our Terms. This license is for the sole purpose of enabling you to use our Services, in the manner permitted by our Terms. No licenses or rights are

CONFIDENTIAL                                                                                                    WA-NSO-00014828

granted to you by implication or otherwise, except for the licenses and rights expressly granted to you.

## Reporting third-party copyright, trademark, and other intellectual property infringement

To report claims of third-party copyright, trademark, or other intellectual property infringement, please visit our Intellectual Property Policy. We may terminate your WhatsApp account if you repeatedly infringe the intellectual property rights of others.

## Disclaimers

YOU USE OUR SERVICES AT YOUR OWN RISK AND SUBJECT TO THE FOLLOWING DISCLAIMERS. WE ARE PROVIDING OUR SERVICES ON AN "AS IS" BASIS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND FREEDOM FROM COMPUTER VIRUS OR OTHER HARMFUL CODE. WE DO NOT WARRANT THAT ANY INFORMATION PROVIDED BY US IS ACCURATE, COMPLETE, OR USEFUL, THAT OUR SERVICES WILL BE OPERATIONAL, ERROR FREE, SECURE, OR SAFE, OR THAT OUR SERVICES WILL FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE DO NOT CONTROL, AND ARE NOT RESPONSIBLE FOR, CONTROLLING HOW OR WHEN OUR USERS USE OUR SERVICES OR THE FEATURES, SERVICES, AND INTERFACES OUR SERVICES PROVIDE. WE ARE NOT RESPONSIBLE FOR AND ARE NOT OBLIGATED TO CONTROL THE ACTIONS OR INFORMATION (INCLUDING CONTENT) OF OUR USERS OR OTHER THIRD PARTIES. YOU RELEASE US, OUR SUBSIDIARIES, AFFILIATES, AND OUR AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, PARTNERS, AND AGENTS (TOGETHER, THE "WHATSAPP PARTIES") FROM ANY CLAIM, COMPLAINT, CAUSE OF ACTION, CONTROVERSY, OR DISPUTE (TOGETHER, "CLAIM") AND DAMAGES, KNOWN AND UNKNOWN, RELATING TO, ARISING OUT OF, OR IN ANY WAY CONNECTED WITH ANY SUCH CLAIM YOU HAVE AGAINST ANY THIRD PARTIES. YOU WAIVE ANY RIGHTS YOU MAY HAVE UNDER CALIFORNIA CIVIL CODE §1542, OR ANY OTHER SIMILAR APPLICABLE STATUTE OR LAW OF ANY OTHER JURISDICTION, WHICH SAYS THAT: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

CONFIDENTIAL                                                                     WA-NSO-00014829

## Limitation of liability

THE WHATSAPP PARTIES WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR CONSEQUENTIAL, SPECIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES, EVEN IF THE WHATSAPP PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. THE FOREGOING DISCLAIMER OF CERTAIN DAMAGES AND LIMITATION OF LIABILITY WILL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE LAWS OF SOME STATES OR JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN OUR TERMS, IN SUCH CASES, THE LIABILITY OF THE WHATSAPP PARTIES WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## Indemnification

You agree to defend, indemnify, and hold harmless the WhatsApp Parties from and against all liabilities, damages, losses, and expenses of any kind (including reasonable legal fees and costs) relating to, arising out of, or in any way in connection with any of the following: (a) your access to or use of our Services, including information provided in connection therewith; (b) your breach or alleged breach of our Terms; or (c) any misrepresentation made by you. You will cooperate as fully as required by us in the defense or settlement of any Claim.

## Dispute resolution

**Forum and Venue.** If you are a WhatsApp user located in the United States or Canada, the "Special Arbitration Provision for United States or Canada Users" section below applies to you. Please also read that section carefully and completely. If you are not subject to the "Special Arbitration Provision for United States or Canada Users" section below, you agree that you will resolve any Claim you have with us relating to, arising out of, or in any way in connection with our Terms, us, or our Services (each, a "Dispute," and together, "Disputes") exclusively in the United States District Court for the Northern District of California or a state

CONFIDENTIAL                                                                                            WA-NSO-00014830

court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes.

**Governing Law.** The laws of the State of California govern our Terms, as well as any Disputes, whether in court or arbitration, which might arise between WhatsApp and you, without regard to conflict of law provisions.

## Availability and termination of our services

**Availability of Our Services.** Our Services may be interrupted, including for maintenance, repairs, upgrades, or network or equipment failures. We may discontinue some or all of our Services, including certain features and the support for certain devices and platforms, at any time. Events beyond our control may affect our Services, such as events in nature and other force majeure events.

**Termination.** We may modify, suspend, or terminate your access to or use of our Services anytime for any reason, such as if you violate the letter or spirit of our Terms or create harm, risk, or possible legal exposure for us, our users, or others. The following provisions will survive any termination of your relationship with WhatsApp: "Licenses," "Disclaimers," "Limitation of Liability," "Indemnification," "Dispute Resolution," "Availability and Termination of our Services," "Other," and "Special Arbitration Provision for United States or Canada Users."

## Other

- Unless a mutually executed agreement between you and us states otherwise, our Terms make up the entire agreement between you and us regarding WhatsApp and our Services, and supersede any prior agreements.

- We may ask you to agree to additional terms for certain of our Services in the future, which will govern to the extent there is a conflict between our Terms and such additional terms.

- Our Services are not intended for distribution to or use in any country where such distribution or use would violate local law or would subject us to any regulations in another country. We reserve the right to limit our Services in any country.

- You will comply with all applicable U.S. and non-U.S. export control and trade sanctions laws ("Export Laws"). You will not, directly or indirectly, export, re-export, provide, or otherwise transfer our Services: (a) to any individual, entity,

CONFIDENTIAL                                                                                           WA-NSO-00014831

or country prohibited by Export Laws; (b) to anyone on U.S. or non-U.S. government restricted parties lists; or (c) for any purpose prohibited by Export Laws, including nuclear, chemical, or biological weapons, or missile technology applications without the required government authorizations. You will not use or download our Services if you are located in a restricted country, if you are currently listed on any U.S. or non-U.S. restricted parties list, or for any purpose prohibited by Export Laws, and you will not disguise your location through IP proxying or other methods.

- Our Terms are written in English (U.S.). Any translated version is provided solely for your convenience. To the extent any translated version of our Terms conflicts with the English version, the English version controls.

- Any amendment to or waiver of our Terms requires our express consent.

- We may amend or update these Terms. We will provide you notice of amendments to our Terms, as appropriate, and update the "Last Modified" date at the top of our Terms. Your continued use of our Services confirms your acceptance of our Terms, as amended. If you do not agree to our Terms, as amended, you must stop using our Services. Please review our Terms from time to time.

- All of our rights and obligations under our Terms are freely assignable by us to any of our affiliates or in connection with a merger, acquisition, restructuring, or sale of assets, or by operation of law or otherwise, and we may transfer your information to any of our affiliates, successor entities, or new owner.

- You will not transfer any of your rights or obligations under our Terms to anyone else without our prior written consent.

- Nothing in our Terms will prevent us from complying with the law.

- Except as contemplated herein, our Terms do not give any third-party beneficiary rights.

- If we fail to enforce any of our Terms, it will not be considered a waiver.

- If any provision of these Terms is deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from our Terms and shall not affect the validity and enforceability of the remaining provisions,

CONFIDENTIAL    WA-NSO-00014832

except as set forth in the "Special Arbitration Provision for United States or Canada Users" — "Severability" section below.

- We reserve all rights not expressly granted by us to you. In certain jurisdictions, you may have legal rights as a consumer, and our Terms are not intended to limit such consumer legal rights that may not be waived by contract.

- We always appreciate your feedback or other suggestions about WhatsApp and our Services, but you understand that we may use your feedback or suggestions without any obligation to compensate you for them (just as you have no obligation to offer them).

## Special arbitration provision for United States or Canada users

**PLEASE READ THIS SECTION CAREFULLY BECAUSE IT CONTAINS ADDITIONAL PROVISIONS APPLICABLE ONLY TO OUR UNITED STATES AND CANADA USERS. IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, IT REQUIRES YOU TO SUBMIT TO BINDING INDIVIDUAL ARBITRATION OF ALL DISPUTES, EXCEPT FOR THOSE THAT INVOLVE INTELLECTUAL PROPERTY DISPUTES AND EXCEPT THOSE THAT CAN BE BROUGHT IN SMALL CLAIMS COURT. THIS MEANS YOU ARE WAIVING YOUR RIGHT TO HAVE SUCH DISPUTES RESOLVED IN COURT BY A JUDGE OR JURY. THIS SECTION ALSO LIMITS THE TIME YOU HAVE TO START AN ARBITRATION OR, IF PERMISSIBLE, A COURT ACTION. FINALLY, THIS SECTION WAIVES YOUR RIGHT TO HAVE YOUR DISPUTE HEARD AND RESOLVED AS A CLASS ACTION, CLASS ARBITRATION, OR A REPRESENTATIVE ACTION.**

"Excluded Dispute" means any Dispute relating to the enforcement or infringement of your or our intellectual property rights (such as copyrights, trademarks, domains, logos, trade dress, trade secrets, and patents). For clarity and notwithstanding the foregoing, those Disputes relating to, arising out of, or in any way in connection with your rights of privacy and publicity are not Excluded Disputes.

**Federal Arbitration Act.** The United States Federal Arbitration Act governs the interpretation and enforcement of this "Special Arbitration Provision for United States or Canada Users" section, including any question whether a Dispute between WhatsApp and you is subject to arbitration.

**Agreement to Arbitrate for WhatsApp Users Located in the United States or Canada.** For WhatsApp users located in the United States or Canada, WhatsApp

CONFIDENTIAL                                                                                          WA-NSO-00014833

and you each agree to waive the right to a trial by judge or jury for all Disputes, except for the Excluded Disputes. WhatsApp and you agree that all Disputes (except for the Excluded Disputes), including those relating to, arising out of, or in any way in connection with your rights of privacy and publicity, will be resolved through final and binding arbitration. WhatsApp and you agree not to combine a Dispute that is subject to arbitration under our Terms with a Dispute that is not eligible for arbitration under our Terms.

The arbitration will be administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules in effect at the time the arbitration is started, including the Optional Rules for Emergency Measures of Protection and the Supplementary Procedures for Consumer-Related Disputes (together, the "AAA Rules"). The arbitration will be presided over by a single arbitrator selected in accordance with the AAA Rules. The AAA Rules, information regarding initiating a Dispute, and a description of the arbitration process are available at www.adr.org. The arbitrator will decide whether a Dispute can be arbitrated. The location of the arbitration and the allocation of fees and costs for such arbitration shall be determined in accordance with the AAA Rules. Notwithstanding the AAA Rules, we will reimburse you for all the AAA administrative fees in Disputes that are subject to the Supplementary Procedures for Consumer-Related Disputes, unless the arbitrator determines that a Dispute was filed for purposes of harassment or is patently frivolous.

