# EXHIBIT 6

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF JOHN TOWN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, John (Jay) Town, declare as follows:

1.      I am the Vice President and General Counsel for Gray Analytics, a defense and cybersecurity contractor in Huntsville, Alabama.  Prior to joining Gray Analytics, I spent the majority of my career as a prosecutor, most recently as the United States Attorney for the Northern District of Alabama from 2017 to 2020.  I have personal knowledge of the facts in this declaration, and I could and would testify competently to these facts if called as a witness.

2.      I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to offer testimony based on my experience, including with the use of surveillance technology in law enforcement.

3.      In connection with my engagement, I reviewed and evaluated certain judicial decisions, statutes, policy and guidance documents, scholarly publications and treatises, documents produced in this litigation, and other materials.

4.      I then prepared a report setting forth (among other things) my qualifications, my opinions, the basis and reasons for my opinions, and the facts and data that I considered when forming my opinions.

5.      Attached as **Exhibit A** is a true and correct copy of the report that I prepared, dated August 30, 2024.

6.      I affirm that the information, statements, and opinions set forth in Exhibit A were, and are, true and correct.

7.      If called as a witness at trial, I could and would testify to the information, statements, and opinions set forth in Exhibit A.


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of October 2024.



_____

JOHN  TOWN

---

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>    Defendants. | Case No. 4:19-cv-07123-PJH |

**<u>REPORT OF JOHN  "JAY" TOWN</u>**

1

# **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 3

II.    QUALIFICATIONS ................................................................................................ 3

III.   INFORMATION CONSIDERED ........................................................................... 5

IV.   DISCUSSION .......................................................................................................... 6

      A.     Lawful Interception Is an Important Tool ................................................... 6

      B.     Lawful Interception Is Permitted in the United States and in Other Countries ................. 9

      C.     Modern Surveillance Tools are Similar to Older Lawful Intercept Tools ........................ 17

      D.     Intercept Technologies Such as Pegasus Provide Enormous Public Benefits ................. 21

      E.     Some Vendors Place Discretionary Restrictions on the Use of Surveillance Technology ................................................................................................. 22

   V. APPENDIX I - CV OF JAY E. TOWN ......................................................... ...  26

   VI. APPENDIX II - LIST OF INFORMATION CONSIDERED ......................................... 36

I.    **INTRODUCTION**

1.        My name is John "Jay" Town. I have been engaged to offer testimony based on my experience with the use of surveillance technology in law enforcement, addressing: (1) the importance of lawful intercept technologies in law enforcement and national security operations; (2) the lawful interception of electronic communications being permitted in the United States and elsewhere; (3) the similarities between the Pegasus product developed by NSO Group Technologies Limited ("NSO"), and similar software tools, and other available lawful-intercept tools; (4) the benefits of tools such as Pegasus in law enforcement and national security operations; and (5) safeguards that can be imposed to prevent unauthorized use of a surveillance tool.

2.         This report serves as an explanation of my understanding of the technology at issue in this case and details my testimony concerning uses of such lawful intercept capabilities. The views expressed herein are my own and are based on my investigation in this matter as well as the education, experience, training, and skill I have accumulated as a lawyer and a law enforcement official.

II.    **QUALIFICATIONS**

3.        A copy of my curriculum vitae is attached as Appendix I.  It includes my qualifications, and a list of publications that I have authored (identified to the best of my recollection) in the previous ten years.

4.        I am the Vice President and General Counsel of Gray Analytics, a defense and cybersecurity contractor in Huntsville, Alabama.  Prior to joining Gray Analytics, I was the presidentially-appointed, Senate-confirmed United States Attorney for the Northern District of Alabama from 2017-2020.  I began my career as a Judge Advocate in the United States Marines,

3

where I served from 1996 to 2008, both on active duty and in the reserves. Before my appointment as United States Attorney, I was a prosecutor in the Madison County (Alabama) District Attorney's Office in Huntsville. The bulk of my career has been spent as a prosecutor, working with various levels of law enforcement and members of the intelligence community on the entire spectrum of investigations and prosecutions, including prosecutions of governmental misconduct.

5.    I have been involved in, provided oversight of, and led investigations where the lawful interception or collection of communications, metadata, geolocation, and other types of information was authorized for a law enforcement and/or national security purpose. I continue to be involved in providing software applications to law enforcement or intelligence agencies that involve artificial intelligence, machine learning, and advanced analytics relating to native, open-source, and/or commercial data.

6.    My career has been spent almost entirely in law enforcement as a prosecutor or in service to law enforcement and military agencies. I have been involved in the prosecution of more than 10,000 criminal defendants over the course of my career. I have experience obtaining legal authority for the lawful interception of communications at the state and federal levels, including authority by virtue of the Fourth Amendment, U.S. statutes such as the Wiretap Act, and internal Department of Justice policies, as well as state wiretapping laws. I also have experience navigating the judicial approval and oversight process for such lawful intercepts.

7.    I have led and supervised complex investigations where sophisticated technical capabilities were deployed, such as remote surveillance and the interception of communications. I have also been involved in investigations where no such capabilities were available, but they

4

would have been helpful to the investigation had they been available. Accordingly, I am generally familiar with existing lawful-intercept tools and the need for next-generation solutions to address advancements in the technologies available to suspected criminals and terrorists.

8.      As a former judge advocate, state prosecutor, and United States Attorney, I also have experience with and am aware of accountability mechanisms when government agents misuse lawful intercept technologies.  In the United States, we have a robust system of holding government agents who misuse authority for lawful interception accountable, including through internal government agency investigations, investigations by inspectors general, and judicial oversight of potential abuse.

9.      I have not testified as an expert at trial or by deposition in any case during the previous four years.

10.     The content of this report is based on my experience as a prosecutor and a United States Attorney involved in sophisticated investigations, task forces, and steering committees. It is also rooted in my experience as a judge advocate in the United States Marine Corps. That experience includes familiarity with intercept capabilities, legal standards, laws, and processes, and accountability mechanisms for misconduct or abuses.

11.     I am being paid $750/hour for my work in this case. My compensation is not contingent upon the outcome of the case.

## III.    INFORMATION CONSIDERED

12.      A list of the materials and information I have considered specifically in connection with this matter can be found in Appendix II, below.

13.      I do not anticipate needing any exhibits, beyond the materials identified above, to summarize, support, or aid my testimony. If this changes, I will provide any such exhibits.

## IV.    DISCUSSION

### A.    LAWFUL INTERCEPTION IS AN IMPORTANT TOOL

14.    The ability of law enforcement and our national security apparatus to lawfully intercept communications is critical to public safety and national security. It is especially important when criminal and terrorist activities are conceived, planned, and executed utilizing mobile phones, networks, and encrypted messaging applications. The ability to investigate, disrupt, and prosecute criminal activities is of immense benefit to both public safety and national security.  Detecting terrorist plots, economic and traditional espionage, organized crime, human trafficking, and other criminal and violent activities is absolutely critical for law enforcement and the intelligence community.

15.    Access to communications has been a crucial aspect of keeping the homeland secure since the inception of the United States. As far back as Paul Revere, the interception of enemy communications has been critical to our successful protection of the United States.  The lawful intercept of communications enabled law enforcement to bring down the Mafia and other organized crime groups.

