| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)<br>  *jakro@kslaw.com*<br>AARON S. CRAIG (Bar No. 204741)<br>  *acraig@kslaw.com*<br>KING & SPALDING LLP<br>633 West Fifth Street, Suite 1600<br>Los Angeles, CA 90071<br>Telephone: (213) 443-4355<br>Facsimile: (213) 443-4310<br><br>Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED |
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>  v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>            Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF COL. TY M. SHEPARD (RET.) IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

DECLARATION OF COL. TY M. SHEPARD (RET.)       Case No. 4:19-cv-07123-PJH

I, Col. Ty M. Shepard, declare as follows:

1. I retired from the United States Army in May 2023 and from the California Military Department in May 2024. During my tenure in the military, I held a number of positions relating to cybersecurity and cyberoperations. Most recently, that included serving as the Cyber Operations Director for the California Military Department from 2018 to 2023. I have personal knowledge of the facts in this declaration, and I could and would testify competently to these facts if called as a witness.

2. I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to offer testimony based on my experience, including with the use of surveillance technology in military and intelligence operations.

3. In connection with my engagement, I considered a variety of government, industry, and media publications, as well as certain documents produced in this litigation.

4. I then prepared a report setting forth (among other things) my qualifications, my opinions, the basis and reasons for my opinions, and the facts and data that I considered when forming my opinions.

5. Attached as **Exhibit A** is a true and correct copy of the report that I prepared, dated August 30, 2024.

6. I affirm that the information, statements, and opinions set forth in Exhibit A were, and are, true and correct.

7. If called as a witness at trial, I could and would testify to the information, statements, and opinions set forth in Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of October 2024.

*Ty M Shepard*
COL. TY M. SHEPARD (RET.)

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>      Plaintiffs,<br><br>  v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>      Defendants. | Case No. 4:19-cv-07123-PJH |

**<u>REPORT OF COL. TY M. SHEPARD (RET.)</u>**

## TABLE OF CONTENTS

**Pages**

I.  INTRODUCTION ................................................................................................. 3
II. QUALIFICATIONS............................................................................................. 3
III. MATERIALS CONSIDERED AND SUPPORTING EXHIBITS..................... 6
IV. INTENDED TESTIMONY AND REASONING ............................................... 6
V.  STATEMENT OF COMPENSATION............................................................. 12
VI. APPENDIX I - LIST OF INFORMATION CONSIDERED............................ 13

**I.     INTRODUCTION**

1. I, Col. Ty M. Shepard (Ret.), have been engaged to offer testimony concerning the use of surveillance technology in military and intelligence operations, including: (1) the use of encrypted messaging applications by terrorists and other threat actors; (2) the routine use of tools like Pegasus, licensed by NSO Group Technologies Limited ("NSO"), by the U.S. and allied countries and the operational gaps that the lack of such tools would create in attempting to counter threat actors using encrypted messaging applications; (3) the marketplace for such commercial tools and the need to maintain them as confidential; (4) government actors' compliance with terms of service; and (5) safeguards imposed on the use and operation of Pegasus.

2. This report serves as an explanation of my understanding of the technology at issue in this case and details my experience with the uses of such technology. This report is based on my investigation of this matter, as well as my education, experience, and training in cybersecurity, surveillance, intelligence collection, and hostile security environments.

**II.    QUALIFICATIONS**

3. I retired from the United States Army in May 2023 and the California Military Department in May 2024. I earned a Bachelor of Science degree and was commissioned in 1998 from California Polytechnic State University, San Luis Obispo, as an infantry officer. Thereafter, I was assigned to the 3-502nd, 101st Airborne Division at Fort Campbell. I served in Company and Battalion positions and was deployed to Macedonia and Kosovo in support of Kosovo Force (KFOR) rotation 1A.

4. In 2005, I joined the California National Guard and served at the Joint Force Headquarters.

5. In 2007, I was mobilized to Iraq as an infantry Company Commander in support of Operation IRAQI FREEDOM and the Global War On Terrorism. I worked closely with the Joint

Special Operations Command (JSOC) Strategic Debriefing Element (SDE), the British Secret Intelligence Service (SIS), and Army Brigade headquarters elements on this deployment.

