# EXHIBIT 1

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 2 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.          Job 3385
JONATHAN LEE on 09-25-2024          {{Attorneys Eyes Only}}          Page 1

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

   WHATSAPP INC., a Delaware     )
5  corporation, and FACEBOOK,    )
   INC., a Delaware corporation,)
6                                )
                Plaintiffs,      )
7                                )
        vs.                      )   Case No.
8                                )   4:19-cv-07123-PJH
   NSO GROUP TECHNOLOGIES        )
9  LIMITED and Q CYBER           )
   TECHNOLOGIES LIMITED,         )
10                               )
                Defendants.      )
11  _____ )

12

13

14

15      HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

16   VIDEOTAPED 30(B)(6) DEPOSITION OF JONATHAN LEE

17             LOS ANGELES, CALIFORNIA

18          WEDNESDAY, SEPTEMBER 25, 2024

19

20

21

22

23

24  SWIVEL LEGAL SOLUTIONS
   JOB NO.: 3385
25  DORIEN SAITO, CSR 12568, CLR

Page 170

1  BY MR. AKROTIRIANAKIS:
2     Q.  Is there a way to get out of the default?
3        MR. BLOCK:  Objection to form.  Foundation.
4        **THE WITNESS:  So all personal messages on**
5  **WhatsApp are end-to-end encrypted.**
6  BY MR. AKROTIRIANAKIS:
7     Q.  In other words, if a user wanted to make
8  them unencrypted, there would be no way to do that?
9        MR. BLOCK:  Objection to form.
10       **THE WITNESS:  There's no toggle or setting**
11  **that a user would use to -- that would affect the**
12  **encryption status of their message.**
13  BY MR. AKROTIRIANAKIS:
14    Q.  The messages would be encrypted, like it or
15  not, right.
16       MR. BLOCK:  Objection to form.
17       **THE WITNESS:  All personal messages are**
18  **end-to-end encrypted.  There's no user strategy that**
19  **affects the encryption status.**
20  BY MR. AKROTIRIANAKIS:
21    Q.  And you are say "all personal messages."
22       Is there a different kind of message where
23  there is a setting you can do or undo?
24    **A.  There's not a -- a setting.  They're -- and**
25  **I don't recall whether these existed at the time,**

Page 171

1  but there's a category of messages that we consider
2  **to be messages with a business.  And the message**
3  **with a business are often powered by -- by Meta**
4  **technologies that the business uses, and those**
5  **messages we don't call end-to-end encrypted, but**
6  **there isn't a user setting involved.**
7     Q.  And I'm sorry.  You said that you didn't
8  think that the business messages existed in 2019?
9        MR. BLOCK:  Objection to form.
10       **THE WITNESS:  I don't recall the -- the**
11  **status of our business messaging tools at that**
12  **particular time.**
13  BY MR. AKROTIRIANAKIS:
14    Q.  How familiar are you with the technical
15  workings of -- of WhatsApp?
16    **A.  I have a general understanding of how**
17  **WhatsApp works.  My background is not a technical**
18  **background, so the technical nature of how things**
19  **operate, I don't have a level of, say, an engineer.**
20    Q.  Okay.
21       MR. AKROTIRIANAKIS:  So I think we should
22  consider this now part of the 30(b)(6).
23  BY MR. AKROTIRIANAKIS:
24    Q.  The process by which someone would register
25  a WhatsApp account begins with downloading the

Page 172

1  WhatsApp app; correct?
2        MR. BLOCK:  That question exceeds the scope
3  of the 30(b)(6), but overlaps with it.
4        **THE WITNESS:  So answer with respect to**
5  **what I know about how this worked between 2018 and**
6  **2020?**
7        **In short, to register for WhatsApp, a user**
8  **would download the app, and --**
9  BY MR. AKROTIRIANAKIS:
10    Q.  And that could be from the WhatsApp website
11  at the time, or was it only from the Play Store and
12  the app store?
13       MR. BLOCK:  Objection to form.
14       **THE WITNESS:  The -- and it's from the app**
15  **store.  We have an app store.  This is based off the**
16  **requirements of the particular operating system in**
17  **the app store that they provide.**
18  BY MR. AKROTIRIANAKIS:
19    Q.  Okay.  And someone could download the app
20  from the app store without subsequently registering
21  for an account; correct?
22       MR. BLOCK:  Objection to form.  And scope.
23       **THE WITNESS:  Yes.  The first step of**
24  **creating a WhatsApp account would be to download the**
25  **app, when a user could choose not to proceed after**

Page 173

1  downloading.
2  BY MR. AKROTIRIANAKIS:
3     Q.  Okay.  Do you know what a decompiler is?
4        MR. BLOCK:  Objection to scope.
5        **THE WITNESS:  I'm familiar with the term,**
6  **but I don't understand how it operates at a**
7  **technical level.**
8  BY MR. AKROTIRIANAKIS:
9     Q.  Sure.
10       Do you know whether someone could use a
11  decompiler on the app as downloaded from the app
12  store without first registering for a WhatsApp
13  account?
14       MR. BLOCK:  Objection to foundation and
15  scope.
16       You can answer in your personal capacity,
17  if you have knowledge.
18       **THE WITNESS:  I don't know how registering**
19  **or not registering could affect how someone using a**
20  **decompiler work.**
21  BY MR. AKROTIRIANAKIS:
22    Q.  Okay.  Or if somebody could use a
23  decompiler prior to registering?
24       MR. BLOCK:  The same objections.
25       **THE WITNESS:  Again, I don't really know**

Case 4:19-cv-07123-PJH    Document 422-2    Filed 10/11/24    Page 4 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3385
JONATHAN LEE on 09-25-2024            {{Attorneys Eyes Only}}              Pages  174..177

Page 174

1  how did decompiler work, so I also don't know how it
2  would work prior to registration.
3  BY MR. AKROTIRIANAKIS:
4      Q.  Okay.  So you download the app.  Then
5  what's the next step if you wanted to register for
6  an WhatsApp account?
7          MR. BLOCK:  Objection to scope.
8          **THE WITNESS:  You would download the app.**
9  **You would open the app, and you'd be shown a welcome**
10 **screen.  The welcome screen includes links to the**
11 **term of service and the privacy policy.  The user is**
12 **then given the opportunity to agree to the terms of**
13 **services and continue with the registration flow.**
14         **If the user chooses to agree to the terms**
15 **of service and continue, they're given the**
16 **opportunity to enter their phone number that they'll**
17 **be associating with the WhatsApp account.  There's a**
18 **verification process for that phone number, most**
19 **commonly done by an SMS message sent to that phone**
20 **number, after which the account is created, if the**
21 **verification is successful.**
22 BY MR. AKROTIRIANAKIS:
23     Q.  Have you done this yourself?
24     **A.  I use WhatsApp, and in order to use**
25 **WhatsApp, I had to register my account.**

Page 175

1      Q.  Right.
2          But you're not testifying from your memory
3  from the time when you registered a WhatsApp
4  account; am I; right?
5      **A.  Correct.  As we discussed earlier, I spoke**
6  **with two internal experts about the process to do**
7  **this.**
8      Q.  And those are the steps that they explained
9  to you?
10     **A.  They are.**
11     Q.  Okay.  So at what point do you -- after
12 downloading the app and before or during the process
13 that you have now described would you, for example,
14 select a language?
15         MR. BLOCK:  Objection to form and scope.
16         **THE WITNESS:  I don't know specifically**
17 **when that happens.  My recollection from the**
18 **conversations that I had yesterday were that the app**
19 **looks to the language settings of the phone in order**
20 **to surface the -- the language -- the relevant**
21 **language.**
22 BY MR. AKROTIRIANAKIS:
23     Q.  So is your testimony on behalf of WhatsApp
24 and Facebook that you don't have to select a
25 language?  It selects it for you?

Page 176

1          MR. BLOCK:  Objection to form.  And this is
2  outside the scope of the topic.
3          But you can answer in personal capacity.
4          Hang on one second.
5          Sorry for the -- I think I objected on form
6  and scope.
7          And if you have knowledge in your personal
8  capacity, you can answer.
9          **THE WITNESS:  I don't know whether or not a**
10 **user has the opportunity to select their language in**
11 **WhatsApp is part of their registration flow.**
12 BY MR. AKROTIRIANAKIS:
13     Q.  Now earlier, when you testified about the
14 explanations you were given yesterday -- well, let
15 me back up.
16         The explanations that you were given
17 yesterday, is that the sole basis for your -- your
18 ability to testify today as to the process by which
19 users in Israel could accept terms of service in
20 2018, 2019, 2020?
21     **A.  In my capacity answering these questions,**
22 **yes.**
23     Q.  Okay.  And do you recall, you know, did you
24 review any, like, progression of screens or anything
25 like that during your -- during your preparation to

Page 177

1  testify?
2      **A.  In my preparations for this, on this issue,**
3  **these were described to me verbally.**
4      Q.  Okay.  So some person just told you, and
5  now you're doing your best to parrot what you were
6  told yesterday?
7          MR. BLOCK:  Objection to form.
8          **THE WITNESS:  As part of the preparations I**
9  **spoke with two people, one of whom is the product**
10 **manager who leads this particular set of product**
11 **experiences for WhatsApp.  He described them to me,**
12 **and I am describing them to the best of my**
13 **recollection based on my preparation.**
14 BY MR. AKROTIRIANAKIS:
15     Q.  All right.  Is there any, like, depiction
16 of the terms and service in any of the screens that
17 you have to go through in order to register a
18 WhatsApp account?
19         MR. BLOCK:  Foundation.  Scope.
20         You can answer, if you know.
21         **THE WITNESS:  The terms of service are**
22 **presented -- are presented by a link -- a hyperlink**
23 **which a user could choose to click through in order**
24 **to read the terms of service.**
25 ///

Page 178

1  BY MR. AKROTIRIANAKIS:
2     Q.  And not to click through.
3        MR. BLOCK:  And sorry.  I had misunderstand
4  the previous question.  I think it was fairly in
5  scope.
6        THE WITNESS:  It's not a requirement that a
7  user click through the terms of service in order to
8  decide whether or not to accept and continue.
9  BY MR. AKROTIRIANAKIS:
10    Q.  And there's no separate box to check "I
11 accept terms of service."
12    Correct?
13       MR. BLOCK:  Objection to form.
14       THE WITNESS:  I believe the box is
15 accept --
16       MR. CRAIG:  (Sneezing.)
17 BY MR. AKROTIRIANAKIS:
18    Q.  But you think there's a box?
19    A.  That is what I recall from my preparation.
20    Q.  Have you used other apps in your lifetime
21 other than WhatsApp?
22       MR. BLOCK:  This is outside the scope.
23       But you can answer in your personal
24 capacity.
25       THE WITNESS:  I have used apps other than

Page 179

1  WhatsApp.
2  BY MR. AKROTIRIANAKIS:
3     Q.  Yeah.  Hundreds, probably.  At least
4  dozens?
5     A.  I have used a number of apps that are not
6  WhatsApp.
7     Q.  And you know that in some cases, the
8  click -- the clickwrap accepting of terms of service
9  requires you to scroll through the terms of service,
10 and at least pretend you're reading it; right?
11       MR. BLOCK:  Foundation.  Scope.  Calls for
12 a legal conclusion.
13       THE WITNESS:  In my experience using other
14 apps, I have experienced apps or other online
15 services where I have, as part of the registration
16 flow or the flow to access the app, been required to
17 scroll through a document before it enabled me to
18 click "accept."
19 BY MR. AKROTIRIANAKIS:
20    Q.  Okay.  And there's nothing like that with
21 WhatsApp; right?
22       MR. BLOCK:  Object to form.
23 Mischaracterizes.
24       THE WITNESS:  As I say earlier, the
25 WhatsApp registration flow does not require the user

Page 180

1  to click through the terms of service, or to scroll
2  through a document after clicking through it.
3  BY MR. AKROTIRIANAKIS:
4     Q.  But you think that in 2018, 2019, and 2020,
5  it did require clicking a box?
6     A.  My understanding based on the preparation
7  is that in order to proceed with the registration
8  flow, you have to click a button of some sort --
9  whether that's a box or a button, I don't know the
10 specific shape -- but in order to demonstrate
11 agreement of the terms of service, and to continue
12 with the registration process.
13    Q.  Could it just be clicking on a link?
14       MR. BLOCK:  Objection to form.
15       THE WITNESS:  Could you clarify what you
16 mean by "link" there?
17 BY MR. AKROTIRIANAKIS:
18    Q.  Well, like, a box would be a little square,
19 maybe, that you have to put a checkmark in or click
20 your pointer in that box; right?
21       MR. BLOCK:  Objection to form.
22       THE WITNESS:  Yeah.  Again, as I said, I
23 don't know the shape of the particular box or button
24 that a user had to -- would have to click in order
25 to proceed, but the user would have to click to

Page 181

1  demonstrate acceptance of the terms in order to
2  continue the registration flow.
3  BY MR. AKROTIRIANAKIS:
4     Q.  So for all you know, it could say, "Click
5  here," and "here" is underscored, and it's a link to
6  accept the terms of service?
7        MR. BLOCK:  Objection to form.
8        THE WITNESS:  Link wouldn't be the -- the
9  term that we would use in that context.  If you are
10 clicking something to proceed in a flow, for
11 instance, we would generally call that a "button."
12 BY MR. AKROTIRIANAKIS:
13    Q.  Okay.  The entirety of your knowledge of
14 what you're testifying to is -- is based 100 percent
15 on these conversations you had with other WhatsApp
16 employees yesterday, September 24, 2024; correct?
17       MR. BLOCK:  Objection to form.
18       THE WITNESS:  As I mentioned, I personally
19 use WhatsApp, although it's been quite some time
20 since I registered for the service.  So I'm basing
21 this testimony almost entirely on the preparation
22 that I conducted yesterday.
23 BY MR. AKROTIRIANAKIS:
24    Q.  Well, you never registered for WhatsApp in
25 Israel, I take it; right?

WhatsApp Inc. vs NSO Group Technologies Limited et al.
JONATHAN LEE on 09-25-2024                          {{Attorneys Eyes Only}}

Job 3385
Pages  318..319

Page 318

1  PAGE   LINE   CHANGE/ADD/DELETE
2  _____  _____  _____
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25 Deponent's Signature _____ Date

Page 319

1          CERTIFICATE OF REPORTER

2          I, DORIEN SAITO, CSR 12568, CLR, a certified

3    Shorthand reporter in and for the State of

4    California, County of Los Angeles, do hereby

5    certify;

6          That JONATHAN LEE, the witness named in the

7    foregoing deposition, was, before the commencement

8    of the deposition, duly administered an oath in

9    accordance with CCP 2094;

10         That said deposition was taken down in

11   stenograph writing by me and thereafter transcribed

12   into typewriting under my direction.

13         That before completion of the deposition,

14   review of the transcript [ ] was [x] was not

15   requested.  If requested any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18         I further certify that I am neither counsel

19   for nor related to any party to said action, nor in

20   any way interested in the outcome thereof.

21         Dated this 26th day of September, 2024.

22

23         _Dorien Saito_

           CERTIFIED SHORTHAND REPORTER

24            IN AND FOR THE COUNTY OF

           LOS ANGELES, STATE OF CALIFORNIA

25

# EXHIBIT 2

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 8 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024                    {{Attorneys Eyes Only}}

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4    _____

5    WHATSAPP INC., a Delaware            )
     corporation, and FACEBOOK, INC.,    )
6    a Delaware corporation,             )
     a Delaware corporation,             )
7                                        )
                 Plaintiffs,             )
8       v.                               ) Case No.
                                         ) 4:19-cv-07123-PJH
9    NSO GROUP TECHNOLOGIES LIMITED      )
     and Q CYBER TECHNOLOGIES LIMITED,   )
10                                       )
                                         )
11               Defendants.             )
     _____)

12

13        HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14          VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                    DEPOSITION OF

16      WHATSAPP INC., by and through its Designated

17                    Representative,

18                     CARL WOOG

19             Palo Alto, California 94304

20             Wednesday, August 14, 2024

21

22

23   Reported Stenographically by:
     MARY J. GOFF
24   CSR No. 13427
     WA CSR No. 21030779
25   Job No. 3226
     PAGES 1-384

1  working with great intensity to identify what was
2  going on.
3     Q   So you have never spoken to ▮▮▮▮▮▮▮
4  ▮▮▮▮, as far as you know?
5     A   Sorry.  I don't believe so, but I don't
6  recall if I have.
7     Q   Do you know at all what his
8  responsibilities with respect to either WhatsApp or
9  Facebook were?
10    A   Not that I recall.
11    Q   Do you know whether Mr. Robinson was
12 attributing the exploitation of this vulnerability
13 to NSO as of May 5, 2019?
14    A   Sir I do not know what Mr. Robinson
15 determined at that -- at that point in time.
16    Q   Do you know if WhatsApp more generally was
17 attributing anything to NSO as of May 5, 2019?
18    A   I believe that was our -- our -- our
19 strongest hypothesis that the team was working to
20 validate and confirm.
21    Q   And do you know what that was based on?
22    A   Sir, I -- my recollection, I recall
23 security engineers telling me that they believed
24 that NSO was attacking our users.
25        And this was an attack that was underway,

1  and they were working to put to stop.
2     Q   And do you know what that was based on,
3  that attribution to NSO?
4     A   Sir, based on their technical expertise.
5     Q   So you don't know?
6     A   I'm not a technical expert, no, sir.
7     Q   Okay.  So you don't know?
8     A   No, sir.
9        ATTORNEY ANDRES:  Objection, asked and
10 answered.
11    Q   (BY ATTORNEY AKROTIRIANAKIS) Are all
12 WhatsApp chats end-to-end encrypted?
13    A   Sir, we have a distinction between what we
14 refer to as "personal WhatsApp chats" and chats that
15 are with businesses that use a technology service
16 called an "API."We have a White Paper that explains
17 this.  Generally.
18        I think the way we think of WhatsApp is
19 kind of how people like you and me would chat with
20 one another, but we also have these business
21 services.
22        Those business services using the API, we
23 do not designate those at end-to-end encrypted.  But
24 what people are thinking of when they are using
25 their WhatsApp in their handset on their -- on their

1  phones app to app, those are indeed end-to-end
2  encrypted.  We usually refer to those as personal
3  images.
4     Q   All right.  So all WhatsApp personal
5  messages are end-to-end encrypted?
6     A   Yes, sir.
7     Q   And all WhatsApp calls are end-to-end
8  encrypted?
9     A   Yes, sir.
10    Q   Is that true both with respect to voice
11 calls and video calls?
12    A   Yes, voice and video calls are both
13 protected by end-to-end encryption on an
14 application-to-application basis.
15    Q   Does a WhatsApp user have to pay extra for
16 the end-to-end encryption or is that a standard
17 feature?
18    A   That's a standard feature, sir, and it
19 cannot be turned off.
20    Q   So it's impossible to have a WhatsApp
21 account -- a personal WhatsApp account without
22 end-to-end encryption, correct?
23    A   That is how our service works, sir.
24    Q   So yes?
25    A   Yes.

1     Q   How much does it cost for a user to
2  establish a WhatsApp account?
3     A   Sir --
4        ATTORNEY ANDRES:  Objection, relevance.
5     A   -- sir, accounts are free to establish.
6  There's no cost.
7     Q   (BY ATTORNEY AKROTIRIANAKIS) So what --
8  what does a person need in order to set up a
9  WhatsApp account?
10    A   Sir, you need a mobile phone, and you need
11 the ability to download the app from either the
12 Apple App Store or the Google Play Store.
13        Or you can also download the app directly
14 from our website, if you're having trouble accessing
15 those stores.  And then you download that
16 application onto your phone.
17        And then from there you open the app.
18 There'll be some information there about our Terms
19 of Service that you would need to agree to prior to
20 using our service.
21        And then there's just some initial setup
22 questions that -- that we have.  And then from there
23 you're pretty much off and running.
24    Q   Well, what are the initial setup
25 questions?

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 10 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024              {{Attorneys Eyes Only}}          Pages  178..181

Page 178

1    A   Well --
2         ATTORNEY ANDRES:  Objection, relevance.
3    A   -- well -- so you have to enter your phone
4  number in order to effectively activate your
5  account.
6         So you enter your phone number, and that
7  will send an SMS message to you, which you -- you
8  type in a code for that, and then that allows you to
9  start your account.
10        I think we also ask for a name, which is
11 optional.  You can choose your actual name.  You can
12 choose a nickname.  I think there's an option to put
13 in a photo and things like that, which you can do,
14 if you chose.
15        And after that, you're able to chat freely
16 and securely.
17   Q   (BY ATTORNEY AKROTIRIANAKIS) So the "Name
18 Field" is not required?
19   A   I don't believe so, sir.  I think you have
20 to enter something in that name, but you don't have
21 to chose your actual name.
22        Does that --
23   Q   Could --
24   A   -- distinction make sense?
25   Q   Okay.  It could be literally anything?

Page 179

1    A   I believe so.
2    Q   It could be symbols?  It doesn't even have
3  to be letters?
4    A   I don't know if you can use symbols.
5  That -- sometimes apps have trouble with symbols.
6         But perhaps.  I don't know for sure.  You
7  have to put in something, I believe, in that field.
8    Q   But it doesn't have to be your name?
9    A   It does not have to be your name, sir.
10   Q   Other than what you have described right
11 now, is there any other vetting that WhatsApp does
12 prior to granting a user account to someone?
13   A   Sir, I'm not an expert in this, but we do
14 have quite a talented group of people that are
15 looking for signals of inauthenticity and perhaps
16 abuse right from the setup time.
17        So what we're looking for there is
18 potentially accounts that may be intended to be set
19 up for spam or automation or other account setup
20 that is inauthentic in some way.
21        I'm drawing to draw a distinction between
22 that and a normal person who is just trying to use
23 WhatsApp for private and secure calls.
24   Q   So like a -- you're trying to ferret out
25 whether it's an actual person or a bot that's

Page 180

1  setting the account?
2    A   I think that's fair to say, sir, yes.
3    Q   Okay.  But assuming that somebody is an
4  actual person, literally anybody could sign up for a
5  WhatsApp account, as long as they have a mobile
6  phone and the ability to download the WhatsApp app,
7  correct?
8    A   Right.  And then that text message
9  authentication that I mentioned.  Those basic steps.
10   Q   Right.  But you don't, like, say:  Like,
11 well, is this a person who we really want using our
12 system?
13        They just decide themselves, right?
14   A   That's right.
15   Q   Can a person have multiple WhatsApp
16 accounts with different phone numbers?
17   A   Yes.  But basically a phone number -- an
18 easier way of thinking of it is that an account is
19 tied to a phone number.
20        So if you have two phones, then you could
21 have a WhatsApp on one phone and a WhatsApp on the
22 other phone.  That would be two accounts, but you
23 may be the same -- the same person.  We have that.
24        And then we also have the ability to
25 have -- we have multiple -- the ability to install

Page 181

1  multiple apps on one phone.
2         So for example, we have the WhatsApp app
3  and we have WhatsApp Business app.
4         And you could use your phone and download
5  both instances of WhatsApp on your phone.
6         And the reason why some people want to do
7  that is because they're a small business and they
8  like to separate their chats from their personal use
9  and their business use.  So it effectively gives
10 them two Inboxes to do so.
11        And the Business app has some of its
12 own -- different policies and rules that I'm less
13 familiar with.  But effectively that's designed for
14 the small business owner that relies on WhatsApp to,
15 you know, run their business, respond to customer
16 inquiries, and hopefully run a successful business
17 that -- for their customers.
18   Q   So let's go back to the names.
19        You said that -- that you have to -- that
20 your belief is that you have to put in something in
21 the -- in the "Setup" field that requests a name,
22 but it's incons -- inconsequential what it is that's
23 put into that field; is that fair?
24   A   That's fair.  It's a user choice.
25   Q   And that's permitted by the WhatsApp Terms

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 11 of 113

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024              {{Attorneys Eyes Only}}        Pages  382..384

Page 382

1
2
3
4      I, CARL WOOG, do hereby declare under penalty
5  of perjury that I have read the foregoing
6  transcript; that I have made any corrections as
7  appear noted, in ink, initialed by me, or attached
8  hereto; that my testimony as contained herein, as
9  corrected, is true and correct.
10      EXECUTED this_____ day of_____,
11  20____, at_____, _____.
             (City)                    (State)
12
13
14      _____
             CARL WOOG
15
16
17
18
19
20
21
22
23
24
25

Page 383

1      I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14      That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:   (   ) that the witness has failed or
17  refused to approve the transcript.
18      I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22      I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of       , 2024.
25      _Mary Goff_____
             MARY J. GOFF

Page 384

1              ERRATA SHEET
2              SWIVEL LEGAL
3         560 W Main Street, C163
4       Alhambra, California 91801
5            213-788-2327
6         CASE:  WhatsApp v. NSO Group
7  PAGE  LINE  FROM                    TO
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18
19      _____
20      CARL WOOG
21  Subscribed and sworn to before me
22  this _____ day of _____, 2024.
23  _____
24      Notary Public
25

# EXHIBIT 3

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 13 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024            {{Attorneys Eyes Only}}              Page 1

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4    _____

5    WHATSAPP INC., a Delaware           )
     corporation, and FACEBOOK, INC.,    )
6    a Delaware corporation,             )
     a Delaware corporation,             )
7                                        )
               Plaintiffs,               )
8        v.                              ) Case No.
                                         ) 4:19-cv-07123-PJH
9    NSO GROUP TECHNOLOGIES LIMITED      )
     and Q CYBER TECHNOLOGIES LIMITED,   )
10                                       )
                                         )
11             Defendants.               )
     _____)

12

13       HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14        VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                  DEPOSITION OF

16    WHATSAPP INC., by and through its Designated

17                 Representative,

18                CLAUDIU GHEORGHE

19           Palo Alto, California 94304

20             Friday, August 16, 2024

21

22   Reported Stenographically by:
     MARY J. GOFF
23   CSR No. 13427
     WA CSR No. 21030779
24   Job No. 3296
     PAGES 1-295

25

1    A   I'm confused.

2    Q   Let me rephrase.  Scratch that.

3    A   Yeah.

4    Q   Are the stanzas in XML?

5    A   I believe it was an XML protocol, yes.

6    Q   Okay.  And so the format of the stanzas is

7  defined somewhere?

