# EXHIBIT 37

## FILED UNDER SEAL

# EXHIBIT 38

## FILED UNDER SEAL

EXHIBIT 39

Case 4:19-cv-07123-PJH    Document 437-2    Filed 10/18/24    Page 4 of 90
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}           Page 1

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4    _____

5    WHATSAPP INC., a Delaware            )
     corporation, and FACEBOOK, INC.,    )
6    a Delaware corporation,              )
     a Delaware corporation,             )
7                                         )
                 Plaintiffs,              )
8       v.                                ) Case No.
                                          ) 4:19-cv-07123-PJH
9    NSO GROUP TECHNOLOGIES LIMITED       )
     and Q CYBER TECHNOLOGIES LIMITED,    )
10                                        )
                                          )
11               Defendants.              )
     _____)

12

13        HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14         VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                    DEPOSITION OF

16    WHATSAPP INC., by and through its Designated

17                  Representative,

18                 CLAUDIU GHEORGHE

19            Palo Alto, California 94304

20            Friday, August 16, 2024

21

22   Reported Stenographically by:
     MARY J. GOFF
23   CSR No. 13427
     WA CSR No. 21030779
24   Job No. 3296
     PAGES 1-295

25

Page 150

1    Q    (BY ATTORNEY WEINBERG) Okay.  This box
2 here with some text, this is the -- an excerpt of
3 the offer stanza, right?
4    **A   The what?**
5    Q    This is an excerpt of the offer stanza --
6        ATTORNEY BLOCK:  Object to form.
7    Q    (BY ATTORNEY WEINBERG) -- that is being
8 sent in the first arrow?
9        ATTORNEY BLOCK:  Object to form.
10   **A   It looks like an XML tag as part of the**
11 **offer stanza, which was done manually, I guess, for**
12 **the purpose of the presentation.**
13   Q    (BY ATTORNEY WEINBERG) Right.  So what is
14 it showing inside of this offer tag?  What are --
15 what are we looking at?
16       ATTORNEY BLOCK:  Object to form.
17   **A   One of the parameters used within an**
18 **element nested within the offer had a value called**
19 **"connecting_tone_desc," which is a -- I can't**
20 **recollect exactly the purpose of that parameter.  It**
21 **was probably used to configure the -- the way the**
22 **phone would ring.**
23       **And that value, instead of a value that**
24 **would be normally filled i -- filled in by the**
25 **server, in this case it was filled in by a client**

Page 151

1 with a value that looks like a malicious piece of
2 code.
3    Q    (BY ATTORNEY WEINBERG) So just to be
4 clear, "connecting_tone_desc," that string to the
5 left of the equal sign is the parameter name,
6 correct?
7    **A   Yes.**
8    Q    And everything to the right of the equal
9 sign is the parameter value?
10   **A   Yes.**
11   Q    Okay.  So in normal operation, is the
12 chatdserver supposed to fill in that value?
13       ATTORNEY BLOCK:  Object to form.
14       What do you mean by "normal operation"?
15   Q    (BY ATTORNEY WEINBERG) Go ahead.
16   **A   Yeah, what do you mean by "normal**
17 **operation"?**
18   Q    You just said that the client filled in
19 this value.
20       Is the client not supposed to fill in this
21 value?
22       ATTORNEY BLOCK:  Object to form.
23   **A   Based on what I remember now, I believe**
24 **no, this was not a parameter that was normally sent**
25 **by the -- by the client.**

Page 152

1    Q    (BY ATTORNEY WEINBERG) Okay.  So how would
2 it normally arrive here?
3        ATTORNEY BLOCK:  Object to form.
4    Q    (BY ATTORNEY WEINBERG) I think you just
5 said it was not normally be sent by the client,
6 so...
7        ATTORNEY BLOCK:  I didn't understand the
8 question.  That's why I objected.
9    **A   What was the question?  Sorry.**
10   Q    (BY ATTORNEY WEINBERG) If this value in
11 the offer stanza would typically not ordinarily be
12 filled in by the client, how would it ordinarily be
13 filled in, the value?
14   **A   So this was --**
15       ATTORNEY BLOCK:  Object to form.
16   **A   -- this was a feature -- an old feature**
17 **that was not in use, so that's why I don't remember**
18 **exactly of -- all the details that are related to**
19 **with it.**
20       **Based on my memory right now, I believe we**
21 **used this a long time before the attack.  And it was**
22 **not in use at the time of the attack.**
23       **And the way we used it from my memory**
24 **right now, from what I remember right now, it is**
25 **that the server will fill in that value and will**

Page 153

1 pass it to -- to the callee.
2    Q    (BY ATTORNEY WEINBERG) Okay.  So earlier
3 you talked about the chatdserver, I call it,
4 enriching the data in the offer stanza and then
5 passing it to the callee.
6        Do you remember that?
7    **A   Yes.**
8    Q    So is that what you make reference to with
9 this "connecting_tone_description" variable; that
10 you think this is one of the parameters filled in by
11 the chatdserver?
12       ATTORNEY BLOCK:  Objection to form.
13   **A   Yes, that's what I mean by it.  But again,**
14 **I don't know the actual details right now about the**
15 **purpose of that field just because it was -- even at**
16 **the time of the attack, there were years since we**
17 **actually used that feature.**
18   Q    (BY ATTORNEY WEINBERG) Okay.  So the value
19 of this parameter was not really in use at a -- by
20 the chatdserver at the time --
21       ATTORNEY BLOCK:  Object to form.
22   Q    (BY ATTORNEY WEINBERG) -- in 2019?
23   **A   It was not in use either by the client or**
24 **by the server at that time from -- based on my**
25 **knowledge.**

Case 4:19-cv-07123-PJH    Document 437-2    Filed 10/18/24    Page 6 of 90

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3296
WHATSAPP INC. on 08-16-2024              {{Attorneys Eyes Only}}          Pages  198..201

Page 198

1 that:
2          The IP address of the remote
3     server was included in the
4     malicious code.
5          Does that mean that it was just hard-coded
6 right into the ELF file?
7     **A   I don't remember exactly.  It's possible,**
8 **but I don't remember all the details of that aspect.**
9     Q   Yeah, I don't -- I don't see it anywhere
10 else in the rest of the --
11    **A   I think it's likely in the -- in the ELF**
12 **file.**
13    Q   If it were elsewhere in the tone_desc
14 parameter value, we would be able to see it in plain
15 text, right?
16         ATTORNEY BLOCK:  Object to form.
17    **A   Not always.  Like, the malicious, like,**
18 **payloads are designed in a way that they're super**
19 **cryptic.  They're not meant to be easily, like,**
20 **interpreted by a human.**
21         **And they're minimized -- like, minified**
22 **typically, so I would say that -- that's why I -- if**
23 **you look at it and -- it looks suspicious, but it**
24 **it's not meant to be easily, like, readable by a**
25 **human.**

Page 199

1     Q   (BY ATTORNEY WEINBERG) Okay.  It's a shell
2 script though.  I mean, you can -- you could read
3 that by a human, and you would be able to see an
4 IP address in there if your -- it would be a bunch
5 of numbers, wouldn't it?
6         ATTORNEY BLOCK:  Object to form.
7     **A   I just don't know.  Again, I'm not a --**
8 **I'm not an expert in interpreting this -- this**
9 **malicious payload.**
10    Q   (BY ATTORNEY WEINBERG) Okay.  So you don't
11 know where these IP addresses in paragraphs 4 and 5
12 came from?
13         ATTORNEY BLOCK:  Object to form.
14    **A   I know that these were -- was something**
15 **that -- like, these addresses were something that we**
16 **collected, and -- but I don't know exactly the**
17 **origin of it.  If -- again, I just don't know the**
18 **exact details.**
19    **I think it's probably in the ELF file.**
20 **And we have the data about each call -- malicious**
21 **call offer and what IP was associated with each of**
22 **those, so I'm sure we can -- we can back that with**
23 **actual data.  I just don't remember right now.  It's**
24 **been a while since I worked on this, so...**
25    Q   (BY ATTORNEY WEINBERG) Okay.  So sitting

Page 200

1 here right now, you don't remember where these
2 IP addresses came from?
3     **A   Yeah.**
4     Q   Do you remember what the purportedly
5 malicious code was supposed to be doing with these
6 IP addresses?
7         ATTORNEY BLOCK:  Object to form.
8     **A   The only thing that I remember was that**
9 **there was very specific code that would connect to**
10 **the IP, download some data, and execute it.  That's**
11 **what I remember right now.**
12    Q   (BY ATTORNEY WEINBERG) Okay.  The -- the
13 data that was downloaded and executed, is that
14 the -- what you assume to be the Pegasus agent?
15    **A   I don't know how Pegasus works.  I can**
16 **probably speculate, but I don't know.  I have -- I**
17 **have never -- I don't know how it works.**
18         ATTORNEY BLOCK:  And I will object on
19 scope.
20         ATTORNEY WEINBERG:  Can we go off the
21 record for a bit?
22         THE VIDEOGRAPHER:  It's 3:50 p.m.
23         (A break was taken from 3:50 p.m. to
24 3:59 p.m.)
25         THE VIDEOGRAPHER:  We are on the record at

Page 201

1 3:59 p.m.
2     Q   (BY ATTORNEY WEINBERG) All right.  Just
3 before we broke we were talking about your
4 declaration, Exhibit 1164, and the origin and the
5 meaning of these two IP addresses listed in
6 paragraphs 4 and 5.
7     What is it that your analysis or Andrew
8 Robinson's analysis revealed was that these two
9 servers were being used for?
10         ATTORNEY BLOCK:  Objection to form.
11    **A   So based on my recollection, I haven't**
12 **reviewed any documents recently with this detail.**
13 **But based on the -- my recollection from -- from**
14 **that from 2019, the code opened the socket to one of**
15 **those IPs, downloaded some data, and then executed**
16 **it.**
17    Q   (BY ATTORNEY WEINBERG) Did WhatsApp ever
18 obtain the data that was downloaded from those --
19 purportedly downloaded from those servers?
20    **A   No, not that I'm -- not that I'm aware of.**
21         ATTORNEY BLOCK:  And I will just note for
22 the record that that answer is qualified by the
23 scope of Mr. Gheorghe's designation.
24    Q   (BY ATTORNEY WEINBERG) I think, as we
25 discussed, these the first topic is WhatsApp's

Page 294

```
 1        I, MARY J. GOFF, CSR No. 13427, Certified
 2   Shorthand Reporter of the State of California,
 3   certify;
 4        That the foregoing proceedings were taken
 5   before me at the time and place herein set forth, at
 6   which time the witness declared under penalty of
 7   perjury; that the testimony of the witness and all
 8   objections made at the time of the examination were
 9   recorded stenographically by me and were thereafter
10   transcribed under my direction and supervision; that
11   the foregoing is a full, true, and correct
12   transcript of my shorthand notes so taken and of the
13   testimony so given;
14        That before completion of the deposition,
15   review of the transcript ( ) was (XX) was not
16   requested:   (   ) that the witness has failed or
17   refused to approve the transcript.
18        I further certify that I am not financially
19   interested in the action, and I am not a relative or
20   employee of any attorney of the parties, nor of any
21   of the parties.
22        I declare under penalty of perjury under the
23   laws of California that the foregoing is true and
24   correct, dated this   day of        , 2024.
25                    Mary Goff
                      _____
                      MARY J. GOFF
```

Page 295

```
 1              ERRATA SHEET
 2              SWIVEL LEGAL
 3           560 W Main Street, C163
 4           Alhambra, California 91801
 5              213-788-2327
 6         CASE:  WhatsApp v. NSO Group
 7   PAGE  LINE  FROM                    TO
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18
19        _____
20        CLAUDIU GHEORGHE
21   Subscribed and sworn to before me
22   this _____ day of _____, 2024.
23   _____
24        Notary Public
25
```

# EXHIBIT 40

## FILED UNDER SEAL

# EXHIBIT 41

## FILED UNDER SEAL

EXHIBIT 42



PRESS RELEASE

# Four Russian Government Employees Charged in Two Historical Hacking Campaigns Targeting Critical Infrastructure Worldwide

Thursday, March 24, 2022

**For Immediate Release**

Office of Public Affairs

## Defendants' Separate Campaigns Both Targeted Software and Hardware for Operational Technology Systems

The Department of Justice unsealed two indictments today charging four defendants, all Russian nationals who worked for the Russian government, with attempting, supporting and conducting computer intrusions that together, in two separate conspiracies, targeted the global energy sector between 2012 and 2018. In total, these hacking campaigns targeted thousands of computers, at hundreds of companies and organizations, in approximately 135 countries.

A June 2021 indictment returned in the District of Columbia, *United States v. Evgeny Viktorovich Gladkikh*, concerns the alleged efforts of an employee of a Russian Ministry of Defense research institute and his co-conspirators to damage critical infrastructure outside the United States, thereby causing two separate emergency shutdowns at a foreign targeted facility. The conspiracy subsequently attempted to hack the computers of a U.S. company that managed similar critical infrastructure entities in the United States.

An August 2021 indictment returned in the District of Kansas, *United States v. Pavel Aleksandrovich Akulov, et al.*, details allegations about a separate, two-phased campaign undertaken by three officers of Russia's Federal Security Service (FSB) and their co-conspirators to target and compromise the computers of hundreds of entities related to the energy sector worldwide. Access to such systems would have provided the Russian government the ability to, among other things, disrupt and damage such computer systems at a future time of its choosing.

