```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      OAKLAND DIVISION

 4
     WHATSAPP INC. ET AL,              )   CV-19-7123-PJH
 5                                     )
                     PLAINTIFFS,       )   SAN JOSE, CALIFORNIA
 6                                     )
               VS.                     )   NOVEMBER 7, 2024
 7                                     )
     NSO GROUP TECHNOLOGIES LIMITED    )   PAGES 1-96
 8   ET AL,                            )
                                       )
 9                   DEFENDANTS.       )
                                       )
10   _____

11                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE PHYLLIS J. HAMILTON
12               UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    BY:  MICAH GALVIN BLOCK
                           DAVIS POLK AND WARDWELL LLP
15                         1600 EL CAMINO REAL
                           MENLO PARK, CA 94025
16

17   FOR THE PLAINTIFF:    BY:  GREG D ANDRES
                                LUCA E. MARZORATI
18                              GINA CORA
                                CRAIG CAGNEY
19                              ANTONIO J. PEREZ-MARQUES
                           DAVIS POLK & WARDWELL LLP
20                         450 LEXINGTON AVE
                           NEW YORK, NY 10017
21

22           APPEARANCES CONTINUED ON THE NEXT PAGE

23
     OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
24                               CERTIFICATE NUMBER 13185

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER
```

1    <u>APPEARANCES CONTINUED:</u>

2    FOR THE DEFENDANT:        **BY:  JOSEPH N. AKROTIRIANAKIS**
                                **AARON CRAIG**
3                               **MATTHEW NOLLER**
                                KING & SPALDING LLP
4                               633 WEST FIFTH STREET, SUITE 1700
                                LOS ANGELES, CA 90071

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN JOSE, CALIFORNIA              NOVEMBER 7, 2024

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 1:30 P.M.)

 4              THE CLERK:  CALLING CIVIL CASE 19-7123-PJH.

 5    WHATSAPP, INC, ET AL. VERSUS NSO GROUP TECHNOLOGIES, LIMITED,

 6    ET AL.

 7              PARTIES, PLEASE STEP FORWARD AND STATE YOUR APPEARANCES.

 8              MR. BLOCK:  GOOD AFTERNOON, YOUR HONOR.

 9         MICAH BLOCK FROM DAVIS POLK FOR PLAINTIFFS.  WITH ME ALSO

10    FROM DAVIS POLK, GREG ANDRES, GINA CORA.

11              THE COURT:  GOOD AFTERNOON.

12              MR. BLOCK:  LUCA MARZORATI.

13              THE COURT:  GOOD AFTERNOON.

14              MR. BLOCK:  ANTONIO PEREZ.

15              THE COURT:  GOOD AFTERNOON.

16              MR. BLOCK:  AND CRAIG CAGNEY.

17              THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

18         YOU ARE GOING TO BE ARGUING THE MOTION, MR. BLOCK?

19              MR. BLOCK:  WE HAVE SPLIT IT UP.

20              THE COURT:  THAT'S FINE.

21         OKAY.

22              MR. AKROTIRIANAKIS:  GOOD AFTERNOON, YOUR HONOR.

23         JOE AKROTIRIANAKIS ON BEHALF OF THE DEFENDANTS.  WITH MY

24    COLLEAGUES, MATTHEW NOLLER, AARON CRAIG.

25              THE COURT:  GOOD AFTERNOON.
```

1          MR. AKROTIRIANAKIS:  AND MATTHEW DAWSON.

2      WE LIKEWISE HAVE A DIVISION OF --

3          THE COURT:  THAT'S FINE WITH ME, ANYTHING YOU'D LIKE.

4      ALL RIGHT.  NOW THERE'S AN AWFUL LOT OF MATERIAL HERE.  WE

5  ARE NOT GOING TO GET TO EVERYTHING TODAY.  I HAVEN'T EVEN READ

6  ALL THE VARIOUS SEALING MOTIONS, AND I KNOW THERE ARE STILL SIX

7  OUTSTANDING DISCOVERY ISSUES WHICH I HAVEN'T READ CAREFULLY

8  ANYWAY, BUT I AM PREPARED TO ENTERTAIN ARGUMENT TODAY ON THE

9  SUMMARY JUDGEMENT MOTIONS AND THE SANCTIONS MOTION.

10      AND RATHER THAN LOOKING -- THEY ARE NOT EXACTLY

11  CROSS-MOTIONS BUT BOTH SIDES HAVE FILED MOTIONS, AND RATHER

12  THAN HAVE EACH SIDE ARGUE THEIR MOTION, IN VIEW OF THE

13  OVERLAPPING ISSUES, I WOULD LIKE TO DO IT ISSUE BY ISSUE AND

14  HAVE EACH SIDE WEIGH IN ON EACH ISSUE.

15      AND I HAVE DIVIDED THEM -- THE ISSUES INTO -- WE ARE GOING

16  TO START WITH THE JURISDICTIONAL ISSUES AND THEN WE WILL GO TO

17  THE MERITS AND LOOK AT THE CFAA AND THE CALIFORNIA EQUIVALENCE

18  AND THEN LOOK AT THE BREACH OF CONTRACT AND THEN WE WILL GO TO

19  THE SANCTIONS ISSUE.  THAT'S THE ORDER IN WHICH I WOULD LIKE TO

20  PROCEED.

21      NOW I KNOW THERE WAS A REQUEST TO SEAL THE PROCEEDINGS,

22  WHICH OBVIOUSLY YOU KNOW I DENIED.  AND I'M NOT PREPARED TO

23  ENTERTAIN ARGUMENT ON THE SEALING MOTIONS.  AS I HAVE

24  INDICATED, I HAVE NOT ACTUALLY READ THEM YET, BUT I WILL SAY

25  THAT HAVING READ THE BRIEFS, THE BRIEFS CONTAIN INFORMATION

1    THAT I WILL NOT SEAL.

2        I THINK BOTH SIDES HAVE ENGAGED IN OVER-SEALING, ALTHOUGH

3    I ASSUME THAT A LOT OF PLAINTIFF'S SEALING IS SIMPLY PURSUANT

4    TO THE PROTECTIVE ORDER, BUT MOST OF THE SEALING, AT LEAST ON

5    THE TWO SUMMARY JUDGEMENT MOTIONS, HAVE TO DO WITH TECHNICAL

6    INFORMATION AND THEY DON'T HAVE TO DEAL WITH THE RESTRICTION

7    ISSUES THAT GAVE RISE TO MY WILLINGNESS TO SEAL MUCH OF THE

8    PRETRIAL PROCEEDINGS.

9        AND GIVEN THE HEIGHTENED STANDARD THAT APPLIES ON A CASE

10   DISPOSITIVE MOTION SUCH AS THIS, I WILL JUST TELL YOU IN

11   ADVANCE, AND I DON'T KNOW HOW THIS IS GOING TO IMPACT WHAT YOU

12   ARE GOING TO SAY TODAY OR WHAT YOU ARE ULTIMATELY GOING TO WANT

13   TO DO, BUT WE HAVE A VERY STRONG PRESUMPTION IN OUR LOCAL RULES

14   AGAINST SEALING OF BRIEFS, AND I'VE READ THE HIGHLIGHTED

15   UNREDACTED BRIEFS AND ALMOST ALL OF IT IS, IN MY VIEW, IS NOT

16   SUBJECT TO BEING SEALED.

17       I KNOW THERE IS AN INTEREST IN NOT HAVING YOUR PRIVATE

18   BUSINESS INFORMATION ON THE PUBLIC RECORD, BUT THIS IS A PUBLIC

19   FORUM, AND I WILL JUST TELL YOU IN ADVANCE AND I DON'T KNOW

20   WHAT YOUR ULTIMATE RESPONSE WILL BE TO HAVING TO UNSEAL THE

21   BRIEFS, AND I HAVEN'T EVEN LOOKED AT THE -- NOT EVEN COUNTING

22   YET THE EXHIBITS AND THE DECLARATIONS, BECAUSE YOU ARE IN A

23   MUCH BETTER POSITION TO KNOW WITH UNSEALED BRIEFS, WHICH OF THE

24   DECLARATIONS AND EXHIBITS CAN ALSO BE UNSEALED, BUT THAT'S FOR

25   ANOTHER DISCUSSION OR FOR YOU ALL TO MEET AND CONFER AND TO

1   DECIDE HOW YOU WANT TO APPROACH IT, BUT I DID WANT YOU TO KNOW

2   BEFORE YOU START TALKING THAT THE BRIEFS ARE NOT GOING -- I'M

3   NOT GOING TO ALLOW THEM TO REMAIN UNDER SEAL.

4        ALL RIGHT.  SO IN TERMS OF THE ISSUES, WE ARE GOING TO

5   START FIRST WITH THE JURISDICTION ISSUE.  THE DEFENDANTS IN

6   THEIR MOTION FOR SUMMARY JUDGEMENT RAISED AGAIN, AND THEY ARE

7   CERTAINLY ABLE TO DO SO NOW, THAT THERE IS AN EVIDENTIARY

8   RECORD, THE ISSUE OF LACK OF PERSONAL JURISDICTION.

9        WHO IS GOING TO ARGUE THAT PART OF THE MOTION?

10           MR. NOLLER:  I AM, YOUR HONOR.

11           THE COURT:  OKAY.  AND YOUR LAST NAME IS NOLLER.

12   OKAY.  ALL RIGHT, MR. NOLLER.

13        YES, I WOULD LIKE YOU AT THE PODIUM WHEN YOU MAKE YOUR

14   ARGUMENTS FOR SURE.

15        ALL RIGHT.  MR. NOLLER, I DID NOTICE THAT IN YOUR -- LET'S

16   SEE -- I GUESS IT'S NOT IN THE MOTION FOR SUMMARY JUDGEMENT,

17   IT'S ACTUALLY IN THE SANCTIONS OPPOSITION THAT YOUR TEAM FILED

18   THAT YOU DIDN'T MENTION THESE FIVE ILL-CONCEIVED LAWSUITS THAT

19   WERE FILED AGAINST YOUR CLIENT.

20        AND YOU INDICATED THAT OF THE FOUR, THREE OF THOSE FOUR

21   WERE DISMISSED FOR LACK OF PERSONAL JURISDICTION AND ONE WAS

22   DISMISSED FOR LACK OF FORUM NON CONVENIENS, I THINK YOU SAID.

23        BUT I FOUND IT CURIOUS THAT YOU DIDN'T CITE THEM AS

24   PERSUASIVE AUTHORITY.  YOU ARE TRYING TO PERSUADE ME THAT

25   THERE'S NO JURISDICTION, BUT THOSE CASES OBVIOUSLY MUST NOT

1    APPLY OR CONTROL OR EVEN BE PERSUASIVE BECAUSE YOU DIDN'T EVEN

2    GIVE US THE CITATIONS.  WE FOUND A COUPLE OF CASES IN THIS

3    DISTRICT THAT YOU COULD BE REFERRING TO THAT WERE DISMISSED,

4    BECAUSE THE PLAINTIFF AS WELL AS THE DEFENDANT WAS NOT A

5    CITIZEN, BUT I CAN'T IMAGINE YOU WOULD BE CITING THOSE FOR THE

6    PROPOSITION THAT A U.S. PLAINTIFF -- CALIFORNIA-BASED U.S.

7    PLAINTIFF IS IN THE SAME POSITION AS A FOREIGN PLAINTIFF SUING

8    NSO.

9         SO IF YOU COULD START WITH TELLING ME WHAT THOSE CASES

10   HAVE TO DO WITH YOUR CASE AND TELL ME WHY YOU DIDN'T GIVE ME A

11   CITATION FOR THEM, IF I'M CORRECT, THAT IT'S THOSE CASES.

12            MR. NOLLER:  YES, YOUR HONOR.

13        SO I CAN START BY IDENTIFYING THOSE CASES FOR YOU AND

14   EXPLAINING WHAT THEY ARE AND WHAT THEY HOLD AND THEN EXPLAIN

15   WHY WE ARE NOT SPECIFICALLY RELYING ON THEM IN THE PERSONAL

16   JURISDICTION MOTION.

17        AND SO THOSE CASES ARE A CASE THAT WAS FILED BY A

18   GENTLEMAN NAMED CORALLO, CORALLO V. NSO IN THE NORTHERN

19   DISTRICT OF CALIFORNIA.  THAT CASE WAS DISMISSED FOR LACK OF

20   PERSONAL JURISDICTION.  MR. CORALLO WAS, AS YOU INDICATED

21   YOUR HONOR, A RESIDENT OF A FOREIGN COUNTRY.

22            THE COURT:  OKAY.

23            MR. NOLLER:  THE OTHER LAWSUIT THAT WAS FILED IN THE

24   NORTHERN DISTRICT OF CALIFORNIA WAS THE APPLE LAWSUIT, THE

25   LAWSUIT FILED BY APPLE AGAINST NSO.  THAT CASE, APPLE HAS MOVED

1    TO VOLUNTARILY DISMISS.  THAT MOTION IS STILL PENDING BEFORE

2    THE DISTRICT COURT, ALTHOUGH WE CERTAINLY EXPECT THE COURT TO

3    GRANT IT, TO SOME EXTENT, THE MOTION IS NOT OPPOSED.

4        AND IN OUR VIEW, APPLE IS MOVING TO DISMISS THAT CASE FOR

5    REASONS THAT OVERLAP WHAT SOME OF THE FORUM NON CONVENIENS

6    ARGUMENTS THAT WE RAISED IN THIS COURT AND THAT YOUR HONOR

7    REJECTED --

8            THE COURT:  WELL, I READ THE NEWSPAPER ARTICLES ABOUT

9    IT, AND ACTUALLY I DID READ THE MOTION THAT WAS FILED ON IT,

10    RIGHT.

11            MR. NOLLER:  THE OTHER CASE, YOUR HONOR, THAT WAS

12    FILED IN THE NORTHERN DISTRICT FOR JUDGE DONATO WAS DADA V.

13    NSO.  THAT CASE WAS FILED BY A COLLECTION OF PLAINTIFFS, SOME

14    OF WHOM ARE FOREIGN RESIDENTS, AT LEAST ONE OF WHOM IS A U.S.

15    RESIDENT BUT WAS NOT A UNITED STATES RESIDENT AT THE TIME OF

16    THE CONDUCT CHALLENGED IN THE COMPLAINT.  THAT CASE WAS

17    DISMISSED FOR FORUM NON CONVENIENS AS WELL.

18        AND THEN THERE IS A CASE THAT WAS FILED IN THE EASTERN

19    DISTRICT OF VIRGINIA, KHASHOGGI V. NSO.  THE PLAINTIFF IN THAT

20    CASE IS A U.S. RESIDENT, RESIDED IN VIRGINIA, SHE ALLEGES AT

21    THE TIME OF THE CONDUCT, THAT CASE WAS DISMISSED FOR LACK OF

22    PERSONAL JURISDICTION.

23        NOW THE REASON THAT WE DIDN'T RELY ON THOSE CASES IN OUR

24    PERSONAL JURISDICTION MOTION AS OPPOSED TO SORT OF MENTIONING

25    THEM AS CONTEXT IN THE SANCTIONS OPPOSITION IS THAT IN THE

```
1    SPECIFICS OF THE FACTS, THEY ARE DISTINGUISHABLE FROM THIS
2    CASE, AND WE THINK THAT THERE ARE STRONGER AUTHORITIES WITHIN
3    THE NINTH CIRCUIT, OTHER CASES THAT ARE MORE ON POINT TO WHAT
4    PLAINTIFF IS ALLEGING HERE, AND YOU KNOW, TO GO TOWARD
5    EXPLAINING WHY PLAINTIFF'S SPECIFIC ELECTIONS IN THIS CASE AND
6    SPECIFIC EVIDENCE IN THIS CASE IS NOT SUFFICIENT TO SUPPORT
7    PERSONAL JURISDICTION OVER NSO.
8              THE COURT:  OKAY.  ALL RIGHT.
9              MR. NOLLER:  SO WE WOULD BE HAPPY FOR YOUR HONOR TO
10   READ THOSE CASES, WE THINK THEY MAKE FOR GOOD READING, BUT I
11   WOULDN'T SUBMIT THAT THEY ARE DISPOSITIVE OF THE PERSONAL
12   JURISDICTION ISSUE IN THIS CASE.
13             THE COURT:  OKAY.
14   ALL RIGHT.  SO WHAT'S YOUR BEST ARGUMENT FOR -- IN SUPPORT
15   OF DISMISSAL OF THE CASE FOR LACK OF PERSONAL JURISDICTION?  I
16   KNOW YOU RAISE THE CONSENT ISSUE AS WELL AS THE TYPICAL
17   STANDARD THAT WOULD APPLY AS WELL.
18             MR. NOLLER:  THAT'S RIGHT, YOUR HONOR.
19   SO WE DIDN'T ADDRESS CONSENT AFFIRMATIVELY BECAUSE WE
20   UNDERSTOOD THIS COURT TO HAVE ALREADY RESOLVED THAT ISSUE IN
21   THE MOTION TO DISMISS ORDER.
22   PLAINTIFFS HAVE RAISED AN AMENDMENT TO THE TERMS OF
23   SERVICE IN THEIR OPPOSITION WHICH WE HAVE RESPONDED TO ON
24   REPLY.  I'M HAPPY TO START THERE IF YOUR HONOR WOULD LIKE ME
25   TO, OTHERWISE I WOULD START WITH THE TYPICAL STANDARD.
```

