1  JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
    *jakro@kslaw.com*
2  AARON S. CRAIG (Bar No. 204741)
    *acraig@kslaw.com*
3  KING & SPALDING LLP
   633 West Fifth Street, Suite 1700
4  Los Angeles, CA 90071
   Telephone:   (213) 443-4355
5  Facsimile:   (213) 443-4310

6  Attorneys for Defendants
   NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      OAKLAND DIVISION

11

12 WHATSAPP INC., a Delaware corporation,      Case No. 4:19-cv-07123-PJH
   and FACEBOOK, INC., a Delaware
13 corporation,                                **DEFENDANTS' OPPOSITION TO
                                               PLAINTIFFS' MOTION FOR PARTIAL
14           Plaintiffs,                       SUMMARY JUDGMENT**

15      v.
                                               Date:  November 7, 2024
16 NSO GROUP TECHNOLOGIES LIMITED              Time:  1:30 p.m.
   and Q CYBER TECHNOLOGIES LIMITED,           Place: Courtroom 3, Ronald V. Dellums
17                                                    Federal Building & U.S. Courthouse,
             Defendants.                              1301 Clay Street, Oakland, California
18

19                                             Action Filed: 10/29/2019

20

21

22

23

24

25

26

27

28

---

1

## <u>TABLE OF CONTENTS</u>

2

Page(s)

Introduction ............................................................................................................... 1

Argument ................................................................................................................... 3

    I.     The Court lacks personal jurisdiction over NSO. ..................................... 3

    II.    Plaintiffs are not entitled to summary judgment on their breach of contract claim. 3

        A.    Plaintiffs do not prove NSO agreed to the WhatsApp TOS. ............................3

        B.    There is a material dispute over whether NSO breached the TOS.....................6

        C.    There is a material dispute over whether any breach damaged Plaintiffs..........8

    III.   Plaintiffs are not entitled to summary judgment on their CFAA claims.................. 9

        A.    NSO did not access "target devices" at all............................................................. 9

        B.    NSO did not access WhatsApp servers "without authorization." ...................10

        C.    NSO did not "exceed authorized access" to WhatsApp servers......................15

        D.    NSO did not conspire with its government customers to violate CFAA.........18

        E.    Plaintiffs cannot assert or prove a "password-trafficking" claim. ...................21

        F.    There is a material dispute over NSO's intent. ..................................................22

        G.    There is a material dispute over whether Plaintiffs suffered "damage" or "loss." ...............................................................................................................23

    IV.   Plaintiffs are not entitled to summary judgment on their CDAFA claim. ............. 24

    V.    There is a material dispute over whether Plaintiffs have unclean hands. .............. 25

Conclusion ............................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

3                                                                              **Page(s)**

4

**Cases**

5   *A.C. v. City of Santa Clara*,
       2015 WL 5350412 (N.D. Cal. Sept. 14, 2015) ............................................................ 5
6
    *Abu v. Dickson*,
7       107 F.4th 508 (6th Cir. 2024)........................................................................... 14, 17, 22

8   *Albert's Organics, Inc. v. Holzman*,
       2020 WL 3892861 (N.D. Cal. July 10, 2020) ............................................................ 25
9
    *Alvarez v. Hill*,
10      518 F.3d 1152 (9th Cir. 2008).................................................................................... 21

11  *Andrews v. Sirius XM Radio Inc.*,
       932 F.3d 1253 (9th Cir. 2019).................................................................................... 24
12
    *Apache Stronghold v. United States*,
13       101 F.4th 1036 (9th Cir. 2024)................................................................................... 21

14  *Artifex Software, Inc. v. Hancom, Inc.*,
       2017 WL 4005508 (N.D. Cal. Sept. 12, 2017) ............................................................ 9
15
    *Ash v. N. Am. Title Co.*,
16      223 Cal. App. 4th 1258 (2014) .................................................................................... 8

17  *AtPac, Inc. v. Aptitude Sols., Inc.*,
       730 F. Supp. 2d 1174 (E.D. Cal. 2010)...................................................................... 24
18
    *Barrilleaux v. Mendocino Cty.*,
19      2018 WL 3585133 (N.D. Cal. July 26, 2018) ............................................................ 15

20  *Benjamin v. B&H Educ., Inc.*,
       877 F.3d 1139 (9th Cir. 2017)...................................................................................... 5
21
    *Berman v. Freedom Fin. Network, LLC*,
22      30 F.4th 849 (9th Cir. 2022)................................................................................. 3, 4, 5

23  *Bettelheim v. Hagstrom Food Stores, Inc.*,
       113 Cal. App. 2d 873 (1952)........................................................................................ 8
24
    *Better Holdco, Inc. v. Beeline Loans, Inc.*,
25      2021 WL 3173736 (S.D.N.Y. July 26, 2021) ............................................................ 24

26  *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*,
       2023 WL 5278654 (D. Md. Aug. 16, 2023)................................................................ 10

27

28

*Brewster v. City of L.A.*,
  672 F. Supp. 3d 872 (C.D. Cal. 2023).........................................................................25

*CBS Inc. v. Merrick*,
  716 F.2d 1292 (9th Cir. 1983)........................................................................................7

*CCC Info. Servs., Inc. v. Tractable, Inc.*,
  2023 WL 415541 (N.D. Ill. Jan. 25, 2023) ..................................................................24

*Chabolla v. ClassPass Inc.*,
  2023 WL 4544598 (N.D. Cal. June 22, 2023) ................................................................4

*Chegg, Inc. v. Doe*,
  2023 WL 4315540 (N.D. Cal. July 3, 2023) .................................................................17

*Chisolm v. 7-Eleven, Inc.*,
  814 F. App'x 194 (9th Cir. 2020) ...................................................................................5

*Cohodes v. Mimedx Grp.*,
  2024 WL 4353634 (N.D. Cal. Sept. 24, 2024) .............................................................23

*In re Cty. of Orange*,
  219 B.R. 543 (C.D. Cal. Bankr. 1997)............................................................................8

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015).........................................................................................6

*Delacruz v. St. Bar of Cal.*,
  2018 WL 3077750 (N.D. Cal. Mar. 12, 2018) ..............................................................18

*Dresser-Rand Co. v. Jones*,
  957 F. Supp. 2d 610 (E.D. Pa. 2013) ............................................................................10

*EEOC v. Aramco*,
  499 U.S. 244 (1991)..................................................................................................19, 20

*El Omari v. Buchanan*,
  2021 WL 5889341 (S.D.N.Y. Dec. 10, 2021) ..............................................................24

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016)..................................................................................14, 15

*Gonzales v. Koranda*,
  2024 WL 3861988 (E.D. Cal. Aug. 19, 2024) ..............................................................21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)..........................................................................................9

*IAM v. OPEC*,
  649 F.2d 1354 (9th Cir. 1981)........................................................................................20

iii

*IJLSF, LLC v. It's Just Lunch Int'l*,
   2021 WL 3012850 (Cal. Ct. App. July 16, 2021) ...................................................... 8

*Jackson v. Amazon.com, Inc.*,
   65 F.4th 1093 (9th Cir. 2023) ............................................................................. 4, 5, 6

*Joffe v. Google, Inc.*,
   746 F.3d 920 (9th Cir. 2013) ................................................................................... 21

*Kiser v. Moyal*,
   2024 WL 4229936 (M.D. La. Sept. 18, 2024) .......................................................... 17

*Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*,
   2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) .......................................................... 10

*Lews Jorge Const. Mgmt. v. Pomona Unif. Sch. Dist.*,
   34 Cal. 4th 960 (2004) ............................................................................................... 9

*Lukasian House, LLC v. Ample Int'l, Inc.*,
   2012 WL 13009130 (C.D. Cal. Apr. 20, 2012) ........................................................ 24

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ........................................................................... *passim*

*Marshall v. Hipcamp Inc.*,
   2024 WL 2325197 (W.D. Wash. May 22, 2024) ........................................................ 3

*Massel v. SuccessfulMatch.com*,
   2024 WL 802194 (N.D. Cal. Feb. 27, 2024) .............................................................. 4

*MetroPCS v. Rivera*,
   220 F. Supp. 3d 1326 (N.D. Ga. 2016) .................................................................... 21

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) .................................................................................................. 19

*Morrison v. Nat'l Australia Bank*,
   561 U.S. 247 (2009) .................................................................................................. 19

*Nadarajah v. Gonzales*,
   443 F.3d 1069 (9th Cir. 2006) .................................................................................. 20

*Navajo Nation v. U.S. Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008) .................................................................................. 21

*NetApp, Inc. v. Nimble Storage, Inc.*,
   41 F. Supp. 3d 816 (N.D. Cal. 2014) ....................................................................... 18

*Nexans Wires S.A. v. Sark-USA, Inc.*,
   319 F. Supp. 2d 468 (S.D.N.Y. 2004) ...................................................................... 24

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014).................................................................................. 4

*Patel v. City of Long Beach*,
    564 F. App'x 881 (9th Cir. 2014) ........................................................................... 21

*Pickern v. Pier 1 Imports*,
    457 F.3d 963 (9th Cir. 2006).................................................................................. 15

*Progressive Sols., Inc. v. Stanley*,
    2018 WL 1989547 (N.D. Cal. Mar. 8, 2018) ........................................................... 5

*Rocha v. Urban Outfitters, Inc.*,
    2024 WL 393486 (N.D. Cal. Feb. 1, 2024)............................................................... 4

*Sadlock v. Walt Disney Co.*,
    2023 WL 4869245 (N.D. Cal. July 31, 2023)........................................................... 4

*Satcom Sol. & Res. LLC v. Pope*,
    2020 WL 4511773 (D. Colo. Apr. 20, 2020).......................................................... 18

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021).................................................................................... 4

*Shaw v. United States*,
    580 U.S. 63 (2016)................................................................................................. 23

*Sonico v. Charter Commc'ns, LLC*,
    2021 WL 268637 (S.D. Cal. Jan. 27, 2021).............................................................. 5

