# Exhibit D

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WHATSAPP INC. and<br>META PLATFORMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES<br>LIMITED and Q CYBER<br>TECHNOLOGIES LIMITED,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 19-cv-07123-PJH<br>)<br>)<br>)<br>)<br>)<br>) |

---

## REBUTTAL EXPERT REPORT OF ANTHONY VANCE

September 21, 2024

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

---



DEPOSITION EXHIBIT
1610
11/14/24
Rich Germosen, FAPR, RDR, CRR

**REBUTTAL OF ANTHONY VANCE IN RESPONSE TO REPORTS OF TERRENCE MCGRAW, TY M. SHEPARD, AND JOHN "JAY" TOWN**

## I.  SCOPE AND SUMMARY OF TESTIMONY

I intend to provide expert opinion in rebutting the expert opinions of Terrence McGraw, Col. Ty M. Shepard (Ret.), and John "Jay" Town in the of WhatsApp Inc. and Meta Platforms, Inc. v. NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively referred to as "Defendants" or individually as "NSO" and "Q Cyber," C.A. No. 19-cv-07123-PJH (the "NSO Proceedings") on the following points, as well as other subjects addressed in this report.

With respect to policy implications of Pegasus (Section II):

A.  WhatsApp users have legitimate needs for end-to-end encryption (E2EE)
B.  Plaintiffs comply with all lawful government data requests
C.  Pegasus is exploitation software and not equivalent to legitimate lawful intercept technologies
D.  Pegasus is a dangerous exploitation tool used against vulnerable populations and civil society around the world
E.  NSO is not authorized to exploit the software or systems of companies like Plaintiffs'

With respect to issues relating to Defendants' May 2019 attack on WhatsApp (Section III):

A.  Plaintiffs Demonstrated Due Diligence to Protect WhatsApp Servers from Attacks
B.  The WhatsApp Platform Was Compromised in the May Attack
C.  The May 2019 Attacks Were Caused by Defendants and Plaintiffs' Response Was Reasonable
D.  WhatsApp Showed Due Diligence in Responding to the May 2019 Attack
E.  Plaintiffs Demonstrated Good Judgment in Waiting to Fully Block the May 2019 Attack
F.  Exploitation Vendors Should Be Held Accountable for the Harm They Cause to Victim Organizations, Such as in the Case of Defendants' May 2019 Attack

This report sets forth the basis and reasons for my opinions, including the materials and information relied upon in forming those opinions and conclusions and the facts or data considered by me in forming my opinions.

The materials I have considered in forming my opinions are the exhibits and information referenced in this report and the additional materials identified in Appendix A. This report is based on information currently available to me. I reserve the right to continue my investigation and analysis, which may include a review of documents and information not yet produced, and testimony from depositions that have not yet occurred or for which transcripts are not yet available. I further reserve the right to expand or otherwise modify my opinions and conclusions as my investigation and study continues, and to supplement my opinions and conclusions in response to any additional information that becomes available, to any matters raised by Defendants, or to any opinions or conclusions possessed by experts for Defendants.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I submitted an opening report in this matter on August 30, 2024. My testifying experience, and compensation are set forth in Section II of my initial report, and remain unchanged. A copy of my *curriculum vita* is attached as Appendix B.

## II. POLICY IMPLICATIONS OF PEGASUS

### A. WhatsApp Users Have Legitimate Needs for End-to-End Encryption (E2EE)

*1. WhatsApp Users have legitimate needs for end-to-end encryption*

McGraw, Shepard, and Town claim that WhatsApp's end-to-end encryption (E2EE) enables illegal purposes. Shepard states that, "Various threat actors, including terrorist organizations, narcotics groups, human traffickers, organized crime, cross-border gangs, and nation-states, routinely use encrypted messaging applications, including WhatsApp, to conceal their activities from detection by military, national security, and law-enforcement agencies."[1] Town opines that "Criminal organizations, terrorist organizations, and other bad actors increasingly use sophisticated technical capabilities,"[2] and that "applications like WhatsApp, Signal, and Telegram enable criminals and terrorists to discuss their illegal, and often deadly schemes without fear of detection."[3] McGraw argues that "WhatsApp and similar E2EE messaging platforms have been used by all types of criminals and terrorists worldwide to commit unspeakable atrocities."[4]

These opinions are myopic and ignore the fact that encryption is a commonly used form of technology, and that WhatsApp has more than 2 billion monthly active users[5] who have expectations of online privacy and therefore also have legitimate needs for end-to-end encryption. These users include journalists, human rights activists and lawyers, religious leaders, diplomats, and government officials, all of whom depend on WhatsApp to communicate securely with others.[6] The fact that members of these groups have been targeted by exploitation software such as Pegasus underscores their legitimate need for secure communications that WhatsApp is designed to provide.

Moreover, millions of WhatsApp users live in jurisdictions where they have a legal right to privacy. For example, the *Charter of Fundamental Rights of the European Union* states that "Everyone has the right to respect for his or her private and family life, home and communications,"[7] and that "Everyone has the right to the protection of personal data concerning

---

[1] Shepard, p. 6.

[2] Town, p. 9.

[3] Town, p. 19

[4] McGraw, p. 33.

[5] WhatsApp Blog, Two Billion Users – Connecting the World Privately, Feb. 12, 2020, https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

[6] Adam Entous, "WhatsApp claims that an Israeli tech firm's spyware targeted human-rights activists and journalists," *The New Yorker*, October 29, 2019, https://www.newyorker.com/news/news-desk/whatsapp-sues-an-israeli-tech-firm-whose-spyware-targeted-human-rights-activists-and-journalists.

[7] Charter of Fundamental Rights of the European Union (2000), Article 7.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

him or her."[8] These rights are enforced in part by the EU's *General Data and Privacy Regulation* (GDPR). In the United States, five states now have comprehensive privacy laws granting rights to their citizens, with another fourteen signed bills that will go into effect between October 2024 and January 2026.[9] There are also numerous other federal laws that protect the privacy of specific types of data (e.g., the Health Insurance Portability and Accountability Act for protected health information[10]) or certain populations (e.g., the Children's Online Privacy Protection Rule [COPPA] applicable to children under age 13[11]).

However, because technology advances at a faster rate than do legal protections, individuals must take measures to protect their data and online communications from hackers, companies that seek to acquire consumer data without consent, and other bad actors. Messaging apps that use E2EE to communicate such as WhatsApp are one of the most effective, practical, and user-friendly means available to individuals to protect their online privacy.

Moreover, as illustrated by the rise in corporate data breaches,[12] users' communications that should be protected by corporations are instead leaked as companies are breached by attackers. In my opinion, E2EE—such as that used in WhatsApp—is one of the best ways users can ensure the security and privacy of their online communications.

*2. Law enforcement has ample alternative data sources to E2EE messaging apps like WhatsApp*

Shepard and Town argue that law enforcement and intelligence agencies have little recourse in the face of E2EE messaging apps such as WhatsApp. Shepard claims that, "Law enforcement and intelligence agencies often cannot gain access to and read communications of such threat actors directly through legal process served on communications providers such as WhatsApp, even with the approval of federal judges."[13] Similarly, Town states that "Without such technical capabilities, whether hardware or software, the gathering of intelligence is left to human intelligence, which is a tactic extending back perhaps thousands of years."[14] I disagree.

These statements are hyperbole and suggest law enforcement access to E2EE is an insurmountable detriment that prevents successful policing. It is obviously not. These opinions ignore the many alternative data sources available to law enforcement and intelligence agencies. These sources of data include cell phone carrier records, cell phone tower records, SMS messages, internet service provider logs, email, social media account records, GPS location data,

---

[8] Ibid., Article 8.

[9] International Association of Privacy Professionals (IAPP) 2024. "US State Privacy Legislation Tracker," https://iapp.org/resources/article/us-state-privacy-legislation-tracker/.

[10] https://www.cdc.gov/phlp/php/resources/health-insurance-portability-and-accountability-act-of-1996-hipaa.html?CDC_AAref_Val=https://www.cdc.gov/phlp/publications/topic/hipaa.html

[11] https://www.ftc.gov/legal-library/browse/rules/childrens-online-privacy-protection-rule-coppa

[12] Identity Theft Resource Center. *2023 Annual Data Breach Report*, January 25, 2024, https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

[13] Shepard, p. 7.

[14] Town, pp. 7–8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and many more. Rather than being set back "thousands of years" as Town claims,[15] law enforcement agencies today operate in what privacy scholars have called "the golden age of surveillance."[16] Furthermore, the numerous alternative sources of surveillance data readily available to be acquired through legal means, undermines the argument for the necessity of exploitation tools such as Pegasus used to compromise individuals' personal devices and communications. This was made clear by the United States Department of Commerce adding NSO to the Entity List, as discussed further in Section II.D.

## B. Plaintiffs Comply with All Lawful Government Data Requests

McGraw points out that "the CEO of Telegram—an E2E encrypted messaging application similar to WhatsApp—was arrested in France for purportedly allowing his platform to be used for criminal activity."[17] Shepard claims that, "many encrypted messaging application providers such as WhatsApp do not help the government obtain access to encrypted communications, even with lawful processes issued by courts."[18] These statements are inaccurate, unfair, and irrelevant for several reasons.

Initially, McGraw's association of Telegram with WhatsApp is unfair and unwarranted. First, unlike Telegram, Plaintiffs comply with lawful data requests, as discussed further below. Second, charges against Telegram CEO Pavel Durov are related to a lack of content moderation on the Telegram platform. By contrast, Plaintiffs invest significant resources to moderate the content of its platforms.[19] In the case of WhatsApp's E2EE messages, content moderation techniques include detection of unencrypted content on the client and voluntary reports from WhatsApp users.[20]

Furthermore, and contrary to Shepard's claims, Meta complies will all lawful data requests, which they report in their biannual transparency report, "Government Requests for User Data":

> Meta responds to government requests for data in accordance with applicable law and our terms of service. Each and every request we receive is carefully reviewed for legal sufficiency and we may reject or require greater specificity on requests that appear overly broad or vague.[21]

Further, the WhatsApp FAQ states:[22]

---

[15] Ibid., p. 8.

[16] Peter Swire, Testimony of Peter Swire at U.S. Senate Judiciary Committee Hearing, "Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy," July 8, 2015, https://www.judiciary.senate.gov/imo/media/doc/07-08-15%20Swire%20Testimony.pdf.

[17] McGraw, p. 34.

[18] Shepard, p. 10.

[19] https://transparency.meta.com/enforcement/

[20] WhatsApp, "Safety" under "About community admin controls," https://faq.whatsapp.com/1905967136259857.

[21] Meta, "Government Requests for User Data," https://transparency.meta.com/reports/government-data-requests.

[22] WhatsApp. "What is traceability and why does WhatsApp oppose it?" https://faq.whatsapp.com/1206094619954598.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Can WhatsApp work with law enforcement without traceability?**

WhatsApp respects the important work law enforcement does to keep people safe. Our dedicated team reviews and responds to valid law enforcement requests. We respond to valid requests by providing the limited categories of information available to us, consistent with applicable law and policy. We also have a team devoted to assisting law enforcement 24/7 with emergencies involving imminent harm or risk of death or serious physical injury. We consistently receive feedback from law enforcement that our responses to requests help solve crimes and bring people to justice.

It's also important to understand that depending upon the nature of their investigations, law enforcement officials have multiple investigative tools, and may obtain information from many sources, including different companies, other governments, or from users' devices."

In the case of WhatsApp, Meta collects various data through the normal operation of the WhatsApp service that may be produced according to lawful government requests. This includes certain location data, contact information, and usage data.[23] However, WhatsApp users' private messages cannot be produced because Plaintiffs do not have access to users' messages according to WhatsApp's secure E2EE design. Therefore, Shepard's claim that WhatsApp does not help governments obtain lawful access to WhatsApp information is incorrect and misleading.

**C. Pegasus is Exploitation Software and Not Equivalent to Legitimate Lawful Intercept Technologies**

*1. Pegasus is a software exploitation and intrusion tool, not merely a communications intercept tool*

McGraw, Shepard, and Town claim that Pegasus is similar to lawful intercept technologies. For example, McGraw recounts the history of the lawful intercept industry and concludes that "This lawsuit raises policy concerns for law enforcement, national intelligence, and the lawful intercept industry because it threatens governments' ability to leverage the private sector for the development of critical law enforcement tools."[24] Likewise, Shepard states that "Government agencies use surveillance tools like Pegasus to gain insight into operational planning, threat actor identities, and specific plots."[25] Similarly, Town claims that "Pegasus or software tools like it are the natural evolution of lawful intercept tools. While the new tools take advantage of new technology, the functions remain similar to late 20th century technology – intercepting communications being sent and received, seizing information in the target's possession, and conducting audio and video surveillance."[26]

---

[23] https://apps.apple.com/us/app/whatsapp-messenger/id310633997 (noting under "App Privacy" that WhatsApp will collect certain data from users).

[24] McGraw, p. 31; *see also* pp. 5–6.

[25] Shepard, p. 8.

[26] Town, p. 17.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

These opinions are inaccurate. First, Pegasus is not the modern-day equivalent of a wiretap, but rather is an exploitation tool designed to gain unauthorized access or hack[27] victims' devices. Second, Pegasus is fundamentally different from lawful intercept and surveillance tools that passively collect information, and which are subject to statutory rules about what communications and court review can be intercepted. In contrast, Pegasus actively exploits software vulnerabilities to gain total control of targeted devices. In other words, Pegasus is hacking software that enables not only surveillance of a device, but also persistent and broad control of victims' devices. Accordingly, it is extremely dangerous because of the exploits it uses and the unfettered access and control of victims' devices it enables.

This point is illustrated by McGraw, who defines the terms "vulnerability," "vector," "payload," "mechanism," and "exploit" as they relate to Pegasus. These are longstanding terms and concepts of the hacking, penetration testing, and software exploitation communities.[28] They clearly identify Pegasus as first and foremost a software exploitation and intrusion tool, not merely an interception tool.

