1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
      *jakro@kslaw.com*
2   AARON S. CRAIG (Bar No. 204741)
      *acraig@kslaw.com*
3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1700
4   Los Angeles, CA 90071
    Telephone:    (213) 443-4355
5   Facsimile:    (213) 443-4310

6   Attorneys for Defendants
    NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

7

8                      UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  WHATSAPP INC., a Delaware corporation,    Case No. 4:19-cv-07123-PJH
    and FACEBOOK, INC., a Delaware
12  corporation                               **REPLY IN SUPPORT OF DEFENDANTS'
                                               MOTION TO STRIKE THE
13               Plaintiffs,                   SUPPLEMENTAL EXPERT REPORT OF
                                               DANA TREXLER**
14        v.
                                               Date:    April 10, 2025
15  NSO GROUP TECHNOLOGIES LIMITED             Time:    2:00 p.m.
    and Q CYBER TECHNOLOGIES LIMITED,          Place:   Courtroom 3
16
                 Defendants.                   Action Filed:  10/29/2019
17

18

19

20

21

22

23

24

25

26

27

28

---

REPLY IN SUPPORT OF                                    Case No. 4:19-cv-07123-PJH
DEFENDANTS' MOTION TO
STRIKE

1    **I.    INTRODUCTION**

2        Plaintiffs engaged in gamesmanship by serving an initial expert report that purported to

3    calculate Defendants' revenues and profits allegedly subject to disgorgement using a flawed

4    methodology, and then waiting until the very day that rebuttal reports were due to abandon that

5    methodology in its entirety and replace it with one based on Defendants' actual revenues.

6        Plaintiffs cannot meet their burden of showing that their decision was substantially justified

7    or harmless, and Rule 37 therefore requires that Ms. Trexler not be allowed to testify to the

8    supplemental opinion.  Plaintiffs' gamesmanship has caused Defendants substantial prejudice—in

9    the time and money spent rebutting the original methodology, and the subsequent time and effort

10    spent preparing supplemental reports to rebut Ms. Trexler's belatedly disclosed opinion.  That

11    prejudice cannot be cured.  Moreover, Plaintiffs appear to have been operating in bad faith, as they

12    have offered no explanation for why they did not disclose Ms. Trexler's opinion earlier than they

13    did, which would have allowed Defendants to avoid the costs associated with Mr. Pinsonneault's

14    completing and reducing to writing his analysis rebutting Ms. Trexler's initial disgorgement

15    opinion.

16        **A.    Plaintiffs' Description of The NSO Revenue Spreadsheet is Misleading**

17        Plaintiffs' description of the NSO Revenue Spreadsheet (Dkt. 487-4) is inaccurate and

18    unfair.

19        First, Plaintiffs describe the NSO Revenue Spreadsheet as being "tailor-made" for

20    litigation and created at the direction of counsel.  (Opp. at 1.)  The NSO Revenue Spreadsheet is a

21    summary of voluminous records setting forth factual information, including the revenues

22    Defendants received from their customers and the installation vectors that each of Defendants'

23    Pegasus customers had licensed to use, that Defendants' Vice President Global Business

24    Operations, Sarit Gil, obtained from several different sources.  The NSO Revenue Spreadsheet is

25    a summary of voluminous records of the type commonly used in complex business litigation and

26    is admissible under Rule 1006.  The fact that Defendants' counsel provided guidance to Ms. Gil

27    in determining what records to summarize is unremarkable.

28        Next, the parts of the NSO Revenue Spreadsheet that Ms. Trexler actually used to calculate

1    NSO's revenues are easy to understand and did not require Ms. Gil's deposition testimony to be

2    comprehensible.  Ms. Trexler's supplemental opinion starts by summing the revenues Defendants

3    earned for licensing Pegasus between Q2 2018 and Q2 2020 for accounts that had the right to use

4    Covert Android Pegasus.  (Dkt. 487-6 at Supp. Exhibit 1 and Supp. Exhibit 1.1.)  Ms. Trexler

5    describes how she obtained this information in her footnote to her Supplemental Exhibit 1.1:  "I

6    have included revenue for accounts labeled 'PGS' in 'Product' column and 'Yes' in 'Covert

7    Android was provided' column."  As Ms. Trexler acknowledges, this information was clearly

8    marked, located in columns C-K of the NSO Revenue Spreadsheet (revenues), column L (product

9    type), and columns T and U ("Covert Android was provided?" and "Covert Android deal portion").

