# EXHIBIT 1

1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
      *jakro@kslaw.com*
2   AARON S. CRAIG (Bar No. 204741)
      *acraig@kslaw.com*
3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1700
4   Los Angeles, CA 90071
    Telephone:    (213) 443-4355
5   Facsimile:    (213) 443-4310

6   Attorneys for Defendants NSO GROUP TECHNOLOGIES
    LIMITED and Q CYBER TECHNOLOGIES LIMITED
7

8

9                          UNITED STATES DISTRICT COURT

10                        NORTHERN DISTRICT OF CALIFORNIA

11                               OAKLAND DIVISION

12   WHATSAPP INC., a Delaware corporation,        Case No. 4:19-cv-07123-PJH
     and FACEBOOK, INC., a Delaware
13   corporation,                                  **DEFENDANTS' RESPONSES AND**
                                                   **OBJECTIONS TO PLAINTIFFS' FIFTH**
14              Plaintiffs,                        **REQUESTS FOR PRODUCTION**

15        v.
                                                   Action Filed:  10/29/2019
16   NSO GROUP TECHNOLOGIES LIMITED                Trial Date:    12/2/2024
     and Q CYBER TECHNOLOGIES LIMITED,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

---

1   extent this request calls for documents disclosing the identities of Defendants' third-party clients.

2   *See* Order at 5, Dkt. No. 292.  Defendants further object to the extent that any documents

3   responsive to the request contain information that is prohibited from disclosure by Israeli law,

4   regulation, or governmental order or directive, any other applicable law, or contract.

5          Subject to and without waiving the foregoing objections or protections in the Stipulated

6   Protective Order, Defendants respond that they do not possess documents responsive to this

7   request because they do not maintain documents in the usual course of business containing

8   revenue, cost, or pricing information for its products according to specific vector, exploit, or

9   customer's use of the same and have not located any such documents after a good faith and

10  reasonable search.  However, Defendants will produce responsive and nonprivileged documents

11  in their possession, custody, and control sufficient to show Defendants' best efforts to determine

12  their revenue, costs, and profits attributable to "Relevant Spyware" that was directed at, targeted,

13  or used WhatsApp or its servers to access Target Devices, from April 29, 2018 to May 10, 2020.

14  Order at 3, 4, Dkt. No. 292.  Defendants intend to withhold any documents in their possession,

15  custody, or control that are responsive to this request if they contain information prohibited from

16  disclosure by Israeli law, regulation, governmental order or directive, other applicable law, or

17  contract.  Defendants will conduct a reasonable and proportional search for documents and

18  anticipate substantial completion of their responsive production within approximately 180 days,

19  subject to receiving any necessary approvals and licenses.

20  **REQUEST FOR PRODUCTION NO. 130:**

21          Contracts between You and third parties concerning Relevant Spyware that was licensed

22  or sold to any NSO Customer in the Relevant Time Period, including any contracts for support or

23  other related services.

24  **RESPONSE TO REQUEST FOR PRODUCTION NO. 130:**

25          Defendants object to this request to the extent it calls for documents protected from

26  disclosure by the attorney-client privilege.  Defendants object to the request as irrelevant,

27  overbroad, and unduly burdensome insofar as it is not appropriately limited in scope or time (1)

28  to Defendants' contracts concerning "Relevant Spyware" as the Court defined that term, namely

1    NSO spyware directed at, targeting, or using WhatsApp or its servers to access Target Devices;

2    and (2) during the period of April 29, 2018 to May 10, 2020.  Order at 3, 4, Dkt. No. 292.

3    Defendants further object to the extent the request calls for the disclosure of Confidential

4    Information or Items, including Defendants' competitively sensitive business or sales

5    information, that is governed by the Stipulated Protective Order.  *See* Dkt. No. 132.  Moreover,

6    Defendants object to the term "NSO Customer(s)" as vague and ambiguous because that term is

7    undefined and can be interpreted in more than one way.  Defendants object to the extent this

8    request calls for documents disclosing the identities of Defendants' third-party clients.  *See* Order

9    at 5, Dkt. No. 292.  Defendants further object to the extent that the requests seek contracts

10   containing information that is prohibited from disclosure by Israeli law, regulation, or

11   governmental order or directive, any other applicable law, or contract.

12          Subject to and without waiving the foregoing objections, Defendants respond that they

13   will stand on their objections and not produce documents responsive to this request.

14   **REQUEST FOR PRODUCTION NO. 131:**

15          Your financial statements or other documents sufficient to show all revenue, costs, and

16   profit realized from Your or any NSO Customer's use of Relevant Spyware to exploit CVE-

17   2019- 3568.

18   **RESPONSE TO REQUEST FOR PRODUCTION NO. 131:**

19          Defendants object to the request as irrelevant, overbroad, and unduly burdensome insofar

20   as it is not appropriately limited in scope or time (1) to Defendants' revenue, costs, and profit

21   from "Relevant Spyware" as the Court defined that term, namely NSO spyware directed at,

22   targeting, or using WhatsApp or its servers to access Target Devices; and (2) during the period of

23   April 29, 2018 to May 10, 2020.  Order at 3, 4, Dkt. No. 292.   Defendants object to the request

24   to the extent it implies that Defendants "use" Relevant Spyware—only Defendants' customers

25   make use of the law enforcement and intelligence tools developed by Defendants.  Defendants

26   also object to this request as irrelevant, unduly burdensome, and disproportionate to the needs of

27   the litigation insofar as it requires Defendants to expend significant time and expenses to query

28   documents and extract information concerning revenue, cost, or profit according to any specific

# EXHIBIT 2

## FILED UNDER SEAL

# EXHIBIT 3

## FILED UNDER SEAL

# EXHIBIT 4

## FILED UNDER SEAL

# EXHIBIT 5

## PUBLIC REDACTED VERSION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC, and FACEBOOK, INC., ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Case No. 4:19-cv-07123-PJH |
| ) | |
| NSO GROUP TECHNOLOGIES LIMITED, ) | |
| and Q CYBER TECHNOLOGIES LIMITED, ) | |
| ) | |
| *Defendants.* ) | |

**REPORT OF JOSHUA J. MINKLER**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### I.    INTRODUCTION

1.    My name is Joshua James Minkler. I have been engaged to offer testimony based on my specialized experience conducting investigations and prosecuting criminal cases based on surveillance technology. The scope of my testimony includes: (1) the lawful interception and surveillance of communications by federal law enforcement officers; (2) the unique investigatory challenges presented to state and federal law enforcement by end-to-end encryption and endpoint encryption; and (3) the benefits of tools such as Pegasus in law enforcement and national security operations.

2.    This report explains my understanding of the technology in this case and details my testimony concerning using such lawful intercept capabilities. The views expressed herein are my own and are based on my investigation into

1

this matter and the education, experience, training, and skills I have accumulated as a lawyer and a federal law enforcement official.

## II.    **QUALIFICATIONS**

3.    My resume is attached as Appendix A. It includes my qualifications, and sets forth significant investigations and prosecutions in which I was involved.[1]

4.    I am currently a Partner at the law firm Barnes & Thornburg LLP. In that role, I represent clients in matters relating to white-collar, compliance, and criminal investigations.

5.    Before joining Barnes & Thornburg, I served as the United States Attorney for the Southern District of Indiana from 2014-2020, as the Acting US Attorney, Attorney General Appointed US Attorney, Court Appointed US Attorney, and Presidentially Appointed, Senate confirmed US Attorney. Before serving as US Attorney, I served in various roles in the Office of the United States Attorney for the Southern District of Indiana from 1994 to 2015. These roles include: 1994 to 2010 – Assistant United States Attorney; 2010-2011 – Chief, Drug and Violent Crimes Unit/Lead; and 2011-2014 – First Assistant United States Attorney. Before that, I was an Assistant Prosecuting Attorney for the Kent County (Michigan) Prosecuting Attorney from 1989 to 1994.

6.    With over thirty years of law enforcement experience, I have led more than fifty investigations, resulting in the prosecution of more than 500 criminal

---

[1] I have authored no publications in the last ten years.

defendants in federal court. I have significant experience obtaining authorization for the lawful interception of communications at the state and federal levels, supervising the use of those law enforcement techniques, and working with federal law enforcement agencies, including the Federal Bureau of Investigation (FBI), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the US Drug Enforcement Administration (DEA).

7.    I have led and supervised complex investigations, including those involving organized crime, child exploitation, terrorism, and human trafficking, where sophisticated technical capabilities were deployed, such as remote surveillance and the interception of communications. I have also been involved in investigations where no such capabilities were available, but they would have been helpful to the investigation had they been available. Accordingly, I am familiar with existing lawful interception tools and the need for next-generation solutions to address technological advancements available to suspected criminals and terrorists.

8.    I have significant familiarity with the interception and use of communications in criminal prosecution.

9.    For example, beginning in the Fall of 1998, I led a joint FBI and Indianapolis Metropolitan Police Department investigation into a violent organized group of drug distributors operating in the Brightwood neighborhood on the northeast side of Indianapolis. Using court authorized interception of phone calls and pager messages, law enforcement seized 78 weapons, 12 kilograms of cocaine, and $200,000 in cash during the investigation. Twenty-

one defendants were charged. During the spring and summer of 2000, ten of the defendants were tried in a seven-week trial. Over 100 witnesses and 1,200 exhibits were presented to the jury. Murders that were at a record high in the Brightwood neighborhood in 1998, declined in 1999, 2000, and 2001. I received an award from the FBI's Special Agent in Charge for the investigation and prosecution of this matter.

10.    From December 2004 until March 2005, I led a team of DEA agents and Indiana State Police investigators in an investigation that involved four court-authorized wire intercepts with three extensions under the Department of Justice's Special Operations Division's ("SOD") "Operation Money Clip." Operation Money Clip was a SOD-supported, multi-jurisdictional, multi-agency Organized Crime Drug Enforcement Task Force (OCDETF) investigation targeting the Henry and Tony Franco-Arrellano poly-drug trafficking organization. SOD initiated Operation Money Clip after intelligence identified a defined Mexican criminal organization being supplied by Regional Priority Target (RPOT)[2] Ignacio Coronel-Villareal. Operation Money Clip received intelligence from our law enforcement counterparts in Mexico, including communications intelligence. In addition, evidence obtained from legal electronic surveillance in the United States was provided to and used by law enforcement counterparts in Mexico.

11.    As a result of this investigation, 16 defendants were indicted, arrested, convicted, and sentenced in the Southern District of Indiana. In

---

[2] RPOT—Regional Priority Target is an OCDETF term for high-level targets as determined by the Department of Justice.

addition, 48 kilograms of cocaine, 875 pounds of marijuana, seven guns, and assets valued at $1,450,000 were seized and forfeited. More importantly, three Mexico-based sources of supply were indicted and convicted in this investigation, including OCDETF Priority Target Juan Carlos Bermudez. On June 14, 2005, Bermudez was arrested on the outstanding arrest warrant issued in the Southern District of Indiana during a trip from the Mexico to Chicago, Illinois. Bermudez was the first multi-jurisdictional RPOT target to be indicted and convicted in the Southern District of Indiana. My team received a 2006 United States Attorney Award. Additionally, the case was recognized as the Great Lakes OCDETF case of the year at a Department of Justice Ceremony in Washington, D.C., on July 31, 2007. I received an award from the Assistant Attorney General for the Criminal Division. All defendants were arrested, pled guilty, and were sentenced to prison. The denials of motions to suppress were appealed. The judgments were affirmed on appeal. *United States v. Evarardo Lira-Esquivel*, 509 F.3d 820 (7th Cir. 2007).

12.    In 2015, I also supervised the investigation and prosecution of Jared S. Fogle and Russell C. Taylor for distributing and receiving Child Sexual Abuse Material (CSAM) and conspiring to do so, as well as repeatedly traveling to engage in commercial sex acts with underage minors. Between March 2001 and May 2015, Fogle received and viewed CSAM given to him by Taylor. Taylor secretly produced CSAM of victims between 9 and 16 years old in his house. Taylor also obtained and shared CSAM videos made outside of the United States showing the sexual abuse of victims as young as six years old through Internet sources.

Fogle also repeatedly utilized the Internet to solicit minors for commercial sexual acts. He did this using an email account, social networking websites, online messaging, and text messages. After victimizing a minor, Fogle sent messages to the victim offering to pay her a fee, if she could find another underage girl to have sex with him – indicating that "the younger" the next victim was "the better."

13.     I supervised the investigation and federal terrorism prosecution of Akram Musleh, who was arrested in 2016 while attempting to board a bus from Indianapolis to New York, where he was to fly to and transit through Morocco to territory controlled by the Islamic State of Iraq and al-Sham (ISIS). The FBI electronically surveilled Musleh as he consumed ISIS propaganda and made contact with more than 12 ISIS fighters, supporters, and facilitators around the world to join the terrorist organization. In his conversations with those contacts, Musleh declared his allegiance to ISIS, expressed his eagerness to join ISIS, and sought to determine the best way to travel from the United States to ISIS-controlled territory in Syria or North Africa. Musleh also sought the advice of his contacts on when to travel and the best routes to avoid detection by law enforcement authorities. When one of his contacts suggested Musleh send money to support the terror organization instead of traveling, Musleh replied that he was afraid sending money would draw law enforcement attention and Musleh "[didn't] want to lose [his] freedom before doing something massive." In searches of Musleh's electronic devices, the FBI recovered numerous files containing ISIS propaganda, including horrific pictures and videos depicting violence inflicted on countless people in the Middle East and North Africa. Also located on Musleh's

electronic devices was a "kill list" of US service members published by ISIS and a pro-jihad video Musleh produced and created, which included a listing of Indiana service members killed in action during Operation Iraqi Freedom.

14.    In 2019, I supervised the investigation and prosecution of Moyad Dannon and Mahde Dannon, who agreed to manufacture and sell at least 55 fully automatic "ghost guns" to a buyer located on the American southwest border, believing those weapons would be shipped to the Middle East for use by ISIS and its members. Moyad Dannon had numerous and extensive conversations with an undercover agent who he believed was a member of ISIS then fighting in Syria. During those conversations, Moyad expressed his desire to travel from Indiana to ISIS-controlled areas of Syria, where he sought to utilize his knowledge of firearms and other skills to provide direct military assistance to ISIS in its fight against the United States and the Syrian government. In a search of Dannon's devices following his arrest, FBI agents located approximately 16 gigabytes of ISIS propaganda, including graphically violent videos depicting ISIS fighters beheading civilians and hostages and ISIS snipers killing US military personnel. Identical ISIS propaganda videos were discovered on a laptop computer.

15.    In each of these instances, interception of communications was critical to the investigation and prosecution of these crimes.  Today, many of these communications likely would have been encrypted, impairing or impeding the investigations and prosecutions.

16.    In addition, I also have significant experience supervising criminal investigations involving end to end (E2E) communications. For example, I supervised an investigation of an organized crime group called "the Mob," which committed at least 26 robberies of pharmacies, and one homicide, in the Indianapolis area from September 12, 2014, through June 6, 2016.  Our investigation determined that the members of the Mob used Facebook Messenger to communicate with each other to recruit new members into the gang, plan the robberies, and sell the prescription drugs that they obtained from the robberies. In that case, my team obtained Facebook Messenger communications through federal search warrants. Given Meta's recent migration to E2E encryption, law enforcement would *not* have obtained these records, the prosecution might not have occurred, and additional crimes might have been committed.

17.    I also supervised the investigation into methamphetamine trafficking activity of Clifford King. King's organization distributed over 500 pounds of pure methamphetamine over a six-month period ranging from late 2019 through March 19, 2020. During the investigation, law enforcement identified two of King's methamphetamine suppliers—Eric Walker and Derrick Granger. Even though Granger regularly supplied large quantities of methamphetamine to King, law enforcement never intercepted them speaking during approximately sixty days of wiretap interceptions over King's cellphone. During the search of Granger's cellphone, law enforcement found screenshots indicated that Granger communicated with King over FaceTime. Like Facebook Messenger (now) and WhatsApp, FaceTime is a communication platform that

features E2E encryption. As a result, it became clear to us that law enforcement did not intercept Granger during the wiretap because he was speaking to King exclusively over FaceTime.

