# EXHIBIT A

1             UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4    _____

5                                    )
     WHATSAPP LLC, a Delaware         )
6    corporation, and META PLATFORMS, )
     INC., a Delaware corporation,    ) CASE NO.:
7                                      ) 4:19-CV-07123-
                        Plaintiffs,    ) PJH
8                                      )
              v.                       )
9                                      )
     NSO GROUP TECHNOLOGIES LIMITED    )
10   and Q CYBER TECHNOLOGIES          )
     LIMITED,                          )
11                                     )
                        Defendants.    )
12   _____)

13

14       ** THIS TRANSCRIPT IS MARKED CONFIDENTIAL

15          PURSUANT TO PROTECTIVE ORDER **

16

17           DEPOSITION OF JOSHUA MINKLER

18                    VOLUME I

19             LOS ANGELES, CALIFORNIA

20           TUESDAY, FEBRUARY 11, 2025

21

22

23

24   REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                     CSR NO. 14125
25   JOB NO.:       571437

1        Q.   So as you sit here today, you don't have          10:27:09

2   any information or expertise about the legislative           10:27:09

3   purpose of Title 3?                                          10:27:09

4        A.   I do not.                                          10:27:09

5             (Reporter clarification.)                          10:27:11

6        Q.   So as you sit here today, you don't have          10:27:11

7   any information or expertise to talk about the               10:27:13

8   legislative purpose of Title 3; is that correct?            10:27:27

9        A.   That is correct.                                   10:27:31

10            MR. AKROTIRIANAKIS:  Counsel, whenever             10:27:35

11   you're at a stopping point, I'm having like a               10:27:37

12   computer fritz out here.  I'd like to fix it.               10:27:40

13            MR. ANDRES:  Sure.  I just have a couple           10:27:43

14   more questions, Joe, but no more than a couple              10:27:44

15   minutes and we can take a break.                            10:27:48

16            MR. AKROTIRIANAKIS:  Okay.                         10:27:50

17   BY MR. ANDRES:                                              10:27:50

18        Q.   Can you explain, Mr. Minkler, why NSO's          10:27:51

19   conduct in this case is not similar to those types         10:27:54

20   of conduct that led to the passage of Title 3 which        10:27:57

21   were unauthorized wiretaps and recordings?                 10:28:00

22            MR. AKROTIRIANAKIS:  Object to the form of        10:28:08

23   the question.  It's overbroad and incomprehensible.        10:28:10

24        A.   Well, I'm somewhat -- I read the                 10:28:13

25   Complaint, and I'm somewhat familiar with the              10:28:20

1    allegation in the Complaint, but I am not familiar          10:28:22

2    with the accuracy of the allegations, nor am I             10:28:31

3    familiar with whether or not the use of NSO's              10:28:37

4    Pegasus was authorized.  So I --                           10:28:47

5        Q.   So as you sit here --                             10:28:52

6        A.   Yeah.  I'm sorry.  I don't know if that's         10:28:54

7    helpful.                                                   10:28:56

8        Q.   Go ahead.  I'm sorry.                             10:28:56

9        A.   I understand your question.  I have no            10:28:57

10   problem understanding your question.  I just -- I          10:29:00

11   would say I don't know enough about the facts and          10:29:05

12   circumstances of NSO's conduct in this case to             10:29:08

13   determine whether or not it was consistent with the        10:29:13

14   abuses you described in the 60s.                           10:29:17

15       Q.   In the -- in the course of your retention         10:29:21

16   in this case, have you seen any authorization, court       10:29:24

17   orders, or any documents that would authorize NSO to       10:29:29

18   engage the Pegasus tool on a phone, WhatsApp, any          10:29:38

19   device?                                                    10:29:41

20           MR. AKROTIRIANAKIS:  We cutout part of             10:29:41

21   that question again, Greg.                                 10:29:42

22   BY MR. ANDRES:                                             10:29:46

23       Q.   In the course of your representation of           10:29:47

24   NSO in this case, have you seen any wiretaps or            10:29:49

25   authorizations which allowed for the use of the            10:29:53

1    as a lawyer, not as an academic, as I believe you're          11:26:39
2    using the term.                                               11:26:47
3        Q.    Have you ever done any academic research            11:26:47
4    with respect to Title 3?                                      11:26:49
5        A.    No.                                                 11:26:50
6        Q.    Let's turn to paragraph 38 --                       11:26:50
7              MR. AKROTIRIANAKIS:  Object to --                    11:26:54
8        Q.    -- of your report?                                  11:26:55
9              MR. AKROTIRIANAKIS:  I'm going to                    11:26:56
10   interpose a late objection.  Excuse me, Counsel.  I           11:26:57
11   get to interpose objections.                                  11:27:00
12             Even when Mr. Minkler answers the question          11:27:01
13   faster than I can interpose them before he answers,           11:27:05
14   but I will object to form of the question again and           11:27:08
15   the use of "academic" in this context.                        11:27:12
16       Q.    I ask you to turn to paragraph 38 of your           11:27:14
17   report.                                                       11:27:18
18       A.    Yes.                                                11:27:21
19       Q.    Paragraph 38 refers to the Foreign                  11:27:21
20   Intelligence Surveillance Act; is that correct?               11:27:29
21       A.    It does.                                            11:27:30
22       Q.    And then it sites a number of sections             11:27:31
23   of -- of section -- of Title 50; is that correct?             11:27:34
24       A.    It does.                                            11:27:39
25       Q.    Have you read each of those sections of             11:27:39

