# Exhibit A to the Declaration of Aaron S. Craig
## April 4, 2025

# EXHIBIT 8

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                  OAKLAND DIVISION
 3
      - - - - - - - - - - - - - - - - - -
 4                              )
      WHATSAPP INC., a Delaware      )
 5    corporation, and META PLATFORMS, )
      INC., a Delaware corporation,    )
 6                              )
                      Plaintiffs,  )
 7                              )  Case No.:
      v.                        )  4:19-cv-07123-PJH
 8                              )
      NSO GROUP TECHNOLOGIES LIMITED   )
 9    and Q CYBER TECHNOLOGIES LIMITED,)
                                )
10                    Defendants.  )
      - - - - - - - - - - - - - - - - - -
11       Highly Confidential - Subject to Protective Order
12            VIDEO DEPOSITION OF RAMON ESHKAR
13               Tuesday, August 27, 2024
14               Commencing:  9:17 a.m. BST
15
16               Davis Polk & Wardwell LLP
                  5 Aldermanbury Square
17                   London, EC2 7HR
                     United Kingdom
18
19
20
21
22
23
24    Court Reporter:
      Chanelle Malliff, CLR
25
```

HIGHLY CONFIDENTIAL

Page 14

1　colleague.
2　　Q. Who is that colleague?
3　　A. An employee of mine.
4　　Q. What is that employee's name?
5　　A. ███
6　　Q. And the surname?
7　　A. ███
8　　Q. ███?
9　　A. Yes.
10　　Q. What is ███s job?
11　　A. He's responsible for the customer support.
12　　Q. Do you know ███s title?
13　　A. Yeah, it's VP, customer support.
14　　Q. ███ reports to you?
15　　A. Yes.
16　　Q. When did you review your understanding with
17　███?
18　　A. During my stay at the -- in Israel, like a
19　few days ago.
20　　Q. How long was the conversation that you had in
21　preparation for this deposition with ███
22　　A. Not more than an hour.
23　　Q. And what did you and ███ discuss?
24　　A. Just the processes related to this topic.
25　　Q. And by "this topic" you mean?

Page 15

1　　A. I mean creation, what's related to the
2　opening account.
3　　Q. On WhatsApp?
4　　A. Yeah.
5　　Q. And why is ███, as VP of customer
6　support, an appropriate person to talk to about the
7　processes that defendants follow related to creating
8　accounts on WhatsApp?
9　　MR. AKROTIRIANAKIS: Objection: misstates the
10　witness's testimony.
11　　THE WITNESS: I'm sorry?
12　　MR. AKROTIRIANAKIS: If you understand his
13　question you can answer.
14　　THE WITNESS: Can you please repeat?
15　BY MR. BLOCK:
16　　Q. Is creating accounts on WhatsApp part of
17　███ job?
18　　A. No, it's part of one of his department's job.
19　　Q. Which department is that?
20　　A. The white services department.
21　　Q. What is the white services department?
22　　A. It's a department responsible for creating
23　accounts and purchasing other services that we need.
24　　Q. Why is it called white services?
25　　MR. AKROTIRIANAKIS: Objection: foundation.

Page 16

1　　THE WITNESS: I'm sorry?
2　BY MR. BLOCK:
3　　Q. Why is it called white services?
4　　MR. AKROTIRIANAKIS: Same objection.
5　　THE WITNESS: Actually the name was decided
6　before I join so I can't recall the reason.
7　BY MR. BLOCK:
8　　Q. Do you have an understanding of what makes a
9　service a white service?
10　　A. I do.
11　　Q. What is that?
12　　A. It means that the service is being set up in
13　an anonymized way.
14　　Q. Is one of the services that defendants set up
15　in an anonymized way WhatsApp?
16　　MR. AKROTIRIANAKIS: Objection: vague.
17　　THE WITNESS: Again? Again, sorry?
18　BY MR. BLOCK:
19　　Q. What are the services that the white services
20　department deals in?
21　　A. There are a few services.
22　　Q. Is WhatsApp one of them?
23　　MR. AKROTIRIANAKIS: Objection: vague.
24　　THE WITNESS: What?
25　　MR. AKROTIRIANAKIS: I said "objection:

Page 17

1　vague". If you understand his question though you
2　can answer.
3　　THE WITNESS: Okay. Sorry, come again?
4　BY MR. BLOCK:
5　　Q. Sure. Is WhatsApp one of the services that
6　the white services department of defendants deals
7　with?
8　　MR. AKROTIRIANAKIS: Same objection.
9　　THE WITNESS: Yes, they deal with it.
10　BY MR. BLOCK:
11　　Q. Okay, tell me how the white services
12　department -- so, withdrawn.
13　　Does the white services department set up
14　WhatsApp accounts in an anonymized way?
15　　A. They do.
16　　Q. And what does it -- what do you mean by in
17　an anonymized way?
18　　A. It means that they're created in a way that
19　will be secure an obstacle where -- to the use of the
20　service later on.
21　　Q. What do you mean by secure?
22　　A. I mean that the infrastructure will protect
23　the customer when using the account.
24　　Q. Does that mean protect the customer from
25　having its identity discovered?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1     A. What do you mean by his identity?
2         MR. AKROTIRIANAKIS: Sorry, is this a
3  realtime tablet? It's not working.
4         (Pause)
5  BY MR. BLOCK:
6     Q. Why do your -- is it accurate that your
7  customers want their WhatsApp accounts to be set up
8  in an anonymized way?
9         MR. AKROTIRIANAKIS: Objection: no
10  foundation.
11         THE WITNESS: What do you mean?
12  BY MR. BLOCK:
13     Q. I'm asking why you set up anonymized WhatsApp
14  accounts for your customers?
15     A. The entire infrastructure is anonymized to
16  protect the customer and the infrastructure that
17  they're using.
18     Q. Is that to protect the customer from being
19  identified?
20         MR. AKROTIRIANAKIS: Objection: vague.
21         THE WITNESS: What do you mean by identified?
22  BY MR. BLOCK:
23     Q. Let me just ask you. In what regard are you
24  trying to protect the customer by anonymizing the
25  WhatsApp service?

Page 19

1     A. We want to [Hebrew] to.
2         MR. BLOCK: May we have help from the
3  translators, please?
4         THE INTERPRETER: Distance. We would like to
5  distance.
6         THE WITNESS: Would like to distance --
7  I'm not so sure it's the word, but to, let's say,
8  distance the customer.
9  BY MR. BLOCK:
10     Q. From whom?
11     A. From the environment so that they can run
12  their operation in a secured way, not to expose their
13  operation.
14     Q. You also said you create the accounts in a
15  way that will be "op sec aware" to the use of the
16  service later on. Did I get that right?
17     A. Op sec, operational security.
18     Q. Okay, and what does it mean to be op sec
19  aware to the use of the service later on?
20     A. What I mean is that you apply all the measure
21  that you can in order to protect the activity, the
22  operation.
23     Q. And that's again to protect it from being
24  discovered by third parties?
25         MR. AKROTIRIANAKIS: Objection: misstates

Page 20

1  testimony.
2         THE WITNESS: By another one.
3  BY MR. BLOCK:
4     Q. By another one? Someone other than the
5  customer who is operating the service and NSO itself?
6         MR. AKROTIRIANAKIS: Objection: misstates
7  testimony.
8  BY MR. BLOCK:
9     Q. Correct?
10     A. The customer.
11     Q. Someone other than the customer?
12     A. Someone other than the customer.
13     Q. Do you create the WhatsApp services for the
14  customer in a way that can be traced back to NSO?
15         MR. AKROTIRIANAKIS: Objection: vague.
16         THE WITNESS: What do you mean by "can be
17  traced back"?
18  BY MR. BLOCK:
19     Q. So that another can identify NSO as the
20  entity that created the WhatsApp account?
21     A. So the question is?
22         MR. AKROTIRIANAKIS: Object to the form of
23  the question.
24  BY MR. BLOCK:
25     Q. Do you create the WhatsApp services for the

Page 21

1  customer in a way that can be traced back to NSO?
2         MR. AKROTIRIANAKIS: Object to the form of
3  the question. Vague.
4         THE WITNESS: We create services in
5  an anonymous way.
6  BY MR. BLOCK:
7     Q. Anonymous for the customer and anonymous for
8  NSO; is that right?
9         MR. AKROTIRIANAKIS: Objection: misstates
10  testimony.
11         THE WITNESS: Anonymous mean anonymous, so in
12  an anonymous way.
13  BY MR. BLOCK:
14     Q. Okay, so why don't we start at the beginning.
15  In what circumstance will NSO create an anonymized
16  WhatsApp account?
17     A. In what ways?
18     Q. When does it happen?
19     A. When does it happen. Okay. Either for
20  demonstrations, for real system, customer systems.
21         (Reporter clarification.)
22  For real systems.
23     Q. Real systems, is that what you said?
24     A. Systems that are being used by the customer.
25     Q. So just to clarify my record because we had

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1  some cross talk, which I appreciate.  Let me ask the
2  question again, is that okay?
3      A.  Please.
4      Q.  In what circumstances will NSO create
5  anonymized WhatsApp accounts?
6      A.  So for the use of demonstration, to set up a
7  customer system, and for internal use mainly for
8  testing.
9      Q.  Is the internal use research and development?
10     A.  Yes, all preparation for demo training.
11     Q.  Okay, let's focus on the research and
12 development use case.  Has NSO in fact created
13 anonymized WhatsApp accounts for its own use for
14 research and development?
15     MR. AKROTIRIANAKIS:  Objection.  It's beyond
16 the scope of this witness's designation.  We have
17 another designee for that.  If you know the answer to
18 the question you can answer in your personal
19 capacity.
20     THE WITNESS:  In that sense we provide a
21 service to our colleagues.  So we are being asked to
22 provide, and we provide.
23     MR. BLOCK:  Joe, who will be the witness on
24 that?
25     MR. AKROTIRIANAKIS:  ████████

Page 23

1  BY MR. BLOCK:
2      Q.  When you say provide a service to colleagues,
3  which colleagues are you talking about?
4      A.  I wanted to refer to R&D as a department.  So
5  when they approach my department, and my department
6  provide them with the account that they're asking.
7      Q.  And specifically ████████s department
8  within your department provides that account?
9      A.  Correct.
10     Q.  Okay, and how does that happen?
11     MR. AKROTIRIANAKIS:  Objection: no
12 foundation.
13 BY MR. BLOCK:
14     Q.  Let me pull back.  You spoke with ████████
15 to confirm the processes that defendants used to
16 create these anonymized accounts as part of your
17 preparation to testify today; is that right?
18     A.  I discussed with ███ my understanding of the
19 processes to make sure that I am ready for this
20 session.
21     Q.  Please explain the process of setting up
22 an anonymized WhatsApp account at NSO?
23     A.  So we get a request.  The team that
24 responsible for the creation of the accounts get a
25 request, and they follow, create the accounts as

Page 24

1  requested, and provide it back.
2      Q.  Okay, I want to focus on the part of the
3  process where they create the account as requested.
4  What happens step-by-step?
5      MR. AKROTIRIANAKIS:  Objection: no
6  foundation.
7      THE WITNESS:  So I'm not creating the
8  account -- the accounts myself, so I gave a general
9  description of that, okay?  So for example they're
10 being asked to provide one account so the relevant
11 employee will create the account, like anyone
12 creating a WhatsApp account, follow the same steps,
13 and provide the details to the one that asked it.
14 BY MR. BLOCK:
15     Q.  Will the relevant employee when creating this
16 account use a real name?
17     A.  He will use a name.  It can be like two
18 letters.  It can be something else.
19     Q.  Is this done on a mobile interface or a web
20 interface, or in some different way?
21     A.  In most cases it is being done by mobile.
22     Q.  So let me see if I understand.  The employee
23 on ████████ team will download a WhatsApp mobile
24 application on to a mobile device and register a
25 WhatsApp account, is that accurate?

Page 25

1      A.  In most of the cases, yes.
2      Q.  And in doing so that NSO employee will follow
3  the normal WhatsApp process for registration through
4  the WhatsApp application downloaded from
5  an application store; is that accurate?
6      MR. AKROTIRIANAKIS:  Objection: vague.
7      THE WITNESS:  He will follow the steps it
8  need in order to create the account.
9  BY MR. BLOCK:
10     Q.  However they'll use a fake name, is that
11 accurate?
12     MR. AKROTIRIANAKIS:  Objection: misstates
13 testimony.
14     THE WITNESS:  They will put a name.
15 BY MR. BLOCK:
16     Q.  A name that is not the real name of the
17 person creating the account or of the person who
18 requested it; correct?
19     A.  Not the name of the one creating and not the
20 one that -- the one receiving.
21     Q.  Is there any special process for deciding
22 what name to use?
23     A.  No.
24     Q.  Okay.  Why does a relevant employee create
25 the account instead of the colleague creating it

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 38

1  he is an employee of mine.  And the other were
2  related to what we are talking now.
3      Q.  Okay.  Did you discuss any other topics with
4  ████████ that were specifically to prepare for your
5  testimony today besides the WhatsApp account creation
6  topics?
7      A.  That was the main -- the main topic.  We also
8  covered other topics such as training.
9      Q.  Any others?
10     A.  Maybe.  It's like a normal call between us so
11  I don't remember them all but --
12     Q.  I'm just trying to discover what information
13  you received from ████████ for purposes of
14  testifying today.  So you discussed training.  We'll
15  talk about that in a moment.
16     A.  Sure.
17     Q.  Can you think of any others that you
18  discussed with him to prepare for your testimony?
19     A.  Again, it was more to, in a way, just make
20  sure that I'm up to speed from my perspective because
21  I am aware of those processes anyway, so I just
22  wanted to make sure I'm aligned.
23     Q.  What did you discuss about training?
24     A.  You know like the agenda, the duration,
25  things like that.

Page 39

1      Q.  Of a particular training?
2      A.  No, in general.
3      Q.  Okay.  What is the agenda and duration of
4  training in general that you discussed with
5  ████████
6      A.  It's like a four-days training that will be
7  the average.  Some will be less, some will be more.
8      Q.  Is this training for customers or training
9  for NSO employees or something different?
10     A.  For customers.
11     Q.  Do defendants train customers to create
12  anonymized WhatsApp accounts?
13     A.  No, we do not train.  To the best of my
14  recollection we do not do that.
15     Q.  But defendants do create anonymized WhatsApp
16  accounts for use by customers; is that accurate?
17     A.  We do create accounts for the customers.
18     Q.  And when is the most recent occasion when
19  defendants created an anonymized WhatsApp account for
20  use by a customer of which you are aware, sir?
21     MR. AKROTIRIANAKIS:  Objection: no
22  foundation.  Hold on, I've got to object first.  No
23  foundation and it's beyond the scope of the
24  designation of this witness.
25     THE WITNESS:  I think we talked about the

Page 40

1  timelines before, right?  So I know that we have
2  created during the EU but not specifically a date
3  within.
4  BY MR. BLOCK:
5      Q.  And you know you created anonymized WhatsApp
6  accounts for customers -- strike that.
7      You know that defendants created anonymized
8  WhatsApp accounts for use by customers in 2024;
9  correct?
10     MR. AKROTIRIANAKIS:  Objection: no
11  foundation.  Also beyond the scope of the designation
12  of this witness.
13     THE WITNESS:  I would say for customers.
14  BY MR. BLOCK:
15     Q.  You did it for customers or you did it for
16  four customers?
17     MR. AKROTIRIANAKIS:  Object to the form of
18  the question.
19  BY MR. BLOCK:
20     Q.  Let me just ask my question again.  You know
21  that defendants created anonymized WhatsApp accounts
22  for use by defendants' customers during calendar year
23  2024; is that correct?
24     MR. AKROTIRIANAKIS:  Objection: no
25  foundation.  Also beyond the scope of the designation

Page 41

1  of this witness.
2      THE WITNESS:  I'm not sure it's correct.
3  BY MR. BLOCK:
4      Q.  When is the most recent occasion of which you
5  were aware when defendants created anonymized
6  WhatsApp accounts for use by one of defendants'
7  customers?
8      MR. AKROTIRIANAKIS:  Objection: no
9  foundation.  Also beyond the scope of the designation
10  of this witness.
11     THE WITNESS:  I don't have a specific date in
12  mind.
13  BY MR. BLOCK:
14     Q.  Do you know whether that occurred in 2018?
15     MR. AKROTIRIANAKIS:  Objection: no
16  foundation.
17     THE WITNESS:  In 2018 the department wasn't
18  under my responsibility.
19  BY MR. BLOCK:
20     Q.  Do you know whether it occurred in 2019?
21     MR. AKROTIRIANAKIS:  Same objection.
22     THE WITNESS:  Same they were not part of my
23  department in 2019.
24  BY MR. BLOCK:
25     Q.  Do you know whether it occurred in 2020?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 62

1  roughly two years ago maybe. Time flies but more or
2  less.
3      Q. As a director were you director of client
4  executive, is that how you say it?
5      A. Yes.
6      Q. And then you became VP client executive?
7      A. Correct.
8      Q. And now SVP client executive?
9      A. No, I'm SVP for what we called the CBD. It's
10  actually the customer based division.
11      Q. Customer base division?
12      A. We call it customer base division.
13      Q. Business?
14      A. Division.
15      Q. Okay. And that includes client executive as
16  one of the departments within your purview?
17      A. Indeed.
18      Q. Okay. How did you come to work for NSO?
19          MR. AKROTIRIANAKIS: Objection: vague.
20          THE WITNESS: Can you please repeat or
21  explain?
22          MR. AKROTIRIANAKIS: Do you want it in
23  Hebrew? That's an English way of speaking. Do you
24  understand his question?
25          THE WITNESS: I'm not sure.

Page 63

1  BY MR. BLOCK:
2      Q. Let me try to ask... How were you introduced
3  to the opportunity to work at NSO?
4      A. NSO made contact.
5      Q. Who at NSO made contact?
6      A. I don't remember the lady from HR at the time
7  but --
8      Q. Someone in a recruiting function?
9      A. Yes.
10      Q. Reached out to you over LinkedIn or email?
11      A. She reached out via LinkedIn and then a phone
12  call.
13      Q. Before you started that application process,
14  did you know anybody at NSO?
15      A. I came aware of the fact that there is
16  someone that I know at NSO after, okay. I didn't
17  know in advance that he works there.
18      Q. I understand. Who is that person?
19      A.  ████
20      Q.  ████ is a first name or a last name?
21      A. Yeah, a first name.
22      Q.  ████████
23      A. Yes.
24      Q. Last name?
25      A.  ████████ I'm not sure I'm spelling it

Page 64

1  correctly.  ████  I think.
