# Exhibit B to the Declaration of Aaron S. Craig
# April 4, 2025

# EXHIBIT 8

FILED UNDER SEAL

**Custodian:**      Shaner, Josh

**Application:**      WhatsApp

**Active Participants:** ███████████████████████

██████████████████

**Other Recipients:** █████████████████████

████████████ Josh Shaner

█████████████████████████

██████████████████████████

████████████████████

████████████████████

███████████████████████

██████████████████████████

██

█████████████████████████

███████████████

███████████████

██████████████████

███████████████

████████████████████

████████████████████

████████████

█████████████████

████████████

█████████████████

██████████████ |

████████████

███████████████████████

████████████████

**Date/Time Start:**      12/05/2018 01:25 AM

**Date/Time End:**      12/05/2018 05:00 AM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 01:25:09 | ████████ ███ | Demo in Golf is over and was a success ☺ | 0 |
| 04:20:07 | ████████ ████████ ███ | Hi all,<br><br>WhatsApp had made changes in their servers that currently fail all installations and can cause crashes that risk the Hummingbird vector. | 0 |



EXHIBIT
2007
8·27·24 CM
PENGAD 800-631-6989

|  |  | We need to immediately pause all Hummingbird installations cross all systems (Customer sites (P2 &P3, Tactical covert), Sales) until the Android research team will be able to provide a solution.<br><br>Official message to clients was synced with CEs ▮▮▮<br><br>The team is working on a solution in top priority, hoping to provide a solution ASAP.<br><br>We will keep you updated.<br><br>Thanks,<br><br>▮▮▮▮▮▮ |  |
|---|---|---|---|
| 04:22:20 | ▮▮▮▮<br>▮▮▮▮ | ▮ בסיילס מוריד אתה ?בסיילס | 0 |
| 04:43:54 | ▮▮▮▮<br>▮▮▮▮<br>▮▮▮ | כן | 0 |
| 04:45:06 | ▮▮▮▮<br>▮▮▮▮<br>▮▮▮ | הורדתי את wise nservices את סתם (המערכות את לצרוך שלא) לרסט לא מנת על יסמי בעבודה ללקוחות ולהפריע.<br>בשב חושב שכולם צריכים לעשות ככה☺ | 0 |
| 04:45:37 | ▮▮▮▮<br>▮▮▮▮ | בנגייוס התראות יקפיץ לא זה? | 0 |
| 04:46:20 | ▮▮▮▮<br>▮▮▮▮<br>▮▮▮ | נצטרך להחזיר שנצטרך שגם תשכח אל ) הלקוחות ולא נסבול שאנחנו עדיף אבל  יקפיץ סובלים הלקוחות ומספיק (ריסוט לעשות | 0 |
| 05:00:29 | ▮▮▮▮<br>▮▮▮▮ | מחר עד לנושא רלוונטיות התראות הורידו @447624092448 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 10

## FILED UNDER SEAL

**Custodian:**    Shaner, Josh

EXHIBIT
2058
9-17-24 SD

**Application:**    WhatsApp

**Active Participants:**    ███████████████████████
███████████████████
██████████████████████████
████████████████████████
███████████

**Other Recipients:**    █████████████████ Josh Shaner
███████████████████████████████
██████████████████
████████████████████████
█████████████████████
███████████████████
████████████████████████
███████████████████████████
███████████████████████████
██████

**Date/Time Start:**    06/12/2019 02:05 AM

**Date/Time End:**    06/12/2019 11:45 AM

| Time | From | Message Body | Deleted |
|------|------|-------------|---------|
| 02:05:37 | ██████████ ██ | < 132f2fd2-5d4c-4b85-98a3-ae4a39c35d67.jpg > | 0 |
| 02:06:39 | ██████████ ████████ | ▯ | 0 |
| 02:12:43 | ██████████ ████████ | Eden/ Heaven/ Hummingbird R.I.P announcement (to the English speakers among us) | 0 |
| 02:37:01 | ████████ ████████████ | Hey, Can someone from the office visit the confluence page for P supported devices list https://conflu.office.corp/display/IAPC/ and update the lists in the owncloud? ownCloud\Presales\PGS\Supported devices & Release Notes | 0 |

| Time | | Message | |
|---|---|---|---|
| 02:58:09 | ▮▮▮▮ | I will after lunch | 0 |
| 03:00:46 | ▮▮▮▮ | Thanks. Also features and capabilities. Please update when you do. Shookran! | 0 |
| 03:02:24 | ▮▮▮▮ | شيء لايوجد | 0 |
| 03:04:24 | ▮▮▮▮ | البحث عن توقف | 0 |
| 03:44:19 | ▮▮▮▮ | Done | 0 |
| 11:11:28 | ▮▮▮▮ | Good evening everyone. After a long day of work and issues with momento installation. We have run a test:<br><br>- Successful installation on iOs 11.4.4 IPhone X (PXL cell)<br><br>- successful auto-install installation (PXL WiFi) on S8 android 8. | 0 |
| 11:11:38 | ▮▮▮▮ | 🎉👍 | 0 |
| 11:12:13 | ▮▮▮▮ | 👏👏👏👏 | 0 |
| 11:12:26 | ▮▮▮▮ | Well done (!) for a long long effort. Good luck in the demo tomorrow!! | 0 |
| 11:12:30 | ▮▮▮▮ | Well done guys! Glad to hear. Good luck tomorrow ▮ | 0 |
| 11:12:30 | ▮▮▮▮ | Good luck ! | 0 |
| 11:14:46 | ▮▮▮▮ | Good news! Nice to hear▮ | 0 |
| 11:15:22 | ▮▮▮▮ | Good luck guys! You rock 👏 | 0 |
| 11:26:41 | ▮▮▮▮ | Good luck tomorrow | 0 |
| 11:28:25 | ▮▮▮▮ | Good luck champ | 0 |

| 11:38:58 | | Great!<br><br>Good luck | 0 |
|---|---|---|---|
| 11:45:59 | | Thx guys and girl | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SHANER_WHATSAPP_00001515

# EXHIBIT 11

## FILED UNDER SEAL



| | Custodian: | Shaner, Josh |
| | Application: | WhatsApp |
| | Active Participants: | |
| | Other Recipients: | Josh Shaner |
| | Date/Time Start: | 05/12/2019 08:31 AM |
| | Date/Time End: | 05/12/2019 11:58 AM |

| Time | From | Message Body | Deleted |
| --- | --- | --- | --- |
| 08:31:19 | | < 47015109-d5c7-4d8b-a7bb-777a2e4c3bcd.jpg > | 0 |
| 08:32:00 | | Congrats to ▮ and ▮ for leading a complex PiXcell POC in the city of Jerusalem.<br><br>Bravo guys 🏍️🏍️ | 0 |
| 08:33:59 | | Kings!!👑👑👑 | 0 |
| 08:35:48 | | I made my warrior face | 0 |
| 08:36:17 | | Horror face after locking the target | 0 |
| 08:37:07 | | Great job guys !<br><br>Waiting to hesr about it in the office | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SHANER_WHATSAPP_00001489

| 09:56:36 | ████████ ███████ ██████ | Hi team, | 0 |
| | | I am sure most of you already heard about Eden | |
| | | Just making sure every one is alligned | |
| | | So bottom line, Eden has finished its duty with us as a patch was done on the server side with the application it works with | |
| | | I heard some sales managers taking it in a dramatic way, your job is to make sure they remeber that along the years NSO has proven time after time that one of its biggest value is   the ability to "survive" this harsh enviorment of the cat and mouse game | |
| | | At this point all demos will move to | |
| | | 1 click Android | |
| | | 0 click ios | |
| | | R&D are working hard on different directions, hopfully we will have good news soon but please rember that our technological status is still great as we (as a company) have the resources to find some thing new in a relatively short time | |
| 09:58:34 | ████████ ██████ | Tomer I would vote for you! | 0 |
| 09:59:16 | ████████ ███████ ██████ | ☺ | 0 |
| 10:00:10 | ████████ ██████ | 👆 | 0 |
| 11:58:02 | ████████ ██████ | Amazing job and well done you 2 Pixcell warriors 🖖 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 12

## FILED UNDER SEAL

**Application:**          WhatsApp

**Active Participants:**  ████████████████████████████████
                         ████████████████████████████████████
                         ████████████████████████████████████
                         ████████████████████████████████████
                         ███████████

**Other Recipients:**    ████████████████████████████████████
                         ████████████████  Josh Shaner
                         ████████████████████████████████████████
                         ████████████████████████████████
                         ████████████████████████████████
                         ██████████████████████████████████████
                         ███████████████████████████████████████
                         ████████████████████████████████████████████
                         ████
                         ████████████████████████████████████████████
                         ████████████████████████████████████████
                         ████████████████████████████
                         █████████████████████████████████
                         ████████████████████████████████████████
                         ███████████████████████████████████████████
                         ████████████████████████████████████████
                         █████████████████████████
                         █████████████████████████████████████████
                         ████████████████████████████████████████████
                         ███████████████████████████████████████████████
                         ████████████████████████████████████████████████
                         ████████████████████████████████████
                         ████████████████████████

**Date/Time Start:**     05/08/2019 01:29 AM

**Date/Time End:**       05/08/2019 01:59 PM

| Time | From | Message Body | Deleted |
|------|------|-------------|---------|
| 01:29:19 | ████████████████ ███████████ ████ | Done with demo | 0 |
| 01:29:21 | ████████████████ ████████████ ███ | Thanks | 0 |
| 01:33:47 | ████████████████ ████████████████ | ████████████ - any news about this one? | 0 |

| 01:36:36 | ███████ | ...ked yesterday, it would crash the news Page and again and didn't work. Then I used Sales 3.<br><br>██ has demo today in Buick, will use Sales 3 I guess. | 0 |
|---|---|---|---|
| 01:38:27 | ███████<br>███████ | Ok, a reminder for everyone: if you want (and you should want) that the support will investigate a failure you encountered, you should send ███ Yossi an email with the details and out ██ in CC.<br><br>And please do it: imitate investigations, for the sake of future demos and the product in general...p | 0 |
| 01:47:51 | ███████<br>███████<br>█████ | Still waiting for confirmation but it could be a really big one with the President of Brazil; will keep updated as it happens. | 0 |
| 01:52:36 | ███████<br>███████<br>██ | not sure i understood. Are you going to test Eden on sales 3? would be good if you could as part of your demo preparations. Like ██ mentioned above, if you do encounter any issue, please contact support and provide the relevant information for their investigation. Thanks. | 0 |
| 01:59:25 | ███████<br>███████ | Yesterday from Porsche, I worked with ████████████ all details given. No much more for me to do. They would investigate the issue.... on their hands.<br>I am talking about Sales 6.<br>Sales 3 worked well for me. | 0 |
| 02:19:01 | ███████<br>███████<br>██ | Yes you're right ████ I meant sales 6. FYI ████████ | 0 |
| 02:32:14 | ███████<br>███████<br>███ | hey, the WA credentials blocked again yesterday, I added 2 new pairs to sales6.<br>you may use it again with 2 Eden attacks per hour for now. | 0 |
| 02:33:45 | ███████<br>███████<br>██ | Thanks ████<br>████████ if you could test Eden on sales 6 and update, that would be great | 0 |
| 03:44:00 | ███████<br>███████<br>█████ | Good morning from Brasília team,<br>Sent a zero click from Sales 6 ID 625 at 08:09; received first WA call at 08:37 - no joined call.<br>Received second WA call at 07:41hs - no joined call. Installation status FAILED DUE TO INTERACTION. Device not touched. Cheers | 0 |
| 03:47:41 | ███████<br>███████<br>██ | hi ████<br>please take it with support offline so they can investigate.<br>thanks | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 04:48:22 | ██████████ ██████████ ██████████ | ...Sales 3 admin click fail. Looking at moving to Sales 3 now. Any objections pls? | 0 |
| 07:49:50 | ██████████ ██████████ ██████████ | Demo at 20:30IL all vectors Sales 3. | 0 |
| 10:58:55 | ██████████ ██████████ ██████████ | Demo finished. Total success. | 0 |
| 11:09:02 | ██████████ ████████ ███████ | 👀👀 | 0 |
| 11:49:55 | ██████████ ██████████ ████████ | Great | 0 |
| 13:59:02 | ██████████ ██████████ ██████ | 👌 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 17

## FILED UNDER SEAL

**Custodian:** DiVittorio, Terrance

**Device:** iPhone XS Max

**Application:** WhatsApp

**Active Participants:** Terry DiVittorio - ███████████████████████████████

**Date/Time Start:** 01/31/2018 12:46 PM

**Date/Time End:** 01/31/2018 05:37 PM

**Subject:**

| Time | From | Message Body | Tags |
|---|---|---|---|
| 12:46:57 | Terry DiVittorio - ████████████ | Hey man, any updates? | |
| 12:51:50 | ████████████ | Hey BrotherNot yetAssuming in probably 2-3 hours from now.Ill call you once I have themI also have an update for you in regards of G3 pgs demos | |
| 12:54:07 | Terry DiVittorio - ████████████ | Ok, we're in California, really good PGSS demo yesterday for the FBI here in Los Angles yesterday and demo'ing PiXcell for San Bernardino today.   G3 is a mess, contract likely will be canceled next week, can't get Avihood or Gorev to respond | |
| 12:54:47 | ████████████ | Embarrassing.. | |
| 12:58:27 | Terry DiVittorio - ████████████ | And total disrespectful and unprofessional of ████████████ at least when I WhatsApp ████ she replies | |
| 12:59:04 | ████████████ | Agree████████s on vacation but still... | |
| 17:30:31 | Terry DiVittorio - 17037284283@s.whatsapp.net | Any updates? | |
| 17:34:04 | ████████████ | No man████ just sent me a msg that they are still discussing | |
| 17:34:18 | ████████████ | As soon as I have new info ill call u | |
| 17:37:04 | Terry DiVittorio - ████████████ | Thanks man, we start the PiXcell demo in 20 minutes, will send you a msg when we finish, thanks. | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 30

