Pages 1 - 158

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton, Judge

WHATSAPP, INC. and FACEBOOK,   )
INC.,                          )
                               )
          Plaintiffs,          )
                               )
  VS.                          )        **NO. 4:19-CV-07123-PJH**
                               )
NSO GROUP TECHNOLOGIES         )
LIMITED, et al.,               )
                               )
          Defendants.          )
_____ )


                         Oakland, California
                         Wednesday, April 10, 2025

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                DAVIS, POLK AND WARDWELL, LLP
                450 Lexington Avenue
                New York, NY 10017
          BY:   **GREG D. ANDRES**
                **ANTONIO J. PEREZ-MARQUES**
                **LUCA E. MARZORATI**
                **GINA M. CORA**
                **ATTORNEYS AT LAW**

                DAVIS, POLK & WARDWELL, LLP
                900 Middlefield Road, Suite 200
                Redwood City, CA 94063
          BY:   **MICAH G. BLOCK**
                **ATTORNEY AT LAW**

 (Appearances continued on following page.)

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**APPEARANCES (CONT.'D):**

For Defendants:

                KING & SPALDING, LLP
                633 West Fifth Street, Suite 1700
                Los Angeles, CA 90071
      **BY:  JOSEPH N. AKROTIRIANAKIS**
              **AARON S. CRAIG**
              **ATTORNEYS AT LAW**

                KING & SPALDING, LLP
                1700 Pennsylvania Avenue, Northwest
                Suite 900
                Washington, DC 20006
      **BY:  JONATHAN WEINBERG**
              **ATTORNEY AT LAW**

                KING & SPALDING, LLP
                50 California Street, Suite 3300
                San Francisco, CA 94111
      **BY:  MATTHEW V. NOLLER**
              **ATTORNEY AT LAW**

<u>**Wednesday - April 10, 2025**</u>                          <u>**10:02 a.m.**</u>

<u>P R O C E E D I N G S</u>

---o0o---

1       **THE COURT:**  Okay.

     **MR. ANDRES:**  Your Honor, good morning.  This is Greg Andres from Davis Polk for the plaintiff, Meta and WhatsApp, and with me at counsel table is Antonio Perez, next to him is Luca Marzorati, Micah Block, and also Gina Cora, and they'll all be speaking today.

  Good morning, Your Honor.

     **THE COURT:**  All right.  Good morning.

     **MR. AKROTIRIANAKIS:**  Good morning, Your Honor.  For the defendant, Joe Akrotirianakis, Jonathan Weinberg, Aaron Craig and Matthew Noller.

     **THE COURT:**  All right.  Good morning.  And I hope you and those other members of your firm who were in the fire zone are back in your homes and trying to move forward.

     **MR. AKROTIRIANAKIS:**  Thank you, Your Honor.  I am. And I, on a personal level, appreciate the Court's accommodating.  This would have been very difficult if we had had these proceedings on the schedule previously set.

     **THE COURT:**  I understand.  They're still going to be difficult.

     **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

     **THE COURT:**  Okay.  All right.  Okay.  So I scheduled

1   this earlier in the day than my typical schedule just so that

2   we have more time if more time is needed, and clearly I

3   anticipate that this will take a while for us to get through

4   all of this.   And I do have some sort of general remarks to

5   make, but I'd like to go over some of the logistical issues and

6   procedures just so that as we go through the morning and I

7   entertain your arguments on all the various factual and legal

8   issues, you have some idea about the constraints that you are

9   dealing with.

10      All right.   So starting first this morning I wanted to

11  just go over the schedule.   At your request, I continued it to,

12  the trial until April 28th.   Following the entry of summary

13  judgment on liability, I reduced the trial dates from 10 to

14  five, since liability's not an issue.   That means that we have

15  the whole week.   I typically have a dark day, but for this

16  trial we're going to go every day, Monday through Friday, of

17  the week of the 28th.   My trial schedule is 8:30 to 1:30 on

18  days in which we're taking evidence.   On the first and last day

19  of the trial we go from 8:30 to 4:00.   First day we'll take,

20  we'll do jury selection and opening statements, and if time

21  allowing, any evidence production can commence on that day.

22  But typically we get through the jury selection and the opening

23  statements on Monday.

24      As I indicated, that will be a long day.   Tuesday through

25  Friday I -- will be the more truncated schedule, 8:30 to 1:30.

1  We have two 15-minute breaks, typically at 10:00 a.m. and

2  11:45.

3      You should know during trials with these really truncated

4  days I don't do sidebars.  I expect you to advise me the day

5  before of any particular issues that need to be dealt with so

6  that we can do it before the jury arrives.  We make good

7  utilization of their time.  As long as they're here on time we

8  end on time so that they can go on about their lives.  That

9  means, though, given that, that timeframe, there is a limited

10  amount of time.  I am one of the judges on this Court, I think

11  almost all of the judges on the Court, we impose time limits.

12  So each side will be allotted essentially two days after jury

13  selection and your opening statements.  That's nine hours each.

14      I anticipate, however, that we won't be able to conclude

15  with jury instructions and closing arguments until the

16  following Monday.  So the following Monday will be available

17  for that purpose, and that will be a long day, and the jury can

18  commence its deliberations on that following Monday.  Tuesday

19  is available if the jury needs more time to deliberate.

20  Wednesday, however, I'm headed back east.  So the trial must be

21  completed within this timeframe.  There simply is no other

22  option, which is why I'm imposing the time limits.  Well,

23  actually I impose time limits just because I think it imposes a

24  degree of discipline that I have found over the years is very

25  helpful.

```
 1        Okay.  So that's the schedule which at this point cannot
 2   be varied.
 3        So let's -- and then I wanted to spend a little time
 4   before we get started just clarifying, making sure I have a
 5   clear understanding about how you all want to handle the
 6   voluminous sealing in this case.  I have to admit I have not
 7   had the experience of having so much information that either or
 8   both parties want to keep out of public view for various
 9   reasons.  So I asked you all to include in your pretrial papers
10   your proposals, and I'm not sure I understand exactly what it
11   is that you all want.
12        Let's start with the plaintiffs.  Who's going to talk
13   about this issue?  Okay.  Okay.  Just say your name when you --
14   into the microphone when you get there.
15        MR. MARZORATI:  Thank you, Your Honor.  Luca Marzorati
16   for plaintiffs.
17        THE COURT:  Okay.  You've indicated in your statement
18   that the identities, identifying information of the non-
19   testifying witnesses you want to keep out of the record.
20   They're non-testifying, so they won't be here and required to
21   give their names, and I'm assuming you mean just in
22   documentation.
23        MR. MARZORATI:  That's right, Your Honor.  And just to
24   be clear, we submitted that statement before Your Honor's
25   order, omnibus order, on the sealing.  So we're happy to abide
```

1    by the limitations in that order.

2          THE COURT:  Okay.  And then you also indicated with

3    regard to the individual compensation.  The difficulty I had in

4    reviewing your papers is that this is a damages trial, and what

5    you're seeking is essentially reimbursement for that

6    compensation.  I don't know how you keep the amounts out of the

7    record and under seal.  I mean, that's the issue here, and I

8    don't see any reason why that should be sealed.  I understand

9    why you might want to keep the names.  Is there any way the

10   names can be coded in some fashion and just use their roles, or

11   is that too easy to identify?

12       My understanding you don't want all of your employees to

13   know what everybody's making, right?

14         MR. MARZORATI:  That's right, Your Honor.  And in

15   light of Your Honor's order on sealing, we have actually

16   publicly filed the compensation information for the individuals

17   whose compensation we will be seeking.

18         THE COURT:  Okay.

19         MR. MARZORATI:  So that shouldn't be an issue at

20   trial --

21         THE COURT:  Okay.

22         MR. MARZORATI:  -- the compensation of those

23   individuals.

24         THE COURT:  Okay.  And then the identifying

25   information on nonparty users.  We're gonna get into that when

1   we start talking about the motions in limine, but I'm not

2   exactly sure who -- I believe this is information that you did

3   not provide in discovery; is that right?

4        **MR. MARZORATI:**  There was limited information in

5   discovery about what we know about the individuals who were

6   targeted.  And as you'll here in connection with the motions in

7   limine, we don't plan on introducing that information in our

8   case in chief.  So much of that information is not information

9   that we'll present.  Our only request would be that to the

10  extent that this Court does allow introduction of that

11  evidence, we would just ask that if there are documents being

12  shown, they not be broadcast to the public, they just be shown

13  to the jury kind of consistent with Your Honor's sealing

14  rulings.

15       **THE COURT:**  Yeah.  With regard to sealed documents,

16  obviously anything that the parties are relying upon is going

17  to be shared with the jury.  If I have approved sealing, they

18  can certainly -- I'm pretty sure our electronic equipment can

19  be configured so that it is not broadcast to the public as long

20  as the jury can see it.

21       Okay.  So the sensitive business information, the

22  commercially, that's the stumbling block.  Both sides in my

23  view want to seal way more than I'm willing to permit.  I

24  understand in these cases, and this one, unlike some other

25  business cases, has other particular constraints that the

1   parties are dealing with.  But nonetheless, this is a public

2   court, this is a public trial, and to the extent that

3   commercially sensitive business information includes -- I mean,

4   I'm not even sure what it is.  I -- this would be a very

5   difficult decision for me to decide without being able to look

6   at the documents that you are claiming are commercially

7   sensitive.  I assume that most of your work, particularly given

8   this is a case about spyware, most of it's probably

9   commercially sensitive, but that's not going to be enough to

10  permit you to use it in this trial without it being shown to

11  the jury at least.  The question is:  How much of it is going

12  to be shown to the public.

13          **MR. MARZORATI:**  Completely understood, Your Honor.

14      So, Your Honor, and just to be clear in light of Your

15  Honor's recent ruling on sealing, we're not going to maintain

16  any of that information under seal.  There was a lot of

17  documents that were filed by us last Friday, I believe, which

18  filed those documents without being sealed.  We're just waiting

19  on Your Honor to resolve defendants' objections to sealing, and

20  then we're happy to file the rest of those documents on the

21  public docket.

22          **THE COURT:**  Okay.  And this -- you're talking about

23  the second --

24          **MR. MARZORATI:**  That's correct, Your Honor.

25          **THE COURT:**  -- third bite at the apple that I've given

1   them on the -- following the omnibus ruling.

2           **MR. MARZORATI:**  That's exactly right.

3           **THE COURT:**  Okay.  I think it was filed.  I have not

4   read it yet.

5       Defense, did you file that yet?  I'm just asking one

6   question.  Did you file the revised request?

7           **MR. CRAIG:**  Aaron Craig for defendants, Your Honor.

8   Thank you, Your Honor.

9       Yes, we did file the revised omnibus motion to seal as to

10  the two categories:  One, the redactions of names of

11  non-witnesses who are NSO employees, and the other being

12  references to certain foreign proceedings.  That was filed on

13  April 4th as per Your Honor's order.

14          **THE COURT:**  Okay.  And ...

15          **MR. CRAIG:**  And we also put into the public record, as

16  did plaintiffs, a great number of the exhibits that Your Honor

17  ruled were not to be sealed and did not implicate any of the

18  three categories that was subject to our sealing request.

19          **THE COURT:**  Okay.  Okay.  And I guess I said that if

20  we have time today we might talk about -- and I think I

21  actually forgot my chart.  But in any event, with regard to

22  your request for how to treat information, we're clear, right?

23          **MR. MARZORATI:**  Yes.  And we dropped those requests in

24  light of Your Honor's order on sealing.

25          **THE COURT:**  Okay.  Okay.  Now, just so that you

1    understand, my view is that given how much is disclosed about

2    the functionality of the software, et cetera, how much was

3    disclosed in the briefing which I have already ordered to be

4    unsealed, which you have done, and in the Court's order.  I

5    don't see the need to continue to maintain seal on a lot of the

6    information that was included in your first omnibus request.

7    I'm just not going to seal that so just so that you know.

8         But we're clear, you that so you can take a seat.

9              **MR. MARZORATI:**  Thank you, Your Honor.

10             **THE COURT:**  And we'll deal with the defendants'

11   request.

12        Now, you've made a request that has three parts.  Well,

13   first of all, closing the courtroom to the public.  The answer

14   is:  No, I'm not going to do that.

15        And trial exhibits containing sensitive information being

16   sealed at least temporarily.  I wanted to know what have you

17   done with the trial exhibits?  Have you filed them with the

18   Court?

19             **MR. CRAIG:**  Yes, Your Honor.

20             **THE COURT:**  Are they all filed under seal?

21             **MR. CRAIG:**  We have lodged them with the Court, and I

22   believe that there have been binders that have been submitted

23   of all the trial exhibits.

24             **THE COURT:**  You didn't put them on the docket yet.

25   They're not on ECF?

 1          **MR. CRAIG:**  Correct.

 2          **THE COURT:**  Okay.  Okay.  And Kelly, we know where

 3  these are?

 4          **THE COURTROOM DEPUTY:**  Yes.

 5          **THE COURT:**  Okay.  All right.  So they can remain,

 6  because if they're not going to be produced and admitted in

 7  court, there's no reason for us to disclose them.  So we can

 8  maintain -- I assume that's your request.  We can maintain them

 9  privately.  They're not under seal if they're just lodged, but

10  they're held securely until they actually become exhibits.

11          **MR. CRAIG:**  That's what I understand, Your Honor.

12          **THE COURT:**  Okay.  And then you also request to

13  restrict access to any testimony regarding the various legal

14  obligations NSO has with respect to information in its

15  possession and permanently seal any related documents.  What

16  are you asking for?

17          **MR. CRAIG:**  So Your Honor is correct that a great deal

18  of information has now been put into the public sphere because

19  of the summary judgment briefing, and I believe that -- let me

20  get to the -- let me start at the finish.  I believe that

21  there's a very small amount of information that is going to be

22  within this issue, be within the ambit of what we're seeking to

23  seal, and it can very likely be dealt with on a case-by-case

24  basis at the trial.  But the issues that I foresee involve, you

25  know, first issues about the existence and the proceedings in a

foreign country of which Your Honor is aware and as to which

there are foreign orders governing who is read into those

proceedings, if you will.  We don't believe that that should

come up at trial, and there is a motion in limine to exclude

that, in fact.

> **THE COURT:**  Right.

> **MR. CRAIG:**  But plaintiffs have said they think that

could be relevant to impeach our witnesses.  If that --

> **THE COURT:**  Well, we'll get into that.

> **MR. CRAIG:**  Yeah.  If that happens, then we have

obligations to ask the Court to restrict the dissemination of

that to the fullest extent possible.

> **THE COURT:**  And by dissemination -- you've asked to

restrict access to testimony.  What do you mean by that?

> **MR. CRAIG:**  Well, in that case if they're going -- if

counsel is going to be allowed to ask questions about the

existence of sealed foreign proceedings as to which there are

foreign orders about -- you know, gag orders, we would ask that

the, you know, either the courtroom be sealed or at a minimum

that the transcript of the proceedings be sealed to prevent its

dissemination.

> So that's the first category.

> The second category would be computer code and its

equivalents.  In Your Honor's recent order on the omnibus

sealing motion the Court recognized that code should be

1   redacted from documents in which it is present.

2       The plaintiffs have put onto their exhibit list a great

3   deal of technical documents involving, you know, lots of

4   computer code.  I've -- Your Honor, I haven't finished going

5   through it to see whether it is NSO computer code or WhatsApp

6   computer code, but I don't think that's going to come up in

7   this trial.  But if it does, I think it can be dealt with at

8   the time.  But I don't foresee it being, you know, relevant to

9   any of the issues of remedies that the plaintiffs are going to

10  get.  But if there is code or computer code equivalents, again,

11  we are -- that was produced to this Court subject to a license

12  that obligated us to use best efforts to try to restrict the,

13  you know, to restrict it from going into the public sphere,

14  which, if it could, would not only --

15          THE COURT:  Well, computer code, it's not coming in.

16          MR. CRAIG:  Yes.

17          THE COURT:  It can remain sealed.  And frankly, I

18  don't know how many jurors actually understand computer code,

19  and I can't imagine why you would need to show them computer

20  code.  But nonetheless, that will remain sealed.

21          MR. CRAIG:  Then again, there are technic' -- well,

22  let me -- there's names of NSO customers, the different

23  countries and agencies of those countries that have purchased

24  Pegasus.  We don't think, consistent with how Your Honor has

25  ruled, that this information, it doesn't matter who the

customers are.  What matters is what they do with Pegasus or
how Pegasus gets used, so ...

        THE COURT:  Well, this is the next big topic we're
going to get into.

        MR. CRAIG:  Right.

        THE COURT:  Because this isn't a matter of the Court
sealing it.  You haven't given discovery on it, correct?

        MR. CRAIG:  Yes and no.  There has been certain things
that NSO has been precluded by its regulator in Israel from --

        THE COURT:  Meaning you have not given it, regardless
of the reason.

        MR. CRAIG:  Yes.

        THE COURT:  But you haven't provided it, correct?

        MR. CRAIG:  Correct.

        THE COURT:  Okay.

        MR. CRAIG:  And there is -- but there is some
information that is in the -- on both parties' exhibit lists
about certain countries and their use of Pegasus.  There's
information in plaintiffs' documents about their awareness of
the -- and I'm not going to list the countries now, but of
countries in Europe and Asia and the Middle East that are
customers of Pegasus, and there is information that we have put
into the record about the FBI's acquisition of a license for
Pegasus, and the CIA.

        So those are customers of Pegasus that has.  But generally

1    speaking what the customers, you know, the details of their

2    operations, to the extent it's known to NSO, Your Honor is

3    correct that that has not -- that is not a subject that the

4    witnesses were allowed to testify about or that we were allowed

5    to produce evidence of for national security reasons.

6         **THE COURT:**  All right.  Well, I'm not considering that

7    at this point.

8         **MR. CRAIG:**  Thank you, Your Honor.

9         And then the last category I would say is information

10   that, while not code, consists of trade secrets that could be

11   useful not only to NSO's competitors, but also to the criminals

12   that are targeted by NSO's customers as to the details as to

13   how Pegasus functions.  I think this is a much narrower scope

14   than, you know, the subject of our original omnibus sealing

15   motion.  And if time allows, as Your Honor said, we have a

16   couple of examples of those documents that my colleague,

17   Mr. Weinberg, you know, has a very brief presentation to

18   provide Your Honor, or we could provide it in writing in a

19   couple of pages under seal, as much as I'm loathed to ask for

20   more sealing in this case, because we are all exhausted by

21   sealing issues.  But, you know, this is where we are.

22        **THE COURT:**  Okay.  All right.  And then you

23   indicate -- okay.  That, we covered.  Okay.  We've covered

24   yours.

25        **MR. CRAIG:**  Thank you, Your Honor.

1          **THE COURT:**  So, okay.  I think we're all pretty much

2    on the same page, then, and it doesn't look to be the problem

3    that I initially thought it might be.

4          Okay.  And then let's move on.

5          A couple of things that you all raised in your pretrial

6    statement that I just wanted to be able to confirm and to go

7    over with you.

8          The disgorgement issue.  Who can speak to that?

9          **MR. ANDRES:**  This is Greg Andres from Davis Polk.

10    Meta is not seeking disgorgement.

11          **THE COURT:**  All right.  So that's been confirmed, but

12    obviously -- stay back up here.

13          There's still some issues, though, with regard to

14    disgorgement, because you have a damages expert who -- oh, I

15    think it's the rebuttal report of your damages expert which

16    goes into the whole profit issue, and we're gonna have to

17    figure out where that line is drawn.  If there's no longer a

18    disgorgement, as I understand it, you're still making an

19    argument that some of that evidence might be relevant to the

20    whole punitive damages.  And I'm a little concerned about that,

21    because I don't think the degree of specificity that -- I think

22    it's Trexler, Ms. Trexler.

23          **MR. ANDRES:**  Yes.  Your Honor, actually, Mr. Block is

24    going to handle that issue, so I'm going to tag team to him if

25    that's okay.

1              **THE COURT:**  Okay.  We're not doing the *Daubert* motions

2    just yet because -- come on up.

3              **MR. ANDRES:**  Go ahead.

4              **THE COURT:**  Because I want to do that after we've gone

5    through a couple of other issues.  But I am a little concerned

6    about just the scope of the kind of evidence on NSO's profits

7    that would be necessary in this kind of case.

8              **MR. BLOCK:**  Thank you, Your Honor.  Michael Block for

9    plaintiffs.

10        I think that the opinions on the profitability of NSO do

11   go to the punitive damages issue because they relate to the

12   financial condition of defendants and their ability to pay, in

13   addition to potentially relating to oppression and malice in

14   relation to what they obtained.  So it won't -- it would not be

15   a calculation of disgorgement on "X" date this was earned, but

16   I do think we will want to put into the record evidence

17   regarding NSO's finances and the enormous revenues that they

18   obtained from the product and the unlawful conduct.

19             **THE COURT:**  And do you anticipate the entirety of the

20   report, I think it's in a rebuttal report, do you anticipate

21   needing all of that evidence?  I mean, it seems to me that it's

22   a more generalized kind of presentation would be appropriate if

23   you're not going for disgorgement.

24             **MR. BLOCK:**  I am confident, Your Honor, that there

25   are -- sort of, we did it line by line.  And just to set it, it

1    was Ms. Trexler's supplemental report, not the rebuttal I think

2    contains this information.  So there must be something in there

3    where she says, I conclude that disgorgement is X, which she

4    would not present.  We could do a narrower proffer if that

5    would be helpful, but we haven't done that line by line.

6         **THE COURT:**  Yeah.  Okay.  All right.  We'll get into

7    that a little bit more later.

8         Okay.  I wanted also to confirm that the plaintiffs'

9    request for fees, costs, interest and injunction will all be

10   handled after the jury trial.  All right?  To the extent that I

11   indicated that there might be factual determines or findings

12   that the jury needs to make that might be important to the

13   injunction, having now read all of your papers, I don't want to

14   hear anything about injunctive relief or any of the information

15   that you all think would be pertinent to that decision at this

16   trial.  I think that would be -- I mean, it's difficult enough

17   that there are these three claims, three different kinds of --

18   two different kinds of claims, different kind of damages apply

19   to each, and I think there's too much danger of jury confusion

20   to start injecting the kind of issue, testimony that would go

21   to injunctive relief.  So that will be handled separately.

22        Whether or not we will need an evidentiary hearing for it

23   is a question for another day.  I'm amenable to having an

24   evidentiary hearing if there are additional facts that need to

25   be had, but none of this I want at this trial.  I think it's

 1   going to be complicated enough for the jury to follow.

 2        I also wanted to find out, you have in your pretrial

 3   statement, your joint pretrial statement, a list of stipulated

 4   facts that should be incorporated into the record.  Is there a

 5   proposal for how that is done?  It's -- in my court it's done

 6   in one of two ways.  Either at the beginning of the

 7   presentation of evidence one party will read it into the record

 8   and I would instruct the jury on what it means for there to be

 9   stipulated -- stipulations entered into by the parties, or a

10   list of stipulations can simply be put in writing and handed

11   out to the jury.  Indeed, you can prepare a jury notebook if

12   you wish, so that all of them can have an agreed-upon set of

13   certain kinds of documents.

14        Name?

15        **MR. PEREZ-MARQUES:**  Yes, Your Honor.  Antonio

16   Perez-Marques from Davis Polk for the plaintiffs.

17        We -- of those options, we prefer the idea of having it

18   read to the jury at the outset.

