JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  jakro@kslaw.com
AARON S. CRAIG
  acraig@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:     (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS' MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION [L.R. 7-9(a)]**<br><br>Judge:   Hon. Phyllis J. Hamilton<br><br>Action Filed:   10/29/2019 |

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively, "NSO") hereby move under Local Rule 7-9(a) for leave to file a motion for reconsideration of the Court's April 15, 2025, Final Pretrial Order (Dkt. 686). Reconsideration is justified because that Order, in granting Plaintiffs' MILs and *Daubert* motions, reflects "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court." L.R. 7-9(b).

By seeking to hold NSO liable for punitive damages, Plaintiffs have, throughout this litigation, squarely put at issue what NSO intended with respect to its Pegasus technology. Moreover, Plaintiffs' case has always been (and this Court's summary judgement ruling was) based on "generalized" evidence of how NSO's Pegasus technology functioned and "generalized" evidence of how NSO interacts with its customers. Plaintiffs have also consistently taken the position that their claims are *not* limited to the attempted use of Pegasus against 1,400 target devices in April and May 2019. Accordingly, Plaintiffs sought summary judgment on liability without presenting any specific evidence about the customers involved in the alleged use of Pegasus against 1,400 target devices in April and May 2019, or those customers' specific actions during that time frame.[1] Nor, this Court concluded, did Plaintiffs need such evidence; the Court granted summary judgment based on Plaintiffs' generalized evidence.

Because Plaintiffs have been permitted to rely on generalized evidence in presenting their case, NSO must be permitted to rely on generalized evidence in response. By way of proffer, NSO would seek to introduce the following evidence that reflects its intent in creating and licensing Pegasus and which therefore bears directly on Plaintiffs' claim for punitive damages: (1) Exhibits A-1908 and A-2005, exemplar NSO contracts that require the customer to represent that it will use

---

[1] Indeed, Plaintiffs have admitted that they cannot establish that Pegasus was successfully installed on *any* of the 1,400 target devices. (Trial Exhs. A-1034 ("We are not in a position to confirm whether your account (or any other user's account) was compromised"); A-1063 ("We can't know for certain whether Pegasus was installed on your phone, and being targeted does not necessarily mean that attackers succeeded in placing spyware on your phone.").) Trial Exhibits A-1036, A-1039, A-1064, A-1065, A-1067 all contain similar admissions from Plaintiffs and Citizen Lab.

Pegasus "only for the prevention and investigation of crimes and terrorism and ensure that the System will not be used for human rights violations" (as do end-user certifications of NSO's customers affirming the same thing to Israel's Ministry of Defense, Exhibits A-2087 and A-2088)[2]; and (2) the testimony of CEO Yaron Shohat (a) that all of NSO's customer contracts in effect during the applicable period, and all times since, contain this language; (b) that all of NSO's customers are governments approved by the Government of Israel; (c) that NSO follows the same due diligence processes for every one of its customers (including all customers who had licenses active in April-May 2019); and (d) about what NSO's due diligence and customer investigation processes entails. Plaintiffs can rebut such evidence, and the jury will evaluate it and decide on whether NSO has acted with malice, oppression or fraud. Plaintiffs are free to cross-examine NSO's witnesses, as Plaintiffs have done at depositions, with their own generalized evidence about misuse of Pegasus and the role NSO plays in setting up and supporting its customers' uses of Pegasus.

The Court's Final Pretrial Order, however, precludes NSO from offering this evidence, creating an artificial and one-sided trial in which the Court will permit Plaintiffs to rely on "generalized" evidence about "the purpose of Pegasus" (Dkt. 595 at 12) to impute bad motives to NSO and to describe NSO as selling malicious "spyware"—despite the fact that Pegasus "spying" on target devices is not relevant under the Court's framework because it is not the "conduct which gave rise to [CDAFA] liability" (Dkt. 686 at 1-2)—while the Court simultaneously precludes NSO from presenting any evidence of its intent in a case where Plaintiffs have put Defendants' intent squarely at issue. The Court should reconsider that ruling because it reflects "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court." L.R. 7-9(b). In particular, the Court's ruling and rationale are inconsistent with its summary judgment order, the positions Plaintiffs have taken throughout this litigation, and with the history of discovery in this case. The Court should therefore reconsider its Order and permit NSO to present

---

[2] NSO does not seek to "impute" its customers' intentions to itself. (Dkt. 686 at 4.) NSO seeks to introduce evidence of *its own* intent in designing and licensing Pegasus, irrespective of how any particular customer has used Pegasus. That is not "inconsistent" with NSO's lack of control over its customers or with NSO's status as a for-profit enterprise (*id.*), but whether it is or not is a question for Plaintiffs to probe on cross-examination and for the jury, not the Court, to resolve.

evidence related to its intent in creating Pegasus and licensing it solely to vetted government customers, which bear directly on whether NSO acted with intent to cause injury or in willful and knowing disregard of the rights or safety of another. CACI No. 3945, Punitive Damages - Entity Defendant - Trial Not Bifurcated.

