Pages 1 - 77

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton, Judge

WHATSAPP, INC., a Delaware      )
Corporation, et al.,            )
                                )
          Plaintiffs,           )
                                )
  VS.                           )      **NO. C 19-07123 PJH**
                                )
NSO GROUP TECHNOLOGIES          )
LIMITED, et al.,                )
                                )
          Defendants.           )
_____ )

                     Oakland, California
                     Thursday, April 24, 2025

          <u>**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**</u>

**<u>APPEARANCES</u>**:  (via videoconference)

For Plaintiffs:
                    DAVIS, POLK & WARDWELL LLP
                    450 Lexington Avenue
                    New York, New York  10017
              BY:   **ANTONIO PEREZ-MARQUES, ATTORNEY AT LAW**
                    **GREG D. ANDRES, ATTORNEY AT LAW**
                    **GINA M. CORA, ATTORNEY AT LAW**
                    **LUCA MARZORATI, ATTORNEY AT LAW**

                    DAVIS, POLK & WARDWELL LLP
                    900 Middlefield Road - Suite 200
                    Redwood City, California  94063
              BY:   **MICAH G. BLOCK, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**


Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

```
 1   APPEARANCES:   (continued, via videoconference)

 2   For Defendants:
                          KING & SPALDING LLP
 3                        633 West Fifth Street - Suite 1700
                          Los Angeles, California  90071
 4                   BY:  JOSEPH AKROTIRIANAKIS, ATTORNEY AT LAW
                          AARON S. CRAIG, ATTORNEY AT LAW
 5
                          KING & SPALDING LLP
 6                        50 California Street - Suite 3300
                          San Francisco, California  94111
 7                   BY:  MATTHEW V. NOLLER, ATTORNEY AT LAW

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

---oOo---

**THE CLERK:**  The United States District Court for the Northern District of California is now in session.  The Honorable Phyllis J. Hamilton presiding.

Your Honor, now calling 19-7123, WhatsApp, Inc., et al. versus NSO Group Technologies Limited, et al.

Counsel, if you can please state your appearances beginning with the Plaintiff.

**MR. ANDRES:**  Good morning, Your Honor, this is Greg Andres from Davis Polk.  I'm here with my colleagues Antonio Perez-Marques, Micah Block, Gina Cora -- all the way to my right -- and also in the room with us is Luca Marzorati.  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. AKROTIRIANAKIS:**  Good morning, Your Honor, Joe Akrotirianakis, Aaron Craig and Matthew Noller.  And I'm sorry, Your Honor, that I don't have a suit with me.  I'm traveling for this case and wasn't anticipating a further hearing.

**THE COURT:**  That's fine.  Thank you for appearing.

**MR. AKROTIRIANAKIS:**  Thank you, Your Honor.

**THE COURT:**  Okay.  All right.  Let's see, what is the -- Jenny, down in the corner, there's -- is that you down in the -- with the court's seal?  Is that --

1          **THE CLERK:**  Yes, that's the evidence PC, yes.

2          **THE COURT:**  Okay.  All right.  Thank you.

3      All right.  We have just a few things to talk about

4  although I'm sure it will probably take us a while to get

5  through these few things.

6      First of all, I would say good catch to the Defense team

7  on the video -- on the jury video.  I hadn't watched it for

8  years, and I agree, there shouldn't be any references in that

9  video to any potential parties in the case.  We probably as a

10  court should think about removing the names of the companies --

11  all the names of the companies that are mentioned in that.

12      If the Defense has no objection, we can indeed -- well,

13  our IT Department is now looking into whether or not they can

14  excise that portion of it and play the rest of the tape, which

15  is pretty helpful, I think.  Jurors have found it helpful.  If

16  there is no objection to us doing that, we will proceed to do

17  it.  If I -- if the IT department can't excise it, we won't

18  show anything.

19          **MR. AKROTIRIANAKIS:**  Yes, Your Honor, thank you.

20  There's no objection if they can excise that.  And, in fact, I

21  don't have any objection -- we don't have any objection to

22  obviously the jurors being instructed that they shouldn't --

23  they shouldn't consult social media of any kind and things like

24  that.  The only issue is in the particular statement that Judge

25  Illston makes, she says that, you know, "Facebook is wonderful"

1    or something to that effect; and it is just not the right case

2    for that.  That's all.

3        **THE COURT:**  Well, she didn't -- she said, "these

4    wonderful tech companies."  I think she mentioned two names,

5    Google and Facebook; but she did characterize them as both

6    being wonderful companies.  I totally agree, there is -- like I

7    said, it was a good catch.  If we cannot excise it, we won't

8    show anything.

9        That admonition, however, is included in the jury

10   instructions that I give; but jurors, which we are all attuned

11   to looking at screens, it has an additional impact to have it

12   said on the screen before they, you know, come into the

13   courtroom.  So, it would be my preference to use it but only if

14   we can excise that.

15       **MR. AKROTIRIANAKIS:**  I think that's right.

16       **THE COURT:**  I should know some time today whether or

17   not that can occur.  Okay.  So, those objections are granted.

18                      (Pause in proceedings.)

19       **THE COURT:**  Okay.  Before we turn to the jury

20   instructions, I did want to mention just a couple of things.

21   You-all submitted -- and I appreciate the additional work that

22   you did to submit some revised items including a joint verdict

23   form -- I just wanted to point out two things.  We will need

24   for you to prepare one that is blind, that does not have the

25   parties -- the lawyers' addresses and firm names, that's just a

1    blind document.

2        There was a typo on page 1, first sentence, when answering

3    the following questions and filling out this verdict form, it

4    says "filing out this verdict form."  So, that should be

5    corrected.  And then obviously with regard to the punitive

6    damages instruction as soon as we know what the number is, we

7    can add that number; but you should put a blank there so that a

8    number can be inserted, okay, in case we have to do it manually

9    depending upon when we decide on what the numbers are going to

10   be on all of the instructions.  Okay, got that?

11            **MR. ANDRES:**  Understood, thank you, Your Honor.

12            **THE COURT:**  Okay.  Now, let's turn then to the jury

13   instructions.  What I wanted to do was to go over your jury

14   instructions, then talk about the jointly filed document

15   identifying provisionally sealed documents, talk about those

16   documents; and then we will talk about the discovery and

17   deposition excerpts and how they should be handled.  So, that's

18   the order that we will go.

19       I do remind you all, though, that I do still need two

20   items and that's the brief description of the case that is

21   provided to the jury before we start with the jury selection

22   process.  I don't generally use the same claims and defenses

23   even though that's an instruction.  I usually use something

24   that's far more abbreviated than that just essentially to tell

25   them what kind of case it is and who the parties are.  I'm

```
 1    still waiting for that.  That didn't come in as I anticipated
 2    yesterday or was it due today?  It is due today?
 3               MR. ANDRES:  Yes, Your Honor.
 4               THE COURT:  Okay.  So, it will come in as well as the
 5    witness list, I assume.
 6               MR. AKROTIRIANAKIS:  Yes, Your Honor.  I had a quick
 7    question, if I could ask the Court's guidance on the
 8    preparation of that document, first of all, on the statement of
 9    the case, I think -- we have exchanged drafts and we are very
10    close on that at least from my perspective.  We are about to
11    send, after this hearing, our further comments to the
12    Plaintiffs.
13        On the list of witnesses, do I understand correctly that
14    the Court wants a single list of all witnesses that it will
15    read to the jury for the purpose of if the jurors think they
16    might know somebody --
17               THE COURT:  Yeah.
18               MR. AKROTIRIANAKIS:  -- with the same name?  Okay,
19    thank you, Your Honor.  And then on the list of the lawyers, as
20    I understand, this is not a list of the lawyers that the
21    Court -- that the parties expect to have a speaking role during
22    the trial but all the lawyers who will be in the courtroom so
23    that we can know if the jurors think they might know someone or
24    something like that.  Is that accurate?
25               THE COURT:  Actually, typically what I do is to -- I
```

1   generally ask Counsel so that you have an early opportunity to

2   interact with the jury, I ask Counsel to introduce themselves

3   and the people that they think they want the jury to know.  I

4   mean, you can obviously list even the people in the -- that are

5   not seated at counsel table if you wish.  It is totally up to

6   you to introduce yourself, your law firm and the lawyers and/or

7   client representatives who are present.  So, actually I don't

8   need a name.  You -- those names.  You-all can -- will be asked

9   to provide that yourselves.

10          **MR. AKROTIRIANAKIS:**  So, shall we include on the

11  submission -- for today's submission to the Court a list of

12  attorney names?  And if so, what would you like --

13          **THE COURT:**  If it's -- if it is settled, if you know

14  who everybody -- the identity of everybody who will be in

15  attendance, you can list it just for my benefit; but I'm not

16  going to read it off.

17          **MR. AKROTIRIANAKIS:**  I see.

18          **THE COURT:**  I will read off simply the list of

19  witnesses.

20          **MR. AKROTIRIANAKIS:**  Okay.  Thank you, Your Honor.

21          **THE COURT:**  Okay.

22          **MR. ANDRES:**  Your Honor, one other clarifying

23  question, if I might, I understand that we are going to be

24  talking about jury instructions today and I appreciate that.

25  Is it correct that we will also still have a charging

1    conference at the end of the trial in case there are additional

2    instructions that are merited as a result of what happens

3    during the trial?

4         **THE COURT:** Of course. I mean, that's for the record.

5         **MR. ANDRES:** Okay.

6         **THE COURT:** We will have a charge conference probably

7    if we can anticipate the end of the trial the day before.

8         **MR. ANDRES:** Thank you, Your Honor.

9         **THE COURT:** Okay. And -- okay. So, you are going to

10   send me today the description of the case and the list of

11   witnesses. They don't have to be in alphabetical order. They

12   can be in any order you wish. You can start first with

13   Plaintiffs and then Defendants. It doesn't really matter. I'm

14   not going to tell the jury for which side they are testifying,

15   and you don't have to indicate what their roles are or anything

16   like that. It is just the names. Okay?

17        **MR. AKROTIRIANAKIS:** Yes, Your Honor.

18        **MR. ANDRES:** Yes.

19        **THE COURT:** All right. So, let's start with -- let's

20   start with the jury instructions. Now, I noted with regard to

21   the first submission of jury instructions that there was no

22   written set of objections by Plaintiff, and I understand from

23   the filing by -- from Defendants last night that you filed --

24   and I didn't have a chance to read them -- objections. I

25   assume you want these to supercede the first set. I did not

1    reread that, first set of objections.

2         **MR. NOLLER:**  So, Your Honor, I don't think I would use

3    the word "supercede," but because this is a revised set of

4    proposed instructions from both parties that are different in

5    some ways than the instructions that we submitted before, these

6    objections are directed specifically to the new set of proposed

7    instructions.  So, I wouldn't want to suggest that, you know,

8    we are abandoning or waiving any of the objections that we made

9    before.

10        We are just taking the rulings that your Court -- that

11   Your Honor made in the pretrial order, the statements on the

12   record, and trying to accommodate those in a new set of

13   objections or a new set of instructions.  And that's what our

14   objections relate to.

15        **THE COURT:**  Okay.  "Supercede," using that word

16   obviously was the wrong word.  My inquiry, though, is we don't

17   have to go back and look at those now, do we?

18        **MR. NOLLER:**  The old objections, Your Honor?

19        **THE COURT:**  The old objections.

20        **MR. NOLLER:**  That's right, yes.

21        **THE COURT:**  Okay.  So, today we are only going to deal

22   with any new objections.

23        **MR. NOLLER:**  Correct.

24        **THE COURT:**  Now, you did also file some joint

25   instructions.  Now, these are in addition to -- and I assume

1    that you want them given to in addition to the joint

2    instructions that you initially filed; correct?

3             **MS. CORA:**  That's correct, Your Honor.

4         **THE COURT:**  Okay.  All right.  So, those -- the joint

5    instructions -- I looked at.  They are perfectly fine, both

6    your old set and the new set and those will be given.  So, the

7    only real issues we have are with regard -- right now is with

8    regard to the second set.  I need to make sure I have those in

9    front of me.

10                      (Pause in proceedings.)

11        **THE COURT:**  All right.  I have both sets in front of

12   me.  So, we are just going to go through them one at a time.

13                      (Pause in proceedings.)

14        **THE COURT:**  Turning to both parties' instruction

15   number 1, claims and defenses, the big dispute appears to be --

16   well, the main dispute -- obviously because the first couple of

17   paragraphs are identical.  The main dispute is whether or not

18   the jury's task is to determine what damages, if any,

19   Defendants owe Plaintiffs.  And I also think in the last

20   sentence there's a difference in the wording in that the

21   Defendants task the jury with whether to decide damages and

22   permit the jury to decide if they feel the evidence supports

23   that as opposed to the Plaintiffs' last sentence, which suggest

24   that the jury -- well, because it omits the "if any," suggests

25   the jury must find some sort of damages.  And it also uses much

1   stronger language in using the term what the jury should

2   consider is what the jury may consider.

3       I prefer the Defendants' version.  And, Plaintiffs'

4   Counsel, I thought we had already addressed this at the

5   pretrial conference.  I guess I wasn't clear enough, but the

6   whole damages question that was determined on summary judgment

7   was more in line with the type of damages as opposed to the

8   amount of damages because there was no evidence put on as to

9   the amount of damages.

10      The type of damages being the remediation --

11  investigation, remediation costs in the Court's view would

12  surely amount to at least $5,000; but that amount does not bind

13  the jury.  So, I'm not going to put that amount in any

14  instruction; and the jury, in the Court's view, could indeed

15  find that the Plaintiffs haven't proven any damages.  Why are

16  we having a damages trial?  The Court has found certainly

17  damage in the sense of harm, but the Court hasn't found damage

18  in the sense of an amount to be assessed.

19      So, I would go with the Defendants' instruction, and I

20  prefer the more permissive language as well.  Did anyone

21  wish -- I can see that there is someone.

22          **MR. ANDRES:**  Ms. Cora, Your Honor.

23          **MS. CORA:**  If I can just address that for a moment,

24  Your Honor.  We understood your ruling as per our discussion at

25  the pretrial conference to be limited to our breach of contract

claim.  And so, Defendant -- so Plaintiffs have agreed to a

nominal damages instruction; and we understood that with

respect to breach of contracts, you did not find a loss amount.

However, we had understood that you agreed that in

granting liability on the CFAA claims you necessarily found a

$5,000 loss because that requirement is mandatory under the

statute and is written on page 10 of your order of -- granting

summary judgment; that under Section (a)(4) an element is a

$5,000 loss within a one-year period.

And in addition to that for both CFAA statutes, there is a

$5,000 loss requirement as a standing element; and that is

described in the Ninth Circuit case cited in our proposed

instruction.

And so, we are not seeking to instruct the jury that they

must find at least $5,000 in damages, but we do think that it

is fair to instruct the jury both as to the $5,000 loss finding

and not to indicate affirmatively that it is possible to find

zero compensatory damages because such a finding would be

inconsistent with your summary judgment order; and the Court

would likely need to revise that and -- to be $5,000 after any

such ruling.

**THE COURT:**  Okay.  But I think that I explained in

doing that because I had no evidence before me as to what the

amounts were, that I viewed my finding as a prima facie finding

on the basis of the type of damage that I recognized in the

order that would necessarily entail at least $5,000 but that --

I don't see how that binds the jury in this case.  You still

have to prove damages.

And while I have made a prima facie showing that you have

shown probably $5,000 in damages, the jury could find that it's

more or the jury could find that you have not established that

the Plaintiffs are entitled to any damages.  I mean, I

imagine -- I don't know all the discovery in this case; right.

I don't know what you-all know about this case, but I imagine

one of the arguments could be that because the expenses

entailed in this investigation were salaries that otherwise

would have been paid, I would imagine the Defendants would

argue that you are not entitled to damages because you would

have paid them the same amount anyway even though obviously you

had to allocate those resources to this thing as opposed to

something else.  I imagine there will be arguments like that,

and I don't intend to take that away from the jury.

I understand the argument and it's -- my thinking on this

is evolving as we go along as should be apparent to all of you,

but I'm more comfortable with allowing the jury to have the

full scope of is discretion.  So, I'm sorry.  I'm ruling

against Plaintiff on this.

            **MR. ANDRES:**  Thank you.

            **THE COURT:**  I'm going to use the Defense instruction.

Okay.  Next are the instructions going to the findings of fact.

1    Now, I appreciate that the Plaintiffs' revised instructions are

2    more limited in terms of those findings than the original ones.

3    Nonetheless, the dispute is between the extent of the findings

4    that should be included with the Defendants giving -- you know,

5    as skimpy as an explanation as possible and the Plaintiffs

6    giving a little more heft to their -- to their findings.

7        So, I would like to hear what your arguments are on this

8    question because I -- I do think that it's not -- it's

9    certainly not -- in my view it's certainly not necessary to

10    spell out the elements to the extent that the Plaintiff has.

11    Particularly in breaking out Section 1030(a)(2) and 1030(a)(4),

12    I don't see how that's necessary given that the Court has

13    already found liability on both.

14        But I would like for both sides to be heard.  I haven't

15    made up my mind specifically on this one.  So, I would like

16    both sides to be heard on this.

17        **MS. CORA:**  Thank you, Your Honor.  I can address why

18    we believe that the jury should be instructed as to the

19    elements.  As Your Honor is aware, this is a trial.  And in

20    order for the jury to have the information to award damages, it

21    necessarily needs to understand the conduct at issue; and this

22    is particularly true with respect to punitive damages where the

23    jury needs to make assessments about the conduct at issue.

24        **THE COURT:**  But the conduct at issue is different than

25    the elements.

1          **MS. CORA:**  Yes, Your Honor, but the jury will not be

2     able -- because this is a damages only trial unlike a trial

3     where there is liability -- a liability determination, there

4     will be, you know, truncated evidence on liability; and,

5     therefore, these instructions assist the jury in understanding

6     the Court's findings as a matter of law as to liability.

7          This is -- the instruction as to elements is also

8     consistent with what Judge Orrick did in the *Diaz* case that we

9     cite in our instructions.

10         In that case liability had been established during an

11    initial trial.  And then during the subsequent retrial on

12    compensatory and punitive damages, Judge Orrick went through

13    each element and described the findings -- and at a high level,

14    the elements and findings based on those elements.  And that's

15    what we tried to do in our instruction.

16         Defendants' proposed instruction on the CFAA is extremely

17    skimpy.  It doesn't inform the jury that there were two

18    different bases for liability, and it also misdescribes the

19    scope of the Court's order as to what -- the conduct at issue.

20    So, essentially what Defendant seem to be trying to do is sweep

21    their liability under the rug and keep it from the jury.

22         **THE COURT:**  Well, I agree that Defendants' instruction

23    number 2 -- to the extent that that's it -- isn't enough from

24    which the jury I think can glean enough information about the

25    case.  I agree with that.  But, you know, as everything in this

1    case, it's a line drawing exercise.  Where do we draw the line

2    on how much information?

3         Are you finished, Counsel?  I don't --

4         **MR. PEREZ:**  Your Honor, this is Antonio Perez.  If I

5    can just add one point for Plaintiffs, I think that part of the

6    issue here is that the jury is going to be charged with

7    determining what damages flowed from the conduct giving rise to

8    liability.  It's not enough for them to assess that question

9    just to know that liability was incurred.  They need a more

10   specific understanding of what conduct gave rise to that

11   liability so that they can -- I think as even Defendants have

12   insisted is necessary -- draw a necessary connection between

13   the conduct that gave rise to the liability and the damages

14   that we intend to prove occurred.

15        And in order to do that, they need to know not only that

16   liability was incurred but how that liability was incurred so

17   they can draw that connection.

18        **THE COURT:**  Okay, thank you.  From the Defense?

19        **MR. NOLLER:**  Thank you, Your Honor.  So, we fully

20   agree that the jury's task is based on the conduct that

21   incurred liability; but the Plaintiffs are going to introduce

22   loads of evidence on what that conduct is.

23        If you look at their deposition designations, the

24   evidence, their exhibit lists, they are intending essentially

25   to introduce all of the exact same evidence on the conduct that

1    they would have introduced anyway.  They have designated

2    something like two hours of deposition testimony from

3    Defendants' technical witness.  They have their own witness

4    that they are going to be testifying.  They have gone so far as

5    to introduce all of the same exact evidence on profits that

6    they would have introduced in connection with discouragement.

7        And so, the conduct is not going to be hidden from the

8    jury.  The jury is going to hear about all of it, and it is

9    going to be their task to determine whether that conduct

10   satisfies the test for punitive damages.

11       And we are also not trying to hide from the jury the

12   district court's finding of liability.  Our version of

13   instruction number 1, that Your Honor has accepted, says

14   outright that the Court found that Defendants are liable on

15   each of Plaintiffs' claims.

16       So, then the question is just, you know, in order to

17   instruct the jury as to what the conduct they have to consider

18   is, is it necessary to instruct them as to each separate

19   statutory element of the claims?  And I think Your Honor is

20   right, that the conduct and the elements are just distinct

21   issues.

22       So, the conduct that Your Honor found violated the CFAA

23   was that these versions of Pegasus at a particular point in

24   time operated by sending messages containing Pegasus code

25   through WhatsApp servers, that according to Plaintiffs, the

1   servers would not have sent on their own.  That is the conduct

2   that this Court found violated CFAA.

3       What the agent did once it was installed in user devices

4   has nothing to do with that.  What the -- you know, a lot of

5   these other issues just have nothing to do with that particular

6   conduct.  And in order for the jury to understand that

7   particular conduct, I take Your Honor's point about how it's

8   described in our instruction; but we think our instruction is a

9   lot closer to all the jury needs to know to understand what the

10  conduct at issue is and the Plaintiffs' instruction, which goes

11  point-by-point through legal findings, how facts apply to

12  particular statutory elements just have nothing to do with the

13  jury's task at the trial.

14      And in particular, as Your Honor noted in breaking out the

15  separate legal theories under CFAA, I mean, the jury doesn't

16  need to know that either because the jury is only awarding one

17  amount of damages for CFAA.  The underlying conduct for both

18  theories is the same.  And so, the jury doesn't have any reason

19  to know that, you know, NSO was liable on this provision of

20  CFAA, the second provision of CFAA.  It has nothing to do with

21  the damages.

22      In fact, in particular instructing the jury that the Court

23  found intent to defraud under 1030(a)(4), which is a different

24  statute, a different standard of proof, a different standard

25  for finding defraud than fraud under the punitive damages

1   statute, I mean, that would just be hugely prejudicial and

2   unfair to NSO to essentially tell the jury that the Court has

3   already found, you know, one of the elements of punitive

4   damages that the jury has to consider when that is not, in

5   fact, the case.

6        **MS. CORA:**  Your Honor, that is not what the

7   instructions do.  The instructions are -- the instruction on

8   (a)(4) with respect to Your Honor's finding on intent to

9   defraud is near the specific finding.

10       Now, it is unfortunate for Defendants that that was your

11  finding as a matter of law, but that is the liability finding

12  in this case where our punitive damages instruction does not

13  seek to avoid another finding of fraud.  We are not saying that

14  fraud has been established for purposes of punitive damages,

15  but it's certainly relevant that there is a finding as a matter

16  of law that Defendants acted with an intent to defraud.

17       In addition, we have instructions from Judge Orrick that

18  detail the elements of a case for liability have been

19  established in a damages only trial.  Defendants can point to

20  no instructions in this posture where juries are essentially

21  shielded from the Court's findings or the prior trial findings.

22       **MR. NOLLER:**  Your Honor, it is not a question of

23  shielding and the fact that one judge in a different case under

24  different circumstances gave a particular instruction doesn't

25  mean that that same approach is appropriate here.

1          And even if the instruction on 1030(a)(4) doesn't

2     explicitly say that the jury has to find intent to defraud for

3     purposes of punitive damages, that is, of course, how a jury is

4     going to understand that.  It is the same words.  The jury is

5     not going to understand the find but -- for, you know, fairness

6     to Defendants incredibly important distinctions between what

7     this Court was finding on summary judgment, what the Plaintiffs

8     had to prove for those purposes, and what they have to prove

9     for purposes of punitive damages.

10         And in terms of relevance for what the jury has to

11    consider, the fact that this Court found intent to defraud

12    under a particular provision of a different statute is not

13    relevant to that.

14         What is relevant to punitive damages is what did the

15    Defendants do, what actions did the Defendants take that this

16    Court found created liability.

17         The action for purposes of 1030(a)(4) was redesigning

18    Pegasus.  The fact that this Court found that action satisfied

19    a statutory provision that uses the language "intent to

20    defraud" is not relevant to whether the conduct satisfies the

21    standards for punitive damages under California law; and that

22    is what the jury has to decide in this case.

23              **THE COURT:**  Okay.

24              **MS. CORA:**  Well, Your Honor -- can I address that,

25    Your Honor?

1          **THE COURT:**  Okay.

2          **MS. CORA:**  So, I think Your Honor has recognized that

3    critical to Plaintiffs' punitive damages case is the repeated

4    nature of Defendants' attacks.  And with respect to the finding

5    of intent to defraud on (a)(4), the specific finding was that

6    Defendants redesigned Pegasus to evade detection after

7    Plaintiffs first fixed its security breach.  That goes directly

8    to the conduct at issue for punitive damages, which Mr. Noller

9    said is very important for the jury to understand.

10          **THE COURT:**  Okay.

11          **MR. NOLLER:**  Your Honor, just briefly --

12          **THE COURT:**  Bottom line -- bottom line is the

13    Defendants' proposed number 2 doesn't go far enough, and the

14    Plaintiffs' instructions 2, 3, and 4 probably goes further than

15    I think is necessary.  You-all need to meet and confer and come

16    up with something that both sides can agree on, at least

17    something that's closer than these.

18          **MR. NOLLER:**  Your Honor, could you --

19          **THE COURT:**  I agree with Plaintiffs' Counsel in

20    principle that the jury obviously needs to know something about

21    what happened and what conduct gave rise to the -- to the

22    Court's finding of liability even -- notwithstanding the fact

23    that they are going to hear a lot about the conduct at the

24    trial, they need to know what the basis of the liability is

25    before they get -- I think realistically can make a damages

1    determination.

2          But like I said, Plaintiffs give way more details than is

3    necessary in my view.  So, you need to cut back on that; and I

4    would simply require you to meet and confer on this and to try

5    to come up with something closer.  Submit whenever you can

6    before the trial if you can.

7          I'm not going to have a chance to look at it, so I will

8    just tell you for the first day on your opening statements you

9    are not going to be able to refer to these instructions unless

10   they are settled.  So, that should encourage you-all to come up

11   with something that's much more of a compromise than this.

12         **MS. CORA:**  Understood Your Honor.

13         **MR. NOLLER:**  Understood.

14         **THE COURT:**  Okay.  Okay.  And then that takes us to

15   the damages.  Before we get to damages overview, both sides

16   have submitted -- there is an additional one and that's --

17   let's see -- oh, customers use of Pegasus.  This is Plaintiffs

18   I believe.

19         **MS. CORA:**  Yes, Your Honor.

20         **THE COURT:**  Where did that come from?  I mean, that

21   wasn't in the first set.

22         **MS. CORA:**  We had proposed in our first set an

23   instruction on conspiracy, and Your Honor clarified during the

24   pretrial conference and in your subsequent order, they need to

25   not make a finding as to the elements of conspiracy although

1    you do think that perhaps the evidence is there to have made

2    such a finding.

3         So, we abandoned an instruction with respect to conspiracy

4    and instead proposed this instruction which is consistent with

5    Your Honor's finding on summary judgment and also with respect

6    to the order that you issued after the pretrial conference

7    because the instruction is just -- it is merely meant to

8    eliminate the thought in any juror's mind that Defendants can

9    evade responsibility because Pegasus was used by their

10   customers.  So, this is a much narrower instruction than what

11   we had previously proposed.

12        **THE COURT:**  Okay.  But the Defendants have already

13   been found liable.  I'm not even sure how this would come up.

14   I mean, the Defendants can't argue that they are not liable

15   because they have already been found to be liable.

16        **MS. CORA:**  They certainly should not do that, but they

17   can insinuate that their customers used Pegasus as opposed to

18   Defendants.

19        They have asked, Your Honor -- in fact, in the motions in

20   limine -- to preclude Plaintiffs from arguing that -- that

21   Defendants -- that NSO used Pegasus in order to leave the door

22   open on this argument.  Your Honor denied that motion in

23   limine, but we believe that this will be one of their -- you

24   know, one of Defendants' themes at trial.

25        **THE COURT:**  Well, I believe that -- I mean, their

1    clients did use Pegasus.  Their liability has been determined

2    by the Court, and I believe my ruling was that they could not

3    disavow their liability.  Legally they are liable.  They can't

4    argue otherwise.  I never -- I did not enter a ruling that said

5    that they can't say they sold it to governments and governments

6    used it.

7         I mean, I'm not exactly sure I understand why this is

8    necessary.  They can argue the use by their clients as long as

9    they don't disavow liability.  They can't undermine the Court's

10   prior determination is what I'm suggesting.

11        MS. CORA:  And we are open to revising the

12   instruction, but that is merely the point that we were trying

13   to convey to the jury so that the jury understood that

14   Defendants are liable no matter that Pegasus was used by their

15   customers.

16        THE COURT:  Okay.  How about we handle it this way,

17   how about we see what the evidence is.  And at the time of the

18   charge conference, we can determine if there was such an

19   insinuation, if there was testimony that I didn't strike.  I'm

20   sure if someone suggested that, I would strike the testimony

21   and probably get really angry at Defense Counsel for eliciting

22   that.  So, why don't we just wait and see if something like

23   this is necessary depending upon how the evidence comes in.

24        MS. CORA:  Thank you, Your Honor.

25        THE COURT:  Okay.  I assume that's fine with Defense

```
1    as well.

2            MR. NOLLER:  Yes, Your Honor.  I mean, we would just

3    note that we think if an instruction like this is given, it has

4    to -- as we put in our objections -- you know, account for the

5    fact that NSO's intent is not the same as its customers.  And

6    so, that liability doesn't necessarily carry over to punitive

7    damages, but we can deal with that at the time.  So, that's

8    fine, Your Honor.

9            THE COURT:  All right.  And then the next one is the

10   damages overview.  And once again the real question is if

11   the -- if any should be included.  And I have already approved

12   that.  So, the Defense will be -- instruction will be given.

13   All right.  Now, Defendants' instruction number 4, compensatory

14   damages/multiple legal theories.  Didn't you-all submit

15   something revised on that?

16           MS. CORA:  Yes, it is revised in instruction --

17   Plaintiffs' revised instruction number 7 and Defendants'

18   number 4.

19           THE COURT:  Okay.

20           MS. CORA:  It is essentially -- the parties are

21   essentially in agreement.  Again, it is the "if any" issue --

22           THE COURT:  Right.

23           MS. CORA:  -- which is present in Defendants'

24   instruction.  And then there is a minor word difference at the

25   end of the instruction.  Instead of "legal claims alleged,"
```

1    Defendants' instruction includes "legal theories alleged."

2            **THE COURT:**  Oh, it should be claims.

3            **MS. CORA:**  Okay.

4            **THE COURT:**  It should be claims.  So, that comes from

5    the Plaintiff, but the "if any" stays in.

6            **MS. CORA:**  Yes.

7            **MR. NOLLER:**  That's fine, Your Honor.  The only real

8    disagreement was "if any."

9            **THE COURT:**  Okay.  So, redo that one as well to

10   submit.  Now, we are at the punitive damages instruction, okay.

11   I just had a couple of questions.  They are very similar.  They

12   are very similar except the -- except, let's see, is the malice

13   the same?

14           **MR. NOLLER:**  Your Honor, there is a difference in

15   malice and there is a difference, at the very end of the

16   instruction, on whether -- on the extraterritoriality issue.

17           **THE COURT:**  Okay.

18           **MS. CORA:**  There is -- Defendants also deviate from

19   the pattern instruction with respect to the elements for

20   considering reprehensibility.  They've also deleted one of

21   those elements.

22           **THE COURT:**  Yeah, they have deleted the whether

23   Plaintiffs are -- let's see.

24           **MR. NOLLER:**  Your Honor, I'm happy to address that and

25   explain.  What we deleted was -- it is consistent with our

1   edits to the malice definition, the element of the

2   reprehensibility that goes to the -- you know, whether NSO, you

3   know, knew about and disregarded a known risk of harm to third

4   parties.  And the reason that we have removed that language is

5   that at Plaintiffs' suggestion on their MILs, this Court has

6   precluded Defendants from introducing evidence as to the steps

7   it took to avoid harm to the third parties through their due

8   diligence processes, their, you know, investigations of misuse,

9   all of the evidence that NSO would need to put forward to

10  counter any assertion that they did disregard a known risk for

11  third parties NSO is no longer able to submit at trial.

12       And so, it would just be unfair and misleading to the jury

13  to instruct the jury that they should infer an element of

14  punitive damages that NSO is not able to introduce any evidence

15  on.  So, that's why we removed that language.

16            **MS. CORA:**  So --

17            **THE COURT:**  And point to me, yours is instruction

18  number 5 --

19            **MR. NOLLER:**  That's correct.

20            **THE COURT:**  -- and where specifically is the language

21  that you are referring to?

22            **MR. NOLLER:**  Yes, Your Honor.  So, it is not present

23  in our instruction number 5, but it would be under the

24  definition of malice, so toward the bottom of the first page of

25  instruction number 5.

1          **THE COURT:**  Okay.

2          **MR. NOLLER:**  That's the first sentence of the pattern

3     definition of malice.

4          **THE COURT:**  Okay.

5          **MR. NOLLER:**  Plaintiffs' instruction number 8 at the

6     bottom of their first page, you can see the full definition.

7     The part that we have omitted relates to, you know, harm to

8     third parties that you have precluded Defendants from

9     introducing evidence on.

10         The other portion that we removed was under the pattern

11    instruction.  If you look at page 2 of our instruction

12    number 5, it would ordinarily be number 2 under the

13    reprehensibility factors.  You can see that in Plaintiffs'

14    patterns instruction -- Plaintiffs' proposed instruction,

15    rather, page 2, whether Defendants disregarded the health or

16    safety of others, the same problem.  This is a question that

17    Defendants wanted to submit evidence of their due diligence

18    practices; wanted to submit evidence of the many affirmative

19    steps they take to avoid harm to others, and Your Honor has

20    ruled that that can't come in.  So, the jury shouldn't be

21    instructed on that is our position.

22         **THE COURT:**  Okay.

23         **MS. CORA:**  Your Honor, these -- what Defendants have

24    done, they have removed a definition of malice that is not just

25    in the pattern instruction, but it is also in the California

1    law and by reference in the CFAA section.  So, there is no

2    basis to do that.

3         In addition, the definition of malice that they remove,

4    the portion of the definition, includes the consideration that

5    Defendants' conduct was despicable and was done with a willful

6    and knowing disregard of the rights or safety of another.  And

7    that other could be Plaintiffs.  And our argument is very much

8    that Defendants acted willfully and knowingly with a disregard

9    of Plaintiffs' rights to have an intrusion free server.

10        So, I think this is kind of a Hail Mary for class by

11   Defendants.  They took to renew arguments that you have already

12   rejected now multiple times including with respect to their

13   leave for a motion to reconsider because they are arguing that

14   Your Honor's rulings are hampering their defense when that's

15   not true.

16        **MR. NOLLER:**  Your Honor, if the instructions said

17   "willful and knowing disregard and the rights and safety of

18   Plaintiffs," we wouldn't have an objection to that.  The

19   problem is that Plaintiffs have throughout this case been

20   trying to accuse NSO of threatening harm to third parties,

21   WhatsApp users at large in general, whether or not they were

22   involved in the 1,400 accounts that were attempted to be

23   accessed in April and May 2019.

24        In order to respond to that theory of punitive damages,

25   Defendants should be able to introduce evidence of the due

diligence practices, the other steps they have taken to avoid that harm.

Now, Your Honor, at Plaintiffs urging, has ruled that Defendants are not allowed to do that.  It is in their proposed statement of the case that the purpose of NSO's conduct was to surveil WhatsApp users.  If Plaintiffs are going to make that argument, we need to be able to introduce evidence of the ways that NSO tries to avoid that harm.

If we are not allowed to introduce evidence of the ways NSO tries to evade that harm, then Plaintiffs should not be allowed to argue that NSO exposed those users to harm.

If Plaintiffs want to argue only that NSO exposed Plaintiffs to harm, that's a different argument and we can deal with that; but to the extent that the instruction -- and this is all we have removed -- allows the jury to find punitive damages based on threatened harm to third parties, to WhatsApp users or other people other than Plaintiffs, Your Honor's rulings prohibits NSO from introducing evidence that goes directly to that question.  And so, it would be unfair to allow a jury to make a finding of malice on that basis.

THE COURT:  And harm to third parties in not an issue in this case.

MR. NOLLER:  I entirely agree, Your Honor.  And so, if the definition were revised to refer specifically to harm to Plaintiffs, I think that would be fine.  The problem -- that

```
1    includes the factor number 2 under reprehensibility, which is
2    whether Defendants disregarded the health or safety of others.
3    You want to change that to Plaintiffs, again, I think that's
4    okay.  The problem is other or of another includes third
5    parties, whose harm Your Honor just said is irrelevant.
6         MS. CORA:  Your Honor, they are rewriting the law.
7    This is the instruction -- this is the definition of malice is
8    that --
9         THE COURT:  But you can't have it both ways.  I mean,
10   either this is about a harm to Plaintiffs or it is about a harm
11   to third parties in addition to Plaintiffs.  And that's not
12   what the case is about.  At least that's certainly not my
13   understanding.  If it is about harm to the target users, then I
14   think I'm going to have to go back and reverse a lot of prior
15   rulings.
16        MS. CORA:  No.  That is not what we are -- we are not
17   saying that this case is about harm to users.
18        THE COURT:  But -- what is the harm?  What is the harm
19   in changing another or others to Plaintiffs?
20        MS. CORA:  Well, this is the first time we heard about
21   this proposal.  This was not brought up during the
22   meet-and-confers.
23        THE COURT:  Okay.
24        MR. NOLLER:  That's not true, Your Honor.
25        THE COURT:  Okay.  I don't --
```

1          MS. CORA:  It is very true.

2          THE COURT:  Look, we have too much stuff to go

3    through.  I'm going to change it to Plaintiffs and then it can

4    stay.  With that, Mr. Noller, does number 2 go back in on the

5    reprehensibility if it says Plaintiffs?

6          MR. NOLLER:  If it says Plaintiffs, yes, I think we

7    can agree to that.

8          THE COURT:  Well, I don't need to go into --

9          MR. NOLLER:  I'm not sure that sentence, you know,

10   makes a lot of sentence.

11         THE COURT:  Right.

12         MR. NOLLER:  I think it is clearly directed to third

13   parties.  If it says "Plaintiffs," that would deal with our

14   problem.

15         THE COURT:  Well, I think it is pertinent to a

16   different kind of case.  This isn't about health or safety of

17   these two big corporations.

18         MR. NOLLER:  I completely agree.

19         THE COURT:  I think it is irrelevant.  I would be

20   inclined to strike it as well; but if Plaintiffs want that

21   number 2 in, the "others" will be changed to "Plaintiffs."

22         MS. CORA:  We do.  We do want that in even if modified

23   to Plaintiffs.

24         THE COURT:  Okay.  All right.  So, I will accept

25   that -- I will accept modifications to the third party

1  suggestion.  And, otherwise, I think they are pretty much the

2  same; right?

3         MR. NOLLER:  There is one other issue, Your Honor,

4  which is the very last -- excuse me, I'm looking at the wrong

5  document -- the very last sentence of Defendants' proposed

6  number 5.  The sentence that reads "punitive damages may not be

7  used to punish Defendants for the impact of their misconduct on

8  persons other than Plaintiffs or for acts committed outside of

9  California."

10     That last clause, "or for acts committed outside of

11  California," is omitted from Plaintiffs' instruction and we

12  think needs to be included.

13         THE COURT:  Is it in the California -- is it in the

14  CACI instruction?

15         MR. NOLLER:  Yes, Your Honor.  Maybe not in those

16  exact terms, but there is a portion of the pattern instruction

17  on conduct outside of California.  It comes directly from the

18  Supreme Court's decision in *State Farm*, the Ninth Circuit's

19  decision in *White versus Ford Motor Company*.  The states cannot

20  award punitive damages for conduct that occurred outside of the

21  State.

22         THE COURT:  Okay.

23         MS. CORA:  Your Honor, I disagree with all of those

24  statements.  That language is not in the pattern instruction.

25  In the directions for use under the California model

1    instruction 3945, which is a pattern, the directions provide --

2    quoting *State Farm* -- "that a jury must be instructed that it

3    may not use evidence of out-of-state conduct to punish a

4    Defendant for action that was lawful in a jurisdiction where it

5    occurred."

6         And then the next sentence says, "an instruction on this

7    point should be included within this instruction if appropriate

8    to the facts."

9         The facts are not -- there are no facts here that make

10   this appropriate.  The predicate conduct is Defendants'

11   violation of CCDAFA, which Your Honor found as a matter of law

12   included a violation of Plaintiffs' servers in California.  The

13   misconduct occurred in California as a matter of law.

14        Now, *State Farm* and the other cases that Mr. Noller just

15   cited are about -- largely about dissimilar conduct where

16   Defendants -- Plaintiffs argue to the jury that the jury should

17   take into account a nationwide effect or effects of the

18   Defendants' misconduct that are unrelated to the conduct at

19   issue.

20        And *State Farm* makes -- itself makes this point very clear

21   on page 422 of that decision when the Supreme Court writes (as

22   read:) "Lawful out-of-state conduct may be probative when it

23   demonstrates the deliberate less and culpability of the

24   Defendant's action in the state where it is tortious, but that

25   conduct must have a nexus to the specific harm suffered by

1 Plaintiff."

2      Here, there is an obvious nexus to the conduct --

3 misconduct suffered by Plaintiffs in California.  And what

4 Defendants are seeking to do -- and it is clear based on their

5 objections to Plaintiffs' instructions -- is they are seeking

6 to confuse the jury that because perhaps they pressed a button

7 in Israel, punitive damages need to be discounted for that

8 conduct in Israel.  That is absolutely outside of the law.

9      And all of these cases are motivated by concerns over

10 Federalism, differences between states, state law.  And this

11 simply is not -- there is no legal basis for this.

12      **MR. NOLLER:**  Your Honor, that's -- that's not

13 accurate.  Ms. Cora is talking about a different part of *State*

14 *Farm*.  The language that she is quoting from *State Farm* about

15 legal conduct is in *State Farm*, and then *State Farm* immediately

16 goes on to say (as read:) "Nor does a state have a legitimate

17 concern in imposing punitive damages to punish a Defendant for

18 unlawful acts committed outside of its jurisdiction."

19      And in *White versus Ford Motor*, the Ninth Circuit reversed

20 a jury instruction for not including the exact sort of language

21 we are asking for here and expressly held that, quote -- this

22 is at page 1018 of *White* -- (as read:) "A state may not impose

23 economic sanctions on violators of its law with the intent of

24 changing the tortfeasors conduct in other states" -- and in our

25 case it would be other jurisdictions -- quote, "whether the

 1  extraterritorial conduct is lawful or not."

 2       And so, there is no question that -- as Ms. Cora found,

 3  Your Honor found -- that the conduct that violated CCDAFA, as

 4  Ms. Cora said, included some conduct that took place in

 5  California.  We don't dispute that, and we are not going to

 6  challenge that at trial.

 7       But it is also undisputed that leagues of other conduct

 8  that Plaintiffs have challenged in this case -- including

 9  conduct that they are going to tell the jury supports punitive

10  damages -- did not happen in California, and the jury needs to

11  be instructed that even if they can consider that conduct for

12  purposes of reprehensibility or the other things that *State*

13  *Farm* says.

14       What they can't do is award punitive damages to punish NSO

15  for that conduct.  It's not a question of Federalism.  It is

16  not a question of legal versus illegal conduct.  It is a

17  question of the due process limits on California's regulatory

18  authority to punish parties for things that they did not do in

19  California.

20       The Supreme Court and the Ninth Circuit are absolutely

21  clear that punitive damages cannot be awarded for that.  And in

22  *White* it is reversible error to not instruct the jury to that

23  effect.

24            **THE COURT:**  All right.  I have heard enough.  I have

25  heard enough of your argument.  I think I need to read these

1    two cases to satisfy myself before making a final decision.

2         So, the only thing that's left outstanding then with

3    regard to this instruction is whether or not Plaintiffs' or

4    Defendants' last sentence will be used.  Okay.  And I will let

5    you know after I have had a chance to digest this issue.

6              **MR. NOLLER:**  Thank you, Your Honor.

7              **THE COURT:**  Okay.  I think that takes care of the jury

8    instructions, the disputed ones.  Okay.  I will let you know on

9    the punitive damages last sentence, and you-all will meet and

10   confer on the claims, the element related instructions.

11   I believe, that's Defendants' 2 and Plaintiffs' 2, 3, 4.

12             **MR. NOLLER:**  Yes, Your Honor.

13             **THE COURT:**  Okay.  And they can't be used in opening

14   statements unless we have resolved it and you-all have

15   submitted -- if you submit something that both sides stipulate

16   to, then it's just -- I'm automatically going to use it, and

17   you can use it in your openings.  So, that should be incentive

18   to you-all to work through that over the next four days.

19             **MR. NOLLER:**  Understood.  Thank you.

20             **MR. ANDRES:**  Thank you, Your Honor.

21             **THE COURT:**  Okay.  Now we have -- let's turn to the

22   joint filing that you made the other day identifying the

23   provisionally sealed documents.  Let's talk about those

24   documents.  I will just say I couldn't find the documents the

25   Defense referred to, the A1021 -- 1046 and 1225.  On the A1026,

1   you gave me a docket number so I was able to find it; but I
2   have no idea.  The docket is a mess, and I have no idea.  I
3   know those are trial exhibit numbers, but your exhibit list
4   doesn't have a location for them; and we were unable to find
5   those, so I have not looked at them.
6       With regard to the other ones, I have been able to look
7   at.  So, let's start with the Plaintiffs', the trial exhibits
8   identified in the chart included in that filing.  It appears to
9   me that the sealing issue is simplified on the back page.  Most
10  of the documents you want the employee names, phone numbers,
11  WhatsApp account numbers redacted.  I have no problem with that
12  on all of these exhibits.
13      Two of them, it appears that the Defendant wants the
14  entirety of the document sealed.  I note that on the export
15  control technical information, some of it is already redacted
16  on these -- on the exhibits.  It's not available for us to see.
17  It is not entirely clear to me that the information on these
18  documents needs to be sealed in its entirety, but I'm too tired
19  to fight about this one, so -- and because it is only two, I'm
20  just going to let it happen.  I would like the trial evidence
21  to go in as smoothly as possible.
22      So, with regard to the sealing aspect of these seven
23  exhibits, they may be sealed as set forth on the back page or
24  the last page of that joint filing.  All right.  I assume
25  everybody is okay with that; right?

1          **MR. CRAIG:**  Yes, Your Honor.  I have an additional

2    concern on this topic, which is that when we were reviewing

3    Plaintiffs' deposition designations, it makes references to

4    additional exhibits not contained in their filing as to which

5    the Court has already granted Plaintiffs' -- sorry, granted

6    Defendants' motion to seal in ruling on the omnibus motions

7    because of the technical information contained therein; and

8    that wasn't put in Plaintiffs' submission, perhaps because it

9    was not provisionally sealed but rather it is actually sealed

10   now; but I trust that the Court's ruling will apply to those --

11   any such documents like those as well.

12         **THE COURT:**  Right.  If I have already approved sealing

13   of a document, it can remain sealed; meaning that it will be

14   published only to the jury during the course of the trial and

15   not to the public.

16         **MR. CRAIG:**  Thank you, Your Honor.

17         **THE COURT:**  Okay.

18         **MR. CRAIG:**  With respect to the one family of

19   documents -- it is different iterations of the same e-mail -- I

20   do believe it can be found at the record, but we would be happy

21   to submit it under seal to Your Honor highlighted with the

22   proposed redactions we would propose making to be consistent

23   with the Court's motions in limine rulings.

24         **THE COURT:**  Okay.

25         **MR. CRAIG:**  Because these e-mails make reference to

1    the fact that Plaintiffs believe that some of the targets are

2    members of civil society and human rights defenders and the

3    like, and we don't believe that that's appropriate to publish

4    to the jury.

5         THE COURT:  I agree.  Well, which exhibits are you

6    speaking of specifically?

7         MR. CRAIG:  This is the ones that are in Defendants'

8    portion of the submission.

9         THE COURT:  The ones that commence with the letter A?

10        MR. CRAIG:  Yes.  So, we used our trial exhibit

11   numbers, and we made reference to the fact that one of those is

12   provisionally under seal at docket 608-3, Exhibit F, but we can

13   resubmit it to the Court for the Court's convenience today.

14        THE COURT:  Well, I looked at that.  I'm not sure -- I

15   mean, what's the issue with that?  Is there -- does one side or

16   the other object to that being used as evidence?  Do the

17   Plaintiffs object?

18        MR. MARZORATI:  Your Honor, Luca Marzorati for the

19   Plaintiffs.  That document is -- basically entirely contains

20   discussions of topics that have now been excluded by the

21   Court's motion in limine.  We have noted in our sealing filing,

22   obviously it is not the place to expound on that, but we do

23   think that document, there is no relevance to the issues that

24   remain in this trial.

25        And I will speak about the four documents that Defendants

1    included on their list.  They are basically all versions of

2    similar e-mails that center around the same point in time, and

3    I think others at the table will address this in a moment; but

4    we do have a concern that, you know, what we think is

5    irrelevant would require redaction of almost the entire

6    document.  It is not clear to us -- we asked Counsel for a

7    proposal, how they would redact it.  We haven't gotten that

8    proposal yet.  That is our concern with this particular

9    exhibit.

10          We are in agreement that phone numbers, personally

11   identifying information should remain under seal.  With respect

12   to these four exhibits -- and, in fact, many of the exhibits on

13   Defendants' exhibit list, it is unclear to us what the

14   relevance is and also how you could possibly redact some of

15   these documents to make in what limited relevance, if any,

16   there may be.

17          **THE COURT:**  All right.  Before we turn to these four

18   exhibits on the Defendants' exhibit list, let's -- I want to

19   make sure we have covered everything that we need to cover with

20   regard to the seven exhibits that are Plaintiffs' exhibits.

21   All right.  I have already indicated that the sealing is

22   approved.  I understood that that was one of Defendants'

23   objections.  Are these other -- are these documents otherwise

24   unobjectionable?

25          **MR. CRAIG:**  It's impossible to answer that without

```
 1   knowing the context in which they intend to use them.  I mean,
 2   there are text messages -- streams of text messages among and
 3   between Defendants and third parties that obviously, you know,
 4   contain hearsay information on their face.
 5       So, it's -- we can't say right now whether we think they
 6   should be admitted or not or whether there are evidentiary
 7   objections.  It depends on how -- the purpose Plaintiffs intend
 8   to use them for.
 9           THE COURT:  Okay.  Given the amount of documents -- I
10   just want you-all to think about this.  Given the amount of
11   documents that are on these various different exhibit lists and
12   discovery excerpt lists, you-all are going to use your nine
13   hours objecting and arguing about the admissibility of these
14   exhibits if you can't come to some sort of an accord on this.
15       The amount of time you spend arguing is counted against
16   you just as testimony and argument is.  So, just think about
17   that.  Additionally, I don't do sidebars.  So, you are going to
18   be told if there is an objection about something that I need to
19   read in advance to know what you are talking about, you are
20   going to be directed to wait until the end of the day with that
21   particular witness so that after the trial day I can go over
22   it.  So, you-all are going to have to do, I think, more work to
23   get this in shape so that it can be put before the jury in a
24   coherent and cohesive manner.
25           MR. ANDRES:  Your Honor, can I just address that
```

```
 1   point?

 2            THE COURT:  Yeah.

 3            MR. ANDRES:  We don't have to do it now, but we do

 4   think it would be helpful to have some direction from the Court

 5   with respect to meet-and-confers.  I will just give you an

 6   example.  There is an Al Qaeda video on the Defendants' witness

 7   list.  Now, maybe that -- maybe they haven't re-reviewed that

 8   in light of the Court's order yesterday, but from our view of

 9   the evidence -- either the designations or the documents on the

10   witness list -- there are documents that directly contravene

11   the Court's rulings on the motions in limine; and we would

12   like -- we would also like to resolve those before the trial

13   starts.

14        We are happy to give you some examples.  As I mentioned,

15   the Al Qaeda video is probably one of the best; but there are

16   substantial issues, so if we can address that at the end of the

17   conference, I think that would be helpful.  We certainly don't

18   want to be penalized at trial for losing time if the Defendants

19   are admitting documents that are clearly outside the Court's

20   order.

21        So, and I'm not accusing anybody of doing anything.  And,

22   again, there has been a subsequent ruling; but we do need a

23   process to do that so that we understand what is coming in and

24   what is not.

25        And I will just say one other thing -- and apologies for
```

1    being long- winded -- that applies also to the Defendants'

2    proposed witnesses.  And I confess that I haven't been a party

3    to every conversation about who is showing up from Israel or

4    who is not, but I do know that there is an outstanding issue

5    that one witness who may or may not come from Israel may need

6    an interpreter.  And if that's true, we certainly have a right

7    to understand who that would be or what process would be

8    followed to get an interpreter, how that would count against

9    the clock, et cetera; but we don't know that.

10          And I would also, before the end of this conference -- and

11   am happy to state on behalf of the Plaintiffs -- which

12   witnesses will be in the courtroom and testify and I would like

13   you to ask that same thing of the Defendants because at least I

14   lack clarity on that issue.

15          **THE COURT:**  Okay.  All right.  Let me just inquire of

16   our court reporter.  We have been at this for an hour and

17   45 minutes.  Does our court reporter need a break?

18                      (Off-the-record discussion had.)

19          **THE COURT:**  Okay.  So, with regard to the seven

20   exhibits that have been identified, they will -- the sealing

21   requests are fine; and at this time the Defendant is not

22   lodging a specific relevance objection even though that's sort

23   of suggested in this filing.  At this time there is no such

24   objection.

25          **MR. MARZORATI:**  By Defendants or by Plaintiffs?

1          **THE COURT:**  Well, it says the documents Defendants

2   introduce below on relevance grounds, okay.  And then with

3   regard to these -- well, it is not clear to me.  Are there any

4   objections?

5          **MR. MARZORATI:**  Yes, we would object to all four

6   documents Defendants have listed on this as irrelevant.

7          **THE COURT:**  Okay.  Asking the Defendants, are there

8   any objection to say the seven documents that I have already

9   approved the sealing of?

10         **MR. CRAIG:**  I -- it depends on the context and the

11  purpose for which they are introduced, Your Honor.  We are not

12  lodging -- I don't think it would be appropriate for us to be

13  going exhibit-by-exhibit to discuss evidentiary objections at

14  this point unless we are going through the entirety of both

15  sides' exhibit lists, which we definitely don't have time to do

16  today.

17         **THE COURT:**  Nor do we have time to do at any time

18  given the lists.  There is no way I'm looking at all of those

19  exhibits.  I have no idea which ones you are going to

20  introduce, and there is no way I'm going to be looking at all

21  of them before.

22         **MR. CRAIG:**  Correct, Your Honor, and we think that

23  they should be dealt with in the normal course where, when the

24  exhibit is marked and introduced, that objections be made and

25  ruled upon.

1          **THE COURT:**  Okay.  As long as they are evidentiary.  I

2    don't entertain speaking objections.

3          **MR. CRAIG:**  Yes, Your Honor.

4          **THE COURT:**  Okay.

5          **MR. ANDRES:**  Your Honor --

6          **THE COURT:**  Okay.

7          **MR. ANDRES:**  -- sorry, that goes to the -- we have

8    substantially reduced the list of exhibits in light of --

9          **THE COURT:**  Let's just finish this filing and then --

10   to the extent that we have time, we will go through the exhibit

11   lists and the discovery expert list.

12      All right.  With regard to A1026 -- that's the only one

13   that I was able to find -- the Defendants have a relevance

14   objection to this that you would like dealt with now I

15   understand.

16         **MR. MARZORATI:**  The Plaintiffs have a relevance --

17         **THE COURT:**  Plaintiffs, yes.  I'm sorry.  This is

18   Defendants' exhibits.  Okay.  Please, just state what your

19   objection is.  I have read that exhibit.

20         **MR. MARZORATI:**  This is a document that has to do with

21   the victim outreach and with the various policy concerns.  It

22   is ripe with references to the identities of the victims.  We

23   understand your Court's previous rulings over the past two

24   weeks to exclude this from trial.

25         **THE COURT:**  Okay.  Any response?

**MR. CRAIG:**  Yes, Your Honor.  We intend to redact --
as I assume would be the case with every exhibit in this
case -- to redact any information that would run afoul of
Your Honor's rulings on the motions in limine, as I said, in
this case with respect to the fact that Plaintiffs believe that
certain of the targets were members of civil society and the
like.  So, that is a response to that portion of the objection.

**THE COURT:**  What about the exhibit is admissible?

**MR. CRAIG:**  We believe that it shows the fact that
these issues were raised to the highest levels of both
Plaintiffs in the case.

**THE COURT:**  These issues --

**MR. CRAIG:**  Facebook -- these issues about the NSO
attack.  Your Honor, we believe the jury is going to have
substantial questions about why this case has been brought --
notwithstanding the fact that there have been no injuries to
Plaintiffs or their servers, what is the purpose of -- of why
the jury is sitting here for a week when the amount of damages
is so small and that the Plaintiffs' witnesses have admitted
that there is no impairment of any of their computers or
servers by this attack.

And part of that goes to animus, which is set forth in
other exhibits, on the part of Plaintiffs' top executives --
the CEO of WhatsApp -- and the fact that this was communicated
up to Mr. Zuckerberg and Ms. Sandberg and the other executives

1   listed on the e-mail helps what the purpose is of why

2   Plaintiffs brought this case because it is not about actually

3   any injuries to their computers.

4        **MR. MARZORATI:**  Your Honor, I would just say if that's

5   an accurate preview of what Defendants case is going to look

6   like and I don't think has any relevance to the damages issue.

7   Those need to be decided.  We are not claiming compensatory

8   damages for any of the, you know, executives that Mr. Craig

9   just talked about in that conversation.  It also has nothing to

10  do with punitive damages.  It is just really a question of what

11  NSO did, and this underscores exactly why we need to have an

12  orderly exchange schedule because our concern is that NSO is

13  going to force us to run out the nine hours we have by having

14  these objections and disputes on the record.

15       **THE COURT:**  Okay.  This exhibit in my view is not at

16  all relevant to the issues that are left in the case.  So, I'm

17  prepared to rule on this one now.  I haven't found the other

18  ones.  If you can send those -- at least point out the docket

19  number where I can find them, I will look at them.  If they are

20  the same as this, I'm not allowing any of that.

21                    (Pause in proceedings.)

22       **THE COURT:**  Okay.

23       **MR. MARZORATI:**  Thank you.

24       **THE COURT:**  All right.  That finishes with this recent

25  filing.  All right.  So, that leaves us with the big issue, and

 1   that is these voluminous lists of deposition excerpts and

 2   exhibits and how they are -- both sides have filed long lists

 3   of both and some counter-designations and objections to them.

 4        I would like to hear from you-all what your proposals are

 5   for how we handle any of the objections.  Typically in a

 6   case -- a big paper case such as this where there are a lot of

 7   deposition designations, for instance, I have in the past

 8   required Counsel to identify which deposition excerpts they are

 9   going to be using the following day, so that if there are any

10   objections -- although I can't imagine why there are still

11   objections given all of the pretrial rulings -- obviously, if

12   any of the excerpts are in violation of the pretrial rulings, I

13   am not going to allow you to use them.

14        So, it seems to me that you ought to be able to get it

15   down to -- you know, just the amount of -- and I assume most of

16   these are on video and not paper exhibits; right?  Well, I'm

17   mixing up exhibits and the depo -- the depos I'm assuming are

18   not paper transcripts but are video depositions.  Am I

19   incorrect about that?

20             **MR. PEREZ:**  No.  That's correct, Your Honor.

21             **THE COURT:**  Okay.  So, you ought to be able to edit

22   out the stuff that doesn't comply with my pretrial orders.

23             **MR. PEREZ:**  That's certainly correct, Your Honor,

24   although I think the discussion, nonetheless, to the extent to

25   which there may not be a common understanding between the

1    parties but I think with the guidance from today's conference,

2    we should be able to eliminate some of the remaining

3    disagreements and resolve certainly some of our objections to

4    their designations.  I think many of them fall into the

5    category that was just addressed by reference to their exhibit.

6         With respect to their objections to some of our

7    designations, I did -- we got those late last night but I did

8    with my colleagues have an opportunity to go through them.  I

9    think many of those issues we should be able to resolve by

10   agreement.  Some of them are just counter-designations that we

11   don't have an issue with or other things I think that are

12   readily resolved between the parties.

13        There are a few higher-level issues on which if the Court

14   would indulge us, I think it would be helpful to be heard and

15   perhaps get the Court's guidance.

16             **THE COURT:**  Okay.

17             **MR. PEREZ:**  Those are a bit more fundamental, and it

18   would be helpful to have clarity before openings.

19             **THE COURT:**  Okay.

20             **MR. AKROTIRIANAKIS:**  Your Honor, before we leave the

21   issue of depo designations, can I comment on the thing that

22   Counsel just mentioned?

23             **THE COURT:**  Okay.  I'm having a hard time hearing you,

24   Counsel.

25             **MR. AKROTIRIANAKIS:**  Can you hear me better?  I'm

1    trying to maybe lean towards the computer.

2            **THE COURT:**  Yeah.

3            **MR. AKROTIRIANAKIS:**  The biggest area or a big area of

4    disconnect in terms of the Plaintiffs' designations -- and they

5    are voluminous -- is that the -- there's a lot of time that is

6    going to be spent talking about, like, the number of sales and

7    the profitability of sales, that will be dealt with at length

8    it appears is so intended with respect to the percipient

9    witnesses; and the principal dispute of fact between the two

10   expert economists is a dispute about how calculations of

11   profits from 2018 and '19 -- which is seven and six years

12   ago -- should be calculated by the experts and so on.

13       None of that is relevant to compensatory damages of

14   course, Your Honor, and it's not relevant to punitive damages.

15   I think the law is fairly clear; that what's pertinent to a

16   calculation of an appropriate amount of punitive damages of the

17   current financial condition of the company, the Defendant, and

18   we have produced documentary evidence about that.  Recently,

19   the 2024 P&L and balance sheet was completed.  We provided

20   that, and we agreed to stipulate to its authenticity and

21   admissibility and in the case law, that's generally, you know

22   what courts require.

23       What is not relevant is all this time we are going to

24   spend talking about profits from six and seven years ago and

25   how they are calculated and what the profitability per sale

1    was, et cetera, et cetera.  That is a lot of dispute in the

2    designations that we would be asking the Court, I suppose at

3    some point, to rule on, whatever you like, Your Honor, before

4    they are played.

5        Also, our witnesses -- the Plaintiff intends to proceed by

6    just splaying depositions pursuant to Federal Rule of Civil

7    Procedure 32.  The witnesses are here, but they want proceed in

8    that fashion, which I suppose the rules do allow but I think

9    it's helpful and easier, frankly, for the jury to not have them

10   to hear the direct examination here and then the redirect

11   examination over there and so on.

12       And so, one question that it raises this issue with these

13   voluminous designations is when will the cross or redirect --

14   however the Court wants to think about -- take place.  Will it

15   take place after the playing of the depositions or will it take

16   place at some later time?

17       **THE COURT:**  I'm not sure I understand.  You say the

18   witnesses are here.  Does it contemplate -- are you talking

19   about your witnesses or the Plaintiffs' witnesses?

20       **MR. AKROTIRIANAKIS:**  Much of the Plaintiffs' case,

21   hours of it, is adverse testimony.  So, they want to call

22   employees and executives of the Defendants to testify in the

23   Plaintiffs' case, but they don't want to actually call them --

24   although they are not unavailable -- they want to play

25   deposition testimony.  And that is in theory allowed under

1   Federal Rule of Civil Procedure 32.

2       My question is:  If you are going to allow them to proceed

3   in that way, then should the redirect examination or

4   cross-examination that -- that the jury would hear to complete

5   the testimony then follow the playing of these designations or

6   will -- either way it counts against us.  I just think it is

7   complicated for the jury to, like, try and remember what it is

8   connected to days later.

9       **THE COURT:**  Right, right, right.  So, the Plaintiffs

10   are calling your witnesses -- your employees and witnesses in

11   their case in chief and using that in lieu of an in-person

12   direct examination; right?

13       **MR. AKROTIRIANAKIS:**  That's right.  They are calling

14   them but then they are not -- they are not going to put them on

15   the stand.  They are just going to say, "We are now going to

16   play the deposition of so-and-so," and then, like, play two

17   hours of that person's deposition.  And we have some

18   completeness objections that I hope, as Mr. Andres just

19   mentioned, we will be able to work out.  I think we will.

20       There is obviously going to be a cross-examination, a

21   redirect examination, however you want to think about it.  Our

22   examination of those witnesses on those topics that will be

23   necessitated -- obviously at the deposition of these witnesses,

24   we didn't then conduct our redirect examination after.  And so,

25   a question arises as to whether that redirect examination

```
 1   should take place for the jury's benefit immediately following

 2   the playing of -- of the deposition or not.

 3       As I said, the witnesses are here to offer that testimony.

 4   I think it would be to the jury's benefit to hear it at this

 5   point.  This is an issue about the conduct of the trial based

 6   on these designations.

 7           THE COURT:  Do you have a preference?  I generally

 8   prefer that a witness be dealt with at one time.

 9           MR. AKROTIRIANAKIS:  That would be our preference both

10   with respect to these designations, Your Honor, and also with

11   respect to -- for example, there are some executives from the

12   Plaintiffs that are on both sides' witness lists.  We have

13   tried to reach an agreement that the entirety of those

14   witnesses' testimonies, whether they technically be the Defense

15   case in chief or within the scope of examination -- this is,

16   like, you know, from 30 years ago.  We used to try cases this

17   way.  Now, judges typically -- as the Court has indicated --

18   want it all heard together.  That's how we would prefer to

19   proceed.

20           THE COURT:  Well, obviously if the person were here in

21   person, I would -- and both sides wanted to call him or her in

22   their case, I would require them to do it seriatim.  I mean, I

23   wouldn't allow the witness to go away and then to come back

24   three days later to testify for the other side.  We would do it

25   all at one time.  I don't see any reason why we shouldn't do
```

1   that with regard to the recorded examination as well.  Is that

2   the Defense preference?

3           **MR. PEREZ:**  I'm sorry.  Were you asking --

4           **MR. AKROTIRIANAKIS:**  My greatest preference is just to

5   know what we want to do.  I think it makes best sense --

6           **THE COURT:**  I have a preference, but I don't have a

7   strong feeling about it.  It makes --

8           **MR. AKROTIRIANAKIS:**  I think it is easier for the jury

9   to understand the testimony if it is all together.  They can

10  just hear from the witness once, even if it includes the

11  playing.  So, my preference for that reason would be that it is

12  all together the same way it would with just a live witness.

13          **THE COURT:**  Okay.  What's the Plaintiffs' preference?

14          **MR. PEREZ:**  So, Your Honor, I think

15  Mr. Akrotirianakis, you know, made an important point but then

16  sort of glossed over it, which is that from an admissibility

17  perspective, it is absolutely fair game for us to play these

18  deposition designations as part of our case in chief.  They are

19  30(b)(6) corporate representative testimony, and in other cases

20  the testimony of corporate officers.  So, they are admissible

21  and they are playable as deposition designations for the jury.

22  They are usable for any purpose under Rule 32.

23          So, what he is fundamentally talking about now in terms of

24  having his own questioning of that witness where we are just

25  playing a video for the jury, and then they want to bring that

witness to the stand and ask their questions of that witness,
what they are really talking about is doing the Defense case
during our case in chief.  And that we consider problematic.

The way to bring to bear whatever portions of questioning
they have within the context of our designations is through the
counter-designations, which they have already made.  And I
think we can work those out.

But to the extent they have totally different points that
they want to elicit from these witnesses that are part of the
Defense case, that belongs in the Defense case.  And when you
are talking about a video, there isn't this issue of the same
person coming to the stand twice -- getting up and getting down
and back up again.  They will see the video.  And then during
the Defense case if the Defendants choose to call the witness
live, they are entitled to do that; but they are not entitled
to bring in -- sorry, Your Honor.  Go ahead.

        **THE COURT:**  I was just going to ask, you mentioned
something about counter-designations.  So, we are talking about
the additional parts of the same deposition being played in
conjunction with the part that you are designating.

        **MR. PEREZ:**  Exactly.

        **THE COURT:**  All right.  And so, their
counter-designations would be played at the same time or
immediately after; right?

        **MR. PEREZ:**  They would be played at the same time.

1              **THE COURT:**  Okay.

2              **MR. AKROTIRIANAKIS:**  There's two issues, Your Honor.

3    So, for example, I will just use one witness -- Tamir

4    Gazneli -- he is the research and development guy.

5    Mr. Marques -- Mr. Perez-Marques took his deposition and I

6    defended it; okay.  And so, we had a day of cross-examination,

7    no redirect examination -- as is almost always the case in the

8    deposition of a party witness; okay.  So, Mr. -- Plaintiffs

9    want to present hours of Mr. Gazneli's cross-examination from

10   his deposition.

11             In some of those cases, they would take, like, on one page

12   this and this; and our counter-designation is, well, for the

13   sake of the rule of completeness or other similar concerns, you

14   should really play the four lines in between; okay.  So, that's

15   one issue and I don't -- that's the one that I think easily can

16   be worked out because it is the kind of thing in fairness the

17   Court should say, well, like, if you are going to play this and

18   this, you have got to play the rest of the context too, not

19   just pluck these statements out of context.

20             But the other issue is whether we would then have the

21   redirect examination based on that cross-examination following

22   the cross-examination or whether it would be two or three or

23   four -- depending on when it is -- days later in the Defense

24   case in chief; okay.  That's the other issue, Your Honor.

25             And I think it is both confusing to the jury and really

1    inefficient for everyone especially in a timed trial like this

2    to try to reorient themselves to testimony that was given by

3    audio -- I'm sorry -- by video days earlier.

4            **THE COURT:**  Okay.  Okay.  Well --

5            **MR. AKROTIRIANAKIS:**  My preference would be that if

6    they want to just play the deposition, they could do it with

7    him on the stand or not on the stand, but the jury should hear

8    the redirect examination that follows that cross-examination

9    right after it's been given.

10           **THE COURT:**  All right.  Anything else on that?

11           **MR. PEREZ:**  Well, I would just note, if I could,

12   Your Honor, you know, the decision not to redirect these

13   witnesses at their deposition was a choice made by Defense

14   Counsel.  It was a choice made in the context that these

15   witnesses were sitting as corporate designees such that their

16   testimony was always going to be playable for a jury.

17       It was also in the context that -- as the Court may

18   remember hearing from Defense Counsel going back many months if

19   not years -- there were real questions whether these witnesses

20   would be available for trial given the alleged difficulties of

21   traveling out of Israel.  They chose not to ask their

22   questions.

23       And so, now to say in order to fix that decision, they

24   want to call one of their witnesses live during our case in

25   chief because we have chosen in a way consistent with the rules

1    to play deposition video we believe is an imposition on our

2    right to present our case as we see fit.

3        THE COURT:  Okay.  Typically I have some agreement

4    between the parties on this kind of question.  In the absence

5    of agreement, both sides are entitled to their own flow.  I

6    agree, it will be confusing to the jury; but it is just one of

7    many things that I think is going to be confusing to this

8    particular jury.  I think each side is entitled to present

9    their case in the way in which they want.  So, if it is going

10   to be disjointed, it is simply going to be disjointed and we

11   will just have to deal with it.

12       MR. PEREZ:  Thank you, Your Honor.  Mr. Akrotirianakis

13   before raising that issue made one more substantive point about

14   the content of testimony and then I did have a few higher-level

15   issues that I wanted to address and seek the Court's guidance.

16   I think they will help the parties in cutting through these

17   designations disputes.

18       THE COURT:  And I do want your response on his first

19   issue though with regard to the profitability --

20       MR. PEREZ:  Exactly, Your Honor.  That's where I

21   wanted to start.

22       THE COURT:  Okay.

23       MR. PEREZ:  So, the issue with profitability is

24   that -- I believe Mr. Akrotirianakis is mistaken as to the

25   relevance of that point.  A profit motive under Ninth Circuit

law -- and I would point the Court to the *Monsanto* case, which
we have, I think, referenced to the Court before -- a profit
motive is relevant to punitive damages.  It bears on the nature
of the conduct, whether it was undertaken with malice,
oppression or fraud.

And here, where you have a case that not only -- this
wasn't some isolated incident, and I will put aside the
escalation -- but the fact that this was repeated conduct; when
you have a Defendant that engaged in this conduct -- which has
been found to violate the law -- and they did so by selling a
product for millions of dollars earning millions and tens of
millions of dollars in profit as a result, that is highly
relevant for the jury to understand in assessing punitive
damages.

It is different -- and the Ninth Circuit has recognized
this.  Profit motives are relevant to the assessment of
punitive damages, and that's the reason that we would like to
put this testimony in.  We are talking about very small
portions of testimony as well.  I know that doesn't bear on
relevance.  We are not talking about hours.  This is a point
that is relevant to punitive damages, and we expect will be a
very limited portion of our presentation.

            **THE COURT:**  Okay.

            **MR. AKROTIRIANAKIS:**  It's just not relevant to
punitive damages, Your Honor.  He's talking about a case

where -- and I'm not sure what the Court's experience would be. These are typically in state court and sometimes when the case is brought in federal court and you have, like, an injured plaintiff, then the plaintiff is -- and the defendant is the product -- the maker of the product that injured the plaintiff, then the plaintiff appropriately makes an argument that the defendant has put its profits over the health and safety of people including the plaintiff, who now is maimed and has to live their life in whatever shape it is because of the product.

That is not at all this case.  And the profits from seven and six years ago are not at all relevant to the punitive damages instruction that the Court -- that the parties agree on and that the Court is now going to give.

**THE COURT:**  Yeah.

**MR. AKROTIRIANAKIS:**  No part of it that says what were the profits six and seven years ago.  What it says is:  What is the financial condition of the Defendants today, and you can't hit them harder than their ability to pay today, not seven and six years ago.

**MR. PEREZ:**  Your Honor, I think Mr. Akrotirianakis is mixing two separate points.  Financial condition is a present question for purposes of sizing punitive damages.  In assessing the reprehensibility and the despicable nature of the conduct, a profit motive at the time the conduct was engaged in is relevant under the *Monsanto* case by the Ninth Circuit.  That is

1    controlling Ninth Circuit law.

2        We would like to be able to put on evidence that

3    Defendants engaged in this conduct, which has been found to

4    violate U.S. and California law.  California law is pertinent

5    for punitive damages and that they did so with a profit motive

6    and indeed had a very profitable business at the time of these

7    violations that they were engaged in by virtue of legal

8    violations.  That is an important and relevant part of our

9    punitive damages case.

10           **THE COURT:**  Is the --

11           **MR. AKROTIRIANAKIS:**  I would just invite the Court to

12    look at the reprehensibility factors that are in the

13    instruction we all just agreed to and the Court is about to

14    give and then say, which one is it, if any, that Mr. Perez's

15    argument is directed to because it is not.

16        It would be in the case of an injured plaintiff.  Health

17    and safety of the plaintiff, that could go to reprehensibility,

18    as I just mentioned.  Monsanto as a maker -- as a chemical

19    company that allegedly has caused injury to plaintiffs in the

20    past, that's not this case, Your Honor.  This is just a big

21    distraction.  They are trying to inflame the jury; take up a

22    lot of time.  It is going to devolve into a battle of the

23    experts about how do you calculate profits in a case where it

24    is just not relevant.

25           **THE COURT:**  And is it the Plaintiffs' intent to put on

1    profitability evidence from 2018-'19 and to forego putting on

2    profit -- putting on the value of the company and its

3    profitability as of today or carrying it through for eight

4    years?

5            **MR. PEREZ:**  It is not as -- as I said, Your Honor, we

6    view it as two separate issues.  The financial condition today,

7    we recently got audited financial statements from the

8    Defendants that will be put into evidence and will bear on the

9    current financial condition.

10           Separately, there's a question that the jury is going to

11   have to answer with respect to punitive damages including under

12   the heading of malice whether the conduct was done with willful

13   disregard of Plaintiffs' rights.  And the fact that there was a

14   profit motive, we intend to argue to the jury, bears on the

15   willfulness of this conduct.  This wasn't an inadvertent

16   violation.  This was something that they were pursuing as a

17   core part of their for-profit business model.

18           **THE COURT:**  Okay.

19           **MR. PEREZ:**  So, we are not doing one instead of the

20   other.  They are two separate issues, and we would like to be

21   able to put on evidence of both.

22           **THE COURT:**  Two separate timeframes, 2018-'19 and

23   today.

24           **MR. PEREZ:**  That's correct, Your Honor, because its

25   current financial condition but profit motive at the time that

```
 1   the conduct was engaged in as far as the willfulness analysis

 2   for purposes of malice for punitive damages.

 3            THE COURT:  Okay.  Give me a citation that supports

 4   each position.  Mr. Akrotirianakis, you have mentioned the

 5   Monsanto case.  Have one of your people send me the citation

 6   for the case you are talking about.  There are so many Monsanto

 7   cases.  I don't know which one you are talking about.

 8            MR. PEREZ:  We can have that for you, Your Honor,

 9   before we are even through with this conference.

10            THE COURT:  Okay.  And that's Plaintiffs.  Defendants,

11   can you get me --

12            MR. AKROTIRIANAKIS:  We will submit our authority,

13   Your Honor.

14            THE COURT:  Okay.  Great.  All right.  I will make a

15   decision.  It really does seem to me, though, that the most

16   important part -- I understand the argument about profit motive

17   and its impact.  In this kind of case I'm not so sure.  But in

18   any event, I will take a look at your authority before making a

19   decision on that.

20            MR. PEREZ:  Thank you, Your Honor.

21            THE COURT:  Okay.

22            MR. PEREZ:  Then there were a handful of other

23   overarching points with respect to the designations that I had

24   hoped to raise.

25            THE COURT:  Okay, we have about 15 minutes.  The court
```

1    reporter has -- needs at least a half an hour before her next

2    matter.

3            MR. PEREZ:   Of course, Your Honor.   I appreciate it.

4    The first is that they've objected to a number of our

5    designations on the -- they've already said they are irrelevant

6    because they bear on current operations.   And the issue here,

7    the types of designations, NSO's current operations, the type

8    of testimony they are objecting to here, for instance, is NSO's

9    head of research and development testifying that NSO today or

10   at the time of his deposition has a research and development

11   group of 130 plus people with a budget of $40 million to

12   $50 million for a year.

13           Now, that testimony is highly relevant to the question of

14   punitive damages; and the reason is in the instruction as

15   agreed, it states that one of the purposes of punitive damages

16   is to deter similar acts in the future.   And in that context,

17   the fact that this Defendant today maintains a robust research

18   and development function -- and that Mr. Gazneli has testified

19   that even today they are engaged in finding new exploits to

20   install spyware on people's phones -- is from our perspective

21   inescapably relevant and indeed critical for the jury's

22   assessment on whether it's appropriate to issue a punitive

23   damages award for the agreed purpose -- the purpose in the jury

24   instructions -- of deterring similar acts in the future.

25           And just to give you one example of the types of testimony

1    we are talking about, we asked Mr. Gazneli:  Is it accurate

2    that after -- at this point in May of 2019, NSO's R&D group was

3    working hard on potential solutions to restore zero click

4    capability -- the ability to install spyware without the user

5    taking any action.

6        Mr. Gazneli answered:  As a research group and development

7    team, you constantly work on research in order to find possible

8    ways -- rapid solutions.  And, as I explained before,

9    eventually we are producing a product for customers.

10        And I asked him:  And is that still true today?

11        And he answered:  This is our business.  This is our

12    business.  He -- and that's the piece they object to, "this is

13    our business."  That is a statement that bears on the risk of

14    recurrence in a way that is unavoidably relevant to the

15    punitive damages and the jury's assessment of whether it is

16    necessary and appropriate to deter similar misconduct in the

17    future.

18            **THE COURT:**  Okay.

19            **MR. CRAIG:**  You are on mute, Joe.

20            **MR. AKROTIRIANAKIS:**  That would be a pertinent point,

21    Your Honor, if the Court had determined that the entirety of

22    NSO's business violates the CFAA or the CCDAFA.  It is absurd

23    really to suggest in a case like this where the finding of

24    liability is that three versions -- among dozens of versions of

25    Pegasus, three versions from seven and six years ago, used a

1    message that traversed a WhatsApp server; and now to say that,

2    like, the fact that they have a $40 million R&D budget for a

3    government contractor in another country who does all kinds of

4    things that have never been alleged to be unlawful in this

5    case -- let alone held by the Court to be unlawful in its

6    finding of liability in this case -- is pertinent to -- to the

7    purposes that Mr. Perez mentioned, it's just not the case.

8         It is not specific to WhatsApp.  It is not tethered to the

9    finding of liability in the case.  This is exactly the type of

10   sort of generalized evidence that I was mentioning in our

11   motion, which I understand the Court has denied, but this is

12   now a different matter about the scope of the evidence at this

13   trial.

14        It is simply the fact that not all of NSO's products are

15   even alleged to be unlawful in this case let alone have been

16   found by the Court to be unlawful in this case.  And this is

17   well beyond what they told the Court was relevant in the

18   context of the motions in limine that -- the motions in limine

19   that the parties have filed and that the Court has now ruled

20   upon.  What they want to do is just have a -- you know, a trial

21   on liability basically, which is, of course, not the point of

22   this short and truncated trial on damages.

23             **THE COURT:**  Okay.

24             **MR. PEREZ:**  Your Honor, if I can just respond very

25   briefly, I just view all of those arguments as going to weight,

1    not admissibility.  And if they want to, as they were just

2    saying, put Mr. Gazneli on the stand and have him unpack what

3    they are spending their $40 to $50 million a year R&D budget

4    on, what these 130 people are doing, what he meant when he said

5    it's their business to develop new exploits when one gets shut

6    down, they are welcome to do that.

7        The question is highly relevant to the question of whether

8    deterrence of similar misconduct in the future is needed for a

9    punitive damages award.

10        **MR. AKROTIRIANAKIS:**  That's the key word, similar

11    misconduct that traverses WhatsApp servers.  $40 million and

12    130 people or whatever Counsel just mentioned does not have

13    anything to do with WhatsApp servers six and seven years ago.

14        **THE COURT:**  Yeah, I think this is going too far

15    afield, Mr. Perez.  I would not be inclined to allow that

16    evidence in.  Anything else?

17        **MR. PEREZ:**  Yes, two other issues, Your Honor.  One

18    objection that they made -- and perhaps this is resolved by the

19    discussion on the jury instructions -- but we just had in the

20    context of the jury instructions a discussion about their

21    acting and knowingly disregard of the rights of Plaintiffs.

22        We designated some testimony wherein their witnesses

23    acknowledged that they made no efforts to comply with WhatsApp

24    terms of service.  We think that bears directly on knowing

25    disregard of WhatsApp's rights and therefore believe that

1    should be admitted.

2            **MR. CRAIG:**  It's a contract.

3            **MR. AKROTIRIANAKIS:**  Your Honor, it's a contract

4    claim.  The punitive damages are not available for a contract

5    claim.  That is just, like, a thousand percent clear by

6    California law.  Only the CCDAFA claim that gives rise to

7    punitive damages.

8            **MR. PEREZ:**  That's not the issue, Your Honor, which

9    violation gives rise to the punitive damages claim.  The

10   punitive damages claim arises from CCDAFA.  One of the

11   questions that's going to be put to the jury under the agreed

12   punitive damages instruction is whether they acted in knowing

13   disregard of WhatsApp's rights.  That's where we just landed

14   after discussion of this point.

15       Now, you have their witnesses saying, "I made no effort to

16   comply with the WhatsApp term of service."  That is a source of

17   WhatsApp's rights, a very clear and concrete one, that they are

18   acknowledging in their testimony they disregarded.  That bears

19   on a question that is going to be put to the jury of whether

20   they acted in disregard of Plaintiffs' rights in carrying out

21   the violations that gave rise to the CCDAFA violation.

22           **MR. AKROTIRIANAKIS:**  Your Honor, the CACI instruction

23   on punitive damages is not talking about knowing disregard of

24   contractual rights under -- of any kind, let alone an adhesion

25   contract like a terms of service.  It talks about your rights

1  that arise under the statute that gives rise to punitive

2  damages, which in this case is CCDAFA, not the terms of

3  service.

4          THE COURT:  Okay.  Anything else on that?  I agree

5  with the Defendant.  I think you guys are really taking this

6  far afield.  I agree with the Defendant.  I wouldn't allow that

7  in.

8          MR. PEREZ:  Thank you, Your Honor.  The last point I

9  wanted to raise is there are -- and this is perhaps a bit of a

10  trickier issue -- there are issues in the designations where

11  their witnesses confirmed that they continued to install

12  spyware via WhatsApp servers up to May 2020.  And May 2020, as

13  the Court will recall, was sort of the end -- the last date as

14  of which these witnesses would answer questions.

15      We believe it is important for the jury to understand that

16  the reason the story ends at that point is because of a limit

17  on discovery not because there is no further evidence after

18  that point or, you know, that they should make an inference one

19  way or another as to the existence of violations thereafter.

20      And, therefore, we would like to be able to say -- and

21  this is not alleging any discovery violation by them -- but

22  just the factual point that the evidentiary record stops at

23  May 2020 isn't a fact that the jury must be aware of.  And we

24  are open to the Court's suggestions as to how the jury should

25  be made aware of that.  We have designated some testimony that

1    includes that point become made.  We are also open to it

2    just -- the jury being instructed on that issue.  We do think

3    it is important for the jury not to come away thinking that

4    because the testimony stops on a dime in May 2020, that they

5    should infer that the conduct necessarily stopped at that

6    point.  We just don't have evidence one way or the other.

7            THE COURT:  So, why would we want -- we don't want

8    them to infer that the conduct continued either.  Isn't it

9    better just to cut it off clean, one way or the other -- as

10   opposed to allowing an inference one way or the other?

11           MR. PEREZ:  That's exactly right, Your Honor.  That's

12   what we want, just as of May 2020, that that's the last date as

13   to which they are answering questions; and, therefore, there is

14   no inference to be made thereafter.

15           THE COURT:  Okay.

16           MR. CRAIG:  That would create an inference.

17           THE COURT:  Yeah, I think it does too.  I think that

18   that's the kind of thing we leave for a jury question.  If the

19   jury asks about that, if that -- for some reason that has some

20   implication for their verdict, they will ask it.  If not, why

21   raise it as an issue?  This is about this discrete period, and

22   it is broad enough as it is.

23           MR. AKROTIRIANAKIS:  That's the only way to tether it

24   to the finding of liability.

25           THE COURT:  Exactly.  I'm not going to allow it.

1       **MR. PEREZ:**  Thank you, Your Honor.  I think there were

2  just one or two additional points that Mr. Block wanted to

3  raise, if possible.

4       **MR. BLOCK:**  Your Honor, there is a witness Meta

5  employee -- a WhatsApp employee, Jonathan Lee, who is on

6  Defendants' list and under trial subpoena to travel across the

7  country to be here.  He won't be called in our case in chief.

8  He would be only in the Defense case.  He was disclosed for

9  injunctive reasons, and then they also said that he's relevant

10 to punitive damages; but this is someone for whom he is not

11 relevant compensatory.  Nobody seeks compensation for the time

12 that he spent.  He is a policy employee who gave policy advice

13 to Plaintiffs regarding victim outreach and the like.  We don't

14 understand that he has anything relevant to say and would love

15 to spare him a trip across the country if that's possible.  So,

16 we wanted to raise that objection to Mr. Lee being on the

17 witness list at all.

18       **THE COURT:**  He is your employee, your client's

19 employee?

20       **MR. BLOCK:**  Correct, Your Honor.  We are not bringing

21 him to trial nor are we seeking compensation for time that he

22 spent.

23       **THE COURT:**  Okay.  Defense Counsel?

24       **MR. AKROTIRIANAKIS:**  I'm not prepared to shoot from

25 the hip on this one -- this hasn't been raised before now.  He

1  doesn't need to be here Monday, obviously, but whenever the

2  lectern gets turned over to us, we can sort it out between

3  them.  I'm sure Meta will have the resources to bring Mr. Lee

4  here.  He is under subpoena.  He is an officer and a managing

5  agent.  He is within Rule 45.  They have had the subpoena for,

6  I don't know, a month or two.

7          THE COURT:  Mr. Craig -- excuse me.  Mr. Craig, do you

8  have more information about this witness?

9          MR. CRAIG:  Like Mr. Akrotirianakis, I'm not prepared

10 to argue.  They have not raised this previously.

11         THE COURT:  Okay.  All right.  Well, we are trying to

12 resolve as many things as possible.  All right.  So, we do have

13 to adjourn in just a few minutes.  All right.  So, there are a

14 number of things that you-all need to submit today; and I will

15 make a final determination on the punitive damages instruction

16 for you.

17     And in terms of the profitability timeframe, after I look

18 at your authority, I will give you a decision on that.  All

19 right.  The rest is sort of up to you guys in terms of

20 preparing this for trial.  You have these limitations, and I

21 need you to meet and confer and to try to resolve as much about

22 the evidence as you can.

23     In the absence of any other firm process, I will follow

24 the procedure I typically do and that is to stay around in the

25 afternoon to resolve any issues with regard to evidentiary

 1  matters that are anticipated for the following day, so that you

 2  don't end up using all of your time objecting.

 3      However, with regard to the deposition excerpts, you need

 4  to prepare that stuff now, and it simply needs to comply with

 5  my pretrial rulings.  You need to prepare that because your

 6  technical people, I understand, have already been here.  They

 7  know how to set it up.  You know, it only works for a jury if

 8  it runs smoothly.  The electronic presentations are great.

 9  They have grown accustom to seeing visuals, but it only works

10  if it works.  That means that you need to resolve things.  You

11  don't want to be stopping the videotape and asking for a ruling

12  on an objection as to a particular sentence.

13      So, you-all still have a lot of work to do to get this

14  case ready for trial.  Other than that, I'm going to be at the

15  Ninth Circuit -- at the Northern District Conference starting

16  tomorrow afternoon, all weekend.  So, I'm not going to be

17  around.  After today, you won't hear from me.  And I will see

18  you Monday.  I hope that you got the jury questionnaires.

19          **MR. ANDRES:**  We did, Your Honor.

20          **MR. AKROTIRIANAKIS:**  We did, Your Honor.

21          **MR. PEREZ:**  Your Honor, one point, if I could just

22  following up on what the Court just said, which we -- the need

23  to kind of resolve evidentiary issues the day before they

24  arrive, all we would ask is that we agree with the Court's

25  instruction that witnesses' designations, exhibits be disclosed

```
 1   effectively 48 hours prior.  So, for instance, if someone is

 2   going -- if an exhibit is going to be used on Wednesday, we

 3   know that -- we are told that on Monday, so that on Tuesday we

 4   are in a position to raise it with the Court.

 5          THE COURT:  I typically just say the day before; but

 6   if both sides can agree to 48 hours before, that would be

 7   better.

 8          MR. AKROTIRIANAKIS:  I'm not sure it works,

 9   Your Honor, in a trial that's really going to be, like, four

10   days of evidence to say, Well, before the Plaintiffs' case

11   starts, I need to know what exhibits you are going to use in

12   the Defense case.  I mean, it doesn't work that -- if they want

13   to resolve things earlier, that's fine with me.

14          THE COURT:  Yeah, it would be great if you could do

15   it; but my typical rule is the afternoon beforehand, before

16   it's called so that we can talk about it that afternoon.

17          MR. PEREZ:  That's fine, Your Honor.  Close of

18   evidence on, you know, a given day is fine for us for the

19   following day's exhibits.

20          MR. BLOCK:  As long as it is before that afternoon

21   session so that we can use it.

22          THE COURT:  The idea is that it is disclosed at the

23   end of the trial day, and we can convene later in that same

24   afternoon if need be to discuss it before its introduced the

25   following day.
```

1          **MR. PEREZ:**  Thank you very much.

2          **THE COURT:**  That's the idea.  All right.  And I can do

3    that every day next week that we are taking evidence.

4          **MR. PEREZ:**  Thank you, Your Honor.

5          **THE COURT:**  Okay.  All right.  I'm sure our court

6    reporter is anxious to get going to her next assignment, and I

7    will see you-all on Monday morning.

8          **MR. ANDRES:**  Have a good weekend, Your Honor.

9          **MR. AKROTIRIANAKIS:**  Thank you, Your Honor.

10          **THE CLERK:**  Court is adjourned.

11               (Proceedings adjourned at 12:31 p.m.)

12                    ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   April 27, 2025

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter