# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4

5   WHATSAPP LLC AND META            )  C-19-07123 PJH
    PLATFORMS, INC.,                 )
6                                    )  OAKLAND, CALIFORNIA
                                     )
            PLAINTIFFS,              )
7                                    )  MAY 2, 2025
            VS.                      )
8                                    )  VOLUME 5
    NSO GROUP TECHNOLOGIES LIMITED   )
9   AND Q CYBER TECHNOLOGIES         )  PAGES 848-1175
    LIMITED,                         )
10                                   )
            DEFENDANTS.              )
11  _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14            UNITED STATES DISTRICT JUDGE

15

16  A P P E A R A N C E S:

17  FOR THE PLAINTIFFS:    DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074

24       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

849

```
 1

 2        APPEARANCES (CONTINUED)

 3

 4     FOR THE DEFENDANTS:      KING & SPALDING
                                BY:  JOSEPH N. AKROTIRIANAKIS
 5                                   AARON S. CRAIG
                                633 WEST FIFTH STREET, SUITE 1600
 6                              LOS ANGELES, CALIFORNIA  90071

 7                              BY:  MATTHEW V. NOLLER
                                50 CALIFORNIA STREET, SUITE 3300
 8                              SAN FRANCISCO, CALIFORNIA  94111

 9

10     ALSO PRESENT:            CURT EVANS
                                BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                        INDEX OF WITNESSES

3

4        DEFENDANTS'

5

6        **YARON SHOHAT**
             CROSS-EXAM BY MR. ANDRES (RES.)          P. 865
             REDIRECT EXAM BY MR. AKROTIRIANAKIS       P. 896
7            RECROSS-EXAM BY MR. ANDRES                P. 899

8

9        **TAMIR GAZNELI**
             DIRECT EXAM BY MR. AKROTIRIANAKIS         P. 903
             CROSS-EXAM BY MR. PEREZ                   P. 942
10           REDIRECT EXAM BY MR. AKROTIRIANAKIS       P. 982

11

12       **GREG PINSONNEAULT**
             DIRECT EXAM BY MR. CRAIG                  P. 991
             VOIR DIRE EXAM BY MR. ANDRES              P. 995
13           DIRECT EXAM BY MR. CRAIG (RES.)           P. 999
             CROSS-EXAM BY MR. ANDRES                  P. 1024
14           REDIRECT EXAM MR. CRAIG                   P. 1056

15

16

17

18

19

20

21

22

23

24

25

1

2                                  INDEX OF EXHIBITS

3                                        MARKED        ADMITTED

4       PLAINTIFFS'

5       936                              869

6

7

8       DEFENDANTS'

9       1148                                          1174

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    OAKLAND, CALIFORNIA                          MAY 2, 2025

 2                      P R O C E E D I N G S

 3         (COURT CONVENED AT 8:20 A.M.)

 4         (JURY OUT AT 8:20 A.M.)

 5              MR. ANDRES:  GOOD MORNING, YOUR HONOR.

 6              THE COURT:  GOOD MORNING.

 7              MR. CRAIG:  GOOD MORNING, YOUR HONOR.

 8              THE CLERK:  CALLING CIVIL CASE 19-7123-PCP, WHATSAPP

 9    INC., ET AL., VERSUS NSO GROUP TECHNOLOGIES LIMITED, ET AL.

10         COUNSEL, PLEASE STATE YOUR APPEARANCES.

11              MR. ANDRES:  GOOD MORNING, YOUR HONOR.

12         GREG ANDRES, TONY PEREZ, MICAH BLOCK FROM DAVIS POLK ON

13    BEHALF OF WHATSAPP AND META.

14         AND ALSO AT COUNSEL TABLE WITH US IS CARL WOOG FROM

15    WHATSAPP.

16              THE COURT:  GOOD MORNING.

17              MR. CRAIG:  GOOD MORNING, YOUR HONOR.

18         AARON CRAIG, JOE AKROTIRIANAKIS, AND MATT NOLLER FOR THE

19    DEFENDANTS, AND WITH US IS OUR REPRESENTATIVE, MR. SHOHAT.

20              THE COURT:  ALL RIGHT.  GOOD MORNING.

21              MR. ANDRES:  VERY, VERY, VERY, VERY BRIEFLY,

22    YOUR HONOR.

23         YESTERDAY IN RESPONSE TO QUESTIONS ON CROSS-EXAMINATION,

24    MR. SHOHAT TESTIFIED ABOUT THE IDENTITIES OF THE TARGETS, AND

25    HE USED THE WORDS "CERTAIN PEOPLE."
```

1           THE COURT:  RIGHT.

2           MR. ANDRES:  THE CLEAR IMPLICATION IS, I KNOW THESE

3    ARE BAD PEOPLE.

4           YOUR HONOR HOPEFULLY CLEANED THAT OUT AND SAID PEOPLE ARE

5    PEOPLE, AND THAT'S FINE.  I'M NOT ASKING.  I JUST DON'T WANT

6    HIM TO SAY IT AGAIN.

7           BECAUSE IF YOUR HONOR READS THE PRETRIAL ORDER, THERE ARE

8    PAGES AND PAGES AND PAGES OF MR. AKROTIRIANAKIS SAYING HE HAS

9    NO IDEA WHO THE TARGETS ARE.  HE SAID IT OVER AND OVER AGAIN.

10          AND YOUR HONOR WROTE, DEFENDANTS' COUNSEL SAID THAT THEY

11   DO NOT HAVE SPECIFIC INFORMATION ABOUT THE TARGETS IN THIS

12   CASE.

13          SO MR. SHOHAT CAN'T TESTIFY THAT CERTAIN PEOPLE ARE THE

14   TARGETS OF THIS CASE WHEN WE'VE HEARD OVER AND OVER THAT THAT'S

15   NOT TRUE.  SO WE'LL DEAL WITH THAT IN THE INSTRUCTIONS.  I'M

16   NOT ASKING FOR A CURATIVE INSTRUCTION NOW.

17          BUT IF HE SAYS IT AGAIN, I AM GOING TO ASK FOR ONE.  I

18   WANT HIM TO BE ON NOTICE THAT HE SHOULDN'T BE TESTIFYING IN

19   THAT MANNER.

20          THE COURT:  YES.

21          MR. AKROTIRIANAKIS:  IT WAS HIS QUESTION THAT I WAS

22   ANSWERING.  I'M NOT SURE IT COULD BE ANSWERED IN ANY DIFFERENT

23   WAY.

24          THE WITNESS IS ADVISED OF ALL OF THE MIL RULINGS.

25          THE COURT:  CLEARLY IT WAS A LOADED RESPONSE, CERTAIN

```
1     PEOPLE.

2              MR. AKROTIRIANAKIS:  WELL --

3              THE COURT:  HE WAS DEFINITELY, IN MY VIEW, SIGNALLING

4     THAT IT WAS A PARTICULAR CATEGORY, WHICH HAS BEEN RULED OUT IN

5     THIS CASE.  SO, YES.

6              MR. AKROTIRIANAKIS:  OR THAT IT WASN'T MASS

7     SURVEILLANCE LIKE THEY'RE IMPLYING, YOUR HONOR.  IT'S CERTAIN

8     PEOPLE.  IT'S NOT EVERYBODY.

9              THE COURT:  "CERTAIN" MAY NOT BE USED.  NOTHING THAT

10    TRIGGERS OUT -- I MEAN, AS IT IS, THE TESTIMONY IS GOING -- HAS

11    GONE FURTHER THAN WHAT MY ORDER HAD INDICATED WITH THE ADDITION

12    OF THE INTELLIGENCE GATHERING.  WE NEVER EVEN TALKED ABOUT

13    THAT.

14             MR. ANDRES:  THAT'S --

15             THE COURT:  BUT YOUR WITNESS USED THAT TERM AS WELL,

16    MR. GHEORGHE, FOR INTELLIGENCE.

17             MR. ANDRES:  I'M NOT SURE HE DID IN THE CONTEXT OF

18    LAW ENFORCEMENT --

19             THE COURT:  NO, NOT IN THAT CONTEXT.

20        BUT HE DID -- HE DID USE THAT.  SO IT WAS INJECTED THROUGH

21    THE VIDEO TESTIMONY OF MR. GHEORGHE.

22             MR. ANDRES:  OKAY.  WELL, LOOK, MAYBE WE CAN JUST

23    HAVE NO MORE REFERENCE TO INTELLIGENCE BECAUSE, YOU KNOW, I

24    DON'T --

25             THE COURT:  WELL, IT'S ALREADY OUT THERE.
```

```
 1              MR. ANDRES:  OKAY.

 2              THE COURT:  I'M NOT GOING TO CLOSE THE DOOR ON THAT.

 3              MR. ANDRES:  UNDERSTOOD.

 4              THE COURT:  BUT I DID NOTICE THE USE BY MR. SHOHAT.

 5       HE'S DOING, OTHERWISE, VERY, VERY WELL IN TRYING TO COMPLY WITH

 6       THE COURT'S ORDERS.

 7          BUT I DON'T LIKE THE SIGNALLING OF THAT, THAT THERE'S SOME

 8       CATEGORY.

 9              MR. ANDRES:  YOUR HONOR, I'M NOT SURE I AGREE THAT

10       HE'S DOING WELL.

11          (LAUGHTER.)

12              THE COURT:  WELL --

13              MR. ANDRES:  BUT THAT'S -- YOU KNOW, MAYBE MY

14       CROSS-EXAMINATION IS BAD.

15              THE COURT:  I SHOULD SAY HE'S DOING BETTER THAN I

16       EXPECTED.

17              MR. ANDRES:  YES, AS YOU WOULD IMAGINE FROM A SCHOOL

18       CHILD.

19          BUT, YOUR HONOR, HE ALSO TESTIFIED YESTERDAY ABOUT OTHER

20       LAWSUITS AGAINST META, WHICH IS ALSO -- AND HERE'S THE QUESTION

21       AND ANSWER:  "YOU UNDERSTAND THAT IN THIS COURTROOM, NOBODY HAS

22       FOUND META OR WHATSAPP VIOLATED ANY LAW?

23          "NOT IN THIS COURTROOM."

24          CLEARLY THE IMPLICATION IS OUTSIDE OF THIS COURTROOM,

25       THERE ARE LAWSUITS OR THAT META HAS VIOLATED THE LAW, AND THAT
```

```
 1         ALSO VIOLATES THE COURT'S ORDER ABOUT OTHER LAWSUITS.

 2              AND, AGAIN, NOTHING WE CAN DO ABOUT IT.  BUT HE CERTAINLY

 3         SHOULDN'T DO THAT AGAIN.

 4              IT -- RELATEDLY -- OKAY.

 5                   THE COURT:  THAT ONE DOESN'T CONCERN ME THAT MUCH.

 6                   MR. ANDRES:  OKAY.  RELATEDLY, HE TALKED ABOUT HIS

 7         CHUMMY RELATIONSHIP WITH APPLE AND HOW NSO AND APPLE ARE BOTH,

 8         YOU KNOW, PEERS, TECHNOLOGY FIRMS.

 9              AS YOUR HONOR KNOWS FROM THE SUMMARY JUDGMENT ORDER, WHICH

10         YOU IDENTIFIED THIS DIRECTLY, APPLE SUED NSO.

11              I'M NOT PLANNING ON BRINGING UP THAT LAWSUIT, BUT I

12         CERTAINLY AM PLANNING ON CONFRONTING MR. SHOHAT WITH THE

13         SPECIFIC STATEMENTS THAT APPLE MADE ABOUT NSO, AND I THINK

14         THAT'S FAIR GAME GIVEN WHAT HE'S SAID ABOUT APPLE.

15                   THE COURT:  OKAY.

16                   MR. ANDRES:  OKAY.

17              THIRDLY, YOUR HONOR --

18                   MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR, WOULDN'T THAT

19         BE BRINGING UP OTHER LAWSUITS.

20                   MR. ANDRES:  I'M NOT GOING TO BRING UP THE LAWSUIT.

21                   THE COURT:  WELL, HE'S -- HE'S RESPONDING TO -- I

22         MEAN, OBVIOUSLY MR. SHOHAT'S TESTIMONY ABOUT BEING IN THE SAME

23         BUILDING AS APPLE, WHICH WAS NOT A NECESSARY BIT OF INFORMATION

24         THAT THIS JURY WOULD NEED TO KNOW, THAT THEY SHARED A BUILDING,

25         WAS DESIGNED TO SHOW THAT THEY'RE ALL JUST BUSINESS AND THEY'RE
```

1    ALL JUST KIND OF EQUIVALENT.

2        IT'S KIND OF LIKE THE STATEMENT THAT YOU MADE DURING YOUR

3    OPENING THAT THIS WAS JUST A BUSINESS DISPUTE BETWEEN, YOU

4    KNOW, THESE BIG BUSINESSES.

5        MR. AKROTIRIANAKIS:  I THINK THE COURT MADE THE

6    STATEMENT IN VOIR DIRE SEVERAL TIMES TO THE JURORS THAT IT WAS

7    A BUSINESS DISPUTE, YOUR HONOR.

8        THE COURT:  I -- I DON'T RECALL DOING THAT, THAT THIS

9    WAS A BUSINESS DISPUTE?

10        THIS IS SOMETHING MORE THAN THAT, AT LEAST IN MY VIEW.

11        MR. AKROTIRIANAKIS:  WELL, ON THIS ISSUE, YOUR HONOR,

12    I DON'T THINK THAT THE FACT THAT THE WITNESS TESTIFIED THAT

13    THEY'RE IN THE SILICON VALLEY, IF YOU WILL, OF ISRAEL, TOGETHER

14    WITH ALL THE OTHER HIGH-TECH COMPANIES, THAT THAT MEANS THAT WE

15    SHOULD HAVE A DISCOURSE ABOUT APPLE'S ALLEGATIONS UNLESS THEN

16    ON REDIRECT HE'S GOING TO BE ABLE TO SAY THAT APPLE DISMISSED

17    THOSE ALLEGATIONS AGAINST NSO, WHICH IS TRUE.

18        MR. ANDRES:  I'M NOT GOING TO BRING UP THE LAWSUIT.

19    I'M NOT, BECAUSE I'M TRYING TO --

20        THE COURT:  WHAT ARE YOU GOING TO BRING UP?

21        MR. ANDRES:  I'M GOING TO SAY, APPLE SAID THAT YOUR

22    SPYWARE -- THAT YOU ARE A MALICIOUS SPYWARE COMPANY, AND THAT'S

23    A STATEMENT THEY MADE IN THEIR COMPLAINT AND IN A PRESS

24    RELEASE.  THAT'S ALL I'M GOING TO SAY.  I'M NOT GOING TO SAY

25    ANYTHING ABOUT THE LAWSUIT OR ANYTHING ABOUT THAT BECAUSE OF

```
 1            YOUR HONOR'S RULINGS.

 2                 THE COURT:  BUT THEY SAID IT IN THEIR COMPLAINT

 3       AGAINST NSO THAT WAS FILED IN THIS COURT.

 4                 MR. ANDRES:  CORRECT.

 5                 THE COURT:  SO HOW IS THAT NOT TAKING SOMETHING FROM

 6       THAT LAWSUIT?

 7                 MR. ANDRES:  WELL, BECAUSE THROUGHOUT THIS TRIAL,

 8       WE'RE REDACTING THINGS, WE'RE NOT PUTTING FULL DOCUMENTS IN.

 9            I'M JUST GOING TO ASK HIM IF HE'S FAMILIAR WITH A

10       STATEMENT MADE BY APPLE ABOUT THEIR BUSINESS, AND HE OPENED THE

11       DOOR TO THAT.

12                 MR. AKROTIRIANAKIS:  AND THEN WHY WOULD THE --

13                 THE COURT:  DID --

14                 MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.

15                 THE COURT:  I DON'T LIKE THE IDEA OF YOU MENTIONING

16       THE COMPLAINT, THAT IT CAME FROM A COMPLAINT.

17            DID IT COME FROM SOME OTHER SOURCE THAT MR. SHOHAT WOULD

18       BE AWARE OF?

19                 MR. ANDRES:  I'M -- I WASN'T GOING TO REFERENCE THE

20       COMPLAINT.  I WAS JUST GOING TO READ SOMETHING FROM IT, BUT I

21       CAN PARAPHRASE IT SO THAT HE -- HE'S OBVIOUSLY SITTING RIGHT

22       HERE.

23            BUT I'M NOT ASKING HIM TO REFERENCE THE COMPLAINT IN ANY

24       WAY.

25                 MR. AKROTIRIANAKIS:  WELL, BUT THEN ON REDIRECT I
```

```
1     SHOULD BE ABLE TO ASK HIM, ISN'T IT TRUE THAT APPLE WITHDREW

2     THAT ASSERTION, WE WON'T CALL IT AN ALLEGATION BECAUSE THEN I'D

3     BE QUOTING FROM THE COMPLAINT, BUT THEY DID, YOUR HONOR.  THEY

4     MADE THAT ALLEGATION IN THE COMPLAINT AND THEN THEY WITHDREW

5     THE COMPLAINT.  WE NEVER HAD THE OPPORTUNITY TO RESPOND TO THAT

6     ALLEGATION IN DISCOVERY OR IN THIS FORMAT, AND THEY WITHDREW

7     THE ALLEGATION.  SO I THINK THAT THE --

8          THE COURT:  DOES THE ALLEGATION EXIST SOMEWHERE OTHER

9     THAN THE COMPLAINT?

10          MR. ANDRES:  THERE'S A --

11          MR. AKROTIRIANAKIS:  IT'S TAKEN FROM THE COMPLAINT

12    AND PUT INTO A PRESS RELEASE, YOUR HONOR.

13          MR. ANDRES:  YEAH.

14          THE COURT:  HMM.

15          MR. AKROTIRIANAKIS:  BUT THEY WITHDREW THE ASSERTION,

16    THE ALLEGATION, THE ASSERTION, WHATEVER YOU WANT TO CALL IT,

17    WITH THEIR DISMISSAL OF THEIR OWN COMPLAINT BEFORE

18    JUDGE DONATO.

19          THE COURT:  OKAY.

20          MR. ANDRES:  THEY STILL SAID IT.  I'M JUST GOING

21    TO --

22          THE COURT:  ALL RIGHT.  I DON'T WANT TO OPEN THE DOOR

23    TO ANY OTHER LITIGATION JUST BECAUSE HE SAID THAT THEY WORKED

24    IN THE SAME BUILDING.  IF YOU WANT TO CHALLENGE THAT THEY HAVE

25    THIS CHUMMY RELATIONSHIP IN SOME OTHER WAY, FINE.  BUT NOT
```

```
1         THROUGH LITIGATION.

2              MR. ANDRES:  OKAY.

3         AND LASTLY, YOUR HONOR, YESTERDAY MR. SHOHAT TALKED ABOUT

4    HIS BACKGROUND AS A COMPUTER ENGINEER AND A SOFTWARE ENGINEER

5    AND THAT HE DID, YOU KNOW, HIS VARIOUS JOBS.

6         I'M ALSO GOING TO CROSS-EXAMINE HIM ABOUT THE FACT THAT HE

7    WAS INVOLVED IN CYBER WARFARE.  I'M NOT GOING TO MENTION HIS

8    MILITARY SERVICE OR ANYTHING LIKE THAT, CONSISTENT WITH YOUR

9    COURT'S RULING.

10        BUT GIVEN HIS TESTIMONY ABOUT HIS BACKGROUND IN SOFTWARE,

11   I THINK IT'S FAIR TO REFERENCE THAT HE ALSO HAS A BACKGROUND IN

12   CYBER WAR, WHICH IS EXACTLY WHAT THIS CASE IS ABOUT.

13             MR. AKROTIRIANAKIS:  YOUR HONOR, HE -- WHAT HE'S

14    TALKING ABOUT -- WHAT HE'S TALKING ABOUT IS MR. SHOHAT'S

15    MILITARY SERVICE.

16        WHAT MR. SHOHAT DID IN THE ISRAELI MILITARY WAS RELATED TO

17   A SOFTWARE THAT RUNS THE KIND OF THING THAT WE HAVE HERE WHERE

18   IT'S LIKE A -- I'M NOT VERY TECHNICAL ABOUT THIS -- BUT LIKE A

19   DOME OVER THE COUNTRY IN CASE THERE'S AN INCOMING MISSILE

20   ATTACK.

21        THAT HAS NOTHING TO DO WITH WHAT WE'RE TALKING ABOUT.

22        I THINK IT'S TOTALLY FAIR FOR MR. ANDRES TO QUESTION

23   MR. SHOHAT ABOUT WORKING FOR RSA OR THE OTHER TECH COMPANIES

24   AND WHAT HE DID THERE AS -- IN HIS ROLE.

25             BUT I REALLY THINK THAT IT'S JUST SUPER INFLAMMATORY TO
```

1    START TALKING ABOUT WARFARE, PARTICULARLY IN THE CIRCUMSTANCES

2    OF AN ONGOING WAR THAT OBVIOUSLY IS UNPOPULAR IN THIS COMMUNITY

3    AND MANY, MANY OTHERS IN LIGHT OF THE VOIR DIRE AND THE MANY

4    CAUSE CHALLENGES THAT WERE GRANTED BY THE COURT ABOUT TWICE THE

5    NUMBER I'VE EVER SEEN.

6         BUT MR. SHOHAT'S MILITARY SERVICE IN RESPECT OF CYBER

7    WARFARE REALLY HAS NOTHING TO DO WITH ANYTHING LIKE THE KIND OF

8    TECHNOLOGY THAT'S AT ISSUE IN THIS CASE.

9         AND HE TESTIFIED TO THAT IN HIS DEPOSITION, SO COUNSEL IS

10   AWARE EXACTLY WHAT HIS MILITARY SERVICE WAS.

11         MR. ANDRES:  I'M NOT TALKING ABOUT HIS MILITARY

12    SERVICE.  HE DIDN'T TESTIFY ANYTHING ABOUT A DOME OR ANY OF

13    THOSE THINGS.  I'M NOT TALKING ABOUT ANY WAR NOW OR ANYTHING

14    LIKE THAT.

15         YOU'VE GIVEN THE DEFENSE A TREMENDOUS -- I'M NOT SAYING

16    THIS CRITICALLY -- BUT A TREMENDOUS AMOUNT OF LEEWAY TO PUT ON

17    THEIR CASE.

18         HE TESTIFIED THAT HE HAS EXPERIENCE IN CYBER WARFARE.

19    THOSE ARE HIS WORDS.  THAT'S ALL HE SAID.  THAT'S ALL I'M GOING

20    TO ASK HIM.

21         HE SAID HE'S A COMPUTER ENGINEER, HE SAID HE'S A SOFTWARE

22    ENGINEER, HE SAID HE WORKED AT A CONFERENCE, HE NICELY GOT TO

23    SAY THAT THIS CONFERENCE IS GOING IN SAN FRANCISCO THAT HE

24    USUALLY COMES TO.

25         THE COURT:  HE DID MENTION THAT.

```
 1                  MR. ANDRES:  WHO CARES?  THOSE ARE IRRELEVANT FACTS

 2      THAT THEY BROUGHT OUT.

 3                  THE COURT:  DID HE USE THE WORD CYBER WARFARE

 4      HIMSELF?

 5                  MR. ANDRES:  YES.  YES.

 6                  THE COURT:  CAN YOU POINT ME --

 7                  MR. ANDRES:  HE ABSOLUTELY SAID I WORKED -- SORRY, I

 8      WORKED IN ELECTRONIC WARFARE.

 9                  THE COURT:  OKAY.  IS THAT THE SAME AS CYBER WARFARE?

10                  MR. AKROTIRIANAKIS:  IF HE HAD --

11                  MR. ANDRES:  WELL, HE SAID --

12                  THE COURT:  WELL, FIRST OF ALL, HIS BACKGROUND IS

13      RELEVANT.  HE OPENED THE DOOR BY TESTIFYING ABOUT HIS

14      BACKGROUND.

15          IF HE HAS EXPERIENCE THAT COULD POTENTIALLY BEAR UPON HIS

16      TESTIMONY HERE AND HIS ROLE HERE, I DON'T SEE WHY THAT'S NOT

17      FAIR GAME IF HE TESTIFIED ABOUT IT.

18                  MR. AKROTIRIANAKIS:  OKAY.  THEN I THINK I GET TO ASK

19      ABOUT -- I THINK I GET TO ASK HIM TO EXPLAIN, ON REDIRECT

20      EXAMINATION, YOUR HONOR, THEN WHAT IS THE COMMENT ABOUT CYBER

21      WARFARE, AND THEN HE CAN TELL THE JURY THAT HE WAS WORKING ON

22      DEFENSIVE TECHNOLOGY THAT WAS INTENDED TO SAVE HIS COUNTRY FROM

23      A NUCLEAR HOLOCAUST.

24                  THE COURT:  OKAY.

25                  MR. AKROTIRIANAKIS:  BUT IF HE WANTS TO OPEN THE DOOR
```

```
1       TO THAT --

2                   THE COURT:  YEAH, HIS BACKGROUND IS --

3                   MR. ANDRES:  HIS BACKGROUND.

4                   THE COURT:  HIS BACKGROUND IS HIS BACKGROUND.

5            BUT BOTH SIDES, I THINK, ARE PROBABLY GOING INTO TERRITORY

6       THAT'S NOT NECESSARY IN THIS CASE.

7                   MR. ANDRES:  IT'S JUST TWO QUESTIONS, YOUR HONOR.

8                   THE COURT:  OKAY.  BUT I DON'T WANT YOU OBJECTING

9       WHEN HE REDIRECTS AND ASKS FOR A MORE DETAILED EXPLANATION.

10                  MR. ANDRES:  I WOULD LOVE FOR HIM TO DO THAT.

11                  THE COURT:  OKAY.

12                  MR. ANDRES:  I'M HOPING HE DOES, THAT HE DOESN'T

13      DISAPPOINT THIS TIME.

14                  THE COURT:  OKAY.

15                  MR. ANDRES:  OKAY.  LET'S GO, YOUR HONOR.

16                  MR. CRAIG:  YOUR HONOR, BEFORE WE START, COUNSEL HAS

17      RENEWED AN EMAIL REQUEST TO RECALL MS. TREXLER TO THE STAND TO

18      TESTIFY SOMETHING ABOUT THE NSO FINANCIAL DOCUMENTS THAT --

19                  THE COURT:  OKAY.  BUT WE DISCUSSED THAT ALREADY.  HE

20      CAN DO THAT.

21                  MR. CRAIG:  WELL, YOUR HONOR, IT'S NOWHERE -- IT'S

22      NOT IN MS. TREXLER'S, ANY OF HER REPORTS.

23                  THE COURT:  I KNOW.  BUT I ALREADY GAVE PERMISSION

24      THAT IF -- WE TALKED ABOUT THE FINANCIALS, WHICH WERE PRODUCED

25      LATE.  NOBODY HAD THEM.  NO ONE'S EXPERT HAD A CHANCE TO LOOK
```

1      AT THEM.

2           I ASKED HOW YOU WERE GOING TO PUT THEM ON, YOU SAID YOU

3      WERE GOING TO PUT THEM ON THROUGH MR. SHOHAT, AND I TOLD

4      MR. ANDRES THAT HE COULD RECALL MS. TREXLER, WHO'S BEEN SITTING

5      IN THE COURTROOM, AND ASK HER QUESTIONS ABOUT THOSE FORMS THAT

6      SHE HAS SEEN AS SHE'S SITTING HERE IN THE COURTROOM.

7           I'VE ALREADY GIVEN PERMISSION ABOUT THAT.

8                MR. ANDRES:  THANK YOU, YOUR HONOR.

9                MR. CRAIG:  I UNDERSTAND MR. ANDRES YESTERDAY TO BE

10     ASKING ABOUT HER TO EXPLAIN THE FORMAT OF THE DOCUMENT.

11          BUT I NOW UNDERSTAND HIM TO BE ASKING HER OPINIONS ABOUT

12     THE SUBSTANCE.  IF THEY'RE GOING TO BE ABLE TO DO THAT, I ONLY

13     ASK BECAUSE WE HAVE MR. PINSONNEAULT PREPARED TO TESTIFY TODAY,

14     AND IF SHE'S GOING TO GIVE AN UNDISCLOSED OPINION ABOUT THE

15     CONTENTS OF THEM, THEN MR. PINSONNEAULT SHOULD BE ALLOWED TO DO

16     SO AS WELL.

17               THE COURT:  I AGREE.

18               MR. ANDRES:  I AGREE ENTIRELY, YOUR HONOR.

19               THE COURT:  OKAY.  LET'S GO.

20               MR. ANDRES:  WE'RE IN FULL AGREEMENT.  LET'S DO IT.

21               THE COURT:  WE'RE IN FULL AGREEMENT FOR THE FIRST

22     TIME IN THIS TRIAL.

23          (LAUGHTER.)

24               THE COURT:  SO LET'S TAKE A WIN AND LET'S GET THE

25     JURY OUT BEFORE EVERYBODY CHANGES THEIR MIND.

1          MR. CRAIG:  THANK YOU, YOUR HONOR.

2          MR. ANDRES:  THANK YOU.

3       I'M JUST GOING TO MOVE THIS PODIUM A LITTLE.

4          THE CLERK:  DO YOU HAVE THE WITNESS ON THE --

5          THE WITNESS:  SHOULD I GO THERE?

6          THE CLERK:  YES, PLEASE.

7          THE COURT:  GOOD MORNING, MR. SHOHAT.  YOU'RE STILL

8    UNDER OATH.

9          **(DEFENDANTS' WITNESS, YARON SHOHAT, WAS PREVIOUSLY SWORN.)**

10         THE WITNESS:  THANK YOU.

11      (PAUSE IN PROCEEDINGS.)

12         THE CLERK:  ALL RISE FOR THE JURY.

13      (JURY IN AT 8:35 A.M.)

14         THE CLERK:  THANK YOU.  PLEASE BE SEATED.

15         THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

16   GENTLEMEN OF THE JURY.  GOOD TO SEE YOU HERE.  THANK YOU AGAIN

17   FOR YOUR PUNCTUALITY.

18      MR. ANDRES, CONTINUE.

19         MR. ANDRES:  THANK YOU, YOUR HONOR.  GOOD MORNING.

20              **CROSS-EXAMINATION (RESUMED)**

21   BY MR. ANDRES:

22   Q.  MR. SHOHAT, YESTERDAY I WAS ASKING YOU SOME QUESTIONS

23   ABOUT YOUR AWARENESS OF U.S. LAW, LIKE THE FEDERAL COMPUTER

24   FRAUD AND ABUSE ACT AND THE CALIFORNIA DATA ACCESS AND FRAUD

25   ACT.

1        DO YOU REMEMBER THAT?

2    A.   I DO.

3    Q.   I ASKED YOU WHETHER, WHEN WHATSAPP SUED YOU FOR VIOLATIONS

4    OF THESE STATUTES, WHETHER AT SOME POINT YOU BECAME AWARE OF

5    THAT LAWSUIT; CORRECT?

6    A.   CORRECT.

7    Q.   I ASKED YOU SPECIFICALLY, CERTAINLY BY THE TIME OF THIS

8    LAWSUIT, YOU WERE AWARE OF THE ALLEGATIONS OF VIOLATIONS OF

9    LAW; CORRECT?

10   A.   I DISTINGUISHED BETWEEN THE TIME OF THE LAWSUIT AND THE

11   TIME THAT NSO BECAME -- SHOWED UP -- THE TIME THAT NSO SHOWED

12   TO THIS LAWSUIT.

13   Q.   EXACTLY.  OKAY.  THAT'S EXACTLY WHERE I WAS GOING.

14        SO YOU WERE MAKING A DISTINCTION BETWEEN THE TIME THAT

15   NSO -- THAT META FILED THIS LAWSUIT AND THE TIME THAT NSO

16   BECAME AWARE OF IT?

17   A.   THIS IS CORRECT.

18   Q.   AND YOU WERE SUGGESTING THERE'S A GAP THERE.

19   A.   THIS IS CORRECT.

20   Q.   EXCUSE ME?

21   A.   THIS IS CORRECT, YES.

22   Q.   AND THEN I WAS ASKING YOU ABOUT THE FACT THAT THERE WAS

23   TESTIMONY OR EVIDENCE IN THIS CASE THAT THE CONDUCT CONTINUED

24   AFTER THE LAWSUIT WAS FILED.  AND, AGAIN, YOU REFERENCED THIS

25   GAP; CORRECT?

1     A.   IT CONTINUED AFTER THE LAWSUIT WAS FILED.

2          BUT YOU WERE ASKING ME ABOUT THE POINT THAT THEY WERE

3     AWARE, AND I SAID IT'S TWO DIFFERENT TIMEFRAMES.

4     Q.   AND YOU'RE AWARE -- OR I CAN REFRESH YOUR RECOLLECTION, I

5     CAN ASK THE COURT TO TAKE JUDICIAL NOTICE THAT THIS LAWSUIT WAS

6     FILED ON OCTOBER 29TH --

7     A.   I'M AWARE.  '19.

8     Q.   -- 2019.  JUST LET ME FINISH MY QUESTION.  LET ME TRY IT

9     AGAIN.  QUESTION, ANSWER, QUESTION, ANSWER.

10    A.   I THOUGHT YOU WERE DONE.

11    Q.   THE COURT REPORTER IS DOING ALL THE HARD WORK HERE.

12         YOU'RE AWARE THAT META FILED THIS LAWSUIT ON OCTOBER 29TH,

13    2019?  YES OR NO?

14    A.   YES.

15    Q.   OKAY.  AND IT'S YOUR CONTENTION THAT YOU OR NSO DID NOT

16    BECOME AWARE OF THAT LAWSUIT UNTIL MUCH LATER?

17    A.   I SAID NSO SHOWED TO THE LAWSUIT A FEW MONTHS LATER.

18    Q.   AND THAT'S FALSE?

19    A.   THAT'S MY KNOWLEDGE.

20    Q.   OKAY.  MR. SHOHAT, ARE YOU AWARE OF THE FACT ON

21    OCTOBER 29TH, 2019, THE DAY THIS LAWSUIT WAS FILED, THAT NSO

22    ISSUED A STATEMENT ABOUT THIS LAWSUIT?

23    A.   I'M NOT AWARE.

24    Q.   OKAY.

25    A.   COULD HAVE BEEN.

1    Q.   WELL, THAT WOULD SUGGEST THAT THERE WAS NO GAP BETWEEN THE

2    TIME THE LAWSUIT WAS FILED AND THE TIME THE COMPANY OR YOU

3    BECAME AWARE?

4    A.   AGAIN, I DIDN'T SAY WE WERE NOT AWARE.  I SAID WE SHOWED

5    TO THE LAWSUIT A FEW MONTHS LATER.

6    Q.   OKAY.  SO NOW YOUR TESTIMONY TODAY IS THAT, THAT YOU WERE

7    AWARE WHEN THE LAWSUIT WAS FILED?

8    A.   I -- IF YOU'RE ASKING ME WHEN I BECAME AWARE, I DON'T

9    KNOW.  I DON'T REMEMBER.  I DON'T THINK THE DATE YOU MENTIONED.

10        I DO KNOW WHEN THE COMPANY BECAME PART OF THIS PROCESS.

11   Q.   YESTERDAY YOU TESTIFIED, AND I'M QUOTING, "I UNDERSTAND.

12   AND I SAID THAT WE WERE NOT AWARE, EVEN THOUGH IT WAS FILED.

13   WE BECAME AWARE OF IT AT A LATER STAGE.  SO THERE'S A GAP

14   BETWEEN WHEN IT WAS FILED AND WHEN WE BECAME AWARE.  IT'S NOT

15   THE SAME POINT."

16        DO YOU WANT ME TO SHOW YOU YOUR TESTIMONY?

17   A.   NO.

18   Q.   TODAY YOU'RE SAYING SOMETHING DIFFERENT?

19   A.   NO.

20             MR. ANDRES:  CAN I APPROACH THE WITNESS, YOUR HONOR?

21             THE COURT:  YES.

22             MR. ANDRES:  I'M GOING TO HAND THIS EXHIBIT TO

23   MR. AKROTIRIANAKIS.  IT'S NSO'S STATEMENT ON OCTOBER 29TH, 2019

24   (HANDING).

25             I NEED AN EXHIBIT NUMBER.

1           936.  PLAINTIFFS' EXHIBIT 936, YOUR HONOR.

2               THE COURT:  ALL RIGHT.

3           (PLAINTIFFS' EXHIBIT 936 WAS MARKED FOR IDENTIFICATION.)

4               MR. ANDRES:  AND IT'S REDACTED.

5      Q.   I'LL HAND THIS TO YOU (HANDING).

6           OKAY.  DO YOU SEE THAT?  IT'S REDACTED, BUT IT HAS THE

7      DATE OF THE NSO STATEMENT; CORRECT?  PLEASE TAKE ALL THE TIME

8      YOU NEED TO LOOK AT IT.

9      A.   I SEE IT.  IT'S VERY SHORT.  IT'S REDACTED.

10     Q.   YES, AS MANY DOCUMENTS ARE IN THIS CASE.  YOU UNDERSTAND

11     THAT THOSE ARE CONSISTENT WITH THE COURT'S RULINGS?

12     A.   I UNDERSTAND.

13     Q.   LET'S GO THROUGH THIS.  SO THE DATE OF THIS, IT SAYS "NEWS

14     PROVIDED BY NSO GROUP."  CORRECT?

15     A.   YES.

16     Q.   OKAY.  AND THAT'S YOU?  YOU'RE NSO GROUP?

17     A.   WE'RE NSO GROUP.  I DON'T KNOW -- I'M NOT FAMILIAR WITH

18     THIS DOCUMENT, IF THAT'S YOUR QUESTION.

19     Q.   OKAY.  BUT THERE'S NO DISPUTE THAT YOU WORK FOR NSO GROUP.

20     YOU'RE THE CEO?

21     A.   I'M THE CEO.

22     Q.   OKAY.  AND THE DATE IS OCTOBER 29TH, 2019?

23     A.   CORRECT.

24     Q.   AND THE TOP PARAGRAPH -- THE TOP HEADING, OR HEADLINE,

25     SAYS "NSO GROUP STATEMENT ON FACEBOOK LAWSUIT."

```
 1          DO YOU SEE THAT?

 2     A.   YES, I SEE THAT.

 3     Q.   DID I READ THAT CORRECTLY?

 4     A.   THAT'S WHAT IT SAYS.

 5     Q.   NSO STATEMENT ON FACEBOOK LAWSUIT.  THAT'S WHAT WE'RE

 6     TALKING ABOUT; CORRECT?

 7     A.   YES, UM-HUM.

 8     Q.   MY ABILITY TO PRONOUNCE THESE NAMES IS CHALLENGING AT THE

 9     LEAST, BUT HERZLIYA?

10     A.   YES.

11     Q.   THAT'S THE NAME THAT YOU WERE TALKING ABOUT YESTERDAY

12     WHERE YOUR COMPANY IS AND YOU SAID IT'S LIKE THE SILICON

13     VALLEY OF --

14     A.   YES.

15     Q.   JUST LET ME FINISH.

16     A.   SORRY.

17     Q.   I'LL GIVE YOU A CHANCE, I PROMISE.

18          HERZLIYA, AM I PRONOUNCING THAT CORRECTLY?

19     A.   VERY WELL.

20     Q.   THAT'S WHERE YOUR HEADQUARTERS ARE?

21     A.   CORRECT.

22     Q.   AND THIS STATEMENT COMES FROM HERZLIYA?

23     A.   THAT'S WHAT IT SAYS.

24     Q.   IT SAYS OCTOBER 29TH, 2019.

25          THAT'S THE DAY THIS LAWSUIT WAS FILED?
```

1    A.   YES, THAT'S THE DATE.

2    Q.   NO GAP BETWEEN THE DATE THE LAWSUIT IS FILED AND THE DATE

3    THAT NSO BECOMES AWARE OF IT?

4    A.   I DIDN'T SAY THAT, BETWEEN THE DATE THAT'S WRITTEN HERE

5    AND THE DATE IT WAS FILED.

6    Q.   IT'S THE SAME DATE?

7    A.   I'M NOT SURE WHO'S QUOTED HERE.  THERE'S START OF

8    QUOTATION AND THEN NO END.  NO -- IT DOESN'T SAY WHO'S BEING

9    QUOTED.  LIKE, I'D LOVE TO SEE WHO'S BEING QUOTED HERE BECAUSE

10   YOU REDACTED THE NAME OF SOMETHING WHICH IS COMPLETELY PUBLIC.

11        I THINK IT COULD HAVE -- I DON'T KNOW.

12   Q.   WELL --

13   A.   I DON'T KNOW WHAT --

14   Q.   WELL, IT'S FROM NSO GROUP.  SOMEBODY AT THE COMPANY KNOWS

15   ABOUT IT?

16   A.   I'D LOVE TO GOOGLE THIS PRESS RELEASE AND SEE WHO'S

17   QUOTED, BECAUSE I CANNOT SEE IT AND I CANNOT SAY WHO'S QUOTED.

18        I KNOW THE COMPANY BECAME AWARE LATER.  MAYBE MY KNOWLEDGE

19   IS INCORRECT OR INCOMPLETE.

20        BUT I'D LOVE TO SEE WHO'S BEING QUOTED, IF IT'S AN

21   EMPLOYEE OF THE COMPANY BECAUSE IT HAS -- IT HAS QUOTATION

22   START, NO END, AND NO NAME OF WHO IS BEING QUOTED.

23        IF IT WAS THE COO OF THE COMPANY, FOR INSTANCE, WHY WOULD

24   YOU REDACT HIS NAME?

25   Q.   THERE ARE COURT RULES ABOUT THE REDACTIONS.

1        YOUR HONOR, I'LL MOVE ON.

2        THE POINT IS THAT THIS IS FROM NSO GROUP.  NOBODY DISPUTES

3   THAT?

4   A.   I DIDN'T SAY THAT.

5   Q.   I'M ASKING IF YOU DISPUTE THAT THIS CAME FROM NSO GROUP?

6   A.   I DON'T KNOW THAT.  I KNOW THAT THERE IS THIS PAPER.  I

7   DON'T KNOW WHERE IT'S TAKEN FROM, WHICH SAYS THAT THIS IS FROM

8   NSO.

9   Q.   AND IN THE STATEMENT THAT'S NOT REDACTED IT SAYS, CAN YOU

10  READ ALONG WITH ME, "IN THE STRONGEST POSSIBLE TERMS."

11       DO YOU SEE THAT?

12  A.   I SEE THAT.

13  Q.   IN THE STRONGEST POSSIBLE TERMS, WE DISPUTE TODAY'S

14  ALLEGATIONS AND WILL VIGOROUSLY FIGHT THEM."

15  A.   IT --

16  Q.   IT SAYS THAT, RIGHT?

17       SORRY.  MR. AKROTIRIANAKIS, I ASSURE YOU, IS GOING TO HAVE

18  QUESTIONS FOR YOU TODAY.  I ASSURE YOU OF THAT.

19       IS THAT WHAT THIS DOCUMENT SAYS?

20  A.   IT SAYS IT COULD BE ANYONE IN THIS COURTROOM BEING QUOTED.

21  I DON'T KNOW WHO'S BEING QUOTED HERE.

22       BUT, YES, THIS IS WHAT IT SAYS.

23  Q.   OKAY.  OCTOBER 29TH, 2019 NSO SAYS, "IN THE STRONGEST

24  POSSIBLE TERMS, WE DISPUTE TODAY'S ALLEGATIONS AND WILL

25  VIGOROUSLY FIGHT THEM."

1         CORRECT?

2    A.   THIS IS WHAT THIS PAPER SAYS.

3    Q.   AND IT'S THE SAME DAY THAT THIS LAWSUIT WAS FILED?

4         THE COURT:  I DON'T HAVE A COPY OF THAT, SO I'M NOT

5    SURE WHAT YOU ALL ARE --

6         MR. ANDRES:  OH, SORRY YOUR HONOR.

7    I'M GOING TO MOVE ON, YOUR HONOR, BUT HAPPY TO (HANDING).

8    Q.   OKAY.  I CAN GRAB THAT FROM YOU, MR. SHOHAT.

9         AND JUST SO WE'RE CLEAR, THERE'S NO GAP BETWEEN THE DATE

10   THAT NSO SAYS THEY ARE GOING TO VIGOROUSLY FIGHT THIS LAWSUIT

11   AND THE DATE THAT IT WAS FILED?

12   A.   THERE'S NO GAP ON THE DATE ON THAT PAPER, YES.

13   Q.   MR. SHOHAT, IN YOUR DEPOSITION, YOU TESTIFIED THAT NSO

14   NEVER KNOWS THE TARGETS OF YOUR CUSTOMERS; CORRECT?

15   A.   I DON'T REMEMBER THE EXACT QUOTATION.  BUT I WILL SAY THAT

16   WE DON'T KNOW THE -- CAN YOU REPEAT THE QUESTION SO I HAVE THE

17   EXACT PHRASING?

18   Q.   NSO DOES NOT KNOW THE PEOPLE WHOSE PHONES IN WHATSAPP ARE

19   TARGETED BY YOUR CLIENT, WHOEVER YOUR CLIENTS ARE?

20   A.   WHEN A CLIENT, A GOVERNMENT AGENCY, TARGETS A PERSON OF

21   INTEREST, WE ARE NOT PART OF IT.  WE DON'T KNOW WHO'S BEING

22   TARGETED.  WE ARE NOT INVOLVED.

23        AND WE DEFINITELY DON'T KNOW WHO IS THE PERSON OR EVEN

24   WHAT'S THE MOBILE PHONE NUMBER WHICH IS BEING TARGETED.

25   Q.   OKAY.  I WAS GOING TO ASK YOU ABOUT THAT.

 1      A.    THIS IS FROM --

 2      Q.    EXCUSE ME.

 3            I WAS GOING TO ASK ABOUT THE MOBILE PHONES, BUT YOU'VE

 4      SAID THAT ALREADY.

 5            SO JUST TO BE CLEAR, WITH RESPECT TO THE --

 6            MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  I DON'T

 7      THINK HE HAD FINISHED HIS ANSWER.

 8      BY MR. ANDRES:

 9      Q.    I'M SORRY.  DID YOU FINISH YOUR ANSWER?

10      A.    I DIDN'T.

11            THE COURT:  WELL, HE WAS ANSWERING SOMETHING THAT

12      WASN'T ASKED, SO LET'S START AFRESH WITH A NEW QUESTION.

13      BY MR. ANDRES:

14      Q.    MR. SHOHAT, NSO DOES NOT KNOW THE PEOPLE, THE IDENTITY OF

15      THE PEOPLE WHOSE PHONES ARE TARGETED WITH PEGASUS; CORRECT?

16      A.    NO.  THE REASON I SAY NO IS BECAUSE WE MIGHT LEARN ABOUT

17      IT AFTER THE FACT.

18            BUT AT THE TIME THAT THE GOVERNMENT AGENCY TARGETS

19      SOMEONE, WE DON'T KNOW AND ARE NOT PART OF THAT -- WE DON'T

20      KNOW THE NUMBER OR THE PERSON.

21      Q.    ALL RIGHT.

22            YOUR HONOR, THAT'S DIRECTLY INCONSISTENT WITH YOUR RULING

23      THIS MORNING, SO I WOULD ASK TO STRIKE IT AND I CAN TRY AGAIN.

24            THE COURT:  YES.

25            MR. ANDRES:  I CAN --

 1              THE COURT:  YES, LADIES AND GENTLEMEN OF THE JURY,

 2      PLEASE DISREGARD MR. SHOHAT'S LAST RESPONSE.

 3          RE-ASK THE QUESTION.

 4      BY MR. ANDRES:

 5      Q.  WITH RESPECT TO THE IDENTITIES OF THE PEOPLE WHOSE PHONES

 6      ARE TARGETED BY PEGASUS, NSO DOES NOT KNOW THE IDENTITY OF

 7      THOSE PEOPLE?

 8      A.  I'M NOT SURE WHAT I DID WRONG TO -- BECAUSE --

 9              THE COURT:  IT'S EITHER A YES OR A NO.

10              THE WITNESS:  OKAY.

11          REPEAT THE QUESTION.  I WILL ANSWER WITH YES OR NO.

12      BY MR. ANDRES:

13      Q.  OKAY.  FOR THE THIRD TIME, NSO DOES NOT KNOW THE IDENTITY

14      OF THE PEOPLE WHOSE PHONES AND THEIR WHATSAPP APPLICATIONS ARE

15      TARGETED BY YOUR CLIENTS?

16      A.  CAN YOU SAY IT ONE MORE TIME FOR ME, BECAUSE IT'S NOT --

17      Q.  HOW ABOUT WITH RESPECT TO THE INDIVIDUALS -- THERE'S 1400

18      INDIVIDUALS IN THIS CASE WHOSE PHONES WERE TARGETED.

19          AT THE TIME THEY WERE TARGETED, NSO DID NOT KNOW THE

20      IDENTITY OF THOSE PEOPLE?

21      A.  THANK YOU FOR THE CLARIFICATION.

22          THE ANSWER IS NO.  NO, WE DIDN'T KNOW -- NO.

23      Q.  YEAH, I'M SORRY.  AND I DON'T MEAN -- I REALIZE IF YOU

24      NEED HELP WITH THE TRANSLATION OR ANYTHING, WE CAN GET THAT.

25          BUT YOU'RE SAYING NO, NSO, AT THE TIME OF THE PEGASUS AND

1       THE SPYING, DOES NOT KNOW THE IDENTITIES OF THE PEOPLE WHOSE

2       PHONES ARE BEING SPIED UPON?

3       A.   THIS IS A CORRECT STATEMENT.

4       Q.   THANK YOU.

5       A.   THANK YOU.

6       Q.   AND THEY DON'T KNOW THE PHONE NUMBERS?

7       A.   NO.

8       Q.   YESTERDAY YOU TESTIFIED THAT NSO NEVER INTENDED TO HARM

9       WHATSAPP SERVERS; CORRECT?

10      A.   CORRECT.

11      Q.   AND YOU UNDERSTAND AND YOU'VE SEEN THE TESTIMONY OF THE

12      WHATSAPP ENGINEERS WHO WORKED NIGHT AND DAY TO PATCH THE

13      EXPLOITS FROM NSO; CORRECT?  YOU WERE IN THE COURTROOM FOR

14      THAT?

15      A.   CORRECT.

16      Q.   YOU SAW THE TESTIMONY OF MR. GHEORGHE?

17      A.   CORRECT.

18      Q.   AND YOU SAW THE TESTIMONY OF DREW ROBINSON?

19      A.   I DID.

20      Q.   YOU UNDERSTAND THAT THEY SPENT A CONSIDERABLE AMOUNT OF

21      TIME RESPONDING TO NSO'S ATTACK ON WHATSAPP?  THAT'S A YES OR

22      NO.

23      A.   I DON'T UNDERSTAND THEY SPENT A SPECIFIC AMOUNT OF TIME.

24           SO I'LL CORRECT THAT TO BE MORE ACCURATE.

25           WHATSAPP WAS NOT THE TARGET OF THOSE GOVERNMENT AGENCIES

1    OPERATION.

2    Q.   RIGHT.  WHATSAPP WAS THE TARGET OF NSO'S HACK.  THAT'S

3    WHAT THE COURT FOUND.  YOU'RE FAMILIAR THAT THAT'S WHAT THE

4    COURT FOUND, THAT NSO VIOLATED THE CALIFORNIA AND FEDERAL

5    COMPUTER FRAUD ACT BECAUSE OF WHAT THEY INSERTED IN THE

6    WHATSAPP CODE; RIGHT?

7         WE WENT OVER THAT YESTERDAY.  YOU UNDERSTAND THAT.

8             MR. AKROTIRIANAKIS:  OBJECTION.  THAT MISSTATES THE

9    EVIDENCE AND THE COURT'S ORDER, YOUR HONOR.

10            THE COURT:  I THINK SO, TOO.  YOU'RE PARSING IT A

11   LITTLE FINALLY.

12        THE TARGETS ARE THE TARGETS.

13        WHATSAPP SERVERS ARE IN BETWEEN --

14            MR. ANDRES:  CORRECT.

15            THE COURT:  -- THE LAUNCH.

16   BY MR. ANDRES:

17   Q.   NSO SENT ITS CODE AND SOFTWARE INTO WHATSAPP SERVERS.

18            THE COURT:  YES.

19            MR. ANDRES:  THAT'S UNDISPUTED, YOUR HONOR.

20   Q.   RIGHT?

21   A.   CORRECT.

22            MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR, THAT'S

23   NOT CORRECT.  THAT'S A MISSTATEMENT OF THE EVIDENCE AND THE

24   COURT'S RULING.

25            MR. ANDRES:  APPARENTLY THE COURT DOESN'T THINK SO.

 1                    THE COURT:  I DON'T THINK SO.  THE TARGETS ARE THE

 2       TARGETS.  THE TARGET ARE THE TARGET USERS.

 3            BUT WHATSAPP SERVERS WERE IMPLICATED, PEGASUS WENT THROUGH

 4       THE WHATSAPP SERVERS.

 5                    MR. ANDRES:  EXACTLY.

 6                    MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

 7       BY MR. ANDRES:

 8       Q.   AND YOU UNDERSTAND THAT AS A RESULT OF THAT, WHATSAPP

 9       ENGINEERS HAD TO RESPOND?

10       A.   I DO.

11       Q.   HAD TO WORK VERY HARD?

12       A.   I DO.

13       Q.   NIGHTS AND WEEKENDS?

14       A.   I DO.

15       Q.   LOTS OF PEOPLE.

16            YOU HAVE TO ANSWER YES, NO.  YOU CAN'T NOD.

17       A.   WHAT IS -- LOTS OF PEOPLE IS RELATIVE, SO IT'S NOT A YES

18       OR A NO.

19            BUT THEY WORKED HARD.  THEY DID.

20       Q.   OKAY.  LET'S NOT QUIBBLE ABOUT THAT.

21            THE -- AND I -- YOU TESTIFIED IN YOUR OWN DEPOSITION THAT

22       WHEN YOU WERE ON THE OTHER SIDE DOING CYBER WORK, YOU WERE

23       INVOLVED IN PATCHES.

24       A.   I WAS INVOLVED IN SIMILAR WORK, YEAH.

25       Q.   YEAH.

1     A.   SAME SIZE, YEAH.

2     Q.   WHEN YOU WERE ON THE OTHER SIDE, WHEN SOMEBODY WAS

3     ATTACKING YOUR SYSTEMS, YOU COULD PATCH THEM.  THAT'S WHAT

4     PEOPLE DO, AND YOU EXPECTED WHATSAPP TO DO THAT?

5     A.   THAT'S WHAT I -- THAT'S WHAT YOU DO WHEN YOU DO

6     CYBERSECURITY.

7     Q.   RIGHT.  AND THAT IS A FORM OF HARM BECAUSE WHATSAPP HAD TO

8     HAVE ITS ENGINEERS DIVERT THEMSELVES FROM THEIR NORMAL JOB AND

9     RESPOND, IN YOUR WORDS, TO THE INTRUSION BY NSO; RIGHT?

10    A.   THEY --

11    Q.   THAT'S A FORM OF HARM?

12    A.   SO I --

13    Q.   MY QUESTION IS, YES OR NO, THAT IS A FORM OF HARM?

14          MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR, THIS IS A

15    LEGAL ARGUMENT.

16          THE COURT:  SUSTAINED.

17          THE WITNESS:  I WANT TO --

18          THE COURT:  YOU DON'T HAVE TO ANSWER.

19    BY MR. ANDRES:

20    Q.   YOU DON'T BELIEVE THAT --

21          THE WITNESS:  CAN I?

22          THE COURT:  YOU DON'T NEED TO ANSWER THAT LAST

23    QUESTION.

24    BY MR. ANDRES:

25    Q.   YOU UNDERSTAND THAT WHATSAPP HAD TO DO A LOT OF WORK IN

1    RESPONSE TO NSO'S INTRUSION ON THEIR SERVERS?  YES OR NO?  YOU

2    UNDERSTAND THEY HAD TO DO A LOT OF WORK?

3    A.   I KNOW -- I -- INCIDENT RESPONSE TEAMS WORK VERY HARD ALL

4    THE TIME.  THEY'RE ON CALL ALL THE TIME.  THEY TARGET CYBER

5    ATTACKS ALL THE TIME.  I'VE DONE THOUSANDS OF CYBER ATTACKS ALL

6    MY LIFE AND WORKED VERY HARD IN DOING IT, YES.

7    Q.   THIS ONE WAS MORE SOPHISTICATED THAN THE ONES THAT COME IN

8    EVERY DAY?

9    A.   IT WAS VERY SOPHISTICATED.  I'LL GIVE YOU THAT.

10   Q.   NSO IS A MARKET LEADER IN THIS TECHNOLOGY?

11   A.   NSO IS STATE OF THE ART TECHNOLOGY.

12   Q.   IT'S SOPHISTICATED?

13   A.   I DON'T ARGUE THAT.

14   Q.   SO, YES, IT'S SOPHISTICATED?

15   A.   YES, IT'S SOPHISTICATED.

16   Q.   OKAY.  JUST TO BE CLEAR, YOU'RE NOT HERE TO ARGUE.  YOU'RE

17   HERE TO ANSWER QUESTIONS, SO --

18   A.   I DON'T THINK I ARGUED.

19        THE COURT:  EXCUSE ME, GENTLEMEN.  GENTLEMEN.  LET'S

20   BRING IT DOWN A NOTCH.

21   BY MR. ANDRES:

22   Q.   WE WOULD AGREE THAT NSO WASN'T INVITED INTO WHATSAPP'S

23   SERVERS.  FAIR?

24   A.   YES.

25   Q.   AND YOU DIDN'T ASK PERMISSION?

1    A.   NO.

2    Q.   WE WERE TALKING ABOUT YOUR EXPERIENCE IN THIS FIELD,

3    RIGHT, AND YOU -- LET ME GET THIS RIGHT -- YOU HAVE A HISTORY

4    OF WORKING IN THIS FIELD; CORRECT?

5    A.   YES, I MENTIONED IT YESTERDAY.

6    Q.   AND YOU HAVE A BACKGROUND IN WORKING IN ELECTRONIC

7    WARFARE; CORRECT?

8    A.   THAT I DID NOT MENTION YESTERDAY, BUT, YES, I DO.

9    Q.   AND YOU TESTIFIED TO THAT IN YOUR DEPOSITION; CORRECT?

10   A.   THIS IS CORRECT.

11   Q.   "I WILL SAY THAT THE DOMAIN I WORKED IN WAS ELECTRONIC

12   WARFARE."

13        THOSE ARE YOUR WORDS?

14   A.   YES.  THIS IS BEFORE I JOINED THE CYBERSECURITY INDUSTRY.

15   Q.   FAIR.  AND YOU -- THAT'S FROM YOUR TESTIMONY WHEN YOU TOOK

16   AN OATH AND YOU SAID YOU WERE GOING TO TELL THE TRUTH?

17   A.   YES.

18   Q.   NO DISPUTE ABOUT THAT, YOU'VE BEEN INVOLVED IN ELECTRONIC

19   WARFARE?

20   A.   THIS IS PART OF MY RESUME.

21   Q.   I THINK WE'VE ALREADY ESTABLISHED THAT NSO IS A MARKET

22   LEADER; IS THAT CORRECT?

23   A.   IT IS.

24   Q.   AND THERE WAS TESTIMONY ABOUT THIS ZERO-CLICK VECTOR.

25   THAT EFFECTIVELY MEANS -- YES OR NO -- THAT EFFECTIVELY MEANS

1    THAT THE USER, OR THE PERSON WHOSE PHONE PEGASUS IS ATTACKING

2    DOESN'T HAVE TO DO ANYTHING; CORRECT?

3    A.   CORRECT.

4    Q.   IN YOUR DEPOSITION, YOU TESTIFIED THAT YOUR CLIENTS DON'T

5    CARE IF THE VECTORS ARE ZERO-CLICK OR ONE-CLICK OR ANYTHING; IS

6    THAT CORRECT?

7    A.   NO.

8    Q.   NO, IT'S NOT CORRECT?

9    A.   IT'S NOT CORRECT.

10   Q.   OKAY.

11   A.   I CAN TELL YOU WHAT I SAID.

12   Q.   WELL, LET'S TAKE A LOOK AT WHAT YOU SAID.

13        YOU WERE ASKED, "WOULD YOU" --

14        MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR.  COULD I HAVE

15   PAGE AND LINE?

16        MR. ANDRES:  SURE.

17        THE COURT:  YES.

18        MR. ANDRES:  PAGE 68:01 TO 68:16.

19   "WOULD YOU BE SURPRISED IF PEGASUS GAVE A CUSTOMER AN

20   OPTION TO CHOOSE WHICH ZERO-CLICK VECTOR TO USE?

21   "ANSWER:  BECAUSE CUSTOMERS DON'T CARE WHICH VECTOR THEY

22   USE, AS LONG AS THEY GET THE INTELLIGENCE THEY NEED."

23   Q.   CORRECT?

24   A.   CORRECT.  THIS IS NOT WHAT YOU JUST ASKED ME ABOUT.

25   Q.   OKAY.  BUT YOU AGREE WITH WHAT I JUST READ?

1     A.   I WOULD AGREE.

2     Q.   THAT'S THE TESTIMONY YOU GAVE UNDER OATH?

3     A.   I WOULD LIKE TO MAKE A DIFFERENCE BETWEEN THIS AND WHAT

4     YOU ASKED ME BECAUSE THAT'S NOT THE SAME.  YOU ASKED ME IF THE

5     CUSTOMER CARED IF IT WAS ZERO-CLICK OR NOT ZERO-CLICK.

6          THEY DO CARE.  HEARING MY TESTIMONY, I SAID DIFFERENT

7     VECTORS OF THE ZERO-CLICK.  THAT TESTIMONY IS NOT THE SAME.

8     Q.   FAIR ENOUGH.  NSO DECIDES WHICH VECTOR TO USE, NOT THE

9     CUSTOMERS?

10    A.   NOT NSO, BUT THE SYSTEM ITSELF DECIDES WHICH, WHICH VECTOR

11    TO -- IS LAUNCHED.

12    Q.   THAT'S AN NSO DECISION.  THAT'S NOT THE CLIENT.

13    A.   THE TECHNOLOGY, DEPENDING ON THE CERTAIN PART OF THIS, WE

14    USE THE RIGHT VECTOR.  FOR INSTANCE, IF IT'S APPLE DEVICE, IOS,

15    OR ANDROID, OBVIOUSLY THE SYSTEM WILL USE DIFFERENT VECTOR.

16    IT'S NOT NSO.  IT'S NOT SOMEONE AT NSO SITTING BEHIND THE

17    SCENES AND DECIDES.  NO.

18    Q.   BUT NSO CREATES THE SOFTWARE?

19    A.   OF COURSE.

20    Q.   SO IT IS NSO'S SOFTWARE AND THAT SOFTWARE DECIDES?

21    A.   IT'S LOGIC WITHIN THE SOFTWARE THAT WE DEVELOPED.

22    Q.   THANK YOU.  NOW, WE WERE TALKING ABOUT THE VECTORS, WE

23    WERE TALKING ABOUT PATCHES.  WHEN NSO PUTS OUT A VECTOR AND

24    WHATSAPP OR SOMEBODY ELSE PATCHES THAT, NSO THEN TRIES TO BREAK

25    THAT PATCH?

```
 1      A.   NO, WE DON'T TRY TO BREAK THE PATCH.

 2           WE MAKE SURE -- WE TRY TO MAKE SURE THAT THE SYSTEM

 3      CONTINUES TO WORK, NOT -- WE NEVER BREAK A PATCH.

 4      Q.   AND FOR THE SYSTEM TO WORK, YOU NEED TO FIND ANOTHER WAY

 5      INTO WHATSAPP'S SERVERS?

 6      A.   WE NEED TO FIND ANOTHER WAY INTO THE MOBILE DEVICE THAT IS

 7      BEING TARGETED, NOT NECESSARILY THROUGH WHATSAPP SERVERS.

 8      Q.   BUT YOU GET TO THE MOBILE DEVICE THROUGH WHATSAPP SERVERS?

 9      THAT'S WHAT THE COURT RULED?

10      A.   ONLY IN VERY SMALL CASES OF THE VECTOR THAT WE HAVE, VERY

11      SMALL, THREE OF THEM AS MENTIONED BEFORE.

12      Q.   AND THAT'S THE CONDUCT THAT IS THE SUBJECT OF THIS LAWSUIT

13      IS THE VIOLATION OF FEDERAL AND STATE LAW IS NSO'S ATTACK ON

14      WHATSAPP'S SERVER.

15           I CAN READ THE --

16      A.   NO, I --

17      Q.   YOU AGREE WITH THAT?

18      A.   I AGREE THAT THIS IS WHAT THE COURT DECIDED.

19           I JUST SAID THAT IF A VECTOR BREAKS, WE WILL NOT

20      NECESSARILY FIND ANOTHER VECTOR THROUGH WHATSAPP SERVERS.  WE

21      HAD DOZENS OF VECTOR SERVER LISTS.  YOU MENTIONED THREE OF THEM

22      THAT USED WHATSAPP.  THERE ARE MANY OTHERS THAT DON'T.

23           SO IF OUR ABILITY TO SEND A MESSAGE THROUGH A WHATSAPP

24      SERVER IS DISABLED, WE MIGHT FIND A DIFFERENT WAY TO SEND THE

25      MESSAGE NOT THROUGH WHATSAPP, BUT SOMETHING DIFFERENT.
```

1    Q.   AND SO YOU USED THOSE VECTORS FOR OTHER, LIKE, USED THEM

2    FOR APPLE DEVICES, TOO?  YOU SAID THERE WERE OTHER VECTORS

3    OUTSIDE OF PEGASUS, OR OUTSIDE OF WHATSAPP?

4    A.   PEGASUS CAN TARGET, CAN ALLOW GOVERNMENT AGENCIES TO

5    TARGET ALSO IOS DEVICES, YES.

6    Q.   THAT'S APPLE DEVICES, WHEN YOU SAY IOS, APPLE?

7    A.   MY PRONUNCIATION OF APPLE WAS CONFUSING YESTERDAY, SO I'M

8    USING IOS.

9    Q.   FAIR ENOUGH.  AND MY UNDERSTANDING OF COMPUTER SOFTWARE IS

10   NOT AS GOOD AS YOURS.

11   A.   YES.

12   Q.   AND SO THEY KEEP GOING, THERE'S A FIX, AND YOU GO AGAIN TO

13   FIND OUT A WAY AROUND THAT FIX LIKE YOU DID IN THIS CASE?

14   A.   WE FIND AN ALTERNATIVE WAY, NOT NECESSARILY AROUND THE

15   FIX, BUT AN ALTERNATIVE WAY TO GET -- TO ALLOW THE TECHNOLOGY

16   TO GET TO THE TARGET DEVICE, WHICH IS --

17   Q.   THE TECHNOLOGY HERE IS PEGASUS.  SO YOU FIND ANOTHER WAY

18   TO GET PEGASUS ON THE PHONE?

19   A.   YES.

20   Q.   OKAY.  AND THAT HAPPENED ONCE IN THIS CASE, AND YOU HAD TO

21   FIND A SECOND ALTERNATIVE.  FAIR?

22   A.   YES.

23   Q.   AND THEN IT HAPPENED A SECOND TIME AND YOU FOUND A THIRD

24   ALTERNATIVE?

25   A.   YES, AS WE DISCUSSED.

1    Q.   AND PART OF THE $50-PLUS MILLION THAT'S USED FOR R&D IS

2    FOR THIS PROCESS, TO FIND FIXES?  SOME PART OF THAT $52 MILLION

3    IS TO FIND FIXES?

4    A.   WE DON'T FIND FIXES, WE FIND VECTORS, OR WAYS TO ACCESS

5    THE PHONE.  BUT, YES, THE INTENTION IS THAT.

6    Q.   THAT'S WHAT THE R&D MONEY IS FOR?

7    A.   PART OF IT.

8    Q.   AND WHEN THESE FIXES GO IN OR THE SOFTWARE GOES TO THE

9    PHONE, YOU USED THE WORD IN YOUR DEPOSITION THAT THERE'S FULL

10   DENIABILITY; CORRECT?

11   A.   YES.  I MIGHT HAVE USED IT.

12   Q.   FULL DENIABILITY MEANS THAT THE PERSON WHOSE PHONE IS

13   BEING SPIED UPON DOES NOT KNOW WHO'S SPYING ON THEM?

14   A.   THAT'S CORRECT.

15   Q.   THAT'S HARMFUL, ISN'T IT?

16        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  IT'S,

17   AGAIN, A LEGAL QUESTION.

18        MR. ANDRES:  "HARM" IS NOT A LEGAL TERM, YOUR HONOR.

19        THE COURT:  IN THIS -- IN THE SENSE THAT YOU'RE USING

20   IT, IT'S -- ULTIMATELY IT'LL BE A JURY QUESTION AS TO WHETHER

21   OR NOT IT'S HARM.

22        SO I'M GOING TO SUSTAIN THE OBJECTION.

23        MR. ANDRES:  THANK YOU, YOUR HONOR.

24   Q.   YESTERDAY YOU WERE LOOKING AT THE BALANCE SHEET, AND

25   MR. AKROTIRIANAKIS WAS POINTING OUT THAT THERE'S APPROXIMATELY

1      $5 MILLION IN CASH ON HAND; IS THAT CORRECT?

2      A.   WE HAD IT IN THE BEGINNING OF THE YEAR, YES.

3      Q.   AND YOU SAID THAT TO SORT OF STAY AFLOAT, NSO SPENDS $10

4      MILLION A MONTH TO STAY AFLOAT; CORRECT?

5      A.   YES.

6      Q.   SO THAT'S $5 MILLION, EVERY TWO WEEKS YOU SPEND

7      $5 MILLION?

8      A.   WE SAY $5 MILLION ON THE BALANCE SHEET, SO WE HAD 8 AT

9      THAT POINT IN TIME, BUT MY RECOLLECTION, WE NEED 10.

10     Q.   BUT TO STAY AFLOAT, YOU PAY $10 MILLION A MONTH; IS THAT

11     CORRECT?

12     A.   WE SPEND ABOUT 10 MILLION, YES.

13     Q.   THAT'S APPROXIMATELY $120 MILLION A YEAR?

14     A.   APPROXIMATELY.

15     Q.   AND THAT'S ON TOP OF THE MONEY THAT YOU SPEND ON RESEARCH

16     AND DEVELOPMENT -- RESEARCH AND DEVELOPMENT?

17     A.   NO.   THE RESEARCH AND DEVELOPMENT IS INCLUDED IN THAT.

18     Q.   OKAY.   BUT WHEN --

19     A.   THAT'S WHAT I SAID WHEN I MENTIONED THE 10 MILLION.

20     Q.   WHEN YOUR LAWYER IS SUGGESTING THAT YOU ONLY HAVE

21     $5 MILLION AND THAT'S NOT A FAIR AMOUNT TO PAY IN PUNITIVE

22     DAMAGES, YOU ACTUALLY PAY, OR YOU'RE EXPENDING $120 MILLION A

23     YEAR?

24     A.   THIS IS CORRECT.

25     Q.   OKAY.   YESTERDAY WE WERE TALKING ABOUT, OR I'M SORRY, YOU

1    WERE TESTIFYING ABOUT THE FACT THAT YOU'RE AN OFFICER OF NSO

2    AND IN THE MANAGEMENT; CORRECT?

3    A.   YES.

4    Q.   AND YOU'RE RESPONSIBLE IN THAT ROLE, AND DURING THE TIME

5    OF THE EVENTS IN THIS LAWSUIT, YOU WERE RESPONSIBLE FOR THE

6    PRACTICES AT NSO; IS THAT CORRECT?

7    A.   AS THE CEO OF THE COMPANY?

8    Q.   YEAH.

9    A.   YES.

10   Q.   WELL, IN MANAGEMENT.

11   A.   SINCE BEING CEO, I'M RESPONSIBLE FOR EVERYTHING.  IF YOU

12   ASK ME BEFORE THAT TIME, I NEED TO KNOW EXACTLY WHICH PRACTICES

13   YOU'RE TALKING ABOUT.

14   Q.   OKAY.  WELL, FOR THE PRACTICES RELATED TO PEGASUS, FOR

15   EXAMPLE?  YOU WERE AWARE OF THAT DURING THE TIME THAT YOU WERE

16   THE COO?

17   A.   I WAS AWARE OF SOME OF THEM.  I WAS NOT RESPONSIBLE FOR

18   THEM.

19   Q.   OKAY.  BUT THAT PEGASUS IS ONE OF YOUR MOST IMPORTANT

20   PRODUCTS; CORRECT?

21   A.   YEAH, BUT IT WAS NOT -- IT WAS NOT UNDER MY

22   RESPONSIBILITY.

23   Q.   IN YOUR ROLE AS CEO, YOU'RE RESPONSIBLE FOR JUDGMENTS AND

24   CORPORATE DECISION MAKING; CORRECT?

25   A.   I THINK IT'S FAIR TO SAY THAT, YES.

1    Q.   AND THAT ULTIMATELY YOU'RE INVOLVED IN DEVELOPING

2    CORPORATE POLICY; CORRECT?

3    A.   YES.

4    Q.   YOU UNDERSTAND THAT AS AN EMPLOYEE THAT'S A MANAGING AGENT

5    FOR THE PURPOSES OF PUNITIVE DAMAGES, IF THE EMPLOYEE EXERCISED

6    SUBSTANTIAL INDEPENDENT AUTHORITY, JUDGMENT IN CORPORATE

7    DECISION MAKING, THAT EMPLOYEE'S DECISIONS ARE RELEVANT?

8        DO YOU UNDERSTAND THAT?

9    A.   I DO.

10   Q.   JUST A QUICK QUESTION ABOUT THE DOCUMENTS THAT WE SAW

11   YESTERDAY.

12       MR. AKROTIRIANAKIS, AS DID I, SHOWED YOU SOME OF THOSE

13   FINANCIAL RECORDS.

14       DO YOU REMEMBER THOSE?

15   A.   YES.

16   Q.   THERE WAS A BALANCE SHEET AND A P&L?

17   A.   YES.

18   Q.   BOTH FOR NSO AND FOR Q CYBER?

19   A.   CORRECT.

20   Q.   OKAY.  AND THOSE COVER THE FULL YEAR OF 2025?

21       I'M SORRY.  THOSE COVER THE FULL YEARS OF 2023 AND 2024?

22   A.   THIS IS CORRECT.

23   Q.   AND THEY WERE JUST RECENTLY FINALIZED IN 2025?

24   A.   I MENTIONED THAT THE 2023 WAS RECENTLY AUDITED.

25   Q.   OKAY.  BUT THOSE DOCUMENTS WERE RECENTLY PRODUCED IN 2025?

1    A.    THE 2023 WAS PRODUCED IN 2024 AND AUDITED IN 2025.

2          THE 2024 WAS PRODUCED IN 2025, YES.

3    Q.    RIGHT.  BUT THEY WERE ONLY RECENTLY PRODUCED IN THIS CASE?

4    A.    I PRODUCED -- I DON'T KNOW WHEN THEY WERE PRODUCED.

5    Q.    OKAY.  THAT'S NOT ON YOU.

6          THE -- IT'S FAIR TO SAY THAT YOU TESTIFIED THAT THERE WAS

7    AN AUDIT DONE, I THINK YOU MAYBE SAID YESTERDAY, FOR ONE OF

8    THOSE YEARS; CORRECT?

9    A.    I GOT THE AUDIT REPORT, OR WE GOT, NOT I, THIS WEEK.

10   Q.    YOU'VE BEEN AWARE OF THIS TRIAL FOR SOME TIME, CORRECT, AT

11   LEAST SINCE JANUARY?

12   A.    CORRECT, YES.

13   Q.    AND IS IT FAIR TO SAY THAT THESE DOCUMENTS WERE NOT

14   PRODUCED UNTIL AFTER THERE WAS A TRIAL SET IN THIS MATTER?

15   A.    I DON'T KNOW THE TIME.

16   Q.    YOU'RE POINTING TO THESE DOCUMENTS AS AN INABILITY TO PAY

17   A PUNITIVE DAMAGES AWARD; CORRECT?

18   A.    IT SHOWS THE FINANCIAL STATUS OF THE COMPANY.

19   Q.    YOU'RE NOT AN ACCOUNTANT THOUGH; RIGHT?

20   A.    I'M NOT.  I HAVE AN M.B.A. DEGREE, SO I DID HAVE SEVERAL

21   FINANCE COURSES.  BUT, NO, I'M NOT AN ACCOUNTANT.

22   Q.    WHEN PEGASUS INFECTS A WHATSAPP USER'S PHONE, IT'S ABLE TO

23   GATHER ALMOST ALL OF THE INFORMATION ON THAT PHONE; CORRECT?

24   A.    IT CAN GATHER UP INFORMATION.

25   Q.    SO IF SOMEBODY'S CREDIT CARDS ARE ON THOSE PHONES, ARE YOU

1      ABLE TO GATHER THAT INFORMATION?

2      A.   I'M NOT FAMILIAR THAT WE ARE GATHERING CREDIT CARD

3      INFORMATION.

4      Q.   WELL, ACCORDING TO YOU, YOU'RE NOT GATHERING ANY OF THE

5      INFORMATION, IT'S YOUR CLIENTS; RIGHT?

6      A.   THANK YOU FOR CORRECTING ME ON THAT.

7           BUT THE TECHNOLOGY, I'M NOT FAMILIAR THAT IT'S GATHERING

8      CREDIT CARD INFORMATION.

9      Q.   HERE'S THE QUESTION:  IT HAS THE POWER TO TAKE CREDIT CARD

10     INFORMATION OFF PEOPLE'S PHONES; CORRECT?

11     A.   WE COULD DEVELOP THE FUNCTIONALITY TO TAKE CREDIT CARD

12     INFORMATION.  I'M NOT FAMILIAR THAT WE DEVELOPED SUCH

13     FUNCTIONALITY.

14     Q.   RIGHT NOW THE TESTIMONY, I THINK YOU OR ONE OF YOUR

15     COLLEAGUES GAVE IT, IS YOU GET ALL OF THE INFORMATION EXCEPT

16     FOR THE OPERATING SYSTEM?

17     A.   I HEARD RAMON'S TESTIMONY.  HE DID SAY THAT.  I THINK HE

18     WAS NOT ACCURATE.

19     Q.   IF SOMEBODY'S CREDIT CARD INFORMATION WAS ON THE PHONE,

20     YOU WOULD HAVE THE ABILITY TO GET THAT INFORMATION?

21     A.   WE WOULD HAVE THE ABILITY TO ADD THIS FUNCTIONALITY TO THE

22     SYSTEM.  I DON'T BELIEVE IT EXISTS TODAY.

23     Q.   YOU HAVE THE ABILITY TO GET SOMEBODY'S DOCUMENTS THAT ARE

24     ON SOMEBODY'S PHONE; CORRECT?

25     A.   THEY -- THE AGENCY HAS THE ABILITY TO GET CERTAIN

1    DOCUMENTS, CERTAIN TYPE OF DOCUMENTS, LIKE EMAIL ATTACHMENTS

2    CAN BE GATHERED FROM THE PHONE, YES.

3    Q.   SO IF SOMEBODY'S BANK STATEMENTS WERE ATTACHED TO AN

4    EMAIL, YOU COULD GET THEM?

5    A.   THE GOVERNMENT AGENCY TRACKING THAT PHONE WOULD BE ABLE TO

6    GET THAT, YES.

7    Q.   OKAY.  YESTERDAY YOU TESTIFIED THAT YOUR OFFICE IS IN THE

8    SAME BUILDING AS APPLE.

9         DO YOU REMEMBER THAT?

10   A.   I DO.

11   Q.   IF I UNDERSTOOD YOUR POINT CORRECTLY, THE POINT IS THAT

12   NSO IS A REGULAR TECH COMPANY, JUST LIKE APPLE; ISN'T THAT

13   RIGHT?

14   A.   IT IS.

15   Q.   YOU'RE IN THE SAME BUILDING?

16   A.   WE ARE.

17   Q.   THAT'S NOT HOW APPLE SEES IT; RIGHT?

18   A.   I -- I THINK THEY SEE IT THE SAME WAY.  WE SHARE THE SAME

19   ELEVATOR WHEN WE GO UP.

20   Q.   ARE YOU AWARE THAT APPLE HAS RECENTLY WARNED ITS CLIENTS

21   ABOUT NSO ATTACKS DUE TO PEGASUS?

22   A.   I BELIEVE THAT APPLE WARNED ITS CLIENTS ABOUT ATTACKS, AND

23   IT SAID THAT -- AND IF YOU WANT, YOU CAN SHOW THIS TO THE JURY,

24   I'M SURE -- THAT IT'S SOPHISTICATED ATTACKS, SUCH AS NSO.

25        THEY DID SPECIFICALLY SAY THAT THOSE ATTACKS WERE USING

1    NSO TECHNOLOGY.

2         I'D LOVE TO SEE THE TEXT OF SUCH, IF YOU THINK OTHERWISE.

3    Q.   APPLE REFERS TO NSO AS SPYWARE; CORRECT?

4    A.   THEY MIGHT.

5    Q.   AND THEY HAVE REFERRED TO NSO AS AMORAL; CORRECT?

6    A.   APPLE AT SOME POINT REFERRED TO NSO AS AMORAL AND

7    MALICIOUS, AND LATER ON APPLE WITHDREW THOSE ASSERTIONS.

8         MR. ANDRES:  YOUR HONOR, THAT OBVIOUSLY VIOLATES

9    SPECIFICALLY WHAT YOUR HONOR RULED ON BEFORE.

10        THE COURT:  WELL, YOU ASKED THE QUESTION.  I'M NOT

11   SURE --

12        MR. ANDRES:  OKAY.

13        THE COURT:  -- WHAT YOU EXPECTED TO GET.

14        MR. ANDRES:  OKAY.

15   Q.   APPLE HAS SAID THAT NSO DESIGNED THE MOST HIGHLY INVASIVE

16   SPYWARE AND THAT IT SELLS IT, DISTRIBUTES IT, AND OPERATES IT?

17   A.   I DON'T BELIEVE THEY SAID THAT WE OPERATE IT.

18   Q.   APPLE DOESN'T VIEW ITSELF AS ONE OF YOUR FRIENDS, DOES IT?

19   A.   I DIDN'T FINISH MY ANSWER.

20   Q.   I'M SORRY?

21        THE COURT:  YOU MAY FINISH YOUR ANSWER.

22        THE WITNESS:  THANK YOU.

23        SO I THINK YOU'RE MISTAKEN IF YOU SAY THAT APPLE SAID THAT

24   WE OPERATED.  I'M NOT FAMILIAR WITH IT, AND IF THEY SAID IT,

25   OKAY.  AND IF YOU'RE QUOTING SOMETHING, I'D LOVE TO SEE THE

1     QUOTATION BECAUSE IT SOUNDS TO ME THAT IT'S EITHER OUT OF

2     CONTEXT OR MISLEADING BECAUSE I DON'T BELIEVE THEY SAID THAT.

3      BY MR. ANDRES:

4      Q.   OKAY.

5           ONE MINUTE, YOUR HONOR.

6                THE COURT:  YES.

7           (DISCUSSION OFFER THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

8      BY MR. ANDRES:

9      Q.   WE'VE BEEN -- YOU'VE BEEN ANSWERING QUESTIONS ABOUT

10     RESEARCH AND DEVELOPMENT; IS THAT CORRECT?

11     A.   YES.

12     Q.   OKAY.  AND SOME OF THAT RESEARCH AND DEVELOPMENT INVOLVES

13     TESTING PEGASUS BEFORE IT'S ROLLED OUT TO YOUR CLIENTS;

14     CORRECT?

15     A.   YES.

16     Q.   THAT'S A SUBSTANTIAL PERIOD OF TIME, AND THERE ARE A BUNCH

17     OF PEOPLE INVOLVED IN THAT; CORRECT?

18     A.   YES.

19     Q.   AND THAT'S EXPENSIVE?

20     A.   YES.

21     Q.   OKAY.  YOU'RE FAMILIAR WITH THE PHRASE -- MAYBE YOU'RE

22     NOT.

23          LET ME ASK YOU, ARE YOU FAMILIAR WITH THE PHASE "THERE ARE

24     TWO SIDES TO EVERY STORY"?

25     A.   YES.

1    Q.   YOU'RE FAMILIAR WITH THAT?

2    A.   YES.

3    Q.   YOU HEARD YOUR LAWYER SAY THAT IN HIS OPENING?

4    A.   I DON'T REMEMBER, BUT IT'S COMMON.

5    Q.   IN TERMS OF WHETHER THIS COURT HAS FOUND THAT NSO VIOLATED

6    THE COMPUTER FRAUD AND ABUSE ACT, DO YOU UNDERSTAND THAT THERE

7    ARE NOT TWO SIDES TO THAT STORY IN LIGHT OF THE JUDGE'S

8    RULINGS?

9    A.   THERE'S ONLY ONE SIDE THERE, THE COURT'S SIDE.

10   Q.   IN TERMS OF WHETHER THIS COURT HAS FOUND THAT NSO VIOLATED

11   THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS FRAUD ACT, IN

12   LIGHT OF THE COURT'S RULING, THERE'S NOT TWO SIDES TO THAT

13   STORY, IS THERE?

14   A.   NO.

15   Q.   IN TERMS OF WHETHER OR NOT NSO HAS BREACHED ITS CONTRACT

16   WITH WHATSAPP, THERE'S NOT TWO SIDES TO THAT STORY?

17   A.   THE COURT HAS RULED.

18        MR. ANDRES:  YOUR HONOR, I HAVE NO MORE QUESTIONS AT

19   THIS TIME.

20        THE COURT:  ALL RIGHT.  THANK YOU.

21        REDIRECT?

22        MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

23        MAY I PROCEED?

24        THE COURT:  YES.

25   ///

1                          **REDIRECT EXAMINATION**

2     BY MR. AKROTIRIANAKIS:

3     Q.   WE HAVE A LITTLE GLARE HERE.  I THINK IT'S MY HEIGHT.

4          CAN YOU SEE ME OKAY?

5     A.   YEAH, I CAN SEE YOU.

6     Q.   YOU WERE BEING ASKED QUESTIONS ABOUT WHEN THE LAWSUIT WAS

7     FILED AND WHAT NSO DID WHEN IN RELATION TO THAT.

8          DO YOU RECALL THOSE QUESTIONS?

9     A.   YES.

10    Q.   I THINK WE ALL AGREE THAT THE LAWSUIT WAS FILED ON

11    OCTOBER 29, 2019.

12    A.   THIS IS CORRECT.

13    Q.   OKAY.  AND INCIDENTALLY, WERE YOU THE CEO AT THAT TIME?

14    A.   NO.

15    Q.   WERE YOU THE COMPANY'S PRESS OFFICER AT THAT TIME?

16    A.   NO.

17    Q.   AND DO YOU KNOW WHO THE PERSON QUOTED IN THIS DOCUMENT IS?

18    A.   THERE IS NO NAME.

19    Q.   OKAY.  BUT WAS IT YOU?

20    A.   IT WAS DEFINITELY NOT ME.

21    Q.   OKAY.  THE DEFENDANTS APPEARED IN THIS CASE VOLUNTARILY

22    AND EVEN BEFORE BEING SERVED WITH A COMPLAINT; CORRECT?

23    A.   I BELIEVE THAT'S THE CASE, YES.

24    Q.   AND DO YOU RECALL WHEN THAT WOULD HAVE BEEN RELATIVE TO

25    THE FILING OF THE COMPLAINT?

1    A.   I THINK IT WAS PROBABLY MARCH OR APRIL 2020.

2    Q.   OKAY.  AND IN RELATION TO THE FILING OF THE COMPLAINT AND

3    THE DEFENDANTS' VOLUNTARY APPEARANCE IN THIS CASE AND THE TRIAL

4    OF THIS CASE, WHEN WAS THE -- WHICH IS NOW, RIGHT? -- WHEN WAS

5    THE COURT'S FINDING OF LIABILITY THAT COUNSEL HAS MADE

6    REFERENCE TO?

7    A.   I BELIEVE DECEMBER '24, IF I'M NOT MISTAKEN.

8    Q.   DECEMBER OF LAST YEAR?

9    A.   LAST YEAR.

10   Q.   COULD WE HAVE EXHIBIT 1781 IN EVIDENCE, YOUR HONOR?

11        PLEASE, MR. BAKALE.  AND IF YOU COULD -- YEAH, THIS IS IT.

12        OKAY.  SO WHEN COUNSEL WAS EXAMINING FROM OVER THERE --

13   A.   YEAH.

14   Q.   -- HE WAS ASKING YOU ABOUT, LIKE --

15        ACTUALLY, MAY I, YOUR HONOR?

16             THE COURT:  YES.

17             MR. AKROTIRIANAKIS:  GO AND EXAM --

18             THE COURT:  YEAH, JUST KEEP YOUR VOICE UP.

19             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

20             THE COURT:  WHICH YOU HAVE NO DIFFICULTY DOING.

21             MR. AKROTIRIANAKIS:  I'M SORRY IF THAT'S BEEN TO THE

22   COURT'S OR THE JURY'S DISCOMFORT, YOUR HONOR.

23             THE COURT:  NO, NO.  I'M JUST JOKING.

24   BY MR. AKROTIRIANAKIS:

25   Q.   SO YOU WERE BEING ASKED QUESTIONS ABOUT THIS LINE,

1       MR. SHOHAT (INDICATING)?

2    A.   YES.

3    Q.   THE RESEARCH AND DEVELOPMENT, AND SPECIFICALLY THIS ITEM

4    $52 MILLION AND CHANGE IN 2023; AND 50 -- ALMOST $60 MILLION IN

5    2024.

6        DO YOU RECALL THAT?

7    A.   THIS IS CORRECT.

8    Q.   OKAY.  THE R&D BUDGETS THAT WE'RE TALKING ABOUT HERE IN

9    2023 AND 2024 ON EXHIBIT 1781, DID THEY -- WOULD THEY HAVE HAD

10   ANYTHING TO DO WITH THE DEVELOPMENT OF THE THREE VERSIONS OF

11   PEGASUS THAT WE'RE TALKING ABOUT IN THIS CASE?

12   A.   SOME PART OF -- NO.  THIS IS '24.  THE DEVELOPMENT OF THE

13   VECTORS WAS IN 2018, 2019.

14   Q.   SO THE SAME QUESTION FOR 2023, THAT WOULDN'T HAVE ANYTHING

15   TO DO WITH THE VECTORS THAT ARE AT ISSUE IN THIS CASE?

16   A.   NO VECTOR WHATEVER.

17   Q.   OKAY.  WHO WOULD BE THE -- WHO WOULD BE THE BEST PERSON TO

18   TALK ABOUT -- TO TESTIFY ABOUT THE VERSIONS OF PEGASUS THAT

19   WERE IN USE IN 2018 AND 2019 AND IF, WHEN, AND HOW THEY

20   INTERACT WITH THE WHATSAPP SERVERS?

21   A.   MR. GAZNELI.

22   Q.   GAZNELI, SPELLING FOR THE RECORD, G-A-Z-N-E-L-I.

23       IS THAT CORRECT?

24   A.   CORRECT.

25           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.  NOTHING

```
 1        FURTHER.

 2                    THE COURT:  ALL RIGHT.  ANY --

 3                    MR. ANDRES:  JUST VERY BRIEFLY, YOUR HONOR.

 4                    THE COURT:  ALL RIGHT.

 5                          RECROSS-EXAMINATION

 6        BY MR. ANDRES:

 7        Q.   YOU WERE ASKED QUESTIONS ABOUT YOUR ARRIVAL, NSO'S ARRIVAL

 8        IN THIS CASE.

 9             ARE YOU AWARE OF THE FACT THAT THERE WAS A DEFAULT

10        JUDGMENT?

11        A.   I DON'T EVEN KNOW WHAT THAT MEANS.

12                    MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  THAT'S A

13        TOTAL MISSTATEMENT OF THE RECORD.

14        BY MR. ANDRES:

15        Q.   DO YOU KNOW WHAT A DEFAULT JUDGMENT IS?

16        A.   NO.

17                    MR. ANDRES:  OKAY.  YOUR HONOR --

18                    THE COURT:  OVERRULED.

19                    MR. ANDRES:  SORRY.  OKAY.

20                    THE COURT:  NO.  I OVERRULED HIS OBJECTION.

21                    MR. ANDRES:  YEAH.

22                    THE COURT:  I'M NOT SURE WHERE YOU'RE GOING WITH

23        THIS.

24                    MR. ANDRES:  WELL, MR. SHOHAT SAYS HE DOESN'T KNOW

25        WHAT A DEFAULT JUDGMENT IS, SO I'M NOT GOING TO ASK HIM TO
```

1        OPINE IF HE DOESN'T KNOW THE ANSWER.

2                THE COURT:  OKAY.

3                MR. AKROTIRIANAKIS:  I'D LIKE THE COURT TO TAKE

4        NOTICE THAT THERE'S NEVER BEEN A JUDGMENT.

5                MR. ANDRES:  YOUR HONOR, WE CAN DEAL WITH THIS WHEN

6        THE WITNESS IS NOT ON THE STAND.

7                THE COURT:  THERE WAS A DEFAULT IN THE CASE

8        ORIGINALLY AS I RECALL.  BUT YOU'RE RIGHT, THAT'S NOT THE SAME

9        THING AS A DEFAULT JUDGMENT, AND I BELIEVE BEFORE THE CASE WAS

10       REASSIGNED TO ME, IT WAS OVERTURNED; CORRECT?  IT WAS VACATED.

11               MR. AKROTIRIANAKIS:  THE COURT WITHDREW IT, THERE WAS

12       A DISPUTE ABOUT THE SERVICE, AND THE DEFENDANTS VOLUNTARILY

13       APPEARED BEFORE THIS COURT.

14               THE COURT:  RIGHT.

15               MR. ANDRES:  AFTER THERE WAS A DEFAULT.

16               THE COURT:  YES, TECHNICALLY THERE WAS.

17           ALL RIGHT.  BUT, LADIES AND GENTLEMEN OF THE JURY, THIS IS

18       A NON-ISSUE.

19           LET'S MOVE ON.

20        BY MR. ANDRES:

21        Q.   YOUR LAWYER ASKED YOU ABOUT THE LAWSUIT BY APPLE.

22           ARE YOU AWARE OF THE FACT THAT APPLE SAID THAT NSO ARE

23       NOTORIOUS HACKERS, AMORAL 21ST CENTURY MERCENARIES WHO HAVE

24       CREATED HIGHLY SOPHISTICATED CYBER SURVEILLANCE MACHINERY THAT

25       INVITES ROUTINE AND FLAGRANT ABUSE.

1          MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.

2          THE COURT:  EXCUSE ME.  I AGREE.  HE DIDN'T ASK ANY

3     QUESTIONS ABOUT THE LAWSUIT.

4          MR. ANDRES:  I HEARD HIM TO UNDERSTAND -- TO ASK IF

5     IT WAS -- IF IT WAS DISMISSED.

6          THE COURT:  NO, I DIDN'T --

7          MR. ANDRES:  I'M SORRY, YOUR HONOR.  THEN I'M WRONG.

8     I'LL WITHDRAW THAT QUESTION.

9          MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  NOW I

10    NEED TO ASK A FOLLOW-UP QUESTION FOR THAT, WHICH I APOLOGIZE

11    BECAUSE I DID NOT BRING IT UP ON MY REDIRECT.

12         THE COURT:  HE DID NOT BRING IT UP.

13    BY MR. ANDRES:

14    Q.   THIS LAWSUIT WAS ULTIMATELY WITHDRAWN; CORRECT?

15    A.   THIS LAWSUIT WAS DISMISSED, NO SETTLEMENT WAS DONE, NO

16    DAMAGES WERE PAID, NO ACCUSATIONS WERE -- WE'RE ON GOOD TERMS

17    WITH APPLE.

18         MR. ANDRES:  OKAY.  THANK YOU.

19        NOTHING FURTHER, YOUR HONOR.

20         MR. AKROTIRIANAKIS:  I GUESS I DON'T NEED TO DO IT,

21    YOUR HONOR.  THANK YOU VERY MUCH.

22         THE COURT:  YES.

23        THANK YOU, MR. SHOHAT.  YOU MAY STEP DOWN.

24         THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR.

25         THE COURT:  NEXT WITNESS.

```
 1              MR. AKROTIRIANAKIS:  IN LIGHT OF WHERE WE ARE,

 2    YOUR HONOR, WOULD IT BE BETTER TO DO THE -- THEY WANTED TO

 3    REOPEN TO DO THE MS. TREXLER PART OF IT.

 4              THE COURT:  I THOUGHT THEY WERE GOING TO DO THAT IN

 5    THEIR REBUTTAL.

 6          BUT IF YOU WISH TO REOPEN FOR MS. TREXLER NOW --

 7              MR. ANDRES:  WE'RE GOING TO DO IT IN THE REBUTTAL.

 8    THANK YOU, YOUR HONOR.

 9              THE COURT:  YES.

10              MR. AKROTIRIANAKIS:  WELL, THEN MR. PINSONNEAULT

11    SHOULD BE ALLOWED TO RESPOND TO THAT, AS HE WOULD HAVE IF SHE

12    HAD GIVEN THE TESTIMONY.

13              THE COURT:  IF SHE OFFERS AN OPINION, HE CAN RESPOND

14    TO IT, YES.

15              MR. AKROTIRIANAKIS:  OKAY.  THAT'S MY ONLY QUESTION

16    ABOUT WHETHER IT'S REBUTTAL OR THEIR CASE-IN-CHIEF, YOUR HONOR.

17    I JUST WANT TO MAKE SURE THAT WE HAVE THE OPPORTUNITY.

18              THE COURT:  YES.

19              MR. AKROTIRIANAKIS:  OKAY.  THANK YOU.

20          THE DEFENDANTS CALL TAMIR GAZNELI.

21          AND MAY I RETRIEVE HIM, YOUR HONOR?  I THINK HE MIGHT --

22              THE COURT:  YES.

23          (PAUSE IN PROCEEDINGS.)

24              THE CLERK:  GO AHEAD AND PLEASE STEP UP AND REMAIN

25    STANDING.
```

1           PLEASE RAISE YOUR RIGHT HAND.

2           **(DEFENDANTS' WITNESS, TAMIR GAZNELI, WAS SWORN.)**

3              THE WITNESS:  YES.

4              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

5           SPEAK CLEARLY INTO THE MICROPHONE.  PLEASE STATE YOUR FULL

6   NAME AND SPELL IT FOR THE RECORD.

7              THE WITNESS:  MY NAME IS TAMIR GAZNELI.

8              MR. AKROTIRIANAKIS:  MAY I PROCEED, YOUR HONOR.

9              THE COURT:  YES.

10                       **DIRECT EXAMINATION**

11  BY MR. AKROTIRIANAKIS:

12  Q.   GOOD MORNING, MR. GAZNELI.

13  A.   GOOD MORNING.

14  Q.   OUTSIDE YOUR PRESENCE, WE JUST HEARD TESTIMONY FROM

15  MR. SHOHAT THAT HE BELIEVED THAT YOU WERE THE BEST PERSON TO

16  TESTIFY ABOUT WHAT VERSIONS OF PEGASUS WERE IN USE IN 2018 AND

17  2019 AND IF, WHEN, AND HOW THEY INTERACTED WITH WHATSAPP.

18       DO YOU AGREE THAT YOU'RE THE BEST PERSON TO ADDRESS THAT?

19  A.   YES.

20  Q.   OKAY.  LET ME START WITH YOUR BACKGROUND.

21       HOW OLD ARE YOU TODAY, MR. GAZNELI.

22  A.   I'M 43.

23  Q.   FORTY-THREE.  AND WHERE DO YOU LIVE?

24  A.   IN ISRAEL.

25  Q.   ALL RIGHT.  DID YOU GROW UP IN ISRAEL?

1    A.   NO.

2    Q.   WHAT COUNTRY ARE YOU FROM ORIGINALLY?

3    A.   FROM GEORGIA.

4    Q.   AND WHERE IS THE COUNTRY OF GEORGIA, MR. GAZNELI?

5    A.   IT'S NEAR THE BLACK SEA, ARMENIA, TURKEY, AZERBAIJAN.

6    Q.   I'M SORRY, DO YOU -- AZERBAIJAN.

7         IS -- THAT'S NORTH BORDER TOUCHES ON RUSSIA MAYBE A LITTLE

8    BIT?

9    A.   YES.

10   Q.   WAS ENGLISH YOUR FIRST LANGUAGE, MR. GAZNELI?

11   A.   NO.  IT'S MY FOURTH.

12   Q.   OKAY.  AND SO WHAT ARE THOSE, JUST FOR THE SAKE OF

13   INTEREST?

14   A.   GEORGIAN, RUSSIAN, HEBREW, AND ENGLISH.

15   Q.   AND I ASK YOU BECAUSE THERE MAY BE TIMES WHEN I HAVE TO

16   ASK YOU TO REPEAT AN ANSWER FOR THE SAKE OF THE COURT REPORTER,

17   OR MAYBE SLOW DOWN JUST SLIGHTLY SO THAT IT'S CLEAR.

18        BUT IF YOU LEAN FORWARD INTO THE MICROPHONE, I THINK WE'RE

19   GOING TO BE OKAY.

20   A.   OKAY.

21   Q.   HOWEVER, IF YOU WANT ME TO RESTATE OR KIND OF REFRAME A

22   QUESTION SO IT'S EASIER TO UNDERSTAND, PLEASE LET ME KNOW THAT,

23   TOO.  OKAY?

24   A.   OKAY.

25   Q.   WHO IS YOUR EMPLOYER?

1      A.    NSO GROUP.

2      Q.    WHAT IS YOUR POSITION AT NSO GROUP?

3      A.    I'M THE VICE PRESIDENT OF RESEARCH AND DEVELOPMENT.

4      Q.    AND COULD YOU PLEASE BRIEFLY SUMMARIZE YOUR EDUCATION AND

5      YOUR WORK EXPERIENCE AS IT RELATES TO COMPUTER ENGINEERING.

6      A.    YES.  I HAVE A DEGREE FROM BAR-ILAN UNIVERSITY FROM

7      ISRAEL.  DURING THE STUDIES, I WORKED FOR TWO YEARS AS A

8      STUDENT IN THE MINISTRY OF DEFENSE OF ISRAEL AS A SOFTWARE

9      DEVELOPER POSITION, MAINLY AROUND DOING SOME AUTOMATION

10     DEVELOPMENT TASKS.

11           AFTER MY GRADUATION, I STARTED TO WORK AT MARVELL FOR

12     EIGHT YEARS AS A SOFTWARE DEVELOPER, AND DID SOME DIFFERENT

13     POSITIONS AS A DEVELOPER.

14     Q.    OKAY.  NOW, MARVELL IS M-A-R-V-E-L-L?

15     A.    YES.

16     Q.    IS THAT THE SAME MARVELL THAT'S LOCATED HERE IN SILICON

17     VALLEY?

18     A.    YES.

19     Q.    YOU WEREN'T WORKING HERE IN SILICON VALLEY?

20     A.    NO, NO.  ITS SITE IS IN ISRAEL.

21     Q.    OKAY.  AND THE SCHOOL THAT YOU MENTIONED IS BAR, B-A-R,

22     HYPHEN, ILAN, I-L-A-N, UNIVERSITY?

23     A.    YES.

24     Q.    HOW LONG HAVE YOU BEEN EMPLOYED BY NSO GROUP?

25     A.    IT'S ABOUT TEN YEARS.

1     Q.   SO GOING BACK TO 2015?

2     A.   YES.

3     Q.   HAVE YOU ALWAYS WORKED IN THE R&D, OR RESEARCH AND

4     DEVELOPMENT, DEPARTMENT?

5     A.   YES.

6     Q.   WHEN WERE YOU PROMOTED TO BE THE VICE PRESIDENT OF

7     RESEARCH AND DEVELOPMENT?

8     A.   IT WAS AROUND END OF 2022.

9     Q.   AND WHAT WAS YOUR TITLE IN RESEARCH AND DEVELOPMENT IN

10    2018 AND 2019, IF YOU REMEMBER?

11    A.   YEAH.  I WAS, AT THE BEGINNING, A RESEARCH TEAM LEADER,

12    THEN WAS PROMOTED TO ANDROID R&D GROUP LEADER, AND EVENTUALLY

13    THE VICE PRESIDENT OF R&D.

14    Q.   DO YOU PERFORM ANY WORK FOR NSO IN CALIFORNIA?

15    A.   NO.

16    Q.   DO YOU PERFORM ANY WORK FOR NSO ANYWHERE IN THE

17    UNITED STATES?

18    A.   NO.

19    Q.   IN YOUR JOB AS THE VICE PRESIDENT FOR RESEARCH AND

20    DEVELOPMENT, DO YOU SUPERVISE OTHER NSO EMPLOYEES?

21    A.   YES.

22    Q.   AND WHERE ARE THOSE EMPLOYEES LOCATED AND WHERE DO THEY

23    WORK?

24    A.   IN ISRAEL.

25    Q.   IS ANYONE IN YOUR R&D DEPARTMENT LOCATED OUTSIDE OF

1    ISRAEL?

2    A.   NO.

3    Q.   AND JUST REORIENTING YOU TO YOUR TESTIMONY A MINUTE AGO,

4    IN 2019 WHEN THE INCIDENT THAT WE'RE TALKING ABOUT IN THIS

5    TRIAL HAPPENED, YOU WERE THE RESEARCH TEAM LEADER OF THE NSO

6    ANDROID SECURITY RESEARCH TEAM; IS THAT RIGHT?

7    A.   YES.

8    Q.   AND THE SAME WOULD HAVE BEEN TRUE IN 2018?

9    A.   YES.  I WAS, AT THE BEGINNING OF 2018, A RESEARCHER, AND

10   THEN WAS PROMOTED TO RESEARCH TEAM LEADER.

11   Q.   AT THAT TIME WHEN YOU WERE PROMOTED TO BE THE RESEARCH

12   TEAM LEADER OF NSO'S ANDROID SECURITY RESEARCH TEAM, WHAT WAS

13   THE FUNCTION OF THAT TEAM?

14   A.   OKAY.  SO THE TEAM IS RESPONSIBLE FOR STUDYING AND

15   UNDERSTANDING THE INTERNALS OF ANDROID APPLICATIONS, ANDROID

16   ECOSYSTEM ITSELF, THE OPERATING SYSTEM.

17   Q.   AND WHERE IS THE ANDROID SECURITY RESEARCH TEAM LOCATED?

18   A.   ISRAEL.

19   Q.   WHAT KIND OF ANDROID APPLICATIONS DID THE TEAM STUDY IN

20   2018 AND 2019?

21   A.   THEY STUDIED MANY APPLICATIONS, THE SERVICES OF THE

22   ECOSYSTEM ITSELF, OR THE OPERATING SYSTEM ITSELF, APPLICATIONS

23   LIKE INSTANT MESSAGE APPLICATIONS, BROWSERS, ET CETERA.

24   Q.   AND DID THE APPLICATIONS THAT YOUR TEAM WAS STUDYING

25   INCLUDE A WHATSAPP APPLICATION?

1    A.   YES.

2    Q.   ALL RIGHT.  I WANT TO ASK YOU NOW SOME QUESTIONS ABOUT

3    PEGASUS, AND I WILL FOCUS MY QUESTIONS ON THE PEGASUS VERSIONS

4    FOR THE ANDROID SIDE FOR THE APRIL 2018 TO MAY 2020 TIME

5    PERIOD.  OKAY?

6    A.   OKAY.

7    Q.   DOES PEGASUS REFER TO ONE PRODUCT OR MORE THAN ONE

8    PRODUCT?

9    A.   IT HAS MANY PRODUCTS SUPPORTING IT.

10   Q.   AND WHAT ARE THE PRODUCTS IN THIS SUITE OF TECHNOLOGY

11   PRODUCTS?

12   A.   OKAY.  ONE OF THE MAIN PARTS OF PEGASUS IS PEGASUS AGENT.

13   THIS IS THE SOFTWARE WHICH IS INSTALLED ON THE INTELLIGENCE

14   TARGET'S DEVICE.

15        AND ANOTHER SUITE OF CAPABILITIES IS THE WAY, ALL THE

16   TOOLS THAT ARE INCLUDED IN PEGASUS IN ORDER TO MAKE THIS

17   HAPPEN, THE INSTALLATION VECTORS.

18   Q.   AND WHAT ARE THE -- WELL, ALL RIGHT.

19        IS THE PEGASUS AGENT ONE OF THOSE COMPONENTS?

20   A.   YES.

21   Q.   AS OPPOSED TO THE INSTALLATION VECTOR?  AM I MAKING A

22   CORRECT DISTINCTION?

23   A.   YES.  THE PEGASUS AGENT IS THE SOFTWARE THAT IS INSTALLED

24   EVENTUALLY ON THE TARGET, THE TARGET DEVICE, AND IT GATHERS

25   INTELLIGENCE INFORMATION FOR THE CUSTOMERS.

1          AND THE WAY THE PEGASUS AGENT GETS TO THE DEVICE IS

2     INSTALLATION VECTOR.

3     Q.   DOES THE PEGASUS AGENT EVER COMMUNICATE ANYTHING OVER

4     WHATSAPP SERVERS?

5     A.   NO.

6     Q.   DOES THE PEGASUS AGENT EVER SEND ANY DATA OVER WHATSAPP

7     SERVERS?

8     A.   NO.

9     Q.   IS THE PEGASUS AGENT DELIVERED TO THE TARGET PHONE THROUGH

10    WHATSAPP SERVERS?

11    A.   NO.

12    Q.   FROM WHERE DOES THE PEGASUS AGENT GET SENT TO THE TARGET

13    PHONE?

14    A.   GOVERNMENT CUSTOMER OWNED SERVERS.

15          MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I MOVE -- THE

16    GLARE, I CAN'T REALLY SEE THE WITNESS.

17          CAN I MOVE THIS JUST SLIGHTLY FORWARD?

18          THE COURT:  SURE.

19          (PAUSE IN PROCEEDINGS.)

20          THE COURT:  YOU CAN MOVE IT OVER A LITTLE BIT IF YOU

21    WANT.

22          MR. AKROTIRIANAKIS:  OKAY.  THERE ARE NO WHEELS ON

23    IT.

24          THE COURT:  MAKE SURE YOU DON'T UNCONNECT ANYTHING.

25          MR. AKROTIRIANAKIS:  YEAH.  THAT'S MUCH BETTER.

1       THANK YOU, YOUR HONOR.

2       Q.   WHAT IS AN INSTALLATION VECTOR?

3       A.   INSTALLATION VECTOR IS A WAY OF GETTING THE PEGASUS AGENT

4       TO THE TARGET'S DEVICE.

5       Q.   AND WE HEARD SOME RECORDED TESTIMONY FROM YOUR DEPOSITION

6       EITHER YESTERDAY OR THE DAY BEFORE YESTERDAY.  OKAY?  AND IN

7       THAT RECORDED TESTIMONY, YOU DESCRIBED THREE INSTALLATION

8       VECTORS THAT INTERACTED WITH WHATSAPP BETWEEN APRIL 2018 AND

9       MAY 2020.

10           AND YOU REFERRED TO THEM AS HEAVEN, EDEN, AND ERISED.

11           ARE YOU FAMILIAR WITH THOSE VECTORS?

12      A.   YES.

13      Q.   AND THOSE ARE THE SO-CALLED HUMMINGBIRD VECTORS; RIGHT?

14      A.   YES.

15      Q.   IS THERE ANY, LIKE, SPECIAL MEANING TO THAT WORD

16      HUMMINGBIRD?

17      A.   NOTHING SPECIAL ABOUT IT.  JUST A NAME.

18      Q.   OKAY.  LIKE A CUSTOMER FACING MARKETING?

19      A.   YES.

20      Q.   BUT I CAN REFER TO THEM COLLECTIVELY AS HUMMINGBIRD

21      VECTORS AND YOU'LL KNOW THAT I'M TALKING ABOUT HEAVEN, EDEN,

22      AND ERISED?

23      A.   YES.

24      Q.   OKAY.  NOW, MR. GAZNELI, DO YOU UNDERSTAND THAT HER HONOR

25      HAS FOUND NSO LIABLE BASED ON THE INTERACTION OF THE

1    HUMMINGBIRD VECTORS WITH THE WHATSAPP SERVERS?

2    A.   YES.

3    Q.   AND DO YOU ACCEPT THAT RULING?

4    A.   YEAH.

5    Q.   AND YOU UNDERSTAND THAT THIS TRIAL IS ABOUT WHAT, IF ANY,

6    DAMAGES FACEBOOK HAS; RIGHT?

7    A.   YES.

8    Q.   CAN YOU PUBLISH, PLEASE, THE SAME PART OF EXHIBIT 1781,

9    WHICH IS IN EVIDENCE, THAT WE HAD A MINUTE AGO, OR A FEW

10   MINUTES AGO?

11        AND DO YOU SEE ON THE SCREEN BEFORE YOU THERE'S A PART OF

12   THE P&L FOR 2023 AND 2024 FOR NSO TECHNOLOGIES, LIMITED?

13   A.   YES.

14   Q.   ALL RIGHT.  AND DO YOU SEE, MR. GAZNELI -- OH,

15   INCIDENTALLY, IN YOUR -- IN YOUR ROLE AS THE VICE PRESIDENT OF

16   RESEARCH AND DEVELOPMENT, DO YOU SOMETIMES SIT IN MANAGEMENT

17   MEETINGS WHERE THESE FINANCIAL DOCUMENTS MAY BE DISCUSSED

18   DURING THE MEETING?

19   A.   YES.

20   Q.   OKAY.  THAT'S NOT PARTICULARLY YOUR PART, BUT YOU ARE

21   THERE FOR THOSE MEETINGS; RIGHT?

22   A.   YES.

23   Q.   OKAY.  NOW, THERE'S A LINE HERE THAT SAYS, "RESEARCH AND

24   DEVELOPMENT," AND IT GIVES SOME BUDGET FIGURES FOR 20 -- OR THE

25   P&L FIGURES FOR 2023 AND 2024.

1        DO YOU SEE THAT?

2   A.   YES.

3   Q.   AND AT LEAST FOR THE MOST PART, THOSE ARE BUDGETS THAT

4   YOU, AS THE VICE PRESIDENT FOR RESEARCH AND DEVELOPMENT, WOULD

5   BE MANAGING?

6   A.   YES.

7        MR. PEREZ:  I'M GOING TO JUST OBJECT TO LEADING.  I

8   THINK HE'S DOING IT REPEATEDLY, YOUR HONOR.

9        THE COURT:  YEAH, IT'S A LITTLE LEADING.

10       BUT I'M GOING TO ALLOW THAT ANSWER TO STAND.

11       MR. AKROTIRIANAKIS:  OKAY.  THANK YOU, YOUR HONOR.

12  Q.   LET ME ASK YOU, MR. GAZNELI, THE QUESTION I'M REALLY

13  GETTING AT.  IS ANY PART OF THIS 2024 BUDGET, 59,989, SPENT ON

14  INSTALLATION VECTORS THAT -- OR I SHOULD SAY, WAS ANY PART OF

15  THIS 2024 BUDGET FOR RESEARCH AND DEVELOPMENT SPENT ON

16  INSTALLATION VECTORS THAT HAVE ANYTHING TO DO WITH WHATSAPP?

17  A.   NO.

18  Q.   SAME QUESTION -

19       MR. PEREZ:  I OBJECT TO THAT QUESTION, YOUR HONOR,

20  AND THE ANSWER.  I THINK THAT THERE'S BEEN A RULING ABOUT

21  CURRENT ACTIVITIES.

22       THE COURT:  YEAH, YEAH, CONNECTING THIS -- THIS IS A

23  DIFFERENT ISSUE.

24       MR. AKROTIRIANAKIS:  MR. --

25       THE COURT:  I THOUGHT IT WAS YOUR MOTION THAT YOU

1        DIDN'T WANT IT, CORRECT, ANY CURRENT ACTIVITIES IN THIS CASE.

2             MR. AKROTIRIANAKIS:  I'M NOT ASKING ABOUT CURRENT

3        ACTIVITIES, YOUR HONOR.  I'M JUST ASKING WHETHER, IN FOLLOW-UP

4        TO MR. --

5             THE COURT:  WELL, YOU'RE ASKING WHETHER OR NOT THIS

6        BUDGET HAS ANYTHING TO DO WITH EVENTS THAT WERE SIX YEARS AGO.

7        DOESN'T THAT SORT OF OPEN THE DOOR TO THE CURRENT ACTIVITY IF

8        YOU START DOING THAT?

9             MR. AKROTIRIANAKIS:  IT'S JUST THE SAME QUESTION THAT

10       MR. SHOHAT ANSWERED, YOUR HONOR.

11            OKAY.  I WILL GO SOMEPLACE ELSE.

12       Q.   CAN YOU GIVE THE JURY A SORT OF BASIC IDEA OF HOW THE

13       HUMMINGBIRD INSTALLATION VECTORS WORKED?

14       A.   YES.  SO BASICALLY THE SYSTEM BUILDS WHATSAPP MESSAGES

15       THAT ARE BEING SENT LATER TO THE INTELLIGENCE TARGET'S DEVICE.

16       SOME OF THOSE MESSAGES CONTAIN CODE WHICH CAN BE EXECUTED ON

17       THOSE SPECIFIC DEVICES, ANDROID DEVICES.

18            EVENTUALLY THAT CODE IS BEING EXECUTED ON THE TARGET

19       DEVICES AND INSTRUCTED TO REACH OUT TO CUSTOMER OWNED SERVERS

20       IN ORDER TO DOWNLOAD THE PEGASUS AGENT.

21            AND WHENEVER THE PEGASUS AGENT IS BEING EXECUTED ON THE

22       DEVICE, IT COLLECTS THE INTELLIGENCE DATA FOR THE CUSTOMERS AND

23       SENDS BACK TO THE CUSTOMER OWNED SERVERS.

24       Q.   AND JUST FOR THE SAKE OF THE RECORD, ARE YOU SAYING THE

25       CUSTOMER'S OWN SERVERS, OR THE CUSTOMER OWNED SERVERS?

1    A.   CUSTOMER OWNED SERVERS.

2    Q.   THANK YOU, MR. GAZNELI.

3         ALL RIGHT.  CAN I REFER TO THESE, THESE INITIAL MESSAGES

4    CONTAINING THE COMPUTER CODE AS INSTALLATION MESSAGES?

5    A.   YES.

6    Q.   NOW, IN YOUR TESTIMONY THAT WE SAW ON THE RECORDED

7    DEPOSITION TESTIMONY, YOU REFERRED TO SOMETHING CALLED

8    HANDSHAKING.

9    A.   YES.

10   Q.   DO YOU RECALL HAVING GIVEN THAT TESTIMONY IN YOUR

11   DEPOSITION?

12   A.   YES.

13   Q.   OKAY.  WOULD YOU PLEASE BRIEFLY EXPLAIN THE CONCEPT OF

14   HANDSHAKING?

15   A.   YES.  HANDSHAKE IS A NORMAL PROCEDURE IN -- WHEN TWO

16   COMPUTER ORIENTED DOMAINS ARE CONNECTED TOGETHER, FOR EXAMPLE,

17   WHENEVER YOU BROWSE TO A WEBSITE, THERE IS AN INITIAL HANDSHAKE

18   THAT IS BEING DONE BETWEEN TWO PARTIES, OR WHETHER YOU MAKE A

19   CALL, THERE'S A CERTAIN MESSAGES THAT ARE EXCHANGED BETWEEN TWO

20   PARTIES IN ORDER TO MAKE A CONNECTION, AND THIS IS CALLED A

21   HANDSHAKE.

22   Q.   OKAY.  IS IT UNIQUE TO WHATSAPP CALLING?

23   A.   NO.

24   Q.   ALL RIGHT.  THE COMPUTER CODE THAT WAS IN THE INSTALLATION

25   MESSAGES -- ACTUALLY, CAN YOU PUT UP EXHIBIT 13 IN EVIDENCE,

1      AND I THINK IT'S THE TOP OF PAGE 10 THAT HAS THE -- LIKE, SOME

2      COMPUTER CODE.  YES, PAGE 10.

3          OKAY.  AND ARE YOU ABLE TO SEE THAT ON THE SCREEN IN FRONT

4      OF YOU, MR. GAZNELI?

5      A.   YES.

6      Q.   OKAY.  AND YOU RECOGNIZE THIS COMPUTER CODE?

7      A.   YES.

8      Q.   OKAY.  IT'S A -- SO YOU READ COMPUTER CODE YOURSELF?

9      A.   YES.

10     Q.   OKAY.  SO TO SOMEONE LIKE YOU WHO CAN READ COMPUTER CODE,

11     THIS DOESN'T LOOK MAYBE LIKE IT DOES TO SOMEONE LIKE ME WHO

12     DOESN'T READ COMPUTER CODE; RIGHT?

13     A.   RIGHT.

14          MR. PEREZ:  OBJECTION.  LEADING, YOUR HONOR.

15          THE COURT:  YES, IT IS A LITTLE LEADING, BUT IT'S ALL

16     RIGHT.

17     BY MR. AKROTIRIANAKIS:

18     Q.   ALL RIGHT.  I THINK THIS SCREEN IS A LITTLE BRIGHT, SO

19     TAKE IT DOWN.  THANK YOU.

20          SO WHEN I'M TALKING ABOUT THE COMPUTER CODE AND

21     INSTALLATION MESSAGES, I'M TALKING ABOUT THE COMPUTER CODE THAT

22     WE JUST LOOKED AT THERE.  OKAY?

23     A.   YEAH.

24     Q.   THE COMPUTER CODE AND THE INSTALLATION MESSAGES, WAS THAT

25     DESIGNED TO RUN ON WHATSAPP SERVERS?

1    A.   NO.

2    Q.   ON WHAT, OR WHERE, I SHOULD SAY, WAS THAT COMPUTER CODE IN

3    THE INSTALLATION MESSAGES DESIGNED TO RUN?

4    A.   IT WAS DESIGNED TO RUN ONLY ON ANDROID DEVICES.

5    Q.   OKAY.  SO THE TARGET DEVICE?

6    A.   YES.

7    Q.   COULD IT RUN ON WHATSAPP SERVERS?

8    A.   NO.

9    Q.   DID PEGASUS EVER EXECUTE ANY FOREIGN CODE ON ANY WHATSAPP

10   SERVER?

11   A.   NO.

12   Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO DAMAGE THE

13   WHATSAPP SERVER OR SERVICE?

14   A.   NO.

15   Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO SLOW DOWN THE

16   WHATSAPP SERVERS OR SERVICE?

17   A.   NO.

18   Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO ALTER OR DELETE

19   ANY DATA FROM THE WHATSAPP SERVERS?

20   A.   NO.

21   Q.   WERE THE INSTALLATION MESSAGES DESIGNED TO DAMAGE THE

22   FUNCTION OF THE WHATSAPP SERVERS OR SERVICE IN ANY WAY?

23   A.   NO.

24   Q.   AS THE LEADER OF NSO'S ANDROID SECURITY RESEARCH TEAM, DID

25   YOU OVERSEE THE DESIGN OF THE HUMMINGBIRD VECTORS?

1    A.   YES.

2    Q.   WAS IT A GOAL OR OBJECTIVE OF THAT DESIGN TO DAMAGE OR

3    DISTURB THE WHATSAPP SERVICE?

4    A.   NO.

5    Q.   CAN YOU PLEASE EXPLAIN?

6    A.   SO OUR MISSION IS TO CREATE THIS TYPE OF SOFTWARE TOOLS

7    FOR GOVERNMENT AGENCY CUSTOMERS AND NOT HARM ANY WHATSAPP

8    SERVERS, OR ANY OTHER SERVER, WHICH IS INVOLVED IN THE SENDING

9    THIS TYPE OF MESSAGES, OR ANY TYPE OF MESSAGES, AND BUILDING

10   THE INSTALLATION VECTORS.

11        THIS IS NOT THE MISSION.

12        AND EVEN BY DOING SO, IT WILL HARM THE INSTALLATION

13   VECTORS THEMSELVES AND HARM THE MISSION IN A WAY THAT IT WILL

14   MOTIVATE THE PLATFORM OWNERS TO BLOCK THE MESSAGES AND TO BLOCK

15   THE FUNCTIONALITY OF THE INSTALLATION VECTOR.

16        SO IT'S PRACTICALLY UNDERMINING OUR MISSION AND THE FACT

17   THAT WE ARE WORKING TO PROVIDE THIS TYPE OF TOOLS FOR THE

18   CUSTOMERS.

19   Q.   SO THEN WAS IT A GOAL OF YOUR DESIGN NOT TO DAMAGE OR

20   DISTURB THE WHATSAPP SERVERS?

21   A.   YEAH, ABSOLUTELY, YEAH.

22   Q.   AND CAN YOU PLEASE EXPLAIN THAT?

23   A.   YES.  WE INVEST A LOT IN UNDERSTANDING THE ECOSYSTEM IN A

24   WAY THAT WE WILL OPERATE ACCORDING TO THE RULES OF THE

25   ECOSYSTEM AND WILL NOT DISTURB ANYTHING IN THE WAY.

1          OF COURSE THIS ALSO SERVES THE PURPOSE OF OPERATING

2     SYSTEMS FOR OUR CUSTOMERS IN ORDER TO BE ABLE TO, TO USE THIS

3     TYPE OF VECTORS FOR LONGER TIMES.

4          BUT AS I SAID, THE -- IT COMES ALONG WITH THE FACT THAT

5     THE IDEA IS TO ACT AS A NORMAL USER AND NOT HARM ANYTHING IN

6     ANY WAY.

7     Q.   I REALIZE I ASKED YOU TO SIT CLOSE TO THE MICROPHONE, BUT

8      MAYBE JUST SLIGHTLY BACK BECAUSE OF THE ACOUSTICS.

9     A.   OKAY.

10    Q.   THANK YOU.

11         ALL RIGHT.  SO WHAT, IF ANY, KINDS OF MEASURES DID NSO

12    TAKE TO AVOID DISTURBING OR HARMING THE WHATSAPP SERVERS?

13    A.   OKAY.  SO WE DO SENSITIVE RESEARCH IN TERMS OF THE

14     ECOSYSTEM, AS I SAID, IN ORDER TO REALLY INTERNALLY LEARN THE

15     INTERNAL RULES THAT THE ECOSYSTEM HAS, AND AS I SAID, TO BE AS

16     COMPLYING TO THEM AS POSSIBLE.

17         AND IN ADDITION, WE ALSO TRY TO MINIMIZE OUR FOOTPRINT IN

18    THE ECOSYSTEM THAT IS INVOLVED IN THE INSTALLATION VECTORS, OF

19    COURSE, IN THE WHATSAPP SERVERS, ALSO.

20         AND AS I SAID, IT ALSO SERVES THE OPERATION SECURITY GOALS

21    THAT THE CUSTOMERS REQUIRE FROM US.

22         AND THAT'S -- AND ADDITIONALLY, LIKE, WE ALSO STARTED THE

23    APPLICATIONS THAT MIGHT HAVE AND MIGHT BE ABLE TO SHINE ON THE

24    WAY THAT THE ECOSYSTEM WORKS AND AS ANTI-SPAMMING RULES MAY BE

25    ON THE ECOSYSTEM AND APPLY THOSE RULES IN ORDER NOT TO BE

1    BANNED OR BLOCKED, AND TO BE AS NORMAL A USER AS POSSIBLE.

2    Q.   AND THE OPERATIONAL SECURITY THAT YOU'RE TALKING ABOUT, IS

3    THAT CALLED OPSEC IN YOUR INDUSTRY?

4    A.   YES.

5    Q.   AND YOU HAD TALKED ABOUT SPAMMING AND OTHER OPSEC MEASURES

6    THAT YOUR CUSTOMERS WOULD -- AND YOURSELF -- WOULD REQUIRE.

7         CAN YOU GIVE ANOTHER EXAMPLE?

8    A.   YEAH.  SO THE OPSEC HAS TWO SIDES, BASICALLY.  THE ONE

9    SIDE OF OPSEC IS TO BE AS NON-DETECTIBLE FOR THE TARGET, FOR

10   THE CUSTOMER, FOR THE TARGETS, TOWARDS THE TARGET, AND THIS IS

11   A REQUIREMENT OF THE INTELLIGENCE AGENCY'S, TO BE ABLE TO RUN

12   THEIR INVESTIGATIONS ACCORDINGLY, AND THIS IS THE ONE PART OF

13   THE OPERATIONAL SECURITY.

14        AND THE OTHER PART OF THE OPERATIONAL SECURITY IS, AS I

15   SAID BEFORE, TO LEAVE AS LESS FOOTPRINT ON THE ECOSYSTEM AS

16   POSSIBLE IN ORDER TO NOT DISTURB OR HARM ANYTHING IN ANY WAY.

17   Q.   AND DID THOSE MEASURES THAT YOU TOOK TO AVOID HARMING

18   WHATSAPP'S SERVERS ENHANCE PEGASUS'S OPERATIONAL SECURITY?

19   A.   YES.

20             MR. PEREZ:  OBJECTION.  LEADING.

21             THE COURT:  OVERRULED.

22   BY MR. AKROTIRIANAKIS:

23   Q.   DID YOU GET THE ANSWER?  DID HE ANSWER?

24             THE COURT:  DID YOU GIVE THE ANSWER?

25             THE WITNESS:  YES.

1          THE COURT:  OKAY.

2     BY MR. AKROTIRIANAKIS:

3     Q.   YOUR ANSWER WAS YES?

4     A.   YES.

5     Q.   OKAY.  COULD YOU PLEASE EXPLAIN?

6     A.   SO THE OPERATIONAL SECURITY OF THE ECOSYSTEM, AS I SAID,

7     IS VERY IMPORTANT IN TERMS OF, LIKE, THE -- THIS IS PRACTICALLY

8     A REQUIREMENT FROM A CUSTOMER, AND IT WAS A REQUIREMENT FOR

9     THIS DOMAIN TO BE AS, AS I SAID, AS LESS -- IN ORDER TO CREATE

10    AS LESS FOOTPRINT AS POSSIBLE IN THE WAY THAT IT WILL NOT BE

11    DISTURBING TO THE ECOSYSTEM ITSELF.

12          AND ALSO, TOWARDS THE TARGET, THE TARGET, IN ORDER TO BE

13    DETECTED AND BLOCKED FOR THE USAGE OF THE INSTALLATION VECTORS.

14    Q.   NOW, WITH THE HUMMINGBIRD VECTORS, THE INITIAL

15    INSTALLATION MESSAGES WENT THROUGH AT LEAST ONE TYPE OF

16    WHATSAPP SERVER?

17    A.   YES.

18    Q.   AND ARE YOU FAMILIAR WITH THE DIFFERENT TYPES OF WHATSAPP

19    SERVERS?

20    A.   YES.

21          MR. PEREZ:  YOUR HONOR, I THINK THAT MISCHARACTERIZES

22    THE SUMMARY JUDGMENT RULING AS TO ONE TYPE OF SERVERS.

23          MR. AKROTIRIANAKIS:  I SAID AT LEAST ONE TYPE OF

24    SERVER.

25          MR. PEREZ:  AT LEAST ONE TYPE.  OKAY.  MULTIPLE

1    TIMES.

2              THE COURT:  THERE ARE MULTIPLE TYPES.

3              MR. PEREZ:  YES.  THANK YOU.

4    BY MR. AKROTIRIANAKIS:

5    Q.   ARE THERE MULTIPLE TYPES OF WHATSAPP SERVERS?

6    A.   YES.

7    Q.   AND YOU'RE FAMILIAR WITH THE DIFFERENT TYPES?

8    A.   YES.

9    Q.   ALL RIGHT.  NOW CAN WE PUT UP THE COMPUTER CODE.  FOR THE

10   RECORD, IT'S EXHIBIT 13, THE TOP OF PAGE 10.

11        THANK YOU.

12        OKAY.  NOW, REALIZING TO SOMEONE WHO IS NOT A CODE READER

13   THAT THIS LOOKS A LITTLE FOREIGN, IS THIS CODE THAT WE SEE HERE

14   ENCRYPTED IN ANY WAY?

15   A.   NO.

16   Q.   WHAT IS PLAIN TEXT IN THIS CODING LANGUAGE THAT WE'RE

17   TALKING ABOUT?

18   A.   IT MEANS CLEAR TEXT THAT CAN BE READ AS IT IS.

19   Q.   OKAY.  AND IS THIS, WHAT WE SEE HERE, PLAIN TEXT?

20   A.   YES.

21   Q.   IN YOUR RECORDED TESTIMONY, YOU USED THE TERM

22   "FINGERPRINTING"?

23   A.   YES.

24   Q.   WHAT IS FINGERPRINTING?

25   A.   FINGERPRINTING IS A PROCEDURE THAT HAS BEEN DONE BEFORE

1    THE INSTALLATION VECTOR ITSELF IS BEING INITIATED TOWARDS THE

2    TARGET DEVICE IN ORDER TO GATHER PREREQUISITE INFORMATION SO

3    THAT THE CODE WOULD BE, IT WOULD BE IN THE MESSAGES, WOULD BE

4    DESIGNED SPECIFICALLY FOR THAT TARGET.

5    Q.   OKAY.  AND WHAT -- WHAT INFORMATION IS THAT?

6    A.   PREREQUISITE INFORMATION LIKE WHETHER THE TARGET IS

7    TARGETED DEVICE IS ONLINE, WHAT WHATSAPP VERSION HE USES, THIS

8    TYPE OF INFORMATION, GENERAL INFORMATION OF THE TARGET DEVICE,

9    PHONE AND STATE.

10   Q.   WHAT WAS THE LAST THING YOU SAID?

11   A.   PHONE AND STATE, THE CONNECTIVITY AND STATE.

12   Q.   CONNECTIVITY AND STATE?

13   A.   YES.

14   Q.   NOW, THAT FINGERPRINTING OR BASIC INFORMATION, FROM WHERE

15   DOES THAT COME?

16   A.   FROM THE TARGET DEVICE ITSELF.

17   Q.   AND DOES GETTING THAT INFORMATION, THAT FINGERPRINTING

18   INFORMATION, INVOLVE THE WHATSAPP SERVERS?

19   A.   THE MESSAGE IS PASSED THROUGH THEM, BUT THE INFORMATION

20   ITSELF COMES FROM THE TARGET DEVICE.

21   Q.   ALL RIGHT.  I'M GOING TO MOVE TO A LITTLE BIT OF A

22   DIFFERENT AREA AND ASK YOU ABOUT INFRASTRUCTURE.

23        WHAT INFRASTRUCTURE DOES AN NSO CUSTOMER RECEIVE IN ORDER

24   TO BE ABLE TO OPERATE PEGASUS?

25   A.   SO THE CUSTOMER OPERATOR RECEIVES A TERMINAL THROUGH WHICH

1        THEY ENTER THE INTELLIGENCE TARGET'S PHONE NUMBER.

2             AND THEN THEY CAN INITIATE THE INSTALLATION VECTORS.

3             WHENEVER THE INSTALLATION VECTOR IS INITIATED, THEN THE

4    WIS, WHICH IS THE SOFTWARE CODE SERVER WHICH ORCHESTRATES THE

5    INSTALLATION FLOW, STARTS TO WORK.  AND AS I SAID, IT

6    ORCHESTRATES ALL THE INSTALLATION FLOW OF THE INSTALLATION

7    VECTORS, WHICH EVENTUALLY, AS I EXPLAINED BEFORE, PUTS THE --

8    INSTRUCTS THE DEVICE TO REACH TO THE PEGASUS AGENT THAT WILL BE

9    DOWNLOADED FROM THE PEGASUS SERVER THAT RESIDES ON THE CUSTOMER

10   PREMISES.

11            AND WHENEVER THE AGENT IS BEING DOWNLOADED ON THE DEVICE,

12   THEN THE CUSTOMER OPERATOR HAS A SERVICE WHICH IS CALLED ALT

13   CONTROL SERVER THROUGH WHICH, OR USING WHICH, IT CAN WORK AND,

14   LIKE, CONTROL THE AGENT THAT RUNS ON THE TARGET DEVICE.

15   Q.   AND WHO DOES THAT CONTROLLING?

16   A.   THE CUSTOMER.

17   Q.   ALL RIGHT.  I WANT TO BREAK DOWN A COUPLE OF PARTS OF YOUR

18   ANSWER THERE.  THE TERMINAL, THAT WAS THE FIRST PIECE OF

19   INFRASTRUCTURE THAT YOU MENTIONED.

20   A.   YES.

21   Q.   WHAT DOES IT LOOK LIKE AND WHAT IS IT FOR?

22   A.   IT'S MAINLY A SCREEN, OR IT MAY BE A LAPTOP OR MAY BE A

23   DESKTOP WITH A SCREEN THAT HAS A SERVICE ON IT THAT RUNS THE

24   PEGASUS FRONT END IN ORDER TO BE -- TO ENABLE THE OPERATOR TO

25   INSERT THE PHONE NUMBER OF THE TARGET DEVICE.

1    Q.   AND IN YOUR ANSWER --

2              MR. PEREZ:  YOUR HONOR, OBJECTION.  I THINK WE'RE

3    GETTING VERY CLOSE TO THE LINE WITH RESPECT TO MIL 4.

4              THE COURT:  WHICH IS?  SORRY.

5              MR. PEREZ:  EVIDENCE SUGGESTING THAT NSO LACKED

6    CONTROL OVER A CUSTOMER'S USE OF PEGASUS, WHICH THE COURT

7    GRANTED.

8              THE COURT:  YES.  OKAY.  WE'RE GETTING CLOSE TO THAT.

9    WE'RE NOT THERE YET.

10             MR. AKROTIRIANAKIS:  OKAY, YOUR HONOR.  I DON'T MEAN

11   TO GO THERE, SO PLEASE STOP ME.

12             THE COURT:  OKAY.  I'M --

13             MR. AKROTIRIANAKIS:  YOU KNOW MY INTENTIONS.

14             THE COURT:  OKAY.  COUNSEL IS PAYING ATTENTION.  HE

15   WILL.  HE'LL OBJECT.

16             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

17   Q.   AND I THINK -- I THINK IN YOUR LAST ANSWER YOU USED THE

18   WORD "OPERATOR."

19   A.   YES.

20   Q.   OKAY.  DO YOU MEAN THE PERSON WHO IS SITTING AT THE

21   TERMINAL?

22   A.   YES.

23   Q.   OKAY.  AND WHO WOULD THAT PERSON BE?

24             MR. PEREZ:  SAME OBJECTION, YOUR HONOR.

25             THE COURT:  ALL RIGHT.  THIS IS -- THIS IS ACTUALLY

1    INFORMATION THAT WE'VE HEARD PREVIOUSLY, SO I'M NOT SURE I'M

2    GOING TO SUSTAIN THIS OBJECTION.

3            MR. PEREZ:  I THINK, YOUR HONOR, THAT THAT QUESTION

4    SPECIFICALLY, WHO IS THE OPERATOR SITTING AT THE TERMINAL, I'M

5    NOT SURE WE COULD BE MORE SQUARELY WITHIN THE REALM OF MIL 4,

6    UNDER WHICH THEY'RE PRECLUDED FROM PUTTING IN EVIDENCE THEIR

7    ARGUMENT SUGGESTING THAT THEY LACKED CONTROL.

8            THE COURT:  OKAY.  SUSTAINED.

9    BY MR. AKROTIRIANAKIS:

10   Q.   DOES NSO INPUT THE NUMBERS OR OPERATE THE SYSTEM?

11           MR. PEREZ:  SAME OBJECTION, YOUR HONOR.

12           THE COURT:  SUSTAINED.

13   BY MR. AKROTIRIANAKIS:

14   Q.   WHO PICKS THE TARGET?

15           MR. PEREZ:  SAME OBJECTION, YOUR HONOR.

16           THE COURT:  WELL, WE'VE ALREADY HEARD TESTIMONY FROM

17   MR. SHOHAT ON THAT, SO I'M GOING TO ALLOW THIS ONE.

18           THE WITNESS:  THE CUSTOMER DOES.

19   BY MR. AKROTIRIANAKIS:

20   Q.   ALL RIGHT.  NOW, TELL THE JURY, PLEASE, WHAT WAS THE WIS

21   AND WHAT WAS ITS FUNCTION?

22   A.   OKAY.  WIS -- WIS IS PRACTICALLY A BACK END SERVER, IT'S A

23   PIECE OF SOFTWARE WHICH IS RESPONSIBLE FOR BUILDING THE

24   SPECIFIC MESSAGES FOR A WHATSAPP -- WHICH WOULD BE LATER SENT

25   TO THE WHATSAPP CLIENT THAT RUNS ON THE TARGET'S DEVICE.

1           SO ITS FUNCTIONALITY IS BASICALLY CREATING THE MESSAGES

2    FOR THE INSTALLATION VECTOR WHICH WILL BE LATER SENT TO THE

3    TARGET DEVICE.

4    Q.   AND DOES THE WIS PERFORM THAT FINGERPRINTING FUNCTION THAT

5    YOU TOLD US ABOUT?

6    A.   YES.  BEFORE THE INSTALLATION VECTOR ITSELF IS BEING

7    INITIATED, IT ALSO ORCHESTRATES THE FINGERPRINT PROCEDURE IN

8    ORDER TO BE ABLE TO GAIN ALL THE REQUIRED INFORMATION IN ORDER

9    TO CREATE THE SPECIFIC MESSAGES AND CODE FOR THE SPECIFIC

10   DEVICE.

11   Q.   ALL RIGHT.  NOW, YOU MENTIONED TWO TYPES OF SERVERS, THE

12   PEGASUS SERVER AND THE CONTROL SERVER.

13   A.   YES.

14   Q.   ALL RIGHT.  AND WHAT WOULD THOSE LOOK LIKE, IF WE HAD ONE

15   HERE?  WHAT WOULD IT LOOK LIKE?

16   A.   ALL THESE SERVERS, THEY RUN ON A BOX OF HARDWARE THAT IS

17   ON THE CUSTOMER PREMISES, AND THIS BOX IS -- WE CAN CALL IT

18   SERVER.  IT HAS DIFFERENT SERVICES AND SERVERS WHICH ARE, AS I

19   EXPLAINED, THE WIS, THE PEGASUS SERVER, AND THE CONTROL SERVER.

20   Q.   SO DOES IT LOOK JUST LIKE SERVERS IN A RACK?

21   A.   YEAH.

22   Q.   AND WHAT IS THE ROLE OF THE PEGASUS SERVER?

23   A.   THE PEGASUS SERVER HOLDS THE PEGASUS AGENT, AND WHEN IT'S

24   REACHED OUT, THEN IT SENDS THE PEGASUS AGENT TO THE TARGET

25   DEVICE.

1          AND IT ALSO HOLDS ALL THE DATABASES THAT EVENTUALLY HOLD

2     THE INTELLIGENCE DATA THAT ARE GATHERED FROM THE CUSTOMER'S

3     TARGETS AND DIRECTED TO THE -- TO THOSE SERVERS TO BE STORED.

4     Q.    WHAT IS THE LOCATION OF THE -- ALL OF THIS INFRASTRUCTURE

5     HARDWARE THAT YOU'RE TELLING US ABOUT?

6     A.    THEY'RE ON CUSTOMER PREMISES.

7     Q.    AND FINALLY, THE CONTROL SERVER, WHAT IS THE ROLE OF THE

8     CONTROL SERVER?

9     A.    THE CONTROL SERVER ENABLES THE OPERATOR TO BE ABLE TO

10    COMMUNICATE WITH THE AGENT AND CONTROL IT EVENTUALLY.

11    Q.    ALL RIGHT.  YOU TESTIFIED A FEW MINUTES AGO ABOUT THE --

12    COMING TO UNDERSTAND THE ECOSYSTEM WITH RESPECT TO ANDROID

13    RESEARCH THAT YOU WERE DOING.

14         DO YOU RECALL THAT TESTIMONY?

15    A.    YES.

16    Q.    ALL RIGHT.  TO DEVELOP THE HUMMINGBIRD INSTALLATION

17    VECTORS, DID NSO STUDY THE ANDROID ECOSYSTEM?

18    A.    YES.

19    Q.    AND DID IT ALSO STUDY THE WHATSAPP CLIENT APPLICATION?

20    A.    YES.

21    Q.    AND HOW -- HOW DID YOU STUDY IT?  WHAT DOES THAT LOOK

22    LIKE?

23    A.    WE DOWNLOAD IT FROM THE, FROM THE STORE AND INSTALLED IT

24    ON THE DEVICE AND USED DECOMPILING TOOLS TO UNDERSTAND THE

25    CODE.

1    Q.   AND WHAT DECOMPILING TOOLS DID YOU USE?

2    A.   IDA AND JEB, IDA, I-D-A, AND JEB, J-E-B.

3    Q.   DID NSO HAVE A LICENSE TO USE THE IDA TOOL?

4    A.   YES.

5    Q.   AND DID NSO HAVE A LICENSE TO USE THE JEB TOOL?

6    A.   YES.

7    Q.   TO DEVELOP THE HUMMINGBIRD INSTALLATION VECTORS, DID NSO

8    STUDY -- WELL, TURNING TO THE STUDY OF THE WHATSAPP

9    APPLICATION, I SHOULD SAY, YOU SAID THAT YOU DECOMPILED THE

10   WHATSAPP CLIENT APPLICATION.

11       DID YOU DECOMPILE THE WHATSAPP SERVER APPLICATION?

12   A.   NO.  WE HAVE NO ACCESS TO IT.

13   Q.   NO ACCESS TO THE CODE?

14   A.   TO THE CODE.

15   Q.   IF YOU DON'T HAVE ACCESS TO THE CODE OF THE SERVER

16   APPLICATION, HOW IS IT THAT YOU ARE ABLE TO STUDY IT?

17   A.   OKAY.  SO IT'S CALLED BLACK BOX STUDYING.  WE TAKE TOOL

18   DEVICES, DOWNLOAD TO THEM THE APPLICATION, THE WHATSAPP CLIENT

19   APPLICATION, AND THEN WE SEND MESSAGES BETWEEN THOSE DEVICES,

20   AND THEN WE LOOK AT THE OUTPUT.  SO WE DON'T HAVE ANY IDEA WHAT

21   HAPPENS ON THE SERVER, BUT WE CAN SEE WHAT'S BEING SENT AND

22   WHAT IS BEING OUTPUTTED TOWARDS THE TARGET.

23   Q.   AND WHEN YOU'RE -- YOU'RE HOLDING YOUR HANDS UP AND SAYING

24   TWO DEVICES, YOU MEAN LIKE TWO MOBILE PHONES?

25   A.   YEAH, COMPANY OWNED PHONES WE WORKED WITH.

1    Q.   AND DOING THIS, WHAT DID YOU CALL THIS KIND OF STUDY?

2    A.   IT'S BLACK BOX.

3    Q.   OKAY.  DOING THIS BLACK BOX STUDY WITH THE TWO MOBILE

4    PHONES THAT YOU OWNED, WERE YOU ABLE TO DETERMINE WHETHER THERE

5    WERE ANY PARTS OF A MESSAGE WHERE THE SERVER IS NOT LOOKING?

6         MR. PEREZ:  OBJECTION.  LEADING, AND I THINK COUNSEL

7    INJECTED THINGS INTO HIS QUESTION THAT WEREN'T PART OF THE

8    PRIOR TESTIMONY.

9         THE COURT:  ALL RIGHT.  SUSTAINED AS TO LEADING.

10   BY MR. AKROTIRIANAKIS:

11   Q.   WHAT WERE YOU ABLE TO DETERMINE USING THE BLACK BOX METHOD

12   THAT YOU DISCUSSED?

13   A.   SO AS I SAID BEFORE, WE DON'T HAVE ANY ACCESS TO THE

14   SERVER CODE, AND WE HAVE NO IDEA AND NO WAY TO UNDERSTAND WHAT

15   GOES INSIDE AND RUNS AND HOW IT'S BEING PROCESSED.

16        WHAT WE CAN KNOW AND UNDERSTAND IS WHAT, AS I SAID, WHAT'S

17   INPUT AND WHAT IS OUTPUT.

18        SO, YEAH.

19   Q.   AND WHAT, IF ANYTHING, WERE YOU ABLE TO DETERMINE ABOUT

20   THE AVAILABLE FIELDS IN WHATSAPP MESSAGES?

21   A.   NOT -- NOT WHAT THEY ARE -- HOW THEY'RE PROCESSING THE

22   SERVER, JUST THAT THE -- THEY ARE FORWARDED OR NOT.

23   Q.   AFTER YOU STUDIED THE WHATSAPP CLIENT AND THE SERVERS AS

24   YOU'VE NOW TOLD US ABOUT, WHAT DID YOU DO THEN?

25   A.   THEN WE DEVELOPED AN INTERNAL LAB, INTERNAL ECOSYSTEM

1    ENVIRONMENT TO BE ABLE TO WORK AND DEVELOP THE INSTALLATION

2    VECTOR WITHOUT WORKING WITH THE -- WITHOUT THE WHATSAPP

3    SERVERS, IN ORDER TO CREATE A CONTAINED ENVIRONMENT TO BE ABLE

4    TO WORK ON IT.

5    Q.   AND THIS CREATING OF A CONTAINED ENVIRONMENT, OR YOU

6    CALLED IT INTERNAL ECOSYSTEM, IS THAT, LIKE, INDUSTRY PRACTICE

7    IN THE SOFTWARE DEVELOPMENT INDUSTRY?

8              MR. PEREZ:  OBJECTION.  LEADING, YOUR HONOR.

9              THE COURT:  SUSTAINED.

10   BY MR. AKROTIRIANAKIS:

11   Q.   HOW WOULD YOU DESCRIBE THE DEVELOPMENT OF THE INTERNAL

12   ECOSYSTEM IN TERMS OF SOFTWARE IN THE SOFTWARE DEVELOPMENT

13   INDUSTRY?

14   A.   SO AS A SOFTWARE DEVELOPER, OR ANY COMPANY, I THINK, THAT

15   WOULD LIKE TO DO SO, FIRST YOU WOULD LIKE -- LET'S TAKE MY

16   EXAMPLE, OKAY, IF YOU WANTED TO DEVELOP A WEBSITE, YOU DON'T

17   START BY PUBLISHING IT IN A SERVER AND JUST GO.

18        YOU FIRST DEVELOP AN INTERNAL SERVICE, OR ECOSYSTEM, TEST

19   IT, AND THEN YOU PUBLISH IT TO PRODUCTION.

20        SO, YEAH, THIS IS THE -- THIS IS THE STANDARD PROCEDURE

21   THAT I WAS REFERRING TO.

22   Q.   AND YOUR INTERNAL ECOSYSTEM THAT YOU DEVELOPED IN THE

23   LABORATORY THAT YOU TESTIFIED TO, IS THAT CONNECTED TO THE

24   INTERNET IN ANY WAY?

25   A.   NO.

1    Q.   DOES THE USE OF THAT INTERNAL ECOSYSTEM INVOLVE THE

2    WHATSAPP SERVERS IN ANY WAY?

3    A.   NO.

4    Q.   WERE THERE ANY STEPS THAT YOU TOOK AFTER TESTING YOUR

5    SOFTWARE ON THE INTERNAL ECOSYSTEM THAT YOU'VE TOLD US ABOUT?

6    A.   YES.  AFTER WE FINALIZED THE INTERNAL DEVELOPMENT AND

7    RESEARCH AND GOT THE INSTALLATION VECTOR WORKING, BEFORE WE

8    PUBLISH IT TO THE CUSTOMERS AND DEPLOY IT TO THE CUSTOMERS, WE

9    WOULD LIKE TO TEST IT IN A REAL ENVIRONMENT, SO WE TESTED IT IN

10   A REAL ENVIRONMENT.

11        THE COURT:  EXCUSE ME, COUNSEL.

12        WE'RE A LITTLE PAST THE TIME WE NORMALLY TAKE A BREAK.

13        MR. AKROTIRIANAKIS:  OH.  THAT'S FINE, YOUR HONOR.  I

14   DIDN'T REALIZE.

15        THE COURT:  OKAY.  THAT'S ALL RIGHT.

16        ALL RIGHT.  MEMBERS OF THE JURY, WE'RE GOING TO TAKE OUR

17   FIRST 15 MINUTE BREAK FOR THE MORNING.  WE'LL SEE YOU BACK IN

18   15 MINUTES.

19        THE CLERK:  ALL RISE FOR THE JURY.

20        (JURY OUT AT 10:04 A.M.)

21        (RECESS FROM 10:04 A.M. UNTIL 10:20 A.M.)

22        THE COURT:  YES.  WHAT WAS THE PROBLEM?

23        MR. CRAIG:  I WANTED TO TELL THE COURT THE SECOND

24   NEXT QUESTION I WAS GOING TO ASK, BECAUSE I WANT TO POINT OUT A

25   DISTINCTION TO THE COURT SO THAT WE DON'T --

 1                    THE COURT:  OKAY.

 2                    MR. AKROTIRIANAKIS:  MAYBE IT'S APPROPRIATE THAT I

 3       ASK THE WITNESS TO STEP IN THE HALLWAY.

 4                    THE COURT:  AT THIS POINT, I DON'T THINK SO.  I DON'T

 5       THINK THAT'S NECESSARY.

 6                    MR. AKROTIRIANAKIS:  OKAY.  I WAS GOING TO ASK HIM --

 7       THIS IS A POINT THAT -- SO THE COURT'S SUMMARY JUDGMENT WAS

 8       ABOUT THAT, AND THE 1400 AND ALL THAT WAS ABOUT THE EDEN

 9       VECTOR -- THERE'S HEAVEN, EDEN, ERISED.

10                    THE COURT:  RIGHT.

11                    MR. AKROTIRIANAKIS:  I WAS GOING TO ASK THE WITNESS

12       ABOUT A DISTINCTION WITH RESPECT TO THE LATER ERISED VECTOR

13       THAT ISN'T ADDRESSED IN THE COURT'S MOTION.

14           I WAS GOING TO FIRST HAVE HIM ADMIT THAT THE ERISED VECTOR

15       DID USE THE WHATSAPP SIGNALLING SERVERS.

16                    THE COURT:  UM-HUM.

17                    MR. AKROTIRIANAKIS:  BUT THEN I WAS GOING TO ASK HIM

18       WHETHER IT -- LIMITED TO ERISED -- AND I CAN DO IT IN A LEADING

19       QUESTION OR I CAN DO IT IN A NON-LEADING QUESTION, BUT IT WOULD

20       BE SAFER WITH A LEADING QUESTION -- WHETHER THE ERISED VECTOR

21       ALSO USED WHATSAPP RELAY SERVERS IN ADDITION TO THE SIGNALLING

22       SERVER OR WHETHER IT WAS JUST THE SIGNALLING SERVER, AND I

23       THINK IT'S --

24                    THE COURT:  YOU KNOW, I'M ACTUALLY VERY SURPRISED AT

25       HOW MUCH TECHNICAL INFORMATION IS COMING IN AT THIS TRIAL.  I

1      DON'T ACTUALLY UNDERSTAND WHY SO MUCH OF IT IS NECESSARY.

2          BUT IT'S CERTAINLY GOING TO REQUIRE THAT WE REDO THE JURY

3      INSTRUCTIONS, WHICH IS A LITTLE MORE PROBLEMATIC.

4          BUT WHAT'S THE DISTINCTION?  I MEAN, WHY DOES THE JURY

5      NEED TO KNOW THE DISTINCTION BETWEEN THE SIGNALLING SERVERS AND

6      RELAY SERVERS?

7              MR. AKROTIRIANAKIS:  WELL, BECAUSE THE ASSERTION, THE

8      ALLEGATION -- IN THE TRIAL, I MEAN, OF COURSE, NOT IN THE

9      LARGER CASE, LIABILITY IS ESTABLISHED AND THIS REALLY DOESN'T

10     HAVE TO DO WITH LIABILITY.

11         BUT THEY'RE ARGUING THAT THE REPEATING OF THE -- THE

12     REPETITION OF CONDUCT IS A FACT RELEVANT TO PUNITIVE DAMAGES,

13     AND THIS ISN'T THE SAME CONDUCT, YOUR HONOR.  THEY DEVELOPED

14     SOMETHING DIFFERENT THAT INTERACTS DIFFERENTLY, ALBEIT WITH

15     SIGNALLING SERVERS.

16             THE COURT:  IS THAT A DISTINCTION THAT REALLY MAKES A

17     DIFFERENCE?

18             MR. AKROTIRIANAKIS:  WELL, ACTUALLY, IT DOES LEGALLY,

19     YOUR HONOR, BECAUSE THE STATE OF THE EVIDENCE --

20             THE COURT:  I MEAN, ALL THREE OF THE DIFFERENT

21     VECTORS WENT THROUGH WHATSAPP SERVERS OF ONE KIND OR ANOTHER;

22     RIGHT?

23             MR. AKROTIRIANAKIS:  THAT'S TRUE, YOUR HONOR.  BUT --

24             THE COURT:  AND TWO OF THEM WERE DEVELOPED AFTER --

25     THERE WAS HEAVEN, AND THEN THE SUBSEQUENT ONES WERE DEVELOPED

1    AFTER WHATSAPP ATTEMPTED TO REMEDIATE AND CLOSE THE

2    VULNERABILITY; CORRECT?

3              MR. AKROTIRIANAKIS:  THE -- YEAH, HEAVEN, EDEN,

4    ERISED.  AND HE'S GOING TO EXPLAIN WHAT THE CHANGES WERE AND

5    WHAT HE UNDERSTOOD AND SO ON.

6         THE REASON IT'S IMPORTANT, YOUR HONOR -- AND I AGREE WITH

7    YOU THAT THIS LEVEL OF TECHNICAL DETAIL MAYBE IS LOST ON THE

8    JURY, I WOULD SAY I THINK THEY'RE VERY INTERESTED -- THAT THE

9    STATE OF THE EVIDENCE IN THIS CASE -- AND, OF COURSE, ALSO THE

10   TRUTH -- IS THAT THE SIGNALLING SERVERS, WHICH ALL THREE OF THE

11   VECTORS USE, ARE NOT IN CALIFORNIA, AND THE EVIDENCE IS, FROM

12   MR. GHEORGHE, THAT THERE ARE TWO CLUSTERS OF RELAY SERVERS THAT

13   ARE IN CALIFORNIA.

14        AND ERISED DOESN'T HAVE ANYTHING TO DO WITH CALIFORNIA.

15   IT DOESN'T HAVE ACTS IN CALIFORNIA, WHICH IS, OF COURSE, PART

16   OF THE PUNITIVE DAMAGES JURY INSTRUCTION.

17        AND I DON'T KNOW THAT I WOULD ARGUE THAT BECAUSE, AGAIN, I

18   DON'T THINK THAT THEY'RE INTO THIS WHOLE LEVEL OF DETAIL.

19        BUT I DO THINK IT'S AN IMPORTANT FACT TO ELICIT, AT A

20   MINIMUM, FOR APPELLATE PURPOSES.

21              MR. PEREZ:  YOUR HONOR, WE DO HAVE SOME FUNDAMENTAL

22   OBJECTIONS TO THIS FOR A COUPLE OF REASONS.

23        ONE IS I THINK WHAT DEFENSE COUNSEL IS PROPOSING TO DO IS

24   GETTING INTO A LEVEL OF TECHNICAL DETAIL ABOUT ERISED THAT'S

25   COMPLETELY UNFAIR WHEN THEY HAVEN'T PRODUCED THE CODE.

1           SO THEY PURPORT TO CHARACTERIZE HOW IT WORKED IN DETAIL.

2     WE ALL AGREE IT WENT THROUGH WHATSAPP SERVERS, ERISED, WITH

3     THIS LAWSUIT PENDING, USED WHATSAPP SERVERS TO TRIGGER THE

4     INSTALLATION OF PEGASUS.  THAT'S UNDISPUTED.

5           BUT TO START PARSING IT SO FINELY AND SAYING USE THIS

6     SERVER, NOT THAT ONE, WHEN THEY HAVEN'T PRODUCED A SINGLE LINE

7     OF CODE AND WE HAVE NO ABILITY TO CHALLENGE THAT WE THINK IS

8     COMPLETELY UNFAIR AND WOULD BE CONTRARY TO THE COURT'S RULINGS.

9           NOR DO WE THINK THAT CALIFORNIA CONDUCT, WITH RESPECT TO

10    THIS FACT, THE REPUTATION OF THE CONDUCT AFTER WHATSAPP HAD

11    UNAMBIGUOUSLY SIGNALLED THIS IS NOT PERMITTED, WE DON'T WANT

12    THIS TO HAPPEN, IT DOESN'T MATTER WHETHER THAT WAS IN

13    CALIFORNIA OR NOT.  IT'S BECAUSE OF THE INTENT IT REFLECTS.

14          THE CONDUCT THAT GAVE RISE TO LIABILITY WAS IN CALIFORNIA,

15    AS THE COURT HAS ALREADY FOUND.

16          THE FACT THAT THEY KEPT DOING IT, THAT'S STATE OF MIND

17    EVIDENCE REGARDLESS OF A NEXUS TO CALIFORNIA.

18              THE COURT:  UM-HUM.

19              MR. AKROTIRIANAKIS:  PUNITIVE DAMAGES CAN ONLY BE

20     IMPOSED AS TO ACTS IN CALIFORNIA, YOUR HONOR.

21              MR. PEREZ:  THAT'S NOT CORRECT AS A MATTER OF LAW,

22     YOUR HONOR, AND WE'LL DISCUSS THAT AT THE CHARGE CONFERENCE.

23              THE COURT:  YES, WE'LL DISCUSS THAT, AND THERE'S

24     ALREADY BEEN SOME INITIAL DETERMINATIONS BY ME.

25          I AGREE, IF YOU HAVEN'T EXCHANGED, WHICH YOU DID NOT, THE

1      CODE ON THIS, I AGREE WITH PLAINTIFFS' COUNSEL, THIS IS WAY TOO

2      MUCH TECHNICAL DETAIL FOR DEFENDANTS WHO HAVEN'T PROVIDED THE

3      COMPUTER CODE TO THE OPPOSING SIDE.

4           SO, NO, YOU MAY NOT GO INTO THAT.

5               MR. PEREZ:  THANK YOU, YOUR HONOR.

6               THE COURT:  ALL RIGHT.

7           KELLY, LET'S GET THE JURY.

8               MR. AKROTIRIANAKIS:  THANK YOU FOR HEARING ME ON IT,

9      YOUR HONOR.

10               THE COURT:  SURE.

11               MR. AKROTIRIANAKIS:  I DIDN'T WANT TO VIOLATE.

12               THE COURT:  THANK YOU.

13           (PAUSE IN PROCEEDINGS.)

14               THE CLERK:  ALL RISE FOR THE JURY.

15           (JURY IN AT 10:26 A.M.)

16               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

17               THE COURT:  ALL RIGHT.  THANKS.

18           ALL RIGHT.  YOU MAY CONTINUE, COUNSEL.

19               MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20           WITH THE COURT'S PERMISSION, I WOULD LIKE TO PUBLISH

21      EXHIBIT 35, WHICH IS IN EVIDENCE.

22           AND COULD WE BLOW UP ON THIS PART RIGHT HERE?

23      Q.   SO -- I'M SORRY, COULD YOU DO IT SO WE CAN SEE THE DATE

24      ALSO?

25           MR. GAZNELI, ARE YOU ABLE TO SEE ON THE SCREEN BEFORE YOU

1      EXHIBIT 35?

2      A.   YES.

3      Q.   AND THE DATE OF THIS --

4            MR. CRAIG:  JOE.

5            (PAUSE IN PROCEEDINGS.)

6            THE COURT:  THERE'S NO BINDER FOR THIS WITNESS.

7            MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  I HADN'T

8      INTENDED TO USE THIS DOCUMENT WITH HIM.  LET ME GET A COPY FOR

9      YOU.

10           (PAUSE IN PROCEEDINGS.)

11           MR. AKROTIRIANAKIS:  IT WAS IN EVIDENCE THROUGH

12     MR. ESHKAR.

13           (PAUSE IN PROCEEDINGS.)

14           MR. AKROTIRIANAKIS:  HE WAS A VIDEO WITNESS.  DO YOU

15     WANT ONE BINDER FOR ALL THE VIDEOS?

16           THE COURT:  THAT WOULD BE HELPFUL.  DID YOU HAVE ONE?

17           MR. AKROTIRIANAKIS:  THEY WERE THEIR VIDEOS,

18     YOUR HONOR.

19           THE COURT:  I'M SORRY.  MINE ARE ALL COMMINGLED, AND

20     I DON'T HAVE ONE FROM EITHER SIDE.

21           MR. AKROTIRIANAKIS:  MAY I APPROACH THE CLERK JUST

22     WITH THE ONE I'M GOING TO ASK ABOUT, YOUR HONOR?

23           THE COURT:  YES.

24           MR. AKROTIRIANAKIS:  (HANDING.)

25           AND THIS IS EXHIBIT 35, OR IT'S IN EVIDENCE AS EXHIBIT 35,

1    YOUR HONOR.  IT'S PLAINTIFFS' EXHIBIT.

2              THE COURT:  PLAINTIFFS' EXHIBIT 35.

3              MR. AKROTIRIANAKIS:  YES.

4              THE COURT:  OKAY.

5              MR. AKROTIRIANAKIS:  MAY I PROCEED?

6              THE COURT:  YEAH.

7    BY MR. AKROTIRIANAKIS:

8    Q.   SO I DON'T KNOW IF I ASKED YOU, MR. GAZNELI, IF YOU SAW

9    THAT THE DATE IS MAY 12TH OF THIS EXCHANGE OF MESSAGES?

10   A.   YES.

11   Q.   AND DO YOU KNOW RAMON ESHKAR?

12   A.   YES.

13   Q.   HE'S A COLLEAGUE OF YOURS?

14   A.   YES.

15   Q.   IN HIS MESSAGE ON MAY 12TH, 2019, MR. ESHKAR WRITES ABOUT

16   WHATSAPP LATEST VERSION AND CHANGE IN THE SECOND LINE OF HIS

17   MESSAGE.

18   A.   YES.

19   Q.   AND LATER IN HIS MESSAGE, HE TALKS ABOUT WHAT NSO IS GOING

20   TO DO IN TERMS OF REMOVING THE VECTOR?

21   A.   YES.

22   Q.   MY QUESTION FOR YOU IS WHETHER THIS DATE, FEBRUARY --

23   MAY 12TH, 2019, WAS WHEN YOU CLOSED THE EDEN VECTOR?

24   A.   YES.

25   Q.   ALL RIGHT.  NOW, EARLIER IN YOUR TESTIMONY, YOU MENTIONED

1      SOMETHING ABOUT SERVERS HAVING RULES.

2      A.   YES.

3      Q.   CAN YOU EXPLAIN THAT CONCEPT?

4      A.   SO EACH SERVER IS A SPECIFIC PIECE OF CODE WHICH, IN

5      DEVELOPING A PIECE OF CODE, YOU HAVE TO DEFINE SPECIFIC RULES

6      THAT YOU WOULD LIKE THE SERVER TO WORK ACCORDINGLY.

7           SO THIS IS -- YEAH, THIS IS NORMAL PRACTICE IN SOFTWARE

8      DEVELOPMENT.

9      Q.   OKAY.  IN THE WHATSAPP SERVERS THAT YOU WERE STUDYING, DID

10     THE RULES OF THOSE SERVERS AT ANY POINT IN TIME CHANGE?

11     A.   YES.

12     Q.   ALL RIGHT.  SO I WANT TO TALK ABOUT THE FIRST TIME THAT

13     THE SERVER RULES CHANGED.  OKAY?

14          WHEN WHATSAPP CHANGES ITS SERVER RULES, DOES IT SEND OUT,

15     LIKE, A NOTICE OF CHANGE OF SERVER RULES OR SOME KIND OF

16     EXPLANATION?

17     A.   NO.

18     Q.   WOULD YOU, AS SOMEONE WHO'S STUDYING WHATSAPP WITH THE

19     BLACK BOX THAT YOU TALKED ABOUT, KNOW IMMEDIATELY THAT THERE

20     WAS A CHANGE?

21     A.   NO.

22     Q.   OR WHY THERE WAS A CHANGE?

23     A.   NO.

24     Q.   DO YOU -- I DIRECT YOUR ATTENTION TO DECEMBER 2018 AND THE

25     END OF THE HEAVEN VECTOR.

1          DO YOU REMEMBER THAT DATE?

2     A.   YES.

3     Q.   AM I CORRECT THAT THAT WAS THE END OF THE HEAVEN VECTOR?

4     A.   YES.

5     Q.   CAN YOU EXPLAIN WHAT TYPE OF CHANGE OCCURRED THAT CAUSED

6     NSO THEN TO CLOSE THE HEAVEN VECTOR?

7     A.   WE STARTED TO GET AN ERROR MESSAGE DURING THE INSTALLATION

8     FLOW, AN ERROR MESSAGE 403.

9     Q.   AND WHEN YOU SAY THAT YOU STARTED RECEIVING AN ERROR

10    MESSAGE 403, WHAT DOES THAT LOOK LIKE WHEN YOU SEE THE MESSAGE?

11    A.   IT'S A STANDARD ERROR IN THE COMMUNICATION.  IT JUST

12    STATES SERVER UNREACHABLE.

13    Q.   AND AN ERROR 403?

14    A.   YES.

15    Q.   SORT OF LIKE ERROR 404?

16    A.   YES.

17    Q.   WHAT IS ERROR 404, IF YOU KNOW?

18    A.   I CAN'T REMEMBER, I CANNOT REMEMBER THE TEXT OF IT.  BUT,

19    YEAH, IT'S LIKE --

20    Q.   THAT'S OKAY.

21    A.   YEAH.

22    Q.   COMMON 404 ERROR MESSAGE?

23    A.   YEAH.

24    Q.   AND WHAT DID YOU DO AFTER HAVING RECEIVED THE 403 ERROR

25    MESSAGE, ERROR MESSAGES THAT WE'RE TALKING ABOUT IN DECEMBER

1    2018?

2    A.   WE GOT VECTOR TO THE SKETCH TABLE AND STARTED TO

3    UNDERSTAND THE NEW RULES THAT WERE SET NOW IN THE WHATSAPP

4    SERVER IN ORDER TO TRY TO FIND A -- USING THE NEW RULES, HOW TO

5    BE ABLE TO USE THE INSTALLATION VECTOR.

6    Q.   AND, I'M SORRY, YOU WENT TO SOME TABLE AFTER THAT?

7    A.   THE WORK --

8    Q.   WE CAN'T TALK AT THE SAME TIME.  JUST SAY YOUR ANSWER

9    AGAIN BECAUSE I DIDN'T UNDERSTAND IT.

10   A.   OKAY.  WE JUST GOT BACK TO WORK.  WE LEARNED THE NEW RULES

11   OF THE WHATSAPP SERVER IN ORDER TO BE ABLE TO USE THE

12   INSTALLATION VECTOR AGAIN.

13   Q.   OKAY.  ARE YOU SAYING THE SKETCH TABLE, OR SCRATCH TABLE?

14   A.   I JUST MEANT TO SAY THAT WE GOT BACK TO WORK.

15   Q.   OKAY.  AT THE TIME WOULD YOU HAVE HAD INDICATION THAT THE

16   SERVER RULES CHANGE WAS RELATED TO SECURITY?

17   A.   NO, I DON'T KNOW.

18   Q.   WHAT DID YOU KNOW?

19   A.   THAT THE RULES CHANGED AND WE HAD TO ADJUST.

20   Q.   WAS IT THE EDEN VERSION OF PEGASUS INSTALLATION VECTOR

21   THAT WAS IN OPERATION IN MAY OF 2019?

22   A.   YES.

23            MR. AKROTIRIANAKIS:  NO FURTHER QUESTIONS,

24   YOUR HONOR.

25            THE COURT:  ALL RIGHT.

1          MR. PEREZ.

2                          **CROSS-EXAMINATION**

3     BY MR. PEREZ:

4     Q.   GOOD MORNING, MR. GAZNELI.

5     A.   GOOD MORNING.

6     Q.   WE'VE MET BEFORE; RIGHT?

7     A.   YES.

8     Q.   I HAD THE OPPORTUNITY TO TAKE YOUR DEPOSITION IN LONDON IN

9     SEPTEMBER OF LAST YEAR; IS THAT RIGHT?

10    A.   YES.

11    Q.   AND WHEN I TOOK YOUR DEPOSITION, YOU WERE UNDER OATH;

12    ISN'T THAT RIGHT?

13    A.   YES.

14    Q.   YOU SWORE TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING

15    BUT THE TRUTH AT THAT DEPOSITION?

16    A.   YES.

17    Q.   SAME OATH YOU TOOK TODAY?

18    A.   YES.

19    Q.   AND DID YOU TESTIFY TRUTHFULLY AT YOUR DEPOSITION?

20    A.   YES.

21    Q.   AND YOU WERE DESIGNATED AS A CORPORATE REPRESENTATIVE BY

22    THE DEFENDANTS IN THIS CASE ON A RANGE OF TOPICS; ISN'T THAT

23    CORRECT?

24    A.   YES.

25    Q.   THAT INCLUDED THE RESEARCH THAT LED TO THE HUMMINGBIRD

1    VECTORS?  THAT WAS ONE OF THE TOPICS ON WHICH DEFENDANTS PUT

2    YOU FORWARD AS THEIR CORPORATE REPRESENTATIVE; CORRECT?

3    A.   YES.

4    Q.   AND ALSO THE FUNCTIONALITY OF PEGASUS AND THE INSTALLATION

5    VECTORS, YOU WERE THE CORPORATE DESIGNEE ON THAT TOPIC AS WELL;

6    RIGHT?

7    A.   YES.

8    Q.   YOU WERE ALSO DESIGNATED ON NSO'S EFFORTS TO DEVELOP NEW

9    HUMMINGBIRD VECTORS FOLLOWING SYSTEM CHANGES BY WHATSAPP THAT

10   INTERFERED WITH THOSE VECTORS' OPERATIONS; IS THAT CORRECT?

11   A.   YES.

12   Q.   SO IN ADDITION TO BRINGING TO BEAR YOUR OWN KNOWLEDGE OF

13   THOSE TOPICS, YOU HAD AN OBLIGATION, AS YOUR COUNSEL PUT IT THE

14   OTHER DAY, TO STUDY UP ON THOSE TOPICS; CORRECT?

15   A.   YEAH.

16   Q.   AND, INDEED, YOU PREPARED FOR YOUR TESTIMONY; ISN'T THAT

17   RIGHT?

18   A.   YEAH.

19   Q.   AFTER YOUR DEPOSITION, YOUR TRANSCRIPT WAS PROVIDED TO YOU

20   AND YOU HAD THE OPPORTUNITY TO REVIEW IT; ISN'T THAT CORRECT?

21   A.   YES.

22   Q.   AND YOU HAD THE OPPORTUNITY TO MAKE ANY CORRECTIONS THAT

23   YOU THOUGHT WERE NECESSARY; RIGHT?

24   A.   YES.

25   Q.   AND IF WE LOOK AT -- IF WE COULD PUT UP THE DEPOSITION

1    TRANSCRIPT, PAGE 333 --

2          MAY I PUBLISH TO THE JURY, YOUR HONOR?

3                THE COURT:  YES.

4                MR. PEREZ:  IT'S JUST THE SIGNATURE PAGE.

5                THE CLERK:  THERE'S JUST A DELAY.

6                MR. PEREZ:  OH, GREAT.

7          IF WE COULD ZOOM IN ON THE CERTIFICATE OF WITNESS THERE,

8    THAT BOTTOM PORTION.

9    Q.   YOU SIGNED THE CERTIFICATION REFLECTING THAT THE

10   TRANSCRIPT WAS ACCURATE; CORRECT?

11   A.   YES.

12   Q.   THAT'S YOUR SIGNATURE THAT WE SEE THERE?

13   A.   YEAH.

14   Q.   AFFIRMING THAT THE TRANSCRIPT WAS CORRECT; RIGHT?

15   A.   YES.

16   Q.   SO IN YOUR TESTIMONY JUST NOW, YOU DON'T MEAN TO

17   CONTRADICT ANYTHING THAT YOU SAID IN YOUR DEPOSITION TESTIMONY;

18   CORRECT?

19   A.   NO.

20   Q.   AND THE JURY CAN RELY ON EVERY WORD OF YOUR DEPOSITION

21   TESTIMONY; IS THAT RIGHT?

22   A.   YEAH.

23   Q.   THANK YOU.

24         NOW, YOU WERE ASKED ABOUT YOUR CURRENT RESPONSIBILITIES AS

25   VICE PRESIDENT OF R&D AND THE EMPLOYEES THAT YOU SUPERVISE.

1          DO YOU RECALL THOSE QUESTIONS?

2    A.   YES.

3    Q.   THERE ARE OVER 100 SUCH EMPLOYEES, AREN'T THERE?

4    A.   YES.

5    Q.   HOW MANY PEOPLE ARE IN THE R&D GROUP AT NSO?

6    A.   ABOUT 140.

7    Q.   140 PEOPLE?

8    A.   YES.

9    Q.   CURRENTLY DEVOTED TO RESEARCH AND DEVELOPMENT AT NSO?

10   A.   YES.

11   Q.   AND THAT WORK IS SUPPORTED BY THE $50 MILLION BUDGETS THAT

12   ARE REFLECTED IN NSO'S FINANCIAL STATEMENTS; ISN'T THAT RIGHT?

13   A.   YES.

14   Q.   NOW, YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL AS TO

15   WHETHER THE 50 MILLION, AND ALMOST $60 MILLION BUDGETS FOR R&D

16   THAT WE SAW IN THE 2024 FINANCIAL STATEMENTS, WHETHER ANY OF

17   THAT BUDGET FOR LAST YEAR WENT TOWARDS DEVELOPING THE VECTORS

18   THAT ARE AT ISSUE IN THIS CASE.

19          DO YOU RECALL THOSE QUESTIONS?

20   A.   YES.

21   Q.   ALL RIGHT.  AND THE ANSWER WAS NO, THE MONEY WE SPENT IN

22   2024 DIDN'T PAY FOR WORK IN 2017 OR '18; RIGHT?

23   A.   YEAH.

24   Q.   BUT IN 2018 AND 2019, THERE WAS AN R&D BUDGET, WASN'T

25   THERE?

1     A.   YES.

2     Q.   RIGHT.  AND, IN FACT, IF I COULD SHOW THE WITNESS -- THIS

3     IS PLAINTIFFS' EXHIBIT 264.

4              MR. MARZORATI:  CAN I APPROACH?

5              THE COURT:  YES.

6              MR. AKROTIRIANAKIS:  MAY I HAVE A MOMENT TO GET,

7     YOUR HONOR?  IT'S NOT IN MY BINDER.

8          YOUR HONOR, I THINK THAT WE ALREADY TALKED ABOUT THIS.

9              MR. PEREZ:  YOUR HONOR, THEY OPENED THE DOOR --

10             THE COURT:  YEAH.

11             MR. PEREZ:  -- BY ASKING WHETHER THE CURRENT BUDGET

12    WENT TOWARDS THE WORK TO DEVELOP THESE VECTORS.

13             MR. AKROTIRIANAKIS:  I THINK ACTUALLY MR. ANDRES

14    ASKED ABOUT THAT ON MR. SHOHAT'S CROSS-EXAMINATION.  SO I DON'T

15    THINK I OPENED THE DOOR TO ANYTHING, YOUR HONOR.

16             THE COURT:  I'M NOT SURE WHAT IT IS I'M LOOKING AT

17    HERE.

18             MR. PEREZ:  YOUR HONOR, I WOULD DIRECT THE COURT TO

19    PAGE 4, WHICH REFLECTS THE RESEARCH AND DEVELOPMENT EXPENSES

20    FOR 2019 AND 2018.

21             THE COURT:  OKAY.  AND IS THAT WHAT YOU WANT TO ASK

22    HIM ABOUT?

23             MR. PEREZ:  YES, YOUR HONOR.

24             THE COURT:  OKAY.  I'M GOING TO ALLOW IT.

25    BY MR. PEREZ:

1    Q.   MR. GAZNELI, YOU RECOGNIZE EXHIBIT 264, PLAINTIFFS'

2    EXHIBIT 264?  THESE ARE THE CONSOLIDATED FINANCIAL STATEMENTS

3    FOR NSO GROUP TECHNOLOGIES, LIMITED, FOR DECEMBER 31ST, 2019;

4    IS THAT RIGHT?

5    A.   YES.

6    Q.   AND IF WE LOOK AT PAGE 4 OF THAT DOCUMENT, IT REFLECTS THE

7    RESEARCH AND DEVELOPMENT EXPENSES FOR 2019 AND 2018?  THAT'S

8    THE TIME PERIOD DURING WHICH THE HUMMINGBIRD VECTORS WERE BEING

9    DEVELOPED AND WORKED ON; CORRECT?

10   A.   RIGHT.

11   Q.   AND IT REFLECTS THAT IN 2019, THE RESEARCH AND DEVELOPMENT

12   EXPENSES OF NSO GROUP WERE $67 MILLION; RIGHT?

13   A.   YES.

14   Q.   SO ACTUALLY EVEN --

15        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I'M

16   SORRY, YOUR HONOR.  I HAVE TO OBJECT TO THE FOUNDATION.  THIS

17   IS A CONSOLIDATED -- I JUST WOULD ASK IF HE COULD LAY SOME

18   FOUNDATION FOR THE -- THIS WITNESS'S KNOWLEDGE OF THE

19   CONSOLIDATED COMPANIES.

20        THE COURT:  I AGREE.  I AGREE.

21   BY MR. PEREZ:

22   Q.   ARE THESE FIGURES CONSISTENT WITH YOUR GENERAL

23   RECOLLECTION, HAVING BEEN IN THE R&D DEPARTMENT --

24        MR. AKROTIRIANAKIS:  SAME OBJECTION, YOUR HONOR.

25   BY MR. PEREZ:

1      Q.   THAT AT THE TIME PERIOD --

2              THE COURT:  CONSOLIDATED MEANING Q CYBER AS WELL?

3              MR. AKROTIRIANAKIS:  NO.  OTHER COMPANIES,

4      YOUR HONOR, THAT THERE'S BEEN NO EVIDENCE ABOUT IN THIS CASE.

5      THESE ARE CONSOLIDATED FINANCIALS OF HISTORICAL GROUPED

6      COMPANIES.

7              THE COURT:  OKAY.  OKAY.  YOU NEED TO --

8              MR. PEREZ:  I'M GOING TO ASK THE QUESTION WITHOUT

9      REFERENCE TO THE DOCUMENT, YOUR HONOR.

10             THE COURT:  OKAY.

11     BY MR. PEREZ:

12     Q.   IS IT CONSISTENT WITH YOUR EXPERIENCE FROM THE R&D GROUP

13     AT NSO THAT DURING THE TIME PERIOD THE HUMMINGBIRD VECTORS WERE

14     BEING DEVELOPED, NSO HAD A R&D BUDGET IN THE TENS OF MILLIONS

15     OF DOLLARS?

16     A.   YES.

17     Q.   THANK YOU.

18          YOU WERE ASKED SOME QUESTIONS ABOUT THE ANDROID TEAM, DO

19     YOU RECALL THAT, AND WHAT APPLICATIONS THE ANDROID TEAM STUDIED

20     IN 2018 AND 2019?  DO YOU REMEMBER THAT?

21     A.   YES.

22     Q.   RIGHT.  AND JUST TO REORIENT THE JURY, THE ANDROID TEAM IS

23     A TEAM WITHIN R&D THAT IS FOCUSSED ON DEVELOPING INSTALLATION

24     VECTORS FOR ANDROID DEVICES; IS THAT RIGHT?

25     A.   YES.

GAZNELI CROSS BY MR. PEREZ

1    Q.   OKAY.  AND WHEN YOU WERE ASKED ABOUT WHAT APPLICATIONS

2    THAT ANDROID TEAM STUDIED, YOU POINTED TO AT LEAST FOUR

3    DIFFERENT TYPES OF APPLICATIONS; RIGHT?

4    A.   (NODS HEAD UP AND DOWN.)

5    Q.   YOU MENTIONED INSTANT MESSAGING APPLICATIONS; CORRECT?

6    A.   YES.

7    Q.   BROWSERS?

8    A.   YES.

9    Q.   OPERATING SYSTEMS?

10   A.   YES.

11   Q.   AND OTHER APPLICATIONS; RIGHT?

12   A.   YES.

13   Q.   SO THOSE ARE ALL DIFFERENT WAYS THAT THE R&D GROUP, AND

14   THE ANDROID TEAM SPECIFICALLY, IS STUDYING FOR HOW -- OR WAS

15   STUDYING IN 2018 AND 2019 FOR HOW TO GET PEGASUS ON TO TARGET

16   PHONES; ISN'T THAT RIGHT?

17   A.   YES.

18   Q.   OKAY.  SO THAT, FOR BROWSERS, THAT WOULD INCLUDE THINGS

19   LIKE SAFARI AND GOOGLE CHROME?  THAT'S WHAT BROWSERS MEANS;

20   RIGHT?

21   A.   YEAH, SAFARI WAS FOR IOS.

22   Q.   OKAY.  SO CHROME WOULD BE AN EXAMPLE OF A BROWSER THAT

23   RUNS ON ANDROID DEVICES; RIGHT?

24   A.   FOR EXAMPLE.

25   Q.   AND THAT WOULD BE ALL THESE DIFFERENT PATHS THAT THE

1    ANDROID TEAM WAS STUDYING FOR HOW TO GET PEGASUS ON TO TARGET

2    DEVICES; RIGHT?

3    A.   YES.

4    Q.   AND THAT WORK CONTINUES TODAY, DOESN'T IT?

5           MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

6           THE COURT:  SUSTAINED.

7    BY MR. PEREZ:

8    Q.   I'D LIKE TO CLARIFY, IF WE COULD FOR THE JURY, THE

9    TIMELINE OF NSO'S DEVELOPMENT OF THE HUMMINGBIRD VECTORS.

10         NOW, YOU TESTIFIED IN YOUR DEPOSITION THAT THE RESEARCH

11   TEAM CAME UP WITH THE IDEA OF MANIPULATING THE CONNECTING

12   TONE_DESC FIELD DURING THE RESEARCH PHASE IN LATE 2017 OR EARLY

13   2018; IS THAT CORRECT?

14   A.   WE WEREN'T MANIPULATING ANYTHING.

15   Q.   LET ME PUT IT THIS WAY.  YOU CAME UP WITH THE IDEA OF

16   PUTTING THE CODE THAT WAS TRIGGERING THE INSTALLATION OF

17   PEGASUS IN THE CONNECTING TONE_DESC FIELD, THAT IDEA WAS

18   GENERATED BY THE RESEARCH DEPARTMENT IN LATE 2017 OR EARLY

19   2018?  THAT'S WHAT YOU TESTIFIED TO; ISN'T THAT RIGHT?

20   A.   YES.

21   Q.   SO AT THAT POINT IN LATE 2017 OR EARLY 2018, THE RESEARCH

22   TEAM WAS ALREADY RESEARCHING HOW TO USE WHATSAPP TO INSTALL

23   PEGASUS; ISN'T THAT RIGHT?

24   A.   THIS WAS IN THE MIDDLE OF STUDYING IT.

25   Q.   SO TOWARDS THE BEGINNING, BUT NOT THE VERY BEGINNING;

1    RIGHT?

2    A.    YEAH.

3    Q.    SO EARLIER THAN LATE 2017, EARLY 2018 WAS WHEN THE

4    RESEARCH GROUP STARTED INVESTIGATING WHATSAPP AS A POTENTIAL

5    TOOL TO INSTALL PEGASUS ON TARGET DEVICES; RIGHT?

6    A.    YES.

7    Q.    OKAY.  AND NOW, AFTER THE RESEARCH TEAM CONDUCTED ITS

8    INVESTIGATION, IT BUILT AN INTERNAL ENVIRONMENT IN WHICH TO

9    TEST THE INSTALLATION VECTOR; ISN'T THAT RIGHT?

10   A.    IT'S DEVELOPMENT TEST.

11   Q.    TO DEVELOP AND TEST; RIGHT?  FIRST YOU HAVE TO DEVELOP AND

12   THEN THE NEXT STEP IS TO TEST; RIGHT?

13   A.    YES.

14   Q.    SO THEY DEVELOP THIS INTERNAL ENVIRONMENT THROUGH WHICH

15   NSO CAN SEND WHATSAPP MESSAGES FROM ONE DEVICE TO ANOTHER;

16   CORRECT?

17   A.    YES.

18   Q.    AND YOU USED THAT INTERNAL ENVIRONMENT TO DEVELOP THE

19   INSTALLATION VECTOR; RIGHT?

20   A.    YES.

21   Q.    AND THAT PERIOD -- THAT WORK, THE DEVELOPMENT WORK WENT ON

22   FOR MONTHS; RIGHT?

23   A.    YES.

24   Q.    AND YOU HAD A TEAM OF AT LEAST FOUR ENGINEERS WORKING ON

25   THAT?

1    A.    YES.

2    Q.    OKAY.  FULL-TIME EMPLOYEES?

3    A.    YES.

4    Q.    WORKING ON STUDYING HOW TO USE WHATSAPP TO GET PEGASUS ON

5    TO TARGET DEVICES; CORRECT?

6    A.    YEAH.

7    Q.    AND THEN AFTER THAT DEVELOPMENT PHASE, THE R&D TURNED TO

8    TESTING THE INSTALLATION VECTOR, AGAIN, STILL IN THE INTERNAL

9    ENVIRONMENT; CORRECT?

10   A.    YES.

11   Q.    AND THAT TESTING IN THE INTERNAL ENVIRONMENT, THAT ALSO

12   WENT ON FOR A PERIOD OF MONTHS; CORRECT?

13   A.    YES.

14   Q.    AND THEN AFTER THE TESTING ON THE INTERNAL ENVIRONMENT,

15   THEN THE R&D GROUP TURNED TO TESTING THE INSTALLATION VECTORS

16   THROUGH WHATSAPP'S ACTUAL SERVERS; RIGHT?

17   A.    YES.

18   Q.    AND THAT -- THERE'S NO CUSTOMER INVOLVED AT THAT POINT;

19   RIGHT?  THAT'S NSO SENDING THE CODE THROUGH WHATSAPP SERVERS;

20   RIGHT?

21   A.    YES.

22   Q.    OKAY.  AND THAT PERIOD OF TESTING THROUGH WHATSAPP'S

23   ACTUAL SERVERS ALSO WENT ON FOR A PERIOD OF MONTHS; CORRECT?

24   A.    YES.

25   Q.    AND IT WASN'T UNTIL OCTOBER 2018, PER YOUR TESTIMONY, THAT

1    THE FIRST HUMMINGBIRD VECTOR, HEAVEN, WAS IN PRODUCTION,

2    MEANING DELIVERED TO CUSTOMERS FOR USE; RIGHT?

3    A.   YES.

4    Q.   SO THE ENTIRE PROCESS OF DEVELOPING THE FIRST OF THE

5    HUMMINGBIRD VECTORS, WE'RE TALKING ABOUT A YEAR, AT LEAST, OF

6    RESEARCH AND DEVELOPMENT TO DEVELOP THIS THING; IS THAT RIGHT?

7    A.   YES.

8    Q.   WITH FOUR ENGINEERS WORKING FULL TIME; CORRECT?

9    A.   YEAH.

10   Q.   NOW, THAT RESEARCH AND DEVELOPMENT WORK INCLUDED WORKING

11   TO UNDERSTAND THE, WHAT WE CALL THE CLIENT APPLICATION; RIGHT?

12   THE APP THAT'S ACTUALLY ON SOMEONE'S PHONE; CORRECT?

13   A.   YES.

14   Q.   AND IN ORDER TO UNDERSTAND THE CLIENT APPLICATION, YOU

15   DECOMPILE AND HAD REVERSE ENGINEERED THE CODE; CORRECT?

16   A.   WE DECOMPILED THE CODE, YEAH.

17   Q.   AND I THINK YOU TESTIFIED AT YOUR DEPOSITION THAT YOU

18   REVERSE ENGINEERED IT; RIGHT?

19   A.   I TESTIFIED THAT REVERSE ENGINEERING IS A LEGAL TERM, AND

20   WE SAID THAT WE WERE DECOMPILING THE CODE.

21   Q.   RIGHT.  AND I THINK YOU AGREED AT YOUR DEPOSITION THAT THE

22   WORK YOU WERE DOING FITS THE DEFINITION OF REVERSE ENGINEERING.

23   YOU'RE NOT CHANGING THAT TESTIMONY, ARE YOU?

24   A.   I'M NOT CHANGING ANYTHING.

25   Q.   I DIDN'T THINK SO.

1              MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

2              MR. PEREZ:  I'LL WITHDRAW THE COMMENT.  EXCUSE ME,

3      YOUR HONOR.

4              THE COURT:  THANK YOU.

5      BY MR. PEREZ:

6      Q.   WITH RESPECT TO THE SERVERS, YOU HAD TO USE A DIFFERENT

7      RESEARCH TECHNIQUE; RIGHT?

8      A.   YES.

9      Q.   RIGHT.  AND I THINK YOU JUST TESTIFIED TO THIS UNDER

10     EXAMINATION BY YOUR LAWYER.  YOU HAD TO USE BLACK BOX

11     INVESTIGATION TECHNIQUES; RIGHT?

12     A.   YES.

13     Q.   AND THAT IS EVEN MORE CHALLENGING, ISN'T IT?

14     A.   IT DOESN'T MATTER IF IT IS CHALLENGING OR NOT.  IT'S,

15     LIKE, THE FACT THAT WE DON'T HAVE AN ACCESS TO A CODE, THERE'S

16     NO OTHER WAY.

17     Q.   THERE'S NO OTHER WAY, BUT IT'S HARDER THAN JUST

18     DECOMPILING CODE THAT YOU HAVE ON YOUR DEVICE; RIGHT?

19     A.   I -- IT'S SUBJECTIVE.

20     Q.   YOU DON'T HAVE A VIEW ON THAT?

21     A.   EXCUSE ME?

22     Q.   YOU DON'T HAVE A VIEW ON THAT?

23     A.   SOMETIMES IT MAY BE HARDER, SOMETIMES IT MAY BE VERY EASY.

24     Q.   I'D LIKE TO TALK FOR A MOMENT ABOUT THE DISTINCTION

25     BETWEEN DEFENSIVE AND OFFENSIVE CYBERSECURITY OR CYBER OFFENSE.

1          YOU UNDERSTAND WHAT I'M TALKING ABOUT?

2     A.   YES.

3     Q.   YOU TALKED ABOUT THIS DISTINCTION IN YOUR DEPOSITION.  DO

4     YOU RECALL THAT?

5     A.   YEAH.

6     Q.   DEFENSIVE CYBERSECURITY WORK INVOLVES TAKING STEPS TO

7     PREVENT UNAUTHORIZED ACCESS TO COMPUTER SYSTEMS; ISN'T THAT

8     RIGHT?

9     A.   YES.

10    Q.   NOW, THAT IS NOT THE WORK THAT NSO WAS DOING WITH RESPECT

11    TO THE HUMMINGBIRD VECTORS; CORRECT?

12    A.   CORRECT.

13    Q.   RIGHT.  THE WORK THAT NSO WAS DOING WAS NOT DEFENSIVE,

14    DESIGNED TO PREVENT ACCESS.  IT WAS DESIGNED TO GAIN ACCESS;

15    ISN'T THAT CORRECT?

16    A.   IT WAS TO GAIN ACCESS TO INTELLIGENCE TARGET OWNED DEVICES

17    AND DATA.

18    Q.   IT WASN'T DEFENSIVE IN NATURE, IT WAS OFFENSIVE IN NATURE,

19    TO GAIN ACCESS, NOT TO PREVENT ACCESS; CORRECT?

20    A.   YES.

21    Q.   YOU WERE ASKED BY YOUR COUNSEL ABOUT THE TERMINOLOGY

22    HUMMINGBIRD VECTORS, AND I BELIEVE YOU TESTIFIED THAT THAT WAS

23    A MARKETING NAME, OR CUSTOMER FACING NAME; IS THAT CORRECT?

24    A.   YES.

25    Q.   SO YOU TALKED TO YOUR CUSTOMERS ABOUT THE HUMMINGBIRD

1    VECTORS?

2    A.   IT'S A PRODUCT OF THE COMPANY, YEAH.

3    Q.   RIGHT.  AND IT'S A PRODUCT THAT YOU ACTIVELY MARKETED TO

4    YOUR CUSTOMERS; RIGHT?

5    A.   YES.

6    Q.   IN ORDER TO TRY TO GET MORE CONTRACTS; RIGHT?

7    A.   THIS IS A PRODUCT THE COMPANY SELLS, YEAH.

8    Q.   THIS IS THE BUSINESS; RIGHT?

9    A.   YES.

10   Q.   SO YOU ARE ACTUALLY, DURING THIS RELEVANT TIME PERIOD, OUT

11   THERE IN FRONT OF CUSTOMERS -- YOU PERSONALLY; RIGHT?  YOU

12   TESTIFIED --

13   A.   NO, I DID NOT.  I TESTIFIED I WAS MEETING WITH CUSTOMERS

14   WHENEVER THE TECH, THE TECH QUESTIONS WERE RELEVANT.  I'M NOT A

15   SALES PERSON.  I'M NOT IN THE SALES DEPARTMENT.

16   Q.   BUT WE AGREE THAT YOU TESTIFIED THAT YOU PARTICIPATED IN

17   MEETINGS WITH CUSTOMERS WHERE YOU DISCUSSED INSTALLATION OF

18   TECHNOLOGIES; IS THAT RIGHT?

19   A.   SOME MEETINGS WITH SOME CUSTOMERS.

20   Q.   AND SO NSO, DURING THE RELEVANT TIME PERIOD, WAS IN FRONT

21   OF PROSPECTIVE CUSTOMERS TALKING ABOUT THE HUMMINGBIRD VECTORS;

22   RIGHT?

23   A.   TALKING ABOUT THE CAPABILITY AND NOT RELEVANT -- NOT

24   INTERNALS OF HOW IT'S DONE.

25   Q.   SO YOU WOULDN'T TELL THEM THAT IT WORKED THROUGH WHATSAPP,

1    BUT YOU WOULD TELL THEM THAT YOU HAD THE ABILITY TO ACHIEVE

2    ZERO-CLICK INSTALLATION ON ANDROID DEVICES; CORRECT?

3    A.   THIS IS THE PRODUCT.

4    Q.   THAT IS THE PRODUCT, THAT IS YOUR BUSINESS; RIGHT?

5    A.   YES.

6    Q.   AND THAT CAPABILITY WAS A DISTINGUISHING COMPETITIVE

7    ADVANTAGE FOR NSO, WASN'T IT?

8    A.   YES.

9    Q.   RIGHT.  YOU TESTIFIED AT YOUR DEPOSITION THAT YOU HEARD

10   FROM CUSTOMERS THAT OTHER PEOPLE IN THE INDUSTRY DIDN'T HAVE

11   THAT CAPABILITY; RIGHT?

12   A.   I TESTIFIED THAT SOME OF THE CUSTOMERS SAID THAT, YES.

13   Q.   RIGHT.  SOME CUSTOMERS TOLD YOU, WOW, WE HAVEN'T SEEN THIS

14   FROM OTHERS; RIGHT?

15   A.   YEAH.

16   Q.   AND THAT WAS A WAY -- THE REASON THAT NSO WAS TALKING

17   ABOUT THOSE VECTORS WAS IN ORDER TO GET MORE BUSINESS, MORE

18   REVENUE; ISN'T THAT RIGHT?

19   A.   NO.  IT'S TO INTRODUCE THE ABILITY TO THE CUSTOMERS.

20   Q.   RIGHT.  IN THE CONTEXT OF TRYING TO LAND ANOTHER CONTRACT;

21   RIGHT?

22   A.   AGAIN, I'M NOT A SALES PERSON.  I WAS BROUGHT IN ORDER TO

23   EXPLAIN THE TECH SIDE.  SO THIS WAS THE PURPOSE OF THE MEETINGS

24   WHERE I WAS.

25   Q.   WELL, YOU SURELY HAVE ENOUGH UNDERSTANDING TO KNOW THAT

1     WHEN NSO IS MEETING WITH A PROSPECTIVE CUSTOMER, THE PURPOSE IS

2     TO TRY TO MAKE THAT AN ACTUAL CUSTOMER, NOT JUST PROSPECTIVE;

3     RIGHT?

4     A.    YEAH.

5     Q.    RIGHT.  SO THE PURPOSE OF DESCRIBING TO THEM AND

6     INTRODUCING TO THEM THE CAPABILITIES IS TO BRING THEM IN AS A

7     CUSTOMER AND GENERATE REVENUE; ISN'T THAT RIGHT?

8     A.    THAT'S -- YEAH.

9     Q.    THAT'S THE BUSINESS; RIGHT?

10    A.    THAT'S THE FLOW OF ANY BUSINESS.

11    Q.    RIGHT.  WELL, ANY SPYWARE BUSINESS; RIGHT?

12    A.    NO.

13    Q.    OKAY.  WELL, WHAT YOU WERE SELLING WAS PEGASUS; RIGHT?

14    WHAT YOUR COMPANY WAS SELLING?

15    A.    WE ARE NOT SELLING SPYWARE.

16    Q.    YOU DON'T CONSIDER IT SPYWARE; IS THAT RIGHT?

17    A.    IT'S NOT SPYWARE.

18    Q.    IT'S SOFTWARE THAT'S DESIGNED TO GET INFORMATION OFF

19    PEOPLE'S MOBILE PHONES WITHOUT THEIR KNOWLEDGE; IS THAT

20    CORRECT?

21    A.    NO.

22    Q.    IT IS SOFTWARE DESIGNED TO GET PEOPLE'S INFORMATION OFF

23    THEIR PHONES?  THAT IS -- YOU DISAGREE WITH THAT STATEMENT?

24    A.    YES.

25    Q.    WE WENT THROUGH AT LENGTH IN YOUR DEPOSITION, MR. GAZNELI,

1     THE CAPABILITIES OF PEGASUS.  YOU'RE NOT CHANGING THAT

2     TESTIMONY, ARE YOU?

3     A.   I'M NOT CHANGING IT.

4     Q.   THE PURPOSE OF PEGASUS, AND THE CAPABILITIES OF PEGASUS,

5     INCLUDE GETTING INFORMATION OFF TARGET DEVICES; ISN'T THAT

6     CORRECT?

7     A.   THAT IS A SOFTWARE CAPABILITY THAT IS DESIGNED TO GAIN

8     ACCESS FOR INTELLIGENCE AGENCIES TO GET ACCESS AND DATA FROM --

9     INTELLIGENCE DATA -- FROM THEIR TARGETS.

10    Q.   RIGHT.  IT'S MEANT TO GET INFORMATION FROM THE PHONES?

11    YOU'RE NOT DISAGREEING WITH THAT, ARE YOU?

12    A.   YES, BUT NOT PEOPLE.  SPECIFIC PEOPLE.

13    Q.   YOU DON'T CONSIDER THE TARGETS PEOPLE, MR. GAZNELI?

14    A.   NO, THAT'S NOT WHAT I SAID.

15         WHAT I SAID IS THAT THE TARGETS ARE INTELLIGENCE TARGETS

16    OF INTELLIGENCE AGENCIES.

17    Q.   YOU DON'T KNOW ANYTHING ABOUT WHO THE INDIVIDUAL TARGETS

18    WHO HAD PEGASUS INVOLVED -- INSTALLED THROUGH WHATSAPP SERVERS

19    WERE, DO YOU?

20    A.   THE COMPANY ISN'T AWARE OF THE TARGETS.

21    Q.   SO YOU HAVE NO IDEA WHO THESE TARGETS WERE; RIGHT,

22    MR. GAZNELI?  YOU DON'T KNOW WHO THE INDIVIDUALS WERE?

23    A.   NO.

24    Q.   GOING BACK TO THE SPYWARE POINT, MR. GAZNELI, WE NOW AGREE

25    THAT THE PURPOSE OF PEGASUS IS TO GET INFORMATION FROM THE

1       PHONES.  WE CAN DISAGREE AS TO WHETHER THE OWNERS OF THOSE

2       PHONE ARE PEOPLE, BUT IT IS DESIGNED TO GET INFORMATION FROM

3       THEIR PHONES.

4            IT IS ALSO DESIGNED, MR. GAZNELI, TO DO SO WITHOUT THAT

5       PERSON'S KNOWLEDGE; ISN'T THAT RIGHT?

6       A.   THIS IS THE SOFTWARE DEFINITION, TO BE ABLE TO DO -- TO

7       GAIN ACCESS FOR THE INTELLIGENCE AGENCIES WITHOUT THE TARGETS

8       TO BE NOTICED ABOUT IT.

9       Q.   RIGHT.  BUT YOU DON'T CONSIDER SOFTWARE DESIGNED TO GET

10      INFORMATION FROM SOMEONE'S MOBILE DEVICE WITHOUT THEIR

11      KNOWLEDGE, THAT'S JUST NOT YOUR DEFINITION OF SPYWARE; IS THAT

12      RIGHT?

13      A.   I'M -- I'M NOT GOING TO GET INTO DEFINING IT.  THIS IS A

14      SOFTWARE TOOL THAT WE DEVELOPED FOR THESE PURPOSES AS I

15      EXPLAINED.

16      Q.   WELL, YOU JUST TESTIFIED YOU DON'T CONSIDER IT SPYWARE.

17      SO I'M ASKING YOU, YOU DON'T CONSIDER SOFTWARE THAT IS DESIGNED

18      TO GET INFORMATION FROM SOMEONE'S PHONE TO BE INSTALLED WITHOUT

19      THEIR KNOWLEDGE AND TO TAKE THEIR INFORMATION WITHOUT THEIR

20      KNOWLEDGE, YOU DON'T CONSIDER THAT SPYWARE?  IS THAT YOUR

21      TESTIMONY?

22      A.   YES.

23      Q.   OKAY.  I'D LIKE TO ASK YOU ABOUT THE ERISED VECTOR AS TO

24      WHICH YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL.

25           DO YOU RECALL THAT?

1     A.    YEAH.

2     Q.    YOU'RE FAMILIAR WITH THE ERISED VECTOR; RIGHT?

3     A.    YES.

4     Q.    IT WAS DEVELOPED DURING YOUR TIME IN THE R&D GROUP AT NSO?

5     A.    YES.

6     Q.    AND I BELIEVE YOU TESTIFIED THAT -- CAN YOU REMIND ME WHEN

7     YOU BECAME VICE PRESIDENT OF RESEARCH AND DEVELOPMENT?

8     A.    IT WAS BEGINNING OF 20 -- VICE PRESIDENT OF RESEARCH AND

9     DEVELOPMENT?

10    Q.    YES.

11    A.    END OF 2022.

12    Q.    END OF 2022.  SO AT THE BEGINNING OF 2020, YOU WERE

13    DIRECTOR OF R&D?

14    A.    NOT THE BEGINNING.  THE MIDDLE.

15    Q.    NOW, ERISED -- AND YOU TESTIFIED ABOUT THIS AT YOUR

16    DEPOSITION -- WAS DEVELOPED AFTER WHATSAPP REMEDIATED THE 2019

17    ATTACKS; IS THAT RIGHT?

18    A.    YEAH.

19    Q.    RIGHT.  SO IN MAY 2019, THIS JURY HAS HEARD A LOT ABOUT

20    THIS, WHATSAPP FIXED THE MECHANISM BY WHICH EDEN, THE SECOND OF

21    THE THREE INSTALLATION, HUMMINGBIRD VECTORS, WAS INSTALLING

22    PEGASUS ON USER'S PHONES; CORRECT?

23    A.    YES.

24    Q.    AND AFTER WHATSAPP PREVENTED EDEN FROM WORKING, NSO'S R&D

25    GROUP DEVELOPED ANOTHER VECTOR TO CONTINUE USING WHATSAPP TO

1    INSTALL PEGASUS ON USERS' DEVICES; ISN'T THAT RIGHT?

2    A.   THIS WAS A DIFFERENT VECTOR, IT USED DIFFERENT SERVERS AND

3    TYPE OF SERVERS.

4    Q.   CAN WE AGREE THAT IT TRIGGERED THE INSTALLATION OF

5    WHATSAPP -- OF PEGASUS, AT LEAST IN PART, THROUGH THE SENDING

6    OF WHATSAPP MESSAGES?

7    A.   YES.

8    Q.   YES.  AND THAT WAS AFTER WHATSAPP HAD CLOSED THE

9    VULNERABILITIES, IF THAT'S THE WORD YOU'D LIKE TO USE, THAT

10   ALLOWED THE EDEN VECTOR ALSO TO USE WHATSAPP MESSAGES TO

11   INSTALL PEGASUS; IS THAT WHAT YOU SAID?

12   A.   YES.

13   Q.   AND ERISED WAS IN USE IN 2020; ISN'T THAT CORRECT?

14   A.   YES.

15   Q.   ALL THE WAY UP THROUGH AT LEAST MAY OF 2020; ISN'T THAT

16   CORRECT?

17   A.   YES.

18   Q.   AND THE PURPOSE OF ERISED SENDING MESSAGES THROUGH

19   WHATSAPP SERVERS WAS TO TRIGGER INSTALLATION OF PEGASUS ON

20   TARGET DEVICES; RIGHT?

21   A.   YES.

22   Q.   IN ORDER TO OBTAIN ACCESS TO THOSE USERS AS INFORMATION;

23   RIGHT?

24   A.   YES.

25   Q.   NOW, YOU TESTIFIED UNDER EXAMINATION BY YOUR LAWYERS ABOUT

1   SOME OF THE INFRASTRUCTURE THAT THE CUSTOMERS HAVE.

2       DO YOU RECALL THOSE QUESTIONS?

3   A.   YES.

4   Q.   AND THAT INCLUDES COMPUTERS, SERVERS?  IS THAT GENERALLY

5   WHAT IT INCLUDES, THE INFRASTRUCTURE?

6   A.   YES.

7   Q.   AND THAT INFRASTRUCTURE WOULD BE PURCHASED BY, OR LEASED,

8   BY NSO; ISN'T THAT RIGHT?

9   A.   NOT ALL OF IT.

10  Q.   SOME OF THEM AT LEAST; RIGHT?

11  A.   YEAH.

12  Q.   AND THE GROUP AT NSO THAT WAS RESPONSIBLE FOR THE

13  ACQUIRING OF THIS INFRASTRUCTURE WAS CALLED THE WHITE SERVICES

14  GROUP; ISN'T THAT RIGHT?

15  A.   YES.

16  Q.   AND THE PURPOSE OF THE WHITE SERVICES GROUP WAS NOT JUST

17  TO ACQUIRE THIS INFRASTRUCTURE, BUT TO DO IT IN A WAY THAT WAS

18  ANONYMIZED; ISN'T THAT CORRECT?

19  A.   THIS IS REQUIREMENT OF THE CUSTOMERS, YES.

20  Q.   I THINK YOU USED THOSE EXACT WORDS IN YOUR DEPOSITION.

21  IT'S A REQUIREMENT THAT THE ACQUISITION OF THE INFRASTRUCTURE

22  BE ANONYMIZED; RIGHT?

23  A.   YES.

24  Q.   SO THAT IT COULDN'T BE TRACED BACK TO THE CUSTOMER;

25  CORRECT?

1    A.    YES.

2    Q.    AND COULDN'T BE TRACED BACK TO NSO; RIGHT?

3    A.    YES.

4    Q.    THAT WAS ONE OF THE WAYS, NOT THE ONLY WAY, BUT ONE OF THE

5    WAYS THAT NSO COVERED ITS TRACKS HERE; ISN'T THAT RIGHT?

6    A.    I'M NOT -- I WON'T COVER TRACKS.  IT'S CUSTOMER'S

7    REQUIREMENT.  THIS IS TO BE, AS I SAID, TO BE UNDETECTABLE IN

8    TERMS OF TARGET, TARGET DEVICES.

9    Q.    RIGHT, IT WAS UNDETECTABLE BY DESIGN; RIGHT?

10   A.    YES.

11   Q.    AND NSO, THROUGH ITS WHITE SERVICES GROUP, WAS THE ONE WHO

12   TOOK RESPONSIBILITY FOR ACHIEVING THAT RESULT OF MAKING IT

13   UNTRACEABLE AND UNDETECTABLE; ISN'T THAT RIGHT?

14   A.    NSO, AS I SAID, THE SERVERS AND THE ECOSYSTEM OF THE

15   INFRASTRUCTURE SITS ON CUSTOMER'S PREMISES.  IT'S OWNED BY

16   THEM.

17   Q.    IT'S ACQUIRED BY NSO ANONYMOUSLY; RIGHT?

18   A.    SOME OF THEM.

19   Q.    YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL ABOUT THE

20   HANDSHAKE PROCESS.

21         DO YOU RECALL THAT?

22   A.    YES.

23   Q.    AND THAT REFERS TO THE INFORMATION THAT GETS EXCHANGED

24   BETWEEN TWO DEVICES TO ESTABLISH A CONNECTION BETWEEN THEM; IS

25   THAT GENERALLY CORRECT?

1    A.   YES.

2    Q.   AND YOU ALSO TESTIFIED ABOUT THE FINGERPRINTING STAGE;

3    RIGHT?

4    A.   YES.

5    Q.   AND THE FINGERPRINTING STAGE OCCURS AS -- DURING THE

6    HANDSHAKE; IS THAT CORRECT?

7    A.   NO -- NOT DURING THE HANDSHAKE, BUT THE HANDSHAKE IS A

8    SUBPROCEDURE OF THE FINGERPRINT.

9    Q.   RIGHT.  AND THE REASON IT'S CALLED FINGERPRINTING IS

10   BECAUSE YOU'RE ACQUIRING INFORMATION ABOUT THE TARGET DEVICE;

11   ISN'T THAT RIGHT?

12   A.   YES, IN ORDER TO DEFINE -- TO DESIGN THE SPECIFIC MESSAGES

13   TO BE SENT TO THAT SPECIFIC TARGET.

14   Q.   EXACTLY.  BECAUSE WITHOUT THAT INFORMATION, YOU CAN'T

15   CRAFT THE MESSAGES THAT WOULD TRIGGER INSTALLATION OF PEGASUS;

16   ISN'T THAT RIGHT?

17   A.   ON THE TARGET'S DEVICES, YES.

18   Q.   RIGHT.  SO THE FINGERPRINTING, THROUGH FINGERPRINTING, YOU

19   ARE OBTAINING INFORMATION FROM -- ABOUT THE TARGET DEVICE FOR

20   PURPOSES OF CRAFTING THE MESSAGE THAT'S GOING TO TRIGGER

21   INSTALLATION OF PEGASUS; ISN'T THAT RIGHT?

22   A.   CRAFTING FOR THE PURPOSE OF DEFINING -- DESIGNING TO THE

23   SPECIFIC TARGET THAT IS BEING INSTALLED.

24   Q.   YOU NEED THAT INFORMATION IN ORDER TO COMPLETE THE

25   INSTALLATION; ISN'T THAT RIGHT?

```
 1      A.   YES.

 2      Q.   WITHOUT THE FINGERPRINTING, THERE IS NO INSTALLATION OF

 3      PEGASUS; RIGHT?

 4      A.   THERE -- WITHOUT THE FINGERPRINTING, THE INFORMATION WOULD

 5      NOT BE SUFFICIENT AND THEN THE, THE SUCCESS RATE WILL NOT BE

 6      GOOD.

 7      Q.   RIGHT.  IT WOULDN'T WORK WITHOUT THE FINGERPRINTING;

 8      RIGHT?

 9      A.   YEAH.

10      Q.   AND THEN YOU WOULDN'T BE ABLE TO GET THE PEGASUS ON THE

11      PHONE AND THE CUSTOMER COULDN'T GET THE INFORMATION OFF THE

12      PHONE, ISN'T THAT RIGHT, WITHOUT THE FINGERPRINTING?

13      A.   YES.

14      Q.   AND YOU TESTIFIED AT YOUR DEPOSITION ABOUT MULTIPLE TYPES

15      OF INFORMATION THAT ARE OBTAINED AS PART OF THAT FINGERPRINTING

16      STAGE.

17           DO YOU REMEMBER THAT GENERALLY?

18      A.   YES.

19      Q.   YOU SAID YOU OBTAIN THE OPERATING SYSTEM OF THE TARGET

20      DEVICE; ISN'T THAT RIGHT?

21      A.   YES.

22      Q.   AND THE TYPE OF DEVICE?  YES?

23      A.   YES.

24      Q.   AND THE -- WHICH VERSION OF WHATSAPP IT'S RUNNING;

25      CORRECT?
```

1    A.   YES.

2    Q.   AND THAT'S TRUE OF THE HUMMINGBIRD VECTORS?  THEY WOULD

3    OBTAIN INFORMATION ABOUT WHAT VERSION OF WHATSAPP THE TARGET

4    DEVICE WAS RUNNING?

5    A.   YES.  SOME OF THE VECTORS REQUIRED DIFFERENT TYPES OF

6    INFORMATION.  BUT GENERALLY, YES.

7    Q.   OKAY.  YOU WOULD ALSO OBTAIN INFORMATION ABOUT WHETHER THE

8    TARGET DEVICE WAS ONLINE; RIGHT?

9    A.   YES.

10   Q.   AND WHETHER IT HAD A WHATSAPP ACCOUNT; CORRECT?

11   A.   YES.

12   Q.   AND YOU WOULD ALSO GET, AT LEAST IN THE CASE OF ERISED,

13   INFORMATION ABOUT THE VENDOR THAT THE TARGET DEVICE USED;

14   RIGHT?

15   A.   YES.

16   Q.   AND ALL THAT INFORMATION THAT WE JUST RECITED CAME THROUGH

17   WHATSAPP SERVERS FROM THE TARGET DEVICE; RIGHT?

18   A.   THIS IS THE -- THIS IS THE WAY THE MESSAGES ARE

19   TRANSMITTED, ONLY THROUGH WHATSAPP SERVERS.

20   Q.   ONLY THROUGH WHATSAPP SERVERS?  NO WAY TO GET THIS

21   NECESSARY INFORMATION, THERE WAS NO WAY TO GET IT OTHER THAN

22   THROUGH WHATSAPP SERVERS; RIGHT?

23   A.   YES.

24   Q.   AND NOW SOME OF THE INFORMATION COMES FROM THE TARGET

25   DEVICE THROUGH THE SERVERS, BUT SOME OF THE INFORMATION COMES

1    FROM THE SERVERS THEMSELVES; ISN'T THAT CORRECT?

2    A.   ONLY ONE.

3    Q.   OKAY.  AND THE PIECE OF INFORMATION THAT COMES FROM THE

4    WHATSAPP SERVER THAT PEGASUS IS OBTAINING FROM THE SERVER IS

5    THE -- WHETHER THE TARGET HAS A WHATSAPP ACCOUNT; RIGHT?

6    A.   YES.

7    Q.   AND THAT ALSO IS INFORMATION WITHOUT WHICH THE

8    INSTALLATION COULD NOT BE SUCCESSFUL; RIGHT?

9    A.   IF THE TARGET HAS NO WHATSAPP SERVER AND THE INSTALLATION

10   VECTOR RELIES ON WHATSAPP SERVER.

11   Q.   YEAH.  WITHOUT KNOWING -- WITHOUT THAT PIECE OF

12   INFORMATION FROM THE WHATSAPP SERVER, THE INSTALLATION DOESN'T

13   WORK; ISN'T THAT CORRECT?

14   A.   NO.  YOU CAN SEND THE INSTALLATION VECTOR WITHOUT KNOWING

15   IT AND HOPE IT WILL WORK.  BUT IT DOESN'T -- IT'S NOT A --

16   Q.   IT WOULD JUST BOUNCE BACK; RIGHT?

17   A.   YEAH.

18   Q.   SO WHEN MR. SHOHAT TOOK THE STAND YESTERDAY AND WAS ASKED,

19   WAS PEGASUS INTENDED TO TAKE ANY DATA FROM WHATSAPP, AND HE

20   ANSWERED, ABSOLUTELY NOT, THAT'S INCORRECT; RIGHT?

21   A.   NO.

22   Q.   IT WAS DESIGNED TO OBTAIN, FROM THE SERVER, AT A MINIMUM,

23   WHETHER THE TARGET HAD A WHATSAPP ACCOUNT?

24   A.   WHATEVER END USER INSERTS A NEW -- CREATES A NEW CONTACT

25   IN THE DEVICE, THEN THIS CONTACT, THE SERVICE ACCESSES THE SAME

1    INFORMATION TO GET THE SAME INFORMATION FROM THE WHATSAPP

2    SERVERS.  SO THIS IS STANDARD PROCEDURE IN ADDING ANY CONTACT

3    TO ANY DEVICE.

4    Q.   ANY -- FOR NSO?

5    A.   NO.  NOR EVERYBODY.  THIS IS -- YEAH, THIS IS THE

6    PROCEDURE.

7    Q.   THE SOFTWARE WAS DESIGNED TO OBTAIN FROM THE WHATSAPP

8    SERVER THE INFORMATION OF WHETHER THE TARGET HAD A WHATSAPP

9    ACCOUNT; ISN'T THAT CORRECT?

10   A.   YES.

11   Q.   SO IT'S NOT CORRECT THAT IT WASN'T DESIGNED TO OBTAIN

12   INFORMATION FROM THE SERVER; RIGHT?

13   A.   IT WAS -- IT WAS QUERIED -- THE SYSTEM WAS QUERYING THE

14   SYSTEM OF THE SPECIFIC PHONE NUMBER IF IT HAS AN ACTIVE

15   WHATSAPP ACCOUNT.

16   Q.   AND THAT WAS BY DESIGN, MR. GAZNELI, WASN'T IT?

17   A.   NO.

18   Q.   THAT WAS PART OF THE WAY YOUR TEAM DESIGNED THE SOFTWARE?

19   A.   YES.

20   Q.   NOW, WHAT WE JUST DESCRIBED ABOUT THE OPERATING SYSTEM AND

21   WHETHER THERE'S A WHATSAPP ACCOUNT, THAT'S WHAT YOU REFER TO AS

22   THE INITIAL FINGERPRINT STAGE; ISN'T THAT RIGHT?

23   A.   YES.

24   Q.   THERE'S ANOTHER FINGERPRINT STAGE AS WELL; RIGHT?

25   A.   ONLY FOR ERISED.

1    Q.   OKAY.  AND SO AS PART OF THAT SECOND STAGE -- WELL, LET ME

2    READ YOUR TESTIMONY.  I'M READING FROM PAGE 300 AT LINE 24.

3         "THE NEXT STEP WAS INDUCING THE VICTIM'S WHATSAPP CLIENT

4    TO DISCLOSE WHETHER IT WAS 32 BIT OR 64 BIT; IS THAT RIGHT?"

5              THE WITNESS:  YES.

6    BY MR. PEREZ:

7    Q.   "ANSWER:  YES."

8         IS THAT TRUE ONLY AS TO ERISED?

9    A.   THAT SPECIFIC PART FOR ERISED IS THE MODEL OF THE DEVICE.

10   Q.   THE MODEL OF THE DEVICE; RIGHT?  BECAUSE ERISED ONLY

11   WORKED ON SAMSUNG DEVICES?

12   A.   YES.

13   Q.   RIGHT.  BUT HEAVEN AND EDEN WOULD WORK ON ANY ANDROID

14   DEVICE; RIGHT?

15   A.   FOR THIS DEVICE.  NOT ANY DEVICE.

16   Q.   A BROAD RANGE OF ANDROID DEVICES; CORRECT?

17   A.   (NODS HEAD UP AND DOWN.)

18   Q.   SO THIS POINT THAT THE NEXT STEP WAS INDUCING THE VICTIM'S

19   WHATSAPP CLIENT TO DISCLOSE WHETHER IT WAS 32 BIT OR 64 BIT,

20   THAT REFERRED -- THAT ALSO APPLIES TO HEAVEN AND EDEN?

21   A.   SOME PART OF IT, YEAH.  WHEN WE ADDED THE SUPPORTING

22   64 BITS, YES.

23   Q.   AND I ASKED YOU -- THIS IS LINE 8 ON PAGE 301, AND

24   DEFENDANTS NEEDED THAT INFORMATION TO DETERMINE NEXT STEPS IN

25   THE ATTACK; IS THAT RIGHT?

1        YOU ANSWERED, TO DETERMINE WHICH PAYLOAD TO CONTINUE WITH

2   AND WHICH MESSAGES SEQUENCE TO USE.

3        AND I ASKED YOU.

4        "QUESTION:  AND DEFENDANTS OBTAINED THAT INFORMATION,

5   32 BIT VERSUS 64 BIT, THROUGH RELAY NEGOTIATION AND BANDWIDTH

6   ESTIMATION; IS THAT RIGHT?"

7        YOU ANSWERED, "YES."

8        AND WE WENT ON ABOUT THIS.

9        NOW, ALL THAT STAGE -- YOU REFER TO THIS AS THE SECOND

10  STAGE OF THE FINGERPRINT?

11  A.   YES.

12  Q.   THAT INFORMATION WAS GOING THROUGH WHATSAPP SERVERS; ISN'T

13  THAT CORRECT?

14  A.   YES.

15  Q.   SO WHEN YOUR COUNSEL ASKED YOU WHETHER THE FINGERPRINTING

16  STAGE INVOLVED WHATSAPP RELAY SERVERS, IT DOES INVOLVE WHATSAPP

17  RELAY SERVERS?

18  A.   IT'S NOT THE FINGERPRINT.  AS I EXPLAINED, THE

19  FINGERPRINTING, AS YOU REFERRED AND COUNSEL REFERRED TO BEFORE,

20  WAS THE INITIAL STATE WHICH WAS DONE, PARTICULARLY IT WAS DONE

21  BEFORE THE INSTALLATION WAS EXECUTED.

22       WHEN THIS SPECIFIC PART WAS DONE AFTER THE INSTALLATION,

23  AFTER THE EXECUTION IS DONE AS PART OF THE INSTALLATION VECTOR

24  ITSELF.

25  Q.   OKAY.  SO AS PART OF THE INSTALLATION VECTOR ITSELF,

1    PEGASUS WAS OBTAINING INFORMATION FROM THE TARGET DEVICES

2    THROUGH WHATSAPP SERVERS; CORRECT?

3    A.   YES.

4    Q.   YES?

5    A.   YES.

6    Q.   AND IT WAS DESIGNED TO GET THAT INFORMATION THROUGH

7    WHATSAPP SERVERS; RIGHT?

8    A.   THIS INFORMATION WAS NOT FROM THE WHATSAPP SERVERS.  IN

9    FACT, IT WAS -- IT WAS DEFINED ACCORDING TO THE RESPONSE FROM

10   THE TARGET DEVICE.

11   Q.   IT CAME THROUGH WHATSAPP SERVERS; CORRECT?

12   A.   YES.

13   Q.   AND IT WAS DESIGNED TO DO SO; CORRECT?

14   A.   YES.

15   Q.   I'D LIKE TO ASK YOU SOME QUESTIONS -- YOU WERE ASKED A

16   NUMBER OF QUESTIONS ABOUT WHETHER YOU INTENDED TO HARM

17   WHATSAPP.

18        DO YOU RECALL THAT?  IT WENT ON FOR SOME TIME.  DO YOU

19   REMEMBER THAT QUESTIONING?

20   A.   YES.

21   Q.   NOW, I WANT TO ASK YOU A LITTLE DIFFERENT PERSPECTIVE ON

22   THAT QUESTION, MR. GAZNELI.

23        ISN'T IT CORRECT THAT WHEN YOUR R&D GROUP DESIGNS A

24   STRATEGY TO INSTALL PEGASUS, YOUR GROUP WANTS TO KEEP IT UP AND

25   RUNNING FOR AS LONG AS POSSIBLE?

1    A.   YES.

2    Q.   ALL RIGHT.  AND THAT REQUIRES MINIMIZING THE RISK OF

3    DETECTION; ISN'T THAT CORRECT?

4    A.   THIS IS ONLY ONE PART OF IT.  I EXPLAINED THE OTHER PART

5    RELATES ALSO FOR THE DISCOVERY TOWARDS THE TARGETS THEMSELVES.

6    Q.   LET'S JUST MAKE SURE WE'RE CLEAR ON THIS, MR. GAZNELI.

7         WE AGREE THAT R&D HAS THE GOAL OF KEEPING ITS INSTALLATION

8    VECTORS UP AND RUNNING FOR AS LONG AS POSSIBLE; RIGHT?

9    A.   YES.

10   Q.   AND PART OF KEEPING THEM UP AND RUNNING AS LONG AS

11   POSSIBLE IS MINIMIZING THE RISK OF THEIR DETECTION; ISN'T THAT

12   CORRECT?

13   A.   AS I SAID, THIS IS ONE PART OF IT.

14        IN ADDITION, IT WAS -- THE GOAL IS TO MINIMIZE THE

15   FOOTPRINT ON THE ECOSYSTEM.

16   Q.   RIGHT.  RIGHT.  I WANT TO STEP LIGHTLY, NOT LEAVE

17   FOOTPRINTS.  THAT'S WHAT YOU'RE SAYING?

18   A.   YES.

19   Q.   OKAY.  BECAUSE IN ORDER TO KEEP THE VECTORS UP AND RUNNING

20   AS LONG AS POSSIBLE, YOU DON'T WANT PEOPLE TO TELL YOU'VE BEEN

21   THERE; CORRECT?

22   A.   I CANNOT TELL WHETHER OR NOT I'VE BEEN THERE.  BUT IN

23   TERMS OF I USE THE SYSTEM ACCORDING TO THE RULES THAT'S SET,

24   AND TO LOOK AS NORMAL AS POSSIBLE.

25   Q.   RIGHT.  IN ORDER TO MINIMIZE THE RISK OF DETECTION; ISN'T

1     THAT CORRECT?

2     A.   YES.

3     Q.   BECAUSE -- AND, INDEED, THAT'S THE ROLE OF THE OPSEC

4     GROUP, OR AT LEAST PART OF THE ROLE OF THE OPSEC GROUP;

5     CORRECT?

6     A.   PART OF THE ROLE, YES.

7     Q.   RIGHT, TO MINIMIZE THE RISK OF DETECTION SO THAT THE

8     INSTALLATION VECTORS CAN BE KEPT GOING AS LONG AS POSSIBLE;

9     CORRECT?

10    A.   YES.

11    Q.   SO THAT THEY CAN BE USED AS MANY TIMES AS POSSIBLE; ISN'T

12    THAT RIGHT?

13    A.   AS FAR AS THE CUSTOMERS WOULD LIKE AND HAVE THE RIGHT TO

14    DO IT, YEAH.

15    Q.   OKAY.  AND THAT'S -- THE REASON YOU'RE MINIMIZING THE RISK

16    OF DETECTION DELIBERATELY IS THAT NSO UNDERSTANDS THAT THERE

17    ARE ACTORS OUT THERE, SUCH AS WHATSAPP, THAT WOULD TAKE STEPS

18    TO BLOCK THE INSTALLATION IF THEY DETECTED IT; ISN'T THAT

19    RIGHT?

20    A.   YES.

21    Q.   AND THAT'S WHY -- YOU RECALL THE HEAVEN OPSEC DOCUMENT

22    THAT I SHOWED YOU AT YOUR DEPOSITION?

23    A.   YES.

24    Q.   WHY DON'T WE PUT IT UP ON THE SCREEN.  IT'S PTX-60.

25         AND MR. EVANS, IF WE CAN GO TO PAGE 2.

1          YOU WERE ASKED ALL THESE QUESTIONS BY YOUR COUNSEL ABOUT

2    WHETHER YOU INTENDED TO HARM WHATSAPP.

3          NOW, THE WAY YOU REFERRED TO WHATSAPP IN THE CONTEXT OF

4    OPSEC, IN THE CONTEXT OF DELIBERATELY HIDING WHAT YOU WERE

5    DOING FROM WHATSAPP, WAS YOU CALLED THEM A THREAT ACTOR; ISN'T

6    THAT RIGHT?

7    A.   YEAH, IT'S NOT A DOCUMENT I WROTE.  WE TALKED ABOUT THAT

8    AT THE DEPOSITION.

9    Q.   RIGHT.  THIS IS A DOCUMENT FROM THE OPSEC TEAM?

10   A.   YES.

11   Q.   AND WHATSAPP WAS VIEWED NOT A FRIEND, NOT A COLLEAGUE,

12   CHARACTERIZED AS A THREAT ACTOR; RIGHT?

13   A.   THIS IS A TERM USED BY OPSEC TOWARDS ANY SERVICE THAT

14   WOULD DISTURB THIS.

15   Q.   RIGHT.  AND NSO VIEWED WHATSAPP AS A THREAT BECAUSE THEY

16   WERE A THREAT TO NSO'S CONTINUED -- ABILITY TO CONTINUE

17   PROVIDING THE ABILITY TO INFECT ADDITIONAL DEVICES; ISN'T THAT

18   RIGHT?

19   A.   OKAY.

20   Q.   I'M SORRY?

21   A.   YEAH.

22   Q.   BECAUSE YOU UNDERSTOOD THAT WHATSAPP WOULD BLOCK THE

23   EXPLOIT IF THEY DETECTED IT; RIGHT?

24   A.   IF YOU DAMAGE THE SERVICE AND THE SERVERS, WHICH WE DIDN'T

25   DO PURPOSEFULLY IN ORDER TO ACT AS NORMAL AS POSSIBLE, THEN, OF

1    COURSE, THE PROVIDER WOULD BLOCK THE MESSAGES, YES.

2    Q.   ACT AS NORMAL AS POSSIBLE SO NO ONE WOULD KNOW WHAT YOU

3    WERE DOING; RIGHT?

4    A.   AS WE SAW BEFORE, THE CODE WAS SENT PLAIN CORRECT TEXT.

5    SO IF SOMEONE WOULD LIKE TO VIEW THAT CODE, THEY HAVE THE

6    ABILITY.

7    Q.   YOU'RE NOT CHANGING YOUR TESTIMONY, MR. GAZNELI, THAT NSO

8    DELIBERATELY MINIMIZED THE RISK OF DETECTION; CORRECT?

9    A.   NO, I'M NOT CHANGING ANYTHING.

10   Q.   RIGHT.  YOU HAD A TEAM OF PEOPLE WHO WAS DEVOTED TO

11   PREVENTING DETECTION OF THIS; CORRECT?

12   A.   YES.

13   Q.   OKAY.  AND THE REASON -- YOU UNDERSTOOD THAT THE REASON

14   THAT WHATSAPP WOULD BLOCK THIS ACTIVITY IF THEY DETECTED IT WAS

15   THAT NSO KNEW THAT WHATSAPP DID NOT WANT THIS ACTIVITY ON THEIR

16   SERVERS; RIGHT?

17   A.   I DON'T KNOW WHETHER WHATSAPP KNEW IT OR NOT.

18   Q.   WELL, YOU CERTAINLY UNDERSTOOD IF THEY DETECTED IT, THEY

19   WOULD BLOCK IT; RIGHT?

20   A.   THIS IS A STANDARD PROCEDURE IN ANY VECTOR, TO MINIMIZE

21   THE FOOTPRINT AS I SAID BEFORE, YEAH.

22   Q.   AND DESPITE KNOWING THAT WHATSAPP WOULD STOP THIS ACTIVITY

23   IF THEY DETECTED IT, DESPITE KNOWING THAT WHATSAPP DIDN'T WANT

24   THIS ON THEIR SERVERS, NSO DID IT ANYWAY; ISN'T THAT RIGHT?

25   A.   AS I SAID, I DON'T KNOW WHAT WHATSAPP WANTED OR NOT.  HOW

1       WOULD I KNOW?

2       Q.   AND NSO DID THAT REPEATEDLY; ISN'T THAT CORRECT?

3       A.   AS I SAID BEFORE, WHEN THE RULES CHANGED, THE PRODUCT WAS

4       ADJUSTED AND ACT ACCORDING TO THE NEW RULES.

5       Q.   WELL, IT WAS REPEATED IN A COUPLE DIFFERENT SENSES; RIGHT?

6            LET ME BREAK IT DOWN FOR YOU.

7            THE HEAVEN INSTALLATION VECTOR, WHICH USED WHATSAPP TO

8       TRIGGER THE INSTALLATION OF PEGASUS ON USERS' DEVICES, THAT

9       WASN'T USED JUST ONCE, WAS IT?

10      A.   HEAVEN.

11      Q.   THE HEAVEN INSTALLATION VECTOR WAS NOT USED ONLY ONE TIME,

12      WAS IT, MR. GAZNELI?

13      A.   BY THE CUSTOMERS?

14      Q.   BY WHOEVER WAS USING IT?

15      A.   BY CUSTOMERS, AS I SAID, AS LONG AS IT WAS ACTIVE, IT WAS

16      USED.

17      Q.   IT WAS USED MANY TIMES; ISN'T THAT RIGHT?

18      A.   AS FAR AS THEY HAD THE RIGHT TO USE IT, YEAH.

19      Q.   I'M SORRY?

20      A.   AS FAR AS THE FOUND RIGHT, THEY NEEDED TO BE USED.

21      Q.   SO IT WAS USED AS MANY TIMES AS THE CUSTOMERS WANTED;

22      RIGHT?

23      A.   NO.  THE CUSTOMERS HAD THE LIMITED ABILITY -- THE LIMITED

24      AMOUNT OF USE TO THEM TO DO.

25      Q.   RIGHT.  AND IF THEY WANT MORE USES, NSO CHARGES THEM MORE;

1     ISN'T THAT CORRECT?

2     A.   AGAIN, THIS IS NOT MY --

3     Q.   NOT YOUR AREA?

4     A.   YEAH.

5     Q.   OKAY.  BUT WE AGREE, MR. GAZNELI, THAT HEAVEN WAS USED

6     REPEATEDLY OVER THE COURSE OF MONTHS, AT LEAST, TO TRIGGER THE

7     INSTALLATION OF PEGASUS ON USERS' DEVICES; WASN'T IT?

8     A.   IT WAS USED FROM OCTOBER 2018 TO DECEMBER 2018.

9     Q.   OKAY.  AND AFTER HEAVEN NO LONGER WORKED BECAUSE OF

10    CHANGES THAT WHATSAPP HAD MADE, NSO DEVELOPED A NEW VECTOR THAT

11    ALSO TRIGGERED THE INSTALLATION OF PEGASUS BY TRANSMITTING

12    MESSAGES THROUGH WHATSAPP SERVERS; ISN'T THAT RIGHT?

13    A.   YES.

14    Q.   AND THAT VECTOR WAS EDEN; ISN'T THAT RIGHT?

15    A.   YES.

16    Q.   AND THEN EDEN WAS ALSO USED REPEATEDLY FOR A PERIOD OF

17    MONTHS TO INSTALL PEGASUS ON USERS' PHONES; ISN'T THAT RIGHT?

18    A.   YES.

19    Q.   ALL RIGHT.  AND THEN IN MAY 2019, WHATSAPP BLOCKED, MADE

20    CHANGES THAT BLOCKED EDEN FROM WORKING; ISN'T THAT CORRECT?

21    A.   YES.

22    Q.   AND, AGAIN, NSO DEVELOPED YET ANOTHER VECTOR, ERISED, THAT

23    WOULD TRIGGER INSTALLATION OF PEGASUS BY TRANSMITTING WHATSAPP

24    MESSAGES?

25    A.   THEY'RE NOT SAYING VECTORS.  THAT'S VERY DIFFERENT IN

1    ESSENCE.

2    Q.   DIFFERENT VECTORS, MR. GAZNELI, BUT ALSO ACTIVATED THROUGH

3    THE TRANSMISSION OF WHATSAPP MESSAGES, AT LEAST IN SOME

4    INSTANCES; ISN'T THAT RIGHT?

5    A.   SOME OF THEM.  SOME OF THE WHATSAPP SERVERS.  DIFFERENT

6    VECTORS UNITED DIFFERENT WHATSAPP SERVERS.

7    Q.   NOW, YOU WERE ASKED -- WELL, SO YOU WOULD AGREE THAT THIS

8    WASN'T -- THAT THIS WAS A PATTERN OF BEHAVIOR BY NSO; CORRECT?

9    A.   AS I SAID, THE -- THE DIFFERENT -- THE VECTORS WERE

10   DIFFERENT IN ESSENCE OF USING DIFFERENT WHATSAPP SERVERS, AND

11   SOME OF THEM WERE NO SERVERS USED, AT LEAST FOR THE -- EXCEPT

12   FOR THE WHAT'S SIGNALLING SERVER.

13        SO IF YOU WANT TO TALK ABOUT THE DIFFERENCE, THE

14   DIFFERENCES BETWEEN THEM, WE CAN TALK ABOUT IT.

15   Q.   WELL, WHY DON'T WE TALK ABOUT WHAT'S THE SAME BETWEEN

16   THEM, BECAUSE FOR PURPOSES OF THIS CASE, THEY HAVE ONE VERY

17   IMPORTANT THING IN COMMON, WHICH IS THAT THEY ALL TRIGGERED THE

18   INSTALLATION OF PEGASUS BY TRANSMITTING MESSAGES THROUGH

19   WHATSAPP SERVERS; ISN'T THAT CORRECT?

20   A.   THEY ALL USED WHATSAPP SIGNALLING SERVER IN ORDER TO

21   TRANSMIT.

22   Q.   RIGHT, IN ORDER TO TRIGGER INSTALLATION OF PEGASUS;

23   CORRECT?

24   A.   IT COULDN'T BE DONE ONLY BY USING THE SERVER.  BUT AS PART

25   OF THEM, YES.

1    Q.   RIGHT.  AND THE PURPOSE -- I THINK YOU TESTIFIED AT YOUR

2    DEPOSITION, WITHOUT INSTALLATION, THERE IS NO OBTAINING OF

3    INFORMATION; RIGHT?

4    A.   YES.

5    Q.   RIGHT.  SO IT WAS COMMON TO ALL THREE OF THESE VECTORS

6    THAT THEY'RE USING THE SERVERS IN ORDER TO MAKE THE EXTRACTION

7    OF INFORMATION POSSIBLE; CORRECT?

8    A.   YES.

9         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

10   BY MR. PEREZ:

11   Q.   MR. GAZNELI, YOU'RE THE VICE PRESIDENT OF RESEARCH AND

12   DEVELOPMENT?

13   A.   YES.

14   Q.   YOU CONSIDER YOURSELF A SENIOR OFFICER OF THE COMPANY?

15   A.   YEAH.

16   Q.   PART OF THE MANAGEMENT TEAM?

17   A.   YES.

18   Q.   SUBSTANTIAL AUTHORITY AT THE COMPANY?

19   A.   YES.

20   Q.   A ROLE IN CORPORATE DECISION MAKING?

21   A.   YEAH.

22   Q.   OKAY.  AND THIS CONDUCT THAT WE DESCRIBED THAT WE'VE JUST

23   RUN THROUGH FOR THE JURY WHEREBY AN INSTALLATION VECTOR WAS

24   BLOCKED AND THEN NSO GOT BACK TO WORK AND DESIGNED A NEW WAY OF

25   USING WHATSAPP SERVERS TO TRIGGER INSTALLATION OF PEGASUS,

1    THAT'S WORK THAT YOU WERE PERSONALLY INVOLVED IN; RIGHT?

2    A.   YES.

3    Q.   RIGHT.  THAT'S WORK THAT YOU OVERSAW AND APPROVED?

4    A.   YES.

5    Q.   AND YOU AUTHORIZED?

6    A.   YES.

7    Q.   ARE YOU AWARE OF THE COURT'S RULING THAT NSO'S WORK IN

8    REDESIGNING PEGASUS TO OVERCOME WHATSAPP'S UPDATES REFLECTED AN

9    UNLAWFUL INTENT IN VIOLATION OF UNITED STATES LAW?

10   A.   I'M AWARE OF THE RULING, YEAH.

11   Q.   YEAH.  AND THAT IS -- THAT WORK, REDESIGNING PEGASUS,

12   THAT'S WORK THAT YOU PERSONALLY PARTICIPATED -- PARTICIPATED

13   IN, APPROVED, AND AUTHORIZED; CORRECT?

14   A.   YES.

15        MR. PEREZ:  NO MORE QUESTIONS AT THIS TIME,

16   YOUR HONOR.

17        THE COURT:  ALL RIGHT.  ANY REDIRECT?

18        MR. AKROTIRIANAKIS:  I JUST HAVE ONE QUESTION,

19   YOUR HONOR.  IF I MAY?  I THINK THAT IT'S -- IT WAS PLAINLY --

20        THE COURT:  WHICH?

21        MR. AKROTIRIANAKIS:  THE ONE THAT WE DISCUSSED AT THE

22   BREAK, I THINK IT'S PLAINLY THE SUBJECT OF THAT EXAMINATION AND

23   FAIRY DIRECT.

24        THE COURT:  I'M SORRY, I DON'T REMEMBER WHAT WE

25   DISCUSSED AT THE BREAK.  THAT WAS AN HOUR AGO.

1          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I'LL JUST ASK

2     THE QUESTION AND IF THERE'S STILL ON OBJECTION --

3          THE COURT:  OKAY.

4                     **REDIRECT EXAMINATION**

5     BY MR. AKROTIRIANAKIS:

6     Q.   IN RESPONSE TO MR. PEREZ'S QUESTIONS, YOU -- WELL, IN

7     MR. PEREZ'S QUESTIONS, YOU WERE ASKED WHICH OF THE VECTORS USED

8     WHATSAPP SERVERS AND SIGNALLING SERVERS VERSUS RELAY SERVERS.

9     I WANT TO ASK YOU A FOLLOW-UP QUESTION TO THAT.

10         WHICH OF THE THREE HUMMINGBIRD VECTORS USED WHATSAPP

11    SIGNALLING SERVERS IN SOME WAY?

12    A.   ALL OF THEM.

13    Q.   AND WHICH OF THE HUMMINGBIRD VECTORS USED WHATSAPP RELAY

14    SERVERS?

15         MR. PEREZ:  OBJECTION, YOUR HONOR.  SAME OBJECTION

16    THAT I MADE BEFORE, AS WELL AS 403.

17         THE COURT:  ALL RIGHT.  I THINK I'M GOING TO ALLOW IT

18    AT THIS TIME GIVEN THE AMOUNT OF TESTIMONY WE'VE HEARD ON THE

19    SIGNALLING -- ON THE TWO DIFFERENT KINDS OF SERVERS.

20         HE MAY ANSWER.

21         THE WITNESS:  ONLY EDEN.

22    BY MR. AKROTIRIANAKIS:

23    Q.   OKAY.  AND TO REORIENTING THE JURY TO YOUR EARLIER

24    TESTIMONY, EDEN WAS THE VECTOR THAT WE SAW WAS CLOSED ON

25    MAY 12TH, 2019; CORRECT?

1    A.   YES.

2    Q.   OKAY.  AND NO VECTOR BEFORE -- AND THAT WAS NOT THE FIRST

3    VECTOR?  WHICH WAS THE FIRST IN TIME VECTOR?

4    A.   HEAVEN.

5    Q.   AND WHAT WAS THE TIME PERIOD DURING WHICH THE HEAVEN

6    VECTOR WAS OPEN?

7    A.   OCTOBER 2019 TO DECEMBER 2019.  OCTOBER 2018 TO DECEMBER

8    2018.

9    Q.   OKAY.  AND THAT HAD NOTHING TO DO WITH RELAY SERVERS?

10   A.   NOT WHATSAPP RELAY SERVERS.

11   Q.   ALL RIGHT.  YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER A

12   MOBILE PHONE NUMBER HAD A WHATSAPP ACCOUNT ASSOCIATED TO IT.

13        DO YOU RECALL THOSE QUESTIONS?

14   A.   YES.

15   Q.   ALL RIGHT.  DO YOU USE WHATSAPP?

16   A.   YES.

17   Q.   ME, TOO.

18        IF I CALLED YOU RIGHT NOW USING WHATSAPP AND I HAD YOU AS

19   A CONTACT IN MY PHONE, WOULD THE INFORMATION THAT I RECEIVED ON

20   MY -- IT'S OVER THERE -- IPHONE BE THE SAME INFORMATION THAT

21   YOU WERE TALKING ABOUT, WHETHER THE NUMBER IS A WHATSAPP

22   ACCOUNT?

23   A.   YES.

24   Q.   ALL RIGHT.  AND IF YOU USED YOUR WHATSAPP TO CALL

25   MR. PEREZ ON HIS WHATSAPP, WOULD THAT BE THE SAME INFORMATION

1      THAT WOULD RETURN FROM THE SERVER, WHETHER MR. PEREZ'S MOBILE

2      NUMBER HAS A WHATSAPP ACCOUNT?

3      A.   YES.

4      Q.   DOES THAT HAVE ANYTHING TO DO WITH PEGASUS?

5      A.   NO.

6      Q.   ALL RIGHT.  IS THAT INFORMATION THAT WHATSAPP KEEPS SECRET

7      IN ANY WAY?

8      A.   NO.

9           MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

10          THE COURT:  ALL RIGHT.

11          MR. PEREZ:  I THINK JUST ONE QUICK ISSUE.

12                       **RECROSS-EXAMINATION**

13     BY MR. PEREZ:

14     Q.   MR. GAZNELI, NSO'S LAWYER WAS JUST ASKING YOU WHETHER THE

15     INFORMATION THAT NSO OBTAINED AS PART OF THIS FINGERPRINTING

16     PROCESS, WHETHER THAT WAS SIMILAR, AT LEAST WITH RESPECT TO

17     WHETHER THE TARGET HAD A WHATSAPP ACCOUNT, WHETHER THAT WAS

18     SIMILAR TO WHAT YOU OR I WOULD OBTAIN IF WE WERE CALLING ONE

19     ANOTHER BY WHATSAPP.

20          DO YOU RECALL THAT?

21     A.   YES.

22     Q.   IF I USED MY MOBILE PHONE TO CALL YOUR MOBILE PHONE;

23     RIGHT?

24     A.   YES.

25     Q.   THAT WAS THE QUESTION YOU WERE JUST ASKED?

1    A.   YES.

2    Q.   BUT WHEN NSO IS SENDING THESE MESSAGES, IT WASN'T USING A

3    MOBILE PHONE; RIGHT?

4    A.   IT WAS USING A CLIENT THAT WAS INSTALLED.

5    Q.   RIGHT.  IT WAS USING THE WIS, CORRECT, TO GENERATE THE

6    MESSAGES?

7    A.   THE MESSAGES WERE GENERATED BY WIS, BUT IT WAS SENT

8    THROUGH A CLIENT THAT WAS INSTALLED ON THE DEVICE.

9    Q.   RIGHT.  AND THAT CAPABILITY TO GENERATE THESE MESSAGES

10   THROUGH THE WIS, THAT WAS PART OF THE CAPABILITY THAT NSO

11   DEVELOPED THROUGH THIS MULTI-MONTH, YEAR LONG R&D PROCESS;

12   ISN'T THAT RIGHT?

13   A.   YES.

14        MR. PEREZ:  THANK YOU.  NOTHING FURTHER, YOUR HONOR.

15        THE COURT:  OKAY.  THANK YOU.

16     I ASSUME THAT'S IT?

17        MR. AKROTIRIANAKIS:  YES.  THANK YOU, YOUR HONOR.

18        THE COURT:  ALL RIGHT.  THANK YOU, MR. GAZNELI.  YOU

19   MAY STEP DOWN.

20      MR. AKROTIRIANAKIS, CALL YOUR NEXT WITNESS, PLEASE.

21        MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  WE'RE GOING TO

22   PLAY A VIDEO, SO --

23        MR. CRAIG:  YOUR HONOR, WE'RE GOING TO PLAY THE VIDEO

24   TESTIMONY OF WITNESS SUSAN GLICK, AND WE'D LIKE TO MOVE INTO

25   EVIDENCE IN ADVANCE OF THE TESTIMONY EXHIBIT 1021, MUCH

```
 1         DISCUSSED.

 2               THE COURT:  OKAY.  I JUST WANT TO BE SURE, WITH

 3         REGARD TO 1021, TWO THINGS.  I WENT BACK TO LOOK AT THE SECOND

 4         PRETRIAL ORDER, AND IT SAYS I DISALLOWED THE ADMISSION OF 1026

 5         AND ANY EXHIBITS ARRIVING OUT OF THE SAME EMAIL THREAD.

 6            IS THIS PART OF THAT EMAIL THREAD?

 7               MR. CRAIG:  IT -- THE CONTENT OF EXHIBIT 1026 HAS

 8         BEEN REDACTED IN ITS ENTIRETY FROM EXHIBIT 1021.

 9               MR. ANDRES:  I'M SORRY, YOUR HONOR.  THE ANSWER TO

10         YOUR QUESTION IS YES.

11               THE COURT:  OKAY.  THAT'S -- THAT'S ALL I'M GETTING

12         AT, BECAUSE I'M TRYING TO BE CONSISTENT THROUGHOUT, AND IT'S

13         REALLY DIFFICULT WITH ALL OF THESE DOCUMENTS.

14            AND YESTERDAY I INDICATED THAT I ALREADY APPROVED THE

15         REDACTIONS OF THIS, BUT THEN WHEN I WENT BACK TO LOOK AT THE

16         SECOND PRETRIAL ORDER, I CLEARLY ALREADY MADE A DETERMINATION

17         WITH REGARD TO ANY PARTS OF THAT EMAIL THREAD.

18            IS THIS PART OF THE EMAIL THREAD?  IF IT IS, THEN IT CAN'T

19         COME IN.

20               MR. CRAIG:  YOUR HONOR, I COULDN'T SAY IT'S PART OF

21         THE SAME EMAIL THREAD.

22            I WOULD SAY THAT YOUR HONOR HADN'T LOOKED AT EXHIBIT 1021

23         BEFORE YOU MADE YOUR RULING BECAUSE IT WASN'T ANYWHERE IN THE

24         RECORD, AND ONCE YOUR HONOR LOOKED AT IT, WE -- I MEAN, WE'VE

25         HAD AMPLE DISCUSSION ABOUT THIS OUTSIDE THE JURY'S PRESENCE.
```

```
1            THE COURT:  WHO WAS ON THE ORIGINAL THREAD THAT I

2     LOOKED AT?  1026?  WERE THESE SAME PEOPLE ON THAT?

3            MR. CRAIG:  NO.  THERE WERE MANY MORE PEOPLE ON

4     EXHIBIT 1026 THAN --

5            THE COURT:  THIS, TO ME, SEEMS TO BE A PRETTY EASY

6     ISSUE.  I SAID THIS EXHIBIT CAN'T COME IN IF IT'S PART OF THE

7     SAME EMAIL THREAD.  IT EITHER IS OR IT ISN'T.

8        DOES ANYONE KNOW?

9            MR. AKROTIRIANAKIS:  IT ISN'T, YOUR HONOR.  THIS IS

10    ABOVE THAT EMAIL THREAD.  THERE ARE ADDITIONAL MESSAGES ABOUT

11    DIFFERENT TOPICS THAN WHAT IS IN THE LOWER PART, OR THE EARLIER

12    MESSAGES IN TIME.  THAT WAS WHAT WE EXPLAINED TO YOUR HONOR.

13           THE COURT:  OKAY.  DID THIS PRECEDE --

14           MR. AKROTIRIANAKIS:  NO, NO, IT CAME AFTER.  IT CAME

15    AFTER.  IT'S ADDITIONAL INFORMATION THAT CAME LATER IN TIME IN

16    SUBSEQUENT EMAILS, INCLUDING OTHER PEOPLE, OR DIFFERENT PEOPLE,

17    THAN THE EARLIER MESSAGES.

18           THE COURT:  OKAY.

19           MR. ANDRES:  YOUR HONOR, THAT SOUNDS LIKE IT'S PART

20    OF THE SAME THREAD.

21        I'M NOT AN EMAIL THREAD EXPERT, BUT WHEN ALL THE EMAILS

22    COME TOGETHER, THAT'S WHAT A THREAD IS.

23        THIS IS PART OF THE SAME THREAD, WHICH YOUR HONOR RULED IT

24    SHOULDN'T COME IN.

25        I THINK MR. AKROTIRIANAKIS BASICALLY JUST TESTIFIED TO
```

1        THAT, THAT IT'S ALL PART OF THE SAME THREAD.

2            THE COURT:  IT'S PART OF THE SAME THREAD IN -- I

3    MEAN, I ALREADY RULED ON IT.

4            MR. AKROTIRIANAKIS:  YOU RULED THAT IT WAS

5    ADMISSIBLE, YOUR HONOR.

6            THE COURT:  YESTERDAY, BECAUSE I HAD NOT LOOKED AT MY

7    PRIOR ORDER.  THE PRIOR ORDERS -- JUST REFRESH MY RECOLLECTION

8    THAT I SAID --

9            MR. AKROTIRIANAKIS:  I WILL --

10            THE COURT:  AS I RECALL, THERE WERE FOUR EMAILS THAT

11    YOU -- THAT WE TALKED ABOUT THAT HAD NOT BEEN PROVIDED TO ME

12    AND I COULDN'T FIND IN THE RECORD.

13            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14            THE COURT:  AND THE ONLY ONE I LOOKED AT WAS THE

15    1026, AND I SAID 1026 IS NOT ADMISSIBLE, AND ANY OTHERS THAT

16    ARE PART OF THAT EMAIL THREAD.

17            MR. AKROTIRIANAKIS:  I WOULD DISAGREE THAT THIS IS

18    PART OF THAT EMAIL THREAD, YOUR HONOR.

19        ALTHOUGH THE -- BELOW THE REDACTION IS, IN PART, IN 1026.

20        THE PART HERE IN 1021 IS NOT IN 1026, IT'S NOT IN THE

21    OTHER DOCUMENTS.

22        IT'S ONLY LATER IN TIME, AND THEN THERE'S SOME OTHERS THAT

23    COME LATER IN TIME THAT WE'RE NOT OFFERING.

24            MR. ANDRES:  WHICH MAKES IT PART OF THE SAME THREAD.

25    I DON'T WANT TO WASTE ANYBODY'S TIME, BUT -- IT'S PART OF THE

```
1      SAME THREAD.

2              THE COURT:  IT'S PART OF THE SAME THREAD.

3          HER TESTIMONY CAN COME IN, BUT THIS CANNOT.

4              MR. ANDRES:  THANK YOU, YOUR HONOR.

5              THE COURT:  OKAY.

6              MR. CRAIG:  WE CALL GREG PINSONNEAULT TO THE STAND,

7      YOUR HONOR.

8              THE COURT:  YOU'RE NOT GOING TO PLAY THIS?

9              MR. CRAIG:  WE HAVE TO -- I BELIEVE, PER YOUR HONOR'S

10     RULING, WE HAVE TO -- WE NEED TO REMOVE CERTAIN PARTS OF THE

11     TRANSCRIPT SECTION THAT YOUR HONOR HAD READ AND I THOUGHT HAD

12     APPROVED.

13             THE COURT:  OKAY.  OKAY.

14             MR. AKROTIRIANAKIS:  I'M HAPPY TO PLAY THIS,

15     YOUR HONOR, WITHOUT SHOWING THE DOCUMENT.

16         IT DOES REFER IN PART TO THE CONTENT OF THE DOCUMENT, THE

17     PART THAT WE -- THAT IS WHAT WE WANT IS ACTUALLY IN THERE.

18             THE COURT:  HERE.  WHY DON'T YOU TAKE THIS WHILE

19     WE'RE DOING THE NEXT TESTIMONY AND JUST HIGHLIGHT THE PORTIONS

20     THAT YOU BELIEVE WOULD HAVE TO COME OUT AND I'LL TAKE A LOOK AT

21     IT -- EXCUSE ME -- AND DECIDE IF I AGREE WITH THAT.

22             MR. AKROTIRIANAKIS:  THE PARTS OF THIS THAT WOULD --

23             THE COURT:  THE PARTS THAT YOU FEEL YOU HAVE TO

24     EXCISE IF THE EMAIL IS NOT COMING IN.

25             MR. AKROTIRIANAKIS:  WELL, IF THE EMAIL IS NOT COMING
```

```
 1        IN, I CAN DO ALL OF IT.  BUT PART OF THE TESTIMONY REFERS TO

 2        THE CONTENT OF THE EMAIL.

 3             THE COURT:  THAT'S WHAT I'M SAYING.  AS LONG AS THE

 4        CONTENT IS NOT REFLECTED IN THE TESTIMONY, YOU CAN -- YOU CAN

 5        PLAY IT.

 6             BUT IF -- I DON'T REMEMBER IF SHE REFERS SPECIFICALLY TO

 7        THIS EMAIL IN HER TESTIMONY.

 8             MR. AKROTIRIANAKIS:  HER MEMORY OF THE EVENTS IS

 9        REFRESHED BY HAVING REVIEWED THE EMAIL AND THEN SHE TESTIFIED

10        ABOUT THE EVENTS.

11             I WILL DO THAT, YOUR HONOR.  I UNDERSTAND THE COURT'S

12        INSTRUCTION.

13             THANK YOU.

14             THE COURT:  ALL RIGHT.  SO CALL YOUR NEXT WITNESS.

15        MR. CRAIG, YOU'RE GOING TO DO THE NEXT EXAMINATION.

16             MR. CRAIG:  YES, I AM, YOUR HONOR.

17        GREGORY PINSONNEAULT.

18             THE COURT:  OKAY.

19             THE CLERK:  PLEASE STEP UP AND REMAIN STANDING.

20        PLEASE RAISE YOUR RIGHT HAND.

21             **(DEFENDANTS' WITNESS, GREG PINSONNEAULT, WAS SWORN.)**

22             THE WITNESS:  I DO.

23             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

24        SPEAK CLEARLY INTO THE MICROPHONE.  PLEASE STATE YOUR FULL

25        NAME AND SPELL IT FOR THE RECORD.
```

1          THE WITNESS:  MY NAME IS GREGORY ALAN PINSONNEAULT,

2    WHICH IS SPELLED G-R-E-G-O-R-Y, A-L-A-N,

3    P-I-N-S-O-N-N-E-A-U-L-T.

4                    **DIRECT EXAMINATION**

5    BY MR. CRAIG:

6    Q.   MR. PINSONNEAULT, I'M AARON CRAIG.

7          HAVE YOU PREPARED ANY SLIDES TO ASSIST YOU WITH YOUR

8    TESTIMONY HERE TODAY?

9    A.   YES, I HAVE.

10   Q.   SORRY.  DO YOU HAVE THE DIRECT BOOK IN FRONT OF YOU?

11   A.   NO, I DO NOT.

12   Q.   OKAY.  GIVE ME ONE MOMENT.

13          (PAUSE IN PROCEEDINGS.)

14          MR. CRAIG:  I'LL GIVE YOU MY COPY.

15   MAY I APPROACH THE WITNESS?

16          THE COURT:  SURE.

17          MR. ANDRES:  YOUR HONOR, I DON'T WANT TO INTERRUPT.

18   CAN WE GET THE SLIDES?

19          MR. CRAIG:  THEY'RE IN THE BOOK.

20          MR. ANDRES:  WHICH BOOK?

21          MR. CRAIG:  THE ONE I JUST HANDED YOU.

22          MR. ANDRES:  THIS ONE HERE (INDICATING)?

23          MR. CRAIG:  YES.

24          MR. ANDRES:  THANK YOU.

25   BY MR. CRAIG:

```
1     Q.   CAN YOU -- I'LL GIVE COUNSEL A MOMENT TO --

2               MR. ANDRES:  NO.  SORRY.  GO FOR IT.

3     BY MR. CRAIG:

4     Q.   MAY WE PUBLISH THE SLIDES?

5               THE COURT:  YES.

6          THESE ARE YOUR DEMONSTRATIVES?

7               MR. CRAIG:  YES, YOUR HONOR.

8               THE COURT:  YEAH.

9     BY MR. CRAIG:

10    Q.   CAN YOU PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND.

11    A.   CERTAINLY.

12         SO I HAVE TWO UNDERGRADUATE DEGREES FROM THE UNIVERSITY OF

13    WASHINGTON.  I HAVE A BACHELOR OF ARTS IN ECONOMICS AND MATH,

14    AND A BACHELOR OF SCIENCE IN COMPUTER SCIENCE.

15         THEN I EARNED A MASTER'S DEGREES IN ECONOMICS FROM THE

16    UNIVERSITY OF CALIFORNIA AT BERKELEY.

17    Q.   BY WHOM ARE YOU CURRENTLY EMPLOYED?

18    A.   A COMPANY CALLED LITINOMICS, INC., WHICH IS

19    L-I-T-I-N-O-M-I-C-S.

20    Q.   HOW LONG HAVE YOU WORKED AT LITINOMICS?

21    A.   I HAVE WORKED AT LITINOMICS SINCE IT WAS FOUNDED IN 2007

22    AS A START-UP.

23    Q.   WHAT DO YOU DO THERE?

24    A.   SO I -- I SERVE AS AN ECONOMIC DAMAGES CONSULTANT,

25    OFTENTIMES AS AN EXPERT, IN MATTERS SUCH AS THIS ONE.
```

1    Q.   WHERE IS YOUR OFFICE LOCATED?

2    A.   WE'RE CURRENTLY LOCATED IN PLEASANTON, CALIFORNIA.

3    Q.   HAVE LITINOMICS'S OFFICES ALWAYS BEEN IN THE BAY AREA?

4    A.   YES.  SO WHEN WE STARTED UP, WE WERE IN MOUNTAIN VIEW.  WE

5    HAD A SMALL OFFICE IN MOUNTAIN VIEW.

6         EVENTUALLY WE ADDED AN OFFICE HERE IN OAKLAND AT 1901

7    HARRISON.  WE EXPANDED THAT OFFICE OVER TO 2010 AND EVENTUALLY

8    MOVED ALL OF OUR OPERATIONS TO OAKLAND IN 2016.

9         I LIVE OUT IN PLEASANTON, SO IN 2022, WE MOVED THE OFFICE

10   OUT TO PLEASANTON TO BE CLOSER TO HOME.

11   Q.   CAN YOU TELL -- DO YOU HOLD ANY PROFESSIONAL AFFILIATIONS

12   AND CERTIFICATIONS?

13   A.   YES.  I HOLD THE CERTIFIED LICENSING PROFESSIONAL

14   CERTIFICATION.

15   Q.   CAN YOU TELL THE JURY ABOUT YOUR PUBLICATIONS AND

16   PRESENTATIONS.

17   A.   CERTAINLY.  SO I HAVE 12 PUBLICATIONS AND 18

18   PRESENTATIONS.  THOSE ARE TYPICALLY ON THE TOPIC OF ECONOMIC

19   DAMAGES, SUCH AS THAT ARE AT ISSUE IN THIS CASE.

20   Q.   HAVE YOU PREVIOUSLY TESTIFIED AS AN EXPERT WITNESS AT

21   TRIALS AND ARBITRATIONS?

22   A.   YES, I HAVE.

23   Q.   ON HOW MANY OCCASIONS?

24   A.   I BELIEVE THIS IS MY 13TH OCCASION.

25   Q.   WERE YOU ACCEPTED BY THE COURT OR ARBITRATOR AS AN EXPERT

1       EACH TIME?

2       A.   YES, I WAS.

3       Q.   HAVE YOU TESTIFIED FOR BOTH PLAINTIFFS AND DEFENDANTS, OR

4       JUST ONE OR THE OTHER?

5       A.   I HAVE TESTIFIED FOR BOTH PLAINTIFFS AND DEFENDANTS.

6       Q.   AND WHEN YOU'VE TESTIFIED FOR PLAINTIFFS, WHAT'S BEEN THE

7       SUBJECT MATTER OF YOUR TESTIMONY?

8       A.   GENERALLY THE SUBJECT MATTER IS THE CALCULATION OF

9       ECONOMIC DAMAGES.

10      Q.   AND HOW ABOUT WHEN TESTIFYING FOR DEFENDANTS?

11      A.   SO THE SAME SUBJECT MATTER FOR DEFENDANTS, BUT OFTEN WHEN

12      I'M RETAINED BY THE DEFENDANTS, I'M ALSO REBUTTING THE OPINIONS

13      OF THE PLAINTIFF'S DAMAGES EXPERT, AND THAT'S ALSO WHAT I'VE

14      BEEN RETAINED TO DO HERE.

15      Q.   IN ADDITION TO YOUR TIMES TESTIFYING, HAVE YOU BEEN

16      RETAINED AS AN EXPERT WITNESS IN CASES WHERE YOU'VE NOT

17      TESTIFIED?

18      A.   YES, I HAVE.

19      Q.   ON APPROXIMATELY HOW MANY TIMES?

20      A.   SO I'VE -- THE COUNT IS WELL OVER 100 AT THIS POINT.  I

21      DON'T HAVE THE EXACT COUNT.  ON OVER 100 MATTERS I'VE BEEN

22      RETAINED AS AN EXPERT WITNESS.

23      Q.   HAVE YOU BEEN ENGAGED AS AN EXPERT IN LITIGATIONS WHERE AN

24      HOURLY LABOR RATE WAS AT ISSUE?

25      A.   YES.

1    Q.   HOW MANY TIMES?

2    A.   AT LEAST 50 TIMES I'VE BEEN INVOLVED IN LITIGATION

3    INVOLVING LABOR EXPENSE AND LABOR RATES.

4            MR. AKROTIRIANAKIS:  YOUR HONOR, WE TENDER

5    MR. PINSONNEAULT AS AN EXPERT IN THE SUBJECT OF DAMAGES

6    CALCULATIONS IN GENERAL, AND SPECIFICALLY IN SEEKING DAMAGES

7    FOR REIMBURSEMENT OF EMPLOYEE TIME.

8            THE COURT:  ANY OBJECTION?

9            MR. ANDRES:  CAN I DO SOME VOIR DIRE, YOUR HONOR?

10           THE COURT:  YES.

11           MR. ANDRES:  THANK YOU.

12                        **VOIR DIRE EXAMINATION**

13   BY MR. ANDRES:

14   Q.   GOOD AFTERNOON, MR. PINSONNEAULT.

15   A.   GOOD AFTERNOON.

16   Q.   DID I PRONOUNCE THAT RIGHT?

17   A.   YOU DID.

18   Q.   OKAY.  I DIDN'T HEAR EVERYTHING.  YOU TESTIFIED THAT YOU

19   HAVE SOME LICENSE, A CERTIFIED LICENSING.  CAN YOU TELL ME WHAT

20   THAT IS?

21   A.   YEAH, CERTIFIED LICENSING PROFESSIONAL.

22   Q.   WHAT IS THAT?

23   A.   SO IT'S A DESIGNATION THAT'S INTENDED TO REFLECT EXPERTISE

24   IN THE LICENSING OF INTELLECTUAL PROPERTY.

25   Q.   YOU UNDERSTAND THAT THIS CASE HAS NOTHING TO DO WITH THE

1    LICENSING OF INTELLECTUAL PROPERTY?

2    A.   I DON'T KNOW IF I'D -- SO CERTAINLY NOT THE PRIMARY THRUST

3    OF THIS CASE ISN'T I.P.

4    Q.   WHAT ABOUT THIS CASE IS INTELLECTUAL PROPERTY?

5    A.   WELL, SO WHEN I WAS -- WHEN I ISSUED MY EXPERT REPORT, I

6    CERTAINLY ADDRESSED ISSUES THAT RELATED TO INTELLECTUAL

7    PROPERTY.

8    Q.   WHAT?

9    A.   I DON'T THINK THAT I'M HERE TO TESTIFY ABOUT THOSE ISSUES.

10   Q.   THERE AREN'T ANY ISSUES ABOUT INTELLECTUAL PROPERTY.

11   A.   JUST TO BE CLEAR, I DON'T WANT TO -- I DON'T WANT TO SAY

12   SOMETHING THAT I'M NOT SUPPOSED TO, BUT I'M NOT AWARE THAT I'M

13   OFFERING AN OPINION TODAY ABOUT INTELLECTUAL PROPERTY.  I AGREE

14   WITH YOU ABOUT THAT.

15   Q.   BUT THAT'S WHERE YOUR LICENSING AND EXPERTISE IS?

16   A.   NO.  THAT'S A CERTIFICATION THAT I HOLD.

17   Q.   AND IT SOUNDS LIKE YOUR OTHER EXPERTISE IS TESTIFYING AS

18   AN EXPERT WITNESS.  IS THAT WHAT YOU DO PRINCIPALLY IS TESTIFY

19   AS AN EXPERT WITNESS?

20   A.   SO I -- A LARGE PORTION OF MY PROFESSIONAL CAREER HAS BEEN

21   EITHER CONSULTING OR TESTIFYING IN ECONOMIC MATTERS, SUCH AS

22   THIS ONE, ON THE TOPIC OF ECONOMIC DAMAGES.

23        IN ADDITION, I ALSO SERVE AS A LICENSING CONSULTANT AND

24   ADDRESS OTHER NON-LITIGATION ISSUES IN MY PROFESSIONAL WORK.

25   Q.   BUT THAT'S LICENSING OF INTELLECTUAL PROPERTY, WHICH I

1    THINK WE'VE UNDERSTOOD IS NOT RELEVANT HERE.

2    A.   I WOULD SAY LICENSING OF INTELLECTUAL PROPERTY IS

3    CERTAINLY THE MAJORITY OF THAT WORK.  BUT ALSO I'VE ALSO

4    ADDRESSED ANTITRUST ISSUES AND SOME OTHER ISSUES AS WELL IN

5    THAT NON-LITIGATION WORK.

6    Q.   SIR, JUST TO DIG IN A LITTLE TO THAT, YOU SAID THAT MOST

7    OF YOUR WORK IS TESTIFYING.  LAST YEAR, HOW MUCH OF YOUR WORK

8    AT LITINOMICS -- IS THAT THE --

9    A.   LITINOMICS, YES, THAT'S CORRECT.

10   Q.   THAT'S THE LITIGATION ECONOMICS?

11   A.   IT'S A CONTRACTION OF LITIGATION AND ECONOMICS, THAT'S

12   CORRECT.

13   Q.   YEAH.  HOW MUCH LAST YEAR OF YOUR WORK DIDN'T INVOLVE

14   TESTIFYING?

15          MR. CRAIG:  OBJECTION, YOUR HONOR.  THIS GOES WELL

16   BEYOND VOIR DIRE.  HE'S GETTING INTO CROSS-EXAMINATION.

17          MR. ANDRES:  FINE, YOUR HONOR.  JUST ONE MORE

18   QUESTION.  I'M FINE.

19          THE COURT:  OKAY.

20   BY MR. ANDRES:

21   Q.   ARE YOU AN ACCOUNTANT?

22   A.   I AM NOT AN ACCOUNTANT.  I DO NOT HOLD A CPA.  I'M NOT AN

23   ACCOUNTANT.

24   Q.   THAT REQUIRES YOU TAKING A TEST WHERE THERE'S FOUR PARTS

25   AND SOMETIMES IT'S MORE DAYS THAN NOT AND IT'S HARDER NOW THAN

1    IT USED TO BE.  THAT'S THE CPA EXAM?

2    A.   CERTAINLY I HEARD MS. TREXLER TESTIFY TO THOSE TYPES OF

3    ISSUES, YES.

4    Q.   I THINK SHE SAID IT'S MAYBE EASIER NOW FOR THIS GENERATION

5    THAN HER GENERATION.  BUT IN EITHER CASE, YOU NEVER TOOK THE

6    TEST AND YOU'RE NOT AN ACCOUNTANT?

7    A.   I AM NOT A CPA.  THAT'S CORRECT.

8         MR. ANDRES:  THANK YOU, YOUR HONOR.  MAY I JUST HAVE

9    A MINUTE TO CONSULT?

10        THE COURT:  SURE.

11   CAN YOU PUT HIS QUALIFICATIONS BACK UP?  OR DO I HAVE

12   THAT?

13        MR. CRAIG:  YOUR HONOR, HIS DEMONSTRATIVE, HIS SLIDES

14   ARE IN A -- SHOULD BE IN YOUR BOOK UNDER A TAB THAT SAYS --

15        THE COURT:  ALL RIGHT.  OKAY.  LET ME JUST TAKE A

16   LOOK.

17        MR. CRAIG:  I BELIEVE THEY'RE ALSO ON THE SCREEN.

18        (PAUSE IN PROCEEDINGS.)

19        THE COURT:  OKAY.

20        MR. ANDRES:  YOUR HONOR, I JUST DIDN'T UNDERSTAND

21   WHAT FIELD THEY'RE OFFERING THIS EXPERT IN.  HE SOUNDS LIKE AN

22   EXPERT IN LICENSING, BUT I DON'T THINK THEY'RE OFFERING HIM IN

23   LICENSING.

24        MR. CRAIG:  WE WEREN'T, WHICH MAKES THAT VOIR DIRE

25   TOTALLY INAPPROPRIATE.

1           THE COURT:  OKAY.

2           MR. CRAIG:  I CAN REPEAT THE --

3           THE COURT:  YOU'RE OFFERING HIM AS AN EXPERT IN WHAT

4    FIELD?

5           MR. AKROTIRIANAKIS:  THE SUBJECT OF DAMAGES

6    CALCULATIONS AND SPECIFICALLY IN SEEKING DAMAGES FOR

7    REIMBURSEMENT OF EMPLOYEE TIME.

8           THE COURT:  OKAY.  AND HIS DEGREES ARE IN ECONOMICS

9    AND MATH.

10        OKAY.  ALL RIGHT.

11        DO YOU HAVE AN OBJECTION TO --

12          MR. ANDRES:  I DON'T.  OBVIOUSLY HE'S NOT AN

13   ACCOUNTANT, BUT I HAVE NO OBJECTION, YOUR HONOR.  THANK YOU.

14          THE COURT:  ALL RIGHT.  HE WILL BE ACCEPTED ON THE

15   DAMAGES QUESTION.

16          MR. CRAIG:  YES.  THANK YOU, YOUR HONOR.

17                 **DIRECT EXAMINATION (RESUMED)**

18   BY MR. CRAIG:

19   Q.  IS LITINOMICS BEING COMPENSATED FOR YOUR TIME IN THIS

20   CASE?

21   A.  YES, IT IS.

22   Q.  CAN YOU SUMMARIZE THAT COMPENSATION?

23   A.  YES.  SO MY -- LITINOMICS CHARGES MY TIME AND STAFF TIME

24   THAT WORKED ON THIS MATTER AT AN HOURLY RATE.  MY HOURLY

25   BILLING RATE IS $650 AN HOUR.  OTHER STAFF ARE CHARGED AT LOWER

1    RATES THAN THAT.

2         IN TOTAL, WE HAVE BILLED APPROXIMATELY $160,000 IN THIS

3    MATTER.  THAT'S FOR THE INVOICES THAT WE SUBMITTED THROUGH THE

4    END OF MARCH.

5         AND WE'VE BEEN PAID FOR ALL OF THOSE INVOICES.

6    Q.   WHEN YOU WERE HERE YESTERDAY -- WERE YOU HERE YESTERDAY

7    WHEN MS. TREXLER DESCRIBED HER TEAM?

8    A.   YES, I WAS.

9    Q.   HOW DOES THE SIZE OF HER TEAM COMPARE TO YOURS?

10   A.   FROM WHAT SHE DESCRIBED IN HER TESTIMONY, THE SUPPORT

11   STAFF, OR TEAM, THAT WAS WORKING WITH HER WAS LARGER THAN THE

12   TEAM THAT WAS WORKING WITH ME ON THIS MATTER.

13        I THINK SHE DESCRIBED THAT SHE HAD TWO PRIMARY STAFF, OR

14   HELPERS ON THE CASE, I THINK SHE SAID TWO PRIMARY PEOPLE.  I

15   WOULD SAY I HAD ONE PRIMARY ASSISTANT ON THIS CASE.

16        MS. TREXLER ALSO DESCRIBED THAT SHE HAD TWO TO THREE

17   ANALYSTS OR ASSOCIATES THAT HELPED AUDIT OR QUALITY CONTROL HER

18   REPORT AND HER SCHEDULES, AND I HAD ONE SUCH INDIVIDUAL.

19   Q.   IS YOUR OR LITINOMICS'S COMPENSATION IN ANY WAY CONTINGENT

20   ON THE TESTIMONY THAT YOU'RE GIVING TODAY?

21   A.   NO, IT IS NOT.

22   Q.   AND IS YOUR OR LITINOMICS'S COMPENSATION CONTINGENT IN ANY

23   WAY ON THE OUTCOME OF THE CASE?

24   A.   NO, IT IS NOT.

25   Q.   HAVE YOU EVER WORKED FOR NSO OR ANY OF ITS AFFILIATES

1    BEFORE THIS ENGAGEMENT?

2    A.   NO.

3    Q.   HAVE YOU EVER HAD ANY DISCUSSIONS WITH NSO ABOUT DOING

4    OTHER FURTHER WORK FOR NSO OR ANY OF ITS AFFILIATES AFTER THIS

5    CASE?

6    A.   NO, I HAVE NOT.

7    Q.   WHAT MATERIALS HAVE YOU REVIEWED OVER THE COURSE OF YOUR

8    ENGAGEMENT?

9    A.   SO AS I MENTIONED EARLIER, THE PRIMARY OPINIONS THAT I'M

10   OFFERING ARE REBUTTAL OPINIONS TO MS. TREXLER'S REPORT AND HER

11   OPINIONS OFFERED HERE AT TRIAL.

12       SO I FIRST RECEIVED MS. TREXLER'S REPORT, AND I ASKED FOR

13   ALL OF THE DIFFERENT DOCUMENTS THAT MS. TREXLER IDENTIFIED THAT

14   SHE HAD REVIEWED AND RECEIVED.  I THINK SHE TESTIFIED TO --

15   ABOUT WHAT SHE LOOKED AT, SO I RECEIVED ALL OF THOSE MATERIALS

16   AND TRIED TO REVIEW THOSE.

17       I ALSO RECEIVED ADDITIONAL DEPOSITIONS.  I HELD

18   CONVERSATIONS WITH NSO EMPLOYEES -- OR DEFENDANTS' EMPLOYEES,

19   AND I EVENTUALLY ISSUED AN EXPERT REPORT WITH MY REBUTTAL

20   OPINIONS.

21   Q.   AND HAVE YOU BEEN READING THE DAILY TRANSCRIPTS FOR ANY

22   TIMES THAT YOU WEREN'T PRESENT IN THE COURT DURING THIS CASE?

23   A.   YES.  SO I WAS IN COURT WEDNESDAY AND THURSDAY, AND THEN

24   I'VE READ THE TRANSCRIPTS FOR WHEN I HAVE NOT BEEN IN THE

25   COURTROOM.

1    Q.   MR. PINSONNEAULT, DO YOU HAVE ANY UNDERSTANDING AS TO

2    WHETHER PLAINTIFFS' EMPLOYEES FOR WHOM DAMAGES WERE SOUGHT WERE

3    SALARIED OR HOURLY?

4    A.   YES.  TO MY UNDERSTANDING, ALL OF THE 22 EMPLOYEES WHICH

5    ARE AT ISSUE PER MS. TREXLER'S CALCULATIONS ARE SALARIED

6    EMPLOYEES.

7    Q.   WHAT'S THAT BASED ON?

8    A.   I THINK MS. TREXLER TESTIFIED TO THAT FACT, AS WELL AS

9    OTHER, OTHERS OF THE FACEBOOK EMPLOYEES THAT HAVE TESTIFIED.

10   Q.   AND WHAT'S THE IMPLICATION TO YOUR ANALYSIS OF THE FACT

11   THAT THESE TWO EMPLOYEES ARE SALARIED?

12   A.   SO FOR A SALARIED EMPLOYEE, THE AMOUNT THAT'S PAID DOES

13   NOT CHANGE WHETHER IT'S -- WHETHER THE EMPLOYEE WORKS OVERTIME

14   HOURS OR WEEKEND HOURS.  NO MATTER HOW MANY HOURS THE EMPLOYEE

15   WORKS, THEY'RE EARNING THE SAME -- I THINK FACEBOOK PAYS ON A

16   TWO WEEK PERIOD, SO THE SAME TWO WEEK AMOUNT EVERY TWO WEEKS,

17   REGARDLESS OF THE WORK PERFORMED DURING THOSE TWO WEEKS.

18        AND IT ALSO DOESN'T CHANGE DEPENDING ON WHETHER THEY

19   WORKED ON ONE PROJECT OR ANOTHER.  THEY'RE BEING COMPENSATED

20   THE SAME BASE SALARY IN EVERY PERIOD.

21   Q.   DID MS. TREXLER INCLUDE ANY INFORMATION IN HER REPORT OR

22   HER TESTIMONY THAT META INCURS ANY ADDITIONAL EXPENSE WHEN ITS

23   EMPLOYEES, LIKE CLAUDIU GHEORGHE AND DREW ROBINSON, WORK ON

24   PROJECT A VERSUS PROJECT B?

25   A.   SORRY.  CAN YOU REPEAT THAT?  I MISSED THE FIRST PART.

1     SORRY.

2     Q.   DID MS. TREXLER INCLUDE IN HER REPORT OR HER TESTIMONY

3     HERE IN COURT ANY INFORMATION ABOUT WHETHER META INCURS

4     ADDITIONAL EXPENSE WHEN ITS EMPLOYEES, LIKE MR. GHEORGHE OR

5     MR. ROBINSON, WORK ON ONE PROJECT VERSUS ANOTHER?

6     A.   I DIDN'T SEE ANYTHING ALONG THOSE LINES IN MS. TREXLER'S

7     REPORT, NOR DID I HEAR MS. TREXLER TESTIFY TO SOMETHING ALONG

8     THOSE LINES HERE IN THE COURTROOM.

9     Q.   AND DID MS. TREXLER PUT IN HER REPORT ANY INFORMATION

10    ABOUT WHETHER THERE WERE ANY PROJECTS OR TASKS THAT FACEBOOK OR

11    WHATSAPP WAS UNABLE TO COMPLETE BECAUSE OF NSO'S CONDUCT THAT'S

12    AT ISSUE IN THIS CASE?

13    A.   AGAIN, I DID NOT SEE ANYTHING ALONG THOSE LINES IN

14    MS. TREXLER'S REPORT, HER EXPERT REPORT, NOR DID I HEAR HER

15    TESTIFY TO THAT TYPE OF FACT HERE IN THE COURTROOM.

16    Q.   WHAT'S THE IMPORTANCE OF THAT TO THE ISSUES IN THIS CASE?

17    A.   WELL, SO MS. TREXLER'S CALCULATION IS ULTIMATELY TRYING

18    TO -- SHE INCLUDES BASE SALARY AND OTHER TYPES OF EXPENSES IN

19    HER CALCULATION THAT SHE PRESENTED YESTERDAY.

20         AND THE FACT THAT THERE'S NO ADDITIONAL -- NO ADDITIONAL

21    EXPENSE OR NO TASKS THAT WERE NOT ABLE TO BE COMPLETED INSTEAD

22    OF THE TASKS THAT THE FACEBOOK EMPLOYEES DID WORK ON DRAWS INTO

23    QUESTION WHETHER THAT EXPENSE IS REALLY TIED TO THE -- THE

24    EXPENSE THAT MS. TREXLER CALCULATED IS TIED TO THE WORK

25    PERFORMED IN MAY OF 2019 AND BEYOND.

1                MR. CRAIG:  YOUR HONOR, I HAVE A NEW TOPIC TO GO

2      INTO, BUT I SEE WE'RE AT 11:45.

3                THE COURT:  NO.  YOU CAN GO AHEAD.

4                MR. CRAIG:  OKAY.

5           CAN WE SWITCH TO MS. TREXLER'S DEMONSTRATIVES, SLIDE 9.

6      Q.   DO YOU RECOGNIZE THIS FROM YESTERDAY?

7      A.   YES, I DID SEE THIS DEMONSTRATIVE YESTERDAY.

8      Q.   AND MS. TREXLER INCLUDES SALARY, 401(K), AND PAID TAXES.

9           DO YOU SEE THAT?

10     A.   YEAH.  SO THOSE THREE CATEGORIES IN HER CALCULATIONS IN

11     HER REPORT, SHE ACTUALLY GROUPED THOSE TOGETHER INTO ONE

12     CALCULATION OF AN HOURLY AMOUNT FOR THOSE THREE, THE SALARY,

13     THE EMPLOYER PAID 401(K) CONTRIBUTION, AND THE EMPLOYER PAID

14     TAXES.

15     Q.   NOW, MS. TREXLER ALSO INCLUDES PERFORMANCE BONUS.

16          DID YOU DO ANY CALCULATION OF HOW BIG A PART OF HER

17     DAMAGES CALCULATION WAS FROM THE PERFORMANCE BONUS?

18     A.   YEAH.  SO THE PERFORMANCE BONUS IS THE SECOND PIECE OF THE

19     FOUR PIECES SHE INCLUDES IN HER ULTIMATELY HOURLY LABOR RATE.

20     AND THAT PERFORMANCE BONUS IS A RELATIVELY SMALL PORTION FOR

21     THE EMPLOYEES, THE 22 EMPLOYEES.

22          FOR ALL OF THE 22 EMPLOYEES, IT'S LESS THAN 10 PERCENT OF

23     THE TOTAL THAT SHE CALCULATED IN THAT HOURLY LABOR RATE.  I

24     THINK SHE TESTIFIED YESTERDAY, AND CONFIRMED THAT THERE ARE

25     FIVE OF THOSE EMPLOYEES THAT HAD ZERO PERFORMANCE BONUS

1    INCLUDED.

2         AND THE REST OF THEM ARE, LIKE I SAID, LESS THAN

3    10 PERCENT, OFTENTIMES IN THE 3 TO 5 PERCENT RANGE.

4    Q.   MS. TREXLER INCLUDES HEALTH CARE CONTRIBUTION.  DID YOU

5    CALCULATE WHAT PROPORTION OF HER $444,719 WAS REPRESENTED BY

6    THE HEALTH CARE CONTRIBUTION?

7    A.   YES.  SO, AGAIN, THE HEALTH CARE CONTRIBUTION, THE THIRD

8    CATEGORY THAT SHE BREAKS OUT, AND THAT IS AN EVEN SMALLER

9    EXPENSE THAN THE PERFORMANCE BONUS.

10        SO TYPICALLY IT'S 1 TO 3 PERCENT.  I THINK THE HIGHEST

11   PERCENTAGE IS AROUND 6 PERCENT.

12        SO 6 PERCENT OR LESS, AND TYPICALLY IN THE 1 TO 3 PERCENT

13   RANGE.

14   Q.   NOW, SHE ALSO INCLUDES RSU'S.  WHAT ARE RSU'S?

15   A.   RSU'S ARE -- WE'VE HEARD A FAIR AMOUNT OF TESTIMONY ABOUT

16   THESE.  THEY'RE RESTRICTED STOCK UNITS.

17   Q.   ONCE GRANTED, CAN RSU'S BE TAKEN AWAY FOR POOR

18   PERFORMANCE?

19   A.   AS FAR AS I'M AWARE, THE RSU'S THAT ARE AT ISSUE IN THIS

20   CASE CANNOT BE TAKEN AWAY.  THE REASON -- THE ONLY REASON THAT

21   THE EMPLOYEE WOULD NOT RECEIVE THE RSU'S, OR VEST IN THE RSU'S,

22   IS IF THEY LEFT THE COMPANY, EITHER WHETHER THEY WERE

23   TERMINATED OR WHETHER THEY TERMINATED THEIR OWN EMPLOYMENT.

24   Q.   WHAT PERCENTAGE OF MS. TREXLER'S $444,719 NUMBER IS

25   REPRESENTED BY THE RSU'S?

1    A.   SO THOSE RSU'S -- THE RSU PORTION OF HER CALCULATIONS

2    REPRESENTS 40.2 PERCENT OF THE NUMBER THAT SHE PRESENTED

3    YESTERDAY.

4    Q.   DO YOU HAVE AN OPINION ON WHETHER IT'S APPROPRIATE TO

5    INCLUDE RSU'S IN THE LABOR RATE CALCULATED BY MS. TREXLER?

6    A.   I DO.

7    Q.   WHAT IS THAT OPINION?

8    A.   MY OPINION IS THAT IT IS NOT APPROPRIATE TO INCLUDE THE

9    RSU'S IN THE LABOR EXPENSE CALCULATION AS SHE DID.

10   Q.   DO YOU HAVE A DEMONSTRATIVE ABOUT THIS?

11   A.   YES, I DO.

12   Q.   CAN WE GO TO SLIDE 2 OF MR. PINSONNEAULT'S DEMONSTRATIVES.

13        ALL RIGHT.  WHAT IS -- WHAT'S THE BASIS FOR YOUR OPINION

14   THAT IT'S NOT APPROPRIATE TO INCLUDE RSU'S IN THE $444,719?

15   A.   SO I SUMMARIZED TWO PRIMARY OPINIONS HERE.

16        THE FIRST IS THAT ALL OF THE RSU'S THAT WERE INCLUDED BY

17   MS. TREXLER WERE GRANTED FOR WORK PERFORMED PRIOR TO MAY OF

18   2019.  SO AS WE HEARD, MS. TREXLER'S ANALYSIS FOCUSSED ON THE

19   MAY 2ND TO MAY 13 TIME PERIOD, AND THEN A LATER TIME PERIOD,

20   MAY 13TH, OR MAY 14TH, 2019, AND THEREAFTER.

21        BUT ALL OF THESE RSU'S WERE GRANTED FOR WORK PERFORMED

22   BEFORE, AND GENERALLY FAR BEFORE, THE MAY 2019 TIME PERIOD.

23        SO THAT'S ONE REASON.

24        THE SECOND REASON IS THAT MS. TREXLER HERSELF ESTABLISHED

25   A TEST IN HER REPORT -- SHE DIDN'T CALL IT A TEST -- BUT SHE

1    ESSENTIALLY LAID OUT WHY, WHY EXPENSES SHOULD BE INCLUDED IN

2    HER CALCULATION, AND RSU'S DO NOT SATISFY THE VERY TEST THAT

3    SHE LAYS OUT.

4    Q.   OKAY.  I WANT TO ASK YOU A LITTLE BIT MORE ABOUT YOUR

5    FIRST REASON.

6         WHY DO YOU SAY THAT THE WORK -- THAT THE RSU'S INCLUDED BY

7    MS. TREXLER WERE GRANTED FOR WORK DONE BEFORE MAY 2ND OF 2019?

8    A.   WELL, SHE TESTIFIED TO THAT YESTERDAY.

9         BUT I ALSO CONFIRMED IN THE UNDERLYING DOCUMENTS THAT THE

10   RSU GRANTS THAT RESULT IN THE EXPENSE THAT WERE -- THAT SHE

11   INCLUDES IN 2019 WERE ALL GRANTED -- I THINK THE LATEST RSU'S

12   GRANTED WERE MARCH 20TH OF 2019.  MANY OF THEM WERE GRANTED AS

13   FAR BACK AS MAY 15TH OF 2015.

14   Q.   CAN WE PUBLISH EXHIBIT PTX-320 IN EVIDENCE, PAGE 5.

15        (PAUSE IN PROCEEDINGS.)

16        MR. CRAIG:  OKAY.  THANK YOU.

17   Q.   MR. PINSONNEAULT, WHEN YOU -- WERE YOU HERE WHEN

18   MS. TREXLER TESTIFIED ABOUT THIS DOCUMENT?

19   A.   YES, I WAS.

20   Q.   OKAY.  THE FIRST LINE, UNDER THE COLUMN THAT'S HIGHLIGHTED

21   GRANT DATE, AWARD DATE, IT SAYS MARCH 16TH, 2015.

22        WHAT'S YOUR UNDERSTANDING OF WHAT WAS THE TIME PERIOD OF

23   WORK PERFORMANCE FOR WHICH THOSE RSU'S WERE GRANTED?

24   A.   SO SEVERAL WITNESSES HAVE TESTIFIED ABOUT THE FACT THAT

25   RSU'S CAN BE GRANTED FOR -- AS A PERFORMANCE BONUS, AND

1    TYPICALLY I THINK WE HEARD THAT MARCH -- IN MARCH OF THE

2    FOLLOWING YEAR IS WHEN THOSE PERFORMANCE BONUS RSU'S ARE

3    GRANTED, OR AWARDED.

4         SO THE MARCH 16TH, 2015 AWARD DATE WOULD INDICATE THAT'S

5    FOR WORK PERFORMED IN 2014, SO THE PRIOR YEAR.

6    Q.   SO MS. TREXLER INCLUDED THESE RSU'S GRANTED IN 2015 FOR

7    WORK PERFORMED IN 2014 IN HER CALCULATION OF DAMAGES THAT

8    FACEBOOK WANTS NSO TO PAY FOR THINGS THAT HAPPENED IN 2019?

9    A.   THAT'S CORRECT.

10   Q.   IS THAT THE SAME -- SORRY.  DO YOU THINK THAT'S

11   APPROPRIATE?

12   A.   NO, I DO NOT.

13   Q.   THERE'S THREE MORE ROWS ASSOCIATED WITH THIS FIRST

14   EMPLOYEE WHO'S IDENTIFIED BY AN EMPLOYEE I.D.

15        CAN YOU WALK THROUGH EACH OF THEM AND EXPLAIN WHEN THE

16   WORK WAS PERFORMED THAT'S ASSOCIATED WITH ALL OF THESE STOCK

17   UNIT GRANTS?

18   A.   YES.  SO THE SECOND AWARD DATE THERE IS MARCH 15TH, 2016.

19   SO, AGAIN, THAT WOULD BE FOR WORK THAT WAS PERFORMED IN THE

20   CALENDAR YEAR 2015.

21        NEXT IS MARCH 15, 2017.  AGAIN, THAT WOULD BE FOR WORK

22   PERFORMED IN 2016.

23        AND FINALLY, MARCH 20TH, 2018, THAT WOULD BE FOR WORK

24   PERFORMED IN 2017.

25        SO FOR THESE FOUR ROWS OF AWARDS, THESE ARE COVERING

1    PERFORMANCE IN 2014 TO 2017.

2    Q.   NOW, IS MS. TREXLER'S METHODOLOGY OF INCLUDING RSU'S IN AN

3    HOURLY LABOR RATE AN ACCEPTED METHODOLOGY?

4    A.   NOT IN MY EXPERIENCE.

5    Q.   IS THAT BECAUSE OF THE DATE ISSUE YOU WERE JUST TALKING

6    ABOUT OR SOMETHING ELSE?

7    A.   NO, THIS IS INDEPENDENT OF THE DATE ISSUE WE JUST WALKED

8    THROUGH.

9    Q.   BEFORE THIS CASE, HOW MANY TIMES IN YOUR PROFESSIONAL

10   CAREER AS AN ECONOMIC DAMAGES EXPERT HAVE YOU SEEN A PARTY IN

11   LITIGATION CALCULATE AN HOURLY LABOR RATE?

12   A.   SO AS WE DISCUSSED -- OR AS I TESTIFIED TO EARLIER, MORE

13   THAN 50 TIMES I'VE DEALT WITH CALCULATIONS OF LABOR RATES AND

14   LABOR EXPENSES.

15   Q.   HOW MANY TIMES HAVE YOU SEEN THAT NUMBER OF LABOR RATE

16   INCLUDE RSU'S?

17   A.   I'VE NEVER SEEN AN EXPERT TRY TO INCLUDE RSU EXPENSE IN

18   THOSE CALCULATIONS.

19   Q.   CAN WE PUT BACK UP MR. PINSONNEAULT'S SLIDES, AND WE CAN

20   TURN THE MONITOR BACK ON.

21        NUMBER 2.

22        ALL RIGHT.  WHAT IS YOUR SECOND OPINION ABOUT THE RSU'S?

23   A.   SO, AGAIN, AS WE DISCUSSED -- OR AS I MENTIONED EARLIER,

24   MS. TREXLER INCLUDED WHAT I'M CALLING HER A TEST, BUT

25   ESSENTIALLY A JUSTIFICATION FOR WHY EXPENSES SHOULD BE INCLUDED

1          IN -- SHE USED THE TERM FULLY BURDENED LABOR RATE IN HER

2     REPORT.

3          SO SHE PUT FORTH A TEST, AND THE RSU'S THAT ARE AT ISSUE

4     HERE DO NOT SATISFY THAT TEST.

5     Q.   OKAY.  NOW, IN YOUR BOOK THAT YOU HAVE IN FRONT OF YOU,

6     THERE SHOULD BE AN EXHIBIT 2093 THAT'S MS. TREXLER'S EXPERT

7     REPORT, AND SINCE I GAVE YOU MY BOOK, I'M GOING TO ASK YOU TO

8     READ THE FIRST SENTENCE OF PARAGRAPH 84.

9     A.   CERTAINLY.  SO THIS IS EXHIBIT A-2093-032, PARAGRAPH 84.

10         THE FIRST SENTENCE READS, "THE CALCULATION OF AN

11    EMPLOYEE'S BURDENED LABOR RATE NOT ONLY CONSIDERS THE

12    EMPLOYEE'S SALARY, BUT ALSO CONSIDERS OTHER EXPENDITURES PAID

13    BY AN EMPLOYER TO, OR ON BEHALF OF, AN EMPLOYEE."

14    Q.   DO RSU'S FALL WITHIN THAT DEFINITION?

15    A.   NO.  SO SHE'S DESCRIBING EXPENDITURES PAID BY AN EMPLOYER

16    EITHER TO OR ON BEHALF OF AN EMPLOYEE.

17         RSU'S ARE NOT EXPENDITURES AND THEY'RE NOT PAID.  RSU'S

18    ARE GRANTED AND THEY'RE VESTED.  THERE'S NOTHING PAID REALLY

19    INTO RSU'S.

20    Q.   NOW, CAN YOU READ THE SECOND SENTENCE OF THAT SAME

21    PARAGRAPH.

22    A.   THE SECOND SENTENCE READS, "THESE ADDITIONAL EXPENDITURES

23    CAN BE PAID DIRECTLY TO AN EMPLOYEE, E.G., A PERFORMANCE BONUS

24    OR A RETIREMENT CONTRIBUTION, OR PAID ON BEHALF OF AN EMPLOYEE,

25    E.G., THE EMPLOYER'S SHARE OF HEALTH CARE INSURANCE PREMIUMS OR

1    PAYROLL TAXES."

2    Q.   DO YOU BELIEVE RSU'S FALL WITHIN THAT DEFINITION?

3    A.   AGAIN, NO.  SO, AGAIN, THE FOCUS IS ON EXPENDITURE BEING

4    PAID DIRECTLY TO AN EMPLOYEE OR PAID ON BEHALF OF AN EMPLOYEE,

5    AND RSU'S ARE NEITHER PAID TO AN EMPLOYEE NOR ARE THEY PAID ON

6    BEHALF OF AN EMPLOYEE.

7    Q.   CAN YOU JUST EXPLAIN THAT A LITTLE MORE?

8    A.   YES.  SO, AGAIN, AS I MENTIONED, RSU'S ARE SHARES OF

9    STOCK.  THEY'RE NOT PAID TO AN EMPLOYEE.  THEY'RE -- THEY ARE

10   AWARDED OR GRANTED.  EVENTUALLY THEY VEST, AND AT THE VESTING

11   DATE, THE SHARES ARE TRANSFERRED TO THE EMPLOYEE.  THERE'S NO

12   PAYMENT BEING MADE.  IT'S JUST A SHARE OF STOCK THAT'S GOING

13   FROM FACEBOOK TO THE EMPLOYEE.

14   Q.   NOW, HAVE YOU PREPARED ANY DEMONSTRATIVE EXHIBITS ABOUT

15   MS. TREXLER'S RSU CALCULATION?

16   A.   YES, I HAVE.

17   Q.   CAN WE GO TO THE NEXT SLIDE?

18       DID YOU --

19   A.   I THINK YOU MIGHT WANT TO TAKE OFF --

20   Q.   NO.  THAT'S FINE.

21   A.   OH, SORRY.

22   Q.   DID YOU CALCULATE ANNUALIZED COMPENSATION FOR MR. GHEORGHE

23   AND MR. YUANYUAN WANG?

24   A.   I DID.

25   Q.   AND THIS IS THE ANNUAL COMPENSATION WITH WHICH MS. TREXLER

1      WAS HAVING DIFFICULTY YESTERDAY?

2      A.   I DO RECALL THERE WERE SEVERAL QUESTIONS ABOUT ANNUALIZED

3      LABOR RATES YESTERDAY.

4      Q.   HOW WERE YOU ABLE TO DO IT?

5      A.   WELL, MS. TREXLER EXPLAINS THAT HER CALCULATION TOOK

6      ANNUAL NUMBERS AND DIVIDED BY 2080 TO GET TO AN HOURLY RATE.

7      SO I SIMPLY MULTIPLIED THE HOURLY RATE BY 2080.

8      Q.   WHAT WAS MR. GHEORGHE'S ANNUALIZED COMPENSATION FOR 2019

9      WHEN RSU'S ARE INCLUDED?

10     A.   SO THE ORANGE BARS ARE WHEN THE RSU'S ARE INCLUDED.  SO

11     MR. GHEORGHE'S ANNUALIZED LABOR RATE WITH THE RSU'S INCLUDED

12     ARE $840,840.

13     Q.   AND HOW MUCH IS IT IF YOU REMOVE THE RSU'S THAT AWARDED

14     FOR THE WORK THAT HE DID BACK IN 2014 THROUGH 2018.

15     A.   SO THE BLUE BAR IS THE NUMBER FOR MR. GHEORGHE WHEN THE

16     RSU'S ARE EXCLUDED, AND THAT NUMBER DROPPED -- THE ANNUALIZED

17     LABOR LATE IS 274,144.

18     Q.   AND WHAT IS MR. WANG'S ANNUAL COMPENSATION WITH THE RSU'S

19     INCLUDED?

20     A.   SO, AGAIN, INCLUDING THOSE RSU'S IS THE ORANGE BAR, SO

21     MR. WANG'S ANNUALIZED LABOR RATE IS 1,167,670.

22     Q.   AND WHAT IF YOU REMOVE THE RSU'S THAT HE WAS PROVIDED FOR

23     THE WORK HE DID WAY BACK WHEN?

24     A.   AND THE BLUE BAR IS WHEN RSU'S ARE EXCLUDED, AND THAT

25     DROPS DOWN TO 308,547.

1    Q.   HAVE YOU DONE THE SAME CALCULATION FOR THE OTHER 20

2    EMPLOYEES?

3    A.   YES.  I HAVE A -- THE NEXT -- THE NEXT DEMONSTRATIVE HERE

4    SHOWS THE HOURLY LABOR RATE FOR ALL 22 EMPLOYEES BROKEN OUT

5    BETWEEN THE RSU'S AND EVERYTHING ELSE THAT SHE INCLUDES,

6    MS. TREXLER INCLUDES IN HER ANALYSIS.

7    Q.   WHAT CONCLUSIONS, IF ANY, DO YOU DRAW FROM THIS DATA?

8    A.   SO THE BLUE BARS, AGAIN, ARE ESSENTIALLY ALL THE LABOR

9    RATE THAT DOESN'T RELATE TO RSU'S, SO THAT'S THE -- ON THE

10   BOTTOM.

11        SO, AGAIN, THESE ARE HOURLY LABOR RATES.  SO $100 AN HOUR

12   IS ABOUT 208,000.

13        SO YOU CAN SEE THE BLUE BARS RANGE BETWEEN ABOUT 75,000 --

14   SORRY, $75 AN HOUR UP TO MAYBE $160-, $170 AN HOUR.

15        SO THOSE -- THAT'S A FAIRLY TIGHT RANGE, AND THEY'RE RATES

16   THAT I WOULD EXPECT FOR SECURITY ENGINEERS.

17        WHEN YOU ADD IN THE RSU'S, SUDDENLY THESE RATES JUMP

18   SIGNIFICANTLY, AS WE TALKED THROUGH A COUPLE EXAMPLES, AND

19   THEY'RE HIGHLY VARIABLE BASED ON THE EMPLOYEE FOR A NUMBER OF

20   REASONS.

21        BUT THEY VARIED PRETTY WIDELY, AND YOU SEE THERE'S A

22   COUPLE -- OR SEVERAL EMPLOYEES THAT HAVE SIGNIFICANTLY HIGHER

23   HOURLY RATES WHEN THEIR RSU'S ARE ADDED IN.

24   Q.   WHAT WOULD HAPPEN TO MS. TREXLER'S $444,719 NUMBER IF YOU

25   REMOVED THE RSU'S?

1   A.   SO AS I MENTIONED, 40 PERCENT, 40.2 PERCENT OF THAT NUMBER

2   IS RELATED TO THE RSU EXPENSE, AND THAT 40.2 PERCENT IS

3   178,764.

4        SO ESSENTIALLY THAT 444,719 WOULD DROP BY THAT 178,764,

5   AND IT WOULD BE REDUCED DOWN TO 265,955.

6   Q.   OKAY.  THANK YOU.

7        I'M GOING TO SHOW YOU MS. TREXLER'S CALCULATION OF

8   PLAINTIFFS' LABOR EXPENSES TO RESPOND TO DEFENDANTS' EXPLOIT.

9   A.   I THINK THAT'S ON PAGE 31 OF MS. TREXLER'S REPORT.

10  Q.   SORRY.  CAN YOU GO TO EXHIBIT -- TURN OFF THE MONITOR AND

11  GO TO EXHIBIT 2093.

12       WHAT PAGE OF THE EXHIBIT?

13  A.   033.

14  Q.   033.  THANK YOU.

15       NOW, TOWARDS THE BOTTOM THERE'S A ROW THAT SAYS COST OF

16  LABOR, PARENS, ADDITIONAL EMPLOYEES THAT MS. TREXLER DID NOT

17  INTERVIEW HERSELF.

18       THE AMOUNT MS. TREXLER INCLUDES FOR THESE EMPLOYEES IS

19  $105,469.

20       HAVE YOU REACHED AN OPINION ABOUT MS. TREXLER'S INCLUSION

21  OF THAT 105,469?

22  A.   YES.

23  Q.   WHAT IS THAT OPINION?

24  A.   IN MY OPINION, SO THAT -- THAT -- THE NUMBER -- THE NUMBER

25  OF HOURS THAT SHE INCLUDES IN THAT CALCULATION WERE NOT

1        SUPPORTED BY FACEBOOK'S CORPORATE DESIGNEE WITNESS ON THE TOPIC

2        OF HOURS SPENT BY FACEBOOK AND WHATSAPP.

3             SO THAT 105,469 IS SIGNIFICANTLY OVERSTATED AND INCLUDES

4        HOURS THAT ARE FAR BEYOND WHAT MR. ROBINSON, WHO IS FACEBOOK'S

5        CORPORATE DESIGNEE, WAS ABLE TO TESTIFY TO.

6        Q.   AND ARE YOU REFERRING TO THE TESTIMONY READ BY MY PARTNER,

7        MR. AKROTIRIANAKIS, YESTERDAY WHERE MR. ROBINSON'S ANSWERS WERE

8        I DON'T KNOW, I DON'T RECALL?

9        A.   THAT IS THE GENERAL TESTIMONY I'M REFERRING TO, YES.

10            MR. CRAIG:  YOUR HONOR, I'D LIKE TO READ A BRIEF

11       ADDITIONAL PORTION FROM MR. ROBINSON'S 30(B)(6) TESTIMONY.

12            THE COURT:  OKAY.

13            MR. CRAIG:

14       "QUESTION:  WHAT WAS BRENDON TISZKA'S TITLE IN 2019?

15       "ANSWER:  I DON'T KNOW.

16       "QUESTION:  WHAT DID BRENDON TISZKA DO TO RESPOND TO

17       DEFENDANTS' EXPLOIT IN MAY 2019?

18            "ANSWER:  I DON'T KNOW THE FULL EXTENT OF HIS WORK.

19            "QUESTION:  DO YOU KNOW ANY OF THE EXTENT OF HIS WORK?

20            "ANSWER:  WE HAD SOME BRIEF CONVERSATIONS ABOUT IT.

21       BEYOND THAT, I DON'T KNOW MUCH ABOUT WHAT HE DID.

22            "QUESTION:  SO YOU CAN'T TELL ME ANYTHING ABOUT WHAT HE

23       DID?

24            "ANSWER:  I KNOW HE ASKED ME TO INVESTIGATE SOME OF THE

25       PAYLOAD THAT WAS BEING INVESTIGATED.

1          "QUESTION:  DO YOU KNOW ANYTHING ELSE ABOUT WHAT HE DID?

2          "ANSWER:  NO.

3          "QUESTION:  HOW LONG DID IT TAKE HIM TO ASK YOU TO ANALYZE

4     SOME OF THE PAYLOAD THAT WAS BEING INVESTIGATED?

5          "ANSWER:  IT LOOKS LIKE WE HAD A CONVERSATION SPANNING

6     ABOUT THREE HOURS."

7     Q.   HAVE YOU REVIEWED MR. ROBINSON'S ENTIRE RULE 30(B)(6)

8     DEPOSITION TRANSCRIPT AS PLAINTIFFS' CORPORATE DESIGNEE ABOUT

9     THE TIME SPENT BY PLAINTIFFS' EMPLOYEES IN RESPONDING TO THE

10    EXPLOIT?

11    A.   YES.  I CERTAINLY -- I READ THE PAGES WHERE HE WAS ASKED

12    ABOUT THE 14 EMPLOYEES, AND THE -- SO MS. TREXLER TESTIFIED

13    ABOUT 22 EMPLOYEES, OR CALCULATED -- DID CALCULATIONS ON 22

14    EMPLOYEES IN TOTAL, 8 WHICH SHE HERSELF INTERVIEWED, AS I

15    UNDERSTAND, AND THEN 14 THAT SHE DID NOT INTERVIEW.

16         SO I READ MR. ROBINSON'S TESTIMONY ON ALL 22 OF THOSE

17    EMPLOYEES.

18    Q.   AND CAN YOU SUMMARIZE IT?

19    A.   SO I THINK, AS WAS READ YESTERDAY, FOR 12 OF THOSE 14

20    EMPLOYEES, MR. ROBINSON WAS UNABLE TO IDENTIFY EITHER THE TITLE

21    OR THEIR ROLE OF THE EMPLOYEE, THE ROLE THE EMPLOYEE PLAYED IN

22    THAT MAY 2ND TO MAY 13 TIME PERIOD.

23         AND THEN AS WE JUST HEARD FOR MR. TISZKA, I THINK HE WAS

24    ABLE TO IDENTIFY AT LEAST THREE HOURS, OR THREE HOURS THAT

25    RELATED TO THAT WORK.

1          AND THEN FOR THE 14TH EMPLOYEE, MR. LABUNETS, MR. ROBINSON

2     WAS ABLE TO EXPLAIN THE ROLE AND THE TITLE OF MR. LABUNETS.

3     Q.   SO MS. TREXLER CALCULATED $105,469 FOR THESE EMPLOYEES.

4          DID YOU MAKE AN ALTERNATIVE CALCULATION?

5     A.   YES.  SO I DID AN ALTERNATIVE CALCULATION BASED ON

6     MR. ROBINSON'S TESTIMONY THAT INCLUDED ALL OF THE TIME THAT

7     MS. TREXLER DID FOR MR. LABUNETS, AND THEN THREE HOURS FOR

8     MR. TISZKA.

9          AND THAT CALCULATION RESULTS IN THAT SECOND ROW, THE

10    ADJUSTED LABOR EXPENSE FOR 14 EMPLOYEES, BASED ON THE ROBINSON

11    TESTIMONY, OF $8,272.  SO IN TOTAL, THAT'S A REDUCTION TO THE

12    105,469 THAT SHE CALCULATED OF 97,197.

13    Q.   NEXT, DID MS. TREXLER DIVIDE HER DAMAGES CALCULATION TO BE

14    BEFORE AND AFTER A CERTAIN DATE?

15    A.   YEAH.  IN HER REPORT, SHE SET FORTH A CALCULATION THAT

16    WENT FROM MAY 2ND THROUGH MAY 13TH, 2019, AND THEN A SECOND

17    CALCULATION FOR THE PERIOD AFTER MAY 13TH, 2019.

18    Q.   CAN WE GO TO THE NEXT SLIDE.  LET'S START WITH THE PERIOD

19    OF TIME BEFORE MAY 13TH, 2019.

20         WHAT WAS MS. TREXLER'S TOTAL?

21    A.   SO BEFORE -- WELL, THROUGH MAY 13TH, 2019, SORRY, THAT

22    MAY 2ND TO MAY 13TH 2019 TIME PERIOD, SHE INCLUDED A TOTAL OF

23    215,079.

24    Q.   IS THIS NUMBER COMPRISED OF TWO DIFFERENT GROUPS OF

25    PEOPLE?

1    A.   YEAH.  SO AS I MENTIONED, MS. TREXLER'S ANALYSIS WAS SPLIT

2    BETWEEN 8 EMPLOYEES THAT SHE HERSELF INTERVIEW AND HAD THEN 14

3    EMPLOYEES THAT SHE DID NOT INTERVIEW.

4         AND SO FOR THE 8 EMPLOYEES, SHE CALCULATED 109,610.  AND

5    FOR THOSE OTHER 14, SHE TESTIFIED -- OR SHE CALCULATED 105,469.

6    Q.   AND WHAT'S YOUR UNDERSTANDING AS TO WHAT THE WORK -- WHAT

7    WORK WAS DONE THAT'S REPRESENTED BY THIS $215,079 NUMBER?

8    A.   SO MY UNDERSTANDING IS THAT MAY 13TH, 2019 DATE IS THE

9    DATE THAT PLAINTIFFS CLAIM THE SECURITY VULNERABILITY WAS FULLY

10   CLOSED.

11        SO THAT PERIOD FROM MAY 2ND TO MAY 13TH, 2019, THAT

12   215,079, IS THE LABOR EXPENSE CALCULATED BY MS. TREXLER PRIOR

13   TO THE FULL CLOSURE OF THE SECURITY VULNERABILITY.

14   Q.   NOW, WHAT'S THE DOLLAR AMOUNT AFTER MAY 13TH?

15   A.   AFTER MAY 13TH, 2019, THE DOLLAR AMOUNT IS 229,640.

16   Q.   AND WHAT'S YOUR UNDERSTANDING OF WHAT THAT AMOUNT OF MONEY

17   REPRESENTS AS FAR AS WORK BEING DONE?

18   A.   SO, AGAIN, THIS IS MONEY THAT'S AFTER THE TIME PERIOD THAT

19   THE SECURITY VULNERABILITY WAS FULLY CLOSED AS THE PLAINTIFFS

20   CLAIM, AS I UNDERSTAND.

21        SO -- AND, FOR EXAMPLE, THAT INCLUDES A TARGET OUTREACH

22   PROGRAM IS ONE ITEM IN THAT TIME PERIOD.

23   Q.   SO MS. TREXLER'S AMOUNT AFTER MAY 13 IS GREATER THAN THE

24   AMOUNT BEFORE MAY 13?

25   A.   YES, IT IS.

1    Q.   BASED ON THE TRIAL TESTIMONY YOU'VE HEARD AND THE EXHIBITS

2    YOU'VE SEEN, DOES THAT SURPRISE YOU?

3    A.   I AM SURPRISED.  SO THERE'S BEEN A LOT OF TESTIMONY ON

4    THAT MAY 2ND TO MAY 13, 2019 TIME PERIOD ABOUT THE AMOUNT OF

5    LABOR THAT WENT INTO THAT EFFORT.

6         THERE'S BEEN VERY LITTLE ABOUT THE POST-MAY 2013 -- SORRY,

7    MAY 13TH TIME PERIOD.

8         SO THE FACT THAT THERE'S MORE THAN HALF OF THAT EXPENSE

9    THAT MS. TREXLER CALCULATED RELATES TO THAT PERIOD, I'M

10   SURPRISED BASED ON THE TRIAL TESTIMONY.

11   Q.   NOW, DO YOU HAVE ANY RESPONSE TO MS. TREXLER'S TESTIMONY

12   YESTERDAY ABOUT THE PERIOD THAT CAME AFTER MAY 13, 2019, THE

13   TARGET OUTREACH PROGRAM THAT YOU JUST MENTIONED?

14   A.   YES.  SO THERE'S BEEN VERY LITTLE DETAIL ABOUT WHAT THAT,

15   WHAT THAT TARGET OUTREACH PROGRAM INVOLVED, THE EMPLOYEES THAT

16   WERE INVOLVED IN THAT.

17        SO IN MY OPINION, THERE -- THIS 229,640 OVERSTATES THE

18   DAMAGES.

19   Q.   AND MS. TREXLER DIDN'T EVEN BREAK OUT THE BEFORE AND AFTER

20   MAY 13TH, 2019 IN HER TESTIMONY YESTERDAY, DID SHE?

21   A.   SHE CERTAINLY DIDN'T BREAK DOWN THE TOTAL NUMBER.

22        I DO THINK SHE WALKED THROUGH AN EXAMPLE OF MR. GHEORGHE

23   WHERE SHE TALKED ABOUT THE AMOUNT PRIOR TO MAY 13TH AND THE

24   AMOUNT AFTER MAY 13TH.  I THINK THAT'S THE ONLY EMPLOYEE THAT

25   SHE TALKED ABOUT IN DETAIL AS FAR AS I RECALL.

1    Q.   NOW, WE'VE JUST SEEN THREE DIFFERENT REDUCTIONS THAT

2    YOU'VE SUGGESTED TO MS. TREXLER'S DAMAGES CALCULATION.

3         HAVE YOU PREPARED AN ESTIMATE OF WHAT MS. TREXLER'S

4    DAMAGES WOULD BE IF YOU APPLIED ALL THREE CALCULATIONS?

5    A.   SO I HAVE TRIED TO CREATE AN EXEMPLAR TEMPLATE OF HOW YOU

6    MIGHT ADJUST MS. TREXLER'S $444,719.

7    Q.   AND COULD YOU BRIEFLY WALK US THROUGH THIS?

8    A.   SURE.  SO THE 444,719 AT THE TOP IS THE NUMBER THAT

9    MS. TREXLER TESTIFIED TO YESTERDAY FOR ALL OF -- AND THAT'S FOR

10   ALL 22 EMPLOYEES.

11        SO AS I MENTIONED, THE 14 EMPLOYEES THAT SHE DID NOT

12   INTERVIEW, BASED ON MR. ROBINSON'S TESTIMONY, ONLY 97,197 IS

13   SUPPORTED.

14        SO IF YOU TAKE THAT AMOUNT OUT -- SORRY, ONLY 8,000 IS

15   SUPPORTED, WHICH RESULTS IN A REDUCTION OF 97,197.

16        SO IF YOU REMOVE THAT, YOU GET DOWN TO THE SECOND ROW,

17   WHICH IS 347,522.

18        SO THEN THE NEXT ADJUSTMENT WE DISCUSSED WAS THE FACT THAT

19   A PRETTY LARGE PORTION OF HER EXPENSE RELATES TO THAT

20   POST-MAY 20 -- SORRY, POST-MAY 13TH, 2019 TIME PERIOD, AND ON

21   THE PREVIOUS SLIDE WE SAW THAT AMOUNT WAS 229,640.

22        AND THERE'S NO OVERLAP BETWEEN THE EIGHT EMPLOYEES THAT

23   WORKED POST-MAY 13TH, 2019 AND THOSE 14 THAT WORKED -- THE 14

24   THAT MS. TREXLER DID NOT INTERVIEW.

25        SO, AGAIN, THAT'S ANOTHER REDUCTION THAT YOU CAN MAKE IN

1    ITS ENTIRETY OF THE 229,640.

2         SO IF YOU REMOVE THAT, THAT WOULD BE 117,882.

3         AND THEN THE LAST ROW IS, AS I TESTIFIED EARLIER,

4    40.2 PERCENT OF HER CALCULATION, MS. TREXLER'S CALCULATION,

5    RELATES TO THESE RSU'S EXPENSE.

6         SO IF YOU DETERMINE THAT THE RSU EXPENSE IS NOT PROPERLY

7    AWARDED, THEN YOU WOULD REMOVE 40.2 PERCENT OF THAT 117,882,

8    WHICH WOULD RESULT IN 70,493.

9              MR. CRAIG:  YOUR HONOR, THAT IS THE END OF THIS

10    PORTION OF MR. PINSONNEAULT'S TESTIMONY.

11         THE ONLY THING HE WOULD HAVE LEFT WOULD BE TO MAKE -- GIVE

12    OPINIONS ABOUT THE FINANCIAL STATEMENTS.

13         BUT I WASN'T CLEAR IF YOUR HONOR WANTED MS. TREXLER TO GO

14    FIRST WITH HER PART OF THAT SO THAT HE COULD REBUT IT?  HE IS A

15    REBUTTAL EXPERT, AFTER ALL.  OR IF HE SHOULD GIVE HIS OPINIONS

16    ABOUT THAT NOW.

17              THE COURT:  WHY DON'T WE TALK ABOUT THAT.

18         LET'S TAKE OUR 15 MINUTE BREAK.

19         LADIES AND GENTLEMEN OF THE JURY, YOU'RE EXCUSED.

20              THE CLERK:  ALL RISE FOR THE JURY.

21         (JURY OUT AT 12:13 P.M.)

22              THE COURT:  OKAY.  MR. ANDRES?  I DON'T HAVE AN

23    OPINION.  I DON'T CARE ONE WAY OR THE --

24         YOU CAN STEP DOWN.

25              THE WITNESS:  THANK YOU.

1             THE COURT:  BUT YOU DON'T HAVE TO LEAVE.  WE'RE GOING

2      TO TALK ABOUT THIS.

3             MR. ANDRES:  I'M SORRY ABOUT THE TIME, YOUR HONOR.

4      AND I DON'T UNDERSTAND WHAT THE BIG DEAL IS.  I MEAN, THIS

5      ISN'T -- NEITHER SIDE DID A REPORT, AND THIS IS NOT REALLY

6      REBUTTAL, NOT REBUTTAL.  IT'S JUST TESTIMONY --

7             THE COURT:  I DON'T KNOW WHY IT'S NECESSARY AT ALL.

8      WHY IS IT NECESSARY?  WHY IS ADDITIONAL TESTIMONY ON THOSE

9      DOCUMENTS NECESSARY?

10            MR. ANDRES:  WELL, BECAUSE, AS YOU'RE GOING TO SEE,

11     MR. SHOHAT SUBSTANTIALLY MISREPRESENTED THOSE DOCUMENTS,

12     SUBSTANTIALLY.

13         AND MS. TREXLER IS GOING TO TESTIFY ABOUT WHAT THEY SAY,

14     AND IT'S RELEVANT FOR THE CASE.

15         AND YOUR HONOR PROMISED US THAT WE COULD DO IT YESTERDAY.

16            THE COURT:  YEAH, YOU CAN DO IT.

17            MR. ANDRES:  YEAH.  IT'S NOT GOING TO BE LONG, BUT I

18     JUST DON'T UNDERSTAND WHAT --

19            THE COURT:  OKAY.  YOU TWO DECIDE.  LET'S TRY

20     SOMETHING BRAND NEW.  YOU TWO DECIDE HOW YOU WOULD LIKE TO

21     HANDLE THE REVIEW BY YOUR EXPERTS OF THE FINANCIAL RECORDS.

22     THE TWO OF YOU, YOU DECIDE.

23            MR. CRAIG:  THANK YOU, YOUR HONOR.

24            MR. ANDRES:  THANKS, JUDGE.

25            (RECESS FROM 12:14 P.M. UNTIL 12:30 P.M.)

```
 1              THE CLERK:  ALL RISE FOR THE JURY.

 2          (JURY IN AT 12:30 P.M.)

 3              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 4          (PAUSE IN PROCEEDINGS.)

 5              THE COURT:  ALL RIGHT.  MR. CRAIG, HOW ARE WE GOING

 6      TO PROCEED?

 7              MR. CRAIG:  WE ARE GOING TO HAVE NO MORE QUESTIONS

 8      FOR MR. PINSONNEAULT AT THIS TIME.

 9          I BELIEVE WE'VE REACHED AN AGREEMENT THAT AFTER

10      MS. TREXLER MAKES ANY TESTIMONY SHE'S GOING TO MAKE ABOUT THE

11      FINANCIAL STATEMENTS, THEN WE CAN RECALL MR. PINSONNEAULT.

12              THE COURT:  OKAY.

13              MR. CRAIG:  AND SINCE MR. ANDRES HAS ALREADY MOVED

14      HIS STUFF IN, I WILL YIELD THE LECTERN.

15              THE COURT:  ALL RIGHT.  SO THIS IS YOUR REBUTTAL?

16              MR. CRAIG:  THIS IS CROSS.

17              MR. ANDRES:  SO THEY WANT TO CALL THE WITNESS BACK.

18      WE WANT TO DEFER TO THEM SO THEY CAN BRING THEIR CASE IN

19      HOWEVER THEY WANT.

20              THE COURT:  OKAY.  WE'VE GOT --

21              MR. ANDRES:  THIS IS MY CROSS.

22              THE COURT:  OKAY.

23              MR. ANDRES:  THIS IS MY CROSS.  THEY'RE GOING TO REST

24      AT SOME POINT, THEN WE'RE GOING TO PUT ON MS. TREXLER, AND THEN

25      I GUESS THEY'RE GOING TO CALL HIM BACK.  I DON'T --
```

1        THE COURT:  OKAY.  WE HAVE LIMITED TIME.  LET'S GET

2    GOING.

3        MR. ANDRES:  THAT'S NOT MY BUSINESS, JUDGE.

4    THANK YOU.

5                    **CROSS-EXAMINATION**

6    BY MR. ANDRES:

7    Q.   MR. PINSONNEAULT?

8    A.   YOU GOT IT RIGHT THE FIRST TIME, PINSONNEAULT.

9    Q.   OKAY.

10   A.   SORRY.  FIVE LETTERS TO MAKE A HARD O.

11   Q.   I'M GOING TO CALL YOU MISTER.

12       OKAY.  JUST A FEW QUESTIONS.  WE'VE ALREADY SUSTAINED THAT

13   YOU'RE NOT AN ACCOUNTANT.  I'M NOT GOING TO GO OVER THAT AGAIN.

14       CAN I GET THIS SLIDE OF HIS QUALIFICATIONS?

15       DO YOU HAVE IT IN FRONT OF YOU?

16   A.   I DO.

17   Q.   THIS IS YOUR BACKGROUND AND WHAT YOU DO AND STUFF LIKE

18   THAT; RIGHT?

19   A.   THAT'S CORRECT.

20   Q.   OKAY.  AND YOU GET HIRED IN YOUR --

21       THE CLERK:  I AM SORRY.  EXCUSE ME, MR. ANDRES.

22   WHO'S DISPLAYING THE SIDE?

23       MR. AKROTIRIANAKIS:  I HOPE THEY ARE.  I DON'T HAVE

24   IT.

25       THE CLERK:  OKAY.  SORRY.  I SWITCHED TO YOU.

1         THE WITNESS:  SORRY.  CAN YOU --

2    BY MR. ANDRES:

3    Q.   YEAH, SURE.  YOU TESTIFY FREQUENTLY, I THINK WAS PART OF

4    YOUR TESTIMONY BEFORE; IS THAT DIRECT?

5    A.   YES.

6    Q.   AND LITINOMICS IS LITIGATION ECONOMICS, SO SOME IMPORTANT

7    PART OF YOUR BUSINESS IS LITIGATION?

8    A.   YES, THAT'S TRUE.

9    Q.   AND YOU GET PAID TO TESTIFY, IN EFFECT, OR TO GIVE AN

10   OPINION?

11   A.   I -- IF I'M RETAINED AS THE EXPERT, I'M TYPICALLY RETAINED

12   AS AN INDEPENDENT EXPERT IN LITIGATION.

13   Q.   I'M NOT SUGGESTING THAT YOU'RE SOMEHOW GETTING PAID OFF.

14   I'M SAYING YOU GET PAID TO GIVE YOUR EXPERTISE?

15   A.   YES.  OTHER -- WE HAVE DONE PRO BONO MATTERS AS WELL.  BUT

16   TYPICALLY, OUR TYPICAL ARRANGEMENT IS THAT WE ARE PAID FOR OUR

17   WORK.

18   Q.   ARE YOU WORKING PRO BONO FOR NSO?

19   A.   NO, WE ARE NOT.

20   Q.   I THINK YOU SAID THEY PAID YOU 160 SOMETHING THOUSAND

21   DOLLARS?

22   A.   THAT'S CORRECT.

23   Q.   THEY PAID ON TIME?

24   A.   I -- I THINK SO.  I DON'T -- I HAVEN'T LOOKED BACK TO SEE

25   HOW FREQUENTLY THEY PAID.  BUT I DON'T HAVE ANY RECOLLECTION

1        THAT THEY DIDN'T PAY.

2        Q.   DID YOU GET A CHECK?

3        A.   THAT I DON'T RECALL.

4        Q.   IF YOU DID, IT DIDN'T BOUNCE?  THEY'RE GOOD FOR THEIR

5        MONEY, HUH?

6        A.   YES.

7        Q.   OKAY.  SO THIS DOCUMENT THAT TALKS -- I'M SORRY, I JUST --

8        YOU SHOULD TALK TO THE JURY, BUT I'M JUST -- THIS TALKS ABOUT

9        YOUR PRESENTATIONS; RIGHT?  YOU'VE GIVEN 18 PRESENTATIONS?

10       A.   THAT'S CORRECT.

11       Q.   WHAT IS THAT?  THAT'S LIKE WHEN YOU GIVE A PRESENTATION TO

12       A LAW SCHOOL, WHAT IS THAT?

13       A.   SO I'M PRESENTING ON THE TOPIC -- USUALLY ON THE TOPIC OF

14       ECONOMIC DAMAGES, FOR EXAMPLE, TO A LAW SCHOOL, TO AN EXPERT

15       WITNESS ASSOCIATION, OR TO INTELLECTUAL PROPERTY ORGANIZATIONS.

16       Q.   THESE ARE THE PEOPLE THAT ARE GOING TO HIRE YOU NEXT;

17       RIGHT?  THESE ARE THE NEXT GENERATION OF LAWYERS THAT YOU'RE

18       GOING TO WORK WITH AND THEY'RE POTENTIAL CLIENTS?

19       A.   I DON'T -- THAT'S NOT HOW I VIEW IT.  IF THAT IS HOW IT

20       WORKS OUT, GREAT.  BUT IT'S SOMETHING THAT I HAVE CONTRIBUTED

21       MY TIME TO BOTH LAW SCHOOLS AND TO PRESENT AT LAW CONFERENCES.

22       I'M A MEMBER OF ORGANIZING LAW CONFERENCES.

23       Q.   JUST ASKING THE QUESTIONS.

24            EIGHTEEN OF THOSE ARE TO -- I ASSUME THESE KIDS THAT ARE

25       IN LAW SCHOOL, THEIR HOPE IS TO BECOME LAWYERS?  IS THAT FAIR?

1    A.   I WOULD THINK THAT THE STUDENTS IN LAW SCHOOL WOULD HOPE

2    TO BECOME LAWYERS.

3    Q.   AND THEY'RE GOING TO BE INVOLVED IN LITIGATION AND THEY'RE

4    GOING TO HIRE EXPERT WITNESSES LIKE YOU?

5    A.   I'M NOT SURE -- I'M NOT SURE WHAT -- I THINK IT'S A PRETTY

6    SMALL PORTION THAT ACTUALLY WOULD GO INTO LITIGATIONS THAT

7    WOULD BE AN AREA WHERE THEY WOULD HIRE ME.

8    Q.   I HOPE NOT.  I HOPE YOU'RE NOT DISCOURAGING THEM FROM

9    GOING INTO LITIGATION.  BUT LET'S PUT THAT ASIDE.

10        WHAT ABOUT EXPERT WITNESS ASSOCIATIONS?  WHAT ARE THOSE?

11   THOSE ARE OTHER PEOPLE LIKE YOU.

12   A.   SO THOSE ARE CERTAINLY OTHER EXPERT WITNESSES LIKE ME AND

13   MS. TREXLER, YES.

14   Q.   THOSE ARE OTHER PEOPLE THAT ARE BEING PAID TO GIVE THEIR

15   TESTIMONY?

16   A.   WELL, WHEN THEY'RE ON A PRESENTATION -- WHEN THEY'RE AT

17   CONFERENCES, THEY'RE NOT BEING PAID TO GIVE TESTIMONY.

18   Q.   NO, BUT THEIR JOB -- THESE ARE A GROUP OF PEOPLE WHOSE JOB

19   IS TO GET PAID TO GIVE TESTIMONY IN LITIGATION LIKE THIS?

20   THAT'S WHAT AN EXPERT WITNESS IS?

21   A.   AN EXPERT -- YES, SO EXPERT WITNESSES ARE RETAINED TO BE

22   EXPERTS IN LITIGATION SUCH AS THIS.

23   Q.   OVER HERE, YOU HAVE EXPERT ON MORE THAN 100 MATTERS.  WHEN

24   YOU SAY MATTERS, DOES THAT MEAN, LIKE, 100 DIFFERENT CASES THAT

25   HAVE BEEN FILED OR DIFFERENT --

1    A.   YES, YES.

2    Q.   SO THAT'S 100 TIMES.

3         OF THOSE 100 TIMES THAT YOU WERE HIRED TO GIVE AN OPINION,

4    HOW MANY TIMES DID YOU DISAGREE WITH THE PARTIES THAT HIRED

5    YOU?

6    A.   I WOULD SAY -- I WOULD SAY SEVERAL.

7    Q.   SEVERAL.  LIKE, FOUR?  FIVE?  TEN?

8    A.   I WOULD SAY WE'VE BEEN RETAINED AND THE COMPANY THAT HIRED

9    ME ULTIMATELY DID NOT WANT TO HAVE ME PROVIDE EXPERT OPINIONS

10   IN THE CASE ON AT LEAST PROBABLY 20 OCCASIONS.

11   Q.   SO 80 PERCENT OF THE TIME THAT YOU GET PAID TO GIVE YOUR

12   OPINION, YOUR CLIENT AGREES WITH YOU?

13   A.   WELL, I'M NOT SURE IT IS QUITE AS SIMPLE AS 100 PERCENT

14   AGREEMENT OR 100 PERCENT DISAGREEMENT.

15   Q.   I'M JUST GOING TO TELL YOU RIGHT NOW, DON'T RELY ON MY

16   MATH, BECAUSE I CAN'T EVEN DO MY KID'S HOMEWORK.

17        SO YOU SAID 20, I SEE 100, 100 MINUS 20 IS 80.  I'M NOT

18   TRYING TO TRICK YOU, BUT THAT'S WHAT YOU SAID, SO LET'S FIGURE

19   THAT OUT.

20   A.   YEAH, I WOULD SAY THE 20 TIMES THAT I HAVE NOT ACTUALLY

21   BEEN HIRED AS AN EXPERT ARE TIMES WHERE I'VE CONSULTED AND

22   ULTIMATELY THE CLIENT DETERMINED THAT THE OPINIONS THAT I WOULD

23   BE WILLING TO OFFER AS AN INDEPENDENT EXPERT WOULD NOT SUIT

24   THEIR PURPOSES IN LITIGATION, FOR EXAMPLE.

25   Q.   THAT'S ALL RIGHT.  LITINOMICS, THAT'S THE COMPANY YOU WORK

1      AT?

2      A.   YES.

3      Q.   ARE THERE ANY ACCOUNTANTS THAT WORK THERE?

4      A.   YES.

5      Q.   THERE ARE ACCOUNTANTS THAT WORK AT LITINOMICS WHO ARE

6      ALSO -- WHO ALSO SERVE AS EXPERT WITNESSES?

7      A.   YES.

8      Q.   AND NONE OF THEM WERE AVAILABLE TO SERVE AS AN EXPERT ON

9      THIS CASE?

10     A.   I DON'T THINK THEY WERE INTERESTED IN HIRING AN ACCOUNTANT

11     FOR THIS CASE.

12          WELL, I CAN'T SAY WHAT THEY WERE INTERESTED IN.  THEY

13     ULTIMATELY REACHED OUT TO ME AND HIRED ME AS AN EXPERT WITNESS.

14     Q.   UNDERSTOOD.  BUT YOU ARE WHAT'S CALLED A REBUTTAL WITNESS?

15     A.   YES, THAT'S TRUE.

16     Q.   YOU ARE REBUTTING THE TESTIMONY OF AN ACCOUNTANT?

17     A.   I -- SO IN MY LINE OF WORK --

18     Q.   JUST?

19     A.   I OFTEN WORK AGAINST ACCOUNTANTS.

20     Q.   LET ME JUST ASK YOU.

21          MR. CRAIG:  OBJECTION.

22          COURT REPORTER:  I AM SORRY, I CAN'T DO BOTH.

23          MR. ANDRES:  LET ME ASK THE QUESTION AGAIN.

24     Q.   I DON'T HAVE A LOT OF TIME.

25     A.   I'M TRYING TO ANSWER YOUR QUESTION.

```
 1                   THE COURT:  HOLD ON.  LET'S START OVER AGAIN.

 2                   MR. ANDRES:  THAT'S WHAT I WAS TRYING TO DO,

 3       YOUR HONOR.

 4                   THE COURT:  ASK YOUR QUESTION.

 5       BY MR. ANDRES:

 6       Q.   YOU'RE NOT AN ACCOUNTANT?

 7       A.   THAT'S CORRECT.

 8       Q.   YOU ARE A REBUTTAL WITNESS?

 9       A.   THAT'S CORRECT.

10       Q.   NSO HIRED AN ECONOMIST TO REBUT THE TESTIMONY OF AN

11       ACCOUNTANT?  YES OR NO?

12       A.   THAT'S TRUE, YES.

13       Q.   OKAY.  LET ME JUST KEEP GOING JUST SO WE CAN KEEP GOING.

14            YOU SEEMED TO -- THERE WERE QUESTIONS ABOUT THE AMOUNT OF

15       TIME YOU GOT PAID AND HOW MANY PEOPLE THAT YOU HAD ON YOUR TEAM

16       AND HOW MANY PEOPLE MS. TREXLER HAD ON HER TEAM.

17            DO YOU REMEMBER THAT?

18       A.   YES.

19       Q.   WERE YOU COMPLAINING, OR ARE YOU UPSET SOMEHOW THAT SHE

20       HAD MORE PEOPLE ON HER TEAM THAN YOU HAD ON YOUR TEAM?

21       A.   I WOULD SAY THAT I WAS SURPRISED THAT SHE WASN'T ABLE TO

22       ESTIMATE HER FEES IN THIS CASE.  AS AN EXPERT WITNESS, I THINK

23       IT'S A DUTY TO BE ABLE TO COME TO COURT AND TESTIFY WHAT YOU'VE

24       BEEN COMPENSATED AND WHAT FIRM HAS BEEN COMPENSATED IN A CASE.

25            AND YESTERDAY SHE WASN'T ABLE TO DO THAT, WAS SHE?  LIKE
```

1    I SAID, IT SURPRISED ME.  ALL SHE PROVIDED WAS THE NUMBER OF

2    PEOPLE THAT WORKED WITH HER, SO I WAS MAKING A COMPARISON SINCE

3    I HAD GIVEN THE NUMBER, AND SHE WAS UNABLE TO DO SO YESTERDAY,

4    I WAS COMPARING MY TEAM TO HER TEAM.

5    Q.   FAIR ENOUGH.  BUT THIS ISN'T LIKE BASKETBALL, IT'S NOT

6    FIVE ON FIVE, PEOPLE ON ONE SIDE AND THE OTHER SIDE COULD HAVE

7    A DIFFERENT NUMBER OF TEAMS?

8    A.   SURE.  I WASN'T TRYING TO SAY THE OPINIONS I OFFERED WAS

9    AFFECTED BY THAT IN ANY WAY.  I'M SIMPLY TALKING ABOUT THE

10   TOTAL FEES AS A COMPARISON SINCE SHE WAS UNABLE TO TESTIFY TO

11   THAT.

12   Q.   YOU'VE BEEN IN THIS COURTROOM?

13   A.   AS I SAID, WEDNESDAY AND THURSDAY I WAS IN THE COURTROOM.

14   Q.   WHEN MS. TREXLER TESTIFIED?  YES, YOU WERE IN THIS

15   COURTROOM WHEN MS. TREXLER TESTIFIED?

16   A.   YES.

17   Q.   I'M SUPPOSED TO TALK SLOWER, SO I'M SORRY.

18       YOU KNOW THAT MR. AKROTIRIANAKIS NEVER DEPOSED HER; RIGHT?

19   YOU HEARD THAT TESTIMONY?

20   A.   THAT -- I DO UNDERSTAND THAT, YES.

21   Q.   SO HE HAD NEVER HAD AN OPPORTUNITY TO ASK HER ALL THESE

22   QUESTIONS ABOUT WHO WORKED FOR YOU, HOW MUCH -- DO YOU REMEMBER

23   THAT?

24   A.   I KNOW HE WASN'T DEPOSED, YES.  I THINK HE DID ASK THAT

25   QUESTION YESTERDAY, AND SHE WASN'T ABLE TO TESTIFY TO IT.

1    Q.   DID YOU HEAR HIM ASK MS. TREXLER TO MAKE A PHONE CALL AT

2    THE BREAK?

3    A.   I -- I DO RECALL THAT, THAT REQUEST.

4    Q.   DO YOU REMEMBER WHAT THE JUDGE RULED ABOUT THAT?

5    A.   I THINK THE JUDGE INDICATED THAT WAS NOT NECESSARY.

6    Q.   SO THAT WAS NOT NECESSARY, AND YET WE'RE HERE TALKING

7    ABOUT WHO'S GOT WHAT TEAM AND HOW MANY PEOPLE ARE ON EACH SIDE,

8    AND YOU SEEM TO BE UPSET THAT SHE HAS MORE PEOPLE ON HER TEAM

9    THAN YOURS.

10        THAT DOESN'T AFFECT YOUR OPINION, DOES IT?

11            MR. CRAIG:  OBJECTION, YOUR HONOR.  THIS IS JUST

12   ARGUMENT.

13            MR. ANDRES:  I'M TRYING --

14            THE COURT:  IT'S CROSS.  IT'S CROSS.

15            THE WITNESS:  AGAIN, AS I EXPLAINED, AS I UNDERSTAND,

16   IT'S MY DUTY TO COME TO COURT AND BE READY TO TESTIFY TO THE

17   TOTAL COMPENSATION OF THE TEAM THAT DID WORK FOR ME.

18        AGAIN, I WAS SURPRISED THAT MS. TREXLER WAS NOT ABLE TO DO

19   SO.  SO THE ONLY BASIS THAT I COULD PROVIDE TO COMPARE THE

20   FEES, SINCE THEY WERE ASKED ABOUT AND NO NUMBER WAS ABLE TO BE

21   GIVEN IN COURT, I MADE A COMPARISON OF MY TEAM TO HER TEAM.

22        I AM NOT SUGGESTING THAT IN ANY WAY I WAS CONSTRAINED IN

23   ORDER -- IN TERMS OF MY REBUTTAL BECAUSE I HAD A SMALLER TEAM.

24   BY MR. ANDRES:

25   Q.   LET'S JUST BOTH AGREE THAT THAT'S ALL IRRELEVANT.  OKAY?

1          MR. CRAIG:  OBJECTION, YOUR HONOR.

2    BY MR. ANDRES:

3    Q.   DO YOU AGREE WITH THAT?

4          THE COURT:  WHAT IS YOUR OBJECTION?

5          MR. ANDRES:  YEAH, WHAT --

6          MR. CRAIG:  HE'S ASKING THE WITNESS TO OPINE ON THE

7    RELEVANCE OF CERTAIN TESTIMONY, YOUR HONOR.

8          THE COURT:  WHAT IS YOUR OBJECTION?  THAT HE'S ASKING

9    FOR A LEGAL OPINION?

10          MR. CRAIG:  YES, YOUR HONOR.

11          THE COURT:  OKAY.

12       OVERRULED.  IT'S CROSS-EXAMINATION.

13          MR. ANDRES:  PLEASE.

14          THE COURT:  THERE'S A LOT OF LEEWAY.

15    BY MR. ANDRES:

16    Q.   PLEASE.

17    A.   I DISAGREE THAT THE TOTAL COMPENSATION OF A FIRM IS

18    IRRELEVANT.  I CAN'T AGREE WITH YOU ON THAT.

19    Q.   OKAY.  SO IT SOUNDS LIKE PART OF YOUR OTHER CONCERN, OR

20    THE OTHER ISSUE THAT YOU'RE COMPLAINING ABOUT, YOU UNDERSTAND

21    THAT IN THIS CASE, NSO ENGAGED IN A CYBER ATTACK AGAINST

22    WHATSAPP?  YOU AGREE WITH THAT; RIGHT?

23    A.   I UNDERSTAND THAT THE COURT HAS DETERMINED CERTAIN

24    VIOLATIONS, AND I'VE HEARD THE TERM CYBER ATTACK BEING USED.  I

25    COULDN'T CHARACTERIZE IT MYSELF.

1        Q.   SORRY.  I JUST -- I WANT TO MAKE SURE WE'RE ON THE SAME --

2        DO YOU HAVE SOME DISAGREEMENT WITH THE COURT ABOUT THE RULING

3        HERE?

4        A.   NOT AT ALL.

5        Q.   OKAY.  AND YOU'RE NOT A LAWYER ANYWAY; RIGHT?

6        A.   I AM NOT A LAWYER, THAT'S CORRECT.

7        Q.   OKAY.  SO YOU UNDERSTAND THAT THE COURT HAS MADE RULINGS

8        ABOUT WHAT STATUTES HAVE BEEN VIOLATED.  WE'RE ON THE SAME PAGE

9        WITH THAT; RIGHT?

10       A.   YES.

11       Q.   OKAY.  AND IT SOUNDS LIKE -- AND YOU'VE HEARD TESTIMONY

12       THAT THIS -- AND IT CAME FROM MR. SHOHAT -- THAT THE CYBER

13       ATTACK WAS COMPLEX.

14            YOU UNDERSTAND THAT; RIGHT?

15       A.   I HAVE HEARD TESTIMONY TO THAT EFFECT, YES.

16       Q.   DO YOU NOT THINK THAT MR. SHOHAT WAS TELLING THE TRUTH

17       WHEN HE TESTIFIED?

18       A.   I HAVE NOT REACHED ANY LIABILITY CONCLUSIONS, AND I'M NOT

19       HERE TO JUDGE THE TESTIMONY.

20       Q.   BUT YOU -- THE REASON THAT YOU'RE IN THIS COURTROOM IS

21       THAT YOU CAN HEAR THE TESTIMONY AND TELL THE JURORS WHAT YOUR

22       OPINION IS BASED ON WHAT HAPPENS IN THE COURTROOM.  YOU'RE

23       GETTING PAID FOR THAT; RIGHT?

24       A.   ACTUALLY, THE OPINIONS THAT I'M OFFERING ARE ON THE

25       CALCULATION OF ECONOMIC DAMAGES, WHICH I LAID OUT IN MY REPORT,

1    WHICH WAS FILED MANY MONTHS AGO.  IT'S NOT TO LISTEN TO THE

2    TESTIMONY IN THE COURT AND CREATE NEW OPINIONS ON THE FLY.

3    Q.   SINCE YOU ISSUED THAT REPORT, THERE'S BEEN A LIABILITY

4    FINDING; RIGHT?  THAT CHANGES THINGS, DOESN'T IT?

5    A.   FROM A DAMAGES PERSPECTIVE?

6    Q.   YEAH.

7    A.   IN MY EXPERT REPORT, I ASSUMED THAT THERE WOULD BE A

8    LIABILITY FINDING.  SO ON THE DAMAGES SIDE, IT DOESN'T CHANGE

9    ANYTHING.  THAT'S THE ASSUMPTION THAT ALL DAMAGES EXPERTS HAVE

10   TO MAKE, BECAUSE IF THERE'S NO LIABILITY, DAMAGES ARE NOT

11   AWARDED.

12        SO IN ALL REPORTS THAT I'VE SEEN, BOTH PARTIES ASSUME THAT

13   LIABILITY WILL BE FOUND.  THAT'S A FUN MENTAL ASSUMPTION OF THE

14   ANALYSIS.

15   Q.   OKAY.  YOU HEARD -- YOU DON'T DISAGREE THAT NSO HAS

16   COMPLEX SPYWARE; RIGHT?  YES OR NO?  LET'S JUST CUT TO THE

17   CHASE.

18   A.   I DON'T DISAGREE WITH THAT.

19   Q.   OKAY.  AND SO FIXING THAT ON WHATSAPP'S SIDE IS ALSO

20   COMPLEX; RIGHT?  I MEAN, THEY'RE REBUTTING THIS COMPLEX,

21   SOPHISTICATED ATTACK?

22             MR. CRAIG:  OBJECTION.  FOUNDATION, YOUR HONOR.

23             THE COURT:  SUSTAINED.

24             MR. ANDRES:  IT'S IN HIS REPORT, YOUR HONOR.

25             THE COURT:  SUSTAINED.

1    BY MR. ANDRES:

2    Q.   IN YOUR REPORT, YOU TALK ABOUT ALL THE CAPABILITIES OF

3    PEGASUS, DON'T YOU?

4    A.   I DO INCLUDE A SECTION TALKING ABOUT THE CAPABILITIES OF

5    PEGASUS, YES.

6    Q.   YEAH.  YOU HAVE A WHOLE SECTION ON WHAT THE BACKGROUND OF

7    THE COMPANY IS; RIGHT?  WHEN IT WAS FOUNDED?  THAT Q CYBER

8    CHANGED ITS NAME?  ARE YOU NOT FAMILIAR -- DID YOU READ YOUR

9    REPORT BEFORE YOU CAME?

10   A.   I'M VERY FAMILIAR WITH MY REPORT, YES.

11   Q.   AND IT TALKS ABOUT THE Q CYBER CHANGED ITS NAME; RIGHT?

12   A.   IT DOES.

13   Q.   IT TALKS ABOUT THAT IT WAS ESTABLISHED IN 1986 -- SORRY,

14   19 -- I GOT TO FIND THAT.  YOU KNOW THAT IT WAS ESTABLISHED

15   ABOUT 15 YEARS AGO, 2010; RIGHT?

16   A.   I DON'T HAVE THAT FACT COMMITTED TO MEMORY.  I'M SORRY.

17   Q.   DO YOU HAVE SOME REASON TO BELIEVE THAT THAT'S NOT RIGHT,

18   2010?

19   A.   I JUST DON'T HAVE A RECOLLECTION ONE WAY OR THE OTHER.

20   Q.   BUT YOU READ YOUR REPORT?

21   A.   I DID.

22   Q.   AND ACCORDING TO YOU, THAT'S THE WHOLE REASON YOU'RE HERE

23   IS TO TALK ABOUT THE OPINION IN YOUR REPORT?  YOU DON'T

24   REMEMBER THE FACTS?

25   A.   THERE ARE A LOT OF NUMBERS AND YEARS IN MY REPORT.  SO I

1      DO NOT REMEMBER THE EXACT YEAR THAT Q CYBER WAS FOUNDED.

2      Q.   IT SOUNDS LIKE META PAID ITS EMPLOYEES FOR WORKING ON THE

3      CYBER ATTACK.

4           YOU AGREE WITH ME?

5      A.   I THINK WE HEARD TESTIMONY THAT FACEBOOK EMPLOYEES DID

6      WORK FROM MAY 2ND THROUGH 13TH AND THEY WERE PAID.

7      Q.   RIGHT?

8      A.   YES.

9      Q.   AND THAT AMOUNT OF MONEY, LET'S CALL THAT X.

10          AND THEN THEY GOT MORE MONEY FROM THE RSU'S; RIGHT?  WHEN

11     THEY VEST, THEY GET PAID THE MONEY FROM THE RESTRICTED STOCK

12     OPTIONS; CORRECT?

13     A.   SO WHEN RSU'S VEST, THE SHARES DO TRANSFER, YES.

14     Q.   RIGHT.  IT -- IT'S NOT NECESSARY TO REPEAT MY QUESTION IF

15     THE ANSWER IS YES.  THEY GET MORE MONEY FROM THE RSU'S WHEN

16     THEY VEST; RIGHT?

17     A.   THEY DO NOT -- I CAN'T AGREE WITH THAT QUESTION.  THEY

18     DON'T GET MORE MONEY FROM THE RSU'S.  THEY GET THE RSU'S

19     THEMSELVES.

20     Q.   AND IF THEY SOLD THEM, THEY'D GET MORE MONEY?

21     A.    IF THEY SOLD THEM ON THE SECONDHAND MARKET, YES, THEY

22     WOULD GET MORE MONEY.

23     Q.   SO IT SOUNDS LIKE YOU'RE UPSET BECAUSE META PAID ITS OWN

24     EMPLOYEES TO FIX THIS SOPHISTICATED CYBER ATTACK WITH SOME

25     MONEY, AND THEY ALSO GAVE THEM STOCK OPTIONS BECAUSE THIS WAS A

1    HARD JOB, AND NOW YOU'RE COMPLAINING THAT THEY GOT PAID TOO

2    MUCH MONEY?

3    A.    WELL, I WOULD PHRASE IT.  AS I TRIED TO EXPLAIN TO THE

4    JURY, THERE ARE TWO PRIMARY DISAGREEMENTS WITH THE INCLUSION OF

5    RSU'S.  ONE OF THEM IS THE TIMING REASON, WHICH IS A STANDALONE

6    BASIS THAT THE CALCULATIONS THAT MS. TREXLER DID ARE NOT

7    ALIGNED WITH THAT MAY 2ND TO MAY 13TH TIME PERIOD.

8          AND THEN THE SECOND REASON IS THE FACT THAT THESE ARE NOT

9    MONIES PAID -- THESE ARE RSU -- STOCK SHARES THAT ARE

10   TRANSFERRED INTO THE FUTURE FOR OVER A FOUR YEAR VESTING

11   SCHEDULE.

12   Q.    HER APPROACH WAS MORE CONSERVATIVE, WASN'T IT?

13   A.    SAY THAT AGAIN.

14   Q.    HER APPROACH WAS MORE CONSERVATIVE?

15   A.    NO, I DON'T THINK SO.  WELL, META HAS NOT PRODUCED THE

16   DATA TO ACTUALLY BE ABLE TO ANSWER THAT QUESTION.

17   Q.    SORRY.  YOU HAVE DATA FOR YOUR ANALYSIS THAT YOU THINK IS

18   IMPORTANT AND YOU DON'T HAVE IT?

19   A.    NO.  META DID NOT PRODUCE 2020 DATA.

20   Q.    DID YOU ASK FOR IT?

21   A.    I DON'T -- WELL, I DON'T THINK I --

22   Q.    SIR, DID YOU OR DID YOU NOT ASK FOR THAT DATA?

23   A.    I DON'T RECALL ASKING FOR THE 2020 DATA.

24   Q.    SO NOW YOU'RE, YOU'RE CRITICIZING META FOR NOT HAVING

25   PRODUCED DOCUMENTS THAT YOU DIDN'T ASK FOR?  WE DON'T HAVE THE

1    ABILITY TO SPY ON YOUR INFORMATION, KNOW WHAT YOU'RE THINKING

2    OR WHATEVER, SO IF THERE'S INFORMATION THAT YOU DIDN'T GET, YOU

3    DIDN'T COMMUNICATE THAT WITH YOUR LAWYERS?

4    A.   SO ACTUALLY, MS. TREXLER'S BURDEN IS TO ESTABLISH THE

5    DAMAGES.  I GUESS SHE --

6    Q.   SHE DOESN'T --

7            THE COURT:  COUNSEL, COUNSEL.  PLEASE DON'T

8    INTERRUPT.  LET HIM FINISH HIS ANSWER.

9            THE WITNESS:  THANK YOU, YOUR HONOR.

10    SHE ASKED FOR WHATEVER DATA SHE ASKED FOR.  I REVIEWED

11   THAT DATA AND RESPONDED TO IT.  AND IN MY OPINION, SHE LOOKED

12   AT THE WRONG DATA.  SHE LOOKED AT THE WRONG TIME PERIOD.

13   BY MR. ANDRES:

14   Q.   OKAY.

15   A.   SO THAT'S THE TIME PERIOD PIECE OF MY EXPLANATION.

16   Q.   BUT YOU COULD HAVE ASKED FOR THAT INFORMATION, YOU

17   UNDERSTAND THAT?

18   A.   I THINK WHEN I WAS RETAINED ON THE CASE, FACT DISCOVERY

19   HAD CLOSED.  SO I ACTUALLY DON'T THINK THAT I COULD HAVE ASKED,

20   AS FAR AS I'M AWARE.

21   Q.   IS THAT A LEGAL OPINION THAT YOU'RE GIVING?

22   A.   YOU ASKED ME A QUESTION.  I DON'T THINK THAT I HAD THE

23   ABILITY TO ASK FOR ADDITIONAL DATA WHEN I WAS RETAINED.

24   Q.   YOU DON'T THINK YOUR LAWYERS OVER HERE HAD THE ABILITY TO

25   ASK THAT?  THEY'RE NOT SHRINKING LILIES EXACTLY.

1    A.   I'M NOT SURE THAT THEY WERE -- THAT THEY KNEW THAT

2    MS. TREXLER WAS GOING TO TRY TO INCLUDE RSU'S UNTIL SHE ISSUED

3    AN OPINION THAT DID SO.  AND AS WE DISCUSSED, I THINK THAT'S

4    NOT A STANDARD, EXCEPTED PRACTICE.

5    Q.   OKAY.  LET'S TALK ABOUT YOUR -- WE TALKED ABOUT YOUR WORK

6    AS A -- NOT MAKING MONEY TESTIFYING AS AN EXPERT WITNESS.

7         YOU'RE NOT AN EXPERT IN HOW WHATSAPP SERVERS WORK; RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   I MEAN, I SEE YOU WENT -- OH, WE DON'T HAVE THIS ANYMORE.

10        I THOUGHT YOU HAD A COMPUTER SCIENCE -- YOU WENT -- SORRY.

11   UNIVERSITY OF WASHINGTON, 1996, COMPUTER SCIENCE.

12        YOU HAVE --

13   A.   I DO HAVE A BACHELOR'S DEGREE IN COMPUTER SCIENCE, YES.

14   Q.   IT'S NOTHING TO BE ASHAMED ABOUT.  CONGRATULATIONS.  BUT

15   THAT'S NOT PART OF THIS WORK AT ALL?

16   A.   I'M NOT OFFERING ANY OPINIONS RELATING TO THE TECHNICAL

17   ASPECTS OF THIS CASE.

18   Q.   NO OPINIONS ABOUT ANY SECURITY PRACTICES OR EXPLOITS OR

19   VULNERABILITIES?

20   A.   OTHER THAN THE DAMAGES I CALCULATED.  BUT, YEAH, IN TERMS

21   OF THOSE THEMSELVES, THAT'S CORRECT.

22   Q.   I'M TALKING ABOUT THE SERVER AND THE SPYWARE AND ALL THAT

23   STUFF.  THAT'S NOT -- YOU'RE NOT THE GUY FOR THAT?

24   A.   AS LONG AS WE'RE CLEAR, YES, THAT'S CORRECT.

25   Q.   OKAY.  NOTHING ABOUT PEGASUS.  LET'S WHIP THROUGH THIS.

1    YOU'RE NOT AN EXPERT ABOUT PEGASUS.  YOU KNOW THAT IT SPIES ON

2    PEOPLE, BUT BEYOND THAT, BEYOND WHAT'S IN YOUR REPORT, YOU

3    DON'T HAVE ANY OTHER INFORMATION?

4    A.   I KNOW THAT NSO DISAGREES, AS WE'VE HEARD, WITH THE WHOLE

5    SPY AND SPYWARE ASPECT.

6         BUT CERTAINLY I'VE REVIEWED PEGASUS INFORMATION.  I'M NOT

7    TRYING TO HOLD MYSELF OUT AS AN EXPERT IN PEGASUS IN ANY WAY.

8    Q.   AND I'M NOT TRYING TO ASK YOU.  BUT YOUR REPORT SAYS THAT

9    PEGASUS HAS UNLIMITED ACCESS TO TARGETS, MOBILE AND -- THAT'S

10   IN YOUR REPORT.  SO YOU'VE ADOPTED THAT IN SOME FASHION.

11   THAT'S WHAT YOUR REPORT SAYS.

12        DO YOU HAVE YOUR REPORT UP THERE?

13   A.   I DON'T THINK I HAVE MY REPORT.

14   Q.   I'LL GIVE IT TO YOU.

15        YOUR HONOR, I'M NOT SURE I HAVE AN EXTRA COPY, BUT I ALSO

16   DON'T HAVE A LOT OF TIME TO SPEND ON THIS.

17             THE COURT:  OKAY.  GO AHEAD.  GO AHEAD.

18   BY MR. ANDRES:

19   Q.   SORRY.  I'M JUST GOING TO -- I DON'T WANT TO SPEND A LOT

20   OF TIME ON THIS, BUT YOU SEE THIS DOCUMENT THAT YOU PASTED IN

21   HERE?  JUST TAKE A LOOK AT THAT.  IT LISTS ALL THE BENEFITS OF

22   PEGASUS; RIGHT (HANDING)?

23   A.   YES, THERE'S AN EXCERPT FROM A DOCUMENT TALKING ABOUT

24   BENEFITS OF PEGASUS, THAT'S CORRECT.

25   Q.   THAT'S A DOCUMENT YOU GOT FROM NSO?

1    A.   WELL, THAT WAS A DOCUMENT THAT WAS PRODUCED IN THIS CASE

2    BY NSO AS I UNDERSTAND IT.

3    Q.   WELL, HOW DID YOU GET IT?

4    A.   I THINK -- IF I'M RECALLING THIS DOCUMENT CORRECTLY, I

5    THINK IT MADE -- THIS WAS ONE OF THE DOCUMENTS THAT WAS

6    REFERENCED BY MS. TREXLER, AND I REQUESTED IT FROM COUNSEL, AND

7    I RECEIVED ALL THOSE DOCUMENTS.

8    Q.   YOU GOT IT FROM NSO?

9    A.   I GOT IT FROM COUNSEL FOR NSO.  CORRECT.

10   Q.   SEE HOW MUCH EASIER IT IS IF WE JUST ANSWER THE QUESTION

11   DIRECTLY.

12        IN THERE IT TALKS ABOUT ENCRYPTED CONTENT ON DEVICES;

13   RIGHT?

14   A.   I DO SEE IT -- I THINK YOU -- THERE'S A BULLET, HANDLE

15   ENCRYPTED CONTENT ON DEVICES.

16   Q.   AND THAT PEGASUS COLLECTS NEW AND UNIQUE TYPES OF

17   INFORMATION, CONTACTS, FILES, ENVIRONMENTAL WIRETAPS AND

18   PASSWORDS.

19        DO YOU SEE THAT?

20   A.   YEAH, I SEE THAT.

21   Q.   OKAY.  YOU'RE NOT AN EXPERT IN ANY OF THAT STUFF?

22   A.   NO.

23   Q.   OKAY.  YOU UNDERSTAND THAT THE JUDGE HAS FOUND NSO LIABLE

24   ON THE COMPUTER FRAUD AND ABUSE ACT?  IT'S A FEDERAL STATUTE.

25   YOU UNDERSTAND THAT?

1    A.   I DO HAVE THAT UNDERSTANDING, YES.

2    Q.   DO YOU HAVE ANY EXPERTISE ABOUT DAMAGES AS IT RELATES TO

3    THE CFAA AS IT'S CALLED?

4    A.   I WOULDN'T HOLD MYSELF OUT AS A LEGAL EXPERT IN TERMS OF

5    THE DAMAGES FOR THE CFAA.

6         I CALCULATED DAMAGES, AND I THINK I HAVE THE EXPERTISE IN

7    ORDER TO CALCULATE DAMAGES THAT WOULD BE APPROPRIATE UNDER THE

8    CFAA.

9    Q.   BUT YOU'RE -- SO WHICH IS IT?  YOU'RE NOT A LEGAL -- ARE

10   YOU AN EXPERT OR ARE YOU NOT AN EXPERT IN THE COMPUTER FRAUD

11   AND ABUSE ACT?

12   A.   WELL, I JUST WANT TO BE CLEAR.  I UNDERSTAND THAT THE

13   COURT IS GOING TO INSTRUCT THE JURY ON WHAT DAMAGES ARE

14   APPROPRIATE.

15   Q.   SIR --

16   A.   I'M NOT OFFERING ANY OPINIONS ABOUT THE TYPES OF DAMAGES

17   THAT ARE APPROPRIATE.

18        I HAVE PERFORMED CALCULATIONS, AND I THINK THAT MY

19   EXPERTISE ASSISTS IN THE CALCULATION OF -- IN THE CALCULATION

20   OF EXPENSES THAT ARE RELEVANT TO THE CFAA.

21   Q.   YOU WERE DEPOSED IN THIS CASE?

22   A.   YES, I WAS.

23   Q.   IN YOUR DEPOSITION, YOU SAID -- YOU WERE ASKED, OR YOU

24   WERE ASKED, "YOU'RE NOT AN EXPERT ON COMPUTER FRAUD AND ABUSE

25   ACT?"

1       AND YOU ANSWERED, "I DO NOT HOLD MYSELF OUT AS AN EXPERT

2    ON THAT PARTICULAR ACT."

3       DO YOU REMEMBER THAT TESTIMONY?

4    A.   YES, AND IF I -- I THOUGHT I UNDERSTOOD THIS QUESTION THAT

5    YOU GAVE TO ME WAS ABOUT DAMAGES UNDER THE CFAA.

6       I JUST WANT TO BE CLEAR, I THINK THAT ANSWER IS ASKING

7    ABOUT THE ENTIRE ACT.

8    Q.   YOU'RE NOT AN EXPERT IN THAT ACT?

9    A.   I DO NOT THINK I'M AN EXPERT GENERALLY IN THE CFAA ACT.

10   Q.   HOW ABOUT THE CALIFORNIA STATUTE THAT THE JUDGE HAS FOUND

11   NSO VIOLATED?  ARE YOU AN EXPERT IN THAT?

12   A.   I WOULD NOT SAY THAT I'M AN EXPERT IN THE LEGAL ACTS, THE

13   CALIFORNIA ACTS.

14   Q.   NOW, ONE OF THE AREAS THAT YOU DISAGREE -- ONE OF THE

15   AREAS, BESIDES THE SIZE OF HER TEAM, THAT YOU DISAGREE WITH

16   MS. TREXLER'S CALCULATION HAS TO DO WITH THE OUTREACH TO

17   VICTIMS; RIGHT?

18   A.   CERTAINLY I ADDRESSED THAT IN MY EXPERT REPORT, YES.

19   Q.   AND YOU DISAGREE WITH HER?

20   A.   I -- AS I EXPLAINED IN MY REPORT, AND I THINK I TESTIFIED

21   HERE, CERTAINLY -- I DON'T THINK MS. TREXLER HAS JUSTIFIED THE

22   NUMBER OF HOURS SHE INCLUDES RELATED TO THAT VICTIM OUTREACH

23   PROGRAM.

24   Q.   LET'S JUST STEP BACK FOR A SECOND.

25       MS. TREXLER HAS SAID THAT THE DAMAGES ARE $444,719.

1        YOU KNOW THAT; RIGHT?

2    A.   THAT'S MY RECOLLECTION OF HER TESTIMONY, YES.

3    Q.   YOU'RE NOT GIVING AN OPINION THAT THE DAMAGES HERE ARE

4    ZERO; RIGHT?

5    A.   I HAVEN'T REACHED AN OPINION THAT THE DAMAGES ARE ZERO,

6    NO.

7    Q.   SO YOU HAVE -- YOU HAVE -- YOU HAVE NOT GIVEN AN OPINION

8    THAT THE DAMAGES ARE ZERO?

9    A.   THAT'S CORRECT.

10   Q.   AND YOU BELIEVE THAT THE DAMAGES SHOULD BE SOMEWHERE IN

11   THE NEIGHBORHOOD OF $200,000?

12   A.   NO, I DON'T -- THAT'S NOT CORRECT.

13   Q.   YOU DON'T -- YOU BELIEVE IT'S SOMEPLACE IN BETWEEN

14   $200,000 AND THE $400,000 THAT SHE GAVE; RIGHT?

15   A.   NO.  ACTUALLY, I -- WHAT I TRIED TO EXPLAIN IN MY REPORT

16   IS THAT IT'S SOMEWHERE BETWEEN 0 AND 200 SOMETHING ODD THOUSAND

17   DOLLARS NUMBER THAT I INCLUDED IN MY REPORT.

18   Q.   BUT YOU DIDN'T GIVE A NUMBER IN YOUR REPORT?

19   A.   THAT'S CORRECT.  I DIDN'T HAVE ACCESS -- SO AS WE'VE

20   DISCUSSED AND I'VE TESTIFIED TO, MS. TREXLER INTERVIEWED EIGHT

21   DIFFERENT FACEBOOK WITNESSES, AND APPARENTLY WAS TOLD

22   ADDITIONAL INFORMATION ABOUT ANOTHER 14.

23        AND IN MY ENTIRE CAREER, I'VE NEVER ACTUALLY HAD THE

24   OPPORTUNITY TO INTERVIEW A WITNESS OR AN EMPLOYEE OF THE

25   ADVERSE PARTY IN THAT CASE.  SO I DIDN'T HAVE ACCESS TO WHAT

1    MS. TREXLER HAD ACCESS TO.  ALL I COULD EXPLAIN IN MY REPORT

2    WAS MS. TREXLER HAS NOT JUSTIFIED THE INCLUSION OF ALL OF THIS

3    LABOR TIME, WHICH WAS A SIGNIFICANT AMOUNT OF TIME THAT SHE

4    INCLUDED.  THAT WAS MY OPINION.

5    Q.   A LOT OF NEW THINGS HAPPENING IN THIS CASE.  YOU DIDN'T

6    EVEN ASK TO INTERVIEW ANYBODY?

7    A.   AS I JUST SAID, I DID NOT ASK, I DON'T -- THERE'S --

8    THERE'S UNFORTUNATELY NO WAY FOR ME TO GIVE AN INTERVIEW OF THE

9    OPPOSING PARTY.

10   Q.   YOU CAN ASK YOUR LAWYERS?

11   A.   AGAIN --

12   Q.   HAVE A DEPOSITION TAKEN?

13   A.   IN MY ENTIRE CAREER, I'VE NEVER HAD THAT CHANCE, NOR HAS

14   ANY OTHER EXPERT THAT I'M AWARE OF HAD THE CHANCE TO INTERVIEW

15   THE OPPOSING -- AN EMPLOYEE FROM AN OPPOSING PARTY.

16   Q.   SO THERE IS DISAGREEMENT WITH MS. TREXLER ABOUT OUTREACH

17   TO VICTIMS; RIGHT?

18   A.   CAN YOU -- SORRY, YOU JUST ASKED THAT.

19   Q.   YOU THINK THAT THERE WAS A -- THAT SHE OVERSTATED HER WORK

20   AS IT RELATES TO VICTIM NOTIFICATION IN THIS CASE; RIGHT?

21   A.   YEAH, I WOULD SAY THAT THAT POST-MAY 13TH, 2019 TIME

22   PERIOD, WHICH IS THE LARGER CHUNK OF HER CALCULATION, THAT'S

23   THE TIME -- THAT TIME PERIOD I THINK SHE'S SIGNIFICANTLY

24   OVERSTATED.

25   Q.   SO YOU HAVE A PROBLEM WITH WHATSAPP NOTIFYING ITS USERS

1    THAT THE APPLICATION ON THEIR PHONE, OR THEIR PHONE, HAS BEEN

2    AFFECTED WITH SPYWARE?  YOU THINK THERE'S SOMETHING WRONG WITH

3    THAT?

4    A.   I DON'T -- I DON'T HAVE ANY PROBLEM WITH THE ACTIONS THAT

5    DEFENDANT -- SORRY -- THAT PLAINTIFFS TOOK IN THIS CASE.  I

6    HAVEN'T JUDGED ONE WAY OR THE OTHER.

7         WHAT I'M OFFERING OPINIONS ABOUT IS THE NUMBER OF HOURS

8    THAT MS. TREXLER INCLUDES IN HER CALCULATION.

9         SO IF WE RECALL MS. TREXLER'S TESTIMONY, SHE DETERMINES

10   THE NUMBER OF HOURS AND THEN MULTIPLIES IT BY AN HOURLY LABOR

11   RATE.

12        WHAT I'M SAYING IS THAT NUMBER OF HOURS, BASED ON MY

13   REVIEW, IS TOO HIGH.  ULTIMATELY IT'S GOING TO BE THE JURY'S

14   JOB TO DETERMINE THAT NUMBER OF HOURS, AND I UNDERSTAND THAT.

15   Q.   BUT MY QUESTION WAS WHETHER YOU HAD AN ISSUE WITH THE

16   ACTUAL NOTIFICATION OF PEOPLE WHOSE PHONES ARE INFECTED WITH

17   SPYWARE.

18        THE ANSWER TO THAT IS YOU HAVE NO ISSUE WITH THAT;

19   CORRECT?

20   A.   I DON'T HAVE ANY ISSUE WITH THE ACTIONS THAT PLAINTIFFS

21   TOOK.

22   Q.   YOU THINK IT MAKES SENSE FOR WHATSAPP TO NOTIFY ITS USERS

23   THAT THEY HAVE THIS SPYWARE ON THEIR PHONE; RIGHT?  YOU THINK

24   THAT'S APPROPRIATE?  OR ARE YOU NOT ABLE TO SAY THAT?

25   A.   WELL, BASED ON -- BASED ON THINGS I KNOW, BASED ON THE

1    COURT'S ORDERS, I THINK IT'S -- I THINK IT'S PERFECTLY

2    APPROPRIATE WHAT THEY DID, BUT I DON'T THINK I CAN EXPLAIN THE

3    BASIS FOR THAT.

4    Q.   YOU HAVE A PHONE.  WOULDN'T YOU WANT TO BE NOTIFIED IF

5    PEGASUS WAS ON YOUR PHONE?  WOULDN'T YOU BE CONCERNED ABOUT

6    THAT?

7    A.   YES, I WOULD BE CONCERNED IF PEGASUS WAS ON MY PHONE.

8    Q.   YOU WOULD BE SCARED?  YOU WOULD BE SCARED?

9    A.   I WOULD BE --

10   Q.   YOU WOULD BE SCARED?

11   A.   I WOULD BE CONCERNED ABOUT WHAT THAT MEANS FOR ME IF

12   PEGASUS WAS ON MY PHONE.

13   Q.   SO NOW WE'RE TALKING ABOUT THE VICTIM NOTIFICATION AND ALL

14   THAT STUFF.  YOU'RE NOT AN EXPERT IN PR OR PUBLIC RELATIONS OR

15   ANYTHING LIKE THAT; RIGHT?

16   A.   I'M NOT A PR, PUBLIC RELATIONS, EXPERT, NO.

17   Q.   OKAY.  WE TALKED ABOUT ZERO DAMAGES.  I'M GOING TO GET

18   THIS OVER WITH SHORTLY.

19        SO WE TALKED ABOUT THE FACT THAT MS. TREXLER TALKED ABOUT

20   CERTAIN, CERTAIN SPECIFIC EMPLOYEES, AND THERE'S ONE CALLED --

21   ONE GENTLEMAN CALLED AASHIN GAUTAM.

22        DO YOU KNOW WHO THAT IS?

23   A.   I'VE READ WHAT MS. TREXLER WROTE ABOUT MR. GAUTAM, YES.

24   Q.   OKAY.  AND YOU OBJECT TO HIS WORK BECAUSE YOU SAY HE WAS

25   INVOLVED IN VICTIM OUTREACH; RIGHT?

1    A.   I -- AGAIN, I -- I WOULD SAY THE NUMBER OF HOURS THAT

2    MS. TREXLER -- I DON'T CARE TO ADDRESS MY OPINION AS OBJECTING

3    TO WORK.

4        I DISAGREE WITH THE NUMBER OF HOURS THAT MS. TREXLER

5    INCLUDED FOR THESE VARIOUS EMPLOYEES.  THAT'S MY DISAGREEMENT

6    WITH MS. TREXLER.

7    Q.   RIGHT.  I UNDERSTAND THAT, AND I'M GOING TO ASK YOU ALL

8    THOSE QUESTIONS, BUT I NEED TO START, OTHERWISE WE'RE GOING TO

9    HAVE OBJECTIONS WITH THE PREMISE THAT YOU DON'T OBJECT TO THE

10   WORK THAT HE DID.

11   A.   AGAIN, AS WE DISCUSSED, I HAVE NO OBJECTIONS TO --

12   PLAINTIFFS ARE FREE TO DO WHATEVER WORK THEY WANT TO DO.

13   THAT'S -- I'M NOT OBJECTING ONE WAY OR THE OTHER.

14   Q.   YOU DIDN'T INTERVIEW HIM?

15   A.   AS WE DISCUSSED EARLIER, NO, I DID NOT INTERVIEW

16   MR. GAUTAM.

17   Q.   YOU DIDN'T INTERVIEW MS. SUSAN GLICK, DID YOU?

18   A.   I DID NOT INTERVIEW MS. GLICK.

19   Q.   SOMEHOW, IN YOUR REPORT, YOU DISTINGUISH BETWEEN THE

20   PEOPLE THAT MS. TREXLER INTERVIEWED AND THE PEOPLE WHO

21   MR. GHEORGHE -- DO YOU KNOW WHO THAT IS, CLAUDIU GHEORGHE?

22   HE'S ONE OF THE WHATSAPP ENGINEERS.

23   A.   YES.

24   Q.   YOU HAVE SOME CONCERN OR PROBLEM ABOUT SOME PEOPLE WERE

25   INTERVIEWED BY MR. GHEORGHE AND SOME PEOPLE WERE INTERVIEWED BY

1    MS. TREXLER; RIGHT?

2    A.   WELL, CERTAINLY, AS I UNDERSTAND IT, EIGHT OF THE

3    EMPLOYEES WERE INTERVIEWED BY MS. TREXLER, AND THEN

4    MR. GHEORGHE PROVIDED INFORMATION ABOUT THE OTHER 14.  I'M NOT

5    SURE WHETHER HE INTERVIEWED -- I THINK YOU ASKED IF HE

6    INTERVIEWED THEM.  I DON'T KNOW IF HE INTERVIEWED THEM.

7         BUT AS I UNDERSTAND, HE RELAYED INFORMATION TO MS. TREXLER

8    ABOUT THE OTHER 14 EMPLOYEES.

9    Q.   YEAH.  THEY WORKED FOR HIM; RIGHT?

10   A.   I THINK HIS TESTIMONY WAS THAT SOME HE SUPERVISED DURING

11   THAT PROCESS AND SOME HE DID NOT.  THAT'S MY RECOLLECTION OF

12   HIS TESTIMONY.

13   Q.   HE WAS DIRECTLY INVOLVED IN THE RESPONSE, MR. GHEORGHE?

14   A.   YES, I'M NOT DISAGREEING -- YOU ASKED IF THEY WORKED FOR

15   HIM.  UNDER -- AS I UNDERSTOOD HIS TESTIMONY FROM THAT MAY 2ND

16   TO MAY 13TH TIME PERIOD, HE TESTIFIED SOME HE DIRECTLY

17   SUPERVISED AND SO WAS VERY FAMILIAR WITH THEIR WORK, AND OTHERS

18   HE DID NOT SUPER VISIT, SO WAS LESS SO.

19   Q.   WE'VE GOT TO GET OUT OF HERE BY 1:30 AND I DON'T WANT TO

20   BE RESPONSIBLE.  IF IT'S YES, JUST SAY YES.  I DON'T WANT TO

21   TRICK YOU.  YOU DON'T HAVE TO REPEAT MY ENTIRE QUESTION.  I'M

22   LONG WINDED.  YOU CAN DO BETTER THAN ME.

23        YOU UNDERSTAND THAT MR. GHEORGHE HAD A FRONT ROW SEAT IN

24   THE PROCESS?  HE WAS THERE?

25   A.   I DEFINITELY UNDERSTAND THAT MR. GHEORGHE WAS INVOLVED IN

1     THAT MAY 2ND TO MAY 13TH PROCESS.

2     Q.   SO IT'S NOT LIKE HE'S SOME GUY THAT'S IN ANOTHER COUNTRY

3     SOMEWHERE ELSE AND DOESN'T KNOW WHAT'S HAPPENING.  HE'S A

4     RELIABLE SOURCE TO PROVIDE INFORMATION ABOUT WHO WORKED ON THE

5     ATTACK; RIGHT?  IS THAT FAIR?  THAT'S NOT HARD.

6     A.   HE -- HE MAY BE A RELIABLE SOURCE.

7          AGAIN, THE VERY -- VERY LITTLE INFORMATION IN

8     MS. TREXLER'S REPORT EVEN DESCRIBED WHAT WAS RELAYED TO HER.

9          SO THERE -- SHE SET OUT THIS $105,000 DAMAGES CALCULATION

10    FOR 14 EMPLOYEES AND SHE HAS ONE SMALL FIGURE THAT HAS A TITLE

11    AND A ROLE WITH NO DETAIL.

12         SO WHEN I WAS REVIEWING HER OPINION, I HAD NO BASIS, AND

13    THIS IS WHY MY OPINION WAS IN THE FORM THAT IT WAS OF -- I

14    DON'T THINK THAT SHE HAS ESTABLISHED THE HOURS THAT SHE

15    INCLUDES IN HER CALCULATION.

16         AND EVEN, LIKE I TESTIFIED EARLIER, EVEN TODAY, FOR THAT

17    POST-MAY 13TH, 2019 TIME PERIOD, I STILL HAVE NOT HEARD

18    ANYTHING THAT ESTABLISHES THAT THOSE HOURS WOULD BE

19    RECOVERABLE.

20    Q.   OKAY.  I'VE JUST GOT A NOTE THAT I'M RUNNING OUT OF TIME.

21         YOU AGREE THAT SALARIES OR WAGES ARE PROPERLY INCLUDED IN

22    MS. TREXLER'S CALCULATION; RIGHT?

23    A.   I'M NOT SURE THAT -- AGAIN, WITHOUT THE SUFFICIENT DETAIL,

24    I'M NOT AWARE OF ENOUGH DETAIL TO DETERMINE THAT WITH

25    CERTAINTY.

1    Q.   SIR, YOU SAID YOU'RE -- I KNOW YOU DON'T REMEMBER ALL THE

2    DETAILS OF YOUR REPORT, BUT YOU READ IT BEFORE YOUR TESTIMONY

3    TODAY; RIGHT?

4    A.   YES, I DID.

5    Q.   HOW ABOUT YOUR DEPOSITION TESTIMONY?

6    A.   YES.

7    Q.   YOU SEEM TO HAVE A HARD TIME REMEMBERING THAT, BECAUSE

8    WHEN ASKED ABOUT WHETHER WAGES OR SALARY SHOULD BE INCLUDED,

9    YOU SAID I WOULD SAY IN GENERAL, SALARY OR WAGES IS CERTAINLY

10   ONE OF THE MOST COST ELEMENTS TYPICALLY CONSIDERED IN THE

11   CALCULATION OF FULLY BURDENED LABOR COSTS?  YOU AGREE WITH

12   THAT?  THAT'S YOUR TESTIMONY?

13   A.   AND AS I EXPLAINED, IN GENERAL, YES.

14        WHEN YOU'RE TALKING ABOUT A YEARS LONG PROCESS, THEN

15   SALARY IS ALWAYS INCLUDED.  WHEN YOU'RE TALKING ABOUT A HANDFUL

16   OF HOURS, THAT'S A DIFFERENT ANSWER.

17   Q.   YOU AGREE PAYROLL TAXES SHOULD BE INCLUDED?

18   A.   AGAIN, WITH A SIMILAR ANSWER TO -- IF WE'RE TALKING ABOUT

19   A YEARS LONG PROCESS, YES.

20        IF WE'RE TALKING ABOUT TWO YEARS OF A PARTICULAR

21   EMPLOYEE'S TIME, THEN CERTAINLY IT WOULD BE RELEVANT TO INCLUDE

22   SALARIES AND ALL THESE EXPENSES.

23        IF WE'RE TALKING ABOUT 4 HOURS, 8 HOURS, 12 HOURS,

24   20 HOURS OF A SALARIED EMPLOYEE, THAT'S A DIFFERENT ANSWER.  IT

25   JUST REQUIRES MORE OF A -- MORE TO ESTABLISH THAT.

1    Q.   SORRY.  I'M JUST GOING TO CUT TO THE CHASE, I'M RUNNING

2    OUT OF TIME.  IS THERE SOME REASON WHY, TODAY, YOUR TESTIMONY

3    IS DIFFERENT FROM WHAT IT WAS WHEN YOU TESTIFIED UNDER OATH

4    DURING YOUR DEPOSITION?

5            MR. CRAIG:  OBJECTION, YOUR HONOR.

6            MR. ANDRES:  I JUST WANT TO KNOW.

7            THE COURT:  IS THERE AN OBJECTION?

8            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  SCOPE.

9            THE COURT:  AND --

10           MR. CRAIG:  NO FOUNDATION FOR THE --

11           MR. ANDRES:  HE'S JUST TESTIFIED THREE TIMES THAT HE

12   DOESN'T GIVE THE OPINION IN HIS DEPOSITION.

13           THE COURT:  IT'S THEIR CROSS EXAMINATION.

14   BY MR. ANDRES:

15   Q.   DID SOMETHING HAPPEN?  DID YOU READ SOMETHING OR DID YOU

16   TALK TO SOMEBODY?

17       I AM SORRY.  IS THERE SOMETHING THAT YOU'VE READ OR SAW

18   DURING THE TRIAL -- IT'S MY NEW YORK ACCENT -- THAT YOU SAW

19   DURING THE TRIAL OR READ OR HEARD THAT CAUSED YOU TO CHANGE

20   YOUR OPINIONS FROM WHEN YOU TESTIFIED AT THE DEPOSITION?

21   A.   I DON'T THINK THAT I'VE CHANGED MY OPINIONS FROM MY REPORT

22   TO MY DEPOSITION TO TODAY.

23   Q.   OKAY.  I JUST ASKED YOU ABOUT PAYROLL TAX, AND YOU DIDN'T

24   SORT OF SAY THAT THEY SHOULD BE INCLUDED.

25           AND IN YOUR DEPOSITION IT SAID, I'M NOT OFFERING AN

1    OPINION THAT OBJECTS TO HER, AND I THINK "BY HER" YOU MEAN

2    MS. TREXLER, HER INCLUSION OF PAYROLL TAXES.

3         THAT'S WHAT YOU TESTIFIED ABOUT.  DO YOU DISAGREE WITH

4    THAT?

5    A.   NO.  I -- I DON'T DISAGREE WITH THAT.

6         I'M JUST REFERRING BACK TO WHAT -- SO THIS WAS A SERIES OF

7    QUESTIONS THAT WAS ASKED OF ME IN MY DEPOSITION.  I WAS ASKED

8    THAT FIRST QUESTION, WHICH I EXPLAINED IN GENERAL, YES, IF

9    YOU'RE TALKING ABOUT A YEARS LONG PROCESS, THEN ALL OF THESE

10   EXPENSES ARE NORMALLY INCLUDED.

11        IT'S -- IT'S JUST -- AND I THINK I WAS CLEAR ON THIS IN MY

12   DEPOSITION.  IT'S THE FACT THAT IT'S THE FOCUS OF A LIMITED

13   NUMBER OF HOURS.

14   Q.   I -- I'M NOT GOING TO SPEAK FOR ANYBODY ELSE, BUT NONE OF

15    THAT IS CLEAR TO ME.

16        WHAT'S CLEAR IS THAT YOU SAID, I AM NOT OFFERING AN

17   OPINION THAT OBJECTS TO HER INCLUSION OF PAYROLL TAX.

18        DO YOU AGREE WITH THAT, OR NOT?

19   A.   WELL --

20   Q.   YES OR NO?  YOU CAN ANSWER YES OR NO?

21   A.   IF YOU WANT TO GIVE ME A COPY OF MY DEPOSITION SO I CAN

22   ACTUALLY SEE IT.  YOU'RE READING SOMETHING THAT I DON'T EVEN

23    KNOW WHAT YOU'RE READING.

24   Q.   WHEN I READ IT THE FIRST TIME, YOU AGREED WITH IT, AND

25    THEN YOU HAVE GONE ON AND ON.

1      A.   NO.  ACTUALLY, I HAD TRIED TO EXPLAIN -- I THINK --

2               THE COURT:  ALL RIGHT.  THIS IS.

3               MR. ANDRES:  LET ME ASK YOU --

4               THE COURT:  THIS IS REALLY GETTING OLD.

5      BY MR. ANDRES:

6      Q.   LET ME ASK YOU ABOUT THE RESTRICTED STOCK UNITS.  DO YOU

7      REMEMBER THAT?

8      A.   YES.

9      Q.   OKAY.  YOU OBJECT TO THAT BEING INCLUDED; CORRECT?

10     A.   YES, I DO.

11     Q.   OKAY.  ARE YOU AWARE THAT NSO PROVIDES STOCK BASED

12     COMPENSATION TO ITS EMPLOYEES?

13     A.   YES, I DO THINK THAT -- I RECALL SEEING THAT IN THEIR

14     FINANCIAL STATEMENTS AT SOME POINT IN TIME.  I DON'T KNOW ABOUT

15     TODAY, BUT AT SOME POINT IN TIME.

16     Q.   AND THAT WOULD BE SIMILAR TO THE RSU'S; CORRECT?  I MEAN,

17     THAT'S THE SAME TYPE OF COMPENSATION GENERALLY?

18     A.   CERTAINLY IT'S UNDER AN UMBRELLA THAT COULD BE SIMILAR.

19     IT COULD BE STOCK OPTIONS, IT COULD BE RSU'S.  THERE ARE MANY

20     TYPES OF STOCK-BASED COMPENSATION.

21     Q.   RIGHT.  BUT THEY'RE BOTH STOCK-BASED COMPENSATION

22     GENERALLY?

23     A.   GENERALLY, BASED ON THE NAME, YES, THEY ARE BOTH

24     STOCK-BASED COMPENSATION, CORRECT.

25     Q.   NO GOOD FOR META, BASED ON YOUR OPINION, BUT PERFECTLY

1    OKAY FOR NSO?  IS THAT YOUR OPINION?

2    A.   THAT'S NOT HOW I WOULD CHARACTERIZE MY OPINION.

3    Q.   BUT YOU THINK IT'S OKAY THAT NSO GIVES STOCK-BASED

4    COMPENSATION?

5    A.   SURE.  AND I DON'T HAVE ANY -- I DON'T HAVE ANY PROBLEM

6    WITH PLAINTIFFS GIVING STOCK-BASED COMPENSATION.

7         MY DISAGREEMENT WITH MS. TREXLER, I THINK AS IS CLEAR, IS

8    THAT I HAVE A DISAGREEMENT WITH INCLUDING IT IN A LABOR

9    CALCULATION FOR A LIMITED NUMBER OF HOURS LIKE WE TALKED ABOUT

10   IN THIS CASE.

11          MR. ANDRES:  JUST GIVE ME ONE MINUTE, YOUR HONOR.

12          (PAUSE IN PROCEEDINGS.)

13          MR. ANDRES:  I HAVE NOTHING FURTHER FOR THIS WITNESS,

14   YOUR HONOR.  THANK YOU.

15          THANK YOU, MR. PINSONNEAULT.

16          THE COURT:  ALL RIGHT.  REDIRECT?

17          MR. CRAIG:  THANK YOU.  I THINK I HAVE TWO QUESTIONS.

18                     **REDIRECT EXAMINATION**

19   BY MR. CRAIG:

20   Q.   YOUR ISSUE WITH THE INCLUSION OF THE 14 EMPLOYEES THAT

21   WERE DESCRIBED AS INTERVIEWED BY MR. GHEORGHE, IS THAT -- IS

22   YOUR DISAGREEMENT BASED ON WHO INTERVIEWED THEM?

23   A.   NO, NOT AT ALL.

24   Q.   CAN YOU JUST EXPLAIN WHAT YOUR DISAGREEMENT, AGAIN, WAS

25   BASED ON?

1     A.   YEAH.  SO, AGAIN, FACEBOOK -- SO THROUGH THE PROCESS OF

2     THIS LITIGATION, FACEBOOK PUT FORTH A CORPORATE DESIGNATED

3     WITNESS TO SPEAK ON BEHALF OF FACEBOOK AND WHATSAPP.

4          THAT WITNESS, AGAIN, COULDN'T TESTIFY ABOUT 12 OF THOSE 14

5     EMPLOYEES AT ALL.  HE COULDN'T NAME THE TITLE, NOR THE ROLE

6     THAT THE WITNESS -- OR THE EMPLOYEE PLAYED.

7          THAT'S THE ISSUE AND THE REASON -- AND, AGAIN, FOR THE

8     13TH AND 14TH, ONE WAS THREE HOURS AND THE 14TH, HE WAS ABLE TO

9     ACTUALLY EXPLAIN THE ROLE.

10         SO THAT WAS THE BASIS FOR EXCLUDING, OR MY OPINION THAT

11    SHE SHOULD HAVE EXCLUDED ALL OF THOSE HOURS EXCEPT FOR THE

12    THREE AND MR. LABUNETS'S TIME.

13    Q.   ONE LAST QUESTION.  YOU WERE ASKED ABOUT NSO HAVING

14    CHANGED ITS NAME.

15         HAVE ANY OTHER PARTIES IN THIS LITIGATION CHANGED ITS

16    NAME?

17    A.   YES.

18         MR. CRAIG:  NO MORE QUESTIONS.

19         THE COURT:  ALL RIGHT.

20         BEFORE WE EXCUSE MR. PINSONNEAULT, DID YOU ALL RESOLVE

21    WHAT YOU'RE GOING TO DO ABOUT THE FINANCIAL?

22         MR. ANDRES:  NSO WOULD PREFER TO BRING HIM BACK, AND

23    WE JUST DON'T WANT TO -- THEY WANT TO LET THEM GET WHATEVER

24    EVIDENCE IN THEY WANT TO.  SO WE PREFER TO JUST GET IT DONE.

25         THE COURT:  YEAH.

1       MR. ANDRES:  AND FINISH THE DAY.  BUT THEY DON'T WANT

2    TO DO THAT.

3       THE COURT:  YOU HAVE 20 MINUTES.  LET'S FINISH.

4       MR. ANDRES:  THAT'S FINE WITH US, YOUR HONOR.

5       MR. AKROTIRIANAKIS:  I HAVE A COUPLE OTHER THINGS FOR

6    OUR CASE-IN-CHIEF.

7       THE COURT:  WELL, THE GLICK -- WE NEED TO GIVE THE --

8    THERE ARE COUNTER-DESIGNATIONS IN HERE.  I NEED TO ALLOW THE

9    PLAINTIFFS TO LOOK AT IT AS WELL.

10      MR. AKROTIRIANAKIS:  I SHARED IT WITH THEM.

11      THE COURT:  OH, YOU SHARED IT WITH THEM?

12      MR. AKROTIRIANAKIS:  I EXCISED THE PART OF THE

13   TRANSCRIPT OF WHAT THE COURT IS LOOKING AT WHERE EITHER MY

14   QUESTIONS OR THE WITNESS'S ANSWERS QUOTED OUT OF THE DOCUMENT

15   THAT THE COURT NOW WANTS NOT TO USE.

16      THE COURT:  BUT THERE ARE OTHER SECTIONS IN RED WHICH

17   ARE WHATSAPP'S DESIGNATIONS THAT IS ALSO REFERRED TO 1021.

18      MR. AKROTIRIANAKIS:  I SEE.  I HAVE NO OBJECTION TO

19   THEM TAKING OUT PARTS OF THEIR OWN COUNTER-DESIGNATIONS,

20   YOUR HONOR.

21      THE COURT:  ALL RIGHT.  BUT THAT DOESN'T DEAL WITH

22   THE ISSUE CURRENTLY BEFORE US.

23      DO YOU WANT TO ASK MR. PINSONNEAULT MORE QUESTIONS, OR ANY

24   QUESTIONS, ABOUT THE FINANCIAL RECORDS?

25      MR. AKROTIRIANAKIS:  HIS ONLY ROLE, YOUR HONOR, IS

1    GOING TO BE TO SPEAK TO ANYTHING THAT MS. TREXLER TESTIFIES

2    ABOUT THOSE, AND I DON'T KNOW WHAT THAT IS.

3            MR. ANDRES:  I DON'T THINK THAT'S RIGHT.  HE'S GOING

4    TO JUST -- SOMEBODY IS GOING TO EXPLAIN THESE DOCUMENTS,

5    BECAUSE MR. SHOHAT, OUR VIEW IS HIS TESTIMONY WAS INACCURATE

6    AND HE'S NOT AN ACCOUNTANT, NOR AN ECONOMIST, I THINK.

7            THE COURT:  RIGHT.

8            MR. ANDRES:  SO IT'S JUST TESTIMONY ABOUT WHAT THEY

9    MEAN.

10           THE COURT:  SO YOU WANT SURREBUTTAL?  SO AM I CLEAR

11   THEN, THERE'S NOT GOING TO BE ANY OPINIONS ON THIS?

12           MR. AKROTIRIANAKIS:  AS LONG AS MS. TREXLER IS NOT

13   GOING TO BE OFFERING OPINIONS, THEN I DON'T THINK THAT, THAT

14   MR. PINSONNEAULT HAS TESTIMONY TO OFFER ABOUT THE DOCUMENTS.

15       IF SHE IS GOING TO OFFER OPINIONS, I DON'T KNOW WHAT THOSE

16   ARE, YOUR HONOR, AND I WOULD LIKE FOR MR. PINSONNEAULT TO HEAR

17   THEM AND THEN TO EXPRESS ANY OPINIONS THAT HE HAS ABOUT THE

18   SAME CONDUCT.

19           THE COURT:  OKAY.

20           MR. ANDRES:  THAT'S FINE, YOUR HONOR.  SHE IS GOING

21   TO -- HER OPINION IS THAT MR. SHOHAT'S TESTIMONY WAS NOT --

22           MR. AKROTIRIANAKIS:  NOW WE'RE HAVING ARGUMENT.

23           MR. ANDRES:  -- WAS NOT ACCURATE ABOUT THAT.  YOU'RE

24   ASKING ME WHAT THE OPINIONS ARE.

25           THE COURT:  AND HOW MUCH TIME DO WE THINK WE'RE

```
 1         LOOKING AT?  BECAUSE WE -- YOU ALL ONLY HAVE A LITTLE BIT OF

 2         TIME LEFT ON THE CLOCK.

 3              MR. ANDRES:  I THINK I HAVE 40 MINUTES, YOUR HONOR,

 4         AND I THINK SHE'S GOING TO BE ABOUT 35.  SO I DON'T THINK WE

 5         COULD FIT HER IN TODAY.  I COULD TRY TO CUT THAT DOWN OVER THE

 6         WEEKEND, BUT I DON'T THINK WE WOULD FIT HER IN TODAY.

 7              THE COURT:  OKAY.

 8              MR. AKROTIRIANAKIS:  YOUR HONOR, I --

 9              MR. ANDRES:  SO IF WE WANT TO TALK ABOUT THE GLICK,

10         AND I THINK THERE ARE SOME OTHER THINGS THEY WANT TO DO.

11              THE COURT:  I WOULD LIKE TO UTILIZE THE JURY'S TIME

12         FOR THE REMAINING.  THE GLICK DEPOSITION -- EXCERPT IS NOT

13         READY.

14          WHAT'S NEXT?

15              MR. AKROTIRIANAKIS:  I HAVE TWO RFA RESPONSES, RFA'S

16         AND THE ADMISSION TO READ INTO THE RECORD, YOUR HONOR, AND I

17         WOULD ASK THE COURT TO GIVE 2.112 WHEN I DO THAT SO THAT THE

18         JURY UNDERSTANDS.

19          AND THEN I HAVE 15 LINES OF MR. GHEORGHE, WHO THE COURT

20         WILL RECALL WAS A CORPORATE DESIGNEE ON THE ISSUE THAT WE'RE

21         TALKING ABOUT, 15 LINES FROM HIS DEPOSITION THAT I WOULD LIKE

22         TO READ INTO THE RECORD.

23              THE COURT:  OKAY.  LET'S SEE IF I HAVE THE -- WHAT

24         WAS IT?  WHAT WAS THE INSTRUCTION NUMBER?

25              MR. AKROTIRIANAKIS:  IT'S --
```

```
 1                THE COURT:  2.12.

 2                MR. AKROTIRIANAKIS:  2.12 IS THE MODEL INSTRUCTION

 3       NUMBER, YOUR HONOR.

 4                THE COURT:  ALL RIGHT.  I HAVE THAT.

 5           ALL RIGHT.  YES, MR. PINSONNEAULT, I'M SO SORRY, YOU MAY

 6       STEP DOWN.

 7           ALL RIGHT.  TO OUR JURY, EVIDENCE WILL BE -- NOW WILL BE

 8       PRESENTED TO YOU IN THE FORM OF ADMISSIONS TO THE TRUTH OF

 9       CERTAIN FACTS.

10           THESE ADMISSIONS WERE GIVEN IN WRITING BEFORE THE TRIAL IN

11       RESPONSE TO REQUESTS THAT WERE SUBMITTED UNDER ESTABLISHED

12       COURT PROCEDURES, AND YOU MUST TREAT THESE FACTS AS HAVING BEEN

13       PROVED.

14           MR. AKROTIRIANAKIS.

15                MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

16           REQUEST FOR ADMISSION 176.  ADMIT THAT DEFENDANTS DID NOT

17       CREATE THE CODE DESCRIBED IN THE CVE-2019-3568.

18           ANSWER:  PLAINTIFFS ADMIT THAT THE CODE DESCRIBED IN

19       CVE-2019-3568 EXISTED BEFORE JANUARY 2018.

20           AND REQUEST FOR ADMISSION NUMBER 179.  ADMIT THAT, AS AN

21       ORDINARY PART OF PLAINTIFFS' BUSINESS, PLAINTIFFS INVESTIGATE

22       AND CLOSE SECURITY VULNERABILITIES INVOLVING THE WHATSAPP

23       SERVICE.

24           AND THE ADMISSION IS PLAINTIFFS ADMIT THAT AS AN ORDINARY

25       PART OF PLAINTIFFS' BUSINESS, PLAINTIFFS INVESTIGATE AND
```

1      REMEDIATION ACTUAL OR POTENTIAL SECURITY THREATS.

2              MR. ANDRES:  YOUR HONOR, MR. AKROTIRIANAKIS DIDN'T

3      READ THE OBJECTIONS IN THAT REFERENCE, SO I'M HAPPY TO HAVE HIM

4      DO IT AGAIN, BUT THERE ARE OBJECTIONS.

5              MR. AKROTIRIANAKIS:  WELL, THE ADMISSIONS ARE MADE

6      SUBJECT TO THE OBJECTIONS, YOUR HONOR.  I DON'T UNDERSTAND.

7              MR. ANDRES:  RIGHT.

8              THE COURT:  CERTAINLY.  AND WHY IS IT THAT THESE

9      WEREN'T PRESENTED TO ME TO RESOLVE THE OBJECTIONS BEFORE THEY

10     WERE READ TO THE JURY, WHICH IS TYPICALLY HOW WE DO IT?

11             MR. ANDRES:  WE JUST HEARD ABOUT THEM.

12             MR. AKROTIRIANAKIS:  WELL, NO, YOUR HONOR.  WE

13     DESIGNATED THEM, OF COURSE, FOR RAISING DURING THE TRIAL.

14             THE COURT:  OKAY.  I DON'T WANT TO ENTERTAIN THE

15     OBJECTIONS.  THE JURY MAY NOT HEAR THE OBJECTIONS.

16         IF, INDEED, I RULE THAT THE ADMISSIONS ARE NOT APPROPRIATE

17     BECAUSE OF THE OBJECTIONS, I WILL INSTRUCT THE JURY TO

18     DISREGARD.

19         WE'LL DO THAT OUT OF THEIR PRESENCE.

20             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

21             MR. ANDRES:  THANK YOU, YOUR HONOR.

22             THE COURT:  OKAY.

23             MR. AKROTIRIANAKIS:  AND READING FROM THE DEPOSITION

24     OF CLAUDIU GHEORGHE --

25             MR. PEREZ:  YOUR HONOR, WE JUST, BEFORE HE GOES ON,

1    WE DO HAVE AN OBJECTION TO THE READING OF HIS TESTIMONY.  THEY

2    HAD THIS WITNESS ON THE STAND.  THEY HAD EVERY OPPORTUNITY TO

3    ASK HIM QUESTIONS.  HE WAS UP THERE FOR A COUPLE HOURS AT

4    LEAST.  SO WE DON'T THINK AT THIS POINT, WHEN HE'S NO LONGER

5    AVAILABLE, THAT THEY SHOULD HAVE THE OPPORTUNITY TO JUST READ

6    HIS TESTIMONY.

7            THE COURT:  OKAY.  RESPONSE?

8            MR. AKROTIRIANAKIS:  HE'S THE CORPORATE DESIGNEE.

9    HE'S UNDER SUBPOENA.  HE'S ON MY WITNESS LIST.  IF THEY WANT TO

10   BRING HIM BACK AND I CAN ASK HIM THESE 15 LINES OF QUESTIONS,

11   I'D BE FINE TO PROCEED THAT WAY.  BUT I ALSO THINK IT'S 100

12   PERCENT WITHIN MY RIGHTS, PURSUANT TO FEDERAL RULE OF CIVIL

13   PROCEDURE 32, BECAUSE WE HAD ALL OF THE PLAYING OF THE

14   DEPOSITIONS EARLIER DURING THE PLAINTIFFS' CASE, FOR ME TO READ

15   THIS TESTIMONY THAT WAS GIVEN ON BEHALF OF THE PLAINTIFF PARTY.

16           MR. PEREZ:  WE ALSO HAVE AN OBJECTION TO THE

17   SUBSTANCE OF THIS BECAUSE WE BELIEVE IT TRIES TO RELITIGATE AN

18   ISSUE THAT WAS RESOLVED ON SUMMARY JUDGMENT.

19           THE COURT:  AND WHAT ISSUE?

20           MR. PEREZ:  ABOUT THE INVOLVEMENT OF CALIFORNIA-BASED

21   SERVERS IN THE ATTACK AND THE BASIS OF LIABILITY BEING THE USE

22   OF CALIFORNIA-BASED SERVERS IN THE ATTACK.

23           THE COURT:  OKAY.  LET ME SEE.  LET ME SEE.  IT'S 15

24   LINES.  LET ME SEE.

25           MR. AKROTIRIANAKIS:  IT RELATES TO WHERE THE SERVERS

1    ARE LOCATED, YOUR HONOR.

2        (PAUSE IN PROCEEDINGS.)

3            MR. AKROTIRIANAKIS:  IT'S JUST ON THE BACK PAGE,

4    YOUR HONOR, IT'S HIGHLIGHTED.

5            THE COURT:  OKAY.  THIS IS PERMISSIBLE.

6            MR. PEREZ:  WE WOULD JUST ASK TO READ SOME

7    COUNTER-DESIGNATIONS.

8            THE COURT:  YOU CAN.

9            MR. AKROTIRIANAKIS:  THANK YOU.  FOR THE RECORD,

10   READING FROM PAGE 142, LINES 10 THROUGH 25.  AS CORRECTED BY

11   MR. GHEORGHE IN HIS ERRATA, SIGNED SEPTEMBER 23, 2024.

12       "QUESTION:  AND THE DATA, WHEN YOU SPOKE ABOUT THE DATA

13   CENTERS, YOU SAID THESE ARE THE THREE DATA CENTERS USED FOR

14   CHAT, THE ONE IN ALTOONA, VIRGINIA, AND NEW MEXICO?

15       "ANSWER:  YES.

16       "QUESTION:  SO WHEN THEY'RE USED FOR CHAT, THEY'RE THE

17   SAME ONES THAT ARE ALSO USED FOR VOICE OVER I.P.?

18       "ANSWER:  FOR SIGNALLING.

19       "QUESTION:  FOR SIGNALLING, THAT'S RIGHT.  THAT'S WHERE

20   THE SIGNALLING SERVERS ARE; CORRECT?

21       "ANSWER:  YES."

22            THE COURT:  COUNTER?

23            MR. PEREZ:  YES.  THE COUNTER IS FROM PAGE 206,

24   STARTING AT LINE 8.  EXCUSE ME.

25            THE QUESTION IS, "DO PLAINTIFFS KNOW ABOUT ANY SERVER

```
1    PHYSICALLY LOCATED IN CALIFORNIA THAT WAS SPECIFICALLY TARGETED

2    BY PEGASUS SOFTWARE?

3         "ANSWER:  THE ONLY THING THAT I KNOW IS THAT DURING THE

4    ATTACK THAT WE OBSERVED, THERE WERE SOME SERVERS LOCATED IN THE

5    EDGE LOCATIONS IN THE SAN JOSE AND LOS ANGELES METRO AREAS THAT

6    WERE INVOLVED IN THOSE ATTACKS, RELAY SERVERS."

7              THE COURT:  ALL RIGHT.  THANK YOU.

8              ALL RIGHT.  ANYTHING ELSE?

9              MR. AKROTIRIANAKIS:  JUST THE GLICK ISSUE,

10   YOUR HONOR.

11             THE COURT:  OKAY.  IS THAT THE LAST PIECE OF EVIDENCE

12   YOU HAVE BESIDES THE PINSONNEAULT REBUTTAL, OR WHATEVER WE'RE

13   GOING TO CALL IT, TO THE REBUTTAL OF MS. TREXLER?

14             MR. AKROTIRIANAKIS:  YEAH.  OTHER THAN THOSE THINGS,

15   THEN SUBJECT TO FIGURING OUT THE ISSUES RELATED TO THE

16   REDACTIONS ON THE EXHIBITS, WHICH IS NOT AN ISSUE FOR THE JURY,

17   WE WOULD REST SUBJECT TO THAT.

18             THE COURT:  OKAY.  AND THE -- THE GLICK EXCERPT, YOU

19   SAID, RUNS ABOUT SEVEN MINUTES?

20             MR. AKROTIRIANAKIS:  IT'S EVEN SHORTER NOW WITH THE

21   EXCISION, YOUR HONOR.

22             THE COURT:  AND THERE MIGHT BE MORE ONCE THE

23   PLAINTIFFS HAVE A CHANCE TO LOOK AT IT.  SOME OF THEIR

24   DESIGNATIONS ARE INCLUDED IN THERE.

25             MR. AKROTIRIANAKIS:  THAT INCLUDES THE
```

```
1       DESIGNATIONS -- I THINK IT INCLUDES BOTH PARTIES' DESIGNATIONS

2       WAS SEVEN MINUTES, I'VE EXCISED, THEY MAY EXCISE FURTHER, SO I

3       THINK IT MAY BE SHORTER THAN THE SEVEN MINUTES.

4               THE COURT:  RIGHT.  HAVE YOU ALL HAD AN

5       OPPORTUNITY -- IS IT READY TO BE PLAYED, OR HAVE YOU HAD AN

6       OPPORTUNITY TO REVIEW YOUR DESIGNATIONS?

7               MR. ANDRES:  WE HAVE TO REVIEW IT, YOUR HONOR.

8               THE COURT:  YOU HAVE NOT HAD A CHANCE TO REVIEW IT?

9               MR. ANDRES:  NO.

10              THE COURT:  OKAY.  OKAY.  SINCE IT'S SHORT, IT'S

11      LIKELY TO BE SOMEWHERE LESS THAN SEVEN MINUTES.  WE CAN DO THAT

12      MONDAY.

13          THE -- IT LOOKS LIKE WE HAVE ROUGHLY TWO HOURS LEFT OF THE

14      ALLOTTED TIME THAT I'VE GIVEN THESE LAWYERS FOR THE

15      PRESENTATION OF THEIR CASE, WHICH MEANS, LADIES AND GENTLEMEN

16      OF THE JURY, THAT WE WILL CONCLUDE EARLY MONDAY MORNING, AND WE

17      WILL ALSO HAVE CLOSING ARGUMENTS AND JURY INSTRUCTIONS ON

18      MONDAY.

19          SO YOU SHOULD BE PREPARED ON MONDAY FOR A FULL DAY.  THAT

20      MEANS WE START AT 8:30, WE GO TO 4:00, AND THE COURT WILL

21      PROVIDE LUNCH FOR YOU, SO YOU DON'T HAVE TO WORRY ABOUT THAT.

22          IT SEEMS TO ME THAT THIS WOULD PROBABLY BE, UNLESS WE HAVE

23      SOMETHING WE CAN DO IN THE NEXT NINE MINUTES, THIS WOULD

24      PROBABLY BE AN APPROPRIATE TIME TO END THE DAY.

25              ARE YOU IN AGREEMENT?
```

1           MR. ANDRES:  YES, PLEASE, YOUR HONOR.

2           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

3           THE COURT:  OKAY.  I WILL STAY AND WORK WITH THEM,

4    BUT YOU ALL ARE FREE.  ENJOY YOUR WEEKEND AND REMEMBER THE

5    INSTRUCTION TO NOT TALK ABOUT THE CASE OR DO ANY INDEPENDENT

6    RESEARCH OR POSTING ABOUT IT.

7           THE CLERK:  ALL RISE FOR THE JURY.

8        (JURY OUT AT 1:22 P.M.)

9           THE COURT:  ALL RIGHT, COUNSEL.

10       LET'S -- WE'RE GOING TO TAKE A LUNCH BREAK BEFORE WE START

11   WORKING ON JURY INSTRUCTIONS BECAUSE WE NEED TO DO THAT SO THAT

12   YOU CAN PREPARE YOUR CLOSING ARGUMENTS FOR MONDAY.

13       BUT BEFORE WE DO THAT, I'D ALSO LIKE TO RESOLVE THE

14   REMAINING ISSUES, ONE WITH THE PART -- WITH REGARD TO THE GLICK

15   DEPOSITION.  I KNOW YOU ALL HAVEN'T HAD AN OPPORTUNITY TO

16   REVIEW IT, BUT I'M JUST A LITTLE CONFUSED ABOUT THIS.

17       THE DEPOSITION -- IT SEEMS TO ME THERE ARE THREE ISSUES

18   THAT ARE SORT OF RAISED BY THIS EXCERPT.

19       ONE IS THE NOTIFICATION OF TARGET USERS ISSUE, AND I THINK

20   THAT'S SORT OF THE MAIN REASON FOR THIS; RIGHT?

21       BUT I'M NOT EXACTLY SURE WHY THIS IS IMPORTANT.

22       AND WITHOUT THE EXHIBIT 1021, AREN'T THERE OTHER THINGS

23   THAT SHOULD BE REDACTED FROM THIS IF THE EXHIBIT IS NOT COMING

24   IN?

25           MR. AKROTIRIANAKIS:  WELL, I EXCISED ALL THE READING

1    OF THE CONTENT OF THE EXHIBIT THAT'S NOT GOING TO BE RECEIVED,

2    YOUR HONOR.

3        AND THE --

4            THE COURT:  OF THE CONTENT.  OKAY.

5            MR. AKROTIRIANAKIS:  YES.  SO YOU SEE ON PAGE 6 OF 8

6    OF THE DOCUMENT THE COURT HAS, I HAVE -- I ASK A QUESTION

7    BEGINNING AT LINE 68 -- I'M SORRY, PAGE 68, LINE 19, AND NOW

8    I'M READING TO MS. GLICK FROM THE DOCUMENT.

9            THE COURT:  I SEE, UM-HUM.

10           MR. AKROTIRIANAKIS:  AND --

11           THE COURT:  ALL RIGHT.

12           MR. AKROTIRIANAKIS:  AND IT BEGINS, QUOTE, AND I'VE

13   STRICKEN THAT.  AND THEN I INSTRUCT MY NEXT QUESTION.  I'M

14   SORRY, I DIDN'T MEAN TO INTERRUPT, YOUR HONOR.

15           THE COURT:  NO, NO.  GO AHEAD.  I WAS INTERRUPTING

16   YOU.

17           MR. AKROTIRIANAKIS:  MY NEXT QUESTION, I'M FULLY

18   READING FROM THE DOCUMENT AND ASKING IF SHE SEES THAT, SO I'VE

19   STRICKEN THAT.

20       AND THEN WE GET INTO THE SUBSTANTIVE ISSUE THAT IS NOT

21   ABOUT THE CONTENT OF THE DOCUMENT, IT'S HER RECOLLECTION OF THE

22   EVENTS.

23       WHAT DO YOU KNOW ABOUT THE SECURITY FLAW?

24       THIS RED IS ACTUALLY THEIR COUNTER-DESIGNATION,

25   YOUR HONOR.  BUT THAT'S NOT ABOUT THE DOCUMENT.

1           THE COURT:  OKAY.  AND THE REFERENCES IN THE

2     TRANSCRIPT ABOUT THE DOCUMENT 1021, IT'S MENTIONED SEVERAL

3     TIMES.

4           MR. AKROTIRIANAKIS:  YEAH, I DESCRIBED - I DO

5     DESCRIBE THE DOCUMENT.  IF WE TAKE OUT THE DESCRIPTION OF THE

6     DOCUMENT, YOUR HONOR -- SO THE CONTENT OF THE DOCUMENT IS NOT

7     IN HERE, AND IF IT IS -- IF I'VE MISSED ANY PLACE WHERE THERE

8     IS CONTENT OF THE DOCUMENT, I'M HAPPY TO TAKE IT OUT AS OPPOSED

9     TO THE PURPOSE OF THE DOCUMENT.

10         IF THE -- WE TOOK OUT, FOR EXAMPLE, ANY QUESTION AND

11    ANSWER THAT HAD REFERENCE TO 1021, I DON'T THINK THE

12    EXAMINATION WOULD MAKE ANY SENSE, YOUR HONOR.

13         SO THE POINT OF THIS WITNESS'S TESTIMONY AS RELEVANT TO

14    THIS CASE ARE TWO THINGS:  ONE, SHE AGREES THERE WASN'T A LEGAL

15    OBLIGATION.

16           THE COURT:  I THINK SHE SAYS SHE DOESN'T KNOW.

17           MR. ANDRES:  AND THAT'S NOT RELEVANT.

18           MR. AKROTIRIANAKIS:  WELL, SHE'S THE HEAD OF THEIR --

19           MR. ANDRES:  SHE'S NOTED HEAD.  SHE'S NOT A LAWYER.

20           THE COURT:  WAIT.  LET HIM FINISH.

21           MR. AKROTIRIANAKIS:  SHE IS THE -- IN CHARGE OF THEIR

22    GDPR COMPLIANCE.

23         AND I ASKED HER IF SHE -- WELL, THE COURT HAS READ HER

24    TESTIMONY ABOUT HER NOT KNOWING OF ANY LEGAL OBLIGATION, AND

25    NEVER HAVING HEARD, WITHIN THE COMPANY, THAT THEY WERE DOING

1    THIS BECAUSE OF A LEGAL OBLIGATION.

2         AND THEN SHE PREPARES THIS COMMUNICATION FROM HERSELF TO

3    HER CEO, MR. CATHCART, AND IN THAT TELLS HIM THAT THE SECURITY

4    FLAW -- SHE'S RECOUNTING, DURING THE SAME PERIOD, DURING KIND

5    OF THE NEAR END PART OF THE PERIOD, THAT SHE'S RECOUNTING THAT

6    THEY -- THE EVENTS BACK TO MAY AND SAID, YEAH, THEY FIXED THE

7    SECURITY FLAW IN MAY.

8         THAT'S ON PAGE 7, 71:12 AT THE BOTTOM THERE.  AND I ASK

9    HER, IS IT CORRECT THAT YOU FIXED THE FLAW BACK IN MAY 2019?

10        SHE SAYS, WHATEVER THE ISSUE WAS, THEY FIXED IT TO THE

11   BEST OF MY KNOWLEDGE.

12        AND SHE WAS TRYING TO BE ACCURATE, AS SHE CONFIRMS OTHER

13   PLACES HERE, OF COURSE, WHEN SHE'S DISCUSSING THIS WITH HER

14   CEO.

15        SO THEY FIXED IT IN MAY, AND NOW THIS ENTIRELY LONG

16   PERIOD, WHICH AS I SAID YESTERDAY, AND AS YOU HEARD NOW FROM

17   THE EXPERTS, IS REALLY THE MAJORITY OF WHAT THEY'RE ASKING FOR

18   IN TERMS OF COMPENSATION IS AFTER THE PERIOD IN TIME IN WHICH

19   SHE'S TESTIFYING HERE TO -- COMMUNICATING TO HER CEO THAT THEY

20   HAD FIXED THE -- THEY HAD REMEDIATED THE ISSUE.

21             THE COURT:  ALL RIGHT.  THOSE ARE THE TWO ISSUES YOU

22    WANT THIS IN FOR?

23             MR. AKROTIRIANAKIS:  I THINK THAT'S RIGHT,

24    YOUR HONOR.  I'M SORRY, I HAVE A BIT OF A HEADACHE.  I THINK

25    THAT'S RIGHT.  IF I CAN THINK OF ANYTHING MORE RIGHT NOW, I

```
 1        WILL MENTION IT.  BUT I THINK THAT'S IT.

 2            WE CAN CUT OUT SOME OF THIS STUFF ABOUT WHO'S

 3   AASHIN GAUTAM.  NONE OF THAT MATTERS ANYMORE AFTER 1021 IS NOT

 4   GOING TO BE IN.  IT WAS EXPLANATION ABOUT THE DOCUMENT.  I WAS

 5   TRYING TO BE MINIMAL IN MY EXCISION TO TRY AND GET TO THE END

 6   OF THIS.  BUT I CAN PROBABLY TAKE OUT MORE OF THE STUFF THAT'S

 7   NOT TRULY NECESSARY TO THE TWO ISSUES I MENTIONED TO YOU.

 8            THE COURT:  OKAY.

 9            MR. ANDRES:  SUSAN GLICK IS NOT THE HEAD OF GDPR.

10   GDPR IS NOT RELEVANT.  GDPR IS THE DATA PRIVACY ACT IN EUROPE.

11   NOT RELEVANT FOR ANYTHING.

12        SHE DOESN'T HAVE FIRST-HAND KNOWLEDGE ABOUT ANY OF THIS

13   INFORMATION ABOUT THE FIX.  THAT'S ALREADY COME IN TEN TIMES.

14        THE TESTIMONY RELATES TO THE DOCUMENT WHICH HAS NOW BEEN

15   PRECLUDED, AND THERE IS NO BASIS -- SHE'S NOT A LAWYER.

16        AND BEYOND THAT, YOU DON'T HAVE TO HAVE A LEGAL BASIS TO

17   NOTIFY YOUR VICTIMS THAT NSO'S SPYWARE IS ON THEIR PHONE.

18        SO EVERYTHING ABOUT THIS DOCUMENT IS IRRELEVANT.

19        AND I CONTINUE TO BELIEVE, BUT I'M GUESSING, THAT THE

20   REASON THEY WANT THIS IN IS BECAUSE IT SAYS MARK ZUCKERBERG AND

21   SHERYL SANDBERG.

22        AND BY THE WAY, THERE'S NO EVIDENCE THAT THEY GOT THIS

23   EMAIL, AND THEN WHEN SHE'S ASKED ABOUT IT LATER, SHE SAID

24   MARK ZUCKERBERG AND SHERYL SANDBERG -- I THINK, I'M DOING THIS

25   FROM MEMORY -- NEVER HAD A REACTION OR NEVER SAID ANYTHING
```

1     NEGATIVE ABOUT NSO.

2          SO NOTHING ABOUT THIS TESTIMONY.  FOR THE SAME REASON THAT

3     THE DOCUMENT IS EXCLUDED, THE TESTIMONY SHOULD BE EXCLUDED.

4          BY THE WAY, IF WE WANT TO TALK ABOUT VICTIM NOTIFICATION,

5     THEY'RE TALKING ABOUT THE JOURNALISTS AND THE HUMAN RIGHTS

6     ACTIVISTS AND THE POLITICAL DISSIDENTS, AND ALL OF THE PEOPLE

7     WHO WE'RE NOT GETTING INTO.

8          THE COURT:  SURE.  BUT THEY'RE NOT RAISING THE

9     SPECIFICS OF THAT.  THEY'RE TALKING ABOUT IT IN TERMS OF

10    DAMAGES FOR THAT EXTENDED PERIOD OF TIME WHICH INCLUDED THE

11    VICTIM OUTREACH IN SEPTEMBER.

12         MR. ANDRES:  BUT NOT HER TIME.  SO NOBODY IS ASKING

13    FOR MS. GLICK'S TIME.

14         AND THE ENGINEERS AND OTHERS HAVE ALREADY TESTIFIED ABOUT

15    THESE FACTS.

16         SHE'S NOT SOMEBODY WHOSE TIME WE'RE ASKING TO BE

17    COMPENSATED.

18         THE COURT:  OKAY.  ALL RIGHT.

19         MR. AKROTIRIANAKIS, IF, INDEED, THE PURPOSE IS TO PUT ON

20    CUMULATIVE EVIDENCE THAT, INDEED, THE FIX WAS IN MAY.  IT'S

21    CUMULATIVE, BUT THAT'S NOT NECESSARILY INADMISSIBLE.

22         AND THE LEGAL OUTREACH THAT THERE -- THAT THAT HAPPENED IN

23    SEPTEMBER, EVEN THOUGH SHE ISN'T THE PERSON THAT WOULD

24    NECESSARILY HAVE BEEN RESPONSIBLE FOR IT, AND SHE SAYS, I DON'T

25    KNOW, I DON'T KNOW WHAT THAT GETS YOU.  BUT YOU CAN PUT ON

1     THAT -- YOU CAN PUT ON THAT AMOUNT.

2          BUT ALL THE REFERENCES TO THE EMAIL, THE 1021 WHICH I'VE

3     NOW EXCLUDED, HAVE TO COME OUT.

4          AND THE REFERENCES TO ZUCKERBERG AND SANDBERG AND WHATEVER

5     THE LAST -- THE OTHER PERSON'S NAME IS, SANDBERG, THEY NEED TO

6     COME OUT.

7               MR. AKROTIRIANAKIS:  THAT'S NOT MY PURPOSE.  IT'S THE

8     MR. CATHCART, THE CEO OF WHATSAPP.

9               THE COURT:  OKAY.  TAKE OUT, EXCISE THE PORTIONS THAT

10    DON'T HAVE ANYTHING TO DO WITH THE FIX FINALIZATION IN MAY, OR

11    THE LEGAL OUTREACH TO USERS OCCURRING IN SEPTEMBER.

12         YOU CAN LEAVE IN EVERYTHING ELSE.

13         I DID ASK YOU PREVIOUSLY TO TAKE OUT THE REFERENCE TO HER

14    HAVING GONE TO LAW SCHOOL AFTERWARDS.

15              MR. AKROTIRIANAKIS:  AND THAT'S -- I'M SORRY.  I

16    DIDN'T MEAN TO INTERRUPT YOU, YOUR HONOR.

17              THE COURT:  SO THAT'S JUST THAT FIRST CLAUSE OF THAT

18    SENTENCE.

19              MR. AKROTIRIANAKIS:  WE DID A LITTLE SURGERY ON THAT

20    ONE AND IT'S OUT, YOUR HONOR.

21              THE COURT:  IT'S OKAY.  OKAY.

22              MR. AKROTIRIANAKIS:  AS WELL, YOUR HONOR, AS THE -- I

23    THINK IT'S THE VERY LAST QUESTION AND ANSWER, I HAVEN'T CROSSED

24    IT OUT ON WHAT I'M HOLDING, BUT I HOPE IT'S CROSSED OUT ON WHAT

25    I GAVE YOU.

1          THE COURT:  IT'S CROSSED OUT, YEAH.

2          SO ON THE TWO SUBJECTS THAT YOU ARE OFFERING HER FOR, YOU

3    CAN DO IT, JUST AS LONG AS LONG AS YOU EXCITE THE REFERENCES

4    THAT I JUST MENTIONED.

5          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  IT WILL BE

6     SHORTER THEN.

7          THE COURT:  OKAY.  IT SHOULD BE.  IT SHOULDN'T BE

8     LONG AT ALL.

9          ALL RIGHT.  WHY DON'T WE TAKE A LUNCH BREAK, AND THEN

10    WE'LL COME BACK AND TALK ABOUT JURY INSTRUCTIONS.

11          I SPENT ALL AFTERNOON YESTERDAY LOOKING AT THEM, AND I'M

12    CERTAINLY READY TO TELL YOU WHAT I'M PREPARED TO DO.

13          SO HOW MUCH TIME WOULD YOU LIKE?  45 MINUTES OR AN HOUR?

14          MR. AKROTIRIANAKIS:  WHATEVER IS THE --

15          THE COURT:  LEE-ANNE, HOW MUCH TIME WOULD YOU LIKE?

16          THE REPORTER:  45 MINUTES.

17          THE COURT:  OKAY.  45 MINUTES.  SEE YOU BACK AT 2:15.

18          MR. ANDRES:  THANK YOU, YOUR HONOR.

19          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20          (THE LUNCH RECESS WAS TAKEN FROM 1:32 P.M. UNTIL

21     2:20 P.M.)

22

23

24

25

1                    **AFTERNOON SESSION**

2            (JURY OUT AT 2:20 P.M.)

3                THE COURT:  OKAY.  I'VE GOT SOME NEW FACES HERE.

4          LET'S FIRST JUST MAKE SURE, WITH REGARD TO THE JOINTLY

5     AGREED UPON INSTRUCTIONS, THAT EVERYBODY IS STILL IN AGREEMENT.

6                MR. NOLLER:  AS FAR AS I KNOW, YOUR HONOR.

7                THE COURT:  OKAY.

8          WE HAVE THE ORIGINAL SET OF JOINT INSTRUCTIONS FILED ON

9     MARCH 13TH, AND THEY INCLUDE -- THEY WERE THE ONES FROM WHICH

10    THE PRELIMINARY INSTRUCTIONS CAME.

11         SO WE START WITH -- STARTING WITH 2.2, WE ALREADY GAVE --

12    USED THE STIPULATIONS.

13         I DON'T THINK THAT WE NEED 2.3, THE JUDICIAL NOTICE

14    INSTRUCTION, OR THE USE OF INTERROGATORIES.

15         PERHAPS WE SHOULD GIVE THE DEPOSITION IN LIEU OF LIVE

16    TESTIMONY, BECAUSE I DIDN'T GIVE THAT BEFORE THE FIRST USE OF

17    DEPOSITIONS.

18         AND SO WE'LL DO THAT AND JUST USE IT IN THE PAST TENSE.

19    OKAY?

20                MR. PEREZ:  YES, YOUR HONOR.

21                MR. NOLLER:  THAT MAKES GOOD SENSE TO US.

22                THE COURT:  OKAY.  SO WE DON'T NEED TO REGIVE THE

23     STIPULATION INSTRUCTION.

24         WE DON'T NEED TO USE THE JUDICIAL NOTICE.

25         I WILL GIVE THE DEPOSITION IN LIEU OF LIVE TESTIMONY, 2.4.

```
 1          USE OF INTERROGATORIES, WE HAVEN'T HAD THAT.

 2              MR. PEREZ:  CORRECT, YOUR HONOR.

 3              THE COURT:  SO I DON'T NEED TO GIVE THAT.

 4              MR. NOLLER:  CORRECT.

 5              THE COURT:  AND REQUEST FOR ADMISSIONS I'VE ALREADY

 6     GIVEN, SO WE DON'T NEED TO RE-GIVE THAT.

 7          SO THAT LEAVES THE EXPERT OPINION, WHICH WE NEED TO GIVE;

 8     CHARTS AND SUMMARIES NOT RECEIVED; AND CHARTS AND SUMMARIES

 9     RECEIVED.

10          HAVE WE -- DO WE HAVE SOME IN BOTH CATEGORIES?

11              MR. PEREZ:  I DON'T BELIEVE WE HAVE CHARTS AND

12     SUMMARIES.

13              THE COURT:  WHAT ABOUT THE ONES NOT RECEIVED, THE

14     DEMONSTRATIVES WOULDN'T REALLY COUNT AS THAT.

15              MR. PEREZ:  NO, WE DIDN'T CONSIDER THOSE TO BE IN

16     THAT CATEGORY.

17              THE COURT:  YEAH.  DO YOU AGREE?

18              MR. NOLLER:  THAT'S FINE.

19              THE COURT:  OKAY.  SO WE DON'T NEED THOSE TWO

20     INSTRUCTIONS.

21          AND THEN THE CACI 220, THE HYPOTHETICAL QUESTIONS, I DON'T

22     THINK WE HAD ANY HYPOTHETICAL QUESTIONS, DID WE?

23              MR. NOLLER:  I THINK IT'S POSSIBLE THAT THERE MIGHT

24     BE SOME ON MONDAY IN CONNECTION WITH THE REBUTTALS.  I DON'T

25     KNOW FOR SURE.  BUT WE MAY WANT TO LEAVE THAT OPEN JUST IN
```

1        CASE.

2                THE COURT:  OKAY.  WE'LL LEAVE THAT OPEN.

3                MR. ANDRES:  YOUR HONOR, EXCUSE ME.  SORRY.

4        I THINK WE CAN CHECK IN THE TRANSCRIPT.  I REMEMBER SOME

5   BUT-FOR QUESTIONS, WHICH WOULD STRIKE ME AS HYPOTHETICAL.  BUT

6   WE CAN CHECK THE TRANSCRIPT OVER THE WEEKEND.

7                THE COURT:  OKAY.

8        OKAY.  THE NEXT ONE, CORPORATIONS AND PARTNERSHIPS, FAIR

9   TREATMENT, THAT ONE IS OKAY.

10       AND THEN WE HAVE THE CONCLUDING INSTRUCTIONS, DUTY TO

11  DELIBERATE; CONDUCT OF THE JURY; COMMUNICATIONS WITH THE COURT;

12  AND RETURN OF VERDICT.  THOSE ARE ALL FINE.

13       OKAY.  AND THEN WE TURN TO THE SECOND SET OF JOINTLY

14  SUBMITTED INSTRUCTIONS, AND WE HAVE FOREIGN LANGUAGE TESTIMONY.

15       WE DIDN'T --

16                MR. NOLLER:  NO ONE ENDED UP TESTIFYING IN A FOREIGN

17  LANGUAGE, SO WE DON'T NEED THAT.

18                MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  IT WAS

19  JUST, LIKE, ONE WORD THAT MR. ESHKAR HAD IN THE EXHIBITS THAT

20  WERE PLAYED WHERE HE CALLED FOR THE ASSISTANCE OF THE

21  INTERPRETER.  THE COURT MAY RECALL, AND THEN HE KIND OF

22  DISAGREED WITH HER TRANSLATION FROM HEBREW INTO ENGLISH OF THE

23  QUESTION.

24       I DON'T HAVE -- I DON'T THINK WE NEED IT, BUT I DID WANT

25  TO PUT THAT --

```
1              THE COURT:  FOR ONE WORD THAT HE DISAGREED WITH?

2              MR. AKROTIRIANAKIS:  NO, I DON'T THINK WE NEED IT.

3              THE COURT:  AND THEN CLARIFIED?

4         I DON'T THINK WE NEED IT, EITHER.

5         OKAY.  SO WE DON'T NEED THAT ONE.

6         AND THEN BREACH OF CONTRACT, INTRODUCTION.  LET'S SEE,

7    THAT'S DOCKET 703-1.

8              DID YOU FILE THAT TWO TIMES?  LET'S SEE WHICH ONE I HAVE.

9              MR. NOLLER:  I BELIEVE THERE WAS A --

10             THE COURT:  OKAY.  THAT'S THE BLIND INSTRUCTION.

11    OKAY.

12        YES, SO THAT ONE WILL BE GIVEN, BREACH OF CONTRACT,

13   INTRODUCTION.

14        OKAY.  I'M NOT SURE ABOUT THE NEXT TWO.  YOU'RE -- THE

15   CALIFORNIA STATUTE AND THE CORPORATE DESIGNEE ON 3 AND 4, LET'S

16   JUST SKIP THOSE FOR NOW.

17             MR. NOLLER:  OKAY.

18             THE COURT:  LET'S SEE.  THE MITIGATION AND NOMINAL

19    DAMAGES INSTRUCTIONS ARE FINE.  YOU STILL WANT THOSE?

20             MR. NOLLER:  YES, YOUR HONOR.

21             THE COURT:  OKAY.  AND THE COMPENSATORY DAMAGES, NO

22    REPUTATIONAL HARM, NUMBER 9, I'LL GIVE THAT.

23        AND WE'RE GOING TO SKIP 7 AND 8 AND TALK ABOUT THE

24   SUBSTANTIVE INSTRUCTIONS SEPARATELY.

25             OKAY?
```

```
1              MR. PEREZ:  YES, YOUR HONOR.

2              MR. NOLLER:  YES, YOUR HONOR.

3              THE COURT:  OKAY.  SO LET'S TURN TO THOSE NOW.

4         AND WE'RE TALKING ABOUT WHAT WAS ORIGINALLY IDENTIFIED AS

5    PLAINTIFFS' -- AS DEFENDANTS' 2, PLAINTIFFS' 2, 3, 4, AND

6    PUNITIVES?  THOSE ARE THE REMAINING INSTRUCTIONS.  OKAY?

7         AND I HAVE VARIOUS DIFFERENT VERSIONS, SO I'LL JUST START

8    BY TELLING YOU WHAT I AM INCLINED TO DO, AND THEN WE CAN HAVE

9    SOME DISCUSSION ABOUT IT.

10        OKAY.  SO THE FIRST ONE WOULD BE THE BREACH OF CONTRACT,

11   INTRODUCTION.

12        AND I THINK -- I MEAN, THIS IS VERY SIMPLE.  IT INCLUDES

13   BOTH INFORMATION ABOUT -- WELL, IT DOESN'T GIVE THE ELEMENTS.

14   I'VE DECIDED THAT I THINK WE NEED TO TELL THE JURY WHAT THE

15   ELEMENTS OF THE OFFENSES ARE, PARTICULARLY GIVEN HOW THIS TRIAL

16   HAS TRANSPIRED.

17        I WAS ORIGINALLY OF THE VIEW THAT WE JUST SIMPLY NEEDED TO

18   GIVE THEM AN ABBREVIATED VERSION OF WHAT WAS FOUND.

19        NOW I THINK WE NEED BOTH THE ELEMENTS AND WHAT WAS FOUND

20   MORE EXTENSIVELY THAN I THOUGHT BEFORE.

21        SO THE BREACH OF CONTRACT, EVEN THOUGH IT'S STILL PRETTY

22   THIN, I THINK IT PROBABLY COVERS IT ENOUGH BECAUSE THE REVERSE

23   ENGINEERING OR DECOMPILING WAS ALL THAT I FOUND, AND I DON'T

24   KNOW THAT WE NEED THE ELEMENTS OF THE BREACH -- I MEAN, OF

25   THE -- I'M SURE THE JURY WON'T NEED ANY REAL ASSISTANCE ON
```

 1    THAT.

 2          SO THAT ONE IS FINE.

 3          I'M LOOKING AT DOCKET NUMBER 703-1, PAGE 3, FILED

 4    APRIL 21ST, 2025.  OKAY?

 5                MR. PEREZ:  I'M SORRY, WHICH PAGE, YOUR HONOR?

 6                THE COURT:  PAGE 3.

 7                MR. PEREZ:  3 OF 10?

 8                THE COURT:  3 OF 10.

 9                MR. PEREZ:  BREACH OF CONTRACT, INTRODUCTION?

10                THE COURT:  YES.

11                MR. NOLLER:  YES, YOUR HONOR.

12                THE COURT:  THAT WAS IN THE JOINTLY FILED SET.

13          OKAY.  AND THEN FOR THE CFAA, I'VE GONE BACK TO THE

14    ORIGINAL FILINGS, AND MY INTENT IS TO GIVE, WITH REGARD TO THE

15    ELEMENTS OF BOTH SECTIONS OF CFAA.

16          I'M LOOKING AT DOCKET 587-3, PAGE 5 OF 17, AND PAGE 6 OF

17    17 FILED MARCH 13TH, 2025.

18          THESE ARE THE PLAINTIFFS' PROPOSED INSTRUCTIONS.

19          I WOULD EXCISE THE LAST PARAGRAPH FROM EACH.

20                MR. NOLLER:  SORRY, YOUR HONOR.

21                MR. PEREZ:  SORRY.  THIS IS INSTRUCTION NUMBER 3, SO

22    DOCKET -- OR DOCUMENT 587-3, PAGE 4 OF 17, YOUR HONOR.

23                THE COURT:  NO, PAGE 5.

24                MR. PEREZ:  PAGE 5, OBTAINING INFORMATION BY

25    COMPUTER?

```
1              THE COURT:  YES.

2         EVERYBODY ON THAT?

3              MR. PEREZ:  YES, YOUR HONOR.

4              MR. NOLLER:  I AM NOW, YOUR HONOR.

5              THE COURT:  OKAY.  AND BOTH PAGE 5 AND 6 OF 17,

6    WITHOUT THE LAST PARAGRAPH.

7         (PAUSE IN PROCEEDINGS.)

8              MR. PEREZ:  THAT IS OKAY WITH US, YOUR HONOR.

9              MR. NOLLER:  SO, YOUR HONOR, OUR ONE -- AND THIS IS

10   ON PAGE 5, WHAT WAS PROPOSED IN INSTRUCTION NUMBER 4.

11        THE ONE, I THINK, ISSUE WE MIGHT HAVE IS THAT WE DIDN'T

12   UNDERSTAND THIS COURT TO HAVE FOUND -- THIS IS IN REFERENCE TO

13   THE THIRD PARAGRAPH, NSO HAD OBTAINED INFORMATION FROM THE

14   WHATSAPP SERVERS AND TARGET DEVICES.

15        WE UNDERSTOOD THIS COURT'S ORDER TO BE BASED ON THE

16   FINDING THAT WHAT THE SOFTWARE DID WAS OBTAIN INFORMATION FROM

17   THE TARGET DEVICES, THIS METADATA, AND THEN PASS IT THROUGH

18   WHATSAPP SERVERS, NOT THAT THE DATA WAS -- INFORMATION WAS

19   TAKEN FROM WHATSAPP SERVERS.

20             THE COURT:  THE WAY THAT I LOOKED AT THIS WAS THAT,

21   YES, THE INFORMATION -- I THINK YOU ALL REFERRED TO IT AS

22   FINGERPRINTING INFORMATION -- ACTUALLY CAME BACK THROUGH THE

23   WHATSAPP SERVERS.

24        SO IN MY VIEW, THAT'S OBTAINED FROM -- I MEAN, IT DIDN'T

25   GO DIRECTLY FROM THE TARGET DEVICES BACK TO THE WIS.  IT WENT
```

1    THROUGH WHATSAPP.  SO IN MY VIEW, THAT'S SUFFICIENT TO

2    ESTABLISH THAT IT WAS OBTAINED FROM THEM.

3         BUT IT IS A, SORT OF A TWO-STEP PROCESS.

4         ARE YOU SUGGESTING THAT WE SHOULD TAKE OUT THE TARGET

5    DEVICES?

6         MR. NOLLER:  WELL, I -- OUR SUGGESTION WOULD HAVE

7    BEEN TO TAKE OUT "FROM THE WHATSAPP SERVERS," OR PERHAPS

8    REPHRASE "FROM THE TARGET DEVICES THROUGH THE WHATSAPP

9    SERVERS."

10   I UNDERSTAND YOUR HONOR'S RATIONALE.  OUR CONCERN IS WE

11   JUST DON'T WANT THE INSTRUCTION TO SUGGEST TO THE JURY THAT

12   WHAT WAS TAKEN FROM THE WHATSAPP SERVERS WAS THE, YOU KNOW, THE

13   SUBSTANTIVE DATA THAT WAS ULTIMATELY EXTRACTED, OR THAT THERE

14   WAS, LIKE, WHATSAPP INFORMATION ON THE SERVERS, WHATSAPP'S

15   CODE, THINGS LIKE THAT THAT WAS EXTRACTED FROM THE SERVERS,

16   THAT IT WAS JUST THE METADATA FROM THE TARGET DEVICES THAT

17   PASSED THROUGH THE SERVERS.

18        THE COURT:  OKAY.  AND THE NEXT INSTRUCTION ACTUALLY

19   DOES SAY THAT, AND I GUESS I COULD CHANGE THE ORDER OF THEM OR

20   MAYBE JUST USE THE SAME LANGUAGE.

21   THE NEXT INSTRUCTION THAT I WAS GOING TO APPROVE AFTER

22   THESE AT PAGES 5 AND 6 WAS FROM INSTRUCTION AT DOCKET 722-1 --

23        MR. PEREZ:  YOUR HONOR, COULD WE STAY ON THE LAST ONE

24   JUST FOR ONE MOMENT BEFORE WE MOVE OFF IT?

25   WE DO THINK THAT, PARTICULARLY THE WAY THE EVIDENCE CAME

```
1    IN AND SOME OF THE POINTS THAT WERE ARGUED TODAY ABOUT WHAT

2    CAME FROM THE DEVICES THROUGH THE SERVERS VERSUS FROM THE

3    SERVER DIRECTLY, IT'S ACTUALLY QUITE IMPORTANT FOR THE JURY TO

4    UNDERSTAND, PRECISELY WHAT THE COURT JUST SAID, THAT FOR

5    PURPOSES OF FINDING LIABILITY, THE COURT FOUND THAT INFORMATION

6    PASSING THROUGH THE SERVERS CONSTITUTED INFORMATION TAKEN FROM

7    THE SERVERS SO THAT THE JURY IS NOT THINKING THERE'S A LEGALLY

8    IRRELEVANT DISTINCTION BETWEEN THOSE TWO GIVEN THAT THEY'VE

9    HIGHLIGHTED THAT DISTINCTION.

10          THE COURT:  LET ME THROW IN THE THIRD ONES BECAUSE

11    THERE ARE THREE PARTS TO THE CFAA, AND I THINK PROBABLY WE NEED

12    TO REGULARIZE THE LANGUAGE BETWEEN THEM ALL.

13       SO TAKE A LOOK AT THIS -- THE ONE AT 722-1 FILED

14    APRIL 27TH, PAGE 2 OF 3.

15          MR. NOLLER:  SO, YOUR HONOR, WE HAD DISCUSSED THIS AT

16    ONE OF THE RECENT HEARINGS.  I THINK THE ONE CHANGE THAT

17    YOUR HONOR MADE WAS REMOVING THE WORD "THEN" FROM THE LAST

18    SENTENCE OF THE FIRST PARAGRAPH.

19       AND WE THINK WITH THAT CHANGE, THE SENTENCE WOULD

20    ACCURATELY DESCRIBE THE COURT'S FINDING.

21          MR. PEREZ:  I'M SORRY, YOUR HONOR.  I WAS TRYING TO

22    FIND THE DOCUMENT, SO I DIDN'T HEAR DEFENSE COUNSEL'S PROPOSAL.

23          THE COURT:  DID YOU FIND THE DOCUMENT?

24          MR. PEREZ:  I DID.

25          THE COURT:  OKAY.  SO LET'S LOOK AT THAT.
```

```
 1              MR. NOLLER:  I'M HAPPY TO RESTATE IT.  I THINK THIS

 2     IS CONSISTENT WITH WHAT YOUR HONOR SAID AT THE HEARING WE HAD

 3     ON THIS BEFORE.

 4          IT WAS THAT THIS PROPOSAL, IF YOU JUST TAKE THE WORD

 5     "THEN" OUT OF THE LAST SENTENCE, SO THE LAST CLAUSE OF THAT

 6     LAST SENTENCE IN THE FIRST PARAGRAPH, AND "AND THAT THE WIS WAS

 7     THEN ABLE TO OBTAIN PROTECTED INFORMATION BY HAVING IT SENT

 8     FROM THE TARGET USERS THROUGH THE WHATSAPP SERVERS AND BACK TO

 9     THE WIS," I THINK IF YOU JUST REMOVE THE WORD "THEN."

10              THE COURT:  I THOUGHT WE JUST ADDED THAT.

11              MR. NOLLER:  NO, YOUR HONOR, BECAUSE THE ISSUE WITH

12     "THEN" FROM OUR PERSPECTIVE IS THAT IT SUGGESTS THAT THE

13     INFORMATION WAS PASSED BACK THROUGH WHATSAPP SERVERS AFTER THE

14     PEGASUS AGENT WAS INSTALLED ON THE TARGET DEVICE, AND THAT'S

15     NOT CORRECT.

16          BUT I THINK THAT IF WE JUST REMOVE THE WORD "THEN," THAT

17     CREATES THAT SORT OF TEMPORAL SUGGESTION, THEN THAT'S ACCURATE,

18     THAT'S CONSISTENT WITH THE COURT'S FINDING WHICH OBVIOUSLY IN

19     SOME RESPECTS WE DISAGREE WITH, BUT IT'S WHAT WE HAVE.

20              THE COURT:  RIGHT.

21              MR. NOLLER:  AND WOULD BE AN APPROPRIATE WAY TO

22     DESCRIBE THE COURT'S FINDING.

23              THE COURT:  OKAY.

24              MR. PEREZ:  SO I THINK THAT WAS MY SUGGESTION A FEW

25     CONFERENCES AGO, AND WE HAVE NO PROBLEM WITH THAT EDIT TO THAT
```

```
 1      SENTENCE.

 2           WE DO HAVE A COUPLE OTHER EDITS ON THAT INSTRUCTION.

 3              THE COURT:  WELL, WE'RE -- THE POINT OF THIS

 4      INSTRUCTION IS THE ADDING BACK THE INTENTIONALLY KNOWING AND

 5      INTENT TO DEFRAUD.  THAT'S GOING BACK IN.

 6              MR. PEREZ:  YES.

 7              THE COURT:  AND I'M GOING TO GIVE ANOTHER INSTRUCTION

 8      ON THE PUNITIVE DAMAGES, AN INSTRUCTION TO SORT OF CLARIFY THE

 9      DIFFERENCE BETWEEN THE WAY INTENT IT USED.

10              MR. NOLLER:  YOUR HONOR --

11              THE COURT:  SO WHAT WAS YOUR OTHER --

12              MR. PEREZ:  THAT'S IT.

13              THE COURT:  THAT'S A SEPARATE THING.

14              MR. NOLLER:  YOUR HONOR, I'M NOT SAYING THIS TO ARGUE

15      SOMETHING YOU DECIDED.  I JUST WANT TO MAKE A RECORD.  I WANT

16      TO STATE FOR PRESERVATION PURPOSES THAT WE STILL OBJECT TO

17      INCLUDING THE PHRASE "INTENT TO DEFRAUD" IN THE INSTRUCTION.

18      BUT OBVIOUSLY WE AGREE IF THE COURT DOES THAT, IT IS

19      APPROPRIATE, AS YOU JUST SAID, TO INSTRUCT THE JURY ON THE

20      DIFFERENCE.

21              THE COURT:  RIGHT.  OKAY.

22           ALL RIGHT.  SO THIS INSTRUCTION, AS IT APPEARS ON THE

23      DOCKET, WILL BE GIVEN, WITH THE DELETION OF THE "THEN."

24           BUT OTHER THAN THAT, IT'S THE SAME AS IS REFLECTED ON THE

25      DOCKET.  OKAY?
```

 1          MR. NOLLER:  SUBJECT TO OUR EXISTING OBJECTIONS,

 2     THAT'S FINE, YOUR HONOR.

 3          MR. PEREZ:  YES, THAT'S OKAY, YOUR HONOR.

 4          THE COURT:  OKAY.  SO WITH THIS DEFINITION, LET'S GO

 5     BACK TO THE PRECEDING ONES, THE 587-3, PAGE 5 AND 6, AND

 6     DETERMINE IF WE SHOULD CHANGE THE DESCRIPTION TO MATCH THIS

 7     DESCRIPTION.

 8          MR. NOLLER:  I THINK SOMETHING LIKE THAT WOULD BE

 9     APPROPRIATE, YOUR HONOR, IN THE THIRD PARAGRAPH.  WHETHER IT'S

10     THE EXACT SAME LANGUAGE OR SOMETHING SIMILAR, I THINK

11     REPHRASING IT TO, YOU KNOW, MORE PRECISELY DESCRIBE THE, THE

12     ORDER OF OPERATIONS, SO TO SPEAK, IN TERMS OF WHAT THE DATA WAS

13     AND WHERE IT WENT WOULD BE APPROPRIATE.

14          MR. PEREZ:  AND, AGAIN, YOUR HONOR, WE THINK THAT

15     GIVEN THE COURT, AS I THINK THE COURT JUST EXPLAINED, TREATED

16     THE INFORMATION THAT PASSED THROUGH THE SERVERS AS INFORMATION

17     TAKEN FROM THE SERVERS, THE EXISTING LANGUAGE IS ENTIRELY

18     APPROPRIATE.

19          AND, INDEED, TODAY WE HEARD EVIDENCE THAT INFORMATION CAME

20     FROM THE SERVERS THEMSELVES AS WELL.

21          MR. NOLLER:  I'M NOT SURE THAT THAT'S RIGHT.  BUT IN

22     ANY EVENT, IT WASN'T THE BASIS OF THIS COURT'S FINDING.  THE

23     BASIS OF THIS COURT'S FINDING WAS THE INFORMATION FROM THE

24     TARGET DEVICES.

25          AND, AGAIN, NOT TRYING TO, YOU KNOW -- WE DISAGREE THAT

1    THAT'S FROM THE SERVER, WE DISAGREE THAT IT'S PROTECTED

2    INFORMATION, BUT THAT'S BEEN RESOLVED.  I UNDERSTAND THAT.

3         AGAIN, MY CONCERN IS MAKING SURE THAT THE JURY UNDERSTANDS

4    AND ISN'T INADVERTENTLY MISLED INTO THINKING THAT THE

5    INFORMATION AT ISSUE WAS THE ULTIMATE, YOU KNOW, TEXT MESSAGES,

6    EMAILS, THE THINGS THAT WERE EXTRACTED BY THE PEGASUS AGENT.

7         MR. PEREZ:  YOUR HONOR, I THINK THAT'S SOMETHING THAT

8    THEY'RE MORE THAN WELCOME TO ARGUE FACTUALLY TO THE JURY AS TO

9    WHAT INFORMATION WASN'T BASED ON THE EVIDENCE AT TRIAL AND NOT

10   A MATTER FOR THE INSTRUCTIONS.  I BELIEVE THE EXISTING LANGUAGE

11   IS AN ACCURATE STATEMENT OF THE COURT'S FINDINGS.

12        THE COURT:  OKAY.  WHAT I WANT TO KNOW IS, IS THERE

13   ANY SUGGESTION OF SPECIFIC LANGUAGE THAT I SHOULD SUBSTITUTE ON

14   EITHER OF THESE TWO INSTRUCTIONS?  OTHERWISE I'M GOING TO GIVE

15   THEM AS IS WITH THE DELETION OF THE FIFTH PARAGRAPH -- OF THE

16   LAST PARAGRAPH.  NOTE NOTE CHECK MR. PEREZ.

17        MR. NOLLER:  YES, YOUR HONOR, I THINK AS YOU PROPOSED

18   AND AS I MENTIONED, CARRYING THE LANGUAGE FROM THE PREVIOUS

19   INSTRUCTION WE WERE JUST TALKING ABOUT FROM DOCKET 722-1, FROM

20   THE TARGET DEVICES THROUGH THE WHATSAPP SERVERS, IS MORE

21   PRECISE, IT'S MORE ACCURATE, IT AVOIDS THE CONFUSION THAT WE'RE

22   TALKING ABOUT.  AND OBVIOUSLY THIS IS SOMETHING WE CAN ARGUE.

23        BUT WHEN IT'S THE COURT INSTRUCTING THE JURY AS TO WHAT IT

24   ALREADY FOUND AND WHAT THE JURY CAN'T FIND AGAINST AND IS

25   REQUIRED TO ACCEPT, I THINK IT'S IMPORTANT TO BE PRECISE AND

```
 1    NOT CREATE, YOU KNOW, THE SORT OF RISK OF CONFUSION THAT I'M

 2    TALKING ABOUT.

 3              MR. PEREZ:  AGAIN, THE PROBLEM, YOUR HONOR, IS THAT

 4    THE COURT FOUND THAT THAT INFORMATION CAME FROM THE SERVERS.

 5    THE COURT TREATED THAT INFORMATION AS HAVING COME FROM THE

 6    SERVERS.

 7        SO THAT FINDING, THAT THE WIS TOOK INFORMATION FROM THE

 8    SERVERS, IS IN THAT CATEGORY OF FINDINGS THAT THE JURY IS NOT

 9    AT LIBERTY TO FIND OTHERWISE.

10              THE COURT:  I AGREE.  LOOK AT THE INSTRUCTION NUMBER

11    5, AND IT'S, I BELIEVE, THE THIRD PARAGRAPH -- IT'S THE

12    PARAGRAPH STARTING WITH "THIRD, NSO OBTAINED INFORMATION FROM

13    THE WHATSAPP SERVERS AND TARGETED DEVICES."

14        IS THERE A SUGGESTION HOW THAT SHOULD BE CHANGED, IF AT

15    ALL?

16              MR. PEREZ:  I'M SORRY, YOUR HONOR.  MY THIRD ON

17    PAGE 6 BEGINS WITH NSO ACTED KNOWINGLY AND WITH INTENT TO

18    DEFRAUD.

19              THE COURT:  NO.  I'M ON PAGE 5.

20              MR. NOLLER:  YES, YOUR HONOR.  OUR PROPOSAL IS JUST

21    TO CARRY THE LANGUAGE OVER FROM THE INSTRUCTION IN 722.

22              THE COURT:  OKAY.  AND TELL ME WHAT LANGUAGE IT IS

23    YOU WOULD SUBSTITUTE IN THAT ONE SENTENCE.

24              MR. NOLLER:  UNDERSTOOD.  YES, OKAY.

25        SO OUR PROPOSAL WOULD BE TO SAY "NSO OBTAINED INFORMATION
```

1      FROM THE TARGET DEVICES," WHICH IS WHAT THIS COURT FOUND -- LET

2      ME GO BACK TO 722 -- "SENT MESSAGES THROUGH THE WHATSAPP

3      SERVERS THAT CAUSED PEGASUS TO BE INSTALLED ON TARGET USER'S

4      DEVICES AND THAT THE WIS WAS ABLE TO OBTAIN PROTECTED

5      INFORMATION BY HAVING IT SENT FROM THE TARGET USERS THROUGH THE

6      WHATSAPP SERVERS AND BACK TO THE WIS."

7           AND I WILL SAY, YOUR HONOR, THAT THE LANGUAGE IN THIS

8      COURT'S SUMMARY JUDGMENT ORDER WAS THROUGH WHATSAPP SERVERS AND

9      VIA WHATSAPP SERVERS, UNDERSTANDING THAT YOUR HONOR FOUND THAT

10     SATISFIED THE STATUTORY LANGUAGE.

11          BUT THE LANGUAGE IN THE COURT'S ORDER WAS NOT "FROM

12     WHATSAPP SERVERS," IT WAS "THROUGH WHATSAPP SERVERS."

13               MR. PEREZ:  WE CONTINUE TO DISAGREE, YOUR HONOR.  WE

14     DON'T WANT THE JURY LEFT WITH THE MISINFORMATION THAT THE COURT

15     DID NOT FIND THAT INFORMATION WAS TAKEN FROM THE SERVERS.

16          THE COURT DID FIND THAT INFORMATION WAS TAKEN FROM THE

17     SERVERS BECAUSE IT FOUND THAT THAT --

18               THE COURT:  WHAT'S YOUR SUGGESTION?

19               MR. PEREZ:  MY SUGGESTION IS TO LEAVE THE LANGUAGE AS

20     IT IS, YOUR HONOR, ON PAGE 587-3.

21               MR. NOLLER:  YOUR HONOR, I DON'T SEE HOW THERE'S

22     LITERALLY ANY CHANCE THAT THE JURY WOULD BE CONFUSED ABOUT

23     THAT.  YOU'RE FINDING -- YOU'RE INSTRUCTING THE JURY THAT YOU

24     FOUND LIABILITY FOR THIS REASON.  I DON'T KNOW WHAT THE WORRY

25     THERE WOULD EVEN BE.

1090

```
 1          BUT FROM OUR PERSPECTIVE, I THINK THE WORRY IS VERY

 2     SIGNIFICANT THAT THE COURT IS GOING TO UNDERSTAND THAT IT CAN'T

 3     SECOND GUESS WHAT THIS COURT HAS FOUND.  AND OBVIOUSLY WE'RE

 4     NOT GOING TO ASK IT TO.  SO THE JURY NEEDS TO CORRECTLY

 5     UNDERSTAND WHAT THOSE FACTS ARE, AND THIS SORT OF BARE BONES

 6     LANGUAGE IN THE CURRENT THIRD PARAGRAPH CREATES A SIGNIFICANT

 7     RISK OF THAT.

 8          MR. PEREZ:  THE RISK OF JURY CONFUSION EXISTS BECAUSE

 9     OF HOW THEY'VE ARGUED IT.  THEY'RE TRYING TO DRAW A DISTINCTION

10     THERE AS IF ONE OF THEM IS PROBLEMATIC AND THE OTHER IS NOT.

11     IT'S IMPORTANT TO HAVE BOTH IN THERE.  AND THE EXISTING

12     LANGUAGE, WHICH IS VERY, VERY SIMPLE, SIMPLER THAN WHAT THEY

13     PROPOSED, FROM THE WHATSAPP SERVERS AND TARGET DEVICES IS

14     FAITHFUL TO THE COURT'S SUMMARY JUDGMENT RULING AND CLEAR TO

15     THE JURY.

16          THE COURT:  OKAY.

17          MR. NOLLER:  YOUR HONOR, JUST ONE MORE BRIEF POINT.

18          THE ARGUMENT WE'RE MAKING IS NOT THAT, AT THIS STAGE --

19     OBVIOUSLY WE MADE THE ARGUMENT BEFORE AND WE BELIEVE WE WERE

20     CORRECT, BUT YOUR COURT HAS HELD OTHERWISE, FOR CURRENT

21     PURPOSES, WE'RE NOT ARGUING THAT THERE'S SOME, FOR PURPOSES OF

22     LIABILITY, LEGALLY SIGNIFICANT DIFFERENCE BETWEEN -- FROM THE

23     SERVERS OR THROUGH THE SERVERS.

24          THE POINT OF THE ARGUMENT, THE DISTINCTION THAT WE'VE BEEN

25     DRAWING HERE GOES, AS WITH SO MUCH OF WHAT WE'VE BEEN DEALING
```

1    WITH BECAUSE OF THE WAY PLAINTIFFS HAVE BROUGHT THIS CASE,

2    PUNITIVE DAMAGES.  WE THINK THERE'S A REALLY IMPORTANT

3    DIFFERENCE FOR PURPOSES OF WHAT THE CONDUCT THAT THE JURY HAS

4    TO CONSIDER IS IS WHETHER THE JURY BELIEVES THAT WHAT NSO DID

5    WAS, YOU KNOW, HACKED DIRECTLY INTO THE SERVERS AND REMOVE

6    WHATSAPP'S CODE OR WHATSAPP'S PROPERTY FROM THOSE SERVERS

7    VERSUS WHAT ACTUALLY HAPPENED, WHICH IS THAT IT COLLECTED SOME

8    METADATA FROM TARGET USERS AND THEN PASSED THAT BACK THROUGH

9    WHATSAPP SERVERS.

10          MR. PEREZ:  THOSE ARE ALL FACTUAL POINTS THAT THEY

11    CAN ARGUE BASED ON THE EVIDENCE, YOUR HONOR.

12          THE COURT:  RIGHT, RIGHT.

13      I WONDER, THOUGH, BOTH OF THESE INSTRUCTIONS WERE PREPARED

14    BY YOU, BY YOUR COUNSEL, AND YOU HAVE CHOSEN TO USE DIFFERENT

15    LANGUAGE.

16      I UNDERSTAND THAT THE LATER ONE, THE APRIL 27TH ONE, WAS

17    BASED UPON OUR LAST DISCUSSION ABOUT INSTRUCTIONS.

18      BUT HOW DO YOU RECONCILE THE USE OF DIFFERENT LANGUAGE,

19    THE THROUGH AS OPPOSED TO FROM?

20          MR. PEREZ:  I THINK THE LANGUAGE IN INSTRUCTION

21    4587-3, PAGE 5, IS A LITTLE SIMPLER AND A LITTLE CLEARER, AND

22    WE HAVE NO OBJECTION TO USING THAT IN BOTH.

23          THE COURT:  OKAY.  BUT HOW DO YOU RECONCILE -- WHAT

24    DID YOU DO -- WHY IS THE LAST ONE YOU SUBMITTED DIFFERENT?  WAS

25    THAT AN INTENTIONAL COMPROMISE WITH THE DEFENDANTS?

```
 1          I THINK THIS IS ONE OF YOUR DISPUTED ONES, THOUGH, SO I

 2    THINK YOU CHANGED IT ALL ON YOUR OWN.

 3          MR. NOLLER:  THAT WAS LANGUAGE THAT THE PARTIES

 4    EXCHANGED AND AGREED ON, WITH THE EXCEPTION OF THE WORD "THEN."

 5          THE COURT:  OKAY.

 6        YEAH, I ACTUALLY THINK THAT THE LANGUAGE --

 7          MR. PEREZ:  SORRY, YOUR HONOR.

 8          THE COURT:  THE LATER LANGUAGE ON 2 IS MORE ACCURATE,

 9    FRANKLY.

10          MR. PEREZ:  THE LANGUAGE --

11          THE COURT:  "DEFENDANTS WHATSAPP INSTALLATION SERVICE

12    SENT MESSAGES THROUGH WHATSAPP SERVERS THAT CAUSED PEGASUS TO

13    BE INSTALLED ON TARGET USER'S DEVICES, AND THAT THE WIS WAS

14    ABLE TO OBTAIN PROTECTED INFORMATION BY HAVING IT SENT FROM THE

15    TARGET USERS THROUGH THE WHATSAPP SERVERS AND BACK TO THE WIS."

16        PERHAPS WE NEED A CLARIFICATION THAT SENDING IT THROUGH

17    THE SERVERS WAS, IN THE COURT'S VIEW, OBTAINING IT FROM THE

18    SERVERS.

19        I MEAN, I INTENTIONALLY MEANT IT TO COVER THE LANGUAGE OF

20    THE STATUTE, WHICH REQUIRES THE OBTAINING OF INFORMATION.

21          MR. PEREZ:  THAT WORKS JUST FINE FOR US, YOUR HONOR.

22          THE COURT:  SO I GUESS I CAN ASK YOU TO PROPOSE

23    SOMETHING THAT INCLUDES THAT.  I MEAN, THAT'S WHAT WAS

24    INTENDED.

25          MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.  THANK YOU.
```

```
1              THE COURT:  OKAY.  AND NOW LET'S TURN TO THE NEXT

2      ONE, NUMBER 6.

3              MR. NOLLER:  SORRY, YOUR HONOR.  NUMBER 6 OR PAGE 6?

4              THE COURT:  PAGE 6.

5              MR. NOLLER:  THANK YOU.

6              THE COURT:  PAGE 6 OF 17.

7          THIS ONE DOESN'T NEED -- DOESN'T SUFFER FROM THE SAME

8      PROBLEM.

9              MR. NOLLER:  I ACTUALLY THINK IT DOES HAVE A SIMILAR

10     ISSUE, YOUR HONOR, IN THE SECOND PARAGRAPH.  SO TOWARD THE END

11     OF THAT PARAGRAPH, NSO ACCESSED WHATSAPP SERVERS WITH

12     AUTHORIZATION AND USED SUCH ACCESS TO OBTAIN OR ALTER

13     INFORMATION ON THE WHATSAPP SERVERS AND TARGET DEVICES.

14         SO THAT WOULD BE SORT OF THE SAME ISSUE FOR US,

15     YOUR HONOR.

16         AND EVEN UNDER -- EVEN IF THE COURT UNDERSTANDS

17     INFORMATION PASSING THROUGH THE WHATSAPP SERVERS AS BEING

18     OBTAINING INFORMATION ON THE WHATSAPP SERVERS, THERE WAS NO

19     FINDING CERTAINLY THAT NSO ALTERED INFORMATION ON THE WHATSAPP

20     SERVERS.

21             THE COURT:  YEAH, THAT'S JUST THE LANGUAGE OF THE, OF

22     THE STATUTE, ACTUALLY.

23             MR. NOLLER:  YES, UNDERSTOOD.

24         BUT THE WAY THAT IT'S PHRASED MAKES IT SEEM LIKE THAT

25     LANGUAGE IS WHAT THE COURT FOUND.  SO WE THINK IT WOULD BE
```

```
1    APPROPRIATE TO USE THE SAME SORT OF DESCRIPTION OF THE CONDUCT

2    AS WE'VE BEEN DISCUSSING.

3              THE COURT:  AND TO REMOVE THE "ALTER."

4              MR. PEREZ:  WELL, YOUR HONOR, IT IS, AS THE COURT

5    JUST SAID, THAT IS A STATEMENT OF THE ELEMENT OF THE OFFENSE,

6    AND THAT IS WHAT THE COURT FOUND INASMUCH AS IT FOUND THAT THAT

7    ELEMENT WAS SATISFIED.

8              MR. NOLLER:  BUT, YOUR HONOR, THE INSTRUCTION ISN'T

9    PHRASED IN TERMS OF THAT BEING JUST THE ELEMENT.  IT'S PHRASED

10   IN TERMS OF WHAT THE COURT FOUND AS A MATTER OF NSO'S CONDUCT.

11   AND IN THAT CONTEXT, IT'S NOT CORRECT, THERE'S NO --

12             THE COURT:  WELL, IT'S BOTH.  IT'S BOTH THE ELEMENTS

13   AND THE CONDUCT DESCRIBED THEREIN.  IT'S BOTH.  RIGHT?

14             MR. PEREZ:  WE READ IT, YOUR HONOR, AS AN EXPLANATION

15   OF WHAT EXCEEDING AUTHORIZED ACCESS MEANS.  "NSO EXCEEDED ITS

16   AUTHORIZED ACCESS TO WHATSAPP SERVERS, WHICH MEANS THAT NSO

17   ACCESSED," AND THAT IS AN ACCURATE STATEMENT OF THE LAW AND THE

18   LEGAL ELEMENT THAT THE COURT FOUND SATISFIED.

19             THE COURT:  YEAH, AND THERE'S NO ARGUMENT THAT THERE

20   IS ANY ALTERING DONE.

21        YEAH, I THINK THAT'S PROBABLY FINE.

22        NOW, WOULD YOU ALL PREFER THAT I GIVE THE ONE THAT MOST

23   CLEARLY SETS FORTH THE FINDING BEFORE THE TWO THAT DEFINE WHAT

24   THESE TWO -- THE ELEMENTS ARE?  OR THE OTHER WAY AROUND?  I

25   THOUGHT THE TWO WITH THE ELEMENTS SHOULD COME FIRST AND THEN
```

```
1    SPECIFICALLY HERE'S A SUCCINCT INSTRUCTION ABOUT WHAT WAS

2    FOUND.

3              MR. NOLLER:  THAT'S FINE, YOUR HONOR.

4              MR. PEREZ:  I'M SORRY.  IS THE COURT LOOKING AT

5    INSTRUCTION -- I'M SORRY -- PAGES 5 AND 6 OF 587-3?

6              THE COURT:  YEAH.  SHOULD THOSE PRECEDE THE ONE AT

7    722-1, PAGE 5 OF 2?

8         THAT'S WHAT MADE MORE SENSE TO ME --

9              MR. PEREZ:  YES.

10              THE COURT:  -- IN TERMES OF TRYING TO MAKE SURE THAT

11    THE JURY HAS A CLEAR --

12              MR. PEREZ:  I THINK WE DEFER TO THE COURT AS TO

13    WHATEVER THE COURT THINKS IS CLEARER FOR THE JURY, YOUR HONOR.

14              MR. NOLLER:  YES, WE AGREE WITH THAT.

15              THE COURT:  OKAY.

16         AND THEN THE NEXT ONE THAT I HAVE DOWN IS --

17              MR. NOLLER:  YOUR HONOR, I'M REALLY SORRY, BUT JUST

18    FOR PRESERVATION, I JUST WANT TO AGAIN OBJECT TO THE INTENT TO

19    DEFRAUD LANGUAGE IN THE INSTRUCTION ON PAGE 6.

20              THE COURT:  OKAY.

21         OKAY.  TURNING TO THE CALIFORNIA STATUTE, I'M LOOKING AT

22    301 -- I'M SORRY.

23         703-1, FILED ON APRIL 21ST.  IT WAS THE JOINT INSTRUCTION

24    THAT YOU ALL SUBMITTED.  THAT'S THE JOINT ONE.  OKAY.

25              AND I WOULD CONSIDER, HOWEVER, THE 722-1, PAGE 3 FILED ON
```

1    APRIL 27TH.  I HAVEN'T DECIDED BETWEEN THOSE TWO.

2         MR. PEREZ:  YES, YOUR HONOR.  WE BELIEVE STRONGLY,

3    FOR WHAT IT'S WORTH, THAT GIVEN THE EMPHASIS AT OPENING,

4    THROUGHOUT THE COURSE OF THE TRIAL, ON WHERE CONDUCT TOOK

5    PLACE, THE ADDITIONAL LANGUAGE IN 722-1, PAGE 3, THAT

6    SPECIFICALLY THE COURT FOUND THE WIS TARGETED CALIFORNIA

7    SERVERS AND THE PEGASUS CODE WAS SENT THROUGH THOSE SERVERS 43

8    TIMES IN MAY 2019 IS REALLY INDISPENSABLE IN OUR VIEW.

9         MR. NOLLER:  YES.  SO WE DON'T AGREE WITH THAT,

10   YOUR HONOR.  I MEAN, I THINK THIS IS, AS MR. PEREZ WAS SAYING

11   WITH RESPECT TO SOME OTHER THINGS, THAT'S CERTAINLY A FACTUAL

12   THING THEY CAN ARGUE TO THE JURY, BUT IT DOESN'T NEED TO BE

13   ADDED TO THE INSTRUCTION.

14        THE -- SO, YOU KNOW, WE THINK THE INSTRUCTION THAT THEY

15   PROPOSED, KNOWING FULL WELL THAT WE WERE SEEKING AN

16   EXTRATERRITORIALITY INSTRUCTION, IS SUFFICIENT AND DOESN'T NEED

17   TO BE MODIFIED.

18        I WILL SAY, IF THE COURT DISAGREES WITH THAT, WE'LL ACCEPT

19   THAT.

20        BUT WE JUST DON'T SEE THAT IT'S NECESSARY.

21        THE COURT:  IS THE -- THERE'S ONLY ONE ADDITIONAL

22   SENTENCE THAT'S ADDED TO THIS INSTRUCTION.

23        MR. NOLLER:  WELL, YOUR HONOR, I DON'T HAVE IT

24   DIRECTLY IN FRONT OF ME, BUT I THINK THERE WAS AN EXTRA

25   PARAGRAPH.  MAYBE IT'S A ONE SENTENCE LONG PARAGRAPH, BUT THERE

```
1    WAS --

2              THE COURT:  NO, THERE'S ONLY ONE SENTENCE THAT'S BEEN

3    ADDED.

4              MR. PEREZ:  AND, YOUR HONOR, I THINK THE COURT

5    ALREADY ADDRESSED THIS A COUPLE CONFERENCES AGO, THAT WE HAD

6    DISCUSSED, AND I THOUGHT THE COURT HAD RULED, THAT IN LIGHT OF

7    THE PUNITIVE DAMAGES THAT THE COURT INSERTED ABOUT

8    EXTRATERRITORIALITY, THAT THE COURT AGREED IT WAS APPROPRIATE

9    TO INSTRUCT THE JURY AS TO WHAT THE COURT FOUND WITH RESPECT TO

10   CONDUCT IN CALIFORNIA ALL, AGAIN, IN THE SPIRIT OF THE JURY

11   UNDERSTANDING WHAT WAS THE CONDUCT THAT GAVE RISE TO LIABILITY,

12   PARTICULARLY WITH THE EMPHASIS ON WHERE CONDUCT OCCURRED, WE

13   BELIEVE THIS LANGUAGE IS CRITICAL.

14             THE COURT:  ALL RIGHT.  OKAY.

15             MR. NOLLER:  AGAIN, YOUR HONOR, WE JUST DON'T THINK

16   IT'S NECESSARY.  IF THE COURT THINKS IT'S NECESSARY, WE DON'T

17   HAVE A STRONG OBJECTION TO THE WAY THAT THEY'VE PHRASED IT.

18   BUT WE JUST THINK IT'S A FACTUAL ARGUMENT THEY CAN MAKE TO THE

19   JURY AND IT DOESN'T NEED TO BE INSTRUCTED ON.

20             MR. PEREZ:  IT'S NOT SOMETHING WE BELIEVE WE SHOULD

21   HAVE TO ARGUE TO THE JURY BECAUSE IT'S SOMETHING THAT THE COURT

22   HAS ALREADY FOUND AND THEY'RE NOT AT LIBERTY TO DISAGREE WITH.

23             MR. NOLLER:  THAT GOES THE SAME WAY TO THE ARGUMENTS

24   WE WERE HAVING BEFORE IN THE OTHER DIRECTION.  BUT I'LL LEAVE

25   IT TO YOUR HONOR.
```

1          THE COURT:  YEAH, I THINK CLARITY IN BOTH -- IN TERMS

2     OF THE ELEMENTS AND WHAT WAS FOUND IS NECESSARY IN THIS CASE,

3     YOU KNOW, IN LIGHT OF ALL THE ARGUMENTS THAT HAVE BEEN RAISED.

4          I RAISED IT BECAUSE I THOUGHT THAT THIS ONE WAS ACTUALLY A

5     CLEARER STATEMENT FOR THE JURY THAN THE FIRST ONE.

6          SO I'M GOING TO GIVE 722-1 FILED APRIL 27TH, PAGE 3 OF 3,

7     INSTEAD OF SEARCH 03-1, FILED ON APRIL 21ST.

8          MR. PEREZ:  THANK YOU, YOUR HONOR.

9          THE COURT:  OKAY.

10         NEXT, THE COMPENSATORY DAMAGES, BREACH OF CONTRACT.

11         I BELIEVE THAT 703-1, PAGE 5 OF 10, FILED APRIL 21ST, IT'S

12    A JOINT, JOINTLY PREPARED INSTRUCTION, IS FINE.

13         MR. PEREZ:  WE'RE OKAY WITH THAT ONE, YOUR HONOR.

14         THE COURT:  OKAY.

15         MR. NOLLER:  LIKEWISE.

16         THE COURT:  OKAY.  SO YOU BOTH AGREED ON THE

17    INTRODUCTORY INSTRUCTION FOR A BREACH OF CONTRACT AND FOR THE

18    COMPENSATORY DAMAGES, BREACH OF CONTRACT?

19         MR. NOLLER:  YES, YOUR HONOR, THOSE WERE BOTH JOINT

20    SUBMISSIONS.

21         THE COURT:  OKAY.  THAT'S FINE.

22         AND THEN THE MITIGATION OF DAMAGES WAS JOINT, THAT'S

23    703-1, PAGE 6 OF 10.

24         ALSO A JOINT INSTRUCTION, THAT'S FINE.

25         STILL FINE WITH YOU ALL?

1          MR. NOLLER:  YES, YOUR HONOR.

2          MR. PEREZ:  IT IS, YOUR HONOR.  WE'LL COME TO THIS

3     LATER, BUT THE ONLY CONCERN WITH THIS, WHICH PERHAPS NEED NOT

4     BE ADDRESSED IN THIS PARTICULAR INSTRUCTION, IS THE LAST

5     PARAGRAPH THERE THAT TALKS ABOUT THAT PLAINTIFFS MADE

6     REASONABLE EFFORTS TO AVOID THE HARM.

7          THERE'S A SEPARATE MIL RULING ABOUT THE SUFFICIENCY OF

8     PLAINTIFFS' DEFENSES NOT BEING AT ISSUE, AND WE WERE GOING TO

9     PROPOSE AN INSTRUCTION ON THAT POINT SPECIFICALLY.

10         BUT -- SO THAT'S THE ONLY CONCERN WITH THAT LANGUAGE IS

11    WHETHER THAT COULD CREATE CONFUSION TO THE JURY AS TO WHETHER

12    THAT IS IN OR OUT.  BUT WE BELIEVE THAT CAN BE ADDRESSED

13    THROUGH A SEPARATE INSTRUCTION THAT WE WOULD PROPOSE AS TO

14    CERTAIN ITEMS.

15         MR. NOLLER:  WELL, YOUR HONOR, THAT LANGUAGE WAS

16    PROPOSED BY PLAINTIFFS.  THAT PARTICULAR PARAGRAPH FOR THIS

17    INSTRUCTION WAS PROPOSED BY PLAINTIFFS AFTER THE COURT'S MIL

18    RULING.  WE AGREED TO IT.  I DON'T THINK WE WOULD OBJECT TO

19    STRIKING THAT PARAGRAPH FROM THE INSTRUCTION.  WE CERTAINLY

20    DON'T AGREE THERE'S A NEED FOR A SEPARATE INSTRUCTION ON

21    WHATSAPP'S -- THE SUFFICIENCY OF WHATSAPP'S SECURITIES.  WE

22    HAVEN'T MADE ANY ARGUMENT ON THAT, AND WE'RE NOT GOING TO.

23    THAT'S CLEARLY OUT UNDER THE COURT'S MIL AND IT HASN'T BEEN

24    BROUGHT UP.

25         IF THE WORRY IS THAT THAT PARAGRAPH IS GOING TO CONFUSE

```
1        THE JURY IN SOME WAY, I DON'T SEE A PROBLEM WITH REMOVING IT.

2                THE COURT:  OKAY.

3                MR. PEREZ:  WE'RE HAPPY TO LEAVE IT IN, YOUR HONOR.

4        WE WOULD LIKE TO BE HEARD AS TO A FEW ITEMS THAT, PER THE MILS,

5        WE THINK THE COURT SHOULD BE INSTRUCTED TO DISREGARD.

6                THE COURT:  WHAT ABOUT THIS INSTRUCTION?  WHAT ABOUT

7        THIS INSTRUCTION?  THIS WAS A JOINTLY PREPARED INSTRUCTION.

8                MR. PEREZ:  WE'RE OKAY WITH THIS ONE, YOUR HONOR.

9                THE COURT:  OKAY.  AS WRITTEN?

10               MR. PEREZ:  AS WRITTEN, YOUR HONOR.

11               THE COURT:  I MEAN, IT SAYS IT SPECIFICALLY GOES TO

12       THE BREACH OF CONTRACT.  IT'S -- I THINK IT'S GOING TO BE

13       DIFFICULT FOR THEM TO CABIN INFORMATION THAT'S PERTINENT ONLY

14       TO ONE CLAIM, BUT NOT THE OTHERS.

15           BUT THAT'S WHAT WE'RE GOING TO ASK THEM TO DO.

16           OKAY.  AND THEN THE NOMINAL DAMAGES, I ASSUME THAT'S STILL

17       OKAY.

18               MR. PEREZ:  YES, YOUR HONOR.

19               MR. NOLLER:  YES, YOUR HONOR.

20               THE COURT:  OKAY.

21           NOW WE GET TO THE TRICKIER ONES.

22           LOOKING FOR THE COMPENSATORY DAMAGES FOR THE CFAA, I'M

23       GOING TO GIVE 703-1, PAGE 8 OF 10.

24           BUT I WOULD LIKE TO DEAL WITH THE WHOLE QUESTION OF THE

25       DAMAGES, THE COMPROMISE ISSUE, WHICH MR. AKROTIRIANAKIS BEAT
```

1    WITH A DEAD -- A HAMMER, BEAT IT DEAD DURING THE CLOSING

2    ARGUMENTS.

3         THERE'S SOME AMBIGUITY, ACTUALLY, AS TO WHAT -- EVEN

4    THOUGH I'VE RULED THAT THESE COSTS OF RESPONDING, IDENTIFYING,

5    INVESTIGATING, DAMAGE ASSESSMENT, BECAUSE THOSE THINGS APPEAR

6    IN THE STATUTE, I'VE INDICATED THAT THOSE ARE RECOVERABLE.

7    OKAY.

8         IN TRYING TO FIGURE OUT WHETHER OR NOT IT'S ENTIRELY

9    INAPPROPRIATE FOR THE DEFENSE TO ARGUE THAT THE COMPUTERS

10   WERE -- THE SERVERS WEREN'T HARMED OR COMPROMISED, I MEAN,

11   CLEARLY THAT EVIDENCE IS -- IT'S PROBABLY -- THAT ARGUMENT IS

12   PROBABLY FAIR GIVEN THAT THE LACK OF HARM TO THE SERVER --

13   PHYSICAL HARM TO THE SERVER AND LACK OF COMPROMISING OF, YOU

14   KNOW, ITS FUNCTIONING IS RELEVANT TO AN ARGUMENT THAT DAMAGES

15   SHOULD BE MINIMAL, MINIMIZED, RIGHT?  THAT IT GOES TO THE LEVEL

16   OF DAMAGES.

17        BUT I WANT TO MAKE SURE THIS JURY UNDERSTANDS THAT IT CAN

18   AWARD DAMAGES WITHOUT PROOF OF -- WELL, THAT'S NOT TRUE

19   BECAUSE, I WOULD ARGUE THAT INTRUDING INTO, INTO A SERVER THAT

20   HAS NOT INVITED YOU IS A COMPROMISE OF THE SERVER.  I MEAN,

21   EXPLOITING A VULNERABILITY IS THE COMPROMISE OF A SERVER.

22        SO I THINK IT'S JUST A MATTER OF DEGREE AND PERSPECTIVE.

23        SO I DO WANT TO ALLOW BOTH SIDES TO MAKE THEIR ARGUMENT ON

24   WHAT IT MEANS TO COMPROMISE A SERVER, BECAUSE SOME OF THE

25   PLAINTIFFS' WITNESSES SAID THE SERVERS WEREN'T COMPROMISED, THE

```
1      SERVERS WEREN'T HARMED.

2           BUT I THINK THAT THAT CAN BE ARGUED WITHOUT USING THE WORD

3      "COMPROMISE."  I MEAN, THERE'S NOTHING THAT REQUIRES THAT WORD

4      SPECIFICALLY.  I MEAN, HARM CAN BE INTERPRETED IN DIFFERENT

5      WAYS.

6               MR. NOLLER:  YEAH, YOU -- SORRY, YOUR HONOR.

7               THE COURT:  I KNOW YOU ALL ARE TAKING THE POSITION

8      THAT THE VENTURA CASE SAYS THAT THERE HAS TO BE THIS SORT OF

9      PHYSICAL HARM IN ALL OF THIS.

10          I'VE TOLD YOU I'M FOLLOWING JUDGE SPERO'S LEAD ON THIS

11     PARTICULAR ISSUE IN ALLOWING THESE OTHER KINDS OF DAMAGES.

12          BUT WE STILL HAVE TO KIND OF FIGURE OUT WHAT TO DO WITH

13     THAT WHOLE HARM COMPROMISE ISSUE.

14               MR. NOLLER:  YES.

15               THE COURT:  SO I'D LIKE TO HEAR FROM YOU ON THAT.

16               MR. NOLLER:  YOUR HONOR, UNDERSTOOD.  AND I DO

17     UNDERSTAND THE CONCERN.

18          IT IS NOT OUR INTENTION, AND WE HAVEN'T INTENDED, TO ARGUE

19     THAT DAMAGE, AS THE CFAA DEFINES IT, IS REQUIRED FOR PURPOSES

20     OF COMPENSATORY DAMAGES.

21          BUT IT IS RELEVANT TO THE AMOUNT, AND IT'S VERY RELEVANT

22     TO PUNITIVE DAMAGES.

23          AND SO I UNDERSTAND YOUR HONOR'S DESIRE TO MAKE SURE THAT

24     THESE DISTINCTIONS ARE CLEAR.

25               THE COURT:  RIGHT.
```

1          MR. NOLLER:  SO THE PROPOSAL THAT I WOULD MAKE, AND

2     WE CAN DISCUSS THIS, OF COURSE, IS IN THIS INSTRUCTION 703-1 ON

3     PAGE 8, PERHAPS SAY SOMETHING LIKE -- I'M NOT MARRIED TO THE

4     SPECIFIC FRAMING -- BUT SOMETHING LIKE "THE COMPUTER FRAUD AND

5     ABUSE ACT ALLOWS PLAINTIFFS TO RECOVER COMPENSATORY DAMAGES FOR

6     EITHER DAMAGE OR LOSS."

7          PLAINTIFFS -- AND THEN YOU COULD SAY SOMETHING LIKE

8     "EITHER IS SUFFICIENT," OR SOMETHING LIKE THAT.

9          PLAINTIFFS ARE CLAIMING, IN THIS CASE, LOSS, AND THEN

10     DEFINE WHAT THOSE LOSSES ARE, AND I THINK SOMEWHERE IN THERE,

11     YOU CAN HAVE A STATEMENT THAT ESSENTIALLY TELLS THE JURY THAT

12     EITHER DAMAGE OR LOSS CAN BE COMPENSATORY DAMAGES UNDER THE

13     CFAA.  IT DOESN'T HAVE TO BE DAMAGE, IT DOESN'T HAVE TO BE

14     DAMAGE AND LOSS.  IT CAN BE DAMAGE OR LOSS.

15          THE COURT:  IS THAT THE LANGUAGE OF THE STATUTE?

16          MR. NOLLER:  ESSENTIALLY.  I --

17          THE COURT:  WAIT.  I HAVE IT HERE IN FRONT OF ME.

18     LET ME SEE.

19          MR. PEREZ:  YOUR HONOR, I THINK EXPECTING THE JURY TO

20     DRAW A LINE BETWEEN DAMAGE AND LOSS IS ASKING QUITE A LOT.  I'M

21     NOT SURE I COULD NECESSARILY EXPLAIN THAT SUPER CLEARLY RIGHT

22     NOW.

23          I THINK THIS CAN BE ADDRESSED MUCH MORE SIMPLY IN A WAY

24     THAT'S MUCH MORE HELPFUL TO THE JURY BY SIMPLY SAYING THAT

25     DAMAGE TO SERVERS IS NOT REQUIRED, OR DAMAGE TO INFRASTRUCTURE

```
 1     IS NOT REQUIRED, THAT THE JURY -- THAT THE JURY MAY FIND

 2     RECOVERABLE LOSSES EVEN IF THERE WAS NO HARM TO SERVERS,

 3     SOMETHING LIKE THAT THAT'S JUST VERY DIRECT AND I THINK

 4     CAPTURES THE POINT WITHOUT WHAT'S THE DIFFERENCE BETWEEN DAMAGE

 5     AND LOSS.

 6            THE COURT:  WELL, I WAS THINKING ABOUT SOMETHING LIKE

 7      THAT TO BEGIN WITH.

 8            BUT I DON'T KNOW.

 9            WELL, I MEAN, HIS POINT IS SORT OF REASONABLE, THOUGH,

10     GIVEN THAT LOSS IS DEFINED IN THE STATUTE AS THE THINGS THAT

11     YOU'RE SEEKING COMPENSATORY DAMAGES FOR.

12            MR. NOLLER:  YES, YOUR HONOR.  THAT WAS THE IDEA.

13            I MEAN, THE IDEA IS THAT THE CFAA HAS THESE VERY

14     PARTICULAR DEFINITIONS OF DAMAGE AND LOSS THAT DON'T -- YOU

15     KNOW, THAT ARE SPECIFIC TO THIS CONTEXT.

16            AND SO, YOU KNOW, THE DEFINITION OF DAMAGE IN THE CFAA IS

17     NOT WHAT YOU WOULD JUST THINK OF AS BEING DAMAGE IN A GENERAL

18     SORT OF TORT CASE OR SOME OTHER CONTEXT.

19            AND SO, YOU KNOW, WE DON'T -- I DON'T THINK THE PROPOSAL I

20     MADE REQUIRES THE JURY TO DISTINGUISH BETWEEN DAMAGE AND LOSS,

21     BECAUSE IT WOULDN'T ASK THE JURY TO, LIKE, THINK ABOUT THE

22     DEFINITION OF LOSS.

23            IT WOULD JUST TELL THE JURY THAT THE CFAA HAS THESE TWO

24     CATEGORIES OF RECOVERABLE AMOUNTS, THEY'RE CLAIMING ONE OF

25     THEM, WHICH IS LOSS, AND THEY DON'T NEED TO PROVE THE OTHER
```

1    ONE.

2              THE COURT:  AND, INDEED, THE LANGUAGE USED DESCRIBES

3    THIS CATEGORY AS RECOVERABLE LOSSES, AS OPPOSED TO DAMAGE,

4    HARM, OR INJURY.

5         I MEAN, THAT'S IN THE PROPOSED INSTRUCTION.

6              MR. PEREZ:  EXACTLY, YOUR HONOR.  IT'S ALL WORDED IN

7    TERMS OF LOSS, FOR ANY LOSS PLAINTIFF SUFFERED, RECOVERABLE

8    LOSSES MAY INCLUDE.

9         THE ONLY POINT THAT WE THINK NEEDS TO BE CLARIFIED IS JUST

10   THAT PHYSICAL HARM TO SERVERS IS NOT REQUIRED.

11             THE COURT:  NO, I AGREE.

12        AND IT APPEARS THAT DEFENSE COUNSEL DOESN'T DISAGREE WITH

13   THAT.  IT'S JUST THEN IN THE WORDSMITHING OF IT, RIGHT?  IT CAN

14   BE EITHER OR.

15             MR. NOLLER:  YEAH.  I MEAN, I THINK WE WOULD TAKE THE

16   POSITION, AS AN INITIAL MATTER, THAT THE INSTRUCTION AS

17   PROPOSED IS SUFFICIENT.  I DON'T WANT TO GIVE THAT UP.

18        BUT UNDERSTANDING THAT YOUR COURT HAS --

19             THE COURT:  YEAH, I --

20             MR. NOLLER:  -- THAT YOUR HONOR DISAGREES WITH THAT

21   AND WANTS TO CLARIFY THIS ISSUE, YEAH, I THINK IT'S JUST A

22   QUESTION OF WORDSMITHING.

23             THE COURT:  OKAY.  SO HOW WOULD YOU WORDSMITH THAT

24   ADDITIONAL SENTENCE?  I'LL ALLOW BOTH OF YOU TO MAKE A

25   SUGGESTION AND THEN I'LL PICK THE BEST ONE.

1106

```
 1              MR. NOLLER:  UNDERSTOOD, YOUR HONOR.

 2         AND I'M TRYING TO FIND THE, THE SPECIFIC LANGUAGE HERE.

 3         (PAUSE IN PROCEEDINGS.)

 4              MR. PEREZ:  YOUR HONOR, I'M HAPPY TO GO FIRST IF

 5    MR. NOLLER IS THINKING ABOUT IT.

 6              THE COURT:  OKAY.

 7              MR. PEREZ:  WE WOULD JUST SAY THAT "YOU NEED NOT FIND

 8    DAMAGE TO SERVERS OR INFRASTRUCTURE IN ORDER TO FIND

 9    RECOVERABLE LOSSES."

10              THE COURT:  HMM.  OKAY.

11         DO YOU HAVE AN ALTERNATIVE THAT YOU WOULD SUGGEST,

12    COUNSEL?

13              MR. NOLLER:  YES, YOUR HONOR.

14         MY PROPOSAL -- AND THIS COMES FROM SECTION 1030(G) OF THE

15    CFAA, WHICH IS THE PRIVATE RIGHT OF ACTION PROVISION --

16              THE COURT:  UM-HUM.

17              MR. NOLLER:  -- WHICH READS "ANY PERSON WHO SUFFERS

18    DAMAGE OR LOSS," AND SO ON.

19         OUR PROPOSAL WOULD BE SOMETHING ALONG THE LINES OF, "THE

20    FEDERAL COMPUTER FRAUD AND ABUSE ACT PERMITS A PLAINTIFF TO

21    RECOVER EITHER A DAMAGE OR LOSS CAUSED BY VIOLATION OF THE

22    STATUTE.  PLAINTIFF MAY RECOVER COMPENSATORY DAMAGES BY PROOF

23    OF EITHER DAMAGE OR LOSS.  IN THIS CASE, PLAINTIFFS SEEK TO

24    RECOVER FOR LOSS."

25         AND THEN THE SAME LIST OF THE AVAILABLE LOSSES THAT IS IN
```

```
1    THE CURRENT INSTRUCTION.

2             THE COURT:  HMM.  I --

3             MR. PEREZ:  YOUR HONOR, I THINK THAT IS JUST A MUCH

4    MORE COMPLICATED WAY OF SAYING WHAT I BELIEVE IS EFFECTIVELY

5    THE SAME THING, AND THAT IT'S JUST MUCH CLEARER FOR THE JURY

6    JUST TO PUT IT IN TERMS OF WHAT THEY'VE ACTUALLY BEEN HEARING

7    ABOUT, MAKE THE JURY'S JOB EASIER IN THE CONTEXT OF A FAIRLY

8    COMPLEX SET OF INSTRUCTIONS.

9             AND THE WHOLE THING IS WORDED IN TERMS OF LOSS.  THERE'S

10   NO REFERENCE TO DAMAGE, YOU KNOW, COMPENSATORY DAMAGES, WHICH

11   IS A LEGAL TERM FOR ANY LOSSES THAT WE SUFFERED, RECOVERABLE

12   LOSSES MAY INCLUDE THE FOLLOWING.

13            THE JURY NEED NOT FIND -- YOU KNOW, YOU NEED NOT FIND

14   DAMAGE TO INFRASTRUCTURE -- SERVERS OR OTHER INFRASTRUCTURE IN

15   ORDER TO FIND RECOVERABLE LOSSES.

16            I THINK THAT'S MUCH EASIER FOR THE JURY TO WORK WITH.

17             THE COURT:  THAT'S A SIMPLER APPROACH, BUT THE

18   DEFENSE RECOMMENDATION IS NOT INACCURATE.

19            HMM.  OKAY.  I COULD GO EITHER WAY ON THIS, ACTUALLY.

20            YOU KNOW, IT WOULD BE HELPFUL TO SEE IT WRITTEN OUT.

21   PERHAPS YOU CAN WRITE THEM OUT AND FILE THEM ON THE DOCKET AND

22   JUST LET ME READ THE ENTIRETY OF WHAT YOU -- OF WHAT IT WOULD

23   SOUND LIKE.

24             MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.

25             THE COURT:  AND I'LL JUST PICK ONE OR THE OTHER.  I'M
```

1    NOT GOING TO TINKER WITH IT.

2            MR. NOLLER:  THAT WOULD BE GREAT.

3            THE COURT:  AND IN YOUR VIEW, WOULD THE NEXT

4    INSTRUCTION ON THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD

5    ACT NEED THE SAME LANGUAGE?  DO YOU THINK THAT WOULD BE

6    NECESSARY?

7            MR. PEREZ:  YES, YOUR HONOR, THE SAME CONCEPT.

8        AND, AGAIN, THAT'S ONE BENEFIT OF THE SIMPLER LANGUAGE IS

9    THAT WE CAN USE IT IN BOTH INSTEAD OF NEEDING IT NOW TRACK YET

10   ANOTHER LEGAL STANDARD AND NOW WE'RE TALKING ABOUT THE SAME

11   ISSUES, BUT IN THE LANGUAGE OF THE STATE STATUTE.  IT'S JUST

12   ASKING AN AWFUL LOT OF THE JURY.

13           THE COURT:  UM-HUM.

14       OKAY.  EXCEPT THAT THE LANGUAGE OF 703-1, PAGE 9 OF 10,

15   THE LANGUAGE IS DIFFERENT, OBVIOUSLY.  "THESE DAMAGES SHALL

16   INCLUDE AMOUNTS SUFFICIENT TO COMPENSATE PLAINTIFFS FOR THE

17   HARM THEY SUFFERED AS A RESULT OF ANY VIOLATIONS, INCLUDING ANY

18   EXPENDITURE REASONABLY AND NECESSARILY INCURRED BY PLAINTIFFS

19   TO VERIFY THAT ITS COMPUTERS, COMPUTER SYSTEM, COMPUTER

20   NETWORK, COMPUTER PROGRAM, AND/OR DATA WAS OR WAS NOT ALTERED,

21   DAMAGED, OR DELETED BY THE ACCESS."

22           MR. NOLLER:  YES, YOUR HONOR.

23       I MEAN, I THINK THAT'S MAYBE GETTING AT WHAT I WAS GOING

24   TO SAY, WHICH IS THAT I THINK THIS INSTRUCTION IS ALREADY

25   FRAMED IN TERMS OF THE DAMAGE AND THE HARM THAT THEY CAN

```
 1        RECOVER FOR, AND IT DESCRIBES WHAT THAT IS.

 2               THE COURT:  UM-HUM.

 3               MR. NOLLER:  AND I THINK MORE SO HERE THAN PERHAPS

 4        WITH RESPECT TO CFAA WHERE THERE IS SORT OF THE WEIRD TECHNICAL

 5        DAMAGE, LOSS ISSUE.

 6               THE COURT:  RIGHT.

 7               MR. NOLLER:  I THINK THERE'S A LOT LESS RISK OF THE

 8        SORT OF CONFUSION THAT YOU'RE WORRIED ABOUT WITH RESPECT TO

 9        THIS INSTRUCTION.

10               THE COURT:  YEAH.

11               MR. PEREZ:  WE DISAGREE, YOUR HONOR.

12           AND THE COURT MAY REMEMBER THAT IN THEIR OPENING, THEY HAD

13        A SLIDE THAT SAID "NO DAMAGE," AND THEN A SUBPOINT ON THAT

14        SLIDE WAS SOMETHING TO THE EFFECT OF "NO HARM TO SERVERS."

15           SO THEY'VE KIND OF LINKED THAT FACTUAL CONCEPT TO THE

16        LEGAL ARGUMENT THAT THERE'S NO DAMAGE, OR NO DAMAGES.

17           SO THE SIMPLE POINT, AGAIN, AND IT CAN BE BASICALLY THE

18        SAME SENTENCE, THAT "YOU MAY AWARD COMPENSATORY DAMAGES WITHOUT

19        A FINDING OF DAMAGE TO SERVERS OR OTHER INFRASTRUCTURE," IT CAN

20        BE THE SAME SENTENCE TO MAKE THAT POINT VERY CLEAR FOR THE

21        JURY.

22               MR. NOLLER:  YOUR HONOR, THE SLIDE THAT MR. PEREZ

23        MENTIONED SAID, "NO DAMAGE, BUT THEY CLAIM LOSS," AND WAS, YOU

24        KNOW, I THINK VERY STRAIGHTFORWARD THAT LOSS IS SOMETHING

25        THEY'RE AT LEAST IN THEORY PERMITTED TO RECOVER.
```

```
 1              THE COURT:  BUT THIS STATUTE DOESN'T USE THE SAME

 2     TERMS, "DAMAGE OR LOSS."

 3          THIS STATUTE USES THE TERM "HARM SUFFERED, INCLUDING ANY

 4     EXPENDITURE NECESSARILY INCURRED," TO DO THIS LIST OF THINGS,

 5     TO VERIFY THAT ITS SYSTEM WAS NOT ALTERED, DAMAGED, OR DELETED.

 6          THIS SEEMS TO BE A NARROWER STATUTE THAN THE OTHER.

 7              MR. NOLLER:  I THINK IN THAT RESPECT, YOUR HONOR, IT

 8     IS.

 9          AND I THINK WHAT YOU SAID IS MOSTLY CORRECT.  JUST FOR

10     PURPOSES OF CLARITY, THE CDAFA -- THE PRIVATE CAUSE OF ACTION

11     PROVISION, YOU KNOW, DOES SAY THAT IT'S FOR AN OWNER OR LESSEE

12     WHO SUFFERS DAMAGE OR LOSS, AND THEN IT PROVIDES THAT THEY CAN

13     RECOVER THESE HARMS.

14              THE COURT:  OKAY.

15              MR. NOLLER:  THE DISTINCTION IS THAT CDAFA DOESN'T

16     DEFINE DAMAGE OR LOSS --

17              THE COURT:  OKAY.  THE OTHERS DO.

18              MR. NOLLER:  -- LIKE THE CFAA DOES.

19          SO WHAT I THINK IS APPROPRIATE ABOUT THIS INSTRUCTION THAT

20     REALLY WOULDN'T BE POSSIBLE IN THE CFAA INSTRUCTION JUST

21     BECAUSE OF THE SORT OF FUNKY WAY THE STATUTE WORKS, IS THIS,

22     THE CFAA -- OR THE CDAFA INSTRUCTION JUST DOESN'T MENTION

23     DAMAGE OR LOSS BECAUSE IT REALLY ISN'T AN IMPORTANT PART OF THE

24     PROVISION IN THE SAME WAY THAT IT IS FOR CFAA.

25          WHAT MATTERS IS THE HARM THAT THE PLAINTIFF SUFFERED,
```

1    INCLUDING EXPENDITURES AND ALL THE THINGS THAT YOU MENTIONED.

2         SO I JUST -- I DON'T THINK THAT THE SAME ISSUE ARISES.  I

3    THINK THIS ISSUE, TO THE EXTENT IT ARISES AT ALL, ONLY REALLY

4    ARISES WITH RESPECT TO CFAA, AND WE CAN DEAL WITH THAT IN THE

5    CFAA INSTRUCTION.

6         MR. PEREZ:  YOUR HONOR, I MIGHT SAY IT WOULDN'T ARISE

7    IN THE ABSTRACT IN JUST A GENERIC CASE.

8         BUT AS THE COURT OBSERVED, THIS IS A POINT THAT THEY HAVE

9    BEAT MERCILESSLY THROUGHOUT THE COURSE OF THIS TRIAL, SO IT'S A

10   POINT THAT I THINK IS RIFE -- IT'S A SERIOUS RISK OF JURY

11   CONFUSION.

12        AND THERE'S NO DISAGREEMENT AS TO THE SUBSTANTIVE LAW.  WE

13   AGREE THAT DAMAGE TO THE SERVERS IS NOT REQUIRED.

14        THERE'S NO REASON THAT POINT SHOULDN'T BE MADE CLEAR FOR

15   THE JURY SO THEY'RE NOT CONFUSED BY THE EVIDENCE AND ARGUMENT.

16        MR. NOLLER:  YOUR HONOR, I DON'T THINK IT'S QUITE AS

17   CLEAR WITH RESPECT TO CDAFA BECAUSE OF THE LANGUAGE THAT

18   YOUR HONOR QUOTED.

19        WHAT IT PROVIDES IN THE STATUTE IS EXPENDITURE REASONABLY

20   AND NECESSARILY INCURRED BY PLAINTIFFS TO VERIFY THAT ITS

21   COMPUTERS, COMPUTER SYSTEM, ET CETERA, WAS NOT ALTERED,

22   DAMAGED, OR DELETED BY THE ACCESS.

23        SO I SUPPOSE IF THERE WAS AN INVESTIGATION INTO THAT, THAT

24   COULD BE RECOVERED EVEN THEY FOUND THAT THERE WAS NO DAMAGE, AS

25   WAS THE CASE HERE.

```
1              BUT, YOU KNOW, THIS LANGUAGE IS MUCH MORE TIED TO THAT AS

2      THE CATEGORY.

3              THE COURT:  YEAH, BUT THE LANGUAGE IS THE

4      INVESTIGATION INTO IT.  WHETHER OR NOT THEY SUFFERED IT DOESN'T

5      MAKE A DIFFERENCE.

6              MR. NOLLER:  UNDERSTOOD.  AND I THINK THAT THE

7      INSTRUCTION IS PERFECTLY CLEAR ABOUT THAT, AND WE'RE NOT

8      ARGUING OTHERWISE, AND WE NEVER HAVE.

9              THE COURT:  HMM.  I DON'T KNOW.  I THINK PROBABLY THE

10     TWO INSTRUCTIONS SHOULD BE PARALLEL, SO THE SAME LANGUAGE

11     SHOULD APPEAR IN BOTH IF IT'S GOING TO APPEAR IN ONE OR THE

12     OTHER.  OKAY?

13             MR. NOLLER:  UNDERSTOOD.

14             THE COURT:  SO BOTH OF YOU SUBMIT THOSE TWO

15     INSTRUCTIONS WITH THE -- WITH WHATEVER IT IS YOU'RE GOING TO

16     PROPOSE AS ADDITIONAL LANGUAGE, AND I'LL PICK ONE OF THE TWO.

17             MR. NOLLER:  YES, YOUR HONOR.

18             THE COURT:  OKAY.

19         OKAY.  THE NEXT ONE IS -- YOU ALL HAVE SUBMITTED A JOINT

20     INSTRUCTION, PAGE 10 OF 10 OF 703-1, WHICH IS ON NO

21     REPUTATIONAL HARM.

22         I ASSUME YOU STILL WANT THAT.

23             MR. NOLLER:  WE DO, YOUR HONOR, YES.

24             MR. PEREZ:  AND WE HAVE NO OBJECTION, YOUR HONOR.

25             THE COURT:  OKAY.  AND THEN WE HAVE ANOTHER ONE ON,
```

```
 1         LET'S SEE, COMPENSATORY DAMAGES, MULTIPLE LEGAL THEORIES.

 2              I THINK THAT WE SHOULD CHANGE "THEORIES" TO "CLAIMS."

 3                   MR. NOLLER:  YES, I THINK WE DISCUSSED THAT IN A

 4         PREVIOUS HEARING, AND THAT'S FINE.

 5                   THE COURT:  YEAH.  WE JUST CHANGED IT, THOUGH, WITH

 6         REGARD TO THE LAST SENTENCE OF THE DEFENDANTS' PROPOSAL.

 7                   MR. NOLLER:  OH, I SEE.

 8                   THE COURT:  THE PLAINTIFFS' PROPOSED INSTRUCTION

 9         ALREADY HAD "CLAIMS," AND YOU HAD "THEORIES."  SO IT SHOULD

10         APPEAR IN BOTH PLACES, BOTH THE TITLE AND IN THE LAST SENTENCE.

11              AND WE ADDED THE "IF ANY," LANGUAGE, "YOU WILL BE ASKED TO

12         DETERMINE WHAT COMPENSATORY DAMAGES, IF ANY, DEFENDANTS OWE

13         PLAINTIFFS."

14              RIGHT?

15                   MR. NOLLER:  YES, YOUR HONOR.

16                   MR. PEREZ:  YOUR HONOR, WHICH DOCUMENT NUMBER ARE?

17                   THE COURT:  703-5 FILED ON APRIL 21ST, PAGE 6 OF 9.

18                   MR. NOLLER:  YOUR HONOR, WE ARE FINE WITH THAT

19         INSTRUCTION, WITH THE MODIFICATIONS THAT YOU MENTIONED.

20                   THE COURT:  OKAY.

21                   MR. PEREZ:  THE MODIFICATIONS ARE CHANGING "THEORIES"

22         TO "CLAIMS"?

23                   THE COURT:  YES.

24                   MR. PEREZ:  I SEE "IF ANY" IN THERE.  WAS THERE A

25         PROPOSAL --
```

```
 1                    THE COURT:  NO.  BUT THAT'S WHAT -- I THINK THAT'S

 2          WHY I PICKED THIS ONE OVER YOURS, BECAUSE IT HAD THE "IF ANY."

 3                    MR. PEREZ:  THAT IS FINE, YOUR HONOR.

 4                    THE COURT:  OKAY.  ALL RIGHT.

 5               AND NOW WE GET TO THE BIG ONE, THE PUNITIVE DAMAGES

 6          INSTRUCTION, AND YOU ALL -- THERE WERE A COUPLE OF ISSUES THAT

 7          WERE RAISED BY BOTH SIDES, BUT IT MAINLY CAME DOWN TO THE

 8          INTENT ISSUE AND THE INTENT TO DEFRAUD.

 9               OKAY.  THIS IS HOW I PROPOSE THAT THAT BE RESOLVED.

10               MOST OF THE LANGUAGE IN THE INSTRUCTION IS SIMILAR, IT'S

11          NOT IDENTICAL, BUT IT'S PRETTY MUCH -- THEY TRACK THE SAME

12          ORDER AND WHAT HAVE YOU.  OKAY?

13               WHAT STRUCK ME IS THAT THE INTENT REQUIREMENT IS DIFFERENT

14          AS TO -- THE DEFENSE HAS POINTED OUT ON NUMEROUS OCCASIONS --

15          FOR THE PUNITIVE DAMAGES INSTRUCTION, AS IT IS FOR THE

16          COMPENSATORY DAMAGES INSTRUCTION, AS IT IS FOR THE COURT'S

17          FINDING OF LIABILITY.

18               WE'VE ADDED BACK THE INSTRUCTION THAT INCLUDES THE COURT'S

19          FINDING THAT THE INTRUSION VIOLATIONS WERE DONE KNOWINGLY,

20          INTENTIONALLY, AND WITH INTENT TO DEFRAUD, AT LEAST WITH

21          RESPECT TO THE -- TO THE SUBSEQUENT -- THE GETTING AROUND OF

22          THE FIX, RIGHT?

23               SO HOW DO WE MAKE A DISTINCTION TO THE JURY BETWEEN THESE?

24               WHEN WE LOOK AT THE PUNITIVE DAMAGES INSTRUCTION, THE --

25          IT'S CLEAR THAT THE JURY HAS TO FIND, BY CLEAR AND CONVINCING
```

```
 1        EVIDENCE, MALICE, FRAUD, OR OPPRESSION.

 2             THERE ARE DEFINITIONS ON WHAT EACH OF THESE THINGS MEAN,

 3        AND THEY ALL HAVE THEIR OWN MENS REA REQUIREMENT.  RIGHT?

 4             SO I PROPOSE THAT WE ADD TO THE INSTRUCTION, AT THE END --

 5        I FORGET -- LET'S SEE.  WE WOULD ADD IT AFTER -- WELL, FIRST OF

 6        ALL, LET'S PULL UP THE DEFENDANTS'.

 7             703-5 FILED APRIL 21ST, PAGE 7 OF 9.  THAT'S THE

 8        INSTRUCTION WE'RE LOOKING AT.

 9                  MR. NOLLER:  I'M THERE, YOUR HONOR.

10                  THE COURT:  OKAY.

11             SO WE'VE GOT, AT THE BOTTOM OF THE FIRST PAGE, MALICE

12        MEANS INTENT TO CAUSE INJURY; OPPRESSION MEANS IN KNOWING

13        DISREGARD; AND DESPICABLE CONDUCT MEANS CONDUCT SO VILE.

14             OKAY.  THAT'S NOT SO IMPORTANT.

15             OKAY.  ALL RIGHT.  THOSE ARE THE THREE COMPONENTS OF THE

16        PUNITIVE DAMAGES FINDING; RIGHT?

17                  MR. PEREZ:  YES, YOUR HONOR.

18             WE DID HAVE A COMMENT ON THE MALICE DEFINITION, BUT I'M

19        HAPPY TO RESERVE THAT UNTIL THE COURT FINISHES ADDRESSING THIS.

20                  THE COURT:  WELL, WHAT'S THAT?

21                  MR. PEREZ:  THE DEFINITION OF MALICE OMITS THE SECOND

22         PART OF THE DEFINITION OF MALICE, WHICH IS IN CALIFORNIA CIVIL

23         CODE 3294.

24                  THE COURT:  WHICH IS?

25                  MR. PEREZ:  AND IS INCORPORATED BY REFERENCE INTO
```

1    CDAFA.

2         SO IT SHOULD CONTINUE, "OR THAT DEFENDANTS' CONDUCT WAS

3    DESPICABLE AND WAS DONE WITH A WILLFUL AND KNOWING DISREGARD OF

4    THE RIGHTS OR SAFETY OF PLAINTIFFS.  A PERSON ACTS WITH KNOWING

5    DISREGARD WHEN THE PERSON IS AWARE OF THE PROBABLE DANGEROUS

6    CONSEQUENCES OF THE PERSON'S CONDUCT AND DELIBERATELY FAILS TO

7    AVOID THOSE CONSEQUENCES."

8              THE COURT:  IS THAT IN THE -- IN THE CACI

9    INSTRUCTION?

10             MR. NOLLER:  YOUR HONOR, WE DEALT WITH THIS --

11             MR. PEREZ:  YES, YOUR HONOR.

12             THE COURT:  I'VE FORGOTTEN.

13             MR. NOLLER:  -- AT THE SECOND PRETRIAL HEARING AND

14   YOUR HONOR RESOLVED IT IN THE SECOND FINAL PRETRIAL ORDER.

15   THIS WAS DISCUSSED.

16        THE ISSUE IS THAT, AS YOUR HONOR NOTED AT THE HEARING,

17   THAT LANGUAGE IS, YOU KNOW, DESIGNED FOR CASES WHERE THERE IS

18   AN ISSUE OF HARM TO THIRD PARTIES OR DISREGARD OF THE HEALTH OR

19   SAFETY OF THIRD PARTIES.

20        THAT'S NOT THIS KIND OF CASE.  YOUR HONOR HAS CLEARLY HELD

21   THAT THIRD PARTIES AREN'T RELEVANT, WHATSAPP USERS AREN'T

22   RELEVANT.

23        ALL THAT'S RELEVANT IS WHETHER THERE WAS INTENT TO HARM

24   PLAINTIFFS, AND IN THE SECOND FINAL PRETRIAL ORDER, YOUR COURT

25   ADOPTED -- YOUR HONOR ADOPTED OUR PROPOSED INSTRUCTION

1    NUMBER 5.

2              THE COURT:  YEAH, I DID.

3              MR. PEREZ:  YOUR HONOR, THE ISSUE IS TWO-FOLD.  ONE

4    IS WE'RE NOT TALKING ABOUT HARM TO OTHERS.  WE'RE TALKING ABOUT

5    HARM TO PLAINTIFF.  THAT ISSUE WAS RESOLVED AT THE SECOND FINAL

6    PRETRIAL.

7              ALL WE'RE ASKING FOR IS THE ADDITION OF "KNOWING DISREGARD

8    OF THE RIGHTS OR SAFETY OF PLAINTIFFS," NOT "PLAINTIFFS OR

9    OTHERS."

10             AND THE REASON THIS HAS BECOME VERY IMPORTANT IS THAT, AS

11   THE COURT WILL REMEMBER, THERE'S BEEN A LOT OF TALK ABOUT, DID

12   YOU BEAR THEM ANY ILL WILL?  DID YOU -- THAT'S BEEN A MAJOR

13   ISSUE IN THIS TRIAL IS WHETHER THEY ACTUALLY INTENDED HARM, OR

14   DID THEY NOT INTEND HARM?  BOTH SIDES HAVE ELICITED EVIDENCE ON

15   THAT.

16             SO THE FACT THAT A KNOWING DISREGARD OF PLAINTIFFS' RIGHTS

17   IS, PER THE CALIFORNIA CODE, INCORPORATED INTO CDAFA AND IS

18   PART OF THE DEFINITION OF MALICE AND IS SOMETHING THAT THE JURY

19   SHOULD HAVE AWARENESS OF.

20             THE COURT:  WE DID TALK ABOUT THAT AND WE SUBSTITUTED

21   "PLAINTIFFS" --

22             MR. PEREZ:  IT WAS SUPPOSED TO BE --

23             THE COURT:  -- AS OPPOSED TO "ANOTHER."

24             MR. PEREZ:  EXACTLY.  BUT IN THAT MALICE DEFINITION,

25   IT DROPPED OUT ENTIRELY.

```
 1              THE COURT:  OKAY.  LET ME SEE IF I HAVE THAT.

 2              MR. PEREZ:  IT WAS IN 703-3, YOUR HONOR, AT PAGE 10

 3    OF 12.

 4              THE COURT:  I CAN'T -- I THINK I MUST NOT HAVE

 5    BROUGHT IT WITH ME.

 6              MR. NOLLER:  I MEAN, YOUR HONOR, I THINK I'LL JUST

 7    REFER YOU BACK --

 8              THE COURT:  HOLD ON.  LET ME JUST SEE.  I MEAN, I

 9    KNOW I MARKED UP THAT ONE, TOO.

10         OKAY.  IT'S LOST SOMEWHERE IN MY STACK OF PAPERS.

11         KELLY, CAN YOU JUST PULL UP THE DOCKET FOR ME?  IT'S --

12         WHAT'S THE PLAINTIFFS'?

13              MR. PEREZ:  IT WAS 703-3, PAGE 10, YOUR HONOR.

14              THE CLERK:  703-3, PAGE 7?

15              THE COURT:  707 --

16              MR. PEREZ:  I'M SORRY.  703-3.

17              THE COURT:  703-3?

18              MR. PEREZ:  YES, YOUR HONOR, PAGE 10.

19         SO THIS HAS RIGHTS OR SAFETY --

20              THE CLERK:  INSTRUCTION NUMBER 8?

21              MR. PEREZ:  I'M SORRY?

22              THE CLERK:  INSTRUCTION NUMBER 8?

23              MR. PEREZ:  YES, INSTRUCTION NUMBER 8, PUNITIVE

24    DAMAGES.  IT'S ON PAGE 10.

25              THE COURT:  WOULD YOU PRINT OUT 10 AND 11?
```

```
1              THE CLERK:  YES.

2              MR. PEREZ:  SO THIS HAS THE LANGUAGE OF "RIGHTS OR

3    SAFETY OF ANOTHER," AND WE HAD TALKED ABOUT CHANGING THAT TO

4    "RIGHTS OR SAFETY OF PLAINTIFF."

5              THE COURT:  OKAY.  AND THE ORIGINAL CACI INSTRUCTION,

6    DO YOU HAVE THAT?

7              MR. PEREZ:  WE DO, YOUR HONOR.  THIS LANGUAGE IS FROM

8    THE CACI INSTRUCTION.  I'M NOT SURE I HAVE A COPY.

9              THE COURT:  OKAY.

10             MR. PEREZ:  BUT WE CAN GET ONE MOMENTARILY.

11             THE COURT:  ACTUALLY, I THINK I HAVE IT.

12         EXCUSE ME.  I'M JUST GOING TO GET MY PAPERS OFF MY DESK.

13         (PAUSE IN PROCEEDINGS.)

14             THE COURT:  I CANNOT FIND THE PAPERS THAT I WAS

15   REFERRING TO, BUT I DID -- I JUST BROUGHT THE CACI INSTRUCTION

16   WITH ME.

17         OKAY.  NOW, WE'RE LOOKING AT 703, AND YOURS WAS 703 DASH?

18             MR. PEREZ:  3, PAGE 10, YOUR HONOR.

19             THE COURT:  OKAY.  THAT'S NUMBER 8, YES.  OKAY.

20         OH, I SEE.

21             MR. PEREZ:  SO THAT HAS THE FULL DEFINITION OF MALICE

22   TRACKING CACI.

23             THE COURT:  OKAY.

24         OH, I SEE.  OKAY.

25         AND WE DID ORIGINALLY CHANGE THAT TO "THE RIGHTS AND
```

```
1    SAFETY OF ANOTHER."

2              MR. PEREZ:  FROM "ANOTHER" TO "PLAINTIFFS."

3              THE COURT:  "TO PLAINTIFFS," RIGHT, "FROM ANOTHER" TO

4     "PLAINTIFFS."

5         OKAY.  SO THAT IS ADDITIONAL LANGUAGE THAT'S IN THE

6    INSTRUCTION.

7         AND WHAT'S YOUR VIEW ABOUT THAT GIVEN THAT WE CHANGED IT

8    TO LIMIT IT TO THE PLAINTIFFS?

9              MR. NOLLER:  YEAH, SO I HAVE TWO THOUGHTS ON THAT,

10    YOUR HONOR.

11        THE FIRST IS THAT I THINK CHANGING -- THAT'S OBVIOUSLY

12   PREFERABLE TO HAVING IT SAY "ANOTHER."

13        THE PROBLEM, I THINK, IS THAT BY CHANGING "ANOTHER" TO

14   "PLAINTIFFS," YOU'RE SORT OF SUBSTITUTING A WORD THAT ISN'T

15   INTENDED TO CAPTURE, YOU KNOW, WHAT YOU'RE SUBSTITUTING IT

16   WITH.

17        SO AS I THINK YOUR HONOR RECOGNIZED AT THE HEARING, THAT

18   LANGUAGE, AND THE OTHER LANGUAGE THAT YOU AGREED WE COULD

19   STRIKE FROM THE FACTORS FOR REPREHENSIBILITY, GOES TO, YOU

20   KNOW, THE CASES OF HARM TO THIRD PARTIES, OR RISKS TO THIRD

21   PARTIES WHERE THERE'S A DANGEROUS PRODUCT OR A CHEMICAL OR A

22   POLLUTANT OR SOMETHING LIKE THAT.

23        AND, YOU KNOW, YOUR HONOR HAS HELD VERY CLEARLY THAT THIRD

24   PARTIES AREN'T RELEVANT TO THIS CASE.

25        NOW, WITH THAT SAID, IF THE COURT WANTS TO --
```

1       THE COURT:  YOU KNOW, IN READING THIS, I'M NOT SO

2   SURE NOW, READING IT IN THE BOOK, THAT THE DISREGARD OF THE

3   RIGHTS OR SAFETY OF ANOTHER COULDN'T APPLY, WOULD NECESSARILY

4   ONLY APPLY TO A THIRD PARTY.

5       MR. NOLLER:  OKAY.

6       THE COURT:  I'M NOT SO SURE I AGREE WITH THAT NOW.

7       MR. NOLLER:  OKAY.  SO IN THAT RESPECT, I'LL GO TO

8   THE SECOND THOUGHT I HAD, WHICH IS THAT IF THE COURT IS GOING

9   TO CHANGE IT TO "PLAINTIFFS," WE THINK IT NEEDS TO BE SPECIFIED

10  THAT IT'S THE PLAINTIFFS' RIGHTS UNDER CDAFA.

11      THE COURT:  OH, RIGHT.

12      MR. NOLLER:  I THINK WE HAD SOME ISSUES WITH SOME OF

13  THE ARGUMENTS EARLIER WHERE THERE WAS SOME ATTEMPT TO ARGUE

14  THAT DISREGARD, FOR EXAMPLE, OF CONTRACT RIGHTS WOULD SATISFY

15  IT, AND THAT'S NOT CORRECT.

16      SO IF YOU'RE GOING TO SAY "DISREGARD OF PLAINTIFFS'

17  RIGHTS," I MEAN, A, I DON'T THINK SAFETY SHOULD BE IN THERE,

18  BECAUSE THEY'RE A COMPANY, AND THAT IT SHOULD SAY "RIGHTS UNDER

19  CDAFA" AND NOT JUST "RIGHTS" GENERALLY.

20      THE COURT:  I AGREE WITH THAT.

21      MR. PEREZ:  CERTAINLY NO OBJECTION TO THE REMOVAL OF

22  "SAFETY."

23      AND IF THE COURT --

24      THE COURT:  "DISREGARD THE RIGHTS OF THE" --

25      MR. PEREZ:  PLAINTIFF.

```
 1            THE COURT:  -- "OF THE PLAINTIFF UNDER THIS

 2     PARTICULAR STATUTE."

 3            IT'S -- I THINK IT'S GOING TO REALLY BE HARD FOR THE JURY

 4     TO SEPARATE WHICH -- I MEAN, EVEN THOUGH WE TELL THEM THAT IT

 5     DOESN'T MATTER THE THEORY, ALL THE DAMAGES ARE THE SAME, THAT

 6     THEY CAN ONLY FIND PUNITIVE DAMAGES UNDER THIS ONE STATUTE.

 7            I KNOW WE SAY THAT AT THE BEGINNING, BUT I DON'T SEE THAT

 8     IT WOULD BE HARMFUL TO SAY IT AGAIN.

 9            MR. NOLLER:  YEAH, YOUR HONOR, I AGREE IT PROBABLY IS

10     BEST TO SAY IT SEVERAL TIMES.

11            THE COURT:  YEAH.

12            MR. PEREZ:  YOUR HONOR, WE --

13            THE COURT:  I DON'T DISAGREE.

14            MR. PEREZ:  WELL, THE MODEL LANGUAGE DOESN'T SAY --

15     IS NOT LIMITED TO RIGHTS UNDER THE STATUTE.  IT'S DISREGARD OF

16     THE RIGHTS OF ANOTHER.  RIGHT?

17            THE START -- AND I'M NOT ARGUING TO GO BACK TO "ANOTHER."

18            BUT THE FACT THAT IT TALKS ABOUT THE RIGHTS OF ANOTHER

19     IMPLIES STRONGLY THAT IT'S NOT LIMITED TO RIGHTS UNDER CDAFA.

20            THE POINT IS, WE'RE NOW TALKING ABOUT THE NATURE OF

21     DEFENDANTS' CONDUCT IN THE CONTEXT OF A PUNITIVE DAMAGES

22     ASSESSMENT, AND IT'S IN THE DEFINITION OF MALICE, AND IT'S

23     "DISREGARD OF THE RIGHTS OF ANOTHER," "RIGHTS" OR "SAFETY."

24            CDAFA DOESN'T TALK ABOUT SAFETY.

25            SO THE FACT THAT THEY ARE TALKING ABOUT SAFETY IN THE
```

1    MODEL INSTRUCTION REALLY HAS TO BE READ AS SAYING, ALL RIGHT,

2    WELL, THE RIGHTS THEY'RE TALKING ABOUT PLAINLY ARE LIMITED TO

3    RIGHTS UNDER CDAFA BECAUSE SAFETY WOULDN'T BE IN THERE.

4            THE COURT:  BUT WOULD IT BE APPROPRIATE FOR THEM

5    TO -- WOULD IT BE APPROPRIATE FOR THE JURY TO AWARD PUNITIVE

6    DAMAGES FOR A DISREGARD OF THE PLAINTIFFS' RIGHTS UNDER THE

7    TERMS OF SERVICE?

8            MR. PEREZ:  WE HAVE NOT ARGUED THE TERMS OF SERVICE

9    ISSUE.  WE HEARD THE COURT'S RULINGS.

10       I COULD HAVE ASKED MR. GAZNELI THAT QUESTION.  HE'S THE

11   ONE THAT TESTIFIED ABOUT THE --

12           THE COURT:  I KNOW.  BUT MY QUESTION IS, WOULD IT BE

13   CORRECT FOR THEM TO MAKE THAT FINDING?

14           MR. PEREZ:  WE DON'T BELIEVE THERE'S ANYTHING IN THE

15   INSTRUCTION THAT WOULD EXCLUDE THAT.  IT'S RIGHTS OR SAFETY OF

16   ANOTHER.

17       YOUR HONOR, IT DOES NOT -- IT SORT OF -- THE FACT THAT IT

18   REFERS TO SAFETY SORT OF, ON ITS FACE, CAN'T BE LIMITED TO

19   UNDER CDAFA.

20           MR. NOLLER:  YOUR HONOR, THIS IS NOT A CDAFA

21   INSTRUCTION.  IT'S A GENERAL PUNITIVE DAMAGES INSTRUCTION THAT

22   IS, YOU KNOW, DESIGNED TO BE BROAD AND MODIFIABLE BASED ON HOW

23   IT APPLIES TO ANY PARTICULAR CASE.

24       I MEAN, YOUR HONOR CERTAINLY KNOWS, GIVEN WHO KNOWS HOW

25   MANY TRIALS YOU'VE HAD TO DEAL WITH THIS, THE PURPOSE OF JURY

1    INSTRUCTIONS IS TO BE, YOU KNOW, TWEAKED BASED ON THE

2    PARTICULAR ISSUES.

3         AND SO WHEN YOU HAVE A CASE THAT IS SPECIFIC TO ONE

4    STATUTE THAT EVERYBODY AGREES IS THE ONLY STATUTE UNDER WHICH

5    PUNITIVE DAMAGES ARE AVAILABLE, YOU HAVE TO ASK, WELL, WHAT

6    PART OF THE MODEL INSTRUCTION FITS THAT AND WHAT PART DOESN'T?

7         AND OBVIOUSLY SAFETY DOESN'T FIT THAT, AND BECAUSE THERE

8    ARE THESE OTHER CLAIMS, IT NEEDS TO BE MADE CLEAR TO THE JURY

9    THAT THE RIGHTS THAT MATTER ARE THE RIGHTS UNDER THE ONLY

10   STATUTE IN THIS CASE THAT PERMITS THE AWARD OF PUNITIVE

11   DAMAGES.

12        THE COURT:  YEAH, PUNITIVE -- IT WOULDN'T BE

13   APPROPRIATE FOR THE JURY TO AWARD PUNITIVE DAMAGES FOR A

14   VIOLATION OF THE CFAA.

15        MR. PEREZ:  WELL, FIRST OF ALL, THE CONDUCT THAT

16   VIOLATES THE CFAA, OTHER THAN THE LOCATION OF THE SERVERS, IS

17   EFFECTIVELY IDENTICAL TO THE CONDUCT THAT VIOLATES THE CDAFA,

18   SO I THINK IN THE JURY'S MIND, IT'S THE UNLAWFUL ENCROACHMENT

19   OF THE SERVERS.

20        IF THE QUESTION IS, DOES THE CONDUCT THAT VIOLATES THE

21   CONTRACT, IS THAT PROPERLY TAKEN INTO ACCOUNT, NOT FOR PURPOSES

22   OF LIABILITY, BUT FOR PURPOSES OF THE HOLISTIC ANALYSIS OF THE

23   NATURE OF DEFENDANTS' CONDUCT FOR PURPOSES OF ASSESSING WHETHER

24   IT ENTAILED DISREGARD OF PLAINTIFFS' RIGHTS, WHETHER IT

25   ENTAILED MALICE, OPPRESSION, OR FRAUD, WE VIEW THAT AS

```
1    ABSOLUTELY FAIR GAME.

2         NOW, WE HAVEN'T PRESENTED EVIDENCE ON IT, WE HAVEN'T

3    ARGUED IT TO THE JURY BECAUSE THE COURT DIDN'T PERMIT US TO DO

4    SO.

5         BUT WE DON'T THINK THAT THE INSTRUCTION SHOULD BE CABINED

6    IN THAT WAY.

7              THE COURT:  WELL, THE CONDUCT IS THE CONDUCT, AND THE

8     CONDUCT ACTUALLY FORMS THE BASIS FOR LIABILITY FOR ALL THREE,

9     ALL THREE VIOLATIONS.  THE CONDUCT IS THE SAME.  IT'S THE

10    INCURSION OF THE STATUTE FOR THE TWO, YOU KNOW, THE TWO

11    STATUTES, AND OBVIOUSLY THE BREACH OF CONTRACT IS THE REVERSE

12    ENGINEERING AND DECOMPILING.

13        SO THAT ARGUMENT IS FINE WITH REGARD TO THOSE TWO

14    STATUTES.

15        BUT IT'S NOT FINE WITH REGARD TO THE CONDUCT UNDERLYING

16    THE BREACH OF CONTRACT.

17             MR. PEREZ:  ANOTHER PROBLEM HERE, YOUR HONOR, IS THAT

18    IF WE START TALKING ABOUT PLAINTIFFS' RIGHTS UNDER CDAFA, THE

19    JURY DOESN'T HAVE A DEFINITION OF WHAT THAT MEANS.

20        SO THE CONCEPT OF JUST PLAINTIFFS' RIGHTS, THERE'S BEEN

21    ALL THIS ARGUMENT ABOUT, WAS THERE ILL WILL, WAS THERE INTENT

22    TO HARM?

23        THE FACT THAT THE MODEL INSTRUCTION TALKS ABOUT KNOWING

24    DISREGARD OF RIGHTS IN THAT LEVEL OF GENERALITY --

25             THE COURT:  WELL, YOU'RE THE ONE THAT WANTS THIS
```

```
 1       LANGUAGE.  WHAT RIGHTS ARE WE TALKING ABOUT?

 2               MR. PEREZ:  WELL --

 3               THE COURT:  WHAT RIGHTS DOES THIS EVEN REFER TO?

 4               MR. PEREZ:  CERTAINLY THE RIGHT TO BE FREE FROM

 5       INCURSION, THE RIGHT TO NOT HAVE SPYWARE BEING INSTALLED

 6       THROUGH WHATSAPP SERVERS.

 7           YOU KNOW, SOME OF THOSE RIGHTS ARE ARTICULATED IN THE

 8       TERMS OF SERVICE.  WE'RE NOT POINTING TO THE VIOLATION OF THE

 9       TERMS OF SERVICE AS A BASIS FOR PUNITIVE DAMAGES.  BUT IT IS

10       PART AND PARCEL OF THEIR CONDUCT, WHAT THEY DID AND HOW THEY

11       DID IT.

12           AND THE FACT THAT YOU HAVE WITNESSES WHO HAVE TESTIFIED

13       THAT THEY FULLY UNDERSTOOD -- YOU KNOW, SENIOR OFFICERS OF THE

14       DEFENDANTS WHO TESTIFIED THAT THEY UNDERSTOOD THAT WHATSAPP DID

15       NOT WANT THIS ACTIVITY ON THEIR SERVERS, AT THAT LEVEL OF

16       GENERALITY.

17           WE WOULD ARGUE TO THE JURY THAT REFLECTS A KNOWING

18       DISREGARD OF PLAINTIFFS' RIGHTS.

19           AND SO TO NOW MAKE THE SURE TRY TO PARSE, YES, BUT, IS

20       THAT A RIGHT UNDER CDAFA, IT'S JUST -- THIS ISN'T A LAW SCHOOL

21       EXAM.  IT GETS A LITTLE TOO COMPLICATED.

22               THE COURT:  HMM.

23               MR. PEREZ:  AND THE LANGUAGE IN THE MODEL INSTRUCTION

24       IS SIMPLER AND EASIER FOR THE JURY TO WORK WITH.

25               THE COURT:  THE FACT THAT WE'RE CONTINUING TO ARGUE
```

 1    THIS, THOUGH, MAKES IT LESS AND LESS CLEAR TO ME WHAT THIS EVEN

 2    MEANS.  WHAT DOES THIS EVEN MEAN, THE KNOWING DISREGARD OF THE

 3    RIGHTS OF THE PLAINTIFFS?  WHAT'S -- IT'S NOT DEFINED ANYWHERE.

 4         MR. NOLLER:  I MEAN, YOUR HONOR, I THINK THE ONLY WAY

 5    TO UNDERSTAND IT, IF YOU LOOK AT THE PARAGRAPH THAT PRECEDES --

 6    SO ON PAGE 7 OF DOCUMENT 703-5.

 7         I CAN MAYBE TURN TO --

 8         THE COURT:  703 DASH?

 9         MR. NOLLER:  -- 703-3, BECAUSE I THINK IT WILL BE THE

10    SAME FOR THE POINT I'M GOING TO MAKE.

11         YEAH, SO IF YOU'RE ON 703-3 STILL, YOUR HONOR, ON

12    PAGE 10 -- AND, AGAIN, THIS IS THE LANGUAGE THE PLAINTIFFS

13    PROPOSED -- THE THIRD PARAGRAPH ON PAGE 10 THAT SORT OF KICKS

14    OFF THE LIST OF SOME OF THE REQUIREMENTS, "YOU MAY AWARD

15    PUNITIVE DAMAGES ONLY IF YOU FIND THAT PLAINTIFFS HAVE PROVEN

16    BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANTS' CONDUCT THAT

17    VIOLATED THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT WAS

18    DONE WITH MALICE, OPPRESSION, OR FRAUD."

19         SO IT'S NOT THIS SORT OF HOLISTIC ANALYSIS OF ALL OF

20    DEFENDANTS' CONDUCT.  IT'S AN ANALYSIS OF THE SPECIFIC CONDUCT

21    THAT THIS COURT FOUND VIOLATED THAT STATUTE.

22         SO IN THIS CONTEXT, THE RIGHTS THAT ARE AT ISSUE HAVE TO

23    BE, AND CAN ONLY BE, THE RIGHTS UNDER THAT STATUTE.

24         THE COURT:  OKAY.  SO WHY DOES IT NEED TO BE REPEATED

25    AGAIN THEN?  I MEAN, NOW -- NOW YOU POINTED OUT, WE'VE ALREADY

1    GOT IT IN PARAGRAPH 1 AND WE'VE GOT IT IN PARAGRAPH 3.  NOW

2    YOU'RE ASKING TO PUT IT IN THE NEXT FULL PARAGRAPH AS WELL?

3              MR. NOLLER:  WELL, BECAUSE I THINK, YOUR HONOR, THAT

4    THE PHRASING IN THE PARAGRAPH I JUST QUOTED ISN'T TIED TO THAT

5    PARTICULAR POINT.  IT'S A MORE GENERAL POINT THAT SUPPORTS WHAT

6    I'M SAYING.

7         BUT I THINK IT'S STILL IMPORTANT, PARTICULARLY IN RESPECT

8    NOW THAT WE'VE -- MR. PEREZ ARTICULATING THAT THEY WANT THE

9    JURY TO CONSIDER EVERYTHING, THAT IN TERMS OF, YOU KNOW,

10   SPECIFICALLY STATING WHAT THE RIGHTS ARE AND, AS YOUR HONOR

11   SAID, THIS IS PROBABLY GOING TO BE DIFFICULT FOR THE JURY, IT

12   CAN ONLY HELP THE JURY TO BE MORE PRECISE ABOUT WHAT

13   SPECIFICALLY IS AT ISSUE WITH RESPECT TO THOSE RIGHTS.

14        AND IF PLAINTIFFS AREN'T GOING TO TRY TO ARGUE THAT THEY

15   SHOULD GET PUNITIVE DAMAGES FOR THE CONDUCT THAT BREACHED THE

16   TERMS OF SERVICE, THEN I FRANKLY DON'T UNDERSTAND WHAT THE

17   OBJECTION IS.

18             MR. PEREZ:  YOUR HONOR, I THINK THE COURT IS

19   ABSOLUTELY CORRECT.  I HADN'T FOCUSSED ON THAT LANGUAGE.

20        BUT IT'S ALREADY COVERED.  IT'S DEFENDANTS' CONDUCT THAT

21   VIOLATED CDAFA.

22             THE COURT:  RIGHT.

23             MR. PEREZ:  IT DOESN'T NEED TO BE SAID AGAIN.

24             THE COURT:  IT DOESN'T NEED TO BE SAID AGAIN.  I

25   DIDN'T REALIZE IT WAS IN PARAGRAPH 3 AS WELL.  I DON'T SEE WHY

```
 1      WE SHOULD SAY IT AGAIN IMMEDIATELY AFTER THE -- YOU KNOW, THE

 2      LIST OF AGENTS, DIRECTORS, ET CETERA, THAT QUALIFY.

 3               MR. NOLLER:  I MEAN, YOUR HONOR --

 4               THE COURT:  SO, YEAH.  OKAY.  OKAY.

 5          SO WHAT ABOUT THE SECOND SENTENCE?  IS THAT NECESSARY?

 6               MR. PEREZ:  "A PERSON ACTS WITH KNOWING DISREGARD,"

 7      YOUR HONOR?  IS THAT THE ONE?

 8               THE COURT:  YEAH.

 9               MR. PEREZ:  YES, I THINK THE "KNOWING DISREGARD," TO

10      HAVE THAT CONCEPT DEFINED IS HELPFUL.

11               MR. NOLLER:  I THINK IF YOUR HONOR IS GOING TO

12      INCLUDE "KNOWING DISREGARD," IT'S PROBABLY BEST TO HAVE THE

13      DEFINITION OF THAT.

14               THE COURT:  TO HAVE THE DEFINITION.  OKAY.  ALL

15      RIGHT.

16          THEN WE'LL GO WITH THAT, 70 -- 703-3, PAGE 10 OF 12.

17          WHEN WE LOOK AT PAGE 11, I THINK I ALREADY APPROVED, OR

18      INDICATED I WAS INCLINED TO APPROVE THE REMOVAL OF SECTION 2

19      UNDER SUBSECTION A --

20               MR. NOLLER:  YES, THAT'S WHAT --

21               THE COURT:  -- BECAUSE IT DIDN'T APPLY.

22               MR. NOLLER:  THAT'S WHAT YOUR HONOR HELD IN THE

23      SECOND FINAL PRETRIAL CONFERENCE.

24               MR. PEREZ:  THAT'S FINE, YOUR HONOR.

25               THE COURT:  OKAY.  SO NOW WE CAN GET TO HOW WE SORT
```

1     OF DIFFERENTIATE THE INTENT REQUIRED IN ORDER TO FIND MALICE,

2     FRAUD, AND OPPRESSION FROM THE INTENT FOUND BY THE COURT TO

3     EXIST IN THE UNDERLYING CONDUCT.  OKAY?

4          SO I'M THINKING SOMETHING ALONG THESE LINES, AND WE MIGHT

5     HAVE TO TWEAK IT A LITTLE BIT, OBVIOUSLY.  "EVEN THOUGH THE

6     COURT HAS ALREADY DETERMINED THAT DEFENDANTS ACCESSED

7     PLAINTIFFS' SERVERS INTENTIONALLY, KNOWINGLY, AND WITH AN

8     INTENT TO DEFRAUD AS EXPLAINED IN INSTRUCTION NUMBERS," AND

9     WE'LL NUMBER THE TWO INSTRUCTIONS THAT HAVE THOSE FINDINGS IN

10    THEM, "IT IS UP TO THE JURY TO DECIDE WHETHER PLAINTIFFS HAVE

11    PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANTS ACTED

12    WITH EITHER INTENT TO CAUSE INJURY," AND WE CAN EXTEND THAT,

13    "TO SHOW MALICE, KNOWING DISREGARD OF PLAINTIFFS' RIGHTS TO

14    SHOW OPPRESSION, OR INTENT TO HARM TO SHOW FRAUD."

15         MR. PEREZ:  AND, YOUR HONOR, WOULD THAT BE ADDITIONAL

16    LANGUAGE, OR WOULD THAT BE REPLACING ANYTHING?

17         THE COURT:  THAT WOULD BE ADDITIONAL LANGUAGE THAT WE

18    WOULD PUT IN AFTER -- LET'S SEE -- PERHAPS AFTER THE

19    DEFINITIONS OF "FRAUD" AND "MANAGING AGENT" AND BEFORE WE GO TO

20    "THERE IS NO FIXED FORMULA."

21         MR. PEREZ:  YOUR HONOR, THE -- I'M OBVIOUSLY REACTING

22    ON THE FLY, BUT THE STRUCTURE OF THE POINT I THINK IS

23    REASONABLE, EVEN THOUGH THE COURT ALREADY FOUND A, B, AND C,

24    IT'S UP TO THE JURY TO DECIDE BLANK.

25         MY ONLY CONCERN IS THAT WHEN YOU GET TO THE BLANK, I WOULD

1     SAY "UP TO THE JURY TO DECIDE 1, 2, OR 3, IN ORDER TO FIND

2     OPPRESSION, FRAUD, OR MALICE RESPECTIVELY," BUT WE SEEM TO BE

3     DROPPING OUT SOME OF THE LANGUAGE WHERE OPPRESSION, FRAUD, OR

4     MALICE ARE DEFINED ABOVE.

5          THE COURT:  YEAH.  SINCE WE'VE HAD THIS DISCUSSION,

6     I'M EXTENDING IT.  THIS WAS SORT OF AN ABBREVIATED SHORTHAND OF

7     WHAT I THINK THE ADDITIONAL LANGUAGE SHOULD SAY.

8          BUT WE CAN FILL IN THE BLANKS AS TO WHAT HAS TO BE SHOWN

9     FOR PUNITIVE DAMAGES, FOR THOSE THREE ELEMENTS OF PUNITIVE

10    DAMAGES.

11         MR. PEREZ:  YES.

12         THE COURT:  WE CAN DEFINE THAT MORE BROADLY,

13    OBVIOUSLY.

14         MR. PEREZ:  AND, YOUR HONOR, JUST SO I'M NOT --

15    BRIEFLY, MY VIEW OF THAT WOULD BE THAT'S ALREADY DEFINED IN THE

16    INSTRUCTION, SO PERHAPS IT WOULD BE CLEAREST -- RIGHT,

17    OPPRESSION, FRAUD, MALICE ARE ALREADY DEFINED.

18         SO IF WE JUST SAID, "EVEN THOUGH THE COURT HAS ALREADY

19    FOUND 1, 2, AND 3, IT IS UP TO THE JURY TO DETERMINE WHETHER

20    WE'VE PROVEN BY CLEAR AND CONVINCING EVIDENCE OPPRESSION,

21    FRAUD, OR MALICE, AS DEFINED ABOVE" WOULD DO THE TRICK.

22         THE COURT:  "AS DEFINED ABOVE"?

23         MR. PEREZ:  YES, "AS I HAVE DEFINED THOSE TERMS."

24         THE COURT:  OR "AS DEFINED BELOW."  I MEAN, I'M NOT

25    SO SURE IT WOULDN'T MAKE MORE SENSE TO SAY THAT FIRST.

1          MR. PEREZ:  YES, THAT'S FINE WITH US, YOUR HONOR.

2          THE COURT:  THAT WOULD BE OKAY.

3          MR. NOLLER:  IT MAY SHOCK YOUR HONOR TO LEARN THAT I

4     WAS GOING TO MAKE THE SAME PROPOSAL WITH RESPECT TO THE

5     DEFINITION OF THOSE TERMS.

6          I THINK THE ONLY OTHER THING I WOULD SUGGEST, OR REQUEST,

7     I GUESS, IS WHEN YOUR HONOR SAYS, YOU KNOW, THE COURT HAS

8     ALREADY FOUND INTENT TO DEFRAUD, THAT YOU ADD SOMETHING ALONG

9     THE LINES OF "FOR PURPOSES OF THE CALIFORNIA" OR "THE FEDERAL

10    COMPUTER FRAUD AND ABUSE ACT," OR "UNDER THE COMPUTER FRAUD AND

11    ABUSE ACT."

12         AND TOWARD THE END, WHEN YOU SAY, YOU KNOW, "MALICE,

13    OPPRESSION, OR FRAUD," SAY SOMETHING LIKE, "IN CONNECTION WITH

14    THE CONDUCT THAT VIOLATED THE CALIFORNIA STATUTE," JUST TO MAKE

15    THAT DISTINCTION CLEAR AGAIN TO THE JURY.

16         THE COURT:  YEAH, I DO THINK THAT THIS IS NECESSARY,

17    AND IT SHOULD BE INSERTED BEFORE WE GIVE THE DEFINITIONS OR

18    IMMEDIATELY AFTER WE GIVE THE DEFINITIONS --

19         MR. PEREZ:  YEAH, NO PROBLEM -- I'M SORRY,

20    YOUR HONOR.

21         THE COURT:  -- AS DEFINED.  AND THAT WOULD OBVIATE

22    THE NEED FOR US TO REDEFINE THEM AGAIN.  I AGREE, THAT'S

23    BETTER.

24         MR. NOLLER:  I WOULD ALSO JUST RAISE -- THIS IS A

25    SEPARATE POINT, BUT I WANT TO GET IT ON THE RECORD.

```
 1              THE DEFINITION OF FRAUD IN THE MODEL INSTRUCTION IS
 2     "WHETHER DEFENDANTS INTENTIONALLY MISREPRESENTED OR CONCEALED A
 3     MATERIAL FACT," AND UNDER CALIFORNIA LAW -- AND I BELIEVE WE
 4     HAVE A SORT OF POCKET BRIEF ON THIS THAT WE CAN SUBMIT TO
 5     YOUR HONOR IF YOU WANT TO SEE IT -- CONCEALMENT REQUIRES A DUTY
 6     TO DISCLOSE, AND OUR POSITION WOULD BE THAT THERE HASN'T BEEN
 7     ANY EVIDENCE ADMITTED AT TRIAL THAT WOULD SUPPORT THE
 8     IMPOSITION OF A DUTY TO DISCLOSE.
 9              AND SO IN DEFINING FRAUD, IT SHOULD BE LIMITED TO THE
10     MISREPRESENTATION OF AN INTENTIONAL FACT.
11                   THE COURT:  IN THIS INSTRUCTION?
12                   MR. NOLLER:  YES, YOUR HONOR.
13                   MR. PEREZ:  WE'RE JUST HEARING THIS FOR THE FIRST
14     TIME, YOUR HONOR, SO WE'D LIKE TO SEE THE PROPOSED LANGUAGE AND
15     HAVE AN OPPORTUNITY TO REACT TO IT.
16                   THE COURT:  "THE MISREPRESENTATION OR CONCEALMENT OF
17     A MATERIAL FACT," YOU'D TAKE THE "CONCEALMENT" OUT?
18                   MR. NOLLER:  YEAH.  WE WOULD JUST REMOVE "OR
19     CONCEALED."
20              AND OBVIOUSLY WE CERTAINLY DON'T OBJECT TO HAVING AN
21     EXCHANGE OF ARGUMENTS ON THIS.
22              BUT THAT WOULD BE OUR PROPOSAL IS THAT IT WOULD READ
23     "DEFENDANTS" -- I'M SORRY.  READING IS MUCH FASTER.
24              "FRAUD MEANS THAT DEFENDANTS INTENTIONALLY MISREPRESENTED
25     A MATERIAL FACT, AND DID SO INTENDING TO HARM PLAINTIFFS."
```

```
 1              THE COURT:  OKAY.

 2              MR. PEREZ:  WE WOULD, AGAIN, LIKE TO -- WE'RE HEARING

 3       THIS FOR THE FIRST TIME.  WE'D LIKE TO SEE THE PROPOSAL, AND IF

 4       THEY COULD IDENTIFY THEIR AUTHORITY, THAT WOULD BE HELPFUL FOR

 5       US AS WELL.

 6              MR. NOLLER:  WE CAN DO THAT.

 7              THE COURT:  OKAY.  WHY DON'T YOU DO THAT OVER THE

 8       WEEKEND.

 9          SO YOU ALL UNDERSTAND WHAT I'M TRYING TO DO WITH THIS

10       ADDITIONAL SORT OF CLARIFICATION FOR THE JURY, AND WE'RE KIND

11       OF ON THE SAME PAGE, AND I THINK THAT IF THE LANGUAGE, "EVEN

12       THOUGH THE COURT HAS DETERMINED," ET CETERA, ET CETERA, AND

13       EVEN WITH YOUR QUALIFIED LANGUAGE, COMES BEFORE THE DEFINITIONS

14       AND THEN SAY, "THE JURY STILL HAS TO FIND MALICE, FRAUD, OR

15       OPPRESSION, ONE OF THE THREE AS DEFINED BELOW," YEAH, I THINK

16       THAT WOULD WORK.

17              MR. PEREZ:  THAT'S OKAY WITH US, YOUR HONOR.

18              MR. NOLLER:  I THINK, WITH APOLOGIES AGAIN, SUBJECT

19       TO OUR OBJECTION TO INTENT TO DEFRAUD BEING THERE AT ALL, THAT

20       SOUNDS FINE.

21              THE COURT:  YEAH.  OKAY.

22          ALL RIGHT.  SO YOU'VE GOT THESE THREE INSTRUCTIONS THEN TO

23       WORK ON, AND IF YOU COULD FILE THEM SOMETIME TOMORROW SO I'LL

24       LOOK AT THEM ON SUNDAY SO I CAN LET YOU KNOW FIRST THING MONDAY

25       SO THAT YOU CAN TAKE THOSE INTO ACCOUNT IN YOUR CLOSING
```

```
1      ARGUMENT.

2                  MR. NOLLER:  YES, YOUR HONOR.

3                  MR. PEREZ:  YOUR HONOR --

4                  MR. NOLLER:  I APOLOGIZE, JUST BEFORE WE SHIFT TO

5      SOMETHING ELSE, JUST BECAUSE I -- THIS WAS A GOOD SUGGESTION

6      THAT I NEGLECTED.

7          IN THE LANGUAGE THAT YOUR HONOR IS PROPOSING, I THINK IT

8      WOULD BE APPROPRIATE TO STATE THE BURDEN OF PROOF UNDER WHICH

9      THE COURT FOUND THE FINDINGS.

10         SO THE COURT FOUND, BY A PREPONDERANCE OF THE EVIDENCE,

11     THAT NSO ACTED WITH INTENT TO DEFRAUD FOR PURPOSES OF THE

12     COMPUTER FRAUD AND ABUSE ACT.

13         THIS JURY STILL HAS TO FIND WHETHER PLAINTIFFS, BY CLEAR

14     AND CONVINCING EVIDENCE, ET CETERA.

15                 THE COURT:  THAT'S OKAY.  THAT'S OKAY WITH ME.

16                 MR. NOLLER:  THANK YOU, YOUR HONOR.

17                 MR. PEREZ:  YOUR HONOR, WE DID HAVE TWO OTHER POINTS

18     ON THE PUNITIVE DAMAGES INSTRUCTIONS.

19                 THE COURT:  OKAY.

20                 MR. PEREZ:  ONE IS THAT PLAINTIFFS HAVE ARGUED AND

21     PRESENTED EVIDENCE AT TRIAL ABOUT WHETHER THEIR EXECUTIVES WERE

22     AWARE OF CDAFA, AND WE WOULD LOVE THE PUNITIVE DAMAGES

23     INSTRUCTION TO INCLUDE A STATEMENT THAT PLAINTIFFS DO NOT HAVE

24     ANY BURDEN TO PROVE THAT DEFENDANTS HAD KNOWLEDGE OF CALIFORNIA

25     LAW OR CDAFA, AND THAT WE DON'T HAVE TO PROVE THAT THEY HAD AN
```

```
1        INTEND TO VIOLATE CALIFORNIA LAW OR CDAFA.

2            THEY'VE PUT THAT AT ISSUE THROUGH HOW THEY'VE PRESENTED

3    THEIR EVIDENCE.

4            MR. NOLLER:  YES, YOUR HONOR, AND THAT'S A JURY

5    ARGUMENT.  THAT'S NOT PART OF THE STANDARD FOR PUNITIVE

6    DAMAGES.

7            THE COURT:  YEAH.  I MEAN, GENERALLY SPEAKING,

8    IGNORANCE OF THE LAW IS NO DEFENSE TO ANY KIND OF CONDUCT.

9            MR. PEREZ:  WELL, THE JURY MAY NOT APPRECIATE THAT,

10   YOUR HONOR, WHEN IT'S BEEN EMPHASIZED TO THEM, WE DIDN'T KNOW

11    ABOUT THE LAW, WE DIDN'T KNOW ABOUT THE LAW.

12        THE JURY SHOULD KNOW, THEY DON'T NEED TO KNOW ABOUT THE

13   LAW.  THEY VIOLATED THE LAW.  THAT'S SUFFICIENT.

14        AND IT'S GOING TO CREATE CONFUSION TO HAVE BEEN TOLD

15   REPEATEDLY AND HAVE IT EMPHASIZED TO THEM, AS IF IT'S A FACT

16   THAT MATTERS, THAT THE DEFENDANTS PURPORTEDLY WEREN'T AWARE OF

17   THIS LAW, WHEN, IN FACT, THAT CARRIES NO SIGNIFICANCE IN THE

18   ANALYSIS.

19            MR. NOLLER:  YOUR HONOR, THAT'S NOT CORRECT.

20        IT DOES MATTER, AND I THINK YOUR HONOR RECOGNIZED THIS IN

21    THE ARGUMENT YESTERDAY.

22        IT'S TRUE THAT NOT KNOWING ABOUT OR INTENDING TO VIOLATE

23   THE LAW DOESN'T AFFECT LIABILITY.  THAT'S ABSOLUTELY TRUE.

24   WE'RE NOT DISPUTING THAT.  WE'VE NEVER SAID OTHERWISE.

25            BUT IT'S ABSOLUTELY RELEVANT TO INTENT FOR PURPOSES OF
```

1137

1    PUNITIVE DAMAGES.  PART OF THE DEFINITION OF MALICE IS -- THAT

2    HAS NOW BEEN ADDED TO THE INSTRUCTION IS WHETHER THERE WAS A

3    KNOWING DISREGARD OF THE PLAINTIFFS' RIGHTS.

4         THAT'S ALSO PART OF THE DEFINITION OF OPPRESSION, WHETHER

5    THERE WAS KNOWING DISREGARD OF PLAINTIFFS' RIGHTS.

6         AND WE'VE SUBMITTED AUTHORITIES ON THIS IN THE BRIEF THAT

7    WE FILED IN RESPONSE TO THE PROPOSED CURATIVE INSTRUCTION.

8         WHETHER THERE WAS INTENT TO VIOLATE THE LAW IS RELEVANT TO

9    THE PLAINTIFFS' INTENT FOR PUNITIVE DAMAGES.

10        SO THIS IS JUST SOMETHING THAT THE PARTIES SHOULD ARGUE TO

11   THE JURY.  WE'RE NOT SUGGESTING THAT THAT FORECLOSES PUNITIVE

12   DAMAGES.

13        BUT TO INSTRUCT THE JURY THAT THEY DON'T HAVE TO PROVE IT

14   TAKES THAT -- TAKES AN ISSUE THAT IS ABSOLUTELY RELEVANT AND

15   THAT WE ARE ENTITLED TO ARGUE AWAY FROM THE JURY, AWAY FROM US

16   IN A WAY THAT WOULD BE INAPPROPRIATE.

17            MR. PEREZ:  AND, YOUR HONOR, THE FACT THAT THEY

18    INTEND TO ARGUE IT IS ALL THE MORE REASON THAT IT NEEDS TO BE

19    IN HERE.  BECAUSE WE'RE NOT SUGGESTING THAT -- THE INSTRUCTION

20    WE'VE PROPOSED WOULD JUST SAY -- AND WE HAVEN'T SUBMITTED IT TO

21    THE COURT YET -- BUT IT WOULD JUST SAY "PLAINTIFFS DO NOT HAVE

22    ANY BURDEN TO PROVE THAT DEFENDANTS HAD KNOWLEDGE OF CALIFORNIA

23    LAW."

24        THAT'S AN ACCURATE STATEMENT, AND THAT'S AN IMPORTANT

25    POINT FOR THE JURY TO APPRECIATE WHEN IT'S BEING ADDRESSED TO

```
 1    THEM AGAIN AND AGAIN THAT DEFENDANTS PURPORTEDLY DIDN'T KNOW

 2    ABOUT CALIFORNIA LAW.

 3              THE COURT:  AND WHERE WOULD THAT GO IN THE PUNITIVE

 4    DAMAGES INSTRUCTION?

 5              MR. PEREZ:  THAT'S A GOOD QUESTION.  IT COULD GO

 6    EITHER TOWARDS THE BEGINNING WHERE YOU SAY THEY DON'T HAVE TO

 7    PROVE KNOWLEDGE OF CALIFORNIA LAW, HERE'S WHAT THEY DO HAVE TO

 8    PROVE; OR IT COULD GO AFTER THE DEFINITION OF WHAT THEY DO HAVE

 9    TO PROVE, THEY HAVE TO PROVE ANY OF A, B, OR C, THEY DON'T HAVE

10    TO PROVE KNOWLEDGE OF CALIFORNIA LAW.

11              MR. NOLLER:  YOUR HONOR, IT'S JUST NOT NECESSARY.

12    THAT'S AN ARGUMENT THAT THEY CAN MAKE TO THE JURY.  IT APPEARS

13    NOWHERE IN THE MODEL INSTRUCTION OR ANY OF THE OTHER MODEL

14    INSTRUCTIONS.

15         AND THE EFFECT OF THAT, IF YOU INCLUDE THAT LANGUAGE, IS

16    NOT GOING TO BE TO LEAVE IT TO THE PARTIES TO ARGUE THIS AND

17    THEN THE JURY CAN THINK ABOUT IT.

18         IT'S GOING TO BE TO TELL THE JURY THAT WHETHER NSO

19    INTENDED TO VIOLATE THE LAW IS NOT RELEVANT, AND IT IS

20    RELEVANT.  THERE ARE CASES THAT SAY IT'S RELEVANT.

21         WE'RE ENTITLED TO ARGUE THAT THAT'S A RELEVANT FACT TO

22    CONSIDER.

23         WE'RE NOT GOING TO ARGUE -- WE HAVEN'T ARGUED AND WE'RE

24    NOT GOING TO -- THAT IT'S THEIR BURDEN TO PROVE AN INTENT TO

25    VIOLATE THE LAW.
```

```
 1            BUT WHETHER NSO HAD THAT INTENT IS ABSOLUTELY RELEVANT TO

 2    ITS INTENT FOR PURPOSES OF MALICE AND OPPRESSION, AND INCLUDING

 3    THAT LANGUAGE WOULD JUST ELIMINATE THAT ARGUMENT THAT NSO IS

 4    ENTITLED TO MAKE.

 5            THE COURT:  YEAH.

 6            MR. PEREZ:  YOUR HONOR, I'M HAPPY TO -- WE'RE GOING

 7    TO BE SUBMITTING A PUNITIVE DAMAGES INSTRUCTION TO THE COURT

 8    TOMORROW.  WE'RE HAPPY TO INCLUDE THIS LANGUAGE FOR THE COURT'S

 9    CONSIDERATION AND THEN THE COURT CAN REVIEW IT IN CONTEXT.

10            THE COURT:  YEAH.  IT'S NOT LIKELY I'M GOING TO GRANT

11    IT, THOUGH.  I TEND TO AGREE WITH DEFENSE COUNSEL'S ARGUMENT ON

12    THAT.

13        IT IS -- IT WOULD BE DIFFERENT IF THE JURY WAS BEING ASKED

14    TO FIND LIABILITY.  I MEAN, IT WOULD DEFINITELY BE THE KIND OF

15    INSTRUCTION I WOULD GIVE IF THE JURY WERE MAKING THAT

16    DETERMINATION.

17        BUT ON PUNITIVE DAMAGES, I THINK IT HAS A BEARING.

18        IT SORT OF REMINDS ME OF CRIMINAL CASES IN WHICH

19    DEFENDANTS ARGUE AT SENTENCING THAT THEY DIDN'T HAVE -- THEY

20    DIDN'T HAVE THE KNOWLEDGE.

21        I MIGHT TAKE THAT INTO ACCOUNT IN SENTENCING, BUT IT

22    WOULDN'T HAVE ANY IMPACT ON WHETHER OR NOT AT TRIAL THAT WOULD

23    RELIEVE THEM OF LIABILITY.  SO I KIND OF THINK IT'S AN ARGUMENT

24    ISSUE AND NOT A JURY INSTRUCTION ISSUE.

25            MR. NOLLER:  THANK YOU, YOUR HONOR.
```

1         THE COURT:  WAS THERE ANYTHING ELSE?  ARE WE AT THE

2    END OF THE DAY?

3         MR. PEREZ:  WE ARE VERY, VERY CLOSE, YOUR HONOR.

4       THE LAST POINT IS THIS -- REMAINS THIS EXTRATERRITORIALITY

5    INSTRUCTION IN THE PUNITIVE DAMAGES, WHICH IS THAT THEY'VE

6    INSERTED THIS LANGUAGE THAT -- AND WHICH THE COURT HAS

7    ACCEPTED, BUT LET ME EXPLAIN WHY THE ANALYSIS HAS CHANGED BASED

8    ON THE TRIAL -- THAT "PUNITIVE DAMAGES MAY NOT BE USED TO

9    PUNISH DEFENDANTS FOR THE IMPACT OF THEIR MISCONDUCT ON PERSONS

10   OTHER THAN PLAINTIFFS," ALL OF THAT IS AGREED.

11      AND THEN THEY HAD ADDED THE PHRASE, "OR FOR ACTS COMMITTED

12   OUTSIDE OF CALIFORNIA."

13      NOW, THE COURT MAY REMEMBER THAT THAT LANGUAGE IS NOT FROM

14   THE MODEL INSTRUCTION.  THEY DIDN'T IDENTIFY ANY PRECEDENT.

15      WE BELIEVE IT'S CONTRARY TO SUPREME COURT AUTHORITY.

16      IT'S ALSO CONTRARY TO THE COURT'S RULING THAT DEFENDANTS

17   VIOLATED CDAFA AS A MATTER OF LAW.

18      BUT THE ISSUE THAT WE WANTED TO FLAG FOR THE COURT TODAY

19   IS THAT IT'S NOW BECOME HUGELY PREJUDICIAL BECAUSE OF HOW THEY

20   HAVE PRESENTED THEIR EVIDENCE.

21      THE COURT WILL REMEMBER, EVEN TODAY, THERE'S BEEN THIS

22   EMPHASIS ON, AND YOUR RESEARCH TEAM, WHERE DID THEY SIT?  THEY

23   SAT IN ISRAEL, RIGHT?

24      AND THERE'S AN INSTRUCTION HERE THAT WOULD GIVE THE JURY

25   THE IMPRESSION THAT CONDUCT CAN'T BE CONSIDERED FOR PURPOSES OF

```
 1    PUNITIVE DAMAGES.

 2         NOW, THE SUPREME COURT HAS SAID THE EXACT OPPOSITE.  IN

 3    THE STATE FARM CASE, THAT'S 538 U.S. 408, AND IT'S AT PAGE 422,

 4    THE SUPREME COURT HELD THAT, QUOTE, "OUT OF STATE CONDUCT MAY

 5    BE PROBATIVE WHEN IT DEMONSTRATES THE DELIBERATENESS AND

 6    CULPABILITY OF THE DEFENDANT'S ACTION IN THE STATE WHERE IT IS

 7    TORTIOUS, BUT THAT CONDUCT MUST HAVE A NEXUS TO THE SPECIFIC

 8    HARM SUFFERED BY PLAINTIFF."

 9         AND SO HERE WE HAVE A FACT PATTERN THAT IS SQUARELY WITHIN

10    THE STATE FARM LANGUAGE.  CONDUCT THAT'S ALREADY BEEN FOUND TO

11    GIVE RISE TO LIABILITY IN CALIFORNIA, THE UNLAWFUL ACCESSING OF

12    SERVERS, AND OUT OF STATE CONDUCT, THE DEVELOPMENT OF THAT

13    CAPABILITY, THAT IS CRITICALLY IMPORTANT TO AN ASSESSMENT OF

14    THE DELIBERATENESS AND CULPABILITY OF THOSE ACTIONS, AND, WE

15    WILL ARGUE, HAS A NEXUS TO THE IN STATE TORTIOUS CONDUCT.

16         SO WE WOULD EITHER DROP THE EXTRATERRITORIALITY

17    INSTRUCTION, OR SIMPLY ADD TO THE INSTRUCTION THE LANGUAGE FROM

18    STATE FARM, VERBATIM FROM A CONTROLLING SUPREME COURT CASE,

19    THAT "OUT OF STATE CONDUCT MAY BE PROBATIVE WHEN IT

20    DEMONSTRATES THE DELIBERATENESS AND CULPABILITY OF THE

21    DEFENDANT'S ACTION IN THE STATE, BUT THAT CONDUCT MUST HAVE A

22    NEXUS TO THE SPECIFIC HARM SUFFERED BY PLAINTIFF."

23         MR. NOLLER:  YOUR HONOR, WHAT STATE FARM GOES ON TO

24    SAY IS THAT "DESPITE THAT, STATES CANNOT IMPOSE PUNITIVE

25    DAMAGES TO PUNISH A DEFENDANT FOR UNLAWFUL ACTS COMMITTED
```

```
1     OUTSIDE OF ITS JURISDICTION."

2          THAT IS THE LANGUAGE THAT WE'VE INCORPORATED HERE.  THAT'S

3     WHY IT'S IN THE CONTEXT OF PUNISHING DEFENDANTS FOR CONDUCT

4     OUTSIDE OF CALIFORNIA.

5          AND YOUR HONOR ALREADY DECIDED THIS.

6          THE COURT:  THERE ARE -- WELL, NO, I HAVEN'T BEEN

7     ASKED TO DECIDE THIS SPECIFIC ISSUE.

8          BUT THERE IS CONDUCT IN THE UNITED STATES, THE ACCESSING

9     OF THE SERVERS IN THE UNITED STATES.

10          MR. PEREZ:  EXACTLY, YOUR HONOR.  NOT ONLY IN THE

11     UNITED STATES, BUT IN CALIFORNIA, AND THAT'S THE CONDUCT THAT

12     GIVES RISE TO LIABILITY.

13          AND THE PUNITIVE DAMAGES INSTRUCTION, AS WE WERE ALREADY

14     REVIEWING, ALREADY MAKES THE POINT THAT MR. NOLLER JUST MADE,

15     WHICH IS THAT THEY CAN ONLY BE HELD -- ASSESS PUNITIVES BASED

16     ON THE CONDUCT THAT GAVE RISE TO CDAFA LIABILITY.

17          THE COURT:  AND CDAFA LIABILITY REQUIRES --

18          MR. PEREZ:  RIGHT.  BUT WHAT THE SUPREME COURT --

19          THE COURT:  -- REQUIRES CALIFORNIA CONDUCT.

20          MR. PEREZ:  EXACTLY, YOUR HONOR.

21          BUT WHAT THE JURY NEEDS TO UNDERSTAND IS IN ASSESSING THE

22     NATURE OF THAT CONDUCT THAT WAS TORTIOUS IN CALIFORNIA, THEY

23     MAY CONSIDER OUT OF STATE CONDUCT THAT BEARS ON THE CULPABILITY

24     AND DELIBERATENESS OF THAT CONDUCT.

25          THAT IS WHAT STATE FARM SAYS.
```

```
1        SO WE'RE NOT VIOLATING THE RULE THAT MR. NOLLER JUST

2   QUOTED FROM STATE FARM THAT THEY CAN ONLY BE PUNISHED FOR ACTS

3   WITHIN THE STATE.

4        THEY WOULD BE BEING PUNISHED FOR ACTS WITHIN THE STATE,

5   BUT THE JURY IS AT LIBERTY TO CONSIDER OUT OF STATE CONDUCT IN

6   ASSESSING THE NATURE OF THAT VIOLATION.

7             THE COURT:  UM-HUM.

8             MR. NOLLER:  YOUR HONOR, AGAIN, I JUST THINK THIS IS

9   JURY ARGUMENT.

10       AND THE NINTH CIRCUIT HELD IN WHITE VERSUS FORD MOTOR

11  COMPANY -- WHICH WE ALREADY SUBMITTED TO YOUR HONOR, YOU

12  ALREADY REVIEWED IT, YOU SAID YOU FOUND IT MORE PERSUASIVE THAN

13  PLAINTIFFS' AUTHORITIES -- IT'S REVERSIBLE ERROR NOT TO

14  INSTRUCT THE JURY ON THE EXTRATERRITORIALITY POINT.

15            MR. PEREZ:  YOUR HONOR --

16            MR. NOLLER:  SO PLAINTIFFS -- EXCUSE ME.

17       IF PLAINTIFFS WANT TO PROPOSE ALTERNATIVE LANGUAGE IN

18  THEIR FILINGS, WE'LL CONSIDER IT.

19       BUT IT WOULD NOT BE APPROPRIATE, AND IT WOULD BE

20  REVERSIBLE, FOR THIS COURT TO DO THEIR PRIMARY REQUEST TO DROP

21  THAT LANGUAGE.  THAT'S LANGUAGE THAT THE NINTH CIRCUIT HAS HELD

22  HAS TO BE INCLUDED IN A PUNITIVE DAMAGES INSTRUCTION.

23            MR. PEREZ:  YOUR HONOR, THE NINTH CIRCUIT'S WHITE

24  DECISION PREDATES STATE FARM, SO STATE FARM IS THE CONTROLLING

25  AUTHORITY AND SAYS SQUARELY THAT OUT OF STATE CONDUCT THAT
```

1       BEARS ON CULPABILITY AND DELIBERATENESS IS PROBATIVE, SO LONG

2       AS IT HAS A NEXUS TO THE CONDUCT.

3              NOW, WE CAN MAKE ARGUMENT IN THAT CONTEXT, BUT THE JURY

4       NEEDS TO HAVE THE CONTEXT.

5                     THE COURT:  AND YOUR PROPOSAL WOULD BE SIMPLY TO

6       STRIKE THE "OR FOR ACTS COMMITTED OUTSIDE OF CALIFORNIA"?

7                     MR. PEREZ:  WE CAN STRIKE THAT OR WE CAN LEAVE THAT

8       LANGUAGE IF THE COURT PREFERS.  IF MR. NOLLER CONSIDERS IT

9       REVERSIBLE ERROR NOT TO HAVE THAT LANGUAGE, KEEP THAT LANGUAGE

10      AND ADD THE LANGUAGE FROM STATE FARM THAT OUT OF STATE CONDUCT

11      MAY BE PROBATIVE -- I'M NOT GOING TO SAY IT YET AGAIN, BUT THAT

12      LANGUAGE, THAT OUT OF STATE CONDUCT IS RELEVANT.

13                    THE COURT:  OKAY.  BOTH OF YOU SUBMIT YOUR COMPETING

14      INSTRUCTIONS TOMORROW, AND I WILL LET YOU KNOW.

15                    MR. PEREZ:  THANK YOU, YOUR HONOR.

16            MAY I RAISE ONE LAST POINT?

17                    THE COURT:  I'M RUNNING OUT OF JUICE.

18                    MR. PEREZ:  AS AM I, YOUR HONOR.  THAT WILL BE VERY,

19      VERY BRIEF, AND WE'LL SUBMIT THIS IN WRITING, BUT JUST TO FLAG.

20            THERE'S A HANDFUL OF SMALL ISSUES THAT WE THINK SHOULD

21      HAVE VERY SHORT, SIMPLE INSTRUCTIONS, LIKE REDACTIONS, THAT THE

22      COURT (SIC) SHOULDN'T MAKE ANY INFERENCE AS TO THE CONTENT OF

23      WHAT'S BEEN REDACTED.

24            I THINK THAT'S SOMETHING THAT -- THEY'VE SEEN A BUNCH OF

25      REDACTED DOCUMENTS.  WE DON'T WANT THEM GUESSING ABOUT THE

1    CONTENT.

2         SECOND, NO INFERENCES ABOUT THE IDENTITIES OF CUSTOMERS OR

3    TARGETS.  THAT'S ALSO THAT THERE'S BEEN A LOT OF SORT OF VEILED

4    TESTIMONY ABOUT AND INNUENDO, AND WE BELIEVE THEY SHOULD BE

5    INSTRUCTED, "THAT'S SOMETHING I'VE RULED IS IRRELEVANT, YOU

6    SHOULDN'T MAKE ANY INFERENCES OR ASSUMPTION ABOUT WHO THE

7    CUSTOMERS ARE, WHO THE TARGETS ARE."

8         AND THEN THERE ARE A FEW THINGS THAT WE THINK ARE CURATIVE

9    OF ISSUES THAT HAVE EITHER COME UP AT TRIAL OR THAT TRACK THE

10   MOTIONS IN LIMINE, THAT THEY SHOULD DISREGARD ANY ARGUMENT

11   ABOUT THE SUFFICIENCY OF PLAINTIFFS' SECURITY MEASURES, THE

12   ALLEGED LAWFULNESS OF THE USE OF PEGASUS IN OTHER

13   CIRCUMSTANCES, OR ARGUMENTS ABOUT THE THEFT OF INTELLECTUAL

14   PROPERTY.

15            THE COURT:  HMM.

16            MR. PEREZ:  AND WE CAN SUBMIT THIS IN WRITING.  I

17   DON'T MEAN TO ARGUE THAT NOW.

18            THE COURT:  I DON'T WANT TO SPEND MY WHOLE WEEKEND

19   READING YOUR STUFF, SO I WANT THOSE THREE IMPORTANT

20   INSTRUCTIONS, AND I'LL -- I DON'T WANT TO ENTERTAIN A LOT MORE

21   OVER THE WEEKEND.

22        THE FIRST TWO, I AGREE WITH YOU THAT AN INSTRUCTION WITH

23   REGARD TO THE REDACTIONS AND WITH REGARD TO CUSTOMERS AND

24   TARGETS I THINK IS PROBABLY GOOD.  YOU CAN SUBMIT THAT.

25            WITH REGARD TO THE OTHER THREE, ANY RESPONSE?

```
 1            MR. NOLLER:  YES, YOUR HONOR.

 2         AND IF I COULD MAKE JUST SORT OF A RECORD ON THE OTHERS AS

 3    WELL.

 4         WE'RE FINE WITH THE REDACTION INSTRUCTION.

 5         WE'RE FINE WITH AN INSTRUCTION ON THE IDENTITIES OF THE

 6    WHATSAPP USERS.

 7         AND FOR THOSE TWO, WE'RE FINE WITH THE WAY THE PLAINTIFFS

 8    HAVE WRITTEN THE INSTRUCTION, SO WE CAN AGREE TO THOSE.

 9         IN PRINCIPLE, I THINK AN INSTRUCTION ON CUSTOMERS,

10    DEPENDING ON HOW IT WAS PHRASED, COULD BE AGREEABLE.

11         THE PROBLEM WITH PLAINTIFFS' PROPOSED INSTRUCTION IS THAT

12    THE WAY THAT IT'S WRITTEN WOULD --

13            THE COURT:  IS THERE A PROPOSED INSTRUCTION?

14            MR. PEREZ:  WE GAVE IT TO THEM FOR MEET AND CONFER

15     PURPOSES, BUT WE HAVE NOT SUBMITTED IT TO THE COURT,

16     YOUR HONOR.

17            THE COURT:  AH.

18            MR. NOLLER:  I'M HAPPY TO READ IT.  IT'S SHORT.

19            THE COURT:  OKAY.

20            MR. NOLLER:  "DURING TRIAL, YOU HAVE HEARD REFERENCES

21     MADE TO DEFENDANTS' CUSTOMERS.  I HAVE RULED THAT THE

22     IDENTITIES OF DEFENDANTS' CUSTOMERS ARE NOT RELEVANT TO THE

23     ISSUES IN THIS TRIAL.  YOU SHOULD NOT MAKE ANY INFERENCES OR

24     ASSUMPTIONS AS TO THE IDENTITIES OR AFFILIATIONS OF DEFENDANTS'

25     CUSTOMERS."
```

```
1            AND OUR PROBLEM WITH THAT -- AND IT MAY BE JUST A

2     WORDSMITHING ISSUE, I'M NOT SURE -- I THINK TO THE EXTENT THAT

3     THE INSTRUCTION IS THAT YOU SHOULDN'T CONSIDER, LIKE, WHICH

4     SPECIFIC GOVERNMENTS WERE NSO'S CUSTOMERS, THAT'S FINE.  YOUR

5     COURT -- YOUR HONOR RULED THAT OUT AND WE HAVEN'T RAISED IT.

6            WHAT I THINK IS NOT OKAY, AND WOULD BE DIRECTLY CONTRARY

7     TO YOUR HONOR'S RULINGS, WOULD BE TO SUGGEST TO THE JURY THAT

8     THEY CAN'T CONSIDER THE FACT THAT NSO'S CUSTOMERS ARE

9     GOVERNMENTS AND GOVERNMENT AGENCIES.

10           YOUR HONOR HELD IN THE MIL ORDER THAT NSO WAS ALLOWED TO

11    MAKE THAT ARGUMENT TO THE JURY.  YOU HELD YESTERDAY THAT IT WAS

12    FINE FOR NSO TO SAY THAT THEIR CUSTOMERS WERE EXCLUSIVELY

13    GOVERNMENTS AND GOVERNMENT AGENCIES.

14           AND THE WAY THAT THIS INSTRUCTION IS PHRASED WOULD TAKE

15    THAT OUT OF CONSIDERATION BY THE JURY IN CONTRADICTION TO

16    YOUR HONOR'S RULINGS.

17              THE COURT:  YOU KNOW, I THINK THIS IS -- YOU GUYS ARE

18     REALLY GETTING TOO PICKY ABOUT THIS STUFF.  I MEAN, THE

19     IDENTITIES OF THE CUSTOMERS HAS NOT BEEN ADMITTED, AND IT'S AS

20     SIMPLE AS THAT.

21           I DON'T KNOW WHY WE NEED TO CHARACTERIZE IT ANY OTHER WAY.

22           THE IDENTITIES ARE NOT SOMETHING THE JURY SHOULD CONSIDER,

23    PERIOD.

24              MR. NOLLER:  YOUR HONOR, I THINK MAYBE JUST STRIKING

25     "OR AFFILIATIONS OF DEFENDANTS' CUSTOMERS" WOULD DEAL WITH
```

```
1     THAT.

2              THE COURT:  I DON'T EVEN KNOW -- NO.  JUST THE

3     IDENTITIES AREN'T, AREN'T RELEVANT.  THEY HAVEN'T BEEN

4     ADMITTED, PERIOD.

5              MR. PEREZ:  WE'LL PROPOSE AN INSTRUCTION ON THAT,

6     YOUR HONOR.

7              THE COURT:  THIS IS SIMPLE.

8              MR. NOLLER:  OKAY, YOUR HONOR.  I APOLOGIZE FOR

9     DRAGGING THIS ON.

10         I'LL ADDRESS THE OTHER, THE OTHER ISSUES.

11         SO THE INSTRUCTION THAT THEY'RE PROPOSING, THE FOURTH

12    INSTRUCTION, IS BASICALLY JUST A SHORTENED VERSION OF THE

13    INSTRUCTION THEY ALREADY PROPOSED DIRECTED TO THE OPENING

14    STATEMENT.

15         I UNDERSTOOD YOUR HONOR YESTERDAY TO SAY THAT YOU WEREN'T

16    GOING TO PROVIDE AN INSTRUCTION ON THE OPENING STATEMENT.  I

17    DON'T THINK ANYTHING HAS CHANGED THAT WOULD --

18             THE COURT:  WHAT SPECIFICALLY ABOUT THE OPENING

19    STATEMENT?

20             MR. NOLLER:  SURE.  SO THIS INSTRUCTION SAYS, "IN

21    DEFENDANTS' OPENING STATEMENT AND AT OTHER POINTS THROUGHOUT

22    THE TRIAL, YOU HAVE HEARD CERTAIN SUGGESTIONS THAT ARE NOT

23    PROPER AND YOU SHOULD DISREGARD THEM."

24         I MEAN, RIGHT AWAY WE OBJECT TO SORT OF DRAGGING

25    DEFENDANTS THROUGH THE MUD HERE.  IF THERE'S FACTS THAT AREN'T
```

1    SUPPOSED TO BE CONSIDERED, YOU CAN JUST INSTRUCT THE JURY AS TO

2    THAT WITHOUT SINGLING OUT DEFENDANTS.

3         BUT MOVING ON, THE FIRST ONE IS "ANY ARGUMENTS CONCERNING

4    THE SUFFICIENCY OF PLAINTIFFS' SECURITY MEASURES."

5         WE DON'T THINK THAT'S NECESSARY.

6         THE COURT:  THERE HAVEN'T BEEN ANY.

7         MR. NOLLER:  WE HAVEN'T MADE ARGUMENTS ON THAT, AND

8    WE WON'T.

9         THE SECOND POINT IS "ANY ARGUMENT THAT SUGGESTED THAT ANY

10   USE OF PEGASUS IS LAWFUL."

11        THAT WAS ONE STATEMENT IN THE OPENING STATEMENT THAT

12   DIDN'T EVEN SAY THEY WERE LAWFUL.  WE HAVEN'T MADE THAT

13   ARGUMENT.  WE'RE NOT GOING TO MAKE THAT ARGUMENT.  SO, AGAIN,

14   THERE'S JUST NO REASON TO INCLUDE THIS INSTRUCTION.

15        THE THIRD POINT, "ANY ARGUMENTS THAT SUGGESTED THAT DAMAGE

16   TO PLAINTIFFS' SERVERS IS REQUIRED IN ORDER FOR YOU TO FIND

17   THAT COMPENSATORY DAMAGES ARE AVAILABLE TO PLAINTIFFS."

18        YOU'RE DEALING WITH THAT IN THE INSTRUCTIONS ON CFAA.  WE

19   DON'T NEED A SEPARATE INSTRUCTION ON THAT.

20        "ANY ARGUMENTS THAT ASSERT THAT PLAINTIFFS ATTEMPTED TO

21   STEAL THE INTELLECTUAL PROPERTY OF DEFENDANTS."  YOU'VE RULED

22   THAT OUT.  WE HAVEN'T BROUGHT IT UP ONCE SINCE THE OPENING

23   STATEMENT.  WE'RE NOT GOING TO USE THE WORD "STEAL" AGAIN, SO I

24   DON'T THINK THERE NEEDS TO BE AN INSTRUCTION ON THAT, EITHER.

25        AND THEN FINALLY, "ANY ARGUMENT THAT RELATES TO

1    PLAINTIFFS' INTENT IN BRINGING THIS LAWSUIT, WHICH IS NOT

2    RELEVANT TO THE QUESTION OF DAMAGES BEFORE YOU."

3         AND ON THAT, I WOULD SAY THERE JUST, YOU KNOW, THERE

4    WASN'T ANYTHING SAID ON THAT POINT IN THE OPENING STATEMENT

5    THAT VIOLATED ANY COURT ORDER.

6         TO THE EXTENT THAT YOUR HONOR THINKS THERE WAS SOMETHING

7    THERE THAT WE SHOULDN'T SAY AGAIN, WE'LL FOLLOW WHATEVER

8    INSTRUCTIONS YOU GIVE.

9         WHAT'S RELEVANT, AND WHAT WE WERE TRYING TO GET AT IN THE

10   OPENING STATEMENT, IS THE ARGUMENT THAT I THINK WE ARE ENTITLED

11   TO MAKE, WHICH IS THAT AT LEAST SOME OF THE COSTS THAT WERE

12   INCURRED, ALLEGEDLY, IN CONNECTION WITH THIS INVESTIGATION WERE

13   INCURRED NOT BECAUSE PLAINTIFFS WERE ACTUALLY TRYING TO

14   INVESTIGATE OR REPAIR ANY DAMAGE TO THEM, BUT BECAUSE THEY WERE

15   ESSENTIALLY TRYING TO CREATE, YOU KNOW, A RECORD THAT THEY

16   COULD USE IN MAKING THESE PUBLIC STATEMENTS AGAINST NSO.

17        AND THE ARGUMENT WOULD BE THAT THAT -- THAT THOSE SORT OF

18   EXPENSES ARE NOT REASONABLE, WERE NOT NECESSARY IN RESPONSE TO

19   THE CONDUCT THAT THE COURT HAS FOUND, AND SO SHOULDN'T BE

20   COMPENSABLE.

21        BUT, AGAIN, WE'RE HAPPY TO PHRASE THAT HOWEVER YOUR HONOR

22   THINKS IS APPROPRIATE, BUT JUST BECAUSE THERE WAS SOME LANGUAGE

23   IN THE OPENING STATEMENT THAT PLAINTIFFS DON'T LIKE, I DON'T

24   THINK THERE'S ANY REASON TO INSTRUCT THE JURY IN A WAY THAT,

25   YOU KNOW, ACCUSES DEFENDANTS OF MISCONDUCT WHEN THERE WASN'T

```
1    ANY VIOLATION OF ANY COURT ORDER OR ANYTHING ELSE AT THAT POINT

2    IN THE CASE.

3              THE COURT:  OKAY.

4              MR. PEREZ:  YOUR HONOR, I THINK MOST OF THE -- OR

5    MUCH OF WHAT'S IN HERE WE CAN PROBABLY DROP.  ONE OF THEM THE

6    COURT JUST RULED ON.  ANOTHER ONE WE'VE COVERED ELSEWHERE IN

7    THE INSTRUCTIONS.

8         BUT THE ARGUMENT ABOUT THEFT OF INTELLECTUAL PROPERTY,

9    THERE IS SUCH A THING AS PRIMACY BIAS, YOU KNOW, THE FIRST

10   THING YOU HEAR IS THE ONE THAT STICKS IN YOUR HEAD, AND ONE OF

11   THE FIRST THINGS THAT THIS JURY HEARD FROM DEFENDANTS WAS THAT

12   WHATSAPP AND META WERE TRYING TO STEAL NSO'S INTELLECTUAL

13   PROPERTY.

14        THAT'S A CLAIM THAT THE COURT DESCRIBED YESTERDAY AS

15   OUTLANDISH.

16        AND WE BELIEVE THAT THE JURY, GIVEN THAT IT WAS WHEN THEY

17   HAD THEIR NOTEPADS OUT AND WERE FIRST DIGESTING WHAT THIS CASE

18   WAS ALL ABOUT, WE BELIEVE THERE'S A REAL RISK THAT THEY SEIZE

19   ON THIS POINT.

20              THE COURT:  AND WHAT KIND OF INSTRUCTION WOULD YOU

21   WANT ON THAT?

22              MR. PEREZ:  THAT THE COURT SHOULD -- I'M SORRY --

23   THAT THE JURY SHOULD -- THAT THEY HEARD THIS ACCUSATION IN

24   DEFENDANTS' OPENING STATEMENT, AND THAT IT SHOULD BE

25   DISREGARDED BY THEM.
```

```
1            MR. NOLLER:  YES, AGAIN, I THINK THE ISSUE,

2     YOUR HONOR, IS THAT AT THAT POINT IN TIME, THAT DIDN'T VIOLATE

3     ANY ORDER THAT THIS COURT HAD ISSUED BEFORE.

4            WE HAD FLAGGED THIS ISSUE IN PREVIOUS FILINGS IN THE CASE.

5     THEY DIDN'T MOVE TO EXCLUDE IT.

6            ONCE IT CAME UP, THEY OBJECTED, YOUR HONOR HAS EXCLUDED

7     IT, AND WE HAVE ABIDED BY WHAT YOUR HONOR TOLD US.

8            AND I JUST DON'T THINK THERE'S ANY NON-SPECULATIVE, PURELY

9     SPECULATIVE REASON TO THINK THAT THAT IS STUCK IN THE JURY'S

10    MIND OR THAT THEY'RE GOING TO REMEMBER IT AFTER A WEEK WHERE IT

11    NEVER CAME UP AGAIN IN THOSE TERMS, WHERE THE LAST THING THAT

12    THEY'RE GOING TO HEAR IS THE CLOSING ARGUMENTS WHERE WE'RE NOT

13    GOING TO USE THOSE TERMS, AND I JUST DON'T THINK THERE'S

14    ANYTHING OTHER THAN JUST COMPLETE SPECULATION THAT THAT'S GOING

15    TO BE ON THEIR MINDS.

16           SO IN THE CONTEXT WHERE THERE WASN'T A VIOLATION OF THE

17    COURT ORDER, WHERE WE HAVE COMPLIED ENTIRELY WITH THE

18    INSTRUCTIONS THAT YOUR COURT HAS GIVEN ONCE THE ISSUE WAS

19    RAISED, IT'S NOT APPROPRIATE AND WOULD PREJUDICE DEFENDANTS TO

20    TELL THE JURY THAT DEFENDANTS COMMITTED SOME SORT OF MISCONDUCT

21    THAT HAS TO BE DISREGARDED BY THE JURY.

22           THE COURT:  HMM.

23           MR. PEREZ:  YOUR HONOR, WE -- I MEAN --

24           THE COURT:  IT'S TRUE, I DIDN'T ORDER THEM NOT TO SAY

25    IT UNTIL I HEARD THEM SAY IT.
```

1        MR. PEREZ:  EXACTLY, YOUR HONOR, NOR CAN WE MOVE ON

2    EVERY OUTLANDISH IDEA THAT THEY MIGHT HAVE TO RAISE.

3        HOW IN THE WORLD WOULD WE HAVE MOVED EVIDENCE OF ALLEGED

4    THEFT OF INTELLECTUAL PROPERTY SHOULD NOT BE ADMITTED?  THAT

5    ACCUSATION WAS BASELESS.  WE HAD NO REASON TO MOVE ON THAT.  WE

6    WEREN'T AWARE OF THAT ALLEGATION UNTIL THEY RAISED IT, EITHER.

7        AND, YET, IT'S THE FIRST THING THEY TOLD THE JURY.

8        SO NOW WE'RE IN A SITUATION WHERE THEY -- CALL IT

9    SPECULATION, BUT I'M PRETTY CONFIDENT A BUNCH OF THESE JURORS

10   HAVE WRITTEN DOWN THIS IDEA THAT WE WERE TRYING TO STEAL THEIR

11   INTELLECTUAL PROPERTY.

12       IT WASN'T PROPER, THERE WAS NO EVIDENTIARY BASIS FOR IT,

13   AND THE JURY SHOULD BE TOLD TO DISREGARD IT.

14       THE COURT:  HMM.

15       MR. NOLLER:  IT WAS A 30(B)(6) TOPIC.  WE RAISED IT

16   IN ALMOST EXACTLY THOSE TERMS IN OUR OPPOSITION TO SUMMARY

17   JUDGMENT.  THIS WAS NOT A SURPRISE THAT THIS WAS GOING TO BE

18   PART OF THE CASE.  THEY COULD HAVE MOVED TO EXCLUDE IT.  THEY

19   DIDN'T.

20       ONCE IT CAME UP, YOUR HONOR RULED, WE'VE COMPLIED WITH

21   YOUR HONOR'S RULINGS.

22       AND I THINK IT IS JUST AS LIKELY THAT GIVING THIS

23   INSTRUCTION WILL JUST RAISE IT BACK IN THE JURY'S MIND AND THE

24   JURY'S ATTENTION, SOMETHING THAT WAS MENTIONED ONCE, HASN'T

25   BEEN MENTIONED AGAIN, AND ISN'T GOING TO BE MENTIONED AGAIN.

```
1              THE COURT:  YEAH.  IT -- I THINK IT PROBABLY DID HAVE

2       SOME IMPACT.  I FOUND IT SOMEWHAT SHOCKING, FRANKLY.

3              UNLIKE THE OTHER THINGS THAT YOU ALL HAVE ARGUED ABOUT

4       TODAY, INCLUDING THE BUSINESS ABOUT THE MOTIVE BEHIND FACEBOOK

5       BRINGING THE ACTION, I THINK IT'S FAIR GAME FOR THEM TO REFER

6       TO THAT AS A PR STUNT.  I THINK THEY'RE ENTITLED TO DEFEND

7       THEMSELVES AGAINST THIS ACTION AND ATTRIBUTE A MOTIVE, JUST AS

8       YOU'RE ATTRIBUTING VARIOUS MOTIVES TO THEM.

9              I THINK EVERYTHING ELSE, EXCEPT THE USE -- ANY SUGGESTION

10      THAT THE USE OF PEGASUS IS LAWFUL, THAT ONE I FIND A LITTLE BIT

11      TRICKY BECAUSE I DON'T REALLY KNOW.  IT'S PROBABLY LAWFUL

12      SOMEWHERE.  IT'S NOT LAWFUL IN THE WAY IN WHICH IT WAS USED

13      HERE IN THIS CASE, AT LEAST THAT'S MY VIEW.

14             BUT I DON'T KNOW THAT I WANT TO WADE INTO THAT.

15             DO YOU HAVE ANY PLANS WITH REGARD TO YOUR CLOSING TO

16      SUGGEST THAT -- I MEAN, THAT SEEMS TO INFRINGE UPON THE

17      DETERMINATION.  IT'S NOT -- DOES IT REALLY MATTER IF IT'S

18      LAWFUL SOMEWHERE ELSE?  I MEAN, WHAT'S AT ISSUE IS WHAT'S

19      HAPPENED IN THIS CASE.

20             MR. NOLLER:  YEAH, I TAKE THE POINT, YOUR HONOR, AND

21      WE DON'T INTEND TO ARGUE THAT.

22             THE POINT OF WHAT WAS RAISED IN THE OPENING STATEMENT WAS

23      REALLY JUST TO TRY TO RESPOND TO THIS IDEA, WHICH I THINK THE

24      PLAINTIFFS HAVE PRESSED AT VARIOUS POINTS THROUGHOUT THE TRIAL,

25      THAT WHAT'S AT ISSUE IS PEGASUS AS A WHOLE.
```

1        YOU KNOW, THEY'VE SAID THAT WHAT WAS A DANGER WAS EVERY

2   WHATSAPP USER AND SOME OF THESE OTHER THINGS, AND WE WERE JUST

3   TRYING TO GET ACROSS THE IDEA THAT THIS IS ABOUT A SMALL SUBSET

4   OF THAT.  THE REST OF IT IS NOT PART OF THE CASE AND HASN'T

5   BEEN ADDRESSED.

6        BUT FOR PURPOSES OF THE CONDUCT AT ISSUE IN THIS CASE,

7   YOUR HONOR HAS FOUND LIABILITY, YOU ARE GOING TO INSTRUCT THE

8   JURY THAT YOU FOUND LIABILITY THAT THIS CONDUCT WAS UNLAWFUL.

9   YOU'VE ALREADY INSTRUCTED THEM AS TO THAT.

10       WE'RE NOT GOING TO TRY TO SUGGEST OTHERWISE IN OUR CLOSING

11   ARGUMENT.  WE HAVEN'T DONE SO AT ANY POINT IN THE TRIAL AFTER

12   THE CLOSING, SO I JUST DON'T THINK THERE'S ANY REASON, AGAIN,

13   TO SINGLE DEFENDANTS OUT AS SOMEHOW HAVING DONE SOMETHING

14   INAPPROPRIATE --

15             THE COURT:  RIGHT.

16             MR. NOLLER:  -- WHEN IT WASN'T PROHIBITED AT THE

17    TIME --

18             THE COURT:  AT THE TIME.

19             MR. NOLLER:  -- AND WE HAVEN'T RAISED IT AGAIN.

20             THE COURT:  YEAH.  I THINK IT WOULD BRING A LOT OF --

21   MORE ATTENTION TO IT THAN IS PROBABLY NECESSARY AT THIS TIME.

22             MR. PEREZ:  WELL, ON THE LAWFULNESS IN OTHER USES, I

23   THINK IF WE HEAR DEFENDANTS COMMITTING THAT THEY'RE NOT GOING

24   TO BE MAKING THAT POINT IN AN EFFORT TO SORT OF SANITIZE THEIR

25   INTENT THAT, WELL, IN OTHER PLACES THIS IS LAWFUL, IF WE'RE NOT

1    HEARING THAT POINT IN CLOSING, THEN I DON'T THINK WE NEED AN

2    INSTRUCTION ON IT.

3        THE ONLY ONE FROM THIS LIST THAT WE DO THINK REQUIRES AN

4    INSTRUCTION IS THE THEFT.

5            THE COURT:  IS THE THEFT?

6            MR. PEREZ:  YES, YOUR HONOR.

7            THE COURT:  HMM.  WELL, I CAN SEE YOUR POINT BECAUSE,

8    YOU KNOW, THERE'S THAT STATEMENT.

9        BUT WHAT DO YOU PROPOSE WOULD BE THE INSTRUCTION?  I MEAN,

10   HAD I ALLOWED MR. ANDRES TO CONTINUE WITH HIS OBJECTIONS -- I

11   KIND OF WAVED HIM DOWN -- I WOULD HAVE JUST TOLD THE JURY TO

12   DISREGARD THE STATEMENT.  I WOULDN'T HAVE ADMONISHED OR DONE

13   ANYTHING LIKE THAT IN FRONT OF THE JURY.  I WOULD HAVE JUST

14   SAID TO DISREGARD THE STATEMENT WITH REGARD TO THEFT.

15       WHAT ARE YOU PROPOSING I TELL THEM IN THE CONTEXT OF A

16   JURY INSTRUCTION?

17           MR. PEREZ:  WELL, WHAT WE HAD DRAFTED -- AND I'M

18   MINDFUL THAT THIS MAY BE DIFFERENT THAN WHAT THE COURT WOULD

19   PREFER TO SEE -- WAS "IN DEFENDANTS' OPENING STATEMENT," AND IT

20   ALSO SAID "AND AT OTHER POINTS THROUGHOUT TRIAL," WHICH WOULD

21   NOT APPLY TO THIS PARTICULAR POINT -- ACTUALLY, IT PROBABLY

22   WOULD BECAUSE OF SOME OF THE EXAMINATION THEY DID OF

23   MR. ROBINSON -- "YOU HAVE HEARD CERTAIN SUGGESTIONS" -- THIS

24   WOULD NEED TO BE REWRITTEN BECAUSE IT WAS A LIST OF POINTS AND

25   NOW IT WOULD BE ONE POINT.

1          BUT IT WOULD EFFECTIVELY SAY THAT ANY ARGUMENTS THAT

2     ASSERT THAT PLAINTIFFS ATTEMPTED TO STEAL THE INTELLECTUAL

3     PROPERTY OF DEFENDANTS SHOULD BE DISREGARDED.

4          THE COURT:  HMM.

5          MR. PEREZ:  BUT I DO NEED TO WORDSMITH IT BECAUSE THE

6     LANGUAGE CHANGES WHEN IT'S NO LONGER A LIST.  SO WE'LL BE HAPPY

7     TO -- I KNOW IT'S THE END OF A LONG DAY.

8          THE COURT:  YEAH, AND I'M NOT THINKING CLEARLY RIGHT

9     NOW.

10          MR. PEREZ:  IT WILL BE A SENTENCE OR TWO, AND WE CAN

11     SUBMIT THAT WITH OUR SUBMISSION THIS WEEKEND FOR THE COURT'S

12     CONSIDERATION.

13          THE COURT:  OKAY.  I'LL CONSIDER IT.

14          BUT I DON'T KNOW.  I KIND OF THINK IT MIGHT BE OPENING UP

15     SOMETHING THAT THEY'VE PROBABLY HAVE FORGOTTEN SINCE I HAVEN'T

16     ALLOWED THEM, THROUGHOUT THE ENTIRE TRIAL, TO GO BACK TO THAT

17     ISSUE.

18          I DON'T REMEMBER THERE BEING ANYTHING SAID ABOUT IT IN

19     FRONT OF THE JURY AFTER THE OPENING STATEMENT.

20          MR. NOLLER:  NO, YOUR HONOR.

21          AND I UNDERSTAND THAT WE'RE ALL GETTING TIRED, BUT I DO

22     WANT TO RESPOND TO THE REFERENCE TO THE EXAMINATION OF

23     MR. ROBINSON.

24          NOBODY USED THE WORD "STEAL" IN THAT EXAMINATION.  THE

25     PROBLEM IS THE WORD "STEAL."  WE HAVEN'T USED IT AGAIN.  WE'RE

```
1    ENTITLED TO PROBE MR. ROBINSON AND MR. GHEORGHE ABOUT THE

2    ACTIONS THAT THEY TOOK TO TRY TO ACQUIRE THE PEGASUS AGENT.

3         WE'RE ALLOWED, AS YOUR HONOR RULED IN THE MIL'S, WE'RE

4    ALLOWED TO ARGUE THAT THOSE ACTIONS WEREN'T REASONABLE, THAT

5    THEY WEREN'T DIRECTED TOWARD ACTUALLY REMEDYING THE INTRUSION

6    AS PLAINTIFFS CALL IT, THAT THEY WERE DIRECTED TOWARDS

7    SOMETHING ELSE.

8         AND, YOU KNOW, I THINK AS LONG AS WE DON'T CALL IT

9    STEALING, WHICH WE'RE NOT GOING TO DO, WE'RE PERFECTLY WITHIN

10   WHAT YOUR HONOR HAS RULED AND IT JUST HASN'T COME UP IN THOSE

11   TERMS.

12         MR. PEREZ:  YOUR HONOR, IT'S BEEN A LONG DAY AND A

13   LONG WEEK, BUT THE EXAMINATION OF MR. ROBINSON FOCUSSED ON THIS

14   POINT PRETTY EXTENSIVELY.  IT WAS, YOU KNOW, FETCHING THE

15   PAYLOAD, EFFORTS TO GET THE PAYLOAD, DIFFERENT EFFORTS TO TRY

16   TO OBTAIN THE AGENT.

17         THEY REALLY WENT AFTER THAT POINT.

18         THE COURT:  YEAH, BUT HE WAS TRYING TO GET HIS HANDS

19   ON IT, WHICH SEEMS REASONABLE TO ME.

20         MR. PEREZ:  EXACTLY, YOUR HONOR.

21      THE CONFUSION --

22         THE COURT:  IT'S ONLY THE CHARACTERIZATION OF

23   STEALING --

24         MR. PEREZ:  EXACTLY, YOUR HONOR.

25         THE COURT:  -- THAT IS OBJECTIONABLE IN MY VIEW.
```

```
 1              MR. PEREZ:  EXACTLY, YOUR HONOR, AND THAT'S WHAT

 2     WE'RE ASKING THE COURT TO INSTRUCT THE JURY TO DISREGARD IS THE

 3     SUGGESTION THAT THERE WAS ANY EFFORT BY PLAINTIFFS TO STEAL

 4     THE --

 5              THE COURT:  WRITE SOMETHING.

 6              MR. PEREZ:  YES.

 7              THE COURT:  WRITE SOMETHING.

 8              MR. PEREZ:  TO STEAL THE INTELLECTUAL PROPERTY.

 9              THE COURT:  WRITE SOMETHING AND I'LL TAKE A LOOK AT

10     IT.

11          I'M NOT AS CONCERNED ABOUT THAT NOW, HAVING HEARD ALL THE

12     OTHER EVIDENCE THAT HAS COME IN SUBSEQUENT TO THAT.  BUT I'LL

13     CONSIDER IT.

14          SO I'M EXPECTING ABOUT SIX DIFFERENT INSTRUCTIONS FILED

15     OVER THE WEEKEND, PREFERABLY ON SATURDAY AND I CAN LOOK AT IT

16     ON SUNDAY.

17              MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.  THANK YOU

18     VERY MUCH.

19              MR. ANDRES:  YOUR HONOR, JUST BRIEFLY.

20          MY UNDERSTANDING IS THAT ON MONDAY, WE'RE GOING TO CALL

21     DANA TREXLER, OUR EXPERT.  THEY'RE GOING TO RECALL THEIR EXPERT

22     TO REBUT THAT, AND THEN WE'RE DONE.

23          THEY HAVE WITNESSES THAT ARE UNDER SUBPOENA THAT I CAN'T

24     GET RELEASED FROM MR. AKROTIRIANAKIS.  WE'VE HAD INCONSISTENT

25     INSTRUCTIONS ABOUT WHO HAS TO BE HERE OR NOT.  WE HAD A WITNESS
```

1    GO TO THE AIRPORT LAST NIGHT THAT GOT CALLED BACK, AND THEN

2    SUBSEQUENTLY HEARD THAT HE WAS ALLOWED TO LEAVE.

3        THESE PEOPLE HAVE BEEN SITTING AROUND FOR A WEEK, AND IT

4    DOESN'T SEEM LIKE, A, THEY'RE RELEVANT, AND, B, THAT ANYBODY

5    WOULD HAVE ANY TIME TO CALL THEM.

6        SO I WOULD LIKE ANYBODY ELSE UNDER SUBPOENA RELEASED, AND

7    MR. AKROTIRIANAKIS WON'T DO THAT.

8            THE COURT:  COME ON.

9            MR. ANDRES:  I DON'T KNOW WHY.

10            THE COURT:  COME ON.  THERE HAS TO HAVE BEEN A

11    DECISION AT SOME POINT.

12            MR. AKROTIRIANAKIS:  I'M SORRY.

13            THE COURT:  WE NEED -- THIS IS GOING TO CONCLUDE ON

14    MONDAY MORNING.

15            MR. AKROTIRIANAKIS:  YES, YOUR HONOR, AND I -- I TOLD

16    MR. ANDRES -- FIRST OF ALL, THE WITNESS WHO WAS GOING ON AN

17    AIRPLANE, I TOLD MR. ANDRES, LET HIM GO IF YOU'RE HAPPY FOR ME

18    TO READ FROM THE DEPOSITION.  HE WOULDN'T DO IT.  SO I DIDN'T

19    KEEP HIM HERE.  HE DID.

20        SO THAT ASIDE, YOUR HONOR, I ASKED IF HE WOULD BE WILLING

21    TO GIVE US A DISCLOSURE OF WHAT MS. TREXLER IS GOING TO TESTIFY

22    ABOUT, AND THEN I AM PERFECTLY -- AND I DON'T WANT ANYBODY TO

23    STAY IN OAKLAND OR SAN FRANCISCO ANY LONGER THAN THEY NEED TO,

24    YOUR HONOR.

25        I JUST ASKED FOR A DISCLOSURE SO I COULD KNOW SO I COULD

1    BE CONFIDENT THAT I WOULDN'T NEED ANYBODY ELSE AND RELEASE

2    THEM.

3            MR. ANDRES:  WHICH I HAVE DONE ON THE RECORD AND TO

4    MR. AKROTIRIANAKIS 12 TIMES.

5            MR. AKROTIRIANAKIS:  HE SAYS THAT SHE --

6            MR. ANDRES:  AND THE --

7        (SIMULTANEOUS SPEAKING.)

8            THE COURT:  OKAY.  OKAY.  OKAY.  PLEASE.  PLEASE.

9        OKAY.  BESIDES TREXLER, AND THEN IF PINSONNEAULT IS CALLED

10    IN AFTERWARDS, WHO ELSE IS NEEDED?  WE'RE GOING TO DO THE

11    GLICK --

12            MR. AKROTIRIANAKIS:  IT WOULD ONLY --

13            THE COURT:  -- EXCERPT.  WHAT ELSE IS THERE?

14            MR. AKROTIRIANAKIS:  IT WOULD ONLY BE RELATIVE TO

15    WHATEVER SHE SAYS, WHICH HAS NOT BEEN DISCLOSED, OTHER THAN

16    SAYING SHE'S GOING TO CALL MR. SHOHAT A LIAR.  AND SHE --

17    AND --

18            THE COURT:  AND YOUR EXPERT HASN'T BEEN DISCLOSED,

19    EITHER, RIGHT?  SO WE HAVE TWO EXPERTS WHO ARE GOING TO SAY

20    SOMETHING ABOUT THE FINANCIAL RECORDS THAT WERE ONLY DISCLOSED

21    A FEW DAYS AGO.  SO NEITHER ONE OF THEM HAVE HAD A CHANCE TO

22    SEE THEM UNTIL NOW.

23            MR. AKROTIRIANAKIS:  NO.  THEY WERE DISCLOSED A MONTH

24    AGO, YOUR HONOR.  THIS IS WHY RULE 26 HAS THE SUPPLEMENTAL

25    DISCLOSURES OBLIGATION.

1        IF WE HAD A DISCLOSURE AND I KNEW WHAT SHE WAS GOING TO

2    SAY, THEN I THINK I WOULD PROBABLY BE COMFORTABLE THAT

3    MR. PINSONNEAULT -- WHO IS JUST IN REBUTTAL TO THAT, HE'S NOT

4    GOING TO SAY ANYTHING NEW, HE'S ONLY GOING TO RESPOND TO WHAT

5    SHE SAYS.

6        BUT I DON'T KNOW WHAT THAT IS OTHER THAN COUNSEL'S

7    STATEMENT TO ME HERE AFTER SESSION THAT SHE'S GOING TO CALL

8    MR. SHOHAT A LIAR.

9        SO I DON'T KNOW WHAT ELSE IT IS.  I DOUBT HE'S REALLY

10   GOING TO HAVE TO HER DO THAT.  IT WOULD BE TOTALLY

11   INAPPROPRIATE.  SHE'S NOT AN EXPERT IN THE VERACITY OF

12   TESTIMONY.

13       SO I DON'T KNOW WHAT IT'S GOING TO BE AND I DON'T KNOW

14   WHAT IS NECESSARY TO RESPOND TO IT.

15           THE COURT:  BUT WOULD ONE OF THE WITNESSES WHO ARE ON

16   STANDBY BE THE PERSON YOU'D CALL?  I THOUGHT YOU WERE GOING TO

17   CALL PINSONNEAULT TO RESPOND TO IT.

18           MR. AKROTIRIANAKIS:  I MIGHT HAVE TO CALL MR. SHOHAT

19   TO RESPOND TO IT.  I DON'T KNOW BECAUSE I DON'T KNOW WHAT IT

20   IS.

21           THE COURT:  OKAY.  BUT HE'S HERE.  WHY CAN'T YOU

22   RELEASE THE OTHER WITNESSES?

23           MR. AKROTIRIANAKIS:  I DON'T KNOW THAT THERE ARE A

24   LOT OF OTHER WITNESSES, YOUR HONOR.  WE HAVEN'T EVEN GONE

25   THROUGH WHAT IT IS.  I THINK THERE'S, LIKE, ONE PERSON WHO IS

1    OUT OF THE AREA, AND I -- AGAIN, IF I KNEW WHAT SHE WAS GOING

2    TO SAY AND IT WOULDN'T BE -- IT WOULD NOT BE -- I DON'T THINK

3    I'M THE ONE MAKING IT AN ISSUE, YOUR HONOR.

4          MR. ANDRES:  YOUR HONOR, LET'S GO THROUGH THE LIST.

5       CORTNEY PADUA, DOES SHE NEED TO BE HERE ON MONDAY?

6    OTHERWISE SHOULD SHE GO TO WORK?  SHE'S ON THE LIST.

7          MR. AKROTIRIANAKIS:  SHE'S ALREADY BEEN RELEASED.

8          MR. ANDRES:  SHE HASN'T.  SO HE'S NOW RELEASING HER.

9       YUANYUAN WANG, DOES HE NEED TO BE HERE ON MONDAY?

10         MR. AKROTIRIANAKIS:  I DON'T KNOW.

11         THE COURT:  WHAT WOULD HE TESTIFY TO?

12         MR. AKROTIRIANAKIS:  I DON'T KNOW.  I DON'T KNOW WHAT

13   MS. TREXLER IS GOING TO SAY.  YESTERDAY SHE WAS TESTIFYING

14   ABOUT THE NECESSITY FOR THE TYPES OF SERVICES THAT MR. WANG

15   PROVIDES TO META.

16      SO IS IT CONCEIVABLE THAT HE COULD BE NECESSARY TO SAY,

17   LOOK, WE WOULD BE DOING THOSE THINGS WHETHER OR NOT THERE WAS

18   AN NSO?

19      YOU MIGHT RECALL, YOUR HONOR, THAT SHE WAS GIVING BUT-FOR

20   WORLD TESTIMONY ON MR. ANDRES'S EXAMINATION WHERE SHE SAID,

21   YEAH, YOU KNOW, EVEN THOUGH I'M NOT A CYBERSECURITY EXPERT, IN

22   A WORLD WHERE THERE WASN'T AN NSO, YOU WOULDN'T NEED TO HAVE

23   WANG AND GHEORGHE AND ALL THESE PEOPLE, YOU WOULDN'T NEED THOSE

24   TEAMS.

25         THE COURT:  EXCUSE ME.

```
1            MR. ANDRES:  THAT'S ABSURD.

2            THE COURT:  ARE YOU GOING TO CALL HER TO TESTIFY

3    ABOUT MR. WANG?

4            MR. ANDRES:  NO.

5            THE COURT:  OKAY.  WHY CAN'T HE BE RELEASED?

6            MR. AKROTIRIANAKIS:  IF HE'S NOT GOING TO HAVE HER

7    START GIVING OPINIONS LIKE THAT, YOUR HONOR, THEN I WILL NOT

8    NEED MR. WANG.  I GUARANTEE IT.

9        BUT I DON'T KNOW WHAT HER OPINIONS ARE GOING TO BE BECAUSE

10   WE HAVEN'T HAD A DISCLOSURE OF WHAT THEY'RE GOING TO BE, APART

11   FROM SAYING THAT SHE'S GOING TO CALL MR. SHOHAT A LIAR.

12           MR. ANDRES:  NO.  SHE'S GOING TO TESTIFY ABOUT THE

13   FINANCIAL RECORDS.

14           THE COURT:  THE FINANCIAL RECORDS.

15           MR. ANDRES:  I JUST HAVE TWO --

16           THE COURT:  IF I DON'T --

17           MR. ANDRES:  I HAVE TWO --

18           THE COURT:  HOLD ON.  HOLD ON.

19       IF WE RELEASE -- IF I ORDER MR. WANG TO BE RELEASED, THAT

20   MEANS YOU CANNOT ASK QUESTIONS ABOUT HIM.

21           MR. ANDRES:  I'M NOT GOING TO, AND HE KNOWS THAT.

22           THE COURT:  OKAY.

23           MR. AKROTIRIANAKIS:  OR HIS JOB, YOUR HONOR.  THAT'S

24   THE ISSUE, THE SECURITY ENGINEER, ANYTHING THAT GETS INTO,

25   LIKE, SECURITY ENGINEERING OR WHAT HE DOES FOR META.
```

```
 1              THE COURT:  OH, COME ON, YOU GUYS.  I DON'T

 2   UNDERSTAND.

 3              MR. AKROTIRIANAKIS:  I DON'T, EITHER.

 4              THE COURT:  I JUST DON'T UNDERSTAND THIS INABILITY TO

 5   AGREE TO ANYTHING, TO COOPERATE WITH EACH OTHER IN EVEN THE

 6   SLIGHTEST WAY.  I'VE NEVER HAD THIS EXPERIENCE BEFORE IN 34

 7   YEARS, EVER.

 8              MR. AKROTIRIANAKIS:  WE ACTUALLY SHARED FOUR CORDIAL

 9   EMAILS YESTERDAY, YOUR HONOR.

10              THE COURT:  WELL, GOOD FOR YOU.

11         BUT THE IDEA OF KEEPING WITNESSES WHO ARE NOT GOING TO BE

12   NEEDED OVER THE COURSE OF THE WEEKEND IN A FOREIGN LOCATION FOR

13   THEM --

14              MR. AKROTIRIANAKIS:  THEY LIVE HERE.

15              THE COURT:  -- IT'S OUTRAGEOUS.

16              MR. AKROTIRIANAKIS:  THEY LIVE HERE.

17              THE COURT:  EVEN IF THEY LIVE HERE, YOU'RE KEEPING

18   THEM ON CALL.  WHY CAN'T THEY BE RELEASED IF YOU'RE NOT --

19   DON'T YOU WANT THIS TRIAL TO BE OVER WITH MONDAY MORNING?  YOU

20   ONLY HAVE 40 MINUTES LEFT.

21              MR. AKROTIRIANAKIS:  I WAS READY TO REST TODAY,

22   YOUR HONOR.

23              THE COURT:  OR AN HOUR.  YOU HAVE A LITTLE MORE.

24              MR. AKROTIRIANAKIS:  YEAH, HE HAS 35 MINUTES.  I HAVE

25   A LOT OF EXTRA TIME.
```

1          BUT I WAS READY TO REST TODAY, YOUR HONOR.  THIS IS THE

2     ONLY ISSUE.

3          IN FACT, IF HE WASN'T GOING TO CALL MS. TREXLER TO CALL

4     MR. SHOHAT A LIAR, APPARENTLY, I WOULD BE READY TO REST RIGHT

5     NOW, SUBJECT TO THE TWO REDACTION ISSUES THAT THEY SAID THAT

6     THEY WERE GOING TO TAKE CARE OF AND WE NEED TO ADDRESS SO WE

7     CAN KNOW WHAT THE EVIDENCE IS THAT WE CAN ARGUE IN CLOSING.

8          BUT I'M READY REST RIGHT NOW.  IT'S JUST THIS TREXLER

9     ISSUE THAT, THAT THEY'RE RAISING.

10          AND I THINK I SAID, EVEN WHEN THE JURY WAS HERE, THAT

11     SUBJECT TO THAT, WE WERE READY TO REST.

12          THE COURT:  OKAY.

13          MR. ANDRES:  AASHIN GAUTAM, CAN HE BE RELEASED?

14          MR. AKROTIRIANAKIS:  IF SHE'S NOT GOING TO TESTIFY

15     ABOUT ANYTHING RELATED TO WHAT MR. GAUTAM DOES OR THE AREAS

16     THAT HE WORKS AT IN META, IF SHE'S NOT GOING TO SAY ANYTHING

17     LIKE THAT, THEN I DON'T CARE, YOUR HONOR.

18          MR. ANDRES:  JESUS PALAU.

19          MR. AKROTIRIANAKIS:  HE'S ANOTHER ENGINEER.

20          MR. ANDRES:  YEAH.  IT'S A YES OR NO, CAN HE BE

21     RELEASED?

22          THE COURT:  ARE YOU GOING TO --

23          MR. ANDRES:  NO.

24          THE COURT:  OKAY.  SO YOU'RE NOT GOING TO ASK HER ANY

25     QUESTIONS ABOUT WANG, PALAU?

```
 1              MR. ANDRES:  NO.

 2              MR. AKROTIRIANAKIS:  SECURITY, WHATEVER MR. GAUTAM

 3    DOES WHICH RELATES TO NOTIFICATIONS.

 4          SEE, IT'S, AS ALWAYS, YOUR HONOR, DIFFICULT LINE DRAWING.

 5              THE COURT:  WHO -- ARE THEY LOCAL?  WHO'S LOCAL?

 6              MR. ANDRES:  I THINK THEY'RE ALL --

 7              MR. AKROTIRIANAKIS:  MR. PALAU.

 8              MR. ANDRES:  EXCUSE ME.

 9              THE COURT:  THEY'RE ALL --

10              MR. ANDRES:  I'M NOT AN EXPERT ON THE GEOGRAPHY HERE,

11    BUT NOBODY LIVES IN OAKLAND, AND MY UNDERSTANDING IS THAT

12    REGARDLESS OF WHERE YOU LIVE IN THIS AREA, YOU HAVE TO DRIVE A

13    COUPLE HOURS TO GET HERE.

14          SO THEY'RE NOT FIVE HOURS AWAY.  I THINK THEY'RE ALL

15    GENERALLY HERE.

16          BUT THEY HAVEN'T GONE TO -- THEY WANT TO GO TO WORK ON

17    MONDAY.

18          I'M NOT GOING TO, FOR THE 200TH TIME, ASK HER ANYTHING

19    ABOUT OTHER THAN THE FINANCIAL RECORDS.

20          AND THESE PEOPLE, EVERY NIGHT, WE CAN'T GET THEM RELEASED.

21              THE COURT:  YEAH.

22              MR. AKROTIRIANAKIS:  I HAVEN'T EVER REQUESTED THAT

23    ANY OF THEM APPEAR IN COURT.

24              MR. ANDRES:  NOW WE HEAR WE'RE GOING TO RELITIGATE

25    WHETHER OR NOT WE'RE CALLING TREXLER.
```

```
 1              WE DECIDED THAT YESTERDAY, AND THAT'S WHAT WE KEEP HEARING

 2         ABOUT.

 3              CAN WE PLEASE JUST RELEASE THESE WITNESSES?

 4              MR. AKROTIRIANAKIS:  YOUR HONOR --

 5              THE COURT:  WHY CAN'T WE RELEASE THOSE THREE

 6         ENGINEERS?  HE SAID HE'S NOT GOING TO ASK ANY QUESTIONS ABOUT

 7         THEM.

 8              MR. AKROTIRIANAKIS:  YOUR HONOR, I DON'T HAVE ANY

 9         DIFFERENT REASONS THAN THE ONE I'VE SAID ALREADY.

10         I WILL TELL YOU, I HAVE NEVER REQUESTED ANY WITNESS --

11         THEY'VE ALL BEEN ON CALL.  THEY HAVEN'T BEEN, LIKE, WAITING IN

12         A WITNESS ROOM LIKE THE OLD DAYS, YOUR HONOR.  THEY'VE ALL BEEN

13         ON CALL, MOST OF THEM LIVE LOCALLY, INCLUDING

14         MR. BARCONS PALAU, INCLUDING MR. WANG, AND SOME OF THE OTHERS

15         I'M SURE.  MR. GAUTAM DOES NOT.

16         I HAVE NEVER ASKED FOR ANY OF THEM TO BE BROUGHT TO COURT

17         EXCEPT FOR MR. BARCONS PALAU.  I ASKED THAT HE BE HERE

18         YESTERDAY.  I THOUGHT WE WERE GOING TO GET A LOT FURTHER THAN

19         WE ENDED UP.

20         LAST NIGHT I CONSIDERED THE EVIDENCE, I DECIDED THAT I

21         DIDN'T THINK I WAS GOING TO NEED HIM, UNTIL THIS TREXLER ISSUE

22         CAME UP WHICH IS A POTENTIAL PANDORA'S BOX.

23              THAT'S THE ONLY REASON, YOUR HONOR.

24              THE COURT:  HMM.  OKAY.  OKAY.

25              MR. AKROTIRIANAKIS:  THERE'S --
```

```
 1              THE COURT:  SOMEONE LIVING LOCALLY, IF THEY LIVE IN

 2    MENLO PARK, IT'S STILL SEVERAL HOURS AWAY FROM HERE.  SO I CAN

 3    UNDERSTAND WHY, IF THEY'RE ON CALL -- ARE THEY CLOSER THAN TWO

 4    HOURS AWAY?

 5              MR. ANDRES:  I DON'T EVEN KNOW THAT IT NEEDS TO BE ON

 6    CALL.  WHEN IS HE GOING TO CALL THEM?  THERE'S NO TIME LEFT.

 7          AND HERE, EVERY TIME -- IF I EVEN OPEN MY MOUTH, WE'RE

 8    GOING TO GET ANOTHER 30 MINUTES FROM HIM.  HE'S GOING TO SAY

 9    SOMETHING ELSE ABOUT A PANDORA'S BOX OR THINGS THAT DON'T MAKE

10    ANY SENSE.

11          THESE WITNESSES, WE'RE ASKING THAT THEY BE RELEASED.

12    THAT'S IT.  THAT IS OUR MOTION.  WE WOULD LIKE A RULING ON THAT

13    AND WE WOULD LIKE TO GO HOME.

14              THE COURT:  OKAY.  GIVEN THE REPRESENTATION THAT

15    THEY'RE NOT GOING TO ASK THEIR DAMAGES EXPERT ANY QUESTIONS

16    ABOUT THESE THREE ENGINEERS, I'M INCLINED TO RELEASE THEM.

17          DO YOU HAVE A REALLY GOOD REASON WHY I SHOULDN'T, MEANING

18    THAT THEY CAN GO TO WORK.  AND IF YOU FIND THAT YOU NEED THEM

19    AND WE'VE RUN OUT OF -- WE'RE NOT GOING TO SIT AND WAIT FOR

20    THEM TO GET HERE.  WE'RE NOT GOING TO SIT AND WAIT FOR TWO

21    HOURS ON MONDAY, BECAUSE I WANT CLOSING ARGUMENTS AND

22    INSTRUCTIONS AND THE JURY TO START ITS DELIBERATIONS ON MONDAY.

23              MR. AKROTIRIANAKIS:  IF HE'S NOT GOING TO ARGUE ABOUT

24    SECURITY, I DON'T NEED SECURITY ENGINEERS, YOUR HONOR.

25          IF HE'S NOT GOING TO ARGUE ABOUT WHAT MR. GAUTAM DOES FOR
```

```
1        THE COMPANY, THEN I DON'T NEED MR. GAUTAM EITHER.

2              THE COURT:  OKAY.

3              MR. ANDRES:  I'LL JUST RELY ON WHAT I SAID SIX TIMES

4    ON THE RECORD TO ANSWER THAT QUESTION, WHICH HE KNOWS THE

5    ANSWER TO.  HE KNOWS THAT.  I'M NOT GOING TO ANSWER IT AGAIN.

6    I'VE SAID IT SIX TIMES.

7              THE COURT:  OKAY.  HE'S SAID HE'S NOT GOING TO USE

8    THEM.  HIS WITNESS IS NOT GOING TO REFER TO THEM.

9         SO YOU NEED TO RELEASE THEM -- SO I'M GOING TO GIVE HIM

10   PERMISSION TO RELEASE THEM.

11             MR. ANDRES:  THANK YOU, YOUR HONOR.

12             MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.

13             THE COURT:  OKAY, THOSE THREE.

14             MR. ANDRES:  THERE'S FOUR OF THEM.

15             THE COURT:  THERE'S WANG, GAUTAM --

16             MR. BLOCK:  BARCONS PALAU, AND PADUA.

17             THE COURT:  OH, PADUA, RIGHT.

18             MR. AKROTIRIANAKIS:  PADUA HAS NEVER BEEN -- DAYS,

19   YOUR HONOR, SHE HASN'T BEEN ON THE LIST.

20             THE COURT:  ALL.  ALL FOUR, YOU'RE ABLE TO RELEASE

21   THEM.

22        LET'S WRAP THIS UP, PLEASE.

23             MR. AKROTIRIANAKIS:  ALL RIGHT.

24        EXHIBIT 1148 WAS OFFERED DURING THE TESTIMONY OF

25   MR. GHEORGHE.  THE COURT MIGHT REMEMBER THAT I WANTED TO
```

```
1        DISPLAY THE FIRST PAGE AND THERE WAS SOME OF THE USUAL ABOUT
2       IT, AND SO I ONLY MOVED IN EVIDENCE THE FIRST PAGE, YOUR HONOR.
3            THEY WERE GOING TO PROPOSE REDACTIONS TO THE REMAINDER OF
4       IT.  THERE'S NOTHING.
5            SO AT THIS POINT, I WOULD MOVE THE ENTIRETY OF
6       EXHIBIT 1148.
7            AND EXHIBIT 10, WHICH IS THEIR EXHIBIT, THE COURT WILL
8       REMEMBER THEY MOVED THIS IN EVIDENCE DURING MR. GHEORGHE'S
9       DIRECT EXAMINATION.
10           IT CONTRAVENES THE COURT'S ORDER THAT THEY REDACT FROM
11      ANYTHING THAT THEY WERE GOING TO PUT IN FRONT OF THE JURY
12      ANYTHING ABOUT JOURNALISTS, HUMAN RIGHTS ACTIVISTS, AND OTHERS
13      ON THE LIST.
14           SO THEY WERE GOING TO DO THAT.
15           THEN THEY PROPOSED A REDACTION THAT WIPES OUT NOT JUST
16      THAT, BUT THE ENTIRE PARAGRAPH, SOME OF WHICH I WANT TO ARGUE
17      FROM, YOUR HONOR.
18           SO I WOULD LIKE TO PROPOSE A REDACTION THAT ACTUALLY
19      COMPLIES WITH THE COURT'S ORDER ABOUT JOURNALISTS, HUMAN RIGHTS
20      ACTIVISTS, AND OTHERS, THAT IS SURGICAL IN THE REDACTION SO
21      THAT THE PARTS OF THE DOCUMENT THAT ARE RELEVANT TO MY ARGUMENT
22      REMAIN.
23             THE COURT:  AND WHERE IS THIS DOCUMENT?  I MEAN,
24      YOU'RE TALKING ABOUT SOMETHING, I HAVE NO IDEA WHAT YOU'RE
25      TALKING ABOUT.
```

```
 1              THE CLERK:  THAT'S THE REDACTION THEY GAVE ME.

 2              MR. AKROTIRIANAKIS:  SO IF THE COURT GOES TO PAGE 5

 3    OF 8.

 4              MR. PEREZ:  I'M SORRY.  I'M NOT SURE WE HAVE THE

 5    PROPOSED REDACTIONS.

 6              MR. AKROTIRIANAKIS:  IT'S YOUR PROPOSED REDACTIONS.

 7              MR. PEREZ:  I KNOW WHAT OUR PROPOSED REDACTIONS ARE.

 8        I JUST HAVEN'T SEEN A COUNTERPROPOSAL FROM THEM.

 9              MR. AKROTIRIANAKIS:  IF I COULD, YOUR HONOR, ON

10    PAGE 5 -- AND THE PAGE NUMBERS ARE ON THE BOTTOM RIGHT-HAND

11    CORNER WHERE IT'S 10.0005 -- THERE'S A PARAGRAPH ALMOST IN THE

12    SECOND HALF OF THE PAGE THAT STARTS WITH "SCOPE OF AFFECTED

13    USERS," AND IT READS, "WE GOT A LIST OF AFFECTED PEOPLE BASED

14    ON PHONE NUMBERS WITH RELEVANT STATISTICS PER COUNTRY AND WITH

15    CONTENT."

16        THAT'S PERTINENT INFORMATION TO MY ARGUMENT THAT THEY HAD

17    THAT ON, AS THE ENTRY READS, MAY 8TH, 2019.

18              THE COURT:  ON PAGE 5 OF THIS EXHIBIT?

19              MR. AKROTIRIANAKIS:  DOES THE BOTTOM RIGHT-HAND

20    CORNER SAY PTX 0010.000 SOMETHING?

21              THE COURT:  YEAH.

22              MR. AKROTIRIANAKIS:  OKAY.  SO ON PAGE 5, YOUR HONOR,

23    SO EXHIBIT 10, PAGE 5 -- IT MIGHT BE EASIER IF I JUST DISPLAY

24    IT ON THE ELMO.

25              THE COURT:  OKAY.
```

1          MR. AKROTIRIANAKIS:  SO AS THE COURT CAN SEE, THERE'S

2     THIS -- ON MAY 8TH, THERE'S THIS ENTRY BY MR. LABUNETS -- WHO

3     WE HEARD TESTIMONY ABOUT AND HIS ROLE -- AND HE WRITES, SCOPE

4     OF AFFECTED USERS.  WE GOT A LIST OF AFFECTED PEOPLE, AND SO

5     ON.

6          I WANT TO MAKE AN ARGUMENT, BASED ON THAT AND THE NEXT

7     SENTENCE.  THE NEXT SENTENCE, THE THIRD SENTENCE, "LIKELY THERE

8     ARE JOURNALISTS, HUMAN RIGHTS ACTIVISTS AND OTHERS ON THE LIST"

9     SHOULD HAVE BEEN STRICKEN BEFORE THEY MOVED IT INTO EVIDENCE.

10         NOW THEIR PROPOSAL IS TO REDACT THE ENTIRETY OF THAT

11    PARAGRAPH.

12         THE COURT:  OH, THAT'S WHY I CAN'T FIND IT.  IT'S

13    ALREADY GONE.

14         MR. AKROTIRIANAKIS:  YEAH.  SO WHAT I SAY,

15    YOUR HONOR, IS THAT WE WOULD -- THAT WHAT IS APPROPRIATELY

16    REDACTED IS THAT "LIKELY THERE ARE JOURNALISTS," ET CETERA,

17    EVERYTHING THAT YOU SEE HIGHLIGHTED ON THE SCREEN HERE BEFORE

18    YOU, BUT PRESERVING THE FIRST TWO SENTENCES, WHICH ARE

19    RELEVANT, ALREADY ADMITTED ON THEIR MOTION, AND I WANT TO MAKE

20    USE OF IN MY ARGUMENT.

21         THE COURT:  ANY OBJECTION?

22         MR. PEREZ:  NO.  ACTUALLY, THAT'S FINE WITH US.  THE

23    LANGUAGE THAT THEY PROPOSED TO REDACT IS WHAT WAS TROUBLING US,

24    AND NOW WE HAVE THE INSTRUCTION ABOUT IDENTITY.

25         THE COURT:  OKAY.  THAT'S FINE.

```
1              MR. AKROTIRIANAKIS:  AND 1140 --

2              THE COURT:  SEE, THIS IS AN EXAMPLE.  WHY DO I HAVE

3         TO BE INVOLVED IN THIS?

4              MR. PEREZ:  YOU DON'T, YOUR HONOR.

5              MR. AKROTIRIANAKIS:  WE RAISED THIS, AND REGRETTABLY,

6         WE WERE UNABLE TO REACH THAT AGREEMENT.

7              BUT, OKAY.  THANK YOU, YOUR HONOR.

8              1148 WAS THE OTHER ONE.  THEY WERE GOING TO PROPOSE

9         REDACTIONS TO THE COURT.  IT'S ALREADY IN EVIDENCE.

10             THERE ARE NO REDACTIONS, SO I WOULD JUST MOVE THE

11        DOCUMENT, THE REMAINDER OF THE DOCUMENT ON THE FOUNDATION

12        ESTABLISHED.

13             MR. CRAIG:  YOUR HONOR -- SORRY, YOUR HONOR.

14             THEY SENT US AN EMAIL WITH A PROPOSED REDACTION.  THEY

15        DIDN'T SEND US THE PROPOSED REDACTED DOCUMENT.  BUT THERE IS

16        ONE SENTENCE THEY WANTED REDACTED ON PAGE 4, AND I'M TRYING NOW

17        TO FIND WHERE IT IS ON PAGE 4.

18             MR. PEREZ:  I DON'T THINK IT'S 1148.

19             MR. CRAIG:  BUT WE'RE ACCEPTABLE -- WE'RE AGREEABLE

20        TO THE -- TO THE PROPOSED REDACTION.  WE JUST WANT TO MOVE IT

21        INTO EVIDENCE.

22             MR. PEREZ:  IF THEY'RE OKAY WITH OUR REDACTION, WE

23        HAVE NO OBJECTION.

24             THE COURT:  ADMITTED.

25             (DEFENDANTS' EXHIBIT 1148 WAS ADMITTED IN EVIDENCE.)
```

1          THE COURT:  ADMITTED.  THAT'S IT.

2          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

3     HAVE A GOOD EVENING.

4          MR. PEREZ:  THANK YOU, YOUR HONOR.

5     (THE EVENING RECESS WAS TAKEN AT 4:35 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                   CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16          IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076

17

18

19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595

20

21          DATED:  MAY 2, 2025

22

23

24

25