# EXHIBIT C

```
1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        OAKLAND DIVISION

4

5    WHATSAPP LLC AND META              )   C-19-07123 PJH
     PLATFORMS, INC.,                   )
6                                       )   OAKLAND, CALIFORNIA
                    PLAINTIFFS,         )
7                                       )   APRIL 29, 2025
               VS.                      )
8                                       )   VOLUME 2
     NSO GROUP TECHNOLOGIES LIMITED     )
9    AND Q CYBER TECHNOLOGIES           )   PAGES 265-516
     LIMITED,                           )
10                                      )
                    DEFENDANTS.         )
11   _____   )

12

13                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14                UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANTS:      KING & SPALDING
                                BY:  JOSEPH N. AKROTIRIANAKIS
5                                    AARON S. CRAIG
                                633 WEST FIFTH STREET, SUITE 1600
6                               LOS ANGELES, CALIFORNIA  90071

7                               BY:  MATTHEW V. NOLLER
                                50 CALIFORNIA STREET, SUITE 3300
8                               SAN FRANCISCO, CALIFORNIA  94111

9

10     ALSO PRESENT:            CURT EVANS
                                BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    INDEX OF PROCEEDINGS

3     OPENING STATEMENT BY MR. PEREZ            P. 281

4     OPENING STATEMENT BY MR. AKROTIRIANAKIS    P. 298

5

6

7

8                    INDEX OF WITNESSES

9     PLAINTIFFS'

10    **CARL WOOG**
           DIRECT EXAM BY MR. ANDRES           P. 319
11         CROSS-EXAM BY MR. AKROTIRIANAKIS     P. 345
           REDIRECT EXAM BY MR. ANDRES          P. 364
12

13    **CLAUDIU GHEORGHE**
           DIRECT EXAM BY MR. PEREZ            P. 368
14         CROSS-EXAM BY MR. AKROTIRIANAKIS     P. 415

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                        MARKED        ADMITTED

4       PLAINTIFFS'

5       112                                            329
        13                                             375
6       10                                             388

7


8       DEFENDANTS'

9       1148, COVER PAGE                               452
        1083, PAGE 1 AND                               458
10           REDACTED PAGE 4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    OAKLAND, CALIFORNIA                     APRIL 29, 2025

 2                    P R O C E E D I N G S

 3         (COURT CONVENED AT 8:21 A.M.)

 4             THE CLERK:  PLEASE BE SEATED.

 5         CALLING CIVIL CASE 19-7123-PJH, WHATSAPP, INC., ET AL.

 6    VERSUS NSO GROUP TECHNOLOGIES LIMITED, ET AL.

 7             PARTIES, PLEASE STATE YOUR APPEARANCES.

 8             MR. ANDRES:  GOOD MORNING, YOUR HONOR.

 9         GREG ANDRES, TONY PEREZ, AND MICAH BLOCK FOR WHATSAPP.

10             THE COURT:  GOOD MORNING.

11             MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.

12         JOE AKROTIRIANAKIS, AARON CRAIG, AND MATT NOLLER FOR

13    DEFENDANTS.

14             THE COURT:  GOOD MORNING.  ALL RIGHT.  I ASSUME THAT

15    WHAT YOU ALL WANTED TO TALK ABOUT HAS TO DO WITH THE FILING

16    THAT YOU MADE LATE LAST NIGHT.  I DIDN'T SEE THEM UNTIL ABOUT

17    20 MINUTES AGO.  THEY WERE FILED, AS I UNDERSTAND IT, AROUND

18    MIDNIGHT.

19         I HAVE TO SAY THAT I HAVEN'T HAD SUFFICIENT TIME TO ABSORB

20    THIS, EXACTLY.

21         I'M ABSOLUTELY AMAZED AT THE FILING FROM THE DEFENDANTS.

22         I, FRANKLY, DON'T UNDERSTAND WHY THIS ISSUE WASN'T BROUGHT

23    TO MY ATTENTION.  I MEAN, I DON'T -- I DON'T EVEN KNOW WHERE TO

24    BEGIN WITH THIS.  I DON'T KNOW WHAT THE EVIDENCE IS ON ANY OF

25    THIS.  WE HAVEN'T HAD ANY ARGUMENTS ABOUT THIS EXPORT CONTROL.
```

```
 1    I DON'T KNOW WHAT THE DISTINCTION IS BETWEEN THE EXPORT CONTROL

 2    MATERIAL THAT YOU WISH TO PUT ON AND ALL THE OTHER THINGS THAT

 3    WE'VE BEEN TALKING ABOUT.

 4         IT SEEMS TO ME THAT THREE OR FOUR OF THE MOTIONS IN LIMINE

 5    WOULD ENCOMPASS THIS INFORMATION.

 6         BUT THIS IS THE FIRST TIME I'VE EVER HEARD OF THE POINT

 7    YOU MAKE IN NUMBER 4 AT THE BEGINNING OF YOUR BRIEF, AND THAT'S

 8    THE APPROVAL BY THE GOVERNMENT OF ISRAEL.

 9         I DON'T BELIEVE I'VE EVER HEARD THAT.

10         ONE OF THE DIFFICULTIES THAT I'VE HAD IN THIS CASE IS THAT

11    NOT ONLY HAVE I NEVER SEEN ANY OF THE EVIDENCE THAT YOU ALL

12    WANT TO PUT IN ON THE DAMAGES QUESTION, BECAUSE OBVIOUSLY THAT

13    WASN'T PART OF THE SUMMARY JUDGMENT MOTION, BUT I DON'T KNOW

14    WHAT EVIDENCE HAS BEEN PRODUCED TO THE PLAINTIFFS AND WHAT

15    ISN'T.

16         WHY WOULDN'T THIS CATEGORY BE NECESSARILY INCLUDED IN THE

17    DISCUSSION ABOUT THE ISRAELI PROCEDURES?  I MEAN, AFTER ALL,

18    IT'S THE EXPORT CONTROL PROVISIONS THAT GAVE RISE TO THE LEGAL

19    PROCEEDINGS --

20         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

21         THE COURT:  -- IN ISRAEL.  IT ALL SEEMS WRAPPED UP TO

22    ME.

23         NO DISTINCTION HAS BEEN MADE UNTIL NOW, AND NOW TRIAL HAS

24    ALREADY STARTED, I HAVE NO IDEA WHAT THE EVIDENCE LOOKS LIKE

25    THAT YOU ARE GOING TO PUT ON, AND, FRANKLY, WE'RE ABOUT TO
```

```
 1        START OUR FIRST DAY OF TRIAL IN ABOUT FIVE MINUTES.

 2              I DON'T SEE HOW THIS IS RESOLVED IN THE NEXT FIVE MINUTES.

 3              MR. AKROTIRIANAKIS:  AND I DON'T THINK IT NEEDS TO

 4        BE, YOUR HONOR.  BUT I THINK THAT WE CAN MAKE IT CLEAR TO THE

 5        COURT.

 6        THEY ARE SEPARATE PROCEEDINGS AND SEPARATE ISSUES THAT

 7        HAVE REALLY NOTHING TO DO WITH EACH OTHER.  THEY'RE ACTUALLY

 8        SEPARATE DEPARTMENTS, IF YOU WILL, OF THE ISRAELI GOVERNMENT,

 9        AND THIS REALLY DEALS WITH THE PUBLIC LAW.

10        BUT IT'S NOT SOMETHING THAT NEEDS TO BE ADDRESSED THIS

11        MORNING, YOUR HONOR.  I DON'T BELIEVE IT'S GOING TO COME UP

12        IN -- IT'S NOT GOING TO COME UP IN OPENING STATEMENT, AND I

13        DON'T BELIEVE IT'S GOING TO COME UP IN THE CONTEXT OF THEIR

14        CASE-IN-CHIEF, SO THERE'S NO URGENCY TO DEAL WITH THIS THIS

15        MORNING, AND I DON'T THINK THAT WAS THE REASON WHY -- IN FACT,

16        WE HADN'T ASKED FOR THIS CONFERENCE, YOUR HONOR.

17              MR. ANDRES:  YOUR HONOR, I'M MINDFUL OF THE AXIOM

18        THAT WHEN YOU'RE AHEAD, YOU SHOULD SHUT UP, SO I'M ONLY GOING

19        TO SAY TWO SENTENCES.

20        ONE, I THINK YOU'RE ABSOLUTELY RIGHT THAT THIS IS WITHIN

21        THE AMBIT OF YOUR ORDER, AND I'LL TELL YOU WHY.  IT DEALS

22        SPECIFICALLY WITH THE ISSUE OF GENERALIZED EVIDENCE OF BUSINESS

23        PRACTICES, OF WHICH, BY THE WAY, WE ALSO DON'T KNOW ANYTHING.

24        I WAS GOING TO SAY WE DON'T KNOW NOTHING, BUT WE DON'T KNOW

25        ANYTHING I THINK IS THE PROPER GRAMMAR.  SO WE DON'T KNOW
```

```
 1      ANYTHING.
 2           AND WE ASKED QUESTIONS DURING DEPOSITIONS, AND THEY
 3      REFUSED TO ANSWER.
 4           SO WE'RE HAPPY TO DEFER THIS UNTIL WHENEVER, YOUR HONOR,
 5      AND HAPPY TO PROCEED WITH OPENINGS.  WE CERTAINLY DON'T WANT TO
 6      KEEP THE JURY.
 7           BUT WE'RE OBVIOUSLY AVAILABLE WHENEVER YOUR HONOR WANTS,
 8      AND AS LONG AS DEFENSE COUNSEL IS NOT GOING TO OPEN ON IT, THEN
 9      I THINK WE DON'T HAVE TO GET IT RESOLVED.
10           THE OTHER ISSUES THAT WE HAVE, AND THEY ALL --
11                THE COURT:  SO SPECIFICALLY, IT'S ANDRES?  I'VE BEEN
12      CALLING YOU ANDRES, BUT IT'S ANDRES?
13                MR. ANDRES:  NO.  IT'S ACTUALLY ANDRES.  WE'RE FROM
14      BROOKLYN.
15                THE COURT:  ANDRES.  OKAY.
16                MR. ANDRES:  THE BROOKLYN VERSION.  SOME PEOPLE CALL
17      ME ANDRES.  BUT IT'S DEFINITELY NOT ANDRES.
18           BUT I'LL ANSWER TO ANYTHING, YOUR HONOR.
19                THE COURT:  OKAY.  BUT WITH REGARD TO THE INFORMATION
20      THAT'S IN THE FOUR POINTS IN THE FIRST PARAGRAPH OF THE
21      DEFENDANTS' FILING?
22                MR. ANDRES:  WE DON'T HAVE EVIDENCE ABOUT IT.  THIS
23      IS NOT A CASE ABOUT ISRAEL AND ITS LAWS.  WE DON'T HAVE AN
24      EXPERT FROM ISRAEL.  WE DON'T HAVE THE APPLICATIONS FOR THEIR
25      LICENSES.  WE DON'T HAVE ANY DISCOVERY ABOUT ANY OF THIS
```

1      INFORMATION.

2          AND WHEN WE ASKED QUESTIONS ABOUT THESE ISSUES, THEY

3      SPECIFICALLY REFUSED TO ANSWER WHICH, BY THE WAY, WAS IN

4      VIOLATION OF THE COURT'S DISCOVERY RULINGS.  WE WENT THROUGH

5      THIS WHOLE PROCESS IN RICHMOND.

6          WE DON'T HAVE EVIDENCE, OR THERE'S BEEN NO DISCOVERY ABOUT

7      THESE ISSUES.  IT'S ALL BEEN BLOCKED.  WE HAVE THIS SORT OF

8      TYPICAL SWORD AND SHIELD ISSUE WHERE THEY'RE BLOCKING US FROM

9      GETTING ANY INFORMATION, AND NOW THEY WANT TO RAISE THIS ISSUE.

10         SO, AGAIN, I DON'T WANT TO KEEP THE JURY.

11             MR. AKROTIRIANAKIS:  THAT'S JUST NOT TRUE,

12     YOUR HONOR.  I URGE THE COURT THAT WE TAKE THIS UP WHEN WE'RE

13     NOT RUSHED, BECAUSE THAT'S JUST NOT THE CASE.  THEY DO HAVE AN

14     ISRAELI EXPERT.  THIS COURT ADMITTED THE GENTLEMAN PRO HAC VICE

15     IN THIS CASE, YOU'LL REMEMBER, AN ISRAELI EXPERT THAT THEY

16     HAVE.

17         BUT THAT'S NOT THE ISSUE.  THIS IS NOT GOING TO COME UP

18     NOW.  I WOULD LIKE TO ADDRESS IT WHEN WE'RE NOT PRESSED FOR

19     TIME BECAUSE I DO THINK IT'S AN IMPORTANT ISSUE.

20             MR. ANDRES:  MY POINT WAS WE DON'T HAVE AN ISRAELI

21     LAW ISSUE TESTIFYING.  YES, WE HAVE ISRAELI COUNSEL.  WE HAVE

22     TO BECAUSE THAT'S WHERE NSO DECIDES TO PRODUCE EVIDENCE IN THIS

23     CASE.  THEY PRODUCED DISCOVERY IN ISRAEL.  THE ONLY WAY WE CAN

24     RECEIVE IT -- WE CAN'T REVIEW IT IN THIS COURTROOM OR ANYWHERE.

25     BUT I'M FINE TO DEAL WITH THIS LATER, YOUR HONOR.

```
1              THE COURT:  ARE ALL OF THE JURORS HERE?

2              THE CLERK:  YES.

3              THE COURT:  OKAY, GREAT.  EVERYONE IS ON TIME.

4         ALL RIGHT.  YEAH, I JUST READ THIS, AND I'M --

5              MR. ANDRES:  SORRY FOR THE LATE FILING, YOUR HONOR --

6              THE COURT:  I'M SURPRISED.

7              MR. ANDRES:  -- ON OUR SIDE.  WE'LL TRY TO DO BETTER.

8              THE COURT:  NO, THAT'S FINE.  I DIDN'T MEAN IT AS A

9    CRITICISM THAT BOTH SIDES FILED LATE.

10             MR. AKROTIRIANAKIS:  IT'S ALSO --

11             THE COURT:  I MEAN, I KNOW YOU HAD A BIG DAY

12   YESTERDAY.  BUT I DIDN'T HAVE ENOUGH TIME TO EVEN BEGIN TO

13   UNDERSTAND --

14             MR. ANDRES:  TOTALLY UNDERSTAND.

15             MR. AKROTIRIANAKIS:  IT IS A BIG CASE, YOUR HONOR.

16             THE COURT:  -- WHAT PEOPLE'S POSITIONS ARE.  BUT I'LL

17   ALLOW YOU ALL TO MAKE YOUR RECORD.  WE'LL HAVE SOME ARGUMENT

18   TIME.  WE CAN DO IT AFTER THE TRIAL DAY TODAY SINCE IT'S NOT

19   NECESSARILY FOR TODAY'S PRESENTATION, AND I'LL MAKE A DECISION

20   THEN.

21             MR. ANDRES:  THANK YOU, YOUR HONOR.

22        MR. PEREZ IS GOING TO OPEN FOR WHATSAPP, YOUR HONOR.

23             THE COURT:  OKAY.

24             MR. ANDRES:  JUST SO YOU KNOW.

25             THE COURT:  OKAY.  THAT'S FINE.
```

```
 1            MR. ANDRES:  THANK YOU.

 2            THE COURT:  ARE YOU READY TO BEGIN WITH YOUR OPENING

 3     STATEMENT FOLLOWING THEIRS?

 4            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THERE IS ONE

 5     ISSUE THAT'S GOING TO COME UP TODAY BECAUSE I BELIEVE IT'S THE

 6     SECOND WITNESS.

 7            THIS IS, HIS NAME IS CLAUDIU GHEORGHE, AND THE THIRD

 8     WITNESS, MR. ROBINSON, DREW ROBINSON, WAS THE 30(B)(6) WITNESS

 9     ON -- DESIGNATED.  THE COURT WILL HEAR FROM MR. ROBINSON ON THE

10     ISSUES OF THE TIME SPENT, AS CLAIMED BY THE PLAINTIFFS, DEALING

11     WITH THIS -- WITH THE ISSUES IN THIS CASE.

12            AND MR. ROBINSON WAS, WAS TOTALLY UNKNOWLEDGEABLE ABOUT A

13     GOOD DEAL OF THE WORKERS WHOSE EXPENSES ARE CLAIMED IN THIS

14     CASE, AS THE COURT IS AWARE FROM OUR EARLIER FILINGS, AND THE

15     COURT MADE A RULING THAT THE PARTIES WILL NOT BE ABLE TO

16     PRESENT EVIDENCE THAT WAS NOT PROVIDED IN DISCOVERY.

17            NOW WHAT THEY WANT TO DO IS HAVE A DIFFERENT WITNESS WHO

18     WAS NOT THE COMPANY'S DESIGNEE BINDING THE COMPANY COME UP AND

19     TESTIFY TO THE ISSUES AS TO WHICH THE 30(B)(6) WITNESS WAS

20     UNKNOWLEDGEABLE, YOUR HONOR, AND I THINK THAT VIOLATES THE

21     COURT'S ORDER AND I THINK IT'S GOING TO COME UP, PERHAPS NOT

22     BEFORE THE BREAK, SO WE CAN TAKE IT UP THEN OR SOMETHING, BUT I

23     DO THINK IT'LL COME UP DURING TODAY'S TESTIMONY.

24            THE COURT:  AND THE WITNESS IS GHEORGHE?

25            MR. AKROTIRIANAKIS:  YEAH, I THINK HE PRONOUNCES HIS
```

```
 1        NAME GHEORGHE.

 2              THE COURT:  GHEORGHE, OKAY.

 3              MR. AKROTIRIANAKIS:  AND HE, AS WE UNDERSTAND FROM

 4   OUR MEETING AND CONFERRING, IS THE WITNESS FROM WHOM THEY

 5   INTEND TO ELICIT ALL OF THIS TESTIMONY THAT WE DIDN'T GET IN

 6   DISCOVERY BECAUSE THE 30(B)(6) WITNESS, WHO'S THE WITNESS WHO

 7   WILL TESTIFY AFTER MR. GHEORGHE, AS THE COURT WILL SEE DURING

 8   MY CROSS-EXAMINATION OF HIM, DIDN'T HAVE ANY INFORMATION ABOUT

 9   THESE PEOPLE.

10              THE COURT:  OKAY.  RESPONSE?

11              MR. BLOCK:  THE ACTUAL PROCEDURE IS A LITTLE BIT MORE

12   COMPLICATED BECAUSE OF THE WAY THE DESIGNATIONS WENT THROUGH.

13        BUT THE BOTTOM LINE, YOUR HONOR, MR. GHEORGHE WAS

14   DISCLOSED, WAS DEPOSED, WILL TESTIFY ONLY WITHIN HIS PERSONAL

15   KNOWLEDGE, ALL OF WHICH WAS AVAILABLE TO DEFENDANTS AT HIS

16   DEPOSITION, ABOUT PEOPLE HE KNEW.

17        HE'S REALLY GOING TO BE DESCRIBING META AND WHATSAPP'S

18   RESPONSE TO THE ATTACKS IN THIS CASE, WHICH IS SORT OF THE CORE

19   OF OUR DAMAGES TRIAL.

20        AND MR. ROBINSON WILL ALSO TESTIFY WITHIN THE SCOPE OF HIS

21   PERSONAL KNOWLEDGE ABOUT PEOPLE HE WORKED WITH AND HIS ROLE,

22   AND THEIRS, IN THE RESPONSE.

23              THEY HAVE AN ISSUE -- I BEG YOUR PARDON.

24              THE COURT:  NO, NO.  NEITHER IS AN EXPERT?

25              MR. BLOCK:  NEITHER IS AN EXPERT.
```

```
 1          MR. ROBINSON SEPARATELY TESTIFIED AS A CORPORATE

 2     REPRESENTATIVE.  HE WAS ASKED QUESTIONS DURING THAT DEPOSITION

 3     ABOUT PEOPLE ABOUT WHOM HE DID NOT HAVE PERSONAL KNOWLEDGE, AND

 4     HIS MEMORY WAS IMPERFECT.

 5          SO WE HAVE PREVIOUSLY LITIGATED IN CONNECTION WITH THE

 6     DAUBERT AGAINST MS. TREXLER, AND I BELIEVE THE MOTIONS IN

 7     LIMINE.  THEY SAID THEY WANT TO MAKE SURE THERE WERE NO NEW

 8     DOCUMENTS OR WITNESSES THAT WEREN'T PRODUCED IN EVIDENCE, AND

 9     THEY SAID MS. TREXLER, THE EXPERT, SHOULD NOT BE ABLE TO

10     TESTIFY ABOUT PEOPLE SHE DIDN'T INTERVIEW PERSONALLY.

11          YOU DENIED THAT DAUBERT AND --

12               THE COURT:  RIGHT.

13               MR. BLOCK:  -- THESE WITNESSES WILL GET UP ONLY IN

14     THEIR PERSONAL CAPACITY, GIVING ONLY THEIR PERSONAL KNOWLEDGE

15     ABOUT PEOPLE WHO ARE INCLUDED IN MS. TREXLER'S ANALYSIS.

16               THE COURT:  AND THEY WERE SUBJECT TO

17     CROSS-EXAMINATION?

18               MR. BLOCK:  THEY WERE DEPOSED BY THE DEFENDANTS IN --

19     THEY WERE BOTH DEPOSED IN PERSONAL CAPACITY.

20          MR. ROBINSON WAS ALSO DEPOSED, AFTER MS. TREXLER'S REPORT,

21     AS A CORPORATE REPRESENTATIVE.  HE WAS DISCLOSED ON TIME SPENT,

22     AND THERE WERE ASPECTS OF THAT TOPIC ON WHICH HE HAD IMPERFECT

23     KNOWLEDGE.

24          SO THEY ASKED HIM, WHO WAS MR. SO-AND-SO?  HE SAID, I

25     DON'T REMEMBER THAT PERSON'S TITLE.
```

1          I BELIEVE THEY WANT TO PLAY THAT DEPOSITION TESTIMONY.  WE

2     CAN TALK ABOUT WHETHER THAT'S PROPER IN TERMS OF EVIDENCE AND

3     402/403 AND THE JURY NEEDING TO HEAR IT.

4          BUT THESE GENTLEMEN WILL GET UP, BOTH WERE DISCLOSED --

5     SETTING THE CORPORATE REPRESENTATIVE ASIDE -- IN THEIR PERSONAL

6     CAPACITY.  THEY WERE OPEN TO CROSS.

7          IN THE CORPORATE REPRESENTATIVE CAPACITY, IF THEY NEEDED

8     MORE, THERE WAS TIME TO DEAL WITH THAT.  BUT I THINK WE'VE

9     ALREADY LITIGATED IT.

10          THE COURT:  AND YOU'RE TRYING TO EXCLUDE THESE

11     WITNESSES?

12          MR. AKROTIRIANAKIS:  NO.  WHAT I'M SAYING IS VERY

13     SIMPLE, AND THIS IS A LITTLE BIT OF KIND OF A THREE CARD MONTE

14     THAT WE'RE SEEING HERE.

15          BEFORE ANY DEPOSITIONS WERE TAKEN IN THIS CASE, WE SERVED

16     A 30(B)(6) NOTICE WITH ALL OF OUR CATEGORIES THAT WE WANTED TO

17     TAKE THE COMPANY'S BINDING TESTIMONY ON.

18          THEY CHOSE WHICH WITNESSES WOULD BE THE CORPORATE

19     SPOKESPERSONS FOR THOSE AREAS.

20          AND THIS MR. ROBINSON WAS DESIGNATED TO GIVE THE COMPANY'S

21     TESTIMONY ON THE ISSUE OF WHAT THE INDIVIDUAL PERSONS, ALL OF

22     WHOM ARE THE PEOPLE FOR WHOM THEY'RE CLAIMING DAMAGES FOR THEIR

23     TIME DID, AND HOW MUCH TIME THEY SPENT, BASICALLY THE EVIDENCE

24     SUPPORTING MS. TREXLER, WHO'S RIGHT THERE, HER EXPERT OPINION.

25          THE COURT:  OKAY.

1        MR. AKROTIRIANAKIS:  SO WE WERE GOING TO TAKE THAT

2    TESTIMONY FROM MR. ROBINSON.  THE FACT THAT SOME OTHER WITNESS

3    KNEW BITS ABOUT IT, I COULDN'T BE EXPECTED TO SAY, OH, WELL, I

4    BETTER GET READY TO TAKE THIS PERSON'S DEPOSITION ABOUT IT.

5    AFTER ALL, THIS IS THE PURPOSE OF RULE 30(B)(6).

6        AND AT THE TIME THAT MR. GHEORGHE TESTIFIED, WE WOULD HAVE

7    HAD NO IDEA, BECAUSE WE DIDN'T HAVE --

8        THE COURT:  WHAT IS IT THAT YOU WANT?

9        MR. AKROTIRIANAKIS:  I WANT MR. GHEORGHE NOT TO BE

10   PERMITTED TO CONTROVERT THE BINDING TESTIMONY OF THE COMPANY ON

11   THE PARTICULAR SUBJECT FOR WHICH THE OTHER WITNESS WAS

12   DESIGNATED AND THEY DIDN'T PRODUCE A WITNESS WITH KNOWLEDGE.

13       THE COURT:  YOU'RE NOT SUGGESTING THAT HIS TESTIMONY

14   CAN'T SUPPLEMENT THE 30(B)(6) WITNESS'S TESTIMONY?

15       MR. AKROTIRIANAKIS:  WELL, MAYBE -- I DON'T THINK

16   THAT THEY CAN CONTROVERT THEIR, THEIR BINDING ADMISSIONS THAT

17   THE COMPANY MADE THROUGH ITS 30(B)(6) WITNESS, YOUR HONOR.

18       THE COURT:  ARE YOU SAYING THAT THEY CANNOT ADD TO

19   THAT 30(B)(6) WITNESS'S TESTIMONY WITH A WITNESS WHOSE

20   KNOWLEDGE IS BASED UPON HIS OWN PERSONAL EXPERIENCE?

21       MR. AKROTIRIANAKIS:  YOUR HONOR, WHEN A 30(B)(6)

22   WITNESS TESTIFIES, THEY ARE THE COMPANY TESTIFYING.

23       IF THE COMPANY IS ASKED, WHAT DID THESE PEOPLE DO, AND THE

24   COMPANY SAYS, I DON'T KNOW.  HOW MUCH TIME DID THEY SPEND?  I

25   DON'T KNOW.  YOU CAN'T HAVE ANOTHER WITNESS COME IN AND SAY,

1    OH, EVEN THOUGH THE COMPANY DOESN'T KNOW AND YOU TOOK THAT

2    BINDING ADMISSION FROM THE COMPANY, I'M GOING TO GIVE TESTIMONY

3    THAT CONTROVERTS THE COMPANY'S TESTIMONY.

4         THAT'S NOT HOW 30(B)(6) WORKS, YOUR HONOR.  THIS IS

5    SANDBAGGING, DIRTY POOL.

6              THE COURT:  RESPONSE?

7              MR. BLOCK:  SURE.  THAT'S NOT THE LAW WITH RESPECT TO

8    30(B)(6) TESTIMONY, YOUR HONOR.

9         SO HAD THE REPRESENTATIVE SAID THAT PERSON SPENT NO TIME,

10   WE MIGHT HAVE A DIFFERENT ISSUE.

11        BUT THIS WAS A REPRESENTATIVE WHO HAD -- WHO WAS NOT ABLE

12   TO REMEMBER EVERY SINGLE PERSON, AND WE COULD HAVE LITIGATED

13   THE DEGREE OF HIS PREPARATION, BUT WE CITED CASES ON THIS.

14             THE COURT:  RIGHT.  IT DOESN'T SOUND TO ME LIKE IT'S

15   CONTROVERTING.  IT SOUNDS TO ME LIKE IT'S SUPPLEMENTING.

16        OVERRULED.

17        LET'S CALL THE JURY IN.

18             MR. BLOCK:  THANK YOU, YOUR HONOR.

19             THE COURT:  WE HAVE NO WITNESSES IN THE COURTROOM;

20   RIGHT?

21             MR. ANDRES:  YOUR HONOR, I'M GOING TO FLIP THE

22   PODIUM, IF THAT'S OKAY?

23             THE COURT:  YES.

24             MR. ANDRES:  THANK YOU.

25        IS THIS FINE, YOUR HONOR, OR CAN WE DO IT A LITTLE --

1           THE COURT:  NO, YOU CAN DO -- YOU CAN MOVE IT AROUND.

2       ALL RIGHT.  THE ONLY WITNESSES THAT ARE PRESENT IN THE

3    ROOM ARE EXPERTS AND CORPORATE WITNESSES?  DID I HEAR THAT

4    CORRECTLY?

5           MR. BLOCK:  I BEG YOUR PARDON.

6       YES, YOUR HONOR, THAT'S EXACTLY RIGHT.

7           THE COURT:  ALL RIGHT.  SAME FOR THE DEFENSE?

8           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

9           THE COURT:  OKAY.

10       (PAUSE IN PROCEEDINGS.)

11       (JURY IN AT 8:38 A.M.)

12           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

13           THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

14    GENTLEMEN OF THE JURY.  AND THANK YOU ALL FOR BEING HERE ON

15    TIME.

16       WE'RE READY TO GET STARTED WITH THE TRIAL.

17       WHO'S GOING TO -- I FORGET.  YOU TOLD ME, BUT I FORGOT

18    ALREADY.

19           MR. PEREZ:  YES, YOUR HONOR, ANTONIO PEREZ.

20           THE COURT:  ALL RIGHT.  COME FORWARD.

21           MR. PEREZ:  THANK YOU.

22       **(MR. PEREZ GAVE HIS OPENING STATEMENT ON BEHALF OF THE**

23    **PLAINTIFFS.)**

24           MR. PEREZ:  GOOD MORNING.

25       ON MAY 2ND, 2019 WHATSAPP ENGINEERS NOTICED DATA GOING

1    THROUGH WHATSAPP SERVERS THAT DIDN'T LOOK LIKE WHAT THEY

2    EXPECTED TO SEE.

3         WHAT THEY WERE LOOKING AT WAS PART OF THE DATA THAT GETS

4    EXCHANGED BETWEEN TWO CELL PHONES AS PART OF SETTING UP A

5    WHATSAPP PHONE CALL JUST IN THE INSTANT THAT THAT CALL IS

6    ESTABLISHED.

7         THIS WAS NOT DATA THAT A NORMAL WHATSAPP USER HAD THE

8    ABILITY TO MODIFY, OR EVEN TO SEE.

9         BUT WHAT THEY SAW LOOKED LIKE EXECUTABLE CODE, A COMPUTER

10   PROGRAM, THAT SOMEONE HAD INJECTED INTO THAT DATA.

11        IT LOOKED MALICIOUS, DESIGNED TO MAKE A COMPUTER DO

12   SOMETHING IT WASN'T INTENDED TO DO.

13        SPECIFICALLY, IT LOOKED LIKE CODE MEANT TO RUN ON AN

14   ANDROID DEVICE, A MOBILE PHONE RUNNING THE ANDROID OPERATING

15   SOFTWARE.

16        AS THEY INVESTIGATED FURTHER, THEY SAW THAT MESSAGES LIKE

17   THIS HAD GONE THROUGH WHATSAPP SERVERS 1500 TIMES IN JUST THE

18   FEW DAYS THAT THEY HAD BEEN INVESTIGATING.  BETWEEN MAY 2ND AND

19   MAY 6TH, 1500 INSTANCES OF MESSAGES LIKE THE ONE YOU'RE LOOKING

20   AT GOING THROUGH WHATSAPP SERVERS, APPROXIMATELY 400 MESSAGES A

21   DAY THAT THIS CODE WAS BEING SENT.

22        BUT THEY DIDN'T KNOW WHO WAS SENDING IT, AND THEY DIDN'T

23   KNOW WHAT IT DID.

24        WHAT WHATSAPP CAME TO LEARN WAS SHOCKING, AND IT'S THE

25   REASON THAT WE ARE HERE TODAY.

1        WHAT THE ENGINEERS LEARNED WAS THAT THESE MESSAGE DID NOT

2   COME FROM ANY NORMAL WHATSAPP USER.  THEY HAD BEEN CREATED BY A

3   HIGHLY SOPHISTICATED SPECIAL SPYWARE COMPANY BASED IN ISRAEL, A

4   COMPANY FOUNDED BY VETERANS OF ELITE ISRAELI MILITARY UNITS, A

5   COMPANY IN THE BUSINESS OF CREATING POWERFUL SPYWARE AND

6   SELLING THAT CAPABILITY TO FOREIGN GOVERNMENTS FOR PROFIT.

7        THESE MESSAGES WERE THE PRODUCT OF EXTENSIVE RESEARCH AND

8   DEVELOPMENT.  THIS COMPANY HAD REVERSE ENGINEERED WHATSAPP'S

9   CODE AND USED IT TO BUILD A SPECIAL COMPUTER THAT COULD CRAFT

10  MESSAGES THAT WOULD LOOK LIKE AN ORDINARY WHATSAPP PHONE CALL

11  WHEN, IN FACT, THEY WERE ANYTHING BUT ORDINARY.  AND THEY DID

12  THIS SO THAT THEY COULD USE WHATSAPP SERVERS TO INJECT THEIR

13  CODE INTO THE PHONES OF ANY ONE OF WHATSAPP'S MORE THAN A

14  BILLION USERS, AT LEAST ANY OF THEM RUNNING THE ANDROID

15  SOFTWARE ON THEIR PHONE.

16       AND THEY HAD FIGURED OUT HOW TO HIDE THEIR MALICIOUS CODE

17  IN THE DATA THAT GETS EXCHANGED BETWEEN TWO CELL PHONES IN THE

18  INSTANCE, LESS THAN A SECOND, BETWEEN WHEN ONE USER DIALS AND

19  THE OTHER PHONE RINGS.

20       EVEN MORE SHOCKING WAS WHAT THESE MESSAGES DID.  IT

21  STARTED WITH WHAT LOOKED LIKE A NORMAL WHATSAPP PHONE CALL.

22  THE PHONE MIGHT RING JUST ONCE.

23       BUT ONCE THE PHONE RANG, ONCE THE CALL CAME IN, EVEN IF

24  THE USER DIDN'T ANSWER, THE PHONE WOULD BE TRIGGERED TO REACH

25  OUT TO ANOTHER SERVER SET UP BY THE SPYWARE COMPANY AND

1      DOWNLOAD POWERFUL SPYWARE ON TO THE PHONE.

2           THE USER DIDN'T HAVE TO CLICK ON ANY LINKS, DIDN'T HAVE TO

3      OPEN ANY SUSPICIOUS FILES.  HE COULD BE FAST ASLEEP.  JUST THE

4      CALL ITSELF WOULD CAUSE THE PHONE TO DOWNLOAD THE SPYWARE.

5           AND ONCE INSTALLED, THE CUSTOMERS OF THIS SPYWARE COMPANY

6      WOULD HAVE, EFFECTIVELY, FULL ACCESS TO THE PHONE:  THE ABILITY

7      TO READ MESSAGES, LISTEN TO PHONE CALLS IN REAL TIME, PINPOINT

8      THE USER'S LOCATION, EVEN TURN ON THE PHONE'S MICROPHONE TO

9      LISTEN TO CONVERSATIONS, AND TAKE PICTURES WITH THE PHONE'S

10     CAMERA, ALL REMOTELY, ALL WITHOUT THE USER HAVING ANY IDEA.

11          THAT IS WHAT THEY WERE USING WHATSAPP'S SERVERS TO DO, TO

12     GET THAT SPYWARE ON TO USERS' PHONES AND TURN THOSE PHONES INTO

13     SPYING DEVICES OF EXTRAORDINARY POWER.

14          THE INSTALLATION WAS COVERT.  IT WAS DELIBERATELY HIDDEN

15     FROM WHATSAPP AND FROM THE USER.

16          AND IN THIS TRIAL, YOU'LL LEARN THAT THIS COMPANY BOASTED

17     THAT THEIR INSTALLATION WAS, IN THEIR WORDS, COMPLETELY

18     INVISIBLE AND CANNOT BE STOPPED.

19          THAT SPYWARE WAS CALLED PEGASUS, AND THE COMPANY THAT

20     DEVELOPED AND MARKETED IT AND PROFITED FROM IT ARE THE

21     DEFENDANTS IN THIS CASE, NSO AND ITS PARENT COMPANY, Q CYBER.

22          THIS ATTACK THAT WAS DISCOVERED IN MAY 2019, IT WASN'T THE

23     FIRST TIME NSO HAD USED WHATSAPP SERVERS TO INSTALL THEIR

24     SPYWARE, AND IT WASN'T THE LAST.

25          WE'RE HERE TODAY BECAUSE REPEATEDLY, FROM 2018 ALL THE WAY

1      TO 2020, NSO USED WHATSAPP SERVERS, INCLUDING SERVERS RIGHT

2      HERE IN CALIFORNIA, TO INSTALL THEIR POWERFUL PEGASUS SPYWARE

3      ON THE PHONES OF WHATSAPP USERS SO THAT THEIR CUSTOMERS COULD

4      SPY ON THOSE USERS, INFECTING, BY THEIR ESTIMATION, BETWEEN

5      HUNDREDS AND TENS OF THOUSANDS OF PEOPLE.

6           THOSE ARE THE FACTS AND THEY ARE NOT DISPUTED.

7           NOW, LET ME TELL YOU WHAT THE COURT HAS ALREADY RULED.

8           JUDGE HAMILTON HAS ALREADY RULED THAT NSO AND Q CYBER

9      BROKE THE LAW.  WHAT THEY DID WAS ILLEGAL.

10          THEY BROKE THE UNITED STATES COMPUTER FRAUD AND ABUSE ACT

11     BY SENDING MESSAGES THROUGH WHATSAPP SERVERS THAT CAUSED

12     PEGASUS TO BE INSTALLED ON USERS' PHONES AND OBTAINING

13     PROTECTED INFORMATION FROM THOSE PHONES THROUGH WHATSAPP

14     SERVERS.

15          THE COURT HAS ALSO RULED THAT NSO AND Q CYBER BROKE THE

16     CALIFORNIA COMPUTER DATA ACCESS -- COMPUTER DATA ACCESS AND

17     FRAUD ACT FOR THOSE SAME REASONS AS THE FEDERAL STATUTE, AND

18     BASED ON ADDITIONAL FINDINGS THAT NSO TARGETED CALIFORNIA

19     SERVERS AND PEGASUS CODE WAS SENT THROUGH WHATSAPP'S CALIFORNIA

20     SERVERS 43 TIMES IN MAY 2019.  THAT'S 43 TIMES JUST IN MAY.

21     DURING THE PERIOD THAT WHATSAPP HAD DETECTED THE ATTACK BEFORE

22     THEY PUT A STOP TO IT ON MAY 13TH, 43 INSTANCES OF THIS CODE

23     GOING THROUGH WHATSAPP'S CALIFORNIA-BASED SERVERS.

24          SO WE'RE NOT ASKING YOU TO DETERMINE WHETHER NSO AND

25     Q CYBER BROKE THE LAW.  THEY DID.  THAT HAS BEEN ESTABLISHED,

 1    AND YOU WILL BE INSTRUCTED, AND HAVE BEEN INSTRUCTED, THAT

 2    THAT'S SOMETHING YOU MUST ACCEPT AS TRUE.

 3        WHAT WE ARE ASKING YOU TO DETERMINE, AND WE ARE HERE TO

 4    PRESENT TO YOU EVIDENCE TO ALLOW TO YOU MAKE THIS

 5    DETERMINATION, IS HOW MUCH NSO SHOULD PAY IN DAMAGES FOR THESE

 6    VIOLATIONS AND THE BREACHES OF CONTRACT, BECAUSE IN ADDITION TO

 7    BREAKING THE LAW, THE COURT ALSO FOUND THAT NSO BROKE ITS

 8    CONTRACT WITH WHATSAPP, THE TERMS OF SERVICE, AND THEY BROKE

 9    THAT CONTRACT BY REVERSE ENGINEERING WHATSAPP'S CODE.

10        MY NAME IS ANTONIO, TONY, PEREZ, AND WITH MY PARTNERS,

11    GREG ANDRES AND MICHAEL BLOCK, IT'S OUR PRIVILEGE TO BE HERE

12    REPRESENTING WHATSAPP AND META.

13        WE'RE JOINED AT COUNSEL TABLE BY CARL WOOG, AN EXECUTIVE

14    FROM WHATSAPP.  HE'S THE VICE PRESIDENT OF GLOBAL

15    COMMUNICATIONS.  YOU'LL BE HEARING FROM HIM AS A WITNESS, AND

16    HE'S ALSO GOING TO BE HERE WITH US THROUGHOUT THE TRIAL AT

17    COUNSEL TABLE AS A CORPORATE REPRESENTATIVE.

18        AND AT THE CONCLUSION OF TRIAL, WE'LL BE ASKING YOU TO

19    AWARD TWO CATEGORIES OF DAMAGES:  COMPENSATORY DAMAGES TO PAY

20    BACK WHATSAPP FOR ITS COSTS IN RESPONDING TO NSO'S ATTACKS,

21    THOSE ARE THE COSTS OF INVESTIGATING THE ATTACK, PATCHING THE

22    SYSTEM TO PREVENT IT FROM HAPPENING AGAIN, AND NOTIFYING USERS

23    SO THAT THEY COULD TAKE APPROPRIATE MEASURES.

24        AND WE'RE ALSO GOING TO ASK YOU TO AWARD PUNITIVE DAMAGES,

25    WHICH ARE DIFFERENT.  THEIR PURPOSE IS NOT TO COMPENSATE

1    WHATSAPP, BUT TO PUNISH NSO AND TO DETER SIMILAR MISCONDUCT IN

2    THE FUTURE.

3         AS THE PLAINTIFF, WE HAVE THE BURDEN TO PROVE WITH

4    EVIDENCE THAT WE ARE ENTITLED TO DAMAGES.

5         AS TO COMPENSATORY DAMAGES, WE MUST PROVE THAT BY THE

6    PREPONDERANCE OF THE EVIDENCE, WHICH MEANS THAT OUR EVIDENCE

7    MUST SHOW THAT IT'S MORE PROBABLE THAN NOT THAT WE'RE ENTITLED

8    TO THOSE DAMAGES.

9         AS TO PUNITIVES, WE MUST PROVE IT BY CLEAR AND CONVINCING

10   EVIDENCE, WHICH MEANS WE MUST LEAVE YOU WITH THE FIRM BELIEF

11   THAT SUBJECT DAMAGES ARE WARRANTED.

12        THE COURT WILL INSTRUCT YOU FURTHER AS TO WHAT THOSE

13   BURDENS MEAN, BUT WE WELCOME THESE BURDENS, WHICH WE BELIEVE

14   THE EVIDENCE WILL SATISFY.

15        OVER THE NEXT WEEK, WE WILL BE PRESENTING EVIDENCE IN THE

16   FORM OF WITNESS TESTIMONY FROM THAT STAND, VIDEOTAPED TESTIMONY

17   FROM SOME OF NSO'S PERSONNEL, AND DOCUMENTS, ALL OF WHICH BEAR

18   ON THESE ISSUES OF DAMAGES.

19        TODAY I WOULD JUST LIKE TO GIVE YOU A PREVIEW OF WHAT THE

20   EVIDENCE IS GOING TO SHOW, STARTING WITH THE PARTIES, THEN AS

21   TO COMPENSATORY DAMAGES, AND FINALLY PUNITIVE DAMAGES.

22        LET ME START WITH THE PARTIES.

23        WHATSAPP IS ONE OF THE WORLD'S LARGEST COMMUNICATION

24   PLATFORMS.  IT IS OWNED BY META, WHICH USED TO BE CALLED

25   FACEBOOK, AND IS ALSO A PLAINTIFF IN THIS CASE.

1          BOTH THOSE COMPANIES ARE BASED HERE IN NORTHERN

2     CALIFORNIA, SPECIFICALLY IN MENLO PARK.

3          AT THE TIME OF THE ATTACK THAT WAS DETECTED IN 2019, ABOUT

4     ONE AND A HALF BILLION PEOPLE USED WHATSAPP TO COMMUNICATE.

5          NOW IT'S CLOSER TO 3 BILLION PEOPLE USING WHATSAPP.

6          IT'S A FREE SERVICE, FREE TO THE USERS.

7          ORIGINALLY, WHATSAPP WAS ONLY FOR, EFFECTIVELY, TEXT

8     MESSAGES AND GROUP CHATS.

9          BUT BY 2015, WHATSAPP HAD CREATED VOICE CALLING AND VIDEO

10    CALLING, AND A KEY FEATURE OF WHATSAPP, AS YOU'LL HEAR AT THIS

11    TRIAL, IS THAT IT'S ENCRYPTED.  THE MESSAGES ARE PRIVATE BY

12    DESIGN AND AVAILABLE ONLY TO THE SENDER AND THE RECIPIENT, OR

13    THE CALLER AND THE CALLEE.

14         THE DEFENDANTS, NSO, THEY ARE A COMMERCIAL SPYWARE COMPANY

15    BASED IN ISRAEL.

16         THE OTHER DEFENDANT IS Q CYBER, WHICH IS THE PARENT

17    COMPANY OF NSO, AND I'LL REFER TO BOTH OF THEM TOGETHER AS NSO

18    FOR SIMPLICITY.

19         THEIR BUSINESS IS TO MAKE POWERFUL SPYWARE, SOFTWARE

20    DESIGNED TO GET INFORMATION FROM PEOPLE'S MOBILE PHONES WITHOUT

21    THE OWNER KNOWING.

22         THEY HAVE AN EXTENSIVE RESEARCH AND DEVELOPMENT FUNCTION,

23    ACCOUNTING FOR FULLY HALF OF THEIR EMPLOYEES SIT IN RESEARCH

24    AND DEVELOPMENT.

25         AND THEY ALSO DESIGN, IN ADDITION TO THE SPYWARE, THEY

1      DESIGN STRATEGIES FOR GETTING THAT SPYWARE ON TO PEOPLE'S

2      PHONES.

3           THEY CALL THAT STEP, THE INSTALLATION, THEY CALL THAT THE

4      HEART OF ANY OPERATION, BECAUSE IT'S THE INSTALLATION THAT

5      MAKES THE EXTRACTION OF INFORMATION POSSIBLE, AND IT'S THE

6      INSTALLATION THAT THEY WERE DOING THROUGH WHATSAPP SERVERS.

7           THEY SELL THESE CAPABILITIES TO FOREIGN GOVERNMENTS.  THAT

8      IS THEIR BUSINESS.

9           IT WAS FOUNDED, AS I MENTIONED, BY VETERANS OF ELITE

10     ISRAELI MILITARY UNITS, BUT IT'S A PRIVATE COMPANY, A

11     FOR-PROFIT ENTERPRISE.  THEY MAKE MONEY BY DEVELOPING AND

12     SELLING THESE CAPABILITIES.  THAT IS NOT DISPUTED.  AND THEIR

13     FLAGSHIP PRODUCT IS PEGASUS, WHICH IS THE PRODUCT THAT THEY

14     WERE USING WHATSAPP TO INSTALL.

15          IT IS A HIGHLY SOPHISTICATED PRODUCT, AS YOU WILL HEAR,

16     AND IT CARRIES A HEFTY PRICE TAG.  EACH CONTRACT FOR PEGASUS

17     WOULD BE FOR MILLIONS OF DOLLARS, AND THEY WOULD CHARGE MORE,

18     THE MORE TARGETS THE CUSTOMER WANTED TO INFECT.

19          THE COURT, AS I MENTIONED, HAS ALREADY RULED THAT NSO

20     BROKE THE LAW BY USING WHATSAPP SERVERS IN THIS WAY, INCLUDING

21     THEIR USE OF CALIFORNIA SERVERS.

22          THE QUESTION IS DAMAGES, SO LET ME SPEND A FEW MINUTES ON

23     WHAT THE EVIDENCE WILL SHOW AS TO DAMAGES, STARTING WITH

24     COMPENSATORY DAMAGES.

25          THESE ARE, AS I MENTIONED, PAYMENTS TO COMPENSATE WHATSAPP

1    FOR THE WORK IT HAD TO DO AS A RESULT OF THE ATTACK.  YOU WILL

2    HEAR ABOUT THAT WORK DURING THIS TRIAL, THE WORK OF

3    INVESTIGATING EXACTLY WHAT WAS HAPPENING, HOW IT WORKED, HOW IT

4    WAS TAKING ADVANTAGE OF WHATSAPP'S SYSTEMS, THE WORK OF

5    PATCHING THOSE SYSTEMS TO PREVENT THE SAME TYPE OF THING FROM

6    HAPPENING IN THE FUTURE, AND THE WORK OF NOTIFYING VICTIMS.

7         YOU ARE GOING TO HEAR FROM WHAT WHATSAPP ENGINEERS, TWO OF

8    THE ENGINEERS, MR. GHEORGHE AND MR. ROBINSON, WHO WORKED ON THE

9    INVESTIGATION AND RESPONSE.  AND YOU WILL HEAR HOW, AS I

10   SUMMARIZED, THEY NOTICED MESSAGES THAT LOOKED SUSPICIOUS AND

11   CAME TO REALIZE IN MAY 2019 THAT THEY WERE DEALING WITH A

12   MALICIOUS AND HIGHLY SOPHISTICATED ATTACK.

13        YOU WILL ALSO HEAR FROM THEM HOW AFTER WHATSAPP DETECTED

14   THE ATTACK, THEY, AND MANY OTHERS, HAD TO WORK ROUND THE CLOCK,

15   MANY HOURS, LONG HOURS, NIGHTS AND WEEKENDS, MANY DROPPING

16   THEIR REGULAR WORK TO DO THIS INSTEAD, AND YOU WILL HEAR WHY

17   THIS WORK OF INVESTIGATING AND REMEDIATING WAS NECESSARY AND

18   APPROPRIATE.

19        YOU'LL ALSO HEAR FROM ANOTHER FACT WITNESS, MR. WOOG, WHO

20   WAS INVOLVED IN REACHING OUT TO WHATSAPP USERS WHO WERE

21   TARGETED BY THE SPYWARE, AND YOU WILL HEAR WHY THAT WORK ALSO

22   WAS NECESSARY AND APPROPRIATE, INCLUDING SO THAT USERS COULD

23   UPDATE THEIR SOFTWARE.

24        AND FINALLY, YOU'LL HEAR FROM WHATSAPP'S EXPERT WITNESS,

25   DANA TREXLER, WHO'S A FORENSIC ACCOUNTANT, AND SHE CONDUCTED AN

1    ANALYSIS OF THE COSTS THAT WHATSAPP INCURRED IN RESPONDING TO

2    THE ATTACK, AND SHE WILL PRESENT TO YOU HER CALCULATION, WHICH

3    TOTALS THOSE COSTS AS AMOUNTING TO $444,719.

4         SO THAT IS THE EFFECTIVELY THE COMPENSATORY DAMAGES PIECE

5    OF THIS CASE, AND AT THE END OF TRIAL, WE WILL ASK YOU TO AWARD

6    THAT AMOUNT OF COMPENSATORY DAMAGES, $444,719, TO WHATSAPP AS

7    DAMAGES, THE COST OF THE WORK THEY HAD TO DO.

8         THAT LEAVES PUNITIVE DAMAGES.  AND AS TO PUNITIVES, THE

9    EVIDENCE IS DIFFERENT.

10        THIS WILL BE PRINCIPALLY EVIDENCE OF NSO'S CONDUCT, WHAT

11   THEY DID AND HOW THEY DID IT.

12        AND MUCH OF THAT EVIDENCE WILL COME FROM THEIR OWN

13   WITNESSES AND THEIR OWN DOCUMENTS.

14        THE COURT WILL INSTRUCT YOU AS TO WHAT WHATSAPP MUST

15   PROVE.  WE MUST PROVE BY CLEAR AND CONVINCING EVIDENCE THAT

16   THEY CARRIED OUT THEIR CONDUCT WITH MALICE, OPPRESSION, OR

17   FRAUD.  AND THE COURT WILL INSTRUCT YOU AS TO WHAT THOSE TERMS

18   MEAN.

19        THE PURPOSE IS VERY IMPORTANT TO BEAR IN MIND.  IT IS NOT

20   TO COMPENSATE WHATSAPP, BUT TO PUNISH THE MISCONDUCT AND DETER

21   SIMILAR MISCONDUCT IN THE FUTURE.

22        SO WE WILL ASK YOU TO PAY VERY CLOSE ATTENTION TO THE

23   EVIDENCE AS TO WHAT NSO DID AND HOW THEY DID IT.

24        TODAY, LET ME PREVIEW WHAT THAT EVIDENCE WILL SHOW.

25        BY 2018, NSO HAD DEVELOPED THEIR FIRST ZERO-CLICK

1    INSTALLATION VECTOR.  ZERO-CLICK IS A TERM THAT YOU'LL HEAR

2    THROUGHOUT THIS TRIAL, AND THAT MEANS AN INSTALLATION LIKE THE

3    ONE I DESCRIBED THAT REQUIRES NO ACTION BY THE TARGET, BY THE

4    VICTIM.  THEY DON'T HAVE TO CLICK ON A LINK OR OPEN A FILE.  IT

5    GETS INSTALLED AUTOMATICALLY WITHOUT ANY ACTION BY THE USER.

6    THAT'S WHAT ZERO-CLICK MEANS.

7         THEY DEVELOPED THEIR FIRST ZERO-CLICK VECTOR IN 2018, AND

8    IT WORKED BY PLACING A FAKE WHATSAPP PHONE CALL TO THE TARGET,

9    AND IT ONLY WORKED THROUGH WHATSAPP SERVERS.  THAT WAS THEIR

10   ONLY ZERO-CLICK INSTALLATION VECTOR AT THAT TIME.

11        THE MESSAGES THAT THEY WERE SENDING DIDN'T COME FROM A

12   REGULAR WHATSAPP APPLICATION LIKE SOMEONE MIGHT HAVE ON THEIR

13   PHONE.  IT CAME FROM A SPECIAL COMPUTER THAT THEY HAD BUILT,

14   THAT NSO HAD BUILT, CALLED THE WHATSAPP INSTALLATION SERVERS,

15   WIS, WHICH IS ANOTHER TERM THAT YOU WILL BE HEARING ABOUT AT

16   TRIAL.

17        THEY DESIGNED THE WIS BY REVERSE ENGINEERING WHATSAPP'S

18   COMPUTER CODE IN VIOLATION OF THE TERMS OF SERVICE, AND THEY

19   DESIGNED THAT COMPUTER TO CREATE FAKE MESSAGES THAT MIMICKED

20   THE KIND OF REAL MESSAGES THAT WOULD GO THROUGH WHATSAPP

21   SERVERS.

22        ONCE RECEIVED, THOSE MESSAGES WOULD TRIGGER THE USER'S

23   PHONE TO REACH OUT TO A THIRD SERVER AND DOWNLOAD THE PEGASUS

24   SPYWARE.

25        THE ONLY THING THEY NEEDED TO MAKE THIS HAPPEN WAS THE

1    PHONE NUMBER.

2         IT WAS A HIGHLY SOPHISTICATED STRATEGY.  THEY CALLED

3    PEGASUS A BREAKTHROUGH SOLUTION, AND WHEN THEY DEVELOPED

4    ZERO-CLICK INSTALLATION, THEY CALLED IT A SIGNIFICANT MILESTONE

5    FOR THE COMPANY.

6         DURING THIS TIME, 2018 TO 2020, THEIR ONLY ZERO-CLICK

7    INSTALLATION VECTOR FOR ANDROID DEVICES WENT THROUGH WHATSAPP'S

8    SERVERS.

9         AND THE EVIDENCE WILL SHOW THAT THEY USED THAT CAPABILITY

10   AGAIN AND AGAIN.

11        AND WHEN WHATSAPP MADE CHANGES TO THEIR SOFTWARE, TO THEIR

12   SYSTEMS, THAT PREVENTED THEIR ATTACKS FROM WORKING, THEY

13   DESIGNED A NEW ONE AND CAME RIGHT BACK.

14        NSO'S -- THE EVIDENCE IS ALSO GOING TO SHOW THAT NSO'S

15   MOST SENIOR EXECUTIVES WERE AWARE THAT THIS WAS GOING ON.  THEY

16   KNEW THAT PEGASUS -- THAT NSO WAS USING WHATSAPP SERVERS TO

17   INSTALL PEGASUS.  THIS WAS NOT THE ACT OF A ROGUE EMPLOYEE.

18   THIS WAS THEIR BUSINESS, A CAPABILITY THAT THEY INTENTIONALLY

19   DEVELOPED AND SOLD FOR MILLIONS OF DOLLARS.

20        THE EVIDENCE WILL ALSO SHOW THAT THEY HID THEIR CONDUCT,

21   THEY DELIBERATELY MISLED, AND THEY DID SO TO TRICK WHATSAPP AND

22   TO TRICK WHATSAPP USERS TO GET INFORMATION FOR THOSE PHONES AND

23   SELL THAT CAPABILITY FOR PROFIT.

24        SOME OF THE FACTS THAT THE EVIDENCE WILL SHOW AS TO THEIR

25   CONCEALMENT:  YOU WILL SEE THAT THEY TRICKED WHATSAPP USERS AND

1    WHATSAPP INTO PASSING FORGED MESSAGES THAT WERE DESIGNED TO

2    LOOK LIKE NORMAL NETWORK TRAFFIC WHEN, IN FACT, THEY WERE

3    ANYTHING BUT ORDINARY.

4         THE EVIDENCE WILL ALSO SHOW HOW THEY COVERED THEIR TRACKS.

5    YOU WILL HEAR THAT NSO MAINTAINED A GROUP CALLED THE WHITE

6    SERVICES TEAM, THE WHITE SERVICES TEAM, AND THE ROLE OF THAT

7    GROUP WAS TO BUY OR LEASE THE COMPUTER EQUIPMENT THAT THEY

8    NEEDED TO CARRY OUT THESE ATTACKS, SERVERS, OTHER

9    INFRASTRUCTURE, AND TO DO SO IN A WAY THAT WAS ANONYMIZED, IN A

10   WAY THAT COULDN'T BE TRACED BACK TO NSO OR THEIR CUSTOMERS.

11        THEY ALSO MAINTAINED WITHIN THEIR R&D GROUP, THEIR

12   RESEARCH AND DEVELOPMENT GROUP, ANOTHER TEAM CALLED THE OP SET

13   GROUP, OPERATIONAL SECURITY, A STAND ALONE TEAM WHOSE PURPOSE

14   WAS TO AVOID DETECTION OF WHAT NSO WAS DOING SO THAT THEY COULD

15   KEEP THESE STRATEGIES UP AND RUNNING AS LONG AS POSSIBLE.

16        THAT -- THE ROLE OF THAT TEAM INCLUDED HIDING THIS, MAKING

17   SURE THAT THIS CONDUCT REMAINED HIDDEN FROM WHATSAPP USERS, AND

18   ALSO FROM WHATSAPP.

19        AND THE MOST IMPORTANT ASSET THAT THEY WANTED TO

20   PROTECT -- YOU'LL SEE THIS IN THEIR DOCUMENTS -- WAS THIS

21   WHATSAPP EXPLOIT.  THAT WAS THEIR NUMBER ONE SECRET TO PROTECT.

22        THE EVIDENCE IS ALSO GOING TO SHOW THE REASON THAT THEY

23   HID THIS CONDUCT FROM WHATSAPP, AND THAT IS THAT THEY KNEW THAT

24   WHATSAPP DID NOT PERMIT THIS KIND OF ACTIVITY.  THEY KNEW THAT

25   WHATSAPP DID NOT WANT THIS TYPE OF CONDUCT ON THEIR SERVERS.

1              AND THEY KNEW THAT IF WHATSAPP DETECTED WHAT THEY WERE

2       DOING, WHATSAPP WOULD STOP IT.

3              AND SO FOR THAT REASON, THEY COVERED THEIR TRACKS, THEY

4       DELIBERATELY HID WHAT THEY WERE DOING THROUGH ANONYMIZED

5       SERVERS, FORGED MESSAGES, AND OTHER STRATEGIES, ALL IN ORDER TO

6       MAKE AN INSTALLATION THAT, IN THEIR OWN WORDS, WAS COMPLETELY

7       INVISIBLE AND CANNOT BE STOPPED.

8              ONCE THE INSTALLATION WAS COMPLETE, THE EVIDENCE IS ALSO

9       GOING TO SHOW THE CAPABILITIES OF PEGASUS, THE ABILITY TO READ

10      MESSAGES, LISTEN TO PHONE CALLS, EXTRACT CONTACT LISTS,

11      PINPOINT LOCATIONS, ACTIVATE DEVICE MICROPHONES, AND TAKE

12      PICTURES, AS I MENTIONED, WITH THE PHONE'S CAMERA, ALL WITHOUT

13      THE USER KNOWING.

14             AND FINALLY, THE LAST POINT I WANTED TO PREVIEW FOR YOU

15      TODAY IS THAT THE EVIDENCE WILL SHOW THAT THEY DID THIS

16      REPEATEDLY, AGAIN AND AGAIN AND AGAIN.  THE WHATSAPP VECTORS

17      WERE USED TO INSTALL PEGASUS BETWEEN HUNDREDS AND TENS OF

18      THOUSANDS OF TIMES.  THIS WAS NOT A ONE-TIME ATTACK.  THIS WAS

19      A REPEATED PATTERN OF ATTACKS OVER THE COURSE OF YEARS.

20             AND I TALKED ABOUT THE ATTACK THAT WAS DETECTED IN MAY

21      2019, BUT THAT WASN'T THE FIRST TIME, AND IT WASN'T THE LAST.

22             YOU WILL HEAR ABOUT THREE DIFFERENT INSTALLATION VECTORS

23      THAT NSO DEVELOPED AND USED AGAINST WHATSAPP SERVERS, AND THEY

24      REFER TO THESE THREE VECTORS COLLECTIVELY AS THE HUMMINGBIRD

25      VECTORS.  THAT'S A TERMINOLOGY THAT YOU'LL HEAR AT THIS TRIAL,

1    THE HUMMINGBIRD VECTORS IS THE COLLECTION OF THEIR THREE

2    ZERO-CLICK INSTALLATION VECTORS FOR ANDROID DEVICES.

3         THE FIRST OF THOSE WAS HEAVEN.  THAT WAS THEIR NAME FOR

4    IT.  AND THAT WAS ACTIVE IN 2018.  THAT WAS THEIR FIRST

5    ZERO-CLICK INSTALLATION VECTOR FOR ANDROID DEVICES, THE ONE

6    THAT THEY CALLED A SIGNIFICANT MILESTONE FOR THE COMPANY.

7         IN DECEMBER 2018, HOWEVER, WHATSAPP MADE SYSTEMS CHANGES

8    AND HEAVEN DIDN'T WORK ANYMORE.

9         THE EVIDENCE WILL SHOW THAT NSO DIDN'T GIVE UP.  THEY GOT

10   RIGHT BACK TO WORK AND DESIGNED A NEW EXPLOIT BY WHICH THEY

11   COULD SEND PEGASUS CODE THROUGH WHATSAPP SERVERS.  THAT SECOND

12   EXPLOIT WAS CALLED EDEN, AND THAT ONE WAS ACTIVE IN 2019.

13        THAT'S THE EXPLOIT THAT CARRIED OUT THE ATTACKS THAT

14   WHATSAPP DETECTED IN MAY OF 2019.

15        AND I MENTIONED THE WORK THAT WHATSAPP ENGINEERS DID AFTER

16   THAT ATTACK WAS DETECTED TO INVESTIGATE IT AND PREVENT IT FROM

17   HAPPENING AGAIN.  THAT WORK WAS SUCCESSFUL, AND AFTER MAY 13TH,

18   2019, EDEN DIDN'T WORK ANYMORE, EITHER.

19        BUT, AGAIN, NSO DID NOT GIVE UP.  THEY DIDN'T STOP TRYING.

20   THEY GOT BACK TO WORK AND DESIGNED A THIRD INSTALLATION VECTOR.

21   THIS ONE WAS CALLED ERISED, WHICH IS DESIRE SPELLED BACKWARDS.

22        AND THE EVIDENCE WILL SHOW THAT THEY WERE USING ERISED TO

23   TRANSMIT PEGASUS CODE THROUGH WHATSAPP SERVERS EVEN AFTER THIS

24   LAWSUIT HAD BEEN BROUGHT, EVEN AFTER WHATSAPP HAD SUED THEM IN

25   THIS COURTHOUSE FOR VIOLATING FEDERAL AND CALIFORNIA LAW BY

1    HACKING OUR SERVERS, PUTTING THEM ON NOTICE THAT THEIR CONDUCT

2    WAS ILLEGAL, THEY WERE STILL DOING IT.

3         EVERY TIME THEY STOPPED, THEY ATTACKED AGAIN, AND THEY

4    REFER TO THIS AS THE CAT AND MOUSE GAME.  YOU'LL SEE THEM USING

5    THAT TERMINOLOGY.  THEY ATTACK, WE DEFEND; THEY ATTACK AGAIN,

6    WE DEFEND AGAIN; THEY KEEP COMING BACK AND BACK AND BACK.  THAT

7    IS WHAT THE EVIDENCE WILL SHOW.  THIS IS THEIR BUSINESS.

8         SO, LADIES AND GENTLEMEN, THANK YOU FOR YOUR ATTENTION.

9    I'VE PREVIEWED WHAT THE EVIDENCE WILL SHOW AS TO NSO'S CONDUCT

10   AND AS TO THE COSTS THAT WHATSAPP INCURRED AS A RESULT.

11        THE COURT HAS ALREADY FOUND THAT NSO BROKE THE LAW, AND

12   YOU'LL BE INSTRUCTED THAT YOU MUST ACCEPT THAT DETERMINATION AS

13   TRUE.

14        THE ONLY QUESTION IS WHAT DAMAGES NSO SHOULD PAY TO BE

15   HELD ACCOUNTABLE FOR THIS CONDUCT.

16        AT THE END OF TRIAL, AFTER YOU HAVE HEARD THE EVIDENCE, MY

17   COLLEAGUE, MR. ANDRES, WILL HAVE THE OPPORTUNITY TO EXPLAIN TO

18   YOU WHY YOU SHOULD AWARD WHATSAPP COMPENSATORY DAMAGES IN THE

19   AMOUNT OF THE $444,000 THAT I MENTIONED.

20        AND BEYOND THAT, HE WILL HAVE THE OPPORTUNITY TO EXPLAIN

21   WHY NSO'S CONDUCT IN THIS CASE, SECRETLY USING WHATSAPP SERVERS

22   TO INSTALL SPYWARE ON THESE PEOPLE'S PHONES, WITHOUT THEIR

23   KNOWLEDGE OR CONSENT, WITHOUT THE CONSENT OR KNOWLEDGE OF

24   WHATSAPP, AND DOING THAT REPEATEDLY AGAIN AND AGAIN IS

25   MALICIOUS, OPPRESSIVE, AND FRAUDULENT, WHY IT IS THE KIND OF

1    DESPICABLE AND REPREHENSIBLE CONDUCT THAT WARRANTS PUNITIVE

2    DAMAGES.

3         THANK YOU VERY MUCH FOR YOUR ATTENTION THIS MORNING.

4              THE COURT:  ALL RIGHT.  AND FOR THE DEFENSE THIS

5    MORNING?

6              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

7              **(MR. AKROTIRIANAKIS GAVE HIS OPENING STATEMENT ON BEHALF**

8    **OF DEFENDANTS.)**

9              MR. AKROTIRIANAKIS:  MAY I PROCEED?

10             THE COURT:  YES.

11             MR. AKROTIRIANAKIS:  MEMBERS OF THE JURY, GOOD

12   MORNING.

13        AS I MENTIONED YESTERDAY DURING VOIR DIRE, THERE ARE

14   ALWAYS TWO SIDES TO THE STORY.

15        THIS IS THE REASON WE ARE HERE.  WILL CATHCART, THE HEAD

16   OF WHATSAPP, WANTS TO DAMAGE NSO AS MUCH AS POSSIBLE.  AND HE

17   WANTED HIS STAFF TO FIND WAYS TO DAMAGE NSO AS MUCH AS

18   POSSIBLE.

19        THAT'S WHAT A WHATSAPP SOFTWARE ENGINEERING MANAGER NAMED

20   CLAUDIU GHEORGHE WAS WORKING ON WHEN HE SENT THESE MESSAGES ON

21   JUNE 20, 2019.  AND THAT'S WHAT'S BEHIND THIS LAWSUIT.

22        NOW, YOU MIGHT THINK THAT WANTING TO DAMAGE YOUR

23   COUNTERPART, ADVERSARY, AS MUCH AS POSSIBLE IS THE NORM IN A

24   BUSINESS DISPUTE BETWEEN TWO COMPANIES.  IT'S NOT.

25             PLAINTIFFS ARE SEEKING DAMAGES FOR TIME SPENT BY THEIR

1    SALARIED EMPLOYEES, AND MUCH OF THAT TIME WAS SPENT TRYING TO

2    FIND WAYS, AS THE MESSAGES SAY, TO DAMAGE NSO AS MUCH AS

3    POSSIBLE.

4         ONE OF THE INSTRUCTIONS THAT YOU WILL RECEIVE FROM THE

5    COURT AT THE END OF THE CASE CONCERNS THE PURPOSE OF

6    COMPENSATORY DAMAGES, AND IT PROVIDES THAT THE PURPOSE OF

7    COMPENSATORY DAMAGES IS TO PUT PLAINTIFFS IN AS GOOD A POSITION

8    AS THEY WOULD HAVE BEEN IF THE DEFENDANTS HAD NOT COMMITTED THE

9    CONDUCT THAT THE COURT HAS FOUND TO BE VIOLATIVE.

10        FINDING WAYS TO HURT NSO AS MUCH AS POSSIBLE IS SIMPLY NOT

11   PUTTING PLAINTIFFS BACK IN AS GOOD A POSITION, AND IT IS NOT

12   PROPER DAMAGES.

13        AND AS YOU'LL SEE IN A FEW MINUTES, PLAINTIFFS' ENGINEERS

14   EVEN SPENT SOME OF THEIR TIME TRYING TO STEAL THE PEGASUS CODE,

15   AND PLAINTIFFS ARE SEEKING DAMAGES FOR THAT TIME, TOO.

16        THOSE AREN'T PROPER DAMAGES, EITHER.

17        BUT WHAT IT -- BUT THAT IS WHAT WE'RE HERE TO DECIDE, WHAT

18   ARE THE PROPER DAMAGES?

19        MAKING THIS ALL MORE REMARKABLE IS THAT NSO NEVER INTENDED

20   TO INJURE THE PLAINTIFFS.  AND WHAT NSO DID, IN FACT, NEVER

21   HARMED THE PLAINTIFFS' SERVERS OR COMPUTERS IN ANY WAY, AND

22   THEY'LL TELL YOU THEMSELVES.

23        WHO ARE THE DEFENDANTS?

24        THE DEFENDANTS IN THIS LAWSUIT ARE GOVERNMENT CONTRACTING

25   COMPANIES IN ISRAEL.  AS YOU HEARD, ONE DEFENDANT IS NSO GROUP

1    TECHNOLOGIES, LIMITED, AND THE OTHER DEFENDANT IS ITS PARENT

2    COMPANY, Q CYBER TECHNOLOGIES, LIMITED.

3         AS THE NAME SUGGESTS, NSO IS A TECHNOLOGY COMPANY.  THE

4    TECHNOLOGY THAT IT DEVELOPS ARE INTELLIGENCE GATHERING PRODUCTS

5    THAT NSO LICENSES EXCLUSIVELY TO GOVERNMENT AGENCIES.

6         NSO'S MAIN OFFERING TO ITS GOVERNMENT CUSTOMERS IS A SUITE

7    OF TECHNOLOGIES THAT ARE MARKETED UNDER THE NAME BRAND PEGASUS.

8    PEGASUS IS COMPRISED OF A COLLECTION OF PROGRAMS THAT HAVE BEEN

9    LICENSED BY GOVERNMENTS AND GOVERNMENT AGENCIES AROUND THE

10   WORLD.  NSO HAS NEVER LICENSED PEGASUS TO ANY KIND OF CUSTOMER

11   OTHER THAN A GOVERNMENT AGENCY.

12        AS MR. PEREZ STATED, I THINK -- WELL, I STOPPED COUNTING

13   AFTER EIGHT TIMES.

14        FACEBOOK IS GOING TO BE CALLED PEGASUS SPYWARE THROUGHOUT

15   THIS TRIAL, AND WHEN YOU THINK OF THE TERM "SPYWARE," IT

16   CONJURES THOUGHTS OF SCAMMERS WHO ARE TRYING TO STEAL BANK

17   ACCOUNT OR CREDIT CARD INFORMATION.

18        PEGASUS IS NOT THAT.

19        FACEBOOK -- FACEBOOK IS GOING TO TRY AND SCARE YOU INTO

20   THINKING THAT IT CAN BE USED FOR THAT, BUT YOU'RE NOT GOING TO

21   HEAR ANY EVIDENCE THAT PEGASUS WAS EVER LICENSED TO OR USED BY

22   SCAMMERS.  IT WAS ONLY USED BY GOVERNMENTS.

23        AND SPYWARE IS AN INTERESTING WORD.  SPYING, AFTER ALL, IS

24   ALL ABOUT GATHERING INTELLIGENCE AND INFORMATION, AND PEGASUS

25   IS A GOVERNMENT INTELLIGENCE TOOL FOR THE MOBILE DEVICE ERA.

1          THIS IS A VERY SIMPLIFIED SCHEMATIC OF HOW THE PEGASUS

2     INTELLIGENCE TOOL IS INSTALLED ON A TARGET DEVICE.  THE SCENE

3     IS THAT YOU HAVE A TARGET, INTELLIGENCE TARGET WITH A MOBILE

4     PHONE FROM WHICH A GOVERNMENT AGENCY WANTS TO GATHER

5     INTELLIGENCE.

6          IF THAT GOVERNMENT AGENCY IS A CUSTOMER OF NSO, THEY WILL

7     HAVE RECEIVED A LAPTOP CONTAINING THE PEGASUS USER INTERFACE

8     AND A SERVER RACK THAT CONTAINS A PROGRAM THAT SENDS THE

9     PEGASUS AGENT.  THAT IS SOMETIMES CALLED THE SECONDARY PAYLOAD

10    SERVER.

11         THIS HARDWARE IS THE CUSTOMER'S PROPERTY.  THE SOFTWARE IS

12    LICENSED ONLY.

13         THE USER INTERFACE ON THE LAPTOP, OR USING THE USER

14    INTERFACE ON THE LAPTOP, THE PEGASUS SOFTWARE GENERATES A

15    CONNECTION TO A MOBILE PHONE THAT CAUSES THE MOBILE PHONE TO

16    REACH OUT TO THE PAYLOAD SERVER AND DOWNLOAD THE PEGASUS AGENT

17    FROM THE PAYLOAD SERVER TO THE MOBILE PHONE.

18         THE GOVERNMENT AGENCY CAN THEN GATHER INTELLIGENCE FROM

19    THE MOBILE PHONE.

20         THERE ARE MANY WAYS TO MAKE THIS INITIAL CONNECTION WITH

21    THE INTELLIGENCE TARGET'S PHONE.  AS RELEVANT TO THIS CASE,

22    HOWEVER, THREE RELATED VERSIONS OF PEGASUS THAT WERE AVAILABLE

23    BETWEEN LATE 2018 AND MID-2020, THE INSTALLATION PROCESS

24    INVOLVED SENDING SPECIALLY CONFIGURED MESSAGES THROUGH --

25    WHATSAPP MESSAGES, OF COURSE WHATSAPP MESSAGES TRAVEL AND

1    TRANSIT WHATSAPP SERVERS.

2         THERE HAVE BEEN DOZENS OF VERSIONS OF THE PEGASUS SOFTWARE

3    WHERE THE INSTALLATION HAD NOTHING TO DO WITH WHATSAPP, AND

4    THOSE HAVE NEVER BEEN HELD TO VIOLATE THE LAWS OR TERMS OF

5    SERVICE OF THE CONTRACT AT ISSUE IN THIS CASE.

6         BUT A VERSION THAT WAS ACTIVE IN APRIL AND MAY OF 2019 DID

7    USE WHATSAPP IN THE INSTALLATION PROCESS, AS DID ONE VERSION

8    THAT CAME BEFORE AND ONE VERSION THAT CAME AFTER.

9         NSO RESEARCHERS DISCOVERED A WAY TO BE ABLE TO SEND THE

10   FIRST INSTALLATION MESSAGE TO THE PHONES OF TARGETS BY SENDING

11   THE PHONE A WHATSAPP MESSAGE INSTRUCTING THE PHONE TO DOWNLOAD

12   PEGASUS, THE PEGASUS AGENT FROM THE SEPARATE SERVER.

13        THESE VERSIONS OF PEGASUS WERE FOR GATHERING INTELLIGENCE

14   FROM DEVICES WITH ANDROID OPERATING SYSTEMS, AND FOR THE

15   WHATSAPP CALL TO GO FROM THE PEGASUS USER INTERFACE TO THE

16   TARGET'S ANDROID PHONE, THERE IS A MESSAGE THAT IS CALLED A

17   CALL OFFER, AND THAT WOULD BE SENT FROM THE SYSTEM TO A MOBILE

18   PHONE OF THE TARGET THAT IS SELECTED BY NSO'S GOVERNMENT

19   CUSTOMER.

20        AFTER REACHING THE MOBILE PHONE OF THE TARGET, THE CALL

21   OFFER MESSAGE WOULD CAUSE THE TARGET PHONE TO REACH OUT TO THE

22   SECONDARY PAYLOAD SERVER, ALSO OWNED BY NSO'S GOVERNMENT

23   CUSTOMER, AND DOWNLOAD THE PEGASUS AGENT AND INSTALL IT ON THE

24   TARGET PHONE.

25        NOW, THE REASON I SAY THIS AGAIN IS TO POINT OUT TO YOU

1    THAT THE SECOND PART WHERE THE TARGET PHONE REACHES OUT TO THE

2    PAYLOAD SERVER AND DOWNLOADS PEGASUS, NONE OF THAT GOES THROUGH

3    WHATSAPP SERVERS OR INVOLVES WHATSAPP AT ALL, AND THE DATA THAT

4    IS GATHERED FROM THE TARGET PHONE, THAT DOESN'T GO THROUGH

5    WHATSAPP SERVERS, EITHER.

6         BUT THE INITIAL CALL OFFER MESSAGE, THAT AND SOME

7    INFORMATION ABOUT THE PHONE, LIKE DOES IT HAVE WHATSAPP, IS IT

8    CONNECTED TO THE INTERNET, THOSE DID PASS THROUGH WHATSAPP

9    SERVERS IN 2019.

10        NOW, FOR YOUR TASK IN THIS CASE, THE MOST IMPORTANT FACT

11   IS THIS:  THESE SPECIALLY CONFIGURED MESSAGES THAT WERE ROUTED

12   THROUGH WHATSAPP SERVERS DID NOT IN ANY WAY IMPAIR THE

13   FUNCTIONALITY OF OR OTHERWISE AFFECT THE WHATSAPP SERVERS OR

14   THE WHATSAPP SYSTEM.

15        I COULD NOT SUMMARIZE IT ANY MORE SUCCINCTLY THAN FACEBOOK

16   DID ITSELF IN THIS INTERNAL REPORT:  "THE WHATSAPP SERVERS WERE

17   NOT COMPROMISED BY THIS ATTACK."

18        THIS IS A FACEBOOK DOCUMENT, NOT AN NSO DOCUMENT.  IT'S

19   FACEBOOK'S OWN WORDS.  AND FACEBOOK AND WHATSAPP PROVIDED THIS

20   INTERNAL DOCUMENT IN THIS LAWSUIT ON A HIGH LY CONFIDENTIAL

21   BASIS.

22        IT'S ACTUALLY PART OF A FORMAL REPORT PRESENTATION, THIS

23   IS, THERE'S A REPORT ALSO, INTERNAL TO FACEBOOK AND WHATSAPP

24   ONLY, THIS PRESENTATION, CALLED THE "TECHNICAL ANALYSIS OF THE

25   WHATSAPP 0-CLICK EXPLOIT," AND THE TESTIMONY OF PLAINTIFFS'

1    WITNESSES WILL BE THE SAME AS THIS:  THE WHATSAPP SERVERS WERE

2    NOT COMPROMISED.

3         IN THIS LAWSUIT, PLAINTIFFS ALLEGE THAT THE USE OF

4    WHATSAPP TO SEND PEGASUS MESSAGES WAS ILLEGAL UNDER U.S. LAW.

5    PLAINTIFFS ALLEGE THAT NSO UNLAWFULLY ACCESSED SERVERS OWNED BY

6    FACEBOOK IN VIOLATION OF A LAW CALLED CFAA --

7              MR. ANDRES:  OBJECTION, YOUR HONOR.

8              MR. AKROTIRIANAKIS:  -- A CALIFORNIA LAW CALLED CDAFA

9    THAT APPLIES TO CONDUCT IN CALIFORNIA.

10        AS WE HEARD A BIT AGO, THE COURT HAS GRANTED JUDGMENT ON

11   LIABILITY, RULING THAT THE SENDING OF THOSE MESSAGES -- THE

12   INSTALLATION MESSAGES TO THE TARGET AND HAVING THOSE TRANSIT

13   WHATSAPP SERVERS VIOLATED THE STATUTES THAT I MENTIONED.

14        SO THIS TRIAL IS STRICTLY ABOUT DAMAGES.

15             THE CLERK:  I JUST TURNED IT OFF SO THAT THE BRIGHT

16   LIGHT IS NOT SHINING IN THE JURORS' FACES.

17             MR. AKROTIRIANAKIS:  OH, I'M SORRY.

18             THE CLERK:  IF SOMETHING COMES UP, I'LL TURN IT BACK

19   ON.

20             MR. AKROTIRIANAKIS:  OKAY.  THANK YOU.

21        SO THIS TRIAL IS STRICTLY ABOUT DAMAGES.

22        AND FACEBOOK IS ASKING YOU TO ORDER NSO TO GIVE IT EVEN

23   MORE MONEY.  SOMETHING -- THERE'S SOMETHING I'M BRINGING UP --

24   SOMETHING WE DIDN'T HEAR FROM FACEBOOK, PERHAPS BECAUSE THEY

25   WANT YOU TO BE SCARED, IS THAT PEGASUS IS DESIGNED IN SUCH A

```
 1    WAY THAT IT CANNOT BE USED IN THE UNITED STATES.

 2         THE REASON WHY IS THAT PEGASUS SIMPLY DOES NOT WORK IN

 3    THIS GEOGRAPHICAL TERRITORY.

 4         IT ALSO CANNOT BE USED AGAINST AN AMERICAN PHONE NUMBER

 5    WITH A PLUS 1 COUNTRY CODE.  THE SINGLE EXCEPTION TO THAT WAS A

 6    SPECIALLY CONFIGURED VERSION OF PEGASUS TO BE USED IN

 7    DEMONSTRATION TO POTENTIAL U.S. GOVERNMENT CUSTOMERS.

 8         SO SOMEONE TRAVELLING OUTSIDE OF THE UNITED STATES WITH A

 9    PHONE NUMBER THAT STARTS WITH PLUS 1, PEGASUS DOES NOT WORK

10    AGAINST IT.

11         HERE IN THE UNITED STATES, PEGASUS DOES NOT WORK AGAINST

12    ANY DEVICE, REGARDLESS OF THE PHONE NUMBER.

13         YOUR TASK IN THIS TRIAL IS TO DETERMINE WHAT, IF ANY,

14    DAMAGES THESE VIOLATIONS CAUSED TO PLAINTIFFS.  AS

15    JUDGE HAMILTON HAS INSTRUCTED YOU, THERE ARE TWO TYPES OF

16    DAMAGES THAT ARE POTENTIALLY AT ISSUE IN THIS CASE AND YOU WILL

17    BE ASKED TO MAKE DECISIONS ABOUT.  THOSE ARE COMPENSATORY

18    DAMAGES AND PUNITIVE DAMAGES.

19         I'M GOING TO FIRST TALK ABOUT COMPENSATORY DAMAGES, AND

20    THEN I WILL ADDRESS PUNITIVE DAMAGES TOWARDS THE END.

21         SO WHAT ARE THE CLAIMED DAMAGES?

22         THEY'RE INCREDIBLY SMALL CONSIDERING THAT FACEBOOK, NOW

23    CALLED META, IS A COMPANY WORTH MORE THAN $1.3 TRILLION.

24         PLAINTIFFS ARE SEEKING $444,719 IN CLAIMED DAMAGES.

25         AND FOR PERSPECTIVE, YOU'RE GOING TO HEAR TESTIMONY ABOUT
```

1    ONE OF PLAINTIFFS' SOFTWARE ENGINEERS, A PERSON NAMED

2    YUANYUAN WANG, THAT PERSON'S ANNUAL SALARY, ACCORDING TO THE

3    WAY THE PLAINTIFFS CALCULATE IT, WAS OVER 1.1 MILLION.  THAT'S

4    MORE THAN TWO AND A HALF TIMES THE ENTIRE AMOUNT OF DAMAGES

5    THAT ARE CLAIMED IN THIS CASE.

6        WHY ARE THE DAMAGES SO SMALL?  PLAINTIFFS' OWN WITNESSES

7    WHO WILL TESTIFY, LIKELY TODAY, AGREE THAT PEGASUS DID NOT

8    AFFECT WHATSAPP SERVICE OR SERVERS IN ANY WAY.  HERE IS SOME OF

9    THE TESTIMONY THAT YOU WILL HEAR FROM ONE OF PLAINTIFFS' OWN

10   SECURITY ENGINEERS, THE GENTLEMAN IS CLAUDIU GHEORGHE, I ALSO

11   MENTIONED HIM, HE WAS THE ONE WITH THE MESSAGE AT THE BEGINNING

12   OF THIS TALK.  HE'S A WHATSAPP SECURITY ENGINEER WHO DESCRIBES

13   HIMSELF AS THE MAIN COORDINATOR FOR THIS PROJECT.

14       (A VIDEOTAPE WAS PLAYED IN OPEN COURT, BUT NOT REPORTED.)

15       MR. AKROTIRIANAKIS:  IN SHORT, THE SPECIALLY

16   CONFIGURED MESSAGES THAT ROUTED THROUGH WHATSAPP SERVERS, THEY

17   TOOK NOTHING FROM THE SERVERS, THEY LEFT NOTHING BEHIND, AND

18   THEY HAD NO EFFECT, EVEN FOR THE NANOSECOND THAT THEY WERE

19   PASSING THROUGH.

20       AS PLAINTIFFS' OWN INTERNAL INVESTIGATION CONCLUDED,

21   PEGASUS DID NOT COMPRISE WHATSAPP SERVERS IN ANY WAY.

22       NOW, I SUSPECT THAT FACEBOOK'S WITNESSES ARE GOING TO TRY

23   AND WALK THIS BACK, PROBABLY THROUGH THEIR GLOBAL HEAD OF THE

24   DEPARTMENT OF SPIN, OR AS THEY CALL IT COMMUNICATIONS.  THAT'S

25   THIS GENTLEMAN, MR. WOOG.

1          AND IF HE TRIES TO CONTRADICT THE ACTUAL SECURITY

2     ENGINEERS, LIKE MR. GHEORGHE --

3               MR. ANDRES:  OBJECTION, YOUR HONOR.

4               THE COURT:  OVERRULED.

5               MR. AKROTIRIANAKIS:  -- YOU SHOULDN'T LET HIM GET

6      AWAY WITH IT.

7          WHEN HE TRIES TO TELL YOU SOMETHING LIKE, OH, WELL, THE

8     INTEGRITY OF OUR SERVERS, OR THEY DID SOMETHING THEY WEREN'T

9     SUPPOSED TO DO, I WANT YOU TO REMEMBER WHAT MR. GHEORGHE SAID

10    IN THE SWORN TESTIMONY THAT YOU JUST SAW.

11         WHATSAPP SERVERS WERE NOT COMPROMISED IN ANY WAY.

12         INSTEAD, PEGASUS SIMPLY USED THE WHATSAPP SERVICE TO SEND

13    A MESSAGE TO TARGETS OF GOVERNMENT AGENCIES.  THOSE MESSAGES

14    CONTAINED PEGASUS CODE THAT DID NOT AND COULD NOT ACTUALLY DO

15    ANYTHING TO HARM THE WHATSAPP SERVERS OR REWRITE ANY OF

16    WHATSAPP'S OWN CODE.

17         AND THAT WAS BY DESIGN.

18         IT'S GOING TO BE BLANK FOR A MINUTE, SO FOR THE JURORS,

19    YOU CAN TAKE IT DOWN.

20         THE DEFENDANTS' WITNESSES WILL TESTIFY THAT THE FACT THAT

21    WHATSAPP SERVERS WAS UNDAMAGED WAS BY DESIGN.  PEGASUS IS

22    SPECIFICALLY DESIGNED SO THAT IT WOULD NOT AFFECT THE SERVERS

23    IN ANY WAY.

24         AND FROM THE PERSPECTIVE OF THE WHATSAPP SERVERS, A

25    PEGASUS MESSAGE BEHAVED JUST LIKE THE HUNDREDS OF BILLIONS OF

1    OTHER WHATSAPP MESSAGES PROCESSED DAY IN AND DAY OUT THROUGH

2    THOSE SERVERS, ALL IN ACCORDANCE WITH THE SERVER'S RULES.

3         AFTER ALL, SERVERS ARE NOT CAPABLE OF THOUGHT, AT LEAST

4    NOT YET.  AND THEY PROCESS MESSAGES ONLY ACCORDING TO THE

5    SERVER'S RULES.  IF A MESSAGE DOES NOT COMPLY WITH SERVER

6    RULES, THE SERVER DOES NOT PROCESS IT.

7         ULTIMATELY THAT'S WHAT HAPPENED HERE.  WHATSAPP

8    IMPLEMENTED A SOFTWARE PATCH THAT CHANGED ITS SERVER RULES SO

9    THAT THE WHATSAPP SERVERS WOULD NO LONGER PROCESS THESE

10   SPECIALLY CONFIGURED MESSAGES.

11        NOW, COUNSEL, AS HE HAS ALREADY, WILL CALL DEFENDANTS A

12   LOT OF NAMES DURING THIS TRIAL, HACKERS, FOR EXAMPLE, AND

13   THAT'S BECAUSE FACEBOOK WANTS TO CREATE AN IMPRESSION THAT NSO

14   HACKED THE PASSWORD FOR THE COMPUTER THAT STORES THE WHATSAPP

15   CODE, OR MAYBE ERASED PARTS OF IT, OR REWROTE PARTS OF IT.

16        BUT NSO DIDN'T DO THAT, AND FACEBOOK WON'T PUT ON ANY

17   EVIDENCE THAT NSO DID.

18        INSTEAD -- MS. COLLINS, CAN I HAVE THE SCREEN -- NSO

19   SIMPLY FIGURED OUT A WAY TO FORMAT A WHATSAPP MESSAGE SUCH THAT

20   IT WOULD SEND A SIGNAL TO A TARGET DEVICE, AND NSO'S GOVERNMENT

21   CUSTOMERS THEN SENT THOSE MESSAGES THROUGH WHATSAPP SERVERS TO

22   THEIR TARGETS.

23        NONE THAT HARMED WHATSAPP SERVERS IN ANY WAY.

24        BUT FACEBOOK IS ASKING FOR COMPENSATORY DAMAGES, AND FOR

25   THOSE DAMAGES, I'M SORRY TO TELL YOU THAT THERE MAY BE SOME

1    MATH.

2          CHOICE NUMBER 1 WILL BE THAT FACEBOOK HAD $0 IN LOSSES

3    BECAUSE EVERYTHING IT'S ASKING FOR IS THE EXPENSE OF SALARIED

4    EMPLOYEES WHO WOULD HAVE BEEN PAID THE SAME NO MATTER WHAT NSO

5    DID.

6          AND LET ME BE CLEAR ABOUT THAT.  IN THIS WORLD WHERE WE

7    ARE, COMPARED TO A HYPOTHETICAL WORLD WHERE THERE IS NO NSO,

8    THERE IS NO PEGASUS, WHATSAPP AND FACEBOOK WOULD NOT HAVE SPENT

9    EVEN ONE CENT MORE OR LESS THAN THEY DID.

10         SO IN TERMS OF WHAT DID THE PLAINTIFFS LOSE AND WHAT NEEDS

11   TO BE RESTORED TO THEM, THE ANSWER IS $0.

12         IN FACEBOOK'S ALTERNATIVE REALITY WHERE, EVEN THOUGH THEY

13   DIDN'T PAY ANY ADDITIONAL MONEY, BUT HAVE LOSSES NONETHELESS,

14   THERE WILL BE MATH.

15         THERE WILL ALSO BE ECONOMISTS TO HELP WITH THE MATH, AND

16   YOUR TASK WILL BE TO DECIDE WHICH CATEGORIES OF THINGS THAT

17   WENT INTO THIS $444,000 NUMBER WERE ACTUALLY LOSSES THAT

18   RESULTED FROM FACEBOOK REMEDIATING ANYTHING THAT NSO DID.

19         FACEBOOK'S DAMAGES BREAK INTO TWO TIME PERIODS:  UP TO AND

20   INCLUDING MAY 13TH, 2019, WHICH WAS THE DAY THAT THE SECURITY

21   PATCH WAS APPLIED; AND AFTER MAY 13TH, 2019.

22         THIS IS THE CALCULATION THAT THEIR EXPERT DID, AND YOU

23   WILL HEAR FROM HER WHY THAT WAS.

24         AND THE EVIDENCE WILL SHOW SEVERAL WAYS THAT THIS $444,000

25   NUMBER IS ACTUALLY QUITE INFLATED.

1          WHAT ARE THE CLAIMED DAMAGES BEFORE MAY 13TH, 2019?

2          ALTHOUGH THERE WAS NO DAMAGE TO WHATSAPP SERVERS,

3     PLAINTIFFS DO CLAIM THAT THEY SUFFERED LOSSES.  THAT IS BECAUSE

4     BETWEEN MAY 2 AND MAY 13, 2019, SEVERAL FACEBOOK AND WHATSAPP

5     EMPLOYEES SPENT SOME TIME INVESTIGATING AND CREATING A SOFTWARE

6     PATCH THAT WOULD CAUSE WHATSAPP SERVERS NO LONGER TO PROCESS

7     PEGASUS MESSAGES.

8          ON MAY 2, FACEBOOK DISCOVERED THE VULNERABILITIES.  NO

9     LATER THAN MAY 6TH, FACEBOOK HAD THE PATCHES READY.  THEY

10    INSTALLED THE PATCH ON MAY 13, WHICH FIXED THE VULNERABILITY

11    AND ENABLED THE SERVERS THAT PROCESSED THE PEGASUS MESSAGES TO

12    NO LONGER DO SO.

13         BETWEEN MAY 2 AND MAY 13, FACEBOOK IS CLAIMING THAT THE

14    VALUE OF ITS EMPLOYEES' TIME SPENT WORKING ON THIS PATCH WAS

15    ALMOST EXACTLY $215,000, WHICH CORRESPONDS TO 21 EMPLOYEES

16    WORKING FULL TIME.

17         NOW, OVER 40 PERCENT OF THE CLAIMED EXPENSE IS ASSOCIATED

18    WITH SOMETHING CALLED RESTRICTED STOCK UNITS, OR RSU'S, MEANING

19    SHARES OF FACEBOOK STOCK THAT THE EMPLOYEES RECEIVED FOR WORK

20    THEY DID BEFORE 2019 AND THAT THOSE EMPLOYEES WOULD HAVE

21    RECEIVED, EVEN IF THEY HAD NOT DONE ANY WORK RELATING TO ANY

22    VULNERABILITY IN WHATSAPP.

23         OUR ECONOMIST WILL TELL YOU IT'S IMPROPER FOR FACEBOOK TO

24    INCLUDE THOSE RSU'S IN ANY CALCULATION OF COMPENSATORY DAMAGES,

25    AND HE WILL EXPLAIN WHY.

1           NOW, SEVERAL OF PLAINTIFFS' EMPLOYEES WILL TESTIFY ABOUT

2     THE WORK THEY DID AND HOW LONG IT ACTUALLY TOOK THEM.  AND THE

3     AMOUNT OF TIME IT ACTUALLY TOOK FACEBOOK TO CREATE A PATCH WAS

4     NEXT TO NOTHING, AND YOU WILL HEAR WHY THAT WAS.

5           IT WASN'T ANYWHERE NEAR THE $215,000 I MENTIONED.  THE

6     WORK STARTED, AS I SAID, ON THE AFTERNOON OF MAY 2, A THURSDAY,

7     AND THEY HAD THE PATCHES READY BY THE MORNING OF MAY 6TH, THE

8     FOLLOWING MONDAY.

9           BUT FACEBOOK IS TRYING TO COLLECT FOR THE WHOLE PERIOD OF

10    TIME, INCLUDING THE EXTRA WEEK BETWEEN MAY 6 AND MAY 13 FOR

11    21 EMPLOYEES WORKING FULL TIME.

12          AGAIN, THE AMOUNT OF TIME IT ACTUALLY TOOK THE PATCH WAS

13    A -- TOOK TO DEVELOP THE PATCH WAS A HANDFUL OF HOURS.  THAT'S

14    ONE REASON WHY THE CLAIMED DAMAGES IN THIS CASE THROUGH

15    MAY 13TH ARE INFLATED, AND THERE ARE OTHERS THAT YOU WILL HEAR

16    ABOUT OVER THE COURSE OF THIS WEEK.

17          ANOTHER REASON FACEBOOK'S DAMAGES CLAIM IS INFLATED IS

18    THEY WANT NSO TO PAY FOR TIME THAT THEIR ENGINEERS SPENT TRYING

19    TO STEAL NSO'S TRADE SECRETS, AND THAT IS NOT COMPENSATORY

20    DAMAGES, EITHER.

21          AFTER FACEBOOK FOUND THE PEGASUS MESSAGES, THEY DIDN'T

22    IMMEDIATELY BLOCK THEM.  THEY LET PEGASUS KEEP USING WHATSAPP

23    FOR ABOUT A WEEK SO THAT THEY COULD STUDY IT, AND DURING THAT

24    TIME, WHATSAPP'S ENGINEERS TRIED TO STEAL NSO'S MOST CRITICAL

25    TRADE SECRETS, THE SOURCE CODE FOR WHAT IS KNOWN AS THE PEGASUS

1    AGENT.

2         AND THERE ARE INSTANT MESSAGES.  THESE ARE BETWEEN

3    MR. GHEORGHE AND A FACEBOOK ENGINEER CALLED DREW ROBINSON,

4    HE'LL TESTIFY LATER TODAY, MAYBE EARLY TOMORROW.  AND HERE THEY

5    ARE DISCUSSING A FAILED EFFORT, IN MR. GHEORGHE'S WORDS, TO

6    FETCH THE PAYLOAD.

7         FOR OVER A WEEK, FACEBOOK ENGINEERS TRIED TO CON THIRD

8    PARTY SERVERS AROUND THE WORLD INTO SENDING FACEBOOK THE

9    PEGASUS AGENT, SOFTWARE THAT, AS I SAID EARLIER, WAS NEVER

10   TRANSMITTED ACROSS ANY FACEBOOK OR WHATSAPP SERVERS, AND THEY

11   ARE ASKING NSO TO PAY FOR THAT EFFORT.

12        AT THE SAME TIME, FACEBOOK ENGINEERS MADE SECRETIVE BACK

13   CHANNEL OUTREACHES TO CONTACTS AT NSO'S CLOUD PROVIDER WHO, AT

14   FACEBOOK'S URGING, SNOOPED AROUND INTO NSO'S SERVERS, A MOVE

15   THAT FACEBOOK'S ENGINEERS PURPOSELY HID, AS YOU SEE HERE, FROM

16   THEIR OWN LEGAL DEPARTMENT.  AND AS MR. ROBINSON WRITES IN THIS

17   MESSAGE, "LEGAL WASN'T SUPPOSED TO HEAR THAT."

18        HERE, AGAIN, THEY'RE ASKING NSO TO PAY FOR THAT.

19        AFTER A WEEK OF TRYING TO FAIL TO CAPTURE NSO'S TRADE

20   SECRETS, WHATSAPP FINALLY GAVE UP AND INSTALLED THE SECURITY

21   PATCH IT COULD HAVE INSTALLED DAYS EARLIER.

22        YOU'LL BE ASKED TO DETERMINE WHETHER NSO SHOULD HAVE TO

23   PAY FOR ALL THAT WORK, INCLUDING FACEBOOK'S UNNECESSARY EFFORTS

24   TO STEAL NSO'S SOFTWARE.

25        AND TO GET EVEN MORE IN THE WEEDS, THERE WAS BOTH A SERVER

1    SIDE AND A CLIENT SIDE.  THE CLIENT YOU'LL HEAR IN THIS CONTEXT

2    THE TERM MEANS THE APP THAT IS ON THE TARGET PHONE.

3        THERE WAS A SERVER SIDE AND A CLIENT SIDE FIX.  THE SERVER

4    SIDE FIX TOOK ABOUT AN HOUR.  THE CLIENT SIDE FIX TOOK A LITTLE

5    LONGER, BUT THEY WERE BOTH READY BY MAY 6TH, WITHIN TWO

6    WORKDAYS OF HAVING DISCOVERED PEGASUS ON MAY 2, AND THIS COST

7    VERY LITTLE TIME AND EFFORT.

8        THE SECOND PART OF FACEBOOK'S DAMAGES COME FROM THE PERIOD

9    AFTER MAY 13TH, 2019, AND IT'S ALSO INFLATED.

10       IT'S MOSTLY COMPRISED OF THE EXPENSE OF THREE GENTLEMEN,

11   AASHIN GAUTAM, OTTO EBELING, AND MICHAEL SCOTT, NOT THAT

12   MICHAEL SCOTT.

13       FACEBOOK WON'T BE CALLING ANY OF THESE WITNESSES TO TELL

14   YOU ABOUT WHAT THEY DID, ALTHOUGH THEY WILL BE ASKING FOR MORE

15   THAN $100,000 FOR THEIR TIME.

16       THE TIME SPENT AFTER MAY 13TH WAS WORKING ON A PROJECT TO

17   NOTIFY THE GOVERNMENT CUSTOMERS' TARGETS.  YOU'RE GOING TO HEAR

18   FROM FACEBOOK WITNESSES THAT THEY HAD NO LEGAL OBLIGATION TO

19   NOTIFY THOSE GOVERNMENT CUSTOMER TARGETS.

20       YOU'RE ALSO GOING TO HEAR THAT WHATSAPP HAD A LIST OF THE

21   1470 TARGET PHONE NUMBERS VERY QUICKLY, BUT THEY WAITED FROM

22   MAY 2019 UNTIL THE END OF OCTOBER TO NOTIFY THEM, AND WHEN THEY

23   DID NOTIFY THOSE 1470 NUMBERS, THEY SENT THEM A SHORT TEXT

24   MESSAGE OVER WHATSAPP.

25       WHATSAPP ALSO CREATED AN FAQ PAGE WITH AN EMAIL ADDRESS

1    FOR THE TARGETS TO REACH OUT IF THEY WANTED MORE INFORMATION,

2    AND THE EVIDENCE WILL BE THAT NO ONE EVER REACHED OUT TO THAT

3    EMAIL ADDRESS TO ASK FOR MORE INFORMATION.

4         FOR THE TARGET NOTIFICATION, FACEBOOK SAYS IT SPENT

5    $229,640, AND SO YOU ARE HERE TO DECIDE WHETHER FACEBOOK'S

6    COMPENSATORY DAMAGES WERE WORTH 0, THE $444,000 NUMBER, OR

7    SOMEWHERE IN BETWEEN.

8         YOU WILL ALSO BE ASKED TO DECIDE WHETHER DEFENDANTS SHOULD

9    BE PUNISHED WITH SOMETHING CALLED PUNITIVE DAMAGES.

10        PUNITIVE DAMAGES ARE RECOVERABLE ONLY UNDER THE CALIFORNIA

11   STATUTE, THE CDAFA.

12        YOU CANNOT AWARD PUNITIVE DAMAGES UNDER THE FEDERAL

13   STATUTE OR FOR WHATSAPP'S TERMS OF SERVICE.

14        JUDGE HAMILTON WILL INSTRUCT YOU THAT PUNITIVE DAMAGES MAY

15   ONLY BE RECOVERED FOR HARMS TO THE PLAINTIFF AND NOT TO THIRD

16   PARTIES AND NOT FOR ALLEGED, ANY ALLEGED REPUTATIONAL HARM TO

17   THE PLAINTIFFS.

18        ALSO, PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR ANY ACTS

19   OUTSIDE OF CALIFORNIA.

20        SO THOSE ARE SOME IMPORTANT QUALIFICATIONS THAT YOU WILL

21   HAVE TO LISTEN FOR CAREFULLY AND BE THINKING ABOUT WHEN YOU

22   HEAR THE EVIDENCE IN THIS CASE.

23        ANOTHER THING THAT JUDGE HAMILTON WILL INSTRUCT YOU IS

24   THAT PUNITIVE DAMAGES ARE NOT TO COMPENSATE A PLAINTIFF FOR ANY

25   LOSS THAT IT SUFFERED.  THAT'S WHAT COMPENSATORY DAMAGES ARE

1    FOR.  THE PURPOSE OF PUNITIVE DAMAGES IS PURELY TO PUNISH A

2    DEFENDANT FOR TRULY REPREHENSIBLE CONDUCT THAT ANY RATIONAL

3    PERSON WOULD FIND DESPICABLE, AND THAT IS BECAUSE THEY DO NOT

4    COMPENSATE THE PLAINTIFF, RATHER, THEY PROVIDE A FORM OF A

5    WINDFALL TO THE PLAINTIFF, AND FOR THAT REASON, PUNITIVE

6    DAMAGES ARE ONLY AVAILABLE WITH PROOF OF CLEAR AND CONVINCING

7    EVIDENCE THAT NSO HARMED PLAINTIFFS THROUGH EGREGIOUS CONDUCT

8    IN WHICH NSO ACTED WITH WHAT THE LAW CALLS MALICE, OPPRESSION,

9    OR FRAUD.

10        NOW, THOSE ARE THREE WORDS THAT HAVE VERY SPECIFIC LEGAL

11   MEANINGS.

12        MALICE REQUIRES A SHOWING THAT NSO ACTED WITH AN INTENT TO

13   CAUSE HARM TO THE PLAINTIFF.

14        OPPRESSION REQUIRES A SHOWING OF CONDUCT THAT ANY

15   REASONABLE PERSON WOULD DESPISE, AND, MOREOVER, THAT THAT

16   CONDUCT SUBJECTED THE PLAINTIFF TO CRUEL HARDSHIP.

17        FRAUD MEANS THAT THE DEFENDANTS INTENTIONALLY

18   MISREPRESENTED MATERIAL FACTS AND DID SO INTENDING TO CAUSE

19   HARM TO THE PLAINTIFF.

20        MEMBERS OF THE JURY, THIS CASE IS ABOUT MESSAGES

21   TRANSITING THROUGH COMPUTER SERVERS, NOT ABOUT WHATSAPP OR

22   FACEBOOK SUFFERING BODILY HARM OR ANY THREAT OF PHYSICAL

23   DANGER.  NO ONE AT FACEBOOK OR WHATSAPP WAS INJURED.  NO ONE AT

24   FACEBOOK OR WHATSAPP WAS EVER UNSAFE.

25        NEITHER PLAINTIFF SUFFERED ANY HARDSHIP, MUCH LESS CRUEL

1    HARDSHIP.

2         NOW, TURNING TO WHETHER ANY KIND OF HARM WAS INTENDED OR

3    WHETHER THERE WAS, IN FACT, ANY HARM TO FACEBOOK OR WHATSAPP.

4    AS I HAVE ALREADY MENTIONED, THE TECHNOLOGY AT ISSUE IN THIS

5    CASE WAS INTENDED NOT TO HARM THE PLAINTIFFS, AND YOU WILL HEAR

6    FROM THE NSO VICE PRESIDENT WHO LEADS THE RESEARCH AND

7    DEVELOPMENT TEAM THAT DESIGNED PEGASUS.  HIS NAME IS

8    TAMIR GAZNELI, AND HE AND MR. SHOHAT HAVE TRAVELED HERE FROM

9    ISRAEL TO TESTIFY.

10        AND MR. GAZNELI WILL TESTIFY THAT PEGASUS WAS SPECIFICALLY

11   DESIGNED NOT TO CAUSE ANY HARMFUL EFFECT OR ANY EFFECT AT ALL

12   ON FACEBOOK'S SERVERS, AND THERE WILL BE NO EVIDENCE TO THE

13   CONTRARY.

14        PEGASUS, AS WE HAVE ALREADY HEARD, IN FACT, DID NOT IMPAIR

15   THE AVAILABILITY OF WHATSAPP'S SERVICE OR WHATSAPP'S SERVERS.

16   IT DID NOT SLOW THEM DOWN.  IT DID NOT STEAL OR DELETE ANY

17   DEVICE, ANY DATA FROM ANY -- FROM WHATSAPP SERVERS, NOR DID IT

18   CORRUPT ANY DATA ON THOSE SERVERS.

19        AS PLAINTIFFS' INTERNAL INVESTIGATION CONCLUDED, PEGASUS

20   DID NOT COMPROMISE THE WHATSAPP SERVERS IN ANY WAY.

21        INSTEAD, IT SIMPLY USED THE WHATSAPP SERVICE TO SEND

22   MESSAGES TO TARGETS OF GOVERNMENT CUSTOMERS.  THE MESSAGES

23   CONTAINED CODE THAT DID NOT AND COULD NOT EXECUTE ON WHATSAPP'S

24   SERVERS.  THAT WILL BE UNDISPUTED.

25        WE CAN GO DARK.

1          PUNITIVE DAMAGES MAY NOT BE IMPOSED TO PUNISH DEFENDANTS

2     FOR ACTS OUTSIDE OF CALIFORNIA.  THAT IS A LIMITATION THAT I

3     ALREADY MENTIONED.

4          THE EVIDENCE WILL SHOW THAT NSO DID NOT KNOW THEY WERE

5     VIOLATING THE CDAFA, OR EVEN THAT THIS CALIFORNIA LAW EXISTED,

6     AND THAT THEY CERTAINLY DIDN'T INTEND TO BREAK IT.

7          NSO, AFTER ALL, IS A COMPANY IN ISRAEL, HALF A WORLD AWAY

8     FROM HERE.

9          AT THE END OF THE TRIAL, NSO WILL ASK YOU TO FIND THAT

10    THERE HAS BEEN NO CLEAR AND CONVINCING EVIDENCE OF ANY MALICE,

11    OPPRESSION, OR FRAUD, AND SO THAT AN AWARD OF PUNITIVE DAMAGES

12    IS NOT WARRANTED.

13         SO WHAT'S THE REAL REASON THAT YOU'LL BE HERE FOR THE REST

14    OF THE WEEK, AND POSSIBLY PART OF NEXT WEEK?

15         THE ANSWER IS PR.  YOU KNOW FACEBOOK, A COMPANY WORTH MORE

16    THAN A TRILLION DOLLARS IS NOT HERE FOR THAT AMOUNT OF MONEY.

17         WHAT FACEBOOK WANTS IS TO MAKE HEADLINES AND GET GOOD

18    PRESS, AND THEY SAW GOING AFTER NSO AS A GREAT WAY TO DO THAT.

19         YOU'LL SEE IN FACEBOOK'S OWN WORDS THAT THEY WANTED TO

20    ATTACK NSO SO THAT THEY COULD, IN THEIR WORDS, OWN THE

21    NARRATIVE IN THE PRESS.  THAT'S WHAT THIS CASE IS ABOUT,

22    FACEBOOK'S PR NARRATIVE.  IT'S A STORY.  IT'S NOT REALITY.

23         SO WHEN FACEBOOK'S LAWYERS AND WITNESSES COME UP HERE OVER

24    THE NEXT COUPLE OF DAYS AND START CALLING NSO ALL SORTS OF BAD

25    NAMES AND CLAIMING THAT NSO ATTACKED WHATSAPP OR HACKED

1    WHATSAPP, I WANT YOU TO KEEP THIS IN MIND.

2         I WANT YOU TO REMEMBER BEFORE FACEBOOK WAS TRYING TO WIN A

3    PR LAWSUIT, THE VERY SAME WITNESSES THAT THEY'RE GOING TO BRING

4    BEFORE YOU TODAY ADMITTED THAT NSO'S TECHNOLOGY DID NOT

5    COMPROMISE THE WHATSAPP SERVERS OR HURT WHATSAPP SERVICE IN ANY

6    WAY.

7         SO NO MATTER WHAT FACEBOOK TELLS YOU NOW, THE CASE ISN'T

8    REALLY ABOUT FACEBOOK TRYING TO GET COMPENSATION FOR ANY

9    DAMAGES THAT IT ACTUALLY SUFFERED.  THE CASE IS ABOUT FACEBOOK

10   TRYING TO ADVANCE ITS OWN PROFIT MOTIVE BY SCORING A PR VICTORY

11   AND TRYING TO HURT NSO IN THE PROCESS.

12        THAT IS THE REASON THAT WE WILL SPEND THIS WEEK TOGETHER

13   IN THIS COURTROOM.

14        AND I WILL HAVE THE OPPORTUNITY TO ADDRESS YOU LIKE THIS

15   NEXT MONDAY, MAYBE THIS FRIDAY, POSSIBLY SOONER IF THINGS MOVE

16   FASTER THAN ANTICIPATED.  WHEN I DO, I WILL ASK YOU NOT TO TAKE

17   PART OF FACEBOOK'S CRUSADE AGAINST NSO.

18        THANK YOU.

19             THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

20        IS PLAINTIFF READY WITH YOUR FIRST WITNESS?

21             MR. ANDRES:  WE ARE, YOUR HONOR.

22        WHATSAPP CALLS CARL WOOG.

23        I'M JUST GOING TO MOVE THE PODIUM BACK, YOUR HONOR.

24             THE COURT:  PLEASE TAKE THE STAND.

25             THE WITNESS:  THANK YOU, YOUR HONOR.

1          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

2          **(PLAINTIFFS' WITNESS, CARL WOOG, WAS SWORN.)**

3          THE WITNESS:  I DO.

4          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

5          PROSPECTIVE JUROR:  THANK YOU.

6          THE CLERK:  SPEAK CLEARLY INTO THE MICROPHONE, AND

7     PLEASE STATE YOUR FULL NAME FOR THE RECORD, AND PLEASE SPELL

8     YOUR NAME FOR THE RECORD.

9          THE WITNESS: YES, MA'AM.

10         GOOD MORNING.  MY NAME IS CARL WOOG, C-A-R-L.  MY LAST

11    NAME IS W-O-O-G.  GOOD MORNING.

12                         **DIRECT EXAMINATION**

13    BY MR. ANDRES:

14    Q.   GOOD MORNING, MR. WOOG.

15         CAN YOU PLEASE DESCRIBE FOR THE JURY YOUR EDUCATIONAL

16    BACKGROUND AFTER HIGH SCHOOL.

17    A.   YES.

18         AFTER HIGH SCHOOL, I WENT TO BOSTON UNIVERSITY.  I STUDIED

19    POLITICAL SCIENCE AND AMERICAN HISTORY, AND I ALSO HAVE A

20    GRADUATE DEGREE FROM BOSTON UNIVERSITY AS WELL.

21    Q.   IN WHAT YEARS DID YOU RECEIVE THOSE DEGREES?

22    A.   I RECEIVED MY UNDERGRADUATE DEGREE IN 2004, AND MY

23    GRADUATE DEGREE IN 2006.

24    Q.   ARE YOU CURRENTLY EMPLOYED?

25    A.   YES.

1      Q.   WHERE?

2      A.   AT WHATSAPP.

3      Q.   AND CAN YOU DESCRIBE FOR THE JURY WHAT WHATSAPP IS?

4      A.   WHATSAPP IS AN APP THAT YOU CAN DOWNLOAD ON YOUR PHONE,

5      YOU DOWNLOAD IT ON YOUR IPHONE OR YOUR ANDROID PHONE.  AND WHAT

6      WE DO IS ALLOW YOU TO BE ABLE TO TEXT MESSAGE OR CALL YOUR

7      FRIENDS, YOUR LOVED ONES, WHENEVER THEY ARE IN THE WORLD, AND

8      WE DO SO IN A WAY THAT IS PRIVATE.  SO THE CONVERSATIONS ARE

9      ONLY BETWEEN YOU AND THEM.

10     Q.   IS IT FAIR TO SAY THAT WHATSAPP IS A COMMUNICATIONS

11     PLATFORM?

12     A.   YES.

13     Q.   AND WHERE ARE WHATSAPP'S CORPORATE HEADQUARTERS?

14     A.   WE'RE JUST DOWN THE ROAD IN MENLO PARK.

15     Q.   YOU TESTIFIED THAT YOU'RE EMPLOYED BY WHATSAPP.  WHAT YEAR

16     DID YOU START WORKING THERE?

17     A.   I STARTED EIGHT YEARS AGO THIS WEEK ON MAY 1ST, 2017.

18     Q.   AND WHAT IS YOUR CURRENT TITLE OR POSITION AT WHATSAPP?

19     A.   I'M THE VICE PRESIDENT OF GLOBAL COMMUNICATIONS.

20     Q.   AND IN THAT ROLE, WHAT ARE YOUR RESPONSIBILITIES?

21     A.   I LEAD A TEAM THAT IS RESPONSIBLE FOR COMMUNICATING WITH

22     THE NEWS MEDIA AND TO PEOPLE ALL OVER THE WORLD ABOUT HOW THEY

23     USE OUR APP.  WE TALK A LOT ABOUT THE VALUES OF WHATSAPP AND

24     WHAT WE'RE TRYING TO DO, WHICH IS, AS I MENTIONED, TO BE ABLE

25     TO HELP PEOPLE COMMUNICATE PRIVATELY AND SECURELY.

 1              AND IN ADDITION, I'M ON THE LEADERSHIP TEAM OF WHATSAPP

 2      WHERE WE DISCUSS THE PRODUCTS THAT WE'RE TRYING TO BUILD, THE

 3      APPROACH TO THOSE PRODUCTS, WHY THEY'RE IMPORTANT FROM A

 4      BUSINESS APPROACH, AND HOW WE ADVOCATE FOR PEOPLE'S PRIVACY AND

 5      SECURITY.

 6      Q.    AND WHAT YEAR WERE YOU PROMOTED TO THE VICE PRESIDENT OF

 7      GLOBAL COMMUNICATIONS?

 8      A.    THAT WAS ABOUT THREE YEARS AGO.

 9      Q.    AND BEFORE THAT, DID YOU HOLD OTHER POSITIONS AT WHATSAPP?

10      A.    YES.  BEFORE THAT I WAS DIRECTOR OF COMMUNICATIONS, AND

11      WHEN I STARTED IN 2017, I WAS HIRED, I WAS CALLED A

12      COMMUNICATIONS MANAGER.

13      Q.    OKAY.  WHAT WERE YOUR RESPONSIBILITIES IN THOSE ROLES?

14      A.    A VERSION OF THE SAME.  FUNDAMENTALLY TO HELP THE NEWS

15      MEDIA AND OTHER PEOPLE UNDERSTAND HOW OUR APP WORKS.  YOU KNOW,

16      WHEN WE ANNOUNCE NEW FEATURES, TO PUT OUT INFORMATION ABOUT

17      THOSE FEATURES, TO EXPLAIN THE TECHNOLOGY BEHIND THEM.

18              BUT OVER THE YEARS, OUR TEAM HAS GROWN IN SIZE, AND OF

19      COURSE I HAVE HAD THE OPPORTUNITY TO LEAD A TEAM NOW OF PEOPLE

20      WHO DO THAT WORK.

21      Q.    LET ME FILL IN THE SPACE BETWEEN AFTER YOU GOT YOUR

22      MASTER'S DEGREE AND BEFORE YOU STARTED AT WHATSAPP.

23              DID YOU WORK DURING THAT PERIOD?

24      A.    YES.

25      Q.    CAN YOU BRIEFLY DESCRIBE TO THE JURY WHERE YOU WORK AND

1    WHAT ROLES YOU HAD?

2    A.   YEAH.  PRIOR TO COMING TO WHATSAPP, I WORKED FOR THE

3    CAMPAIGN FOR PRESIDENT BARACK OBAMA, AND WHEN I FINISHED WITH

4    THE CAMPAIGN, I WENT TO WORK IN THE ADMINISTRATION.  I WORKED

5    THERE FOR ABOUT SEVEN YEARS.  I WAS A SPOKESPERSON, FIRST AT

6    THE DEPARTMENT OF DEFENSE, AND THEN I WORKED AT THE WHITE HOUSE

7    WHERE I WAS A SPOKESPERSON FOR THE NATIONAL SECURITY COUNCIL.

8    Q.   YOU TESTIFIED EARLIER THAT WHATSAPP IS A COMMUNICATION

9    PLATFORM.

10        CAN YOU TELL THE JURY SPECIFICALLY THE VARIOUS WAYS THAT

11   PEOPLE COMMUNICATE, OR THE DIFFERENT PRODUCTS THAT ARE

12   AVAILABLE TO THE PEOPLE WHO USE WHATSAPP?

13   A.   ABSOLUTELY.

14        TO KEEP IT SIMPLE, WE ALLOW YOU TO SEND A TEXT MESSAGE

15   THAT IS PRIVATE BETWEEN YOU AND OTHERS.  YOU CAN DO A GROUP OF

16   PEOPLE, YOU CAN DO A CALL, A VIDEO CALL, YOU CAN SEND OTHER

17   TYPES OF THINGS OVER A MESSAGE OR A CALL AS WELL.

18   Q.   AND HOW DO YOU MAKE A PHONE CALL ON WHATSAPP?

19   A.   YEAH.  ONCE YOU HAVE THE APP OPEN, YOU HAVE THE

20   OPPORTUNITY, YOU KNOW, TO SELECT THE PERSON YOU'RE TRYING TO

21   CONTACT, AND YOU CAN EITHER TYPE TO THEM AND PRESS SEND ON A

22   MESSAGE, OR YOU CAN TAP THE CALLING BUTTON AT THE TOP AND THAT

23   WILL ESTABLISH A SECURE CALL BETWEEN YOU AND THE OTHER SIDE.

24   Q.   ARE THERE FEATURES ABOUT SENDING PHOTOS, VIDEOS,

25   DOCUMENTS?  CAN YOU EXPLAIN THOSE?

1    A.    SURE.  YOU CAN ATTACH ANYTHING INTO A TEXT MESSAGE.  YOU

2    CAN SEND A PHOTO, YOU COULD SEND A DOCUMENT, YOU COULD SEND

3    WHERE YOUR LOCATION IS.  AND ALL OF THAT WE PROTECT WITH A

4    SECURITY IN THE CASE TECHNOLOGY CALLED END TO END ENCRYPTION.

5    Q.    OKAY.  WHAT ABOUT GROUP CHATS, OR FOR BUSINESSES SHARING

6    YOUR LOCATION?  CAN YOU EXPLAIN THOSE FEATURES TO THE JURY?

7    A.    YOU CAN SEND YOUR LOCATION, SO YOU CAN LET PEOPLE KNOW

8    WHERE YOU ARE.  WE PROTECT THAT AS WELL.

9          THERE'S ALSO MANY, MANY BUSINESSES THAT USE OUR SERVICE

10   AROUND THE WORLD TO, YOU KNOW, RESPOND TO THEIR CUSTOMERS AND

11   HELP THEM ANSWER QUESTIONS, THINGS OF THAT NATURE.

12   Q.    CAN YOU EXPLAIN TO THE JURY HOW SOMEBODY CAN SIGN UP FOR

13   WHATSAPP?  HOW THEY GET THE APP AND HOW IT WORKS?

14   A.    IT'S VERY SIMPLE.  IF YOU HAVE AN IPHONE, YOU GO TO THE

15   APP STORE, IF YOU HAVE AN ANDROID PHONE, YOU GO TO THE GOOGLE

16   PLAY STORE, AND YOU SEARCH FOR WHATSAPP, YOU DOWNLOAD WHATSAPP,

17   IT COMES ON TO YOUR PHONE, AND THEN YOU BEGIN THE SIGN UP

18   PROCESS.

19   Q.    WHAT DOES THE SIGN UP PROCESS REQUIRE?

20   A.    YOU HAVE TO HAVE A MOBILE PHONE, YOU HAVE TO HAVE A PHONE

21   NUMBER.  SO YOU PUT IN YOUR PHONE NUMBER AND YOU GET A

22   REGISTRATION CODE VIA SMS.  YOU PUT IN THAT CODE, AND THEN YOU

23   CONTINUE WITH THE PROCESS.  YOU AGREE TO OUR TERMS OF SERVICE,

24   YOU PICK A NAME TO USE THE APP, AND THEN YOU CAN GO ON FROM

25   THERE.

1    Q.   AND WHAT KIND OF DEVICES CAN YOU USE WHATSAPP ON?

2    A.   SO YOU NEED A MOBILE PHONE IN ORDER TO USE WHATSAPP.  IT

3    COULD BE EITHER AN IPHONE OR ANDROID PHONE.  BUT ONCE YOU SIGN

4    UP, YOU CAN ALSO USE IT ON YOUR DESKTOP, TOO.  YOU COULD

5    INSTALL IT ON YOUR COMPUTER, SO YOU CAN SEND TEXT MESSAGES FROM

6    YOUR COMPUTER AS WELL, YOUR DESKTOP, LAPTOP.

7    Q.   HOW MANY USERS DOES WHATSAPP HAVE TO -- HOW MANY PEOPLE

8    USE WHATSAPP?

9    A.   WE HAVE THREE BILLION USERS AROUND THE WORLD.

10   Q.   AND BACK IN MAY OF 2019, HOW MANY PEOPLE USED WHATSAPP?

11   A.   IT WAS LESS.  PROBABLY AROUND ONE AND A HALF BILLION AT

12   THAT TIME.

13   Q.   AND CAN YOU EXPLAIN TO THE JURY WHAT THE NUMBER OF

14   COUNTRIES THAT WHATSAPP OPERATED IN IN 2019?

15   A.   WE HAVE USERS FROM OVER 180 COUNTRIES AROUND THE WORLD.

16   Q.   OKAY.  AND DOES AN INDIVIDUAL OR BUSINESS HAVE TO PAY TO

17   USE WHATSAPP?

18   A.   IT'S TOTALLY FREE FOR PEOPLE TO USE.  BUT WE DO SELL

19   BUSINESS FEATURES, PARTICULARLY TO LARGER BUSINESSES, LIKE IF

20   YOU'RE AN AIRLINE OR KIND OF A LARGE COMPANY WHERE YOU MIGHT BE

21   GETTING A LOT OF MESSAGES AND YOU'RE TRYING TO DO CUSTOMER

22   SERVICE, WE CHARGE THE BUSINESSES FOR THOSE SERVICES.

23   Q.   AND THAT'S HOW WHATSAPP MAKES MONEY?

24   A.   YES.

25   Q.   YOU MENTIONED SOMETHING CALLED END TO END ENCRYPTION.  CAN

1        YOU EXPLAIN WHAT THAT MEANS?

2        A.   YES.  IT'S A TECHNICAL TERM, BUT THE IDEA IS FAIRLY

3        STRAIGHTFORWARD.  WHAT WE'RE TRYING TO DO IS WE SECURE THE

4        MESSAGE BEFORE IT EVER LEAVES YOUR PHONE.  SO WHEN YOU PRESS

5        SEND, IT'S SECURED WITH A LOCK THAT CAN ONLY BE OPENED BY THE

6        OTHER SIDE OF THE PHONE.

7            SO IF YOU'RE TEXTING YOUR LOVED ONE, NO ONE CAN READ THAT

8        MESSAGE IN BETWEEN, INCLUDING US.

9            IT CAN ONLY BE SEEN ON ONE SIDE OR THE OTHER, AND THAT IS

10       JUST BETWEEN YOU AND THE PEOPLE YOU'RE COMMUNICATING WITH.

11       Q.   AND WHATSAPP EMPLOYED END TO END ENCRYPTION?

12       A.   WE DO.  WE DEVELOPED AND MADE SURE THIS TECHNOLOGY GOES

13       EVERYWHERE.

14       Q.   WHY?

15       A.   BECAUSE FUNDAMENTALLY, PRIVACY IS THE FOUNDATION OF

16       WHATSAPP.  IT'S BEEN PART OF OUR APP FROM THE BEGINNING.  AND

17       WE BELIEVE THAT PEOPLE SHOULD BE ABLE TO HAVE A PRIVATE

18       CONVERSATION ONLINE, JUST AS YOU WOULD HAVE A PRIVATE

19       CONVERSATION IN YOUR LIVING ROOM.

20           SO THE BELIEF IS THAT IF YOU CAN DO THAT IN PERSON, YOU

21       SHOULD BE ABLE TO DO THAT ONLINE, EVEN IF YOU CAN'T BE TOGETHER

22       IN PERSON.

23           I THINK WE ALL REMEMBER COVID AND A TIME WHERE YOU

24       COULDN'T BE TOGETHER.  BUT, OF COURSE, MANY OF US HAVE LOVED

25       ONES AROUND THE WORLD, AND YOU WANT TO BE ABLE TO COMMUNICATE

1    WITH THEM PRIVATELY, SAFE IN THE KNOWLEDGE THAT NO ONE ELSE IS

2    ABLE TO HEAR THAT CONVERSATION.

3    Q.   WHEN DID WHATSAPP BEGIN EMPLOYING END TO END ENCRYPTION?

4    A.   IT TOOK SOME TIME FOR US TO ROLL THIS OUT.  IT WAS BEFORE

5    I JOINED THE COMPANY.  BUT WE STARTED WORKING ON IT IN 2015 AND

6    COMPLETED THAT DEPLOYMENT IN APRIL OF 2016.

7    Q.   IS SECURITY IMPORTANT AT WHATSAPP?

8    A.   YES.

9    Q.   WHY?

10   A.   BECAUSE SECURITY AND PROVIDING PEOPLE WITH THE BEST

11   SECURITY TECHNOLOGY AVAILABLE HELPS PROTECT PEOPLE'S PRIVACY.

12   Q.   AND AS THE GLOBAL DIRECTOR OF COMMUNICATIONS, ARE YOU

13   FAMILIAR GENERALLY WITH WHATSAPP'S SECURITY PROGRAMS?

14   A.   OF COURSE I'M NOT AN ENGINEER, BUT PART OF MY JOB IS TO

15   TRY TO HELP UNDERSTAND HOW OUR SYSTEMS WORK SO I CAN

16   COMMUNICATE THAT OUT WHEN JOURNALISTS ARE ASKING QUESTIONS, OR

17   OTHERS ARE ASKING QUESTIONS, AND I CAN RESPOND ON BEHALF OF THE

18   ORGANIZATION.

19   Q.   AND HOW DID YOU BECOME FAMILIAR WITH WHATSAPP'S SECURITY?

20   A.   AFTER I JOINED THE COMPANY, AGAIN, ALMOST EIGHT YEARS AGO,

21   I SPENT A LOT OF TIME WITH THE FOUNDING ENGINEERS AND THE

22   LEADERS OF WHATSAPP TO TRY TO LEARN HOW THEY OPERATE, WHY THEY

23   BUILT THE APP THE WAY THEY DID.

24        AND PART OF MY JOB, I FREQUENTLY AM TALKING TO ENGINEERS

25   ABOUT WHAT THEY'RE BUILDING AND, YOU KNOW, HOW THAT'S

1      ULTIMATELY GOING TO WORK SO I CAN HELP COMMUNICATE WHAT WE DO

2      TO PEOPLE AROUND THE WORLD.

3      Q.   AND WHAT DO YOU KNOW SPECIFICALLY ABOUT SECURITY

4      APPARATUS?

5      A.   I KNOW IT'S INCREDIBLY IMPORTANT TO WHAT WE DO.  I MEAN,

6      WE BRING IN VERY GOOD PEOPLE WHO WORK REALLY HARD AT THIS.

7      Q.   YOU TESTIFIED EARLIER ABOUT SOMETHING CALLED THE TERMS OF

8      SERVICE.  HOW IS IT THAT A WHATSAPP USER BECOMES FAMILIAR OR

9      AGREES TO THE TERMS OF SERVICE?

10     A.   THE TERMS OF SERVICE ARE --

11             MR. AKROTIRIANAKIS:  OBJECTION AS TO THE RELEVANCE.

12             THE COURT:  PARDON ME.

13             MR. AKROTIRIANAKIS:  AS TO THE RELEVANCE, YOUR HONOR.

14             THE COURT:  OVERRULED.

15     BY MR. ANDRES:

16     Q.   YOU CAN ANSWER THE QUESTION.

17         IF THAT'S OKAY, YOUR HONOR?

18             THE COURT:  YES.

19             THE WITNESS:  YOU'RE ASKING ABOUT THE TERMS OF

20     SERVICE?

21     BY MR. ANDRES:

22     Q.   CORRECT.

23     A.   SO THE TERMS OF SERVICE IS SOMETHING THAT EVERY USER

24     RECEIVES WHEN THEY SIGN UP FOR THE APP FOR THE FIRST TIME, AND

25     IT'S SOMETHING THAT WILL DISPLAY AND YOU READ THE TERMS OF

```
1     SERVICE AND THEN YOU HAVE TO AGREE TO THE TERMS OF SERVICE IN

2     ORDER TO USE WHATSAPP.

3     Q.   AND HOW DOES A USER AGREE TO THE TERMS OF SERVICE?

4     A.   THEY READ IT ON THEIR MOBILE PHONE AND THEN THEY TAP

5     AGREE.

6          MR. ANDRES:  YOUR HONOR, I'D LIKE TO SHOW THE WITNESS

7     PLAINTIFFS' EXHIBIT 112 ON HIS SCREEN.

8          THE COURT:  ANY OBJECTION, MR. AKROTIRIANAKIS?

9          MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

10         THE COURT:  ALL RIGHT.  IT MAY BE PUBLISHED.

11         MR. ANDRES:  YOUR HONOR, YOUR HONOR, I AM HAPPY TO

12    PUBLISH IT AND ENTER IT INTO THE -- LET ME ASK THE WITNESS WHAT

13    IT IS.

14    Q.   WHAT IS THIS, MR. WOOG?

15    A.   THIS IS THE WHATSAPP TERMS OF SERVICE.

16    Q.   AND YOU'RE FAMILIAR WITH IT?

17    A.   YES.

18    Q.   SOMETHING THAT YOU REVIEW IN THE COURSE OF YOUR WORK AT

19    WHATSAPP?

20    A.   YES.

21         MR. ANDRES:  OKAY.  YOUR HONOR, THE GOVERNMENT -- THE

22    PLAINTIFFS WOULD MOVE TO ADMIT EXHIBIT, THE PLAINTIFFS'

23    EXHIBIT 112 AND TO PUBLISH IT TO THE JURY.

24         THE COURT:  ALL RIGHT.  ANY OBJECTION?

25         MR. AKROTIRIANAKIS:  ONLY AS STATED, YOUR HONOR.
```

1           THE COURT:  ONLY?

2           MR. AKROTIRIANAKIS:  ONLY AS PREVIOUSLY STATED.

3           THE COURT:  OKAY.  NOTED.

4      IT MAY BE PUBLISHED.

5      (PLAINTIFFS' EXHIBIT PTX-112 WAS ADMITTED IN EVIDENCE.)

6           MR. ANDRES:  THANK YOU, YOUR HONOR.

7  Q.   MR. WOOG, I'M GOING TO ASK YOU TO TURN -- CAN YOU EXPLAIN

8  TO THE JURY WHAT THIS IS, PLAINTIFFS' EXHIBIT 112?

9  A.   THIS IS THE TERMS OF SERVICE.  THIS IS THE TERMS OF

10  SERVICE THAT WAS ACTIVE IN 2016, AND BASICALLY IT DEFINES HOW

11  ANYONE WHO USES WHATSAPP, WHAT THEY CAN AND CAN'T DO WHEN THEY

12  USE WHATSAPP.

13  Q.   I'M GOING TO ASK TO HAVE SHOWN TO YOU PAGE 3 AND ASK YOU

14  IF YOU SEE THE SECTION THAT SAYS ACCEPTABLE USE OF OUR

15  SERVICES.

16  A.   YES.

17  Q.   CAN YOU BLOW THAT UP.  OKAY.

18      AND I'M GOING TO ASK YOU TO READ THAT THROUGH THE END OF

19  SECTION, SUBSECTION A.

20      CAN YOU READ THAT FOR THE JURY?

21  A.   YES.  IT SAYS, "LEGAL AND ACCEPTABLE USE."

22           THE COURT:  EXCUSE ME.

23           MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I

24  THOUGHT THIS WAS ALREADY DEALT WITH.

25           THE COURT:  YEAH.  I'M NOT SURE THAT THE DETAILS OF

1        THE TERMS OF SERVICE ARE NECESSARY GIVEN THE COURT'S ALREADY

2        FOUND THAT THEY WERE VIOLATED.

3               MR. ANDRES:  I UNDERSTAND.  IT'S TWO QUESTIONS,

4        YOUR HONOR, JUST SO THE JURY UNDERSTANDS WHAT THE TERMS OF

5        SERVICE ARE.

6               THE COURT:  OKAY.  ALL RIGHT.  OVERRULED.

7               MR. AKROTIRIANAKIS:  YOUR HONOR --

8               THE COURT:  OVERRULED.

9        YOU MAY ANSWER.

10              THE WITNESS:  THANK YOU, YOUR HONOR.

11         THIS SAYS, "LEGAL AND ACCEPTABLE USE.  YOU MUST ACCESS AND

12     USE OUR SERVICES ONLY FOR LEGAL, AUTHORIZED, AND ACCEPTABLE

13     PURPOSES.  YOU WILL NOT USE (OR ASSIST OTHERS IN USING) OUR

14     SERVICES IN WAYS THAT:  (A) VIOLATE, MISAPPROPRIATE, OR

15     INFRINGE THE RIGHTS OF WHATSAPP, OUR USERS, OR OTHERS,

16     INCLUDING PRIVACY, PUBLICITY, INTELLECTUAL PROPERTY, OR OTHER

17     PROPRIETARY RIGHTS."

18     BY MR. ANDRES:

19     Q.   DO YOU HAVE AN UNDERSTANDING, YOU, WHAT THAT MEANS?

20     A.   SIMPLY IT MEANS YOU CAN'T ABUSE WHATSAPP TO VIOLATE

21     PEOPLE'S PRIVACY.

22              MR. AKROTIRIANAKIS:  OBJECTION.  NO FOUNDATION FOR

23     THIS WITNESS.

24              THE COURT:  YES, SUSTAINED.

25              MR. AKROTIRIANAKIS:  MOVE TO STRIKE, YOUR HONOR.

1              THE COURT:  HOLD ON.

2         WHAT'S THE BASIS FOR THIS TESTIMONY?  WHAT'S HIS

3    FOUNDATION?

4              MR. ANDRES:  HE DEALS WITH THE TERMS OF SERVICE EVERY

5    DAY.  I CAN ASK HIM.  HE TESTIFIED TO THAT.

6              THE COURT:  WHERE ARE YOU GOING WITH THIS?

7              MR. ANDRES:  I WANT TO IDENTIFY FOR THE JURY WHAT THE

8    RELEVANT TERMS OF SERVICE ARE BECAUSE THIS CASE IS ABOUT THE

9    FACT THAT YOUR HONOR HAS FOUND THAT NSO HAS VIOLATED THOSE

10   TERMS.

11             MR. AKROTIRIANAKIS:  NOT THESE TERMS OF SERVICE.

12             THE COURT:  EXCUSE ME.  DON'T INTERRUPT, PLEASE.

13             MR. ANDRES:  SORRY.  YOUR HONOR, I WANT TO SHOW

14   MR. WOOG THIS PORTION AND THE NEXT PORTION THAT DEAL WITH THE

15   SPECIFIC PORTIONS OF THE TERMS OF SERVICE THAT YOUR HONOR FOUND

16   WERE VIOLATED SO THE JURY IS AWARE OF THAT.

17             THE COURT:  ALL RIGHT.  BUT WHY IS -- WHY IS THAT

18   NECESSARY?

19             MR. ANDRES:  SO THEY UNDERSTAND WHAT IS PROHIBITED BY

20   WHATSAPP'S TERMS OF SERVICE AND THEY UNDERSTAND WHAT YOUR HONOR

21   HAS FOUND IN TERMS OF NSO'S VIOLATION.

22             THE COURT:  ALL RIGHT.  I'LL ALLOW IT.  OVERRULED.

23             MR. ANDRES:  THANK YOU.

24   Q.  MR. WOOG, AND TO BE CLEAR, YOU DEAL WITH THE TERMS OF

25   SERVICE DURING THE COURSE OF YOUR WORK AT WHATSAPP?

1    A.   YES, SIR.

2    Q.   OKAY.  CAN I ASK YOU TO TURN TO THE SECTION THAT SAYS

3    "HARM TO WHATSAPP'S USERS"?

4    A.   YES.

5    Q.   OKAY.  AND WITH RESPECT TO THIS SECTION, CAN I ASK YOU TO

6    READ THAT SECTION ALL THE WAY THROUGH THE END OF SUBSECTION C?

7         MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  IT'S THE

8    SAME OBJECTION.  IT'S ONLY SUBSECTION A.

9         THE COURT:  WHAT'S IT'S ONLY SUBSECTION A?

10        MR. AKROTIRIANAKIS:  THE --

11        THE COURT:  YES, ONLY SUBSECTION A IS WHAT THE COURT

12   HAS FOUND.

13        MR. AKROTIRIANAKIS:  YOUR HONOR --

14        THE COURT:  HE MAY READ THROUGH A, BUT THAT'S IT.

15        MR. ANDRES:  THANK YOU, YOUR HONOR.

16   Q.   GO AHEAD.

17   A.   THROUGH SUBSECTION A IT SAYS, "YOU MUST NOT (OR ASSIST

18   OTHERS TO) ACCESS, USE, COPY, ADAPT, MODIFY, PREPARE DERIVATIVE

19   WORKS BASED UPON, DISTRIBUTE, LICENSE, SUBLICENSE, TRANSFER,

20   DISPLAY, PERFORM, OR OTHERWISE EXPLOIT OUR SERVICES IN

21   IMPERMISSIBLE OR UNAUTHORIZED MANNERS, OR IN WAYS THAT BURDEN,

22   IMPAIR, OR HARM US, OUR SERVICES, SYSTEMS, OUR USERS, OR

23   OTHERS, INCLUDING THAT YOU MUST NOT DIRECTLY OR THROUGH

24   AUTOMATED MEANS:  (A) REVERSE ENGINEER, ALTER, MODIFY, CREATE

25   DERIVATIVE WORKS FROM, DE COMPILE, OR EXTRACT CODE FROM OUR

1    SERVICES."

2    Q.   MR. WOOG, LET ME TURN YOUR ATTENTION TO MAY OF 2019.

3         WERE YOU WORKING AT WHATSAPP AT THE TIME?

4    A.   YES.

5    Q.   DID YOU BECOME AWARE OF A CYBER ATTACK AGAINST WHATSAPP IN

6    MAY OF 2019?

7    A.   YES.

8    Q.   AND WAS IT IMPORTANT TO YOUR ROLE AS THE HEAD OF

9    COMMUNICATIONS TO UNDERSTAND THE DETAILS OF THAT CYBER ATTACK?

10   A.   YES.

11   Q.   WHY?

12   A.   I WANTED TO LEARN AS MUCH AS I COULD ABOUT THE ATTACK SO

13   WE COULD PREPARE PUBLIC COMMUNICATION ABOUT THE ATTACK.  WE

14   WANTED TO BE TRANSPARENT ABOUT WHAT HAD HAPPENED SO WE COULD

15   EXPLAIN THAT TO OUR USERS, AND WE COULD ALSO TAKE ACTION TO

16   PROTECT THEM AND TO EXPLAIN THOSE ACTIONS THAT WE WERE TAKING

17   TO PROTECT THEM, AND ALSO THE ACTIONS THEY COULD TAKE TO

18   FURTHER PROTECT THEMSELVES FROM THIS TYPE OF SPYWARE.

19   Q.   DID YOU LEARN WHO WAS RESPONSIBLE FOR THE ATTACK?

20   A.   YES.

21   Q.   WHO?

22   A.   IT WAS THE NSO GROUP.

23   Q.   AND HOW DID YOU LEARN THAT?

24   A.   I LEARNED THAT FROM OUR SECURITY TEAM, OUR TECHNICAL

25   EXPERTS.

```
 1              MR. AKROTIRIANAKIS:  OBJECTION.  HEARSAY, YOUR HONOR.

 2              THE COURT:  OVERRULED.

 3    BY MR. ANDRES:

 4    Q.   AND, MR. WOOG, WHAT ROLE DID YOU PLAY WITH RESPONSE TO

 5    THE -- IN TERMS OF THE RESPONSE TO NSO'S CYBER ATTACK AGAINST

 6    WHATSAPP?

 7    A.   I GATHERED INFORMATION ABOUT THE ATTACK SO WE COULD BE

 8    ORGANIZED IN HOW WE WOULD COMMUNICATE PUBLICLY ABOUT WHAT HAD

 9    HAPPENED.  MY ROLE WAS TO HELP PREPARE THAT PUBLIC

10    COMMUNICATION THAT WE ULTIMATELY DID TO LET PEOPLE KNOW WHAT

11    HAD HAPPENED, TO LET THE SECURITY COMMUNITY KNOW WHAT PROBLEMS

12    WE HAD SOLVED, AND THEN ULTIMATELY WHAT PEOPLE COULD DO TO

13    PROTECT THEMSELVES.

14    Q.   AND WHY DID YOU DO THAT?

15    A.   AS I MENTIONED EARLIER, PRIVACY IS FUNDAMENTAL TO

16    WHATSAPP.  IT'S WHY IT WAS ESTABLISHED IN THE FIRST PLACE.  AND

17    WE BELIEVE THAT PEOPLE SHOULD BE ABLE TO HAVE PRIVATE

18    COMMUNICATION.

19              AND IN THIS CASE, THAT WAS, THAT WAS VIOLATED AND WE

20    THOUGHT IT WAS THE RIGHT THING TO DO TO TELL PEOPLE WHAT HAD

21    HAPPENED AND TO HELP EXPLAIN THE STEPS THAT WE WERE GOING TO

22    TAKE TO PROTECT THEM.

23    Q.   AND DID YOU COMMUNICATE THROUGH THE PRESS?

24    A.   YES.

25    Q.   HOW DID YOU DO THAT?
```

1    A.   I TALKED TO MANY REPORTERS AROUND THE WORLD ABOUT WHAT HAD

2    HAPPENED AND ULTIMATELY WHAT WE WERE DOING AND, AGAIN, THE

3    STEPS THAT PEOPLE COULD TAKE TO PROTECT THEMSELVES FROM THESE

4    ATTACKS.

5    Q.   AND WERE YOU ALSO INVOLVED IN ORGANIZING THE RESPONSE IN

6    TERMS OF THE PEOPLE OR THE VICTIMS OF THE MAY 2019 ATTACK?

7    A.   YES, WE DID THAT AS WELL.

8    Q.   AND WHAT DID YOU DO WITH RESPECT TO THOSE USERS OR PEOPLE?

9    A.   WELL, WE WANTED TO COMMUNICATE WITH THOSE PEOPLE DIRECTLY

10   SO THEY KNEW THAT THEY HAD COME UNDER SURVEILLANCE, AND WE

11   WANTED TO LET THEM KNOW WHAT THEY COULD DO, AGAIN, TO PROTECT

12   THEMSELVES.

13       SO AS PART OF MY JOB, I HELPED PREPARE AND SUPPORT THOSE

14   COMMUNICATIONS, AND I EVEN TALKED TO VICTIMS DIRECTLY.

15   Q.   IN TERMS OF INFORMATION THAT YOU PROVIDED TO VICTIMS, WHAT

16   TYPES OF INFORMATION DID YOU PROVIDE AND WHY?

17   A.   WE TOLD THEM THE NATURE OF THE ATTACK, WHO WAS BEHIND THE

18   ATTACK, AND WE GAVE THEM BEST PRACTICES ON WHAT THEY COULD DO

19   TO FURTHER SECURE THEMSELVES.

20   Q.   AND YOU TESTIFIED THAT OVER THE COURSE OF THE PROCESS,

21   VICTIMS REACHED OUT TO YOU, OR YOU HAD SOME COMMUNICATIONS WITH

22   THEM?

23   A.   YES, SIR.  VICTIMS REACHED OUT TO WHATSAPP AND WE

24   RESPONDED.

25   Q.   MR. WOOG, IN TERMS OF THIS RESPONSE BY WHATSAPP AS TO THAT

1    CYBER ATTACK, WERE THERE OTHER PEOPLE OR TEAMS INVOLVED BEYOND

2    YOU?

3    A.   CERTAINLY.

4    Q.   WHAT TYPES OF TEAMS AT WHATSAPP WERE INVOLVED?

5    A.   WE HAD OUR ENGINEERS, OUR SECURITY TEAM, WE HAD OUR

6    CUSTOMER OPERATIONS TEAM.  WE HAD A NUMBER OF PEOPLE WHO WERE

7    INVOLVED IN STOPPING AND RESPONDING TO THIS ATTACK.

8    Q.   ARE YOU FAMILIAR WITH SOMEBODY NAMED -- AND PLEASE, I BEAR

9    YOUR PATIENCE FOR PRONOUNCING THIS NAME -- AASHIN GAUTAM?

10   A.   AASHIN, YES.

11   Q.   CAN YOU TELL THE JURY THE PROPER PRONUNCIATION?  I

12   APOLOGIZE.

13   A.   AASHIN GAUTAM.

14   Q.   WHO'S HE?

15   A.   HE AT THE TIME WAS LEADING OUR CUSTOMER OPERATIONS TEAM.

16   HE WAS RESPONSIBLE FOR HELPING BUILD THE ABILITY TO COMMUNICATE

17   DIRECTLY WITH USERS, GET QUESTIONS FROM USERS, THAT SORT OF

18   THING.

19   Q.   WHEN YOU SAY TO "DEAL WITH USERS," YOU'RE TALKING ABOUT IN

20   WHAT CONTEXT?

21   A.   I'M TALKING ABOUT PEOPLE WHO RELY ON WHATSAPP FOR THEIR

22   PRIVATE COMMUNICATION.

23   Q.   AND THAT WAS NOT CONTEXT OF THE NSO ATTACK.

24         MR. AKROTIRIANAKIS:  OBJECTION.  LEADING.

25         THE COURT:  SUSTAINED.

1      BY MR. ANDRES:

2      Q.   WHAT CONTEXT WERE YOU TALKING ABOUT WITH RESPECT TO HIS

3      WORK WITH VICTIMS?

4      A.   WELL, IN GENERAL HE WAS WORKING ON CUSTOMER OPERATIONS, SO

5      PEOPLE MIGHT ASK ANY TYPES OF QUESTIONS.

6           BUT SPECIFICALLY IN THIS CASE, WE WERE LOOKING TO GET

7      INFORMATION DIRECTLY TO THE VICTIMS OF THIS ATTACK.

8               MR. AKROTIRIANAKIS:  OBJECTION.  HEARSAY, YOUR HONOR,

9      AS TO MR. GAUTAM'S STATEMENTS TO WHOEVER.

10              THE COURT:  AS TO MR. GAUTAM'S STATEMENTS, YES.  BUT

11     THE SUBJECT IS FAIR HERE.

12     BY MR. ANDRES:

13     Q.   WHAT WAS YOUR UNDERSTANDING OF WHAT MR. GAUTAM WAS DOING

14     AS IT RELATES TO THE NSO ATTACK IN MAY OF 2019?

15     A.   HE WAS WORKING --

16              MR. AKROTIRIANAKIS:  HEARSAY.

17              THE COURT:  OVERRULED.

18              THE WITNESS:  MAY I ANSWER, YOUR HONOR?

19              THE COURT:  YES.

20              THE WITNESS:  MY RECOLLECTION IS THAT HE WAS WORKING

21     TO HELP GET INFORMATION TO THE VICTIMS OF THIS ATTACK.

22     BY MR. ANDRES:

23     Q.   ARE YOU ALSO FAMILIAR WITH DREW ROBINSON?

24     A.   YES, OF COURSE.

25     Q.   WHO IS HE?

1    A.   ONE OF OUR SECURITY ENGINEERS.

2    Q.   DO YOU KNOW IF HE WAS INVOLVED IN TERMS OF THE ATTACK?

3    A.   YES, I RECALL HIM WORKING TO PUT A STOP TO THE ATTACK AND

4    HELPING PROTECT OUR SYSTEMS AND OUR USERS.

5    Q.   AND WHAT ABOUT CLAUDIU --

6    A.   OF COURSE.

7    Q.   GHEORGHE?  AND, AGAIN, MAYBE YOU CAN PRONOUNCE THAT NAME

8    FOR THE JURY.

9    A.   CLAUDIU, HE WAS ALSO RESPONSIBLE FOR OUR CALLING SYSTEM,

10   SO THAT'S THE ABILITY TO PLACE A CALL.

11       AND HE, HE WORKED TO STOP THE ATTACK AND IMPROVE OUR

12   SYSTEMS.

13       MR. ANDRES:  YOUR HONOR, IF I MAY JUST HAVE ONE

14   MINUTE TO CONSULT MY COLLEAGUES.

15       THE COURT:  SURE.

16   (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.

17       MR. ANDRES:  I HAVE NO FURTHER QUESTIONS AT THIS

18   TIME, YOUR HONOR.  THANK YOU.

19       THE COURT:  ALL RIGHT.  I THINK NOW IS THE TIME FOR

20   OUR FIRST 15 MINUTE BREAK.  TYPICALLY 10:00 O'CLOCK IS THE TIME

21   FOR THE FIRST BREAK.

22       YOU CAN DO THE REDIRECT AS SOON AS WE RESUME.

23       LADIES AND GENTLEMEN, YOU'RE EXCUSED FOR 15 MINUTES.

24       THE CLERK:  ALL RISE FOR THE JURY.

25       (JURY OUT AT 10:01 A.M.)

```
 1              (RECESS FROM 10:01 A.M. UNTIL 10:16 A.M.)

 2                  THE COURT:  ALL RIGHT.  WHAT'S THE ISSUE?

 3                  MR. ANDRES:  YOUR HONOR, THE ISSUE IS THAT

 4      MR. AKROTIRIANAKIS VIOLATED YOUR ORDERS ABOUT A DOZEN TIMES IN

 5      HIS OPENING, AND I WANTED TO -- AND I'M REQUESTING AN

 6      INSTRUCTION TO THE JURY.

 7                  HE SAID THAT NSO IS USED EXCLUSIVELY FOR GOVERNMENTS.  WE

 8      KNOW THAT'S NOT TRUE, OR WE HAVEN'T GOTTEN ANY DISCOVERY ABOUT

 9      THAT.

10                  HE TALKED ABOUT WHAT WAS LEGAL IN CERTAIN PLACES.  THIS

11      CASE IS NOTHING ABOUT ANY LEGAL ACTIVITY BY NSO.  IT IS ABOUT

12      THEIR VIOLATION OF FEDERAL AND CALIFORNIA LAW AND BREACH OF

13      CONTRACT.

14                  HE BLAMED THE VICTIM BY LEAVING UP THIS SLIDE, WHICH WAS

15      COVERED SPECIFICALLY BY YOUR MOTION IN LIMINE, I THINK IT'S 5

16      OR 6.  HE USED THIS SLIDE THAT SAYS WHATSAPP SERVERS WERE NOT

17      COMPRISED BY THE ATTACK.  HE LEFT IT UP THERE FOR QUITE SOME

18      TIME.

19                  HE TALKED ABOUT WHAT WAS HAPPENING IN THE U.S. AND PUT UP

20      A MAP OF THE UNITED STATES.

21                  HE USED THE WORD "ALLEGATION" OR "ACCUSED," WHICH JUST

22      YESTERDAY, JUST YESTERDAY HE WAS WARNED NOT TO DO.

23                  HE TALKED ABOUT A WHOLE RANGE OF THINGS THAT ARE OUTSIDE

24      THE COURT'S ORDER, YOUR HONOR, CAUSING ME TO HAVE TO OBJECT TO

25      THE JURY, WHICH I DIDN'T WANT TO DO.
```

```
 1            MY UNDERSTANDING IS THAT HIS VIDEO MAY HAVE BEEN SPLICED

 2    AS WELL IN AN INAPPROPRIATE WAY.  I DON'T KNOW THAT BECAUSE I

 3    HAVEN'T SEEN IT, BUT I'M GOING TO ASK YOUR HONOR TO HAVE THE

 4    DEFENSE SEND US THEIR OPENING SLIDES.  BUT I'M CONCERNED ABOUT

 5    THE VIDEO AND THE ORDERING OF THE QUESTIONS AND WHETHER THEY

 6    WERE SPLICED IN A CERTAIN WAY.  I DON'T KNOW THAT.  I'M NOT

 7    MAKING ACCUSATIONS.  SO I'M ASKING FOR A COPY OF THAT.

 8            BUT WE NEED TO HAVE THE COURT ADDRESS THE JURY DIRECTLY

 9    AND AS SOON AS POSSIBLE TO COUNTERACT MR. AKROTIRIANAKIS'S

10    OPENING.

11            THE COURT:  WELL, YOU JUST NAMED SIX DIFFERENT AREAS

12    THAT YOU FIND WERE OFFENDING IN SOME WAY, IN VIOLATION OF THE

13    ORDER.  WHAT IS IT THAT YOU WANT THE COURT TO TELL THE JURY

14    ABOUT EACH OF THOSE DIFFERENT THINGS?

15            MR. ANDRES:  I'M GOING TO HAVE TO -- I'M GOING TO

16    HAVE TO WRITE SOMETHING, YOUR HONOR, BECAUSE OBVIOUSLY I CAN'T

17    DO IT ON THE FLY AND I DON'T WANT TO TAKE --

18            THE COURT:  OKAY.

19            MR. ANDRES:  BUT I THINK YOUR HONOR WOULD AGREE THAT

20    THERE WERE A NUMBER OF ISSUES THAT WERE OVER THE LINE.

21            THE COURT:  SOME -- THERE WERE.  THERE WERE A COUPLE,

22    FOR SURE.

23            I'M NOT SO SURE, THOUGH, THAT THE WHATSAPP SERVERS WERE

24    NOT COMPROMISED IS -- I MEAN, OBVIOUSLY THAT IS NOT A

25    REQUIREMENT FOR DAMAGES TO BE FOUND.
```

```
 1                MR. ANDRES:  YEAH.

 2                THE COURT:  I'VE ALREADY FOUND THAT DAMAGES CAN BE

 3       SHOWN IN ANOTHER WAY.

 4            AND I KNOW THEY ARGUE THAT YOU HAVE TO SHOW THE

 5       COMPROMISING, BUT I THINK IT'S THEIR WAY OF TRYING TO MINIMIZE

 6       THE DAMAGES.

 7                MR. PEREZ:  YOUR HONOR, THE ISSUE ACTUALLY IS A

 8       LITTLE DIFFERENT, WHICH IS THAT THIS SLIDE, WHICH THEY SHOWED

 9       PROBABLY FIVE OR SIX TIMES DURING THEIR OPENING, IT HAS THIS

10       SENTENCE ABOUT COMPROMISING THE SERVERS, WHICH IS WHAT THEY

11       WERE ORALLY FOCUSSED ON.

12                THE COURT:  RIGHT.

13                MR. PEREZ:  BUT IT'S GOT THIS OTHER STUFF WHICH, WHEN

14       THEY -- WOULD YOU LIKE ME TO PASS THIS UP, YOUR HONOR?

15                THE COURT:  YEAH, I DON'T REMEMBER WHAT IT -- I ONLY

16       LOOK AT THE HIGHLIGHTED LINE.

17                MR. PEREZ:  WHEN THEY DEPOSED MR. GHEORGHE, THEY

18       FOCUSSED ON THAT OTHER STUFF, ALLEGED OTHER LAX SERVER

19       SECURITY, THE VULNERABILITY, AND THE CODE, RIGHT?  AND THEY

20       KEPT FLASHING IT UP.  AND THEY LEFT IT UP FOR MINUTES AND

21       MINUTES AND MINUTES.

22                THE COURT:  UM-HUM.

23                MR. PEREZ:  AND THIS WAS SPECIFICALLY ADDRESSED BY

24       MIL 5.

25                THE COURT:  RIGHT.
```

```
 1            MR. PEREZ:  THE COURT RULED -- GRANTED OUR MOTION TO

 2   EXCLUDE, TO PRECLUDE DEFENDANTS FROM OFFERING EVIDENCE,

 3   TESTIMONY, OR ARGUMENTS -- EVIDENCE, WHICH THIS IS -- ABOUT THE

 4   ALLEGED INSUFFICIENCY OF WHATSAPP'S SECURITY MEASURES.

 5            THE COURT:  I AGREE.

 6            MR. PEREZ:  THAT IS --

 7            THE COURT:  HE DIDN'T EMPHASIZE THAT.  HE ONLY

 8   EMPHASIZED THE BOTTOM LINE.

 9        BUT YOU'RE RIGHT, THIS SHOULD HAVE BEEN REDACTED.

10            MR. ANDRES:  BUT, YOUR HONOR, MR. AKROTIRIANAKIS HAS

11   HAD TWO OCCASIONS TO SPEAK TO THE JURY, ONCE DURING VOIR DIRE

12   WHEN HE TALKED ABOUT ALLEGATIONS AND ACCUSATIONS, AND SECOND

13   DURING HIS OPENING, AND HE'S 0 FOR 2.

14        SO IT'S JUST NOT FAIR THAT HE'S ALLOWED TO TRAMPLE ALL

15   OVER THE COURT'S RULING --

16            MR. AKROTIRIANAKIS:  YOUR HONOR, I --

17            MR. ANDRES:  -- WITH ABSOLUTELY NO CONSEQUENCES.

18            MR. AKROTIRIANAKIS:  I SAID --

19            MR. ANDRES:  EXCUSE ME.

20            THE COURT:  I AGREE.

21            MR. ANDRES:  THANK YOU, YOUR HONOR.

22            MR. AKROTIRIANAKIS:  I SAID --

23            THE COURT:  I AGREE.

24            MR. AKROTIRIANAKIS:  I SAID ALLEGED AND THAT THE

25   COURT FOUND.  I SAID -- IT WAS THE VERY NEXT SENTENCE I SAID,
```

343

```
 1        THEY HAVE ALLEGED THIS AND THE COURT HAS DETERMINED THAT WE'RE

 2    LIABLE.

 3            THE COURT:  YOU SAID THAT, THOUGH, BECAUSE HE GOT UP

 4    AND MADE AN OBJECTION.

 5            MR. AKROTIRIANAKIS:  NO.  THIS IS IN MY SCRIPT.  I

 6    PROMISE.  I'LL SHOW IT TO YOU.  I HAVE EXACTLY THAT.

 7            THE COURT:  OKAY.  THAT'S A MINOR ONE.

 8        THIS ONE IS MORE SIGNIFICANT.  THE REST OF IT SHOULD HAVE

 9    BEEN REDACTED.

10            MR. AKROTIRIANAKIS:  WE --

11            THE COURT:  I'LL TELL YOU --

12            MR. AKROTIRIANAKIS:  WE PROVIDED THIS --

13            THE COURT:  THIS IS WHAT WE'RE GOING TO DO GOING

14    FORWARD, SINCE WE DON'T WANT TO WASTE THE JURY'S TIME.  WE'RE

15    GOING TO GO FORWARD.

16        COUNSEL, YOU CAN OBJECT, AND IF IT'S IN VIOLATION, JUST

17    OBJECT, "VIOLATES MIL X."

18            MR. ANDRES:  OKAY.

19            THE COURT:  AND I'LL -- I'LL TELL THE JURY TO

20    DISREGARD IF IT'S IN VIOLATION.

21            MR. ANDRES:  THANK YOU, YOUR HONOR.

22            THE COURT:  THAT'S WHAT WE'LL DO GOING FORWARD.

23        AND THEN I'LL CONSIDER GIVING AN INSTRUCTION.  IN FACT, IN

24    MY PRETRIAL ORDER, I SAID I STILL DON'T KNOW IF AN INSTRUCTION

25    TO THE JURY IS GOING TO BE REQUIRED DEPENDING UPON HOW THE
```

```
1     EVIDENCE COMES IN.

2          THIS IS CLEARLY IN VIOLATION OF THE ORDER.

3               MR. ANDRES:  THANK YOU, YOUR HONOR.

4               MR. AKROTIRIANAKIS:  YOUR HONOR, I --

5               THE COURT:  WOULD YOU HAND THIS BACK.

6               MR. PEREZ:  YOUR HONOR, I JUST WANT TO BE CLEAR, IF

7     THEY INTEND TO USE THAT DOCUMENT IN THEIR CROSS-EXAMINATION OF

8     MR. GHEORGHE --

9               THE COURT:  IT HAS TO BE REDACTED.

10              MR. PEREZ:  THANK YOU, YOUR HONOR.

11              THE COURT:  ALL THE DOCUMENTS HAVE TO BE REDACTED TO

12    EXCLUDE THE INFORMATION THAT THE COURT HAS ALREADY EXCLUDED

13    THROUGH ITS VARIOUS ORDERS, EVERY DOCUMENT.

14         OKAY.  LET'S BRING THE JURY BACK IN AND LET'S CONTINUE

15    WITH THE REDIRECT.

16              MR. ANDRES:  THANK YOU, YOUR HONOR.

17              THE COURT:  AND, YES, WOULD YOU RETAKE THE STAND FOR

18    US, MR. WOOG.

19              THE WITNESS:  YES, YOUR HONOR.

20         (PAUSE IN PROCEEDINGS.)

21         (JURY IN AT 10:23 A.M.)

22              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

23              THE COURT:  ALL RIGHT.  REDIRECT, MR. AKROTIRIANAKIS?

24              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

25    ///
```

1        **CROSS-EXAMINATION**

2    BY MR. AKROTIRIANAKIS:

3    Q.   MR. WOOG, I WANTED TO START WITH ONE OF THE LAST THINGS

4    THAT YOU SAID, WHICH WAS THAT MR. GHEORGHE WAS WORKING TO

5    IMPROVE WHATSAPP'S SYSTEMS.  THAT'S RIGHT?

6    A.   YES, SIR.

7    Q.   AND ALSO MR. ROBINSON WAS WORKING TO IMPROVE WHATSAPP'S

8    SYSTEMS?

9    A.   HE WAS WORKING TO INCREASE THE SECURITY OF OUR SYSTEMS.

10   Q.   FOR THE WORK THAT HE WAS DOING ON THIS CASE?

11   A.   I FIRST MET DREW WHEN HE WAS CALLED IN TO SUPPORT THE

12   RESPONSE TO THE ATTACK THAT NSO HAD CONDUCTED.

13   Q.   I'M JUST ASKING YOU, MR. WOOG, IF THE WORK THAT YOU'RE

14   REFERRING TO AS HIS EFFORTS TO IMPROVE WHATSAPP'S SYSTEMS WAS

15   THE WORK THAT YOU WERE SAYING HE WAS DOING ON THIS CASE?

16   A.   I BELIEVE SO.

17   Q.   AND LIKEWISE, MR. GHEORGHE AND THEIR RESPECTIVE TEAMS;

18   CORRECT?

19   A.   YES.

20   Q.   ALL RIGHT.  NOW, WE'VE MET BEFORE TODAY; RIGHT?

21   A.   IT'S GOOD TO SEE YOU AGAIN.

22   Q.   LIKEWISE.  AT YOUR DEPOSITION IN THIS CASE, YOU WERE

23   DESIGNATED TO TESTIFY ON BEHALF OF THE PLAINTIFFS AS TO

24   INTERNAL AND EXTERNAL STATEMENTS THAT WHATSAPP HAD MADE ABOUT

25   THE EVENTS THAT WE'RE HERE TALKING ABOUT TODAY; CORRECT?

1    A.   I BELIEVE SO, YES.

2    Q.   I'M GOING TO MOVE THIS SLIGHTLY.  THERE'S LIKE A GLARE AND

3    I CAN'T REALLY SEE YOU.  SORRY.

4         YOU ARE THE VICE PRESIDENT FOR GLOBAL COMMUNICATIONS AT

5    WHATSAPP?

6    A.   YES.

7    Q.   AND THAT DEPARTMENT IS TYPICALLY, OR SHORTHANDED AS COMMS

8    WITHIN WHATSAPP AND FACEBOOK; CORRECT?

9    A.   YES.

10   Q.   AS THE GLOBAL HEAD OF COMMS, YOU ARE A MEMBER OF THE

11   WHATSAPP SENIOR LEADERSHIP TEAM?

12   A.   YES.

13   Q.   AND YOU ARE THE SENIOR PUBLIC RELATIONS OFFICER GLOBALLY;

14   CORRECT?

15   A.   FOR WHATSAPP, YES.

16   Q.   AND IN ADDITION TO BEING RESPONSIBLE FOR PUBLIC RELATIONS,

17   YOU ALSO HAVE RESPONSIBILITY FOR THE MARKETING AND BUSINESS

18   STRATEGY AROUND WHATSAPP'S PRODUCTS; CORRECT?

19   A.   I SUPPORT THE TEAM IN MAKING DECISIONS ABOUT THOSE

20   FUNCTIONS.  BUT THEY DON'T REPORT TO ME DIRECTLY.

21   Q.   WOULD YOU LOOK IN THE BINDER THAT'S THERE.

22   A.   SORRY.  I HAVE TWO BINDERS HERE.

23   Q.   SURE.  THE TOP ONE?

24   A.   OKAY.

25   Q.   IT HAS EXHIBIT 1076.  JUST HAVE A LOOK, PLEASE.  I THINK

 1     YOU'LL RECOGNIZE IT AS YOUR LINKEDIN PROFILE.

 2     A.   I HAVE IT HERE.

 3     Q.   OKAY.  DO YOU RECOGNIZE IT AS YOUR LINKEDIN PROFILE?

 4     A.   YES.

 5     Q.   OKAY.  AND YOU WROTE THAT YOURSELF; RIGHT?

 6     A.   I DID.

 7     Q.   OKAY.  ONE OF THE THINGS THAT YOU WROTE IN THE SECOND

 8     SENTENCE IS THAT YOU BUILT THE COMMUNICATIONS TEAM FROM

 9     SCRATCH.

10         DO YOU SEE THAT?

11     A.   YES.

12     Q.   AND THEN YOU ALSO GO ON AND TALK ABOUT THE

13     RESPONSIBILITIES OF -- YOUR RESPONSIBILITIES ON THE LEADERSHIP

14     TEAM.  AND IN THAT YOU LIST PUBLIC AFFAIRS, MARKETING, AND

15     BUSINESS STRATEGY; CORRECT?

16     A.   IF I MAY, SIR, IT SAYS I AM A MEMBER OF THE WHATSAPP

17     LEADERSHIP TEAM RESPONSIBLE FOR PRODUCT DEVELOPMENT, PUBLIC

18     AFFAIRS, MARKING AND BUSINESS STRATEGY.

19         SO IT'S THE RESPONSIBILITY OF THE LEADERSHIP TEAM TO MAKE

20     THOSE TYPES OF DECISIONS.

21     Q.   THANK YOU, MR. WOOG.

22         WHATSAPP'S HEADQUARTERS IS IN A BUILDING ON THE META

23     CAMPUS IN MENLO PARK?

24     A.   YES.

25     Q.   YOU'VE BEEN THERE MANY TIMES?

```
1    A.   YES.

2    Q.   YOU YOURSELF LIVE IN LOS ANGELES; RIGHT?

3    A.   I DO.

4    Q.   THE ADDRESS OF META'S HEADQUARTERS IS 1 HACKER WAY;

5    CORRECT?

6    A.   YEAH.

7    Q.   SORT OF AN HOMAGE TO FACEBOOK'S BEGINNINGS?

8    A.   I THINK THERE'S A STORY ABOUT IT.  I DON'T FULLY RECALL.

9         BUT I THINK SO.

10   Q.   OKAY.  YOU'VE BEEN THE GLOBAL HEAD OF COMMS SINCE AUGUST

11   2022?

12   A.   THAT SOUNDS RIGHT.  I BELIEVE THAT'S WHEN I RECEIVED MY

13   PROMOTION TO MY CURRENT ROLE.

14   Q.   AND YOU'VE BEEN IN THE SAME POSITION IN TERMS OF

15   RESPONSIBILITIES, ALBEIT WITH A DIFFERENT TITLE, GOING BACK TO

16   AT LEAST 2019; CORRECT?

17   A.   YES, SIR.  OUR TEAM HAS GROWN, AS OUR APP HAS GROWN.  SO

18   MY -- I RECEIVED PROMOTIONS ALONG THE WAY.

19   Q.   RIGHT.  MY POINT, MR. WOOG, IS THAT YOUR RESPONSIBILITIES,

20   ALTHOUGH YOU HAVE A LOFTIER TITLE TODAY, ARE THE SAME AS THEY

21   WERE IN 2019; CORRECT?

22   A.   I THINK THAT'S FAIR TO SAY.

23   Q.   AND YOU DID BUILD THE COMMUNICATIONS TEAM YOURSELF AND

24   FROM SCRATCH?

25   A.   YES, SIR.
```

1    Q.   AND YOUR FOCUS IN YOUR VARIOUS COMMUNICATIONS ROLES IS TO

2    COMMUNICATE WHATSAPP'S STORY PUBLICLY TO THE NEWS MEDIA;

3    CORRECT?

4    A.   YES, THAT'S PART OF MY JOB, YES.

5    Q.   AND SOCIAL MEDIA?

6    A.   YES.  WE ALSO POST THINGS ONLINE ABOUT WHATSAPP AND HOW WE

7    WORK, HOW WE OPERATE, WHAT WE'RE BUILDING, HOW OUR FEATURES

8    WORK, OUR BELIEFS ON PRIVACY.

9    Q.   AND TO COMMUNICATE WHATSAPP'S STORY IN OTHER FORMS OF

10   PUBLIC MEDIA; CORRECT?

11   A.   YES.

12   Q.   NOW, THE BUILDING OF THE DEDICATED WHATSAPP COMMS TEAM

13   ALLOWED WHATSAPP TO PLAY OFFENSE AS WELL AS IT PLAYS DEFENSE

14   WITH RESPECT TO PUBLIC RELATIONS; IS THAT RIGHT, MR. WOOG?

15   A.   WELL, I THINK WHEN I STARTED THERE WASN'T MANY OF US, AND

16   PART OF OUR DAY-TO-DAY WAS SIMPLY RESPONDING TO ALL THE

17   QUESTIONS THAT WE RECEIVED.

18        AND OVER TIME, AS WE BUILT THE TEAM, PARTICULARLY PEOPLE

19   AROUND THE WORLD, WE WERE ABLE TO GO OUT AND TALK TO PEOPLE,

20   MEET PEOPLE FOR THE FIRST TIME AND GO OUT AND EXPLAIN WHAT WE

21   WERE TRYING TO DO.

22   Q.   SO I TAKE THAT AS A YES THAT YOUR BUILDING OF A DEDICATED

23   COMMS TEAM WITHIN WHATSAPP WAS SOMETHING THAT ALLOWED THE

24   COMPANY TO PLAY OFFENSE AS WELL AS IT PLAYED DEFENSE WITH

25   RESPECT TO PUBLIC RELATIONS?

```
1    A.   I DON'T THINK THOSE ARE MY WORDS, BUT I DO THINK WE SHOULD

2    BE ABLE TO RESPOND TO PEOPLE'S QUESTIONS AND WE SHOULD BE ABLE

3    TO AFFIRMATIVELY GO OUT AND TELL THE PEOPLE WHAT WE'RE TRYING

4    TO BUILD TO PROTECT THEIR PRIVACY.

5    Q.   RIGHT.  SO YOU AND YOUR TEAM HAVE NEVER SAID THAT HAVING

6    THIS TEAM HAS ALLOWED THE COMPANY TO PLAY OFFENSE AS WELL AS IT

7    PLAYS DEFENSE WITH RESPECT TO PUBLIC RELATIONS?

8    A.   I'M NOT SURE ONE WAY THE OTHER.

9    Q.   OKAY.  WE'LL COME BACK TO THAT.  WHATSAPP IS OWNED BY

10   FACEBOOK, NOW CALLED META?

11   A.   YES.

12   Q.   AND META IS A PUBLICLY TRADED COMPANY?

13   A.   YES, IT IS.

14   Q.   AND IT SEEKS TO MAKE A PROFIT FOR ITS SHAREHOLDERS?

15   A.   YES.

16   Q.   AND THE -- YOU BELIEVE THAT, THAT WHATSAPP'S TECHNOLOGIES

17   DO BENEFIT ITS USERS?

18   A.   ABSOLUTELY.

19   Q.   AND THAT'S TRUE EVEN THOUGH META IS TRYING TO MAKE A

20   PROFIT FOR ITS SHAREHOLDERS; CORRECT?

21   A.   OUR FUNDAMENTAL ROLE AT WHATSAPP IS TO PROVIDE PEOPLE WITH

22   PRIVATE COMMUNICATION, AND THERE'S MANY WAYS THAT META BUILDS A

23   BUSINESS, BUT THE PRIVATE COMMUNICATION IS REALLY NOT PART OF

24   THAT.

25   Q.   MR. WOOG, IT'S TRUE, IN YOUR VIEW, THAT WHATSAPP'S
```

1     TECHNOLOGIES HAVE A BENEFIT, EVEN THOUGH THE COMPANY IS A

2     FOR-PROFIT COMPANY; CORRECT?

3     A.   IT PROVIDES ENORMOUS BENEFIT TO PEOPLE ALL OVER THE WORLD

4     WHO USE OUR SERVICES, ABSOLUTELY.

5     Q.   NOW, WHATSAPP -- EXCUSE ME.

6          META'S CURRENT MARKET CAP IS OVER $1.3 TRILLION; CORRECT?

7     A.   I HAVEN'T CHECKED THE LATEST, BUT THAT SEEMS IN LINE WITH

8     WHAT I RECALL.

9     Q.   AND YOU WOULD AGREE THAT THE FACT THAT META SEEKS TO MAKE

10    A PROFIT DOESN'T MEAN THAT IT ALSO CANNOT HAVE GOOD MOTIVES IN

11    TRYING TO PROMOTE WHATSAPP TECHNOLOGIES; CORRECT?

12    A.   I'M SORRY, I DON'T THINK I UNDERSTAND YOUR QUESTION.

13    Q.   OKAY.  WHATSAPP IS A FOR-PROFIT COMPANY; RIGHT?

14    A.   YES.

15    Q.   META IS A FOR-PROFIT COMPANY; RIGHT?

16    A.   YES.

17    Q.   OKAY.  AND THE FACT THAT A COMPANY IS TRYING TO MAKE A

18    PROFIT, AS OPPOSED TO, FOR EXAMPLE, BEING A CHARITY --

19    A.   OKAY.

20    Q.   YOU UNDERSTAND THE DIFFERENCE, RIGHT?

21    A.   YES, SIR.

22    Q.   OKAY.  THE FACT THAT A COMPANY WORKS FOR PROFIT DOES NOT

23    IN AND OF ITSELF MAKE IT A BAD COMPANY.

24         WOULD YOU AGREE?

25    A.   I AGREE.

```
1      Q.   AND SO YOU WERE TELLING US ABOUT THE ACQUISITION OF

2      WHATSAPP.  I BELIEVE YOU SAID IT WAS IN 2015 OR '14?

3      A.   2014.

4      Q.   2014.

5           AND THAT WAS -- THE ACQUISITION PRICE WAS PUBLICLY

6      REPORTED TO BE $19 BILLION; IS THAT RIGHT?

7      A.   YES.

8                MR. ANDRES:  OBJECTION.  RELEVANCE.

9                THE COURT:  WHAT IS THE RELEVANCE, COUNSEL?

10               MR. AKROTIRIANAKIS:  IT RELATES TO THIS --

11               THE COURT:  THEIR FINANCIAL CONDITION IS NOT AT ISSUE

12     IN THIS CASE.

13               MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I'M ASKING HIM

14     ABOUT THE FACT THAT THEY'RE TRYING TO MAKE A PROFIT AND WHETHER

15     THAT IS --

16               THE COURT:  WELL, YOU ALREADY ASKED THAT.

17          WHAT'S THE SPECIFIC DOLLAR AMOUNT, WHAT'S THE RELEVANCE OF

18     THAT?

19               MR. AKROTIRIANAKIS:  THAT HE'S TRYING TO MAKE A

20     PROFIT OVER AND ABOVE THAT, YOUR HONOR.

21               THE COURT:  OH.  WAS THERE AN OBJECTION?

22               MR. ANDRES:  THERE WAS, YOUR HONOR.

23               THE COURT:  SUSTAINED.

24               MR. ANDRES:  THANK YOU.

25     BY MR. AKROTIRIANAKIS:
```

1    Q.   IN 2019, THE GOAL THAT WHATSAPP HAD WAS ULTIMATELY TO

2    BECOME PROFITABLE; CORRECT?

3    A.   I THINK OUR FUNDAMENTAL GOAL IS TO PROVIDE THE WORLD WITH

4    PRIVATE AND SECURE COMMUNICATION.  AND AS I MENTIONED EARLIER,

5    WE ALSO HAVE A BUSINESS THAT WE PROVIDE THE WORLD AS WELL.

6    Q.   AND YOU WOULD LIKE IT TO BE A PROFITABLE BUSINESS?

7    A.   YES.  BUILDING A PROFITABLE BUSINESS HELPS SUSTAIN THE

8    ABILITY TO HELP PEOPLE COMMUNICATE PRIVATELY.

9    Q.   NOW, YOU TOLD US THAT EARLIER IN YOUR CAREER YOU WERE A

10   SPOKESPERSON FOR THE DEPARTMENT OF DEFENSE?

11   A.   YES, SIR.

12   Q.   AND AT THE TIME, THAT WAS -- THAT WAS A POINT IN TIME WHEN

13   THE DEPARTMENT OF DEFENSE HAD THE LARGEST BUDGET OUT OF ANY OF

14   THE CABINET LEVEL DEPARTMENTS IN THE UNITED STATES GOVERNMENT;

15   CORRECT?

16          MR. ANDRES:  OBJECTION.  RELEVANCE.

17          THE COURT:  I DON'T SEE THE RELEVANCE OF THE

18   DEPARTMENT OF DEFENSE --

19          MR. AKROTIRIANAKIS:  I'LL WITHDRAW THE QUESTION,

20   YOUR HONOR.

21          THE COURT:  THANK YOU.

22   BY MR. AKROTIRIANAKIS:

23   Q.   THE DEPARTMENT OF DEFENSE ITSELF CONTRACTS WITH, LIKE,

24   THOUSANDS OF GOVERNMENT CONTRACTORS ALL OF WHICH ARE TRYING TO

25   MAKE A PROFIT; CORRECT?

1              MR. ANDRES:  OBJECTION, YOUR HONOR.

2              THE COURT:  SUSTAINED.

3         YOU DON'T HAVE TO ANSWER THAT.

4              THE WITNESS:  OKAY, YOUR HONOR.

5    BY MR. AKROTIRIANAKIS:

6    Q.   YOU TESTIFIED THAT WHATSAPP HAS OVER 3 BILLION USERS

7    TODAY?

8    A.   WE HAVE APPROXIMATELY 3 BILLION USERS TODAY.

9    Q.   OKAY.  AND AT THE -- IN 2019, YOU HAD OVER, DID YOU SAY,

10   1 AND A HALF BILLION?

11   A.   I WOULD SAY AROUND THAT NUMBER, YES.

12   Q.   OKAY.  AND IT'S TRUE THAT WHATSAPP DELIVERS WELL OVER

13   100 BILLION MESSAGES PER DAY; CORRECT?

14   A.   YES.

15   Q.   THE WHATSAPP APPLICATION IS FREE FOR ANYONE TO DOWNLOAD?

16   A.   YES, IT IS.

17   Q.   LITERALLY ANYONE; RIGHT?

18   A.   YOU NEED TO HAVE AN IPHONE OR ANDROID DEVICE, AND AS I

19   MENTIONED EARLIER, YOU GO TO THE APP STORE AND FROM THERE YOU

20   CAN DOWNLOAD WHATSAPP FOR FREE.

21   Q.   OKAY.  AND THE USERS FOR WHATSAPP ARE NOT REQUIRED TO

22   IDENTIFY THEMSELVES IN ORDER TO SET UP A WHATSAPP ACCOUNT;

23   CORRECT?

24   A.   YOU DO NEED TO PUT IN A NAME.  IT COULD BE A NICKNAME.

25   BUT YOU NEED TO PUT IN SOME NAME IN ORDER TO USE OUR SERVICE.

1    Q.   IT COULD BE A CHARACTER?

2    A.   SURE.

3    Q.   IT DOESN'T NEED TO BE --

4    A.   LIKE WHEN YOU SAY CHARACTER, DO YOU --

5    Q.   LIKE A LETTER?  LIKE I, FOR EXAMPLE, MY NAME IS JOE, AND I

6    COULD JUST PUT J?

7    A.   I DON'T KNOW IF YOU NEED A COUPLE LETTERS OR A COUPLE

8    CHARACTERS.  BUT YOU CAN CHOOSE WHAT YOU WANT TO BE CALLED ON

9    THE SERVICE.

10   Q.   I COULD LITERALLY PUT ANY COMBINATION IN THAT FIELD?

11   A.   I THINK SO.

12   Q.   IT DOESN'T NEED TO BE MY NAME?

13   A.   IT DOESN'T NEED TO BE YOUR NAME.  IT COULD BE A NICKNAME,

14   RIGHT.

15   Q.   AND THAT'S PERMISSIBLE AS FAR AS WHATSAPP IS CONCERNED?

16   A.   I THINK SO.

17   Q.   AND UTTERLY INCONSEQUENTIAL WHAT IS ENTERED IN THE NAME

18   FIELD FROM WHATSAPP'S PERSPECTIVE, I MEAN?

19   A.   WELL, IT -- IT'S THE NAME THAT YOU CHOOSE, AND OTHER

20   PEOPLE WILL SEE THAT NAME WHEN YOU TEXT THEM.

21        I'M NOT SURE I UNDERSTAND YOUR QUESTION.

22   Q.   SURE.  WHATSAPP DOESN'T CARE WHAT SOMEBODY PUTS OR DOESN'T

23   PUT IN THE NAME FIELD WHEN THEY'RE SIGNING UP FOR WHATSAPP;

24   CORRECT?

25   A.   THAT'S YOUR DECISION.

1    Q.   MEANING ANY WHATSAPP USER'S DECISION?

2    A.   YES.

3    Q.   OKAY.  AND THAT'S UNDERSTOOD BY WHATSAPP; CORRECT?

4    A.   I THINK SO.

5    Q.   AND FOR THAT REASON, WHATSAPP DOESN'T KNOW WHO ITS

6    INDIVIDUAL USERS ARE?

7            MR. ANDRES:  OBJECTION, YOUR HONOR.  MOTION IN LIMINE

8    6, AND RELEVANCE.

9            MR. AKROTIRIANAKIS:  I THINK THE RELEVANCE WILL BE

10   APPARENT FROM MY NEXT QUESTION, YOUR HONOR.

11           THE COURT:  OKAY.  I'LL ALLOW YOU TO ASK THE NEXT

12   QUESTION.

13       BUT THE USER I.D. INFORMATION HAS BEEN ALREADY ADDRESSED

14   IN THIS MOTION IN LIMINE NUMBER 6.

15           MR. AKROTIRIANAKIS:  I WASN'T GOING TO GET INTO THAT,

16   YOUR HONOR.

17           THE COURT:  OKAY.  ALL RIGHT.  ONE MORE QUESTION.

18   BY MR. AKROTIRIANAKIS:

19   Q.   ALL WHAT IS NEEDED TO BE PROVIDED IS, IN TERMS OF THE

20   INFORMATION, IS A PHONE NUMBER; CORRECT?

21   A.   TO SIGN UP FOR WHATSAPP, YOU NEED A PHONE NUMBER, AND THEN

22   YOU NEED TO PICK A NAME TO USE OUR SERVICE, AND YOU HAVE TO

23   AGREE TO THE TERMS OF SERVICE AS WELL.

24   Q.   AND IT'S THROUGH THAT PHONE NUMBER THAT WHATSAPP

25   COMMUNICATES WITH ITS USERS?

1    A.   WELL, THE PHONE NUMBER IS HOW YOU COMMUNICATE WITH OTHER

2    USERS.  IS THAT WHAT YOU MEAN?

3    Q.   WELL, IN THIS CASE, YOU UNDERSTAND THAT WHATSAPP SENT A

4    TEXT MESSAGE TO THE 1470 USERS THAT WE'RE TALKING ABOUT; RIGHT?

5              MR. ANDRES:  OBJECTION, YOUR HONOR.

6              THE COURT:  SUSTAINED.

7              MR. ANDRES:  THIS IS ALSO -- THANK YOU.

8              THE COURT:  SUSTAINED.

9    BY MR. AKROTIRIANAKIS:

10   Q.   DID YOU NOT TESTIFY ABOUT A NOTIFICATION PROJECT?

11   A.   YES, WE ULTIMATELY NOTIFIED PEOPLE IN RESPONSE TO THIS

12   ATTACK.

13   Q.   RIGHT.  AND YOU DID SO BY SENDING THEM A TEXT MESSAGE ON

14   WHATSAPP?

15   A.   WE SENT THEM A WHATSAPP MESSAGE.  THAT WAS ONE OF THE WAYS

16   THAT WE COMMUNICATED WITH USERS.

17   Q.   I BEG YOUR PARDON.  YOU SENT THEM A WHATSAPP MESSAGE?

18   A.   YES.

19   Q.   BUT IT WAS A TEXT MESSAGE?

20   A.   THERE WAS TEXT IN THE WHATSAPP MESSAGE.

21   Q.   OVER THE WHATSAPP SERVERS?  THAT'S ALL I'M GETTING AT.

22   A.   FROM US TO THEM, YES.

23   Q.   NOW, YOU TESTIFIED ABOUT END TO END ENCRYPTION?

24   A.   YES.

25   Q.   THAT'S NOT A USER CHOICE; RIGHT?  THAT'S JUST A FUNCTION

1    OF THE SYSTEM; RIGHT?

2    A.   YES.  IT IS ON BY DEFAULT, AND IT SECURES EVERY MESSAGE

3    THAT YOU SEND BEFORE IT EVEN LEAVES YOUR PHONE.  AND THERE'S NO

4    OFF SWITCH TO END TO END ENCRYPTION.

5    Q.   NOW, IN MAY 2019, WHATSAPP CAME TO BELIEVE THAT SOME OF

6    NSO'S CUSTOMERS HAD TRIED TO USE PEGASUS WITH RESPECT TO 1470

7    WHATSAPP USER DEVICES?

8            MR. ANDRES:  OBJECTION, YOUR HONOR.  THIS VIOLATES

9    SEVERAL MILS, INCLUDING MOTION IN LIMINE NUMBER 4.

10           THE COURT:  SUSTAINED.

11           MR. AKROTIRIANAKIS:  I'M NOT SURE WHICH PART --

12           THE COURT:  THE CUSTOMER PART.

13       I ASSUME THAT'S WHAT YOU'RE OBJECTING TO?

14           MR. ANDRES:  YES, YOUR HONOR.

15           THE COURT:  YES.

16           MR. AKROTIRIANAKIS:  IT'S PAGE 6, LINE 10 AND 11 ON

17   DOCUMENT 686 ON THE COURT'S DOCKET.

18           THE COURT:  I DON'T HAVE THAT IN FRONT OF ME.  I JUST

19   HAVE A LIST OF ALL MY PRETRIAL RULINGS, AND IT APPEARS TO COME

20   WITHIN MIL 4.

21   BY MR. AKROTIRIANAKIS:

22   Q.   WHATSAPP CAME TO BELIEVE THAT PEGASUS TECHNOLOGY HAD BEEN

23   USED WITH RESPECT TO 1470 WHATSAPP USERS' DEVICES IN APRIL AND

24   MAY OF 2019; CORRECT?

25           MR. ANDRES:  OBJECTION, YOUR HONOR.  MOTION IN

```
 1   LIMINE.

 2              THE COURT:  OVERRULED.  THAT ONE I THINK IS FINE.

 3              THE WITNESS:  I'M SORRY.  COULD YOU ASK THE QUESTION

 4   AGAIN?

 5   BY MR. AKROTIRIANAKIS:

 6   Q.   IN MAY 2019, WHATSAPP CAME TO BELIEVE THAT NSO'S PEGASUS

 7   TECHNOLOGY HAD BEEN USED WITH RESPECT TO 1470 WHATSAPP USER

 8   DEVICES IN APRIL AND MAY OF 2019?

 9   A.   I'M NOT SURE HOW LONG IT TOOK US TO REALIZE THE NUMBER.

10   BUT, YES, THAT WAS THE ATTACK THAT WE WERE REFERRING TO.

11   Q.   AND IN MAY 2019, WHATSAPP CONDUCTED AN INVESTIGATION?

12   A.   YES, INDEED.

13   Q.   AND THAT LED TO THE PUBLISHING OF A, SOMETHING CALLED A

14   CVE?

15   A.   YES.  A CVE IS A COMMONLY ACCEPTED PRACTICE BY TECHNOLOGY

16   COMPANIES ALL OVER THE WORLD.  AS A MATTER OF BEST PRACTICES,

17   YOU WANT TO MAKE PUBLICATIONS TO THE SECURITY COMMUNITY WHEN

18   YOU'VE SOLVED SOMETHING AND YOU'VE IMPROVED YOUR TECHNOLOGY.

19   YOU EXPLAIN THAT SO OTHERS CAN TAKE THE SAME STEPS AS WELL AND

20   UNDERSTAND WHAT YOU'VE DONE.

21   Q.   NOW, YOU YOURSELF ARE NOT A TECHNICAL PERSON; IS THAT

22   FAIR?

23   A.   THAT'S FAIR.

24   Q.   AND AT THE TIME, YOU CHOSE TO RELY ON THE EXPERTISE OF

25   MR. GHEORGHE AND MR. ROBINSON IN ORDER FOR YOU AND FOR THE
```

```
 1    COMPANY TO UNDERSTAND WHAT THE COMPANY BELIEVED HAPPENED;

 2    RIGHT?

 3    A.   YES.

 4    Q.   AND AS PART OF THAT INVESTIGATION, WHATSAPP DISCOVERED A

 5    SECURITY FLAW IN ITS CODE?

 6    A.   I -- I BELIEVE WE IDENTIFIED THE ATTACK, WE STOPPED THE

 7    ATTACK, AND THEN WE IMPROVED OUR CODE WITH THE INTENT OF MAKING

 8    SURE IT COULDN'T HAPPEN AGAIN.

 9    Q.   AND WHATSAPP, IN FACT, FIXED THE FLAW IN MAY OF 2019 SO

10    THAT IT COULDN'T BE DONE AGAIN; RIGHT?

11          MR. ANDRES:  OBJECTION, YOUR HONOR.  MOTION IN LIMINE

12    NUMBER 5.

13          THE COURT:  YES, SUSTAINED.

14    BY MR. AKROTIRIANAKIS:

15    Q.   LET ME ASK YOU, MR. WOOG, WHATSAPP CONSTANTLY REVIEWS ITS

16    CODE AND IS ALWAYS LOOKING FOR WAYS TO IMPROVE ITS SECURITY;

17    CORRECT?

18    A.   WE ARE CONSTANTLY LOOKING TO IMPROVE OUR SECURITY, INDEED,

19    TO PROTECT OUR USERS.

20    Q.   AND YOU HAVE TEAMS OF PEOPLE WHO DO THAT AS THEIR REGULAR

21    JOB; CORRECT?

22    A.   YES.

23    Q.   AND THAT TEAM, THOSE TEAMS, MAKE ROUTINE REPORTS ABOUT THE

24    IMPROVEMENTS THAT THEY MAKE?

25    A.   I'M SORRY, I DON'T KNOW WHAT YOU MEAN BY REPORTS.
```

1    Q.   WELL, IN THE PROCESS OF FINDING AND IMPROVING SECURITY, IF

2    YOUR SECURITY TEAMS FIND FLAWS IN WHATSAPP'S CODE BASE, THEY

3    IMPROVE THEM AND WRITE REPORTS ABOUT THEM; CORRECT?

4    A.   YEAH, WE MAINTAIN A WEBSITE WHERE WE EXPLAIN THE, THE

5    IMPROVEMENTS THAT WE'RE MAKING.  SO PEOPLE CAN REPORT BUGS, OR

6    VULNERABILITIES TO US, AND THEN WE IMPROVE ON THEM, OR

7    SOMETIMES WE IDENTIFY THEM ON OUR OWN, OF COURSE, AND WE MAKE

8    IMPROVEMENTS TO THE APP.

9         WE MAKE ALL THAT INFORMATION AVAILABLE PUBLICLY SO OUR APP

10   CAN BE MORE SECURE, AND OTHER APPS WHO MAY USE SOME OF OUR CODE

11   CAN BE MORE SECURE AS WELL.

12   Q.   MY POINT IS THAT WHATSAPP EMPLOYS A NUMBER OF PEOPLE WHOSE

13   ENTIRE JOB IT IS IS TO LOOK FOR AND CORRECT FLAWS IN WHATSAPP'S

14   CODE; CORRECT?

15           MR. ANDRES:  OBJECTION, YOUR HONOR.  SAME OBJECTION.

16           THE COURT:  SUSTAINED.

17   BY MR. AKROTIRIANAKIS:

18   Q.   AS PART OF THE NOTIFICATION PROJECT THAT YOU TESTIFIED TO,

19   WHATSAPP SET UP AN FAQ PAGE; CORRECT?

20   A.   YES, WE DID, ON OUR WEBSITE.

21   Q.   NOW, YOU TESTIFIED PREVIOUSLY ABOUT WHY YOU NOTIFIED THE

22   USERS.

23        DO YOU REMEMBER THAT TESTIMONY?

24   A.   YES.

25   Q.   OKAY.  AND THAT NOTIFICATION WAS OCTOBER 26TH, 2019;

1      CORRECT?

2      A.   OCTOBER 2019, YES.

3      Q.   DO YOU RECALL WHETHER IT WAS EARLY OR LATE OCTOBER?

4      A.   I THINK THAT WAS THE DATE.

5      Q.   AND THE SAME DAY THAT YOU SENT THAT NOTICE, WHATSAPP FILED

6      THIS LAWSUIT; CORRECT?

7      A.   YES, THAT'S TRUE.

8      Q.   AND ALSO ON THE SAME DAY YOU SENT THE NOTICE, THE HEAD OF

9      WHATSAPP, WILL CATHCART, PUBLISHED AN OP ED IN "THE WASHINGTON

10     POST" ABOUT NSO; CORRECT?

11     A.   YES, THAT'S CORRECT.

12     Q.   YOUR TESTIMONY IS THAT THE -- WELL, IT'S, WHAT, SIX MONTHS

13     SINCE THE DISCOVERY OF THE -- AND RESOLUTION OF THE

14     VULNERABILITY THAT YOU SENT THIS NOTIFICATION?

15     A.   I -- IT TOOK SEVERAL MONTHS TO COMPLETE OUR INVESTIGATION,

16     TO COMPLETE, YOU KNOW, COMPLETE THE PROCESS OF GOING OUT AND

17     NOTIFYING USERS.

18         SOME OF THOSE USERS WE WERE ABLE TO ENGAGE WITH PRIOR TO

19     THAT DATE, BUT THAT WAS THE DATE WHERE WE SENT THE TEXT

20     MESSAGE.

21     Q.   YOU RESOLVED THE VULNERABILITY ON MAY 13TH?

22     A.   I BELIEVE THAT'S CORRECT.

23     Q.   YOU ISSUED A PRESS ARTICLE THAT DAY AS WELL; CORRECT?

24     A.   ON THAT DAY, WE ISSUED INFORMATION TO THE NEWS MEDIA THAT

25     WE HAD NOT ONLY STOPPED AND FIXED -- NOT ONLY STOPPED AN ATTACK

1    FROM A SPYWARE COMPANY, THAT WE HAD MADE IMPROVEMENTS TO OUR

2    SYSTEMS, AND THAT WE MADE IMPROVEMENTS TO OUR APP, AND THAT NOW

3    THOSE UPDATES TO THE APP, WHICH ARE AVAILABLE ON EITHER THE IOS

4    STORE OR THE GOOGLE PLAY STORE, THOSE UPDATES WERE AVAILABLE,

5    AND WE SPOKE PUBLICLY ABOUT THE NEED FOR PEOPLE, PARTICULARLY

6    PEOPLE WHO WERE VULNERABLE TO THESE TYPES OF ATTACKS, TO UPDATE

7    THEIR APP AS SOON AS POSSIBLE.

8    Q.   AND IT WAS ALMOST SIX MONTHS LATER THAT YOU NOTIFIED YOUR

9    USERS?

10   A.   IT WASN'T UNTIL OCTOBER THAT WE COMPLETED THE PROCESS OF

11   NOTIFYING OUR USERS, YES.

12   Q.   WELL, YOU REMEMBER BEFORE WE MENTIONED THAT THERE WAS A

13   BROAD WHATSAPP MESSAGE THAT WENT OUT?

14   A.   IN MAY WE PUT OUT INFORMATION TO THE NEWS MEDIA ABOUT THE

15   NATURE OF THE ATTACK AND THE FACT THAT THERE WERE, YOU KNOW,

16   UPDATES AVAILABLE TO WHATSAPP THAT COULD FURTHER PROTECT

17   PEOPLE.

18   Q.   I THINK I'M ASKING A DIFFERENT QUESTION, MR. WOOG.

19        YOU SENT OUT A BROAD WHATSAPP MESSAGE.  I CALLED IT A TEXT

20   MESSAGE EARLIER, YOU CORRECTED ME AND SAID IT WAS A WHATSAPP

21   MESSAGE.

22        DO YOU REMEMBER THAT?

23   A.   YES, THOSE ARE A WHATSAPP MESSAGE DIRECTLY TO THE VICTIMS

24   OF THE ATTACK.

25   Q.   THERE WAS A COUPLE OF MESSAGES THAT WERE SENT DIRECTLY TO

1     1470; CORRECT?

2     A.   YES.

3     Q.   AND THAT WAS SENT NOT UNTIL THE END OF OCTOBER AND THE DAY

4     YOU FILED THIS LAWSUIT AND PUBLISHED AN OP ED IN "THE

5     WASHINGTON POST"?

6     A.   YES.

7              MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  REDIRECT?

9              MR. ANDRES:  VERY BRIEFLY, YOUR HONOR.

10                        **REDIRECT EXAMINATION**

11    BY MR. ANDRES:

12    Q.   MR. WOOG, COUNSEL FOR NSO ASKED YOU IF MR. ROBINSON WAS

13    INVOLVED IN WORKING ON THE SECURITY OF WHATSAPP'S CODE.

14        DO YOU REMEMBER THAT?

15    A.   YES.

16    Q.   AS FAR AS YOU'RE AWARE, WAS MR. ROBINSON ALSO WORKING IN

17    RESPONSE TO NSO'S CYBER ATTACK ON WHATSAPP?

18    A.   YES, INDEED.

19    Q.   AND COUNSEL FOR NSO ASKED YOU WHETHER OR NOT MR. GHEORGHE,

20    OR CLAUDIU, IF I GOT THAT RIGHT, WAS ALSO WORKING ON THE

21    SECURITY OF WHATSAPP.

22        DO YOU REMEMBER THAT?

23    A.   YES.

24    Q.   OKAY.  WAS MR. GHEORGHE ALSO WORKING ON THE RESPONSE TO

25    NSO'S CYBER ATTACK ON WHATSAPP'S SERVERS?

1      A.   YES, OF COURSE.

2      Q.   AND DO YOU UNDERSTAND THAT TO HAVE BEEN A SOPHISTICATED

3      ATTACK?

4      A.   VERY MUCH SO.

5            MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION, HEARSAY,

6      YOUR HONOR.

7            THE COURT:  OBJECTION?

8            MR. AKROTIRIANAKIS:  FOUNDATION, HEARSAY FROM THIS

9      WITNESS.

10           THE COURT:  OVERRULED.

11     BY MR. ANDRES:

12     Q.   LET ME JUST ASK YOU AGAIN.  DID YOU UNDERSTAND THIS TO BE

13     A SOPHISTICATED ATTACK?

14     A.   MY UNDERSTANDING IS THIS WAS UNPRECEDENTED.  IT WAS A

15     SEVERE INTRUSION OF OUR SYSTEMS AND THAT A NUMBER OF PEOPLE

16     WERE INFECTED WITH SPYWARE AROUND THE WORLD.

17           AND IT WAS SOMETHING WE HADN'T SEEN BEFORE, AND WE WORKED

18     AS QUICKLY AS POSSIBLE TO STOP, PROTECT OUR -- IMPROVE OUR

19     SYSTEMS AND PROTECT OUR USERS AND TELL THE WORLD ABOUT WHAT HAD

20     HAPPENED.

21     Q.   MR. -- COUNSEL FOR NSO ASKED YOU SOME QUESTIONS ABOUT HOW

22     YOU COMMUNICATED TO THE PUBLIC ABOUT THE NSO CYBER ATTACK.

23           DO YOU REMEMBER THAT?

24     A.   YES.

25     Q.   AND HE ASKED YOU WHEN THAT OCCURRED.  WAS THERE A

1    NOTIFICATION EARLY ON IN THE PROCESS?

2    A.   THE FIRST THING WE DID PUBLICLY WAS SPEAK ABOUT THE

3    IMPROVEMENTS THAT WE HAD MADE TO THE APP AND TO TELL PEOPLE

4    THAT THERE WAS AN UPDATE AVAILABLE THAT THEY COULD DOWNLOAD AND

5    HAVE MORE PROTECTION.

6    Q.   AND SO THAT HAPPENED BEFORE THE FILING OF THIS LAWSUIT?

7    A.   YES, THAT HAPPENED IN MAY OF 2019.

8    Q.   AND THEN YOU MADE A STATEMENT WHEN THIS LAWSUIT WAS FILED;

9    ISN'T THAT CORRECT?

10   A.   THAT'S CORRECT.

11        MR. AKROTIRIANAKIS:  OBJECTION.  LEADING.

12   BY MR. ANDRES:

13   Q.   ISN'T THAT YOUR JOB?

14        THE COURT:  OVERRULED.

15        THE WITNESS:  IT'S PART OF MY JOB TO COMMUNICATE

16   PUBLICLY ABOUT THE ACTIONS OF WHATSAPP, YES.

17   BY MR. ANDRES:

18   Q.   AND YOU'RE ALSO FAMILIAR THAT JUDGE HAMILTON HAS RULED

19   THAT NSO VIOLATED THE LAW IN THIS CASE; ISN'T THAT RIGHT?

20   A.   YES.

21        MR. AKROTIRIANAKIS:  OBJECTION.  LEADING.

22        MR. ANDRES:  YOUR HONOR --

23        THE COURT:  IT IS LEADING, BUT I'LL ALLOW THAT ONE

24   SINCE IT'S BEEN SAID PREVIOUS TIMES THROUGHOUT THE COURSE OF

25   THIS MATTER.

```
 1              MR. ANDRES:  JUST ONE MOMENT, YOUR HONOR.

 2        I HAVE NOTHING FURTHER, YOUR HONOR.  THANK YOU.

 3              THE COURT:  ALL RIGHT.  RECROSS?

 4              MR. AKROTIRIANAKIS:  NONE, YOUR HONOR.

 5        BUT I KNOW THAT MR. WOOG IS IN ANY EVENT THEIR

 6   REPRESENTATIVE, BUT COULD I ASK THAT HE REMAIN ON CALL?

 7              THE COURT:  IS HE ON YOUR WITNESS LIST?

 8              MR. AKROTIRIANAKIS:  HE IS.

 9              THE COURT:  OKAY.  ALL RIGHT.

10        YOUR EXCUSED AT THIS TIME.  YOU MAY RETURN TO YOUR SEAT.

11              THE WITNESS:  THANK YOU, YOUR HONOR.

12              THE COURT:  I'LL LET YOU KNOW AT THE END OF THE DAY

13   WHETHER OR NOT YOU NEED TO COME BACK TOMORROW.

14              THE WITNESS:  THANK YOU, YOUR HONOR.

15              MR. ANDRES:  AS THEY SAY IN VEGAS, HE'S GOING TO BE

16   HERE ALL WEEK, YOUR HONOR.

17              THE COURT:  OKAY.

18              MR. ANDRES:  HE'S OUR REPRESENTATIVE.

19              THE COURT:  OKAY.  THEN THAT'S NOT AN ISSUE.

20              MR. ANDRES:  THANK YOU.

21              THE COURT:  ALL RIGHT.  THANK YOU.

22        ALL RIGHT.  NEXT WITNESS, PLEASE.

23              MR. PEREZ:  YOUR HONOR, PLAINTIFFS CALL

24   CLAUDIU GHEORGHE.

25              THE CLERK:  PLEASE GO AHEAD AND REMAIN STANDING.
```

1          PLEASE RAISE YOUR RIGHT HAND.

2          **(PLAINTIFFS' WITNESS, CLAUDIU GHEORGHE, WAS SWORN.)**

3               THE WITNESS:  YES.

4               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

5          SPEAK CLEARLY INTO THE MICROPHONE.  PLEASE STATE YOUR FULL

6     NAME AND SPELL YOUR NAME FOR THE RECORD.

7               THE WITNESS:  MY NAME IS CLAUDIU GHEORGHE.

8               MR. PEREZ:  THANK YOU, MR. GHEORGHE.

9               THE COURT:  HOLD ON.  HE NEEDS TO SPELL IT.

10              MR. PEREZ:  EXCUSE ME.

11              THE WITNESS:  SORRY.  WHAT DO I HAVE TO DO?

12              MR. PEREZ:  SPELL YOUR NAME, PLEASE.

13              THE WITNESS:  LETTER BY LETTER?

14              MR. PEREZ:  YES, PLEASE.

15              THE WITNESS:  MY FIRST NAME IS CLAUDIU,

16    C-L-A-U-D-I-U, AND THE LAST NAME IS GHEORGHE, WHICH IS

17    G-H-E-O-R-G-H-E.

18                         **DIRECT EXAMINATION**

19    BY MR. PEREZ:

20    Q.   THANK YOU, MR. GHEORGHE.

21         CAN YOU PLEASE DESCRIBE FOR THE JURY YOUR EDUCATIONAL

22    BACKGROUND AFTER HIGH SCHOOL?

23    A.   SURE.  I HAVE A BACHELOR DEGREE IN COMPUTER SCIENCE FROM

24    POLITEHNICA UNIVERSITY OF BUCHAREST, MY HOME COUNTRY IN

25    ROMANIA; AND I HAVE A MASTER'S DEGREE IN DISTRIBUTED SYSTEMS

1     FROM VRIJE UNIVERSITEIT IN AMSTERDAM, THE NETHERLANDS.

2     Q.   AND CAN YOU EXPLAIN TO THE JURY WHAT DISTRIBUTED SYSTEMS

3     MEANS?

4     A.   DISTRIBUTED SYSTEMS ARE COMPUTER SYSTEMS THAT RELY ON

5     LARGE GROUPS OF INDIVIDUAL COMPUTERS THAT COMMUNICATE AND

6     COORDINATE WITH EACH OTHER IN ORDER TO SOLVE COMPLEX PROBLEMS.

7     Q.   DO YOU CURRENTLY WORK AT EITHER WHATSAPP OR META?

8     A.   I DO NOT WORK AT WHATSAPP OR META.

9     Q.   DID YOU WORK AT EITHER OF THOSE COMPANIES AT SOME POINT IN

10    THE PAST?

11    A.   YES.  I WORKED AT FACEBOOK, NOW CALLED META, STARTING FROM

12    2012 UNTIL 2021.

13    Q.   AND WHAT ROLES DID YOU HAVE DURING YOUR TIME WITH META?

14    A.   MY FIRST ROLE WAS A SOFTWARE ENGINEER, SO I STARTED JUST

15    LIKE A FRESH GRAD IN 2012.  I WAS WORKING IN THE INFRASTRUCTURE

16    TEAM AT FACEBOOK.

17         AND I TRANSITIONED TO THE WHATSAPP TEAM AFTER THE COMPANY

18    WAS ACQUIRED, AND I TRANSITIONED TO ANOTHER SOFTWARE

19    ENGINEERING ROLE AT WHATSAPP.

20         AND AFTER WE LAUNCHED VOICE AND VIDEO CALLING, WHICH WAS

21    MY FIRST PROJECT WITH WHATSAPP, I TRANSITIONED TO A MANAGERIAL

22    ROLE WHERE I BUILT A TEAM AROUND ALL THE SYSTEMS THAT WE BUILT

23    FOR VOICE AND VIDEO CALLING.

24    Q.   WHAT WERE YOU DOING DURING YOUR TIME AT FACEBOOK BEFORE

25    YOU STARTED WORKING FOR WHATSAPP?

1    A.   I WAS A SOFTWARE ENGINEER IN THE INFRASTRUCTURE TEAM IN

2    FACEBOOK.  WE WERE BUILDING ALL OF THE DISTRIBUTED SYSTEMS USED

3    TO DELIVER IMAGES AND VIDEOS OVER THE INTERNET TO USERS.

4    Q.   AND DURING THE TIME THAT YOU WERE WORKING FOR META AND

5    WHATSAPP, WHERE WERE YOU BASED?

6    A.   I WAS ALL THE TIME BASED IN THE BAY AREA.  SO I LIVED IN

7    MOUNTAIN VIEW AND SAN MATEO.

8    Q.   AND WHERE WERE FACEBOOK AND WHATSAPP HEADQUARTERED DURING

9    YOUR TIME AT THOSE COMPANIES?

10   A.   FACEBOOK WAS ALWAYS HEADQUARTERED IN MENLO PARK FOR ALL

11   THE TIME THAT I WORKED THERE.

12   Q.   AND WHAT ABOUT WHATSAPP?

13   A.   WHATSAPP WAS INITIALLY BASED IN MOUNTAIN VIEW, SO I WORKED

14   FROM THE MOUNTAIN VIEW OFFICE FOR A YEAR OR SO, AND THEN WE

15   RELOCATED TO THE MENLO PARK OFFICE.

16   Q.   YOU MENTIONED VOICE AND VIDEO CALLING FOR WHATSAPP.

17        WHAT ARE VOICE AND VIDEO CALLING FOR WHATSAPP?

18   A.   VOICE AND VIDEO CALLING IS A FEATURE ON WHATSAPP WHERE ONE

19   WHATSAPP USER CAN HAVE A REAL TIME CONVERSATION WITH ANOTHER

20   WHATSAPP USER USING EITHER AUDIO OR AUDIO AND VIDEO.

21   Q.   WHEN DID THAT VOICE AND VIDEO CALLING FEATURE BECOME

22   AVAILABLE ON WHATSAPP?

23   A.   I WAS PART OF THE INITIAL TEAM THAT BUILT THIS FEATURE,

24   AND WE LAUNCHED IT -- WE MADE IT PUBLIC IN MARCH 2015.

25   Q.   WHAT WAS THE SERVICE BEFORE THAT POINT?

1    A.   THE SERVICE BEFORE THAT POINT HAD MESSAGING, IT HAD GROUP

2    CHATTING, IT HAD ABILITY TO SEND IMAGES AND VIDEOS.

3    Q.   WHAT WAS YOUR ROLE IN THE DEVELOPMENT OF VOICE AND VIDEO

4    CALLING FOR WHATSAPP?

5    A.   MY ROLE WAS TO DESIGN AND IMPLEMENT THE INFRASTRUCTURE

6    THAT HELPS VOICE AND VIDEO CALLING FUNCTION OVER THE INTERNET,

7    SO THE SERVERS.

8    Q.   WHAT IS THAT INFRASTRUCTURE, THE SERVERS YOU MENTIONED?

9    A.   SO THE INFRASTRUCTURE WE HAD FOR WHATSAPP VOICE AND VIDEO

10   CALLING IS A VERY LARGE GEOGRAPHICALLY DISTRIBUTED SYSTEMS,

11   SYSTEM, AND IT'S ROUGHLY STRUCTURED IN TWO COMPONENTS.

12        ONE OF IT IS WHAT WE CALL THE SIGNALLING COMPONENT, WHICH

13   IS USED TO INITIATE THE CALL AND TO REACH THE OTHER PERSON IN

14   THE CALL.

15        AND THE SECOND PART OF THE INFRASTRUCTURE IS WHAT WE CALL

16   THE RELAY SERVER, WHICH IS THE COMPONENT THAT HELPS DELIVER ALL

17   THE AUDIO OR VIDEO DATA BETWEEN THE TWO USERS.

18   Q.   THE SIGNALLING SERVERS THAT YOU MENTIONED, WHERE WERE

19   THOSE BASED AROUND MAY 2019?

20   A.   ALL THE SIGNALLING SERVERS WE USED AT THAT TIME WERE

21   CO-LOCATED WITH THE REST OF THE CHAT SERVERS THAT WHATSAPP

22   USED, AND THEY WERE ALL BASED IN THE UNITED STATES.

23   Q.   AND THE RELAY SERVERS, WHERE WERE THOSE BASED?

24   A.   THE RELAY SERVERS ARE MUCH MORE SPREAD.  SO WE HAD AROUND

25   100 LOCATIONS ACROSS THE GLOBE WHERE WE HAD RELAY SERVERS.

1    Q.   WERE ANY OF THOSE RELAY SERVERS IN CALIFORNIA?

2    A.   WE HAD TWO CLUSTERS OF SERVERS IN CALIFORNIA, ONE IN THE

3    SAN JOSE AREA, AND ONE IN THE LOS ANGELES AREA.

4    Q.   WAS THERE ANY PARTICULAR REASON THAT YOU WANTED TO WORK ON

5    WHATSAPP VOICE AND VIDEO CALLING?

6    A.   YES.  I THOUGHT IT WAS AN EXTREMELY VALUABLE FEATURE FOR

7    USERS TO FREELY COMMUNICATE IN REAL TIME.  I THINK WE TAKE FOR

8    GRANTED NOW THAT YOU CAN CALL ANYONE IN THE WORLD FOR FREE OVER

9    VIDEO AND IT WORKS FLAWLESSLY.  BUT AT THAT TIME THAT WASN'T

10   AVAILABLE TO EVERYONE, AND I THOUGHT IT WAS AN EXTREMELY

11   VALUABLE FEATURE.

12   Q.   I'D LIKE TO DIRECT YOUR ATTENTION TO THE TIME PERIOD OF

13   MAY 2019.

14        WHAT WAS THE STATUS OF WHATSAPP VOICE AND VIDEO CALLING AT

15   THAT TIME?

16   A.   SO IN MAY 2019, WE WERE ALREADY A FEW YEARS IN AFTER THE

17   LAUNCH.  WE HAD A LOT OF SUCCESS WITH LAUNCHING THIS FEATURE

18   INITIALLY, A LOT OF PEOPLE STARTED USING IT AND DEPENDING ON IT

19   EVERY DAY.

20        WE STARTED INVESTING IN, MORE IN BUILDING NEW FEATURES.

21   SO INITIALLY WE HAD ONLY AUDIO CALLING, THEN WE ADDED VIDEO

22   CALLING.

23        THEN WE ADDED GROUP CALLING.  SO JUST THE YEAR BEFORE IN

24   2018, WE JUST ADDED THE ABILITY TO HAVE GROUP CALLS BETWEEN

25   USERS.  SO WE WERE WORKING ON -- IN EARLY 2019, WE WERE WORKING

1    ON MAKING A LOT OF IMPROVEMENTS TO GROUP CALLING.

2        AND ALSO, WE WERE EXPANDING OUR NETWORK OF RELAY SERVERS

3    TRYING TO GET AS CLOSE AS POSSIBLE TO USERS SO THAT THEY WOULD

4    HAVE THE BEST QUALITY POSSIBLE ON THEIR CALLS.

5    Q.   AND WHAT WAS YOUR ROLE AT THAT POINT IN MAY 2019?

6    A.   MY INITIAL ROLE WAS A SOFTWARE ENGINEERING MANAGER, SO IT

7    WAS A MIX OF TECHNICAL RESPONSIBILITY AND MANAGERIAL

8    RESPONSIBILITY.

9    Q.   DID YOU HAVE ANYONE REPORTING TO YOU?

10   A.   YES.  I HAD A TEAM OF SEVERAL ENGINEERS REPORTING TO ME AT

11   THAT TIME.

12   Q.   APPROXIMATELY HOW MANY?

13   A.   SOMEWHERE BETWEEN SIX AND EIGHT.  AND WE HAD A COUPLE

14   INTERNS TOO IN THAT TIME.  SO I DON'T REMEMBER THE ACTUAL

15   NUMBER, BUT IT'S AROUND THAT.

16   Q.   WERE YOU AND YOUR TEAM STILL IN THE BAY AREA?

17   A.   YES.  EVERYONE IN MY TEAM WAS BASED IN MENLO PARK.

18   Q.   AND WHAT WERE YOUR RESPONSIBILITIES PERSONALLY DURING THAT

19   TIME PERIOD?

20   A.   MY MAIN RESPONSIBILITY WAS TO ENSURE THAT WHENEVER

21   SOMEONE, A USER, STARTS A CALL ON WHATSAPP, THAT THE CALL WOULD

22   CONNECT.

23        AND THAT AFTER IT CONNECTS, THAT IT HAS THE BEST QUALITY

24   POSSIBLE THAT WE CAN PROVIDE.

25        SO THAT WAS MY MAIN RESPONSIBILITY.

1     Q.   DID THERE COME A TIME IN 2019 WHEN YOU CAME TO LEARN OF

2     WHAT APPEARED TO BE AN ATTACK ON WHATSAPP'S SERVERS?

3     A.   YES.  SO ON THURSDAY, MAY 2ND, ONE SUCH ENGINEER ON MY

4     NAME, JESUS, FOUND SOME SUSPICIOUS MESSAGES FLOWING THROUGH OUR

5     SIGNALLING SERVERS, AND HE ANNOUNCED THE TEAM ABOUT THAT IN A

6     TASK, AND THAT'S HOW I FOUND OUT ABOUT IT.

7     Q.   YOU MENTIONED YOUR TEAM MEMBER WAS JESUS.  WHAT'S THE FULL

8     NAME?

9     A.   JESUS BARCONS PALAU.

10    Q.   AND HOW DID MR. PALAU, AS YOU UNDERSTAND IT, COME TO LEARN

11    OF THIS, WHAT APPEARED TO BE THE ATTACK?

12    A.   JESUS WAS WORKING ON A PROJECT RELATING WITH HARDENING --

13    HE WAS WORKING ON A PROJECT RELATING WITH HARDENING, THE LOGIC

14    THAT WE HAD INSIDE OUR SERVER THAT INTRODUCED ADDITIONAL

15    VALIDATION OF MESSAGES SENT BY WHATSAPP APPS.

16    Q.   AND WHAT DID YOU DO WHEN YOU LEARNED OF WHAT MR. PALAU HAD

17    FOUND WITH A POTENTIALLY SUSPICIOUS MESSAGE?

18    A.   WE SAW SOME REALLY SUSPICIOUS -- LIKE, WE SAW THE CONTENTS

19    OF THOSE SUSPICIOUS MESSAGES LOOKED UNORDINARY.  THEY LOOKED

20    LIKE WHAT WE CALL IN OUR TECHNICAL TERM, LIKE, AN EXPLOIT, OR A

21    SHELL CODE.  IT WAS BASICALLY SOME MALICIOUS CODE IN IT.

22    Q.   MR. GHEORGHE, DO YOU HAVE PLAINTIFFS' -- DO YOU HAVE YOUR

23    BINDER WITH YOU, YOUR WITNESS BINDER?

24    A.   YES.

25    Q.   COULD YOU FLIP TO PLAINTIFFS' EXHIBIT 13, PLEASE?  AND LET

1       ME KNOW WHEN YOU HAVE IT IN FRONT OF YOU.

2       A.   YES.

3       Q.   DO YOU RECOGNIZE PLAINTIFFS' EXHIBIT 13?

4       A.   YES.  THIS WAS THE INITIAL TASK, OR PROJECT, THAT JESUS

5       WAS WORKING ON THAT LED TO THE DISCOVERY OF THIS ATTACK.

6       Q.   WHAT IS A TASK AS THAT TERM IS USED AT WHATSAPP?

7       A.   A TASK IS ESSENTIALLY A DOCUMENT THAT CONTAINS ALL THE

8       INFORMATION RELATED WITH THE PROJECT FOR TRACKING PURPOSES.  WE

9       USE THAT INTERNALLY FOR TRACKING ALL THE ENGINEERING WORK.

10      Q.   IS THAT A STANDARD PART OF WHATSAPP PRACTICE TO KEEP

11      RECORDS IN THIS FORM?

12      A.   YES, WE KEEP RECORDS LIKE THIS FOR ANY PROJECT WE HAD.

13           MR. PEREZ:  YOUR HONOR, I'D LIKE TO OFFER PLAINTIFFS'

14      EXHIBIT 13 INTO EVIDENCE AND ASK THAT IT BE PUBLISHED TO THE

15      JURY.

16           THE COURT:  ANY OBJECTION?

17           MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

18           THE COURT:  IS THIS MARKED PTX?

19           MR. PEREZ:  13, YES.

20           THE COURT:  ALL RIGHT.  ADMITTED.

21        (PLAINTIFFS' EXHIBIT PTX-13 WAS ADMITTED IN EVIDENCE.)

22      BY MR. PEREZ:

23      Q.   GREAT.  SO THE JURY NOW HAS IN FRONT OF IT PTX-13.

24           CAN YOU EXPLAIN AGAIN WHAT THIS TASK PERTAINS TO?

25      A.   SO THIS IS A TASK THAT WAS FILED A WHILE BEFORE WE FOUND

1    THE ATTACK, AND THE PURPOSE OF THIS TASK WAS TO VALIDATE

2    CERTAIN MESSAGES SENT FROM THE WHATSAPP APPS TO THE SIGNALLING

3    SERVER.

4    Q.   AND WHEN YOU SAY TO VALIDATE THOSE MESSAGES, OR THE

5    STANZAS, WHAT DOES THAT MEAN?

6    A.   THE WHATSAPP APPLICATION HAS A SPECIFIC PROTOCOL THAT IT

7    USES TO COMMUNICATE WITH THE SIGNALLING SERVER, AND WE THOUGHT

8    THAT IT WAS USEFUL TO VALIDATE THAT, THE MESSAGES SENT BY THE

9    WHATSAPP APPS THAT ARE CONFORMING WITH THE PROTOCOL THAT THE

10   SIGNALLING SERVER IS EXPECTING.

11   Q.   AND HOW DOES THIS WORK RELATE TO THE DISCOVERY OF NSO'S

12   ATTACK?

13   A.   SO AS WE'RE DOING THIS VALIDATION WORK, WE BASICALLY --

14   LIKE, WE WERE NOT LOOKING FOR AN ATTACK.  WE JUST SAW SOME

15   INVALID MESSAGES BEING SENT, AND WE LOOKED INTO MORE DETAILS.

16        THESE ARE NOT THE ONLY INVALID MESSAGES THAT WE WERE

17   SEEING.  WE WERE SEEING SOME OTHER INVALID MESSAGES THAT WERE

18   SOMETIMES CAUSED BY JUST BUGS IN THE SOFTWARE OR OTHER REASONS.

19        SO THIS ONE WAS SPECIFICALLY ALARMING BECAUSE IT HAD, YOU

20   KNOW, SOME REALLY SUSPICIOUS CONTENT IN IT.

21   Q.   IF I COULD DIRECT YOUR ATTENTION TO THE PAGE ENDING 0006.

22   THERE'S A MESSAGE THERE FROM MR. PALAU WHERE HE WRITES,

23   "CANARYING STANZA VALIDATION IN CHATD555.ATN, SOME VALIDATIONS

24   FAILED."

25        WHAT DOES THAT MEAN?

1    A.   SO FIRST OF ALL, THE PROCESS OF CANARYING IS A PROCESS OF

2    TAKING A CHANGE AND RUNNING IT IN PRODUCTION, WITH PRODUCTION

3    TRAFFIC.

4         AND JESUS POSTED ABOUT THIS BECAUSE HE REACHED A MILESTONE

5    WITH THE DEVELOPMENT OF THIS PROJECT WHERE HE WAS READY TO TEST

6    HIS NEW LOGIC WITH PRODUCTION TRAFFIC, BUT ONLY IN -- WITH A

7    SMALL AMOUNT OF TRAFFIC FROM PRODUCTION, AND THAT'S WHY WE USED

8    THE CONCEPT OF CANARYING.

9         BY STANZA, STANZA MEANS A SIGNALLING MESSAGE, ESSENTIALLY.

10   SO IT'S A MESSAGE SENT BY THE WHATSAPP APP TO THE SIGNALLING

11   SERVER.

12        AND THAT CODE NAME CHATD555.ATN REFERS TO ONE SPECIFIC

13   SERVER THAT WAS RUNNING THE SIGNALLING SERVER, WHICH WAS

14   LOCATED IN ALTOONA, WHICH WAS THE DATA CENTER WE HAD AT THAT

15   POINT.

16   Q.   WHAT DOES IT MEAN THAT SOME VALIDATIONS FAILED?

17   A.   IT MEANS THAT HIS NEW VALIDATION LOGIC WAS DETECTING SOME

18   FAILURES IN PRODUCTION.

19   Q.   IF WE LOOK TOWARDS THE BOTTOM OF THE PAGE ENDING IN 0009,

20   THERE'S AN ENTRY FROM MR. PALAU WHERE HE WRITES, "FOUND THIS

21   CALL OFFER" -- I'LL WAIT UNTIL IT'S UP ON THE SCREEN.  "FOUND

22   THIS CALL OFFER, WORTH TAKING A LOOK."

23        WHAT IS A CALL OFFER?

24   A.   A CALL OFFER IS A TYPE OF STANZA THAT HE WAS REFERRING

25   EARLIER.  SO IT'S A TYPE OF SIGNALLING MESSAGE THAT IS SENT BY

1    THE WHATSAPP APP WHENEVER IT INITIATES A CALL.

2    Q.   AND WHERE DOES THE CALL OFFER TRAVEL FROM THE CALLER

3    DEVICE THROUGH THE SERVER?

4    A.   SO THE WAY IT WORKS IS THE INITIATING APP SENDS THE CALL

5    OFFER TO THE SIGNALLING SERVER; THE SIGNALLING SERVER PERFORMS

6    SOME MINOR MODIFICATIONS TO IT; AND THEN IT FORWARDS THAT OFFER

7    TO THE DEVICE -- TO THE APP OF THE CALLEE.

8        SO THEN THE PERSON YOU'RE TRYING TO CALL'S PHONE STARTS

9    RINGING.  SO THAT'S HOW IT STARTS RINGING IS BECAUSE OF THIS

10   CALL OFFER THAT WAS BEING FORWARDED.

11   Q.   AND HOW LONG DOES THAT PROCESS TAKE FROM THE INITIATION OF

12   THE CALL OFFER TO IT BEING RECEIVED BY THE CALLEE DEVICE?

13   A.   IT DEPENDS.  IT DEPENDS ON MANY FACTORS.

14       BUT ASSUMING THAT THE CALLEE IS CONNECTED TO THE INTERNET,

15   IT WILL TAKE, ESSENTIALLY, MILLISECONDS, OR LIKE A FRACTION OF

16   A SECOND.

17   Q.   AFTER THE LINK IN HIS NOTE HE WRITES, "LOOKED AT USER

18   ACCOUNT, THIS IS THE REGISTERED DEVICE."

19       AND IT SAYS, "DEVICE_NAME:

20   SAMSUNG-VMWARE_VIRTUAL_PLATFORM."

21       WHAT DOES THAT REFLECT?

22   A.   SO A REGULAR DEVICE NAME IS SOMETHING LIKE A VERSION OF AN

23   IPHONE OR LIKE AN ANDROID VERSION 5, SOMETHING LIKE THAT.  SO

24   THAT'S WHAT WE NORMALLY USE WHEN YOU SEE A DEVICE NAME.

25       BUT THIS DEVICE NAME IS VERY UNUSUAL, SO IT POINTS TO

1    ESSENTIALLY A VIRTUAL MACHINE, WHICH IS IN FACT AN EMULATOR

2    THAT WAS RUNNING A FAKE LINE.

3        SO THIS WAS NOT AN ORDINARY WHATSAPP APPLICATION.

4    Q.   AND WHAT IS THE DATE OF THIS ENTRY FROM MR. PALAU?

5    A.   THE DATE?

6    Q.   YES.

7    A.   MAY 2ND.

8    Q.   AT THE VERY BOTTOM OF THIS PAGE THERE'S A MESSAGE FROM

9    IBRAHIM MOHAMED.  WHO IS MR. MOHAMED?

10   A.    MR. MOHAMED IS A SECURITY ENGINEER WHO WAS BASED IN LONDON

11   AT THAT TIME, AND HE WAS WORKING WITH US ON VARIOUS SECURITY

12   RELATED PROJECTS.

13   Q.   HE WRITES IN HIS MESSAGE, "THERE IS THIS STRING," AND THEN

14   HIS MESSAGE CONTINUES AT THE TOP OF THE NEXT PAGE, AND THERE'S

15   A BLOCK OF TEXT.

16       WHAT DOES THIS BLOCK OF TEXT REFLECT?

17   A.    SO THIS BLOCK OF TEXT REFLECTS THE MALICIOUS MESSAGE THAT

18   I WAS MENTIONING EARLIER THAT CONTAINS WHAT WE CALL A SHELL

19   CODE OR AN EXPLOIT.

20       IT LOOKS LIKE -- NORMALLY THIS FIELD WILL HAVE A STRING

21   VALUE IN IT, LIKE SOMETHING THAT A HUMAN CAN READ.

22       BUT WHAT WE HAVE HERE IS A BUNCH OF INSTRUCTIONS THAT THE

23   COMPUTER CAN READ.  SO THEY'RE NOT MEANT FOR, FOR HUMAN --

24   DEFINITELY NOT MEANT FOR CONSUMPTION OF THE WAY IT WAS, THAT

25   FIELD WAS MEANT TO BE USED.

1    Q.    WHAT WAS YOUR REACTION TO SEEING THIS?

2          AND, PLEASE, MR. GHEORGHE, IF YOU NEED WATER, GO AHEAD.  I

3    FEEL LIKE I KEEP INTERRUPTING YOUR EFFORT TO TAKE A SIP.

4    A.    YEAH, I'M GOOD.

5          I MEAN, I -- I'VE SEEN -- IT LOOKS LIKE SHELL CODE.  IT

6    LOOKS LIKE AN EXPLOIT.  IT LOOKS LIKE SOMETHING MALICIOUS.

7    I'VE STUDIED THINGS LIKE THAT IN SCHOOL AND I'VE HEARD ABOUT

8    THEM OR I'VE READ ABOUT THEM, BUT I'VE NEVER SEEN THEM IN REAL

9    LIFE.

10         SO IT LOOKED VERY SUSPICIOUS.  IT'S DEFINITELY NOT

11   SOMETHING THAT YOU WOULD SEE FROM A REGULAR WHATSAPP

12   APPLICATION.

13   Q.    DO YOU RECALL WHAT FIELD THIS SHELL SCRIPT APPEARED IN?

14   A.    YES.  THE NAME OF THE FIELD, I THINK IT WAS TONE_DESC.

15   IT'S A VERY SPECIFIC NAME.  SO IT'S TONE DESC, TONE_DESC,

16   D-E-S-C.  T-O-N-E.

17         YEAH, SO IT'S A FIELD THAT WE -- I CAN'T REMEMBER EXACTLY

18   HOW WE WERE USING IT.  IT WAS DESIGNED TO CONTROL SOME LOGIC ON

19   THE WHATSAPP APPLICATION RELATED WITH THE PATTERN OF THE RING

20   TONE UPON RINGING.

21         BUT I -- I BELIEVE IT WASN'T EVEN IN USE AT THE TIME.

22         SO WE USED IT AT SOME POINT, AND IT WASN'T IN USE AT THE

23   TIME IT WAS DEPRECATED.

24   Q.    IS THAT A FIELD THAT A REGULAR WHATSAPP USER HAS THE

25   ABILITY TO MODIFY?

1    A.    NO, NEVER.  THAT FIELD WAS SUPPOSED TO BE FILLED IN ONLY

2    BY THE SIGNALLING SERVER.  IT WAS NEVER SUPPOSED TO BE SENT BY

3    THE CLIENT.

4    Q.    AND WHEN YOU SAY "THE CLIENT," WHAT DO YOU MEAN?

5    A.    I MEAN THE WHATSAPP APPLICATION THAT INITIATES THE CALL.

6    Q.    IS THIS A FIELD THAT A REGULAR WHATSAPP USER WOULD HAVE

7    THE ABILITY TO SEE?

8    A.    NO.  THIS IS PART OF THE METADATA THAT IS BEING EXCHANGED

9    WHEN THE RINGING PROCESS STARTS IN THE CALL.  SO NONE OF THIS

10   WOULD BE VISIBLE.

11   Q.    AND WHAT -- THERE'S A SERIES -- AFTER THE FIRST THREE

12   LINES, THERE'S SORT OF A SERIES OF LINES, MANY OF WHICH START

13   WITH THE LETTER X AND THEN SOME NUMBERS.

14         WHAT DOES THAT PORTION REFLECT?

15   A.    THAT PORTION IS ESSENTIALLY BINARY CODE.  SO BINARY CODE

16   IS ESSENTIALLY, THEY'RE A SET OF INSTRUCTIONS THAT ARE MEANT TO

17   BE READ ONLY BY COMPUTERS.  SO IT'S -- IT'S A PROGRAM MEANT TO

18   BE EXECUTED BY A COMPUTER, BUT IT'S UNREADABLE BY HUMANS.

19   Q.    WHAT WAS DONE WITH THAT ENCODED INFORMATION?

20   A.    SO WE DID SOME RESEARCH AND WE TOOK THIS BINARY CODE AND

21   WE REVERSE ENGINEERED IT INTO A FORMAT THAT WAS READABLE TO

22   HUMANS, AND BASED ON MY RECOLLECTION, I REMEMBER THIS CODE WAS

23   ESSENTIALLY CONNECTING TO AN EXTERNAL SERVER OUTSIDE OF THE

24   CONTROL THAT WE HAD.  IT WAS DOWNLOADING SOME DATA AND THEN IT

25   WAS EXECUTING THAT DATA.

1    Q.   DO YOU RECALL WHO DID THAT WORK OF REVERSE ENGINEERING

2    THIS CODE?

3    A.   YES.  THAT WORK WAS PERFORMED BY THE MALWARE ANALYSIS

4    TEAM, WHICH WAS A TEAM IN THE FACEBOOK SECURITY TEAM, AND THE

5    ENGINEER WHO WORKED ON IT WAS DREW ROBINSON.

6    Q.   OKAY.  IF WE GO TO PAGE 0011, IN THE MIDDLE OF THE PAGE

7    THERE IS AN ENTRY FROM MR. PALAU, AND HE WRITES, "THESE ARE ALL

8    THE FAILED STANZAS (USING THE NEW VALIDATION METHOD) FOR THE

9    PAST HOUR."

10        WHAT DOES THAT REFLECT?

11   A.   SO JESUS POSTED AN UPDATE ON THE NUMBER OF FAILED

12   VALIDATIONS WE WERE SEEING.  AND THIS COMMENT WAS POINTING TO

13   ANOTHER DOCUMENT THAT HAD MORE DETAILS ABOUT WHERE THE FAILURE

14   HAPPENED AND HOW MANY OF THEM WERE THEY.

15   Q.   AND WHEN DID WHATSAPP START LOGGING THESE STANZAS?

16   A.   I BELIEVE THAT WE STARTED LOGGING IT EXACTLY THE SAME DAY.

17   SO I THINK WITH HIS CHANGE THAT HE MENTIONED HERE, THIS IS WHEN

18   WE ACTUALLY STARTED LOGGING FAILURES RELATED TO THIS ATTACK.

19   Q.   IF WE GO TO THE PAGE ENDING IN 0014, MR. PALAU WRITES AT

20   THE TOP OF WHAT YOU HOPEFULLY SEE ON YOUR SCREEN, "ADDING ALL

21   THE MALICIOUS OFFER STANZAS SINCE WE STARTED LOGGING THEM.

22   TOTAL NUMBER:  1568."

23        WHAT DOES THAT MEAN?

24   A.   JESUS WAS PROVIDING AN UPDATE ON --

25             MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION,

1      YOUR HONOR.

2             THE COURT:  YEAH, YOU NEED TO ESTABLISH A FOUNDATION.

3      BY MR. PEREZ:

4      Q.   DO YOU HAVE AN UNDERSTANDING --

5             THE COURT:  HIS UNDERSTANDING.

6      BY MR. PEREZ:

7      Q.   DO YOU HAVE AN UNDERSTANDING OF WHAT THIS REFLECTS?

8      A.   YES.

9      Q.   WHAT DOES IT REFLECT?

10            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

11     FOUNDATION.

12            THE COURT:  WHAT IS HIS UNDERSTANDING BASED ON?

13     BY MR. PEREZ:

14     Q.   WHAT IS YOUR UNDERSTANDING BASED ON?

15     A.   MY UNDERSTANDING IS BASED ON HAVING MANY DETAILS, LIKE, I

16     HAD A LOT OF INSIGHTS INTO WHAT JESUS'S WORK WAS RELATED IN

17     THIS TASK.

18     Q.   WHAT WAS YOUR ROLE WITH RESPECT TO THIS INVESTIGATION WORK

19     THAT WAS GOING ON AT THIS TIME?

20     A.   MY ROLE WAS TO COORDINATE ALL THE ENGINEERING WORK FROM

21     THE WHATSAPP SIDE IN ORDER TO UNBLOCK THE -- UNDERSTANDING OF

22     THE ATTACK, AND TO DEPLOY A REMEDIATION AS SOON AS POSSIBLE.

23     Q.   AND WHAT WAS YOUR REPORTING RELATIONSHIP WITH MR. PALAU?

24     A.   JESUS WAS A MEMBER OF MY TEAM.  HE WAS A MEMBER OF THE

25     VOICE AND VIDEO CALLING INFRASTRUCTURE TEAM.

1    Q.   SO YOU WERE OVERSEEING HIS WORK ON THIS INVESTIGATION?

2    A.   YES.

3    Q.   AND IN THAT CONTEXT, DID YOU DEVELOP AN UNDERSTANDING OF

4    WHAT HE WAS COUNTING HERE WITH THE 1568 MALICIOUS OFFER

5    STANZAS?

6    A.   YES.  SO THESE ARE THE TOTAL NUMBER --

7              MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  HEARSAY.

8              THE COURT:  OVERRULED.

9    BY MR. PEREZ:

10   Q.   WHAT ARE THEY?

11   A.   THESE ARE TOTAL NUMBER OF FAILED VALIDATIONS THAT WE WERE

12   SEEING IN PRODUCTION FROM THE MOMENT WE STARTED LOGGING UNTIL

13   THE MOMENT HE POSTED THIS UPDATE, WHICH WAS MAY 6TH.

14   Q.   AND COULD THOSE BE FAILED VALIDATIONS FOR ANY REASON?

15   A.   NO.  THIS SPECIFIC LOGGING -- THIS LOGGING WAS VERY

16   SPECIFIC TO THE SUSPICIOUS MESSAGES THAT JESUS FOUND.  SO WE

17   ADDED DEDICATED LOGGING FOR DETECTING THESE, AND ALL OF THESE

18   WERE RELATED TO THOSE.

19   Q.   AND SO 1568 INSTANCES OF THAT MESSAGE IN THE PERIOD THAT

20   YOU WERE LOGGING?

21   A.   YES, STARTING FROM THE MOMENT WE STARTED -- INITIATED THE

22   LOGGING UNTIL THE MOMENT HE GAVE THE UPDATE ON MAY 6TH.

23   Q.   SO FOUR DAYS?

24   A.   YES.

25   Q.   DO YOU HAVE ANY UNDERSTANDING OF HOW MANY TIMES THIS SHELL

1    CODE TRANSITED WHATSAPP'S SERVERS, IF ANY, BEFORE THE LOGGING

2    STARTED?

3    A.   NO, WE HAVE NO INSIGHT INTO THAT BECAUSE WE WERE NOT AWARE

4    OF THIS HAPPENING, SO WE HAD NO LOGGING FOR IT.

5    Q.   WHAT WAS YOUR REACTION TO SEEING THE NUMBER OF INSTANCES

6    IN WHICH THIS MALICIOUS STANZA HAD GONE THROUGH WHATSAPP

7    SERVERS?

8    A.   SO IT WAS VERY WORRISOME.  OUR INITIAL EXPECTATION WAS

9    THAT WE WILL SEE A VERY LOW NUMBER.  WE THOUGHT THAT THERE WAS

10   JUST SOMEONE ON THE INTERNET, LIKE, MESSING AROUND WITH OUR

11   SIGNALLING SERVER AND TRYING SOME THINGS, YOU KNOW, OUT.

12       BUT WHEN WE SAW THIS NUMBER, WE REALIZED THAT THIS IS

13   NOT -- THIS IS NOT, YOU KNOW, SOMEONE TESTING SOMETHING OR

14   PLAYING WITH IT.  LIKE, IT'S SOMETHING THAT THERE IS A CONSTANT

15   STREAM OF EVENTS GOING, AND IT -- AT THE SAME TIME, IT WASN'T

16   PROPORTIONAL WITH THE LEVEL OF TRAFFIC.  LIKE, WE WERE

17   PROCESSING PROBABLY EVEN BILLIONS OF MESSAGES EVERY DAY.  SO

18   IT'S MUCH LOWER THAN THAT.

19       SO IT REALLY POINTS TO THE WORST CASE SCENARIO, WHICH WAS

20   A HIGHLY TARGETED ATTACK THAT WAS DEPLOYED IN PRODUCTION.

21   Q.   AND WHAT DO YOU MEAN BY "DEPLOYED IN PRODUCTION"?

22   A.   LIKE, IT WAS NOT TESTING.  LIKE, IT WAS NOT JUST ONE

23   PERSON JUST, YOU KNOW, LIKE A SECURITY RESEARCHER TRYING TO

24   FIND SOME THINGS IN WHATSAPP AND TESTING THINGS OUT.

25       LIKE, IT WAS SOMETHING THAT WAS FUNCTIONAL AND IT WAS

1    DEPLOYED.

2    Q.   AND SO WHAT WAS YOUR UNDERSTANDING OF WHAT YOUR TEAM HAD

3    DISCOVERED AT THIS POINT?

4    A.   SO ON MAY 6TH, I BELIEVE WE HAD A GOOD LEVEL OF

5    UNDERSTANDING.  BUT WE DID NOT HAVE FULL UNDERSTANDING OF HOW

6    THE ATTACK WORKED.  WE KNEW THAT WE WERE DEALING WITH A SERIOUS

7    ATTACK, THAT IT WAS AFFECTING USERS IN REAL TIME, LIKE, AT THE

8    SAME TIME.

9         BUT WE DIDN'T HAVE FULL UNDERSTANDING YET OF HOW THE

10   ATTACK WORKS, AND WE WERE NOT READY TO REMEDIATE IT YET.

11   Q.   MR. EVANS, WE CAN TAKE DOWN THAT EXHIBIT.

12        MR. GHEORGHE, WERE YOU INVOLVED IN ANY WORK THAT FOLLOWED

13   THE IDENTIFICATION OF THIS EXPLOIT?

14   A.   YES, I WAS INVOLVED DEEPLY WITH ALL THE WORK REQUIRED FOR

15   US TO, TO UNDERSTAND HOW THE ATTACK WORKS, AND ALSO TO

16   REMEDIATE IT.

17   Q.   WHAT WERE THE GOALS OF THE WORK THAT YOU WERE OVERSEEING?

18   A.   THE GOAL WAS ESSENTIALLY TO PROTECT WHATSAPP USERS, SO WE,

19   WE HAD TO FIRSTLY FULLY UNDERSTAND THE ATTACK, AND THEN BASED

20   ON THAT UNDERSTANDING, COME UP AS SOON AS POSSIBLE WITH A

21   REMEDIATION TO PREVENT FURTHER ABUSE.

22   Q.   WHY WAS IT PART OF YOUR GOAL TO FULLY UNDERSTAND THE

23   ATTACK?

24   A.   FULLY UNDERSTANDING THE ATTACK IS AN ESSENTIAL STEP, THAT

25   IT'S MANDATED BY PROCESS, BY STANDARD PRACTICE IN REGARDS TO

1        INCIDENT RESPONSE FOR SECURITY ISSUES.

2             SO IF YOU -- IF YOU GO AND REMEDIATE TOO QUICKLY, YOU MAY

3        LOSE YOUR ABILITY TO UNDERSTAND HOW THE ATTACK WORKS IN ITS

4        FULL SHAPE.

5             SO WE -- AT THE SAME TIME, YOU CANNOT JUST, YOU KNOW,

6        SPEND FOREVER TIME TRYING TO INVESTIGATE IT.  LIKE, YOU HAVE TO

7        SPEND ALL THE TIME REQUIRED TO INVESTIGATE AND UNDERSTAND AND

8        THEN REMEDIATE SO THAT YOU CAN REMEDIATE AS SOON AS POSSIBLE.

9        Q.   IF YOU COULD TURN IN YOUR BINDER TO PLAINTIFFS'

10       EXHIBIT 10, OR PTX-10, AND LET ME KNOW WHEN YOU HAVE IT.

11       A.   YEP, I HAVE IT.

12       Q.   MR. GHEORGHE, DO YOU RECOGNIZE PTX-10?

13       A.   YES.  THIS IS WHAT WE CALLED INTERNALLY AT FACEBOOK AT

14       THAT TIME A SEV.  SO SEV IS A DOCUMENT THAT WE USE TO KEEP

15       TRACK OF ALL THE PROGRESS ON INCIDENTS INSIDE THE COMPANY FROM

16       AN ENGINEERING POINT OF VIEW.

17       Q.   IS THAT A FORM OF DOCUMENT THAT'S COMMONLY USED BY

18       WHATSAPP?

19       A.   YES, IT WAS COMMONLY USED BY WHATSAPP AND BY ANY TEAM IN

20       FACEBOOK.

21       Q.   AND THAT'S TO KEEP A, AN ONGOING RECORD OF THE WORK BEING

22       DONE WITH RESPECT TO THE INCIDENT?

23       A.   YES.

24             MR. PEREZ:  YOUR HONOR, WE'D LIKE TO OFFER PTX-10

25       INTO EVIDENCE AND ASK THAT IT BE PUBLISHED TO THE JURY.

1          THE COURT:  ANY OBJECTION?

2          MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

3          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

4     (PLAINTIFFS' EXHIBIT PTX-10 WAS ADMITTED IN EVIDENCE.)

5     BY MR. PEREZ:

6     Q.   MR. GHEORGHE, WHO IS THE OWNER OF THE SEV THAT IS MARKED

7     THERE OR ENTERED INTO EVIDENCE AS PTX-10?

8     A.   THE OWNER OF THE SEV IS JOAQUIN MORENO GARIJO.  HE WAS A

9     MEMBER OF THE INCIDENT RESPONSE TEAM, AND HE WAS THE PERSON WHO

10    WAS ON CALL IN THAT TEAM AT THE MOMENT THAT WE FOUND THE

11    SUSPICIOUS MESSAGES.  HE'S THE ONE THAT FILED THIS INCIDENT

12    REPORT.

13    Q.   AND A FEW LINES DOWN FROM THAT, THERE'S A LINE THAT SAYS

14    STARTED.

15         WHAT DOES THAT LINE REFLECT?

16    A.   IT'S THE MOMENT THAT WE DECLARED THAT WE HAVE AN

17    INVESTIGATION, A SECURITY INVESTIGATION HAPPENING, AND IT'S THE

18    MOMENT THAT JOAQUIN FILED THIS SEV.

19    Q.   AND WHAT'S THE TIME AND DATE THAT'S IDENTIFIED THERE?

20    A.   IT'S MAY 2ND, 6:25 P.M.

21    Q.   AND WHAT IS -- HOW DOES THAT TIMING CORRESPOND WITH WHEN

22    YOUR TEAM IDENTIFIED THE SHELL CODE THAT WE WERE LOOKING AT

23    EARLIER?

24    A.   WE FIRSTLY IDENTIFIED THE SHELL CODE, AND THEN WE FILED

25    THE SEV.  SO IT HAPPENED PROBABLY A FEW HOURS -- WE IDENTIFIED

1    THE MALICIOUS CODE A FEW HOURS BEFORE THIS SEV WAS FILED.

2    Q.   AND IF YOU -- THIS MIGHT BE EASIER IN YOUR PAPER COPY, BUT

3    IF YOU JUST FLIPPED THROUGH -- AND MR. EVANS, IF WE CAN JUST

4    SCROLL AND LOOK AT SOME OF THESE PAGES -- CAN YOU DESCRIBE FOR

5    THE JURY AT A HIGH LEVEL, YOU DON'T HAVE TO GO NAME BY NAME,

6    BUT WHAT THE POSITIONS OF THE PEOPLE WHO ARE INVOLVED IN THIS

7    DOCUMENT?

8    A.   SO PEOPLE INVOLVED IN THIS DOCUMENT, MANY OF THEM ARE A

9    MEMBER OF THE -- MEMBERS OF THE FACEBOOK SECURITY TEAM.  SOME

10   OF THEM ARE PART OF THE INCIDENT RESPONSE TEAM.

11        SOME OF THEM ARE -- FOR INSTANCE, AMEL IS A SECURITY

12   PARTNER WHO WAS WORKING WITH WHATSAPP AT THAT POINT FULL TIME.

13        AND DREW ROBINSON WAS A PART OF THE SECURITY TEAM.

14        SO GENERALLY THEY'RE ENGINEERS WHO WERE TAKING PART IN THE

15   INVESTIGATION, WERE EITHER PART OF WHATSAPP ENGINEERING TEAM OR

16   PART OF THE FACEBOOK SECURITY TEAM.

17   Q.   I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE ENDING IN 003,

18   AND THERE'S AN ENTRY FROM MR. GARIJO AT MAY 6TH, 12:27 P.M., HE

19   STATES, "WA ENGINEERING WORK IS COORDINATED BY CLAUDIU

20   GHEORGHE."

21        WHAT DOES THAT REFLECT?

22   A.   THAT REFLECTS MY ROLE IN THE INVESTIGATION.  SO I WAS THE

23   ONE -- THE PERSON WHO WAS COORDINATING ALL THE WHATSAPP

24   ENGINEERING WORK THAT WAS NEEDED IN ORDER TO MAKE PROGRESS ON

25   THE INVESTIGATION.

1      Q.   AND BELOW THAT, THERE'S A NUMBERED LIST.  WHAT DOES THAT

2      LIST REFLECT?

3      A.   THAT LIST OF FIVE ITEMS CONTAINS THE LIST OF TASKS OR

4      PROJECTS THAT WE HAD TO DO IN ORDER TO MAKE PROGRESS WITHIN THE

5      INVESTIGATION AT THAT MOMENT.

6           WE ENDED UP FILING TENS, OR I DON'T KNOW THE ACTUAL

7      NUMBER, LIKE MAYBE A HUNDRED OF THEM IN TOTAL, BUT THESE WERE

8      AT THAT TIME THE MOST IMPORTANT ONES, THE TOP PRIORITY.

9      Q.   SO IS THIS LIST OF FIVE THE FULL LIST OF TASKS THAT THE

10     TEAM WAS WORKING ON TO INVESTIGATE THE ATTACK?

11     A.   NO, THIS WAS NOT THE FULL LIST OF TASKS.  MANY OF THESE

12     TASKS ACTUALLY HAD A LOT OF TASKS UNDERNEATH THEM.  SO I WOULD

13     DESCRIBE THEM AS MAYBE, LIKE, THE TOP THREE OF TASKS, BUT THIS

14     WAS NOT AN EXHAUSTIVE LIST.

15     Q.   WHO ON YOUR TEAM -- WHO ON YOUR TEAM WAS INVOLVED IN THESE

16     TASKS IN THIS INVESTIGATION?

17     A.   WE HAD SOME PEOPLE WHO WERE INVOLVED THROUGHOUT THE ENTIRE

18     INVESTIGATION ALL THE TIME.  SOME OF THEM BEING SAISH GERSAPPA,

19     S-A-I-S-H.  HE WAS WORKING -- HE WAS A MEMBER OF THE VOICE AND

20     VIDEO CALLING INFRASTRUCTURE TEAM, AND HE WAS ASSISTING WITH

21     ALL THE WORK-RELATED WITH THE RELAY.

22          JESUS WAS ALSO A MEMBER OF MY TEAM, AND HE WAS WORKING ON

23     THE SIGNALLING SERVER TO ASSIST IN THE INVESTIGATION.

24          AND THERE WERE OTHER FOLKS LIKE YUANYUAN, WHO'S A MEMBER

25     OF THE SISTER TEAM IN THE VOICE AND VIDEO CALLING, AND HE WAS

1   ALSO WORKING FULL TIME ON THIS.

2   Q.   AND WERE THERE OTHERS OUTSIDE YOUR TEAM WHO WERE ALSO

3   INVOLVED IN THIS EFFORT?

4   A.   YES.  WE HAD TO PULL IN PEOPLE, SOMETIMES SPORADICALLY,

5   SOMETIMES PERMANENTLY, TO HELP OUT WITH THE INVESTIGATION.

6        FOR INSTANCE, WE NEEDED SOMEONE IN THE LARGER CHAT SERVER

7   TEAM TO HELP US WITH SOME CHANGES RELATED TO THE INVESTIGATION.

8   I HAD TO GO AND TALK TO THEIR MANAGER TO GET THEIR TIME

9   ALLOCATED TO THIS OR WE HAD OTHER PEOPLE IN THE INTERNAL GROUP

10  TEAM TO HELP US INVESTIGATE CRASHES, YOU KNOW, STUFF LIKE THAT.

11  Q.   DURING THE TIME THAT YOU WERE COORDINATING WHATSAPP'S

12  RESPONSE TO THE ATTACK, WHAT PERCENTAGE OF YOUR TIME WOULD YOU

13  SAY YOU SPENT ON THAT WORK?

14  A.   I DROPPED EVERYTHING THAT I WAS DOING AND I -- THAT'S THE

15  ONLY THING THAT I WAS WORKING ON AT THAT TIME.

16       I PUT ALL THE -- I CANCELLED ALL MY TEAM MEETINGS, I

17  CANCELLED ALL MY INTERVIEWS THAT I HAD SCHEDULED, AND MY

18  CALENDAR GOT FILLED UP ONLY WITH THINGS RELATED TO THIS

19  INCIDENT.

20  Q.   AND FOR WHAT PERIOD OF TIME DID THAT CONTINUE THAT YOU

21  WERE FULLY OCCUPIED BY THIS INVESTIGATION WORK?

22  A.   I WAS HEADS DOWN ON IT FROM THE MOMENT WE FOUND OUT THAT

23  IT WAS AN ACTIVE ATTACK ON MAY 2ND UNTIL WE ROLLED OUT THE

24  REMEDIATION ON MAY 13TH.

25  Q.   AND CAN YOU EXPLAIN TO THE JURY WHAT YOUR HOURS WERE LIKE

1    DURING THAT PERIOD?

2    A.   IT WAS, IT WAS REALLY INTENSE.  SO WE -- WE WERE WORKING

3    NON-STOP, BASICALLY, ON THIS.  LIKE, I WAS WORKING -- I WAS IN

4    THE OFFICE WORKING WITH THE FOLKS IN MENLO PARK THROUGHOUT THE

5    DAY.  WE HAD PEOPLE IN LONDON THAT HELPED US TO INVESTIGATE THE

6    SECURITY ASPECTS OF THE ATTACK.

7         AND WE WERE WORKING AROUND THE CLOCK WITH THEM, SO WE HAD

8    TO HAND OFF EVERYTHING THAT WE FOUND IN MENLO PARK TO LONDON IN

9    THE EVENING.

10        SO I WOULD GET HOME, I WOULD GET A LITTLE BIT OF DINNER,

11   AND THEN COORDINATE WITH LONDON AS THEY WERE STARTING THEIR

12   DAY.

13        AND THEN I WOULD GO AND GET MAYBE FIVE, SIX HOURS OF

14   SLEEP, AND WAKE UP SUPER EARLY IN THE MORNING.  SO WE HAD TO

15   TAKE OVER WHAT LONDON DID AND SORT OF CONTINUE IN MENLO PARK.

16   Q.   AND HOW DID THAT SCHEDULE COMPARE WITH YOUR NORMAL WORK

17   SCHEDULE?

18   A.   I DON'T THINK THERE'S A WAY TO COMPARE THESE SCHEDULES.

19   IT WAS VERY INTENSE.  I MEAN, WE -- WE WERE NOT WORKING IN THAT

20   CADENCE EVER, I'D SAY.

21   Q.   THE WORK YOU WERE DOING IN RESPONSE TO THE ATTACK, HOW DID

22   THAT COMPARE WITH YOUR REGULAR JOB RESPONSIBILITIES?

23   A.   DEALING WITH THIS INCIDENT WAS VERY UNIQUE.  WE -- I

24   HADN'T HAD TO DEAL WITH SOMETHING LIKE THIS IN THE PAST FOR ALL

25   MY CAREER.

1          IT INVOLVED NOT JUST WHATSAPP-RELATED WORK, BUT IT WAS A

2     VERY LARGE, COMPLEX, CROSS-FUNCTIONAL INITIATIVE THAT INVOLVED

3     WORKING WITH OTHER ORGANIZATIONS AND TEAMS INSIDE THE LARGER

4     COMPANY OF FACEBOOK.

5          SO IT INVOLVED WORKING WITH FACEBOOK SECURITY VERY

6     CLOSELY, WITH THE COMMS TEAM, WITH THE LEGAL TEAM, AS WELL AS

7     WE HAD TO COORDINATE WITH THE UPPER MANAGEMENT AND KEEP THEM UP

8     TO DATE ON THE PROGRESS WE WERE MAKING.

9     Q.   SO WHAT HAPPENED WITH YOUR REGULAR WORK DURING THE TIME

10    THAT YOU WERE WORKING ON THIS RESPONSE TO THE ATTACK?

11    A.   PART OF THE REGULAR WORK THAT WE WERE DOING CONTINUED, SO

12    NOT EVERYONE ON MY TEAM WAS INVOLVED IN THE INVESTIGATION ALL

13    THE TIME.  SO THERE WERE SOME PROJECTS THAT CONTINUED WITH LESS

14    TECHNICAL GUIDANCE FROM ME AND OTHER PEOPLE WHO WERE DEDICATED

15    TO THE INVESTIGATION.

16         BUT WE HAD TO PUT ON HOLD PRETTY MUCH ALL THE PROJECTS

17    THAT ME AND EVERYONE WHO WAS DEDICATED ALL THE TIME TO THE

18    INVESTIGATION HAD BEFORE.

19         SO ALSO I WANTED TO NOTE THAT ME, JESUS, AND SAISH WERE

20    THE MOST SENIOR PEOPLE ON THE TEAM.  SO A BIG CHUNK OF WORK

21    DEPENDED ON US, AND WE PUT ALL OF THAT ON HOLD.

22    Q.   WERE SAISH AND JESUS ALSO DEDICATED FULL TIME TO THIS

23    INVESTIGATION?

24    A.   YES, THEY WERE WORKING ALL THE TIME CLOSELY WITH ME ON

25    THIS.

```
1     Q.   DO YOU KNOW CARL WOOG?

2     A.   YES.

3     Q.   DID HE HAVE ANY ROLE IN THE ATTACK RESPONSE BASED ON YOUR

4     EXPERIENCE?

5     A.   OF COURSE, YEAH.  I WORKED CLOSELY WITH CARL ON HOW WE --

6     IN ORDER TO COORDINATE THE PUBLIC DISCLOSURE OF THE FINDINGS.

7     Q.   I'D LIKE TO GO THROUGH A FEW NAMES WITH YOU AND JUST ASK

8     YOU TO EXPLAIN TO THE JURY WHETHER THEY PLAYED A ROLE IN THE

9     RESPONSE TO THE ATTACK AND, IF SO, WHAT ROLE.

10         JOHN ALTENMUELLER?  DO YOU KNOW THAT NAME?

11    A.   YES.  JOHN ALTENMUELLER WAS ANOTHER MEMBER OF MY TEAM.  HE

12    WORKED SPORADICALLY ON, I THINK, ONE OF THE DAYS HE WAS HELPING

13    US WITH REVERSE ENGINEERING SOME OF THE PARTS THAT WE WERE

14    ANALYZING.

15    Q.   WHAT ABOUT MENG ZHANG?

16    A.   MENG ZHANG WAS PART OF THE SISTER TEAM IN VOICE AND VIDEO

17    CALLING.  SO JUST TO MAKE IT CLEAR, WE HAD, INSIDE THE VOICE

18    AND VIDEO -- INSIDE THE VOICE AND VIDEO CALLING TEAM, WE HAD

19    TWO BIG TEAMS.  THERE WAS THE SERVER TEAM AND THE CLIENT TEAM,

20    AND I WAS MANAGING THE SERVER TEAM.  SO MENG WAS PART OF THE

21    CLIENT TEAM, WHICH WAS A SISTER TEAM.

22    Q.   WHAT ABOUT ANDY YANG?

23    A.   ANDY YANG WAS ALSO A MEMBER OF THE CLIENT TEAM.

24    Q.   AND WHAT WAS HIS ROLE ON THE ATTACK RESPONSE?

25    A.   HE WAS HELPING OUT WITH -- HE WAS PROVIDING US CONTEXT AND
```

1    GUIDANCE WITH UNDERSTANDING HOW THE EXPLOIT WORKED ON THE, ON

2    THE VOICE AND VIDEO CALLING CLIENT LOGIC SPECIFICALLY.

3    Q.   HOW ABOUT MINGSONG BI?  DID THAT INDIVIDUAL HAVE A ROLE?

4    AND IF SO, WHAT WAS IT?

5    A.   YES.  MINGSONG BI WAS ANOTHER SOFTWARE ENGINEER IN THE

6    CLIENT VOICE AND VIDEO CALLING TEAM, AND HE WAS THE ONE WHO

7    WORKED ON ONE OF THE REMEDIATION CANDIDATES FOR THE

8    VULNERABILITY ON THE CLIENT.

9    Q.   NASRIN JALEEL?

10   A.   NASRIN WAS A MEMBER OF MY TEAM, THE SERVER TEAM.  AND SHE

11   WORKED BRIEFLY ON ONE TASK RELATED TO THE INVESTIGATION.

12   Q.   WHAT ABOUT YUANYUAN WANG?

13   A.   YUANYUAN WANG WAS ONE OF THE LEADS IN THE CLIENT TEAM, AND

14   HE WAS DEDICATED ALL THE TIME, LIKE HE -- I RELIED ON HIM FOR

15   ANY EXPERTISE AND WORK RELATED TO THE CLIENT THROUGHOUT THE

16   INVESTIGATION.

17   Q.   XI DENG?

18   A.   XI DENG WAS ANOTHER MEMBER OF THE CLIENT TEAM, AND HE WAS

19   WORKING ALONG WITH YUANYUAN.  SO HE WAS DEDICATED ALL THE TIME,

20   I BELIEVE, THROUGHOUT THE INVESTIGATION.

21   Q.   WHEN YOU SAY ALL THE TIME, YOU MEAN FULL TIME?

22   A.   YES.  HE WAS -- HE WAS A CONTRIBUTOR FOR THE ENTIRE

23   DURATION OF THE INVESTIGATION.

24   Q.   WHAT ABOUT ROGER SHEN?

25   A.   ROGER SHEN WAS PART OF THE CLIENT TEAM, AND HE WAS AN

1    EXPERT IN THE VOICE AND VIDEO CALLING LOGIC ON IPHONE

2    SPECIFICALLY, AND HE HELPED OUT WITH SOME, SOME WORK THAT

3    REQUIRED THAT EXPERTISE.  BUT HE WASN'T PRESENT ALL THE TIME.

4    HE HAD A SPORADIC PRESENCE IN THE INVESTIGATION.

5    Q.   WHAT ABOUT JOHN SHELLER?

6    A.   JOHN SHELLER WAS A MEMBER OF THE WHATSAPP ANDROID TEAM,

7    AND HE HELPED US OUT WITH SOME OF THE REVERSE ENGINEERING WORK

8    THROUGHOUT THE INVESTIGATION.  IT WAS A SPORADIC CONTRIBUTION.

9    Q.   SO YOU'RE DISTINGUISHING BETWEEN SOME PEOPLE WHO WORKED

10   SPORADICALLY AND OTHERS WHO WERE DEDICATED TO IT FULL TIME?

11           MR. AKROTIRIANAKIS:  OBJECTION.  LEADING.

12           THE COURT:  SUSTAINED.

13           THE WITNESS:  YES.

14           THE COURT:  EXCUSE ME.  I SUSTAINED THE OBJECTION.

15      REPHRASE.

16           MR. PEREZ:  YES.  THAT'S FINE.

17   Q.   WHEN YOU SAY SPORADIC, WHAT DO YOU MEAN?

18   A.   BY SPORADIC, I MEAN THEY WERE NOT PRESENT IN THE WAR ROOMS

19   ALL THE TIME.  SO WE HAD TO MINIMIZE THE NUMBER OF PEOPLE IN

20   THE INVESTIGATION BECAUSE THE MORE PEOPLE WE ADDED, IT ACTUALLY

21   HINDERED OUR ABILITY TO MAKE PROGRESS.

22      SO WE HAD TO KEEP ONLY THE MINIMUM AMOUNT OF PEOPLE

23   INVOLVED.

24      IT WAS ALSO SOMETHING WE COULDN'T TELL EVERYONE IN THE

25   COMPANY WHAT WAS HAPPENING BECAUSE IT WAS SOMETHING WE WERE

1    DOING IN A PRIVATE SETTING.

2         SO WE HAD SOME PEOPLE THAT WERE, AGAIN, ALL THE TIME IN

3    THE WAR ROOM, THEY WERE PRESENT, PEOPLE LIKE OTTO AND ME AND

4    JESUS AND SAISH.

5         BUT THERE WERE SOME OTHER FOLKS THAT WERE INVOLVED IN THE

6    INVESTIGATION THAT WE DIDN'T NEED THEM ALL THE TIME.  SO WE

7    ONLY HAD A NEED FOR THEM FOR GETTING A SPECIFIC TASK DONE, AND

8    AFTER THAT TASK WAS DONE, WE WOULD TELL THEM TO GO BACK TO

9    THEIR REGULAR PROJECTS AND NOT BE PART OF THE INVESTIGATION.

10   Q.   YOU MENTIONED OTTO.  WHO IS OTTO?

11   A.   OTTO EBELING IS A SECURITY ENGINEER WHO HELPED US

12   THROUGHOUT THE INVESTIGATION.

13        AND HE WAS ALSO ONE OF THE SECURITY ENGINEERS THAT

14   SUGGESTED THE VALIDATION WORK THAT WE DID THAT LED TO THE

15   DISCOVERY OF THE ATTACK.

16   Q.   GOING BACK TO THE SAME SERIES OF QUESTIONS, IGOR MILYAKOV,

17   WHAT WAS HIS ROLE, IF ANY, IN THE INVESTIGATION?

18   A.   IGOR WAS A MEMBER OF THE WHATSAPP CHAT TEAM.  HE -- WE

19   NEEDED HIM TO DO SOME -- TO MAKE SOME CHANGES IN THE CHAT

20   LOGIC.

21        I CAN'T REMEMBER THE ACTUAL CHANGES HE MADE, BUT THERE

22   WERE SOME CHANGES THAT JESUS COULD NOT DO, AND WE -- I HAD TO

23   GO AND TALK TO HIS MANAGER, MIKHAIL VORONTSOV, AND WE HAD TO

24   HAVE HIM WORK WITH US FOR A DAY OR TWO, I CAN'T REMEMBER

25   EXACTLY, BUT HE -- YEAH, HE WORKED ON A PROJECT, HE GOT IT

1    DONE, AND HE WASN'T INVOLVED IN IT ANYMORE.

2    Q.   WHAT ABOUT ARAVIND THANGAVEL?

3    A.   ARAVIND WAS A MEMBER OF THE INTERNAL TOOLS TEAM, AND WE

4    NEEDED HIM IN ORDER TO UNDERSTAND AND IN ORDER TO COLLECT AND

5    ANALYZE SOME OF THE CRASH LOGS THAT WE DETECTED THAT ARE

6    RELATED TO THE INVESTIGATION.  SO WE NEEDED MORE INFORMATION

7    ABOUT THE CRASH LOGS AND HOW MANY OF THEM WERE HAPPENING, AND

8    ALSO WE NEEDED THE DETAILS OF THE CRASHES IN ORDER TO MAKE

9    PROGRESS WITH THE INVESTIGATION.

10        AND ARAVIND HELPED US TO COLLECT ALL THAT INFORMATION.  HE

11   WAS VERY INVOLVED, BUT I DON'T THINK HE WAS A FULL-TIME

12   INVOLVEMENT.

13   Q.   WHEN YOU SAY "CRASH LOGS," WHAT DO YOU MEAN?

14   A.   THESE ARE ESSENTIALLY RECORDS OF INSTANCES OF THE WHATSAPP

15   APPLICATION CRASHING THAT WERE RECORDED ON THE WHATSAPP SERVER.

16        SO JUST TO BE CLEAR, THIS EXPLOIT WAS NOT RELIABLE 100

17   PERCENT OF THE TIME.  SO IT WOULD CAUSE CRASHES IN SOME OF THE

18   CASES BECAUSE IT'S VERY SOPHISTICATED.

19        AND THOSE CRASHES ACTUALLY HELPED US TO FURTHER UNDERSTAND

20   HOW IT WORKS.

21   Q.   LAST NAME, ABY JOHN, DID THAT PERSON HAVE A ROLE?  AND IF

22   SO, WHAT WAS IT?

23   A.   ABY JOHN WAS A PRODUCT MANAGER, IF I REMEMBER CORRECTLY.

24   SO HE HELPED US WITH THE COORDINATION WORK THROUGHOUT THE

25   INVESTIGATION, MORE IN THE LATTER PART OF THE INVESTIGATION,

1        NOT INITIALLY.  HE WASN'T INVOLVED WITH THE UNDERSTANDING.

2        Q.   IF WE COULD GO BACK TO PTX-10, WHICH YOU SHOULD STILL HAVE

3        ON YOUR SCREEN, AND GO TO PAGE 0006, AND THERE'S A MESSAGE FROM

4        YOU ON FRIDAY, MAY 10TH, AT 5:04 P.M. PACIFIC, AND YOU SAY, "WE

5        CONFIRMED THAT THE EXISTING EXPLOIT IS FIXED."

6             WHAT WAS THE STATE OF THE INVESTIGATION AT THIS TIME?

7        A.   SO ON FRIDAY, MAY 10TH IS THE MOMENT WHEN WE STOPPED

8        THE -- WE MADE THE EXPLOIT NOT WORK ANYMORE.

9             SO AFTER THIS MOMENT, USERS WERE NOT AFFECTED ANYMORE, AND

10       WE DID IT BY ROLLING OUT A FIX ON OUR RELAY SERVER THAT MADE

11       THE EXPLOIT LOOK LIKE IT WAS BROKEN, BUT IT WASN'T OBVIOUS THAT

12       IT WAS -- THAT WE DETECTED IT.

13       Q.   WAS THERE FURTHER REMEDIATION AFTER THAT POINT?

14       A.   YES.  THE LEFT -- THE COMPLETE REMEDIATION HAPPENED ON

15       MONDAY, THE FOLLOWING MONDAY, ON MAY 13TH WHEN WE ROLLED OUT

16       NEW VERSIONS OF THE WHATSAPP APPLICATION FOR ANDROID AND IOS,

17       AND WE INSTRUCTED ALL THE USERS TO UPDATE THEIR APPS

18       IMMEDIATELY.

19             AND WE ALSO MADE ANOTHER FIX IN THE SIGNALLING SERVER THAT

20       WOULD PREVENT THESE MALICIOUS CALLS EVEN TO HAPPEN.  SO THE

21       USERS WOULD NOT EVEN SEE ANYTHING AT THAT POINT.

22       Q.   OKAY.  SO CAN YOU EXPLAIN TO THE JURY, AT A HIGH LEVEL,

23       THE FULL SCOPE OF THE REMEDIATION WORK THAT WHATSAPP UNDERTOOK

24       WITH RESPECT TO THIS ATTACK?  THE MOMENTS OF IT I MEAN.

25       A.   YES.  SO THERE WERE THREE PARTS OF THE REMEDIATION.

1          ONE WAS ON THE WHATSAPP APPLICATION.  SO WE PATCHED THE

2     WHATSAPP APPLICATION TO AVOID THE ATTACK FROM BEING EFFECTIVE.

3     SO THAT WAS ONE PART.

4          THE SECOND PART WAS IN THE SIGNALLING SERVER, WHENEVER WE

5     WERE DETECTING THOSE SUSPICIOUS MESSAGES THAT LED TO THE

6     DISCOVERY OF THE ATTACK, WE WOULD NOT ALLOW THEM TO GO THROUGH.

7     SO WE WOULD JUST STOP THEM.

8          AND THE THIRD ONE WAS IN THE RELAY SERVER.  WE WOULD

9     PREVENT THAT SPECIFIC -- WE WOULD PREVENT THE USE OF THE CLIENT

10    VULNERABILITY.  SO THE CLIENT VULNERABILITY WAS BEING MISUSED

11    THROUGH THE RELAY, AND WE FOUND SOME WAYS TO DETECT THE WAY

12    THEY WERE MISUSING IT, AND WE HAD A SPECIFIC LOGIC THAT WE PUT

13    IN PLACE IN THE RELAY THAT WOULD NOT ALLOW THE ATTACKER TO

14    MISUSE THE CLIENT VULNERABILITY.

15         SO ESSENTIALLY EVEN PEOPLE WHO WOULD NOT BE UPDATING THEIR

16    APP WOULD STILL BE PROTECTED IN THIS CASE.

17    Q.   AND CAN YOU EXPLAIN TO THE JURY WHY THIS REMEDIATION WORK

18    WAS UNDERTAKEN?

19    A.   WE TOOK THIS REMEDIATION WORK AS PART OF THE INCIDENT

20    RESPONSE PROCESS WE WERE FOLLOWING.  SO WE DETECTED AN ATTACK,

21    AND WE TOOK ALL THE STEPS TO REMEDIATE AS SOON AS POSSIBLE.

22    Q.   DID THERE COME A TIME WHEN WHATSAPP ATTRIBUTED THE ATTACK

23    TO NSO?

24    A.   I REMEMBER VAGUELY THROUGHOUT THE INVESTIGATION, THE WEEK

25    OF THE INVESTIGATION, THAT WE WERE BRIEFED ON THE FACT THAT NSO

1     WAS BEHIND THE ATTACK.

2           BUT I DON'T -- I DON'T REMEMBER EXACTLY WHEN.

3     Q.   THROUGH YOUR WORK ON THE INVESTIGATION, DID YOU DEVELOP AN

4     UNDERSTANDING OF HOW NSO'S EXPLOIT WORKED?

5     A.   YES, I DEVELOPED A GOOD UNDERSTANDING OF HOW THE EXPLOIT

6     WORKED.

7     Q.   AND WHAT WAS THAT UNDERSTANDING?

8     A.   SHOULD I EXPLAIN HOW THE --

9     Q.   IF YOU COULD.

10    A.   SURE.

11          SO JUST AS A DISCLAIMER, THIS IS A VERY SOPHISTICATED,

12    SOPHISTICATED ATTACK AND EXPLOIT.

13          IT ALL STARTED WITH THE VIDEO CALL.  SO THEY WERE USING A

14    FAKE CLIENT, AND THE FAKE CLIENT WOULD START THE VIDEO CALL

15    WITH THE DEVICE OF THE VICTIM.

16          AND IN THE FIRST STEP OF THE ATTACK, IT WOULD INJECT SOME

17    MALICIOUS CODE IN THE MEMORY OF THE VICTIM'S APPLICATION, THE

18    WHATSAPP APPLICATION.

19          AND THERE ARE SEVERAL STEPS THAT FOLLOWED THAT THAT

20    ESSENTIALLY THEY USED TO EXECUTE THAT MALICIOUS CODE THAT THEY

21    INJECTED IN THE FIRST STEP.

22          AND THEY USED MANY MECHANISMS, MECHANISMS TO ACHIEVE THAT.

23    IT'S A VERY HARD THING TO DO.

24          FOR INSTANCE, THE FIRST THING THAT THEY WERE DOING, THAT

25    THE ATTACKER WAS DOING WAS TO LEARN THE LAYOUT OF THE MEMORY OF

1   THE WHATSAPP APPLICATION, WHICH MAY SOUND SIMPLE, BUT IT'S

2   ACTUALLY EXTREMELY COMPLICATED.  THEY BYPASSED SYSTEM LEVEL

3   PROTECTIONS THAT THE APPLICATION HAD FROM THE ANDROID OPERATING

4   SYSTEM, AND JUST THAT ON ITS OWN IS A VERY HARD THING TO DO.

5   IT'S NOT SOMETHING YOU WOULD NORMALLY SEE.  IT'S A VERY, VERY

6   HARD TASK.

7       AND AFTER THEY LEARNED, LIKE, THE LAYOUT OF THE MEMORY OF

8   THE APPLICATION, THEY STARTED MODIFYING THE INSTRUCTIONS IN THE

9   PROGRAM OF THE APPLICATION, SO THEY STARTED DOING MODIFICATIONS

10  TO THE APPLICATION ITSELF, THE LOGIC IN THE APPLICATION.

11      AND THE WAY THEY DID THAT IS VERY CREATIVE.  SO THE VIDEO

12  CALL WAS ELEVATED TO A GROUP CALL ACTUALLY THROUGHOUT THIS

13  PROCESS, SO IT WAS A SECOND ATTACKER THAT WAS BEING ADDED TO

14  THE GROUP CALL.  AND THEY USED THAT AS A WAY TO ESSENTIALLY

15  CHANGE THE MEMORY INSIDE OF THE APPLICATION.

16      AND THEN THEY FOUND A WAY TO EXECUTE, TO EXECUTE THE

17  MALICIOUS CODE BY RELYING ON A SYSTEM CALL FROM A DATABASE

18  SOFTWARE THAT WE WERE USING INSIDE THE WHATSAPP APPLICATION

19  CALLED SQLITE.

20      SO THEY USED A SYSTEM THAT WAS AVAILABLE INSIDE SQLITE, IT

21  WAS COMPLETELY UNRELATED, AND WE WERE USING SQLITE FOR STORAGE

22  MESSAGES INTERNALLY IN THE APP, SO THEY USED THAT AS A WAY TO

23  EXCLUDE THE CODE.

24      AND THE WAY THEY HIJACKED THE EXECUTION WAS BY TERMINATING

25  THE CALL.  SO THE LAST STEP OF THE ATTACK WAS THE CALL WILL BE

1    TERMINATED SUDDENLY.

2         THE WHOLE ATTACK PROBABLY TOOK, LIKE, MAYBE FIVE -- THREE

3    TO FIVE SECONDS.  I THINK ALL OF THIS WAS HAPPENING IN A FEW

4    SECONDS.

5         AND THE LAST STEP WAS, AGAIN, TERMINATING THE CALL.  SO

6    THE ATTACKER WOULD TERMINATE THE CALL, AND AFTER ALL THE MEMORY

7    HAS BEEN MODIFIED SO THAT WHEN THE, WHEN THE CALL FINISHED,

8    THEY HAD THE CLEAN-UP ROUTINE.

9         SO WHENEVER WE FINISH A CALL, WE DO SOME CLEAN UP AFTER

10   EVERYTHING FINISHES.  AND INSTEAD OF THAT CLEAN UP, THEY

11   ACTUALLY MANAGED TO RUN THEIR OWN CODE.

12        SO AT THAT POINT, WE KIND OF LOST THE EXECUTION OF THE

13   APP, AND THEY KIND OF TOOK OVER AT THAT POINT.

14   Q.   WHAT ROLE DID WHATSAPP'S SIGNALLING SERVERS PLAY IN THE

15   ATTACK?

16   A.   SO THE SIGNALLING SERVER WAS BASICALLY TRICKED TO PASS

17   THIS MALICIOUS CODE TO THE WHATSAPP APPLICATION.  SO IT WAS, IT

18   WAS USED TO INJECT THE MALICIOUS CODE IN THE APP'S MEMORY.

19        LIKE, THE -- THE WHATSAPP APPLICATION OF THE VICTIM

20   TRUSTED THE SERVER, LIKE, WE DESIGNED WHATSAPP WITH THE FACT

21   THAT WE TRUST THE SERVER.

22        SO IT WAS TAKING THIS MESSAGE THAT WOULD NORMALLY BE

23   PROVIDED ONLY BY THE SERVER AND WOULD KEEP IT INSIDE THE

24   MEMORY.

25   Q.   AND WHAT ROLE, IF ANY, DID THE WHATSAPP RELAY SERVERS PLAY

1    IN THE ATTACK?

2    A.   SO THE WHATSAPP RELAY SERVER WAS USED IN ALL THE STEPS

3    REQUIRED TO TAKE OVER THE EXECUTION.  SO THEY WERE USING THE

4    WHATSAPP RELAY SERVER TO LEARN ABOUT THE MEMORY AND TO DO ALL

5    THAT MEMORY MANIPULATION INSIDE THE WHATSAPP APPLICATION.

6    Q.   LAST QUESTION, MR. GHEORGHE.  HOW WOULD YOU ASSESS THE

7    SOPHISTICATION OF NSO'S ATTACK?

8    A.   I THINK IT'S HIGHLY SOPHISTICATED.  IT'S SOMETHING THAT

9    I'VE NEVER -- IT'S THE MOST SOPHISTICATED ATTACK THAT I'D KNOWN

10   OF AT THAT TIME.  WE CONSIDERED IT STATE OF THE ART.  IT WAS

11   HIGHLY SOPHISTICATED.  IT TOOK US A REALLY LONG TIME TO, TO

12   DECIPHER AND LEARN HOW IT WORKED.

13        WE THOUGHT INITIALLY THAT IT WAS GOING TO TAKE 45, 48

14   HOURS.  THAT WAS OUR GOAL, FIND HOW IT WORKS IN 24 HOURS, HAVE

15   ANOTHER 24 HOURS TO REMEDIATE, AND BE DONE WITH IT.

16        BUT WE JUST COULDN'T DO IT.  LIKE, WE HAD FOUR CLASS

17   SECURITY EXPERTS WORKING ESSENTIALLY NON-STOP TO FIND THIS, AND

18   THAT'S WHY WE INVOLVED PEOPLE IN LONDON AND MENLO PARK, BECAUSE

19   WE WEREN'T MAKING ENOUGH PROGRESS.  SO IT WAS VERY

20   SOPHISTICATED.

21        MR. PEREZ:  OKAY.  NO MORE QUESTIONS AT THIS TIME,

22   YOUR HONOR.

23        THE COURT:  ALL RIGHT.  THANK YOU.

24   ARE YOU READY TO START YOUR CROSS?

25        MR. AKROTIRIANAKIS:  I CAN BE, YOUR HONOR.

 1              THE COURT:  OKAY.  WOULD YOU RATHER WE TAKE OUR 15

 2     MINUTE BREAK BEFORE YOU START?

 3              MR. AKROTIRIANAKIS:  THAT'S FINE.

 4              THE COURT:  OKAY.  ALL RIGHT.

 5         LADIES AND GENTLEMEN, WE'LL TAKE OUR SECOND 15 MINUTE

 6     BREAK OF THE MORNING.

 7         WE'LL BE BACK AT 12:05.

 8              THE CLERK:  ALL RISE FOR THE JURY.

 9         (JURY OUT AT 11:49 A.M.)

10              THE COURT:  ALL RIGHT.  MR. GHEORGHE, YOU CAN STEP

11     DOWN.

12         YES, COUNSEL?

13              MR. ANDRES:  JUST THAT THE WITNESS -- BEFORE THEIR

14     CROSS-EXAMINATION STARTS, AMONG THE OTHER THINGS THAT

15     MR. AKROTIRIANAKIS MENTIONED IN HIS OPENING WAS SOME NOTION

16     THAT META WAS STEALING THE INTELLECTUAL PROPERTY OF NSO.

17         THAT'S COMPLETELY INAPPROPRIATE IN THIS TRIAL.  THIS IS

18     NOT -- THERE'S BEEN NO EVIDENCE ABOUT THAT.  THEY'RE MERE

19     ALLEGATIONS THAT HE WANTS TO PUT IN FRONT OF THE JURY, AND IT'S

20     NOT APPROPRIATE.

21              THE COURT:  MR. AKROTIRIANAKIS, IS THERE -- IS THERE

22     EVIDENCE IN THE RECORD?

23              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I SHOWED SOME

24     OF IT TO THE JURY.  THIS IS WHAT WE WERE DOING BETWEEN MAY 6TH

25     AND MAY 13TH, THE TIME THAT THEY ARE CLAIMING DAMAGES FOR.

1          AND I WOULD ADD, I THINK I UNDERSTAND THE COURT'S RULINGS

2     IN TERMS OF SUSTAINING HIS OBJECTIONS AND THE POWERPOINT THAT I

3     SHOWED IN OPENING, YOUR HONOR.

4          THEY -- THIS IS THEIR EXHIBIT BOOK UNREDACTED.  THEY GAVE

5     US -- THEY SAID THESE ARE GOING TO BE THE EXHIBITS.

6          AND NOW THEY'RE UPSET WITH ME AND TRYING TO GET ME IN

7     TROUBLE WITH YOU --

8          THE COURT:  HOLD ON.  WE HAVE TWO SEPARATE ISSUES.

9     FIRST ISSUE, THE THEFT, IS THERE EVIDENCE IN THE RECORD?

10         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

11         THE COURT:  IF SO, WHERE IS IT?

12         MR. AKROTIRIANAKIS:  IT'S IN SOME OF THE EXHIBITS

13    THAT I SHOWED DURING THE OPENING.  THERE ARE OTHERS.

14         THIS GENTLEMAN -- THIS GENTLEMAN WAS SPEAKING WITH

15    MR. ROBINSON ABOUT SOME OF THOSE EFFORTS.  MR. ROBINSON WAS

16    SPEAKING WITH OTHERS ABOUT WHAT THEY WERE DOING DURING THE TIME

17    THAT THEY'RE SAYING, FULL TIME, THESE PEOPLE WERE WORKING ON

18    THIS REMEDIATION PROJECT.

19         MR. ANDRES:  THAT'S MR. AKROTIRIANAKIS TESTIFYING

20    ABOUT HOW HE -- THERE ISN'T ANY EVIDENCE, NO ONE HAS EVER BEEN

21    ASKED ANY OF THOSE QUESTIONS, EVER.

22         THE COURT:  IF THERE'S SOMETHING -- IF THERE'S

23    SOMETHING IN THE RECORD FROM WHICH HE CAN MAKE THAT ARGUMENT,

24    THEN IT'S APPROPRIATE.

25         I NEED TO SEE IT, THOUGH.

```
 1              MR. AKROTIRIANAKIS:  I URGE YOU TO SEE IT,

 2   YOUR HONOR.

 3              THE COURT:  WELL, JUST TELL ME WHERE IT IS.

 4              MR. AKROTIRIANAKIS:  WELL, I CAN PROVIDE THE COURT

 5   THE EXHIBIT NUMBERS.

 6          DO YOU HAVE THEM?  PLEASE WRITE THEM DOWN.

 7          WE PROVIDED THEM IN -- WE PROVIDED, AT THE COURT'S

 8   DIRECTION, WE HAD ALREADY AGREED TO IT ANYWAY, THE EXHIBIT

 9   NUMBERS THAT WE INTENDED TO SHOW IN OPENING.  THEY ARE IN THOSE

10   EXHIBITS.

11              THE COURT:  OKAY.  I DON'T HAVE THEM.

12              MR. ANDRES:  YOUR HONOR --

13              THE COURT:  I REFER -- TELL ME WHERE THEY ARE IN THE

14   RECORD, OR GIVE ME A COPY OF THEM SO THAT I CAN --

15              MR. AKROTIRIANAKIS:  I WILL, YOUR HONOR.  I WILL.

16              THE COURT:  OKAY.  YOU MAY NOT ASK ANY QUESTIONS

17   ABOUT THAT UNTIL I LOOK AT THE DOCUMENT WHICH YOU SAY GIVE RISE

18   TO YOUR ABILITY --

19              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

20              THE COURT:  -- TO PURSUE THAT.

21              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

22              MR. ANDRES:  AND JUST BECAUSE HE HAS SOME THEORY

23   DOESN'T MAKE IT RELEVANT.  IT COULD BE PREJUDICIAL.

24              THE COURT:  IT COULD BE, BUT I NEED TO SEE IT FIRST.

25              MR. ANDRES:  FAIR ENOUGH.
```

```
 1              THE COURT:  EVERYTHING IS SO THEORETICAL IN THIS

 2    CASE.  I DON'T HAVE --

 3              MR. ANDRES:  IT'S NOT THEORETICAL FROM OUR SIDE,

 4    YOUR HONOR.

 5              THE COURT:  I UNDERSTAND YOUR OBJECTION.  BUT I --

 6    BEFORE I THINK RULE ON IT, I NEED TO SEE IT.

 7              MR. ANDRES:  THANK YOU.

 8              MR. AKROTIRIANAKIS:  YOUR HONOR, THE TWO DOCUMENTS

 9    THAT THEY JUST MOVED INTO EVIDENCE CONTAIN EXACTLY THE SAME

10    THING THAT YOU WERE SUSTAINING MY OBJECTIONS TO IN MR. WOOG'S

11    TESTIMONY.

12              THE COURT:  I KNOW, I NOTICED IT, TOO.  THE VERY

13    FIRST EXHIBIT THAT YOU PUT ON, MR. PEREZ --

14              MR. AKROTIRIANAKIS:  AND THE SECOND.

15              THE COURT:  -- USED THE WORD "VULNERABILITIES."

16    HIS -- MR. GHEORGHE'S TESTIMONY, OVER AND OVER AGAIN, USED THE

17    WORD, THE EXPLOITING OF THE VULNERABILITY WHICH, INDEED, WAS

18    THE SUBJECT OF A MOTION IN LIMINE.

19              MR. PEREZ:  YOUR HONOR, THE TERM "VULNERABILITY" IS A

20    TERM OF ART, WHICH IF MR. AKROTIRIANAKIS WANTS TO EXPLORE ON

21    CROSS-EXAMINATION, MR. GHEORGHE CAN EASILY EXPLAIN.

22         THE PROBLEM WITH THE EXHIBIT THAT THEY USED ON OPENING IS

23    THAT THEY HAVE SUGGESTED THAT THIS IS CRITICAL OF THE

24    SUFFICIENCY OF WHATSAPP'S SECURITY EFFORTS, AND IN PARTICULAR

25    THERE'S A REFERENCE IN THERE TO LAX SERVER SIDE SECURITY.
```

1          AND THAT'S THE TYPE OF CONTENT THAT WAS THE SUBJECT OF OUR

2     MIL.

3          THE TERM "VULNERABILITY" IS A TERM OF ART THAT THERE'S NO

4     GETTING AROUND BECAUSE THAT'S HOW THEY SPEAK.

5               THE COURT:  ALL RIGHT.  SO THAT WORD --

6               MR. AKROTIRIANAKIS:  READING FROM THE --

7               THE COURT:  -- THAT WORD IS NOT GOING TO TRIGGER AN

8     OBJECTION GIVEN THAT YOUR WITNESS USED IT.  I WAS WRITING IT

9     DOWN EVERY TIME HE USED THE WORD.

10         THE MOTION IN LIMINE PROHIBITS -- I WROTE IT DOWN -- LET'S

11    SEE.  THE ORDER PROHIBITS TESTIMONY OR ARGUMENT ABOUT THE

12    INSUFFICIENCY OF WHATSAPP'S SECURITY MEASURES, INCLUDING

13    WHATSAPP'S PURPORTEDLY -- THAT WHATSAPP PURPORTEDLY CREATED THE

14    VULNERABILITY THAT NSO EXPLOITED.

15              MR. AKROTIRIANAKIS:  I'M --

16              THE COURT:  THAT'S WHAT THE ORDER SAYS.

17              MR. AKROTIRIANAKIS:  AND I'M NOT -- YOUR HONOR, I AM

18    NOT TRYING TO INTRODUCE EVIDENCE THAT THEY CREATED IT.  I DON'T

19    EVEN THINK THEY DID CREATE IT.

20         BUT IT WAS THERE.  AND IT -- THEY WERE WORKING ON IT AT

21    THE TIME.  THAT'S WHAT THIS DOCUMENT THAT WE'VE JUST RECEIVED

22    IN EVIDENCE IS TALKING ABOUT, THOSE TIMELINES.  THEY WERE

23    ALREADY WORKING ON THIS LONG BEFORE.

24         AND SO WE NEED TO BE ABLE TO, ON SOME LEVEL, TALK ABOUT

25    THEIR WORK WITH THE SOFTWARE PATCH.  WE NEED TO TALK ABOUT

1    ACTUALLY WHAT THEY WERE DOING, AND THEY'VE NOW INTRODUCED TWO

2    DOCUMENTS THAT INCLUDE EXACTLY THE SAME INFORMATION I WAS GOING

3    TO GO THROUGH WITH MR. WOOG, WHICH IS WHY I SAID I NEED TO

4    RECALL THEM, BECAUSE THEY THEN INTRODUCED THIS.

5         AND THIS OTHER DOCUMENT, I MEAN, THE COURT SEES, THIS IS

6    THEIR EXHIBIT BOOK, THEY'VE GIVEN IT, IT'S UNREDACTED.  THIS IS

7    A DOCUMENT THAT THEY'RE EXPLAINING I SHOWED UNREDACTED.  THEY

8    GAVE IT TO ME LAST NIGHT OR THE NIGHT BEFORE IN THIS FORMAT.

9    SO --

10             MR. PEREZ:  IT HASN'T BEEN PUBLISHED TO THE JURY,

11   YOUR HONOR, OTHER THAN BY HIM IN OPENING.

12             MR. AKROTIRIANAKIS:  THIS IS THEIR EXHIBIT BOOK.

13             THE COURT:  WHY DIDN'T YOU REDACT IT IF YOU THOUGHT

14   THOSE WERE OFFENDING PORTIONS?

15             MR. PEREZ:  WE KEPT IT OUT OF THE RECORD BY A

16   DIFFERENT MEANS, WHICH WAS NOT INTRODUCING IT INTO EVIDENCE.

17             MR. AKROTIRIANAKIS:  THEY HANDED ME THIS DOCUMENT

18   THIS MORNING AFTER MY OPENING STATEMENT.

19             THE COURT:  WELL, THE DOOR IS OPEN TO WHETHER OR NOT

20   THERE WERE SECURITY VULNERABILITIES THAT THE -- THAT THE ATTACK

21   EXPLOITED.  THE DOOR IS OPEN TO THAT, AND I'M GOING TO ALLOW

22   IT.

23        THE LINE DRAWING THAT YOU ALL ARE EXPECTING ME TO DO IS

24   GETTING TO BE REALLY TOO FINE HERE.

25             MR. AKROTIRIANAKIS:  I AGREE WITH THAT, YOUR HONOR.

1           THE COURT:  AND IT'S COME IN THROUGH YOUR WITNESS'S

2    TESTIMONY AND THROUGH THIS PARTICULAR EXHIBIT, WHICH IS YOURS.

3        SO --

4           MR. ANDRES:  YOUR HONOR --

5           THE COURT:  THAT'S IT.  MY RULING STILL STANDS.

6    THERE'S NO TESTIMONY OR ARGUMENT ABOUT THE INSUFFICIENCY WITH

7    AN ATTEMPT TO SHIFT THE FOCUS TO THAT, THE FACT THAT THEY

8    CREATED IT.

9           MR. AKROTIRIANAKIS:  IT WAS EXISTING IN THEIR CODE

10   BASE, YOUR HONOR.

11          THE COURT:  THAT STILL STANDS.  THAT STILL STANDS.

12       BUT YOU CAN CERTAINLY EXPLORE WHAT THEY WERE DOING,

13   WHETHER OR NOT THEY WERE WORKING ON IT BEFOREHAND.

14       I MEAN, I WOULD THINK THAT THAT WOULD BE SUFFICIENT

15   EVIDENCE.  THAT WOULD BE ADMISSIBLE EVIDENCE IF THEY WERE

16   WORKING ON THIS PARTICULAR VULNERABILITY BEFORE THE ATTACK

17   OCCURRED.

18       I ASSUME THAT'S WHAT YOU'RE TRYING TO GET AT.

19          MR. AKROTIRIANAKIS:  NOT ONLY THAT, YOUR HONOR, BUT

20   THEY ALSO SAY NSO DIDN'T CREATE THE VULNERABILITY, WHICH IS, OF

21   COURSE, CRITICAL.  THEY'RE TRYING TO CREATE THE IMPRESSION THAT

22   WE REWROTE THE CODE SOMEHOW.  THERE'S NO EVIDENCE OF THAT.

23   THIS WITNESS IS ABOUT TO TESTIFY, AS HE DID IN THE VIDEO YOU

24   SAW IN THE OPENING, THAT THAT WASN'T THE CASE.

25          THE COURT:  ALL RIGHT.

1          MR. AKROTIRIANAKIS:  EXHIBIT 1131, INCIDENTALLY, IS

2     THE FETCH, THE PAYLOAD EXHIBIT THAT I SHOWED DURING OPENING

3     STATEMENT, AND THERE'S ANOTHER ONE THAT HAS SIMILAR, SIMILAR

4     CONTENT, YOUR HONOR.

5          AND ALL THESE TIMELINES THAT WE'RE GOING TO HAVE HERE,

6     THEY ALL SAY, YOU KNOW, THAT THIS VULNERABILITY EXISTED IN

7     2015, IN 2017.  I MEAN, THIS IS -- ANYWAY, I JUST URGE THE

8     COURT TO -- I'M HEEDING THE COURT'S DIRECTIONS.  I'M TRYING TO

9     BE VERY CAREFUL ABOUT IT.  IT'S NOT SUPER EASY WHEN I'M

10    CONSTANTLY BEING INTERRUPTED WITH ACCUSATIONS THAT I VIOLATED

11    THE COURT ORDER, AS YOU SEE I HAVE NOT.

12         THE COURT:  OKAY.  TONE IT DOWN.  TONE TO DOWN.

13         TO THE EXTENT THAT YOUR EXHIBITS -- I'M NOT EXACTLY SURE

14    WHAT TO EVEN THINK ABOUT THE FACT -- I DIDN'T KNOW IT WAS YOUR

15    EXHIBIT HE WAS SHOWING.

16         MR. PEREZ:  IT WAS NOT.  IT'S NOT.  WE HAVE NOT MOVED

17    THAT EXHIBIT INTO EVIDENCE, YOUR HONOR.  WE HAVE NOT USED THAT

18    CONTENT.

19         THE COURT:  SO THAT'S JUST PART OF THE DISCOVERY.

20    YOU JUST DISCLOSED IT.

21         MR. PEREZ:  YES.

22         MR. AKROTIRIANAKIS:  NO, NO, IT'S THE BINDER THEY

23    GAVE ME THIS MORNING.  YOU TOLD THE PARTIES, YOU HAVE TO

24    EXCHANGE THE EXHIBITS YOU'RE GOING TO USE WITH WITNESSES.  THIS

25    IS THE VERY FIRST EXHIBIT IN THE MR. GHEORGHE BINDER HERE.

```
 1            THE COURT:  SO IT'S LISTED AS A TRIAL EXHIBIT.

 2            MR. AKROTIRIANAKIS:  NOT JUST A TRIAL EXHIBIT, BUT

 3     ONE THAT THEY INTENDED TO USE WITH THE WITNESS THIS MORNING.

 4     THEY GAVE IT TO ME TWO DAYS AGO, YOUR HONOR.  IT'S NOT

 5     REDACTED.

 6            THE COURT:  OKAY.

 7            MR. AKROTIRIANAKIS:  SO I SHOWED IT IN MY OPENING

 8     STATEMENT, THEN I GET ACCUSED OF VIOLATED COURT ORDERS, WHICH

 9     IS SOMETHING IN 26 YEARS, I'VE TAKEN CARE NOT TO DO, EVEN WHEN

10     I DISAGREE, I WILL RESPECT THE COURT'S AUTHORITY, OF COURSE.

11     I'M JUST TRYING TO CONDUCT AN EXAMINATION.

12            THE COURT:  OKAY.  THAT ONE IS FINE.  THAT'S FINE.

13     I'M NOT GOING TO GO BACK AND DO ANYTHING ABOUT THAT.

14         BUT WHAT I'M CONCERNED ABOUT NOW IS THAT YOU'VE INJECTED

15     INTO THIS, THROUGH YOUR OWN WITNESSES, TESTIMONY THAT THERE WAS

16     THIS VULNERABILITY IN YOUR SECURITY MEASURES THAT WAS

17     EXPLOITED.

18            MR. PEREZ:  IT IS NOT A VULNERABILITY IN SECURITY

19     MEASURES, YOUR HONOR.  "VULNERABILITY" IS A TERM OF ART, WHICH

20     MR. GHEORGHE CAN EXPLAIN, WHICH JUST MEANS IT'S EFFECTIVELY A

21     CHARACTERISTIC OF THE CODE THAT A MALICIOUS ACTOR DEVELOPS THE

22     ABILITY TO EXPLOIT.

23            THE COURT:  AND TOOK ADVANTAGE OF.

24            MR. PEREZ:  YES.  IT'S NOT A DEFECT.  THAT'S NOT WHAT

25     "VULNERABILITY" MEANS.  IT'S NOT AN INSUFFICIENCY.
```

```
1              THE COURT:  OKAY.  AND YOUR MOTION IN LIMINE WENT

2    TO --

3              MR. PEREZ:  ALLEGED INSUFFICIENTLY.

4              THE COURT:  THE ARGUMENT THAT THERE WAS AN ALLEGED

5    INSUFFICIENCY.

6              MR. PEREZ:  EXACTLY.

7              THE COURT:  AND I SUSTAINED THAT AND I STAND BY THAT.

8              MR. AKROTIRIANAKIS:  AND I WON'T MAKE AN ARGUMENT

9    WITH REGARD TO THAT, YOUR HONOR.

10             THE COURT:  WITH REGARD TO THE THEFT, I STILL NEED TO

11   SEE EVIDENCE THAT SUGGESTS THAT WHATSAPP WAS TRYING TO SOMEHOW

12   PILFER NSO'S TECHNOLOGY OR AT LEAST --

13             MR. ANDRES:  STEAL.  THIS GENTLEMEN --

14             THE COURT:  -- SOURCE CODE.

15             MR. AKROTIRIANAKIS:  THIS GENTLEMAN AND THE NEXT

16   WITNESS IN THE EXHIBIT THAT I'VE NOW NAMED FOR THE COURT,

17   EXHIBIT 1131, AS AN EXAMPLE ARE TALKING ABOUT WHAT THOSE

18   EFFORTS ARE.  THERE ARE OTHER EXAMPLES AS WELL WHEN WE TALK

19   ABOUT -- AND THERE'S A TIMELINE WHEN THEY'RE TALKING ABOUT WHAT

20   THEY WERE WORKING ON.

21             THE COURT:  OKAY.  THEN TAKE THE NEXT FIVE MINUTES,

22   PULL OUT THE EXHIBITS AND SHOW THEM TO ME.

23             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24             THE COURT:  I DON'T WANT ANY QUESTIONS ABOUT THEFT

25   UNTIL I'VE SEEN THE EXHIBITS THAT YOU BELIEVE SUGGEST THAT
```

```
1      THAT'S A REASONABLE EVIDENCE-BASED ARGUMENT.  I NEED A BREAK.

2      TAKE FIVE.

3           AND THE COURT REPORTER NEEDS A BREAK.

4           OKAY.

5                MR. ANDRES:  TIME, YOUR HONOR?

6                THE COURT:  TEN MINUTES.  THAT'S IT.

7                MR. ANDRES:  THANK YOU, YOUR HONOR.

8                MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

9           (RECESS FROM 12:00 P.M. UNTIL 12:13 P.M.)

10          (JURY IN AT 12:13 P.M.)

11          (PAUSE IN PROCEEDINGS.)

12               THE COURT:  ALL RIGHT.  MR. GHEORGHE IS BACK ON THE

13     STAND.  THANK YOU.

14          PLEASE COMMENCE YOUR CROSS-EXAMINATION.

15               MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

16          I HAVE A BINDER FOR THE WITNESS.  MAY I APPROACH?

17               THE COURT:  YES.

18                        CROSS-EXAMINATION

19     BY MR. AKROTIRIANAKIS:

20     Q.   GOOD AFTERNOON, MR. GHEORGHE.

21               MR. PEREZ:  I'M SORRY, YOUR HONOR.  DO WE HAVE A COPY

22     OF THE WITNESS BINDER?

23               THE COURT:  I DON'T KNOW.  DO YOU?

24               MR. PEREZ:  NOT TO MY KNOWLEDGE.

25               THE COURT:  DO YOU -- DO YOU HAVE COPIES FOR THEM?
```

```
 1              MR. AKROTIRIANAKIS:  I WAS TOLD THAT WE DID NOT

 2     PROVIDE THEM FOR CROSS-EXAMINATION.  THEY'RE THE SAME EXHIBITS

 3     THAT HAVE BEEN PRODUCED IN DISCOVERY.  LIKE, I GOT MY WHOLE SET

 4     RIGHT THERE.

 5              THE COURT:  USUALLY IT'S A COURTESY.  IS THERE AN

 6     EXTRA COPY THAT THE DEFENSE CAN USE?

 7          ARE YOU GOING TO -- YOU CAN USE MINE IF YOU DON'T HAVE

 8     ONE.

 9              MR. AKROTIRIANAKIS:  I HAVE IT HERE, YOUR HONOR.

10              THE COURT:  I ASSUME YOU'RE GOING TO PUT THEM UP ON

11     THE SCREEN?

12              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

13              THE COURT:  OKAY.

14              MR. AKROTIRIANAKIS:  (HANDING.)

15              MR. PEREZ:  THANK YOU.

16     BY MR. AKROTIRIANAKIS:

17     Q.   MR. GHEORGHE, I WANTED TO ASK YOU SOME QUESTIONS ABOUT

18     SOME OF THE EXHIBITS YOU TESTIFIED ABOUT IN YOUR DIRECT

19     EXAMINATION.

20          WOULD YOU PUBLISH EXHIBIT 13, PLEASE.

21          DO YOU RECALL THIS EXHIBIT, MR. GHEORGHE?

22     A.   YES.

23              THE CLERK:  THIS IS EXHIBIT, I'M SORRY, 13?

24              MR. AKROTIRIANAKIS:  13.

25              THE CLERK:  THIS IS MARKED 1105?  SAME EXHIBIT.
```

1           MR. AKROTIRIANAKIS:  1105 WAS THE DEPOSITION NUMBER,

2    AND THEY'VE RENUMBERED IT 13 FOR PURPOSES -- IT'S IN EVIDENCE

3    AS EXHIBIT 13.  IT'S ALSO MARKED AS EXHIBIT 1105.

4    Q.   AND YOU IDENTIFIED, MR. GHEORGHE, THIS EXHIBIT AS A

5    TIMELINE; IS THAT RIGHT?

6    A.   THIS IS A TASK.

7    Q.   A TASK, THANK YOU.

8         AND THE TASK HERE IS CALLED SERVER TO VALIDATE CALL

9    STANZAS AS DEFINED IN THE PROTOCOL; IS THAT RIGHT?

10   A.   YES.

11   Q.   YOU SEE THAT ON THE TOP OF THE PAGE.

12        AND THE NEXT LINE IS "FOLLOW UP ON S164677."

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   DO YOU RECALL WHAT S164677 WAS?

16   A.   I DON'T REMEMBER EXACTLY WHAT THAT WAS.  I -- YEAH, I JUST

17   DON'T REMEMBER.  IT POINTS TO A SEV, WHICH IS AN INCIDENT THAT

18   WAS FILED INTERNALLY.  BUT I DON'T REMEMBER ALL THE DETAILS.

19   Q.   OKAY.  DO YOU REMEMBER THAT IT DOESN'T HAVE ANYTHING TO DO

20   WITH NSO?

21   A.   UM --

22   Q.   OR DO YOU THINK IT DOES.

23           MR. PEREZ:  FOUNDATION.

24           THE WITNESS:  I DON'T THINK IT HAS --

25           THE COURT:  EXCUSE ME.

```
 1            ESTABLISH A FOUNDATION FIRST FOR HIS KNOWLEDGE OF THIS.

 2       BY MR. AKROTIRIANAKIS:

 3       Q.   YEAH.  DO YOU KNOW ONE WAY OR THE OTHER WHETHER THIS

 4       S164677 HAS ANYTHING TO DO WITH NSO?

 5       A.   I DON'T THINK SO.

 6       Q.   THANK YOU.  IF WE COULD GO TO THE TOP OF -- AND I'M SORRY,

 7       THE CREATOR OF THIS TASK IS MR. BARCONS PALAU.

 8            DO YOU SEE THAT?

 9       A.   YES.

10       Q.   AND THAT WAS YOUR TESTIMONY; RIGHT?

11       A.   YES.

12       Q.   AND HE TOLD ME THAT HIS NAME IS PRONOUNCED JESUS.  IS THAT

13       HOW YOU UNDERSTAND IT?  OR HOW HE PRONOUNCES IT IS AS JESUS.

14       HE'S SPANISH, RIGHT?

15       A.   HE'S FROM SPAIN, YEAH.

16       Q.   DO YOU KNOW HOW HE PRONOUNCES HIS FIRST NAME?

17       A.   WE ALL PRONOUNCE NAMES IN SLIGHTLY DIFFERENT WAYS, BUT

18       YEAH.

19       Q.   SURE.  I MEAN NO DISRESPECT TO MR. BARCONS PALAU IF I'M

20       PRONOUNCING HIS FIRST NAME OTHER THAN AS HE WOULD.

21            ALL RIGHT.  AND ABOVE MR. BARCONS PALAU'S NAME IS A NUMBER

22       OF SUBSCRIBERS.

23            DO YOU SEE THAT?

24       A.   YES.

25       Q.   AND WHAT DOES IT MEAN TO BE A SUBSCRIBER TO A TASK?
```

1    A.   BEING A SUBSCRIBER TO A TASK MEANS THAT YOU ARE ABLE TO

2    SEE -- YOU ARE BEING NOTIFIED ON ANY UPDATE THAT WAS HAPPENING

3    ON THE TASK.

4    Q.   OKAY.  AND THE DATE THAT THIS TASK WAS CREATED IS

5    OCTOBER 4, 2018; IS THAT RIGHT?

6    A.   YES.

7    Q.   AND THAT WAS BEFORE YOU AT WHATSAPP HAD ANY KNOWLEDGE

8    ABOUT THE EVENTS THAT WE'RE HERE TALKING ABOUT TODAY; CORRECT?

9    A.   YES.

10   Q.   SO YOU WERE WORKING ON THIS TASK BEFORE ANYTHING TO DO

11   WITH PEGASUS OR NSO, EVERYTHING THAT WE'RE TALKING ABOUT HERE

12   TODAY; CORRECT?

13   A.   YES.

14   Q.   ALL RIGHT.  NOW, IF YOU LOOK AGAIN AT THE NAMES OF THE

15   PEOPLE ON THE -- WHAT ARE SUBSCRIBERS TO THIS TASK, AND I WON'T

16   GO THROUGH ALL OF THEM, BUT THE FIRST ONE IS ABY JOHN.

17        DO YOU SEE THAT?

18   A.   YES.

19   Q.   IS THAT A MR. OR A MS. JOHN?

20   A.   IT'S A MISTER.

21   Q.   AND MR. JOHN WAS ONE OF THE PEOPLE THAT YOU HAD MENTIONED

22   IN THE COURSE OF YOUR DIRECT EXAMINATION AS LATER PROVIDING

23   SOME WORK RELATIVE TO THE REMEDIATION EFFORT; RIGHT?

24   A.   YES.

25   Q.   ALL RIGHT.  AND ANOTHER ONE IS ANDREY LABUNETS, THAT'S THE

1       THIRD NAME, IF I'M PRONOUNCING IT CORRECTLY, AND I HOPE I AM.

2       A.    LABUNETS, YEAH.

3       Q.    THANK YOU, MR. GHEORGHE.

4             MR. LABUNETS IS ANOTHER PERSON WHO WAS WORKING

5             IS THAT RIGHT?

6       A.    YES.

7       Q.    WE SEE MR. TISZKA, MR. WOOG, AND THEN YOU ARE AT THE KIND

8       OF SECOND TO LAST ON THE FIRST LINE.

9             DO YOU SEE THAT?

10      A.    YES.

11      Q.    AND WITHOUT BELABORING THE POINT, IF YOU LOOK AT THE OTHER

12      NAMES THAT ARE LISTED THERE BELOW AS SUBSCRIBERS TO THIS TASK,

13      YOU SEE A GOODLY NUMBER OF THE PEOPLE WHO YOU TESTIFIED IN

14      RESPONSE TO MR. PEREZ'S QUESTIONS WERE LATER WORKING ON THE

15      EFFORT HERE THAT WE'RE TALKING ABOUT TODAY; CORRECT?

16      A.    YES.

17      Q.    NOW, IN OCTOBER 2018 WHEN THIS TASK WAS CREATED, IT IS A

18      FACT THAT WHATSAPP WAS NOT VALIDATING THESE STANZAS AT THAT

19      TIME; CORRECT?

20                MR. PEREZ:  OBJECTION, YOUR HONOR.

21                THE WITNESS:  WE HAD SOME VALIDATION --

22                THE COURT:  HOLD ON.

23            WHAT'S THE OBJECTION?

24                MR. PEREZ:  MIL 5, YOUR HONOR.

25                THE COURT:  OVERRULED.  I'M GOING TO OVERRULE THAT

1    ONE.

2         YOU INTRODUCED THIS EXHIBIT.

3    BY MR. AKROTIRIANAKIS:

4    Q.   DO YOU REMEMBER MY QUESTION, MR. GHEORGHE?

5    A.   I THINK THE QUESTION WAS ABOUT WHETHER WE WERE

6    VALIDATING -- THAT WE HAD NO VALIDATION AT THAT POINT; IS THAT

7    RIGHT?

8    Q.   YEAH.  THE TITLE OF THIS TASK IS "SERVER TO VALIDATE CALL

9    STANZAS."

10        IT WAS A PROJECT, AS I UNDERSTAND IT, TO CREATE VALIDATION

11   FOR SERVER STANZAS OF SOME KINDS; RIGHT?

12   A.   YES.  THESE ARE THE SIGNALLING MESSAGES SENT BY THE

13   WHATSAPP APP, AND WE FOLLOWED THIS PROJECT TO DO VALIDATION OF

14   THE SIGNALLING MESSAGES AND BY THE WHATSAPP CLIENT.

15   Q.   IN FACT, ON PAGE 3 OF EXHIBIT 13, IF YOU SEE

16   MR. BARCONS PALAU'S FIRST ENTRY THERE WHERE HE SAYS, "I WILL BE

17   THE ONE DRIVING --" I BEG YOUR PARDON.  IT'S PAGE 4.

18        "I WILL BE THE ONE DRIVING THIS TASK."

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   AND HE WRITES, "TODAY I HAVE BROUGHT AWARENESS OF THE NEED

22   FOR STANZA VALIDATION DURING THE WEEKLY SERVER TECH TALK, WHERE

23   I HAVE EXPLAINED THE SECURITY ISSUES AND SERVER SIDE FIXES.

24   THANKS, OTTO EBELING, AND IBRAHIM MOHAMED."

25        CORRECT?

1    A.   YES.

2    Q.   ALL RIGHT.  AND AT THE TIME THAT MR. BARCONS PALAU WROTE

3    THAT ON DECEMBER 5TH, 2018, THE STANZA VALIDATION THAT HE'S

4    TALKING ABOUT THERE BEING A NEED FOR DID NOT EXIST; RIGHT?

5    A.   WE DID NOT START WORKING ON IT AT THAT POINT.

6    Q.   OKAY.  NOW, AT SOME POINT, DID YOU START LOGGING STANZAS?

7    THAT'S IN THIS DOCUMENT; RIGHT?

8    A.   YES.

9    Q.   OKAY.  AND THAT IS, IF WE JUST SKIP AHEAD A FEW PAGES,

10   WHERE YOU TALKED ABOUT THE CANARYING ON YOUR DIRECT

11   EXAMINATION.

12        IS THAT RIGHT?

13   A.   YES.  SO AT THAT POINT, JESUS ALREADY IMPLEMENTED THE

14   VALIDATION AND HE WAS TESTING THE VALIDATION IN PRODUCTION.

15   Q.   OKAY.  AND THAT WAS IN APRIL, LATE APRIL OF 2019; RIGHT?

16   A.   YES.

17   Q.   ALL RIGHT.  AND MR. BARCONS PALAU, IN FACT, WRITES ON

18   PAGE 6 THAT HE WAS "CANARYING STANZA VALIDATION," ET CETERA,

19   AND YOU SEE, BY FLIPPING OVER TO THE TOP OF THE NEXT PAGE, THAT

20   THE DATE OF THAT MESSAGE WAS APRIL 24, 2019; CORRECT?

21   A.   YES.

22   Q.   ALL RIGHT.  NOW, ON DIRECT EXAMINATION, YOU SAID THAT ON

23   MAY 2ND, IF WE CAN SKIP FORWARD IN THE DOCUMENT, IT'S PAGE 9,

24   MR. BARCONS PALAU HAS THIS SORT OF LONGER ENTRY HERE THAT IS

25   DATED MAY 2, 2019.

1           DO YOU SEE THAT?

2      A.   YES.

3      Q.   OKAY.  AND THAT IS WHERE HE SAYS, "FOUND THIS CALL OFFER,

4      WORTH TAKING A LOOK."

5           DO YOU SEE WHERE HE SAYS THAT?

6      A.   YES.

7      Q.   AND THAT WAS THE SEEING OF THE INVALID MESSAGES, AS YOU

8      TESTIFIED TO, THAT YOU SAID HAD SUSPICIOUS CONTENT; CORRECT?

9      A.   YES.

10     Q.   ALL RIGHT.  IF WE CAN GO OVER -- WELL, AT THE VERY BOTTOM

11     OF THIS PAGE HERE THERE IS AN ENTRY, AND IT SKIPS OVER THE TWO

12     PAGES IN MY PAPER VERSION, WHERE MR. MOHAMED SAYS, "THIS IS THE

13     STRING."

14          AND THEN ON THE TOP OF PAGE 10, THE NEXT PAGE, THE

15     CONTINUATION OF MR. MOHAMED'S MESSAGE, THERE'S THIS CODE.

16          DO YOU SEE THAT?

17     A.   YES.  THIS IS THE SUSPICIOUS MESSAGE THAT STARTED THE

18     INVESTIGATION.

19     Q.   RIGHT.  THIS CODE THAT WE SEE HERE AT THE TOP OF PAGE 10

20     IN EXHIBIT 13 IS THE SUSPICIOUS CONTENT THAT YOU WERE REFERRING

21     TO ON YOUR DIRECT EXAMINATION; RIGHT?

22     A.   YES.

23     Q.   AND AM I CORRECT THAT THIS IS CALLED SOMETHING LIKE

24     HEXADECIMAL CODE?

25     A.   PARTS OF IT.  SO THE PART THAT IS BINARY IS ENCODED IN

 1      HEXADECIMAL.

 2          BUT WHAT I SEE HERE ON THE SCREEN IS NOT JUST THAT, SO IT

 3      HAS SOME, SOME OTHER INSTRUCTIONS THAT ARE NOT IN HEXADECIMAL

 4      THAT ARE MEANT TO BE EXECUTED IN THE INTERPRETER, AND THEY'RE

 5      READABLE BY THE HUMAN, SO YOU CAN TAKE A LOOK AT IT AND KIND OF

 6      UNDERSTAND WHAT'S GOING ON.

 7      Q.   OKAY.  SO PART OF THIS MESSAGE IS READABLE BY HUMAN EYES

 8      WHO CAN READ COMPUTER CODE; RIGHT?

 9      A.   YES.

10      Q.   AND YOU'RE ONE OF THOSE PEOPLE?

11      A.   YES.

12      Q.   AND MR. ROBINSON IS ALSO A PERSON WHO READS COMPUTER CODE;

13      CORRECT?

14      A.   HE'S A PERSON THAT KNOWS MUCH MORE DEEPLY NOT JUST THE

15      PART AT THE TOP, BUT ALSO THE ONE WITH THE HEXADECIMAL.  SO

16      HE'S AN EXPERT IN THAT PART, IN THE HEXADECIMAL.

17      Q.   RIGHT.  AND YOU CAN DECOMPILE, OR DISASSEMBLE THE

18      HEXADECIMAL CODE SO THAT IT IS READABLE TO A PERSON WHO CAN

19      READ COMPUTER CODE; CORRECT?

20      A.   YES.  WE REFER TO THAT AS REVERSE ENGINEERING.

21      Q.   OKAY.  AND THE TOOL THAT YOU USE FOR REVERSE ENGINEERING

22      IS -- THERE ARE SEVERAL; RIGHT?

23      A.   I KNOW -- I HAVE NO IDEA ABOUT WHAT THE TOOL -- WHAT TOOL

24      WE USED.  BUT I KNOW OF MANY TOOLS AVAILABLE THAT YOU CAN USE.

25      I JUST DON'T KNOW WHICH ONE WE USED IN THIS CASE.

1    Q.   OKAY.  WELL, JUST QUICKLY, YOU'RE AWARE OF IDA, I-D-A, AND

2    JEB, J-E-B?

3    A.   I'M ACTUALLY NOT FAMILIAR WITH THIS.  THIS IS A DOMAIN

4    EXPERTISE THAT I DON'T HAVE.

5    Q.   OKAY.  SO THAT WOULD BE A QUESTION FOR MR. ROBINSON?

6    A.   YES, THAT'S CORRECT.

7    Q.   THANK YOU.

8         NOW, YOU SAID IN YOUR DIRECT EXAMINATION THAT THIS, WHAT

9    WE SEE HERE, THIS CODE, WAS NOT HOW THIS FIELD WAS MEANT TO BE

10   USED.

11        DO YOU REMEMBER THAT TESTIMONY?

12   A.   YES.

13   Q.   OKAY.  AND I THINK YOU FOLLOWED UP TO SAY THAT THE FIELD

14   THAT WE'RE TALKING ABOUT WHERE THIS CODE WAS FOUND WAS NOT IN

15   USE AT THE TIME IN WHATSAPP MESSAGING.

16        IS THAT CORRECT?

17   A.   WE -- BASED ON MY RECOLLECTION, THIS WAS DEPRECATED.  SO

18   IT WAS -- POSSIBLY IT WAS BEING USED BY SOME VERY OLD CLIENTS

19   THAT WERE NOT UPDATED.

20        BUT BASED ON MY RECOLLECTION, I BELIEVE THAT THIS FIELD

21   WAS NOT USED BY THE MAIN WHATSAPP APPLICATION AT THAT MOMENT.

22   Q.   OKAY.

23             THE COURT:  AND WHAT MOMENT ARE WE TALKING ABOUT?

24             PROSPECTIVE JUROR:  THE MOMENT WE DISCOVERED THE

25   ATTACK.

```
1                THE COURT:  OKAY.

2     BY MR. AKROTIRIANAKIS:

3     Q.   SO FOR THE RECORD, THAT WOULD BE MAY 2, 2019; CORRECT?

4     A.   YES.

5     Q.   AND DO YOU KNOW GOING BACK HOW FAR IN TIME THIS WOULD HAVE

6     BEEN AN EMPTY FIELD IN THE CURRENT VERSIONS OF WHATSAPP?

7     A.   I'M NOT SURE WHAT YOU REFER TO BY EMPTY FIELD.

8     Q.   YEAH, THE -- YOU SAID DEPRECATED ON YOUR DIRECT

9     EXAMINATION, YOU SAID NOT IN USE AT THE TIME.  I TOOK THAT AS

10    EMPTY, THAT THERE'S NOTHING IN THE FIELD IN A TYPICAL WHATSAPP

11    MESSAGE.

12         IS THAT -- DO I UNDERSTAND YOU CORRECTLY?

13    A.   NO.  DEPRECATION WAS RELATED WITH THE LOGIC ON THE CLIENT.

14    SO THE CLIENT, EVEN IF IT RECEIVED THIS VALUE, WOULD NOT

15    ACTUALLY USE IT.  IT WOULD NOT ACT UPON IT.

16    Q.   BUT THE SERVER WOULD?

17    A.   I DON'T KNOW IF WE WERE STILL SENDING THIS FROM THE SERVER

18    SIDE.

19         THIS WAS A FIELD THAT WAS INTENDED TO BE FILLED ONLY BY

20    THE SERVER.  I JUST DON'T KNOW AT THAT MOMENT IF WE WERE

21    ACTUALLY SENDING IT.

22    Q.   LET ME ASK YOU A SLIGHTLY DIFFERENT QUESTION.

23         WITH THE ASSISTANCE OF THE REVERSE ENGINEERING USING THE

24    DECOMPILER, YOU WERE -- "YOU" MEANING WHATSAPP -- WERE ABLE SEE

25    WHAT THIS MESSAGE SAID; RIGHT?
```

1    A.   ARE YOU REFERRING TO THE HEX --

2    Q.   YES, EVERYTHING INCLUDING WHAT'S READABLE TO HUMAN EYES

3    AND THE HEXADECIMAL.

4         AFTER RUNNING IT THROUGH THE REVERSE ENGINEERING PROCESS

5    YOU TESTIFIED TO, YOU WERE ABLE TO READ IT; RIGHT?

6    A.   YES, WE WERE ABLE TO ANALYZE THIS.

7    Q.   OKAY.  AND EVEN WITHOUT ANY REVERSE ENGINEERING OR

8    DECOMPILING OR DISASSEMBLING OR ANYTHING LIKE THAT, YOU, JUST

9    LOOKING AT THIS, KNOW THAT'S NOT NORMAL; RIGHT?

10   A.   YES, I CAN TELL VERY EASILY THAT THIS IS NOT A NORMAL

11   FIELD THAT WAS BEING SENT.

12   Q.   VERY EASILY AND VERY IMMEDIATELY?  IS THAT FAIR?

13   A.   YES.

14   Q.   AND YOU STARTED LOGGING ON THIS VERY DAY, MAY 2, 2019?

15   A.   I BELIEVE THIS IS WHEN WE STARTED THE LOGGING OF ALL THE

16   SUSPICIOUS MESSAGES.

17   Q.   AND PRIOR TO MAY 2, 2019, THERE WAS NO LOGGING; IS THAT

18   RIGHT?

19   A.   YES, THERE WAS NO LOGGING RELATED TO THIS SPECIFIC

20   SUSPICIOUS MESSAGE BEFORE THAT.

21   Q.   WHAT I'M GETTING AT, MR. GHEORGHE, IS THAT UPON LOGGING,

22   YOU IMMEDIATELY FOUND WHAT YOU'VE CALLED SUSPICIOUS MESSAGES;

23   CORRECT?

24   A.   UPON THE DEPLOYMENT OF THE VALIDATION IS -- SO, LIKE, THE

25   WHOLE -- THE TRIGGER FOR ALL OF THIS WAS THE DEPLOYMENT OF THE

1    VALIDATION THAT LED TO THE DISCOVERY OF THE SUSPICIOUS MESSAGE.

2         LOGS WAS AN EFFECT OF THAT.  SO FIRST WE DISCOVERED THE

3    FAILURES OF THE VALIDATION AND THEN WE ADDED THE LOGGING.

4    Q.   ONCE YOU ADDED LOGGING, THE SAME DAY THAT YOU STARTED

5    LOGGING, YOU SAID, OH, YEAH, HERE'S THESE MESSAGES; RIGHT?

6    A.   YES.  SO JUST TO EXPLAIN IN A LITTLE MORE DETAIL, WE WERE

7    SEEING FAILURES BEFORE WE DISCOVERED THE ATTACK TOO.

8         SO SOME CASES THEY WERE BENIGN, THERE WOULD BE SOMETHING

9    LIKE MAYBE ONE OF OUR OFFICIAL CLIENTS WOULD SEND THAT WAS AN

10   ERROR.

11        SO FOR ALL OF THESE, WE HAD TO GO IN DETAILS TO

12   INVESTIGATE TO SEE WHETHER THE VALIDATIONS ARE MEANINGFUL OR

13   NOT AND FIND OUT WHAT THE ROOT CAUSE OF THE VALIDATION.

14        SO WE WERE FINDING VALIDATION, I DON'T REMEMBER EXACTLY,

15   BUT PROBABLY IN APRIL.

16        SO IN THIS CASE, WE FOLLOWED UP AND WE TRIED TO UNDERSTAND

17   WHAT IT IS, AND THAT'S WHY WE ADDED THE LOGGING TO UNDERSTAND

18   WHAT'S CAUSING THE VALIDATION FAILURE.

19   Q.   NOW, CAN YOU TURN, PLEASE, TO PAGE 11.

20        AND WHILE YOU'RE DOING THAT, ONE OF YOUR OBJECTIVES WAS TO

21   DEPLOY A SOLUTION ASAP; IS THAT RIGHT, MR. GHEORGHE?

22   A.   OUR OBJECTIVE WAS TO PROTECT WHATSAPP USERS FROM, FROM ANY

23   ABUSE.

24   Q.   AND YOU WANTED TO DO THAT ASAP?

25   A.   INITIALLY, YES.  I ACTUALLY WANTED TO DO IT AS SOON AS

1    POSSIBLE BECAUSE I WAS CONCERNED ABOUT USERS BEING ABUSED.

2    Q.   NOW, MR. BARCONS PALAU WRITES, IN THE MIDDLE OF PAGE 11,

3    "I CAN SEND A CHANGE IN NEXT CHATD DEPLOY TO DROP FAILED

4    STANZAS."

5         DO YOU SEE THAT LANGUAGE?

6    A.   YES.

7    Q.   NOW, CHATD IS A WAY INTERNALLY TO WHATSAPP THAT YOU REFER

8    TO THE SIGNALLING SERVERS; CORRECT?

9    A.   YES.  SO THE SIGNALLING SEVER IS QUANTITATIVE WITH THE

10   CHATD SERVER.  SO THE ONE THAT JESUS IS REFERRING TO HERE IS

11   THE SIGNALLING SERVERS RUNNING INSIDE THE CHATD SERVERS.

12   Q.   CAN WE HAVE EXHIBIT 10 IN EVIDENCE, PLEASE.

13        WHAT IS A STANZA AND WHAT DOES IT MEAN TO VALIDATE A

14   STANZA, MR. GHEORGHE?

15   A.   A STANZA IS A CODE NAME INTERNALLY THAT WE USE AT WHATSAPP

16   FOR A SIGNALLING MESSAGE.  SO IT'S A MESSAGE THAT IS BEING SENT

17   FROM A WHATSAPP APP TO THE SIGNALLING SERVER.

18   Q.   AT THE BOTTOM -- AND THIS DOCUMENT -- I'M SORRY.  WE'LL

19   STAY AT THE TOP FOR A SECOND.

20        THIS DOCUMENT IS A SEV THAT YOU REFERRED TO ALREADY.

21        DO YOU SEE THAT?

22   A.   YES.  THIS WAS THE SEV THAT WAS TRACKING THE WHOLE

23   INCIDENT.

24   Q.   AND THERE'S AN S178165.

25        DO YOU SEE THAT AS THE SEV NUMBER?

1    A.   YES.

2    Q.   OKAY.  AND THAT'S A DIFFERENT SEV THAT WE -- THAN WHAT WE

3    WERE TALKING ABOUT A FEW MINUTES AGO WHEN I WAS ASKING YOU

4    ABOUT ONE HAVING NOTHING TO DO WITH NSO.

5         DO YOU REMEMBER THAT?

6    A.   YES, I BELIEVE THOSE ARE DIFFERENT.

7    Q.   TWO DIFFERENT THINGS?

8    A.   YES.

9    Q.   ALL RIGHT.  AND THE OWNER OF THIS SEV IS

10   MR. MORENO GARIJO; CORRECT?

11   A.   YES.

12   Q.   ALL RIGHT.  NOW, DOWN AT THE BOTTOM OF THE FIRST PAGE,

13   MR. MORENO GARIJO GIVES SORT OF A HISTORICAL RECAP OF SORT OF

14   THE BACKGROUND TO THIS.

15        DO YOU SEE THAT?  HE SAYS, "WHAT WE KNOW UNTIL NOW," ON

16   MAY 3RD, 2019?

17   A.   YES.

18   Q.   ALL RIGHT.  AND HE WRITES, "CONTEXT:  THERE WAS NOT A

19   SCHEMA FOR VOIP STANZAS."

20        WHAT DOES "SCHEMA" MEAN IN THIS CONTEXT?

21   A.   A SCHEMA IS A SPECIFICATION OF THE PROTOCOL USED BETWEEN

22   THE WHATSAPP APPLICATION AND THE SIGNALLING SERVER.

23   Q.   AND THE NEXT SENTENCE STARTS WITH THE WORD PRODSEC.  WHAT

24   IS PRODSEC?

25   A.   PRODSEC IS THE NAME OF THE WHATSAPP -- OF THE FACEBOOK

1        SECURITY TEAM AT THAT TIME.  SO IT WAS THE SHORT VERSION OF --

2        A SHORT VERSION OF PRODUCT SECURITY.

3        Q.   IT'S LIKE PROD, SEC, PRODUCT SECURITY, PRODSEC; RIGHT?

4        A.   YES.

5        Q.   OKAY.  "PRODSEC EVALUATED PRODUCT."

6             WHAT'S THE PRODUCT?

7        A.   I THINK HE WAS REFERRING TO THE WHATSAPP PRODUCT.

8        Q.   OKAY.  "AND REQUESTED TO HAVE A VALID DEFINED SCHEMA FOR

9        THESE STANZAS."

10            "WHATSAPP SECURITY" -- THAT'S WHAT WS MEANS IN THIS

11       CONTEXT; RIGHT?

12       A.   I'M NOT SURE ACTUALLY WHAT THAT MEANS RIGHT NOW.

13       Q.   OKAY.  WELL, WS MEANS SOMETHING RELATED TO WHATSAPP?

14       YOU'RE COMFORTABLE WITH THAT; RIGHT?

15       A.   IN MY OPINION, I THINK HE MADE A TYPO.  I THINK HE MEANT

16       WA.  SO I THINK HE MEANT, LIKE, WHATSAPP, ESSENTIALLY, WHATSAPP

17       ENGINEERING.

18       Q.   OKAY.  I MEAN, HE SAYS WS IN THE NEXT LINE DOWN AND THE

19       THIRD ONE AFTER THAT.

20            BUT ANYWAY, YOU'RE COMFORTABLE THAT THE WS IS A REFERENCE

21       TO SOMETHING RELATIVE TO WHATSAPP; RIGHT?

22       A.   YEAH, I THINK THAT'S FAIR.

23       Q.   OKAY.  "WHATSAPP IMPLEMENTED THIS FUNCTIONAL AND DEFINED A

24       VALID SCHEMA, BUT DIDN'T ENFORCE THE SCHEMA ON THE SERVER SIDE.

25       WHATSAPP ADDED THE SERVER-SIDE LOGGING TO WHATSAPP FOR INVALID

1    STANZAS FEW WEEKS AGO."

2         AND THEN HE GOES ON, "HOW WAS DETECTED:  WHATSAPP

3    IDENTIFIED INVALID/SUSPICIOUS STANZAS IN THE JUST ADDED

4    LOGGING."

5         DO YOU SEE THAT, MR. GHEORGHE?

6    A.   YES.

7    Q.   AND HE'S REFERRING BACK TO THE JUST ADDED BY

8    MR. BARCONS PALAU THAT WE WERE SEEING IN EXHIBIT 13; CORRECT?

9    A.   YES, THIS IS THE VALIDATION WORK THAT JESUS WAS DOING THAT

10   LED TO THE DISCOVERY OF THAT.

11   Q.   OKAY.  NOW, MR. MORENO GARIJO WAS ON CALL FOR FACEBOOK

12   SECURITY AT THE PERIOD OF TIME THAT HE STARTED WRITING THIS

13   SEV; CORRECT?

14   A.   YES, THAT'S THE MAIN REASON WHY HE WAS INVOLVED WITH THE

15   INVESTIGATION.  HE WAS THE ON-CALL FOR INCIDENT RESPONSE.

16   Q.   SO IN THE FACEBOOK SECURITY TEAM, SOMEBODY IS ALWAYS ON

17   CALL, OR TAKES CALLS, THE SAME WAY THAT DOCTORS DO AND THINGS

18   LIKE THAT; RIGHT?

19   A.   EXACTLY.

20   Q.   SO THAT'S LIKE A REGULAR PART OF FACEBOOK SECURITY; AM I

21   CORRECT?

22   A.   I'M NOT SURE WHAT YOU MEAN BY "REGULAR PART."

23   Q.   SO PEOPLE WHO WORK IN FACEBOOK SECURITY TEAM, IN THE

24   FACEBOOK SECURITY TEAM, SOMEBODY OF THEM IS ALWAYS ON CALL AS

25   PART OF THEIR REGULAR DUTIES; IS THAT RIGHT?

1    A.   IT WAS A SPECIFIC TEAM, THE INCIDENT RESPONSE TEAM, THAT

2    WAS INVOLVED IN THIS.  SO THAT TEAM HAD THE SPECIFIC ON CALL

3    THAT WE HAD TO ALWAYS REACH OUT TO IF WE WERE DEALING WITH AN

4    INCIDENT.

5    Q.   AND THEY'RE ALWAYS AVAILABLE FOR THAT PURPOSE?

6    A.   YES, THERE'S -- THE EXPECTATION IS THAT THERE'S ALWAYS

7    SOMEONE ON CALL THAT YOU CAN REACH OUT TO.

8    Q.   CAN WE GO TO PAGE 3 IN THE MIDDLE.  THERE'S A MESSAGE FROM

9    MR. MORENO GARIJO AT 9:37 A.M. ON MAY 6TH.

10        AND HE SAYS -- HE DESCRIBES A WORKING HYPOTHESIS AND TWO

11   VULNERABILITIES WHICH WE BELIEVE ARE USED IN TANDEM.

12        DO YOU SEE THAT?

13   A.   YES.

14   Q.   ALL RIGHT.  AND THE FIRST ONE, VULNERABILITY A, HE

15   IDENTIFIES AS A SERVER-SIDE VULNERABILITY, AND VULNERABILITY B

16   IS A CLIENT-SIDE BUG.

17        DO YOU SEE THAT?

18   A.   YES.

19   Q.   ALL RIGHT.  NOW, CLIENT-SIDE IN THIS CASE MEANS THE

20   WHATSAPP APPLICATION THAT'S SITTING ON THE PHONE, THE USER'S

21   PHONE; CORRECT?

22   A.   YEAH.  MORE SPECIFICALLY, THE LOGIC RELATED TO VOICE AND

23   VIDEO CALLING ON THE APPLICATION.

24   Q.   BUT IN ANY EVENT, IT'S ALL ON THE PHONE IN THEIR POCKET OR

25   WHATEVER IT IS, IT'S ON THE PHONE; RIGHT?  IT'S NOT ON THE

1        SERVER?

2        A.   YES.

3        Q.   IT'S THE OTHER VULNERABILITY THAT'S ON THE SERVER,

4        VULNERABILITY A; CORRECT?

5        A.   YES.

6        Q.   ALL RIGHT.  NOW, ON PAGE 4, THERE'S A REFERENCE TO "WE

7        KNEW THE VULNERABILITY WAS INTRODUCED IN SEPTEMBER 2017."

8             DO YOU SEE THAT?

9             AND MY ONLY QUESTION IS, WHICH VULNERABILITY IS THAT A

10       REFERENCE TO?

11       A.   I'M SORRY.  WHERE IS THAT?

12       Q.   IT'S THE FOURTH PARAGRAPH.  IT STARTS WITH, "WE KNOW THE

13       VULNERABILITY."

14            SORRY ABOUT THAT.

15       A.   THIS IS REFERRING TO THE CLIENT-CLIENT VULNERABILITY.

16       Q.   OKAY.  SO THERE'S THE SERVER-SIDE VULNERABILITY THAT

17       EXISTED AT SOME POINT BEFORE MR. BARCONS PALAU WAS WRITING

18       ABOUT IT IN OCTOBER 2018; AND THERE WAS THIS SERVER-SIDE --

19       THIS CLIENT-SIDE VULNERABILITY THAT, ACCORDING TO THIS

20       DOCUMENT, "WE KNOW THE VULNERABILITY WAS INTRODUCED IN

21       SEPTEMBER 2017."

22            CORRECT?

23       A.   YES.

24       Q.   OKAY.  AND IT -- YOU HAVE NO REASON TO BELIEVE THAT EITHER

25       VULNERABILITY WAS INTRODUCED BY NSO GROUP; CORRECT?

1    A.   NO.   THE VULNERABILITIES EXIST ONLY AS AN EFFECT OF

2    SOFTWARE ENGINEERS MAKING CHANGES TO THE WHATSAPP SOFTWARE.   SO

3    ONLY SOFTWARE ENGINEERS WORKING AS WHATSAPP COULD MAKE THOSE

4    CHANGES.

5    Q.   WHAT I'M ABOUT TO DO IS GOING TO SOUND SUPER LAWYERLY.

6    YOU SAID "NO" AT THE BEGINNING OF YOUR ANSWER, BUT YOUR ANSWER

7    IS ACTUALLY, "YES, YOU HAVE NO REASON TO BELIEVE THAT NSO GROUP

8    HAD ANYTHING TO DO WITH THE CREATION OF EITHER OF THESE

9    VULNERABILITIES"; CORRECT?

10   A.   WELL, I THINK IT REQUIRES A LITTLE MORE CONTEXT, BECAUSE A

11   VULNERABILITY EXISTS IN THE MOMENT THERE'S AN ATTACK FOR IT.

12       SO SOFTWARE ENGINEERS DON'T CREATE VULNERABILITIES.   WE

13   BUILD THE PRODUCT, AND THE MOMENT THAT VULNERABILITY COMES TO

14   EXISTENCE IS WHEN AN ATTACKER PROVES THAT IT CAN MISUSE IT.

15   Q.   I SEE THE DISTINCTION YOU'RE MAKING.

16       YOU'RE SAYING THAT THERE ARE FLAWS THAT EXIST IN SOFTWARE

17   CODE, AND THEY COULD BECOME VULNERABILITIES IF SOMEBODY COMES

18   ALONG AND TRIES TO MAKE USE OF THEM?

19       IS THAT FAIR?

20   A.   YES.

21   Q.   OKAY.   NOW, THESE FLAWS THAT EXISTED IN THE WHATSAPP CODE,

22   THOSE WERE PREEXISTING FLAWS BOTH ON THE CLIENT SIDE AND ON THE

23   SERVER SIDE; CORRECT?

24   A.   YES, THOSE WERE PREEXISTING BEFORE THE ATTACK.

25   Q.   ALL RIGHT.   ON PAGE 5 OF THIS DOCUMENT, THERE'S A

1     PARAGRAPH IN THE MIDDLE OF THE PAGE THAT MR. -- HELP ME WITH

2     HIS NAME.  IS IT LABUNETS?

3     A.   ANDREY LABUNETS.

4     Q.   LABUNETS, THANK YOU.

5          AND HE SAYS, "SCOPE AFFECTED USERS."

6          DO YOU SEE THAT?

7     A.   YES.

8     Q.   AND HE SAYS -- HE STARTS BY SAYING "WE GOT A LIST OF

9     AFFECTED PEOPLE BASED ON PHONE NUMBERS."

10          MR. PEREZ:  OBJECTION, YOUR HONOR.  MIL 1.  WE'RE

11     GETTING INTO --

12          THE COURT:  I'M SORRY.  I'M STILL ON THE LAST

13     EXHIBIT.

14       WHERE ARE WE NOW?

15          MR. AKROTIRIANAKIS:  IT'S PAGE 5, YOUR HONOR.  I WAS

16     JUST GOING TO READ THE FIRST CLAUSE.  THIS IS EXHIBIT 10 IN

17     EVIDENCE.

18          THE COURT:  EXHIBIT 10.

19          MR. PEREZ:  WE NEED TO TAKE THAT DOWN.

20          THE COURT:  OKAY.  EXHIBIT 10.  AND -- OKAY.

21          MR. AKROTIRIANAKIS:  PAGE 5, SCOPE.

22          THE COURT:  AND WHAT WHY ARE?

23          MR. AKROTIRIANAKIS:  IN THE MIDDLE OF THE PAGE,

24     YOUR HONOR.  IT SAYS, "SCOPE OF AFFECTED USERS," AND I WAS

25     GOING TO ASK THE WITNESS WHEN THEY WERE ABLE TO IDENTIFY THE

1    VULNERABILITIES, WHICH I THINK IS OBVIOUS.

2              MR. PEREZ:  YOUR HONOR, SQUARELY UNDER MIL 1, VICTIM

3    IDENTITIES.

4              THE COURT:  I'M SORRY.  MIL 1 HAS TO DO WITH NSO'S

5    CUSTOMERS?

6              MR. PEREZ:  SORRY.  I MAY BE CITING THE WRONG MIL,

7    YOUR HONOR.

8         IT'S ACTUALLY MIL 6 IS VICTIM IDENTITIES.

9              MR. AKROTIRIANAKIS:  I CAN DO IT WITHOUT THE

10   DOCUMENT.

11        THE DOCUMENT IS IN EVIDENCE, BUT I CAN DO THIS WITHOUT THE

12   DOCUMENT.

13             THE COURT:  OKAY.  BUT KEEPING IN MIND MIL 6.  YOU'RE

14   NOT GOING TO GET INTO THE --

15             MR. AKROTIRIANAKIS:  I'M NOT GOING TO GET INTO THAT.

16   I WAS JUST GOING TO ASK HIM THE TIME IT WAS THAT THEY WERE ABLE

17   TO SCOPE THE AFFECTED USERS AS MR. LABUNETS SAID.

18             THE COURT:  OKAY.  THAT'S FINE.

19   BY MR. AKROTIRIANAKIS:

20   Q.   ALL RIGHT.  WITHOUT LOOKING AT THE DOCUMENT, THE JURY, BUT

21   YOU ARE LOOKING AT EXHIBIT 10, PAGE 5; RIGHT, MR. GHEORGHE?

22   A.   GIVE ME ONE MOMENT.

23   Q.   SURE.

24        I THINK SHE CAN DO IT WHERE YOUR SCREEN IS LIVE.

25             THE CLERK:  YEAH, HE CAN PUT IT BACK UP BECAUSE IT'S

1      NOT PUBLISHING TO THE JURY.

2              THE WITNESS:  I CAN SEE IT ON THE SCREEN NOW.

3      BY MR. AKROTIRIANAKIS:

4      Q.   OKAY.  AND THE -- MR. LABUNETS WRITES THAT "WE GOT A LIST

5      OF AFFECTED PEOPLE BASED ON PHONE NUMBERS."

6           DO YOU SEE THAT?

7      A.   YES.

8      Q.   ALL RIGHT.  AND THAT WAS, THE SCOPE OF AFFECTED USERS, IT

9      WAS IDENTIFYING THE AFFECTED USERS?

10     A.   YES.  IT WAS ONE OF THE GOALS THAT WE HAD AS PART OF THE

11     INVESTIGATION.

12     Q.   OKAY.  AND ONE OF THE -- AND THE WAY THAT YOU DID THAT IS

13     THAT YOU WERE ABLE TO DO A SEARCH FOR WHEN THIS CODE HAD GONE

14     THROUGH WHATSAPP SERVERS; CORRECT?

15     A.   SORRY.  WILL YOU PLEASE REPEAT THE QUESTION AGAIN.

16     Q.   HOW WAS IT -- WELL, FIRST, THIS WAS ON MAY 8TH, 2019 AT

17     10:54.

18          DO YOU SEE THAT?

19     A.   YES.

20     Q.   ALL RIGHT.  AND DO YOU KNOW HOW IT WAS THAT MR. LABUNETS,

21     BY MAY 8TH, 2019 AT 10:54, WAS ABLE TO HAVE A LIST OF AFFECTED

22     PEOPLE?

23     A.   YES, I KNOW EXACTLY HOW WE GOT THAT.

24          SO WE --

25     Q.   PLEASE TELL THE JURY.

1    A.   SO WE BASICALLY WERE USING THE LOGGING FOR ALL THE

2    SUSPICIOUS MESSAGES THAT WERE ESSENTIALLY INITIATED WHAT WE

3    THOUGHT WAS AN ATTACK, AND AS PART OF THAT LOGGING, WE LOGGED

4    PHONE NUMBERS OF THE VICTIMS, AND ALSO OTHER METADATA

5    ASSOCIATED WITH THEM, LIKE THEIR DEVICE, WHETHER IT WAS ANDROID

6    OR AN IPHONE OR THE COUNTRY WHERE THEY'RE LOCATED, AND MAYBE A

7    COUPLE OTHER METADATA FIELDS THAT I DON'T REMEMBER RIGHT NOW.

8         BUT IT WAS A RESULT OF THE LOGGING THAT WE DID.

9    Q.   OKAY.  THAT WAS SOMETHING YOU WERE ABLE TO DO BETWEEN

10   MAY 2 AND SOME DATE PRIOR TO MAY 8TH, 2019; CORRECT?

11   A.   YES.

12   Q.   ALL RIGHT.  NOW, JUST ONE MORE QUESTION ABOUT THIS

13   DOCUMENT.

14        ON PAGE 6 -- AND MAY I PUBLISH, YOUR HONOR?  MAY WE

15   PUBLISH?

16             THE COURT:  PAGE 6.

17             MR. AKROTIRIANAKIS:  6, IN THE MIDDLE OF THE PAGE,

18   MR. GHEORGHE HIMSELF WRITES AN ENTRY, ABOUT THE MIDDLE OF THE

19   PAGE, JUST BELOW ACTUALLY.

20             THE COURT:  STARTING WITH "WE CONFIRM"?

21             MR. AKROTIRIANAKIS:  WE CONFIRM, YES.

22             THE COURT:  I THINK THAT'S ALREADY BEEN DISCUSSED, SO

23   YES.

24             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

25   Q.   YOU WROTE, ON MAY 10TH, 2019, "WE CONFIRMED THAT THE

1    EXISTING EXPLOIT IS CURRENTLY FIXED.  NEXT STEPS:"

2         DO YOU SEE THAT?

3    A.   YES.

4    Q.   AND THIS WAS SOMETHING ABOUT IPHONE BY MONDAY.

5         DO YOU SEE THAT?

6    A.   THAT LINE REFERS TO BOTH ANDROID AND IPHONE.

7    Q.   RIGHT.  ONE OF THE THINGS THAT YOU WERE WORKING ON AS A

8    FIX FOR IPHONES?

9    A.   BOTH ANDROID AND IPHONE.  I THINK BY MONDAY REFERS TO BOTH

10   ANDROID AND IPHONE.

11   Q.   OKAY.  YOU HAD FIXED THE ANDROID PART OF IT BY MAY 10TH?

12   A.   IT SAYS THAT IT WOULD LIKELY BE AVAILABLE ON MAY 10TH, BUT

13   WE DIDN'T HAVE IT YET.

14   Q.   WHAT IS THE -- WHAT WERE YOU CONFIRMING ON MAY 10TH THAT

15   THE EXISTING EXPLOIT IS CURRENTLY FIXED?

16   A.   WE WERE CONFIRMING THAT OUR SERVER CHANGE ON THE RELAY WAS

17   MAKING THE EXPLOIT TO NOT WORK ANYMORE.

18   Q.   OKAY.  AND THAT WAS BY MAY 10TH, AND THEN YOU WORKED ON

19   SOMETHING, INCLUDING SOMETHING RELATIVE TO IPHONE, HOPEFULLY TO

20   PUSH OUT BY MONDAY; CORRECT?

21   A.   BOTH ANDROID AND IPHONE, AND WE WOULD ALSO -- OVER THE

22   WEEKEND, WE MONITORED OUR SERVER LOGS IN ORDER TO CONFIRM THAT

23   THE ATTACK WAS FIXED.

24        SO THE PATTERN OF THE ATTACK CHANGED AFTER WE DEPLOYED

25   THAT FIX ON FRIDAY.

1    Q.   YOU DEPLOYED A FIX ON FRIDAY.  YOU DIDN'T DEPLOY A FIX ON

2    MAY 13TH, OR DID YOU?

3    A.   THAT WAS THE SECOND.  SO THERE WAS, LIKE, THREE FIXES IN

4    TOTAL:  THIS WAS THE CLIENT FIX, THE RELAY FIX, AND THE

5    SIGNALLING FIX.

6    Q.   I SEE.  AND YOUR TESTIMONY IS THAT THERE WAS A SEPARATE

7    CLIENT FIX FOR IPHONE?

8    A.   IT WAS THE SAME FIX FOR BOTH ANDROID AND IPHONE, BUT THEY

9    WERE BEING RELEASED SEPARATELY BECAUSE THEY'RE DIFFERENT

10   SYSTEMS TO RELEASE.

11   Q.   NOW, THE CODE THAT WE WERE TALKING ABOUT THAT WE SAW

12   EARLIER, THAT IS SPECIFIC TO ANDROID; CORRECT?

13   A.   THE CODE THAT WE SAW -- YOU MEAN THE MALICIOUS CODE?

14   Q.   THE CODE THAT WE SAW IN THE DOCUMENT, THE HEXADECIMAL

15   CODE, ALL THAT THAT MR. IBRAHIM WAS TALKING ABOUT, THAT IS

16   ANDROID-SPECIFIC CODE; CORRECT?

17   A.   IT IS ANDROID SPECIFIC.

18   Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT EXAMINATION ABOUT A

19   NUMBER OF THE PEOPLE WHO WORKED ON THE PROJECT.

20        DO YOU RECALL THAT TESTIMONY?

21   A.   YES.

22   Q.   AND I WON'T GO THROUGH ALL OF THEM, BUT DID I UNDERSTAND

23   YOU CORRECTLY TO SAY THAT MR. ALTENMUELLER WORKED SPORADICALLY?

24   A.   YES.  BY SPORADIC, I MEAN HE WAS INVOLVED JUST WITH ONE

25   TASK THAT WE NEEDED IN THE INVESTIGATION.

1    Q.   YOU IDENTIFIED A NUMBER OF OTHERS, MENG ZHANG -- I'LL GIVE

2    YOU THE SPELLINGS -- ANDY YANG, MINGSONG BI, SPELLED B-I, WHO

3    ALSO WERE NOT WORKING FULL TIME; CORRECT?

4    A.   YES.

5    Q.   YOU SAID THAT NASRIN -- HOW DO YOU PRONOUNCE THAT?

6    A.   NASRIN.

7    Q.   YEAH, JALEEL, RIGHT, J-A-L-E-E-L?

8    A.   YES, I THINK THAT SOUNDS RIGHT.

9    Q.   AND HE BRIEFLY WORKED ON ONE TASK?

10   A.   SHE.

11   Q.   I BEG YOUR PARDON.

12       MS. JALEEL BRIEFLY WORKED ON ONE TASK, ACCORDING TO YOUR

13   TESTIMONY?

14   A.   YES.

15   Q.   DID YOU SAY THAT MR. WANG, YUANYUAN WANG, WORKED FULL TIME

16   FOR THE -- WORKED FULL TIME -- WORKED THROUGHOUT THE -- WELL,

17   WERE YOU SAYING THAT HE WAS WORKING FULL TIME THROUGHOUT THE

18   ENTIRE PERIOD, OR THAT HE WORKED THROUGHOUT THE ENTIRE PERIOD,

19   BUT NOT FULL TIME?

20   A.   HE WAS INVOLVED THROUGHOUT THE ENTIRE INVESTIGATION.  SO

21   HE WAS THE MOST -- ONE OF THE MOST SENIOR PEOPLE IN THE CLIENT

22   TEAM.  SO I WAS RELYING ON YUANYUAN FOR ANY CHANGES OR INSIGHTS

23   INTO HOW THE CLIENT WORKS.

24       SO I CAN'T REMEMBER EXACTLY, LIKE, EVERY DAY WHAT HE DID.

25   BUT I WOULD RELY ON HIM ALMOST EVERY DAY THROUGHOUT THE

1    INVESTIGATION.  SO I CONSIDERED HIM BEING PART OF THE, BOTH THE

2    INVESTIGATION -- THE UNDERSTANDING OF THE TECH, AND ALSO THE

3    REMEDIATION.  SO HE WAS INVOLVED PRETTY MUCH ALL THE TIME.

4    Q.   THROUGHOUT THE ENTIRETY OF YOUR INVESTIGATION?

5    A.   YES.

6    Q.   RIGHT.  BUT MY QUESTION IS A LITTLE BIT DIFFERENT.  I'M

7    JUST TRYING TO UNDERSTAND IF YOUR TESTIMONY IS THAT HE WAS

8    WORKING FULL TIME AND NOT DOING ANYTHING ELSE, OR IF HE WORKED

9    MAYBE ON THIS EVERY DAY, BUT NOT FULL TIME?

10   A.   SO I ACTUALLY DON'T KNOW IN A LOT OF DETAIL WHAT YUANYUAN

11   WAS DOING.  LIKE, WE -- WE WERE FIRE FIGHTING THIS, RIGHT?  SO

12   I WAS EXTREMELY BUSY.  WHATEVER I -- I HAD A LOT OF STUFF GOING

13   ON, SO MY GOAL AT THAT POINT WAS NOT TO TRACK WHAT PEOPLE WERE

14   DOING, WHAT EACH PERSON IN THE INVESTIGATION WAS DOING.

15        SO THAT BEING SAID, I DON'T KNOW WHETHER HE -- THE ONLY

16   THING THAT HE DID THROUGHOUT THE ENTIRE INVESTIGATION WAS THIS

17   INVESTIGATION.  THAT I DON'T KNOW.

18   Q.   OKAY.  MR. -- I'M SORRY, XI, X-I?

19   A.   XI DENG.

20   Q.   IS THAT MS. OR MR. DENG?

21   A.   MISTER.

22   Q.   MR. DANG, YOU SAID THAT HE WORKED THROUGHOUT THE ENTIRE

23   PERIOD, BUT NOT FULL TIME.  SO HIM YOU DO KNOW ABOUT; CORRECT?

24   A.   YES.

25   Q.   ALL RIGHT.  AND THERE'S A MR. SHEN, ROGER SHEN; IS THAT

 1   CORRECT?

 2   A.   YES.  ROGER WAS --

 3   Q.   I'M SORRY, MR. GHEORGHE, IF I COULD?

 4        YOU TESTIFIED THAT HE HAD SPECIFIC PROJECTS, NOT ALL THE

 5   TIME, SPORADIC.  THAT WAS YOUR TESTIMONY ON DIRECT EXAMINATION;

 6   CORRECT?

 7   A.   YES.

 8   Q.   AND THERE WAS A PERSON NAMED JOHN, AND I JUST DIDN'T WRITE

 9   FAST ENOUGH.  I KNOW IT'S NOT JOHN ALTENMUELLER BECAUSE WE

10   ALREADY COVERED HIM.

11        DO YOU REMEMBER ANOTHER PERSON NAMED JOHN?

12   A.   JOHN SHELLER PERHAPS.

13   Q.   OKAY.  HE SAID -- HE, HE ALSO TESTIFIED TO, WORKED

14   SPORADICALLY; CORRECT?

15   A.   YES.

16   Q.   IGOR, WHICH IS MR. MILYAKOV -- DID I SAY HIS NAME

17   CORRECTLY?

18   A.   MILYAKOV.

19   Q.   THANK YOU.  M-I-L-Y-A-K-O-V FOR THE RECORD.

20        YOU SAID YOU CAN'T REMEMBER WHAT HE WAS DOING, BUT HE

21   WORKED A DAY OR TWO; CORRECT?

22   A.   YES.

23   Q.   AND THERE'S ANOTHER GENTLEMEN NAMED MR. THANGAVEL,

24   T-H-A-N-G-A-V-E-L, AND YOU PRONOUNCED HIS FIRST NAME ARAVIND,

25   IF I HEARD YOU CORRECTLY?

1    A.   YES.

2    Q.   OKAY.  YOU SAID THAT HE WAS VERY INVOLVED, BUT NOT FULL

3    TIME; CORRECT?

4    A.   YES.

5    Q.   ALL RIGHT.  NOW, I WANT TO MOVE TO KIND OF ONE MORE

6    AREA -- WELL, THERE'LL BE MORE AREAS, BUT I'M GOING TO MOVE TO

7    A DIFFERENT ONE NOW.

8         YOU REFERRED TO KNOWING ABOUT SOMETHING BECAUSE OF

9    CRASHES.

10        DO YOU REMEMBER THAT TESTIMONY?

11   A.   WILL YOU BE A LITTLE MORE SPECIFIC ABOUT THE CRASHES?

12   Q.   YEAH.  YOU MENTIONED SOMETHING OR OTHER ABOUT CRASHES AND

13   THAT THERE WERE CRASH LOGS OR SOMETHING?

14   A.   YES.  SO AS PART OF THE ATTACK, SOME OF THE ATTACK

15   ATTEMPTS WOULD FAIL, AND THE WAY THEY WOULD FAIL IS THEY WOULD

16   CAUSE THE APP OF THE VICTIM TO CRASH.

17        AND WHENEVER A CRASH HAPPENED, IT WOULD BE LOGGED THROUGH

18   THE WHATSAPP SERVER.  SO THAT WAS REALLY USEFUL INFORMATION FOR

19   US TO USE IN IDENTIFYING HOW THE ATTACK WORKS BECAUSE THE --

20   WITH THE CRASH, THERE'S SORT OF A SNAPSHOT OF THE VICTIM'S

21   APPLICATION, AND THAT SNAPSHOT CONTAINED A LOT OF INTERESTING

22   DETAILS THAT WE COULD USE IN THE UNDER -- IN UNDERSTANDING THE

23   TECH.

24   Q.   I JUST HAVE ONE QUESTION ABOUT THAT, TO BE VERY CLEAR

25   ABOUT.  THAT CRASH IS ON THE CLIENT APP?  IT IS NOT ON THE

1    WHATSAPP SERVER; CORRECT?

2    A.   YES, THAT'S CORRECT.

3    Q.   ALL RIGHT.  NOW, I FORGOT ONE.

4         ABY JOHN, OR ABY JOHN, HOW DOES THE --

5    A.   ABY JOHN.

6    Q.   AND IT'S A GENTLEMAN; RIGHT?

7    A.   YES, IT'S A GENTLEMAN.

8    Q.   YOU SAID THAT HE WORKED A LITTLE.

9         THAT WAS YOUR TESTIMONY; CORRECT?

10   A.   HE WAS DOING SOME COORDINATION WORK AND HELPING ME OUT

11   WITH THE COORDINATION.  I DON'T REMEMBER EXACTLY ALL THE DATES

12   HE WAS INVOLVED.  I DO REMEMBER THAT HE GOT INVOLVED, LIKE,

13   LATER IN THE INVESTIGATION.

14        SO DEFINITELY IN THE INITIAL DAYS OF THE INVESTIGATION, I

15   DON'T THINK HE WAS INVOLVED AT THAT POINT.

16        BUT, AGAIN, I DON'T REMEMBER EXACT DAYS AND WHEN HE

17   STARTED BEING INVOLVED.

18   Q.   I'M JUST ASKING YOU THAT, ON DIRECT EXAMINATION, YOUR

19   TESTIMONY WAS THAT MR. JOHN, QUOTE, WORKED A LITTLE, UNQUOTE;

20   CORRECT?

21   A.   HE WORKED SPORADICALLY.  LET ME SAY IT THAT WAY.

22   Q.   FAIR.

23        ALL RIGHT.  NOW, EARLIER, SORT OF NEAR THE END OF YOUR

24   DIRECT TESTIMONY, YOU WERE TALKING ABOUT BYPASSING OF SYSTEM

25   LEVEL PROTECTIONS, MODIFYING THE APPLICATION, CHANGING THE

1      MEMORY, AND THEN YOU USED THE WORD "HIJACKED" AT SOME POINT,

2      WHICH WAS A REFERENCE TO THE TERMINATION OF THE CALL AND

3      DISAPPEARING THE CALL FROM THE TARGET DEVICE.

4          DO YOU RECALL THAT TESTIMONY?

5      A.   IT WAS -- IT WASN'T RELATED TO THE DISAPPEARING OF THE

6      CALL.

7          IT WAS RELATED WITH THE TERMINATION OF THE CALL.

8          SO TERMINATION OF THE CALL HAPPENS WHEN YOU CALL SOMEONE

9      AND YOU JUST PRESS THE RED BUTTON.  THAT'S BASICALLY THE

10     TERMINATION OF THE CALL.

11     Q.   OH.  IT WAS AFTER THE TERMINATION OF THE CALL, THE CLEAN

12     UP AS YOU CALLED IT?

13     A.   YES, SO --

14     Q.   I'M SORRY.  LET ME JUST, IF I COULD.  ALL OF THOSE THINGS

15     THAT I'VE NOW MENTIONED ARE THINGS THAT ARE HAPPENING ON THE

16     CLIENT DEVICE, I'M SORRY, ON THE CLIENT APP ON THE TARGET

17     PHONE; CORRECT?

18     A.   YES, THAT'S CORRECT.

19     Q.   NOT ON THE WHATSAPP SERVERS, TO BE CLEAR?

20     A.   YES, NONE OF THEM HAPPENED ON THE WHATSAPP SERVER.

21     Q.   ALL RIGHT.  THERE IS A BINDER THERE BEFORE YOU THAT HAS AN

22     EXHIBIT 1148 IN IT.

23         DO YOU HAVE IT BEFORE YOU, SIR?

24     A.   YES, I FOUND IT.

25     Q.   OKAY.  AND THIS DOCUMENT IS A DOCUMENT YOU RECOGNIZE;

1     RIGHT?

2     A.   YES.  THIS IS A DOCUMENT THAT WE REFER TO INTERNALLY AS A

3     WHITE PAPER OF THE ATTACK.

4     Q.   OKAY.  SO I'LL CALL IT THE WHITE PAPER, AND YOU'LL KNOW

5     WHAT I'M TALKING ABOUT, EXHIBIT 1148; RIGHT?

6     A.   YES.

7     Q.   OKAY.  NOW, YOU CONTRIBUTED TO THE PREPARATION OF THIS

8     DOCUMENT?

9     A.   I WAS NOT ONE OF THE AUTHORS OF THE DOCUMENT.  I -- IT WAS

10    WRITTEN BY, LARGELY BY SECURITY ENGINEERS, ANDREY LABUNETS AND

11    OTTO EBELING.

12         MY CONTRIBUTION OF IT WAS TO REVIEW, SO I DID REVIEW THE

13    DOCUMENT, AND I PROVIDED SOME FEEDBACK.

14         IT IS POSSIBLE THAT I MAY HAVE EVEN HAD MINOR

15    CONTRIBUTION, LIKE WROTE MAYBE ONE PARAGRAPH.

16         BUT I CAN'T REMEMBER THE DETAILS.

17    Q.   AND YOU BELIEVE THAT THE CONTENTS OF THIS DOCUMENT ARE

18    ACCURATE; CORRECT?

19              MR. PEREZ:  OBJECTION TO FOUNDATION, YOUR HONOR.

20              THE COURT:  SUSTAINED.

21    BY MR. AKROTIRIANAKIS:

22    Q.   YOU'VE REVIEWED THIS DOCUMENT, BOTH IN PREPARATION FOR

23    YOUR DEPOSITION LAST SUMMER AND YOUR TESTIMONY TODAY; CORRECT?

24    A.   SO I -- I CANNOT SAY IT WAS 100 PERCENT ACCURATE.  LIKE, I

25    THINK IT WAS BASICALLY -- IT REFLECTS THE UNDERSTANDING OF THE

1     SECURITY ENGINEERS OF HOW THE ATTACK WORKED AT THAT TIME.

2     Q.   WELL, EXHIBIT 1148 REFLECTS THE UNDERSTANDING OF FACEBOOK

3     AND WHATSAPP AS TO THE TECHNICAL ANALYSIS OF THE WHATSAPP

4     ZERO-CLICK EXPLOIT; CORRECT?

5            MR. PEREZ:  SAME OBJECTION, YOUR HONOR, TO

6     FOUNDATION.

7            THE COURT:  I THINK HE'S EXPLAINED WHAT HIS KNOWLEDGE

8     AND UNDERSTANDING IS BASED UPON.

9        I DON'T KNOW THAT HE CAN GIVE YOU MORE INFORMATION,

10    COUNSEL.

11    BY MR. AKROTIRIANAKIS:

12    Q.   DID YOU TESTIFY AT YOUR DEPOSITION THAT YOU BELIEVED THAT

13    THIS DOCUMENT, EXHIBIT 1148, IN FACT REFLECTED THE

14    UNDERSTANDING OF FACEBOOK AND WHATSAPP OF THE TECHNICAL

15    ANALYSIS OF THE WHATSAPP ZERO-CLICK EXPLOIT?

16    A.   YES, I THINK IT REFLECTED THE UNDERSTANDING AT THAT POINT

17    IN TIME OF THE TECH.

18    Q.   OKAY.  AND THE POINT IN TIME WE'RE TALKING ABOUT IS

19    OCTOBER 2019?

20    A.   YES.

21    Q.   OKAY.  INCIDENTALLY, YOU WERE NOT JUST TESTIFYING IN YOUR

22    PERSONAL CAPACITY AT YOUR DEPOSITION ABOUT THIS SUBJECT, BUT

23    ALSO TO THE KNOWLEDGE OF THE ENTIRE COMPANY, BOTH COMPANIES

24    REALLY, ON THIS PARTICULAR TOPIC, THE TECHNICAL ANALYSIS OF THE

25    WHATSAPP ZERO-CLICK EXPLOIT; CORRECT, MR. GHEORGHE?

1     A.   YES.  BUT JUST TO BE CLEAR, I'M NOT A SECURITY EXPERT, AND

2     I DID NOT AUTHOR THE DOCUMENT, SO --

3     Q.   OKAY.  YOU WERE DESIGNATED BY THE PLAINTIFFS TO GIVE

4     BINDING TESTIMONY ON THEIR BEHALF AS TO HOW THE COMPANY

5     UNDERSTOOD HOW PEGASUS WORKED.

6          THAT WAS YOUR UNDERSTANDING AT THE TIME YOU GAVE YOUR

7     DEPOSITION IN THIS CASE; CORRECT, MR. GHEORGHE?

8     A.   NO.  MY TESTIMONY WAS NOT ABOUT HOW PEGASUS WORKED.  I

9     ACTUALLY DON'T KNOW HOW PEGASUS WORKS IN DETAIL.

10    Q.   DO YOU RECALL THAT -- WELL, I'LL JUST READ FROM YOUR

11    DEPOSITION.

12         I'LL COME BACK TO THIS, YOUR HONOR.

13         DO YOU BELIEVE THAT EXHIBIT 11 -- WELL, I'LL OFFER

14    EXHIBIT 1148 WITH THE FOUNDATION LAID BY THE WITNESS,

15    YOUR HONOR.

16              THE COURT:  ALL RIGHT.  ANY OBJECTION?

17              MR. PEREZ:  I'M NOT SURE WHAT THEY'RE USING IT FOR

18    YET, YOUR HONOR.

19              THE COURT:  WELL, COUNSEL --

20              MR. PEREZ:  I'M SORRY, 1148?  NO, 1148 WE DO HAVE AN

21    OBJECTION UNDER MIL 5.  THERE ARE PORTIONS OF THAT DOCUMENT

22    THAT SHOULD BE REDACTED BEFORE BEING PUBLISHED TO THE JURY.

23              MR. AKROTIRIANAKIS:  I'M NOT GOING TO PUBLISH IT.

24              THE COURT:  YOU'RE NOT GOING TO PUBLISH IT NOW?

25              MR. AKROTIRIANAKIS:  I WILL ASK ON A PAGE-BY-PAGE

1    BASIS SO THAT WE CAN AVOID ANY ISSUES.

2          THE COURT:  OKAY.  WHY DON'T WE, IF WE'RE GOING TO DO

3    IT ON A PAGE-BY-PAGE BASIS, YOU CAN OBJECT IF THERE'S ANY

4    PARTICULAR INFORMATION ON THAT PARTICULAR PAGE.

5          MR. PEREZ:  I WILL TRY, YOUR HONOR.

6          THE COURT:  OKAY.  ALL RIGHT.  SO --

7          MR. AKROTIRIANAKIS:  IS IT RECEIVED, YOUR HONOR?

8          THE COURT:  YEAH.  WELL, NO, I HAVEN'T RECEIVED IT

9    YET.  WE'RE GOING TO DO IT PAGE BY PAGE AS YOU INDICATED.

10        WHAT'S YOUR FIRST REFERENCE, WHICH PAGE?

11         MR. AKROTIRIANAKIS:  I'M NOT GOING TO WALK THROUGH

12   THE DOCUMENT, YOUR HONOR.

13        I WAS GOING TO JUST ASK HIM IF HE RECOGNIZES IT, MOVE IT

14   INTO EVIDENCE, AND WE CAN DEAL WITH ANY OTHER ISSUES AT ANOTHER

15   TIME.

16         THE COURT:  OKAY.  YOU'RE NOT GOING TO SHOW ANY OF IT

17   NOW.

18         MR. AKROTIRIANAKIS:  WITH THE COURT'S PERMISSION, I

19   WILL SHOW JUST THE FIRST PAGE.

20         THE COURT:  I WILL --

21         MR. AKROTIRIANAKIS:  THAT HAS NO SUBSTANTIVE

22   INFORMATION.

23         THE COURT:  OKAY.  ANY OBJECTION TO THE FIRST PAGE?

24         MR. PEREZ:  NOT THE TITLE PAGE.  BUT WE DO OBJECT TO

25   IT BEING ENTERED INTO EVIDENCE IN AN UNREDACTED FORM.

1          THE COURT:  OKAY.  WE'LL SIMPLY PROVISIONALLY ALLOW

2     IT TO BE USED WITHOUT BEING PUBLISHED AT THIS TIME, COUNSEL,

3     AND THEN WE'LL TALK ABOUT WHAT NEEDS TO BE REDACTED.

4          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

5       I'M SORRY.  YOU'LL NOT LET IT BE PUBLISHED AT THIS TIME?

6          THE COURT:  NOT AT THIS TIME.

7          MR. AKROTIRIANAKIS:  OKAY.

8          THE COURT:  UNLESS YOU WANT TO DO IT, A PAGE, SO THAT

9     COUNSEL CAN LOOK AT IT FIRST.

10         MR. AKROTIRIANAKIS:  I JUST WANTED TO SHOW JUST THIS

11    ONE PAGE SO I CAN ASK HIM WHO THESE PEOPLE ARE.

12         THE COURT:  OH, THE COVER PAGE.

13         MR. AKROTIRIANAKIS:  WHOSE NAMES ARE LISTED AS

14    AUTHORS, YOUR HONOR.

15         THE COURT:  OH, THE COVER PAGE.  HE SAID HE DOES NOT

16    OBJECT TO THE COVER PAGE.  THAT'S FINE.  YOU CAN PUBLISH IT.

17         MR. AKROTIRIANAKIS:  OKAY.  THEN MAY I OFFER JUST THE

18    COVER PAGE, I SUPPOSE?

19         THE COURT:  YES.

20         MR. AKROTIRIANAKIS:  OKAY.  THANK YOU, YOUR HONOR.

21         THE COURT:  THE COVER PAGE IS ADMITTED.

22        (DEFENDANTS' EXHIBIT 1148, COVER PAGE ONLY, WAS ADMITTED

23    IN EVIDENCE.)

24    BY MR. AKROTIRIANAKIS:

25    Q.  ALL RIGHT.  THIS IS THE COVER PAGE OF THE WHITE PAPER THAT

1    WE'VE BEEN TALKING ABOUT, THE TECHNICAL ANALYSIS OF WHATSAPP

2    ZERO-CLICK EXPLOIT.

3         DO YOU SEE THAT?

4    A.   YES.

5    Q.   ALL RIGHT.  AND MR. LABUNETS, MR. EBELING, ANOTHER PERSON

6    WHO'S NAME IS COVERED WITH THE REDACTING BOX, AND MR. TISZKA

7    ARE THE FORMALLY LISTED AUTHORS OF THIS TECHNICAL ANALYSIS; IS

8    THAT RIGHT?

9    A.   YES.

10   Q.   ALL RIGHT.  AND THIS IS A DOCUMENT THAT YOU REVIEWED AND

11   PROVIDED FEEDBACK ON AT OR ABOUT THE TIME IT WAS PUBLISHED IN

12   OCTOBER 2019?

13   A.   YES.  I REMEMBER I REVIEWED THIS DOCUMENT AT THAT TIME.

14   Q.   AND THESE GENTLEMEN ARE SECURITY ENGINEERS EMPLOYED BY

15   FACEBOOK; IS THAT RIGHT?

16   A.   YES.  ALL THE PEOPLE ON THIS LIST ARE A MEMBER OF THE --

17   ARE MEMBERS OF THE FACEBOOK SECURITY TEAM.

18   Q.   AND MR. MOHAMED, IBRAHIM MOHAMED, WHOSE NAME WE SAW IN

19   OTHER DOCUMENTS OFFERED BY PLAINTIFFS, HE ALSO IS A SECURITY

20   ENGINEER AT FACEBOOK; CORRECT?

21   A.   YES.  IBRAHIM WAS A TEAMMATE OF OTTO EBELING.

22   Q.   OKAY.  SO, YES, HE WAS A FACEBOOK SECURITY ENGINEER?

23   A.   YES.

24   Q.   ALL RIGHT.  CAN YOU TURN IN YOUR OTHER BOOK THAT YOU HAVE

25   THERE TO EXHIBIT 9.

1    A.   LIKE THE DIRECT?

2    Q.   IT SAYS -- ON THE COVER, IT SAYS GHEORGHE, YOUR NAME, ON

3    DIRECT.

4    A.   YEAH.

5    Q.   AND THERE'S AN EXHIBIT 9.

6         THIS IS ANOTHER DOCUMENT TO WHICH YOU CONTRIBUTED.

7         AM I CORRECT, MR. GHEORGHE?

8    A.   I ALSO REVIEWED THIS DOCUMENT, BUT DID I NOT AUTHOR IT.

9    SO IT WAS CREATED BY SECURITY ENGINEERS.

10   Q.   AT FACEBOOK?

11   A.   YES.

12   Q.   AND YOU REVIEWED THE DOCUMENT AND OFFERED COMMENTARY ON IT

13   AT THE TIME THAT IT WAS PREPARED; TRUE?

14   A.   YES, I DID REVIEW THE DOCUMENT.

15   Q.   ALL RIGHT.  AND THIS DOCUMENT, THE OTHER COLLABORATORS ON

16   THIS DOCUMENT WERE THE SAME FACEBOOK SECURITY ENGINEERS WHOSE

17   NAMES WE JUST SAW ON THE COVER PAGE OF EXHIBIT 1148; CORRECT?

18   A.   THAT I DON'T REMEMBER EXACTLY.  I KNOW THAT

19   ANDREY LABUNETS AND OTTO EBELING WERE INVOLVED WITH THIS

20   PRESENTATION.  BUT I DON'T KNOW IN DETAIL, LIKE, HOW THEY

21   COLLABORATED ON IT.

22        MR. AKROTIRIANAKIS:  YOUR HONOR, DOES THE COURT HAVE

23   A COPY OF THE WITNESS'S DEPOSITION?

24        THE COURT:  YEAH.

25        MR. AKROTIRIANAKIS:  MAY I APPROACH THE CLERK?

```
1              THE COURT:  YES.

2              MR. AKROTIRIANAKIS:  (HANDING.)

3         I'LL DO IT A DIFFERENT WAY ACTUALLY, YOUR HONOR.

4    Q.   YOU REMEMBER, EVEN NOW, WITHOUT YOUR MEMORY BEING

5    REFRESHED, THAT MR. EBELING AND MR. LABUNETS, AT LEAST, WERE

6    THE AUTHORS OF EXHIBIT 9; CORRECT?

7    A.   YES.  LOW CONFIDENCE ON OTTO EBELING, BUT HIGH CONFIDENCE

8    ON ANDREY LABUNETS.

9    Q.   OKAY.  AND MR. LABUNETS WAS SORT OF THE FACEBOOK LEAD ON

10   THE PROJECT, AND YOU WERE HIS COUNTERPART AT WHATSAPP, THE

11   WHATSAPP LEAD; IS THAT RIGHT?

12   A.   YES, WE COLLABORATED CLOSELY DURING THE INVESTIGATION.

13   Q.   AND SO IT'S FAIR TO SAY THAT YOU AND MR. LABUNETS WERE

14   LIKE THE TWO TEAM LEADERS THAT WERE, THAT WERE DIRECTING THE

15   REMEDIATION EFFORT; CORRECT?

16   A.   YES, BOTH THE UNDERSTANDING OF THE TECH AND THE

17   REMEDIATION.  THE REMEDIATION WAS MOSTLY ON ME, TO BE HONEST.

18   I DON'T THINK, I DON'T THINK ANDREY CONTRIBUTED MUCH TO THAT.

19        BUT DEFINITELY FOR THE UNDERSTANDING, IT WAS BOTH ME AND

20   HIM.

21   Q.   OKAY.  AND THIS DOCUMENT THAT WE'RE LOOKING AT NOW,

22   EXHIBIT 9, THIS WAS AN INTERNAL FACEBOOK AND WHATSAPP

23   PRESENTATION; CORRECT?

24   A.   YES.

25        JUST TO PROVIDE A LITTLE MORE CONTEXT, THIS WAS SORT OF
```

1    THE INTERNAL VERSION OF THE WHITE PAPER.  SO WE -- THE REASON

2    WHY WE WROTE THIS WAS TO PRESENT IT INTERNALLY TO THE FACEBOOK

3    ENGINEERS TO CREATE AWARENESS ABOUT WHAT HAPPENED INSIDE THE

4    COMPANY.

5    Q.   AND TO DISTINGUISH FROM THAT THE, THE WHITE PAPER WAS

6    DISTRIBUTED TO THE PUBLIC?

7    A.   THAT I DON'T KNOW.  I DON'T THINK IT WAS DISTRIBUTED TO

8    THE PUBLIC.  IT MAY HAVE BEEN PRESENTED OUTSIDE OF THE COMPANY.

9         I DO REMEMBER -- FOR INSTANCE, WE PRESENTED IT TO THE

10   GOOGLE PROJECT ZERO TEAM, WHICH IS ALSO A FAMOUS SECURITY TEAM

11   AT GOOGLE.

12        BUT I DON'T -- I ACTUALLY DON'T REMEMBER WHETHER WE MADE

13   THIS PUBLICLY AVAILABLE.  I DON'T THINK SO.

14   Q.   I'M NOT SUGGESTING THAT YOU MADE IT AVAILABLE TO THE

15   GENERAL PUBLIC, BUT YOU MADE IT AVAILABLE OUTSIDE OF WHATSAPP

16   AND FACEBOOK; CORRECT?

17   A.   THE WHITE PAPER?  YES.

18   Q.   THE OTHER -- TO BE CLEAR, THE PRESENTATION WAS AN INTERNAL

19   DOCUMENT?

20   A.   YES.

21   Q.   OKAY.

22        I OFFER EXHIBIT 9, YOUR HONOR.

23        MR. PEREZ:  YOUR HONOR, THIS IS THE DOCUMENT THAT, AS

24   PREVIOUSLY DISCUSSED, REQUIRES REDACTIONS FROM MIL 5.

25        THE COURT:  OKAY.  SO THERE ARE NO REDACTIONS

1    CURRENTLY IN THE DOCUMENT?  IS THAT WHAT YOU'RE SUGGESTING?

2            MR. AKROTIRIANAKIS:  THAT I THINK ON PAGE 4 IS THE

3    PAGE THAT THE COURT WOULD BE CONCERNED ABOUT, AND I THINK IT'S

4    BEEN ADDRESSED DURING THE LAST BREAK.

5            THE COURT:  OKAY.  AND WHAT ABOUT THE REST OF IT?

6    HAVE YOU ALL LOOKED AT IT CLOSELY ENOUGH TO KNOW?

7            MR. PEREZ:  WE HAVE NOT, YOUR HONOR, SO WE WOULD WANT

8    THE OPPORTUNITY TO MAKE SURE THAT IT'S PROPERLY REDACTED.

9            MR. AKROTIRIANAKIS:  THIS IS PLAINTIFFS' DOCUMENT,

10   YOUR HONOR.

11           MR. PEREZ:  THIS IS NOT A DOCUMENT WE HAVE OFFERED

12   INTO EVIDENCE.

13           THE COURT:  SURE, BUT THERE'S A LOT OF INFORMATION

14   THAT WE NEED TO BE CAREFUL ABOUT BASED UPON THE PRETRIAL -- THE

15   PRETRIAL RULINGS.

16           MR. AKROTIRIANAKIS:  SURE.  MAY I OFFER PAGE 1, THE

17   COVER PAGE, YOUR HONOR, AND PAGE 3 -- I'M SORRY -- PAGE 4.

18           THE COURT:  PAGE 1, WHICH JUST HAS THE TITLE; RIGHT?

19           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

20           THE COURT:  OKAY.  AND PAGE 4?

21           MR. AKROTIRIANAKIS:  IT'S THIS PAGE, YOUR HONOR.

22           MR. PEREZ:  THAT'S THE COURT --

23           THE COURT:  THAT'S THE ONE THAT WE'VE HAD SOME

24   DISCUSSION ABOUT, BUT WE DIDN'T RESOLVE YET.  WE'RE GOING TO

25   TALK ABOUT IT AFTER TODAY WHAT, IF ANY, OF THIS SHOULD BE

1     REDACTED.

2              MR. AKROTIRIANAKIS:  OKAY, YOUR HONOR.  I HAVE A

3     REDACTED VERSION I CAN OFFER AS EXHIBIT 1083.

4              THE COURT:  1083.

5              MR. PEREZ:  YOUR HONOR, WE HAVE NOT SEEN A REDACTED

6     VERSION.

7              THE COURT:  OKAY.  WELL, HE JUST POINTED IT OUT.  DO

8     WE HAVE 1083 IN FRONT OF US?

9         YES, I HAVE A 1083 IN MY BINDER.

10             MR. PEREZ:  PAGE 4, AS REDACTED, WE WOULD NOT HAVE AN

11    OBJECTION TO.

12             THE COURT:  OKAY.

13             MR. AKROTIRIANAKIS:  ALL RIGHT.  SO ON THE FOUNDATION

14    OFFERED BY THE WITNESS, I WOULD OFFER AT THE MOMENT,

15    YOUR HONOR, THE COVER PAGE, PAGE 1, AND PAGE 4, REDACTED, OF

16    EXHIBIT 1083.

17             THE COURT:  OKAY.  THOSE ARE ADMITTED.

18         (DEFENDANTS' EXHIBIT 1083, PAGE 1 AND REDACTED PAGE 4, WAS

19    ADMITTED IN EVIDENCE.)

20             MR. AKROTIRIANAKIS:  AND WOULD YOU PUBLISH, PLEASE,

21    THE COVER PAGE.

22    Q.   OKAY.  MR. GHEORGHE, NOW ON THE SCREEN BEFORE YOU IS

23    EXHIBIT 1083, BUT IT'S THE SAME AS THE EXHIBIT 9 THAT WE WERE

24    JUST LOOKING AT THAT'S IN THE BOOK BEFORE YOU; CORRECT?

25    A.   YES.  I'M LOOKING AT THE WITNESS BINDER RIGHT NOW.

1    Q.   OKAY.  LOOK IN THE BINDER AT EXHIBIT 9, IT'S PLAINTIFFS'

2    EXHIBIT NUMBER 9, SO IT WOULD BE YOUR DIRECT BINDER.

3         MR. PEREZ:  YOUR HONOR, WE WOULD JUST ASK THAT THE

4    WITNESS BE QUESTIONED FROM THE REDACTED VERSION THAT IS IN

5    EVIDENCE.

6         THE COURT:  WELL, THE ONLY ONE THAT CAN BE SHOWN IS

7    THE REDACTED VERSION IF YOU WANT IT PUBLISHED TO THE JURY.

8         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I'M JUST --

9    THE WITNESS HAS NOW TESTIFIED AT LENGTH ABOUT EXHIBIT 9.  I

10   JUST WANTED TO CONFIRM FOR THE TRIER OF FACT THAT IT'S THE SAME

11   FOUNDATION FOR THE DOCUMENT THAT'S NOW -- THAT'S NOW BEEN

12   RECEIVED IN EVIDENCE.

13        THE COURT:  OKAY.  BUT IT WON'T BE PUBLISHED.

14        MR. AKROTIRIANAKIS:  YES, YOUR HONOR, EXHIBIT 1083 IN

15   EVIDENCE WILL BE PUBLISHED.

16        THE COURT:  YES.

17        MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

18      AND ONLY PAGE 4, YOUR HONOR.

19        THE COURT:  RIGHT.

20   BY MR. AKROTIRIANAKIS:

21   Q.   YOU CAN CONFIRM THAT EXHIBIT 9 AND EXHIBIT 1083 ARE THE

22   SAME ALBEIT ONE HAS REDACTED BOXES OVER SOME OF THE CONTENT?

23   A.   I DON'T SEE ANY REDACTED BOXES, TO BE HONEST.

24   Q.   THE ONE IN THE BOOK DOESN'T HAVE REDACTIONS.  THE -- JUST

25   LOOK AT PAGE 4 IN THE BOOK, AND IF YOU CAN CONFIRM IT'S THE

1    SAME SLIDE DECK THAT WE'RE LOOKING AT ON THE SCREEN, PAGE 4.

2    A.   YOU MEAN THIS ONE (INDICATING)?

3    Q.   YES.

4         THE COURT:  YES, THAT'S IT.

5         THE WITNESS:  YES.

6    BY MR. AKROTIRIANAKIS:

7    Q.   IT'S THE SAME; RIGHT, MR. GHEORGHE?

8    A.   YES.

9    Q.   OKAY.  NOW, WHAT YOU -- YOU SAID A COUPLE MINUTES AGO THAT

10   YOU DON'T KNOW HOW PEGASUS WORKS.

11   A.   YES.

12   Q.   OKAY.  WHAT YOU INVESTIGATED WAS THE INSTALLATION LAYER,

13   OR THE INITIAL PAYLOAD AS SOME PEOPLE CALL IT, THAT WAS THE ONE

14   PART THAT TRAVERSED WHATSAPP SERVERS; CORRECT?

15   A.   I JUST DON'T KNOW THE ARCHITECTURE OF PEGASUS.  SO I DON'T

16   KNOW.  WHETHER IT WAS THE FIRST LAYER OR THE SECOND ONE, LIKE,

17   I JUST DON'T KNOW.  I'VE NEVER SEEN THE FULL DETAILS OF THAT

18   SOFTWARE MYSELF.

19   Q.   SURE.  YOU WERE ABLE TO SEE ONE PART OF IT, AND YOU

20   REALIZE THERE ARE OTHER PARTS THAT YOU'VE NEVER SEEN; CORRECT?

21   A.   WHAT WE SAW WAS AN ATTACK AGAINST WHATSAPP USERS, AND WE,

22   WE GAINED GOOD UNDERSTANDING OF IT, BUT IT WAS NOT COMPLETE.

23   LIKE, WE ALL KNEW THAT THERE WERE SOME PARTS OF IT THAT WE WERE

24   NOT ABLE -- WE NEVER -- LIKE, AT THAT TIME WE WERE NOT ABLE TO

25   UNDERSTAND AND REVERSE ENGINEER.

 1    Q.   SURE.  AND THOSE PARTS WERE HAPPENING OUTSIDE THE WHATSAPP

 2    SERVER ENVIRONMENT; IS THAT RIGHT?

 3    A.   I MEAN, I JUST DON'T KNOW WHAT WAS HAPPENING, SO I CANNOT

 4    SPECULATE ON THAT.

 5         LIKE, I JUST DON'T KNOW.

 6    Q.   WELL, IF IT WERE HAPPENING ON THE WHATSAPP SERVER, YOU

 7    WOULD HAVE BEEN ABLE TO FIND IT LIKE YOU DID THIS CODE, AND YOU

 8    WOULD HAVE IDENTIFIED WHO IT WENT TO, LIKE YOU DID THIS CODE

 9    THAT WE ALREADY TALKED ABOUT; RIGHT?

10    A.   NO, I DON'T THINK IT WORKED LIKE THAT, BECAUSE IT -- LIKE,

11    WE JUST DON'T KNOW WHAT WAS HAPPENING AFTER.  SO IT MAY HAVE

12    INVOLVED WHATSAPP SERVERS OR NOT.  WE JUST DON'T KNOW.

13    Q.   OKAY.  YOU DON'T KNOW.

14         YOU DO KNOW THAT WHATSAPP SERVERS DIDN'T EXECUTE OR RUN

15    ANY FOREIGN COMPUTER CODE THAT PEGASUS HAD INSERTED INTO THE

16    MESSAGES THAT WE LOOKED AT, LIKE THE CALL OFFER MESSAGES THAT

17    YOU TESTIFIED ABOUT; CORRECT?

18    A.   SO THE SERVER NEVER EXECUTED THAT CODE.  IT BASICALLY JUST

19    PASSED IT TO THE CLIENT.

20    Q.   THAT'S MY POINT.  NOTHING EVER HAPPENED ON THE WHATSAPP

21    SERVERS OTHER THAN FOR A NANOSECOND THE MESSAGES GOING THROUGH

22    THE SERVERS AND EVERYTHING ELSE THAT'S HAPPENING IS HAPPENING

23    ON THE CLIENT DEVICE?

24    A.   WELL, THINGS WERE HAPPENING ON THE SERVER.  LIKE,

25    BASICALLY THE SERVER WAS BEING ABUSED IN THIS PROCESS.  LIKE,

1    THE -- THE WHATSAPP CLIENT WAS DESIGNED TO TRUST TO HOLD THE

2    MESSAGES SENT BY THE SERVER, AND IN THIS CASE, THE FAKE CLIENT

3    WAS ESSENTIALLY MAKING THE SERVER TO SEND SOMETHING -- IT WAS

4    TRICKING THE SERVER, BASICALLY, TO SEND SOME MESSAGES THAT THE

5    SERVER WOULD NORMALLY NOT SEND.

6    Q.   I WANTED TO COME BACK TO YOUR TRICKING THE SERVER IN A

7    MINUTE.

8         BUT IT IS TRUE THAT NO CODE WAS EVER EXECUTED ON THE

9    WHATSAPP SERVERS; CORRECT?

10   A.   YOU MEAN MALICIOUS CODE?

11   Q.   THE PEGASUS CODE, NONE OF IT WAS EVER EXECUTED ON THE

12   WHATSAPP SERVERS; CORRECT?

13   A.   WELL, IT DEPENDS HOW YOU LOOK AT IT.  IT WAS BEING

14   INJECTED.  SO IF YOU LOOK AT THE WHOLE ATTACK AS A SEQUENCE OF

15   STEPS, THE FIRST ATTACK WAS TO INJECT THE MALICIOUS CODE, AND

16   THAT WAS HAPPENING TO THE WHATSAPP SERVERS.

17   Q.   I ASKED YOU A PRETTY SPECIFIC QUESTION, MR. GHEORGHE.  DID

18   ANY CODE EXECUTE ON THE WHATSAPP SERVERS?

19   A.   YES.  I MEAN, WE EXECUTED SOME LOGIC THAT WAS SENDING THE

20   MESSAGES.  IT'S NOT LIKE THE RELAYING OF THE MESSAGE ITSELF WAS

21   SOME CODE THAT WAS BEING EXECUTED.

22   Q.   I'M GOING TO READ FROM, WITH THE COURT'S PERMISSION, FROM

23   PAGE 170 AND LINES 20 TO 23.

24        THE COURT:  OKAY.  GO AHEAD.

25        MR. AKROTIRIANAKIS:

```
 1              "QUESTION:  DID THE CHATD SERVER EXECUTE THIS MALICIOUS

 2       CODE?

 3              "ANSWER:  NO."

 4       Q.   THAT WAS YOUR TESTIMONY THE DAY THAT YOU GAVE YOUR

 5       TESTIMONY; RIGHT, MR. GHEORGHE?

 6       A.   YES.  I THINK I WAS REFERRING TO THE FACT THAT THE CHATD

 7       SERVER DISTINCTION NOT EXECUTE THE MALICIOUS CODE AND THEY WERE

 8       NOT REMOTE CONTROLLED, ESSENTIALLY, LIKE, THE MEMORY OF THE

 9       SERVER WAS NOT HAMPERED WITH.  THERE WAS NONE OF THE

10       CONTROLLING OF THE REMOTE ABILITY.  THAT WAS NOT HAPPENING ON

11       THE SERVER.

12       Q.   AS YOU TESTIFIED A MOMENT AGO, IT SIMPLY PASSED THE

13       MESSAGE ALONG.

14              MR. PEREZ:  I'M SORRY.  I'M NOT SURE THE WITNESS WAS

15       FINISHED WITH HIS ANSWER.

16              THE COURT:  ALL RIGHT.  LET'S GIVE HIM --

17              MR. AKROTIRIANAKIS:  I DON'T THINK THERE WAS A

18       QUESTION, YOUR HONOR.

19              THE COURT:  LET'S GIVE HIM AN OPPORTUNITY.  REPEAT

20       YOUR QUESTION SO THAT HE CAN ANSWER.

21              MR. AKROTIRIANAKIS:  I DON'T BELIEVE THERE WAS A

22       QUESTION PENDING.  I THINK THE WITNESS WAS JUST TALKING,

23       YOUR HONOR.

24              THE COURT:  WAS THERE SOMETHING ELSE THAT YOU WANTED

25       TO SAY, MR. GHEORGHE?
```

```
1              THE WITNESS:  I THINK WE CAN MOVE ON.

2              THE COURT:  OKAY.  DID YOU FEEL LIKE YOU HAD A

3    COMPLETE OPPORTUNITY TO FINISH YOUR ANSWER?

4              THE WITNESS:  YES.

5              THE COURT:  OKAY.  ALL RIGHT.  MOVE ON.

6    BY MR. AKROTIRIANAKIS:

7    Q.  AND THE CHATD SERVER, IN YOUR TESTIMONY THAT YOU GAVE LAST

8    YEAR, IS A REFERENCE TO THE SIGNALLING SERVERS; CORRECT,

9    MR. GHEORGHE?

10   A.  YES.  SO THE SIGNALLING SERVER RUNS COLOCATED WITH THE

11   CHAT SERVER.

12   Q.  AND THE MESSAGES THAT WERE SENT ACROSS THE WHATSAPP

13   SERVERS DID NOT IMPAIR THE AVAILABILITY OF WHATSAPP SERVERS TO

14   PERFORM THEIR NORMAL FUNCTIONS; CORRECT, MR. GHEORGHE?

15   A.  BY AVAILABILITY, WHAT DO YOU MEAN BY AVAILABILITY IN THIS

16   CASE?

17             MR. AKROTIRIANAKIS:  I'M GOING TO READ FROM THE

18   WITNESS'S DEPOSITION AT PAGE 183, LINES 7 THROUGH 12,

19   YOUR HONOR?

20             THE COURT:  ALL RIGHT.

21             MR. AKROTIRIANAKIS:  MAY I PROCEED?

22             THE COURT:  YES.

23             MR. PEREZ:  I'M SORRY, 173?

24             MR. AKROTIRIANAKIS:  183, LINES 7 THROUGH 12.

25         "QUESTION:  WELL, DID IT, THIS OPERATION, IMPAIR THE
```

1        AVAILABILITY OF THOSE SERVERS TO PERFORM THEIR NORMAL

2        FUNCTIONS?

3              "ANSWER:  THIS DOES NOT IMPAIR THE AVAILABILITY OF THE

4        SERVERS."

5                    MR. PEREZ:  SORRY.  WAS THERE A QUESTION?

6                    THE COURT:  HE JUST READ FROM -- THIS IS A PARTY

7        WITNESS, IS HE NOT?

8                    MR. AKROTIRIANAKIS:  AND A 30(B)(6), YOUR HONOR.

9                    THE COURT:  ALL RIGHT.  HE'S CERTAINLY WELCOME TO

10       READ ANY PORTION OF HIS DEPOSITION.

11                   MR. AKROTIRIANAKIS:  I'LL READ FROM PAGE 250, LINE 10

12       THROUGH 15.

13             "QUESTION:  SO MY QUESTION IS, DO YOU HAVE ANY REASON TO

14       BELIEVE THAT THE OPERATION OF PEGASUS SLOWED DOWN IN ANY

15       MATERIAL WAY ANY OF WHATSAPP'S SERVERS?

16             "ANSWER:  NO, I DON'T BELIEVE THE SUSPICIOUS ATTACK THAT

17       WE OBSERVED SLOWED DOWN THE WHATSAPP SERVERS."

18             AND PAGE 250, LINE 22, THROUGH 251, LINE 1.

19             "QUESTION:  AS FAR AS WHATSAPP KNOWS, PEGASUS DIDN'T

20       DELETE ANY OF WHATSAPP'S DATA FROM WHATSAPP'S SERVERS; CORRECT?

21             "ANSWER:  I'M NOT AWARE OF ANY DATA BEING DELETED."

22             AND PAGE 251, LINE 18 THROUGH 24.

23             "QUESTION:  WAS THERE ANY SUCH EFFECT ON WHATSAPP SERVERS

24       BY THE PEGASUS SOFTWARE THAT YOU'RE AWARE OF?

25             "ANSWER:  YEAH, I'M NOT AWARE."

```
1            PAGE 183, LINE 24, THROUGH 184, LINE 7.

2            "QUESTION:  IF WHATSAPP SERVERS STORED SOME DATA THAT IT

3     NEEDS TO MAKE AVAILABLE FOR ITS NORMAL OPERATION, DID THIS

4     OPERATION OF PEGASUS CORRUPT THE DATA ON THE SERVERS?

5            "ANSWER:  SO THIS DID NOT CORRUPT ANY DATA ON THE

6     SIGNALLING OR THE RELAY SERVERS."

7     Q.   AND AS YOUR COLLEAGUES WROTE IN THE PRESENTATION, EXHIBIT

8     1083, ON PAGE 4, THE SERVERS WERE NOT COMPROMISED?

9            THAT'S WHAT THE DOCUMENT, THE PRESENTATION INTERNAL TO

10    FACEBOOK AND WHATSAPP SAYS; CORRECT, MR. GHEORGHE?

11    A.   YES, THAT'S CORRECT.

12    Q.   AND YOU BELIEVE THAT EXHIBIT 1083, ALSO EXHIBIT 9, BUT IN

13    EVIDENCE AS EXHIBIT 1083 IS A DOCUMENT THAT REFLECTS THE

14    UNDERSTANDING OF FACEBOOK AND WHATSAPP SECURITY ABOUT THE

15    MAY 2019 INCIDENT; CORRECT, MR. GHEORGHE?

16    A.   YES.

17    Q.   ALL RIGHT.  NOW, IN RESPECT OF WHATSAPP'S AND FACEBOOK'S

18    SECURITY PRACTICE, THERE WAS A UNIFORM PROCEDURE THAT WHATSAPP

19    SECURITY EMPLOYEES FOLLOWED TO DETECT AND REMEDIATE

20    VULNERABILITIES IN SOFTWARE; CORRECT?

21    A.   I'M SORRY, CAN YOU REPEAT THE QUESTION?

22    Q.   I'LL JUST READ FROM THE DEPOSITION.

23           PAGE 45, LINE 20.

24           "QUESTION:  WAS THERE A UNIFORM PROCESS OR PROCEDURE THAT

25    WHATSAPP SECURITY EMPLOYEES FOLLOWED TO DETECT AND REMEDIATE
```

1    VULNERABILITIES IN THE SOFTWARE?

2         "ANSWER:  YES."

3         AND, FOR EXAMPLE, MR. GHEORGHE, THAT PRACTICE WOULD

4    INCLUDE LOOKING AT CODE, TALKING AMONGST THE TEAM,

5    COLLABORATING WITH THE TEAM, AND UNDERSTANDING WHAT THE CODE

6    DOES; CORRECT?

7    A.   YES, THOSE WERE STANDARD PRACTICE, PRACTICES THAT WE HAD

8    IN THE TEAM.

9    Q.   AND WHENEVER THAT PROCESS THAT WE'VE JUST DISCUSSED

10   UNCOVERED A SECURITY ISSUE, THE EMPLOYEES THAT WE'RE TALKING

11   ABOUT WOULD FILE EITHER A TASK OR A SEV AND GIVE A TIMELINE TO

12   REMEDIATE THE FLAW IN THE WHATSAPP CODE; CORRECT?

13   A.   YES.

14   Q.   WHAT IS A RED TEAM, MR. GHEORGHE?

15   A.   A RED TEAM IS A TEAM INSIDE THE -- A SECURITY TEAM THAT IS

16   RESPONSIBLE TO CONDUCT OFFENSIVE SECURITY AGAINST THE SYSTEMS

17   OF THE COMPANY.

18   Q.   SO THESE ARE BASICALLY WHATSAPP OR FACEBOOK EMPLOYEES WHO

19   ARE SPECIALLY EMPLOYED BY THE COMPANY TO CONDUCT WHAT'S CALLED

20   PENETRATION TESTING AGAINST THE COMPANY'S SYSTEMS; CORRECT?

21   A.   YES.

22   Q.   ALL RIGHT.  AND IF THE DEDICATED RED TEAM -- AND THEY ACT

23   LIKE THEY'RE AN ATTACKER; RIGHT?

24   A.   YES.  SO THEY -- SOMETIMES THEY DO TALK TO THE TEAMS, BUT

25   SOMETIMES THEY DON'T.  SO IT'S UP TO THE TEAM BASICALLY IN HOW

1    THEY SORT OF COLLABORATE WITH THE TEAMS.

2    Q.   WELL, SOMETIMES IT'S LIKE A FIRE DRILL; RIGHT?  THEY DON'T

3    TELL YOU IN ADVANCE, THEY JUST CREATE AN EVENT TO TEST THE

4    RESPONSE ABILITY; CORRECT?

5    A.   YES.

6    Q.   AND FOR THE RECORD, THAT IS RESPONSE, ABILITY, SECOND

7    WORD.

8         AND WHEN THE RED TEAM FINDS VULNERABILITIES, THOSE

9    VULNERABILITIES, OR FLAWS, TOO WOULD BE REMEDIATED USING THE

10   STANDARD RESPONSE PROCESS THAT WE'VE TALKED ABOUT; CORRECT?

11   A.   YES.  WE WOULD FOLLOW THE SAME PROCESS IF THE RED TEAM

12   WOULD FLAG ISSUES TO US.

13   Q.   AND FACEBOOK AND WHATSAPP ALSO EMPLOY OUTSIDE THIRD PARTY

14   RESEARCHERS TO DO PENETRATION TESTING ON THE SYSTEM AND REPORT

15   VULNERABILITIES THAT THEY FIND; CORRECT?

16   A.   YES.  FACEBOOK HAS A BUG BOUNTY PROGRAM AS WELL, SO ANY

17   SECURITY RESEARCHER THAT FINDS A VULNERABILITY HAS THE CHANCE

18   TO FILE THAT WITH THE COMPANY, AND THEY WOULD GET REWARDED FOR

19   IT.

20   Q.   OKAY.  SO IF SOMEBODY IS JUST, LIKE, YOU KNOW, POKING AT

21   WHATSAPP'S CODE, TO USE A COMMONPLACE EXPRESSION, AND THEY FIND

22   FLAWS IN THE CODE, IF THEY REPORT THEM TO THE COMPANY, THE

23   COMPANY PAYS THEM; RIGHT?

24   A.   WE WOULD -- IT'S VERY COMMON TO REWARD THE SECURITY

25   RESEARCHERS FOR THEIR FINDINGS, YES.

1    Q.   AND THEN THE -- WHAT THE INTERNAL TEAM WOULD DO, YOUR TEAM

2    WOULD DO, IS THAT YOU WOULD --

3              THE COURT:  DO YOU NEED WATER?

4         JUROR NUMBER 2, DO YOU NEED TO GET WATER?

5              JUROR:  I HAVE SOME.

6              THE COURT:  OKAY.  WE'RE ALMOST AT THE END OF THE

7    DAY.

8              MR. AKROTIRIANAKIS:  MAY I PROCEED, YOUR HONOR?

9              THE COURT:  YES.

10   BY MR. AKROTIRIANAKIS:

11   Q.   IF THE VULNERABILITY CAME TO YOUR ATTENTION ON ACCOUNT OF

12   THESE OUTSIDE RESEARCHERS, IT WOULD STILL BE HANDLED IN EXACTLY

13   THE SAME WAY THAT YOU ALREADY TESTIFIED ABOUT IN TERMS OF YOUR

14   REGULAR SECURITY PROTOCOL AND PROCEDURES; CORRECT?

15   A.   GENERALLY, YES.  BUT THERE'S SOME DIFFERENCES.

16        SO, FOR INSTANCE, THE SECURITY RESEARCHERS NEED TO RESPECT

17   CERTAIN RULES ABOUT HOW THEY DISCLOSE THE ISSUE.  SO, FOR

18   INSTANCE, IF SECURITY RESEARCHERS FINDS AN ISSUE AND THEY

19   DISCLOSE IT PUBLICLY BEFORE THEY DISCLOSE IT TO US, THEN WE

20   WOULD NOT REWARD THEM, ESSENTIALLY.

21        SO THE NORMAL POLICY IS THAT THEY DISCLOSE THAT THROUGH

22   OUR TOOLS TO US AND WE HAVE 30 TO 60 DAYS TO FULLY REMEDIATE,

23   AND THEN AFTER THAT THEY HAVE THE RIGHT TO DISCLOSE IT

24   PUBLICLY.

25        SO THERE'S SOME DIFFERENT RESTRICTIONS WITH REGARDS TO THE

1    EXTERNAL RESEARCHERS.

2              MR. AKROTIRIANAKIS:  I'M GOING TO READ FROM THE

3    DEPOSITION AT PAGE 55, LINE 7.

4         "QUESTION:  SO DID WHATSAPP NOT HAVE STANDARD PROTOCOLS

5    FOR RESPONDING TO SECURITY RESEARCH REPORTING INCIDENTS?

6         "ANSWER:  WE HAD A STANDARD PROTOCOL.  IT WAS THE SAME

7    PROTOCOL THAT I DESCRIBED ALSO EARLIER ABOUT INTERNAL FINDINGS

8    OF VULNERABILITIES.  IT WAS VERY SIMILAR TO THAT.  THE ONLY

9    DIFFERENCE BETWEEN THAT IS THAT IT ORIGINATED FROM THIS WHITE

10   HAT PROGRAM.  BUT THAT'S THE ONLY DIFFERENCE.  THE REST OF THE

11   PROCESS IS THE SAME.  WE WOULD FILE A TICKET OR A SEV AND WE

12   WOULD PRIORITIZE IT ACCORDINGLY AND REMEDIATE AND FILE A CVE,

13   AND, YEAH."

14   Q.   FIXING VULNERABILITIES IN THE WHATSAPP CLIENT APPLICATION

15   IMPROVES THE SECURITY OF THAT APPLICATION; CORRECT,

16   MR. GHEORGHE?

17   A.   YES, IT PREVENTS FROM ISSUES FROM -- THE SAME ISSUE FROM

18   BEING EXPLOITED GOING FORWARD.

19   Q.   AND THAT IS A FACT THAT IS TRUE REGARDLESS OF HOW WHATSAPP

20   WOULD HAVE LEARNED OF THE VULNERABILITY; CORRECT?

21   A.   WHAT IS THE DISTINCTION THERE?

22   Q.   SO WE'VE JUST DISCUSSED AT LEAST THREE WAYS THAT YOU WOULD

23   LEARN OF VULNERABILITIES; CORRECT?

24   A.   YES.  WE WILL LEARN ABOUT VULNERABILITIES FROM DIFFERENT

25   SOURCES.

1    Q.   AND WE'VE DISCUSSED AT LEAST THREE:  THE OUTSIDE

2    RESEARCHERS; THE INTERNAL RED TEAM; AND THEN JUST THE SECURITY

3    ENGINEERS; CORRECT?

4    A.   YES.

5    Q.   AND YOU HANDLE THEM ALL THE SAME WAY ONCE YOU FIND OUT

6    ABOUT THE VULNERABILITY; CORRECT?

7    A.   YES, IT'S THE SAME PROCESS.

8    Q.   OKAY.  AND FIXING VULNERABILITIES IN EACH ONE OF THOSE

9    INSTANCES, THROUGH THAT SAME PROCESS, IN EACH CASE IS AN

10   APPLICATION IMPROVEMENT IN TERMS OF THE SECURITY OF THE

11   WHATSAPP APP; CORRECT?

12   A.   YES, IT MAKES THE APP NOT VULNERABLE TO THE EXACT ATTACK

13   THAT WAS FOUND AND POSSIBLY A RELATED SIMILAR ATTACK.

14   Q.   IN OTHER WORDS, IT MAKES IT MORE SECURE THAN IT WAS

15   BEFORE; CORRECT?

16   A.   YES, IT MAKES IT MORE SECURE.

17           THE COURT:  OKAY.  ARE YOU ALMOST FINISHED?

18           MR. AKROTIRIANAKIS:  I HAVE MORE, YOUR HONOR, BUT I

19   THINK -- I WOULDN'T BE ABLE TO FINISH IN --

20           THE COURT:  IN A COUPLE MINUTES?  OKAY.

21       ALL RIGHT.  LADIES AND GENTLEMEN, WE HAVE REACHED THE END

22   OF THE FIRST TRIAL DAY.

23       I'M GOING TO EXCUSE YOU UNTIL 8:30 TOMORROW MORNING.

24       PLEASE REMEMBER THE INSTRUCTION I GAVE YOU YESTERDAY TO

25   NOT TALK ABOUT THE CASE WITH ANYBODY OR TO DO ANY INDEPENDENT

```
1       RESEARCH OR TO POST ANYWHERE ABOUT IT.

2            AND WE WILL SEE YOU TOMORROW MORNING.

3            AND LEAVE YOUR NOTE PADS IN THE JURY BOX, JURY ROOM.

4                THE CLERK:  ALL RISE FOR THE JURY.

5                THE COURT:  MR. GHEORGHE, YOU CAN STEP DOWN.

6       (JURY OUT AT 1:31 P.M.)

7                THE COURT:  ALL RIGHT.  I THINK WE SHOULD PROBABLY

8       TAKE A BREAK.  LEE-ANNE, WOULD YOU LIKE A BREAK?

9            ALL RIGHT.  WE'RE GOING TO TAKE A BREAK AND THEN WE WILL

10      DISCUSS WHAT NEEDS TO BE DISCUSSED TO GET THROUGH TOMORROW.

11           ALL RIGHT.  HOW ABOUT A 15 MINUTE BREAK AND THEN COME BACK

12      AND WE'LL TAKE OF IT HOPEFULLY WITHIN 15 OR 20 MINUTES AFTER

13      THAT.  OKAY?  SO COME BACK AT 1:45.

14               MR. ANDRES:  THANKS, JUDGE.

15      (RECESS FROM 1:32 P.M. UNTIL 1:46 P.M.)

16      (JURY OUT AT 1:46 P.M.)

17               THE COURT:  ALL RIGHT.  WHAT ISSUES DO YOU ALL WANT

18      TO TALK ABOUT?

19               MR. ANDRES:  YOUR HONOR, FOR THE PLAINTIFF, AS AN

20      INITIAL MATTER, WE'D LIKE THE COURT TO ORDER THE DEFENDANTS TO

21      SEND US A COPY OF THEIR OPENING SLIDES AND THE VIDEOS THEY USED

22      SO THAT WE CAN ADDRESS THE INSTRUCTIONS THAT WE'RE GOING TO

23      PROPOSE TO YOUR HONOR TO CURE WHAT WE THINK WERE VIOLATIONS OF

24      THE COURT ORDER DURING THE OPENING.

25               SO WE DON'T HAVE THE SLIDES OR THE VIDEOS, BUT EVERYTHING
```

```
1     THAT THE DEFENSE HAS WITH RESPECT TO WHAT THEY PRESENTED TO THE

2     JURY IN THEIR OPENING, WE'D LIKE A COPY OF THAT.

3              THE COURT:  OKAY.  AND?

4              MR. AKROTIRIANAKIS:  I DON'T MIND GIVING THEM A COPY

5     OF SOMETHING THAT'S ALREADY BEEN SHOWN, YOUR HONOR.

6              THE COURT:  OKAY.

7              MR. AKROTIRIANAKIS:  I DON'T AGREE, OF COURSE, THAT I

8     VIOLATED COURT ORDERS.  I DON'T THINK I DID.

9              THE COURT:  OKAY.

10             MR. ANDRES:  YOUR HONOR, THAT'S NUMBER 1, AND WE

11    THANK YOU.

12             THE COURT:  AND I'D LIKE YOU TO DO THAT AS SOON AS

13    POSSIBLE.  I MEAN, THIS CASE IS PROBABLY GOING TO GO BE OVER

14    WITH BEFORE FRIDAY, MAYBE?

15             MR. ANDRES:  BY FRIDAY AT LEAST.  I THINK THE WAY

16    THAT YOUR HONOR HAD BUDGETED WAS MONDAY -- YOU HAD SAID MONDAY

17    WE'LL DO OPENINGS -- CLOSINGS.

18             THE COURT:  IF NEEDED.

19             MR. ANDRES:  I -- YES, OKAY.

20             THE COURT:  OKAY.

21             MR. ANDRES:  THAT'S WHAT WE WERE PLANNING ON, BUT

22    OBVIOUSLY IF NEEDED.

23             THE COURT:  OKAY.

24             MR. ANDRES:  THE SECOND THING IS WE WOULD JUST LIKE

25    TO NOW UNDERSTAND WHAT -- WHO'S ON THE DEFENDANTS' WITNESS
```

```
 1        LIST, BOTH BECAUSE THERE HAVE BEEN CHANGES, AS THEY'RE ENTITLED

 2        TO, BUT WE OBVIOUSLY WANT TO MOVE ALONG.  AND THERE ARE ALSO

 3        PEOPLE WHO WE HAVE TO HAVE TRAVEL HERE.

 4             SO IF WE COULD HAVE THE DEFENDANTS NOW, ON THE RECORD,

 5        TELL US WHO THEY EXPECT TO CALL AS WITNESSES, THAT WOULD

 6        FACILITATE TRAVEL, IT WOULD FACILITATE OUR PREPARATION AND THE

 7        LIKE.

 8             THE COURT:  OKAY.

 9             GENERALLY I REQUIRE TO BE NOTIFIED THE DAY BEFORE.  DO YOU

10        THINK YOU'LL FINISH TOMORROW?

11             MR. ANDRES:  WE MIGHT.  I -- THE ONLY -- TOMORROW --

12        SO WE HAVE TWO MORE WITNESSES -- I DON'T KNOW HOW MUCH LONGER

13        MR. AKROTIRIANAKIS HAS WITH THIS WITNESS.

14             WE HAVE ANOTHER ENGINEER WITNESS WHO I THINK WILL BE ABOUT

15        HALF AN HOUR ON DIRECT, WE HAVE OUR DAMAGES EXPERT THAT'S HALF

16        AN HOUR, AND WE HAVE ROUGHLY THREE AND A HALF, MAYBE FOUR

17        HOURS -- IS THAT RIGHT?  HOW MANY HOURS?  WE HAVE VIDEO

18        DEPOSITIONS TO PLAY.  THAT'S WHAT'S LEFT IN OUR CASE, TWO LIVE

19        WITNESSES, AND THE REMAINDER IS TWO -- SOMEWHERE IN THE TWO

20        HOUR RANGE, BUT I CAN FIND OUT MORE TOMORROW.

21             THE COURT:  OKAY.  SOMEWHERE IN THE TWO HOUR RANGE.

22        YOUR WITNESSES OR YOUR VIDEO?

23             MR. ANDRES:  THE VIDEO.

24             THE COURT:  OKAY.

25             AND SO YOU'RE PROBABLY NOT GOING TO FINISH TOMORROW?
```

1          MR. ANDRES:  CORRECT.

2          THE COURT:  OR YOU MIGHT FINISH TOMORROW, BUT THERE

3     WON'T PROBABLY BE TIME FOR THE --

4          MR. ANDRES:  I THINK THAT'S RIGHT.  I THINK THE

5     BIGGER ISSUE WITH RESPECT TO THE WITNESSES, AGAIN, I DON'T KNOW

6     WHY THERE'S ANY MYSTERY AS TO THIS, BUT AT LEAST ONE IS

7     SUPPOSED TO TRAVEL HERE THAT'S ON THEIR WITNESS LIST, ONE OF

8     THE META WITNESSES THAT THEY INTEND TO CALL.

9          YOUR HONOR HAD PRECLUDED EVIDENCE LAST WEEK ABOUT, I

10    THINK, THE SUBJECT MATTER OF WHAT HE WAS GOING TO TESTIFY

11    ABOUT, AN EMAIL THAT HE WAS ON.  YOUR HONOR SAID IT WASN'T

12    RELEVANT.

13         SO WE'D LIKE TO UNDERSTAND, HIS NAME IS JONATHAN LEE,

14    WHETHER WE NEED TO BRING HIM HERE OR NOT.

15         THE COURT:  OKAY.

16         MR. AKROTIRIANAKIS:  I THINK I HAVE A STIPULATION --

17    I'M NOT TRYING TO DRAG MR. LEE HERE.  I THINK THE GENTLEMAN

18    LIVES IN THE WASHINGTON D.C. AREA.  I THINK THERE'S A

19    STIPULATION THAT WE CAN HOPEFULLY REACH THAT WOULD THEN OBVIATE

20    HIS NEED TO TRAVEL, SO WE CAN TALK ABOUT THAT TODAY.

21         THE COURT:  OKAY.  SHOULD MEET AND CONFER?

22         MR. ANDRES:  YEAH, IF WE CAN GET THAT TODAY, THAT

23    WOULD BE GREAT.  THANKS, YOUR HONOR.

24         SO THAT'S THE WITNESS LIST, THE SLIDES, AND THE VIDEO.

25         JUST ONE MORE QUESTION FOR ME AND THEN MY COLLEAGUES ARE

```
 1          GOING TO RAISE AN ISSUE ON THE DEPOSITION.

 2              WHEN WE PLAY THE DEPOSITION VIDEOS, YOUR HONOR, I JUST

 3      WANT TO MAKE SURE THAT I UNDERSTAND HOW THAT WILL BE REPORTED

 4      IN THE TRANSCRIPT.  I DON'T KNOW --

 5              THE COURT:  WE DON'T RECORD WHAT THEY'RE SAYING ON

 6      VIDEO.

 7              MR. ANDRES:  MEANING IT'S NOT GOING TO BE WRITTEN

 8      INTO THE TRANSCRIPT?

 9              THE COURT:  THAT'S RIGHT.

10              MR. ANDRES:  RIGHT.  UNDERSTOOD.

11              THE COURT:  RIGHT.

12              MR. ANDRES:  OKAY.

13              THE COURT:  INSTEAD, WHATEVER FORMAT YOU'RE NOT GOING

14      TO READ IT, IT'S ALL GOING TO BE PLAYED, RIGHT?

15              MR. ANDRES:  CORRECT.  BUT WE'LL HAVE THE DEPOSITION

16      TRANSCRIPT, SO WE CAN PROVIDE THOSE.

17              THE COURT:  OKAY.  THAT WOULD BE HELPFUL.  BUT WHAT

18      GOES UP ON APPEAL IS THE ACTUAL VIDEO RECORD.

19              MR. ANDRES:  YEAH, FINE.

20              THE COURT:  OUR COURT REPORTER DOESN'T TAKE IT DOWN.

21              MR. ANDRES:  I WASN'T SUGGESTING THAT, I JUST WANTED

22      TO UNDERSTAND, YOUR HONOR.  I WANTED TO UNDERSTAND THE PROCESS.

23              THE COURT:  OKAY.

24              MR. ANDRES:  AND THEN LASTLY --

25              MR. BLOCK:  I'M SORRY.  DOES THAT MEAN, YOUR HONOR --
```

```
1       I APOLOGIZE -- THAT WE LODGE THE VIDEO CLIP AS A VIDEO, OR WE

2       LODGE A RECORD OF WHAT WAS PLAYED IN THE VIDEO, RIGHT?  DOES

3       THE DISTINCTION MAKE SENSE?

4            YOU WERE TALKING ABOUT THE APPEAL, AND I UNDERSTOOD

5       YOUR HONOR TO SAY WHAT GOES UP ON APPEAL IS THE VIDEO.  THAT

6       MEANS WE NEED TO HAVE THE COURT RECORD COMPLETE WITH WHAT

7       HAPPENED WHILE THE VIDEO WAS PLAYING.  THAT COULD HAPPEN IN ONE

8       OR TWO OR BOTH FORMS:  A VIDEO FILE THAT IS IN YOUR RECORD THAT

9       COULD BE PLAYED AS A VIDEO; OR A TRANSCRIPT OF WHAT WAS AGREED

10      BETWEEN THE PARTIES AND ALLOWED BY THE JUDGE OF THE PORTION OF

11      THE DEPOSITION THAT WAS PLAYED.

12           WHAT CAN WE LODGE WITH THE COURT TO COMPLETE THE RECORD SO

13      IT'S CLEAR WHAT WAS PLAYED IN THE VIDEO?

14             THE COURT:  YOU KNOW, I DON'T REALLY KNOW.  SOMEONE

15      IN THE CLERK'S OFFICE WILL TELL YOU WHAT YOU NEED ON APPEAL, OR

16      THE NINTH CIRCUIT WILL TELL YOU WHAT THEY WILL ACCEPT.

17           BUT THE TRANSCRIPT SIMPLY SAYS A VIDEO OF THIS WITNESS

18      TESTIFYING IS PLAYED.

19             MR. BLOCK:  AND FOR PURPOSES OF YOUR DOCKET, IF WE

20      WERE TO LODGE WITH YOU A RECORD OF WHAT OCCURRED DURING THAT

21      VIDEO --

22             THE COURT:  OF WHAT OCCURRED?

23             MR. ANDRES:  WE'LL HANDLE IT.  WE'RE GOING TO --

24      WE'LL SUBMIT THE VIDEO AND PUT IT ON THE RECORD, AND WE'LL

25      HANDLE IT.  I'M NOT CONCERNED ABOUT THAT.
```

478

```
1            THE COURT:  KELLY, DO YOU KNOW?  THEY USUALLY SUBMIT
2       A THUMB DRIVE OR A DISK?
3            THE CLERK:  USUALLY, RIGHT, IT'S AN ELECTRONIC
4       VERSION OF IT, NOT A TRANSCRIPT.
5            MR. ANDRES:  DONE.  THANK YOU.
6            THE COURT:  OKAY.
7            MR. ANDRES:  THE LAST ISSUE I'M GOING TO ASK
8       MR. PEREZ TO HANDLE IS JUST SOME OUTSTANDING DESIGNATIONS.  AS
9       I MENTIONED, YOUR HONOR, WE'RE GOING TO BE PLAYING VIDEO
10      TOMORROW.  SO I'M GOING TO LET MR. PEREZ HANDLE THAT ISSUE.
11           THE COURT:  OKAY.
12           MR. ANDRES:  THANK YOU, YOUR HONOR.
13           MR. PEREZ:  YES, YOUR HONOR.  THIS RELATES TO THE
14      CONVERSATION WE WERE HAVING YESTERDAY ABOUT PRICING AND
15      PROFITS, AND WHERE WE LEFT THAT CONVERSATION YESTERDAY -- THIS
16      WAS ABOUT -- THE COURT HAD RULED THAT THE PROFIT MOTIVE WAS
17      RELEVANT, AND THEN WE HAD A DISCUSSION YESTERDAY AROUND WHAT
18      EVIDENCE SHOULD COME IN OR SHOULD NOT COME IN.
19           AND WHERE WE LANDED ON THAT WAS THAT I HAD SUGGESTED WE
20      CAN JUST MAKE THESE POINTS GENERALLY THROUGH TESTIMONY, AND THE
21      COURT RESPONDED, OKAY, THAT'S WHAT I THINK WOULD BE BEST.
22           WE'RE NOW HAVING A DISAGREEMENT ABOUT SOME OF OUR
23      DEPOSITION DESIGNATIONS, AND I CAN READ TO YOU WHAT WE'VE
24      PROPOSED TO DESIGNATE.  THIS IS FROM MS. GIL, WHO WAS ONE OF
25      THE WITNESSES WHO THEY DESIGNATED ON SOME OF THESE TOPICS.  AND
```

1    WE SAID FOR --

2         "QUESTION:  FOR 2018 THROUGH 2020, WHAT WAS THE PRICE ON

3    THE PRICE LIST OF 15 CONCURRENT TARGETS TRIGGERED ONLY, WHICH

4    IS A TYPE OF INSTALLATION?

5         "ANSWER:  SHOULD I ANSWER?

6         "QUESTION:  I'M SORRY, I INTERRUPTED YOU BEFORE.  DID YOU

7    HAVE -- AND SHE ANSWERED, OKAY.  SO AS FAR AS I REMEMBER FOR

8    EUROPE, FOR EXAMPLE, THE STANDARD PRICE WAS AROUND 7 MILLION.

9         "OKAY.  AND HOW MUCH WERE COVERT VECTORS?

10        "THAT'S THE TYPE OF INSTALLATION THAT'S AT ISSUE IN THIS

11   CASE.  HOW MUCH EXTRA WOULD A CUSTOMER, LET'S SAY IN EUROPE,

12   HAVE TO PAY FOR THE USE OF COVERT VECTORS?

13        "ANSWER:  SO IT COULD BE ADDITIONAL 1 MILLION, 1 AND A

14   HALF.  AGAIN, I DON'T REMEMBER EXACTLY THE PRICING.

15        "QUESTION:  ARE YOU AWARE THAT CERTAIN CUSTOMERS PAID MORE

16   THAN $7 MILLION FOR 15 CONCURRENT TARGETS?

17        "ANSWER:  I DON'T REMEMBER -- YES, I DON'T REMEMBER, BUT

18   POTENTIALLY YES."

19        SO THIS IS SORT OF THE HIGHEST LEVEL OF GENERALITY WITH

20   WHICH WE CAN APPROACH THIS ISSUE.  WE HAVE PRICE LISTS.  WE

21   HAVE A SPREADSHEET OF ALL THEIR CONTRACTS WITH EXACTLY HOW MUCH

22   EACH WAS FOR.

23        BUT IF WE'RE TAKING THE APPROACH OF DOING THIS, AS WE

24   DISCUSSED YESTERDAY, GENERALLY THROUGH TESTIMONY, THAT'S THE

25   TESTIMONY.  AND THAT'S WHAT WE WOULD LIKE TO DESIGNATE.

```
1           AND THEN THERE'S A SIMILAR PORTION OF THE DEPOSITION OF

2      A --

3               THE COURT:  AND THIS IS TESTIMONY ABOUT THE FINANCIAL

4      CONDITION IN 2018/'19?

5               MR. PEREZ:  WE DON'T REGARD IT AS FINANCIAL

6      CONDITION, YOUR HONOR.

7               THE COURT:  THE PROFIT?

8               MR. PEREZ:  YES.

9               THE COURT:  PROFITS.

10              MR. ANDRES:  THE COMMERCIAL FACTS ABOUT WHAT THEY

11     SOLD THIS PRODUCT FOR.

12              THE COURT:  RIGHT.

13              MR. PEREZ:  SO THAT'S THE TESTIMONY IN RESPONSE TO

14     THE COURT'S INSTRUCTION YESTERDAY THAT WE WOULD PURPORT TO --

15     WE WOULD LIKE TO OFFER.

16          AND THERE'S A SIMILAR SECTION OF THE DEPOSITION OF A

17     GENTLEMAN, TERRENCE DIVITTORIO, WHO WAS AN EMPLOYEE OF THEIR

18     SALES AGENT IN NORTH AMERICA, AND HE SIMILARLY GOES THROUGH AND

19     TESTIFIES GENERALLY ABOUT THE PRICING.

20          NOW, THEIR OBJECTION TO THAT PORTION IS THAT WHEN HE WAS

21     BEING QUESTIONED, HE HAD IN FRONT OF HIM AN EXHIBIT THAT THEY

22     WERE CALLING TO YOUR ATTENTION YESTERDAY, WHICH WE'RE NOT GOING

23     TO OFFER INTO EVIDENCE.

24          BUT THAT'S HOW THE TESTIMONY CAME IN.  THAT'S WHAT -- THAT

25     WAS WHAT HE HAD IN FRONT OF HIM WHEN HE WAS GIVING HIS GENERAL
```

1      TESTIMONY, CONSISTENT WITH THE COURT'S INSTRUCTION, ABOUT WHAT

2      THEIR PRICING WAS.

3            SO WE WOULD LIKE TO CONFIRM THAT WE CAN OFFER THOSE TWO

4      DESIGNATIONS.

5                  THE COURT:  OKAY.  RESPONSE?

6                  MR. AKROTIRIANAKIS:  TAKING THEM IN THE REVERSE

7      ORDER, YOUR HONOR, MR. DIVITTORIO IS JUST READING FROM A

8      DOCUMENT THAT THE COURT HAS NOW EXCLUDED.  SO IT WOULD BE THE

9      WITNESS'S SORT OF HEARSAY OF AN EXCLUDED DOCUMENT THAT THEY

10     WANT TO OFFER.  BUT THEY ARE SAYING, WELL, WE'RE NOT MOVING THE

11     DOCUMENT IN EVIDENCE, WE JUST HAVE A WITNESS READING FROM THE

12     DOCUMENT THAT'S BEEN EXCLUDED.  IT'S THE ONE THAT WE TALKED

13     ABOUT YESTERDAY, AND I THINK I GAVE COPIES TO THE COURT.

14                 THE COURT:  I HAVE IT.

15                 MR. AKROTIRIANAKIS:  AND THEN WITH RESPECT TO THE

16     SARIT GIL TESTIMONY, YOUR HONOR, THAT ISN'T EVIDENCE THAT WE --

17     I MEAN, THE COURT TALKED ABOUT SAYING, WELL, YOU CAN -- YOU CAN

18     PUT ON EVIDENCE THAT THEY HAVE A PROFIT MOTIVE.

19           WHAT THIS IS IS SPECIFIC PRICING AND SPECIFIC LOCATIONS

20     AND SO ON AND SO FORTH.  IT'S NOT A LEVEL OF GENERALITY ABOUT

21     THE PROFITABILITY OR THE FACT THAT THE COMPANY HOPES THEY'RE

22     GOING TO MAKE MONEY OR ANYTHING LIKE THAT.  IT'S JUST EXACTLY

23     WHAT THE COURT'S ALREADY EXCLUDED.

24                 MR. PEREZ:  YOUR HONOR, AGAIN, THIS IS THE

25     DEPOSITION -- THIS IS THE TESTIMONY, WITNESS TESTIMONY, THAT WE

```
1       AGREED YESTERDAY, YOU'RE NOT GOING TO PUT IN DETAILED FINANCIAL

2       INFORMATION, YOU CAN DO IT THROUGH WITNESS TESTIMONY.

3              THE COURT:  AND YOU'RE NOT GOING TO DO IT THROUGH AN

4       EXPERT.

5              MR. PEREZ:  WE'RE NOT DOING IT THROUGH AN EXPERT.

6       THESE ARE FACT WITNESSES TESTIFYING AS FACT WITNESSES ABOUT

7       WHAT THEIR PRICING WAS.

8              AND WHAT HE CALLS READING FROM THE DOCUMENT IS HIM

9       ENDORSING THAT THAT IS THE PRICING.

10             SO I CAN READ TO YOU, YOU KNOW, WHEN YOU BUY A LICENSE FOR

11      FIVE YEARS, HOW LONG DOES THAT LICENSE -- SORRY, FOR FIVE

12      PHONES, HOW LONG DOES THAT LICENSE LAST?

13             ONE YEAR.

14             AND CAN YOU HAVE TARGET FIVE PHONES STATEMENT?

15             ANSWER:  YES.

16             ALL FOR A ONE YEAR PERIOD?

17             YES.

18             SO FOR THE 25 PHONES AT THE BOTTOM, IT WOULD BE 12

19      MILLION?

20             YES.

21             AND AFTER THE LICENSE EXPIRES AFTER A YEAR, CAN YOU RENEW

22      IT?

23             YES.

24             THIS IS THE GENERAL TESTIMONY THAT WE AGREED YESTERDAY WAS

25      THE PROPER WAY TO PUT IN THIS ISSUE, WITHOUT GETTING INTO
```

1    DETAILED FINANCIAL INFORMATION OR EXPERT TESTIMONY.

2            MR. AKROTIRIANAKIS:  IT ISN'T, YOUR HONOR.  THAT IS

3    MR. DIVITTORIO READING FROM THE DOCUMENT.  HE'S TELLING COUNSEL

4    HOW COUNSEL SHOULD INTERPRET THE DOCUMENT.

5            BUT THIS IS THE VERY TESTIMONY, THE $12 MILLION NUMBER --

6    IF THE COURT HAS THE EXHIBIT --

7            THE COURT:  I HAVE IT.

8            MR. AKROTIRIANAKIS:  -- THAT HE LATER SAID, NO, IT'S

9    NOT 12 MILLION, THAT IS ASPIRATIONAL PRICING.  IT'S 4 MILLION,

10   AND THE CUSTOMER WAS THE CIA, AND WE WERE PITCHING THE DOD, AND

11   THIS IS THE FBI, AND THIS OPENS UP THIS WHOLE CAN OF WORMS IN

12   ORDER TO CORRECT THAT MISSTATEMENT ABOUT THE 12 MILLION.  THIS

13   IS EXACTLY THE TYPE OF DETAILED INFORMATION THAT THE COURT

14   EXCLUDED AND FOR THE SAME REASON, AND NOW THEY WANT TO HAVE A

15   WITNESS JUST READ THE DOCUMENT.

16           MR. PEREZ:  YOUR HONOR, THEY HAVE COUNTER-DESIGNATED

17   WHAT MR. AKROTIRIANAKIS JUST REFERRED TO.  I'M READING FROM

18   THEIR COUNTER-DESIGNATION.

19       "ALL RIGHT.  THEN THERE'S A CHART ON THE LOWER HALF OF THE

20   FIRST PAGE THAT HAS SOME DIFFERENT PRICING.  DO YOU SEE THAT?

21       "YES.

22       "IS IT FAIR TO SAY THAT THE PRICING IN THE TOP CHART IS

23   ASPIRATIONAL PRICING?

24       "YES."

25           SO THEY'VE GOT THEIR SIDE OF THE STORY IN THE DESIGNATION

```
 1        IN THE VIDEOTAPE.  THIS IS NOT A WITNESS WHO'S GOING TO BE AT

 2    TRIAL.

 3            AND WE'RE TALKING ABOUT FIVE, TEN MINUTES OF DEPOSITION

 4    DESIGNATIONS.

 5                THE COURT:  AND IS THE COUNTER-DESIGNATION IN THE

 6    CLIP THAT YOU'RE PLAYING?

 7                MR. PEREZ:  YES.

 8                THE COURT:  SO THEY'RE NOT GOING TO HAVE TO PUT THAT

 9    ON SEPARATELY?

10                MR. PEREZ:  NO.

11                MR. AKROTIRIANAKIS:  WHAT WE'VE COUNTER-DESIGNATED,

12    YOUR HONOR, IS HIM -- BECAUSE LET'S BE CLEAR, WHAT THEY'RE

13    GOING TO TRY AND DO IS ASK THE JURY TO BELIEVE THE $12 MILLION

14    NUMBER AND TO PROVE THAT IT'S NOT THE $12 MILLION NUMBER, WE'RE

15    GOING TO HAVE TO OFFER THE OTHER EXHIBIT THAT I SHARED WITH THE

16    COURT YESTERDAY WHERE THEY'RE SAYING, YEAH, THE TOTAL OF ALL

17    SALES IN THE UNITED STATES WAS 7.6 MILLION, 4 MILLION TO THE

18    CIA, WHICH IS THE LOWER CHART, AND EVEN LESS THAN THE LOWER

19    CHART, 3.6 MILLION, TO THE FBI.

20                THE COURT:  AND WERE YOU ALL PLANNING ON MENTIONING

21    THOSE TWO GOVERNMENTAL AGENCIES?

22                MR. PEREZ:  OF COURSE NOT, YOUR HONOR.  CUSTOMER

23    IDENTITIES ARE EXCLUDED BY MIL 1.  LET ME CORRECT MYSELF, THE

24    TOTAL TIME OF THE DESIGNATIONS THAT WE'VE NOW BEEN DISCUSSING

25    IS 2 MINUTES AND 41 SECONDS.
```

1          MR. AKROTIRIANAKIS:  YOUR HONOR HAS ALREADY EXCLUDED

2     THIS DOCUMENT.  ALL WE'RE TALKING ABOUT NOW IS ARE YOU GOING TO

3     ALLOW HIM TO HAVE A WITNESS READ FROM A DOCUMENT.

4          THE COURT:  HE CAN'T READ FROM THE DOCUMENT THAT'S

5     ALREADY BEEN EXCLUDED.

6          YOU KNOW, IN LOOKING AT THE AUTHORITY THAT YOU ALL

7     SUBMITTED, I THINK IN MY LATEST RULING LAST FRIDAY, I INDICATED

8     I WAS MORE PERSUADED BY THE DEFENSE AUTHORITY THAT THE

9     FINANCIAL STATUS, ET CETERA, GOES MORE TO THE PUNITIVE DAMAGES

10    QUESTION IN TERMS OF THAT PORTION OF THE INSTRUCTION THAT SAYS,

11    YOU KNOW, IT'S DESIGNED TO PUNISH BUT NOT TO BANKRUPT A

12    PARTICULAR PARTY.

13         I JUST DON'T THINK THAT YOU NEED A WHOLE LOT OF DETAIL TO

14    ARGUE THAT, INDEED, THEY HAD A PROFIT MOTIVE.

15         SO I ANTICIPATED SOMETHING MUCH MORE GENERAL THAN TALKING

16    ABOUT SPECIFIC CONTRACTS.

17         MR. PEREZ:  THIS IS NOT SPECIFIC CONTRACTS,

18    YOUR HONOR.

19         WE HAVE EVIDENCE OF SPECIFIC CONTRACTS --

20         THE COURT:  OF SPECIFIC LICENSES, I MEAN.

21         MR. ANDRES:  THIS IS THEIR GENERAL PRICING, THEIR

22    GENERAL PRICING, THEIR PRICING STRUCTURE, HOW THEY CHARGE FOR

23    THIS.

24         THE COURT:  WELL, I DON'T REALLY -- IF IT'S GOING TO

25    BE DONE BY VIDEO, I DON'T WANT THERE TO BE SOME CONFLICT ABOUT

1        WHAT NUMBER IS CORRECT AND WHAT ISN'T CORRECT.

2            IF THERE'S SOMETHING -- IF YOU HAVE A WITNESS THAT CAN

3        TESTIFY, GENERALLY SPEAKING, THIS IS HOW MUCH A LICENSE COSTS

4        FOR WHATEVER NUMBER OF LINES OR WHATEVER, FINE.

5            BUT IF THERE'S -- IF THERE'S A CONFLICT IN THE EVIDENCE ON

6        VIDEO, I THINK THAT JUST OVERLY COMPLICATES THINGS.

7                MR. PEREZ:  YOUR HONOR, WE CAN DO IT WITHOUT, I

8        BELIEVE, THE DIVITTORIO.

9            BUT THE GIL, THAT IS THE WITNESS THAT THEY PUT FORWARD ON

10       THAT TOPIC AS THEIR CORPORATE DESIGNEE.  AND SO TO DEPRIVE US

11       OF THE OPPORTUNITY TO PUT IN WHAT SHE TESTIFIED ABOUT THE

12       PRICING, IT LEAVES US WITH NO EVIDENCE AS TO WHAT THEY TOLD.

13               THE COURT:  AND --

14               MR. PEREZ:  WE HAVE DETAILED INFORMATION, AND WE PUT

15       IT TO THE SIDE.

16               THE COURT:  AND GIL DOESN'T RELY ON THESE DOCUMENTS;

17       IS THAT CORRECT?

18               MR. PEREZ:  NO.

19               THE COURT:  OKAY.  THAT'LL BE FINE.

20               MR. PEREZ:  THANK YOU, YOUR HONOR.

21               THE COURT:  BUT NOT DIVITTORIO ON THIS.

22               MR. PEREZ:  THANK YOU.

23               THE COURT:  OKAY.  NEXT.

24               MR. BLOCK:  ONE MORE, YOUR HONOR.

25           MICAH BLOCK FOR PLAINTIFFS.

1          THIS IS FOR MR. ESHKAR.  MAY I HAND UP AN EXCERPT?

2               THE COURT:  OKAY.

3               MR. BLOCK:  (HANDING.)

4               THE COURT:  OKAY.  WHO'S MR. ESHKAR?

5               MR. BLOCK:  MR. ESHKAR WAS, I BELIEVE HE'S SVP OF THE

6     CUSTOMER BASE DIVISION.  IN ANY EVENT, HE IS AN EXECUTIVE WITH

7     DEFENDANTS WHO WAS DEPOSED IN HIS PERSONAL AND REPRESENTATIVE

8     CAPACITY.

9          THE PARTIES HAVE COME TOGETHER ON NEARLY ALL OF THE

10    DESIGNATIONS AND COUNTER-DESIGNATIONS.  THIS ONE DISPUTE

11    REMAINS.

12         WHAT YOU SEE IN YELLOW IS OUR DESIGNATION.  IN BLUE, IT'S

13    PRINTED VERY LIGHT, BUT CAN YOU SEE THE BLUE ON THE FIRST

14    COUPLE OF PAGES?

15              THE COURT:  YEAH.

16              MR. BLOCK:  THAT BLUE IS COUNTER-DESIGNATION TO WHICH

17     WE DO NOT OBJECT.

18         IF YOU CONTINUE TO FLIP -- AND I'LL GIVE THE COURT, OF

19    COURSE, TIME TO READ IT BECAUSE THERE'S NOT THAT MUCH OF IT --

20    ALL THE REST IS ADDITIONAL COUNTERS THAT -- TO WHICH WE HAVE

21    TWO OBJECTIONS, AND I'LL BE PREPARED TO ADDRESS THOSE AS SOON

22    AS THE COURT'S READY.

23              THE COURT:  PAST PAGE 19, IN THE ORANGE?

24              MR. BLOCK:  CORRECT.  ALL OF THE ORANGE IS ADDITIONAL

25     COUNTERS TO PAGE 18 THAT COME FROM 239, 240, 269, 270.

```
 1              THE COURT:  OKAY.  YOU DON'T OBJECT TO THE

 2     HIGHLIGHTED YELLOW AND BLUE ON PAGES 18 AND 19?

 3              MR. BLOCK:  CORRECT.  THE YELLOW IS OUR DESIGNATION.

 4     THE BLUE WE'VE ACCEPTED AS A PROPER COUNTER-DESIGNATION.

 5              THE COURT:  AND WHAT'S THE SUBJECT?  WHAT'S THIS

 6     ABOUT?

 7              MR. BLOCK:  THE SUBJECT MATTER OF THE TESTIMONY,

 8     WE'RE ASKING HIM WHY YOU SET UP ANONYMIZED WHATSAPP ACCOUNTS

 9     FOR YOUR CUSTOMERS, THE ENTIRE INFRASTRUCTURE IS ANONYMIZED TO

10     PROTECT THE CUSTOMER AND THE INFRASTRUCTURE THAT THEY'RE USING.

11         THIS GOES, YOUR HONOR, TO THEIR PRACTICES OF HIDING,

12     KEEPING THINGS SECRET, WHICH IS RELEVANT TO THE NATURE OF THE

13     CONDUCT FOR PURPOSES OF SHOWING PUNITIVE DAMAGES.

14              THE COURT:  OKAY.  SO THIS IS YOUR QUESTIONS TO THIS

15     MR. ESHKAR?

16              MR. BLOCK:  CORRECT.

17              THE COURT:  WHO'S AN NSO --

18              MR. BLOCK:  -- EXECUTIVE, CORRECT.

19              THE COURT:  -- EXECUTIVE.  OKAY.

20         AND THE ANONYMIZED WHATSAPP ACCOUNTS ARE THOSE THAT WERE

21     THEN USED TO LAUNCH THE PEGASUS THROUGH THE WIS?

22              MR. BLOCK:  WELL, I -- I BELIEVE THAT THAT'S CORRECT.

23         BUT THERE'S SOME DISPUTE ABOUT THAT.

24         WHAT WE KNOW FOR SURE, YOUR HONOR, IS THAT THEY HAD AN

25     ENTIRE DEPARTMENT DEDICATED TO CREATING THESE ACCOUNTS.  THIS
```

1    WAS RELEVANT IN PART TO THE TERMS OF SERVICE, BECAUSE EACH TIME

2    THEY CREATED ONE OF THESE ANONYMIZED ACCOUNTS, THEY WENT

3    THROUGH AND ACCEPTED THE TERMS.

4        WE KNOW THAT THEY USED THEM AT LEAST FOR DEMONSTRATIONS.

5    I BELIEVE THE EVIDENCE SUPPORTS THAT THEY ALSO USED THEM WITH

6    ACTUAL CUSTOMERS, BUT AS YOU KNOW, AND I DON'T THINK WE NEED TO

7    LITIGATE IN CONNECTION WITH THESE DESIGNATIONS, THERE ARE

8    LIMITS TO WHAT WE WERE PROVIDED IN DISCOVERY.

9            THE COURT:  OKAY.

10           MR. BLOCK:  SO THE BLUE SEEMS TO US A PROPER

11    COUNTER-DESIGNATION IN RELATION TO THE YELLOW.

12       WHEN WE GO ON, ON PAGES 239 TO 240, THE FIRST PROBLEM WITH

13    THIS IS WE WON'T WE WILL BE CALLING THE WITNESS, PLAYING THEIR

14    COUNTER, THEY ARE EXCERPTING FOR MOTION IN LIMINE REASONS,

15    WHICH WE AGREE WITH, A PORTION OF AN ANSWER THAT THEY CERTAINLY

16    CANNOT PLAY.

17       HOWEVER, TO PLAY THE REMAINING PORTION OF THE ANSWER WOULD

18    LOSE THE SENSE OF IT.

19       SO YOU HAVE SORT OF THE PROBLEM THAT MR. PEREZ WAS JUST

20    DISCUSSING WITH YOU, PERHAPS HAD THEY - HAD YOUR RULING AT THE

21    TIME, THEY WOULD HAVE ASKED A DIFFERENT QUESTION.  BUT THIS IS

22    HOW THE TESTIMONY CAME IN.  THE TESTIMONY IS ON WHAT YOU

23    EXCLUDED, AND IT'S GOING TO LOOK VERY STRANGE TO THE JURY IF

24    IT'S CLIPPED FROM "BECAUSE THE CLIENTS" TO "WANT TO KEEP IT

25    CONCEALED," ET CETERA.

 1              MR. AKROTIRIANAKIS:  AND THIS IS FROM THE DIRECT

 2     EXAMINATION, YOUR HONOR, NOT CROSS-EXAMINATION?

 3              MR. BLOCK:  I BELIEVE THAT'S CORRECT.

 4              THE COURT:  OKAY.  AND IS THAT THE CASE WITH REGARD

 5     TO ALL THE REMAINING ORANGE PORTIONS AS WELL?

 6              MR. BLOCK:  NO.

 7              MR. AKROTIRIANAKIS:  269 AND 270 ARE MY

 8     CROSS-EXAMINATION, YOUR HONOR.

 9              THE COURT:  OKAY.

10              MR. AKROTIRIANAKIS:  SO WE COULD --

11              THE COURT:  WITH REGARD TO THE 239, 240, IT DOES SEEM

12     TO ME THAT IT MAKES NO SENSE WITH THE PORTIONS THAT YOU ARE

13     PROHIBITED FROM USING.  SO I WOULD NOT APPROVE THAT AS A

14     COUNTER-DESIGNATION TO BE READ.

15              MR. BLOCK:  AND THEN --

16              THE COURT:  AND THEN 269 AND 270?

17              MR. BLOCK:  CORRECT.

18              THE COURT:  WHAT ARE THOSE?

19              MR. BLOCK:  SO THESE ARE TESTIMONY THAT THEY HAVE

20     COUNTERED FROM A DIFFERENT TIMEFRAME, AND SO THEY'VE OBJECTED

21     TO OUR TALKING ABOUT WHAT NSO DOES TODAY.

22          AND IT STARTS, "DOES NSO TODAY PROVIDE ANONYMIZED WHATSAPP

23     ACCOUNTS FOR USE BY CUSTOMERS?

24          "NO.

25          "HAS THAT BEEN THE CASE FOR SOME TIME?"

1          AND THEN THIS IS THE TESTIMONY WHERE THEY SEEK TO PUT IN

2     DISPUTE THE PURPOSE OF THE ACCOUNTS THAT THEY CREATE.

3          SO THAT DOES NOT RELATE TO OUR -- TO WHAT WE HAVE

4     DESIGNATED AFFIRMATIVELY.

5          AND, OF COURSE, IF THEY WANT TO CALL MR. ESHKAR TO THE

6     STAND, WE'LL BE HAPPY TO CROSS HIM.

7               THE COURT:  BUT HOW IS IT RELEVANT TO WHAT WE'RE

8      DOING TODAY?

9               MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  WE --

10              THE COURT:  DOESN'T THAT JUST GO TO --

11              MR. AKROTIRIANAKIS:  WE CAN WITHDRAW THIS,

12     YOUR HONOR, THESE TWO PAGES.

13              THE COURT:  OKAY.

14              MR. AKROTIRIANAKIS:  WE -- THE DISCUSSION OF THIS WAS

15     VERY LATE LAST NIGHT AND IT DIDN'T INVOLVE ME, I'M SORRY.

16              THE COURT:  OKAY.

17              MR. AKROTIRIANAKIS:  SO I'M NOT TRYING TO SAY I'M NOT

18     RESPONSIBLE FOR IT.  OF COURSE I AM.  BUT I WITHDRAW THIS.

19              THE COURT:  YOU WITHDRAW THIS.  OKAY.  ALL RIGHT.

20              MR. BLOCK:  THAT'S IT.  I BELIEVE ALL OF OUR VIDEOS

21      WILL NOW BE READY TO GO.

22          WE WILL BE MOVING SOME EXHIBITS IN THROUGH THE VIDEOS, AND

23     I ASSUME THE PRACTICE WOULD BE TO JUST MOVE THOSE IN BEFORE WE

24     PLAY IT SO THAT THEY CAN BE DISPLAYED WITH THE VIDEO?

25              THE COURT:  RIGHT.

1          MR. BLOCK:  THOSE ARE ALL DISCLOSED.  SO FAR AS I'M

2     AWARE, THERE ARE NO OBJECTIONS TO THE EXHIBITS THAT ARE COMING

3     IN.

4          THE COURT:  OKAY.

5          MR. BLOCK:  THANK YOU, YOUR HONOR.

6          THE COURT:  AND FOR YOU?

7          MR. AKROTIRIANAKIS:  SO ONE THING I WANT TO JUST SAY

8     RIGHT OUT OF THE GATE HERE, YOUR HONOR, IS THAT THEY MOVED IN A

9     DOCUMENT, EXHIBIT 10, WHICH THEN I WAS USING THEIR COPY OF IT

10    BECAUSE IT WAS THE ONE THAT WAS IN EVIDENCE, RATHER THAN HAVE

11    MULTIPLE VERSIONS OF THE SAME DOCUMENT WITH DIFFERENT EXHIBIT

12    NUMBERS, MY EXPERIENCE IS IT TENDS TO BE CONFUSING.

13          THE COURT:  OKAY.

14          MR. AKROTIRIANAKIS:  SO THEY MOVED IN THIS EXHIBIT

15    10, AND THEN I WAS USING THEIR VERSION OF IT, WHICH HAS NO

16    REDACTIONS, AND, FOR EXAMPLE, IT SAYS ON PAGE 5 -- THIS IS THE

17    ONE THAT THE COURT WAS LOOKING AT.

18          THE COURT:  RIGHT.  I HAVE IT.

19          MR. AKROTIRIANAKIS:  IT SAYS LIKELY THERE ARE

20    JOURNALISTS, HUMAN RIGHT ACTIVISTS AND OTHERS ON THE LIST.

21          THE COURT:  RIGHT.  THAT NEEDS TO BE REDACTED.

22          MR. PEREZ:  THAT NEEDS TO BE REDACTED, YOUR HONOR,

23    AND WE HAVE A PROPOSED REDACTION.  THAT WAS AN OVERSIGHT ON OUR

24    PART, AND IT WASN'T SHOWN TO THE JURY.

25          MR. AKROTIRIANAKIS:  IT WAS SHOWN TO THE JURY.

1            MR. PEREZ:  IT WAS SHOWN TO THE JURY BY YOU.

2            MR. AKROTIRIANAKIS:  I DIDN'T REALIZE THAT THEY

3    DIDN'T FOLLOW THE COURT'S ORDERS WITH RESPECT TO DOCUMENTS THAT

4    THEY WERE MOVING INTO EVIDENCE, YOUR HONOR.

5            THE COURT:  DID YOU SHOW THIS PARTICULAR PAGE?

6            MR. AKROTIRIANAKIS:  YEAH.  THE COURT MIGHT REMEMBER

7    THAT I WAS TRYING TO READ THIS PART ABOUT SCOPE OF AFFECTED

8    USERS AND I WANTED MR. GHEORGHE TO TELL US HOW IT WAS THAT THEY

9    GOT THE --

10            THE COURT:  WE DON'T KNOW IF THE JURY PAID ATTENTION

11    TO IT.  I DIDN'T NOTICE THAT UNTIL YOU STARTED TALKING ABOUT

12    THE LIST OF AFFECTED PHONE NUMBERS, BUT THEN YOU STOPPED.

13            MR. PEREZ:  YES.  YOU REMEMBER WE OBJECTED AND WE

14    TOOK IT DOWN IMMEDIATELY.

15            THE COURT:  RIGHT, RIGHT.

16        YOU ALL NEED TO -- YOU KNOW THAT THERE ARE REDACTIONS THAT

17    REQUIRE NOT ONLY BECAUSE OF MY PRETRIAL RULINGS, BUT BECAUSE OF

18    OTHER CONSTRAINTS THAT YOU HAVE.

19        THERE ARE REDACTIONS THAT SHOULD BE CONDUCTED IN ADVANCE

20    OF ANY OF THESE DOCUMENTS BEING PRESENTED BY EITHER SIDE.

21            MR. PEREZ:  YES, YOUR HONOR.

22            MR. AKROTIRIANAKIS:  WELL, I MEAN, YOUR HONOR, THERE

23    WAS ANOTHER DOCUMENT, THIS IS -- IN EVIDENCE AS EXHIBIT 13

24    THAT, YOU KNOW, OUR VERSION OF IT, AT THE COURT'S DIRECTION AND

25    THEIR REQUEST, FOR EXAMPLE, REMOVED ALL THE NAMES OF ALL OF

```
 1        THE -- ALL OF THE EMPLOYEES WHO ARE NOT ON THE LIST OF PEOPLE
 2   FOR WHOM THEY'RE SEEKING COMPENSATION.
 3        AND THEN --
 4             THE COURT:  WELL, THESE HAD NAMES ON IT.
 5             MR. AKROTIRIANAKIS:  THIS IS THEIR DOCUMENT.
 6             THE COURT:  YOU USED IT AS WELL, THOUGH.
 7             MR. AKROTIRIANAKIS:  I DID, YOUR HONOR.  MY POINT IS
 8   THAT WE NOW HAVE TWO STANDARDS.  WE HAVE A BUNCH OF RULES THAT
 9   WE'RE GOING TO PLAY BY AND, FRANKLY, SPENDING A LOT OF TIME
10   TRYING TO ADHERE TO, AND LIKE THE COURT SAW IN EXHIBIT 1148, WE
11   HAD TO REDACT MR. MOHAMED'S NAME AS AN AUTHOR OF THAT IMPORTANT
12   DOCUMENT BECAUSE HE'S NOT A PERSON WHO'S --
13             THE COURT:  SURE.  IT SHOULD BE ACROSS THE BOARD.
14   BOTH SIDES SHOULD HAVE TO REDACT IN CONFORMANCE WITH THE PRIOR
15   ORDERS.
16             MR. AKROTIRIANAKIS:  I JUST WANT IT TO BE THE SAME
17   FOR BOTH, YOUR HONOR.
18        AND FURTHER TO THAT, WHEN MR. WOOG WAS TESTIFYING, YOU
19   KNOW, COUNSEL PUT UP THE TERMS OF SERVICE AND WANTED THE
20   WITNESS TO READ THE PARTS OF IT THAT HAVE NOTHING TO DO WITH
21   THE COURT'S FINDING OF LIABILITY IN THIS CASE, AND THEN HE TOLD
22   THE JURY, I JUST WANT THE JURY TO UNDERSTAND THE BASES UPON
23   WHICH THE COURT HAS ALREADY FOUND DEFENDANTS LIABLE, AND IT WAS
24   ON THE SCREEN, AND IT'S NOT, OF COURSE, THE BASES THAT THE
25   COURT HAS FOUND THE DEFENDANTS LIABLE.
```

```
 1              THE COURT:  BUT THE ONLY -- CORRECT.  THERE WAS A

 2     HIGHLIGHTED PORTION THAT INCLUDED THE ONLY BASIS, THAT WAS

 3     SUBSECTION A.

 4          THE REST OF IT SHOULD HAVE BEEN REDACTED.

 5              MR. AKROTIRIANAKIS:  HERE AGAIN, YOUR HONOR, NOW --

 6     YEAH, THE -- THE SCREEN RIGHT BEFORE THAT WAS, YOU KNOW, THESE

 7     ARE THE LEGAL USES, IMPLYING THAT ANY OTHER USE IS ILLEGAL AND

 8     SO ON.  THAT'S NOT PART OF THE COURT'S ORDER.  THE COURT HASN'T

 9     FOUND THE DEFENDANTS LIABLE AS TO ANY OF THOSE THINGS.

10          COUNSEL HAS NOW TOLD THE JURY THAT THE COURT DID FIND THE

11     DEFENDANTS LIABLE ON THOSE BASES.

12              THE COURT:  YOU KNOW, ALL I CAN DO IS RESPOND TO YOUR

13     OBJECTIONS.

14              MR. AKROTIRIANAKIS:  WELL, I OBJECTED AS TO THE --

15              THE COURT:  IF IT'S -- IF IT HASN'T BEEN REDACTED,

16     LET ME MAKE IT CLEAR FOR THE REST OF THE TRIAL, IT SHOULD NOT

17     BE DISPLAYED UNTIL IT IS REDACTED.

18          YOU ALL ARE FAMILIAR WITH ALL THESE DOCUMENTS.  I'M SEEING

19     IT, ALMOST ALL OF THEM, FOR THE VERY FIRST TIME.  YOU NEED TO

20     BE VERY CAREFUL.  I ADMONISH YOU TO LOOK AT THEM TONIGHT, LOOK

21     AT THEM EACH EVENING BEFORE YOU PUT THEM ON, AND IF THEY NEED

22     TO BE REDACTED, DO SO BEFORE IT'S PUBLISHED.

23              MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.

24              THE COURT:  BOTH SIDES.

25              MR. AKROTIRIANAKIS:  ANOTHER THING, YOUR HONOR,
```

```
1         AND -- WELL, ON THE ISSUE THAT MR. ANDRES WAS RAISING EARLIER

2     ABOUT SAYING IT WAS JUST A WILD THEORY, I DON'T REMEMBER THE

3     EXACT LANGUAGE, THAT I HAD THAT THEY WERE TRYING TO STEAL THE

4     PEGASUS AGENT --

5             THE COURT:  OH, YEAH, I WANT TO SEE THAT.

6             MR. AKROTIRIANAKIS:  I CAN DO IT ON THE ELMO OR I CAN

7     HAND THE COURT THIS COPY.

8             THE COURT:  DOES OPPOSING COUNSEL HAVE IT?

9         OKAY.

10            MR. AKROTIRIANAKIS:  SO --

11            THE COURT:  LET ME -- YEAH, JUST GIVE IT TO KELLY.

12            MR. AKROTIRIANAKIS:  THE -- THEY DESIGNATED A

13    WITNESS, IT'S THE GENTLEMAN WHO'S GOING TO TESTIFY AFTER

14    MR. GHEORGHE, AND THIS IS THE HIGHLIGHTED PART THERE.  THIS IS

15    MR. MASERATI, WHO IS SOMEWHERE OUT THERE.  THERE HE IS.  OKAY.

16        THEY DESIGNATED A 30(B)(6) WITNESS ON THIS TOPIC AND HE

17    TESTIFIED AT LENGTH ABOUT THEIR EFFORTS IN THIS DEPOSITION TO

18    OBTAIN THE PEGASUS AGENT, AND I'VE GOT TWO DOCUMENTS WHICH --

19            THE COURT:  TO OBTAIN THE PEGASUS --

20            MR. PEREZ:  YES, YOUR HONOR.

21            THE COURT:  THAT'S DIFFERENT FROM STEALING.

22            MR. PEREZ:  THIS IS THEIR TOPIC THAT'S BEING READ,

23     AND THE LANGUAGE IS, TO OBTAIN A COPY OF PEGASUS IN CONNECTION

24    WITH INVESTIGATING AND REMEDIATING DEFENDANTS' EXPLOIT.

25        WHAT HE OPENED ON WAS AN EFFORT TO STEAL INTELLECTUAL
```

```
1       PROPERTY, COMPLETELY DIFFERENT.

2               MR. AKROTIRIANAKIS:  YOUR HONOR, THIS IS THEIR

3       REWRITING OF OUR TOPIC, AND THEY DID AGREE TO PUT FORWARD A

4       WITNESS, AND HE TESTIFIED ABOUT THEIR EFFORTS TO GO -- AND IT

5       WASN'T ON THEIR SERVERS.  THEY WENT TO AWS AND THEY SNOOPED

6       AROUND AND THEY CONVINCED SOMEBODY AT AWS, THAT'S WHAT THEY

7       DIDN'T WANT TO TELL THEIR LAWYERS ABOUT, AS THE COURT SAW, AND

8       SAID, HEY, CAN YOU LOOK BEHIND AND SEE WHAT'S ON THIS SERVER?

9           AND THERE'S A NUMBER -- I'M NOT GOING TO BELABOR THIS WITH

10      THE WITNESS UNLESS THE COURT NEEDS MORE FOUNDATION AS TO WHAT

11      THEY WERE, IN FACT, TRYING TO DO.

12              THE COURT:  YOU CANNOT USE THE WORD "STEAL" IF THE

13      TESTIMONY ONLY SUPPORTS THE EFFORT TO OBTAIN A COPY IN

14      CONJUNCTION --

15              MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.

16              MR. PEREZ:  THIS IS NOT TESTIMONY --

17              THE COURT:  IN CONJUNCTION WITH THE INVESTIGATION AND

18      REMEDIATION.

19              MR. PEREZ:  YES, AND THIS IS NOT TESTIMONY THAT HE'S

20      READING FROM HERE.

21              THE COURT:  OH.  WHAT IS IT?

22              MR. PEREZ:  THIS IS AN ATTORNEY SUMMARIZING THE TOPIC

23      ON WHICH THE WITNESS WAS DESIGNATED.

24              THE COURT:  IT'S NOT TESTIMONY.

25              MR. PEREZ:  IT'S NOT TESTIMONY.
```

1          MR. AKROTIRIANAKIS:  THERE'S SUBSEQUENT -- I DIDN'T

2     WANT TO GIVE --

3          THE COURT:  THIS DOESN'T SUPPORT YOUR INTENT TO

4     ACCUSE THEM OF ATTEMPTING TO STEAL.

5          MR. AKROTIRIANAKIS:  WELL, I THINK THAT --

6          THE COURT:  NO, THIS ISN'T ENOUGH.

7          MR. AKROTIRIANAKIS:  WELL, WHAT --

8          MR. PEREZ:  THANK YOU, YOUR HONOR.

9          MR. AKROTIRIANAKIS:  I DO WANT TO ASK THE WITNESS

10    WHAT THEY WERE TRYING TO DO IN RESPECT OF OBTAINING THE, THE --

11    FETCHING THE PAYLOAD AS HE PUT IT.

12         THE COURT:  YOU CAN ASK THAT QUESTION.

13        BUT YOU CAN'T CHARACTERIZE IT AS STEALING, NOT WHEN YOU

14    DON'T HAVE ANY EVIDENCE OF THAT.  IF THIS IS ALL YOU'VE GOT,

15    IT'S --

16         MR. AKROTIRIANAKIS:  IT'S NOT ALL I HAVE, YOUR HONOR.

17    I THINK I CAN DEVELOP THE TESTIMONY, AND WE CAN -- AS WE ALWAYS

18    DO, REVISIT, YOU KNOW, WHAT THE TESTIMONY SUPPORTS OR DOES NOT.

19         THE COURT:  WELL, I'M NOT -- YOU MAY NOT ASK A

20    WITNESS A QUESTION USING THE WORD "THEFT" OR "STEALING" IF THIS

21    IS ALL YOU HAVE.  YOU NEED TO SHOW ME SOMETHING THAT IS MUCH

22    STRONGER THAN OBTAINING A COPY IN CONNECTION WITH THE

23    INVESTIGATION IF YOU WANT TO BE ABLE TO MAKE THAT

24    CHARACTERIZATION.

25         MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.  I WILL

```
1    DO THAT.

2              MR. PEREZ:  YEAH.  AND YOUR HONOR, THERE'S ANOTHER

3    PROBLEM, WHICH IS THAT HE OPENED ON THIS.

4              THE COURT:  I KNOW HE DID.

5              MR. PEREZ:  HE OPENED ACCUSING US OF TRYING TO STEAL

6    THEIR INTELLECTUAL PROPERTY, AND THERE IS NO EVIDENCE OF THAT.

7              THE COURT:  ACTUALLY -- ACTUALLY, LET ME HOLD ON TO

8    THIS.

9         OKAY.

10             MR. PEREZ:  NOTHING FURTHER FROM US, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  ANYTHING ELSE?

12             MR. AKROTIRIANAKIS:  THERE'S AN EXHIBIT, YOUR HONOR,

13   THAT -- ONE OF THE EXHIBITS THAT THE COURT REFERENCED DURING

14   THE SECOND PRETRIAL CONFERENCE, OR THE FURTHER PRETRIAL

15   CONFERENCE THAT WE DID ON VIDEO, YOU SAID THAT WE COULDN'T USE

16   A DOCUMENT, OR OTHER DOCUMENTS LIKE IT.

17        THERE ARE MANY VERSIONS OF SORT OF THE SAME THREAD, AND

18   THERE'S ONE THAT THE COURT WAS NOT LOOKING AT --

19             THE COURT:  IT WAS 1026.

20             MR. AKROTIRIANAKIS:  THAT WAS 1026 IS WHAT THE COURT

21   WAS LOOKING AT.

22        THERE'S ANOTHER ONE, 1021, THAT IS -- THAT INCLUDES A

23   BUNCH OF OTHER STUFF ABOVE, IF YOU WILL, IN AN EMAIL, WHAT THE

24   COURT EXCLUDED.  IT GOES DIRECTLY TO WHEN IT WAS THAT THEY

25   RESOLVED THE -- THAT THEY RESOLVED THE ISSUE HERE, AND THEY SAY
```

1    IT WAS IN MAY, AND I'VE REDACTED EVERYTHING BELOW THAT MESSAGE

2    THAT TALKS ABOUT EVERYTHING THAT WAS IN 1026.

3         SO EVERY SINGLE PART OF 1026 THAT WAS ALSO APPEARING HERE

4    IS A BLACK BOX, AND WE CAN EVEN GET RID OF ALL OF IT.  I HAVE

5    COPIES HERE, YOUR HONOR.

6         IF I MAY?

7              THE COURT:  OKAY.

8              MR. AKROTIRIANAKIS:  AND WHAT YOU'RE LOOKING AT IS,

9    IN THE MIDDLE OF THE PAGE, SUSAN GLICK IS A PRETTY HIGH LEVEL

10   OFFICIAL AT WHATSAPP, AND SHE'S TELLING THE CEO OF THE COMPANY

11   ABOUT THE SECURITY FLAW THAT WHATSAPP FOUND AND FIXED BACK IN

12   MAY.

13        AND SO I WANT TO OFFER THIS DOCUMENT, EXHIBIT 1021, WITH

14   EVERYTHING, AS THE COURT SEES, REDACTED.  I CAN EITHER GET RID

15   OF THESE PAGES THAT HAVE NO TEXT ON THEM OR --

16             THE COURT:  I DON'T SEE ANY REDACTION ON THE ONE YOU

17   GAVE ME.

18             MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  MY

19   APOLOGIES.

20             THE COURT:  OKAY.  ALL RIGHT.  SO THIS IS JUST A

21   LITTLE.

22             MR. AKROTIRIANAKIS:  YEAH.  AND THE PART THAT THE

23   COURT IS LOOKING AT IS MS. GLICK WRITING AN EMAIL TO HER -- TO

24   THE CEO OF THE COMPANY TALKING, ON SEPTEMBER 6TH, 2018, SO

25   THAT'S STILL IN THEIR DAMAGES PERIOD, ABOUT HOW THEY HAD FIXED

 1    THIS PROBLEM WAY BACK IN MAY.  SO IT DIRECTLY RELATES TO THE

 2    SCOPE OF THE COMPENSATORY DAMAGES THAT ARE BEING ASKED FOR IN

 3    THIS CASE, YOUR HONOR.

 4         AND AS THE COURT KNOWS FROM OPENING STATEMENT, THE --

 5              THE COURT:  THIS IS -- I DON'T QUITE UNDERSTAND HOW

 6    IT WORKS HERE, BUT THIS APPEARS TO BE FROM SUSAN GLICK TO

 7    WILL CATHCART.  I'M ASSUMING NEITHER ONE OF THEM ARE GOING TO

 8    TESTIFY.

 9              MR. AKROTIRIANAKIS:  MS. GLICK AUTHENTICATES THIS

10    DOCUMENT IN HER DEPOSITION.  SHE LIVES IN NORTH CAROLINA,

11    DOESN'T WORK FOR WHATSAPP ANYMORE.  SHE WENT TO LAW SCHOOL

12    ACTUALLY, AND WE'RE GOING TO PLAY SOME VERY BRIEF TESTIMONY

13    FROM HER DEPOSITION.

14              THE COURT:  OKAY.

15              MR. AKROTIRIANAKIS:  INCLUDING AUTHENTICATING THIS

16    DOCUMENT.

17         BUT SHE DOESN'T MAKE REFERENCE IN THE PART THAT WE'RE

18    DESIGNATING TO ANY OF THE CONTEXT THAT HAS THE REDACTING BOX

19    OVER THE TOP OF IT.  WHAT SHE'S DOING HERE IS SHE'S DRAFTING A

20    LETTER FOR -- DRAFTING AN EMAIL FOR WILL CATHCART.

21         AND SO THE POINT IS THAT, TO HER CEO, SHE WOULD BE MAKING

22    AS ACCURATE A STATEMENT AS SHE COULD AS TO HER UNDERSTANDING OF

23    THE FACTS AT THE TIME, WHICH ARE THAT THEY FOUND AND FIXED THIS

24    BACK IN MAY.

25         NOW, OF COURSE, THEY'RE ASKING FOR DAMAGES, LIKE, SIX

```
 1      MONTHS BEYOND THAT, WHICH IS ACTUALLY THE MAJORITY OF THE

 2      DAMAGES THAT THEY'RE SEEKING HERE.  AND IF THEY'RE GOING TO DO

 3      THAT, I THINK THAT IT'S FAIR THAT WE SHOULD BE ABLE TO POINT

 4      OUT, AS WE HAVE, THAT, AS I SAID IN THE OPENING STATEMENT, THAT

 5      THEY ACTUALLY FIXED THIS ON MAY 13TH, 2019.

 6               THE COURT:  AND WE JUST HEARD TESTIMONY TO THAT

 7      EFFECT.

 8               MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  THIS IS AN

 9      EMAIL THAT IS BEING SENT BY THE PERSON WHO'S WORKING ON IT TO

10      THE CEO OF THE COMPANY.  I TAKE IT THAT THEY'RE NOT LIKE

11      CONCEDING THAT THEY HAD FIXED IT IN MAY.  YOU JUST HEARD

12      MR. WOOG TALK ABOUT HOW THERE WAS OTHER THINGS THAT NEEDED TO

13      BE DONE AND THEY'RE MAKING ALL THESE OTHER CLAIMS THAT GO

14      BEYOND MAY.

15          SO I THINK THAT THIS DOCUMENT, EXHIBIT 1021 AS REDACTED,

16      IS IMPEACHING OF THAT POSITION THAT THEY WANT TO TAKE, AND I'VE

17      REDACTED OUT EVERYTHING THAT THE COURT'S EXCLUDED.

18               THE COURT:  OKAY.  RESPONSE.

19               MR. MARZORANTI:  YOUR HONOR, I THINK I CAN CUT

20      THROUGH THIS.

21          LUCA MARZORANTI FOR PLAINTIFFS.

22          AT THE APRIL 24TH CONFERENCE, COUNSEL FOR NSO SAID, QUOTE,

23      "THESE ARE ONE FAMILY OF DOCUMENTS.  IT'S DIFFERENT ITERATIONS

24      OF THE SAME EMAIL."

25               YOUR HONOR HAS ALREADY EXCLUDED A-1026.  A-1021 IS A
```

```
 1        DIFFERENT ITERATION OF THE SAME EMAIL.

 2             WE'RE NOT SEEKING COMPENSATION DAMAGES FOR SUSAN GLICK.

 3        WE'RE NOT SEEKING COMPENSATION DAMAGES FOR WILL CATHCART.

 4             I'M HAPPY TO HAND UP A VERSION OF THIS DOCUMENT ALONG WITH

 5        A-1026 WHICH ALREADY HAS ALREADY EXCLUDED.

 6             TO US, THIS IS ANOTHER EXAMPLE.  WE THOUGHT ALL THESE

 7        DOCUMENTS THAT NSO PUT FORWARD TO YOUR HONOR IN CONNECTION WITH

 8        THE PRETRIAL CONFERENCE, YOUR HONOR RULED THAT, ONE, ONE OF THE

 9        DOCUMENTS WAS IRRELEVANT.

10             WE HAD UNDERSTOOD THAT ALL FOUR OF THE DOCUMENTS WERE

11        IRRELEVANT ON THE --

12             THE COURT:  I HADN'T SEEN THEM.  I ONLY SAW THE ONE.

13         I COULDN'T FIND THEM.

14             MR. MARZORANTI:  I UNDERSTAND, YOUR HONOR.

15             AND I'M JUST TAKING NSO'S COUNSEL'S WORD THAT THEY ARE,

16        QUOTE, "ONE FAMILY OF DOCUMENTS," DIFFERENT ITERATION OF THE

17        SAME EMAIL.  THAT'S EXACTLY WHAT THEY ARE.  THEY'RE COMPLETELY

18        IRRELEVANT TO THIS CASE.

19             WE'RE NOT SEEKING COMPENSATORY DAMAGES FOR ANY OF THESE

20        PEOPLE, SUSAN GLICK, WILL CATHCART, THOSE ARE NOT PEOPLE THAT

21        WE'RE --

22             THE COURT:  WHAT ABOUT THEIR ARGUMENT THAT IT

23         SUPPORTS THE POSITION THAT THE FIX WAS COMPLETED IN MAY?

24         DOESN'T THAT GO TO DAMAGES?

25             MR. MARZORANTI:  THE FIX, YOU HEARD TESTIMONY TODAY
```

```
 1       ABOUT WHEN THE FIX WAS COMPLETED.  BUT THIS DOCUMENT, AGAIN, IS

 2       NOT GOING TO HELP SHOW -- THERE'S ONE INDIVIDUAL WHO WE ARE

 3       SEEKING DAMAGES FOR IN THE LATER PERIOD OF TIME.  HE DIDN'T

 4       SEND EITHER OF THESE EMAILS.  NSO HAS CALLED HIM LIVE TO

 5       TESTIFY.  SO I JUST THINK IT'S AN INAPPROPRIATE WAY TO TRY TO

 6       IMPLICATE SENIOR PEOPLE AT PLAINTIFFS' COMPANIES AND BASICALLY

 7       GET THIS DOCUMENT IN THAT, AGAIN, I'M HAPPY TO PASS YOUR HONOR

 8       THE DOCUMENTS SO YOU CAN LOOK AT THEM SIDE BY SIDE.  BUT IT'S

 9       BASICALLY TWO VERSIONS OF THE SAME EMAIL.

10            MR. AKROTIRIANAKIS:  THE PART THAT IS NOT REDACTED IN

11       1021 IS NOT IN 1026.

12            THE COURT:  OKAY.  1026 I'VE ALREADY EXCLUDED.

13            MR. MARZORANTI:  RIGHT.  AND I'VE HIGHLIGHTED IN 1026

14       BASICALLY ALL OF THE PORTION THAT COMES OVER TO 1021.

15            THE COURT:  OKAY.  OKAY.  AND THEN IN 1021, IT'S ONLY

16       THE FIRST TWO PARAGRAPHS.

17            MR. MARZORANTI:  AND IT'S ALSO VERY DIFFICULT TO

18       UNDERSTAND WHAT'S GOING ON IN THIS DOCUMENT BEING THAT -- I

19       THINK THE PARTIES BOTH AGREE THAT THE FINAL FOUR PAGES OF IT

20       ARE PRECLUDED UNDER THE COURT'S PRETRIAL RULINGS.

21            MR. AKROTIRIANAKIS:  THE WITNESS TESTIFIED THAT SHE

22       PREPARED THIS FOR HER CEO, AND SHE WAS TRYING TO BE AS ACCURATE

23       AS POSSIBLE IN COMMUNICATING WITH HER CHIEF EXECUTIVE OFFICER,

24       YOUR HONOR, WHICH I THINK STANDS TO REASON AND KIND OF MAKES

25       SENSE.
```

```
 1              THE COURT:  AND WILL CATHCART IS WHO?

 2              MR. AKROTIRIANAKIS:  HE'S THE CEO OF WHATSAPP, AND

 3    THAT ALSO IS IN THE DESIGNATIONS.

 4          I THINK IT'S CLEAR ANYWAY, BUT --

 5              THE COURT:  WELL, THERE'S NOTHING IN THE FIRST

 6    PARAGRAPH THAT'S OFFENDING.

 7          OKAY.  ALL RIGHT.

 8          OKAY.  PUTTING ASIDE THE RULING WITH REGARD TO 1026, I

 9    HAVEN'T SEEN THIS, WHAT IS -- AND I THINK THERE'S ABSOLUTELY

10    NOTHING ABOUT THE FIRST PARAGRAPH THAT SHOULD CONCERN YOU.

11          WHAT IS IT ABOUT THE SECOND PARAGRAPH THAT YOU THINK IS

12    NOT RELEVANT?

13              MR. MARZORANTI:  YOUR HONOR, I THINK THERE'S A

14    FUNDAMENTAL RELEVANCE OBJECTION TO SUSAN GLICK'S ROLE IN THIS

15    CASE.  AGAIN, WE'RE NOT SEEKING COMPENSATORY DAMAGES FOR

16    SUSAN GLICK.  SHE'S NOT A SENIOR EXECUTIVE OF WHATSAPP.  SHE'S

17    A POLICY -- I DON'T WANT TO DISPARAGE HER POSITION, BUT SHE'S A

18    LOWER LEVEL POLICY EMPLOYEE AT WHATSAPP, NO LONGER A PART OF

19    THE COMPANY.

20          THIS, TO US, IS JUST AN EXAMPLE OF THEM TRYING TO PUT THE

21    EFFORTS OF THE SENIOR EXECUTIVES AT PLAINTIFFS -- AT

22    PLAINTIFFS' COMPANIES, FACEBOOK AND WHATSAPP, WHO REALLY HAD NO

23    INVOLVEMENT IN THE THINGS WE'RE SEEKING DAMAGES FOR BEFORE THE

24    JURY.

25          THIS IS THE ARGUMENT THAT THEY MADE AT THE PRETRIAL
```

```
 1    CONFERENCE, AND IN OUR VIEW, THIS WHOLE EMAIL, ALL FOUR

 2    EXHIBITS -- ALL FOUR EMAILS THAT NSO PREVIOUSLY SHOWED

 3    YOUR HONOR AND SAID THEY'RE BASICALLY THE SAME EMAIL ARE ALL

 4    IRRELEVANT.

 5             THE COURT:  BUT I'M NOT SO SURE THAT I AGREE THAT

 6    IT'S TOTALLY IRRELEVANT.  THIS IS SOME SUPPORT FOR THE POSITION

 7    THAT THE DEFENDANTS ARE TAKING THAT THE FIX OCCURRED BACK IN

 8    MAY.  I MEAN, I ASSUME THEIR ARGUMENT IS THAT THIS IS JUST A

 9    VERY SHORT PERIOD OF TIME, THAT THERE WAS ANY ONGOING INCURSION

10    ON THE WHATSAPP SERVERS.  THIS TENDS TO SUPPORTS THAT IT JUST

11    HAPPENED IN MAY.

12             MR. MARZORANTI:  BUT --

13             MR. AKROTIRIANAKIS:  AND THAT --

14             THE COURT:  AND THAT IT WAS FIXED.

15             MR. MARZORANTI:  YOUR HONOR, THE TESTIMONY IS CLEAR

16    THAT THE FIX, THE TECHNICAL FIX WAS PUSHED OUT IN MID-MAY.  THE

17    ONLY COMPENSATORY DAMAGES WE'RE SEEKING FOR THIS LATER PERIOD

18    ARE WORK OF MR. AASHIN GAUTAM, WHO IS NOT THE SENDER OF THIS

19    EMAIL.  HE WAS NOT INVOLVED IN THIS COMMUNICATION WITH -- AS HE

20    TESTIFIED AT HIS DEPOSITION, HE WAS NOT INVOLVED IN THIS

21    COMMUNICATION WITH WHATSAPP AND FACEBOOK SENIOR EXECUTIVES.  HE

22    WILL BE -- HE'S ON DEFENDANTS' WITNESS LIST.  HE'S PREPARED TO

23    COME HERE AND TESTIFY ABOUT THE LIMITED SCOPE OF WORK THAT HE

24    DID THAT MR. WOOG MENTIONED DURING HIS DIRECT EXAMINATION.

25             THIS JUST SEEMS LIKE A COMPLETE SIDESHOW TO US TO TRY TO
```

```
 1        GET IN THE REFERENCES TO WHATSAPP AND FACEBOOK SENIOR

 2        EXECUTIVES.

 3               MR. AKROTIRIANAKIS:  MR. GAUTAM IS A RECIPIENT OF

 4        THIS EMAIL, YOUR HONOR.  HE'S THE LAST NAME ON THE CC LINE, AND

 5        HE AND MR. GLICK -- MS. GLICK WERE HUGELY INVOLVED IN THIS,

 6        QUOTE-UNQUOTE, NOTIFICATION PROJECT WHICH MAKES UP THE GREATEST

 7        PART OF THE DAMAGES THAT THEY'RE SEEKING IN THIS CASE.

 8          THE FIRST PART IS $215,000.  THE LATER PART IS ALMOST

 9        $230,000.

10               THE COURT:  UM-HUM.  I'M SORRY.  I DON'T SEE THE LACK

11        OF RELEVANCE OF THIS.  I -- AND I ACTUALLY DON'T SEE ANY HARM.

12          THE -- I ASSUME, THOUGH, THAT YOU DON'T WANT THE NAMES IN.

13               MR. MARZORANTI:  I JUST THINK WE THINK THIS DOCUMENT

14        IS CUMULATIVE OF EVIDENCE THAT'S ALREADY IN THE RECORD.  IF

15        THEY'RE USING IT TO SHOW THAT THE FIX WAS ESTABLISHED ON

16        MAY 13TH, I THINK THE JURY HAS ALREADY HEARD THAT AND IT'S JUST

17        PREJUDICIAL TO BASICALLY -- WE THINK SUSAN GLICK'S ENTIRE

18        DEPOSITION DESIGNATION, THERE'S NO REASON FOR HER -- IT'S

19        COMPLETELY IRRELEVANT BASED ON YOUR HONOR'S PRETRIAL RULINGS.

20        JONATHAN LEE, THESE ARE ALL PEOPLE THAT WE'RE NOT CLAIMING

21        COMPENSATORY DAMAGES FOR.

22               THE COURT:  ALL RIGHT.  ARE YOU SAYING THAT THE

23        DEFENDANT SHOULDN'T BE ABLE TO USE MS. GLICK'S DEPOSITION?

24               MR. MARZORANTI:  YEAH.  WE BELIEVE THAT MS. GLICK IS

25        COMPLETELY IRRELEVANT, AND WE'VE OBJECTED TO HER DEPOSITION
```

```
 1      DESIGNATIONS.  I BELIEVE WE'RE STILL WAITING ON AMENDED

 2      DEPOSITION DESIGNATIONS.  YOU HEARD THE NAME OF AN INDIVIDUAL,

 3      JONATHAN LEE.  HE'S AN INDIVIDUAL THAT HAS ALREADY TRAVELED

 4      FROM WASHINGTON D.C. TO CALIFORNIA FOR THIS TRIAL.

 5              THE COURT:  WOULD SHE OTHERWISE, IF SHE WERE WITHIN

 6      THE COURT'S SUBPOENA POWER, BE SUBPOENAED TO -- SHE'S A

 7      WHATSAPP EMPLOYEE; RIGHT?

 8              MR. AKROTIRIANAKIS:  SHE'S A FORMER EMPLOYEE OF

 9      EITHER WHATSAPP OR -- WELL, SHE'S GOT A FACEBOOK EMAIL ADDRESS,

10      AS THE COURT CAN SEE HERE.  SHE LEFT THE COMPANY THIS -- MOVED

11      TO NORTH CAROLINA AND WENT TO LAW SCHOOL, AND SHE LIVES THERE.

12      SHE'S GOT A FAMILY AND ALL THAT.

13              THE COURT:  WELL, I THINK IT'S PART AND PARCEL --

14      WHETHER OR NOT THIS COMES IN DEPENDS ON WHETHER OR NOT HER

15      DEPOSITION IS GOING TO BE USED.  YOU ALL STILL NEED TO MEET AND

16      CONFER.

17          I DON'T SEE -- I -- I DON'T SEE THIS AS BEING UNDULY

18      CUMULATIVE TO THE TESTIMONY THAT'S ALREADY IN, AND I WOULD

19      ALLOW THE DEFENSE TO USE IT AS REDACTED IN THIS FORM.

20          BUT THAT'S ASSUMING THAT YOU ALL WORK OUT WHAT GLICK

21      SHOULD BE TESTIFYING ABOUT ANYWAY.

22              MR. AKROTIRIANAKIS:  THE LAST THING I HAD ON MY

23      LIST -- THANK YOU, YOUR HONOR.

24          THE LAST THING I HAD ON MY LIST FOR TODAY, THERE IS THE

25      FILING THAT WE DID YESTERDAY, WE DON'T NEED TO TAKE THAT UP
```

1     TODAY, I DON'T THINK IT COMES UP TOMORROW AT ALL.

2          THE COURT:  OKAY.

3          MR. AKROTIRIANAKIS:  BUT THE -- THE PARTS OF -- NOW

4     WE'VE GOT, LIKE, PARTS OF 1083 AND 1148 IN EVIDENCE.

5        1148 IS THE WHITE PAPER, AS MR. GHEORGHE TESTIFIED.

6          THE COURT:  RIGHT.

7          MR. AKROTIRIANAKIS:  1083 IS THE SAME AS PLAINTIFFS'

8     EXHIBIT 9, WHICH THEY DID NOT MARK BUT WAS IN THEIR BOOK.

9          THE COURT:  RIGHT.

10          MR. AKROTIRIANAKIS:  AND I THINK THAT THERE -- I

11    THINK THAT THE OBJECTION TO THE -- IF I COULD REFER THE COURT

12    TO PAGE 4 OF EXHIBIT 9, THE OBJECTION HERE, BEFORE THEY MOVED

13    IN EXHIBIT 10 AND EXHIBIT 13, WAS THAT IT MENTIONS THE WORD

14    "VULNERABILITY," AND NOW WE'VE HAD HOURS OF TESTIMONY ABOUT

15    THIS AFTER THEY MOVED IN EVIDENCE DOCUMENTS THAT THEY PRECLUDED

16    ME FROM ASKING MR. WOOG ABOUT WHEN HE WAS TESTIFYING ON

17    CROSS-EXAMINATION.

18          THE COURT:  YEAH.  THE DOOR WAS OPENED.

19          MR. PEREZ:  YOUR HONOR, WE WOULD SUGGEST, I THINK

20    THAT THE PLAYING FIELD ON THIS HAS CHANGED A LITTLE BIT, AND WE

21    WOULD JUST ASK IF WE CAN TAKE THIS AWAY AND GIVE IT SOME

22    THOUGHT TO SEE WHERE THE LINES SHOULD BE DRAWN, BECAUSE IT

23    ISN'T JUST THE WORD "VULNERABILITY."  AS I SAID, THAT'S JUST A

24    TERM OF ART.  IT'S JUST A CHARACTERISTIC OF THE SOFTWARE THAT A

25    BAD ACTOR EXPLOITS.

1          THE -- SO THAT'S NOT THE PROBLEM.

2          BUT THERE ARE THESE OTHER STATEMENTS IN THERE, LIKE

3    REFERENCES TO LAX SERVER SIDE SECURITY, THAT WE DO THINK ARE

4    SQUARELY WITHIN THE COURT'S MOTION IN LIMINE RULING.  SO I

5    THINK IT NEEDS TO BE REVISITED IN LIGHT OF TODAY'S TESTIMONY TO

6    SEE WHAT WE WOULD PROPOSE.

7               THE COURT:  ALL RIGHT.  AND YOU ALL WANT TO MEET AND

8     CONFER ABOUT THAT FIRST.

9               MR. PEREZ:  SURE, YES.

10              MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.

11   MR. GHEORGHE HAS NOW TESTIFIED THAT THERE WAS NO SERVER SIDE

12   VALIDATION, NOT THAT IT WAS LAX, THAT THERE WAS NO SERVER SIDE

13   VALIDATION.

14          THIS DOESN'T SAY NO SECURITY MEASURES.  IT JUST SAYS NO

15   SECURITY SIDE VALIDATION.  THEY'RE TRYING TO IMPROVE THE

16   FACT --

17              THE COURT:  HIS TESTIMONY OPENED THE DOOR PRETTY

18    WIDE.

19              MR. PEREZ:  WE'LL TAKE A LOOK AT IT TONIGHT,

20    YOUR HONOR.

21              THE COURT:  ALL RIGHT.  WE CAN DEAL WITH IT TOMORROW

22    AFTER THE DECISION.

23              MR. BLOCK:  I THINK THIS IS JUST HOUSEKEEPING, SO IT

24    SHOULD BE QUICK.

25          SO WE'VE BEEN TALKING ABOUT SOME OF THE FINANCIAL

1    EVIDENCE, AND YOUR HONOR -- AS YOUR HONOR IS AWARE, ONE OF THE

2    ISSUES IN THE CASE WILL BE FINANCIAL CONDITION FROM RECENT

3    YEARS.

4              THE COURT:  RIGHT.

5              MR. BLOCK:  AND SO SOME MATTER, TWO OR THREE WEEKS

6    AGO, I FORGET THE EXACT DATE, DEFENDANTS PRODUCED FINANCIAL

7    STATEMENTS, SO IT'S FOUR DOCUMENTS, THEY RELATE TO, I THINK

8    IT'S 2023/'24.

9         WE WOULD LIKE TO PUT THOSE INTO EVIDENCE.  NEITHER EXPERT

10   HAS HAD AN OPPORTUNITY TO ADDRESS THOSE BECAUSE OF THE TIMING.

11        SO WE WOULD LIKE TO JUST MOVE THEM INTO EVIDENCE WITH A

12   SHORT DESCRIPTIVE STATEMENT OF WHAT THEY ARE, WHICH WE WOULD DO

13   ON THE RECORD.

14        WE HAD PROPOSED A WRITTEN STIPULATION, I THINK DEFENDANTS'

15   POSITION IS THEY PREFER FOR US TO JUST DO IT LIVE, BUT I DON'T

16   BELIEVE THEY'LL HAVE AN OBJECTION.

17        WE'RE HAPPY TO DO IT THAT WAY.

18             THE COURT:  SO THAT THE EXPERTS CAN LOOK AT THEM.

19             MR. BLOCK:  WELL, I WOULD BE HAPPY TO HAVE -- IT'S

20   VERY SIMPLE, AND THE EXPERTS, I THINK, COULD ADDRESS THEM IF

21   NOT FOR THE FACT THAT NEITHER EXPERT HAS A RULE 26 DISCLOSURE

22   ON THESE DOCUMENTS.

23        WE ARE PREPARED TO SIMPLY MOVE THEM INTO EVIDENCE AND THEN

24   ARGUE FROM THE DOCUMENTS.  THEY ARE NOT COMPLICATED.  THEY ARE

25   FINANCIAL STATEMENTS WITH MERE ARITHMETIC, ATTORNEY ARGUMENT TO

1    SAY, YOU KNOW, ASSETS, LIABILITIES.

2            THE COURT:  I DON'T GENERALLY ALLOW WRITTEN DOCUMENTS

3    MOVED INTO EVIDENCE WITHOUT A WITNESS TO EXPLAIN THEM.

4            MR. BLOCK:  SO THAT'S THE ISSUE THAT WE'RE HERE TO

5    PRESENT, YOUR HONOR.

6            THE COURT:  I MEAN, IT'S NOT THE JURY'S JOB TO READ

7    DOCUMENTS AND IT'S NOT APPROPRIATE, IN MY VIEW, FOR YOU TO

8    ARGUE SOMETHING ABOUT WHICH THERE'S BEEN NO WITNESS TESTIMONY.

9            MR. BLOCK:  SO WE WOULD BE VERY HAPPY TO HAVE OUR

10   EXPERT ADDRESS THESE.  THAT WOULD BE STRAIGHTFORWARD AND

11   DESCRIPTIVE.  SO WE'RE VERY HAPPY WITH THAT SOLUTION.  BUT AS I

12   SAID, WHEN SHE SUBMITTED HER REPORTS IN THIS CASE, WE DID NOT

13   YET HAVE THESE DOCUMENTS, SO SHE DOES NOT HAVE DISCLOSURE ON IT

14   YET.

15           THE COURT:  RIGHT.  IS THE SAME TRUE FOR YOUR EXPERT?

16           MR. CRAIG:  THAT'S CORRECT, YOUR HONOR.  THESE

17   DOCUMENTS, IT'S ABOUT THE 2024 PROFIT AND LOSS AND BALANCE

18   SHEET.  THESE DIDN'T EXIST BACK AT THE TIME THAT THE EXPERT

19   DISCLOSURE DATE WAS.

20           THE COURT:  OKAY.

21           MR. CRAIG:  BUT OUR CEO, YARON SHOHAT, IS GOING TO BE

22   PREPARED TO ANSWER ANY QUESTIONS THAT PLAINTIFFS MIGHT HAVE FOR

23   HIM ABOUT THESE DOCUMENTS.  SO THEY COULD MOVE THEM INTO

24   EVIDENCE AT THAT TIME.

25           THE COURT:  OKAY.  IS THAT --

```
1            MR. BLOCK:  IF YOUR HONOR -- SO --

2            MR. CRAIG:  WE ALSO DON'T OBJECT TO JUST STIPULATING

3     THAT THEY COME INTO EVIDENCE.

4            THE COURT:  IF YOU DON'T OBJECT TO THEM STIPULATING,

5     LET'S TAKE IT OFF THE TABLE.  WE'LL MOVE IT -- LET'S ADMIT THEM

6     RIGHT NOW.

7            MR. BLOCK:  YES, YOUR HONOR.  DO YOU HAVE THE

8     NUMBERS?

9            THE COURT:  IF THERE'S NO OBJECTION.

10           MR. BLOCK:  WELL, IT'S THE FOUR NUMBERS.

11       YOUR HONOR, THERE ARE FOUR DOCUMENTS.  IF I CAN JUST HAVE

12    A MOMENT TO FIND THE NUMBERS?  OR WE CAN DO IT BEFORE THE JURY

13    COMES IN TOMORROW MORNING.

14           THE COURT:  SO.  WE'RE GOING TO START ON TIME

15    TOMORROW.  LET'S DO IT NOW.

16           MR. BLOCK:  OKAY.  IT'LL ONLY TAKE 30 SECONDS.

17           MR. CRAIG:  YOUR HONOR, JUST TO BE CLEAR, WE'RE NOT

18    AGREEING THAT IT'S PROPER NOW FOR THEIR EXPERT TO SUPPLEMENT

19    HER OPINIONS WITH NEW OPINIONS ABOUT THIS ISSUE.  WE DON'T

20    THINK THIS IS -- AND IT SOUNDS LIKE PLAINTIFFS AGREE THAT IT'S

21    NOT A MATTER FOR EXPERT.

22           THE COURT:  WELL, THEY ASKED JUST TO PUT THE

23    DOCUMENTS IN AND GIVE THEM TO THE JURY, SO YEAH.

24           MR. BLOCK:  SO, YOUR HONOR, PLAINTIFFS MOVE TO ADMIT

25    INTO EVIDENCE DEFENDANTS' EXHIBITS A-1779, A-1780, A-1781, AND
```

```
1      A-1782.
2                THE COURT:  ALL RIGHT.  AND THERE'S NO OBJECTION?
3                MR. CRAIG:  NO OBJECTION, PROVIDED THAT THOSE ARE THE
4      FINANCIAL STATEMENTS, THE BALANCE SHEETS, AND THE PROFIT AND
5      LOSS STATEMENT FOR NSO AND Q CYBER.
6                THE COURT:  YES.
7                MR. ANDRES:  SO WE HAVE TO TELL THE JURY AT SOME
8      POINT THAT THEY'VE BEEN ADMITTED, SO HOWEVER YOU WANT TO DO
9      THAT, YOUR HONOR.
10               THE COURT:  WELL, HIS -- THEIR CEO IS GOING TO
11     TESTIFY TO THEM.
12               MR. ANDRES:  NO, NO, NO.  WE HAVE THE BURDEN TO PUT
13     THESE IN.  SO WE JUST WANT THE JURY TO UNDERSTAND THAT THEY'VE
14     BEEN ADMITTED INTO EVIDENCE, WHETHER OR NOT THEIR CEO TESTIFIES
15     OR NOT.
16               THE COURT:  YOU WANT TO DO IT BEFORE YOU REST?
17               MR. ANDRES:  I JUST -- YEAH.
18               THE COURT:  AND BEFORE THEIR WITNESS IS CALLED.
19               MR. ANDRES:  I JUST WANT TO TELL THE JURY THAT THESE
20     EXHIBITS HAVE BEEN ADMITTED.
21               THE COURT:  I CAN USE THE INSTRUCTION THAT YOU ALL
22     SUBMITTED WITH REGARD TO STIPULATION, COUNSEL HAVE STIPULATED
23     THAT THESE DOCUMENTS HAVE COME INTO EVIDENCE.
24               MR. ANDRES:  EXACTLY, YOUR HONOR.
25               THE COURT:  THAT THESE DOCUMENTS HAVE COME INTO
```

1    EVIDENCE AND YOU CAN USE THEM.

2         MR. BLOCK:  AND THEN, YOUR HONOR, THE LAST ISSUE.  SO

3    OBVIOUSLY WE HAVEN'T HAD A CHANCE TO DEPOSE MR. SHOHAT ABOUT

4    THESE DOCUMENTS BECAUSE THEY DIDN'T EXIST AT THE TIME THAT HE

5    WAS DEPOSED.

6         THE COURT:  RIGHT.

7         MR. BLOCK:  I UNDERSTAND HE WILL TESTIFY ABOUT THEM.

8    IT MAY -- AND I THINK WE WILL CROSS HIM ABOUT THEM.

9    IT MAY BE APPROPRIATE FOR US TO SEEK AN OPPORTUNITY TO

10   ADDRESS THOSE DOCUMENTS FOR THE REASON YOU SAID.  WE'RE A

11   LITTLE BIT HAMSTRUNG BECAUSE WE'RE HAVING TO DO IT EXCLUSIVELY

12   THROUGH AN ADVERSE WITNESS, ABOUT WHOM WE HAVE NO DEPOSITION.

13   SO OUR EXPERT IS IN COURT.  I'M NOT PROPOSING THAT SHE

14   WILL DO IT IN HER AFFIRMATIVE TESTIMONY.  IF THE EVIDENCE COMES

15   IN IN A WAY THAT WE THINK IT WOULD BE APPROPRIATE FOR HER TO

16   ADDRESS THOSE DOCUMENTS PREVIOUSLY -- I'M TRYING TO SLOW DOWN,

17   I APOLOGIZE -- IN REBUTTAL, WE WOULD ASK PERMISSION AT THAT

18   TIME.

19        THE COURT:  OKAY.  ALL RIGHT.  THANKS FOR LETTING US

20   KNOW.

21        MR. CRAIG:  WE DON'T AGREE THAT THE EXPERT SHOULD BE

22   TESTIFYING ABOUT THESE DOCUMENTS.

23        THE COURT:  YOU DON'T AGREE TO IT.

24        MR. ANDRES:  2:40, AND IT FEELS LIKE 5:40 IN

25   NEW YORK, YOUR HONOR.  SO THANK YOU VERY MUCH FOR ALL YOUR TIME

1    TODAY, AND WE'LL SEE YOU IN THE MORNING, UNLESS YOU HAVE

2    SOMETHING ELSE THAT YOU WANT US TO ADDRESS?

3            THE COURT:  NO.  I'M DONE.

4            MR. ANDRES:  THANK YOU.

5            THE COURT:  THANK YOU.

6            MR. CRAIG:  THANK YOU, YOUR HONOR.

7        (THE EVENING RECESS WAS TAKEN AT 2:37 P.M.)

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16          _____
            IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076
17

18          _____

19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595
20

21          DATED:  APRIL 29, 2025

22

23

24

25