**Opt-Out Procedure.** You may opt out of this agreement to arbitrate. If you do so, neither we nor you can require the other to participate in an arbitration proceeding. To opt out, you must notify us in writing postmarked within 30 days of the later of: (i) the date that you first accepted our Terms; and (ii) the date you became subject to this arbitration provision. You must use this address to opt-out:

WhatsApp Inc.

Arbitration Opt-Out

1601 Willow Road

Menlo Park, California 94025

United States of America

CONFIDENTIAL                                                                      WA-NSO-00014834

You must include: (1) your name and residence address; (2) the mobile phone number associated with your account; and (3) a clear statement that you want to opt out of our Terms' agreement to arbitrate.

**Small Claims Court.** As an alternative to arbitration, if permitted by your local "small claims" court's rules, you may bring your Dispute in your local "small claims" court, as long as the matter advances on an individual (non-class) basis.

**Time Limit to Start Arbitration.** We and you agree that for any Dispute (except for the Excluded Disputes) we and you must commence an arbitration proceeding within one year after the Dispute first arose; otherwise, such Dispute is permanently barred. This means that if we or you do not commence an arbitration within one year after the Dispute first arose, then the arbitration will be dismissed because it was started too late.

**No Class Actions, Class Arbitrations, or Representative Actions for Users Located in the United States or Canada.** We and you each agree that if you are a WhatsApp user located in the United States or Canada, each of we and you may bring Disputes against the other only on its or your own behalf, and not on behalf of any other person or entity, or any class of people. We and you each agree not to participate in a class action, a class-wide arbitration, Disputes brought in a private attorney general or representative capacity, or consolidated Disputes involving any other person or entity in connection with any Dispute.

**Severability.** If the prohibition against class actions and other Disputes brought on behalf of third parties is found to be unenforceable for a Dispute, then all of the provisions above under the caption "Special Arbitration Provision for United States or Canada Users" will be null and void as to that Dispute.

**Place to File Permitted Court Actions.** If you opt out of the agreement to arbitrate, if your Dispute is an Excluded Dispute, or if the arbitration agreement is found to be unenforceable, you agree to be subject to the "Forum and Venue" provisions in the "Dispute Resolution" section set forth above.

Accessing WhatsApp's terms in different languages

To access our Terms in certain other languages, change the language setting for your WhatsApp session. If our Terms are not available in the language you select, we will default to the English version.

CONFIDENTIAL                                                                                          WA-NSO-00014835

Please review the following documents, which provide additional information about your use of our Services:

WhatsApp Privacy Policy

WhatsApp Intellectual Property Policy

WhatsApp Brand Guidelines

CONFIDENTIAL                                                                    WA-NSO-00014836

# EXHIBIT 12

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| WHATSAPP INC. and | ) | |
| META PLATFORMS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. 19-cv-07123-PJH |
| v. | ) | |
| | ) | |
| | ) | |
| NSO GROUP TECHNOLOGIES | ) | |
| LIMITED and Q CYBER | ) | |
| TECHNOLOGIES LIMITED, | ) | |
| | | |
| Defendants. | | |

---

**EXPERT REPORT OF DANA TREXLER, CPA/CFF**

August 30, 2024

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

---

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY                    Page 1

## I.    INTRODUCTION

1.    On October 29, 2019, WhatsApp Inc. ("WhatsApp") and Meta Platforms, Inc. ("Meta")[1] (collectively, "Plaintiffs") filed a complaint against NSO Group Technologies Limited ("NSO") and Q Cyber Technologies Limited ("Q Cyber") (collectively, "Defendants") alleging that Defendants used WhatsApp servers to send malware to mobile phones and devices for the purpose of extracting data from other WhatsApp users' target devices and conducting surveillance on those users.[2] As a result of Defendants' alleged conduct, Plaintiffs assert that Defendants violated the Computer Fraud and Abuse Act (in violation of 18 U.S.C. § 1030) and the California Comprehensive Computer Data Access and Fraud Act (in violation of California Penal Code § 502), and breached the terms of service with WhatsApp to which Defendants became bound upon their creation of WhatsApp accounts.[3]

2.    This report contains my opinions with respect to the economic remedy amounts, along with the bases for these opinions, to be expressed at trial with respect to the claims filed by Plaintiffs against Defendants.

3.    My analyses and opinions assume Defendants will be found liable for the alleged conduct. This assumption is necessary as a basis for my analysis. I have not been engaged to provide opinions on issues relating to liability; therefore, I offer no opinions on liability in this report and do not intend to express any such opinions at trial.

---

[1] Facebook Inc. changed its name to Meta Platforms Inc. in October 2021. *See* Chris Stokel-Walker, *Why Facebook Changed Its Name to Meta and What is the Metaverse?*, NewScientist (Oct. 21, 2021), https://www.newscientist.com/article/2295438-why-has-facebook-changed-its-name-to-meta-and-what-is-the-metaverse/#:~:text=Here%27s%20everything%20you%20need%20to,as%20Meta%20on%2028%20October. (accessed February 2024); Scott Nover, Why Facebook Changed Its Name, Quartz (Oct. 29, 2021), https://qz.com/2081663/why-facebook-changed-its-name-to-meta (accessed February 2024).
[2] Complaint (Dkt. No.1), ¶ 1.
[3] Complaint (Dkt. No.1), ¶¶ 2, 49-78, Request for Relief section, ¶ 1. The Court subsequently dismissed Plaintiffs' fourth cause of action, Trespass to Chattels. *See* Order Granting in Part and Denying in Part Motion to Dismiss and Denying Motion to Stay Discovery (Dkt. No.111).

## II.    BASIS FOR ANALYSIS

4.      The analysis and opinions in this report are based on the information and documentation identified to date, my education, my experience in performing similar financial analyses and economic damage calculations, documents and testimony in the record, accepted damages methodologies and approaches, and applications of relevant case law.

5.      I am a Managing Director at Stout Risius Ross, LLC, an advisory firm that, among other services, provides business, economic, financial, and consulting services to clients in a variety of industries. I lead Stout's national intellectual property disputes and valuations practice. I am a Certified Public Accountant and Certified in Financial Forensics. My education includes a Master in Business Administration from The Wharton School of the University of Pennsylvania and a Bachelor of Science degree in Accounting from Bucknell University. My curriculum vitae is attached as **EXHIBIT A.**

6.      In forming my opinions, I considered various documents produced by the parties and non-parties, deposition testimony, and certain legal documents from this case. Specifically, I considered the documents identified throughout this report and the accompanying exhibits. A list of the documents that I considered in forming my opinions is provided in **EXHIBIT B.** The documents and information used in my analysis and report are the types of documents and information upon which experts in my field typically rely when performing such an analysis. In addition to the documents produced by the parties, I considered relevant publicly available information of the type typically relied upon by experts in this field. I also spoke with the following individuals:

- Cortney Padua, Security Engineer within the Cross-Meta Security Detection and Response Team at Meta;[4]

- Michael Scott, Threat Investigator within the Espionage Team at Meta;

- Drew Robinson, Security Engineer at Meta;

- Aashin Guatam, Director of Product Management at WhatsApp;

- Otto Ebeling, former Security Engineer at Meta (UK);

---

[4] Deposition of Cortney Padua, 13:120-121.

- Jesus Barcons Palau, Software Engineer at Meta;

- Claudiu Gheorghe, former Software Engineering Manager at Meta;

- YuanYuan Wang, Software Engineering Manager at Meta;

- ███████████, Payroll Manager at Meta;

- █████████████, Equity Programs Analyst within the Securities and Disclosure Equity Operations Group at Meta; and

- ███████████, Director in Global Equity Programs at Meta.

7.    I understand that discovery is ongoing; therefore, this report is based on information available to date. As discussed in more detail in this report, Defendants have not produced the relevant information sought by Plaintiffs through discovery. Further, depositions of all of the parties' witnesses have yet to be completed as of the date of this report, including that of Sarit Bizinsky Gil, Defendants' designated witness for financial, contract, and other relevant topics.

8.    Should additional information, testimony, or documents that affect my analysis or opinions become available after the issuance of my report, I reserve the right to supplement or update my analysis and/or opinions. Additionally, I reserve the right to supplement or update my report based on information, testimony, or documents that have become available within only a short period of time prior to the issuance of this report, as I have had insufficient time to analyze such new information.[5]

9.    I reserve the right to prepare supplemental materials such as summaries, graphical exhibits, or charts for trial, as well as to provide opinions and other materials in response to any additional expert opinions.

10.    This report is prepared in accordance with the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services. The work performed does not include the performance of an audit, review, or compilation of financial statements in accordance with

---

[5] On August 26, 2024, four days before the deadline for this report, NSO produced a document (NSO_WHATSAPP_00045858) that appears to ████████████████████████████. Further, I understand that two of Defendants' witnesses were deposed on August 27, 2024 (Ramon Eshkar) and August 29, 2024 (Yaron Shohat). I have yet to have the opportunity to review these transcripts and incorporate any relevant information into my analysis.

Generally Accepted Auditing Standards ("GAAS") or with attest standards established by the AICPA.

11.  My firm is being compensated at a rate of $795 per hour for my time in this matter, regardless of the outcome of this litigation.

## III.   SUMMARY OF OPINIONS

12.  Assuming Defendants are found  liable, it is my opinion that the Plaintiffs' expenditure of resources for their response totals ███████ and a reasonable estimation of Defendants' profits earned in connection with the targeting of 1,500 devices through Defendants' Exploit ranges from ████████████████████████████████████████████████ ███████████████████████

**Table 1: Summary of Plaintiffs' Claimed Damages and Available Equitable Recoveries[6]**

| Category | Amount |
|---|---|
| Plaintiffs' Response Expenses | ██████ |
| Defendants' Profits Subject to Disgorgement | |
| ████████████████ | ████████████████ |
| ████████████████ | ████████████████ |

13.  Plaintiffs' response costs reflect labor expenditures related to internal efforts to identify, evaluate and remediate Defendants' improper use of WhatsApp servers and targeting of select WhatsApp users.[7] The estimate for Plaintiffs' response expense is conservative, as the calculations only consider the low-end of employee estimates, exclude certain employees who worked on the response for whom I do not have estimated hours, and while employees expressed that they worked

---

[6] **EXHIBIT 1.1; EXHIBIT 1.2.** I reserve the right to supplement or amend this report to account for damages to which Plaintiffs assert they are entitled for Defendants' use of Plaintiffs' computers beyond the 1,500 targeted devices discussed in this report.  At this time, it is my understanding Defendants have provided insufficient information from which to calculate profits subject to disgorgement that are attributable to Defendants' use of Plaintiffs' computers beyond the 1,500 targeted devises discussed in this report.  I understand Plaintiffs reserve any and all rights to seek damages relating to Defendants' use of their servers, including the period during, before, and after 2019.

[7] This report does not calculate or express an opinion on litigation or other legal costs to which Plaintiffs may be entitled and which Plaintiffs may seek to recover from Defendants.  I am informed that Plaintiffs do not waive any rights with regard to seeking such costs or others from Defendants.

security patches to stop NSO.[95] On May 13, 2019, Plaintiffs publicly announced their discovery and remediation of the exploit.[96]

47.    As a result of Defendants' alleged conduct, Plaintiffs assert the following causes of action against Defendants:[97]

- Violation of the Computer Fraud and Abuse Act (18 U.S.C. §1030);

- Violation of the California Comprehensive Computer Data Access and Fraud Act (California Penal Code §502); and

- Breach of Contract in connection with WhatsApp terms.

## VIII.    QUANTIFICATION OF PLAINTIFFS' CLAIMED DAMAGES AND AVAILABLE REMEDIES

48.    I understand that Plaintiffs seek to recover damages in the form of their actual losses (i.e., compensatory damages) and disgorgement of Defendants' ill-gotten gains. In this instance, the ill-gotten gains reflect the profits that Defendants derived from their alleged conduct. I offer no opinion on whether either remedy is available on Plaintiffs' causes of action, which I understand is a legal question. I have only been asked to calculate Plaintiffs' actual losses and Defendants' ill-gotten gains.

49.    As the determination of Plaintiffs' actual losses considers labor cost expenditures, and Defendants' profits reflect those earned from the licensing of NSO's spyware, it is my opinion that these two categories are not duplicative of one another, and therefore, may be additive.

50.    Accordingly, I quantify Plaintiffs' actual damages in the form of the expenditure of resources to respond to and remediate Defendants' conduct described in the Complaint and Defendants' profits derived from targeting WhatsApp.

---

[95] *See e.g.*, WA-NSO-00018457-463.
[96] WhatsApp Reveals Major Security Flaw That Could Let Hackers Access Phones, CBS News (May 14, 2019), https://www.cbsnews.com/sanfrancisco/news/whatsapp-reveals-major-security-flaw-that-could-let-hackers-access-phones/ (accessed February 2024).
[97] Complaint (Dkt. No.1), ¶¶ 2, 49-78, Request for Relief section, ¶ 1. Plaintiffs originally alleged that Defendants wrongfully trespassed on Plaintiffs' property, in violation of California law. The Court subsequently dismissed Plaintiffs' fourth cause of action, Trespass to Chattels. *See* Order Granting in Part and Denying in Part Motion to Dismiss and Denying Motion to Stay Discover (Dkt. No.111).

A. PLAINTIFFS' EXPENDITURE OF RESOURCES FOR RESPONSE

51.    I understand that on or around April 23, 2019, Plaintiffs began logging activity on servers in connection with a security review.[98] On May 2, 2019, one of WhatsApp's engineers discovered in that logging a malformed and potentially malicious message.[99] Over the following days, WhatsApp and Meta engineers and others investigated the source of the malicious message and its impact on Plaintiffs' systems.[100] Between May 10, 2019 and May 13, 2019, Plaintiffs applied software patches to their relay servers and signaling servers and published a security patch for users' WhatsApp client applications to successful resolve the exploit.[101] On May 13, 2019, Plaintiffs publicly announced their discovery and remediation of the exploit.[102] I understand that Plaintiffs continued to perform ongoing work related to the exploit after the security patch was implemented on May 13, 2019.[103]

52.    I understand that Plaintiffs' employees investigated Defendants' Exploit, determined its impact on Plaintiffs' systems, developed and implemented the security patches to resolve the exploit, and performed ongoing work to fully understand the source of the attack, the methods used and full nature of the vulnerability, and the impact on WhatsApp users.[104] As such, the cost incurred by Plaintiffs response to the exploit includes the labor cost associated with certain of Plaintiffs' employees involved in the investigation, remediation, and ongoing efforts surrounding Defendants' alleged conduct, which occurred beginning on or around April 23, 2019, and continued through the latter part of 2019.

53.    In the following sections, I describe and quantify select labor hours and associated costs for this work.

---

[98] *See e.g.*, WA-NSO-00018457-463.

[99] *See* WA-NSO-00017583-604 at 593. S*ee also* WA-NSO-00166464.

[100] *See* WA-NSO-00017583-604 at 593-601. *See also* WA-NSO-00164559-566.

[101] *See* WA-NSO-00017583-604 at 601-603.

[102] https://www.cbsnews.com/sanfrancisco/news/whatsapp-reveals-major-security-flaw-that-could-let-hackers-access-phones/ (accessed February 2024).

[103] Discussion with Cortney Padua, Michael Scott, Drew Robinson, Aashin Guatam, Otto Ebeling, Jesus Palau, Claudiu Gheorghe, and YuanYuan Wang. *See also* WA-NSO-00164559-566.

[104] Discussion with Cortney Padua, Michael Scott, Drew Robinson, Aashin Guatam, Otto Ebeling, Jesus Palau, Claudiu Gheorghe, and YuanYuan Wang. *See also* WA-NSO-00018457-463.

> *1.  Plaintiffs' Employee Labor*

54.  To determine Plaintiffs' labor costs incurred in connection with investigating Defendants' Exploit, determining its impact on Plaintiffs' systems, developing and implementing the security patch to resolve it, and any associated ongoing work after implementing the security patch, I relied on information from discussions with the following individuals, who were involved with these efforts:

- Cortney Padua, Security Engineer within the Cross-Meta Security Detection and Response Team at Meta;[105]

- Michael Scott, Threat Investigator within the Espionage Team at Meta;

- Drew Robinson, Security Engineer at Meta;

- Aashin Guatam, Director of Product Management at WhatsApp;

- Otto Ebeling, former Security Engineer at Meta (UK);

- Jesus Barcons Palau, Software Engineer at Meta;

- Claudiu Gheorghe, former Software Engineering Manager at Meta; and

- Yuan Yuan Wang, Software Engineering Manager at Meta.

55.  My discussions with each of these individuals include an overview of each of their then-in-effect positions and responsibilities, a description of the work they performed in connection with Defendants' Exploit when they performed this work, and an estimation of the amount of time spent in connection with this work. I describe the information represented to me by these individuals in more detail in the following sections.

> *a.  Cortney Padua*[106]

56.  Cortney Padua is currently a Security Engineer on the Cross-Meta Security Detection and Response Team at Meta.[107] At the time of Defendants' Exploit, Ms. Padua was a Security Engineer on the Computer Emergency Response Team at Meta.

---

[105] Deposition of Cortney Padua, August 20, 2024, pp. 114, 120-121.
[106] Discussion with Cortney Padua; Deposition of Cortney Padua, August 20, 2024, pp. 24-25, 49-52, 60-61.
[107] Deposition of Cortney Padua, August 20, 2024, pp. 114, 120-121.

57.     Ms. Padua described her role in the process as including:[108]

- General coordination and support of the response team and strategizing remediation steps and timelines.[109]

- Reviewing WhatsApp logs to gather evidence of Defendants' Exploit and determine population of targeted users.[110]

- Formatting data contained in these WhatsApp logs for further review and analysis by internal data teams.[111]

- Ongoing review of WhatsApp logs to monitor for potential ongoing exploitation of WhatsApp servers.[112]

- Assisting with eDiscovery preservation of WhatsApp logs obtained during the investigation and remediation.[113]

- Supporting reporting efforts, including drafting summaries and presentations of the subject incident.

58.     Ms. Padua estimates that she worked approximately the following number of hours during the noted periods on these tasks:

- May 2 through May 7, 2019 - 24 hours.

- May 8 through May 16, 2019 - 36 hours.

- May 20 through May 28, 2019 - 24 hours.

- Mid-June - 12 hours.

59.     Based on my discussion with Ms. Padua, she estimates that she worked a total of 96 hours in relation to Defendants' Exploit. Using Ms. Padua's estimates, 44 hours are allocated to the period May 2 through May 13,[114] and 52 hours are allocated to the period after May 13.[115]

---

[108] Discussion with Cortney Padua.
[109] See also Deposition of Cortney Padua, August 20, 2024, pp. 24-25, 60-61.
[110] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52, 60-61.
[111] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52, 60-61.
[112] See also Deposition of Cortney Padua, August 20, 2024, p. 105.
[113] See also Deposition of Cortney Padua, August 20, 2024, pp. 49-52.
[114] 60 hours during the 11-workday period May 2 through May 16 = 5.5 hours per workday x 8 workdays between May 2 and May 13.
[115] 96 total hours less 44 hours between May 2 and May 13.

b. *Michael Scott*[116]

60.     Michael Scott is currently a Threat Investigator on the Espionage Team at Meta, which was also his title at the time of Defendants' Exploit.

61.     Mr. Scott described his role as including:

- Analyzing data to assist in understanding the exploit and determining how it was conducted.

- Reviewing and analyzing WhatsApp logs to obtain information such as IP addresses and phone numbers that could help identify targeted WhatsApp users. The identification of targeted users also considered research of publicly available information and other profile information maintained by Meta (e.g., Facebook and Instagram profile information).

- Efforts related to determining the source of the exploit, including cross referencing current information from WhatsApp logs (e.g., IP addresses, domains, and phone numbers) with previously identified information for suspected "test accounts" used by attackers prior to the exploit, which included suspected accounts associated with NSO. Identifying the source of the exploit and related accounts to assist in disabling accounts and preventing those accounts from accessing WhatsApp.

- Attempting to map attackers with victims, including the determination of countries of origin for attacker accounts.

62.     Mr. Scott represented that in relation to Defendants' Exploit, he spent nearly all his working time on these efforts over a 2 to 3-month period beginning in or around April/May 2019. Mr. Scott further stated that ongoing work continued for "months and months," but did not provide an estimate of the portion of his time spent on these ongoing efforts. Using the low end of Mr. Scott's estimate (i.e., 2 months), 64 hours are allocated to the period May 2 through May 13,[117] and 256 hours are allocated to the period after May 13[118] in relation to Defendants' Exploit.

c. *Drew Robinson*[119]

63.     Drew Robinson is currently a Security Engineer at Meta. At the time of Defendants' Exploit, Mr. Robinson was a Security Investigator at Meta.

---

[116] Discussion with Michael Scott.
[117] 8 hours per workday x 8 workdays between May 2 and May 13.
[118] 320 hours over a 2-month period (160 work hours in a month [40 hours per week x 4 weeks] x 2 months) less 64 hours between May 2 and May 13.
[119] Discussion with Drew Robinson.

64.     Mr. Robinson described his role as including:

- Serving as the "on call" for malware analysis and working with WhatsApp engineers to immediately analyze WhatsApp logs to evaluate the "payload" used to deliver the malware to victims.

- Performing various analyses of WhatsApp logs and server information to extract the payloads that had been deployed to help identify the source of the payload (i.e., the orchestrator of the attack).

- Assisting with identification of targeted WhatsApp users and map them back to the malware users. This included analyzing country codes associated with targeted accounts and the nature of the accounts (based in part on publicly available information and Facebook and Instagram profile information).

- Assisting WhatsApp engineers in developing and deploying the security patch.

- Ongoing monitoring for future attacks/exploits and further analysis of ways that NSO was targeting Plaintiffs' services.

- Continued assistance with victim identification.

- Supporting Plaintiffs' legal department and responding to requests for information.

65.     Mr. Robinson represented that he initially worked full time on the exploit for 3 weeks up to the deployment of the security patch, which he conservatively estimated to approximate 120 hours. Mr. Robinson estimated that he worked another 150-200 hours after the security patch was implemented. Using Mr. Robinson's estimates, 64 hours are allocated to the period May 2 through May 13,[120] and 150 hours are allocated to the period after May 13 in relation to Defendants' Exploit.

> *d.   Aashin Guatam*[121]

66.     Aashin Guatam is currently a Director of Product Management at WhatsApp. At the time of Defendants' Exploit, Mr. Guatam was a Director of Customer Operations at WhatsApp.

67.     Mr. Guatam described his role as including:

---

[120] 8 hours per workday x 8 workdays between May 2 and May 13.
[121] Discussion with Aashin Guatam.

- Overall project management of the plan implemented by Plaintiffs to resolve Defendants' Exploit, including post-fix identification of and communication with targeted users, external communication strategy, and legal pursuits.

- Working with and guiding technical teams, operations teams, legal teams, and others to understand the attack and identify the victims of the exploit. This included identifying the targeted accounts and mapping them to the real-life users. The accounts were mapped to real-life users using information from WhatsApp accounts, associated social media accounts, and other publicly available information.

- Developing a victim outreach strategy and working with technical teams, operations teams, legal teams, and others to notify the identified victims of the exploit.

68.    Mr. Guatam represented to me that he spent, on average, 50% of his working hours from May/June to November 2019 working on this matter. As such, I have considered the low end of Mr. Guatam's estimate (i.e., beginning in June) that he worked 480 hours (6 months [June through November] multiplied by 160 working hours per month multiplied by 50%). Using Mr. Guatam's estimate, all 480 hours are allocated to the period after May 13 in relation to Defendants' Exploit.

    e.  *Otto Ebeling*[122]

69.    Otto Ebeling currently owns a cyber security consulting company that is sometimes contracted by Plaintiffs. At the time of responding to Defendants' Exploit, Mr. Ebeling was a Security Engineer at Meta, based in the United Kingdom.

70.    Mr. Ebeling described his role as including:

- Investigating initial reports relayed to him from WhatsApp engineers to ascertain if a vulnerability existed. This included determining whether the suspicious activity was benign or malicious.

- Understanding Defendants' Exploit and how it worked.

- Determining how to respond to and prevent Defendants' Exploit. Mr. Ebeling consulted with WhatsApp engineers that ultimately created and implemented the security patch.

- Monitoring applicable information to confirm the security patches were working as intended after they were implemented by Plaintiffs' employees.

---

[122] Discussion with Otto Ebeling.

- Determining if Defendants were exploiting any other unknown vulnerabilities. This included reviewing and analyzing certain software code.

71.   Mr. Ebeling represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours for 3 weeks on this project. Mr. Ebeling also informed me that he spent one-third (33%) to one-half (50%) of his working time for the second half of 2019 working on ongoing matters associated with Defendants' Exploit. Using Mr. Ebeling's estimates, 64 hours are allocated to the period May 2 through May 13,[123] and 320 hours[124] are allocated to the period after May 13 in relation to Defendants' Exploit.

*f.   Jesus Barcons Palau*[125]

72.   Jesus Barcons Palau is currently a Software Engineer at Meta, which was also his title at the time of Defendants' Exploit in May 2019.

73.   Mr. Palau described his role as including:

- Consulting with security professionals to investigate abnormal "stanzas"[126] in data passing through WhatsApp servers. This included identifying and investigating stanzas that did not conform with specifications established by WhatsApp. After certain abnormal stanzas were identified, Mr. Palau worked to implement processes to detect other non-conforming and potentially malicious stanzas in data.

- Implementing code to detect malicious stanzas not adhering to WhatsApp specifications.

- Implementing measures to assure that invalid stanzas were blocked from WhatsApp servers.

74.   Mr. Palau informed me that during the initial response efforts, he spent all his working time, and additional overtime hours, on this project. Mr. Palau represented to me that he spent more than 100% of his working hours from April 29 through May 10 on response efforts. Using Mr. Palau's estimates, 56 hours are allocated to the period May 2 through May 10[127] in relation to Defendants' Exploit.

---

[123] 8 hours per workday x 8 workdays between May 2 and May 13.
[124] 6 months multiplied by 160 working hours in a month multiplied by 1/3 of his working time.
[125] Discussion with Jesus Palau.
[126] Stanza is "a general term in WhatsApp for metadata -- for a type of metadata that is sent from a client to a server." Claudiu Gheorghe Deposition, 24:19-24.
[127] 8 hours per workday x 7 workdays between May 2 and May 10.

g.  *Claudiu Gheorghe*[128]

75.    Claudiu Gheorghe was a Software Engineering Manager at Meta at the time of Defendants' Exploit in May 2019.

76.    Mr. Gheorghe described his role as including:

- Coordinating the investigation and remediation of Defendants' Exploit. Mr. Gheorghe orchestrated efforts among engineering teams, security teams, and legal teams.

- Supervising Meta engineers to execute the investigation and remediation of Defendants' Exploit. This included effectively allocating staffing resources to execute this project. Mr. Gheorghe performed a managerial role in connection with leading coordination for the investigation and remediation of Defendants' Exploit.

- Identifying victims of Defendants' Exploit.

- Assisting in drafting a white paper regarding Defendants' Exploit.

77.    Mr. Gheorghe represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours from May 2, 2019 through May 13, 2019 on this project. After the patch was implemented on May 13, 2019, Mr. Gheorghe informed me that he spent 50% of his time on this project for two more weeks. Using Mr. Gheorghe's estimates, 64 hours are allocated to the period May 2 through May 13,[129] and 40 hours are allocated to the period after May 13[130] in relation to Defendants' Exploit.

h.  *YuanYuan Wang*[131]

78.    YuanYuan Wang is currently a Software Engineering Manager at Meta, which was also his title at the time of Defendants' Exploit in May 2019.

79.    Mr. Wang described his role as including:

- Confirming that the exploit was occurring. This included identifying abnormal patterns through his knowledge of the WhatsApp architecture.

---

[128] Discussion with Claudiu Gheorghe.
[129] 8 hours per workday x 8 workdays between May 2 and May 13.
[130] 80 hours over a 2-week period (2 weeks x 40 hours per week) x 50%.
[131] Discussion with YuanYuan Wang.

- Organizing and providing applicable information regarding Defendants' Exploit to security teams at Meta.

- Consulting with security teams at Meta to identify the software code permitting Defendants' Exploit.

- Understanding the software code relevant to Defendants' Exploit.

- Consulting with security teams at Meta to improve and secure the applicable software code. This fixed the software code permitting Defendants' Exploit.

80.  Mr. Wang represented to me that during the initial remediation work of resolving Defendants' Exploit, he spent all his working hours from May 2, 2019 through May 13, 2019 on this project. Using Mr. Wang's estimate, 64 hours are allocated to the period May 2 through May 13[132]in relation to Defendants' Exploit.

### i.   Other Employees Identified by Claudiu Gheorghe[133]

81.  In addition to the discussions I had with the above-noted individuals, Claudiu Gheorghe identified 14 other Meta professionals that participated in the investigation and response efforts.[134] As discussed, Mr. Gheorghe was a Software Engineering Manager at Meta who performed a managerial role leading coordination across multiple teams in connection with addressing Defendants' Exploit in May 2019.

82.  Mr. Gheorghe provided descriptions of roles and estimates of hours worked for each of the Meta employees he identified as participating in the investigation and response efforts from May 2, 2019 through May 13, 2019. This is reflected in **EXHIBIT 2.2** to my report.

### 2.   Plaintiffs' Employee Labor Cost

83.  After identifying the employees involved in responding to Defendants' Exploit, and their respective estimated labor hours, I determined the cost of this labor. To determine the cost of labor of each applicable employee, I multiplied each applicable employee's burdened labor rate by the number of hours worked on responding to Defendants' Exploit.

---

[132] 8 hours per workday x 8 workdays between May 2 and May 13.
[133] Discussion with Claudiu Gheorghe.
[134] **EXHIBIT 2.2.**

84.     The calculation of an employee's burdened labor rate not only considers the employee's salary, but also considers other expenditures paid by an employer to, or on behalf of, an employee. These additional expenditures can be paid directly to an employee (e.g., performance bonus or retirement contributions) or paid on behalf of an employee (e.g., the employer's share of healthcare insurance premiums or payroll taxes). In addition to base salary, the inclusion of an employer's additional expenditures to, or on behalf of, an employee reflects the employer's total economic cost incurred in connection with the subject employee's time.

85.     To calculate each employee's burdened labor rate, I relied on data provided by Plaintiffs detailing payroll information for specific employees which included wages, employee and employer payroll taxes, and certain employer-paid benefits. I also obtained employee bonus information and the amount of employer-paid health benefits. For purposes of determining a compensation rate for individual employees, I considered the following costs incurred by Plaintiffs:

- Salary

- Performance bonus

- Employer payroll taxes

- Employer portion of health benefits

- Restricted Stock Unit ("RSU") grants

86.     As detailed in **EXHIBIT 3.1**, I considered the above amounts and determined an hourly-equivalent compensation rate for each of the individuals discussed in the preceding section. I determined Plaintiffs' relevant expenditures by multiplying each applicable employee's hours spent on resolving Defendants' Exploit and for related ongoing work by their burdened labor rate. As summarized in the following table, Plaintiffs' expenditures to respond to Defendants' Exploit total ███.

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY** Page 31

**Table 3: Plaintiffs' Labor Expenses to Respond to Defendants' Exploit [135]**

| Employee Name | 2019 Title | Hours Worked | Hourly Rate | Cost of Labor |
|---|---|---|---|---|
| Cortney Padua | Security Engineer | 96 | ■ | ■ |
| Michael Scott | Threat Investigator | 320 | ■ | ■ |
| Drew Robinson | Security Investigator | 214 | ■ | ■ |
| Aashin Guatam | Director of Customer Ops. | 480 | ■ | ■ |
| Otto Ebeling | Security Engineer | 384 | ■ | ■ |
| Jesus Palau | Software Engineer | 56 | ■ | ■ |
| Claudiu Gheorghe | Software Engineering Manager | 104 | ■ | ■ |
| YuanYuan Wang | Software Engineering Manager | 64 | ■ | ■ |
| | | | Cost of Labor | ■ |
| | | Cost of Labor (Additional Employees Identified by Mr. Gheorghe) | | ■ |
| | | | Total Cost of Labor | ■ |

87.     The estimate included in Table 3 is conservative, as the calculations only consider the low-end of employee estimates, exclude certain employees who worked on the response for whom I do not have estimated hours, and while employees expressed that they worked extended hours and weekends, I do not include such extended hours and weekends in my calculations.

88.     While these individuals were salaried employees and were not paid on an hourly basis, the hourly equivalent labor rate provides a means to determine the cost of their respective time to Plaintiffs with respect to responding to Defendants' Exploit. While some of these individuals perform security-related tasks in the ordinary course of their employment by Plaintiffs, they would have directed this time to other efforts in the absence of Defendants' alleged conduct. Accordingly, these efforts and associated cost are reflective of an "opportunity cost" to Plaintiffs. Further, as this was a required effort in light of Defendants' Exploit, in the absence of these employees, Plaintiffs would have needed to expend resources to obtain these types of services from third parties.

B. DEFENDANTS' ILL-GOTTEN GAINS SUBJECT TO DISGORGEMENT

89.     In this instance, Defendants' ill-gotten gains subject to disgorgement reflect the profit that Defendants derived from their unauthorized access to Plaintiffs' systems, including the use of Defendants' Exploit. I understand that Plaintiffs allege that Defendants' Exploit for the WhatsApp Service was ■

---

[135] EXHIBITS 1.1, 2.1, AND 2.2.

, and that both Defendants' development and sale of that exploit violated its Terms of Service and federal and state law. Accordingly, I estimate Defendants' ill-gotten gains resulting from the development and licensing of Pegasus ████ ██████████████████████, and any other spyware targeting Plaintiffs' systems based on the information available to date.

90.    As discussed in further detail, Plaintiffs assert that Defendants have not produced all relevant information, and depositions of Defendants' witnesses have only recently occurred[136] or are scheduled to occur after the date of this report. Accordingly, I reserve the right to update my analysis based on such information.

91.    Specifically, I understand that Plaintiffs requested from Defendants the information to evaluate Defendants' ill-gotten gains from targeting Plaintiffs' systems. As of the date of this report, I understand that Defendants have not produced certain financial information, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████.

92.    Given the absence of certain information requested from Defendants, my assessment of Defendants' profits recognized in conjunction with the alleged conduct relies on the documents produced to date and reasonable assumptions regarding certain information contained in those documents. Additional documents produced by Defendants (or other parties) and future deposition testimony may impact my analysis, assumptions, and conclusions.

93.    The following sections address my determination of Defendants' ill-gotten gains subject to disgorgement based on the information reasonably available to me to date.

*1.   Total Reported Revenue from the Sale and License of the Pegasus Product*

94.    As an initial matter, I consider the reported revenues for Pegasus contained in certain financial information produced to date. ████████████████████████████████████████████

---

[136] Given the timing of Defendants' depositions, I have not fully evaluated the testimony or its impact on my analysis.



123. █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  Accordingly, based

on the information contained in Table 8, a reasonable estimation of Defendants' profits earned in

connection with the targeting of 1,500 devices through Defendants' Exploit ranges from ████

██████████████████████████████████████████████████████████

█████████████████████

### C.  DEFENDANTS' USE OF PLAINTIFFS' SYSTEMS

124. Counsel for Plaintiffs asked me to determine whether the use of Plaintiffs' systems for purposes

of Defendants' Exploit was worth more than $5,000 in one year to Defendants or their customers.

To do so, I consider the customer ████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████

125. I first consider that, ████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ █ ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

---

[188] **EXHIBITS 4 AND 4.1.**
[189] WA-NSO-00074412-414 at 413-414.

126.    I next consider that the Defendants produced a document which appears to ███████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.[190] Table 9 summarizes ███████████████████████████████████████████████████████████ ██████



127.    From this data, it is my opinion that the use of Plaintiffs' systems for purposes of Defendants' Exploit was ████████████████████████████████, which exceeds $5,000 in one year.

*   *   *   *   *   *

---

[190] *See* NSO_WHATSAPP_00045858.

[191] NSO_WHATSAPP_00045858.

[192] ████████████████████████████████████████████████████████████████████

[193] ████████████████████████████████████████████

128.    The procedures performed were limited to those described herein based on the documents provided to date and other information obtained. Information obtained after the date of this report, or within a short period of time prior to its issuance, may affect this analysis and this effect may be material. If requested, I will update my analysis.

129.    My procedures were performed solely with respect to the above referenced litigation. This report is not to be reproduced, distributed, disclosed, or used for any other purpose.

**STOUT**

_____

Dana M. Trexler, CPA/CFF                                    August 30, 2024

# EXHIBIT 13

## FILED UNDER SEAL

# EXHIBIT 14

## FILED UNDER SEAL

# EXHIBIT 15

## FILED UNDER SEAL

# EXHIBIT 16

## FILED UNDER SEAL

# EXHIBIT 17

## FILED UNDER SEAL

# EXHIBIT 18

## FILED UNDER SEAL

# EXHIBIT 19

## FILED UNDER SEAL

# EXHIBIT 20

## FILED UNDER SEAL

# EXHIBIT 21

## FILED UNDER SEAL

# EXHIBIT 22

## FILED UNDER SEAL

EXHIBIT 23

# WhatsApp Terms Of Service

Last modified: January 28, 2020 (archived versions)

WhatsApp Inc. ("WhatsApp," "our," "we," or "us") provides messaging, Internet calling, and other services to users around the world. Please read our Terms of Service so you understand what's up with your use of WhatsApp. You agree to our Terms of Service ("Terms") by installing, accessing, or using our apps, services, features, software, or website (together, "Services").

NO ACCESS TO EMERGENCY SERVICES: There are important differences between WhatsApp and your mobile and fixed-line telephone and SMS services. Our Services do not provide access to emergency services or emergency services providers, including the police, fire departments, or hospitals, or otherwise connect to public safety answering points. You should ensure you can contact your relevant emergency services providers through a mobile, fixed-line telephone, or other service.

IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, OUR TERMS CONTAIN A BINDING ARBITRATION PROVISION, WHICH STATES THAT, EXCEPT IF YOU OPT OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES, WHATSAPP AND YOU AGREE TO RESOLVE ALL DISPUTES THROUGH BINDING INDIVIDUAL ARBITRATION, WHICH MEANS THAT YOU WAIVE ANY RIGHT TO HAVE THOSE DISPUTES DECIDED BY A JUDGE OR JURY, AND THAT YOU WAIVE YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS, CLASS ARBITRATIONS, OR REPRESENTATIVE ACTIONS. PLEASE READ THE "SPECIAL ARBITRATION PROVISION FOR UNITED STATES OR CANADA USERS" SECTION BELOW TO LEARN MORE.

## About our services

**Registration.** You must register for our Services using accurate data, provide your current mobile phone number, and, if you change it, update this mobile phone number using our in-app change number feature. You agree to receive text messages and phone calls (from us or our third-party providers) with codes to register for our Services.

**Address Book.** You provide us the phone numbers of WhatsApp users and your other contacts in your mobile phone address book on a regular basis. You confirm you are authorized to provide us such numbers to allow us to provide our Services.

**Age.** You must be at least 13 years old to use our Services (or such greater age required in your country for you to be authorized to use our Services without parental approval). In addition to being of the minimum required age to use our Services under applicable law, if you are not old enough to have authority to agree to our Terms in your country, your parent or guardian must agree to our Terms on your behalf.

**Devices and Software.** You must provide certain devices, software, and data connections to use our Services, which we otherwise do not supply. For as long as you use our Services, you consent to downloading and installing updates to our Services, including automatically.

WA-NSO-00195067

**Fees and Taxes.** You are responsible for all carrier data plan and other fees and taxes associated with your use of our Services. We may charge you for our Services, including applicable taxes. We may refuse or cancel orders. We do not provide refunds for our Services, except as required by law.

## Privacy policy and user data

WhatsApp cares about your privacy. WhatsApp's Privacy Policy describes our information (including message) practices, including the types of information we receive and collect from you and how we use and share this information. You agree to our data practices, including the collection, use, processing, and sharing of your information as described in our Privacy Policy, as well as the transfer and processing of your information to the United States and other countries globally where we have or use facilities, service providers, or partners, regardless of where you use our Services. You acknowledge that the laws, regulations, and standards of the country in which your information is stored or processed may be different from those of your own country.

## Acceptable use of our services

**Our Terms and Policies.** You must use our Services according to our Terms and posted policies. If we disable your account for a violation of our Terms, you will not create another account without our permission.

**Legal and Acceptable Use.** You must access and use our Services only for legal, authorized, and acceptable purposes. You will not use (or assist others in using) our Services in ways that: (a) violate, misappropriate, or infringe the rights of WhatsApp, our users, or others, including privacy, publicity, intellectual property, or other proprietary rights; (b) are illegal, obscene, defamatory, threatening, intimidating, harassing, hateful, racially, or ethnically offensive, or instigate or encourage conduct that would be illegal, or otherwise inappropriate, including promoting violent crimes; (c) involve publishing falsehoods, misrepresentations, or misleading statements; (d) impersonate someone; (e) involve sending illegal or impermissible communications such as bulk messaging, auto-messaging, auto-dialing, and the like; or (f) involve any non-personal use of our Services unless otherwise authorized by us.

**Harm to WhatsApp or Our Users.** You must not (or assist others to) access, use, copy, adapt, modify, prepare derivative works based upon, distribute, license, sublicense, transfer, display, perform, or otherwise exploit our Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm us, our Services, systems, our users, or others, including that you must not directly or through automated means: (a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services; (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the integrity or performance of our Services; (e) create accounts for our Services through unauthorized or automated means; (f) collect the information of or about our users in any impermissible or unauthorized manner; (g) sell, resell, rent, or charge for our Services; or (h) distribute or make our Services available over a network where they could be used by multiple devices at the same time.

**Keeping Your Account Secure.** You are responsible for keeping your device and your WhatsApp account safe and secure, and you must notify us promptly of any unauthorized use or security breach of your account or

WA-NSO-00195068

our Services.

## Third-party services

Our Services may allow you to access, use, or interact with third-party websites, apps, content, and other products and services. For example, you may choose to use third-party data backup services (such as iCloud or Google Drive) that are integrated with our Services or interact with a share button on a third party's website that enables you to send information to your WhatsApp contacts. Please note that when you use third-party services, their own terms and privacy policies will govern your use of those services.

## Licenses

**Your Rights.** WhatsApp does not claim ownership of the information that you submit for your WhatsApp account or through our Services. You must have the necessary rights to such information that you submit for your WhatsApp account or through our Services and the right to grant the rights and licenses in our Terms.

**WhatsApp's Rights.** We own all copyrights, trademarks, domains, logos, trade dress, trade secrets, patents, and other intellectual property rights associated with our Services. You may not use our copyrights, trademarks, domains, logos, trade dress, patents, and other intellectual property rights unless you have our express permission and except in accordance with our Brand Guidelines. You may use the trademarks www.facebookbrand.com/trademarks of our affiliated companies only with their permission, including as authorized in any published brand guidelines.

**Your License to WhatsApp.** In order to operate and provide our Services, you grant WhatsApp a worldwide, non-exclusive, royalty-free, sublicensable, and transferable license to use, reproduce, distribute, create derivative works of, display, and perform the information (including the content) that you upload, submit, store, send, or receive on or through our Services. The rights you grant in this license are for the limited purpose of operating and providing our Services (such as to allow us to display your profile picture and status message, transmit your messages, store your undelivered messages on our servers for up to 30 days as we try to deliver them, and otherwise as described in our Privacy Policy).

**WhatsApp's License to You.** We grant you a limited, revocable, non-exclusive, non-sublicensable, and non-transferable license to use our Services, subject to and in accordance with our Terms. This license is for the sole purpose of enabling you to use our Services, in the manner permitted by our Terms. No licenses or rights are granted to you by implication or otherwise, except for the licenses and rights expressly granted to you.

## Reporting third-party copyright, trademark, and other intellectual property infringement

To report claims of third-party copyright, trademark, or other intellectual property infringement, please visit our Intellectual Property Policy. We may terminate your WhatsApp account if you repeatedly infringe the intellectual property rights of others.

WA-NSO-00195069

## Disclaimers

YOU USE OUR SERVICES AT YOUR OWN RISK AND SUBJECT TO THE FOLLOWING DISCLAIMERS. WE ARE PROVIDING OUR SERVICES ON AN "AS IS" BASIS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND FREEDOM FROM COMPUTER VIRUS OR OTHER HARMFUL CODE. WE DO NOT WARRANT THAT ANY INFORMATION PROVIDED BY US IS ACCURATE, COMPLETE, OR USEFUL, THAT OUR SERVICES WILL BE OPERATIONAL, ERROR FREE, SECURE, OR SAFE, OR THAT OUR SERVICES WILL FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE DO NOT CONTROL, AND ARE NOT RESPONSIBLE FOR, CONTROLLING HOW OR WHEN OUR USERS USE OUR SERVICES OR THE FEATURES, SERVICES, AND INTERFACES OUR SERVICES PROVIDE. WE ARE NOT RESPONSIBLE FOR AND ARE NOT OBLIGATED TO CONTROL THE ACTIONS OR INFORMATION (INCLUDING CONTENT) OF OUR USERS OR OTHER THIRD PARTIES. YOU RELEASE US, OUR SUBSIDIARIES, AFFILIATES, AND OUR AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, PARTNERS, AND AGENTS (TOGETHER, THE "WHATSAPP PARTIES") FROM ANY CLAIM, COMPLAINT, CAUSE OF ACTION, CONTROVERSY, OR DISPUTE (TOGETHER, "CLAIM") AND DAMAGES, KNOWN AND UNKNOWN, RELATING TO, ARISING OUT OF, OR IN ANY WAY CONNECTED WITH ANY SUCH CLAIM YOU HAVE AGAINST ANY THIRD PARTIES. YOU WAIVE ANY RIGHTS YOU MAY HAVE UNDER CALIFORNIA CIVIL CODE §1542, OR ANY OTHER SIMILAR APPLICABLE STATUTE OR LAW OF ANY OTHER JURISDICTION, WHICH SAYS THAT: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

## Limitation of liability

THE WHATSAPP PARTIES WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR CONSEQUENTIAL, SPECIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES, EVEN IF THE WHATSAPP PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. THE FOREGOING DISCLAIMER OF CERTAIN DAMAGES AND LIMITATION OF LIABILITY WILL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE LAWS OF SOME STATES OR JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN OUR TERMS, IN SUCH CASES, THE LIABILITY OF THE WHATSAPP PARTIES WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## Indemnification

You agree to defend, indemnify, and hold harmless the WhatsApp Parties from and against all liabilities, damages, losses, and expenses of any kind (including reasonable legal fees and costs) relating to, arising out

WA-NSO-00195070

of, or in any way in connection with any of the following: (a) your access to or use of our Services, including information provided in connection therewith; (b) your breach or alleged breach of our Terms; or (c) any misrepresentation made by you. You will cooperate as fully as required by us in the defense or settlement of any Claim.

## Dispute resolution

**Forum and Venue.** If you are a WhatsApp user located in the United States or Canada, the "Special Arbitration Provision for United States or Canada Users" section below applies to you. Please also read that section carefully and completely. If you are not subject to the "Special Arbitration Provision for United States or Canada Users" section below, you agree that you and WhatsApp will resolve any Claim relating to, arising out of, or in any way in connection with our Terms, us, or our Services (each, a "Dispute," and together, "Disputes") exclusively in the United States District Court for the Northern District of California or a state court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes. Without prejudice to the foregoing, you agree that, in our sole discretion, we may elect to resolve any Dispute we have with you in any competent court in the country in which you reside that has jurisdiction over the Dispute.

**Governing Law.** The laws of the State of California govern our Terms, as well as any Disputes, whether in court or arbitration, which might arise between WhatsApp and you, without regard to conflict of law provisions.

## Availability and termination of our services

**Availability of Our Services.** Our Services may be interrupted, including for maintenance, repairs, upgrades, or network or equipment failures. We may discontinue some or all of our Services, including certain features and the support for certain devices and platforms, at any time. Events beyond our control may affect our Services, such as events in nature and other force majeure events.

**Termination.** We may modify, suspend, or terminate your access to or use of our Services anytime for any reason, such as if you violate the letter or spirit of our Terms or create harm, risk, or possible legal exposure for us, our users, or others. The following provisions will survive any termination of your relationship with WhatsApp: "Licenses," "Disclaimers," "Limitation of Liability," "Indemnification," "Dispute Resolution," "Availability and Termination of our Services," "Other," and "Special Arbitration Provision for United States or Canada Users."

## Other

- Unless a mutually executed agreement between you and us states otherwise, our Terms make up the entire agreement between you and us regarding WhatsApp and our Services, and supersede any prior agreements.

WA-NSO-00195071

- We may ask you to agree to additional terms for certain of our Services in the future, which will govern to the extent there is a conflict between our Terms and such additional terms.

- Our Services are not intended for distribution to or use in any country where such distribution or use would violate local law or would subject us to any regulations in another country. We reserve the right to limit our Services in any country.

- You will comply with all applicable U.S. and non-U.S. export control and trade sanctions laws ("Export Laws"). You will not, directly or indirectly, export, re-export, provide, or otherwise transfer our Services: (a) to any individual, entity, or country prohibited by Export Laws; (b) to anyone on U.S. or non-U.S. government restricted parties lists; or (c) for any purpose prohibited by Export Laws, including nuclear, chemical, or biological weapons, or missile technology applications without the required government authorizations. You will not use or download our Services if you are located in a restricted country, if you are currently listed on any U.S. or non-U.S. restricted parties list, or for any purpose prohibited by Export Laws, and you will not disguise your location through IP proxying or other methods.

- Our Terms are written in English (U.S.). Any translated version is provided solely for your convenience. To the extent any translated version of our Terms conflicts with the English version, the English version controls.

- Any amendment to or waiver of our Terms requires our express consent.

- We may amend or update these Terms. We will provide you notice of amendments to our Terms, as appropriate, and update the "Last Modified" date at the top of our Terms. Your continued use of our Services confirms your acceptance of our Terms, as amended. If you do not agree to our Terms, as amended, you must stop using our Services. Please review our Terms from time to time.

- All of our rights and obligations under our Terms are freely assignable by us to any of our affiliates or in connection with a merger, acquisition, restructuring, or sale of assets, or by operation of law or otherwise, and we may transfer your information to any of our affiliates, successor entities, or new owner.

- You will not transfer any of your rights or obligations under our Terms to anyone else without our prior written consent.

- Nothing in our Terms will prevent us from complying with the law.

- Except as contemplated herein, our Terms do not give any third-party beneficiary rights.

- If we fail to enforce any of our Terms, it will not be considered a waiver.

- If any provision of these Terms is deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from our Terms and shall not affect the validity and enforceability of the remaining provisions, except as set forth in the "Special Arbitration Provision for United States or Canada Users" — "Severability" section below.

- We reserve all rights not expressly granted by us to you. In certain jurisdictions, you may have legal rights as a consumer, and our Terms are not intended to limit such consumer legal rights that may not be waived by contract.

WA-NSO-00195072

- We always appreciate your feedback or other suggestions about WhatsApp and our Services, but you understand that we may use your feedback or suggestions without any obligation to compensate you for them (just as you have no obligation to offer them).

## Special arbitration provision for United States or Canada users

PLEASE READ THIS SECTION CAREFULLY BECAUSE IT CONTAINS ADDITIONAL PROVISIONS APPLICABLE ONLY TO OUR UNITED STATES AND CANADA USERS. IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, IT REQUIRES YOU TO SUBMIT TO BINDING INDIVIDUAL ARBITRATION OF ALL DISPUTES, EXCEPT FOR THOSE THAT INVOLVE INTELLECTUAL PROPERTY DISPUTES AND EXCEPT THOSE THAT CAN BE BROUGHT IN SMALL CLAIMS COURT. THIS MEANS YOU ARE WAIVING YOUR RIGHT TO HAVE SUCH DISPUTES RESOLVED IN COURT BY A JUDGE OR JURY. THIS SECTION ALSO LIMITS THE TIME YOU HAVE TO START AN ARBITRATION OR, IF PERMISSIBLE, A COURT ACTION. FINALLY, THIS SECTION WAIVES YOUR RIGHT TO HAVE YOUR DISPUTE HEARD AND RESOLVED AS A CLASS ACTION, CLASS ARBITRATION, OR A REPRESENTATIVE ACTION.

"Excluded Dispute" means any Dispute relating to the enforcement or infringement of your or our intellectual property rights (such as copyrights, trademarks, domains, logos, trade dress, trade secrets, and patents). For clarity and notwithstanding the foregoing, those Disputes relating to, arising out of, or in any way in connection with your rights of privacy and publicity are not Excluded Disputes.

**Federal Arbitration Act.** The United States Federal Arbitration Act governs the interpretation and enforcement of this "Special Arbitration Provision for United States or Canada Users" section, including any question whether a Dispute between WhatsApp and you is subject to arbitration.

**Agreement to Arbitrate for WhatsApp Users Located in the United States or Canada.** For WhatsApp users located in the United States or Canada, WhatsApp and you each agree to waive the right to a trial by judge or jury for all Disputes, except for the Excluded Disputes. WhatsApp and you agree that all Disputes (except for the Excluded Disputes), including those relating to, arising out of, or in any way in connection with your rights of privacy and publicity, will be resolved through final and binding arbitration. WhatsApp and you agree not to combine a Dispute that is subject to arbitration under our Terms with a Dispute that is not eligible for arbitration under our Terms.

The arbitration will be administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules in effect at the time the arbitration is started, including the Optional Rules for Emergency Measures of Protection and the Supplementary Procedures for Consumer-Related Disputes (together, the "AAA Rules"). The arbitration will be presided over by a single arbitrator selected in accordance with the AAA Rules. The AAA Rules, information regarding initiating a Dispute, and a description of the arbitration process are available at www.adr.org. The arbitrator will decide whether a Dispute can be arbitrated. The location of the arbitration and the allocation of fees and costs for such arbitration shall be determined in accordance with the AAA Rules. Notwithstanding the AAA Rules, we will reimburse you for all the AAA administrative fees in Disputes that are subject to the Supplementary Procedures for Consumer-Related Disputes, unless the arbitrator determines that a Dispute was filed for purposes of harassment or is patently frivolous.

WA-NSO-00195073

**Opt-Out Procedure.** You may opt out of this agreement to arbitrate. If you do so, neither we nor you can require the other to participate in an arbitration proceeding. To opt out, you must notify us in writing postmarked within 30 days of the later of: (i) the date that you first accepted our Terms; and (ii) the date you became subject to this arbitration provision. You must use this address to opt-out:

WhatsApp Inc.
Arbitration Opt-Out
1601 Willow Road
Menlo Park, California 94025
United States of America

You must include: (1) your name and residence address; (2) the mobile phone number associated with your account; and (3) a clear statement that you want to opt out of our Terms' agreement to arbitrate.

**Small Claims Court.** As an alternative to arbitration, if permitted by your local "small claims" court's rules, you may bring your Dispute in your local "small claims" court, as long as the matter advances on an individual (non-class) basis.

**Time Limit to Start Arbitration.** We and you agree that for any Dispute (except for the Excluded Disputes) we and you must commence an arbitration proceeding within one year after the Dispute first arose; otherwise, such Dispute is permanently barred. This means that if we or you do not commence an arbitration within one year after the Dispute first arose, then the arbitration will be dismissed because it was started too late.

**No Class Actions, Class Arbitrations, or Representative Actions for Users Located in the United States or Canada.** We and you each agree that if you are a WhatsApp user located in the United States or Canada, each of we and you may bring Disputes against the other only on its or your own behalf, and not on behalf of any other person or entity, or any class of people. We and you each agree not to participate in a class action, a class-wide arbitration, Disputes brought in a private attorney general or representative capacity, or consolidated Disputes involving any other person or entity in connection with any Dispute.

**Severability.** If the prohibition against class actions and other Disputes brought on behalf of third parties is found to be unenforceable for a Dispute, then all of the provisions above under the caption "Special Arbitration Provision for United States or Canada Users" will be null and void as to that Dispute.

**Place to File Permitted Court Actions.** If you opt out of the agreement to arbitrate, if your Dispute is an Excluded Dispute, or if the arbitration agreement is found to be unenforceable, you agree to be subject to the "Forum and Venue" provisions in the "Dispute Resolution" section set forth above.

## Accessing WhatsApp's terms in different languages

To access our Terms in certain other languages, change the language setting for your WhatsApp session. If our Terms are not available in the language you select, we will default to the English version.

Please review the following documents, which provide additional information about your use of our Services:

WA-NSO-00195074

WhatsApp Privacy Policy

WhatsApp Intellectual Property Policy

WhatsApp Brand Guidelines

WA-NSO-00195075

# EXHIBIT 24

## FILED UNDER SEAL

# EXHIBIT 25

FILED UNDER SEAL

# EXHIBIT 26

FILED UNDER SEAL

# EXHIBIT 27

## FILED UNDER SEAL

# EXHIBIT 28

## FILED UNDER SEAL

# EXHIBIT 29

FILED UNDER SEAL

# EXHIBIT 30

FILED UNDER SEAL

# EXHIBIT 31

## FILED UNDER SEAL

# EXHIBIT 32

FILED UNDER SEAL

EXHIBIT 33

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 105 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                              Page 1

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     OAKLAND DIVISION

4      - - - - - - - - - - - - - - - x

5      WHATSAPP INC., a Delaware        :

6      corporation, and FACEBOOK,       :

7      INC., a Delaware corporation, :

8             Plaintiffs,              :    CASE NO.

9      v.                               :    4:19-cv-07123-PJH

10     NSO GROUP TECHNOLOGIES LIMITED:

11     And Q CYBER TECHNOLOGIES         :

12     LIMITED,                         :

13            Defendants.               :

14     - - - - - - - - - - - - - - - x

15          HIGHLY CONFIDENTIAL, ATTORNEYS' EYES

16       VIDEOTAPED DEPOSITION OF ANDREW ROBINSON

17            Thursday, September 19, 2024

18                    9:36 a.m.

19

20

21     JOB NO.:  44484

22     Pages 1 through 389

23     Reported By:  CASSANDRA E. ELLIS, CSR-CA #14448,

24     CSR-HI #475, CCR-WA #3484, RPR, RMR, RDR, CRR,

25     Realtime Systems Administrator #823848

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 106 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                            Pages 286..289

Page 286

1  this exhibit.
2        (Exhibit No. 1517 was marked for
3  identification.)
4        MR. MARZORATI:  Can I give him that
5  one?
6        MR. AKROTIRIANAKIS:  Yeah.
7        MR. MARZORATI:  Okay.
8  BY MR. CRAIG:
9     Q.  All right.  So Cortney Padua, what
10  was her title in 2019?
11     A.  She would have been a security, I
12  believe, engineer on CERT.
13     Q.  And you don't know the expense to
14  WhatsApp or Facebook of employing Ms. Padua in
15  2019, do you?
16        MR. MARZORATI:  Objection outside
17  the scope of his 30(b)(6) testimony.
18     A.  I do not.
19     Q.  Okay.  Do you know whether Cortney
20  Padua took any vacation or PTO in May or June of
21  2019?
22     A.  I do not know.
23     Q.  Okay.  All right.
24        What actions did Cortney Padua take
25  in responding to defendant's exploit in May of

Page 287

1  2019?
2     A.  So much of what Cortney did was
3  essentially translation of all of the raw logs
4  and information that we were collecting as a
5  part of the investigation, and translating that
6  into actual databases that we could more easily
7  leverage for investigations, as well as
8  preserving the various documents that we used
9  during the course of our investigation.
10     Q.  And -- and is it your understanding
11  that she spent about 96 hours, from May 2nd to
12  June 15th, 2019, on that -- on those tasks?
13     A.  Yes, that is, that is approximately
14  how much time.
15     Q.  All right.  I'd like to divide
16  up -- well, of the time that Cortney Padua
17  spent, how much of it was spent, and I'm going
18  to give you five different categories and ask
19  you to allocate her time into those five
20  categories, and you can take notes if you want
21  or you don't have to.
22     A.  Is there something I can use to
23  take notes?
24     Q.  Of course.
25        THE WITNESS:  Do you have a pen?

Page 288

1  Sorry.
2  BY MR. CRAIG:
3     Q.  Thanks.  So the first category is
4  improving WhatsApp software code; the second is
5  identifying and notifying WhatsApp users; the
6  third is trying to understand and identify the
7  exploit and the source of the exploit.
8     A.  Sorry.  Could you go back, repeat
9  that one?
10     Q.  Yeah.  Trying to understand and
11  identify the exploit and the source of the
12  exploit; fourth is, communications and legal;
13  and the fifth is other.
14        So out of the -- out of the time
15  that Cortney Padua spent, can you allocate that
16  among those five categories?
17        MR. MARZORATI:  I will object to
18  this exercise in its entirety as beyond the
19  scope of his 30(b)(6) testimony.
20        Drew, to the extent you understand
21  any of this or these are categories that you've
22  heard of before, you can attempt to answer.
23     A.  I would say that I would cause --
24  of the categories provided to me I would
25  classify her work here as in support of trying

Page 289

1  to identify and understand the source of the
2  exploit.
3     Q.  Okay.  All of it?
4     A.  Essentially, yes.
5     Q.  Okay.  Michael Scott, what was his
6  title in 2019?
7     A.  He was a threat investigator.
8     Q.  Okay.  Did he take any vacation or
9  PTO in May or June of 2019?
10        MR. MARZORATI:  Objection, outside
11  the scope.
12     A.  I do not know.
13     Q.  How much time did Michael Scott
14  spend working on responding to the NSO exploit
15  in 2019?
16     A.  He was essentially full time
17  throughout the months of May and June, focused
18  on this issue.
19     Q.  How -- so again, I'm going to refer
20  you to the five categories that I identified
21  earlier, how much of his time was spent in each
22  of those five categories during May and June of
23  2019?
24        MR. MARZORATI:  Same objections to
25  this exercise.

Page 290

1     A.  I'm not sure the specific
2  breakdown, also, I would say the two categories,
3  in my mind, would overlap to some degree, so
4  it's a little confusing.
5          But his time would have been split,
6  to some degree.  I'm not sure what, between the
7  identify, notify users, and trying to understand
8  and identify the source of the exploit.
9     Q.  Which two categories do you think
10  overlap?
11     A.  Those two, the identify and notify
12  users, and trying to understand and ID, the
13  source of the exploit.
14     Q.  All right.  To me the distinction
15  is pretty clear between identifying and
16  notifying the WhatsApp users who may have been
17  targeted and understanding and identifying the
18  exploit, itself, and where it came from, what it
19  is about those two that you find overlapping?
20          MR. MARZORATI:  Object to the
21  testimony from Mr. Craig and to the form of the
22  question.
23     A.  To me, identifying the users
24  involved and the targeting of an exploit is
25  critical to understanding the source of the

Page 291

1  exploit.
2     Q.  All right.  So is your testimony
3  that -- that Michael Scott spent about 50
4  percent of his time identifying and notifying
5  the users of WhatsApp who may have been targeted
6  with Pegasus, and 50 percent of the time trying
7  to understand and identify what the exploit was?
8          MR. MARZORATI:  Objection,
9  misstates his testimony.
10     A.  I do not know what the delineation
11  between those two categories that you've
12  outlined is.
13     Q.  All right.  How much of your time
14  was spent responding to the exploit?
15     A.  In the hundreds of hours.
16     Q.  You can't narrow it down anymore
17  than that?
18     A.  I would say a conservative estimate
19  would probably be somewhere around the order of
20  300 hours, 300 to 400 hours.
21     Q.  And referring again to my five
22  categories, which -- which ones were you
23  involved in?
24          MR. MARZORATI:  Same objections as
25  before.

Page 292

1     A.  Again, trying to understand and ID
2  the source of the exploit, identifying and
3  notifying users, and probably a good bit of
4  other in there, as well.
5     Q.  Did you take any PTO in 2019?
6     A.  I more than likely did.
7     Q.  Do you remember when?
8     A.  I do not.
9     Q.  All right.  How much time did
10  Aashin Gautam spend responding to the exploit?
11     A.  Approximately half of his time,
12  from the months of May to November, was spent
13  working on issues related to this incident.
14     Q.  And what did Mr. Gautam do?
15     A.  He was a director for WhatsApp
16  customer operations.
17     Q.  What did he --
18     A.  He worked in --
19          MR. MARZORATI:  You can finish your
20  answer, Mr. Robinson.
21     A.  He worked in victim outreach.
22     Q.  So all of this time, this three and
23  a half months of his time, was spent on victim
24  outreach?
25          MR. MARZORATI:  Objection to the

Page 293

1  extent -- same objections as before regarding
2  this category again.
3          THE WITNESS:  Sorry, repeat the
4  question.
5          MR. CRAIG:  Yeah.
6  BY MR. CRAIG:
7     Q.  Would you -- would you categorize
8  all of the time that Mr. Gautam spent as victim
9  outreach?
10          MR. MARZORATI:  Same objections as
11  before regarding this category game.
12     A.  Yes.
13     Q.  How much time did YuanYuan Wang
14  devote to working on the exploit in 2019?
15     A.  It would have been approximately --
16  approximately 80 to 90 hours.
17     Q.  Would you consider how many hours
18  is a full-time day for Facebook and META?
19          MR. MARZORATI:  Objection, calls
20  for speculation.  It's also outside the scope of
21  his testimony.
22     A.  Individuals will -- can work a
23  varying number of hours during their day.
24     Q.  And in your testimonial aid, here,
25  it says:  May and June full time, and I'm just

Case 4:19-cv-07123-PJH   Document 401-2   Filed 09/27/24   Page 108 of 112
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                    Pages  294..297

Page 294

1  curious how you get from that to your answer of
2  80 to 90 hours?
3      **A.  Correct.  So, well, in part, I have**
4  **the opportunity to talk to him, and I believe**
5  **that was roughly the time that he conveyed to**
6  **me, as well as the rough calculation of roughly**
7  **eight hours a day over an 11 -- over the course**
8  **of 11 days.**
9      Q.  Do you know how many -- are you
10  counting weekend days in that?
11     **A.  During this time period, yes.**
12     Q.  Okay.  And what did Mr. Wang --
13  specifically what was he doing in respect to
14  responding to the exploit?
15         MR. MARZORATI:  Do you need a
16  break?
17         **THE WITNESS:  I'm good, just water**
18  **down the wrong pipe.**
19         **Sorry, could you repeat the**
20  **question?**
21  BY MR. CRAIG:
22     Q.  What did Mr. Wang do, between May
23  2nd and June 13 of 2019 with respect to the NSO
24  exploit?
25     **A.  He was responsible for**

Page 295

1  **investigating the -- or helping investigates the**
2  **client-side vulnerability, performing some of**
3  **the lobbying that we needed to gather the**
4  **information needed to remediate the issue, as**
5  **well as implementation of some of the fix.**
6      Q.  Are you able to allocate his time
7  among the five categories that I've -- that I've
8  given you?
9         MR. MARZORATI:  Same objections as
10  before.
11     **A.  I am not.**
12     Q.  What did Mister -- let me ask you:
13  Otto Ebeling, what was his title in 2019?
14     **A.  He was a security engineer.**
15     Q.  Did he take any PTO during 2019?
16         MR. MARZORATI:  Objection as
17  outside the scope.
18     **A.  I do not know.**
19     Q.  What actions did Mr. Ebeling take
20  in responding to defendant's exploit in May
21  2019?
22     **A.  He worked to analyze the exploit**
23  **and understand how it functioned.**
24     Q.  How much did -- sorry.
25         What was Aby John's title in 2019

Page 296

1      **A.  I'm sorry, could you repeat the**
2  **name.**
3      Q.  Aby John, A-b-y, J-o-h-n?
4      **A.  I don't know.**
5      Q.  What did Aby John do in responding
6  to defendant's exploit in May 2019?
7      **A.  I don't know.**
8      Q.  What was Andy Yang's title in 2019?
9      **A.  I don't know.**
10     Q.  What did Andy Yang do in responding
11  to defendant's exploit in May 2019?
12     **A.  I don't know.**
13     Q.  What was Andrey Labunets' title in
14  2019?
15     **A.  I believe he would have been a**
16  **security engineer.**
17     Q.  And what did Andrey Labunets do in
18  respect of identifying -- I'm sorry -- in
19  responding to the exploit in 2019?
20     **A.  I'm sorry, could you clarify the**
21  **question?**
22     Q.  Yeah.  What did Andrey Labunets do
23  in responding to defendant's exploit in May of
24  2019?
25     **A.  He performed several functions**

Page 297

1  **around the investigation to include looking at**
2  **our own servers to make sure that there wasn't**
3  **some additional infection, as well as helping**
4  **some of the -- I believe helping some of the**
5  **exploit analysis.**
6      Q.  What did -- what was Airoven's --
7  Airoven Thangavell's (phonetic) title in 2019?
8      **A.  I do not know.**
9      Q.  What did Airoven Thangavell do to
10  respond to the defendant's exploit in 2019?
11     **A.  I do not know.**
12     Q.  What was Brendon Tiszka's title in
13  2019?
14     **A.  I don't know.**
15     Q.  What did Brendon Tiszka do to
16  respond to defendant's exploit in May 2019?
17     **A.  I don't know the full extent of his**
18  **work.**
19     Q.  Do you know any of the extent of
20  his work?
21     **A.  We had some brief conversations**
22  **about it, beyond that, I don't know much about**
23  **what he did.**
24     Q.  So you can't tell me anything about
25  what he did?

**Page 386**

```
1              ACKNOWLEDGMENT OF DEPONENT
2              I, ANDREW ROBINSON, do hereby
3    acknowledge that I have read and examined the
4    foregoing testimony, and the same is a true,
5    correct and complete transcription of the
6    testimony given by me and any corrections appear
7    on the attached Errata sheet signed by me.
8
9    _____      _____
10       (DATE)                  (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 387**

```
1         CERTIFICATE OF SHORTHAND REPORTER
2              I, Cassandra E. Ellis, Registered
3    Professional Reporter, the officer before whom
4    the foregoing proceedings were taken, do hereby
5    certify that the foregoing transcript is a true
6    and correct record of the proceedings; that said
7    proceedings were taken by me stenographically
8    and thereafter reduced to typewriting under my
9    supervision; and that I am neither counsel for,
10   related to, nor employed by any of the parties
11   to this case and have no interest, financial or
12   otherwise, in its outcome.
13              IN WITNESS WHEREOF, I have hereunto
14   set my hand this 23RD day of September 2024.
15
16
17
18   Cassandra E. Ellis
19   CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484,
20            CSR-HI #475, RPR, RMR, RDR,
21            CRR, REALTIME SYSTEMS
22            ADMINISTRATOR #823848
23
24
25
```

**Page 388**

```
1              E R R A T A   S H E E T
2      IN RE:  WHATSAPP/FACEBOOK, v. NSO GROUP/Q
3    CYBER
4    RETURN BY: _____
5    PAGE    LINE    CORRECTION AND REASON
6    _____  _____   _____
7    _____  _____   _____
8    _____  _____   _____
9    _____  _____   _____
10   _____  _____   _____
11   _____  _____   _____
12   _____  _____   _____
13   _____  _____   _____
14   _____  _____   _____
15   _____  _____   _____
16   _____  _____   _____
17   _____  _____   _____
18   _____  _____   _____
19   _____  _____   _____
20   _____  _____   _____
21   _____  _____   _____
22   _____  _____   _____
23
24   _____      _____
25      (DATE)                  (SIGNATURE)
```

**Page 389**

```
1      E R R A T A   S H E E T   C O N T I N U E D
2      IN RE:  WHATSAPP/FACEBOOK, v. NSO GROUP/Q
3    CYBER
4    RETURN BY: _____
5    PAGE    LINE    CORRECTION AND REASON
6    _____  _____   _____
7    _____  _____   _____
8    _____  _____   _____
9    _____  _____   _____
10   _____  _____   _____
11   _____  _____   _____
12   _____  _____   _____
13   _____  _____   _____
14   _____  _____   _____
15   _____  _____   _____
16   _____  _____   _____
17   _____  _____   _____
18   _____  _____   _____
19   _____  _____   _____
20   _____  _____   _____
21   _____  _____   _____
22   _____  _____   _____
23
24   _____      _____
25      (DATE)                  (SIGNATURE)
```

# EXHIBIT 34

## FILED UNDER SEAL

# EXHIBIT 35

## FILED UNDER SEAL

# EXHIBIT 36

## FILED UNDER SEAL