16.     The lawful intercept of communications enabled law enforcement to prevent or furthered the successful prosecution of defendants involved in violent crimes and other criminal activities.  The lawful intercept of communications has enabled law enforcement and the intelligence community to thwart terrorist activities.  The lawful intercept of communications has allowed the American military to identify and neutralize targets with precision or provide troops in a forward position the ability to avoid or counter enemy contact.

6

17.     On several occasions throughout my career, intercepting communications resulted in preventing additional criminal activity and the eventual conviction and sentencing of the criminal actors. The sophistication of the technology aiding these investigations and prosecutions varied from cell site location information to Title III wiretap intercepts to communications collected under the Foreign Intelligence Surveillance Act (FISA). Such lawful intercepts resulted in solving or proving the essential elements of the criminal offenses.  For instance, murders were solved and proven. Terrorist attacks were thwarted. As a result, public safety and national security was improved, which may have not been the case without the lawful intercepts. The intercept of enemy communications not only provides targeting capabilities which allow military assets to neutralize enemy threats, but also to avoid the enemy in the theater of operations.

18.     A specific instance of an investigation where the lawful interception of communications was vital to public safety and national security involved an individual planning a terrorist attack at a holiday parade in a major population center. The targets of the attack would have been innocent men, women, and children attending the parade and celebrating the holiday. This activity, to include the planning, timing, and method of terror, would not have been accurately detected but for the deployment of lawful intercept technology.

19.     Conversely, the inability of law enforcement or intelligence agencies to intercept such communications lawfully is highly detrimental to public safety and national security.

20.     The inability to use sophisticated technology to conduct the lawful interception of communications puts law enforcement agents in jeopardy.  Without such technical capabilities, whether wiretap or software, law enforcement instead may incur very serious risks to officer safety by embedding an officer, sometimes for years, inside a criminal organization to gain

similar intelligence. Without such technical capabilities, whether hardware or software, the gathering of intelligence is left to human intelligence, which is a tactic extending back perhaps thousands of years.  Without such technical capabilities, whether hardware or software, law enforcement instead may only employ outdated technology such as a notepad, binoculars, and an unmarked vehicle.  Even 20th century technology such as a recording device carried by an informant is outdated. Without advanced technical capabilities, whether hardware or software, law enforcement instead deploys all of the above to counter next generation technology used and deployed quite effectively by criminals, criminal organizations, and terrorists. American law enforcement and intelligence agencies must be able to deploy lawful technology and tools to counter wrongdoers. Criminal and terrorist actors are aware of the technologies deployed by law enforcement and the intelligence community and counter with increasingly sophisticated technologies designed to defeat detection, intercept, or capture.

21.     Law enforcement and the intelligence community engage in the lawful intercept of communications of subjects of investigations, criminals, and terrorists every day.  From something as simple as recording jail calls or single-consent recordings to the interception of communications wiretaps under Title III or the Foreign Intelligence Surveillance Act ("FISA"), the lawful intercept of communications provides valuable investigative leads, evidence, and predictive capabilities that improve public safety and national security.

22.     In my experience, the lawful interception of communications is a significant force multiplier to any investigation.  Evidence introduced from the lawful interception of certain communications is often critical in subsequent criminal prosecutions.  Indeed, without the lawful interception of certain communications, investigations often would have insurmountable hurdles

and additional investigative measures would not have been successful. It is my experience that such communications are often of such great import and probative significance as evidence that many defendants admit their guilt.

23.      The lawful interception of certain communications is also critical to detecting, disrupting and prosecuting terrorist activities.  Without such tools, there would be significant counterterrorism gaps to the detriment of innocent people, the homeland, and national security.

24.      Overall, deploying technical tools to enhance investigations significantly and positively impacts public safety and national security.  Criminal organizations, terrorist organizations, and other bad actors increasingly use sophisticated technical capabilities.  Law enforcement and the intelligence community must possess access to the technical capabilities necessary to counter these capabilities.  End-to-end encryption of devices and applications is a major impediment to law enforcement and the intelligence community.

25.      The lawful interception of certain communications provides law enforcement and the intelligence community the ability to effectively conduct public safety and/or national security missions. Based on my experience, the absence of such capabilities to intercept communications lawfully puts law enforcement at a disadvantage and weakens public safety and national security postures.

### B.    LAWFUL INTERCEPTION IS PERMITTED IN THE UNITED STATES AND IN OTHER COUNTRIES

26.      Lawful intercept, including interception of electronic communications and similar or related information, are permitted by many, if not most, countries.  Lawful interception techniques are permissible in the United States, the State of California, and many international

jurisdictions, such as those of our allies and other democracies if used by appropriate law enforcement or security agencies.

### *Lawful Surveillance Is Used by the United States*

27.     The United States has always engaged in the interception of communications for law enforcement and national security purposes.  The U.S. Constitution and laws require that every lawful intercept be defined and proportional, with many accompanying legal and internal requirements by those agencies deploying such intercepts.  There are many statutory rubrics for the law interception of communications, such as Title III wiretaps, FISA, and state wiretap laws, discussed herein.

28.     Title III of the Electronic Communications Protection Act (18 U.S.C. 2510, et seq.) has certain requirements that must be met before a wiretap may issue.

29.     First, the Title III application must be prepared by an affiant law enforcement agent who has developed the probable cause necessary to support a wiretap.  The application then must be signed, under oath, by a United States Attorney or their designee.

30.     Next, the Title III application must be presented to a federal judge with an accompanying memorandum of law describing the legal authority under which the judge may authorize a Title III wiretap.

31.     The application must particularly describe what types of communication(s) are to be lawfully intercepted.  This could include traditional telephones, cellular phones, text messages, application messages, emails, and aural transfers. This can also include financial transfers and transactions.

32.     Moreover, the application must particularly describe the probable cause for the specific, predicated offense or offenses. The Electronic Communications Protection Act ("ECPA") has specific requirements, depending on the type of interception. If a place or facility is to be the subject of the wiretap, it must be specifically, and often narrowly, described.  If oral or voice communications are to be the subject of the wiretap, there must be a strong justification for such a "roving interception" and must be signed by a presidentially appointed Assistant Attorney General or equivalent.

33.     In some cases, investigation targets seek to frustrate a wiretap.  For instance, a "drop phone" describes a situation when targets of a wiretap, out of paranoia or belief, would literally "drop" their mobile phones in the garbage and begin using a new phone and number. This obviously frustrates a wiretap on the dropped phone. To avoid this pitfall, law enforcement agencies submitting the application must specifically ask the court for permission to target any phone used by the target of the wiretap through a roving wiretap. Failure to do so will result in the necessity for another wiretap application. A roving wiretap of oral or voice communications will only be authorized, however, if the roving wiretap is the least intrusive means and the information cannot be gathered by other less intrusive means.

34.     This is an example of how the technology deployed by law enforcement can be simply defeated by the criminal element. Additionally, it is an example as to why law enforcement must continually deploy more sophisticated capabilities to keep up with, or stay ahead of, those who threaten public safety or national security.

35.     The predicated offenses under investigation must also be particularly described. By DOJ Criminal Division policy, and often court requirements, all known individuals involved

11

in the criminal activity must be included in the Title III application (even if their communications are unlikely to be intercepted).

36.     Often the most difficult hurdle of any wiretap application is the requirement that the affidavit for the wiretap application affirm that all other means have been explored to gather evidence for the predicated offense(s) before a wiretap application can even be submitted. This is often difficult to show or prove to the satisfaction of a federal judge. Typically, it is known that the other "less intrusive means" will be unsuccessful before they are attempted, but those feckless means must be attempted nonetheless and to the satisfaction of not only the judge, but the approving official.

37.     Once approved by the court, the application and court order are distributed to the service provider for intercept.  The timeframes associated normally do not exceed a thirty-day period.  The lawful interception of communications under Title III is a careful balance between probable cause and privacy.

38.     The Foreign Intelligence Surveillance Act ("FISA") provides another means by which intelligence agencies can lawfully intercept communications. There has been much scrutiny of the use of FISA. A good deal of the criticism has been of Section 702 of FISA, discussed herein.

39.     Generally, FISA provides that a law enforcement or intelligence agency, through the Department of Justice, can submit an application for a FISA warrant to a judge sitting on a specialized Foreign Intelligence Surveillance Court, or FISC. FISA provides the Government a vehicle to seek authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  In order to persuade a court to grant a FISA warrant, there are many steps

that the Department of Justice must undertake before submission. Among other items, the FISC must find that probable cause exists that the subject of the FISA warrant is a foreign power or agent of a foreign power. Unlike a Title III wiretap, FISA requires that "a significant purpose" of the surveillance is to obtain foreign intelligence. FISA also requires that all surveillance be minimized to the extent possible.

40.    In 2023, the Department of Justice stated that it filed 327 FISA applications, 313 of which included requests for the authority to conduct electronic surveillance.  The technology used in electronic surveillance is incredibly sophisticated.  The technology used to mine the communications intercepted is also incredibly sophisticated.

41.    Under FISA Section 702, the Government may also seek authority to intercept communications of a person that is not inside the continental United States and is a foreign person. The goal is to collect foreign intelligence.  However, since communications are with two or more persons, whose identities are not always readily apparent, sometimes communications are incidentally collected involving U.S. persons. Such communications may still be used for intelligence purposes.  On April 20, 2024, President Biden signed into law the latest iteration of FISA.  The law itself is less than 50 years old, having been originally conceived in 1978, and has evolved over time, especially after 9/11.

42.    Section 702 of FISA mandates that a FISA warrant "may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States." This one sentence is incredibly important to the rubric of FISA 702. First, the target person (and their communications) must be outside of the United States. Moreover, a foreign

13

person cannot be targeted for FISA 702 collection when the actual, or even tangential, goal is to target a U.S. person. Finally, a foreign person cannot be targeted for FISA collection when the actual, or even tangential, goal is to target a person, regardless of nationality or citizenship, that is known to be in the United States.

43.     In addition to the arduous task of getting court approval for a FISA warrant, the recent Reforming Intelligence and Securing America Act builds in additional hurdles and safeguards to every FISA application.

44.     There are criminal and civil penalties for violations of FISA by law enforcement or intelligence agencies. The intended impact of criminalizing certain behaviors by law enforcement or the intelligence agency is to ensure compliance with the law and strike the balance between national security and lawful intercept. In addition to the legal penalties, the FBI has significant policies against FISA abuses carrying punitive results, to include termination.

45.     Based on my experience, Pegasus or similar software capabilities could be lawfully deployed in the United States by American law enforcement.

### *Lawful Surveillance Is Used by Individual States*

46.     Not every state allows for the lawful intercept of communications, like the federal Title III framework.  This is not to say that state law enforcement does not want or does not need the capability.  Quite to the contrary, states often partner with federal agencies on investigative operations precisely so they can harness the power of federal capabilities, to include communications intercept. Roughly 90% of all prosecutions take place at the county or state level. Most do not require sophisticated software or communications intercept technology, but certainly the most complex cases do.  It is my experience that any data or information from

communications by a defendant is incredibly helpful in a criminal investigation. Whether it is a recorded jail call, cell site location information, or a lawful communications intercept, the ability to use communications data or information in an investigation and subsequent prosecution is often vital to the success of the case. I have personally introduced such evidence successfully at trial and relied on such data or information to secure a conviction that withstood appeal.

47.    Most states follow a similar rubric to Title III in the lawful intercept of communications. Each state has a different process for approvals and application, but none that I reviewed are significantly different than the restrictions and requirements of a basic Title III intercept order. In Alabama, only the Alabama Law Enforcement Agency can engage in a wiretap. Police and sheriff departments cannot. In California, the state Attorney General or a District Attorney must affirm under oath that the probable cause developed regarding the predicate offense in the application is true and accurate. In New Jersey, the criminal offenses associated with intercepting communications do not apply to law enforcement so long as the capture is for a law enforcement purpose and lawful. Other states have similar restrictions, requirements, and predications.

### *Lawful Surveillance Is Used by Foreign Governments*

48.    The United States is not unique in allowing government agencies to make use of lawful-intercept technologies.

49.    Based on my experience working in the U.S. Department of Justice and independent research, I am aware that other nations have legal rubrics permitting law enforcement, military, or intelligence agencies to lawfully intercept communications. I am not an expert in the laws of any particular foreign nation, but I know that many foreign nations allow

15

for the lawful interception of communications, including electronic communications. Many of those jurisdictions impose requirements to obtain authorization for such interceptions, as does the United States.

50. A 1975 comparative study performed by staff at the Library of Congress, for example, suggests that the enactment of various wiretapping or electronic surveillance laws, as well as exceptions for lawful interception by law enforcement or authorized government agents, was widespread. The study indicates that Australia, Canada, France, the Federal Republic of Germany (i.e., West Germany), Great Britain, India, Italy, Japan, Mexico, Spain, and Sweden had all enacted some form of wiretapping or electronic surveillance laws while also allowing for lawful interception.

51. More recent sources (circa 2010) describe the laws of the United Kingdom, Australia, New Zealand, the United States, Canada, France, and The Netherlands as generally allowing the lawful interception of communications with prior judicial authorization. India also permitted the interception of telephonic conversations.

52. Another publicly available database compiled by Vodafone Group with support from Hogan Lovells provides information for at least fifty-seven counties. A sampling of those records, which were last updated between 2017 and 2022, indicates that the vast majority of those countries permitted law enforcement agencies or national security agencies to conduct lawful intercepts as of the date that the online database or relevant entries were last updated.

53. In my experience, the lawful interception of communications by a foreign nation state, such as a U.S. ally, can and has facilitated the protection of the United States.

### C.    MODERN SURVEILLANCE TOOLS ARE SIMILAR TO OLDER LAWFUL INTERCEPT TOOLS

54.    Pegasus or software tools like it are the natural evolution of lawful intercept tools. While the new tools take advantage of new technology, the functions remain similar to late 20th century technology – intercepting communications being sent and received, seizing information in the target's possession, and conducting audio and video surveillance.

55.    Over time, however, the technologies being deployed by bad actors have changed. When Title III became law, American law enforcement didn't have the internet or software applications on cell phones.  Even when we passed the PATRIOT Act, we did not have the technology we have today.  Then, we had BlackBerrys.  Now we have advanced computers in our phones with a variety of applications with powerful capability and end-to-end, or zero access, encryption.

56.    Criminal organizations, foreign terrorist organizations, and domestic terrorists or organizations are deploying more sophisticated means by which they plan and execute their nefarious activities. The use of these increasingly sophisticated means of communication by criminal and terrorist organizations is designed exclusively to avoid detection or capture by law enforcement and intelligence agencies. These criminal and terrorist groups have been enabled by software companies, application developers, and even hardware corporations due to readily available encryption capabilities.  End-to-end encryption ("E2EE") allows for messages to become indiscernible in transit between communication devices.  This poses a great challenge for the lawful intercept of communications. E2EE is available on something as simple as any iOS platform or with certain applications subscribed to by the end-to-end users.

17

57.     Moreover, mobile devices contain a great deal of data that are often protected by strong encryption or cryptographic measures. As a practical matter, this makes the seizure of a locked cellular device or tablet a useless collection.  Without the ability to view the data and information contained on a device, the seizure accomplishes very little.

58.     There is perhaps no better example of the encumbrances posed by tech companies than the 2015 terrorist attack in San Bernardino, California.  There, two terrorists (Syed Rizwan Farook and Tashfeen Malik) murdered fourteen people and injured nearly two dozen others during a meeting at an office holiday party at the Inland Counties Regional Center in San Bernardino, California.  This remains as one of the deadliest mass shootings in American history. It immediately became clear to law enforcement that this attack was inspired or motivated by foreign terrorist organizations' propaganda.

59.     Not knowing if other perpetrators were involved in this terrorist attack, or whether future attacks loomed, the FBI attempted to exploit immediately the cellular device of Farook's phone. Unfortunately, despite the phone belonging to the county government, which gave its full consent to search the phone, the FBI was unable to secure assistance from Apple, Inc. to successfully exploit the information within that device.  The lawful exploit of the communications and information on Farook's phone was not the subject of any Fourth Amendment constraints for a variety of reasons. The FBI sought, and was granted, a court order that mandated that Apple, Inc. provide the FBI with the ability to access the phone.  Apple, Inc., despite the possibility of imminent future terrorist attacks in the United States, refused to cooperate and provide any meaningful technical assistance, clinging instead to an internal policy. Apple, Inc. sought to challenge the court order (and ensuing court orders).  The litigation ceased

after the FBI used sophisticated third-party software to fully exploit the phone. But for the existence and deployment of the sophisticated software, the FBI may not have ever been able to inspect the contents of a terrorist's device.

60.     End to end encryption has also more recently foiled the FBI's attempts to investigate the attempted assassination of former President Trump.  As publicly reported, Thomas Matthew Crooks was killed by a Secret Service counter-sniper team after firing at least eight shots toward the stage during a July 13 campaign rally in Butler, Pennsylvania.  The FBI was able to break into Crooks' smartphone using technology from Israeli intelligence company Cellebrite, but has not been successful in accessing his encrypted messages on three messaging services.  FBI Director Christopher Wray testified recently before the House Judiciary Committee that investigators still have no firm grip on Crooks' motive or ideology. "This has unfortunately become very commonplace," he said. "It's a real challenge not just for the FBI but for state and local law enforcement all over the country."

61.     By allowing communications to occur on encrypted platforms without giving law enforcement or intelligence officials the ability to decrypt the communications, applications like WhatsApp, Signal, and Telegram enable criminals and terrorists to discuss their illegal, and often deadly schemes without fear of detection. The secrecy provided by these applications allows wrongdoers to commit all kinds of nefarious conduct, including child abuse and other violent crimes, financial crimes, and terrorism.

62.     Lawful access to devices, and the data or communications and information contained within them, is imperative to public safety and national security.  The use of widespread and increasingly sophisticated encryption technologies significantly impairs, or

entirely prevents, many serious criminal and national security investigations, including those involving violent crime, drug trafficking, child exploitation, cybercrime, and domestic and international terrorism. Criminals and terrorists cannot be allowed to control whether they can be lawfully surveilled, to the detriment of both national security and public safety.

63.     This is exactly why sophisticated communications intercept technology is necessary and just the natural extension of current, sometimes outdated, lawful interception methods.  Criminals and criminal organizations are communicating with increasingly sophisticated software and methods.  Foreign terrorist organizations are communicating with increasingly sophisticated software and methods. It would be an affront to national security and public for law enforcement and the intelligence community to be unable to counter the technologies deployed by criminals and terrorists.

64.     The next generation of lawful intercept must be able to continue collecting the types of data previously available to law enforcement and allow for the collection of new data streams, while also overcoming the currently deployed generation of criminal activities and threats to national security. I have reviewed materials summarizing the capabilities of NSO's Pegasus technology, and it appears designed to capture more traditional forms of communications or information (e.g., written communications, the content of audio calls, the content of conversations within range of an activated microphone, call logs, location data, etc.), while also providing law enforcement access to new data streams (e.g., text and social media messages, browsing history, installed applications, Wi-Fi networks, etc.).  Such advanced software can be further fortified by advanced analytics software, able to correlate the data into discernible intelligence in nanoseconds.  Pegasus and similar software intended to combat the

proliferation of E2EE are simply logical extensions of existing lawful-intercept tools. Criminal and terrorist elements continue to evolve the sophistication of their communications to avoid detection and law enforcement and the intelligence community must outpace this evolution technically.

###    D.    INTERCEPT TECHNOLOGIES SUCH AS PEGASUS PROVIDE ENORMOUS PUBLIC BENEFITS

65.    In my experience, the successful uses of lawful-intercept technologies are rarely publicized, due to the confidential and highly sensitive nature of the law enforcement, antiterrorism, or intelligence investigations in which they are used.

66.    Based on public reports, however, there are obvious benefits to next-generation lawful intercept technologies, including Pegasus.

67.    One publicly known success is the reported use of Pegasus by the Mexican government to capture Joaquin Guzman, better known as El Chapo.  Guzman was the leader of the Sinaloa Cartel, one of the deadliest criminal organizations on the planet.  The Sinaloa Cartel, with which I have experience, is responsible for the deaths of hundreds of thousands of people worldwide by its hand or by its distribution of synthetic narcotics, including fentanyl and others. Guzman had evaded or escaped from Mexican authorities for decades, building his drug empire all the while.  In 2016, Guzman was captured and extradited to the United States.  The United States Attorney's Office for the Eastern District of New York handled the prosecution and charged Guzman with multiple counts of drug trafficking, distribution, murder, and other charges.  He was convicted on all counts and is serving a "life plus 30" prison sentence at the ADX facility in Florence, Colorado. But for Pegasus software or some other tool with similar capabilities, it is unlikely that the Mexican authorities would have been able to determine the

whereabouts or locations of Guzman and his associates. According to public information, such crime intelligence was useful in the capture, prosecution, and conviction of El Chapo.  While the United States did not deploy Pegasus, the United States certainly was a direct beneficiary of its deployment.  Among other examples, Pegasus was reportedly used to track Israeli hostages held by Hamas, and European authorities have deployed Pegasus to combat terrorism, organized crime, and a global child-abuse ring.

### *Pegasus Has Been Used by Countries Throughout the World*

68.    There are reports that Pegasus software has been sold and deployed in several countries throughout the world, to include Five Eyes nations that regularly share signals intelligence with the United States.  The use of Pegasus by those nation states is presumably within the boundaries of the intercept laws in that nation.

### E.    SOME VENDORS PLACE DISCRETIONARY RESTRICTIONS ON THE USE OF SURVEILLANCE TECHNOLOGY

69.    The legal strictures for the lawful interception of communications are onerous and complex in a normal circumstance. In addition, there are ethical and end-user restrictions in software licensing agreements imposed by responsible software and analytics platform companies. These restrictions often require some combination of ethical use of the software, legitimate end-user or use case purpose, and compliance with legal and international norms, guidance, and policies. These additional standards of use by the end user imposed by the seller of a Software-as-a-Service (SaaS) or Platform-as-a-Service (PaaS) create additional compliance hurdles for the users of the software or platform.  The end user licensing agreements (EULA) of certain software or platforms impose user conditions and restrictions and any violation of the EULA can, and often does, result in discontinued licensing of use of the software or platform.

70.     For example, the U.S. Federal Bureau of Investigation obtained a license for and tested NSO's surveillance technology in criminal investigations, according to authorized public sources.  The FBI was required to certify that the tool would be used only to collect data from mobile devices for the prevention and investigation of crimes and terrorism, in compliance with privacy and national security laws.  That is an example of an end-user licensing agreement that restricts the end-user's authorized use of the tool.

71.     Recognizing that many uses cases involve counter-intelligence and counter-terrorism purposes, the United Nations publishes international standards for human rights articulated in the United Nations Guiding Principles on Business and Human Rights ("UNGPs"), the Organization for Economic Cooperation and Development Guidelines for Multinational Enterprises, and the Counter Terrorism Legal Training Curriculum. These guiding principles are not mandated by law, but they encourage compliance from both developers and end-users and require a minimization of risk of abuse.

72.     Refusal to provide a license to a government or an end-user that poses a high risk of misuse is an appropriate due diligence effort by the developer.  The mitigation of any proven violations should also be continuous and, when justified, result in removing the end-user's permission to use the tool.

73.     Violations may be difficult for vendors to discover, such as covert use of the technology for unauthorized purposes, because government agencies are unwilling to identify the targets of national security or other covert investigations. Inserting contractual limitations on access controls, use cases, and targets of deployment are also common mitigation measures for ethical vendors committed to ensuring the lawful use of software or platforms.  Another such

measure would be requiring a customer's cooperation in any investigation of potential misuse, with suspension or disconnection of service as a consequence of failure to cooperate.

Executed August 30, 3024.

Jay E. Town

_____

Jay Town

**APPENDIX I**



# Jay E. Town

**Vice President & General Counsel,
Gray Analytics
Former United States Attorney,
Northern District of Alabama**

---

## EDUCATION

**UNIVERSITY OF NOTRE DAME**                                    South Bend, Indiana

B.A., *Government & International Relations* – 1995

**SETON HALL UNIVERSITY SCHOOL OF LAW**                   Newark, New Jersey

Juris Doctor – 1998

**BAR MEMBERSHIPS**

United States Supreme Court, 2012; Alabama, 2005; New Jersey, 2002; Indiana, 1998

## PROFESSIONAL EXPERIENCE

**GRAY ANALYTICS, INC.**                                    Huntsville, Alabama

**Vice President & General Counsel, 2020-Present**

o Provide legal and corporate governance advice directly to the President and Chief Executive Officer on vast array of legal and contractual issues, to include personnel matters, prime contract vehicles, contract and non-disclosure agreement reviews, and other risk management concerns that arise in a corporate environment.

o Provide corporate legal advice to senior executives regarding myriad legal and contractual issues, to include, but notwithstanding, review of government contracts, commercial subcontracts, nondisclosure agreements, commercialization agreements, FAR and DFARS issues, procurement integrity, human resources issues, and other legal realities of corporate governance.

o Develop business for the full spectrum of the suite of services offered by Gray Analytics, to include ATHENA.i™: Advanced Analytics for Law Enforcement, cyber security and maturity services, monitoring services abating against organization conflicts of interest for corporate mergers and acquisitions, internal investigations for companies experiencing breach, disruption, or criminal activities, digital forensics, and other technical services provided by Gray Analytics.

1 (Jay E. Town)

- o Project lead for ATHENA.i™: Advanced Analytics for Law Enforcement solution, which is a data correlation framework solution designed for local, state, and federal law enforcement and intelligence agencies which harnesses the capabilities of artificial intelligence, machine learning, and large language modeling.

- o Manager of company projects ranging from advanced analytics for federal and state law enforcement, AI/ML projects, cyber security, and corporate and internal investigations, including performance oversight of employees and staff.

- o Engage in marketing efforts for Gray Analytics involving various subject matters, related and unrelated to the corporate mission, which include the conduct of interviews with print, radio, and television media, penning of opinion pieces, drafting of law review articles, and other outreach on behalf of Gray Analytics.

**U.S. ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ALABAMA** Birmingham, Alabama

**United States Attorney, 2017-2020**

- o Nominated by President of the United States Donald J. Trump on June 12, 2017, to serve as the chief federal law enforcement officer in the Northern District of Alabama.

- o Confirmed by the United States Senate by unanimous vote on August 3, 2017, to serve as U.S. Attorney for the Northern District of Alabama and sworn in on August 11, 2017.

- o Oversaw all federal criminal prosecutions in the Northern District of Alabama, setting prosecutorial records, especially as the prosecutions related to crime guns and illegal firearms, in 2017, 2018, and 2019.

- o Coordinated with local, state, and federal law enforcement, to include Alabama District Attorneys and the Alabama Attorney General, to ensure the criminal prosecution of repeat and career offenders in the jurisdiction that offered the greatest sanction.

- o Coordinated and provided oversight to lawful communication interceptions under Title III of the Omnibus Crime Control and Safe Streets Act and the Foreign Intelligence Surveillance Act. Coordination was by and between multiple federal agencies or other United States Attorneys Offices. Law enforcement activities were often coordinated between multiple local, state, and federal agencies.

- o Coordinated and provided oversight on the prosecution of complex criminal activities and conspiracies to engage in terrorist activities, dealing with multiple agencies and jurisdictions.

- o Oversaw and managed all federal civil litigation involving the United States in the Northern District of Alabama, to include, but notwithstanding qui tam actions, false claims, procurement fraud, health care fraud, bankruptcy, civil defense, and civil rights violations.

- o Managed both the Birmingham Headquarters Office and Huntsville Branch Office, collectively consisting of over 120 full time and part time employees, while also setting the investigative priorities for all of the federal law enforcement agencies operating in the Northern District of Alabama, to include the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Marshals Service (USMS), Department of Homeland Security (DHS/ICE), United States

2 (Jay E. Town)

Secret Service (USSS), United States Postal Inspectors Service (USPIS), and various other agencies and Offices of Inspectors General.

o   Oversaw and managed all federal criminal investigations, grand jury investigations, and resulting prosecutions involving violations of federal criminal laws, to include, but notwithstanding, career violent offenders, health care fraud, mail fraud, wire fraud, kidnapping, illegal firearms, organized crime, illegal narcotics possession and trafficking, human trafficking, procurement integrity, illegal immigration./reentry, and criminal civil rights offenses.

o   Oversaw and managed an annual of budget of $13 million, to include accounting for expenditures ranging from personnel, infrastructure, government travel.

o   Hired dozens of prosecutors and staff after an intensive vetting process that coordinated with a hiring committee, the Executive Office for U.S. Attorneys, and the Department of Justice.

o   Served as Chairman, President's Commission on Law Enforcement and the Administration of Justice Subcommittee on Criminal Justice System Personnel Intersection, which coordinated, led, and managed a national effort to improve the criminal justice system in the United States. This Presidential Commission was the first of its kind in over fifty years.

o   Served as Chairman, Servicemembers & Veterans Rights Subcommittee to the Attorney General's Advisory Committee, which led all Department of Justice initiatives and protection measures relating to current, former, and future members of the Armed Forces.

o   Served as Member, Management, Personnel, & Performance Subcommittee to the Attorney General's Advisory Committee, which oversaw all expenditures within the Department of Justice and proposed new infrastructure, software, and personnel initiatives to be ultimately considered by the Attorney General of the United States.

Served as Member, Law Enforcement Coordination Subcommittee to the Attorney General's Advisory Committee, which oversaw all initiatives in support of local, state, and federal law enforcement, to include grant funding, training, and policy expansions.

o   Member, Attorney General's Violent Crime Reduction Coordination Committee, which coordinated and promulgated nationwide crime fighting measures such as Project Safe Neighborhoods and Project Guardian, serving as the lone United States Attorney on the committee.

o   Member, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) National Crime Gun Intelligence Governing Board which coordinated, promulgated, and promoted ATF initiatives across the nation, to include the National Integrated Ballistic Information Network (NIBIN), Crime Gun Intelligence Centers, and the National Correlation & Training Center.

o   Recipient of 2020 Project Safe Neighborhoods Crime Reduction Program of the Year for creating the Prosecutor-to-Prosecutor Program (P3), which developed a system for state and federal prosecutors to share crime intelligence and make prosecutorial decisions that served to reduce crime, especially violent crime, in the Northern District of Alabama.  The P3 Program is now nationally renowned crime reduction program having been implemented in several U.S. Attorney districts across the country.

3 (Jay E. Town)

**MADISON COUNTY DISTRICT ATTORNEY'S OFFICE**   Huntsville, Alabama

  **State Prosecutor (Assistant District Attorney)**, 2005 to 2017

- o Investigated, managed and ultimately prosecuted cases involving every aspect of criminal prosecution, to include capital murder, murder, robbery, fraud, theft, embezzlement, narcotics possession/distribution and burglary.  Case load ranged from 800-1000 cases per year.

- o Prosecuted violent crimes and other felonies before dozens, if not scores, of juries as both lead and assistant (second chair) counsel.

- o Legislative liaison for the Alabama District Attorneys Association, working in concert with the Alabama Office of the Attorney General and District Attorneys from across the State of Alabama, responsible for the identification and drafting of statewide laws impacting the Alabama criminal justice system, including, but notwithstanding, the Fair Justice Act, Victims Bill of Rights and Jurors Bill of Rights.

- o Primary prosecutor charged with assisting the District Attorney in managing the operation of the Madison County District Attorney's Pretrial Intervention Program, to include the drafting of the policies governing the program, providing explanations to attorneys and judges about the parameters of the program and overseeing the employees who handle daily operations.

- o Prosecuted thousands of criminal charges and defendants since 2005 managing one of the largest caseloads in the State of Alabama, securing convictions in each jury trial for charges ranging from Capital Murder to Robbery, Assault, Burglary or Theft.

- o Teach Continuing Legal Education courses for both prosecutors and attorneys from across the State of Alabama regarding criminal procedure, updates in criminal law, advances in Alabama appellate processes and practical usage 4th, 5th and 6th Amendment issues in the prosecution of myriad types of crimes.

- o Conduct and organize various seminars for members of law enforcement, to include training regarding organized crime, white collar crime, joint task force investigations, criminal procedure as it relates to search and seizure, criminal procedure as it relates to arrests and interrogation and advances in law enforcement technology and investigation techniques.

  Prosecutorial duties include managing every facet of prosecution from inception through trial/plea, research and drafting of innumerable motions, conducting fact investigations, drafting procedural motions, developing grand jury investigations, preparing witnesses for testimony at trial, and developing prosecution strategy.

- o Developed and instituted the first ever Veterans Treatment Court in Madison County with a sitting Circuit Court Judge which diverts from prosecution veterans in need of veterans services in an effort to strengthen and embolden each participant's value to the community.

**MCELROY, DEUTSCH, MULVANEY& CARPENTER, LLP**  Morristown, New Jersey

**Firm Associate**, 2002 to 2005

- o Provided global legal advice as outside general counsel for Fortune 500 companies such as Johnson & Johnson, Raytheon, AT&T, Bristol Myers Squibb and Bayer Pharmaceutical regarding issues ranging from federal criminal investigations, FDA issues, class action suits, contract claims and private civil suits.

4 (Jay E. Town)

o   Served as counsel to companies and individuals being investigated by various United States Attorney's Offices, to include the District of New Jersey, managing and assisting in every aspect of those cases throughout the investigative process, assessing and analyzing evidence related to the cases and preparing for litigation.

o   Investigated and managed cases involving complex commercial litigation, surety, labor & employment law, white collar criminal defense and insurance defense litigation in federal and state courts.

o   Lead a large team of associates, paralegals and legal assistants in the defense of a large pharmaceutical and commercial medial company overseeing attorneys and all staff in the review and distribution of requested materials to federal authorities.

o   Responsibilities included managing all aspects of litigation from inception through trial, research and drafting of appellate briefs and dispositive motions, conducting fact investigations and depositions, drafting procedural motions, preparing witnesses for testimony at trial and deposition, and developing litigation strategy involving both civil and criminal practice.

o   Defended myriad white collar criminal allegations and issues to include, but notwithstanding, corporate fraud, insurance fraud, health care fraud, conspiracy and Racketeering.

o   Primary industries represented were major pharmaceutical companies, household consumer corporations and insurance/surety companies.

**UNITED STATES MARINE CORPS - Judge Advocate (Rank: Major/O-4)**

**Operational Lawyer**, Headquarters Marine Corps, Washington, D.C.        Mar '04 to Apr '08

o   Conducted and reviewed investigations directly for the Staff Judge Advocate to the Commandant of the Marine Corps regarding myriad issues, occurrences and incidents involving Marines in the Global War on Terror.

o   Advised deploying Commanders on operational legal readiness, rules of engagement, laws of armed conflict, military justice, criminal/administrative investigations, and myriad other legal issues associated with deployment to, and conduct of operations within, a theater of war.

o   Primary responsibilities were to investigate and report various tactical failures and command "lessons learned" at command and joint command levels, to include review of administrative and criminal investigations of misconduct occurring in both Iraq and Afghanistan theaters of war.

o   Provided pre-mobilization and pre-deployment legal assistance to commands and their judge advocates in order to ensure operational readiness and enhance deployment capabilities.

o   Coordinated with military intelligence to operationalize strategy and commander's intent, to include SIGINT.

**Trial Counsel**, 1st Force Service Support Group, Camp Pendleton, California Nov '00 – Aug '02

o   Investigated and prosecuted over 300 cases in the busiest legal section in the entire DOD at the infamous Legal Team Echo.

o   Secured convictions in each of my nearly two dozen special and general courts-martial.

5 (Jay E. Town)

- o Secured convictions or separation in countless Summary Court Martials and Administrative Separation matters.
- o Range of cases includes conspiracy to commit murder, rape, indecent acts, felony larceny, obstruction of justice, child sexual abuse, narcotics distribution, assault & battery, extortion, and unauthorized absence.

**Deputy Staff Judge Advocate**, 1st Marine Aircraft Wing, Okinawa, Japan, Oct '99 – Nov '00

- o Advised Commanding Generals and all subordinate commanders on military justice, environmental law, ethics, criminal/administrative investigations, operational law, and Status of Forces Agreements.
- o Directed commanders and troops on the rules of engagement and handling of enemy prisoners of war during pre-deployment and while deployed in the Pacific Theater of Operations.
- o Trained deploying marines on the tactical advantages of the laws of armed conflict as they related to various exercises and operations.
- o Coordinated training with military intelligence, to include SIGINT and HUMINT, during various Wing and joint exercises.

**UNIVERSITY OF ALABAMA-HUNTSVILLE – Adjunct Professor**

**UAH Adjunct, Department of Political Science**, 2009 to 2011

- o Professor of Political Science for undergraduate and graduate studies.
- o Instructor in courses regarding laws of armed conflict, modern warfare, executive war powers, congressional war powers and all aspects of the Hague and Geneva Conventions.
- o Developed all course and lecture materials, to include drafting of examinations, syllabuses and course outline materials.
- o Organized and conducted guest speaking appearances on relevant contemporary subject matter.

# CHARITABLE & PHILANTHROPIC EXPERIENCE

**CONGRESSIONAL MEDAL OF HONOR FOUNDATION**        Mt. Pleasant, South Carolina

- o Director, Foundation Board of Directors (2014 to Present), responsible for the fiduciary oversight of the operation of the Foundation, a 501(c)3 charitable organization, to include management of the President/CEO, asset accountability and program development.
- o Emeritus Director to the Foundation, having been voted as such by all sitting directors to the seat after being forced to resign all charitable boards when accepting my appointment as United States Attorney in 2017.

  Member of the Foundation Executive Committee providing overall guidance to the Chairman and other Executive Committee members regarding the direction of the organization, to include managing a budget and endowment in excess of $10m annually, developing and monitoring programming in all 50 states and continually engaging national outreach with various governmental and charitable organizations regarding those values that endow the Medal of Honor.

6 (Jay E. Town)

- o Chairman, Audit Committee, charged with overall review of the financial stability and health of the Foundation's assets and expenditures with full reporting requirements to the Board at large.

- o Former Chairman, Foundation's Executive Council, charged with conduct of development and projects as directed by the Board of Directors which included the draft of a Strategic Plan for the nationwide rollout of the Foundation's Character Development Program, a teaching resource for educators currently being implemented in schools nationwide.

- o The Congressional Medal of Honor Foundation is a national organization and Board works in concert with all living recipients of the Medal of Honor to ensure that programs and necessary outreach are developed to ensure that the legacy of the Medal and those values that endow the Medal of Honor remain a focal point of social consciousness and educational trust.

- o Hosted the "*Medal of Honor Gala*: In the Company of Heroes" in 2010 which was the largest assembly of Medal of Honor recipients ever in the history of the State of Alabama and raised nearly a half-million dollars that went toward the Foundation's Character Development Program.

**AMERICA'S WARRIOR PARTNERSHIP**                                            Augusta, Georgia

- o Emeritus Director (2022 to Present), continue to advise the Board of Directors and AWP personnel regarding mission specific goals and projects.

- o Director, Vice Chairman and Executive Committee Member, Augusta Warrior Project Board of Directors (2013 to 2022), responsible for the fiduciary oversight of the operation of AWP, a 501(c)3 charitable organization, to include liaising and partnering with the Wounded Warrior Project, The Bob Woodruff Foundation, myriad federal and state agencies and several other national veterans organizations.

- o Emeritus Director, having been voted by all sitting directors to the seat after being forced to resign all charitable boards due to a Presidential internal rule when accepting my appointment as United States Attorney in 2017.

- o Implement and expand the national scope and outreach of AWP's "Community Integration Program" which is the national leader in the holistic integration of veterans services in communities nationwide to provide for a more comprehensive approach to veterans care and caregiver support.

- o The Augusta Warrior Project is a national organization and Board with the primary mission is reduction of veteran suicide and consolidating veterans' services in large population centers so that veterans are ensured full beneficiary of all services, benefits and programs available, to include services from private, state, federal and defense department organizations.

- o Created and national standardized Veterans Treatment Court model and handbook, in collaboration with several veterans services organizations and the American Bar Association, which allows any jurisdiction to attain this model free of charge and easily implement a Veterans Treatment Court program with full explanation of roles and responsibilities of all parties.

7 (Jay E. Town)

**BOYS & GIRLS CLUBS OF NORTH ALABAMA**                    Huntsville, Alabama

- o  Director, Boys & Girls Clubs of North Alabama Board of Directors (2006 to 2015), responsible for the financial and fiduciary oversight of this 501(c)3 charitable organization.

- o  Served as Chairman of the Board (2007-09) and Vice Chairman of the Board (2006-07), managing all directors and direction of board meetings, programming and employee oversight, to include the management of a $5m budget.

- o  Served on the Board of Directors faithfully since 2006 until being nominated and elected as the Vice Chairman-Chairman Elect.

- o  Delegated authority to Executive Committee members, Board members and staff to accomplish the daily, monthly and annual goals of the Clubs.

- o  The Boys & Girls Clubs of North Alabama is a regional organization and Board in service to youth.


**PUBLICATIONS & SCHOLARLY ARTICLES**

- **Law Review Articles**

  - o  *Counting Heads: The Decennial Census and Adjustments to Enumeration*, Notre Dame Law Review Reflection, Vol. 96, Issue 3, Article 1 (2021), University of Notre Dame School of Law.

    - ▪  https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=1092&context=ndlr_online

  - o  *The Digital Person: Law Enforcement & The Purchase of Data in a Post-Carpenter Age*, Belmont Law Review, Vol. 11, Issue 1 (2023), Belmont University School of Law.

    - ▪  https://repository.belmont.edu/lawreview/vol11/iss1/1/

- **Published Opinion Articles**

  - o  Harris is the Original Soros Prosecutor, Washington Times, August 5, 2024

    - ▪  https://www.washingtontimes.com/news/2024/aug/5/harris-is-original-soros-prosecutor/

  - o  *Here's what Biden admin, cheerleading media get wrong on crime stats*, Fox News Opinion, June 27, 2024

    - ▪  https://www.foxnews.com/opinion/biden-admin-cheerleading-media-wrong-crime-stats

  - o  *The reauthorization of FISA 702 was vital to national security*, Yellowhammer News, May 2, 2024

    - ▪  https://yellowhammernews.com/former-u-s-attorney-jay-town-the-reauthorization-of-fisa-702-was-vital-to-national-security/

  - o  *New York's Prosecution of Trump Is The Perfect Lawfare Prosecution – An Anything But Perfect*, The Daily Caller, April 18, 2024

8 (Jay E. Town)

- - https://dailycaller.com/2024/04/18/jay-town-new-yorks-prosecution-of-trump-is-the-perfect-lawfare-prosecution-and-anything-but-perfect/
  - *Why The Perception That Crime Is Rising Persists*, www.TheDispatch.com, April 8, 2024
    - https://thedispatch.com/article/why-the-perception-that-crime-is-rising-persists/
  - *Clean energy supply chain threatens national security*, www.256Today.com, September 6, 2022
    - https://256today.com/clean-energy-a-threat-to-national-and-economic-security/
  - *The Profile Puzzle: Putting together the pieces before an active shooter attack*, Yellowhammer News, June 4, 2022
    - https://yellowhammernews.com/the-profile-puzzle-putting-together-the-pieces-before-an-active-shooter-attack/
  - *The Profile Puzzle: Putting together the pieces before an active shooter attack*, www.256Today.com, June 2, 2022
    - https://256today.com/the-profile-puzzle-putting-together-the-pieces-before-an-active-shooter-attack/
  - *The fatal overdose: An American tragedy*, www.256Today.com, May 26, 2022
    - https://256today.com/the-fatal-overdose-an-american-tragedy/
  - *China Exploiting Supply Chain Vulnerabilities*, National Defense Magazine, December 9, 2020
    - https://www.nationaldefensemagazine.org/articles/2020/12/9/china-exploiting-supply-chain-vulnerabilities
  - *Let Trump Be Trump*, www.AL.com, November 21, 2016
    - http://www.al.com/opinion/index.ssf/2016/11/let_trump_be_trump_our_enemies.html
  - <u>**Note**</u>: I have compiled this list of published opinion articles to the best of my capability and recollection. It is entirely possible, if not likely, that additional articles were published but are not referenced here.

## ACHIEVEMENTS AND HONORS

**Department of Justice Project Safe Neighborhoods Program of the Year**, 2020

**Keynote Speaker**, Various Charitable & Government Events, 2016 to Present

**Alabama Republican Rising Star,** Alabama GOP presented by Chairman Bill Armistead, 2013

**D.A.R. Medal of Honor** (Nat'l Soc. of the D.A.R. (Hunt's Spring Chapter) May 5, 2011

**Young Professional of the Year Finalist** (Huntsville/Madison Co. Chamber of Commerce) 2008

**Global War on Terror Service Medal**    (Active Reservist during GWOT) October 1, 2005

**Armed Forces Reserve Medal**    (Active Reservist during time of war) October 1, 2005

**Navy and Marine Corps Commendation Medal**    (Personal Performance) December 10, 2002

**National Defense Medal**    (Active military service post 9/11) September 11, 2001

9 (Jay E. Town)

**Navy and Marine Corps Achievement Medal (**Performance as Trial Counsel) June 24, 2001

**Navy and Marine Corps Achievement Medal (**Performance as Deputy SJA) October 26, 2000

**Dates of Rank:** Major, Oct. 6, 2006; Capt, Aug. 1, 2000; 1stLt, Aug. 15, 1998; 2ndLt, Aug. 15, 1996

**Honorable Discharge:**  April 1, 2008

10 (Jay E. Town)

**APPENDIX II**

**LIST OF INFORMATION CONSIDERED**

**JUDICIAL DECISIONS**

- New York Times v. U.S. Dep't of Justice, 22-cv-1539 (JSR) (S.D.N.Y. July 7, 2023)

- FBI v. Fazaga, 142 S.Ct 1051 (2022)

- United States v. Moalin, 10cr4246 JM (S.D. Cal. Aug. 4, 2021)

- Carpenter v. United States, 138 S. Ct. 2206 (2018)

- Riley v. California, 573 U.S. 373(2014)

- United States v. Jones, 565 U.S. 400 (2012)

- United States v. Gonzalez, Inc., 412 F.3d 1102 (9th Cir. 2005)

- Kyllo v. United States, 533 U.S. 27 (2001)

- United States v. Knotts, 460 U.S. 276 (1983)

- Smith v. Maryland, 442 U.S. 735 (1979)

- United States v. Donovan, 429 U.S. 413, (1977)

- Camara v. Mun. Ct. of City and Cnty. of San Francisco, 387 U.S. 523, 528 (1967)

- Katz v. United States, 389 US 347 (1967)

- Olmstead v. United States, 277 US 438 (1928)

**LAWS**

- 18 U.S.C. §119

- 18 U.S.C. §1030, et seq

- 18 U.S.C. §2510, et seq

- 34 U.S.C. §10101, et seq

- 47 U.S.C. §302a, et seq

- 47 U.S.C. §1001, et seq

- 50 U.S.C. §1801, et seq

- Alabama Stat. §20-2B-2, et seq

- California Penal Code 502, et seq

- California Penal Code 629.50, et seq

- New Jersey Stat. §2A:156A-4, et seq

**POLICIES AND GUIDANCE**

- Justice Manual, Title 9-7.000, U.S. Department of Justice,

  https://www.justice.gov/jm/justice-manual

- Jammers, Federal Communications Commission,

  https://www.fcc.gov/enforcement/areas/jammers

- Executive Order, President Joe Biden, March 27, 2023.

  https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet-

  president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial-

  spyware-that-poses-risks-to-national-security/

**SCHOLARLY PUBLICATIONS AND TREATISES**

- Comparative Study on Wiretapping and Electronic Surveillance Laws in Major Foreign

  Countries, Members of Staff, Law Library, Library of Congress (1975)

- Exploring Lawful Hacking as a Possible Answer to the "Going Dark" Debate, Carlos Liguori,  Michigan Technology Law Review, University Michigan School of Law, 2020 Volume 5, https://search.app/s8qA4j2F4hFiv2qPA

- Design and implementation of a looking-forward Lawful Interception architecture for future mobile communication systems, Ingrid Huso, et al., Science Direct, Computer Networks Volume 249, July 2024, https://www.sciencedirect.com/science/article/pii/S1389128624003505?dgcid=rss_sd_all

- The Aftermath of Carpenter: An Empirical Study of Fourth Amendment Law, Matthew Tokson, 135 Harv. L. Rev. (2022), https://harvardlawreview.org/wp-content/uploads/2022/04/135-Harv.-L.-Rev.-1790.pdf

- Lawful Hacking: Using Existing Vulnerabilities for Wiretapping on the Internet, Steven M. Bellovin, et seq., Journal of Technology and Intellectual Property, Northwestern University Pritzker School of Law, 2014, Volume 12, Issue 1, https://scholarlycommons.law.northwestern.edu/njtip/vol12/iss1/1/

- Electronic Surveillance and Conversations in Plain View: Admitting Intercepted Communications Relating to Crimes Not Specified in the Surveillance Order, John D. LaDue, Notre Dame Law Review, University of Notre Dame School of Law, Volume 64, Issue 3, Article 3, 1999, https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=2155&context=ndlr

- Not a Suicide Pact: The Constitution in a Time of National Emergency, Richard A. Posner, Oxford University Press, 2006.

- 1 World Online Business Law, Chapter 7: Technology Surveillance

- Country Legal Framework Resources, Provision of Real-time Lawful Interception Assistance, https://clfr.globalnetworkinitiative.org

**DOCUMENTS PRODUCED IN THIS LITIGATION**

- Complaint Exhibit 10
- FPM-00021846
- NSO_WHATSAPP_00000078
- NSO_WHATSAPP_00000262
- NSO_WHATSAPP_00045591

**OTHER MATERIALS**

- NSO Group, Transparency and Responsibility Report (2023), https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf
- Israel Taps Blacklisted Pegasus Maker to Track Hostages in Gaza, https://www.bloomberg.com/news/articles/2023-10-26/israel-taps-blacklisted-pegasus-maker-nso-to-track-gaza-hostages-and-hamas
- Internal Documents Show How Close the F.B.I. Came to Deploying Spyware, https://www.nytimes.com/2022/11/12/us/politics/fbi-pegasus-spyware-phones-nso.html, and linked materials therein obtained by the New York Times through Freedom of Information Act requests
- The Battle for the World's Most Powerful Cyberweapon, https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html
- https://www.justice.gov/nsd/media/1350236/dl?inline

- Telegram Founder's Indictment Thrusts Encryption Into The Spotlight, New York Times, Aug. 29, 2024, https://www.nytimes.com/2024/08/29/technology/telegram-encryption-pavel-durov.html
- https://therecord.media/encrypted-apps-a-challenge-trump-assassination-attempt-wray-fbin