6. I subsequently served as a staff officer in the 79th Infantry Brigade Combat Team, executive officer 1-184th Infantry, Joint Staff current operations officer, executive officer for the Joint Staff, and Brigade S3 for the 115th Regional Support Group.

7. In 2013, I completed my resident intermediate-level education at the United States Army Command and General Staff College and Advanced Operation Course.

8. In 2014, I was asked to work as the Friendly Force Tracking (FFT), tactical Beyond Line of Site (BLOS) secure communication and Common Operating Picture (COP) Subject Matter Expert (SME) for the United States Northern Command (NORTHCOM). I assisted in building the COP/FFT information technology systems and architecture for NORTHCOM, trained its units/Joint Task Forces, was the COP/FFT lead/attended all National Special Security Events (NSSE) and select high-level Special Event Assessment Rating (SEAR) events along with named operations along the U.S. border and National Capital Region over three years. In this capacity, I also assisted Special Operations Command (SOCOM), Army South (ARSOUTH), the Department of State (DoS), and other federal agencies.

9. Following that assignment, I was selected and deployed to the U.S. Embassy in Ukraine in 2017 as a C4ISR (Command, Control, Communications, Computers, Intelligence, Surveillance, and Reconnaissance) advisor. As part of this deployment, I assisted Ukraine in building its current multi-domain intelligence-sharing platform.

10. In 2020, I trained and led a Joint Task Force headquarters element to Guantanamo Bay Naval Base in Cuba and served as the Deputy Director of the Commission Liaisons Office in support of the Global War on Terrorism.

11. In early 2022, I deployed to Washington, D.C., and Europe for mission support to Special Operations Command Europe (SOCEUR) while assigned (OPCON) to the Office of the Secretary of Defense's Defense (OSD) Defense Digital Service (DDS)

12. My final military position was the Joint Operations Director (J3) for the California National Guard.

13. In my California active-duty capacity, I stood up and managed numerous programs, such as the veteran's employment initiative Work for Warriors, the national defense support to Civilian Authority C4ISR program, the Joint Task Force Cyber Commander, and the Civil Support Task Force Commander for the California Military Department.

14. From 2018 to 2023, my responsibilities included being the Cyber Operations Director for the California military department. As part of this, I commanded two Air Force Cyber Protection Team (CPT) squadrons and an Army CPT, worked closely with the U.S. Cyber Command and National Security Agency (NSA), and was part of the FBI cyber security task force. I assisted in writing the current California strategic plan, "Cal-Secure," creating and standing up the California Cyber Security Integration Center (Cal-CSIC), standing up the California Department to Technology (CDT) cyber–Security Operations Center (SOC), had my teams perform over two hundred Independent Security Assessments (ISAs) for California state agencies required by Government Code Section 11549.3 as amended by Assembly Bill 670 which included internal/external penetration testing. In this capacity, I also developed/created the yearly nationally recognized cyber exercise "Cyber Dawn" and deployed cyber–Incident Response (IR) teams for complex cyber-attacks in California per the request of the Governor's Office of Emergency Services (Cal-OES).

15. I retired from the United States Army in May 2023.

16. I retired from the California Military Department in May 2024.

17. My awards and decorations include the Legion of Merit, Bronze Star, Defense Meritorious Service Medal, Meritorious Service Medal (with four Oak Leaf Clusters), Army Commendation Medal, Army Achievement Medal (with three Oak Leaf Clusters), Ranger Tab, Combat Action Badge, Airborne badge, and Expert Infantrymen's badge.

18. Through my various assignments, I am familiar with the marketplace of commercial and non-commercial cyber-surveillance tools, including Pegasus, used by the United States and its allies/partners. I am also familiar with the technical tradecraft practiced by significant U.S. adversaries, including nation-states, terrorist groups, international criminal syndicates, drug traffickers, human smugglers, and others.

19. I have not testified as an expert at trial or by deposition during the last four years.

20. I have not authored any publications in the prior ten years.

### III.   MATERIALS CONSIDERED AND SUPPORTING EXHIBITS

21. In preparing this report, I have relied on facts and data from various sources, including those set forth in Appendix I.

22. I do not plan to use any exhibits during my testimony.

### IV.   INTENDED TESTIMONY AND REASONING

*Threat Actors Use Encrypted Messaging Applications to Undermine U.S. and Allied National Security*

23. Various threat actors, including terrorist organizations, narcotics groups, human traffickers, organized crime, cross-border gangs, and nation-states, routinely use encrypted messaging applications, including WhatsApp, to conceal their activities from detection by military, national security, and law-enforcement agencies. These threat actors need to maintain command and control over their operations, which requires the ability to communicate discreetly, quickly,

across borders, and in multiple domains. U.S. and allied law enforcement and intelligence agencies (hereafter "agencies") have significant signals intelligence gathering capabilities, but companies that provide messaging applications often design their systems to prevent anyone, including government agencies, from decrypting communications stored or sent using the applications. To overcome such encryption and conduct lawful surveillance, government agencies need to develop or purchase licenses to use special surveillance tools. Many companies regularly update their applications to block such decryption tools, so government agencies must continually update their tools or purchase licenses to use updated tools.

*Threat Examples*

24. I have witnessed threat actors using encrypted messaging applications and the related challenges posed for U.S. and allied intelligence agencies in the several theaters where I have been deployed or for which I have otherwise had operational responsibilities. These include Russian intelligence services (and proxies) operating in Ukraine and Eastern Europe, terrorist groups in the Middle East, and groups trafficking in drugs, other illicit items, or human beings on the U.S. southern border. All of these groups use encrypted messaging applications as a convenient and easily accessible method of planning and committing crimes and attacks that undermine the public safety and national security of the United States and its allies\partners.

25. Law enforcement and intelligence agencies often cannot gain access to and read communications of such threat actors directly through legal process served on communications providers such as WhatsApp, even with the approval of federal judges. When presented with lawful court orders authorizing agencies to collect substantive communications on messaging platforms, such providers often respond that they only have the ability to provide the *encrypted* message traffic, which they cannot decipher. As a result, U.S. and allied law enforcement and

intelligence agencies face a constant challenge from malicious groups who use encrypted messaging applications to plan and commit crimes such as terrorism, smuggling drugs, illicit items, and humans, and even assassinations.

***The U.S. and its Allies Widely Use Surveillance Tools like Pegasus to Protect National Security***

26. U.S. military and intelligence agencies, as well as those of U.S. allies, routinely use surveillance tools similar to Pegasus to combat a variety of threat actors. Such tools sometimes are developed by agencies, sometimes purchased from private companies, and sometimes have elements of both. Such tools can allow intelligence officers to learn about communications involving threat actors while operating remotely and secretly.

27. Government agencies use surveillance tools like Pegasus to gain insight into operational planning, threat actor identities, and specific plots.

28. Tools like Pegasus provide intelligence insight to the U.S. and allied national security agencies. Based on this insight, U.S. and allied national security agencies are often able to successfully disrupt attempts to injure or kill people, damage or destroy critical infrastructure, and otherwise threaten public safety and security. There would be significant risks and harm to American lives and critical infrastructure if these tools did not exist or if the U.S. and its allies did not have access to them.

29. Such tools allow for the collection of intelligence remotely and secretly. In the absence of these tools, agencies would need to place more intelligence officers in harm's way through human "undercover" style collection to gain insights and collect intelligence through direct and dangerous interactions. Even if agencies dedicated more resources to these types of undercover losses, they would be constrained by funds, trained personnel, and other resources to

replace the insight from surveillance tools. Some threat actors would successfully evade detection if cyber-surveillance tools were not available.

30. Cyber surveillance tools allow for greater insight into threat actors' intentions, identities, and operational plans. Without such tools, intelligence agencies would increasingly be unable to spot threats in their earlier stages and would more often investigate in a reactive manner, after incidents had occurred and damage had already been done. This would have adverse consequences in a range of situations, including the inability to counter human trafficking, drug smuggling, and terrorist infiltration on the U.S. southern border and the loss of information about foreign government efforts to carry out assassinations.

### *The U.S. and Its Allies Draw on a Large Market of Cyber Surveillance Tools*

31. Based on my experience, there is a wide market of commercial and open-source tools like Pegasus. Agencies rely on a variety of sources to develop or obtain surveillance tools. While some tools are developed internally, agencies often draw upon tools, or components, that are available on the dark web or from commercial providers.

32. Commercial tools are particularly important for U.S. allies who do not have the resources to develop and maintain their own cyber surveillance capabilities. The ability of allied government agencies to access commercial surveillance tools is vital for intelligence gathering, including intelligence that directly affects joint U.S.-allied operations and U.S. national security.

33. Nation-states and other adversaries of the U.S. routinely develop and use surveillance tools. If the U.S. and allied nations were not able to use such surveillance tools, it would create a strategic battlefield imbalance that would threaten the U.S.'s future because the country with the best technology usually prevails in international competition.

### *Cyber Surveillance Tools Require Stealth*

34. In my experience, many encrypted messaging application providers such as WhatsApp do not help the government obtain access to encrypted communications, even with lawful processes issued by courts. Usually, these requests are denied or acted upon slowly. Where they are acted upon, such providers may identify internal policies that prohibit them from cooperating or technological restrictions that prevent them from disclosing clear text communications of messaging sent on their platforms.

35. In my experience, government agencies do not normally disclose sophisticated technical surveillance tools or methods to encrypted messaging application providers because such disclosures would potentially lead those providers to update their software to render those tools or methods non-functional.

### *Government Agencies Routinely Ignore "Terms of Service"*

36. Encrypted messaging platforms often have "Terms of Service" in place for users of their platforms. Intelligence agencies typically do not follow ordinary terms of service when acting in a governmental capacity and pursuing major security and safety threats.

37. Moreover, many non-government users routinely engage in activities that are inconsistent with the Terms of Service and without adverse action by providers. For example, users routinely register using pseudonyms and avoid disclosing their true identities or locations even when required by the terms of service, and providers typically do not enforce such policies. Indeed, the level of unlawful activity that occurs through encrypted messaging platforms suggests that companies do not ordinarily enforce their Terms of Service.

*Many Cyber Surveillance Tools Do Not Have the Safeguards that Pegasus Does*

38. I am aware that NSO employs a number of safeguards to limit misuse of its surveillance tool Pegasus. All of NSO's customers are known to it, and NSO requires each customer to sign a contract certifying that it will use the tool only to investigate terrorism and serious crime. NSO does not rely solely on an end-user licensing agreement. It also takes other steps to prevent misuse.

39. I have reviewed NSO's vetting process and find it is robust and human rights-focused. Under its vetting process, NSO has guidelines and a clear process that prohibits any sale of its surveillance products to countries and customers that are not trusted to use them appropriately.

40. NSO, as a policy, does not license its Pegasus technology to agencies of adversaries of the United States and cannot provide its technology to agencies that are not approved by the State of Israel, a democracy and an ally of the United States.

41. NSO, moreover, has a track record of enforcing its guidelines and taking action when it learns about customer violations.

42. It is also notable that the Israeli government—a U.S. ally and a democracy—participates in oversight of NSO's surveillance technology. I understand that this oversight includes prohibiting the export of the tool to objectionable potential customers and withdrawing it from customers who misuse it.

43. While no company policy can prevent all misuse of technology, many companies that provide surveillance technology do not engage in similar diligence. When NSO refuses to sell its tool to a country and agency, in most cases, that country and agency can acquire tools with

similar functions from other companies that do not impose similar restrictions or develop the tools themselves.

44.   I am unaware of a strategic available commercial off-the-shelf (COTS) surveillance tool used internationally that has more safeguards than Pegasus.

45.   In the commercial cyber surveillance tool market, most companies and individuals who create such tools do not perform due diligence on customers. Indeed, cyber surveillance tools and exploits are often readily available on the dark web or through open-source technology.

## V.   STATEMENT OF COMPENSATION

46.   I will be paid $500 per hour for my work on this matter.  My compensation is not contingent upon the outcome of the case.

Executed on August 30, 3024, in Folsom, California.

*Ty M Shepard*
Ty M. Shepard

# APPENDIX I

# LIST OF INFORMATION CONSIDERED

**Foreign Intelligence Surveillance Act**

https://www.nsa.gov/Signals-Intelligence/FISA/#:~:text=The%20Foreign%20Intelligence%20Surveillance%20Act,assistance%20from%20U.S.%20telecommunications%20companies.

**National Cybersecurity Strategy**

https://www.whitehouse.gov/wp-content/uploads/2023/03/National-Cybersecurity-Strategy-2023.pdf

**CISA Cybersecurity Strategic Plan FY24-26**

https://www.cisa.gov/sites/default/files/2023-08/FY2024-2026_Cybersecurity_Strategic_Plan.pdf

**Department of State (ITAR)**

https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_kb_article_page&sys_id=24d528fddbfc930044f9ff621f961987

**Cal-Secure**

https://cdt.ca.gov/wp-content/uploads/2021/10/Cybersecurity_Strategy_Plan_FINAL.pdfl-Secure

**California Emergency Support Function 18**

https://www.caloes.ca.gov/wp-content/uploads/Preparedness/Documents/18-CalOES-CA-ESF-18-Cybersecurity-Annex.pdfornia Emergency Support Function 18

**MITRE ATT&CK® Framework**

https://attack.mitre.org/

https://attack.mitre.org/matrices/mobile/

https://attack.mitre.org/tactics/mobile/

https://attack.mitre.org/mitigations/mobile/

**CDT ISA Overview**

https://cdt.ca.gov/security/independent-security-assessments-services/

**Congressional Research NSSE Fact Sheet**

https://sgp.fas.org/crs/homesec/R43522.pdf

**Books**

Matthew Bender, *Data Privacy and Cybersecurity Law: A Compliance Guide for U.S. Federal, State, and Local Governments*

Kim Zetter, *Countdown to Zero Day*

Stephen Budiansky, *Code Warriors NSA's Codebreakers and the Secret Intelligence War Against the Soviet Union* (New York: Knopf, 2017).

**Articles**

https://www.theguardian.com/news/2022/feb/02/fbi-confirms-it-obtained-nsos-pegasus-spyware

https://www.nytimes.com/2022/11/12/us/politics/fbi-pegasus-spyware-phones-nso.html (and linked materials)

https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html

https://www.nytimes.com/2021/11/03/business/nso-group-spyware-blacklist.html

https://www.nbcnews.com/storyline/paris-terror-attacks/paris-attack-could-renew-debate-over-encrypted-messaging-apps-n464276

https://www.nytimes.com/2015/11/17/world/europe/encrypted-messaging-apps-face-new-scrutiny-over-possible-role-in-paris-attacks.html

https://www.bbc.com/news/technology-66099040

https://www.rcc.int/swp/news/38/cyber-caliphate-what-apps-are-the-islamic-state-using

https://www.rand.org/pubs/commentary/2017/09/how-isis-is-transforming.html

https://www.technologyreview.com/2023/10/16/1081694/the-fight-over-the-future-of-encryption-explained/

https://www.pewresearch.org/internet/2014/11/12/public-privacy-perceptions/

https://www.nytimes.com/2014/03/22/business/fallout-from-snowden-hurting-bottom-line-of-tech-companies.html

https://www.bsr.org/reports/bsr-meta-human-rights-impact-assessment-e2ee-report.pdf

https://nsarchive.gwu.edu/themes/custom/nsarchive/templates/pdfjs/web/viewer.html?file=https%3A%2F%2Fnsarchive.gwu.edu%2Fsites%2Fdefault%2Ffiles%2Fdocuments%2F4404132%2FCombatting-Terrorism-Center-Robert-Graham-How.pdf

https://www.scirp.org/journal/paperinformation?paperid=81897

https://www.vox.com/world/2017/6/30/15886506/terrorism-isis-telegram-social-media-russia-pavel-durov-twitter

https://ctc.westpoint.edu/how-terrorists-use-encryption/

https://harvardnsj.org/2021/09/03/shining-light-on-the-going-dark-phenomenon-u-s-efforts-to-overcome-the-use-of-end-to-end-encryption-by-islamic-state-supporters/

https://www.nytimes.com/2023/12/06/technology/meta-messenger-encryption.html

https://www.theguardian.com/technology/2023/apr/20/crime-agencies-condemn-facebook-instagram-encryption-plans

https://www.nytimes.com/2014/03/22/business/fallout-from-snowden-hurting-bottom-line-of-tech-companies.html

https://www.bbc.com/news/uk-39396578

https://www.uscybersecurity.net/whatsup-whatsapp/

https://www.pbs.org/wgbh/frontline/article/isis-via-whatsapp-blow-yourself-up-o-lion/

https://press.armywarcollege.edu/cgi/viewcontent.cgi?article=1963&context=monographs

https://www.usatoday.com/story/news/2017/03/26/london-attacker-whatsapp-message/99668890/

https://news.sky.com/story/whatsapp-denies-government-access-to-encrypted-messages-11043069

https://www.theguardian.com/global-development/2023/jul/13/zuckerberg-asked-testify-meta-facebook-instagram-whatsapp-role-human-trafficking-florida

https://www.nytimes.com/2024/08/29/technology/telegram-encryption-pavel-durov.html

https://www.coloradopolitics.com/fbi-and-privacy-hawks-clash-over-encryption-after-trump-assassination-attempt/article_a85aaf7c-8585-5af3-91af-7915feb52c82.html

https://arstechnica.com/tech-policy/2015/01/uk-prime-minister-wants-backdoors-into-messaging-apps-or-hell-ban-them/

https://www.wsj.com/articles/BL-DGB-39944

15

https://www.washingtonpost.com/technology/2021/04/14/azimuth-san-bernardino-apple-iphone-fbi/

https://www.wired.com/story/the-time-tim-cook-stood-his-ground-against-fbi/

https://www.nytimes.com/2016/02/18/technology/apple-timothy-cook-fbi-san-bernardino.html

https://www.npr.org/sections/alltechconsidered/2016/12/03/504130977/a-year-after-san-bernardino-and-apple-fbi-where-are-we-on-encryption

https://therecord.media/encrypted-apps-a-challenge-trump-assassination-attempt-wray-fbi

https://www.axios.com/2024/08/27/telegram-pavel-durov-encryption-hackers-criminals

https://uk.finance.yahoo.com/news/nothing-stopping-spread-child-abuse-230100073.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAAsze6BeTT0apE5AA9R1yD-wP1JJYcQSp-2OpgTeMNvMSQTpymTE9af5AIj-_nCJZBpW41az6OzX32X_R1OLCrIh-ILZjXckI_O2Ca6Q7VaILPm75JOkgPRxO6XmuUUj2-Moe-B1YhGiO7ihUTGKmzzV5h-FTswraRohPMsNujgJ

https://www.theguardian.com/technology/2024/apr/18/terror-watchdog-condemns-whatsapp-for-lowering-uk-users-minimum-age-to-13

https://www.marketplace.org/2023/08/01/whatsapp-has-streamlined-business-communication-for-human-smuggling/

https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media

https://ourworld.unu.edu/en/women-are-being-traded-as-slaves-on-whatsapp-heres-how-the-un-can-act

https://www.theguardian.com/world/2016/apr/30/syrians-forced-sexual-slavery-lebanon

https://www.myfloridalegal.com/newsrelease/attorney-general-moody-calls-meta-ceo-zuckerberg-florida-testify-about-use-meta

https://www.nytimes.com/2024/08/28/technology/durov-telegram-liability-platforms.html

https://www.nytimes.com/2024/08/28/business/telegram-ceo-pavel-durov-charged.html

https://www.nytimes.com/2024/08/20/technology/meta-section-230-lawsuit.html

https://timelines.ai/whatsapp-user-statistics-and-revenue-analysis/#:~:text=Revenue%20Figures%20from%202018%20to%202024&text=In%202018%2C%20WhatsApp%20made%20%24443,it's%20likely%20higher%20than%202023.

https://www.businessofapps.com/data/whatsapp-statistics/

https://www.nextgov.com/acquisition/2024/08/us-intelligence-agencies-eye-closer-partnerships-private-sector/399113/

**Video Clip/Interview**

https://www.msnbc.com/andrea-mitchell-reports/watch/feinstein---i-ve-never-been-more-concerned--567674435736

**Additional Documents**

Complaint Exhibit 10

FPM-00021846

Memorandum Order dated July 7, 2023, *New York Times v. U.S. Department of Justice*, No. 22-cv-1539 (JSR) (S.D.N.Y. 2023)

NSO_WHATSAPP_00000078

NSO_WHATSAPP_00000262

NSO_WHATSAPP_00045591

NSO Group, Transparency and Responsibility Report, 2023