8    A   Like right now?

9    Q   In 2019.  All of my questions will be

10  about how the system was in May of 2019.

11    A   Okay.  I believe there was a -- like a

12  text document that described the stanzas in the

13  protocol.

14        In one of the repositories that we had, it

15  was called "the common repo" that was referenced by

16  all the client and the server engineers.

17        And at that time we actually had a formal

18  representation of the protocol in another system

19  that actually led to the discovery of the attack --

20    Q   All right.

21    A   -- so there was -- yeah.

22    Q   So a stanza, which you said is an

23  XML-defined message --

24    A   Yes.

25    Q   -- has a certain -- certain structure to

1  it?

2    A   Yes.

3    Q   And so that structure would involve some

4  parameters and parameter values -- sort of parameter

5  names and parameter values?

6        ATTORNEY BLOCK:  Objection to form.

7    A   It involves that, but not just that.

8    Q   (BY ATTORNEY WEINBERG) What else does it

9  involve?

10    A   It involves other types of stanzas as well

11  that are child stanzas.  So there's like a hierarchy

12  of stanzas, essentially.

13    Q   All right.  So it's XML, so it's a

14  hierarchical --

15    A   Yeah.

16    Q   -- structure?

17    A   Yeah.

18    Q   And so an offer stanza, for example, is a

19  kind of VoIP stanza?

20    A   It's a type of stanza, yeah.

21    Q   Okay.  And so the structure for that kind

22  of stanza is defined in this common repo?

23    A   Yeah.

24    Q   Okay.  Let me put a document in front of

25  you.  1167.

1        (Exhibit 1167 was marked for

2  identification and is attached to the transcript.)

3    Q   (BY ATTORNEY WEINBERG) I want to chat with

4  you a bit about the stanzaming.  Is that how you

5  pronounced it, stanzaming?

6    A   Stanzaming.

7    Q   Got it.

8        Do you recognize this document?

9    A   Yes.

10    Q   What is it?

11    A   It displays a SEV that was filed for the

12  incident.

13    Q   Okay.  What is an SEV?

14    A   Yeah, so a SEV or S-E-V is a formal

15  document used by Facebook to track the operational

16  or security incidents within the company.

17    Q   Okay.  And what would I call this kind of

18  document?  Is this a chat?  Is this -- what kind of

19  a system is this kept in?

20        ATTORNEY BLOCK:  Objection to form.

21    A   So I'm trying -- like, I don't know

22  exactly how to explain this as a concept.  Outside

23  it -- it's kind of like a task, but it's really not

24  like a task.  It's more like a project, like, if I

25  would have to explain it in a different way.

1    Q   (BY ATTORNEY WEINBERG) And so what's

2  reflected here in this document is the actions and

3  messages -- actions taken and messages sent for this

4  SEV project, the stanzaming project?

5        ATTORNEY BLOCK:  Objection to form.

6    A   Yes.

7    Q   (BY ATTORNEY WEINBERG) Okay.  I would like

8  you to take a quick look at page 3.  Towards the

9  bottom it says that -- there's a message from

10  ████████████████ on Monday, May 6, at -- 2019,

11  at 12:27 p.m.?

12    A   Yes.

13    Q   And he says that the WhatsApp engineering

14  work for this SEV investigation is coordinated by

15  you; is that accurate?

16    A   Yes.

17    Q   And what does that mean, it was

18  "coordinate -- well, what is "engineering work" that

19  he is referring to?

20    A   It is the engineering work required to

21  investigate and remediate the attack.

22    Q   And the engineering work comprises what?

23    A   It involved a lot of steps and a lot of

24  work from -- not just from me, but from a larger

25  group of people.

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 15 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024           {{Attorneys Eyes Only}}             Pages 30..33

Page 30

1    Q   Okay.  I guess I'm just trying to get a
2  sense of what distinguishes engineering work from
3  some other category of work that you may have not
4  been responsible for.
5        Would you be able to shed some light on
6  that?
7        ATTORNEY BLOCK:  Objection to form.
8    A   Like, what was the nonengineering work?
9    Q   (BY ATTORNEY WEINBERG) Well, if you're
10 coordinating the engineering work, was there other
11 kinds of work that you weren't coordinating or were
12 you coordinating all the work?
13       ATTORNEY BLOCK:  Objection to form and --
14   A   I was coordinating just the engineering at
15 WhatsApp.
16       ATTORNEY BLOCK:  -- just pause and give me
17 a chance to object before you start your answer,
18 please.
19   Q   (BY ATTORNEY WEINBERG) Okay.  And so what
20 does "coordinating network" mean?
21   A   Coordination in this case means scoping
22 work that needs to be done in order to achieve the
23 goal.
24   Q   And monitoring its progress as well, I
25 assume?

Page 31

1    A   Ensuring progress in monitoring, yes.
2    Q   It lists five tasks that were -- that you
3  were coordinating here.
4        Would you be able to just introduce us to
5  each of these five tasks and what they entailed?
6    A   So Number 1 -- and by the way, I don't
7  remember all the details of these tasks right now,
8  so I'll do my best to say it based on what I
9  remember.
10       Number 1, "logging packets from attackers
11 in EdgeRay," this task was about logging data from
12 the relay servers for the calls that we flagged at
13 "suspicious" and as part of the attack.
14   Q   What are the relay servers?
15   A   The relay servers are the servers
16 responsible for handling the realtime traffic
17 between devices during a call on WhatsApp.
18   Q   So they're a proxy between WhatsApp
19 clients?
20       ATTORNEY BLOCK:  Objection to form.
21   A   They're not just proxy.  They are -- they
22 have an essential role in establishing the realtime
23 channel between the devices.
24   Q   (BY ATTORNEY WEINBERG) The relay servers
25 also work in establishing the connection between

Page 32

1  the --
2    A   They --
3    Q   -- clients?
4    A   -- facilitate the connection -- the
5  realtime connection between the devices.
6    Q   What's difference between facilitating and
7  establishing?
8    A   In some cases there's direct
9  communication -- realtime communication between the
10 devices.
11       So if I call you, in some scenarios the
12 packets will actually not go through the relay.  But
13 in order to establish -- to -- like, in order to
14 establish that channel, you have to go through the
15 relay first.  But the actual packets are not proxied
16 in that case.
17       So in about 50 percent of the cases, the
18 relay acts as a proxy; but in the rest of them, it
19 does not act as a proxy.
20   Q   How do you determine -- or how does the
21 system determine whether the relay will be acting as
22 a proxy between clients and when it will not?
23   A   It is based on heuristics and whether
24 we -- we can establish a direct connection between
25 the devices or not.

Page 33

1        In some scenarios, it's not possible.  The
2  network configuration does not allow that to -- to
3  happen.
4    Q   So the relay servers will proxy
5  information between the clients whenever it's not
6  possible for the clients to communicate with each
7  other directly; is that accurate?
8        ATTORNEY BLOCK:  Objection to form.
9    A   Yes.
10   Q   (BY ATTORNEY WEINBERG) I have seen a lot
11 of references to "signaling servers" in the
12 documents.
13       What's the difference between the relay
14 servers and the signaling servers?
15   A   There are two main flows in establishing
16 the call on WhatsApp.  The first part that happens
17 at the beginning when you set up the call is called
18 signaling.
19       And the second part that happens -- that
20 transfers the real -- makes the realtime
21 communication between the devices is the relay.
22   Q   I guess I need some clarification.  The --
23 you said earlier that the relay servers facilitate
24 the creation of the connection?
25   A   Of the realtime channel.

Page 34

1    Q    Of the realtime channel.
2         So could you clarify what's the difference
3  between establishing the creation of the realtime
4  channel versus initiating -- setting up a call,
5  which is done by the signaling servers?
6         ATTORNEY BLOCK:  Objection to form.
7    A    So just to clarify, the difference between
8  the -- yeah.
9    Q    (BY ATTORNEY WEINBERG) Yeah, sorry.  The
10 signaling servers, you said, set up the call.
11        And then you said that the relay servers
12 will help establish the realtime channel and then
13 sometimes proxy data from one client to the other;
14 is that accurate?
15   A    Yes.
16        ATTORNEY BLOCK:  Objection, misstates the
17 testimony.
18   Q    (BY ATTORNEY WEINBERG) Could you expound a
19 little bit on that -- those two different functions?
20   A    Yes.  So the setup of the call always
21 starts with the signaling server.  And the signaling
22 server is the same server that we use for chat, so
23 it's synonymous with chatserver.
24   Q    Is that what's referred to as the
25 chatdservers --

Page 35

1    A    Yes.
2    Q    -- in the --
3    A    The VoIP signaling is a module within
4  chatd.
5    Q    And so the voice signaling uses the chat
6  functionality of WhatsApp to establish calls?
7    A    To start the call.
8    Q    To start the call.
9         And once it starts the call, the -- the
10 relay server establishes the realtime channel?
11   A    Exactly.
12   Q    And then half the time -- or some portion
13 of the time that relay server will then proxy data
14 between the two clients and in other instance it
15 will -- the two clients will access -- will
16 communicate directly in a peer-to-peer fashion?
17        ATTORNEY BLOCK:  Objection to form.
18   A    Yes.
19   Q    (BY ATTORNEY WEINBERG) So we will get into
20 all of this in detail in a little bit.  I just
21 wanted to close the loop on this resume.
22        In 2019, shortly after the stanzaming
23 investigation, your title changed to software
24 engineering manager for application security; is
25 that correct?

Page 36

1    A    Yes.
2    Q    And that was a position you held from 2019
3  to 2021?
4    A    Yes.
5    Q    Could you describe your work and
6  responsibilities in that position?
7    A    So the main responsibility that I had for
8  the WhatsApp application security team is to drive
9  the roadmap for hardening and improving security
10 across WhatsApp.
11   Q    And was this a new position created in
12 response to the stanzaming incident?
13        ATTORNEY BLOCK:  Objection to form;
14 foundation.
15   A    I'm not sure what you mean by -- like, in
16 response to that.
17   Q    (BY ATTORNEY WEINBERG) Was there a
18 security team before you took over as the security
19 engineering manager?
20        ATTORNEY BLOCK:  Objection to form.
21   A    There were people working on security, but
22 it was not a team dedicated to it.
23   Q    (BY ATTORNEY WEINBERG) What's the
24 difference?
25   A    So we had, for instance, a security

Page 37

1  partner that was assigned to WhatsApp.
2         And part of the security team was not
3  just -- not just hiring new people that worked full
4  time for WhatsApp, but it was also working
5  cross-functionally with other teams in Facebook like
6  the Facebook security team.
7         There were already people assigned to
8  WhatsApp before we had the team.  It was just not
9  organized in the same way that we did it after.
10   Q    Do you remember in 2019, when you became
11 the software engineering manager for application
12 security, who you reported to?
13   A    The first manager that I had was ███████
14 ███.
15   Q    And you had another manager after that,
16 evidently?
17   A    Yeah, he left the company.  And then the
18 next manager that I had was ████████.
19   Q    And then how big was your team by the end
20 of 2019?
21   A    By the end of 2019, I have to remember,
22 but I think we only had three years, I believe, in
23 the team.
24   Q    And who were they?
25   A    I believe ███████████ and ██████

Page 102

1 correct?
2        ATTORNEY BLOCK:  Objection to form.
3    Q    (BY ATTORNEY WEINBERG) I'll rephrase.
4        The ultimate choice of a physical server
5 that processes the request is the result of
6 WhatsApp's algorithms by choice?
7        ATTORNEY BLOCK:  Objection to form;
8 misleading.
9    A    The load balancer that takes the decision
10 of which physical server is actually provided by
11 Facebook infrastructure.  That's not what the
12 WhatsApp team works on.
13    Q    (BY ATTORNEY WEINBERG) So the -- I guess
14 we did speak about WhatsApp's DNS.  We talked about
15 ISP's DNS.  And now we're talking about Facebook's
16 load balancers, right?
17    A    Yes.
18    Q    And those are all components owned by --
19 or operated by parties other than the user, correct?
20        ATTORNEY BLOCK:  Objection to form.
21    A    I'm not sure about the concept of, like,
22 parties other than the user.  What --
23    Q    (BY ATTORNEY WEINBERG) Those are --
24    A    -- does that mean?
25    Q    Those are server programs controlled by

Page 103

1 Facebook and WhatsApp and the ISP?
2        ATTORNEY BLOCK:  Objection to form.
3    A    Facebook.
4    Q    (BY ATTORNEY WEINBERG) Okay.  The -- can a
5 user choose the specific physical server that
6 ultimately would process his request?
7        ATTORNEY BLOCK:  Objection to form.
8    A    By "user," you mean a human?
9    Q    (BY ATTORNEY WEINBERG) I'll try -- I'll
10 start with that, sure.
11    A    There's -- we don't provide a way for --
12 for the user to choose what server will process the
13 request.
14    Q    So it's not possible for a client to send
15 a request into WhatsApp's infrastructure and specify
16 which server -- physical server will process that
17 request?
18        ATTORNEY BLOCK:  Objection to form.
19    A    By "client," you mean an official WhatsApp
20 client?
21    Q    (BY ATTORNEY WEINBERG) Let's start with
22 that.
23    A    Sure.  A WhatsApp official client does not
24 allow setting the -- the physical server that will
25 handle the request.

Page 104

1    Q    Okay.  Did Pegasus send requests that
2 specified the physical server that would handle the
3 request?
4        ATTORNEY BLOCK:  Objection to form;
5 foundation.
6        You can answer, if you know.
7    A    I don't know what Pegasus did.
8    Q    (BY ATTORNEY WEINBERG) All right.  But you
9 have no evidence or reason to believe then that
10 Pegasus sent requests into this infrastructure and
11 targeted a specific physical server location?
12        ATTORNEY BLOCK:  Objection,
13 mischaracterizes; calls for speculation.
14    A    I don't know whether they targeted or not.
15 I just don't know.
16    Q    (BY ATTORNEY WEINBERG) All right.  Can I
17 ask you a few questions about the -- hang on.
18 Scratch that.  All right.
19        That was a really great side from where we
20 left off with the signaling server.  I think that's
21 where we left off.  We were talking about the
22 signaling server initiating a VoIP call and how it
23 did that, and we just discussed the physical and
24 transport layer infrastructures, the routing
25 infrastructures that it uses.  So back up to the

Page 105

1 application layer, if we could.
2        The signaling server, which you said was
3 the chatdserver helps a client establish a call, you
4 said?
5        ATTORNEY BLOCK:  Objection to form.
6    A    I don't remember exactly what I said.
7    Q    (BY ATTORNEY WEINBERG) If you would open
8 up the -- the White Paper, you'll see right there in
9 that -- on page 4, the "WhatsApp VoIP
10 Infrastructure":
11        WhatsApp VoIP infrastructure
12        has server and client applications.
13        The server functions as an
14        intermediary between the WhatsApp
15        applications, helping them to
16        establish a call, as well as
17        proxying VoIP data between clients
18        once the call starts.
19        Do you see that?
20    A    Yes.
21    Q    Okay.  So we are talking -- that's two
22 different operations.
23        One of them is establishing the call.  The
24 other one is -- is proxying data once the call
25 starts.  So I would like, to talk about that first

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 18 of 113

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 114..117

Page 114

1    A   So these are concurrent.  So as soon as
2 the caller receives -- the -- the callee receives
3 the offer, as soon as it's processed and it starts
4 ringing in the same time, it also sends back a
5 confirmation to the server that it started ringing.
6        And I don't recollect specifically the
7 name of that stanza, but I think it's a -- I think
8 it's an offer ACK that is being sent.
9    Q   (BY ATTORNEY WEINBERG) Okay.  What then
10 does the chatdserver do once it receives this offer
11 ACK?
12   A   I think what it does is it forwards the
13 ACK to the call so that the caller can also start
14 the ring -- the ringing process.
15   Q   Have you heard the term "offer" --
16 sorry -- "Answer stanza"?
17   A   Yes.
18   Q   I saw it in some of the documents.
19       What is it it Answer stanza?
20   A   The Answer stanza, I believe, is the
21 stanza that is sent from the callee at the moment
22 the user presses the "Answer" button and accepts the
23 call.
24   Q   All right.  So at our current step, the
25 chatdserver sent the offer ACK back to the -- to the

Page 115

1 caller; and now if the callee picks up the phone,
2 his device will send an Answer stanza somewhere?
3    A   To the chatd.
4        ATTORNEY BLOCK:  Objection to form.
5    Q   (BY ATTORNEY WEINBERG) The caller, once
6 the caller picks up the phone, the caller's phone
7 will send an Answer stanza back to the chatdserver,
8 right?
9        ATTORNEY BLOCK:  Object to form.
10   A   The caller will send back an answer when
11 the user presses the "Answer" button, yes.
12       ATTORNEY BLOCK:  Did you say "caller" or
13 "callee" on that one?  I got confused.
14   Q   (BY ATTORNEY WEINBERG) The callee would
15 send the answer?
16       ATTORNEY BLOCK:  I think we have got
17 testimony about the "caller" sending an answer
18 stanza.
19       ATTORNEY AKROTIRIANAKIS:  I'm sure she is
20 going to have to listen when she goes through it, I
21 hope.
22   A   Yeah, that's not accurate.  So the answer
23 is only sent by the callee.
24   Q   (BY ATTORNEY WEINBERG) Got it.  All right.
25 At that point is there a peer-to-peer connection

Page 116

1 established?
2    A   No.
3        ATTORNEY BLOCK:  Objection to form.
4    Q   (BY ATTORNEY WEINBERG) Okay.  So what
5 happens next?
6    A   Even before the answer happens, there's a
7 negotiation process between the caller and the
8 callee about the latency, about the bandwidth that
9 is going to be used.  So all that negotiation
10 happens before there's any -- any answer.
11   Q   Okay.  So then I'll go back one step.
12       The chatdserver sent the offer ACK to the
13 caller and now a negotiation process begins, you
14 say?
15       ATTORNEY BLOCK:  Objection to form.
16   A   Sorry.  So the -- the caller -- can you
17 repeat the last part?
18   Q   (BY ATTORNEY WEINBERG) The callee sends an
19 acknowledgment back to the chatdserver, the offer
20 acknowledgment, and what happens next?
21       You talked about a negotiation process.
22       ATTORNEY BLOCK:  Objection to form.
23   A   The chat server will forward the offer ACK
24 or send another stanza that I don't remember its
25 name.  But it would signal to the callee, the fact

Page 117

1 that the caller has been reached and the offer was
2 ACK'd by the callee.
3        And once they both know that -- both --
4 they know about each other, that they're aware that
5 there's a call happening, this is when the -- the
6 relay and bandwidth negotiation starts happening.
7    Q   (BY ATTORNEY WEINBERG) Okay.  Tell me
8 about what you mean by "the relay and bandwidth
9 negotiation."
10       ATTORNEY BLOCK:  Objection to form.
11   A   About each of them or --
12   Q   (BY ATTORNEY WEINBERG) I just want to know
13 the steps that are involved in the negotiation
14 process that you just mentioned.
15       ATTORNEY BLOCK:  Objection to form.
16       Wait for a question.
17   Q   (BY ATTORNEY WEINBERG) What are the steps
18 of the negotiation process you just mentioned?
19       ATTORNEY BLOCK:  Objection to form.
20   A   About what negotiation?
21   Q   (BY ATTORNEY WEINBERG) You testified that
22 the chatdserver sends the offer ACK back to the
23 caller.
24       And after that happens and the two -- the
25 caller and the callee know that they are now ready

Page 118

1 to communicate, a negotiation process begins wherein
2 the caller and callee negotiate the relay and
3 bandwidth parameters.
4       I would like to understand, if you could
5 explain to me, what that negotiation entails.
6       ATTORNEY BLOCK:  Objection to form;
7 misstates.
8    **A   So this negotiation, the relay**
9 **negotiation, starts by every -- both caller and**
10 **callee probing -- reaching all the relays in the**
11 **list of relays that were distributed by the chat**
12 **server.**
13    Q   (BY ATTORNEY WEINBERG) Sorry.  Say that
14 again.
15    **A   So both caller and callee will attempt**
16 **connecting to every relay in the list of relays that**
17 **they both -- they were both given by the signaling**
18 **server.**
19    Q   Okay.  What's next?
20    **A   This process is done not just by the**
21 **IP address, but also by an authorization token that**
22 **is unique to the call.  So both caller and callee**
23 **will be passed a unique authorization token to use**
24 **only those specific relays.**
25       **And using the token, both the caller and**

Page 119

1 **callee attempt to connect to every relay in that**
2 **list using the authorization token.**
3    Q   Okay.  So to rephrase what you said, the
4 chatdserver provides a list to the two clients of
5 relay servers and provides them authentication
6 credentials, and each one tries to connect to the --
7 to all of the relay servers provided to them by the
8 chatdserver?
9    **A   Authorization token.**
10      ATTORNEY BLOCK:  Objection to the form;
11 misstates.
12    **A   Authorization token.  It's only**
13 **authorization.  It's not authentication.**
14    Q   (BY ATTORNEY WEINBERG) Okay.  Tell me --
15 what is that authorization token?
16    **A   So the relay server is designed in a way**
17 **that it does not perform advanced authentication of**
18 **the devices that send data to it.**
19      **It operates at a lower security level**
20 **where the only thing that it does is validates an**
21 **authorization token that has a low expiration time.**
22      **So as long as you have a valid token, you**
23 **can use the relay.  So that is authorization for**
24 **authentication, but we don't -- we don't**
25 **authenticate the users of the relay.**

Page 120

1    Q   (BY ATTORNEY WEINBERG) Okay.  What is the
2 purpose of trying to connect to all those relays?
3    **A   The purpose of connecting to the relays is**
4 **firstly to see which one is available; and second,**
5 **to measure the latency to each of them.**
6    Q   Let me ask:  How does the chatdserver
7 decide which relay servers to give to these two
8 clients?
9      ATTORNEY BLOCK:  Object to form.
10    **A   The decision to pick -- to select the list**
11 **of relays is based on latency measurements.  And the**
12 **information that it uses is the caller IP address**
13 **and the last seen IP of the callee.**
14      **The algorithm that we used at that time**
15 **was essentially to find the top three of each --**
16 **based on each IP address, and we merged the list so**
17 **that the sum of the latency is -- is the lowest.**
18      **So we choose the top lowest latency sum in**
19 **that merged list of the relays, and that's the one**
20 **that we delivered to both of them.**
21    Q   (BY ATTORNEY WEINBERG) Okay.  So the
22 chatdserver chooses which relay servers the clients
23 should attempt to connect to?
24      ATTORNEY BLOCK:  Object to form.
25    Q   (BY ATTORNEY WEINBERG) I think you just

Page 121

1 got done saying that?
2    **A   Yes, the chatdservers decide that.  Yes.**
3    Q   Okay.  And then there's a second choice,
4 evidently, that you talked about just before this
5 where the clients connect to this list of relay
6 servers and then they -- each one decides which one
7 of the connections to then use; is that --
8    **A   I think it's a little confusing -- there's**
9 **some confusion in there, so let me clarify.**
10    Q   Sure.
11    **A   Both the server -- both the signaling**
12 **server and the clients make a decision in this**
13 **process.  It's a hybrid decision.**
14      **So the server picks the top five, let's**
15 **say, or three.  But in the end, each client picks**
16 **its own, like, relay to use, and that's just one.**
17 **But the client decides that based on the short list.**
18    Q   Do the two clients have to agree on a
19 specific relay server to use?
20    **A   They don't.  The -- the network paths are**
21 **completely asynchronous and, like, they don't need**
22 **to be the same.**
23      **So the packets -- if I initiate a voice**
24 **video call to you, the packets that I sent to you**
25 **don't need to take the same network path that**

Page 122

1 you sent -- the packets that you sent to me.
2 They're separate.
3        However, in most cases they'll use a
4 similar network path, but that's just statistics.
5    Q    All right.  And they make that choice
6 based on performance considerations, I assume?
7    A    Yes.
8    Q    All right.  What's an example of the
9 performance considerations?
10    A    What do you mean by "performance
11 consideration"?
12    Q    The client chooses a relay server based on
13 which server provides it the best performance,
14 generally speaking, correct?
15        ATTORNEY BLOCK:  Object to form.
16    A    The best latency.
17    Q    (BY ATTORNEY WEINBERG) The best latency.
18        So what is the definition of "latency"?
19    A    It's a roundtrip time between the client
20 device and the edge location or the relay.
21    Q    Okay.  So now the connection between the
22 clients and the relay server, is there a protocol
23 for establishing that connection?
24    A    Yes.
25    Q    And what protocol is that?

Page 123

1    A    It's a custom STUN protocol.
2    Q    STUN?
3    A    STUN, S-T-U-N.
4    Q    STUN?
5    A    It is a -- STUN is a -- it's a protocol
6 format.  So the messages are -- are using the STUN
7 headers, but the protocol itself is designed by
8 WhatsApp.  It's proprietary.
9    Q    What do you mean by the -- which part of
10 it is proprietary and which part of it's not
11 proprietary?
12        ATTORNEY BLOCK:  Objection to form.
13    A    So for instance, the headers are standard.
14 They're part of the STUN message format.
15        But the payload inside the STUN messages
16 is customized for the face -- for the WhatsApp
17 network, particularly with regards to encryption.
18    Q    (BY ATTORNEY WEINBERG) What sorts of data
19 is in the payload of these STUN protocol messages?
20    A    The most important piece of information
21 that is sent in the payload, it's the authorization
22 token that I mentioned before, which is a preshared
23 key ex -- preshared key encryption mechanism that
24 has built-in expiration.
25    Q    So explain that to me.  You said earlier

Page 124

1 that the authentication token or --
2    A    Authorization token.
3    Q    -- authorization token is different -- is
4 not authentication.
5        So could you help me understand the
6 difference between these two things?  I could draw
7 an analogy, but maybe you can as well.
8        ATTORNEY BLOCK:  Objection to form.
9    A    Between authorization and authentication?
10    Q    (BY ATTORNEY WEINBERG) Yeah.  Is
11 authorization like you have a key and anybody who
12 has a key can walk in and authorization, and
13 authentication is knowing somebody's identity; is
14 that the difference?
15        ATTORNEY BLOCK:  Object to form.
16    A    That's one way to characterize it, yes,
17 informally.
18    Q    (BY ATTORNEY WEINBERG) Okay.  How would
19 you characterize it?
20    A    So authentication requires a higher level
21 of checking.  And it involves check -- like,
22 verifying the identity of the end -- of the endpoint
23 that is trying to connect.  Whereas, with
24 authorization, as long as you have the token,
25 there's no other checks that are being performed.

Page 125

1    Q    Okay.  So now that the clients are
2 connected to their respective relays, what happens
3 next in the protocol?
4    A    So the clients do probing of the relay
5 during this phase of negotiation by sending multiple
6 messages and taking a lot of measurements.  And the
7 next thing that they do is they exchange that data
8 between them.
9    Q    Exchange what data between them?
10    A    The data -- the latency measurements that
11 each party has done.
12    Q    Okay.
13    A    That data is exchanged through a stanza
14 that is specific.  And I don't remember exactly the
15 name if the stanza, but it's a specific stanza only
16 used for VoIP.
17        So the signaling server is again involved
18 with proxying this information from the caller to
19 the callee and from the callee to the caller.  Both
20 ways.
21    Q    Okay.  And then what?
22    A    At that point each -- both the caller and
23 the callee knows -- designates a particular relay
24 that they will start using.
25        And nothing else happens as -- until the

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 21 of 113

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}                      Pages  134..137

Page 134

1    Q   Any others?
2    A   Not from what I remember.
3    Q   Okay.  So we spoke about the chatdservers
4  and the relay servers.  I'll start with the
5  chatdservers.
6        Where were they implemented?  The
7  computers that executed the chatd functionality,
8  where were they located?
9    A   They were located in the data centers that
10  we just mentioned.
11    Q   Okay.  And the relay servers, were they
12  also located in the data centers we just mentioned?
13    A   No.
14    Q   Okay.  Where were they located?
15    A   The relay servers were located in the edge
16  locations that we talked about earlier.
17    Q   And those edge locations are the 100
18  locations, including the two in California?
19    A   Yes.
20    Q   Okay.  In order to access one of these
21  servers, for example, the chatdserver or the relay
22  servers or one of these load balancing servers,
23  there is presumably some kind of either
24  authorization or authentication that occurs?  Yes?
25        ATTORNEY BLOCK:  Object to form.

Page 135

1    A   Would you want to be more specific with
2  regards to, like, what authorization --
3    Q   (BY ATTORNEY WEINBERG) Sure.  Let's start
4  with the load balancers.  All right.
5        The edge load balancers, when it receives
6  a request, will it process it automatically or will
7  it check for some kind of authorization?
8        ATTORNEY BLOCK:  Object to form.
9    A   The edge location, in case of the relay,
10  it will check the author -- authorization token in
11  the STUN message that is sent by the client.
12        And if that token is not valid, it will
13  not allow the use of the relay.
14    Q   (BY ATTORNEY WEINBERG) And that's those
15  temporary tokens that don't do authorization -- I'm
16  sorry -- that don't do authentication --
17    A   Exactly.
18    Q   -- but instead do authorization?
19    A   Exactly.
20    Q   And what about the chatdservers?  What
21  kind of credentials are required for accessing the
22  functionality implemented by the chatdservers?
23        ATTORNEY BLOCK:  Objection to form.
24    A   The chatdservers -- and just to be clear,
25  we're talking about the servers in the data centers

Page 136

1  now, not in the edge locations?
2    Q   (BY ATTORNEY WEINBERG) Are the
3  chatdservers in the edge locations?
4    A   No.
5    Q   So then the chatdservers in the data
6  centers?
7    A   In the data centers, which is only load
8  balancers in the edge locations.
9        And those will not perform authentication
10  for the chat traffic.  The authentication happens on
11  the chat servers inside the data centers.
12        And it's based on -- it's a proprietary
13  protocol -- it's the noise protocol that essentially
14  provides both encryption and authentication at the
15  same time.
16    Q   Okay.  Tell me about this authentication
17  protocol for accessing the chatdservers.
18        ATTORNEY BLOCK:  Object to form.
19    A   What specifically do you want to know
20  about it?
21    Q   (BY ATTORNEY WEINBERG) What is the form of
22  the credentials?
23    A   In a simplified way, the credential is
24  essentially an identity key that's stored on the
25  client device.

Page 137

1    Q   And the client passes it along with every
2  request that it makes to the chatdserver?
3    A   It doesn't.  It's more complicated.
4    Q   Okay.  Tell me --
5    A   It's -- it's part of the handshake -- the
6  initial handshake that it does with the chatd.  But
7  from that point on, it uses a preshared key to -- it
8  uses a negotiated shared key to encrypt the rest of
9  the traffic.
10    Q   Got it.  How are the original credentials
11  obtained?
12    A   The credentials are obtained through the
13  registration process to WhatsApp.
14    Q   And what does WhatsApp then send
15  the user that constitutes these credentials?
16        ATTORNEY BLOCK:  Object to form.
17    A   I'm not sure what you mean by "what does
18  it send to users."
19    Q   (BY ATTORNEY WEINBERG) When the user needs
20  to authenticate the chatdservers, it needs to
21  provide some kind of authenticating information, so
22  I'm asking:  What does WhatsApp provide the client
23  to help it authenticate those requests?
24        ATTORNEY BLOCK:  Object to form.
25    A   So in order to validate -- to

Page 138

1  authenticate, the WhatsApp server sends an
2  activation code to verify that the person who
3  initiates the registration process has ownership
4  over the phone number.
5          And it's over SMS.  So we'll send the code
6  over SMS.  In using that code, the client can finish
7  the registration process.  And after that is
8  finished, the credentials are being admitted.
9          But just to be clear, that identity key
10  that I was talking about is never seen by the
11  server.  It's the basis of the internal encryption.
12  So the identity key -- identity key is never -- does
13  not -- does never leave the client device.
14     Q    I'm not sure that I followed all of that.
15          The identity key is -- how does it arrive
16  at the client device?
17          ATTORNEY BLOCK:  Objection to form.
18     A    It is generated -- like, it is generated
19  locally by the client device before the registration
20  starts and when someone installs the app on their
21  phone.
22     Q    (BY ATTORNEY WEINBERG) So the client
23  creates its own identity key kind of like a private
24  key?
25          ATTORNEY BLOCK:  Object to form.

Page 139

1     A    You can refer to it as a private key, yes.
2     Q    (BY ATTORNEY WEINBERG) Okay.  And how does
3  it use that private key to authenticate to the
4  chatdserver?
5     A    It is a complex protocol which is part of
6  what noise does, but it's essentially a key to
7  there.
8          So there's a public key and a private key.
9  The public key is what is sent to the server so the
10  server can verify that the client is indeed who --
11  who they claim they are.
12          So there's multiple keys involved.  And
13  this protocol is fairly complex.  So I'm not an
14  encryption expert, by the way, so I can talk to some
15  aspects of it, but I don't know, like, the -- very
16  little details of, like, how -- how, like -- all the
17  steps involved and all the types of keys.  There are
18  multiple keys involved in this process.
19          But the idea is that the identity key is
20  something that -- or the private key does never
21  leave the client device.
22     Q    Okay.  So client device uses this private
23  key to obtain a negotiated key with a chatdserver
24  for each session?
25          ATTORNEY BLOCK:  Object to form.

Page 140

1     A    Yes.
2     Q    (BY ATTORNEY WEINBERG) Okay.  And that
3  negotiated key is what gets passed to -- from the
4  client to the chatdserver upon each request to the
5  chatdserver?
6     A    The shared key not passed.  The shared key
7  is only used an encryption key for the -- as a block
8  cipher encryption key for the traffic.
9          And the server uses that shared key to
10  decrypt the -- that payload.
11     Q    And that same shared key is used to
12  encrypt it?
13     A    By the client, yes.
14     Q    Okay.
15     A    And this is only metadata, by the way.  It
16  does not include, like, the actual content of the
17  messages.  That's a different -- a different thing.
18     Q    I'm sorry.  The key is used to encrypt
19  only metadata?
20     A    The -- yes, it's used to encrypt the data
21  that is sent between the client and the server over
22  the Internet so that someone cannot just look at the
23  traffic and understand what the client is talking
24  with the server.
25     Q    When that message arrives at the

Page 141

1  chatdserver, the server then decrypts it using the
2  same shared key.
3          How does it decide that it's an authentic
4  message?
5          ATTORNEY BLOCK:  Object to form.
6     A    It would not be able to decrypt the
7  content.  And it would not pass all the -- the
8  checks on the -- so the -- basically, the -- there's
9  a verification process that checks whether the --
10  the message was tampered with, it was modified.
11          And it will do all of that upon receival.
12  The chatdserver will do that before using the
13  payload.
14     Q    (BY ATTORNEY WEINBERG) And that's just
15  based on the shared key?
16     A    Yes.
17     Q    Okay.  You told us a moment ago about the
18  server locations for the chat features.  And I think
19  that you testified earlier today that the VoIP uses
20  the -- those chat servers.
21          So I just want to confirm that the --
22  those server locations we discussed just now are for
23  the -- are the servers being used for voice over IP.
24          ATTORNEY BLOCK:  Object to the form of the
25  question.

Page 206

1      A   What kind of server?
2      Q   (BY ATTORNEY WEINBERG) Any server
3  physically located in California.
4         ATTORNEY BLOCK:  Same objection.
5      A   Any server owned by Facebook?
6      Q   (BY ATTORNEY WEINBERG) Any server in
7  California owned by anybody.
8         The question is:  Does -- do Plaintiffs
9  know about any server physically located in
10  California that was specifically targeted by Pegasus
11  software?
12        ATTORNEY BLOCK:  Objection to form.
13     A   The only thing that I know is that during
14  the attack that we observed, there were some servers
15  located in the edge locations in the San Jose and
16  Los Angeles metro areas that were involved in those
17  attacks, relay servers.
18        That's the only thing -- the only
19  information that I have.
20     Q   (BY ATTORNEY WEINBERG) Okay.  But do
21  you --
22        ATTORNEY BLOCK:  Can we take a short
23  break?
24        ATTORNEY WEINBERG:  Just one second.
25     Q   (BY ATTORNEY WEINBERG) The relay server

Page 207

1  can't be targeted by client requests, right?
2         ATTORNEY BLOCK:  Object to form.
3      Q   (BY ATTORNEY WEINBERG) It's -- WhatsApp
4  decides to how to route the relay servers -- how to
5  write requests to the relay servers?
6         ATTORNEY BLOCK:  Object to form.
7      A   So the signaling server picks the relay
8  servers from all the available edge locations.
9      Q   (BY ATTORNEY WEINBERG) And the signaling
10  server is programmed by WhatsApp?
11     A   By -- yes.
12     Q   And the user can't select the relay server
13  to use?
14     A   The user can select the relay server.
15        What the signaling server does is selects
16  from the hundred, it selects the top three or five.
17        But ultimately any of the clients can
18  decide on each -- like, what relay server can you
19  use from the set of three or five.
20     Q   And the relay servers, remind me, are
21  located in -- can you confirm that a user cannot
22  purposely direct requests at a particular relay
23  server?
24        ATTORNEY BLOCK:  Object to form.
25     A   That's not entirely correct.  So a user

Page 208

1  a -- a client is given a lister of relays.
2         And as part of the relay negotiation
3  process, every client conducts all the relays they
4  were given.  But ultimately, the data packets that
5  are being sent is up in the decision of each client.
6  So they decide on their own which relay server to
7  use.
8      Q   (BY ATTORNEY WEINBERG) Okay.
9         ATTORNEY BLOCK:  Can we take that short
10  break?
11        ATTORNEY WEINBERG:  Sure.
12        THE VIDEOGRAPHER:  Off the record at
13  4:11 p.m.
14        (A break was taken from 4:11 p.m. to
15  4:30 p.m.)
16        THE VIDEOGRAPHER:  We were on the record
17  at 4:30 p.m.
18     Q   (BY ATTORNEY WEINBERG) Thank you.
19        So just before we left off you were
20  talking about the investigation that WhatsApp
21  conducted for -- I guess it's about -- around the
22  week of May 2, 2019?
23     A   What investigation about the attack?
24     Q   The stanzaming investigation.  From what I
25  understand, WhatsApp studied traffic for about a

Page 209

1  week or so before closing the vulnerability to see
2  if they could gain some insight into -- into the
3  incident; is that correct?
4         ATTORNEY BLOCK:  Object to form.
5      A   Yes, we firstly detected the suspicious
6  activity.  I don't remember exactly the day.  I
7  think it was Thursday or Friday.
8         And the following Friday -- until the
9  following Friday, we did logging of the activity of
10  the attack in order to gain an understanding of how
11  the attack works.
12        ATTORNEY BLOCK:  I don't want to interrupt
13  you, but I probably should have done it before you
14  started.  I thought you were going to go there
15  first.
16        As I mentioned to you off the record,
17  during the break Mr. Gheorghe did some rereview of
18  some of the prep that he did for his incorporate
19  representative topics, including with respect to
20  QuadraNet, so I commend to you revisiting those
21  topics when you wish to do so.
22        ATTORNEY WEINBERG:  All right.  Thank you.
23     Q   (BY ATTORNEY WEINBERG) If you could take a
24  quick look at 1167.  That's Exhibit 1167.  It's the
25  stanzaming chat.  Just at page -- I'll remind you

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 24 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024                    {{Attorneys Eyes Only}}            Pages 210..213

Page 210

1  that at the bottom of page 1, there was this --
2  actually, I guess, the -- yeah, at the top of page 2
3  where it says that the suspicious stanza received in
4  this incident was being sent on May 2, 2019.  That's
5  the second and third line of that.
6        So this instance sort of began it -- on
7  May 2, 2019, correct?
8     **A   Yes.**
9     Q    And then if you go down to the next line
10 where you have got Joaquin speak -- writing on
11 Friday, May 3, at 4:49 a.m., he says:
12        Here is a "diff" -- with the
13        name of a "diff" -- that will
14        enforce our servers to only accept
15        valid stanzas.  This could mitigate
16        the impact, but we would like to
17        first identify the vulnerability,
18        if there is, before modifying this.
19        My understanding of the "diff" in this
20 context is that there's a code change that's
21 available to push to the server?
22    **A   That's exactly right.**
23    Q    And once that gets pushed to the server,
24 it will modify the servers to only accept valid
25 stanzas; is that correct?

Page 211

1        ATTORNEY BLOCK:  Object to form.
2     **A   I haven't reviewed that "diff" for, like,**
3  **years, so I don't know about all the details in it,**
4  **but it's likely a change that enforces the**
5  **validation -- like, the blocking -- it does**
6  **enforcement for the stanza validation --**
7     Q    (BY ATTORNEY WEINBERG) Got it.
8     **A   -- for the signaling server.**
9     Q    Understood.  And it says:
10        This can mitigate the impact,
11        but we would like to first identify
12        the vulnerability, if there is,
13        before modifying this.
14        And so what he is saying there is:  Hey,
15 let's not push this valid -- this enforcement out to
16 the server just yet; let's leave it open for a
17 while, observe some traffic, and see what we can
18 learn about this incident?
19        Is that what you guys ended up doing?
20    **A   Yes.  That is -- and by the way, this is**
21 **an industry standard practice.  We're not -- like,**
22 **we're just following the process, basically.**
23    Q    I see.
24        So going through all these materials,
25 there were a lot of logs with different names.  And

Page 212

1  I just want to go through some of them to figure out
2  which ones of them refer to what and whether there's
3  repeats and -- just for nomenclature sake.
4     **A   Sure.**
5     Q    "Server trace logs," what does that
6  typically refer to in these documents?  And I can
7  show you a document, if you're confused about it,
8  but server trace logs.
9     **A   Refreshing my memory right now, I think**
10 **server trace log -- can I see the document?  I think**
11 **that'll be easier.**
12    Q    Sure.  It's in 1105, the "stanza
13 validation project task."
14        Let's see if I can find exactly where.  So
15 May 4, 2019 is page 13 of the document.
16    **A   What page?  Sorry.**
17    Q    Page 13 of the document is -- there's a
18 comment from Jesus on May 4, 2019.  He says:
19        Adding server trace logs for
20        some number, sending the malicious
21        stanza.
22        ATTORNEY BLOCK:  Object to form.
23    Q    (BY ATTORNEY WEINBERG) The question is:
24 What is the trace log?
25    **A   The server trace log is a log from the**

Page 213

1  **chat server about -- at different points in handling**
2  **stanzas.**
3        **So once the trace log -- it's a tool.**
4  **It's an internal tool where we would, for a**
5  **particular number, enable trace logs.  And we**
6  **would -- once that's enabled, we would see in**
7  **realtime all the activity from that number**
8  **throughout the chat servers.**
9     Q    Did you also have server trace logs for
10 the relay servers?
11    **A   Those are called differently.  Those are**
12 **called EdgeRay logs.**
13    Q    EdgeRay logs.
14        And what kind of information is contained
15 in the EdgeRay log?
16    **A   In the EdgeRay log, we did some custom**
17 **logging regarding the source IP of the packet, the**
18 **destination IP, the size of the packet, and the**
19 **content of the packet, I believe.**
20        **We were changing that logging format quite**
21 **a lot, so I don't know off the top of my head, like,**
22 **all the fields that we were logging.**
23        **But at a high level, that's -- those are**
24 **the ones that I remember right now.**
25    Q    Okay.  Validation log?

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 25 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages 254..257

Page 254

1 of the objects of using Pegasus was to read
2 information from the phone, including chat logs.
3     I'm asking if you're aware of the Pegasus
4 software deleting those logs.
5   **A   I'm not aware of a deletion.**
6     ATTORNEY BLOCK:  And the same objections
7 to that question.
8   Q   (BY ATTORNEY WEINBERG) Are you aware of
9 Pegasus offering -- altering those logs?
10     ATTORNEY BLOCK:  Same objections.  Vague.
11   **A   I'm not aware.**
12   Q   (BY ATTORNEY WEINBERG) Does WhatsApp own
13 those logs?
14     ATTORNEY BLOCK:  Objection to form and
15 scope.
16   **A   I'm not an expert into, like, the Terms of**
17 **Service and what data WhatsApp owns and what not, so**
18 **I don't -- I cannot speak to that.**
19   Q   (BY ATTORNEY WEINBERG) Do you have any
20 evidence that Pegasus prevented WhatsApp from
21 accessing the client devices as it normally would?
22     I think you testified earlier that
23 WhatsApp was able to send messages to the client
24 devices, pull logs, that kind of thing?
25     ATTORNEY BLOCK:  Object to form;

Page 255

1 misstates.
2   Q   (BY ATTORNEY WEINBERG) I'll rephrase my
3 question.
4     Do you have any evidence that Pegasus
5 prevented WhatsApp from accessing the client logs --
6 devices as it normally would?
7     ATTORNEY BLOCK:  Objection to form.
8   **A   I'm not aware of any information related**
9 **to this.**
10   Q   (BY ATTORNEY WEINBERG) Do you have any
11 evidence that Pegasus prevented WhatsApp users from
12 using their -- the WhatsApp service?
13     ATTORNEY BLOCK:  I object to form and
14 scope, partial.
15   **A   What was the question again?**
16   Q   (BY ATTORNEY WEINBERG) Do you have any
17 evidence that Pegasus prevented -- I'm sorry.
18     ATTORNEY WEINBERG:  Would you read back
19 the question for me?
20     (The court reporter read back the
21 following testimony:
22     Do you have any evidence that
23     Pegasus prevented WhatsApp users
24     from using their -- the WhatsApp
25     service?)

Page 256

1     ATTORNEY BLOCK:  Same objections.
2   **A   What do you mean by "the WhatsApp service"**
3 **in this case?**
4   Q   (BY ATTORNEY WEINBERG) WhatsApp provided a
5 VoIP service that allowed users to make telephone
6 calls and video calls, and that's the service I'm
7 referring to.
8     ATTORNEY BLOCK:  Same objections.
9   **A   So I'm -- I'm a little confused by this**
10 **question.  Like, I don't understand, like, how --**
11 **like, how would Pegasus not allow users to use VoIP**
12 **and not allow access to VoIP services?**
13   Q   (BY ATTORNEY WEINBERG) I guess I'm not
14 sure about your clarification question there.
15     You could imagine that you get some sort
16 of virus on your phone which prevents you from
17 making phone calls using WhatsApp.  Right?
18     Did Pegasus do that?
19   **A   I don't have any information about that.**
20   Q   Just generally, did Pegasus cause
21 WhatsApp's service to break?  That's --
22     ATTORNEY BLOCK:  Objection to form.
23   **A   Cause to break?**
24     **I would say yes.  Because normally, like,**
25 **in a regular -- like, if you see -- if you see**

Page 257

1 **this -- the attack from the point of view of the**
2 **victim, like, if you receive some messages from the**
3 **server that are passed and those servers are**
4 **supposed to be sent by a legitimate client and they**
5 **all seem -- they were supposed to be doing not what**
6 **-- what they were doing.**
7     **So in our -- the way we think about it in**
8 **this trust model, the server is a trusted entity,**
9 **and it was -- so basically this attack made the**
10 **server forward some messages that would normally not**
11 **be sent by a regular client.**
12     **So that -- that actually -- I think I**
13 **would say that breaks the WhatsApp service.**
14   Q   (BY ATTORNEY WEINBERG) I didn't mean in a
15 metaphysical way.  I meant in a technological way,
16 WhatsApp's VoIP service was still accessible to any
17 user that --
18   **A   In a technological way, they were causing**
19 **crashes.  So their -- the victim's application would**
20 **crash in many of the cases of the attack.**
21     **I think that is very clear evidence that**
22 **in a technological way, they were impairing our**
23 **service.**
24   Q   So the extent of the impaired service
25 would be that during a failed installation,

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 26 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}                    Pages  258..261

Page 258

1 sometimes there would be a crash?
2      ATTORNEY BLOCK:  Object to form; misstates
3 testimony.
4     A   I think that's one evidence how they were
5 impairing the service, but that was just an example,
6 but...
7     Q    (BY ATTORNEY WEINBERG) Well, impairing the
8 trust in the service might be a different category.
9 I'm just kind of speaking from a technical
10 perspective.
11       Did the service still provide voice
12 services which allowed WhatsApp users to communicate
13 with one another across long distances?
14      ATTORNEY BLOCK:  I object to the preamble
15 of the question, and I object to the form of the
16 question that followed.  And --
17    A   Just to --
18      ATTORNEY BLOCK:  -- it --
19    A   -- be clear, I'm using "trust" here in a
20 very technical manner.  Trust is an important aspect
21 of designing secure systems.
22       And like, having a trust model in your
23 system influences a lot, like, the security of the
24 system.  So I'm not using it in a metaphorical sense
25 or in any way.  Trust is a big -- an important part

Page 259

1 of how you design secure systems.  It's the trust
2 model of your system.
3      ATTORNEY WEINBERG:  All right.  Can we
4 take a short break?  Is that all right with you
5 guys?
6      ATTORNEY BLOCK:  Yeah.
7      THE VIDEOGRAPHER:  6:02 p.m.
8      (A break was taken from 6:02 p.m. to
9 6:19 p.m.)
10      THE VIDEOGRAPHER:  We are on the record at
11 6:19 p.m.
12    Q    (BY ATTORNEY WEINBERG) All right.  Do we
13 have Exhibit 1106 out already?  I would like to
14 direct your attention to page 7 of this.
15    A   Would you confirm the number at the
16 bottom?
17    Q   Yeah.  It's 115245.
18    A   All right.
19    Q   There's an exchange here where Andrew
20 Stephen Robinson writes at 13:44:15, the time -- he
21 says:
22          So digging through the logs
23          for testing you guys -- for
24          testing, are you guys using
25          emulated devices which can't reach

Page 260

1          out to the Internet?  Because I'm
2          seeing actual commands with
3          malicious C2s in the payloads
4          between test numbers.
5       And then YuanYuan Wang responds, and
6 afterwards Andrew Stephen Robinson responds:
7          My concern is that you popped
8          yourselves.
9       What do you understand to be this concern
10 about the researchers here, quote, popping
11 themselves?  What does that mean?
12      ATTORNEY BLOCK:  I'll object to having
13 omitted YuanYuan's statement in your preamble.  And
14 I object to scope.
15       But you can answer, to the extent you
16 understand.
17    A   Where is the comment that says "popping
18 themselves"?
19    Q    (BY ATTORNEY WEINBERG) It's at -- the
20 comment at 13:47:43.  It says:
21          My concern is you popped
22          yourselves.
23    A   Yeah, so I think I know what's going on
24 here.
25       As part of the investigation, we were

Page 261

1 trying to repo to see how the attack works.  And as
2 part of that, some of the engineers would take one
3 of the malicious payloads that we found, and they
4 would essentially try to put that in their test
5 devices and tried to simulate how the exploit works.
6       And Andrew Robinson is concerned here
7 because "popping themselves" means that they would
8 actually execute the malicious code on their test
9 devices and that would essentially infect them and
10 successfully contact the C2 servers.
11       And that is a breach -- "popping
12 themselves" in this context means that you have
13 breached -- like, you let the attacker that you
14 found out about them.
15       So it would -- would completely compromise
16 the investigation in that case, so we had to operate
17 at a very silent level where we couldn't let the
18 attacker know at all that we found out about this
19 attack in any means -- by any means.
20       And I think that's what he means by
21 "popping themselves" in this case.  Like, reveal to
22 the attacker that we found the malicious payload.
23    Q   And so in these instances, some engineers
24 were executing the suspicious offer stanzas --
25    A   On their own devices.

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}          Pages  270..273

Page 270

1 of the C2 servers was located on AW -- was hosted by
2 AWS.  And we tried to reach out to AWS to give us
3 whatever they had on that machine that had that IP.
4       I don't know what he means by "payload" in
5 this case.  Payload is kind of a generic name, so I
6 don't know what he means by "payload."  But that's
7 what I know that we tried to get from AWS.
8    Q   (BY ATTORNEY WEINBERG) I would presume
9 that the payload from a C2 server is whatever it is
10 that the C2 server is programmed to deliver to a
11 client, right?
12       ATTORNEY BLOCK:  Object to form; calls for
13 speculation.
14    A   Yeah, I don't know what he meant.
15    Q   (BY ATTORNEY WEINBERG) All right.  All
16 right.  So just about the fixes then.
17       In this document, do you see on page --
18 the second page in that same Aby John comment that
19 we just spoke about, it discusses server fixes and
20 client fixes.
21       So can you tell me about the remediation
22 work that WhatsApp did in response to this -- to
23 this incident?
24    A   Yeah, I can talk about that.
25       So the remediation -- the immediate

Page 271

1 remediation of the attack entailed three fixes.  Two
2 of them were server side, and one of them --
3    Q   Two server side?
4    A   -- two server-side fixes and one client
5 side fix that was rolled out with all the
6 applications, all the platforms that use WhatsApp,
7 the Android, iPhone, whatever.  Like, all the
8 phones.
9    Q   The client-side fixes were for Android and
10 iPhone?
11    A   Yes.  It was a cross -- cross-platform
12 fix.  It was the same fix that would apply to both
13 platforms.
14    Q   Okay.  So the vulnerability on the client
15 was both an Android and an iOS exploit?
16       ATTORNEY BLOCK:  Object to form.
17    A   So the vulnerability was in the C code
18 responsible for handling voice and video calling
19 logic, and it was the same code running on both of
20 these platforms.
21    Q   (BY ATTORNEY WEINBERG) Okay.  Did WhatsApp
22 have any evidence that any iOS devices were
23 compromised using this vulnerability?
24    A   From what I remember, yes, we had some
25 iOS -- some samples of the attacks that were

Page 272

1 targeting iOS devices, but a majority of the
2 samples, from what I remember, was all Android.
3    Q   I'll have you take a look at Exhibit 1119.
4       (Exhibit 1119 was marked for
5 identification and is attached to the transcript.)
6    A   Yeah.
7    Q   (BY ATTORNEY WEINBERG) Just -- my only
8 questions on this is:  This is a WorkChat that you
9 received on May 14, 2019?
10    A   Yeah.
11    Q   I think that's it.
12    A   Okay.
13    Q   What was the client-side fix that you
14 talked about?
15    A   The client-side fix was preventing the
16 buffer overflow that was used in the remote code
17 execution.
18       So we limited the buffer size sent -- that
19 is sent from the remote end.  We limited it to the
20 size of the buffer that we have locally.  So after
21 that fix, memory corruption could not occur anymore.
22    Q   Was the buffer overflow vulnerability in a
23 piece of third-party software?
24    A   No.
25    Q   And you -- to roll out this

Page 273

1 server-side fix -- sorry -- the client-side fix, you
2 rolled out an update to the Android Google store?
3    A   The Play Store.
4    Q   The Play Store; is that correct?
5    A   Yes.
6       ATTORNEY BLOCK:  Objection to form.
7 Sorry.  Belated.
8    Q   (BY ATTORNEY WEINBERG) Did you send the
9 same update to the Apple Store -- App Store?
10       ATTORNEY BLOCK:  Objection to form.
11    A   Yes, we did.
12    Q   (BY ATTORNEY WEINBERG) Tell me about the
13 server-side fixes.
14    A   The first fix we rolled out on the server
15 side was for the relay.  And we rolled that out on
16 Friday.  I don't remember the actual date, that
17 week.
18    Q   Okay.  So what did you do to the relay
19 server --
20    A   The relay server --
21    Q   -- software?
22    A   -- sorry?
23    Q   The relay server software.
24    A   Yes.  So the relay server fix was about
25 limiting the messages that were used, the SRTPSR and

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 28 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                           Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}              Pages 274..277

Page 274

1  RR.
2         The messages that were used to do -- to
3  exploit the buffer overflow were being kept and
4  dropped by the -- by the server.  So a normal
5  WhatsApp application would not send these really
6  large SR and RR SRTP packets.  So it was very easy
7  for us to identify the ones sent by a malicious --
8  by a fake client.
9         In this case it was the fake client that
10 was attacking the victim, so it was very easy for us
11 to basically put some logic in place that would
12 basically -- that would just drop those SRTPRR
13 messages.
14        And as an effect, we observed immediately
15 a different behavior in the pattern of the attacks,
16 so we knew for sure that -- that we -- we broke
17 their exploit.
18        It seemed kind of like it was broken, but
19 it wasn't clear.  It seemed broken, but it wasn't
20 clear that we actually found it.  And we did it --
21 that intentionally to monitor their behavior.
22     Q   So this change to the relay server
23 enhanced the security of the relay server beyond
24 what it was before the fix?
25     A   No, it did not.  It was actually a

Page 275

1  temporary change that we made only for this.  We
2  pulled it out after we rolled out the client fix.
3  We did it just to break their exploit, basically.
4         From a protocol perspective, the
5  message -- like, you -- it wasn't -- it was just
6  very -- something very specific that only those
7  clients were sending, so that's why we could do it.
8     Q   And in that respect, the change to the
9  relay server created an additional barrier to -- to
10 the exploit that didn't exist before; so it,
11 therefore, enhanced the security of the relay server
12 beyond what it was?
13     A   It -- it did not enhance the security of
14 the relay server at all.  It -- the only reason why
15 we put that change is to break that specific
16 exploit, yes.
17     Q   Did the change restore the server to a
18 previous condition?
19        ATTORNEY BLOCK:  Objection to form.
20     A   Restore the server to a previous
21 condition?  I'm not sure what that means.
22     Q   (BY ATTORNEY WEINBERG) The client-side
23 vulnerability, I think that's the one that was
24 reported in the CVE, right?
25        ATTORNEY BLOCK:  Object to form.

Page 276

1     A   What CVE?
2     Q   (BY ATTORNEY WEINBERG) It's this -- the
3  number is listed on the White Paper, if you want to
4  look at it, but CVE-2019-3568.
5     A   Can I get that?
6     Q   And 1148 is the exhibit number.
7        ATTORNEY BLOCK:  You're looking for --
8     A   Yeah, got it.  3568.  Yes, that's the one.
9     Q   (BY ATTORNEY WEINBERG) So just for the
10 record, you have identified the same CVE number on
11 the CVE list at Exhibit 1163?
12     A   Yes.
13     Q   So this says that the buffer overflow --
14 I'm looking at Exhibit 1163 at page 4.  And I am
15 looking at the entry here for CVE-2019-3568.
16        And that's the vulnerability that was
17 closed with the client-side fix, right?
18     A   Yes.
19     Q   So this is -- the description of that
20 vulnerability, it says:
21        A buffer overflow
22        vulnerability in WhatsApp VoIP
23        stack allowed remote code execution
24        via a specially crafted series of
25        RTCP packets sent to a target phone

Page 277

1        number.  The issue affects WhatsApp
2        for Android prior to
3        Version 2.19.134, WhatsApp Business
4        for Android prior to
5        Version 2.19.44, WhatsApp for iOS
6        prior to Version 2.19.51, and so
7        on.
8        All right.  So this only refers to the
9  client-side vulnerability, right?  And this -- this
10 CVE refers to the client-side vulnerability?
11        ATTORNEY BLOCK:  Object to form.
12     A   Yes.
13     Q   (BY ATTORNEY WEINBERG) And that
14 vulnerability existed in WhatsApp's code as WhatsApp
15 wrote the code, right?
16        ATTORNEY BLOCK:  Objection to form.
17     A   So the way -- the way I look at the
18 vulnerability is it's a -- the vulnerability exists
19 in the moment when you have an attack that exploits
20 it.
21     Q   (BY ATTORNEY WEINBERG) I don't know if
22 that's right.  What's the difference between a
23 vulnerability and an exploit?
24        ATTORNEY BLOCK:  Objection to form; scope.
25     Q   (BY ATTORNEY WEINBERG) Isn't it the case

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 29 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                      Job 3296
WHATSAPP INC. on 08-16-2024          {{Attorneys Eyes Only}}                         Pages  278..281

Page 278

1 that a vulnerability is a potential for
2 exploitation, and an exploit is when the
3 vulnerability is actually exploited?
4       ATTORNEY BLOCK:  Objection to form; and
5 scope.
6    **A   So the way I see a vulnerability is in --**
7 **like, that exists in the moment you have an attack**
8 **that -- that uses it.**
9    Q   (BY ATTORNEY WEINBERG) Don't you have a
10 vulnerability the moment you write a code that has a
11 vulnerability?
12      Like, if I make a fence and the fence has
13 a gap in it, the fence has a vulnerability.  And if
14 somebody walks through that fence -- that gap in the
15 fence, that's -- that's an exploit of the
16 vulnerability?
17   **A   No, I don't --**
18      ATTORNEY BLOCK:  Object to -- sorry.
19 Objection to form; scope; vagueness; incomplete
20 hypothetical, et cetera.
21   **A   -- yeah, I don't agree with that.**
22   **So software has virtually, like, always**
23 **some flaws in it.**
24   Q   (BY ATTORNEY WEINBERG) What would you call
25 those flaws?

Page 279

1    ATTORNEY BLOCK:  Huh?
2    **A   They're just flaws.  The moment you build**
3 **an attack --**
4      ATTORNEY BLOCK:  Can you just let the
5 witness finish his answer before you interrupt?
6      ATTORNEY WEINBERG:  He paused.
7    Q   (BY ATTORNEY WEINBERG) Go ahead.
8    **A   So there's always going to be flaws in --**
9 **in the software.  Like, it's always there.  There's**
10 **always -- any software that exists today has some**
11 **flaws in it.**
12   **The moment that becomes a vulnerability**
13 **and becomes relevant is when someone is able to**
14 **exploit it and have an attack that uses it.**
15   **Until then, it's -- it's just software.**
16   Q   (BY ATTORNEY WEINBERG) Okay.  I think we
17 are just having a semantic discussion.  So we want
18 to call the hole in the software that is
19 exploitable, a flaw?
20      ATTORNEY BLOCK:  Objection to form.
21   **A   I think a vulnerability is -- is a flaw.**
22 **My point is that an attack is the one that validates**
23 **that you can use that flaw to do something bad with**
24 **it.**
25   Q   (BY ATTORNEY WEINBERG) And I guess my only

Page 280

1 question is that:  That flaw existed in WhatsApp's
2 software as WhatsApp wrote it, right?  It wasn't
3 created by anybody else?
4      ATTORNEY BLOCK:  Objection to form.
5    **A   So we -- we wrote the software for the**
6 **VoIP stack having in mind all the -- like, we**
7 **designed it and we wrote it, assuming that the**
8 **messages being sent are a part of the WhatsApp**
9 **network and that they're official clients built by**
10 **the WhatsApp team.**
11   **So with that regards, there was no flaw.**
12 **Voice calling was working perfectly fine.**
13   Q   (BY ATTORNEY WEINBERG) Nobody changed
14 WhatsApp's code, right?
15      ATTORNEY BLOCK:  Object to form.
16   Q   (BY ATTORNEY WEINBERG) No -- pegasus
17 didn't change WhatsApp's code, correct?
18   **A   I --**
19      ATTORNEY BLOCK:  Object to form and scope.
20   **A   -- I actually don't agree with that.**
21 **Because they changed the memory layout of the**
22 **application and they actually did change the**
23 **WhatsApp code.**
24   **They made the --**
25   Q   (BY ATTORNEY WEINBERG) On the client?

Page 281

1    **A   -- on the client, yes.  They changed the**
2 **WhatsApp client on -- they changed the WhatsApp code**
3 **running on the victim's phone.**
4    Q   But the flaw or vulnerability they used to
5 do that, which is the vulnerability disclosed at
6 CVE-2019-3568, was a vulnerability that existed in
7 WhatsApp's code as WhatsApp had released it?
8      ATTORNEY BLOCK:  Objection to form.  It's
9 asked and answered.  And I think it's time to move
10 on.
11      ATTORNEY WEINBERG:  All right.  Let's go
12 off the record for a bit.
13      THE VIDEOGRAPHER:  It's 6:59 p.m.
14      (A break was taken from 6:59 p.m. to
15 7:06 p.m.)
16      THE VIDEOGRAPHER:  Back on the record at
17 7:06 p.m.
18   Q   (BY ATTORNEY WEINBERG) All right.  You
19 said that there were two server changes that were
20 precipitated by this.  The first one was this relay
21 server change.
22   **What was the second?**
23   **A   The second fix was on the signaling server**
24 **that enforced the validation of the stanza -- of the**
25 **offer stanzas and dropped them.**

Page 294

```
 1      I, MARY J. GOFF, CSR No. 13427, Certified
 2  Shorthand Reporter of the State of California,
 3  certify;
 4      That the foregoing proceedings were taken
 5  before me at the time and place herein set forth, at
 6  which time the witness declared under penalty of
 7  perjury; that the testimony of the witness and all
 8  objections made at the time of the examination were
 9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14      That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:   (   ) that the witness has failed or
17  refused to approve the transcript.
18      I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22      I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of       , 2024.
25
```

*Mary Goff*

MARY J. GOFF

Page 295

```
 1              ERRATA SHEET
 2              SWIVEL LEGAL
 3          560 W Main Street, C163
 4        Alhambra, California 91801
 5            213-788-2327
 6      CASE:  WhatsApp v. NSO Group
 7  PAGE  LINE  FROM                 TO
 8  ____|_____|_____|_____
 9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18
19      _____
20      CLAUDIU GHEORGHE
21  Subscribed and sworn to before me
22  this _____ day of _____, 2024.
23  _____
24      Notary Public
25
```

EXHIBIT 4

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 32 of 113

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3326
JESUS PALAU on 09-13-2024                {{Attorneys Eyes Only}}                          Page 1

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4                       --oOo--

5

6    WHATSAPP INC., a Delaware corporation,
     and FACEBOOK, INC., a Delaware
7    corporation,

8              Plaintiffs,
     v.                        Case No.  4:19-cv-07123-PJH
9
     NSO GROUP TECHNOLOGIES LIMITED
10   and Q CYBER TECHNOLOGIES LIMITED,

11             Defendants.
     _____/
12

13         **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

14          STENOGRAPHIC REPORTER'S VIDEOTAPED

15              DEPOSITION TRANSCRIPT OF

16               JESUS BARCONS PALAU

17             FRIDAY, SEPTEMBER 13, 2024

18

19

20   Reported Stenographically by:

21   KIMBERLY D'URSO, CSR 11372, RPR

22   Job No.  3326

23

24

25

WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3326
JESUS PALAU on 09-13-2024                    {{Attorneys Eyes Only}}                    Pages 86..89

Page 86

1          THE WITNESS:  It seems that perhaps I had
2  something in mind to start executing on it.
3  BY MR. AKROTIRIANAKIS:
4     Q.  Okay.  Was this a document that you reviewed
5  yesterday, by the way?
6          MR. BLOCK:  Objection.
7          THE WITNESS:  I think --
8          MR. BLOCK:  Hang on one second.
9          In light of the 30(b)(6), I'm going to let it
10  go.
11          You can answer.
12          THE WITNESS:  I think so.
13  BY MR. AKROTIRIANAKIS:
14     Q.  Okay.  All right.  Going over to the next page,
15  5, of Exhibit 1105, you do an entry that says:
16  "Currently chatd.atn is validating relaylatency" -- one
17  word -- "stanza."
18          Do you see that?
19     A.  Yes.
20     Q.  What does that mean?
21     A.  It seems at that time I already had code in
22  place, which means that I was not very disciplined to
23  actually update the task to "in progress."  It seems
24  that to have code in place, it was already being
25  canaried.

Page 87

1          (Reporter clarification.)
2  BY MR. AKROTIRIANAKIS:
3     Q.  Canaried.
4     A.  So it seems at that date, I change the task
5  from "planned" to in "progress."  Again, I was not very
6  disciplined in keeping subscribers up-to-date.
7          And at that point, on March 22, 2019, I already
8  have the two pieces that were important to do stanza
9  validation.  One is a validation engine of sorts, you
10  can think of.  And then the other piece is the schema
11  defined for some of the stanzas, actually one stanza,
12  which is the relaylatency.
13          In this schema, I indicate exactly what the
14  relaylatency stanza should have, which fields, which
15  ones are optional, the range of values that we expect,
16  all these sort of things.
17          With that, any stanza that comes from a client
18  hitting that particular --
19          (Reporter clarification.)
20          THE WITNESS:  -- machine server,
21  chatd555.atn -- I can go -- I can explain later what this
22  means -- so any client stanza -- any relaylatency stanza
23  being sent by clients would be validated using the
24  validation engine and the schema that I define.
25          Based on that logic, we would have two

Page 88

1  outcomes:  Either the stanza is valid or it's not valid.
2          And depending on those outcomes, what I'm doing
3  is I'm incrementing counters of valid, non-valid stanzas
4  for that particular one that are regulated in a permanent
5  basis and reported to some internal tools that we use to
6  visualize data.
7          On the chatd555, so this is the place where I
8  was canarying the changes.  You see, when he we make
9  changes on the code, we don't deploy it to all the
10  machines at once, that if something goes wrong it can be
11  terribly wrong in a very large scale.  So we want to
12  first make sure that our changes work on a single
13  machine, so if something goes wrong, it's just a single
14  machine that suffers the consequences, not the entire
15  fleet.
16  BY MR. AKROTIRIANAKIS:
17     Q.  And that process of testing changes on a single
18  machine is what is called "canarying"; is that right?
19     A.  That's the word that we use, at least in
20  internally.
21     Q.  Do you know what the origin of that is?
22     A.  Perhaps bringing a canary in the coal mine.
23     Q.  That would have been my guess.
24          All right.  Now, this process of determining if
25  a stanza is either valid or not valid is what is meant

Page 89

1  by the term "validation" or "validating" in this
2  particular context; correct?
3          MR. BLOCK:  Object to form.
4          THE WITNESS:  Yes.  Validating stanzas,
5  validating these relay latency stanza.
6  BY MR. AKROTIRIANAKIS:
7     Q.  You were going to tell us what chatd555.atn is.
8     A.  That's true -- apologies.  I forgot about that.
9          So we name our servers in this way.  What you
10  see first is chatd.  We have type of servers that we
11  call them "chatd."  We are micro service-oriented, so we
12  split responsibilities and business logic across
13  different back ends, across different services.
14          Chat is the one -- or chatd is the service that
15  clients connect to.  And it'S responsible for the
16  connection lifecycle and protocol and also doing message
17  routing.
18          The 555 that we see after that -- or actually,
19  let's forget the 555.  Let's look at the ATN.  We're
20  running different data centers.  ATN is the three letter
21  acronym that is -- that is built in Altoona.  I don't
22  recall which state.
23          And then the 555 is just a number, so we number
24  all our machines between 0 and N.  Perhaps we have like
25  a thousand or so machines at that time, that they were

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 34 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3326
JESUS PALAU on 09-13-2024          {{Attorneys Eyes Only}}          Pages  90..93

Page 90

1  chatd.atn.  And 555 was the number that I chose for some
2  reason.
3      Q.  All right.  The 555 here is not particularly
4  meaningful to what you were doing in this task?
5          MR. BLOCK:  Objection to form.
6          THE WITNESS:  I don't think I had any
7  sentimental attachment to this number.  It's just one
8  that I chose.
9  BY MR. AKROTIRIANAKIS:
10     Q.  All right.  I want to ask you something about
11  this answer that you just gave.  Chatd is the service
12  that clients connect to; correct?
13     A.  That is correct.
14     Q.  And chatd is responsible for the connection
15  lifecycle for the client; correct?
16     A.  That's correct.  When the application --
17  WhatsApp application connects to the servers, they
18  connect to WhatsApp -- they connect to chatd, yes.
19     Q.  And from chatd, the message routing goes on
20  from there; correct?
21         MR. BLOCK:  Objection to form.
22         THE WITNESS:  Chatd responsible -- Chatd has
23  multiple responsibilities.  One of them is message
24  routing, yes.
25  BY MR. AKROTIRIANAKIS:

Page 91

1      Q.  Okay.  But the chatd server is sort of like the
2  "gateway" of sorts; is that fair?
3          MR. BLOCK:  Objection to form.
4          THE WITNESS:  Chatd is the server that clients
5  connect to.
6  BY MR. BLOCK:
7      Q.  It would be the first serve that clients
8  connect to?
9          MR. BLOCK:  Objection to form.
10  BY MR. AKROTIRIANAKIS:
11     Q.  And the only server that clients connect to?
12         MR. BLOCK:  Objection to form.
13         THE WITNESS:  You see the connection lifecycle
14  is a little complicated.  If you want I, can walk you
15  through it.
16  BY MR. AKROTIRIANAKIS:
17     Q.  Well, I would appreciate that.  But can you
18  answer my question first, or are you unable to
19  understand my question?
20         MR. BLOCK:  Objection to form.
21         THE WITNESS:  The thing is that you expect a
22  yes-or-no answer to a question that is more nuanced than
23  that.
24  BY MR. AKROTIRIANAKIS:
25     Q.  Okay.  There are some pictures in her later

Page 92

1  that we're going to get to that might help the
2  explanation.  Okay?  So why don't we save the
3  explanation.  Let me ask another question.
4      You mentioned "ATN" being an abbreviation for
5  Altoona?
6      A.  Yes.
7      Q.  That's one of the chatd servers; correct?
8      A.  That's one of the data centers.
9      Q.  And what are the other data centers?
10     A.  Around that time, I think that we were
11  deployed -- the chatd was deployed in ATN and also FRC.
12  And also, at that time, we were starting to ramp up in a
13  new data center -- in a different data center called --
14  that we call "VLL."
15     Q.  And FRC, does that stand for anything in
16  particular?
17     A.  Yes, I'm trying to recall.  Perhaps I will say
18  something wrong.
19         MR. BLOCK:  And I'll object on foundation to
20  this line of questions.
21  BY MR. AKROTIRIANAKIS:
22     Q.  Do you remember what "VLL" stood for?
23     A.  Yes.  Something Las Lunas.  And perhaps FCC was
24  some Foster City [sic].
25     Q.  Forest City?

Page 93

1      A.  Forest City sounds better than -- yeah.  Thank
2  you for that.
3      Q.  Okay.  Altoona, Forest City, and Las Lunas;
4  right?
5      A.  Thank you very much.
6      Q.  Those were the three data centers that hosted
7  or that housed chatd servers?
8          MR. BLOCK:  Objection to form.  Foundation.
9          THE WITNESS:  At that time, I remember that
10  2018 -- 2019 -- beginning of 2019, I remember that we
11  were -- that we had presence in ATN and FRC.  And I
12  remember that we were starting to ramp up or having
13  present in VLL.  I don't know if we were starting traffic
14  in VLL.
15  BY MR. AKROTIRIANAKIS:
16     Q.  Do you know where Las Lunas is?
17     A.  I could guess, but I could guess wrong.
18     Q.  Okay.  Go ahead and guess.
19     A.  New Mexico, perhaps.
20         MR. BLOCK:  Objection to form.
21  BY MR. AKROTIRIANAKIS:
22     Q.  And where is Forest City?  North Carolina?
23     A.  Perhaps.  Rings a bell, but I may be wrong.
24     Q.  Do you recall where Altoona is?
25     A.  No, I do not.  Sorry.

Case 4:19-cv-07123-PJH    Document 422-2    Filed 10/11/24    Page 35 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                    Job 3326
JESUS PALAU on 09-13-2024            {{Attorneys Eyes Only}}                          Pages 94..97

Page 94

1   Q.  Okay.
2       (Reporter requests a break.)
3       MR. AKROTIRIANAKIS:  We can take a break.
4       THE VIDEOGRAPHER:  All right.  The time is
5   11:24 a.m.  We are off the record.
6       (Break taken.)
7       THE VIDEOGRAPHER:  All right.  The time is
8   11:40 a.m.  We are back on the record.
9   BY MR. AKROTIRIANAKIS:
10      Q.  All right.  Mr. Barcons, you understand that
11  you remain under oath; correct?
12      A.  Yes, I do.
13      Q.  All right.  After you wrote:  "Currently
14  chatd555.atn is validating relaylatency stanza," you
15  wrote:  "No actions are taken, just bumping counters."
16  And then you have a Facebook URL.  Do you see that?
17      A.  I do.
18      Q.  And what does it mean to say "No actions are
19  taken, just bumping counters"?
20      A.  I mean that no drastic actions are taken,
21  meaning that even if a stanza is not valid, according to
22  the spec, we are not going to drop it.
23      Q.  Okay.  Is that something that's referred to as
24  "enforcing"?
25      MR. BLOCK:  Objection to form.

Page 95

1       THE WITNESS:  I think that "enforcing" word
2   would be a synonym of it.
3   BY MR. AKROTIRIANAKIS:
4       Q.  Can you go back to page 3 of Exhibit 1105?
5       A.  I'm there.
6       Q.  Mr. Ebeling, in his message in the second
7   paragraph, writes:  "It'd be a lot cleaner/safer to have
8   the server enforce proper schema for all messages and
9   make sure clients don't send server-only messages, et
10  cetera."  Do you see that?
11      A.  I do.
12      Q.  Okay.  And the part of this about a
13  "server-only message," what does that mean?
14      MR. BLOCK:  Object to form and to the partial
15  reading.
16  BY MR. AKROTIRIANAKIS:
17      Q.  Do you have any understanding of the term
18  "server-only messages," Mr. Barcons?
19      A.  There are some stanzas that are supposed to be
20  only server initiated.  And we wanted to make sure that
21  clients, especially fake, unofficial clients, would not
22  send those server-only generated stanzas.  Our official
23  clients can never do that.
24      MR. BLOCK:  I think it was "unofficial," for
25  the transcript.

Page 96

1       MR. AKROTIRIANAKIS:  "Fake, unofficial."
2   BY MR. AKROTIRIANAKIS:
3       Q.  All right.  Returning you to page 5 of Exhibit
4   1105.  Mr. Ebeling writes to you at the bottom of the
5   page:  "One thought we had when discussing this with
6   Ibrahim was the fact that the schema is in Erlang.  May
7   make it harder to understand for folks not familiar with
8   Erlang."  Do you see that?
9       A.  I see that.
10      Q.  "And some other schema configuration format
11  could be easier to understand.  What are you are
12  thoughts on that"; right?
13      A.  I read that.
14      Q.  Ultimately -- well, do you recall what your
15  thoughts were, if you had any?
16      A.  Yes, beauty is in the eye of the beholder.
17  Otto and Ibrahim, Erlang is not their programming
18  language of choice.  On the other hand, I think that
19  Erlang provides -- with Erlang, we can provide very
20  concise and readable --
21      (Reporter clarification due to accent.)
22      THE WITNESS:  -- form for engineers programmers
23  familiar with Erlang to understand whatever the schema
24  that we are validating.
25  BY MR. AKROTIRIANAKIS:

Page 97

1       Q.  "Readable form for engineers," -- something --
2   "Erlang to understand," -- "form"?
3       MR. BLOCK:  "Familiar."
4   BY MR. AKROTIRIANAKIS:
5       Q.  "Familiar with Erlang."
6       All right.  So you were in favor of Erlang, and
7   Otto and Ebeling and Ibrahim Mohamed were wondering
8   whether it was better to consider a different computer
9   language; is that right?
10      MR. BLOCK:  Objection to form.
11      THE WITNESS:  I think that Otto wanted me to
12  make sure that I considered this; and I did consider it.
13  BY MR. AKROTIRIANAKIS:
14      Q.  Can you turn over to the top of page 6.
15      A.  I'm there.
16      Q.  What language ultimately did you go with?
17      A.  Erlang.
18      Q.  And what is the code that we see here at top of
19  page 6 with your entry?
20      A.  That would be an Erlang term.
21      Q.  And what is it specifically?
22      A.  As I said earlier, beauty is in the eye of the
23  beholder.  So what this really means is this is defining
24  a schema for an element which name is the hash,
25  "relaylatency," which has the following --

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 36 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                          Job 3326
JESUS PALAU on 09-13-2024                {{Attorneys Eyes Only}}              Pages  214..217

Page 214

1 would indicate the receiver.  You can use "victim" or
2 "target" as a synonym.
3 BY MR. AKROTIRIANAKIS:
4     Q.  All right.  How many targets did you ultimately
5 determine that there were?
6     A.  I don't remember.
7     Q.  Can you remember even an approximation?
8     A.  In the hundreds, perhaps.
9     Q.  Do you remember how it was that you went from
10 everybody who received a stanza to some other smaller
11 subset of that that you identified as targets?
12        MR. BLOCK:  Objection to form.
13        THE WITNESS:  From that list of targets, we had
14 to remove some phone numbers, some accounts that we
15 believe were not victims.  Some of them will be WhatsApp
16 engineers internally trying to figure out what happened
17 when the receiver receives that stanza.
18        If you remember previously, Yuanyuan was
19 changing the client code to send that malicious payload
20 in the stanza to try to figure out what could happen on
21 the receiving side.  So we had to exclude those phone
22 numbers.
23        Those phone numbers, by the way, are going to
24 be the ones that have "555" in between of them.  Those
25 are numbers never located by telecom companies in the

Page 215

1 U.S., so we know that they cannot be real clients -- real
2 users using those numbers.  So those ones we filtered ut,
3 the 555 numbers, we filtered out.
4        We also filtered out -- Yuanyuan pointed out we
5 could look at the IP of the sender, and if there was a
6 receiver account with the same IP, very likely it was the
7 phone number that the attacker was using to test or
8 develop something, so we have to also remove those ones
9 from the list of victims/targets.
10        I can think of those two.
11 BY MR. AKROTIRIANAKIS:
12     Q.  Can you think of any other categories that were
13 removed from the list of numbers that you started with?
14     A.  Only this comes to mind.
15        MR. AKROTIRIANAKIS:  Okay.  I don't think I
16 have any other questions for you.
17        MR. BLOCK:  No questions.
18        THE VIDEOGRAPHER:  Will counsel please state
19 their transcript and video orders for the record.
20        MR. BLOCK:  I won't be able to, but you could
21 follow up with my team.
22        MR. AKROTIRIANAKIS:  I'm in the same position.
23 My assistant, Nina, can let you know.
24        THE VIDEOGRAPHER:  This ends Volume 1 of the
25 video deposition of Jesus Barcons Palau.  The time is

Page 216

1 4:22 p.m.  We are off the record.
2             (4:22 p.m., deposition concluded.)
3                  --oOo--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 217

1 STATE OF CALIFORNIA       )
                           ) ss:
2 COUNTY OF ALAMEDA         )
3
4        I, KIMBERLY E. D'URSO, do hereby certify:
4
5        That the witness named in the foregoing
6 deposition was present and duly sworn to testify to the
7 truth in the within-entitled action on the day and date
8 and at the time and place therein specified;
9        That the testimony of said witness was reported
10 by me in shorthand and was thereafter transcribed through
11 computer-aided transcription;
12        That the foregoing constitutes a full, true and
13 correct transcript of said deposition and of the
14 proceedings which took place;
15        Further, that if the foregoing pertains to the
16 original transcript of a deposition in a federal case,
17 before completion of the proceedings, review of the
18 transcript [ ] was [ ] was not requested.
19        That I am a certified stenographic reporter and
20 a disinterested person to the said action;
21        IN WITNESS WHEREOF, I have hereunder subscribed
22 my hand this 15th day of September, 2024.
23 *Kimberly D'Urso*
_____
24 KIMBERLY D'URSO, CSR NO. 11372, RPR
25

# EXHIBIT 5

## FILED UNDER SEAL

# EXHIBIT 6

## FILED UNDER SEAL

# EXHIBIT 7

## FILED UNDER SEAL

# EXHIBIT 8

## FILED UNDER SEAL

# EXHIBIT 9

## FILED UNDER SEAL

# EXHIBIT 10

## FILED UNDER SEAL

# EXHIBIT 11

## FILED UNDER SEAL

# EXHIBIT 12

## FILED UNDER SEAL

EXHIBIT 13

You are currently viewing an archived version of the Terms of Service. View the current version or all past versions.

Last modified: August 25, 2016

# WhatsApp Terms Of Service

WhatsApp Inc. ("WhatsApp," "our," "we," or "us") provides messaging, Internet calling, and other services to users around the world. Please read our Terms of Service so you understand what's up with your use of WhatsApp. You agree to our Terms of Service ("Terms") by installing, accessing, or using our apps, services, features, software, or website (together, "Services").

**NO ACCESS TO EMERGENCY SERVICES: There are important differences between WhatsApp and your mobile and fixed-line telephone and SMS services. Our Services do not provide access to emergency services or emergency services providers, including the police, fire departments, or hospitals, or otherwise connect to public safety answering points. You should ensure you can contact your relevant emergency services providers through a mobile, fixed-line telephone, or other service.**

**IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, OUR TERMS CONTAIN A BINDING ARBITRATION PROVISION, WHICH STATES THAT, EXCEPT IF YOU OPT OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES, WHATSAPP AND YOU AGREE TO RESOLVE ALL DISPUTES THROUGH BINDING INDIVIDUAL ARBITRATION, WHICH MEANS THAT YOU WAIVE ANY RIGHT TO HAVE THOSE DISPUTES DECIDED BY A JUDGE OR JURY, AND THAT YOU WAIVE YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS, CLASS ARBITRATIONS, OR REPRESENTATIVE ACTIONS. PLEASE READ THE "SPECIAL ARBITRATION PROVISION FOR UNITED STATES OR CANADA USERS" SECTION BELOW TO LEARN MORE.**

## About our services

CONFIDENTIAL    WA-NSO-00014825

**Registration.** You must register for our Services using accurate data, provide your current mobile phone number, and, if you change it, update this mobile phone number using our in-app change number feature. You agree to receive text messages and phone calls (from us or our third-party providers) with codes to register for our Services.

**Address Book.** You provide us the phone numbers of WhatsApp users and your other contacts in your mobile phone address book on a regular basis. You confirm you are authorized to provide us such numbers to allow us to provide our Services.

**Age.** You must be at least 13 years old to use our Services (or such greater age required in your country for you to be authorized to use our Services without parental approval). In addition to being of the minimum required age to use our Services under applicable law, if you are not old enough to have authority to agree to our Terms in your country, your parent or guardian must agree to our Terms on your behalf.

**Devices and Software.** You must provide certain devices, software, and data connections to use our Services, which we otherwise do not supply. For as long as you use our Services, you consent to downloading and installing updates to our Services, including automatically.

**Fees and Taxes.** You are responsible for all carrier data plan and other fees and taxes associated with your use of our Services. We may charge you for our Services, including applicable taxes. We may refuse or cancel orders. We do not provide refunds for our Services, except as required by law.

## Privacy policy and user data

WhatsApp cares about your privacy. WhatsApp's Privacy Policy describes our information (including message) practices, including the types of information we receive and collect from you and how we use and share this information. You agree to our data practices, including the collection, use, processing, and sharing of your information as described in our Privacy Policy, as well as the transfer and processing of your information to the United States and other countries globally where we have or use facilities, service providers, or partners, regardless of where you use our Services. You acknowledge that the laws, regulations, and standards of the country in which your information is stored or processed may be different from those of your own country.

CONFIDENTIAL    WA-NSO-00014826

## Acceptable use of our services

**Our Terms and Policies.** You must use our Services according to our Terms and posted policies. If we disable your account for a violation of our Terms, you will not create another account without our permission.

**Legal and Acceptable Use.** You must access and use our Services only for legal, authorized, and acceptable purposes. You will not use (or assist others in using) our Services in ways that: (a) violate, misappropriate, or infringe the rights of WhatsApp, our users, or others, including privacy, publicity, intellectual property, or other proprietary rights; (b) are illegal, obscene, defamatory, threatening, intimidating, harassing, hateful, racially, or ethnically offensive, or instigate or encourage conduct that would be illegal, or otherwise inappropriate, including promoting violent crimes; (c) involve publishing falsehoods, misrepresentations, or misleading statements; (d) impersonate someone; (e) involve sending illegal or impermissible communications such as bulk messaging, auto-messaging, auto-dialing, and the like; or (f) involve any non-personal use of our Services unless otherwise authorized by us.

**Harm to WhatsApp or Our Users.** You must not (or assist others to) access, use, copy, adapt, modify, prepare derivative works based upon, distribute, license, sublicense, transfer, display, perform, or otherwise exploit our Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm us, our Services, systems, our users, or others, including that you must not directly or through automated means: (a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services; (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the integrity or performance of our Services; (e) create accounts for our Services through unauthorized or automated means; (f) collect the information of or about our users in any impermissible or unauthorized manner; (g) sell, resell, rent, or charge for our Services; or (h) distribute or make our Services available over a network where they could be used by multiple devices at the same time.

**Keeping Your Account Secure.** You are responsible for keeping your device and your WhatsApp account safe and secure, and you must notify us promptly of any unauthorized use or security breach of your account or our Services.

CONFIDENTIAL                                                                                                    WA-NSO-00014827

## Third-party services

Our Services may allow you to access, use, or interact with third-party websites, apps, content, and other products and services. For example, you may choose to use third-party data backup services (such as iCloud or Google Drive) that are integrated with our Services or interact with a share button on a third party's website that enables you to send information to your WhatsApp contacts. Please note that when you use third-party services, their own terms and privacy policies will govern your use of those services.

## Licenses

**Your Rights.** WhatsApp does not claim ownership of the information that you submit for your WhatsApp account or through our Services. You must have the necessary rights to such information that you submit for your WhatsApp account or through our Services and the right to grant the rights and licenses in our Terms.

**WhatsApp's Rights.** We own all copyrights, trademarks, domains, logos, trade dress, trade secrets, patents, and other intellectual property rights associated with our Services. You may not use our copyrights, trademarks, domains, logos, trade dress, patents, and other intellectual property rights unless you have our express permission and except in accordance with our Brand Guidelines. You may use the trademarks www.facebookbrand.com/trademarks of our affiliated companies only with their permission, including as authorized in any published brand guidelines.

**Your License to WhatsApp.** In order to operate and provide our Services, you grant WhatsApp a worldwide, non-exclusive, royalty-free, sublicensable, and transferable license to use, reproduce, distribute, create derivative works of, display, and perform the information (including the content) that you upload, submit, store, send, or receive on or through our Services. The rights you grant in this license are for the limited purpose of operating and providing our Services (such as to allow us to display your profile picture and status message, transmit your messages, store your undelivered messages on our servers for up to 30 days as we try to deliver them, and otherwise as described in our Privacy Policy).

**WhatsApp's License to You.** We grant you a limited, revocable, non-exclusive, non-sublicensable, and non-transferable license to use our Services, subject to and in accordance with our Terms. This license is for the sole purpose of enabling you to use our Services, in the manner permitted by our Terms. No licenses or rights are

CONFIDENTIAL    WA-NSO-00014828

granted to you by implication or otherwise, except for the licenses and rights expressly granted to you.

## Reporting third-party copyright, trademark, and other intellectual property infringement

To report claims of third-party copyright, trademark, or other intellectual property infringement, please visit our Intellectual Property Policy. We may terminate your WhatsApp account if you repeatedly infringe the intellectual property rights of others.

## Disclaimers

YOU USE OUR SERVICES AT YOUR OWN RISK AND SUBJECT TO THE FOLLOWING DISCLAIMERS. WE ARE PROVIDING OUR SERVICES ON AN "AS IS" BASIS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND FREEDOM FROM COMPUTER VIRUS OR OTHER HARMFUL CODE. WE DO NOT WARRANT THAT ANY INFORMATION PROVIDED BY US IS ACCURATE, COMPLETE, OR USEFUL, THAT OUR SERVICES WILL BE OPERATIONAL, ERROR FREE, SECURE, OR SAFE, OR THAT OUR SERVICES WILL FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE DO NOT CONTROL, AND ARE NOT RESPONSIBLE FOR, CONTROLLING HOW OR WHEN OUR USERS USE OUR SERVICES OR THE FEATURES, SERVICES, AND INTERFACES OUR SERVICES PROVIDE. WE ARE NOT RESPONSIBLE FOR AND ARE NOT OBLIGATED TO CONTROL THE ACTIONS OR INFORMATION (INCLUDING CONTENT) OF OUR USERS OR OTHER THIRD PARTIES. YOU RELEASE US, OUR SUBSIDIARIES, AFFILIATES, AND OUR AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, PARTNERS, AND AGENTS (TOGETHER, THE "WHATSAPP PARTIES") FROM ANY CLAIM, COMPLAINT, CAUSE OF ACTION, CONTROVERSY, OR DISPUTE (TOGETHER, "CLAIM") AND DAMAGES, KNOWN AND UNKNOWN, RELATING TO, ARISING OUT OF, OR IN ANY WAY CONNECTED WITH ANY SUCH CLAIM YOU HAVE AGAINST ANY THIRD PARTIES. YOU WAIVE ANY RIGHTS YOU MAY HAVE UNDER CALIFORNIA CIVIL CODE §1542, OR ANY OTHER SIMILAR APPLICABLE STATUTE OR LAW OF ANY OTHER JURISDICTION, WHICH SAYS THAT: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

CONFIDENTIAL    WA-NSO-00014829

## Limitation of liability

THE WHATSAPP PARTIES WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR CONSEQUENTIAL, SPECIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES, EVEN IF THE WHATSAPP PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. THE FOREGOING DISCLAIMER OF CERTAIN DAMAGES AND LIMITATION OF LIABILITY WILL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE LAWS OF SOME STATES OR JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN OUR TERMS, IN SUCH CASES, THE LIABILITY OF THE WHATSAPP PARTIES WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## Indemnification

You agree to defend, indemnify, and hold harmless the WhatsApp Parties from and against all liabilities, damages, losses, and expenses of any kind (including reasonable legal fees and costs) relating to, arising out of, or in any way in connection with any of the following: (a) your access to or use of our Services, including information provided in connection therewith; (b) your breach or alleged breach of our Terms; or (c) any misrepresentation made by you. You will cooperate as fully as required by us in the defense or settlement of any Claim.

## Dispute resolution

**Forum and Venue.** If you are a WhatsApp user located in the United States or Canada, the "Special Arbitration Provision for United States or Canada Users" section below applies to you. Please also read that section carefully and completely. If you are not subject to the "Special Arbitration Provision for United States or Canada Users" section below, you agree that you will resolve any Claim you have with us relating to, arising out of, or in any way in connection with our Terms, us, or our Services (each, a "Dispute," and together, "Disputes") exclusively in the United States District Court for the Northern District of California or a state

CONFIDENTIAL                                                                              WA-NSO-00014830

court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes.

**Governing Law.** The laws of the State of California govern our Terms, as well as any Disputes, whether in court or arbitration, which might arise between WhatsApp and you, without regard to conflict of law provisions.

## Availability and termination of our services

**Availability of Our Services.** Our Services may be interrupted, including for maintenance, repairs, upgrades, or network or equipment failures. We may discontinue some or all of our Services, including certain features and the support for certain devices and platforms, at any time. Events beyond our control may affect our Services, such as events in nature and other force majeure events.

**Termination.** We may modify, suspend, or terminate your access to or use of our Services anytime for any reason, such as if you violate the letter or spirit of our Terms or create harm, risk, or possible legal exposure for us, our users, or others. The following provisions will survive any termination of your relationship with WhatsApp: "Licenses," "Disclaimers," "Limitation of Liability," "Indemnification," "Dispute Resolution," "Availability and Termination of our Services," "Other," and "Special Arbitration Provision for United States or Canada Users."

## Other

- Unless a mutually executed agreement between you and us states otherwise, our Terms make up the entire agreement between you and us regarding WhatsApp and our Services, and supersede any prior agreements.

- We may ask you to agree to additional terms for certain of our Services in the future, which will govern to the extent there is a conflict between our Terms and such additional terms.

- Our Services are not intended for distribution to or use in any country where such distribution or use would violate local law or would subject us to any regulations in another country. We reserve the right to limit our Services in any country.

- You will comply with all applicable U.S. and non-U.S. export control and trade sanctions laws ("Export Laws"). You will not, directly or indirectly, export, re-export, provide, or otherwise transfer our Services: (a) to any individual, entity,

CONFIDENTIAL                                                                                                    WA-NSO-00014831

or country prohibited by Export Laws; (b) to anyone on U.S. or non-U.S. government restricted parties lists; or (c) for any purpose prohibited by Export Laws, including nuclear, chemical, or biological weapons, or missile technology applications without the required government authorizations. You will not use or download our Services if you are located in a restricted country, if you are currently listed on any U.S. or non-U.S. restricted parties list, or for any purpose prohibited by Export Laws, and you will not disguise your location through IP proxying or other methods.

- Our Terms are written in English (U.S.). Any translated version is provided solely for your convenience. To the extent any translated version of our Terms conflicts with the English version, the English version controls.

- Any amendment to or waiver of our Terms requires our express consent.

- We may amend or update these Terms. We will provide you notice of amendments to our Terms, as appropriate, and update the "Last Modified" date at the top of our Terms. Your continued use of our Services confirms your acceptance of our Terms, as amended. If you do not agree to our Terms, as amended, you must stop using our Services. Please review our Terms from time to time.

- All of our rights and obligations under our Terms are freely assignable by us to any of our affiliates or in connection with a merger, acquisition, restructuring, or sale of assets, or by operation of law or otherwise, and we may transfer your information to any of our affiliates, successor entities, or new owner.

- You will not transfer any of your rights or obligations under our Terms to anyone else without our prior written consent.

- Nothing in our Terms will prevent us from complying with the law.

- Except as contemplated herein, our Terms do not give any third-party beneficiary rights.

- If we fail to enforce any of our Terms, it will not be considered a waiver.

- If any provision of these Terms is deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from our Terms and shall not affect the validity and enforceability of the remaining provisions,

CONFIDENTIAL                                                                                  WA-NSO-00014832

except as set forth in the "Special Arbitration Provision for United States or Canada Users" — "Severability" section below.

- We reserve all rights not expressly granted by us to you. In certain jurisdictions, you may have legal rights as a consumer, and our Terms are not intended to limit such consumer legal rights that may not be waived by contract.

- We always appreciate your feedback or other suggestions about WhatsApp and our Services, but you understand that we may use your feedback or suggestions without any obligation to compensate you for them (just as you have no obligation to offer them).

## Special arbitration provision for United States or Canada users

**PLEASE READ THIS SECTION CAREFULLY BECAUSE IT CONTAINS ADDITIONAL PROVISIONS APPLICABLE ONLY TO OUR UNITED STATES AND CANADA USERS. IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, IT REQUIRES YOU TO SUBMIT TO BINDING INDIVIDUAL ARBITRATION OF ALL DISPUTES, EXCEPT FOR THOSE THAT INVOLVE INTELLECTUAL PROPERTY DISPUTES AND EXCEPT THOSE THAT CAN BE BROUGHT IN SMALL CLAIMS COURT. THIS MEANS YOU ARE WAIVING YOUR RIGHT TO HAVE SUCH DISPUTES RESOLVED IN COURT BY A JUDGE OR JURY. THIS SECTION ALSO LIMITS THE TIME YOU HAVE TO START AN ARBITRATION OR, IF PERMISSIBLE, A COURT ACTION. FINALLY, THIS SECTION WAIVES YOUR RIGHT TO HAVE YOUR DISPUTE HEARD AND RESOLVED AS A CLASS ACTION, CLASS ARBITRATION, OR A REPRESENTATIVE ACTION.**

"Excluded Dispute" means any Dispute relating to the enforcement or infringement of your or our intellectual property rights (such as copyrights, trademarks, domains, logos, trade dress, trade secrets, and patents). For clarity and notwithstanding the foregoing, those Disputes relating to, arising out of, or in any way in connection with your rights of privacy and publicity are not Excluded Disputes.

**Federal Arbitration Act.** The United States Federal Arbitration Act governs the interpretation and enforcement of this "Special Arbitration Provision for United States or Canada Users" section, including any question whether a Dispute between WhatsApp and you is subject to arbitration.

**Agreement to Arbitrate for WhatsApp Users Located in the United States or Canada.** For WhatsApp users located in the United States or Canada, WhatsApp

CONFIDENTIAL                                                                      WA-NSO-00014833

and you each agree to waive the right to a trial by judge or jury for all Disputes, except for the Excluded Disputes. WhatsApp and you agree that all Disputes (except for the Excluded Disputes), including those relating to, arising out of, or in any way in connection with your rights of privacy and publicity, will be resolved through final and binding arbitration. WhatsApp and you agree not to combine a Dispute that is subject to arbitration under our Terms with a Dispute that is not eligible for arbitration under our Terms.

The arbitration will be administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules in effect at the time the arbitration is started, including the Optional Rules for Emergency Measures of Protection and the Supplementary Procedures for Consumer-Related Disputes (together, the "AAA Rules"). The arbitration will be presided over by a single arbitrator selected in accordance with the AAA Rules. The AAA Rules, information regarding initiating a Dispute, and a description of the arbitration process are available at www.adr.org. The arbitrator will decide whether a Dispute can be arbitrated. The location of the arbitration and the allocation of fees and costs for such arbitration shall be determined in accordance with the AAA Rules. Notwithstanding the AAA Rules, we will reimburse you for all the AAA administrative fees in Disputes that are subject to the Supplementary Procedures for Consumer-Related Disputes, unless the arbitrator determines that a Dispute was filed for purposes of harassment or is patently frivolous.

**Opt-Out Procedure.** You may opt out of this agreement to arbitrate. If you do so, neither we nor you can require the other to participate in an arbitration proceeding. To opt out, you must notify us in writing postmarked within 30 days of the later of: (i) the date that you first accepted our Terms; and (ii) the date you became subject to this arbitration provision. You must use this address to opt-out:

WhatsApp Inc.

Arbitration Opt-Out

1601 Willow Road

Menlo Park, California 94025

United States of America

CONFIDENTIAL                                                                          WA-NSO-00014834

You must include: (1) your name and residence address; (2) the mobile phone number associated with your account; and (3) a clear statement that you want to opt out of our Terms' agreement to arbitrate.

**Small Claims Court.** As an alternative to arbitration, if permitted by your local "small claims" court's rules, you may bring your Dispute in your local "small claims" court, as long as the matter advances on an individual (non-class) basis.

**Time Limit to Start Arbitration.** We and you agree that for any Dispute (except for the Excluded Disputes) we and you must commence an arbitration proceeding within one year after the Dispute first arose; otherwise, such Dispute is permanently barred. This means that if we or you do not commence an arbitration within one year after the Dispute first arose, then the arbitration will be dismissed because it was started too late.

**No Class Actions, Class Arbitrations, or Representative Actions for Users Located in the United States or Canada.** We and you each agree that if you are a WhatsApp user located in the United States or Canada, each of we and you may bring Disputes against the other only on its or your own behalf, and not on behalf of any other person or entity, or any class of people. We and you each agree not to participate in a class action, a class-wide arbitration, Disputes brought in a private attorney general or representative capacity, or consolidated Disputes involving any other person or entity in connection with any Dispute.

**Severability.** If the prohibition against class actions and other Disputes brought on behalf of third parties is found to be unenforceable for a Dispute, then all of the provisions above under the caption "Special Arbitration Provision for United States or Canada Users" will be null and void as to that Dispute.

**Place to File Permitted Court Actions.** If you opt out of the agreement to arbitrate, if your Dispute is an Excluded Dispute, or if the arbitration agreement is found to be unenforceable, you agree to be subject to the "Forum and Venue" provisions in the "Dispute Resolution" section set forth above.

Accessing WhatsApp's terms in different languages

To access our Terms in certain other languages, change the language setting for your WhatsApp session. If our Terms are not available in the language you select, we will default to the English version.

CONFIDENTIAL                                                                    WA-NSO-00014835

Please review the following documents, which provide additional information about your use of our Services:

WhatsApp Privacy Policy

WhatsApp Intellectual Property Policy

WhatsApp Brand Guidelines

CONFIDENTIAL    WA-NSO-00014836

EXHIBIT 14

# WhatsApp Terms Of Service

Last modified: January 28, 2020 (archived versions)

WhatsApp Inc. ("WhatsApp," "our," "we," or "us") provides messaging, Internet calling, and other services to users around the world. Please read our Terms of Service so you understand what's up with your use of WhatsApp. You agree to our Terms of Service ("Terms") by installing, accessing, or using our apps, services, features, software, or website (together, "Services").

NO ACCESS TO EMERGENCY SERVICES: There are important differences between WhatsApp and your mobile and fixed-line telephone and SMS services. Our Services do not provide access to emergency services or emergency services providers, including the police, fire departments, or hospitals, or otherwise connect to public safety answering points. You should ensure you can contact your relevant emergency services providers through a mobile, fixed-line telephone, or other service.

IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, OUR TERMS CONTAIN A BINDING ARBITRATION PROVISION, WHICH STATES THAT, EXCEPT IF YOU OPT OUT AND EXCEPT FOR CERTAIN TYPES OF DISPUTES, WHATSAPP AND YOU AGREE TO RESOLVE ALL DISPUTES THROUGH BINDING INDIVIDUAL ARBITRATION, WHICH MEANS THAT YOU WAIVE ANY RIGHT TO HAVE THOSE DISPUTES DECIDED BY A JUDGE OR JURY, AND THAT YOU WAIVE YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS, CLASS ARBITRATIONS, OR REPRESENTATIVE ACTIONS. PLEASE READ THE "SPECIAL ARBITRATION PROVISION FOR UNITED STATES OR CANADA USERS" SECTION BELOW TO LEARN MORE.

## About our services

**Registration.** You must register for our Services using accurate data, provide your current mobile phone number, and, if you change it, update this mobile phone number using our in-app change number feature. You agree to receive text messages and phone calls (from us or our third-party providers) with codes to register for our Services.

**Address Book.** You provide us the phone numbers of WhatsApp users and your other contacts in your mobile phone address book on a regular basis. You confirm you are authorized to provide us such numbers to allow us to provide our Services.

**Age.** You must be at least 13 years old to use our Services (or such greater age required in your country for you to be authorized to use our Services without parental approval). In addition to being of the minimum required age to use our Services under applicable law, if you are not old enough to have authority to agree to our Terms in your country, your parent or guardian must agree to our Terms on your behalf.

**Devices and Software.** You must provide certain devices, software, and data connections to use our Services, which we otherwise do not supply. For as long as you use our Services, you consent to downloading and installing updates to our Services, including automatically.

WA-NSO-00195067

**Fees and Taxes.** You are responsible for all carrier data plan and other fees and taxes associated with your use of our Services. We may charge you for our Services, including applicable taxes. We may refuse or cancel orders. We do not provide refunds for our Services, except as required by law.

## Privacy policy and user data

WhatsApp cares about your privacy. WhatsApp's Privacy Policy describes our information (including message) practices, including the types of information we receive and collect from you and how we use and share this information. You agree to our data practices, including the collection, use, processing, and sharing of your information as described in our Privacy Policy, as well as the transfer and processing of your information to the United States and other countries globally where we have or use facilities, service providers, or partners, regardless of where you use our Services. You acknowledge that the laws, regulations, and standards of the country in which your information is stored or processed may be different from those of your own country.

## Acceptable use of our services

**Our Terms and Policies.** You must use our Services according to our Terms and posted policies. If we disable your account for a violation of our Terms, you will not create another account without our permission.

**Legal and Acceptable Use.** You must access and use our Services only for legal, authorized, and acceptable purposes. You will not use (or assist others in using) our Services in ways that: (a) violate, misappropriate, or infringe the rights of WhatsApp, our users, or others, including privacy, publicity, intellectual property, or other proprietary rights; (b) are illegal, obscene, defamatory, threatening, intimidating, harassing, hateful, racially, or ethnically offensive, or instigate or encourage conduct that would be illegal, or otherwise inappropriate, including promoting violent crimes; (c) involve publishing falsehoods, misrepresentations, or misleading statements; (d) impersonate someone; (e) involve sending illegal or impermissible communications such as bulk messaging, auto-messaging, auto-dialing, and the like; or (f) involve any non-personal use of our Services unless otherwise authorized by us.

**Harm to WhatsApp or Our Users.** You must not (or assist others to) access, use, copy, adapt, modify, prepare derivative works based upon, distribute, license, sublicense, transfer, display, perform, or otherwise exploit our Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm us, our Services, systems, our users, or others, including that you must not directly or through automated means: (a) reverse engineer, alter, modify, create derivative works from, decompile, or extract code from our Services; (b) send, store, or transmit viruses or other harmful computer code through or onto our Services; (c) gain or attempt to gain unauthorized access to our Services or systems; (d) interfere with or disrupt the integrity or performance of our Services; (e) create accounts for our Services through unauthorized or automated means; (f) collect the information of or about our users in any impermissible or unauthorized manner; (g) sell, resell, rent, or charge for our Services; or (h) distribute or make our Services available over a network where they could be used by multiple devices at the same time.

**Keeping Your Account Secure.** You are responsible for keeping your device and your WhatsApp account safe and secure, and you must notify us promptly of any unauthorized use or security breach of your account or

WA-NSO-00195068

our Services.

## Third-party services

Our Services may allow you to access, use, or interact with third-party websites, apps, content, and other products and services. For example, you may choose to use third-party data backup services (such as iCloud or Google Drive) that are integrated with our Services or interact with a share button on a third party's website that enables you to send information to your WhatsApp contacts. Please note that when you use third-party services, their own terms and privacy policies will govern your use of those services.

## Licenses

**Your Rights.** WhatsApp does not claim ownership of the information that you submit for your WhatsApp account or through our Services. You must have the necessary rights to such information that you submit for your WhatsApp account or through our Services and the right to grant the rights and licenses in our Terms.

**WhatsApp's Rights.** We own all copyrights, trademarks, domains, logos, trade dress, trade secrets, patents, and other intellectual property rights associated with our Services. You may not use our copyrights, trademarks, domains, logos, trade dress, patents, and other intellectual property rights unless you have our express permission and except in accordance with our Brand Guidelines. You may use the trademarks www.facebookbrand.com/trademarks of our affiliated companies only with their permission, including as authorized in any published brand guidelines.

**Your License to WhatsApp.** In order to operate and provide our Services, you grant WhatsApp a worldwide, non-exclusive, royalty-free, sublicensable, and transferable license to use, reproduce, distribute, create derivative works of, display, and perform the information (including the content) that you upload, submit, store, send, or receive on or through our Services. The rights you grant in this license are for the limited purpose of operating and providing our Services (such as to allow us to display your profile picture and status message, transmit your messages, store your undelivered messages on our servers for up to 30 days as we try to deliver them, and otherwise as described in our Privacy Policy).

**WhatsApp's License to You.** We grant you a limited, revocable, non-exclusive, non-sublicensable, and non-transferable license to use our Services, subject to and in accordance with our Terms. This license is for the sole purpose of enabling you to use our Services, in the manner permitted by our Terms. No licenses or rights are granted to you by implication or otherwise, except for the licenses and rights expressly granted to you.

## Reporting third-party copyright, trademark, and other intellectual property infringement

To report claims of third-party copyright, trademark, or other intellectual property infringement, please visit our Intellectual Property Policy. We may terminate your WhatsApp account if you repeatedly infringe the intellectual property rights of others.

WA-NSO-00195069

## Disclaimers

YOU USE OUR SERVICES AT YOUR OWN RISK AND SUBJECT TO THE FOLLOWING DISCLAIMERS. WE ARE PROVIDING OUR SERVICES ON AN "AS IS" BASIS WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND FREEDOM FROM COMPUTER VIRUS OR OTHER HARMFUL CODE. WE DO NOT WARRANT THAT ANY INFORMATION PROVIDED BY US IS ACCURATE, COMPLETE, OR USEFUL, THAT OUR SERVICES WILL BE OPERATIONAL, ERROR FREE, SECURE, OR SAFE, OR THAT OUR SERVICES WILL FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE DO NOT CONTROL, AND ARE NOT RESPONSIBLE FOR, CONTROLLING HOW OR WHEN OUR USERS USE OUR SERVICES OR THE FEATURES, SERVICES, AND INTERFACES OUR SERVICES PROVIDE. WE ARE NOT RESPONSIBLE FOR AND ARE NOT OBLIGATED TO CONTROL THE ACTIONS OR INFORMATION (INCLUDING CONTENT) OF OUR USERS OR OTHER THIRD PARTIES. YOU RELEASE US, OUR SUBSIDIARIES, AFFILIATES, AND OUR AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, PARTNERS, AND AGENTS (TOGETHER, THE "WHATSAPP PARTIES") FROM ANY CLAIM, COMPLAINT, CAUSE OF ACTION, CONTROVERSY, OR DISPUTE (TOGETHER, "CLAIM") AND DAMAGES, KNOWN AND UNKNOWN, RELATING TO, ARISING OUT OF, OR IN ANY WAY CONNECTED WITH ANY SUCH CLAIM YOU HAVE AGAINST ANY THIRD PARTIES. YOU WAIVE ANY RIGHTS YOU MAY HAVE UNDER CALIFORNIA CIVIL CODE §1542, OR ANY OTHER SIMILAR APPLICABLE STATUTE OR LAW OF ANY OTHER JURISDICTION, WHICH SAYS THAT: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

## Limitation of liability

THE WHATSAPP PARTIES WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR CONSEQUENTIAL, SPECIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES, EVEN IF THE WHATSAPP PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OUR AGGREGATE LIABILITY RELATING TO, ARISING OUT OF, OR IN ANY WAY IN CONNECTION WITH OUR TERMS, US, OR OUR SERVICES WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. THE FOREGOING DISCLAIMER OF CERTAIN DAMAGES AND LIMITATION OF LIABILITY WILL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE LAWS OF SOME STATES OR JURISDICTIONS MAY NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES, SO SOME OR ALL OF THE EXCLUSIONS AND LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN OUR TERMS, IN SUCH CASES, THE LIABILITY OF THE WHATSAPP PARTIES WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

## Indemnification

You agree to defend, indemnify, and hold harmless the WhatsApp Parties from and against all liabilities, damages, losses, and expenses of any kind (including reasonable legal fees and costs) relating to, arising out

WA-NSO-00195070

of, or in any way in connection with any of the following: (a) your access to or use of our Services, including information provided in connection therewith; (b) your breach or alleged breach of our Terms; or (c) any misrepresentation made by you. You will cooperate as fully as required by us in the defense or settlement of any Claim.

## Dispute resolution

**Forum and Venue.** If you are a WhatsApp user located in the United States or Canada, the "Special Arbitration Provision for United States or Canada Users" section below applies to you. Please also read that section carefully and completely. If you are not subject to the "Special Arbitration Provision for United States or Canada Users" section below, you agree that you and WhatsApp will resolve any Claim relating to, arising out of, or in any way in connection with our Terms, us, or our Services (each, a "Dispute," and together, "Disputes") exclusively in the United States District Court for the Northern District of California or a state court located in San Mateo County in California, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such Disputes. Without prejudice to the foregoing, you agree that, in our sole discretion, we may elect to resolve any Dispute we have with you in any competent court in the country in which you reside that has jurisdiction over the Dispute.

**Governing Law.** The laws of the State of California govern our Terms, as well as any Disputes, whether in court or arbitration, which might arise between WhatsApp and you, without regard to conflict of law provisions.

## Availability and termination of our services

**Availability of Our Services.** Our Services may be interrupted, including for maintenance, repairs, upgrades, or network or equipment failures. We may discontinue some or all of our Services, including certain features and the support for certain devices and platforms, at any time. Events beyond our control may affect our Services, such as events in nature and other force majeure events.

**Termination.** We may modify, suspend, or terminate your access to or use of our Services anytime for any reason, such as if you violate the letter or spirit of our Terms or create harm, risk, or possible legal exposure for us, our users, or others. The following provisions will survive any termination of your relationship with WhatsApp: "Licenses," "Disclaimers," "Limitation of Liability," "Indemnification," "Dispute Resolution," "Availability and Termination of our Services," "Other," and "Special Arbitration Provision for United States or Canada Users."

## Other

- Unless a mutually executed agreement between you and us states otherwise, our Terms make up the entire agreement between you and us regarding WhatsApp and our Services, and supersede any prior agreements.

WA-NSO-00195071

- We may ask you to agree to additional terms for certain of our Services in the future, which will govern to the extent there is a conflict between our Terms and such additional terms.

- Our Services are not intended for distribution to or use in any country where such distribution or use would violate local law or would subject us to any regulations in another country. We reserve the right to limit our Services in any country.

- You will comply with all applicable U.S. and non-U.S. export control and trade sanctions laws ("Export Laws"). You will not, directly or indirectly, export, re-export, provide, or otherwise transfer our Services: (a) to any individual, entity, or country prohibited by Export Laws; (b) to anyone on U.S. or non-U.S. government restricted parties lists; or (c) for any purpose prohibited by Export Laws, including nuclear, chemical, or biological weapons, or missile technology applications without the required government authorizations. You will not use or download our Services if you are located in a restricted country, if you are currently listed on any U.S. or non-U.S. restricted parties list, or for any purpose prohibited by Export Laws, and you will not disguise your location through IP proxying or other methods.

- Our Terms are written in English (U.S.). Any translated version is provided solely for your convenience. To the extent any translated version of our Terms conflicts with the English version, the English version controls.

- Any amendment to or waiver of our Terms requires our express consent.

- We may amend or update these Terms. We will provide you notice of amendments to our Terms, as appropriate, and update the "Last Modified" date at the top of our Terms. Your continued use of our Services confirms your acceptance of our Terms, as amended. If you do not agree to our Terms, as amended, you must stop using our Services. Please review our Terms from time to time.

- All of our rights and obligations under our Terms are freely assignable by us to any of our affiliates or in connection with a merger, acquisition, restructuring, or sale of assets, or by operation of law or otherwise, and we may transfer your information to any of our affiliates, successor entities, or new owner.

- You will not transfer any of your rights or obligations under our Terms to anyone else without our prior written consent.

- Nothing in our Terms will prevent us from complying with the law.

- Except as contemplated herein, our Terms do not give any third-party beneficiary rights.

- If we fail to enforce any of our Terms, it will not be considered a waiver.

- If any provision of these Terms is deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from our Terms and shall not affect the validity and enforceability of the remaining provisions, except as set forth in the "Special Arbitration Provision for United States or Canada Users" — "Severability" section below.

- We reserve all rights not expressly granted by us to you. In certain jurisdictions, you may have legal rights as a consumer, and our Terms are not intended to limit such consumer legal rights that may not be waived by contract.

WA-NSO-00195072

- We always appreciate your feedback or other suggestions about WhatsApp and our Services, but you understand that we may use your feedback or suggestions without any obligation to compensate you for them (just as you have no obligation to offer them).

## Special arbitration provision for United States or Canada users

PLEASE READ THIS SECTION CAREFULLY BECAUSE IT CONTAINS ADDITIONAL PROVISIONS APPLICABLE ONLY TO OUR UNITED STATES AND CANADA USERS. IF YOU ARE A WHATSAPP USER LOCATED IN THE UNITED STATES OR CANADA, IT REQUIRES YOU TO SUBMIT TO BINDING INDIVIDUAL ARBITRATION OF ALL DISPUTES, EXCEPT FOR THOSE THAT INVOLVE INTELLECTUAL PROPERTY DISPUTES AND EXCEPT THOSE THAT CAN BE BROUGHT IN SMALL CLAIMS COURT. THIS MEANS YOU ARE WAIVING YOUR RIGHT TO HAVE SUCH DISPUTES RESOLVED IN COURT BY A JUDGE OR JURY. THIS SECTION ALSO LIMITS THE TIME YOU HAVE TO START AN ARBITRATION OR, IF PERMISSIBLE, A COURT ACTION. FINALLY, THIS SECTION WAIVES YOUR RIGHT TO HAVE YOUR DISPUTE HEARD AND RESOLVED AS A CLASS ACTION, CLASS ARBITRATION, OR A REPRESENTATIVE ACTION.

"Excluded Dispute" means any Dispute relating to the enforcement or infringement of your or our intellectual property rights (such as copyrights, trademarks, domains, logos, trade dress, trade secrets, and patents). For clarity and notwithstanding the foregoing, those Disputes relating to, arising out of, or in any way in connection with your rights of privacy and publicity are not Excluded Disputes.

**Federal Arbitration Act.** The United States Federal Arbitration Act governs the interpretation and enforcement of this "Special Arbitration Provision for United States or Canada Users" section, including any question whether a Dispute between WhatsApp and you is subject to arbitration.

**Agreement to Arbitrate for WhatsApp Users Located in the United States or Canada.** For WhatsApp users located in the United States or Canada, WhatsApp and you each agree to waive the right to a trial by judge or jury for all Disputes, except for the Excluded Disputes. WhatsApp and you agree that all Disputes (except for the Excluded Disputes), including those relating to, arising out of, or in any way in connection with your rights of privacy and publicity, will be resolved through final and binding arbitration. WhatsApp and you agree not to combine a Dispute that is subject to arbitration under our Terms with a Dispute that is not eligible for arbitration under our Terms.

The arbitration will be administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules in effect at the time the arbitration is started, including the Optional Rules for Emergency Measures of Protection and the Supplementary Procedures for Consumer-Related Disputes (together, the "AAA Rules"). The arbitration will be presided over by a single arbitrator selected in accordance with the AAA Rules. The AAA Rules, information regarding initiating a Dispute, and a description of the arbitration process are available at www.adr.org. The arbitrator will decide whether a Dispute can be arbitrated. The location of the arbitration and the allocation of fees and costs for such arbitration shall be determined in accordance with the AAA Rules. Notwithstanding the AAA Rules, we will reimburse you for all the AAA administrative fees in Disputes that are subject to the Supplementary Procedures for Consumer-Related Disputes, unless the arbitrator determines that a Dispute was filed for purposes of harassment or is patently frivolous.

WA-NSO-00195073

**Opt-Out Procedure.** You may opt out of this agreement to arbitrate. If you do so, neither we nor you can require the other to participate in an arbitration proceeding. To opt out, you must notify us in writing postmarked within 30 days of the later of: (i) the date that you first accepted our Terms; and (ii) the date you became subject to this arbitration provision. You must use this address to opt-out:

WhatsApp Inc.
Arbitration Opt-Out
1601 Willow Road
Menlo Park, California 94025
United States of America

You must include: (1) your name and residence address; (2) the mobile phone number associated with your account; and (3) a clear statement that you want to opt out of our Terms' agreement to arbitrate.

**Small Claims Court.** As an alternative to arbitration, if permitted by your local "small claims" court's rules, you may bring your Dispute in your local "small claims" court, as long as the matter advances on an individual (non-class) basis.

**Time Limit to Start Arbitration.** We and you agree that for any Dispute (except for the Excluded Disputes) we and you must commence an arbitration proceeding within one year after the Dispute first arose; otherwise, such Dispute is permanently barred. This means that if we or you do not commence an arbitration within one year after the Dispute first arose, then the arbitration will be dismissed because it was started too late.

**No Class Actions, Class Arbitrations, or Representative Actions for Users Located in the United States or Canada.** We and you each agree that if you are a WhatsApp user located in the United States or Canada, each of we and you may bring Disputes against the other only on its or your own behalf, and not on behalf of any other person or entity, or any class of people. We and you each agree not to participate in a class action, a class-wide arbitration, Disputes brought in a private attorney general or representative capacity, or consolidated Disputes involving any other person or entity in connection with any Dispute.

**Severability.** If the prohibition against class actions and other Disputes brought on behalf of third parties is found to be unenforceable for a Dispute, then all of the provisions above under the caption "Special Arbitration Provision for United States or Canada Users" will be null and void as to that Dispute.

**Place to File Permitted Court Actions.** If you opt out of the agreement to arbitrate, if your Dispute is an Excluded Dispute, or if the arbitration agreement is found to be unenforceable, you agree to be subject to the "Forum and Venue" provisions in the "Dispute Resolution" section set forth above.

## Accessing WhatsApp's terms in different languages

To access our Terms in certain other languages, change the language setting for your WhatsApp session. If our Terms are not available in the language you select, we will default to the English version.

Please review the following documents, which provide additional information about your use of our Services:

WA-NSO-00195074

WhatsApp Privacy Policy

WhatsApp Intellectual Property Policy

WhatsApp Brand Guidelines

WA-NSO-00195075

EXHIBIT 15

EXHIBIT 16

EXHIBIT 17

EXHIBIT 18

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 72 of 113

WhatsApp Inc. vs NSO Group Technologies Limited et al.
ROBINSON, ANDREW on 09/19/2024

Highly Confidential, Job 3329
Page 1

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             OAKLAND DIVISION

4    - - - - - - - - - - - - - - x

5    WHATSAPP INC., a Delaware       :

6    corporation, and FACEBOOK,   :

7    INC., a Delaware corporation, :

8          Plaintiffs,       : CASE NO.

9    v.                      : 4:19-cv-07123-PJH

10   NSO GROUP TECHNOLOGIES LIMITED:

11   And Q CYBER TECHNOLOGIES      :

12   LIMITED,                 :

13          Defendants.       :

14   - - - - - - - - - - - - - - x

15      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES

16      VIDEOTAPED DEPOSITION OF ANDREW ROBINSON

17          Thursday, September 19, 2024

18               9:36 a.m.

19

20

21   JOB NO.:  44484

22   Pages 1 through 389

23   Reported By:  CASSANDRA E. ELLIS, CSR-CA #14448,

24   CSR-HI #475, CCR-WA #3484, RPR, RMR, RDR, CRR,

25   Realtime Systems Administrator #823848

Page 230

1      A.   Correct.
2      Q.   Okay.  And you, at some point, came
3   to learn that he was right about that; right?
4      A.   Yes.
5      Q.   All right.  When is it that you
6   came to learn that this was a zero day that
7   WhatsApp was dealing with?
8      A.   Oh, I would ask here, are you
9   referring to the client-side zero day or the
10  server-side issue?
11     Q.   Well, you and Mr. Tiszka are
12  talking about the server-side issue; right?
13     MR. MARZORATI:  Objection to form.
14     A.   It's actually a little ambiguous,
15  here.
16     Q.   Okay.  They both were zero days, in
17  any event; right?
18     A.   Yes.
19     Q.   Both the server-side vulnerability
20  and the client-side vulnerability were zero day
21  vulnerabilities --
22     MR. MARZORATI:  Objection.
23  BY MR. AKROTIRIANAKIS:
24     Q.   -- is that right?
25     MR. MARZORATI:  Sorry, Joe.

Page 231

1      Objection to form.
2      A.   It is my knowledge that, yes, they
3   were both zero days.
4      Q.   All right.  Now, Mr. Tiszka writes
5   to you, we have the payload here.  And he
6   references you to something called phabricator,
7   spelled with a P-h; do you see that?
8      A.   I see that.
9      Q.   What is phabricator?
10     A.   Phabricator is a tool we have
11  internally, that let's us copy/paste text and
12  share that with other people.
13     Q.   Now, when Mr. Tiszka writes:  We
14  have the payload here, by payload he's referring
15  to the ELF file; correct?
16     A.   I believe, in part, I'm not sure
17  exactly what this paste is, so I can't say for
18  sure, without looking at the contents of the
19  paste.
20     Q.   Well, he's not referring to the
21  Pegasus agent, is he?
22     MR. MARZORATI:  Objection to form.
23     A.   Not to my knowledge.
24     Q.   Okay.  Because neither META nor
25  WhatsApp nor Facebook ever obtained the Pegasus

Page 232

1   agent; right?
2      MR. MARZORATI:  Objection to form.
3      You can answer, if you know.
4      A.   To my knowledge, we never retained
5   a copy of Pegasus.
6      Q.   But you did want the Pegasus agent;
7   correct?
8      MR. MARZORATI:  Objection to form.
9      A.   That is correct.
10     Q.   You write:  This isn't a valid ELF;
11  do you see that?
12     A.   I see that.
13     Q.   And were you correct or were you
14  mistaken?
15     A.   I would say that's partially true,
16  partially correct.  Yeah, partially, partially
17  correct there.
18     Q.   And in what sense is it either
19  partially correct or partially incorrect?
20     A.   So at times you can corrupt or
21  malform the headers of executable files, but
22  they will still be runnable on their target
23  operating system or executable on their target
24  operating system, as was the case here.
25     So even though the header was not

Page 233

1   entirely valid, it was still interpretable --
2   interpretable as valid arm -- arm compiled
3   machine code.
4      Q.   That you then disassembled?
5      A.   That is correct.
6      Q.   And you obtained an IP address?
7      MR. MARZORATI:  Objection to form.
8      A.   I obtained a lot of IP addresses
9   from the various ELFs we had.
10     Q.   In this case, Mr. Tiszka asks:  Is
11  there an IP address in there that is -- that it
12  is reaching out to; do you see that, at the
13  bottom of page 1 of Exhibit 1403 -- I'm sorry,
14  1503?
15     A.   Yes, I see that.
16     Q.   And then you respond that you were
17  looking to see if you could find a valid
18  sockaddr struct now; do you see that?
19     A.   I see that.
20     Q.   What does that term reference?
21     A.   So a sockaddr struct would be a
22  structure that exists commonly within Linux
23  network communications for how you tell command
24  or tell a given ELF file that you want to open a
25  connection to a remote server.

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 74 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                          Pages 234..237

Page 234

1      Q.   What was the target operating
2   system of this ELF?
3           MR. MARZORATI:  Objection, lacks
4   foundation.
5      A.   I believe it was meant to target
6   the Android operating system.
7      Q.   And there's only one IP address per
8   ELF; is that right?
9      A.   In the analysis I conducted?
10     Q.   Yes.
11     A.   Yes, I believe that was the case.
12     Q.   All right.  And what was the --
13   well, if you turn to the -- to the last page of
14   Exhibit 1503, you provide an IP address to
15   Mr. Tiszka; do you see that?
16     A.   I see that.
17     Q.   And where did you get the IP
18   address?
19     A.   From the analysis of the machine
20   code.
21     Q.   The decompiled ELF?
22     A.   Yes.
23     Q.   And how did you get the IP address?
24     A.   Well, I eventually found a sockaddr
25   struct.

Page 235

1      Q.   After you decompiled the code?
2      A.   That is correct.
3      Q.   Are you familiar with the technical
4   aspects of how a WhatsApp call works?
5           MR. MARZORATI:  Objection to form
6   and foundation.
7           You can answer, if you know.
8      A.   Not in great detail.
9      Q.   Are you, in general terms, familiar
10   with the technical aspects of how a WhatsApp
11   call works?
12          MR. MARZORATI:  Same objections.
13     A.   And same answer.
14     Q.   All right.  Well, how would you, if
15   you were asked to explain to a person without a
16   computer science background, how is it that you
17   would explain how a WhatsApp call works?
18          MR. MARZORATI:  Same objections.
19     A.   You hit the call button on your
20   target contact on the person you want to call,
21   and if they pick up the other end you will be
22   connected with a voice call.
23     Q.   Is that your full understanding of
24   how WhatsApp calling works, from a technical
25   perspective?

Page 236

1      A.   No, but you asked me to explain it
2   to non -- to a person without a computer science
3   background.
4      Q.   Sure.  If you were going to ask to
5   explain technically of how a call works with a
6   person who doesn't have a computer science
7   background how would you explain it?
8           MR. MARZORATI:  Objection.  Sorry,
9   repeat that one more time.
10   BY MR. AKROTIRIANAKIS:
11     Q.   If you were trying to explain
12   technically how a WhatsApp call works to a
13   person who does not have a computer Science
14   background, what explanation would you give?
15     A.   I mean, the one I just gave.  I
16   would keep it simple.
17     Q.   Well in, order to explain your
18   investigation in this case, you would need to
19   make reference to servers; right?
20          MR. MARZORATI:  Objection to form,
21   foundation.
22     A.   In this case?  Sure, I would need
23   to reference a server.
24     Q.   Okay.  So tell us, by reference to
25   servers, how it is that a WhatsApp call works?

Page 237

1           MR. MARZORATI:  Objection to form,
2   lacks foundation.
3      A.   Sure.  So when you would hit the
4   call button in the WhatsApp client, a request
5   makes its way to the WhatsApp servers, which
6   then essentially forwards the request onto the
7   recipient who can then choose to accept or
8   decline the call.
9      Q.   By hitting the answer or decline
10   button on their phone?
11     A.   Whenever things are working
12   correctly, yes.
13     Q.   All right.  Can you refer to your
14   presentation, Exhibit 1204, please?
15     A.   1204?
16     Q.   I'm sorry, it's exhibit --
17     A.   1206.
18     Q.   1206?  Thank you.
19          Again, you wrote Exhibit 1206;
20   correct?
21     A.   Yes.
22     Q.   And you don't -- do you recall
23   when, where or who to you presented this
24   presentation?
25          MR. MARZORATI:  Objection to form.

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 75 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                            Pages 286..289

Page 286

1  this exhibit.
2       (Exhibit No. 1517 was marked for
3  identification.)
4       MR. MARZORATI:  Can I give him that
5  one?
6       MR. AKROTIRIANAKIS:  Yeah.
7       MR. MARZORATI:  Okay.
8  BY MR. CRAIG:
9       Q.  All right.  So Cortney Padua, what
10  was her title in 2019?
11      A.  She would have been a security, I
12  believe, engineer on CERT.
13      Q.  And you don't know the expense to
14  WhatsApp or Facebook of employing Ms. Padua in
15  2019, do you?
16      MR. MARZORATI:  Objection outside
17  the scope of his 30(b)(6) testimony.
18      A.  I do not.
19      Q.  Okay.  Do you know whether Cortney
20  Padua took any vacation or PTO in May or June of
21  2019?
22      A.  I do not know.
23      Q.  Okay.  All right.
24      What actions did Cortney Padua take
25  in responding to defendant's exploit in May of

Page 287

1  2019?
2       A.  So much of what Cortney did was
3  essentially translation of all of the raw logs
4  and information that we were collecting as a
5  part of the investigation, and translating that
6  into actual databases that we could more easily
7  leverage for investigations, as well as
8  preserving the various documents that we used
9  during the course of our investigation.
10      Q.  And -- and is it your understanding
11  that she spent about 96 hours, from May 2nd to
12  June 15th, 2019, on that -- on those tasks?
13      A.  Yes, that is, that is approximately
14  how much time.
15      Q.  All right.  I'd like to divide
16  up -- well, of the time that Cortney Padua
17  spent, how much of it was spent, and I'm going
18  to give you five different categories and ask
19  you to allocate her time into those five
20  categories, and you can take notes if you want
21  or you don't have to.
22      A.  Is there something I can use to
23  take notes?
24      Q.  Of course.
25      THE WITNESS:  Do you have a pen?

Page 288

1  Sorry.
2  BY MR. CRAIG:
3       Q.  Thanks.  So the first category is
4  improving WhatsApp software code; the second is
5  identifying and notifying WhatsApp users; the
6  third is trying to understand and identify the
7  exploit and the source of the exploit.
8       A.  Sorry.  Could you go back, repeat
9  that one?
10      Q.  Yeah.  Trying to understand and
11  identify the exploit and the source of the
12  exploit; fourth is, communications and legal;
13  and the fifth is other.
14      So out of the -- out of the time
15  that Cortney Padua spent, can you allocate that
16  among those five categories?
17      MR. MARZORATI:  I will object to
18  this exercise in its entirety as beyond the
19  scope of his 30(b)(6) testimony.
20      Drew, to the extent you understand
21  any of this or these are categories that you've
22  heard of before, you can attempt to answer.
23      A.  I would say that I would cause --
24  of the categories provided to me I would
25  classify her work here as in support of trying

Page 289

1  to identify and understand the source of the
2  exploit.
3       Q.  Okay.  All of it?
4       A.  Essentially, yes.
5       Q.  Okay.  Michael Scott, what was his
6  title in 2019?
7       A.  He was a threat investigator.
8       Q.  Okay.  Did he take any vacation or
9  PTO in May or June of 2019?
10      MR. MARZORATI:  Objection, outside
11  the scope.
12      A.  I do not know.
13      Q.  How much time did Michael Scott
14  spend working on responding to the NSO exploit
15  in 2019?
16      A.  He was essentially full time
17  throughout the months of May and June, focused
18  on this issue.
19      Q.  How -- so again, I'm going to refer
20  you to the five categories that I identified
21  earlier, how much of his time was spent in each
22  of those five categories during May and June of
23  2019?
24      MR. MARZORATI:  Same objections to
25  this exercise.

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 76 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                           Pages 290..293

Page 290

1    A.  I'm not sure the specific
2  breakdown, also, I would say the two categories,
3  in my mind, would overlap to some degree, so
4  it's a little confusing.
5        But his time would have been split,
6  to some degree.  I'm not sure what, between the
7  identify, notify users, and trying to understand
8  and identify the source of the exploit.
9    Q.   Which two categories do you think
10  overlap?
11    A.   Those two, the identify and notify
12  users, and trying to understand and ID, the
13  source of the exploit.
14    Q.   All right.  To me the distinction
15  is pretty clear between identifying and
16  notifying the WhatsApp users who may have been
17  targeted and understanding and identifying the
18  exploit, itself, and where it came from, what it
19  is about those two that you find overlapping?
20        MR. MARZORATI:  Object to the
21  testimony from Mr. Craig and to the form of the
22  question.
23    A.   To me, identifying the users
24  involved and the targeting of an exploit is
25  critical to understanding the source of the

Page 291

1  exploit.
2    Q.   All right.  So is your testimony
3  that -- that Michael Scott spent about 50
4  percent of his time identifying and notifying
5  the users of WhatsApp who may have been targeted
6  with Pegasus, and 50 percent of the time trying
7  to understand and identify what the exploit was?
8        MR. MARZORATI:  Objection,
9  misstates his testimony.
10    A.   I do not know what the delineation
11  between those two categories that you've
12  outlined is.
13    Q.   All right.  How much of your time
14  was spent responding to the exploit?
15    A.   In the hundreds of hours.
16    Q.   You can't narrow it down anymore
17  than that?
18    A.   I would say a conservative estimate
19  would probably be somewhere around the order of
20  300 hours, 300 to 400 hours.
21    Q.   And referring again to my five
22  categories, which -- which ones were you
23  involved in?
24        MR. MARZORATI:  Same objections as
25  before.

Page 292

1    A.   Again, trying to understand and ID
2  the source of the exploit, identifying and
3  notifying users, and probably a good bit of
4  other in there, as well.
5    Q.   Did you take any PTO in 2019?
6    A.  I more than likely did.
7    Q.  Do you remember when?
8    A.  I do not.
9    Q.  All right.  How much time did
10  Aashin Gautam spend responding to the exploit?
11    A.   Approximately half his time,
12  from the months of May to November, was spent
13  working on issues related to this incident.
14    Q.   And what did Mr. Gautam do?
15    A.   He was a director for WhatsApp
16  customer operations.
17    Q.   What did he --
18    A.   He worked in --
19        MR. MARZORATI:  You can finish your
20  answer, Mr. Robinson.
21    A.   He worked in victim outreach.
22    Q.   So all of this time, this three and
23  a half months of his time, was spent on victim
24  outreach?
25        MR. MARZORATI:  Objection to the

Page 293

1  extent -- same objections as before regarding
2  this category again.
3        THE WITNESS:  Sorry, repeat the
4  question.
5        MR. CRAIG:  Yeah.
6  BY MR. CRAIG:
7    Q.   Would you -- would you categorize
8  all of the time that Mr. Gautam spent as victim
9  outreach?
10        MR. MARZORATI:  Same objections as
11  before regarding this category game.
12    A.   Yes.
13    Q.   How much time did YuanYuan Wang
14  devote to working on the exploit in 2019?
15    A.   It would have been approximately --
16  approximately 80 to 90 hours.
17    Q.   Would you consider how many hours
18  is a full-time day for Facebook and META?
19        MR. MARZORATI:  Objection, calls
20  for speculation.  It's also outside the scope of
21  his testimony.
22    A.   Individuals will -- can work a
23  varying number of hours during their day.
24    Q.   And in your testimonial aid, here,
25  it says:  May and June full time, and I'm just

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 77 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                          Pages  294..297

Page 294

1   curious how you get from that to your answer of
2   80 to 90 hours?
3         A.  Correct.  So, well, in part, I have
4   the opportunity to talk to him, and I believe
5   that was roughly the time that he conveyed to
6   me, as well as the rough calculation of roughly
7   eight hours a day over an 11 -- over the course
8   of 11 days.
9         Q.  Do you know how many -- are you
10  counting weekend days in that?
11        A.  During this time period, yes.
12        Q.  Okay.  And what did Mr. Wang --
13  specifically what was he doing in respect to
14  responding to the exploit?
15              MR. MARZORATI:  Do you need a
16  break?
17              THE WITNESS:  I'm good, just water
18  down the wrong pipe.
19              Sorry, could you repeat the
20  question?
21  BY MR. CRAIG:
22        Q.  What did Mr. Wang do, between May
23  2nd and June 13 of 2019 with respect to the NSO
24  exploit?
25        A.  He was responsible for

Page 295

1   investigating the -- or helping investigates the
2   client-side vulnerability, performing some of
3   the lobbying that we needed to gather the
4   information needed to remediate the issue, as
5   well as implementation of some of the fix.
6         Q.  Are you able to allocate his time
7   among the five categories that I've -- that I've
8   given you?
9              MR. MARZORATI:  Same objections as
10  before.
11        A.  I am not.
12        Q.  What did Mister -- let me ask you:
13  Otto Ebeling, what was his title in 2019?
14        A.  He was a security engineer.
15        Q.  Did he take any PTO during 2019?
16              MR. MARZORATI:  Objection as
17  outside the scope.
18        A.  I do not know.
19        Q.  What actions did Mr. Ebeling take
20  in responding to defendant's exploit in May
21  2019?
22        A.  He worked to analyze the exploit
23  and understand how it functioned.
24        Q.  How much did -- sorry.
25              What was Aby John's title in 2019

Page 296

1         A.  I'm sorry, could you repeat the
2   name.
3         Q.  Aby John, A-b-y, J-o-h-n?
4         A.  I don't know.
5         Q.  What did Aby John do in responding
6   to defendant's exploit in May 2019?
7         A.  I don't know.
8         Q.  What was Andy Yang's title in 2019?
9         A.  I don't know.
10        Q.  What did Andy Yang do in responding
11  to defendant's exploit in May 2019?
12        A.  I don't know.
13        Q.  What was Andrey Labunets' title in
14  2019?
15        A.  I believe he would have been a
16  security engineer.
17        Q.  And what did Andrey Labunets do in
18  respect of identifying -- I'm sorry -- in
19  responding to the exploit in 2019?
20        A.  I'm sorry, could you clarify the
21  question?
22        Q.  Yeah.  What did Andrey Labunets do
23  in responding to defendant's exploit in May of
24  2019?
25        A.  He performed several functions

Page 297

1   around the investigation to include looking at
2   our own servers to make sure that there wasn't
3   some additional infection, as well as helping
4   some of the -- I believe helping some of the
5   exploit analysis.
6         Q.  What did -- what was Airoven's --
7   Airoven Thangavell's (phonetic) title in 2019?
8         A.  I do not know.
9         Q.  What did Airoven Thangavell do to
10  respond to the defendant's exploit in 2019?
11        A.  I do not know.
12        Q.  What was Brendon Tiszka's title in
13  2019?
14        A.  I don't know.
15        Q.  What did Brendon Tiszka do to
16  respond to defendant's exploit in May 2019?
17        A.  I don't know the full extent of his
18  work.
19        Q.  Do you know any of the extent of
20  his work?
21        A.  We had some brief conversations
22  about it, beyond that, I don't know much about
23  what he did.
24        Q.  So you can't tell me anything about
25  what he did?

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 78 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                        Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                                          Pages 334..337

Page 334

1    threat; is that right?
2         A.   It depends on how you would
3    classify physical threat.
4         Q.   All right.  This is Exhibit 1508,
5    and the only thing I'm going to ask you about
6    is --
7             MR. AKROTIRIANAKIS:  There you go,
8    counsel.  Sorry, here you go, counsel.
9             (Exhibit No. 1508 was marked for
10   identification.)
11            MR. AKROTIRIANAKIS:  I'm sorry, I
12   didn't mean to throw that, if I did.
13   BY MR. AKROTIRIANAKIS:
14        Q.   Do you see where you write here, in
15   the second line:  We are concerned they'll
16   target us; do you see that?
17        A.   I see that.
18        Q.   There's the possibility of physical
19   harassment; do you see that?
20        A.   I see that.
21            MR. MARZORATI:  Objection, misreads
22   the document.
23   BY MR. AKROTIRIANAKIS:
24        Q.   They've employed other
25   organizations to try and harass people; do you

Page 335

1    see that?
2             MR. MARZORATI:  Objection, read the
3    portion of that line, but not the full one,
4    which reads:  They've employed other
5    organizations to try and harass people who have
6    outed them in person.
7    BY MR. AKROTIRIANAKIS:
8         Q.   You wrote those words?
9         A.   I wrote the words.
10        Q.   Okay.  And that all ties back to
11   this human intelligence thing that we've been
12   talking about; right?
13            MR. MARZORATI:  Objection to form.
14        A.   It is related to BlackCube.
15        Q.   Well, is there any other evidence
16   that supports the statements that you're making
17   to Ms. Padua?
18            MR. MARZORATI:  Objection to form.
19        A.   At this time, the interaction
20   between BlackCube and our legal counsel had not
21   occurred, so I would say that this was a
22   prediction that came true.
23        Q.   So this -- these statements are
24   based entirely on your reading this New York
25   Times article that you reference in the link to

Page 336

1    Ms. Padua?
2         A.   That is correct.
3         Q.   All right.  Anything else, at all?
4             MR. MARZORATI:  Objection to form.
5         A.   Related to what?
6         Q.   Related to why you're making these
7    statements to Ms. Padua, other than reading the
8    New York Times article?
9         A.   It is understood by many people in
10   my industry that NSO Group is not the nicest of
11   companies.
12        Q.   Now, what's that based on?
13            MR. MARZORATI:  Objection to form.
14        A.   The opinions of other industry
15   professionals.
16        Q.   Okay.  So other things that other
17   people, outside of WhatsApp, told you, outside
18   of WhatsApp and Facebook?
19            MR. MARZORATI:  Object to form.
20        A.   That is correct.
21        Q.   All right.  You refer to pesky
22   mercenary, what is Pesky Mercenary?
23        A.   Pesky Mercenary would be a code
24   name that we use internally for case tracking.
25            Pesky Mercenary would be NSO Group.

Page 337

1         Q.   So when we see references in
2    documents to Pesky Mercenary that -- that would
3    be a reference to NSO?
4         A.   That is correct.
5         Q.   Okay.  And who gave NSO that code
6    name?
7         A.   I believe that was -- oh --
8         Q.   Go ahead.
9         A.   I believe that was Michael Scott.
10            MR. AKROTIRIANAKIS:  Okay.
11   Jonathan, give me the sticker, please.
12            Off the record.
13            (Discussion held off the written
14   record.)
15   BY MR. AKROTIRIANAKIS:
16        Q.   All right.  Did Mr. Scott come up
17   with other nicknames for NSO?
18            MR. MARZORATI:  Objection,
19   misstates testimony.
20        A.   I don't believe so, for NSO,
21   specifically.
22            (Exhibit No. 1207 was marked for
23   identification.)
24   BY MR. AKROTIRIANAKIS:
25        Q.   All right.  I have given you

Case 4:19-cv-07123-PJH   Document 422-2   Filed 10/11/24   Page 79 of 113
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Highly Confidential, Job 3329
ROBINSON, ANDREW on 09/19/2024                                            Pages  338..341

Page 338

1  Exhibit 1207, and I ask if you recognize the
2  document?
3          MR. MARZORATI:  Please feel free to
4  look through it, that will help you recognize
5  it.
6      A.   I believe I recognize the document.
7      Q.   Okay.  What is Exhibit 1207?
8      A.   I believe it is a Quip.
9      Q.   Okay.  And what is this Quip?
10     A.   The title is:  Infrastructure
11  related to exploit targeting, WhatsApp VoIP
12  vulnerability.
13     Q.   All right.  And the first heading,
14  under that, is c2 servers believed to be used to
15  deliver malicious payloads; right?
16     A.   In parentheses, malware, yes.
17     Q.   All right.  And there's a list of
18  41 items; do you see that?
19     A.   I see the first list of 41 items.
20     Q.   Okay.  And are these the c2 servers
21  that WhatsApp believed to be used to deliver
22  malicious payloads?
23     A.   I don't know if this was the full
24  list, but this would have been, at the very
25  least, a partial list of the c2 servers we

Page 339

1  identified.
2      Q.   Okay.  Who compiled Exhibit 1207?
3      A.   I believe, largely, I did.
4      Q.   Okay.  And these are IP addresses
5  that WhatsApp obtained from ELF files that were
6  involved in the S178165 incident?
7      A.   Supplemented with other metadata
8  about those IP addresses, yes.
9      Q.   Other than these 41 IP addresses,
10  do you know whether WhatsApp obtained any other
11  IP addresses from the ELF files used in the
12  S178165 incident?
13          MR. MARZORATI:  Objection, calls
14  for speculation, lacks foundation.
15     A.   I don't recall with this
16  document -- if this document held the full list
17  or not.
18     Q.   Do you recall there being a greater
19  number than 41 IP addresses?
20     A.   I don't recall what the specific
21  number of IP addresses was or if it was greater
22  than 41 or not.
23     Q.   All right.  And in any event, the
24  c2 servers that are listed in Exhibit 1207 are
25  the same as the secondary payload servers or

Page 340

1  SPSs that you identified in your presentation,
2  Exhibit 1206; correct?
3      A.   These would be secondary payload
4  servers, yes.
5      Q.   And how did you obtain the provider
6  information?
7      A.   That's publicly available
8  information.
9      Q.   How did you obtain it?
10     A.   I -- using WHOIS records.
11     Q.   All right.  What is WHOIS?
12     A.   It's a public service that ISPs
13  provide detailing the ASN, the provider, the
14  country where a server is located, and the
15  sudden add-on which that server exists.
16     Q.   The country where the server is
17  located or the country where the provider is
18  located?
19     A.   I believe it is usually one and the
20  same.
21     Q.   Well, you wrote, in Exhibit 1207,
22  country location of provider; right?
23     A.   I did.
24     Q.   All right.  And WHOIS does not
25  purport to tell you the -- the country location

Page 341

1  of the physical server, does it?
2          MR. MARZORATI:  Objection to form.
3      A.   Well, typically, ASN's, the way
4  network infrastructure works, is that the -- it
5  will be located in physically the same location
6  as the country of the provider.
7      Q.   A server is a physical item?
8      A.   A server is a physical item.
9      Q.   Okay.  And by show of hands, what
10  size is it?
11     A.   It can be very -- usually they --
12  they will be measured in what's called U's,
13  usually, so it can be, like, say one U racks or
14  four U racks.
15     Q.   Okay.  How big is a one U rack?
16     A.   A rack can be roughly this wide and
17  one U is approximately this tall.
18     Q.   So four U's would be approximately
19  how large?
20     A.   Four units, so about four times
21  that one U size.
22     Q.   Maybe about a foot and a half for
23  four U?
24     A.   I don't know what -- I don't know
25  what this equates to in feet, but I would say,

WhatsApp Inc. vs NSO Group Technologies Limited et al.
ROBINSON, ANDREW on 09/19/2024

Highly Confidential, Job 3329
Pages  386..389

| | |
|---|---|
| **Page 386** | **Page 387** |

Page 386

1    ACKNOWLEDGMENT OF DEPONENT

2           I, ANDREW ROBINSON, do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true,

5    correct and complete transcription of the

6    testimony given by me and any corrections appear

7    on the attached Errata sheet signed by me.

8

9    _____    _____

10        (DATE)                    (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 387

1         CERTIFICATE OF SHORTHAND REPORTER

2           I, Cassandra E. Ellis, Registered

3    Professional Reporter, the officer before whom

4    the foregoing proceedings were taken, do hereby

5    certify that the foregoing transcript is a true

6    and correct record of the proceedings; that said

7    proceedings were taken by me stenographically

8    and thereafter reduced to typewriting under my

9    supervision; and that I am neither counsel for,

10   related to, nor employed by any of the parties

11   to this case and have no interest, financial or

12   otherwise, in its outcome.

13           IN WITNESS WHEREOF, I have hereunto

14   set my hand this 23RD day of September 2024.

15

16

17

18   *Cassandra E. Ellis* _____

19   CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484,

20               CSR-HI #475, RPR, RMR, RDR,

21               CRR, REALTIME SYSTEMS

22               ADMINISTRATOR #823848

23

24

25

Page 388

1              E R R A T A    S H E E T

2       IN RE:  WHATSAPP/FACEBOOK, v. NSO GROUP/Q

3    CYBER

4    RETURN BY: _____

5    PAGE    LINE    CORRECTION AND REASON

6    ____  ____    _____

7    ____  ____    _____

8    ____  ____    _____

9    ____  ____    _____

10   ____  ____    _____

11   ____  ____    _____

12   ____  ____    _____

13   ____  ____    _____

14   ____  ____    _____

15   ____  ____    _____

16   ____  ____    _____

17   ____  ____    _____

18   ____  ____    _____

19   ____  ____    _____

20   ____  ____    _____

21   ____  ____    _____

22   ____  ____    _____

23

24   _____    _____

25        (DATE)                (SIGNATURE)

Page 389

1    E R R A T A   S H E E T   C O N T I N U E D

2       IN RE:  WHATSAPP/FACEBOOK, v. NSO GROUP/Q

3    CYBER

4    RETURN BY: _____

5    PAGE    LINE    CORRECTION AND REASON

6    ____  ____    _____

7    ____  ____    _____

8    ____  ____    _____

9    ____  ____    _____

10   ____  ____    _____

11   ____  ____    _____

12   ____  ____    _____

13   ____  ____    _____

14   ____  ____    _____

15   ____  ____    _____

16   ____  ____    _____

17   ____  ____    _____

18   ____  ____    _____

19   ____  ____    _____

20   ____  ____    _____

21   ____  ____    _____

22   ____  ____    _____

23

24   _____    _____

25        (DATE)                (SIGNATURE)

EXHIBIT 19

EXHIBIT 20

EXHIBIT 21

EXHIBIT 22

EXHIBIT 23

EXHIBIT 24

EXHIBIT 25

EXHIBIT 26

EXHIBIT 27

EXHIBIT 28

EXHIBIT 29



# Attachment 1

Confidential



**WESTBRIDGE**

## PHANTOM

### Turn Your Target's Smartphone into an Intelligence Gold Mine



Phantom is an end-to-end cyber intelligence software which remotely and covertly extracts all data from any smartphone. Installation is performed remotely (over the air) with either minimal or no engagement from the target, requires no third party involvement from cell phone carriers, and leaves no traces whatsoever on the device. Covertly gather all data on a target smartphone including: contact list, text messages, call history, emails, instant messaging, call interception, room wiretap, camera snapshots, calendar, GPS tracking, browser history and app data such as Skype and Facebook. Created to answer a void in law enforcement data gathering ability, this field-proven solution is used by intelligence agencies around the world, helping to reduce crime, prevent terrorism and maintain public safety.

WA-NSO-00100527



## Westbridge Technologies

Westbridge Technologies is the North-American branch of NSO Group, a world-leading cyber intelligence company which provides cutting edge technology in the field of cyber intelligence gathering. Westbridge's product line enables law enforcement and intelligence agencies to remotely and covertly extract crucial intelligence from the most commonly used mobile devices. These breakthrough systems were developed in order to provide governments with a way to address the communications interception challenges in today's highly dynamic cyber battlefield.

What makes Westbridge unique is the combination of technical expertise with a strong operational and intelligence background, combined with an understanding of the legal framework. These powerful synergies are reflected in the creativity of our solutions and drive unmatched value for our customers.

- Based in Bethesda, MD, Westbridge Technologies was founded in 2014 as the North American branch of the international company NSO Group.
- NSO Group was founded in 2010. The company is privately owned, with the majority ownership held by an American private equity firm.
- NSO Group is the provider of a variety of unique cyber intelligence systems, focused on extracting critical information from mobile devices.
- The company has a strong global customer base, which includes leading intelligence organizations and law enforcement agencies throughout Asia, Africa, Europe and Latin America.
- 85% of the company's resources are focused on research and development

## THE PHANTOM ADVANTAGE

The Phantom system enables intelligence organizations and law enforcement agencies to produce invaluable intelligence by extracting and monitoring crucial data from mobile devices:

- **Unlimited access to the target's mobile devices** - Installation is performed remotely (over-the-air) with either minimal or no engagement from the target.
- **Independent solution** - No cooperation with third party is required (AT&T, Verizon, Apple, Google)
- **Voice interception** – Monitor voice and VoIP calls in real-time.
- **Application monitoring** – Monitor a multitude of applications including Skype, WhatsApp, Viber, Facebook and Blackberry Messenger (BBM.)
- **Bridge the intelligence gap** – Collect unique types of information (Photos, Instant Messaging, Passwords, etc.) which assist in building an accurate and comprehensive intelligence panorama.
- **Handle encrypted content and devices** - Overcome encryption, SSL, proprietary protocols and any hurdle introduced by the complex communications world.
- **Supports the most popular smartphones today** – iPhone, Samsung, Motorola, LG, Blackberry, Sony, etc.
- **Superior Geo-location** – Track targets and get accurate positioning information using GPS. **Persistent tracking** – Identify and warn against the use of multiple eSIM cards with a single target, Phantom can endure the mobile device factory reset.
- **Modular capabilities** – Phantom's capabilities can be customized to the client's specific needs and regulations

We welcome your questions, inquires and feedback.

     WA-NSO-00100528

EXHIBIT 30

EXHIBIT 31

EXHIBIT 32

EXHIBIT 33

EXHIBIT 34

EXHIBIT 35

EXHIBIT 36

EXHIBIT 37

EXHIBIT 38

# EXHIBIT 39

EXHIBIT 40

EXHIBIT 41

EXHIBIT 42

EXHIBIT 43

EXHIBIT 44

HEARING ON ANNUAL WORLDWIDE THREATS

Tuesday, March 8, 2022

U.S. House of Representatives,

Permanent Select Committee on Intelligence,

Washington, D.C.

The committee met, pursuant to call, at 10:03 a.m., in Room 2175, Rayburn House Office Building, the Honorable Adam Schiff (chairman of the committee) presiding.

Present:    Representatives Schiff, Himes, Carson, Speier, Quigley, Swalwell, Castro, Maloney, Demings, Krishnamoorthi, Cooper, Crow, Turner, Wenstrup, Stewart, Crawford, Stefanik, Mullin, Kelly of Mississippi, LaHood, Fitzpatrick, and Gallagher.

RPTR WARREN

EDTR ZAMORA

[11:03 a.m.]

    Mr. Stewart.    And for the benefit of the American people as well, there are some other, as I said, other issues that I think we should talk about, although briefly, then I want to reserve as much of my time as I can to come back to Ukraine.

    Director Haines, and really all of you, in the last year, we went through this thing that made several of us on the committee very uncomfortable, in the sense that there was a DHS and FBI mandate to report on domestic violent extremists or extremism.

    Director, that mandated that you or you chose to at that point on March 21 to release a standalone report, which is something quite unusual, for us to take an issue, a single issue like that, with a standalone report from the DNI, talking again about domestic violent extremism.    And there is obviously a lot of work, a lot of intense analysis which, again, the reason that I am concerned about is that, as I have expressed to, I think, all of you, is the sense we should never turn the awesome power of the CIA or the awesome power of the NSA on American persons.    And I believe that you all agree with that, and it seems like we are approaching that line.

    Interestingly, in this most recent report, do you know how many times DVEs are mentioned?    Zero, not a single time, which begs the question, I mean, there is a couple perhaps explanations.    One of them is that we fixed the problem, which seems unlikely. I have never seen an example where one report highlights something as this is a intense area of issue for us, the next year it is not mentioned at all.    I am afraid that the work last year was a result of political pressure.

    And I wonder if anyone of you would like to perhaps offer an explanation for why it was so important a year ago and yet doesn't make into it the report at all in this most

recent.

Director <u>Haines.</u>    Sure.    I can start.    So it is mentioned; it is just under a separate name.    You will see we talk about racially or ethnically motivated violent extremism, and that is a form of, in many respects, domestic violent extremism. Obviously, it can occur in other places, but it also occurs domestically, and it does remain a problem.    But I will turn to Director Wray to talk about how much of a problem.

Mr. <u>Wray.</u>    Well, from the FBI perspective, domestic violent extremism, of course, is central to our mission, separate and apart from authorities that others in the Intelligence Community might have.    And we are aggressively pursuing it.    And it remains a very significant, high priority.

Mr. <u>Stewart.</u>    And, Director, I agree with that, that you should, as the Director of the FBI, have that responsibility.    What made us uncomfortable was we were doing it within the framework of many assets and the efforts of those within the Intelligence Community which, once again, we should have a very clear line between those two efforts.

If I could in the minute I have left, Director, according to some open source reporting, the FBI purchased NSO spyware Pegasus in 2019 and evaluated the program under a name called Phantom.    Can you confirm that, you know, if that is true or not?

Mr. <u>Wray.</u>    What I can tell you is that the FBI has not and did not use the NSO products operationally in any investigation.    I can confirm that we bought a limited license for testing and evaluation, so not used in any investigation of anyone but rather as part of our routine responsibilities to evaluate technologies that are out there, not just from a perspective of could they be used someday legally but also, more importantly, what are the security concerns raised by those products.    So very different from using it to investigating it.

Mr. <u>Stewart.</u>   So I understand that you did purchase a program and you tested it. Is that accurate?

Mr. <u>Wray.</u>   We had a limited license for testing and evaluation.   We have tested and evaluated, and that is over.

Mr. <u>Stewart.</u>   Did you --

Mr.   <u>Wray.</u>   It hasn't been used in any investigation of anyone.

Mr. <u>Stewart.</u>   Did the FBI ever notify Congress of their intention to test this product?

Mr. <u>Wray.</u>   That, I don't know the answer to.   I can look into that.   I am not sure --

Mr. <u>Stewart.</u>   Please do because we are unaware of any notification.

And then, why would we test a product such as that if you don't have the intention to use it?

Mr. <u>Wray.</u>   Well, we test -- it is a good question.   I am glad you asked me.   We test and evaluate all sorts of technologies and products that, if in the wrong hands, can be used against our agents, for example, conducting their operations.   So part of it is, from a counterintelligence security perspective, we need to know what tools are out there that the bad guys can use against our people.   So that is part of why we test it.   And by the way, because that allows us to inform our own countermeasures and things like that.

Mr. <u>Stewart.</u>   Okay.   And my time is expired.   But are you saying then that you would never intend to use that against U.S. persons, only for counterintelligence?   Is that true?

Mr. <u>Wray.</u>   We decided not to use it -- even before the current and brouhaha, we decided not to use it for any purpose other than just the one I have already referred to.

Mr. <u>Stewart.</u>   Okay.   Thank you.   I appreciate your response.