"Russian state-sponsored hackers pose a serious and persistent threat to critical infrastructure both in the United States and around the world," said Deputy Attorney General Lisa O. Monaco. "Although the criminal charges unsealed today reflect past activity, they make crystal clear the urgent ongoing need for American businesses to harden their defenses and remain vigilant. Alongside our partners here at home and abroad, the Department of Justice is committed to exposing and holding accountable state-sponsored hackers who threaten our critical infrastructure with cyber-attacks."

"The FBI, along with our federal and international partners, is laser-focused on countering the significant cyber threat Russia poses to our critical infrastructure," said FBI Deputy Director Paul Abbate. "We will continue to identify and quickly direct response assets to victims of Russian cyber activity; to arm our partners with the information that they need to deploy their own tools against the adversary; and to attribute the misconduct and impose consequences both seen and unseen."

"We face no greater cyber threat than actors seeking to compromise critical infrastructure, offenses which could harm those working at affected plants as well as the citizens who depend on them," said U.S. Attorney Matthew M. Graves for the District of Columbia. "The department and my office will ensure that those attacking operational technology will be identified and prosecuted."

"The potential of cyberattacks to disrupt, if not paralyze, the delivery of critical energy services to hospitals, homes, businesses and other locations essential to sustaining our communities is a reality in today's world," said U.S. Attorney Duston Slinkard for the District of Kansas. "We must acknowledge there are individuals actively seeking to wreak havoc on our nation's vital infrastructure system, and we must remain vigilant in our effort to thwart such attacks. The Department of Justice is committed to the pursuit and prosecution of accused hackers as part of its mission to protect the safety and security of our nation."

In addition to unsealing these charges, the U.S. government is taking action to [enhance private sector network defense efforts](#) and [disrupt similar malicious activity](#).

The Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) has already released numerous Technical Alerts, ICS Alerts and Malware Analysis

Reports regarding Russia's malign cyber activities, including the campaigns discussed in the indictments. These are located at: https://www.cisa.gov/shields-up

1. *United States v. Evgeny Viktorovich Gladkikh – defendant installed backdoors and launched malware designed to compromise the safety of energy facilities*

In June 2021, a federal grand jury in the District of Columbia returned an indictment charging Evgeny Viktorovich Gladkikh (Евгений Викторович Гладких), 36, a computer programmer employed by an institute affiliated with the Russian Ministry of Defense, for his role in a campaign to hack industrial control systems (ICS) and operational technology (OT) of global energy facilities using techniques designed to enable future physical damage with potentially catastrophic effects.

According to the indictment, between May and September 2017, the defendant and co-conspirators hacked the systems of a foreign refinery and installed malware, which cyber security researchers have referred to as "Triton" or "Trisis," on a safety system produced by Schneider Electric, a multinational corporation. The conspirators designed the Triton malware to prevent the refinery's safety systems from functioning (*i.e.*, by causing the ICS to operate in an unsafe manner while appearing to be operating normally), granting the defendant and his co-conspirators the ability to cause damage to the refinery, injury to anyone nearby, and economic harm. However, when the defendant deployed the Triton malware, it caused a fault that led the refinery's Schneider Electric safety systems to initiate two automatic emergency shutdowns of the refinery's operations. Between February and July 2018, the conspirators researched similar refineries in the United States, which were owned by a U.S. company, and unsuccessfully attempted to hack the U.S. company's computer systems.

The three-count indictment alleges that Gladkikh was an employee of the State Research Center of the Russian Federation FGUP Central Scientific Research Institute of Chemistry and Mechanics' (Государственный научный центр Российской Федерации федеральное государственное унитарное предприятие Центральный научно-исследовательский институт химии и механики, hereinafter "TsNIIKhM") Applied Developments Center ("Центр прикладных разработок," hereinafter "ADC"). On its website, which was modified after the Triton attack became public, TsNIIKhM described itself as the Russian Ministry of Defense's leading research organization. The ADC, in turn, publicly asserted that it engaged in research concerning information technology-related threats to critical infrastructure (*i.e.*, that its research was defensive in nature).

The defendant is charged with one count of conspiracy to cause damage to an energy facility, which carries a maximum sentence of 20 years in prison, one count of attempt to cause damage to an energy facility, which carries a maximum sentence of 20 years in prison, and one count of conspiracy to commit computer fraud, which carries a maximum sentence of five years in prison.

Assistant U.S. Attorneys Christopher B. Brown and Luke Jones for the District of Columbia, in partnership with the National Security Division's Counterintelligence and Export Control Section, are prosecuting this case. The FBI's Washington Field Office conducted the investigation.

The U.S.-based targets of the conspiracy cooperated and provided valuable assistance in the investigation. The Department of Justice and the FBI also expressed appreciation to Schneider Electric for its assistance in the investigation, particularly noting the company's public outreach and education efforts following the overseas Triton attack.

2. *United States v. Pavel Aleksandrovich Akulov, Mikhail Mikhailovich Gavrilov, and Marat Valeryevich Tyukov – defendants undertook years-long effort to target and compromise computer systems of energy sector companies*

On Aug. 26, 2021, a federal grand jury in Kansas City, Kansas, returned an indictment charging three computer hackers, all of whom were residents and nationals of the Russian Federation (Russia) and officers in Military Unit 71330 or "Center 16" of the FSB, with violating U.S. laws related to computer fraud and abuse, wire fraud, aggravated identity theft and causing damage to the property of an energy facility.

The FSB hackers, Pavel Aleksandrovich Akulov (Павел Александрович Акулов), 36, Mikhail Mikhailovich Gavrilov (Михаил Михайлович Гаврилов), 42, and Marat Valeryevich Tyukov (Марат Валерьевич Тюков), 39, were members of a Center 16 operational unit known among cybersecurity researchers as "Dragonfly," "Berzerk Bear," "Energetic Bear," and "Crouching Yeti." The indictment alleges that, between 2012 and 2017, Akulov, Gavrilov, Tyukov and their co-conspirators, engaged in computer intrusions, including supply chain attacks, in furtherance of the Russian government's efforts to maintain surreptitious, unauthorized and persistent access to the computer networks of companies and organizations in the international energy sector, including oil and gas firms, nuclear power plants, and utility and power transmission companies. Specifically, the conspirators targeted the software and hardware that controls equipment in power generation facilities, known as ICS or Supervisory Control and Data Acquisition (SCADA) systems. Access to such systems would have provided the Russian government the ability to, among other things, disrupt and damage such computer systems at a future time of its choosing.

According to the indictment, the energy sector campaign involved two phases. In the first phase, which took place between 2012 and 2014 and is commonly referred to by cyber security researchers as "Dragonfly" or "Havex," the conspirators engaged in a supply chain attack, compromising the computer networks of ICS/SCADA system manufacturers and software providers and then hiding malware – known publicly as "Havex" – inside legitimate software updates for such systems. After unsuspecting customers downloaded Havex-infected updates, the conspirators would use the malware to, among other things, create backdoors into infected

systems and scan victims' networks for additional ICS/SCADA devices. Through these and other efforts, including spearphishing and "watering hole" attacks, the conspirators installed malware on more than 17,000 unique devices in the United States and abroad, including ICS/SCADA controllers used by power and energy companies.

In the second phase, which took place between 2014 and 2017 and is commonly referred to as "Dragonfly 2.0," the conspirators transitioned to more targeted compromises that focused on specific energy sector entities and individuals and engineers who worked with ICS/SCADA systems. As alleged in the indictment, the conspirators' tactics included spearphishing attacks targeting more than 3,300 users at more than 500 U.S. and international companies and entities, in addition to U.S. government agencies such as the Nuclear Regulatory Commission. In some cases, the spearphishing attacks were successful, including in the compromise of the business network (*i.e.*, involving computers not directly connected to ICS/SCADA equipment) of the Wolf Creek Nuclear Operating Corporation (Wolf Creek) in Burlington, Kansas, which operates a nuclear power plant. Moreover, after establishing an illegal foothold in a particular network, the conspirators typically used that foothold to penetrate further into the network by obtaining access to other computers and networks at the victim entity.

During the Dragonfly 2.0 phase, the conspirators also undertook a watering hole attack by compromising servers that hosted websites commonly visited by ICS/SCADA system and other energy sector engineers through publicly known vulnerabilities in content management software. When the engineers browsed to a compromised website, the conspirators' hidden scripts deployed malware designed to capture login credentials onto their computers.

The conspiracy's hacking campaign targeted victims in the United States and in more than 135 other countries.

Akulov, Gavrilov and Tyukov are charged with conspiracy to cause damage to the property of an energy facility and commit computer fraud and abuse, which carries a maximum sentence of five years in prison, and conspiracy to commit wire fraud, which carries a maximum sentence of 20 years in prison. Akulov and Gavrilov are also charged with substantive counts of wire fraud and computer fraud related to unlawfully obtaining information from computers and causing damage to computers. These offenses carry maximum sentences ranging from five to 20 years in prison. Finally, Akulov and Gavrilov are also charged with three counts of aggravated identity theft, each of which carry a minimum sentence of two years consecutive to any other sentence imposed.

Assistant U.S. Attorneys Scott Rask, Christopher Oakley and Ryan Huschka forthe District of Kansas, and Counsel for Cyber Investigations Ali Ahmad and Trial Attorney Christine Bonomo of the National Security Division's Counterintelligence and Export Control Section are prosecuting this case. The FBI's Portland and Richmond field offices conducted the investigation, with the assistance of the FBI's Cyber Division.

Numerous victims, including Wolf Creek and its owners Evergy and the Kansas Electric Power Cooperative, cooperated and provided invaluable assistance in the investigation.

An indictment is merely an allegation and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

**Note:** View the concurrent announcement by the Department of State of a $10 million reward for information leading to the arrest of a defendant or identification of other conspirators as part of its Rewards for Justice program.

View the concurrent announcement by the FBI, Department of Energy and Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) of a Joint Cybersecurity Advisory containing technical details, indicators of compromise and mitigation measures.

*Updated July 13, 2022*

## Attachments

Gladkikh indictment.pdf [PDF, 783 KB]

Akulov Gavrilov Tyukov indictment.pdf [PDF, 5 MB]

## Topics

| COUNTERING NATION-STATE THREATS | CYBERCRIME |

## Components

Federal Bureau of Investigation (FBI) | National Security Division (NSD) | Office of the Deputy Attorney General

Press Release Number: 22-285

Case 4:18-cv-07123-PJH    Document 437-2    Filed 10/18/24    Page 17 of 90

# Related Content

---

**PRESS RELEASE**

## Russian National Indicted for Series of Ransomware Attacks

The Justice Department today unsealed an indictment charging Russian national Aleksandr Viktorovich Ryzhenkov (Александр Викторович Рыженков) with using the BitPaymer ransomware variant to attack numerous victims in Texas and throughout the United States...

October 1, 2024

---

**PRESS RELEASE**

## Two Russian Nationals Charged in Connection with Operating Billion Dollar Money Laundering Services

The Justice Department today announced actions coordinated with the Department of State, Department of the Treasury, and other federal and international law enforcement partners to combat Russian money laundering operations...

September 26, 2024

---

**SPEECH**

## Deputy Attorney General Lisa Monaco Delivers Remarks at the Convening of the Election Threats Task Force

Washingtion

Thank you very much, Mr. Attorney General — and good afternoon, everyone.

I also want to start by expressing my sympathies to the families who have been impacted by yet...

Case 4:19-cv-07123-PJH    Document 437-2    Filed 10/18/24    Page 18 of 90

September 4, 2024

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

EXHIBIT 43

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on May 25, 2021

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| EVGENY VIKTOROVICH GLADKIKH, | : | <u>VIOLATIONS:</u> |
| | : | **18 U.S.C. § 1366(a)** |
| Defendant. | : | **(Conspiracy To Cause Damage** |
| | : | **to an Energy Facility)** |
| | : | |
| | : | **18 U.S.C. § 1366(a)** |
| | : | **(Attempt To Cause Damage to an** |
| | : | **Energy Facility)** |
| | : | |
| | : | **18 U.S.C. §§ 371 and 1030(a)(2)(C),** |
| | : | **(a)(5)(C), (c)(2)(B)(ii), and (c)(4)(B)** |
| | : | **(Conspiracy To Access Protected** |
| | : | **Computers and Obtain Information** |
| | : | **and To Intentionally Damage Protected** |
| | : | **Computers by Knowing Transmission)** |
| | : | |
| | : | <u>Criminal Forfeiture:</u> |
| | : | **18 U.S.C. § 982(a)(2)(B); 18 U.S.C.** |
| | : | **§ 1030(i)(1)(A)-(B); 21 U.S.C. § 853(p)** |

## <u>INDICTMENT</u>

The Grand Jury charges:

At all times relevant to this Indictment:

## <u>INTRODUCTION</u>

1.     Defendant EVGENY VIKTOROVICH GLADKIKH (Евгений Викторович Гладких) ("GLADKIKH") was a resident and citizen of the Russian Federation ("Russia"), who had no residence or last known residence in the United States.



2.      The STATE RESEARCH CENTER OF THE RUSSIAN FEDERATION FGUP
CENTRAL SCIENTIFIC RESEARCH INSTITUTE OF CHEMISTRY AND MECHANICS
("ГОСУДАРСТВЕННЫЙ      НАУЧНЫЙ      ЦЕНТР      РОССИЙСКОЙ      ФЕДЕРАЦИИ
ФЕДЕРАЛЬНОЕ  ГОСУДАРСТВЕННОЕ  УНИТАРНОЕ  ПРЕДПРИЯТИЕ  НАУЧНО-
ИССЛЕДОВАТЕЛЬСКИЙ  ИНСТИТУТ  ХИМИИ  И  МЕХАНИКИ"),  known  by  the
abbreviation "TsNIIKhM" or "CNIIHM," was a research institute of the Russian government.
TsNIIKhM's website described the organization as the leading research organization of the
Russian Ministry of Defense ("MoD").

3.      The Applied Development Center ("ЦЕНТР ПРИКЛАДНЫХ РАЗРАБОТОК"),
known by the abbreviation "ADC," was a component of TsNIIKhM engaged in, among other
things, offensive and defensive cyber activity.

4.      As set forth in greater detail below, GLADKIKH and co-conspirators known and
unknown to the Grand Jury, including TsNIIKhM and members of TsNIIKhM and ADC, prepared,
supported, conducted, and conspired to conduct computer intrusions using ADC resources that
targeted energy facilities in the United States and elsewhere.  Between in or around May and
September 2017, they gained unauthorized access to the systems of a refinery outside the United

2

States using techniques and tools designed to enable an attacker to cause effects including physical damage, with potentially catastrophic effects, rather than merely causing a plant shutdown. In so doing they triggered an emergency shutdown of that facility's operations. Then, between in or around February and July 2018, GLADKIKH and co-conspirators targeted a U.S.-based company's similar facilities with similar techniques and tools and attempted to gain unauthorized access to its systems. Those 2018 attempts were unsuccessful.

### A. Background Regarding Defendant, TsNIIKhM, and the Applied Development Center

5.    GLADKIKH and other co-conspirators known and unknown to the Grand Jury were employed by ADC within TsNIIKhM.

6.    TsNIIKhM and its predecessor organizations have a history of developing cutting-edge weapons for the Russian government and its predecessors, including the Russian Empire and the Union of Soviet Socialist Republics (U.S.S.R.). The earliest known predecessor to TsNIIKhM, the Special Chemical Laboratory for Research on Smokeless Powders of the Okhtinsk Powder Plant, was founded in St. Petersburg, Russia, as a weapons laboratory in or around 1894. In or around 1937, the U.S.S.R. renamed the lab "NII-6" designating it as a scientific research institute. Among other things, NII-6 developed anti-tank grenades to aid the Red Army during the Second World War. TsNIIKhM uses the following symbol as its logo:



7. After the Second World War, NII-6 continued producing explosives, as well as missile propellants and warheads. NII-6 was renamed TsNIIKhM in 1969. Among other things, TsNIIKhM produced explosives for Soviet interceptor satellites, which were built to attack other satellites orbiting the Earth.

8. After the U.S.S.R. dissolved, TsNIIKhM primarily engaged in civilian projects until 2005. In or around 2005, TsNIIKhM became subordinate to the MoD, Federal Service for Technical and Export Control ("Федеральной Службы По Техническому И Экспортному Контролю"), known as FSTEK.

9. Within the MoD, TsNIIKhM emphasized high-level mathematics, with specific applications in space warfare and cyber operations. In or around 2009, TsNIIKhM was assigned as the leading institute for development of new advanced weapons and was instrumental in weapons modernization. TsNIIKhM emerged as a premier MoD research and development facility working on cutting-edge space weapons and cyber capabilities.

10. TsNIIKhM was divided into divisions that are responsible for research relating to, among other subjects: satellites; nanotechnology; advanced rocket technology; protecting critical infrastructure from cyber threats; and development of weapons and special military equipment. TsNIIKhM also officially collaborates with Russian research and development institutes engaged in cyber capabilities, physics, chemistry, military, and industrial research.

11. The component of TsNIIKhM referred to as ADC publicly stated that its mission was to engage in research related to information technology-related threats to critical infrastructure. ADC publicly asserted that its research was defensive.

4

### B. Industrial Control Systems, Operational Technology, and Safety Instrumented Systems

12.     Systems that control industrial processes and ensure that they operate safely are called Industrial Control Systems ("ICS") or Operational Technology ("OT") systems.

13.     Human operators remotely monitor and control ICS and OT through a Distributed Control System ("DCS"). A DCS connects an information technology ("IT") network to the OT network. A DCS consists of a computer, which can be accessible over the Internet; a controller, which is a computer that controls a physical device; and software applications. One type of DCS device is an "Engineering Workstation," which configures, maintains, and monitors applications and equipment.

14.     A Safety Instrumented System ("SIS") monitors the status of DCS-controlled processes. If those processes function in an unsafe manner, the SIS attempts to bring the processes back into a safe state or performs a "safe shutdown" of the process.

15.     "Triconex" is the name of SIS equipment developed and sold by Schneider Electric, a multinational corporation based in France that produces, among other things, automated systems for the energy sector. The Triconex SIS and other Schneider Electric ICS/OT products are used globally, including within the United States, across the energy and other critical/non-critical infrastructure sectors.

### C. Overview of the Criminal Scheme

16.     Between no later than in or about August 2014 and continuing through at least in or after July 2018, GLADKIKH, TsNIIKhM, and other co-conspirators known and unknown to the Grand Jury, who were located outside the United States, conspired to commit computer intrusions targeting energy facilities, including refineries in the United States and overseas, and to cause damage to those facilities. The conspiracy specifically targeted OT and SIS computer

systems and sought to install malicious software applications ("malware") designed to cause physical safety systems to cease operating or to operate in an unsafe manner.

### a. The TRITON Computer Intrusion Scheme Targeting VICTIM COMPANY 1 Refinery

17.     VICTIM COMPANY 1 was a foreign corporation engaged in, among other things, petroleum refining.  VICTIM COMPANY 1 operated a refinery that utilized Triconex SIS devices for monitoring and managing the physical safety of systems including burner management systems, which facilitate safe initiation, operation, and shut-down of power generation furnaces, and sulfur recovery, which is a means of managing hazardous gas produced by crude oil refining.  GLADKIKH later demonstrated a specific interest in sulfur recovery units.

18.     As described below, GLADKIKH and co-conspirators gained unauthorized access to and installed a package of malware on protected computers belonging to VICTIM COMPANY 1 at a refinery facility operated by VICTIM COMPANY 1.  The malware was designed to give an unauthorized operator access to and control of a Triconex device, including the ability to load additional software.  That malware later became known as "TRITON" or "TRISIS" in the computer security industry.

19.     On or about August 12, 2014, an individual at TsNIIKhM accessed an online service used to test whether malicious files are detectable by computer security services.  The actor uploaded a malware file that was a modified version of a tool called "cryptcat," which is an open source tool used to create a back door on a compromised computer to allow continued access.  Through this upload, the actor sought to determine whether computer network security tools (*e.g.*, anti-virus programs) were likely to detect the modified version of cryptcat.

20.     On or about April 6, 2017, an individual at TsNIIKhM accessed the online test service and uploaded the same modified version of cryptcat that an individual at TsNIIKhM previously uploaded in 2014.

21.     Beginning no later than May 2017, GLADKIKH gained unauthorized access to the IT network of VICTIM COMPANY 1's refinery.  Among other things, GLADKIKH accessed technical Triconex SIS log files.  GLADKIKH also sought to disable VICTIM COMPANY 1's cybersecurity systems, which were designed to prevent unauthorized access to VICTIM COMPANY 1's networks.

22.     In or about May 2017, GLADKIKH and co-conspirators attempted to execute the modified version of cryptcat described above on VICTIM COMPANY 1's computer network, which showed a "file last modified" date of August 12, 2014—matching the date of the first cryptcat upload by an individual at TsNIIKhM to the online test service referenced above.  The modified version of cryptcat file detected on VICTIM COMPANY 1's computer network had the same hash value—indicating an identical copy—as the modified version of cryptcat that had been uploaded to the online test service.

23.     On or about May 23, 2017, GLADKIKH began seeking information regarding specific software designed to run network servers.  At that time, such software was out of date, but was still used on some "historian" servers at VICTIM COMPANY 1, which were used to log historical events on the OT network and connected devices such as the SIS.

24.     On or about May 24, 2017, GLADKIKH further familiarized himself with the format of log files used for Triconex devices.

25.     On or about May 29, 2017, GLADKIKH used a historian server at VICTIM COMPANY 1 ("MACHINE 1") and stolen administrator login credentials to remotely access an

Engineering Workstation ("MACHINE 2") without authorization. MACHINE 2 was part of the DCS at VICTIM COMPANY 1's refinery and was connected to SIS devices, including the Tristation engineering workstation and Triconex systems.

26. Further on or about May 29, 2017, GLADKIKH installed a "back door" on MACHINE 2, which would allow an unauthorized user to gain access in the future. GLADKIKH subsequently sought information regarding protocols that would be used to communicate with a Triconex device.

27. On or about June 2, 2017, GLADKIKH and CO-CONSPIRATOR 1 familiarized themselves with a safety feature of the Triconex SIS that required a physical key to be turned to "program" mode in order for the Triconex device to allow new computer code to be installed. Normal plant running mode for the Triconex device would be in "run" mode, preventing intentional or unintentional alteration of the safety functions.

28. Further on or about June 2, 2017, GLADKIKH installed, without authorization, a package of software applications on a Triconex SIS device connected to MACHINE 2. The physical key on that device was positioned in "program" mode. Those applications comprised an early version of the TRITON malware. Within minutes of that installation, initiated by the Triconex SIS detecting a fault, an emergency shutdown of the VICTIM COMPANY 1 refinery occurred.

29. MACHINE 2 and the affected Triconex SIS provided safety controls for physical systems that handled sensitive operations including sulfur recovery and burner management systems, which could cause explosions or release toxic gases if not operated in a safe manner.

30. On or about July 17, 2017, GLADKIKH attempted to install software, without authorization, on MACHINE 1. That software was designed to gather user login credentials.

8

31.     On or about August 4, 2017, GLADKIKH installed an updated version of the TRITON malware on a Triconex device at VICTIM COMPANY 1.  The physical key on that device was positioned in "program" mode.

32.     Within several hours, after the TRITON malware was copied across other Triconex SIS components, the malware caused a fault that was detected by a Triconex SIS safety feature, which in turn triggered another emergency shutdown of the VICTIM COMPANY 1 refinery.

33.     On or about August 30, 2017, GLADKIKH obtained unauthorized access to a file server at VICTIM COMPANY 1 containing business records.  GLADKIKH then sought information regarding a prior safety exercise at VICTIM COMPANY 1 and how VICTIM COMPANY 1 responded to that incident.

34.     In summary, GLADKIKH and co-conspirators gained unauthorized access to the VICTIM COMPANY 1's DCS, and then used such access to further access the VICTIM COMPANY 1's Triconex SIS and install the package of malware known as TRITON.  The TRITON malware was designed and customized to operate on the precise model of Triconex SIS devices used by VICTIM COMPANY 1.  By installing the TRITON malware on VICTIM COMPANY 1's Triconex SIS, GLADKIKH and co-conspirators caused damage to the property of VICTIM COMPANY 1.

35.     The methods and tools GLADKIKH and co-conspirators used demonstrate that, rather than seeking to simply cause a shutdown, they intended to gain the capability to prevent safety systems from functioning and to cause physical damage to the refinery, with potentially catastrophic effects.  In particular, GLADKIKH and co-conspirators gained the capability to cause a shutdown when they gained unauthorized access to VICTIM COMPANY 1's DCS.  By further expanding their unauthorized access to VICTIM COMPANY 1's SIS, GLADKIKH and co-

conspirators obtained the additional capability to cause physical damage by disabling or altering the safety shutdown functions that would normally stop a refinery from catastrophic failure.

36.     In addition, GLADKIKIH and co-conspirators could have used less sophisticated malware and tools if they had intended to simply cause a shutdown. Instead, GLADKIKH and co-conspirators developed and used malware, including TRITON and other tools, that was designed to enable an attacker to load software onto the Triconex SIS devices in order to alter the safety performance of the SIS; to take physical control of the ICS at VICTIM COMPANY 1; and to cause the ICS to operate in an unsafe manner while maintaining the appearance that the ICS was operating normally. Such additional capabilities, which were custom-built into the TRITON malware that GLADKIKH and his co-conspirators used, could be employed to cause property damage, economic harm, as well as physical injury and death to individuals in close proximity to the targeted energy facility.

### b. The Attempted Computer Intrusion Scheme Targeting U.S. COMPANY 1

37.     On or about February 22, 2018, an individual at TsNIIKhM accessed a public website operated by the U.S. Department of Defense and viewed a technical research paper written in the 1970s for the Office of Civil Defense ("PAPER 1"). Among other things, PAPER 1 contained an extensive survey of U.S. refineries and their vulnerabilities, including an analysis of explosion and fire risk in refinery operations. PAPER 1 listed states that contained the greatest refining capacity in the United States, and where such capacities were most concentrated.

38.     On or about March 2, 2018, an individual at TsNIIKhM accessed a public website operated by the U.S. Department of Defense and viewed a technical research paper written in the 1960s for the Office of Civil Defense, which contained a Department of Defense assessment of vulnerabilities of the U.S. petroleum refining industry to attack ("PAPER 2"). PAPER 2 examined

a small number of refineries in detail, discussed their vulnerabilities, and assessed the probable damage that a nuclear attack or other disaster would cause to each.

39.     Several refineries that were prominently mentioned in PAPER 1 and PAPER 2 were acquired by U.S. COMPANY 1.  U.S. COMPANY 1 is a U.S.-based corporation conducting business in the oil and energy sectors and operating multiple refineries in the United States.  Two of the refineries owned by U.S. COMPANY 1 that were discussed in PAPERS 1 and 2 were updated to operate as sulfur recovery plants no later than the 1970s.

40.     On or about March 6, 2018, GLADKIKH used a Virtual Private Network ("VPN") to conduct online reconnaissance of U.S. COMPANY 1 facilities by reviewing information that U.S. COMPANY 1 had made publicly available, including: (i) information about two of U.S. COMPANY 1's refineries that had been listed in PAPERS 1 and 2, both of which contained sulfur recovery systems; and (ii) job postings at U.S. COMPANY 1 that could potentially identify ICS equipment used at U.S. COMPANY 1 facilities.  Because job postings refer to specific expertise and experience an employer seeks, reviewing job postings is a common tool used by malicious online actors to learn about equipment and processes that potential victims use.  Malicious actors can use this knowledge to research and identify vulnerabilities that they can then seek to exploit. GLADKIKH also accessed web subdomains pertaining to two of U.S. COMPANY 1's U.S.-based refineries that were listed in the papers referenced above.

41.     Approximately 20 minutes later, GLADKIKH initiated numerous instances of Structured Query Language ("SQL") injection attempts targeting protected computers belonging to U.S. COMPANY 1.  These attempts were not successful.  Shortly after the SQL injection attempts concluded, an individual at TsNIIKhM again accessed the web subdomain for one of the U.S. COMPANY 1 refineries referenced above.

42.     SQL is used to store data in databases.  A successful SQL injection can allow an actor to gain unauthorized access to a database, which enables the actor to read and write information, execute administrative operations, and issue commands to the operating system.  SQL injection attacks can be used to obtain login credentials, steal data, erase data, or change data.

43.      On or about March 16, 2018, GLADKIKH initiated another series of SQL injection attempts, targeting protected computers belonging to U.S. COMPANY 1.  Those attempts were not successful.

44.     On or about April 17, 2018, GLADKIKH sought information regarding U.S. COMPANY 1 and specifically regarding one of the U.S. COMPANY 1 refineries referenced above.

45.     On or about July 5, 2018, GLADKIKH scanned protected computers belonging to U.S. COMPANY 1 for vulnerabilities that could enable unauthorized access to its network.

46.     On or about July 30, 2018, GLADKIKH familiarized himself with the specific network security system used by U.S. COMPANY 1.

47.     That same day, on or about July 30, 2018, GLADKIKH engaged in further vulnerability scanning of protected computers belonging to U.S. COMPANY 1.

<u>**COUNT ONE**</u>
**(Conspiracy To Cause Damage to an Energy Facility)**

48.     Paragraphs 1 through 47 are re-alleged and incorporated herein.

49.     From at least on or about August 12, 2014 and continuing through at least on or about July 30, 2018, beginning outside of the jurisdiction of any particular State or district and, pursuant to 18 U.S.C. §§ 3237 and 3238, within the venue of the United States District Court for the District of Columbia, the defendant, EVGENY VIKTOROVICH GLADKIKH, together with other co-conspirators known and unknown to the Grand Jury, including TsNIIKhM and members

of TsNIIKhM and ADC, did knowingly and willfully combine, conspire, confederate and agree to violate Title 18, United States Code, Section 1366(a), by damaging and attempting to damage the property of an energy facility in any amount and causing and attempting to cause a significant interruption and impairment of a function of an energy facility, that is, an energy facility belonging to U.S. COMPANY 1, in violation of Title 18, United States Code, Section 1366(a).

**(Conspiracy To Cause Damage to an Energy Facility, in violation of
Title 18, United States Code, Section 1366(a))**

### COUNT TWO
**(Attempt To Cause Damage to an Energy Facility)**

50.     Paragraphs 1 through 47 are re-alleged and incorporated herein.

51.     From at least on or about March 6, 2018, and continuing through at least on or about July 30, 2018, beginning outside of the jurisdiction of any particular State or district and, pursuant to 18 U.S.C. §§ 3237 and 3238, within the venue of the United States District Court for the District of Columbia, the defendant, EVGENY VIKTOROVICH GLADKIKH, did knowingly and willfully attempt to damage the property of an energy facility in any amount and attempt to cause a significant interruption and impairment of a function of an energy facility, that is, an energy facility belonging to U.S. COMPANY 1, in violation of Title 18, United States Code, Section 1366(a).

**(Attempt To Cause Damage to an Energy Facility, in violation of
Title 18, United States Code, Section 1366(a))**

## COUNT THREE
**(Conspiracy To Access Protected Computers and Obtain Information and
To Intentionally Damage Protected Computers by Knowing Transmission)**

52.      Paragraphs 1 through 47 are re-alleged and incorporated herein.

### The Conspiracy

53.      From at least on or about August 12, 2014 and continuing through at least on or about July 30, 2018, outside of the jurisdiction of any particular State or district and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia, the defendant, EVGENY VIKTOROVICH GLADKIKH, together with other co-conspirators known and unknown to the Grand Jury, including TsNIIKhM and members of TsNIIKhM and ADC, did knowingly and willfully combine, conspire, confederate and agree to commit the following offenses against the United States:

      a.   In furtherance of a criminal and tortious act in violation of the Constitution and the laws of the United States, that is, causing damage to an energy facility, in violation of Title 18, United States Code, Section 1366(a), intentionally accessed, and attempted to access, computers without authorization, and thereby obtained, and attempted to obtain, information from protected computers, such conduct having involved an interstate and foreign communication, in violation of Title 18, United States Code, Section 1030(a)(2)(C) and (c)(2)(B)(ii); and

      b.   Knowingly caused the transmission of a program, information, code, and command, and as a result of such conduct, intentionally caused, and attempted to cause, damage without authorization to protected computers, and caused, and attempted to cause, more than $5,000 in loss in one year, and caused, and

attempted to cause, physical injury to any person, and caused, and attempted to

cause, a threat to public health or safety, in violation of Title 18, United States

Code, Section 1030(a)(5)(A) and (c)(4)(B);

all in violation of Title 18, United States Code, Sections 371, 1030(a)(2)(C) and (c)(2)(B)(ii), and

Sections 1030(a)(5)(A) and (c)(4)(B).

## Object of the Conspiracy

54.     It was the object of the conspiracy for the defendant, GLADKIKH, together with

his co-conspirators, to obtain unauthorized access to protected computers belonging to energy

facilities in the United States and elsewhere, including information stored on such computers, in

order to cause damage and attempt to cause damage to such computers and to such energy facilities

and to cause a significant interruption and impairment of a function of such energy facilities.

## Manner and Means

55.     Among the manner and means by which GLADKIKH and his co-conspirators

would and did carry out the objectives of the conspiracy were the following:

a.  They would attempt to and did obtain unauthorized access to protected

computers using stolen login credentials, SQL injection attempts, and

vulnerability scans.

b.  Using such unauthorized access, they would attempt to and did:

a.  install software without authorization to create "back doors" on

protected computers to allow persistent unauthorized access;

b.  install and delete files without authorization on protected computers;

and

15

c. install unauthorized software on protected computers comprising Safety Instrumented Systems, which in turn enabled them to send unauthorized commands to Industrial Control Systems, and could be further used to cause property damage, economic harm, physical injury, and death.

### Overt Acts

56.     In furtherance of the conspiracy, and to accomplish its objects, GLADKIKH, together with other co-conspirators known and unknown to the Grand Jury, including TsNIIKhM and members of TsNIIKhM and ADC, committed and caused to be committed various overt acts beginning outside the jurisdiction of any particular State or district, including the overt acts described in paragraphs 19 through 28, 30, 31, 33, 37, 38, 40, 41, and 43 through 47, which paragraphs are re-alleged and incorporated herein.

**(Conspiracy To Access Protected Computers and Obtain Information and To Intentionally Damage Protected Computers by Knowing Transmission, in violation of Title 18, United States Code, Sections 371, 1030(a)(2)(C) and (c)(2)(B)(ii), and 1030(a)(5)(A) and (c)(4)(B))**

### FORFEITURE ALLEGATION

1.     Upon conviction of the offense charged in Count Three, the defendant shall forfeit to the United States any property, real or personal, constituting or derived from, any proceeds that the defendant obtained, directly or indirectly, as a result of such violation, pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i)(1)(B). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any proceeds that the defendant obtained, directly or indirectly, as a result of the offense charged in Count Three.

2.     Upon conviction of the offense charged in Count Three, the defendant shall forfeit to the United States the defendant's interest in any personal property that was used or intended to

be used to commit or to facilitate the commission of such violation, pursuant to Title 18, United States Code, Section 1030(i)(1)(A). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any personal property that was used or intended to be used to commit or to facilitate the commission of the offense charged in Count Three.

    3.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the Court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i)(1)(A)-(B); and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

_____

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

EXHIBIT 44

# UNITED STATES DISTRICT COURT
## District of Kansas
(Kansas City Docket)

F I L E D

AUG 2 6 2021

TIMOTHY
By _____ Ce; u y

UNITED STATES OF AMERICA,

Plaintiff,

v.

PAVEL ALEKSANDROVICH AKULOV,
MIKHAIL MIKHAILOVICH GAVRILOV, and
MARAT VALERYEVICH TYUKOV

Defendants.

CASE NO. 21 - 20047 - HLT / JPC

~~FILED UNDER SEAL~~

# INDICTMENT

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1.     At all times relevant to the indictment, from at least in and around July 2012

through at least in and around November 2017, the Russian Federation ("Russia") operated

an intelligence and law enforcement agency called the Federal Security Service ("FSB").

The FSB was headquartered in Moscow, Russia, and was comprised of multiple units,

including Military Unit 71330, which was also known within the FSB as "Center 16." The

Conspirators in this case are members of a discrete operational unit within Center 16 known

by cybersecurity researchers as "Dragonfly," "Berzerk Bear," "Energetic Bear," and "Crouching Yeti." FSB Center 16 was primarily located at 12 Prospekt Vernadskogo in Moscow, Russia.

2.     Defendants     PAVEL     ALEKSANDROVICH     AKULOV     (Павел Александрович Акулов), MIKHAIL MIKHAILOVICH GAVRILOV (Михаил Михайлович Гаврилов), and MARAT VALERYEVICH TYUKOV (Марат Валерьевич Тюков) were FSB officers working for Center 16. The Defendants, along with other members of FSB Center 16, knowingly and intentionally conspired with each other and with persons known and unknown to the grand jury (collectively, the "Conspirators") to undertake a sophisticated campaign to target and compromise (*i.e.*, "hack") and maintain persistent access to the networks of critical infrastructure and energy companies worldwide, including in the District of Kansas. Cybersecurity researchers referred to the two phases of the Conspirators' campaign relevant to the allegations herein as: (i) "Dragonfly" or "Havex"; and (ii) "Dragonfly 2.0."

3.     A common theme of both campaign phases was the Conspirators' focus on software and hardware that controls equipment in power generation facilities, known as Industrial Control Systems ["ICS"] or Supervisory Control and Data Acquisition systems ["SCADA"] systems. During the Havex phase, the Conspirators compromised the computer networks of ICS/SCADA manufacturers and software providers and then hid their malware inside the legitimate software updates for such systems (known as a "supply chain attack"). Upon being downloaded by unsuspecting customers, the Conspirators' malicious software, among other functions, located and compromised the customers'

2

ICS/SCADA systems. Through such efforts, as well as other techniques, the Conspirators installed malware on more than 17,000 unique devices in the United States and elsewhere, including ICS/SCADA controllers used by power and energy companies.

4. During the later Dragonfly 2.0 phase, the Conspirators transitioned to more targeted compromises that focused on specific energy sector entities or individuals and engineers who worked in or with ICS/SCADA systems. Such efforts included: (i) spearphishing attacks, often with SCADA themes, targeting more than 3,300 users at more than 500 U.S. and international companies and entities; and (ii) compromising servers hosting websites commonly visited by engineers in the energy sector or otherwise involved in ICS/SCADA system manufacturing and then using these websites to deploy malware onto the engineers' (or other visitors') computers (known as a "watering hole attack").

5. Regardless of the evolution of the Conspirators' methods of compromise, the Conspirators' goals remained the same: to establish and maintain surreptitious, unauthorized access to networks, computers, and devices of companies and other entities in the energy sector, including power generation facilities, in the United States and elsewhere. Such accesses enabled the Russian government to disrupt and damage such systems, if it wished.

6.    Images of Defendants are included below:

Pavel Aleksandrovich Akulov
(Павел Александрович Акулов)



Mikhail Mihailovich Gavrilov
(Михаил Михайлович Гаврилов)



Marat Valeryevich Tyukov
(Марат Валерьевич Тюков)



## THE VICTIMS

7.      The vast majority of companies targeted (and, in many cases, compromised)
by the Conspirators were hundreds of U.S. and international energy sector companies and
small commercial companies working with the energy sector, including companies that
provide software and hardware used to control ICS/SCADA systems.  The Conspirators
also compromised and used, without authorization, the computers and networks of other
companies, some of which had no ties to the energy industry, to serve as proxies to conduct
and attempt to conduct intrusions into energy sector targets.

8.      The following are examples from among hundreds of U.S.-based companies
and organizations that were victims and targets of the conspiracy:

        a.      the Nuclear Regulatory Commission ("NRC"), a U.S.
government agency responsible for regulating entities that use nuclear
materials, including nuclear power plants;

5

b. Wolf Creek Nuclear Operating Corporation ("Wolf Creek"), a company located in Burlington, Kansas, that operates the Wolf Creek Generating Station, a nuclear power plant;

c. Westar Energy, a company located in Topeka, Kansas, which was one of the owners of Wolf Creek during the conspiracy;

d. Kansas Electric Power Cooperative ("KEPCO"), a member-owned not-for-profit power generation and transmission electric cooperative located in Topeka, Kansas, which was one of the owners of Wolf Creek during the conspiracy;

e. Company One, a data storage company located in the Midwestern United States;

f. Company Three, a commercial construction company located in Michigan;

g. Company Four, a renewable energy company located in New York;

h. Company Five, a renewable energy company located in New England;

i. Company Six, an Illinois-based media company that produces publications and websites catering to engineers in the manufacturing, oil and gas, and industrial control systems industries;

j. Company Seven, a company located in Pennsylvania that provides digital high-definition cable and high-speed internet;

6

k.   Company Eight, an energy company located in Illinois;

l.   Company Nine, an energy company located in Ohio; and,

m.   Company Ten, a U.S. company that specializes in providing consulting services to nuclear power providers.

9.   Additionally, hundreds of foreign victims and targets of the conspiracy were based in over 135 countries, including: Albania, Australia, Belgium, Brazil, Canada, China, Croatia, Denmark, Finland, France, Germany, Hungary, India, Ireland, Italy, the Netherlands, New Zealand, Norway, Pakistan, Singapore, Slovakia, South Africa, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.  This group included global oil and gas firms, utility and electrical grid companies, nuclear power plants, renewable energy companies, consulting and engineering groups, and advanced technology firms.

10.   One of the victim companies based outside the United States was Company Two, a global SCADA and industrial automation company.

## THE DEFENDANTS

11.   Defendant PAVEL ALEKSANDROVICH AKULOV was a Russian military officer assigned to Military Unit 71330 and held the rank of lieutenant as of 2013. AKULOV conducted online reconnaissance in support of the Conspirators' spearphishing campaigns, including reconnaissance supporting the Conspirators' targeting of, and unauthorized access to, Wolf Creek's computer network (part of Dragonfly 2.0).

12.   Defendant MIKHAIL MIKHAILOVICH GAVRILOV was a Russian military intelligence officer assigned to Military Unit 71330.  During his tenure with the unit, GAVRILOV held the position of captain and, later, major.  GAVRILOV conducted,

at least in part, computer intrusions into Wolf Creek's computer network, as well as computer intrusions against Company Seven's computer network, which the Conspirators used to access various energy, utility, and critical infrastructure webmail login webpages (both part of Dragonfly 2.0).

13.    Defendant MARAT VALERYEVICH TYUKOV was a Russian military intelligence officer assigned to Military Unit 71330. TYUKOV engaged in unauthorized access to a server owned by Company One, which he, at least in part, used to manage command and control ("C2") infrastructure. TYUKOV also engaged in computer intrusions against Company Two's computer network. The Conspirators then laced updates for Company Two's industrial control software with malware, where it was available for download by power and energy companies worldwide, including in the United States (part of Dragonfly/Havex).

## COUNT 1

**CONSPIRACY TO CAUSE DAMAGE TO THE PROPERTY OF AN ENERGY FACILITY; TO GAIN UNLAWFUL ACCESS AND OBTAIN INFORMATION FROM A PROTECTED COMPUTER; TO DAMAGE A PROTECTED COMPUTER; AND TO ACCESS A NON-PUBLIC COMPUTER OF A GOVERNMENT AGENCY WITHOUT AUTHORIZATION
[18 U.S.C. § 371]**

14.    The allegations contained in paragraphs 1 through 10 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

15.    Beginning at least in and around July 2012 and continuing through at least in and around November 2017, the exact dates being unknown to the grand jury, in the District of Kansas and elsewhere, the defendants,

8

**PAVEL ALEKSANDROVICH AKULOV**
**MIKHAIL MIKHAILOVICH GAVRILOV, and**
**MARAT TYUKOV**

knowingly and intentionally combined, conspired, confederated, and agreed together, with

each other and with others known and unknown to the grand jury, to commit the following

offenses against the United States:

       a.    to knowingly and willfully cause damage to the property of an energy

facility that would have, if completed, caused a significant interruption and

impairment in the function of such energy facility, in violation of Title 18, United

States Code, Section 1366;

       b.    to access a computer without authorization and to obtain thereby

information from a protected computer, in furtherance of a criminal and tortious act

in violation of the laws of the United States, that is, conspiracy to commit wire fraud,

in violation of Title 18, United States Code, Section 1349, in violation of Title 18,

United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B)(ii);

       c.    to knowingly cause the transmission of a program, information, code,

and command, and as a result of such conduct, to cause damage without

authorization to a protected computer, and where the offense did cause and would,

if completed, have caused loss aggregating more than $5,000 in value to at least one

person during a one-year period from a related course of conduct affecting a

protected computer and damage affecting at least 10 protected computers during a

one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A)

and 1030(c)(4)(B); and

d.    to intentionally, without authorization, access a non-public computer of a department or agency of the United States, namely, the NRC, that is exclusively for the use of the Government of the United States, in violation of Title 18, United States Code, Sections 1030(a)(3) and 1030(c)(2)(A).

16.    All in violation of Title 18, United States Code, Sections 371 and 2.

## OBJECT OF THE CONSPIRACY

17.    The object of the conspiracy was to establish and maintain surreptitious, unauthorized access to networks, computers, and devices of companies and other entities in the energy sector, including power generation facilities, in the United States and elsewhere, thereby enabling the Russian government to disrupt and damage such systems, if it wished.

## MANNER AND MEANS OF THE CONSPIRACY

18.    To avoid detection by law enforcement, security researchers, and victims, and to mask their FSB affiliation and location in Russia, the Conspirators used a variety of fictitious names and personas, as well as online infrastructure (including servers, domains, email accounts, and other online services), provided by and belonging to companies in the United States and elsewhere.

19.    The Conspirators used this infrastructure, frequently without authorization, for a wide range of conduct in furtherance of the conspiracy, including the methods identified below, internal communications, reconnaissance and research about energy sector victims, and the storage, management, and distribution of hacking tools and malware.

20.     The Conspirators often initiated their hacking activities by researching victim organizations and probing their computer networks.  This reconnaissance provided technical and biographical information that the Conspirators could exploit in targeting their computer intrusion victims.

21.     In some cases, the Conspirators gained unauthorized access to victim devices and networks through a particular malware package (known publicly as "Havex") that was designed to compromise computers, networks, and ICS/SCADA devices.  Among other things, Havex allowed the Conspirators to install backdoor access to compromised devices and networks.  One of the ways the Conspirators spread Havex to more than 17,000 unique devices worldwide was by inserting Havex into otherwise legitimate ICS/SCADA software through supply chain attacks.

22.     The Conspirators also gained unauthorized access to targeted victim networks by exploiting a vulnerability in a particular security software package (the "Security Software Vulnerability") that allowed for remote code execution – *i.e.*, the Conspirators could run unauthorized programs on the victim machine.  While the specific vulnerability used by the Conspirators is unknown, it is likely that at some victims had not installed available software patches.  The Conspirators then used such access to create administrator accounts on victim networks.  Examples of U.S.-based victims that were compromised through this method include Company Three and Company Seven.

23.     In some cases, the Conspirators used administrator-level privileges (*e.g.*, privileges obtained using the Security Software Vulnerability) to access victim networks through remote desktop protocol ("RDP") connections and to create company email

accounts. They then used those accounts to send spearphishing emails to numerous targets, including individuals and engineers who worked in or with critical infrastructure ICS/SCADA systems. For example, the Conspirators used their unauthorized access to Company Three's computer network to create email accounts for fictitious employees (*e.g.*, jon.patrick@[Company Three's corporate domain].com) and to send spearphishing e-mails to accounts at Wolf Creek, Westar Energy, NRC, Company Four, Company Eight, and Company Nine. In many cases, the Conspirators crafted these spearphishing emails to appear as though the sender was a job seeker with experience in critical infrastructure tools and protocols.

24.     The Conspirators would attach a purported résumé, titled either "Controls Engineer.docx," "CV Controls Engineer.docx," or "CV [false Company Three employee name]" (the "Controls Engineer Résumés") that contained malware that would collect victims' computer credentials by leveraging a Server Message Block ("SMB") redirect vulnerability. Specifically, when a recipient opened the malicious attachment, their computer would attempt to download a file from a server controlled by the Conspirators. If the victim network's firewall did not block outbound SMB protocol traffic, the recipient's computer in many cases would attempt to authenticate to the Conspirators' server by sending the recipient's username and password hash (*i.e.*, a string of numbers that can be translated into an actual password if the recipient device has the proper algorithm or via a brute force attack). If Conspirators successfully decrypted the password via brute force, they could then use the username and password to gain unauthorized access to the network.

25.    In addition, the Conspirators used spearphishing emails and publicly known vulnerabilities in popular content management software to compromise web servers hosting websites commonly visited by engineers in energy industries, including websites managed by Company Four, Company Five, and Company Six. The Conspirators used this unauthorized access to add malicious JavaScript code to the websites. These watering hole attacks allowed the Conspirators to steal the credentials of individuals who browsed the compromised websites.

26.    After gaining unauthorized access to victim computers, the Conspirators installed tools and performed a variety of functions designed to maintain control and access to these computers and networks. One such tool was "Backdoor.Goodor," which is a downloader that opened a backdoor on the victim computer and beaconed to hardcoded domains controlled by the Conspirators. The Conspirators would then work to identify, collect, package, and view user credentials, all to allow the Conspirators to move laterally (*i.e.*, to additional computers within a victim network or entity) and hierarchically (*i.e.*, at increasingly higher levels of access) throughout victims' computer networks. Through such methods, the Conspirators would identify and obtain access to sensitive, private data and maintain persistent access that would enable future cyber operations, including operations designed to interfere with and damage power and power delivery systems.

## COMPUTER INTRUSIONS AND OTHER OVERT ACTS

PHASE ONE: Deployment and Management of Havex Infrastructure

27.    Between at least 2012 through 2014, the Conspirators used spearphishing, watering hole attacks, and supply chain attacks to deploy Havex, which they subsequently

13

used, in part, to map and compromise networked ICS/SCADA devices. Specifically, after infecting a computer on a network, one Havex component would automatically use the Open Communications Platform, a protocol used for Windows communications with SCADA devices, to locate ICS/SCADA devices on a targeted network.

28.    Havex also allowed the Conspirators to, among other things, copy login credentials, gather user information from infected computers and devices, and install backdoors, allowing them to access and control compromised devices at will.

*Compromise and Use of Company One Server as a Proxy*

29.    Beginning in at least July 2012, the Conspirators accessed, without authorization, a server owned by Company One ("the Company One Proxy"). From in and around July 2012 through in and around April 2013, the Conspirators maintained exclusive control of this server and used it as a proxy through which they could route their operational traffic while hiding their true location and identities as they engaged in criminal activity. While being used by the Conspirators, the server housing the Company One proxy was located in the United States.

30.    The Conspirators used the Company One proxy to, among other things, create and manage a wide-ranging network of Havex C2 servers. For example, on August 28, 2012, the Conspirators used the Company One proxy to upload Havex malware control panels to three C2 servers. The Conspirators maintained exclusive access to the control panels installed on these three servers via a unique password. The Conspirators used this same password to access more than 250 other domains that they used to host Havex C2 infrastructure.

14

31.     On or about August 30, 2012, TYUKOV used the Company One proxy to access the Havex control panels on three Havex C2 servers. After viewing the files on those servers, TYUKOV uploaded one copy of the Havex malware to each of the C2 domains.

32.     While logged into the Havex control panels, TYUKOV also uploaded files for use in watering hole attacks that installed Havex and other exploits on a visitor's computer.

### Target Research and SQL Injection

33.     The Conspirators commonly conducted online research to identify potential targets. For example, on multiple occasions in July 2012, the Conspirators used the Company One proxy to conduct target research on the website of the International Atomic Energy Agency. One of the pages viewed by the Conspirators listed companies and agencies involved in nuclear power activities in the United States, and discussed numerous entities targeted by the Conspirators throughout the conspiracy, including the NRC, Wolf Creek, Company Eight, and Company Nine.

34.     Throughout December 2012, the Conspirators repeatedly targeted the website of Company Ten via Structured Query Language (SQL) injections, an exploitation method that relies on misconfigured web applications to provide an actor with the ability to read and write information, execute administrative operations, and issue commands to the operating system.

35.     Through these efforts, the Conspirators compromised Company Ten's website and obtained non-public information, including the usernames and passwords of

15

more than 10,000 users on Company Ten's website. Among these were hundreds of individual users at entities targeted throughout the conspiracy, including the NRC, Wolf Creek, Westar Energy, Company Eight, and Company Nine.

### SCADA Manufacturer Compromise

36.    In and around August 2012, TYUKOV and other Conspirators used the Company One proxy to conduct SQL injections against a website belonging to Company Two. Ultimately, TYUKOV obtained unauthorized access to nonpublic data, including internal configuration information about the server hosting Company Two's website, information about the database supporting that website, and the username and password for the website's administrator account.

37.    On or about November 12, 2012, the Conspirators again accessed Company Two's server and downloaded BIOS and driver software for Company Two products.

### Havex Supply Chain Attack

38.    Between at least 2013 and 2014, the Conspirators caused the distribution of Havex malware inside legitimate Company Two driver software that was available for public download. Once installed, this software attempted to contact Havex C2 infrastructure. For example, a version of the compromised update software was found on a SCADA device used by a power generation plant in the United States.

PHASE TWO: Targeted Persistent Access to Victim Companies' Systems

39.     In a second phase of the conspiracy, the Conspirators undertook other efforts to obtain long-term, persistent access to the computer systems of energy companies and their power generation facilities (generally referred to "Dragonfly 2.0," as noted above).

*Energy Sector Spearphishing Attacks via Compromised Servers*

40.     In and around early 2014, the Conspirators used the Security Software Vulnerability to compromise a Michigan-based server that belonged to Company Three.

41.     From in and around March 2014 through in and around October 2015, the Conspirators used this unauthorized access to create four administrator accounts on Company Three's network with usernames resembling legitimate systems or processes, such as MS_AutoUP, SYSTEM_USER, LOCAL_SYS, and SYSTEM_NT (the Conspirators also created accounts with identical names on other victim networks).

42.     In and around February and March 2017, the Conspirators used one of their unauthorized administrator accounts to create four Company Three email accounts associated with fictitious names.  From on or about February 28, 2017, to on or about May 31, 2017, the Conspirators used these email accounts to send spearphishing emails with malware-laced attachments to more than 3,300 email accounts associated with more than 500 U.S. and international companies and entities, primarily in the energy sector.  The targets of the Conspirators' spearphishing emails included more than 170 companies and entities in the United States, in addition to hundreds of companies in and entities in Africa, Asia, Australia, Europe, the Middle East, and South America, as well as more.  Some examples of the Conspirators spearphishing against U.S.-based targets include:

17

      a.     one e-mail sent on or about May 24, 2017 to an NRC account;

      b.     ten nearly identical emails sent on or about May 5 and 15, 2017, to eight Wolf Creek accounts belonging to eight Wolf Creek employees ("Employees 1 through 8");

      c.     twenty-nine emails sent on or about May 19, 2017, to nineteen KEPCO accounts;

      d.     nineteen emails sent on or about May 19 and 24, 2017, to nineteen Westar Energy accounts;

      e.     thirty-seven emails sent on or about May 24 and 29, 2017 to twenty-nine Company Four accounts;

      f.     eighteen emails sent from on or about May 11, 2017, to May 24, 2017, to fourteen Company Eight accounts;

      g.     three emails sent from on or about May 15, 2017,  to May 24, 2017, to two accounts at Company Nine.

43.    The Conspirators sent the May 5, 2017 spearphishing emails to Wolf Creek Employees 1 through 7 over the course of about five minutes, after AKULOV had conducted reconnaissance against Wolf Creek, Westar Energy, and international energy sector networks.

44.    The Conspirators specifically targeted users likely to have access to ICS/SCADA data and systems, since these emails, as well as the malware-laced attachments, typically referenced SCADA systems.  An example of one of these emails is included below.



From:    Kevin North <kevin North@____
To:      ____
Date:    5/5/2017 8:58:01 AM
Subject: CV Kevin North
Attachments    CV Controls Engineer.docx

Hello

Over 10 years Controls/Software Experience

   Software development for PLC based control systems:
   SIEMENS S5, S7-200, S7-300, S7-400 series,
   Rockwell 5000, 500 series.
   SCADA, HMI configuration.

   Various Conveyor system experiences
   Networking with PLC's: Ethernet, PROFIBUS-DP, PROFINET  MPI, ASI, DeviceNet, DH+
   EPLAN

Multi – skilled controls engineer with experience in hands-on project based work. Experience ranges from budget estimate and man
engineering projects to developing and commissioning software for PLC - SCADA control systems.

I Look forward to hearing back.

Best Regards,

Kevin North

45.    On or about May 15, 2017, GAVRILOV assisted in drafting the spearphishing e-mail sent that day to Wolf Creek Employee 1.

46.    Although many targeted users at U.S.-based entities opened the malicious attachments, most of the malicious activity was blocked by victims' network firewalls (which blocked outbound SMB protocol connections) or mitigated before the actors could leverage the stolen credentials. But, as discussed below, even a single user clicking on the malicious attachment was enough for the Conspirators to compromise a targeted company's network.

*Compromise of Wolf Creek's Computer Network*

47.     In and around May 2017, after using the Conspirator-created Company Three accounts to send spearphishing emails to Wolf Creek email accounts as described in paragraphs 42-46, the Conspirators compromised at least one Wolf Creek user account and used that account to download and store malware on Wolf Creek's business network, which was not directly connected to any ICS/SCADA devices.  The Conspirators then used this malware to move laterally across Wolf Creek's computer network and harvest additional Wolf Creek employee credentials.  The servers that housed the accounts for Employees 1-8 – as well as Employee 9, discussed below – during this time were located in the District of Kansas.  Further, during this time, all of Wolf Creek's internet traffic was routed through servers located in the District of Kansas.

48.     Specifically, the Conspirators first obtained unauthorized access to Wolf Creek's computer network on or about May 11, 2017, by compromising Employee 1's account via the spearphishing activity described above.  The Conspirators then used Employee 1's credentials to access his/her account without authorization on dozens of occasions from on or about May 11, 2017, through on or about May 17, 2017 to, among other things, maintain persistence and compromise additional accounts.

49.     During this time, the Conspirators added several malicious executable files and computer scripts to Employee 1's file storage.  For example, on or about May 11, 2017, minutes after first accessing Employee 1's account, the Conspirators added a malware file called ntdll.exe, which contained Backdoor.Goodor, to Employee 1's file storage.  When

executed, ntdll.exe allowed the Conspirators to execute commands on victim systems via one of nine C2 servers, some of which the Conspirators also used to target other victims.

50.    Later that same day, GAVRILOV placed a shortcut file (named SETROUTE.lnk) in several Wolf Creek users' file storage, including Employee 1. The Conspirators designed the shortcut files to request access to a file icon (*e.g.*, pic.png) from a Conspirator-controlled server outside Wolf Creek's network, thereby sending user credentials to those servers via an SMB redirect attack. The SMB redirect attack did not require that a user click on the malicious file. Instead, this attack would be triggered if a user opened a directory containing the shortcut file.

51.    The next day, on or about May 12, 2017, after the Conspirators had obtained access to Wolf Creek's computer network, AKULOV continued to familiarize himself with Wolf Creek and Westar Energy.

52.    On or about May 15, 2017, GAVRILOV added three files – svcsrv.bat, Inveigh.ps1, and Inveigh-Relay.ps1 – to Employee 1's file storage. These files were designed to exploit SMB traffic, allowing the Conspirators to collect usernames and password hashes for computers on a victim network.

53.    That same day, the Conspirators added more malware – notepad.exe.lnk, d.js, and SD.bat – to the file storage of several Wolf Creek employees, including Employee 1. The Conspirators designed these files to capture additional information about a victim network and gather usernames and password hashes to aid the Conspirators' efforts to compromise Wolf Creek's network.

54.    Through such methods, the Conspirators obtained access to at least one other Wolf Creek employee account, ("Employee 9"), which the Conspirators used, without authorization, from on or about May 18, 2017, through on or about May 29, 2017. As with Employee 1's account, the Conspirators used Employee 9's account to store and download malware on Wolf Creek's network.

*Compromise and Creation of Energy Sector Watering Hole Domains*

55.    From in and around December 2016 through in and around June 2017, the Conspirators seeded at least six domains with malicious JavaScript code (since remediated) that, using an SMB redirect attack, caused computers visiting those websites to become watering holes. One of the compromised websites belonged to Company Four, another belonged to Company Five, and four belonged to Company Six. During the Conspiracy, the servers hosting these websites were located in the United States.

56.    All of these websites would have been of interest to those involved in the energy sector, including power system operators. Moreover, each of these compromised websites involved information or publications of particular interest to those involved in the energy sector or the manufacture and use of ICS/SCADA devices.

57.    In some cases, the Conspirators gained the necessary access to embed the malicious JavaScript code via spearphishing. For example, on May 29, 2017, the Conspirators sent a spearphishing email with a "Controls Engineer Résumés" malicious attachment to a Company Four employee who had administrative access to Company Four's website ("Employee 10"). Employee 10 opened the attachment, which caused the transmission of Employee 10's username and hashed password to the Conspirators. On or

about June 5, 2017, the Conspirators used Employee 10's credentials to access the administrative portion of Company Four's website to insert the malicious JavaScript code.

58.    Alternatively, the Conspirators also gained the necessary unauthorized access through vulnerabilities in popular content management software. For example, on or about April 7, 2017, the Conspirators compromised Company Five's website in this manner.

59.    These watering holes resulted in connections between several domestic energy sector companies' computer networks and the Conspirators' credential harvesting servers. This included computers at Westar Energy, which connected to one of the Conspirators' servers on April 4, 2017.

*Use of Compromised Company Seven Account as a Proxy*

60.    On or about March 2, 2017, after the Conspirators accessed, without authorization, a Company Seven server via the Security Software Vulnerability, the Conspirators created an administrator account called MS_BACKUP on Company Seven's computer network. The Conspirators remotely accessed this account from on or about March 2, 2017, to on or about November 14, 2017. During this time, the servers hosting Company Seven's network were located in the United States.

61.    The Conspirators repeatedly used Company Seven's network (via the MS_BACKUP account) as a proxy to further the conspiracy. For example, from on or about May 28, 2017, to on or about November 12, 2017, the Conspirators attempted to, and in many cases did, log into the web services of various Chinese and European energy, utility, and critical infrastructure entities.

62.    Additionally, on or about September 29, 2017, GAVRILOV used the MS_BACKUP account to access some of the conspiracy's other hacking infrastructure.

## COUNT 2

### COMPUTER FRAUD – UNLAWFUL ACCESS TO OBTAIN INFORMATION FROM PROTECTED COMPUTERS
### [18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(2)(B)(ii), and 2]

63.    The allegations contained in paragraphs 1 through 62 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

64.    From on or about May 11, 2017, to on or about May 29, 2017, in the District of Kansas and elsewhere, the defendants,

### PAVEL ALEKSANDROVICH AKULOV and
### MIKHAIL MIKHAILOVICH GAVRILOV,

intentionally accessed a computer without authorization and thereby obtained information from a protected computer, in furtherance of a criminal and tortious act in violation of the laws of the United States, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and aided and abetted the same, to wit, AKULOV and GAVRILOV accessed, and aided and abetted accessing, without authorization Wolf Creek's computer network and obtained user credentials.

65.    All in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B)(ii) and 2.

## COUNTS 3-6

**COMPUTER FRAUD – DAMAGE TO PROTECTED COMPUTERS**
**[18 U.S.C. §§ 1030(a)(5)(A), 1030(b), 1030(c)(4)(B), and 2]**

66.    The allegations contained in paragraphs 1 through 62 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

67.    On or about the dates listed below, in the District of Kansas and elsewhere, the defendants,

**PAVEL ALEKSANDROVICH AKULOV and**
**MIKHAIL MIKHAILOVICH GAVRILOV,**

knowingly caused and attempted to cause the transmission of a program, information, code, and command, and as a result of such conduct, caused and attempted to cause damage without authorization to a protected computer; to wit, the defendants knowingly caused and attempted to cause the transmission of malware to computers on Wolf Creek's computer network, and aided and abetted the same, and as a result of such conduct, caused and attempted to cause damage without authorization to computers used by Wolf Creek. The offenses caused loss resulting from a related course of conduct affecting one or more protected computers aggregating at least $5,000 in value.

| Count | Approximate Date | Basis |
|-------|------------------|-------|
| 3 | May 11, 2017 | Transmitting the ntdll.exe file to Employee 1's user directory |
| 4 | May 11, 2017 | Transmitting the SETROUTE.lnk file to multiple user directories |
| 5 | May 15, 2017 | Transmitting svcsrv.bat, Inveigh.ps1, and Inveigh-Relay.ps1 to Employee 1's user directory |
| 6 | May 15, 2017 | Transmitting the notepad.exe.lnk, d.js, and SD.bat files to Employee 1's and other accounts' file storage |

68.    Each in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(c)(4)(B), and 2.

## COUNT 7

### WIRE FRAUD CONSPIRACY
### [18 U.S.C. § 1349]

69.    The allegations contained in paragraphs 1 through 13 and paragraphs 18 through 62 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY AND ITS OBJECTS

70.    Beginning at least in and around July 2012 and continuing through at least in and around November 2017, the exact dates being unknown to the grand jury, in the District of Kansas and elsewhere, the defendants,

### PAVEL ALEKSANDROVICH AKULOV
### MIKHAIL MIKHAILOVICH GAVRILOV, and
### MARAT VALERYEVICH TYUKOV

knowingly and intentionally conspired, combined, and agreed together, with each other, and with others known and unknown to the grand jury, to commit an offense against the United States, that is, wire fraud, contrary to the provisions of Title 18, United States Code, Section 1343; to wit, the defendants, PAVEL ALEKSANDROVICH AKULOV, MIKHAIL MIKHAILOVICH GAVRILOV, and MARAT VALERYEVICH TYUKOV, together with conspirators, devised and intending to devise a scheme to defraud, and to obtain property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and

foreign commerce, certain writings, signs, signals, and pictures for the purpose of executing such scheme.

71.    Specifically, an object of the conspiracy was to, by means of false and fraudulent pretenses, obtain authentication credentials to maintain persistent access to victim computer networks by hacking computers belonging to companies and entities that were part of the global energy sector, including their power generation facilities.  These victims include those described in paragraphs 7 through 10 above.

72.    With respect to computer intrusions that were part of the conspiracy, the Conspirators transmitted, in interstate and foreign commerce, computer code and files designed to gain unauthorized access to victims' computers and networks.  After compromising victims' systems, the Conspirators sent commands to, and received communications from, computer files and malware that they had installed on victim machines.

73.    For example, some of the Conspirators' intrusion activities involved supply chain attacks that spread malware via vendors that provided equipment and software to energy and power generation companies.  After gaining unauthorized access to the computers of equipment vendors, the Conspirators would illegally obtain and modify victim vendors' software, and then replace the legitimate software on vendors' websites with versions that would, when installed by users, grant the Conspirators unauthorized access to victims' computers via backdoors and other malware.

74.    The Conspirators also used stolen authentication credentials to misrepresent their identities within the victims' networks to obtain unauthorized access to and move

laterally within victim networks. The Conspirators also created administrator-level accounts to misrepresent their identities within the victims' networks and email accounts that mimicked those of legitimate victim accounts.

75.     In addition, the Conspirators crafted and transmitted, in interstate and foreign commerce, spearphishing emails designed to gain unauthorized access to victims' computer networks. The Conspirators created spearphishing emails that appeared legitimate to deceive recipient victims into opening the emails and their malicious attachments, thus enabling the Conspirators to steal credentials for the victims' computer networks.

76.     In some instances, Conspirators also compromised and then used watering hole domains, which the Conspirators used to induce victim computers to reveal credentials for the victims' computer networks and download malicious software that would gain unauthorized access to the victims' computers.

77.     All in violation of Title 18, United States Code, Section 1349.

## COUNTS 8 - 17

### WIRE FRAUD
### [18 U.S.C. §§ 1343 and 2]

78.     The allegations contained in paragraphs 1 through 13 and paragraphs 18 through 62, and paragraphs 70 through 77 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

79.     On or about the dates set forth below, in the District of Kansas and elsewhere, the defendants,

## PAVEL ALEKSANDROVICH AKULOV and
## MIKHAIL MIKHAILOVICH GAVRILOV,

having devised and intending to devise a scheme to defraud, and to obtain property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, and pictures for the purpose of executing such scheme and artifice, and aided and abetted the same; to wit, the defendants knowingly transmitted malware by means of wires to Wolf Creek's computer systems, on or about the dates and times set forth below in Counts 8 through Count 17, and stole and used Employee 1's user authentication credentials to make a transmission in furtherance of adding malware to Wolf Creek's computer network, on or about the date and time set forth below in Count 17.

| Count | Approximate Date (EDT) | Basis |
|-------|------------------------|-------|
| 8 | May 5, 2017 | Spearphishing Email Sent to Employee 2 |
| 9 | May 5, 2017 | Spearphishing Email Sent to Employee 3 |
| 10 | May 5, 2017 | Spearphishing Email Sent to Employee 1 |
| 11 | May 5, 2017 | Spearphishing Email Sent to Employee 4 |
| 12 | May 5, 2017 | Spearphishing Email Sent to Employee 5 |
| 13 | May 5, 2017 | Spearphishing Email Sent to Employee 6 |
| 14 | May 5, 2017 | Spearphishing Email Sent to Employee 7 |
| 15 | May 15, 2017 | Spearphishing Email Sent to Employee 1 |
| 16 | May 15, 2017 | Spearphishing Email Sent to Employee 8 |
| 17 | May 11, 2017 | First outbound transmission from Employee 1's account to an IP address controlled by the Conspirators |

80.    Each was in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 18 - 20

### AGGRAVATED IDENTITY THEFT
[18 U.S.C. §§ 1028A and 2]

81.     The allegations contained in paragraphs 1 through 13, paragraphs 18 through 62, and paragraphs 70 through 77 are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

82.     On or about the dates set forth below, in the District of Kansas and elsewhere, the defendants,

### PAVEL ALEKSANDROVICH AKULOV and
### MIKHAIL MIKHAILOVICH GAVRILOV,

knowingly transferred, possessed and used without lawful authority, a means of identification of another person, and aided and abetted the same, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, as charged in Count 7, knowing that the means of identification belonged to another real person who worked on behalf of the targeted victim organization.

| Count | Approximate Dates | Victim Organization | Means of Identification |
|---|---|---|---|
| 18 | May 11, 2017, to May 17, 2017 | Wolf Creek | Username and password for account used by Employee 1 |
| 19 | May 18, 2017, to May 29, 2017 | Wolf Creek | Username and password for account used by Employee 9 |
| 20 | May 31, 2017, to June 5, 2017 | Company Four | Username and password for account used by Employee 10 |

83.     Each in violation of Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(4), and 2.

## FORFEITURE NOTICE

84.     The allegations contained in paragraphs 1 through 83 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(B), and 1030(i) and Title 28, United States Code, Section 2461.

85.     Upon conviction of one or more of the offenses set forth in Counts One through Seventeen of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(B), and 1030(i)(1)(B) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

86.     Upon conviction of one or more of the offenses set forth in Counts One through Six of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1030(i)(1)(A), any personal property that was used or intended to be used to commit or to facilitate the commission of such violations.

## SUBSTITUTE ASSETS

87.     If any of the property described above, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

31

e.    has been commingled with other property which cannot be divided

without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant

to Title 21, United States Code, Section 853(p).


A TRUE BILL.



August 26, 2021                          s/Foreperson
DATE                                     FOREPERSON OF THE GRAND JURY


DUSTON J. SLINKARD
ACTING UNITED STATES ATTORNEY

MARK J. LESKO
ACTING ASSISTANT ATTORNEY GENERAL


By: /s/ Ali Ahmad,
Ali Ahmad
Counsel for Cyber Investigations
National Security Division
Main Justice Building
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Ph: (202) 514-2000
Fax: (202) 532-4251
Email: Ali.Ahmad2@usdoj.gov
NY S. Ct. No. 4428587

By: /s/ Christine Bonomo,
Christine Bonomo
Trial Attorney
National Security Division
Main Justice Building
950 Pennsylvania Avenue, NW

Washington, D.C. 20530
Ph: (202) 514-2000
Fax: (202) 532-4251
Email: Christine.Bonomo@usdoj.gov
NY S. Ct. No. B10113801

By: /s/ Scott C. Rask,
Scott C. Rask
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Scott.Rask@usdoj.gov
Ks. S. Ct. No. 15643

By: /s/ D. Christopher Oakley,
D. Christopher Oakley
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Chris.Oakley@usdoj.gov
Ks. S. Ct. No. 19248

By: /s/ Ryan J. Huschka,
Ryan J. Huschka
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Ryan.Huschka@usdoj.gov
Ks. S. Ct. No. 23840

IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## PENALTIES

### Count 1 [18 U.S.C. § 371 conspiracy]

- Punishable by a term of imprisonment of not more than five years.  18 U.S.C. § 371.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Count 2 [18 U.S.C. §§ 1030(a)(2)(C) & 1030(c)(2)(B)(ii) computer fraud to obtain information]

- Punishable by a term of imprisonment of not more than five years.  18 U.S.C. § 1030(c)(2)(B).

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 3-6 [18 U.S.C. §§ 1030(a)(5)(A) & 1030(c)(4)(B) computer fraud to damage protected computers]

- Punishable by a term of imprisonment of not more than ten years.  18 U.S.C. § 1030(c)(4)(B).

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 7-17 [18 U.S.C. §§ 1349 and 1343 wire fraud conspiracy and wire fraud]

- Punishable by a term of imprisonment of not more than twenty years.  18 U.S.C. § 1343.

- A term of supervised release of not more than three years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

## Counts 18-21 [18 U.S.C. § 1028A aggravated identity theft]

- Punishable by a term of imprisonment of not less than two years consecutive to any other sentence imposed.  18 U.S.C. §§ 1028A(a)(1) & 1028A(b)(2).

- A term of supervised release of not more than one year.  18 U.S.C. § 3583(b)(3).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.  18 U.S.C. § 3013(a)(2)(A).

EXHIBIT 45

10/15/24, 5:05 PM    Office of Public Affairs | Russian National Charged for Conspiring with Russian Military Intelligence to Destroy Ukrainian Governm…

Case 4:19-cv-07123-PJH    Document 437-3    Filed 10/18/24    Page 75 of 90



PRESS RELEASE

# Russian National Charged for Conspiring with Russian Military Intelligence to Destroy Ukrainian Government Computer Systems and Data

Wednesday, June 26, 2024

| For Immediate Release
| Office of Public Affairs

## Defendant is Alleged to Have Assisted with an Attack in Advance of Russia's February 2022 Invasion of Ukraine

*Note: Concurrent with the return of the indictment, the U.S. Department of State's Rewards for Justice program is offering a reward of up to $10 million for information on Stigal's location or his malicious cyberactivity. Anyone possessing such information should contact Rewards for Justice [here](#).*

A federal grand jury in Maryland returned an indictment yesterday charging Amin Timovich Stigal (Амин Тимович Стигал), 22, a Russian citizen, with conspiracy to hack into and destroy computer systems and data. In advance of the full-scale Russian invasion of Ukraine, targets included Ukrainian Government systems and data with no military or defense-related roles. Later targets included computer systems in countries that were providing support to Ukraine, including the United States. Stigal remains at large.

"As alleged, the defendant conspired with Russian military intelligence on the eve of Russia's unjust and unprovoked invasion of Ukraine to launch cyberattacks targeting the Ukrainian government and later targeting its allies, including the United States." said Attorney General Merrick B. Garland. "The Justice Department will continue to stand with Ukraine on every front in its fight against Russia's war of aggression, including by holding accountable those who support Russia's malicious cyber activity."

"The GRU has repeatedly applied in cyberspace Russia's statecraft of indiscriminate destruction and intimidation," said Assistant Attorney General Matthew G. Olsen. "The Department will do its part to prevent and disrupt such malicious behavior that relies upon online services or infrastructure in the U.S., or that targets U.S. victims. We will also identify, pursue, and eventually hold to account those responsible for Russia's malicious actions, including the cybercriminals that the Russian government cultivates in furtherance of its malign agenda."

"Amin Timovich Stigal attempted to leverage malware to aid the Russian military in the invasion of Ukraine," said FBI Deputy Director Paul Abbate. "Today's indictment demonstrates the FBI's unwavering commitment to combat malicious cyber activities by our adversaries, and we will continue to work with our international partners to thwart attempts to undermine and harm our allies."

"Malicious cyber actors who attack our allies should know that we will pursue them to the full extent of the law," said U.S. Attorney Erek L. Barron for the District of Maryland. "Cyber intrusion schemes such as the one alleged threaten our national security, and we will use all the technologies and investigative measures at our disposal to disrupt and track down these cybercriminals."

"The indictment of Amin Stigal is yet another example of the FBI's commitment to combating cyber threats both at home and internationally," said Special Agent in Charge William J. DelBagno of the FBI Baltimore Field Office. "To those adversaries who seek to compromise our international partners' systems, know you will be identified and you will face consequences for your actions. The FBI vows to continually pursue justice and disrupt malicious cyber actors."

According to court documents, in Jan. 2022, Stigal and members of the Main Intelligence Directorate of the General Staff (GRU) of the Russian Federation (the Conspirators) conspired to use a U.S.-based company's services to distribute malware known in the cybersecurity community as "WhisperGate" to dozens of Ukrainian government entities' computer systems and destroy those systems and related data in advance of the Russian invasion of Ukraine. The United States government previously joined with allies and partners in May 2022 to attribute this cyber-attack to the Russian military and to condemn the attack and similar destructive cyber activities against Ukraine.

On Jan. 13, 2022, the Conspirators attacked multiple Ukrainian government networks, including the Ukrainian Ministry of International Affairs, the State Treasury, the Judiciary Administration, the State Portal for Digital Services, the Ministry of Education and Science, the Ministry of Agriculture, the State Service for Food Safety and Consumer Protection, the Ministry of Energy, the Accounting Chamber for Ukraine, the State Emergency Service, the State Forestry Agency, and the Motor Insurance Bureau. The Conspirators infected computers on these and other networks with malware called WhisperGate, which was designed to look like ransomware. However, as the indictment alleges, WhisperGate was actually a cyberweapon designed to completely destroy the target computer and related data.

In conjunction with these attacks, the Conspirators compromised several of the targeted Ukrainian computer systems, exfiltrated sensitive data, including patient health records, and defaced the websites to read: "Ukrainians! All information about you has become public, be afraid and expect the worst. This is for your past, present and future." That same day, the Conspirators offered the hacked data for sale on the internet. The effort was aimed at sowing concern among the broader Ukrainian population regarding the safety of government systems and data.

In August 2022, the Conspirators also hacked the transportation infrastructure of a Central European country that was supporting Ukraine. The indictment further alleges that from Aug. 5, 2021, through Feb. 3, 2022, the Conspirators leveraged the same computer infrastructure they used in the Ukraine-related attacks to probe computers belonging to a federal government agency in Maryland in the same manner as they had initially probed the Ukrainian Government networks.

If convicted, Stigal faces a maximum penalty of five years in prison. A federal district court judge will determine any sentence after taking into account the U.S. Sentencing Guidelines and other statutory factors.

The FBI's Baltimore Field Office is investigating the case with the support of the FBI's Milwaukee and Boston Field Offices.

Assistant U.S. Attorneys Aaron S.J. Zelinsky and Robert I. Goldaris for the District of Maryland are prosecuting the case, with valuable assistance from the National Security Division's National Security Cyber Section.

*An indictment is merely an allegation. All defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*

[Indictment](#)

*Updated June 28, 2024*

10/15/24, 5:05 PM    Office of Public Affairs | Russian National Charged for Conspiring with Russian Military Intelligence to Destroy Ukrainian Governm…

Case 4:18-cv-07123-RJH    Document 437-3    Filed 10/18/24    Page 78 of 90

## Topics

| CYBERCRIME | NATIONAL SECURITY |

## Components

[Office of the Attorney General](#)  |  [Criminal - Office of International Affairs](#)  |  [Federal Bureau of Investigation (FBI)](#)  |  [National Security Division (NSD)](#)  |  [USAO - Maryland](#)

Press Release Number: 24-815

# Related Content

## PRESS RELEASE

### U.S. Army Soldier Sentenced to 14 Years in Prison For Attempting to Assist ISIS to Conduct Deadly Ambush on U.S. Troops

Cole Bridges, also known as Cole Gonzales, 24, of Stow, Ohio, was sentenced to 168 months in prison followed by 10 years of supervised release for attempting to provide material...

October 11, 2024

## PRESS RELEASE

### Previously Extradited Foreign National Sentenced for Role in Multimillion-Dollar Business Email Compromise Schemes Targeting Educational Institutions and Businesses in Texas and North Carolina

A dual citizen of Nigeria and the United Kingdom was sentenced yesterday to seven years in prison for his role in a multimillion-dollar business email compromise (BEC) scheme.



October 2, 2024

---

PRESS RELEASE

## Two Russian Nationals Charged in Connection with Operating Billion Dollar Money Laundering Services

The Justice Department today announced actions coordinated with the Department of State, Department of the Treasury, and other federal and international law enforcement partners to combat Russian money laundering operations...

September 26, 2024

---

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

EXHIBIT 46

SEALED

ASJZ/RIG USAO 2022R00237

USDC- BALTIMORE
*24 JUN 25 AM10:54

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | **FILED UNDER SEAL** |
| v. | CRIMINAL NO. LKG 24cr 206 |
| AMIN STIGAL, | (Conspiracy to Commit Computer Intrusion and Damage (18 U.S.C. § 371); Forfeiture (18 U.S.C. §§ 982, and 1030(i), 21 U.S.C. § 853(p)) |
| Defendant. | |

## INDICTMENT

### COUNT 1
### (Conspiracy to Commit Fraud and Related Activity in Connection with Computers)

The Grand Jury for the District of Maryland charges that:

At all times relevant:

1.      In or around December 2020 to the present, the Russian Federation ("Russia") operated a military intelligence agency called the Main Intelligence Directorate of the General Staff ("GRU"). The GRU had multiple units which engaged in cyber operations that, among other things, involved the destruction of computer systems in foreign countries through computer intrusions.

2.      Defendant AMIN STIGAL was a Russian citizen and civilian who knowingly and intentionally conspired with GRU officers including other persons known and unknown to the Grand Jury (collectively the "Conspirators"), to gain unauthorized access (to "hack") into computers associated with the Ukrainian Government or entities associated with the governments of countries that provide support to the Ukrainian Government in resisting Russia's unjustified invasion of Ukraine. First, in the month prior to the full-scale Russian invasion of Ukraine in

February 2022, the Conspirators hacked the computers of dozens of Ukrainian Government entities, including in critical infrastructure, as well as entities responsible for other sectors with no military or defense-related roles, including agriculture, education and science, and emergency services, and destroyed or attempted to destroy those systems in advance of the Russian invasion of Ukraine in February 2022. The Conspirators used software that was designed to appear as if the computers had suffered a ransomware attack, when in fact the data on the computers had been deleted. The Conspirators also stole and leaked through online platforms the personal data of thousands of Ukrainian civilians, including medical records. The purpose of the attack was, in part, to sow concern among Ukrainian citizens regarding the safety of their Government's systems and their personal data in advance of the Russian attack of Ukraine. This campaign became publicly known in cybersecurity circles as the "WhisperGate" campaign.

3.    In addition, the Conspirators hacked a Central European country's transportation infrastructure in October 2022. The Central European country was a supporter of Ukraine and had delivered civilian and military aid to Ukraine following the Russian invasion of Ukraine in February 2022.

4.    The Conspirators also probed systems in the United States, including multiple sites maintained by a U.S. Government Agency located in Maryland.

5.    To conceal their connections to Russia and the Russian Government, the Conspirators used false identities and made false statements about their identities. To further avoid detection, the Conspirators used a network of computers located across the world, including in the United States, and paid for this infrastructure using cryptocurrency.

**Defendants**

6.      The defendant, AMIN STIGAL [Амин Тимович Стигал] is a Russian citizen who supports the activities of the GRU by setting up online infrastructure for GRU officers to use in cyberattacks, including in the deployment of the WhisperGate malware described further below.

**Relevant Terms**

7.      "Bitcoin" or "BTC" was a type of virtual currency, circulated over the Internet as a form of value. Bitcoin were not issued by any Government, bank, or company, but rather were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin were just one of many varieties of virtual currency.

8.      A "darknet website" was a hidden website available through a network of globally distributed relay computers called The Onion Router, or "Tor," network.  Unlike standard Internet websites, Tor-based websites anonymize Internet activity by routing a user's communications through a global network of relay computers (or proxies), thus effectively masking information about the user's computer.

9.      "Encryption" was a way of scrambling data so that only authorized parties can read or understand the information.  In order to access encrypted data, a user must have access to a password (known as a "decryption key") that enabled the user to decrypt it.

10.      "Malware" was malicious computer software intended to, when successfully installed, cause the victim computer to behave in a manner inconsistent with the intention of the owner or user of the victim computer, usually unbeknownst to that person.

11.      Voice Over Internet Protocol "VOIP" was a technology that allowed users to make voice calls using a broadband Internet connection instead of a regular phone line.

3

**The Conspiracy**

12.     Beginning no later than in or around December 2020, and continuing through the date of this Indictment, in an offense that began outside the jurisdiction of any particular State or district of the United States, and continued in the District of Maryland and elsewhere, the defendant, **AMIN STIGAL**, did knowingly and unlawfully conspire with others known and unknown to the Grand Jury to commit an offense against the United States, that is:

        a.      to knowingly cause the transmission of a program, information, code, and command, and, as a result of such conduct, intentionally cause damage without authorization to a protected computer, with such offense causing: loss to 1 or more persons during a 1-year period aggregating at least $5,000 in value; and damage affecting 10 or more protected computers during a 1-year period; in violation of Title 18, United States Code, Section 1030(a)(5)(A) and (c)(4)(B);

**Object of the Conspiracy**

13.     The object of the conspiracy was for STIGAL, together with his co-conspirators, to identify and exploit vulnerabilities in, and obtain unauthorized access to, protected computers belonging to target Governments and infrastructure systems outside of Russia in order to cause damage and render the targeted protected computers inoperable. In addition, it was a further object of the conspiracy for STIGAL, together with his co-conspirators, to exfiltrate data from those protected computers and stage public releases of that data in order to embarrass the target Governments and create concern among their citizens about vulnerabilities to cyberattack.

**Manner and Means of the Conspiracy**

14.     From December 2020 through the present, the Conspirators scanned protected computers worldwide for possible vulnerabilities, including in the District of Maryland, as a preliminary step toward gaining unauthorized access to those protected computers.

4

15.     It was further part of the conspiracy that the Conspirators gained unauthorized access to protected computers by exploiting those vulnerabilities identified through the scanning and stole copies of files and programs that could be accessed from the targeted protected computers.

16.     It was further part of the conspiracy that the Conspirators would infect protected computers with malware, which would render those computers unusable. The malware was often disguised to appear like ransomware, but in fact would leave the victim with no method to recover their data.

17.     It was further part of the conspiracy that the Conspirators would exfiltrate data from the targeted protected computers prior to disabling them, and would post that data, including personal information of individuals, for sale on the internet. The data was posted, in part, to sow concern among Ukraine citizens regarding the safety of their Government's systems and their personal data in advance of the Russian invasion of Ukraine.

## Overt Acts

### STIGAL Creates Conspirators' Accounts

18.     From on or about September 17, 2021, through on or about January 28, 2022, STIGAL created or caused to be created five accounts on Company 1's servers for the purpose of use in the Conspirators' attacks.  Company 1 was a messaging and VOIP platform located in the United States.

19.     From on or about September 17, 2021, through on or about January 18, 2022, STIGAL and other Conspirators caused more than 225 files, including numerous malware scripts to be uploaded to accounts on Company 1's servers, including accounts controlled by STIGAL.

Attack on Ukrainian Government Computer Systems

20.     On or about August 19, 2021, the Conspirators scanned more than 2,400 public facing Ukrainian Government websites for potential vulnerabilities, including Diia.gov.ua (DIIA), the website for a Ukrainian Government application that was built in partnership with the United States and allowed the Ukrainian people to connect with Ukrainian Government services and access Ukrainian Government documents.

21.     In January 2022, the Conspirators probed a variety of protected computer systems associated with the Ukrainian Government for potential vulnerabilities, including the State Treasury of Ukraine, Ukrainian Maritime Services, and Ukrainian Railways (uz.gov.ua).

22.     On or about January 13, 2022, the Conspirators attacked protected computers of at least two dozen Ukrainian Government networks, including the Ministry of International Affairs, the State Treasury, the Judiciary Administration, the State Portal for Digital Services (DIIA), the Ministry of Education and Science, the Ministry of Agriculture, the State Service for Food Safety and Consumer Protection, the Ministry of Energy, the Accounting Chamber for Ukraine, the State Emergency Service, the State Forestry Agency, and the Motor Insurance Bureau, using a malware program known as WhisperGate.

23.     The Conspirators infected the targeted protected computers associated with the Ukrainian Government networks with WhisperGate, which uses a two-stage malware program. The first stage wiped the Master Boot Record ("MBR") from the targeted computer.  The MBR allows an operating system to be loaded (booted) into a usable interface. Without an MBR, a computer is unable to restart or operate normally.

24.     The Conspirators also caused a ransom note to be placed on the targeted protected computer stating:

6

> Your hard drive has been corrupted. In case you want to recover all hard drives of your organization, You should pay us $10k via bitcoin wallet [address] and send message . . . with your organization name. We will contact you to give further instructions.

In truth, as described further below, although a ransom note was displayed, the data on the targeted computers was destroyed, and therefore not recoverable even if a ransom were paid.

25.     The Conspirators also caused the second stage of the malware to be activated. This stage contained a "GET" request to a URL maintained by Company 1. That request resulted in the downloading and execution of a program from an account on Company 1's servers that the Conspirators had created, that corrupted the files on the targeted protected computer, rendering the protected computer inoperable and entirely deleting data from the computer systems.

26.     In addition, on or about that same date, January 13, 2022, the Conspirators compromised protected computers hosting the DIIA website and other websites, and caused a message to be displayed in Polish, Russian, and Ukrainian reading: "Ukrainians! All information about you has become public, be afraid and expect the worst. This is for your past, present and future."

Release of Exfiltrated Information

27.     Within hours of the attack, on or about January 13, 2022, the Conspirators listed for sale data described as originating from the Ukrainian Government on forums across the darknet, using moniker "Free Civilian," including:

      a.  Criminal records obtained from Ukrainian Government systems.

      b.  Patient health data from Ukrainian Government systems; and

      c.  Motor Insurance Bureau information from Ukrainian Government systems.

28.     On that same day, the Conspirators also offered for sale on the internet data for 13.5 million users from Diia.gov.ua for $80,000.

Central European Country Infrastructure Attack

29.     In October 2022, the Conspirators probed computer networks associated with a Central European country's transportation sector.  The Central European country was a supporter of Ukraine and had delivered civilian and military aid to Ukraine following the Russian invasion of Ukraine in February 2022.

30.     As a result of the vulnerabilities discovered in the probing activities, the Conspirators gained access to protected computers associated with a Central European country's transportation section in or around October 2022.

Scanning of U.S. Government Assets in Maryland

31.     From on or about August 5, 2021, through on or about February 3, 2022, the Conspirators probed public-facing websites hosted by protected computers and unassigned servers maintained by a Government Agency located in Maryland, 63 times.  This probing used the same infrastructure that the Conspirators previously employed to conduct scanning against targets.

18 U.S.C. § 371

8

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to the Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 982 and 1030(i), and 21 U.S.C. § 853(p) in the event of the defendant's conviction on the offense charged in Count One of this Indictment.

2.      Upon conviction of the offense set forth in Count One, the defendant,

### AMIN STIGAL

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(B) and 1030(i), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such violation, and pursuant to 18 U.S.C. § 1030(i), any personal property that was used or intended to be used to commit or to facilitate the commission of such violation.

### Substitute Assets

3.      If any of the property described above, as a result of any act or omission of the defendant:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred, sold to, or deposited with a third party;

        c.   has been placed beyond the jurisdiction of the Court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

18 U.S.C. §§ 982, 1030(i)
21 U.S.C. § 853(p)

Erek L. Barron
United States Attorney

SIGNATURE REDACTED

Foreperson
Date: 6/25/24

10