```
1              SO ON CONSENT, THIS COURT RULED --

2              THE COURT:  WELL I PREVIOUSLY RULED ON THAT, BUT

3    UNLIKE ONE OF THE OTHER ISSUES THAT GOES TO ACTUALLY THE

4    ELEMENT, AN ELEMENT OF THE CFAA ON WHICH I THINK I MADE A

5    FINDING THAT IT FAILED TO STATE A CLAIM, THIS IS A LITTLE

6    DIFFERENT, THIS IS JURISDICTION; ISN'T JURISDICTION SOMETHING

7    THAT CAN BE RAISED AT ANY TIME?

8              MR. NOLLER:  JURISDICTION CAN BE RAISED -- WELL,

9    PERSONAL JURISDICTION, AS LONG AS WE HAVE PRESERVED THE

10   DEFENSE, WHICH I THINK WE CLEARLY HAVE, CAN BE RAISED AT ANY

11   TIME.  I DON'T BELIEVE THAT PLAINTIFFS CAN CLAIM THAT

12   JURISDICTION HAS BEEN CREATED AT ANY PARTICULAR TIME.  THE LAW

13   IS QUITE CLEAR IN THE NINTH CIRCUIT AND THROUGHOUT.  OTHER

14   COURTS, THE PERSONAL JURISDICTION IS JUDGED AT THE TIME THE

15   LAWSUIT IS FILED.

16        AND SO WHEN YOU ARE LOOKING FOR THE CONTACTS OR THE

17   CONDUCT THAT IS RELEVANT TO WHETHER PERSONAL JURISDICTION

18   EXISTS, IT'S ONLY CONDUCT THAT PREDATES THE FILING OF THE

19   LAWSUIT.

20        AND THAT SAME RULE APPLIES IN THE CONTEXT OF CONSENT TO

21   JURISDICTION AS WELL, CITING CASES IN OUR REPLY TO THAT POINT,

22   AND PLAINTIFFS HAVEN'T CITED ANY CASE FROM ANY COURT IN THE

23   COUNTRY THAT ALLOWED A PLAINTIFF TO SUE UNDER A CONTRACT THAT

24   DOESN'T REQUIRE CONSENT TO JURISDICTION, AS THIS COURT HELD

25   ABOUT THE TERMS OF SERVICE THAT EXISTED AT THE RELEVANT TIME.
```

1    AMEND THAT COMPLAINT UNILATERALLY TO CHANGE THE FORUM SELECTION

2    CLAUSE, AND THEN SEEK TO APPLY THAT AMENDMENT RETROACTIVELY TO

3    A LAWSUIT THAT WAS FILED BEFORE THE AMENDMENT.

4         TO THE EXTENT THAT PARTIES HAVE ATTEMPTED SIMILAR THINGS

5    THROUGH AMENDING ARBITRATION CLAUSES, WHICH OF COURSE IS JUST A

6    KIND OF FORUM SELECTION CLAUSE, COURTS HAVE UNIVERSALLY

7    REJECTED THAT GAMBIT.

8         THE NINTH CIRCUIT CITED CASES TO THAT EFFECT IN ONE OF THE

9    CASES THAT WE CITED IN OUR PAPERS, THAT IS THE AL-SAFIN V.

10   CIRCUIT CITY STORES, SQUARELY REJECTED THE IDEA AND SAID THAT

11   NO COURT HAS HELD THAT A PARTY MAY UNILATERALLY AMEND THE

12   CONTRACT MIDWAY THROUGH LITIGATION CONCERNING THE CONTRACT.

13        AND ALTHOUGH THAT CASE SPECIFICALLY DID NOT INVOLVE THE

14   FORUM SELECTION CLAUSE, IT CITED CASES HOLDING -- ADDRESSING

15   WHETHER AN ARBITRATION AGREEMENT CAN BE AMENDED AFTER IT HAS

16   BEEN CHALLENGED DURING LITIGATION.  THE NINTH CIRCUIT

17   RECOGNIZED THAT COURTS HAVE UNIVERSALLY DECLINED TO PERMIT THE

18   AMENDMENT IN THOSE CIRCUMSTANCES.

19        AND SO WE WOULD SUBMIT THAT THAT'S EXACTLY THE CASE HERE,

20   PLAINTIFFS FILED THIS LAWSUIT IN 2019, YOUR HONOR ALREADY HELD

21   THAT THE TERMS OF SERVICE IN EFFECT IN 2019 DID NOT INVOLVE

22   CONSENT TO JURISDICTION IN CLAIMS BROUGHT BY WHATSAPP AGAINST

23   ITS USERS.  WHATSAPP HAS INDICATED IT MIGHT CHALLENGE THAT ON

24   APPEAL BUT IT'S NOT ASKING THIS COURT TO REVISIT THAT DECISION.

25   AND AFTER THE LAWSUIT WAS FILED, AN AMENDMENT TO THE TERMS OF

1    SERVICE CAN'T RETROACTIVELY CREATE JURISDICTION THAT DIDN'T

2    EXIST BEFORE.

3            THE COURT:  OKAY.

4            MR. NOLLER:  AND YOU KNOW, I THINK THE REASON,

5    YOUR HONOR, THAT THEY'VE RAISED THIS CONSENT ISSUE FIRST IN

6    THEIR OPPOSITION AND SOME OTHER ISSUES THAT THIS COURT ALREADY

7    ADDRESSED IS THAT THE REASON THIS COURT FOUND PERSONAL

8    JURISDICTION ON THE MOTIONS TO DISMISS WAS THAT IT READ THE

9    COMPLAINT TO ALLEGE THAT NSO HAD SPECIFICALLY SOUGHT OUT AND

10   TARGETED WHATSAPP'S PARTICULAR SERVERS IN CALIFORNIA AS OPPOSED

11   TO SERVERS IN SOME OTHER LOCATION.

12       AS I READ PLAINTIFF'S OPPOSITION, THEY ARE NOT REALLY

13   MAKING THAT ARGUMENT, AND THAT'S BECAUSE THE FACTS IN THE

14   RECORD DON'T SUPPORT IT.  THE UNDISPUTED RECORD SHOWS THAT IN

15   DESIGNING PEGASUS, ANYTHING INVOLVING PEGASUS, NSO DID NOT

16   SPECIFICALLY TARGET WHATSAPP SERVERS IN ANY PARTICULAR

17   LOCATION, MUCH LESS IN CALIFORNIA, THEY SIMPLY SENT MESSAGES

18   OVER WHATSAPP'S SERVERS IN THE SAME WAY THAT ANY OTHER MESSAGE

19   WOULD BE SENT OVER WHATSAPP SERVERS, AND THE DECISION AS TO

20   WHICH SERVER ANY PARTICULAR MESSAGE PASSED THROUGH WAS DUE

21   ENTIRELY TO WHATSAPP'S OWN UNILATERAL DECISIONS AND HOW IT

22   DESIGNED AND IMPLEMENTED ITS NETWORK INFRASTRUCTURE.

23       AND PLAINTIFFS AFFIRMATIVELY ARGUE ON PAGE 8 OF THEIR

24   OPPOSITION, THAT PEGASUS WOULD HAVE SENT MESSAGES OVER WHATSAPP

25   SERVERS, "NO MATTER WHERE THEY WORK."  NOW THAT PROVES THAT THE

1    LOCATION OF WHATSAPP'S SERVERS WAS IRRELEVANT TO ANYTHING NSO

2    IS ACCUSED TO HAVING DONE IN THIS CASE.

3        AND I THINK IT'S ALSO INTERESTING, IN RESPECT TO THIS

4    POINT, THAT AFTER ALLEGING OR SUGGESTING IN THEIR COMPLAINT

5    THAT NSO WAS SOMEHOW EXECUTING MALICIOUS CODE ON WHATSAPP'S

6    SERVERS OR HACKING INTO WHATSAPP'S SERVERS THROUGH MALICIOUS

7    CODE, NOW THAT'S NOT REALLY THEIR THEORY ANYMORE, THEIR THEORY

8    IS THAT NSO ALTERED THE WHATSAPP'S CLIENT IN A WAY THAT

9    PLAINTIFFS PROHIBITED AND THEN USED THAT ALTERED CLIENT TO SEND

10   MESSAGES THAT PASSED THROUGH WHATSAPP'S SERVERS, NO DIFFERENTLY

11   THAN ANY OTHER WHATSAPP'S MESSAGE.

12       NOW THE WAY THAT PLAINTIFFS HAVE DESCRIBED WHAT NSO DID

13   WITH RESPECT TO THE WHATSAPP CLIENT IS INACCURATE,

14   MR. AKROTIRIANAKIS WILL ADDRESS THAT IN CONNECTION WITH THE

15   CFAA CLAIM.  AND EVEN IF THEIR FACTUAL ASSERTIONS WERE CORRECT,

16   IT STILL WOULDN'T SUPPORT A CFAA CLAIM, BUT FOR PURPOSES OF

17   PERSONAL JURISDICTION, WHAT I THINK IS IMPORTANT IS THAT ALL OF

18   THAT CONDUCT THAT THEY DESCRIBE NSO AS HAVING ALLEGEDLY

19   INVOLVED IN, IN TERMS OF DESIGNING WHAT THEY CALL THE WIS

20   SERVER TO ALLEGEDLY CIRCUMVENT THE OFFICIAL WHATSAPP CLIENT TO

21   CREATE THESE MESSAGES THAT THEY CLAIM THE WHATSAPP CLIENT

22   COULDN'T HAVE SENT, ALL OF THAT WOULD HAVE HAPPENED ENTIRELY

23   OVERSEAS IN ISRAEL WITH NO CONSIDERATION OR EVEN INTERACTION

24   WITH WHATSAPP SERVERS IN ANY PARTICULAR LOCATION.

25       BY THE TIME THAT PEGASUS WAS DESIGNED AND SET UP TO SEND

1   THESE MESSAGES AND THE MESSAGE WAS SENT, AT THAT POINT IN TIME

2   EVERYONE AGREES THAT THE MESSAGE SIMPLY PASSED THROUGH WHATSAPP

3   SERVERS IN THE SAME WAY THAT ANY OTHER MESSAGE WOULD PASS

4   THROUGH WHATSAPP SERVERS ON THE WAY TO THE SENDER FROM THE

5   RECIPIENT.  SO IN THAT WAY, THE SERVER IN REALLY FUNCTIONED AS

6   NOTHING MORE THAN A TRANSMITTAL DEVICE, IN THE SAME WAY AS

7   SENDING A LETTER THROUGH THE MAIL.

8        AND SO FOR THE PURPOSES OF THAT USE OF THE SERVERS TO SEND

9   THESE MESSAGES WITH PEGASUS, THE LOCATION OF WHATSAPP SERVERS

10  WAS COMPLETELY IRRELEVANT, IT MADE NO DIFFERENCE TO HOW PEGASUS

11  WORKED, IT MADE NO DIFFERENCE AS TO WHAT NSO DID.

12       NSO'S CORPORATE DESIGNEE HAS TESTIFIED TO THAT EFFECT IN

13  HIS DEPOSITION THAT NSO DID NOT INVESTIGATE WHERE ANY OF

14  WHATSAPP'S SERVERS WERE, DIDN'T KNOW WHERE ANY OF WHATSAPP'S

15  SERVERS WERE, IT DIDN'T CARE WHERE WHATSAPP'S SERVERS WERE

16  BECAUSE IT MADE NO DIFFERENCE TO HOW PEGASUS WOULD FUNCTION.

17       AND SO BECAUSE PLAINTIFFS ARE UNABLE TO PROVE, AS THEY

18  ALLEGE, THAT NSO SPECIFICALLY TARGETED CALIFORNIA-BASED

19  SERVERS, THEY SORT OF PULL THIS SWITCH IN THE OPPOSITION WHERE

20  THEY NOW CLAIM THAT SPECIFIC JURISDICTION EXISTS, BECAUSE ONE,

21  NSO USED WHATSAPP SERVERS; AND TWO, SOME OF THOSE SERVERS

22  HAPPEN TO BE LOCATED IN CALIFORNIA.

23       BUT THAT IS JUST AN ATTEMPT TO REVIVE THE INDIVIDUALIZED

24  TARGETING THEORY OF PERSONAL JURISDICTION THAT THE

25  NINTH CIRCUIT APPLIED PRIOR TO WALDEN AND THAT THE SUPREME

1    COURT UNANIMOUSLY REJECTED IN WALDEN AND AS THE NINTH CIRCUIT

2    LATER RECOGNIZED IN AXIOM FOODS.

3        IN ORDER TO DEMONSTRATE PERSONAL JURISDICTION BASED ON THE

4    USE OF WHATSAPP SERVERS, IT'S NOT ENOUGH FOR PLAINTIFFS TO

5    ALLEGE OR PROVE THAT SOME OF THOSE SERVERS WERE IN CALIFORNIA.

6    AFTER WALDEN AND AXIOM FOODS, COURTS THROUGHOUT THE COUNTRY,

7    INCLUDING IN THE NINTH CIRCUIT, HAVE ADDRESSED SPECIFIC

8    JURISDICTION IN CFAA CLAIMS LIKE THIS, HAVE HELD THAT ACCESSING

9    A COMPUTER THAT JUST HAPPENS TO BE IN THE FORUM STATE IS NOT

10   ENOUGH TO SUPPORT SPECIFIC JURISDICTION, BECAUSE WHEN THAT IS

11   THE CASE, THE LOCATION OF THE SERVER IS ENTIRELY FORTUITOUS,

12   ENTIRELY DUE TO THE PLAINTIFF'S OWN ACTIVITIES AND MADE NO

13   DIFFERENCE TO THE DEFENDANT'S ACTIVITIES, AND THAT INCLUDES THE

14   NINTH CIRCUIT'S DECISION IN HUNGER STATION, WHICH HELD THAT THE

15   ALLEGED CONDUCT OF HACKING INTO A COMPUTER IN THE UNITED STATES

16   DID NOT SUPPORT JURISDICTION IN THE UNITED STATES BECAUSE THE

17   LOCATION OF THE SERVERS WAS FORTUITOUS.

18       MOST RECENTLY THE THIRD CIRCUIT HELD IN HASSON V.

19   FULLSTORY THAT A DEFENDANT WHO WAS ACCUSED OF INSTALLING

20   SPYWARE ON CONSUMERS' LAPTOPS IN THE UNITED STATES, THE

21   PLAINTIFF WAS A PENNSYLVANIA RESIDENT, ALLEGED THAT THE

22   DEFENDANT HAD INSTALLED SPYWARE ON HIS COMPUTER IN

23   PENNSYLVANIA.  THE THIRD CIRCUIT HELD THAT TRANSMITTING

24   COMPUTER CODE TO A BROWSER THAT HAPPENS TO BE IN PENNSYLVANIA

25   WAS NOT AN INTENTIONAL PHYSICAL ENTRY INTO THE FORUM SUFFICIENT

 1     TO ESTABLISH EXPRESS AIMING UNDER CALDER.  AND THAT WAS BECAUSE

 2     THE PLAINTIFF IN THAT CASE DID NOT ALLEGE THAT THE DEFENDANT

 3     "SPECIFICALLY SENDS THE CODE BECAUSE THE USER IS LOCATED IN

 4     PENNSYLVANIA."

 5          IT'S THE EXACT SAME SITUATION HERE.  WHATSAPP HASN'T

 6     ALLEGED AND THEY CAN'T PROVE THAT NSO TARGETED ANY PARTICULAR

 7     WHATSAPP SERVER BECAUSE OF WHERE THAT SERVER WAS.  THE LOCATION

 8     OF THE SERVER WAS COMPLETELY IRRELEVANT.

 9          AND I WOULD ALSO DIRECT THIS COURT TO THE NORTHERN

10     DISTRICT OF CALIFORNIA'S RECENT DECISION IN X CORP. V. CENTER

11     FOR COUNTERING DIGITAL HATE.  AGAIN, FOUND NO SPECIFIC

12     JURISDICTION WHERE THE DEFENDANT DID NOT "SPECIFICALLY SEEK OUT

13     ANY PARTICULAR SERVERS WITHIN THE FORUM."

14          (INAUDIBLE) CUTTER FROM THE CENTRAL DISTRICT OF CALIFORNIA

15     HELD THAT THE LOCATION OF THE SERVERS WAS RANDOM, FORTUITOUS

16     AND ATTENUATED TO THE DEFENDANT'S PURPORTED ACTIONS WHEN THEY

17     WERE SIMPLY TARGETING THE DEFENDANT'S SERVERS GENERALLY BUT NOT

18     TARGETING SPECIFIC SERVERS IN ANY PARTICULAR LOCATION.

19          AND THE CENTRAL DISTRICT'S DECISION IN KARP V. BUCHEM

20     WHERE THE PLAINTIFF ALLEGEDLY ACCESSED THE PLAINTIFF'S SERVER

21     AND THAT THE PLAINTIFF'S SERVER HAPPENED TO BE IN CALIFORNIA

22     WHERE IT HELD THAT THAT WAS THE EXACT KIND OF RANDOM,

23     FORTUITOUS OR ATTENUATED CONTACT THAT IS INSUFFICIENT TO

24     ESTABLISH PERSONAL JURISDICTION OVER A DEFENDANT.

25               THE COURT:  OKAY.

1          MR. NOLLER:  THANK YOU, YOUR HONOR.

2          MR. BLOCK:  YOUR HONOR, MICAH BLOCK FOR PLAINTIFFS.

3      SHALL I START WITH THE PURPOSEFUL DIRECTION OF THE SERVERS

4  OR THE CONSENT, YOUR HONOR?

5          THE COURT:  EITHER.  IT DOESN'T MATTER.

6          MR. BLOCK:  OKAY.  WELL LET ME START WITH THE

7  SERVERS.

8      AND I THINK THE POINT TO REMEMBER IS THAT THE FACTS THAT

9  YOUR HONOR FOUND IN THE DISMISSAL ORDER WERE SUFFICIENT FOR

10  PERSONAL JURISDICTION ARE EXACTLY AS ALLEGED, PROVED EXACTLY AS

11  WE ALLEGE THEM.  AND SO THE ARGUMENT THAT THOSE FACTS, AS WE

12  ALLEGE THEM, DO NOT SUFFICE FOR PERSONAL JURISDICTION, SIMPLY

13  SEEKS TO REVIVE THIS NEGOTIATION OF A FORTUITY, WHICH ARISES IN

14  CASES UNLIKE THIS ONE INVOLVING THIRD PARTY SERVERS.

15      SO LET ME BACK UP.  WHAT WE ALLEGED IN THE COMPLAINT WAS

16  THAT DEFENDANTS KNOWINGLY AND WITHOUT PERMISSION USED AND

17  CAUSED TO BE USED, WHATSAPP SIGNALLING SERVERS AND RELAY

18  SERVERS, INCLUDING SERVERS LOCATED IN CALIFORNIA.

19      YOU QUOTED THAT ALLEGATION, THAT ALLEGATION WAS TRUE, IT

20  IS TRUE, DISCOVERY CONFIRMED IT.

21      WE ALSO ALLEGED THAT THE WHATSAPP SIGNALLING SERVERS

22  FACILITATED THE INITIATION OF CALLS BETWEEN DEVICES USING THE

23  WHATSAPP'S SERVICES.  THAT'S TRUE AND UNDISPUTED.  AND WHAT THE

24  RECORD HAS SHOWN IS THAT NSO SOUGHT OUT WHATSAPP SERVERS AND

25  CONDUCTED WHAT YOUR HONOR AND COURTS IN THIS CIRCUIT HAVE

1   ANALOGIZED TO BREAKING AND ENTERING.

2        SO THIS IS AN INTENTIONAL TORT CASE.  AND IN ALL OF THE

3   CASES THAT LOOK AT THIS KIND OF ACCESSING OF BREAKING AND

4   ENTERING, THE LOCATION OF THE SERVER IS NOT A MERE FORTUITY AND

5   SUFFICES.

6        SO WHAT THESE PERPETRATORS DID WAS BREAK INTO WHATSAPP

7   SERVERS THAT ARE IN CALIFORNIA.  AND THAT SUFFICES FOR PERSONAL

8   JURISDICTION.  THE LINES OF CASES THAT TALK ABOUT A FORTUITY OF

9   LOCATION ARE GENERALLY CASES WHERE IT'S A THIRD PARTY SERVER.

10        SO YOU TALK ABOUT TRADEMARK INFRINGEMENT AND TRYING TO GET

11   PERSONAL JURISDICTION OVER THE ALLEGED INFRINGER BECAUSE THEIR

12   WEB SERVICES VENDOR HAPPENED TO USE A HOSTING SITE IN THE FORUM

13   JURISDICTION.  THAT'S NOT THE CASE HERE AT ALL.

14        AND SO IT MAY BE SO THAT NSO WOULD HAVE, AND IN FACT IT

15   DID, IN FACT DID ATTACK WHATSAPP'S SERVERS, NOT ONLY IN

16   CALIFORNIA BUT ALSO ELSEWHERE, BUT FOR THIS KIND OF A TORT

17   WHERE IT'S A BREAKING AND ENTERING, THE FACT THAT THEY -- AND

18   IT'S UNDISPUTED -- BROKE INTO SERVERS THAT ARE IN CALIFORNIA

19   SHOWS THE PURPOSEFUL DIRECTION OF THE ALLEGED CONDUCT AT THE

20   FORUM STATE.

21        THE COURT:  BUT NOT BECAUSE THEY WERE IN CALIFORNIA,

22   AS OPPOSING COUNSEL ARGUES.

23        MR. BLOCK:  WELL I'M NOT SURE HOW TO EXACTLY PARSE

24   THAT, YOUR HONOR.

25        IT'S NOT NECESSARILY TRUE THAT THEY DECIDED THE LOCATION

1    WAS IMPORTANT; HOWEVER THEY DECIDED IT WAS IMPORTANT TO GET

2    INTO THOSE SERVERS, THOSE SERVERS ARE IN CALIFORNIA.

3        SO IF YOU WANT TO STEAL SOMETHING FROM MY HOUSE BECAUSE

4    YOU KNOW I OWN IT, YOU MAY NOT CARE WHETHER MY HOUSE IS IN

5    OAKLAND OR IN WASHINGTON, D.C., BUT YOU CHOOSE MY HOUSE AND

6    THAT IS ENOUGH.

7        IT IS NOT ABOUT EXPRESS AIMING AT THE PLAINTIFF, IT'S NOT

8    ABOUT THEIR CONTACTS WITH WHATSAPP, IT'S ABOUT THEIR CONTACTS

9    WITH A WHATSAPP-OWNED SERVER WHICH IS THE SERVER THAT THEY

10   DECIDED TO HACK INTO.

11           THE COURT:  OKAY.

12           MR. BLOCK:  ON CONSENT, YOUR HONOR, TO GO BACK TO

13   THAT BEFORE I CONTINUE WITH THE REST OF THE PURPOSEFUL

14   DIRECTION, ONE THING IS CLEAR, IF THEY WERE TO STAND UP TODAY

15   AND SAY "WE CONSENT TO YOUR JURISDICTION," THEN THERE WOULD BE

16   NO PERSONAL JURISDICTION PROBLEM BASED ON A FACT THAT OCCURS

17   TODAY.  SO IT'S A WAIVABLE ISSUE.

18       SO I THINK IT PROVES TOO MUCH FOR THEM TO SAY THE LINE IS

19   DRAWN FINALLY AT THE MOMENT OF THE COMPLAINT AND YOU CAN LOOK

20   AT NOTHING ELSE.

21       AND I WOULD JUST CITE TO YOUR HONOR, FOR EXAMPLE, THE

22   CARDELL FINANCIAL CORPORATION CASE FROM SDNY, WHICH IS 2012

23   WL12932049, WHICH SAYS FOR PURPOSES OF JURISDICTION BASED ON

24   CONSENT, THERE IS NO CASE LAW THAT DEFINITIVELY SETS PARAMETERS

25   FOR THE RELEVANT PERIOD OF INQUIRY BUT IT IS CLEAR THAT FACTS

1         CONTEMPORANEOUS WITH THE COMMENCEMENT OF THE LITIGATION ARE

2         IMPORTANT.

3              SO WHAT WE HAVE WITH RESPECT TO CONSENT HERE IS NEW TERMS

4         OF SERVICE THAT CAME AFTER THE COMPLAINT BUT WHILE THE ALLEGED

5         CONDUCT WAS STILL ONGOING, AS DISCOVERY HAS REVEALED.

6              SO IT'S UNDISPUTED THAT THEY -- THAT THE NEW TERMS ARE

7         BILATERAL AND DO NOT HAVE THE SORT OF UNILATERAL ASPECT THAT

8         YOUR HONOR FOUND VITIATED CONSENT IN YOUR DISMISSAL ORDER,

9         WHICH IS TO SAY AT DISMISSAL, LOOKING AT THE OLD TERMS, YOU

10        FOUND A FORUM SELECTION CLAUSE THAT APPLIED ONLY TO CLAIMS THAT

11        USERS MAY HAVE AGAINST WHATSAPP, NOT THE CLAIMS THAT WHATSAPP

12        MAY HAVE AGAINST USERS.  IT'S UNDISPUTED THAT THE NEW TERMS PUT

13        IN PLACE SINCE THEN APPLY BOTH WAYS, THEY HAVE CAPTURED CLAIMS

14        LIKE THE ONES ASSERTED HERE.

15              THE COURT:  AND GIVE ME THE DATES THAT ARE INVOLVED

16        HERE?  WHEN DID THE NEW TERMS BECOME EFFECTIVE?

17              MR. BLOCK:  IN 2020, AND I HAVE THE EXACT DATES,

18        YOUR HONOR, GIVE ME A MOMENT.

19            (PAUSE IN PROCEEDINGS.)

20              MR. BLOCK:  WHATSAPP UPDATED ITS TERMS IN JANUARY OF

21        2020.  AND THEN IN FEBRUARY OF 2020, JUST AS ONE EXAMPLE, THIS

22        IS DOCKET NUMBER 62 ON YOUR DOCKET, NSO FILED A DECLARATION IN

23        CONNECTION WITH THE OLDER DISMISSAL BRIEFING TALKING ABOUT THE

24        NEW TERMS AND HOW THEY WERE DIFFERENT FROM THE OLD TERMS, WHICH

25        WERE THE ONLY TERMS WE HAD BEEN ABLE TO CITE AT THE TIME OF THE

1       ALLEGATION.

2           AND SO IT'S CLEAR THAT NSO WAS AWARE OF THE NEW TERMS, AND

3       IT'S NOW CLEAR ON DISCOVERY, I DON'T THINK IT'S DISPUTED, THEY

4       ADMITTED THAT THE CONDUCT THAT WE ALLEGED THEY WERE

5       UNDERTAKING, ATTACKS ON THE WHATSAPP'S SERVERS, CONTINUED PAST

6       THE COMPLAINT, WHICH IS AN ISSUE WE WILL GET INTO AND THROUGH,

7       UP AT LEAST UNTIL THE END OF THE DISCOVERY PERIOD AFTER WHICH

8       POINT THEY DIDN'T ANSWER QUESTIONS.  SO THERE WAS

9       POST-COMPLAINT ATTACKS.

10          SO WE KNOW THAT THEY WERE AWARE OF --

11              THE COURT:  ATTACKS AFTER MAY OF 2019?

12              MR. BLOCK:  HUNDRED PERCENT CORRECT, YOUR HONOR,

13      AFTER MAY OF 2020.  WE KNOW THAT THEY WERE AWARE OF THE

14      TERMS --

15              THE COURT:  MAY OF 2020, NOT 2019?

16              MR. BLOCK:  I'M SORRY, JANUARY OF 2020 IS WHEN THE

17      NEW TERMS CAME INTO PLACE.

18              THE COURT:  RIGHT.  AND THE ATTACKS THAT FORM THE

19      BASIS OF THIS COMPLAINT?

20              MR. BLOCK:  THE CORE DESCRIBED IN THE COMPLAINT IS

21      APRIL AND MAY OF 2019 AND DISCOVERY HAS REVEALED THAT AFTER,

22      AND THIS IS RELEVANT TO OTHER ISSUES WE WILL ARGUE TODAY, AFTER

23      THAT PARTICULAR ATTACK WAS BEATEN BACK, NSO CONTINUED TO ATTACK

24      WHATSAPP SERVERS IN A DIFFERENT WAY.

25              SO WE KNOW THAT WHEN NSO AGREED TO THE TERMS OF SERVICE BY

1    CREATING WHATSAPP ACCOUNTS, THEY AGREED TO BE BOUND BY

2    AMENDMENTS.

3         SO IF YOU LOOK AT THEIR PRE-JANUARY 2020 AGREEMENTS, THEY

4    WERE AGREEING TO BE BOUND BY AMENDMENTS BY CONTINUED USE OF THE

5    SERVICE.

6         THEN WE BELIEVE THAT THERE WERE POST-JANUARY 2020

7    ADDITIONAL AGREEMENTS TO THE SERVICE.  WE BELIEVE THAT IN PART

8    BECAUSE THEY ADMITTED THAT A CORE PART OF THEIR BUSINESS

9    OPERATIONS WAS TO RUN WHAT THEY CALL A WHITE SERVICES

10   DEPARTMENT WHICH WOULD GENERATE DOZENS AND DOZENS OF WHATSAPP

11   ACCOUNTS THAT THEY USE FOR PURPOSES OF THE ATTACKS AND THEY

12   ALSO ADMIT AND THE RECORDS SHOW THAT THEY USED WHATSAPP FOR

13   THEIR OWN INTERNAL BUSINESS PURPOSES.

14        ONE OF THE DISCOVERY DISPUTES WE HAVE BEFORE YOUR HONOR IS

15   THAT WE NEED -- THEY HAVE DESIGNATED A BUNCH OF PHONE NUMBERS

16   THAT ARE THEIR PHONE NUMBERS THAT WERE USED ON WHATSAPP'S

17   HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY, WE NEED TO BE ABLE TO

18   PROVIDE THOSE TO SOMEONE WHO CAN RUN THEM THROUGH OUR DATABASE

19   TO GET THE PRECISE DATES, BUT THE EVIDENCE THAT WE HAVE SHOWS

20   AT LEAST BY A PREPONDERANCE THAT THERE WERE NEW SIGNINGS ON,

21   NEW REGISTRATIONS AFTER THE JANUARY 2020 DATE OF THE NEW TERMS.

22   AND SO WE THINK THAT SUFFICES FOR CONSENT UNDER THAT FORUM

23   SELECTION CLAUSE.

24        ALL OF THAT CONTRACTING, YOUR HONOR, THE DOZENS AND DOZENS

25   AND DOZENS OF SIGNINGS ON TO WHATSAPP, OF CREATING WHATSAPP

1     ACCOUNTS, IS RELEVANT NOT ONLY TO CONSENT, BUT ALSO TO SHOW THE

2     EXTENT OF NSO'S CONTACTS WITH THE FORUM STATE.

3          SO WE HAVE NOT ONLY THEIR PURPOSEFUL DIRECTION OF THE

4     ATTACKS AS BREAKING AND ENTERING INTO CALIFORNIA-BASED SERVERS

5     BUT ALSO NSO PURPOSEFULLY AVAILING ITSELF OF THE PRIVILEGES OF

6     DOING BUSINESS IN CALIFORNIA.

7          WE'VE GOT COUNTS OF REGISTRATIONS THAT WE ARE AWARE OF

8     WHICH ARE IN THE DOZENS, BOTH FOR THEIR OWN BUSINESS PURPOSES

9     AND FOR USE WITH THE ATTACKS.

10          IN ADDITION, AND YOUR HONOR FOUND THIS FACT STANDING ALONE

11    INSUFFICIENT TO ESTABLISH PURPOSEFUL AVAILMENT AT THE DISMISSAL

12    STAGE, BUT WE HAVE THEIR EXTENSIVE CONTACTS WITH QUADRANET.

13    QUADRANET IS ONE OF THE SERVERS THEY USE TO DELIVER THE PEGASUS

14    AGENT.

15          NSO HAS SAID THAT THERE IS NO CONTRACT IN THE RECORD

16    LINKING NSO DIRECTLY TO QUADRANET, WHAT THE RECORD DOES SHOW IS

17    THAT THE WAY THEY OPERATED THEIR ATTACK WAS TO SET UP

18    ANONYMIZED VIRTUAL PRIVATE SERVER SERVICES THAT THEY USED IN

19    THEIR OWN DEMONSTRATIONS AND WITH THEIR CUSTOMERS, SO WE KNOW

20    THAT, AND WE KNOW THAT THEY HARD CODED THE IP ADDRESS OF THE

21    CALIFORNIA-BASED QUADRANET SERVER INTO THEIR MALICIOUS ATTACK

22    MESSAGES WHICH ONLY NSO COULD HAVE CREATED.

23          THEY ALSO TESTIFIED ABOUT HOW THEY USED THESE

24    ANONYMIZATION TOOLS, BITCOIN PAYMENTS THAT COULDN'T BE TRACED

25    BACK TO THEM, CREATING GMAIL ACCOUNTS, AND WHAT WE SEE WITH

1    QUADRANET IS A SUBLET TO AN MD CALLED GREEN CLOUD WHICH THEN IS

2    LINKED TO A GMAIL ACCOUNT AND BITCOIN PAYMENT.

3         SO AS YOU ARE AWARE, WE DO NOT HAVE ALL OF WHAT WE SOUGHT

4    IN DISCOVERY, BUT THAT ALONE, THE TESTIMONY THAT THIS IS HOW

5    THEY OPERATED, THE FACT THAT THEY USED THE QUADRANET IP ADDRESS

6    IN THE ATTACK PAYLOAD AND THE FACT THAT THEY -- WHICH MEANS IT

7    CAN ONLY HAVE BEEN THEM, REGARDLESS OF WHAT THE INTERMEDIARIES

8    BETWEEN THEM AND QUADRANET WERE, SHOW HOW INTEGRAL THAT

9    QUADRANET SERVER WAS, AT LEAST TO THE PORTION OF THE ATTACKS

10   THAT IT USED, AND I THINK WE COUNT MORE THAN 700 FROM THE LOGS

11   WE WERE ABLE TO SEE, JUST FROM THE LOGS THAT WE WERE ABLE TO

12   SEE.

13        SO THEIR EXTENSIVE CONTRACTING WITH WHATSAPP, THE

14   QUADRANET SERVER, AND THEN YOU ALSO HAVE NSO'S EXTENSIVE

15   MARKETING IN CALIFORNIA.

16        SO THROUGH WESTBRIDGE, WHICH HELD ITSELF OUT AS NSO'S

17   MARKETING ARM, THEY CONDUCTED DEMONSTRATIONS AND SOUGHT TO SELL

18   THIS EXACT TECHNOLOGY AT ISSUE IN THE CASE, AT LEAST IN

19   SAN DIEGO, IN SAN FRANCISCO, IN SAN BERNARDINO, IN LOS ANGELES,

20   THEY DEMONSTRATED IT TO THE FEDERAL BUREAU OF INVESTIGATION IN

21   LOS ANGELES IN CALIFORNIA.

22        NOW THEY HAVE SAID THAT NONE OF THAT CONDUCT IS

23   ATTRIBUTABLE TO THEM UNLESS THE U.S. MARKETING ARM IS AN ALTER

24   EGO.  I THINK THAT'S NOT RIGHT.  WHAT WE KNOW FROM THE

25   DISCOVERY RECORD IS THAT EVERY SINGLE ONE OF THOSE

1    DEMONSTRATIONS THAT THIS ENTITY WESTBRIDGE CONDUCTED WAS

2    SUPPORTED ON THE BACK END BY NSO.  NSO PROVIDED THE TECHNOLOGY,

3    SET UP THE REMOTE SERVERS THAT WERE USED IN THE DEMONSTRATION,

4    COMMUNICATED EXTENSIVELY WITH THE WESTBRIDGE PEOPLE ABOUT WHERE

5    THEY WERE GOING, WHETHER THEY WERE GOING TO CONDUCT A

6    DEMONSTRATION, WHICH VECTOR TO TEST, WHEN AND HOW, IN ORDER

7    THAT NSO, IT WAS ALWAYS NSO'S TECHNOLOGY, NEVER WESTBRIDGE'S,

8    NSO COULD PROVIDE THE TECHNOLOGY AND ENSURE IT WOULD FUNCTION

9    WHILE THE WESTBRIDGE PERSONNEL WERE THERE.  I BELIEVE THE

10   RECORD ALSO HAS NSO PERSONNEL COMING TO THE UNITED STATES TO

11   PARTICIPATE IN THOSE DEMONSTRATIONS.

12       I DON'T THINK IT CAN BE REASONABLY DISPUTED THAT THE

13   CLAIMS ARISE FROM NSO'S ACTIVITIES IN CALIFORNIA.  AS I

14   MENTIONED, THE LOG SHOWED AT LEAST 700 OF THE ATTACKS USED THIS

15   QUADRANET SERVER IN CALIFORNIA.

16       THERE IS AN ARGUMENT THAT THEY MAKE ABOUT THE

17   CALIFORNIA-BASED RELAY SERVERS AND THE CALIFORNIA PAYLOAD

18   SERVERS BEING SMALL IN PROPORTION TO THE ENORMOUS SCALE OF

19   THEIR ATTACKS, I DON'T THINK THAT ARGUMENT HAS PERSUASIVE VALUE

20   BECAUSE THE ATTACKS THAT INVOLVED CALIFORNIA ALONE WOULD BE

21   SUFFICIENT TO -- WOULD BE AND ARE SUFFICIENT TO ESTABLISH

22   GROUNDS FOR PERSONAL JURISDICTION HERE.

23       SO THE FACT THAT THEY MADE THOSE CONTACTS LOOK SMALL BY

24   ATTACKING AT GREAT SCALE ELSEWHERE IN ADDITION DOES NOT VITIATE

25   THE GROUNDS FOR PERSONAL JURISDICTION OF THEM BASED ON THEIR

1    CONTACTS HERE.

2         IT'S ALSO IMPORTANT, I THINK YOUR HONOR, THAT IF YOU DO

3    NOT FIND THAT THE CONTACTS WITH CALIFORNIA ARE SUFFICIENT,

4    THERE WILL BE 4(K)(2) JURISDICTION, NATIONWIDE JURISDICTION

5    UNDER RULE 4(K)(2).  THE ANALYSIS IS THE SAME, EXCEPT THAT NOW

6    WE LOOK AT CONNECTIONS THROUGHOUT THE UNITED STATES INSTEAD OF

7    ONLY WITH CALIFORNIA.  AND NOW ALL OF THE SIGNALLING SERVERS AT

8    THE RELEVANT TIMES WERE IN THE UNITED STATES.  AND TECHNICAL

9    JARGON NOW, YOUR HONOR, BUT THERE IS A DISTINCTION IN THE BRIEF

10   BETWEEN THE SIGNALLING SERVERS AND THE RELAY SERVERS BOTH OF

11   WHICH THE NSO ATTACKS, YOUR HONOR, UNDISPUTEDLY ACCESSED AS

12   PART OF THE ATTACKS THEY PERPETRATED.

13        SO WE THEN HAVE JUST, WESTBRIDGE IN ADDITION, MARKETED NOT

14   ONLY IN CALIFORNIA, BUT ALSO ELSEWHERE IN THE UNITED STATES.

15   4(K)(2) APPLIES IN A SITUATION WHERE THERE ARE INSUFFICIENT

16   CONTACTS WITH A SINGLE STATE BUT SUFFICIENT CONTACTS FOR THE

17   UNITED STATES AS A WHOLE.

18        THEY HAVE AN OPTION TO OPPOSE RULE 4(K)(2) JURISDICTION BY

19   SAYING -- BY IDENTIFYING ANOTHER DISTRICT IN WHICH THEY WOULD

20   BE SUBJECT TO PERSONAL JURISDICTION.  THEY HAVE NOT DONE THAT.

21   THEY HAD A COUPLE OF ARGUMENTS THAT SAID, IF YOU BELIEVE WE ARE

22   AN ALTER EGO TO WESTBRIDGE THEN WE CAN BE SUED WHERE WESTBRIDGE

23   RESIDES, THAT'S A DELAWARE CORPORATION.

24        SO YOU DON'T GET OUT OF RULE 4(K)(2) BY SAYING, ASSUME AN

25   ALTERNATIVE IN A HYPOTHETICAL WORLD, I MIGHT BE SUBJECT TO

```
 1        JURISDICTION ELSEWHERE.

 2                THE COURT:  OKAY.

 3            ALL RIGHT.  THANK YOU.

 4            BRIEF RESPONSE?

 5                MR. NOLLER:  YES.  THANK YOU, YOUR HONOR.

 6            I WOULD LIKE TO START WITH PURPOSEFUL DIRECTION, IF I

 7        COULD, BECAUSE I THINK YOU JUST HEARD COUNSEL FOR PLAINTIFFS

 8        AGREE THAT THEIR THEORY OF PERSONAL JURISDICTION IS EXACTLY

 9        WHAT I SAID IT WAS, WHICH IS THAT NSO ACCESSED WHATSAPP

10        SERVERS; AND TWO, SOME OF THOSE SERVERS HAPPENED, BECAUSE OF

11        WHATSAPP'S OWN UNILATERAL DECISIONS, TO BE LOCATED IN

12        CALIFORNIA.

13            THAT CASE AFTER CASE, INCLUDING IN THE CAFA CONTEXT,

14        INCLUDING CONTRARY TO COUNSEL'S STATEMENTS IN CASES WHERE THE

15        DEFENDANT WAS ACCUSED OF ACCESSING THE PLAINTIFF'S OWN

16        COMPUTERS, HAS HELD THAT ACCESSING A COMPUTER THAT HAPPENS TO

17        BE IN THE FORUM STATE IS NOT SUFFICIENT TO SHOW PURPOSEFUL

18        DIRECTION UNLESS THE CONDUCT WAS DIRECTED AT THAT COMPUTER

19        SPECIFICALLY BECAUSE IT WAS IN THE FORUM STATE.

20            YOU HEARD COUNSEL FOR PLAINTIFFS CONCEDE THAT THAT IS NOT

21        THE CASE HERE, SO WE WOULD SUBMIT THAT THAT IS SUFFICIENT.

22            AND I WOULD ALSO POINT OUT THAT ALL OF THE CASES I CITED

23        TO YOUR HONOR AT THE END OF MY PRESENTATION, NONE OF THOSE

24        CASES INVOLVED ACCESS TO THIRD PARTY SERVERS, THEY WERE ALL

25        CASES IN WHICH THE DEFENDANT WAS EITHER ACCUSED OF ACCESSING
```

```
1    THE PLAINTIFF'S OWN COMPUTER, OWN SERVER, OR IN THE HUNGER
2    STATION CASE, THE DEFENDANT WAS ACCUSED OF HACKING INTO, YES, A
3    THIRD PARTY SERVER, BUT IT WAS A SERVER THAT THE PLAINTIFF HAD
4    SPECIFICALLY RENTED TO STORE ITS OWN DATA, AND TARGETING A
5    THIRD PARTY SERVER BECAUSE IT CONTAINED THE PLAINTIFF'S DATA
6    WAS WHAT THE ALLEGATION IN THAT CASE WAS.
7         AND IN ALL OF THOSE CASES BECAUSE THE DEFENDANT DIDN'T
8    SPECIFICALLY TARGET ANY PARTICULAR SERVER IN ANY PARTICULAR
9    LOCATION, ALL THAT CAN SHOW IS INDIVIDUALIZED TARGETING TOWARD
10   THE PLAINTIFF AND NOT ANY FORUM-SPECIFIC CONTACTS WITH THE
11   FORUM.
12        COUNSEL ALSO MENTIONED WHATSAPP'S SIGNALLING SERVERS AS AN
13   IMPORTANT PART OF THEIR ALLEGATIONS IN THE COMPLAINT.  WELL
14   THEY CONCEDED NONE OF THE SIGNALLING SERVERS WERE IN
15   CALIFORNIA, SO THAT CAN'T HAVE ANY BEARING ON WHETHER THERE WAS
16   JURISDICTION IN CALIFORNIA.
17        WITH RESPECT TO THE RELAY SERVERS, AND I WILL ALSO
18   APOLOGIZE FOR GETTING INTO SOME OF THE TECHNICAL DETAILS, THERE
19   WERE THREE PEGASUS INSTALLATION VECTORS IN USE AT THE RELEVANT
20   TIME.  IN THE ORDER THAT THEY WERE USED THEY WERE HEAVEN, EDEN
21   AND AEROSET.  HEAVEN AND AEROSET MADE NO USE OF WHATSAPP'S
22   RELAY SERVERS, THE ONLY INSTALLATION VECTOR THAT SENT MESSAGES
23   OVER WHATSAPP RELAY SERVERS WAS EDEN.  AND THE UNDISPUTED
24   EVIDENCE IN THE RECORD PROVES THAT EDEN, WHEN IT WAS OPERATING,
25   DID NOT DO ANYTHING TO SELECT PARTICULAR WHATSAPP'S RELAY
```

1    SERVERS OR TO CONTROL WHICH WHATSAPP'S RELAY SERVER ANY MESSAGE

2    PASSED THROUGH MUCH.

3        THE WAY THAT IT WORKED WAS THAT NSO SET UP WHAT THEY HAVE

4    CALLED A THIRD PARTY SERVER, THE WIS SERVER.  WHAT THE WIS

5    SERVER WAS WAS EFFECTIVELY AN ANDROID ENVIRONMENT EQUIVALENT TO

6    AN ANDROID PHONE OR SOMETHING LIKE THAT.  NOW LIKE AN ANDROID

7    PHONE, THE WIS ANDROID ENVIRONMENT COULD HAVE THE OFFICIAL

8    WHATSAPP CLIENT INSTALLED ON IT AND IT COULD USE THE OFFICIAL

9    WHATSAPP CLIENT.

10       PEGASUS CREATED THE MESSAGES THAT IT SENT THROUGH THE WIS

11   SERVER AND THROUGH THE CONNECTION TO THE WHATSAPP CLIENT SENT

12   THOSE MESSAGES USING THE WHATSAPP CLIENT, USING THE WHATSAPP'S

13   CLIENT'S OWN ALGORITHMS FOR CHOOSING AND SELECTING RELAY

14   SERVERS.

15       AND THE WAY THAT THAT WORKED, AND AGAIN YOUR HONOR THIS IS

16   UNDISPUTED, IS THAT ANY TIME A WHATSAPP MESSAGE WAS SENT AND

17   PLAINTIFFS AND THEIR EXPERTS CONCEDE THAT THAT WORKED THE SAME

18   WAY WITH PEGASUS, THE WHATSAPP'S RELAY SIGNALLING SERVER WOULD

19   UNILATERALLY GENERATE A LIST OF FIVE IP ADDRESSES THAT WERE

20   ASSOCIATED WITH RELAY SERVERS LOCATED ANYWHERE OUT OF

21   WHATSAPP'S MORE THAN A HUNDRED RELAY SERVER FARMS ACROSS THE

22   ENTIRE WORLD.

23       THOSE FIVE IP ADDRESSES WERE UNILATERALLY SELECTED BY

24   WHATSAPP USING AN ALGORITHM THAT WHATSAPP DESIGNED TO SELECT

25   THOSE FIVE RELAY SERVERS BASED ON WHICH SERVERS HAD THE BEST

1    PERFORMANCE.

2         ONCE THAT LIST WAS GENERATED, THE WHATSAPP CLIENT WOULD

3    TEST THE PERFORMANCE OF EACH OF THOSE FIVE IP ADDRESSES, AGAIN

4    USING AN ALGORITHM THAT WHATSAPP DESIGNED TO FIGURE OUT WHICH

5    OF THOSE FIVE IP ADDRESSES HAD THE LOWEST LATENCY AND THE BEST

6    PERFORMANCE.

7         PEGASUS JUST USED THAT ALGORITHM.  IT SENT A MESSAGE OVER

8    WHATSAPP'S CLIENTS, USED WHATSAPP'S OWN ALGORITHM FOR CHOOSING

9    WHICH RELAY SERVER HAD THE BEST PERFORMANCE, HAD NOTHING TO DO

10   WITH THE SERVER'S LOCATION, NOTHING TO DO WITH WHERE THE SERVER

11   WAS.

12        AND THE AWS LOGS THAT THEIR EXPERT, MR. YOUSSEF HAS SORT

13   OF SELECTIVELY EXCERPTED IN HIS DECLARATION SHOW THIS HAPPENED.

14   THEY SHOW, AS MR. YOUSSEF HAS CONCEDED, PEGASUS RECEIVING THE

15   LIST OF FIVE IP ADDRESSES FROM THE WHATSAPP SIGNALLING SERVER.

16   THERE'S NO ARGUMENT THAT NSO HAD ANY INFLUENCE OVER THAT AND

17   NSO COULDN'T HAVE ANY INFLUENCE OVER THAT BECAUSE IT HAPPENS

18   PURELY ON THE WHATSAPP'S SIDE.

19        IT THEN SHOWS PEGASUS TESTING THE LATENCY OR PERFORMANCE

20   OF EACH OF THOSE FIVE IP ADDRESSES AND SELECTING THE ONE OF

21   THOSE IP ADDRESSES THAT HAD THE "BEST" PERFORMANCE.

22        NSO'S CORPORATE DESIGNEE ON THIS TESTIFIED TO THIS EFFECT.

23   HIS DECLARATION IS IN THIS COURT, HAVE MADE THIS CLEAR THAT

24   WHEN PEGASUS WAS SELECTING THE RELAY SERVERS THAT WAS USED, IT

25   WAS JUST USING WHATSAPP'S ALGORITHM FOR SELECTING THE RELAY

1    SERVERS WITH THE BEST PERFORMANCE.

2         SO THERE WAS NO CONDUCT BY NSO TO SELECT ANY PARTICULAR

3    WHATSAPP RELAY SERVER, ANY PARTICULAR WHATSAPP'S SIGNALLING

4    SERVER ANYWHERE IN THE WORLD, MUCH LESS IN CALIFORNIA

5    SPECIFICALLY.

6         AND FOR THAT REASON, THE SAME REASON WHY THERE IS NOT

7    JURISDICTION IN CALIFORNIA, THERE'S ALSO NOT JURISDICTION UNDER

8    4(K)(2) BECAUSE THERE'S NO EVIDENCE IN THE RECORD THAT NSO IS

9    SPECIFICALLY TARGETING ANY PARTICULAR WHATSAPP SERVER IN THE

10   UNITED STATES, IT WAS JUST SENDING A MESSAGE OVER WHATSAPP LIKE

11   ANYBODY ELSE, LIKE YOU OR I COULD SEND A MESSAGE OVER WHATSAPP

12   AND THAT MESSAGE HAPPENED TO PASS THROUGH WHATEVER SERVER

13   WHATSAPP DIRECTED THAT MESSAGE TO.

14        SO IF THEIR ARGUMENT FOR PERSONAL JURISDICTION HOLDS UP,

15   IT WOULD CREATE PERSONAL JURISDICTION IN CALIFORNIA OR WHEREVER

16   A MESSAGE HAPPENS TO PASS THROUGH ANY TIME ANY WHATSAPP USER

17   SENDS A MESSAGE ON WHATSAPP THAT WHATSAPP DIDN'T LIKE.

18        THEY COULD SAY THAT USER WAS USING WHATSAPP RELAY SERVERS

19   IN A WAY THAT WASN'T PERMITTED, THAT SERVER HAPPENED TO BE IN

20   WHATEVER LOCATION WHATSAPP DECIDED TO PUT IT AND THEY WOULD

21   CLAIM THAT WOULD BE TARGETING THAT SERVER.

22        THERE IS NO LAW TO SUPPORT THAT RESULT.  AND THAT INCLUDES

23   THE "BREAKING AND ENTERING CASES" THAT COUNSEL HAS CITED.

24        THE TWO CASES THAT THEY CITED IN THEIR OPPOSITION WERE

25   A -- 2022 WESTLAW 1304421, THAT WAS A DEFAULT JUDGMENT CASE, SO

1    THERE WAS NO EVIDENCE OR ARGUMENT SUBMITTED BY THE DEFENDANT.

2    BUT EVEN WITH THAT, PERSONAL JURISDICTION WAS EXERCISED IN THAT

3    CASE NOT JUST BECAUSE THE DEFENDANT ACCESSED A SERVER THAT

4    HAPPENED TO BE IN CALIFORNIA BUT BECAUSE THE COURT FOUND, AS

5    THIS COURT FOUND IN THE MOTION TO DISMISS ORDER, THAT THE

6    DEFENDANT SPECIFICALLY SOUGHT OUT CALIFORNIA SERVERS.

7         THE DEFENDANT IN THAT CASE HAD ALSO CREATED WEBSITES IN

8    CALIFORNIA THAT IT USED TO TARGET THE CALIFORNIA MARKET FOR ITS

9    PRODUCTS.  IT ALSO COMMITTED I.T. INFRINGEMENT THAT THE COURT

10   HELD WAS TARGETED AT CALIFORNIA.  SO THERE WERE MORE CONTACTS

11   THERE THAN JUST THIS SORT OF BREAKING AND ENTERING ANALOGY.

12   THE OTHER CASE THEY CITED FOR THIS, E3 INNOVATION, 2021 WESTLAW

13   5741442, HELD PERSONAL JURISDICTION DID NOT EXIST IN THAT CASE

14   BECAUSE THE PLAINTIFF HAD NOT TARGETED SERVERS IN THE FORUM

15   STATE.

16        AND I THINK THAT SORT OF GETS IT WHERE THE BREAKING AND

17   ENTERING ANALOGY KIND OF FALLS APART.  SO YOU MIGHT BE ABLE TO

18   USE THAT ANALOGY WHEN YOU ARE TALKING ABOUT THE SORT OF CONDUCT

19   THAT CAFA PROHIBITS, BUT IT DOESN'T WORK WHEN YOU ARE TALKING

20   ABOUT PERSONAL JURISDICTION BECAUSE IF I'M BREAKING AND

21   ENTERING INTO SOMEBODY'S HOUSE, I KNOW WHERE THAT HOUSE IS

22   BEFORE I GO THERE.  AND IN ORDER TO BREAK INTO THAT HOUSE, I

23   HAVE TO TRAVEL TO THE HOUSE.  AND WHEREVER I TRAVEL IS GOING TO

24   BE WHERE THE HOUSE IS AND I'M GOING TO BE IN THE STATE WHERE

25   THE HOUSE IS.  AND THERE'S NO WAY I CAN BREAK INTO A HOUSE OR A

1   BANK OR A PHYSICAL PROPERTY WITHOUT TARGETING THE SPECIFIC

2   LOCATION OF THAT BANK OR HOUSE.

3       IT DOESN'T WORK THAT WAY WITH SERVERS BECAUSE IF I SEND A

4   MESSAGE ON MY PHONE OVER A SERVER, IF I HIT A BUTTON ON MY

5   PHONE AND SEND A MESSAGE OVER WHATSAPP, I DON'T KNOW WHERE THAT

6   MESSAGE IS GOING.

7       AND THERE'S NO EVIDENCE THAT NSO DID EITHER.  THE BEST

8   THAT THEY CAN DO IS POINT TO SOME AFTER THE FACTS LOGGING THAT

9   ON THE WIS SERVER WHEN IT WAS BEING OPERATED BY NSO'S CUSTOMERS

10  AFTER A PARTICULAR USE OF PEGASUS, THE IP ADDRESSES THAT

11  WHATSAPP MADE AVAILABLE AFTER THE FACT WERE LOGGED.

12      BUT ALL THAT TELLS YOU IS THAT IN THIS PARTICULAR INSTANCE

13  IN THE PAST, WHATSAPP'S OWN ALGORITHM DECIDED ON THAT THESE

14  FIVE RELAY SERVERS HAD THE BEST PERFORMANCE AT THAT PARTICULAR

15  POINT IN TIME, AND OF THOSE FIVE RELAY SERVERS OF WHATSAPP'S

16  OWN ALGORITHM DECIDED ONE OF THOSE RELAY SERVERS HAD THE BEST

17  PERFORMANCE, AGAIN AT THAT PARTICULAR POINT IN TIME.

18      LEARNING THAT AFTER THE FACT, NSO HAD REVIEWED THAT

19  INFORMATION, AND THE EVIDENCE IS UNDISPUTED THAT IT DIDN'T, BUT

20  EVEN IF IT HAD, LEARNING WHERE WHATSAPP MADE PARTICULAR SERVERS

21  AVAILABLE IN ONE PARTICULAR INSTANCE AFTER THE FACT DOES NOT

22  SHOW THAT THEY WERE TARGETING THOSE PARTICULAR SERVERS IN THE

23  FUTURE BECAUSE THERE WOULD BE NO WAY FOR NSO TO KNOW IN ANY

24  PARTICULAR INSTANCE OF THE USE OF PEGASUS WHETHER WHATSAPP

25  WOULD MAKE THE SAME SERVICES AVAILABLE, WHETHER IT WOULD CHOOSE

1   THE SAME SERVERS BASED ON ITS OWN ALGORITHMS, OR WHETHER THE IP

2   ADDRESSES WHATSAPP CONTINUED TO MAKE AVAILABLE WOULD BE

3   ASSOCIATED WITH THE SAME SERVERS IN THE SAME LOCATIONS.

4          THE COURT:  OKAY.  LET'S WRAP THIS UP.

5          MR. NOLLER:  YES.  UNDERSTOOD, YOUR HONOR.

6      SO TURNING BRIEFLY TO PURPOSEFUL AVAILMENT AND THEN I WILL

7   FINISH WITH CONSENT.

8      SO I THINK IT'S IMPORTANT TO DISTINGUISH PURPOSEFUL

9   AVAILMENT FROM PURPOSEFUL DIRECTION BECAUSE THOSE TWO TESTS

10  APPLY IN DIFFERENT TYPES OF CASES.

11     SO PURPOSEFUL DIRECTION APPLIES IN TORT LIKE CASES, AS

12  THIS COURT HELD IN THE MOTION TO DISMISS ORDER, THAT THE

13  NINTH CIRCUIT HAS HELD IN HUNGERSTATION, THE CAFA CLAIM IN THIS

14  CASE, THE CADAFA CLAIM, THAT'S A PURPOSEFUL DIRECTION CLAIM,

15  THAT'S A TORT TYPE CLAIM.  THE PURPOSEFUL AVAILMENT ANALYSIS

16  APPLIES ONLY TO THE CONTRACT CLAIM.

17     AND SO AS THIS COURT RECOGNIZED IN THE MOTION TO DISMISS

18  ORDER, AN ORDER FOR CONTACTS WITH CALIFORNIA TO BE RELEVANT TO

19  PURPOSEFUL AVAILMENT, THEY HAVE TO HAVE A CONNECTION TO THE

20  TERMS OF SERVICE.  AND THIS COURT ALREADY HELD THAT THE MERE

21  CREATION OF WHATSAPP ACCOUNTS WOULDN'T SHOW PURPOSEFUL

22  AVAILMENT BECAUSE THERE WAS NOTHING ABOUT CALIFORNIA INVOLVED

23  IN THE NEGOTIATION OR PERFORMANCE OF THOSE CONTRACTS.

24     THE OTHER EVIDENCE THAT THEY HAVE CITED FOR PURPOSEFUL

25  AVAILMENT, THE QUADRANET SERVER AND WESTBRIDGE'S MARKETING HAD

1    NOTHING TO DO WITH THE TERMS OF SERVICE.  THIS COURT FOUND THAT

2    EXACT SAME THING IN THE MOTION TO DISMISS ORDER.

3        THE QUADRANET SERVER, EVEN IF THEY COULD PROVE THAT NSO

4    KNEW WHERE THAT SERVER WAS OR HAD LEASED IT, BY THE TIME THAT

5    THE QUADRANET SERVER WAS USED, IT WAS USED IN A STEP AFTER THE

6    PROCESS AFTER WHATSAPP SERVERS WERE NO LONGER PART OF THE FLOW

7    OF DATA.

8        SO THE WAY THAT IT WORKS IS THE PEGASUS MESSAGE WOULD BE

9    TRANSMITTED OVER THE WHATSAPP SERVER, THAT WOULD TRIGGER THE

10   CONNECTION ON THE TARGET USER'S DEVICE TO A THIRD PARTY SERVER.

11   ONCE THE TARGET DEVICE WAS CONNECTED TO THE THIRD PARTY SERVER,

12   NOTHING ELSE WAS TRANSMITTED OVER THE WHATSAPP'S DEVICES, SO

13   THERE'S NO CONNECTION BETWEEN THE THIRD PARTY SERVER AND THE

14   WHATSAPP SERVERS OR THE TERMS OF SERVICE.

15       IT'S ALSO UNANIMOUSLY HELD, EVERY COURT TO HAVE ADDRESSED

16   THE QUESTION HAS HELD, THEY CITED NO CASE TO THE CONTRARY, THAT

17   THE USE OF A THIRD PARTY SERVER IN THE FORUM STATE CANNOT SHOW

18   PURPOSEFUL DIRECTION WITHOUT SOME EVIDENCE THAT THE DEFENDANT

19   CONTROLLED THE LOCATION OF THAT SERVER.

20       AND ALTHOUGH THEY HAVE ARGUED THAT THEY CAN SORT OF

21   SPECULATE FROM CONTACTS THAT NSO MUST HAVE LEASED THIS SERVER,

22   THEY HAVE NO EVIDENCE AND THEY DON'T CLAIM THAT THEY HAVE ANY

23   EVIDENCE THAT NSO CHOSE TO PLACE THAT SERVER IN CALIFORNIA,

24   PICKED THAT SERVER BECAUSE IT WAS IN CALIFORNIA.  THEY HAVE NO

25   EVIDENCE SUGGESTING THAT IT WAS ANYTHING OTHER THAN QUADRANET'S

1    OWN UNILATERAL DECISION TO PUT THAT SERVER IN CALIFORNIA.

2         ON WESTBRIDGE'S MARKETING POINT, AGAIN FOR PURPOSES OF

3    PURPOSEFUL AVAILMENT, THAT HAS NOTHING TO DO WITH WHATSAPP'S

4    TERMS OF SERVICE.

5         THE MORE CORE PROBLEM THOUGH IS THAT IT IS NOW CLEAR AFTER

6    WILLIAMS THAT IN ORDER TO EXERCISE PERSONAL JURISDICTION OVER A

7    MARKETING COMPANY THAT'S MARKETING ANOTHER COMPANY'S GOODS, YOU

8    HAVE TO SHOW AT A MINIMUM THAT THE DEFENDANT SUBSTANTIALLY

9    CONTROLLED OR ACTIVELY DIRECTED THE MARKETING.

10        EVERY WITNESS IN THIS CASE RELEVANT TO WEST VIRGINIA NSO,

11   TERRY DIVITTORIO, JOSH SHANER, YARON SHOHAT, THEY ALL

12   TESTIFIED, MR. SHOHAT SUBMITTED A DECLARATION, ALL SAYING

13   UNEQUIVOCALLY, NSO DID NOT CONTROL OR DIRECT WHAT WESTBRIDGE

14   DID IN ITS MARKETING, DID NOT TELL WESTBRIDGE TO MARKET TO ANY

15   PARTICULAR LOCATION, TO MARKET TO ANY PARTICULAR CUSTOMERS OR

16   IN ANY PARTICULAR WAY, ALL OF THOSE DECISIONS WERE UP TO

17   WHATSAPP.

18        AND IN FACT, MR. SHOHAT TESTIFIED THAT HE DIDN'T EVEN

19   KNOW, NSO WAS NOT INFORMED WHICH CUSTOMERS WESTBRIDGE GOING TO

20   BE MARKETING TO OR WHERE.  THE EVIDENCE THAT PLAINTIFFS CITED

21   IN THIS RESPECT SHOWS ONLY THAT NSO MADE SOME OF ITS

22   INFRASTRUCTURE AVAILABLE SO THAT WESTBRIDGE COULD MARKET ITS

23   TECHNOLOGY AND PROVIDED SOME INPUT AND ASSISTANCE IN SOME OF

24   THESE MARKETING EFFORTS.

25        BUT THE CASE LAW IS ABSOLUTELY CLEAR THAT THAT SORT OF

1    ASSISTANCE, IT'S EXACTLY WHAT YOU WOULD EXPECT FROM ANY COMPANY

2    WORKING WITH A MARKETING COMPANY TO SELL ITS GOODS IN A FORUM.

3    AND THAT SORT OF ASSISTANCE, MERE KNOWLEDGE THAT THE MARKETING

4    WAS HAPPENING DOES NOT CONSTITUTE SUBSTANTIAL CONTROL OR ACTIVE

5    DIRECTION OF THE MARKETING.

6         AND THEN TO CONCLUDE ON CONSENT QUICKLY, YOUR HONOR, YOU

7    KNOW, COUNSEL CONCEDED THAT EVERYTHING RELEVANT TO THEIR

8    CONSENT ARGUMENT OCCURRED AFTER THEY FILED THE COMPLAINT IN

9    MAY 2019.

10         THERE IS NO CASE ANYWHERE IN THE COUNTRY HOLDING THAT

11   PERSONAL JURISDICTION CAN BE BASED ON SUCH POST-COMPLAINT

12   CONDUCT.  THE ONE CASE THAT THEY MENTIONED FROM THE SOUTHERN

13   DISTRICT OF NEW YORK WHICH WE ACTUALLY CITED IN OUR REPLY FOUND

14   IT WAS "WELL SETTLED THAT PERSONAL JURISDICTION HAS TO BE BASED

15   ON CONDUCT AT THE TIME THE ACTION IS FILED."

16         IT THEN APPLIED THAT RULE TO THE CONSENT CONTEXT AND IT

17   WAS IN THAT CONTEXT THAT THE COURT FOUND THAT ACTIONS

18   CONTEMPORANEOUS WITH OR YEARS PRIOR TO THE FILING OF THE

19   LAWSUIT COULD BE RELEVANT TO CONSENT.  IT DID NOT HOLD AND IT

20   DID NOT CONSIDER THE CONDUCT AFTER THE FILING OF THE COMPLAINT

21   COULD BE RELEVANT TO CONSENT.

22         THE COURT:  OKAY.  YOU HAVE TO WRAP IT UP.  IT'S

23   ALMOST AN HOUR AND WE ARE ONLY ON THE FIRST ISSUE.

24         MR. NOLLER:  I UNDERSTAND, YOUR HONOR, IF I COULD SAY

25   ONE THING VERY BRIEFLY BECAUSE COUNSEL BROUGHT IT UP.

1       THEY HAVE NO EVIDENCE THAT THEY EVER NOTIFIED NSO OF THE

2   2020 AMENDMENTS, THEY RELY ONLY ON COUNSEL'S KNOWLEDGE OF THAT

3   AMENDMENT.  BUT OF COURSE CALIFORNIA LAW GOVERNS THIS, AND IT'S

4   ABSOLUTELY CLEAR UNDER CALIFORNIA LAW, THE CALIFORNIA COURT OF

5   APPEALS HELD THIS IN THE COSTA DECISION, THAT COUNSEL'S

6   KNOWLEDGE OF THE AGREEMENT CANNOT BE ATTRIBUTED TO THE CLIENT

7   FOR PURPOSES OF THE CONTRACT FORMATION.  THE COSTA COURT HELD

8   THAT IN THE CONTEXT OF AN ARBITRATION CLAUSE, WHICH AGAIN IS

9   JUST A KIND OF FORUM SELECTION CLAUSE.

10      SO THERE IS JUST NO BASIS TO COUNSEL'S KNOWLEDGE OF THE

11  AMENDMENT TO NSO.  AND WITHOUT THAT, THEY HAVE NO EVIDENCE THAT

12  NSO EVER RECEIVED NOTICE OF THE AMENDMENT OR AGREED TO IT WHICH

13  IS THEIR BURDEN TO PROVE UNDER THE NINTH CIRCUIT'S DECISION IN

14  JACKSON V. AMAZON.

15          THE COURT:  OKAY.  THANK YOU.

16          MR. BLOCK:  YOUR HONOR, I KNOW YOU WANT TO MOVE ON,

17  IT'S JUST, MAY I --

18          THE COURT:  WELL, YOU DIDN'T RAISE JURISDICTION IN

19  YOUR MOTION YOU SIMPLY ON OPPOSED THEIRS.  THEY HAVE THE BURDEN

20  ON IT, SO TYPICALLY THEY GET THE LAST WORD ON THE ISSUE.

21          MR. BLOCK:  VERY WELL, YOUR HONOR.

22          THE COURT:  OKAY.  LET'S MOVE ON TO THE MERITS.

23      I DON'T USE THE TERM CFAA BECAUSE I USE THAT TO APPLY TO

24  CAFA, BUT ANYWAY, THE CFAA CAUSE OF ACTION, WHO IS GOING TO

25  ARGUE THAT?

```
1              MR. BLOCK:  IT WILL BE ME FOR PLAINTIFFS, YOUR HONOR.

2              THE COURT:  OKAY.  YOU CAN GO FIRST.

3              MR. BLOCK:  AND FOR THE REPORTER'S BENEFIT, THIS IS

4       MICAH BLOCK FOR PLAINTIFFS.

5              SO YOUR HONOR, WE HAVE A NUMBER OF DIFFERENT SUBSECTIONS

6       AT ISSUE FOR THE CFAA, AND I JUST WANT TO START BY SAYING AS A

7       FORMAL MATTER, WHAT WE PLED WAS A VIOLATION OF SECTION 1030.

8       YOUR HONOR EVALUATED A COUPLE OF DIFFERENT THEORIES OF

9       LIABILITY UNDER SECTION 1030 AT THE DISMISSAL STAGE, BUT

10      YOUR HONOR DID NOT DISMISS THE SECTION 1030 CLAIM.

11             AND SO I THINK AS A FORMAL MATTER, ALL OF THOSE THEORIES

12      OF LIABILITY REMAIN ALIVE AND IN THE CASE, AND THAT'S

13      CONSISTENT WITH THE WAY THE PARTIES HAVE LITIGATED THE CASE.

14             SO I WOULD POINT, JUST AS AN EXAMPLE, TO DOCKET 163 AT

15      PAGE 8 WHICH IS THE JOINT CASE MANAGEMENT STATEMENT AFTER -- I

16      BELIEVE THAT'S 2023, AFTER THE CASE WAS REVIVED AFTER THE

17      APPEAL.  WE SET OUT VERY CLEARLY ALL OF THE SUBSECTIONS THAT WE

18      INTEND TO PURSUE AT THAT TIME.  WE TOOK DISCOVERY ON THEM.  SO

19      EVERYBODY HAS KNOWN POST-DISMISSAL, THROUGHOUT DISCOVERY IN THE

20      CASE THAT WE WOULD BE PROCEEDING ON EACH OF THE SUBSECTIONS

21      THAT WE HAVE NOW RAISED IN OUR BRIEF.

22             LET ME START WITH INTENTIONAL ACCESS.  SO 1030(A)(2)(C)

23      IS INTENTIONALLY ACCESSING AND OBTAINING INFORMATION FROM ANY

24      PROTECTED COMPUTER.  1030(A)(4) IS ACCESSING A PROTECTED

25      COMPUTER WITH INTENT TO DEFRAUD.  AND THEN WE HAVE 1030(A)(6)
```

1        AND 1030(B), THE PASSWORD LOCK INFORMATION CONSPIRACY THEORY.

2            AND SO FOR 1030(A)(2)(C) AND 1030(A)(4), LET'S TALK ABOUT

3        NSO'S INTENTIONAL ACCESS, INTENTIONALLY ACCESSING WHATSAPP'S

4        SERVERS AND TARGET DEVICES.

5            AGAIN, I THINK ALTHOUGH I WOULD QUIBBLE WITH SOME OF THE

6        WAYS THAT NSO COUNSEL DESCRIBED THEIR ATTACK, THE FUNDAMENTAL

7        CONTOURS OF WHAT NSO DID ARE VERY WELL UNDERSTOOD SUBJECT TO

8        SOME LIMITATIONS IMPOSED BY THEIR REFUSAL TO GIVE US THE ACTUAL

9        CODE, FOR EXAMPLE FOR THE WIS.  BUT FROM WHAT WE HAVE BEEN ABLE

10       TO OBSERVE, EVERYTHING WE OBSERVED, EVERYTHING OUR EXPERTS

11       DESCRIBED IS ESSENTIALLY CONCEDED.

12           AND I WOULD POINT YOU, IF I COULD GIVE JUST ONE PIECE OF

13       EVIDENCE TO THE GAZNELI DEPOSITION, YOUR HONOR, MR. GAZNELI IS

14       THEIR CORPORATE REPRESENTATIVE, I BELIEVE HIS TITLE WAS HEAD OF

15       R&D, IN ANY EVENT, HE'S AN ENGINEER AND HE DESCRIBED THE

16       OPERATION OF THE ATTACKS, AND WE RELY EXTENSIVELY ON HIS

17       DEPOSITION TESTIMONY AND CITE THOSE ADMISSIONS OF NSO ON HIS

18       BEHALF.  HE TESTIFIED AS A REPRESENTATIVE THROUGHOUT THE BRIEF.

19           NSO BUILT THIS CUSTOM SOFTWARE THAT THEY CALLED THE

20       WHATSAPP INSTALLATION SERVICE OR WIS.  IT'S UNDISPUTED THAT

21       THAT SOFTWARE AT LEAST CREATED AND WAS NECESSARY FOR THE

22       SENDING OF THE MALFORM'S MESSAGES THAT THEY USED IN THE

23       ATTACKS.

24           MR. GAZNELI IN A REPLY DECLARATION, AFTER HAVING SAID AT

25       HIS DEPOSITION THAT ONLY THE WIS COULD SEND MESSAGES AND THAT

1    THE OFFICIAL CLIENT COULD NOT, HE SAID ACTUALLY, OH, WE USED

2    THE OFFICIAL CLIENT TO SEND THEM.

3         HARD TO KNOW WHAT TO MAKE OF THAT, YOUR HONOR, I DON'T

4    THINK IT NEEDS TO BE CREDITED AT ALL GIVEN WHAT HE ADMITTED IN

5    HIS DEPOSITION, BUT EVEN IF YOU WERE TO TAKE IT AT ITS FACE, HE

6    DOESN'T REFUTE ANY OF THE TESTIMONY HE GIVES THAT THESE ARE

7    MESSAGES THAT THE OFFICIAL CLIENT COULD NOT HAVE SENT.

8         YOU OR I COULDN'T PICK UP A WHATSAPP'S APPLICATION ON A

9    PHONE AND SEND THESE MESSAGES, THE WIS CREATED THEM, MUST HAVE

10   BEEN INVOLVED IN SENDING THEM.  HE TESTIFIED AT DEPOSITION THAT

11   THE WIS DID SEND THEM.  IN ANY EVENT, IT MUST HAVE BEEN

12   INVOLVED AT A MINIMUM.  AND I THINK THE UNDISPUTED RECORD BASED

13   ON HIS ADMISSIONS IS THAT'S THE WAY THEY SENT THEM.

14        THESE MESSAGES WERE SENT TO WHATSAPP SERVERS.  AND SO YOU

15   HAVE SIGNALLING SERVERS AND RELAY SERVERS, THE MESSAGES WERE

16   SENT THROUGH SIGNALLING SERVERS, THEY WERE SENT TO TARGET

17   DEVICES.

18        IT'S A LITTLE BIT COMPLICATED THE WAY THAT THEY USED THIS

19   SOPHISTICATED TECHNOLOGY TO CREATE CALLS, MAKE GROUP CALLS, RUN

20   MULTIPLE MESSAGES IN A SHORT AMOUNT OF TIME TO OVERRIDE REGULAR

21   SERVER BEHAVIOR.  THE DETAILS ARE NOT THAT IMPORTANT BECAUSE

22   IT'S UNDISPUTED THEY USED THESE MESSAGES TO ACCESS WHATSAPP

23   SERVERS.  THEY ACCESSED THE SIGNALING SERVERS BY SENDING THE

24   MESSAGES INTO THEM.  THEY USED THEIR SOFTWARE TO CREATE CONTENT

25   IN AN OTHERWISE UNUSED PROTOCOL THAT NOBODY IN THE WHATSAPP

1    NETWORK ECOSYSTEM COULD USE.

2        SO IT WAS NOT POSSIBLE FOR A USER TO SET A VALUE OF THE,

3    FOR EXAMPLE THERE IS A TECHNICAL FIELD CALLED CONNECTING TONE

4    DESK, CONNECTING TONE DESCRIPTION, THEY FOUND THIS DIFFUSED

5    FIELD, FIGURED OUT A WAY TO INJECT MESSAGES INTO THAT, THAT

6    INCLUDED MALICIOUS CODE THAT WOULD END UP ON A TARGET DEVICE

7    AND ACCESSED THE WHATSAPP SERVERS SENDING THAT INTO THEM.

8        AND THEY GOT THAT MESSAGE INTO THE MEMORY OF TARGET

9    DEVICES THROUGHOUT WHATSAPP APPLICATION ON THE TARGET DEVICE

10   PHONE.  SO THERE IS I THINK NO QUESTION THAT THERE WAS

11   INTENTIONAL ACCESS OF SERVERS AND TARGET DEVICES.

12       MR. GAZNELI ADMITTED EVERY TRANSMISSION FOR THE PEGASUS

13   INSTALLATION HAD TO BE TRANSMITTED THROUGH THE WHATSAPP

14   SERVERS, THAT'S AT PAGE 184.  "NSO ADMITS THAT IT DESIGNED THE

15   INSTALLATION VECTOR USED IN THE 2019 ATTACKS TO USE THE

16   WHATSAPP'S RELAY SERVERS, CIRCUMVENTING A 2018 SECURITY UPGRADE

17   IS THAT HAD BEATEN BACK ONE OF THEIR EARLIER ATTACKS.

18       THEY USED THE CALIFORNIA RELAY SERVERS AT LEAST 176 TIMES

19   IN MAY 2019 ALONE, AND OF COURSE WE CAN ONLY COUNT FROM WHAT WE

20   ARE ABLE TO LOG AND WE DON'T HAVE A FULL RECORD OF THE

21   ACTIVITY.

22       AS TO THOSE DEVICES --

23           THE COURT:  LET ME JUST MAKE SURE I UNDERSTAND.

24       YOUR ARGUMENT IS THAT THE INTENT TO ACCESS APPLIES TO THE

25   WHATSAPP SERVERS AS OPPOSED TO THE TARGET USER'S DEVICE?

```
1              MR. BLOCK:  BOTH, YOUR HONOR.

2              THE COURT:  OKAY.  THE TARGET USER'S DEVICE, HOWEVER,

3    BELONGED TO INDIVIDUALS AND NOT TO WHATSAPP, CORRECT?

4              MR. BLOCK:  IT'S TRUE THAT THE TARGET DEVICE IS NOT

5    WHATSAPP'S PROPERTY.

6              THE COURT:  OKAY.  BUT THE TARGET DEVICE WOULD

7    NECESSARILY HAVE TO HAVE A WHATSAPP APP, AN ORIGINAL CLIENT I

8    THINK YOU REFERRED TO IT, IN ORDER TO RECEIVE IT.

9              MR. BLOCK:  THAT'S CORRECT, YOUR HONOR.

10             THE COURT:  OKAY.

11         AND THEN JUST IN TERMS OF HOW THIS WORKS, A SIGNAL -- NOT

12   A SIGNAL, BUT THE VECTOR IS SENT FROM THE WIS, IT GOES TO THE

13   SERVER FIRST, THE SERVER THEN SENDS IT ON TO THE TARGETED

14   DEVICE, AND IN TERMS OF HOW INFORMATION ON THE TARGET DEVICE IS

15   OBTAINED, THAT NECESSARILY SUGGESTS TO ME THAT SOMETHING GOES

16   BACK FROM THE TARGET DEVICE THROUGH A SERVER.

17             MR. BLOCK:  YES, IT WOULD TRAVEL THROUGH SERVERS,

18   YOUR HONOR.

19             THE COURT:  IT WOULD NOT GO DIRECTLY BACK TO THE WIS?

20             MR. BLOCK:  NO, IT WOULD NOT.

21             THE COURT:  IT WOULD GO TO A SERVER.  SO A SERVER IS

22   THE WEIGH STATION IN BETWEEN THE WIS AND THE TARGET DEVICE, IN

23   BOTH DIRECTIONS.

24             MR. BLOCK:  THAT'S A HUNDRED PERCENT CORRECT,

25   YOUR HONOR.
```

```
 1              THE COURT:  OKAY.

 2              MR. BLOCK:  SO I WANT TO SEPARATE THE SORT OF

 3    SURVEILLANCE OPERATION WORLD AFTER THEY GET PEGASUS ON TO A

 4    DEVICE WHERE THERE CAN BE COMMUNICATION BETWEEN THAT DEVICE AND

 5    NSO THAT DOES NOT INVOLVE WHATSAPP.

 6              BUT BEFORE PEGASUS IS ON THE DEVICE, IN THE PROCESS OF

 7    GETTING THE PEGASUS AGENT INSTALLED ON THE TARGET DEVICE, THERE

 8    IS A WHOLE LOT OF SIGNALLING THAT GOES ON.  ONE OF THE CORES IS

 9    THE SENDING OF THE EXECUTABLE FILE THAT THEY HID IN A DISUSED

10    CALL SETTING AND CAUSED THE SERVERS TO PASS ON TO THOSE

11    DEVICES, IT THEN HAS TO GET WRITTEN TO A PARTICULAR PLACE IN

12    THE MEMORY OF THE TARGET DEVICE.

13              IN ORDER TO MAKE THAT ALL WORK, IT WASN'T JUST, DEAR

14    SERVER, HERE IS A VIRUS, A MALICIOUS FILE, PLEASE SEND IT TO

15    THE PHONE; DEAR PHONE, HERE'S A MALICIOUS FILE, PLEASE INSTALL

16    IT.  THEY HAD TO FINGERPRINT THE DEVICE WHICH USED A PRETTY

17    SOPHISTICATED SET OF MESSAGING TO GET INFORMATION BACK TO THE

18    WIS VIA THE WHATSAPP SERVERS ABOUT THE PRECISE OPERATING SYSTEM

19    AND MEMORY STRUCTURE OF THE PHONE ON WHICH -- OF THE TARGET

20    PHONE, THE DEVICE ON WHICH THE OFFICIAL CLIENT OF THE TARGETED

21    INSTALLED.

22              THEY DID THAT BECAUSE THEY NEEDED TO SEND MESSAGES THAT

23    WOULD OVERWRITE PORTIONS OF THE MEMORY ON THE COMPUTER AND

24    CAUSE THAT EXCUSABLE FILE TO BE WRITTEN INTO THE MEMORY OF THE

25    DEVICE.
```

1        SO THIS WHOLE FINGERPRINTING AND ACTIVATION AND

2    INSTALLATION PROCESS WAS A WHOLE SERIES OF MESSAGES, AND THIS

3    IS DESCRIBED IN OUR EXPERT'S DECLARATION, IT'S ALSO DESCRIBED

4    IN A VERY SIMILAR WAY IN THEIR EXPERT DECLARATIONS, BUT EVEN

5    BEFORE YOU TALK ABOUT EXTRACTING PRIVATE E-MAILS AND PHOTOS AND

6    SURVEILLANCE INFORMATION FROM THE TARGET DEVICES, WHICH IS

7    SOMETHING THAT PEGASUS OBVIOUSLY DID, THEY WERE OBTAINING

8    INFORMATION FROM THAT DEVICE THROUGH THE SERVERS, INFORMATION

9    THAT NO REGULAR USER COULD POSSIBLY GET.

10       NSO ACCESSED THE WHATSAPP'S SERVERS AND THE TARGET

11   DEVICES, I THINK I WOULD LIKE TO TURN NOW, YOUR HONOR, TO THE

12   "WITHOUT AUTHORIZATION" AND "EXCEEDS AUTHORIZATION POINTS."

13       I THINK NSO'S CONDUCT IS FIRST PROPERLY THOUGHT OF AS

14   WITHOUT AUTHORIZATION UNDER THE STATUTE.  THEY USE THIS WIS,

15   THEIR OWN SOFTWARE, NOT THE OFFICIAL CLIENT, AND IN FACT IN

16   ORDER TO USE THE WIS, THEY HAD TO TAKE IDENTITY KEYS THAT WERE

17   CREATED BY SETTING UP A REAL WHATSAPP ACCOUNT AND PUT THEM

18   THROUGH THEIR SOFTWARE.

19       NOW AGAIN, THEY HAVE NOT GIVEN US THE CODE FOR HOW THE WIS

20   ACTUALLY OPERATES.  SO WE CAN INFER A LOT ABOUT IT, WE HAVE

21   SOME DESCRIPTIONS, WE TOOK TESTIMONY, BUT WE DON'T HAVE THE

22   CODE BECAUSE THEY REFUSED TO PRODUCE THAT.

23       IN THE WIS, THEY USED THESE IDENTITY KEYS TO OBTAIN

24   AUTHORIZATION TOKENS, AND ESSENTIALLY I THINK IT'S ANALOGOUS,

25   YOUR HONOR, TO USING SOMEBODY ELSE'S PASSWORD.

1          SO THERE ARE A NUMBER OF CASES IN SIMPLER FACT PATTERNS

2     WHERE, FOR EXAMPLE A FORMER EMPLOYEE GETS A PASSWORD FROM A

3     CURRENT EMPLOYEE AND USES THAT OTHER EMPLOYEE'S PASSWORD TO GO

4     AND ACCESS A COMPUTER SERVER TO LOG ON TO, FOR EXAMPLE, THE

5     COURT'S SERVERS, WOULD BE THE ANALOGY, USING THE COURT AS THE

6     EMPLOYER.

7          COURTS HAVE FOUND THAT THAT ACCESS IS WITHOUT

8     AUTHORIZATION WHEN IT'S PERPETRATED THROUGH USE OF CREDENTIALS

9     THAT THE PERSON USING THEM KNOWS THEY ARE NOT ENTITLED TO USE.

10         AND SO IN THIS SITUATION THEY WERE CREATING THESE DUMMY

11    ACCOUNTS FOR THEMSELVES AND THEIR CUSTOMERS USING THOSE

12    CREDENTIALS TO ACCESS THE WHATSAPP SERVERS WITHOUT

13    AUTHORIZATION.

14         AND YOUR HONOR, NSO KNEW THAT ITS CONDUCT WAS

15    UNAUTHORIZED.  SO I WOULD POINT YOU TO MY DECLARATION,

16    ACCOMPANYING OUR MOTION, EXHIBIT 24, JUST AS AN EXAMPLE.

17    THAT'S A DOCUMENT WHERE THEY TALK ABOUT OPERATIONAL SECURITY

18    OFFSET CONCERNS FOR ONE OF THEIR ATTACKS.

19         THEY TALK ALL ABOUT THE DELIBERATE STEPS THAT THEY TOOK TO

20    HIDE THEIR ATTACKS FROM WHATSAPP BECAUSE THEY KNEW THAT

21    WHATSAPP WOULD SHUT THEM OFF IF THEY WERE DISCOVERED.

22         AND THEY ADMITTED -- IT SEEMS SORT OF OBVIOUS, YOUR HONOR,

23    BUT UNSURPRISINGLY THEY ADMITTED THAT IN DEPOSITION TOO.

24         "DID YOU EVER ASK WHATSAPP FOR PERMISSION?"

25         "NO."

1          "DID YOU UNDERSTAND THAT IF WHATSAPP DISCOVERED WHAT YOU

2     WERE DOING, THEY WOULD STOP IT?"

3          "YES, WE UNDERSTOOD THAT.  AND IN FACT THAT'S WHAT

4     WHATSAPP DID."

5          SO NSO KNEW THAT WHAT IT WAS DOING WAS WITHOUT

6     AUTHORIZATION.

7          IN ADDITION TO ALL OF THAT ACCESS WITHOUT AUTHORIZATION

8     THROUGH THE WIS, WE NOW HAVE, THROUGH DISCOVERY, A RECORD OF

9     NSO PERSISTING WITH ITS ATTACKS AFTER ANY POSSIBLE SEMBLANCE OF

10    AUTHORIZATION WAS REVOKED.

11         SO COUNSEL SPOKE ABOUT THREE DIFFERENT ATTACKS, HEAVEN,

12    EDEN AND AEROSET.  HEAVEN WAS DISABLED BY SECURITY UPGRADES

13    THAT WHATSAPP IMPLEMENTED PRIOR TO THE 2019 ATTACKS THAT WE

14    DISCOVERED AND DESCRIBED IN THE COMPLAINT.  NSO FOUND OUT

15    IMMEDIATELY WHEN THOSE UPGRADES OCCURRED THAT THEY DISABLED

16    THAT PARTICULAR INSTALLATION VECTOR AND SET TO WORK ON

17    DESIGNING A WAY TO CIRCUMVENT THOSE TECHNOLOGICAL RESTRICTIONS

18    IN ORDER TO BUILD A NEW ATTACK, A NEW WAY TO USE WHATSAPP

19    SERVERS TO INSTALL THEIR SOFTWARE.

20         THEN WE HAVE EDEN, WHATSAPP FOUND THE EDEN ATTACKS AND CUT

21    THEM OFF.  AND THAT'S DESCRIBED IN THE COMPLAINT.  AFTER THAT,

22    NSO WENT BACK TO WORK AND BUILT THE AEROSET ATTACK WHICH THEY

23    SAID IN DISCOVERY THEY CONTINUED TO PERPETRATE AFTER THE

24    COMPLAINT WAS FILED.

25         AND SO YOU HAVE THE REVOCATION OF ANY SEMBLANCE OF

1    AUTHORIZATION BY THE SECURITY UPGRADES THAT THEY UNDERSTOOD TO

2    SHUT OFF THEIR ATTACKS.  YOU HAVE THE 2019 UPGRADES THAT SHUT

3    OFF EDEN, AND THEN YOU HAVE THE COMPLAINT IN THIS CASE ACCUSING

4    THEM OF ACCESS WITHOUT AUTHORIZATION.  AND THEY CONTINUE TO TRY

5    AND USE WHATSAPP SERVERS IN WAYS THAT THEY KNEW WERE

6    UNAUTHORIZED.

7         WHATSAPP ALSO PURGED EVERY NSO ACCOUNT THAT IT COULD FIND

8    BECAUSE NSO -- BECAUSE WHATSAPP HAD DISCOVERED THAT NSO WAS

9    USING THOSE IN IMPROPER WAYS.

10         AND SO THIS IS LIKE THE POWER VENTURES CASE THAT WE CITE

11    IN THE BRIEF, YOUR HONOR, THEIR CONDUCT IS WITHOUT

12    AUTHORIZATION BECAUSE IT WAS AFTER ANY POSSIBLE AUTHORIZATION

13    WAS CLEARLY REVOKED.

14         ALTERNATIVELY, YOUR HONOR, IF THEY INVOKE THEIR

15    REGISTRATION FOR THE WHATSAPP SERVER AS AUTHORIZATION, WHICH

16    REGISTRATION BY THE WAY REQUIRED THEM TO SIGN ON TO THE TERMS

17    OF SERVICE, THEY PLAINLY EXCEEDED WHATEVER ACCESS WAS

18    AUTHORIZED.

19         I THINK THE MOST IMPORTANT TESTIMONY AND THE SIMPLEST ON

20    THIS IS THAT THEY ADMIT, AND AGAIN I WOULD POINT TO GAZNELI,

21    THAT AN ORDINARY USER USING THE WHATSAPP SERVICE COULD NOT

22    POSSIBLY SEND THE MESSAGES THAT THEY SENT, THEY HAD TO BUILD AN

23    ENTIRE SOPHISTICATED SET OF SOFTWARE TO CREATE A MESSAGING

24    SYSTEM THAT WAS DIFFERENT IN KIND AND CONTENT.

25         SO THEY SENT MESSAGES THAT MASQUERADED AS REAL MESSAGES

1    BUT HAD CONTENT THAT NO REGULAR CLIENT COULD CREATE OR SEND.

2    AND THAT'S THE ONLY WAY THAT THEIR ATTACK WOULD WORK.  THEY PUT

3    MALICIOUS CONTENT INTO AREAS OF A MESSAGING PROTOCOL THAT THE

4    OFFICIAL CLIENT DOES NOT USE.

5         THAT EXCEEDS AUTHORIZED ACCESS, AND IT'S ACCESS TO

6    PARTICULAR AREAS OF A FILE STRUCTURE THAT THEY WERE NOT

7    AUTHORIZED TO ACCESS.

8         EVEN IF YOU CONSIDER THEIR SIGNING UP FOR WHATSAPP

9    ACCOUNTS MAKES THEM MORE -- AND I WILL GO BACK TO VAN BUREN,

10   IT'S INSIDE HACKERS AND OUTSIDE HACKERS.  JUST TO TAKE A STEP

11   BACK, THEY ARE MORE ANALOGOUS TO AN OUTSIDE HACKER THAN THE

12   INSIDER, LIKE THE EMPLOYEE WHO GOES INTO A PERSONNEL DATABASE

13   THEY ARE NOT SUPPOSED TO USE EVEN THOUGH THEY HAVE CREDENTIALS.

14   BUT IF BY THE USE OF THOSE USER CREDENTIALS, YOU CONSIDER THEM

15   MORE LIKE AN INSIDER, THEN THEIR CONDUCT EXCEEDED WHATEVER

16   AUTHORIZATION THEY HAVE THROUGH THAT REGISTRATION.

17        THE CASES ARE CONSISTENT THAT CONDUCT LIKE PASSWORD

18   GUESSING OR FINDING POLLS AND PROGRAMS WILL NOT RELIEVE

19   LIABILITY.  FOR EXAMPLE, U.S. V. PHILLIPS HAS LANGUAGE TO THAT

20   EFFECT.  THAT'S 477 F.3D, 215.

21        THERE'S A FLAVOR OF NSO'S ARGUMENT, MAYBE MORE THAN A

22   FLAVOR, A CORE THEME THAT EVERYTHING THEY DO MUST HAVE BEEN

23   AUTHORIZED BECAUSE IT WORKED.  THEY SAY WE SUCCEEDED, WE

24   MANAGED TO GET IT THROUGH THE SERVER, WHATEVER THE SERVER

25   ALLOWS, THE SERVER AUTHORIZED.

1      AND I JUST DON'T THINK THAT'S THE LAW, YOUR HONOR, BECAUSE

2   IF IT WERE THE LAW, THEN EVERY SUCCESSFUL HACK WOULD BE AN

3   AUTHORIZED HACK AND THERE'S VERY LITTLE THAT THE CFAA WOULD

4   BAR.

5      THE RECORD IS THAT THEY HAD A VERY SOPHISTICATED PROGRAM

6   TO DEVELOP THEIR ATTACKS AND SENT MESSAGES THAT NO ORDINARY

7   USER COULD.  AND OF COURSE THE WHATSAPP ECOSYSTEM IS BUILT ON A

8   SERVER THAT INTERACTS WITH AN OFFICIAL CLIENT IN WAYS THAT ARE

9   CONTROLLED, NOT ONLY BY CONTROLLED TECHNOLOGICALLY, INCLUDING

10  THROUGH THE IDENTITY PIECE WE SPOKE ABOUT, ONLY BY EVADING

11  THOSE TECHNOLOGICAL BARRIERS WAS NSO ABLE TO CONDUCT ITS

12  ATTACKS.

13     NSO OBTAINED INFORMATION FROM A PROTECTED COMPUTER, THAT'S

14  1030(A)(2).  WE SPOKE A LITTLE BIT ABOUT INFORMATION THEY

15  OBTAINED, IT'S THROUGH THE SERVERS FROM THE DEVICES AND ON THE

16  SERVERS THEMSELVES.  NSO DEFRAUDED PLAINTIFFS AND USERS AND

17  THEY OBTAINED -- I DON'T THINK THE $5,000 LIMIT IS AT ISSUE

18  HERE BUT WE ADDRESS IT IN OUR BRIEFS.

19     WITH RESPECT TO FRAUD, THE CASES -- RYANAIR IS A GOOD

20  RECENT EXAMPLE.  THIS ISN'T COMMON LAW FRAUD, IT'S ENOUGH THAT

21  THE CONDUCT IS DECEITFUL, COURTS WILL LOOK TO WHETHER OR NOT

22  THERE WAS AN INTENT TO CAUSE LOSS OR OBTAIN PECUNIARY GAIN.  I

23  THINK NSO'S CONCEPT EASILY MEETS THAT STANDARD.

24     1030(B) IS CONSPIRACY.  NSO CONSPIRED WITH ITS CUSTOMERS.

25  THAT REQUIRES A KNOWING AGREEMENT WITH ANOTHER TO COMMIT THE

1    UNLAWFUL ACT.  I'M CITING IN REAL ESTATE LENOVO ADWARE

2    LITIGATION.  THIS IS IN THE BRIEFS, YOUR HONOR, ALSO ADDRESSED

3    IN RYANAIR.

4        I THINK THERE'S NO QUESTION FROM THE RECORD WE HAVE, NSO

5    SAYS THEY WERE LICENSING TO CUSTOMERS.  THEY ARE RESPONSIBLE

6    FOR THAT CUSTOMER USE BECAUSE ALTHOUGH THEY HAVE NOT GIVEN US

7    THEIR ACTUAL CONTRACTS WITH THOSE CUSTOMERS, THEY WERE AGREEING

8    WITH THE CUSTOMERS TO -- AND ENCOURAGING THE CUSTOMERS TO

9    COMMIT THESE ACTS.

10        THAT'S A 1030(B) CONSPIRACY.  THEY ARE ALSO, WHICH I WILL

11   ADDRESS SEPARATELY, RESPONSIBLE FOR THAT CUSTOMER CONDUCT

12   BECAUSE THEY INDUCED AND ENCOURAGED IT, BUT I CAN COME TO THAT

13   SEPARATELY.

14        I THINK THE ONLY ONE I DIDN'T ADDRESS, YOUR HONOR, IS

15   TRAFFICKING AND PASSWORD-LIKE INFORMATION, WHICH IS 1030(A)(6).

16        FOR THAT ONE, TWO THEORIES, YOUR HONOR.

17        FIRST OF ALL, PEGASUS ITSELF IS PASSWORD-LIKE INFORMATION.

18   WHAT THEY SELL IS THE ABILITY TO ACCESS A USER'S DEVICE IN THE

19   SAME MANNER AS IF THE USER -- AS IF YOU HAVE THE USER'S

20   PASSWORD AND HAD THE DEVICE IN YOUR HAND.

21        SECOND, YOUR HONOR, THEY TRAFFICKED IN WHATSAPP'S

22   CREDENTIALS.  SO NO MATTER IT WAS AN OFFICIAL CLIENT OR THE WIS

23   THAT ULTIMATELY SENT SOME MESSAGE, IT'S A HUNDRED PERCENT CLEAR

24   THAT THEY USED THESE WHATSAPP ACCOUNTS THAT THEY CREATED TO

25   OBTAIN LEGITIMATE IDENTITY KEYS AND AUTHORIZATION TOKENS AND

1    THEN USED THOSE IN THE WIS TO CONDUCT THE ATTACKS WHICH

2    INVOLVED DOING THINGS THAT THE OFFICIAL CLIENT TO WHICH THOSE

3    KEYS WERE ISSUED COULD NOT POSSIBLY DO.

4         I'M INCLINED TO PAUSE THERE, YOUR HONOR.

5              THE COURT:  OKAY.  ARE YOU SEEKING FINDING IN YOUR

6    CLIENT'S FAVOR WITH REGARD TO ALL FOUR OF THOSE SECTIONS OR

7    WOULDN'T ANY ONE OF THEM SUFFICE?

8              MR. BLOCK:  I THINK ALL FOUR, YOUR HONOR, ABSOLUTELY.

9         I DON'T KNOW IF ONE WOULD SUFFICE.  I THINK WE HAVE PROVEN

10   ALL FOUR, AND SO WE WILL BE VERY HAPPY TO GET THE CORRECT

11   RULING ON EACH OF THEM, YOUR HONOR.

12             THE COURT:  ALL RIGHT.

13        RESPONSE?

14             MR. AKROTIRIANAKIS:  YOUR HONOR, JOE AKROTIRIANAKIS,

15   I THINK WHAT YOU JUST HEARD WOULD CONSTITUTE -- A LOT OF IT WAS

16   JUST RESTATING WHAT'S IN THE BRIEFS.  I WILL TRY NOT TO DO

17   THAT.  BUT THAT WOULD BE A REWRITING OF VAN BUREN, NOSAL, THE

18   NINTH CIRCUIT EN BANC DECISION, THE SUPREME COURT'S DECISION IN

19   VAN BUREN, ALL OF WHICH OF COURSE BIND ALL OF US AND THE COURT.

20        I WILL TRY TO ADDRESS DIFFERENT PARTS OF THIS, BUT I

21   WANTED TO START OUT WITH THE LAST THING, THE TRAFFICKING AND

22   PASSWORDS, BECAUSE THAT IS NOT IN THE COMPLAINT, THAT WAS NOT

23   EVER RAISED AT ANY POINT DURING THE LITIGATION.  IN FACT THE

24   LAST THING THIS MR. BLOCK SAID, PEGASUS IS A PASSWORD-LIKE

25   INFO, THAT'S NOT WHAT THAT SECTION IS ABOUT.

1      AND AS THE COURT KNOWS FROM CRIMINAL CASES THAT ARE BASED

2  ON WHAT ACTUALLY IS TRAFFICKING AND PASSWORD, THAT'S NOT WHAT

3  THAT SECTION IS INTENDED TO PROSCRIBE.

4      WE CITED TO -- THE SEVENTH CIRCUIT HAS THE JURY

5  INSTRUCTION THAT RELATES TO THAT, IT'S NOTHING LIKE WHAT

6  MR. BLOCK IS SAYING.  BUT THAT IS NOT A CLAIM THAT THEY RAISED

7  EVER UNTIL THEIR MOTION FOR SUMMARY JUDGEMENT.  AS THE COURT

8  KNOWS YOU CAN'T DO THAT.

9      AND THIS VERY, VERY LAST THING HE SAID, THE TRAFFICKED IN

10  WHATSAPP'S CREDENTIALS, THAT'S NOT SOMETHING THEY EVEN RAISED

11  IN THEIR MOTION FOR SUMMARY JUDGEMENT, THEY RAISED THAT FOR THE

12  FIRST TIME IN THEIR REPLY BRIEF.

13      SO IN TERMS OF WHAT THE CORRECT DECISION WOULD BE, I ALSO

14  WOULD LIKE THE CORRECT DECISION ON THAT.

15      NOW MANY TIMES IN HIS REMARKS, MR. BLOCK TALKED ABOUT WHAT

16  YOU COULD NOT POSSIBLY DO, AND I WILL COME BACK TO THAT.  AND

17  HE WAS SAYING THAT A WHATSAPP USER COULD NOT POSSIBLY DO THIS.

18  AND WHAT HE'S SAYING IS THAT, YOU KNOW, A PERSON WHO -- AN

19  ORDINARY USER, IF YOU WILL, OF WHATSAPP WHO USES IT LIKE I

20  WOULD, FOR EXAMPLE, WOULDN'T KNOW TO DO THESE THINGS.

21      BUT THAT'S NOT WHAT THE CFAA IS DIRECTED TO.  AND THE WAY

22  HE PUT IT WAS TO SAY THAT THE CFAA WOULD REACH VERY LITTLE.

23      WELL, THE CFAA IS A CRIMINAL STATUTE, IT MUST BE STRICTLY

24  CONSTRUED, IT IS STRICTLY CONSTRUED, AND IT DOES REACH EXACTLY

25  THAT WHICH CONGRESS INTENDS FOR IT TO REACH AND NOTHING MORE.

1          THIS CASE IS AND HAS BEEN ALWAYS A TERMS OF SERVICE

2     DISPUTE THAT HAS BEEN DRESSED UP TO LOOK LIKE A CFAA DISPUTE.

3     AS I SAID -- AS MANY CASES HAVE SAID, THE CFAA IS A CRIMINAL

4     STATUTE, IT HAS LIMITED REACH AND IT IS STRICTLY CONSTRUED IN

5     ACCORDANCE WITH THE RULE OF LENITY.  IT PROVIDES A CIVIL REMEDY

6     IN VERY LIMITED CIRCUMSTANCES, AND DISCOVERY IN THIS CASE SHOWS

7     THAT THOSE CIRCUMSTANCES DO NOT APPLY.

8          NOW THERE ARE NUMEROUS MEANS BY WHICH THE CFAA CAN BE

9     VIOLATED, IN FACT EVEN FOR THAT CIVIL REMEDY, BUT THEY ALL

10    REQUIRE A PLAINTIFF TO SHOW EITHER THAT THE DEFENDANT ACTED

11    WITHOUT AUTHORIZATION OR THAT THE DEFENDANT EXCEEDED AUTHORIZED

12    ACCESS.

13         THOSE ARE BOTH ALL OR NOTHING TESTS, AS THIS COURT POINTED

14    OUT IN ITS MOTION TO DISMISS, AS THE SUPREME COURT SUBSEQUENTLY

15    TOLD US IN THE VAN BUREN DECISION IN 2021.  FOR CONDUCT TO BE

16    WITHOUT AUTHORIZATION, THE PERSON COULD HAVE NO RIGHT AT ALL TO

17    USE A COMPUTER FOR ANY WAY OR FOR ANY PURPOSE.  THEY CAN'T

18    ACCESS THE COMPUTER WITHOUT AUTHORIZATION EVEN IF THEY ARE JUST

19    VIOLATING LIMITS ON THEIR ACCESS.  THAT COMES FROM THE COURT,

20    THE NINTH CIRCUIT IN BREKKA.

21         NOW TO EXCEED AUTHORIZED ACCESS, A PERSON HAS TO ACCESS AN

22    AREA OF THE COMPUTER TO WHICH THEY HAVE NO ACCESS RIGHTS.  THAT

23    IS LITERALLY THE HOLDING OF THE VAN BUREN DECISION.

24         AND SO YES, THOSE ARE LIMITED THINGS THAT THE CFAA

25    REACHES, BUT THAT'S APPROPRIATE, IT'S A CRIMINAL STATUTE, IT

1    REACHES EXACTLY THOSE THINGS THAT CONGRESS HAS SAID IT SHOULD

2    REACH.

3          NOW THEY HAVE CONCEDED, EVEN IN OPPOSITION TO OUR MOTION

4    FOR SUMMARY JUDGEMENT, THAT NSO HAD AUTHORIZATION TO SEND

5    MESSAGES.  AND I WANT TO BACK UP FOR JUST A MINUTE BECAUSE THE

6    COURT ASKED A QUESTION AND I THINK IT'S IMPORTANT FOR US TO

7    UNDERSTAND THAT WHAT I'M ABOUT TO SAY WOULD BE AT LEAST A

8    DISPUTE OF FACT, HE SAID WE PUT THEM THROUGH OUR SOFTWARE.  AND

9    YOU WERE ASKING THE QUESTION, YOUR HONOR, ABOUT HOW THIS WORKS

10   AND WHETHER THINGS COME BACK THROUGH THE DEVICE FROM THE

11   WHATSAPP'S SERVERS.

12         SO I WOULD LIKE TO EXPLAIN IT IN SOMEWHAT LAYMAN'S TERMS,

13   AND IF THE COURT HAS SOME MORE TECHNICAL QUESTIONS THAT I'M NOT

14   ABLE TO ANSWER, I THINK ONE OF MY COLLEAGUES WOULD BE ABLE TO

15   DO THAT.

16         BUT THE WIS, OKAY, THIS IS THE INTERFACE, IF YOU WILL,

17   THAT WAS CREATED BY NSO.  AND IT DOES NOT SEND MESSAGES OVER --

18   IT DOES NOT SEND WIS MESSAGES OVER WHATSAPP SERVERS, IT SENDS

19   WHATSAPP MESSAGES.  THE CONTENT OF THAT MESSAGE, THE FIELDS IN

20   THE CONTENT OF THAT MESSAGE ARE AUTHORED, IF YOU WILL, BY THE

21   WIS, SUCH THAT THE NSO CUSTOMER REALLY HAS THE MESSAGE CREATED

22   BY THE WIS FOR THEM AND THEN THEY JUST EXECUTE IT BY PUTTING IN

23   THE TARGET PHONE DEVICE OR THE TARGET PHONE NUMBER.

24         THEN A WHATSAPP MESSAGE, AN ACTUAL WHATSAPP MESSAGE USING

25   ACTUAL WHATSAPP CREDENTIALS SENDS THAT WHATSAPP MESSAGE

```
1    THROUGH, AS WE HEARD EARLIER, THE SIGNALLING SERVERS,

2    POTENTIALLY THROUGH RELAY SERVERS, DEPENDING ON WHICH VERSION

3    OF PEGASUS IT IS, AND THEN IT GOES TO THE TARGET DEVICE.

4         NOW NOTHING COMES BACK FROM THE TARGET DEVICE IN TERMS OF

5    DATA FROM THE DEVICE.  THE EXTRACTION OF DATA FROM THE TARGET

6    DEVICE DOES NOT COME BACK IN THE WAY THAT COUNSEL HAS

7    DESCRIBED, BUT IF IT'S IMPORTANT TO THE COURT TO UNDERSTAND

8    THIS, I WILL TELL YOU.  WHAT COMES BACK IS LIMITED TO

9    INFORMATION ABOUT THAT DEVICE.

10        FOR EXAMPLE, IF I TRY TO DO A WHATSAPP MESSAGE TO THE

11   COURT'S PHONE ON ITS DESK IN YOUR OFFICE, IT WOULDN'T GO

12   THROUGH BECAUSE YOUR DESK TELEPHONE DOESN'T HAVE WHATSAPP ON

13   IT.  SO ONE OF THE THINGS THAT YOU WOULD NEED TO UNDERSTAND

14   ABOUT THE DEVICE THAT YOU ARE SENDING A WHATSAPP MESSAGE TO IS

15   THAT THAT DEVICE ALSO HAS WHATSAPP.

16        AND THERE'S SOME OTHER INFORMATION ABOUT THE DEVICE THAT

17   IS NECESSARY FOR THESE WHATSAPP MESSAGES THAT ARE SENT, PEGASUS

18   MESSAGES IF YOU WILL, AND ALSO EVERY OTHER WHATSAPP MESSAGE

19   THAT EXISTS.  EVERY ONE I'VE EVER SENT, IF THE COURT USES IT,

20   EVERY ONE YOU HAVE SENT, EVERY ONE MR. BLOCK HAS EVER SENT, BUT

21   NO DATA COMES BACK FROM THE TARGET DEVICE THROUGH THE WHATSAPP

22   SERVERS IN THE WAY HE DESCRIBED.

23        WHAT HAPPENS IS THE PEGASUS MESSAGE GOES TO THE TARGET

24   DEVICE AND IT CAUSES --

25             THE COURT:  THROUGH A WHATSAPP'S SERVER.
```

```
 1              MR. AKROTIRIANAKIS:  THROUGH A WHATSAPP SERVER.

 2              THE COURT:  IT DOESN'T GO DIRECTLY TO THE TARGET

 3      DEVICE.

 4              MR. AKROTIRIANAKIS:  NO, IT'S A WHATSAPP MESSAGE THAT

 5      HAS PARTICULAR CONTENT THAT IS AUTHORED BY THE WIS.  BUT IT'S A

 6      REGULAR WHATSAPP MESSAGE, IT'S NOT SOME SPECIAL WIS MESSAGE

 7      THAT WIS IS SENDING A MESSAGE THROUGH WHATSAPP SERVERS.

 8      WHATSAPP --

 9              THE COURT:  SO IT'S A REGULAR WHATSAPP MESSAGE BUT

10      WIS HAS SORT OF PIGGYBACKED THIS VECTOR ONTO THE MESSAGE.

11              MR. AKROTIRIANAKIS:  NO.  THE -- THERE ARE FIELDS IN

12      THE MESSAGE THAT ARE FILLED OUT AND THEY ARE FILLED OUT BY THE

13      WIS IN WAYS THAT ARE ACCEPTED BY THE WHATSAPP SERVER.

14          AND COUNSEL, AS I SAID, HAS SEVERAL TIMES MENTIONED THAT

15      THERE'S NO WAY THAT ANYONE COULD DO THIS.  COMPUTERS DON'T WORK

16      THAT WAY, YOUR HONOR, THEY ARE CODE BASED.  SO IF THE CODE

17      ALLOWS IT, IT IS AUTHORIZED.  IF THE CODE ALLOWS IT, ANYBODY

18      CAN DO IT, OKAY.

19          AND THE UNDISPUTED TESTIMONY IN THIS CASE FROM THEIR

20      30(B)(6) WITNESSES WAS THAT THERE WERE NO CODE BASED

21      RESTRICTIONS AGAINST ANYTHING THAT WAS SENT THROUGH THEIR

22      SERVERS.

23          AND WHEN THEY FINALLY WERE ACTUALLY LOOKING FOR THIS, AND

24      IT WASN'T BECAUSE THEY HAD ANY SUSPICION ABOUT NSO, BUT THEY

25      HEARD FROM A THIRD PARTY SECURITY VENDOR LIKE HEY, WHY DON'T
```

1      YOU LOOK AT THIS PARTICULAR THING, WHEN THEY STARTED LOOKING

2      FOR IT, THEY IMMEDIATELY SAW THIS.  THERE IS NO DECEIT THAT

3      EVEN WENT ON HERE.

4          BUT THE MESSAGE GOES THROUGH THE WHATSAPP SERVER TO THE

5      TARGET DEVICE AND IT CAUSES THE TARGET DEVICE TO REACH OUT TO

6      ANOTHER SERVER, NOT A WHATSAPP SERVER, ANOTHER SERVER, A

7      COMMAND AND CONTROL SERVER THAT'S OWNED BY NSO'S FOREIGN

8      SOVEREIGN GOVERNMENT CUSTOMER TO RETRIEVE THE PEGASUS CODE FROM

9      THAT SEPARATE SERVER OUTSIDE THE WHATSAPP ENVIRONMENT AND PUT

10     IT ON THE TARGET DEVICE SO THAT THEN DATA FROM THE DEVICE CAN

11     BE EXFILTRATED.

12         SO NONE OF THE DATA GOES BACK THROUGH THEIR SERVER.  AND

13     THAT WAS, AS I UNDERSTOOD THE COURT'S QUESTION.

14             THE COURT:  THAT WAS MY QUESTION.

15     YOU ARE SAYING THE DATA GOES DIRECTLY TO NSO'S CLIENT.

16             MR. AKROTIRIANAKIS:  NSO'S CLIENT'S SERVER THAT'S

17     OUTSIDE THIS ENVIRONMENT.  THEY CALL IT THE COMMAND AND CONTROL

18     SERVER, THEY WERE TALKING ABOUT IT EARLIER IN THE CONTEXT OF

19     THE --

20             THE COURT:  AND YOU ARE TALKING ABOUT THE DATA THAT'S

21     EXTRACTED FROM THE USER'S DEVICE.

22             MR. BLOCK:  THE TARGET USER.  YES, YOUR HONOR.  THE

23     PERSON WHO IS A SUSPECTED CRIMINAL OR A TERRORIST OR WHOEVER,

24     WHATEVER REASON IS BEING INVESTIGATED BY THE GOVERNMENT --

25             THE COURT:  SO YOU ARE SAYING, CONTRARY TO WHAT

1    OPPOSING COUNSEL SAID, NOTHING GOES BACK FROM THE TARGET USER'S

2    PHONE THROUGH THE WHATSAPP SERVER BACK TO THE WIS.

3         MR. AKROTIRIANAKIS:  THAT'S RIGHT.  NO INFORMATION

4    GOES BACK TO THE WIS.  THE WIS IS SEPARATE, YOUR HONOR, IT SORT

5    OF JUST CREATES THE CONTENT FOR THE MESSAGE WHICH IS THEN SENT

6    BY WHATSAPP LIKE EVERY OTHER WHATSAPP MESSAGE.  AND IT ONLY

7    GOES TO PARTS OF THE WHATSAPP SERVERS THAT EVERY OTHER

8    MESSAGE -- EVERY OTHER WHATSAPP MESSAGE GOES TO.

9         SO IT NEITHER IN THAT SENSE EXCEEDS AUTHORIZED ACCESS

10   BECAUSE YOU HAVE THE AUTHORIZATION TO SEND WHATSAPP MESSAGES IF

11   YOU HAVE WHATSAPP CREDENTIALS AND IT ONLY GOES THROUGH THOSE

12   PARTS OF THE SERVER WHERE ALL WHATSAPP MESSAGES GO.

13        THIS IS EXACTLY THE GATES UP/DOWN, IN THIS CASE GATE UP

14   INQUIRY THAT VAN BUREN TALKS ABOUT WITH RESPECT TO EXCEEDING

15   AUTHORIZED ACCESS.

16        SO IF YOU WANT TO THINK ABOUT IT AS, THE GATE IS UP, I

17   ALWAYS THINK OF LIKE SOME KIND OF MEDIEVAL CASTLE THAT HAS A

18   COURTYARD THAT EVERYBODY CAN GO INTO, NOBODY CAN GO INTO THE

19   CASTLE ITSELF BUT EVERYBODY CAN GO AROUND IN THE COURTYARD,

20   THAT IS THE PLACE WHERE ALL THESE MESSAGES GO.  THEY GO NOWHERE

21   ELSE THAT EVERY OTHER WHATSAPP MESSAGE --

22        THE COURT:  OKAY.  MY PROBLEM IS NOT SO MUCH

23   UNDERSTANDING THE WITHOUT AUTHORIZATION PORTION OF THE STATUTE

24   BUT THE OBTAINING OF INFORMATION PORTION.  THAT'S WHY I'M

25   ASKING, WHERE DOES IT GO?  WHERE DOES THE INFORMATION

1    OBTAINED -- AND I'M ASSUMING THAT THAT INFORMATION OBTAINED IS

2    ON THE TARGET USER'S DEVICE, WHERE DOES THAT GO?  HOW DOES NSO

3    OBTAIN THAT INFORMATION?

4            MR. AKROTIRIANAKIS:  NSO DOES NOT OBTAIN INFORMATION

5    FROM --

6            THE COURT:  NSO'S CLIENT OBTAINS THAT INFORMATION.

7            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

8        AND IT GOES FROM THE TARGET DEVICE TO THE COMMAND AND

9    CONTROL SERVER.  IN THE EARLIER PART OF THE HEARING WHERE THEY

10   WERE DISCUSSING PERSONAL JURISDICTION AND THE QUADRANET SERVER,

11   FOR EXAMPLE, WAS REFERENCED, THE QUADRANET SERVER IS THIS ROLE

12   OF THE COMMAND AND CONTROL SERVER OUTSIDE OF THE WHATSAPP

13   ENVIRONMENT TO WHERE NSO'S CUSTOMER WOULD EXFILTRATE

14   INFORMATION FROM THE TARGET PHONE.

15       SO THAT IS THE INFORMATION THAT IS THE SUBJECT OF THE

16   CRIMINAL OR COUNTERTERRORISM INVESTIGATION, WHATEVER IT IS,

17   THAT IS BEING UNDERTAKEN BY A FOREIGN SOVEREIGN PURSUANT TO ITS

18   AUTHORIZATION AND IT DOES NOT GO BACK TO NSO.

19           THE COURT:  OKAY.

20           MR. AKROTIRIANAKIS:  IF I MAY, YOUR HONOR, I NEED TO

21   GET A DRINK OF WATER.

22       ALL RIGHT.  NOW LET ME GO FOR A MOMENT TO THE "WITHOUT

23   AUTHORIZATION."

24       THIS WAS A THEORY THAT WAS PLEADED IN THE COMPLAINT.  THE

25   COURT WROTE IN ITS MOTION TO DISMISS ORDER THAT IT WAS

```
 1    DISMISSING THAT THEORY TO VIOLATION OF THE CFAA AND THAT THE

 2    CASE PROCEEDED ON AN EXCEEDED AUTHORIZED ACCESS THEORY.

 3          WHAT YOU HEARD MR. BLOCK SAY -- AND THAT WAS BECAUSE THEY

 4    ASSERT THAT NSO AGREED TO THE TERMS OF SERVICE THAT THEN

 5    AUTHORIZED THEM TO SEND MESSAGES.  IN FACT, YOUR HONOR, IT'S

 6    NOT THE TERMS OF SERVICE THAT ALLOWS YOU TO SEND MESSAGES

 7    THROUGH WHATSAPP, IT'S THE WHATSAPP CREDENTIALS.

 8          AND WHETHER ONE AGREES TO TERMS OF SERVICE IS A SEPARATE

 9    LEGAL QUESTION.  IF SOMEONE SIGNS UP FOR A WHATSAPP ACCOUNT,

10    YOU GET WHATSAPP CREDENTIALS AND THEN YOU ARE AUTHORIZED TO

11    SEND WHATSAPP MESSAGES.

12          AS I SAID BEFORE, IT'S AN ALL OR NOTHING QUESTION, BOTH

13    WITH RESPECT TO "WITHOUT AUTHORIZATION" AND "EXCEEDING

14    AUTHORIZATION," BUT THE FACT THAT NSO HAD WHATSAPP CREDENTIALS

15    MEANS IT WAS AUTHORIZED TO SEND WHATSAPP'S MESSAGES AND TO GO

16    TO --

17          THE COURT:  AND IF IT DID SEND WHATSAPP MESSAGES,

18    DOESN'T THAT ALSO MEAN IT AGREED TO THE TERMS OF SERVICE?

19          MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  I CAN ADDRESS

20    THAT.

21          THE COURT:  YEAH, YOU SHOULD.

22          MR. AKROTIRIANAKIS:  THERE IS A BODY OF CASE LAW -- I

23    WILL ADDRESS THIS BECAUSE THE COURT WOULD LIKE ME TO, I WOULD

24    LIKE TO RETURN TO THAT OTHERWISE.

25          BUT THESE ARE TWO SEPARATE ISSUES, YOUR HONOR.  ONE IS DID
```

```
 1    NSO HAVE THE CREDENTIAL THAT ALLOWS IT TO SEND WHATSAPP

 2    MESSAGES?  AND IT ONLY EVER USED LEGITIMATE WHATSAPP

 3    CREDENTIALS.  THERE IS NOT ANY SORT OF FAKE WHATSAPP

 4    CREDENTIALS OR FAKE WHATSAPP MESSAGES, THESE ARE REAL WHATSAPP

 5    MESSAGES.

 6          THE COURT:  AND YOU ARE SAYING THEN THAT WITH A

 7    LEGITIMATE WHATSAPP CREDENTIAL AND USING A LEGITIMATE WHATSAPP

 8    APP, YOU COULD SEND MESSAGES WITHOUT AGREEING TO THE TERMS OF

 9    SERVICE?

10          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

11        THE QUESTION OF WHETHER TERMS OF SERVICE HAVE BEEN AGREED

12    TO IS ESSENTIALLY WHETHER THE PARTIES HAVE MUTUAL ASSENT TO A

13    CONTRACT.  IT'S A QUESTION OF --

14          THE COURT:  SURE.  BUT DO YOU KNOW HOW MANY

15    COMPUTER-BASED CASES THAT THIS DISTRICT HAS, AND DO YOU KNOW

16    HOW MANY CASES SAY THAT AGREEING -- BEING ADVISED OF THE TERMS

17    OF SERVICE AND AGREEING BY USING THE APP IS SUFFICIENT CONSENT?

18          MR. AKROTIRIANAKIS:  WELL, WHAT THOSE CASES SAY,

19    YOUR HONOR, WHAT THE BERMAN CASE THAT BOTH PARTIES CITE, IT'S

20    BERMAN V. FREEDOM FINANCIAL NETWORK, 30 F.4TH, 849, IS THAT A

21    COMPANY TRYING TO ENFORCE AN ONLINE CONTRACT MUST PROVE TWO

22    THINGS:  ONE, THAT THEY PROVIDED REASONABLY CONSPICUOUS NOTICE

23    OF THE TERMS TO WHICH THE CONSUMER WILL BE BOUND; AND TWO, THE

24    CONSUMER TOOK SOME ACTION, SUCH AS CLICKING A BUTTON OR

25    CHECKING A BOX, THAT UNAMBIGUOUSLY MANIFESTED HIS OR HER ASSENT
```

1    TO THOSE TERMS.

2         AND NOW YOU HAVE A WHOLE BUNCH OF CASES THAT HAVE IN THE

3    OPINION, SCREEN SHOTS AND DISCUSSIONS ABOUT WHETHER THOSE TWO

4    ELEMENTS HAVE BEEN MET.

5         AND THOSE CASES TALK ABOUT --

6              THE COURT:  WAS THERE NOTHING ON THE WHATSAPP APP

7    THAT REQUIRED A USER TO CLICK ON THE BUTTON, "I AGREE TO THE

8    TERMS OF SERVICE"?  I CAN'T REMEMBER THE LAST TIME I OPENED AN

9    APP THAT DIDN'T ASK ME TO AGREE TO THE TERMS OF SERVICE --

10             MR. AKROTIRIANAKIS:  WELL, YOUR HONOR, THERE IS --

11             THE COURT:  -- OR ADVISE BY USING THIS APP, WE ARE

12   PRESUMING YOU AGREE TO THE TERMS OF SERVICE.

13             MR. AKROTIRIANAKIS:  YOUR HONOR, THERE IS NO EVIDENCE

14   THAT WAS SUBMITTED WITH THE MOTION FOR SUMMARY JUDGEMENT THAT

15   WOULD SUPPORT A FINDING ALONG THE LINES THAT THE COURT IS

16   TALKING ABOUT NOW.

17        WHAT WE HAVE, AND THAT IS THE PRECISE EVIDENCE THAT WAS

18   NEVER PRODUCED IN DISCOVERY IN THIS CASE, WAS NEVER SUBMITTED

19   TO THE COURT WITH THE MOTION FOR SUMMARY JUDGEMENT, AND THAT

20   THE MOTION WITH RESPECT TO THE TERMS OF SERVICE SHOULD BE

21   DENIED, IT MUST BE DENIED, FRANKLY, FOR THAT REASON ALONE.

22        NOW WHAT THEY DID WAS THEY SUBMITTED A DECLARATION WITH

23   THEIR REPLY BRIEF FROM THEIR EXPERT, WHO ISN'T AN EXPERT IN HOW

24   DO YOU SIGN UP FOR A WHATSAPP ACCOUNT OR ANYTHING LIKE THAT.

25   THEIR 30(B)(6) WITNESS WHO THEY DESIGNATED TO TESTIFY ON THE

1    COMPANY'S BEHALF AS TO HOW YOU AGREE TO THE TERMS OF SERVICE

2    KNEW NOTHING ABOUT IT, AND FORTHRIGHTLY ADMITTED THAT HIS

3    ENTIRE KNOWLEDGE WAS BASED ON TWO CONVERSATIONS HE HAD HAD THE

4    DAY BEFORE, HE HAD NEVER WALKED THROUGH THE PROCESS HIMSELF AND

5    WAS UNABLE TO EXPLAIN IT, EITHER TO ME IN THE DEPOSITION OR TO

6    THE COURT IN THEIR MOTION.

7         SO THEY SUBMIT A SCREEN SHOT, AND THIS IS THE YOUSSEF

8    DECLARATION, AND IT HAS A SNIP IN IT THAT IS ABOUT THE SIZE OF

9    THE SCREEN OF A SMART PHONE, AND THE COURT CAN LOOK AT IT, IT

10   SHOULDN'T BECAUSE IT SHOULD HAVE BEEN PRODUCED IN DISCOVERY IN

11   THIS CASE, IT NEVER WAS, NO OTHER DISCOVERY ON ANY OF THESE

12   POINTS EVER WAS PRODUCED IN DISCOVERY.

13        SO WHAT YOU WOULD BE LOOKING AT IS SOMETHING THAT WAS

14   NEVER PROVIDED TO THE PARTIES, WAS NEVER THE SUBJECT OF

15   CROSS-EXAMINATION, IT'S ONLY SUBMITTED WITH THEIR REPLY BRIEF.

16        BUT THE QUESTION THAT YOU WOULD HAVE IS WHETHER THAT

17   PROVIDES REASONABLY CONSPICUOUS NOTICE OF TERMS AND WHETHER IT

18   REQUIRED A CONSUMER TO TAKE SOME ACTION THAT UNAMBIGUOUSLY

19   MANIFESTED ASSENT TO TERMS.

20        AND THAT IS A FACTUAL QUESTION.  THERE'S A BUNCH OF CASES

21   THAT TALK ABOUT ALL THE ISSUES THAT THE COURT WOULD LOOK TO,

22   AND EVEN THAT, IF IT WERE GOING TO BE CONSIDERED, IS UTTERLY

23   INCOMPLETE BECAUSE THE FACTORS THAT THE COURT WOULD BE REQUIRED

24   TO CONSIDER INCLUDE NOT JUST A SINGLE SCREEN SHOT BUT THE

25   ENTIRE PROGRESSION OF -- THAT SOMEONE WOULD GO THROUGH TO SIGN

1    UP FOR AN ACCOUNT, AND ACCORDING TO THEM, BE BOUND TO THE TERMS

2    OF SERVICE.

3         THE CASE LAW THAT WE DO HAVE, AND I HAVE A NUMBER OF THESE

4    THAT I'VE GOT HERE, YOUR HONOR, THEY ARE NOT IN ANY BRIEF,

5    AGAIN BECAUSE THEY ONLY EVER BROUGHT THIS UP IN THEIR REPLY

6    BRIEF.

7         THE COURT:  WHY DON'T YOU GO BACK TO THE ARGUMENT

8    THEN ON THE ELEMENTS OF THE CFAA CLAIM.

9         MR. AKROTIRIANAKIS:  ALL RIGHT.

10        SO FOLLOWING THE COURT'S DISMISSAL OF THE "WITHOUT

11   AUTHORIZATION" CLAIM, WE HAVE PROCEEDED ON THIS "EXCEEDED

12   AUTHORIZED ACCESS" THEORY.

13        THE SUPREME COURT IS VERY CLEAR ABOUT WHAT THAT REQUIRES,

14   AND THEY CAN'T SHOW IT, AND THEY KNOW IT, AND SO NOW WHAT THEY

15   HAVE COME UP WITH IN OPPOSITION TO THE MOTION FOR SUMMARY

16   JUDGEMENT IS WHAT I WILL CALL A LIMITED AUTHORIZATION THEORY.

17   WHAT THEY ARE SAYING IS, TO USE MR. BLOCK'S TERMINOLOGY, THAT

18   NSO USED WHATSAPP IN WAYS THEY KNEW WERE UNAUTHORIZED AND IN

19   IMPROPER WAYS.

20        THERE IS NO SUCH THING UNDER THE CFAA, YOUR HONOR, YOU

21   NEED TO LOOK ONLY AT THE VAN BUREN CASE.  THAT CASE WAS ABOUT A

22   LAW ENFORCEMENT OFFICER WHO WAS QUERYING LAW ENFORCEMENT

23   COMPUTERS FOR REASONS THAT HAD NOTHING TO DO WITH HIS JOB, AND

24   HE HAD AUTHORIZATION TO ACCESS THOSE COMPUTERS BECAUSE HE WAS

25   AN OFFICER AND FOR OFFICIAL PURPOSES, BUT HE WAS HERE DOING IT,

1    AGAIN TO USE MR. BLOCK'S TERMINOLOGY, IN WAYS HE KNEW WERE

2    UNAUTHORIZED.

3        AND THE VAN BUREN COURT HELD THAT THAT CANNOT BE A

4    VIOLATION OF THE CFAA.  SO THERE IS NO LIMITED AUTHORIZATION

5    THEORY OF LIABILITY UNDER THE CFAA, IT'S EITHER WITHOUT

6    AUTHORIZATION, WHICH THE COURT HAS ALREADY DISMISSED AND IN ANY

7    EFFECT WOULDN'T APPLY NOW BECAUSE THEY ADMIT THAT NSO USED REAL

8    AUTHENTICATION KEYS AND REAL AUTHENTICATION CREDENTIALS TO SEND

9    MESSAGES OVER WHATSAPP SERVERS.  AND IT ALSO CANNOT BE THE

10   EXCEEDED AUTHORIZED ACCESS THEORY BECAUSE THAT WOULD REQUIRE

11   NSO TO HAVE GONE TO PLACES IN THE WHATSAPP SERVERS THAT IT IS

12   NOT ABLE TO GO BY SENDING WHATSAPP MESSAGES, AND IT DIDN'T DO

13   THAT EITHER.

14       SO THE THEORY FALLS APART.  HE SAYS, WELL IF YOU DON'T

15   BELIEVE MY THEORY, THAT WOULD MEAN THAT THE CFAA DOESN'T COVER

16   MUCH, AND I COME BACK TO SAYING THAT THAT MAY BE TRUE AND

17   THAT'S OKAY BECAUSE IT REACHES AS FAR AS CONGRESS WANTS IT TO

18   REACH.  IT'S A CRIMINAL STATUTE, IT IS NARROW IN SCOPE, IN

19   TERMS OF ITS CIVIL REMEDY THAT IT PROVIDES, WHICH IS ALL WHAT

20   IS RELEVANT HERE.

21       AND AGAIN, THIS CASE IS REALLY ABOUT NSO DOING THINGS THAT

22   THEY DIDN'T LIKE NSO DOING BUT THAT WERE NOT TECHNOLOGICALLY

23   PRECLUDED BY THEIR SOFTWARE, WHICH IS WHAT THE CFAA REQUIRES.

24       SO AS I SAY, IT'S A TERMS OF SERVICE CASE, SORT OF DRESSED

25   UP, IF YOU WILL, AS A CFAA CASE, AND IT DOESN'T WORK ON EITHER

1    OF THOSE THEORIES.

2              THE COURT:  OKAY.

3              MR. AKROTIRIANAKIS:  ON THE CONSPIRACY, YOUR HONOR --

4    LET ME FIRST ADDRESS THE REVOCATION OF ACCESS.

5         THIS IS SOMETHING IF THE COURT IS GOING TO ENTERTAIN THIS

6    ATTEMPT TO RESURRECT THE "WITHOUT AUTHORIZATION" CLAIM THAT THE

7    COURT DISMISSED AT THE MOTION TO DISMISS STAGE, UNDER NOSAL II

8    AND POWER VENTURES, REVOCATION OF ACCESS, WHICH COMES INTO PLAY

9    UNDER THE NO AUTHORIZATION THEORY ONLY, OKAY, WOULD HAVE TO BE

10   CATEGORICAL, EXPLICIT, UNEQUIVOCAL AND PARTICULARIZED.

11        AND COUNSEL SAID, OH WELL YEAH, THIS CASE IS JUST LIKE

12   POWER VENTURES, WHICH IT'S INTERESTING THAT HE CALLED IT POWER

13   VENTURES BECAUSE THE OTHER PARTY IN THAT CASE WAS OF COURSE

14   FACEBOOK.  AND IN THAT CASE, THE CATEGORICAL, EXPLICIT,

15   UNEQUIVOCAL AND PARTICULARIZED REVOCATION WAS IN THE FORM OF A

16   CEASE AND DESIST LETTER, OF COURSE FACEBOOK KNOWS HOW TO SEND

17   THOSE SINCE THEY DID ONE IN 2016 OR '18 IN THAT CASE, THERE IS

18   NOTHING LIKE THAT HERE.  THERE IS NOTHING THAT MR. BLOCK

19   DESCRIBED THAT WOULD EITHER BE CATEGORICAL, EXPLICIT,

20   UNEQUIVOCAL OR PARTICULARIZED.

21        HE REFERENCED THESE 2018 SECURITY UPDATES THAT, ACCORDING

22   TO HIM, STYMIED THE HEAVEN VECTOR.  HE SAID IT WAS DISABLED BY

23   SECURITY UPGRADES AFTER THEY FOUND IT.  THAT'S NOT TRUE.

24   WHATSAPP NEVER FOUND THE HEAVEN VECTOR, THAT IS UNDISPUTED.

25   THEY DID SOME TOTALLY UNRELATED CODE MODIFICATION THAT HAD THE

1    ANCILLARY EFFECT OF AFFECTING THE ABILITY OF THE HEAVEN VECTOR.

2    THE EDEN VECTOR, OF COURSE THEY DID DISCOVER, NOT THROUGH

3    THE USE OF FOLLOWING THE ADVICE OF A SECURITY VENDOR WHO SAID

4    WELL WHY DON'T YOU LOOK FOR THESE THINGS, AS I MENTIONED

5    EARLIER, ONCE THEY DID, THEIR WITNESSES TESTIFIED IT WAS

6    TOTALLY OBVIOUS TO THEM.  THEY DIDN'T SEND ANY CEASE AND DESIST

7    LETTER OR DO ANYTHING ELSE EXTERNAL FACING THAT WAS

8    CATEGORICAL, EXPLICIT, UNEQUIVOCAL OR PARTICULARIZED.

9    INTERNAL THINGS THAT WHATSAPP MAY HAVE DONE LIKE MAKING

10   CODE ADJUSTMENTS THAT WOULD HAVE THE EFFECT OF DISABLING THESE

11   VECTORS CANNOT BE A REVOCATION OF ACCESS UNDER NOSAL OR POWER

12   VENTURES OR ANY OF THE OTHER CASES.  YOU NEED TO BE UNEQUIVOCAL

13   AND EXPLICIT TO THE OTHER PARTY.  THINGS THAT NSO DOES NOT SEE

14   IS NOT A REVOCATION.

15   ALL RIGHT.  MR. BLOCK SEVERAL TIMES REFERENCED "INDUCED

16   AND ENCOURAGED" AND SAID THAT NSO WAS RESPONSIBLE FOR ITS

17   CUSTOMERS'S USE OF PEGASUS BECAUSE IT INDUCED AND ENCOURAGED

18   THAT USE.

19   WHAT THAT REALLY IS, YOUR HONOR, IS AN AIDING AND ABETTING

20   ARGUMENT.  THE CFAA DOES NOT AUTHORIZE CIVIL AIDING AND

21   ABETTING LIABILITY, IT DOES NOT HAVE VICARIOUS LIABILITY, THAT

22   THEORY HAS BEEN REJECTED UNIFORMLY BY COURTS ADDRESSING IT.

23   I WILL REFERENCE THE COURT TO THE SUPREME COURT'S CASE IN

24   CENTRAL BANK OF DENVER, 511 U.S. 164, AND THE NINTH CIRCUIT'S

25   DECISION IN FREEMAN V. DIRECTTV, 457 F.3D, 1001, THAT CLEARLY

1    HOLD THAT WHEN A FEDERAL STATUTE CREATES A CIVIL AIDING AND

2    ABETTING LIABILITY, IT DEPENDS ON THE STATUTORY TEXT.

3        AND AS THE COURT IN <u>CENTRAL BANK OF DENVER</u>, THE SUPREME

4    COURT IN <u>CENTRAL BANK OF DENVER</u> HELD, WHEN CONGRESS IMPOSES

5    AIDING AND ABETTING LIABILITY, IT USES THE WORDS AID AND ABET

6    IN THE STATUTORY TEXT.  AND ACCORDING TO THE NINTH CIRCUIT IN

7    FREEMAN, ABSENT SUCH EXPLICIT PROVISIONS, A STATUTE DOES NOT

8    CREATE CIVIL AIDING AND ABETTING LIABILITY.

9        NEITHER CAN PLAINTIFFS ESTABLISH CONSPIRACY BETWEEN NSO

10   AND ITS CUSTOMERS TO BE SURE THERE IS A CONSPIRACY THEORY

11   THAT'S AVAILABLE UNDER THE CFAA, BUT IT WOULD REQUIRE PROOF

12   THAT THE PARTIES AGREED TO VIOLATE THE CFAA.  AND THERE'S JUST

13   NO EVIDENCE ABOUT THAT.

14       IN FACT, WHAT EVIDENCE IS BEFORE THE COURT, WHICH IS THE

15   CONTRACTS BETWEEN NSO AND ITS CUSTOMERS, AND THE LICENSE

16   BETWEEN A PARTICULAR NSO CUSTOMER, THE LICENSE THAT THAT

17   CUSTOMER OBTAINED FROM THE -- OR I'M SORRY, THE END USE

18   CERTIFICATE, THE BACK CUSTOMER SUBMITTED TO THE ISRAELI

19   MINISTRY OF DEFENSE, NSO ACTUALLY PROHIBITS UNLAWFUL USES OF

20   ITS TECHNOLOGY AND IT PUNISHES CUSTOMERS IF THEY STRAY FROM

21   THAT.  IT REQUIRES ITS CUSTOMERS TO COMPLY WITH PRIVACY LAWS,

22   IT REQUIRES ITS CUSTOMERS TO COMPLY WITH JUDICIAL WARRANT

23   REQUIREMENTS AND IT DOES NOT EVIDENCE A CONSPIRACY BETWEEN NSO

24   AND ITS CUSTOMERS TO VIOLATE THE CFAA, QUITE TO THE CONTRARY.

25           THE COURT:  OKAY.  WE ARE FAST APPROACHING THE SECOND

1        HOUR.  WE STILL HAVE THE MOTION FOR SANCTIONS.

2              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

3              THE COURT:  SO JUST TAKE A FEW MINUTES TO WRAP UP,

4        PLEASE.

5              MR. AKROTIRIANAKIS:  YEAH, I JUST WOULD ADD ON THE

6        POINT OF THE CALIFORNIA STATUTE, YOUR HONOR, THE ENTIRETY OF

7        THE SUBSTANCE OF THE ARGUMENT ABOUT THAT, AND I BRING IT UP

8        BECAUSE THE COURT REFERENCED IT AS PART OF THIS -- PART OF THE

9        HEARING -- THE ENTIRE ARGUMENT IN THE MOTION IS THAT FOR THE

10       REASONS DESCRIBED, THIS IS PAGE 25, LINES 23 TO 25, THIS IS TWO

11       LINES, THAT FOR THE SAME REASONS THAT THEY THINK THAT THEY ARE

12       ENTITLED TO SUMMARY JUDGEMENT ON THE CFAA CLAIM, THEY ALSO

13       BELIEVE THAT THEY ARE ENTITLED TO SUMMARY JUDGEMENT ON THE

14       CALIFORNIA CLAIM.

15          THE STATUTES ARE SOMEWHAT DIFFERENT BUT I CAN'T RESPOND TO

16       THAT IN TERMS OF THE DIFFERENCES, YOUR HONOR, THEIR CLAIM THAT

17       THEY ARE ENTITLED TO SUMMARY JUDGEMENT ON THE CALIFORNIA

18       STATUTE IS REALLY JUST THE SAME ARGUMENT THAT THEY HAVE MET.

19             AND I WILL --

20             THE COURT:  AND IS YOUR CLIENT ENTITLED TO SUMMARY

21       JUDGEMENT ON THAT CLAIM?

22             MR. AKROTIRIANAKIS:  WE HAVE MOVED FOR SUMMARY

23       JUDGEMENT ON THAT CLAIM FOR DIFFERENT REASONS, YOUR HONOR.

24       THEY ARE IN THE BRIEF.  THEY ARE IN RESPECT OF

25       EXTRATERRITORIALITY.  I DON'T THINK I NEED TO BELABOR THE

1    COURT'S TIME WITH THAT HERE, THEY ARE PRETTY STRAIGHTFORWARD.

2        FOR THE SAME REASONS THAT THEY CANNOT ESTABLISH EITHER

3    "WITHOUT AUTHORIZATION" OR "EXCEEDING AUTHORIZED ACCESS" AS

4    THOSE HAVE BEEN DEFINED FOR THIS COURT, BY VAN BUREN, THE

5    SUPREME COURT BY THE NINTH CIRCUIT EN BANC IN THE NOSAL CASE

6    AND BY THE NINTH CIRCUIT IN BREKKA, THEY ARE NOT ENTITLED TO

7    SUMMARY JUDGEMENT AND NSO IS ENTITLED TO SUMMARY JUDGEMENT ON

8    THE CFAA CLAIM.

9        THIS CASE, AS I MENTIONED TWICE NOW, IS A TOSS -- TERMS OF

10   SERVICE DISPUTE DRESSED UP AS A CFAA CLAIM, IT SHOULD BE TRIED

11   AS A TERMS OF SERVICE DISPUTE, YOUR HONOR, NOT A DRESSED UP

12   CFAA CLAIM.

13       THE COURT:  AND YOU ARE NOT MOVING FOR SUMMARY

14   JUDGEMENT ON THE BREACH OF CONTRACT CLAIM?

15       MR. AKROTIRIANAKIS:  WE HAVE NOT MOVED FOR SUMMARY

16   JUDGEMENT ON THE BREACH OF CONTRACT CLAIM.  THEY HAVE NOT

17   PRODUCED ANY EVIDENCE IN DISCOVERY OF HOW ONE AGREES TO -- AND

18   I'M NOT EVEN SAYING IN RESPONSE TO THE MOTION, THEY HAVE

19   PROVIDED NOTHING IN DISCOVERY THAT IS ADMISSIBLE EVIDENCE OF

20   HOW SOMEONE WOULD AGREE TO THE TERMS OF SERVICE.

21       I BELIEVE THAT UNDER RULE 56(F), THE COURT COULD GRANT

22   SUMMARY JUDGEMENT IN NSO'S FAVOR ON THAT BASIS BUT THAT WOULD

23   BE BASED ON THAT PROVISION, YOUR HONOR, NOT ON ANY PART OF OUR

24   MOTION WHICH IS DIRECTED TO PERSONAL JURISDICTION AND THE CFAA.

25       THE COURT:  OKAY.  ALL RIGHT.

```
 1          WE NEED TO MOVE THIS ALONG.  I'VE GOT ANOTHER HALF-HOUR
 2     FOR THIS AND I DO WANT TO HEAR WHAT YOU HAVE TO SAY ABOUT THE
 3     BREACH OF CONTRACT CLAIM BEFORE WE TURN TO SANCTIONS, BUT I
 4     ALSO WANT YOU TO ADDRESS WHAT COUNSEL DESCRIBED AS THE ROUTE
 5     THAT THE MESSAGE TAKES AND I WANT YOU TO TELL ME WHETHER OR NOT
 6     YOU ARE IN AGREEMENT THAT YOU WERE INCORRECT AND THAT THE
 7     INFORMATION EXTRACTED DOESN'T COME BACK THROUGH THE SERVER TO
 8     THE WIS BUT INSTEAD GOES TO THE CLIENT'S SERVER.
 9          MAYBE I MISUNDERSTOOD, BUT I WOULD LIKE YOU TO RESPOND TO
10     THAT AND THEN WE WILL MOVE ON.
11               MR. BLOCK:  SURE.
12          AND I WANT TO DISTINGUISH BETWEEN WHAT I WILL CALL THE
13     SURVEILLANCE PHASE.  AFTER THE ATTACK IS OVER, THE PEGASUS
14     AGENT IS ON THE PHONE AND NSO CAN SEE WHATEVER IS HAPPENING,
15     THAT IS A COMMUNICATION BETWEEN THE TARGET DEVICE AND NSO OR
16     ITS CLIENT'S SERVER ARCHITECTURE THAT DOES NOT USE WHATSAPP.  I
17     TRIED TO EXPLAIN THAT AT THE OUTSET BUT WE DON'T DISAGREE ON
18     THAT.
19          HOWEVER, AS PART OF THE ATTACK, THEY ARE GETTING
20     INFORMATION FROM THE DEVICE.  SO LET ME START WITH EXHIBIT 6 TO
21     MY DECLARATION IN SUPPORT OF SUMMARY JUDGEMENT.
22          THESE ARE EXCERPTS FROM THE DEPOSITION OF MR. GAZNELI,
23     CORPORATE REPRESENTATIVE, HEAD OF R&D, AT PAGE 306.
24               "QUESTION:  THAT ALLOWED THE DEFENDANTS TO OBTAIN THE
25     LOCATION OF THE LIBWHATSAPP.SO FILE, CORRECT?
```

```
1              "ANSWER:  YES.

2              "QUESTION:  THAT INFORMATION CAME FROM THE WHATSAPP

3    SERVERS?

4              "ANSWER:  NO.

5              "QUESTION:  FROM THE TARGET DEVICE?

6              "ANSWER:  YES.

7              "QUESTION:  VIA THE WHATSAPP SERVERS?

8              "ANSWER:  YES.

9              "QUESTION:  AND A REGULAR WHATSAPP USER USING THE

10   WHATSAPP CLIENT APP CANNOT OBTAIN THAT INFORMATION, RIGHT?

11             "ANSWER:  AGAIN, USING THE WHATSAPP'S CLIENT, NO, BUT

12   THERE ARE WAYS TO OBTAIN THE INFORMATION."

13        SO WHEN WE TALK ABOUT THIS FINGERPRINTING PROCESS, AND

14   IT'S NOT JUST, DOES THE TARGET HAVE A WHATSAPP ACCOUNT, IT'S

15   WHERE IS THE LOCATION IN THE TARGET DEVICE'S MEMORY OF A

16   PARTICULAR FILE SO THAT I CAN SEND A PRETTY SOPHISTICATED

17   BUFFER OVERFLOW HACK THAT'S GOING -- A MESSAGE THAT'S GOING TO

18   CAUSE THE DEVICE TO WRITE THIS MALICIOUS CODE INTO ITS MEMORY

19   IN A WAY THAT I CAN LATER CAUSE IT TO BE EXECUTED.

20             THE COURT:  AND IT'S THAT INFORMATION THAT GOES BACK

21   TO THE WIS.

22             MR. BLOCK:  THAT INFORMATION GOES THROUGH -- IT

23   CERTAINLY GOES BACK THROUGH THE WHATSAPP SERVERS.  IT GOES BACK

24   TO, I WILL SAY THE PEGASUS INFRASTRUCTURE.

25             AND SO WHETHER THAT'S THE WIS WHICH HAS NOW BEEN DESCRIBED
```

1        AS -- WE HAVE DESCRIBED IT AS THE FAKE CLIENT, WHICH I THINK IS

2        HOW IT WAS DESCRIBED IN DEPOSITION, IT'S BEEN DESCRIBED AS AN

3        INTERFACE, IT GOES BACK TO THE PEGASUS INFRASTRUCTURE IN SOME

4        WAY.

5              WE KNOW THAT THEY, AS PART OF THE ATTACK, HAVE TO OBTAIN

6        THAT INFORMATION BECAUSE IT INFLUENCES THE WAY THEY WRITE LATER

7        PARTS OF THE ATTACK THAT CAUSE MALICIOUS CODE TO BE WRITTEN

8        INTO THE TARGET DEVICE'S MEMORY BASED ON THIS VERY SPECIFIC

9        INFORMATION ABOUT HOW THE MEMORY ON THAT DEVICE IS MAINTAINED.

10             THAT'S NOT, IS IT AN IPHONE 14, IT'S TELL ME ABOUT YOUR

11       MEMORY, WHERE IS THIS LIBRARY, HOW CAN I MANIPULATE IT.

12             I WOULD JUST ALSO POINT YOU TO EXHIBIT 6 TO MY DECLARATION

13       OPPOSING SUMMARY JUDGEMENT, THAT'S NSO'S INTERROGATORY

14       RESPONSES AT PAGE 10, LINES 17 TO 19.  EDEN, ONE OF THE

15       ATTACKS, ALSO OBTAINED INFORMATION ABOUT THE CALLEY DEVICE SUCH

16       AS WHETHER THE CALLEY DEVICE WAS ONLINE BY EXCHANGING MESSAGES

17       FROM WITH THAT CALLEY DEVICE OVER WHATSAPP SERVERS.

18             SO THEY HAVE SAID THEY ARE GETTING INFORMATION FROM THE

19       TARGET DEVICE THROUGH THE WHATSAPP SERVERS, BOTH IN THEIR

20       CORPORATE REPRESENTATIVE TESTIMONY AND IN THEIR INTERROGATORY

21       RESPONSES.

22             THE COURT:  ALL RIGHT.

23             NOW I WOULD LIKE TO HEAR FROM YOU ON THE TERMS OF SERVICE.

24       YOUR CLIENT MOVED FOR SUMMARY JUDGEMENT ON THAT --

25             MR. BLOCK:  YES.

```
1              THE COURT:  -- AND DEFENSE HAS NOT.

2         WHAT IS YOUR RESPONSE?  I MEAN, YOU'VE ALL TALKED A LITTLE

3    BIT ABOUT IT, BUT SPECIFICALLY WHAT'S YOUR RESPONSE TO THE

4    FACT -- TO THE ARGUMENT THAT THERE WAS NO AGREEMENT TO TERMS OF

5    SERVICE?  THAT'S MY QUESTION.

6              MR. BLOCK:  I START WHERE YOUR HONOR DID WITH SOME

7    SURPRISE, WHICH IS TO SAY THE CASES STANDING FOR THE

8    PROPOSITION THAT THE NORMAL WAY OF PRESENTING TERMS AND HAVING

9    SOMEBODY CLICK, THAT THAT WILL CONSTITUTE ASSENT.  SO NOBODY

10   SPENT A LOT OF TIME ON THIS ISSUE IN DISCOVERY.  WE PUT FORWARD

11   A CORPORATE REPRESENTATIVE WHO EXPLAINED, YES, THE REGISTRATION

12   PROCESS REQUIRES US TO PRESENT THE TERMS, AND YES THEY MUST

13   CLICK ON THEM.  AND THAT WAS ENOUGH.  WE PUT THAT PRIMA FACIE

14   FACE FORWARD IN OUR BRIEF.

15             THE COURT:  WHO IS THE EXPERT?  THE CORPORATE

16   REPRESENTATIVE?

17             MR. BLOCK:  THE CORPORATE REPRESENTATIVE IS MR. LEE,

18   WHO GAVE THAT TESTIMONY.  BUT WE HAVE -- I'M NOT SURE EXACTLY

19   HOW WE WOULD DO IT AT TRIAL BUT THAT'S HOW WE DID IT IN

20   RESPONSE TO THEIR DEPOSITION QUESTIONS.

21        WE ALSO HAVE IN DISCOVERY, YOUR HONOR, THEIR KNOWLEDGE OF

22   THE TERMS.  SO I WOULD REFER YOU TO EXHIBIT 24 TO MY

23   DECLARATION, I BELIEVE IT'S MY DECLARATION IN SUPPORT OF

24   SUMMARY JUDGEMENT, NOT OPPOSING, BUT I WILL CONFIRM THAT.

25        THIS IS NSO_WHATSAPP_8957.  THIS IS AN INTERNAL NSO
```

1    DOCUMENT WHERE THEY TALK ABOUT THE TERMS AND WHAT THE TERMS

2    PREVENT THEM FROM DOING AND IN PARTICULAR WHATSAPP CLAIMS

3    AGAINST REVERSE ENGINEERING.

4         SO IF --

5              THE COURT:  BUT THE CLAIMS AGAINST REVERSE

6    ENGINEERING, WELL, THE TERMS OF SERVICE THAT PRECLUDE

7    DECOMPILING AND REVERSE ENGINEERING ARE THE AMENDED TERMS,

8    RIGHT, THEY WEREN'T -- WERE THEY IN THE ORIGINAL?

9              MR. BLOCK:  THEY WERE, YOUR HONOR.

10        SO THE SUBSTANTIVE PROVISIONS OF THE TERMS AS TO WHICH WE

11   ASSERT BREACH ARE IDENTICAL TO THE TERMS BEFORE JANUARY 2020 AT

12   ALL RELEVANT TIMES, AFTER JANUARY 2020 -- I'M GETTING NODS FROM

13   MY TEAM TO MAKE SURE I DIDN'T MAKE A MISTAKE.  THEY ARE

14   IDENTICAL NO CHANGE AT ALL, ALL THOSE SUBSTANTIVE PROVISIONS

15   ARE EXACTLY THE SAME.

16        THE ONLY THING WE CHANGED, YOUR HONOR, AFTER YOU

17   INTERPRETED THE EARLIER TERMS WITH THE FORUM SELECTION CLAUSE

18   TO SAY THAT THEY DID NOT APPLY TO A CLAIM BY WHATSAPP AGAINST

19   NSO, THEN WE AMENDED THOSE TERMS SO THAT THEY, AFTER

20   JANUARY 2020, THEY DO APPLY TO THAT.  THAT'S THE CHANGE.

21        BUT THE SUBSTANTIVE PROVISIONS, THEY WERE IN PLACE

22   BEFOREHAND, THEY WERE IN PLACE AFTER, THERE IS NO QUESTION THAT

23   NSO SIGNED UP TO THE SERVICE.  AND WE ARE NOT TALKING ABOUT A

24   CONSUMER CASE WHERE SOMEBODY SAYS I HAD NO IDEA, RIGHT, NSO WAS

25   IN THE BUSINESS OF CREATING THESE ACCOUNTS, THEY HAD AN ENTIRE

```
1     DEPARTMENT, MR. ESHKAR TESTIFIES ABOUT THIS, THEY CALLED IT

2     WHITE SERVICES, WHICH GENERATES THESE DOZENS OF ACCOUNTS.  THEY

3     SIGNED UP OVER AND OVER AGAIN.

4          AND AFTER WE PUT FORTH THE PRIMA FACIE CASE SAYING OF

5     COURSE IN ORDER TO DO THAT, YOU HAD TO GO THROUGH OUR PROCESS

6     WHICH INVOLVED BEING PRESENTED THE TERMS AND CLICKING ASSENT,

7     THEY DIDN'T COME BACK IN OPPOSITION WITH A DECLARATION THAT

8     SAID NO, NO, I'M THE ONE WHO DID THAT REGISTRATION AND I DON'T

9     RECALL EVER SEEING IT, OR IT WASN'T SUFFICIENTLY CONSPICUOUS,

10    OR ANYTHING OF THE SORT, THEY ONLY SAID AHA, YOU SHOULD HAVE

11    DONE MORE IN DISCOVERY.

12         AND SO THAT WAS A SURPRISE TO US.  I THINK WE DID PLENTY.

13    I THINK WE DID PLENTY.

14              THE COURT:  ALL RIGHT.

15         LET ME TURN --

16              MR. AKROTIRIANAKIS:  YOUR HONOR, EVERY CASE, EVERY

17    CASE HAS SCREEN SHOTS.

18         THE JACKSON CASE SPECIFICALLY SAYS IT'S THEIR BURDEN TO

19    COME FORWARD.  WE DIDN'T NEED TO PUT FORWARD A DECLARATION

20    SAYING WE DIDN'T AGREE TO THE TERMS OF SERVICE.  THEY HAVE TO

21    PROVE THAT WE AGREED TO IT AND THEY DIDN'T DO IT.

22         AND I URGE YOU TO GO TO EXHIBIT 24 AS HE HAS ASKED YOU TO

23    GO, AND IF YOU CAN FIND A MENTION IN THERE OF THE TERMS OF

24    SERVICE, YOUR HONOR, I WILL STAND CORRECTED.

25              THE COURT:  OKAY.  ALL RIGHT.
```

 1          LET'S TURN, PLEASE, TO THE MOTION FOR SANCTIONS BEFORE WE

 2     CONCLUDE.

 3          NOW I DO FIND IT JUST SLIGHTLY ODD THAT YOU -- THAT

 4     WHATSAPP IS MOVING FOR SUMMARY JUDGEMENT AND FOR TERMINATING

 5     SANCTIONS FOR DISCOVERY ABUSE AT THE SAME TIME.

 6          OBVIOUSLY IF YOU THINK YOU ARE ENTITLED TO SUMMARY

 7     JUDGEMENT, IT'S -- YOU CLEARLY DON'T NEED THE DISCOVERY OR YOUR

 8     ALTERNATIVE REQUEST FOR EVIDENTIARY SANCTIONS IS RELIANT UPON

 9     THE COURT'S FINDING IN YOUR FAVOR ON A PARTICULAR EVIDENTIARY

10     SANCTION, CORRECT?

11          MR. ANDRES:  I WOULD DISAGREE WITH THAT, YOUR HONOR.

12          GREG ANDRES FROM DAVIS POLK.

13          YOUR HONOR, WE ARE ABSOLUTELY MOVING FOR SUMMARY

14     JUDGEMENT.  WE BELIEVE THAT THERE IS SUFFICIENT EVIDENCE FOR US

15     TO -- FOR THE COURT TO RULE ON OUR SUMMARY JUDGEMENT.

16          WE ARE OPPOSING THEIR SUMMARY JUDGEMENT, AND YOU WILL HAVE

17     HEARD FROM THE LAWYERS FOR NSO REPEATEDLY ABOUT THE LACK OF

18     EVIDENCE.  THAT IS THE LACK OF EVIDENCE THAT THEY FAILED TO

19     PROVIDE.  AND MOREOVER, THE NINTH CIRCUIT HAS SAID THAT THE

20     FAILURE TO PRODUCE EVIDENCE IS NECESSARILY PREJUDICIAL.

21          SO IT'S NOT INCONSISTENT TO SAY WE THINK THERE IS

22     SUFFICIENT EVIDENCE FOR SUMMARY JUDGEMENT AND FOR US TO SAY

23     THAT NSO FAILED TO MEET ITS DISCOVERY OBLIGATIONS AND THAT THE

24     COURT COULD ALSO DISMISS THIS CASE OR RULE THAT THERE SHOULD BE

25     TERMINATING SANCTIONS.  AND HERE'S WHY --

1          THE COURT:  BUT MY QUESTION IS, ARE ANY OF THE CLAIMS

2     THAT YOU ARE MOVING ON FOR SUMMARY JUDGEMENT DEPENDENT UPON A

3     FINDING BY THE COURT THAT SOME SORT OF EVIDENTIARY SANCTION IS

4     WARRANTED OR DO YOU BELIEVE THE UNDISPUTED EVIDENCE AND THE

5     EVIDENCE YOU DO HAVE IS SUFFICIENT TO WARRANT SUMMARY JUDGEMENT

6     STANDING ALONE, STANDING APART FROM ANY EVIDENTIARY SANCTION?

7          MR. ANDRES:  YES.

8       SO THE ANSWER IS NO, WE ARE NOT RELYING ON ANY RULING BY

9     THE COURT FOR EVIDENTIARY SANCTIONS IN ORDER TO HAVE THE COURT

10    RULE ON SUMMARY JUDGEMENT.  WE THINK THERE IS SUFFICIENT

11    EVIDENCE IN THE RECORD FOR THE COURT TO GRANT SUMMARY

12    JUDGEMENT.

13          THE COURT:  OKAY.

14       AND IF SUMMARY JUDGEMENT WERE GRANTED, THEN WOULD THAT

15    OBVIATE THE NEED OF THE COURT TO DECIDE THESE SANCTIONS MOTION?

16          MR. ANDRES:  YES, YOUR HONOR.  I THINK THE ANSWER IS

17    YES, YOUR HONOR, BUT LET ME THINK ABOUT THAT.

18       I MEAN OBVIOUSLY WE ARE NOT ASKING YOU TO RULE TWICE ON

19    THE SAME GROUNDS, SO I THINK THE ANSWER TO THAT IS YES.

20          THE COURT:  OKAY.  GO AHEAD.  GO AHEAD AND ARGUE.

21          MR. ANDRES:  BUT HERE'S WHY -- SORRY, NOW I'M GETTING

22    A NOTE TO CORRECT ME.

23       THE SANCTIONS ISSUES OR THE EVIDENTIARY RULINGS FOR

24    SANCTIONS COULD ALSO BE RELEVANT FOR THE INJUNCTIVE RELIEF BUT

25    I WILL COME BACK TO THAT.

1        SO TO THE EXTENT YOUR HONOR RULED ON SUMMARY JUDGEMENT,

2   THERE WOULD STILL BE THE PHASE OF THE CASE WHERE WE ARE TALKING

3   ABOUT INJUNCTIVE RELIEF, AND THE EVIDENTIARY SANCTIONS RULINGS

4   MIGHT BE RELEVANT FOR THAT PURPOSE.

5        BUT LET ME TALK ABOUT SANCTIONS, YOUR HONOR, AND THESE

6   FACTS ARE NOT IN DISPUTE.  ON THREE OCCASIONS, YOUR HONOR,

7   NOVEMBER, FEBRUARY AND AUGUST, YOUR HONOR RULED THAT NSO WAS TO

8   PRODUCE DISCOVERY NOTWITHSTANDING ANY ISRAELI LOG RESTRICTIONS.

9   PERIOD, END OF STORY.  WE HAD THE RICHMARK HEARING, WE THEN HAD

10  THE MOTION TO COMPEL AND THEN WE HAD A MOTION FOR

11  CLARIFICATION.  ALL THREE OF THOSE ORDERS HAVE NOW BEEN

12  VIOLATED BECAUSE NSO HAS NOT PRODUCED THAT EVIDENCE; IN FACT,

13  IN CLAIMING THAT THEY HAVE COMPLIED WITH THESE DISCOVERY

14  ORDERS, NSO REPEATEDLY SAYS THAT THEY HAVE DONE SO BALANCING

15  THE ISRAELI LAW RESTRICTIONS, WHICH IS EXACTLY THE OPPOSITE OF

16  WHAT YOUR HONOR RULED IN RICHMARK, YOUR HONOR RULED THAT THOSE

17  ISRAELI LAW RESTRICTIONS WERE NOT RELEVANT FOR THE DEFENDANT'S

18  NEED TO PRODUCE DISCOVERY.

19       SO ONE MIGHT ARGUE THAT THEY ARE TRYING TO REARGUE THE

20  RICHMARK ANALYSIS, REALLY WHAT THEY ARE DOING IS JUST IGNORING

21  THAT BECAUSE THEY CONTINUE TO TALK ABOUT THEIR DISCOVERY

22  OBLIGATIONS IN THAT CONTEXT.

23       SO THERE IS THE ISSUE ABOUT THE PRODUCTION OF COMPUTER

24  CODE, THERE IS THE ISSUE WITH RESPECT TO E-MAILS, THERE IS THE

25  ISSUE WITH RESPECT TO FINANCIAL DATA, THERE IS THE ISSUE WITH

1    RESPECT TO THE DEFENDANT'S INSTRUCTING THEIR WITNESSES NOT TO

2    ANSWER A CERTAIN QUESTION.

3         BUT LET ME, IN THE INTEREST OF TIME, TALK ABOUT THE

4    PRODUCTION OF COMPUTER CODE.

5         NSO HAS CONCEDED TWO CRUCIAL FACTS.  ONE, THEY DIDN'T

6    OBTAIN AN EXPERT LICENSE TO PRODUCE THAT EVIDENCE HERE IN THE

7    UNITED STATES.  THAT EVIDENCE HAS BEEN PRODUCED IN ISRAEL.

8         AND IT'S NOT AN ISSUE OF GEOGRAPHY, PUTTING ASIDE THE

9    DIFFICULTY ONE MIGHT HAVE GETTING TO ISRAEL THESE DAYS, IT'S

10   THE ACCESS TO THAT INFORMATION.  THAT INFORMATION CANNOT BE

11   VIEWED BY A LAWYER AT DAVIS POLK OR ANY OUTSIDE COUNSEL FOR

12   META.  IT CAN'T BE VIEWED BY ANY LAWYER AT META, IT CAN'T BE

13   VIEWED BY ANY EXPERT WITNESS, IT CAN'T BE BROUGHT TO THIS COURT

14   HERE IN THE UNITED STATES.  IT CERTAINLY CAN'T BE USED AT

15   TRIAL.

16        SO THE NOTION THAT NSO HAS SOMEHOW COMPLIED WITH THEIR

17   DISCOVERY OBLIGATIONS BY PRODUCING THIS CODE IN ISRAEL WHERE NO

18   ONE CAN SEE IT AND NOBODY CAN ANALYZE IT AND IT CAN'T BE USED

19   IN THIS PROCEEDING IN ANY WAY, SHAPE OR FORM, BELIES THE IDEA

20   THAT THEY HAVE COMPLIED WITH THE COURT'S ORDER BY PRODUCING

21   THAT.

22        AND AGAIN, NOT ONE ORDER, YOUR HONOR, BUT THREE.

23        SO IN THE FIRST INSTANCE, THEY VIOLATED THE COURT'S ORDER

24   BY NOT PRODUCING THAT EVIDENCE IN A WAY THAT COULD BE USED IN

25   WHICH VIOLATES THE COURT'S ORDER OF NOVEMBER 15TH,

1    FEBRUARY 23RD, AND AUGUST 1ST.

2         THE BOTTOM LINE IS YOUR HONOR RULED THAT NOTWITHSTANDING

3    ANY ISRAELI RESTRICTIONS, THAT EVIDENCE HAD TO BE PRODUCED IN

4    THIS COURT AND IT HASN'T.

5         SECONDLY, EVEN IF, AND WE DON'T THINK YOUR HONOR SHOULD,

6    EVEN IF THAT ISRAELI PRODUCTION BY NSO WAS IN FACT A PRODUCTION

7    OF SOME SORT, IT IS CLEARLY NOT THE FULL FUNCTIONALITY OF THE

8    PEGASUS CODE THAT YOUR HONOR ORDERED, IT'S A PART OF IT.  AND

9    NSO HAS CONCEDED THAT, IT IS NOT THE FULL FUNCTIONALITY THAT

10   YOUR HONOR REQUIRED UNDER THE ORDERS, AGAIN, WHICH I HAVE

11   MENTIONED.

12        NOW YOU MAY HEAR FROM THE DEFENDANTS THAT SOMEHOW THIS

13   EVIDENCE ISN'T IMPORTANT OR IT DOESN'T MATTER BECAUSE META

14   RECEIVED THE SAME EVIDENCE FROM THE FBI.  AND THAT'S A RED

15   HERRING AND NOT TRUE.

16        FIRST OF ALL, THE EVIDENCE THAT WE RECEIVED FROM THE FBI,

17   THERE IS NO WAY THAT WE COULD EVER COMPARE THAT TO THE EVIDENCE

18   THAT'S BEEN PRODUCED IN ISRAEL BECAUSE WE CAN'T SEE IT.  AND

19   THE EVIDENCE THAT WAS PRODUCED BY THE FBI WAS A PORTION OF THE

20   AWS SERVER, NOT THE ENTIRE THING, AND CERTAINLY -- AGAIN, THERE

21   IS NO WAY TO COMPARE THAT TO WHAT'S BEEN PRODUCED IN ISRAEL FOR

22   THE SERVER WHICH WE OBVIOUSLY HAVEN'T SEEN.  SO THAT'S A SECOND

23   AND SEPARATE VIOLATION OF THE COURT'S ORDER.

24        AS I SAID, THERE ARE ISSUES THAT WE MENTIONED IN OUR BRIEF

25   ABOUT E-MAILS, THEY HAVEN'T PRODUCED ANY E-MAILS, THAT'S

1    INCONCEIVABLE THAT THAT'S POSSIBLE.  THEY HAVE DIRECTED

2    WITNESSES NOT TO ANSWER DEPOSITION QUESTIONS.  THEY BASICALLY,

3    AS ONE OF MY COLLEAGUES HAVE MENTIONED, HAVE SAID THAT THESE

4    EXPLOITS CONTINUE UP UNTIL THE LAST DAY THAT THEY WOULD ALLOW

5    ANYBODY TO ASK QUESTIONS.  THEY BASICALLY TOOK YOUR HONOR'S

6    RULING WITH RESPECT TO DOCUMENT DISCOVERY AND IMPOSED THAT IN

7    DEPOSITION AND SAID THE -- THEY INSTRUCTED THEIR CLIENTS NOT TO

8    ANSWER QUESTIONS AFTER A PARTICULAR TIME FRAME.

9         LET ME TELL YOUR HONOR WHY WE THINK TERMINATING SANCTIONS

10   ARE APPROPRIATE HERE AND WHY THE DEFENDANT'S CONDUCT HAS BEEN

11   WILLFUL.

12        IN A CASE ABOUT COMPUTER INTRUSIONS AND COMPUTER CODES

13   THAT WERE USED FOR THAT COMPUTER INTRUSIONS, THE DEFENDANTS

14   HAVE NOT PRODUCED THE COMPUTER CODE IN THIS CASE.  THAT IS

15   SOMETHING THAT YOUR HONOR ON THREE SEPARATE OCCASIONS RULED.

16        THEY ASKED FOR A SIX-MONTH AJOURNMENT SO THAT THEY COULD

17   FIGURE OUT HOW TO PRODUCE THAT EVIDENCE.  AND HERE WE ARE AND

18   THEY HAVEN'T DONE THAT.

19        AND NOTABLY, YOUR HONOR, AT THAT TIME, WHEN YOUR HONOR,

20   AFTER EXTENDED ARGUMENT, ALLOWED FOR A SIX-MONTH DELAY IN

21   DISCOVERY, MOVED THE TRIAL DATE, YOUR HONOR SPECIFICALLY SAID,

22   I WILL NOT HESITATE TO IMPOSE SANCTIONS IF NSO FAILS TO PRODUCE

23   THAT EVIDENCE.

24        NOW THEY HAVE MADE A CONSCIENCE DECISION TO RELY, ONE

25   MIGHT SAY HIGH, BUT IN EITHER CASE RELY ON THESE ISRAELI LAW

1    RESTRICTIONS TO NOT PRODUCE THAT EVIDENCE.  AGAIN, COMPLETELY

2    CONTRARY TO THE COURT'S ORDER.  THAT IS A WILLFUL DECISION THAT

3    THEY HAVE MADE.

4         WE KNOW THAT THEY HAVE DONE OTHER THINGS IN THIS CASE THAT

5    ALSO SUGGEST THAT THEY NEVER INTENDED TO PRODUCE THAT CODE OR

6    THAT THEY HAVE DONE THINGS LIKE MOVING THE CODE AND THE SERVER

7    INFORMATION FROM GERMANY BACK TO ISRAEL DURING THE COURSE OF

8    THIS CODE.

9         PUBLIC REPORTING HAS ALSO SUGGESTED, WHETHER IT'S TRUE OR

10   NOT, I CAN'T SAY, THAT THE NSO SPECIFICALLY WENT TO THE ISRAELI

11   GOVERNMENT TO SEEK SOME PROTECTION.

12        NOW THE RECORD FROM THE DEFENDANTS IS CONFLICTING AS TO

13   THAT POINT.  THEY ADMIT THAT IN THE BEGINNING THEY WENT AND

14   SPOKE TO THE ISRAELI GOVERNMENT OR THEY WERE CALLED IN BY THEIR

15   REGULATORS TO TALK ABOUT THE DISCOVERY IN THIS CASE, AND AT

16   OTHER TIMES THEY SAY, WE DIDN'T ASK FOR THE SEIZURE ORDER.

17        BUT WE KNOW AT LEAST THAT THE DEFENDANTS HAVE FAILED TO

18   ANSWER ANY QUESTIONS OR PROVIDE ANY GOOD FAITH EXPLANATION FOR

19   WHY THEY HAVEN'T PRODUCED THE CODE OR WHY IT IS -- AGAIN,

20   ACCORDING TO THE REPORTING, THAT A LAWYER OR PARTNER AT KING &

21   SPALDING WROTE AN E-MAIL TO SOMEBODY REPRESENTING THE ISRAELI

22   GOVERNMENT SAYING, ARE YOU GOING TO RESCUE US FROM OUR

23   OBLIGATIONS TO PRODUCE DISCOVERY IN THIS CASE.

24        SO AGAIN, THAT'S BEEN WHAT'S BEEN REPORTED IN THE PRESS, I

25   CAN'T VERIFY THAT THAT'S TRUE, BUT WE HAVE ASKED THE DEFENDANTS

1    TO RESPOND TO THAT, TO SAY WHETHER IT'S TRUE OR FALSE, HOW THAT

2    RELATES, BUT THERE IS NO QUESTION THAT THE DECISIONS IN THIS

3    CASE BY NSO HAVE BEEN KNOWING AND WILLFUL NOT TO PARTICIPATE IN

4    DISCOVERY ON THE MOST IMPORTANT PART.

5        I'M JUST LOOKING AT THE CLOCK, YOUR HONOR, BECAUSE I'M

6    MINDFUL THAT I'M RUNNING OUT OF TIME.  WITH THAT, I'M HAPPY TO

7    ANSWER ANY QUESTIONS.

8        I WILL SAY THAT IF YOUR HONOR IS NOT INCLINED TO IMPOSE

9    TERMINATING SANCTIONS, AND AGAIN WE BELIEVE THAT THERE'S EVERY

10   REASON TO, AND THIS, WHILE UNIQUE REMEDY IN A CASE ABOUT

11   COMPUTER CODE WHERE THE COMPUTER CODE HAS NOT BEEN PRODUCED, IS

12   CERTAINLY A CASE THAT FALLS IN THAT BAILIWICK.

13       IF YOUR HONOR WAS INSTEAD INCLINED TO ISSUE RULINGS WITH

14   RESPECT TO EVIDENTIARY RULINGS, WE HAVE OUTLINED THOSE ISSUES

15   IN OUR BRIEF, AND I THINK IF THAT'S THE DIRECTION THE COURT WAS

16   HEADED, WE WOULD BE HAPPY TO ADDRESS THAT IN SOME ADDITIONAL

17   BRIEFING.  BUT WITH THAT, I'M HAPPY TO ANSWER ANY QUESTIONS AND

18   I'M MINDFUL OF THE TIME.

19           THE COURT:  WELL, THE AUTHORITY CLEARLY PREFERS CASES

20    BE DECIDED ON THE MERITS AS OPPOSED TO VIA A TERMINATING

21    SANCTION.

22       DO YOU HAVE A VIEW AS TO WHAT IS PREFERABLE IN THIS CASE

23    IF THE COURT WERE INCLINED TO GRANT YOU SUMMARY JUDGEMENT AND

24    TO GRANT YOU TERMINATING SANCTIONS?  I DON'T WANT TO HAVE TO DO

25    BOTH IF I DETERMINE THAT BOTH ARE WARRANTED.

1          MR. ANDRES:  YOUR HONOR, I CERTAINLY AGREE THAT THE

2     CASE LAW IS CLEAR THAT A RESOLUTION ON THE MERITS IS

3     PREFERABLE, BUT I WILL SAY THAT THE CONDUCT HERE WITH RESPECT

4     TO DISCOVERY IS FAIRLY EGREGIOUS IN LIGHT OF THE THREE

5     INSTANCES IN WHICH WE LITIGATED THE ISSUE ABOUT THE <u>RICHMARK</u>

6     ISSUE AND THE ISRAELI LAW.

7          SO I THINK WE WOULD CLEARLY PREFER TO HAVE A RESOLUTION ON

8     THE MERITS.  I'M NOT LOOKING BEHIND ME TO SEE IF ONE OF MY

9     COLLEAGUES IS FURIOUSLY WRITING ME A NOTE TO CORRECT ME, BUT I

10    THINK CLEARLY WE UNDERSTAND THE PUBLIC POLICY PREFERS A

11    RESOLUTION ON THE MERITS.

12          THE COURT:  OKAY.

13          MR. ANDRES:  I HOPE I'VE ANSWERED YOUR QUESTION.

14          THE COURT:  YEAH.

15          OKAY.  NOW I HAVE TO SAY, I WENT BACK AND LOOKED AT THE

16    THREE ORDERS THAT HE REFERENCED, AND INDEED I THINK I WAS

17    PRETTY CLEAR THAT THE COMPUTER CODE WAS SUPPOSED TO BE

18    PRODUCED.

19          MR. CRAIG:  AND IT WAS, YOUR HONOR, IT WAS ABSOLUTELY

20    PRODUCED.

21          I WANT TO ADDRESS A COUPLE MISREPRESENTATIONS -- THIS IS

22    AARON CRAIG FROM KING & SPALDING.  I WANT TO ADDRESS A COUPLE

23    MISREPRESENTATIONS THAT COUNSEL JUST MADE.

24          THE FIRST IS THAT THE AUGUST 1ST ORDER ADDRESSES ISRAELI

25    LAW RESTRICTIONS.  I ACTUALLY JUST READ IT AGAIN WHILE COUNSEL

1    WAS TALKING, IT DOESN'T SAY ANYTHING ABOUT ISRAELI LAW

2    RESTRICTIONS.  COUNSEL JUST SAID YOUR HONOR RULED IN THIS

3    ORDER, WHICH IS THE FIRST ORDER THAT ORDERED NSO TO PRODUCE

4    COMPUTER CODE --

5            THE COURT:  OKAY.

6            MR. CRAIG: --  THAT IT DOESN'T SAY ANYTHING ABOUT

7    PLACE OF PRODUCTION, IT DOESN'T SAY ANYTHING ABOUT

8    NOTWITHSTANDING ISRAELI LAW RESTRICTIONS YOU NEED TO PRODUCE

9    IT.

10       WE HAD THREE WEEKS BETWEEN THIS ORDER AND THE START OF

11   DEPOSITIONS OF OUR CLIENTS AND WE PRODUCED IT IN ISRAEL.

12           THE COURT:  I WILL TELL YOU SIMPLY, JUST GET TO THE

13   CHASE --

14           MR. CRAIG:  YES.

15           THE COURT:  -- IN MY VIEW, THAT IS NOT SUFFICIENT.

16           MR. CRAIG:  YOUR HONOR, YOU MAY NOT VIEW IT AS

17   SUFFICIENT BUT IT IS CLEARLY COMPLIANT WITH YOUR ORDER.

18           THE COURT:  NO.  I DON'T BELIEVE IT IS.  MY ORDER WAS

19   IT HAS TO BE PRODUCED FOR THIS LITIGATION.

20           MR. CRAIG:  AND --

21           THE COURT:  FOR THIS LITIGATION.

22           MR. CRAIG:  YES, YOUR HONOR.

23           THE COURT:  MEANING THAT IT'S SOMETHING THEY COULD

24   SEE, THAT IT'S SOMETHING THAT COULD BE PRESENTED IN THIS

25   COURTROOM.

1          MR. CRAIG:  YOUR HONOR, COUNSEL --

2          THE COURT:  I THINK THAT'S -- EVEN IF I DIDN'T SAY IT

3    EXACTLY THAT WAY, THAT'S IMPLICIT, AND I VIEW ANYTHING ELSE AS

4    JUST PURE GAMESMANSHIP AND AN INTENTIONAL VIOLATION OF MY

5    ORDER.

6          MR. CRAIG:  I HAVE NEVER SEEN A CASE, YOUR HONOR,

7    SANCTIONING A PARTY, LET ALONE TERMINATING SANCTIONS FOR

8    VIOLATING SOMETHING THAT THE COURT BELIEVES IS IMPLICIT IN ITS

9    ORDER.

10         WE PRODUCED IT TO THEIR COUNSEL OF RECORD IN THIS CASE.

11   THIS IS A COUNSEL WHO APPEARED IN THIS CASE LAST YEAR AND WE

12   PRODUCED IT TO HIM.  AND THAT'S UNDISPUTED.

13         THE COURT:  OKAY.  I DON'T NEED TO HEAR ANYMORE.

14         IF THAT'S THE POSITION YOU ARE TAKING, THAT YOU HAVE

15   ALREADY PRODUCED IT, THEN I DON'T NEED TO HEAR ANYMORE ON THIS

16   MOTION.

17         MR. CRAIG:  YOUR HONOR, THAT IS NOT OUR ENTIRE

18   POSITION, BY ANY MEANS.

19         YOUR HONOR, WE HAD THREE WEEKS TO DO SO AND THAT'S WHAT WE

20   DID.

21         IF YOUR HONOR IS GOING TO CLARIFY AN ORDER OR SAY THAT IT

22   NEEDS TO BE PRODUCED IN THE UNITED STATES, OUR CLIENT WILL OF

23   COURSE GO TO THE GOVERNMENT OF ISRAEL, SEEK THE LICENSE WE GOT,

24   EXCLUDING COMPUTER CODE.  THEY CAN SEEK A NEW LICENSE TO THE

25   GOVERNMENT OF ISRAEL AND SAY, IN LIGHT OF THE FACT THAT

1    PLAINTIFFS ALREADY HAVE A COPY OF THIS, AND THEY DO, WHICH IS

2    SOMETHING THEY DIDN'T TELL YOUR HONOR WHEN THEY FILED THEIR

3    MOTION TO COMPEL AND FILED THEIR RICHMARK MOTION OF WHICH THE

4    FIRST FACTOR IS THE IMPORTANCE OF THE CODE TO THE LITIGATION,

5    THEY DID NOT TELL YOUR HONOR, BY THE WAY WE ALREADY HAVE A

6    COPY, WE WANT THEM TO VIOLATE ISRAELI LAW AND PRODUCE IT, BUT

7    WE ALREADY HAVE A COPY.

8        I THINK THAT'S A CRITICAL FACTOR IN KEEPING THE COURT'S

9    DIRECTION.

10       COUNSEL ALSO SAID THEY CAN'T COMPARE WHAT THEY HAVE TO THE

11   VERSION THAT WAS COMPARED IN ISRAEL.  WHY NOT?  THEY HAVE

12   COUNSEL IN ISRAEL WHO ARE ENTITLED TO VIEW THE CODE AND THAT

13   COUNSEL CAN VIEW THE FBI CODE THAT THE FBI GAVE THEM.

14       OUR CLIENT CAN'T DO THAT, OUR CLIENT CAN'T MAKE THAT

15   COMPARISON.

16           THE COURT:  SO THE CODE THAT THEY HAVE THAT CAN BE

17   USED BY COUNSEL IN THIS CASE DIDN'T COME FROM YOU, DIDN'T COME

18   FROM NSO?

19           MR. CRAIG:  WELL FIRST OF ALL, WE DO THINK THAT THEY

20   COULD USE IT IN THIS CASE IF THEY GOT A LICENSE FROM THE

21   GOVERNMENT OF ISRAEL TO DO SO.

22           THE COURT:  WELL WHY SHOULD THEY HAVE TO GET THE

23   LICENSE?  YOU WERE ORDERED TO PRODUCE IT.

24           MR. CRAIG:  AND WE HAVE PRODUCED IT.

25       YOUR HONOR, THEY CAN ALSO NOT ONLY -- WHETHER OR NOT THEY

1    CAN EXPORT IT OUT OF ISRAEL, THEY CAN HAVE AN EXPERT REVIEW IT

2    IN ISRAEL.  WE HAVE TOLD THEM THAT WE ARE WILLING TO WAIVE THE

3    TIME PERIOD, IN TERMS OF FINDING EXPERTS TO REVIEW IT, AND THAT

4    EXPERT CAN COMPARE WHAT THEY ALREADY HAVE TO THE CODE THAT WE

5    PRODUCED IN ISRAEL, WHICH HAD WE HAD LEGAL PERMISSION FROM THE

6    GOVERNMENT OF ISRAEL TO DO SO, WE WOULD HAVE DONE SO IN THIS

7    COUNTRY.

8        BUT YOUR HONOR, YOUR HONOR'S RULING IS -- WAS TO PRODUCE

9    THE CODE.  WE HAD A VERY LIMITED AMOUNT OF TIME.  COUNSEL IS

10   TALKING ABOUT SIX MONTHS, THERE WASN'T ANY ORDER SIX MONTHS AGO

11   TO PRODUCE CODE, THAT ORDER WAS ISSUED IN THE LAST HUNDRED

12   DAYS, AND WE HAD THREE WEEKS BETWEEN THEN AND THE START OF

13   DEPOSITIONS TO PRODUCE IT AND WE PRODUCED IT IN THE ONLY

14   LOCATION WHERE WE COULD.

15       THERE IS NO PRECEDENT FOR SANCTIONING A PARTY FOR DOING

16   WHAT THE COURT'S ORDER COMPELLED IT TO DO.

17           THE COURT:  ALL RIGHT.

18           MR. CRAIG:  MAY I ADD ONE MORE POINT, YOUR HONOR?

19       ALL OF THIS RELATES TO THE QUESTION OF FULL FUNCTIONALITY

20   OF PEGASUS.  WE HAVE SUBMITTED AN ENORMOUS AMOUNT OF

21   DOCUMENTARY EVIDENCE THAT DEMONSTRATES THE FULL FUNCTIONALITY

22   OF PEGASUS.  THEY HAVE NOT REFUTED THAT OR REBUTTED IT.

23       THEY ACKNOWLEDGE THAT OUR DOCUMENT PRODUCTION, WHICH DID

24   TAKE SEVERAL MONTHS TO GET PERMISSION FROM THE GOVERNMENT OF

25   ISRAEL TO PRODUCE, DOES IN FACT CONVEY AND IS SUFFICIENT TO

1        SHOW THE FULL FUNCTIONALITY OF PEGASUS.

2            AND IN LIGHT OF THAT, THIS CODE IS SUPERFLUOUS,

3        PARTICULARLY IN LIGHT OF THE FACT THAT THEY HAVE NOT -- THAT

4        THEY ALREADY HAVE A COPY.

5            YOUR HONOR, COUNSEL MENTIONED AN ARTICLE IN *THE GUARDIAN*

6        ABOUT MY PARTNER, ROD ROSENSTEIN, THEY ATTRIBUTE THAT TO SAYING

7        THAT HE ASKED THE GOVERNMENT OF ISRAEL TO INTERVENE IN

8        DISCOVERY OBLIGATIONS.  THAT'S NOT WHAT THAT ARTICLE SAYS, THE

9        ARTICLE SAYS THAT ROD ROSENSTEIN, THE FORMER DEPUTY ATTORNEY

10       GENERAL, HAD A CONVERSATION WITH COUNSEL FOR THE GOVERNMENT OF

11       ISRAEL ASKING IT TO COME TO THE RESCUE.

12           IT DOESN'T SAY ANYTHING ABOUT DISCOVERY OBLIGATIONS, AND

13       MY UNDERSTANDING IS THAT CONVERSATION WAS NOT ABOUT DISCOVERY

14       OBLIGATIONS.  THERE IN FACT WERE NO PRODUCTION OBLIGATIONS AT

15       THAT TIME, THIS WAS IN 2020.  THE CONVERSATION WAS ABOUT, WE

16       WOULD LIKE THE GOVERNMENT OF ISRAEL, OR WOULD THE GOVERNMENT OF

17       ISRAEL ASK THE UNITED STATES STATE DEPARTMENT TO ASK THE

18       NORTHERN DISTRICT OF CALIFORNIA TO DISMISS THIS CASE.

19           THIS IS SOMETHING THAT THERE IS AMPLE PRECEDENT FOR IN

20       CASES INVOLVING ISSUES OF NATIONAL SECURITY WHICH THE

21       GOVERNMENT OF ISRAEL HAS ALREADY IDENTIFIED THAT ITS NATIONAL

22       SECURITY CONCERNS AND WHICH YOUR HONOR IS WELL FAMILIAR.

23           THAT HAD NOTHING TO DO WITH A CONVERSATION ABOUT

24       DISCOVERY, BUT COUNSEL JUST INVENTS THAT, ADDS IT ON TO THE

25       PUBLIC REPORTING.

1          THERE HAS BEEN NO EFFORT TO -- THERE HAS BEEN A MASSIVE

2     EFFORT BY THE DEFENDANTS TO COMPLY WITH THE COURT'S ORDERS.  WE

3     HAVE PRODUCED 50,000 PAGES OF TECHNICAL MATERIAL OF WHICH

4     SAMPLES OF THAT HAVE BEEN PROVIDED TO THE COURT AS EXHIBITS 1

5     THROUGH 100 TO MY DECLARATION.  THAT'S PART OF DOCKET ENTRY

6     429.  AND IT'S REALLY UNREFUTED THAT WE HAVE PROVIDED

7     INFORMATION THAT IS RESPONSIVE TO EACH OF THE DOCUMENT REQUESTS

8     THAT YOUR HONOR GRANTED THEIR MOTION TO COMPEL, AND THAT THAT

9     DEMONSTRATE, EVEN THOUGH THIS WASN'T PART OF THEIR MOTION TO

10    COMPEL, THAT DEMONSTRATE THE FULL FUNCTIONALITY OF THE PEGASUS

11    SYSTEM.  AND WE PRESENTED THAT IN OPPOSITION AND THEY DIDN'T

12    RESPOND IN REPLY.

13          MR. ANDRES:  ONE MINUTE, YOUR HONOR.  FIVE THINGS IN

14     ONE MINUTE, PLEASE.

15          THE COURT:  OKAY.

16          MR. ANDRES:  ONE, THERE ARE THREE EXPLOITS AT ISSUE

17     THAT YOUR HONOR ORDERED THE DEFENDANTS TO PRODUCE.

18          YOUR HONOR DIRECTED THE DEFENDANTS TO PROVIDE THE FULL

19     FUNCTIONALITY OF ALL RELEVANT SPYWARE.  THAT'S A QUOTE FROM THE

20     FEBRUARY 23RD, 2024, AND THEY HAVEN'T PRODUCED THAT, EVEN WHAT

21     THEY PRODUCED IN ISRAEL; ONE.

22          TWO, YOUR HONOR RULED ON NOVEMBER 15TH THAT THEY HAD TO

23     MAKE THE PRODUCTION, DESPITE THE DECL AND OTHER ISRAELI LAW

24     RESTRICTIONS, DESPITE IT.  SO YOU SPECIFICALLY SAID THAT.

25          THERE IS ABSOLUTELY CASE LAW FOR TERMINATING SANCTIONS

1    WHEN A PARTY IS RELYING ON FOREIGN LAW AS AN EXCUSE NOT TO MAKE

2    PRODUCTIONS.

3        AND THIRDLY WITH RESPECT TO THE ISSUES WITH ROD ROSENSTEIN

4    AND THE PUBLIC REPORTING, I THINK THE RECORD IS MORE FULSOME

5    THAN WHAT COUNSEL HAS DESCRIBED BECAUSE THERE IS ALSO A MEMO

6    ANALYZING THE RICHMARK CASE THAT WAS ALSO LEAKED, AND IF TRUE,

7    SUGGEST THAT THEY WERE TALKING ABOUT THESE SPECIFIC ISSUES.

8        MOREOVER, THIS IS THE FIRST TIME WE HAVE EVER HEARD ANY

9    REBUTTAL TO THAT.

10       THANK YOU, THANK YOU FOR YOUR TIME, HAVE A WONDERFUL

11   EVENING.

12           THE COURT:  OKAY.  LET ME REITERATE ABOUT THE BRIEFS

13    IN THE CASE.

14       I NEED TO LOOK AT THE SANCTIONS MOTION JUST A LITTLE BIT

15    MORE CLOSELY BUT I WOULD CERTAINLY BE WILLING TO ALLOW YOU ALL

16    TO REDACT ANY INFORMATION PERTINENT TO THE RESTRICTIONS, THE

17    FOREIGN RESTRICTIONS THAT WE HAVE TALKED ABOUT THROUGHOUT THE

18    COURSE OF THIS CASE.

19       BUT ALL OF THE TECHNICAL INFORMATION ABOUT THE

20   FUNCTIONALITY AND SOME OF IT'S PLAINTIFF'S TECHNICAL

21   INFORMATION AS WELL AS THE DEFENDANT'S TECHNICAL INFORMATION,

22   I'M NO LONGER ALLOWING THAT TO PROCEED UNDER SEAL FOR PURPOSES

23   OF THIS SERIES OF MOTIONS, AND IF THIS MATTER GOES TO TRIAL, IT

24   WON'T BE SEALED AT TRIAL EITHER.

25           MR. ANDRES:  YOUR HONOR, ANY REDACTIONS ON THE SIDE

1      OF OUR CLIENT ARE SOLELY BECAUSE OF THE PROTECTIVE ORDER.

2          THE COURT:  I READ THAT IN YOUR PAPERS AND I THINK I

3      UNDERSTOOD THAT.  BUT THE -- I MEAN, WHEN I WAS READING THE

4      DEFENSE BRIEFS, I JUST COULDN'T BELIEVE HOW MUCH OF THE

5      MATERIAL IS REDACTED THAT HAS NOTHING TO DO WITH ANYTHING OTHER

6      THAN THE TECHNICAL ASPECT OF THE DEVICES AT ISSUE, THE

7      COMPUTERS AT ISSUE IN THIS CASE, AND THAT'S SIMPLY NOT

8      PROTECTABLE.  ALL RIGHT?

9          SO I HAVEN'T READ YOUR MOTION THOUGH, SO I'M JUST SAYING I

10     WILL TAKE A LOOK AT THE MOTIONS WITH REGARD TO THE BRIEFING.

11     AND WITH REGARD TO ALL THE OTHER EXHIBITS, I HAVEN'T -- IT'S

12     GOING TO TAKE ME A WHILE TO GET THROUGH ALL OF THAT.  BUT AS

13     FAR AS THE MOTIONS FOR SUMMARY JUDGEMENT, THOSE NEED TO BE

14     FILED UNREDACTED ON THE PUBLIC DOCKET, AND THE MOTION FOR

15     SANCTIONS AS WELL EXCEPT THAT YOU CAN REDACT ANY OF THE

16     INFORMATION ABOUT THE FOREIGN INVOLVEMENT AND RESTRICTIONS.

17         MR. ANDRES:  THANK YOU, YOUR HONOR.

18         MR. CRAIG:  THANK YOU, YOUR HONOR.

19         MR. ANDRES:  YOUR HONOR, THERE IS ALSO ONE ISSUE THAT

20     I THINK THE PARTIES AGREE ON WITH RESPECT TO STIPULATION TO

21     EXPERT TESTIMONY, I'M GOING TO ASK MY PARTNER, MR. PEREZ, TO

22     ADDRESS -- I'M GOING TO ASK HIM TO BE BRIEF.

23         MR. PEREZ-MARQUES:  VERY BRIEF, YOUR HONOR.  THIS IS

24     ANTONIO PEREZ-MARQUES FOR THE PLAINTIFFS.

25         THE PARTIES HAVE FILED A STIPULATION TO EXTEND THE PERIOD

1    FOR EXPERT DEPOSITIONS AND THAT WE HAVE AGREED ON A SCHEDULE

2    FOR THOSE DEPOSITIONS TO TAKE PLACE, IT WON'T IMPACT ANY OTHER

3    DEADLINES IN THE CASE, OBVIOUSLY SUMMARY JUDGEMENT IS ALREADY

4    BRIEFED, BUT WE WOULD JUST ASK IF THE COURT COULD SO ORDER THAT

5    STIPULATION, WE WOULD APPRECIATE IT.

6            THE COURT:  IT'S ALREADY BEEN FILED ON THE DOCKET?

7            MR. PEREZ-MARQUES:  IT HAS.

8            THE COURT:  THERE'S SO MUCH STUFF ON THIS DOCKET, WE

9    HAVEN'T GOTTEN TO EVERYTHING.  BUT YES, I WILL PULL THAT OUT,

10   AND KELLY, IF YOU COULD PULL THAT OUT AND PRINT IT OUT FOR ME,

11   AND I WILL TAKE A LOOK AT IT TONIGHT.

12           MR. PEREZ-MARQUES:  THANK YOU, YOUR HONOR.

13      IT'S DOCKET 450, IF THAT'S HELPFUL.

14           THE COURT:  ALL RIGHT.  ANYTHING ELSE?

15      ALL RIGHT.  MATTER STANDS SUBMITTED.  I WANT THOSE BRIEFS

16   ON THE PUBLIC DOCKET WITHIN A WEEK.

17           MR. NOLLER:  THANK YOU, YOUR HONOR.

18           THE COURT:  OKAY.

19      (THE PROCEEDINGS WERE CONCLUDED AT 3:59 P.M.)

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4

5

6

7            I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT, CERTIFICATE

12   INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF

13   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15

16

17

18

19

20

21

22   _____
     SUMMER A. FISHER, CSR, CRR
23   CERTIFICATE NUMBER 13185

24
         DATE:  11/12/24
25