*Sprint Sols. Inc. v. Pac. Cellupage Inc.*,
    2014 WL 12607836 (C.D. Cal. Apr. 28, 2014) ...................................................... 22

*Sylabs, Inc. v. Rose*,
    2024 WL 4312719 (N.D. Cal. Sept. 26, 2024) ....................................................... 24

*Temurian v. Piccolo*,
    2019 WL 5963831 (S.D. Fla. Nov. 13, 2019).......................................................... 21

*Tenderloin Hous. Clinic, Inc.*,
    38 Cal. 4th 23, 50 (2006) ......................................................................................... 9

*Tijerina v. Alaska Airlines, Inc.*,
    2024 WL 270090 (S.D. Cal. Jan. 24, 2024).............................................................. 5

*Union Pump Co. v. Centrifugal Tech. Inc.*,
    404 F. App'x 899 (5th Cir. 2010) ............................................................................ 5

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013)................................................................................. 19

*United States v. Bollinger*,
   798 F.3d 201 (4th Cir. 2015) ................................................................ 20

*United States v. Clark*,
   435 F.3d 1100 (9th Cir. 2006) .............................................................. 19

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) .............................................................. 23

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) .......................................... 11, 12, 13, 14

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) (en banc) .................................... 2, 16, 17

*United States v. Saini*,
   23 F.4th 1155 (9th Cir. 2022) .............................................................. 23

*United States v. Sidorenko*,
   102 F. Supp. 3d 1124 (N.D. Cal. 2015) ............................................... 20

*United States v. Thomas*,
   877 F.3d 591 (5th Cir. 2017) ............................................................... 11

*United States v. Toscanino*,
   500 F.2d 267 (2d Cir. 1974) ................................................................ 20

*United States v. Vasquez-Velasco*,
   15 F.3d 833 (9th Cir. 1994) ................................................................. 19

*United States v. Weingarten*,
   632 F.3d 60 (2d Cir. 2011) .................................................................. 20

*Van Buren v. United States*,
   593 U.S. 374 (2021) .................................................... 2, 17, 21, 24

*Wages v. IRS*,
   915 F.2d 1230 (9th Cir. 1990) ............................................................... 3

*Williams v. DDR Media, LLC*,
   2023 WL 2314868 (N.D. Cal. Feb. 28, 2023) ....................................... 4

*X Corp. v. Bright Data Ltd.*,
   2024 WL 2113859 (N.D. Cal. May 9, 2024) .......................................... 8

*Yukos Cap. S.A.R.L. v. Feldman*,
   977 F.3d 216 (2d Cir. 2020) ................................................................ 23

**Statutes**

18 U.S.C. § 1029 .................................................................................................... 22

18 U.S.C. § 1030(a)(2) ....................................................................................... 2, 10

18 U.S.C. § 1030(a)(4) ....................................................................................... 2, 10

18 U.S.C. § 1030(a)(6) ..................................................................................... 21, 22

Cal. Civ. Code § 3300 ............................................................................................. 8

Cal. Penal Code § 502(e)(1) .................................................................................. 25

**Other Authorities**

Fed. R. Civ. P. 26 .................................................................................................... 5

Fed. R. Civ. P. 32(a)(3) ........................................................................................... 5

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 5

Fed. R. Civ. P. 56(d) ............................................................................................... 7

Fed. R. Civ. P. 56(f)(1) ........................................................................................... 6

Fed. R. Evid. 1002 .................................................................................................. 5

**INTRODUCTION**

Plaintiffs provide WhatsApp, an encrypted messaging service that terrorists, human traffickers, and other criminals use to plan and commit serious crimes. Plaintiffs know this, but they purposely collect no information about who their users are and trumpet that they have no ability to review the messages or calls of the criminals to whom they provide powerful encryption technology, free of charge. As a result, governments that wish to stop crime and terrorism must use surveillance technology like Pegasus, a product NSO created and licenses exclusively to governments. Pegasus provides those governments—and only governments, never NSO—access to criminals' mobile devices to obtain evidence that services like WhatsApp would otherwise hide.

During the period relevant here, Pegasus functioned in part by sending WhatsApp messages to the mobile phones of targets of government investigations. When the target device processed the messages, the processing would cause the target device to download surveillance software from the government's servers. The government would then use the software to collect evidence from the target's device. Plaintiffs admit these messages did not impair the WhatsApp service, execute any foreign code on WhatsApp's servers, or compromise or damage WhatsApp's servers in any way. The messages simply passed through WhatsApp servers, like letters passing through the mail, in full compliance with the servers' technical rules and limitations.

Yet Plaintiffs, who have never sued anyone who used WhatsApp to promote terrorism, plan mass shootings, or exploit children for sex, has sued NSO for designing Pegasus and licensing it to governments who wish to stop those crimes. Cutting through Plaintiffs' obfuscation and technical jargon, the gist of their complaint is simple: Pegasus sent messages over WhatsApp that Plaintiffs did not *want* sent. Plaintiffs claim this harmless conflict with their subjective desires breached WhatsApp's Terms of Service ("TOS") and violated the Computer Fraud and Abuse Act ("CFAA") and California Comprehensive Computer Data Access and Fraud Act ("CDAFA").

Those claims are bunk, both legally and factually. And the thread holding them together is Plaintiffs' mischaracterization of how Pegasus worked. In Plaintiffs' telling, NSO created a phony WhatsApp program that sent phony WhatsApp messages disguised as real ones, messages that WhatsApp's servers would have rejected had they not been disguised. That is pure fantasy. The

truth, as revealed in the very evidence Plaintiffs cite, is that NSO developed an interface called the WhatsApp Installation Server ("WIS"). WIS created WhatsApp messages—*real* WhatsApp messages—containing code that would be executed on target devices. Pegasus then sent those real WhatsApp messages with WhatsApp's "official" application, using valid security credentials tied to real WhatsApp accounts. Those credentials authorized Pegasus to send the messages drafted by WIS, which passed harmlessly through WhatsApp servers in the same way as any other message. Although the messages contained Pegasus code, that fact would have been clear to anyone who looked.[1] The reason WhatsApp servers allowed those messages, therefore, is not that Pegasus hid their nature. It is that WhatsApp *wrote its server code* to allow them, to permit WhatsApp users to send messages containing the exact same content as the messages sent by Pegasus.

For that reason alone, Plaintiffs cannot prove their claims. But even if Plaintiffs' fictional description of Pegasus were true, they *still* could not prove that Pegasus's use of WhatsApp servers was "unauthorized" in any relevant sense. That is because Plaintiffs *concede* that, at a minimum, NSO was *always* allowed to send ordinary WhatsApp messages through WhatsApp servers using the WhatsApp application. That permission, however limited, gave NSO "authorized access" both to WhatsApp's servers as a whole and to the areas of those servers that process WhatsApp messages. 18 U.S.C. § 1030(a)(2), (a)(4).[2] Even if Plaintiffs could prove NSO used its authorized access in an unauthorized *way* or for an unauthorized *purpose*, that is not illegal hacking actionable under CFAA.[3] At worst, it might constitute a breach of WhatsApp's TOS, *if* Plaintiffs could prove NSO agreed to the TOS and the TOS prohibited its conduct. But Plaintiffs cannot prove that, either.

For all those reasons—plus, more fundamentally, the fact that this Court lacks personal jurisdiction over NSO—the Court should grant NSO's pending motion for summary judgment. (Dkt. 396-2.) At least, though, the Court should deny Plaintiffs' motion and hold that a reasonable jury could find in NSO's favor on all of Plaintiffs' claims.

---

[1] And *was* immediately clear to Plaintiffs once they did look. (Akro. Exh. A at 127:9-129:24, 131:2-132:16, 139:51-140:2, 151:16-152:9.)

[2] Unless noted, all statutory citations are to Title 18, U.S. Code and all emphases thereto are added.

[3] *Van Buren v. United States*, 593 U.S. 374, 389-90 (2021); *United States v. Nosal* (*Nosal I*), 676 F.3d 854, 862-63 (9th Cir. 2012) (en banc); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133-35 (9th Cir. 2009).

1

**ARGUMENT**

2

**I.      The Court lacks personal jurisdiction over NSO.**

3        The Court should deny Plaintiffs' motion because, as explained in NSO's motion, Plaintiffs

4   cannot prove NSO purposefully directed any case-related conduct at California or the United States.

5   (Dkt. 396-2 at 8-18.)  This Court thus "lacks personal jurisdiction" over NSO and cannot "enter[]

6   a final judgment against [it]."  *Wages v. IRS*, 915 F.2d 1230, 1234 n.5 (9th Cir. 1990).

7

**II.     Plaintiffs are not entitled to summary judgment on their breach of contract claim.**

8        Plaintiffs cannot prove as a matter of law what they identify as the elements of their breach

9   claim.  (Dkt. 399-2 ("MSJ") at 5.[4])  A reasonable jury could find that (1) NSO never agreed to the

10  WhatsApp TOS, (2) NSO did not breach the TOS, (3) Plaintiffs waived the contractual provisions

11  they seek to enforce, and (4) any breach did not cause damage to Plaintiffs.

12

**A.      Plaintiffs do not prove NSO agreed to the WhatsApp TOS.**

13       Plaintiffs' evidence is not sufficient to prove NSO agreed to the WhatsApp TOS.  They rely

14  on a bare assertion "that agreeing to the Terms is necessary to create a WhatsApp account." (MSJ

15  6.) "[T]he act of setting up an account," however, "is insufficient evidence that [a user] manifested

16  assent to the terms of use." *Marshall v. Hipcamp Inc.*, 2024 WL 2325197, at *5 (W.D. Wash. May

17  22, 2024).  Rather, to prove consent to a company's TOS, the company must prove "a consumer

18  has actual knowledge" or "inquiry notice" of the contract's terms.  *Berman v. Freedom Fin.*

19  *Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  Plaintiffs do not claim, and submit no evidence,

20  that NSO had actual knowledge of the WhatsApp TOS.  So they must rely on inquiry notice, which

21  requires them to prove that "(1) [they] provide[d] reasonably conspicuous notice of the terms to

22  which the consumer will be bound; and (2) the consumer t[ook] some action, such as clicking a

23  button or checking a box, that unambiguously manifest[ed] his or her assent to those terms." *Id.*

24       Plaintiffs do not submit sufficient evidence on either requirement for inquiry notice. The

25  "inquiry notice standard demands conspicuousness tailored to the ordinary user, not to the expert

26  user," and determining whether notice is conspicuous requires a fact-specific, detail-oriented

27  assessment how contractual terms are presented to a consumer. *Id.* at 856-57.  Any notice "must

28

---

[4] MSJ and evidentiary citations omit internal quotation marks and alterations and add emphasis.

3

be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," which requires a factfinder to analyze the font, size, and color of a disclosure, as well as how the disclosure compares to the surrounding text and the overall design of a webpage.  *Id.*  A factfinder must also consider whether the terms are disclosed in a pop-up window or indirectly through a hyperlink, and whether the hyperlink is made "readily apparent" through "design elements" such as "the use of a contrasting font color (typically blue) and the use of all capital letters."  *Id.*  But even a "conspicuous hyperlink" in "close proximity … to relevant buttons" is insufficient when other design elements suggest a lack of conspicuousness.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177-79 (9th Cir. 2014).  Courts do not hesitate to find disclosures inadequate when they fail these requirements.[5]

Plaintiffs submit *no* evidence from which a factfinder could determine that they provided "reasonably conspicuous notice" of the WhatsApp TOS.  *Berman*, 30 F.4th at 856.  Plaintiffs do not submit any images of the WhatsApp sign-up process at any time, let alone from 2018-2019.  They provide no evidence of whether or how a user is informed that creating a WhatsApp account constitutes consent to the TOS; of the font, size, or color of any notice; of how any notice is presented within the context of the WhatsApp application or website; or of whether or how the hyperlink to the TOS was highlighted for users.  Without such evidence, Plaintiffs cannot prove they adequately disclosed the WhatsApp TOS.  *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099-1100 (9th Cir. 2023) ("Amazon failed to meet its burden to demonstrate mutual assent" when it "did not provide the court with a copy or description of any [contract] notice").

Plaintiffs similarly lack evidence that WhatsApp users "unambiguously manifest[] [their] assent" to the TOS.  *Berman*, 30 F.4th at 856.  Plaintiffs' assertion that users "have to click a button" (MSJ 6) is insufficient.  "[M]erely clicking on a button … does not signify a user's agreement to anything," so "[t]he presence of an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound is critical."  *Berman*, 30 F.4th at 857-58 (cleaned

---

[5] *Massel v. SuccessfulMatch.com*, 2024 WL 802194, at *5 (N.D. Cal. Feb. 27, 2024); *Rocha v. Urban Outfitters, Inc.*, 2024 WL 393486, at *4-5 (N.D. Cal. Feb. 1, 2024); *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *9-11 (N.D. Cal. July 31, 2023); *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *4-7 (N.D. Cal. June 22, 2023); *Williams v. DDR Media, LLC*, 2023 WL 2314868, at *5 (N.D. Cal. Feb. 28, 2023); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480-82 (2021).

up).[6]  The notice must be conspicuous, and it "must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement."  *Id.* at 858.  But Plaintiffs submit no evidence of the content or presentation of any supposed notice that "click[ing] a button" will "demonstrate agreement of the [TOS]."  (MSJ 6.)  Without such evidence, Plaintiffs cannot prove WhatsApp users unambiguously consent to the TOS.  *Jackson*, 65 F.4th at 1099-1100.

What little evidence Plaintiffs do submit is inadmissible.  First, Plaintiffs cannot rely on Meghan Andre as a declarant because they did not disclose her as a witness under Rule 26.  (Akro. Exh. G.)  As a result, they are "not allowed to use" her "to supply evidence on [their] motion."  Fed. R. Civ. P. 37(c)(1); *Chisolm v. 7-Eleven, Inc.*, 814 F. App'x 194, 196 (9th Cir. 2020); *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139, 1150 (9th Cir. 2017).[7]  Next, Plaintiffs cannot rely on the testimony of their own corporate designee, Jonathan Lee, because it was not based on his personal knowledge.  *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010); *Tijerina v. Alaska Airlines, Inc.*, 2024 WL 270090, at *2-3 (S.D. Cal. Jan. 24, 2024).[8]  Mr. Lee testified he has no personal knowledge of the sign-up process and was "entirely relying" on "verbal[]" descriptions by two WhatsApp employees.  (Block Exh. 2 at 175:2-10, 176:23-177:13, 185:14-19.)  His testimony about those descriptions, therefore, is hearsay that Plaintiffs may not use for their own motion.  Plaintiffs also may not rely on their experts' reports because they are all unsworn.  (Block Exhs. 1, 12, 25, 26, 29); *Progressive Sols., Inc. v. Stanley*, 2018 WL 1989547, at *8 (N.D. Cal. Mar. 8, 2018); *A.C. v. City of Santa Clara*, 2015 WL 5350412, at *9 n.4 (N.D. Cal. Sept. 14, 2015).  And to the extent Plaintiffs' witnesses purport to describe the "contents" of the WhatsApp application or website, that testimony violates the Best Evidence Rule.  Fed. R. Evid. 1002; *Sonico v. Charter Commc'ns, LLC*, 2021 WL 268637, at *6 (S.D. Cal. Jan. 27, 2021).

Even if it were admissible, Plaintiffs' evidence does not provide *any* information about how WhatsApp visually notified users of its TOS, much less show that any such notice was conspicuous.

---

[6] Plaintiffs say a TOS provision provides this notice (MSJ 6), but that is circular. That provision could bind WhatsApp users only if they agreed to the TOS in the first place, so notice must come from *outside* the TOS. *Jackson*, 65 F.4th at 1100-01; *Berman*, 30 F.4th at 857-58.

[7] The failure to disclose Ms. Andre is anything but harmless; NSO would have taken her deposition to learn what basis, if any, she has for her claims.

[8] *See* Fed. R. Civ. P. 32(a)(3) (only "[a]n adverse party" may use corporate designee testimony).

1  They simply assert *that* users agreed to the TOS, which is a bare legal conclusion.  *Jackson*, 65

2  F.4th at 1099-1100; (*see* Dkt. 399-5; Block Exh. 8 at 70:16-72:25; Exh. 16 at 326:9-327:9).   Mr.

3  Lee testified he did not even *review* any evidence and so knows nothing about the appearance of

4  WhatsApp's sign-up process.  (Block Exh. 2 at 176:23-177:3, 180:22-25.)  Moreover, he admitted

5  that users did not need to click on or read the TOS to sign up.  (*Id.* at 177:15-178:8.)[9]

6       In sum, Plaintiffs' evidence is insufficient to prove it properly notifies consumers that

7  signing up for WhatsApp constitutes consent to the WhatsApp TOS.  Plaintiffs thus cannot receive

8  summary judgment on whether NSO agreed to the TOS.  If anything, *NSO* is entitled to summary

9  judgment on that issue. Fed. R. Civ. P. 56(f)(1).

10      **B.     There is a material dispute over whether NSO breached the TOS.**

11      Plaintiffs also cannot prove as a matter of law that NSO breached the TOS.  As an adhesion

12  contract, the TOS must be interpreted against Plaintiffs.  *Daniel v. Ford Motor Co.*, 806 F.3d 1217,

13  1225 (9th Cir. 2015).  So interpreted, there is a dispute whether the TOS prohibited NSO's conduct.

14      **1.**  Plaintiffs first claim NSO breached TOS provisions against "reverse-engineering" or

15  "decompiling" the WhatsApp application (in tech-speak, the "WhatsApp client").  (MSJ 8.)  But

16  reverse-engineering, as commonly understood, involves commercial competition through

17  "manufacturing a similar product."  Oxford English Dictionary, *"Reverse-Engineer*."  NSO did not

18  do that.  Moreover, Plaintiffs cannot prove NSO created WhatsApp accounts *before* reverse-

19  engineering or decompiling the client.  Plaintiffs' corporate designee testified that the WhatsApp

20  client can be downloaded *without* first creating an account.  (Akro Exh. B at 111:15-113:11.)  Then,

21  free tools allow the client to be decompiled, again without creating a WhatsApp account.  (*Id.* at

22  113:6-114:6; McGraw Exh. B ¶ 51.)  If NSO decompiled or reverse-engineered the "official"

23  WhatsApp client *before* creating WhatsApp accounts, then Plaintiffs have no basis to argue NSO

24  was bound by any contractual prohibition on such conduct.  But Plaintiffs submit no evidence as to

25  *when* NSO decompiled (or, as Plaintiffs claim, "reverse-engineered") the "official" WhatsApp

26

---

27  [9] Plaintiffs reference the deposition testimony of NSO employee Ramon Eshkar and third-party
   witness Joshua Shaner, but neither testified they agreed to WhatsApp's TOS or that signing up for

28  WhatsApp required them to do so.  (MSJ 6; Block Exh. 8 at 70:16-72:25; Exh. 16 at 326:9-327:9.)
   Also, Mr. Shaner worked for Westbridge (not NSO) so his testimony cannot prove what *NSO* did.

1    client, so they cannot prove as a matter of law that NSO was prohibited from doing so at that time.

2        Plaintiffs also claim NSO breached TOS provisions prohibiting collecting user data "in any

3    impermissible or unauthorized manner"; requiring WhatsApp use "only for legal, authorized, and

4    acceptable purposes"; and prohibiting "illegal" uses. (MSJ 8-11.) But because NSO never operated

5    Pegasus (Akro. Exh. H ¶ 14), it never took or assisted any of the actions Plaintiffs contend would

6    violate these provisions. Moreover, the words "impermissible," "unauthorized," and "acceptable"

7    are vague and must be interpreted against Plaintiffs. While Plaintiffs claim *they* did not authorize

8    Pegasus to use WhatsApp servers, that use *was* authorized by Israel, the laws of NSO's government

9    customers, and the FBI. (*Id.* ¶¶ 6-12.) In addition, WhatsApp's system allowed Pegasus to send

10   all the messages it sent, and NSO's conduct did not violate any law. (*Infra* 9-23.)

11       Similarly, a jury could find NSO did not send "viruses or other harmful code" through

12   WhatsApp. (MSJ 8-9.) NSO, as distinct from its government customers, *never* transmitted *any*

13   code to nonconsenting WhatsApp users. And "harmful code" is a subjective term that does not

14   naturally cover Pegasus. Pegasus is a law-enforcement tool, at heart no different than wiretaps and

15   other lawful intercept tools used by governments throughout history. (Town Exh. A ¶¶ 27-41, 64;

16   McGraw Exh. A ¶¶ 19-26.) Indeed, the United States and other democracies commonly use digital

17   surveillance tools just like Pegasus. (Shepard Exh. A ¶¶ 26-33; Town Exh. A ¶¶ 27, 48-53, 67-68;

18   Akro. Exhs. I-J.) Such tools are not "viruses" and do not "harm[]" computers.

19       **2.** Even if NSO had breached any TOS provisions, Plaintiffs do not argue they are entitled to

20   summary judgment on NSO's affirmative defense that Plaintiffs waived those provisions. "The

21   existence of waiver is usually a fact question," *CBS Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir.

22   1983), and the facts would support a finding of waiver because there is no evidence Plaintiffs have

23   *ever* enforced *any* of the relevant TOS provisions against *any* WhatsApp user. NSO sought discovery

24   about WhatsApp's enforcement of those provisions, and Plaintiffs failed to provide a single example

25   of enforcement. (Akro. Decl. ¶ 12 & Exh. K.)[10] That failure is particularly conspicuous when the

26   conduct that Plaintiffs claim violates the TOS is so widespread. Decompilers and information about

---

[10] Plaintiffs have also improperly refused to provide testimony relevant to waiver, which is the subject of a discovery dispute. (Dkt. 381.) The Court should not grant Plaintiffs summary judgment on breach of contract without allowing additional discovery on waiver. Fed. R. Civ. P. 56(d).

WhatsApp's code are easily accessible online.  (McGraw Exh. B ¶¶ 51-52; Akro. Exh. B at 108:15-110:1.)  Governments use WhatsApp in ways that would breach the TOS.  (Shepard Exh. A ¶¶ 34-37; McGraw Exh. A ¶¶ 39-40.)  Criminals use WhatsApp to commit "impermissible," "unauthorized," and "illegal" acts.  (Shepard Exh. A ¶¶ 23-25, 37; Town Exh. A ¶¶ 61-62; McGraw Exh. A ¶ 152.)  Yet Plaintiffs have never enforced the TOS against *any* of that conduct.  A jury could find that non-enforcement to be "so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."  *In re Cty. of Orange*, 219 B.R. 543, 563 (C.D. Cal. Bankr. 1997); *see IJLSF, LLC v. It's Just Lunch Int'l,* 2021 WL 3012850, at *13-14 (Cal. Ct. App. July 16, 2021).[11]

### C.    There is a material dispute over whether any breach damaged Plaintiffs.

Finally, a reasonable jury could find that NSO's alleged breach of the WhatsApp TOS did not damage Plaintiffs.  "[A] breach of contract without damage is not actionable."  *X Corp. v. Bright Data Ltd.*, 2024 WL 2113859, at *10 (N.D. Cal. May 9, 2024) (cleaned up).  And while "nominal damages may be available in the absence of actual damages, damages are not recoverable which are not causally connected with the breach."  *Id.* (cleaned up).  The necessary causal connection is proximate causation: foreseeable damages that, "in the ordinary course of things, would be likely to result" from a breach.  Cal. Civ. Code § 3300; *see Ash v. N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1268 (2014).

The only damages Plaintiffs claim NSO caused are "costs" they allegedly incurred in "investigating and remediating" the vulnerability Pegasus used.  (MSJ 11.)  But even if fixing a vulnerability *WhatsApp itself created* could qualify as damage—which is dubious—it is not the kind of damage that would ordinarily follow from a breach of the TOS provisions on which Plaintiffs rely.  Plaintiffs would not ordinarily suffer *any* harm from conduct aimed at WhatsApp's *users*.[12]  The only TOS provision Plaintiffs invoke that could plausibly involve harm to Plaintiffs are the prohibitions against reverse-engineering and decompiling the WhatsApp client.  But those prohibitions are plainly designed to protect WhatsApp's trade secrets and intellectual property, so

---

[11] That WhatsApp's TOS include a boilerplate "no waiver" clause does not preclude waiver because "[e]ven a waiver clause may be waived."  *Bettelheim v. Hagstrom Food Stores, Inc.*, 113 Cal. App. 2d 873, 878 (1952); *see* 13 Williston on Contracts § 39:36 (4th ed.).  Whether such a waiver occurred here "is a question of fact to be determined by a jury."  *IJLSF*, 2021 WL 3012850, at *13.

[12] Plaintiffs agreed early in the case they would not claim reputational injury to support any legal or equitable relief, in order to avoid producing discovery related to reputation.  (Akro Decl. ¶ 17.)

1    the foreseeable harms from a breach would be those ordinarily flowing from IP infringement: lost

2    profits, market dilution, and the like.  Plaintiffs claim no such damages.

3        Instead, Plaintiffs seek to recover costs far removed from any alleged breach.  NSO's

4    alleged decompiling or reverse-engineering of the WhatsApp client did not harm Plaintiffs at all.

5    Plaintiffs claim they were harmed only because NSO decompiled the official client, *then* used what

6    it learned to design WIS, *then* incorporated WIS into Pegasus, *then* licensed Pegasus to foreign

7    governments, which *then* used Pegasus, which *then* led WhatsApp to discover a preexisting

8    vulnerability in its system.  A jury could find that chain of events too long and unforeseeable to

9    satisfy proximate causation.  Restatement (First) of Contracts § 330 cmt. b; *Lews Jorge Const.*

10   *Mgmt. v. Pomona Unif. Sch. Dist.*, 34 Cal. 4th 960, 976-77 (2004).  Indeed, a reasonable jury could

11   find even *but-for* causation lacking, since NSO did not create the vulnerability, and Plaintiffs look

12   for and fix vulnerabilities in the ordinary course of their business, found the vulnerability here

13   through a project unrelated to NSO, and would have fixed the vulnerability even if Pegasus had

14   never used it.  (Akro. Exh. B at 200:25-201:10, 302:8-310:21; Exh. C at 44:24-48:21.)

15       Plaintiffs also claim they are entitled to disgorgement (MSJ 11), but this is not a *fait*

16   *accompli*.  Under the case they cite, disgorgement is proper when the defendant not only "obtained

17   a benefit" but also deprived the plaintiff of "a corresponding benefit."  *Artifex Software, Inc. v.*

18   *Hancom, Inc.*, 2017 WL 4005508, at *4 (N.D. Cal. Sept. 12, 2017).  Plaintiffs were not deprived of

19   any corresponding benefit, and they do not argue otherwise.  The disgorgement they seek would also

20   be "grossly disproportionate" and an "unwarranted windfall," since they do not claim to have suffered

21   any meaningful harm from any breach.  *Tenderloin Hous. Clinic, Inc*., 38 Cal. 4th 23, 50 (2006).

22   **III.    Plaintiffs are not entitled to summary judgment on their CFAA claims.**

23       As explained in NSO's motion, NSO is entitled to summary judgment on Plaintiffs' CFAA

24   claims because Plaintiffs cannot prove NSO accessed any computer "without authorization" or in a

25   way that "exceed[ed] authorized access."  (Dkt. 396-2 at 21-23.)  At a minimum, however, a jury

26   could conclude NSO did not violate CFAA, a criminal statute that must be interpreted narrowly

27   "under the rule of lenity."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200-01 (9th Cir. 2022).

28       **A.    NSO did not access "target devices" at all.**

Plaintiffs have no evidence NSO "accessed … target devices." (MSJ 12.) The undisputed record proves NSO's government customers alone operate Pegasus and make all decisions about how to do so. (Akro Exh. H ¶¶ 14-16; Dkt. 396-2 at 18-19.) Plaintiffs know the only devices to which NSO sent messages were those under NSO's own control. Indeed, Plaintiffs effectively *concede* NSO "never used its technology itself on devices it did not own or control." (MSJ 20.) Plaintiffs argue that fact "is legally irrelevant" because NSO used WhatsApp servers, but all that shows (if anything) is that NSO accessed *WhatsApp servers*, not *target devices*. Similarly, Plaintiffs' argument that NSO designed a technology that sent messages over WhatsApp servers (*id.*) in no way suggests that NSO ever *operated* the technology.

That likely explains why Plaintiffs furtively pivot to asserting "NSO *caused* target devices to be accessed" by its government customers. (*Id.*) That is also false—NSO simply provides a tool, which its government customers alone decide to use or not—but it would not support a CFAA claim even if it were true. The CFAA provisions Plaintiffs invoke apply only when the defendant *himself* "accesses a computer without authorization or exceeds authorized access." § 1030(a)(2), (a)(4). They do not apply when the defendant allegedly causes *someone else* to access a computer.[13]

**B.    NSO did not access WhatsApp servers "without authorization."**

Plaintiffs also claim NSO unlawfully sent messages over WhatsApp servers, but the evidence proves NSO's use of those servers was not "without authorization." § 1030(a)(2), (a)(4).

**1.** As explained in NSO's motion, Plaintiffs cannot use a motion for summary judgment to resurrect the "without authorization" claim this Court previously dismissed. (Dkt. 396-2 at 21.) A "person uses a computer 'without authorization'" only "when the person has not received permission to use the computer *for any purpose*." *Brekka*, 581 F.3d at 1135 (emphasis added). As this Court correctly held, Plaintiffs cannot claim *both* that NSO agreed to WhatsApp's TOS *and* that NSO completely lacked authorization to use WhatsApp's servers for any purpose. (Dkt. 111 at 37.) Indeed, Plaintiffs *assert* NSO "had authorization to send messages … over WhatsApp's servers." (MSJ 15-16.) That forecloses their "without authorization" claim. (Dkt. 111 at 37.)

---

[13] *Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at *4-5 & n.2 (N.D. Cal. Mar. 20, 2015); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 2023 WL 5278654, at *5 (D. Md. Aug. 16, 2023); *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 615 (E.D. Pa. 2013).

**2.**   Despite conceding NSO was authorized to send WhatsApp messages, Plaintiffs claim NSO did so in an unauthorized *way*.  They argue NSO's authorization was "limit[ed]" to sending messages with the "official" WhatsApp client, and that NSO "circumvented" that "limitation[]" by sending messages with WIS.  (MSJ 15-17.)  That theory is legally and factually baseless.

**a.**   There is no legal basis for Plaintiffs' theory of "limited" authorization.  Under CFAA, a person accesses a computer "without authorization" when they access the computer "without *any* permission *at all*."  *Brekka*, 581 F.3d at 1133 (9th Cir. 2009) (emphasis added).   As a result, someone can violate CFAA's "without authorization" prong only if they have "*no* rights, *limited or otherwise*" to access the computer.  *Id.* (emphasis added).  If they have even "limited" rights to access the computer, their access legally *cannot* be "without authorization" even if they "violate[] those limitations."  *Id.*  In other words, "access without authorization must be an all-or-nothing proposition."  *United States v. Thomas*, 877 F.3d 591, 596 (5th Cir. 2017).  For purposes of CFAA's "access" provisions, "degrees of authorization" simply do not exist.  *Id.*

That rule dooms Plaintiffs' theory.  Plaintiffs claim NSO had at least *some* authorization to send messages over WhatsApp servers.  (MSJ 15-16.)  Even if NSO's authorization had been *limited* to using the "official" client—and it was not—that still would not mean NSO had "no rights, limited or otherwise," to use WhatsApp servers.  *Brekka*, 581 F.3d at 1133.  For NSO's access to be "without authorization," it must have been prohibited from sending *any* WhatsApp messages through *any* means, *including* the "official" client.  And even under Plaintiffs' argument, NSO *always* had the right to send messages with the "official" client.  That right, however "limited," means NSO's access to WhatsApp servers could not be "without authorization."  *Id.*

NSO's conceded authorization to access WhatsApp servers in even a limited way distinguishes *Nosal II*, the only case Plaintiffs cite for their theory.  (MSJ 17.)  In *Nosal II*, the defendant's "computer access was *categorically revoked*" by his former employer.  *United States v. Nosal*, 844 F.3d 1024, 1038 (9th Cir. 2016) (emphasis added).  The defendant thus had "no authorization to access [the employer's] computer system" *at all*, through *any* means.  *Id.* at 1036.  So, in the passage Plaintiffs pluck from context, the Ninth Circuit enforced the employer's "authority to control access to its computers and confidential information by" *completely* excluding

1    "former employees *whose access had been categorically revoked*." *Id.* at 1035 (emphasis added).

2    But the court made clear that, when a person's access has been limited but *not* "categorically

3    revoked," he cannot be sued for "violating use restrictions" on his access. *Id.* at 1038.

4        Unlike in *Nosal II*, any requirement that NSO send WhatsApp messages through the

5    "official" client, if it existed, would not "categorically" prohibit NSO from using WhatsApp

6    servers. *Id.* It would be a mere "use restriction," *id.*, that limited but did not *eliminate* NSO's right

7    to use WhatsApp servers. Even if NSO had exceeded those limits by using a different client, it still

8    did not access WhatsApp servers "without authorization." *Brekka*, 581 F.3d at 1133.

9        **b.** Plaintiffs' theory is also factually incorrect. For all their talk about a requirement to send

10   WhatsApp messages only through the "official" client, Plaintiffs never identify the *source* of that

11   requirement. They simply say it exists because WhatsApp provides a client for receiving access

12   credentials and using WhatsApp servers. (MSJ 15). But those dots do not connect. That WhatsApp

13   provides an application for sending messages does not imply users are *forbidden* from sending

14   messages using a third-party client. The existence of Google's "official" web browser, Chrome,

15   does not mean, for example, that Microsoft Edge users are not authorized to run Google searches.

16       Indeed, Plaintiffs concede Pegasus accessed WhatsApp servers using "real authentication

17   keys" authorizing the use of WhatsApp servers. (MSJ 17.) They accuse NSO of "transfer[ring]

18   the authentication key[s]" so that the WIS interface could send messages instead of the "official"

19   client (*id.*), but that is false and irrelevant. As the witness Plaintiffs cite clearly testified, "WIS

20   *created* the WhatsApp messages," but "those messages were *sent* … using a genuine WhatsApp

21   client." (Gazneli Decl. ¶ 5; *see* Akro. Exh. E at 185:16-188:11.) Even if NSO *had* sent messages

22   with WIS rather than the "official" client, Plaintiffs still do not identify *any* prohibition on doing

23   so. The NSO document they cite does not discuss any *actual* technological restrictions in

24   WhatsApp servers. (Block Exh. 24.) It discusses only WhatsApp's "anti-spam" policies—none of

25   which Plaintiffs claim Pegasus violated—and ways in which the document's author speculated

26   WhatsApp *could* detect Pegasus messages *if* it looked for them. (*Id.* at -8958-8962.) But WhatsApp

27   *didn't* look for them, much less block them. (McGraw Exh. A ¶¶ 130, 136-38; Exh. B ¶¶ 27-29.)

28       **c.** Plaintiffs also claim NSO acted "without authorization" because it used the WIS interface

to draft WhatsApp messages that the "official" client cannot.  (MSJ 16.)  But here too, Plaintiffs cannot explain *why* sending those messages constitutes accessing WhatsApp servers "without authorization."  Even if WhatsApp's client or servers prohibited sending those messages—and they didn't—that would be a purpose-based "use restriction," not a complete technological bar on *access*.  *Nosal II*, 844 F.3d at 1038.  Under Plaintiffs' theory, NSO still had the authority to send ordinary WhatsApp messages, which means NSO did not lack *all* "rights, limited or otherwise," to use WhatsApp servers.  *Brekka*, 581 F.3d at 1133.

Moreover, Plaintiffs identify no prohibition on the messages Pegasus sent.  Each WhatsApp message is accompanied by a form of "fields" containing specifications for the message—think of an order form at a deli, with fields allowing a customer to choose between ham or turkey and mayonnaise or mustard.  (McGraw Exh. A ¶¶ 54, 77.)  Pegasus's "Heaven" and "Eden" vectors wrote Pegasus code into some of those fields (*id.*; Akro. Exh. E at 299:21-300:4), which was "very, very obvious" to WhatsApp because it was written in plain text and not "encrypted … in any way" (Akro. Exh. A at 139:51-140:2).  Put differently, the code appeared on the "outside" of the message, like instructions written on a mailing envelope, plain to see for anyone who looked at it.  (*Id.*; McGraw Exh. A ¶ 138.)

Even if that code would not appear in the fields for WhatsApp messages composed by users other than Pegasus, that does not mean WhatsApp servers *prohibited* the use of those fields.  To the contrary, Plaintiffs admit WhatsApp servers did *not* prohibit messages using those fields.  (Akro. Exh. A at 141:22-143:22; Exh. C at 161:3-169:24.)  Plaintiffs' corporate designee even testified that WhatsApp deliberately *allowed* WhatsApp users to use certain fields, including the "connecting_tone_desc" field used by Pegasus, "for backwards compat[ibility] reasons."  (Akro. Exh. B at 148:12-149:20, 308:19-309:1; Exh. M at 4; McGraw Exh. B ¶ 28.)  Similarly, Plaintiffs complain that Pegasus messages used a "XOR cipher," but that is the same "encryption that WhatsApp uses" (Akro. Exh. E at 298:15-17), and WhatsApp servers *de*ciphered every message they transmitted—or WhatsApp would not have transmitted them at all (Akro. Exh. A at 185:3-188:25; McGraw Exh. B ¶ 31).  WhatsApp servers thus had no restriction blocking messages like those sent by Pegasus.  (McGraw Exh. A ¶¶ 130, 136-38; Exh. B ¶¶ 27-29; Gazneli Decl. ¶ 9.)

Neither did the WhatsApp *client*.  The testimony Plaintiffs cite reflects only that the "official" client did not edit all of the fields used by Pegasus.  (MSJ 16.)  As explained, however, that WhatsApp did not program all of its "official" clients to edit those fields does not mean its clients *blocked* messages using those fields.  Indeed, Pegasus *sent* its messages using an "official" WhatsApp client, so the client obviously allowed those messages.  (Gazneli Decl. ¶ 9.)

At bottom, Plaintiffs' claim is simply that they did not *want* WhatsApp users to use unofficial clients, use certain message fields, or send messages like those sent by Pegasus.  They give the game away when they say they "*assume[d]* that the messages being sent are a part of the WhatsApp network and that they're official clients."  (MSJ 16.)  CFAA does not protect a computer owner's *preferences* or *assumptions*, and "us[ing] [a] computer contrary to the [owner's] interests" is not illegal.  *Brekka*, 581 F.3d at 1133.  Whatever WhatsApp *wanted* its users to do, its "code allow[ed]" Pegasus to send every message it sent.  *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024).  That means WhatsApp's "system authorize[d] the access."  *Id.*

**3.**  Plaintiffs double down on their baseless theory of "limited" authorization by arguing they "revoked" NSO's authorization (1) in 2018 by "implementing security updates" that changed how WhatsApp servers responded to certain messages, and (2) in 2019 by filing this lawsuit.  (MSJ 17-19.)  As Plaintiffs characterize WhatsApp's 2018 updates, they forbid messages only with certain field specifications.  Plaintiffs do not claim that "categorically revoked" NSO's access to WhatsApp servers for *all* purposes, as is obvious from the fact that NSO was able to continue using those servers.  *Nosal II*, 844 F.3d at 1038.  The same is true of this lawsuit, which challenges one *way* NSO allegedly used WhatsApp servers, not NSO's right to use those servers to send ordinary WhatsApp messages.  That distinguishes *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), where Facebook "explicitly revoked authorization for *any* access" by sending a cease-and-desist letter and blocking the defendant's IP address, which removed the defendant's "permission to access Facebook's computers *at all*."  *Id.* at 1067-69 (second emphasis added).  This case involves no such categorical revocation of access to WhatsApp servers.

At a minimum, any revocation was not sufficiently "explicit[]," *id.* at 1068, "[u]nequivocal," or "particularized," *Nosal II*, 844 F.3d at 1028, 1036.  WhatsApp's 2018 updates

had *nothing to do with NSO*.  Plaintiffs admit WhatsApp was responding to "an issue identified …

by an external security researcher," and the updates' effect on Pegasus was incidental and

"[u]nbeknownst to WhatsApp at the time."  (Akro. Exh. L at 6; *see* McGraw Exh. B ¶ 87.)  Nor

could NSO have known of any revocation merely because one of Pegasus's installation vectors

malfunctioned.[14]  With the 2018 updates, the only information NSO received was an error code

reading "error='403'."  (Block Exh. 25 at 9-10.)  That "403" code means only that a server rejected

a message for any number of possible reasons; it contains no explanation of the error, much less an

explicit statement that NSO's access to WhatsApp servers had been completely revoked.  (McGraw

Exh. B ¶¶ 87-91, 98.)  *Power Ventures* recognized that such a nonspecific "block" would not trigger

CFAA's restriction on "unauthorized use" because it does not provide sufficient "notice that … the

block was imposed and that authorization was revoked."  844 F.3d at 1068 n.5.

This lawsuit likewise did not clearly or unequivocally revoke *all* of NSO's authorization to

use WhatsApp servers.  The Complaint challenged only Pegasus as it existed in 2019, not *all* uses

of WhatsApp servers through *any* means for *any* purpose.  Plaintiffs' inclusion of an injunction in

their prayer for relief cannot plausibly be read as an explicit revocation akin to the cease-and-desist

letter and IP block in *Power Ventures*, particularly when Plaintiffs did not seek a preliminary

injunction or claim NSO's use of WhatsApp servers other than through Pegasus was unauthorized.

In any event, Plaintiffs cannot seek summary judgment based on a legal theory and factual

assertions they did not plead in the Complaint.  If Plaintiffs wanted to claim NSO violated CFAA

by continuing to use WhatsApp servers after they filed suit, they had to file an amended complaint

alleging as much.  They may not raise unpleaded theories and allegations for the first time on

summary judgment.  *Pickern v. Pier 1 Imports*, 457 F.3d 963, 968-69 (9th Cir. 2006); *Barrilleaux

v. Mendocino Cty.*, 2018 WL 3585133, at *9 (N.D. Cal. July 26, 2018).

**C.    NSO did not "exceed authorized access" to WhatsApp servers.**

**1.** Plaintiffs' argument that NSO "exceed[ed] authorized access" to WhatsApp servers (MSJ

19-20) ignores that the statutory definition of that phrase limits it to "the unauthorized procurement

---

[14] Plaintiffs update their code frequently, and those updates can "break" third-party app developers'
use of Plaintiffs' services, requiring those third parties to rewrite their code without any suggestion
that their access has been revoked.  (McGraw Exh. B ¶¶ 95-97; Akro. Exh. B at 134:4-144:22.)

or alteration of information," not merely the unapproved use of a computer. *Nosal I*, 676 F.3d at 862. Under CFAA, "exceeds authorized access" means "to access a computer with authorization *and* to use such access *to obtain or alter information in the computer* that the accesser is not entitled so *to obtain or alter*." § 1030(e)(6). Plaintiffs do not argue NSO "obtain[ed] or alter[ed]" information from WhatsApp servers it was "not entitled" to access. *Id.* To the contrary, Plaintiffs admit NSO did not "compromise[]" the servers or "corrupt," "alter," "impair," or "delete" any information on them. (Akro. Exh. B at 249:7-250:10; Exh. C at 183:7-184:7, 250:22-251:24; Exh. N at 4.)

Elsewhere, Plaintiffs claim NSO received "information regarding whether a user has an active WhatsApp account directly from WhatsApp's servers" (MSJ 20-21), but they do not argue NSO was "not entitled" to that information. § 1030(e)(6). That is because *every WhatsApp user* is entitled to that information. Whenever a WhatsApp user sends a call request, a WhatsApp server checks whether the callee has a WhatsApp account and provides that information to the caller's device. (Gazneli Decl. ¶ 11.) That is a necessary first step for *every WhatsApp call*, as WhatsApp servers obviously cannot initiate a call with a callee who does not have WhatsApp. (*Id.*) (As an easy proof, try using WhatsApp to call a landline.) When Pegasus initiated a WhatsApp call, therefore, it received the exact same information that any other WhatsApp user was entitled to receive. (*Id.*; Akro. Exh. E at 294:10-15, 296:15-19; McGraw Exh. A ¶ 75.)

Plaintiffs also claim NSO received information from target devices "via the WhatsApp servers" (MSJ 21), but that is false because NSO never operated Pegasus. More fundamentally, that information was not stored in WhatsApp's servers, and § 1030(e)(6) defines "exceeds authorized access" to require a defendant to "obtain or alter information in *the computer*"—the *same* computer—the defendant "access[ed]." § 1030(e)(6). [15] Plaintiffs thus cannot prove NSO exceeded authorized access to a WhatsApp server without proving NSO "obtain[ed] or alter[ed] information" *on the server* that it was "not entitled so to obtain or alter." *Id.* Plaintiffs cannot make that showing.

**2.** Plaintiffs also ignore that CFAA's "exceeds authorized access" prong applies only when

---

[15] Plaintiffs argue in support of their § 1030(a)(2)(C) claim that "Section 1030(a)(2)(C) prohibits … obtaining information 'from *any protected computer*,'" whether or not it was the unlawfully accessed computer. (MSJ 21.) While that may be true of § 1030(a)(2)(C), it is *not* true of § 1030(e)(6)'s separate definition of "exceeds authorized access."

a defendant "access[es] a computer with permission but then … enter[s] an *area of the computer* to which that authorization does not extend." *Van Buren*, 593 U.S. at 389-90 (cleaned up and emphasis added). As with the "without authorization" prong, "authorization" to enter a particular area of a computer is an all-or-nothing inquiry: "one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Id.* If "a user is permitted to be on a particular 'area within the system' for *some* purposes," then "the user's access to the [area] is 'authorized'" for *all* purposes. *Abu*, 107 F.4th at 508 (emphasis added).

For that reason, Plaintiffs' assertion that NSO was authorized to send WhatsApp messages using the "official" client is just as fatal to their "exceeds authorized access" claim as to their "without authorization" claim. Plaintiffs admit NSO was at least authorized to access the "areas" of WhatsApp servers a WhatsApp message passes through when it is sent using the official client. And there is no dispute that those are the *only* areas of WhatsApp servers that NSO accessed. Although Plaintiffs object to the *content* of the messages Pegasus sent, they do not dispute that those messages were transmitted through the exact same areas of WhatsApp servers as any other WhatsApp message. (Akro Exh. C 129:15-130:23; McGraw Exh. A ¶¶ 123-34, Exh. B ¶¶ 41, 93; Gazneli Decl. ¶ 10.) Plaintiffs' argument is only that NSO used those areas of the servers in an unapproved *way*—yet another "purpose-based limit[] on access" that cannot support a CFAA claim. *Van Buren*, 593 U.S. at 396. Therefore, even if Pegasus had "circumvented technological, code-based limitations" to send messages (MSJ 19), NSO did not thereby access any "*area* of the [server] to which [its] authorization d[id] not extend." *Van Buren*, 593 U.S. at 390 (cleaned up).[16]

**3.**   In all events, however, the undisputed evidence proves NSO did *not* circumvent restrictions on access to WhatsApp servers. Plaintiffs invoke "WhatsApp's Terms and policies" (MSJ 19), but those are irrelevant because the "exceeds authorized access" prong applies only to "technological access barriers," not contractual "use restrictions." *Nosal I*, 676 F.3d at 863; *see Chegg, Inc. v. Doe*, 2023 WL 4315540, at *2 (N.D. Cal. July 3, 2023). And, as explained above, Pegasus messages complied with *every* technological restriction in WhatsApp's server code.

---

[16] *Kiser v. Moyal*, 2024 WL 4229936, at *9 (M.D. La. Sept. 18, 2024) (even if defendant "violated the 'understanding' that [its] improper behavior could not continue, this does not mean that [it] exceeded [its] authorized access to the computer … under *Van Buren*").

(*Supra* 12-14; Gazneli Decl. ¶ 9.)   That NSO updated Pegasus to continue functioning when WhatsApp changed its code—for reasons totally unrelated to NSO, not to "block[] NSO" (MSJ 19)—shows only that NSO was *following* WhatsApp's requirements, just like any third-party app developer who must keep their apps current with WhatsApp's code.  (*Supra* 15.)

>        **D.**    **NSO did not conspire with its government customers to violate CFAA.**

With no evidence NSO ever operated Pegasus, Plaintiffs argue NSO conspired with its government customers.  But the evidence does not support a finding that NSO agreed to violate CFAA with its customers.  In fact, it would be impossible for NSO to do so because CFAA does not apply to a foreign government's use of Pegasus to monitor a foreign device.  The act of state doctrine also bars any claim based on foreign governments' use of Pegasus.[17]

**1.**  Because "CFAA is a federal criminal statute," Plaintiffs' conspiracy claim requires proof that NSO "agreed with at least one other person *to violate the law*."  *Satcom Sol. & Res. LLC v. Pope*, 2020 WL 4511773, at *10 (D. Colo. Apr. 20, 2020) (cleaned up and emphasis added).  It is not sufficient for Plaintiffs to assert only that NSO agreed that its government customers would use Pegasus.  (MSJ 23.)  Plaintiffs must submit "facts showing a knowing agreement with another to commit [an] *unlawful* act."  *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014) (cleaned up and emphasis added); *accord Delacruz v. St. Bar of Cal.*, 2018 WL 3077750, at *8 (N.D. Cal. Mar. 12, 2018).  Plaintiffs have no such facts.

Plaintiffs cannot prove as a matter of law that NSO knowingly agreed with its government customers to *violate CFAA*.  NSO's contracts require governments to agree they will (1) "fully comply with all privacy and national security related laws and regulations, international standards, and any other laws and regulations that are applicable to the use of [Pegasus]" and (2) "immediately notify" NSO of any "misuse or potential misuse."  (Akro. Exh. H ¶ 12.)  The government of Israel also reviews and approves every Pegasus license, and it independently requires NSO's government customers to promise to use Pegasus only for the "[c]ollection of data from mobile devices for the prevention and investigation of crimes and terrorism, in compliance with privacy and national

---

[17] To the extent Plaintiffs contend that NSO conspired with the FBI (a Pegasus customer), that claim would be barred by CFAA's U.S. law-enforcement exemption.  § 1030(f).

security laws." (Akro. Exh. H ¶¶ 5-7; Exhs. I-J.) NSO investigates reports of misuse and suspends or terminates service to customers that misuse its technology. (Akro. Exh. D at 21:16-25, 26:23-31:17, 181:10-15; Exh. H ¶ 12.) Those facts show that NSO, far from *agreeing* with its government customers to violate the law, affirmatively *prohibits* and *punishes* any such unlawful conduct.

**2.** Moreover, any use of Pegasus by a foreign government *could not* violate CFAA because CFAA does not apply to that purely extraterritorial conduct.[18] Under the presumption against extraterritoriality, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 248 (2009). Even when a statute *does* "specifically address[] an issue of extraterritorial application," the presumption still limits "the *extent* of the statutory exception." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455-56 (2007). This ensures courts do not apply statutes in ways that risk "unintended clashes between our laws and those of other nations." *EEOC v. Aramco*, 499 U.S. 244, 248 (1991).

CFAA applies extraterritorially in one limited respect: Its definition of "protected computer" includes a "computer located outside the United States" if it affects "interstate or foreign commerce or communication of the United States." § 1030(e)(2)(B). But that does not unambiguously prohibit access to foreign computers *by foreign actors*, let alone by foreign *governments*. The presumption against extraterritoriality thus compels reading CFAA to prohibit only unauthorized access to a foreign computer *by U.S. nationals* or *from within the United States*.

That reading finds further support in the *Charming Betsy* canon, which creates a "judicial presumption that 'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013); *see United States v. Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994). Under international law, there are "five general principles that permit extraterritorial criminal jurisdiction," *United States v. Clark*, 435 F.3d 1100, 1106 & n.8 (9th Cir. 2006), none of which empower the United States to criminalize foreign governments' access to foreign computers. *See* Restatement (Third) of Foreign Relations Law § 402 & comments a-g; *id.* § 404.

---

[18] It is undisputed that Pegasus cannot be used on any device that is in the United States or has a U.S. phone number. (Akro. Exh. E at 316:3-7, 327:11-328:14; Exh. H ¶ 13.)

Any different conclusion would have absurd and outrageous consequences, effectively making it illegal for any foreign government to access the computer of a criminal within its own borders—even with a warrant in full compliance with local law. (That would, for example, make it a federal crime for an English police officer to search the phone of a foreign terrorist in London, with a warrant.) When CFAA exempts *U.S.* law-enforcement activities from liability, § 1030(f), it defies belief that Congress would have intended to criminalize all such activities by *foreign* governments.[19] The Court should not interpret CFAA to create such an extreme "clash[] between our laws and those of other nations." *Aramco*, 499 U.S. at 248.

Such an interpretation would also raise serious constitutional questions under the Foreign Commerce Clause and Due Process Clause. The Foreign Commerce Clause allows Congress "to regulate Commerce *with* foreign Nations." U.S. Const. art. I, § 8, cl. 3 (emphasis added). The "use of the word 'with'" is a "textual limitation" that "requires a nexus *between* the United States and a foreign country." *United States v. Bollinger*, 798 F.3d 201, 214 (4th Cir. 2015) (emphasis added). A foreign government's use of Pegasus to monitor a foreign resident's device lacks the required nexus with the United States. Prohibiting such purely foreign conduct would also likely violate the Due Process Clause, which similarly prohibits extraterritorial application of federal criminal statutes absent "a sufficient nexus between the defendant and the United States." *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1132-33 (N.D. Cal. 2015). To "avoid" those constitutional "doubts," *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006), this Court should interpret CFAA to prohibit only unauthorized access to a foreign computer *by U.S. nationals* or *from within the United States*. *See United States v. Weingarten*, 632 F.3d 60, 70-71 (2d Cir. 2011) (narrowly interpreting statute to avoid Foreign Commerce Clause concerns).

**3.** The act of state doctrine independently bars any claim based on foreign governments' use of Pegasus. As explained in NSO's motion for summary judgment, such a claim would improperly require this Court to "question the legality of the sovereign acts of foreign states." *IAM*

---

[19] The fact that § 1030(f) specifically addresses only U.S. law-enforcement activity strongly suggests Congress did not intend CFAA to apply to foreign governments in the first place. *Cf. United States v. Toscanino*, 500 F.2d 267, 279-80 (2d Cir. 1974) (holding lack of reference to foreign wiretaps in Wiretap Act was evidence it "has no application outside of the United States").

1    *v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981); (Dkt. 396-2 at 19-20).

2        **E.    Plaintiffs cannot assert or prove a "password-trafficking" claim.**

3        Plaintiffs cannot pursue a claim under CFAA § 1030(a)(6) because they concede they did

4    not plead that claim in their complaint or in any post-complaint filing.  (MSJ 24 n.10.)  Without

5    having previously given NSO notice of their "password-trafficking" theory, Plaintiffs may not raise

6    it for the first time on summary judgment.  *Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th

7    Cir. 2014); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008), *overruled on

8    other grounds by Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024).  Plaintiffs

9    argue otherwise based on *Alvarez v. Hill*, 518 F.3d 1152 (9th Cir. 2008), but *Alvarez* held only that

10   "[a] complaint need not identify the statutory or constitutional source of the claim raised *in order

11   to survive a motion to dismiss*."  *Id.* at 1158 (emphasis added).  The *Alvarez* plaintiff "specifically

12   raised" his claim "in his post-complaint filings, thereby apprising [defendants of the claim] *before

13   summary judgment*."  *Id.* (emphasis added).  Plaintiffs here did no such thing.  *See Gonzales v.

14   Koranda*, 2024 WL 3861988, at *8 (E.D. Cal. Aug. 19, 2024) (distinguishing *Alvarez*).

15       Plaintiffs' claim is meritless anyway.  Section 1030(a)(6) prohibits "knowingly and with

16   intent to defraud traffic[king] … in any password or similar information."  CFAA does not define

17   "password," so courts "must give the term its ordinary meaning."  *Joffe v. Google, Inc.*, 746 F.3d

18   920, 927 (9th Cir. 2013).  In CFAA's "computing context," *Van Buren*, 593 U.S. at 388, the

19   ordinary meaning of "password" is "a sequence of letters, numbers, symbols or other characters

20   used to gain access to a computer, computer system, network, file, program, or function," Fed.

21   Crim. Jury Instr. 7th Cir. 1030[3] (2023 ed.) (citing dictionaries).  No English speaker would say

22   Pegasus or its access vectors are "password[s] or similar information" under that definition.

23   Pegasus constitutes an entire *infrastructure*, including both hardware and software.  It is not a

24   sequence of characters.  Nor is it "information"—much less information "similar" to a sequence of

25   characters.  That distinguishes Pegasus from the "(API) information" and "URL" in the Rule

26   12(b)(6) cases Plaintiffs cite, both of which plausibly *are* sequences of characters.  (MSJ 24.)[20]

27   ───────────────

28   [20] Moreover, the parties in *Temurian v. Piccolo*, 2019 WL 5963831, at *6 (S.D. Fla. Nov. 13, 2019),
     "d[id] not dispute" that API information "constitutes 'password or similar information.'"  *MetroPCS*

Plaintiffs argue Pegasus is like a password because it lets government users "access" a computer (*id.*), but that does not make something similar to a *password* unless it is equivalent to "a sequence of letters, numbers, symbols or other characters."  Fed. Crim. Jury Instr. 7th Cir. 1030[3].  A human hacker can gain access to a computer, but that doesn't turn a person into a password or hiring a hacker into password trafficking.  A keyboard and mouse can also be used to access a computer, but a keyboard or a mouse is not a password either.  Indeed, it is hard to imagine *any* form of unauthorized access under § 1030(a)(2) and § 1030(a)(4) that would *not* qualify as "similar" to a "password" under Plaintiffs' reading of § 1030(a)(6).  But § 1030(a)(6) is a distinct provision with a distinct meaning and scope, and it does not cover Pegasus.

**F.    There is a material dispute over NSO's intent.**

Plaintiffs also cannot prove as matter of law that NSO accessed any computer with the *mens rea* CFAA requires.  Section 1030(a)(2) requires proof that NSO "*intentionally* access[ed] a computer without authorization or exceed[ed] authorized access."  That intent element requires not merely the general intent to access a computer, but the specific intent "to act without authorization or to exceed authorization."  *Abu*, 107 F.4th at 514, 516-17.  And there is a material dispute over whether NSO *intended* to act without authorization or to exceed authorization.  NSO correctly believed that Pegasus was authorized by Israel, the laws of NSO's government customers, and WhatsApp's own code, which allowed Pegasus to send WhatsApp messages over WhatsApp servers.  (Akro. Exh. H ¶¶ 5-12; Gazneli Decl. ¶ 9.)  For the same reasons, there is a material dispute whether NSO "knowingly" acted without authorization or exceeded authorization.  § 1030(a)(4).

There is also a material dispute whether NSO acted with "intent to defraud" under § 1030(a)(4) and § 1030(a)(6), which requires "an intent to deceive [and] cheat."  Model Crim. Jury Instr. 9th Cir. 4.13; *id.* 15.26, 15.30.  CFAA's "intent to defraud" requirement is "the same as the standard used for 18 U.S.C. § 1029 relating to credit card fraud."  S. Rep. No. 99-432, at 10 (1986).  And "intent to defraud" under § 1029 "requires an intent to deceive *and* cheat, which means … the

---

*v. Rivera*, 220 F. Supp. 3d 1326, 1331 (N.D. Ga. 2016), was an uncontested default judgment, and the complaint alleged not that "unlocked mobile devices" were passwords (MSJ 24), but that the "confidential codes/passwords" *stored on* the devices were passwords.  Complaint ¶ 103, *MetroPCS*, No. 1:16-cv-00323, ECF No. 1; *cf. Sprint Sols. Inc. v. Pac. Cellupage Inc.*, 2014 WL 12607836, at *11-12 (C.D. Cal. Apr. 28, 2014) (sale of unlocked phones not "trafficking in a password").

1   intent to deprive a victim of money or property by deception." *United States v. Saini*, 23 F.4th

2   1155, 1160 (9th Cir. 2022).  To the extent older district court cases interpreted "intent to defraud"

3   differently (MSJ 22), those cases cannot survive the Ninth Circuit's holding that "the plain and

4   ordinary meaning" of the phrase is "intent to deceive *and* cheat." *Saini*, 23 F.4th at 1160-61.[21]

5         Plaintiffs do not argue, and cannot prove as a matter of law, that NSO intended to "deprive

6   a victim of money or property." *Id.*  There is no evidence NSO took or intended to take *any* money

7   or property from WhatsApp or anyone else.[22]  Nor can Plaintiffs prove "deception" as a matter of

8   law.  Pegasus did not "deceive WhatsApp's servers and target devices into believing NSO's

9   messages were legitimate traffic from the Official Client" (MSJ 22) because those messages *were*

10  legitimate traffic from the "official" client.  (Gazneli Decl. ¶¶ 4-9).  Moreover, Pegasus did not

11  disguise its messages in any way.  In messages sent by the Heaven and Eden vectors, the Pegasus

12  code was written in plain text in unencrypted fields, which WhatsApp servers easily *could have*

13  seen and blocked because it was "very, very obvious."  (Akro. Exh. A at 139:51-140:2.)  In most

14  messages sent by the "Erised" vector, the code was written directly into the message (Akro. Exh.

15  E at 268:17-269:5), which was encrypted only because *WhatsApp itself* decided to encrypt the

16  contents of *every* message sent by *any* WhatsApp user (Akro. Ex. B at 122:2-126:9).  Pegasus thus

17  did *nothing* deceptive to hide its code—WhatsApp's servers simply did not look for or prohibit

18  those messages.  (McGraw Exh. A ¶¶ 84, 136-38; Exh B. ¶¶ 23-32, 42-44.)[23]

19        **G.     There is a material dispute over whether Plaintiffs suffered "damage" or "loss."**

20        Finally, a jury could conclude Plaintiffs did not suffer "damage" or "loss" as CFAA defines

21  those terms.  Under CFAA, "damage" requires "impairment to the integrity or availability of data,

22  a program, a system, or information."  § 1030(e)(8).  Plaintiffs do not claim to have suffered

23  "damage," since they admit Pegasus did not "compromise[]," "corrupt," "alter," "impair," or

---

[21] *See Shaw v. United States*, 580 U.S. 63, 72 (2016) (same for bank fraud statute); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (same for wire fraud statute).

[22] Because NSO never operated Pegasus, it could not have taken *anything* from target users.

[23] Whether "WhatsApp would [have] shut down [Pegasus] if it discovered it" (MSJ 22) is irrelevant when NSO never made any false statements to hide its conduct.  *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 233 (2d Cir. 2020) (under CFAA, "[a] misunderstanding would not rise to the level of deceit" absent "intentionally misl[eading]" statements); *Cohodes v. Mimedx Grp.*, 2024 WL 4353634, at *6 (N.D. Cal. Sept. 24, 2024) ("Having an ulterior motive" is not "deceit.").

"delete" any information on WhatsApp servers.  (Akro. Exh. B at 249:7-250:10; Exh. C at 183:7-184:7, 250:22-251:24; Exh. N at 4.)  Plaintiffs instead claim "loss" in the form of investigation and repair costs.  (MSJ 25.)  But "[t]he term 'loss' likewise relates to costs caused by harm to computer data, programs, systems, or information services."  *Van Buren*, 593 U.S. at 391-92 (citing § 1030(e)(11)).  So "loss" is *also* "[l]imit[ed]" to "technological harms—such as the corruption of files."  *Id.*  As a result, "costs of responding to an offense" qualify as "loss" only in "situations involving *damage to* or *impairment of* the protected computer."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021) (emphasis added).[24]

Plaintiffs' investigation and repair costs are not "loss" under that definition.  Because WhatsApp's servers undisputedly suffered no damage or impairment, Plaintiffs' investigation did not involve "investigating or remedying *damage* to a computer."  *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004) (emphasis added); *Better Holdco*, 2021 WL 3173736, at *4 (investigation is not "loss" absent "alleg[ation] that [plaintiff] lost service or access to its data, or that its systems were otherwise harmed").[25]  Nor were Plaintiffs "*restoring*" their system "to its condition *prior to* the offense," § 1030(e)(11), because Pegasus did not alter WhatsApp's system in any way.  Instead, Plaintiffs wrote *new* code to fix a *preexisting* vulnerability.  (Akro. Exh. B at 200:25-201:10; McGraw Exh. A ¶ 102.)  Because that vulnerability preexisted and was not "caused by computer intrusions," fixing it does not fall within CFAA's "narrow conception of loss." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir. 2019).

## IV.    Plaintiffs are not entitled to summary judgment on their CDAFA claim.

As explained in NSO's motion, *NSO* is entitled to summary judgment on Plaintiffs' CDAFA claim because CDAFA does not apply to conduct outside of California.  (Dkt. 396-2 at 24-25.)  Moreover, Plaintiffs cannot state a CDAFA claim based on any use of Pegasus to access WhatsApp

---

[24] CFAA's examples of loss reflect the same limitation, referring to "*damage* assessments" and "*restoring* the data, program, system, or information." § 1030(e)(11).

[25] *Sylabs, Inc. v. Rose*, 2024 WL 4312719, at *2-3 (N.D. Cal. Sept. 26, 2024); *Lukasian House, LLC v. Ample Int'l, Inc.*, 2012 WL 13009130, at *3 (C.D. Cal. Apr. 20, 2012); *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1184-85 (E.D. Cal. 2010); *El Omari v. Buchanan*, 2021 WL 5889341, at *14 (S.D.N.Y. Dec. 10, 2021); *CCC Info. Servs., Inc. v. Tractable, Inc.*, 2023 WL 415541, at *3 (N.D. Ill. Jan. 25, 2023).

users' devices because a CDAFA claim can only be brought by a computer's "owner or lessee," Cal. Penal Code § 502(e)(1), and Plaintiffs do not own or lease WhatsApp users' devices.  In all events, however, Plaintiffs do not argue they should receive summary judgment on their CDAFA claim if they do not receive it on their CFAA claims.  (MSJ 25.)  Plaintiffs are not entitled to summary judgment on their CFAA claims, so the same is true for their CDAFA claim.

**V.    There is a material dispute over whether Plaintiffs have unclean hands.**

Finally, Plaintiffs are not entitled to summary judgment because they do not seek judgment on NSO's affirmative defenses, including unclean hands.   "[U]nclean hands may provide a complete defense to an action in law," *Albert's Organics, Inc. v. Holzman*, 2020 WL 3892861, at *5 (N.D. Cal. July 10, 2020) (Hamilton, J.) (cleaned up), when the plaintiff "dirtied [his hands] in acquiring the right he now asserts," *Brewster v. City of L.A.*, 672 F. Supp. 3d 872, 1003 (C.D. Cal. 2023).  Here, logs produced by Plaintiffs from an Amazon Web Services server leased by NSO reveal that a "Michael S." accessed the AWS server on May 2, 2019, when Plaintiffs began investigating Pegasus.  (Akro. Exh. O at 25.)  That appears to refer to Meta employee Michael Scott, whose role in the investigation included "analyzing … the exploit and determining how it was conducted." (Block Exh. 12 at 24.)  In addition, Plaintiffs' corporate designee Andrew Robinson testified that he received information about the AWS server's contents from AWS.  (Akro. Exh. B at 375:9-377:24.)   Neither Mr. Scott, Mr. Robinson, nor any other employee of Plaintiffs had any authorization from NSO to access the AWS server or obtain information stored by NSO on the server.  Accordingly, it appears that Plaintiffs, when gathering evidence for this lawsuit, violated CFAA and CDAFA by accessing the AWS server and induced AWS to breach its confidentiality obligations to NSO.  That supports NSO's unclean hands defense.

**CONCLUSION**

The Court should deny Plaintiffs' motion.

Dated: October 11, 2024                       KING & SPALDING LLP

                                              By: */s/ Joseph N. Akrotirianakis*
                                              JOSEPH N. AKROTIRIANAKIS
                                              AARON S. CRAIG
                                              *Attorneys for Defendants*