This is further illustrated by McGraw in his description of the "Cyber Kill Chain." McGraw inaccurately conflates the "Cyber Kill Chain," created by Lockheed Martin researchers Hutchins et al. in 2011[29] and the MITRE ATT&CK framework, a related but distinct framework.[30] Hutchins et al. (2011) explain at the outset of their paper the type of attacker the "Cyber Kill Chain" contemplates:

> A new class of threats, appropriately dubbed the "Advanced Persistent Threat" (APT), represents well-resourced and trained adversaries that conduct multi-year intrusion campaigns targeting highly sensitive economic, proprietary, or national security information. These adversaries accomplish their goals using advanced tools and techniques designed to defeat most conventional computer network defense mechanisms.[31]

The authors define APT as "a new class of threats, intent on the compromise of data for economic or military advancement."[32] They explain that APT attackers *continually demonstrate the capability to compromise systems by using advanced tools, customized malware, and 'zero-day' exploits that anti-virus and patching cannot detect or mitigate* (emphasis added)."[33]

---

[27] Oxford English Dictionary, verb "hack," "To gain unauthorized access to or control over a computer system, network, a person's telephone communications, etc., typically remotely" (definition III.15.c.).

[28] *See, e.g.,* Skoudis, E., & Liston, T. (2005). Counter Hack Reloaded: A Step-by-Step Guide to Computer Attacks and Effective Defenses. Prentice Hall PTR.

[29] Hutchins, Eric, Michael Cloppert, and Rohan Amin. 2011. "Intelligence-Driven Computer Network Defense Informed by Analysis of Adversary Campaigns and Intrusion Kill Chains." *The Proceedings of the 6th International Conference on Information Warfare and Security.* https://www.lockheedmartin.com/content/dam/lockheed-martin/rms/documents/cyber/LM-White-Paper-Intel-Driven-Defense.pdf.

[30] MITRE. "Frequently Asked Questions," https://attack.mitre.org/resources/faq/.

[31] Hutchins et al. 2011, p. 1.

[32] Ibid., p. 1.

[33] Ibid., p. 2.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Hutchins et al. define a kill chain as "a systematic process to target and engage an adversary to create desired effects,"[34] and describe their network intrusion "Cyber Kill Chain" as follows (emphasis added):

> Expanding on this concept, this paper presents a new kill chain model, one specifically for intrusions. The essence of an intrusion is that the aggressor must develop a payload to breach a trusted boundary, establish a presence inside a trusted environment, and from that presence, take actions towards their objectives, be they moving laterally inside the environment or violating the confidentiality, integrity, or availability of a system in the environment. *The intrusion kill chain is defined as reconnaissance, weaponization, delivery, exploitation, installation, command and control (C2), and actions on objectives.*[35]

As McGraw observes, the Cyber Kill Chain aptly describes the process used by Pegasus to exploit and compromise victims' devices.

The above statements of Hutchins et al. accurately apply to Pegasus as a nation-state-level exploitation tool that leverages zero days to compromise victims' devices in ways that victims cannot detect. Therefore, Pegasus is far more dangerous compared to traditional surveillance technologies because of its abilities to completely compromise victims' devices and enable a wide range of serious abuses.

Furthermore, this highlights the precarious position of companies like Meta because they must defend their networks and platforms against cybersecurity attacks that cannot be differentiated into "surveillance," "lawful intercept," or malicious or criminal operations. The methods, techniques, and tools of exploitation and intrusion are similar regardless of the threat actor. Shepard's statement that government agencies avoid disclosing their tools "because such disclosures would potentially lead those providers to update their software to render those tools or methods non-functional,"[36] confirms that users of software like Pegasus know that their access is unauthorized. In the absence of lawful authorization served on them, Plaintiffs are not required to, and cannot, determine the alleged purposes for which they are accessing their systems.

**D. Pegasus is a Dangerous Exploitation Tool Used Against Vulnerable Populations and Civil Society around the World**

*1. Abuses of Pegasus against members of civil society around the world*

Shepard argues that "[t]ools like Pegasus provide intelligence insight to the U.S. and allied national security agencies."[37] Town asserts that "[b]ased on public reports, however, there are obvious benefits to next-generation lawful intercept technologies, including Pegasus."[38] However, these supposed benefits are juxtaposed with well-documented abuses of Pegasus

---

[34] Ibid., p. 4.
[35] Ibid., p. 4.
[36] Shepard, p. 8.
[37] Ibid.
[38] Town, p. 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

against members of civil society, such as journalists, human rights defenders, and anticorruption activists.

Although listing all instances of forensic analyses revealing abuses of Pegasus is beyond the scope of this report, and NSO refused to produce or discuss those instances with the exception of a few, they are publicly documented by investigative journalists such as those of the Pegasus Project, a consortium of 80 journalists from 17 media organizations in 10 countries around the world.[39] For the purposes of this rebuttal report, it will suffice to list a few cases supported by forensic analyses of victims' devices:

- In 2018, Pegasus was installed on the phone of Hanan Elatr, wife of murdered *Washington Post* journalist Jamal Khashoggi, in the months before his death.[40] Likewise, a separate forensic examination of the phone belonging to Hatice Cengiz, Khashoggi's fiancée, found that it had been compromised by Pegasus four days after Khashoggi's murder.[41]
- In 2019, the phone of French human rights lawyer Joseph Breham working in Morocco was compromised by Pegasus.[42]
- In May 2019, the devices of 63 Catalan activists, lawyers, and politicians were targeted or compromised by Pegasus.[43]
- Between July–August 2020, the device of Princess Haya was compromised 11 times by Pegasus under the "express or implied authority" of Sheik Mohammed bin Rashid Al Maktoum, her ex-husband and prime minister of the United Arab Emirates.[44] Notably, in a letter filed with a UK Court, NSO confirmed it became aware that "Baroness Shackleton's mobile phone, that of another unnamed member of her firm and that of her client [Princess Haya], may be been [sic] compromised" by NSO's technology, and confirmed it was "not in accordance with the contractual terms applicable to it, or which appeared to be beyond the purposes for which the technology was supplied."[45] NSO purportedly terminated its customer's contract and informed Princess Haya through an

---

[39] Pegasus Project, "About the Pegasus Project," https://forbiddenstories.org/about-the-pegasus-project/

[40] Priest, D. "A UAE agency put Pegasus spyware on phone of Jamal Khashoggi's wife months before his murder, new forensics show," *The Washington Post*, Dec. 12, 2021,
"https://www.washingtonpost.com/nation/interactive/2021/hanan-elatr-phone-pegasus/.

[41] Kirchgaessner, S. "Saudis behind NSO spyware attack on Jamal Khashoggi's family, leak suggests," *The Guardian*, Jul. 18, 2021, https://www.theguardian.com/world/2021/jul/18/nso-spyware-used-to-target-family-of-jamal-khashoggi-leaked-data-shows-saudis-pegasus.

[42] Walker, S., Kirchgaessner, S., Lakhani, N., Safi, M. "Pegasus project: spyware leak suggests lawyers and activists at risk across globe," *The Guardian*, Jul. 19, 2021, https://www.theguardian.com/news/2021/jul/19/spyware-leak-suggests-lawyers-and-activists-at-risk-across-globe.

[43] Farrow, R. "How Democracies Spy on their Citizens," *The New Yorker*, Apr. 25, 2022,
https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens; CitizenLab, "Catalan Gate: Extensive Mercenary Spyware Operation against Catalans Using Pegasus and Candiru," Apr. 18, 2022; Kirchgaessner, S., Jones, S. "Phone of top Catalan politician 'targeted by government-grade spyware,'" *The Guardian*, Jul. 13, 2020, https://www.theguardian.com/world/2020/jul/13/phone-of-top-catalan-politician-targeted-by-government-grade-spyware.

[44] Siddique, H. "Dubai ruler hacked ex-wife using NSO Pegasus spyware, high court judge finds," *The Guardian*, Oct. 6, 2021, https://www.theguardian.com/world/2021/oct/06/dubai-ruler-hacked-ex-wife-using-nso-pegasus-spyware-high-court-judge-finds-sheikh-mohammed-princess-haya.

[45] *See* Re Al M [2021] EWHC 1162 (Fam) ¶ 103.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

intermediary,[46] but it is clear that any safeguards it supposedly had in place were ineffective to prevent this abuse of its technology.

- In 2023, the iPhones of prominent Indian journalists Siddharth Varadarajan, founding editor of *The Wire*; and Anand Mangnale, the South Asia editor at *The Organised Crime and Corruption Report Project* (OCCRP), were compromised by Pegasus as late as October 2023.[47] Varadarajan's phone was previously compromised by Pegasus in 2018.[48]
- From 2019 to 2023, the devices of 35 activists, journalists, lawyers, and civil society members in Jordan were compromised by Pegasus.[49]

Town mentions that a "publicly known success is the reported use of Pegasus by the Mexican government to capture Joaquin Guzman, better known as El Chapo."[50] However, Town does not acknowledge that members of civil society in Mexico are some of the most frequently targeted victims of Pegasus according to numerous reports supported by forensic analyses of victims' devices.[51] To cite only three examples, these include:

- From 2014 to 2016, more than 75 text messages containing links to Pegasus malware were sent to Mexican journalists and activists and their families, including a child minor of an investigative journalist.[52]
- In May 2017, investigative journalists investigating cartels were sent links to Pegasus malware that purported to contain information about the killing of Javier Valdez, an investigative journalist who had been assassinated the day before.[53]
- From June to September 2022, the devices of human rights defenders in Mexico, Jorge Santiago Aguirre Espinosa and María Luisa Aguilar Rodríguez of Centro PRODH were compromised by Pegasus.[54]

However, the devices of civil society members of foreign nations are not the only ones that have

---

[46] *Id.* at ¶¶ 27, 95, 104.

[47] Amnesty International. "India: Damning new forensic investigation reveals repeated use of Pegasus spyware to target high-profile journalists," Dec. 28, 2023, https://www.amnesty.org/en/latest/news/2023/12/india-damning-new-forensic-investigation-reveals-repeated-use-of-pegasus-spyware-to-target-high-profile-journalists/

[48] Ibid.

[49] Access Now, "Between a hack and a hard place: how Pegasus spyware crushes civic space in Jordan," Feb. 1, 2024, https://www.accessnow.org/publication/between-a-hack-and-a-hard-place-how-pegasus-spyware-crushes-civic-space-in-jordan/.

[50] Town, p. 21.

[51] Kitroeff, N., Bergman, R. "How Mexico Became the Biggest User of the World's Most Notorious Spy Tool," *The New York Times*, Apr. 18, 2023, https://www.nytimes.com/2023/04/18/world/americas/pegasus-spyware-mexico.html.

[52] Ahmed, A., Perlroth, N. "Using Texts as Lures, Government Spyware Targets Mexican Journalists and Their Families," *The New York Times*, June 19, 2019, https://www.nytimes.com/2017/06/19/world/americas/mexico-spyware-anticrime.html; Scott-Railton, J., Marczak, B., Razzak, B., Crete-Nishihata, M., Deibert, R. "Reckless Exploit: Mexican Journalists, Lawyers, and a Child Targeted with NSO Spyware," CitizenLab, June 19, 2019, https://citizenlab.ca/2017/06/reckless-exploit-mexico-nso/.

[53] Ahmed, A. "A Journalist Was Killed in Mexico. Then His Colleagues Were Hacked." *The New York Times*, No. 27, 2018, https://www.nytimes.com/2018/11/27/world/americas/mexico-spyware-journalist.html.

[54] Kitroeff, N., Bergman, R. "How Mexico Became the Biggest User of the World's Most Notorious Spy Tool," *The New York Times*, Apr. 18, 2023, https://www.nytimes.com/2023/04/18/world/americas/pegasus-spyware-mexico.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

been subjected to abuse by Pegasus—devices belonging to U.S. State Department employees have also been attacked by Pegasus. In December 2021, *The Washington Post* and *Reuters* confirmed that:

> Apple has alerted 11 U.S. Embassy employees that their iPhones have been hacked in recent months with Pegasus spyware from NSO Group, an Israel-based company that licenses software to government clients in dozens of countries that allows them to secretly steal files, eavesdrop on conversations and track the movements of its targets, according to people familiar with the notifications.
> …
> The hacks were concentrated at the U.S. Embassy in Uganda's capital, Kampala, according to the people familiar with Apple's notifications. At least some of those targeted were U.S. citizens working as Foreign Service officers, they said.[55]

Senator Ron Wyden, U.S. Senate Intelligence Committee member, said of this attack: "Companies that enable their customers to hack U.S. government employees are a threat to America's national security and should be treated as such by the government."[56]

In 2023, *The Washington Post* reported that a U.S. government investigation determined that at least 50 government employees (some "very senior") in 10 countries were compromised by commercial spyware such as Pegasus.[57] Although this report did not explicitly link Pegasus to all attacks discovered, the investigation led to an executive order banning the use of commercial spyware (described in the next session), which the White House introduced by specifically citing NSO.[58]

Although Shepard and Town claim benefits for Pegasus, it is my opinion from the foregoing and similar public sources that the harms caused by Pegasus outweigh any supposed benefits.

---

[55] Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/; *see also* Bing, C., Menn, J. "U.S. State Department phones hacked with Israeli company spyware – sources," *Reuters*, Dec. 3, 2021, https://www.reuters.com/technology/exclusive-us-state-department-phones-hacked-with-israeli-company-spyware-sources-2021-12-03/.

[56] Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/.

[57] Nakashima, E., Starts, T. "At least 50 U.S. government employees targeted with phone spyware overseas," Mar. 27, 2023. https://www.washingtonpost.com/national-security/2023/03/27/spyware-diplomats-us-pegasus/.

[58] White House, "FACT SHEET: President Biden Signs Executive Order to Prohibit U.S. Government Use of Commercial Spyware that Poses Risks to National Security," Mar. 27, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet-president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial-spyware-that-poses-risks-to-national-security/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2. *The U.S. Government has sanctioned NSO Group specifically and barred commercial*
   *spyware generally*

Shepard asserts that "U.S. military and intelligence agencies, as well as those of U.S. allies,
routinely use surveillance tools similar to Pegasus to combat a variety of threat actors."[59]
Likewise, Town opines that, "[b]ased on my experience, Pegasus or similar software capabilities
could be lawfully deployed in the United States by American law enforcement."[60] However,
neither Shepard nor Town acknowledge that the United States has sanctioned NSO Group
specifically, and has barred federal agencies from using commercial spyware software, because
Pegasus is harmful to the interests of the United States and democracy globally.

On November 3, 2021, the U.S. Department of Commerce's Bureau of Industry and Security
(BIS) released a final rule that added NSO Group to the Entity List "for engaging in activities
that are contrary to the national security or foreign policy interests of the United States."[61] The
rule states (emphasis added):

> The Entity List (supplement no. 4 to part 744 of the EAR) identifies entities for which
> there is reasonable cause to believe, based on specific and articulable facts, that the
> entities have been involved, are involved, or pose a significant risk of being or becoming
> involved in activities contrary to the national security or foreign policy interests of the
> United States.
> …
> The End-User Review Committee (ERC), composed of representatives of the
> Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the
> Treasury, makes all decisions regarding additions to, removals from, or other
> modifications to the Entity List. …
> …
> **The ERC determined that NSO Group** and Candiru be added to the Entity List based
> on § 744.11(b) of the EAR: Entities for which there is reasonable cause to believe, based
> on specific and articulated facts, that the entity has been involved, is involved, or **poses a**
> **significant risk of being or becoming involved in activities that are contrary to the**
> **national security or foreign policy interests of the United States** and those acting on
> behalf of such entities. **Specifically, investigative information has shown that the**
> **Israeli companies NSO Group and Candiru developed and supplied spyware to**
> **foreign governments that used this tool to maliciously target government officials,**
> **journalists, businesspeople, activists, academics, and embassy workers.**[62]

The U.S. Department of Commerce further explained its decision (emphasis added):

---

[59] Shepard, p. 8.
[60] Town, p. 14.
[61] U.S. Department of Commerce, "Commerce Adds NSO Group and Other Foreign Companies to Entity List for
Malicious Cyber Activities," Nov. 3, 2021, https://www.commerce.gov/news/press-releases/2021/11/commerce-
adds-nso-group-and-other-foreign-companies-entity-list.
[62] Federal Register, "Addition of Certain Entities to the Entity List," Nov. 4, 2021,
https://www.federalregister.gov/documents/2021/11/04/2021-24123/addition-of-certain-entities-to-the-entity-list.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> NSO Group and Candiru (Israel) were added to the Entity List based on evidence that these entities developed and supplied spyware to foreign governments that used these tools to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers. **These tools have also enabled foreign governments to conduct transnational repression, which is the practice of authoritarian governments targeting dissidents, journalists and activists outside of their sovereign borders to silence dissent. Such practices threaten the rules-based international order.**
>
> …
>
> The Entity List is a tool utilized by BIS to restrict the export, reexport, and in-country transfer of items subject to the EAR to persons (individuals, organizations, companies) **reasonably believed to be involved, have been involved, or pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States.**
>
> …
>
> Today's action is a part of the Biden-Harris administration's efforts to put human rights at the center of U.S. foreign policy, including by working to **stem the proliferation of digital tools used for repression.** This effort is aimed at **improving citizens' digital security, combatting cyber threats, and mitigating unlawful surveillance** and follows a recent interim final rule released by the Commerce Department establishing controls on the export, reexport, or in-country transfer of certain items that can be used for malicious cyber activities.[63]

As a consequence of being added to the Entity List, NSO is blocked from purchasing technology from U.S. companies without a license, thus "NSO [can] no longer legally buy Windows operating systems, iPhones, Amazon cloud servers—the kinds of products it uses to run its business and build its spyware."[64]

Furthermore, on March 27, 2023, President Biden issued an executive order that:

> Prohibits departments and agencies across the federal government from operationally using commercial spyware tools that pose significant counterintelligence or security risks to the U.S. Government or significant risks of improper use by a foreign government or foreign person, including to target Americans or enable human rights abuses.[65]

In announcing this executive order, the White House specifically cited that four foreign entities—one of which was NSO—were added to the BIS Entity List in 2021.[66]

---

[63] U.S. Department of Commerce, "Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities," Nov. 3, 2021, https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list.

[64] Farrow, Ronan. "How Democracies Spy on Their Citizens." The New Yorker, April 18, 2022. https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.

[65] White House, "FACT SHEET: President Biden Signs Executive Order to Prohibit U.S. Government Use of Commercial Spyware that Poses Risks to National Security," Mar. 27, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet-president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial-spyware-that-poses-risks-to-national-security/.

[66] Ibid.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The White House also explained the rationale of the executive order as follows (emphasis added):

> **Commercial spyware – sophisticated and invasive cyber surveillance tools sold by vendors to access electronic devices remotely, extract their content, and manipulate their components, all without the knowledge or consent of the devices' users – has proliferated in recent years with few controls and high risk of abuse.**
>
> **The proliferation of commercial spyware poses distinct and growing counterintelligence and security risks to the United States,** including to the safety and security of U.S. Government personnel and their families. U.S. Government personnel overseas have been targeted by commercial spyware, and untrustworthy commercial vendors and tools can present significant risks to the security and integrity of U.S. Government information and information systems.
>
> **A growing number of foreign governments around the world, moreover, have deployed this technology to facilitate repression and enable human rights abuses, including to intimidate political opponents and curb dissent, limit freedom of expression, and monitor and target activists and journalists.** Misuse of these powerful surveillance tools has not been limited to authoritarian regimes. **Democratic governments also have confronted revelations that actors within their systems have used commercial spyware to target their citizens without proper legal authorization, safeguards, and oversight.**
>
> In response, the Biden-Harris Administration has mobilized a government-wide effort to counter the risks posed by commercial spyware. Today's Executive Order builds on these initiatives, and complementary bipartisan congressional action, to establish robust protections against misuse of such tools.[67]

This statement of the White House refutes Town's opinion that, "Based on my experience, Pegasus or similar software capabilities could be lawfully deployed in the United States by American law enforcement."[68] It also undermines McGraw's claim that:

> This lawsuit raises policy concerns for law enforcement, national intelligence, and the lawful intercept industry because it threatens governments' ability to leverage the private sector for the development of critical law enforcement tools.[69]

It is my opinion that Pegasus is precisely the type of commercial spyware software that the March 27, 2023 executive order is designed to prohibit.

---

[67] Ibid.
[68] Town, p. 14.
[69] McGraw, p. 31.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 3. Countries hostile against the U.S. use Pegasus or past NSO-developed exploits

Shepard and Town argue for the benefits of Pegasus for U.S. allies. Shepard states that "Commercial tools are particularly important for U.S. allies who do not have the resources to develop and maintain their own cyber surveillance capabilities."[70] Likewise, Town opines, "In my experience, the lawful interception of communications by a foreign nation state, such as a U.S. ally, can and has facilitated the protection of the United States."[71] Neither Shepard nor Town provide evidence to support their claims of the benefits of commercial spyware tools to U.S. allies.

Regardless, Pegasus has been used by foreign nations hostile to the United States and its allies. First, as discussed in Section II.D(1), in 2021 Pegasus was found to have compromised employees of the U.S. Embassy, including Foreign Service officers, in Kampala, Uganda.[72]

Second, in August of 2024 the Google Threat Analysis Group reported detecting threat actor APT29, attributed to Russia's Foreign Intelligence Service (SVR),[73] using "exploits that were identical or strikingly similar to exploits previously used by commercial surveillance vendors (CSVs) Intellexa and NSO Group."[74]

Even if Russia is not a customer of NSO, this report demonstrates that NSO-developed exploits have been obtained and deployed by actors hostile to the United States and its allies. In my opinion, this negates the supposed benefits to allies of commercial spyware that Shepard and Town claim.

### 4. The safeguards and policies of Pegasus are insufficient

Shepard states that, "I am aware that NSO employs a number of safeguards to limit misuse of its surveillance tool Pegasus."[75] I have not seen evidence of the existence of these safeguards or how effectively they operate nor were they produced with Shepard's report. However, even if the safeguards that Shepard claims do exist, the numerous instances of abuses of Pegasus around the world documented in the section above and in similar public sources indicate that these supposed safeguards are woefully inadequate.

Relatedly, Town asserts that:

---

[70] Shepard, p. 9.

[71] Town, p. 16.

[72] Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/.

[73] MITRE, "APT29," https://attack.mitre.org/groups/G0016/.

[74] Google Threat Analysis Group, "State-backed attackers and commercial surveillance vendors repeatedly use the same exploits," Aug. 29, 2024, https://blog.google/threat-analysis-group/state-backed-attackers-and-commercial-surveillance-vendors-repeatedly-use-the-same-exploits/.

[75] Shepard, p. 11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> The legal strictures for the lawful interception of communications are onerous and complex in a normal circumstance. In addition, there are ethical and end-user restrictions in software licensing agreements imposed by responsible software and analytics platform companies. … The end user licensing agreements (EULA) of certain software or platforms impose user conditions and restrictions and any violation of the EULA can, and often does, result in discontinued licensing of use of the software or platform.[76]

However, Town's assertion of EULAs curtailing governments' use of "lawful intercept tools" like those of NSO is undermined by Shepard's opinion that "[i]ntelligence agencies typically do not follow ordinary terms of service when acting in a governmental capacity and pursuing major security and safety threats."[77] It also is undermined by the numerous instances of abuses of Pegasus around the world documented in this section.

Regardless, the purposes for which Pegasus are intended is irrelevant. NSO may claim that Pegasus is intended to be used for specific purposes, but they cannot guarantee that abuses of Pegasus will not happen. Indeed, I understand that NSO has maintained throughout this litigation that it does not receive information from its customers about the identity of the targets of Pegasus.[78] In fact, Pegasus has been used to harm innocents around the world, including vulnerable groups, civil society, and employees and Foreign Service officers of the U.S. State Department (as described in Section II.D(1)). Therefore, the actual abuses and harms of Pegasus should be considered, rather than the safeguards that supposedly exist to prevent such abuses.

5. *Pegasus violations of policies are difficult to detect*

Town observes that "[v]iolations may be difficult for vendors [like NSO] to discover, such as covert use of the technology for unauthorized purposes, because government agencies are unwilling to identify the targets of national security or other covert investigations."[79]

Indeed. This statement illustrates why Pegasus poses such a dangerous threat to companies like Meta and their customers—any supposed violations of contractual restrictions for Pegasus are difficult for NSO to detect, giving its customers wide latitude in using Pegasus to harm innocents around the world, such as WhatsApp users.

**E. NSO is Not Authorized to Exploit the Software or Systems of Companies Like Plaintiffs'**

Shepard argues that "Intelligence agencies typically do not follow ordinary terms of service when acting in a governmental capacity and pursuing major security and safety threats."[80] However, even if intelligence agencies typically do not follow terms of service agreements (TSAs), that would not authorize NSO to develop exploits that circumvent them. Further,

---

[76] Town, p. 22.
[77] Shepard, p. 10.
[78] Order, Re Discovery Letter Briefs, Mot. For Issuance of Letter Rogatory, Mot. To Compel, and Various Mot. To Seal (Dkt. 358,) at 2.
[79] Town, p. 23.
[80] Shepard, p. 10.

Defendants are not a branch of law enforcement or an intelligence agency, so this statement is irrelevant.

## III. ISSUES RELATING TO THE MAY 2019 ATTACK ON WHATSAPP BY DEFENDANTS

### A. Plaintiffs Demonstrated Due Diligence to Protect WhatsApp Servers from Attacks

McGraw states:

> In my opinion, WhatsApp's failure to validate all stanzas received by its signaling servers and to enforce the validity of those stanzas was a significant deviation from standard industry security practices in the 2018-2019 time period. The Stanza Validation Project was designed to enhance the security of WhatsApp's VoIP system by adding validation and enforcement of stanzas on the WhatsApp signaling servers."[81]

Initially, it is important to recognize that McGraw acknowledges in his report that Pegasus was used to attack the WhatsApp platform by sending malicious stanzas.[82] But for Defendant's Pegasus software, there would have been no attack on the WhatsApp platform in May 2019, nor for that matter the attacks in December 2018 or from June to September 2019. In my opinion, by criticizing WhatsApp's stanza validation, McGraw is blaming the victim in an effort to shift responsibility away from Defendants for the May 2019 attack.

Furthermore, the May 2019 attack required significant investment in research and development to develop the exploit used. As explained by Jesus Barcons Palau, WhatsApp engineer:[83]

> Someone has gone through the effort of creating a fake [WhatsApp] client and send what seems to be a ▮▮▮▮▮▮▮▮▮▮▮▮ after that; right? This takes an incredible amount of time, effort, resources, money. I cannot really imagine that someone did that for any good intent.

Therefore, the costs and expertise required to exploit vulnerabilities in WhatsApp stanza messages sufficient to develop a working exploit was very high, beyond the resources and capabilities of most attackers.

Moreover, Mr. McGraw's criticism is factually incorrect. While WhatsApp did not enforce the validation of the specific stanzas used by Defendants in the May 2019 attack, it did enforce validation for a portion of the "hundreds"[84] of stanzas that WhatsApp used at the time, explained by Gheorghe in his deposition[85]:

---

[81] McGraw, p. 17.

[82] McGraw, p. 15–16.

[83] Barcons Palau Dep. Transcript, Sept. 13, 2024, 140:24 – 141:5.

[84] Gheorghe Dep., Aug. 16, 2024, 157:15.

[85] Ibid., 163:14–164:5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(BY ATTORNEY WEINBERG) So before December 4, 2018, the chatdserver was not enforcing proper schemas for all messages? Do you agree with that?

ATTORNEY BLOCK: Object to form.

A I don't agree with that.

(BY ATTORNEY WEINBERG) It was enforcing proper schema for all messages already?

A It was -- so enforcing and validating the schemas is a relative and a best-effort thing. We were enforcing and validating certain parts of the -- the stanzas.

Was it complete? Was it, like exhaustive? No, it wasn't. But there was some -- some level of validation and enforcement happening already in the chatd code. Not just for VoIP. For all the other stanzas as well.

Additionally, as I document in my opening report, Section VI, these efforts to enforce stanza validation actually disabled Defendants' malware months before the May 2019 attacks.

which legitimate WhatsApp clients would not do. These two implementations of enforced validation caused Defendants' Humingbird attack vector to no longer function.

Furthermore, WhatsApp was in process of enforcing the validation of stanzas at the time of the attack[86]:

And the standard way of rolling these features out is you -- you basically do exactly what we did. We -- you personally validate, log, analyze. In some cases it's just random behavior. And then when you validate and verify everything, then you go and enforce after that.

As I document in my opening report, this process of validating stanzas on WhatsApp servers resulted in the discovery and remediation of Defendants' attack in May 2019[87]:

Second, my review of documents produced by Plaintiffs shows that WhatsApp took ongoing measures to strengthen the security of the WhatsApp platform. For example, a Facebook product security team conducted a security review of WhatsApp in 2018 and recommended that WhatsApp protocol messages, known as stanzas, have a valid defined format known as a *schema.*[88] This review led to the creation of an extensive project

---

[86] Ibid., 162:20–25.

[87] Vance, opening report, p. 5.

[88] WA-NSO-00164559, p. WA-NSO-00164559, "ProdSec evaluated product and requested to have a valid defined schema for these stanzas."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

entitled "Server to validate call stanzas as defined in the protocol," initiated on October 4, 2018, to define schemas for "hundreds" of different stanza types.[89] As each stanza message type was defined, stanzas received that did not meet the predetermined format were logged for observation and eventually blocked as a rule. Furthermore, it was this logging capability that enabled the detection of Defendants' May 2019 attacks described in the complaint.[90] Furthermore, it was this logging capability that enabled the detection of Defendants' May 2019 attacks described in the complaint,[91] illustrating its value as a security control measure.

Therefore, at the time of the May 2019 attack: (1) WhatsApp already enforced validation for some portion of stanza message types; (2) had the compensating control of logging and monitoring the stanza message types involved in the May 2019 attack, leading to its detection; and (3) was in the process of enforcing the validation of the remainder of stanza message types. Mr. McGraw fails to identify any industry standard applicable in the 2018-2019 time period from which these practices deviated, and I am not aware of one. In my opinion, these efforts by Meta to secure the WhatsApp platform were reasonable and demonstrated Meta's commitment to continually improve the security of WhatsApp.

Finally, I observe here that in the field of cybersecurity, there are usually always more security controls that a company like Meta could implement. In my experience, every business must weigh the possible implementation of an additional security control against other business priorities, as well as other security controls that might be implemented. Therefore, the absence of any one control, such as in this case the server enforcing the validation of the particular stanza messages used in the May 2019 attack, does not make Meta's efforts to secure the WhatsApp platform unreasonable.

## B. The WhatsApp Platform Was Compromised in the May Attack

McGraw states that:

> WhatsApp's internal documents are clear that, throughout this process, "WhatsApp servers were not compromised by this [operation of Pegasus]." WA-NSO-00125125. I agree with that assessment because the Pegasus delivery mechanism merely used the WhatsApp servers to exchange data with the target device, and it did so using functions written by WhatsApp, functioning as WhatsApp had intended those functions to work.[92]

Initially, I note that McGraw only relies on a document produced by Plaintiffs that indicates their internal assessment at the time. McGraw does not appear to have obtained access to or reviewed NSO's source code. As a result, McGraw lacks any basis to conclude that WhatsApp's servers were not compromised beyond the statement in WA-NSO-00125125 that he cites.

---

[89] Gheorghe Dep., Aug. 16, 2024, at 157:13–15 ("The process of building that is we star[t]ed doing stanza validation for all the stanzas that WhatsApp uses. There's – there are hundreds of them.").
[90] Ibid., at 154:6–8.
[91] Ibid., at 154:6–8.
[92] McGraw, p. 16.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

There is no doubt that the WhatsApp platform—taking the WhatsApp system as an integrated whole, including WhatsApp servers, clients, and other necessary components—was compromised. In my view, it is not productive to determine whether individual components of the system were compromised, as it is to recognize that the WhatsApp platform was compromised as a consequence of the May 2019 attacks. Even under a segmented view of the system, it is my opinion that NSO knowingly used WhatsApp servers to transmit malicious traffic without WhatsApp's authorization because it did so contrary to WhatsApp's terms of service.

Furthermore, the May 2019 attack forced approximately 30 Meta engineers to analyze and remediate the attack, working in coordinated 24-hour shifts to implement an emergency security update to the servers to enforce the blocking of the malicious stanzas.[93] This emergency response constituted a critical security incident.

## C. The May 2019 Attacks Were Caused by Defendants and Plaintiffs' Response Was Reasonable

*1. Defendants necessitated an emergency security update to WhatsApp servers*

McGraw argues that "Pegasus users merely used the WhatsApp servers (both signaling and relay servers) as a delivery mechanism—the way one might use the post office to deliver letters. To use that delivery mechanism, the Pegasus user had to (and did) present access credentials, issued by WhatsApp."[94]

McGraw's analogy of a post office routing mail is apt in the sense that the U.S. Postal Service operates the U.S. Postal Inspection Service to detect and block dangerous and illegal substances, as described on the Inspection Service website:

> Dangerous mail includes mail bombs, hoax devices, suspicious substances, or any matter that may cause harm. … Postal Inspectors within the Dangerous Mail Investigations Program are specially trained to recognize the common characteristics of suspicious mail and use an array of specialized screening equipment to identify and mitigate threats to postal infrastructure, its employees, and the general public.[95]

In like manner, Defendants' May 2019 attacks compelled Meta engineers to detect, analyze, and mitigate the malicious messages relayed through the WhatsApp servers by Pegasus. As stated in the previous section, the May 2019 attacks impaired the integrity of the WhatsApp system as a whole, that necessitated an emergency around-the-clock response to block the attacks, including by making changes to WhatsApp's servers and the client application.

---

[93] Farrow, Ronan. "How Democracies Spy on Their Citizens." *The New Yorker*, April 18, 2022. https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.

[94] McGraw, p. 28.

[95] U.S. Postal Inspection Service, "Suspicious Mail," https://www.uspis.gov/tips-prevention/suspicious-mail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2. *Defendants' May 2019 attacks caused Plaintiffs to spend more heavily in security in response to Defendants' repeated attacks.*

McGraw states, "It is my opinion that WhatsApp's investigation and remediation action in response to the Stanzaming incident did not harm WhatsApp because in investigating and remediating the vulnerabilities that are the subject of this case, WhatsApp's security personnel were simply doing what they were hired to do, and indeed, what they do every day."[96] This reasoning is flawed for several reasons.

A common formula of risk in cybersecurity is:[97]

$$\text{Risk} = \text{Threat} \times \text{Vulnerability} \times \text{Asset Value}$$

According to this formula, risk is calculated as the product of the existence and severity of a threat, the existence and severity of a vulnerability, and the value of the asset to be protected. If there are no threats to an asset (i.e., the value of "threat" is zero), then there is no risk to the asset. By contrast, if the threat is high, then risk increases proportionally, and an organization will need to invest more in security in order to lower the risk to the asset.

Applying this risk formula to the present matter, I have demonstrated in this rebuttal and in my opening report that Defendants' attacks have significantly raised the severity of threat to WhatsApp to the point of forcing Meta to invest in security sufficient to contend with and defend against a nation-state-level adversary. The risk to the WhatsApp platform has therefore substantially increased, and Meta is now obliged to invest more in security in order to lower the risk to WhatsApp users to pre-NSO levels.

Thus, even when a business has a dedicated security team, as did Meta in 2019, that does not mean the resulting time and expense responding to an attack are fixed costs. Any response by the security team to an active and persistent threat actor requires prioritization over other strategic security initiatives or projects, and leaves less resources and attention to defend the organization against other possible attacks elsewhere.

Furthermore, the following initiatives were incurred by Meta as a direct consequence of the May 2019 attack and subsequent attacks by Defendants, such as those from June to September, 2019:

- Established a dedicated security team for WhatsApp.[98]
- Appointed a software engineering manager for application security to lead efforts to enhance the security of WhatsApp.[99]
- Initiated a strategic security review of WhatsApp to identify security issues outside of VOIP calling and began work to mitigate them.[100]

---

[96] McGraw, p. 30.
[97] Bejtlich, R. 2004. The Tao of Network Security Monitoring: Beyond Intrusion Detection. Pearson.
[98] Gheorghe Dep., Aug. 16, 2024, at 39:21–25; 40:1–25; 41:1–9.
[99] Gheorghe Dep., Aug. 16, 2024, at 35:22–25; 36:1 – 10.
[100] WA-NSO-00125146, Gheorghe Dep., Aug. 16, 2024, 36:7–10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Since these were new initiatives, they do not constitute fixed costs of Meta's security program. To the contrary, in response to Defendants' repeated attacks, Meta has been forced to increase its security to respond to a nation-state level threat actor, which it wasn't compelled to do previously.

**D. WhatsApp Showed Due Diligence in Responding to the May 2019 Attack**

McGraw pursues more victim blaming by asserting that: "During WhatsApp analysis of the suspicious traffic and binary, WhatsApp did not practice proper Operation Security. It attempted to reach out to the suspicious IP addresses using internal devices, which appears to have caused those devices to become infected and/or to potentially contaminate the data in the server logs that WhatsApp was analyzing. WA-NSO-00015239. This clearly demonstrates a lack of forensic skill or awareness of security best practices."[101] I disagree.

First, it must be recognized that Defendants were the source (directly or indirectly) of the malicious traffic, the Pegasus malware binary, and the C2 server that delivered the Pegasus payload, which together caused devices to be compromised. But for Defendants, there would have been no compromised devices in the May 2019 attack. In my opinion, McGraw here is engaging in victim blaming in an attempt to shift responsibility for the May 2019 attack away from Defendants.

Second, McGraw does not present evidence that WhatsApp's internal test devices were in fact "infected" or compromised at any time by the Pegasus malware. The document he cites, WA-NSO-00015239, does not establish this.[102] Rather, the chat log in this document only shows the concern of Drew Robinson, member of the malware team; Andrey Labunets, member of the incident response team; and Otto Ebeling, member of the security team, that a device may have been compromised through testing. However, WhatsApp VoIP engineer YuanYuan says that his device was not compromised because:

YuanYuan Wang (5/03/2019 14:15:12 PDT):



YuanYuan Wang (5/03/2019 14:18:46 PDT):

---

[101] McGraw, pp. 19–20.

[102] It appears that McGraw intended to cite to WA-NSO-00115239, a chat log between Meta engineers discussing testing.

[103] WA-NSO-00115239.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



But I don't think he [YuanYuan] was able to actually run the exploit and actually hit the [C2] server. Not that I'm aware of.

...

...again, I don't think he successfully was able to run that code on his Android device, from what I know."[105]

As further evidence that Meta's internal devices were not compromised, Gheorghe has said publicly that a Meta security team attempted to simulate a compromised device in order to obtain the Pegasus payload, "But their software was smart enough to basically not be tricked by this." Consequently, "We never really were able to get our hands on that."[106]For these reasons, it is unlikely that any Meta engineer's internal device was compromised by the Pegasus malware.

As to McGraw's assertion that Meta engineers' actions could have "potentially contaminate[d] the data in the server logs that WhatsApp was analyzing," Gheorghe stated in his deposition that Meta removed any internal testing behavior from the logs:[107]

That being said. I remember in the logs that we had -- in the stanza logs, I think we had some test numbers in there. And we did some work to remove them. Like, there was some work being done to sort of filter out the ones that were a testing number from the, like, actual victims.

...

It's possible that some logs might have some testing behavior from our side. And I -- from my recollection, I believe we did the work to remove all that data from the -- from the list of victims, let's say, or other data that we -- we used.

Finally, although not all WhatsApp engineers were trained incident responders, it would be unreasonable to expect this to be the case. However, in response to the May 2019 attack, the chat

---

[104]McGraw, p. 16.

[105] Gheorghe Dep., Aug. 16, 2024, 262:25–263:1–5, 265:24–266:1, 17–19.

[106] Farrow, Ronan. "How Democracies Spy on Their Citizens." The New Yorker, April 18, 2022.
https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.

[107] Gheorghe Dep., Aug. 16, 2024, 262:25–263:1–5; 267:20–24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

log that McGraw cites shows that WhatsApp engineers were assisted and guided by members of the incident response, malware analysis, and security teams. This is in my opinion a security best practice. Furthermore, many corporations do not have dedicated incident response and malware analysis teams in house, and the fact that Meta does is an indication of its commitment to security.

### E. Plaintiffs Demonstrated Good Judgment in Waiting to Fully Block the May 2019 Attack

McGraw claims that[108]:



Again, I observe that but for Defendants' actions, there would be no exploit vector. In my opinion, this argument amounts to victim blaming and attempts to divert attention away from Defendants as the root cause of this incident.

Regardless, as I state in my opening report, I believe that Meta showed wisdom and discretion in how it remediated the vulnerability exploited by Defendants:

> By Friday, May 3, a decision was made not to immediately issue a software update to block the attacks so that Plaintiffs' engineers could better understand the attackers' behaviors. Andrey Labunets, a member of the Meta security incident response team,[109] summarized the rationale behind this choice:

>> Made a decision to not roll out the server-side fix dropping the stanzas because we don't understand the root cause, the impact for users, and other possible attacker numbers/techniques. We are working to scope the issue properly and understand those three things (cause, impact, other TTPs [the tactics, techniques, and procedures of the attacker[110]]). We have confirmed support from Whatsapp engineers to do deploy emergency updates this weekend if needed[111]

> In my opinion, Plaintiffs' decision to delay remediation to ensure that the nature and

---

[108] McGraw, pp. 18–19.

[109] Gheorghe Dep., Aug. 16, 2024, at 74:5–9.

[110] https://csrc.nist.gov/glossary/term/Tactics_Techniques_and_Procedures, accessed 8/29/2024.

[111] WA-NSO-00164561

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

scope of the attack was well understood is a valid and accepted practice in incident response. For example, the U.S. National Institute of Standards and Technology's (NIST) *Computer Security Incident Handling Guide*, recommends that:

> When the [incident response] team believes that an incident has occurred, the team should rapidly perform an initial analysis to determine the incident's scope, such as which networks, systems, or applications are affected; who or what originated the incident; and how the incident is occurring (e.g., what tools or attack methods are being used, what vulnerabilities are being exploited). The initial analysis should provide enough information for the team to prioritize subsequent activities, such as containment of the incident and deeper analysis of the effects of the incident.[112]

If an attack is blocked too soon, security professionals risk not fully understanding the scope of the attack and the behaviors of the attackers. This can lead to a failure to completely eradicate the incident or to similar attacks recurring.

On Friday, May 10, 2019, Meta deployed a software update to block the May 2019 attack on WhatsApp relay servers[113] and verified that this was successful in disrupting the attack. Meta engineer Saish Gersappa noted:

However, the WhatsApp client software was deliberately not simultaneously updated to allow Plaintiffs' engineers to observe how attackers responded. Claudiu Gheorghe explained (emphasis added):

> And as an effect [of the software update for the WhatsApp server], we observed immediately a different behavior in the pattern of the attacks, so we knew for sure that -- that we -- we broke their exploit.
>
> It seemed kind of like it was broken, but it wasn't clear. It seemed broken, but it wasn't clear that we actually found it. And **we did it -- that intentionally to monitor their behavior.**[115]

Here again, Meta demonstrated the principle of waiting to thoroughly understand an attacker's behavior before fully remediating an incident.[116]

A public report of the May 2019 incident explained Meta's rationale further:

---

[112] National Institute of Standards and Technology, 2012. SP 800-61: *Computer Security Incident Handling Guide*, p. 29.

[113] WA-NSO-00164564.

[114] Ibid.

[115] Gheorghe Dep., Aug. 16, 2024, 274:14–21.

[116] Vance, opening report, pp. 22–24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The engineers quickly identified ways to block the offending code, but they debated whether to do so. Blocking access would tip off the attackers, and perhaps allow them to erase their tracks before the engineers could make sure that any solution closed all possible avenues of attack. "That would be like chasing ghosts," [Otto] Ebeling said.[117]

Likewise, Jesus Barcons Palau, WhatsApp engineer, explained Meta's reasoning this way:



So answering your question, it was not enforced because it was advised by security engineers working at Facebook, collaborating with this project, with the SEV. And it was purely for the sake of security to understand if there were -- what was the extent of this -- of this problem to see if there were other things that needed batching, fixing, and this was actually the resulting outcome.[118]

Drew Robinson, member of the Meta malware team, concurred:



I agree with these assessments and believe the Meta engineers acted prudently in timing their remediation to conclusively block Defendants' attacks. As I document in section VIII of my opening report, Meta's efforts were successful, which is further evidence of the wisdom of their approach.

Finally, I note that what McGraw proposes is essentially what Meta did in December 2018 when WhatsApp engineers issued a security update that blocked NSO's Heaven exploit vector. However, because Meta did not realize the vulnerability was actively being exploited, they did not understand the full nature of the attack, and NSO was able to adapt to create a similar exploit

---

[117] Farrow, Ronan. "How Democracies Spy on Their Citizens." The New Yorker, April 18, 2022. https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.

[118] Barcons Palau Dep., Sept. 13, 2024, 164:23–165:17.

[119] Drew Robinson Dep., Sept. 19, 2024, 304:9–21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

vector (Eden) within two months. As exemplified by that update, a more durable solution was necessary. By contrast, with the May 2019 attack, WhatsApp engineers made sure they fully understood the nature of the attack, which rendered the Heaven/Eden exploit vector useless.

### F. Exploitation Vendors Should Be Held Accountable for the Harm They Cause to Victim Organizations, Such as in the Case of Defendants' May 2019 Attack

McGraw opines:

> Concerning policy implications may arise from holding software makers liable for how users decide to employ those tools, as Plaintiffs are seeking. The concern is particularly acute here, where the basic tools of law enforcement and counterterrorism organizations are at issue.[120]

I disagree with several of McGraw's assumptions used to form this opinion. First, Pegasus is not a "basic tool[ ] of law enforcement and counterterrorism organizations." This could only be true from McGraw's perspective, if McGraw views political dissidents, journalists, lawyers, and Plaintiffs as "terrorists," which would be disturbing. Second, McGraw equates NSO to a passive software developer, which it is not. Rather, it is a developer of an exploitation and intrusion tool that uses zero-day exploits of third-party software products. Finally, Mr. McGraw appears to argue that NSO's purportedly noble ends should justify its unlawful means, but he identifies no legal framework permitting NSO to develop such tools in violation of companies' terms of service and U.S. laws.

With respect to how NSO's customers might use its products, in my opinion exploit and hacking-as-a-service vendors like NSO should be held responsible for the harm that their tools and services cause, such as in the case of Defendants' May 2019 attack on WhatsApp. This should especially be true when such vendors enable and perpetuate their abuse over years by selling to countries with questionable-to-abysmal human rights records and maintaining inadequate safeguards.

The United States appears to share my view, contrary to Mr. McGraw's suggestion that imposing liability on commercial spyware vendors would somehow harm the interests of U.S. law enforcement and counterterrorism efforts. As stated previously in Section II.D, the U.S. Department of Commerce's Bureau of Industry and Security specifically sanctioned NSO by adding it to its Entity List. President Biden also issued an executive order prohibiting departments and agencies in the federal government from using commercial spyware tools, with the White House citing NSO.[121]

On September 15, 2024, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) sanctioned five individuals and one entity associated with commercial spyware vendor

---

[120] McGraw, p. 34.

[121] White House, "FACT SHEET: President Biden Signs Executive Order to Prohibit U.S. Government Use of Commercial Spyware that Poses Risks to National Security," Mar. 27, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet-president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial-spyware-that-poses-risks-to-national-security/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Intellexa, a competitor of NSO.[122] In announcing these sanctions, Acting Under Secretary of the Treasury for Terrorism and Financial Intelligence Bradley T. Smith stated:[123]

> The United States will not tolerate the reckless propagation of disruptive technologies that threatens our national security and undermines the privacy and civil liberties of our citizens…We will continue to hold accountable those that seek to enable the proliferation of exploitative technologies, while also encouraging the responsible development of technologies that align with international standards."

The above statements directly refute McGraw's concerns of "holding software makers liable"[124] for their commercial spyware and exploitation tools and services. As a competitor of Intellexa, it is my opinion that NSO is in the same class of exploitable technology that the U.S. Treasury is seeking to sanction.

/s/ Anthony Vance
September 21, 2024

---

[122] U.S. Treasury, "Treasury Sanctions Enablers of the Intellexa Commercial Spyware Consortium," Sept. 16, 2024, https://home.treasury.gov/news/press-releases/jy2581?=7194ef805fa2d04b0f7e8c9521f97343
[123] Ibid.
[124] McGraw, p. 34.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## APPENDIX A: Materials Considered

**FILINGS**
- Complaint (Dkt. No. 1) (Oct. 29, 2019)
- Declaration of Shalev Hulio in Support of Defendants' Motion to Dismiss (Dkt. No. 45-11)
- Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. No. 55-6 through 55-17) (Apr. 23, 2020)
- Defendants' Opposition to Motion to Compel Discovery Regarding AWS Server (Dkt. No. 339)
- Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. No. 55) (Apr. 23, 2020)
- Plaintiffs' Motion for Issuance of Letter Rogatory (Dkt. No. 319) (June 26, 2024)
- Plaintiffs' Motion to Compel Discovery Regarding AWS Server (Dkt. No. 332) (Jul. 5, 2024)
- Order, Re Discovery Letter Briefs, Mot. For Issuance of Letter Rogatory, Mot. To Compel, and Various Mot. To Seal (Dkt. No. 358) (Aug. 1, 2024)
- Plaintiffs' Amended Initial Disclosures (Nov. 30, 2023)
- Defendants' Responses & Objections to Plaintiffs' Requests for Admission, Response to RFA No. 14
- Defendants' Supplemental Responses to Plaintiffs' First Set of Interrogatories (9/13/2024)

**DEPOSITIONS**
- Deposition of Claudiu Gheorghe, WhatsApp Incorporated (Aug. 16, 2024)
- Deposition of Cortney Padua, WhatsApp Incorporated (Aug. 20, 2024)
- Deposition of Susan Glick, WhatsApp Incorporated (Sept. 9, 2024)
- Deposition of YuanYuan Wang, WhatsApp Incorporated (Sept. 12, 2024)
- Deposition of Jesus Barcons Palau, WhatsApp Incorporated (Sept. 13, 2024)
- Deposition of Drew Robinson, WhatsApp Incorporated (Sept. 19, 2024)
- Deposition of Ramon Eshkar, NSO Group Technologies Limited (Aug. 27, 2024)
- Deposition of Yaron Shohat, NSO Group Technologies Limited (Aug. 29, 2024)
- Deposition of Tamir Gazneli, NSO Group Technologies Limited (Sept. 4, 2024)
- Deposition of Sarit Bazinsky Gil, NSO Group Technologies Limited (Sept. 6, 2024)
- Deposition of Joshua Shaner (Sept. 17, 2024)
- Deposition of Terrence Patrick DiVittorio (Sept. 18, 2024)

**DEFENDANTS' PRODUCTIONS**
- NSO_WHATSAPP_00000287
- NSO_WHATSAPP_00000312 - NSO_WHATSAPP_00000313
- NSO_WHATSAPP_00000823 – NSO_WHATSAPP_00000826
- NSO_WHATSAPP_00008643 - NSO_WHATSAPP_00008647
- NSO_WHATSAPP_00008957 – NSO_WHATSAPP_00008962
- NSO_WHATSAPP_00008971 – NSO_WHATSAPP_00008982
- NSO_WHATSAPP_00009363 – NSO_WHATSAPP_00009365

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**PLAINTIFFS' PRODUCTIONS**
- WA-NSO-00000121
- WA-NSO-00016429
- WA-NSO-00016432
- WA-NSO-00016565
- WA-NSO-00166464
- WA-NSO-00016952
- WA-NSO-00017577
- WA-NSO-00017581
- WA-NSO-00060737
- WA-NSO-00022111
- WA-NSO-00125122
- WA-NSO-00125146
- WA-NSO-00153192
- WA-NSO-00164559
- WA-NSO-00166464
- WA-NSO-00166465
- WA-NSO-00166025
- WA-NSO-00166464
- WA-NSO-00192765
- WA-NSO-00192781
- WA-NSO-00192812
- WA-NSO-00192815

**THIRD-PARTY PRODUCTIONS**
- All documents produced by Joshua Shaner in connection with this litigation.
- WESTBRIDGE_WHATSAPP_00000660
- WESTBRIDGE_WHATSAPP_00002330
- WESTBRIDGE_WHATSAPP_00002338
- WESTBRIDGE_WHATSAPP_00001351
- WESTBRIDGE_WHATSAPP_00003027
- WESTBRIDGE_WHATSAPP_00002330
- WESTBRIDGE_WHATSAPP_00000660
- WESTBRIDGE_WHATSAPP_00003572
- WESTBRIDGE_WHATSAPP_00002912
- FPM-00015681
- FPM-00016163
- DIVITTORIO_WHATSAPP_00000048

**NSO EXPERT REPORTS**
- Report of Mr. Terrence McGraw (Aug. 30, 2024)
- Report of Mr. John "Jay" Town (Aug. 30, 2024)
- Report of Col. Ty M. Shepard (Ret.) (Aug. 30, 2024)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**SECONDARY SOURCES**
- WhatsApp Blog, Two Billion Users – Connecting the World Privately, Feb. 12, 2020, https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.
- Adam Entous, "WhatsApp claims that an Israeli tech firm's spyware targeted human-rights activists and journalists," *The New Yorker*, October 29, 2019, https://www.newyorker.com/news/news-desk/whatsapp-sues-an-israeli-tech-firm-whose-spyware-targeted-human-rights-activists-and-journalists
- Charter of Fundamental Rights of the European Union (2000), Article 7
- International Association of Privacy Professionals (IAPP) 2024. "US State Privacy Legislation Tracker," https://iapp.org/resources/article/us-state-privacy-legislation-tracker/.
- Peter Swire, Testimony of Peter Swire at U.S. Senate Judiciary Committee Hearing, "Going Dark: Encryption, Technology, and the Balance Between Public Safety and Privacy," July 8, 2015, https://www.judiciary.senate.gov/imo/media/doc/07-08-15%20Swire%20Testimony.pdf.
- https://transparency.meta.com/enforcement/
- https://faq.whatsapp.com/1905967136259857
- https://transparency.meta.com/reports/government-data-requests
- https://apps.apple.com/us/app/whatsapp-messenger/id310633997
- Skoudis, E., & Liston, T. (2005). Counter Hack Reloaded: A Step-by-Step Guide to Computer Attacks and Effective Defenses. Prentice Hall PTR.
- MITRE. "Frequently Asked Questions," https://attack.mitre.org/resources/faq/.
- Pegasus Project, "About the Pegasus Project," https://forbiddenstories.org/about-the-pegasus-project/
- Priest, D. "A UAE agency put Pegasus spyware on phone of Jamal Khashoggi's wife months before his murder, new forensics show," *The Washington Post*, Dec. 12, 2021, "https://www.washingtonpost.com/nation/interactive/2021/hanan-elatr-phone-pegasus/.
- Kirchgaessner, S. "Saudis behind NSO spyware attack on Jamal Khashoggi's family, leak suggests," *The Guardian*, Jul. 18, 2021, https://www.theguardian.com/world/2021/jul/18/nso-spyware-used-to-target-family-of-jamal-khashoggi-leaked-data-shows-saudis-pegasus.
- Walker, S., Kirchgaessner, S., Lakhani, N., Safi, M. "Pegasus project: spyware leak suggests lawyers and activists at risk across globe," *The Guardian*, Jul. 19, 2021, https://www.theguardian.com/news/2021/jul/19/spyware-leak-suggests-lawyers-and-activists-at-risk-across-globe.
- Farrow, R. "How Democracies Spy on their Citizens," *The New Yorker,* Apr. 25, 2022, https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens; CitizenLab, "Catalan Gate: Extensive Mercenary Spyware Operation against Catalans Using Pegasus and Candiru," Apr. 18, 2022.
- Kirchgaessner, S., Jones, S. "Phone of top Catalan politician 'targeted by government-grade spyware,'" *The Guardian*, Jul. 13, 2020, https://www.theguardian.com/world/2020/jul/13/phone-of-top-catalan-politician-targeted-by-government-grade-spyware.
- Siddique, H. "Dubai ruler hacked ex-wife using NSO Pegasus spyware, high court judge finds," *The Guardian*, Oct. 6, 2021,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

https://www.theguardian.com/world/2021/oct/06/dubai-ruler-hacked-ex-wife-using-nso-pegasus-spyware-high-court-judge-finds-sheikh-mohammed-princess-haya.

- Re Al M [2021] EWHC 1162 (Fam) ¶ 103.
- Amnesty International. "India: Damning new forensic investigation reveals repeated use of Pegasus spyware to target high-profile journalists," Dec. 28, 2023, https://www.amnesty.org/en/latest/news/2023/12/india-damning-new-forensic-investigation-reveals-repeated-use-of-pegasus-spyware-to-target-high-profile-journalists/
- Access Now, "Between a hack and a hard place: how Pegasus spyware crushes civic space in Jordan," Feb. 1, 2024, https://www.accessnow.org/publication/between-a-hack-and-a-hard-place-how-pegasus-spyware-crushes-civic-space-in-jordan/.
- Kitroeff, N., Bergman, R. "How Mexico Became the Biggest User of the World's Most Notorious Spy Tool," *The New York Times*, Apr. 18, 2023, https://www.nytimes.com/2023/04/18/world/americas/pegasus-spyware-mexico.html.
- Ahmed, A., Perlroth, N. "Using Texts as Lures, Government Spyware Targets Mexican Journalists and Their Families," *The New York Times*, June 19, 2019, https://www.nytimes.com/2017/06/19/world/americas/mexico-spyware-anticrime.html.
- Scott-Railton, J., Marczak, B., Razzak, B., Crete-Nishihata, M., Deibert, R. "Reckless Exploit: Mexican Journalists, Lawyers, and a Child Targeted with NSO Spyware," CitizenLab, June 19, 2019, https://citizenlab.ca/2017/06/reckless-exploit-mexico-nso/.
- Ahmed, A. "A Journalist Was Killed in Mexico. Then His Colleagues Were Hacked." *The New York Times*, No. 27, 2018, https://www.nytimes.com/2018/11/27/world/americas/mexico-spyware-journalist.html.
- Kitroeff, N., Bergman, R. "How Mexico Became the Biggest User of the World's Most Notorious Spy Tool," *The New York Times*, Apr. 18, 2023, https://www.nytimes.com/2023/04/18/world/americas/pegasus-spyware-mexico.html.
- Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/;
- Bing, C., Menn, J. "U.S. State Department phones hacked with Israeli company spyware – sources," *Reuters*, Dec. 3, 2021, https://www.reuters.com/technology/exclusive-us-state-department-phones-hacked-with-israeli-company-spyware-sources-2021-12-03/.
- Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/.
- Nakashima, E., Starts, T. "At least 50 U.S. government employees targeted with phone spyware overseas," Mar. 27, 2023. https://www.washingtonpost.com/national-security/2023/03/27/spyware-diplomats-us-pegasus/.
- White House, "FACT SHEET: President Biden Signs Executive Order to Prohibit U.S. Government Use of Commercial Spyware that Poses Risks to National Security," Mar. 27, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet-president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial-spyware-that-poses-risks-to-national-security/.
- U.S. Department of Commerce, "Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities," Nov. 3, 2021,

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list.
- Federal Register, "Addition of Certain Entities to the Entity List," Nov. 4, 2021, https://www.federalregister.gov/documents/2021/11/04/2021-24123/addition-of-certain-entities-to-the-entity-list.
- Timberg, C., Harwell, D., Nakashima, E. "Pegasus spyware used to hack U.S. diplomats working abroad," *The Washington Post*, Dec. 3, 2021, https://www.washingtonpost.com/technology/2021/12/03/israel-nso-pegasus-hack-us-diplomats/
- MITRE, "APT29," https://attack.mitre.org/groups/G0016/.
- Google Threat Analysis Group, "State-backed attackers and commercial surveillance vendors repeatedly use the same exploits," Aug. 29, 2024, https://blog.google/threat-analysis-group/state-backed-attackers-and-commercial-surveillance-vendors-repeatedly-use-the-same-exploits/
- Bejtlich, R. 2004. The Tao of Network Security Monitoring: Beyond Intrusion Detection. Pearson.
- https://csrc.nist.gov/glossary/term/Tactics_Techniques_and_Procedures
- National Institute of Standards and Technology, 2012. SP 800-61: *Computer Security Incident Handling Guide*.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Curriculum Vitae

# Anthony Vance

Ralph Medinger Lenz Professor and Commonwealth Cyber Initiative Fellow
Director of Pamplin Integrated Security
Department of Business Information Technology
Pamplin College of Business
Virginia Tech

Senior Editor, *MIS Quarterly*
Board Member, *Journal of the Association for Information Systems*

Anthony@Vance.name
https://anthonyvance.com
+1 801 361 2531

Neurosecurity Lab
https://neurosecurity.net

Updated August 30, 2024

**EDUCATION**

| | |
|---|---|
| **Ph.D., Information Processing Science** | 2010 |
| University of Oulu, Oulu, Finland | |

Dissertation: "Why Do Employees Violate IS Security Policies? Insights from Multiple Theoretical Perspectives"

| | |
|---|---|
| **Ph.D., Computer Information Systems** | |
| Georgia State University, Atlanta, Georgia, USA | 2009 |

Joint-dissertation: "Trusting IT Artifacts: How Trust Affects our Use of Technology"

| | |
|---|---|
| **Ph.D., Management Science** | 2008 |
| Université Paris–Dauphine, Paris, France | |
| Research Center in Management and Organization (DRM/CREPA) | |

Joint-dissertation: "Trusting IT Artifacts: How Trust Affects our Use of Technology"

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| **Master of Information Systems Management, Marriott School**<br>Brigham Young University, Provo, Utah, USA | 2004 |
| **Bachelor of Science, Information Systems, Marriott School**<br>Brigham Young University, Provo, Utah, USA | 2003 |

**WORK EXPERIENCE**

| | |
|---|---|
| **Ralph Medinger Lenz Professor in Business**<br>Virginia Tech, Virginia, USA | 2023–Present |
| **Professor & Commonwealth Cyber Initiative Fellow**<br>Virginia Tech, Virginia, USA | 2021–2023 |
| **Associate Professor & David Adamany Senior Research Fellow**<br>Temple University, Pennsylvania, USA | 2018–2021 |
| **Danny & Elsa Lui Distinguished Associate Professor**<br>University of Hawai'i at Mānoa, Hawaii, USA | 2017–2018 |
| **Associate Professor & Selvoy J. Boyer Fellow**<br>Brigham Young University, Utah, USA | 2015–2018 |
| **Assistant Professor**<br>Brigham Young University, Utah, USA | 2009–2015 |
| **Visiting Research Professor**<br>University of Oulu, Oulu, Finland | 2008–2010 |
| **Instructor**<br>Georgia State University, Atlanta, Georgia | 2006–2008 |
| **Fraud Investigator**<br>Data Quality Integrity, Deloitte LLP, Atlanta, Georgia | 2005 |
| **Information Security Consultant**<br>Enterprise Risk Services, Deloitte LLP, Atlanta, Georgia | 2004 |

**RESEARCH INTERESTS**

1. Behavioral and organizational cybersecurity
2. Neuroscience applications to cybersecurity

**SCHOLARSHIP METRICS**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- 8876 citations per Google Scholar
- 31 H-index

**POPULAR PRESS**

5.  **Anthony Vance** and Zeynep Sahin, "Why Do Employees Keep Ignoring Workplace Cybersecurity Rules?" *The Wall Street Journal*, September 26, 2023, https://wsj.com/tech/cybersecurity/cybersecurity-risks-employees-training-c7415183.

4.  Min-Seok Pang and **Anthony Vance**, "Your Personal Data Has Been Stolen. Will It Really Cost You Anything?" *The Wall Street Journal*, June 6, 2023, https://www.wsj.com/articles/personal-data-stolen-what-cost-you-f0c8e6a1.

3.  **Anthony Vance** and C. Brock Kirwan, "Why Do We Fall for Hackers? Blame Our Brains" *The Wall Street Journal*, February 15, 2023, https://www.wsj.com/articles/why-do-we-fall-for-hackers-blame-our-brains-2fcb4d09.

2.  **Anthony Vance** and Michelle Lowry, "How CISOs Can Wield More Power in Organizations," *The Wall Street Journal*, December 5, 2022, https://www.wsj.com/articles/information-security-officers-power-companies-11670015448.

1.  **Anthony Vance** and Michelle Lowry, "Why Corporate Boards Need More Cybersecurity Expertise," *The Wall Street Journal*, September 7, 2022, https://www.wsj.com/articles/corporate-boards-cybersecurity-experts-11662494801.

**JOURNAL PUBLICATIONS**

36.  Pang, M., **Vance, A**. "Breached and Denied: The Cost of Data Breaches on Individuals as Mortgage Application Denials," *MIS Quarterly*, forthcoming.

35.  Sahin, Z., **Vance, A.** "What Do We Need to Know about the Chief Information Security Officer? A Literature Review and Research Agenda," Computers & Security, forthcoming.

34.  Kirwan, C., **Vance, A**., Jenkins, J., Anderson, B. 2023. "Embracing Brain and Behaviour: Designing Programs of Complementary Neurophysiological and Behavioural Studies," **Information Systems Journal**, 33 (2), pp. 324–349.

33.  **Vance, A.**, Eargle, D., Eggett, D., Straub, D., Ouimet, K. 2022. "Do Security Fear Appeals Work When They Interrupt Tasks? A Multi-Method Examination of Password Strength," *MIS Quarterly*, 46 (3), pp. 1721–1738.

32.  Siponen, M., Soliman, W., **Vance, A.** 2022. "Common Misunderstandings of Deterrence Theory in Information Systems Research and Future Research Directions," *DATA BASE for Advances in Information Systems*, 53 (1), pp. 25–60. Awarded DATA BASE's **"Best Paper"** for 2022.

31.  Abbasi, A., Dobolyi, D., **Vance, A.,** Zahedi, M. 2021. "The Phishing Funnel Model: A Design Artifact to Predict User Susceptibility to Phishing Websites," *Information Systems Research*, 32 (2), pp. 410–436. Awarded ISR's **"Best Published Paper"** for 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

30. Sarkar, S., **Vance, A.** Ramesh, B., Demestihas, M., Wu, D. 2020. "The Influence of Professional Subculture on Information Security Policy Violations: A Field Study in a Healthcare Context." *Information Systems Research*, 31 (4), pp. 1240–1259.

29. Kirwan, C., Bjornn, D., Anderson, B., **Vance, A.**, Eargle, D., Jenkins, J. 2020. "Repetition of Computer Security Warnings Results in Differential Repetition Suppression Effects as Revealed With Functional MRI," **Frontiers in Psychology**, 11, pp. 1–10.

28. **Vance, A.**, Siponen, M., Straub, D. 2020. "The Effects of Sanctions, Moral Beliefs, and Neutralization on Information Security Policy Violations Across Cultures," *Information & Management*, 57, pp. 1–9.

27. Siponen, M., **Vance, A.**, Puhakainen, P. 2020. "Can Employees' Neutralizations be Overcome? A Field Experiment on Password Policy," *Computers & Security*, 88, pp. 1–12.

26. **Vance, A.**, Jenkins, J., Anderson, B., Bjornn, D., Kirwan, B. 2018. "Tuning Out Security Warnings: A Longitudinal Examination of Habituation through fMRI, Eye Tracking, and Field Experiments," *MIS Quarterly*, 42 (2), pp. 355–380.

25. Jenkins, J., Anderson, B., **Vance, A.**, Kirwan, B., Eargle, D. 2016. "More Harm than Good? How Security Messages that Interrupt Make Us Vulnerable," *Information Systems Research*, 27 (4), pp. 880–896. Awarded ISR's "**Best Published Paper**" for 2016.

24. Anderson, B., Jenkins, J., **Vance, A.**, Kirwan, B., Eargle, D. 2016. "Your memory Is Working Against You: How Eye Tracking and Memory Explain Habituation to Security Warnings," *Decision Support Systems*, 92, pp. 3–13.

23. Anderson, B., **Vance, A.**, Kirwan, B., Jenkins, J., Eargle, D. 2016. "From Warning to Wallpaper: Why the Brain Habituates to Security Warnings and What Can Be Done About It," *Journal of Management Information Systems*, 33 (3), pp. 713–743.

22. Hui, K.L., **Vance, A.**, Zhdanov, D. 2016. "Securing Digital Assets," in *MIS Quarterly Research Curations*, Ashley Bush and Arun Rai, Eds., http://misq.org/research-curations.

21. Anderson, B., **Vance, A.**, Kirwan, B., Eargle, D., Jenkins, J. 2016. "How Users Perceive and Respond to Security Messages: A NeuroIS Research Agenda and Empirical Study," *European Journal of Information Systems*, 25 (4), pp. 364–390.

20. Anderson, B., Kirwan, B., Eargle, D., Jensen, S., **Vance, A.** 2015. "Neural Correlates of Gender Differences and Color in Distinguishing Security Warnings and Legitimate Websites: A Neurosecurity Study," **Journal of Cybersecurity**, 1 (1), pp. 109–120.

19. **Vance, A.**, Lowry, P.B., Eggett, D. 2015. "Increasing Accountability through User-Interface Design Artifacts: A New Approach to Addressing the Problem of Access-Policy Violations," *MIS Quarterly*, 39 (2), pp. 345–366.

18. **Vance, A.**, Anderson, B., Kirwan, B., Eargle, D. 2014. "Using Measures of Risk Perception to Predict Information Security Behavior: Insights from Electroencephalography (EEG)," *Journal of the Association for Information Systems*, 15 (10), pp. 679–722.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

17. Siponen, M., **Vance, A.** 2014. "Guidelines for Improving the Contextual Relevance of Field Surveys: The Case of Information Security Policy Violations," *European Journal of Information Systems*, 23 (3), pp. 289–305.

16. Lowry, P.B., Moody, G., Galletta, D., **Vance, A.** 2013. "The Drivers in the Use of Online Whistle-Blowing Reporting Systems," *Journal of Management Information Systems*, 30 (1), pp. 153–190.

15. **Vance, A.,** Lowry, P.B., Eggett, D. 2013. "Using Accountability to Reduce Access Policy Violations in Information Systems," *Journal of Management Information Systems*, 29 (4), pp. 263–289.

14. Abbasi, A., Albrecht, C., **Vance, A.,** Hansen, J. 2012. "MetaFraud: A Meta-Learning Framework for Detecting Financial Fraud," *MIS Quarterly*, 36 (4), pp. 1293–1327.

13. Siponen, M., **Vance, A.,** Willison, R. 2012. "New Insights into the Problem of Software Piracy: The Effects of Neutralization, Shame, and Moral Beliefs," *Information & Management*, 49 (7-8), pp. 334–341.

12. Mahmood, M., Siponen, M., López, F., **Vance, A.** 2012. "Measuring Electronic Commerce Technology Enabled Business Value: An Empirical Investigation," *Journal of Organizational Computing and Electronic Commerce*, 22 (3), pp. 256–279.

11. **Vance, A.,** Siponen, M., Pahnila, S. 2012. "Motivating IS Security Compliance: Insights from Habit and Protection Motivation Theory," *Information & Management*, 49, pp. 190–198.

10. Lowry, P.B., Moody, G., **Vance, A.,** Jensen, M., Jenkins, J., and Wells, T. 2012. "Using an Elaboration Likelihood Approach to Better Understand the Persuasiveness of Website Privacy Assurance Cues for Online Consumers," *Journal of the American Society for Information Science and Technology*, 63 (4), pp. 755–776.

9. Borthick, F., Schneider, G., **Vance, A.** 2012. "Using Graphical Representations of Business Processes in Evaluating Internal Control," *Issues in Accounting Education*, 27 (1), pp. 123–140.

8. **Vance, A.,** Siponen, M. 2012. "IS Security Policy Violations: A Rational Choice Perspective," *Journal of Organizational and End User Computing*, 24 (1), pp. 21–41.

7. Barlow, J., Giboney, J., Keith, M., Wilson, D., Schuetzler, R., Lowry, P.B., **Vance, A.** 2011. "Overview and Guidance on Agile Development in Large Organizations," *Communications of the AIS*, 29 (2), pp. 25–44.

6. Siponen, M., **Vance, A.** 2010. "Neutralization: New Insights into the Problem of Employee Information Systems Security Policy Violations," *MIS Quarterly*, 34 (3), pp. 487–502.

5. Borthick, A. F., Schneider, G., **Vance, A.** 2010. "Preparing Graphical Representations of Business Processes and Making Inferences from Them," *Issues in Accounting Education*, 25 (3), pp. 569–582.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

4.  **Vance, A.,** Lowry, P.B., Ogden, J. 2010. "Testing the Potential of RFID to Increase Supply-Chain Agility and to Mitigate the Bullwhip Effect," ***International Journal of Applied Logistics***, 1 (1), pp. 48–56.

3.  Myyry, L., Siponen, M., Pahnila, S., Vartiainen, T., and **Vance, A**. 2009. "What Levels of Moral Reasoning and Values Explain Adherence to Information Security Rules? An Empirical Study," ***European Journal of Information Systems***, 18, pp. 126–139.

2.  **Vance, A.,** Elie-dit-Cosaque, C., and Straub, D. 2008. "Examining Trust in Information Technology Artifacts: The Effects of System Quality and Culture," ***Journal of Management Information Systems***, 24 (4), pp. 73–100.

1.  Lowry, P.B., **Vance, A.,** Moody, G., Beckman, B., Read, A. 2008. "Explaining and Predicting the Impact of Branding Alliances and Web Site Quality on Initial Consumer Trust of E-Commerce Web Sites," ***Journal of Management Information Systems***, 24 (4), pp. 201–227.

**CONFERENCE PUBLICATIONS**

42. Gedris, K. and **Vance, A.** 2024. "'We Can't Help You – It's Not Criminal': Revealing Barriers to Reporting Cyberstalking through a Focal Concerns Perspective." *Proceedings of Americas Conference on Information Systems* (AMCIS), Salt Lake City, Utah. Awarded **"Best Emergent Research Forum (ERF) Paper."**

41. **Vance, A.,** Lowry, M., Sahin, Z. 2022. "Taking a Seat at the Table: The Quest for CISO Legitimacy," *International Conference on Information Systems*, Copenhagen, Denmark.

40. Dobolyi, D., Abbasi, A., Zahedi, F. **Vance, A.,** 2020. "An Ordinal Approach to Modeling and Visualizing Phishing Susceptibility" IEEE International Conference on Intelligence and Security Informatics (ISI).

39. Kirwan, B., Anderson, B., Eargle, D., Jenkins, J., & **Vance, A.** 2020. Using fMRI to measure stimulus generalization of software notification to security warnings. In *Information Systems and Neuroscience: NeuroIS Retreat 2019*, pp. 93–99.

38. Zou, W., **Vance, A.,** Straub, D., and Yan, J. 2020. "The Differential Role of Alternative Data in SME-Focused Fintech Lending," *ICIS 2020 Proceedings*. 13.

37. Zou, W., **Vance, A.,** and Yan, J. 2020. "The Differential Role of Alternative Data in SME-Focused Fintech Lending," *AMCIS 2020 Proceedings*. 7.

36. Havakhor, T. Ogbanufe, O., **Vance, A.,** 2020. "Are Personal Trades Worth a Thousand Words?" In *Workshop on the Economics of Information Security* (WEIS), Brussels, Belgium. 35% acceptance rate.

35. **Vance, A.,** Eargle, D., Jenkins, J. L., Kirwan, C. B., & Anderson, B. B. 2019. "The Fog of Warnings: How Non-essential Notifications Blur with Security Warnings." In *Fifteenth Symposium on Usable Privacy and Security* (SOUPS), San Jose, CA. 23% acceptance rate.

34. **Vance, A.,** Jenkins, J. L., Anderson, B. B., Brock Kirwan, C., & Bjornn, D. (2019). Improving Security Behavior through Better Security Message Comprehension: fMRI and Eye-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

tracking Insights. In *Information Systems and Neuroscience: NeuroIS Retreat 2018,* pp. 11–17.

33. **Vance, A.,** Jenkins, J. L., Anderson, B. B., Kirwan, C. B., & Bjornn, D. (2018). Why and How to Design Complementary NeuroIS and Behavioral Experiments. In *Information Systems and Neuroscience: Gmunden Retreat on NeuroIS 2017*, pp. 65–71.

32. **Vance, A.,** Kirwan, B., Bjornn, D., Jenkins, J., Anderson, B. 2017. "What Do We Really Know about How Habituation to Warnings Occurs Over Time? A Longitudinal fMRI Study of Habituation and Polymorphic Warnings," *Proceedings of the ACM Conference on Human Factors in Computing Systems* (CHI), Denver, Colorado. 25% acceptance rate.

31. Dobolyi, D., Abbasi, A., Zahedi, F. M., & **Vance, A.** 2017. Predicting User Susceptibility to Phishing Websites. In *INFORMS Workshop on Data Science, Houston, TX.*

30. Anderson, B. B., **Vance, A.,** Jenkins, J. L., Kirwan, C. B., & Bjornn, D. (2017). It all blurs together: How the effects of habituation generalize across system notifications and security warnings. In *Information Systems and Neuroscience: Gmunden Retreat on NeuroIS 2016,* pp. 43-49.

29. Eargle, D., Galletta, D., Kirwan, B., **Vance, A.,** & Jenkins, J. 2016. Integrating Facial Cues of Threat into Security Warnings–An fMRI and Field Study. *AMCIS 2016 Proceedings*. 22.

28. Jenkins, J. L., Anderson, B. B., **Vance, A.,** & Jensen, S. R. 2016. When Training Gets Trumped: How dual-Task interference inhibits Security Training. In *European Conference on Information Systems, 163*.

27. Lerner, A. Saxena, A., Ouimet, K., Turley, B., **Vance, A.,** Kohno, Y., Roesner, F. 2015. "Analyzing the Use of Quick Response Codes in the Wild," *Proceedings of the Thirteenth International Conference on Mobile Systems, Applications and Services,* (MobiSys), Florence, Italy. 13% acceptance rate.

26. Anderson, B., Kirwan, B., Eargle, D., Jenkins, J., Howard, S, **Vance, A.** 2015. "How Polymorphic Warnings Reduce Habituation in the Brain—Insights from an fMRI Study," *Proceedings of the ACM Conference on Human Factors in Computing Systems* (CHI), pp. 2883–2892. Seoul, Korea, 24% acceptance rate.

25. Anderson, B. B., **Vance, A.,** Kirwan, B., Jenkins, J., & Eargle, D. 2015. Using fMRI to explain the effect of dual-task interference on security behavior. In *Information Systems and Neuroscience: Gmunden Retreat on NeuroIS 2015*, pp. 145-150.

24. Anderson, B., **Vance, A.,** Kirwan, B., & Jenkins, J. 2015. "Not Now:" Using fMRI and Eye Tracking to Improve the Timing of Security Messages. *WISP 2015 Proceedings*. 23.

23. Anderson, B., Eargle, D., Jenkins, J., Kirwan, B., & **Vance, A.** 2015. The Impact of Technostress on Users' Responses to Security Warnings: A NeuroIS Study. *AMCIS 2015 Proceedings*. 37.

22. Anderson, B., **Vance, A.,** Kirwan, B., Eargle, D., Howard, S. 2014. "Users Aren't (Necessarily) Lazy: Using NeuroIS to Explain Habituation to Security Warnings," *International Conference on Information Systems*, Auckland, New Zealand.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

21. Anderson, B., **Vance, A.**, Kirwan, B., Eargle, D., Howard, S. 2014. "Why Users Habituate to Security Warnings: Insights from fMRI," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Newcastle, UK.

20. Eargle, D., **Vance, A.**, Eggett, D., Lowry, P.B. 2013. "How Moral Intensity and Impulsivity Moderate the Influence of Accountability on Access Policy Violations in Information Systems," *Workshop on Information Security & Privacy*, AIS SIGSEC and IFIP TC11.1, Milan, Italy.

19. Anderson, B., **Vance, A.**, Eargle, D. 2013. "Is Your Susceptibility to Phishing Dependent on Your Memory?," *Workshop on Information Security & Privacy*, AIS SIGSEC and IFIP TC11.1, Milan, Italy.

18. Anderson, B., **Vance, A.**, Eargle, D., Brock, K. 2013. "Your Memory is Working Against You: How Eye Tracking and Memory Explain Susceptibility to Phishing," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Niagara, NY.

17. **Vance, A.**, Anderson, B., Brock, K., Eargle, D. 2013. "Using Measures of Risk Perception to Predict Information Security Behavior: Insights from Electroencephalography (EEG)," JAIS workshop, *Gmunden Retreat on NeuroIS*, Gmunden, Austria.

16. **Vance, A.**, Eargle, D., Ouimet, K., Straub, D. 2013. "Enhancing Password Security through Interactive Fear Appeals: A Web-based Field Experiment," *Hawaii International Conference on Systems Sciences*, Wailea, HI.

15. Eargle, D., **Vance, A.**, & Lowry, P. B. 2013. "How Moral Intensity and Impulsivity Moderate the Influence of Accountability on Access Policy Violations in Information Systems," In *WISP 2012 Proceedings. 37.*

14. Eargle, D., **Vance, A.**, Allen, G., Barrick, D., Peck, D., Bearnson, T., Tian, J. 2012. "Justifying Breaking the Glass: How Accountability Can Deter Unauthorized Access," *Workshop on Information Security & Privacy*, AIS SIGSEC and IFIP TC11.1, Orlando, FL.

13. Anderson, B., **Vance, A.**, Hansen, J., Kirwan, B., Eargle, D., Hinkle, L., Weagel, A. 2012. "Neural Correlates of Gender Differences in Distinguishing Malware Warnings and Legitimate Websites: A NeuroIS Study," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Provo, UT.

12. **Vance, A.**, Eargle, D., Ouimet, K., Straub, D. 2012. "How Interactivity Can Enhance the Effectiveness of Fear Appeals: A Web-based Field Experiment of Password Security," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Provo, UT.

11. **Vance, A.**, Molyneux, B., Lowry, P.B. 2012. "Reducing Unauthorized Access by Insiders through End-User Design: Making Users Accountable," *Hawaii International Conference on Systems Sciences*, Wailea, HI.

10. **Vance, A.**, Siponen, M., Warkentin, M. 2011. "Deterrence Without Borders: How National Culture Affects IS Security Policy Violations," *Workshop on Information Security & Privacy*, AIS SIGSEC and IFIP TC11.1, Shanghai.

41

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

9.  **Vance, A.**, Molyneux, B., Lowry, P.B. 2011. "A New Approach to the Problem of Unauthorized Access: Raising Perceptions of Accountability through User Interface Design Features," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Blacksburg, VA.

8.  **Vance, A.**, Allen, G., Molyneux, B., Lowry, P.B. 2010. "Making Systems Users Accountable: Using Accountability to Reduce Unauthorized Access of Information," *The Dewald Roode Workshop on Information Systems Security Research*, IFIP WG8.11/WG11.13, Waltham, MA.

7.  Siponen, M., **Vance, A.**, and Willison, R. 2010. "New Insights for an Old Problem: Explaining Software Piracy through Neutralization Theory," *Hawaii International Conference on Systems Sciences*, Poipu, HI.

6.  **Vance, A.**, Siponen, M., Pahnila, S. 2009. "How Personality and Habit Affect Protection Motivation," *Workshop on Information Systems & Privacy*, Phoenix, AZ.

5.  Borthick, A. F., Schneider, G. P., and **Vance, A.** 2009. "Using Graphical Representations of Business Processes in Evaluating Internal Control," *American Accounting Association Annual Midyear Meeting*.

4.  Borthick, F., **Vance, A.** 2007. "Preparing Graphical Representations of Business Processes and   Making Inferences from Them," *American Accounting Association Annual Meeting*.

3.  **Vance, A.** 2007. "Modeling Sarbanes-Oxley Compliance as a Knowledge-intensive Process," *40th Annual Hawai'i International Conference on System Sciences*.

2.  Pallud, J., Monod, E., **Vance, A.** 2006. "The Implications of the Linguistic Turn on IS," *Proceedings of the Twelfth Americas Conference on Information Systems*.

1.  **Vance, A.** 2005. "An Empirical Test of the Potential of RFID Technology to Enhance Supply Chain Agility," *IFIP WG 8.6 Working Conference on Business Agility and IT Diffusion*.

**WORKING PAPERS AND MISCELLANEOUS**

- Lowry, M. Vance, A., Vance, M. (2022) "Inexpert Supervision: Field Evidence on Boards' Oversight of Cybersecurity," available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4002794.

- Vance, A., Warkentin, M., & Johnston, A. (2023). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research.

- Warkentin, M., Vance, A., & Johnston, A. C. (2022). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research. In 55th Hawaii International Conference on System Sciences (HICSS) (pp. 4788).

- Furnell, S., Haskell-Dowland, P., Agrawal, M., Baskerville, R., Basu, A., Bishop, M., ... Vance, A., & Warkentin, M. (2021). Information security and privacy–challenges and outlook. *Advancing Research in Information and Communication Technology: IFIP's Exciting First 60+ Years, Views from the Technical Committees and Working Groups*, 383-401.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Warkentin, M., Johnston, A., & Vance, A. (2021). Introduction to the Innovative Behavioral IS Security and Privacy Research Minitrack. In *54th Hawaii International Conference on System Sciences* (pp. 4517).

- Johnston, A., Warkentin, M., & Vance, A. (2020). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research.

- Warkentin, M., Johnston, A., & Vance, A. (2019). Introduction to the Innovative Behavioral IS Security and Privacy Research Minitrack. In *52nd Hawaii International Conference on System Sciences* (p. 4823).

- Warkentin, M., Vance, A., & Johnston, A. C. (2018). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research. In 51st Hawaii International Conference on System Sciences (HICSS) (p. 3657).

- Warkentin, M., Vance, A., & Johnston, A. C. (2017, January). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research. In 2016 49th Hawaii International Conference on System Sciences (HICSS) (pp. 4001).

- Warkentin, M., Vance, A., & Johnston, A. C. (2016, January). Introduction to the Minitrack on Innovative Behavioral IS Security and Privacy Research. In 2016 49th Hawaii International Conference on System Sciences (HICSS) (pp. 3635-3635). IEEE.

- Warkentin, M., Johnston, A., & Vance, A. (2015, January). Introduction to the Innovative Behavioral IS Security and Privacy Research Minitrack. In *2015 48th Hawaii International Conference on System Sciences* (pp. 3452-3452). IEEE.

**PATENTS**

- Baskerville, R., Grace, M., Straub, D., Stucke, C., Vaishnavi, V., Vandenberg, A., ... & Vance, A. (2014). "Trusted query network systems and methods," U.S. Patent No. 8,775,402. Washington, DC: U.S. Patent and Trademark Office.

**EXTERNAL GRANTS**

- 2021 Commonwealth Cyber Initiative Southwest Virginia, $100,000.

- 2018 NSF Secure & Trustworthy Cyberspace for proposal entitled, "The Blurring of Non-essential Notifications and Critical Security Warnings: Examining the Problem of Generalization in the Brain" (CNS-1814721). Awarded $151,823 with Drs. Bonnie Anderson and Brock Kirwan.

- 2016 NSF award to supplement grant, "The Force of Habit: Using fMRI to Explain Users' Habituation" (CNS-1422831). Awarded $58,185 with Drs. Bonnie Anderson and Brock Kirwan.

- 2016 Google Faculty Research Award for proposal entitled "Improving Adherence to Security Messages through Intelligent Timing: A Neurosecurity Study." Awarded $34,200 with Drs. Bonnie Anderson and Brock Kirwan.

- 2015 Google Faculty Research Award for proposal entitled, "Has Your Warning Turned

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

into Wallpaper? Using Neuroscience to Design Habituation-Resistant Security Messages." Awarded $35,503 with Drs. Bonnie Anderson and Brock Kirwan.

- 2014 NSF Secure & Trustworthy Cyberspace for proposal entitled, "The Force of Habit: Using fMRI to Explain Users' Habituation to Security Warnings" (CNS-1422831). Awarded $294,341 with Drs. Bonnie Anderson and Brock Kirwan.

**UNIVERSITY GRANTS AND STUDENT MENTORING**

- 2019 Young Scholar Award. Mentored Leting Zhang for a $2,000 award
- 2019 Young Scholar Award. Mentored Weifei Zou for a $1,500 award
- 2015 Extension of Magnetic Resonance Imaging Research Facility Initiation Grant, "Understanding the Efficacy of Video-Based Software Privacy Policies." Awarded $5,000 with Drs. Mark Keith and Bonnie Anderson, Brigham Young University
- 2014 Mentoring Environment Grant for proposal entitled "Your Memory is Working Against You: Using fMRI to Explain How Memory Affects Susceptibility to Phishing." Awarded $19,527 to fund mentored research with MISM graduate students, Brigham Young University
- 2014 Magnetic Resonance Imaging Research Facility Initiation Grant, "Understanding the Efficacy of Video-Based Software Privacy Policies." Awarded $5,000 with Drs. Mark Keith and Bonnie Anderson, Brigham Young University.
- 2014 ORCA grant for proposal entitled "Look Sharp! How Eye Tracking and Memory Explain Susceptibility to Phishing." Mentored BSIS students Ian Jones, Thomas Kelly, and Jeff Penovich for a $1,500 grant, Brigham Young University.
- 2012 Mentoring Environment Grant for proposal entitled "Accountability through Justification: A New Approach to the Problem of Unauthorized Access of Information Systems." Awarded $19,704 to fund mentored research with MISM graduate students, Brigham Young University.
- 2012 Global Management Center Grant for International Business Research, for "Deterrence without Borders: How National Culture Affects Information Security Policy Violations." Awarded $1,000, Brigham Young University.
- 2011 ORCA grant for proposal entitled "Making Systems Users Accountable through User Interface Design Features." Mentored BSIS student Lee Wood for his $1,500 grant, Brigham Young University.
- 2011 ORCA grant for proposal entitled "Enhancing Password Security through Interactive Fear Appeals." Mentored BSIS student Kirk Ouimet for his $1,500 grant, Brigham Young University.

**EXTERNAL SERVICE**

- Senior editor, *MIS Quarterly*, 2021–present
- Chair, IFIP WG8.11/WG11.13 Information Systems Security Research, 2021–present
- Editorial board member and guest senior editor for *Journal of the Association for Information Systems*, 2015–present

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Editor, IFIP Working Group 8.11/11.13 Information Systems Security Research, 2010–present
- Minitrack chair, "Innovative Behavioral IS Security and Privacy Research," HICSS,  2015–present
- Associate editor, *MIS Quarterly*, 2016–2021
- USENIX Enigma 2020 Program committee member
- AMCIS 2020 Doctoral Consortium co-chair
- Program Committee member of the NeuroIS Retreat, 2015–2019, Vienna, Austria
- AE for *European Journal of Information Systems*, special issue on "Security and Privacy in 21st Century Organisations"
- AE for *Decision Support Systems*, special issue on "A Comprehensive Perspective on Information Systems Security: Technical Advances and Behavioral Issues"
- AE for *International Conference on Information Systems* (ICIS), 2011–2017,  "Security and Privacy of Information and IS" track
- AE for ECIS 2015, "IS Privacy and Security" track, Münster, Germany
- AE for ECIS 2014, "Information Security and Privacy" track, Tel-Aviv, Israel
- Session chair for ICIS 2013, "Security and Privacy" track, Milan, Italy
- Program committee member, Workshop on Information Security & Privacy (WISP), AIS SIGSEC and IFIP TC11.1, Milan, Italy, 2013
- AE for PACIS 2013, Information Security, Jeju, Korea
- General chair, Dewald Roode Workshop on Information Systems Security Research, IFIP Working Group 8.11/11.13, 2012, Provo, UT
- AE for ECIS 2012, "Information Security and Privacy" track, Barcelona, Spain
- Program committee member, European Security Conference, 2012, Örebro, Sweden
- Track chair for ECIS 2011, "Information Security and Privacy" track, Helsinki, Finland
- Program committee member, Privacy Enhanced Technology and Security Engineering 2011, Busan, Korea
- Program chair, Dewald Roode Workshop on Information Systems Security Research, IFIP Working Group 8.11/11.13, 2010, Waltham, MA

## DISSERTATION COMMITTEE SERVICE

- Dissertation advisor, Zeynep Sahin, Virginia Tech, 2021–present
- Dissertation committee member, Leting Zhang, Temple University, 2020–2022
- External reviewer, Amir Fard Bahreini, University of British Columbia, 2021
- Dissertation advisor, Calvin Nobles, Executive Doctorate in Business Administration, Temple University, 2019–2021
- Dissertation committee member, Siddharth Bhattacharya, Temple University, 2020–2021
- Dissertation committee member, Shan Xiao, Mississippi State University, 2019–2021
- Dissertation committee member, Christopher Barhorst, Virginia Tech, 2019–present
- Dissertation committee member, Daniel Bjornn, Department of Psychology and Neuroscience Center, Brigham Young University, 2018
- Dissertation committee member, David Eargle, Information Systems and Technology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Management, University of Pittsburgh, 2017
- Dissertation committee member, Sumantra Sarkar, Computer Information Systems Department, Georgia State University, 2014
- Dissertation opponent for Ella Kolkowska, Örebro University, Sweden, 2013

**UNIVERSITY SERVICE**
- Director of Pamplin Integrated Security, Pamplin College of Business, Virginia Tech, 2022–present
- Director of the Center for Cybersecurity, Fox School of Business, Temple University, 2018–2021
- Doctoral Program Director, MIS Department, Temple University, 2019–2021
- Course coordinator for MIS major capstone MIS 4596: Managing Enterprise Cybersecurity, 2018–2021
- Fox School Promotion and Tenure Committee member, 2019–2020
- Hiring committee member, Temple University, 2018—2021
- Information Security and Privacy Committee member, BYU, 2014–2017
- PhD-Preparation coordinator, Marriott School, BYU, 2016–2017
- Behavioral Lab Steering Committee member, Marriott School, BYU, 2010–2017
- Faculty recruiting committee member, BYU, 2010–2017
- Information Security & Digital Forensics track director, Masters of Information Systems Management, BYU, 2012–2017
- PhD Preparation track director, Masters of Information Systems Management program, BYU, 2011–2016
- Alumni Relations Committee Chair, BYU, 2014–2016

**SPECIAL RECOGNITIONS/AWARDS**
- Erskine Fellow, University of Canterbury, Christchurch, New Zealand, 2023
- Ralph Medinger Lenz Professor in Business, Virginia Tech, 2023
- "Best Published Paper Award," *Information Systems Research* for papers published in 2021, for article Abbasi, A., Dobolyi, D., Vance, A., Zahedi, M. 2021. "The Phishing Funnel Model: A Design Artifact to Predict User Susceptibility to Phishing Websites," 32 (2), pp. 410–436.
- University of Jyväskylä, Finland Visiting Fellow, 2022
- Commonwealth Cyber Initiative Fellow, Virginia, 2021
- David Adamany Senior Research Fellow, Temple University, 2020–2021
- MIS Quarterly Outstanding Associate Editor Award, 2019
- AIS Distinguished Member—Cum Laude, 2019
- Elmer R. Deaver Senior Research Fellow, Temple University, 2018–2020
- Lieu Distinguished Professor of MIS, University of Hawaiʻi at Mānoa, 2017–2018
- Selvoy J. Boyer Fellowship, Marriott School of Management, 2012—2018
- Kavli Fellow, U.S. National Academy of Sciences
- "Best Published Paper Award," *Information Systems Research* for papers published in

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2016, for article, "More Harm than Good? How Messages that Interrupt Can Make Us Vulnerable," 27 (4), pp. 880–896
- Outstanding Research, 2014 Marriott School of Management
- Nominated for best paper, "Reducing Unauthorized Access by Insiders through End-User Design: Making Users Accountable," **Vance, A.**, Molyneux, B., and Lowry, P.B., *Hawaii International Conference on Systems Sciences*, 2012
- Dissertation awarded grade "excellent" (5/5) by the University of Oulu, Finland, 2010
- Nominated for best paper, "New Insights for an Old Problem: Explaining Software Piracy through Neutralization Theory," Siponen, M., **Vance, A.**, and Willison, R., *Hawaii International Conference on Systems Sciences*, 2010
- Best Case Award, Borthick, A. F., Schneider, G. P., and **Vance, A.** "Using Graphical Representations of Business Processes in Evaluating Internal Control", American Accounting Association Annual Midyear Meeting, 2010
- Outstanding Education Paper Award, Borthick, A. F., Schneider, G. P., and **Vance, A.** "Preparing Graphical Representations of Business Processes and Making Inferences from Them", American Accounting Association Annual Midyear Meeting, 2009
- J. Mack Robinson College of Business GTA Teaching Excellence Award, Georgia State University, 2008
- Nominated for best reviewer, 6th Annual Workshop on HCI in MIS, Montreal, 2007

**PROFESSIONAL AFFILIATIONS**

- Founding member, IFIP Working Group 8.11/11.13, "Information Systems Security Research"
- Special Interest Group on Security (SIGSEC), Association for Information Systems