10   Columns C-K, L, T and U of the NSO Revenue Spreadsheet are all perfectly understandable on

11   their face, even without Ms. Gil's deposition testimony, and those were the parts of the NSO

12   Revenue Spreadsheet that Ms. Trexler used.[1]

13         While Plaintiffs refer to the NSO Revenue Spreadsheet as the "NSO Profit Spreadsheet,"

14   only one column of the document (column BB) makes any reference whatsoever to Defendants'

15   profits, and those calculations were not adopted by either side's damages expert.  Both experts

16   determined Defendants' costs, and therefore its profits, by referring to the audited financial

17   statements of Defendants.

18         Finally, Plaintiffs question the fact that Defendants did not disclose the records

19   underpinning the revenue spreadsheet.  However, records showing the payments Defendants

20   received from their customers, and the contracts showing which installation vectors each customer

21   licensed the right to use, would necessarily reveal the identity of the government customers of

22   Defendants, which this Court already ruled need not be disclosed.  (Dkt. No. 292 at 5.)

23

24

---

25   [1] While the NSO Revenue Spreadsheet also included calculations of "relevant revenue" (columns
     M-P and X-AA) that excluded revenues outside of the 2019 time period that was the subject of the
26   events in the Complaint (and also the subject of Ms. Trexler's initial report), Ms. Trexler
     completely ignored Defendants' temporal-based "relevant revenue" calculations in her analysis
27   (Dkt. 487-6), so the fact that Ms. Gil explained during her deposition how "relevant revenue" was
     calculated is irrelevant to whether Ms. Trexler needed to wait until September 21, 2024, to disclose
28   her supplemental opinion.

REPLY IN SUPPORT OF                                    2                        Case No. 4:19-cv-07123-PJH
DEFENDANTS' MOTION TO STRIKE

1    **II.    ARGUMENT**

2        **A.    Ms. Trexler's Supplemental Report did not "Fill the Interstices of an**

3            **Incomplete Report."**

4        Plaintiffs are correct that supplementation under Rule 26(e) means "correcting

5    inaccuracies, or filling the interstices of an incomplete report based on information that was not

6    available at the time of the initial disclosure." However, it is undisputed that the NSO Revenue

7    Spreadsheet was available at the time of the initial disclosure. Further, Ms. Trexler's supplemental

8    report did not correct inaccuracies or fill interstices. It was a complete do-over of her disgorgement

9    opinion.

10        Ms. Trexler's initial disgorgement opinion used as its starting point the allegations from

11    the Complaint that approximately 1,400 phones had been targeted; based on that, she: (a) raised

12    the number to 1,500; (b) implicitly assumed that each of those targets was successful; and (c)

13    further implicitly assumed that each of those phones was targeted concurrently. She then tried to

14    determine the "per-device" cost of a Pegasus license, which she calculated at either $10,000 or

15    $32,000, and multiplied that by 1,500 concurrent licenses that Defendants' customers would have

16    needed, to come up with her calculation of Defendants' revenues. (Dkt. No. 487-3).

17        Ms. Trexler's supplemental disgorgement opinion employed exactly *none* of that analysis.

18    Instead, she used the NSO Revenue Spreadsheet to determine Defendants' revenues from Pegasus

19    that can be fairly attributed to the Accused Technologies in this litigation, and then took

20    information from NSO's audited financial statement to provide an opinion about the profits earned

21    by Defendants from this revenue. (Dkt. No. 487-6.) This is not correcting an inaccuracy or filling

22    interstices. It is a jettisoning of one opinion and replacing it with an entirely new one.

23        If Ms. Trexler had genuine questions about the NSO Revenue Spreadsheet, and if Plaintiffs

24    did not want to ask Defendants' counsel to clarify the questions that Ms. Trexler had, Ms. Trexler

25    could and should have provided her disgorgement opinion in her August 30, 2024 disclosure, based

26    on her best understanding of the NSO Revenue Spreadsheet. Ms. Trexler could have noted there

27    were items about the NSO Revenue Spreadsheet that were unclear to her, but that Ms. Gil's

28    deposition was upcoming and that deposition might provide additional information that she may

1    use to supplement her opinion.  *That* would have been reasonable, and a subsequent supplemental

2    report would have corrected inaccuracies and filled interstices, in compliance with Rule 26(e).

3    What is not reasonable is disclosing an initial disgorgement opinion, forcing Defendants to go to

4    the time and expense of rebutting it, and then replacing it wholesale on the very day that rebuttal

5    opinions were due, thereby precluding any rebuttal within the rebuttal period.

6    **B.    Plaintiffs' Decision to Delay Disclosing Ms. Trexler's Supplemental Opinion**

7    **Until the Day Mr. Pinsonneault's Rebuttal Report was Due was Neither**

8    **Substantially Justified Nor Harmless.**

9    Plaintiffs' efforts to argue that the delay in disclosing Ms. Trexler's supplemental opinion

10   was substantially justified and harmless are unpersuasive.

11   The principal question for substantial justification is why Plaintiffs did not tell Defendants

12   before September 21, 2024, that Ms. Trexler would be supplementing her opinion with a new

13   disgorgement analysis. As set forth above, all the information used by Ms. Trexler in her

14   supplemental report's disgorgement calculation is plainly understandable on the face of the NSO

15   Revenue Spreadsheet.  But even accepting at face value Plaintiffs' claims that they needed to

16   complete Ms. Gil's deposition to understand the NSO Revenue Spreadsheet, that deposition took

17   place on September 6, 2024, 15 days before the rebuttal report deadline.  At the conclusion of the

18   deposition, Plaintiffs surely knew that they were going to serve a supplemental report, and the

19   declaration of Micah Block confirms that Plaintiffs and Ms. Trexler were *actually working* on her

20   supplemental report on September 6, 2024.  (Dkt. No. 525-1 ¶ 4.)  Notification on that date, or

21   even a full week later, would have saved Defendants the vast majority of the $25,000 that was

22   wasted.  But Plaintiffs' opposition fails to explain or attempt to justify their withholding this

23   information until September 21, 2024.  The reason is obvious—Plaintiffs were engaging in

24   gamesmanship, wanting Defendants to spend resources (resources much more limited than

25   Plaintiffs') on rebutting an obsolete opinion.

26   Plaintiffs argue that "Ms. Trexler worked diligently to prepare her report, and Plaintiffs

27   worked diligently to disclose it."  (Opp. at 12.)  In support of this claim, Plaintiffs quote the

28   declaration of Micah Block (Dkt. No. 525-1), which reads, "between September 6, 2024 and

1    September 21, 2024, Plaintiffs and Ms. Trexler worked diligently to complete the Supplemental

2    Expert Report."  This is as conclusory as it is unpersuasive.  It provides no information as to why

3    the supplemental report was not served earlier, or, at a minimum, why Plaintiffs did not notify

4    Defendants earlier that they would not need to rebut the disgorgement portion of Ms. Trexler's

5    initial report.

6              The timing of the supplemental report was not harmless.  Defendants were harmed by the

7    fact that they had to spend approximately $25,000 rebutting an opinion that Plaintiffs knew (but

8    did not tell Defendants) they were discarding.  Plaintiffs claim that that harm was curable—by

9    spending even more money to prepare supplemental opinions[2] and take Ms. Trexler's deposition.

10   (Opp. at 12.)  Plaintiffs' premise does not support their conclusion, or, using a contemporary

11   expression, "That math just doesn't math."

12             Plaintiffs claim that the timing of the supplemental opinion is not harmless because Ms.

13   Trexler continues to rely on her initial opinion.  That claim is as specious as it is a non sequitur.

14   In support of it, Plaintiffs quote meaningless language from Ms. Trexler's supplemental report

15   such as that her initial report "is incorporated herein by reference," and that the supplemental report

16   "should be read in conjunction with" the initial report.  Defendants have no doubt that Ms. Trexler

17   continues to rely on the sections of her initial opinion that have nothing to do with disgorgement.

18   But the two disgorgement opinions are based on entirely different methodologies entirely

19   inconsistent with one another.  Nobody reading both reports could reasonably believe that Ms.

20   Trexler is going to testify to her initial disgorgement opinion, notwithstanding the meaningless

21   boilerplate language she included and that Plaintiffs quote in their opposition.

22             The four factors employed by the Ninth Circuit in guiding whether a violation of the

23   deadline is justified or harmless support granting Defendants' motion.  Defendants suffered

24   prejudice by having to spend a substantial sum, approximately $25,000, to rebut an obsolete

25   opinion. That prejudice is uncurable.  And while the trial may not be disrupted by the supplemental

26

27   _____

[2] Ironically, Plaintiffs are separately (Dkt. No. 491) moving to strike one of Mr. Pinsonneault's
28   supplemental opinions that Plaintiffs admit here was needed to cure the harm caused by Ms.
     Trexler's belated service of her supplemental report.

1    opinion, the circumstances indicate bad faith or willfulness on the part of Plaintiffs in not giving

2    Defendants notice that would have enabled them to avoid the wasted expenditure.  Plaintiffs cannot

3    meet their burden to show that the timing of Ms. Trexler's opinion was not substantially justified

4    or harmless.

5    **C.    Defendants Are Not to Blame for Plaintiffs Serving Ms. Trexler's**

6    **Supplemental Report on September 21, 2024.**

7    Plaintiffs blame Defendants for the fact that Plaintiffs served Ms. Trexler's supplemental

8    report on September 21, 2024, the day Mr. Pinsonneault's rebuttal report was due.  Specifically,

9    Plaintiffs blame Defendants for not making Ms. Gil available for deposition until September 6,

10    after the deadline for initial expert reports.  This is outrageous, for reasons with which the Court

11    should be well familiar.

12    Defendants attempted to start deposition practice in this case back in January 2024, but

13    Plaintiffs unilaterally postponed *eight* depositions noticed by Defendants for dates to which

14    Plaintiffs had agreed.  *See* List of Eight Depositions Sought by Defendants and Unilaterally

15    Postponed by Plaintiffs, Dkt. No. 391-2.  Plaintiffs would not permit a single deposition in this

16    case until finally making their first witness, Carl Woog, available on August 14, 2024, which was

17    only 16 days before initial expert reports were due!  Moreover, the scheduling of the depositions

18    of Defendants' employees, all of whom reside in Israel, required a massive amount of coordination

19    of witnesses and between and among Defendants' counsel and Plaintiffs' counsel, after which the

20    depositions were scheduled to take place in London between August 27 and September 6, 2024,

21    and Plaintiffs never asked that Ms. Gil's deposition be scheduled before August 30, 2024.  Blaming

22    Defendants for not making Ms. Gil available for deposition until after initial expert reports were

23    served is a massive distortion of what occurred.  The timing of Ms. Gil's deposition was a function

24    of the fact that Plaintiffs delayed the taking of any depositions until 16 days before the deadline

25    for serving expert disclosures.

26    **III.    CONCLUSION**

27    Because Plaintiffs' decision to delay Ms. Trexler's Supplemental Report until the day Mr.

28    Pinsonneault's rebuttal report was due was neither substantially justified nor harmless, that report

1   should be stricken pursuant to Rule 37(c)(1).

2

3   Dated: January 23, 2025                 KING & SPALDING LLP

4                                          By:*/s/Aaron S. Craig*

5                                        JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28