18.    I also supervised the investigation into a methamphetamine trafficking ring operated by Christopher Tate. Tate's organization distributed in excess of 150 pounds of pure methamphetamine in the Indianapolis area. Trial testimony established that Tate communicated with his drug customers and suppliers via FaceTime, another communications platform using E2E encryption, to avoid detection by law enforcement. One of Tate's drug customers, Desiree Evans, testified at trial that Tate communicated with both her and Tate's drug source by FaceTime because "the police couldn't get our conversations that way." Another of Tate's drug customers, Danielle Dowling, testified that Tate wanted her to contact him via FaceTime "[b]ecause you guys weren't supposed to hear his phone calls on FaceTime." Despite our best efforts, the investigation was unable to identify Tate's Indianapolis-based sources of supply because Tate communicated with them through platforms that employed E2E encryption, including possibly WhatsApp or Facebook Messenger.

19.    From February 2019 through November 2020, I supervised the investigation of Jason Betts, the leader of an Indianapolis methamphetamine trafficking group. Later, I became aware that the FBI conducted a court authorized wiretap interception of Betts' cellular telephone from February 19, 2021, through July 14, 2021.  Law enforcement did not intercept any telephone conversations identifying Betts' methamphetamine source during this time

9

period. Betts' organization distributed over 220 pounds of pure methamphetamine and seven kilograms of fentanyl in the Indianapolis area. After his arrest, Betts revealed that his methamphetamine source was Stephen Grider, a resident of California who traveled back and forth from California to Indiana. Betts' cooperation eventually provided sufficient evidence to indict Grider, who pled guilty to conspiracy to distribute methamphetamine and fentanyl. At the trial, Betts testified that he communicated exclusively with Grider through FaceTime, using E2E. When asked at trial why he only communicated with Grider via FaceTime, Betts testified, "Because he said that's the only way that he would conversate with me because the FaceTime cannot be intercepted about any law enforcement, sir." Betts later testified that he also communicated with Grider's drug courier exclusively via FaceTime. When law enforcement arrested Grider in California, law enforcement seized his cellular telephone and executed a search warrant on the telephone. The cellular telephone showed that Grider had substantial contacts with an individual in California who had an extensive criminal record that involved drug distribution and suggested involvement in the Jalisco New Generation Cartel. The contents of the cellular telephone showed that Grider communicated with this individual exclusively via WhatsApp and Signal via E2E encryption. Since law enforcement could not identify Grider's telephone to tap it or obtain the WhatsApp and Signal messages from his cellphone, and because Grider did not cooperate, law enforcement could not prove a case against Grider's source in court or expand the investigation to the source of supply to Grider California-based drug

trafficking organization (DTO). Law enforcement's inability to intercept telephonic communications using platforms with E2E encryption significantly hampered this investigation. If law enforcement could have intercepted Betts' telephonic FaceTime communications with Grider during the wiretap investigation, it would have identified Grider earlier and identified his communications device. Law enforcement would have used those interceptions to obtain authority to intercept Grider's cellular telephones. If law enforcement had the ability to identify Grider's telephonic communications over WhatsApp and Signal, it would have been able to identify Grider's cartel-based source of methamphetamine and fentanyl.

20.    From November 2005 until January 2006, I led DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with two extensions under OCDETF "Operation Motley Crew" focusing on RPOT target John Scruggs who was the kingpin of a cocaine trafficking organization operating in Madison, Indiana. As a result of this investigation, a total of 17 defendants were indicted. During the investigation, kilograms of cocaine, pounds of marijuana, guns, and United States currency were seized. More importantly, the elimination of a large DTO in a relatively small Indiana tourist town (population 13,000) had a tremendous impact on reducing the availability of illegal drugs, reducing the crime rate, and improving the quality of life for all of the law-abiding residents of that town. My team received a United States Attorney Award in 2008. I was recognized with an award from the Special Agent in Charge of the DEA for my work on this case.

21.    During 2001, I led a joint FBI, DEA, United States Department of Health and Human Services (HHS), Indiana Attorney General, and Jennings County, Indiana, Sheriff's Department investigation into the fraudulent prescribing, distribution, and billing of OxyContin by an Indianapolis physician, Dr. Randolph Lievertz, and a Jennings County, Indiana, drug dealer, Melinda Hawkins. Lievertz prescribed more OxyContin to Medicaid recipients in the State of Indiana than any other physician, and Hawkins was the Indiana Medicaid recipient who received the largest amounts of OxyContin. From January 1, 2001 through September 26, 2001, Lievertz caused over $500,000 to be paid by Medicaid for OxyContin. After filling the prescriptions, Hawkins illegally distributed the OxyContin to several individuals, including high school students, in Jennings County, Indiana. This illegal scheme not only bilked taxpayers, it caused an epidemic of OxyContin abuse in rural Jennings County. The five-month investigation employed a variety of law enforcement techniques, including physical surveillance, controlled purchases of OxyContin, a complete financial investigation, court authorized interception of oral communications occurring in Lievertz's examination room, and search warrants. This case won a 2003 United States Attorney Award. HHS Inspector General Janet Rehnquist recognized me with the HHS Public Integrity Award.

22.    I have not testified as an expert at trial or by deposition in any case during the previous four years.

23.    I am being paid $995/hour for my work in this case. My compensation is not contingent upon the outcome of the case.

### III.   **INFORMATION CONSIDERED**

24.     The content of this report is based on my experience as a prosecutor and a United States Attorney involved in sophisticated investigations, task forces, and steering committees. That experience includes familiarity with intercept capabilities, legal standards, laws, processes, and accountability mechanisms for misconduct or abuses.

25.     In addition, a list of the materials and information that I considered in forming the opinions expressed in this report can be found in Appendix B, below.

26.     Beyond the materials identified above, I do not anticipate needing any exhibits to summarize, support, or aid my testimony. If this changes, I will provide any such exhibits.

### IV.   **BACKGROUND**

27.     Pegasus is a tool developed by the Israeli company NSO Group. Pegasus is designed to be covertly and remotely installed on mobile phones running iOS and Android.

28.     All marketing and licensing activities relating to Pegasus must be approved by the Israeli Ministry of Defense (MoD). NSO Group limits its customer base to governments and government agencies. It also requires those customers to use its products only for criminal and national security investigations and has stated that it has an industry-leading approach to human rights. NSO's marketing and licensing activities are also subject to oversight by an internal business ethics committee.

29. ████████████████████████████████████

████████████████████████████████

30. ████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

31.     While Pegasus's capabilities may vary over time due to software updates, it is generally capable of reading text messages, call recording, location tracking, accessing the target device's microphone and camera, and collecting information from apps.

32.     I have reviewed NSO's Transparency and Responsibility Report for 2023. In this report, NSO explained that it is technologically impossible for Pegasus to add, alter, delete, or otherwise manipulate data on targeted mobile devices or perform any other activities beyond viewing and extracting certain data.

33. ████████████████████████████████████



14



34.    NSO also reports its compliance with the United Nations Guiding Principles on Business and Human Rights ("UNGPs"), the Organisation for Economic Co-operation and Development Guidelines for Multinational Enterprises, and the United Nations Counter-Terrorism Legal Training Curriculum. *See* NSO, *Transparency and Responsibility Report 2023*, (Dec. 31, 2023), https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf. In doing so, NSO vets proposed Pegasus licensees, limits the number of instances in which Pegasus can be used, and contractually requires customers to respect human rights and use Pegasus only for legitimate intelligence and law enforcement purposes. *Id.* I have verified that NSO's contracts contain clauses related to human rights and lawful intelligence gathering.

V.    **DISCUSSION**

A. **Lawful Interception and Surveillance by Federal Law Enforcement Agencies**

35.    The ability to lawfully intercept communications is not just a tool, but a critical necessity in ensuring public safety and national security. Without access to real-time communications, law enforcement's ability to prevent

terrorist attacks, conduct criminal investigations, and prosecute criminal activity will be significantly hampered. The inability to use developing technology to conduct the lawful interception of communications puts law enforcement at a disadvantage as technology (and consequently the technology used to evade the law) evolves. Indeed, criminal and terrorist actors are aware of the technologies deployed by law enforcement and counter with increasingly sophisticated technologies to defeat detection, intercept, or capture.

36.    However, federal law provides avenues for law enforcement to lawfully intercept communications using tools like Pegasus, including Title III wiretaps and FISA warrants.

37.    For example, Title III of the Electronic Communications Privacy Act, 18 U.S.C. 2510, *et seq.*, has specific requirements that must be met before a wiretap may be issued, including (1) any wiretap application under Title III must be prepared by an affiant law enforcement agent who has developed the probable cause necessary to support a wiretap and must be signed by a United States Attorney or their designee, 18 U.S.C. § 2518(1)(a); (2) the application must describe with particularity what information is to be intercepted and all other means explored to gather this information, 18 U.S.C. § 2518(1)(b); (3) the application must describe with particularity the probable cause for the specific, predicated offense or offenses, 18 U.S.C. § 2518(1)(b); and (4) a federal judge must approve the application, 18 U.S.C. § 2518(3). And no order for a wiretap "may authorize or approve the interception of any wire, oral, or electronic

communication for any period longer than is necessary to achieve the objective of the authorization." 18 U.S.C. § 2518(5).

38.     The Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801-11, 1821-29, 1841-46, 1861-62, 1871, provides another means by which intelligence agencies can lawfully intercept communications. FISA requires a specialized Foreign Intelligence Surveillance Court to find that probable cause exists that the subject of the FISA warrant is a foreign power or agent of a foreign power and that a "significant purpose" of the warrant is to obtain foreign intelligence. 50 U.S.C. §§ 1804. FISA also requires that all surveillance be "minimized" to the extent possible. *Id.*

39.     In my experience as a federal prosecutor and as the US Attorney, there are significant safeguards that limit the potential for misuse of Title III wiretaps and FISA warrants. For example, federal law provides criminal and civil penalties for abuse of these law enforcement mechanisms. Similarly, the Department of Justice's internal policies provide for penalties for abuse of warrants, including termination. These penalties are a strong deterrent against any potential misuse of surveillance tools.

40.     Based on my experience, federal law enforcement could lawfully deploy Pegasus or similar software capabilities in the United States within these parameters.

## B. Law Enforcement and Intelligence Concerns Regarding Device Encryption

41.     Government access to encrypted communications is not a new issue and has been debated since at least the 1970s. However, in the modern context,

end-to-end encryption ("E2E" or "Device Encryption") has put a unique constraint on law enforcement. E2E protects "data in motion" and encrypts the transmission of messages such that only the original sender and intended recipient have the ability to decrypt the communication. E2E encryption contrasts with traditional "end point" encryption, which protects stored information on locked devices such that the contents of the device cannot be read by anyone who does not possess the password. Increasingly, E2E has become the default on many different applications and messaging services, including WhatsApp, Telegram, and Signal. *See About End-to-End Encryption*, WhatsApp, https://faq.whatsapp.com/820124435853543 (last visited December 10, 2024); *End-to-End Encryption FAQ*, Telegram Support Force, https://tsf.telegram.org/manuals/e2ee-simple (last visited December 10, 2024); *Is It Private? Can I Trust It*, Signal Support, https://support.signal.org/hc/en-us/articles/360007320391-Is-it-private-Can-I-trust-it#:~:text=Signal%20conversations%20are%20always%20end,%2C%20every%20call%2C%20every%20time (last visited December 10, 2024).

42.     The E2E encryption that WhatsApp provides its users prevents law enforcement from intercepting and deciphering communications – communications that law enforcement would have previously been able to obtain and review by intercepting mail, telephone calls, electronic communications, etc. WhatsApp itself informs users that it "does not" comply with law enforcement requests for the content of its users' messages. More importantly, WhatsApp informs users that it "cannot" comply with such lawful requests for the content

of their messages.[3] *See* WhatsApp FAQ, "About government requests for user data," (last accessed Dec. 10, 2024) https://faq.whatsapp.com/808280033839222.

43.     As a practical matter, law enforcement also cannot access encrypted messages on a locked device, even when that has been lawfully seized.

44.     Accordingly, law enforcement and intelligence agencies are delayed or unable to prevent terrorist attacks, investigate crimes, and prosecute criminal activity without access to communications—even with a warrant or court order.

45.     The impact of these limitations is present in several cases, including cases of child exploitation. For example, in August 2019, an undercover police officer in Ohio responded to an advertisement on a prostitution website seeking to sell an underage woman who was a victim of sex trafficking. The undercover officer arranged for a meet-up with the seller and—during the meet-up—arrested him, seizing his cell phone in the process. The day after the arrest, the suspect was overheard saying on a jail cell phone, "If [the police] get in my phone, I'm doing time . . . . If they get in my phone, I'm doing time for other [stuff]." Using this evidence, law enforcement obtained a warrant to search the suspect's cell phone, hoping to obtain the names of other sex trafficking victims. However, law enforcement was unable to bypass the device's encryption—meaning law enforcement was *never* able to identify the names of other potential sex offenders, or other potential victims of sex trafficking. *See Lawful Access*, US Department

---

of Justice Office of Legal Policy (last updated November 18, 2022), https://www.justice.gov/olp/lawful-access.

46.    The issue of warrant-proof encryption spans beyond the sphere of sex trafficking and into the realm of national security. For example, the terrorists in the 2015 Garland, Texas, attack—two Islamic extremists who ultimately carried out an attack for which ISIS claimed responsibility—had been monitored by the FBI for over three years. An undercover agent was on the scene actively monitoring one of them at the time that the first shots were fired. But this was not enough to prevent the attack. And, on the morning of the attack, the terrorists exchanged 109 encrypted messages with an overseas terrorist organization. The FBI could not access the messages and use their contents to halt the attack. Indeed, even years after the terrorist attack, the FBI was not able to access the content of the messages. *See Attorney General William P. Barr Delivers Keynote Address at the International Conference on Cyber Security*, US Department of Justice Office of Public Affairs (July 23, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-keynote-address-international-conference-cyber.

47.    The use of encrypted messaging apps by foreign and domestic terrorist groups has not ceased in the years since the Garland, Texas, terrorist attack. In 2021, E2E was used by the Oath Keepers while planning the January 6th riot on the United States Capitol building. *See, e.g.*, Indictment, *United States v. Rhodes et al.* (D.D.C. January 8, 2021) ("Beginning in November 2020, Rhodes

began disseminating messages on encrypted applications that encouraged his co-conspirators to oppose by force the lawful transfer of presidential power.").

48.    Even more recently, Matthew Crooks planned his attempted assassination of former President Trump using E2E. Although some of these messages have been successfully decrypted, law enforcement still cannot access the entirety of Crooks' messages, and his motivations remain unknown. *See* Testimony of the Honorable Christopher Wray, FBI Director, before the House Judiciary Committee (July 24, 2024), https://judiciary.house.gov/committee-activity/hearings/oversight-federal-bureau-investigation-7 (noting that the FBI is still exploring "a number of digital devices" that belonged to Crooks, and that "it turned out [Crooks] was using some encrypted messaging applications" which the FBI "may never get access to because of the encryption issue that presents an increasingly vexing barrier for law enforcement").

49.    This is only a select set of events, but the list of criminals and terrorists known to be using E2E is extensive. In my experience, criminals and terrorists specifically employ E2E because they are aware that law enforcement has a limited ability to monitor their misconduct. This permits not only the open planning of violent acts, but also allows for the transmission of other criminal activity such as child exploitation, drug trafficking, and cybercrime. And, even if the criminals employing E2E are ultimately identified, encrypted communications are sometimes lost to the government forever and cannot be used as evidence in any resulting prosecutions.

**C. Lawful Surveillance Is Used by Foreign Governments**

50.    Based on my experience working in the US Department of Justice and independent research, I am aware that other nations have legal frameworks that permit law enforcement to intercept communications lawfully. Although I am not an expert in the laws of any particular foreign nation, I am aware that many foreign jurisdictions impose requirements to receive authorization for lawful interceptions that are similar to those in the United States.

51.    Based on my research, at least the United Kingdom, Australia, New Zealand, the United States, Canada, France, Mexico, Jamaica, and the Netherlands generally allow for the lawful interception of communications with prior judicial authorization.

52.    In addition, a publicly available database compiled by Vodafone Group with support from Hogan Lovells provides information for at least fifty-seven counties. *See* Vodafone, *Law Enforcement Disclosure Report*, (June 2014), https://www.vodafone.com/content/dam/vodcom/sustainability/pdfs/vodafone_law_enforcement_disclosure_report.pdf. A sampling of those records, which were last updated between 2017 and 2022, indicates that the vast majority of those countries permitted law enforcement agencies or national security agencies to conduct lawful intercepts as of the date that the online database or relevant entries were last updated.

53.    In my experience, the lawful interception of communications by a foreign nation-state, such as a US ally, can and has facilitated the protection of the United States. For example, in Operation Money Clip, receipt of intercepted

messages from Mexican law enforcement was instrumental in securing arrests and convictions for several of the investigation's targets.

54.    Based on public reporting, Pegasus has been used by several Western-style democracies including Germany, Spain, Belgium, Poland, and Hungary. *See, How Democracies Spy on Their Citizens,* The New Yorker (April 18, 2022), https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.  It has also been publicly reported that the United States has purchased Pegasus, or financed the purchase of Pegasus, to assist American allies in combating crime and terrorism.  This includes Djibouti and Colombia. *See* Michael Levenson, *F.B.I. Secretly Bought Israeli Spyware and Explored Hacking U.S. Phones*, New York Times (Jan. 28, 2022), https://www.nytimes.com/2022/01/28/world/middleeast/israel-pegasus-spyware.html; *Washington Financed Colombia's Purchase Of Pegasus Spy Software*, Barron's (Nov. 8, 2024), https://www.barrons.com/news/washington-financed-colombia-s-purchase-of-pegasus-spy-software-76d6550f.

### D. Interception Technologies Provide the Potential for Significant Benefits to Law Enforcement and the Public

55.    Based on my experience, lawful real-time access to devices and the data, communications, and information therein is imperative to public safety and national security. Criminal and terrorist actors continue to evolve in their communications to avoid detection, and law enforcement and the intelligence community must outpace this evolution technically.

56.    I am not alone in this belief. Numerous United States Attorneys General—appointed by Democrat and Republican presidents—agree on this issue. *See, e.g., Statement from Attorney General William P. Barr on Introduction of Lawful Access Bill in Senate*, US Department of Justice Office of Public Affairs, (June 23, 2020), https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-introduction-lawful-access-bill-senate#:~:text=While%20strong%20encryption%20provides%20enormous,their%20crimes%20and%20avoid%20detection ("While strong encryption provides enormous benefits to society and is undoubtedly necessary for the security and privacy of Americans, E2E encryption technology is being abused by child predators, terrorists, drug traffickers, and even hackers to perpetrate their crimes and avoid detection. Warrant-proof encryption allows these criminals to operate with impunity. This is dangerous and unacceptable."); Christina Carrega et al., *Merrick Garland Cites Domestic Terrorism and Civil Rights in Defending Budget to House Lawmakers*, CNN Politics (May 4, 2021), https://www.cnn.com/2021/05/04/politics/merrick-garland-hearing/index.html (quoting Attorney General Merrick Garland as stating that "[t]he consequence of the internet and encryption means that [criminals and terrorists] can send information and make plans much more swiftly and in greater secrecy than could have been done before. . . . So, we have an emerging and accelerating threat."). President Obama has made similar statements. *See* The White House Office of Press Secretary, *Remarks by the President at South By Southwest Interactive* (Mar. 11, 2016),

24

https://obamawhitehouse.archives.gov/the-press-office/2016/03/14/remarks-president-south-southwest-interactive ("You cannot take an absolutist view on this. So if your argument is strong encryption, no matter what, and we can and should, in fact, create black boxes, then that I think does not strike the kind of balance that we have lived with for 200, 300 years. And it's fetishizing our phones above every other value. And that can't be the right answer. I suspect that the answer is going to come down to how do we create a system where the encryption is as strong as possible, the key is as secure as possible, it is accessible by the smallest number of people possible for a subset of issues that we agree are important.").

57.    Existing lawful intercept capabilities are typically limited to methods that rely upon E911 data, cell tower pings, and Internet Protocol ("IP") data. As a result, law enforcement is often only able to incept traditional (and often antiquated) de-encrypted methods of communications, such as telephone calls and text messages, application messages, and emails. Currently, federal law enforcement does not have technology capable of intercepting E2E communications.

58.    Individuals engaging in organized crime, child exploitation, terrorism, and human trafficking continue to develop technologies to avoid detection by law enforcement, including detection of their illegal activities by lawful electronic surveillance. In my experience, using E2E encryption is one of the most common technologies utilized to defeat lawful electronic surveillance.

59.    In my opinion, the lack of the ability to intercept E2E communications prevents or hampers considerably the investigation, prevention, and prosecution of organized crime organizations, child exploitation, terrorism, and human trafficking.

60.    I have reviewed materials summarizing the capabilities of NSO's Pegasus technology, and it appears designed to capture more traditional forms of communications or information (e.g., written communications, the content of audio calls, the content of conversations within range of an activated microphone, call logs, location data, etc.), while also providing law enforcement access to new data streams (e.g., text and social media messages, browsing history, installed applications, Wi-Fi networks, etc.). Most importantly, NSO's Pegasus technology, or similar technologies, would allow law enforcement legal access to E2E communications used in furtherance of criminal activity.

61.    Pegasus technology, or similar technologies, could provide law enforcement agencies with real-time intelligence of crimes as they are planned. This technology is the natural evolution of current lawful intercept tools and has the potential to provide law enforcement with meaningful data to stop bad actors before they cause greater harm to the public. Additionally, it would allow law enforcement to successfully investigate and prosecute individuals involved in organized drug trafficking organizations, child exploitation, terrorism, and human trafficking. Put simply, it would be an affront to national security and the public for law enforcement and the intelligence community to be unable to counter the technologies deployed by criminals and terrorists.

62.    Based on public reporting, Pegasus itself has been beneficially deployed in several high-profile investigations. Among other examples, this includes the capture of an infamous Mexican cartel leader and the thwarting of terrorist plots, organized crime, and a global child-abuse ring; as well as tracking hostages held in Gaza.  Ronan Bergman & Mark Mazzetti, *The Battle for the World's Most Powerful Cyberweapon*, The New York Times (last updated June 15, 2023), https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html; Gwen Ackerman & Marissa Newman, *Israel Is Using Pegasus Spyware Maker to Track Hostages in Gaza*, Bloomberg (Oct. 26, 2023), https://www.bloomberg.com/news/articles/2023-10-26/israel-taps-blacklisted-pegasus-maker-nso-to-track-gaza-hostages-and-hamas.

Executed December 18, 2024.

_____

Joshua J. Minkler

Joshua James Minkler
Parter, Barnes & Thornburg LLP
11 South Meridian
Indianapolis, Indiana 46204

**Education**:

Indiana University School of Law
Bloomington, Indiana 47405
08/1985 - 05/1988
Juris Doctorate 05/1988

Wabash College
Crawfordsville, Indiana 47953
08/1981 - 05/1985
Bachelor of Arts 05/1985

**Legal Employment**

| | |
|---|---|
| Employer's Name: | Barnes & Thornburg LLP<br>11 S. Meridian<br>Indianapolis, Indiana 46204 |
| Dates Employed: | 11/2020 – Present |
| Job Title: | Partner |
| Employer's Name: | Office of the United States Attorney for the<br>Southern District of Indiana<br>10 West Market, Suite 2100<br>Indianapolis, Indiana 46204 |
| Dates Employed: | 11/1994 – 11/2020 |
| Job Title: | 08/2014 – 11/2020<br>United States Attorney |
| Job Title | 04/2011 – 07/2014<br>First Assistant United States Attorney |
| Job Title: | 05/2010 - 03/2011<br>Chief, Drug and Violent Crimes Unit/Lead |

|  | OCDETF Assistant United States Attorney |
|---|---|
| Job Title: | 11/1994 - 05/2010<br>Assistant United States Attorney |
| Employer's Name: | Office of the Kent County Prosecuting Attorney<br>416 Hall of Justice<br>333 Monroe Avenue, N.W.<br>Grand Rapids, Michigan 49503 |
| Dates Employed: | 12/1989 - 11/01/1994 |
| Job Title: | Assistant Prosecuting Attorney |
| Employer's Name: | Legal Services of Eastern Michigan<br>(Legal Services Corporation)<br>140 East Main Street<br>Midland, Michigan 48640 |
| Dates Employed: | 07/1988 - 12/1989 |
| Job Title: | Staff Attorney |
| Employer's Name: | Cotner, Andrews, Mann & Chapman<br>(No longer in business)<br>528 North Walnut Street<br>Bloomington, Indiana 47402 |
| Dates Employed: | 09/01/1986 - 04/30/1988 |
| Job Title: | Law Clerk |

**Honors and Awards**:

December 2015:  Indianapolis Metropolitan Police Department:  Honorary Chief of Police Award for distinguished service and exceptional performance on behalf of the community of Indianapolis and the Indianapolis Metropolitan Police Department. Presented by the Chief of Police, Indianapolis Metropolitan Police Department.

July 2012:  Office of the Secretary of the Department of Defense:  Patriotic Employer Award for contributing to national security and protecting liberty and freedom by supporting employee participation in America's National Guard and Reserve Force. Presented by the National Chair, Employees Support of Guard and Reserve, Executive Director, Employer Support of Guard and Reserve.

2

<u>January 2012</u>:  Drug Enforcement Administration: Certificate of Appreciation and Recognition for outstanding contribution in the field of drug law enforcement.  Presented by the Special Agent in Charge, Drug Enforcement Administration, Chicago Field Division.

<u>December 2009</u>:  Federal Bureau of Investigation: Commendation for outstanding work on behalf of the people of the United States.  Presented by the Special Agent in Charge, Federal Bureau of Investigation, Indianapolis Division.

<u>November 2008</u>:  Federal Bureau of Investigation: Commendation for outstanding work on behalf of the people of the United States.  Presented by the Special Agent in Charge, Federal Bureau of Investigation, Indianapolis Division.

<u>August 2007</u>:  Investigation: Award for outstanding prosecution skills and assistance provided to the Federal Bureau of Investigation.  Presented by the Director of the Federal Bureau of Investigation.

<u>July 2007</u>:  Department of Justice: Outstanding OCDETF Case, Great Lakes Region and recognition for outstanding contribution to cooperative law enforcement and the OCDETF program.  Presented by the Assistant Attorney General, Criminal Division, United States Department of Justice.

<u>February 2006</u>:  United States Drug Enforcement Administration: Certificate of Appreciation and Recognition for outstanding contributions in the field of drug law enforcement.  Presented by the Special Agent in Charge, Drug Enforcement Administration, Chicago Field Division.

<u>May 2004</u>:  United States Postal Inspection Service: Certificate of Appreciation in recognition of outstanding service and assistance to the United States Postal Inspection Service.  Presented by the United States Postal Inspector in Charge, Detroit Division

<u>July 2003</u>:  Department of Health and Human Services, Office of Inspector General: Integrity Award in recognition of the investigation and conviction of multiple subjects involved in the fraudulent prescribing, billing, and distribution of OxyContin.  Presented by the Inspector General, Department of Health and Human Services.

<u>August 2000</u>:  Federal Bureau of Investigation: Commendation and Recognition of contributions as lead prosecutor of the Brightwood investigation and prosecution. Presented by Special Agent Franklin S. Fabian, Federal Bureau of Investigation, Indianapolis Division.

<u>August 1999</u>:  United States Department of Justice:  Special Achievement Award in recognition of meritorious acts performed in behalf of the Department.  Presented by the Attorney General of the United States of America.

<u>July 1999</u>:  United States Customs Service, Office of Investigations: Commendation and Recognition in appreciation of vigorous and successful prosecution of a major international narcotics smuggling organization.  Presented by the Regional Agent in Charge, United States Customs Service.

<u>October 1998</u>:  City of Indianapolis, Indiana: Indianapolis Police Department Certificate of Commendation in recognition of distinguished service to the City of Indianapolis and to the Indianapolis Police Department.  Presented by the Mayor, City of Indianapolis, the Director of Public Safety, and the Chief of Police.

<u>July 10, 1998</u>:  Department of Treasury, Bureau of Alcohol, Tobacco and Firearms: Certificate of Appreciation and Recognition for investigation and prosecution. Presented by the Special Agent in Charge, Bureau of Alcohol, Tobacco and Firearms.

**Department of Justice Assignments and Committees**

Domestic Terrorism Executive Committee
Co-Chair:  11/2017 – 11/2020

Domestic Terrorism Working Group
Chair:  11/2017 – 11/2020

Attorney General Advisory Committee
Member:  11/2017 – 10/2019

Child Exploitation and Obscenity Working Group
Member:  08/2014 – 01/2017
Co-Chair:  04/2016 – 01/2017

Terrorism and National Security Sub Committee
Member:  05/2015 – 01/2017

Violent and Organized Crime Sub Committee
Member:  08/2014 – 01/2017

**Public Offices**

**United States Attorney; Southern District of Indiana**
Appointed by President Donald J. Trump and Unanimously Confirmed by the United States Senate
10/02/2017 – 11/20/2020

4

**United States Attorney (Interim) Southern District of Indiana**
Appointed by the District Judges of the United States District Court for the Southern
District of Indiana by Hon. Richard L. Young, Chief Judge, United States District Court,
Southern District of Indiana
06/25/2015 – 10/02/2017

**United States Attorney (Interim); Southern District of Indiana**
Appointed by Attorney General Eric H. Holder, Jr.
02/26/2015 – 06/25/2015

**Hussey-Mayfield Public Library (Zionsville, Indiana, Public Library)**
**Board of Trustees**
Appointed by Zionsville, Indiana, Community School Board March 2009
Reappointed January 2013
Offices Held: Vice President 01/2013 – 07/2014; Secretary 03/2009 – 12/2012
03/2009 – 08/01/2014

## Description of Legal Career:

11/1994 – 11/2020
Office of the United States Attorney for the
Southern District of Indiana
10 West Market, Suite 2100
Indianapolis, Indiana 46204

08/2014 – 11/2020
**United States Attorney**
From August 2014 to November 2020 as the United States Attorney, I served as
the Chief Federal Law Enforcement Officer for the Southern District of Indiana and
undertook the following responsibilities:    Setting, communicating and
implementing federal law enforcement priorities within the district to reflect
Department of Justice policy and priorities including the prosecution of federal
crimes; maintaining the national security of the district; protecting federal funds
and defending the interests of the United States; developing and maintaining a
budget that maximizes the use of all available resources; managing the personnel
who compose the Office of the United States Attorney; promoting effective external
communications by disseminating information to the media and the public; and,
supervising the First Assistant United States Attorney.   I was not assigned any
active criminal or civil cases, but I appeared in federal district and magistrate courts
in the Southern District of Indiana on an occasional basis.   I also appeared before
the Seventh Circuit Court of Appeals

04/2011 – 07/2014

**First Assistant United States Attorney**

> From April 2011 to July 2014 as the First Assistant United States Attorney, I was responsible for day-to-day operations of the Office of the United States Attorney including supervising the Criminal Chief, Civil Chief, Drug and Violent Crimes Unit Chief, National Security Unit Chief, two Senior Litigation Counsel, the Administrative Officer, the Public Information/Law Enforcement Coordinator, serving as Acting United States Attorney when the United States Attorney was recused, and all other duties as assigned by the United States Attorney. I was the only direct report to the United States Attorney. I continued to investigate and prosecute OCDETF cases. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

05/2010 - 03/2011

**Chief, Drug and Violent Crimes Unit/Lead**
**OCDETF Assistant United States Attorney**

> From May 2010 to April 2011 as the Chief, Drug and Violent Crimes Unit/Lead OCDETF Assistant United States Attorney, I was Responsible for supervising the attorneys and a paralegal assigned to the Drug and Violent Crimes Unit of the Criminal Division and the oversight of all OCDETF investigations and prosecutions in the Southern District of Indiana on behalf of the United States of America. I continued to investigate and prosecute OCDETF cases. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

11/1994 - 05/2010

**Assistant United States Attorney, Criminal Division**

> From November 1994 to May 2010 as Assistant United States Attorney in the Criminal Division, I was responsible for conducting OCDETF investigations and prosecutions (including motion and appellate practice) of organizations engaged in violations of federal law including drug trafficking, money laundering, public corruption, commercial armed robberies, and firearms offenses on behalf of the United States of America. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

12/1989 - 11/01/1994

Office of the Kent County Prosecuting Attorney

82 Ionia, NW #450

Grand Rapids, Michigan 49503

**Assistant Prosecuting Attorney**

> From December 1989 to November 1994 as an Assistant Prosecuting Attorney, I was responsible for the filing, preparation, motion practice, and trial of assigned

criminal cases including murder, attempted murder, rape, armed robbery, and felony assaults on behalf of the People of the State of Michigan. I appeared in the state courts in Kent County, Michigan on a daily basis.

07/1988 - 12/1989
Legal Services of Eastern Michigan
(Legal Services Corporation)
140 East Main Street
Midland, Michigan 48640

**Staff Attorney**
From July 1988 to December 1989 with Legal Services, I was responsible for the legal representation of legally indigent civil clients in assigned housing and public benefits matters. Practiced with three other lawyers including a lead staff attorney who was responsible for the assignment of cases. The litigation was in state and federal courts in Michigan in the areas of tenant defense, land contract forfeiture, foreclosure defense, consumer protection, and constitutional challenges to federal regulations and policy. Managed 30 – 50 housing related cases in Midland, Isabella, Clare, Gratiot and Bay Counties in Michigan. I appeared in the state courts in those counties in Michigan on a weekly basis.

**Trial and Appeals Experience:**

I have tried over 30 felony cases to verdict in the state courts of Kent County, Michigan. I was sole counsel on all of those cases. I have tried 21 cases to verdict in federal district court. I was sole counsel on 8 of those cases, lead counsel on 11 of those cases, and co-counsel on 2 of those cases. I have prepared and filed over 25 appellate briefs in the United States Court of Appeals for the Seventh Circuit. On over 25 occasions I have presented oral argument before a three judge panel in the United States Court of Appeals for the Seventh Circuit. Many of those cases resulted in published opinions.

**Ten Significant Litigated Matters**

1. ***United States v. Alberto Santana-Cabrera, et al.***
   1:09-cr-00136-WTL-MJD
   United States District Court, Southern District of Indiana
   Honorable William T. Lawrence, Judge
   Date of Representation: 2009 to 2012

From the beginning of the investigation in 2009 through conclusion of the final appeal in 2012, I represented the United States of America. I was sole counsel on the investigation, lead counsel on all motion practice, the jury trial, and the sentencing hearings. I was sole counsel on the appeal.

During 2009, I led agents of the DEA and officers of the IMPD in an investigation into the illegal distribution of stolen firearms and methamphetamine in the Indianapolis area. The investigation revealed that Alberto Santana-Cabrera, an undocumented citizen of Mexico with a prior felony drug conviction, was selling guns and methamphetamine on the west side of Indianapolis. His supplier for the methamphetamine was Abel Flores-Lopez. After an intensive investigation involving electronic surveillance, a confidential informant, an undercover agent, and the execution of numerous search warrants, both defendants were indicted in December of 2009. The matter was tried in May 2010. A majority of the civilian witnesses and both defendants were fluent in Spanish, but spoke little English. After a one-week jury trial involving Spanish interpreters, a jury convicted both defendants of all charges. Santana-Cabrera was sentenced to 75 years in prison and Flores-Lopez was sentenced to 10 years in prison. The judgments were affirmed on appeal. *United States v. Abel Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012).

   **2.** ***United States v. Robert Long, et. al.***
   1:08-cr-00088-LJM-KPF
   United States District Court for the Southern District of Indiana
   Hon. Larry J. McKinney, Judge
   Date of Representation: 03/2008 - 2015
   Co-Counsel: AUSA Joe H. Vaughn

From the beginning of the investigation in March 2008 through post-conviction litigation including direct appeals and collateral attacks that were concluded in 2015, I have represented the United States of America. From March 2008 until June 16, 2008, I led a joint FBI, Indiana State Police, and Indianapolis Metropolitan Police Department (IMPD) investigation into public corruption and drug trafficking activities occurring within the Narcotics and Dangerous Drugs Section of the IMPD. The investigation consisted of court-authorized wiretaps, high-risk undercover operations, sophisticated audio and video surveillance and novel witness interview techniques. The investigation revealed that IMPD Narcotics and Dangerous Drugs Detectives Robert Long and James Edwards and IMPD Patrolman James Davis corruptly abused their positions as IMPD police officers to divert drugs and drug proceeds to their own use, at times using fictitious search warrants to gain access to private property and at other times breaking into residences and stealing the drugs and money therein. This case was tried in the summer of 2009. After a two-week trial, the jury returned convictions. Davis was sentenced to 10 years, Edwards to 17 years, and Long to 25 years in prison. The trial received a 2010 United States Attorney Award. I was recognized by the Special Agent in Charge of the FBI with an award for this case.

The judgments were affirmed on appeal. *United States v. Robert Long*, 639 F.3d 293 (7th Cir. 2011). Edwards' motion for collateral relief pursuant to 28 U.S.C. § 2255 was

denied and that judgment was affirmed on appeal. *Jason P. Edwards v. United States,* 612 Fed.Appx. 390 (7th Cir. 2015).

3. ***United States v. Roy Lampkin et al.,* and *United States v. Earl Allen, et al.***
   1:07-cr-00105-SEB-KPF and 1:07-cr-00106-WTL-DKL
   United States District Court for the Southern District of Indiana
   Hon. Sarah Evans Barker, Judge
   Hon. John D. Tinder, Judge
   Hon. David F. Hamilton, Judge
   Hon. William T. Lawrence, Judge
   Date of Representation:  2006 to 12/2009

From the beginning of the investigation in 2006 until the last defendant was sentenced on December 18, 2009, I represented the United States of America.  I was sole counsel on both cases for all charging decisions, motion practice, and sentencings.  All defendants pled guilty and were sentenced to prison.  There was no appeal of the final judgements.

In January 2006, United States Attorney Brooks assigned me to the Indianapolis Police Department (IPD) West District with instructions to work with the Deputy Chief and develop a high impact OCDETF case that would reduce violent crime in one of the most challenged neighborhoods of that district.  I led a team composed of FBI Safe Streets agents, ATF Project Achillies agents, and IPD officers in conducting a total of 11 court authorized wiretaps over a period of eight months under OCDETF "Operation Westside Story."  This investigation focused on the Haughville Syndicate, a violent cocaine trafficking organization led by Earl Allen and Roy Lampkin operating exclusively in the Haughville neighborhood of Indianapolis. As a result of this investigation a total of 21 defendants were indicted, convicted, and sentenced to federal prison.

Most significantly, on August 14, 2007, more than 300 law enforcement officers executed 36 federal search warrants and two state search warrants at 38 different locations in Indianapolis.  Approximately $67,000 in cash was seized along with 70 illegally possessed firearms, including a machine gun, an Uzi, assault rifles, a 9-millimeter rifle, and several thousand rounds of ammunition.  Within the first year of the takedown, violent crime in the IPD West District dropped 67%.

About this case, Indianapolis Police Department Chief Spears said, "Last year we had a very difficult year with violence.  This year, our murders are down almost 31 percent and those kinds of decreases don't just happen.  I believe they happen because of investigations like this."  The investigative team received a 2009 United States Attorney Award.  I was recognized by the Special Agent in Charge of the FBI with an award for this case.

4. ***United States v. John Scruggs, et.al.***
   IP 06-cr-0008-LJM-DKL
   United States District Court for the Southern District of Indiana
   Hon. Larry J. McKinney, Judge

9

Date of Representation: 11/2005 – 10/2007

From the beginning of the investigation in November 2005 until the final disposition in district court during October 2007, I was the sole counsel representing the United States of America. I was responsible for the investigation, charging, motion practice, and final disposition of the case. All defendants pled guilty and were sentenced. There was no appeal.

From November 2005 until January 2006, I led DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with two extensions under OCDETF "Operation Motley Crew" focusing on RPOT target John Scruggs who was the Akingpin@ of a cocaine trafficking organization operating in Madison, Indiana. As a result of this investigation, a total of 17 defendants were indicted. Sixteen were arrested and convicted. During the investigation, kilograms of cocaine, pounds of marijuana, guns and United States currency were seized. More importantly, the elimination of a large drug trafficking organization in a relatively small Indiana tourist town (population 13,000) had a tremendous impact on reducing the availability of illegal drugs, reducing the crime rate and improving the quality of life for all of the law-abiding residents of that town. My team received a United States Attorney Award in 2008. I was recognized with an award from the Special Agent in Charge of the DEA for my work on this case.

5. *United States v. Juan Carlos Bermudez, et. al.*
   IP 05-cr-00043-SEB-DML
   United States District Court for the Southern District of Indiana
   Hon. Sarah Evans Barker, Judge
   Co-Counsel: Nathan Judish, Department of Justice, Computer Crimes and Intellectual Property Section,
   Date of Representation: 2004 – 12/2007

From the beginning of the investigation during 2004 until the conclusion of the appeal on December 5, 2007, I represented the United States of America. I was sole counsel on the investigation, motion practice, and all sentencing hearings at the district court. I was co-counsel with Mr. Judish on the appeal.

From December 2004 until March 2005, I led a team of DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with three extensions under the Department of Justice's Special Operations Division's ("SOD") "Operation Money Clip." Operation Money Clip was a SOD supported, multi-jurisdictional, multi-agency OCDETF investigation targeting the Henry and Tony Franco-Arrellano poly-drug trafficking organization. Operation Money Clip was initiated by SOD after intelligence identified a defined Mexican criminal organization being supplied by RPOT[1] Ignacio Coronel-Villareal. As a result of this investigation, a total of 16 defendants were indicted, arrested, convicted and sentenced in the Southern District of

---

[1] RPOT – Regional Priority Target is an OCDETF term to identify high-level targets as determined by the Department of Justice.

Indiana. In addition, 48 kilograms of cocaine, 875 pounds of marijuana, seven guns, and assets valued at $1,450,000.00 were seized and forfeited. More importantly, three Mexican based sources of supply were indicted and convicted in this investigation to include OCDETF/ Priority Target Juan Carlos Bermudez. On June 14, 2005, Bermudez was arrested on the outstanding arrest warrant issued in the Southern District of Indiana during a trip he made from the Republic of Mexico to Chicago, Illinois. Bermudez was the first multi-jurisdictional OCDETF RPOT target to be indicted and convicted in the Southern District of Indiana.

My team received a 2006 United States Attorney Award. Additionally, the case was recognized as the Great Lakes OCDETF case of the year at a Department of Justice Ceremony in Washington, D.C. on July 31, 2007. I received an award from the Assistant Attorney General for the Criminal Division. All defendants arrested pled guilty and were sentenced to prison. The denials of motions to suppress were appealed. The judgments were affirmed on appeal. *United States v. Evarardo Lira-Esquivel*, 509 F.3d 820 (7th Cir. 2007).

6. ***United States v. Larry Williams, et al.***
   IP03-CR-0191-M/B
   United States District Court for the Southern District of Indiana
   Hon. Sarah Evans Barker, Judge
   Hon. Larry J. McKinney, Judge
   Date of Representation: 2003 to 2007
   Co-Counsel: John E. Dowd

From the start of the investigation in 2003 through the appeal, remand, and final disposition of the matter in 2007, I represented the United States of America. My co-counsel at trial was AUSA John Dowd.

During the summer of 2003, reacting to heroin overdoses in Bloomington, Indiana, I led an aggressive DEA and Bloomington Police Department investigation that revealed an Indiana University graduate student, Tom Verhovshek, as the source of supply for 1-2 gram quantities of high purity heroin in the Bloomington area. Using Verhovshek's cooperation, the investigation moved up the chain to the sources of supply for the heroin involved in the Bloomington overdoses. Using court authorized wire surveillance, it was determined that Larry D. Williams, Sr., was the leader of a heroin organization in Indianapolis, the members of which distributed in excess of three kilograms of heroin that was approximately 80% pure (heroin is typically diluted and ingested at 2-3% purity) over a period of six months. The investigation continued and Chicago residents Wendell Denson and Herman Cunningham were identified as the sources of supply for the heroin that was shipped to Indianapolis and redistributed in Bloomington.

The seven-month investigation culminated on December 16, 2003, when 150 state, local and federal law enforcement officers executed 17 federal arrest warrants and 15 federal search warrants in the Southern District of Indiana, the Northern District of Illinois, and the Southern District of Ohio. Large quantities of heroin, currency and firearms were seized.

All 17 defendants were indicted, convicted, and sentenced to prison.  The three lead defendants were convicted after a three-week jury trial.  The trial team was recognized with a United States Attorney Award in 2005.  On appeal, the judgments against three of the defendants were reversed and the cases were remanded for a new trial.  *United States v. Herman Cunningham, et al.*, 462 F.3d 708 (7th Cir. 2006).  After the remand, all three defendants pled guilty before the Honorable Larry J. McKinney and were sentenced to prison.  There was no appeal from those judgments.

7. ***United States v. Dr. Randolph Lievertz, et.al.***
   IP02-CR-0005-B/F
   United States District Court for the Southern District of Indiana
   Hon. Sarah Evans Barker, Judge
   Date of Representation: 2001 – 2/2003
   Co-Counsel: Winfield Ong

   From the start of the investigation in 2001 through the final disposition of the matter at sentencing on February 28, 2003, I represented the United States of America.

   During 2001, I led a joint FBI, DEA, United States Department of Health and Human Services (HHS), Indiana Attorney General, and Jennings County, Indiana, Sheriff's Department investigation into the fraudulent prescribing, distribution, and billing of OxyContin by an Indianapolis physician, Dr. Randolph Lievertz, and a Jennings County, Indiana, drug dealer, Melinda Hawkins.  Lievertz prescribed more OxyContin to Medicaid recipients in the State of Indiana than any other physician, and Hawkins was the Indiana Medicaid recipient who received the largest amounts of OxyContin.  From January 1, 2001 through September 26, 2001, Lievertz caused over $500,000 to be paid by Medicaid for OxyContin.  From January 1, 2001 through December 17, 2001, Hawkins caused $130,204.91 to be paid by Medicaid for OxyContin prescriptions written by Lievertz to Hawkins outside the scope of professional practice and not for a legitimate medical purpose.  After filling the prescriptions, Hawkins illegally distributed the OxyContin to several individuals including high school students in Jennings County, Indiana.  This illegal scheme not only bilked taxpayers, it also caused an epidemic of OxyContin abuse in rural Jennings County.

   The five-month investigation employed a variety of law enforcement techniques, including physical surveillance, controlled purchases of OxyContin, a complete financial investigation, court authorized interception of oral communications occurring in Lievertz's examination room (first time this technique had been utilized in the district), and search warrants.  United States Attorney Susan Brooks said, "this joint effort by federal and local law enforcement agencies to identify and address the problem of OxyContin trafficking in a particular area demonstrates the best of proactive law enforcement.".

   In early 2002, both Lievertz and Hawkins were indicted, convicted and sentenced to prison.  This case won a 2003 United States Attorney Award.  Janet Rehnquist, Inspector

General, HHS, recognized me with the HHS Public Integrity Award. After the case was resolved, United States Attorney Brooks and I did significant outreach on the dangers of prescription pill abuse, including a town hall style meeting at Jennings County High School. I was the lead counsel on the investigation and co-counsel on the indictment, motion practice, and sentencing hearing. There was no trial and no appeal.

8. *United States v. Lee Williams, et. al.*
IP99-CR-0059-M/L
United States District Court for the Southern District of Indiana
Hon. Larry J. McKinney, Judge
Date of Representation: 1998 – 11/2002
Co-Counsel: John Dowd and Brian Jennings

From the start of the investigation in 1998 through the conclusion of the appeal on November 15, 2002, I represented the United States of America. During the trial, I had two co-counsel, AUSA John Dowd and cross-designated Marion County Deputy Prosecutor and Special AUSA Brian Jennings.

Beginning in the Fall of 1998, I led a joint FBI and Indianapolis Police Department investigation into a violent organized group of drug distributors operating in the Brightwood neighborhood on the northeast side of Indianapolis. Using court authorized interception of phone calls and pager messages, law enforcement seized 78 weapons, 12 kilograms of cocaine, and $200,000 in cash during the course of the investigation. Twenty-one defendants were charged. During the spring and summer of 2000, 10 of the defendants were tried in a seven-week trial. Over 100 witnesses and 1,200 exhibits were presented to the jury. One defendant pled guilty mid-trial, and the jury returned guilty verdicts against eight of the remaining nine defendants. All of the defendants charged were convicted by jury or by plea (the defendant who was acquitted at trial subsequently pleaded guilty to a firearm charge) with an average sentence of 170 months' incarceration. Eight defendants received sentences longer than 20 years in prison. Murders that were at a record high in the Brightwood neighborhood in 1998, declined in 1999, 2000, and 2001. I received an award from the Special Agent in Charge of the FBI for the investigation and prosecution of this matter. I was sole counsel on the investigation, lead counsel at trial and at all sentencing hearings, and the sole counsel on appeal. While the appeal involved two separate appellate briefs, the cases were combined for the oral argument and opinion. The judgments of all 13 defendants who appealed were affirmed. *United States v. Marvin Dumes, et al.*, 313 F.3d 372 (7th Cir. 2002).

9. *United States v. Morris Carr, et. al.*
IP97-CR-0063-M/F
United States District Court for the Southern District of Indiana
Hon. Larry J. McKinney, Judge
Date of Representation: 1997 to November 1999

Co-Counsel: Melanie C. Conour

From the commencement of the investigation in 1997 through the final appellate judgment rendered on November 18, 1999, I represented the United States of America assisting lead counsel AUSA Melanie C. Conour.

During 1997 and 1998, I co-led a joint DEA, ATF and Indianapolis Police Department investigation with lead counsel AUSA Melanie Conour into members of the Four Corner Vice Lords Gang from Chicago that had infested the City of Indianapolis with drugs and guns.  Twenty-four defendants were charged as a result of the investigation (14 defendants were charged in federal court and 10 defendants were charged in state court in Marion County, Indiana).  After a majority of the defendants entered pleas of guilty, three of the leaders of the organization were tried in a five-week jury trial.  The jury returned verdicts of guilty after hearing evidence that as much as 400 kilograms of cocaine were distributed by the organization that enforced its drug trafficking with violence.  The leaders of the organization were sentenced to life in prison. AUSA Conour and I received awards from the Attorney General, the Mayor of Indianapolis, and the Special Agent in Charge of the ATF for the investigation and prosecution of this matter.  Along with AUSA Conour, I was responsible for the motion practice, trial, sentencing hearings, and defending the judgment on appeal.  I was the sole AUSA responsible for the oral argument before the Seventh Circuit Court of Appeals.  All judgments were affirmed on appeal.  *United States of America v. Thornton, et al.*, 197 F.3d 241 (7th Cir. 1999).

*10.* **People of the State of Michigan v. Tuan Truong and Tai Van Nguyen**
92-59379-FC
17th Circuit Court for the State of Michigan
Hon. Donald Johnston, Judge
Date of Representation: 08/1992 – 1993

As Assistant Prosecuting Attorney, I was sole counsel for the People of the State of Michigan in all preliminary hearings, motion practice, jury trial and disposition hearings in the above case.  Two Vietnamese defendants shot and killed a member of a rival Vietnamese gang member in a Vietnamese restaurant in August 1992.  A majority of the civilian witnesses and both defendants were fluent in Vietnamese, but spoke little English.  There was extensive motion practice to determine the age of the defendants and the admissibility of statements made by one of the defendants.  After a 12-day trial involving Vietnamese interpreters, a jury convicted both defendants of first-degree murder.  Both defendants were sentenced to life without parole and the judgments were affirmed on appeal.  I did not represent the People of the State of Michigan on the appeal.

## APPENDIX B
## LIST OF INFORMATION CONSIDERED

**LAWS**
- 18 U.S.C. 2510, *et seq.*
- 50 U.S.C. §1801, *et seq.*

**POLICIES AND GUIDANCE**
- Justice Manual, Title 9-7.000, U.S. Department of Justice, https://www.justice.gov/jm/justice-manual
- Lawful Access, US Department of Justice Office of Legal Policy (last updated November 18, 2022), https://www.justice.gov/olp/lawful-access
- Executive Order, President Joe Biden, March 27, 2023. https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet- president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial- spyware-that-poses-risks-to-national-security/

**SCHOLARLY PUBLICATIONS AND TREATISES**
- Comparative Study on Wiretapping and Electronic Surveillance Laws in Major Foreign Countries, Members of Staff, Law Library, Library of Congress (1975)
- 1 World Online Business Law, Chapter 7: Technology Surveillance
- Country Legal Framework Resources, Provision of Real-time Lawful Interception Assistance, https://clfr.globalnetworkinitiative.org

**DOCUMENTS PRODUCED IN THIS LITIGATION**
- Complaint and Exhibits
- FPM-00021846
- NSO_WHATSAPP_00000078
- NSO_WHATSAPP_00000262
- NSO_WHATSAPP_00045591
- Exhibit 2005
- Exhibit 2028
- Exhibit 2088

**OTHER MATERIALS**
- https://faq.whatsapp.com/808280033839222
- https://faq.whatsapp.com/820124435853543
- https://judiciary.house.gov/committee-activity/hearings/oversight-federal-bureau-investigation-7
- https://obamawhitehouse.archives.gov/the-press-office/2016/03/14/remarks-president-south-southwest-interactive
- https://support.signal.org/hc/en-us/articles/360007320391-Is-it-private-Can-I-trust-it#:~:text=Signal%20conversations%20are%20always%20end,%2C%20every%20call%2C%20every%20time
- https://therecord.media/encrypted-apps-a-challenge-trump-assassination-

attempt-wray- fbin
- https://tsf.telegram.org/manuals/e2ee-simple
- https://www.barrons.com/news/washington-financed-colombia-s-purchase-of-pegasus-spy-software-76d6550f
- https://www.bloomberg.com/news/articles/2023-10-26/israel-taps-blacklisted-pegasus- maker-nso-to-track-gaza-hostages-and-hamas
- https://www.cnn.com/2021/05/04/politics/merrick-garland-hearing/index.html
- https://www.justice.gov/nsd/media/1350236/dl?inline
- https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-introduction-lawful-access-bill-senate#:~:text=While%20strong%20encryption%20provides%20enormous,their%20crimes%20and%20avoid%20detection
- https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-keynote-address-international-conference-cyber
- https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens
- https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf
- https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html
- https://www.nytimes.com/2022/01/28/world/middleeast/israel-pegasus-spyware.html
- https://www.nytimes.com/2022/11/12/us/politics/fbi-pegasus-spyware-phones-nso.html
- https://www.vodafone.com/content/dam/vodcom/sustainability/pdfs/vodafone_law_enforcement_disclosure_report.pdf
- Indictment, *United States v. Rhodes et al.* (D.D.C. January 8, 2021)

EXHIBIT 6

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                         OAKLAND DIVISION

4        _____

5                                        )
         WHATSAPP LLC, a Delaware         )
6        corporation, and META PLATFORMS, )
         INC., a Delaware corporation,    ) CASE NO.:
7                                         ) 4:19-CV-07123-
                            Plaintiffs,   ) PJH
8                                         )
                    v.                    )
9                                         )
         NSO GROUP TECHNOLOGIES LIMITED   )
10       and Q CYBER TECHNOLOGIES         )
         LIMITED,                         )
11                                        )
                            Defendants.   )
12       _____ )

13

14          ** THIS TRANSCRIPT IS MARKED CONFIDENTIAL

15              PURSUANT TO PROTECTIVE ORDER **

16

17                 DEPOSITION OF JOSHUA MINKLER

18                         VOLUME I

19                  LOS ANGELES, CALIFORNIA

20               TUESDAY, FEBRUARY 11, 2025

21

22

23

24       REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                        CSR NO. 14125
25       JOB NO.:       571437

1      Q.   So as you sit here today, you don't have          10:27:09

2  any information or expertise about the legislative        10:27:09

3  purpose of Title 3?                                        10:27:09

4      A.   I do not.                                         10:27:09

5           (Reporter clarification.)                         10:27:11

6      Q.   So as you sit here today, you don't have          10:27:11

7  any information or expertise to talk about the            10:27:13

8  legislative purpose of Title 3; is that correct?          10:27:27

9      A.   That is correct.                                  10:27:31

10          MR. AKROTIRIANAKIS:  Counsel, whenever            10:27:35

11  you're at a stopping point, I'm having like a            10:27:37

12  computer fritz out here.  I'd like to fix it.            10:27:40

13          MR. ANDRES:  Sure.  I just have a couple          10:27:43

14  more questions, Joe, but no more than a couple           10:27:44

15  minutes and we can take a break.                          10:27:48

16          MR. AKROTIRIANAKIS:  Okay.                        10:27:50

17  BY MR. ANDRES:                                            10:27:50

18      Q.   Can you explain, Mr. Minkler, why NSO's          10:27:51

19  conduct in this case is not similar to those types       10:27:54

20  of conduct that led to the passage of Title 3 which      10:27:57

21  were unauthorized wiretaps and recordings?               10:28:00

22          MR. AKROTIRIANAKIS:  Object to the form of        10:28:08

23  the question.  It's overbroad and incomprehensible.      10:28:10

24      A.   Well, I'm somewhat -- I read the                 10:28:13

25  Complaint, and I'm somewhat familiar with the           10:28:20

| | |
|---|---|
| 1 | allegation in the Complaint, but I am not familiar | 10:28:22 |
| 2 | with the accuracy of the allegations, nor am I | 10:28:31 |
| 3 | familiar with whether or not the use of NSO's | 10:28:37 |
| 4 | Pegasus was authorized.  So I -- | 10:28:47 |
| 5 | Q.   So as you sit here -- | 10:28:52 |
| 6 | A.   Yeah.  I'm sorry.  I don't know if that's | 10:28:54 |
| 7 | helpful. | 10:28:56 |
| 8 | Q.   Go ahead.  I'm sorry. | 10:28:56 |
| 9 | A.   I understand your question.  I have no | 10:28:57 |
| 10 | problem understanding your question.  I just -- I | 10:29:00 |
| 11 | would say I don't know enough about the facts and | 10:29:05 |
| 12 | circumstances of NSO's conduct in this case to | 10:29:08 |
| 13 | determine whether or not it was consistent with the | 10:29:13 |
| 14 | abuses you described in the 60s. | 10:29:17 |
| 15 | Q.   In the -- in the course of your retention | 10:29:21 |
| 16 | in this case, have you seen any authorization, court | 10:29:24 |
| 17 | orders, or any documents that would authorize NSO to | 10:29:29 |
| 18 | engage the Pegasus tool on a phone, WhatsApp, any | 10:29:38 |
| 19 | device? | 10:29:41 |
| 20 | MR. AKROTIRIANAKIS:  We cutout part of | 10:29:41 |
| 21 | that question again, Greg. | 10:29:42 |
| 22 | BY MR. ANDRES: | 10:29:46 |
| 23 | Q.   In the course of your representation of | 10:29:47 |
| 24 | NSO in this case, have you seen any wiretaps or | 10:29:49 |
| 25 | authorizations which allowed for the use of the | 10:29:53 |

1    lawful use of Pegasus?                                    11:34:40

2          MR. AKROTIRIANAKIS:  Object to the form of          11:34:43

3    the question.                                             11:34:45

4       A.   If a federal judge authorized the end user        11:34:45

5    of Pegasus to install that through an intrusion, in       11:34:58

6    my opinion, that would be legal.                          11:35:09

7       Q.   That's not a hack -- what you described is        11:35:12

8    not what's commonly referred to as "hack" or what         11:35:17

9    you've referred to as a "hack;" correct?                  11:35:20

10         MR. AKROTIRIANAKIS:  Object to the form of           11:35:22

11   the question.                                             11:35:22

12      A.   Correct.  A hack, in my opinion, would be         11:35:22

13   something that was done without authority from a          11:35:28

14   federal judge.                                            11:35:37

15      Q.   And you're aware that in this case, since         11:35:37

16   the issuance of your report, Judge Hamilton has           11:35:42

17   found that NSO violated the CFAA.                         11:35:47

18         Are you aware of that?                              11:35:50

19      A.   I am aware of that, though I have not read        11:35:51

20   the order.                                                11:35:56

21      Q.   And you're aware that she also ruled that         11:35:57

22   NSO violated the Companion California Statute?            11:36:00

23      A.   I am aware of that.                               11:36:05

24      Q.   And why is it that you didn't read the           11:36:06

25   opinion?                                                  11:36:09

1    to a device that is encrypted.                       11:38:06

2        Q.   Does that refer to a particular program or   11:38:16

3    company or anyone that has similar software           11:38:18

4    capabilities?                                         11:38:24

5             MR. AKROTIRIANAKIS:  Object to the form of   11:38:26

6    the question.                                         11:38:27

7        A.   It does not.                                 11:38:27

8        Q.   Can I ask you to take a look at              11:38:33

9    paragraph 36 on page 16?                              11:38:38

10            It reads: "However, federal laws provide     11:38:39

11   avenues for law enforcement to lawfully intercept     11:38:44

12   communications using tools like Pegasus, including    11:38:47

13   Title 3 wiretaps and FISA warrants."                  11:38:52

14            Can you explain what that paragraph means?   11:38:55

15       A.   Yes.  If --                                  11:38:57

16       Q.   Please -- please explain.                    11:39:07

17       A.   If there's a valid Title 3 or FISA warrant   11:39:08

18   for communications that are encrypted, in my          11:39:15

19   opinion, Title 3 and FISA would be a proper avenue    11:39:25

20   authorizing law enforcement to use Pegasus.           11:39:37

21       Q.   Are you aware of any Title 3 wiretap order   11:39:41

22   ordering the use of Pegasus or any NSO product?       11:39:45

23       A.   I am not.                                    11:39:48

24       Q.   Are you aware of any FISA warrant            11:39:51

25   approving the use of Pegasus or any NSO product?      11:39:54

| | | |
|---|---|---|
| 1 | MR. AKROTIRIANAKIS: Object to the form of | 11:39:58 |
| 2 | the question. | 11:39:58 |
| 3 | A. I am not. | 11:39:58 |
| 4 | Q. In fact, do you understand that NSO did | 11:39:59 |
| 5 | not obtain a Title 3 wiretap or FISA warrant before | 11:40:07 |
| 6 | attacking WhatsApp servers; correct? | 11:40:10 |
| 7 | MR. AKROTIRIANAKIS: Object to the form of | 11:40:14 |
| 8 | the question. And I think that part of the front | 11:40:14 |
| 9 | end of it didn't come over. | 11:40:15 |
| 10 | Q. Did you hear the question, Mr. Minkler? | 11:40:20 |
| 11 | A. I did. | 11:40:22 |
| 12 | It is my understanding that -- and this | 11:40:24 |
| 13 | is limited to -- obviously to federal law | 11:40:30 |
| 14 | enforcement -- that there is no federal law | 11:40:33 |
| 15 | enforcement warrant FISA or Title 3 allowing for the | 11:40:36 |
| 16 | use and installation of Pegasus, including if it was | 11:40:48 |
| 17 | used and installed in this matter. | 11:40:54 |
| 18 | Q. So to your knowledge, no United States | 11:40:59 |
| 19 | federal judge approved NSO's use of Pegasus to | 11:41:01 |
| 20 | attack WhatsApp servers; correct? | 11:41:05 |
| 21 | MR. AKROTIRIANAKIS: Object to the form of | 11:41:10 |
| 22 | the question. No foundation. | 11:41:13 |
| 23 | A. Your words are "attack the servers." | 11:41:14 |
| 24 | There is no Title 3 or FISA warrant that I'm aware | 11:41:23 |
| 25 | of that has been authorized for anyone in this | 11:41:29 |

| | | |
|---|---|---|
| 1 | country, government agency, to use or install | 11:41:34 |
| 2 | Pegasus. | 11:41:43 |
| 3 | Q.   And to your knowledge, no United States | 11:41:45 |
| 4 | federal judge approved NSO's use of Pegasus to | 11:41:49 |
| 5 | obtain any information for WhatsApp users; correct? | 11:41:53 |
| 6 | A.   Correct. | 11:41:57 |
| 7 | Q.   And to your knowledge, NSO's exploits at | 11:41:57 |
| 8 | issue in this federal litigation violated the | 11:42:01 |
| 9 | federal and California state anti-hacking statutes? | 11:42:04 |
| 10 | MR. AKROTIRIANAKIS:  Object to the form of | 11:42:10 |
| 11 | the question.  No foundation.  Exceeds the scope of | 11:42:11 |
| 12 | the witness's opinion. | 11:42:14 |
| 13 | (Reporter clarification.) | 11:42:18 |
| 14 | A.   My understanding is a federal judge has | 11:42:18 |
| 15 | issued an opinion finding that the use of Pegasus in | 11:42:28 |
| 16 | this matter was not authorized. | 11:42:43 |
| 17 | Q.   Can I ask you to look at paragraph 39 of | 11:42:45 |
| 18 | your report? | 11:42:51 |
| 19 | A.   Yes. | 11:42:51 |
| 20 | Q.   I'm going to direct you to the second | 11:42:51 |
| 21 | sentence that says "For example, federal law | 11:42:59 |
| 22 | provides criminal and civil penalties for abuse -- | 11:43:03 |
| 23 | for abuse of these law enforcement mechanisms." | 11:43:07 |
| 24 | Do you see that? | 11:43:10 |
| 25 | A.   I do. | 11:43:11 |

1    in preparation for preparing my report.                13:39:41

2        Q.   Did you ever sign the stipulated             13:39:44

3    protective order governing the handling of            13:39:48

4    confidential proprietary and other private            13:39:52

5    information and documents in this case?               13:39:56

6        A.   I did not.                                    13:39:56

7        Q.   Can you explain to me what you know about     13:39:57

8    the facts of this case?                                13:40:05

9             MR. AKROTIRIANAKIS:  Objection to the form    13:40:10

10   of the question.                                       13:40:11

11       A.   I know, based on reviewing the Complaint,     13:40:11

12   that there is an allegation that NSO violated the      13:40:28

13   Computer Fraud and Abuse Act through one of NSO's      13:40:41

14   end user's installing Pegasus without the WhatsApp     13:40:55

15   user's permission.  I know there are allegations       13:41:10

16   based on that.  That's a broad, high-level view of     13:41:16

17   my understanding of the facts.                         13:41:31

18           I understand that those facts occurred in      13:41:35

19   2018 and up to including June of 2019.  I know the     13:41:44

20   allegation is that this was in breach as well as       13:41:57

21   the -- of the California equivalent of the Computer    13:42:03

22   Fraud and Abuse Act and also a breach of a             13:42:09

23   contractual agreement that the Complaint alleges       13:42:15

24   existed between NSO and WhatsApp.                       13:42:21

25           Very high-level view.  That's my               13:42:26

1  the question.  Misstates the witness's testimony.          13:59:48

2       A.   My understanding is from reading the             13:59:49

3  allegation in the Complaint is that end users of           13:59:54

4  Pegasus used the technology without a court order.         13:59:58

5       Q.   You've done no analysis of whether Pegasus       14:00:08

6  harmed WhatsApp's computers; correct?                      14:00:11

7       A.   I have not done that analysis.                   14:00:14

8       Q.   You have done no analysis on whether             14:00:17

9  plaintiff's suffered loss or incurred cost; correct?       14:00:20

10      A.   I have not done that analysis.                   14:00:23

11      Q.   You've done no analysis of NSO's profits         14:00:24

12  or the sources of those profits?                          14:00:28

13      A.   I have done no analysis in that area.            14:00:29

14      Q.   You've done no analysis whether the             14:00:32

15  activity generating those profits violated US law or      14:00:35

16  WhatsApp's terms of service?                              14:00:40

17      A.   I have not done that analysis.                   14:00:41

18           MR. AKROTIRIANAKIS:  Hey, Greg.  Can we --       14:00:44

19      Q.   You've done no analysis of NSO's                14:00:46

20  technologies; correct?                                    14:00:48

21           MR. AKROTIRIANAKIS:  Sorry, Greg.  I'm           14:00:49

22  trying to get a word in edgewise here.  Can we take       14:00:51

23  a bathroom break after he answers this question?          14:00:54

24           MR. ANDRES:  Sure.  Can I -- can I have          14:00:57

25  two more minutes?                                         14:00:59

1    communications and also access to stored information       15:25:04

2    in a mobile device that is encrypted.                      15:25:11

3        Q.   And when you say "the use of law                  15:25:14

4    enforcement agencies," what law enforcement agencies       15:25:17

5    are you aware that use this technology lawfully?           15:25:20

6        A.   I'm sorry.  It would allow the use of             15:25:24

7    that.  I understand how the technology works and           15:25:32

8    secondly, I understand how law enforcement would use       15:25:35

9    this technology.  Sorry if I misspoke.                     15:25:39

10       Q.   Sorry.  The next part of that paragraph,          15:25:40

11   it says, "And details my testimony concerning using       15:25:44

12   such lawful intercept capabilities."                       15:25:48

13            I think for the purposes of brevity, you          15:25:53

14   testified that you're not aware of any lawful use --       15:25:56

15   actual lawful use of the technology; is that               15:25:58

16   correct?                                                   15:26:02

17            MR. AKROTIRIANAKIS:  Object to the form of        15:26:02

18   the question.  Misstates the witness's testimony.          15:26:03

19   No foundation.                                             15:26:07

20       A.   I'm not aware of the lawful use of Pegasus        15:26:08

21   in the United States by federal law enforcement            15:26:15

22   agencies.  I -- I have reviewed -- go ahead.               15:26:23

23       Q.   No, go ahead.                                     15:26:30

24       A.   Yeah.  Okay.  I have reviewed materials,          15:26:31

25   again, about the use of Pegasus technology by law          15:26:39

| | | |
|---|---|---|
| 1 | Q. Turn to paragraph 45. | 18:05:02 |
| 2 | A. Yes. | 18:05:28 |
| 3 | Q. This is -- | 18:05:28 |
| 4 | A. The OJP -- | 18:05:37 |
| 5 | Q. Yeah. | 18:05:39 |
| 6 | A. -- document. | 18:05:41 |
| 7 | Q. This is the case that involves -- that you | 18:05:41 |
| 8 | weren't involved in? | 18:05:44 |
| 9 | A. Right. We discussed this earlier. | 18:05:45 |
| 10 | Q. And you didn't speak to the prosecutor? | 18:05:47 |
| 11 | A. I did not. | 18:05:50 |
| 12 | Q. You didn't talk to the undercover police | 18:05:50 |
| 13 | officer? | 18:05:54 |
| 14 | A. I did not. | 18:05:54 |
| 15 | Q. Your -- your interaction with the facts of | 18:05:54 |
| 16 | this case are based solely on the fact that you read | 18:05:58 |
| 17 | this document? | 18:06:01 |
| 18 | A. The OJP report, yes. | 18:06:05 |
| 19 | Q. Okay. Paragraph 46 deals with a speech by | 18:06:07 |
| 20 | Attorney General Barr. | 18:06:12 |
| 21 | A. Correct. | 18:06:14 |
| 22 | Q. Involves a terrorist attack in Garland, | 18:06:15 |
| 23 | Texas in 2015? | 18:06:21 |
| 24 | A. That is correct. | 18:06:22 |
| 25 | Q. Were you involved in that investigation? | 18:06:23 |

| | | |
|---|---|---|
| 1 | A.    I was not. | 18:06:24 |
| 2 | Q.    Have you ever had any disuses about that | 18:06:25 |
| 3 | case with the -- Attorney General Barr? | 18:06:30 |
| 4 | A.    I have not. | 18:06:32 |
| 5 | Q.    Did you talk to the agents involved? | 18:06:33 |
| 6 | A.    I did not. | 18:06:35 |
| 7 | Q.    Did you do any research other than read | 18:06:36 |
| 8 | this speech? | 18:06:40 |
| 9 | A.    I did read the speech and I was aware of | 18:06:41 |
| 10 | this matter when it occurred in 2015.  I didn't do | 18:06:56 |
| 11 | any research in preparing this report.  I'm trying | 18:07:06 |
| 12 | to recall it occurred whether I reviewed other | 18:07:17 |
| 13 | information that was shared with DOJ employees about | 18:07:24 |
| 14 | this matter or whether it was discussed in the ITDT | 18:07:28 |
| 15 | meetings that I attended. | 18:07:39 |
| 16 | My recollection is that it was discussed | 18:07:43 |
| 17 | and I was aware of it at the time it occurred. | 18:07:52 |
| 18 | However, the specificity in paragraph 46 comes from | 18:07:58 |
| 19 | the speech provided by Attorney General Barr. | 18:08:06 |
| 20 | Q.    Can you turn to paragraph 47? | 18:08:11 |
| 21 | A.    Yes. | 18:08:14 |
| 22 | Q.    There's a reference to "United States | 18:08:14 |
| 23 | versus Rhodes?" | 18:08:16 |
| 24 | A.    Yes. | 18:08:16 |
| 25 | Q.    That involves the January 6th | 18:08:16 |

| | | |
|---|---|---|
| 1 | prosecutions? | 18:08:20 |
| 2 | A.   Yes. | 18:08:20 |
| 3 | Q.   And with respect to this prosecution, did | 18:08:21 |
| 4 | you review any of the court documents in this case? | 18:08:35 |
| 5 | A.   Other than the indictment, no. | 18:08:37 |
| 6 | Q.   There was a lengthy trial in this case; | 18:08:39 |
| 7 | isn't that correct? | 18:08:42 |
| 8 | A.   In the Rhodes matter, I -- I believe there | 18:08:42 |
| 9 | were several trials on the January 6th one, and I | 18:08:45 |
| 10 | believe you are correct, although I don't have a | 18:08:51 |
| 11 | personal knowledge of it -- of the trial in the | 18:08:53 |
| 12 | Rhodes matter. | 18:08:56 |
| 13 | Q.   And you didn't talk to any of the | 18:08:57 |
| 14 | prosecutors involved in that case? | 18:08:58 |
| 15 | A.   I did not. | 18:09:00 |
| 16 | Q.   You didn't review any of the transcripts? | 18:09:01 |
| 17 | A.   I did not. | 18:09:03 |
| 18 | Q.   All you did was excerpt a line from the | 18:09:03 |
| 19 | indictment? | 18:09:07 |
| 20 | A.   Correct. | 18:09:08 |
| 21 | Q.   About the use of encrypted messages? | 18:09:10 |
| 22 | A.   Correct. | 18:09:14 |
| 23 | Q.   The defendants in this case were | 18:09:14 |
| 24 | convicted; isn't that correct? | 18:09:18 |
| 25 | A.   They were. | 18:09:18 |

1          I HAVE NOT, AND SHALL NOT, OFFER OR PROVIDE

2     ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY

3     OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

4     ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES

5     OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND

6     MAKING SAME AVAILABLE AT THE SAME TIME TO ALL

7     PARTIES OR THEIR ATTORNEYS.  (CIV. PROC §

8     2025.320(B))

9          I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

10    CONSISTING OF THE CERTIFIED STENOGRAPHER'S

11    NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF

12    ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE

13    PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR

14    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

15    ACTION, NOR SHALL I COLLECT ANY PERSONAL

16    IDENTIFYING INFORMATION ABOUT THE WITNESS AS A

17    SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR

18    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

19    ACTION.  (CIV. PROC. § 2025.320(C))

20

21    DATED:  February 14, 2025

22

23

24    _____
         NATALIE PARVIZI-AZAD, CSR NO.14125

25

EXHIBIT 7



EXHIBIT
2028



nso group

TRANSPARENCY
AND RESPONSIBILITY
REPORT
2021



### b. NSO's Approach to Human Rights

As a company, we are committed to respecting human rights. We work hard to conduct business ethically and responsibly, taking particular care with our most sensitive tools, like Pegasus.

We are committed to the authoritative international standards of the United Nations (UN) Guiding Principles on Business and Human Rights ("UNGPs") and the Organization for Economic Cooperation and Development (OECD) Guidelines for Multinational Enterprises ("OECD Guidelines"), and we honor these commitments with a robust governance framework developed in consultation with leading business and human rights experts, and discussed in detail below. This framework codifies NSO's commitment to ethical business and integrates human rights safeguards into all aspects of our work – from the design to the licensing to the use of our products. While other cyber intelligence technologies have been developed by state agencies and companies in China, Russia, and elsewhere, there is no model to easily replicate or industry standards to help guide us. Nonetheless, to our knowledge, we are the only company in the cyber intelligence industry to have such a thorough governance framework and to have publicly committed to the UNGPs and OECD Guidelines.

> **We continue to improve our processes, and learn from more insightful analyses, in-depth engagements and investigations over the past year.**

As part of our governance framework, we have taken concrete and specific steps, in accordance with international standards, to address and mitigate the human rights risks associated with our products. For example, we license Pegasus only to select approved, verified and authorized states and state agencies, specifically to be used in national security and major law enforcement-driven investigations. We conduct due diligence on those prospective users to assess the risks of misuse. Our standards are higher than the export control requirements of most sovereign states, as well as those of the European Union. We do not license Pegasus to customers where, following our human rights-focused due diligence process, we believe there are inadequate country-level protections in place to confidently prevent misuse, or where the rule of law creates an unduly high risk of misuse. We strictly require that Pegasus is used only where there is a legitimate law enforcement or intelligence-driven reason connected to a specific, pre-identified phone number, and after a process is followed where a state agency decision-maker independent of the user – such as a court - authorizes that use consistent with a written domestic law. Its use against law-abiding citizens is prohibited, and customers, a majority of which are in the EU or OECD, commit that they will use our products responsibly. We limit the number of instances in which it can be used, which also reduces the risk it will be used for reasons other than legitimate law enforcement. Where a customer is accused of misusing our technology, we investigate immediately.

> **When customers are unable to provide sufficient assurances to remain authorized users of our products, we terminated these relationships.**

Where we believe a misuse has occurred, we take immediate action, which has included preventing future use of the system, and try to learn from the situation to prevent it from happening again anywhere else. The Company is very selective with respect to the identity of the countries and customers to which it is willing to sell. Following an in depth review of various compliance concerns the Company has decide



upon a list of over 55 countries to which it has not and will not sell cyber intelligence products to for reasons such as human rights, corruption, and regulatory restrictions. Opportunities from those countries shall not even be brought to the management committee for consideration. Our investigations and engagements with our customers leave us convinced that our products are used appropriately the vast majority of the time. In fact, over the last three years, allegations of misuse amount to less than 0.5% of the instances in which the Pegasus system was used by our customers. Nonetheless, we are acutely aware of the inherent human rights tension associated with our products. The customers for Pegasus are states and state agencies facing the challenge of balancing their duties to protect human rights and individual liberties, while countering major crimes and terrorism. This creates risks for human rights, and the potential for customers to misuse our products. States may be tempted to limit fundamental freedoms to fight terrorism and major criminal activities. In addition, terrorists and criminal enterprises often are based or seek shelter in countries where the rule of law is not always strong, and where the risk our products will be misused by the state agencies charged with investigating them is enhanced. In this context, we believe our framework is thorough and strong, and represents a current best practice in our sector, and we are proud of what we have accomplished to date. But, we also acknowledge that it is not perfect, and we are constantly looking at ways to improve it.

## We also strongly advocate that tailored global standards must be developed to assist in guiding our industry.

We therefore have continued to improve our processes, and have learned from more insightful analyses, in-depth engagements and investigations in the course of the past year. We have already implemented some of these improvements and are designing further enhancements based on our findings. These include enhancements to our due diligence, contracting process, protocols regarding auditability, internal customer oversights and approvals, and document retention and destruction. We also have enhanced our processes for uncovering potential misuse and conducting investigations, and have clarified the implications for customers who decline to participate in our investigations. We further have honed our overall risk-tiering, and how we approach customers where we suspect the risks of potential misuse may be elevated. When customers have been unable to provide sufficient assurances to remain authorized users our products, we have terminated these relationships.

This Transparency and Responsibility Report, NSO Group's first and the first of any company in the cyber intelligence industry, is part of our human rights-focused journey. It reflects our activities and learnings over the past year. In providing the report, we are constrained in our ability to transmit information by factors unique to our industry, including rigid confidentiality requirements about our customers and their activities. Our customers are solely authorized intelligence and law enforcement agencies responsible for investigating and, where possible, preventing serious crimes and terrorist acts. To effectively conduct these types of operations, these agencies must operate discreetly in order to (i) infiltrate criminal and terrorist networks to obtain information critical to stopping illegal acts, and (ii) avoid inadvertently giving criminals and terrorists a chance to thwart preventive activities. As a result, our customers mandate strict confidentiality from us and all other service providers in our sector. Our capacity for action is also limited

# EXHIBIT 8

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 72 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024                {{Attorneys Eyes Only}}

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3                  OAKLAND DIVISION

 4   _____

 5   WHATSAPP INC., a Delaware            )
     corporation, and FACEBOOK, INC.,    )
 6   a Delaware corporation,             )
     a Delaware corporation,             )
 7                                        )
                 Plaintiffs,              )
 8       v.                               ) Case No.
                                          ) 4:19-cv-07123-PJH
 9   NSO GROUP TECHNOLOGIES LIMITED       )
     and Q CYBER TECHNOLOGIES LIMITED,    )
10                                        )
                                          )
11               Defendants.              )
     _____)

12

13       HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

14        VIDEO-RECORDED 30(b)(6) and 30(b)(1)

15                  DEPOSITION OF

16    WHATSAPP INC., by and through its Designated

17                 Representative,

18                   CARL WOOG

19          Palo Alto, California 94304

20          Wednesday, August 14, 2024

21

22

23   Reported Stenographically by:
     MARY J. GOFF
24   CSR No. 13427
     WA CSR No. 21030779
25   Job No. 3226
     PAGES 1-384
```

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 73 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                          Job 3226
CARL WOOG on 08-14-2024              {{Attorneys Eyes Only}}              Pages  66..69

Page 66

1 eight lines. I stand corrected.

2      Mr. Comey is correct in his statement, but
3 for the fact that WhatsApp now has over two billion
4 customers, right?

5      ATTORNEY ANDRES: Objection as to
6 relevance; and form.

7    **A   It is accurate that WhatsApp has over two**
8 **billion users today.**

9    Q   (BY ATTORNEY AKROTIRIANAKIS) And do you
10 agree that they are overwhelmingly good people or
11 would you not be in a position to say?

12   **A   That would be difficult to judge the**
13 **actions of two billion people, but I do believe our**
14 **service is used for a lot of good around the world.**

15   Q   Okay. Do you understand that within the
16 two billion customers of WhatsApp, there are, in
17 fact, terrorists and criminals?

18      ATTORNEY ANDRES: Objection as to
19 relevance.

20   **A   I'm not aware of any specifics in that**
21 **regard, but I understand that at the time he -- he**
22 **included terrorists and criminals in this quote here**
23 **on the page.**

24   Q   (BY ATTORNEY AKROTIRIANAKIS) You have
25 never heard that WhatsApp is used by terrorists and

Page 67

1 criminals?

2    **A   Sir, I'm reading a quote here from this**
3 **person that says "terrorists and criminals" here.**
4 **I'm just reacting to that.**

5    Q   I'm asking you whether you understand that
6 terrorists and criminals have made use of WhatsApp
7 and specifically the end-to-end encrypted
8 communications.

9      ATTORNEY ANDRES: Objection as to
10 relevance.

11   **A   Sir, I'm not aware of any specifics of**
12 **that, but I understand that Director Comey used**
13 **those words here in this news article.**

14   Q   (BY ATTORNEY AKROTIRIANAKIS) Okay. And
15 you understand the entire government -- the entire
16 Taliban government of Afghanistan uses WhatsApp as
17 its telecommunications platform correct, sir?

18      ATTORNEY ANDRES: Objection. The witness
19 has no knowledge as to that.

20      ATTORNEY AKROTIRIANAKIS: I will -- that's
21 not really how Rule 30 works, Greg, but just please
22 follow the Federal Rules of Civil Procedure in
23 your --

24      ATTORNEY ANDRES: If you have a question,
25 Joe, please state the question.

Page 68

1      ATTORNEY AKROTIRIANAKIS: I did state the
2 question. You're instructing the witness in --

3      ATTORNEY ANDRES: I didn't instruct the
4 witness not --

5      ATTORNEY AKROTIRIANAKIS: -- an
6 inappropriate, unlawful way. Yeah, you did. You're
7 coaching his answer.

8      ATTORNEY ANDRES: -- that is ridiculous.
9 The witness can answer, if he knows the answer.

10   Q   (BY ATTORNEY AKROTIRIANAKIS) Do you
11 remember my question?

12   **A   I don't, sir.**

13   Q   All right. You understand the entire
14 Taliban government of Afghanistan uses WhatsApp as
15 its telecommunications platform, correct?

16   **A   Sir, I'm not aware of the actions of the**
17 **entire Taliban.**

18   Q   Have you ever heard that statement, that
19 the Taliban government of Afghanistan uses WhatsApp
20 as its telecommunications platform?

21   **A   I have heard that mentioned in news**
22 **articles, that members of the Taliban may have**
23 **communicated with U.S. officials over WhatsApp. I**
24 **remember an article of that nature.**

25   Q   And WhatsApp is used by the Taliban to

Page 69

1 communicate not just with U.S. officials, but with
2 other members of the Taliban, correct?

3      ATTORNEY ANDRES: Objection as to
4 relevance.

5    **A   Sir, I'm not able to speak to who is using**
6 **our service. I'm not aware of those specifics.**

7    Q   (BY ATTORNEY AKROTIRIANAKIS) So you don't
8 know who is using your service?

9    **A   Sir, we have limited information on the**
10 **two billion people plus who use our service. I was**
11 **just referring to that in general.**

12   Q   So you don't know one way or the other
13 whether the Taliban government of Afghanistan uses
14 WhatsApp as its telecommunications platform?

15      ATTORNEY ANDRES: Objection, asked and
16 answered.

17   **A   I'm not sure, sir. I would need more**
18 **information.**

19   Q   (BY ATTORNEY AKROTIRIANAKIS) You don't
20 know?

21   **A   No, sir.**

22   Q   Okay. All right. What about Al-Qaeda?
23 Are you familiar are with that organization?

24   **A   Sir, I am.**

25   Q   And that's another terrorist organization,

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 74 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                                      Job 3226
CARL WOOG on 08-14-2024                    {{Attorneys Eyes Only}}                    Pages 122..125

Page 122

1    Q    (BY ATTORNEY AKROTIRIANAKIS) Is WhatsApp
2  responsible when its platform is being used in order
3  to trade in child exploitative imagery?
4        ATTORNEY ANDRES:  Objection as to
5  relevance.
6    A    Sir, we have a concerted effort to take
7  action against that heinous imagery and others when
8  we become aware of them.  We have programs in place
9  to prevent and limit their spread.
10        As to the question of responsibility, that
11  sounds like a legal question, and it's beyond my
12  expertise.
13    Q    (BY ATTORNEY AKROTIRIANAKIS) Well, do you
14  feel like when people abuse WhatsApp for an
15  unintended purpose -- well, let me back up.
16        Is WhatsApp intended to be used for people
17  to communicate child pornography to each other?
18    A    No, sir.
19        ATTORNEY ANDRES:  Objection as to
20  relevance.
21    A    No.  No, sir, that is not our objective.
22    Q    (BY ATTORNEY AKROTIRIANAKIS) Okay.  In
23  your time in working for WhatsApp, you have come to
24  learn that it has, at times, been used to
25  communicate child pornography, correct?

Page 123

1        ATTORNEY ANDRES:  Objection as to
2  relevance.
3    A    Sir, we have in receipt of reports from
4  users of that information, as well as the times when
5  we have taken proactive steps based on the
6  information available to us to prevent that very use
7  of our service.
8    Q    (BY ATTORNEY AKROTIRIANAKIS) Okay.  So
9  you, in fact, have verified that WhatsApp has, at
10  times, been used to communicate child pornography,
11  correct?
12        ATTORNEY ANDRES:  Objection, misstates
13  testimony.
14    A    Sir, as I mentioned, there are times when
15  that information has been reported to us, and we
16  have taken action, as well as times when we have
17  proactively identified information being shared of
18  that feature from which we have taken action as
19  well.
20    Q    (BY ATTORNEY AKROTIRIANAKIS) So that
21  sounds like a "Yes."
22        But just to be sure, are you agreeing with
23  me?
24        ATTORNEY ANDRES:  Objection as to
25  relevance.

Page 124

1    A    I will agree with you, sir.
2    Q    (BY ATTORNEY AKROTIRIANAKIS) All right.
3  So yes, WhatsApp has verified that there are -- have
4  been times that it has been used to communicate
5  child pornography?
6    A    Sir, we have --
7        ATTORNEY ANDRES:  Objection, asked and
8  answered.
9    A    -- taken action to prevent our services
10  from continuing to being used in -- in -- by those
11  users who -- who did so or for -- that we had reason
12  to believe that they do so.
13        ATTORNEY ANDRES:  To the extent that this
14  testimony is being asking in the context of a
15  30(b)(6) designation, I object to this line of
16  questioning as outside the scope of the designation.
17    Q    (BY ATTORNEY AKROTIRIANAKIS) Would that be
18  a misuse of the WhatsApp platform, to use it to
19  communicate child pornography?
20        ATTORNEY ANDRES:  Objection as to
21  relevance.
22    A    Sir, we definitely view that abuse.
23        And we have experts at our company that
24  work on these issues every day.  And they work hard
25  to prevent the abuse of our service, as well as

Page 125

1  respond to when we have information that that may be
2  taking place.
3        And we take action to -- to prevent -- to
4  prevent so, and we make reports to law enforcement
5  agencies so they may take further action against
6  those who would try to do such a heinous thing.
7        ATTORNEY AKROTIRIANAKIS:  I'm going to
8  move to strike the last or nine or ten lines of the
9  witness's answer following "sir, we definitely view
10  that as an abuse."
11        ATTORNEY ANDRES:  I object to the motion
12  to strike whatever that is.
13        ATTORNEY AKROTIRIANAKIS:  Yeah, well,
14  you'll find out.
15    Q    (BY ATTORNEY AKROTIRIANAKIS) All right.
16  When someone abuses WhatsApp for an unintended
17  purpose such as the communication of child
18  pornography, is WhatsApp responsible for those acts
19  of abuse?
20        ATTORNEY ANDRES:  Objection, calls for a
21  legal conclusion.
22    A    Sir, I'm not in a position to define
23  responsibility of these matters.  What I know is
24  that we have teams that work around the clock to
25  prevent and respond to those reports of abuse.

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 75 of 96

WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3226
CARL WOOG on 08-14-2024            {{Attorneys Eyes Only}}            Pages 382..384

Page 382

1

2

3

4       I, CARL WOOG, do hereby declare under penalty

5   of perjury that I have read the foregoing

6   transcript; that I have made any corrections as

7   appear noted, in ink, initialed by me, or attached

8   hereto; that my testimony as contained herein, as

9   corrected, is true and correct.

10       EXECUTED this_____ day of_____,

11   20_____, at_____, _____.

             (City)                    (State)

12

13

14       _____

             CARL WOOG

15

16

17

18

19

20

21

22

23

24

25

Page 383

1       I, MARY J. GOFF, CSR No. 13427, Certified

2   Shorthand Reporter of the State of California,

3   certify;

4       That the foregoing proceedings were taken

5   before me at the time and place herein set forth, at

6   which time the witness declared under penalty of

7   perjury; that the testimony of the witness and all

8   objections made at the time of the examination were

9   recorded stenographically by me and were thereafter

10   transcribed under my direction and supervision; that

11   the foregoing is a full, true, and correct

12   transcript of my shorthand notes so taken and of the

13   testimony so given;

14       That before completion of the deposition,

15   review of the transcript ( ) was (XX) was not

16   requested:   (   ) that the witness has failed or

17   refused to approve the transcript.

18       I further certify that I am not financially

19   interested in the action, and I am not a relative or

20   employee of any attorney of the parties, nor of any

21   of the parties.

22       I declare under penalty of perjury under the

23   laws of California that the foregoing is true and

24   correct, dated this   day of      , 2024.

25       *Mary Goff*

             _____

             MARY J. GOFF

Page 384

1               ERRATA SHEET

2               SWIVEL LEGAL

3           560 W Main Street, C163

4         Alhambra, California 91801

5               213-788-2327

6         CASE:  WhatsApp v. NSO Group

7   PAGE  LINE  FROM                    TO

8   ____|_____|_____|_____

9   ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18

19       _____

20       CARL WOOG

21   Subscribed and sworn to before me

22   this _____ day of _____, 2024.

23   _____

24       Notary Public

25

# EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH |
| Plaintiffs, | |
| v. | |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | |
| Defendants. | |

**<u>REPORT OF COL. TY M. SHEPARD (RET.)</u>**

1

## I.    <u>INTRODUCTION</u>

1.    I, Col. Ty M. Shepard (Ret.), have been engaged to offer testimony concerning the use of surveillance technology in military and intelligence operations, including: (1) the use of encrypted messaging applications by terrorists and other threat actors; (2) the routine use of tools like Pegasus, licensed by NSO Group Technologies Limited ("NSO"), by the U.S. and allied countries and the operational gaps that the lack of such tools would create in attempting to counter threat actors using encrypted messaging applications; (3) the marketplace for such commercial tools and the need to maintain them as confidential; (4) government actors' compliance with terms of service; and (5) safeguards imposed on the use and operation of Pegasus.

2.    This report serves as an explanation of my understanding of the technology at issue in this case and details my experience with the uses of such technology. This report is based on my investigation of this matter, as well as my education, experience, and training in cybersecurity, surveillance, intelligence collection, and hostile security environments.

## II.    <u>QUALIFICATIONS</u>

3.    I retired from the United States Army in May 2023 and the California Military Department in May 2024. I earned a Bachelor of Science degree and was commissioned in 1998 from California Polytechnic State University, San Luis Obispo, as an infantry officer. Thereafter, I was assigned to the 3-502nd, 101st Airborne Division at Fort Campbell. I served in Company and Battalion positions and was deployed to Macedonia and Kosovo in support of Kosovo Force (KFOR) rotation 1A.

4.    In 2005, I joined the California National Guard and served at the Joint Force Headquarters.

5.    In 2007, I was mobilized to Iraq as an infantry Company Commander in support of Operation IRAQI FREEDOM and the Global War On Terrorism. I worked closely with the Joint

Special Operations Command (JSOC) Strategic Debriefing Element (SDE), the British Secret Intelligence Service (SIS), and Army Brigade headquarters elements on this deployment.

6.      I subsequently served as a staff officer in the 79th Infantry Brigade Combat Team, executive officer 1-184th Infantry, Joint Staff current operations officer, executive officer for the Joint Staff, and Brigade S3 for the 115th Regional Support Group.

7.      In 2013, I completed my resident intermediate-level education at the United States Army Command and General Staff College and Advanced Operation Course.

8.      In 2014, I was asked to work as the Friendly Force Tracking (FFT), tactical Beyond Line of Site (BLOS) secure communication and Common Operating Picture (COP) Subject Matter Expert (SME) for the United States Northern Command (NORTHCOM).  I assisted in building the COP/FFT information technology systems and architecture for NORTHCOM, trained its units/Joint Task Forces, was the COP/FFT lead/attended all National Special Security Events (NSSE) and select high-level Special Event Assessment Rating (SEAR) events along with named operations along the U.S. border and National Capital Region over three years.  In this capacity, I also assisted Special Operations Command (SOCOM), Army South (ARSOUTH), the Department of State (DoS), and other federal agencies.

9.      Following that assignment, I was selected and deployed to the U.S. Embassy in Ukraine in 2017 as a C4ISR (Command, Control, Communications, Computers, Intelligence, Surveillance, and Reconnaissance) advisor. As part of this deployment, I assisted Ukraine in building its current multi-domain intelligence-sharing platform.

10.      In 2020, I trained and led a Joint Task Force headquarters element to Guantanamo Bay Naval Base in Cuba and served as the Deputy Director of the Commission Liaisons Office in support of the Global War on Terrorism.

16.     I retired from the California Military Department in May 2024.

17.     My awards and decorations include the Legion of Merit, Bronze Star, Defense Meritorious Service Medal, Meritorious Service Medal (with four Oak Leaf Clusters), Army Commendation Medal, Army Achievement Medal (with three Oak Leaf Clusters), Ranger Tab, Combat Action Badge, Airborne badge, and Expert Infantrymen's badge.

18.     Through my various assignments, I am familiar with the marketplace of commercial and non-commercial cyber-surveillance tools, including Pegasus, used by the United States and its allies/partners.  I am also familiar with the technical tradecraft practiced by significant U.S. adversaries, including nation-states, terrorist groups, international criminal syndicates, drug traffickers, human smugglers, and others.

19.     I have not testified as an expert at trial or by deposition during the last four years.

20.     I have not authored any publications in the prior ten years.

## III.    MATERIALS CONSIDERED AND SUPPORTING EXHIBITS

21.     In preparing this report, I have relied on facts and data from various sources, including those set forth in Appendix I.

22.     I do not plan to use any exhibits during my testimony.

## IV.    INTENDED TESTIMONY AND REASONING

### Threat Actors Use Encrypted Messaging Applications to Undermine U.S. and Allied National Security

23.     Various threat actors, including terrorist organizations, narcotics groups, human traffickers, organized crime, cross-border gangs, and nation-states, routinely use encrypted messaging applications, including WhatsApp, to conceal their activities from detection by military, national security, and law-enforcement agencies.  These threat actors need to maintain command and control over their operations, which requires the ability to communicate discreetly, quickly,

6

across borders, and in multiple domains. U.S. and allied law enforcement and intelligence agencies (hereafter "agencies") have significant signals intelligence gathering capabilities, but companies that provide messaging applications often design their systems to prevent anyone, including government agencies, from decrypting communications stored or sent using the applications. To overcome such encryption and conduct lawful surveillance, government agencies need to develop or purchase licenses to use special surveillance tools. Many companies regularly update their applications to block such decryption tools, so government agencies must continually update their tools or purchase licenses to use updated tools.

### Threat Examples

24.     I have witnessed threat actors using encrypted messaging applications and the related challenges posed for U.S. and allied intelligence agencies in the several theaters where I have been deployed or for which I have otherwise had operational responsibilities. These include Russian intelligence services (and proxies) operating in Ukraine and Eastern Europe, terrorist groups in the Middle East, and groups trafficking in drugs, other illicit items, or human beings on the U.S. southern border. All of these groups use encrypted messaging applications as a convenient and easily accessible method of planning and committing crimes and attacks that undermine the public safety and national security of the United States and its allies\partners.

25.     Law enforcement and intelligence agencies often cannot gain access to and read communications of such threat actors directly through legal process served on communications providers such as WhatsApp, even with the approval of federal judges. When presented with lawful court orders authorizing agencies to collect substantive communications on messaging platforms, such providers often respond that they only have the ability to provide the *encrypted* message traffic, which they cannot decipher. As a result, U.S. and allied law enforcement and

intelligence agencies face a constant challenge from malicious groups who use encrypted messaging applications to plan and commit crimes such as terrorism, smuggling drugs, illicit items, and humans, and even assassinations.

### The U.S. and its Allies Widely Use Surveillance Tools like Pegasus to Protect National Security

26.    U.S. military and intelligence agencies, as well as those of U.S. allies, routinely use surveillance tools similar to Pegasus to combat a variety of threat actors. Such tools sometimes are developed by agencies, sometimes purchased from private companies, and sometimes have elements of both. Such tools can allow intelligence officers to learn about communications involving threat actors while operating remotely and secretly.

27.    Government agencies use surveillance tools like Pegasus to gain insight into operational planning, threat actor identities, and specific plots.

28.    Tools like Pegasus provide intelligence insight to the U.S. and allied national security agencies. Based on this insight, U.S. and allied national security agencies are often able to successfully disrupt attempts to injure or kill people, damage or destroy critical infrastructure, and otherwise threaten public safety and security. There would be significant risks and harm to American lives and critical infrastructure if these tools did not exist or if the U.S. and its allies did not have access to them.

29.    Such tools allow for the collection of intelligence remotely and secretly. In the absence of these tools, agencies would need to place more intelligence officers in harm's way through human "undercover" style collection to gain insights and collect intelligence through direct and dangerous interactions. Even if agencies dedicated more resources to these types of undercover losses, they would be constrained by funds, trained personnel, and other resources to

### *Cyber Surveillance Tools Require Stealth*

34.    In my experience, many encrypted messaging application providers such as WhatsApp do not help the government obtain access to encrypted communications, even with lawful processes issued by courts. Usually, these requests are denied or acted upon slowly.  Where they are acted upon, such providers may identify internal policies that prohibit them from cooperating or technological restrictions that prevent them from disclosing clear text communications of messaging sent on their platforms.

35.    In my experience, government agencies do not normally disclose sophisticated technical surveillance tools or methods to encrypted messaging application providers because such disclosures would potentially lead those providers to update their software to render those tools or methods non-functional.

### *Government Agencies Routinely Ignore "Terms of Service"*

36.    Encrypted messaging platforms often have "Terms of Service" in place for users of their platforms. Intelligence agencies typically do not follow ordinary terms of service when acting in a governmental capacity and pursuing major security and safety threats.

37.    Moreover, many non-government users routinely engage in activities that are inconsistent with the Terms of Service and without adverse action by providers.  For example, users routinely register using pseudonyms and avoid disclosing their true identities or locations even when required by the terms of service, and providers typically do not enforce such policies. Indeed, the level of unlawful activity that occurs through encrypted messaging platforms suggests that companies do not ordinarily enforce their Terms of Service.

similar functions from other companies that do not impose similar restrictions or develop the tools themselves.

44.    I am unaware of a strategic available commercial off-the-shelf (COTS) surveillance tool used internationally that has more safeguards than Pegasus.

45.    In the commercial cyber surveillance tool market, most companies and individuals who create such tools do not perform due diligence on customers. Indeed, cyber surveillance tools and exploits are often readily available on the dark web or through open-source technology.

## V.    STATEMENT OF COMPENSATION

46.    I will be paid $500 per hour for my work on this matter.  My compensation is not contingent upon the outcome of the case.

Executed on August 30, 3024, in Folsom, California.

_Ty M Shepard_

Ty M. Shepard

# EXHIBIT 10

## FILED UNDER SEAL

# EXHIBIT 11

## FILED UNDER SEAL

# EXHIBIT 12

## FILED UNDER SEAL

EXHIBIT 13

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 89 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3228
SUSAN GLICK on 09-09-2024                                                 Page 1

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4   WHATSAPP INC., a Delaware     )
    corporation, and FACEBOOK,    )
5   INC., a Delaware corporation,)
                                  )
6           Plaintiffs,           )
                                  )
7   vs.                           )Case No. 4:19-CV-07123-PJH
                                  )
8   NSO GROUP TECHNOLOGIES        )
    LIMITED and Q CYBER           )
9   TECHNOLOGIES LIMITED,         )
                                  )
10          Defendants.           )
    _____)

11

12

13      VIDEOTAPED DEPOSITION OF SUSAN GLICK

14         MONDAY, SEPTEMBER 9, 2024

15           9:28 A.M. to 3:00 P.M.

16   _____

17            Taken by the Defendants
                at K&L Gates, LLP
18      301 Hillsborough Street, Suite 1200
             Raleigh, North Carolina 27603

19

20

21

22

23

24

25      Reported by: Sophie Brock, RPR, RMR, RDR, CRR

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 90 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                    Job 3228
SUSAN GLICK on 09-09-2024                                         Pages 58..61

Page 58

1  it's unrelated to Cambridge Analytica?
2          MR. ANDRES: Objection.
3  Mischaracterizes the testimony.
4          THE WITNESS: No. The article says
5  that it's related. But this article doesn't say that
6  they settled a lawsuit about Cambridge Analytica,
7  which is what you asked me.
8  BY MR. AKROTIRIANAKIS:
9      Q. Well, not to quibble, but I asked if it was
10 in resolution of a dispute related to Cambridge
11 Analytica. I wasn't suggesting to you that the FTC
12 filed a lawsuit against Facebook. I think this was a
13 pre-lawsuit resolution. Is that how you read it?
14     A. My understanding is that Cambridge Analytica
15 is related to the concerns about violations of the
16 consent order.
17     Q. Okay. And related to concerns over the
18 actions of Facebook and Cambridge Analytica, the FTC
19 believed that Facebook had violated a prior consent
20 order; true?
21         MR. ANDRES: Objection. Asked and
22 answered.
23         THE WITNESS: Based on my understanding
24 of this article, yeah.
25

Page 59

1  BY MR. AKROTIRIANAKIS:
2      Q. Okay. And the resolution that was reached
3  between the FTC and Facebook related to that dispute
4  was that Facebook agreed to pay a $5 billion penalty;
5  right?
6          MR. ANDRES: Objection. Asked and
7  answered.
8          THE WITNESS: That's what the headline
9  says.
10 BY MR. AKROTIRIANAKIS:
11     Q. Well, does the headline help you recall the
12 events that are the subject of the article?
13     A. I remember that there was a lot of privacy
14 concerns about Facebook in the aftermath of Cambridge
15 Analytica.
16     Q. Do you remember that Facebook agreed to pay a
17 record breaking $5 billion penalty?
18         MR. ANDRES: Objection. Asked and
19 answered.
20         THE WITNESS: No.
21 BY MR. AKROTIRIANAKIS:
22     Q. Do you remember that the $5 billion penalty
23 against Facebook is the largest ever imposed on any
24 company for violating consumers' privacy?
25     A. No.

Page 60

1          MR. ANDRES: Objection. Relevance.
2  BY MR. AKROTIRIANAKIS:
3      Q. Okay. So you also don't remember that it was
4  one of the largest penalties ever assessed by the
5  United States Government for any violation?
6          MR. ANDRES: Objection. Asked and
7  answered.
8          THE WITNESS: No.
9  BY MR. AKROTIRIANAKIS:
10     Q. Okay. Returning your attention to
11 Exhibit 1021, if you would, and specifically to your
12 draft note for Mr. Cathcart that begins on the bottom
13 of page 1 of Exhibit 1021. Are you with me?
14     A. I'm with you.
15     Q. All right. At the time that you wrote the
16 initial email in Exhibit 1021, WhatsApp believed that
17 there were approximately 1,470 WhatsApp
18 account-holders who had been targeted using Pegasus;
19 correct?
20     A. That's what the email says.
21     Q. And WhatsApp knew at the time that the users
22 of Pegasus were law enforcement and intelligence
23 agencies of sovereign governments; also correct?
24     A. No.
25     Q. What's incorrect about my statement?

Page 61

1      A. I don't remember that we knew with any
2  certainty that the users were members of law
3  enforcement. I think we had reason to believe that
4  they were members of sovereign governments.
5      Q. Okay. Did you ever come to believe that the
6  Pegasus users were, in fact, law enforcement agencies,
7  intelligence agencies, and the like?
8          MR. ANDRES: Objection. Asked and
9  answered.
10         THE WITNESS: As I said before, I don't
11 think we ever knew that they were members of law
12 enforcement. We had reason to believe they were
13 members of sovereign governments.
14 BY MR. AKROTIRIANAKIS:
15     Q. Did WhatsApp come to believe that the
16 WhatsApp users who had been targeted using Pegasus
17 were suspected criminals and terrorists?
18     A. Can you repeat the question?
19     Q. Did WhatsApp come to believe that the
20 WhatsApp users who had been targeted using Pegasus
21 were suspected criminals and terrorists?
22     A. No.
23     Q. Not at any time?
24     A. WhatsApp had reason to believe that some may
25 be, which was a reason to look into it prior to

Case 4:19-cv-07123-PJH    Document 593-2    Filed 03/13/25    Page 91 of 96
WhatsApp Inc. vs NSO Group Technologies Limited et al.                              Job 3228
SUSAN GLICK on 09-09-2024                                                    Pages 134..137

Page 134

1    Q. Why are the two tied together?
2    A. If you're planning to launch a product in a
3  geography, then it's not helpful to have user concerns
4  in that geography immediately before you launch it or
5  while you launch it.
6    Q. And it is true that WhatsApp and Facebook
7  believed that the risk of potential backlash was most
8  acute in India and Mexico; correct?
9    A. That's what the email says.
10    Q. Well, is it your recollection that that was,
11  in fact, true?
12    A. It's my recollection that I would have
13  prioritized truth in emails that went to executives.
14    Q. In your tweaked version here, you also have
15  removed the word "false" from the sentence about
16  perceptions that WhatsApp was vulnerable to hacking;
17  do you see that?
18    A. Let me -- can I take a minute to compare?
19    Q. Yeah, you should. Thank you.
20    A. Okay, I see the difference between -- I see
21  that difference that you referenced between the two
22  emails.
23    Q. And the slightly tweaked version,
24  Exhibit 1026, removes the word "false" from the
25  sentence about perceptions that WhatsApp was

Page 135

1  vulnerable to hacking; correct? Is that right?
2    A. That's true.
3    Q. And why did you remove that word?
4    A. I don't remember.
5    Q. Do you recall being concerned that, in fact,
6  WhatsApp had large vulnerabilities to hacking?
7    A. No.
8    Q. All right. You see the second bullet down
9  that says -- after the third sub-bullet, it says,
10  "Concerns over sharing data with Citizen Lab"?
11    A. I see that.
12    Q. And in the parenthetical, it says (as read):
13        "The limited information we gave
14        them was through a contract that
15        is typical of engagements like
16        this."
17        Do you see that?
18    A. I do.
19    Q. Was that the contract that you previously
20  referenced pursuant to which you believed WhatsApp and
21  Facebook were paying Citizen Lab?
22    A. I was only ever aware of one contract, so
23  this must be one and the same.
24    Q. Okay. Let's go back to Exhibit 1021
25  (indicating).

Page 136

1    A. This is 1026 (indicating).
2    Q. I'm sorry, then it's the other one.
3    A. Okay.
4    Q. Do you have Exhibit 1021 before you?
5    A. Yes.
6    Q. What was the concern over sharing with
7  Citizen Lab?
8    A. There was a lot of sensitivity and concern in
9  general in the public about data shared among the
10  Facebook family of apps.
11    Q. And why was that?
12    A. Because data privacy was a big topic at that
13  time.
14    Q. And Facebook had repeatedly gotten in trouble
15  for data privacy issues; is that fair to say?
16        MR. ANDRES: Objection to the form of
17  the question.
18        THE WITNESS: What do you mean by
19  "gotten in trouble"?
20  BY MR. AKROTIRIANAKIS:
21    Q. Well, got in trouble with the US Government
22  and had to settle lawsuits with classes of plaintiffs
23  all over the United States. Things like that.
24        MR. ANDRES: Objection to the form of
25  the questions.

Page 137

1        THE WITNESS: I think it's accurate to
2  say that Facebook was under constant scrutiny for
3  their use of data.
4  BY MR. AKROTIRIANAKIS:
5    Q. And it's paid billions and billions of
6  dollars to settle lawsuits and government
7  investigations related to its use of data; fair?
8    A. Fair.
9    Q. And it's not actually use that makes you pay
10  billions and billions of dollars, it's abuse and
11  misuse; also fair?
12    A. I don't know.
13    Q. WhatsApp shared data with Citizen Lab so it
14  could determine how many of the targeted phones
15  belonged to people who Citizen Lab believed were
16  members of civil society; true?
17    A. WhatsApp collaborated with Citizen Lab to try
18  to do diligence before reaching out to potentially
19  affected users because they didn't want to just
20  blindly notify potentially affected users.
21    Q. And further to that desire, WhatsApp shared
22  data with Citizen Lab; right?
23    A. Correct.
24    Q. And the purpose of that data sharing was in
25  order to determine how many, if any, of the targeted

WhatsApp Inc. vs NSO Group Technologies Limited et al.
SUSAN GLICK on 09-09-2024

Job 3228
Pages 202



Page 202

1          CERTIFICATE OF REPORTER

2                 ---oOo---

3          I, Sophie Brock, Registered Diplomate Reporter and

4     Certified Realtime Reporter, do hereby certify:

5          That prior to being examined, the witness in the

6     foregoing deposition was by me duly sworn to testify to

7     tell the truth, the whole truth, and nothing but the

8     truth.

9          That the foregoing deposition was taken in-person

10    at the time and date therein set forth and was taken

11    down by me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision; said

13    transcript being a true record of said proceedings.

14         I further certify that I am neither counsel for,

15    nor related to, any of the parties to said deposition,

16    nor in any way interested in the outcome of this cause.

17         Further, that if the foregoing pertains to the

18    original transcript of a deposition in a federal case,

19    before completion of the proceedings, review of the

20    transcript was requested.

21         In witness whereof, I have hereunto subscribed my

22    name on this 10th day of September, 2024.

23                 _Sophie Brock_

24

                   Sophie Brock, RDR, CRR
25                 Notary Number: 200834000001

# EXHIBIT 14

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S FOURTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS WHATSAPP LLC FKA WHATSAPP INC. AND META PLATFORMS, INC. FKA FACEBOOK, INC.** |

PROPOUNDING PARTY:    NSO GROUP TECHNOLOGIES

                                        LIMITED AND Q CYBER TECHNOLOGIES LIMITED

RESPONDING PARTY:    WHATSAPP LLC fka WHATSAPP INC. AND META

                                      PLATFORMS, INC. fka FACEBOOK, INC.

SET NO.:                         FOUR (4)

1   limitations on access to WhatsApp's servers.

2   **REQUEST FOR PRODUCTION NO. 239:**

3        Documents sufficient to show the areas of WhatsApp servers that you contend NSO

4   accessed that are not generally accessible to WhatsApp users.

5   **REQUEST FOR PRODUCTION NO. 240:**

6        All Documents and Communications related to NSO's alleged access to any areas of

7   WhatsApp's servers that are not generally accessible to WhatsApp's users.

8   **REQUEST FOR PRODUCTION NO. 241:**

9        Documents sufficient to describe the design and intended operation of the functionality of

10   the Facebook Research App.

11   **REQUEST FOR PRODUCTION NO. 242:**

12        Documents and Communications sufficient to show Plaintiffs' development, testing,

13   troubleshooting and maintenance of the Facebook Research App.

14   **REQUEST FOR PRODUCTION NO. 243:**

15        Documents and Communications sufficient to show the processes, methods, and

16   Technology used by the Facebook Research App to monitor and exfiltrate data from Devices on

17   which the Facebook Research App was installed.

18   **REQUEST FOR PRODUCTION NO. 244:**

19        Documents and Communications sufficient to show the Technology used to transmit any

20   data or information from any Device on which Facebook Research App was installed.

21   **REQUEST FOR PRODUCTION NO. 245:**

22        Documents and Communications sufficient to describe the data and information Plaintiffs

23   obtained from Devices through the Facebook Research App.

24   **REQUEST FOR PRODUCTION NO. 246:**

25        All Documents and Communications produced to the plaintiffs in the lawsuit styled *Klein*

26   *v. Meta Platforms, Inc.*, Case No. 3:20-cv-08570-JD (N.D. Cal.) that refer or relate to the Facebook

27   Research             App         or           Project           Ghostbusters.

28

# EXHIBIT 15

## FILED UNDER SEAL