| | | |
|---|---|---|
| 1 | the code? | 11:27:42 |
| 2 | A.   I have not. | 11:27:43 |
| 3 | Q.   And then, it says -- in the first | 11:27:46 |
| 4 | sentence, it says -- it says, "FISA is another means | 11:27:50 |
| 5 | by which intelligence agencies can lawfully | 11:27:55 |
| 6 | intercept communications." | 11:28:00 |
| 7 | Is that right? | 11:28:02 |
| 8 | MR. AKROTIRIANAKIS:   Object to the form of | 11:28:03 |
| 9 | the question.   Counsel has misread the document. | 11:28:04 |
| 10 | Q.   Second lines says, "Another mean by which | 11:28:06 |
| 11 | intelligence agencies can lawfully intercept | 11:28:17 |
| 12 | communications." | 11:28:21 |
| 13 | A.   I do see that. | 11:28:22 |
| 14 | Q.   And what are you referring to when you say | 11:28:22 |
| 15 | "intelligence agencies"? | 11:28:25 |
| 16 | A.   In my training and experience, it would be | 11:28:26 |
| 17 | the FBI. | 11:28:28 |
| 18 | Q.   Does it include -- and so, you never | 11:28:29 |
| 19 | served in the FBI; is that correct? | 11:28:39 |
| 20 | A.   I did not. | 11:28:40 |
| 21 | Q.   And you never applied for a FISA award; is | 11:28:41 |
| 22 | that correct? | 11:28:49 |
| 23 | A.   I have not. | 11:28:49 |
| 24 | Q.   Have you ever appeared in front of the | 11:28:50 |
| 25 | FISA Court? | 11:28:51 |

1    to a device that is encrypted.                          11:38:06

2         Q.   Does that refer to a particular program or    11:38:16

3    company or anyone that has similar software             11:38:18

4    capabilities?                                           11:38:24

5              MR. AKROTIRIANAKIS:  Object to the form of    11:38:26

6    the question.                                           11:38:27

7         A.   It does not.                                  11:38:27

8         Q.   Can I ask you to take a look at               11:38:33

9    paragraph 36 on page 16?                                11:38:38

10             It reads: "However, federal laws provide      11:38:39

11   avenues for law enforcement to lawfully intercept       11:38:44

12   communications using tools like Pegasus, including      11:38:47

13   Title 3 wiretaps and FISA warrants."                    11:38:52

14             Can you explain what that paragraph means?    11:38:55

15        A.   Yes.  If --                                   11:38:57

16        Q.   Please -- please explain.                     11:39:07

17        A.   If there's a valid Title 3 or FISA warrant    11:39:08

18   for communications that are encrypted, in my            11:39:15

19   opinion, Title 3 and FISA would be a proper avenue      11:39:25

20   authorizing law enforcement to use Pegasus.             11:39:37

21        Q.   Are you aware of any Title 3 wiretap order    11:39:41

22   ordering the use of Pegasus or any NSO product?         11:39:45

23        A.   I am not.                                     11:39:48

24        Q.   Are you aware of any FISA warrant             11:39:51

25   approving the use of Pegasus or any NSO product?        11:39:54

1    MR. AKROTIRIANAKIS:  Object to the form of                11:39:58

2  the question.                                               11:39:58

3    A.   I am not.                                            11:39:58

4    Q.   In fact, do you understand that NSO did             11:39:59

5  not obtain a Title 3 wiretap or FISA warrant before        11:40:07

6  attacking WhatsApp servers; correct?                       11:40:10

7    MR. AKROTIRIANAKIS:  Object to the form of                11:40:14

8  the question.  And I think that part of the front          11:40:14

9  end of it didn't come over.                                11:40:15

10   Q.   Did you hear the question, Mr. Minkler?             11:40:20

11   A.   I did.                                              11:40:22

12        It is my understanding that -- and this             11:40:24

13  is limited to -- obviously to federal law                 11:40:30

14  enforcement -- that there is no federal law               11:40:33

15  enforcement warrant FISA or Title 3 allowing for the      11:40:36

16  use and installation of Pegasus, including if it was      11:40:48

17  used and installed in this matter.                        11:40:54

18   Q.   So to your knowledge, no United States             11:40:59

19  federal judge approved NSO's use of Pegasus to            11:41:01

20  attack WhatsApp servers; correct?                         11:41:05

21        MR. AKROTIRIANAKIS:  Object to the form of          11:41:10

22  the question.  No foundation.                             11:41:13

23   A.   Your words are "attack the servers."               11:41:14

24  There is no Title 3 or FISA warrant that I'm aware        11:41:23

25  of that has been authorized for anyone in this            11:41:29

| 1 | country, government agency, to use or install | 11:41:34 |
| 2 | Pegasus. | 11:41:43 |
| 3 |     Q.   And to your knowledge, no United States | 11:41:45 |
| 4 | federal judge approved NSO's use of Pegasus to | 11:41:49 |
| 5 | obtain any information for WhatsApp users; correct? | 11:41:53 |
| 6 |     A.   Correct. | 11:41:57 |
| 7 |     Q.   And to your knowledge, NSO's exploits at | 11:41:57 |
| 8 | issue in this federal litigation violated the | 11:42:01 |
| 9 | federal and California state anti-hacking statutes? | 11:42:04 |
| 10 |     MR. AKROTIRIANAKIS:  Object to the form of | 11:42:10 |
| 11 | the question.  No foundation.  Exceeds the scope of | 11:42:11 |
| 12 | the witness's opinion. | 11:42:14 |
| 13 |     (Reporter clarification.) | 11:42:18 |
| 14 |     A.   My understanding is a federal judge has | 11:42:18 |
| 15 | issued an opinion finding that the use of Pegasus in | 11:42:28 |
| 16 | this matter was not authorized. | 11:42:43 |
| 17 |     Q.   Can I ask you to look at paragraph 39 of | 11:42:45 |
| 18 | your report? | 11:42:51 |
| 19 |     A.   Yes. | 11:42:51 |
| 20 |     Q.   I'm going to direct you to the second | 11:42:51 |
| 21 | sentence that says "For example, federal law | 11:42:59 |
| 22 | provides criminal and civil penalties for abuse -- | 11:43:03 |
| 23 | for abuse of these law enforcement mechanisms." | 11:43:07 |
| 24 |     Do you see that? | 11:43:10 |
| 25 |     A.   I do. | 11:43:11 |

```
1       A.    That's correct.                              13:27:59

2       Q.    And presumably some of these countries as    13:27:59

3  well have changed their wiretapping electric            13:28:02

4  surveillance laws in the last 50 years.  Is that a      13:28:07

5  fair assumption?                                        13:28:10

6       A.    That's a fair assumption.                    13:28:11

7       Q.    Okay.  The second document says, "One        13:28:12

8  World Online Business --" I'm sorry, Mr. Minkler,       13:28:18

9  let's go back to the comparative study.  You didn't     13:28:25

10 write any part of that document; did you?               13:28:27

11      A.    No.                                          13:28:29

12      Q.    But you read the whole thing?                13:28:30

13      A.    I considered it.                             13:28:49

14      Q.    What does that mean?                         13:28:49

15      A.    Considered it -- I did read it, but a        13:28:50

16 thorough review and analysis is probably not an         13:28:53

17 accurate statement.  I reviewed the document to         13:28:55

18 determine whether countries had laws in place on        13:28:59

19 electronic surveillance, or whether they did not.       13:29:09

20      Q.    I just want to make sure I understood what   13:29:12

21 you said.  You said you did not read it?                13:29:15

22      A.    No, I read it.  Absolutely I read it.        13:29:18

23      Q.    You read the whole thing?                    13:29:27

24      A.    Yes.                                         13:29:28

25      Q.    Sorry.  That's not what it says on the       13:29:29
```

| | | |
|---|---|---|
| 1 | transcript so I just wanted to clarify -- | 13:29:31 |
| 2 | A.   Yeah.   Considered it was probably -- is | 13:29:32 |
| 3 | accurate.  But I did read it, yes. | 13:29:35 |
| 4 | Q.   Yes or no, did you read the whole | 13:29:38 |
| 5 | document? | 13:29:40 |
| 6 | A.   Yes, I did read the whole document. | 13:29:41 |
| 7 | Q.   Okay.  I'm sorry, thank you. | 13:29:42 |
| 8 | So One World Online -- "One World Online | 13:29:44 |
| 9 | Business Law, Chapter 7: Technology Surveillance." | 13:29:50 |
| 10 | What is that? | 13:29:55 |
| 11 | A.   I do not specifically recall that | 13:29:55 |
| 12 | document.  If I had it in front of me, obviously, I | 13:30:00 |
| 13 | could -- it probably would come back to me quicker. | 13:30:03 |
| 14 | Q.   Do you know what year that was published? | 13:30:06 |
| 15 | A.   I do not as I sit here today.  If I -- if | 13:30:09 |
| 16 | I had the document in front of me, I could tell you. | 13:30:13 |
| 17 | Q.   And do you know how long that chapter is? | 13:30:15 |
| 18 | A.   I do not. | 13:30:19 |
| 19 | Q.   And did you read the whole thing? | 13:30:20 |
| 20 | A.   I did read that whole thing. | 13:30:22 |
| 21 | Q.   Were you involved in writing it or | 13:30:23 |
| 22 | participating in any way in the drafting of that | 13:30:25 |
| 23 | chapter? | 13:30:29 |
| 24 | A.   I was not. | 13:30:29 |
| 25 | Q.   Okay.  The next document says, "Country | 13:30:30 |

| | | |
|---|---|---|
| 1 | Legal Framework Resources.  Provision of Real Time | 13:30:33 |
| 2 | Lawful and Interception Assistance." | 13:30:36 |
| 3 | Do you see that? | 13:30:39 |
| 4 | A.   I do. | 13:30:39 |
| 5 | Q.   What is that? | 13:30:40 |
| 6 | A.   Again, that specific document is not | 13:30:43 |
| 7 | coming back to me.  If I had it in front of me, I | 13:30:48 |
| 8 | could recall it and tell you more about it, but I'm | 13:30:53 |
| 9 | not recalling that specific document right now. | 13:30:57 |
| 10 | Q.   Okay.  And the next section is entitled, | 13:30:59 |
| 11 | "Documents Produced in This Litigation." | 13:31:04 |
| 12 | Do you see that? | 13:31:05 |
| 13 | A.   Yes. | 13:31:05 |
| 14 | Q.   I think we've established that you read | 13:31:06 |
| 15 | the Complaint and the exhibits; is that correct? | 13:31:11 |
| 16 | A.   Correct. | 13:31:13 |
| 17 | Q.   And it's fair to say that these following | 13:31:13 |
| 18 | documents that have Bates numbers or exhibit | 13:31:15 |
| 19 | numbers, those are documents that you also reviewed? | 13:31:17 |
| 20 | A.   Correct. | 13:31:20 |
| 21 | Q.   And who provided you that list of | 13:31:21 |
| 22 | documents? | 13:31:25 |
| 23 | A.   Those documents were provided to me by | 13:31:27 |
| 24 | counsel for NSO. | 13:31:31 |
| 25 | Q.   Okay.  And are there any -- is there | 13:31:32 |

| | | |
|---|---|---|
| 1 | A.    I did not. | 13:36:34 |
| 2 | Q.    And so, you never asked to understand or | 13:36:35 |
| 3 | see who NSO's clients were? | 13:36:41 |
| 4 | A.    I did not ask to see who NSO's clients | 13:36:45 |
| 5 | were, no. | 13:36:52 |
| 6 | Q.    And wouldn't that be relevant to the | 13:36:54 |
| 7 | determination of whether there was a lawful use of | 13:36:56 |
| 8 | Pegasus in terms of who their -- who their clients | 13:36:58 |
| 9 | were that were using Pegasus? | 13:37:02 |
| 10 | MR. AKROTIRIANAKIS:  Object to the form of | 13:37:05 |
| 11 | the question.  Incomplete hypothetical. | 13:37:05 |
| 12 | A.    It is one factor that would be relevant. | 13:37:08 |
| 13 | Q.    And that's not a factor you were able to | 13:37:14 |
| 14 | consider? | 13:37:16 |
| 15 | A.    I did not consider that factor. | 13:37:16 |
| 16 | Q.    So in this -- well, in this document, you | 13:37:20 |
| 17 | verified in paragraph 34 of your expert report -- | 13:37:28 |
| 18 | the last sentence in the paragraph, "I have verified | 13:38:04 |
| 19 | that NSO's contract contain clauses relates to human | 13:38:04 |
| 20 | rights and lawful intelligence data." | 13:38:08 |
| 21 | Do you see that? | 13:38:10 |
| 22 | A.    I do. | 13:38:10 |
| 23 | Q.    Would it be relevant to your determination | 13:38:11 |
| 24 | about the credibility of a party's ability to -- to | 13:38:14 |
| 25 | comply with human rights and lawful intelligent | 13:38:18 |

| | |
|---|---|
| 1 | gathering depending on who the client was? | 13:38:21 |
| 2 |       MR. AKROTIRIANAKIS:  Object to the form of | 13:38:24 |
| 3 | the question. | 13:38:24 |
| 4 |     A.   That would be relevant.  That would be a | 13:38:32 |
| 5 | relevant factor, yes. | 13:38:34 |
| 6 |     Q.   Would you come to a different conclusion | 13:38:34 |
| 7 | if, for example, the client was Iran versus it being | 13:38:40 |
| 8 | Spain? | 13:38:41 |
| 9 |     A.   Yes. | 13:38:41 |
| 10 |     Q.   And that's not information that you had? | 13:38:41 |
| 11 |     A.   This is the -- this is the one agreement | 13:38:52 |
| 12 | that I had to consider in preparing my report and | 13:38:54 |
| 13 | opinion. | 13:38:58 |
| 14 |     Q.   That's the one agreement that NSO decided | 13:38:58 |
| 15 | to give you? | 13:39:00 |
| 16 |       MR. AKROTIRIANAKIS:  Object to the form of | 13:39:02 |
| 17 | the question. | 13:39:02 |
| 18 |     A.   It's the one exhibit I considered. | 13:39:02 |
| 19 |     Q.   You didn't ask for any other contracts? | 13:39:06 |
| 20 |     A.   I did not. | 13:39:14 |
| 21 |     Q.   In the course of preparing your expert | 13:39:14 |
| 22 | report, did you ever review WhatsApp's terms of | 13:39:17 |
| 23 | service? | 13:39:19 |
| 24 |     A.   I have reviewed WhatsApp's terms of | 13:39:20 |
| 25 | service.  I don't know if I -- I did not review it | 13:39:33 |

Confidential - Pursuant to PO
Transcript of Joshua Minkler
Conducted on February 11, 2025                    120

| | | |
|---|---|---|
| 1 | in preparation for preparing my report. | 13:39:41 |
| 2 | Q.   Did you ever sign the stipulated | 13:39:44 |
| 3 | protective order governing the handling of | 13:39:48 |
| 4 | confidential proprietary and other private | 13:39:52 |
| 5 | information and documents in this case? | 13:39:56 |
| 6 | A.   I did not. | 13:39:56 |
| 7 | Q.   Can you explain to me what you know about | 13:39:57 |
| 8 | the facts of this case? | 13:40:05 |
| 9 | MR. AKROTIRIANAKIS:  Objection to the form | 13:40:10 |
| 10 | of the question. | 13:40:11 |
| 11 | A.   I know, based on reviewing the Complaint, | 13:40:11 |
| 12 | that there is an allegation that NSO violated the | 13:40:28 |
| 13 | Computer Fraud and Abuse Act through one of NSO's | 13:40:41 |
| 14 | end user's installing Pegasus without the WhatsApp | 13:40:55 |
| 15 | user's permission.  I know there are allegations | 13:41:10 |
| 16 | based on that.  That's a broad, high-level view of | 13:41:16 |
| 17 | my understanding of the facts. | 13:41:31 |
| 18 | I understand that those facts occurred in | 13:41:35 |
| 19 | 2018 and up to including June of 2019.  I know the | 13:41:44 |
| 20 | allegation is that this was in breach as well as | 13:41:57 |
| 21 | the -- of the California equivalent of the Computer | 13:42:03 |
| 22 | Fraud and Abuse Act and also a breach of a | 13:42:09 |
| 23 | contractual agreement that the Complaint alleges | 13:42:15 |
| 24 | existed between NSO and WhatsApp. | 13:42:21 |
| 25 | Very high-level view.  That's my | 13:42:26 |

1    the question.                                            14:45:27

2        A.    I have done no independent analysis of         14:45:27

3    that impact.                                             14:45:32

4        Q.    And you've done no analysis on what            14:45:34

5    banning NSO from using plaintiff's computers would       14:45:37

6    do on national security; correct?                        14:45:42

7            MR. AKROTIRIANAKIS:  Object to the form of       14:45:45

8    the question.                                            14:45:46

9        A.    To the extent I'm offering an opinion that     14:45:46

10   the use of a tool such as Pegasus would be helpful       14:46:02

11   to law enforcement in investigating, prosecuting, or     14:46:09

12   preventing issues relevant to national security,         14:46:15

13   I -- I have done some analysis.  But I have done no      14:46:18

14   independent analysis on how that would impact the        14:46:23

15   plaintiff's computers.                                   14:46:27

16       Q.    Does your analysis involve the weighing of     14:46:28

17   the harms of hacking into Meta's servers versus the      14:46:34

18   potential benefits on national security?                 14:46:38

19           MR. AKROTIRIANAKIS:  Object to the form of       14:46:43

20   the question.                                            14:46:43

21       A.    The -- my analysis and opinion did             14:46:43

22   consider that fact, yes.                                 14:46:58

23       Q.    So you think it's okay to protect national     14:46:59

24   security if it involves violating federal law?           14:47:04

25           MR. AKROTIRIANAKIS:  Object to the form of       14:47:10

1    the question.  Incomplete hypothetical.                    14:47:12

2        A.   I would disagree that statement.  I -- I          14:47:13

3    agree there are allegations in the Complaint, which        14:47:17

4    I have reviewed, which allege hacking, as you put          14:47:21

5    it.  My understanding and opinion is that law             14:47:30

6    enforcement's use of this tool would not be hacking       14:47:37

7    as I have defined it because it would be done             14:47:46

8    pursuant to a lawful court order.                          14:47:48

9        Q.   And you have been able to form that              14:47:50

10   opinion by conveniently not reading the judge's          14:47:53

11   opinion in this case; correct?                            14:47:56

12       MR. AKROTIRIANAKIS:  Object to the form of           14:47:58

13   the question.                                             14:47:58

14       A.   I have formed that opinion, yes.                 14:47:58

15       Q.   Without reading the judge's opinion?            14:48:04

16       MR. AKROTIRIANAKIS:  Object to the form of           14:48:09

17   the question.                                             14:48:09

18       A.   I did not read the judge's opinion.            14:48:09

19       Q.   You have done no analysis on the benefit       14:48:13

20   to society by preventing misuse or abuse of NSO's        14:48:17

21   technology; correct?                                      14:48:22

22       MR. AKROTIRIANAKIS:  Object to the form of           14:48:23

23   the question.                                             14:48:24

24       A.   I would say I considered that factor.  I       14:48:24

25   did not analyze that.  But I considered that factor      14:48:41

| | | |
|---|---|---|
| 1 | in forming my opinion that it would be beneficial | 14:48:43 |
| 2 | for law enforcement to have access to a tool such as | 14:48:51 |
| 3 | NSO's Pegasus.  I did consider that as a fact. | 14:49:01 |
| 4 | Q.   And how did you weigh the benefit to | 14:49:10 |
| 5 | society of preventing the misuse or abuse of NSO's | 14:49:13 |
| 6 | technology? | 14:49:15 |
| 7 | MR. AKROTIRIANAKIS:  Object to the form of | 14:49:16 |
| 8 | the question.  You can answer if you understand what | 14:49:18 |
| 9 | he's asking. | 14:49:19 |
| 10 | A.   I think I understand your question.  The | 14:49:19 |
| 11 | way I analyzed it is I reviewed materials alleging | 14:49:25 |
| 12 | that end users had abused, in the cases you listed, | 14:49:32 |
| 13 | Pegasus technology.  I weighed that against what I | 14:49:42 |
| 14 | saw was the value to law enforcement of this type of | 14:49:53 |
| 15 | technology if properly used by law enforcement.  And | 14:49:58 |
| 16 | my opinion after weighing those factors was that a | 14:50:02 |
| 17 | tool such as Pegasus would be beneficial to law | 14:50:19 |
| 18 | enforcement in criminal and in national security | 14:50:21 |
| 19 | matters. | 14:50:23 |
| 20 | Q.   So you weigh the established abuse by NSO | 14:50:24 |
| 21 | in cases involving journalists and civil rights | 14:50:32 |
| 22 | activists against the hypothetical possibly that if | 14:50:35 |
| 23 | NSO got a court order and used Pegasus legally, | 14:50:40 |
| 24 | which there's no evidence, that the latter | 14:50:42 |
| 25 | hypothetical outweighed the known abuses by NSO? | 14:50:47 |

| | | |
|---|---|---|
| 1 | That's your testimony? | 14:50:50 |
| 2 | MR. AKROTIRIANAKIS: Object to the form of | 14:50:52 |
| 3 | the question. Assumes facts not in evidence, and is | 14:50:53 |
| 4 | a hypothetical that is incomplete. | 14:50:56 |
| 5 | A. I reviewed the allegations. I reviewed | 14:50:59 |
| 6 | Dr. Vance's report which had additional allegations | 14:51:08 |
| 7 | that were not in the Complaint. And I am of the | 14:51:14 |
| 8 | opinion that Pegasus is a beneficial tool that could | 14:51:19 |
| 9 | be properly used by law enforcement. I guess the | 14:51:29 |
| 10 | complete and total enjoining of the use of such a | 14:51:41 |
| 11 | tool, I would disagree with based on that opinion. | 14:51:50 |
| 12 | Q. But you understand that the injunction | 14:52:02 |
| 13 | would be to ensure that NSO complies with the law. | 14:52:07 |
| 14 | You understand that? | 14:52:14 |
| 15 | MR. AKROTIRIANAKIS: Object to the form of | 14:52:15 |
| 16 | the question. | 14:52:16 |
| 17 | A. I would not have a problem or disagree | 14:52:16 |
| 18 | with an injunction, in my opinion, again, that | 14:52:26 |
| 19 | allows federal law enforcement to use NSO's Pegasus | 14:52:32 |
| 20 | pursuant to a court order. | 14:52:42 |
| 21 | Q. Would you object to an injunction that | 14:52:45 |
| 22 | required NSO to follow federal law? Yes or no? | 14:52:47 |
| 23 | MR. AKROTIRIANAKIS: Object to the form of | 14:52:53 |
| 24 | the question. Incomplete hypothetical. No | 14:52:54 |
| 25 | foundation. | 14:52:55 |

1        A.    I -- I would not object -- it's -- it's a        14:52:56

2    prospective order that requires NSO to follow        14:53:12

3    federal law.  As I have described it in my report, I        14:53:18

4    would support it.        14:53:25

5        Q.   You've done no analysis of NSO's state of        14:53:26

6    mind in developing, using, and selling Pegasus;        14:53:31

7    correct?        14:53:36

8            MR. AKROTIRIANAKIS:  Object to the form of        14:53:36

9    the question.        14:53:36

10       A.    I have reviewed materials provided by NSO.        14:53:36

11   The documents speak for themselves.  My -- from        14:53:53

12   reviewing those reports, it appears to me that their        14:53:55

13   state of mind, again, from reviewing the documents I        14:54:04

14   reviewed, was to provide a tool for law enforcement        14:54:08

15   to properly, in compliance with the laws of that        14:54:16

16   country, intercept end-to-end encrypted        14:54:25

17   communications.  That's the extent of my analysis.        14:54:28

18       Q.   You've done no analysis of whether NSO is        14:54:31

19   likely to violate the target computers at WhatsApp        14:54:34

20   if they're not enjoined; right?        14:54:40

21           MR. AKROTIRIANAKIS:  Object to the form of        14:54:44

22   the question.        14:54:44

23       A.    I have not done that analysis.        14:54:44

24       Q.   Okay.        14:54:46

25           MR. ANDRES:  I apologize, but now I'm        14:54:49

1   communications and also access to stored information        15:25:04

2   in a mobile device that is encrypted.                       15:25:11

3       Q.   And when you say "the use of law                   15:25:14

4   enforcement agencies," what law enforcement agencies        15:25:17

5   are you aware that use this technology lawfully?            15:25:20

6       A.   I'm sorry.  It would allow the use of              15:25:24

7   that.  I understand how the technology works and            15:25:32

8   secondly, I understand how law enforcement would use        15:25:35

9   this technology.  Sorry if I misspoke.                      15:25:39

10      Q.   Sorry.  The next part of that paragraph,           15:25:40

11  it says, "And details my testimony concerning using         15:25:44

12  such lawful intercept capabilities."                        15:25:48

13           I think for the purposes of brevity, you           15:25:53

14  testified that you're not aware of any lawful use --         15:25:56

15  actual lawful use of the technology; is that                15:25:58

16  correct?                                                    15:26:02

17           MR. AKROTIRIANAKIS:  Object to the form of         15:26:02

18  the question.  Misstates the witness's testimony.           15:26:03

19  No foundation.                                              15:26:07

20      A.   I'm not aware of the lawful use of Pegasus         15:26:08

21  in the United States by federal law enforcement             15:26:15

22  agencies.  I -- I have reviewed -- go ahead.                15:26:23

23      Q.   No, go ahead.                                      15:26:30

24      A.   Yeah.  Okay.  I have reviewed materials,           15:26:31

25  again, about the use of Pegasus technology by law           15:26:39

1    enforcement agencies in other countries.                    15:26:54

2        Q.    And what's the basis you have to conclude          15:26:59

3    that that use of Pegasus by law enforcement in other        15:27:01

4    countries was lawful?                                        15:27:06

5        A.    It would be by reading that source               15:27:07

6    material.                                                    15:27:16

7        Q.    Right.  So in other words, you're not            15:27:18

8    giving legal opinion about the legality of some law          15:27:20

9    enforcement effort in Saudi Arabia or anywhere else;         15:27:23

10   is that correct?                                             15:27:29

11       A.    That's correct.                                   15:27:29

12       Q.    You're not qualified to testify about the         15:27:30

13   lawfulness of some law enforcement technique in a            15:27:33

14   foreign country?                                             15:27:36

15       A.    I would agree that.  I think the exception        15:27:37

16   would be 2008 in the Republic of Mexico.  I had some        15:27:54

17   limited knowledge of how Mexican law enforcement             15:28:03

18   agencies were using information which DEA shared             15:28:13

19   with them in my investigation.  And again, I had a           15:28:20

20   limited understanding that that use was lawful.              15:28:24

21       Q.    Okay.  Let's skip ahead to paragraph 6 on        15:28:27

22   page 2.  It says, "With over 30 years of law                 15:28:35

23   enforcement experience, I have led more than 50              15:28:42

24   investigations resulting in the prosecution of more          15:28:45

25   than 500 criminal defendants in federal court."              15:28:47

1    opinion, lead anyone to believe that the FBI          17:31:39

2    deployed Pegasus.                                     17:31:45

3         Q.   Is that serious?                            17:31:47

4         MR. AKROTIRIANAKIS:  Object to the form of       17:31:51

5    the question.  Don't answer that.  Just don't answer  17:31:52

6    it.                                                   17:31:54

7         Ask a real question, Greg.  Move on.             17:31:55

8         Q.   Isn't it true that your report and your     17:32:02

9    opinions suggests that there's a lawful use of        17:32:05

10   Pegasus that is appropriate?                          17:32:09

11        A.   Yes.                                         17:32:14

12        Q.   And yet the Department of Justice and the   17:32:14

13   FBI have concluded not to use NSO?                     17:32:18

14        MR. AKROTIRIANAKIS:  Object to the form of        17:32:27

15   the question.                                          17:32:28

16        A.   My understanding is that the FBI and         17:32:28

17   Department of Justice, from this reporting, decided    17:32:31

18   not to deploy Pegasus.  That is correct.               17:32:36

19        Q.   And if the Department of Justice is not      17:32:39

20   going to use Pegasus, how is there a lawful use of     17:32:43

21   Pegasus in federal law enforcement?                    17:32:49

22        MR. AKROTIRIANAKIS:  Object to the form of        17:32:54

23   the question.                                          17:32:54

24        A.   My understanding, again, and my opinion is   17:32:54

25   in the future, because of the need for technology      17:33:03

1  that can be utilized to monitor end-to-end              17:33:11

2  encryption, that technology could be used by the        17:33:18

3  Department of Justice, including the FBI.  Clearly       17:33:26

4  they decided in '22 not to use it.  Could they --       17:33:31

5  could they have a different opinion based on a           17:33:39

6  necessity to use it?  Yes.                               17:33:45

7      Q.  Where in your opinion about the benefit of       17:33:48

8  tools such as Pegasus in law enforcement and             17:33:52

9  national security does it say "in the future"?           17:33:54

10      MR. AKROTIRIANAKIS:  Object to the form of          17:34:00

11  the question.                                            17:34:02

12      A.  I believe my report would be -- is              17:34:02

13  addressed to the benefits of tools such as Pegasus      17:34:09

14  in law enforcement and national security operations.    17:34:14

15  And those benefits would be current and clearly in      17:34:18

16  the future.                                              17:34:22

17      Q.  Right.  But as of the New York Times            17:34:29

18  article that you're relying on for your opinion, you    17:34:31

19  had information that you failed to disclose in your     17:34:34

20  report that the Department of Justice has decided       17:34:36

21  not to use Pegasus?                                      17:34:38

22      MR. AKROTIRIANAKIS:  Object to the form of          17:34:41

23  the question.                                            17:34:42

24      A.  My understanding is the Department of           17:34:42

25  Justice does not have any devices to include Pegasus    17:34:51

| | | |
|---|---|---|
| 1 | Q.   Turn to paragraph 45. | 18:05:02 |
| 2 | A.   Yes. | 18:05:28 |
| 3 | Q.   This is -- | 18:05:28 |
| 4 | A.   The OJP -- | 18:05:37 |
| 5 | Q.   Yeah. | 18:05:39 |
| 6 | A.   -- document. | 18:05:41 |
| 7 | Q.   This is the case that involves -- that you | 18:05:41 |
| 8 | weren't involved in? | 18:05:44 |
| 9 | A.   Right.  We discussed this earlier. | 18:05:45 |
| 10 | Q.   And you didn't speak to the prosecutor? | 18:05:47 |
| 11 | A.   I did not. | 18:05:50 |
| 12 | Q.   You didn't talk to the undercover police | 18:05:50 |
| 13 | officer? | 18:05:54 |
| 14 | A.   I did not. | 18:05:54 |
| 15 | Q.   Your -- your interaction with the facts of | 18:05:54 |
| 16 | this case are based solely on the fact that you read | 18:05:58 |
| 17 | this document? | 18:06:01 |
| 18 | A.   The OJP report, yes. | 18:06:05 |
| 19 | Q.   Okay.  Paragraph 46 deals with a speech by | 18:06:07 |
| 20 | Attorney General Barr. | 18:06:12 |
| 21 | A.   Correct. | 18:06:14 |
| 22 | Q.   Involves a terrorist attack in Garland, | 18:06:15 |
| 23 | Texas in 2015? | 18:06:21 |
| 24 | A.   That is correct. | 18:06:22 |
| 25 | Q.   Were you involved in that investigation? | 18:06:23 |

|   |   |
|---|---|
| 1  A.    I was not. | 18:06:24 |
| 2  Q.    Have you ever had any disuses about that | 18:06:25 |
| 3  case with the -- Attorney General Barr? | 18:06:30 |
| 4  A.    I have not. | 18:06:32 |
| 5  Q.    Did you talk to the agents involved? | 18:06:33 |
| 6  A.    I did not. | 18:06:35 |
| 7  Q.    Did you do any research other than read | 18:06:36 |
| 8  this speech? | 18:06:40 |
| 9  A.    I did read the speech and I was aware of | 18:06:41 |
| 10  this matter when it occurred in 2015.  I didn't do | 18:06:56 |
| 11  any research in preparing this report.  I'm trying | 18:07:06 |
| 12  to recall it occurred whether I reviewed other | 18:07:17 |
| 13  information that was shared with DOJ employees about | 18:07:24 |
| 14  this matter or whether it was discussed in the ITDT | 18:07:28 |
| 15  meetings that I attended. | 18:07:39 |
| 16      My recollection is that it was discussed | 18:07:43 |
| 17  and I was aware of it at the time it occurred. | 18:07:52 |
| 18  However, the specificity in paragraph 46 comes from | 18:07:58 |
| 19  the speech provided by Attorney General Barr. | 18:08:06 |
| 20  Q.    Can you turn to paragraph 47? | 18:08:11 |
| 21  A.    Yes. | 18:08:14 |
| 22  Q.    There's a reference to "United States | 18:08:14 |
| 23  versus Rhodes?" | 18:08:16 |
| 24  A.    Yes. | 18:08:16 |
| 25  Q.    That involves the January 6th | 18:08:16 |

1    prosecutions?                                      18:08:20

2         A.    Yes.                                    18:08:20

3         Q.    And with respect to this prosecution, did    18:08:21

4    you review any of the court documents in this case?    18:08:35

5         A.    Other than the indictment, no.         18:08:37

6         Q.    There was a lengthy trial in this case;    18:08:39

7    isn't that correct?                                18:08:42

8         A.    In the Rhodes matter, I -- I believe there    18:08:42

9    were several trials on the January 6th one, and I     18:08:45

10   believe you are correct, although I don't have a     18:08:51

11   personal knowledge of it -- of the trial in the      18:08:53

12   Rhodes matter.                                      18:08:56

13        Q.    And you didn't talk to any of the        18:08:57

14   prosecutors involved in that case?                  18:08:58

15        A.    I did not.                               18:09:00

16        Q.    You didn't review any of the transcripts?    18:09:01

17        A.    I did not.                               18:09:03

18        Q.    All you did was excerpt a line from the     18:09:03

19   indictment?                                         18:09:07

20        A.    Correct.                                 18:09:08

21        Q.    About the use of encrypted messages?     18:09:10

22        A.    Correct.                                 18:09:14

23        Q.    The defendants in this case were         18:09:14

24   convicted; isn't that correct?                      18:09:18

25        A.    They were.                               18:09:18

| | | |
|---|---|---|
| 1 | and President Biden; isn't that correct? | 18:11:40 |
| 2 | A.   That is correct. | 18:11:42 |
| 3 | Q.   So nothing about the fact that he used | 18:11:43 |
| 4 | E-to-E communications hampered the investigation | 18:11:51 |
| 5 | that you're aware of? | 18:11:54 |
| 6 | A.   I know -- I'm not personally aware of what | 18:11:55 |
| 7 | occurred in this investigation.  I am aware of | 18:12:05 |
| 8 | Director Ray's testimony where he expressed some | 18:12:10 |
| 9 | frustration about encrypted messaging applications | 18:12:14 |
| 10 | used in this matter that he did not believe the FBI | 18:12:22 |
| 11 | would be able to obtain.  And I believe his words, | 18:12:24 |
| 12 | which are here, is that is an increasingly vexing | 18:12:31 |
| 13 | barrier for law enforcement. | 18:12:36 |
| 14 | Q.   Can you take a look at Tab 49? | 18:12:39 |
| 15 | A.   Paragraph 49 or Tab 49? | 18:12:44 |
| 16 | Q.   Tab 49. | 18:12:46 |
| 17 | A.   Okay. | 18:12:48 |
| 18 | (Exhibit 2018 marked.) | 18:13:15 |
| 19 | THE CERTIFIED STENOGRAPHER:  This is being | 18:13:15 |
| 20 | marked as Exhibit 2018. | 18:13:16 |
| 21 | BY MR. ANDRES: | 18:13:49 |
| 22 | Q.   Do you see that? | 18:13:49 |
| 23 | A.   I do. | 18:13:49 |
| 24 | Q.   Can you turn to the back page? | 18:13:50 |
| 25 | A.   Yes. | 18:13:51 |

1    frameworks that prevent law enforcement to intercept          18:15:26

2    communications lawfully.  But I'm not an expert on            18:15:30

3    the laws of any particular nation.  I'm aware that            18:15:32

4    many foreign jurisdictions pose requirements to               18:15:35

5    receive authorization for lawful intercepts that are          18:15:40

6    similar to the United States."                                18:15:40

7         Do you see that?                                         18:15:41

8    A.    That is correct, yes.                                   18:15:41

9    Q.    You testified that you worked in Mexico                 18:15:42

10   during your time at the US Attorney's Office.  Are            18:15:45

11   there any other countries that you've worked in?              18:15:48

12   A.    No.                                                     18:15:50

13   Q.    And --                                                  18:15:50

14   A.    Worked with, I should say.  I was not                   18:15:52

15   actually in Mexico.                                           18:15:54

16   Q.    And with respect to the legal frameworks                18:15:55

17   or the research that you did to come to the                   18:16:01

18   conclusion, what is this based on?  What is your              18:16:03

19   statement in paragraph 50 based on?                           18:16:19

20   A.    The materials that I listed in my appendix              18:16:19

21   that I reviewed, the Library of Congress report, and          18:16:23

22   a law enforcement disclosure report.                          18:16:26

23   Q.    Is it fair to say that you've never done                18:16:27

24   any research about the legal frameworks of other             18:16:29

25   countries?                                                    18:16:33

| | | |
|---|---|---|
| 1 | MR. AKROTIRIANAKIS:  Object to the form of | 18:16:39 |
| 2 | the question.  Misstates, in part, the witness's | 18:16:39 |
| 3 | testimony. | 18:16:41 |
| 4 | A.  Other than what I've described in this | 18:16:41 |
| 5 | report, that is a fair statement. | 18:16:43 |
| 6 | Q.  And that's the peer -- you read, a | 18:16:46 |
| 7 | treatise from 1975, for example? | 18:16:50 |
| 8 | A.  That's one of the materials I reviewed.  I | 18:16:52 |
| 9 | also reviewed the law enforcement discloser report | 18:17:01 |
| 10 | from 2014. | 18:17:04 |
| 11 | Q.  You've never done any analytical study on | 18:17:04 |
| 12 | the laws of other nations as it relates to | 18:17:08 |
| 13 | intercepting communications? | 18:17:10 |
| 14 | MR. AKROTIRIANAKIS:  Object to the form of | 18:17:12 |
| 15 | the question. | 18:17:17 |
| 16 | A.  I have not. | 18:17:17 |
| 17 | Q.  You've never reviewed data from any of | 18:17:18 |
| 18 | these countries about their law enforcement | 18:17:21 |
| 19 | intercept capabilities? | 18:17:24 |
| 20 | A.  Other than what is described in the | 18:17:25 |
| 21 | materials I reviewed, no. | 18:17:29 |
| 22 | Q.  You've never written or published any | 18:17:31 |
| 23 | material about the law enforcement -- law | 18:17:41 |
| 24 | enforcement's ability to intercept communications | 18:17:41 |
| 25 | internationally; is that correct? | 18:17:44 |

1    of end-to-end encryption in 2016, digital security          18:47:19

2    has become even more important."                            18:47:25

3            Did you read that?                                  18:47:27

4        A.   I did.                                             18:47:28

5        Q.   And you do you understand there are valid          18:47:28

6    uses for end-to-end encryption?                             18:47:30

7        A.   I do.                                              18:47:31

8        Q.   And that's why you use WhatsApp, because           18:47:32

9    it provides security for your messages?                     18:47:33

10       A.   That's one of the reasons I use WhatsApp,          18:47:39

11   correct.                                                    18:47:41

12       Q.   Mr. Minkler, have you yourself ever                18:47:56

13   prosecuted a child sexual exploitation case in which       18:47:56

14   the use of end-to-end encryption prevented law             18:47:56

15   enforcement from intercepting and deciphering              18:47:56

16   communications?                                             18:48:00

17       A.   I have not.                                        18:48:00

18       Q.   Have you yourself ever prosecuted a               18:48:00

19   terrorism case in which the use of end-to-end              18:48:03

20   encryption prevented law enforcement from                 18:48:05

21   intercepting and deciphering communications?               18:48:08

22       A.   I have not.                                        18:48:10

23       Q.   It's fair to say you don't have a                 18:48:11

24   photographic memory; is that correct?                      18:48:13

25       A.   That is correct.                                  18:48:14

1           CERTIFIED STENOGRAPHER'S CERTIFICATE

2     STATE OF CALIFORNIA    )
                             ) SS.
3     COUNTY OF LOS ANGELES )

4

5           I, NATALIE PARVIZI-AZAD, HERBY CERTIFY:

6           I AM A DULY QUALIFIED CERTIFIED SHORTHAND

7     REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

8     CERTIFICATE NUMBER CSR 14125 ISSUED BY THE COURT

9     REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

10    FORCE AND EFFECT.   (BUS. & PROF. § 8016)

11          I AM NOT FINANCIALLY INTERESTED IN THIS

12    ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY

13    ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES.

14    (CIV. PROC. § 2025.320(A))

15          I AM AUTHORIZED TO ADMINISTER OATHS OR

16    AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

17    PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING

18    EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER OATH

19    OR AFFIRMATION BY ME.   (CIV. PROC. §§ 2025.320,

20    2025.540(A))

21          I AM THE CERTIFIED OFFICER THAT

22    STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23    FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT

24    IS A TRUE RECORD OF THE TESTIMONY GIVEN.   (CIV.

25    PROC. §  2025.540(A))

1          I HAVE NOT, AND SHALL NOT, OFFER OR PROVIDE

2     ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY

3     OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

4     ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES

5     OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND

6     MAKING SAME AVAILABLE AT THE SAME TIME TO ALL

7     PARTIES OR THEIR ATTORNEYS.  (CIV. PROC §

8     2025.320(B))

9          I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

10    CONSISTING OF THE CERTIFIED STENOGRAPHER'S

11    NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF

12    ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE

13    PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR

14    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

15    ACTION, NOR SHALL I COLLECT ANY PERSONAL

16    IDENTIFYING INFORMATION ABOUT THE WITNESS AS A

17    SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR

18    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

19    ACTION.  (CIV. PROC. § 2025.320(C))

20

21    DATED:  February 14, 2025

22

23

24    _____

        NATALIE PARVIZI-AZAD, CSR NO.14125

25