2      Q. So you knew  ████  before you joined NSO but
3  only learned after you joined NSO that  ████  was
4  also employed then?
5      A. (Witness nods).
6      Q. Okay.
7      A. During the process, not after. During the
8  process.
9      Q. Fair enough. Do you work in a particular
10  physical location for NSO, your office?
11      A. Yes.
12      Q. Tel Aviv?
13      A. Herzliya.
14          MR. AKROTIRIANAKIS: H-E-R-Z-L-I-Y-A in
15  English.
16  BY MR. BLOCK:
17      Q. Do you travel on business for NSO?
18      A. Yeah, I travel.
19      Q. Have you traveled to the United States on
20  business for NSO?
21      A. No, not that I recall.
22      Q. How do you communicate with your co-workers
23  for business purposes?
24          MR. AKROTIRIANAKIS: Objection: vague.
25          THE WITNESS: How do I --

Page 65

1  BY MR. BLOCK:
2      Q. Communicate?
3      A. We talk. We meet. We use phone calls.
4      Q. You meet in person?
5      A. Yeah, we meet in person.
6      Q. You use the telephone?
7      A. We use the telephone.
8      Q. Videoconferencing?
9      A. We use videoconferencing.
10      Q. Do you communicate with your co-workers at
11  NSO using email?
12      A. Yes.
13      Q. And do you communicate with your co-workers
14  at NSO using messaging services?
15      A. Yes.
16      Q. Which messaging services do you use for
17  business purposes at NSO?
18      A. What do you mean for business purposes like
19  our communication between employees of the company?
20      Q. Yes.
21      A. We use the various types of popular IMs.
22      Q. Such as?
23      A. Such as Signal.
24      Q. Any others?
25      A. Yeah, can be WhatsApp. Can be WebEx.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q. Do you have a smartphone?
2    A. Yes.
3    Q. What kind is it?
4    A. Samsung.
5    Q. Did NSO provide that smartphone to you?
6    A. So I'm not so sure what -- I don't want to
7  confuse the legal terms here. From one side they do,
8  and the other side there is something with the like
9  we buy it. So I don't want what's the right term to
10 use, but at the end of the day I get it from the
11 company. But there is something in the background
12 with regards to the taxation or something like that
13 with regards to giving to someone a phone.
14    Q. Did you go to a store and purchase the
15 device?
16    A. No.
17    Q. Did NSO hand the device to you?
18    A. Yes.
19    Q. Does NSO pay for the service on the device?
20    A. Yes.
21    Q. In -- has that been your arrangement ever
22 since you joined NSO in 2015?
23    MR. AKROTIRIANAKIS: Objection: vague.
24    THE WITNESS: My arrangement you mean for the
25 phone to be provided?

Page 67

1  BY MR. BLOCK:
2    Q. Yes.
3    A. Yeah, it was the same when I joined.
4    Q. So for as long as you have been an NSO
5  employee, NSO has provided you with a phone to use
6  for work and paid for the service; correct?
7    MR. AKROTIRIANAKIS: Objection: no
8  foundation.
9    THE WITNESS: The moment I left the army and
10 started, every company provided a phone.
11 BY MR. BLOCK:
12    Q. Okay. Did you download a WhatsApp
13 application on to that phone?
14    A. I have.
15    Q. And do you use that for business purposes at
16 NSO?
17    A. What do you mean by business purposes?
18    Q. To engage in business-related communications?
19    A. Yes.
20    Q. Did you set up that WhatsApp account
21 yourself?
22    A. Yes.
23    Q. Do you recall going through the regular
24 registration process?
25    A. Yes, it was long ago. I think I had it even

Page 68

1  before I joined so I just kept the same account.
2    Q. Have you ever used a white services
3  anonymized WhatsApp account yourself?
4    A. No, not that I recall.
5    Q. Do you know whether NSO generally provides
6  smartphones to all of its employees?
7    MR. AKROTIRIANAKIS: Objection: foundation.
8    THE WITNESS: As much as that they were
9  provided to some of our employees.
10 BY MR. BLOCK:
11    Q. Do you know where the line is drawn who gets
12 smartphones and who doesn't?
13    MR. AKROTIRIANAKIS: Objection: no
14 foundation.
15    THE WITNESS: I don't know in other
16 departments. I know for my department.
17 BY MR. BLOCK:
18    Q. So tell me for your department?
19    A. For my department we provide phones.
20    Q. And that includes everyone in the white
21 services department?
22    A. Yes.
23    Q. Okay. And --
24    A. An employee might choose not to have a phone
25 so I don't know if right now at this moment all of

Page 69

1  them with a phone that we have provided, but they do
2  have this option.
3    Q. Okay. Have you ever sent a WhatsApp message
4  other than through the WhatsApp client application on
5  a mobile device?
6    MR. AKROTIRIANAKIS: Objection: foundation.
7    THE WITNESS: Just to make sure, have I ever
8  sent a WhatsApp messages not using the phone?
9  I've used the web interface, if this is what you
10 mean, but not more than that, so it's coming out from
11 my phone.
12 BY MR. BLOCK:
13    Q. Okay. And when you have used the web
14 interface you logged in with your personal WhatsApp
15 credentials, which are the same ones associated with
16 the WhatsApp application on your smartphone; is that
17 accurate?
18    MR. AKROTIRIANAKIS: Objection: foundation.
19 Vague. Compound.
20    THE WITNESS: Just operated a web interface
21 using the barcode scanning.
22 BY MR. BLOCK:
23    Q. Barcode scanning, okay. You haven't operated
24 the emulator that we discussed earlier to send a
25 WhatsApp message; correct?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1     A. Correct.
2     Q. Have you observed operation of the emulator
3 to send a WhatsApp message?
4     A. Not that I recall.
5     Q. Okay. Do you know whether the emulator is
6 capable of sending WhatsApp messages?
7         MR. AKROTIRIANAKIS: Objection: foundation.
8         THE WITNESS: If I'm aware that what?
9 BY MR. BLOCK:
10     Q. Whether the emulator that we discussed
11 earlier is capable of sending WhatsApp messages?
12         MR. AKROTIRIANAKIS: Same objection.
13 Foundation.
14         THE WITNESS: I would understand it does.
15 BY MR. BLOCK:
16     Q. Do you have knowledge of the extent to which
17 defendants personnel have agreed to the WhatsApp
18 terms of service?
19         MR. AKROTIRIANAKIS: Objection: calls for a
20 legal conclusion. No foundation. Also beyond the
21 scope of the designation of this witness.
22         THE WITNESS: I'm not sure I follow.
23 BY MR. BLOCK:
24     Q. Okay. We talked about the process that the
25 white services department uses when it creates

Page 71

1 anonymized accounts. Do you remember that?
2     A. Yes, I do.
3         MR. AKROTIRIANAKIS: Objection: misstates his
4 testimony.
5 BY MR. BLOCK:
6     Q. Do you know whether or not the white services
7 department employees agreed to WhatsApp terms of
8 service when they create anonymized accounts?
9         MR. AKROTIRIANAKIS: Objection: foundation,
10 vague, and it calls for a legal conclusion. It's
11 also beyond the scope of the designation of this
12 witness.
13         THE WITNESS: They established the account so
14 they follow the steps required in order to establish
15 the account.
16 BY MR. BLOCK:
17     Q. So you would understand if agreeing to the
18 terms of services is a normal step, then that's a
19 step that they take?
20     A. No --
21         MR. AKROTIRIANAKIS: Objection --
22         MR. BLOCK: Did you say "no"?
23         MR. AKROTIRIANAKIS: Hold on, I get to make a
24 record too. Objection: it misstates his testimony,
25 no foundation, it's vague and it calls for a legal

Page 72

1 conclusion, it's Beyond the scope of the designation
2 of this witness.
3 BY MR. BLOCK:
4     Q. So the question was you would understand that
5 agreeing to the terms of service -- strike that.
6     The question was, you would understand that if
7 agreeing to the WhatsApp terms of service is a normal
8 step required in order to establish the account, then
9 that's a step that the white services department
10 employees take; correct?
11         MR. AKROTIRIANAKIS: All of the same
12 objections and, as phrased, it's also an incomplete
13 hypothetical.
14         THE WITNESS: They would follow the steps in
15 order to establish the account, so.
16 BY MR. BLOCK:
17     Q. You're not aware of any way in which the
18 white services department personnel deviate from the
19 normal process for establishing a WhatsApp account
20 when they set up anonymized WhatsApp accounts for
21 defendants?
22         MR. AKROTIRIANAKIS: Objection: foundation;
23 vague; beyond the scope of the designation of this
24 witness.
25         THE WITNESS: I'm not sure I can answer that.

Page 73

1 BY MR. BLOCK:
2     Q. Okay.
3     (Exhibit 2002 marked for identification.)
4         Mr. Eshkar, you've been handed a document
5 that's been marked Exhibit 2002. It's dated
6 March 25, 2019 and bears the Bates stamp
7 DIVITTORIO_WHATSAPP_[a bunch of zeros and then]65.
8     A. Okay.
9     Q. Do you recognize this document?
10     A. I do not recall this document.
11     Q. Okay. Under "Other Recipients", on the
12 bottom line, do you see where it says
13 █████████████████████████
14     A. Yeah, I see that.
15     Q. Is that your MSISDN?
16     A. It is my phone number.
17     Q. Have you used the same phone number for
18 WhatsApp since you joined NSO in 2015?
19     A. I haven't changed my number.
20     Q. Have you ever used a different phone number
21 for WhatsApp in NSO-related business communications?
22     A. I'm not sure I follow. If I have another
23 device?
24     Q. Correct.
25     A. I have another device.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 78

1    MR. AKROTIRIANAKIS: Objection: foundation.
2    THE WITNESS: I don't know how successful he
3 was in that time but it was his job to do that.
4 BY MR. BLOCK:
5    Q. Okay. Who at NSO supervised Mr. DiVittorio's
6 work?
7    MR. AKROTIRIANAKIS: Objection: foundation.
8 Assumes facts not in evidence.
9    A. I don't know who was responsible to
10 supervise.
11 BY MR. BLOCK:
12    Q. Okay. You had a client executive's role at
13 this time in 2019 that we're looking at on
14 Exhibit 2002; correct?
15    A. Yes, at that time I was, yes.
16    Q. Did your job responsibilities include
17 anything to do with the US market?
18    A. No, we were to provide the needed help to the
19 team at the US, not to anyone else.
20    Q. Does the client executive team at NSO work on
21 sales?
22    MR. AKROTIRIANAKIS: Objection: vague.
23    THE WITNESS: We need to define sales
24 actually.
25 BY MR. BLOCK:

Page 79

1    Q. Here's my understanding and I'm going to ask
2 you to give it in your own words. It sounds like you
3 would support a demonstration, help the sales team
4 who needed you to come do a demonstration, and then
5 also support install systems but you weren't sales
6 people per se. I don't know if that's right. What
7 was the relation -- so here's my question to you.
8    What was -- what is the relation between the
9 client executive team at NSO and the sales
10 organization at NSO today?
11    MR. AKROTIRIANAKIS: Objection: foundation.
12 Also vague.
13    THE WITNESS: Who do you mean by relations?
14 They work together. In general terms the client
15 executive's job are -- is to execute the contract
16 once done and maintain the relationship with the
17 customer, to represent the customer within -- sorry
18 the company within the customer area and vice versa.
19 As a result there might be aware to what we call
20 an app sale opportunity, which in that case they will
21 bring this information to the sales team which takes
22 the commercial responsibility from that moment on.
23 And they will be responsible for the renewal of the
24 contracts once they're done.
25 BY MR. BLOCK:

Page 80

1    Q. Is the client executive team involved in
2 original contracts for new customers?
3    A. What's original contracts?
4    Q. You just talked about contract renewal?
5    A. That's right.
6    Q. A brand new contract for a new customer,
7 instead of a renewal?
8    A. Okay.
9    Q. Is the client executive team involved in
10 negotiating and executing a new contract for a new
11 customer?
12    A. They will not be -- general they will not be
13 involved in what we call a new customer or a new
14 logo, so this process is led by sales.
15    Q. Referring back to Exhibit 2002. Do you know
16 who sent the message that's written here as from
17 ███████ and then a phone number?
18    A. I'm trying to look at the upper side of the
19 document but also there I don't see -- I don't think
20 I know -- I don't recall this name.
21    Q. Do you recall who is ███████████
22    A. I do.
23    Q. Who is ████████████
24    A. He was a salesperson.
25    Q. Was he an NSO employee?

Page 81

1    MR. AKROTIRIANAKIS: No foundation.
2    THE WITNESS: Again I don't know who his
3 contract were with so.
4 BY MR. BLOCK:
5    Q. And do you know if ███████████ had sales
6 responsibility in a particular geography?
7    MR. AKROTIRIANAKIS: Objection: foundation.
8    THE WITNESS: To the best of my knowledge he
9 was responsible for Latin America at the time, but
10 since he wasn't my employee so I don't know if he was
11 assigned to additional areas but this is my
12 understanding.
13 BY MR. BLOCK:
14    Q. Okay. In the first message in the table in
15 Exhibit 2002, on the third line, do you see where it
16 says "PGS"?
17    A. Yes, I see.
18    Q. Do you understand that to be shorthand for
19 Pegasus?
20    A. In general we use PGS as Pegasus.
21    Q. In the next line Mr. DiVittorio says -- he
22 uses the letter CL. Do you see that?
23    A. Yes.
24    Q. Do you understand that to refer to
25 Citizen Lab?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

1    MR. AKROTIRIANAKIS:  Objection: foundation.

2    THE WITNESS:  I am aware that CL stands for

3 Citizen Lab.  I'm not sure if this is in the context

4 of that particular document, so I can take the time

5 to read it but --

6    Q.  Not necessary.

7    A.  I do know that we do use CL as Citizen Lab.

8    Q.  "We", NSO?

9    A.  Generally.

10    Q.  Yes.  Do you know who -- and again please

11 forgive my pronunciation -- ████████████ is?

12    A.  I do.

13    Q.  Who is that?

14    A.  ████ used to work at NSO as a -- well, she

15 had several roles so I'm not so sure on that

16 particular date.  What the date here? 2018. So,

17 from overall responsibility of sales to what we call

18 at the time CBO, which is chief business officer.

19    (Exhibit 2003 marked for identification.)

20    MR. AKROTIRIANAKIS:  Maybe you can state what

21 comprises the document?

22    MR. BLOCK:  Did I give you something other

23 than 58 and 59?

24    (Off the record discussion.)

25 BY MR. BLOCK:

1    Q.  ████████████ you've been handed Exhibit 2003,

2 which is dated January 31, 2019 and is Bates stamped

3 DiVittorio_WhatsApp_00000058.  It's a two-page

4 document that also includes the page numbered 59?

5    A.  The page 59?

6    Q.  Yeah, the Bates numbered page 58 --

7    A.  Yes, sorry, got it.

8    Q.  Do you understand Exhibit 2003 to be a record

9 of a WhatsApp communication?

10    MR. AKROTIRIANAKIS:  Objection: foundation.

11    THE WITNESS:  I can see it's a communication.

12 BY MR. BLOCK:

13    Q.  And the third line on the document says:

14 "Application: WhatsApp"?

15    A.  Sorry, what?

16    Q.  The third line on the first page of the

17 document says "Application: WhatsApp".  Do you see

18 that?

19    A.  Yes, I see that.

20    Q.  And under "Other Recipients", do you see your

21 phone number and name on the fourth line?

22    A.  The fourth line.  It's not my phone number.

23    Q.  ████████████ is not your phone number?

24    A.  It is but the number unless -- let me see it.

25 It's like ████- ah, no, it's the other one.  Sorry,

1 it goes on the left.  Yes, sorry, yes I see my

2 number.

3    Q.  Okay.  So do you recognize Exhibit 2003 as

4 a WhatsApp communication that you were included on in

5 January 2019?

6    MR. AKROTIRIANAKIS:  Objection: foundation.

7    THE WITNESS:  I can see my name as part of

8 the communication presenting to me.

9 BY MR. BLOCK:

10    Q.  Do you remember this communication?

11    A.  Can I take a moment to read it?

12    Q.  Yes.  (Pause.)

13    A.  I don't recall the specific communication.

14    Q.  On the second page do you see the name

15 ████████████

16    A.  Yes, I do.

17    Q.  Do you know who ████████████ is?

18    A.  Yes, I do.

19    Q.  Who is that?

20    A.  ████████████ is a former employee of NSO.

21    Q.  What did ████████████ do for NSO?

22    A.  At the time that I knew ████ he was -- at

23 the end of it he was responsible for the pre-sale

24 team.  I just don't remember if he was a team manager

25 and then managed the pre-sales team, but, anyway, he

1 was in the pre-sales team.

2    Q.  What does pre-sales do?

3    MR. AKROTIRIANAKIS:  Objection: foundation.

4    THE WITNESS:  They support sales process.

5 BY MR. BLOCK:

6    Q.  Do you know who ████████████s?

7    A.  Yes.

8    Q.  Who is ████████████

9    A.  Also a former employee of NSO.

10    Q.  In what role?

11    MR. AKROTIRIANAKIS:  No foundation.

12    THE WITNESS:  If my memory serves me well she

13 was the private assistant -- Personal Assistant of

14 ████████

15 BY MR. BLOCK:

16    Q.  How about ████████████

17    A.  Yes, I know ████

18    Q.  And who is ████

19    A.  ████ is an employee of NSO.

20    Q.  What does she do?

21    A.  She runs the department of what we call sales

22 operation.

23    Q.  What does sales operations do generally?

24    MR. AKROTIRIANAKIS:  Objection: foundation.

25    THE WITNESS:  The way that I'm familiar with

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

1 the department job is that they were unfocused.
2 BY MR. BLOCK:
3    Q. Who is ███████
4    A. ████ is a former employee of NSO.
5    Q. In what role?
6    A. Sales.
7    Q. Do you know what geography or customers ████
8 was responsible for?
9    A. He shifted a lot.
10    Q. Do you happen to know what he was doing in
11 January 2019?
12       MR. AKROTIRIANAKIS: Objection: foundation.
13       THE WITNESS: Specifically '19 I do not
14 recall.
15 BY MR. BLOCK:
16    Q. Okay. Who is ███████?
17    A. ███████ is a former employee of NSO.
18    Q. In what role?
19    A. Sales as well.
20    Q. And do you know what ███████s
21 responsibilities were in January 2019?
22       MR. AKROTIRIANAKIS: Objection: foundation.
23       THE WITNESS: He was part of the sales team
24 of the -- again if I remember correctly the African
25 region. At the end of it he managed the region.

1 I don't remember if he managed it from the early
2 beginning of his arrival or later on during his work
3 at NSO.
4 BY MR. BLOCK:
5    Q. Okay. Do you know who ███████
6 ████ is? She's the last name under "other
7 recipients"?
8    A. She's the last name. The last name confuse
9 me but if I'm not -- if this is who I think she is
10 then she was a sales -- sales. She was doing sales,
11 salesperson.
12    Q. And do you recall the scope of her
13 responsibilities?
14       MR. AKROTIRIANAKIS: Objection: vague.
15 Foundation.
16       THE WITNESS: Again if I am correct she was
17 doing sales. Later on she was doing marketing
18 I think. I might be wrong.
19 BY MR. BLOCK:
20    Q. Okay. The first message on Exhibit 2003 from
21 ███████ is in Hebrew. Do you see that?
22    A. I do.
23    Q. I believe the second word is [Hebrew: ayin
24 dalet nun] which is Eden; is that correct?
25    A. It is correct.

1    Q. And what -- I realize it's in Hebrew but
2 could you explain to me in English what the first
3 sentence of the message says?
4    A. It looks like it's either misprinted or
5 because of right to left and left to right. So do
6 you think there is any way to get like sorted to the
7 right side, because I think there is a mismatch at
8 the beginning. Do you have like the soft copy? Can
9 you like --
10    Q. This is how it was produced to us. So you're
11 not able to read the Hebrew from right to left?
12    A. I can read the Hebrew.
13    Q. Why don't you just read the Hebrew for me,
14 just the first sentence up to the ellipsis, the three
15 dots. And I would just ask the interpreters if
16 they're able to interpret what you read to me.
17       MR. AKROTIRIANAKIS: You're asking him to
18 read it in Hebrew?
19       MR. BLOCK: Yes, please read in Hebrew to the
20 interpreter.
21       MR. AKROTIRIANAKIS: You want him to read it
22 from left to right for the record?
23       MR. BLOCK: No, I believe it reads from right
24 to left.
25    A. Right to left.

1    Q. Are you able to?
2    A. I can read it but I think like it will not
3 make -- I can do it, right, but --
4    Q. It won't make sense?
5    A. I don't think because you need to move it to
6 the right and I think because of the -- how do you
7 call it, the star?
8    Q. The asterisk?
9    A. Yes, the asterisk. I think, right, it's --
10 I can read it. It's Hebrew, I can read it, but --
11    Q. Are you able to get the sense of the first
12 sentence from looking at it in Hebrew notwithstanding
13 the problems that you're describing?
14       MR. AKROTIRIANAKIS: Objection: foundation.
15       THE WITNESS: It's not.
16 BY MR. BLOCK:
17    Q. You should read the left word first, the left
18 most word first and then --
19    A. Yeah but it's like -- if only move to the
20 right I wouldn't bother you but I think that because
21 of the Hebrew to English part it got -- okay,
22 I'll try. Let's do it like that.
23       So the first sentence?
24    Q. Please.
25    A. So just give me a moment. I give just

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 118

1  record so we can move on. I think I'm referring to
2  something from the transcript not from the order. Do
3  we need to go off the record?
4       MR. AKROTIRIANAKIS: We can go off the record
5  or on the record I'm trying to explain the legal
6  issue to my client. It's up to you.
7       MR. BLOCK: How much time do you need?
8       MR. AKROTIRIANAKIS: I'm trying to explain it
9  to my client.
10      MR. BLOCK: Let's go off the record.
11      VIDEOGRAPHER: Going off the record. The
12  time is 1:02.
13           (A short break)
14      VIDEOGRAPHER: On the record. The time is
15  13:10. Thank you.
16      MR. AKROTIRIANAKIS: So, I think that you're
17  either misrecalling or misstating the court's
18  comments but in any event what you're referring to
19  does not find its way into this order. However,
20  I think that you can ask some questions that relate
21  to the subject that you're getting at. But I don't
22  think that -- so in any event I think you can ask the
23  question you were asking but in general this order is
24  directed to a specific time frame and more
25  specifically to targeting or directing at WhatsApp

Page 119

1  servers or using WhatsApp in a way to access target
2  devices. So with that go ahead.
3       MR. BLOCK: Okay, I'll just refer to page 4
4  of 7 in docket 292, lines 4-7 which I think assumed
5  that there would be a production of the relevance by
6  way of, pursuant to the order, timely. But it says:
7       "If after reviewing the relevance by
8       where from that time frame plaintiffs
9       are able to provide evidence that any
10      attack lasted beyond that time frame
11      plaintiffs may seek further discovery at
12      that time."
13      MR. AKROTIRIANAKIS: Right and I agree --
14  sorry, I didn't mean to interrupt you.
15      MR. BLOCK: That's okay. I'll just say.
16      MR. AKROTIRIANAKIS: That's not what you
17  stated before though. You said before or after.
18  We're talking before, many years before. I don't
19  agree the court ever said before or after. Clearly
20  she said what you just read. We can read it here
21  today. Anyway, go ahead, ask your question.
22      MR. BLOCK: I appreciate it. I don't think
23  she's barred this line of questioning and if we end
24  up with a disagreement about that, that is the thing
25  that happens in litigations from time to time. So

Page 120

1  let me ask a question.
2  BY MR. BLOCK:
3       Q. What were defendants' vectors for zero-click
4  installation of Pegasus in 2015?
5       MR. AKROTIRIANAKIS: Objection: no
6  foundation.
7       THE WITNESS: So it's way back but I would
8  say there were both what we called triggered
9  capabilities and covert capabilities.
10  BY MR. BLOCK:
11      Q. Triggered and covert?
12      A. Yes.
13      Q. What were the covert capabilities in 2015?
14      MR. AKROTIRIANAKIS: No foundation. And to
15  the extent you're -- this is beyond the scope of the
16  designation, just so that's clear. I don't think
17  that you're intending to ask this as part of the
18  30(b)(6) but I want to be clear he's not being
19  designated for this. Another witness would be.
20      THE WITNESS: So again I don't recall the
21  various specific vectors but there were vectors.
22  BY MR. BLOCK:
23      Q. And do you recall whether any of the
24  zero-click vectors in 2015 involved WhatsApp in any
25  way?

Page 121

1       A. As much as I know, no, it didn't involve
2  WhatsApp.
3       Q. And do you recall whether any of the
4  triggered vectors in 2015 involved WhatsApp in any
5  way?
6       A. What do you mean by "any way"? Sending a
7  link to a target via WhatsApp, it's "any way"?
8       Q. Yes.
9       A. So I would say that as much as I know for the
10  trigger we do not use that. The customer might
11  choose to take the link and use his own, either
12  WhatsApp or a different system, to send the link.
13      Q. So from a user interface standpoint when the
14  user elects to pursue a triggered installation does
15  that happen through the user interface or do they
16  then walk over to a mobile phone and send a WhatsApp
17  message; how does that work?
18      MR. AKROTIRIANAKIS: Objection: vague.
19  Compound.
20      THE WITNESS: When they choose to proceed
21  with a trigger installation, the system produce a
22  link. It is then up to the customer to decide if he
23  sends it over a regular SMS which at a certain point
24  of time he could have done via the system, or he
25  extract the link, either copy or whatever, and then

31 (Pages 118 - 121)

1    send using any other method that he has.
2    BY MR. BLOCK:
3        Q. At this time in 2015 did the system enable
4    sending the link by WhatsApp message through the user
5    interface?
6        MR. AKROTIRIANAKIS: Objection: foundation.
7        THE WITNESS: As much as I recall, no.
8    BY MR. BLOCK:
9        Q. Did there come a later time when the system
10   enabled the user to initiate a triggered installation
11   by sending a WhatsApp message through the user
12   interface?
13       A. The trigger installation, right?
14       Q. Yes.
15       A. As much as I know, no.
16       Q. When did it become possible for the user to
17   send a covert installation that involved WhatsApp?
18       MR. AKROTIRIANAKIS: Objection: vague. No
19   foundation.
20       THE WITNESS: As much as I understand around
21   summer 2018, maybe close to the end of it. I don't
22   know the exact date, but somewhere there.
23   BY MR. BLOCK:
24       Q. And do you recall a name for that
25   WhatsApp-related zero-click installation vector that

1    came online some time around 2018?
2        A. So internal names were like Eden, or Heaven.
3        Q. Are those the same?
4        A. What do you mean by the same.
5        Q. I mean is Eden one thing and Heaven a
6    different thing or are those used interchangeably?
7        A. For myself and the team as you know those are
8    covert vectors. I don't know if the technology
9    behind them is different.
10       Q. Okay, but you and your team would discuss
11   them separately as different vectors no matter how
12   they operate?
13       A. As different vectors.
14       Q. Okay. And you had an understanding that Eden
15   used WhatsApp in some way but you don't know the
16   details; is that correct?
17       MR. AKROTIRIANAKIS: Objection: vague.
18   Foundation. Beyond the scope of the designation.
19       THE WITNESS: My understanding would be that,
20   yes.
21   BY MR. BLOCK:
22       Q. What is your understanding, if any, as to how
23   Heaven used WhatsApp?
24       MR. AKROTIRIANAKIS: Vague. No foundation.
25   Beyond the scope of the designation.

1        THE WITNESS: I'm trying to understand. You
2    mean how it worked?
3    BY MR. BLOCK:
4        Q. Sure.
5        A. So I don't know how it worked. So --
6        Q. But do you have an understanding that however
7    it worked involved WhatsApp?
8        A. That's my understanding.
9        Q. So we spoke about Eden and Heaven. Are you
10   aware of any other names for defendants' installation
11   vectors that involved WhatsApp?
12       MR. AKROTIRIANAKIS: Objection: foundation.
13       THE WITNESS: Yes.
14   BY MR. BLOCK:
15       Q. What are the other names that you're aware
16   of?
17       A. Erised.
18       Q. Like desire but spelt backwards?
19   E-R-I-S-E-D, correct?
20       A. Yes.
21       Q. We have Eden, Heaven and Erised. Any others?
22       A. Not that I recall.
23       Q. Have you heard the term Hummingbird?
24       A. Yes, I have heard the term Hummingbird.
25       Q. Do you know one way or another whether

1    Hummingbird used WhatsApp?
2        A. I think we are confusing here with terms.
3        Q. How so?
4        A. Because there are different names being used
5    so like I said before, from the customer perspective
6    it would be covert, right. And there are names that
7    we use internally and there are names that we use
8    sometimes externally. So in that regard Hummingbird,
9    as much as I remember from the period, would be like
10   an umbrella name for the family of such covert
11   vectors.
12       Q. The family of installation vectors that use
13   WhatsApp?
14       A. Again, as much as I understand, Hummingbird
15   is the name that we've used externally in some cases.
16       Q. For the family of installation vectors that
17   use WhatsApp?
18       MR. AKROTIRIANAKIS: Objection: no
19   foundation.
20       THE WITNESS: As much as I can understand.
21   BY MR. BLOCK:
22       Q. Is that a yes?
23       MR. AKROTIRIANAKIS: No foundation.
24       THE WITNESS: Yes.
25   BY MR. BLOCK:

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1    Q. And in the Hummingbird family, what are
2 the -- strike that. What are the names you know of
3 installation vectors in the Hummingbird family?
4    A. So I don't recall when we introduced the name
5 Hummingbird but I don't think, as much as I remember,
6 that there will be other names than what we said
7 before.
8    Q. And the ones we said before were Eden, Heaven
9 and Erised?
10    A. Yes, I just don't remember when we started
11 with the Hummingbird term so it may not be the whole
12 three of them, maybe just one or two of them.
13    Q. And Erised from Eden, Heaven and Erised you
14 don't recall knowledge of another installation vector
15 that used WhatsApp?
16    A. I don't remember.
17    Q. You said you first became aware of
18 an installation vector that used WhatsApp around
19 2018, maybe late I think those were your words,
20 something like that?
21    A. Something like that, yes.
22    Q. When is the latest point in time that you're
23 aware of defendants using an installation vector that
24 used WhatsApp?
25    A. I would say somewhere around 2019 maybe a

Page 127

1 little bit into 2020 but I'm not sure of the exact
2 date so that would be like a ballpark.
3    Q. Okay. Is that something Mr. Gazneli would
4 know?
5        MR. AKROTIRIANAKIS: Objection: no
6 foundation.
7        THE WITNESS: He might.
8    Q. What's the latest point in time when you're
9 aware of defendants trying to defendant a zero-click
10 installation using WhatsApp?
11        MR. AKROTIRIANAKIS: Objection: no
12 foundation.
13        THE WITNESS: I have no knowledge of that.
14 BY MR. BLOCK:
15    Q. We may have asked this before. Was Eden to
16 your knowledge specific to a particular operating
17 system such as Android, iOS, BlackBerry?
18    A. As much as I recall, it's for Android
19 platform.
20    Q. And was Heaven specific to a specific
21 operating system such as Android, iOS or BlackBerry?
22    A. Same here, as much as I remember it's
23 an Android platform.
24    Q. And was Erised specific to a particular
25 operating system?

Page 128

1    A. Same for as much as I know, for Android
2 platform.
3    Q. Are you aware of WhatsApp ever using
4 WhatsApp -- sorry. Let me try again. Are you aware
5 of defendants ever using an installation vector that
6 involved WhatsApp to install Pegasus on an iOS
7 device?
8    A. Not that I recall, no.
9    Q. And we're talking about zero-click exploits
10 versus sending messages, right?
11    A. So again I'm less comfortable with the know
12 how because myself or my team do not develop so it's
13 hard for me to say. But as much as I know it was not
14 used for iOS.
15    Q. Are you general familiar with the user
16 interface that customers see when they operate
17 Pegasus?
18    A. Generally aware, yes.
19    Q. During an agent installation process, is it
20 possible it see in the user interface the phone
21 numbers of the target devices identified for
22 installation?
23    A. The customer enters the number so the number
24 is presented on the user interface what we call the
25 UI.

Page 129

1    Q. Are you aware of something called a
2 whitelist, a whitelist of numbers?
3    A. Yes.
4    Q. What is the concept of a whitelisted phone
5 number as it relates to Pegasus?
6    A. So it might be used in other departments of
7 different use. So I would say from the perspective
8 that I have, okay. Because it's a general term, it
9 might be used also by other departments. But it will
10 means that there are certain numbers that their flow
11 of the installation is a bit different.
12    Q. Can you give me an example?
13    A. Yes. If the customer hold a test device,
14 which they usually do, it's a common practice before
15 they go on a real operation to run a test. Then the
16 test, the test device, might have been on the
17 whitelist. So they can install and maybe install
18 again in, you know, some time later.
19    Q. And perhaps install again, sometimes later in
20 a manner that the system would prevent had the number
21 not been on a whitelist?
22    A. Can you explain that?
23    Q. Yeah, you said a test device number might be
24 whitelisted so Pegasus can be installed and then
25 installed again. Is that what you said?

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1    A. Yeah, it can be installed and then installed
2    again, yes.
3    Q. Why does it have to be on a whitelist in
4    order to be installed and then installed again?
5        MR. AKROTIRIANAKIS: Objection: no
6    foundation.
7        THE WITNESS: Because from -- because when
8    you send -- when the customer send installation to a
9    real target there are some operational security
10   measures that they should apply. One of them is the
11   time in between the installation. Clearly for a test
12   device if he had to wait a few days then by the time
13   he will finish his test then the operation will not
14   be relevant.
15   BY MR. BLOCK:
16   Q. And as we discussed, op sec measures are
17   measures to make sure the operation remains secret,
18   right?
19   A. Secured.
20   Q. Secured including against disclosure to
21   others?
22       MR. AKROTIRIANAKIS: Objection: vague.
23       THE WITNESS: I tend to agree.
24   BY MR. BLOCK:
25   Q. Let's look at page 34 of 46 in Exhibit 2004,

Page 131

1    titled Exhibit D Service Level Agreement. Do you see
2    that?
3    A. Thirty --
4    Q. 34 of 46.
5    A. Exhibit D. Yes, I see that.
6    Q. What is a service level agreement generally
7    in defendants' contracts for Pegasus?
8        MR. AKROTIRIANAKIS: Objection: misstates the
9    document.
10       THE WITNESS: So generally talking about what
11   we call SLAs, or service level agreement, not in the
12   context of this contract but in general service level
13   agreement will be our way to define the service that
14   we provide to our customer like how long they will
15   wait for an answer for a phone call, what our service
16   covers in means of for example the hardware, so on so
17   forth, and what is the definitions of minor or major
18   or critical, so on so forth. I have more examples if
19   you need but this is more or less. How they can
20   contact us. At what times.
21   BY MR. BLOCK:
22   Q. If you take a moment to look at -- strike
23   that. In Exhibit 2004 the service level agreement
24   runs from page 34 of 46 through page 46 of 46;
25   correct?

Page 132

1        MR. AKROTIRIANAKIS: Objection: no
2    foundation.
3        THE WITNESS: I'm not so sure about the
4    clarification part, the 7. But the rest looks like
5    they are part of the SLA.
6    BY MR. BLOCK:
7    Q. Okay. And do defendants use standard terms
8    in their SLAs that they repeat with multiple
9    customers?
10   A. If we use what?
11   Q. The same terms over and over again?
12   A. Some of the terms are being used again and
13   again.
14       MR. BLOCK: I have received a request for a
15   lunch break and so I suggest that we go off the
16   record.
17       MR. AKROTIRIANAKIS: Okay. That's fine.
18       VIDEOGRAPHER: Going off the record. The
19   time is 13:34. End of media card 3, volume 1 of the
20   video deposition of Ramon Eshkar.
21       (Lunch recess.)
22       VIDEOGRAPHER: This is the beginning of media
23   card 4, volume 1 in the deposition of Ramon Eshkar.
24   Going on the record the time is 14:17. Thank you.
25       MR. AKROTIRIANAKIS: Before we get started

Page 133

1    again I wanted to designate the transcript as highly
2    confidential under the protective order, and also the
3    witness would like to read and sign. And let me know
4    before the end and I'll let you know if you need to
5    send it directly to him or to me to send to him
6    because it might be -- there might be a difference.
7    BY MR. BLOCK:
8    Q. Okay, thank you. Welcome back, Mr. Eshkar.
9    Just a couple looking over my notes. I think you
10   mentioned that the name Hummingbird was used
11   externally by defendants with customers. Was it?
12   A. It was used externally.
13   Q. But Eden, and Heaven, and Erised were not
14   used externally with customers; is that correct?
15   A. They were not meant to use externally.
16   Q. That was a matter of defendants' policy?
17       MR. AKROTIRIANAKIS: Objection: vague; no
18   foundation.
19       THE WITNESS: I mean they were internal names
20   so people were not supposed to use it externally.
21   BY MR. BLOCK:
22   Q. I understand. Can you give me an example how
23   Hummingbird was used externally?
24   A. An example?
25   Q. Yes, please.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    A. If the customer and the one he, let's say the
2  client executive that he is talking to would like to
3  talk about the same topic, then they can say
4  Hummingbird.
5    Q. And how much information did defendants share
6  with customers about what Hummingbird means?
7        MR. AKROTIRIANAKIS: Objection: vague.
8        THE WITNESS: The concept is that it means
9  the covert vector.
10  BY MR. BLOCK:
11    Q. So defendants customers understood that
12  Hummingbird was a label for a covert vector for
13  installation of Pegasus end device agents?
14        MR. AKROTIRIANAKIS: Objection: foundation.
15        THE WITNESS: Can you please repeat?
16  BY MR. BLOCK:
17    Q. Yeah let me -- was the Hummingbird family
18  of vectors used to install products other than
19  Pegasus?
20    A. No.
21    Q. Did defendants' customers understand that
22  Hummingbird was a name to refer to covert
23  installation of Pegasus?
24        MR. AKROTIRIANAKIS: Objection: foundation.
25        THE WITNESS: Customers will understand that

Page 135

1  Hummingbird is a covert vector.
2  BY MR. BLOCK:
3    Q. And did defendants disclose -- I'm sorry.
4  You said customers will understand that Hummingbird
5  is a covert vector. My question is, did defendants'
6  customers understand that Hummingbird was a name for
7  a covert vector for Pegasus?
8        MR. AKROTIRIANAKIS: Objection: foundation.
9        THE WITNESS: I'm trying to understand what's
10  the difference. Maybe it's better to translate.
11  BY MR. BLOCK:
12    Q. You excised Pegasus. I asked you a question;
13  you skipped Pegasus when I read it back. I was
14  trying to figure out if you meant something by that.
15  Did customers not know that Hummingbird was for
16  Pegasus?
17        MR. AKROTIRIANAKIS: Objection: foundation.
18        THE WITNESS: I would assume they understand
19  that it's for Pegasus.
20  BY MR. BLOCK:
21    Q. Because defendants communicated to their
22  customers that Hummingbird referred to covert
23  installation vector or vectors for Pegasus?
24        MR. AKROTIRIANAKIS: Object to the form of
25  the question.

Page 136

1        THE WITNESS: You mean if they will make the
2  linkage because of the way that we present vectors to
3  the customers?
4  BY MR. BLOCK:
5    Q. My question is about what defendants
6  communicated to their customers about Hummingbird.
7  Did defendants communicate to their customers that
8  Hummingbird referred to a family of vectors?
9        MR. AKROTIRIANAKIS: Objection: vague. Go
10  ahead.
11        THE WITNESS: No, it was for a covert vector.
12  BY MR. BLOCK:
13    Q. Okay. Did defendants communicate to their
14  customers that Hummingbird was for a covert vector
15  for Pegasus?
16    A. Yes.
17    Q. Do you still have Exhibit 2004 in front of
18  you?
19    A. Yes.
20    Q. Will you please turn to the page numbered 12
21  of 46. Are you there?
22    A. 12 of 46. Yes I'm there.
23    Q. Just to situate you, in case you have to flip
24  back, we're in Exhibit A-1 to Exhibit A. And
25  Exhibit A is the description of the system and

Page 137

1  services. And on page 8 --
2    A. Okay.
3    Q. -- it says:
4        "The System Provider's Pegasus system is
5        comprised of the following (the
6        'System'): (a) the features and
7        capabilities detailed in the
8        table attached hereto as Exhibit A-1."
9        Did I read that correctly?
10    A. Where are you at? I see Exhibit A-1 under
11  "The System" (a) and I see -- but I don't see what
12  you just read.
13    Q. Sure. On page 8 of 46 it says:
14        "The System: The System Provider's
15        Pegasus system is comprised of the
16        following (the 'System'): (a) ..."
17    A. Page 8 of 46?
18    Q. Yes. Read from the top of the page. Do me a
19  favor. Please read page 8 of 46, starting with
20  Exhibit A, and getting to the end of the first
21  subparagraph (a).
22    A. So from paragraph (a), right?
23    Q. No, please read from Exhibit A, at the top.
24    A. Okay:
25        "Description of the System and Services"

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 150

1    A. Yes.
2    Q. Do those connect to the NOC?
3        MR. AKROTIRIANAKIS: Objection: foundation.
4        THE WITNESS: So we do provide email access
5    and phone access I just don't know if those are the
6    exact email and phone number at the time since --
7    I don't know again it's not our contract so I don't
8    know if there was something there, but we do provide
9    email access and phone number. Today there is a
10   dedicated system for this communication so email is
11   hardly ever used.
12   BY MR. BLOCK:
13   Q. What is that dedicated system called?
14   A. It's the NSD. NSD.
15   Q. What does NSD stand for?
16   A. Okay. I think it's NSO support -- I don't
17   recall exactly but something like that.
18   Q. Something like that?
19   A. It's initials that describe a support system.
20   Q. What function do the tunnels and VPS you just
21   mentioned serve relative to Pegasus?
22   A. So to the best of my knowledge they are part
23   of the infrastructure required in order to connect
24   between the system to the outside and back and forth.
25   Q. Earlier we talked about the white services

Page 151

1    department, do you recall that?
2    A. Yes.
3    Q. And one of the things that the white services
4    department will do is set up VPS servers for a
5    customer; is that accurate?
6    A. They will not set it up. They will procure
7    the service. There is another team that will set it
8    up.
9    Q. Okay so let me start with the procurement.
10   And to set the stage a customer is setting up
11   an installation of Pegasus and requires VPS as part
12   of the infrastructure to operate Pegasus; is that
13   accurate?
14       MR. AKROTIRIANAKIS: Objection. Object to
15   the form of the question. Vague. No foundation.
16       THE WITNESS: So can you please clarify?
17   BY MR. BLOCK:
18   Q. Yeah. I think you testified to the effect
19   that customers need VPS to operate Pegasus. Is that
20   accurate?
21       MR. AKROTIRIANAKIS: Objection: misstates his
22   testimony.
23       THE WITNESS: VPS are part of the
24   infrastructure required for the system.
25   BY MR. BLOCK:

Page 152

1    Q. And one job of the white services department
2    is to procure anonymized VPS; is that accurate?
3    A. This is part of the job.
4    Q. And what steps are involved when someone in
5    the white services department procures anonymized
6    VPS?
7        MR. AKROTIRIANAKIS: Objection: no
8    foundation.
9        THE WITNESS: They will pick a provider that
10   provides the VPS, and they will choose the service
11   that they want from that provider, and they will have
12   to follow the procurement process required according
13   to that specific supplier.
14   BY MR. BLOCK:
15   Q. In what sense is the service anonymized?
16   A. In the sense that it cannot be linked to
17   either the customer or NSO.
18   Q. And how do defendants achieve that
19   anonymization with respect to VPS?
20       MR. AKROTIRIANAKIS: Objection: foundation.
21       THE WITNESS: They use an anonymized --
22   I don't know what to call it -- way in order to gain
23   a service.
24   BY MR. BLOCK:
25   Q. And I would like to know what you know about

Page 153

1    the details of that anonymized way. Can you explain
2    it?
3        MR. AKROTIRIANAKIS: Objection: foundation.
4        THE WITNESS: So to the best of my knowledge
5    they will use financial means which are not directly
6    related to the customer or to the company. That's
7    I think the main point here that will allow them to
8    establish an anonymized VPS account.
9    BY MR. BLOCK:
10   Q. Can you give me an example of financial means
11   not directly related to the customer or the company
12   that the white services department uses for these
13   purposes?
14   A. It can be like a credit card.
15   Q. A credit card registered in the name other
16   than the customer or defendants I presume; is that
17   accurate?
18   A. Sounds to me, yes.
19   Q. And do you know the details about how the
20   white services department procures credit cards and
21   names not related to defendants or their customers?
22       MR. AKROTIRIANAKIS: Objection: foundation.
23       THE WITNESS: How exactly they are doing
24   that, no.
25   BY MR. BLOCK:

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1    Q. Okay. Does NSO use cryptocurrency as
2  a financial means for setting up anonymized VPS?
3      MR. AKROTIRIANAKIS: Objection: foundation.
4      THE WITNESS: If I'm not mistaken, yes.
5  BY MR. BLOCK:
6    Q. Bitcoin for example?
7      MR. AKROTIRIANAKIS: Foundation.
8      THE WITNESS: Bitcoin for example.
9  BY MR. BLOCK:
10   Q. Have you ever heard of Quadranet?
11   A. Sounds familiar.
12   Q. Is Quadranet familiar to you as a VPS
13 provider?
14   A. No, I don't recall no.
15   Q. Okay. Do you recall anything about
16 Quadranet?
17   A. Not that I recall, no.
18   Q. Have you heard of Green Cloud VPS?
19   A. I heard the name but I don't have more
20 details than that.
21   Q. Do you recall having heard it in connection
22 with your work for defendants?
23   A. Yes.
24   Q. And what else do you recall about how you
25 heard the name, if anything?

Page 155

1    A. Just the name. I mean nothing in particular.
2    Q. How about the name Choopa, C-H-O-O-P-A, is
3  that familiar to you?
4    A. No.
5    Q. Can you name any VPS servers that you know
6  defendants use when setting up anonymized VPS for
7  customers?
8      MR. AKROTIRIANAKIS: Objection: foundation.
9      THE WITNESS: Not that come in mind.
10 BY MR. BLOCK:
11   Q. Do customers select the VPS provider, or
12 does -- do defendants?
13     MR. AKROTIRIANAKIS: Objection: overboard.
14 No foundation.
15     THE WITNESS: Some customers choose to set up
16 the infrastructure themselves so they will do it A to
17 Z.
18 BY MR. BLOCK:
19   Q. I'm going to ask a question that I think your
20 counsel has an objection to but I just want to be
21 clear for the record. Can you name customers that
22 handled the infrastructure themselves A to Z?
23     MR. AKROTIRIANAKIS: Are you asking him a yes
24 or no question or are you asking him to name the
25 customers?

Page 156

1      MR. BLOCK: Let's start with yes or no.
2  BY MR. BLOCK:
3    Q. Are you able to name customers who handle the
4  installation and infrastructure themselves?
5    A. Yes.
6    Q. Will you please identify them for the record?
7      MR. AKROTIRIANAKIS: Okay, that I will
8  instruct him not to answer.
9  BY MR. BLOCK:
10   Q. Are you able to name customers for whom
11 defendants performed the infrastructure procurement
12 and installation?
13   A. If I can?
14     MR. AKROTIRIANAKIS: He's asking you yes or
15 no, if you can.
16   A. Yes, I can.
17 BY MR. BLOCK:
18   Q. Will you please identify for the record the
19 customers for whom defendants did the infrastructure
20 installation that you are able to name?
21     MR. AKROTIRIANAKIS: Again I'm going to
22 instruct him not to answer for the same reason.
23 BY MR. BLOCK:
24   Q. Can you tell me how many customers defendants
25 have performed infrastructure installation for?

Page 157

1      MR. AKROTIRIANAKIS: Objection: foundation.
2      THE WITNESS: Throughout which period of
3  time?
4  BY MR. BLOCK:
5    Q. Let's start with the entire life of the
6  company?
7      MR. AKROTIRIANAKIS: Objection: foundation.
8      THE WITNESS: I don't have exact number in
9  mind.
10 BY MR. BLOCK:
11   Q. Can you estimate it by order of magnitude?
12     MR. AKROTIRIANAKIS: Objection: foundation.
13     THE WITNESS: More than ten. I mean tens.
14 BY MR. BLOCK:
15   Q. Tens?
16   A. Around.
17   Q. More than 100?
18     MR. AKROTIRIANAKIS: Objection: foundation.
19     THE WITNESS: I don't know.
20 BY MR. BLOCK:
21   Q. You can't rule it out, not sure.
22     MR. AKROTIRIANAKIS: Objection: foundation.
23 Compound. Vague.
24     THE WITNESS: I need to count the number that
25 we had each career and then to sum it. So ...

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 270

1  I meant is that if there is a demonstration for a
2  customer then we would like to show that part of the
3  information that the system can extract is
4  WhatsApp-related, therefore we will have a test
5  device with a WhatsApp account with basic
6  communication so during the demo we can show that we
7  can collect the data.
8  BY MR. AKROTIRIANAKIS:
9      Q.  You just used the term WhatsApp-related.  Is
10  there any other relation to WhatsApp, other than
11  demonstrating the ability to extract WhatsApp
12  messages from the demo client phone that you're
13  using?
14      MR. BLOCK:  Objection to form.
15      THE WITNESS:  Come again?  I lost you.  It
16  was very long.
17      Q.  Sorry.  In your answer you just used the term
18  WhatsApp-related.  Other than demonstrating the
19  ability to extract a WhatsApp message from the demo
20  phone that you're talking about, is there any other
21  relation to WhatsApp?
22      MR. BLOCK:  Objection to form.
23      THE WITNESS:  No.
24      MR. AKROTIRIANAKIS:  All right, thank you.
25      MR. BLOCK:  I assume, Joe, you'll permit

Page 271

1  questions about that testimony but not about other
2  topics?
3      MR. AKROTIRIANAKIS:  I asked two questions.
4  If you've got two questions, or one question as some
5  kind of recross-examination, then you can ask that
6  but we're well beyond 7 hours and it's well after
7  7 p.m. now.
8      MR. BLOCK:  I do not have re-cross.  I have
9  many other questions.
10      MR. AKROTIRIANAKIS:  Then if you don't have
11  any re-cross then I think we're done.
12      MR. BLOCK:  Then we obviously object to the
13  closure of the deposition but we'll allow it to
14  proceed, subject to that objection.
15      VIDEOGRAPHER:  Going off the record.  The
16  time is 19:08.  End of media card 6, volume 1 and
17  this is the end of the video deposition of Ramon
18  Eshkar.  If I could ask about the video and
19  transcript, if you could state that please?
20      MR. AKROTIRIANAKIS:  Is it possible if
21  I could tell you after because someone else manages
22  that and I inevitably will mess it up.
23      MR. BLOCK:  Same answer.
24  (Whereupon, the deposition concluded at 7:09 pm)
25

Page 272

1          CERTIFICATE OF COURT REPORTER
2
3      I, CHANELLE M.L. MALLIFF, a Certified
4  LiveNote Reporter, Certified Shorthand Stage IV
5  stenographic reporter, RPR and CRR (*NCRA 2003 and
6  2004), hereby certify that:
7          RAMON ESHKAR appeared on Tuesday, August 27,
8  2024, agreed to tell the truth, the whole truth, and
9  nothing but the truth, under the penalties of perjury,
10  and was thereupon examined by counsel; that the
11  testimony of RAMON ESHKAR was recorded by me
12  stenographically and was thereafter transcribed by me;
13  that the foregoing transcript is a true, accurate and
14  verbatim record to the best of my skill and ability.
15      I further certify that I am not a relative or
16  employee of any party to the action; nor am I an
17  employee or relative of any attorney or counsel to any
18  party to the action; nor am I in any way financially or
19  otherwise interested in the outcome of the action.
20
21
22
23      CHANELLE M.L. MALLIFF
24          CLR, CSSIV(NZ)
25

Page 273

1  Joseph N. Akrotirianakis, Esq.
2  jakro@kslaw.com
3          August 30, 2024
4  RE:   Whatsapp LLC., Et Al. v. NSO Group Technologies
           Limited, Et Al.
5      8/27/2024, Ramon Eshkar (#6878149)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

69 (Pages 270 - 273)

# EXHIBIT 9

## FILED UNDER SEAL

**Custodian:**               Shaner, Josh

**Application:**            WhatsApp

**Active Participants:**     ██████████████████████████████████████

██████████████████████████████

**Other Recipients:**      ████████████████████████████████

████████████████████ Josh Shaner

███████████████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████

██████████████████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████

███████████████████████████████████

███████████████████

██████████████████████████████████████

███████████████████████████████

████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

**Date/Time Start:**      12/05/2018 01:25 AM

**Date/Time End:**      12/05/2018 05:00 AM

| Time | From | Message Body | Deleted |
|---|---|---|---|
| 01:25:09 | ████████████ ████ | Demo in Golf is over and was a success ☺ | 0 |
| 04:20:07 | ████████████ ████████████ ██████ | Hi all,<br><br>WhatsApp had made changes in their servers that currently fail all installations and can cause crashes that risk the Hummingbird vector. | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXHIBIT

*2007*

*8·27·24 CM*

PENGAD 800-631-6989

SHANER_WHATSAPP_00001098

<table>
<tr>
<td></td>
<td></td>
<td>
We need to immediately pause all Hummingbird installations cross all systems (Customer sites (P2 &P3, Tactical covert), Sales) until the Android research team will be able to provide a solution.

Official message to clients was synced with CEs ██████

The team is working on a solution in top priority, hoping to provide a solution ASAP.

We will keep you updated.

Thanks,

██████████
</td>
<td></td>
</tr>
<tr>
<td>04:22:20</td>
<td>████████████</td>
<td>██ ?בסיילס מוריד אתה</td>
<td>0</td>
</tr>
<tr>
<td>04:43:54</td>
<td>████████████<br>██████</td>
<td>כן</td>
<td>0</td>
</tr>
<tr>
<td>04:45:06</td>
<td>████████████<br>████████<br>██████</td>
<td>services את סתם (המערכות את לצרוך שלא) לרסט לא מנת על יסמי wise את הורדתי<br>בעבודה ללקוחות ולהפריע.<br>בחושב שכולם צריכים לעשות ☺ככה</td>
<td>0</td>
</tr>
<tr>
<td>04:45:37</td>
<td>████████████<br>██████</td>
<td>?בנגייוס התראות יקפיץ לא זה</td>
<td>0</td>
</tr>
<tr>
<td>04:46:20</td>
<td>████████████<br>████████<br>██████</td>
<td>נצטרך להחזיר שנצטרך שגם תשכח אל ) הלקוחות ולא נסבול שאנחנו עדיף אבל יקפיץ<br>סובלים הלקוחות ומספיק (ריסוט לעשות</td>
<td>0</td>
</tr>
<tr>
<td>05:00:29</td>
<td>████████████<br>██████</td>
<td>מחר עד לנושא רלוונטיות התראות תורידו ██████████</td>
<td>0</td>
</tr>
</table>

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SHANER_WHATSAPP_00001099

# EXHIBIT 10

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         OAKLAND DIVISION

5    -------------------------------X

6    WHATSAPP INC.                    :

7    a Delaware corporation, and     :

8    META PLATFORMS INC,             :

9    a Delaware Corporation:

10                    Plaintiffs      :

11          v.                        :    Case No.

12   NSO GROUP TECHNOLOGIES LTD       :    4:19-cv-07123-PJH

13   and                             :

14   Q CYBER TECHNOLOGIES LTD         :

15                   Defendants       :

16   -------------------------------X

17          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18                  Deposition of YARON SHOHAT

19                          LONDON

20              THURSDAY, AUGUST 29TH, 2024

21                     9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1 Q. Yes.
2 A. Okay. Which page, please?
3 Q. Page 6, please.
4 A. Page 6.
5    Yes.
6 Q. Under section 2 in the second paragraph, do you see
7    where it says:
8      "Pegasus deploys an invisible software (SW)
9    component agent on a target's device which extracts and
10   securely transmits data for intelligence analysis."
11 A. I see it.
12 Q. What does it mean that the agent was invisible?
13 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
14 A. I didn't write it. I don't know what it refers to.
15 Q. Are you familiar with the Pegasus technology that the
16   defendants offer?
17 A. Of course.
18 Q. Okay. Does that technology deploy a software component
19   that defendants describe as "invisible"?
20 A. It deploys an agent which the owner or user of the
21   targeted device is not aware of. If that's what
22   "invisible" means ...
23 Q. Does it deploy it in a manner that's invisible to the
24   infrastructure used to install it?
25 MR. AKROTIRIANAKIS: Objection. Vague.

Page 47

1 A. I am not sure what you mean by "infrastructure".
2 Q. Okay, when you said "agent", what did you mean?
3 A. Piece of software.
4 Q. And what is the agent in the context of Pegasus?
5 A. The software of Pegasus, which is running on the
6    targeted device.
7 Q. Okay, and what's an installation vector?
8 A. It is the way, the method, to deliver that agent on to
9    the device.
10 Q. The second to last bullet on page 6 says:
11     "Cooperation with local MNO is not required."
12    Do you see that?
13 A. Where, exactly?
14 Q. The second to last bullet on page 6. On exhibit 2016 it
15   says:
16     "Cooperation with local MNO is not required."
17    Do you see that?
18 A. I see that.
19 Q. Do you know what "MNO" stand for?
20 A. Yes.
21 Q. What is it?
22 A. Mobile network operator.
23 Q. Why does NSO highlight the fact that cooperation with
24   the local mobile network operator is not required?
25 MR. AKROTIRIANAKIS: Objection. No foundation.

Page 48

1 A. Because competing solutions do require MNO cooperation.
2    Some of the competing.
3 Q. Have defendants sometimes used Whatsapp infrastructure
4    as part of an installation vector for Pegasus?
5 A. I wouldn't call it Whatsapp infrastructure. But if you
6    ask if we -- if it might send Whatsapp messages, the
7    answer's yes.
8 Q. Including with respect to zero click installation?
9 A. Yes.
10 Q. Does the operation of that Whatsapp related zero click
11   installation vector require cooperation from Whatsapp?
12 A. No.
13 Q. Before operating that Whatsapp related zero click
14   installation vector, did defendants ever inform Whatsapp
15   about what they were doing?
16 MR. AKROTIRIANAKIS: No foundation.
17 A. I don't know if there were any discussions with Whatsapp
18   personnel. Might. I am not aware of.
19 Q. So if it happened, you don't know about it?
20 A. I don't know about it.
21 Q. And now, as CEO of defendants, you have never become
22   aware of a communication that defendants had with
23   Whatsapp before deploying the Hummingbird installation
24   vectors; correct?
25 A. If such discussions did occur, they were before the

Page 49

1    relevant period of 2019. So since then, there were not
2    such discussions.
3 Q. And I am asking about whether those discussions occurred
4    before 2019?
5 MR. AKROTIRIANAKIS: Objection. The question's incomplete.
6    Or maybe not even a question at all.
7 A. I didn't say that there were discussions before 2019.
8    I said that, if there were discussions, they were before
9    2019.
10 Q. But you are not aware of any discussion between
11   defendants and Whatsapp before 2019; correct?
12 A. I am not aware. But it is definitely possible.
13 Q. Are you aware of any instance in which defendants have
14   asked permission from a third party whose technology
15   defendants are using as part of an installation vector
16   for Pegasus?
17 MR. AKROTIRIANAKIS: Objection. No foundation.
18 A. I am not aware.
19 Q. Do defendants have installation vectors for Pegasus
20   today?
21 A. Yes.
22 MR. AKROTIRIANAKIS: I am actually going to instruct the
23   witness not to answer that question. The witness has
24   now answered the question, but ...
25 Q. Have defendants sought permission from any third party

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1    whose technology is involved in the provision of the
2    installation vectors defendants used for Pegasus today?
3 MR. AKROTIRIANAKIS: I am going to instruct the witness not
4    to answer that question, on the basis of the court's
5    order docket number 292.
6 MR. BLOCK: Joe, we discussed this before.
7 MR. AKROTIRIANAKIS: We did.
8 MR. BLOCK: And I want to just state for the record, our
9    understanding of that order is not a "limitation ordered
10    by the court under rule 30 C2". It made no mention of
11    any depositions and gives no basis for you to instruct
12    the witness not to answer. You have referred, in
13    relation to those instructions, to the court's Richmark
14    analysis. The threshold question is whether the witness
15    is prohibited from answering my question because of
16    a non-US legal obligation. So if the defendants assert
17    that a non-US law prohibits the witness from answering
18    my question, please say so. We can decide later whether
19    to ask the court to consider, under Richmark, what the
20    result should be for the defendants' discovery and
21    obligations in this case. But at this deposition,
22    I respectfully request a clear statement from defendants
23    as to the threshold issue.
24        So is it your position that a non-US law prohibits
25    the witness from answering the question I asked?

Page 51

1 MR. AKROTIRIANAKIS: My position is that the court's order
2    states that -- the court's order adopts the definition
3    requested by you, with a time limitation imposed by the
4    court, and says that you can seek further discovery from
5    the court.
6 MR. BLOCK: Are you stating that the defendant is prohibited
7    by a foreign legal obligation from answering the
8    question that I asked? I understand, because I asked
9    you that question before and you didn't, that you have
10    not given that instruction. And so we object to your
11    instruction to the witness not to answer as a violation
12    of rule 30.
13 By Mr. Block:
14 Q. Mr. Shohat, do defendants have an installation vector
15    for Pegasus today that uses Whatsapp technology in any
16    way?
17 MR. AKROTIRIANAKIS: I am sorry, I am going to need to catch
18    up with the transcript here.
19        Okay, go ahead.
20 A. Go ahead?
21 MR. AKROTIRIANAKIS: Do you have his question in mind?
22 A. Yes, I do. Can you repeat it, please?
23 Q. Yes. Do defendants have an installation vector for
24    Pegasus today that uses Whatsapp technology in any way?
25 A. No.

Page 52

1 Q. Do defendants have an installation vector for Pegasus
2    today that uses Facebook technology in any way?
3 A. No.
4 Q. Do defendants use an emulator capable of sending
5    Whatsapp messages in connection with Pegasus today?
6 MR. AKROTIRIANAKIS: Objection. No foundation.
7 A. I don't think I am the right person to answer that.
8 Q. Do you know the answer?
9 A. I don't know.
10 Q. Okay.
11        What are the internal names that defendants use for
12    every installation vector that you are aware of that use
13    Whatsapp technology?
14 MR. AKROTIRIANAKIS: Objection. Foundation. Also vague as
15    to time.
16 A. Actually, I don't know. We are not -- like, the
17    internal code names for vectors are internal and mostly
18    used by the R&D and support teams, and less of
19    an interest for, of me. You mentioned before the name
20    Hummingbird, which is the general name we use for zero
21    click installation, regardless of whether it is using
22    Whatsapp or other methods. That's the term that I am
23    using.
24 Q. So do you know which Hummingbird installation vectors
25    use Whatsapp?

Page 53

1 MR. AKROTIRIANAKIS: Objection. Vague.
2 A. I was told that as part of the preparation for this
3    deposition. I am not sure if my counsel --
4 MR. AKROTIRIANAKIS: He is not asking about conversations
5    that you had with lawyers for the company about the
6    lawsuit.
7 A. Before that, I did not know, or did not recall, which
8    codes were referring to Whatsapp or other vectors.
9 Q. Okay. Before that, did you know, setting aside the code
10    names, which vectors used Whatsapp technology and which
11    did not?
12 MR. AKROTIRIANAKIS: Objection. Vague.
13 A. I might have knew, but I did not recall before meeting
14    with my lawyers in the last few days.
15 Q. Okay.
16        Are you aware of any installation vectors that use
17    Facebook or Facebook Messenger?
18 A. I am not aware.
19 Q. You don't know which installation vectors do or do not
20    use those services?
21 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
22 A. I am not aware of any usage of Facebook Messenger.
23 Q. Is there any policy at defendants with respect to
24    conducting research and development on Whatsapp
25    technology?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1 A. Yes.
2 Q. And then it says:
3     "Pegasus 2.70 (android and P2 platform)."
4     Do you see that?
5 A. Mm-hm.
6 Q. Do you know what "P2 platform" means in that line?
7 MR. AKROTIRIANAKIS: Objection. Foundation.
8 A. I am not sure.
9 Q. Do you recall using the term "P2 platform" in your work
10    at NSO?
11 A. I don't recall using "P2".
12 Q. Do you know -- strike that.
13    I think I am finished with that document. I will
14    ask you if I want to refer you to it.
15    Thinking back to the 2018/19 time frame, did NSO
16    provide customers the ability to choose which specific
17    installation vector to use when trying to put Pegasus on
18    a target device?
19 MR. AKROTIRIANAKIS: Objection. No foundation.
20 A. I don't recall what -- how do UI -- what UI allowed
21    customers in 2018/19.
22 Q. I have seen distinctions between zero click or covert,
23    and triggered or social engineering one click
24    installation vectors generally. Do those terms make
25    sense to you?

Page 67

1 A. Yes.
2 Q. Is it okay with you if I use covert and zero click
3    interchangeably?
4 A. I prefer zero click in this context.
5 Q. Zero click, okay. And as to the alternative, social
6    engineering, or triggered, or one click --
7 A. Triggered, one click.
8 Q. Sorry, let me just ask the question.
9 A. Sorry.
10 Q. As to the alternative, one click, social engineering,
11    triggered; what do you prefer?
12 A. Let's stick with one click and zero click.
13 Q. Okay.
14    Aside from an option to choose between a zero click
15    and a one click installation vector, are you aware of
16    Pegasus ever providing a customer a choice of which zero
17    click vector to use?
18 A. I am not aware such option was given.
19 Q. Okay. Do you know that such option was never given or
20    you simply don't know whether or not it ever happened?
21 A. I would be very surprised if such option existed.
22 Q. Okay. So thinking back to your knowledge of the UI in
23    2018/19, you are not aware of that option having existed
24    at that time?
25 A. I am not aware.

Page 68

1 Q. And thinking of your knowledge of the UI as it exists
2    today, you have also never seen Pegasus give a customer
3    an option to choose which zero click installation vector
4    to use; right?
5 A. Correct.
6 Q. And that's been true consistently over the course of
7    your time at NSO?
8 A. Yes.
9 Q. Why would you be surprised if Pegasus gave a customer
10    an option to choose which zero click installation vector
11    to use?
12 A. Because customers don't care which vector they use, as
13    long as they get the intelligence they need.
14 Q. That's a matter for NSO and the system to take care of,
15    not a matter for customers to operate?
16 A. Correct.
17 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
18 A. I said "correct".
19 Q. Okay. Thank you.
20    Have you seen the complaint in this lawsuit?
21 A. I don't recall.
22 Q. Do you understand that plaintiffs accuse defendants of
23    being responsible for technology that used Whatsapp
24    infrastructure as an installation vector for Pegasus, at
25    least in the April to May 2019 timeframe?

Page 69

1 MR. AKROTIRIANAKIS: Objection. No foundation.
2 A. I understand that the complaint is about that timeframe.
3    About, actually, an event that happened in,
4    I believe, April 2019.
5 Q. Setting aside the question of whether it was the
6    defendants themselves or the defendants' customers who
7    operated the technology at issue, do you admit that NSO
8    created the technology that was used to implement the
9    attacks that the complaint describes?
10 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
11 A. NSO developed the technology that our customers are
12    using.
13 Q. And that's the technology that was used in the events
14    that the complaint in this lawsuit describes in April
15    and May 2019; correct?
16 MR. AKROTIRIANAKIS: Objection. No foundation.
17 A. NSO developed the technology that was used in the event
18    that the complaint refers to.
19 Q. Okay.
20 MR. AKROTIRIANAKIS: I am also going to object to the
21    question as vague.
22 Q. As part of its Pegasus technology, NSO developed
23    an installation vector called Heaven that uses Whatsapp
24    signaling as part of a process that achieves zero click
25    installation of the Pegasus endpoint on a mobile phone;

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1  true?
2  MR. AKROTIRIANAKIS: Objection. Compound. Vague. No
3  foundation.
4  A. NSO developed -- can you repeat, please?
5  Q. Yes. As part of its Pegasus technology, NSO developed
6  an installation vector called Heaven that uses Whatsapp
7  signaling as part of a process that achieves zero click
8  installation of the Pegasus endpoint agent on a mobile
9  phone; true?
10 MR. AKROTIRIANAKIS: Objection. Compound. Vague. No
11 foundation.
12 A. I am not sure about what Whatsapp signaling means, but
13 NSO developed technology, developed installation vector
14 for Pegasus, that involved Whatsapp messages, to install
15 the agent on a target device.
16 Q. NSO also sold technology that constituted
17 an installation vector for Pegasus that involved
18 Whatsapp messages to install the agent on a target
19 device; true?
20 MR. AKROTIRIANAKIS: Objection. Vague.
21 A. No. NSO licensed its technology.
22 Q. Okay. Licensed and obtained revenues from customers in
23 exchange for a license to technology Pegasus created,
24 that used Whatsapp messages to install the Pegasus agent
25 on a target device; correct?

Page 71

1  A. No.
2  MR. AKROTIRIANAKIS: Objection. Vague.
3  A. Not correct. Customers pay us for the capabilities they
4  get, not for the technology itself. They really don't
5  care if it's Whatsapp or anything else involved. They
6  pay us for the capability to obtain intelligence which
7  is needed for them to fight crime and terror.
8  Q. And all the rest is NSO's operation under the hood?
9  MR. AKROTIRIANAKIS: Objection. The question is
10 incomprehensible. And argumentative.
11 A. Definitely not NSO operation. You might claim
12 technology, not operation.
13 Q. Right. NSO, you said, doesn't sell any of its
14 technology to customers, and retains ownership of all of
15 that technology; correct?
16 MR. AKROTIRIANAKIS: Objection. It is a compound question.
17 It is a vague question. There is no foundation for this
18 witness, among other reasons because it calls for
19 a legal conclusion.
20 A. NSO does not sell its technology, but licenses its
21 technology.
22 Q. Do you have information about the content of the
23 Whatsapp messages that NSO technology sent as part of
24 the Heaven and Eden installation vectors?
25 MR. AKROTIRIANAKIS: Objection. The question assumes facts

Page 72

1  not in evidence. And there is no foundation.
2  A. Do you mean what's the content of the Whatsapp messages
3  sent?
4  Q. Yes.
5  A. I don't.
6  Q. Okay. So if I asked you about a payload in a call offer
7  stanza, would you know anything about that?
8  MR. AKROTIRIANAKIS: Objection. Vague.
9  A. Payload and?
10 Q. In a call offer stanza. Are these terms familiar to
11 you?
12 A. No.
13 Q. Do you know how the Heaven and Eden installation vectors
14 caused a target device to download the Pegasus agent?
15 MR. AKROTIRIANAKIS: Objection. No foundation.
16 A. I don't recall.
17 Q. Okay. Is this information that you once knew but do not
18 recall, or never had occasion to know?
19 A. Might have heard, knew. I don't recall.
20 Q. You don't recall whether or not you ever knew that
21 information?
22 MR. AKROTIRIANAKIS: Objection. Misstates the witness'
23 testimony.
24 A. If I knew, I don't recall it.
25 Q. Okay.

Page 73

1  What legal entity is your employer?
2  A. Q Cyber Technologies Ltd.
3  Q. That's Q Cyber of Israel?
4  A. Yes.
5  Q. Has that been true throughout your employment with
6  defendants, since 2018?
7  A. Yes.
8  Q. As a corporate representative, what is the relationship
9  between Q Cyber Technologies Limited and NSO Group
10 Technologies Limited?
11 A. Q Cyber Technologies Limited is the owner of the shares,
12 the full owner of NSO.
13 Q. And who is the owner of Q Cyber Technologies Limited?
14 A. The owner of Q Cyber Technologies Limited is a company
15 by the name OSY SARL, based in Luxembourg.
16 Q. Is OSY an acronym?
17 A. It is. I don't remember what it stands for.
18 Q. Okay.
19 A. I once -- I don't recall. I once knew.
20 Q. NSO is an acronym, right?
21 A. Yes.
22 Q. For?
23 A. NSO is an acronym for the first letter of the first
24 names of the three founders of the company: ████
25 ██████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1  Q.  Okay.  And that includes the agent that will ultimately
2      be installed on a mobile device, correct?
3  A.  Correct.
4  Q.  It includes installation vectors, correct?
5  A.  Correct.
6  Q.  It includes the user interface?
7  A.  Correct.
8  Q.  It includes storage and monitoring related software?
9  A.  Correct.
10  Q.  Anything else you can think of?
11  A.  These are the main components.
12  Q.  Okay.
13      Who is ▓▓▓▓▓▓▓▓
14  A.  I am not familiar with the name.
15  Q.  Who is ▓▓▓▓▓▓
16  A.  ▓▓▓▓▓▓▓▓ used to be a product manager, and
17      I believe even ran the product management group, up,
18      more or less, to the time that I joined the company.
19  Q.  Did ▓▓▓▓▓▓▓▓ have responsibility for Pegasus in
20      that role?
21  A.  For some of the components that we mentioned.
22  Q.  Okay.
23      By the way, I would like to spell the name I gave
24      you a moment before, for the court reporter's benefit,
25      and in case I mispronounced it, so that you might know

Page 175

1  the person, notwithstanding the way the name came out of
2  my mouth, okay. ▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓  Do you know ▓▓▓▓▓▓
4  A.  I do not know this person.
5  Q.  Okay.  Have you ever heard that name aside from this
6      deposition?
7  A.  Not before preparing for this deposition.
8  Q.  How did you hear it in connection with your preparation?
9  MR. AKROTIRIANAKIS:  Don't reveal communications with
10      counsel.  If you read it in a document or something like
11      that you can say it.
12  A.  I heard it from my counsel.
13  Q.  You don't recall seeing that name in any document you
14      reviewed?
15  A.  No.
16  Q.  You don't recall seeing that name in the complaint in
17      this lawsuit?
18  A.  No.
19  Q.  Okay.  Who is ▓▓▓▓▓▓▓
20  A.  ▓▓▓▓ was one of the support team members, or managers,
21      for Q.
22  Q.  What do you mean by "support"?
23  A.  Support, you mentioned before tier 1, tier 2, tier 3.
24      He is probably in all of those.
25  Q.  Is it ▓▓▓▓▓▓▓

Page 176

1  A.  Okay, yes.
2  Q.  Oh, I am asking you.  I didn't know if ▓▓▓ was male or
3      a female?
4  A.  Yes, ▓▓▓ is a male.  Yes.
5  Q.  Do you know whether ▓▓▓▓▓▓ did any work related to
6      defendants' use of Whatsapp technology for installation
7      vectors?
8  A.  He supported Pegasus throughout the relevant period, so
9      I assume he was familiar with the vectors.
10  Q.  Okay.  Who is ▓▓▓▓▓▓▓
11  A.  It is another person on the support team.
12  Q.  Do you know what ▓▓▓▓▓ responsibilities were at
13      NSO?
14  A.  Similar to ▓▓▓▓▓▓
15  Q.  I know we mentioned this name, who is ▓▓▓▓▓
16  A.  He is the manager of what we call the success teams,
17      which includes the support teams.
18  Q.  ▓▓▓▓ has knowledge of NSO client relations?
19  A.  The support team interacts with clients, so to that
20      extent, yes.
21  Q.  Do you know whether ▓▓▓▓ worked on research and
22      development for Pegasus?
23  A.  He did not work for research and development.
24  Q.  How about customer support for Pegasus?
25  A.  Customer support for Pegasus reported to him.

Page 177

1  Q.  Okay. ▓▓▓▓▓▓▓▓▓▓
2  A.  ▓▓▓▓
3  Q.  ▓▓▓▓  Thank you.
4  A.  The name rings a bell, but I don't know his role.
5  MR. AKROTIRIANAKIS:  There was a name you said, ▓▓▓▓
6  A.  ▓▓▓▓
7  Q.  The reporter might appreciate your spelling, if you have
8      it.
9  MR. AKROTIRIANAKIS:  I have ▓▓▓▓▓▓▓▓  And I will
10      trust my friends across the table to correct me if
11      I have that wrong.
12  By Mr. Block:
13  Q.  Cast your mind back to April or May 2019, if you will?
14  A.  Okay.
15  Q.  We have discussed Hummingbird, do you recall that?
16  A.  Yes.
17  Q.  What does Hummingbird mean to you?
18  A.  Hummingbird is the general name for zero click vector
19      over and through the operating system.
20  Q.  Do you remember when Hummingbird went offline
21      in May 2019?
22  A.  Hummingbird goes online and offline many times a year.
23      I don't remember specific dates.
24  Q.  Do you remember the events that are described in the
25      complaint in this lawsuit?

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 Q. Right, you were --

2 A. We became, we were brought in to the loop only after

3    Francisco Partners and the potential acquired became

4    agreed on the terms and they were about to conclude the

5    transaction, only then we became aware that such

6    presentations were conducted.

7 Q. You were asked a lot of questions, both numerically and

8    time wise, about the P&L statements of WestBridge and

9    involvement about any payments made to WestBridge,

10   I think the question actually related to a decision that

11   you were asked to make about whether or not to send the

12   money to the company, do you remember that line of

13   questions?

14 A. Yes, I remember.

15 Q. Okay.  And in your answers to that, they were not really

16   attached in time to any particular period, but are you

17   able to say when it was at all that you became ever

18   involved with, like, reviewing the P&L for WestBridge,

19   or anything like that?

20 MR. BLOCK:  I object to the form of the question and the

21   coaching of the witness.

22 A. I became aware of it, of the request to make money

23   transfers to WestBridge, only after I became CEO, which

24   means all of my answers were for a period after August

25   '22.

Page 255

1 Q. August 2022?

2 MR. BLOCK:  Objection to form.

3 A. Yes.  After August 2022.

4 Q. Okay.  And you were asked a lot of questions about trips

5    that you made to the United States, to Washington DC,

6    with a stop over in New York, and meetings with, in DC,

7    reporters, policymakers and service providers, do you

8    recall that testimony?

9 MR. BLOCK:  Objection to form.

10 A. Yes.

11 Q. When were those trips to Washington DC that you

12   testified about in relation to you becoming the CEO of

13   the company?

14 A. All of those trips to Washington were after August 2022.

15 MR. AKROTIRIANAKIS:  Alright, thank you.

16 THE VIDEOGRAPHER:  Going off the record.  The time is 19:22.

17   End of media card number 6 volume 1 and this is the end

18   of the video deposition of Yaron Shohat.

19 (7:22 p.m.)

20    (Whereupon, the deposition concluded at 7:22 p.m.)

21

22

23

24

25

Page 256

1    CERTIFICATE OF COURT REPORTER

2

3 I, CHRIS LANG, an Accredited Real-time Reporter, hereby

4 certify that the testimony of the witness YARON SHOHAT in

5 the foregoing transcript, taken on this 29TH day of AUGUST,

6 2024 was recorded by me in machine shorthand and was

7 thereafter transcribed by me; and that the foregoing

8 transcript is a true and accurate verbatim record of the

9 said testimony.

10

11 I further certify that I am not a relative, employee,

12 counsel or financially involved with any of the parties to

13 the within cause, nor am I an employee or relative of any

14 counsel for the parties, nor am I in any way interested in

15 the outcome of the within cause.

16

17

18

19 Name:   CHRIS LANG

20 Date:  8/29/24

21

22

23

24

25

Page 257

1

2    CERTIFICATE OF DEPONENT

3

4 I, YARON SHOHAT, hereby certify that I have read the

  foregoing pages, numbered 1  through 259, of my deposition

5 of testimony taken in these proceedings on 29TH, AUGUST,

  2024 and, with the exception of the changes listed on the

6 next page and/or corrections, if any, find them to be a true

  and accurate transcription thereof.

7

8

9

10

11 Signed:  .......................

12 Name:   YARON SHOHAT

13 Date:  .......................

14

15

16

17

18

19

20

21

22

23

24

25

65 (Pages 254 - 257)

# EXHIBIT 13

FILED UNDER SEAL

**Custodian:**            Shaner, Josh

EXHIBIT

2058
9-17-24 SD

**Application:**          WhatsApp

**Active Participants:**

**Other Recipients:**                                             Josh Shaner

**Date/Time Start:**      06/12/2019 02:05 AM

**Date/Time End:**        06/12/2019 11:45 AM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 02:05:37 | | < 132f2fd2-5d4c-4b85-98a3-ae4a39c35d67.jpg > | 0 |
| 02:06:39 | | ▯ | 0 |
| 02:12:43 | | Eden/ Heaven/ Hummingbird R.I.P announcement (to the English speakers among us) | 0 |
| 02:37:01 | | Hey, <br><br> Can someone from the office visit the confluence page for P supported devices list <br><br> https://conflu.office.corp/display/IAPC/ <br><br><br> and update the lists in the owncloud? <br> ownCloud\Presales\PGS\Supported devices & Release Notes | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Time | Sender | Message | |
|---|---|---|---|
| 02:58:09 | ▮▮▮▮ | I will after lunch | 0 |
| 03:00:46 | ▮▮▮▮ | Thanks. Also features and capabilities. Please update when you do. ▮▮▮ | 0 |
| 03:02:24 | ▮▮▮▮ | شيء لايوجد | 0 |
| 03:04:24 | ▮▮▮▮ | البحث عن توقف | 0 |
| 03:44:19 | ▮▮▮▮ | Done | 0 |
| 11:11:28 | ▮▮▮▮ | Good evening everyone. After a long day of work and issues with momento installation. We have run a test:<br><br>- Successful installation on iOs 11.4.4 IPhone X (PXL cell)<br><br>- successful auto-install installation (PXL WiFi) on S8 android 8. | 0 |
| 11:11:38 | ▮▮▮▮ | 🤷👍👏 | 0 |
| 11:12:13 | ▮▮▮▮ | 👏👏👏👏👏 | 0 |
| 11:12:26 | ▮▮▮▮ | Well done (!) for a long long effort. Good luck in the demo tomorrow!! | 0 |
| 11:12:30 | ▮▮▮▮ | Well done guys! Glad to hear. Good luck tomorrow ▯ | 0 |
| 11:12:30 | ▮▮▮▮ | Good luck ! | 0 |
| 11:14:46 | ▮▮▮▮ | Good news! Nice to hear▯ | 0 |
| 11:15:22 | ▮▮▮▮ | Good luck guys! You rock ✍ | 0 |
| 11:26:41 | ▮▮▮▮ | Good luck tomorrow | 0 |
| 11:28:25 | ▮▮▮▮ | Good luck champ | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 11:38:58 | | Great!<br><br>Good luck | 0 |
|---|---|---|---|
| 11:45:59 | | Thx guys and girl | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SHANER_WHATSAPP_00001515

# EXHIBIT 14

FILED UNDER SEAL



| | | |
|---|---|---|
| **Custodian:** | Shaner, Josh | |
| **Application:** | WhatsApp | |
| **Active Participants:** | | |
| **Other Recipients:** | | Josh Shaner |
| **Date/Time Start:** | 05/12/2019 08:31 AM | |
| **Date/Time End:** | 05/12/2019 11:58 AM | |

| Time | From | Message Body | Deleted |
|---|---|---|---|
| 08:31:19 | | < 47015109-d5c7-4d8b-a7bb-777a2e4c3bcd.jpg > | 0 |
| 08:32:00 | | Congrats to ▮▮▮ and ▮▮▮ for leading a complex PiXcell POC in the city of Jerusalem.<br><br>Bravo guys 🏍️🏍️ | 0 |
| 08:33:59 | | Kings!!👑👑👑 | 0 |
| 08:35:48 | | I made my warrior face | 0 |
| 08:36:17 | | Horror face after locking the target | 0 |
| 08:37:07 | | Great job guys !<br><br>Waiting to hesr about it in the office | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 09:56:36 | ███████████ ███████ ███████ | Hi team, I am sure most of you already heard about Eden Just making sure every one is alligned So bottom line, Eden has finished its duty with us as a patch was done on the server side with the application it works with I heard some sales managers taking it in a dramatic way, your job is to make sure they remeber that along the years NSO has proven time after time that one of its biggest value is   the ability to "survive" this harsh enviorment of the cat and mouse game At this point all demos will move to 1 click Android 0 click ios R&D are working hard on different directions, hopfuly we will have good news soon but please rember that our technological status is still great as we (as a company) have the resources to find some thing new in a relatively short time | 0 |
| 09:58:34 | ███████████ ███████████ | ███████ would vote for you! | 0 |
| 09:59:16 | ███████████ ███████████ ███████ | ☺ | 0 |
| 10:00:10 | ███████████ ███████████ | 👆 | 0 |
| 11:58:02 | ███████████ ███████████ | Amazing job and well done you 2 Pixcell warriors ✊ | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 15

FILED UNDER SEAL

**Custodian:** Shaner, Josh

**Application:** WhatsApp

**Active Participants:** ███████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
██████████

**Other Recipients:** ██████████████████████████████████
█████████████████ Josh Shaner
████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
████████
██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████
███████████████████████████████████
██████████████████████████████████████
██████████████████████████████
███████████████████
██████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
███████████████████████
███████████████████

**Date/Time Start:** 05/08/2019 01:29 AM

**Date/Time End:** 05/08/2019 01:59 PM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 01:29:19 | ████████████ ███████ ████ | Done with demo | 0 |
| 01:29:21 | ████████████ ███████ ████ | Thanks | 0 |
| 01:33:47 | ████████████ ██████████████ | ██████████ - any news about this one? | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 01:36:36 | | asked yesterday, it would crash news page 2 and it didn't work. Then I used Sales 3.<br><br>▮ has demo today in Buick, will use Sales 3 I guess. | 0 |
|---|---|---|---|
| 01:38:27 | | Ok, a reminder for everyone: if you want (and you should want) that the support will investigate a failure you encountered, you should send ▮ & ▮ an email with the details and out ▮ in CC.<br><br>And please do it: imitate investigations, for the sake of future demos and the product in general...p | 0 |
| 01:47:51 | | Still waiting for confirmation but it could be a really big one with the President of Brazil; will keep updated as it happens. | 0 |
| 01:52:36 | | not sure i understood. Are you going to test Eden on sales 3? would be good if you could as part of your demo preparations. Like ▮ mentioned above, if you do encounter any issue, please contact support and provide the relevant information for their investigation. Thanks. | 0 |
| 01:59:25 | | Yesterday from Porsche,  I worked with ▮ and then With ▮ all details given. No much more for me to do. They would investigate the issue.... on their hands.<br>I am talking about Sales 6.<br>Sales 3 worked well for me. | 0 |
| 02:19:01 | | Yes you're right ▮ I meant sales 6. FYI ▮▮ | 0 |
| 02:32:14 | | hey, the WA credentials blocked again yesterday, I added 2 new pairs to sales6.<br><br>you may use it again with 2 Eden attacks per hour for now. | 0 |
| 02:33:45 | | Thanks ▮<br><br>▮ if you could test Eden on sales 6 and update, that would be great | 0 |
| 03:44:00 | | Good morning from Brasília team,<br><br>Sent a zero click from Sales 6 ID 625 at 08:09; received first WA call at 08:37 - no joined call.<br><br>Received second WA call at 07:41hs - no joined call. Installation status FAILED DUE TO INTERACTION. Device not touched. Cheers | 0 |
| 03:47:41 | | hi ▮<br><br>please take it with support offline so they can investigate.<br><br>thanks | 0 |

| | | | |
|---|---|---|---|
| 04:48:22 | ███████████ ███████████ ███████████ | ...Sales 3 admin test fail. Edwin is looking into it. I'm moving to Sales 3 now. Any objections pls? | 0 |
| 07:49:50 | ███████████ ███████████ ███████████ | Demo at 20:30IL all vectors Sales 3. | 0 |
| 10:58:55 | ███████████ ███████████ ███████████ | Demo finished. Total success. | 0 |
| 11:09:02 | ███████████ ███████████ ██████████ | 🙈🙈 | 0 |
| 11:49:55 | ███████████ ███████████ ██████████ | Great | 0 |
| 13:59:02 | ███████████ ███████████ ██████ | 🤞 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 20

## FILED UNDER SEAL

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  jakro@kslaw.com
AARON S. CRAIG (Bar No. 204741)
  acraig@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD.,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S RESPONSES AND OBJECTIONS TO PLAINTIFFS WHATSAPP, INC. AND META PLATFORMS, INC. FKA FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSION**<br><br>**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY** |

PROPOUNDING PARTY:    WHATSAPP LLC fka WHATSAPP INC. AND META

PLATFORMS, INC. fka FACEBOOK, INC.

RESPONDING PARTY:    DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED

AND Q CYBER TECHNOLOGIES LIMITED.

SET NO.:    ONE (1)

**DEFENDANTS HEREBY DESIGNATE THESE RESPONSES AS HIGHLY**

**CONFIDENTIAL-ATTORNEY'S EYES ONLY UNDER THE PROTECTIVE ORDER**

**ENTERED IN THIS CASE**

In accordance with Rules 26 and 36 of the Federal Rules of Civil Procedure, NSO Group Technologies Limited ("NSO") and Q Cyber Technologies Limited ("Q Cyber") (collectively, "Defendants"), by and through their undersigned counsel, hereby respond and object to Plaintiffs WhatsApp LLC and Meta Platforms, Inc.'s ("Plaintiffs") First Set of Requests for Admission (collectively, the "Requests" and each, individually, a "Request") served by Plaintiffs on March 7, 2023, as follows.

## **GENERAL OBJECTIONS**

1.      The responses to the Requests are made solely for the purpose of this action.

2.      Defendants object to the Requests to the extent that they purport to impose requirements or obligations different from or beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules of this Court.

3.      Each response is made solely with regard to the subject matter directly at issue in this action during the timeframe relevant to this action.

4.      Each response is made subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, proprietary information, trade secrets, and the like, and any and all other objections on grounds that would require the exclusion of any response herein if such were offered in Court, all of which objections and grounds are reserved and may be interposed at any time, including at the time of trial.

5.      Defendants object to the extent that the Requests seek information not relevant to the claims or defenses of any party.

6.      Defendants object to the extent that the Requests are unlimited in scope or time.

7.      Defendants' responses are not intended to be, and shall not be construed as, a waiver of any objection(s) to the Requests.

8.      No incidental or implied admissions are intended in these responses. Defendants' response to any Request should not be taken as an admission that Defendants accept or admit the existence of any fact(s) or any document(s) assumed by that Request or that such response constitutes admissible evidence.

9.      Defendants have not completed their investigation of the facts related to this case, discovery in this action, or preparation for trial.  These responses are based upon information known at this time and are given without prejudice to Defendants' right to amend, supplement, or revise these responses with any subsequently-discovered information.  Defendants expressly reserve the right to make such additional or modified responses as may be appropriate.

**OBJECTIONS TO THE DEFINITIONS**

1.      Definition No. 1 ("Attack Period"):  Defendants object to the definition of "Attack Period" as biased and prejudicial.  Defendants' products are used for law enforcement purposes.  Accordingly, to the extent Defendants' products were used in the conduct alleged in this action, if at all, such use is not fairly characterized as an "Attack."

2.      Definition No. 4 ("Control"):  Defendants object to the definition of "Control" as vague and ambiguous and overbroad.  The definition accounts for a wide variety of conduct beyond any common sense understanding of the word control.  While the ability to "direct" can be understood as a form of control, a person can readily "manage," "use," "access," and "modify" something without controlling it.  Moreover, having the "ability to" do something, as stated in the definition of "Control," is distinct from exercising that ability, as the Requests seem use the term.  That contrast renders the term Control vague and ambiguous. Responding to any Request which utilizes this definition would create impressible vagueness and ambiguity.  Defendants interpret the term "Control" to mean having the ability to exclude all others from accessing.

3.      Definition No. 5 ("Device"):  Defendants object to the definition of "Device" as vague, ambiguous and overbroad, because it purports to encompass any "electronic device."  That circular definition—using the word device to define the word device—renders "Device" vague and ambiguous.  To the extent the definition to intended to encompass any electronic object, the definition would be overbroad and responding to any Request which incorporate this definition would be unduly burdensome and not proportional to the needs of the case.  Defendants interpret the term "Device" to mean a computer, mobile phone or server.

4.      Definition No. 8 ("NSO Spyware"):  Defendants object to the definition of "NSO

Spyware" as biased and prejudicial.  The term "Spyware" is an inherently pejorative term that baselessly maligns Defendants' products.  Defendants will not refer to their products—which are used by law enforcement to catch the worst of criminals—as "Spyware."  Defendants further object to the overbroad scope of this definition.  Any Request incorporating this definition would seek information related to technologies other than the Pegasus technology ("Pegasus") that was used with respect to the approximately 1,400 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7).  Any technology other than Pegasus has no relevance to Plaintiffs' allegations or any issue in this case.  Because responding to any Request which incorporates this definition would be unduly burdensome and not proportional to the needs of the case, Defendants interpret the term "NSO Spyware" to mean the version of Pegasus in effect during April and May of 2019 that was allegedly used to access the approximately 1,400 "Target Devices" described in the Complaint.

5.      Definition No. 11 ("Person(s)"):  Defendants object to Plaintiffs' definition of "Person(s)" as vague, ambiguous and overbroad.  This definition includes 16 distinct roles or types of entities.  Responding to any Request which relies on such a broad definition of "Person," moreover, would be unduly burdensome and not proportional to the needs of the case.

6.      Definition No. 12 ("Technology"):  Defendants' object to Plaintiffs' definition of "Technology" as vague and ambiguous and overbroad.  Plaintiffs' definition is extremely expansive and responding to any Requests which incorporate this definition would be unduly burdensome and not proportional to the needs of the case.

7.      Definition No. 13 ("WestBridge"):  Defendants' object to Plaintiffs' definition of "WestBridge" as vague and ambiguous and overbroad.  It is unclear whether Plaintiffs' definition of WestBridge, which includes "affiliates," is intended to include Defendants.   Defendants interpret the term "WestBridge" to include only WestBridge Technologies, Inc. and its employees.

8.      Definition No. 15 ("You" or "Your"):  Defendants object to Plaintiffs' definition of "You" and "Your" as vague and ambiguous and overbroad.  Under the guise of these words, Plaintiffs improperly sweep in a host of people and entities, including Defendants' "current and former directors, employees, subsidiaries, corporate parents, affiliates, agents, representatives, and

all other persons acting or purporting to act on its behalf." Responding to any Request which incorporates this term would be unduly burdensome and not proportional to the needs of the case. Unless otherwise indicated, any response to the Requests containing the term "You" or "Your" is limited to Defendants NSO and Q Cyber and their employees.

**OBJECTIONS TO THE INSTRUCTIONS**

1.      NSO objects to Plaintiffs' Instruction No. 1 to the extent it seeks to impose any obligation that is inconsistent with the scope of discovery permitted under the Federal Rules of Civil Procedure. NSO further objects to Plaintiffs' Instruction No. 1 to the extent that the terms in Plaintiff's requests are objectionable.

2.      NSO objects to Plaintiffs' Instruction No. 4 to the extent it is inconsistent with or omits parts of Fed. R. Civ. P. 26(e), which defines a party's obligations to supplement.

3.      NSO objects to Plaintiffs' Instructions Nos. 5, 6, 7, and 8 to the extent these instructions are inconsistent with or omits parts of Fed. R. Civ. P. 36(a)(4), which states how a party must answer a request for admission.

**OBJECTIONS TO THE REQUESTS**



DEFENDANTS' RESPONSES AND
OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSION

Case No. 4:19-cv-07123-PJH



DEFENDANTS' RESPONSES AND
OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSION

Case No. 4:19-cv-07123-PJH



1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**REQUEST FOR ADMISSION NO. 6:**

Admit that since July 19, 2020, You have performed a demonstration of NSO Spyware for a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "demonstration" is vague and ambiguous in the context of this Request.  Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

/ / /

**REQUEST FOR ADMISSION NO. 7:**

Admit that since July 19, 2020, You have shared information concerning Your finances with a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the words "shared," "finances," and "located" are vague and ambiguous in the context of this Request.  The word "located," in particular, is subject to multiple meanings that are materially different as it could refer to a person's physical location, place of residence, state of incorporation, or operating or headquarters location(s), among other definitions.  Defendants further object because, in light of these ambiguities and Plaintiffs' overbroad definition of the term "Person(s)," responding to this Request would be unduly burdensome.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

**REQUEST FOR ADMISSION NO. 8:**

Admit that since July 19, 2020, You have shared documentation about NSO Spyware with a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the words "shared," "documentation," and "located" are vague and ambiguous in the context of this Request. The word "located," in particular, is subject to multiple meanings that are materially different as it could refer to a person's physical location, place of residence, state of incorporation, or operating or headquarters location(s), among other definitions. Defendants further object because, in light of these ambiguities and Plaintiffs' overbroad definition of the term "Person(s)," responding to this Request would be unduly burdensome. Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint ) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

1   business information.

2   **REQUEST FOR ADMISSION NO. 9:**

3         Admit that since July 19, 2020, You have caused the distribution and licensed use of NSO

4   Spyware to a Person located outside Israel.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

6         Defendants incorporate by reference the General Objections, Objections to the Definitions,

7   and Objections to the Instructions as if set forth herein.  Defendants object that the words "caused,"

8   "distribution," "use," and "located" are vague and ambiguous in the context of this Request.

9   Plaintiffs' use of the word "caused" here is vague and ambiguous because any license is subject to

10  approval of the Government of Israel Ministry of Defense.  Accordingly, Defendants are not in a

11  position to make representations as to the decisions of its regulators and cannot determine what

12  "caused the distribution and licensed use" of Pegasus.  The word "located," moreover, is subject

13  to multiple meanings that are materially different as it could refer to a person's physical location,

14  place of residence, state of incorporation, or operating or headquarters location(s), among other

15  definitions.  Defendants further object because, in light of these ambiguities and Plaintiffs'

16  overbroad definition of the term "Person(s)," responding this Request would be unduly

17  burdensome.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague,

18  unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably

19  respond on behalf of the many people potentially included by that term, and any response is limited

20  to the acts of defendants NSO Group and Q Cyber that are known to their management and legal

21  personnel.  Defendants further object to this Request as it seeks information regarding a time period

22  of nearly three years that is not relevant to the issues in the litigation.  The relevant time period for

23  this action is January 2018 through May 13, 2019, and information outside that time period is not

24  relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants

25  further object to this Request to the extent that it falsely implies that persons, teams, groups,

26  divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the

27  definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs

28

intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 10:**

Admit that You developed NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "developed" is vague and ambiguous in the context of this Request.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation,

1   or governmental order or directive, or any other applicable law, regulation, or governmental order

2   or directive.  Defendants further object on the ground and to the extent that this Request seeks

3   private, proprietary, trade secret, or confidential business information.

4        Subject to and without waiving those objections, Defendants respond as follows:  Admit.

5   **REQUEST FOR ADMISSION NO. 11:**

6        Admit that a version of NSO Spyware is named "Pegasus."

7   **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

8        Defendants incorporate by reference the General Objections, Objections to the Definitions,

9   and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "a

10   version of NSO Spyware" is vague and ambiguous in the context of this Request, given Plaintiffs'

11   overbroad definition of NSO Spyware.  Defendants further object to this Request to the extent

12   Plaintiffs intend for the phrase "NSO Spyware" to refer to any product the relevant version of

13   Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used

14   with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis

15   that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further

16   object to the extent they are prohibited from disclosing the requested information by any Israeli

17   law, regulation, or governmental order or directive, or any other applicable law, regulation, or

18   governmental order or directive.  Defendants further object on the ground and to the extent that

19   this Request seeks private, proprietary, trade secret, or confidential business information.

20        Subject to and without waiving those objections, Defendants respond as follows:  Admit.

21   **REQUEST FOR ADMISSION NO. 12:**

22        Admit that Exhibit 10 to the Complaint accurately described the functionality of NSO

23   Spyware named "Pegasus."

24   **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

25        Defendants incorporate by reference the General Objections, Objections to the Definitions,

26   and Objections to the Instructions as if set forth herein.  Defendants object that the word

27   "functionality" is vague and ambiguous in the context of this Request.  Because no one document

28

can describe the "functionality" of complex software in full, it is not possible for Defendants to answer this Request without Plaintiff specifying which aspects of Pegasus's "functionality" they which to confirm are described "accurately." Defendants object that this request is vague and ambiguous as to time, because the technology at issue changes over time. Defendants note that Exhibit 10 to the Complaint states that "We … release[] major upgrades to the Pegasus system [a] few times a year." Thus, in the absence of Plaintiffs specifying a specific time period for the Request, Defendants cannot state if the document is accurate as a particular version of Pegasus. For the same reason, responding to this Request as stated would be unduly burdensome and not proportional to the needs of the case. Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012. Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018. Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 13:**

Admit that You created the original version of the Exhibit 10 attached to the Complaint.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012.  Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Exhibit 10 to the Complaint accurately describes the "System Setup and Training" You provide to Persons using NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the words "accurately" and "Persons" are vague and ambiguous in the context of this Request.  Defendants object that this request is vague and ambiguous as to time, because the technology at issue changes over time.  Defendants note that Exhibit 10 to the Complaint states that "We … release[] major upgrades to the Pegasus system [a] few times a year."  For the same reason, responding to this

Request as stated would be unduly burdensome and not proportional to the needs of the case. Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to this Request as it seeks information regarding Defendants' practices but does not specify the applicable time period for the request. Responding to such a request would be unduly burdensome and is not feasible. In any event, the relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. In light of Plaintiffs' use of the word "provide," Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012. Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018. Except as expressly admitted herein, Defendants deny

1  the request.

2  **REQUEST FOR ADMISSION NO. 15:**

3      Admit that a version of NSO Spyware is named "Phantom."

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

5      Defendants incorporate by reference the General Objections, Objections to the Definitions,

6  and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "version

7  of NSO Spyware" is vague and ambiguous in the context of this Request.  Defendants further

8  object to this Request as it seeks information regarding Defendants' products without stating a

9  period for the request.  The relevant time period for this action is January 2018 through May 13,

10  2019, and information outside that time period is not relevant to any party's claim or defense nor

11  proportional to the needs of the case.  Defendants further object to this Request to the extent

12  Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant

13  version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was

14  allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)

15  on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.

16  Defendants further object to the extent they are prohibited from disclosing the requested

17  information by any Israeli law, regulation, or governmental order or directive, or any other

18  applicable law, regulation, or governmental order or directive.  Defendants further object on the

19  ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

20  business information.

21      Subject to and without waiving those objections, Defendants respond as follows:  Denied.

22  **REQUEST FOR ADMISSION NO. 16:**

23      Admit that You licensed use of NSO Spyware during the 2019 Attack Period.

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

25      Defendants incorporate by reference the General Objections, Objections to the Definitions,

26  and Objections to the Instructions as if set forth herein.  Defendants object that the words

27  "licensed," "use," and "the 2019 Attack Period" are vague and ambiguous in the context of this

28

Request.  The approval of any license is subject to approval of the Government of Israel Ministry of Defense and Defendants are not in a position to make representations as to the decisions of its regulators.  Defendants further object to this request to the extent it implies that Defendants operate Pegasus.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks."  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit that licenses of Pegasus were in effect during the period April 29, 2019 to May 10, 2019.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 17:**

Admit that NSO Spyware is capable of collecting information from a Device.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "Device" is vague and ambiguous in the context of this Request, is improperly defined and overbroad.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 18:**

Admit that NSO Spyware is designed to collect information from a Device.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the terms "Device" and "designed" are vague and ambiguous in the context of this Request.  The term "Device" is improperly defined and is overbroad.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent the word "designed," in conjunction with "NSO Spyware" or

any aspect of the Requests, suggests Defendants acted with any improper or unlawful intent or purpose at any time.  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 19:**

Admit that NSO Spyware is marketed for the purpose of collecting information from a Device.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "Device," "purpose," and "marketed" is vague and ambiguous in the context of this Request.  The term "Device" is improperly defined and is overbroad.  The term marketed, moreover, could refer to a prohibitively broad set of activities, such that responding to this Request as stated would be unduly burdensome and not proportional to the needs of the case.  It is also unreasonable and unduly burdensome for Defendants to ascribe a single "purpose" to the marketing of Pegasus, if any. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent the word "marketed," in conjunction with "NSO Spyware" or any aspect of the Requests, suggests Defendants acted with any improper or unlawful intent or purpose at any time.  Defendants further

1  object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any

2  product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time

3  period for this action that was allegedly used with respect to the approximately 1,400 Target

4  Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs'

5  allegations in the Complaint.  Defendants further object to the extent they are prohibited from

6  disclosing the requested information by any Israeli law, regulation, or governmental order or

7  directive, or any other applicable law, regulation, or governmental order or directive.  Defendants

8  further object on the ground and to the extent that this Request seeks private, proprietary, trade

9  secret, or confidential business information.

10      Subject to and without waiving those objections, Defendants respond as follows:  Admit

11  that Defendants' marketing of Pegasus has included that Pegasus is capable of collecting

12  information from mobile devices.

13  **REQUEST FOR ADMISSION NO. 20:**

14      Admit that the use of WhatsApp is governed by the WhatsApp Terms of Service.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

16      Defendants incorporate by reference the General Objections, Objections to the Definitions,

17  and Objections to the Instructions as if set forth herein.  Defendants object that this request calls

18  for a legal conclusion.  Defendants object that the terms "use of" and "governed by" are vague and

19  ambiguous.  Defendants further object on the basis that responding to this Request calls for a legal

20  conclusion insofar the Request requires Defendants to assess whether certain conduct is governed

21  by an agreement. Defendants further object that they lack sufficient knowledge or information to

22  respond to this Request, particularly as the hypothetical and undefined "use" in this Request

23  corresponds to Plaintiffs' software application and Plaintiffs' terms of service, not Defendants'

24  software or terms.

25      Subject to and without waiving those objections, Defendants respond that they lack

26  information sufficient to enable them to truthfully admit or deny the request, and therefore deny it

27  on that basis.

28

**REQUEST FOR ADMISSION NO. 21:**

Admit that You agreed to the WhatsApp Terms of Service prior to or during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that this request calls for a legal conclusion. Defendants object that the phrase "agreed to" is vague and ambiguous in the context of this Request. In addition to being a complex question involving various factors not readily assessable in the context of a discovery response, whether an entity has agreed to terms of service presents multiple questions of law. Accordingly, Defendants object to this Request as it calls for a legal conclusion. Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred. Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Denied.

**REQUEST FOR ADMISSION NO. 22:**

Admit that You used WhatsApp prior to or during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the word "used" is

vague and ambiguous in the context of this Request, especially in combination with the term "You." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred. Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to this request on the basis that they lack sufficient knowledge or information to respond to this Request, particularly as Pegasus is operated by NSO's sovereign customers. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants admit that certain of their employees are among the nearly 2 billion people who reportedly used WhatsApp in 2019, including during the period between April 29, 2019 and May 10, 2019.

**REQUEST FOR ADMISSION NO. 23:**

Admit that You used WhatsApp Computers to install or attempt to install NSO Spyware to a Device.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the terms "used," "Device," and "attempt to install" are vague and ambiguous in the context of this Request, particularly in conjunction with the term "You." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome. Defendants cannot reasonably respond

on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that You did not have permission from WhatsApp or Meta to install or attempt to install NSO Spyware using WhatsApp Computers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "attempt to install" is vague and ambiguous in the context of this Request, as it is not clear what constitutes "attempt[ing] to install."  Defendants object that the request implies that Defendants installed or attempted to install NSO Spyware using WhatsApp Computers, which is not true or accurate.  Defendants object to Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q

Cyber that are known to their management and legal personnel.  Defendants further object to Plaintiffs' use of the term "install" to the extent is miscomprehends or misstates how Pegasus functions, including because Pegasus would not require that anything be installed on a "WhatsApp Computer," even if used in connection Plaintiffs' allegations.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Exhibit A to the Complaint, starting on page 8 of Exhibit 11 to the Complaint, accurately describes Your "Systems and Services," as defined in Exhibit A to the Complaint, as of December 17, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "Exhibit A to the Complaint, starting on page 8 of Exhibit 11 to the Complaint" is vague and ambiguous. Defendants interpret this request as asking about Exhibit A to Exhibit 11 to the Complaint. Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since."  Defendants object that the term "accurately" is vague

and ambiguous in the context of this Request as the time period for this Request is unclear. In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if the document is accurate as to any "Systems and Services" at the time. Defendants further object to this Request to the extent that it seeks information prior to January 2018. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to the phrase "Your 'Systems and Services'" because Plaintiffs' overbroad definition for "Your" renders this request vague, overbroad, unduly burdensome, and not proportional to the needs of the case. Defendants further object to the extent the phrase "your 'Systems and Services'" implicitly seeks information regarding any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit A to Exhibit 11 to the Complaint is authentic. Defendants admit that Exhibit A appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant to a contract. Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Exhibit A-1 to the Complaint, starting on page 9 of Exhibit 11 to the Complaint, accurately describes the "Features and Capabilities" of NSO Spyware, as of December 17, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Defendants incorporate by reference the General Objections, Objections to the Definitions,

and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "Exhibit A-1 to the Complaint, starting on page 9 of Exhibit 11 to the Complaint" is vague and ambiguous. Defendants interpret this request as asking about Exhibit A-1 to Exhibit 11 to the Complaint. Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since."  Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear.  In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if the document is accurate as to any "Features and Capabilities" at the time.  Defendants further object to this Request to the extent that it seeks information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit A-1 to Exhibit 11 to the Complaint is authentic.  Defendants admit that Exhibit A-1 to Exhibit 11 appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant

to a contract.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Exhibit B to the Complaint titled "Considerations," starting on page 32 of Exhibit 11 to the Complaint, accurately describes payments to be made to You for "the provision of the License, System, and Services" related to Pegasus, as of December 17, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the term "You" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Any response is limited to Defendants NSO and Q Cyber.  Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since."  Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear.  In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if Exhibit B is accurate as to any payments.  Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Exhibit C to the Complaint, starting on page 33 of Exhibit 11 to the Complaint, accurately describes the "Installation Requirements" of NSO Spyware as of December 17, 2015.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the phrase "Exhibit C to the Complaint, starting on page 33 of Exhibit 11 to the Complaint" is vague and ambiguous. Defendants interpret this request as asking about Exhibit C to Exhibit 11 to the Complaint. Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since." Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear. Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit C to Exhibit 11 to the Complaint is authentic. Defendants admit that Exhibit C to Exhibit 11 appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant

to a contract.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Exhibit D to the Complaint, starting on page 34 of Exhibit 11 to the Complaint, is a true and accurate copy of a service level agreement between NSO Group Technologies Ltd. And Infralock Development Limited.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants object on the basis that they are not permitted under Israeli law and their agreement to disclose the identity of any potential customers.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 30:**

Admit that You owned or Controlled servers used to install NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the term "Controlled" is vague and ambiguous in the context of this Request; Defendants interpret "Control" to mean having the ability to exclude all others from accessing.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many

people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object on the basis that the Request does not specify the applicable time period.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 31:**

Admit that You provided technical support to Persons using NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the terms "provided" and "technical support" as vague and ambiguous in the context of this Request, particularly given the breadth of people and entities included as "Persons."  Defendants further object because, in light of Plaintiffs' overbroad definition of the term "Person(s)," responding this Request would be unduly burdensome.  Defendants object that the term "You" renders this Request

1  vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Defendants

2  cannot reasonably respond on behalf of the many people potentially included by that term, and any

3  response is limited to the acts of defendants NSO Group and Q Cyber that are known to their

4  management and legal personnel.  Defendants further object on the basis that the Request does not

5  specify the applicable time period.  The relevant time period for this action is January 2018 through

6  May 13, 2019, and information outside that time period is not relevant to any party's claim or

7  defense nor proportional to the needs of the case.  As the Requests use the term "provides,"

8  Defendants further object to this Request to the extent that it falsely implies that persons, teams,

9  groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology

10  within the definition of "NSO Spyware."  Defendants further object to this Request to the extent

11  Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant

12  version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was

13  allegedly used with respect to the approximately 1,400 Target Devices described in the

14  Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the

15  Complaint.  Defendants further object to the extent they are prohibited from disclosing the

16  requested information by any Israeli law, regulation, or governmental order or directive, or any

17  other applicable law, regulation, or governmental order or directive.  Defendants further object on

18  the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

19  business information.

20      Subject to and without waiving those objections, Defendants respond as follows:  Admit.

21  **REQUEST FOR ADMISSION NO. 32:**

22      Admit that Your support engineers could be reached at the phone number ███████

23  ██

24  **RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

25      Defendants incorporate by reference the General Objections, Objections to the Definitions,

26  and Objections to the Instructions as if set forth herein.  Defendants further object that the term

27  "support engineers" is vague and ambiguous in the context of this Request as the Requests fail to

28  ———————————————————————————————

define this term. Defendants further object that the term "Your" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object on the basis that the Request is vague in that it does not specify the applicable time period. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Admit.

**REQUEST FOR ADMISSION NO. 33:**

Admit that Your Technical Support Center could be reached at the e-mail address ██████████████████

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the term "Technical Support Center" is vague and ambiguous in the context of this Request as the Requests fail to define this term. Defendants further object that the term "Your" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object because Defendants lack sufficient knowledge or information to respond to this Request on the basis that the email address appears to be operated by a third party entity. Defendants further object on the basis that the Request does

1    not specify the applicable time period.  The relevant time period for this action is January 2018

2    through May 13, 2019, and information outside that time period is not relevant to any party's claim

3    or defense nor proportional to the needs of the case.  Defendants further object to the extent they

4    are prohibited from disclosing the requested information by any Israeli law, regulation, or

5    governmental order or directive, or any other applicable law, regulation, governmental order or

6    directive.  Defendants further object on the ground and to the extent that this Request seeks private,

7    proprietary, trade secret, or confidential business information.

8         Subject to and without waiving those objections, Defendants respond as follows:  Admit.

9    **REQUEST FOR ADMISSION NO. 34:**

10        Admit that, between April 29, 2019 and May 10, 2019, WestBridge used, caused to be

11   used, and Controlled the Device associated with the phone number ███████████

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

13        Defendants incorporate by reference the General Objections, Objections to the Definitions,

14   and Objections to the Instructions as if set forth herein.  Defendants further object that the terms

15   "used, caused to be used," "Controlled," and "Device" as vague and ambiguous.  Defendants

16   interpret "Control" to mean having the ability to exclude all others from accessing. Defendants

17   further object to the extent they are prohibited from disclosing the requested information by any

18   Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation,

19   or governmental order or directive.  Defendants further object on the ground and to the extent that

20   this Request seeks private, proprietary, trade secret, or confidential business information.

21        Subject to and without waiving those objections, Defendants respond as follows:

22   Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and

23   therefore deny it on that basis.

24   **REQUEST FOR ADMISSION NO. 35:**

25        Admit that between April 29, 2019 and May 10, 2019, WestBridge employee Josh Shaner,

26   used, caused to be used, and Controlled the Device associated with the phone number ██████

27   ██████

28

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the terms "used, caused to be used," "Controlled," and "Device" are vague and ambiguous in the context of this Request. Defendants interpret "Control" to mean having the ability to exclude all others from accessing. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and therefore deny it on that basis.

**REQUEST FOR ADMISSION NO. 36:**

Admit that You used, caused to be used, and Controlled the WhatsApp account associated with phone number ███████████ during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the terms "associate with," "used, caused to be used," and "Controlled" are vague, ambiguous, unduly burdensome, and not proportional to the needs of the case. Defendants interpret "Control" to mean having the ability to exclude all others from accessing. Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred. Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the

acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and therefore deny it on that basis.

**REQUEST FOR ADMISSION NO. 37:**

Admit that You used, caused to be used, and Controlled the WhatsApp account associated with phone number ███████ during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the terms "associate with," "used, caused to be used," and "Controlled" are vague, ambiguous, unduly burdensome, and not proportional to the needs of the case.  Defendants interpret "Control" to mean having the ability to exclude all others from accessing.  Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on

1  the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential
2  business information.

3       Subject to and without waiving those objections, Defendants respond as follows:
4  Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and
5  therefore deny it on that basis.

6  **REQUEST FOR ADMISSION NO. 38:**

7       Admit that You had Control over the servers that resolve to the Internet Protocol (IP)
8  address 54.93.81.200 during the 2019 Attack Period.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

10       Defendants incorporate by reference the General Objections, Objections to the Definitions,
11  and Objections to the Instructions as if set forth herein.  Defendants interpret "Control" to mean
12  having the ability to exclude all others from accessing.  Defendants further object to the phrase
13  "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist
14  law enforcement in protecting the public and are used for investigative purposes, not in "attacks."
15  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly
16  burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond
17  on behalf of the many people potentially included by that term, and any response is limited to the
18  acts of defendants NSO Group and Q Cyber that are known to their management and legal
19  personnel.  Defendants further object to the extent they are prohibited from disclosing the
20  requested information by any Israeli law, regulation, or governmental order or directive, or any
21  other applicable law, regulation, or governmental order or directive.  Defendants further object on
22  the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential
23  business information.

24  / / /
25  / / /
26  / / /
27  / / /

1      Subject to and without waiving those objections, Defendants respond as follows:

2  Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and

3  therefore deny it on that basis.

4

5  Dated:  April 17, 2023                    KING & SPALDING LLP

6

7                                            By:    /s/ Aaron S. Craig

8                                                   JOSEPH N. AKROTIRIANAKIS
                                                    AARON S. CRAIG
9                                                   Attorneys for Defendants NSO GROUP
                                                    TECHNOLOGIES LIMITED and Q
10                                                  CYBER TECHNOLOGIES LIMITED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am a citizen of the United States and resident of the State of California. I am employed in the County of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

On April 17, 2023, I served the following documents in the manner described below:

**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S RESPONSES AND OBJECTIONS TO PLAINTIFFS WHATSAPP, INC. AND META PLATFORMS, INC. FKA FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSION**

☑    BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through King & Spalding LLP's electronic mail system to the email addresses set forth below.

On the following parties in this action:

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 17, 2023, at Los Angeles, California.

By: _____
ADRIANA S. KIM

## SERVICE LIST

| | |
|---|---|
| Greg D. Andres<br>DAVIS POLK & WARDWELL LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 450-4724<br>Email: greg.andres@davispolk.com | Craig T. Cagney<br>DAVIS POLK & WARDWELL LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 450-3162<br>Email: craig.cagney@davispolk.com |
| Antonio J. Perez-Marques<br>DAVIS POLK & WARDWELL LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 450-4559<br>Email: antonio.perez@davispolk.com | Micah G. Block<br>DAVIS POLK & WARDWELL LLP<br>1600 El Camino Real<br>Menlo Park, California 94025<br>Telephone: (650) 752-2000<br>Email: micah.block@davispolk.com |

# EXHIBIT 22

## FILED UNDER SEAL

**Custodian:**                Shaner, Josh

EXHIBIT
PENGAD 800-631-6989
2057
9-17-24

**Application:**               WhatsApp

**Active Participants:**    ██████████████████████████████████
                           ████████████████████████████████████

**Other Recipients:**      ████████████████████████████████
                           █████████████████████ Josh Shaner
                           ██████████████████████████████████████
                           ████████████████████████
                           ██████████████████████████████████
                           █████████████████████████████████
                           ██████████████████████████████████
                           ██████████████████████████████████
                           ███
                           ███████████████████████████████████
                           █████████████████████████████████
                           ████████████████████████████████████
                           ████████████████████████
                           ██████████████████████████████
                           █████████████████████████████
                           ██████████████████
                           ████████████████████████████
                           ███████████████████████████████████
                           ██████████████████████████
                           ████████████████████████████████████
                           ██████████████████

**Date/Time Start:**       05/12/2019 12:58 AM

**Date/Time End:**        05/12/2019 06:16 AM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 00:58:39 | ████████████ ████████████ ██████ | ████ and I are starting a Sting POC in 10 min - sales3. | 0 |
| 05:12:59 | ████████████ ████████ ████ | ‏3 סיילס על בדיקות התחיל בעז | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    SHANER_WHATSAPP_00001487

| 05:13:01 | | הוקטורים כל | 0 |
|---|---|---|---|
| 05:16:42 | | Eden will not work .. | 0 |
| 05:17:40 | | Wont it still work with earlier WA versions? | 0 |
| 05:18:51 | | No , per r&d they close vector from the server side .. so please don't try to install hummingbird | 0 |
| 05:27:48 | | ok ? | 0 |
| 05:39:23 | | Ok | 0 |
| 05:39:25 | | Thanks | 0 |
| 06:16:55 | | Done with training | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 32

## FILED UNDER SEAL

**Custodian:** DiVittorio Terrence

**Device:** iPhone XS Max

**Application:** WhatsApp

**Active Participants:** Terry DiVittorio ██████████████████████████████

**Date/Time Start:** 01/31/2018 12:46 PM

**Date/Time End:** 01/31/2018 05:37 PM

**Subject:**

| Time | From | Message Body | Tags |
|------|------|--------------|------|
| 12:46:57 | Terry DiVittorio - ████████████ | Hey man, any updates? | |
| 12:51:50 | ████████████████ | Hey BrotherNot yetAssuming in probably 2-3 hours from now.Ill call you once I have themI also have an update for you in regards of G3 pgs demos | |
| 12:54:07 | Terry DiVittorio - ████████████ | Ok, we're in California, really good PGSS demo yesterday for the FBI here in Los Angles yesterday and demo'ing PiXcell for San Bernardino today.   G3 is a mess, contract likely will be canceled next week, can't get ██████████ to respond | |
| 12:54:47 | ████████████████ | Embarrassing.. | |
| 12:58:27 | Terry DiVittorio - ████████████ | And total disrespectful and unprofessional of ██████████ at least when I WhatsApp ████ she replies | |
| 12:59:04 | ████████████████ | Agree████ is on vacation but still… | |
| 17:30:31 | Terry DiVittorio - ████████████ | Any updates? | |
| 17:34:04 | ████████████████ | No man████ just sent me a msg that they are still discussing | |
| 17:34:18 | ████████████ | As soon as I have new info ill call u | |
| 17:37:04 | Terry DiVittorio - ████████ | Thanks man, we start the PiXcell demo in 20 minutes, will send you a msg when we finish, thanks. | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 35

FILED UNDER SEAL

| Name associated with phone number | Phone number | Country code | Produced document source | Confidentiality stamping |
|---|---|---|---|---|
| ███████████ | ██████ | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | United States | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| Josh Shaner | ██████ | United States | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Uruguay | SHANER_WHATSAPP_00000950 | Confidential |
| | | United Kingdom | SHANER_WHATSAPP_00000951 | Confidential |
| | | Germany | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000957 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000957 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | DIVITTORIO_WHATSAPP_00000128 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000950 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |
| | | Israel | SHANER_WHATSAPP_00000951 | Confidential |

# EXHIBIT 36

## FILED UNDER SEAL

**Custodian:** Shaner, Josh

**Application:** WhatsApp

**Active Participants:** ████████████████████████████
████████████████████

**Other Recipients:** ███████████████ Josh Shaner
████████████████████████
████████████████████████████
██████████████████████████████
████████████████████████████
██████████████████████████████
████████████████████

**Date/Time Start:** 09/16/2018 12:46 AM

**Date/Time End:** 09/16/2018 04:11 AM

| Time | From | Message Body | Deleted |
|------|------|-------------|---------|
| 00:46:26 | ████████████ ████████████ ██████ | Hi everyone,<br><br>Tomorrow sales 3 is going to be down from 9:30 to 11:30 in order to upgrade pgs 3 to the latest version | 0 |
| 04:07:14 | ████████████ ████████████ | Hey,<br><br>Does anyone have ██████ Signal Tours) number? | 0 |
| 04:07:42 | ████████████ ████████ ████████████ |  | 0 |
| 04:11:25 | ████████████ ████████████ | Danke sehr! | 0 |

CONFIDENTIAL

**Custodian:** Shaner, Josh

**Application:** WhatsApp

**Active Participants:** ███████████████████████
███████████

**Other Recipients:** ███████████████████████
███████ Josh Shaner
████████████████████████████
████████████████████████████
███████████████████████
████████████████████████
███████████████████████████
███
████████████████████████████
██████████████████████
████████████████████████████
████████████████
████████████████████
████████████████████████
██████████████████████████
█████████████████
███████████████████████
█████████████████
████████████████████
████████████████
██████████████████████
████████████████████████████
███████████████████████
████████████████

**Date/Time Start:** 09/17/2018 06:19 AM

**Date/Time End:** 09/17/2018 07:42 AM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 06:19:43 | ████████<br>███████████ | Hi, will have no time to tests. ███ asked me to use sales 4 because sales 1 is going down. Please ensure all works well. Diablo, Heaven & 1c. Thanks. | 0 |
| 07:38:54 | ████████<br>███████████ | Hi, need help on Heaven. NOC is busy, who else can help? ███████████ | 0 |
| 07:41:33 | ████████████<br>█ | Hey, checking now. | 0 |

SHANER_WHATSAPP_00000951

| 07:41:48 | ██████████████ | | 0 |
|---|---|---|---|
| | ██████████████ | | |
| 07:42:03 | ██████████████ | ☺❤☺ | 0 |
| | ██████████████ | | |
| | █ | | |

CONFIDENTIAL

Shaner, Josh

**Custodian:**

**Application:** WhatsApp

**Active Participants:** ██████████████████████

**Other Recipients:** ████████████████████████████████████ Josh Shaner
████████████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████

**Date/Time Start:** 09/24/2018 09:27 AM

**Date/Time End:** 09/24/2018 09:27 AM

| Time | From | Message Body | Deleted |
|------|------|-------------|---------|
| 09:27:29 | ██████████████<br>██████████████ | Hey.<br><br>Im sorry if there was no clear message.<br><br>Those days and until further notice:<br><br>1. We can only use Sales 4.<br><br>2. We can only demo Heaven, Diablo and Sting.<br><br><br>No 1 click installation of any kind (including Link without SMS) is allowed due to OPSEC reasons that will be later on detailed to us all.. | 0 |

SHANER_WHATSAPP_00000957

**Custodian:** DiVittorio Terrence

**Device:** iPhone XS Max

**Application:** WhatsApp

**Active Participants:** Terry DiVittorio ████████████████████████████

**Date/Time Start:** 04/02/2018 11:47 AM

**Date/Time End:** 04/02/2018 11:53 AM

Subject:

| Time | From | Message Body | Tags |
|------|------|--------------|------|
| 11:47:30 | Terry DiVittorio - ████████████ ██████ | Hello ████ the NSA executive cannot meet with us next week, but agreed to the following week, 16-20 April.  Should be able to confirm a date today or tomorrow.  I will also have another meeting or two that week, one with the former CTO of Dell, ████████ who you met, who is now with company, Intelligent Decisions.   They will be a new reseller partner but he wants to explore a hosted Phantom solution that would be managed in one of their secure data centers. | |
| 11:52:38 | ████ ████████ ████ | Alright. I'll wait for the confirmation | |
| 11:53:20 | Terry DiVittorio - ████████████ ██████ | Thanks! | |