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                   OAKLAND DIVISION
4    -------------------------------X
     WHATSAPP INC., a Delaware        )
5    corporation, and FACEBOOK, INC., )
     a Delaware corporation,          )
6                                     )
                  Plaintiffs,         )
7                                     )  Case No.
        v.                            )
8                                     )  4:19-CV-07123-PJH
     NSO GROUP TECHNOLOGIES LIMITED   )
9    and Q CYBER TECHNOLOGIES         )
     LIMITED,                         )
10                                    )
                  Defendants.         )
11   -------------------------------X
12               **HIGHLY CONFIDENTIAL**
13                ATTORNEYS' EYES ONLY
14             VIDEOTAPED DEPOSITION OF
15            TERRENCE PATRICK DIVITTORIO
16      Wednesday, September 18, 2024; 9:33 a.m. EDT
17
18   Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
     CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
19   NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
     Court Reporter, NY Association Certified Reporter, OR
20   CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
     23005926, Remote Counsel Reporter, LiveLitigation
21   Authorized Reporter, Notary Public
22

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 86

1  offering me a very lucrative salary beyond what I
2  was making at VariQ.
3        Also, at that time at VariQ, VariQ
4  was on a track for acquisition, and so they were
5  not going to be -- and they were eventually
6  acquired by Capgemini, so I knew that there might
7  not be a long -- long runway at VariQ, so I
8  was -- I was open to job -- job opportunities.
9     Q.    You said that Westbridge was a
10 technology products company.
11       What products did Westbridge
12 produce?
13    A.    Westbridge didn't produce any
14 products.
15    Q.    None at all?
16    A.    None.  Not one.
17    Q.    During the -- how many years were
18 you there?
19    A.    Three.
20    Q.    During the three years and four
21 months, say, that you were there, did they
22 produce any -- any products at all?

Page 87

1     A.    No.
2     Q.    Not one?
3     A.    Not one.
4     Q.    Throughout that time, the three
5  years and four months, you continued to have
6  relationships and discussions with people at NSO
7  and Q Cyber; is that fair?
8     A.    Yes.
9     Q.    Was that on a daily basis?
10    A.    Daily basis, sure.
11    Q.    And just so I understand this --
12 and I apologize if I asked this, but I didn't
13 understand the answer -- what did you understand
14 the financing to be of Westbridge in terms of
15 capital or who was financing and how much?
16    A.    My understanding is that it was Q
17 that was financing Westbridge, because Westbridge
18 had not sold any products or capability to
19 generate revenue to be self-sustaining.
20    Q.    It was a start-up?
21    A.    It seemed like it was, yes.
22    Q.    I mean, it had three employees --

Page 88

1     A.    Um-hum.
2     Q.    -- so is it fair to say it was a
3  start-up?
4     A.    Not when I joined.  They were
5  already in place before I got there.
6     Q.    And what was happening before you
7  got there?
8     A.    I believe they were --
9        ATTORNEY AKROTIRIANAKIS:
10       Objection: no foundation.
11       THE WITNESS:  -- I believe they
12 were trying to sell with the -- with
13 ████████████████ to the U.S. market.
14 BY ATTORNEY ANDRES:
15    Q.    Is it fair to say that when you
16 came in to take over as president, you did some
17 due diligence about what was -- what you were
18 taking over and --
19    A.    Of course.
20    Q.    -- and what was happening?
21    A.    Yes.
22    Q.    Explain that to me.

Page 89

1     A.    I met with ████████ and
2  ████████ several times to help me -- help --
3  help me understand, as their board member -- as
4  board members, what Westbridge was doing, what
5  Westbridge was responsible for, what my role and
6  responsibilities would be.
7     Q.    And what did they tell you?
8     A.    They said that it's a technology
9  product company that serves, they believe, the
10 U.S. intelligence community, Department of
11 Defense, Department of Homeland Security and
12 Federal law enforcement; and that they needed
13 someone with a background and relationships in
14 those markets.
15       They said that the company is
16 established, has -- has a certificate of
17 incorporation, all the other required
18 documentation to be an operating U.S. entity.
19 They said it was part of a larger family of
20 companies, and that's where the support for
21 infrastructure would come from: HR, accounting
22 and finance, and -- and funding to -- to fund

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 90

1 payroll.
2      Q.    What did they tell you about the
3 capital available to -- to Westbridge to convince
4 you that it wasn't some fly-by-night operation?
5      A.    Well, I -- I'd worked with ███ in
6 the past and trusted his judgment.  And ███
7 is a very reputable former Department of Defense
8 individual.  So I asked them, you know, Is this a
9 six-month run?  A year run?  Did they have the
10 funds and the -- and the capability to support,
11 you know, what's going to take, in my opinion, 12
12 to 15 months to get this strategy that I wanted
13 to put in place launched?  And they said yes.
14      Q.    And what did you think the capacity
15 in terms of funding was to launch in 12 to
16 18 months?
17           ATTORNEY AKROTIRIANAKIS:
18      Objection: vague.
19           THE WITNESS:  I don't understand
20      the question.
21 BY ATTORNEY ANDRES:
22      Q.    What -- what -- what amount of

Page 91

1 money or capital did you think was necessary at
2 that time to continue the launch through 12 to
3 18 months?
4      A.    Not more than they were currently
5 funding.  I didn't need additional employees.
6 What I hired were two consultants who worked on a
7 small retainer but more of a commission or
8 success fee, so I didn't need more working
9 capital other than what was being already funded
10 for the company.
11      Q.    And what was that?
12      A.    Enough to cover payroll for myself,
13 ███ enough to cover our
14 infrastructure, supplies, our office space, our
15 travel; and then outsourced 80P services for our
16 benefits and our insurance.
17      Q.    Is that a million dollars?
18      A.    I can't remember the number.
19      Q.    Was it more than 5 million?
20      A.    I don't remember the number.
21      Q.    You were the president of
22 Westbridge.

Page 92

1           You're not aware of what its
2 assets were, what its cash balance was, what
3 loans it had?
4      A.    It was --
5           ATTORNEY AKROTIRIANAKIS:
6      Objection: misstates his testimony.
7           THE WITNESS:  -- it was several
8      years ago.  I don't remember.
9 BY ATTORNEY ANDRES:
10      Q.    So at no time -- you don't
11 currently remember have [sic] been refreshed
12 about what the assets or cash available, capital
13 available to Westbridge was?
14           ATTORNEY AKROTIRIANAKIS:
15      Objection: misstates his testimony; it's
16      also a incomprehensible question.
17 BY ATTORNEY ANDRES:
18      Q.    I'm happy to have you clarify --
19      A.    I don't understand --
20      Q.    -- whatever --
21      A.    -- I don't understand the question.
22      Q.    Okay.  When you got to Westbridge,

Page 93

1 as the president, did you look at its books and
2 records?
3      A.    For our operating costs at
4 Westbridge?
5      Q.    Yes.
6      A.    Yes.
7      Q.    You did review that?
8      A.    Um-hum.
9      Q.    Did you meet with an accountant?
10      A.    No.
11      Q.    Okay.  What was your understanding
12 of Westbridge financial condition?
13           ATTORNEY AKROTIRIANAKIS:
14      Objection: vague.
15           THE WITNESS:  Again, meeting with
16      the Board, they assured me that through
17      the family of companies, that there would
18      be no issues with covering our costs,
19      meeting payroll; ensuring that if we had
20      growth requirements, they could be --
21      they could be met.
22

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 94

1  BY ATTORNEY ANDRES:
2      Q.    Did you file tax returns for
3  Westbridge?
4      A.    No.
5      Q.    Not at all?
6      A.    That was done in support from the
7  infrastructure folks at Q.  They hired attorneys
8  to do that with us.
9      Q.    And so you were the president of
10 Westbridge, but you had nothing to do with
11 reviewing its financial disclosures, tax
12 returns --
13     A.    No.
14     Q.    -- anything?
15     A.    No.
16          ATTORNEY AKROTIRIANAKIS:
17 Objection: it assumes facts not in
18 evidence --
19 BY ATTORNEY ANDRES:
20     Q.    Do you have any sense in terms of
21 the range --
22          ATTORNEY AKROTIRIANAKIS:  Hold on.

Page 95

1  I get to -- I get to interpose
2  objections, too.
3          -- it assumes facts not in
4  evidence; no foundation.
5          ATTORNEY ANDRES:  Which facts are
6  not in evidence?
7          ATTORNEY AKROTIRIANAKIS:  Hold on.
8  The transcript is coming in.
9          (Whereupon, counsel reviews the
10         material provided.)
11          ATTORNEY AKROTIRIANAKIS:  That
12 there were financial disclosures that
13 were required as an example of the fact
14 that you haven't elicited.
15 BY ATTORNEY ANDRES:
16     Q.    You said that Q Cyber filed tax
17 returns for Westbridge?
18          ATTORNEY AKROTIRIANAKIS:
19 Objection: misstates his testimony.
20          THE WITNESS:  I don't remember.
21 BY ATTORNEY ANDRES:
22     Q.    You don't remember who -- you don't

Page 96

1  remember --
2      A.    They --
3      Q.    Let me just finish the question.
4  I'm sorry.
5              -- you don't remember that
6  answer, or you don't remember who filed tax
7  returns for Westbridge?
8      A.    I remember that Q Cyber's finance
9  folks, with local attorneys, managed that for
10 Westbridge.
11     Q.    When you say "local attorneys,"
12 local to what jurisdiction?
13     A.    To Maryland, where we had our
14 offices.
15     Q.    There were people at -- from
16 Q Cyber that came to your offices in Maryland?
17     A.    No.  No.
18          ATTORNEY AKROTIRIANAKIS:
19 Objection: misstates his testimony.
20 BY ATTORNEY ANDRES:
21     Q.    When people from NSO and Q Cyber
22 were in the United States, did they come in your

Page 97

1  offices?
2      A.    Yes.
3      Q.    How frequently?
4      A.    Maybe quarterly.
5      Q.    When you say offices, can you
6  describe -- was it one office, two offices, five,
7  what was -- what was the physical layout?
8      A.    We had a reception area with some
9  couches and a desk and four -- I believe four
10 individual offices and a kitchen area --
11     Q.    Okay.  Who sat --
12     A.    -- and -- I'm sorry -- and -- and a
13 conference room.
14          I'm sorry.
15     Q.    -- who sat in those four offices?
16     A.    I sat in one; ██████████ sat in
17 one; and Josh Shaner sat in one.
18     Q.    And what type of building was it
19 in?
20          In terms of an office building?
21     A.    Yes.
22     Q.    Do you remember what floor it was?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 98

1    A.    I believe it was the second floor.
2    Q.    Okay. And what was the rent for
3    those facilities?
4    A.    I can't remember how much the rent
5    was.
6    Q.    Was it more than $10,000 --
7    A.    No, no --
8    Q.    -- a month?
9    A.    -- no, no. No.
10    Q.    Less than $10,000 a month?
11    A.    Probably about -- I believe about
12    1,800 to $2,000 a month.
13    Q.    Okay. And who paid for that rent?
14    A.    Q Cyber.
15    Q.    Okay. Was computer equipment in
16    that -- in that facility?
17    A.    We had laptops.
18    Q.    Did you rent those or buy them?
19    A.    They were provided by Q Cyber.
20    Q.    Okay. How about the office
21    furniture? Did you buy or rent that?
22    A.    That was already in place when I

Page 99

1    arrived. I'm not sure how they acquired it.
2    Q.    Did you have business cards made?
3    A.    Yes.
4    Q.    Who paid for the business cards?
5    A.    Q Cyber.
6    Q.    What else did Q Cyber pay for?
7    A.    Office supplies, kitchen supplies,
8    our travel, our payroll.
9    Q.    Is there anything related to
10    Westbridge that wasn't paid for by Q Cyber/NSO?
11        ATTORNEY AKROTIRIANAKIS:
12    Objection: assumes facts not in evidence;
13    also misstates his testimony.
14    BY ATTORNEY ANDRES:
15    Q.    I'm not trying to characterize your
16    testimony or state any other facts. I'm asking
17    you whether or not there was anything related to
18    Westbridge that Q Cyber didn't pay for.
19        ATTORNEY AKROTIRIANAKIS:
20    Objection: vague.
21        THE WITNESS: No.
22

Page 100

1    BY ATTORNEY ANDRES:
2    Q.    Okay. Let's just take a break from
3    Westbridge for a second, finish out your -- your
4    employment history.
5        You left Westbridge at some
6    point?
7    A.    Yes.
8    Q.    By the way -- I'm sorry. One other
9    question: Where does the name Westbridge come
10    from?
11        ATTORNEY AKROTIRIANAKIS:
12    Objection: no foundation.
13        THE WITNESS: I don't know.
14    BY ATTORNEY ANDRES:
15    Q.    You didn't -- you didn't create
16    that name?
17    A.    No, I did not.
18    Q.    Did any of the people on the Board
19    tell you what the name -- where the name came
20    from?
21    A.    No.
22    Q.    Was it near a bridge?

Page 101

1    A.    No.
2    Q.    West of a bridge?
3    A.    I don't know.
4    Q.    Anybody named Westbridge ever
5    associated with the entity?
6    A.    Not that I'm aware of.
7    Q.    Okay. So as --
8        ATTORNEY AKROTIRIANAKIS:
9    Objection: no foundation.
10        ATTORNEY ANDRES: Sorry. Joe, go
11    ahead.
12        ATTORNEY AKROTIRIANAKIS: -- no
13    foundation.
14        ATTORNEY ANDRES: No foundation
15    for what?
16        ATTORNEY AKROTIRIANAKIS: I don't
17    know I'm required to explain my
18    objections, but you asked him if anybody
19    named Westbridge was ever -- something
20    with the entity.
21        ATTORNEY ANDRES: And what
22    foundation would be required to ask that

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 130

1          ATTORNEY AKROTIRIANAKIS:
2     Objection: vague.
3  BY ATTORNEY ANDRES:
4      Q.    In -- in terms of, like, money you
5  were paid, as opposed to equity or bonuses or --
6  was your -- was your base salary $250,000?
7      A.    Yes.
8      Q.    Okay.  Did you get any incentive
9  bonuses or any commissions, or anything along
10 those lines?
11     A.    An incentive bonus, yes.
12     Q.    What was your incentive bonus?
13     A.    I don't remember the exact amount,
14 but it was for developing and launching the new
15 U.S. market strategy, building a pipeline of
16 opportunities with potential customers.
17     Q.    And how much was it?
18     A.    I don't remember.
19     Q.    Was it more than $20,000?
20     A.    No.
21     Q.    Was it more than $10,000?
22     A.    I don't remember.

Page 131

1      Q.    And those bonuses came from
2  Q Cyber?
3          ATTORNEY AKROTIRIANAKIS:  Object
4  to the form of the question: assumes
5  facts not in evidence.
6      THE WITNESS:  No --
7          ATTORNEY ANDRES:  Just -- sorry --
8  to understand the objection so I can make
9  sure.
10     What -- what facts -- I just want
11 to make sure that the question is
12 appropriate.
13     Could you just articulate what
14 facts you have a concern about?
15         ATTORNEY AKROTIRIANAKIS:  Yeah.
16 You asked him:
17     "Question:  Did you get any
18     incentive bonuses?"
19     He said:
20     "Answer:  An incentive
21     bonus."
22     And now you're talking about

Page 132

1  incentive bonuses.
2          ATTORNEY ANDRES:  Okay.
3  BY ATTORNEY ANDRES:
4      Q.    Did you receive more than one
5  incentive bonus?
6      A.    No.
7      Q.    For the one incentive bonus that
8  you received, was that paid by Q Cyber?
9          ATTORNEY AKROTIRIANAKIS:
10     Objection: no foundation.
11     THE WITNESS:  No; Westbridge.
12 BY ATTORNEY ANDRES:
13     Q.    And how do you know that Westbridge
14 paid that?
15     A.    It was in a -- it was in a -- my
16 payroll check.
17     Q.    Okay.  You testified earlier that
18 Q Cyber funded Westbridge and -- is that right?
19         ATTORNEY AKROTIRIANAKIS:
20     Objection: misstates his testimony.
21     THE WITNESS:  Westbridge had its
22     own bank account, its own banking

Page 133

1  services.  Our payroll was paid from that
2  bank account.
3      Q Cyber would put money in that
4  bank account, but all of our pay -- all
5  of our funding that we used locally was
6  in our Westbridge bank account.
7  BY ATTORNEY ANDRES:
8      Q.    The money in the bank account that
9  Westbridge used to pay salaries came from
10 Q Cyber, right?
11     A.    Some -- one of the parent -- one of
12 the many companies that our -- from one of those
13 companies in the hierarchy of companies in the
14 family.
15     Q.    So that would have been Q Cyber or
16 NSO?
17     A.    Not NSO.  Q Cyber or S.á.r.l --
18     Q.    Orally -- OSY?
19     A.    O- -- OS- -- OSY.
20     Q.    Okay.  So those were the two
21 companies that would put money in -- in
22 Westbridge's bank account?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 134

1    A.    I believe so.
2    Q.    Okay.  You said that one of the --
3    your concerns -- or one of the things that led
4    you to leave Westbridge was this lawsuit that
5    Meta and WhatsApp have filed, and you testified
6    that you had discussions with the board about
7    that.
8          Can you explain what
9    discussions you had with the board relating to
10   the lawsuit?
11         ATTORNEY AKROTIRIANAKIS:
12   Objection: misstates his testimony.
13         THE WITNESS:  I remember meeting
14   with ▇▇▇▇▇ once and at another time
15   with both ▇▇▇▇▇ to share with them
16   my concerns that this was another in a
17   series of bad press articles that could
18   impact prospects and our potential sales
19   and that I believe it was going to be
20   more difficult to get appointments, to
21   get meetings, to engage new customers.
22

Page 135

1    BY ATTORNEY ANDRES:
2    Q.    And what was his response?
3    A.    It -- I remember ▇▇▇▇ saying, Yes,
4    this -- this may make it harder, but we need to
5    continue working to close these deals, that --
6    you know, work through it like you have in the
7    past with the 60 Minutes story, with the
8    Khashoggi story, keep us apprised of any contacts
9    from customers or partners that you hear about.
10         But they understood that that --
11   that was creating more challenges.
12   Q.    Did you have any other discussions
13   with ▇▇▇▇▇
14   A.    No, not that I recall.
15   Q.    Did you and ▇▇▇▇ discuss at
16   any time the substance of the -- of the
17   allegations in the lawsuit?
18   A.    No.
19   Q.    And what about with ▇▇▇▇▇
20   A.    No.
21   Q.    Did you have any discussions at all
22   with ▇▇▇▇▇

Page 136

1    A.    Not individually --
2    Q.    Yeah.
3    A.    -- I met with him when I met with
4    ▇▇▇▇▇  And, again, the discussion was
5    around the impact on potential prospects; current
6    sales opportunities in the pipeline; the fact
7    that, you know, we all knew it was difficult
8    already to sell foreign technology into the
9    U.S. Government market, but this was creating
10   even more challenges.
11   Q.    So did either you, anybody on the
12   board or anybody at Westbridge do any
13   investigation as to the validity of the
14   allegations in the lawsuit?
15   A.    No.
16         ATTORNEY AKROTIRIANAKIS:  No
17   foundation.
18   BY ATTORNEY ANDRES:
19   Q.    And as you sit here today, you have
20   no understanding of whether or not those
21   allegations are true or not?
22         ATTORNEY AKROTIRIANAKIS:  No

Page 137

1    foundation.
2         THE WITNESS:  I don't understand
3    the question.
4    BY ATTORNEY ANDRES:
5    Q.    I think you described that your
6    concern with respect to the Meta lawsuit was the
7    press; is that right?
8    A.    Yes.
9    Q.    Were you also concerned about the
10   actual allegations that -- that made up the
11   lawsuit?
12         ATTORNEY AKROTIRIANAKIS:  No
13   foundation.
14         THE WITNESS:  No.
15   BY ATTORNEY ANDRES:
16   Q.    Did you do anything to investigate
17   whether or not those allegations were true or
18   not?
19   A.    No.
20   Q.    Did you have any concerns about
21   whether Westbridge was selling products from NSO
22   that were engaged in conduct that violated the

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 162

1    A.    No.
2    Q.    And you mentioned that Pegasus is
3 used for -- to target certain phones.
4          Have you done demonstrations of
5 -- of Pegasus for clients?
6    A.    No, I have not.
7    Q.    And can you explain specifically
8 how it works?
9    A.    No, I cannot.
10   Q.    Do you know if it involves an
11 installation vector?
12   A.    I've heard that term, but I don't
13 know how that works.
14   Q.    Okay.  When you were explaining the
15 use of Pegasus to your clients in the
16 United States, how did you explain it?
17   A.    That it was a technology that would
18 allow you to find a target's phone, acquire the
19 target's phone and exfiltrate information off the
20 phone.  If they wanted more information, then I
21 would bring Josh in to have a technical
22 discussion about how the system worked.

Page 163

1    Q.    Josh Shaner?
2    A.    Yes.
3    Q.    And would you ever rely on
4 technical advice from people at NSO with respect
5 to your clients?
6    A.    No.
7    Q.    So you never put -- put somebody
8 from -- one of your clients in touch with anyone
9 at NSO to explain the technology?
10   A.    No, not directly.
11         There were clients here in the U.S.
12 who requested deeper technical knowledge than
13 Josh Shaner had --
14   Q.    Okay.
15   A.    -- and they would come from Israel
16 to meet with us and those clients.
17   Q.    And some of the capacity of -- of
18 Pegasus to obtain information involved the
19 infiltration into unauthorized servers; is that
20 correct?
21   A.    I have no idea.
22   Q.    You -- you don't know whether or

Page 164

1 not Pegasus operated through unauthorized access?
2    A.    No, I do not know.
3    Q.    As you sit here today, you don't
4 know that Pegasus, to operate, infiltrated Meta
5 servers or WhatsApp servers?
6    A.    I don't know.
7          ATTORNEY AKROTIRIANAKIS:
8    Objection.  The question is vague and
9    assumes facts not in evidence.
10 BY ATTORNEY ANDRES:
11   Q.    And based on your long-standing
12 work in this cybersecurity community, are you --
13 did you ever have a concern that if Pegasus is
14 operating through unauthorized access, that that
15 would involve illegal conduct?
16         ATTORNEY AKROTIRIANAKIS:
17    Objection: incomplete hypothetical; also,
18    it assumes facts not in evidence; no
19    foundation.
20         THE WITNESS:  I did not know
21    Pegasus was operating in an unauthorized
22    manner.

Page 165

1 BY ATTORNEY ANDRES:
2    Q.    Pegasus has the ability to capture
3 encrypted messages off communication
4 applications, right?
5          ATTORNEY AKROTIRIANAKIS:
6    Objection: no foundation; also misstates.
7          THE WITNESS:  It's one of the
8    features of the -- of the system.
9 BY ATTORNEY ANDRES:
10   Q.    It's an important feature, correct?
11   A.    To some customers, it was an
12 important feature.
13   Q.    Sure.  And do you have any
14 knowledge as to whether when Westbridge sells
15 Pegasus to have encrypted messages captured, that
16 that potentially violates the law?
17         ATTORNEY AKROTIRIANAKIS:
18    Objection: misstates --
19         THE WITNESS:  I don't know.
20         ATTORNEY ANDRES:  Hold on --
21 BY ATTORNEY ANDRES:
22   Q.    You don't know --

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 190

1        THE WITNESS:  No.
2  BY ATTORNEY ANDRES:
3      Q.    What was E-Tel?
4      A.    Oh, I apologize.  E- -- E-Tel was
5  a -- a reseller partner.
6      Q.    And who worked at E-Tel?
7      A.    ██████████
8      Q.    Yeah.
9            What about Compass?
10     A.    No.
11     And Q what is a -- what is a -- in
12  what fashion did E-Tel operate as a reseller?
13           ATTORNEY AKROTIRIANAKIS:  Object
14     to the form of the question.
15           THE WITNESS:  They facilitated
16     meetings with contacts they had in the
17     U.S. Government.
18  BY ATTORNEY ANDRES:
19     Q.    And you're not familiar with
20  Compass Stratagem?
21     A.    Yes, I am.
22     Q.    Who's that?

Page 191

1      A.    That's ██████ company.
2      Q.    And they were a reseller?
3            ATTORNEY AKROTIRIANAKIS:  Object
4      to the form -- well, go ahead.
5            THE WITNESS:  No.
6  BY ATTORNEY ANDRES:
7      Q.    Were they an agent of Westbridge?
8      A.    They were a consultant.
9      Q.    And what did they do in terms of
10  consultant?
11     A.    Set up meetings with contacts they
12  had in U.S. Government agencies.
13     Q.    How did Compass Stratagem as a
14  consultant -- how did their role differ from
15  E-Tel as a reseller?
16     A.    E-Tel had contracting vehicles or
17  existing contracts with Government agencies for
18  which their contacts could acquire technologies.
19           Compass was a single propriety
20  consultancy.
21     Q.    How were resellers compensated?
22     A.    Through commissions or success

Page 192

1  fees.
2      Q.    And who paid those commissions or
3  success fees?
4      A.    Westbridge.
5      Q.    And where did Westbridge get the
6  financing to pay those commissions or success
7  fees?
8      A.    From the revenue that was generated
9  from the sale and then paid from OSY or Q into
10  the Westbridge account.
11     Q.    So Q had some role in compensating
12  the resellers?
13           ATTORNEY AKROTIRIANAKIS:
14     Objection: misstates his testimony; no
15     foundation.
16           THE WITNESS:  Again, funding from
17     the -- one of the companies -- OSY, Q --
18     into the Westbridge account.  And then
19     Westbridge ended up -- ended up paying
20     the consultants and the reseller fees.
21  BY ATTORNEY ANDRES:
22     Q.    So in that regard, Westbridge was a

Page 193

1  pass-through for the payment from Q Cyber or
2  somebody in Israel to the reseller?
3            ATTORNEY AKROTIRIANAKIS:  Object
4      to the form of the question -- questions,
5      really: no foundation; also calls for a
6      legal conclusion.
7            THE WITNESS:  Again, Westbridge
8      paid the consultants and the resellers.
9            The consultants had retainers.
10     The resellers were based on a commission
11     or success fee.
12  BY ATTORNEY ANDRES:
13     Q.    What about the revenue from these
14  sales?  Did that go to Q Cyber?
15           ATTORNEY AKROTIRIANAKIS:  Object
16     to the form of the question.
17           THE WITNESS:  I believe so, yes.
18  BY ATTORNEY ANDRES:
19     Q.    And just to be clear about the
20  payment of the resellers, the money -- there are,
21  say, two transactions.  The money goes from
22  Q Cyber to Westbridge.  That's Transaction 1.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 198

1  not approved any payment. I plan to meet them
2  again in two weeks and bring this up again.
3            That's an e-mail that you
4  wrote.
5            Do you see that?
6      A.   Yes.
7      Q.   When you write, "Management still
8  has not approved this payment," what do you mean
9  by that?
10     A.   The Westbridge board.
11     Q.   Okay. And do you -- do you have
12  a -- aware that there was a planned meeting two
13  weeks later with the Westbridge board?
14     A.   I was hoping to meet with them
15  again in two weeks.
16     Q.   Okay. If you go back to this
17  second -- the first page -- the back of the first
18  page says 5203. Now we're in December,
19  December 24, 2019, and you're writing back to
20  ███  and also somebody named ███████
21            It says -- he had asked you
22  about the status, and you write, Unfortunately,

Page 199

1  no ████ no updates. I was at our overseas
2  headquarters this past week and inquired to the
3  status of payment and was told that payment
4  consideration was now with our newly hired
5  general counsel.
6            Do you see that?
7      A.   Yes.
8      Q.   Westbridge Technologies does not
9  have an overseas headquarters, does it?
10     A.   No, it does not.
11     Q.   That reference to overseas
12  headquarters is a reference to NSO or Q Cyber,
13  correct?
14     A.   Yes.
15     Q.   Okay. And then it says, [as read]
16  Inquired the status of the payment and told that
17  payment consideration was now done newly hired
18  general counsel.
19            Do you see that?
20     A.   Yes.
21     Q.   Did Westbridge -- Westbridge
22  Technologies ever have a general counsel?

Page 200

1      A.   No.
2      Q.   That is a reference to newly hired
3  general counsel at NSO, correct?
4            ATTORNEY AKROTIRIANAKIS:
5      Objection: no foundation.
6            THE WITNESS: I don't know if it
7      was NSO or Q Cyber.
8  BY ATTORNEY ANDRES:
9      Q.   And so the payments that were going
10 to E-Tel were coming from NSO and Q Cyber; is
11 that correct?
12           ATTORNEY AKROTIRIANAKIS:
13     Objection: leading; no foundation.
14           THE WITNESS: No; they were
15     being -- they were going to be made from
16     Westbridge, but Westbridge had to receive
17     the money from OSY or Q.
18 BY ATTORNEY ANDRES:
19     Q.   As a pass-through? Westbridge was
20 a pass-through in that regard?
21           ATTORNEY AKROTIRIANAKIS:
22     Objection to the form of the question.

Page 201

1            THE WITNESS: Yes.
2  BY ATTORNEY ANDRES:
3      Q.   Okay. You can put that aside.
4  Thank you.
5            Westbridge was located in
6  Maryland, correct?
7      A.   Yes.
8      Q.   And who chose to put the company in
9  -- in West -- in -- in -- in Maryland in
10 Bethesda?
11     A.   It was there before I started.
12           ATTORNEY AKROTIRIANAKIS: Object
13     to the form of the question; no
14     foundation; also --
15 BY ATTORNEY ANDRES:
16     Q.   Fair to say you had --
17           ATTORNEY ANDRES: Sorry.
18           ATTORNEY AKROTIRIANAKIS: -- also
19     misstates the testimony.
20 BY ATTORNEY ANDRES:
21     Q.   -- fair to say you had no role in
22 deciding where the Westbridge offices would be?

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 210

1    ATTORNEY AKROTIRIANAKIS:  Do you
2  want to break for lunch, Greg?
3    Are you done with this document?
4    ATTORNEY ANDRES:  Sure.
5    Does that work?
6    THE WITNESS:  Sure.
7    ATTORNEY ANDRES:  Okay.
8    THE VIDEOGRAPHER:  The time is
9  12:45 p.m.  We're going off the record.
10    --oOo--
11    (Whereupon, at 12:45 p.m. EDT, a
12    luncheon recess was taken.)
13    --oOo--
14
15
16
17
18
19
20
21
22

Page 211

1  A F T E R N O O N    S E S S I O N
2    (1:40 p.m. EDT.)
3    --oOo--
4    TERRENCE PATRICK DIVITTORIO,
5  was called for continued examination and, after
6  having been previously duly sworn by the certified
7  stenographer to tell the truth, the whole truth and
8  nothing but the truth, was examined and testified
9  further as follows:
10    --oOo--
11    THE VIDEOGRAPHER:  The time is
12  1:40 p.m.  We're going back on the
13  record.
14    Please proceed, Counsel.
15    --oOo--
16  EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFFS
17    --oOo--
18  BY ATTORNEY ANDRES:
19    Q.  Mr. DiVittorio, earlier, you
20  testified that if there were questions from your
21  client's --
22    CERTIFIED STENOGRAPHER:  Excuse

Page 212

1  me.  I think you don't have your mic on.
2    ATTORNEY ANDRES:  Yes.  Thank you.
3  BY ATTORNEY ANDRES:
4    Q.  -- Mr. DiVittorio, earlier, you
5  testified that if clients had technical questions
6  that you couldn't answer and required deeper
7  technical people, that there were people from NSO
8  that would come from Israel.
9    Do you remember that testimony?
10    A.  Yeah --
11    ATTORNEY AKROTIRIANAKIS:
12    Objection: misstates his testimony.
13    THE WITNESS:  -- yes.
14  BY ATTORNEY ANDRES:
15    Q.  So I have two questions:  One, what
16  clients require more technical people to come
17  from Israel; and, Two, Who would come to Israel
18  to address those technical issues?
19    A.  One client was the FBI; another
20  client was U.S. Cyber Command.
21    I think those are the only two.
22    Q.  And who from Israel came to provide

Page 213

1  the technical information?
2    A.  ▓▓▓▓▓▓▓ would come and the CTO,
3  a guy named ▓▓▓▓▓▓  I don't know his last
4  name.
5    Another engineer, presales
6  engineer, named ▓▓▓▓▓▓▓▓  He came one time.
7    Another engineer named
8  ▓▓▓▓▓▓▓▓▓▓▓▓
9    Q.  And they were from NSO?
10    A.  Yes.
11    Q.  Okay.  And what were their roles at
12  NSO?
13    A.  So ▓▓▓ was the CTO, chief
14  technology officer; ▓▓▓▓▓▓▓▓▓▓▓ were
15  presales engineers.
16    Q.  Did you say -- I might have
17  missed -- did you say ▓▓▓ lso came over?
18    A.  ▓▓▓▓
19    Q.  ▓▓▓▓▓▓▓▓▓▓▓
20    A.  I believe that's how you say it.
21    Q.  And he -- he -- or she also came
22  over to the United States?

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 214

1    A.    Yes, he did.
2    Q.    To provide technical information?
3    A.    Yes.
4    Q.    And his or her -- is it a him or a
5    her?
6    A.    It's a him.
7    Q.    His nickname was ██████
8    A.    ████
9    Q.    ████    Okay.  Thank you.
10         Okay.  Can I -- you testified
11   earlier about the level of detail that you were
12   aware of in terms of Pegasus and how you
13   described that to your clients.
14         Do you remember that?
15   A.    Yes.
16   Q.    Did you ever ask for additional
17   training from NSO about the details of Pegasus?
18   A.    No.
19   Q.    Never?
20   A.    Never.
21         ATTORNEY ANDRES:  Can I get
22   Tab 44?

Page 215

1         --oOo--
2    (Deposition Exhibit Number 2076,
3         WhatsApp chat, Bates stamped
4         DIVITTORIO_WHATSAPP_00000055
5         through
6         DIVITTORIO_WHATSAPP_00000057,
7         marked for identification, as of
8         this date.)
9         --oOo--
10   BY ATTORNEY ANDRES:
11   Q.    I'm showing you Exhibit 2076.
12         ATTORNEY ANDRES:  Do you have a
13   copy for Joe?
14   BY ATTORNEY ANDRES:
15   Q.    This is a series of text messages,
16   Mr. DiVittorio, between you and ██████
17   Please take a look and read whatever you want.
18   I'm going to ask you a series of questions.
19         (Whereupon, the witness reviews
20         the material provided.)
21   BY ATTORNEY ANDRES:
22   Q.    Have you had a chance to take a

Page 216

1    look at it?
2    A.    Yes.
3    Q.    So this is a WhatsApp communication
4    between you and ██████ on November 20th,
5    2018.
6         Do you see that?
7    A.    Yes.
8    Q.    If you look at the first entry at
9    14:09:30, ████ writes, Hi.  Are you planning to
10   come to Israel?  If so, please send purpose and
11   agenda first.  Any development with FOSIL?
12         Do you see that?
13   A.    Yes.
14   Q.    "FOSIL" is a -- is a reference to
15   the FBI; is that correct?
16   A.    Yes.
17   Q.    It's a code name?
18   A.    Yes.
19   Q.    In the next -- in response,
20   six minutes or so later, you write, Hi ████
21   Yes.  Purpose is, 1), conduct internal kickoff
22   meeting for DACIA with ██████

Page 217

1         Do you see that?
2    A.    Yes.
3    Q.    What is DACIA, and who is ████
4    ████
5    A.    DACIA is the code name for the
6    country for which CIA was going to provide
7    Pegasus.
8    Q.    And what country is that?
9    A.    Djibouti.
10   Q.    And who's ██████
11   A.    ██████ were the engineers
12   who were going to be installing the system in
13   Djibouti.
14   Q.    And then you write, Number 2),
15   receive PGSS 3 demonstration training for
16   upcoming U.S. Cyber Command demonstration 7
17   December.
18         Do you see that?
19   A.    Yes.
20   Q.    "PGSS 3" is Pegasus?
21   A.    Yes.
22   Q.    And this reflects that you're

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 246

1      Do you see that?
2    A.    Yes.
3    Q.    What does that relate to?
4    A.    I don't remember.
5    Q.    But it relates to selling Pegasus
6  for a reduced price; is that fair?
7    A.    Yes.
8    Q.    And you only had two Pegasus
9  customers in the United States; is that correct?
10   A.    Yes.
11   Q.    So is it fair to say this relates
12 either to the FBI or the CIA?
13         ATTORNEY AKROTIRIANAKIS:
14   Objection: no foundation; also misstates
15   the document.
16         THE WITNESS:  No.  It could be any
17   number of prospective customers.
18 BY ATTORNEY ANDRES:
19   Q.    Understood.
20         --oOo--
21         (Deposition Exhibit Number 2083,
22         WhatsApp chat, Bates stamped

Page 247

1         DIVITTORIO_WHATSAPP_00000017
2         through
3         DIVITTORIO_WHATSAPP_00000019,
4         marked for identification, as of
5         this date.)
6         --oOo--
7  BY ATTORNEY ANDRES:
8    Q.    Let me show you Exhibit 2083.
9         THE WITNESS:  I'm sorry.
10         ATTORNEY AKROTIRIANAKIS:  Thank
11   you.
12 BY ATTORNEY ANDRES:
13   Q.    Okay.  This is a -- an e-mail --
14 I'm sorry -- this is a WhatsApp message between
15 you and ▮▮▮▮ on April 10th, 2018.
16         Do you see in the first
17 message, you say, Hey man, Can we chat in two
18 hours about new thoughts on the Cyber Command
19 700,000 K deal I have?
20         Do you see that?
21   A.    Yes.
22   Q.    Who does that refer to?

Page 248

1    A.    That refers to an opportunity with
2  Cyber Command for a limited proof of concept that
3  we were pursuing.
4    Q.    And then in 10:38 -- 36:39, you
5  say, Okay.  Let's do it after the call with
6  ▮▮▮▮
7         ▮▮▮▮▮▮ a reference to the
8  FBI; is that correct?
9    A.    No.  That's a sales representative
10 in Israel.
11   Q.    Okay.  And then it says, How did
12 ▮▮▮ react?
13         Do you see that?
14   A.    Yes.
15   Q.    And ▮▮▮▮ writes, So so . . .but I
16 think we can get her to agree.  What we need is
17 exact details of who the customer is, where he is
18 going to use it and our side of a conditions to
19 this very low price.
20         Do you see that?
21   A.    Yes.
22   Q.    That message from ▮▮▮▮ suggests or

Page 249

1  implies that you need the permission of ▮▮▮ to
2  sell to a particular customer and know where
3  they're going to use it; is that correct?
4         ATTORNEY AKROTIRIANAKIS:  Object
5    to the form of the question: it misstates
6    the document; also misread the document;
7    no foundation.
8         THE WITNESS:  No.  And ▮▮▮ would
9    make recommendations on whether or not
10   they would impact the -- or devalue sale
11   prices for other customers.  So ▮▮▮ was
12   worried that if we sell it -- sold it to
13   Cyber Command for 700,000, that every
14   other customer in the U.S. would want it
15   for 700,000.
16 BY ATTORNEY ANDRES:
17   Q.    But in either case, she had a --
18 you were -- she was inputting as to whether the
19 price and customer were appropriate?
20         ATTORNEY AKROTIRIANAKIS:  Object
21   to the form of the question: misstates
22   the testimony and the document.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 250

1    THE WITNESS:  No.  She would only
2    recommend whether she thought it would
3    be -- devalue the price for other
4    customers and also impact outside the
5    U.S. sales if there were any
6    collaboration between U.S. Government
7    agencies and Five Eye customers or other
8    customers around the world.
9  BY ATTORNEY ANDRES:
10    Q.    Where -- where is there some
11  reference to Five Eyes?
12    A.    There isn't.  This is what I
13  remember and what I know from conversations.
14    Q.    And this -- but this is explicitly
15  talking about approval; isn't that correct?
16    ATTORNEY AKROTIRIANAKIS:  Object
17    to the form of the question: it misstates
18    the document.
19    THE WITNESS:  Again, if -- it was
20    more around her recommendation and
21    whether we should move forward with this
22    or not and the impact of the overall

Page 251

1  business.
2  BY ATTORNEY ANDRES:
3    Q.    Okay.  You can put that aside.
4    ATTORNEY ANDRES:  Tab 50.
5    --oOo--
6    (Deposition Exhibit Number 2084,
7    Westbridge Price Quote, Pegasus,
8    Landmark and PiXcell, September
9    3, 2018, Bates stamped
10    DIVITTORIO_WHATSAPP_00000078
11    through
12    DIVITTORIO_WHATSAPP_00000093,
13    marked for identification, as of
14    this date.)
15    --oOo--
16  BY ATTORNEY ANDRES:
17    Q.    I'm showing you Exhibit 2084, which
18  is a document --
19    ATTORNEY AKROTIRIANAKIS:  Can you
20    hand that?
21  BY ATTORNEY ANDRES:
22    Q.    -- Bates Number

Page 252

1  DIVITTORIO_WHATSAPP00000078.
2    I'm just going to ask you to
3  look inside the front page.  There's a cus- --
4  customer reference that says, Dear Mr. Cibas --
5  or Cibas -- I may be -- C-I-B-A-S -- and it's --
6  there's a signature block for you.
7    Who is that?
8    A.    Oh.  He's a special agent with
9  the -- the Drug Enforcement Agency, DEA.
10    Q.    Okay.  And the first page ref- --
11  reflects that this is a price quote for Pegasus,
12  Landmark and PiXcell to the DEA?
13    A.    Um-hum.
14    Q.    Okay.  Put that aside.
15    ATTORNEY ANDRES:  Forty-two --
16    Tab 42.
17    --oOo--
18    (Deposition Exhibit Number 2085,
19    WhatsApp chat, Bates stamped
20    COMPASS_WHATSAPP_00000264, marked
21    for identification, as of this
22    date.)

Page 253

1    --oOo--
2  BY ATTORNEY ANDRES:
3    Q.    Showing you Exhibit 2085.
4    Take a look at this.  This is
5  communications between you and ███████ from
6  November 11th, 2018.
7    Do you see that?
8    A.    Yes.
9    Q.    At 4:48:08, you write, Been working
10  most of the day. . . closed to CIA deal, $4
11  million.
12    What does that refer to?
13    A.    The -- the CIA deal --
14    Q.    And it was --
15    A.    -- sale to the CIA.
16    Q.    -- and it was $4 million?
17    A.    Yes.
18    Q.    And then two down, at 4:58:16, it
19  says, So with that and FBI, 7.6 million closed.
20    Do you see that?
21    A.    Yes.
22    Q.    What does that refer to?

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 262

1 be able to ask a question like "Any other
2 thoughts?" if we were in court, which we
3 are.
4          So why don't you ask a question
5 that you would ask in court?  And then
6 the witness can answer.
7 BY ATTORNEY ANDRES:
8     Q.    Mr. DiVittorio --
9          ATTORNEY ANDRES:  Are you
10 finished?
11 BY ATTORNEY ANDRES:
12     Q.    -- I'm asking if you have any other
13 thoughts about the text at 15:17:01.
14     A.    No.
15          ATTORNEY ANDRES:  Tab 10.
16     Okay.  I gotcha.
17     What about this document?
18          (Sotto voce discussion between
19          co-counsel.)
20 BY ATTORNEY ANDRES:
21     Q.    I'm going to show you a document,
22 2087.

Page 263

1          --oOo--
2     (Deposition Exhibit Number 2087,
3     Letter, Bates stamped
4     DIVITTORIO_WHATSAPP_00000132,
5     marked for identification, as of
6     this date.)
7          --oOo--
8          ATTORNEY ANDRES:  It's -- it's the
9     same piece of paper.
10     Doesn't it come with that?
11          (Sotto voce discussion between
12          co-counsel.)
13          ATTORNEY ANDRES:  Give me that
14     one, too.  Mark it separately.
15 BY ATTORNEY ANDRES:
16     Q.    Take a look that.  I'm going to
17 show you another related document.
18     A.    Does Joe get one?
19     Q.    Yeah.
20          --oOo--
21     (Deposition Exhibit Number 2088,
22     End Use/User Certificate, Bates

Page 264

1     stamped
2     DIVITTORIO_WHATSAPP_00000131,
3     marked for identification, as of
4     this date.)
5          --oOo--
6 BY ATTORNEY ANDRES:
7     Q.    I'm going to also show you 2- --
8 2088.
9          The first document is a -- is a
10 letter from the FBI on December 4th, 2018 to the
11 State of Israel, Ministry of Defense, certifying
12 that a Delaware company is authorized to purchase
13 Pegasus on its behalf.
14          Do you see that?
15     A.    Yes.
16     Q.    Is this the sale of Pegasus to the
17 FBI that you were involved in?
18     A.    Yes.
19     Q.    And the second document, 2088, is
20 -- looks like a Defense Export Control
21 certificate.
22          Do you see that?

Page 265

1     A.    Yes.
2     Q.    And the signature of the cosignee
3 is Steven Pandelides, who's a section chief.
4          Do you see that?
5     A.    Yes.
6     Q.    And that is the same name on the
7 letter in 2087.
8          Do you see that?
9     A.    Yes.
10     Q.    And the date of the letter is
11 December 4th, 2018, and the date of the letter is
12 December 7th, '18.
13          Do you see that?
14     A.    Yes.
15     Q.    And with respect to the export
16 license, who secured that?
17          ATTORNEY AKROTIRIANAKIS:  Object
18     to the form of the question.
19          THE WITNESS:  I don't understand
20     the question.
21 BY ATTORNEY ANDRES:
22     Q.    Did somebody -- you were involved

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 274

1    A.    Yes.
2    Q.    Did Westbridge have its own bank
3  account?
4    A.    Yes.
5    Q.    And you mentioned previously that
6  ███████ was a member of Westbridge's board of
7  directors.
8         Did Westbridge have other
9  members of its board of directors?
10    A.    Yes.
11    Q.    And I believe you testified to the
12  other gentleman as ███████
13    A.    Yes.
14    Q.    Westbridge was organized under the
15  laws of some state in the United States?
16    A.    Yes.
17    Q.    And do you remember which one?
18    A.    Delaware.
19    Q.    Did Westbridge have its own annual
20  operating budget?
21    A.    Yes.
22    Q.    And who would -- who would draft

Page 275

1  that budget?
2    A.    I would draft it and share with the
3  board of directors.
4    Q.    And who would approve the budget
5  that you drafted and shared with the board of
6  directors?
7    A.    The board.
8    Q.    What sorts of items would be paid
9  out of Westbridge's annual operating budget?
10    A.    Our payroll, our health insurance,
11  our 401(k), our rent space, any administrative
12  office supplies, taxes, any printing or marketing
13  materials that we needed to generate, conferences
14  or expo fees, travel.
15    Q.    Does Westbridge have its own
16  accountants and lawyers local here in -- in
17  either Maryland or Virginia?
18    A.    No.
19    Q.    I want to show you an exhibit that
20  was previously marked as Exhibit 2009.
21
22

Page 276

1          --oOo--
2          (Deposition Exhibit Number 2009
3          was previously marked for
4          identification and handed to the
5          witness.)
6          --oOo--
7          ATTORNEY AKROTIRIANAKIS:  Thank
8    you.
9          ATTORNEY ANDRES:  I'm trying to
10    avoid the camera.  It's not a great look.
11  BY ATTORNEY AKROTIRIANAKIS:
12    Q.    Now, during your direct
13  examination, you testified to a -- a company
14  called Francisco Partners.
15          Do you recall that testimony?
16    A.    Yes.
17          ATTORNEY ANDRES:  Object.  Before
18    we get to the document, I'll just ask --
19    this doesn't have a Bates number.
20          Was it produced, or where does it
21    come from?
22          ATTORNEY AKROTIRIANAKIS:  Yeah, it

Page 277

1  was previously marked as Exhibit 2009.
2          ATTORNEY ANDRES:  Okay.  Thank
3    you.
4  BY ATTORNEY AKROTIRIANAKIS:
5    Q.    You understood that Francisco
6  Partners was a -- was an investor in one of the
7  family of companies?
8    A.    My understanding was that they
9  acquired NSO and Circles.
10    Q.    And did you understand that they
11  had acquired 100 percent or some other percentage
12  of -- or some lesser percentage of -- of some of
13  these related entities?
14    A.    I believe it was a lesser
15  percentage than 100, but I can't be sure what the
16  number was.
17    Q.    Okay.  Do you know what the name of
18  the holding company was that held the -- the
19  shares to the -- to the entity that was acquired
20  -- majority acquired by Francisco Partners?
21    A.    I don't remember.
22    Q.    Okay.  Do you know where that

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 342

1     I, Cindy L. Sebo, Nationally Certified Court
2 Reporter herein, do hereby certify that the foregoing
3 deposition of TERRENCE PATRICK DIVITTORIO was taken
4 before me pursuant to notice at the time and place
5 indicated; that said witness duly swore to tell the
6 truth, the whole truth, and nothing but the truth
7 under penalties of perjury; that said testimony of
8 witness was correctly recorded to the best of my
9 abilities in machine shorthand, thereafter
10 transcribed under my supervision with computer-aided
11 transcription; that deposition is a true and accurate
12 record of the testimony given by the witness; that I
13 am neither counsel, nor kin to any party in said
14 action, nor interested in the outcome; and that a
15 copy of this transcript obtained from a source other
16 than the court reporting firm, including an adversary
17 or co-counsel in the matter, is uncertified and may
18 not be used at

19 _____

    CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
20 RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
    NJ Certified RT 30XR00019500, NM CSR 589, NY
21 Realtime Court Reporter, NY Association Certified
    Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778,
22 WA CSR 23005926, Notary Public

Page 343

1 JOSEPH AKROTIRIANAKIS, ESQ.
2 jakro@kslaw.com
3         September 26, 2024
4 RE: WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
5   9/18/2024, Terrence Patrick Divittorio (#6891990)
6     The above-referenced transcript is available for
7 review.
8     Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16     Return completed errata within 30 days from
17 receipt of testimony.
18     If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21       Yours,
      Veritext Legal Solutions
22

Page 344

1     E R R A T A  S H E E T
2 WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
3 9/18/2024 - Terrence Patrick Divittorio (#6891990)
4 PAGE   LINE   CORRECTION AND REASON
5 ____  _____  _____
6 ____  _____  _____
7 ____  _____  _____
8 ____  _____  _____
9 ____  _____  _____
10 ____  _____  _____
11 ____  _____  _____
12 ____  _____  _____
13 ____  _____  _____
14 ____  _____  _____
15 ____  _____  _____
16 ____  _____  _____
17 ____  _____  _____
18 ____  _____  _____
19 ____  _____  _____
20
21 _____  _____
22 Terrence Patrick Divittorio    Date

Page 345

1     E R R A T A  S H E E T
2 WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
3 9/18/2024 - Terrence Patrick Divittorio (#6891990)
4 PAGE   LINE   CORRECTION AND REASON
5 ____  _____  _____
6 ____  _____  _____
7 ____  _____  _____
8 ____  _____  _____
9 ____  _____  _____
10 ____  _____  _____
11 ____  _____  _____
12 ____  _____  _____
13 ____  _____  _____
14 ____  _____  _____
15 ____  _____  _____
16 ____  _____  _____
17 ____  _____  _____
18 ____  _____  _____
19 ____  _____  _____
20
21 _____  _____
22 Terrence Patrick Divittorio    Date

87 (Pages 342 - 345)

# EXHIBIT 31

## FILED UNDER SEAL

Message

_____

From:       Terry DiVittorio ██████████████████████████
            ████████████████████████████

Sent:       21/08/2019 09:03:13
To:         Tomer Timor [/o=First Organization/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d550c13d0f684983b5fac075c4f4353e-
            Tomer]
CC:         ████████████████████████████████████████████
            █████████████████████
            █████████████████████████████████████████████
            ███████████████████ Josh Shaner █████████████
            ████████████████████████████████████████
            ██████████████████████████████

Subject:    Re ┌──────┐ 1st day of training
                │Redacted - Per Court Order│


Thanks ████ great to hear Day 1 went well.

I will be in the office today around 11:45am and will stop in to great the attendees.

████

Sent from my iPhone

On Aug 21, 2019, at 11:20 AM, ████████████████████ wrote:

Hi ████
Thanks for the summary and very glad to hear it is going well !

# Redacted – Export Controlled

Good luck with the rest of the week  !

_____

From:    ████████████████████████████
Sent:    Wednesday, August 21, 2019 12:07 AM
To:      █████████████████ Terry DiVittorio ████████████████
Cc:      ████████████ Josh Shaner ██████████████████████████
Subject: ┌──────┐ 1st day of training
          │Redacted - Per Court Order│

Hi All,

Today we began the training for ⬚⬚⬚⬚⬚ in general they are very smart and already have a pretty good understanding of the system.
They were interested to know about other solutions we may have (cloud for example) and covert vector for android, as they asked directly I told them that we do have cloud capabilities that they have not purchased and regarding the covert android I told them it is something we are working on and don't have an estimation to when it may be available because it is still in research stages.

**Participants**: 7,  1 who has seen demos in the past of PGS2.
They are mostly from tech backgrounds, a few with intelligence background.
At this time they are not divided into roles, and will probably all be doing everything on the system.

**Today's content**: intro, full system demo, target profiling, SE exercise, installations, hands-on practice: each one practiced every vector, assembling domains, cases.

**PGS env**: sales 6, fortunately it's working really well.

Special thanks to Josh and Ben for helping me set up, test the system and entertain the guests ☺

Have a great evening/morning!

████████████ **Training Expert, System Training & Intelligence| NSO Group Ltd.**
████████████

* All Materials included in this email are property of NSO Group Ltd. and are strictly confidential * 2019 *
<image001.jpg>

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# EXHIBIT 32

## FILED UNDER SEAL

**Custodian:** DiVittorio Terence

**Device:** iPhone XS Max

**Application:** WhatsApp

**Active Participants:** Terry DiVittorio ██████████████████████
████████████████████

**Date/Time Start:** 02/01/2018 03:53 PM

**Date/Time End:** 02/01/2018 08:06 PM

Subject:

| Time | From | Message Body | Tags |
|------|------|--------------|------|
| 15:53:00 | Terry DiVittorio - ██████████ | Can we get on a call to catch up Sunday after the management meeting?  Lots to discuss and not all bad! ☺ | |
| 16:38:42 | ██████ ████ ██████ ██████ | Sure! | |
| 16:38:56 | ██████ ████ ██████ | Sunday is the kick of | |
| 16:39:09 | ██████ ██████ ██████ | Is Monday meeting still on? | |
| 20:03:59 | Terry DiVittorio - ██████████ | Forgot Sunday was the kickoff, maybe Monday early for me we can try.  And yes, Monday's POC is a go, we also have customer demos Tuesday and Friday next week, (Langley, Intel Agency and US Secret Service). | |
| 20:06:22 | Terry DiVittorio - ██████████ | Productive week this week in California.  FBI Los Angeles Field Office and San Bernardino customers.  San Bernardino opportunity includes Landmark, PiXcell and PGSS.  We'll have to customize PGSS for their use but understand this is very doable. | |

# EXHIBIT 33

FILED UNDER SEAL

**Custodian:** Shaner, Josh

EXHIBIT

2062
9-17-24 SD

**Application:** WhatsApp

**Active Participants:** ████████████████████ : Josh Shaner ████████████████████████████

**Date/Time Start:** 05/09/2019 10:17 AM

**Date/Time End:** 05/09/2019 10:28 AM

| Time | From | Message Body | Deleted |
|------|------|--------------|---------|
| 10:17:28 | ████████ : Josh Shaner US (owner) | < 7674bb0e-680c-46d1-9b6f-f7d3012d958b.jpg > | 0 |
| 10:18:27 | ████████████ ▮ | Hi checking | 0 |
| 10:19:44 | ████████████ ▮ | For how long have you expirienced this? | 0 |
| 10:19:56 | ████████ : Josh Shaner US (owner) | The last two install attempts today | 0 |
| 10:20:20 | ████████████ ▮ | the domain was down momentarily for 4 minutes (not long enough for our monitoring to catch it) | 0 |
| 10:20:38 | ████████████ ▮ | can I have sourceid to check? and if you can try again itll be great | 0 |
| 10:21:20 | ████████████ ▮ | Im also checking as we speak | 0 |
| 10:21:58 | ████████ : Josh Shaner US (owner) | Source Id 633 | 0 |
| 10:23:19 | ████████████ 2 | After checking it seems that all the credentials have been blocked | 0 |
| 10:23:30 | ████████ : Josh Shaner US (owner) | Which credentials? | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 10:24:02 | | the credentials needed in order to send HB Installs | 0 |
|---|---|---|---|
| 10:24:14 | | Are you trying HB? | 0 |
| 10:24:20 | Josh<br>Shaner US (owner) | I just installed on Sales 3 an hour ago.. | 0 |
| 10:24:25 | Josh<br>Shaner US (owner) | HB? | 0 |
| 10:24:35 | | Hummingbird - Eden | 0 |
| 10:24:41 | Josh<br>Shaner US (owner) | Yeah | 0 |
| 10:24:46 | | The credentials are different for every enviorment | 0 |
| 10:25:00 | | I just talked with Yossi and he said he was aware of this | 0 |
| 10:25:26 | | It seems that Eden is currently isnt up on sales6 | 0 |
| 10:27:09 | Josh<br>Shaner US (owner) | Oh ok. All good | 0 |
| 10:27:16 | Josh<br>Shaner US (owner) | I'll use Sales 3 for the demo | 0 |
| 10:28:40 | | 👍 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 34

## FILED UNDER SEAL

**Custodian:** DiVittorio, Terence

**Device:** iPhone XS Max

**Application:** WhatsApp

**Active Participants:** Terry DiVittorio ███████████████████████████

**Date/Time Start:** 01/20/2018 03:15 PM

**Date/Time End:** 01/20/2018 03:26 PM

**Subject:**

| Time | From | Message Body | Tags |
|------|------|--------------|------|
| 15:15:47 | Terry DiVittorio - ███████████ | Hey man, I can't remember if we discussed you coming to California with us for the San Bernardino PiXcell demo on the 31st of Jan?  But we now also have a PGSS and PiXcell demo for the FBI Los Angeles Field Office.  Know you're supposed to be here the following week to work with G3 but let me know what you think about California, thanks! | |
| 15:17:50 | ██████ ████████ | Hi manI think we spoke about it, I have a POC with my new team member in Indonesia on that week | |
| 15:18:07 | ██████ ████████ | I believe that ██ will be ready for the demos | |
| 15:18:25 | ██████ ████████ | His first demo was good and he's learning a lot | |
| 15:18:50 | ██████ ████████ | BTW is the demo in Germany final? | |
| 15:19:00 | Terry DiVittorio - ███████ | Ok, a good problem to have, (multiple demos, and if ain't demo'ing, we ain't selling!) | |
| 15:24:15 | Terry DiVittorio - ███████ | Still working on Germany, will know more middle of next week | |
| 15:26:06 | ██████ ████████ | 👆 | |

# EXHIBIT 43

FILED UNDER SEAL

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 jakro@kslaw.com
AARON S. CRAIG (Bar No. 204741)
 acraig@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:     (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LTD. and Q CYBER TECHNOLOGIES LTD.,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S RESPONSES AND OBJECTIONS TO PLAINTIFFS WHATSAPP, INC. AND META PLATFORMS, INC. FKA FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSION**<br><br>**HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY** |

PROPOUNDING PARTY:    WHATSAPP LLC fka WHATSAPP INC. AND META

PLATFORMS, INC. fka FACEBOOK, INC.

RESPONDING PARTY:    DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED

AND Q CYBER TECHNOLOGIES LIMITED.

SET NO.:    ONE (1)

**DEFENDANTS HEREBY DESIGNATE THESE RESPONSES AS HIGHLY**

**CONFIDENTIAL-ATTORNEY'S EYES ONLY UNDER THE PROTECTIVE ORDER**

**ENTERED IN THIS CASE**

In accordance with Rules 26 and 36 of the Federal Rules of Civil Procedure, NSO Group Technologies Limited ("NSO") and Q Cyber Technologies Limited ("Q Cyber") (collectively, "Defendants"), by and through their undersigned counsel, hereby respond and object to Plaintiffs WhatsApp LLC and Meta Platforms, Inc.'s ("Plaintiffs") First Set of Requests for Admission (collectively, the "Requests" and each, individually, a "Request") served by Plaintiffs on March 7, 2023, as follows.

## GENERAL OBJECTIONS

1.      The responses to the Requests are made solely for the purpose of this action.

2.      Defendants object to the Requests to the extent that they purport to impose requirements or obligations different from or beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules of this Court.

3.      Each response is made solely with regard to the subject matter directly at issue in this action during the timeframe relevant to this action.

4.      Each response is made subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, proprietary information, trade secrets, and the like, and any and all other objections on grounds that would require the exclusion of any response herein if such were offered in Court, all of which objections and grounds are reserved and may be interposed at any time, including at the time of trial.

5.      Defendants object to the extent that the Requests seek information not relevant to the claims or defenses of any party.

6.      Defendants object to the extent that the Requests are unlimited in scope or time.

7.      Defendants' responses are not intended to be, and shall not be construed as, a waiver of any objection(s) to the Requests.

8.      No incidental or implied admissions are intended in these responses.  Defendants' response to any Request should not be taken as an admission that Defendants accept or admit the existence of any fact(s) or any document(s) assumed by that Request or that such response constitutes admissible evidence.

9.      Defendants have not completed their investigation of the facts related to this case, discovery in this action, or preparation for trial.  These responses are based upon information known at this time and are given without prejudice to Defendants' right to amend, supplement, or revise these responses with any subsequently-discovered information.  Defendants expressly reserve the right to make such additional or modified responses as may be appropriate.

## OBJECTIONS TO THE DEFINITIONS

1.      Definition No. 1 ("Attack Period"):  Defendants object to the definition of "Attack Period" as biased and prejudicial.  Defendants' products are used for law enforcement purposes.  Accordingly, to the extent Defendants' products were used in the conduct alleged in this action, if at all, such use is not fairly characterized as an "Attack."

2.      Definition No. 4 ("Control"):  Defendants object to the definition of "Control" as vague and ambiguous and overbroad.  The definition accounts for a wide variety of conduct beyond any common sense understanding of the word control.  While the ability to "direct" can be understood as a form of control, a person can readily "manage," "use," "access," and "modify" something without controlling it.  Moreover, having the "ability to" do something, as stated in the definition of "Control," is distinct from exercising that ability, as the Requests seem use the term.  That contrast renders the term Control vague and ambiguous. Responding to any Request which utilizes this definition would create impressible vagueness and ambiguity.  Defendants interpret the term "Control" to mean having the ability to exclude all others from accessing.

3.      Definition No. 5 ("Device"):  Defendants object to the definition of "Device" as vague, ambiguous and overbroad, because it purports to encompass any "electronic device."  That circular definition—using the word device to define the word device—renders "Device" vague and ambiguous.  To the extent the definition to intended to encompass any electronic object, the definition would be overbroad and responding to any Request which incorporate this definition would be unduly burdensome and not proportional to the needs of the case.  Defendants interpret the term "Device" to mean a computer, mobile phone or server.

4.      Definition No. 8 ("NSO Spyware"):  Defendants object to the definition of "NSO

Spyware" as biased and prejudicial. The term "Spyware" is an inherently pejorative term that baselessly maligns Defendants' products. Defendants will not refer to their products—which are used by law enforcement to catch the worst of criminals—as "Spyware." Defendants further object to the overbroad scope of this definition. Any Request incorporating this definition would seek information related to technologies other than the Pegasus technology ("Pegasus") that was used with respect to the approximately 1,400 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7). Any technology other than Pegasus has no relevance to Plaintiffs' allegations or any issue in this case. Because responding to any Request which incorporates this definition would be unduly burdensome and not proportional to the needs of the case, Defendants interpret the term "NSO Spyware" to mean the version of Pegasus in effect during April and May of 2019 that was allegedly used to access the approximately 1,400 "Target Devices" described in the Complaint.

5.    Definition No. 11 ("Person(s)"): Defendants object to Plaintiffs' definition of "Person(s)" as vague, ambiguous and overbroad. This definition includes 16 distinct roles or types of entities. Responding to any Request which relies on such a broad definition of "Person," moreover, would be unduly burdensome and not proportional to the needs of the case.

6.    Definition No. 12 ("Technology"): Defendants' object to Plaintiffs' definition of "Technology" as vague and ambiguous and overbroad. Plaintiffs' definition is extremely expansive and responding to any Requests which incorporate this definition would be unduly burdensome and not proportional to the needs of the case.

7.    Definition No. 13 ("WestBridge"): Defendants' object to Plaintiffs' definition of "WestBridge" as vague and ambiguous and overbroad. It is unclear whether Plaintiffs' definition of WestBridge, which includes "affiliates," is intended to include Defendants. Defendants interpret the term "WestBridge" to include only WestBridge Technologies, Inc. and its employees.

8.    Definition No. 15 ("You" or "Your"): Defendants object to Plaintiffs' definition of "You" and "Your" as vague and ambiguous and overbroad. Under the guise of these words, Plaintiffs improperly sweep in a host of people and entities, including Defendants' "current and former directors, employees, subsidiaries, corporate parents, affiliates, agents, representatives, and

all other persons acting or purporting to act on its behalf." Responding to any Request which incorporates this term would be unduly burdensome and not proportional to the needs of the case. Unless otherwise indicated, any response to the Requests containing the term "You" or "Your" is limited to Defendants NSO and Q Cyber and their employees.

**OBJECTIONS TO THE INSTRUCTIONS**

1.    NSO objects to Plaintiffs' Instruction No. 1 to the extent it seeks to impose any obligation that is inconsistent with the scope of discovery permitted under the Federal Rules of Civil Procedure. NSO further objects to Plaintiffs' Instruction No. 1 to the extent that the terms in Plaintiff's requests are objectionable.

2.    NSO objects to Plaintiffs' Instruction No. 4 to the extent it is inconsistent with or omits parts of Fed. R. Civ. P. 26(e), which defines a party's obligations to supplement.

3.    NSO objects to Plaintiffs' Instructions Nos. 5, 6, 7, and 8 to the extent these instructions are inconsistent with or omits parts of Fed. R. Civ. P. 36(a)(4), which states how a party must answer a request for admission.

**OBJECTIONS TO THE REQUESTS**

[Text redacted]





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' RESPONSES AND
OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSION

6

Case No. 4:19-cv-07123-PJH



1

2

3

**REQUEST FOR ADMISSION NO. 6:**

Admit that since July 19, 2020, You have performed a demonstration of NSO Spyware for a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "demonstration" is vague and ambiguous in the context of this Request.  Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

/ / /

**REQUEST FOR ADMISSION NO. 7:**

Admit that since July 19, 2020, You have shared information concerning Your finances with a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the words "shared," "finances," and "located" are vague and ambiguous in the context of this Request.   The word "located," in particular, is subject to multiple meanings that are materially different as it could refer to a person's physical location, place of residence, state of incorporation, or operating or headquarters location(s), among other definitions.  Defendants further object because, in light of these ambiguities and Plaintiffs' overbroad definition of the term "Person(s)," responding to this Request would be unduly burdensome.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

**REQUEST FOR ADMISSION NO. 8:**

Admit that since July 19, 2020, You have shared documentation about NSO Spyware with a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the words "shared," "documentation," and "located" are vague and ambiguous in the context of this Request. The word "located," in particular, is subject to multiple meanings that are materially different as it could refer to a person's physical location, place of residence, state of incorporation, or operating or headquarters location(s), among other definitions. Defendants further object because, in light of these ambiguities and Plaintiffs' overbroad definition of the term "Person(s)," responding to this Request would be unduly burdensome. Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint ) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

business information.

**REQUEST FOR ADMISSION NO. 9:**

Admit that since July 19, 2020, You have caused the distribution and licensed use of NSO Spyware to a Person located outside Israel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the words "caused," "distribution," "use," and "located" are vague and ambiguous in the context of this Request. Plaintiffs' use of the word "caused" here is vague and ambiguous because any license is subject to approval of the Government of Israel Ministry of Defense. Accordingly, Defendants are not in a position to make representations as to the decisions of its regulators and cannot determine what "caused the distribution and licensed use" of Pegasus. The word "located," moreover, is subject to multiple meanings that are materially different as it could refer to a person's physical location, place of residence, state of incorporation, or operating or headquarters location(s), among other definitions. Defendants further object because, in light of these ambiguities and Plaintiffs' overbroad definition of the term "Person(s)," responding this Request would be unduly burdensome. Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to this Request as it seeks information regarding a time period of nearly three years that is not relevant to the issues in the litigation. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs

intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 10:**

Admit that You developed NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "developed" is vague and ambiguous in the context of this Request.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation,

or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 11:**

Admit that a version of NSO Spyware is named "Pegasus."

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "a version of NSO Spyware" is vague and ambiguous in the context of this Request, given Plaintiffs' overbroad definition of NSO Spyware.  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Exhibit 10 to the Complaint accurately described the functionality of NSO Spyware named "Pegasus."

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "functionality" is vague and ambiguous in the context of this Request.  Because no one document

can describe the "functionality" of complex software in full, it is not possible for Defendants to answer this Request without Plaintiff specifying which aspects of Pegasus's "functionality" they which to confirm are described "accurately." Defendants object that this request is vague and ambiguous as to time, because the technology at issue changes over time. Defendants note that Exhibit 10 to the Complaint states that "We … release[] major upgrades to the Pegasus system [a] few times a year." Thus, in the absence of Plaintiffs specifying a specific time period for the Request, Defendants cannot state if the document is accurate as a particular version of Pegasus. For the same reason, responding to this Request as stated would be unduly burdensome and not proportional to the needs of the case. Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012. Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018. Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 13:**

Admit that You created the original version of the Exhibit 10 attached to the Complaint.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012.  Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Exhibit 10 to the Complaint accurately describes the "System Setup and Training" You provide to Persons using NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the words "accurately" and "Persons" are vague and ambiguous in the context of this Request.  Defendants object that this request is vague and ambiguous as to time, because the technology at issue changes over time.  Defendants note that Exhibit 10 to the Complaint states that "We … release[] major upgrades to the Pegasus system [a] few times a year."  For the same reason, responding to this

Request as stated would be unduly burdensome and not proportional to the needs of the case. Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object to this Request as it seeks information regarding Defendants' practices but does not specify the applicable time period for the request. Responding to such a request would be unduly burdensome and is not feasible. In any event, the relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. In light of Plaintiffs' use of the word "provide," Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012. Exhibit 10 is therefore of no relevance to Plaintiff's allegations, which start in 2018. Except as expressly admitted herein, Defendants deny

the request.

**REQUEST FOR ADMISSION NO. 15:**

Admit that a version of NSO Spyware is named "Phantom."

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the phrase "version of NSO Spyware" is vague and ambiguous in the context of this Request. Defendants further object to this Request as it seeks information regarding Defendants' products without stating a period for the request. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Denied.

**REQUEST FOR ADMISSION NO. 16:**

Admit that You licensed use of NSO Spyware during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the words "licensed," "use," and "the 2019 Attack Period" are vague and ambiguous in the context of this

DEFENDANTS' RESPONSES AND
OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSION

Case No. 4:19-cv-07123-PJH

Request.  The approval of any license is subject to approval of the Government of Israel Ministry of Defense and Defendants are not in a position to make representations as to the decisions of its regulators.  Defendants further object to this request to the extent it implies that Defendants operate Pegasus.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks."  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit that licenses of Pegasus were in effect during the period April 29, 2019 to May 10, 2019.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 17:**

Admit that NSO Spyware is capable of collecting information from a Device.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the word "Device" is vague and ambiguous in the context of this Request, is improperly defined and overbroad.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 18:**

Admit that NSO Spyware is designed to collect information from a Device.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the terms "Device" and "designed" are vague and ambiguous in the context of this Request.  The term "Device" is improperly defined and is overbroad.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent the word "designed," in conjunction with "NSO Spyware" or

1  any aspect of the Requests, suggests Defendants acted with any improper or unlawful intent or

2  purpose at any time.  Defendants further object to this Request to the extent Plaintiffs intend for

3  the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.*

4  the version in effect at the relevant time period for this action that was allegedly used with respect

5  to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other

6  products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the

7  extent they are prohibited from disclosing the requested information by any Israeli law, regulation,

8  or governmental order or directive, or any other applicable law, regulation, or governmental order

9  or directive.  Defendants further object on the ground and to the extent that this Request seeks

10  private, proprietary, trade secret, or confidential business information.

11    Subject to and without waiving those objections, Defendants respond as follows:  Admit.

12  **REQUEST FOR ADMISSION NO. 19:**

13    Admit that NSO Spyware is marketed for the purpose of collecting information from a

14  Device.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

16    Defendants incorporate by reference the General Objections, Objections to the Definitions,

17  and Objections to the Instructions as if set forth herein.  Defendants object that the word "Device,"

18  "purpose," and "marketed" is vague and ambiguous in the context of this Request.  The term

19  "Device" is improperly defined and is overbroad.  The term marketed, moreover, could refer to a

20  prohibitively broad set of activities, such that responding to this Request as stated would be unduly

21  burdensome and not proportional to the needs of the case.  It is also unreasonable and unduly

22  burdensome for Defendants to ascribe a single "purpose" to the marketing of Pegasus, if any.

23  Defendants further object to this Request to the extent that it falsely implies that persons, teams,

24  groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology

25  within the definition of "NSO Spyware."  Defendants further object to this Request to the extent

26  the word "marketed," in conjunction with "NSO Spyware" or any aspect of the Requests, suggests

27  Defendants acted with any improper or unlawful intent or purpose at any time.  Defendants further

28

object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit that Defendants' marketing of Pegasus has included that Pegasus is capable of collecting information from mobile devices.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the use of WhatsApp is governed by the WhatsApp Terms of Service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that this request calls for a legal conclusion.  Defendants object that the terms "use of" and "governed by" are vague and ambiguous.  Defendants further object on the basis that responding to this Request calls for a legal conclusion insofar the Request requires Defendants to assess whether certain conduct is governed by an agreement. Defendants further object that they lack sufficient knowledge or information to respond to this Request, particularly as the hypothetical and undefined "use" in this Request corresponds to Plaintiffs' software application and Plaintiffs' terms of service, not Defendants' software or terms.

Subject to and without waiving those objections, Defendants respond that they lack information sufficient to enable them to truthfully admit or deny the request, and therefore deny it on that basis.

1    **REQUEST FOR ADMISSION NO. 21:**

2          Admit that You agreed to the WhatsApp Terms of Service prior to or during the 2019

3    Attack Period.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

5          Defendants incorporate by reference the General Objections, Objections to the Definitions,

6    and Objections to the Instructions as if set forth herein.  Defendants object that this request calls

7    for a legal conclusion.  Defendants object that the phrase "agreed to" is vague and ambiguous in

8    the context of this Request.  In addition to being a complex question involving various factors not

9    readily assessable in the context of a discovery response, whether an entity has agreed to terms of

10   service presents multiple questions of law.  Accordingly, Defendants object to this Request as it

11   calls for a legal conclusion.  Defendants further object to the phrase "2019 Attack Period" to the

12   extent it implies any "attack" occurred.  Defendants' products assist law enforcement in protecting

13   the public and are used for investigative purposes, not in "attacks."  Defendants further object to

14   Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome.  Defendants cannot

15   reasonably respond on behalf of the many people potentially included by that term, and any

16   response is limited to the acts of defendants NSO Group and Q Cyber that are known to their

17   management and legal personnel.  Defendants further object to the extent they are prohibited from

18   disclosing the requested information by any Israeli law, regulation, or governmental order or

19   directive, or any other applicable law, regulation, or governmental order or directive.  Defendants

20   further object on the ground and to the extent that this Request seeks private, proprietary, trade

21   secret, or confidential business information.

22         Subject to and without waiving those objections, Defendants respond as follows:  Denied.

23   **REQUEST FOR ADMISSION NO. 22:**

24         Admit that You used WhatsApp prior to or during the 2019 Attack Period.

25   **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

26         Defendants incorporate by reference the General Objections, Objections to the Definitions,

27   and Objections to the Instructions as if set forth herein.  Defendants object that the word "used" is

28

1  vague and ambiguous in the context of this Request, especially in combination with the term

2  "You."  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, and

3  unduly burdensome.  Defendants cannot reasonably respond on behalf of the many people

4  potentially included by that term, and any response is limited to the acts of defendants NSO Group

5  and Q Cyber that are known to their management and legal personnel.  Defendants further object

6  to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants'

7  products assist law enforcement in protecting the public and are used for investigative purposes,

8  not in "attacks."  Defendants further object to this request on the basis that they lack sufficient

9  knowledge or information to respond to this Request, particularly as Pegasus is operated by NSO's

10 sovereign customers.  Defendants further object to the extent they are prohibited from disclosing

11 the requested information by any Israeli law, regulation, or governmental order or directive, or any

12 other applicable law, regulation, or governmental order or directive.  Defendants further object on

13 the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

14 business information.

15 Subject to and without waiving those objections, Defendants respond as follows:

16 Defendants admit that certain of their employees are among the nearly 2 billion people who

17 reportedly used WhatsApp in 2019, including during the period between April 29, 2019 and May

18 10, 2019.

19 **REQUEST FOR ADMISSION NO. 23:**

20 Admit that You used WhatsApp Computers to install or attempt to install NSO Spyware to

21 a Device.

22 **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

23 Defendants incorporate by reference the General Objections, Objections to the Definitions,

24 and Objections to the Instructions as if set forth herein.  Defendants object that the terms "used,"

25 "Device," and "attempt to install" are vague and ambiguous in the context of this Request,

26 particularly in conjunction with the term "You."  Defendants further object to Plaintiffs' use of the

27 term "You" as overbroad, vague, and unduly burdensome.  Defendants cannot reasonably respond

28

on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 24:**

Admit that You did not have permission from WhatsApp or Meta to install or attempt to install NSO Spyware using WhatsApp Computers.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "attempt to install" is vague and ambiguous in the context of this Request, as it is not clear what constitutes "attempt[ing] to install."  Defendants object that the request implies that Defendants installed or attempted to install NSO Spyware using WhatsApp Computers, which is not true or accurate.  Defendants object to Plaintiffs' use of the term "You" as overbroad, vague, and unduly burdensome.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q

1   Cyber that are known to their management and legal personnel.  Defendants further object to

2   Plaintiffs' use of the term "install" to the extent is miscomprehends or misstates how Pegasus

3   functions, including because Pegasus would not require that anything be installed on a "WhatsApp

4   Computer," even if used in connection Plaintiffs' allegations.  Defendants further object to this

5   Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at

6   NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO

7   Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase

8   "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version

9   in effect at the relevant time period for this action that was allegedly used with respect to the

10  approximately 1,400 Target Devices described in the Complaint) on the basis that no other

11  products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the

12  extent they are prohibited from disclosing the requested information by any Israeli law, regulation,

13  or governmental order or directive, or any other applicable law, regulation, or governmental order

14  or directive.  Defendants further object on the ground and to the extent that this Request seeks

15  private, proprietary, trade secret, or confidential business information.

16      Subject to and without waiving those objections, Defendants respond as follows:  Denied.

17  **REQUEST FOR ADMISSION NO. 25:**

18      Admit that Exhibit A to the Complaint, starting on page 8 of Exhibit 11 to the Complaint,

19  accurately describes Your "Systems and Services," as defined in Exhibit A to the Complaint, as of

20  December 17, 2015.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

22      Defendants incorporate by reference the General Objections, Objections to the Definitions,

23  and Objections to the Instructions as if set forth herein.  Defendants object that the phrase "Exhibit

24  A to the Complaint, starting on page 8 of Exhibit 11 to the Complaint" is vague and ambiguous.

25  Defendants interpret this request as asking about Exhibit A to Exhibit 11 to the Complaint.

26  Defendants further object that the words "as of" are vague and ambiguous in the context of this

27  Request as they could mean "on" or "since."  Defendants object that the term "accurately" is vague

28

DEFENDANTS' RESPONSES AND
OBJECTIONS TO PLAINTIFFS' FIRST SET
OF REQUESTS FOR ADMISSION

25

Case No. 4:19-cv-07123-PJH

and ambiguous in the context of this Request as the time period for this Request is unclear.  In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if the document is accurate as to any "Systems and Services" at the time.  Defendants further object to this Request to the extent that it seeks information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the phrase "Your 'Systems and Services'" because Plaintiffs' overbroad definition for "Your" renders this request vague, overbroad, unduly burdensome, and not proportional to the needs of the case.  Defendants further object to the extent the phrase "your 'Systems and Services'" implicitly seeks information regarding any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit A to Exhibit 11 to the Complaint is authentic.  Defendants admit that Exhibit A appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant to a contract.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 26:**

Admit that Exhibit A-1 to the Complaint, starting on page 9 of Exhibit 11 to the Complaint, accurately describes the "Features and Capabilities" of NSO Spyware, as of December 17, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Defendants incorporate by reference the General Objections, Objections to the Definitions,

and Objections to the Instructions as if set forth herein. Defendants object that the phrase "Exhibit A-1 to the Complaint, starting on page 9 of Exhibit 11 to the Complaint" is vague and ambiguous. Defendants interpret this request as asking about Exhibit A-1 to Exhibit 11 to the Complaint. Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since." Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear. In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if the document is accurate as to any "Features and Capabilities" at the time. Defendants further object to this Request to the extent that it seeks information prior to January 2018. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit A-1 to Exhibit 11 to the Complaint is authentic. Defendants admit that Exhibit A-1 to Exhibit 11 appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant

to a contract.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 27:**

Admit that Exhibit B to the Complaint titled "Considerations," starting on page 32 of Exhibit 11 to the Complaint, accurately describes payments to be made to You for "the provision of the License, System, and Services" related to Pegasus, as of December 17, 2015.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants object that the term "You" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Any response is limited to Defendants NSO and Q Cyber.  Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since."  Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear.  In the absence of Plaintiffs specifying a time period for the Request, Defendants cannot state if Exhibit B is accurate as to any payments. Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Exhibit C to the Complaint, starting on page 33 of Exhibit 11 to the Complaint, accurately describes the "Installation Requirements" of NSO Spyware as of December 17, 2015.

/ / /

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants object that the phrase "Exhibit C to the Complaint, starting on page 33 of Exhibit 11 to the Complaint" is vague and ambiguous. Defendants interpret this request as asking about Exhibit C to Exhibit 11 to the Complaint. Defendants further object that the words "as of" are vague and ambiguous in the context of this Request as they could mean "on" or "since." Defendants object that the term "accurately" is vague and ambiguous in the context of this Request as the time period for this Request is unclear. Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny whether Exhibit C to Exhibit 11 to the Complaint is authentic. Defendants admit that Exhibit C to Exhibit 11 appears to describe certain aspects of a technology system that was to be provided in 2015 pursuant

to a contract.  Except as expressly admitted herein, Defendants deny the request.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Exhibit D to the Complaint, starting on page 34 of Exhibit 11 to the Complaint, is a true and accurate copy of a service level agreement between NSO Group Technologies Ltd. And Infralock Development Limited.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object to this Request to the extent that it seeks information for multiple years or information prior to January 2018.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants object on the basis that they are not permitted under Israeli law and their agreement to disclose the identity of any potential customers.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Denied.

**REQUEST FOR ADMISSION NO. 30:**

Admit that You owned or Controlled servers used to install NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the term "Controlled" is vague and ambiguous in the context of this Request; Defendants interpret "Control" to mean having the ability to exclude all others from accessing.  Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many

| DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION | 30 | Case No. 4:19-cv-07123-PJH |
|---|---|---|

people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel. Defendants further object on the basis that the Request does not specify the applicable time period. The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware." Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint) on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Denied.

**REQUEST FOR ADMISSION NO. 31:**

Admit that You provided technical support to Persons using NSO Spyware.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the terms "provided" and "technical support" as vague and ambiguous in the context of this Request, particularly given the breadth of people and entities included as "Persons." Defendants further object because, in light of Plaintiffs' overbroad definition of the term "Person(s)," responding this Request would be unduly burdensome. Defendants object that the term "You" renders this Request

vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object on the basis that the Request does not specify the applicable time period.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  As the Requests use the term "provides," Defendants further object to this Request to the extent that it falsely implies that persons, teams, groups, divisions or sections at NSO deploy, use, or operate Pegasus or any other technology within the definition of "NSO Spyware."  Defendants further object to this Request to the extent Plaintiffs intend for the phrase "NSO Spyware" to refer to any product other than the relevant version of Pegasus (*i.e.* the version in effect at the relevant time period for this action that was allegedly used with respect to the approximately 1,400 Target Devices described in the Complaint)on the basis that no other products are relevant to Plaintiffs' allegations in the Complaint.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 32:**

Admit that Your support engineers could be reached at the phone number ███████ 

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the term "support engineers" is vague and ambiguous in the context of this Request as the Requests fail to

define this term.  Defendants further object that the term "Your" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object on the basis that the Request is vague in that it does not specify the applicable time period.  The relevant time period for this action is January 2018 through May 13, 2019, and information outside that time period is not relevant to any party's claim or defense nor proportional to the needs of the case.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows:  Admit.

**REQUEST FOR ADMISSION NO. 33:**

Admit that Your Technical Support Center could be reached at the e-mail address ██████████████████

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the term "Technical Support Center" is vague and ambiguous in the context of this Request as the Requests fail to define this term.  Defendants further object that the term "Your" renders this Request vague, ambiguous, unduly burdensome and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object because Defendants lack sufficient knowledge or information to respond to this Request on the basis that the email address appears to be operated by a third party entity.  Defendants further object on the basis that the Request does

1 not specify the applicable time period.  The relevant time period for this action is January 2018

2 through May 13, 2019, and information outside that time period is not relevant to any party's claim

3 or defense nor proportional to the needs of the case.  Defendants further object to the extent they

4 are prohibited from disclosing the requested information by any Israeli law, regulation, or

5 governmental order or directive, or any other applicable law, regulation, or governmental order or

6 directive.  Defendants further object on the ground and to the extent that this Request seeks private,

7 proprietary, trade secret, or confidential business information.

8     Subject to and without waiving those objections, Defendants respond as follows:  Admit.

9 **REQUEST FOR ADMISSION NO. 34:**

10     Admit that, between April 29, 2019 and May 10, 2019, WestBridge used, caused to be

11 used, and Controlled the Device associated with the phone number ███████████

12 **RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

13     Defendants incorporate by reference the General Objections, Objections to the Definitions,

14 and Objections to the Instructions as if set forth herein.  Defendants further object that the terms

15 "used, caused to be used," "Controlled," and "Device" as vague and ambiguous.  Defendants

16 interpret "Control" to mean having the ability to exclude all others from accessing. Defendants

17 further object to the extent they are prohibited from disclosing the requested information by any

18 Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation,

19 or governmental order or directive.  Defendants further object on the ground and to the extent that

20 this Request seeks private, proprietary, trade secret, or confidential business information.

21     Subject to and without waiving those objections, Defendants respond as follows:

22 Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and

23 therefore deny it on that basis.

24 **REQUEST FOR ADMISSION NO. 35:**

25     Admit that between April 29, 2019 and May 10, 2019, WestBridge employee Josh Shaner

26 used, caused to be used, and Controlled the Device associated with the phone number ███████

27 ██████

28

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the terms "used, caused to be used," "Controlled," and "Device" are vague and ambiguous in the context of this Request. Defendants interpret "Control" to mean having the ability to exclude all others from accessing. Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and therefore deny it on that basis.

**REQUEST FOR ADMISSION NO. 36:**

Admit that You used, caused to be used, and Controlled the WhatsApp account associated with phone number ███████ during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein. Defendants further object that the terms "associate with," "used, caused to be used," and "Controlled" are vague, ambiguous, unduly burdensome, and not proportional to the needs of the case. Defendants interpret "Control" to mean having the ability to exclude all others from accessing. Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred. Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case. Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the

acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential business information.

Subject to and without waiving those objections, Defendants respond as follows: Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and therefore deny it on that basis.

**REQUEST FOR ADMISSION NO. 37:**

Admit that You used, caused to be used, and Controlled the WhatsApp account associated with phone number ███████████ during the 2019 Attack Period.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Defendants incorporate by reference the General Objections, Objections to the Definitions, and Objections to the Instructions as if set forth herein.  Defendants further object that the terms "associate with," "used, caused to be used," and "Controlled" are vague, ambiguous, unduly burdensome, and not proportional to the needs of the case.  Defendants interpret "Control" to mean having the ability to exclude all others from accessing.  Defendants further object to the phrase "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist law enforcement in protecting the public and are used for investigative purposes, not in "attacks." Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond on behalf of the many people potentially included by that term, and any response is limited to the acts of defendants NSO Group and Q Cyber that are known to their management and legal personnel.  Defendants further object to the extent they are prohibited from disclosing the requested information by any Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  Defendants further object on

1    the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

2    business information.

3        Subject to and without waiving those objections, Defendants respond as follows:

4    Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and

5    therefore deny it on that basis.

6    **REQUEST FOR ADMISSION NO. 38:**

7        Admit that You had Control over the servers that resolve to the Internet Protocol (IP)

8    address 54.93.81.200 during the 2019 Attack Period.

9    **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

10        Defendants incorporate by reference the General Objections, Objections to the Definitions,

11   and Objections to the Instructions as if set forth herein.  Defendants interpret "Control" to mean

12   having the ability to exclude all others from accessing.  Defendants further object to the phrase

13   "2019 Attack Period" to the extent it implies any "attack" occurred.  Defendants' products assist

14   law enforcement in protecting the public and are used for investigative purposes, not in "attacks."

15   Defendants further object to Plaintiffs' use of the term "You" as overbroad, vague, unduly

16   burdensome, and not proportional to the needs of the case.  Defendants cannot reasonably respond

17   on behalf of the many people potentially included by that term, and any response is limited to the

18   acts of defendants NSO Group and Q Cyber that are known to their management and legal

19   personnel.  Defendants further object to the extent they are prohibited from disclosing the

20   requested information by any Israeli law, regulation, or governmental order or directive, or any

21   other applicable law, regulation, or governmental order or directive.  Defendants further object on

22   the ground and to the extent that this Request seeks private, proprietary, trade secret, or confidential

23   business information.

24   / / /

25   / / /

26   / / /

27   / / /

28

1    Subject to and without waiving those objections, Defendants respond as follows:

2   Defendants lack information sufficient to enable them to truthfully admit or deny the Request, and

3   therefore deny it on that basis.

4

5   Dated: April 17, 2023                KING & SPALDING LLP

6

7                                   By:    */s/ Aaron S. Craig*

8                                          JOSEPH N. AKROTIRIANAKIS
                                           AARON S. CRAIG
9                                          Attorneys for Defendants NSO GROUP
                                           TECHNOLOGIES LIMITED and Q
10                                         CYBER TECHNOLOGIES LIMITED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PROOF OF SERVICE**

2

I am a citizen of the United States and resident of the State of California. I am employed in the County of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

3

4

5

On April 17, 2023, I served the following documents in the manner described below:

6

**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S RESPONSES AND OBJECTIONS TO PLAINTIFFS WHATSAPP, INC. AND META PLATFORMS, INC. FKA FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSION**

7

8

☑      BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through King & Spalding LLP's electronic mail system to the email addresses set forth below.

9

10

On the following parties in this action:

11

**PLEASE SEE ATTACHED SERVICE LIST**

12

13

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 17, 2023, at Los Angeles, California.

14

15

By:  _____
                      ADRIANA S. KIM

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**SERVICE LIST**</u>

| Greg D. Andres | Craig T. Cagney |
|---|---|
| DAVIS POLK & WARDWELL LLP | DAVIS POLK & WARDWELL LLP |
| 450 Lexington Avenue | 450 Lexington Avenue |
| New York, New York 10017 | New York, New York 10017 |
| Telephone: (212) 450-4724 | Telephone: (212) 450-3162 |
| Email: greg.andres@davispolk.com | Email: craig.cagney@davispolk.com |
| Antonio J. Perez-Marques | Micah G. Block |
| DAVIS POLK & WARDWELL LLP | DAVIS POLK & WARDWELL LLP |
| 450 Lexington Avenue | 1600 El Camino Real |
| New York, New York 10017 | Menlo Park, California 94025 |
| Telephone: (212) 450-4559 | Telephone: (650) 752-2000 |
| Email: antonio.perez@davispolk.com | Email: micah.block@davispolk.com |