19        **THE COURT:**  Okay.  And is -- does it encompasses more

20   than or anything in addition to or less than what is reported

21   in the pretrial statement?

22        **MR. PEREZ-MARQUES:**  There is nothing further at this

23   time.  To the extent that we continue speaking with the

24   defendants, if there's anything else we will be -- if the Court

25   would welcome it, would potentially come forward with

 1   additional facts, but there are none at this time.

 2        **THE COURT:**  Okay.  All right.  Then you can prepare

 3   that as kind of a standalone?

 4        **MR. PEREZ-MARQUES:**  We will, Your Honor.

 5        **THE COURT:**  And then you can simply indicate to me

 6   when you'd like to read it, and an attorney for -- assuming

 7   that you want it put on at the beginning of your case, whoever

 8   is making the presentation can read it.

 9        **MR. PEREZ-MARQUES:**  Yes, Your Honor.  These are

10   foundational facts that we think at the beginning would make

11   sense.

12        **THE COURT:**  Okay.  That sounds good.

13        There was also a suggestion in the pretrial statement that

14   there might be stipulations to the authenticity of documents

15   and even to the admissibility of some of the expert documents.

16   Have you all firmed that up?

17        **MR. PEREZ-MARQUES:**  I do not believe there's been

18   further agreement on that issue.

19        **THE COURT:**  Okay.  So, so far there is no stipulation

20   as to the authenticity --

21        **MR. PEREZ-MARQUES:**  That is correct, Your Honor.

22        **THE COURT:**  -- of any of the documents?

23        **MR. PEREZ-MARQUES:**  Yes.

24        **THE COURT:**  I would imagine you all would be able --

25   you've been litigating this case for six years.  I would

```
 1   imagine if there are any inauthentic documents, they've already
 2   been ferreted out.  So I think a stipulation would be
 3   appropriate in this case.  And as to the admissibility of them,
 4   I mean, you all haven't been fighting that in discovery that
 5   I'm aware of.
 6             MR. PEREZ-MARQUES:  No, that is certainly something we
 7   can work through, Your Honor.  I think on our side the thinking
 8   was that once the motions in limine are adjudicated and we have
 9   a better sense of --
10             THE COURT:  Right.
11             MR. PEREZ-MARQUES:  ~-- the scope of trial, then we'd
12   be in a better position to meet and confer about specific
13   exhibits.
14             THE COURT:  Okay.  That makes sense.
15        Okay.  Let's see.
16        All right.  And the last I want to confirm, there's some
17   back and forth on the reputation of the respective parties,
18   primarily the plaintiff, because there is a motion going to
19   whether or not those damages are appropriate.  You indicate I
20   believe in your trial brief that the WhatsApp is not seeking
21   damages for reputational harm.
22             MR. PEREZ-MARQUES:  That is correct, Your Honor.
23             THE COURT:  Correct?
24        Okay.  All right.  And there's no equivocation about that?
25             MR. PEREZ-MARQUES:  No, Your Honor.  I think that the
```

1   confusion or disagreement is that I think that there are some

2   points that we would like our witnesses to be able to make just

3   about how the service works, for instance, why the remediation

4   that was done after discovery of the attack was necessary that

5   I believe they might view as being reputational in nature.  But

6   what we've agreed with them through discovery is set forth

7   verbatim in the joint pretrial statement, that we do not intend

8   to seek reputational damages, et cetera, and that we do not

9   intend to make arguments about injury to plaintiffs' reputation

10  and good will in support of the injunctive relief, which won't

11  be a jury issue anyway.

12          **THE COURT:**  Right.

13          **MR. PEREZ-MARQUES:**  But in terms of why the

14  remediation work was necessary, why we had to reach out to

15  affected users, et cetera, we view all of that as fair game,

16  and we don't view that as in conflict with our stipulation

17  about reputational damages.

18          **THE COURT:**  And you don't believe that any argument

19  about the integrity of your equipment or your security is

20  reputational?

21          **MR. PEREZ-MARQUES:**  No, Your Honor.

22          **THE COURT:**  You mean it from sort of a technical

23  aspect.

24          **MR. PEREZ-MARQUES:**  Exactly.  It's, you know, the

25  compromise of the server is to do something for which they were

 1   not intended.  That's sort of the violation of the integrity.

 2   It's not a reputational.  It's not integrity like a person's

 3   integrity where it might be reputational in nature.

 4          **THE COURT:**  Okay.  Okay.  That was my last question.

 5       You wanted to speak on that?

 6          **MR. AKROTIRIANAKIS:**  Yes, Your Honor, just briefly.

 7       The --

 8          **THE COURT:**  State your name for the reporter.

 9          **MR. AKROTIRIANAKIS:**  I'm sorry, Your Honor.  Joe

10   Akrotirianakis for the defendants.

11       I think that the -- this is an issue that for which

12   reference needs to be made to the very specific definition of

13   loss and damage.  Under the CFAA there is no theory advanced of

14   damage at all.  There never has been.  The -- there is loss.

15   Loss is specifically defined.  It does not include notifying

16   users.  It does not include a lot of things.  It does include

17   very specific things that are in the jury instructions proposed

18   by both parties, really.

19       And I think on the issue of reputational harm the jury

20   needs to be instructed that in some way, probably at the outset

21   of the trial relative to our stipulation, that the plaintiffs

22   are not seeking any damages based on reputational harm, so that

23   they're not confused and sort of coming up with that on their

24   own, as we know jurors often do.

25          **THE COURT:**  I don't know.  I don't know if I agree

1    with that, that we should instruct on something that they might

2    be thinking.  I don't know.  We'll consider that at the

3    appropriate time.

4        Okay.  I wanted to say a few things about voir dire before

5    we get into the heart of the matter.  It's described in the

6    case management and pretrial order the process that I use.  But

7    just to reiterate, the jury office will send us a randomly

8    selected group of people who have showed up for jury service.

9    It will be between 20 and 25 people.  You understand we need a

10   six -- we need a unanimous six-person verdict, so we need a --

11   so we need six people.

12       Typically in most of my trials we seat at least seven so

13   that we lose one.  If we go over a weekend, that's when we're

14   more likely to lose a member for whatever reason.  I sometimes

15   choose eight.  I'll leave it up to you.  Tell me now what's

16   your preference.  Do you want seven or eight, or do you want to

17   go with six?  If you go with six, you will have to also

18   stipulate that you will accept a five-person verdict if we

19   happen to lose one person.  So I would imagine you'd want at

20   least seven or eight people.  Has to be a unanimous verdict.

21           **MR. ANDRES:**  Greg Andres.

22       Your Honor, my understanding is that if we have seven

23   jurors, that all seven of those jurors will deliberate.  In

24   other words, there's not an alternate?

25           **THE COURT:**  There's no alternates in federal practice.

1    They all deliberate, and it has to be unanimous.

2            MR. ANDRES:  Seven is fine with us, Your Honor.  Thank

3    you.

4            THE COURT:  Okay.

5            MR. AKROTIRIANAKIS:  I would as a matter of prudence

6    ask for eight, Your Honor, only because I haven't had a trial

7    since COVID started where we didn't lose at least one juror

8    along the way just for COVID, let alone all the other things

9    before -- that were here before COVID.

10           THE COURT:  Okay.  Any strong objection to eight?

11   I'll go with eight.

12           MR. ANDRES:  That's fine, Your Honor.  Thank you.

13           THE COURT:  Okay.  All right.  We will select eight

14   jurors.

15       All right.  The way that it will be done, the jurors will

16   come in, we'll seat 14 of them in the box and the others in the

17   gallery.  And I will go through and ask all the jurors the

18   questions.  Everyone will be required to fill out the

19   questionnaire.  You all will be given copies of the

20   questionnaire.

21       We can probably get them in advance, right?

22           THE COURTROOM DEPUTY:  They e-mail them.

23           THE COURT:  They e-mail, so you'll get them hopefully

24   by the Friday before the Monday trial, so that you can start

25   looking at them if you wish.

 1         Everyone will have the questionnaires.  I will then

 2    conduct the voir dire of the entire group of the 20 to 25

 3    people, and after I finish each side will be -- generally I

 4    allow 20 minutes per side to do some follow-up, and I will

 5    permit that here, as well.

 6         And then we do the hardship and peremptory challenges.

 7    Silently, though.  So the jurors will remain.  At sidebar we'll

 8    discuss hardships and for-cause challenges.  Those people will

 9    be marked off of our little charts, but they won't be excused

10    until at the very end.  I excuse everyone so that no one knows

11    that they have been excused for a particular reason.

12         I have found that if you grant a hardship reason, the next

13    person has the same excuse as the next.  So we don't tell them.

14    We don't let them know what works and what doesn't work.  But

15    I'll handle that at sidebar.  And then you all will exercise

16    your peremptory challenges, three per side, silently on paper.

17    You just pass it back and forth until we've got at least eight

18    people remaining.  The first eight remaining after all

19    challenges will be seated as our jury.

20         Let's see.  Now, I did look at your questionnaire.  I have

21    your suggested additions to the voir dire, and the jointly

22    proposed questions will be incorporated.  They'll be reworked a

23    little bit, because we have a court-wide jury questionnaire

24    that we use.  It's not -- it's no longer the one that I sent

25    you in the -- attached to the case management order.  We have a

1  new one that our entire court uses, so we'll have to rework it

2  a little bit.  The jointly proposed questions will work just

3  fine; I'm not sure about the others.

4       Most of the ones that you object to -- I mean, each side

5  submitted a few, and there are some objections.  There are only

6  a couple that are really not going to be permitted, and that

7  would be number 16, major news sources and outlets relied upon.

8  I don't allow that question.  And those that argue the case,

9  like numbers 37 and 38, those I won't permit.  But any that are

10  not those numbers and any that are not included in the Court's

11  voir dire you're free to ask if you wish during the time that

12  you will be allotted.

13       All right.  Any questions?

14       **MR. ANDRES:**  Can I address that, Your Honor?  And

15  maybe these issues will be resolved after the motion in limine,

16  but there are also a number of questions that the defendants

17  have proposed with respect to voir dire that refer to lawful

18  surveillance or to the sale of their products to foreign

19  governments.

20       First of all, there's nothing lawful about what's going to

21  happen at this trial.  The defendants --

22       **THE COURT:**  That -- all of that will be clarified

23  after we --

24       **MR. ANDRES:**  Okay.  I just wanted to point out that

25  those relate to the voir dire questions, as well.

 1          **THE COURT:**  And those are pretty much arguing the
 2   case, as well.
 3          **MR. ANDRES:**  Yeah, fair enough.  Thank you.
 4          **THE COURT:**  So I think it will be clear after we get
 5   through this, and we'll issue an order pretty quickly.  I made
 6   up my mind on a lot of this stuff.  I do need your input on
 7   some things today.  But we'll get something out quickly so that
 8   you'll have time to prepare.
 9          **MR. ANDRES:**  One other procedural question if we're
10   going to move into the substance, Your Honor.
11          I understand there are not going to be any sidebars.  I
12   also understood that there are no filings that are allowed to
13   be made during the course of the trial without leave of the
14   Court.  So I just wanted to get that on the record, too, so
15   that all the parties are aware of that.
16          **THE COURT:**  I think that's in my pretrial order, isn't
17   it?
18          **MR. ANDRES:**  Okay.  Great.  Yes, thank you.
19          **THE COURT:**  Yeah, yeah.  The first patent trial I ever
20   had, every morning I came in, the fax machine, for those --
21   I've been on this Court 34 years.  But for those of you who
22   know what fax machines are, it was full of filings, motions
23   overnight, and that's impossible to do when you're in trial.
24          Okay.  All right.  Now, let's get to the heart of the case
25   here, and I've really been struggling with this for the last

1   couple of weeks since I received your papers.

2       Okay.  Now, I don't generally entertain argument on each

3   and every motion in limine.  Those I just decide.  But I do

4   entertain argument on those about which I have questions.

5       Now, there's a considerable amount of overlap in this case

6   on issues arising in the motions in limine, in the jury

7   instructions and with the motions pertaining to the experts.

8   So a lot of the issues, once they're decided, will have impact

9   on various different aspects of the trial.  So I'd like to

10  start first with the discussion of what I have identified as

11  some of the overarching issues that arise.

12      Now, I find it really curious that in your motions in

13  limine by and large both sides raise the same objections to the

14  other side's evidence, that the evidence is irrelevant to

15  damages, that the evidence, if admitted, would be unduly

16  prejudicial or confusing to the jury, and the big one, that no

17  discovery has been provided.  That's one of the big issues in

18  this case.

19      I have -- well, and in addition to those, the similarity

20  in the arguments made by both sides to your motions, it does

21  pretty much appear to me that the -- both sides are also sort

22  of doing an end run around the liability determination that the

23  Court has found.  I'm going to point that out as we go through

24  them, and I'm not going to permit that.

25      The defense position appears to be pretty much that

1  everything they want to come in is relative to defending

2  against punitive damages, and the plaintiff, everything it

3  wants to come in pretty much is relevant to prosecuting its

4  punitive damages case, and you all have both, I think, sort of

5  overreached on that issue.

6      So with that said, I also admit that in 34 years on this

7  Court I've just not had the occasion to proceed to trial in a

8  case in which so much discovery has been withheld by either

9  side for whatever reason.  I mean, there are -- there are good

10 reasons.  The defense much more than the plaintiffs, but in

11 some of the motions there are allegations that the plaintiffs

12 withheld discovery, as well.  I think primarily dealing with

13 citizen -- citizen labs, but I'm not -- not entirely sure about

14 that.

15     But -- and I don't recall ever having a trial in which a

16 party has withheld evidence that has not been fully vetted by

17 the other side.  Indeed, I mean, it's a hallmark of federal

18 litigation that discovery is generous and flexible.

19     So I'm really sort of flummoxed by the defense position

20 primarily on how this case should be tried given the evidence

21 that has been -- that has not been shared with the plaintiff.

22     So let's start with what should be the impact?  What is

23 the correct impact to the defense primarily of withholding

24 discovery on how the case will be presented.

25     Okay.  So here are some thoughts that I have on it.

1          In the motion for summary judgment plaintiffs sought

2     terminating sanctions or in the alternative evidentiary

3     sanctions for failure to produce a number of things, including

4     but not limited to the use of Pegasus by NSO customers.  Okay?

5     Right?

6          Now, that seems to violate an earlier discovery order

7     issued by me in February of last year, where the Court, because

8     the identity of the customers, of the NSO customers, was being

9     withheld, the Court ruled specifically that the specific

10    identity of NSO's clients didn't need to be provided; that is,

11    you know, the names of a law enforcement agency or a

12    governmental entity, but that order also made it very clear

13    that the plaintiff was entitled to discover information about

14    what actions were taken is by the specific third parties.

15         Now, I expected that that information would be provided

16    perhaps by using a pseudonym or a code of some sort to specify

17    the identity, but exactly what that customer did, what actions

18    they engaged in vis-a-vis this incursion -- is that the correct

19    word?  Intrusion?  Incursion?  You don't want to use the word

20    hack, right?

21         **MR. ANDRES:**  Well, actually, all three of those words

22    apply.  I think hack applies, as well.

23         But obviously the statutory language is exceeding

24    authority.  But it's an intrusion, it's a hack.  It's all of

25    those things, Your Honor.

1          **THE COURT:**  Right.

2      Okay.  So I did expect that information to be provided.

3  So I guess I'm sort of at a loss.  You know, I'm not privy to

4  all of your discovery.  I only see what is presented to me.  I

5  have no idea who has what, who knows what.  So I thought that I

6  would go through and find out exactly what -- where you all

7  stand in terms of this evidence.  I mean, there are a half

8  dozen of the motions in limine, plaintiffs' motions, that go to

9  exactly this question that whether or not the defendant should

10  be able to put on evidence about which it did not provide

11  discovery related to -- primarily related to its customers,

12  right?

13      Okay.  So I'd like to find out from the plaintiff what you

14  received in discovery, how you were able to test the accuracy

15  of the information you received.  Do you have anything besides

16  the self-serving testimony of the defendants' own witnesses

17  about what happened?  Do you ...

18      And specifically looking at your motion, your various

19  different motions in limine, I can ask you specifically, did

20  you receive -- your motion in limine number 2, for instance,

21  goes to evidence, argument, testimony that Pegasus was used or

22  can be used or is needed to investigate crime, including sex

23  child exploitation terrorism, including because of end-to-end

24  encryption.

25      Now, you say that the defendant hasn't produced any

discovery showing that any specific intrusions on the plaintiffs' system were the result of an investigation into criminal activity, terrorism, et cetera.  Did you get such evidence?  Is there any specific evidence as to what happened in this case, or is it all this high level "this is our business practice and policy"?

**MR. ANDRES:**  No, we did not receive any of that evidence, A.  B, as those witnesses did not answer questions about that -- so that's about the investigation check -- child pornography, terrorism, et cetera, et cetera.  That is all at a abstraction and NSO's say-so.

Beyond that, we do not have evidence about any particular government.  We don't know whether it's Russia or Iraq or Saudi Arabia.  We don't know.  There was a reference earlier about some information in discovery about those things.  That's largely in the press, what's been reported in the press. Beyond that, there's also press accounts and some testimony about misuses of their technology.  So there's this issue with respect to the princess from Dubai, her husband who's the emirate using that.

So it sort of goes all over the place, but we don't think it's accurate to say that -- we don't know anything about any investigations, period.  We don't know anything specifically, and they've refused to answer any questions about what governments or what entities used their product.  We do know

1    that the FBI never used their product.  That doesn't seem to be

2    in dispute.

3        But the specific answer to your question is we don't know

4    about any of their targets or what was done, and they say they

5    don't know, that they don't have access to the targeting

6    information that their clients used their technology for.

7        Have I answered your question, Your Honor?  I want to make

8    sure I got everything.

9        **THE COURT:**  You don't have any evidence directly on

10   this.  Is there any -- do you have any evidence -- there were

11   14 intrusions at issue in this period of time in May 2019,

12   right?  There were 1400 that have been referenced throughout

13   this litigation, right?  Do you know who conducted any of those

14   14 intrusions?

15       **MR. ANDRES:**  We don't.

16       **THE COURT:**  Do you know if they were different users

17   of the Pegasus software that committed these intrusions?  Were

18   they all committed by the same person, the same entity?

19       **MR. ANDRES:**  The short answer is no, but if I could

20   just, another sentence.

21       We also know, and we're not seeking to admit this

22   evidence.  I'm not making this argument so that we can admit

23   the identity of those targets, because Your Honor has ruled

24   that that's not relevant.  But I think it's informative.  We

25   know that those were journalists.  We know that they were civil

1  rights activists.  We know that they were political dissidents.

2      And the reason that up raise that, Your Honor, is because

3  when you look at the types of governments or clients of NSO

4  that might be seeking to surveil with spyware the activities of

5  a journalist, political dissident, civil rights leader, it

6  would lead you to believe that that may be a government that is

7  not a democracy or is not following the types of procedures

8  that we do here when you seek to surveil somebody legally under

9  Title III.

10     So the short answer is no.  Sorry to go beyond that.  But

11  I think it's relevant.

12     We all are abiding by Your Honor's ruling as to citizens

13  lab, who helped the plaintiff with respect to the identity.

14  That information is not coming in.  You ruled that there was

15  not going to be any discovery as to that.  There was motion

16  practice.  We've abided by that.  But that also means that some

17  other targets, whether they allegedly are terrorism targets or

18  whatever, shouldn't come in.

19     And just one more thing, Your Honor.  We don't want a mini

20  trial on foreign surveillance, the legality of it, terrorism

21  investigations.  One of their experts, a military official, has

22  testified about his work with the CIA in the Ukraine about

23  Pegasus.  That's not relevant in any way.  We don't want a mini

24  trial about that.

25     What we anticipate that this damages-only trial will be

about are the violations of law that Your Honor found that

involves NSO intruding, hacking, what have you, into Meta's

systems here in California and the damages that result from

that, compensatory and punitive.

We don't a mini trial on end-to-end encryption and whether

or not it is used by criminals.  Because by the way, it's also

used by our own government and encryption, and it is completely

legal.  So the whole idea that law enforcement is precluded

from investigating terrorism and child pornography because bad

people use end-to-end encryption, a lot of good people use it,

too, and it's completely irrelevant to the specific issues of

the intrusion in this case, and we shouldn't be having that

discussion.

Sorry, I keep saying one more thing, but one more thing.

One more thing.  As Your Honor knows better than anyone in this

courtroom from having reviewed, I assume, over 34 years, dozens

if not hundreds of Title III applications, nothing about NSO

involves anything remotely similar to a Title III application

or lawful surveillance.  Nobody from the Department of Justice

in Washington approved it, as you know is a requirement.

There's no affidavit brought before -- nothing about what this

trial about relates in any way to any specific lawful activity

that we're aware of.

**THE COURT:**  Right.

**MR. ANDRES:**  I'm sorry for being long-winded.

1        **THE COURT:**  No, it's going to be up to a higher court

2    than this one to determine if this is hacking in the sense that

3    most people understand it or whether or not it's -- there's

4    some exception other than the law enforcement exception that

5    appears in the federal statute.

6        **MR. ANDRES:**  But Your Honor implicitly found that that

7    law enforcement exception --

8        **THE COURT:**  No, I did.

9        **MR. ANDRES:**  -- does not apply here, right?  And so --

10       **THE COURT:**  I did.  And there's no evidence of

11   anything happening here in the United States.

12      **MR. ANDRES:**  By the way, we also went to the Supreme

13   Court on sovereign immunity and a whole bunch of --

14      **THE COURT:**  I understand that.  I'm just admitting

15   that I'm the first word, not the last word.  And indeed, the

16   defendant might be~-- the defendants in this case might be able

17   to persuade higher courts that this is something other than a

18   computer hacking or intrusion that is not justified.  They

19   might be able to persuade someone else.  I wasn't persuaded.

20     But let me continue with just my list.  I just want to

21   make sure I have a clear understanding of what you were not

22   provided in this case.

23      **MR. AKROTIRIANAKIS:**  Your Honor, can I respond not to

24   the argument on motions in limine that we're not to yet, but on

25   the earlier parts that were responsive to the Court's question

 1   in terms of the discovery that is purported to --

 2        **THE COURT:**  I'm going to give you a chance,

 3   Mr. Akrotirianakis.

 4        **MR. AKROTIRIANAKIS:**  I just didn't want to lose; I'm

 5   doing the best notes I can.

 6        **THE COURT:**  No.  I haven't finished my questions of

 7   the plaintiffs' attorney, and I'm certainly going to give you

 8   an opportunity to respond.

 9        Did you -- so, did you -- I asked you whether or not you

10   received any discovery showing the specific intrusions and

11   whether or not they were the result of any particular

12   governmental client of the defendants.

13        **MR. ANDRES:**  Correct.  The answer is no.

14        **THE COURT:**  Did you receive any discovery that the

15   incursions on the WhatsApp system were the result of an

16   investigation into criminal activity?

17        **MR. ANDRES:**  No.

18        **THE COURT:**  Did you receive any discovery that there

19   were any efforts to screen the governmental clients or the

20   clients who used Pegasus in this particular instance?

21        **MR. ANDRES:**  The only thing in the record is very

22   general testimony about what those practices are, that is --

23   that there are screening practices.

24        **THE COURT:**  No, but that --

25        **MR. ANDRES:**  But there's nothing specific about the

1  intrusions on this case that there were necessarily that

2  screening -- I think what NSO would say, they'll say it

3  themselves, but that that's their practice so that presumably

4  that happened in this case.  But we're not aware of what that

5  screening was as to this intrusion.  By the way, we have no

6  idea who the clients are for this intrusion.  And it's also,

7  just to note, a real contradiction in their positions that on

8  the one hand they screen, but on the other hand they say they

9  have no control or have no idea who the targets are because

10  they just install the spyware and then the governments or

11  entities or people that they sell to are on their own, they

12  don't have insight into that.  So ...

13         **THE COURT:**  No training provided to those?

14      **MR. ANDRES:**  I don't -- we're not aware of that.

15      **THE COURT:**  Did you receive any discovery about any

16  investigation undertaken by NSO against any of the possible

17  actors in this case, in this instance, who may have misused

18  Pegasus?

19      **MR. ANDRES:**  No.  I have a vivid memory of the

20  defendants playing a series of terrorism-related videos to

21  witnesses about terrorists who were included, but we didn't

22  receive any information about what government was involved or

23  what investigation was done.

24      **THE COURT:**  Okay.  And did you receive any discovery

25  on the relative level of control over Pegasus that were either

 1    retained by NSO or used by their clients?

 2          **MR. ANDRES:**  We know that there was some testimony and

 3    I think some documents about NSO testing Pegasus and some

 4    testimony about the fact that they're involved in the

 5    installation, but beyond that I don't think there's any

 6    evidence.  Let me just check if that's correct.

 7          Yeah, again, nothing specific.  But as Your Honor may

 8    remember from summary judgment, there is some evidence that NSO

 9    is involved, again, in the installation.

10          **THE COURT:**  I need your appearance, please.

11          **MR. BLOCK:**  It's Micah Block for plaintiffs.  We

12    presented to you on summary judgment, Your Honor, evidence

13    showing defendants' involvement in -- one of their defenses

14    was, we didn't do it, our customers did.  And we presented the

15    evidence that was available to us regarding their participation

16    and installation, technical support, going to the customer's

17    sites.  There's probably more that I'm not thinking of, but

18    it's in those papers.

19          So we know that that was a practice and that their

20    customers cannot operate any given attack without NSO's support

21    and participation.  However, there was no evidence about these

22    1400.  So nothing to tie it specifically, and certainly nothing

23    in the realm of, you know, here's one of the 1400 that was the

24    result of a law enforcement investigation or anything testable

25    in that sense.

1          **THE COURT:**  Okay.  All right.  So you don't know any

2    specific details about what happened?

3          **MR. ANDRES:**  Correct.

4          **THE COURT:**  For this incursion.

5        Okay.  All right.  Mr. Akrotirianakis, you wanted to

6    respond.

7          **MR. AKROTIRIANAKIS:**  Yeah, I'd appreciate if the Court

8    went through the same list of questions so I can respond to

9    them specifically, but I would first say, Your Honor, that much

10   of -- well, first I would say that I'm going to assume that

11   counsel just is not all knowing about what happened on his side

12   of the case and has made a number of statements that are

13   incorrect on that basis and not intentional misstatements to

14   the Court.

15       Also, to the extent that there is -- these are discovery

16   disputes, I have not had the opportunity in my career to, like,

17   do them on the fly like this.  But much of this that the Court

18   is now getting into was not requested in discovery, and if it

19   had been requested and not provided or objected to, we would

20   have litigated those issues as we have many, many other issues

21   in this case.

22         **THE COURT:**  Are you saying there was no request for

23   information about who conducted this hack?

24         **MR. AKROTIRIANAKIS:**  No, Your Honor.  What I'm saying

25   is that --

1          **THE COURT:**  Why would there have to be a discovery

2     request?  I mean, the order that I issued in February of last

3     year said that the plaintiffs were permitted to -- you know, he

4     can't listen to both you and me at the same time.  Okay?

5          The discovery order said that they were permitted to take

6     discovery on what your clients specifically did in this

7     instance.

8          **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  And --

9          **THE COURT:**  Why don't you have an obligation to

10    provide that?

11         **MR. AKROTIRIANAKIS:**  And we did.

12         **THE COURT:**  Did you do it with regard to specific

13    clients?

14         **MR. AKROTIRIANAKIS:**  We gave Your Honor that

15    information which NSO has.  And so if we go through Your

16    Honor's list, I can tell you we have that or we don't have

17    that.  And to the extent that it is in our possession, custody

18    or control, did we provide it, and what specifically did we

19    provide.

20         **THE COURT:**  Did you provide the -- without using the

21    actual names, did you provide a list of who was responsible?

22         **MR. AKROTIRIANAKIS:**  We provided --

23         **THE COURT:**  For these 14 incursions.

24         **MR. AKROTIRIANAKIS:**  We would not know who are the

25    specific customers who are targeting those 1400, Your Honor.

```
 1   NSO provides the system to its customers.  It provides support

 2   as needed, operating center support, if you will, a hotline to

 3   help if there are technical problems.

 4        THE COURT:  So you don't know, then, if any of the

 5   entities that were using it were actually using it to detect

 6   crime or terrorism?

 7              MR. AKROTIRIANAKIS:  We do know that, Your Honor.

 8        THE COURT:  How do you know that if you don't know who

 9   did it?

10        MR. AKROTIRIANAKIS:  Well, we only license it to

11   certain people, Your Honor.  They're not able to just -- it's

12   not like you -- I want to make sure I'm understanding the

13   Court's question.  It is licensed to specific users who provide

14   end user certificates as to who is using it and what for.

15        THE COURT:  Hmm.

16        MR. AKROTIRIANAKIS:  We then do not get involved in

17   their criminal investigations, their terrorism investigations.

18        THE COURT:  What if they call you and say it's not

19   working, don't you give some tech support?

20        MR. AKROTIRIANAKIS:  Yes, Your Honor, but that does

21   not expose us to the targets of their criminal and national

22   security investigations.

23        THE COURT:  You don't know if they're doing criminal

24   or national security investigations, do you?

25        MR. AKROTIRIANAKIS:  Not because of that, but we do
```

know because we contract for it to be used for those limited

purposes.  They certify not only to NSO but to the government

of Israel that it is being used only for those limited

purposes.  To the extent that it is alleged not to be used for

those specific purposes, those matters are investigated by NSO,

and if a customer fails to cooperate in that investigation,

they are terminated.  That has happened.  If a customer is

found not to have as is --

**THE COURT:**  Yeah, but what about this particular

incursion?  Everything that you have written in your papers

deals with sort of the business practice and the policy, but it

is not tethered in any way that I can detect to the 1400

intrusions that are at issue in this case.

**MR. AKROTIRIANAKIS:**  Those were investigated by --

well, to answer Your Honor's earlier point, we do not have

discovery to provide on that.  They provided discovery on that

to a point.  They identified a number of these people.  They

identified at least 1200 of them as people not civil society.

There's another subsection of the 1400 that are 200 that were

identified by their agent, the citizen lab, as suspected civil

society.  We have provided the Court a lot of information about

whether we agree with huge swaths of that number.

We tried to take discovery, as the Court will recall,

about those 200 from citizen lab.  They resisted that

discovery, plaintiffs resisted that discovery, and the Court

1  refused us the opportunity to take that discovery.

2      But I don't think that there's a question, particularly

3  from their own documents, about who was operating the system

4  and whether those operators were, in fact, governments and

5  government agencies.

6      In fact, there's a lot of discovery in this case about

7  Facebook being nervous that what they were going to do which

8  was to expose to these 1400 that they were, in fact, being

9  monitored, there was concern on their part that went all the

10 way up to Mark Zuckerberg, and they produced this discovery in

11 this case, the correspondence saying we are going to be

12 aggravating these governments by exposing their use of this

13 technology to investigate crimes.

14     And, in fact, as an example, there is one customer who is

15 identified in their discovery as the customer that would be the

16 greatest number of the suspected criminals, and it's a number

17 as I'm recalling, in the 400s, I think the high 400s, of the

18 1400, that these were all users who were in a particular

19 geography of a particular country from which they assumed and

20 stated in writing and reported all the way up their chain that

21 these were, in fact, narcotics traffickers.

22         **THE COURT:**  Hmm.

23         **MR. AKROTIRIANAKIS:**  So there's been a lot of

24 discovery on that point, Your Honor.  Has it been specific from

25 NSO about who the targets of the investigations are, who's

1    conducting those investigations?  It has not.  And the reason

2    is that we do not have that information.  But as far as the

3    information that we do have and that the Court ordered us to

4    turn over, we have turned it over.

5              **THE COURT:**  Hmm.

6         **MR. ANDRES:**  It doesn't -- whether they've turned it

7    over or not doesn't go -- doesn't dispute the issue that they

8    don't have evidence about the 1400 people, who it was they sold

9    their spyware to, whether they were a government.

10         By the way, we also have no idea whether those governments

11   did it legally, what the foreign law is as to how you are

12   allowed to do surveillance.  This is not a case about

13   surveillance, foreign surveillance or encryption.  It's a case

14   about the sale of issue spyware that is used for surveillance,

15   and particularly about NSO's intrusion on Meta's servers here

16   in California.

17             **THE COURT:**  It's very interesting to me that -- I

18   don't know how you -- I don't know how you fight this general

19   allegation.  How do you -- you're essentially saying that

20   the -- their evidence about how it's used isn't really tethered

21   to anything specific in this case because either they have not

22   given you discovery or they don't know how it was used.  Right?

23             **MR. ANDRES:**  Exactly.

24             **THE COURT:**  They can't guarantee by the fact -- by

25   virtue of the fact that somebody certified, yeah, we're only

going to use it for law enforcement purposes, when they don't

know that that is indeed true in terms of how these 1400

intrusions occurred, whether or not they were a legitimate

pursuit of some law enforcement activity.

**MR. ANDRES:**  Yeah, I think that's right.  We don't

know who was using it.  Obviously that matters.

And moreover, it's just completely irrelevant to the

issues in hand with -- at least with respect to punitive

damages, because that has to be tied to the specific conduct at

issue, not some greater purpose that NSO is trying to save the

world because they're trying to fight terrorism.

And by the way, what they're ultimately trying to do is

scare the jury that if they're penalized in some way, that the

ability to investigate and prosecute terrorism, narcotics and

the like somehow, poof, magically disappears; that their

technology is so important to the fight against these crimes,

that the jury shouldn't penalize them.

By the way, there's nobody here from the U.S. Government

or any one of those other governments.  They're not law

enforcement.  And by the way, whether or not they're actually

doing this for some greater good, let's be clear, they're a

for-profit company.  They do it to make money.  And if some

government benefits from their technology, that's fine, or to

use it for whatever reason.  But they're a for-profit company

that sells spyware, and the issue of terrorism and all of these

other crimes that they purport to be servicing is not really correct and it's not for them to say.

**MR. AKROTIRIANAKIS:** Your Honor, the record will reflect that my friend here just said that it is about the sale, and I would submit to you that our intentions in making sales matter. Our general business practices and policies are, in fact, relevant.

I can go into the numerous ways that they are even just as to the damages allegations in this case, but if the Court is going to preclude us from presenting things or making arguments or submitting evidence on the basis that we withheld discovery, I really do think that we need to focus on what discovery was requested and what discovery did NSO turn over, what discovery did NSO -- was NSO unable to turn over because it is not items that we have possession of or ever did.

**THE COURT:** But even if it is evidence that you didn't have to turn over, that doesn't respond to the argument that it still has to be related to what happened in this case.

**MR. AKROTIRIANAKIS:** Your Honor had --

**THE COURT:** Why should you be able to put on evidence that has nothing to do with what actually happened in this case?

**MR. AKROTIRIANAKIS:** They are seeking punitive damages, Your Honor. Punitive damages, as the Court knows -- and I would just refer the Court to the jury instruction on

punitive damages. In fact, if I may get it, Your Honor -- I
may have it right here -- punitive damages, as the Court knows,
can be approved based on any of three predicates: Malice,
oppression or fraud. All of those focus on the intent of the
actor. So the actor here, NSO's intention in making the sales
of this software are squarely in the biggest issue that is in
the case to be tried, Your Honor. Maybe not the identities of
the 1400, the 1200, the 200.

We don't intend to go there either, and we haven't said in
our motions in limine that we do. But our intentions, what we
were trying to accomplish, the reasons why we did things, those
are the opposite of conscious disregard for the rights of
people, the intent to cause injury, despicable conduct, malice.
All of the things that you're going to be asking the jury to
determine in this case really at the end of the day comes down
to what is NSO's intention in selling this software, not for
the compensatory damages. That's a different issue.

And if this case were about the compensatory damages only,
then a lot of the issues that are in dispute and are before the
Court in the motions in limine and the *Daubert* motions would
only relate to the equitable remedies that the Court has
already said are going to be dealt with at a date after the
trial.

But if we're going to have a trial on punitive damages, if
this Court is going to ask the jury to determine whether my

client engaged in malice or oppression or fraud, then my
client's intentions in doing the things that it did, which in
this case is developing, testing, promoting and licensing its
technology and what it intended to do by that is absolutely
relevant.  In fact, I don't think you can have a fair trial
without those things.  In fact, I think you couldn't -- I don't
believe that the law is that you could have a fair trial
without some evidence of the defendants' intention in selling a
product if the allegation is that by the sale of that product,
you have engaged in despicable conduct, carried on with willful
and conscious disregard of the rights and safety of others,
that you could have made misrepresentations or concealments
with the intent to cause injury, and all of those things that
are the matters that the Court will be instructing the jury on.

I mean, if all of that goes to my client's intention, then
why is my client's intention, which is the opposite of all
those things, not relevant evidence?  It doesn't seem like it
could be.

**MR. ANDRES:**  They're not being -- the jury's not being
asked to find damages because they sold their spyware to
whoever they sold it to.  They're being asked whether there was
malice, oppression or fraud with respect to the intrusion on
Meta's servers, whether they intentionally did that, whether
they did it maliciously, and whether they did it oppressively.
And we will prove that without any reference to the sale of

1   these products to fight some terrorism or to fight some

2   abstract idea that encryption is only used by criminals.  Also

3   not true.

4        So counsel frames the question in a way that doesn't

5   relate to the narrow damages-only trial that should happen in

6   this case.

7            THE COURT:  I'm curious.  I mean, I agree more with

8   you than I agree with defense attorney on what this trial

9   should look like.  On the other hand, how does -- how does the

10  trial look where the -- not only does the issue that defense

11  counsel describes go to their client's intent in selling it,

12  which I agree isn't really the issue, the intent is in how they

13  used it here.  You don't have any real evidence on that except

14  what acts you were able to determine happened, right?  You

15  don't have any real evidence about who launched it and what

16  their purpose was.

17       But what does the trial look like without evidence of the

18  intent in selling the product when indeed that's the only way

19  to describe what the company does?  I mean, isn't the defendant

20  entitled to put on something?  Even if I were to grant all your

21  motions, what does the -- what does the defendant get to say in

22  its opening statement and through its own witnesses, excluding

23  the experts who have all this policy stuff, which I'm probably

24  not going to allow, but what would the defendants' witnesses

25  say?

 1          **MR. ANDRES:**  Your Honor, it's a great question.  You

 2   know, I'm inclined to say it's not exactly my job to decide

 3   what they should say, but --

 4          **THE COURT:**  It's your job to help me figure out what

 5   my rulings are.

 6          **MR. ANDRES:**  Fair enough.

 7          They should put in relevant and admissible evidence that

 8   is relevant to the questions at issue, right?  Because put

 9   aside the discovery issues.  There's a huge relevance and

10   prejudicial 403 issue with respect to this stuff if we're going

11   to be telling these jurors that, you know, Pegasus is essential

12   to the fight against terrorism and pornography and without them

13   we're all, you know, we're all subject to some terrorist

14   attack.

15          I think what they should be allowed to say is that they

16   manufacture spyware and they sell it, which is accurate, right?

17   I mean, who they sell it to, who knows?  We certainly know

18   about abuses, and I think some of their witnesses have also

19   conceded that there have been abuses.  But frankly, who they

20   sell it to doesn't matter.  They do this to make money.  They

21   have a profit motive, and that's really all the jury should be

22   told.

23          We can't -- I mean, we can't introduce all this evidence

24   about what governments they are because we can't test whether

25   it's, you know, Canada or some other country.

1          And I don't want to reference different countries.

2          **THE COURT:**  Right.

3          **MR. ANDRES:**  I don't mean to cast aspersions about

4     which ones are good or which ones are bad.  But there are good

5     ones and there are bad ones, and they're selling them to people

6     potentially other than foreign governments.  But we don't know.

7          **MR. AKROTIRIANAKIS:**  There's no evidence of that.

8          **MR. ANDRES:**  All we know is from the press, which is

9     all that's been offered, right?  That there is one country

10    where the ruler of the country used it in the context of his

11    divorce.

12         **MR. AKROTIRIANAKIS:**  Even the press is not claiming

13    that the customers are other than governments, Your Honor.

14         **THE COURT:**  Please don't interrupt.

15         **MR. ANDRES:**  I'm not -- Your Honor, I don't know, but

16    I think in terms of relevance, Your Honor could rule that what

17    is appropriate is that they can say we sell this, we create,

18    manufacture and distribute this spyware, and that anything

19    beyond that is highly prejudicial.

20         Even the reference to saying that it's done by a

21    government suggests that it's somehow proper or that the way

22    that that government uses it is somehow authorized.  And we

23    just don't know that.  We know that the facts of this case,

24    that they weren't authorized; that it's not like a Title III;

25    that it's not lawful surveillance, and those are the facts.

1        **THE COURT:**  The -- though, you want to prove malice

2   and oppression, right?

3        **MR. ANDRES:**  Yes.

4        **THE COURT:**  Okay.  And how -- how do you do that when

5   you don't really know the intent behind the actions?  You only

6   know the actions, that there were these intrusions.  How do you

7   know they were done maliciously if you don't really know who

8   did it?

9        **MR. ANDRES:**  Your Honor, a few things.

10       One, we know that it was done -- we know that it was done

11   improperly and we know that it was done for surveillance, but

12   we can prove that it was fraudulent, which, Your Honor, by a

13   different standard of proof has already found that there was

14   fraud in the way that the process was developed with the WIS

15   (phonetic) and their whole process.

16       But we can prove that it was fraudulent, malicious and

17   oppressive because it wasn't one off, it wasn't a mistake.  It

18   was a repeated attack against WhatsApp's servers, right?

19       It happened once and we fixed it.  It happened a second

20   time and it fixed it.  It may very well still have be going on,

21   or at least as of the time of the depositions I believe last

22   summer, but my time may be off, but NSO hadn't committed that

23   it had stopped.

24       So we can prove that it was malicious, fraudulent,

25   oppressive because of the repeated attacks, right?  They didn't

1  attack us, we fixed it and they went away.  They attacked us,

2  we fixed it, they came back, we had to fix it again; and they

3  may very well have come back again.

4      So that's how we would prove our case, and that's what our

5  evidence, a very narrow set of evidence who will testify to

6  those narrow facts.  That is the -- that is the conduct for

7  which we are seeking damages.

8          THE COURT:  Okay.

9          MR. AKROTIRIANAKIS:  I really just don't see how you

10  can -- I'm looking at the jury instruction.  It's CACI 3945.

11  That would be if the Court did not grant our request for a

12  bifurcated trial.  It's not too dissimilar if the Court did,

13  but --

14          THE COURT:  Did you make a request to bifurcate the

15  trial?

16          MR. AKROTIRIANAKIS:  We did, Your Honor.  It's in the

17  pretrial --

18          THE COURT:  In the pretrial statement?

19          MR. AKROTIRIANAKIS:  Yeah.

20          THE COURT:  No, I'm not going to bifurcate the trial.

21          MR. AKROTIRIANAKIS:  Okay.  So then you would be,

22  then, giving CACI 3945, Your Honor, as it reflects California

23  law.  And I would refer the Court to it.  I don't see how you

24  would address any of these factors without getting into the

25  defendants' intention.  But I would still appreciate the

1  opportunity to answer the Court's list of questions from

2  Mr. Andres because on my client's behalf I would urge the Court

3  not just to take their word for it that they didn't get

4  discovery about these things.

5      I can tell you what they requested and what was provided.

6  If your decision about what you're gonna to allow in this case

7  is informed by what discovery was provided in this case, even

8  if it wasn't the subject of a motion to compel, because I don't

9  agree with almost everything that he said.

10      **THE COURT:**  Okay.  Do you want me to go through

11  these -- I was just going through the motions.  My questions

12  just come from the motions in limine.

13      **MR. AKROTIRIANAKIS:**  Well, I wrote down some of them,

14  Your Honor.  I just, I don't want to rely on my own ability to

15  take notes here at the lecturn to answer your questions.

16      **THE COURT:**  Okay.  Why don't you go through the ones

17  that you have answers for, and then I'll see if there's

18  anything else.

19      **MR. AKROTIRIANAKIS:**  Efforts to screen clients was

20  something that the Court asked about.  There has been all of

21  our -- we've produced dozens of documents about what we do in

22  order to screen clients, how that process happens, what happens

23  from there.  There was testimony --

24      **THE COURT:**  Yeah, but the question was the efforts to

25  screen the particular clients that committed this intrusion.

```
1    Doesn't matter what you do with regard to other clients.

2            MR. AKROTIRIANAKIS:  It's the same process in respect

3    of all of the clients, Your Honor.

4            THE COURT:  But have you pinpointed it to a time and

5    place that -- so that we could determine whether or not it has

6    to do with this?

7        You see, your case seems to me to be this is what we do,

8    we do it all the time, we do it with everyone, we don't need to

9    give specific information about this particular intrusion.

10   Trust us, we do it the same way every single time.

11           MR. AKROTIRIANAKIS:  Your Honor, how would that be

12   different than any product case where the plaintiff claims to

13   have suffered an injury?

14       For example, put it in a very simple case.  Let's say it's

15   a product that's a consumer-facing product that you buy, like a

16   drug or something like that.  And then the plaintiff has now

17   developed some medical condition that they say is caused by

18   that.  And so the drugmaker is on trial, and you're asking,

19   well, what do you know about this person?  We don't know

20   anything about that person necessarily in my hypothetical.

21   Okay?  Why would we?

22       What we can tell you is what is the drug intended for,

23   what do we do to make sure that we're not engaging in any of

24   these factors that are -- needed to be proved in order to

25   establish an entitlement to punitive damages?
```

1          Now, change the hypothetical.  Instead of it being an

2     Israeli-made law enforcement technology, make it an

3     American-made law enforcement technology of the sort that the

4     Court passes over routinely.  Would the maker of, for example,

5     the software or the hardware used to conduct a law enforcement

6     investigation of surveillance, would the maker of that software

7     know --

8          THE COURT:  But the issue isn't about you making it.

9     It's about the use of it, using it.

10          MR. AKROTIRIANAKIS:  Right, Your Honor.

11          So in the Court's question, let's say that before the

12     Court is a civil rights case against whoever agency claiming

13     that those -- that that agent, that that agency violated the

14     privacy rights or the Fourth Amendment rights or whatever

15     rights of the plaintiff.

16          You're going to bring the maker of the software or the

17     hardware that was used by the law enforcement agency before the

18     Court and say, well, what do you, software maker, know about

19     how this agency used your product in respect of this particular

20     investigation.  They would never know that.  All they would be

21     able to tell you is here's what we do, here's our intention in

22     creating this problem.

23          Yes, so, could Officer Van Buren who is the subject of Van

24     Buren versus the United States, misuse that technology in a way

25     that violates the CFAA?  In that case the Supreme Court said he

1    didn't.  Certainly he had violated his employer's policies and

2    certainly he had violated the rights of somebody, but would the

3    maker of that technology know anything about that?  Of course

4    they would not.  They never would, Your Honor.

5         The Court is asking an impossible question.  But what I

6    can answer is what was requested in discovery and what did we

7    provide.

8         What I think we should be able to say at trial is, you

9    know, Mr. CEO of NSO, what is NSO?  What are NSO's products?

10   What is the intention of NSO in developing, testing, promoting

11   and licensing these products?  And what guardrails do you have

12   to make sure that whoever uses these products that you make is

13   using them consistent with your intentions?

14        And there is a lot of discovery that we've provided on all

15   of those things, which are very typically received in evidence

16   by courts in cases where there are allegations of punitive

17   damages.  In fact -- and there are a legion of cases that are

18   cited in our oppositions to their motion in limine, motions in

19   limine, where the courts say in another context, this wouldn't

20   be relevant, but because the plaintiff seeks punitive damages

21   in this case, the intentions of the defendant is absolutely

22   relevant.

23             THE COURT:  Okay.

24             MR. ANDRES:  Your Honor, can I, just one very quick

25   response.

1        One, the analogy, which doesn't work and we should just

2   stop using it, is to some lawful Title III investigation, as

3   counsel's talking about, would you hold them liable.  Whether

4   you do a Title III and you send it to Verizon and they allow

5   you to surveil somebody's phone, Verizon never hacks into

6   somebody's phone or computer to do that.  In other words, there

7   is a lawful Title III, not the conduct that we're asking for

8   damages, which is NSO hacked into or intruded Meta's services,

9   which is all this trial is about, which is what Your Honor

10  found summary judgment about.

11       So I think those analogies of which they have an expert

12  witness, as you know, don't work in any way, shape or form.

13       And then just separately, on this whole hypothetical that

14  they get up there and say we sell this lawful -- how are we

15  supposed to cross-examine that if we don't know who they're

16  selling to, right?  It makes all the difference in the world.

17  Or how they go about it or how this --

18       Lastly, you know, there's some discussion about

19  Mr. Zuckerberg being involved.  I don't think that's what the

20  evidence shows, and I'm not here to waste your time about that.

21  I just don't want you to think that my silence somehow

22  acknowledges that anything that counsel said is true at least

23  as it relates to that.  I'm not trying to disparage counsel.

24       Lastly, to the question of what should the effect be of

25  the defendants' failure to provide discovery, there are all

1    these specific motions in limine.  And then one you'll hear

2    later, there's also a jury instruction that we're asking for,

3    and that's what we think is really the import of what Your

4    Honor should rule on these issues.

5           **THE COURT:**  The -- if indeed I went with

6    Mr. Akrotirianakis' position and allowed all that evidence in,

7    even though you don't know who did the hack, what they did, you

8    don't know any of the details, if that were to be allowed in,

9    what would that mean in terms of some of the evidence they're

10   trying to keep out that you want to get in?

11          For instance, the information about the NSO being on the

12   entities list.  What does that mean?  Are we just opening up

13   this whole ball of wax if I simply -- I mean, I could go either

14   way.  None of this stuff comes in or all of it comes in.

15          **MR. ANDRES:**  The reason why I would say is that Your

16   Honor has made rulings already that affected the course of this

17   case.  Your Honor ruled that the identity of the individual

18   targets relating to Citizens Lab were not relevant.  Your Honor

19   also ruled that the particular names of the clients were not

20   relevant.  That handicaps --

21          **THE COURT:**  I didn't say they were not relevant.  I

22   said they need not be produced, right?

23          **MR. ANDRES:**  Correct.

24          Now all of a sudden we would be switching course because

25   now all of those issues are in.  Now, Mr. Akrotirianakis gets

1   to play his Al-Qaeda video to the jury, which is not tied to

2   anything that I'm aware of.  Then he gets to talk about child

3   pornography and criminals and all the other abuses.

4        And what are we supposed to say in response?  We've agreed

5   not to bring in evidence that there are allegations that there

6   were misconduct with respect to NSO, whether it's Jamal

7   Khashoggi, whether or not it's this princess.  That has nothing

8   to do with the damages here.

9        And by the way, we have nine hours, and we will abide by

10  that, but we're talking about having a trial about the legality

11  or the use of end-to-end encryption by criminals, and that is

12  not what's at issue here.

13       So the short answer is that if you let all that stuff in,

14  we're gonna ask you to let a whole bunch of stuff, some of

15  which we've been precluded or isn't part of the record, and we

16  just can't do that at this point.  And it's not relevant, and

17  it's certainly, to the extent it has any minimal relevance, is

18  highly prejudicial.

19            **THE COURT:**  Okay.

20            **MR. AKROTIRIANAKIS:**  Your Honor, the Al-Qaeda video

21  that counsel references, the link to it comes directly from

22  their documents that they provided.  They knew about the

23  Al-Qaeda connection.  So for them to say it's untethered to

24  anything in the case is just not true.

25       But I do really want to respond to the Court's questions

about what was requested in discovery, what was produced.
Because if you're gonna preclude me from presenting any
evidence about who my client is, what my client does or even
minimal background, I think I really just need to make a record
on these things, Your Honor.

      **THE COURT:**  Uh-huh.

      **MR. AKROTIRIANAKIS:**  So you asked about
investigations.  We provided --

      **THE COURT:**  You can just go through their motions in
limine.

    The first one is that you -- that there is no discovery
produced with regard to whether or not this incursion was in
furtherance of child -- investigation of crime, terrorism or
child exploitation.

      **MR. AKROTIRIANAKIS:**  All right.  The first motion that
I have here is the identities and affiliations of NSO's
customers, Your Honor.  Is that --

      **THE COURT:**  Oh, yeah.  I'm sorry.  I was looking at
number 2.  Yeah, that's number 1.  But my first question was as
to number 2.  But, yeah.  Number 1 is as to the specific
intrusions, whether or not it was the result of one of
defendants' government clients, right.

    What does the discovery show on the specific intrusions on
plaintiffs' systems were the result of the actions of one of
defendants' government clients?

1          **MR. AKROTIRIANAKIS:**  No discovery has been withheld on

2     that basis, Your Honor.

3          **THE COURT:**  Well, what discovery has been provided?

4          **MR. AKROTIRIANAKIS:**  Everything that we had that was

5     responsive to the Court's orders we have provided, Your Honor.

6          **THE COURT:**  Okay.  Can you describe what you have

7     provided?

8          **MR. AKROTIRIANAKIS:**  I can tell you what we -- what I

9     think you're looking for is do you -- do you have evidence

10    about what your customers did with the -- with your system and

11    who they investigated and where those people are and what

12    numbers of the target devices were being used, and so on.  And

13    the answer to that remains, as I've said earlier, Your Honor,

14    that that is not information that NSO ever had, same as any --

15         **THE COURT:**  Okay.  So the answer would be we don't

16    know --

17         **MR. AKROTIRIANAKIS:**  What we have.

18         **THE COURT:**  -- whether or not there is any evidence of

19    specific intrusions on the plaintiffs' systems being the result

20    of a defendant -- one of your clients in the pursuit of a

21    criminal investigation.

22         **MR. AKROTIRIANAKIS:**  We do know that, Your Honor, but

23    not from our own documents.  We know that from their documents

24    that they produced in discovery.

25         **THE COURT:**  And what document shows that?

1          **MR. AKROTIRIANAKIS:**  They're in the exhibits that have

2     been launched with the Court, Your Honor.  Their own documents

3     talking about who the 1400 are, who they include, grouping them

4     by country, characterizing them in terms of why they might have

5     been investigated, and so on.  That all comes from their

6     documents, Your Honor.

7          **THE COURT:**  I don't think that's my question, though.

8     My question is -- and I'm just trying to look at the motions in

9     limine to figure out which ones are valid and which ones

10    aren't.

11         The allegation of the plaintiffs is that you did not

12    produce discovery on these specific intrusions, the 1400 in the

13    plaintiffs' system, that showed that they were the result of

14    the actions of one of your government clients in the

15    investigation of crime or terrorism.

16         **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  I -- I'm maybe

17    not making myself clear.  I hope I'm answering the Court's

18    question.

19         To the extent that that was requested in discovery and

20    ordered by the Court, we provided whatever we had.  We do not

21    have discovery about who our clients target, what their

22    criminal investigations are.  As you would expect, we don't

23    know what client X is investigating.  It would be totally

24    inappropriate for a software provider to be exposed to what

25    criminal investigations or what counterterrorism investigations

1   are being conducted by a foreign nation state.  They wouldn't

2   want us to know that and we wouldn't want to know that.

3       But in terms of did we provide discovery, and what your

4   question I think is is should I not allow you to argue

5   something because you failed to follow the discovery rules of

6   this Court, the answer is we do did not with respect to that

7   particular category, Your Honor, because we don't have that.

8   We can't produce things that we don't have.

9       They never asked any third parties for it.  But what we do

10  have in the larger record of discovery is what they have

11  produced that answers those questions.

12      **THE COURT:**  Okay.  Correct?  You didn't ask for it?

13      **MR. ANDRES:**  I don't know the answer to that question.

14  I mean, certainly -- but I'm sorry, I can get back to you in

15  terms of what we asked for.

16      I do know that their witnesses didn't answer those

17  questions in particular, and I just want to make sure that

18  we're understanding what counsel's saying.  They don't know

19  what investigations happened, but they want to talk about

20  terrorism and child pornography and the like, even though they

21  don't know if that actually happened, because according to them

22  they don't know anything about those investigations.  And then

23  they point to us and say, well, we know the identities of the

24  individuals that were hacked, and we -- they're relying on us

25  to understand what investigation was done and, Your Honor's

question is what information about the investigation did you

provide, and I think the answer is no.

But if you just give me a moment, I can find out about

what we asked for.

**MR. AKROTIRIANAKIS:**  I can probably cut through this,

Your Honor, by saying that what I would intend to offer as

evidence at the trial is at the high level that we're talking

about.  What is the company's product, what is the intended use

of that product, and what do you do to try and make sure that

the product is used for its intended use.

I don't intend to get into any specific investigation,

much less any investigation about which there was discovery

that was requested and that we had and that we didn't provide

for any reason.

**MR. ANDRES:**  In any case, if they make that

description, that's a generalized description and not tethered

to the facts of this case in any way.

**THE COURT:**  Right.

My problem is twofold.

One, whether or not there -- my concern is that if there

wasn't discovery provided and the plaintiff has no opportunity

to kick the tires of that discovery, that doesn't seem a fair

way to approach this.

Secondly, my other concern is that all of the evidence

that I read from particularly your three technical experts and

others -- I haven't, you know, obviously read all the

depositions and all that, but it's all at such a high level.

It just has nothing to do with what specifically happened in

this case.  And you're essentially asking the Court, you'll ask

the jury to just assume because this is the way we do business,

that that was done in this case.  Therefore, the 1400 hacks

that are at issue here were -- had to have been done by a

government in pursuit of an investigation on crime or child

exploitation or terrorism.

       **MR. AKROTIRIANAKIS:**  Your Honor --

       **THE COURT:**  I've never tried a case in which there was

no evidence as to what exactly happened here.

       **MR. AKROTIRIANAKIS:**  Well, these kinds of cases

involving punitive damages are more typically tried in other

courts than this, Your Honor.  This is a state claim that gives

rise to a right to punitive damages.  So I can only point the

Court to the state instruction on what the jury would be --

would be asked to determine.

    So the key is reprehensibility, right?  The first question

the Court -- or the instruction the Court is going to give is

how reprehensible was, and you fill in the names here, NSO's

conduct.  In deciding how reprehensible NSO's conduct was you

may consider among other factors:  Whether the conduct caused

physical harm.  There's not going to be any evidence of that.

Whether NSO disregarded the health or safety of others.  I

don't think there's going to be any evidence of that.  Whether
the plaintiff was in a financially weak or vulnerable position,
et cetera, et cetera.  All of these things that this goes to
are malice and oppression, which themselves focus on the
intention of the defendant doing what it did that is at issue
in the case.

So those definitions are whether the defendant acted with
intent to cause injury or if the defendants' conduct was
despicable and done with a willful and knowing disregard of the
rights or safety of another people (sic).  How can we answer
those questions if we don't -- if we're not allowed to put in
any evidence of what our intentions were, which are the
opposite of these things, Your Honor?

**THE COURT:**  Okay.  Let's take a different approach to
this.  I was hoping that your arguments would be more helpful.
This is -- I've been struggling with this for the last couple
of weeks.

If indeed the -- and I'll ask you, counsel, if indeed the
defendant were allowed to put on this high level general
business practice evidence, what do you think the appropriate
response would be?  And I'm thinking about it in terms of
expert witnesses who testify at great length about why this
spyware is so good and, you know, why it's essential and
necessary and how it benefits.  I'm a little uncomfortable
about allowing all of that in.  But it's one thing for your --

1    the NSO to come in and say this is what we do.

2        It's another thing to have, without any tethering to the

3    specific acts here, and for them to say, trust me, trust me, we

4    acted in accordance with our business model this time, and to

5    have that bolstered by experts talking about the need for it.

6    So I'm -- I'm not likely to allow those experts.

7        But assuming that the defendant get to say more than you

8    think they should say, we manufacture spyware and we're a

9    for-profit company and this is what happened.  On the intent

10   issue, if they were permitted to testify that they do it for

11   this particular purpose, what do you think is the appropriate

12   response?  Do you think there's a -- there's a remedy for your

13   dilemma, given that I've already ruled that the citizen lab

14   information, that you can't show that it was actually misused,

15   to the extent that it was supposed to be designed only for

16   these benevolent purposes, it has been misused.  Would you -- I

17   forget -- what would be the appropriate response in terms of

18   jury instructions, for instance, that the jury can make some

19   adverse inference because they didn't -- they haven't shown

20   that it was done specifically here, that they're just being

21   asked to trust the defendant?

22       Is there a way to sort of offset if the defendants were

23   allowed to put on some kind of case showing their intent?

24       **MR. ANDRES:**  Look, I don't think there is.  I

25   certainly wouldn't want Your Honor to suggest that when NSO

1    sells its products to foreign governments -- that's the best we

2    could really do, because we know it doesn't -- it isn't sold to

3    the U.S. Government, when it's sold to the foreign government,

4    I wouldn't want there to be the imprimatur that that is

5    somehow -- that that's legally used.

6        But if we were talking about the bare minimum and Your

7    Honor allowed them to say among their customers were foreign

8    governments, I think certainly -- listen, irrespective of all

9    these issues, I think Your Honor has to give a jury instruction

10   because of the lack of the failure to produce discovery,

11   period.  But certainly a more specific instruction on this

12   issue that they didn't give any -- they haven't provided

13   discovery about any particular government, that there's no

14   evidence in this case about what they did with it, I mean,

15   there's a way to say that they sold their products to foreign

16   governments without saying that it was used for terrorism or

17   gangs or drugs or whatever.

18       If ultimately what they want to say is that it was sold to

19   a foreign government, then we'll cross-examine their witnesses

20   about that to the extent that's possible.

21       Beyond that, I don't know how there's a remedy that

22   there's a particular new expert that we would get to rebut that

23   or that there's a particular witness that there is to rebut

24   that.  I'm not entirely sure how we would do that, but I

25   certainly, to the extent that Your Honor is considering that,

 1   what they should be allowed to say should be very limited, and

 2   Your Honor should certainly instruct the jury that there's no

 3   suggestion that any of this stuff is legal.  I guess you can't

 4   instruct the jury that's not relevant to this case, but that's

 5   where you end up at the end of the day when you start going

 6   down this road.

 7        When they start talking about their investigations,

 8   investigation of what?  What do they know about that?  How is

 9   that relevant to the narrow facts with respect to the, you

10   know, the computer intrusion that is really at the heart of

11   this case.

12        **MR. AKROTIRIANAKIS:**  Well, and to answer your question

13   where you started, Your Honor, we have provided all of the

14   information on those subjects, on the investigations, on the

15   guardrails, on the screening procedures, on the control that we

16   have over Pegasus once the client does have it, all the

17   different -- at least the ones I was able to write down that

18   you asked, we have provided full discovery on those issues.

19   They cross-examined our witnesses on each one of those topics,

20   and with documents that we provided.

21        **THE COURT:**  And --

22        **MR. AKROTIRIANAKIS:**  So it -- I'm sorry, I don't mean

23   to interrupt you.

24        **THE COURT:**  And I don't mean to interrupt you either,

25   but I think that the issue has sort of evolved into you've

1   explained that you've given all the discovery you have, but you

2   don't have anything with regard to the specific intrusions at

3   issue here.

4        **MR. AKROTIRIANAKIS:**  I have two points, Your Honor.  I

5   just want to make them super clear for this record.

6        One is if they're going to present a claim for punitive

7   damages that only can be proved by proof of my client's intent,

8   I think that it's fair, it's basically fair for my client to

9   say what its intent was.

10       And the second thing is if the Court is going to give

11   rulings that -- or a jury instruction on the basis that you

12   believe that my client has refused or failed to follow some

13   court order in this case, I think that I shouldn't be required

14   to shoot from the hip right here or that you take their word

15   for it and that we should say, here was the request, here was

16   the objection, what was provided.  You should just -- you

17   shouldn't put me or my client in the position of trying to

18   convince you without showing you the discovery or even us

19   looking at a discovery request about whether discovery was

20   provided if in fact you're talking about instructing a jury

21   that they should draw an adverse inference from the absence of

22   that discovery, Your Honor.

23       I mean, due process requires that.

24       **MR. ANDRES:**  Your Honor, you already found the

25   discovery sanctions.  We're not here to re-litigate that.

1        **MR. AKROTIRIANAKIS:**  Computer code, Your Honor.  One

2    thing --

3        **THE COURT:**  There are three things.

4        **MR. AKROTIRIANAKIS:**  Whatever they were, Your Honor,

5    I'm happy --

6        **THE COURT:**  They went to liability, not to the damages

7    question.  This is a whole other issue.  This is a whole other

8    issue.  And there might be other sanctions imposed for any

9    abuses that occurred with regard to the damages issues as

10   opposed to liability.  It's more likely, though, that any

11   sanction would actually be in the neighborhood of -- in the

12   nature of exclusion of evidence.  I don't generally allow

13   trials to go forward based upon evidence that both sides

14   haven't had an opportunity to fully vet in advance.

15       So the question seems to me to have evolved into whether

16   or not there is any evidence that -- we have to look at it in

17   the context of what happened in this case.  Is there any

18   evidence in this case, other than the evidence that you have to

19   connect the dots to, that your client acted in accordance with

20   what you believe to be a response based upon what's happened

21   with other clients?

22       Do you have any other evidence on~--- do you have any

23   evidence on what specifically was done in this incursion of the

24   1400?

25       **MR. AKROTIRIANAKIS:**  Yes, Your Honor, because with all

```
 1    of the clients, it is the same.  So the high-level evidence
 2    does --
 3            THE COURT:  I mean, why should we believe that, "with
 4    all of the clients it's the same"?  When you say "it's the
 5    same," what do you mean?
 6            MR. AKROTIRIANAKIS:  Well, if the witnesses are not
 7    believed, Your Honor, that ultimately is a question for the
 8    jury.  I -- I -- I think that I'm not doing a very good job
 9    here because I must not be understanding what the Court is
10    asking.
11        Yes, it's true that the -- we have discovery, we provided
12    it, we provided deposition testimony, the witnesses are going
13    to testify consistent with that deposition testimony.  If the
14    jury doesn't believe it, they might not believe it.  They might
15    believe it.  But the fact that they might not believe it, I
16    don't understand why that would mean that it's inadmissible if
17    it's relevant to the issues that you're going to instruct the
18    jury that they're supposed to make findings about, including my
19    client's intentions.  It's all about my client's intentions,
20    Your Honor.  Everything in this punitive damages instruction
21    focuses on the intent of the defendant.
22            THE COURT:  And conduct, intent and conduct of the
23    defendant.
24        Okay.  Anything else?
25            MR. ANDRES:  Nothing, Your Honor.  Thank you.  I
```

1    appreciate it.

2        **THE COURT:**  All right.  So you all have not really

3    helped me resolve this issue.  So, but there's so many others

4    that we have to go on to.

5        **MR. AKROTIRIANAKIS:**  Your Honor, if I could just say,

6    again, there hasn't been any third-party discovery even

7    attempted as far as we're aware by the plaintiffs.  So for them

8    to say we didn't do any third-party discovery, but the record

9    of discovery that you have, even if we provided a hundred

10   percent of it, which we did provide everything that we could,

11   that we had, that we were licensed to provide, but now we're

12   not allowed to present evidence that they didn't go seek from

13   the people who actually have that evidence, that doesn't --

14       **THE COURT:**  But you didn't give him the identities of

15   the third parties.

16       **MR. AKROTIRIANAKIS:**  How are we supposed to

17   subpoena -- yeah.

18       **THE COURT:**  How would they conduct that?

19       **MR. AKROTIRIANAKIS:**  I think there's at least eight

20   customers whose names are part of the discovery in this case,

21   Your Honor.

22       **THE COURT:**  That.  You provided?

23       **MR. AKROTIRIANAKIS:**  Some of them.

24       **THE COURT:**  And others are what, in the media?

25       **MR. AKROTIRIANAKIS:**  In their discovery, Your Honor.

 1   In their discovery.  They know who the customers are.

 2        **THE COURT:**  But -- yeah, but do they know who the --

 3   they're not interested in all of your customers.  They're

 4   interested in the customers that are -- customer or customers

 5   that are responsible for this particular incursion.

 6        **MR. AKROTIRIANAKIS:**  Yes, Your Honor.  And 400 and --

 7        **THE COURT:**  And do they know who that is?

 8        **MR. AKROTIRIANAKIS:**  Yes, Your Honor, yes.  For

 9   four hundred and --

10        **THE COURT:**  I'm surprised.  Who is it?

11        **MR. AKROTIRIANAKIS:**  Of those people and their

12   documents, which I can't say it out loud because they produced

13   all of this stuff "attorneys' eyes only," Your Honor.

14        **MR. ANDRES:**  Your Honor, I'm not exactly sure but if

15   the suggestion is they know and they won't tell us and we're

16   supposed to go to some third party and subpoena the government

17   of some foreign country to get that information, I don't know

18   if we surmised as to who they are, but we certainly didn't get

19   any discovery from them as to who it was or to confirm it in

20   any fashion.

21        **THE COURT:**  Right.

22        **MR. AKROTIRIANAKIS:**  A hundred percent, I've got a

23   list of three clients right here, Your Honor.  I'm not going to

24   say it out loud because they produced these documents

25   "attorneys' eyes only."

1          **UNIDENTIFIED SPEAKER:**  No, it's been unsealed.

2          **MR. AKROTIRIANAKIS:**  Okay.  Then, Uzbekistan, Saudi

3     Arabia, Mexico, that's three of them that are in their

4     documents, Your Honor.  The United States is one that we

5     provided.  There are others.

6          **THE COURT:**  Are you saying that those three countries

7     that you just mentioned are responsible for the hack in this

8     case?

9          **MR. AKROTIRIANAKIS:**  Their documents assert that 400

10    and I think 60 or 70-some of the 1400 were in Mexico, Your

11    Honor.  A goodly number of others is in one other country that

12    is a particularly large user base of WhatsApp whose name is

13    also in the same document.  It's not one of the three I

14    mentioned already.  I'm not sure if this particular --

15         **THE COURT:**  Their user was in that company -- that

16    country, right?  You're talking about the 460-some were in the

17    country that's on your list, one of those countries that's on

18    your list.

19         **MR. AKROTIRIANAKIS:**  Yes, Mexico, Your Honor.

20         **THE COURT:**  Okay.  But does that mean that it was the

21    government of Mexico that was --

22         **MR. AKROTIRIANAKIS:**  Pegasus was licensed for

23    territories and it can only be used in those territories, Your

24    Honor.

25         There's been lots of discovery.  This is why I don't think

we should shoot from the hip here at the lecturn on these

discovery issues.  We should proceed in an orderly fashion.  If

they think that there's discovery that has been requested or

ordered and not provided, we should proceed in an orderly

fashion.  But there has been a lot of deposition testimony on

that very subject in terms of like how does it operate, what

does the license get you, how does -- what does -- we provided

all of that, Your Honor.

      **THE COURT:**  So are you saying, then, that the

incursion could only take place at the hands of the government

in the country in which the user was located?

      **MR. AKROTIRIANAKIS:**  If that is how the license is

described, Your Honor.  Or if that is how the license --

      **THE COURT:**  So there's such a lack of specificity.

      **MR. AKROTIRIANAKIS:**  Well, it's the best I can do

shooting from the hip here, Your Honor, at the lecturn.  I

mean, I wasn't prepared to have a discovery hearing that hasn't

been briefed.

      **THE COURT:**  Did you -- did you provide anything

connecting a particular client, whether or not you gave the

name of the client, but a particular client, with any of these

1400 incursions?  Putting aside their own evidence.  Did you

provide on behalf of NSO anything that would allow them to

connect these 1400 users all over the world to specific

entities?

1          **MR. AKROTIRIANAKIS:**  We don't have that information.

2    We requested it from third parties.  We asked the Court to

3    issue letters rogatory so that we could obtain that information

4    so that we could litigate this very issue, and it was refused,

5    Your Honor.

6          **THE COURT:**  Hmm.  Hmm.

7          **MR. AKROTIRIANAKIS:**  It was opposed and it was

8    refused.

9          **MR. ANDRES:**  They wanted to litigate with Citizens Lab

10   who -- I believe that's what the reference is.

11         **THE COURT:**  That's the only letters rogatory I was

12   asked about.

13         **MR. ANDRES:**  Right.  So who are the potential victims,

14   and they're ignoring the fact that they have the information

15   about who the clients are, and are the only one who knows who

16   the clients are, if it's the government of Mexico or whoever,

17   and they can go directly to those clients and find out.

18         **MR. AKROTIRIANAKIS:**  Your Honor --

19         **MR. ANDRES:**  Somehow, in a circular way, they want to

20   go to the victims or that we surmised or guessed who the

21   governments were, but, Your Honor, it doesn't make any sense.

22         **MR. AKROTIRIANAKIS:**  Your Honor, WhatsApp is the

23   entity here that connected the 1400 to particular phone

24   numbers.  We wouldn't have the phone numbers.  They have the

25   phone numbers.  It's their users.  They connected the code to

those users.  They contracted with Citizen Lab to identify who

they were.  And if we knew who they were, which we tried to get

the Court to order, then we would be able to tell you whether

these are customers or not.

What I can tell you is the way the licensing works, the

way the technology works, that it works in particular

territories but not others.  It's not like NSO gives somebody a

license and they can then get anyone anywhere in the world.

There are parts of the world that are a hundred percent off

limits.  The United States is one of those places.  Okay?  But

if we go to a particular customer and license the technology to

that customer, that's for that customer to use in one or more

particular territories, not just wherever they want to go.

THE COURT:  Okay.

MR. AKROTIRIANAKIS:  And we've provided tons of

discovery on this.  They've taken deposition on it, Your Honor.

I don't know what more we could have done in terms of what we

had, and I think that if the Court is going to effectively

sanction us by saying I'm not going to allow you to present any

evidence of your client's intention at trial because at the

lectern we're being accused of not having provided evidence

that we should actually have an orderly process about, that

Your Honor.  I think due process requires that.

THE COURT:  Okay.

MR. ANDRES:  They certainly have the contracts.  NSO

1   has the contract for all of their clients, and we haven't

2   gotten those, and they certainly know who all those clients

3   are, and they haven't described them in any way.  So ...

4          **MR. AKROTIRIANAKIS:**  We provided the contracts, Your

5   Honor.  We provided exemplar contracts with the --

6          **THE COURT:**  Okay.  I've heard enough to know that you

7   all are not going to help me to decide this dispute.  This is

8   the big one.  This is the big one.  This is the one from which

9   everything else depends on --

10         **MR. ANDRES:**  Agreed.

11         **THE COURT:**  -- how much is going to come in.

12      And it's either going to be the plaintiffs' view or the

13  defendants' view.  I haven't come up with anything that sort of

14  splits the baby here.  Either the defendants going to put on

15  its intent evidence in support of its punitive damages defense,

16  or not.  So the question -- or not.  It's either/or.

17      So the question, though, is, is there any third option

18  besides that, besides blowing up the case, reopening it,

19  allowing discovery.  Because if I were to allow in the evidence

20  of the business practices, you know, particularly as described

21  by the three experts, defendants' three experts, who want to

22  talk about, you know, the necessity of having this product,

23  et cetera, I would be inclined to open it up to also allow the

24  plaintiff to talk about the entities list and the civil society

25  issue, all that.

 1          And that would obviously, since there are discovery

 2    rulings that I've made before I knew the case as well as I

 3    think I might know it now, I'd have to open up discovery.  So

 4    that would throw everything off track.

 5          So those are the three options we're looking at.  We're

 6    looking at plaintiffs' very circumspect presentation,

 7    defendants' broader presentation, or blowing up the case

 8    schedule and allowing discovery to be reopened and you all to

 9    take further discovery, battle it out for the next two years,

10    and then we come back together again.

11          **MR. AKROTIRIANAKIS:**  Your Honor, I think --

12          **THE COURT:**  Those are the three options.  I don't want

13    you to hear anything now.  I want you to think about it.  I

14    want you to think about that, and let's talk about a few other

15    things.

16          **MR. ANDRES:**  Thank you, Your Honor.

17          **MR. AKROTIRIANAKIS:**  I do think there's a middle road,

18    Your Honor.  I don't think that it involves the three experts.

19    I think there is a road that involves that.  I think that their

20    testimony can be narrowed.

21          But as was the case in a number of the cases that I've

22    cited in our opposition to their motions in limine

23    number 1, 2, 3, at least those, which I think are closely

24    related -- I think 4 and 6 are also -- could be related, but

25    the defendants were allowed to, as -- it wasn't even because of

1    punitive damages in every case, but just in a case involving to

2    give some relevant background about what the company does, and

3    it's to a point.  I know the Court says we're not going to have

4    the whole trial on corporate character, but you are allowed to

5    say -- to introduce your client and tell the jury --

6        **THE COURT:**  Didn't I say that's the real dilemma here

7    is how do you get to even describe what you do without getting

8    into that evidence?

9        **MR. AKROTIRIANAKIS:**  Yes, Your Honor.

10       **THE COURT:**  I understand that.

11       **MR. AKROTIRIANAKIS:**  Okay.  Thank you, Your Honor.

12       **THE COURT:**  And I don't see that as necessarily a

13   middle, a middle.

14       **MR. AKROTIRIANAKIS:**  It's not the --

15       **THE COURT:**  It's not everything you want, but it's

16   more what you want without giving the defendant an opportunity

17   to challenge that.

18       **MR. AKROTIRIANAKIS:**  It doesn't involve the three

19   experts or any experts, Your Honor.

20       I could do that just through --

21       **THE COURT:**  You know what, we're going to talk about

22   other things.  We'll take a break, we'll come back, and then at

23   the end I'll come back to you again and ask you once you've had

24   a chance to talk and to convene with your respective teams on

25   the, I guess, four options that are on the table.

1        Now, so let's move past this, because I'm getting a

2   headache just listening to you.  And you can sit down, yes.

3        All right.  There were a couple of other motions in limine

4   not on this subject.  And actually before we do those, there

5   are a couple of other issues that were sort of overarching

6   along with this big one on the scope of the case.  And like I

7   said at the beginning, I think there are some issues that are

8   more related to liability that perhaps the defendant is trying

9   to get in through the backdoor, and I'll just tell you what

10  they are and you can argue if you wish.

11       One is the defendants'.

12       Okay.  We're going to go to 12:30.  Our court reporter

13  will need a break, and then we'll take a short maybe half-hour

14  break and then we'll come back because there's a lot more to go

15  through.

16       Okay.  So one of the issues is the defendants' persistent

17  use of the word "harm."  There seems to be an issue in some of

18  the defendants' jury instructions and some of the arguments

19  that there's a question as to whether or not harm or causation

20  are still at issue, and I believe that the summary judgment

21  order dispenses with those.

22       For instance, my thinking on it is the two statutes, the

23  two hacking statutes don't use that term at all.  They just say

24  I think if you do this conduct and you suffer any loss, suffer

25  loss or damages.  So the harm must come from the breach of

 1    contract cause of action which requires existence of a

 2    contract, performance or excuse by plaintiff, breach and harm

 3    or damages.  It's described both ways in different standards.

 4        Okay.  So if we're talking about just the breach of

 5    contract, the Court's already found that, that there's a breach

 6    of contract.  So the Court has necessarily found causation and

 7    harm.  Why do the jury instructions now continue to use that,

 8    as well as there's some references in the defendants' trial

 9    brief?

10        What's at issue here, what's remaining is the extent of

11    damages, the extent of damages.  And I agree with the defense

12    that the jury can be asked if any damages because the jury

13    could find zero.  Because the Court's finding is essentially

14    that there was a prima facie case made that there was damage by

15    virtue of their need to investigate and remediate.  But that

16    doesn't necessarily mean that the damages couldn't be found to

17    be zero or nominal, if nominal applies.  That's another thing

18    we want to talk about.

19        So I don't think there's a causation here, issue, or

20    whether or not there was damages.  One of the jury instructions

21    proposed by the defendant asked whether damages were caused.

22    I've already found that, so I'm not going to give that

23    instruction.  It's going to be whether or not there are any

24    damages for which the defendant -- plaintiff should be

25    compensated, if any.  That's one of the issues.

1          **MR. NOLLER:**  Thank you, Your Honor.  I can address

2    that or -- Matthew Noller for defendants.

3          **THE COURT:**  Uh-huh.

4          **MR. NOLLER:**  So from what you just said, Your Honor, I

5    actually think there's maybe not that much disagreement and

6    perhaps it was just a question of phrasing in the instructions.

7          With respect to the contract claim, we would agree that

8    this Court found that there was some amount, could have been

9    very minimal, of harm caused by the breach of contract.  Now,

10   harm in a contract context for California is different than

11   actual damage.  So, you know, the harm is different than what

12   they're actually going to recover.  And of course if the jury

13   found, you know, that there was harm but no damage, they could

14   award nominal damages.

15         **THE COURT:**  Exactly.

16         **MR. NOLLER:**  And plaintiffs haven't submitted a

17   nominal damages instruction.  But --

18         **THE COURT:**  But you did.

19         **MR. NOLLER:**  We did, Your Honor, for the reason that

20   I'm saying now.  And that's because in order to determine, you

21   know, whether the damages are zero or whether the damages are

22   500,000, part of that determination is how much of that, those

23   costs, were caused by the defendants' conduct.  And so there's

24   a difference between trying to instruct the jury, the jury can

25   find that the conduct didn't cause any harm at all.  Your Honor

has indicated that you've resolved that.  I'm not trying to
dispute that.

What we think the jury needs to be instructed on is that
the amount of damages that they award also has a causation
requirement, so that the jury could determine that maybe NSO
caused a thousand dollars of the damages but not the remaining
400,000.  Or NSO caused 300,000 but not the remaining.

**THE COURT:**  Sure.

**MR. NOLLER:**  Extent.

And the same goes for foreseeability and mitigation of
damages, as well.  Maybe some of those damages were
foreseeable, but not all of them.  Maybe some of those damages
were appropriately mitigated, but not all of them.

And so causation remains relevant to the extent of damages
that the jury is going to award, not just whether there were
damages at all.  And that's what we were trying to get at in
our instructions.

**THE COURT:**  Okay.  Okay.  I understand that.  And that
seems reasonable.

And do you have -- you submitted nominal damages and
mitigation damages -- mitigation instructions.  Do you -- is
there authority that nominal damages, which aren't available in
every case but would be available in this case?

**MR. NOLLER:**  For the breach of contract claim, Your
Honor, obviously we would prefer that it not be available, but

 1    California law is fairly clear that in a breach of contract

 2    case if there is harm but no actual damage, nominal damages are

 3    within the jury's discretion.  I don't have the case citation

 4    at my fingers, but I believe it would have been cited in

 5    connection with our proposed instruction, and I do think

 6    California law is pretty clear about that.

 7         THE COURT:  All right.  I'm not as familiar with

 8    California law obviously as you are probably.  Nominal damages

 9    are necessary for there to be a punitive damages award?  I mean

10    at least?

11         MR. NOLLER:  That's correct.  Some --

12         THE COURT:  There has to be some sort of compensatory

13    award?

14         MR. NOLLER:  That's correct, Your Honor.  Some amount

15    of actual damage, including nominal damages has to be awarded.

16         THE COURT:  Okay.  Okay.

17      Response?

18         MS. CORA:  Thank you, Your Honor.  This is Gina Cora

19    for the plaintiffs.

20      With respect, I think there are two separate issues for

21    the breach of contract and the anti-hacking claims.  I'll

22    address the breach of contract first.

23      Understanding Your Honor's ruling, the reason why we,

24    first of all, completely agree that harm is inappropriate in

25    the instructions because Your Honor has found causation as a

matter of law, and in resolving the breach of contract claim
you wrote:  "Defendants do not dispute that plaintiffs incurred
costs investigating and remediating defendants' breaches."

Now, what defendants dispute is causation which Your Honor
already found as a matter of law.  They don't dispute that
plaintiffs have incurred employee time and did, in fact,
investigate and remediate after defendants' misconduct.  So
that is why it -- that's why we object, we objected to
defendants' instruction on nominal damages.

Also with --

THE COURT:  Did you all file objections?  I didn't see
any.

MS. CORA:  We did not file objections because we read
Your Honor's instructions not to contemplate standalone
objections to jury instructions.  Therefore, we did not do
that.  If Your Honor would like them, we will file them.

THE COURT:  No, but you -- I asked only because you
said that's why we objected, but you didn't file anything, you
just objected to their --

MS. CORA:  Exactly, and in the meet and confer the
parties agreed to a number of joint instructions, and we did
not agree on the nominal damages instruction for two reasons.
One, as I just explained, for the breach of contract.  And then
with respect to the anti-hacking statutes, Your Honor has
already found as a matter of law that there was at least $5000

of loss.  Now, both parties agree that the verdict form would
include one line for compensatory damages for -- because we are
seeking approximately $440,000 of compensatory damages on the
basis of three different theories.  And so therefore there must
be a finding of at least $5000 of compensatory damages.

**THE COURT:**  Uh-huh.  I don't disagree with that.

**MR. NOLLER:**  Your Honor, even taking that as a given
for the CAFA claim, it still remains possible that the jury --
because that $5000 is not necessarily damages on the contract
claim, as well.  And so on the contract claim there remains the
possibility, as Your Honor noted, that the jury could find that
the appropriate number of damages is zero, and in that instance
they would need to consider nominal damages, and then maybe the
number that they write on the verdict form is 5001.

With respect to causation, again, I didn't hear any
response to the point that there's still an issue as to how
much of those remediation expenses were caused by NSO.  So even
if it's accepted that they did those remediations, some of
them, in response to the access to their servers, we have
evidence, expert testimony, testimony from their own witnesses,
that they left the vulnerability open for a month after they
discovered it.  They could have closed it earlier.  We have
testimony that supports the conclusion that they were already
attempting to fix the vulnerability before they even discovered
NSO's conduct.

1          We have evidence that supports a conclusion that they

2     would have paid their employees the exact same money to do the

3     exact same work to find and replace this vulnerability even if

4     NSO had never been involved.

5          **THE COURT:**  But they've had to, a lot of resources

6     from other things that the employees could have been doing.

7     That doesn't mean they are --

8          **MR. NOLLER:**  Well -- and that's a question for the

9     jury to decide.

10          The point is that we are going -- we have evidence to make

11     these causation arguments.  They affect the amount and the

12     extent of the damages, and the jury needs to be instructed as

13     to that.

14          I also --

15          **THE COURT:**  Does the mitigation and nominal damages

16     instruction only apply to the breach of contract?

17          **MS. CORA:**  Yes.

18          **THE COURT:**  Yeah, because there's no duty to mitigate

19     on the other -- the state or federal statute on hacking.

20          **MR. NOLLER:**  That's correct.  And I believe our

21     proposed instruction makes that clear.

22          **THE COURT:**  Okay.  I'm sure the jury will understand

23     all of this so easily.

24          **MR. NOLLER:**  But I think even if the jury is going to

25     be awarding one amount of damages, they still need to be

1   instructed separately as to how to calculate those damages for

2   the different causes of action so that they can reach those

3   numbers, tally them and then write the number down.

4          **THE COURT:**  There's no disagreement that there's only

5   one amount of damages, correct, across all three?

6          **MS. CORA:**  Of compensatory damages, yes.

7          **THE COURT:**  Of compensatory.

8          **MR. NOLLER:**  That's right.  And we -- I'm sorry.

9          **MS. CORA:**  I'd also note that defendants' mitigation

10  of damages instruction does not make clear that it is only for

11  breach of contract, and there's no basis, as Mr. Noller just

12  admitted, to have a mitigation instruction for the CFAA or

13  CDAFA claims.

14         **MR. NOLLER:**  We wouldn't oppose adding language for

15  the breach of contract claim to that instruction.

16         **THE COURT:**  Okay.  All right.  That's one of the

17  liability-related issues.

18      The other one is the willfulness argument that's being

19  made.  I am aware that the -- that Section 502 does say for a

20  willful violation you have to prove, in order to seek punitive

21  damages, the standard oppression, fraud, malice, right?

22      And I'll allow you all to argue this briefly, but I

23  interpret that provision in the same way that the plaintiffs'

24  long footnote in their trial brief I think interprets it.

25      The willful portion is part of the liability

determination.  It's not an additional damages requirement.
And moreover, moreover, the language of the statutes, the
statute at issue, the CFAA, requires intentional conduct or
knowingly with an intent.  The federal statute requires
knowingly without permission or maybe I mixed those.  I flipped
those.  Knowingly without permission.

I frankly don't understand what intentional -- that
intentional conduct or knowing conduct don't establish willful
conduct, and frankly, I can't imagine how an un-willful
violation of this statute could occur, what an accidental
intrusion, perhaps?  But knowingly, with intent and
intentionally, to me, is tantamount to willful.

And I noticed that in the defendants' own proposed jury
instruction number 8, you define willful as the -- acted with
the purpose of accessing without permission.  That, to me, is
the same as the language of the -- of the state statute.

So I don't think the jury has to find willful.  I think I
already found willful when I found a violation of the statute.
And I suspect this has more to do with the purposeful
direction-type argument that you all were making before and
that you're trying to establish a record for appeal, but I
don't see this as a requirement that has not already been met
and found by the Court.

**MR. NOLLER:**  So, Your Honor, the reason why I don't
think that can be right is that the willful language in CAFA

appears separately in the punitive damages provision, and if

all willfully means is intentional or knowing, then there is no

violation of CDAFA that couldn't support punitive damages, and

as long as you find willfulness and the other stuff.  And if

that's the case --

       **THE COURT:**  No, that's not true.  You still have to

find punitive damages by finding oppression, fraud or malice.

       **MR. NOLLER:**  Understood.  But if that's true, then why

would that provision of CDAFA even say willful?  That's totally

superfluous.  If a finding of a violation of CDAFA requires

intent and knowing --

       **THE COURT:**  What does willful mean other than how you

described it in your jury instruction?

       **MR. NOLLER:**  Yes.  So we think the way it's described

in the jury instruction is correct.  We think it is different,

albeit maybe subtly different from intent and knowing.  And the

reason for that is that we understand intent in CDAFA to be the

intent, part of the conduct involved in intentional access to

the servers.  We understand purpose to be the reason that they

did what they did was to access the servers.

    So if the purpose of the action was something else, but

performing the action involved an intentional access to the

servers, that would not necessarily mean that the purpose of

the action was to access the servers.

       **THE COURT:**  And does the purpose come -- I mean it's

1    very convenient, given yours arguments, that willful means on

2    purpose, because your argument is that you didn't do it on

3    purpose, that it was up to your clients, where does that come

4    from?

5              **MR. NOLLER:**  Yes, Your Honor.  It comes from

6    California Penal Code, Section 7(b)(1), which we cited in our

7    proposed jury instructions.  That provision defines willful as

8    it's used in the California Penal Code, and it describes it in

9    terms of the purpose of the conduct.

10              **THE COURT:**  Okay.  All right.  Response.

11              **MS. CORA:**  So to address the last point first, this is

12    what California Penal Code, Section 7(b)(1) defines willfully

13    as, which is the word willfully when applied to the intent with

14    which an act is done or omitted implies a simple purpose or

15    willingness to commit the act or make the admission referred

16    to.

17         It does not require any intent to violate law or to injure

18    another or to acquire any advantage.

19         And so we agree that the word "willful" as it's used in

20    504(e)(4) is it synonymous with knowingly, which is the

21    predicate conduct under the CDAFA.

22         Now, defendants are asking for an interpretation on this

23    section that is entirely bespoke, and they have no authority

24    that they provided in which any Court has given an instruction

25    that the plaintiffs must prove in addition to oppression, fraud

1    and malice a separate willfulness burden with respect to

2    punitive damages.

3         **MR. NOLLER:**  Your Honor, that's not correct.  We have

4    cited several cases in our jury instructions, Local Ventures

5    case, Mintz case, cases from this district, other California

6    districts that treat willfulness as a separate requirement from

7    malice, oppression and fraud.  And that's because, as I said,

8    if willful just means intentional or knowledge, then there's

9    absolutely no reason for the California legislature to have put

10   the word "willful" in the --

11        **THE COURT:**  But is there a case that says what it

12   means is purposeful?

13        **MR. NOLLER:**  No, Your Honor.  That comes from the

14   definition in Section 7 which opposing counsel just quoted, and

15   I believe as she quoted it supports the way that we have

16   defined it in the instruction directly.

17        **THE COURT:**  It's interesting, the Ninth Circuit has

18   not defined in its model instructions willful, because it

19   recognizes that it has many meanings and depends upon the --

20   its influence -- the construction is influenced by the context.

21        **MR. NOLLER:**  And I would say, if I could, Your Honor,

22   plaintiffs are perfectly able to argue to the jury that the

23   same facts that prove intention and knowledge also prove

24   willful.  We're not suggesting that this is some super high

25   insurmountable burden for them, but it is a requirement in the

1  statute, and we think the jury should be instructed on that.

2          THE COURT:  Yeah, I'm not sure I'm going to interpret

3  it in your favor as on purpose or of purposeful, whatever term

4  you used.

5      Okay.  But those arguments are helpful.  Anything else?

6          MS. CORA:  I would just like to address that the cases

7  that defendant cite are just descriptions of what the statute

8  says.  They do not at all support a separate willfulness

9  requirement being put to the jury for the sake of punitive

10  damages.

11          THE COURT:  Do you agree that it's more a liability

12  determination?

13          MS. CORA:  Yes.  Yes, that Your Honor has already

14  determined.

15          THE COURT:  Yeah.

16          MS. CORA:  Indeed, the Mintz case that Mr. Noller just

17  referenced makes this point clear where the Court in its

18  decision there writes that Section 502(e)(4) provides that

19  punitive damages are available where a defendant commits a

20  willful violation of the statute and has been guilty of

21  oppression, fraud or malice as defined in subdivision C of

22  Section 3294 of the civil code.  That's the portion that they

23  quote.

24      The case goes on to say:  However, this does not imply

25  that every violation of Section 502 warrants punitive damages.

In fact, it suggests precisely the opposite inference, that absent a showing of malice, oppression or fraud against the plaintiff, Section 502 violations do not trigger punitive damages.

Notably, the Court did not say, "and willfulness" in that explanation.  The difference between a violation that triggers punitive damages and one that does not is the showing of malice, oppression or fraud.  And so I stand by the statement that they have no authority for the interpretation that they are asking the Court to include in the jury instructions.

**MR. NOLLER:**  Your Honor, I know you can read the case yourself; I don't want to waste your time, but as opposing counsel just quoted the case, it says unambiguously that an award of punitive damages requires a willful violation and malice, oppression and fraud.  To then go on and say that in the absence of malice, oppression and fraud that there's no punitive damages, well, of course not, because that's a separate requirement.

**THE COURT:**  Sure.  But that doesn't preclude the interpretation, my interpretation, that the willful violation is more a liability determination and the question is whether or not it's implicit in my determination that the statute has been violated.

**MR. NOLLER:**  Understood.  We think it's a slightly different standard than what this Court was addressing.  If

```
 1    Your Honor disagrees ...

 2            THE COURT:  Yeah, yeah.  Well, okay.  We just add it

 3    to the list.

 4        Okay.  A couple of other issues before we take a break in

 5    three minutes or so.  And one is the scope of the damages.

 6    There's a -- compensatory damages.  There is a difference of

 7    view obviously with the defendants' proposed instruction which

 8    has this list of things having to do with harm to the computer

 9    terminals and that, and with the representation in the

10    plaintiffs' trial brief respecting -- with respect to the

11    instructions on how investigation and remediation was broadly

12    construed by one of my colleagues in another case against NSO.

13        I'm more inclined to follow that rule.  Investigation and

14    remediation doesn't seem to me to require any harm to the

15    actual devices.

16        So anything you want to say about that?

17            MR. NOLLER:  Yeah, Your Honor.

18        So I would just say that the Supreme Court's decision in

19    Van Buren says that the definition of loss is focused on

20    technological harms.  I think that decision is binding on this

21    Court no matter what other Courts have said.  We would agree

22    particularly before Van Buren there's some conflicting

23    statements in district court cases.  We think the more

24    persuasive line of cases are those that are consistent with the

25    focus on technological harm from Van Buren, which is that even
```

1    if you're doing an investigation, it has to be related to

2    technological harms to a computer, not merely, you know, some

3    other sort of investigation.

4        **THE COURT:**  Was Van Buren decided after the Apple

5    versus NSO determination?

6        **MR. NOLLER:**  I would have to double-check that.

7        **THE COURT:**  I can't think one of my colleagues would

8    have just ignored clear Supreme Court precedent.

9        **MR. NOLLER:**  No, Your Honor.  I would have to check.

10   I believe Van Buren was before the Apple decision.  I don't

11   want to misstate that.  But nevertheless, I mean, we think that

12   the interpretation in the Apple case is not consistent with Van

13   Buren and was wrong, and this Court should not follow it.

14       **THE COURT:**  Okay.  Response?

15       **MS. CORA:**  I can confirm that the Apple case was

16   decided after Van Buren, and defendants are taking like a

17   straight line of Van Buren out of context, and several district

18   courts, including as Your Honor noted, your colleague, Judge

19   Donato in the Apple case, and as well as the Court in Meta

20   platforms versus Brand Total, which is a case that Your Honor

21   cited in the summary -- in your summary judgment order, both of

22   those decisions expressly reject this interpretation that

23   defendants are advancing.

24       Also, we think you've already decided this issue because

25   it was briefed in the parties' summary judgment briefs, and in

1    order to find liability, you've already determined that there

2    was a loss, and that loss was not limited to technological

3    harms in the way that defendants are misinterpreting Van Buren.

4            **THE COURT:**  Okay.  Okay.  Thank you.

5            Well, it's 12:30.

6            The last thing before we take a break is the ways in which

7    the contract was breached.  That's an issue that kind of

8    percolates throughout.  The -- I agree more with the

9    defendants' interpretation of the order.  The summary judgment

10   order indeed looked at the five ways in which the plaintiff

11   claims that the terms of service were breached.  One by reverse

12   engineering and decompiling, in violation of what the terms of

13   use proscribed.  One was harmful code was sent.  Three, user

14   information was collected.  Four, access was made without

15   authorization.  And five, that it was used -- let's see, NSO

16   used WhatsApp for an illegal purpose.

17           Now, granted it -- even though the Court did not reach

18   whether or not the terms of service were violated by reasons 2

19   through 5 and only made a finding with regard to reverse

20   engineering and decompiling, that's absolutely correct.  There

21   clearly was evidence of harmful code sent, user information was

22   collected.  I mean, we talked about that in the order, and that

23   access was made without authorization.  That goes to the heart

24   of what the Court's finding was.

25           Even though in this particular section there were no

1    specific findings on those three things, but I definitely and

2    intentional did not reach the issue about WhatsApp being used

3    for an illegal purpose.  I thought that there were certainly

4    triable issues on that, and I intentionally did not reach that.

5         I don't want to go so far as to say that a finding in the

6    plaintiffs' favor on the other three were implicit because I

7    didn't really think about it that way, and I thought that the

8    first ground, the reverse engineering and decompiling, was

9    clearer and that was enough.

10        So I think I agree with the defense that that's what

11   you're limited to now.  I did not make specific findings.  And

12   it doesn't mean that they were decided against WhatsApp, they

13   just weren't decided definitively.  And if liability -- for

14   instance, if we blow up the trial and I give you guys another

15   two years to do discovery and we come back and we try the thing

16   again, you can maybe want to reopen that part of the case.  But

17   if we're going to trial in three weeks, I'm not reopening the

18   case so that the plaintiff can put on a case to attempt to

19   prove other~--- the other four ways in which the terms of use

20   that I did not reach were reached.

21        Is that clear?  Kind of?

22             **MR. NOLLER:**  Clear to me, Your Honor.

23             **MS. CORA:**  Understood, Your Honor.  And of course

24   you're in the best position to understand your own order.

25        We interpreted your order to reject the arguments made by

1    defendants in their brief, which, this is from page 14 of your

2    order.  You wrote:  The Court finds no merit in the arguments

3    raised by the defendants.  And what you're referring to there

4    are defendants' arguments with respect to breach of contract

5    that go beyond the reverse engineering and decompiling.

6         So we read your order as rejecting, you know, those

7    arguments and going and making a decision as to the other

8    breaches, but we understood --

9              THE COURT:  I believe that in the conclusion of that

10   section we only made the finding with regard to reverse

11   engineering and decompiling.  And I don't know if that was just

12   because I was sort of exhausted from dealing with the various

13   different issues, but I did not -- I think it's fair to

14   construe it in the way in which the defendants have, that I did

15   not make a specific finding.

16        MS. CORA:  That paragraph concludes that accordingly

17   the Court concludes that plaintiffs have sufficiently

18   established breach.

19             THE COURT:  Oh, okay.

20        MS. CORA:  So ...

21        MR. NOLLER:  As Your Honor noted, you only found

22   breach with respect to decompiling and reverse engineering.  We

23   did make some arguments that were common to all of the breach

24   claims.  We also made arguments that were distinct to their

25   other theories of breach.  Your Honor didn't address those.

1    I'm not going to try to talk Your Honor into a decision you've

2    already made.

3        **THE COURT:**  No.  I think that's only fair.  That's a

4    reasonable interpretation, and I think it's fair.  And to the

5    extent that it's, you know, my fault for not being more

6    specific, the defendant does not have to face those other

7    allegations.

8        So you're limited.  You're limited to what I made a

9    specific finding on.

10       **MS. CORA:**  Understood.

11       **THE COURT:**  Okay.  All right.  We're going to take a

12   break.  We may as well make it a lunch break since it's going

13   on 1:00.  Can you guys get back here in like 30, 40 minutes?

14       **MR. NOLLER:**  Sure.

15       **MR. ANDRES:**  Whatever you prefer, Your Honor.  If you

16   want us back in 30 minutes, that's fine.

17       **THE COURT:**  How about back at 1:15?

18       **MR. ANDRES:**  Yes.

19       **MR. NOLLER:**  Thank you, Your Honor.

20       (A recess was taken from 12:36 p.m. to 1:18 p.m.)

21       **THE COURT:**  Okay.  Let's talk a little bit about the

22   *Daubert* motions and the motions to strike.  We do have --

23   obviously a lot of it is going to depend upon, you know, what I

24   decide to do about the big issues, but I'd like to get as much

25   done today as possible, with the goal that we are going to go

forward with this trial, even if I'm becoming less convinced of

that the more time I spend with you all.

So let's turn to, there are a few other motions in limine

that I wanted to talk about specifically, as well as the

*Daubert* motions. Any preference from you all? Does it matter

which way we go first?

**UNIDENTIFIED SPEAKER:** Wherever you want, Your Honor.

**THE COURT:** Just a couple of the MILs that I have some

question about.

One is plaintiffs' 5, which has to do with the exclusion

of evidence about the insufficiency of plaintiffs' own security

measures. Who will take that one? Let's see. What did I say?

Plaintiffs' 5.

All right. This is evidence about the insufficiency

including that WhatsApp created the vulnerability that NSO

exploited. I'm not sure about this motion. What is it that

you anticipate the defendants -- it's your motion -- that you

anticipate the defendant is going to argue?

**MR. ANDRES:** I think they're going to argue in effect

that we left the door open and allowed them to come in, and I

think that's inconsistent with the Court's ruling in summary

judgment that found that NSO exceeded its authorized access,

including because it redesigned Pegasus to evade detection.

And in finding NSO liable the Court necessarily concluded that

the plaintiffs' claimed damages were caused, as we talked

 1    about, by NSO.

 2        You know, it's our view that the Court concluded that NSO

 3    caused the damage or loss, which is a prerequisite, and we cite

 4    to Creative Computing, which says:  Finding that the

 5    defendants' argument that plaintiffs could have prevented some

 6    of the harm is analogous to a thief arguing that I would not

 7    have been able to steal your television if you had not

 8    installed deadbolts instead of a silly lock on your door with a

 9    credit card.

10        So that's the gist of what we're arguing is that in the

11    context of damages, NSO shouldn't be able to say we deserved it

12    or we left the door open or we didn't properly -- our security

13    measures were not sufficient because we think that's

14    irrelevant.

15        **THE COURT:**  Okay.  And you're not going to argue that,

16    though, are you, Mr. Akrotirianakis?

17        **MR. AKROTIRIANAKIS:**  As much as I followed counsel's

18    argument, I don't think I would be arguing that.  I think that

19    the analogy would be if you claim that somebody walked through

20    your house because your house had no front door and no backdoor

21    and that walking through your house constituted a breaking and

22    entering, for example, I think that was the analogy the Court

23    used in the summary judgment motion, then the remediation of it

24    does not include, I now have to buy you a front door and a back

25    door.  Okay?  The definition -- and this issue goes clearly

to -- it's clearly relevant to the claim of compensatory
damages and the extent of those damages.

The CFAA, as Mr. Noller pointed out, and the Supreme Court
in Van Buren recognized that the CFAA defines damage and loss
very specifically in terms of what a plaintiff in a civil suit
can recover.  The references are Section 1030(e), Subsection 8
and 11.  They define damage and loss respectively.  There's
never been any theory advanced here of damage, and the sole
claim has been for loss.  And some of what the remediation was
that is claimed here is work actually that was in progress at
the time that the -- that WhatsApp discovered this
vulnerability.  And the evidence will show that many months
before the time period that relates to this case, that is April
and May 2019, in late 2018, their own consultants told them,
hey, you've got a problem with your code, you should be testing
for these things, and they developed a protocol to test for
those things and they started testing for them.  And when they
did, they immediately found the code that was at issue in this
case, the malformed packets.

So they created a patch that would then cause their
servers to drop those malformed packets rather than to pass
them along as phone calls.

**THE COURT:**  Hmm.

**MR. AKROTIRIANAKIS:**  So to then say that, like, well,
the work that we're already in the process of doing to create

1    this patch is NSO's fault, in other words, to go back to my

2    analogy, we had ordered a door for the front and back to where

3    there was no door before, but now we want NSO to pay for that

4    door, that's not what the statute allows as loss under the

5    statute.

6         Also, the case I would refer the Court to is called

7    Middleton, United States against Middleton, 231 F.3d 1207.

8    It's a Ninth Circuit case.  It's published.  Its pin cite is

9    1213.  The Court talks about only those costs which were

10   necessary to resecure the computer to avoid further damage are

11   recoverable as loss under the CFAA.  In other words, you don't

12   get to have the defendant pay for you to build a better, more

13   secure system.  They only -- you only get to truly remediate --

14        THE COURT:  It makes no sense to me.

15        MR. AKROTIRIANAKIS:  Well, you should read this case,

16   Your Honor.

17        THE COURT:  You're suggesting that they get to pay to

18   have -- you -- they can ask your client to pay for breaching a

19   system, but the only system that they're able to replace it

20   with is one that was reachable by your client?

21        MR. AKROTIRIANAKIS:  I'm not sure I understand the

22   Court's question.

23        THE COURT:  Well --

24        MR. AKROTIRIANAKIS:  Could you ask it again?

25        THE COURT:  Yeah.  I think what you're saying, and

1  correct me if I'm wrong, is that NSO shouldn't be made to pay

2  if, as it's already been found liable for breaching the system,

3  NSO should not have to pay for them to fix the system so that

4  you can't breach it.  That all they can do is repair the same

5  problem that you -- your client was able to exploit to the same

6  level that it was before?  Well, that makes no sense.

7        MR. AKROTIRIANAKIS:  That's not what I'm saying, Your

8  Honor.

9        THE COURT:  Okay.  Then don't use a door analogy.  Use

10  this case.  What is it that they shouldn't have to pay for?

11        MR. AKROTIRIANAKIS:  So they claim they have --

12        THE COURT:  That you shouldn't have to pay for.

13        MR. AKROTIRIANAKIS:  -- $444,000 in harms, in loss.

14  And the statute defines what is recoverable as loss.  It's

15  in their jury instructions what it is, conducting a damage

16  assessment, responding to an offense and restoring the program

17  to the state it was prior to the exceeding of authorized

18  access.

19        THE COURT:  But the state that it was was hackable.

20  That's the state that it was prior to the hack, the intrusion.

21  That doesn't make sense to me, that they only get compensation

22  to fix -- that's not even a fix.

23        MR. AKROTIRIANAKIS:  In the typical hacking scenario,

24  Your Honor, I'm sure you've sentenced lots of people for this

25  where --

1          **THE COURT:**  Actually, not.  Very few people are

2    charged criminally.

3          **MR. AKROTIRIANAKIS:**  With a 1030?  When I was an

4    assistant, Your Honor, we charged lots of people with that, but

5    anyway ...

6        Typically the defendant does something to the computer

7    that allows the defendants' intrusion.  For example, you change

8    the code in some way.  You create the vulnerability.  You

9    execute, you cause code to be executed on the server or the

10   computer that changes it in some way.  That is not what

11   happened here.

12       So to say, well, you need to now pay for this patch, which

13   changes it from how it was before, is not restoring the

14   computer to the state it was in, it's actually making it more

15   secure than it was.

16         **THE COURT:**  But the state it was actually in was

17   subject to being intruded upon.

18         **MR. AKROTIRIANAKIS:**  This is what Congress says, Your

19   Honor.  I can see the Court disagrees with it, but Congress and

20   the Supreme Court now have told us very specifically what is

21   recoverable in a civil case, and the Ninth Circuit has said

22   only those costs that would resecure the computer are

23   recoverable.

24         **THE COURT:**  But to resecure the computer is different.

25   Now that it's been hacked, why would you resecure it using the

same mechanism that had been breached?  You'd have to change

that.  Isn't that what resecuring it means?

       **MR. AKROTIRIANAKIS:**  No, Your Honor.  And I think the

Ninth Circuit, the Supreme Court and Congress have been clear

about that:

     I think the cause of the disconnect that we have is that

the CFAA typically has in mind cases where the defendant has

rewritten or otherwise affected the code of the computer that's

at issue in the case, and the evidence is undisputed here that

that didn't happen.  So while there are actions that Facebook

took to respond to the offense, to conduct a damage assessment,

et cetera, not every one of these, and including what we're

talking about, is applicable here, and it is not compensable

under this statute.

       **THE COURT:**  Okay.

       **MR. ANDRES:**  I don't have anything to add, Your Honor,

except that, again, defendants should not be allowed to argue

that Meta left the door open, and it sounds like that's exactly

what they're going to argue.  I think we've covered this issue

in our brief, and we agree with Your Honor's position.

       **MR. AKROTIRIANAKIS:**  Yeah, the witness is a gentleman

named Robinson, and he's their witness.  He's on their witness

list.  He would testify that the vulnerability at issue in this

case existed prior to the events and that it was in their code

base.  It wasn't created --

1          **THE COURT:**  Isn't that true with all hacks, there's a
2    vulnerability that's exploited?
3          **MR. AKROTIRIANAKIS:**  No.  You can create, and I think
4    the CFAA largely is directed to those cases where the defendant
5    creates the vulnerability, changes the code and so on.  That's
6    why we're having this disconnect.
7          Occasionally there are cases like this one and Middleton,
8    Van Buren, where that's not the case.
9          Again, Van Buren, Your Honor, the defendant in that case
10   was just using the system.  Frankly in that case the Supreme
11   Court found there was no violation of the CFAA, but if they had
12   decided there was a CFAA violation, then the damages would not
13   have included restoring the system to the state it was in
14   before if the defendant hadn't caused any change to the system.
15         **THE COURT:**  Uh-huh.  Okay.  Okay.  I understand.
16   Anything else?
17         **MR. ANDRES:**  Obviously we don't -- this trial is not
18   about re-litigating the summary judgment order, but beyond
19   that, Judge, we don't have anything.
20         **MR. AKROTIRIANAKIS:**  And I don't intend to argue that
21   he left the door open, only that my client didn't change their
22   code, which I think is fairly undisputed, Your Honor.
23         **THE COURT:**  And why is that relevant now?
24         **MR. AKROTIRIANAKIS:**  Well, it's certainly relevant
25   to --

1          **THE COURT:**  They're not asking for damages for

2     changing of code.

3          **MR. AKROTIRIANAKIS:**  Yeah, they are.

4          **THE COURT:**  Are you?  For the changing of code?

5          **MR. ANDRES:**  No, we're asking for the damages that

6     were required in terms of remediating the intrusion.

7          **THE COURT:**  Right.  And the code wasn't changed, so

8     you're not asking for damages for the changing of the code.

9          **MR. ANDRES:**  Right.  I'm not a computer expert, but

10    the evidence is effectively the money that Meta paid to its

11    engineers to remediate the issues.

12         **THE COURT:**  Right.

13         **MR. AKROTIRIANAKIS:**  What they did, I don't want to

14    get into an overly technical discussion, but I'm prepared to,

15    what they did is they changed their code so that the servers

16    would no longer process these malformed packets, they wrote an

17    additional program that would cause them instead to drop the

18    packets that they didn't want -- that they didn't want to be

19    passed along by the servers, Your Honor.  And it's the efforts

20    of those employees who are on the witness list and are gonna

21    testify in this case who are gonna say this is what I did.  I'm

22    an engineer at Meta, I'm a security engineer, I came in, I saw

23    this problem, I investigated it, and then I wrote code to

24    change the system to make it better.

25         **THE COURT:**  And you're saying that's not compensable?

1          **MR. AKROTIRIANAKIS:**  I'm not saying it.  The Ninth

2    Circuit in Middleton is saying it.  The Supreme Court --

3          **THE COURT:**  That's the argument you're making in your

4    motion.

5          **MR. AKROTIRIANAKIS:**  That is the law, Your Honor.

6          **THE COURT:**  Okay.  And that's the argument that you're

7    making, that they changed the code, and that's not compensable.

8          **MR. AKROTIRIANAKIS:**  It's not resecuring, Your Honor.

9    It's not restoring.

10          **THE COURT:**  Hmm.

11          **MR. AKROTIRIANAKIS:**  It might be securing, but it's

12    not resecuring.  Okay?  And that's very clear from the cases.

13          **THE COURT:**  Okay.  How come it's not clear to you?

14          **MR. ANDRES:**  Again, I'm not entirely understanding

15    what counsel's argument is, but just to be very clear, what

16    we're asking for compensatory damages are the work of the

17    engineers to remediate the intrusions which Your Honor has

18    found, and I think that will become evident during the course

19    of the trial when we present that evidence.

20          **MR. AKROTIRIANAKIS:**  I agree that the Court should

21    just hear from the engineers and their testimony about this.

22          **THE COURT:**  Okay.  That's plaintiffs' 5.

23          How about the defendants' 4, which is the defendant wants

24    to seek argument that NSO used Pegasus.  I'm a little unclear

25    what -- this is a defense motion, right?

1              **MR. ANDRES:**  Yes.

2              **THE COURT:**  Defendants' 4.

3         Okay.  What is it specifically that you're looking for?

4              **MR. AKROTIRIANAKIS:**  Well, so as we discussed this

5    morning, Your Honor, all of our documents that were produced

6    and all of their documents that were produced that bear on the

7    subject make very clear that everyone understood that NSO's --

8    licensed its technology to governments and government agencies,

9    that those were the customers of NSO.

10        And in this case one of the witnesses in particular who I

11   can think of is a gentleman named Mr. Woog, spelled W-o-o-g,

12   but it's pronounced Vogue, intends to say and I don't know who

13   else intends to say that, no, this was NSO who was attacking

14   our users.  And I asked him in deposition, and this is

15   referenced in the papers, I believe, you know, what the basis

16   for that was, and there isn't any basis.  He's just saying,

17   contrary to our documents and theirs, that, you know, his

18   position is that NSO was attacking their users.

19        And putting aside that that doesn't have anything to do

20   with their compensatory damages or even punitive damages,

21   because it's only for harms to them that they can get -- that

22   they can recover punitive damages, I think that this creates a

23   sideshow that we're gonna then have to go to some length to

24   unwind along the lines of dwelling on the evidence that we

25   talked about at length this morning.

 1          **THE COURT:**  So are -- is the motion directed towards

 2    this one particular witness' testimony, or --

 3          **MR. AKROTIRIANAKIS:**  Well, he said it, but I imagine

 4    that others may join.  Whoever says it, it's totally

 5    inconsistent with their documentation, with our documentation,

 6    with all of the other evidence in the case, and this just sort

 7    of blurting it out is what I expect is then going to cause us

 8    to have to unwind a lot of that and waste a lot of time; all of

 9    the 403 factors, on a collateral issue.

10          **THE COURT:**  On whether or not NSO itself used Pegasus.

11          **MR. AKROTIRIANAKIS:**  Operationally uses the

12    technology, yes, Your Honor.

13          **THE COURT:**  Okay.  Response?

14          **MR. ANDRES:**  Again, I don't want to repeat just what

15    we've repeated in our brief, but this is not consistent with

16    the Court's summary judgment where NSO tried to blame liability

17    on its customers or its clients and said we're not responsible

18    because we don't use it, that the Court effectively found that

19    both NSO and then there was a reference to the conspiracy part

20    of the statute that said, look, these governments are basically

21    coconspirators together with NSO.

22          But the evidence again is clear that NSO redesigned

23    Pegasus to evade detection after plaintiffs first fixed the

24    security breach, that there's testimony from their CEO where

25    they're very involved with their clients in terms of the

1   installation and extraction process, and that as you referenced

2   earlier, there's a whole bunch of consumer, you know, tech help

3   that they provide.

4       The customers don't care which vector they use.  NSO is

5   involved in all of that.  So I think the evidence has been

6   clear during the course of discovery and will be clear at trial

7   that they are using the technology together with their --

8   together with their clients.  Whether that means that they know

9   who the targets are, as they say they don't, but nonetheless

10  developing, selling and implementing their spyware.

11          **THE COURT:**  And supporting it along the way.

12          **MR. ANDRES:**  Certainly.

13          **THE COURT:**  Clearly you can't go beyond the summary

14  judgment determination that NSO is liable for -- or let's say

15  is liable and has some responsibility for the use of this

16  product by your clients or whomever you've licensed it to, or

17  given it to or sold it to.  So whether or not that -- I don't

18  see it as a major issue for them to say NSO used it, but NSO is

19  certainly liable for the use of it against these 1400 people.

20          **MR. AKROTIRIANAKIS:**  If what you're saying, Your

21  Honor, is that you've already found in your summary judgment

22  order that NSO picks the targets, that NSO is responsible

23  for --

24          **THE COURT:**  I didn't say anything about the targets.

25          **MR. AKROTIRIANAKIS:**  I agree with you.

1        **THE COURT:**  I don't know who the targets are.  NSO is

2   responsible for the use of this spyware against the targets.

3        That's what the finding was.  So whether or not NSO itself

4   personally used it, it's responsible for its use by NSO or by

5   its client.  That's it.

6        **MR. AKROTIRIANAKIS:**  Well, in any event, Your Honor,

7   the -- and with respect, Your Honor, I don't read the Court's

8   order that way, but in any event, California law is pretty

9   clear that the relative conduct even the co-conspirators -- and

10  I don't agree by making the statement that the Court made

11  findings of conspiracy, and I would urge the Court to review

12  the order if you think that you have.  I reviewed it yesterday

13  for that very purpose.

14       **THE COURT:**  I didn't go through the elements of

15  conspiracy, but the finding is is that NSO, by virtue of its

16  creation, installation, its workaround, its continued support

17  is responsible for the use of it.  Whether or not NSO used it

18  personally or performed those acts on behalf of its client,

19  that's the ruling, and that's what witnesses may testify to.

20       **MR. ANDRES:**  Understood.  Thank you, Your Honor.

21       **MR. AKROTIRIANAKIS:**  Well, Your Honor, if we're going

22  to -- we are going to do that.  I understand California law is

23  very clear.  The case, one of the cases is Thompson versus

24  Catalina.  These are cited in our papers.  The law is very well

25  established.  In fact, the quote I'm going to read it, quote,

it is well settled that although compensatory damages among
joint tortfeasors cannot be apportioned, the jury may apportion
punitive damages among joint tortfeasors of various amounts
according to their individual culpability.

So if we're going to get into NSO operates the software, I
think that the law requires, then, that we also have a
discussion about the relative roles of NSO and its customers if
we're gonna have a trial about punitive damages.

**THE COURT:**  And how is that possible since you won't
give them the identities of the customers?  How is it possible
for them to discover that information?

**MR. AKROTIRIANAKIS:**  The very way that the Court set
out in its ruling that we were not required to turn over the
names of the customers, Your Honor.  We would have the
difference between the role of the customer on the one hand
and --

**THE COURT:**  You know what?  You know what?  I think
that -- I really do think that I'm on the verge of just blowing
this whole thing up, and the first thing I would do if I did
that is to vacate that discovery order.  It actually was
entered almost a year before I even entertained summary
judgment.  If I knew how it was going to be used, like I said,
I assumed you would give if not the name, at least enough
identifying information so discovery could be taken and they
could know who those clients were.

1      It's become increasingly clear to me that in order for the

2  plaintiffs to overcome all of these roadblocks that you're

3  throwing up is for them to know who the customers are, who was

4  using it.  In fact, one of you said earlier something to the

5  tune that you screen and certify your clients and that you have

6  some mechanism to find out if there's an abuse, and thereby you

7  can terminate your relationship with them if they abuse it.

8  Well, how do you know who's abusing and what abuses are

9  committed if you don't know who the clients are, who the

10  governments are that are using them for any of these?  How do

11  you figure out an abuse by a client that you say you can't

12  identify?

13      **MR. AKROTIRIANAKIS:**  I didn't say that we couldn't

14  identify the customers, Your Honor.  What I said was --

15      **THE COURT:**  So you can.  You know the identities of

16  the customers who committed this hack?

17      **MR. AKROTIRIANAKIS:**  No.  We know who the customers

18  are to whom we licensed the technology.  We don't know which

19  customers specifically are responsible for -- if you said go

20  tell me the customers that are responsible for these 1400, I

21  would have to know who the 1400 are, that's information they

22  have, in order to take it back to figure out who the customers

23  were.

24      **THE COURT:**  How then do you figure out an abuse has

25  been committed per your certification procedure without knowing

who's doing what to whom?

    **MR. AKROTIRIANAKIS:** Let me first explain again what I said earlier so the Court is clear.

    We have contracts that are produced in this case that say -- like any software, there's a license agreement. Okay? And because of the nature of this software in particular being export controlled by the government of Israel, the end user, just like any technology that is export controlled by the United States government, requires certification by the end user that it is used consistent with certain purposes. And so the users, the governments that are the customers of NSO, certify to the Israeli government that they are using the technology only in accordance with the requirements of the end user certificate, and that is just as I've described, just as -- certificate.

    And we've produced examples of the end user certificates along with the contracts that say it has to be used for this and for that, and it has to be used consistent with privacy requirements, and it has to be used consistent with applicable requirements for the legal use of surveillance technology and so on.

    Okay. And then if there is an allegation of abuse --

    **THE COURT:** Allegation by whom?

    **MR. AKROTIRIANAKIS:** By anyone. If there is any allegation of abuse, in other words --

1    **THE COURT:**  Who would the allegation be made to?

2    **MR. AKROTIRIANAKIS:**  It could be made to NSO, it could

3    be made to the customer.  If there is an allegation made -- for

4    example, if some person calls NSO and says I think that my

5    ex-boyfriend is hacking my phone using Pegasus, as ridiculous

6    as that would be in light of what I just said, that is

7    investigated by NSO.

8    If, as is the case that they keep bringing up with the

9    Emir of Dubai where there was a suspicion that he had -- was

10   using Pegasus to -- to hack the phone of his wife's lawyer,

11   then putting aside that I can easily construct a scenario where

12   that is a legitimate criminal investigation aside, they

13   investigated that.  Then they terminated the customer on the

14   basis of the findings of their investigation.

15   All of this has been the subject of discovery in this

16   case, Your Honor.  So if there are any investigations from

17   serious like that to I don't want to call them frivolous,

18   because they are allegations, they are investigated by NSO, NSO

19   has the ability to turn off the --

20   **THE COURT:**  So the abuses are brought to your

21   attention.  You don't go out and find them.  So if someone

22   doesn't complain, you'd never know that your client's abusing

23   the software.

24   **MR. AKROTIRIANAKIS:**  We don't monitor the clients' use

25   of the software on an ongoing basis.  However, they maintain

 1    the ability to have a kill switch, if you will, to the client's

 2    use of the technology if there is an allegation of abuse and

 3    the client is either uncooperative in the investigation of that

 4    allegation or if the investigation results in a determination

 5    that the client has abused the technology.

 6         And again, all of this has been the subject of discovery

 7    in this case.

 8              **THE COURT:**  Uh-huh.

 9         **MR. ANDRES:**  Your Honor, just very briefly.  First of

10    all, whatever investigation they did or didn't do, we didn't

11    get any of that in discovery.  And to answer your question from

12    earlier whether we --

13              **THE COURT:**  You got no discovery about any

14    investigation --

15         **MR. ANDRES:**  None.

16         **THE COURT:**  -- into the hack?

17         **MR. ANDRES:**  We got all of this generic abstract,

18    these are our policies, and we did ask, and I checked about

19    that on our break.

20         But just to step back a second, there could be no bigger

21    windfall for this defendant than you blowing up this case and

22    us taking two years because here's what will happen.

23         In a year, these -- NSO will come back and say, oh, we

24    have your discovery, and it's in Israel, so go get it.  Right?

25    And then we'll get nothing because they'll say that there is a

foreign court order that prevents them from doing that, and they will benefit again from the opportunity to delay this trial.

And remember one thing, that before they pulled the stunt about producing the discovery in Israel, they sat here and asked Your Honor to put off discovery, to delay it so that they can work it out.  Their means of working it out was to violate the Court's order by producing it in Israel.

So regardless, nothing could benefit the defendants more than blowing up this trial and making the plaintiffs wait another two years to be able to get the damages that they're entitled to as a result of the summary judgment order.  So I implore you not to do that, and if at the end we are gonna talk about some third or fourth or 12th solution, we have one that we think we'll wait, but I don't want to go out of order or screw anything up, but we would like to address that, because it is prejudicial.

THE COURT:  Yeah, let's address it now.

MR. ANDRES:  Sure.

THE COURT:  Because everything else is sort of contingent upon -- all my other questions are contingent upon this.

MR. AKROTIRIANAKIS:  Can I respond to that, Your Honor, really perversion of history in this case?  And I resent it, and I don't think it's fair, and it's certainly not

accurate.

What happened was the Court ordered -- ruled on four specific motions, categories, if you will, buckets of discovery, and said that you -- that you expected that the parties would interpret them in some way to comply with them. And we did that, and, yes, we had differences with them about what they -- they required, but I, as an officer of the Court, can tell you that I have my client to represent, I respect the Court's orders. I did my best to follow the Court's orders.

And very shortly before the discovery cutoff, they filed a motion to compel, which is the way that these things proceed, saying that we hadn't complied with the Court order, and the Court clarified its earlier order, I think something like three, but it could have been six weeks before the discovery cutoff, in order for us to -- and ordered us to produce certain computer code that was in Israel.

In that amount of time, Your Honor, we could not get a license to export the technology that you clarified now you had expected us to produce. And I do think it's fair, Your Honor, to say, and you said it over and over again yourself, that you were clarifying your earlier order to make it clear that it did, in fact, require the production of this export controlled computer code.

So we tried to comply with the Court's order by producing it to counsel of record in this court in this case, who is in

Israel and to whom we could produce it without violating

criminal law in Israel so that we could comply both with our

Israeli law obligations and your order.  And you differed with

that, and I respect that, but that is what has taken this case

off on a tangent.  And I do resent it being called a stunt

because my client was doing its best to not violate the

criminal laws of its own country and at the same time to comply

with your discovery orders as clarified in this case.

THE COURT:  Let's take the temperature down a bit,

please.

MR. ANDRES:  Here's the proposal, Your Honor.

Actually, let me -- I wrote this down.

So if the --

THE COURT:  Wait.  Before you make your proposal, is

it important -- for me, the difficulty I'm having is the lack

of specific evidence as to what happened in this particular

instance, who did what, when, et cetera.  And there were

evidentiary inferences made obviously with regard to is there

withholding of source code or withholding of it by making it

available only in Israel, et cetera, but how important to

you --

I mean, it seems to me that if the defendants are able to

put on this level, this case at a very high abstract level,

that this is what our industry does, this is, you know, and

it's all -- we've got all of these benevolent purposes, it

would seem to me that you, in representation of your client,

would want to put on evidence that's contrary to that that

would show that they weren't just benevolent actors, that this

whole industry just weren't to be given a pass.  You don't have

that information because I didn't order the information to be

provided such as the citizen lab information.

Don't you think that you would be -- if I'm gonna allow in

this evidence, don't you think that it's in your client's best

interest to have more of that contrary evidence?

**MR. ANDRES:**  I think there's a middle road because I

think under any circumstances they shouldn't be allowed to

provide evidence about terrorism, about narcotics trafficking,

about child -- none of that, period.  That is not why they

exist.  They do not exist, they are not part of law

enforcement, they do not exist to make the world a better

place.  They exist to make money from their product.  They are

a for-profit commercial spyware firm.

That they sell their spyware to governments, who then spy

on their citizens, including journalists, and so whatever that

is, that's fine.  And what we were gonna suggest, Your Honor,

is that they be allowed to say that they exist to sell their

products to foreign governments, among others, right, so they

get in the piece that they exist to sell to governments.  I

think they sell to other people.  They do not get to say it's

for criminal purposes.

1    We just heard counsel talk about somebody who hacked the

2    phone of their lawyer and then talk about how that might be

3    justified about an investigation, none of which we got or we

4    know about.  But in any case there's certainly at least nine

5    instances that there was discovery about at the abstract where

6    there were violations of NSO's policies, so not everybody's

7    following the rules, by the way, fine.  We don't have to hear

8    about what the purpose of these governments are doing, that

9    it's crime or whatever, because that's not really proved, and

10   it's not relevant.

11   So they get to say we sell to foreign governments.  Okay.

12   So they get to get in the little piece about why they exist,

13   and -- but that's it.  And they don't get to say it's for the

14   purposes of terrorism or anything like that.

15   Now, if they're going to call witnesses who are going to

16   testify about that and we ask those witnesses what companies --

17   what countries they sell to and they can't answer, so be it,

18   and Your Honor can instruct the jury.  But you certainly should

19   instruct the jury that they do not need to find -- I haven't

20   thought about what the language should be, but you should

21   instruct the jury that there's no evidence and they don't need

22   to find or there's no implication from this that that sale to

23   governments is for lawful surveillance because that we don't

24   know about.

25   You know, I wouldn't say that that -- I don't know enough

about law in Saudi Arabia or whatever about whether that
surveillance is lawful, since the basis of it is at least the
hacking here in the United States, right?  I mean, we know that
that is misconduct and violates the law.

So again, they can say their clients are foreign
governments.  They can't say that they're selling it for
terrorism or for any particular crime.  They can't say it's for
some military reason.  They can just say they sell to foreign
governments.  It can't -- you know -- and again, we're allowed
to cross-examine their witnesses about who they are, and if
they can't answer, they can't answer.

I think that solves the problem.  It's a little bit of a
middle road.  It at least allows them to say that they sell to
governments.  We think that's prejudicial, but so be it.  But
we don't think that this should wait two years for that.

And just one other point, Your Honor.  I'm sorry to mix up
different points.  But discovery, the discovery is not just the
failure to produce source code.  They didn't produce any
e-mails.  Which, as much as it's painful for me to even say,
that because there are so many e-mails in these cases, and it
takes a tremendous amount of time and effort and money to go
through them, we didn't get any e-mails in this case.

So the discovery or the failure to produce discovery is
more than just the failure to produce the source code or they
produced in Israel in a way that's not useful, whatever.  But

the discovery violations here are significant, and I just think it would be unfair if they somehow benefit from that at this point.

So I'll shut up, but that's our proposal. It's pretty succinct, and it would work for us. And I don't think that it's really that far off, but I don't want to speak for him and I don't want him to say I'm misrepresenting what he's saying. I thought it wasn't far off from what defense counsel suggested, as well, but I didn't --

**THE COURT:** No, he definitely wants to be able to argue the law enforcement purpose, even though it's not their purpose.

**MR. ANDRES:** Fine. I thought he said something different, but I wasn't intending to misrepresent what he said. I just thought he said something like that.

**THE COURT:** Okay. What's your proposal?

**MR. AKROTIRIANAKIS:** Well, certainly that we sell products to foreign governments, among others, is not only insufficient statement of our intention in developing the technology, Your Honor, it also creates a false narrative that they want to promote that the jury should be worried that the surveillance van down the street from their house is using Pegasus to tap their phones and steal their credit cards, and that's just like not the case.

**THE COURT:** So it's not accurate that you only sell to

1   foreign governments?

2        **MR. AKROTIRIANAKIS:**  We do sell to governments.  We've

3   sold to this government and we sell to foreign governments,

4   Your Honor.  But we don't just sell to foreign governments for

5   the purpose of them doing whatever they want.  And to say what

6   counsel said is inconsistent with the contracts.

7        **THE COURT:**  But what difference does it make what they

8   want to do with it?

9        **MR. AKROTIRIANAKIS:**  It is our intention that is

10  relevant in a case with punitive damages allegations, Your

11  Honor, in a case where they will have to find conscious

12  disregard for the rights of others or malice or any of those

13  things that I read this morning from the California jury

14  instruction on punitive damages.  They would have to find those

15  things.  All of them relate to my client's intent.

16      We can't have a trial about my client's intent where they

17  just get to put their side on and my client doesn't even get to

18  say what its intention in developing the technology is.  That's

19  just not fair, Your Honor, and I think it would be error to do

20  it.

21      And on the point of the e-mails, in --

22       **THE COURT:**  Is it fair for you to be able to put on

23  this evidence of your client's intent without any specific

24  evidence as to what happened in this case?

25       **MR. AKROTIRIANAKIS:**  Yes.

 1          **THE COURT:**  Why?

 2          **MR. AKROTIRIANAKIS:**  Because my client creates a

 3   product, and it licenses it to others, like every other

 4   surveillance technology, Your Honor.  If you have a case in

 5   here that involved an alleged abuse of the stingray or any of

 6   those technologies that -- I'm trying to make it familiar to

 7   the Court -- that U.S. law enforcement use on a routine basis.

 8   None of those were built by the United States Government.  They

 9   were all built by government contractors like NSO.  And if some

10   police officer in Maryland abuses that through some way, not

11   only would the stingray maker not be responsible for that

12   abuse, they wouldn't know about it.

13          So to say that my client is responsible for knowing about

14   how all the ways its technology is used, and including in these

15   1400 is not expected.  And as far as us providing discovery

16   about it, we provided the discovery that we have, Your Honor.

17   We just do not have that evidence.  It is in the --

18          **THE COURT:**  I know.

19          But the second part of the problem, it's not just

20   discovery.  It's that all the evidence you have to rest your

21   case on is your business model.  It has nothing to do with this

22   particular hack.

23          **MR. AKROTIRIANAKIS:**  That's not true, Your Honor.  We

24   have --

25          **MR. ANDRES:**  Their business model is based on illegal

1    activity.  And the more we hear about Title III's and U.S. law

2    enforcement, there was no application to a court.  There was no

3    authority from any government to hack into the -- I mean, we're

4    not asking Your Honor to instruct, but we could, that all of

5    the business is based on illegal activity.  I mean that is

6    true, that their business fundamentally relies on their hacking

7    of Meta's -- right?  I mean that's why we're here.

8         And so we're so far afield of a damages trial --

9         **THE COURT:**  Yeah, but you've injected the punitives.

10    The only reason we're talking about it is because they're

11    punitive damages.

12         **MR. ANDRES:**  How is it that we inject those when we're

13    entitled to them?

14         **THE COURT:**  You asserted them.

15         **MR. ANDRES:**  We're entitled to them.

16         **THE COURT:**  Well, that's yet to be proven.

17         **MR. ANDRES:**  We're certainly entitled to ask for them,

18    right?  And we think we can prove that, and the jury's going to

19    figure that out.  But I have a hard time understanding how it's

20    not a strong case for punitive damages when they specifically

21    targeted WhatsApp specifically, not once, but repeatedly.

22         It's like this game of cat and mouse, but very technical,

23    where they intrude, we find out and fix it, they come back with

24    a different vector, and it's a campaign against Meta.

25         And by the way, they can't operate their business of

```
1   providing this spyware to foreign governments unless they

2   commit this first act of hacking into Meta's servers.  I'm

3   sorry, Your Honor.

4        MR. AKROTIRIANAKIS:  None of that is true, Your Honor.

5   That is just like a work of fiction that he just made up at the

6   last five minutes at the lectern.

7        Not only is it not true that it's a -- that they found out

8   about it and they fixed it.  That's all just made up, Your

9   Honor.  I urge the Court just to hear the evidence if you have

10  any questions about it.  He's just -- he's just literally

11  making that up right now, literally making it up.

12       And I think he knows it.

13       THE COURT:  Well, I'm beginning to not find this

14  helpful at all.

15       MR. ANDRES:  I understand, Your Honor.

16       THE COURT:  I think it's sort of deteriorated.

17       Because I'm pretty much interested in just terminating

18  this at this point.

19       Okay.  I think I've heard enough today, and I'll take your

20  comments under advisement.  But there is one last issue with

21  regard to the experts.  I don't need to hear a lot of argument

22  on the experts.  I know that the plaintiffs move to exclude

23  Shepherd, McGraw and Minler all because they're just either

24  technology that's irrelevant or policy, not testimony.

25       I tend to agree.  I tend to agree.  This is not going to
```

1   be -- if I allow the case to be put on that is just about the

2   policy and practice, I'm not going to allow expert testimony on

3   fighting crime and seeking out terrorism and all the benefits

4   of this spyware.  I'm not going to allow that.

5        With regard to the other experts the defendant moves

6   against, Vance and Youssef.  Your arguments, you've made your

7   arguments.  Plaintiff says they're relevant to their punitive

8   damages case.  I'll decide on the basis of your written

9   arguments.

10       But with regard to the two damages experts, I think

11  there's a motion to strike either the supplemental rebuttal

12  reports on those, and I think what I really need to know is --

13  and we hit on this a little bit earlier --

14       **MR. ANDRES:**  I'm going to just turn over to Mr. Block.

15  Thank you.

16       **THE COURT:**  I think, Mr. Block, you did refer to this

17  earlier.  Disgorgement is no longer in the case, right?

18       **MR. BLOCK:**  That is correct.  It's not being sought as

19  a remedy.

20       **THE COURT:**  Okay.  So what should we expect?  Now that

21  you've heard all the arguments now, including the defendants'

22  argument about why it's necessary to establish intent with

23  respect to punitive damages, what do you anticipate with regard

24  to post-disgorgement to the profit-related evidence, your

25  expert, I guess it's Trexler.

1        **MR. BLOCK:**  Correct, Your Honor, Ms. Trexler.  This is

2  Michael Block for plaintiffs.

3        Ms. Trexler will testify as to the evidence we have about

4  defendants' financial condition and profitability.  And so she

5  has analysis that includes overview of the limited discovery we

6  got on their finances, revenues that they obtained from the

7  illegal activity, revenues that they obtained from their

8  activities more broadly, which is relevant to their ability to

9  pay with respect to punitives.

10        So it will be a review of their finances, including in

11  relation to the specific products here.

12        **THE COURT:**  Uh-huh.

13        And with regard to the expert, your motion with regard to

14  Pinsonneault?  Pinsonneault?

15        **MR. CRAIG:**  Pinsonneault, Your Honor.

16        **THE COURT:**  Didn't plaintiffs move to exclude parts of

17  all of his or her testimony?

18        **MR. BLOCK:**  Not all, Your Honor.  So there's two

19  separate issues.  There's a motion to strike a second

20  supplement that Mr. Pinsonneault served after his deposition

21  which, we're happy to rely on the papers there.  Very happy to

22  rely on the papers for that motion.  They have a motion to

23  strike one of Ms. Trexler's reports.  I think, again, happy to

24  rely on the papers.  The situations are very different.  I

25  think that's apparent from the papers.  Happy to talk more

about that if you want.

THE COURT:  Both of those have to do with just the timing of their submission of their reports?

MR. BLOCK:  Correct.  Very different timing issues, but both are timing.

THE COURT:  Okay.

MR. BLOCK:  And then on *Daubert* -- so Mr. Pinsonneault has a number of opinions he offers where he says -- in fact, it does relate in some part to the conversation we were having about cases like Middleton that say that the damages you get have to be related to the intrusion, that sort of thing.

Mr. Pinsonneault was an economist, not a technical expert, wants to opine to the jury on what categories of activities can and cannot be recovered.  In other words, he, an economist, would say these people over here were doing victim outreach.  That's not damages.  We think that invades the province of the jury.  We think it's outside of his expertise as an economist.

If there is to be a legal argument about whether that category of damages is recoverable, Your Honor will decide that.  Mr. Pinsonneault's job is to evaluate the amount of damages at issue, not to tell the jury whether that victim outreach cannot be recovered.

He also has an issue where he's taking advantage of the limitations on discovery.  So I'm not actually sure.  Maybe we'll hear from defendants whether they intend to present

 1   Mr. Pinsonneault's opinions as to the specific profitability of

 2   the Pegasus product, which they created in connection with

 3   disgorgement, but in order to reach that opinion,

 4   Mr. Pinsonneault had to come up with an estimate for how much

 5   of the R&D spend is related to Pegasus.  He did that by having

 6   a conversation with Mr. Gasonelli (phonetic), who gave him a

 7   number, a numerator, this many engineers.  Mr. Pinsonneault

 8   used that as the numerator in a ratio against the proportion of

 9   engineers, and then he said headcount proportion, proportion of

10   R&D spend, I'm going to allocate that way.

11       The problem, Your Honor, is that we didn't get the

12   underlying documents, and we've cited cases in the brief.  It

13   rests only on the self-serving say-so of one defendant witness

14   who says I think the number is X.  And so we've asked to

15   exclude that.

16       There's a third issue where he said in deposition -- so I

17   think it's undisputed that this is an opinion that was not in

18   his report and that's probably sufficient grounds to just find

19   that it's out.  But in deposition he volunteered, after

20   responding to a question, an attack on~-- in connection with

21   his criticisms of the inclusion of stock compensation in the

22   damages analysis that Ms. Trexler does.  He said, I've done, I

23   forgot what it is, 50 or 75 cases, and I've never seen RSUs.

24       We just want to be sure that that won't be given to the

25   jury because that would just be his say-so, hey, I want you to

take my word that in 50 other cases, no evidence or disclosure or opinion about how those 50 cases are related to this one. He wants to say I've never seen RSUs like this, so you should conclude that RSUs can't come in.

He has other -- there's a legitimate disagreement between the experts about how the value restricted stock units, RSUs, their questions about that in terms of the grant date and the vest date, and economists can have differences of opinion about the right way to value that stuff. I think that's fair game. But for him to say I've never seen an RSU like this in 50 cases is something that's very hard for us to cross them on. Also wasn't in his report. And so that should be out, as well, Your Honor.

THE COURT: Okay.

MR. CRAIG: Aaron Craig. Thank you, Your Honor for defendants.

Before I started arguing the *Daubert* motion itself which counsel just jumped into, I want to address the Court's overall question about disgorgement of profits. And I know Your Honor said earlier that there's not going to be a bifurcation of the trial, but I'd like to take 30 seconds to explain why I think it would be much more efficient to wait until after the jury finds an entitlement of punitive damages before both experts start going into their calculation of how much profits NSO earned in 2018 through 2020 and from the sale of covert android

Pegasus and NSO's current financial condition.

That testimony has -- it's very separable from the other issues. If the jury decides that there's an entitlement to punitive damages, that evidence would probably take one to two hours, and then the jury could deliberate on a number of punitive damages. But that's one to two hours is five to 10 percent of the trial time, and there's a lot of nuances in the calculation of punitive damages that when plaintiffs had a disgorgement claim really mattered a lot.

Now plaintiffs -- sorry, NSO's profits about Pegasus is one factor in the jury's possible calculous of the amount of punitive damages that should issue, which is a count that's restrained by a number of other things like the amount of compensatory damages and constitutional limits on multipliers and things like that.

But this is an issue that is very separable, and we think the Court should consider bifurcating it until after the jury decides whether there's an entitlement to punitive damages.

On~---

**THE COURT:** I won't. I've tried it both ways, and I have found there are more problems with bifurcating than not, just in terms of the jury's patience and some of their responses, particularly if it's on a long day or a Friday, I've seen the inflation of compensatory damages because they don't want to deal with -- because I have to tell them in advance,

1    once you find this we're not going to let you go.  Once you

2    render your verdict you're still going to have to stay here,

3    and we're going to put on more evidence.

4        No, it does not work as well as I think a lot of attorneys

5    think it will.  So, no, I won't bifurcate.

6        **MR. CRAIG:**  I appreciate the Court humoring me on the

7    pitch, and of course the Court has much more experience in this

8    than I do.

9        On the issues of Mr. Pinsonneault's, the scope of his

10   testimony, he is not going to opine about whether victim

11   outreach is compensable, and that's not what his opinion said.

12       In plaintiffs' motion they go over and over again on items

13   that Mr. Pinsonneault says are underlying his opinion and they

14   try to couch that as being his actual opinion.  But his opinion

15   is not going to be that victim outreach is not actual damages.

16   His opinion is going to be that Ms. Trexler failed to take into

17   account certain testimony about whether victim outreach was

18   actually something that was required for them to do or whether

19   it was optional for them to do.  They had witnesses that

20   testified we had no legal obligation that I'm aware of to

21   notify witnesses.  It's just something we chose to do.

22       And he's gonna testify that Ms. Trexler should have taken

23   that into account and didn't.  That's perfectly reasonable

24   rebuttal expert testimony.

25       With respect to the calculation of the profits and

Mr. Pinsonneault's calculation of research and development

costs as deductible from profits from revenues to reach the

profit number, the general rule in IP cases, which is, you

know, where this most commonly comes up, is that not all

research and development expenses are deductible from revenues

because if you spent research and development costs to develop

the accused technology, you shouldn't get to deduct that as a

cost.  That would be like a windfall for a defendant if they

spent all this money to develop something that, say, infringes

a patent.

        So you need to separate out the R&D costs that are

quote-unquote innocent from the ones that went in this case to

developing a covert android Pegasus.  Mr. Pinsonneault did that

calculation, and he used solely documents that were produced to

plaintiffs.  He used a roster of NSO's engineers, their

employees.  That was one of the first documents we produced in

this case.  I know because I was directly involved in producing

it.  And he went through them and he had a conversation with

our chief technology officer saying, which one -- out of these

engineers, there's about 140 of them -- which ones of them

worked on covert android Pegasus?

        And plaintiffs could have asked that same question to

Mr. Gasonelli in his deposition.  They could have put that

document in front of him and asked him the same question.  They

chose not to do that.

1          But Mr. Pinsonneault did ask him that question, and

2     Mr. Gasonelli told him, and the result was 27 percent of the

3     engineers worked on covert android Pegasus.  And that is the

4     best available proxy for how much of the R&D was spent on the

5     accused product and the remainder was not spent on the accused

6     product.  And so that was how we developed his methodology for

7     calculating NSO's profits.  And that's reasonable and

8     customary.

9          The last criticism made by counsel was about

10    Mr. Pinsonneault's opinion that in all of his career he'd never

11    seen a plaintiff try to inflate the damages by including RSUs

12    that were -- or stock units that were granted years before.  He

13    has several criticisms about them, and one of them is that he's

14    never seen it done before.  Experts are allowed to talk about

15    their -- testify from their experience.  That's one of the

16    items in Rule 702.

17         They say it's unfair because we can't really cross-examine

18    him about it.  Well, if this was a commonly accepted

19    methodology, there would be lots of ways they could

20    cross-examine him about it.  They could show him lots of other

21    examples where it hasn't been done.  We don't think it's ever

22    been done before.  We don't think any expert has ever tried to

23    include this type of RSU expense as part of a plaintiffs'

24    damages.  Certainly none of the cases that they cited in their

25    brief involve such an attempt.

1      So we think he should be allowed to testify to his

2  experience.

3      Thank you.

4          **THE COURT:**  Okay.  All right.  Thank you.

5      All right.  I think I've heard enough on this case, and

6  the last thing I'd like to hear are the examples that were

7  going to be proffered with respect to the second omnibus

8  sealing motion that was filed, so that when I start looking at

9  it I'll know what some of the things mean.

10         **MR. CRAIG:**  Thank you, Your Honor.  My colleague

11 Jonathan Weinberg is going to briefly address those, and he has

12 the examples here to hand out to the Court and to plaintiffs'

13 counsel.

14         **THE COURT:**  Okay.

15         **MR. WEINBERG:**  Should I hand these to ...

16     Thank you, Your Honor.  Jonathan Weinberg for defendants.

17         **THE COURT:**  Okay.

18         **MR. WEINBERG:**  So these are just briefly two exhibits

19 that were attached to Mr. Craig's declaration earlier showing

20 some -- the types of documents that show NSO's software and how

21 it works.

22     What you're looking at here with exhibit 38 and in more

23 detail in 39 is a detailed workflow explaining the capabilities

24 of NSO's products and the kinds of targets that it can

25 successfully work against.

1      What this shows, if you read through the rest of this

2    document, I won't belabor the point too long here, it shows the

3    installation workflow itself, the software's capabilities,

4    various business methods that are used by NSO in order to

5    deploy these kinds of systems, limitations on the kinds of

6    phone numbers and the kinds of variations they make that are

7    relevant to operational security issues.  And this is the kind

8    of information that could be useful to not only competitors,

9    but also to targets, potential targets, because of the op sec

10    capabilities here.

11      You'll see that some of these pages, as well, towards the

12    end, this proprietary information about the hardware

13    architecture, the software that the -- sorry, the hardware

14    servers that are used, which servers are used for what

15    purposes, how they're configured to work with one another.  And

16    I won't get into all the details of how unless Your Honor

17    wishes me to do so, but this is just the type of document that

18    we're talking about.

19      **THE COURT:**  Okay.  This is one of the actual exhibits?

20      **MR. WEINBERG:**  This is one of the exhibits attached to

21    Mr. Craig's declaration in support of the sealing opposition to

22    sanctions, my apologies.

23      **THE COURT:**  Opposition to sanctions?  I'm sorry, I

24    don't understand.

25      **MR. CRAIG:**  My apologies, Your Honor.  Aaron Craig

1    again.

2         The universe of documents that were at issue in the first

3    omnibus motion to seal were the exhibits for and against the

4    two parties' summary judgment motions and the exhibits for and

5    against the parties' sanctions motion.

6              **THE COURT:**  Okay.

7              **MR. CRAIG:**  Your Honor, we submitted them all a chart

8    in connection with our omnibus motion to seal as to here's the

9    exhibit numbers and here's the reasons for sealing.  Your Honor

10   might remember that chart.

11             **THE COURT:**  Okay.

12             **MR. CRAIG:**  These were included on that chart, but the

13   originally~--- the original point in which they were produced

14   and filed was to demonstrate to the Court that we had produced

15   discovery.  This is in opposition to their motion for sanctions

16   where they said they didn't produce any discovery to show the

17   functionality of Pegasus.

18        We produced, I attached a hundred exhibits to my

19   declaration showing these are examples of the documents that we

20   produced to them in the United States to show the full

21   functionality of Pegasus.  So these are examples that we used

22   to oppose their motion for sanctions.

23             **THE COURT:**  Okay.  Thank you.

24        Okay.  And then I have a second one up here?

25             **MR. WEINBERG:**  This is similar to exhibit 38.  Well,

38 and 39.  They're pretty similar.  They're both dealing with the flowchart for how to deploy the initial printing software onto certain kinds of phones.  These are a little bit different, perhaps reflecting different versions.  But it's a similar analysis there.

**THE COURT:**  And these are documents that you requested to seal in their entirety.  How many -- I recall seeing several of these.  How many of them are there in the group?

**MR. WEINBERG:**  This might be something Aaron could answer for you.

**MR. CRAIG:**  Your Honor, I don't have the answer for the exact number of the number that need to be sealed in their entirety versus the number that could be redacted.

**THE COURT:**  You do recognize that you overreached on wanting to seal the entirety of multiple documents that could easily be redacted.

**MR. CRAIG:**  We certainly recognize that with respect to the employee names, and we apologize for doing that, and I think we did apologize to the Court in the filing on the motion for reconsideration, and we've now resubmitted those with just the proposed redactions, and we would appreciate the opportunity to do the same with respect to the technical documents.  However, that will take a fair amount of time just because of their volume.

If I had to estimate, I'd say it's probably in the range

1   of, you know, 25 to 50 such documents that have this kind of

2   technical information that could be -- some of them like the

3   flowchart one that's just the one page, I think 38, I think

4   that needs to be sealed in its entirety.  Others have

5   information that could be redacted, but doing so at the same

6   time as preparing for a damages trial is a tall order.  But if

7   Your Honor orders us to do it in that timeframe we will find a

8   way to do it.

9           **THE COURT:**  Well, it has to be done by trial if you

10  expect to use them at trial.

11          **MR. CRAIG:**  Your Honor, I don't think either party are

12  going to use any of these in trial.  I don't think the trial's

13  going to be about the sort of technical issues that are talked

14  about.  These are things that we produced in discovery to show

15  the full functionality of Pegasus.

16          **THE COURT:**  Well, if you don't need them for trial,

17  then we have a little bit more time.  There's a lot of stuff

18  you're going to need to do for trial in terms of instructions

19  and forms as soon as you know what I'm going to do with the big

20  issue, right?

21          **MR. CRAIG:**  Correct, Your Honor.

22          **THE COURT:**  Is 39 one of the documents that you

23  believe should be sealed in its entirety?

24          **MR. CRAIG:**  I think there's so little of it that --

25  there's so much of it that is --

1              **THE COURT:**  Well, I don't know what it is, so maybe

2    you could explain.

3              **MR. CRAIG:**  Can I ask Mr. Weinberg to come back up?

4              **THE COURT:**  Okay.

5              **MR. WEINBERG:**  We certainly -- I think that in order

6    to redact this, it would be pretty significant redactions.

7    You'd have to leave -- very little of this would not be

8    sensitive information.

9              **THE COURT:**  Okay.  What is this?  What is it?  What's

10   it telling us?

11             **MR. WEINBERG:**  What is the exhibit?

12       The exhibit is, as I mentioned before, an internal NSO

13   document showing the workflow of how this software operates and

14   how it is that NSO in the back end sets up servers to support

15   this kind of software functionality.

16             **THE COURT:**  Every page?

17             **MR. WEINBERG:**  Yes.  The flowchart on the front page

18   shows the flowchart -- the flow of this installation.  And then

19   the rest of the document describes in greater detail how that

20   flow works.  So if we just, we could start at the first page if

21   this would be useful.

22       The first page talks about the need for a certain kind

23   of -- I don't want to talk about this in open court, but

24   certain kinds of processes.  There's a multistage process where

25   they send a certain fingerprinting code.  Based on the

1    responses that they receive from that fingerprinting, they

2    decide what kind of target it is.  That's this five different

3    kinds of targets that you see on the very first page is that --

4    is that determination.

5           THE COURT:  Just hold up the page that you're looking

6    at.

7           MR. WEINBERG:  Sure.  It's page 3 out of 6, and it's

8    the page ending in 8950, the Bates number.  And there's a table

9    at the top.

10          THE COURT:  Okay.  Okay.

11          MR. WEINBERG:  And so the next paragraph it will say:

12   If the partial floating point -- not floating point.  I'm

13   sorry.  The partial fingerprint response is a certain response,

14   what do you do with it at that point.

15       If we look down at the table below, the bottom table on

16   this same page, that's an operational issue that talks about

17   the kinds of limits the NSO places on its customers and their

18   use of it.  This is business information about how it is that

19   they allow their customers to use.  They use it in a certain

20   way, how they detective use, for example, and how they prevent

21   it.

22          THE COURT:  Okay.

23          MR. WEINBERG:  We move on to the next page, you see

24   the second -- this is page 4 out of 6.  You see there's another

25   description of the subsequent phase of a fuller fingerprint.

1  So this is describing again the stages that NSO's software

2  follows, how it identifies certain conditions on the phone

3  that's being targeted.  It goes on for a few pages.  I'm happy

4  to go through all of it.

5       **THE COURT:**  Okay.  Okay.  Of the documents that are

6  referred to in your revised omnibus motion, are any of those

7  documents slated for trial?  Are most of those only documents

8  that were submitted in support of summary judgment?

9       **MR. CRAIG:**  NSO does not plan to use any of them.  The

10 ones that are in the revised omnibus motion to seal, there are

11 some correspondence between counsel that talks about certain

12 foreign legal proceedings.  I don't expect those to come up to

13 a jury.  I don't know why they would.  And then there's

14 documents that are in the form of like WhatsApp text message

15 chains that have the names of lots of employees on them.  I

16 don't think those are going to be used much at trial, although

17 maybe plaintiffs plan to use a few of them.

18      **MR. MARZORATI:**  Your Honor, we do plan on showing the

19 steps that NSO takes to avoid detection via WhatsApp's platform

20 to talk about the ways that they tried to avoid detection and

21 our efforts to shut them down.  So we do plan on using these

22 before -- you know, to prove punitive damages.

23      **MR. CRAIG:**  I believe plaintiffs' counsel could use

24 the redacted versions without any impact on the effect of those

25 documents.  The names of the non-witnesses should not, you

 1  know, affect how the, you know, their use of those documents in

 2  my opinion, but ...

 3          THE COURT:  Are there names of non-witnesses?  You've

 4  just given me an exhibit that has pretty much just what looks

 5  like a lot of technical information.

 6          MR. CRAIG:  Sorry, Your Honor.  I was referring to, in

 7  the omnibus motion to seal there's three categories of

 8  documents.  Our employee names, the foreign proceedings and the

 9  technical documents.

10          THE COURT:  Okay.

11          MR. CRAIG:  I had moved away from the technical

12  documents back to the question of employee names.  I don't

13  think any of the technical documents that were the subject of

14  our omnibus motion to seal are relevant to the upcoming trial

15  because of Your Honor's rulings on liability.

16          THE COURT:  Plaintiffs' counsel, your name?

17          MR. MARZORATI:  Luca Marzorati.

18      And yeah, we disagree.  Those are documents that are key

19  to our case for punitive damages so we would ask that they be

20  shown to the jury.  Again, we're fine with redaction of names

21  of individuals who won't be testifying.  Makes sense to let

22  them do that.  But in terms of these documents, there's a stark

23  difference between documents describing how technology works,

24  which we have filed now in the public docket and are willing to

25  show at trial, and I think what they try to loop this into,

1    which is source code.  Source code is computer code.  I refer

2    the Court to the Northern District of California model

3    instructions that talk about what source code is.

4        This is not source code.  These are business documents of

5    a tech company.  And the fact that we know it's not computer

6    code because NSO doesn't produce any computer code.  So this is

7    documents describing how their exploits work.  These are very

8    important documents to our case.  We'd like them to be

9    unsealed.

10        **THE COURT:**  You'd like them to be unsealed?

11        **MR. MARZORATI:**  Consistent with the Court's order.

12        **THE COURT:**  Right, right, right.  But as long as

13   they're useable, does it really matter to you if they're sealed

14   or not?  Why does it matter if they're sealed as long as you

15   can use them at trial?

16        **MR. MARZORATI:**  I think two separate issues.  One is

17   we have authority -- to comply with your court's order we have

18   already filed all of our documents which similarly are

19   documents describing how WhatsApp works.  We've put those on

20   the public docket.  We think it's only fair that NSO puts their

21   documents on the public docket.

22        **THE COURT:**  Okay.

23        **MR. MARZORATI:**  Again, this is just in compliance with

24   your court's previous sealing order, and we'd also like the

25   chance to use them at trial.  So I do think unsealing them is

1  important just for basic fairness.

2      **THE COURT:** Okay, I understand the positions.  Okay.

3  Anything else?

4      You're safe with regard to the two categories redacting

5  documents, redacting employee names and with regard to the

6  foreign proceedings?  I don't know that I want any of that

7  information in anyway.  I don't know how we're -- I don't think

8  it's relevant to anything that we're currently facing.

9      So the only category is these you say 25 to 50 that show

10  this kind of information?

11      **MR. CRAIG:** Your Honor, I think that's correct, and I

12  think if the parties were to meet and confer about this

13  specific, if plaintiffs have specific exhibits that they want

14  to use in mind and we'd be happy to confer with them about it

15  and see if there's -- redactions are possible.

16      **THE COURT:** If you could narrow it even further for

17  me, fine.  That would be helpful if there are particular

18  documents like this one.

19      This I see, though, is expert controlled.  Does that mean

20  that you can't?  That you're constrained?  I mean, there are

21  consequences.  Your client's got consequences in another

22  country and consequences here for your decisions.

23      **MR. CRAIG:** This is a little confusing, but the

24  documents that you're looking at, they have certain redactions

25  of them of export control material.

1      The entirety of it is export controlled, but NSO got a

2  license to produce information about the technology that's at

3  issue in this case.  However, these documents also include

4  discussions of other technologies that weren't covered by the

5  license that NSO got.  So we had to redact those boxes that you

6  see that say redacted export control, that is information about

7  different technologies that have nothing to do with the case.

8      **THE COURT:**  Okay.

9      **MR. CRAIG:**  But still the entirety of the document is

10  still export controlled, it's just NSO got a license.

11      **THE COURT:**  Okay.  I'm only concerned right now about

12  those two categories, you're safe.

13      **MR. CRAIG:**  Thank you, Your Honor.

14      **THE COURT:**  Okay.  With regard to the technical

15  documents, I'm only concerned right now about the documents

16  that will be needed by either party at trial.  Can you take a

17  look at those and just submit a stipulation as to -- or even if

18  you don't stipulate, just identify the ones that are important,

19  because I have a lot to do, and I don't really want to spend

20  time on sealed documents unless they're necessary for the

21  upcoming trial.

22      **MR. CRAIG:**  Thank you, Your Honor.

23      **MR. MARZORATI:**  Absolutely, Your Honor.

24      **THE COURT:**  Okay.  I think I have sort of gotten to

25  the end of my list.

1        There are other issues obviously.  There are jury

2   instructions and the verdict form, and all of those will once

3   again depend upon ultimately how I'm going to frame the scope

4   of this trial in ruling on the motions in limine.  So I'll just

5   tell you with regard to the jury instructions I will expect you

6   all to meet and confer.  There aren't that many.  I mean,

7   defendant proposed eight of them and the plaintiff proposed 13.

8   Do I have that right?  Thirteen and eight?  You'll have to meet

9   and confer based upon whatever my rulings are on the motions in

10  limine and revise those, as well as probably the verdict form,

11  but we'll give you some instructions if we keep the trial on

12  track.  I'll take into account everything that you all have

13  said on it, and thank you.  I think we're at the end unless

14  there are any questions.

15        **MR. ANDRES:**  No, thank you, Your Honor.

16        **THE COURT:**  All right.  We're adjourned.

17        (Proceedings concluded at 2:37 p.m.)

18                    **CERTIFICATE OF REPORTER**

19        I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21  DATE:  Monday, April 14, 2025

22

23

24  _____

25  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court