In the alternative, the Court should make clear that Plaintiffs are equally limited at trial to presenting only evidence directly related to the "specific intrusions on *plaintiffs'* systems" that allegedly occurred in April-May 2019. (Dkt. 686 at 2, 6, 8 (emphasis added).) If the Court believes that the record does not contain sufficient evidence to support that approach, it should—as it suggested at the Final Pretrial Conference—reopen discovery to cure any "unfairness" that the Court believes would occur by allowing Defendants to provide evidence of its intentions in developing, testing, promoting, and licensing, Pegasus or the numerous "guardrails" that surround its use. That evidence is the direct opposite of having acted with malice. *See* CACI No. 3945 (defining "knowing disregard" as "aware[ness] of the probable dangerous consequences of the person's conduct" coupled with a "deliberate[] fail[ure] to avoid those consequences").

## I. The Court's MIL Order Is Inconsistent with Plaintiffs' Prior Arguments and with the Court's Summary Judgment Order.

Throughout this case, Plaintiffs have consistently *denied* this Court's current view that the "conduct alleged in this case" is only "the specific intrusions" into WhatsApp's servers through which NSO's customers allegedly attempted to "access[] the 1400 target devices at issue in this suit" in April-May 2019. (Dkt. 686 at 2.) Contrary to NSO's arguments that Plaintiffs' claims *were* so limited, Plaintiffs have consistently and strenuously maintained that they sue NSO for "*all* of NSO's unauthorized access to WhatsApp servers," including NSO's "probing Plaintiffs' servers and vulnerabilities" while designing its technologies and "selling" those technologies, whether or not any particular technology was ever used by any particular customer at any particular point in time. (Dkt. 109 at 2 n.1, 6 (emphasis added); *accord, e.g.*, Dkt. 116 at 17-19; Dkt. 144 at 11; Dkt. 235-2 at 7-9; Dkt. 260-3 at 1-2, 5-6.) For example, Plaintiffs successfully opposed NSO's motion to dismiss their claim for injunctive relief in part by arguing that their claims were not limited to uses of Pegasus in April-May 2019. (Dkt. 109.) Plaintiffs also partially succeeded on a motion to compel

by arguing that their claims extended beyond the use of Pegasus to access WhatsApp servers in April-May 2019. (Dkts. 235-2, 260-3, 292.)

Plaintiffs successfully took the same approach in seeking and obtaining summary judgment on liability. Plaintiffs argued, among other things, that NSO violated CDAFA by researching, developing, and testing the "Heaven" Pegasus vector in 2018 and the "Erised" vector in 2020, neither of which played any role in any access to WhatsApp servers in April-May 2019. (Dkt. 399-2 at 4-5.) Plaintiffs made those arguments based on descriptions of how Pegasus functioned *in general*, not based on any particular use in April-May 2019. (*Id.* at 12-22, 25.) Plaintiffs also sought summary judgment on conspiracy based on purely generalized evidence of NSO's relationships with its customers, without any evidence or argument directed to any specific customer's actual use of Pegasus in April-May 2019. (*Id.* at 23.) This Court granted Plaintiffs summary judgment on liability based on that generalized evidence, relying solely on general descriptions of how Pegasus worked in the abstract. (Dkt. 494 at 11-13.) The Court also suggested in passing that NSO conspired with its customers, presumably relying on Plaintiffs' generalized description of NSO's customer relationships, not based on any evidence of whether NSO agreed with any specific customer's specific use of Pegasus in April-May 2019. (*Id.* at 13.)

If this Court believed that such "generalized" evidence was sufficient for Plaintiffs to establish their claims on summary judgment, it should also be sufficient for NSO to oppose Plaintiffs' claims at trial about Defendants' intent in creating and licensing Pegasus. Plaintiffs sought and received summary judgment based not on how Pegasus functioned on WhatsApp servers in any particular use of Pegasus, but *in general*—and it is in no way unfair to allow NSO to submit "generalized" evidence of its intent in designing Pegasus to function that way in to oppose the punitive damages request. And if this Court could find as a matter of law that NSO conspired with its customers in connection with any April-May 2019 use of Pegasus based solely on generalized evidence unrelated to any particular customer's conduct during that time frame, then NSO should likewise be entitled to rely on generalized evidence of its intent in licensing Pegasus and its due diligence processes. Conversely, if only evidence related to specific customers' actions in the "specific events of this case" were relevant (Dkt. 686 at 3), then this Court could not properly have found conspiracy

without evidence of NSO's specific involvement with specific customers' uses of Pegasus in those specific events. It cannot be both ways.

**II.	In the Alternative, the Court Should Reopen Discovery.**

The Court justified its limits on NSO's trial evidence by adopting Plaintiffs' attorney argument that NSO did not produce evidence related to the specific customers who attempted to use Pegasus in April-May 2019. The Court did not, however, find that NSO violated any court order compelling the production of that information. Nor could the Court make such a finding, since Plaintiffs never moved to compel discovery related to any customer's specific actions in April-May 2019. Indeed, as the Court also recognized, NSO does not *have* any such information in its possession. It is fundamentally unfair to limit NSO's ability to present evidence at trial as punishment for a failure to produce information that NSO never had and thus *could not* produce.[3]

As for the identities of NSO's customers more generally, this Court held NSO was not required to produce that information. If Plaintiffs believed NSO had not produced customer-related information that Plaintiffs requested, that NSO had in its possession and that was within the bounds of allowable discovery set by the Court, then Plaintiffs should have moved to compel that information. Plaintiffs did not do so. And if the Court has changed its mind and decided that the specific identities of NSO's customers *are* relevant, then it should reopen discovery so that NSO can seek permission from Plaintiffs to disclose the alleged 1,400 target users to persons other than outside counsel (including NSO's customers),[4] ask its customers whether they investigated those

---

[3] This has no connection to "*Richmark* considerations" resulting from "competing legal obligations." (Dkt. 686 at 4.) It is not because of any foreign legal restrictions that NSO does not know which of its customers were involved in the April-May 2019 events and lacks information related to its customers' uses of Pegasus. In this respect, this is no different than any other case in which one party seeks discovery that the other party simply does not have.

[4] It appears to NSO that the Court may have been under the misapprehension that NSO is aware of (1) the 1,400 WhatsApp account/phone numbers and (2) knows which of its customers targeted each of those accounts. Plaintiffs never sent the list of numbers to NSO outside of the litigation, and within the litigation Plaintiffs designated the 1,400 WhatsApp account/phone numbers (and all other information related to the 1,400 target users) as Attorneys' Eyes Only under the Protective Order. Therefore, only NSO's counsel has been able to review the numbers (after much resistance,

users, and then seek the necessary permissions to disclose its customers' identities.

Finally, as for NSO's due diligence processes, the Court wrote that Defendants offered no "coherent explanation for how they are able to detect misuses if they don't monitor the use of Pegasus or know when it is being used." (Dkt. 686 at 5.) That is incorrect. As NSO's CEO testified at deposition and would testify at trial, and as NSO's counsel explained at the Final Pretrial Conference, NSO investigates misuses of its technology when it receives an allegation of abuse about a customer. To investigate alleged misuse, NSO asks the customer to give NSO access to information about its use of Pegasus. If the customer refuses to provide that information, NSO terminates the customer. If the customer provides the information and it reflects misuse, NSO also terminates the customer. But until NSO launches an investigation and receives information from its customer, it has no access to information about the customer's specific uses of Pegasus. Nor should it, since NSO's customers use Pegasus as part of anti-terrorism and other classified law-enforcement and intelligence operations vital to their national security. That explanation is entirely coherent. And even if it the Court has doubts about that, it is a credibility question for the jury, not the Court, to resolve.

For all these reasons, the Court's reliance on the absence of evidence to justify excluding evidence of NSO's intent was erroneous. But even if the Court's concerns about the state of the record were supported, they reflect no "discovery misconduct" by NSO (Dkt. 686 at 4) and so would not justify punishing NSO by limiting its ability to defend itself at trial. Rather, those concerns would at most justify reopening discovery, allowing Plaintiffs to file a motion to compel the specific evidence they believe they need to cross-examine NSO's witnesses, and giving NSO an opportunity to collect and produce the evidence the Court determines NSO should be required to produce.[5] That approach is far better than subjecting NSO to an unfair, one-sided trial as a penalty for supposed

---

Plaintiffs also permitted one low-level House Consultant to have access to the ~200 Citizen Lab names, but only under the terms of the Protective Order). So, while NSO has no obligation to create new information to produce to Plaintiffs in discovery by conducting an investigation into these 1,400 numbers, Plaintiffs' confidentiality designations would have prevented such an investigation in all events.

[5] NSO would also be entitled to seek the discovery related to the 1,400 alleged victims that Plaintiffs and Citizen Lab previously refused to provide and the Court declined to order.

evidentiary gaps for which NSO is not to blame.

**III.    In the Alternative, the Court Should Limit Plaintiffs' Trial Evidence.**

As the above discussion reflects, it would be fundamentally unfair to prohibit NSO from seeking to prove its intent through generalized evidence of its business practices—on the ground that such evidence is not tied "to the specific events of this case" (*id.*)—while permitting Plaintiffs to seek punitive damages on the basis evidence that is equally disconnected from any particular use of Pegasus through WhatsApp servers in April-May 2019. It is clear, however, that Plaintiffs intend to do precisely that. In their trial brief, Plaintiffs assert that they are entitled to punitive damages based on "the purpose of Pegasus" generally, on NSO's *design* and *marketing* of Pegasus, on updates to Pegasus that occurred well before and well after any access to WhatsApp servers in April-May 2019, and on what Plaintiffs describe as "NSO's extended pattern of unlawful conduct" before and after April-May 2019. (Dkt. 595 at 10-12.) Plaintiffs thus seek to recover punitive damages based on generalized evidence of NSO's conduct and technology unrelated to any specific use of Pegasus in April-May 2019.

Under the Court's Final Pretrial Order, the fact that Pegasus can extract substantive information (such as emails or text messages) from target devices is no longer relevant because that extraction of information is not the liability-creating conduct for which Plaintiffs can seek punitive damages. This Court held that "[t]he punitive damages analysis does not look to defendants' conduct as a whole, it must be tied to oppression, fraud, or malice in the conduct *which gave rise to liability in the case*." (Dkt. 686 at 1-2 (cleaned up, emphasis added).) The conduct that gave rise to liability here was only the use of WhatsApp servers during the very first phases of a Pegasus installation. To the extent liability was based on extracting any information from target phones, it was only metadata obtained during the initial fingerprinting process that is sent over WhatsApp servers, not the substantive information that Pegasus can access once it is installed.[6] It is undisputed that customers do not obtain substantive information from devices via WhatsApp servers, but rather

---

[6] *See* Dkt. 494 at 12-13 (referring to "protected information" as information "about the precise operating system and memory structure of the [target] phone" and finding liability because such information was "sent from the target users, through the WhatsApp servers, and back to the WIS").

via third-party servers. The fact that Pegasus extracts information like instant messages and emails from target devices once it is installed—which is the fact on which Plaintiffs rely when pejoratively calling Pegasus "spyware"— was irrelevant to liability. And it is hornbook law that Plaintiffs cannot collect damages, either compensatory or punitive, for injuries to third parties. *Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007). The only relevance of the functionality of Pegasus once it is installed on a target device was as *res gestae* evidence to explain why Pegasus is valuable to governments as a tool. But if Defendants are now precluded from providing any evidence or argument about how it intended customers to use Pegasus, the fact that Pegasus extracts substantive information from target devices is likewise irrelevant, and now hugely (and unfairly) prejudicial if NSO is not allowed to introduce evidence of its intent in creating and licensing such a tool or the guardrails that exist around Pegasus's use by NSO's government customers.

Because Plaintiffs succeeded on their MILs by persuading the Court that only evidence directly related to the attempted use of Pegasus in 1,400 "intrusions at issue in this period of time in May 2019" is relevant (Dkt. 84 at 35:9-15), Plaintiffs are judicially estopped from contending otherwise at trial. Therefore, the Court should preclude Plaintiffs from introducing evidence or argument related to (among other things): (1) what Pegasus does on target user devices, including any characterization of Pegasus as "spyware"; (2) NSO's research, development, and testing of Pegasus; and (3) any conduct by NSO before April 2019 or after May 2019. None of that evidence relates to the liability-creating access *to WhatsApp servers* or transmission of metadata across those servers in April-May 2019 or reflects malice, oppression, or fraud by NSO in connection with that specific conduct, so it is irrelevant under the reasoning of the Court's Order. But if Plaintiffs are permitted to argue that NSO's general research, development, and testing of Pegasus reflects malicious, oppressive, or fraudulent intent, then NSO must be able to respond with general evidence of its intent in engaging in that conduct.

//
//
//
//

# CONCLUSION

For the foregoing reasons, the Court should grant NSO leave to file a motion for reconsideration of the Court's Final Pretrial Order.

DATED: April 18, 2025

KING & SPALDING LLP

By: /s/ *Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED