1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5    WHATSAPP LLC AND META          )   C-19-07123 PJH
     PLATFORMS, INC.,               )
6                                   )   OAKLAND, CALIFORNIA
                  PLAINTIFFS,       )
7                                   )   APRIL 28, 2025
            VS.                     )
8                                   )   VOLUME 1
     NSO GROUP TECHNOLOGIES LIMITED )
9    AND Q CYBER TECHNOLOGIES       )   PAGES 1-264
     LIMITED,                       )
10                                  )
                  DEFENDANTS.       )
11   _____)

12

13             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14            UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074

24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

1

2       APPEARANCES (CONTINUED)

3

4       FOR THE DEFENDANTS:      KING & SPALDING
                                 BY:  JOSEPH N. AKROTIRIANAKIS
5                                     AARON S. CRAIG
                                 633 WEST FIFTH STREET, SUITE 1600
6                                LOS ANGELES, CALIFORNIA  90071

7                                BY:  MATTHEW V. NOLLER
                                 50 CALIFORNIA STREET, SUITE 3300
8                                SAN FRANCISCO, CALIFORNIA  94111

9

10      ALSO PRESENT:            MELINDA NEWELL
                                 STEPHEN JOY
11                               CURT EVANS
                                 BRIAN BAKALE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    OAKLAND, CALIFORNIA                        APRIL 28, 2025

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 8:34 A.M.)

 4              THE CLERK:  CALLING CIVIL CASE 19-7123 PJH, WHATSAPP,

 5    ET AL., VERSUS NSO GROUP TECHNOLOGIES, LIMITED, ET AL.

 6         PARTIES, PLEASE STEP FORWARD AND STATE YOUR APPEARANCES.

 7              MR. ANDRES:  GOOD MORNING, YOUR HONOR.

 8         FOR THE PLAINTIFF WHATSAPP AND META, GREG ANDRES.

 9         I'M HERE WITH MY COLLEAGUES, MICAH BLOCK; CARL WOOG IS A

10    COMPANY WITNESS FROM WHATSAPP; TONY PEREZ; AND ALSO AT THE

11    COUNSEL TABLE IS OUR JURY CONSULTANT, MELINDA NEWELL.

12              THE COURT:  OKAY.

13              MR. ANDRES:  GOOD MORNING.

14              THE COURT:  ALL RIGHT.  GOOD MORNING.

15              MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.

16         JOE AKROTIRIANAKIS ON BEHALF OF THE DEFENDANTS, AND

17    AARON CRAIG.

18              THE COURT:  GOOD MORNING.

19              MR. AKROTIRIANAKIS:  AND MATT NOLLER.

20         ON THIS SIDE, OUR CONSULTANT, STEPHEN JOY -- J-O-Y FOR THE

21    RECORD, P-H IN STEPHEN -- AND YARON SHOHAT, S-H-O-H-A-T, FIRST

22    NAME Y-A-R-O-N, THE CEO OF Q CYBER.

23              THE COURT:  ALL RIGHT.  GOOD MORNING.

24         AND I ASSUME MOST OF THE PEOPLE ARE WITH YOU, VARIOUS

25    DIFFERENT TEAMS?
```

1               MR. ANDRES:  YES.

2               THE COURT:  OKAY.  WE DO NEED THIS SIDE, OBVIOUSLY,

3       FOR THE PANEL.

4               MR. ANDRES:  YEP.

5               THE COURT:  WE HAVE A PRETTY GOOD SHOWING.  WE HAVE

6       33 PEOPLE THIS MORNING WHO HAVE SHOWN UP.  I DON'T KNOW IF I'LL

7       QUESTION ALL OF THEM, BUT WE WILL BRING THEM ALL TO THE

8       COURTROOM BECAUSE IT'S MORE SATISFYING FOR PEOPLE TO SPEND THE

9       TIME GETTING HERE EARLY IN THE MORNING TO PARTICIPATE IN SOME

10      WAY.

11              ALL RIGHT.  BEFORE -- WELL, FIRST OF ALL, THE JURY IS

12      GOING THROUGH THEIR ORIENTATION.  I'M NOT SURE IF THEY'RE ABLE

13      TO EXCISE THAT PORTION.  I'VE INSTRUCTED THEM TO FAST FORWARD

14      THROUGH IT, AND THE -- I'M ASSUMING THE JURY OFFICE HAS BEEN

15      ABLE TO ACCOMPLISH THAT, BUT THEY'RE IN THE PROCESS OF GOING

16      THROUGH THE ORIENTATION NOW.  SO WE'RE NOT EXACTLY READY TO

17      START, SOMETIME BETWEEN -- WE EXPECT THEM TO SEND DOWN THE

18      PANEL SOMETIME BETWEEN 9:00 AND 9:30, SO YOU DO HAVE A FEW

19      MINUTES.

20              WE HAVE A FEW MINUTES THAT WE CAN TALK.

21              I'M ASSUMING THAT BOTH SIDES HAVE HAD A CHANCE TO SCOUR

22      THE JURY QUESTIONNAIRES.  I'M SURE YOU'VE NOTED THAT ONE OF THE

23      JURORS IS A META EMPLOYEE, AND ONE OF THE JURORS -- ONE OF THE

24      PROSPECTIVE JURORS HAS A SPOUSE THAT APPEARS TO BE A META

25      EMPLOYEE.

1          OBVIOUSLY WE WOULD NOT ALLOW AN EMPLOYEE OF EITHER -- OF

2     ANY OF THE PARTIES TO BE ON THE JURY, AND I WONDERED IF YOU HAD

3     ANY PREFERENCE FOR HOW I HANDLE THAT.  WE COULD EXCUSE THEM

4     BEFORE THEY COME IN, OR WE CAN ALLOW THEM TO PARTICIPATE AND

5     EXCUSE THEM AT THE APPROPRIATE TIME.

6          MR. ANDRES:  YOUR HONOR, THANKS.  I WAS GOING TO

7     RAISE THAT.  THE PARTICULAR JUROR, NUMBER 30, ACTUALLY NOT ONLY

8     WORKS WITH META, BUT WORKS WITH ME.

9          THE COURT:  OKAY.

10          MR. ANDRES:  SO TO SAVE ME THE INDIGNITY OF HER MAYBE

11     NOT RECOGNIZING ME, MAYBE WE JUST EXCUSE HER BEFORE WE GET

12     THERE.  I DON'T SEE ANY REASON FOR HER TO COME TO THE COURTROOM

13     AND CERTAINLY DON'T WANT TO HAVE ANY DISCUSSION ABOUT THAT

14     ISSUE IN FRONT OF THE JURY.

15          THE COURT:  AND THAT'S THE --

16          MR. ANDRES:  ELAINE LIU.

17          THE COURT:  YEAH.

18          MR. ANDRES:  THAT'S OUR POSITION.

19          MR. AKROTIRIANAKIS:  I WOULD STIPULATE TO THAT JUROR

20     AND THE ONE WHOSE SPOUSE IS A META EMPLOYEE.

21          THE COURT:  ALL RIGHT.  AND THAT IS NUMBER 17,

22     ELIZABETH SHEW KONRAD?

23          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24          THE COURT:  OKAY.  YOU WOULD STIPULATE TO BOTH OF

25     THOSE BEING EXCUSED AND NOT BEING BROUGHT IN?

```
 1              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

 2              THE COURT:  OKAY.  ALL RIGHT.

 3              MR. ANDRES:  THAT'S FINE, YOUR HONOR.

 4              THE COURT:  ALL RIGHT.  BECAUSE -- I MEAN, THEY DO

 5     GET CREDIT, SO THEY WON'T HAVE TO SHOW UP FOR JURY SERVICE

 6     AGAIN.  THIS IS NOT A POSTPONEMENT.  THIS IS AN EXCUSAL FOR

 7     CAUSE.

 8         SO THAT'S JUROR NUMBER 17 AND JUROR NUMBER 30.  KELLY, IF

 9     YOU CAN CONTACT THE JURY OFFICE AND TELL THEM THAT THEY ARE

10     EXCUSED.

11              THE CLERK:  WILL DO.

12              THE COURT:  OKAY.  AND IT WOULD BE FINE TO TELL THEM

13     THAT META IS A PARTY AND THAT'S THE REASON.  I WOULD HATE FOR

14     THEM TO THINK THAT WE JUST DIDN'T WANT THEM FOR SOME OTHER

15     REASON.

16         OKAY.  ALL RIGHT.  ANYTHING ELSE WITH REGARD TO THE LIST

17     OF JURORS THAT YOU ALL WOULD LIKE TO ADDRESS?

18              MR. AKROTIRIANAKIS:  NOT WITH RESPECT TO THE JURORS'

19     LIST, YOUR HONOR.

20              MR. ANDRES:  YEAH, WE HAVE OTHER ISSUES THAT WE CAN

21     DEAL WITH NOW OR LATER, YOUR HONOR, BUT NOTHING WITH RESPECT TO

22     THE JURY.

23              THE COURT:  OKAY.

24              MR. ANDRES:  JUST A COUPLE.

25         THERE ARE STILL SOME DISPUTED ISSUES ON THE JURY
```

1    INSTRUCTIONS, SO WE'RE GOING TO ABIDE BY YOUR HONOR'S

2    INSTRUCTIONS NOT TO REFERENCE THOSE DURING THE OPENINGS FOR AT

3    LEAST THE PLAINTIFF, AND I THINK THAT SHOULD APPLY TO BOTH

4    PARTIES.

5        THERE ARE ALSO A NUMBER OF OUTSTANDING -- AND THOSE IN

6    PARTICULAR RELATE TO THE CALIFORNIA AND FEDERAL STATUTES IN

7    TERMS OF WHAT SPECIFICITY THERE SHOULD BE, AND NOW WE ALSO HAVE

8    A DISPUTE ABOUT THE PUNITIVE DAMAGES RULING.

9        SECOND, THERE ARE ALSO A NUMBER OF ISSUES REMAINING AS TO

10   THE ADMISSIBILITY OF CERTAIN EVIDENCE, AND AS THAT RELATES AT

11   LEAST TO TODAY, WE'VE OFFERED TO EXCHANGE OUR SLIDES FOR THE

12   OPENING WITH THE OTHER SIDE, THEY'VE DECLINED.

13       BUT WE'D LIKE TO SEE THEIR SLIDES BEFORE THEY PRESENT THEM

14   TO MAKE SURE THAT THERE'S NO OBJECTIONABLE EVIDENCE BEING

15   PRESENTED TO THE EVIDENCE.  AGAIN, WE'RE HAPPY TO DO THAT, BUT

16   I WANTED TO RAISE THAT FOR THE COURT.

17           THE COURT:  OKAY.  SO WHAT'S THE PROBLEM WITH THE

18   EXCHANGE?  ARE YOU GOING TO DO AN OPENING TODAY OR RESERVE?

19           MR. AKROTIRIANAKIS:  YES, YOUR HONOR, I WOULD.  AND I

20   DON'T HAVE A PROBLEM GIVING MR. -- GIVING COUNSEL, LIKE, A LIST

21   OF THE EXHIBITS THAT WE INTEND TO SHOW.  I DON'T THINK ANY OF

22   THEM ARE OBJECTIONABLE OR --

23           THE COURT:  AND THEY HAVE ACCESS TO THE EXHIBITS?

24           MR. AKROTIRIANAKIS:  OH, YES.

25           THE COURT:  OKAY.  ALL RIGHT.

```
 1              MR. ANDRES:  GREAT.

 2              THE COURT:  ALL RIGHT.  THAT TAKES CARE OF THAT.

 3         LET'S GO THROUGH THESE ONE AT A TIME.  OKAY.  YOU RAISED

 4    AN ISSUE WITH REGARD TO THE INSTRUCTIONS THAT I ASKED YOU TO

 5    MEET AND CONFER ABOUT.  IT WAS, I BELIEVE, DEFENDANTS' NUMBER

 6    2, AND PLAINTIFFS' 2, 3, AND 4, THAT ONE.

 7              MR. ANDRES:  YEAH, THERE'S ONE ON THAT.  BUT THERE IS

 8     ONE ON THE CALIFORNIA STATUTE THAT DEALS WITH THE AMOUNT -- THE

 9     DETAIL WITH RESPECT TO THE FINDINGS.  I'M GOING TO LET

10     MR. PEREZ HANDLE THAT ISSUE, AND ALSO NOW THE PUNITIVE DAMAGES

11     ISSUE NOW THAT THERE'S BEEN AN ALTERATION.  I'LL LET MR. PEREZ

12     DEAL WITH THAT.

13              MR. PEREZ:  YES, YOUR HONOR, THANK YOU.

14         ANTONIO PEREZ FOR THE PLAINTIFFS.

15         ON THE CFAA INSTRUCTION, YOUR HONOR, WE HAD HEEDED YOUR

16    GUIDANCE AND INSTRUCTION THAT WHAT WE HAD PREVIOUSLY PROPOSED

17    WENT TOO FAR IN TERMS OF DESCRIBING THE FINDINGS OF THE COURT,

18    AND WE HAVE SIGNIFICANTLY NARROWED WHAT WE WERE SUGGESTING.

19         THE COURT MAY REMEMBER OUR INITIAL PROPOSAL HAD SEPARATE

20    INSTRUCTIONS ON SUBSECTIONS OF THE CFAA.  WE THEN NARROWED IT

21    FURTHER, BUT HAD AN INSTRUCTION THAT RECITED THE COURT'S

22    FACTUAL FINDINGS.  WE'VE NOW TAKEN THAT OUT.

23         BUT THE COURT DID SAY, AT THE LAST CONFERENCE LAST WEEK,

24    THAT THE JURY OBVIOUSLY NEEDS TO KNOW SOMETHING ABOUT WHAT

25    HAPPENED, AND, IMPORTANTLY, WHAT CONDUCT GAVE RISE TO THE
```

```
1    COURT'S FINDING OF LIABILITY.

2         AND SO ON THE CFAA, WHAT WE HAVE SUGGESTED, WE'RE DOWN TO

3    DISPUTES ON JUST TWO PHRASES.

4         THE COURT:  DO YOU HAVE A COPY OF YOUR DIFFERENT

5    PROPOSALS SO I CAN LOOK AT THEM?

6         MR. PEREZ:  YES, WE CAN GET THAT.  I BELIEVE IT WAS

7    E-FILED, BUT WE CAN GET A HARD COPY AS WELL.

8         MR. NOLLER:  I HAVE A COPY OF DEFENDANTS' PROPOSAL

9    HERE, AND WE HAVEN'T HAD A CHANCE TO LOOK AT EXACTLY WHAT

10   PLAINTIFFS FILED LAST NIGHT.  I HAVE A COPY OF WHAT THEY

11   PROVIDED US BEFORE THE FILING, BUT I -- I DON'T KNOW IF IT

12   WAS --

13        THE COURT:  I DID NOT LOOK AT THE DOCKET THIS

14   MORNING, SO I HAVE NO IDEA WHAT YOU FILED LAST NIGHT.

15        MR. PEREZ:  I DO HAVE A COPY HERE.

16        THE COURT:  OKAY.

17        MR. PEREZ:  IT HAS HIGHLIGHTED --

18        THE COURT:  JUST LET ME SEE, AS YOU'RE TALKING ABOUT

19   THEM, SO THAT I CAN FOLLOW.

20        (PAUSE IN PROCEEDINGS.)

21        THE COURT:  OKAY.

22        MR. PEREZ:  SO THE COURT --

23        THE COURT:  SO LET'S SEE WHAT I'VE GOT.

24        MR. PEREZ:  SO INSTRUCTION NUMBER 1, COMPUTER FRAUD

25   AND ABUSE ACT, DOES THE COURT HAVE THAT HANDY?
```

```
1              THE COURT:  OKAY.

2              MR. PEREZ:  AND SO IN THIS INSTRUCTION, THERE ARE

3      JUST THREE PHRASES -- FOUR, I GUESS, BUT REALLY ON TWO POINTS,

4      AS TO WHICH THE PARTIES DISAGREE.

5              WE HAVE -- AND EVERYTHING WE ARE PROPOSING TO INCLUDE IN

6      THE INSTRUCTION IS VERBATIM FROM THE COURT'S SUMMARY JUDGMENT

7      RULING.

8              AND SO IN THE FIRST SENTENCE, WE HAVE PROPOSED INCLUDING

9      THE PHRASE "BY INTENTIONALLY, KNOWINGLY, AND WITH INTENT TO

10     DEFRAUD EXCEEDING THEIR AUTHORIZED ACCESS," WHICH, OF COURSE,

11     WAS PART OF THE COURT'S FINDINGS THAT GAVE RISE TO LIABILITY.

12             AND THEN THE REFERENCES TO THE FACTUAL CONDUCT, THE

13     REFERENCE -- THE IDENTIFICATION OF THE WHATSAPP INSTALLATION

14     SERVER, AND THEN THE PHRASE THAT BEGINS WITH THE "AND" AT THE

15     END OF THE FIRST PARAGRAPH, AND THAT THE WIS WAS THEN ABLE TO

16     OBTAIN PROTECTED INFORMATION BY HAVING IT SENT FROM THE TARGET

17     USERS THROUGH THE WHATSAPP SERVERS AND BACK TO THE WIS, WHICH

18     IS, AGAIN, VERBATIM FROM THE COURT'S RULINGS, AND IN OUR VIEW

19     IS A DRAMATIC CUTDOWN OF WHAT WE HAD ORIGINALLY PROPOSED AND

20     REFLECTS IN OUR VIEW THE BARE MINIMUM OF THE INFORMATION THAT

21     THE JURY SHOULD HAVE IN TERMS OF UNDERSTANDING WHAT CONDUCT

22     GAVE RISE TO LIABILITY.

23             THE COURT:  OKAY.

24             MR. NOLLER:  THANK YOU, YOUR HONOR.

25             SO THE CONDUCT THAT GAVE RISE TO LIABILITY IS FULLY
```

```
 1        REPRESENTED IN DEFENDANTS' PROPOSED INSTRUCTION.  WHAT'S

 2     DIFFERENT IS THAT PLAINTIFFS' PROPOSED INSTRUCTION CONTINUES TO

 3     PHRASE THAT CONDUCT IN TERMS OF THE LEGAL ELEMENTS UNDER THE

 4     STATUTE, AND AS THIS COURT RECOGNIZED AT THE LAST HEARING, THE

 5     ELEMENTS ARE DIFFERENT FROM THE CONDUCT.

 6        AND SO ALL THE JURY NEEDS TO KNOW FOR PURPOSES OF FINDING

 7     DAMAGES IS WHAT IS THE CONDUCT.

 8        AND THE CONDUCT WAS THE USE OF DEFENDANTS' TECHNOLOGY TO

 9     SEND MESSAGES THROUGH WHATSAPP SERVERS FOR THE PURPOSE OF

10     INSTALLING PEGASUS ON TARGET USER DEVICES.

11             THE COURT:  THE SECOND PART OF THAT, INFORMATION,

12     WHETHER OR NOT YOU CLASSIFY IT AS METADATA OR WHATEVER, THAT

13     GOES BACK IS IN -- WAS IMPORTANT TO ME IN MAKING THE

14     DETERMINATION.

15             MR. NOLLER:  YES, YOUR HONOR.

16             THE COURT:  AND GOING BACK THROUGH THE SERVER IS WHAT

17     FULFILLS THE OBTAINING PORTION ELEMENT OF THE, OF THE STATUTE.

18             MR. NOLLER:  YES, YOUR HONOR, AND OUR JURY

19     INSTRUCTION INCLUDES THAT FINDING.

20        THE PROBLEM WITH PLAINTIFFS' INSTRUCTION ON THAT FINDING

21     IS THAT THE WAY THAT IT IS PHRASED, IT SUGGESTS THAT THE

22     TRANSFER OF INFORMATION OCCURRED AFTER PEGASUS WAS INSTALLED ON

23     THE TARGET USER DEVICES, WHICH SUGGESTS TO THE JURY THAT WHAT

24     WAS BEING TRANSFERRED FROM THE TARGET USER DEVICES OVER

25     WHATSAPP SERVERS AND BACK TO THE WIS SERVER WAS THE INFORMATION
```

```
 1    THAT PEGASUS ITSELF EXTRACTS FROM THE TARGET DEVICE, THE

 2    WHATSAPP MESSAGES, EMAILS, THINGS LIKE THAT, AND THAT IS NOT

 3    TRUE.

 4         WHAT WAS TRANSFERRED BACK WAS THE INFORMATION THAT WAS

 5    EXCHANGED DURING THE HANDSHAKE AT THE INITIATION OF THE

 6    CONNECTION, AND THE PROBLEM WITH THE WAY DEFENDANTS HAVE

 7    PHRASED IT IS THAT IT SUGGESTS THAT ALL OF THE INFORMATION THAT

 8    PEGASUS EXTRACTED FROM THE DEVICE WAS TRANSFERRED OVER WHATSAPP

 9    SERVERS AND THAT'S NOT ACCURATE AND IT'S NOT WHAT THIS COURT

10    FOUND.

11              THE COURT:  AND IS THAT YOUR ONLY PROBLEM WITH THE

12     INSTRUCTION?

13              MR. NOLLER:  IT'S NOT OUR ONLY PROBLEM.  THAT'S A

14     FACTUAL PROBLEM WITH THAT PORTION OF IT.

15              THE COURT:  OKAY.

16              MR. NOLLER:  OUR OTHER PROBLEM IS THE CONTINUED USE

17     OF THE ELEMENTS THEMSELVES, THE INTENTIONALLY, KNOWINGLY, AND

18     WITH INTENT TO DEFRAUD.

19         THE JURY DOESN'T NEED TO BE TOLD THAT, AND IN PARTICULAR,

20     USING THE PHRASE "INTENT TO DEFRAUD," WHEN PART OF THE ELEMENTS

21     OF THE PUNITIVE DAMAGES ANALYSIS IS INTENT TO DEFRAUD UNDER A

22     DIFFERENT STATUTE WITH A DIFFERENT BURDEN OF PROOF AND A

23     DIFFERENT LEGAL STANDARD.

24         TO INSTRUCT THE JURY THAT THIS COURT ALREADY FOUND INTENT

25     TO DEFRAUD UNDER A DIFFERENT STATUTE WITH A DIFFERENT STANDARD,
```

```
 1       DIFFERENT BURDEN OF PROOF, IS UNNECESSARY AND UNFAIRLY

 2       PREJUDICIAL TO US.

 3            SO ALL THE JURY NEEDS TO KNOW IS THE CONDUCT, NOT THE --

 4       THIS COURT'S LEGAL FINDINGS AS TO HOW THOSE STATUTE'S ELEMENTS

 5       APPLY TO THAT CONTENT.

 6            MR. PEREZ:  YOUR HONOR, IF I MAY RESPOND BRIEFLY?

 7            ON THE FIRST ISSUE HE RAISED, JUST ABOUT THE TIMING OF THE

 8       EXTRACTION OF INFORMATION, THAT SEEMS TO ME IS A POINT THAT CAN

 9       BE VERY EASILY FIXED BY STRIKING THE WORD "THEN."  SO THAT

10       INSTEAD OF SAYING THAT THE WIS WAS THEN ABLE TO OBTAIN, BUT

11       JUST THAT THE WIS WAS ABLE TO OBTAIN.

12            AND I THINK WITH THAT THAT -- WE HAVE SOLVED HIS FACTUAL

13       DISPUTE WITH THAT PORTION OF THE INSTRUCTION.

14            NOW, AS TO THE INTENT TO DEFRAUD, THAT IS NOT A LEGAL

15       FINDING.  IT IS A FACTUAL FINDING AS TO THE STATE OF MIND OF

16       THE DEFENDANTS IN THIS CASE.

17            THAT IS PART OF THE FACTS THAT THE COURT FOUND THAT SHOULD

18       BE PRESENTED TO THE JURY.

19            NOW, THE FACT THAT IT IS ALSO, UNDER A DIFFERENT STANDARD

20       AND DIFFERENT BURDEN OF PROOF, AN INTENT TO DEFRAUD CAN BE

21       RELEVANT TO PUNITIVE DAMAGES, THAT IS AN ISSUE AS TO WHICH WE

22       BELIEVE THE JURY CAN BE FULLY INSTRUCTED, THE JURY CAN BE

23       INSTRUCTED THAT THE PRIOR FINDING WAS UNDER A DIFFERENT

24       EVIDENTIARY STANDARD.  THEY'RE FREE TO ARGUE THIS TO THE JURY

25       IN THEIR CLOSING OR WHEN THEY HAVE AN OPPORTUNITY.
```

1          BUT IT IS NOT UNFAIR PREJUDICE.  IT MAY BE UNHELPFUL TO

2     THEM, BUT IT IS NOT UNFAIR PREJUDICE.  IT WAS, INDEED, A

3     FINDING BY THE COURT THAT WE BELIEVE SHOULD BE PRESENTED TO THE

4     JURY.

5          THE COURT:  OKAY.

6          MR. NOLLER:  SO THE PROPOSALS THAT PLAINTIFFS ARE

7     MAKING NOW TO CHANGE THE INSTRUCTIONS IN THIS WAY ARE BRAND

8     NEW.  THEY WERE NEVER RAISED DURING OUR MEET AND CONFER.  THEY

9     NEVER OFFERED TO STRIKE THE WORD "THEN," SO THAT'S NOT

10    SOMETHING WE'VE HAD A CHANCE TO CONSIDER.  I DON'T THINK THAT

11    THAT FULLY ADDRESSES THE ISSUE.  I THINK OUR INSTRUCTION IS

12    MUCH MORE PRECISE AND ACCURATE, AND I, FRANKLY, HAVE NO IDEA

13    WHAT THE PROBLEM WITH OUR VERSION OF THAT SENTENCE WOULD BE.

14         AS TO INTENT TO DEFRAUD, PLAINTIFFS HAVE NOT, YOU KNOW,

15    OFFERED TO AGREE TO OR PROPOSED ANY INSTRUCTION THAT WOULD

16    INFORM THE JURY THAT THIS IS A DIFFERENT FINDING UNDER A

17    DIFFERENT STANDARD OR A DIFFERENT BURDEN OF PROOF.  IF THEY

18    WANT TO PROPOSE ONE, WE'LL CONSIDER IT.

19         CERTAINLY I THINK IF THE COURT INSTRUCTS THE JURY THAT IT

20    ALREADY FOUND INTENT TO DEFRAUD, THE JURY SHOULD BE INSTRUCTED

21    THAT THAT'S A DIFFERENT QUESTION THAN THE ONE THEY HAVE TO

22    DECIDE.

23         BUT, AGAIN, I JUST DON'T SEE ANY REASON WHY THE JURY NEEDS

24    TO BE TOLD THAT.  THAT'S A LEGAL STANDARD UNDER THE STATUTE.

25    WHAT THE JURY CAN CONSIDER IS THE FACT THAT DEFENDANTS

```
 1    RE-DESIGNED PEGASUS TO EVADE DETECTION AFTER PLAINTIFFS FIRST

 2    FIXED THE SECURITY BREACH.  THAT'S WHAT THIS COURT RELIED ON IN

 3    THE ORDER.  THAT LANGUAGE IS IDENTICAL IN THE PARTIES' TWO

 4    PROPOSALS AND PLAINTIFFS ARE PERFECTLY CAPABLE OF ARGUING THAT

 5    THAT CONDUCT SHOWS AN INTENT TO DEFRAUD FOR PURPOSES OF

 6    PUNITIVE DAMAGES.

 7              THE COURT:  OKAY.  ALL RIGHT.

 8              MR. PEREZ:  WE WOULD BE HAPPY, YOUR HONOR, TO PROPOSE

 9    AN INSTRUCTION ON THE DIFFERENT STANDARDS OF PROOF FOR THE

10    DEFENDANTS' CONSIDERATION IF THAT WOULD RESOLVE THIS ISSUE.

11              THE COURT:  WOULD THAT RESOLVE THE ISSUE FOR YOU?

12              MR. NOLLER:  I DON'T THINK IT WOULD RESOLVE THE

13    ISSUE, YOUR HONOR, BECAUSE WE DON'T THINK THE JURY NEEDS TO BE

14    INSTRUCTED AS TO THAT AT ALL.

15        BUT IF THE JURY IS GOING TO BE INSTRUCTED AS TO THAT,

16    THERE SHOULD BE ANOTHER INSTRUCTION, AND IN THAT INSTANCE, WE

17    WOULD BE HAPPY TO CONSIDER WHAT THE PLAINTIFFS WANT TO PROVIDE.

18              THE COURT:  OKAY.  ALL RIGHT.

19        I NEED TO COMPARE THE LANGUAGE WITH MY PRIOR ORDER BEFORE

20    I MAKE A DETERMINATION, AND I'LL DO THAT BEFORE THE -- WE'LL

21    TAKE A SHORT BREAK BEFORE THE JURY IS SENT IN.

22        OKAY.  ANY OTHERS?

23              MR. PEREZ:  YES, YOUR HONOR.  THERE'S AN ISSUE NOW

24    WITH RESPECT TO THE CDAFA INSTRUCTION, WHICH HAD PREVIOUSLY

25    BEEN AGREED.
```

1      AND THE ISSUE THERE IS THAT, AS THE COURT WILL REMEMBER,

2  LAST WEEK IN THE SECOND FINAL PRETRIAL ORDER, THE COURT

3  ACCEPTED A PROPOSED INSTRUCTION FROM DEFENDANTS THAT WOULD ADD

4  TO THE PUNITIVE DAMAGES INSTRUCTION AN INSTRUCTION ABOUT

5  EFFECTIVELY EXTRATERRITORIALITY.

6      THE COURT:  OKAY.

7      MR. PEREZ:  AND AN INSTRUCTION THAT SAYS THAT, YOU

8  KNOW, IN EFFECT, SPEAKING GENERALLY, THAT PUNITIVE DAMAGES MAY

9  ONLY BE ASSESSED FOR CONDUCT IN CALIFORNIA.

10      THE COURT:  RIGHT.

11      MR. PEREZ:  AND SO THAT NEW INSTRUCTION, WHICH CAME

12  IN LAST FRIDAY, NOW PUTS AT ISSUE DEFENDANTS' CALIFORNIA

13  CONDUCT.  AND SO WHAT WE HAVE -- WHAT WE HAVE PROPOSED IN THAT

14  INSTRUCTION, CONSISTENT WITH WHAT THE COURT SAID LAST WEEK

15  ABOUT THE JURY NEEDING TO HAVE AN UNDERSTANDING OF THE FACTS

16  THAT GAVE RISE TO LIABILITY, IS LANGUAGE THAT WOULD JUST TRACK

17  VERBATIM THE COURT'S FINDINGS WITH RESPECT TO DEFENDANTS'

18  CALIFORNIA CONDUCT.

19      AND SPECIFICALLY IN THE SUMMARY JUDGMENT RULING, THE COURT

20  FOUND THAT PEGASUS CODE WAS SENT THROUGH PLAINTIFFS'

21  CALIFORNIA-BASED SERVERS 43 TIMES DURING THE RELEVANT PERIOD IN

22  MAY 2019, AND THE COURT ALSO CONCLUDED THAT THE WIS DID INDEED

23  TARGET CALIFORNIA-BASED SERVERS.

24      AND SO IN LIGHT OF THE COURT'S OBSERVATION AND COMMENT

25  LAST WEEK THAT THE JURY OBVIOUSLY NEEDS TO UNDERSTAND THE BASIS

1    OF THE FINDING OF LIABILITY, WHAT WE ARE PROPOSING IS AN

2    INSTRUCTION THAT WOULD INCLUDE THAT LANGUAGE VERBATIM IN THE

3    CDAFA INSTRUCTION AS THE BASIS OF THE COURT'S FINDING OF

4    LIABILITY.

5           THE COURT:  THIS IS THE SECOND PARAGRAPH IN YOUR

6    PROPOSED NUMBER --

7           MR. PEREZ:  2.

8           THE COURT:  -- REVISED NUMBER 2?

9           MR. PEREZ:  EXACTLY, YOUR HONOR, STARTING WITH "AND

10   BECAUSE."  BECAUSE THE COURT HAD PREVIOUSLY SAID IN THE

11   INSTRUCTION, I'VE CONCLUDED THAT THE DEFENDANTS VIOLATED CDAFA

12   FOR THE SAME REASONS THAT THEY VIOLATED THE FEDERAL COMPUTER

13   FRAUD AND ABUSE ACT, WHICH IS REALLY INCOMPLETE BECAUSE THERE

14   IS AN ADDITIONAL ELEMENT OF CALIFORNIA-BASED CONDUCT.

15          AND SO WE'VE PROPOSED ADDING LANGUAGE TAKEN DIRECTLY FROM

16   THE SUMMARY JUDGMENT RULING, "AND BECAUSE DEFENDANTS UNLAWFULLY

17   ACCESSED A COMPUTER IN CALIFORNIA, SPECIFICALLY, I FOUND THAT

18   DEFENDANTS WHATSAPP INSTALLATION SERVER OR WIS TARGETED

19   CALIFORNIA SERVERS AND THAT DEFENDANTS' PEGASUS CODE WAS SENT

20   THROUGH PLAINTIFFS' CALIFORNIA-BASED SERVERS 43 TIMES IN MAY

21   2019."

22          VERBATIM FROM THE SUMMARY JUDGMENT RULING AND JUST THE

23   BARE MINIMUM FACTS THAT THE JURY SHOULD UNDERSTAND AS TO THE

24   BASIS OF RELIABILITY UNDER THE STATUTE.

25          THE COURT:  OKAY.

1          RESPONSE?

2               MR. NOLLER:  YES, YOUR HONOR.

3          WHAT OPPOSING COUNSEL DIDN'T MENTION IS THAT THE CDAFA

4     INSTRUCTION THAT THIS COURT PREVIOUSLY ACCEPTED WAS PROPOSED BY

5     PLAINTIFFS IN THAT EXACT FORM, WHILE FULLY KNOWING THAT

6     DEFENDANTS WERE SEEKING AN INSTRUCTION UNDER THE PUNITIVE

7     DAMAGES INSTRUCTION THAT WOULD INCLUDE THE EXTRATERRITORIALITY

8     LANGUAGE.

9          SO IF THEY THOUGHT THAT THAT INSTRUCTION WAS INCOMPLETE,

10    THEY SHOULDN'T HAVE PROPOSED IT IN THAT FORM.  WE HAVE RELIED

11    ON THEIR PROPOSED INSTRUCTION IN AGREEING TO THAT INSTRUCTION,

12    SUBMITTING IT TO THIS COURT, THIS COURT ACCEPTED THAT

13    INSTRUCTION.

14         AND THROUGHOUT ALL OF THAT PROCESS THERE WAS NEVER ANY

15    DOUBT THAT WE WANTED AN EXTRATERRITORIALITY INSTRUCTION AND

16    THAT THIS COURT MIGHT GRANT ONE.

17         SO WE JUST DON'T SEE ANY NEED TO REVISE THE INSTRUCTION

18    THAT THIS COURT ALREADY ACCEPTED, IT'S PERFECTLY SUFFICIENT TO

19    DESCRIBE THE CONDUCT THAT THIS COURT FOUND VIOLATED THE

20    STATUTE.

21              THE COURT:  OKAY.  BUT, YOU KNOW, JURY INSTRUCTIONS

22     AREN'T SETTLED UNTIL THEY'RE SETTLED, AND THEY'RE NOT REALLY

23     SETTLED UNTIL AFTER ALL THE EVIDENCE IS IN.  SO I COULD CHANGE

24     THE ENTIRE SET OF INSTRUCTIONS DEPENDING UPON WHAT THE EVIDENCE

25     IS AT TRIAL.

1        SO I'M NOT GOING TO HOLD THEM TO HAVING AGREED TO

2    SOMETHING ELSE.  THEY OBVIOUSLY DIDN'T THINK I WAS GOING TO

3    AGREE WITH YOU ON THE EXTRATERRITORIALITY ISSUE AT THE TIME.

4        NOW THAT I HAVE AGREED WITH YOU THAT THAT SHOULD BE PART

5    OF THE PUNITIVE DAMAGES INSTRUCTION, THIS SEEMS REASONABLE TO

6    ME TO PINPOINT THE CALIFORNIA-BASED ACTION.

7            MR. NOLLER:  I GUESS IN THAT INSTANCE WHAT WE WOULD

8    REQUEST, BECAUSE WE DIDN'T GET THIS UNTIL THE MIDDLE OF THE DAY

9    YESTERDAY, I DIDN'T REALLY HAVE A GREAT OPPORTUNITY TO CONSIDER

10    THE SPECIFIC FINDINGS.

11        IF THE COURT IS INCLINED TO AMEND THE INSTRUCTION, WE'LL

12    ACCEPT THAT, BUT WOULD MAYBE APPRECIATE A DAY OR TWO JUST TO

13    LOOK AT THE SPECIFIC LANGUAGE AND SEE IF WE CAN COME TO AN

14    AGREEMENT ON THAT.

15            THE COURT:  OKAY.  I MEAN, THIS IS NOT AN INSTRUCTION

16    THAT WILL BE GIVEN UNTIL THE END OF THE TRIAL IN ANY EVENT.

17    SO, YEAH, YOU HAVE UP UNTIL THE TIME OF THE CHARGE CONFERENCE,

18    WHICH WILL BE CLOSE TO THE END OF THE EVIDENTIARY PRESENTATION,

19    TO MAKE ANY CHANGES TO INSTRUCTIONS, AND I'LL ENTERTAIN THEM

20    ALL.

21            MR. NOLLER:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

22            MR. PEREZ:  THE LAST ISSUE WE HAVE, YOUR HONOR, IS AN

23    EVIDENTIARY ISSUE.

24            THE COURT:  UM-HUM.

25            MR. PEREZ:  AGAIN, IT ARISES FROM THE SECOND FINAL

1    PRETRIAL ORDER.

2         AND IN THAT ORDER, THE COURT FOUND -- MADE TWO ORDERS, OR

3    TWO FINDINGS.  ONE WAS THAT PROFIT MOTIVE DURING 2018 TO 2020

4    IS RELEVANT; AND THE OTHER WAS THAT DETAILED FINANCIAL

5    INFORMATION FROM THAT TIME PERIOD SHOULD NOT BE ADMITTED.

6         AND THIS HAS LEFT THE PARTIES WITH A DISAGREEMENT AS TO

7    WHERE THAT LINE IS DRAWN, AND SPECIFICALLY, IN ORDER TO

8    SUBSTANTIATE THIS RELEVANT ISSUE OF PROFIT MOTIVE, WE WOULD

9    LIKE TO BE ABLE TO PUT ON EVIDENCE AS TO THE FACT THAT THEY

10   SOLD THE SPYWARE FOR MILLIONS OF DOLLARS.  THAT'S NOT DETAILED

11   FINANCIAL INFORMATION.

12        THE ONLY FINANCIAL STATEMENTS THAT THE JURY WILL SEE ARE

13   THE CURRENT ONES.

14             THE COURT:  OKAY.

15             MR. PEREZ:  WE'RE NOT TALKING ABOUT BALANCE SHEETS,

16    INCOME STATEMENTS, ANYTHING LIKE THAT.

17        BUT THE SIMPLE FACT, AS PART OF THEIR CONDUCT, THAT THEY

18   SOLD THIS SPYWARE, THAT THE PRICE TAG ON THESE CONTRACTS WAS

19   SEVERAL MILLIONS OF DOLLARS PER INSTANCE, AND, INDEED, THAT

20   THEY CHARGED EXTRA FOR THE ABILITY TO INSTALL THROUGH WHATSAPP

21   SERVERS IS SOMETHING THAT WE BELIEVE THE JURY SHOULD KNOW IN

22   ORDER FOR US TO SUBSTANTIATE THE PROFIT MOTIVE THAT THE COURT

23   HAS ALREADY CONCLUDED IS RELEVANT.

24             THE COURT:  YEAH.  THE DIFFICULTY, AFTER LOOKING AT

25    THE AUTHORITIES THAT YOU ALL SUBMITTED, IS THE LINE DRAWING,

```
 1        WHERE EXACTLY SHOULD THE LINE BE DRAWN?  BECAUSE OBVIOUSLY THE

 2        MOTIVE IS ITSELF ADMISSIBLE AND ARGUABLE, OBVIOUSLY.

 3             SO I'D LIKE TO HEAR FROM THE DEFENSE ON WHETHER OR NOT

 4        THERE SHOULD BE ANY FINANCIAL INFORMATION, EVEN A GENERAL

 5        REFERENCE TO THE AMOUNT, AS OPPOSED TO -- THERE CERTAINLY WON'T

 6        BE ANY DETAIL.  I DON'T WANT ANY EXPERT TESTIFYING --

 7             MR. PEREZ:  NO, YOUR HONOR.

 8             THE COURT:  -- TO THE SAME DEGREE THAT THAT EXPERT

 9        WILL BE TESTIFYING UPON THE CURRENT FINANCIAL STATUS.

10             MR. PEREZ:  EXACTLY, YOUR HONOR.  WE HAVE STRICKEN

11        ALL THAT.  OUR EXPERT HAD CALCULATED HOW MUCH PROFIT WE THOUGHT

12        THEY HAD EARNED FROM THE SPYWARE DURING THE RELEVANT PERIOD.

13        WE'VE PUT THAT COMPLETELY ASIDE.

14             WHAT WE'RE TALKING ABOUT NOW IS FACTS ABOUT THEIR CONDUCT,

15        WHICH WE DON'T VIEW AS FINANCIAL INFORMATION.  WE VIEW THIS AS

16        COMMERCIAL INFORMATION ABOUT THEIR BUSINESS.

17             THEIR WITNESS ON THIS ISSUE WAS NOT THE CFO.  IT WAS THEIR

18        HEAD OF GLOBAL BUSINESS OPERATIONS, A BUSINESS PERSON.

19             SO WHAT WE'D LIKE TO BE ABLE TO SAY IS THEY HAD THESE

20        CONTRACTS, THE CONTRACTS WERE MULTI MILLION DOLLARS CONTRACTS,

21        THAT'S WHAT THEY SOLD THIS FOR.  NOTHING ABOUT PROFIT OR

22        REVENUE OR FINANCIAL INFORMATION, JUST THEIR BUSINESS.

23             MR. AKROTIRIANAKIS:  IF THAT IS THE LEVEL OF DETAIL,

24        I DON'T THINK IT IS BECAUSE WE HAVE THE ACTUAL DEPOSITION CLIPS

25        THAT THEY WANT TO PLAY, BUT IF THAT WAS THE LEVEL OF DETAIL
```

```
1     THAT THEY WANTED TO GET INTO, THEN I WOULD NOT HAVE A PROBLEM

2     WITH THAT, YOUR HONOR.

3          ONE OF THE THINGS -- AND THIS IS JUST AN EXAMPLE OF THE

4     ISSUE -- I HAVE ACTUALLY A -- THE DOCUMENTS THAT THEY INTEND TO

5     OFFER THROUGH A WITNESS WHO IS A THIRD PARTY WITNESS,

6     TERRY DIVITTORIO.  I CAN EITHER DISPLAY IT ON THE ELMO OR I

7     HAVE COPIES IF THE COURT WOULD PREFER.

8          THE COURT:  JUST HAND KELLY A COPY.

9          MR. AKROTIRIANAKIS:  SURE (HANDING).  THAT'S 2081,

10    AND THIS IS 2085 (HANDING).

11         SO MR. DIVITTORIO IS -- WAS THE PRESIDENT OF WEST BRIDGE,

12    WHICH THE COURT WILL PROBABLY RECALL WAS THE, THE, LIKE THE

13    SALES AGENT HERE IN THE UNITED STATES.

14         AND EXHIBIT 2081 IS A DISCUSSION BETWEEN HIM -- REALLY

15    IT'S NOT A DISCUSSION, IT'S AN EMAIL BETWEEN HIM AND A PERSON

16    CALLED MARK DEYLE.  AND THE PART THAT THEY WANT TO PUT IN

17    EVIDENCE IS THIS TOP TABLE HERE THAT SAYS THAT MR. DEYLE SAYS,

18    I HAVE IN MY TABLE, BUT JUST FOR THE RECORD I SHOULD HAVE AN

19    EMAIL FROM YOU WITH THE PRICE, AND THE ONLY EMAIL FROM YOU WITH

20    PRICING SHOWS, AND THEY HAVE THIS TOP TABLE WHICH

21    MR. DIVITTORIO DESCRIBED AS ASPIRATIONAL PRICING.

22         THEN THERE'S THIS LOWER TABLE ON THE SAME DOCUMENT THAT

23    SHOWS, FOR EXAMPLE, ON THE LIST OF 25 LICENSES, THE PRICE IS

24    $4 MILLION INSTEAD OF $12 MILLION.

25         AND MR. DIVITTORIO'S TESTIMONY IS THAT THE ACTUAL PRICES
```

 1    WERE THE LOWER TABLE, AND THE -- AND THAT THE TOP TABLE ARE

 2    ASPIRATIONAL PRICES, AND THAT IS SHOWN IN THIS EXHIBIT 2085,

 3    YOUR HONOR.

 4        IT'S A TEXT MESSAGE BETWEEN MR. DIVITTORIO AND GREG ROSE,

 5    WHO'S ANOTHER PERSON THAT THEY WORK WITH, AND THEY'RE TALKING

 6    ABOUT -- THIS IS FOR THE -- FOR NORTH AMERICA, OR FOR THE

 7    UNITED STATES, YOUR HONOR.

 8        SO THE 4 MILLION WAS THE 4 MILLION THAT THE CIA PAID IN --

 9    AS WE SEE IN EXHIBIT 2085, AND TOGETHER IN THE OTHER

10    HIGHLIGHTED EXHIBIT IN 2085 WITH THE FBI'S 3.6 MILLION, IT IS A

11    TOTAL OF 7.6 MILLION CLOSED DEALS.

12        SO THE PROBLEM THAT WE HAVE WITH INFORMATION LIKE THIS,

13    YOUR HONOR, IS THAT IT'S MISLEADING, IT'S UNTRUE, AND IF

14    THEY'RE GOING TO PUT IN MR. DIVITTORIO'S STATEMENT IN HIS

15    DEPOSITION THAT RELATES TO THE TOP PART OF EXHIBIT 2081, THEN

16    WE THINK IN FAIRNESS HIS TESTIMONY ABOUT WHAT THE ACTUAL PRICES

17    WERE, WHICH IS, FOR EXAMPLE, IN EXHIBIT 2085, SHOULD BE

18    CONSIDERED BY THE JURY BECAUSE IT'S NOT THE TOP TABLE, IT'S THE

19    BOTTOM TABLE.

20        NONE OF THIS, INCIDENTALLY, GOES TO MOTIVE, YOUR HONOR,

21    BECAUSE THESE -- TO PROFIT MOTIVE BECAUSE THESE ARE, OF COURSE,

22    REVENUE NUMBERS.  THEY DON'T SAY ANYTHING ABOUT PROFIT IN ANY

23    SORT OF DIRECT WAY.

24        BUT IF THEY WANT TO SAY -- IF THEY WANTED TO ASK

25    SARIT GIL, WHO'S THE BUSINESS PERSON THAT MR. PEREZ REFERRED

1    TO, ABOUT WHETHER OR NOT NSO OPERATES AS A FOR-PROFIT COMPANY,

2    WHETHER OR NOT THE SYSTEM WAS SOLD FOR, YOU KNOW, MILLIONS OF

3    DOLLARS TO CUSTOMERS, I DON'T THINK THAT IS PROBLEMATIC.

4         WHAT'S PROBLEMATIC ABOUT THIS IS THAT IT'S REVENUE, NOT

5    PROFIT INFORMATION, AND IT'S UNTRUE AND REQUIRES US THEN

6    GETTING INTO, WELL, IT WAS THE CIA, IT WAS THE FBI AND WHAT

7    THEY REALLY PAID AND SO ON, WHICH, OF COURSE, RUNS INTO THE

8    OTHER PROBLEMS THAT YOU HAVE, AT THEIR SUGGESTION, EXCLUDED.

9              THE COURT:  RIGHT.

10        THIS IS A GOOD EXAMPLE OF WHY MY INCLINATION WAS, AFTER

11   THINKING ABOUT THE ARGUMENTS THAT YOU RAISED LAST WEEK, WAS

12   THAT, NO, AND AFTER LOOKING AT THE CASES, WHAT'S IMPORTANT HERE

13   FOR PUNITIVE DAMAGES -- I KNOW YOU ARGUED THE MOTIVE --

14   MOTIVATION SHOWS, OR CAN SHOW POTENTIALLY REPREHENSIBILITY.

15        NONETHELESS, I THINK THAT THIS LINE DRAWING IS WAY TOO

16   COMPLICATED FOR ALL THE THINGS THAT WE'RE GOING TO BE ASKING

17   THIS JURY TO TRY TO COMPARTMENTALIZE AND TO CHANNEL INTO THE

18   RIGHT PLACE, AND I'M NOT -- I'M NOT AT ALL REALLY INTERESTED IN

19   HEARING THE EXPERTS TALK ABOUT THESE KINDS OF DETAILS, WHO THE

20   CONTRACTS WERE WITH.  THERE'S NO REASON FOR THAT TO BE PART OF

21   THIS PRESENTATION.

22        IF, INDEED, IT WAS, AS OPPOSING COUNSEL HAS INDICATED,

23   JUST ABOUT THE, GENERALLY SPEAKING, THE CONTRACTS WERE LARGE,

24   THEY WERE IN THE -- THEY WERE MULTI MILLION DOLLARS CONTRACTS,

25   THAT WOULD BE FINE.

1              BUT THIS KIND OF DETAIL, NO, I WOULD NOT PERMIT THIS.

2              MR. PEREZ:  YOUR HONOR, TO BE CLEAR, WE'RE NOT

3      TALKING ABOUT EXPERT TESTIMONY.  WE ARE NOT GOING TO HAVE OUR

4      EXPERT TALK ABOUT THEIR CONTRACTS.

5              AND AS I SAID, THE WHOLE ANALYSIS OF THE PROFITS THEY

6      EARNED DURING THIS PERIOD, WE HAVE SHELVED IN LIGHT OF THE

7      SECOND FINAL PRETRIAL.

8              THE COURT:  OKAY.

9              MR. PEREZ:  WHAT WE ARE TALKING ABOUT IS THE MULTI

10     MILLION DOLLAR NATURE OF THESE CONTRACTS.

11             BUT WE BELIEVE THAT THIS INFORMATION -- THIS IS JUST ONE

12     EXAMPLE THAT THEY PICKED OUT.  WE HAVE NO OBJECTION TO THEM

13     BEING ABLE TO COME BACK WITH WHAT THEY BELIEVE THE ACTUAL

14     PRICING WAS.  OBVIOUSLY THE CUSTOMER NAMES SHOULD BE REDACTED.

15     THAT'S FINE.

16             BUT THE ISSUE THAT THE -- THE FACT THAT THIS TECHNOLOGY --

17             THE COURT:  YOU'RE NOT GOING TO SHOW -- THERE'S NOT

18     GOING TO BE ENOUGH TIME IN THIS TRIAL FOR YOU TO SHOW THE

19     NATURE OF THESE -- THE EXTENT OF THE CONTRACTS FOR EVERY

20     CONTRACT THAT WAS IN PLAY IN 2018, 2019 DURING THE RELEVANT

21     TIME PERIOD.

22             SO WHAT I -- WHAT I THINK YOU'RE SAYING IS THIS IS --

23     WOULD BE DEEMED ILLUSTRATIVE OF THE KIND OF CONTRACT, THE

24     AMOUNT OF CONTRACT.

25             MR. PEREZ:  EXACTLY.  WHAT WE'RE TALKING ABOUT,

1    YOUR HONOR, ARE SMALL SNIPS IN DEPOSITION DESIGNATIONS.  THIS

2    IS NOT GOING TO TAKE -- IT'S ALL ACCOUNTED FOR IN OUR TRIAL

3    TIME BUDGET, AND WE WILL GET IT DONE WITHIN THE AMOUNT OF HOURS

4    THAT WE HAVE ALLOTTED.  IT'S NOT GOING TO BE EXPERT TESTIMONY.

5    IT'S GOING TO BE EXACTLY WHAT THE COURT JUST INDICATED WAS

6    ACCEPTABLE, WITNESSES AGREEING, YES, WHEN WE SOLD IT, IT WAS

7    FOR MULTI MILLION DOLLAR CONTRACTS.  THAT'S BASICALLY IT.

8                    THE COURT:  ALL RIGHT.

9                    MR. AKROTIRIANAKIS:  WELL, NO WITNESS HAS AGREED THAT

10    WHAT IS RIGHT IN FRONT OF YOUR HONOR RIGHT NOW WAS THE PRICING.

11        WHAT THE WITNESS TESTIFIED TO WAS THAT THE LOWER CHART,

12    WHICH ARE FIGURES ABOUT ONE-THIRD TO 25 PERCENT OF THE PRICES,

13    WAS THE ACTUAL PRICING.

14        AND THEN THE WAY TO -- THAT WE HAVE TO -- AND THEY KNOW

15    THAT.

16        AND THE ONLY WAY THEN TO FIX THAT IS THESE TYPES OF

17    DOCUMENTS LIKE 2085 WHERE MR. DIVITTORIO AND MR. ROSE THEN ARE

18    SAYING, WELL, THE REAL PRICES ARE THESE AND, YOU KNOW, IT'S THE

19    CIA AND THE FBI AND SO ON, YOUR HONOR.

20                    THE COURT:  YEAH, THAT -- THAT GOES TOO FAR.  PICK

21    ANOTHER ONE.

22                    MR. PEREZ:  WE CAN DISPENSE WITH THIS EXHIBIT,

23    YOUR HONOR.

24                    THE COURT:  YES, OKAY.

25                    MR. PEREZ:  WE CAN JUST MAKE THE POINT GENERALLY

```
 1        THROUGH TESTIMONY.

 2                 THE COURT:  OKAY.  THAT'S WHAT I THINK WOULD BE BEST.

 3                 MR. PEREZ:  THANK YOU, YOUR HONOR.

 4                 MR. AKROTIRIANAKIS:  YOUR HONOR, THERE ARE A COUPLE

 5        MORE.  I DON'T THINK THEY'RE GOING TO COME UP --

 6                 THE COURT:  OKAY.

 7                 MR. AKROTIRIANAKIS:  -- BEFORE EVIDENCE.

 8                 THE COURT:  JUST A SECOND.

 9            (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

10        CLERK.)

11                 THE COURT:  OKAY.  ALL RIGHT.  WE'RE PROBABLY ABOUT

12         FIVE OR TEN MINUTES AWAY FROM OUR JURY.

13            SO I'LL JUST LOOK AT THE -- THE CDAFA AND -- THE TWO

14        INSTRUCTIONS THAT YOU GAVE ME, I'LL LOOK AT THAT DURING A

15        BREAK.  I WON'T DO THAT NOW.

16            LET'S FINISH UP AS MUCH AS WE CAN NOW BEFORE THE JURY

17        COMES IN IN LET'S SAY FIVE OR TEN MINUTES.

18                 MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

19            SO ONE ISSUE IS THAT IN THE DEPOSITIONS THAT, THAT

20        PLAINTIFFS WANT TO PLAY, THEY WANT TO PLAY THE PARTS WHERE

21        THEY'RE ASKING THE WITNESSES WHO ARE EMPLOYEES OF MY CLIENTS

22        ABOUT THEIR SERVICE IN THE ISRAELI MILITARY.

23            AND THE COURT MAY KNOW THAT ISRAEL, LIKE MANY COUNTRIES,

24        HAS COMPULSORY MILITARY SERVICE.  AND I'M SURE THE COURT ALSO

25        KNOWS THAT ISRAEL IS ENGAGED PRESENTLY IN A WAR IN GAZA THAT'S
```

```
1     BEEN GOING ON FOR SOME PERIOD OF TIME.

2          FIRST OF ALL, NONE OF THE EXPERIENCE THAT ANY OF THESE

3     PEOPLE HAD IN THE ISRAELI MILITARY IS PERTINENT TO THE WORK

4     THAT THEY'RE DOING FOR NSO.  FOR EXAMPLE, THEY WEREN'T THE KIND

5     OF OFFICERS, SOLDIERS IN THE MILITARY THAT WORKED ON THINGS

6     THAT ARE RELEVANT TO ANY OF THE ISSUES IN THIS CASE.

7          BUT THEY WANT TO ASK QUESTIONS, AND I CAN SHOW THE COURT

8     THE DESIGNATIONS WHERE THEY'RE ASKING THINGS LIKE, MR. BLOCK,

9     FOR EXAMPLE, WAS ASKING RAMON ESHKAR, DID YOU CARRY A RIFLE?

10    THINGS LIKE THAT.  AND IT'S JUST -- IT'S NOT JUST PREJUDICIAL

11    TO THE DEFENDANTS, YOUR HONOR, IT'S PLAYING ON THE PREJUDICES

12    OF THE JURY, WHICH IS REALLY NOT -- HAS NO PLACE IN COURT.

13    THEY'RE TRYING TO, YOU KNOW, INFLAME THE PASSION OF THE JURY TO

14    SAY, WELL, THESE ARE ISRAELIS AND THEY WERE IN THE ISRAELI ARMY

15    AND THEY CARRIED GUNS AND ALL THIS, AND THEY ARE THE SAME

16    PEOPLE WHO ARE PROSECUTING THE WAR IN GAZA NOW, AND THAT JUST

17    HAS NOTHING TO DO WITH THIS TRIAL.

18          MR. PEREZ:  YOUR HONOR, I THINK I CAN CUT THROUGH

19    THIS.  I THINK FOR THE INDIVIDUAL MILITARY SERVICE OF

20    WITNESSES, WE CAN DISPENSE WITH THAT.  WE HAVE NO INTEREST IN

21    PUTTING THAT BEFORE THE JURY.

22          THE COURT:  THANK YOU.

23          MR. PEREZ:  WE AGREE THAT THAT DOESN'T NEED TO BE

24    PART OF IT.

25          THERE'S A RELATED POINT, THOUGH, THAT I DO WANT TO BE VERY
```

1    CLEAR THAT WE DO BELIEVE IS RELEVANT, WHICH IS THAT NSO WHEN

2    THEY -- THE SOPHISTICATION OF NSO AND THEIR TECHNOLOGY IS A KEY

3    ISSUE IN THIS CASE, AND WHEN THEY DESCRIBE THEIR

4    SOPHISTICATION, ONE OF THE FIRST THINGS THEY SAY IS THAT THE

5    COMPANY WAS FOUNDED BY VETERANS OF ELITE ISRAELI MILITARY

6    UNITS.  THAT'S IN THEIR MARKETING MATERIALS.  WE'VE SEEN

7    SCRIPTS OF THEIR SALES DEMONSTRATIONS WHERE IT'S ONE OF THE

8    FIRST THINGS THAT'S MENTIONED.

9         SO WE DO WANT TO BE ABLE TO MAKE THAT POINT, NOT BY

10   REFERENCE TO ANY INDIVIDUAL WITNESS, BUT THAT THE COMPANY'S

11   DNA, THEIR PEDIGREE; THAT THEY WERE FOUNDED BY VETERANS OF

12   ELITE ISRAELI MILITARY UNITS.  AND AGAIN, WHAT I'M TALKING

13   ABOUT IS NOT GOING ON AND ON WITH WITNESSES.  I THINK IT'S A

14   SINGLE Q AND A IN ONE DEPOSITION DESIGNATION WHERE ONE OF THEIR

15   CORPORATE REPRESENTATIVES IS SHOWN THAT LANGUAGE THAT POINTS TO

16   THE COMPANY BEING FOUNDED IN THAT WAY, AND AGREED, YES, THAT'S

17   CORRECT.

18              THE COURT:  AND THAT'S IMPORTANT WHY?

19              MR. PEREZ:  AS A REFLECTION OF THE SOPHISTICATION OF

20    THE, THE SOPHISTICATION OF THEIR CYBER CAPABILITIES, WHICH IS

21    RELEVANT BOTH TO DETERRENCE AND TO THE REPREHENSIBILITY OF

22    THEIR CONDUCT, THE FACT THAT THIS WAS A DELIBERATE EFFORT THAT

23    WAS CARRIED OUT OVER A SIGNIFICANT AMOUNT OF TIME.

24              THE COURT:  OKAY.

25              MR. PEREZ:  AND THAT ALL IS BASED ON THE EXPERTISE

```
 1         THAT THEY'RE BRINGING TO THE TABLE.

 2             AND, AGAIN, WE'RE TALKING ABOUT, I BELIEVE, A SINGLE

 3      QUESTION AND ANSWER.

 4                 THE COURT:  OKAY.

 5                 MR. AKROTIRIANAKIS:  I DON'T KNOW THAT I NEED TO

 6      RESPOND TO THAT, YOUR HONOR.  IT'S JUST NOT RELEVANT.  I

 7      MEAN --

 8                 THE COURT:  YEAH, I DON'T SEE THE RELEVANCE.

 9                 MR. PEREZ:  IT'S A FACT THAT THEY THEMSELVES POINT TO

10      AS A REFLECTION OF THEIR SOPHISTICATION REPEATEDLY, AND ALL WE

11      ARE ASKING FOR IS THE ABILITY TO USE THAT FACT PRECISELY THE

12      SAME WAY THEY USE IT, TO ILLUSTRATE HOW GOOD THEY ARE AT THESE

13      CYBER TACTICS.

14                 THE COURT:  OKAY.  BUT YOU CANNOT USE -- USE THAT

15      KIND OF INFORMATION WITH RESPECT TO ANY INDIVIDUAL WITNESS.

16                 MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.

17                 THE COURT:  OKAY.

18                 MR. PEREZ:  THANK YOU.

19                 THE COURT:  ALL RIGHT.  NEXT.

20                 THE CLERK:  THEY'RE READY?

21                 THE COURT:  THEY'RE READY.

22             OKAY.  ALL RIGHT.  EVERYBODY TAKE FIVE MINUTES.  THE JURY

23      IS GOING TO BE BROUGHT IN AND SEATED, AND THEN WE WILL

24      COMMENCE.

25                 MR. ANDRES:  THANK YOU, YOUR HONOR.
```

1          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

2          (RECESS FROM 9:09 A.M. UNTIL 9:21 A.M.)

3          (PROSPECTIVE JURY PANEL SWORN.)

4          THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

5     GENTLEMEN, WHO RESPONDED TO JURY SERVICE.

6          LET ME START OFF FIRST BY INTRODUCING MYSELF.

7          MADAM CLERK, THE JURY PANEL HAS BEEN SWORN?

8          THE CLERK:  YES, THEY HAVE.

9          THE COURT:  OKAY.  THANK YOU.

10         I'M JUDGE PHYLLIS HAMILTON.  I'M A DISTRICT JUDGE HERE IN

11    THE NORTHERN DISTRICT OF CALIFORNIA.  THIS IS A FEDERAL COURT.

12    I SEE SOME -- I KNOW THAT SOME OF YOU HAVE HAD PRIOR JURY

13    SERVICE, BUT I DON'T BELIEVE ANY ONE OF YOU INDICATED ON YOUR

14    QUESTIONNAIRE THAT YOU'D EVER SERVED IN A FEDERAL COURT.

15         IF YOU ARE WONDERING WHY SOME OF YOU HAVE BEEN SUMMONED

16    FROM AREAS THAT ARE SOME DISTANCE FROM THIS COURTHOUSE, IT'S

17    BECAUSE THE DISTRICT THAT WE SERVE IS CALLED THE NORTHERN

18    DISTRICT OF CALIFORNIA, AND IT RUNS FROM THE OREGON BORDER ON

19    THE WEST COAST OF CALIFORNIA DOWN EVEN, LET'S SEE, SALINAS,

20    MAYBE AS FAR SOUTH AS SALINAS.

21         SO IT'S A PRETTY BROAD AREA.

22         WE HAVE THREE DIVISIONS:  SAN FRANCISCO, OAKLAND, AND

23    SAN JOSE.  AND WE -- SAN FRANCISCO AND OAKLAND BOTH SUMMON FROM

24    THE SAME AREA.  WE DON'T ASK PEOPLE TO DRIVE MORE THAN 75

25    MILES, BUT I KNOW THAT IN THE BAY AREA, EVEN 60 MILES IS PRETTY

1    FAR.

2         SO I THANK YOU ALL FOR SHOWING UP THIS MORNING AND COMING

3    HERE READY TO SERVE.

4         THIS IS A VALUABLE -- I KNOW YOU'VE HAD THE ORIENTATION,

5    OR YOU'VE HAD ORIENTATION THIS MORNING.

6         SO I AGREE THAT, WITH WHAT YOU'VE BEEN TOLD THIS MORNING,

7    THIS IS A VALUABLE PUBLIC SERVICE THAT YOU ALL ARE COMMITTING

8    TO, AND I REALLY APPRECIATE YOUR PRESENCE HERE, AS I'M SURE THE

9    PARTIES DO AS WELL.

10        ALL RIGHT.  NOW, I ALSO WOULD LIKE TO INTRODUCE THE COURT

11   STAFF THAT YOU MIGHT BE INTERACTING WITH.  THE PERSON WHO WILL

12   BE RUNNING THE SHIP IS WHAT WE REFER TO AS OUR COURTROOM

13   DEPUTY, AND THAT'S MS. KELLY COLLINS.

14        AND WE HAVE OUR COURT REPORTER.  YOU PROBABLY WON'T

15   INTERACT WITH MS. SHORTRIDGE AS FREQUENTLY AS YOU WILL WITH

16   MS. COLLINS.

17        NOW, THE PURPOSE OF OUR EXAMINATION THIS MORNING, YOU ALL

18   ARE HERE FOR WHAT WE CALL JURY VOIR DIRE.  IT'S OUR OPPORTUNITY

19   TO EXAMINE EACH ONE OF YOU TO DETERMINE WHETHER OR NOT ANY

20   PROSPECTIVE JUROR SHOULD BE EXCUSED FOR CAUSE, THAT IS, FOR A

21   REASON HAVING TO DO WITH WHAT'S HAPPENING IN THIS LAWSUIT; OR

22   WHETHER OR NOT YOU SHOULD BE EXCUSED JUST BECAUSE, YOU KNOW,

23   THE ATTORNEYS GET AN OPPORTUNITY TO EVALUATE YOUR RESPONSES AND

24   TO MAKE A DECISION AS TO WHETHER OR NOT TO EXCUSE YOU, AND NO

25   REASON NEED BE GIVEN BY THEM FOR WHAT WE CALL PEREMPTORY

1    CHALLENGES.

2         NOW, IN ORDER FOR US TO COMPLETE THIS EXAMINATION, I'M

3    GOING TO ASK YOU SOME QUESTIONS.  THE QUESTIONS ARE NOT

4    DESIGNED TO PUT ANYBODY ON THE SPOT, TO EMBARRASS YOU, OR TO

5    PRY UNNECESSARILY INTO YOUR LIVES.

6         SO I DO WANT YOU TO ANSWER HONESTLY AND FREELY.

7         WHAT WE'RE TRYING TO FIND OUT IS IF YOU HAVE ANY KNOWLEDGE

8    ABOUT THE CASE, WHETHER OR NOT YOU HAVE ANY PRECONCEIVED

9    OPINIONS THAT YOU MIGHT FEEL DIFFICULT TO SET ASIDE.

10        WE KNOW EVERYBODY HAS OPINIONS ON EVERYTHING, BUT THE

11   QUESTION IS WHETHER OR NOT YOU BELIEVE YOU CAN SET THEM ASIDE

12   AND TO JUDGE THE CASE IMPARTIALLY AND FAIRLY.  THAT'S ALL WE'RE

13   SEEKING THIS MORNING.

14        WE ALSO WANT TO KNOW IF YOU HAVE ANY PERSONAL OR FAMILY

15   EXPERIENCES OR CONNECTIONS WHICH MIGHT CAUSE YOU TO IDENTIFY

16   MORE WITH ONE PARTY OR THE OTHER.

17        AND ESSENTIALLY WHAT WE'RE TRYING TO FIND OUT IS IF YOU

18   CAN BE FAIR AND IMPARTIAL TO BOTH SIDES IN THIS DISPUTE.

19        ALL RIGHT.  NOW, FIRST, LET ME ASK YOU ALL, DO ANY OF

20   YOU -- JUST BY A SHOW OF HANDS -- DO ANY OF YOU KNOW ME OR OUR

21   COURT REPORTER OR OUR COURTROOM DEPUTY?

22        NO?  OKAY.

23        AND THEN I THINK IT'S IMPORTANT FOR YOU TO KNOW WHO THE

24   PARTIES ARE.  SO AT THIS TIME I'M GOING TO ASK THE ATTORNEYS

25   REPRESENTING EACH SIDE IN THIS CASE TO INTRODUCE THEMSELVES,

 1       THEIR CLIENT REPRESENTATIVES, AND THEIR PARTY -- THE PARTIES

 2       WHICH ARE HERE THROUGH THEIR CLIENT REPRESENTATIVES.

 3               AND I GUESS IT'S IMPORTANT AS WELL TO LET THE JURY KNOW

 4       WHAT LAW FIRM YOU ARE REPRESENTING.

 5               SO WE'LL START FIRST WITH THE PLAINTIFFS.  MR. ANDRES?

 6               MR. ANDRES:  THANK YOU, YOUR HONOR.

 7               GOOD MORNING, EVERYBODY.  MY NAME IS GREG ANDRES.  I'M A

 8       LAWYER THAT REPRESENTS WHATSAPP AND META, AND I WORK FOR THE

 9       LAW FIRM OF DAVIS POLK & WARDWELL.  THANK YOU AGAIN FOR YOUR

10       SERVICE.

11               MR. PEREZ:  GOOD MORNING EVERYONE.

12               MY NAME IS ANTONIO PEREZ.  I'M ALSO WITH DAVIS POLK &

13       WARDWELL REPRESENTING WHATSAPP AND META.

14               MR. BLOCK:  GOOD MORNING, YOUR HONOR.

15               MY NAME IS MICAH BLOCK, ALSO DAVIS POLK, REPRESENTING

16       WHATSAPP AND META.

17               AND WITH US ALSO?

18               MR. WOOG:  GOOD MORNING EVERYONE.

19               MY NAME IS CARL WOOG.  I WORK FOR WHATSAPP.  THANK YOU.

20               THE COURT:  OKAY.  MR. AKROTIRIANAKIS.

21               MR. AKROTIRIANAKIS:  GOOD MORNING.

22               MY NAME IS JOE AKROTIRIANAKIS.  MY LAW FIRM IS CALLED

23       KING & SPALDING, AND I REPRESENT THE DEFENDANTS NSO GROUP

24       TECHNOLOGIES AND Q CYBER TECHNOLOGIES.

25               MY APOLOGIES.  I'LL JUST SAY THAT AGAIN.

```
 1            MY NAME IS JOE AKROTIRIANAKIS.  MY LAW FIRM IS CALLED

 2     KING & SPALDING.  I REPRESENT THE DEFENDANTS IN THIS CASE,

 3     NSO GROUP TECHNOLOGIES AND Q CYBER TECHNOLOGIES.

 4            MY CLIENT IS MR. YARON SHOHAT.  HE IS THE CEO OF THE

 5     DEFENDANTS, AND HE'S JOINED US HERE FROM ISRAEL.

 6            MY COLLEAGUES ARE AARON CRAIG AND MATT NOLLER.

 7            AND MY HELPER HERE IS STEPHEN JOY, AND HE WILL BE WITH US

 8     JUST TODAY.

 9                THE COURT:  OKAY.  ALL RIGHT.

10            NOW, DO ANY OF YOU RECOGNIZE ANY OF THE LAWYERS OR PARTIES

11     THAT HAVE BEEN IDENTIFIED?  DO YOU KNOW THEM?  HAVE ANY

12     ACQUAINTANCE WITH ANY OF THEM?

13            ALL RIGHT.  DO ANY OF YOU -- ARE YOU FAMILIAR WITH THEIR

14     LAW FIRMS?  DO YOU HAVE ANY CONNECTION OR KNOWLEDGE OR

15     ACQUAINTANCE WITH THE LAW FIRMS THAT THEY'VE ANNOUNCED THEY

16     REPRESENT?

17            ALL RIGHT.  IN THE BACK.  AND YOUR NAME?

18                PROSPECTIVE JUROR:  MY NAME IS JENNIFER LOW.

19                THE COURT:  ALL RIGHT.  MS. LOW.

20                PROSPECTIVE JUROR:  I JUST WANTED TO SHARE, MY

21     BROTHER-IN-LAW IS A LAWYER AT DAVIS POLK.

22                THE COURT:  AND YOUR BROTHER-IN-LAW'S NAME?

23                PROSPECTIVE JUROR:  COLE DAVIS.

24                THE COURT:  COLE DAVIS.  ALL RIGHT.

25            ANY OF THE LAWYERS FROM DAVIS POLK FAMILIAR WITH HIM?
```

```
 1              MR. ANDRES:  I DON'T BELIEVE SO, YOUR HONOR.

 2              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU, MS. LOW.

 3      WE'LL PURSUE THAT FURTHER WHEN WE GET TO YOU.

 4          ALL RIGHT.

 5          SO NO ONE ELSE HAS ANY FAMILIARITY WITH THE LAWYERS, THEIR

 6      CLIENT REPRESENTATIVES, OR THE LAW FIRMS THAT THEY COME FROM?

 7      YES?  IS THAT A HAND UP OR --

 8              PROSPECTIVE JUROR:  I'M NOT SURE IF THIS IS REALLY

 9      IMPORTANT OR NOT.

10          BUT ARE WE TALKING ABOUT META, THE --

11              THE COURT:  I'M GOING TO GET TO THAT NOW.  I'M GOING

12      TO GET TO THAT NEXT.

13          I WAS JUST TALKING ABOUT THESE PEOPLE HERE IN THE

14      COURTROOM.

15          OKAY.  ALL RIGHT.  NOW, LET ME TELL YOU JUST A LITTLE BIT

16      ABOUT THE CASE AND WHAT YOUR JURY SERVICE WOULD BE ALL ABOUT IF

17      YOU ARE SELECTED.

18          THIS IS A CIVIL TRIAL TO DETERMINE DAMAGES.  THE

19      PLAINTIFFS ARE META PLATFORMS AND WHATSAPP.  THEY BROUGHT THIS

20      LAWSUIT AGAINST NSO GROUP AND Q CYBER TECHNOLOGIES FOR

21      VIOLATION OF A FEDERAL LAW CALLED THE COMPUTER FRAUD AND ABUSE

22      ACT, ALSO REFERRED TO AS CFAA; AND FOR A VIOLATION OF THE

23      CALIFORNIA LAW CALLED THE COMPREHENSIVE COMPUTER DATA ACCESS

24      AND FRAUD ACT, ALSO CALLED THE CDAFA; AND FOR BREACH OF

25      CONTRACT WITH WHATSAPP, SPECIFICALLY WHATSAPP'S TERMS OF
```

1    SERVICE.

2         THOSE ARE THE THREE VIOLATIONS.

3         THE DEFENDANTS DEVELOPED, MARKETED, AND LICENSED SOFTWARE

4    CALLED PEGASUS.

5         I'VE ALREADY FOUND THE DEFENDANTS LIABLE FOR VIOLATING THE

6    CFAA AND THE CDAFA, AND AT CERTAIN TIMES RELEVANT TO THIS CASE,

7    THE DEFENDANTS' TECHNOLOGY SENT MESSAGES THROUGH WHATSAPP'S

8    SERVERS THAT CALLED -- THAT CAUSED PEGASUS TO BE INSTALLED ON

9    TARGET USERS' DEVICES.

10         I HAVE FOUND THAT THE DEFENDANTS BREACHED WHATSAPP'S TERMS

11    OF SERVICE BY REVERSE ENGINEERING AND/OR DECOMPILING THE

12    WHATSAPP COMPUTER CODE.

13         PLAINTIFFS SEEK COMPENSATORY DAMAGES FOR THE DEFENDANTS'

14    VIOLATIONS OF THE CFAA, THE CDAFA, AND WHATSAPP'S TERMS OF

15    SERVICE.

16         PLAINTIFFS ALSO SEEK PUNITIVE DAMAGES FOR THE DEFENDANTS'

17    VIOLATIONS OF THE CDAFA.

18         NOW, DURING THE TRIAL, THE JURY WILL BE ASKED TO DETERMINE

19    WHAT AMOUNT OF COMPENSATORY DAMAGES, IF ANY, PLAINTIFFS PROVED

20    BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANTS OWE TO

21    PLAINTIFFS.

22         AND, SECONDLY, TO DETERMINE WHETHER CLEAR AND CONVINCING

23    EVIDENCE SHOWS THAT THE DEFENDANTS' CONDUCT WAS WILLFUL -- I'M

24    SORRY -- WAS MALICIOUS, OPPRESSIVE, OR FRAUDULENT SUCH THAT

25    PUNITIVE DAMAGES ARE WARRANTED.

1        AND, THIRDLY, IF THE JURY DETERMINES THAT PUNITIVE DAMAGES

2    ARE WARRANTED, THEN THE JURY WILL BE ASKED TO DETERMINE WHAT

3    AMOUNT OF PUNITIVE DAMAGES THE PLAINTIFFS SHOULD RECEIVE FROM

4    THE DEFENDANTS.

5        ALL RIGHT.  NOW, BASED UPON THIS BRIEF DESCRIPTION OF THE

6    CASE, DO ANY OF YOU HAVE ANY KNOWLEDGE OF THE FACTS OR EVENTS

7    IN THIS CASE, OTHER THAN WHAT I'VE JUST TOLD YOU, OR HAVE YOU

8    HEARD ABOUT THIS CASE?

9        IF YOU HAVE, PLEASE RAISE YOUR HAND.

10        OKAY.  THANK YOU.

11        NOW, I'M GOING TO READ A LIST OF NAMES, AND THESE ARE

12    NAMES OF WITNESSES THAT MAY POTENTIALLY TESTIFY IN THE TRIAL,

13    EITHER IN PERSON OR BY VIDEO.

14        LISTEN CAREFULLY TO THE NAMES, AND I WILL ASK IF -- TO

15    RAISE YOUR HAND IF YOU RECOGNIZE ANY OF THE NAMES.

16        TERRENCE DIVITTORIO, TERRENCE DIVITTORIO.

17        OKAY.  RAMON ESHKAR.

18        OKAY.  AASHIN GAUTAM.  THAT'S A-A-S-H-I-N, AASHIN.  LAST

19    NAME GAUTAM, G-A-U-T-A-M.  NO?  OKAY.

20        TAMIR GAZNELI, G-A-Z-N-E-L-I.

21        OKAY.  CLAUDIU GHEORGHE, AND THAT'S SPELLED

22    G-H-E-O-R-G-H-E, GHEORGHE.

23        OKAY.  SARIT BIZINSKY GIL, G-I-L.

24        OKAY.  SUSAN GLICK.  NO HANDS GOING UP.  ALL RIGHT.

25        JONATHAN LEE.

```
1              CORTNEY PADUA, P-A-D-U-A.

2              ALL RIGHT.  JESUS BARCONS PALAU, P-A-L-A-U.

3              OKAY.  GREG PINSONNEAULT, P-I-N-S-O-N-N-E-A-U-L-T.

4              OKAY.  ANDREW ROBINSON.

5              JOSHUA SHANER.

6              YARON SHOHAT.  I BELIEVE MR. SHOHAT IS HERE AND HAS

7       ALREADY INTRODUCED HIMSELF.

8              DANA TREXLER.

9              YUANYUAN WANG.  AND THAT'S Y-A-N -- I'M SORRY,

10      Y-U-A-N-Y-U-A-N, W-A-N-G.

11             AND CARL WOOG, W-O-O-G.

12             ALL RIGHT.  NO HANDS WENT UP, MEANING THAT NONE OF YOU

13      RECOGNIZED ANY OF THE NAMES OF THE POTENTIAL WITNESSES.

14             NOW, DO ANY OF YOU HAVE ANY PHYSICAL DISABILITY THAT MIGHT

15      PREVENT YOU FROM SERVING AS A MEMBER OF THE JURY, OR ANY NEED

16      FOR AN ACCOMMODATION?

17             ALL RIGHT.  JUROR NUMBER 5.

18               PROSPECTIVE JUROR:  GOOD MORNING.  I AM A BREAST

19       FEEDING MOM, SO I HAVE TO PUMP EVERY TWO AND A HALF HOURS.

20               THE COURT:  OKAY.

21               PROSPECTIVE JUROR:  IF THAT'S AN ACCOMMODATION.

22               THE COURT:  I THINK YOU'RE FAMILIAR, WE DO HAVE A

23       ROOM --

24               PROSPECTIVE JUROR:  YEP.

25               THE COURT:  -- SET ASIDE FOR THAT PURPOSE.
```

1          PROSPECTIVE JUROR:  YEP.

2          THE COURT:  SO WE CAN MAKE THAT -- HOW MUCH TIME DO

3    YOU NEED EACH TIME?

4          PROSPECTIVE JUROR:  30 MINUTES.  20 AT THE LEAST, 20.

5          THE COURT:  YEAH.  THAT MIGHT PROVE DIFFICULT.  WE'LL

6    KEEP THAT IN MIND.  OKAY?  WE'LL LET YOU KNOW HOW THINGS GO.

7          PROSPECTIVE JUROR:  THANK YOU.

8          THE COURT:  AND YOUR --

9          PROSPECTIVE JUROR:  6.

10          THE COURT:  NUMBER 6, NELSON?

11          PROSPECTIVE JUROR:  YEP.

12          THE COURT:  MS. NELSON.

13       ALL RIGHT.  THANK YOU.

14       ANYONE ELSE?  IN THE FRONT ROW?

15          PROSPECTIVE JUROR:  SO I HAVE METAL PLATES IN THE

16    BACK OF MY NECK ALL THE WAY DOWN, AND THEN I ALSO HAVE A

17    SURGERY IN MY LOWER BACK, SO I'M NOT ABLE TO SIT FOR LONG

18    PERIODS OF TIME.

19          THE COURT:  OKAY.

20          PROSPECTIVE JUROR:  SO I HAVE TO STAND AND SIT.  SO

21    I'VE BEEN TRYING TO GET A NOTE FROM MY DOCTOR SINCE I GOT

22    CALLED TO JURY DUTY, BUT I HAVEN'T HAD A RESPONSE YET.

23          THE COURT:  OKAY.  WELL, IN TERMS OF BEING ABLE TO

24    STAND, YOU CAN STAND WHENEVER YOU'D LIKE.  I ALSO HAVE A BAD

25    BACK, AND I STAND UP FREQUENTLY THROUGHOUT THE COURSE.

1        YOU CAN STAND ANY TIME THAT YOU WISH, AND IF YOU ARE

2   SELECTED, YOU COULD EVEN MOVE TO THE END OF THE BOX AND GET OUT

3   OF THE BOX AND STAND THERE AT THE END WHERE YOU HAVE A LITTLE

4   BIT MORE ROOM TO STRETCH IF YOU NEEDED TO AT ANY TIME DURING

5   THE COURSE.

6        OKAY.  ALL RIGHT.  ANYONE ELSE?

7        ALL RIGHT.  THANK YOU.

8        NOW, THIS IS -- THIS IS GOING TO BE A RELATIVELY SHORT

9   TRIAL BECAUSE, AS I INDICATED, IT IS ABOUT DAMAGES.  AND WE

10   ANTICIPATE THAT THE TRIAL WILL TAKE FIVE TO SIX DAYS, NO MORE

11   THAN SIX DAYS.

12        WE'LL BE IN SESSION TODAY UNTIL 4:00 O'CLOCK, AND ON

13   TUESDAY, WEDNESDAY, THURSDAY, AND FRIDAY OF THIS WEEK, WE'LL BE

14   IN SESSION FROM 8:30 TO 1:30 WITH TWO, 15 MINUTE BREAKS.

15        SO WE HAVE DISCOVERED HERE IN THE NORTHERN DISTRICT OF

16   CALIFORNIA THAT TRIAL DAY MIGHT BE AN HOUR, AN HOUR LESS THAN

17   GOING A FULL DAY, BUT IT'S MORE CONVENIENT FOR THE JURORS, FOR

18   THE LAWYERS, FOR THE COURT, EVERYBODY HAS OTHER BUSINESS TO

19   ATTEND TO.

20        SO IF WE, WE ARE ADJOURNING AT 1:30 SO THAT THOSE OF YOU

21   WHO NEED TO SPEND TIME DOING SOMETHING ELSE WITH YOUR DAY WILL

22   STILL HAVE SEVERAL HOURS IN THE AFTERNOON TO DO THAT.

23        DO BE PREPARED, THOUGH, IF YOU ARE SELECTED, TO BE IN THE

24   COURTROOM AND PAYING ATTENTION FOR THOSE FOUR AND A HALF HOURS,

25   AND BRING SNACKS.  WE'LL TRY TO HAVE SOME FOR YOU, TOO, BUT IF

1    YOU THINK YOU'LL NEED SOMETHING BECAUSE YOU DON'T GET TO EAT

2    LUNCH UNTIL AFTER THE END OF THE DAY, END OF THE COURT DAY.

3         SO THE FULL DAYS FROM 8:30 TO 4:00 ARE ON OUR FIRST DAY,

4    TODAY, AND ON OUR LAST DAY, BECAUSE ON THE LAST DAY WE'LL HAVE

5    CLOSING ARGUMENTS AND JURY INSTRUCTIONS.

6         AND SO WOULD ANY OF YOU FIND IT IMPOSSIBLE TO SERVE FOR

7    FIVE, POTENTIALLY SIX DAYS?  RAISE YOUR HAND.

8         OKAY.  I'M NOT GOING TO ENTERTAIN YOUR REASONS NOW.  I

9    WILL TALK TO EACH ONE OF YOU INDIVIDUALLY, AND AT THAT TIME YOU

10   CAN TELL ME WHY IT WOULD BE IMPOSSIBLE FOR YOU TO SERVE.

11        AND KEEP IN MIND THAT YOU CERTAINLY COULD BE CALLED, IF

12   YOU GET A POSTPONEMENT -- I'M NOT GOING TO EXCUSE YOU -- BUT IF

13   YOU GET A POSTPONEMENT BECAUSE YOU'RE UNABLE TO SERVE NOW, YOU

14   COULD BE CALLED AGAIN RELATIVELY SOON AND THE TRIAL COULD BE

15   MUCH LONGER THAN FIVE DAYS.

16        SO THAT'S JUST ADDED INCENTIVE FOR THOSE OF YOU WHO WOULD

17   FIND IT INCONVENIENT.

18        WE DO APPRECIATE THAT JURY SERVICE IS INCONVENIENT FOR

19   EVERYONE, BUT IT'S SUCH AN IMPORTANT ASPECT OF YOUR

20   CITIZENSHIP.

21        ALL RIGHT.  NOW, YOU'VE HEARD THE PLAINTIFFS IN THE CASE

22   ARE META AND WHATSAPP.  META WAS FORMERLY KNOWN AS FACEBOOK.

23        RAISE YOUR HAND IF YOU'VE HEARD OF META.  OKAY.  AS

24   ANTICIPATED, THAT'S ALMOST EVERYBODY.

25        OKAY.  AND THE DEFENDANTS IN THE GROUP ARE NSO GROUP AND

1    Q CYBER.  HAVE ANY OF YOU HEARD OF THEM BEFORE?

2         OKAY.  ALL RIGHT.  THANK YOU.

3         NOW, LET'S -- I'M GOING TO ASK YOU, AS A GROUP BEFORE I

4    START THE INDIVIDUAL QUESTIONS, HAVE ANY -- HAVE YOU OR ANYONE

5    CLOSE TO YOU, THAT IS, LIKE A FAMILY MEMBER OR SOMEONE IN YOUR

6    HOUSEHOLD, OR SOMEONE YOU SEE WITH A GREAT DEAL OF -- A FAMILY

7    MEMBER EVEN NOT IN YOUR HOUSEHOLD, BUT YOU SEE THEM REGULARLY,

8    LIKE, DAILY -- EVER BEEN ASSOCIATED IN ANY CAPACITY, BEEN

9    EMPLOYED BY OR ASSOCIATED IN ANY CAPACITY WITH EITHER META OR

10   WHATSAPP?

11        OKAY.  THAT'S JUROR NUMBER 6, OKAY.  OKAY.  I'LL INDICATE

12   EVERYONE, MAKE THAT NOTE, AND WE'LL ASK QUESTIONS OF YOU

13   INDIVIDUALLY.

14        AND SAME QUESTION WITH REGARD TO THE DEFENDANTS.  HAS

15   ANYONE EVER BEEN EMPLOYED BY OR ASSOCIATED IN ANY CAPACITY WITH

16   NSO GROUP OR Q CYBER?

17        OKAY.  AND A SHOW OF HANDS AGAIN.  HAVE YOU OR ANY MEMBER

18   OF YOUR HOUSEHOLD EVER OWNED STOCK OR HAD A FINANCIAL INTEREST

19   IN OR A BUSINESS INTEREST OR RELATIONSHIP WITH META OR

20   WHATSAPP?

21        OKAY.  ALL RIGHT.

22        AND HAVE YOU OR ANY MEMBER OF YOUR HOUSEHOLD EVER HAD

23   STOCK OR HELD A FINANCIAL INTEREST IN OR A BUSINESS

24   RELATIONSHIP OF ANY KIND WITH NSO GROUP OR Q CYBER?

25        OKAY.  NOW I'D LIKE TO INTERACT WITH EACH OF YOU

1    INDIVIDUALLY ABOUT SOME OF THESE ISSUES.

2         SO MS. COLLINS WILL GIVE YOU A MICROPHONE THAT CAN BE

3    PASSED SO THAT EVERYONE CAN HEAR YOUR RESPONSES.

4         WE'RE GOING TO START FIRST WITH JUROR NUMBER 1.

5         JUROR NUMBER 1, MS. TRINH, WE DO HAVE YOUR QUESTIONNAIRE,

6    SO WE DO HAVE THE BASIC BACKGROUND INFORMATION THAT YOU'VE

7    PROVIDED.

8         THERE WERE A COUPLE QUESTIONS ON THAT.  YOU INDICATED THAT

9    YOU PREVIOUSLY SERVED ON A JURY.  YOUR ANSWER TO NUMBER 16 WAS

10   YES, IN SAN FRANCISCO.  QUESTION 17, YOU SAID I HAVE NOT SERVED

11   ON A JURY.

12        DOES THAT MEAN YOU WERE CALLED IN FOR JURY DUTY --

13             PROSPECTIVE JUROR:  AND I WAS DISMISSED.

14             THE COURT:  AND YOU WERE DISMISSED?

15             PROSPECTIVE JUROR:  (NODS HEAD UP AND DOWN.)

16             THE COURT:  OKAY.  SO YOU DIDN'T ACTUALLY PARTICIPATE

17    IN A TRIAL?

18             PROSPECTIVE JUROR:  NO.

19             THE COURT:  OKAY.  THANK YOU.

20        YOU ALSO INDICATED THAT YOU DON'T BELIEVE IN THE DEATH

21   PENALTY.

22        BUT YOU UNDERSTAND THIS IS A CIVIL TRIAL, IT'S NOT ABOUT

23   ANY ASPECT OF CRIMINAL LAW.

24             PROSPECTIVE JUROR:  CORRECT.

25             THE COURT:  DO YOU UNDERSTAND THAT?

```
 1              PROSPECTIVE JUROR:  UNDERSTOOD.

 2              THE COURT:  OKAY.  SO YOUR FEELINGS ABOUT THE DEATH

 3    PENALTY WOULDN'T HAVE ANY IMPLICATION FOR THIS TRIAL; CORRECT?

 4              PROSPECTIVE JUROR:  UNDERSTOOD, YEAH.

 5              THE COURT:  OKAY.  AND THEN YOU ALSO INDICATED THAT

 6    YOU -- THAT YOUR SISTER WAS AN EMPLOYMENT ATTORNEY?

 7              PROSPECTIVE JUROR:  UM-HUM.

 8              THE COURT:  OKAY.  YOUR SISTER, I ASSUME, DOESN'T

 9    LIVE WITH YOU OR --

10              PROSPECTIVE JUROR:  SHE DOESN'T LIVE WITH ME, BUT I

11    KNOW THAT SHE'S HAD META CLIENTS.

12              THE COURT:  OH, SHE'S HAD META CLIENTS IN AN

13    EMPLOYMENT CONTEXT?

14              PROSPECTIVE JUROR:  CORRECT.

15              THE COURT:  OKAY.  DOES SHE TALK TO YOU ABOUT HER

16    WORK?

17              PROSPECTIVE JUROR:  OCCASIONALLY.

18              THE COURT:  OKAY.  YOU INDICATED THAT YOU THOUGHT THE

19    U.S. IS WAY TOO LITIGIOUS AND THAT WE HAVE MORE ATTORNEYS PER

20    CAPITA THAN ANY WESTERN COUNTRY.

21              PROSPECTIVE JUROR:  CORRECT.

22              THE COURT:  OKAY.  HOW WOULD THAT HAVE ANY IMPACT, IF

23    ANY, ON YOUR ABILITY TO SERVE AS A FAIR AND IMPARTIAL JUROR?

24              PROSPECTIVE JUROR:  I GUESS IT WOULD DEPEND ON THE

25    SCOPE OF THE CASE AND THE EVIDENCE.
```

```
 1              BUT OTHERWISE, I CAN, YOU KNOW, TAKE THE INFORMATION AND

 2    TRY TO JUDGE IT FAIRLY.

 3              THE COURT:  OKAY.  AND YOU WOULDN'T HOLD IT AGAINST

 4    THE PLAINTIFFS WHO ARE BRINGING THIS LAWSUIT, WOULD YOU?

 5              PROSPECTIVE JUROR:  NO.

 6              THE COURT:  OKAY.  YOU DO INDICATE, THOUGH, THAT YOU

 7    HAVE SOME HARDSHIP.

 8              PROSPECTIVE JUROR:  YES.  AFTER BEING UNEMPLOYED FOR

 9    A YEAR AND A HALF, I STARTED A JOB TWO WEEKS AGO AND IT'S BASED

10    IN L.A., AND I HAVE A FLIGHT THAT I CANCELLED TODAY.  I WAS

11    SUPPOSED TO BE IN L.A. TODAY, AND IN THE L.A. OFFICE MONDAY

12    THROUGH WEDNESDAYS.

13              THE COURT:  EVERY WEEK?

14              PROSPECTIVE JUROR:  FOR THE NEAR TERM AS I GET TO

15    KNOW MY TEAM.

16              THE COURT:  OKAY.  AND YOUR NEW POSITION IS -- IS

17    THAT THE -- YOU INDICATED YOUR OCCUPATION IS REAL ESTATE ASSET

18    MANAGER?

19              PROSPECTIVE JUROR:  CORRECT.

20              THE COURT:  WITH MANULIFE, JOHN HANCOCK?

21              PROSPECTIVE JUROR:  CORRECT.

22              THE COURT:  AND THAT'S THE JOB THAT YOU JUST RECENTLY

23    STARTED?

24              PROSPECTIVE JUROR:  CORRECT.  I WAS IN THE INTERVIEW

25    PROCESS WHEN I INITIALLY RECEIVED THE JURY SUMMONS.
```

1          THE COURT:  OKAY.  WELL, THANK YOU FOR COMING IN.

2          AND YOU INDICATED THAT YOU WERE THE ONLY EMPLOYED MEMBER

3     OF YOUR HOUSEHOLD AT THIS TIME?

4          PROSPECTIVE JUROR:  THAT'S CORRECT, YES.

5          THE COURT:  OKAY.  ALL RIGHT.  SO TELL ME WHAT KIND

6     OF HARDSHIP THAT WOULD PRESENT FOR YOU TO BE SELECTED FOR THIS

7     SHORT TRIAL?

8          PROSPECTIVE JUROR:  WELL, AT THIS TIME, THERE'S

9     REALLY A -- YOU KNOW, I'M SUPPOSED TO BE IN THE OFFICE THREE

10    DAYS A WEEK GETTING TO KNOW MY TEAM.  IT'S A VERY FAST MOVING

11    COMPANY WITH INVESTMENT DECISIONS THAT ARE -- NEED TO BE MADE

12    ON A TIMELY BASIS.

13         AND SO I FEAR THAT BEING OUT OF THE OFFICE FOR FIVE DAYS

14    WOULD LIMIT MY ABILITY TO KIND OF PARTICIPATE IN THE INVESTMENT

15    PROCESS.

16         THE COURT:  OKAY.  DOES YOUR EMPLOYER PAY FOR JURY

17    SERVICE?

18         PROSPECTIVE JUROR:  YES.

19         THE COURT:  OKAY.  ALL RIGHT.

20    NOW, LET'S GO TO -- WE'LL DEFINITELY TAKE THOSE ISSUES

21    INTO CONSIDERATION, BUT THAT DOESN'T AMOUNT TO AN AUTOMATIC

22    EXCLUSION IN THIS CASE.

23    YOU RAISED YOUR HAND WITH REGARD TO ONE OF THE OTHER

24    QUESTIONS ABOUT I THINK IT WAS THE FINANCIAL INTEREST IN OR

25    KNOWING SOMEONE EMPLOYED BY OR ASSOCIATED WITH META.

```
1                    PROSPECTIVE JUROR:  NO.

2                    THE COURT:  NO?

3                    PROSPECTIVE JUROR:  NO.

4                    THE COURT:  OKAY.

5          SO THE OTHER -- THE NEXT QUESTION WAS, HAVE YOU OR

6    ANYONE -- ANY MEMBER OF YOUR HOUSEHOLD EVER OWNED STOCK OR HAD

7    A FINANCIAL INTEREST IN META OR WHATSAPP?

8                    PROSPECTIVE JUROR:  I BELIEVE WE HAVE OWNED STOCK IN

9     META, BUT I DON'T KNOW OFF THE TOP OF MY HEAD.  I WOULD NEED TO

10    CONFIRM WITH OUR FINANCIAL ADVISOR.

11                   THE COURT:  OKAY.

12                   PROSPECTIVE JUROR:  WE HAVE A NON-DISCRETIONARY

13    ACCOUNT WHERE HE TRADES ON OUR BEHALF.

14                   THE COURT:  OKAY.  SO YOU WOULDN'T, YOURSELF, BE

15    SELECTING THE META STOCK IN THIS PARTICULAR ACCOUNT?

16                   PROSPECTIVE JUROR:  NO.

17                   THE COURT:  OKAY.  YOU DON'T KNOW IF YOU STILL HOLD

18    SUCH STOCK?

19                   PROSPECTIVE JUROR:  I DON'T KNOW, UNFORTUNATELY.

20                   THE COURT:  OKAY.  WHAT ABOUT NSO GROUP OR Q CYBER?

21    HAVE YOU HAD ANY RELATIONSHIP WITH THEM?

22                   PROSPECTIVE JUROR:  THAT DOES NOT SOUND FAMILIAR.

23                   THE COURT:  OKAY.  DO YOU HAVE AN OPINION ABOUT META

24    OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

25    IMPARTIAL TO THEIR INTERESTS?
```

1    PROSPECTIVE JUROR:  I FEEL LIKE ALL THESE TECH

2    COMPANIES HAVE A LITTLE TOO MUCH INFLUENCE ON OUR LIVES AND IN

3    THE WAY THAT NEWS IS PRESENTED AND, YOU KNOW, THERE'S -- I'VE

4    DEFINITELY READ A LOT ABOUT HOW THERE'S NOT A LOT OF FACT

5    CHECKING WITH META.

6    THE COURT:  OKAY.  AND DOES THIS -- WOULD THIS

7    OPINION HAVE ANY BEARING ON WHETHER OR NOT YOU COULD DECIDE

8    THIS DISPUTE?  I DESCRIBED THE NATURE OF THIS DISPUTE BETWEEN

9    TWO BUSINESSES VERSUS TWO OTHER BUSINESSES?

10    PROSPECTIVE JUROR:  SURE.  I THINK I COULD BE FAIR

11    ABOUT THE ISSUE.

12    THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINION ABOUT

13    NSO GROUP OR Q CYBER THAT WOULD MAKE IT DIFFICULT?

14    PROSPECTIVE JUROR:  NONE.

15    THE COURT:  NONE, OKAY.

16    NOW, NSO AND Q CYBER ARE COMPANIES THAT ARE BASED IN

17    ISRAEL.  DO YOU HAVE ANY OPINIONS ABOUT COMPANIES BASED IN

18    ISRAEL OR ABOUT ISRAEL ITSELF THAT MIGHT MAKE IT DIFFICULT FOR

19    YOU TO RENDER A FAIR AND IMPARTIAL VERDICT?

20    PROSPECTIVE JUROR:  YEAH, POTENTIALLY I THINK THAT

21    WHAT'S PRESENTED IN THE NEWS ABOUT SORT OF THE, THE -- WHAT'S

22    GOING ON IN GAZA SEEMS FAIRLY ONE-SIDED AT THIS TIME, AND --

23    YEAH, THERE'S A LOT OF -- IT ALSO FEELS LIKE THERE ARE A LOT

24    OF -- YOU KNOW, I'VE ALSO READ ARTICLES ABOUT HOW THERE ARE

25    MEMBERS OF THE ISRAELI INTELLIGENCE SERVICE THAT ARE WORKING

1       FOR SILICON VALLEY COMPANIES.

2               THE COURT:  OKAY.  AND BASED UPON THE -- THIS IS ALL

3       INFORMATION THAT YOU RECEIVED THROUGH NEWS REPORTS?

4               PROSPECTIVE JUROR:  YEP.

5               THE COURT:  OKAY.  AND WOULD WHAT YOU'VE READ SO FAR

6       HAVE ANY IMPACT ON WHETHER OR NOT YOU COULD BE FAIR AND

7       IMPARTIAL, NOTWITHSTANDING YOUR VIEWS ABOUT HOW ISRAEL'S

8       PORTRAYED IN THE NEWS?

9               PROSPECTIVE JUROR:  NO.  I THINK THAT, YOU KNOW,

10      THE -- I THINK THE LEGAL CASE PROBABLY HAS A PRETTY DEFINED

11      SCOPE.

12              THE COURT:  UM-HUM.

13              PROSPECTIVE JUROR:  SO, YOU KNOW, I THINK THAT I CAN

14      BE FAIR IN REGARDS TO THE QUESTION BEING ASKED.

15              THE COURT:  OKAY.  AND IF YOU WERE REPRESENTING THE

16      ISRAELI COMPANIES, WOULD YOU FEEL COMFORTABLE HAVING SOMEONE

17      SUCH AS YOURSELF SITTING ON THE JURY?

18              PROSPECTIVE JUROR:  I WOULD PREFER TO DECLINE.

19              THE COURT:  OKAY.  WELL, THANK YOU FOR YOUR CANDOR.

20          THIS IS IMPORTANT FOR EVERYONE, AND I WILL NEED EVERYONE

21      TO CONFIRM THAT, THIS -- THE QUESTION IS, IF YOU ARE SELECTED

22      AS A JUROR, YOU WILL BE INSTRUCTED, ALL JURORS WILL BE

23      INSTRUCTED, THAT YOU ARE PROHIBITED FROM TALKING ABOUT THE

24      CASE, POSTING ABOUT IT ONLINE, CONDUCTING INDEPENDENT RESEARCH,

25      INCLUDING INTERNET RESEARCH ABOUT THE CASE, THE PARTIES, THE

1       ATTORNEYS, FOR THE ENTIRE DURATION OF THE TRIAL, SIX DAYS.

2           DOES ANYONE ON THIS PANEL BELIEVE THAT YOU'LL BE UNABLE TO

3       COMPLY WITH THAT INSTRUCTION?

4           OKAY, GREAT.

5           AND I ASSUME, NOT HAVING RAISED YOUR HAND, MS. TRINH, THAT

6       YOU COULD ALSO COMPLY WITH THAT INSTRUCTION?

7               PROSPECTIVE JUROR:  YES.

8               THE COURT:  OKAY, GREAT.  THANK YOU.

9           ALL RIGHT.  IF YOU ARE SELECTED FOR THIS JURY, CAN YOU

10      DECIDE THE CASE BASED SOLELY ON THE FACTS AND THE EVIDENCE

11      PRESENTED HERE IN THIS COURTROOM?

12              PROSPECTIVE JUROR:  YES.

13              THE COURT:  AND DO YOU THINK YOU COULD KEEP AN OPEN

14      MIND AND NOT MAKE UP YOUR MIND AS TO ANY OF THE QUESTIONS THAT

15      YOU'LL BE CALLED UPON TO ANSWER UNTIL BOTH SIDES HAVE HAD A

16      FAIR OPPORTUNITY TO PUT ON THEIR CASE?

17              PROSPECTIVE JUROR:  YES.

18              THE COURT:  ALL RIGHT.  AND THE COURT WILL INSTRUCT

19      THE JURY AS TO WHAT LAW TO APPLY TO THE CASE.

20          DO YOU THINK THAT YOU'D BE ABLE TO FOLLOW THE LAW AS IT

21      APPLIES TO THIS CASE, EVEN IF YOU DISAGREE?

22              PROSPECTIVE JUROR:  YES.

23              THE COURT:  OKAY.  ALL RIGHT.

24          THANK YOU, MS. TRINH.

25          IF YOU WOULD PASS THE MICROPHONE.

```
1                ALL RIGHT.  AND GOOD MORNING, MR. GARDELLA.

2                    PROSPECTIVE JUROR:  YES, YOUR HONOR.

3                    THE COURT:  OKAY.  YOU INDICATED THAT YOU ARE AN

4        ASSISTANCE ADMINISTRATOR?

5                    PROSPECTIVE JUROR:  CORRECT.

6                    THE COURT:  OKAY.  WHAT DOES THAT MEAN IN THIS FIELD?

7                    PROSPECTIVE JUROR:  I SET UP NETWORKS, CISCO MERAKI

8        SPECIFICALLY.  THAT --

9                    THE COURT:  CAN YOU SPELL THAT?

10                   PROSPECTIVE JUROR:  M-E-R-A-K-I.

11                   THE COURT:  ALL RIGHT.  AND --

12                   PROSPECTIVE JUROR:  AND MAINTAIN THEM.

13                   THE COURT:  OKAY.  AND YOU SET UP COMPUTER SYSTEMS?

14                   PROSPECTIVE JUROR:  NETWORKS THE COMPUTERS USE.

15       BASICALLY YOUR WI-FI THAT'S IN HERE, SAME SORT OF STUFF.

16                   THE COURT:  OH, OKAY.  OKAY.  THANK YOU.

17            AND YOU ALSO INDICATED THAT YOU HAD PRIOR JURY SERVICE,

18       BOTH CRIMINAL TRIALS; CORRECT?

19                   PROSPECTIVE JUROR:  CORRECT.

20                   THE COURT:  OKAY.  OVER THE YEARS.  YOU DIDN'T

21       INDICATE THE TIMEFRAME, BUT --

22                   PROSPECTIVE JUROR:  IT'S BEEN A WHILE.  THEY WERE

23       SPACED OUT.  ONE WAS WHEN I WAS IN MY 20S, I WANT TO SAY, AND

24       MAYBE ANOTHER AGAIN IN MY 30S.

25                   THE COURT:  OKAY.  SO IT'S BEEN A WHILE.
```

```
1          WAS THERE ANYTHING ABOUT YOUR PRIOR JURY SERVICE THAT

2    WOULD MAKE IT ROUGH FOR YOU TO BE A JUROR AGAIN?

3          PROSPECTIVE JUROR:  NO.  YOU ALL HAVE AIR

4    CONDITIONING?

5          THE COURT:  YES, WE DO.

6          PROSPECTIVE JUROR:  MARIN DOES NOT.

7          THE COURT:  OH, AT THE MARIN COUNTY COURTHOUSE.

8    BEAUTIFUL BUILDING, BUT NO AIR CONDITIONS, HUH?

9          OKAY.  NOW, YOU DID INDICATE ON YOUR QUESTIONNAIRE THAT

10   YOU WORK WITH CYBERSECURITY INTIMATELY.  CAN YOU DESCRIBE WHAT

11   YOU DO?

12         PROSPECTIVE JUROR:  CORRECT.  SO WE DO INSTALL

13   CYBERSECURITIES IN THE NETWORKS TO MAKE SURE PEOPLE CAN'T HACK

14   INTO IT OR INSTALL THINGS WITHOUT OUR KNOWLEDGE OR ON TO OUR

15   CLIENTS' MACHINES.

16         THE COURT:  OKAY.  AND HAVING HEARD WHAT THIS CASE IS

17   ABOUT, DO YOU THINK THAT YOU WOULD BE MORE CLOSELY ALIGNED WITH

18   ONE PARTY OR THE OTHER?

19         PROSPECTIVE JUROR:  MOST LIKELY YES.

20         THE COURT:  AND WHICH PARTY IS THAT?

21         PROSPECTIVE JUROR:  THAT'S GOING TO BE META BECAUSE

22   THEY WERE THE ONES THAT WERE HACKING AND I -- THAT'S PART OF MY

23   JOB IS TO MAKE SURE THAT PEOPLE AREN'T HACKED.

24         THE COURT:  OKAY.  AND DO YOU THINK THE FACT THAT YOU

25   DO THIS KIND OF WORK FOR A LIVING WOULD, INDEED, IMPACT YOUR
```

```
1      ABILITY TO RENDER A FAIR AND IMPARTIAL VERDICT GIVEN THE

2      LIMITED QUESTION THAT'S GOING TO BE PUT TO THE JURY?

3                   PROSPECTIVE JUROR:  I DON'T THINK SO.  I THINK IT

4      WOULD BE OKAY.

5                   THE COURT:  OKAY.  ALL RIGHT.

6            AND YOU WOULD HAVE TO SET ASIDE WHAT YOU KNOW ABOUT

7      CYBERSECURITY AND ACCEPT THE COURT'S FINDINGS ON -- THE

8      FINDINGS ALREADY MADE IN THE CASE AND LOOK AT THE DAMAGES

9      QUESTION IN THE WAY IN WHICH THE COURT PRESENTS IT TO YOU BY

10     VIRTUE OF THE LEGAL INSTRUCTIONS.

11           DO YOU THINK YOU COULD FOLLOW THOSE LEGAL INSTRUCTIONS,

12     EVEN IF YOU HAPPEN TO DISAGREE WITH THEM?

13                  PROSPECTIVE JUROR:  YES.

14                  THE COURT:  OKAY.  ALL RIGHT.

15           NOW, HAVE YOU EVER BEEN ASSOCIATED WITH META?

16                  PROSPECTIVE JUROR:  I HAVE NOT.

17                  THE COURT:  YOU'VE NOT DONE ANY WORK FOR THEM?

18                  PROSPECTIVE JUROR:  NO.  I WORK WITH SOME OF THEIR

19     EX-EMPLOYEES.  THAT'S AS CLOSE AS I'VE BEEN.

20                  THE COURT:  WORKED WITH SOME OF THEM IN YOUR

21     BUSINESS?

22                  PROSPECTIVE JUROR:  CORRECT.

23                  THE COURT:  THEY LEFT META OR FACEBOOK AND CAME TO

24     YOUR COMPANY?

25                  PROSPECTIVE JUROR:  CORRECT.
```

```
 1                THE COURT:  OKAY.  DO YOU HAVE ANY FINANCIAL

 2     INTEREST?

 3                PROSPECTIVE JUROR:  NOT TO MY KNOWLEDGE.  I HAVE A

 4     FINANCIAL PLANNER.  IT'S ALL SEPARATE FROM MY KNOWLEDGE.

 5                THE COURT:  OKAY.  SO YOU'RE UNAWARE OF ANY FINANCIAL

 6     CONNECTION WITH META OR WHATSAPP?

 7                PROSPECTIVE JUROR:  CORRECT.

 8                THE COURT:  AND WHAT ABOUT NSO?

 9                PROSPECTIVE JUROR:  IT WOULD BE THE SAME THING, IT

10     WOULD BE ON THE FINANCIAL PLANNER'S SIDE.

11                THE COURT:  OKAY.  DO YOU HAVE AN OPINION ABOUT META

12     OR WHATSAPP THAT WOULD MAKE IT HARD TO BE FAIR AND IMPARTIAL TO

13     THEIR INTEREST?

14                PROSPECTIVE JUROR:  NO.

15                THE COURT:  WHAT ABOUT NSO AND Q CYBER, DO YOU HAVE

16     ANY OPINION ABOUT THOSE COMPANIES THAT WOULD MAKE IT DIFFICULT

17     FOR YOU TO BE FAIR AND IMPARTIAL?

18                PROSPECTIVE JUROR:  NO, I HAVE NO KNOWLEDGE OF THEM.

19                THE COURT:  OKAY.  THOSE TWO COMPANIES ARE BASED IN

20     ISRAEL, AS I'VE INDICATED.

21            DO YOU HAVE ANY OPINIONS ABOUT COMPANIES BASED IN ISRAEL

22     THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL

23     TO THEIR INTERESTS?

24                PROSPECTIVE JUROR:  NO.  THE COMPANIES ARE SEPARATE

25     FROM THE GOVERNMENT.
```

```
 1                    THE COURT:  OKAY.  AND -- OKAY.  I DON'T NEED TO ASK

 2         THAT.  YOU DIDN'T RAISE YOUR HAND.

 3             IS THERE ANY OTHER INFORMATION ABOUT YOURSELF THAT YOU

 4         THINK YOU SHOULD SHARE WITH US?

 5                    PROSPECTIVE JUROR:  I DON'T KNOW OF ANYTHING THAT'S

 6         RELEVANT.

 7                    THE COURT:  OKAY.  AND CAN YOU KEEP AN OPEN MIND

 8         UNTIL ALL OF THE EVIDENCE IS IN?

 9                    PROSPECTIVE JUROR:  YES.

10                    THE COURT:  AND YOU'VE BEEN INSTRUCTED ON THE LAW AS

11         IT APPLIES TO THIS CASE?

12                    PROSPECTIVE JUROR:  YES, YOUR HONOR.

13                    THE COURT:  OKAY.

14             OKAY.  THANK YOU.

15             OKAY.  PASS THE MIC.

16             AND GOOD MORNING, MR. THAPA.

17                    PROSPECTIVE JUROR:  YES.  GOOD MORNING.

18                    THE COURT:  ALL RIGHT.  YOU HAVE SOME FAMILIARITY

19         WITH CIVIL LITIGATION, CORRECT, YOU INDICATED ON YOUR

20         QUESTIONNAIRE?

21             HAS YOUR RESTAURANT BEEN SUED?

22                    PROSPECTIVE JUROR:  YES.  IT'S ABOUT ADA COMPLIANCE,

23         AND IT'S OVER NOW.  BUT, YEAH, IT WAS, LIKE, TWO YEARS AGO,

24         YEAH.

25                    THE COURT:  OKAY.  ONE LAWSUIT?
```

1          PROSPECTIVE JUROR:  YEAH, ONE LAWSUIT.

2          THE COURT:  ONE LAWSUIT.  OKAY.

3       ANYTHING ABOUT THE WAY -- WAS THERE ANYTHING ABOUT THE WAY

4    IN WHICH THE CASE WAS LITIGATED -- I ASSUME YOU WERE A

5    DEFENDANT; RIGHT?

6          PROSPECTIVE JUROR:  YES.

7          THE COURT:  SOMEONE SUED YOU FOR AN ADA VIOLATION?

8          PROSPECTIVE JUROR:  YES, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  WAS THERE ANYTHING ABOUT THAT

10    EXPERIENCE THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE A JUROR?

11    DID YOUR CASE GO TO TRIAL OR ANYTHING?

12          PROSPECTIVE JUROR:  NO.  WE JUST SETTLED, SO WE

13    DIDN'T GO TO THESE -- LIKE A FEW MONTHS AND THEN WE FIXED IT,

14    SO IT'S CLEAR.

15          THE COURT:  OKAY.  WAS THERE ANYTHING ABOUT THAT THAT

16    LEFT A LASTING IMPRESSION ON YOU SUCH THAT YOU WOULDN'T WANT TO

17    BE A JUROR IN THIS CASE?

18          PROSPECTIVE JUROR:  ABOUT THIS ONE?

19          THE COURT:  YEAH.

20          PROSPECTIVE JUROR:  I HAVE NO IDEA.

21          THE COURT:  OKAY.

22          PROSPECTIVE JUROR:  YEAH.  YEAH.

23          THE COURT:  I DON'T WANT TO CUT YOU OFF.

24          PROSPECTIVE JUROR:  GO AHEAD.  SORRY.

25          THE COURT:  ALL RIGHT.  SO THAT EXPERIENCE DIDN'T

```
1        SORT OF SOUR YOU ON LITIGATION ENTIRELY?

2                 PROSPECTIVE JUROR:  ABOUT THE ADA?

3                 THE COURT:  YEAH.

4                 PROSPECTIVE JUROR:  SO ONCE WE GET THE LAWSUIT, WE

5        CONTACT OUR LAWYER, AND THEN THAT WAS NOT A BIG LAWSUIT, BUT IT

6        WAS A LAWSUIT ANYWAY.  AND WE FIXED UP -- THERE WAS SOME KIND

7        OF COURT THAT WE WENT AT THE BEGINNING.  SO WE DID THAT AT THE

8        BEGINNING AND WE CAME IN AND FIXED IT, SO IT SETTLED.

9                 THE COURT:  OKAY.

10                PROSPECTIVE JUROR:  SO YEAH.

11                THE COURT:  AND HOW LONG AGO WAS THAT?

12                PROSPECTIVE JUROR:  IT'S ABOUT A YEAR AND A HALF AGO.

13                THE COURT:  YEAR AND A HALF.  OKAY.

14           ALL RIGHT.  AND THERE WERE -- IS THERE ANYTHING ABOUT WHAT

15       HAPPENED IN THAT CASE THAT YOU THINK WOULD MAKE YOU FEEL

16       NEGATIVELY ABOUT LAWSUITS IN THIS CASE?

17                PROSPECTIVE JUROR:  NO.

18                THE COURT:  THIS LAWSUIT?

19           WOULD IT CAUSE YOU TO IDENTIFY MORE WITH ONE PARTY OR THE

20       OTHER IN THIS CASE?

21                PROSPECTIVE JUROR:  IT'S ABOUT -- I -- I HAVE NO IDEA

22       ACTUALLY.  IT'S ABOUT SOME -- THE PHYSICAL STRUCTURE OF THE

23       RAMP.

24                THE COURT:  OKAY.

25                PROSPECTIVE JUROR:  YEAH.
```

1          THE COURT:  OKAY.  I THINK I'M NOT MAKING MYSELF

2     ENTIRELY CLEAR ON THAT.

3          PROSPECTIVE JUROR:  I'M SORRY.

4          THE COURT:  BUT LET ME JUST ASK YOU THE OTHER

5     QUESTIONS ON YOUR RELATIONSHIP, IF ANY, WITH META OR FACEBOOK.

6          DO YOU HAVE ANY, OR HAVE YOU HAD IN THE PAST, ANY

7     EMPLOYMENT RELATIONSHIP, BUSINESS RELATIONSHIP, OR HAVE YOU

8     OWNED STOCK IN META?

9          PROSPECTIVE JUROR:  NO, I HAVEN'T.

10         THE COURT:  OKAY.  WHAT ABOUT WITH NSO?

11         PROSPECTIVE JUROR:  I NEVER HEARD ABOUT IT.

12         THE COURT:  NEVER HEARD OF THAT COMPANY.  OKAY.

13    THANK YOU.

14         DO YOU HAVE AN OPINION ABOUT META OR WHATSAPP THAT WOULD

15    MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO THEIR

16    INTERESTS?

17         PROSPECTIVE JUROR:  I HAVE NO IDEA.  BUT I JUST USE

18    THEM AS, LIKE -- BUT DEFINITELY TAKING LOTS OF INFORMATION,

19    LIKE WHEN WE LOG IN, WHEN WE TRY TO SHARE OUR -- ANY KIND OF

20    INFORMATION, LIKE PERSONAL EVENTS OR SOMETHING, I THINK THEY

21    TRACK PRETTY WELL ABOUT IT.  SO THAT'S ALL I KNOW.

22         THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT THEM

23    THAT MIGHT MAKE IT DIFFICULT FOR YOU TO BE FAIR TO THEM?

24         PROSPECTIVE JUROR:  I DON'T HAVE ANYTHING TO SAY

25    ABOUT IT.  I'M -- I'M PRETTY MUCH OPEN WITH THAT.  SO I JUST

1    USE THEM AS, LIKE, MY SOCIAL MEDIA, JUST, LIKE, SHARE WITH MY

2    FRIENDS AND FAMILY.  THAT'S ALL I DO.  SO I HAVE NO IDEA.

3            THE COURT:  OKAY.  AND WITH REGARD TO NSO AND

4    Q CYBER, DO YOU HAVE ANY OPINION ABOUT THEM THAT WOULD MAKE IT

5    DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO THEIR INTERESTS?

6            PROSPECTIVE JUROR:  NO, I DON'T HAVE ANY OPINION

7    ABOUT THEM.

8            THE COURT:  OKAY.  YOU'VE HEARD ME SAY THAT BOTH THE

9    DEFENDANT COMPANIES, NSO AND Q CYBER, ARE BASED IN ISRAEL.

10        DO YOU HAVE ANY OPINIONS ABOUT ISRAELI-BASED COMPANIES OR

11   ABOUT ISRAEL THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR

12   AND IMPARTIAL TO THEM?

13            PROSPECTIVE JUROR:  NO, I DON'T.

14            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU, MR. THAPA.

15            PROSPECTIVE JUROR:  THANK YOU.

16            THE COURT:  OKAY.  MR. PURI?

17            PROSPECTIVE JUROR:  YEAH, GOOD MORNING.

18            THE COURT:  GOOD MORNING.

19        ALL RIGHT, MR. PURI.  YOU'RE A SOFTWARE ENGINEER?

20            PROSPECTIVE JUROR:  YEAH.

21            THE COURT:  OKAY.  WHAT'S THE NATURE -- WHAT'S THE

22   NATURE OF YOUR WORK?  WHAT DO YOU DO?

23            PROSPECTIVE JUROR:  SO I DEVELOP CODE, MOSTLY IN JAVA

24   AND MIDDLE WARE.

25            THE COURT:  ALL RIGHT.  SO YOU DEVELOP CODE.  AND YOU

```
1        WORK FOR A BANK, RIGHT, WELLS FARGO?

2                    PROSPECTIVE JUROR:  YEAH.

3                    THE COURT:  OKAY.  AND YOU INDICATE THAT YOU DO HAVE

4        SOME IDEA ON CYBERSECURITY.  WHAT'S YOUR -- WHAT DID YOU MEAN

5        BY THAT ANSWER?  WHAT ARE YOUR IDEAS ABOUT CYBERSECURITY?

6                    PROSPECTIVE JUROR:  EXCUSE ME.

7            SO SINCE I DEVELOP SOFTWARE, WE HAVE TO TAKE CARE OF, YOU

8        KNOW, DIFFERENT ASPECTS OF CYBERSECURITY SO THAT THE SOFTWARE

9        IS NOT VULNERABLE TO ANY KIND OF ATTACK OR -- IT IS SECURE.  SO

10       WE HAVE TO -- WE HAVE CERTAIN PROTOCOLS THAT WE FOLLOW TO MAKE

11       SURE THE SOFTWARE IS GOOD AND IS NOT COMPROMISED IN ANY WAY.

12                   THE COURT:  OKAY.

13                   PROSPECTIVE JUROR:  INCLUDING CUSTOMERS' DATA AND THE

14       SOFTWARE ITSELF.

15                   THE COURT:  ALL RIGHT.  AND THAT'S WRITTEN INTO THE

16       CODE?

17                   PROSPECTIVE JUROR:  NO, NOT ENTIRELY IN THE CODE.

18           SO SOME OF IT IS OUR CODE, BUT A LOT OF IT IS NETWORK AND

19       HARDWARE AS WELL.

20                   THE COURT:  AND ARE YOU INVOLVED IN THAT ASPECT AS

21       WELL?

22                   PROSPECTIVE JUROR:  NO.

23                   THE COURT:  YOU JUST ARE WORKING WITH THE CODE;

24       RIGHT?

25                   PROSPECTIVE JUROR:  CORRECT.
```

```
1              THE COURT:  ALL RIGHT.  DOES -- DO YOU THINK THAT YOU

2    WOULD IDENTIFY MORE WITH ONE SIDE OR THE OTHER GIVEN HOW I'VE

3    DESCRIBED THIS CASE?

4              PROSPECTIVE JUROR:  NO.

5              THE COURT:  NO?  ALL RIGHT.

6         DO YOU THINK THAT YOU COULD BE FAIR AND IMPARTIAL TO BOTH

7    SIDES?

8              PROSPECTIVE JUROR:  YEAH.

9              THE COURT:  DO YOU HAVE ANY PAST EMPLOYMENT OR

10   FINANCIAL CONNECTION WITH META OR WHATSAPP?

11             PROSPECTIVE JUROR:  SO I MIGHT HAVE OWNED STOCKS, I

12   DON'T REMEMBER AT THIS POINT, FOR FACEBOOK.  BUT I DON'T REALLY

13   RECOLLECT --

14             THE COURT:  OKAY.

15             PROSPECTIVE JUROR:  -- UNLESS I GO AND CHECK MY PAST

16   ACCOUNTS.

17             THE COURT:  OKAY.  AND YOU SAY YOU MIGHT HAVE OWNED.

18   DOES THAT MEAN THAT YOU KNOW YOU DO NOT CURRENTLY OWN?

19             PROSPECTIVE JUROR:  NOT STOCKS, BUT I HAVE MY 401(K),

20   SO MAYBE IT'S PART OF THAT MIX, MY SELECTIONS.

21        BUT I DON'T RECALL RIGHT NOW.

22             THE COURT:  OKAY.  DO YOU MAKE THE SELECTIONS OF

23   HOLDINGS WITHIN YOUR 401(K), OR DO YOU HAVE A FINANCIAL

24   PLANNER OR SOMEONE ELSE THAT DOES THAT?

25             PROSPECTIVE JUROR:  SO I DO MAKE SOME SELECTIONS, BUT
```

```
1         MOST OF IT IS A TARGETED FUND.  SO IT'S PRE-SELECTED.

2              THE COURT:  BY?

3              PROSPECTIVE JUROR:  I THINK IT'S SOME OTHER FIRM THAT

4    MANAGES THE 401(K).

5              THE COURT:  OKAY.  YOU DON'T SELECT THEM YOURSELVES?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  AND YOU DON'T KNOW WHETHER OR NOT YOU

8    HAVE ANY OF THEIR STOCK CURRENTLY?

9              PROSPECTIVE JUROR:  YEAH, RIGHT.

10             THE COURT:  OKAY.  ALL RIGHT.

11        ALL RIGHT.  DO YOU HAVE ANY KNOWLEDGE OF ANY FINANCIAL

12   INTEREST IN THE DEFENDANT COMPANIES, NSO OR Q CYBER?

13             PROSPECTIVE JUROR:  NO.

14             THE COURT:  OKAY.  DO YOU HAVE AN OPINION ABOUT THESE

15   TWO COMPANIES, THE COMPANIES ON BOTH SIDES, EITHER FACEBOOK OR

16   WHATSAPP --

17             PROSPECTIVE JUROR:  NO.

18             THE COURT:  -- THAT MIGHT INTERFERE OR MAKE IT

19   DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO THEM?

20             PROSPECTIVE JUROR:  NO.

21             THE COURT:  DO YOU HAVE ANY OPINION ABOUT THE

22   DEFENDANTS, NSO AND Q CYBER, THAT MIGHT MAKE IT DIFFICULT OR

23   IMPOSSIBLE -- DIFFICULT FOR YOU TO BE FAIR TO THEM AS WELL?

24             PROSPECTIVE JUROR:  NO.

25             THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT
```

```
1        COMPANIES THAT ARE BASED IN ISRAEL --

2              PROSPECTIVE JUROR:  NO.

3              THE COURT:  -- OR ABOUT ISRAEL THAT MIGHT MAKE IT

4     DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL?

5              PROSPECTIVE JUROR:  NO.

6              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU, MR. PURI.

7              PROSPECTIVE JUROR:  I DO WANT TO ADD, WE HAVE A

8     COUPLE OF KIDS, AND I FAILED TO MENTION THAT IN MY, MY

9     QUESTIONNAIRE.  SO THEY'RE 5 AND 11, AND MY WIFE ALWAYS IS NOT

10    ABLE TO GO AND PICK THEM UP, SO WE TAKE TURNS.  SO THAT MIGHT

11    BE SOMETHING, YOU KNOW, I HAVE -- I MIGHT HAVE TO WORK AROUND

12    THAT.

13         SO THAT'S SOMETHING I WAS HOPING I COULD BE EXCUSED FOR.

14              THE COURT:  NO.  SORRY.  EVERYBODY HAS GOT FAMILY AND

15    WORK OBLIGATIONS.  WE APPRECIATE THAT JURY SERVICE IS

16    INCONVENIENT FOR EVERYONE, BUT WE HAVE A TRUNCATED TRIAL DATE

17    FOR A REASON.  WE'LL BE FINISHED WITH TRIAL, EXCEPT ON THE

18    FIRST DAY AND THE LAST DAY, AT 1:30 IN THE AFTERNOON SO

19    EVERYONE IS GOING TO HAVE TO WORK AROUND THAT SCHEDULE.

20              PROSPECTIVE JUROR:  OKAY.  THANK YOU.

21              THE COURT:  ALL RIGHT.  THANK YOU.

22         ALL RIGHT.  AND, MS. NELSON, WE ALREADY -- I'M SORRY, DID

23    I GET THE WRONG NAME?

24              PROSPECTIVE JUROR:  NO, THAT'S ME.

25              THE COURT:  THAT'S YOU.  OKAY.  DID I SKIP SOMEONE?
```

1          THE CLERK:  5 IS A FAILURE TO APPEAR.  5 IS NOT HERE.

2          THE COURT:  THEY DIDN'T COME UP?  OKAY.

3      OKAY.  NUMBER 6.  OH, I SEE.  WE SKIPPED IT.  WE DON'T

4  HAVE NUMBER 5 ALTOGETHER, RIGHT?

5      OKAY.  AND, MS. NELSON, LET'S SEE.  WHAT IS -- YEAH, WHAT

6  IS THE NATURE OF YOUR BUSINESS, REGENERON?

7          PROSPECTIVE JUROR:  IT'S A PHARMACEUTICAL COMPANY

8  BASED IN NEW YORK.  SO I'M A SALES REPRESENTATIVE.

9          THE COURT:  OKAY.  THEY DON'T HAVE AN OFFICE HERE?

10          PROSPECTIVE JUROR:  NO.  SO I'M A SALES

11  REPRESENTATIVE BASED IN THE BAY AREA.  SO MY COMPANY

12  HEADQUARTERS IS IN NEW YORK, BUT I CALL ON THE DOCTORS IN THE

13  GREATER BAY AREA.

14          THE COURT:  OKAY.  ALL RIGHT.  YOU INDICATED IN TERMS

15  OF YOUR -- ANY FAMILIARITY WITH THE LEGAL FIELD, THAT YOUR

16  MOTHER WAS A PARALEGAL?

17          PROSPECTIVE JUROR:  SHE WAS.

18          THE COURT:  SHE IS NOT CURRENTLY IN THAT POSITION?

19          PROSPECTIVE JUROR:  NO.

20          THE COURT:  OKAY.  DID SHE WORK FOR A LAW FIRM?

21          PROSPECTIVE JUROR:  YES.

22          THE COURT:  OKAY.  NEITHER OF THE FIRMS THAT ARE

23  REPRESENTED HERE?

24          PROSPECTIVE JUROR:  NO.

25          THE COURT:  OKAY.  AND YOU DO INDICATE THAT YOU NEED

```
 1        THAT TIME ABOUT EVERY THREE HOURS?

 2                  PROSPECTIVE JUROR:  THAT'S -- YEAH.

 3                  THE COURT:  ROUGHLY?

 4                  PROSPECTIVE JUROR:  ROUGHLY, YEAH.  TWO AND A HALF TO

 5        THREE HOURS.

 6                  THE COURT:  I GUESS IT'S NOT PRECISE, RIGHT?  YOU CAN

 7        COME --

 8                  PROSPECTIVE JUROR:  THREE HOURS IS THE LONGEST I'LL

 9        GO.

10                  THE COURT:  OKAY.

11                  PROSPECTIVE JUROR:  YES.

12                  THE COURT:  ALL RIGHT.  WE WILL TAKE THAT INTO

13        ACCOUNT.

14            DID YOU INDICATE THAT YOU HAD ANY EMPLOYMENT OR

15        ASSOCIATION RELATIONSHIP WITH META OR WHATSAPP?

16                  PROSPECTIVE JUROR:  NO.

17                  THE COURT:  OKAY.  AND SAME WITH NSO AND Q CYBER?

18                  PROSPECTIVE JUROR:  NO.

19                  THE COURT:  HAVE YOU OR ANY MEMBER OF YOUR HOUSEHOLD

20        EVER OWNED STOCK IN ANY OF THESE COMPANIES?

21                  PROSPECTIVE JUROR:  ALONG WITH EVERYONE, I'M NOT

22        SURE.  I DON'T THINK SO.

23                  THE COURT:  OKAY.  AND HAVE YOU ANY OPINION ABOUT

24        META OR WHATSAPP THAT COULD INTERFERE WITH YOUR ABILITY TO BE

25        FAIR AND IMPARTIAL?
```

```
1                      PROSPECTIVE JUROR:  NO.

2                      THE COURT:  AND HOW ABOUT WITH NSO AND Q CYBER?

3                      PROSPECTIVE JUROR:  NO.

4                      THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINION ABOUT

5       COMPANIES BASED IN ISRAEL.

6                      PROSPECTIVE JUROR:  NO.

7                      THE COURT:  OR ABOUT ISRAEL THAT MIGHT INTERFERE WITH

8       YOUR ABILITY TO BE FAIR AND IMPARTIAL TO THE DEFENDANTS?

9                      PROSPECTIVE JUROR:  NO.

10                     THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE ABOUT

11      YOURSELF THAT YOU THINK WE SHOULD KNOW, HAVING HEARD ALL THE

12      QUESTIONS PUT TO EVERYONE ELSE?

13                     PROSPECTIVE JUROR:  YES.

14                     THE COURT:  NOTHING ELSE?

15                     PROSPECTIVE JUROR:  NOTHING ELSE.

16                     THE COURT:  ALL RIGHT.  THANK YOU.

17                     PROSPECTIVE JUROR:  THANK YOU.

18                     THE COURT:  GOOD MORNING, MS. MAHUIKI.

19                     PROSPECTIVE JUROR:  MS. MAHUIKI.

20                     THE COURT:  SURE.

21                     PROSPECTIVE JUROR:  IT'S OKAY.  IT'S HAWAIIAN.

22                     THE COURT:  BUT EVERY VOWEL IS PRONOUNCED AS ITS

23      SEPARATE SYLLABLE; RIGHT?

24                     PROSPECTIVE JUROR:  IT'S LIKE MAHUIKI.

25                     THE COURT:  MAHUIKI.  THANK YOU.
```

```
 1              ALL RIGHT.  LET'S SEE WHAT YOU INDICATED.

 2              YOU INDICATED ON YOUR QUESTIONNAIRE THAT YOU'RE NOT A FAN

 3     OF GOVERNMENT.

 4                   PROSPECTIVE JUROR:  CORRECT.

 5                   THE COURT:  OKAY.

 6                   PROSPECTIVE JUROR:  AT LEAST THE WAY THAT IT'S GOING

 7     CURRENTLY.

 8                   THE COURT:  OKAY.  WELL, YOU KNOW, THERE AREN'T ANY

 9     POLITICAL IMPLICATIONS FOR THIS TRIAL.  YOU HEARD ME DESCRIBE

10     WHAT IT'S ABOUT.

11              WOULD YOUR SORT OF ANTI-GOVERNMENT SENTIMENT RIGHT NOW

12     HAVE ANY IMPACT ON YOUR ABILITY TO BE FAIR AND IMPARTIAL TO THE

13     PARTIES THAT ARE IN THIS CASE?

14                   PROSPECTIVE JUROR:  I THINK I COULD BE FAIR AND

15     IMPARTIAL.

16                   THE COURT:  OKAY.  AND HAVE YOU HAD ANY SORT OF

17     EMPLOYMENT RELATIONSHIP OR FINANCIAL INTEREST IN META OR

18     WHATSAPP?

19                   PROSPECTIVE JUROR:  YES.

20                   THE COURT:  OKAY.

21                   PROSPECTIVE JUROR:  ONE OF MY BEST FRIENDS WORKS FOR

22     META.

23                   THE COURT:  OKAY.

24                   PROSPECTIVE JUROR:  NOT ON WHATSAPP.

25              AND THEN I INHERITED STOCK IN META.
```

```
1              THE COURT:  IN META, OKAY.  AND YOU STILL HOLD IT?

2              PROSPECTIVE JUROR:  CORRECT.

3              THE COURT:  ALL RIGHT.  ALL RIGHT.  WOULD EITHER OF

4      THOSE THINGS TEND TO MAKE YOU IDENTIFY MORE WITH META IN THIS

5      CASE?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  NO?

8              PROSPECTIVE JUROR:  NO, I DON'T THINK SO.

9              THE COURT:  OKAY.  WOULD IT TEND TO -- WELL, DO YOU

10     HAVE ANY OPINION ABOUT META OR WHATSAPP THAT MIGHT IMPACT YOUR

11     ABILITY TO BE FAIR AND IMPARTIAL?

12             PROSPECTIVE JUROR:  ONLY ABOUT MARK ZUCKERBERG.

13     THAT'S NOT -- NOT META ITSELF, BUT THE CREATOR OF IT.

14             THE COURT:  OKAY.  I -- AND I ASSUME, BY THE WAY YOU

15     SAID THAT, THAT YOU HAVE A NEGATIVE OPINION?

16             PROSPECTIVE JUROR:  CORRECT.

17             THE COURT:  OKAY.  AND WOULD THAT NEGATIVE OPINION

18     TRANSLATE INTO --

19             PROSPECTIVE JUROR:  I WOULD TRY NOT TO --

20             THE COURT:  -- BIAS AGAINST META?

21             PROSPECTIVE JUROR:  THERE IS UNCONSCIOUS BIAS THAT I

22     COULD TRY TO WORK THROUGH AND OVERCOME.

23             THE COURT:  DO YOU THINK YOU COULD OVERCOME IT?

24             PROSPECTIVE JUROR:  I DO.

25             THE COURT:  OKAY.  AND WHAT ABOUT NSO AND Q CYBER?
```

```
1          DO YOU HAVE ANY SORT OF -- ANY OPINION ABOUT THOSE TWO

2     COMPANIES --

3                    PROSPECTIVE JUROR:  NO.

4                    THE COURT:  -- THAT WOULD IMPACT YOUR ABILITY TO BE

5     FAIR AND IMPARTIAL?

6                    PROSPECTIVE JUROR:  ONLY ABOUT THE COUNTRY OF ORIGIN.

7                    THE COURT:  OKAY.  SO LET'S GET TO THAT.  I DID ASK

8     QUESTIONS ABOUT ANY BIAS AGAINST COMPANIES THAT ARE BASED IN

9     ISRAEL OR ABOUT ISRAEL ITSELF?

10                    PROSPECTIVE JUROR:  THERE IS.

11                    THE COURT:  OKAY.  AND TELL US WHAT THAT IS.

12                    PROSPECTIVE JUROR:  I HAVE A NEGATIVE BIAS TOWARDS

13    THE GOVERNMENT AND MILITARY OF ISRAEL.

14                    THE COURT:  OKAY.  AND WOULD THAT TRANSLATE INTO

15    NEGATIVE BIAS AGAINST THE DEFENDANT COMPANIES THAT ARE BASED IN

16    ISRAEL?

17                    PROSPECTIVE JUROR:  LIKE WITH THE META ONE, I WOULD

18    TRY MY HARDEST, AND I THINK I COULD BE IMPARTIAL.

19                    THE COURT:  YOU THINK YOU COULD BE IMPARTIAL?

20                    PROSPECTIVE JUROR:  I BELIEVE SO.

21                    THE COURT:  OKAY.  OKAY.

22          DO YOU -- HAVE YOU -- WOULD YOU HAVE ANY DIFFICULTY IN

23    FOLLOWING THE INSTRUCTION NOT TO DO ANY INDEPENDENT RESEARCH ON

24    THIS CASE IF -- OR NOT TO POST ANYTHING --

25                    PROSPECTIVE JUROR:  I WOULDN'T POST.
```

```
 1              THE COURT:  -- ON SOCIAL MEDIA?

 2              PROSPECTIVE JUROR:  NO, I WOULDN'T POST ABOUT IT.  OR

 3       I WOULD NOT INTENTIONALLY GO TO LOOK UP ANYTHING ABOUT THE

 4       CASE.

 5              THE COURT:  RIGHT.

 6              PROSPECTIVE JUROR:  AND IF IT SHOWED UP ON MY FEED,

 7       JUST CLICK AWAY.

 8              THE COURT:  OKAY.  THAT'S A REALLY IMPORTANT

 9       REQUIREMENT OF JURY SERVICE, AND THE REASON FOR THAT IS WE WANT

10       EVERYBODY TO MAKE THE DECISION BASED UPON THE SAME EVIDENCE,

11       AND YOU CAN ONLY DO THAT IF YOU ARE BASING IT ON EVIDENCE

12       THAT'S PRESENTED HERE IN COURT AND NOT ON EXTRANEOUS EVIDENCE

13       SO THAT BOTH SIDES ARE ON EQUAL FOOTING.

14          OKAY.  ALL RIGHT.  CAN YOU THINK OF ANYTHING ELSE THAT YOU

15       SHOULD SHARE WITH US, HAVING HEARD ALL THE QUESTIONS PUT TO THE

16       JURORS BEFORE YOU?

17              PROSPECTIVE JUROR:  I DON'T THINK SO.

18              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

19          AND GOOD MORNING, MS. CHANG.

20              PROSPECTIVE JUROR:  YES, GOOD MORNING.

21              THE COURT:  YOUR SPOUSE OR PARTNER IS A SOFTWARE

22       ENGINEER?

23              PROSPECTIVE JUROR:  YES.

24              THE COURT:  OKAY.  AND DO YOU KNOW WHAT THE NATURE OF

25       THAT WORK IS?
```

```
 1                    PROSPECTIVE JUROR:  NOPE.  NO IDEA.

 2                    THE COURT:  NO IDEA.

 3            (LAUGHTER.)

 4                    THE COURT:  OKAY.  ALL RIGHT.

 5         YOU SERVED ON A JURY ABOUT 20 YEARS AGO?

 6                    PROSPECTIVE JUROR:  YEAH.

 7                    THE COURT:  OKAY.  AND YOU INDICATE THAT THEY WERE

 8      NOT FEDERAL JURORS -- A FEDERAL JURY.

 9            AND IT WAS A CRIMINAL TRIAL?

10                    PROSPECTIVE JUROR:  YES.

11                    THE COURT:  OKAY.  WAS THERE ANYTHING ABOUT THAT

12      EXPERIENCE THAT WOULD MAKE IT HARD FOR YOU TO BE A JUROR AGAIN?

13                    PROSPECTIVE JUROR:  NO.

14                    THE COURT:  NO?  OKAY.

15            AND YOU INDICATED THAT, IN THE QUESTION ABOUT LAWYERS AND

16      LAWSUITS IN GENERAL, YOU THINK THAT PEOPLE ARE ALWAYS AFTER

17      COMPENSATION AND NOT JUSTICE.

18            OKAY.  THIS IS A CIVIL TRIAL, THIS IS A CIVIL TRIAL, NOT A

19      CRIMINAL TRIAL.

20                    PROSPECTIVE JUROR:  RIGHT.

21                    THE COURT:  OKAY.  AND IT IS ABOUT DAMAGES,

22      COMPENSATORY DAMAGES AND PUNITIVE DAMAGES AS I'VE DESCRIBED.

23                    PROSPECTIVE JUROR:  RIGHT.

24                    THE COURT:  ALL RIGHT.  NOW, DO YOU HAVE ANY

25      PRECONCEIVED OPINIONS ABOUT --
```

```
 1              PROSPECTIVE JUROR:  NO.

 2              THE COURT:  -- WHETHER ONE OR TWO BUSINESSES SUE

 3    ANOTHER ONE OR TWO BUSINESSES ABOUT MONETARY DAMAGES, DO YOU

 4    HAVE ANY OPINION ABOUT THAT?

 5              PROSPECTIVE JUROR:  NO.

 6              THE COURT:  NO?  OKAY.  HAVING HEARD HOW I'VE

 7    DESCRIBED THE CASE, IS THAT A CASE FOR WHICH YOU COULD KEEP AN

 8    OPEN MIND AND NOT MAKE ANY DECISION UNTIL AFTER ALL THE

 9    EVIDENCE IS IN?

10              PROSPECTIVE JUROR:  YES.

11              THE COURT:  OKAY.  DO YOU HAVE -- HAVE YOU EVER BEEN

12    EMPLOYED OR HAD ANYONE CLOSE TO YOU, SOMEONE IN YOUR HOUSEHOLD,

13    BEEN EMPLOYED IN ANY CAPACITY BY META?

14              PROSPECTIVE JUROR:  MY SON USED TO WORK FOR A

15    TRANSPORTATION COMPANY THAT HAD A CONTRACT WITH FACEBOOK.

16              THE COURT:  OKAY.

17              PROSPECTIVE JUROR:  BUT HE'S NO LONGER WITH THAT

18    TRANSPORTATION COMPANY.

19              THE COURT:  OKAY.  AND THAT WAS NOT A META COMPANY,

20    IT WAS A COMPANY THAT SERVED -- YOU SAID HAD A CONTRACT WITH

21    META?

22              PROSPECTIVE JUROR:  YEAH.  I THINK IT WAS LIKE A

23    TRANSPORTATION SERVICE FOR FACEBOOK EMPLOYEES.

24              THE COURT:  OH, OKAY.

25              PROSPECTIVE JUROR:  YEAH.
```

```
1                    THE COURT:  OKAY.  THE BIG BUSES?

2                    PROSPECTIVE JUROR:  I THINK SO.

3                    THE COURT:  OKAY.  ALL RIGHT.  SO YOUR SON WORKED FOR

4       THAT COMPANY?

5                    PROSPECTIVE JUROR:  YES.

6                    THE COURT:  BUT HE NO LONGER WORKS FOR THEM.

7                    PROSPECTIVE JUROR:  NO.

8                    THE COURT:  OKAY.  HOW LONG AGO WAS THAT?

9                    PROSPECTIVE JUROR:  HE QUIT A FEW MONTHS AGO, I

10      THINK.

11                   THE COURT:  OKAY.

12                   PROSPECTIVE JUROR:  YEAH.

13                   THE COURT:  OKAY.  AND WERE THEY STILL TRANSPORTING

14      FACEBOOK EMPLOYEES?

15                   PROSPECTIVE JUROR:  I THINK LAST HE HEARD THEY NO

16      LONGER HAVE THAT CONTRACT.

17                   THE COURT:  OKAY.  ALL RIGHT.

18            ASIDE FROM THAT, ANY OTHER INTEREST IN META?  DO YOU OWN

19      ANY STOCK IN META?

20                   PROSPECTIVE JUROR:  NOT THAT I KNOW OF.

21                   THE COURT:  OKAY.  AND HOW ABOUT WITH NSO OR Q CYBER?

22                   PROSPECTIVE JUROR:  NO.

23                   THE COURT:  OKAY.  AND DO YOU HAVE AN OPINION ABOUT

24      META THAT MIGHT MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

25      IMPARTIAL TO THEIR INTEREST?
```

```
 1                    PROSPECTIVE JUROR:  NO.

 2                    THE COURT:  AND DO YOU HAVE ANY OPINION ABOUT NSO OR

 3      Q CYBER?

 4                    PROSPECTIVE JUROR:  NO.

 5                    THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT

 6      COMPANIES THAT ARE BASED IN ISRAEL OR ABOUT ISRAEL --

 7                    PROSPECTIVE JUROR:  NO.

 8                    THE COURT:  -- THAT WOULD MAKE IT DIFFICULT FOR YOU?

 9                    PROSPECTIVE JUROR:  NO.

10                    THE COURT:  ALL RIGHT.  CAN YOU THINK OF ANYTHING

11      ELSE THAT I NEED TO KNOW?

12                    PROSPECTIVE JUROR:  NO.

13                    THE COURT:  HAVING HEARD ALL THE QUESTIONS PUT TO THE

14      JURORS BEFORE YOU?  NO?

15                    PROSPECTIVE JUROR:  NO.

16                    THE COURT:  OKAY.  THANK YOU.

17             ALL RIGHT.  HERE'S ANOTHER DIFFICULT NAME TO PRONOUNCE.

18      WHY DON'T YOU TELL ME?

19                    PROSPECTIVE JUROR:  SAENGSUWARN.

20                    THE COURT:  SAENGSUWARN?

21                    PROSPECTIVE JUROR:  YES.  CAN YOU HEAR ME OKAY

22      THROUGH THE MASK?

23                    THE COURT:  I CAN HEAR YOU.

24                    PROSPECTIVE JUROR:  OKAY.

25                    THE COURT:  ALL RIGHT.  LET'S SEE.  YOU'RE ALSO A
```

1        SOFTWARE ENGINEER.  I GUESS WE SHOULDN'T BE SURPRISED THAT, IN

2        THIS AREA, WE HAVE SO MANY SOFTWARE ENGINEERS, RIGHT?

3              AND WHAT, WHAT DO YOU DO?

4                   PROSPECTIVE JUROR:  I --

5                   THE COURT:  AND YOU WORK FOR TWITTER?

6                   PROSPECTIVE JUROR:  I USED TO.

7                   THE COURT:  YOU USED TO.  OKAY.  AND YOU NO LONGER

8        WORK FOR THEM?

9                   PROSPECTIVE JUROR:  UM-HUM.

10                  THE COURT:  YOU'RE LOOKING FOR WORK NOW?

11                  PROSPECTIVE JUROR:  ABOUT TO, YES.

12                  THE COURT:  YOU'RE ABOUT TO START LOOKING FOR WORK?

13                  PROSPECTIVE JUROR:  CORRECT, YES.

14                  THE COURT:  OKAY.  ALL RIGHT.  SO WHAT DID YOU DO FOR

15       TWITTER?  WHAT KIND OF SOFTWARE ENGINEER WERE YOU?

16                  PROSPECTIVE JUROR:  I WOULD MAKE A WEBSITE, I GUESS.

17       THAT'S THE SIMPLIFIED VERSION.

18                  THE COURT:  OKAY.  YOU WERE INTO WEBSITE BUILDING?

19                  PROSPECTIVE JUROR:  YES.

20                  THE COURT:  OKAY.  AND HOW LONG AGO WAS YOUR LAST

21       EMPLOYMENT WITH TWITTER?

22                  PROSPECTIVE JUROR:  ABOUT TWO YEARS, THREE MONTHS.

23                  THE COURT:  TWO YEARS, THREE MONTHS?

24                  PROSPECTIVE JUROR:  YES.

25                  THE COURT:  OKAY.  ALL RIGHT.  THAT WAS QUITE A WHILE

 1    AGO.

 2         YOU INDICATED, THOUGH, THAT YOU DO HAVE -- EVEN AS A

 3    SOFTWARE ENGINEER GENERALIST, THAT'S HOW YOU DESCRIBE YOURSELF,

 4    THAT YOU HAD TO DEAL WITH SOME SOFTWARE AND SECURITY ASPECTS

 5    FROM TIME TO TIME.

 6         CAN YOU TELL US WHAT THE NATURE OF YOUR CYBERSECURITY

 7    EXPERIENCE IS?

 8              PROSPECTIVE JUROR:  YES.  I GUESS WE -- SOME OF THE

 9    WORK WE DID, WE JUST BUILT THE DEPARTMENT, THE USER LOGS INTO

10    THE WEBSITE, I GUESS, AND WE CONSULT WITH SECURITY ENGINEERS

11    AND HOW TO MAKE SURE THAT BAD ACTORS ARE NOT TRYING TO TAKE

12    OVER THE ACCOUNTS, TRY TO HACK THE ACCOUNTS FROM THE USERS.

13              THE COURT:  OKAY.  BUT THAT WASN'T YOUR

14    RESPONSIBILITY?

15              PROSPECTIVE JUROR:  NOT DIRECTLY.

16              THE COURT:  OKAY.  THERE WERE OTHER PEOPLE WHOSE

17    RESPONSIBILITY IT WAS TO WORK ON THAT?  YOU WERE JUST

18    IDENTIFYING PROBLEM AREAS IN THE LOG IN PROCEDURE?

19              PROSPECTIVE JUROR:  I GUESS, YEAH, WE CONSULT WITH

20    THEM WHEN PROBLEMS HAPPENED, BECAUSE THERE ARE ALWAYS BAD

21    ACTORS TRYING TO HACK THE WEBSITE ALL THE TIME.  SO --

22              THE COURT:  OKAY.  WOULD YOUR PAST EXPERIENCE WITH --

23    AS A SOFTWARE ENGINEER FOR TWITTER CAUSE YOU TO IDENTIFY MORE

24    WITH FACEBOOK THAN WITH THE DEFENDANT IN THIS CASE?

25              PROSPECTIVE JUROR:  FROM THE SECURITY PERSPECTIVE,

```
 1          NO.

 2                THE COURT:  NO?  OKAY.

 3          OKAY.  DO YOU HAVE -- DO YOU -- WELL, LET ME -- THERE WAS

 4     ONE OTHER THING.

 5          YOU SAID THAT YOU HAD AN AUNT IN THAILAND?

 6                PROSPECTIVE JUROR:  THAT'S CORRECT.

 7                THE COURT:  WHO WORKED -- WHO'S AN ATTORNEY?

 8                PROSPECTIVE JUROR:  CORRECT.

 9                THE COURT:  DO YOU HAVE ANYONE HERE IN THE

10     UNITED STATES --

11                PROSPECTIVE JUROR:  NO.

12                THE COURT:  -- THAT'S INVOLVED IN THE LEGAL FIELD?

13                PROSPECTIVE JUROR:  NOTHING ELSE.

14                THE COURT:  ALL RIGHT.  THANK YOU.

15          DO YOU HAVE AND HAVE YOU -- DO YOU HAVE CURRENTLY, OR HAVE

16     YOU EVER HAD ANY EMPLOYMENT CONNECTION WITH FACEBOOK OR

17     WHATSAPP?

18                PROSPECTIVE JUROR:  I'VE INTERVIEWED A FEW TIMES AND

19      RECEIVED AN OFFER, BUT I DID NOT ACCEPT THE OFFERS IN THE PAST.

20      I MIGHT BE LOOKING INTO IT SOON, SO THAT'S KIND OF A RED FLAG

21      HERE.

22                THE COURT:  I'M SORRY, I DIDN'T HEAR THAT.

23                PROSPECTIVE JUROR:  I'VE INTERVIEWED WITH FACEBOOK A

24      FEW TIMES IN THE PAST AND RECEIVED THE OFFERS, BUT I DIDN'T

25      ACCEPT THE OFFER OR JOIN FACEBOOK.  SO I NEVER WORKED FOR THEM
```

```
 1          DIRECTLY.
 2                  THE COURT:  OKAY.  SO YOU HAVE NEVER WORKED FOR THEM?
 3                  PROSPECTIVE JUROR:  NO.
 4                  THE COURT:  OKAY.  AND WITH REGARD TO THE DEFENDANT,
 5          NSO AND Q CYBER, HAVE YOU EVER HAD ANY SORT OF EMPLOYMENT
 6          RELATIONSHIP WITH THEM?
 7                  PROSPECTIVE JUROR:  NO.
 8                  THE COURT:  DO YOU HAVE ANY STOCK OWNERSHIP --
 9                  PROSPECTIVE JUROR:  NOT ANYMORE.  IN THE PAST, YES,
10          BUT NO LONGER OWN ANY FACEBOOK STOCK AT THIS POINT.
11                  THE COURT:  OKAY.  IN THE PAST.  HOW LONG AGO DID YOU
12          DIVEST YOURSELF OF FACEBOOK STOCK?
13                  PROSPECTIVE JUROR:  INDIVIDUAL STOCKS, PROBABLY AT
14          LEAST, AT LEAST FOUR YEARS -- I'M NOT SURE WHAT THE EXACT DATE
15          WAS, BUT AT LEAST FOUR YEARS I WOULD SAY.
16                  THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT
17          FACEBOOK OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE
18          FAIR AND IMPARTIAL TO THEIR INTERESTS?
19                  PROSPECTIVE JUROR:  I GUESS SINCE I MIGHT BE
20          RE-INTERVIEWING WITH THEM SOON, THAT MIGHT AFFECT MY JUDGMENT.
21                  THE COURT:  YOU MIGHT BE RE-INTERVIEWING WITH THEM?
22                  PROSPECTIVE JUROR:  YES.
23                  THE COURT:  WHEN YOU SAY MIGHT, WHAT IS -- HAVE YOU
24          MADE OVERTURES, APPLIED FOR A POSITION WITH THEM?
25                  PROSPECTIVE JUROR:  WELL, THE RECRUITER USUALLY
```

1    REACHED OUT, THE LAST ONE REACHED OUT LAST WEEK, AND I WAS

2    ABOUT TO REPLY TO THEM ACTUALLY, BUT THEN THE JURY CAME UP, SO

3    I KIND OF PUT THAT ON HOLD.  BUT THAT'S PART OF THE PLAN, I

4    THINK.

5            THE COURT:  OKAY.  SO YOU THINK THAT YOU WILL BE

6    APPLYING TO FACEBOOK IN THE FUTURE?

7            PROSPECTIVE JUROR:  CORRECT, YES.

8            THE COURT:  OKAY.  FOR A SOFTWARE ENGINEERING

9    POSITION?

10            PROSPECTIVE JUROR:  CORRECT, YES.

11            THE COURT:  OKAY.  AND BECAUSE OF THAT INTEREST, DO

12    YOU THINK YOU MIGHT BE PREDISPOSED IN FACEBOOK'S FAVOR IN THIS

13    CASE?

14            PROSPECTIVE JUROR:  I'M NOT SURE WHICH WAY IT WOULD

15    GO.  BUT THAT'S DEFINITELY A DATA POINT, I GUESS.

16            THE COURT:  YES, YOU MIGHT BE PREDISPOSED TO

17    FACEBOOK?

18            PROSPECTIVE JUROR:  UM-HUM.

19            THE COURT:  BECAUSE YOU'D LIKE TO WORK FOR THEM?

20            PROSPECTIVE JUROR:  YES, MAYBE.

21            THE COURT:  OKAY.  OKAY.

22        AND DO YOU THINK IT WOULD BE DIFFICULT FOR YOU TO PUT

23    THAT --

24            PROSPECTIVE JUROR:  I COULD TRY.

25            THE COURT:  NOTWITHSTANDING THE FACT THAT YOU'D LIKE

```
1        TO WORK FOR THEM, TO BE FAIR TO THE DEFENDANTS IN THIS CASE?

2              PROSPECTIVE JUROR:  I COULD TRY, BUT, I MEAN,

3        SUBCONSCIOUSLY OR UNCONSCIOUSLY, I'M NOT SURE.

4              THE COURT:  OKAY.  IF YOU WERE REPRESENTING THE

5        DEFENDANTS IN THIS CASE, WOULD YOU WANT SOMEONE LIKE YOU

6        SITTING ON THE JURY?

7              PROSPECTIVE JUROR:  PROBABLY NOT.

8              THE COURT:  PROBABLY NOT.

9         (LAUGHTER.)

10             THE COURT:  OKAY.

11        DO YOU HAVE ANY VIEWS ABOUT COMPANIES THAT ARE BASED IN

12       ISRAEL OR ABOUT ISRAEL THAT MIGHT MAKE IT DIFFICULT FOR YOU TO

13       BE FAIR TO THE NSO GROUP?

14             PROSPECTIVE JUROR:  NO.

15             THE COURT:  NO.  OKAY.

16        CAN YOU THINK OF ANY OTHER REASON WHY YOU SHOULDN'T SIT AS

17       A JUROR, OTHER THAN THE FACT THAT YOU'D LIKE TO WORK FOR THE

18       PLAINTIFF?

19             PROSPECTIVE JUROR:  NO.

20             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

21        AND GOOD MORNING, MS. MEHRLING.

22             PROSPECTIVE JUROR:  YEAH.

23             THE COURT:  WHAT KIND OF NON-PROFIT IS

24       A.G. INNOVATIONS?

25             PROSPECTIVE JUROR:  A.G. INNOVATIONS, WE SUPPORT
```

```
 1        COLLABORATIVE GROUPS WORKING ON REGIONAL ENVIRONMENTAL ISSUES.

 2        I'M A FACILITATOR.

 3                THE COURT:  OKAY.  ALL RIGHT.  HAVE YOU EVER BEEN

 4        EMPLOYED WITH FACEBOOK OR META?

 5                PROSPECTIVE JUROR:  NO.

 6                THE COURT:  OR WHATSAPP?

 7                PROSPECTIVE JUROR:  NO.

 8                THE COURT:  HAVE YOU OR ANYONE CLOSE TO YOU EVER BEEN

 9        EMPLOYED BY OR ASSOCIATED WITH NSO OR Q CYBER?

10                PROSPECTIVE JUROR:  NO.

11                THE COURT:  HAVE YOU EVER OWNED META STOCK?

12                PROSPECTIVE JUROR:  NO.

13                THE COURT:  HAVE YOU EVER OWNED ANY NSO OR Q CYBER

14        STOCK?

15                PROSPECTIVE JUROR:  NO.

16                THE COURT:  DO YOU HAVE AN OPINION ABOUT META OR

17        WHATSAPP THAT MIGHT MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

18        IMPARTIAL?

19                PROSPECTIVE JUROR:  I DON'T THINK SO.

20                THE COURT:  OKAY.  AND DO YOU HAVE AN OPINION ABOUT

21        NSO OR Q CYBER THAT MIGHT MAKE IT DIFFICULT FOR YOU TO BE FAIR

22        AND IMPARTIAL TO THEIR INTERESTS?

23                PROSPECTIVE JUROR:  NOT -- NO, NOT SPECIFICALLY.

24          I HAVE -- LIKE, I'M VAGUELY AWARE OF PEGASUS THAT YOU --

25        NOT SO AWARE THAT I COULD DEFINE EXACTLY WHAT IT DOES EVEN,
```

```
1        BUT, LIKE, I'M AWARE OF IT AS A MILITARY SURVEILLANCE TYPE OF

2        THING, AND I HAVE A NEGATIVE OPINION OF THAT TYPE OF THING

3        GENERALLY.

4                  THE COURT:  THAT TYPE OF THING GENERALLY?

5                  PROSPECTIVE JUROR:  LIKE, MILITARY -- LIKE,

6        TECHNOLOGY USED FOR MILITARY PURPOSES.

7                  THE COURT:  UM-HUM.  OKAY.

8            YOU DON'T REMEMBER WHAT -- WHAT WAS THE SOURCE OF YOUR

9        INFORMATION?

10                 PROSPECTIVE JUROR:  THE NEWS.

11                 THE COURT:  OKAY.  AND CAN YOU REMEMBER ANY KIND OF

12       REPORTING SPECIFICALLY THAT YOU'VE COME ACROSS?

13                 PROSPECTIVE JUROR:  NO.  I -- NO.  NO.

14                 THE COURT:  OKAY.

15                 PROSPECTIVE JUROR:  SORRY.

16                 THE COURT:  OKAY.  BUT YOU UNDERSTAND WE'RE TRYING TO

17       ASSESS WHO CAN BE FAIR AND IMPARTIAL TO BOTH SIDES.  IT'S

18       IMPORTANT --

19                 PROSPECTIVE JUROR:  YEAH.

20                 THE COURT:  -- THAT JURORS HAVE AN OPEN MIND AND NOT

21       HAVE ANY SORT OF PRECONCEIVED NOTIONS THAT THEY CAN'T PUT ASIDE

22       IN ORDER TO BE FAIR TO BOTH SIDES.

23                 PROSPECTIVE JUROR:  YEAH.

24                 THE COURT:  DO YOU THINK YOU COULD DO THAT?

25                 PROSPECTIVE JUROR:  YEAH.  YEAH.  I MEAN, IT SEEMS
```

1      LIKE THE CASE IS BETWEEN THE TWO COMPANIES.

2              THE COURT:  YES.

3              PROSPECTIVE JUROR:  YEAH.  SO, YES, I THINK I COULD.

4              THE COURT:  YEAH, THERE ARE BUSINESSES ON ONE SIDE,

5      META ON ONE SIDE, NSO ON THE OTHER.

6              PROSPECTIVE JUROR:  YEAH.  YEAH, I THINK I COULD.

7              THE COURT:  OKAY.  DO YOU HAVE ANY HESITATION ABOUT

8      THAT?

9              PROSPECTIVE JUROR:  NO.  NO.

10             THE COURT:  NO?  OKAY.

11         OKAY.  DO YOU HAVE ANY OPINION ABOUT ISRAELI-BASED

12     COMPANIES OR ISRAEL THAT MIGHT IMPACT OR MAKE IT DIFFICULT FOR

13     YOU TO BE FAIR AND IMPARTIAL?

14             PROSPECTIVE JUROR:  YEAH, POTENTIALLY.  I AM PART OF

15     COMMUNITY ORGANIZING EFFORTS THAT WORK TOWARDS DIVESTMENT FROM

16     ISRAELI COMPANIES, SO THAT'S PART OF MY NON-PROFESSIONAL LIFE.

17         AND I ALSO HAVE FAMILY, ISRAELI FAMILY, AND I'VE LIVED IN

18     ISRAEL PREVIOUSLY FOR ABOUT A YEAR.

19             THE COURT:  OKAY.  AND YOUR WORK FOR --

20             PROSPECTIVE JUROR:  NON-PROFESSIONALLY, COMMUNITY

21     ORGANIZING.

22             THE COURT:  COMMUNITY ORGANIZING, OKAY, TO DIVEST IN

23     COMPANIES?

24             PROSPECTIVE JUROR:  ISRAELI COMPANIES SPECIFICALLY

25     THAT ARE INVOLVED WITH ISRAELI MILITARY.

```
 1              THE COURT:  OKAY.  ALL RIGHT.  AND THE DIVESTMENT
 2   WOULD BE YOU'RE TRYING TO ENCOURAGE THE UNITED STATES
 3   GOVERNMENT TO DIVEST --
 4              PROSPECTIVE JUROR:  YEAH.
 5              THE COURT:  IS THAT -- WHAT'S THE GOAL?
 6              PROSPECTIVE JUROR:  THE GOAL IS TO PUT FINANCIAL
 7   PRESSURE ON THE ISRAELI GOVERNMENT TO CHANGE THEIR, LIKE,
 8   MILITARY STRATEGY.
 9         AND, YEAH, I MEAN, THE DIVESTMENT CAMPAIGNS ARE MOSTLY
10   LOCAL, LIKE, CITY AND COUNTY LEVELS THAT ARE INVESTED IN,
11   EITHER IN ISRAELI MILITARY DIRECTLY OR IN COMPANIES THAT
12   PROVIDE TECHNOLOGY AND WEAPONS.
13              THE COURT:  OKAY.  AND YOU UNDERSTAND HOW I'VE
14   DESCRIBED WHAT'S HAPPENED IN THIS CASE?
15              PROSPECTIVE JUROR:  YEAH.
16              THE COURT:  WOULD YOUR COMMUNITY INVOLVEMENT, WITH
17   THAT GOAL IN MIND NECESSARILY CAUSE TO YOU IDENTITY -- OR TO BE
18   BIASED AGAINST NSO?
19              PROSPECTIVE JUROR:  I THINK IT COULD BE POTENTIALLY,
20   YEAH.
21              THE COURT:  AND IS IT SOMETHING THAT YOU THINK YOU
22   COULD SET ASIDE IN ORDER TO SERVE ON THIS JURY, WHICH WOULD
23   REQUIRE THAT YOU BE FAIR TO BOTH SIDES?
24              PROSPECTIVE JUROR:  YEAH, YEAH.  I MEAN, I -- I --
25   LIKE I SAID, IT'S BETWEEN BUSINESSES, SO I UNDERSTAND THAT BOTH
```

```
 1          OF THEIR -- EACH COMPANY HAS THEIR, LIKE, YOU KNOW, BUSINESS

 2          GOAL THAT ISN'T THE SAME AS A POLITICAL GOAL.  SO I UNDERSTAND

 3          THAT.

 4                  THE COURT:  RIGHT.

 5                  PROSPECTIVE JUROR:  BUT, YEAH, I THINK IT WOULD BE

 6          DIFFICULT FOR ME TO SET ASIDE, AND I WOULD DO MY BEST.

 7                  THE COURT:  OKAY.  ALL RIGHT.  AND HAVING HEARD ALL

 8          THE QUESTIONS PUT TO THE JURORS BEFORE YOU, IS THERE ANY

 9          ADDITIONAL INFORMATION ABOUT YOURSELF THAT YOU THINK YOU SHOULD

10          SHARE?

11                  PROSPECTIVE JUROR:  I WANTED TO SHARE A HARDSHIP.

12                  THE COURT:  OKAY.

13                  PROSPECTIVE JUROR:  WHICH I KNOW IS -- EVERYBODY HAS.

14          I HAVE A WORK TRIP STARTING TOMORROW MORNING.  I'M PRESENTING

15          AT A CONFERENCE AND RUNNING SEVERAL MEETINGS THROUGHOUT THE

16          REST OF THIS WEEK.

17              AND IT WOULD BE -- YEAH, IT WOULD BE VERY DIFFICULT FOR MY

18          COLLEAGUES TO DO IT WITHOUT MY PRESENCE.  WE'RE A VERY SMALL

19          ORGANIZATION.

20                  THE COURT:  UM-HUM.  DID YOU MAKE A REQUEST TO THE

21          JURY OFFICE FOR A POSTPONEMENT?

22                  PROSPECTIVE JUROR:  I GOT A MESSAGE THAT I WASN'T

23          ALLOWED TO REQUEST ANY POSTPONEMENTS.

24                  THE COURT:  HMM.  A PHONE MESSAGE?

25                  PROSPECTIVE JUROR:  YEAH, LIKE WHEN I CALLED --
```

```
 1              THE COURT:  HAD YOU POSTPONED ONCE BEFORE ALREADY?

 2              PROSPECTIVE JUROR:  UM, YES, BUT MANY YEARS AGO.

 3              THE COURT:  HMM.

 4              PROSPECTIVE JUROR:  YEAH.  I MOVED TO OREGON AND

 5     MOVED BACK LAST YEAR.  I DON'T KNOW IF THAT HAS ANYTHING TO DO

 6     WITH IT.

 7              THE COURT:  OKAY.  WE'LL TAKE THAT INTO ACCOUNT.

 8              PROSPECTIVE JUROR:  OKAY.  THANK YOU.

 9              THE COURT:  BUT IT'S NOT AN AUTOMATIC EXCUSAL.

10              PROSPECTIVE JUROR:  YEAH, I UNDERSTAND.

11              THE COURT:  OKAY.  ALL RIGHT.  IF YOU WILL PASS THE

12     MICROPHONE, PLEASE.

13          MR. CLAIBORNE, GOOD MORNING.  YOU'RE AN ENGINEER FOR

14     WAL-MART.  WHAT'S THE NATURE OF YOUR WORK?

15              PROSPECTIVE JUROR:  SO I'M AN ENGINEERING MANAGER,

16     SPECIFICALLY ENGINEERING APPLICATION ON AUTONOMOUS VEHICLES.

17     SO I DO A LOT OF WORK ONBOARDING AUTONOMOUS TRANSPORTATION

18     SOLUTIONS INTO WAL-MART'S ECOSYSTEM.

19          AND WHEN YOU'RE ONBOARDING A VENDOR, YOU NEED TO MAKE SURE

20     THERE ARE NO VULNERABILITIES WHEN THAT BRIDGE IS CREATED THAT

21     WOULD SHARE DATA FROM ONE SIDE TO THE OTHER, POTENTIALLY EXPOSE

22     A HACKER OR THINGS LIKE THAT.

23          SO I DO WHAT'S CALLED PENETRATION TESTING, PEN TESTING,

24     WHICH IS WHEN YOU SET UP AN API TO CONNECT THOSE TWO SYSTEMS,

25     YOU MAKE SURE THAT THERE ARE NO VULNERABILITIES.
```

```
 1                    THE COURT:  OKAY.  HOW LONG HAVE YOU BEEN DOING THIS
 2       FOR?
 3                    PROSPECTIVE JUROR:  ALMOST THREE YEARS NOW.
 4                    THE COURT:  OKAY.  ALL RIGHT.  WOULD THE WORK THAT
 5       YOU DO CAUSE YOU TO IDENTIFY MORE WITH FACEBOOK IN THIS CASE
 6       THAN WITH THE DEFENDANT?
 7                    PROSPECTIVE JUROR:  NO.
 8                    THE COURT:  OKAY.  DO YOU THINK THAT YOU COULD BE
 9       FAIR AND IMPARTIAL TO BOTH SIDES HAVING HEARD WHAT THIS CASE IS
10       ABOUT?
11                    PROSPECTIVE JUROR:  I DO.
12                    THE COURT:  YOU INDICATE THAT YOU -- LET'S SEE, YOUR
13       PROSPECTIVE BROTHER-IN-LAW, THE PERSON YOUR SISTER IS ABOUT TO
14       MARRY.
15                    PROSPECTIVE JUROR:  NO, MY GIRLFRIEND'S BROTHER.
16                    THE COURT:  YOUR GIRLFRIEND'S BROTHER.  OKAY.
17            (LAUGHTER.)
18                    THE COURT:  OKAY.  I GUESS THAT MAKES SENSE.
19            JUST IS A NEW LAW GRADUATE; IS THAT RIGHT?
20                    PROSPECTIVE JUROR:  THAT'S CORRECT.
21                    THE COURT:  WHAT FIELD, DO YOU KNOW?
22                    PROSPECTIVE JUROR:  ENVIRONMENTAL.
23                    THE COURT:  ENVIRONMENTAL, OKAY.
24            ALL RIGHT.  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT AN
25       ISRAELI-BASED COUNTRY -- COMPANY OR THE COUNTRY OF ISRAEL?
```

```
 1                    PROSPECTIVE JUROR:  NO.

 2                    THE COURT:  THAT WOULD MAKE IT DIFFICULT FOR YOU TO

 3          BE FAIR AND IMPARTIAL?

 4                    PROSPECTIVE JUROR:  NO.

 5                    THE COURT:  NO?  ALL RIGHT.

 6               DO YOU HAVE ANY -- HAVE YOU HAD ANY EMPLOYMENT

 7          RELATIONSHIP OR OTHER BUSINESS RELATIONSHIP WITH FACEBOOK?

 8                    PROSPECTIVE JUROR:  NO.

 9                    THE COURT:  OR WHATSAPP?

10                    PROSPECTIVE JUROR:  NO.

11                    THE COURT:  OKAY.  AND ALL OF YOU KNOW THAT SOMETIMES

12          WHEN I SAY FACEBOOK, I MEAN META?  EVERYBODY KIND OF GOES BACK

13           AND FORTH BETWEEN THOSE NAMES.  OKAY.

14               AND DO YOU HAVE ANY OPINION ABOUT THE COMPANIES INVOLVED

15          IN THIS CASE, STARTING FIRST WITH META AND WHATSAPP, THAT MIGHT

16          MAKE IT DIFFICULT FOR YOU TO BE FAIR TO INTERESTS ON BOTH

17          SIDES?

18                    PROSPECTIVE JUROR:  NO.

19                    THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINION ABOUT

20          NSO OR Q CYBER?

21                    PROSPECTIVE JUROR:  NO.

22                    THE COURT:  ALL RIGHT.  HAD YOU EVER HEARD OF THEM

23          BEFORE THIS CASE?

24                    PROSPECTIVE JUROR:  I HAD NOT, NO.

25                    THE COURT:  OKAY.  CAN YOU THINK OF ANY REASON WHY
```

1    YOU SHOULD NOT BE SEATED AS A JUROR IN THIS CASE?

2           PROSPECTIVE JUROR:  NO.

3           THE COURT:  ALL RIGHT.  THANK YOU.

4        AND GOOD MORNING MS. MAHALINGAM?

5           PROSPECTIVE JUROR:  MS. MAHALINGAM.

6           THE COURT:  GOOD MORNING.

7        BLS INTERNATIONAL IS WHAT KIND OF COMPANY?

8           PROSPECTIVE JUROR:  IT WAS A -- IT WAS JUST A VENDOR

9    TO THE INDIAN CONSULATE.

10          THE COURT:  OKAY.  AND WAS THAT YOUR -- YOUR EMPLOYER

11   IS BLS; RIGHT?

12          PROSPECTIVE JUROR:  YEAH.

13          THE COURT:  OKAY.  AND WHAT KIND OF SERVICES?

14          PROSPECTIVE JUROR:  OH, WE JUST DID PASSPORT

15   RENEWALS, INDIAN PASSPORT RENEWALS.

16          THE COURT:  PASSPORT RENEWALS, OKAY.

17       ALL RIGHT.  THANK YOU.

18       OKAY.  YOU DID INDICATE THAT -- THE QUESTION WAS WHETHER

19   OR NOT YOU HAD ANY STRONG FEELINGS ABOUT AWARDING MONEY TO THE

20   WINNING PARTY IN THIS CASE, AND YOU INDICATED IT DEPENDS UPON

21   THE FACTS OF THE CASE.

22       ALL RIGHT.  BASED UPON WHAT YOU'VE HEARD SO FAR, THIS IS A

23   CASE SOLELY ABOUT DAMAGES.  IS IT A CASE THAT YOU THINK YOU CAN

24   BE FAIR AND IMPARTIAL ON?

25          PROSPECTIVE JUROR:  I -- I CAN TRY MY BEST BUT --

```
 1              THE COURT:  SO THIS IS -- DOES THIS STRONG FEELING

 2   YOU HAVE MEAN THAT YOU WOULD HAVE DIFFICULTY AWARDING DAMAGES,

 3   EVEN IF THE PLAINTIFF PROVED THEIR CASE?

 4              PROSPECTIVE JUROR:  BASED ON THE FACTS OF THE CASE, I

 5   CAN.

 6          BUT -- I CAN.  I CAN TRY TO BE OBJECTIVE.

 7              THE COURT:  OKAY.  CAN YOU JUST EXPLAIN A LITTLE BIT

 8   MORE ABOUT WHY YOU ANSWERED THE QUESTION THIS WAY?

 9              PROSPECTIVE JUROR:  BECAUSE BIG AMOUNTS OF MONEY, I'M

10   NOT REALLY SURE, YOUR HONOR.  SO I HAD ANSWERED THE QUESTION

11   THAT WAY.

12              THE COURT:  OKAY.  YOU SAID, "IT DEPENDS ON THE FACTS

13   OF THE CASE"?

14              PROSPECTIVE JUROR:  YES.

15              THE COURT:  "IF I FEEL THAT THE WINNING PARTY IS NOT

16   DESERVING OF IT, IT WILL BE DIFFICULT FOR ME."

17          WELL, THE JURY IS REQUIRED TO FIND WHETHER OR NOT THE

18   PARTY IS DESERVING OF THE MONEY.  IF THEY'VE PROVEN THAT THEY

19   ARE DESERVING OF IT, COULD YOU AWARD IT?

20              PROSPECTIVE JUROR:  NO, YOUR HONOR.  IT WOULD BE HARD

21   FOR ME.

22              THE COURT:  EVEN IF THEY PROVE THAT THEY'RE ENTITLED

23   TO A MONEY AWARD?

24              PROSPECTIVE JUROR:  I'M KIND OF INDECISIVE AS A

25   PERSON.  THAT'S WHY IT'S HARD.
```

```
 1           I CAN FOLLOW THE FACTS OF THE CASE.  IF GIVEN A CHANCE,

 2      I'LL TRY MY BEST.

 3           THE COURT:  OKAY.  BUT IS THERE SOMETHING ABOUT THE

 4      AWARDING OF MONEY DAMAGES --

 5           PROSPECTIVE JUROR:  NO.

 6           THE COURT:  -- REGARDLESS OF THE PROOF, THAT BOTHERS

 7      YOU?

 8           PROSPECTIVE JUROR:  NO.  NO, YOUR HONOR.

 9           THE COURT:  NO?  OKAY.

10      YOU UNDERSTAND THAT THE PLAINTIFF IN THIS CASE -- THIS IS

11      META AND WHATSAPP -- HAVE THE BURDEN OF PROVING THAT THEY'RE

12      ENTITLED TO AN AWARD OF MONEY DAMAGES?  IT'S UP TO THE JURY TO

13      MAKE THAT DECISION.

14      DO YOU THINK THAT'S SOMETHING THAT YOU COULD DO AFTER

15      HEARING THE EVIDENCE OVER THE COURSE OF A WEEK?

16           PROSPECTIVE JUROR:  I'LL TRY MY BEST IF I'M SELECTED.

17           THE COURT:  OKAY.  I APPRECIATE THAT.

18      BUT I'M JUST NOT SURE I UNDERSTAND WHAT THE HESITANCY IS.

19           PROSPECTIVE JUROR:  JUST THAT I'M NOT A VERY DECISIVE

20      PERSON, AND THAT'S IT.  BUT OTHER THAN THAT, THERE'S NOTHING

21      ELSE, YOUR HONOR, TO BE HONEST, NO.

22           THE COURT:  OKAY.  NOW, YOU ALSO INDICATED, IN THE

23      QUESTION ABOUT LAWYERS AND LAWSUITS, THAT YOU DO HAVE STRONG

24      FEELINGS ABOUT LAWYERS AND LAWSUITS.

25           OKAY.  CAN YOU EXPLAIN WHAT THOSE STRONG FEELINGS ARE AND
```

1    HOW THAT MIGHT IMPACT YOUR BEING A JUROR IN THIS CASE?

2              PROSPECTIVE JUROR:  BOTH PARTIES, I FEEL THEY WILL --

3    THEY COULD TALK CONVINCINGLY, SO CONVINCINGLY, BUT, I MEAN, WHO

4    KNOWS THE TRUTH IN THE END, RIGHT?  SO THAT -- THAT IS MY

5    OPINION.

6              THE COURT:  OKAY.  WELL, IT'S THE JURY'S

7    RESPONSIBILITY TO LISTEN TO THE EVIDENCE, DETERMINE WHAT THE

8    FACTS ARE, AND DETERMINE WHAT YOU BELIEVE TO BE WHAT HAPPENED

9    AND MAKE A DECISION WITHIN THE CONFINES OF THE LAW THAT I WILL

10    PROVIDE TO THE JURY.

11              PROSPECTIVE JUROR:  SURE.

12              THE COURT:  OKAY.  AND, YES, THE LAWYERS WILL BE VERY

13    CONVINCING.  THAT'S THEIR JOB.  BOTH SIDES ARE TRYING TO, YOU

14    KNOW, MAKE THE BEST CASE THEY CAN FOR THEIR CLIENT.  THAT'S

15    WHAT THEY'RE REQUIRED TO DO.

16        OKAY?

17              PROSPECTIVE JUROR:  YES.

18              THE COURT:  ALL RIGHT.  DO YOU THINK THAT YOU CAN

19    LISTEN TO THE EVIDENCE, LISTEN TO THE ARGUMENTS OF THE LAWYERS,

20    AND THEN MAKE A DECISION IN THE CASE?

21              PROSPECTIVE JUROR:  SURE, YOUR HONOR.  I'LL TRY MY

22    BEST.

23              THE COURT:  OKAY.  AND DO YOU THINK YOU'RE

24    PREDISPOSED MORE TO ONE SIDE THAN THE OTHER?

25              PROSPECTIVE JUROR:  NO.

```
1                    THE COURT:  NO?

2                    PROSPECTIVE JUROR:  NO, YOUR HONOR.

3                    THE COURT:  OKAY.  YOU THINK HE CAN BE FAIR TO BOTH

4       SIDES?

5                    PROSPECTIVE JUROR:  YES.

6                    THE COURT:  OKAY.  THANK YOU.

7              DO YOU -- HAVE YOU OR ANYONE IN YOUR HOUSEHOLD EVER BEEN

8       EMPLOYED BY FACEBOOK OR WHATSAPP?

9                    PROSPECTIVE JUROR:  JUST SOME FAMILY MEMBERS.

10                   THE COURT:  EMPLOYED --

11                   PROSPECTIVE JUROR:  YES.

12                   THE COURT:  -- BY THEM?

13             AND FAMILY MEMBERS NOT IN YOUR HOUSEHOLD?

14                   PROSPECTIVE JUROR:  NOT IN MY HOUSEHOLD.

15                   THE COURT:  OKAY.  WHO?

16                   PROSPECTIVE JUROR:  MY HUSBAND'S COUSIN.

17                   THE COURT:  A COUSIN, OKAY.  CURRENTLY EMPLOYED BY

18      FACEBOOK?

19                   PROSPECTIVE JUROR:  YES.

20                   THE COURT:  OKAY.  IN WHAT CAPACITY AND WHERE?

21                   PROSPECTIVE JUROR:  SOFTWARE, AN ENGINEER, OR SENIOR

22      SOFTWARE, I DON'T KNOW.  BUT MENLO PARK, I GUESS.

23                   THE COURT:  OKAY.  SO YOUR HUSBAND'S COUSIN IS

24      CURRENTLY EMPLOYED BY FACEBOOK?

25                   PROSPECTIVE JUROR:  YES.
```

1          THE COURT:  OKAY.  DO YOU -- AND IS THERE ANYONE

2     ELSE?

3          PROSPECTIVE JUROR:  NO, NOT THAT I CAN RECALL.

4          THE COURT:  OKAY.  AND IS YOUR HUSBAND'S COUSIN

5     SOMEONE YOU SEE OFTEN?

6          PROSPECTIVE JUROR:  ONCE EVERY TWO WEEKS.

7          THE COURT:  ONCE EVERY COUPLE OF WEEKS?

8          PROSPECTIVE JUROR:  YES.

9          THE COURT:  OKAY.  DO YOU TALK ABOUT WORK?  DOES HE

10    TALK ABOUT HIS WORK?

11         PROSPECTIVE JUROR:  HE TALKS, BUT WE DON'T TALK MUCH

12    ABOUT HIS WORK.

13         THE COURT:  ABOUT HIS WORK?

14         PROSPECTIVE JUROR:  NO.

15         THE COURT:  OKAY.  BUT HE TALKS ABOUT HIS WORK?

16         PROSPECTIVE JUROR:  YES, HE DOES.

17         THE COURT:  OKAY.  AND HIS POSITION AGAIN IS --

18         PROSPECTIVE JUROR:  I DON'T KNOW IF HE'S A SOFTWARE

19     OR A SENIOR SOFTWARE ENGINEER.

20         THE COURT:  ENGINEER, OKAY.  ALL RIGHT.

21       WOULD THAT -- WOULD YOUR RELATIONSHIP WITH YOUR HUSBAND'S

22    COUSIN CAUSE YOU TO BE MORE INCLINED, PREDISPOSED IN FAVOR OF

23    WHATSAPP AND FACEBOOK?

24         PROSPECTIVE JUROR:  NO.  NO, YOUR HONOR.

25         THE COURT:  OKAY.  SO YOU THINK YOU CAN BE FAIR TO

```
1        BOTH SIDES?

2               PROSPECTIVE JUROR:  YES.

3               THE COURT:  OKAY.  DO YOU HAVE -- KNOW ANYONE OR HAVE

4        ANYONE IN YOUR HOUSEHOLD OR CLOSE TO YOU WHO'S WORKED FOR NSO?

5               PROSPECTIVE JUROR:  NO, YOUR HONOR.

6               THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT THE

7        COMPANIES INVOLVED IN THIS CASE?

8               PROSPECTIVE JUROR:  NO.

9               THE COURT:  NO?  DO YOU HAVE ANY OPINION ABOUT

10       COMPANIES BASED IN ISRAEL OR ABOUT ISRAEL THAT MIGHT MAKE IT

11       DIFFICULT FOR YOU TO BE FAIR TO BOTH SIDES --

12              PROSPECTIVE JUROR:  NO, YOUR HONOR.

13              THE COURT:  -- TO THE DEFENDANTS?

14              PROSPECTIVE JUROR:  NO, YOUR HONOR.

15              THE COURT:  CAN YOU THINK OF ANYTHING ELSE ABOUT

16       YOURSELF, HAVING HEARD ALL THE OTHER QUESTIONS, THAT YOU THINK

17       YOU SHOULD SHARE WITH US?

18              PROSPECTIVE JUROR:  OH.  JUST WE THINK THAT I HOPE

19       IT'LL BE FOUR TO SIX DAYS BECAUSE I'LL HAVE TO TRAVEL TO BE A

20       CAREGIVER FOR MY MOM.  SO THAT'S WHY I'M NOT ABLE TO -- I WON'T

21       BE ABLE TO COMMIT, LIKE, EXTENDED PERIODS.  AND MY BROTHER HAS

22       TO TRAVEL, SO I'LL HAVE TO GO.

23              THE COURT:  WHEN DO YOU HAVE TO TRAVEL?

24              PROSPECTIVE JUROR:  VERY SHORTLY, NEXT WEEK, STARTING

25       NEXT WEEK PROBABLY.  SO IF IT EXTENDS, IT'LL BE DIFFICULT FOR
```

1      ME.

2             THE COURT:  NO, I CAN -- I CAN ASSURE YOU, IT WILL

3      BE -- IT WILL BE FINISHED NO LATER THAN MONDAY.

4             PROSPECTIVE JUROR:  THANK YOU.

5             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

6             PROSPECTIVE JUROR:  ANY FAMILY, ONE OF MY CLOSE

7      FAMILY MEMBERS, HAPPENS TO VISIT FROM INDIA, AND I'M GUESSING

8      PEOPLE HAVE FAMILY CIRCUMSTANCES, BUT I JUST WANTED TO PUT IT

9      OUT THERE.  SO HE'S COMING, HE'S COMING THIS EVENING.  WE'LL BE

10     PICKING HIM UP.  AND THEN HE'LL BE THERE THROUGH THIS WEEK FROM

11     INDIA.  MY NEPHEW IS VISITING.  SO JUST TO PUT IT OUT THERE,

12     YOUR HONOR.

13            THE COURT:  OKAY.  BUT THAT DOESN'T HAVE ANY IMPACT

14     ON YOUR AVAILABILITY?

15            PROSPECTIVE JUROR:  IT DOESN'T, BUT TO SPEND TIME

16     SINCE THEY'RE COMING, SO JUST I WANTED TO LET YOU KNOW.

17            THE COURT:  OKAY.  WELL, YOU'LL HAVE THE WEEKEND.

18            PROSPECTIVE JUROR:  THANK YOU, YOUR HONOR.

19            THE COURT:  OKAY.  THANK YOU.

20         ALL RIGHT.  AND GOOD MORNING, MR. LEDBETTER.

21            PROSPECTIVE JUROR:  HELLO, HOW ARE YOU?

22            THE COURT:  I'M GOOD.  THANK YOU.

23         LET'S SEE.  APPLICATION SYSTEM ADMINISTRATOR, DOES THAT

24     HAVE SOMETHING TO DO WITH COMPUTERS?

25            PROSPECTIVE JUROR:  IT SURE DOES.

1          THE COURT:  OKAY.  TELL US ABOUT IT.

2          PROSPECTIVE JUROR:  I RUN A WHOLE BUNCH OF DIFFERENT

3    SYSTEMS, INCLUDING DOT NET, AZURE SYSTEMS, MICROSOFT, SALES

4    FORCE.  IT'S KIND OF A JACK OF ALL TRADES BASICALLY.

5          THE COURT:  ALL RIGHT.  AND DO YOU HAVE -- YOU

6    INDICATED THAT YOU DO HAVE SOME EXPERIENCE IN THE CYBERSECURITY

7    FIELD.  CAN YOU DESCRIBE THAT?

8          PROSPECTIVE JUROR:  YEAH.  SO WE HAVE SECURITY

9    EXPERTS ON OUR I.T. TEAM, SO I INTERFACE WITH THEM.  I KNOW THE

10   BASICS, BUT WHEN BIGGER ATTACKS HAPPEN, I CALL IN THE EXPERTS.

11         THE COURT:  OKAY.

12      OKAY.  BUT WHAT DO YOU SPEND MOST OF YOUR TIME DOING?

13         PROSPECTIVE JUROR:  SURFING REDDIT.

14      (LAUGHTER.)

15         PROSPECTIVE JUROR:  I'M KIDDING.

16      MONITORING SYSTEMS, YOU KNOW, CREATING SOLUTIONS FOR

17   VARIOUS USERS, LIKE IF THEY NEED A PAGE LAYOUT CHANGED OR A

18   FIELD ADDED OR SOMETHING.

19         THE COURT:  AND YOU WORK FOR VARIOUS DIFFERENT

20   COMPANIES.  LET'S SEE.  YOUR COMPANY IS THE FRANCISCAN

21   CHARITIES?

22         PROSPECTIVE JUROR:  YES.  I WORK FOR THE FRANCISCAN

23   FRIARS.  YOU MAY HAVE HEARD OF THEM.  THEY'RE CONNECTED TO THE

24   POPE.  THEY'RE A CATHOLIC ORDER.

25         THE COURT:  RIGHT.  AND YOU'RE WORKING ON THEIR

```
1        SYSTEMS; RIGHT?

2               PROSPECTIVE JUROR:  UM-HUM, YEAH.

3               THE COURT:  AND NOT FOR ANY COMPANIES, OTHER THAN?

4               PROSPECTIVE JUROR:  I DO FREELANCE ON THE SIDE.

5               THE COURT:  OKAY.  HAVE YOU EVER DONE ANY FREELANCE

6        FOR FACEBOOK OR META?

7               PROSPECTIVE JUROR:  NO.

8               THE COURT:  OKAY.  OR WHATSAPP?

9               PROSPECTIVE JUROR:  NO.

10              THE COURT:  OKAY.  OR NSO AND Q CYBER?

11              PROSPECTIVE JUROR:  NO.

12              THE COURT:  OKAY.  OKAY.  YOU INDICATED THAT YOUR

13       FATHER WAS INVOLVED IN A LOT OF LITIGATION?

14              PROSPECTIVE JUROR:  OH, YEAH.

15              THE COURT:  HE WAS A SCHOOL ADMINISTRATOR.

16              PROSPECTIVE JUROR:  YEAH, HE WAS A DIRECTOR OF

17       SPECIAL ED FOR THE COUNTY OF SANTA CRUZ, SO TARGETED FOR QUITE

18       A FEW LAWSUITS IN THAT POSITION.

19              THE COURT:  RIGHT.  YEAH, THERE'S A PARTICULAR

20       FEDERAL LAW THAT GOVERNS THE SPECIAL ED PARTICIPANTS; RIGHT?

21              PROSPECTIVE JUROR:  YEAH.

22              THE COURT:  I IMAGINE THOSE WERE SUITS THAT YOUR --

23              PROSPECTIVE JUROR:  CORRECT.

24              THE COURT:  THEY OCCUR, BUT THEY END UP IN OUR COURT.

25              PROSPECTIVE JUROR:  ABSOLUTELY, YEAH, COMES WITH THE
```

```
1       JOB.

2                   THE COURT:  ALL RIGHT.  NOW, HAVING HEARD ALL THE

3       OTHER QUESTIONS, DO YOU HAVE ANY RELATIONSHIP, FINANCIAL OR

4       EMPLOYMENT-WISE, WITH FACEBOOK OR META OR WITH NSO OR Q CYBER?

5                   PROSPECTIVE JUROR:  NO FINANCIAL CONNECTIONS OR

6       ANYTHING WITH EITHER.

7                   THE COURT:  NO STOCK OR ANYTHING LIKE THAT?

8                   PROSPECTIVE JUROR:  NO.

9                   THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

10      EITHER -- COMPANIES ON EITHER SIDE?

11                  PROSPECTIVE JUROR:  NO, NOT IN RELATION TO THIS CASE,

12      NO.

13                  THE COURT:  NO?  OKAY.  AND DO YOU HAVE ANY OPINIONS

14      ABOUT ISRAELI-BASED COMPANIES OR ISRAEL?

15                  PROSPECTIVE JUROR:  I'M NOT TOUCHING THAT ONE WITH A

16      TEN FOOT POLE.

17                  THE COURT:  NO.  WELL, YOU DO HAVE TO ANSWER.

18                  PROSPECTIVE JUROR:  NOT IN RELATION TO THIS CASE, NO.

19                  THE COURT:  NOT IN RELATION TO THIS CASE.  OKAY.

20      NOTHING THAT WOULD HAVE ANY IMPACT ON HOW YOU LOOK AT THIS

21      CASE?

22                  PROSPECTIVE JUROR:  NO, YOUR HONOR.

23                  THE COURT:  OKAY.  GREAT.

24           OKAY.  I THINK THAT'S IT.  THANK YOU, MR. LEDBETTER.

25                  PROSPECTIVE JUROR:  THANK YOU.
```

```
1                    THE COURT:  AND GOOD MORNING, MS. KIM.

2                    PROSPECTIVE JUROR:  GOOD MORNING.

3                    THE COURT:  YOU WORK IN I.T. SUPPORT?

4                    PROSPECTIVE JUROR:  I USED TO.

5                    THE COURT:  YOU USED TO?

6                    PROSPECTIVE JUROR:  I WAS LAID OFF LAST YEAR.

7                    THE COURT:  LAST YEAR, OKAY.  AND YOU HAVE NOT BEEN

8      WORKING SINCE YOU WERE LAID OFF?

9                    PROSPECTIVE JUROR:  NO.  I HAVEN'T BEEN ABLE TO FIND

10     A JOB.

11                   THE COURT:  ALL RIGHT.  OKAY.  YOU DID INDICATE THAT

12     YOU BELIEVE IN CAPITAL PUNISHMENT.

13           BUT UNDER THAT -- UNDER THE RELIGIOUS QUESTION.

14           YOU UNDERSTAND THIS IS A CIVIL CASE AND NOT A CRIMINAL

15     CASE AND THERE WON'T BE ANY DISCUSSION ABOUT CAPITAL PUNISHMENT

16     IN THIS CASE?

17                   PROSPECTIVE JUROR:  YES.

18                   THE COURT:  OKAY.  YOU INDICATED THAT YOUR FATHER HAD

19     BEEN INVOLVED IN LITIGATION PREVIOUSLY?

20                   PROSPECTIVE JUROR:  YEAH.

21                   THE COURT:  OKAY.  WERE YOU INVOLVED AT ALL IN THAT?

22                   PROSPECTIVE JUROR:  NO.  I WAS ONLY IN THE INITIAL

23     STAGES BECAUSE I HELPED MY DAD TRANSLATE.  WE'RE ALL

24     IMMIGRANTS, AND I'M THE BEST ENGLISH SPEAKER IN THE FAMILY, SO

25     OFTENTIMES I WOULD HELP HIM TRANSLATE REGARDING HIS JOB.
```

1          THE COURT CASE WAS REGARDING SOMEONE THAT WAS TRYING TO

2     NOT PAY FOR THE SERVICE THAT THEY RECEIVED.  SO THEY WERE TAKEN

3     TO COURT AND MY DAD WON.

4          THE COURT:  OKAY.  IS THERE ANYTHING ABOUT THAT

5     EXPERIENCE WITH THE LEGAL SYSTEM -- WAS THIS IN SMALL CLAIMS

6     COURT OR IN STATE COURT?

7          PROSPECTIVE JUROR:  I BELIEVE IT WAS SMALL CLAIMS.

8     IT HAPPENED A COUPLE YEARS AGO, AND I WASN'T THERE.

9          THE COURT:  OKAY.

10          PROSPECTIVE JUROR:  SO I DON'T REALLY KNOW.

11          THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT THE

12     LEGAL SYSTEM THAT -- THE CIVIL LEGAL SYSTEM THAT WOULD IMPACT

13     YOUR THINKING IN THIS CASE?

14          PROSPECTIVE JUROR:  I DON'T THINK SO.

15          THE COURT:  OKAY.  ALL RIGHT.

16      YOU INDICATED THAT YOU HAVE A VERY BLACK AND WHITE STYLE

17     OF THINKING.

18          PROSPECTIVE JUROR:  YES.

19          THE COURT:  AND THAT COULD CLOUD YOUR JUDGMENT.

20      CAN YOU JUST TELL US A LITTLE BIT MORE ABOUT THAT?

21          PROSPECTIVE JUROR:  IT'S REALLY HARD FOR ME TO NOT BE

22     OPINIONATED ABOUT THINGS, AND I'LL DO MY BEST TO REMAIN NEUTRAL

23     FOR THIS CASE, BUT, YEAH, I'M NOT SURE IF I WAS TO DESCRIBE THE

24     BLACK AND WHITE THINKING.

25          THE COURT:  OKAY.  WELL, THE QUESTION IS, DO YOU

1    THINK THAT, AS YOU SIT HERE NOW, ARE YOU MORE DISPOSED IN FAVOR

2    OF ONE SIDE OR THE OTHER?

3            PROSPECTIVE JUROR:  I DON'T BELIEVE SO.

4            THE COURT:  OKAY.  AND DO YOU THINK YOU CAN KEEP AN

5    OPEN MIND UNTIL THE END OF THE CASE BEFORE YOU MAKE ANY

6    CONCLUSIONS?

7            PROSPECTIVE JUROR:  MAYBE.  I -- YEAH, MAYBE.

8            THE COURT:  OKAY.  YOU UNDERSTAND THAT THE WAY A CASE

9    IS PRESENTED, ONE SIDE GOES FIRST AND THEN THE OTHER SIDE GOES,

10   AND YOU NEED TO KEEP AN OPEN MIND UNTIL YOU HEAR FROM BOTH

11   SIDES BECAUSE YOUR OPINION CAN CHANGE THROUGHOUT THE COURSE OF

12   A TRIAL?

13           PROSPECTIVE JUROR:  YES, I'LL TRY TO DO THAT.

14           THE COURT:  OKAY.  DO YOU -- HAVE YOU EVER HAD A

15   BUSINESS RELATIONSHIP OF ANY KIND WITH FACEBOOK OR META?

16           PROSPECTIVE JUROR:  NO.

17           THE COURT:  OR WHATSAPP?

18           PROSPECTIVE JUROR:  NO.

19           THE COURT:  NO?  AND HOW ABOUT WITH NSO OR Q CYBER?

20           PROSPECTIVE JUROR:  NO.

21           THE COURT:  HAVE YOU EVER OWNED STOCK IN FACEBOOK OR

22   META?

23           PROSPECTIVE JUROR:  NO.

24           THE COURT:  OR NSO OR Q CYBER?

25           PROSPECTIVE JUROR:  NO.

1          THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT

2     FACEBOOK OR META THAT MIGHT MAKE IT DIFFICULT FOR YOU TO BE

3     FAIR AND IMPARTIAL TO THEIR INTEREST IN THIS CASE?

4          PROSPECTIVE JUROR:  NEGATIVE.  I DO NOT HAVE A SOCIAL

5     MEDIA PRESENCE.  I DELETED ALL OF MY ACCOUNTS YEARS AGO, AND I

6     KEEP A VERY LOW PROFILE.

7          THE COURT:  OKAY.  SO YOU DON'T HAVE ANY OPINION,

8     NEGATIVE OPINION ABOUT THEM?

9          PROSPECTIVE JUROR:  NO, I DON'T.

10          THE COURT:  WHEN YOU USED THE WORD "NEGATIVE," YOU

11     MEANT THE ANSWER IS NO, RIGHT, TO MY QUESTION?

12          PROSPECTIVE JUROR:  NO.  I MEAN YES TO YOUR QUESTION.

13          THE COURT:  OKAY.  LET ME ASK IT AGAIN.

14       DO YOU HAVE ANY OPINIONS ABOUT FACEBOOK OR META, OR

15     WHATSAPP, THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

16     IMPARTIAL TO THEIR INTERESTS?

17          PROSPECTIVE JUROR:  POSSIBLY YES.

18          THE COURT:  POSSIBLY YES.  OKAY.  TELL ME WHAT THAT

19     IS.

20          PROSPECTIVE JUROR:  I AM NOT A FAN OF ANY SOCIAL

21     MEDIA PLATFORM.  I HAVE NEGATIVE OPINIONS ABOUT THEM.  SO I

22     STAY AWAY FROM ALL SOCIAL MEDIA IF POSSIBLE.

23          THE COURT:  OKAY.  OKAY.  NOW, I'VE TOLD YOU WHAT

24     THIS CASE IS ABOUT, AND IT'S -- WE'RE NOT GOING TO BE HEARING A

25     LOT OF INFORMATION ABOUT THE SOCIAL MEDIA PLATFORMS, PER SE.

1          BUT DO YOUR NEGATIVE FEELINGS ABOUT FACEBOOK, WHATSAPP,

2     AND ALL SOCIAL MEDIA COMPANIES, DO YOU THINK THAT WOULD MAKE IT

3     HARD FOR YOU TO BE FAIR -- WOULD YOU BE MORE LIKELY TO SIDE

4     WITH THE DEFENDANT OVER FACEBOOK OR WHATSAPP BECAUSE OF WHAT

5     THEY DO?

6               PROSPECTIVE JUROR:  I UNDERSTAND THAT THIS IS A

7      BUSINESS MATTER, SO IT'S NOT REALLY ABOUT THE SOCIAL MEDIA

8      PLATFORM.

9               THE COURT:  RIGHT.

10               PROSPECTIVE JUROR:  BUT YES.

11               THE COURT:  YES, YOU THINK YOU WOULD SIDE MORE WITH

12     THE DEFENDANT?  OR YOU'D BE ABLE TO --

13               PROSPECTIVE JUROR:  YEAH, WITH THE DEFENDANT.

14               THE COURT:  YES, YOU THINK YOU WOULD SIDE MORE WITH

15     THE DEFENDANT BECAUSE YOU DON'T LIKE SOCIAL MEDIA PROGRAMS?

16               PROSPECTIVE JUROR:  I MEAN, YES, EVEN THOUGH MY

17      OPINION ISN'T SUPPOSED TO AFFECT THAT.

18               THE COURT:  OKAY.  OKAY.  OKAY.

19          DO YOU HAVE ANY OPINIONS ABOUT THE DEFENDANT IN THIS CASE,

20     NSO OR Q CYBER?

21               PROSPECTIVE JUROR:  NO.

22               THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT

23      COMPANIES THAT ARE BASED IN ISRAEL OR ABOUT ISRAEL THAT WOULD

24      AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL?

25               PROSPECTIVE JUROR:  NO.

```
 1              THE COURT:  OKAY.  ALL RIGHT.

 2          CAN YOU THINK OF ANY OTHER INFORMATION ABOUT YOURSELF THAT

 3     YOU SHOULD PROVIDE TO US, CONSIDERING ALL THE QUESTIONS PUT TO

 4     THE JURORS BEFORE YOU?

 5              PROSPECTIVE JUROR:  NO.

 6              THE COURT:  NO?  ALL RIGHT.  THANK YOU.

 7          MS. CLOTHIER, GOOD MORNING.

 8              PROSPECTIVE JUROR:  GOOD MORNING.

 9              THE COURT:  AND YOU ARE A LONG TIME TEACHER?

10              PROSPECTIVE JUROR:  CORRECT.

11              THE COURT:  WHAT DO YOU TEACH?

12              PROSPECTIVE JUROR:  I TEACH 12TH GRADE ENGLISH.  MY

13     STUDENTS ARE THRILLED THAT I'M HERE TODAY, I CAN TELL YOU.

14          (LAUGHTER.)

15              PROSPECTIVE JUROR:  THEY WOULD LOVE FOR ME TO BE ON

16     THIS JURY.

17          (LAUGHTER.)

18              THE COURT:  THAT'S VERY FUNNY.

19          LET'S SEE.  OKAY.  LET'S TALK A LITTLE BIT ABOUT A COUPLE

20     THINGS ON YOUR QUESTIONNAIRE HAVING TO DO WITH AWARDING MONEY

21     DAMAGES IN CIVIL LAWSUITS.

22              PROSPECTIVE JUROR:  OH, YEAH.  SO WHEN MY DAUGHTER

23     WAS AN INFANT, I WAS DRIVING ON HIGHWAY 89 WITH HER OTHER MOM,

24     AND A SEMI LOGGING TRUCK CROSSED THE CENTER LINE, AND I HAD TO

25     SWERVE AND WE GOT INTO A CAR ACCIDENT, AND I HAD TO BE BACK
```

1      BOARDED, AND THE CAR WAS TOTALLED.  SO WE HAD A LAWSUIT, AND IT

2      WAS SETTLED.

3                  THE COURT:  OKAY.

4                  PROSPECTIVE JUROR:  SO THIS WAS IN 2005.

5                  THE COURT:  OKAY.  SO YOU DIDN'T HAVE TO GO THROUGH A

6      TRIAL OR ANYTHING LIKE THAT?

7                  PROSPECTIVE JUROR:  NO.

8                  THE COURT:  YOU SETTLED EARLY.

9           OKAY.  YOU DO ALSO INDICATE THAT YOU HAVE STRONG FEELINGS

10     ABOUT AWARDING MONEY DAMAGES TO A WINNING PARTY IN A CIVIL

11     CASE?

12                 PROSPECTIVE JUROR:  HOW DID I WRITE IT?

13                 THE COURT:  HOW DID YOU WRITE YOUR ANSWER?

14                 PROSPECTIVE JUROR:  YEAH.

15                 THE COURT:  YOU SAID, "I OFTEN" -- YOU SAID, "YES, I

16     HAVE STRONG FEELINGS.  I OFTEN THINK THESE CASES ARE MOTIVATED

17     BY GREED, SO I COULD HAVE PROBLEMS WITH THAT, DEPENDING UPON

18     THE SUBJECT MATTER."

19                 PROSPECTIVE JUROR:  YEAH, DEPENDING UPON THE SUBJECT

20     MATTER, I THINK THAT IS TRUE.

21                 THE COURT:  OKAY.  ALL RIGHT.

22                 PROSPECTIVE JUROR:  YEAH.

23                 THE COURT:  NOW, I'VE DESCRIBED WHAT THIS CASE IS

24     ABOUT.  DO YOU THINK THAT THOSE STRONG FEELINGS WOULD COME TO

25     BEAR IN THIS KIND OF A CASE?

1              PROSPECTIVE JUROR:  BASED ON WHAT I'VE HEARD, I DON'T

2     THINK SO.

3              THE COURT:  OKAY.  TWO BUSINESSES VERSUS TWO

4     BUSINESSES, BUT IT IS ABOUT DAMAGES.

5              PROSPECTIVE JUROR:  (NODS HEAD UP AND DOWN.)

6              THE COURT:  OKAY.  ALL RIGHT.  DO YOU THINK THAT YOU

7     CAN HAVE AN OPEN MIND AND DECIDE THE CASE FAIRLY BASED SOLELY

8     UPON THE EVIDENCE PRESENTED HERE IN THE COURTROOM?

9              PROSPECTIVE JUROR:  YES, I DO.

10             THE COURT:  OKAY.  HAVE YOU EVER HAD A -- AN

11    EMPLOYMENT OR BUSINESS RELATIONSHIP WITH META OR WHATSAPP?

12             PROSPECTIVE JUROR:  NO.

13             THE COURT:  OKAY.  HAVE YOU EVER OWNED ANY STOCK, YOU

14    OR ANYONE IN YOUR HOUSEHOLD OWNED ANY STOCK IN FACEBOOK OR

15    META?

16             PROSPECTIVE JUROR:  NO STOCK.  I'M IN THE CALIFORNIA

17    TEACHER PENSION SYSTEM, AND I HAVE NO IDEA HOW THAT MONEY IS

18    INVESTED.  I JUST WANT IT TO BE THERE WHEN I RETIRE.

19             THE COURT:  YEAH, UNDERSTOOD.

20           HAVE YOU HAD A BUSINESS OR EMPLOYMENT RELATIONSHIP, YOU OR

21    ANYONE IN YOUR HOUSEHOLD, WITH NSO OR Q CYBER?

22             PROSPECTIVE JUROR:  NO.

23             THE COURT:  OKAY.  AND ANY FINANCIAL INTEREST IN

24    EITHER OF THOSE COMPANIES?

25             PROSPECTIVE JUROR:  NO.

1          THE COURT:  NO.  OKAY.

2          DO YOU HAVE ANY OPINION ABOUT ANY OF THESE COMPANIES THAT

3     MIGHT MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO

4     BOTH SIDES?

5          PROSPECTIVE JUROR:  NO.

6          THE COURT:  DO YOU HAVE ANY OPINIONS ABOUT COMPANIES

7     BASED IN ISRAEL OR THE COUNTRY OF ISRAEL THAT MIGHT MAKE IT

8     DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL TO NSO, WHICH IS AN

9     ISRAELI-BASED COMPANY?

10          PROSPECTIVE JUROR:  NO.  I FEEL STRONGLY THAT WE'RE

11     ALL EARTHLINGS.

12          THE COURT:  OKAY.  YOU DO INDICATE IN YOUR

13     QUESTIONNAIRE THAT MAKING DECISIONS WILL BE INFORMED BY YOUR

14     MORAL CODE AND UPBRINGING.

15          DO YOU UNDERSTAND THAT IN A CASE SUCH AS THIS, THE JURY IS

16     THE FINDER OF FACT BASED ON WHAT HAPPENS HERE IN THE COURTROOM,

17     AND THE COURT INSTRUCTS ON THE LAW AND THE LAW MUST BE

18     FOLLOWED, WHETHER OR NOT YOU AGREE WITH IT OR NOT?

19          IS THAT SOMETHING THAT YOU THINK YOU CAN DO?

20          PROSPECTIVE JUROR:  I DO IN THIS CASE.

21          THAT IS PRIMARILY FOR, LIKE, A CRIMINAL CASE.  I THINK I

22     WOULD HAVE A REALLY HARD TIME WITH SEXUAL ASSAULT, MURDER,

23     THOSE TYPES OF THINGS.

24          THE COURT:  YEAH, THE CRIMINAL CASES ARE MUCH, MUCH

25     DIFFERENT, OBVIOUSLY, AND THEY HAVE DIFFERENT BURDENS AS WELL.

1           ALL RIGHT.  HAVING HEARD ALL OF THE QUESTIONS PUT TO

2    EVERYONE BEFORE YOU, CAN YOU THINK OF ANY ADDITIONAL

3    INFORMATION THAT YOU SHOULD SHARE WITH US?

4           PROSPECTIVE JUROR:  NOT THAT I'M AWARE OF.  JUST THE

5    ONLY THING IS I WAS JUST WONDERING IF WE GET OCCASIONAL

6    RESTROOM BREAKS?

7           THE COURT:  YES.  AND I WAS JUST ABOUT TO MAKE THAT

8    ANNOUNCEMENT.  I WAS TRYING TO GET THROUGH THE BOX FIRST

9    BECAUSE WE STILL HAVE A NUMBER OF OTHER PEOPLE TO QUESTION.

10          SO NOW IS A GOOD TIME, AS SUGGESTED BY JUROR NUMBER 15,

11   NOW IS A GOOD TIME FOR A BREAK.

12          EVERYONE, WE'LL BREAK FOR 15 MINUTES.

13          WHEN YOU COME BACK IN, PLEASE TAKE THE SAME SEAT THAT YOU

14   OCCUPY NOW.

15          THE CLERK:  ALL RISE FOR THE JURY.

16          (JURY OUT AT 11:03 A.M.)

17          (RECESS FROM 11:03 A.M. UNTIL 11:23 A.M.)

18          THE COURT:  ALL RIGHT.  NOW WE'RE GOING TO START WITH

19   SOME OF OUR JURORS, WE PROBABLY ARE NOT GOING TO GET THROUGH

20   ALL OF YOU, BUT SOME OF OUR JURORS WHO ARE SEATED ON THE

21   BENCHES.

22          OKAY, GREAT.

23          ALL RIGHT.  AND GOOD MORNING, MR. OCCHIPINTI.

24          PROSPECTIVE JUROR:  VERY GOOD.

25          THE COURT:  VERY GOOD.  THANK YOU.

```
1                    PROSPECTIVE JUROR:  CLOSE ENOUGH.

2                    THE COURT:  WELL, WHY DON'T YOU PRONOUNCE IT.

3                    PROSPECTIVE JUROR:  OCCHIPINTI.

4                    THE COURT:  OCCHIPINTI, OKAY.

5                    PROSPECTIVE JUROR:  OR OCCHIPINTI.  OCCHIPINTI.

6                    THE COURT:  OCCHIPINTI.  IS THAT ITALIAN?

7                    PROSPECTIVE JUROR:  IT IS.  SICILIAN, ACTUALLY.

8                    THE COURT:  OKAY.  WHAT'S YOUR OCCUPATION,

9        MR. OCCHIPINTI?

10                    PROSPECTIVE JUROR:  I WORK IN KAISER HOSPITAL,

11       SANTA ROSA, CALIFORNIA.

12                    THE COURT:  IN SANTA ROSA.  WHAT'S YOUR ROLE?

13                    PROSPECTIVE JUROR:  I AM THE CHIEF OF THE SCT

14       DEPARTMENT.

15                    THE COURT:  WHAT'S THAT?

16                    PROSPECTIVE JUROR:  SUPPLY CHAIN TECH.

17                    THE COURT:  SUPPLY CHAIN TECH.

18                    PROSPECTIVE JUROR:  YOU REMEMBER THE COVID DAYS?

19                    THE COURT:  YEAH.

20                    PROSPECTIVE JUROR:  WE WERE BIG THEN.  NOT BEHIND THE

21       SCENES, OF COURSE.

22                    THE COURT:  YOU WERE THE PPE GUYS?

23                    PROSPECTIVE JUROR:  I WAS THE PPE MAN.

24                    THE COURT:  OKAY.  WELL, I HOPE THINGS HAVE SLOWED

25       DOWN FOR YOU.
```

1          OKAY.  NOW, WITH REGARD TO YOUR QUESTIONNAIRE, I DID WANT

2     TO EXPLORE WHY YOU'RE NOT A FAN OF LAWYERS.

3          (LAUGHTER.)

4               PROSPECTIVE JUROR:  I'M NOT SURE I REMEMBER PUTTING

5     THAT DOWN.

6               THE COURT:  OKAY.

7               PROSPECTIVE JUROR:  BUT THE ONLY REASON I PROBABLY

8     PUT THAT DOWN IS WE WERE IN A LAWSUIT PROBABLY ABOUT 12 YEARS

9     AGO, AND THE LAWYERS DID US WRONG.  SO IT WAS JUST A SIMPLE

10    RESTAURANT --

11              THE COURT:  WAS IT THE LAWYERS FOR YOUR SIDE OR THE

12    OTHER SIDE?

13              PROSPECTIVE JUROR:  OUR SIDE.

14              THE COURT:  YOUR OWN LAWYERS DID YOU WRONG?

15              PROSPECTIVE JUROR:  OUR OWN LAWYERS.

16              THE COURT:  ALL RIGHT.  HOW DID THE LITIGATION TURN

17    OUT?

18              PROSPECTIVE JUROR:  WE LOST.

19              THE COURT:  OKAY.  SO IS THERE ANYTHING ABOUT THAT

20    PRIOR EXPERIENCE THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE

21    FAIR AND IMPARTIAL TO BOTH SIDES IN THIS CASE?

22              PROSPECTIVE JUROR:  I DOUBT IT.

23              THE COURT:  OKAY, GREAT.

24          YOU INDICATED THAT YOUR FAMILY WAS INVOLVED IN SOME SORT

25    OF BUSINESS DISPUTES AS WELL?

1        PROSPECTIVE JUROR:  THAT WAS THE ONE.

2        THE COURT:  THAT WAS THE ONE.  OKAY.  GREAT.

3     ALL RIGHT.  THEN THIS PROBABLY WILL GO A LITTLE QUICKER

4  THAN THE FIRST GROUP BECAUSE YOU HEARD ALL THE QUESTIONS AND

5  ANSWERS PREVIOUSLY AND YOU KNOW WHAT I'M LOOKING FOR,

6  ESSENTIALLY WHAT I'M LOOKING FOR.

7     HAVE YOU OR ANYONE CLOSE TO YOU EVER BEEN EMPLOYED BY OR

8  ASSOCIATED WITH META OR WHATSAPP?

9        PROSPECTIVE JUROR:  NO.  BUT WE OWN STOCK.

10       THE COURT:  YOU OWN STOCK CURRENTLY?

11       PROSPECTIVE JUROR:  CURRENTLY.

12       THE COURT:  OKAY.  AND HAVE YOU -- DID YOU PICK IT OR

13  WAS IT YOUR FUND MANAGER WHO SELECTED IT?

14       PROSPECTIVE JUROR:  BOTH.

15       THE COURT:  BOTH.

16       PROSPECTIVE JUROR:  I HAVE MY OWN PORTFOLIO, AND I

17  HAVE ONE THROUGH MY EMPLOYMENT, AND I HAVE A FINANCIAL ADVISOR.

18       THE COURT:  OKAY.

19       PROSPECTIVE JUROR:  AND ALL THREE HAVE META IN IT.

20       THE COURT:  OKAY.

21       PROSPECTIVE JUROR:  BUT I DID CHOOSE MY OWN, YES.  I

22  HAVE QUITE A FEW SHARES OF META.

23       THE COURT:  OKAY.  ANY INTEREST IN NSO OR Q CYBER?

24       PROSPECTIVE JUROR:  NO, YOUR HONOR.

25       THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT

```
 1       META, ASIDE FROM THE STOCK, DO YOU HAVE ANY OPINION ABOUT META

 2       THAT WOULD CAUSE YOU TO IDENTIFY MORE WITH THEM AS OPPOSED TO

 3       THE DEFENDANTS IN THIS CASE?

 4                PROSPECTIVE JUROR:  I OWN SOME STOCK IN IT.  YES, I

 5       THINK I WOULD.

 6                THE COURT:  YOU THINK YOU WOULD.  ALL RIGHT.

 7          SO YOU WOULD, MORE LIKELY, ROOT FOR THEM OVER THE

 8       DEFENDANTS IN THIS CASE, IF YOU WILL?

 9                PROSPECTIVE JUROR:  YEAH, I THINK SO.

10                THE COURT:  OKAY.  AND DO YOU THINK THERE'S ANY WAY

11        THAT YOU COULD PUT THAT ASIDE?

12                PROSPECTIVE JUROR:  IT'S POSSIBLE.  BUT IT'S A

13        FINANCIAL GAIN FOR MY PORTFOLIO.  I WOULD PROBABLY BE LOOKING

14        AT THAT.

15                THE COURT:  UM-HUM.  OKAY.  ALL RIGHT.

16          WELL, I APPRECIATE YOUR CANDOR.

17          DO YOU HAVE ANY OPINIONS ABOUT THE DEFENDANTS' COMPANIES

18        THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL,

19        GIVEN THAT THEY'RE AN ISRAELI-BASED COMPANY?

20                PROSPECTIVE JUROR:  I DON'T THINK SO.

21                THE COURT:  ALL RIGHT.  HAVING HEARD ALL THE

22        QUESTIONS AND ANSWERS BEFORE YOU, PUT TO THE PROSPECTIVE JURORS

23        BEFORE YOU, IS THERE ANY ADDITIONAL INFORMATION ABOUT YOURSELF

24        THAT YOU THINK YOU SHOULD SHARE?

25                PROSPECTIVE JUROR:  THERE'S ONE THING.  I DO HAVE A
```

```
 1         DAUGHTER THAT MADE NATIONALS IN GYMNASTICS.  WE LEAVE FRIDAY

 2         FOR A COLLEGE SHOW CASE TO NAPA, WHICH IS NOT TOO FAR AWAY.

 3         BUT THEN MONDAY WE LEAVE TO UTAH.

 4                   THE COURT:  UM-HUM.

 5                   PROSPECTIVE JUROR:  AND AS A FATHER, I WON'T MISS

 6         THAT.

 7                   THE COURT:  UM-HUM.

 8                   PROSPECTIVE JUROR:  SO I'M WORRIED ABOUT MY

 9         ATTENDANCE.

10                   THE COURT:  RIGHT.  I JUST -- IT'S JUST CURIOUS, I

11         MEAN, EVERYBODY CAN ASK FOR A POSTPONEMENT BEFORE YOU SENT IN

12         YOUR FORMS?

13                   PROSPECTIVE JUROR:  I TRIED, YOUR HONOR.

14                   THE COURT:  AND WHAT HAPPENED?

15                   PROSPECTIVE JUROR:  THESE EVENTS HAPPENED AFTER, SO I

16         WAS ALREADY LATE WHEN I RECEIVED THE -- THE JURY NOTICE.

17              IT WAS A QUALIFICATION.

18                   THE COURT:  OH, OKAY.

19                   PROSPECTIVE JUROR:  SHE WENT FROM STATE, REGION, NOW

20         NATIONAL.

21                   THE COURT:  OKAY.

22                   PROSPECTIVE JUROR:  SO IT WAS A QUALIFICATION, IF SHE

23         DIDN'T MAKE IT, THEN I WOULD BE FREE TO SERVE.  BUT

24         UNFORTUNATELY -- AGAIN, AS A FATHER, I WOULD BE -- I'M NOT

25         GOING TO MISS IT.
```

```
 1                    THE COURT:  YEAH.

 2                    PROSPECTIVE JUROR:  SO --

 3                    THE COURT:  WE'LL TAKE THAT INTO CONSIDERATION.

 4             NOT AN AUTOMATIC EXCUSAL.

 5                    PROSPECTIVE JUROR:  I UNDERSTAND.  BUT I WILL BE

 6        ABSENT THOSE DAYS.

 7                    THE COURT:  AND THOSE --

 8                    PROSPECTIVE JUROR:  I'M AT LEAST TELLING YOU UP

 9        FRONT.

10                    THE COURT:  WHAT DAYS?

11                    PROSPECTIVE JUROR:  FRIDAY WOULD BE ONE DAY, BUT THEN

12        I'M BACK SAT AND SUNDAY, BACK IN SANTA ROSA, WHICH WAS ABOUT AN

13        HOUR AND 20 MINUTE COMMUTE, BY THE WAY, AND THEN MONDAY NIGHT

14        WE TAKE OFF.

15                    THE COURT:  OKAY.  IT'S NOT AN AUTOMATIC EXCUSAL, AND

16        IF YOU ARE SELECTED, YOU WILL BE REQUIRED TO BE HERE UNDER

17        THREAT OF CONTEMPT OF COURT.  I MEAN, THAT'S ALL I CAN TELL

18        YOU.

19                    THE WITNESS:  I UNDERSTAND, YOUR HONOR.

20                    THE COURT:  OKAY, GREAT.

21             AND ANYTHING ELSE?

22                    PROSPECTIVE JUROR:  NO, YOUR HONOR.

23                    THE COURT:  NO?  OKAY.

24             PLEASE PASS.

25             GOOD MORNING, MR. SISON, OR SISON?
```

```
1              PROSPECTIVE JUROR:  SISON.  GOOD MORNING.

2              THE COURT:  LET'S SEE.  NOW, YOU'RE THE SECOND

3     PERSON, I THINK, THAT THIS MORNING MENTIONED SOMETHING ABOUT

4     AUTONOMOUS VEHICLE.

5          NOW, YOU INDICATE YOU'RE AN AUTONOMOUS VEHICLE OPERATOR

6     FOR ZOOX?

7              PROSPECTIVE JUROR:  YES, ZOOX.

8              THE COURT:  ZOOX.  SO ISN'T AN AUTONOMOUS VEHICLE

9     DRIVERLESS?

10             PROSPECTIVE JUROR:  YEAH, BASICALLY SELF DRIVEN.

11             THE COURT:  SO WHAT DO YOU DO AS AN OPERATOR OF A

12    SELF-DRIVING CAR?

13             PROSPECTIVE JUROR:  SO MOSTLY I JUST TEST THE

14    SOFTWARE AND GIVE FEEDBACK TO THE ENGINEERS.  SO I DRIVE THE

15    CARS AROUND, LIKE, THE CITIES AND GIVE FEEDBACK ON THE PROS AND

16    CONS.

17             THE COURT:  AH, OKAY.

18         AND ZOOX, IS THAT THE COMPANY?

19             PROSPECTIVE JUROR:  YEAH, Z-O-O-X.  IT'S OWNED BY

20    AMAZON.

21             THE COURT:  OKAY.  HOW DO YOU PRONOUNCE IT?  AM I

22    SAYING IT RIGHT?

23             PROSPECTIVE JUROR:  ZOOX.

24             THE COURT:  IS THAT A LOCAL COMPANY?

25             PROSPECTIVE JUROR:  HEADQUARTERS IS IN FOSTER CITY.
```

```
1        BUT WE ALSO HAVE BRANCHES IN VEGAS, SEATTLE, MIAMI, AUSTIN.

2              THE COURT:  OKAY.  IS THIS LIKE A COMPETITOR OF

3   WAYMO?

4              PROSPECTIVE JUROR:  YEAH, DIRECT COMPETITOR OF WAYMO.

5              THE COURT:  OKAY.  I SEE THOSE VEHICLES AROUND.  ARE

6   YOUR VEHICLES ON THE STREETS?

7              PROSPECTIVE JUROR:  JUST THE TESTING VEHICLES, BUT

8   NOT PUBLIC YET.

9              THE COURT:  OKAY.

10             PROSPECTIVE JUROR:  AND AT NIGHTTIME, I'M ALSO A REAL

11  ESTATE AGENT FOR REDFIN.

12             THE COURT:  ALL RIGHT.  SO YOU HAVE TWO JOBS.  OKAY.

13  THANK YOU.

14        YOU WERE ON JURY SERVICE PREVIOUSLY?

15             PROSPECTIVE JUROR:  I REMEMBER IN THE PAST I WENT

16  ONCE, BUT IT WAS A -- IT WAS CANCELLED.

17             THE COURT:  OKAY.  THE -- YOU RESPONDED TO A JURY

18  SUMMONS, BUT THERE WAS NO TRIAL WHEN YOU GOT TO THE COURT?

19             PROSPECTIVE JUROR:  RIGHT.

20             THE COURT:  OKAY.  SO YOU HAVE NOT SERVED ON A JURY?

21             PROSPECTIVE JUROR:  CORRECT.

22             THE COURT:  OKAY.  THANK YOU.

23        ALL RIGHT.  HAVE YOU EVER WORKED FOR OR HAD ANY SORT OF

24  BUSINESS RELATIONSHIP WITH META?

25             PROSPECTIVE JUROR:  NO.  MY CURRENT ROLE AS A
```

```
1        SOFTWARE OPERATOR, IT IS CONTRACT.  SO A LOT OF MY COLLEAGUES,

2        THEY HAVE LEFT PARTICULARLY TO WORK AT META FOR THEIR DATA

3        ENTRY TEAMS.  SO I HAVE APPLIED AND, IN THE FUTURE, I MAY APPLY

4        AGAIN.

5                THE COURT:  UM-HUM.

6            OKAY.  ALL RIGHT.  AND, LET'S SEE, HAVE YOU EVER OWNED --

7        WELL, DO YOU HAVE A BUSINESS OR EMPLOYMENT RELATIONSHIP, OR HAS

8        ANYONE IN YOUR HOUSEHOLD EVER HAD SUCH A RELATIONSHIP, WITH THE

9        DEFENDANT COMPANIES?

10               PROSPECTIVE JUROR:  NO.

11               THE COURT:  OKAY.  DO YOU OWN STOCK IN OR HAVE A

12       FINANCIAL INTEREST IN META?

13               PROSPECTIVE JUROR:  MY GRANDFATHER HAS STOCKS, WHICH

14       ME AND MY BROTHER WILL INHERIT.

15               THE COURT:  OKAY.  BUT YOU DON'T YOURSELF?

16               PROSPECTIVE JUROR:  NO.

17               THE COURT:  OKAY.  ALL RIGHT.  AND DO YOU HAVE ANY

18       OPINION ABOUT META THAT WOULD BE -- THAT WOULD MAKE IT

19       DIFFICULT FOR YOU TO BE IMPARTIAL TO THEIR INTERESTS?

20               PROSPECTIVE JUROR:  I THINK SO, HONESTLY.  AND MY

21       FAMILY HAS STOCKS IN META.  I USED WHATSAPP A LOT FOR MY REAL

22       ESTATE WORK, SO I USE THOSE PRODUCTS EVERY DAY FOR WORK.  SO I

23       MIGHT BE A LITTLE BIT BIASED TOWARDS THEM.

24               THE COURT:  YOU MAY BE A LITTLE BIT BIASED TOWARDS

25       THEM?
```

1           PROSPECTIVE JUROR:  I MIGHT FAVOR THEM.

2           THE COURT:  YOU MAY FAVOR THEM.  SIMPLY BECAUSE YOU

3     USE THE PRODUCTS?

4           PROSPECTIVE JUROR:  YES.

5           THE COURT:  OKAY.  AND IF YOU WERE SELECTED AS A

6     JUROR, YOU WOULD BE EXPECTED TO SET ASIDE THAT FAVOR,

7     FAVORITISM, THAT FEELING THAT YOU HAVE, THAT POSITIVE FEELING

8     THAT YOU HAVE BY VIRTUE OF USING THEIR PRODUCTS TO BE FAIR AND

9     IMPARTIAL TO BOTH SIDES.  IS THAT SOMETHING THAT YOU THINK YOU

10    CAN DO?

11          PROSPECTIVE JUROR:  IT WOULD BE VERY DIFFICULT, SO I

12    DON'T BELIEVE SO.

13          THE COURT:  YOU DON'T BELIEVE SO?

14       THE PRODUCTS ARE SO GOOD THAT YOU DON'T THINK THAT YOU

15    COULD BE FAIR TO THE OTHER SIDE?

16          PROSPECTIVE JUROR:  THAT, AND I MAY APPLY FOR THEM IN

17    THE FUTURE.  MY GRANDFATHER HAS STOCKS IN THEM, YEAH.

18          THE COURT:  OKAY.  AND WHAT ABOUT NSO AND Q CYBER?

19    DO YOU HAVE ANY BUSINESS INTEREST OR RELATIONSHIP WITH THEM OF

20    ANY KIND?

21          PROSPECTIVE JUROR:  NO.

22          THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT THAT

23    COMPANY THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

24    IMPARTIAL?

25          PROSPECTIVE JUROR:  NO.  I MEAN, I DO PREFER U.S.

```
1        COMPANIES INHOUSE.  BUT NO.

2                THE COURT:  YOU PREFER THEM, MEANING WHAT?  WHAT DO

3        YOU MEAN?

4                PROSPECTIVE JUROR:  I JUST USE -- I LIKE TO USE U.S.

5        COMPANIES, HAVE ANYTHING -- HAVE THE MONEY CIRCULATING IN THE

6        U.S.

7                THE COURT:  OKAY.  ALL RIGHT.  BUT YOU DON'T HAVE ANY

8        NEGATIVE -- DID YOU -- HAD YOU HEARD OF NSO BEFORE --

9                PROSPECTIVE JUROR:  NO, I'VE NEVER HEARD OF THEM.

10               THE COURT:  -- TODAY?

11           OKAY.  HAVING HEARD ALL THE QUESTIONS PUT TO EVERYONE

12       ELSE, CAN YOU THINK OF A REASON WHY YOU CANNOT BE SEATED AS A

13       JUROR?

14               PROSPECTIVE JUROR:  NO.

15               THE COURT:  OKAY.  THANK YOU.  PASS THE MICROPHONE.

16               PROSPECTIVE JUROR:  JUST ONE OTHER THING.  AS A REAL

17       ESTATE AGENT, I DO SERVICE THE PENINSULA AND MORE SILICON

18       VALLEY, AND A LOT OF MY CLIENTS ALSO HAVE WORKED FOR META.  SO,

19       YEAH, I HAVE TIES WITH THAT AS WELL.

20               THE COURT:  OKAY.  THANK YOU.

21               PROSPECTIVE JUROR:  THANK YOU.

22               THE COURT:  ALL RIGHT.  GOOD MORNING, MS. ALVARADO.

23               PROSPECTIVE JUROR:  GOOD MORNING.

24               THE COURT:  ALL RIGHT.  NOTHING ON YOUR QUESTIONNAIRE

25       THAT JUMPS OUT AT ME.
```

1          HAVE YOU EVER BEEN EMPLOYED BY OR ASSOCIATED WITH META OR

2     WHATSAPP?

3               PROSPECTIVE JUROR:  NO, I HAVE NOT.

4               THE COURT:  HAVE YOU EVER BEEN EMPLOYED BY OR

5     ASSOCIATED WITH NSO OR Q CYBER?

6               PROSPECTIVE JUROR:  NO, I HAVE NOT.

7               THE COURT:  OKAY.  HAVE YOU OR ANY MEMBER OF YOUR

8     HOUSEHOLD EVER OWNED META STOCK?

9               PROSPECTIVE JUROR:  NO.

10              THE COURT:  OR HAD ANY KIND OF A BUSINESS

11    RELATIONSHIP WITH THEM?

12              PROSPECTIVE JUROR:  NO.

13              THE COURT:  AND HOW ABOUT NSO GROUP OR Q CYBER?

14              PROSPECTIVE JUROR:  NO.

15              THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT META

16    OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

17    IMPARTIAL?

18              PROSPECTIVE JUROR:  NO.

19              THE COURT:  AND WHAT ABOUT NSO AND Q CYBER?

20              PROSPECTIVE JUROR:  NO.

21              THE COURT:  NO OPINIONS?  OKAY.

22         DO YOU HAVE ANY OPINIONS ABOUT AN ISRAELI-BASED COMPANY OR

23    ABOUT ISRAEL THAT WOULD MAKE IT DIFFICULT FOR YOU TO RENDER A

24    FAIR VERDICT FOR NSO AND Q CYBER?

25              PROSPECTIVE JUROR:  I DON'T.

1          THE COURT:  OKAY.  HAVING HEARD ALL THE OTHER

2     QUESTIONS AND ANSWERS PRECEDING, IS THERE ANY ADDITIONAL

3     INFORMATION THAT YOU THINK YOU SHOULD SHARE?

4          PROSPECTIVE JUROR:  NO, THERE'S NOTHING ELSE.

5          THE COURT:  NOTHING ELSE.  OKAY.  THANK YOU.

6        AND GOOD MORNING, MS. NGUYEN.

7          PROSPECTIVE JUROR:  GOOD MORNING.

8          THE COURT:  I'M SORRY, I DIDN'T UNDERSTAND YOUR

9     OCCUPATION.  C R N A, WHAT IS THAT?

10          PROSPECTIVE JUROR:  THAT'S A CERTIFIED REGISTERED

11     NURSE APPARENTLY UNANIMOUS THEY TEST.

12          THE COURT:  OH, OKAY.  AND YOUR UCSF, IS THAT AT THE

13     MEDICAL CENTER?

14          PROSPECTIVE JUROR:  CORRECT.

15          THE COURT:  OKAY.  GREAT.  AND YOU HAVE A COUSIN

16     WHO'S A LAWYER; IS THAT CORRECT?

17          PROSPECTIVE JUROR:  HE'S JUST A PERSONAL INJURY

18     LAWYER IN HOUSTON.

19          THE COURT:  IN HOUSTON.

20          PROSPECTIVE JUROR:  BUT THAT'S IRRELEVANT.

21          THE COURT:  THANK YOU.

22        DO YOU -- HAVE YOU EVER BEEN EMPLOYED BY FACEBOOK OR META?

23          PROSPECTIVE JUROR:  NO.

24          THE COURT:  OR WHATSAPP?

25          PROSPECTIVE JUROR:  NO.

1              THE COURT:  HAVE YOU EVER BEEN EMPLOYED OR ASSOCIATED

2      IN ANY WAY WITH NSO OR Q CYBER?

3              PROSPECTIVE JUROR:  NO.

4              THE COURT:  HAVE YOU EVER OWNED STOCK OR HAD A

5      FINANCIAL INTEREST IN ANY OF THESE COMPANIES?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  AND DO YOU HAVE AN OPINION ABOUT META OR

8      WHATSAPP --

9              PROSPECTIVE JUROR:  NO.

10              THE COURT:  -- THAT WOULD MAKE IT DIFFICULT FOR YOU

11      TO BE FAIR AND IMPARTIAL TO THEM?

12              PROSPECTIVE JUROR:  NO.

13              THE COURT:  AND HOW ABOUT WITH NSO GROUP OR Q CYBER?

14      DO YOU HAVE ANY OPINIONS ABOUT THEM?

15              PROSPECTIVE JUROR:  NO.

16              THE COURT:  HAD YOU HEARD OF THEM BEFORE TODAY?

17              PROSPECTIVE JUROR:  NO.

18              THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

19      COMPANIES BASED IN ISRAEL OR ABOUT ISRAEL THAT WOULD MAKE IT

20      DIFFICULT FOR YOU TO BE FAIR AND IMPARTIAL?

21              PROSPECTIVE JUROR:  NO.

22              THE COURT:  NO, OKAY.

23          HAVING HEARD ALL THE OTHER QUESTIONS AND ANSWERS PRECEDING

24      YOU, IS THERE ANY ADDITIONAL INFORMATION ABOUT YOURSELF THAT

25      YOU THINK YOU SHOULD SHARE?

1              PROSPECTIVE JUROR:  NO.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3          AND, LET'S SEE, MR. HALL.

4              PROSPECTIVE JUROR:  UM-HUM.

5              THE COURT:  GOOD MORNING.

6              PROSPECTIVE JUROR:  GOOD MORNING.

7              THE COURT:  WHAT'S THE LABORATORY -- WHAT DO YOU DO

8      AT THE BUSINESS SCHOOL AT STANFORD?

9              PROSPECTIVE JUROR:  I DIRECT A SOCIAL PSYCHOLOGY

10     RESEARCH LABORATORY.

11             THE COURT:  OKAY.

12             PROSPECTIVE JUROR:  SO I DESIGN, CONSULT WITH

13     FACULTY, THE DESIGN OF HUMAN SUBJECTS EXPERIMENTS, BOTH IN A

14     LABORATORY SURVEY RESEARCH, ONLINE SURVEYS.

15             THE COURT:  OH, OKAY.

16          SO DO YOU INTERACT WITH STUDENTS?

17             PROSPECTIVE JUROR:  STUDENTS AND FACULTY, YES.

18             THE COURT:  STUDENTS AND FACULTY.  GRADUATE OR

19     UNDERGRADUATE?

20             PROSPECTIVE JUROR:  GRADUATE ONLY.

21             THE COURT:  GRADUATE ONLY.  THANK YOU.

22          ALL RIGHT.  AND, MR. HALL, HAVE YOU OR ANYONE CLOSE TO YOU

23     EVER BEEN EMPLOYED WITH OR HAD A BUSINESS RELATIONSHIP WITH

24     FACEBOOK OR WHATSAPP?

25             PROSPECTIVE JUROR:  NO.

```
 1              THE COURT:  HAVE YOU OR ANYONE CLOSE TO YOU EVER BEEN
 2    EMPLOYED OR ASSOCIATED WITH NSO OR Q CYBER?
 3              PROSPECTIVE JUROR:  NO.
 4              THE COURT:  HAVE YOU EVER OWNED STOCK IN FACEBOOK?
 5              PROSPECTIVE JUROR:  SURE, YEAH.
 6              THE COURT:  OKAY.  AND IS IT --
 7              PROSPECTIVE JUROR:  NOT CURRENTLY.
 8              THE COURT:  NOT CURRENTLY?
 9              PROSPECTIVE JUROR:  NO.
10              THE COURT:  HOW LONG AGO?
11              PROSPECTIVE JUROR:  JUST IN INDEX FUNDS, AND DIVESTED
12    MAYBE THREE WEEKS AGO.
13              THE COURT:  OKAY.  SO JUST BY CHANCE?
14              PROSPECTIVE JUROR:  YEAH.  WELL, I MEAN, DUE TO
15    WHAT'S GOING ON IN THE MARKET.
16              THE COURT:  OKAY.
17              PROSPECTIVE JUROR:  YEAH, JUST WENT TO CASH.
18              THE COURT:  RIGHT.  WAS YOUR PRIOR -- DID THE STOCK
19    THAT YOU OWNED PREVIOUSLY, WAS IT IN A FUND?  DID YOU MAKE THE
20    DECISION YOURSELF?
21              PROSPECTIVE JUROR:  YEAH, INDEX FUND.  YES, I MADE
22    THE DECISION MYSELF.  BUT IT WAS, YOU KNOW, PART OF A LARGER
23    BUCKET OF STOCKS IN THE INDEX FUND.
24              THE COURT:  OKAY.  BUT YOU DIVESTED --
25              PROSPECTIVE JUROR:  ABOUT TWO OR THREE WEEKS AGO.
```

```
 1                THE COURT:  OKAY.  AND WHAT ABOUT WITH NSO OR

 2    Q CYBER?  DID YOU EVER HAVE ANY BUSINESS OR FINANCIAL

 3    RELATIONSHIP WITH THAT COMPANY?

 4                PROSPECTIVE JUROR:  NO.

 5                THE COURT:  DO YOU HAVE AN OPINION ABOUT FACEBOOK OR

 6    META THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

 7    IMPARTIAL?

 8                PROSPECTIVE JUROR:  I THINK SO, YEAH.  IT'S PRETTY

 9    NEGATIVE.

10                THE COURT:  AND TELL ME WHY.

11                PROSPECTIVE JUROR:  BECAUSE I THINK -- BROADLY, I

12    BELIEVE THAT LARGE TECH HAS AN OUTSIZE, LIKE, EXTRAORDINARILY

13    STRONG INFLUENCE NEGATIVELY ON OUR PSYCHES AND OUR PSYCHOLOGY

14    AND OUR SOCIETY, AND I THINK THE ACT BROADLY VARIES

15    RESPONSIBLY, AND THEY USE THAT POWER AND INFLUENCE TO ENTRENCH

16    THEIR, THEIR INTERESTS.  AND SO I DON'T REALLY HAVE A STRONG

17    OPINION ON THE WELFARE OR WELL BEING OF THAT COMPANY.

18                THE COURT:  OKAY.  ALL RIGHT.

19           NOW, YOU HEARD A LITTLE BIT ABOUT WHAT THIS CASE IS ABOUT,

20    RIGHT?

21                PROSPECTIVE JUROR:  YES.

22                THE COURT:  AND YOU KNOW THAT WE'VE GOT TWO COMPANIES

23    SUING TWO OTHER COMPANIES; RIGHT?

24                PROSPECTIVE JUROR:  YES.

25                THE COURT:  DO YOU THINK THAT YOUR NEGATIVE VIEWS
```

1     ABOUT THE PLAINTIFF WOULD MAKE IT -- WOULD CAUSE YOU TO

2     IDENTIFY MORE WITH THE DEFENDANTS' POSITION IN THIS CASE?

3             PROSPECTIVE JUROR:  NOT NECESSARILY.

4             THE COURT:  OKAY.  DO YOU THINK THAT YOUR NEGATIVE

5     VIEWS ABOUT THE PLAINTIFFS WOULD MAKE IT DIFFICULT FOR YOU TO

6     BE FAIR TO THEIR SIDE?

7             PROSPECTIVE JUROR:  PROBABLY, YES.

8             THE COURT:  OKAY.  DO YOU THINK THAT THOSE NEGATIVE

9     VIEWS CAN BE SET ASIDE SUCH THAT YOU COULD BE FAIR TO BOTH

10    SIDES?

11            PROSPECTIVE JUROR:  NO.

12            THE COURT:  NO?  ALL RIGHT.  OKAY.

13       ALL RIGHT.  DO YOU HAVE ANY OPINIONS ABOUT THE

14    ISRAELI-BASED -- ISRAELI-BASED COMPANIES OR ISRAEL THAT WOULD

15    MAKE IT DIFFICULT TO BE FAIR TO THE DEFENDANTS?

16            PROSPECTIVE JUROR:  NO.

17            THE COURT:  OKAY.  SO IT'S ONLY THE PLAINTIFFS THAT

18    YOU WOULD HAVE DIFFICULTY WITH?

19            PROSPECTIVE JUROR:  CORRECT.

20            THE COURT:  OKAY.  ALL RIGHT.

21       HAVING HEARD THE QUESTIONS AND ANSWERS PUT TO EVERYONE

22    ELSE BEFORE YOU, IS THERE ANY ADDITIONAL INFORMATION ABOUT

23    YOURSELF THAT YOU SHOULD SHARE?

24            PROSPECTIVE JUROR:  NO.

25            THE COURT:  NO?  OKAY.  THANK YOU.

```
1              PLEASE PASS THE MIC.

2              AND GOOD MORNING, MR. CASTELLI.

3                   PROSPECTIVE JUROR:  GOOD MORNING.

4                   THE COURT:  AND WHAT KIND OF SCIENTIST ARE YOU?  WHAT

5     DO YOU LOOK AT AND STUDY?

6                   PROSPECTIVE JUROR:  QUANTUM COMPUTING.

7                   THE COURT:  QUANTUM COMPUTING.  OKAY.  ALL RIGHT.

8              DO YOU HAVE ANY EXPERIENCE WITH CYBERSECURITY?

9                   PROSPECTIVE JUROR:  NO.

10                  THE COURT:  OKAY.  OKAY.  AND YOUR ONLY EXPERIENCE

11    WITH LITIGATION, YOU HAVE A SISTER WHO SUED A CONTRACTING

12    COMPANY; IS THAT RIGHT?

13                  PROSPECTIVE JUROR:  YEAH, THAT'S RIGHT.

14                  THE COURT:  WERE YOU INVOLVED IN THE LITIGATION AT

15    ALL?

16                  PROSPECTIVE JUROR:  NO, I WASN'T.

17                  THE COURT:  OKAY.  IS THERE ANYTHING ABOUT THAT

18    EXPERIENCE THAT YOUR SISTER WENT THROUGH THAT WOULD IMPACT YOUR

19    ABILITY TO BE A JUROR IN THIS CASE?

20                  PROSPECTIVE JUROR:  NO.

21                  THE COURT:  NO?  OKAY.

22             HAVE YOU EVER BEEN EMPLOYED OR ASSOCIATED WITH FACEBOOK?

23                  PROSPECTIVE JUROR:  NO.

24                  THE COURT:  OR WHATSAPP?

25                  PROSPECTIVE JUROR:  NO.
```

130

1              THE COURT:  HAVE YOU EVER BEEN EMPLOYED OR ASSOCIATED

2      WITH NSO OR Q CYBER?

3              PROSPECTIVE JUROR:  NO.

4              THE COURT:  HAVE YOU EVER OWNED STOCK OR HAD A

5      FINANCIAL INTEREST IN META?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  AND HAVE YOU EVER OWNED STOCK OR HAD A

8      FINANCIAL INTEREST IN NSO OR Q CYBER?

9              PROSPECTIVE JUROR:  NO.

10             THE COURT:  DO YOU HAVE ANY OPINION ABOUT META OR

11     WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

12     IMPARTIAL IN THIS CASE?

13             PROSPECTIVE JUROR:  NO.

14             THE COURT:  DO YOU HAVE ANY OPINION ABOUT NSO OR

15     Q CYBER THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

16     IMPARTIAL TO THEIR INTERESTS?

17             PROSPECTIVE JUROR:  NO.

18             THE COURT:  DO YOU HAVE ANY OPINION ABOUT

19     ISRAELI-BASED COMPANIES, SUCH AS NSO AND Q CYBER, OR ABOUT

20     ISRAEL THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

21     IMPARTIAL IN THIS CASE?

22             PROSPECTIVE JUROR:  NO.

23             THE COURT:  NO?  OKAY.

24          HAVING HEARD ALL THE QUESTIONS AND ANSWERS PUT TO EVERYONE

25     BEFORE YOU, CAN YOU THINK OF ANY REASON WHY YOU SHOULD NOT BE

1        SEATED AS A JUROR?

2                PROSPECTIVE JUROR:  I JUST WANTED TO MAKE SURE, I

3        HAVE A SURGERY COMING UP ON MAY 13TH, AND I JUST WANT TO MAKE

4        SURE THAT EVERYTHING WILL BE -- THAT I WON'T BE REQUIRED TO BE

5        HERE BY THAT TIME.

6                THE COURT:  NO.  MAY -- NO.

7                PROSPECTIVE JUROR:  OKAY.

8                THE COURT:  MAY 13TH, NOT AT ALL.

9                PROSPECTIVE JUROR:  OKAY.

10               THE COURT:  WE'LL BE FINISHED NEXT -- BY NEXT MONDAY.

11       OKAY.  THANK YOU.  YOU MAY PASS THE MIC.

12       AND GOOD MORNING, LET'S SEE, MS. GONZALEZ.

13               PROSPECTIVE JUROR:  YES.  GOOD MORNING.

14               THE COURT:  ALL RIGHT.  GOOD MORNING.

15       OKAY.  YOU DID INDICATE ON THE QUESTION ABOUT RELIGIOUS

16       VIEWS THAT MIGHT AFFECT YOUR SERVICE AS A JUROR, YOU INDICATED

17       THAT YOU WERE CATHOLIC.

18           DO YOU HAVE RELIGIOUS VIEWS THAT PRECLUDE YOU FROM SERVING

19       AS A JUROR ON A CIVIL CASE?

20               PROSPECTIVE JUROR:  NOT ON THIS CASE.

21               THE COURT:  OKAY.  AND DO YOU HAVE -- WOULD -- DO YOU

22       THINK THAT YOUR RELIGIOUS VIEWS WOULD HAVE ANY IMPACT ON YOUR

23       ABILITY TO SERVE AS A JUROR AT ALL?

24               PROSPECTIVE JUROR:  NO.

25               THE COURT:  NO.  OKAY.  YOU ALSO INDICATED THAT YOU

```
 1      HAD STRONG FEELINGS ABOUT AWARDING MONEY DAMAGES IN A CIVIL

 2      CASE, BUT YOU, LIKE SEVERAL OTHERS, SAID IT DEPENDS ON THE

 3      SITUATION.

 4          DOES THAT MEAN THAT YOU COULD AGREE TO AWARD DAMAGES IF

 5      YOU BELIEVE THAT THE PLAINTIFF PROVED THAT THEY WERE WARRANTED

 6      IN THIS CASE?

 7              PROSPECTIVE JUROR:  YES, THAT'S CORRECT.

 8              THE COURT:  OKAY.  YOU ALSO HAD A COUPLE OF NEGATIVE

 9      VIEWS ABOUT LAWYERS.  SO DO YOU WANT TO EXPLAIN THAT A LITTLE

10      BIT MORE?

11              PROSPECTIVE JUROR:  UNFORTUNATELY, IN MY PROFESSION,

12      I'M A PROGRAM MANAGER FOR A NONPROFIT IN SAN LEANDRO, BUT I

13      ALSO WAS A FAMILY ADVOCATE, SO I'VE SEEN FAMILIES GO THROUGH

14      SYSTEMS AND DIFFERENT THINGS, SO THE LAWYERS SOMETIMES HAVE

15      PLAYED THEM WRONG, ALTHOUGH THEY ARE NOT AT FAULT.  SO I DO

16      HAVE MIXED FEELINGS ABOUT THAT.  BUT NOT TO AFFECT THIS CASE.

17              THE COURT:  OKAY.  YOU UNDERSTAND THIS IS A BUSINESS

18      DISPUTE BETWEEN LARGE COMPANIES?

19              PROSPECTIVE JUROR:  YES, CORRECT.

20              THE COURT:  OKAY.  AND SO YOUR FEELINGS THAT WERE

21      DEVELOPED WHEN YOU WERE AN ADVOCATE WOULDN'T NECESSARILY

22      TRANSLATE INTO THIS KIND OF SITUATION, WOULD IT?

23              PROSPECTIVE JUROR:  CORRECT, THEY WOULDN'T.

24              THE COURT:  OKAY.  GREAT.

25          OKAY.  AND YOU UNDERSTAND THAT THIS IS A CIVIL CASE AND
```

1    NOT A CRIMINAL CASE, SO ANY INVOLVEMENT OF YOUR FAMILY WITH THE

2    CRIMINAL SYSTEM WOULDN'T NECESSARILY APPLY IN THIS CASE, WOULD

3    IT?

4              PROSPECTIVE JUROR:  YES, CORRECT, IT WOULDN'T APPLY

5     TO THIS.

6              THE COURT:  OKAY.  ALL RIGHT.

7          HAVE YOU HAD ANY EMPLOYMENT OR BUSINESS RELATIONSHIP WITH

8    META?

9              PROSPECTIVE JUROR:  NO.

10             THE COURT:  HAVE YOU -- OR WHATSAPP?

11             PROSPECTIVE JUROR:  NO.

12             THE COURT:  HAVE YOU HAD ANY EMPLOYMENT OR BUSINESS

13    RELATIONSHIP WITH NSO OR Q CYBER?

14             PROSPECTIVE JUROR:  NO.

15             THE COURT:  HAVE YOU OWNED STOCK IN ANY OF THESE

16    COMPANIES?

17             PROSPECTIVE JUROR:  NOT THAT I KNOW OF, BECAUSE I

18    HAVE A FINANCIAL ADVISOR THROUGH WORK FOR MY 401(B).

19             THE COURT:  OKAY.  BUT YOU DON'T MAKE THE DECISIONS

20    IN THAT?

21             PROSPECTIVE JUROR:  NO.

22             THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT

23    META OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE

24    FAIR AND IMPARTIAL?

25             PROSPECTIVE JUROR:  NO.

1          THE COURT:  AND WHAT ABOUT WITH REGARD TO NSO?  DO

2    YOU HAVE ANY FEELINGS ABOUT THEM THAT WOULD MAKE IT DIFFICULT

3    FOR YOU TO BE FAIR AND IMPARTIAL?

4          PROSPECTIVE JUROR:  NO.

5          THE COURT:  LET'S SEE.  OKAY.  THE DEFENDANT

6    COMPANIES ARE BASED IN ISRAEL.  DO YOU HAVE ANY OPINIONS ABOUT

7    ISRAELI-BASED COMPANIES OR ISRAEL?

8          PROSPECTIVE JUROR:  NO.

9          THE COURT:  OKAY.  THANK YOU.

10        HAVING HEARD ALL THE QUESTIONS PUT TO EVERYONE BEFORE YOU,

11    QUESTIONS AND ANSWERS, IS THERE ANY ADDITIONAL INFORMATION

12    ABOUT YOURSELF THAT YOU THINK YOU SHOULD SHARE?

13          PROSPECTIVE JUROR:  WELL, I DO HAVE A HARDSHIP.  I

14    WASN'T ALLOWED TO ASK FOR A POSTPONEMENT FOR SOME REASON ON THE

15    PAPER OR THE TEXT SAID I COULDN'T.

16        UNFORTUNATELY, LIKE I SAID, I AM WORKING FOR A NONPROFIT,

17    SO NONPROFITS BUDGETS ARE VERY SMALL, AND THEY HAVE PUT ME IN

18    CHARGE OF OUR ANNUAL GALA, WHICH RAISES FUNDS FOR OUR ACTUAL

19    DEPARTMENT, WHICH I WORK FOR THE FOOD AND CLOTHING DEPARTMENT

20    WHERE WE SERVE INDIVIDUALS.

21        THE GALA IS ACTUALLY THURSDAY, SO I HAVE TO DO EVERYTHING

22    FROM SET UP TO CLEAN UP TO ORGANIZATION OF EVERYTHING RIGHT

23    NOW.  SO I'VE BEEN WORKING UNTIL, LIKE, 1:00 OR 2:00 O'CLOCK IN

24    THE MORNING TRYING TO GET THINGS AHEAD, BUT, UNFORTUNATELY,

25    IT'S VERY HARD, THERE'S NOBODY ELSE THAT CAN DO IT BECAUSE WE

1     ARE VERY, VERY SHORT STAFFED.  THERE'S NOT VERY MANY OF US.  SO

2     IT'S A BIG GALA WHERE WE GET FUNDING FROM DIFFERENT

3     ORGANIZATIONS, AND WITHOUT ME BEING THERE, THEY'RE NOT GOING TO

4     BE ABLE TO PUT IT ON, UNFORTUNATELY.

5            THE COURT:  I CAN.  I CAN TAKE THAT INTO

6     CONSIDERATION, BUT THAT'S NOT -- YOU DON'T GET AN EXCUSE FOR

7     THAT.

8            PROSPECTIVE JUROR:  YES, UM-HUM.

9            THE COURT:  ALL RIGHT.  THANK YOU.

10         OKAY.  LET'S SEE.  MS. DRESBACH?

11           PROSPECTIVE JUROR:  YES.

12           THE COURT:  OKAY.  GOOD MORNING.

13           PROSPECTIVE JUROR:  GOOD MORNING.

14           THE COURT:  AND AS A MUSICIAN, WHAT DO YOU DO?

15           PROSPECTIVE JUROR:  I WORK FOR A CHURCH, OR A NUMBER

16    OF CHURCHES, AND I ORGANIZE, AS WELL AS FACILITATE, PRAYER

17    VIGILS RIGHT NOW FOR THE PEACE IN MIDDLE EAST.

18           THE COURT:  ALL RIGHT.  AND YOU INDICATED IN YOUR

19    QUESTIONNAIRE -- LET'S SEE, SOMETHING ABOUT RESTORATIVE

20    JUSTICE.

21           PROSPECTIVE JUROR:  YES.

22           THE COURT:  YOU UNDERSTAND THIS IS NOT A CRIMINAL

23    CASE.

24           PROSPECTIVE JUROR:  RIGHT.  SO THAT DOESN'T APPLY.

25           THE COURT:  SO THAT DOESN'T APPLY.

1              AND THE SAME WITH YOUR ANSWER WITH REGARD TO LAWYERS THAT

2      YOU KNOW.

3              PROSPECTIVE JUROR:  YES.

4              THE COURT:  THOSE ARE PRIMARILY MAYBE CRIMINAL

5      LAWYERS?

6              PROSPECTIVE JUROR:  RIGHT.

7              THE COURT:  OKAY.  YOU INDICATED YOU DON'T HAVE FAITH

8      IN THE JUSTICE SYSTEM ANYMORE.

9              PROSPECTIVE JUROR:  RIGHT.

10             THE COURT:  YOU UNDERSTAND THAT -- WELL, YOU SAID

11     BECAUSE OF THE BEHAVIOR OF THE SUPREME COURT.

12             PROSPECTIVE JUROR:  YES.

13             THE COURT:  YOU UNDERSTAND THIS IS A TRIAL COURT?

14             PROSPECTIVE JUROR:  RIGHT.

15             THE COURT:  THIS IS THE FIRST STEP, AND THEN

16     THERE'S -- WHATEVER HAPPENS IN THIS COURT CAN BE APPEALED TO

17     THE COURT OF APPEALS, WHICH IS THE SECOND STEP; AND THEN

18     WHATEVER HAPPENS IN THAT COURT CAN BE APPEALED TO THE SUPREME

19     COURT.

20             PROSPECTIVE JUROR:  YES.

21             THE COURT:  SO THERE IS THAT SEPARATION.  AND YOU

22     KNOW THAT ONE OF THE BIGGEST AND MOST IMPORTANT PARTS OF THE

23     JUSTICE SYSTEM IN A TRIAL COURT IS THE JURY BECAUSE THE JURY IS

24     THE FACT FINDER.

25             PROSPECTIVE JUROR:  YES.

1          THE COURT:  YOU UNDERSTAND THAT?

2          OKAY.  SO DO YOUR OVERALL VIEWS ABOUT THE COURT SYSTEM,

3     WITH THAT BRIEF EXPLANATION ABOUT HOW IMPORTANT THE JURY IS, IS

4     THAT SOMETHING THAT YOU THINK THAT YOU CAN DO, NOTWITHSTANDING

5     YOUR DISAPPOINTMENT OVERALL IN THE JUSTICE SYSTEM?

6          PROSPECTIVE JUROR:  YES, I BELIEVE IT IS.

7          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

8          ALL RIGHT.  HAVE YOU HAD ANY BUSINESS OR EMPLOYMENT

9     RELATIONSHIP WITH META?

10          PROSPECTIVE JUROR:  NO.

11          THE COURT:  HAVE YOU -- LET'S SEE.  HAVE YOU HAD ANY

12     BUSINESS OR EMPLOYMENT RELATIONSHIP WITH NSO OR Q CYBER?

13          PROSPECTIVE JUROR:  NO.

14          THE COURT:  HAVE YOU EVER OWNED STOCK IN ANY OF THESE

15     COMPANIES?

16          PROSPECTIVE JUROR:  NO.

17          THE COURT:  AND DO YOU HAVE AN OPINION ABOUT META OR

18     WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

19     IMPARTIAL TO THEM?

20          PROSPECTIVE JUROR:  YES.  I HAVE A VERY STRONG

21     OPINION AGAINST SOCIAL MEDIA AND FACEBOOK, AND I LOST A STUDENT

22     ONE YEAR TO SUICIDE BECAUSE OF WHAT WAS POSTED.

23          THE COURT:  LET'S SEE.  OKAY.  AND SO TELL ME HOW YOU

24     THINK THAT WOULD AFFECT YOU IN THIS KIND OF CASE.

25          PROSPECTIVE JUROR:  AS I SAT HERE TODAY, I THOUGHT,

1    WELL, I HAVE PROBLEMS WITH BOTH SIDES, SO I DON'T KNOW THAT I

2    COULD LET GO OF MY FEELINGS ABOUT FACEBOOK.  I DISCONTINUED MY

3    ACCOUNT FIVE YEARS AGO, AND I TRY TO ENCOURAGE PEOPLE DAILY TO

4    STAY OFF SOCIAL MEDIA.

5        SO I'M NOT SO SURE.

6            THE COURT:  OKAY.  BUT AS YOU INDICATED, YOU HAVE

7    SORT OF NEGATIVE FEELINGS ABOUT BOTH SIDES?

8            PROSPECTIVE JUROR:  NOT THEIR SIDE, BUT THEIR

9    GOVERNMENT AND NETANYAHU.

10           THE COURT:  OKAY.  THEIR GOVERNMENT.  OKAY.

11       OKAY.  SO HOW DOES THAT TRANSLATE?  COULD YOU BE EQUALLY

12    FAIR OR EQUALLY UNFAIR?

13           PROSPECTIVE JUROR:  I THINK I COULD BE EQUALLY

14    UNFAIR.

15           THE COURT:  EQUALLY UNFAIR.

16           PROSPECTIVE JUROR:  BUT TO BE TRUTHFUL, BECAUSE I DO

17    THESE PRAYER VIGILS FOR PEACE IN THE MIDDLE EAST, I HAVE GREAT

18    PROBLEM WITH NETANYAHU AND THE MILITARY AND THEIR AFFILIATION

19    WITH MR. T-R-U-M-P, AND IT'S -- AND THE GENOCIDE OF THE

20    PALESTINIANS.

21       SO I DON'T KNOW -- I DON'T THINK THAT WOULD INTERFERE

22    BECAUSE I HAVE NO PROBLEM WITH THE PEOPLE OF ISRAEL.

23       BUT I -- YEAH, I DON'T KNOW IF I COULD BE FAIR.

24           THE COURT:  TO THEM?

25           PROSPECTIVE JUROR:  I THINK I COULD BE FAIR TO THEM

```
 1          MORE THAN I COULD BE FAIR TO META.

 2                  THE COURT:  OKAY.

 3                  PROSPECTIVE JUROR:  I THINK I COULD LET THAT GO

 4          BECAUSE I DON'T THINK THAT'S INVOLVED.

 5                  THE COURT:  OKAY.  WELL, THE SOCIAL MEDIA PLATFORM

 6          ITSELF --

 7                  PROSPECTIVE JUROR:  IT'S INVOLVED.

 8                  THE COURT:  WELL, NOT REALLY.  THIS CASE IS JUST

 9          ABOUT DAMAGES.  IT'S NOT ABOUT THE --

10                  PROSPECTIVE JUROR:  BUT I CAN'T SAY THAT I WOULDN'T

11          LIKE TO HAVE INJURY TO THEM.  SO --

12                  THE COURT:  OKAY.  SO SITTING HERE NOW, YOU'D LIKE

13          THEM TO LOSE?

14                  PROSPECTIVE JUROR:  YES.

15                  THE COURT:  BUT ONCE YOU LEARNED ABOUT THE CASE,

16          MIGHT THAT VIEW CHANGE?

17                  PROSPECTIVE JUROR:  YES, I COULD BE FAIR.

18                  THE COURT:  YEAH, IF YOU WERE SEATED AS A JUROR, YOU

19          CAN EVALUATE THE EVIDENCE?

20                  PROSPECTIVE JUROR:  YES.

21                  THE COURT:  AND MAKE A DECISION?

22                  PROSPECTIVE JUROR:  YES.

23                  THE COURT:  AND EVEN IF IT REQUIRED YOU TO HOLD YOUR

24          NOSE, IF YOU, AS A JUROR, FOUND THAT FACEBOOK HAD PROVED ITS

25          CASE, COULD YOU RULE IN THEIR FAVOR?
```

```
1              PROSPECTIVE JUROR:  I THINK I COULD.

2              THE COURT:  OKAY.  AND THE SAME WOULD BE TRUE FOR THE

3      OTHER SIDE AS WELL; RIGHT?

4              PROSPECTIVE JUROR:  YES, YES.

5              THE COURT:  OKAY.  ALL RIGHT.

6          HAVING HEARD ALL THE QUESTIONS AND ANSWERS OF EVERYONE

7      ELSE, CAN YOU LET US KNOW, MS. DRESBACH, IS THERE ANY

8      ADDITIONAL INFORMATION ABOUT YOURSELF THAT YOU THINK YOU SHOULD

9      SHARE AT THIS TIME?

10             PROSPECTIVE JUROR:  I DON'T THINK SO.

11             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

12         OKAY.  AND GOOD MORNING, MS. LOW.

13             PROSPECTIVE JUROR:  HELLO.

14             THE COURT:  YOU INDICATED EARLIER SOMETHING ABOUT

15     YOUR BROTHER-IN-LAW.

16             PROSPECTIVE JUROR:  OH, YES.  YES, HE WORKS AT

17     DAVIS POLK.  I JUST WANTED TO SHARE THAT.  I DON'T KNOW IF IT'S

18     RELEVANT.

19             THE COURT:  RIGHT, AT DAVIS POLK.  BUT AS FAR AS YOU

20     KNOW, HE'S NOT INVOLVED IN THIS CASE AT ALL?

21             PROSPECTIVE JUROR:  NO, NO.  HE DOES M & A.

22             THE COURT:  OH, HE DOES M & A.

23         DO YOU THINK, THOUGH, THAT BECAUSE -- IT'S YOUR

24     BROTHER-IN-LAW; CORRECT?

25             PROSPECTIVE JUROR:  YES.
```

 1                THE COURT:  DO YOU THINK THAT BECAUSE OF HIS

 2    EMPLOYMENT THERE, THOUGH, WOULD YOU BE MORE DISPOSED TO FIND IN

 3    FAVOR OF A COMPANY, SUCH AS META, THAT'S REPRESENTED BY YOUR

 4    BROTHER-IN-LAW'S LAW FIRM?

 5                PROSPECTIVE JUROR:  NO, I DON'T THINK SO.

 6                THE COURT:  OKAY.  YOU ALSO INDICATED SOMETHING ABOUT

 7    RESTORATIVE JUSTICE AS OPPOSED TO IMPRISONMENT, BUT YOU

 8    UNDERSTAND THIS IS A CIVIL CASE AND THERE'S -- NO ONE IS GOING

 9    TO GO TO JAIL IN THIS CASE?  YOU UNDERSTAND THAT?

10                PROSPECTIVE JUROR:  YES, I DO.

11                THE COURT:  OKAY.  YOU ALSO INDICATED SOMETHING ABOUT

12    LAWYERS, THAT LAWYERS ARE IN THE PRACTICE -- IS THIS YOUR

13    ANSWER?  I GUESS SO.

14                PROSPECTIVE JUROR:  I HONESTLY DON'T RECALL WHAT I

15    WROTE.

16                THE COURT:  OKAY.  LET'S SEE IF I'M LOOKING AT THE

17    RIGHT ONE.

18          OH, I'M SORRY.  I'M LOOKING AT MS. DRESBACH'S.

19                PROSPECTIVE JUROR:  OKAY.

20                THE COURT:  YEAH, THAT WAS THE ONLY THING THAT YOU

21    BROUGHT UP WAS YOUR BROTHER-IN-LAW; RIGHT?

22                PROSPECTIVE JUROR:  YES.

23                THE COURT:  OKAY, GREAT.

24          DO YOU HAVE A -- HAVE YOU OR ANYONE CLOSE TO YOU EVER HAD

25    A BUSINESS RELATIONSHIP OR EMPLOYMENT RELATIONSHIP WITH META OR

1    WHATSAPP?

2              PROSPECTIVE JUROR:  NO.

3              THE COURT:  ALL RIGHT.  AND HAVE YOU OR ANYONE CLOSE

4    TO YOU EVER BEEN EMPLOYED WITH OR HAD A BUSINESS RELATIONSHIP

5    WITH NSO OR Q CYBER?

6              PROSPECTIVE JUROR:  NO.

7              THE COURT:  HAVE YOU EVER OWNED META OR FACEBOOK OR

8    WHATSAPP STOCK?

9              PROSPECTIVE JUROR:  I BELIEVE SO, BUT I DON'T THINK

10   THAT THAT WOULD MAKE ME SWAY ONE WAY OR THE OTHER.

11             THE COURT:  YOU BELIEVE THAT YOU HAVE OWNED IT IN THE

12   PAST, OR --

13             PROSPECTIVE JUROR:  CURRENTLY.

14             THE COURT:  AND DID YOU SELECT THE STOCK OR IS

15   THAT --

16             PROSPECTIVE JUROR:  NO, MY HUSBAND DID.

17             THE COURT:  IT'S IN A PORTFOLIO OF SOME SORT?

18             PROSPECTIVE JUROR:  CORRECT, YES.

19             THE COURT:  OKAY.  AND THAT'S SELECTED BY A FINANCIAL

20   ADVISOR, OR --

21             PROSPECTIVE JUROR:  MY HUSBAND.

22             THE COURT:  IT'S IN A FUND?

23             PROSPECTIVE JUROR:  YES.  YEAH.  I DID NOT HAVE A

24   DIRECT SAY TO DO IT OR ANYTHING LIKE THAT.

25             THE COURT:  OKAY.  AND WHAT ABOUT FOR NSO OR Q CYBER?

```
1        ANY FINANCIAL INTEREST IN THAT COMPANY?

2                 PROSPECTIVE JUROR:  NO.

3                 THE COURT:  DO YOU HAVE AN OPINION ABOUT META OR

4    FACEBOOK THAT WOULD MAKE IT DIFFICULT --

5                 PROSPECTIVE JUROR:  NO.

6                 THE COURT:  -- FOR YOU TO BE FAIR AND IMPARTIAL?

7                 PROSPECTIVE JUROR:  NO.

8                 THE COURT:  OKAY.  AND WHAT ABOUT WITH REGARD TO NSO

9    AND Q CYBER?

10                 PROSPECTIVE JUROR:  NO.

11                 THE COURT:  DO YOU HAVE ANY OPINIONS ABOUT

12    ISRAELI-BASED COMPANIES?

13                 PROSPECTIVE JUROR:  NO.

14                 THE COURT:  OR ISRAEL THAT MIGHT MAKE IT DIFFICULT

15    FOR YOU TO BE FAIR AND IMPARTIAL?

16                 PROSPECTIVE JUROR:  NO.

17                 THE COURT:  OKAY.  THANK YOU.

18          HAVING HEARD ALL THE QUESTIONS PUT TO EVERYONE ELSE AND

19    THEIR ANSWERS AS WELL, IS THERE ANY ADDITIONAL INFORMATION THAT

20    YOU THINK YOU SHOULD SHARE WITH US?

21                 PROSPECTIVE JUROR:  I UNDERSTAND THERE'S NO, LIKE,

22    IMMEDIATE DISMISSALS.  I JUST WANTED TO SHARE THAT I'M A

23    PEDIATRIC PHYSICAL -- OR PEDIATRIC OCCUPATIONAL THERAPIST, SO

24    FOR INFANTS AND CHILDREN WHO AREN'T ABLE TO EAT PROPERLY.  SO I

25    HAVE SOME MEDICAL PATIENTS ON MY CASE LOAD RIGHT NOW.  SO I
```

```
 1          JUST WANTED TO SHARE THAT.

 2               THE COURT:  OKAY.

 3          ALL RIGHT.  YOU CAN PASS THE MICROPHONE.  LET'S SEE, HOW

 4     MANY PEOPLE DO I -- OKAY.  I BELIEVE OUR JUROR, MS. NELSON, I

 5     KNOW THAT YOU INDICATED -- WELL, SINCE IT'S OUT IN THE OPEN,

 6     I'LL JUST -- I KNOW YOU INDICATED TO MS. COLLINS THAT YOU

 7     NEEDED A BREAK AT 12:00.

 8               PROSPECTIVE JUROR:  YES.

 9               THE COURT:  YOU KNOW, I'VE GIVEN IT SOME THOUGHT AND

10     I'M GOING TO EXCUSE YOU AT THIS TIME.  I THINK IT WOULD BE TOO

11     HARD, IN OUR TRUNCATED FOUR AND A HALF HOUR DAY, TO BE ABLE TO

12     BREAK WHEN YOU NEED TO BREAK, AND I UNDERSTAND THE URGENCY --

13               PROSPECTIVE JUROR:  YES.

14               THE COURT:  -- THAT THAT PRESENTS TO YOU.  SO I'M

15     GOING TO EXCUSE YOU.

16               PROSPECTIVE JUROR:  OKAY.

17               THE COURT:  PLEASE JUST CHECK IN WITH THE JURY OFFICE

18     AND YOU'RE FREE TO GO.

19               PROSPECTIVE JUROR:  RIGHT NOW?

20               THE COURT:  YES.

21               PROSPECTIVE JUROR:  THANK YOU SO MUCH.

22               THE COURT:  OKAY.  GOING ON WITH MR. MCINERNY.

23               PROSPECTIVE JUROR:  HELLO.

24               THE COURT:  GOOD MORNING.  AND WHAT KIND OF

25     ENVIRONMENTAL CONSULTANT DO YOU DO, MR. MCINERNY?
```

```
 1                    PROSPECTIVE JUROR:  I DO FACILITATION AND MEDIATION

 2        IN NATURE RESOURCE CASES.

 3                    THE COURT:  OH.  IN LITIGATION?

 4                    PROSPECTIVE JUROR:  NO LITIGATION.  WE TRY TO AVOID

 5        THAT.

 6                    THE COURT:  OKAY.

 7                    PROSPECTIVE JUROR:  PRE-LITIGATION, IDEALLY, DEALING

 8        WITH ENDANGERED SPECIES AND CLEAN WATER ACT RELATED RULES.

 9                    THE COURT:  OKAY.  THAT'S GREAT.  AND WE GET A LOT OF

10        THOSE CASES IN OUR COURT, AS I'M SURE YOU KNOW.

11             OKAY.  YOU INDICATED ON YOUR QUESTIONNAIRE THAT YOU DIDN'T

12        THINK AWARDS OF MONEY IN CIVIL CASES SHOULD BE INORDINATELY

13        HIGH.

14             YOU UNDERSTAND THAT THIS CASE IS ABOUT HOW MUCH SHOULD

15        BE -- HOW MUCH, IF ANYTHING, SHOULD BE AWARDED IN THE CASE, AND

16        YOU UNDERSTAND THAT IT'S REALLY -- IT'S GOING TO BE THE JURY'S

17        CALL BASED UPON WHAT THE EVIDENCE SHOWS?

18                    PROSPECTIVE JUROR:  TOTALLY UNDERSTAND.

19                    THE COURT:  OKAY.  AND IS THAT SOMETHING THAT YOU

20        THINK THAT YOU COULD DO?

21                    PROSPECTIVE JUROR:  YES.

22                    THE COURT:  OKAY.  AND YOU INDICATED THAT YOU'RE

23        HIGHLY DUBIOUS OF THE TRIAL COURT SYSTEM AND THE POWER OF THE

24        JUDICIARY?

25                    PROSPECTIVE JUROR:  YEAH, UNDER THE CURRENT
```

```
 1      ADMINISTRATION, THAT APPEARS TO BE THE SITUATION, YES.

 2              THE COURT:  RIGHT.  WELL, WE KNOW WE'RE ALL GOING

 3      THROUGH THIS TOGETHER AND WE DON'T KNOW WHERE IT'S HEADED.

 4      OKAY.

 5          ALL RIGHT.  BUT THE JURY -- THE JURY SYSTEM IS THE

 6      HALLMARK OF THE TRIAL COURT SYSTEM.

 7              PROSPECTIVE JUROR:  AGREED, AND I AM HERE FOR THAT.

 8              THE COURT:  OKAY.  SO YOU THINK THAT YOU COULD

 9      FULFILL YOUR RESPONSIBILITIES AS A JUROR?

10              PROSPECTIVE JUROR:  YES.

11              THE COURT:  NOTWITHSTANDING ALL THE KIND OF CHAOS AND

12      OTHER THINGS THAT ARE CIRCLING AROUND THE JUDICIARY.

13              PROSPECTIVE JUROR:  UNDERSTOOD.

14              THE COURT:  GREAT.  THANK YOU.

15          DO YOU HAVE ANY FORMER BUSINESS OR EMPLOYMENT RELATIONSHIP

16      --

17              PROSPECTIVE JUROR:  NO.

18              THE COURT:  -- WITH ANY OF THE COMPANIES HERE?

19              PROSPECTIVE JUROR:  NO.

20              THE COURT:  DO YOU OWN STOCK IN ANY OF THE COMPANIES?

21              PROSPECTIVE JUROR:  NO, I DO NOT.

22              THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINION ABOUT

23      META OR WHATSAPP --

24              PROSPECTIVE JUROR:  NOT THAT WOULD APPLY IN THIS CASE

25      OR SETTING, NO.
```

```
1                    THE COURT:  AND WHAT ABOUT NSO OR Q CYBER?

2                    PROSPECTIVE JUROR:  NEVER HEARD OF THEM.

3                    THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

4        ISRAELI-BASED COMPANIES OR --

5                    PROSPECTIVE JUROR:  (SHAKES HEAD FROM SIDE TO SIDE.)

6                    THE COURT:  -- ISRAEL THAT MIGHT INFLUENCE OR IMPACT

7        YOU?

8                    PROSPECTIVE JUROR:  NOT THAT WOULD INFLUENCE THIS

9        CASE AT ALL.

10                    THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

11                ANYTHING ELSE YOU CAN THINK OF ABOUT YOURSELF TO SHARE?

12                    PROSPECTIVE JUROR:  NO, NOT THAT'S RELEVANT HERE.

13                    THE COURT:  OKAY.  THANK YOU.

14                AND GOOD MORNING, MR. HECKMAN.

15                    PROSPECTIVE JUROR:  HECKMAN.

16                    THE COURT:  HECKMAN, OKAY.

17                LET'S SEE.  EVP, WHAT IS THAT?

18                    PROSPECTIVE JUROR:  EXECUTIVE VICE-PRESIDENT.

19                    THE COURT:  OKAY.  EXECUTIVE VICE-PRESIDENT.

20                AND THIS IS FOR AN INSURANCE COMPANY; IS THAT RIGHT?

21                    PROSPECTIVE JUROR:  AN INSURANCE BROKER.

22                    THE COURT:  AN INSURANCE BROKER?

23                    PROSPECTIVE JUROR:  A BROKER.

24                    THE COURT:  ALL RIGHT.  AND YOUR SPOUSE IS PRESIDENT

25        OF WHAT?  SAME COMPANY?
```

```
1                    PROSPECTIVE JUROR:  NO.  A SEPARATE COMPANY, A VISUAL

2         COMPANY, AUDIO/VISUAL.

3                    THE COURT:  AUDIO/VISUAL.  OKAY.

4              ALL RIGHT.  AND YOU SAY THAT YOU SELL CYBER INSURANCE

5         POLICIES.  SO YOU'RE SOMEWHAT FAMILIAR WITH CYBERSECURITY?

6                    PROSPECTIVE JUROR:  YEAH.

7                    THE COURT:  OKAY.  JUST TELL US ABOUT THAT.

8                    PROSPECTIVE JUROR:  MANY OF MY CLIENTS BUY CYBER

9         INSURANCE.

10                    THE COURT:  WHAT IS CYBER INSURANCE?

11                    PROSPECTIVE JUROR:  IT COVERS CYBER LOSSES, SO CYBER

12         CRIMES.

13                    THE COURT:  OKAY.  ALL RIGHT.

14              ALL RIGHT.  DO YOU HAVE ANY FAMILIARITY WITH THE ACTUAL --

15                    PROSPECTIVE JUROR:  NO.

16                    THE COURT:  -- WORKING -- THE TECHNICAL WORKING OF

17         ANY CYBERSECURITY SYSTEMS?

18                    PROSPECTIVE JUROR:  I MEAN, A LITTLE.  BUT NOTHING

19         THAT WOULD SWAY MY DECISION.

20                    THE COURT:  OKAY.  SO YOU'VE HEARD ME DESCRIBE WHAT

21         THIS CASE IS ABOUT.

22                    PROSPECTIVE JUROR:  UM-HUM.

23                    THE COURT:  DO YOU HAVE ANY OPINION ABOUT THIS KIND

24         OF LITIGATION?

25                    PROSPECTIVE JUROR:  NO.
```

```
 1                    THE COURT:  OKAY.  THE -- I'M ASSUMING THE INSURANCE
 2       COVERS THE DAMAGES FROM THE LOSS?
 3                    PROSPECTIVE JUROR:  IT CAN, THIRD PARTY AND FIRST
 4       PARTIES DAMAGES, YEAH.
 5                    THE COURT:  OKAY.  THIRD PARTY AND FIRST PARTY.
 6       OKAY.
 7              DOES IT COVER LITIGATION RELATED --
 8                    PROSPECTIVE JUROR:  YES.
 9                    THE COURT:  -- TO THE --
10                    PROSPECTIVE JUROR:  UM-HUM.  IT CAN.
11                    THE COURT:  IT CAN.  OKAY.  YEAH, I GUESS IT ALL
12       DEPENDS ON THE AMOUNT AND TYPE OF COVERAGE PURCHASED; RIGHT?
13                    PROSPECTIVE JUROR:  YES.
14                    THE COURT:  OKAY.  DOES YOUR COMPANY SELL OTHER KINDS
15       OF INSURANCE OTHER THAN CYBER INSURANCE?
16                    PROSPECTIVE JUROR:  YES.  YEAH.
17                    THE COURT:  HOW BIG A PART IS THE CYBER INSURANCE
18       PART OF WHAT YOU SELL?
19                    PROSPECTIVE JUROR:  I MEAN, WE RECOMMEND IT TO EVERY
20       CLIENT.
21                    THE COURT:  OKAY.  ALL RIGHT.  DO YOU HAVE ANY
22       BUSINESS OR FINANCIAL INTEREST IN FACEBOOK?
23                    PROSPECTIVE JUROR:  JUST STOCK IN INDEX FUNDS.
24                    THE COURT:  IN INDEX FUNDS?
25                    PROSPECTIVE JUROR:  UM-HUM.
```

1           THE COURT:  OKAY.  AND HOW ABOUT ANY FINANCIAL

2     INTEREST IN OR EMPLOYMENT RELATIONSHIP WITH THE DEFENDANTS?

3           PROSPECTIVE JUROR:  NO.

4           THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT THE

5     COMPANIES ON EITHER SIDE THAT COULD MAKE IT DIFFICULT FOR YOU

6     TO BE FAIR AND IMPARTIAL?

7           PROSPECTIVE JUROR:  NO.

8           THE COURT:  NO.  AND DO YOU HAVE ANY OPINIONS ABOUT

9     ISRAELI-BASED --

10          PROSPECTIVE JUROR:  NO.

11          THE COURT:  -- COMPANIES OR ISRAEL THAT COULD --

12          PROSPECTIVE JUROR:  NO.

13          THE COURT:  OKAY.  ALL RIGHT.

14        HAVING HEARD ALL THE QUESTIONS AND ANSWERS PREVIOUSLY

15    GIVEN, IS THERE ANY ADDITIONAL INFORMATION THAT YOU NEED TO

16    SHARE WITH US?

17          PROSPECTIVE JUROR:  NO.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19        OKAY.  GOOD MORNING, MS. PINGOL.

20          PROSPECTIVE JUROR:  YES, MA'AM.

21          THE COURT:  OKAY.  YOU'VE INDICATED YOU THAT YOU HAVE

22    SOME DIFFICULTY BECAUSE OF YOUR POSITION AND SOME FAMILY

23    RESPONSIBILITY.

24          PROSPECTIVE JUROR:  THAT'S CORRECT, YOUR HONOR.

25          THE COURT:  OKAY.  CAN YOU EXPLAIN WHAT YOUR HARDSHIP

```
1    IS?

2               PROSPECTIVE JUROR:  I'M A REGISTERED NURSE WORKING AT

3    THE DEPARTMENT OF V.A. BASED IN MENLO PARK AT NIGHT, AND THEN

4    WHEN I COME HOME IN THE MORNING, I TAKE CARE OF MY TWO,

5    FOUR-YEAR-OLD SPECIAL NEED KIDS, AND ON SOME OCCASIONS, I ALSO

6    TAKE CARE OF MY DAUGHTER'S SON, WHO IS A THREE-YEAR-OLD.

7               THE COURT:  OKAY.  AND YOU DO THAT EVERY DAY?

8               PROSPECTIVE JUROR:  EVERY DAY, SIX DAYS A WEEK.

9               THE COURT:  OKAY.  ALL RIGHT.  AND THERE -- THERE'S

10   NO ONE ELSE IN THE HOME?

11              PROSPECTIVE JUROR:  MY HUSBAND, WHO IS RETIRED.

12              THE COURT:  ALL RIGHT.  AND HE COULDN'T COVER FOR

13   YOU?

14              PROSPECTIVE JUROR:  OH.  THERE ARE TWO KIDS, THEY ARE

15   SPECIAL NEEDS KIDS.  IT'S HARD TO -- WE CAN'T HAVE ONE

16   CAREGIVER FOR TWO KIDS.

17              THE COURT:  SO HE PARTICIPATES NOW?

18              PROSPECTIVE JUROR:  MY, MY SON CALLED OFF WORK TODAY

19   TO COVER ME.

20              THE COURT:  OKAY.  YOU SAID -- I'M SORRY, I'M NOT

21   UNDERSTANDING.

22        YOU SAID -- THERE ARE TWO KIDS?

23              PROSPECTIVE JUROR:  YES, MA'AM.

24              THE COURT:  AND YOU NEED TWO CAREGIVERS AT ALL TIMES?

25              PROSPECTIVE JUROR:  YES, MA'AM.
```

```
 1              THE COURT:  AND WHO'S THE OTHER CAREGIVER?  YOUR

 2    HUSBAND?

 3              PROSPECTIVE JUROR:  MY HUSBAND AND I.

 4              THE COURT:  YOUR HUSBAND AND YOU DO IT TOGETHER?

 5              PROSPECTIVE JUROR:  YES, MA'AM.

 6              THE COURT:  OH, OKAY.  AND WHAT'S THE SCHEDULE?

 7              PROSPECTIVE JUROR:  8:00 A.M. TO 5:00 P.M.

 8              THE COURT:  OKAY.  ALL RIGHT.  AND YOU UNDERSTAND

 9    THAT OUR TRIAL DAY ENDS AT 1:30?

10              PROSPECTIVE JUROR:  YES, MA'AM.

11              THE COURT:  OKAY.  AND WOULDN'T THAT BE OF SOME

12    ASSISTANCE?

13              PROSPECTIVE JUROR:  IT'S -- IT WOULD BE VERY

14    DIFFICULT, MA'AM.

15              THE COURT:  OKAY.

16              PROSPECTIVE JUROR:  I WORK AT NIGHT SHIFT, A NIGHT

17    SHIFT, MA'AM.  SO WHEN I GET HOME, I JUST TAKE A SHOWER AND GO

18    PICK THEM UP FROM SCHOOL BECAUSE MY SON AND MY HUSBAND TAKE

19    THEM TO SCHOOL FROM 8:00 TO 11:00.  SO WHEN I GET HOME AT

20    9:00 O'CLOCK, I JUST SHOWER AND GO WITH MY HUSBAND TO GO PICK

21    THEM UP BECAUSE MY SON GOES TO WORK ALREADY AT 9:00.

22              THE COURT:  UM-HUM.  OKAY.  YEAH.

23         OKAY.  NOT AN AUTOMATIC EXCUSAL.

24              PROSPECTIVE JUROR:  I UNDERSTAND.

25              THE COURT:  EVERY -- LOTS OF PEOPLE HAVE CHILD CARE
```

1    RESPONSIBILITIES THAT THEY HAVE TO MAKE OTHER ARRANGEMENTS FOR.

2         OKAY.  WE'LL TAKE THAT INTO CONSIDERATION, HOWEVER.

3              PROSPECTIVE JUROR:  I REALLY APPRECIATE IT.

4              THE COURT:  OKAY.

5         OKAY.  HAVE YOU HAD ANY BUSINESS OR EMPLOYMENT

6    RELATIONSHIP WITH META?

7              PROSPECTIVE JUROR:  THIS IS VERY EMBARRASSING, MA'AM.

8    I'M NOT REALLY INTO SOCIAL THINGS.  I DON'T EVEN HAVE A

9    FACEBOOK ACCOUNT AT ALL.  I -- THERE'S NO --

10             THE COURT:  THERE'S NO REASON TO BE EMBARRASSED.  I

11   DON'T HAVE ONE, EITHER.

12             PROSPECTIVE JUROR:  THERE'S -- THERE'S SO MANY

13   FOREIGN WORDS THAT I'M HEARING RIGHT NOW, LIKE WHATSAPP, YOU

14   KNOW.  I DON'T EVEN KNOW ANY OF THESE THINGS.  THERE'S SO MANY

15   TERMS THAT I DON'T UNDERSTAND IN THIS.

16             THE COURT:  OKAY.  DO YOU -- BUT YOU SPEAK PERFECTLY

17   FINE ENGLISH, YES?

18             PROSPECTIVE JUROR:  BECAUSE I'M -- I'M A REGISTERED

19   NURSE.  ENGLISH IS A LANGUAGE IN MY COUNTRY.

20             THE COURT:  OKAY.  SO -- SO YOUR DIFFICULTY IS YOUR

21   LACK OF FAMILIARITY WITH THE TERMS, NOT THAT YOU DON'T

22   UNDERSTAND THE ENGLISH; RIGHT?

23             PROSPECTIVE JUROR:  CORRECT.  BECAUSE I DON'T PAY

24   ATTENTION TO IT.

25             THE COURT:  OKAY.  IF YOU'RE SELECTED AS A JUROR,

154

```
1    THOUGH, IT WILL BE UP TO THE LAWYERS TO MAKE SURE THAT YOU

2    UNDERSTAND WHAT THEY'RE, WHAT THEY'RE SAYING.

3            PROSPECTIVE JUROR:  YES.

4            THE COURT:  ALL RIGHT.  AS LONG AS YOU'RE -- I MEAN,

5    AS LONG AS YOU'RE AN ENGLISH SPEAKER WITH A CERTAIN LEVEL OF

6    COMPREHENSION, THERE -- THAT'S NO BASIS FOR YOU NOT TO BE ON

7    THE JURY.

8            PROSPECTIVE JUROR:  THAT'S CORRECT.

9            THE COURT:  OKAY.  SO YOU DON'T HAVE ANY SORT OF

10   RELATIONSHIP, FINANCIAL OR OTHERWISE, WITH META OR WHATSAPP;

11   CORRECT?

12           PROSPECTIVE JUROR:  I DO NOT KNOW WITH MY PORTFOLIO,

13   YOUR HONOR.

14           THE COURT:  OKAY.  SO YOU MIGHT?

15           PROSPECTIVE JUROR:  I MIGHT.

16           THE COURT:  BUT YOU DON'T KNOW.

17           PROSPECTIVE JUROR:  I DON'T KNOW.

18           THE COURT:  OKAY.  AND WHAT ABOUT NSO OR Q CYBER?  DO

19   YOU HAVE ANY FINANCIAL OR EMPLOYMENT RELATIONSHIP?

20           PROSPECTIVE JUROR:  I HAVE NO IDEA.

21           THE COURT:  NO IDEA?  OKAY.

22        AND HAVE YOU EVER -- WELL, DO YOU HAVE ANY OPINION ABOUT

23   THESE COMPANIES, ANY OF THEM?

24           PROSPECTIVE JUROR:  OH, GOSH.  I HAVE NO IDEA, MA'AM.

25           THE COURT:  YOU -- OKAY.  YOU DON'T KNOW WHAT THEY
```

1    DO?

2              PROSPECTIVE JUROR:  ALL I KNOW IS FACEBOOK SHARES

3    INFORMATION ABOUT, LIKE, JUST MY FRIENDS.  THEY'RE ALL ON

4    FACEBOOK TAKING PICTURES WHEN THEY GO TO TRIPS OR BUSINESS,

5    THEY JUST ADVERTISE THEIR BUSINESS THING.

6              THE COURT:  OKAY.

7              PROSPECTIVE JUROR:  THAT'S ALL I KNOW.

8              THE COURT:  BUT YOU DON'T USE THE SERVICES PROVIDED

9    BY FACEBOOK?

10             PROSPECTIVE JUROR:  NOT AT ALL.

11             THE COURT:  OKAY.  SO DOES THAT MEAN YOU DON'T HAVE

12   ANY OPINION ABOUT FACEBOOK OR WHATSAPP THAT COULD IMPACT YOUR

13   ABILITY TO BE FAIR AND IMPARTIAL?

14             PROSPECTIVE JUROR:  I DON'T EVEN KNOW -- THIS IS MY

15   FIRST TIME TO HEAR WHATSAPP, YOUR HONOR.

16             THE COURT:  OKAY.  IS THIS YOUR FIRST TIME TO HEAR

17   ABOUT NSO AND Q CYBER AS COMPANIES?

18             PROSPECTIVE JUROR:  ALL I HEARD IS A CYBER ATTACK OR

19   SOMETHING LIKE THAT.

20             THE COURT:  OKAY.  BUT YOU DON'T KNOW ANYTHING --

21             PROSPECTIVE JUROR:  NO, I DON'T.

22             THE COURT:  YOU HAVE NO OPINION ABOUT THAT COMPANY,

23   EITHER?

24             PROSPECTIVE JUROR:  I DON'T.  I DON'T, YOUR HONOR.

25             THE COURT:  OKAY.  DO YOU HAVE ANY OPINION ABOUT

1    COMPANIES THAT ARE BASED IN ISRAEL?

2            PROSPECTIVE JUROR:  I DON'T.

3            THE COURT:  NO?

4            PROSPECTIVE JUROR:  NO, I DON'T.

5            THE COURT:  OKAY.  OTHER THAN THE HARDSHIP THAT YOU

6    DESCRIBED, IS THERE ANY REASON WHY YOU SHOULD NOT BE SEATED AS

7    A JUROR?

8            PROSPECTIVE JUROR:  IT -- IT ALL CONCERNS MY TWO,

9    FOUR-YEAR-OLD SPECIAL NEED KIDS, MY GRAND KIDS.

10            THE COURT:  YEAH.  OTHER THAN THAT?

11            PROSPECTIVE JUROR:  IT'S SO HARD FOR ME TO COMMUTE.

12    MY HUSBAND AND I HAVE TO COME HERE TO -- SO THAT I WON'T GET

13    LOST.  MY STRESS IS SO HIGH, I'M INTO -- I'M JUST AFRAID OF

14    EVERYTHING.

15            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU, MS. PINGOL.

16            PROSPECTIVE JUROR:  THANK YOU.

17            THE COURT:  WOULD YOU PASS THE MICROPHONE.

18        AND WE ARE NOW ON MR. BISH?

19            PROSPECTIVE JUROR:  ANTHONY BISH.

20            THE COURT:  ANTHONY BISH.

21        GOOD MORNING.

22            PROSPECTIVE JUROR:  GOOD MORNING, YOUR HONOR.

23            THE COURT:  AND YOU -- I SHOULD SAY PROFESSOR BISH,

24    GOOD MORNING.

25            PROSPECTIVE JUROR:  THANK YOU.

```
1              THE COURT:  AND YOU SERVED ON A JURY IN SONOMA

2       COUNTY, I SEE.

3              PROSPECTIVE JUROR:  I DID.

4              THE COURT:  ONCE.  AND THAT WASN'T THAT LONG AGO.

5              PROSPECTIVE JUROR:  2021.  IT WAS THE FIRST CASE

6       AFTER COVID THAT ACTUALLY WENT.

7              THE COURT:  REALLY?  OKAY.

8           IS THERE ANYTHING ABOUT YOUR PRIOR EXPERIENCE THAT WOULD

9       MAKE IT DIFFICULT FOR YOU TO BE A JUROR AGAIN?

10             PROSPECTIVE JUROR:  NO.

11             THE COURT:  OKAY.  YOU UNDERSTAND THE DIFFERENCES?

12      THIS IS A CIVIL CASE AND NOT A CRIMINAL CASE?

13             PROSPECTIVE JUROR:  SO WAS THAT ONE.

14             THE COURT:  THAT ONE WAS, TOO?  OKAY.  I DIDN'T SEE

15       THAT.

16          OKAY.  AND THE -- OKAY.  IS THERE ANYTHING ABOUT THAT

17      PRIOR EXPERIENCE THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE A

18      JUROR AGAIN?

19             PROSPECTIVE JUROR:  NO, YOUR HONOR.

20             THE COURT:  NO?  OKAY.

21          AND YOU'VE HEARD ALL THE OTHER QUESTIONS.  HAVE YOU HAD

22      ANY KIND OF BUSINESS RELATIONSHIP OR EMPLOYMENT RELATIONSHIP

23      WITH META?

24             PROSPECTIVE JUROR:  NO.

25             THE COURT:  DO YOU -- HAVE YOU HAD ANY SORT OF
```

```
 1          BUSINESS OR EMPLOYMENT RELATIONSHIP WITH NSO?

 2                    PROSPECTIVE JUROR:  NO.

 3                    THE COURT:  HAVE YOU -- DO YOU OWN STOCK IN ANY OF

 4          THE COMPANIES?

 5                    PROSPECTIVE JUROR:  NO.

 6                    THE COURT:  AND DO YOU HAVE ANY OPINION ABOUT THE

 7          PLAINTIFFS' COMPANIES THAT WOULD MAKE IT DIFFICULT FOR YOU TO

 8          BE IMPARTIAL TO THEIR INTERESTS?

 9                    PROSPECTIVE JUROR:  WELL, IT'S A VERY HOT TOPIC IN MY

10          FAMILY DINNER.

11                    THE COURT:  WHAT, SOCIAL MEDIA?

12                    PROSPECTIVE JUROR:  SOCIAL MEDIA.

13                    THE COURT:  OKAY.

14                    THE WITNESS:  ISRAELI, GAZA.

15                    THE COURT:  RIGHT.  I GUESS THERE ARE TWO REALLY HOT

16          BUTTON ISSUES IMPLICATED IN THIS, IN THIS CASE.

17              BUT THE QUESTION IS, DO YOU HAVE ANY OPINIONS ABOUT EITHER

18          OF THOSE ISSUES --

19                    PROSPECTIVE JUROR:  YES.

20                    THE COURT:  -- THAT WOULD MAKE IT DIFFICULT FOR YOU

21          TO BE FAIR AND IMPARTIAL TO BOTH SIDES?

22                    PROSPECTIVE JUROR:  YES.

23                    THE COURT:  OKAY.  TELL US WHAT THOSE ARE.

24                    PROSPECTIVE JUROR:  I DON'T KNOW THAT I WOULD BE

25          HAPPY WITH GIVING TO FACEBOOK AN AWARD THAT'S HIGH.  AND IF I
```

1    FOUND OUT THAT THE COMPANY WAS SOMEHOW INVOLVED IN THE

2    MILITARY, I WOULD HAVE PREJUDICE AGAINST THAT.

3              THE COURT:  MEANING FACEBOOK OR THE DEFENDANT?

4              PROSPECTIVE JUROR:  FACEBOOK FOR THE PLAINTIFF, AND

5    THE DEFENDANT.

6              THE COURT:  OKAY.  SO YOU SAY THAT YOU WOULD HAVE

7    DIFFICULTY GIVING A LARGE AWARD TO FACEBOOK?

8              PROSPECTIVE JUROR:  YES.

9              THE COURT:  OKAY.  YOU UNDERSTAND THAT THEY HAVE TO

10    PROVE WHETHER OR NOT THEY'RE ENTITLED TO AN AWARD?

11              PROSPECTIVE JUROR:  YES, BUT THEY'RE SUCH A LARGE

12    COMPANY, THE AWARD MIGHT BE ONE DOLLAR.

13              THE COURT:  COULD BE.  COULD BE.

14         SO YOU QUALIFIED IT, THOUGH.  YOU'D HAVE A HARD TIME

15    GIVING A LARGE AWARD.

16              PROSPECTIVE JUROR:  THAT IS CORRECT.

17              THE COURT:  WOULD YOU HAVE A HARD TIME GIVING A SMALL

18    AWARD?

19              PROSPECTIVE JUROR:  NOT NECESSARILY.

20              THE COURT:  OKAY.  IF THEY PROVED THEY WERE ENTITLED

21    TO AN AWARD LARGER THAN YOU THINK, SITTING HERE NOW, COULD YOU

22    EVALUATE THE EVIDENCE AND DETERMINE WHETHER OR NOT YOU AGREE

23    WITH THEM OR NOT?

24              PROSPECTIVE JUROR:  YES.

25              THE COURT:  OKAY.  AND COULD YOU MAKE THE AWARD

1    LARGER THAN YOU THINK IT SHOULD BE TODAY, SINCE YOU DON'T KNOW

2    ANYTHING ABOUT THE CASE, ONCE YOU LEARN ABOUT THE CASE?

3            PROSPECTIVE JUROR:  THAT'S THE PREJUDICE.

4            THE COURT:  OKAY.  SO YOU DO HAVE THAT PREJUDICE.

5    WHAT I'M TRYING TO ASCERTAIN IS WHETHER OR NOT YOU COULD SET

6    ASIDE THAT PREJUDICE.  COULD YOU BE PERSUADED BY THE EVIDENCE

7    THAT APPEARS HERE IN COURT?

8            PROSPECTIVE JUROR:  UNTIL I SEE IT, I DON'T KNOW HOW

9    TO ANSWER THAT QUESTION.

10           THE COURT:  YEAH, EXACTLY.  SO HOW WOULD YOU ANSWER

11   THE QUESTION THAT YOU COULD NOT GIVE A LARGE AWARD, BUT YOU

12   COULD GIVE A SMALL AWARD?

13           PROSPECTIVE JUROR:  I DID NOT SAY THAT.  WHAT I SAID

14   IS I'M PREJUDICED AGAINST.

15           THE COURT:  YOU'RE PREJUDICED, OKAY.

16       WHAT I'M TRYING TO FIND OUT IS NOTWITHSTANDING THAT YOU

17   HAVE THIS BIAS AGAINST FACEBOOK AS A SOCIAL MEDIA COMPANY,

18   WHETHER OR NOT YOU COULD AWARD DAMAGES IF, IN THIS COURTROOM,

19   THEY PROVE THEY'RE ENTITLED TO THEM?

20           PROSPECTIVE JUROR:  UNLIKELY.

21           THE COURT:  HUH.  WHY IS THAT?

22           PROSPECTIVE JUROR:  I HAVE A PREJUDICE AGAINST WHAT

23   FACEBOOK IS AND STANDS FOR.

24           THE COURT:  ALL RIGHT.  AND THAT MEANS THAT YOU'RE --

25   YOU DON'T THINK YOU'RE AMENABLE TO BEING PERSUADED BY THE

```
 1        ACTUAL PROOF THAT'S PUT ON IN COURT?

 2              PROSPECTIVE JUROR:  BUT IF I AGREED TO ONE DOLLAR, I

 3        CERTAINLY COULD AGREE WITH THAT.  IT'S THE AMOUNT I'M TALKING

 4        ABOUT.

 5              THE COURT:  OKAY.  BUT WE DON'T -- WON'T KNOW THE

 6        AMOUNT UNTIL AFTER THERE'S PROOF.  MAYBE --

 7              PROSPECTIVE JUROR:  I BELIEVE THAT THE JURY HAS A

 8        RIGHT TO AWARD WHAT THEY AWARD.  UNLESS YOU'RE GOING TO TELL US

 9        IT HAS TO BE A CERTAIN LEVEL.

10              THE COURT:  RIGHT.  NO, NO.

11          IF THE JURY GETS TO DETERMINE WHETHER TO AWARD DAMAGES AND

12        HOW MUCH, IS THAT SOMETHING THAT YOU THINK YOU COULD DO,

13        NOTWITHSTANDING YOUR BIAS?  BUT IT'S A JURY QUESTION.

14              PROSPECTIVE JUROR:  YES.  AND I'M SAYING TO YOU MY

15        FEAR IS THE PREJUDICE I HAVE IN GIVING A LARGE AMOUNT, NOT A

16        SMALL AMOUNT.

17              THE COURT:  OKAY.  SO YOU'RE SAYING, CORRECT ME IF

18        I'M WRONG, YOU'RE SAYING THAT IF YOU WERE SELECTED TO SIT ON

19        THE JURY, YOU WOULD BE PREDISPOSED TO GRANTING A SMALL AMOUNT,

20        IRRESPECTIVE OF WHAT THE EVIDENCE SHOWED?

21              PROSPECTIVE JUROR:  YES, I GUESS THAT'S THE BEST WAY

22        I COULD ANSWER THAT QUESTION.

23              THE COURT:  OKAY.  I THINK I'M GETTING IT.

24          OKAY.  NOW, WITH REGARD TO -- DO YOU HAVE ANY OPINIONS

25        ABOUT NSO AND Q CYBER, WHO -- THAT MIGHT AFFECT YOUR ABILITY TO
```

1    BE FAIR AND IMPARTIAL TO THEM?

2              PROSPECTIVE JUROR:  DON'T KNOW THOSE COMPANIES.

3              THE COURT:  OKAY.  DO YOU HAVE ANY OPINIONS ABOUT

4    ISRAELI-BASED COMPANIES GENERALLY THAT MIGHT IMPACT, OR ISRAEL,

5    THAT MIGHT IMPACT YOUR ABILITY TO BE FAIR AND IMPARTIAL?

6              PROSPECTIVE JUROR:  YES.  I FIND THAT AT SONOMA

7    STATE, WE HAVE BEEN INSTITUTING WHAT'S CALLED TIME, PLACE,

8    MANNER, AND IT'S BASICALLY A WAY TO SHUT DOWN THE STUDENTS'

9    ABILITY TO VOCALIZE THEIR OPINIONS.  AND I FIND THAT AS THOUGH

10   ISRAEL DOESN'T NECESSARILY LISTEN TO WHAT AMERICA DOES, AND

11   THAT'S THEIR PREROGATIVE.

12        I DO FIND THAT I WISH THEY WOULD.

13             THE COURT:  UM-HUM.  OKAY.

14        NOW, WHAT DOES THAT MEAN IN TERMS OF THIS CASE AND WHETHER

15   OR NOT YOU COULD BE FAIR TO THE DEFENDANT?

16             PROSPECTIVE JUROR:  WELL, I WOULD DO MY BEST.  I

17   DON'T KNOW THAT I CAN GIVE YOU MORE THAN THAT AT THIS POINT.

18             THE COURT:  OKAY.  ALL RIGHT.

19        CAN YOU THINK OF ANY OTHER INFORMATION ABOUT YOURSELF,

20   PROFESSOR, THAT YOU THINK WE SHOULD KNOW?

21             PROSPECTIVE JUROR:  WELL, I WAS JUST LAID OFF, SO

22    LIFE IS WHAT IT IS.

23             THE COURT:  YEAH.  ALL RIGHT.

24        WELL, I'M SORRY TO HEAR THAT.  I'M SURE YOU'RE A VERY GOOD

25    PROFESSOR.

```
1              THANK YOU.

2              PASS THE MIC.

3              OKAY.  HOW MANY MORE PEOPLE DO WE HAVE?  RAISE YOUR HAND

4      IF YOU HAVEN'T BEEN QUESTIONED.

5                   THE CLERK:  FIVE MORE.

6                   THE COURT:  WE HAVE FIVE MORE?

7                   THE CLERK:  YES.

8                   THE COURT:  OKAY.  I THINK I'M GOING TO DO THEM ALL.

9              ALL RIGHT.  THIS IS A LARGER GROUP THAN WE USUALLY GET,

10     BUT I'D LIKE EVERYONE TO PARTICIPATE, SO WE'LL FINISH THESE

11     FIVE BEFORE WE TAKE A BREAK.

12             ALL RIGHT.  GOOD MORNING, MR. ALFIERI.

13                  PROSPECTIVE JUROR:  GOOD MORNING, OR GOOD AFTERNOON.

14                  THE COURT:  OH, IT SURE IS, ISN'T IT?

15             OKAY.  LET'S SEE.  YOU WERE LAST ON A JURY SOME TIME AGO?

16                  PROSPECTIVE JUROR:  SOME TIME AGO.

17                  THE COURT:  BETWEEN 15 AND 20 YEARS AGO; RIGHT?

18                  PROSPECTIVE JUROR:  YEAH.  I'VE SERVED ON TWO JURIES

19      IN SAN FRANCISCO.

20                  THE COURT:  AND THEY WERE CIVIL JURIES?

21                  PROSPECTIVE JUROR:  CIVIL.

22                  THE COURT:  UH-HUH.  AND IS THERE ANYTHING ABOUT YOUR

23      PRIOR SERVICE THAT WOULD MAKE IT DIFFICULT FOR YOU TO DO IT

24      AGAIN?

25                  PROSPECTIVE JUROR:  NO, I DON'T THINK SO.
```

1          THE COURT:  OKAY.  WE DO THINGS A LITTLE DIFFERENTLY

2     IN FEDERAL COURT THAN IN STATE COURT.

3          LET'S SEE NOW.

4          YOU INDICATED SOME PRIOR HISTORY WITH YOUR FATHER INVOLVED

5     IN LITIGATION.  THAT SEEMS LIKE IT WAS --

6          PROSPECTIVE JUROR:  THAT WAS RESOLVED OUT OF COURT,

7     AND I WASN'T INVOLVED IN THAT AT ALL.

8          THE COURT:  YOU WEREN'T.  OKAY.

9          AND THEN YOU INDICATED THAT YOU HAVE SOME DIFFICULTY BEING

10    SELF-EMPLOYED --

11         PROSPECTIVE JUROR:  RIGHT.

12         THE COURT:  BUT THIS IS A SHORT TRIAL.

13         PROSPECTIVE JUROR:  AND I THINK, YEAH, MY ONLY

14    CONCERN WOULD BE HOW LONG DELIBERATION WOULD LAST.

15         THE COURT:  WELL, THAT'S CERTAINLY -- THAT'S UP TO

16    THE JURY.  WE HAVE NO CONTROL OVER THAT.  YEAH.

17         PROSPECTIVE JUROR:  BUT I THINK I CAN, WITH THE

18    SCHEDULE, IT SOUNDS DOABLE.

19         THE COURT:  OKAY, THANK YOU.  SAME QUESTIONS AS

20    EVERYONE ELSE.  DO YOU HAVE ANY EMPLOYMENT OR BUSINESS

21    INTEREST, OR HAVE YOU HAD, WITH ANY OF THE COMPANIES INVOLVED

22    HERE?

23         PROSPECTIVE JUROR:  NO.

24         THE COURT:  DO YOU OWN STOCK OR -- IN ANY OF THE

25    COMPANIES?

1    PROSPECTIVE JUROR:  LIKE MANY OF THE OTHERS, NOT THAT

2    I'M AWARE OF.  I DO HAVE A FUND THAT IS PICKED FOR ME, BUT I

3    DON'T THINK SO.

4    THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

5    THE -- LET'S START FIRST WITH PLAINTIFFS' COMPANIES.

6    PROSPECTIVE JUROR:  WITH META?  I MEAN, I'M ON A -- I

7    THINK SOCIAL MEDIA IS NOT THE GREATEST THING FOR SOCIETY AND

8    FOR YOUNG PEOPLE.  I DON'T THINK THAT, BASED ON WHAT I'VE HEARD

9    SO FAR, THAT WOULD INFLUENCE ME --

10    THE COURT:  UM-HUM.

11    PROSPECTIVE JUROR:  -- AS A JUROR.

12    THE COURT:  OKAY.  AND WHAT ABOUT THE DEFENDANTS'

13    COMPANIES?

14    PROSPECTIVE JUROR:  NOTHING, NO.

15    THE COURT:  NO OPINIONS ABOUT THEM?

16    PROSPECTIVE JUROR:  NO OPINION.

17    THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

18    ISRAELI-BASED COMPANIES?

19    PROSPECTIVE JUROR:  NO.

20    THE COURT:  OR ISRAEL THAT COULD IMPACT YOUR ABILITY

21    TO SERVE?

22    PROSPECTIVE JUROR:  NO, NOT AT ALL.

23    THE COURT:  OKAY.  ALL RIGHT.  HAVING HEARD ALL THE

24    QUESTIONS AND ANSWERS PRECEDING YOU, IS THERE ANY ADDITIONAL

25    INFORMATION THAT YOU WOULD LIKE TO -- THAT YOU THINK YOU SHOULD

```
1        SHARE WITH US?

2              PROSPECTIVE JUROR:  NOTHING I CAN THINK OF.

3              THE COURT:  ALL RIGHT.  THANK YOU, MR. ALFIERI.

4         AND THEN GOOD AFTERNOON TO, LET'S SEE, WHO'S NEXT?  OKAY,

5    MS. CALLEJA?

6              PROSPECTIVE JUROR:  UH-HUH, YES.

7              THE COURT:  OKAY.

8         ALL RIGHT.  MS. CALLEJA, HAVE YOU HAD A BUSINESS OR

9    PROFESSIONAL RELATIONSHIP OR EMPLOYMENT RELATIONSHIP, YOU OR

10   ANYONE IN YOUR HOUSEHOLD --

11             PROSPECTIVE JUROR:  NO.

12             THE COURT:  -- WITH THE PLAINTIFFS?

13             PROSPECTIVE JUROR:  NO.

14             THE COURT:  HOW ABOUT WITH THE DEFENDANTS?

15             PROSPECTIVE JUROR:  NO.

16             THE COURT:  OKAY.  DO YOU OWN ANY STOCK IN THE, YOU

17   OR ANYONE IN YOUR HOUSEHOLD OWN STOCK WITH META?

18             PROSPECTIVE JUROR:  NO.

19             THE COURT:  HOW ABOUT WITH THE DEFENDANTS?

20             PROSPECTIVE JUROR:  NO.

21             THE COURT:  NSO?

22             PROSPECTIVE JUROR:  NO.

23             THE COURT:  DO YOU HAVE AN OPINION ABOUT THE

24   PLAINTIFF COMPANIES THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE

25   FAIR AND IMPARTIAL IN THIS CASE?
```

1          PROSPECTIVE JUROR:  NO, I DON'T BELIEVE SO, NO.

2          THE COURT:  OKAY.  AND WHAT ABOUT WITH REGARD TO THE

3    DEFENDANTS?

4          PROSPECTIVE JUROR:  NO.

5          THE COURT:  NO?  OKAY.

6       AND DO YOU HAVE ANY OPINIONS ABOUT ISRAELI-BASED COMPANIES

7    OR ISRAEL THAT WOULD IMPACT YOUR ABILITY TO BE FAIR AND

8    IMPARTIAL?

9          PROSPECTIVE JUROR:  I DON'T THINK SO, NO.

10          THE COURT:  NO?  OKAY.

11       HAVING HEARD ALL THE OTHER QUESTIONS PUT TO EVERYONE

12    BEFORE YOU, CAN YOU THINK OF ANY REASON WHY YOU SHOULD NOT BE

13    SEATED AS A JUROR?

14          PROSPECTIVE JUROR:  NO.

15          THE COURT:  ALL RIGHT.  THANK YOU.

16       AND GOOD MORNING -- OKAY.  I'M GOING TO HAVE TO ASK

17    MS. VUOJOLA -- I CAN'T EVEN BEGIN TO PRONOUNCE YOUR NAME.

18    COULD YOU PRONOUNCE IT FOR ME?

19          PROSPECTIVE JUROR:  YEAH, IT'S VUOJOLAINEN.

20          THE COURT:  VUOJOLAINEN; IS THAT RIGHT?

21          PROSPECTIVE JUROR:  YEP.

22          THE COURT:  AND THAT'S A FINNISH NAME?

23          PROSPECTIVE JUROR:  YEAH.

24          THE COURT:  ALL RIGHT.

25       IS YOUR COMPANY A TECH COMPANY?

```
 1            PROSPECTIVE JUROR:  YES.  I WORK IN TECH.

 2        BUT IF YOU'RE LOOKING AT THE ANSWER THAT RELATES TO

 3    CYBERSECURITY, YEAH, IT'S LIKE A -- THAT WAS ALMOST TEN YEARS

 4    AGO NOW, BUT IT'S A COMPANY THAT PROVIDED I.T. SERVICES AND

 5    I.T. SOLUTIONS.

 6            THE COURT:  OKAY.  AND THAT WAS TEN YEARS AGO?

 7            PROSPECTIVE JUROR:  YEAH.

 8            THE COURT:  WHAT DO YOU DO NOW?

 9            PROSPECTIVE JUROR:  MARKETING OPERATIONS MANAGER AT A

10    TECH COMPANY.

11            THE COURT:  IT'S A TECH COMPANY?

12            PROSPECTIVE JUROR:  YES.

13            THE COURT:  IS IT PAVE, PAVE?

14            PROSPECTIVE JUROR:  PAVE.

15            THE COURT:  AND WHAT EXACTLY DO YOU DO?  MARKETING

16    AND SALES OF WHAT KIND OF PRODUCTS?

17            PROSPECTIVE JUROR:  THEY OFFER COMPENSATION SOFTWARE.

18            THE COURT:  OKAY.  AND YOU SOLD I.T. SOLUTIONS TO

19    HELP WITH CYBERSECURITY, BUT YOU DIDN'T WORK IN CYBERSECURITY

20    YOURSELF?

21            PROSPECTIVE JUROR:  CORRECT.

22            THE COURT:  AND THAT WAS AT YOUR PRIOR COMPANY?

23            PROSPECTIVE JUROR:  YEAH, A FEW ONES BACK NOW.

24            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

25        OKAY.  AND YOU INDICATED A HARDSHIP BY VIRTUE OF THE
```

```
1    LENGTH OF YOUR COMMUTE; CORRECT?

2              PROSPECTIVE JUROR:  YEP.

3              THE COURT:  OKAY.  DID YOU TAKE PUBLIC TRANSPORTATION

4    TO GET HERE TODAY?

5              PROSPECTIVE JUROR:  I BORROWED A CAR TODAY, BUT I

6    WON'T HAVE ONE TOMORROW.

7              THE COURT:  OKAY.  ALL RIGHT.  DO YOU HAVE, OR HAVE

8    YOU HAD A BUSINESS OR EMPLOYMENT RELATIONSHIP WITH META?

9              PROSPECTIVE JUROR:  NO.

10             THE COURT:  HOW ABOUT WITH NSO?

11             PROSPECTIVE JUROR:  NO.

12             THE COURT:  DO YOU OWN STOCK IN ANY OF THE FOUR

13   COMPANIES INVOLVED HERE?

14             PROSPECTIVE JUROR:  YES, I HAVE STOCK WITH META.

15             THE COURT:  YOU HAVE STOCK WITH META.  OKAY.

16        IS IT IN AN INDEX FUND OR DID YOU SELECT IT YOURSELF?

17             PROSPECTIVE JUROR:  I'VE SELECTED IT MYSELF.

18             THE COURT:  OKAY.  OKAY.  AND HOW ABOUT WITH NSO OR

19   Q CYBER?

20             PROSPECTIVE JUROR:  NO.

21             THE COURT:  NO?  DO YOU HAVE ANY OPINIONS ABOUT META

22   OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

23   IMPARTIAL?

24             PROSPECTIVE JUROR:  NO.

25             THE COURT:  HOW ABOUT WITH NSO OR Q CYBER?
```

170

1          PROSPECTIVE JUROR:  NO.

2          THE COURT:  DO YOU HAVE ANY OPINIONS ABOUT COMPANIES

3    BASED IN ISRAEL, OR ANY OPINIONS ABOUT ISRAEL, THAT WOULD MAKE

4    IT DIFFICULT FOR YOU TO BE FAIR TO ISRAELI COMPANIES THAT ARE

5    INVOLVED IN THIS CASE?

6          PROSPECTIVE JUROR:  NO.

7          THE COURT:  OKAY.  HAVING HEARD ALL THE QUESTIONS AND

8    ANSWERS PUT TO EVERYONE ELSE BEFORE YOU, IS THERE ANY

9    ADDITIONAL INFORMATION ABOUT YOURSELF THAT YOU THINK YOU SHOULD

10   SHARE?

11         PROSPECTIVE JUROR:  I AM DISTRACTED.  MY DOG IS SICK

12   AND I WOULD HAVE BEEN AT THE VET TODAY, BUT I'M HERE.  I'M

13   CONCERNED ABOUT HER WELL BEING.

14         THE COURT:  OKAY.  LET'S SEE.  THAT'S ALL I HAVE FOR

15   YOU.

16       PLEASE PASS THE MICROPHONE.

17       ALL RIGHT.  AND, LET'S SEE, MR. HASSAN?

18         PROSPECTIVE JUROR:  YEAH.

19         THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

20       OKAY.  WHAT IS YOUR CURRENT COMPANY, BILL.COM, WHAT DOES

21   IT DO?

22         PROSPECTIVE JUROR:  WE HELP PEOPLE PAY BILLS.  WE

23   JUST AUTOMATE, LIKE, THE PROCESS FOR, LIKE, COMPANIES TO GET

24   PAID AND PAY OTHER PEOPLE.

25         THE COURT:  OKAY.  AND YOUR CLIENTS ARE TYPICALLY

```
1        BUSINESSES?  OR INDIVIDUALS?

2                PROSPECTIVE JUROR:  TYPICALLY, LIKE ACCOUNTING FIRMS

3        OR, LIKE, BOOKKEEPERS.

4                THE COURT:  OKAY.  AND YOU INDICATED ON THE

5        CYBERSECURITY FIELD QUESTION, YOU SOLD A SOFTWARE RELATED TO

6        CYBERSECURITY.

7            WAS THIS IN A PRIOR JOB?

8                PROSPECTIVE JUROR:  YEAH, THAT'S CORRECT.

9                THE COURT:  OKAY.  CAN YOU JUST TELL US A LITTLE BIT

10       ABOUT THAT?

11               PROSPECTIVE JUROR:  YEAH.  I WORKED AT A COMPANY

12       CALLED PRODUCTIVE, AND THEY BASICALLY GAVE, LIKE, ANALYTICS FOR

13       COMPANIES TO SEE, LIKE, IF THEY'RE ACTUALLY USING SOFTWARE.

14           AND, YEAH, I GUESS WE KIND OF EVALUATED IF IT MADE SENSE

15       TO, LIKE, HAVE CERTAIN PROVISIONS FOR COMPANIES AND EMPLOYEES

16       TO USE FOR, LIKE, VPN'S OR SOMETHING THAT A CYBERSECURITY

17       COMPANY OFFERS.

18               THE COURT:  AND HOW LONG AGO DID YOU LEAVE THAT

19       COMPANY?

20               PROSPECTIVE JUROR:  ABOUT THREE YEARS AGO.

21               THE COURT:  ALL RIGHT.  AND YOU'VE BEEN AT YOUR

22       CURRENT POSITION, THOUGH, LESS THAN A YEAR; RIGHT?

23               PROSPECTIVE JUROR:  THAT'S CORRECT.

24               THE COURT:  UM-HUM.  OKAY.  ALL RIGHT.  THANK YOU.

25           DID YOU -- HAVE YOU HAD A BUSINESS OR EMPLOYMENT
```

1    RELATIONSHIP WITH META?

2              PROSPECTIVE JUROR:  NO, YOUR HONOR.

3              THE COURT:  AND HAVE YOU HAD A BUSINESS OR EMPLOYMENT

4    RELATIONSHIP WITH NSO OR Q CYBER?

5              PROSPECTIVE JUROR:  NO.

6              THE COURT:  AND DO YOU HAVE ANY -- DO YOU OWN STOCK

7    IN META?

8              PROSPECTIVE JUROR:  YEAH, I RECENTLY PURCHASED A FEW

9    SHARES OF META STOCK.

10             THE COURT:  OKAY.  AND YOU PURCHASED THEM DIRECTLY?

11             PROSPECTIVE JUROR:  THAT'S CORRECT.

12             THE COURT:  OKAY.  ALL RIGHT.  AND HOW ABOUT WITH NSO

13   AND Q CYBER, ANY FINANCIAL INTEREST IN THAT COMPANY, THOSE

14   COMPANIES, AT ALL?

15             PROSPECTIVE JUROR:  NO, YOUR HONOR.

16             THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

17   META OR WHATSAPP THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE

18   FAIR AND IMPARTIAL?

19             PROSPECTIVE JUROR:  NO.

20             THE COURT:  AND DO YOU HAVE ANY OPINIONS ABOUT NSO OR

21   Q CYBER THAT WOULD MAKE IT DIFFICULT FOR YOU TO BE FAIR AND

22   IMPARTIAL TO THEIR INTERESTS?

23             PROSPECTIVE JUROR:  NO, YOUR HONOR.

24             THE COURT:  OKAY.  AND DO YOU HAVE ANY OPINIONS ABOUT

25   ISRAELI-BASED COMPANIES THAT MIGHT MAKE IT DIFFICULT FOR YOU TO

```
 1          BE FAIR AND IMPARTIAL TO THE DEFENDANTS?

 2                  PROSPECTIVE JUROR:  NO.

 3                  THE COURT:  OKAY.  HAVING HEARD ALL THE QUESTIONS AND

 4          ANSWERS PRECEDING YOU, IS THERE ANY ADDITIONAL INFORMATION THAT

 5          YOU THINK YOU SHOULD SHARE WITH US?

 6                  PROSPECTIVE JUROR:  NO.

 7                  THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

 8                  PROSPECTIVE JUROR:  OF COURSE.

 9                  THE COURT:  AND LAST, BUT NOT LEAST, IT'S MS. GUPTA?

10                  PROSPECTIVE JUROR:  YES, THAT'S RIGHT.

11                  THE COURT:  ALL RIGHT.  GOOD MORNING.  GOOD

12          AFTERNOON.

13              LET'S SEE.  OKAY.  SO YOU'RE CURRENTLY A CONSULTANT, OR

14          ARE YOU NOT WORKING?

15                  PROSPECTIVE JUROR:  I'M A CONSULTANT.  I DO QUALITY

16          ASSURANCE CONSULTING FOR BIOTECH AND PHARMA.

17                  THE COURT:  OKAY.  IN MICROBIOLOGY AND MOLECULAR

18          BIOLOGY?  THOSE WERE WHAT YOU GOT YOUR PH.D. IN; IS THAT RIGHT?

19                  PROSPECTIVE JUROR:  THAT'S RIGHT.

20                  THE COURT:  OKAY.  AND YOUR HUSBAND WAS PREVIOUSLY

21          EMPLOYED AT IVANTI?

22                  PROSPECTIVE JUROR:  THAT'S RIGHT, YES.

23                  THE COURT:  AND WHAT DO THEY DO?

24                  PROSPECTIVE JUROR:  HE WAS EITHER EVP OR SVP OF

25          ENGINEERING, I THINK.
```

1          THE COURT:  OKAY.  WAS HE A SOFTWARE ENGINEER?

2          PROSPECTIVE JUROR:  YES.

3          THE COURT:  OKAY.  AND HE'S NO LONGER WORKING?

4          PROSPECTIVE JUROR:  YES.  SINCE NOVEMBER, HE WAS LAID

5     OFF IN NOVEMBER.

6          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

7       DO YOU HAVE -- HAVE YOU OR ANYONE IN YOUR HOUSEHOLD HAD A

8     RELATIONSHIP, BUSINESS OR EMPLOYMENT RELATIONSHIP WITH

9     FACEBOOK?

10          PROSPECTIVE JUROR:  NO ONE.

11          THE COURT:  OKAY.

12          PROSPECTIVE JUROR:  NOT AT ANY OF THESE COMPANIES.

13          THE COURT:  AND WITH THE DEFENDANTS, EITHER, NSO?

14          PROSPECTIVE JUROR:  NO.

15          THE COURT:  NO?  DO YOU HAVE STOCK IN ANY OF THE

16     COMPANIES?

17          PROSPECTIVE JUROR:  SO ANYONE WHO OWNS INDEX FUNDS OR

18     TARGETED RETIREMENT FUNDS PROBABLY HAS STOCK IN FACEBOOK AND

19     META AND WHATSAPP.  AND I THINK MY HUSBAND MIGHT HAVE BOUGHT

20     INDIVIDUAL STOCK IN META ALSO.  I'M NOT 100 PERCENT SURE.

21          THE COURT:  OKAY.  BUT WITH REGARD TO -- DO YOU HAVE

22     AN ACCOUNT THAT HAS INDEX FUNDS?

23          PROSPECTIVE JUROR:  YES.

24          THE COURT:  OKAY.  AND YOU'RE NOT SURE WHAT'S IN IT?

25          PROSPECTIVE JUROR:  IT'S A TECH INDEX FUND, SO IT

1        PROBABLY HAS -- IT'S AN INDEX FUND, SO WHATEVER IS IN THE INDEX

2        WILL BE IN THE FUND, RIGHT?

3                THE COURT:  OKAY.

4                PROSPECTIVE JUROR:  SO IT'S NOT SOMETHING THAT WE

5        CONTROL.

6                THE COURT:  OKAY.  ALL RIGHT.

7            THANK YOU.

8            AND DO YOU HAVE ANY FINANCIAL INTEREST IN OR BUSINESS

9        INTEREST IN NSO, THE DEFENDANTS IN THIS COMPANY?

10               PROSPECTIVE JUROR:  NO.  I'VE NEVER HEARD OF THEM.

11               THE COURT:  OKAY.  AND THEY'RE BASED IN ISRAEL.  DO

12       YOU HAVE ANY OPINIONS ABOUT COMPANIES BASED IN ISRAEL OR ABOUT

13       ISRAEL --

14               PROSPECTIVE JUROR:  NO.

15               THE COURT:  -- THAT MIGHT MAKE IT DIFFICULT FOR YOU

16       TO BE FAIR AND IMPARTIAL?

17               PROSPECTIVE JUROR:  NO.

18               THE COURT:  NO?  OKAY.  ALL RIGHT.

19           HAVING HEARD ALL THE QUESTIONS AND ANSWERS PUT BEFORE YOU,

20       CAN YOU THINK OF ANY ADDITIONAL INFORMATION THAT YOU SHOULD

21       SHARE WITH US?

22               PROSPECTIVE JUROR:  I FIDGET A LOT.  WOULD THAT BE AN

23        ISSUE?

24               THE COURT:  NO.

25               PROSPECTIVE JUROR:  I NEED TO DOODLE.  CAN I DO THAT,

1          OR DO I HAVE TO --

2                    THE COURT:  WELL, YOU HAVE TO PAY ATTENTION.  IF YOU

3          CAN DOODLE WHILE PAYING ATTENTION, IF YOU CAN PAY ATTENTION.

4                    PROSPECTIVE JUROR:  ALL RIGHT.  YEAH.  IF YOU -- YOU

5          KNOW, I DON'T KNOW IF THAT'S ALLOWED.  IF THAT'S ALLOWED, THEN

6          IT WORKS.  OTHERWISE IT'S GOING TO BE REALLY HARD.

7                    THE COURT:  THE MAIN -- YOUR MAIN RESPONSIBILITY IS

8          TO STAY AWAKE AND TO PAY ATTENTION.

9                    PROSPECTIVE JUROR:  OKAY.

10                    THE COURT:  OKAY.  ALL RIGHT.

11          OKAY.  WE HAVE FINISHED WITH THE GROUP, AND THE NEXT THING

12          WOULD BE THE ATTORNEYS ARE GIVEN A LIMITED AMOUNT OF TIME TO DO

13          SOME FOLLOW UP.

14          THERE ARE A NUMBER OF AREAS THAT I'M SURE THEY'D LIKE TO

15          HAVE A LITTLE FACE TIME WITH YOU ON.  THAT WILL TAKE ABOUT 45

16          MINUTES, AND THEN WE'LL MAKE OUR FINAL DECISIONS.  I WOULD

17          LIKE, BY A SHOW OF HANDS, WHETHER OR NOT YOU'D LIKE A LUNCH

18          BREAK NOW OR AFTER THIS 40 MINUTES.

19          RAISE YOUR HANDS IF YOU'D RATHER GO FOR A LUNCH BREAK NOW.

20          OKAY.

21          AND RAISE YOUR HAND IF YOU WOULD RATHER GET THIS PART OF

22          THE QUESTIONING DONE BEFORE YOU TAKE A LUNCH BREAK AND THEN WE

23          COME BACK AND WE DO OUR SELECTION.

24          OKAY.  THAT'S THE CLEAR MAJORITY.

25          SO, COUNSEL.

1          MR. ANDRES:  THANK YOU, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  NOW, LET ME JUST EXPLAIN TO

3     THE JURY, THE LAWYERS HAVE EACH BEEN GIVEN A LIMITED AMOUNT OF

4     TIME TO DO THEIR OWN INTERACTION WITH YOU.  THEY MAY ASK YOU

5     QUESTIONS, THEY MAY NOT.  THEY ARE NOT REQUIRED TO.

6        OKAY.

7          MR. ANDRES:  THANK YOU, YOUR HONOR.  I JUST HAVE A

8     FEW QUESTIONS.

9        GOOD AFTERNOON AGAIN, EVERYBODY.  MY NAME IS GREG ANDRES.

10    WE'VE MET BEFORE.

11       I JUST HAVE A FEW FOLLOW-UP QUESTIONS.  THERE'S NO RIGHT

12    OR WRONG ANSWERS.  AS THE JUDGE SAID, WE'RE JUST TRYING TO

13    UNDERSTAND SOME OF YOUR BACKGROUND AND TRYING TO FIND OUT WHO

14    ARE THE RIGHT PEOPLE FOR THE JURY.

15       SO NOT INTENDING TO BE OVERLY PERSONAL, I'M JUST TRYING TO

16    UNDERSTAND SOME FOLLOW-UP QUESTIONS.

17       IF THERE'S SOMETHING ABOUT THE QUESTION THAT YOU DON'T

18    UNDERSTAND, PLEASE ASK ME AND I'LL CLARIFY.  I THINK I'M GOING

19    TO BE PRETTY SHORT.  IT'S NOT A GOOD THING TO BE BETWEEN YOU

20    AND LUNCH, SO I GET THAT.

21       OKAY.  JUROR NUMBER 1, YOU SAID, I THINK, YOUR

22    SISTER-IN-LAW IS A LAWYER; IS THAT CORRECT?

23          PROSPECTIVE JUROR:  SHE'S AN EMPLOYMENT ATTORNEY.

24          MR. ANDRES:  OKAY.  AND I THINK YOU MAYBE SAID THAT

25     SHE MIGHT HAVE CLIENTS THAT INVOLVE META.  I DIDN'T UNDERSTAND

1        THAT ENTIRELY.

2            WOULD SHE HAVE CLIENTS THAT WORK AT META, THAT ARE SUING

3    META, OR THAT -- WHATEVER YOU KNOW ABOUT THAT WOULD BE HELPFUL?

4            PROSPECTIVE JUROR:  SHE'S, LIKE, AN INDEPENDENT

5    ATTORNEY AND HAS A LOT OF TECH CLIENTS WHO MAYBE NEED HER

6    ADVICE ON, YOU KNOW, WHATEVER POTENTIAL LAWSUITS OR MAYBE

7    LAYOFF PACKAGES.

8            MR. ANDRES:  OKAY.  SO WOULD THE LAWSUITS THAT YOU

9    MENTIONED, WOULD THOSE POTENTIALLY BE LAWSUITS AGAINST META?

10           PROSPECTIVE JUROR:  POTENTIALLY.

11           MR. ANDRES:  OKAY.  ANYTHING ABOUT THAT, ABOUT YOUR

12   SISTER-IN-LAW'S WORK THAT WOULD AFFECT YOUR ABILITY TO BE FAIR

13   HERE?

14           PROSPECTIVE JUROR:  NO.  I MEAN, LOOK, I THINK THAT

15   COMPANIES MAKE DECISIONS IN THEIR OWN BEST INTERESTS.  IT'S

16   USUALLY NOT IN THE INTEREST OF THE EMPLOYEE.

17           MR. ANDRES:  OKAY.  FAIR ENOUGH.  THANK YOU.

18        AS I SAY THAT, I WONDER ABOUT WHAT MY BROTHER-IN-LAWS AND

19   SISTER-IN-LAWS SAY ABOUT ME AS A LAWYER, BUT WE'LL DEAL WITH

20   THAT ANOTHER DAY.

21        JUROR NUMBER 9, I THINK YOU SAID THAT YOU'RE CURRENTLY

22   UNEMPLOYED, BUT YOU MAY BE SEEKING A JOB AT SOME POINT?

23           PROSPECTIVE JUROR:  YES.  WELL, I'M SUPPOSED TO START

24   RIGHT NOW, BUT JURY DUTY, SO --

25           MR. ANDRES:  FAIR ENOUGH.  BUT IN TERMS OF WHEN THAT

1    PROCESS IS OVER, AMONG THE COMPANIES THAT YOU'LL CONSIDER

2    WORKING AT IS META?

3        PROSPECTIVE JUROR:  YES.

4        MR. ANDRES:  OKAY.  AND IN TERMS OF THIS CASE, YOU

5    DON'T KNOW ANYTHING ABOUT THE FACTS ABOUT THIS CASE, DO YOU.

6    WHAT THE CLAIMS ARE, ASIDE FROM WHAT THE JUDGE HAS TOLD YOU?

7        PROSPECTIVE JUROR:  NO.

8        MR. ANDRES:  OKAY.  IS THERE ANYTHING ABOUT THE FACT

9    THAT YOU'RE LOOKING FOR A JOB AND THAT YOU MAY GO TO META,

10   ANYTHING ABOUT THAT THAT WOULD SORT OF MAKE IT HARDER FOR YOU

11   TO BE FAIR AND TO WEIGH THE EVIDENCE TRULY FOR BOTH SIDES?

12       PROSPECTIVE JUROR:  I GUESS, YEAH, IF IT'S GOING TO

13   COST ME TO BE BANKRUPT -- I MEAN, THAT'S NOT GOING TO HAPPEN.

14       MR. ANDRES:  OKAY.  THE ISSUE HERE IS JUST ABOUT

15   DAMAGES, SO THE LIABILITY HAS BEEN SET ALREADY.  THE JUDGE HAS

16   RULED THAT NSO VIOLATED THE LAW, AND THE QUESTION NOW IS JUST

17   GOING TO BE WHAT THE DAMAGES ARE.

18     SO YOU THINK YOU WOULD BE AFFECTED BY THAT IN SOME WAY

19   BECAUSE YOU'RE LOOKING FOR A JOB?

20       PROSPECTIVE JUROR:  I BELIEVE SO, YEAH.

21       MR. ANDRES:  OKAY.  THANK YOU.

22     JUROR NUMBER 10, THANK YOU AGAIN FOR YOUR SERVICE.

23     YOU HAD SOME VIEWS ABOUT, ABOUT ISRAEL AND SOME OTHER

24   VIEWS.  I'M JUST WONDERING, IN TERMS OF THIS CASE AS WELL, YOU

25   DON'T KNOW ANYTHING SPECIFIC ABOUT THE ALLEGATIONS IN THIS

1    CASE; IS THAT RIGHT?

2              PROSPECTIVE JUROR:  CORRECT.

3              MR. ANDRES:  OKAY.  SO AT THE END OF THE DAY, DO YOU

4    THINK YOU COULD FAIRLY AND REASONABLY EVALUATE THE EVIDENCE

5    FROM THE LAWYERS ON BOTH SIDES AND MAKE A DECISION?

6              PROSPECTIVE JUROR:  I THINK I COULD.  I RESONATED

7    WITH WHAT SOMEBODY ELSE SAID OVER THERE WHERE, LIKE, I THINK IN

8    MY UNDERSTANDING THAT THE PEGASUS TOOL IS PROBABLY, LIKE, A

9    COLLABORATIVE EFFORT BETWEEN THE PLAINTIFF AND THE DEFENDANT,

10   AND I WOULD NOT LIKE TO SEE EITHER THE PLAINTIFF OR THE

11   DEFENDANT MAKING MONEY OFF OF THAT TOOL.

12        SO I FEEL EQUALLY NEGATIVE ABOUT BOTH SIDES.

13             MR. ANDRES:  OKAY.  I'M NOT SURE THAT'S GREAT, BUT

14   LET'S JUST BREAK THAT DOWN FOR A MINUTE.

15        WHAT YOU'RE GOING TO BE ASKED TO DO IN THIS COURTROOM,

16   LIKE EVERY COURTROOM IN AMERICA, IS LISTEN TO THE TESTIMONY,

17   WHICH WE'RE GOING TO HAVE WITNESSES SITTING AT THIS STAND RIGHT

18   HERE TEN FEET AWAY FROM YOU, AND THEY'RE GOING TO PROVIDE THE

19   EVIDENCE OR THE FACTS.

20        SO WHAT WE'RE ASKING YOU TO DO IS PUT ASIDE WHAT YOU MIGHT

21   KNOW COMING INTO THE JURY AND SIT IN THE JURY BOX, LISTEN TO

22   THE EVIDENCE, THERE WILL BE DOCUMENTS, TOO, THERE MAY BE SOME

23   VIDEOS, AND MAKE A DECISION BASED ON THAT EVIDENCE.

24        SO WE'RE ASKING YOU, WHATEVER YOUR PRECONCEIVED NOTIONS

25   ABOUT PEGASUS ARE AND WHO'S RESPONSIBLE, WE'RE ASKING YOU TO

```
 1        PUT THAT ASIDE, AND WE'RE ASKING YOU TO COME IN AND GIVE BOTH

 2        SIDES A FAIR SHOT AND LISTEN TO WHAT HAPPENS IN THIS COURTROOM.

 3        AGAIN, THIS IS WHAT HAPPENS IN EVERY COURTROOM IN AMERICA.

 4             IS THAT SOMETHING YOU CAN DO?

 5                  PROSPECTIVE JUROR:  YEAH, I THINK I CAN.

 6                  MR. ANDRES:  OKAY.  THANK YOU.

 7             JUROR NUMBER 12 -- I'M ALMOST DONE.  I'M MORE THAN

 8        HALFWAY, I THINK.

 9             JUROR NUMBER 12, I SORT OF HAVE A SIMILAR QUESTION TO YOU.

10        YOU SAID SOMETIMES YOU HAVE A HARD TIME MAKING DECISIONS.

11             BUT DO YOU THINK THAT YOU CAN CONFINE YOUR DECISION, OR

12        LISTEN TO THE EVIDENCE IN THIS COURTROOM FROM BOTH SIDES, THE

13        WITNESSES THAT -- THE EVIDENCE OR THE TESTIMONY THAT COMES FROM

14        THE WITNESSES AND THE DOCUMENTS, AND MAKE A DECISION BASED ON

15        THAT EVIDENCE?

16                  PROSPECTIVE JUROR:  YES, I CAN.

17                  MR. ANDRES:  OKAY.  THANK YOU FOR THAT.

18             OKAY.  JUROR NUMBER 12, YOU ALSO EXPRESSED SOME CONCERN

19        ABOUT YOUR ABILITY TO --

20                  THE CLERK:  YOU'RE ON THE SAME JUROR.

21                  MR. ANDRES:  OH, SORRY.  JUROR 14.

22             LET'S SEE.  JUROR 14, YOU ALSO HAD SOME QUESTIONS ABOUT

23        YOUR ABILITY TO PUT ASIDE YOUR VIEWS ABOUT THINGS THAT WERE

24        HAPPENING OUTSIDE AND COME HERE AND JUDGE THE EVIDENCE.

25             IS THAT SOMETHING YOU CAN DO, OR IS THAT GOING TO BE VERY
```

```
1    HARD FOR YOU?

2              PROSPECTIVE JUROR:  IT'S SOMETHING I COULD POSSIBLY

3    DO.

4              MR. ANDRES:  OKAY.  AND SO YOU HAD SOME CONCERNS

5    ABOUT SOCIAL MEDIA.  DO YOU THINK THAT YOU -- THAT'S GOING TO

6    AFFECT YOUR ABILITY TO RENDER A DECISION HERE?

7              PROSPECTIVE JUROR:  YES.

8              MR. ANDRES:  YOU THINK IT IS?

9              PROSPECTIVE JUROR:  I MEAN, I DON'T KNOW.  EVERYTHING

10   IS SO NUANCED.

11             MR. ANDRES:  YEAH, IT'S SOMETIMES HARD TO BE MAKING

12   THESE DECISIONS, AS SOME JURORS SAID, IN THE ABSTRACT WITHOUT

13   KNOWING THE SPECIFIC FACTS.

14        I THINK ONE THING THAT WE HAVE TO UNDERSTAND IS WHETHER OR

15   NOT YOUR FEELINGS ABOUT SOCIAL MEDIA WILL BE FEELINGS THAT YOU

16   CAN SEPARATE WHEN YOU GO INTO THE JURY ROOM.

17             PROSPECTIVE JUROR:  BECAUSE THIS IS A CIVIL MATTER, I

18   BELIEVE SO, YES.

19             MR. ANDRES:  OKAY.

20        JUROR NUMBER 18, HI.  YOU MAY NOTICE A PATTERN HERE OF

21   BASICALLY THE SAME QUESTIONS THAT WE'RE ASKING TO A LOT OF

22   JURORS.  SOMETHING WE'RE TRYING TO ASCERTAIN IS WHETHER OR NOT

23   YOU CAN PUT ASIDE ANY OF YOUR VIEWS ABOUT THE PARTIES HERE,

24   WHETHER IT'S META OR IF IT'S NSO, AND WHETHER, WHEN YOU GO INTO

25   THE JURY ROOM, YOU CAN DELIBERATE BASED ON WHAT THE FACTS ARE?
```

1              PROSPECTIVE JUROR:  IT WILL BE STILL VERY DIFFICULT

2     FOR ME AS I FEEL -- LIKE I SAID, I DO SERVICE A LOT OF META

3     CLIENTS FOR REAL ESTATE.  SO, FOR EXAMPLE, IF THOSE EMPLOYEES

4     ARE REWARDED BY THEIR COMPANY, THEY'LL BUY BIGGER AND BIGGER

5     HOMES FROM ME.  SO I JUST FAVOR THAT.

6              MR. ANDRES:  OKAY.  AND SO YOU THINK YOU'D HAVE A

7     HARD TIME BEING FAIR IN THE JURY ROOM?

8              PROSPECTIVE JUROR:  CORRECT.

9              MR. ANDRES:  OKAY.  JUROR NUMBER 24, HI.

10             PROSPECTIVE JUROR:  HI.

11             MR. ANDRES:  I KNOW YOU ALSO HAD A CONCERN ABOUT META

12     BASED ON I THINK ONE OF YOUR STUDENTS.

13             PROSPECTIVE JUROR:  YES.

14             MR. ANDRES:  AND I'M SORRY ABOUT THAT.

15         BUT DO YOU THINK, WHEN YOU GOT INTO THE JURY ROOM, META

16     WOULD SORT OF BE STARTING BEHIND, THAT WE WOULDN'T BE STARTING

17     THIS RACE SORT OF TOGETHER, IF YOU WILL, BECAUSE YOU HAVE

18     NEGATIVE VIEWS ABOUT WHAT HAPPENED?

19             PROSPECTIVE JUROR:  I PROFESS TO BE SOMEBODY WHO

20     REALLY SEARCHES AND SEEKS FOR JUSTICE, SO I DON'T THINK I WOULD

21     DO THAT.  I THINK I WOULD BE FAIR.

22             MR. ANDRES:  YOU THINK YOU WOULD BE FAIR?

23             PROSPECTIVE JUROR:  YES.

24             MR. ANDRES:  OKAY.

25             PROSPECTIVE JUROR:  BECAUSE I WOULD BE BETRAYING WHO

```
 1          I AM.

 2                    MR. ANDRES:  OKAY.  FAIR ENOUGH.

 3          SO JUST TO UNDERSTAND THAT ENTIRELY, YOU THINK YOU COULD

 4    PUT ASIDE YOUR PRIOR CONCERNS ABOUT YOUR PRIOR STUDENT AND

 5    LEAVE THAT OUTSIDE THE JURY ROOM, OR THIS COURTROOM, SO THAT

 6    WHEN YOU'RE JUDGING THE EVIDENCE, YOU COULD BE FAIR?

 7                    PROSPECTIVE JUROR:  YES.

 8                    MR. ANDRES:  OKAY.  THANK YOU.  LAST ONE, JUROR 26.

 9          I UNDERSTAND THAT YOU'RE INVOLVED IN SORT OF

10    PRE-LITIGATION WORK IN TERMS OF RESOLVING DISPUTES.

11                    PROSPECTIVE JUROR:  I HAVE BEEN, YES.

12                    MR. ANDRES:  OKAY.  IN TERMS OF ANY VIEWS ABOUT META,

13    DO YOU HAVE VIEWS ABOUT META?

14                    PROSPECTIVE JUROR:  YOU KNOW, BESIDES WHAT I SEE IN

15    THE NEWS WITH ITS CEO, THAT'S IT.  NOT AS IT RELATES TO THIS

16    KIND OF SUBJECT MATTER.

17                    MR. ANDRES:  OKAY.  AND IF THERE WAS NO EVIDENCE IN

18    THIS CASE THAT RELATED IN ANY WAY TO THE CEO, MARK ZUCKERBERG,

19    IF THIS WAS A DISPUTE THAT DIDN'T INVOLVE HIM IN ANY WAY, DO

20    YOU THINK YOU COULD GIVE META A FAIR SHOT --

21                    PROSPECTIVE JUROR:  YES.

22                    MR. ANDRES:  -- IN TERMS OF WEIGHING THE EVIDENCE?

23                    PROSPECTIVE JUROR:  YES.

24                    MR. ANDRES:  AND YOU'LL PAY ATTENTION TO THE

25    TESTIMONY THAT COMES IN AND THE DOCUMENTS?
```

```
1              PROSPECTIVE JUROR:  INDEED.

2              MR. ANDRES:  THANK YOU VERY MUCH.  THANK YOU,

3      EVERYBODY.

4         THANK YOU, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THANK YOU.

6         MR. AKROTIRIANAKIS.

7              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

8         GOOD AFTERNOON.

9         I HAD A COUPLE OF GENERAL QUESTIONS THAT I THOUGHT I MIGHT

10     POSE TO EVERYBODY, AND THEN I HAD SOME SPECIFIC ONES ALSO.

11        COULD I SEE, BY A SHOW OF HANDS, WHO DOES NOT USE SOCIAL

12     MEDIA?  SO EVERYONE ELSE, I TAKE IT, DOES USE SOCIAL MEDIA.

13        OKAY.  WOULD THAT BE -- WOULD THAT BE FACEBOOK IN MOST

14     CASES, BY A SHOW OF HANDS?

15        AND WHAT ABOUT WHATSAPP?  DO WE HAVE WHATSAPP USERS?

16     OKAY.  EVEN MORE.

17        INSTAGRAM?  OKAY.

18        THE COURT HAD MENTIONED EARLIER, AND I BELIEVE YOU SAW A

19     VIDEO, OR RECEIVED OTHER INSTRUCTION OUTSIDE THE COURTROOM,

20     ABOUT DOING RESEARCH ON SOCIAL MEDIA OR TALKING ABOUT THE CASE

21     ON SOCIAL MEDIA, DOING OTHER INTERNET-BASED RESEARCH OR JUST

22     OTHER RESEARCH ABOUT THE CASE.

23        IS THERE ANYONE HERE WHO, IN YOUR HEART OF HEARTS, THINK

24     THAT YOU WOULD REALLY HAVE A DIFFICULT TIME NOT GIVING IN TO

25     TEMPTATION AND TRYING TO LOOK AT THINGS THAT ARE NOT THE
```

1    EVIDENCE THAT YOU'RE GOING TO GET IN THE COURTROOM HERE WHERE

2    THE PARTIES ARE ABLE TO RESPOND TO THE EVIDENCE?

3         IS THERE ANYONE WHO THINKS THAT THEY WOULD NOT BE ABLE TO

4    FOLLOW THE COURT'S INSTRUCTIONS AND NOT GO TO THOSE OUTSIDE

5    SOURCES?

6         OKAY.  JUROR NUMBER 1, YOU GAVE AN ANSWER THAT WAS ALONG

7    THE LINES -- I'M TRYING TO GO IN ORDER SO WE CAN PASS THE MIC

8    EASILY -- IT WAS ALONG THE LINES OF INTEL SERVICES WORKING FOR

9    SILICON VALLEY COMPANIES.

10        DO YOU RECALL THAT ANSWER?

11            PROSPECTIVE JUROR:  YES.  I RECENTLY READ AN ARTICLE,

12   AND I CAN'T REMEMBER WHICH NEWSPAPER, BUT IT WAS BASICALLY

13   ABOUT HOW THERE WERE A LOT OF SENIOR MEMBERS IN SILICON VALLEY

14   TECH COMPANIES THAT WERE FORMER MEMBERS OF THE ISRAELI MILITARY

15   AND THAT THERE WAS A STRONG CONNECTION THERE.

16            MR. AKROTIRIANAKIS:  ANYTHING ELSE THAT YOU RECALL

17   ABOUT WHAT YOU READ?

18            PROSPECTIVE JUROR:  NO.

19            MR. AKROTIRIANAKIS:  DO YOU THINK THAT HAS ANY

20   BEARING ON WHAT YOU'VE NOW HEARD A LITTLE BIT ABOUT THIS CASE?

21            PROSPECTIVE JUROR:  I MEAN, I THINK IF THE CASE HAS

22   ANYTHING TO DO WITH, YEAH, MILITARY APPLICATIONS OR SPYING,

23   THEN, YES.

24            MR. AKROTIRIANAKIS:  AND YOU SAID EARLIER THAT YOU

25   WOULD -- WELL, WHAT I WROTE DOWN WAS THAT YOU WOULD PREFER TO

1    DECLINE IF YOU WERE, IF YOU WERE ME ASKING YOU ABOUT WHETHER

2    YOU WOULD BE A FAIR JUROR IN THIS CASE, REPRESENTING THE

3    DEFENDANTS.

4        WOULD YOU WANT YOURSELF TO BE A JUROR IN THIS CASE, OR

5    WOULD YOU DECLINE?

6            PROSPECTIVE JUROR:  LOOK, I THINK THAT META IS A VERY

7    LARGE ORGANIZATION.  IT'S VERY HARD TO -- WELL, IT SOUNDS LIKE

8    WE'RE DISCUSSING AWARDING DAMAGES FROM YOUR COMPANY, OR THIS

9    ISRAELI COMPANY, TO META.

10       SO I DON'T KNOW EXACTLY THE SIZE OF IT, BUT IT WOULD BE

11   MUCH EASIER TO HAVE A NEGATIVE IMPACT ON THE COMPANY YOU'RE

12   REPRESENTING THAN NOT BY THE SIZE OF THE JUDGMENT.

13           MR. AKROTIRIANAKIS:  OKAY.  AND SO HOW DOES THAT TIE

14   INTO THE, THE QUESTION ABOUT WHETHER YOU WOULD -- IF YOU WERE

15   REPRESENTING THE DEFENDANTS IN THIS CASE, WOULD YOU WANT YOU,

16   OR SOMEONE LIKE YOU, OR YOU, TO BE A JUROR IN THIS CASE?  OR

17   WOULD YOU -- I GUESS WHAT I'M -- I'M SORRY, I DON'T MEAN TO

18   INTERRUPT YOU.

19           THE WITNESS:  NO, NO.  GO AHEAD.

20       MR. AKROTIRIANAKIS:  WHAT I REALLY WANT TO KNOW FROM

21   YOU IS, DO YOU THINK THAT THIS ISN'T REALLY THE RIGHT KIND OF

22   CASE FOR YOU, OR DO YOU THINK THAT YOU COULD BE FAIR IN THIS

23   CASE DESPITE WHAT YOU'VE HEARD?

24           PROSPECTIVE JUROR:  I THINK I COULD TRY TO BE FAIR,

25   BUT I WOULD DEFINITELY, YOU KNOW, HAVE AN IMPLICIT BIAS AGAINST

1          A COMPANY THAT HAD ANY MILITARY APPLICATION IN THEIR SOFTWARE.

2               MR. AKROTIRIANAKIS:  AND WHAT DO YOU MEAN WHEN YOU

3     HAVE AN IMPLICIT BIAS AGAINST A COMPANY?

4               PROSPECTIVE JUROR:  JUST BASICALLY WHAT'S BEEN GOING

5     ON IN THE NEWS, HOW, YOU KNOW, SURVEILLANCE VIA DEVICES, YOU --

6     YOU KNOW, IF I'M TALKING TO MY FRIENDS ABOUT BUYING SOMETHING,

7     THE NEXT THING I SEE ON MY SOCIAL MEDIA FEED ARE ADS FROM THAT

8     COMPANY.

9               MR. AKROTIRIANAKIS:  AND SO YOU THINK THAT THAT WOULD

10    MAKE YOU BIASED AGAINST THE SOCIAL MEDIA COMPANIES OR BIASED

11    AGAINST THE COMPANY THAT MAKES TECHNOLOGY THAT'S FOR

12    INTELLIGENCE GATHERING?

13              PROSPECTIVE JUROR:  THAT'S AS IT RELATES TO KIND OF

14    TECH COMPANIES MONITORING PEOPLE.  SO I THINK IT APPLIES TO

15    BOTH.

16              MR. AKROTIRIANAKIS:  ALL RIGHT.  THANK YOU.

17         JUROR NUMBER 2, YOU GAVE AN ANSWER IN RESPONSE TO THE

18    COURT'S QUESTIONS THAT WAS ALONG THE LINES OF IT BEING YOUR JOB

19    TO MAKE SURE THAT PEOPLE DON'T GET HACKED.

20         DO YOU RECALL THAT ANSWER?

21              PROSPECTIVE JUROR:  YES.

22              MR. AKROTIRIANAKIS:  OKAY.  AND DO YOU THINK THAT --

23    DO YOU THINK THAT THAT ALLOWS YOU TO BE FAIR TO BOTH COMPANIES,

24    KNOWING THAT THERE'S AN ALLEGATION ABOUT THAT IN THIS CASE?

25              PROSPECTIVE JUROR:  YES.  IF THE FACTS POINT ME IN A

```
 1      DIRECTION, I'M GOING TO FOLLOW THEM.

 2              MR. AKROTIRIANAKIS:  AND I BELIEVE YOU ANSWERED THAT

 3      YOU THOUGHT THAT YOU WERE MORE ALIGNED WITH META IN THIS CASE.

 4          DID I HEAR YOU CORRECTLY?

 5              PROSPECTIVE JUROR:  CORRECT.

 6              MR. AKROTIRIANAKIS:  CAN YOU TELL ME MORE?

 7              PROSPECTIVE JUROR:  AS A SYSTEMS ADMINISTRATOR ON THE

 8      DEFENSIVE FROM PERPETRATORS.

 9              MR. AKROTIRIANAKIS:  AND SO IN THAT COMPANY, WOULD

10      YOU SAY THAT MY CLIENT IS STARTING A LITTLE BIT BEHIND, EVEN

11      THOUGH WE HAVEN'T HEARD THE EVIDENCE YET?

12              PROSPECTIVE JUROR:  I WOULD LIKE TO SAY YOUR EQUAL,

13      BUT THE BIAS MAY BE THERE.

14              MR. AKROTIRIANAKIS:  OKAY.  YOU'RE SAYING IT MAY BE

15      THERE.  YOU'RE SAYING IT IS THERE?

16              PROSPECTIVE JUROR:  I WANT TO BE FAIR, TO BE HONEST.

17      BUT I CAN'T SAY THAT I DON'T HAVE PRE, PRESET FEELINGS BECAUSE

18      OF THE WORK I DO.

19              MR. AKROTIRIANAKIS:  YOU CAN'T SAY THAT YOU DON'T

20      HAVE PRESET FEELINGS, MEANING THAT I UNDERSTAND YOU THAT YOU DO

21      HAVE PRESET FEELINGS?

22              PROSPECTIVE JUROR:  I DO.

23              MR. AKROTIRIANAKIS:  AND DO YOU THINK THAT MY CLIENT

24      STARTS OUT BEHIND AND YOU DO THINK THAT YOU WOULD BE MORE

25      ALIGNED, OR BIASED, IN FAVOR OF META AS A STARTING POINT?
```

1             PROSPECTIVE JUROR:  YES.

2             MR. AKROTIRIANAKIS:  JUROR NUMBER 7.

3             PROSPECTIVE JUROR:  HELLO.

4             MR. AKROTIRIANAKIS:  GOOD AFTERNOON.  MS. MAHUIKI.

5    DID I SAY IT RIGHT?

6             PROSPECTIVE JUROR:  CLOSE.

7             MR. AKROTIRIANAKIS:  AT LEAST WHAT I WROTE DOWN IN MY

8    NOTES HERE WAS THAT YOU SAID THAT WITH RESPECT TO THE COURT'S

9    QUESTIONING ABOUT ISRAEL, THAT YOU THOUGHT THAT YOU WERE BIASED

10   AND HAD A NEGATIVE BIAS TOWARDS THE GOVERNMENT AND MILITARY OF

11   ISRAEL.

12        DID I HEAR YOU CORRECTLY?

13            PROSPECTIVE JUROR:  CORRECT.

14            MR. AKROTIRIANAKIS:  HOW DO YOU FEEL ABOUT COMPANIES

15   THAT ARE HEADQUARTERED OR LOCATED IN ISRAEL?

16            PROSPECTIVE JUROR:  I DON'T HAVE A STRONG OPINION.

17   IT COULD BE ANY KIND OF COMPANY.

18            MR. AKROTIRIANAKIS:  SO ARE YOU ABLE TO SEPARATE

19   BETWEEN THE ISRAELI GOVERNMENT ON THE ONE HAND AND A COMPANY

20   THAT IS LOCATED IN ISRAEL, THAT HAS ISRAELI EMPLOYEES AND THE

21   LIKE?

22            PROSPECTIVE JUROR:  I CAN, YEAH.

23            MR. AKROTIRIANAKIS:  OKAY.  AND WHAT ABOUT THE FACT

24   THAT THE TECHNOLOGY IN THIS CASE IS A SURVEILLANCE TECHNOLOGY,

25   OR AN INTELLIGENCE TECHNOLOGY?

1          PROSPECTIVE JUROR:  I DON'T KNOW MUCH ABOUT THE

2     TECHNOLOGY PART IN GENERAL, SO I WOULD BE INTERESTED TO HEAR

3     THE FACTS BECAUSE THIS WOULD BE MY FIRST TIME LEARNING ABOUT

4     THEM.

5          MR. AKROTIRIANAKIS:  DID YOU ALSO SAY THAT YOU OWN

6     STOCK IN META?

7          PROSPECTIVE JUROR:  I DO.  I INHERITED STOCK.

8          MR. AKROTIRIANAKIS:  I SEE.  SO YOU -- IN A DIRECT

9     OR, I GUESS, IT IS A DIRECT SENSE, HAVE A FINANCIAL INTEREST IN

10    THE COMPANY.  DO YOU THINK THAT YOU'RE ABLE TO, IN A CASE

11    THAT'S ABOUT AWARDING DAMAGES TO THE COMPANY THAT YOU HAVE A

12    FINANCIAL INTEREST IN, BELIEVE THAT THAT'LL BE IN THE BACK OF

13    YOUR MIND WHEN YOU'RE CONSIDERING THE EVIDENCE THAT WE SEE IN

14    COURT AND THE INSTRUCTIONS OF THE COURT?

15         PROSPECTIVE JUROR:  I PERSONALLY DON'T CARE IF MY

16    STOCKS GAIN OR LOSE MONEY IN META.  I DON'T -- I JUST INHERITED

17    THEM.  I DIDN'T CHOOSE TO HAVE THEM.  THEY COULD TANK.  I DON'T

18    REALLY CARE.

19         (LAUGHTER.)

20         MR. AKROTIRIANAKIS:  THAT MIGHT BE A GOOD SEGUE TO

21    GOING OUT OF ORDER.

22         NOW JUROR NUMBER 16.

23         PROSPECTIVE JUROR:  YES, SIR.

24         MR. AKROTIRIANAKIS:  MR. OCCHIPINTI.

25         PROSPECTIVE JUROR:  VERY GOOD.

1          MR. AKROTIRIANAKIS:  DO YOU FEEL THE SAME ABOUT THE

2     VALUE OF YOUR, OF YOUR OWNERSHIP IN META?

3          PROSPECTIVE JUROR:  I WILL KEEP MINE.

4          MR. AKROTIRIANAKIS:  OKAY.

5       (LAUGHTER.)

6          MR. AKROTIRIANAKIS:  SO THE QUESTION IS --

7          PROSPECTIVE JUROR:  I HOPE THEY GO UP, QUITE THE

8     OPPOSITE OF WHAT YOU JUST HEARD.

9          MR. AKROTIRIANAKIS:  SURE.  AND DO YOU THINK THAT

10    THAT OWNERSHIP OF THE PLAINTIFF COMPANY IN THIS CASE IS

11    SOMETHING THAT WOULD BE IN YOUR MIND WHEN YOU'RE CONSIDERING

12    THE CASE, AND DOES THAT MEAN THAT MY CLIENT STARTS A LITTLE BIT

13    BEHIND WHEN WE START TALKING ABOUT --

14          PROSPECTIVE JUROR:  YES, SIR.  WITH ALL FAIRNESS, I

15    WOULD NOT BE A FAIR JUROR TO YOUR SIDE.

16          MR. AKROTIRIANAKIS:  THANK YOU, SIR.

17       THERE WAS ANOTHER -- TWO OTHER JURORS, NUMBER 33 AND 34.

18    I'LL ASK YOU THE SAME QUESTIONS.  IT'S THE -- OVER HERE AT THE

19    VERY END.  LET ME TRY IT.  VUOJOLAINEN.

20          PROSPECTIVE JUROR:  YEAH.

21          MR. AKROTIRIANAKIS:  MS. VUOJOLAINEN, GOOD AFTERNOON.

22          PROSPECTIVE JUROR:  HI.

23          MR. AKROTIRIANAKIS:  HOW DO YOU FEEL ABOUT THAT

24    ISSUE, THE SAME QUESTION I JUST ASKED THE GENTLEMAN?

25          PROSPECTIVE JUROR:  RELATED TO STOCK?

1    MR. AKROTIRIANAKIS:  YEAH.  DO YOU THINK THE FACT

2    THAT YOU'RE A PART OWNER OF THE PLAINTIFF COMPANY IN THIS CASE

3    THAT'S ASKING THE JURY TO AWARD DAMAGES IN ITS FAVOR IS GOING

4    TO BE SOMETHING THAT YOU HAVE IN YOUR MIND AND IT'S GOING TO BE

5    IN THE BACK OF YOUR MIND AND IT PUTS THE PARTIES ON UNEQUAL

6    FOOTING AS YOU START YOUR ROLE AS A JUROR IN THIS CASE?

7        PROSPECTIVE JUROR:  I DOUBT IT.  I THINK I CAN PUT

8    THAT ASIDE.

9        MR. AKROTIRIANAKIS:  OKAY.  AND, MR. HASSAN, THE SAME

10   QUESTION TO YOU, SIR.

11       PROSPECTIVE JUROR:  WHAT -- CAN YOU ASK THE QUESTION

12   AGAIN?

13       MR. AKROTIRIANAKIS:  SURE.  DID I UNDERSTAND YOU

14   CORRECTLY THAT YOU OWN SHARES IN META?

15       PROSPECTIVE JUROR:  YES.

16       MR. AKROTIRIANAKIS:  AND THAT THAT WAS DIRECT

17   OWNERSHIP, IF YOU WILL, AS OPPOSED TO INDEX FUND OR SOMETHING

18   ELSE THAT YOU DON'T DIRECTLY CONTROL?

19       PROSPECTIVE JUROR:  THAT'S CORRECT.

20       MR. AKROTIRIANAKIS:  IN OTHER WORDS, YOU MADE A

21   CHOICE TO INVEST IN META, YOU OWN PART OF THE COMPANY; RIGHT?

22       PROSPECTIVE JUROR:  YES.

23       MR. AKROTIRIANAKIS:  OKAY.  SO THAT FACT, THAT YOU

24   ARE PART OWNER OF ONE OF THE COMPANIES THAT IS A PARTY TO THIS

25   CASE AND, IN FACT, THE COMPANY THAT IS ASKING THE JURY TO AWARD

1    DAMAGES TO IT, SO TO GIVE MONEY TO IT, DOES THAT MEAN -- WHEN

2    YOU'RE BEING HONEST WITH YOURSELF ABOUT IT -- THAT YOU THINK

3    THAT YOU WILL BE HOLDING THE PARTIES ON SOME UNEQUAL FOOTING SO

4    THAT MY CLIENTS START BEHIND META IN TERMS OF YOUR

5    CONSIDERATION OF THE CASE, EVEN BEFORE YOU'VE HEARD EVIDENCE?

6            PROSPECTIVE JUROR:  YES.

7            MR. AKROTIRIANAKIS:  SO THEN I HAVE TO ASK YOU THE

8    FOLLOW-UP QUESTION.  DO YOU THINK THAT YOU WOULD THEN BE ABLE

9    TO BE FAIR TO BOTH PARTIES, OR WOULD YOU BE MORE FAIR, SO TO

10   SPEAK -- AND I'M DOING FOR THE RECORD, THE FINGER QUOTES --

11   WOULD YOU BE MORE FAIR TO META, MEANING THAT YOU WOULD BE

12   UNFAIR TO THE OTHER PARTIES?

13           PROSPECTIVE JUROR:  YES.

14           MR. AKROTIRIANAKIS:  DID I MISS ANYBODY WHO OWNS

15   STOCK IN META?  AND I DON'T MEAN IN AN INDEX FUND, I MEAN WHERE

16   YOU MADE AN INVESTMENT DECISION, OR THERE WAS A CASE, I THINK,

17   A LADY WHOSE HUSBAND HAD MADE AN INVESTMENT DECISION.

18       YES, DR. GUPTA WAS IT?

19           PROSPECTIVE JUROR:  YES.  MY HUSBAND, I THINK, HAS

20   META STOCK.  I WANTED TO CALL AND ASK, BUT I WASN'T SURE IF I

21   WAS ALLOWED TO, SO I DIDN'T.

22           MR. AKROTIRIANAKIS:  WELL, OKAY.  SO BASED ON YOUR,

23   YOUR -- I DON'T WANT TO NOT LOOK AT YOU WHEN I'M TALKING TO

24   YOU.

25       SO I'LL TRY AND STAND BY THIS MICROPHONE.

```
 1              SO YOUR CURRENT FRAME OF MIND IS THAT YOU THINK YOUR

 2    HUSBAND DOES INVEST?  META; RIGHT?

 3              PROSPECTIVE JUROR:  I TELL HIM NOT TO BUY INDIVIDUAL

 4    STOCKS, BUT HE STILL DOES IT.  SO HE MIGHT HAVE META STOCK.

 5    I'M NOT SURE.

 6              MR. AKROTIRIANAKIS:  OKAY.  YOU THINK HE DOES, OR YOU

 7    DON'T -- YOU THINK HE DOES NOT?

 8              PROSPECTIVE JUROR:  I DON'T KNOW.  PROBABLY, MAYBE.

 9              MR. AKROTIRIANAKIS:  YOU THINK HE PROBABLY DOES?

10              PROSPECTIVE JUROR:  PROBABLY DOES.

11              MR. AKROTIRIANAKIS:  OKAY.  AND THIS BEING A

12    COMMUNITY PROPERTY STATE, THAT MEANS THAT YOU DO ALSO; RIGHT?

13              PROSPECTIVE JUROR:  YES.

14              MR. AKROTIRIANAKIS:  OKAY.  SO THE FACT THAT YOU ARE

15    AN INVESTOR IN THE PLAINTIFF COMPANY AND THE COMPANY THAT WILL

16    BE ASKING THE JURY TO AWARD MONEY FROM MY CLIENTS TO A COMPANY

17    THAT YOU ARE FINANCIALLY INTERESTED IN, DO YOU THINK THAT THAT

18    IS SOMETHING THAT WILL BE IN YOUR MIND WHEN YOU ARE CONSIDERING

19    THE EVIDENCE IN THIS CASE?  OR DO YOU THINK THAT YOU WOULD BE

20    ABLE TO PUT IT COMPLETELY OUT OF YOUR MIND SUCH THAT MY CLIENTS

21    ARE NOT STARTING FROM A POSITION BEHIND THE COMPANY THAT YOU'RE

22    INVESTING IN?

23              PROSPECTIVE JUROR:  I DON'T THINK THAT IT WOULD

24    AFFECT ANYTHING.

25              MR. AKROTIRIANAKIS:  IT WOULDN'T AFFECT YOU?
```

```
1                  PROSPECTIVE JUROR:  NO.

2                  MR. AKROTIRIANAKIS:  OKAY.  THANK YOU.

3             HAVE I MISSED ANYBODY?  OKAY.

4             MR. SAENGSUWARN, DID I SAY THAT CORRECTLY?

5                  PROSPECTIVE JUROR:  YES.

6                  MR. AKROTIRIANAKIS:  JUROR NUMBER 9.

7             NOW, YOUR ANSWER TO EARLIER QUESTIONING, BOTH IN RESPONSE

8        TO THE COURT AND TO MY COUNTERPART, WAS THAT YOU ARE NOT

9        PRESENTLY WORKING; CORRECT?

10                 PROSPECTIVE JUROR:  UM-HUM.

11                 MR. AKROTIRIANAKIS:  AND THAT YOU HAVE A SPECIFIC

12       PLAN TO GO AND INTERVIEW FOR A JOB AT META; CORRECT?

13                 PROSPECTIVE JUROR:  CORRECT, YES.

14                 MR. AKROTIRIANAKIS:  OKAY.  AND I AM -- I WOULD

15       ASSUME THAT YOU HOPE THAT YOU GET THAT JOB?

16                 PROSPECTIVE JUROR:  THE OFFER AT LEAST, YES.

17                 MR. AKROTIRIANAKIS:  THE OFFER AT LEAST, IS THAT WHAT

18       YOU SAID?

19                 PROSPECTIVE JUROR:  YES.

20                 MR. AKROTIRIANAKIS:  OKAY.

21            SO DO YOU THINK THE FACT THAT YOU HOPE TO WORK AT THIS

22       COMPANY IS SOMETHING THAT WILL BE IN YOUR MIND WHEN YOU ARE

23       HERE CONSIDERING A CASE THAT IS BETWEEN PARTIES THAT YOU'RE NOT

24       HOPING TO WORK AT AND A COMPANY THAT YOU ARE HOPING TO WORK AT?

25                 PROSPECTIVE JUROR:  CORRECT, YES.
```

```
 1              MR. AKROTIRIANAKIS:  OKAY.  AND SO FOR THAT REASON,

 2    WOULD YOU AGREE THEN THAT MY CLIENTS ARE NOT ON THE SAME

 3    FOOTING AS THE PLAINTIFFS AT THE TIME THAT WE'RE STARTING THE

 4    CASE BEFORE WE KNOW ANYTHING ABOUT THE EVIDENCE?

 5              PROSPECTIVE JUROR:  I GUESS, YES, BECAUSE

 6    SUBCONSCIOUSLY, I WILL BE BIASED, RIGHT?  SO --

 7              MR. AKROTIRIANAKIS:  THANK YOU, MR. SAENGSUWARN.

 8         MS. MEHRLING, JUROR NUMBER 10, DID I SAY IT CORRECTLY?

 9              PROSPECTIVE JUROR:  UM-HUM.

10              MR. AKROTIRIANAKIS:  YOU WERE GIVING US SOME ANSWERS

11    BEFORE ABOUT DIVESTMENT FROM ISRAELI COMPANIES AND THAT THE

12    ORGANIZATION THAT YOU'RE IN THE LEADERSHIP OF HAS AS ITS AIM TO

13    PUT FINANCIAL PRESSURE ON THE ISRAELI GOVERNMENT SO THAT IT

14    CHANGES ITS STRATEGIES.

15         DID I UNDERSTAND CORRECTLY?

16              PROSPECTIVE JUROR:  YEAH, YEAH.  I WOULD SAY THAT'S

17    ONE OF THE AIMS.  LIKE, GENERALLY THE AIM IS TO, LIKE,

18    DISMANTLE THE U.S./ISRAELI ALLIANCE.

19              MR. AKROTIRIANAKIS:  AND WHAT ABOUT ISRAELI-BASED

20    COMPANIES?  HOW DO YOU FEEL ABOUT THOSE IN LIGHT OF THIS

21    OBJECTIVE?

22              PROSPECTIVE JUROR:  I MEAN, I WOULD SAY SPECIFICALLY

23    ISRAELI COMPANIES THAT ARE INVOLVED IN MILITARY AIMS, I DON'T

24    SUPPORT THEIR SUCCESS.

25         BUT OTHER COMPANIES, I WOULD FEEL NEUTRAL ABOUT.
```

1          MR. AKROTIRIANAKIS:  SURE.  SO MY CLIENTS ARE A

2     GOVERNMENT CONTRACTOR.

3          PROSPECTIVE JUROR:  UM-HUM.

4          MR. AKROTIRIANAKIS:  THEY HAVE CONTRACTS WITH

5     GOVERNMENTS AROUND THE WORLD.

6          PROSPECTIVE JUROR:  UM-HUM.

7          MR. AKROTIRIANAKIS:  AND THEY'RE A SURVEILLANCE

8     TECHNOLOGY -- THEIR INTELLIGENCE TECHNOLOGY IS EXPORT

9     CONTROLLED UNDER ISRAELI LAW.

10         DOES THAT CONJURE IN YOUR MIND SOME THOUGHT THAT WE SHOULD

11    TALK ABOUT HERE, WHAT WE'RE TALKING ABOUT, THE BIASES THAT

12    PEOPLE MAY HAVE AND WHETHER THEY CAN BE FAIR JURORS IN A CASE

13    LIKE THIS?

14         PROSPECTIVE JUROR:  GOT IT.  YEAH, I THINK MY BIAS

15    WOULD THEN APPLY TO ANY COMPANY THAT CONTRACTED WITH THE

16    ISRAELI GOVERNMENT, LIKE, FOR A MILITARY PURPOSE, WHETHER OR

17    NOT THEY WERE AN ISRAELI COMPANY.

18         MR. AKROTIRIANAKIS:  AND TO A COMPANY LIKE THAT, IF

19    THERE WERE EVIDENCE LIKE THAT, THEN YOU WOULD SAY THAT THE

20    STARTING POINT THAT YOU'RE AT RIGHT NOW IS NOT EVEN FOOTING AS

21    BETWEEN THE TWO SIDES OF THIS CASE?  IS THAT FAIR?

22         MR. ANDRES:  YOUR HONOR, JUST BRIEFLY, WE OBJECT.

23         THE COURT:  YES, I UNDERSTAND.

24      I'LL SPEAK ON THAT.

25      MOVE ALONG.

```
1              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

2         MS. KIM, JUROR NUMBER 14.

3              PROSPECTIVE JUROR:  YES.

4              MR. AKROTIRIANAKIS:  SO YOU HAD MENTIONED, IN

5    RESPONSE TO THE COURT'S QUESTIONING, THAT YOU FIND IT HARD

6    SOMETIMES NOT TO BE OPINIONATED.

7              PROSPECTIVE JUROR:  YES.

8              MR. AKROTIRIANAKIS:  AND DO YOU BELIEVE THAT YOU'VE

9    FORMED ALREADY OPINIONS ABOUT THIS CASE?

10             PROSPECTIVE JUROR:  I WOULD SAY SO.  IT'S HARD NOT

11   TO.

12             MR. AKROTIRIANAKIS:  AND DO YOU THINK THAT, THAT --

13   WITHOUT GETTING INTO WHAT THOSE OPINIONS MIGHT BE, DO YOU THINK

14   THAT YOU WOULD BE ABLE TO SET THE OPINIONS TO THE SIDE -- WELL,

15   LET ME BACK UP.

16        YOU UNDERSTAND WE HAVEN'T HEARD EVIDENCE YET; RIGHT?

17             PROSPECTIVE JUROR:  YEAH.

18             MR. AKROTIRIANAKIS:  AND YOU ALREADY HAVE OPINIONS --

19   AND YOU UNDERSTAND FURTHER THAT A JUROR'S DECISION IS MEANT TO

20   BE BASED UPON THE EVIDENCE THAT YOU HEAR IN COURT AND ON THE

21   INSTRUCTIONS ON THE LAW THAT HER HONOR GIVES; RIGHT?

22             PROSPECTIVE JUROR:  YES.

23             MR. AKROTIRIANAKIS:  OKAY.  AND WITH ALL THAT, YOU

24   BELIEVE ALREADY YOU'VE FORMED OPINIONS ABOUT THIS CASE?

25             PROSPECTIVE JUROR:  OH, IN REGARDS TO THAT, NO.
```

```
1              MR. AKROTIRIANAKIS:  OKAY.  WHAT ABOUT AFTER MY

2      COUNTERPART GETS UP AND HE'S GOING TO GIVE HIS OPENING

3      STATEMENT, I, AS REPRESENTING THE DEFENDANT, WILL GIVE -- WILL

4      GO SECOND IN MY OPENING STATEMENT, AND THEN THEY WILL GIVE

5      THEIR EVIDENCE AND SO ON.

6          SO DO YOU THINK THAT YOU WOULD BE ABLE TO REMAIN

7      UNOPINIONATED, FOR EXAMPLE, AFTER MR. ANDRES GIVES HIS OPENING

8      STATEMENT AND BEFORE I GIVE MINE?  OR BEFORE YOU'VE HEARD THE

9      EVIDENCE IN THE CASE?

10             PROSPECTIVE JUROR:  I WOULD BE ABLE TO REMAIN

11     UNOPINIONATED UNTIL I'VE HEARD BOTH SIDES, YES.

12             MR. AKROTIRIANAKIS:  OKAY.  AND IT'S SORT OF A

13     GENERAL QUESTION, RIGHT?  THE ORDER OF THESE THINGS IS THAT THE

14     PLAINTIFF GOES FIRST, THEN DEFENDANT GOES, AND THERE'S TWO

15     SIDES TO THE STORY.

16         THE ISSUE IN THIS CASE IS A NARROW ONE, AS YOU'VE ALREADY

17     HEARD FROM THE COURT.

18         BUT DOES ANYONE THINK THAT THEY WILL NOT BE ABLE TO

19     RESERVE THEIR THINKING ABOUT THE EVIDENCE AND WEIGHING THE

20     EVIDENCE AND FORMING OPINIONS ABOUT THE CASE UNTIL YOU'VE HEARD

21     BOTH SIDES?  IS THERE ANYONE WHO THINKS THEY NEED TO SPEAK ON

22     THAT ISSUE WHILE WE HAVE IT?

23         OKAY.  THANK YOU.

24         IS IT MR. SISON, NUMBER 18?

25             PROSPECTIVE JUROR:  YES.
```

```
1              MR. AKROTIRIANAKIS:  ALL RIGHT.  AND I UNDERSTAND

2     THAT YOU, TOO, LIKE JUROR NUMBER 9, ARE CONSIDERING APPLYING

3     FOR A JOB WITH META.

4              PROSPECTIVE JUROR:  YES.

5              MR. AKROTIRIANAKIS:  OKAY.  AND I TAKE IT YOU HOPE

6     THAT YOU'RE OFFERED A POSITION WITH META?

7              PROSPECTIVE JUROR:  YES.

8              MR. AKROTIRIANAKIS:  AND DO YOU THINK THAT YOU CAN

9     PUT THOSE THINGS OUT OF YOUR MIND AND CONSIDER THE EVIDENCE IN

10    THIS CASE?  OR DO YOU BELIEVE THAT, BASED ON YOUR HOPE OF

11    RECEIVING AN OFFER OF EMPLOYMENT WITH META IN THE FUTURE, THAT

12    YOU WOULD BE STARTING, IN THIS CASE, WITH MY CLIENT ON A LESSER

13    FOOTING OR AN UNEQUAL FOOTING TO THE PLAINTIFF PARTY IN THIS

14    CASE?

15             PROSPECTIVE JUROR:  RIGHT, IT WOULD BE AN UNEQUAL

16    FOOTING.

17             MR. AKROTIRIANAKIS:  AND SO YOU BELIEVE THAT YOU

18    WOULD BE -- JUST SO IT'S CLEAR -- THAT YOU WOULD BE BIASED IN

19    FAVOR OF META THEN?

20             PROSPECTIVE JUROR:  I THINK SO.

21             MR. AKROTIRIANAKIS:  THANK YOU, MR. SISON.

22             THE COURT:  YOU'RE COMING UP AGAINST YOUR DEADLINE.

23             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24             THE COURT:  SO MAYBE ONE MORE.

25             MR. AKROTIRIANAKIS:  I THINK I'M -- I MAY ACTUALLY --
```

1          OH.  MS. LOW, I SKIPPED.

2          DID I UNDERSTAND YOU CORRECTLY TO SAY THAT YOUR HUSBAND

3     INVESTS DIRECTLY IN META?

4               PROSPECTIVE JUROR:  TO BE HONEST, HE TAKES CARE OF

5     THE FINANCES, SO I DON'T KNOW THE DETAILS.  BUT HE HANDLES THE

6     FINANCES, AND I BELIEVE THAT WE HAVE STOCK IN META.

7               MR. AKROTIRIANAKIS:  OKAY.  AND THE SAME QUESTIONS I

8     ASKED JUROR NUMBER 16 AND SOME OF THE OTHER JURORS.  DO YOU

9     THINK THAT THE FACT THAT YOU ARE FINANCIALLY INVESTED IN ONE OF

10    THE COMPANIES THAT'S A PARTY TO THIS CASE MEANS THAT YOU SET

11    THAT PARTY ON AN UNEQUAL FOOTING TO THE OTHER PARTY?

12              PROSPECTIVE JUROR:  I THINK THAT I CAN VIEW BOTH

13    PARTIES FROM A NEUTRAL PERSPECTIVE AND NOT HAVE THE BIAS.

14              MR. AKROTIRIANAKIS:  OKAY.  THANK YOU.  THANK YOU,

15    MS. LOW.

16         THANK YOU, YOUR HONOR.

17              THE COURT:  ALL RIGHT.

18         LADIES AND GENTLEMEN OF THE JURY, I'M GOING TO EXCUSE YOU

19    FOR A LUNCH BREAK.  PLEASE KEEP IN MIND, WE ARE STILL IN THE

20    PROCESS OF JURY SELECTION.  DO NOT TALK ABOUT WHAT YOU'VE HEARD

21    IN THE COURTROOM THIS MORNING OUTSIDE OF THE COURTROOM.

22         AND YOUR FREE FOR, LET'S SAY, MAYBE AN HOUR.  YOU'RE FREE.

23    COME BACK AT, LET'S SAY, 2:10.

24              THE CLERK:  ALL RISE FOR THE JURY.

25         (JURY OUT AT 1:13 P.M.).

```
1              THE COURT:  ALL RIGHT, COUNSEL.

2         I JUST WANTED TO HAVE A -- BEFORE WE TAKE A BREAK, I

3    WANTED TO GO OVER JUST A COUPLE THINGS.

4         ONE IS, MR. AKROTIRIANAKIS, YOU MENTIONED THE EXPORT

5    CONTROL CONSTRAINTS, AND I THOUGHT THAT WE AGREED THAT THE

6    ISRAELI PROCEEDINGS, WHICH WOULD -- WELL, I THINK THE LANGUAGE

7    THAT I SPECIFICALLY USED -- THIS WAS IN YOUR MOTION IN LIMINE,

8    TO EXCLUDE EVIDENCE OF ISRAELI NATIONAL SECURITY PROCEEDINGS

9    AND RELATED INFORMATION.

10        I TOOK THAT TO INCLUDE EVERYTHING THAT THE GOVERNMENT IN

11   ISRAEL HAD TO DO WITH THIS CASE, NOT JUST THE COURT

12   PROCEEDINGS, BUT THE EXPORT CONTROL AS WELL.

13        YOU MENTIONED THAT TO ONE OF THE JURORS RIGHT BEFORE -- I

14   ASSUME THAT'S WHAT YOU OBJECTED TO, MR. ANDRES.

15             MR. ANDRES:  CORRECT, YOUR HONOR.

16             THE COURT:  SO I'M NOT SURE WE'RE ON THE SAME PAGE

17    WITH THIS.

18             MR. AKROTIRIANAKIS:  YEAH, I THINK THERE ARE

19    DIFFERENT ISSUES, YOUR HONOR.

20        THE ISSUE THAT I WAS ASKING MS. MEHRLING, JUROR NUMBER 10,

21   ABOUT WAS SHE WAS EXPRESSING -- OR SHE EXPRESSED, I THINK

22   PRETTY CLEARLY, A BIAS AGAINST THE ISRAELI GOVERNMENT AND THE

23   ISRAELI MILITARY, AND I WAS ASKING HER, IN FOLLOW-UP, HOW THAT

24   RELATES TO PRIVATE COMPANIES IN ISRAEL, LIKE THE DEFENDANTS IN

25   THIS CASE.
```

1          AND WHAT I HAD ASKED HER WAS -- I THINK THAT THE, THE --

2     IT'S A DIFFERENT ISSUE TO SAY THAT THERE'S, THERE'S

3     RESTRICTIONS ON THINGS THAT MY CLIENTS CAN SAY DISCOVERED IN

4     THE CASE, THINGS LIKE THAT, ON THE BASIS OF THE FACT THAT THIS

5     IS AN EXPORT CONTROLLED TECHNOLOGY, AND THAT THIS IS -- THAT

6     THE LICENSING OF THE PRODUCT IS BY THE ISRAELI MINISTRY OF

7     DEFENSE BECAUSE IT IS EXPORT CONTROLLED.

8          THOSE ARE, AS I SEE IT, TWO DIFFERENT ISSUES, AND I THINK

9     IT'S DIRECTLY RELEVANT TO THE BIAS THAT SHE HAD IN THE CASE.

10          AND REGARDLESS, I WOULD NOT HAVE SAID ANYTHING IF I

11     THOUGHT I WAS CONTRAVENING A COURT ORDER.  I DON'T SEE IT BEING

12     A RELATED POINT TO THE MOTION IN LIMINE THAT THE COURT GRANTED.

13          THE COURT:  IT WAS YOUR MOTION.  I THOUGHT WE

14     WOULDN'T HEAR ANYTHING ABOUT THE REGULATIONS, COURT

15     PROCEEDINGS, ANYTHING HAVING TO DO WITH ISRAEL.

16          MR. AKROTIRIANAKIS:  I DIDN'T ASK HER ABOUT COURT

17     PROCEEDINGS, YOUR HONOR.  WHAT I ASKED HER WAS --

18          THE COURT:  I KNOW.  BUT I ASSUMED THAT THIS WAS IN

19     THE SAME CATEGORY AS THE COURT PROCEEDINGS.  I MEAN, I THINK

20     THE LANGUAGE YOU USED WAS RELATED INFORMATION.  I ASSUMED IT

21     MEANT, WHEN I WAS RULING ON IT, EVERYTHING TO DO WITH WHAT'S --

22     THE LICENSING, ALL OF THAT.

23          WHY WOULD ANY JUROR NEED TO KNOW THAT IN THIS CASE?

24          MR. AKROTIRIANAKIS:  WELL, I THINK THAT -- I THINK

25     THAT IT RELATES SPECIFICALLY TO THE, TO THE ISSUES IN THIS CASE

1    AROUND, AROUND THE ISSUES IN THIS CASE, YOUR HONOR, THAT THE

2    FACT THAT IT'S -- THAT THE -- SORRY.  I JUST LOST MY MIND FOR A

3    SECOND.

4         MAY I REFER TO MY NOTES OVER HERE?

5         THE COURT:  YES.

6         MR. ANDRES:  YOUR HONOR, IN EITHER CASE, THE

7    REPRESENTATION THAT THESE PRODUCTS ARE SOMEHOW ENDORSED OR

8    EXPORT CONTROLLED, THAT THERE'S SOMETHING -- IT'S COMPLETELY

9    OUT OF SCOPE.

10        AND BEYOND THAT -- AND MR. AKROTIRIANAKIS KNOWS THAT.  I

11   MEAN, THIS IS NOT -- THIS IS EXACTLY WHAT'S GOING TO HAPPEN IN

12   OPENING AND THROUGHOUT THIS CASE.  THEY'RE GOING TO PUSH THE

13   LINE AND PUSH THE LINE, AND THAT IS COMPLETELY INAPPROPRIATE.

14        AS IT IS THAT THEY SAID TO THE JURY THAT META HAS ACCUSED

15   NSO OF CERTAIN OFFENSES.  LIABILITY HAS BEEN SET IN THIS CASE,

16   AND I'M EXTREMELY CONCERNED ABOUT THAT, WHICH IS WHY WE'VE

17   ASKED FOR THE EXHIBITS THAT HE'S GOING TO USE IN HIS OPENING.

18        BUT THIS IS NOT -- IT'S NOT THE FIRST TIME THAT NSO HASN'T

19   FOLLOWED THE RULES IN THIS CASE.  YOU KNOW ABOUT ALL THE

20   DISCOVERY ISSUES, I'M NOT GOING TO RAISE THEM NOW.

21        BUT THESE EXPORT CONTROL THINGS ARE EXACTLY THE TYPE OF

22   THING WHERE WE GOT NO DISCOVERY OR WE GOT DISCOVERY IN ISRAEL.

23        SO I JUST -- I DON'T KNOW WHAT TO DO, YOUR HONOR, ASIDE

24   FROM THE FACT THAT COUNSEL SHOULD BE ADMONISHED, AND WE'RE ALL

25   GOING TO HAVE TO PAY VERY CLOSE ATTENTION.

1              THE COURT:  YEAH.

2              MR. AKROTIRIANAKIS:  YOUR HONOR, IT'S NOT A --

3              THE COURT:  BOTH POINTS HE RAISED I NOTICED WHEN YOU

4      WERE MAKING YOUR -- WHEN YOU WERE ASKING THE QUESTIONS.

5          I MEAN, IT'S NOT FAIR TO SAY, AFTER I'VE ALREADY TOLD THEM

6      THAT LIABILITY HAS BEEN DETERMINED, THAT META HAS BEEN

7      ACCUSED -- THAT META ACCUSED YOUR CLIENT.  THE COURT HAS

8      ALREADY FOUND YOUR CLIENT IS LIABLE.

9              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  IF I SAID

10      THAT, I THINK WHAT I MEANT WAS THAT THEY'RE ASKING FOR, FOR

11      DAMAGES IN THE CASE.  I WAS NOT TRYING TO CONTEST LIABILITY.

12              THE COURT:  OKAY.  OKAY.

13          WITH REGARD TO THE EXPORT CONTROL, THAT'S OUT.  THAT -- IT

14      WAS CERTAINLY CONTEMPLATED BY MY ORDER.  I'LL GO BACK AND LOOK

15      AT YOUR BRIEF, BUT I'M PRETTY SURE IT WAS ALL WRAPPED UP INTO

16      THAT PARTICULAR CATEGORY, AT LEAST THAT'S HOW I READ YOUR

17      MOTION IN LIMINE, WHICH I GRANTED.

18          WE NEVER HAD ANY SPECIFIC DISCUSSION ABOUT THE FACT THAT

19      YOUR CLIENT'S PRODUCT IS EXPORT CONTROLLED.  I DON'T REMEMBER

20      THAT COMING UP SPECIFICALLY.

21              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

22              THE COURT:  BUT IT CERTAINLY WAS CONTEMPLATED TO BE

23       IN THAT CATEGORY.

24          YOU WANTED TO EXCLUDE EVERYTHING HAVING TO DO WITH THE

25      COURT, WITH THE LICENSING REQUIREMENT, WITH THE LEGAL

1    REQUIREMENTS THAT YOUR -- THAT YOU WERE CONSTRAINED BY DURING

2    THE DISCOVERY PERIOD.

3         I DON'T KNOW WHY THIS SHOULD BE EXCERPTED OUT, WHY THERE

4    SHOULD BE AN EXCEPTION FOR THIS.

5              MR. AKROTIRIANAKIS:  YOUR HONOR, I WOULD ASK THE

6     COURT TO LOOK AT THE MOTION.  I DON'T THINK THAT THAT'S WHAT WE

7     WERE ASKING FOR.

8              THE COURT:  OKAY.  I'LL LOOK AT.  IT I'LL LOOK AT IT.

9         IN THE MEANTIME, I'M JUST GOING TO TELL YOU WHAT DECISION

10   I'VE MADE WITH REGARD TO THE JURY INSTRUCTION --

11             MR. ANDRES:  THANK YOU, YOUR HONOR.

12             THE COURT:  -- HAVING LOOKED AT THOSE EARLIER.

13        OKAY.  YOU ALL HAVE GIVEN ME COMPETING INSTRUCTIONS

14   NUMBER 1 ON COMPUTER FRAUD AND ABUSE ACT, AND I WILL APPROVE

15   PLAINTIFFS' SENTENCE, SPECIFICALLY, THE COURT FOUND THAT THE

16   DEFENDANTS' WHATSAPP INSTALLATION SERVER, OR WIS, W-I-S, SENT

17   MESSAGES THROUGH WHATSAPP SERVERS THAT CAUSED PEGASUS TO BE

18   INSTALLED ON TARGET USERS'S DEVICES THAT THE WI -- AND THAT THE

19   WIS WAS, STRIKING "THEN," ABLE TO OBTAIN CERTAIN PROTECTED

20   INFORMATION, INSERTING "CERTAIN."

21        OKAY?  EVERYBODY GOT THAT?

22        AND THEN WITH REGARD TO THE LAST SENTENCE, I AGREE WITH

23   THE DEFENDANTS THAT THE INTENT REQUIRED BY THE COMPUTER FRAUD

24   AND ABUSE ACT IS SUFFICIENT.  I AGREE WITH THE DEFENDANTS THAT

25   IF WE WERE TO LEAVE THE INTENT TO DEFRAUD, THAT WOULD REQUIRE

```
1    YET ANOTHER INSTRUCTION TO CLARIFY THE DIFFERENCE WITH REGARD

2    TO THE PUNITIVE DAMAGES INSTRUCTION, AND ALREADY I THINK THE

3    INSTRUCTIONS ARE GOING TO BE SO COMPLICATED, AS THEY DON'T ALL

4    APPLY TO EACH OF THE CAUSES OF ACTION, AS TO LIKELY TO CONFUSE

5    THE JURY.

6         THAT'S MY RULING.  I DON'T WANT TO HEAR ANY MORE ARGUMENT

7    ON IT.

8              MR. NOLLER:  YOUR HONOR, CAN I ASK JUST ONE POINT OF

9    CLARIFICATION?

10             THE COURT:  YEAH.

11             MR. NOLLER:  SO EARLY IN THE PLAINTIFFS' PROPOSED

12   CONSTRUCTION, THERE WAS A CLAUSE THAT SAID THAT YOUR HONOR

13   FOUND THAT NSO KNOWINGLY AND INTENTIONALLY AND WITH INTENT TO

14   DEFRAUD EXCEEDED ITS AUTHORIZED ACCESS.  SO I JUST WANTED TO --

15             THE COURT:  WHICH INSTRUCTION WAS THAT?

16             MR. NOLLER:  THAT WOULD BE PLAINTIFFS' PROPOSED

17   NUMBER 1.

18             THE COURT:  OH, IN THE EARLIER SENTENCE IN THIS?

19             MR. NOLLER:  YES.

20             THE COURT:  OH, I DIDN'T LOOK AT THAT.

21             MR. NOLLER:  I JUST WANTED TO CONFIRM THAT YOUR

22   RULING AS TO THE LAST SENTENCE WOULD ALSO APPLY TO THAT.

23             THE COURT:  I DIDN'T LOOK AT THAT.  LET ME LOOK AT IT

24   AT LUNCH TIME.

25             MR. NOLLER:  OKAY.  THANK YOU, YOUR HONOR.
```

```
 1              THE COURT:  I ONLY LOOKED AT THOSE OTHER TWO

 2       SENTENCES.

 3              OKAY.  I THINK THAT'S WHAT I WAS ASKED TO LOOK AT.  I'LL

 4       LOOK AT THAT OTHER SENTENCE AND LET YOU KNOW.

 5              TAKE A BREAK, BACK AT -- WHAT DID I SAY, 1:10?

 6              MR. ANDRES:  YOU SAID 2:10.

 7              YOUR HONOR, BEFORE YOU LEAVE, JUST TWO THINGS.  THE

 8       DEFENDANT SAID THEY'RE GOING TO GIVE US THE LIST OF EXHIBITS

 9       FOR THEIR OPENING?  CAN WE GET THAT OVER THIS BREAK.

10              THE COURT:  YES, YES.  IF YOU'RE GIVING YOUR OPENING

11       TODAY, I WANT AN EXCHANGE BEFORE, AND I ASSUME WE'RE GOING TO

12       BE READY TO HAVE OPENINGS AND TO GET THEM IN BEFORE 4:00

13       O'CLOCK.

14              MR. ANDRES:  YEAH.

15              AND THEN JUST SECONDLY, YOUR HONOR, JUST TO UNDERSTAND THE

16       PROCESS WHEN WE COME BACK, I ASSUME YOU'RE GOING TO GO THROUGH

17       THE CAUSE STRIKES.

18              THE COURT:  RIGHT.  THIS IS WHAT WE'LL DO.

19              MR. ANDRES:  OKAY.  APOLOGIES.

20              THE COURT:  THE JURORS WILL BE SEATED, BECAUSE IT'S

21       HELPFUL TO SEE THEM.

22              MR. ANDRES:  IT IS.

23              THE COURT:  OTHERWISE WE'D DO IT NOW.  BUT IT'S

24       HELPFUL TO HAVE THEM.  WE HAVE SORT OF A WHITE NOISE THING THAT

25       WE TURN ON SO THAT THEY CAN'T HEAR.
```

 1          WE WILL DO THE HARDSHIPS AND CAUSE SIDE-BAR, AT SIDE-BAR.

 2     EVERYBODY HAS A CHART, YOU'LL MARK OFF THE ONES THAT ARE GONE,

 3     AND THEN YOUR PEREMPTORY CHALLENGES, THREE PER SIDE, YOU

 4     EXERCISE IN WRITING AND YOU SIMPLY PASS IT BACK AND FORTH.

 5          I DON'T DO ANYTHING OUT IN THE OPEN, AND WE EXCUSE ALL --

 6     WELL, THE JURORS THAT WILL BE SEATED -- AND I'LL GO OVER THEM

 7     WITH YOU BEFORE IT'S FINALIZED -- WILL BE THE FIRST EIGHT LEFT

 8     AFTER ALL CHALLENGES HAVE BEEN EXERCISED.

 9          MR. ANDRES:  OKAY.  AND THEN, JUST SO I UNDERSTAND

10     THE PROCEDURE, I'LL TAKE A PAD OF PAPER AND PUT NUMBER 1, I

11     GIVE IT TO --

12          THE COURT:  YEAH, WE HAVE A FORM.

13          MR. ANDRES:  -- DEFENDANTS AND THEY SAY 2, AND I GET

14     IT OUT, SO IT'S 1, 1, 1, 1 UNTIL WE GET TO 6.

15          THE COURT:  YES.

16          MR. AKROTIRIANAKIS:  ALL THAT HAPPENS AT SIDE-BAR.

17          THE COURT:  YOUR PEREMPTORY CHALLENGES YOU DO

18     SILENTLY.

19          KELLY, CAN YOU JUST SHOW THEM THE FORM?  YOU DO IT

20     SILENTLY AND YOU JUST PASS THE PAPER BACK AND FORTH.

21          MR. ANDRES:  WE STAY AT OUR TABLES.

22          MR. AKROTIRIANAKIS:  I SEE.  SO IT'S JUST THE

23     HARDSHIPS --

24          THE COURT:  THE HARDSHIPS AND CAUSE AT SIDE-BAR, WITH

25     THE WHITE NOISE ON, WITH THE JURORS HERE SO YOU CAN SEE THEIR

```
1     FACES.  IT HELPS TO REMEMBER WHAT THEY SAID BY LOOKING AT THEM;

2     RIGHT?

3              MR. AKROTIRIANAKIS:  AND THEN IF YOU PASS, A STRIKE

4     IS CONSIDERED TO HAVE BEEN USED?

5              THE COURT:  YOU KNOW, I DON'T FOLLOW THAT.  YOU CAN

6     USE -- YOU CAN GO IN ANY ORDER YOU WISH.  BUT IT MAKES NO SENSE

7     TO START STRIKING AT THE END OF THE LIST BECAUSE WE'RE NOT

8     GOING TO GET TO THAT.

9              MR. AKROTIRIANAKIS:  NO.  I MEANT IF MR. ANDRES SAYS,

10    WELL, I ACCEPT THE JURY AS IT'S CONSTITUTED AND THEN I STRIKE,

11    HAS HE -- OR CAN HE SAVE ALL HIS STRIKES AT THE END AND SAY --

12             THE COURT:  NO, NO, HE HAS TO DO THEM IN ORDER.

13             MR. ANDRES:  I COULD PASS FOR A ROUND, BUT --

14             THE COURT:  YOU CAN PASS FOR A ROUND.

15             MR. ANDRES:  ONE, ONE, PASS, ONE.

16             THE COURT:  YEAH.  BUT YOU GET TO COME BACK TO

17    EXERCISE THE ONE THAT YOU DIDN'T PASS ON.  YOU GET THREE.

18             MR. ANDRES:  RIGHT.

19             THE COURT:  AND I DON'T REALLY CARE THE ORDER IN

20    WHICH YOU DO THE THREE.

21             MR. AKROTIRIANAKIS:  UNDERSTOOD, YOUR HONOR.

22             THE COURT:  OKAY?  IT DOESN'T REALLY MATTER, THE

23    ORDER.

24             MR. ANDRES:  YOUR HONOR, THERE IS ALSO ONE

25    OUTSTANDING JURY INSTRUCTION, WHICH WE CAN DEAL WITH NOW OR
```

1      LATER, BUT I'LL LET MR. PEREZ TALK ABOUT THAT.

2                  MR. PEREZ:  YES, YOUR HONOR.  THIS MORNING WE ARGUED

3      TWO INSTRUCTIONS.  ONE OF THEM WAS ON THE CFAA, THE OTHER WAS

4      ON CDAFA, WHICH WAS THE ISSUE OF INCLUDING A DESCRIPTION OF THE

5      CALIFORNIA-BASED CONDUCT.

6                  THE COURT:  OKAY.  ALL RIGHT.  AND?

7                  MR. PEREZ:  I WASN'T SURE IF THE COURT HAD RULED ON

8      THAT.

9                  THE COURT:  OH, I THOUGHT I TOLD YOU.  I'M GOING TO

10     INCLUDE THE CALIFORNIA-BASED CONDUCT.

11                 MR. PEREZ:  EXCELLENT.  THANK YOU, YOUR HONOR.

12     APOLOGIES.

13                 THE COURT:  OKAY.  ALL RIGHT.  I WILL SEE YOU BACK

14     HERE AT 2:10.

15                 MR. PEREZ:  THANK YOU, YOUR HONOR.

16                 THE COURT:  THANK YOU.

17         (THE LUNCH RECESS WAS TAKEN FROM 1:25 P.M. UNTIL

18     2:18 P.M.)

19

20

21

22

23

24

25

1            **AFTERNOON SESSION**

2            (JURY IN AT 2:18 P.M.)

3                THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, AT THIS

4      TIME I'M GOING TO NEED TO TALK TO THE ATTORNEYS ABOUT SOME OF

5      THE CHALLENGES, AND I'D LIKE TO DO THAT WITH YOU IN YOUR SEATS

6      SO THAT WE CAN LOOK AT YOU.  WE RECALL WHAT YOU SAID MUCH

7      BETTER IF WE CAN SEE YOUR FACE.

8            BUT I'D LIKE TO DO IT, AND WILL DO IT, OUT OF YOUR

9      HEARING.

10            SO COUNSEL AND I ARE GOING TO MEET AT WHAT WE CALL

11      SIDE-BAR, AND WE'RE GOING TO TALK, AND WE MIGHT BE LOOKING AT

12      YOU FROM TIME TO TIME, BUT WE'RE JUST WORKING THROUGH THE

13      CHALLENGES AND COME UP WITH OUR FINAL SELECTION AS TO WHO'S

14      GOING TO COMPRISE THIS JURY.

15            I ASK YOU JUST TO KEEP YOUR VOICES DOWN.  WE'RE GOING TO

16      PLAY SOME WHITE NOISE SO THAT YOU CAN'T HEAR WHAT WE'RE SAYING,

17      BUT IT'S HELPFUL IF YOU DON'T -- IF YOU WANT TO WHISPER TO EACH

18      OTHER, THAT'S FINE, BUT JUST KEEP YOUR VOICES DOWN.

19            OUR COURT REPORTER WILL NEED TO UNPLUG AND MOVE OVER,

20      SO --

21                THE REPORTER:  I'LL DO IT THROUGH HEADPHONES.

22                THE COURT:  OH, WE'RE SO MODERN HERE NOW.  SO GIVE US

23      A FEW MINUTES FOR THAT.

24            COUNSEL, IF YOU'LL JOIN ME UP AT SIDE-BAR.

25            (SIDE-BAR DISCUSSION ON THE RECORD.)

```
 1            THE COURT:  I NEED TO -- THEY ALWAYS START TALKING

 2     LOUD, AS SOON AS I SAY KEEP YOUR VOICES DOWN.

 3            OKAY.  LET'S GO THROUGH HARDSHIPS AND FOR CAUSE FIRST.

 4            WELL, THE ONLY HARDSHIP WAS THE NURSING MOTHER WHO HER

 5     SCHEDULE JUST WOULD NOT HAVE COMPORTED WITH THE TRIAL SCHEDULE.

 6            MR. ANDRES:  YEAH.

 7            THE COURT:  THE OTHERS AREN'T ONES THAT I WOULD

 8     EXCUSE FOR HARDSHIP, BUT MIGHT GO INTO WHETHER OR NOT I THINK

 9     ULTIMATELY WE WANT TO HAVE THEM ON THE JURY.  IT'S BEEN MY

10     EXPERIENCE THAT IF PEOPLE DON'T REALLY WANT TO BE ON THE JURY,

11     WE REALLY DON'T WANT THEM ON THE JURY, BECAUSE IF THEY DON'T

12     SHOW UP, I MEAN, HAVING -- SENDING A MARSHAL TO GET THEM

13     DOESN'T DO ANYTHING FOR THE TRIAL SCHEDULE AND JUST VERY, VERY,

14     VERY DISRUPTIVE, AND WE DON'T REALLY DO THAT ANYMORE ANYWAY.

15            SO MY EXPERIENCE IS THAT I'LL TRY TO BE AS GENEROUS AS

16     POSSIBLE.  I QUESTIONED EVERYBODY SO THAT I COULD BE AS

17     GENEROUS AS POSSIBLE ON EXCUSALS FOR CAUSE.  OKAY?

18            MR. ANDRES:  UM-HUM.

19            THE COURT:  OKAY.  SO LET'S START WITH PLAINTIFF, ANY

20     FOR CAUSE?

21            MR. ANDRES:  YOUR HONOR, JUROR NUMBER 14 HAS GONE

22     BACK AND FORTH IN TERMS OF WHETHER SHE COULD BE FAIR, AND SHE

23     SAID SHE GOT OFF SOCIAL MEDIA, THAT, YOU KNOW, META WOULD BE

24     BEHIND.

25            I THINK SHE DIDN'T SAY IT IN COURT TODAY, BUT I THINK SHE
```

1    SAID ON HER QUESTIONNAIRE THAT SHE HAS AUTISM.

2              THE COURT:  YEAH, SHE DOES.

3              MR. ANDRES:  SO SHE NEEDS TIME TO FOLLOW.  AND SORT

4    OF SIMILAR ON THINKING VERY BLACK AND WHITE.  SO WE WOULD MOVE

5    TO STRIKE FOR CAUSE JUROR 14.

6              THE COURT:  OKAY.

7         ANY OBJECTION?

8              MR. AKROTIRIANAKIS:  I TRIED TO ASK HER IF SHE WAS --

9    IF SHE WAS GOING TO BE, YOU KNOW, OF AN OPINION IN AN

10   UNSHAKEABLE FORMAT, AND SHE SAID NO, AND SHE COULD BE -- SHE

11   COULD BE FAIR.  BUT I DON'T HAVE PARTICULARLY STRONG FEELINGS.

12             THE COURT:  YEAH, I MEAN, THERE'S A LOT OF --

13   FRANKLY, BOTH OF YOUR -- ALL OF YOUR CLIENTS, IT APPEAR, COULD

14   BE CLASSIFIED AS THE BAD GUYS, I MEAN, THE ANTISOCIAL MEDIA AND

15   THE ANTI WAR IN GAZA STANCE.  I MEAN, THERE ARE STRONG

16   FEELINGS, I THINK, BOTH WAYS.

17        BUT I WAS CONCERNED ABOUT HER NEGATIVE OPINION AGAINST

18   SOCIAL MEDIA GENERALLY -- THERE WERE A HANDFUL OF PEOPLE WHO

19   ALSO HAD THAT -- AND WHETHER OR NOT SHE COULD SET THAT ASIDE.

20        YOU DID, I THINK, ASK HER DURING YOUR FOLLOW-UP WHETHER OR

21   NOT SHE COULD SEPARATE THOSE FEELINGS FROM THE ACTUAL FACTS OF

22   THIS CASE, AND SHE DID SAY SHE COULD.

23        SO NOT A STRICT FOR CAUSE, BUT I AM A LITTLE CONCERNED

24   ABOUT THE AUTISM AND ABOUT HER SAYING AT THE VERY BEGINNING,

25   AND IN HER QUESTIONNAIRE, THAT SHE HAD A TENDENCY TO BE

1    OPINIONATED, WHICH KIND OF SUGGESTS SHE MIGHT NOT, YOU KNOW,

2    HAVE AN OPEN MIND ON IT.

3         SO I'M GOING TO EXCUSE HER.

4              MR. ANDRES:  OKAY.  THANK YOU, YOUR HONOR.

5              THE COURT:  OKAY.  NEXT?

6              MR. ANDRES:  JUROR NUMBER 21, IS, I THINK, A

7    PROFESSOR AT STANFORD.  HE SAID THAT SOCIAL MEDIA HAS A STRONG

8    INFLUENCE ON OUR PSYCHES AND PSYCHOLOGICALLY, AND THEY USE

9    THEIR POWER FOR X, Y, Z, I DIDN'T REMEMBER EXACTLY WHAT HE

10   SAID.  BUT BASICALLY HE SAID THAT WAS IN HIS HEAD.  HE'S A

11   PROFESSOR AT THE STANFORD LAB.

12             THE COURT:  RIGHT.

13             MR. ANDRES:  AND HIS BIAS GENERAL SOCIAL MEDIA, HE

14   BASICALLY SAID HE COULDN'T PUT THAT ASIDE TO BE ABLE TO

15   DELIBERATE FAIRLY, SO WE'D MOVE TO EXCLUDE HIM FOR CAUSE.

16             THE COURT:  YEAH.  ANY OBJECTION?

17             MR. AKROTIRIANAKIS:  NO.

18             THE COURT:  OKAY.  GRANTED FOR CAUSE.

19             MR. ANDRES:  NEXT IS NUMBER 24, WHO'S THE MUSICIAN.

20   SHE HAD A STUDENT THAT COMMITTED SUICIDE.

21             THE COURT:  RIGHT.

22             MR. ANDRES:  AND SHE, FRANKLY, ALSO HAD STRONG VIEWS

23   ABOUT ISRAEL.  BUT SHE CERTAINLY SAID THAT SHE, YOU KNOW,

24   EXPECTED META TO BE QUITE BEHIND, OR THEY WOULDN'T START ON THE

25   STARTING LINE AT THE SAME TIME.

```
 1            AND SHE WAS PRETTY FIRM ABOUT HER VIEWS ABOUT SOCIAL

 2    MEDIA, SO WE WOULD MOVE TO EXCLUDE HER FOR CAUSE.

 3            THE COURT:  OKAY.  SHE DID SAY, IN

 4    MR. AKROTIRIANAKIS'S QUESTIONING FURTHER, THAT SHE THOUGHT SHE

 5    COULD BE FAIR AND PUT ASIDE THOSE FEELINGS.  SHE DID SAY THAT

 6    AFTER SAYING A BUNCH OF NEGATIVE THINGS ABOUT ISRAEL, THE

 7    PROBLEM WITH NETANYAHU, AND I'M A LITTLE NERVOUS ABOUT HER,

 8    BECAUSE SHE HAD NEGATIVE FEELINGS FOR BOTH PARTIES.

 9            MR. ANDRES:  AND SAID MORE DIRECTLY, LIKE, ON THE

10    FIFTH TRY, SHE SAID SHE THOUGHT SHE COULD BE FAIR.

11            MR. AKROTIRIANAKIS:  RIGHT.

12            MR. PEREZ:  I WAS JUST ADDING THAT SHE SAID SHE WOULD

13    LIKE TO SEE THE JURY TOGETHER.

14            THE COURT:  RIGHT, SHE DID SAY THAT.

15        ALL RIGHT.  ANY OBJECTION?

16            MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

17            THE COURT:  OKAY.  I'LL EXCLUDE HER.

18            MR. ANDRES:  AND THEN I THINK OUR LAST FOR CAUSE

19    CHALLENGE IS NUMBER 29, WHO WAS THE SONOMA STATE PROFESSOR, WHO

20    SAID THAT HE WOULDN'T, REGARDLESS OF WHAT THE COURT'S

21    INSTRUCTIONS WERE, HE WOULDN'T GIVE AN AWARD BASED ON THE

22    EVIDENCE, BUT THAT HE WOULD GIVE A DOLLAR AWARD BASED ON HIS

23    BIAS, I THINK HE CALLED IT IMPLICIT BIAS, AGAINST META.

24            THE COURT:  RIGHT.  AND THIS IS -- AND WHEN ASKED

25    ABOUT NSO, HIS ONLY RESPONSE WAS HE DIDN'T KNOW NSO.
```

```
1              MR. ANDRES:  YEAH.

2              THE COURT:  SO, OKAY.

3         ANY OBJECTION?

4              MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

5              THE COURT:  OKAY.

6              MR. ANDRES:  THOSE, I THINK, COMPLETE OUR FOR CAUSE

7    CHALLENGES, YOUR HONOR.

8              THE COURT:  OKAY.  AND FOR THE DEFENSE?

9              MR. AKROTIRIANAKIS:  JUROR NUMBER 1 SAID THAT SHE

10   BELIEVED THAT SHE WOULD BE BIASED.  SHE USED THE WORD IMPLICIT

11   BIAS, BUT SHE WENT ON AT LENGTH ABOUT HOW SHE THOUGHT THAT THE

12   PARTIES WERE ON AN UNEQUAL FOOTING IN HER MIND.

13             THE COURT:  OKAY.  SPEAK UP.

14             MR. AKROTIRIANAKIS:  I'M SORRY.  SHE WENT ON AT

15   LENGTH ABOUT HOW THE PARTIES WOULD BE ON AN UNEQUAL FOOTING IN

16   HER MIND AND IN FOLLOW-UP ABOUT HER RESPONDING TO THE COURT'S

17   QUESTION ABOUT WHETHER SHE WOULD PREFER TO HAVE HER AS A JUROR

18   IN THIS CASE, AND ON MY QUESTIONING SHE SAID THAT SHE WOULD BE

19   BIASED.

20             THE COURT:  I HAD A LITTLE CONCERN ABOUT HER, TOO,

21   ABOUT HER NEW JOB AND -- I MEAN, SHE JUST STARTED, WHAT, A WEEK

22   AGO OR SOMETHING.

23             MR. AKROTIRIANAKIS:  SHE SAID NEW JOB TWO WEEKS AGO

24   AND SHE CANCELLED HER FLIGHT TODAY.

25             THE COURT:  RIGHT, RIGHT.
```

```
 1              MR. AKROTIRIANAKIS:  SHE'S MEANT TO BE IN L.A.

 2    TOMORROW.

 3              THE COURT:  I'M A LITTLE CONCERNED ABOUT HER BEING

 4    DISTRACTED AND HAVING STARTED A NEWER JOB.  THE LAST THING YOU

 5    WANT TO DO IS TO START MISSING WORK WHEN YOU FIRST START.

 6              MR. ANDRES:  NO OBJECTION.

 7              THE COURT:  OKAY.  NO OBJECTION.  I EXCUSE HER FOR

 8    CAUSE THEN.

 9              MR. AKROTIRIANAKIS:  THE SECOND ONE IS JUROR NUMBER 2

10    HAD -- MADE SIMILAR STATEMENTS ABOUT BEING UNABLE TO BE FAIR TO

11    THE DEFENDANTS.  HE SAID HE WAS BIASED.  HE DIDN'T EVEN USE THE

12    WORD IMPLICIT BIAS.  THIS WAS BASED ON HIS ALIGNMENT WITH META

13    BASED ON HIS -- WHAT HE DOES FOR A JOB.

14              THE COURT:  RIGHT.

15              MR. AKROTIRIANAKIS:  WHICH WAS IN DEFENSIVE

16    CYBERSECURITY.

17              THE COURT:  RIGHT.

18              MR. AKROTIRIANAKIS:  YOUR HONOR, ON THAT BASIS WE'D

19    MOVE TO STRIKE HIM.

20              MR. ANDRES:  WE WOULD OBJECT TO THAT, BECAUSE DURING

21    YOUR QUESTIONING, HE SAID HE COULD BE FAIR.

22              THE COURT:  HE DID.

23              MR. AKROTIRIANAKIS:  YOU ASKED HIM THAT REPEATEDLY,

24    AND HE SAID HE COULD BE FAIR.  SO I THINK THE WAY THAT

25    MR. AKROTIRIANAKIS ASKED THE QUESTIONS IN A LEADING WAY SORT OF
```

1      SUGGESTED THAT HE COULDN'T BE FAIR.  BUT HE BASICALLY SAID HE'S

2      NOT INVOLVED IN CYBERSECURITY -- THERE ARE A LOT OF PEOPLE

3      INVOLVED IN COMPUTERS ON THIS JURY.  WE CAN'T EXCLUDE ALL OF

4      THEM.  AND HE SAID HE COULD BE FAIR.

5           THE COURT:  HE ALSO SAID HE WAS MORE ALIGNED IN HIS

6      VIEWS WITH FACEBOOK.  HE ALSO SAID THAT HE -- THE BIAS MIGHT

7      BE, MIGHT BE THERE MORE IN FAVOR OF META.

8           MR. AKROTIRIANAKIS:  AND HE ALSO --

9           THE COURT:  DURING HIS -- HIS QUESTIONS COUNT AS

10     WELL.  THIS IS A GENTLEMAN WITH A STRONG PERSONALITY.  HE

11     CERTAINLY, I THINK, COULD HAVE MADE HIS POINT OTHERWISE.  HE

12     SAID HE COULD BE FAIR EARLIER ON, BUT THE LATER QUESTIONS,

13     WELL --

14          MR. ANDRES:  I WOULD OBJECT TO THAT, YOUR HONOR.

15     WHETHER HE'S A STRONG PERSONALITY OR NOT, HE SAID HE COULD BE

16     FAIR.  A LOT OF PEOPLE HERE HAVE VIEWS, AND THAT'S NOT REALLY

17     THE DETERMINATION.  THE VIEW IS, CAN YOU PUT THOSE VIEWS ASIDE

18     AND BE FAIR.  AND HE SAID YES.

19          THE COURT:  AND I -- HE DIDN'T SAY YES TO THAT

20     SPECIFIC QUESTION.

21          MR. ANDRES:  HE DID TO YOU.  HE DIDN'T SAY IT TO

22     MR. AKROTIRIANAKIS.

23          MR. AKROTIRIANAKIS:  SO THE COURT MAY RECALL THAT HE

24     ANSWERED IN KIND OF A DOUBLE DOUBLE NEGATIVE, AND I SAID, SO

25     THEN DO I UNDERSTAND YOU CORRECTLY THAT YOU ARE SAYING THAT YOU

```
 1        WOULD BE BIASED AGAINST NSO?  AND HE SAID, YES, YOU UNDERSTAND

 2        ME CORRECTLY.

 3                  THE COURT:  YES.  HE'S EXCUSED FOR CAUSE.

 4             OKAY.  ANY OTHERS?

 5                  MR. AKROTIRIANAKIS:  NUMBER -- LET ME GET IT HERE.

 6             NUMBER 9, YOUR HONOR.

 7                  THE COURT:  NUMBER 9.

 8                  MR. AKROTIRIANAKIS:  THIS IS THE GENTLEMAN --

 9                  THE COURT:  WHO'S SEEKING THE JOB WITH FACEBOOK?

10                  MR. AKROTIRIANAKIS:  YES.

11                  THE COURT:  AND YOUR BASIS IS?

12                  MR. AKROTIRIANAKIS:  HE SAID, I WILL BE BIASED.

13        THOSE ARE THE WORDS I WROTE DOWN.  HE SAID HE'S PRESENTLY NOT

14        WORKING, HE HAS A SPECIFIC PLAN TO INTERVIEW, HE HOPES THAT HE

15        WILL RECEIVE AN OFFER, AND THAT THAT WILL BE IN HIS MIND WHEN

16        HE'S CONSIDERING THE EVIDENCE AND THE COURT'S INSTRUCTIONS.

17                  THE COURT:  OKAY.  WELL, YEAH, HE ALSO, LIKE MANY OF

18        THEM, SAID OTHER THINGS.  BUT HE DID SAY THAT HE WOULD BE

19        SUBCONSCIOUSLY BIASED, AND HE DID SAY THAT HE MIGHT BE

20        PREDISPOSED.

21             AND THEN HE SAID HE WAS CONSIDERING WORKING FOR FACEBOOK

22        AND THAT -- AND HIS DECISION AS A JUROR WOULD BE AFFECTED BY

23        THAT, THE FACT THAT HE'S TRYING TO WORK WITH FACEBOOK.

24             WHAT DO YOU THINK?

25                  MR. ANDRES:  NO OBJECTION.
```

1          THE COURT:  OKAY.  THAT'S FOR CAUSE.

2      ANY OTHERS?

3          MR. AKROTIRIANAKIS:  YES.  NUMBER 10, THIS IS NOT,

4  LIKE -- IT WAS NOT SUPER CLEAR TO ME IN HER RESPONSE TO THE

5  COURT'S QUESTIONS, WHICH IS WHY I FOLLOWED UP WITH HER.  I

6  THINK THAT THE -- IN SUM, HER TESTIMONY IS THAT SHE'S

7  INHERENTLY BIASED AGAINST COMPANIES THAT DO BUSINESS IN ISRAEL

8  AND WITH GOVERNMENT AND MILITARY TECHNOLOGY.

9      AND SHE ALSO, AS THE COURT MAY RECALL, HAD SOME

10  PRE-KNOWLEDGE OF THE FACTS OF THE CASE, ALTHOUGH SHE COULDN'T

11  REALLY RECALL WHAT THOSE WERE, OR WHAT THE SOURCE OF THOSE

12  WERE.  BUT SHE WAS AWARE OF PEGASUS, HAD A NEGATIVE OPINION OF

13  THAT TYPE OF THING.  SHE SAID SHE COULDN'T REALLY REMEMBER THE

14  SOURCE OF THAT NEWS, BUT SHE DID SAY THAT SHE HAD A NEGATIVE

15  OPINION OF THAT.

16      AND THEN SHE AMPLIFIED UPON IT IN RESPONSE TO MY FURTHER

17  QUESTIONING AND SAID THAT SHE IS -- I BELIEVE SHE SAID THAT

18  SHE'S BIASED AGAINST COMPANIES THAT DO BUSINESS WITH ISRAEL AND

19  THAT MARKET GOVERNMENT AND MILITARY TECHNOLOGY.

20          MR. ANDRES:  YOUR HONOR, THAT'S, A, INACCURATE; AND,

21  B, WHAT SHE SAID WAS SHE THOUGHT THAT PEGASUS WAS A, WAS A

22  PRODUCT THAT META AND NSO WORKED ON TOGETHER.

23          THE COURT:  RIGHT.

24          MR. ANDRES:  WHICH SUGGESTS THAT BOTH PARTIES ARE.

25      AND THEN I SAID TO HER, LOOK, THE WHOLE EXERCISE HERE IS,

1    CAN YOU PUT THAT ASIDE AND BE FAIR?

2        SO SHE WASN'T EXHIBITING ANY MORE BIAS TOWARDS NSO THAN

3    SHE WAS BY META BECAUSE SHE THOUGHT THAT META WAS RESPONSIBLE

4    FOR PEGASUS, FRANKLY.  AND THAT'S NOT TRUE, AND WE'LL CORRECT

5    HER OF THAT DURING TRIAL.

6        BUT I THINK SHE CAN BE FAIR.  SHE SAID SHE CAN PUT THAT

7    ASIDE AND BE FAIR.

8        I DON'T REMEMBER IF THIS IS THE JUROR WHERE

9    MR. AKROTIRIANAKIS MENTIONED EXPORT CONTROL, BUT I CERTAINLY

10   DON'T THINK HE SHOULD BE PROFITING BY, OR BENEFITING BY RAISING

11   THESE ISSUES THAT ARE INAPPROPRIATE IN FRONT OF THE JURY.  SO

12   WE THINK --

13        THE COURT:  WELL, I HAVEN'T MADE A FINAL

14   DETERMINATION ON THAT JUST YET.

15        MR. ANDRES:  YOUR HONOR, I WAS -- EXCUSE ME.  BUT I

16   THINK JUROR 10 HAS REPEATEDLY SAID THAT SHE COULD BE FAIR.  DID

17   SHE SAY IT ON THE FIRST QUESTION?  MAYBE NOT.  BUT WHEN PRESSED

18   BY BOTH SIDES SAID SHE THOUGHT SHE COULD BE FAIR.

19        THE COURT:  UM-HUM.  I THINK MY BIGGEST CONCERN WITH

20   HER WAS THE WORK, THE COMMUNITY WORK THAT SHE DOES, ACTIVELY

21   TRYING TO GET THE UNITED STATES LOCAL GOVERNMENTS TO DIVEST

22   FROM ISRAEL.

23        MR. AKROTIRIANAKIS:  AND THAT'S WHAT MY COMMENTS WERE

24   DIRECTED TO, YOUR HONOR.  YES, SHE WAS CONFUSED ABOUT WHETHER

25   THERE WAS SOME PARTNERSHIP BETWEEN FACEBOOK AND PEGASUS.  I

1    DON'T THINK THAT WOULD BE A REASON ON ITS OWN TO EXCUSE HER.

2    IT'S NOT EVEN PART OF MY ARGUMENT.  I THINK THAT IT'S THE

3    VOLUNTEER ORGANIZING THAT SHE'S DOING, SHE'S IN THE LEADERSHIP

4    OF AN ORGANIZATION THAT'S URGING, AS THE COURT MENTIONED, THE

5    POSITIONS THAT I'VE ALREADY STATED.

6         MR. ANDRES:  I'M SORRY, JUST SO I UNDERSTAND, A LOT

7    OF THESE PEOPLE HAVE VIEWS ABOUT ISRAEL.  SHE SAID SHE HAS

8    NOTHING AGAINST THE ISRAELI PEOPLE.

9         THE COURT:  RIGHT.

10        MR. ANDRES:  THERE'S NOT GOING TO BE ANY EVIDENCE IN

11   THIS CASE THAT THERE'S ANYTHING GOING ON BETWEEN THE

12   UNITED STATES GOVERNMENT AND NSO BECAUSE NSO IS PRECLUDED FROM

13   RAISING THAT EVIDENCE.

14        SO SHE DIDN'T ACTUALLY SAY ANYTHING OTHER THAN THAT SHE

15   COULD BE FAIR, AND THAT SHE WAS -- THOUGHT THAT PEGASUS -- SHE

16   WAS WRONG ABOUT IT, RIGHT?

17        THE COURT:  RIGHT.

18        MR. ANDRES:  SO I JUST -- I DON'T KNOW THAT WE CAN

19   BE -- IF THE IDEA HERE IS THAT EVERYBODY THAT KNOWS SOMETHING

20   ABOUT ISRAEL IS GOING TO BE EXCLUDED, THAT'S CERTAINLY UNFAIR

21   TO META BECAUSE ALL THESE PEOPLE HAVE VIEWS ABOUT META AND THEY

22   HAVE VIEWS ABOUT ISRAEL.

23        THE COURT:  THEY DO.  THERE ARE FAR MORE VIEWS ABOUT

24   META THAN ABOUT ISRAEL.  BUT I'M TRYING TO BE FAIR, AND I CAN

25   BE GENEROUS ON THESE BECAUSE WE HAVE ENOUGH PEOPLE.

1           SHE'S ON THE EDGE FOR ME.  SHE SEEMS VERY BRIGHT.  SHE'S

2      PROBABLY ONE OF THE MOST KNOWLEDGEABLE OF ALL OF THEM, EXCEPT

3      FOR MAYBE THE CYBERSECURITY GUY.

4           I'M GOING TO LEAVE HER FOR NOW.  SO THAT OBJECTION IS

5      OVERRULED.

6           DO YOU HAVE ANY OTHERS?

7                MR. AKROTIRIANAKIS:  YES, NUMBER 16.  THIS IS THE

8      GENTLEMAN WHO WAS REMARKING ABOUT JUST HOW MUCH STOCK THAT HE

9      OWNS IN META AND SAID THAT HE WOULD BE -- HE WOULD BE BIASED.

10     HE WOULD PROBABLY BE LOOKING AT THAT WAS HIS QUOTE.

11                THE COURT:  WELL, HE'S THE ONE THAT WANTS THE -- THE

12     STOCK VALUE TO RISE.

13                MR. AKROTIRIANAKIS:  YEAH.

14                THE COURT:  BUT HE CLEARLY JUST DOESN'T WANT TO BE

15     HERE.

16                MR. ANDRES:  YOUR HONOR, I HAVE THREE DAUGHTERS, ONE

17     OF WHOM IS A GYMNAST, SO NO OBJECTION.

18                THE COURT:  WELL, YEAH.  HE'S -- HE WASN'T GOING TO

19     SHOW UP ANYWAY, HE SAID.  HE TOLD US IN ADVANCE; RIGHT?

20                MR. ANDRES:  I MEAN, WE HATE TO DO THAT, BUT WE DON'T

21     NEED THOSE PROBLEMS.

22                THE COURT:  THAT'S FINE.  I WILL GRANT THAT.

23           THE LAST TIME THAT I DIDN'T AWARD IT, THE JUROR DIDN'T

24     SHOW UP AND THEN I'M STUCK.

25                MR. AKROTIRIANAKIS:  NUMBER 18 IS ANOTHER ONE WHO'S

 1    INTERVIEWING, OR WANTS TO INTERVIEW AT --

 2             THE COURT:  HIS GRANDFATHER HAS FACEBOOK STOCK.

 3             MR. AKROTIRIANAKIS:  HE SAID HE'S APPLYING FOR JOBS

 4    AT META IN THE FUTURE.

 5             MR. ANDRES:  I MEAN, HE PRETTY FLATLY SAID HE

 6    COULDN'T BE FAIR, YOUR HONOR, SO WE'RE NOT GOING TO OBJECT.

 7             THE COURT:  OKAY.  FOR CAUSE, NUMBER 18.

 8       ANYONE ELSE?

 9             MR. AKROTIRIANAKIS:  I DON'T THINK WE'RE GOING TO GET

10    THIS FAR ANYWAY, BUT NUMBER 34.

11             THE COURT:  THE ONE WHO RECENTLY PURCHASED STOCK IN

12    FACEBOOK?

13             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14             THE COURT:  OKAY.

15             MR. ANDRES:  HE'S THE ONE THAT'S SECOND TO LAST.

16             THE COURT:  RIGHT.

17             MR. AKROTIRIANAKIS:  HE DID USE THE WORD "UNFAIR."

18             THE COURT:  HMM.

19             MR. AKROTIRIANAKIS:  I THINK HE DID USE THE WORD

20    "UNFAIR" IN TALKING ABOUT HOW HE THOUGHT HE WOULD BE ABLE TO BE

21    FAIR OR UNFAIR.

22             THE COURT:  WELL, RECENT PURCHASE OF A STOCK TWO

23    WEEKS AGO.

24             MR. ANDRES:  AND NOT VERY MANY SHARES.

25             THE COURT:  YEAH.  YEAH, I HAVE SOME SUSPICION THAT

```
1        SOME OF THE CLAIMS OF STOCK OWNERSHIP ARE FABRICATED SINCE WE

2     DON'T ASK FOR PROOF OF THAT, AND AS THE -- AS WE GO THROUGH,

3     PEOPLE SEEM TO PICK UP ON WHAT WORKS AND WHAT DOESN'T.

4              MR. ANDRES:  YEAH.

5              MR. AKROTIRIANAKIS:  RIGHT.

6              THE COURT:  BUT HE'S A DIRECT PURCHASER, IT'S NOT IN

7     AN INDEX FUND.

8              MR. ANDRES:  YEAH.

9              THE COURT:  AND IT'S RECENT.  AND HE DID SAY THAT HE

10    WAS MORE DISPOSED TOWARDS FACEBOOK, ALTHOUGH HE THOUGHT HE

11    COULD BE FAIR.

12         DO YOU OBJECT?

13             MR. ANDRES:  I DON'T OBJECT, YOUR HONOR.

14             THE COURT:  OKAY.  SO THAT ONE WILL BE GRANTED.

15         IS THAT IT?

16             MR. AKROTIRIANAKIS:  ON CAUSE, YES, YOUR HONOR.

17             THE COURT:  OKAY.  SO WE HAVE ONE HARDSHIP AND ONE,

18    TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE, TEN FOR CAUSE.

19         ALL RIGHT.  SO NOW YOU GO THROUGH THE PROCESS OF DOING IT

20    ON PAPER.  YOU EXERCISE YOURS, THEN YOU EXERCISE ONE, THEN YOU

21    EXERCISE ONE, YOU EXERCISE ONE, AND THE FIRST EIGHT SEATED IN

22    THAT ORDER, THE FIRST EIGHT LEFT AFTER THOSE PEREMPTORY

23    CHALLENGES ARE EXERCISED WILL SIT.

24             MR. ANDRES:  YOUR HONOR, CAN WE JUST GO THROUGH WHO'S

25    LEFT ON THE JURY?
```

```
 1                 THE COURT:  YEAH.  WHO'S LEFT?

 2                 MR. ANDRES:  SO JUROR NUMBER 1 IS GONE, RIGHT?

 3                 THE COURT:  ARE WE DOING THAT?

 4                 THE CLERK:  3, 4, 7, 8, 10, 11, 12, 13, 15, 19, 20,

 5       22, 23, 25, 26, 27, 28, 31, 32, 33, AND 35.

 6                 MR. ANDRES:  DID YOU GET ALL THAT?

 7                 THE COURT:  OKAY?

 8                 MR. ANDRES:  CAN WE TRY IT ONE MORE TIME?

 9                 MR. CRAIG:  IF PLAINTIFF PASSES, AND THEN WE PASS, IS

10       THE JURY PICKED AT THAT POINT?

11                 THE COURT:  YEAH, IF BOTH SIDES PASS.  IF BOTH SIDES

12       PASS YOUR TURN, YEAH.

13                 MR. AKROTIRIANAKIS:  OTHERWISE WE'D JUST BE PASSING

14       IT BACK AND FORTH ALL AFTERNOON.

15                 THE COURT:  NO, NO.  ONCE YOU EXERCISE -- YES, IF --

16       YES.  IF YOU PASS, RIGHT, RIGHT.  BUT YOU GET TO GO THREE AND

17       THREE.

18            LET ME JUST TELL YOU WHAT I DECIDED ABOUT THE OTHER ISSUE.

19                 MR. CRAIG:  IS THIS ABOUT THE MOTION IN LIMINE,

20       YOUR HONOR, I MEAN ABOUT THE --

21                 THE COURT:  THE JURY INSTRUCTION.

22            WITH REGARD TO THE JURY INSTRUCTION, THAT WAS RAISED --

23                 MR. CRAIG:  ONE MOMENT SO MR. NOLLER CAN COME?

24                 THE COURT:  THE JURY INSTRUCTION, MR. NOLLER REMINDED

25       ME THAT ON JURY INSTRUCTION NUMBER 1, YOU MADE THE SAME
```

```
 1        ARGUMENT ON THE INTENT TO DEFRAUD WITH REGARD TO THE

 2        INTENTIONAL LANGUAGE, INTEND TO DEFRAUD.

 3             SAME RULING, THAT GOES OUT AS WELL.

 4             MR. NOLLER:  THANK YOU, YOUR HONOR.

 5             THE COURT:  ALL RIGHT.  AND THEN WITH REGARD TO THE

 6        EXPORT CONTROL ISSUE, I WENT BACK AND -- ARE COUNSEL ALL HERE?

 7             MR. ANDRES:  YES.

 8             THE COURT:  OKAY.  I WENT BACK AND LOOKED AT THE

 9        BRIEFING AND, YOU'RE RIGHT, THE BRIEFING DID NOT INCLUDE THE

10        EXPORT CONTROL.

11             I WRAPPED TOGETHER, AT LEAST IN MY MIND, THAT THE NATIONAL

12        SECURITY PROCEEDINGS AND RELATED INFORMATION WOULD INCLUDE THE

13        ISRAELI COURT PROCEEDINGS, THE GAG ORDERS, SEIZURE ORDERS, AND

14        THE EXPORT CONTROL REQUIREMENTS.

15             SO AS FAR AS I'M CONCERNED, WE HAVE NOT HAD ANY ARGUMENT

16        ON THAT.  IF THIS IS AN ISSUE, THEN I'D LIKE EACH OF YOU TO

17        FILE, LIKE, A PAGE, TWO PAGES, AND LET ME KNOW WHAT THE

18        ARGUMENTS ARE AND WHAT THE EVIDENCE IS.

19             EVERYTHING I'VE BEEN DECIDED TO -- I'VE BEEN CALLED UPON

20        TO DECIDE HAS SORT OF BEEN IN A VACUUM.  I DON'T REALLY KNOW

21        HOW ALL THIS FITS WHAT THE ARGUMENTS ARE.

22             SO GIVE ME TWO PAGES, NO MORE THAN TWO PAGES, FILE IT AS

23        SOON AS YOU CAN, AND I'LL LET YOU KNOW.

24             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

25             MR. ANDRES:  THANK YOU, YOUR HONOR.
```

1    YOUR HONOR, I KNOW THAT AARON HAD QUESTIONED.  WE START,

2    WE GIVE THE NUMBER FOR A PEREMPTORY CHALLENGE.  THEY DO, TOO.

3    WE CAN PASS IN THE SECOND ROUND.  IF THEY PASS, WE STILL GET TO

4    GO TO THE THIRD ROUND?

5            MR. CRAIG:  NO.

6            THE COURT:  IF BOTH SIDES PASS, IT'S OVER.

7            MR. ANDRES:  OKAY, GREAT.

8            THE COURT:  BUT --

9            MR. AKROTIRIANAKIS:  IF IT'S US THAT PASSED AND THEN

10   YOU PASS --

11           THE COURT:  THE -- THE ONLY -- THE ONLY POINT I WAS

12   TRYING TO MAKE IS IF YOU -- YOU DON'T HAVE TO GO IN ORDER.  YOU

13   CAN SKIP TO NUMBER 8 FIRST AND THEN GO BACK TO NUMBER 2 IF YOU

14   WANT.

15           MR. CRAIG:  UNDERSTOOD.  WE CAN STRIKE ANYONE WE

16   WANT.

17           THE COURT:  YOU CAN STRIKE ANYONE YOU WANT.

18           MS. NEWELL:  IF WE PASS AND THEY EXERCISE A STRIKE,

19   HAVE WE LOST --

20           THE COURT:  THEN YOU GET TO GO BACK.  IT'S ONLY WHEN

21   BOTH SIDES PASS.  THEY COULD JUST DO TWO AND YOU COULD STILL DO

22   THREE.

23           MR. ANDRES:  RIGHT.

24           MR. CRAIG:  CAN WE HAVE A MOMENT TO CONFER BEFORE IT

25   STARTS?

```
1              THE COURT:  WITH WHO?

2              MR. CRAIG:  CAN WE HAVE A MOMENT TO CONFER INTERNALLY

3       BEFORE WE START WITH THE PAPER?

4              THE COURT:  A MOMENT?  GO TO YOUR TABLE.  TALK.

5       YOU'RE GOING TO HAVE TO TALK FOR EACH ONE OF THESE.

6              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

7              MR. ANDRES:  THANK YOU, YOUR HONOR.

8          (END OF DISCUSSION AT SIDE-BAR.)

9              THE COURT:  ALL RIGHT, LADIES AND GENTLEMEN.  WE'LL

10      TAKE JUST A FEW MORE MINUTES.  THE ATTORNEYS HAVE TO DO

11      SOMETHING IN WRITING BETWEEN THEMSELVES BEFORE WE'RE READY, BUT

12      WE'VE DONE THE HARDEST PART.

13          (PAUSE IN PROCEEDINGS.)

14          (SIDE-BAR DISCUSSION ON THE RECORD.)

15             THE COURT:  OKAY.  JUROR NUMBER 81.

16             MR. ANDRES:  IS JUROR NUMBER 3.

17             THE COURT:  I KNOW.  BUT WE WILL RENUMBER THEM.

18             MR. ANDRES:  OKAY.

19             THE COURT:  OKAY.

20             MR. ANDRES:  SO 3, 4.

21             THE COURT:  3, 4, 8.

22             MR. ANDRES:  SORRY.  I JUST SAID IT SHOULD BE 11,

23      YOUR HONOR.

24             THE COURT:  THIS IS 11.

25             MR. ANDRES:  YES.
```

232

```
1                    THE COURT:  AND THEN 13.

2                    MR. ANDRES:  RIGHT.

3                    THE COURT:  15.

4                    MR. ANDRES:  YEP.

5                    THE COURT:  19?

6                    MR. ANDRES:  YEP.

7                    THE COURT:  22?

8                    MR. ANDRES:  CORRECT.

9                    THE COURT:  IS THAT WHAT EVERYBODY HAS?

10                   MR. ANDRES:  THAT'S WHAT WE HAVE, YOUR HONOR.

11                   THE COURT:  THAT'S IT?  OKAY.  THAT WILL BE OUR JURY.

12        I WILL TELL THEM, AND I'LL EXCUSE EVERYBODY ELSE AT THE

13    SAME TIME.  SO NO ONE KNOWS WHAT REASON WORKED, WHAT REASON

14    DIDN'T WORK.

15                   MR. ANDRES:  RIGHT.  AND THEN WE'RE GOING TO TAKE A

16    BREAK BEFORE OPENINGS BECAUSE WE HAVE TO ADDRESS SOME ISSUES.

17                   THE COURT:  WE'LL TAKE JUST A FEW MINUTES.  I WANT TO

18    HAVE THE OPENINGS DONE BEFORE 4:00 O'CLOCK.  I ASSUME YOU ALL

19    DO NOT ANTICIPATE MORE THAN 15, 20 MINUTES FOR YOUR OPENING.

20                   MR. AKROTIRIANAKIS:  MINE IS 20-ISH MINUTES.

21                   THE COURT:  20-ISH.

22                   MR. ANDRES:  22.

23                   THE COURT:  THEN I'M ONLY GOING TO GIVE YOU A FIVE

24    MINUTE BREAK.

25                   MR. ANDRES:  BUT THE EXHIBITS IN DEFENDANTS' OPENING
```

```
 1          SLIDES VIOLATE THE COURT'S ORDERS, SO WE HAVE TO ADDRESS THOSE.

 2                  THE COURT:  WE DON'T HAVE A WHOLE LOT OF TIME.

 3              TELL ME NOW, WHAT IS THE PROBLEM?

 4                  MR. PEREZ:  SO, YOUR HONOR, ONE ISSUE IS THEY'RE

 5          USING -- THEY INTEND TO USE IN THEIR OPENING A SLIDE DECK THAT,

 6          IN THEIR DEPOSITIONS, THEY'VE BEEN USING TO TRY TO FAULT META'S

 7          SECURITY SYSTEMS.  THAT WAS EXPRESSLY ADDRESSED IN MIL 5 WHERE

 8          THE COURT RULED THAT THAT WOULD BE RELITIGATING CAUSATION.

 9                  THE COURT:  RIGHT.

10                  MR. PEREZ:  WE HAVEN'T SEEN THE SLIDE, SO WE DON'T

11          KNOW WHAT THEY'RE USING IT FOR.  BUT IF IT'S FOR THE SAME

12          PURPOSE THAT THEY'VE USED IT IN DEPOSITIONS, THAT WOULD BE

13          DIRECTLY CONTRARY TO THE COURT'S ORDER.

14                  THE COURT:  IS THAT WHAT YOU'RE USING IT FOR?

15                  MR. AKROTIRIANAKIS:  NO.

16                  THE COURT:  WHAT ARE YOU USING IT FOR?

17                  MR. AKROTIRIANAKIS:  TO SHOW THAT THE WORKS WHOSE

18          TIME THEY'RE CLAIMING AS DAMAGES WERE DOING OTHER THINGS DURING

19          THE PERIOD OF TIME WHEN THEY'RE SUPPOSEDLY WORKING ON THE STUFF

20          THAT THEY'RE CLAIMING FOR DAMAGES.

21                  THE COURT:  OKAY.

22                  MR. PEREZ:  IF WE'RE NOT GOING TO HEAR ABOUT LAX

23          SECURITY OR ANYTHING LIKE THAT, THEN WE WOULDN'T HAVE ANY

24          OBJECTION TO THAT IN THE OPENING.

25                  MR. AKROTIRIANAKIS:  DO YOU KNOW WHICH ONE IT IS?
```

1              MR. PEREZ:  I LEFT MY EXHIBITS ON THE DESK, BUT I

2       THINK IT'S 1151.  BUT I'M DOING IT FROM MEMORY.

3              MR. AKROTIRIANAKIS:  IT'S THIS MUCH OF THAT ONE, AND

4       IT'S THE PART WHERE -- IT'S NOT THAT.

5              MR. PEREZ:  OKAY.  THERE WAS ALSO REFERENCE --

6       THERE'S OTHER ISSUES WHERE THEY'RE TALKING ABOUT INDIA AND

7       NATION STATES.  IT SORT OF CALLS INTO --

8              MR. AKROTIRIANAKIS:  NONE OF THAT IS --

9              MR. PEREZ:  AND THEN THERE'S ONE DOCUMENT WHERE

10      THERE'S A REFERENCE TO SOMETHING THAT MARK WAS USING, AND THE

11      MARK IS CLEARLY A REFERENCE TO MARK HAMMELL, WHO'S A SECURITY

12      ENGINEER, AND WE WANTED TO MAKE SURE THAT THEY WOULDN'T IMPLY

13      THAT IT WAS MARK ZUCKERBERG.

14             THE COURT:  RIGHT.  RIGHT.

15             MR. AKROTIRIANAKIS:  I DON'T EVEN KNOW WHO

16      MARK HAMMELL IS OR REMEMBER A MARK ON ANY OF THIS.  SO I DON'T

17      THINK I INTEND TO MENTION MARK.

18             THE COURT:  OKAY.  I MEAN, YOU ALL NEED TO MEET AND

19      CONFER ABOUT ALL OF THESE --

20             MR. PEREZ:  WE'VE BEEN TRYING, YOUR HONOR.

21             THE COURT:  -- THESE ISSUES.  I CAN'T -- YOU CAN'T

22      REALLY EXPECT ME TO KNOW -- I HAVEN'T SEEN THESE EXHIBITS.  YOU

23      CANNOT EXPECT ME TO KNOW WHAT TO DO WITH THEM IN ADVANCE

24      WITHOUT READING THEM.

25             MR. ANDRES:  THAT'S WHY WE ASKED TO SEE THEM LAST

```
1      NIGHT AND THAT WAS DECLINED.  SO --

2           THE COURT:  ALL RIGHT.  I'M GOING TO REQUIRE A GREAT

3      DEAL MORE COOPERATION IN ORDER TO GET THIS THROUGH IN A

4      COHERENT FASHION SO THAT WE'RE NOT WASTING THE JURY'S TIME.

5      ALL RIGHT.

6           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

7           MR. ANDRES:  THANK YOU, YOUR HONOR.

8           THE COURT:  OKAY.

9      (END OF DISCUSSION AT SIDE-BAR.)

10          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE HAVE

11     A JURY.  I'M GOING TO ANNOUNCE WHO'S ON THE JURY, BUT I'D LIKE

12     EVERYONE TO REMAIN UNTIL I GET THROUGH THE LIST, AND THEN THOSE

13     WHO ARE NOT ON THE JURY ARE GOING TO BE FREE TO GO.  BUT PLEASE

14     DON'T LEAVE UNTIL I GET THROUGH AND TELL YOU WHO OUR EIGHT

15     JURORS WILL BE.

16     JUROR NUMBER 1 WILL BE KAILASH THAPA.  YOU WILL BECOME

17     JUROR NUMBER 1.  OKAY.  YOU JUST REMAIN SEATED.

18     JUROR NUMBER 2 WILL BE MR. PURI;

19     JUROR NUMBER 3 WILL BE MS. CHANG;

20     JUROR NUMBER 4 WILL BE MR. CLAIBORNE;

21     JUROR NUMBER 5 WILL BE MR. LEDBETTER;

22     JUROR NUMBER 6 WILL BE MS. CLOTHIER, WHICH WILL MAKE YOUR

23     STUDENTS VERY HAPPY.

24     (LAUGHTER.)

25          THE COURT:  JUROR NUMBER 7 WILL BE MS. ALVARADO; AND,
```

```
 1              JUROR NUMBER 8 WILL BE MR. CASTELLI.

 2              THOSE ARE OUR EIGHT JURORS.

 3              WOULD YOU EIGHT PLEASE REMAIN SEATED.

 4              EVERYONE ELSE, I'M GOING TO THANK AND EXCUSE.  I

 5    APPRECIATE YOUR TIME AND ATTENTION TODAY, AND YOU'RE JUST

 6    SHOWING UP.  THAT MEANS SO MUCH TO US ON BEHALF OF THE NORTHERN

 7    DISTRICT OF CALIFORNIA.  YOUR JURY SERVICE IS COMPLETE, I

 8    BELIEVE, FOR A TWO YEAR PERIOD.  SO YOU'RE EXCUSED.

 9              AND THE EIGHT REMAINING, IF YOU'LL JUST REMAIN SEATED.

10         (PROSPECTIVE JURORS NOT PRESENT, ONLY JURY PANEL REMAINS.)

11         (PAUSE IN PROCEEDINGS.)

12              THE CLERK:  SHOULD I SWEAR THEM IN?

13              THE COURT:  SWEAR THEM IN.

14              THE CLERK:  LET ME SWEAR YOU IN AS JURORS.

15         ALL RIGHT.  PLEASE STAND.  PLEASE RAISE YOUR RIGHT HANDS.

16         (JURY PANEL SWORN.)

17              JURORS:  YES.

18              THE CLERK:  THANK YOU.  PLEASE BE SEATED.

19              THE COURT:  ALL RIGHT.  COUNSEL, I'M GOING TO GIVE

20    THE PRELIMINARY INSTRUCTIONS NOW SO THAT WE KNOW HOW MUCH TIME

21    WE HAVE LEFT FOR OPENINGS, AND WE CAN DETERMINE WHETHER OR NOT

22    WE WANT TO DO THAT TODAY OR FIRST THING IN THE MORNING.

23              SO I'M GOING TO DO THE INSTRUCTIONS FIRST.

24              OKAY.

25              ALL RIGHT.  LADIES AND GENTLEMEN OF THE JURY -- I GUESS
```

1    THAT'S A LITTLE OLD-FASHIONED TO USE LADIES AND GENTLEMEN.

2    I'LL SAY MEMBERS OF THE JURY:

3         YOU ARE NOW THE JURY IN THIS MATTER, AND IT'S MY DUTY TO

4    INSTRUCT YOU ON THE LAW.

5         IT IS YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE

6    THAT WILL BE PRESENTED IN THE CASE.

7         TO THOSE FACTS, YOU WILL APPLY THE LAW AS I GIVE IT TO

8    YOU.

9         YOU MUST FOLLOW THE LAW THAT I GIVE TO YOU, WHETHER OR NOT

10   YOU AGREE WITH IT.  AND YOU MUST NOT BE INFLUENCED BY ANY

11   PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.

12   THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

13   BEFORE YOU.  YOU JUST TOOK AN OATH PROMISING TO DO EXACTLY

14   THAT.

15        AT THE END OF THE TRIAL, I WILL GIVE YOU THE FINAL

16   INSTRUCTIONS, THAT IS, AFTER YOU HAVE HEARD ALL THE EVIDENCE.

17   IT IS THE FINAL INSTRUCTIONS THAT WILL GOVERN YOUR DUTIES AND

18   YOUR DELIBERATIONS.

19        PLEASE DO NOT READ INTO THESE INSTRUCTIONS, OR ANYTHING I

20   MAY SAY OR DO DURING THE COURSE OF THE TRIAL, AS -- THAT I HAVE

21   AN OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD

22   BE.

23        NOW, TO HELP YOU FOLLOW THE EVIDENCE, I'LL GIVE YOU

24   ANOTHER BRIEF SUMMARY OF THE POSITIONS OF THE PARTIES.

25        IN THIS LAWSUIT, THE PLAINTIFFS ARE WHATSAPP AND

238

 1    META PLATFORMS.  THE DEFENDANTS ARE NSO GROUP AND Q CYBER

 2    TECHNOLOGIES.

 3          PLAINTIFFS SUED THE DEFENDANTS FOR VIOLATING THE COMPUTER

 4    FRAUD AND ABUSE ACT, VIOLATING THE CALIFORNIA COMPREHENSIVE

 5    COMPUTER DATA ACCESS AND FRAUD ACT, AND BREACHING A CONTRACT,

 6    SPECIFICALLY, WHATSAPP'S TERMS OF SERVICE.

 7          NOW, BEFORE THIS TRIAL BEGAN, I DETERMINED THAT THE

 8    DEFENDANTS ARE LIABLE ON EACH OF THESE CLAIMS; SPECIFICALLY, I

 9    DETERMINED THAT THE DEFENDANTS VIOLATED THE COMPUTER FRAUD AND

10    ABUSE ACT AND THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS

11    AND FRAUD ACT.

12          I ALSO DETERMINED THAT DEFENDANTS' BREACHED WHATSAPP'S

13    TERMS OF SERVICE.

14          IN THIS TRIAL, YOU MUST ACCEPT EACH OF THESE

15    DETERMINATIONS AS TRUE.

16          BECAUSE I HAVE DETERMINED DEFENDANTS' LIABILITY, YOUR TASK

17    IS TO DETERMINE WHAT DAMAGES, IF ANY, DEFENDANTS OWE THE

18    PLAINTIFFS.  I WILL INSTRUCT YOU ON THE LAW GOVERNING YOUR

19    CONSIDERATION OF DAMAGES AND WHAT FACTS YOU MAY CONSIDER WHEN

20    DECIDING WHETHER TO AWARD DAMAGES.

21          NOW, WHEN A PARTY HAS THE BURDEN OF PROOF BY A

22    PREPONDERANCE OF THE EVIDENCE ON AN ISSUE, IT MEANS THAT YOU

23    MUST BE PERSUADED BY THE EVIDENCE THAT THE PARTY'S FACTUAL

24    CONTENTION IS MORE PROBABLY TRUE THAN NOT TRUE.

25          YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE,

1    REGARDLESS OF WHICH PARTY PRESENTED IT.

2        WHEN A PARTY HAS THE BURDEN OF PROVING A CLAIM OR DEFENSE

3    BY CLEAR AND CONVINCING EVIDENCE, THAT MEANS THAT THE PARTY

4    MUST PRESENT THE EVIDENCE THAT LEAVES YOU WITH A FIRM BELIEF OR

5    CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE FACTUAL

6    CONTENTIONS OF THE CLAIM OR DEFENSE ARE TRUE.

7        THIS IS A HIGHER STANDARD OF PROOF THAN PROOF BY A

8    PREPONDERANCE OF THE EVIDENCE, BUT IT DOES NOT REQUIRE PROOF

9    BEYOND A REASONABLE DOUBT.  THAT'S THE BURDEN THAT APPLIES IN

10   CRIMINAL CASES.

11       NOW, WHAT IS EVIDENCE?

12       THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

13   FACTS ARE:

14       1.  THE SWORN TESTIMONY OF ANY WITNESS;

15       2.  THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE;

16       3.  ANY FACTS TO WHICH THE LAWYERS HAVE AGREED -- THESE

17   ARE CALLED STIPULATIONS; AND,

18       4.  ANY FACTS THAT I INSTRUCT YOU TO ACCEPT AS PROVED.

19       IN REACHING YOUR VERDICT, YOU MAY ONLY CONSIDER THE

20   MATTERS THAT I JUST DESCRIBED AS EVIDENCE.  BUT THERE ARE

21   CERTAIN THINGS THAT ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER

22   THEM IN DECIDING WHAT THE FACTS ARE.  THERE ARE FOUR OF THEM

23   THAT I WANT TO BRING TO YOUR ATTENTION.

24       1.  THE ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

25   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY SAY IN

1    THEIR OPENING STATEMENTS OR IN THEIR CLOSING ARGUMENTS AND AT

2    OTHER TIMES DURING THE TRIAL IS INTENDED TO HELP YOU INTERPRET

3    THE EVIDENCE, BUT IT IS NOT ITSELF EVIDENCE.

4        IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE

5    LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

6        2.  QUESTIONS AND OBJECTIONS BY THE LAWYERS ARE NOT

7    EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

8    WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

9    EVIDENCE, AND YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR

10   BY THE COURT'S RULING ON THE OBJECTION.

11       THE THIRD THING IS TESTIMONY THAT IS EXCLUDED OR STRICKEN,

12   OR THAT YOU ARE INSTRUCTED TO DISREGARD.  THAT IS NOT EVIDENCE

13   AND MUST NOT BE CONSIDERED BY YOU.

14       IN ADDITION, SOME EVIDENCE MAY BE RECEIVED ONLY FOR A

15   LIMITED PURPOSE.  WHEN I INSTRUCT YOU TO CONSIDER CERTAIN

16   EVIDENCE ONLY FOR A LIMITED PURPOSE, YOU MUST DO SO AND YOU MAY

17   NOT CONSIDER THE EVIDENCE FOR ANY OTHER PURPOSE.

18       ANYTHING YOU MAY SEE OR HEAR WHEN THE COURT IS NOT IN

19   SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY ON

20   THE EVIDENCE RECEIVED AT TRIAL IN THIS COURTROOM.

21       ALL RIGHT.  THIS JUST REPEATS WHAT I JUST TOLD YOU, BUT

22   SOME EVIDENCE MAY BE ADMITTED ONLY FOR A LIMITED PURPOSE, AND

23   WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED

24   ONLY FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT

25   LIMITED PURPOSE AND NOT FOR ANY OTHER PURPOSE.

1    EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

2    IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

3    WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

4    CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

5    WHICH YOU CAN FIND ANOTHER FACT.

6    YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES

7    NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

8    OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

9    WEIGHT TO GIVE ANY EVIDENCE.

10    NOW, THERE ARE RULES OF EVIDENCE -- THERE ARE RULES OF

11    EVIDENCE THAT CONTROL WHAT CAN BE RECEIVED INTO EVIDENCE.  WHEN

12    A LAWYER ASKS A QUESTION OR OFFERS AN EXHIBIT INTO EVIDENCE AND

13    A LAWYER ON THE OTHER SIDE THINKS THAT IT IS NOT PERMITTED BY

14    THE RULES OF EVIDENCE, THE LAWYER MAY OBJECT.

15    AND IF I OVERRULE THE OBJECTION, THAT MEANS THE QUESTION

16    MAY BE ANSWERED OR THE EXHIBIT RECEIVED.

17    IF I SUSTAIN THE OBJECTION, THAT MEANS THE QUESTION CANNOT

18    BE ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.

19    WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

20    IGNORE THE QUESTION AND MUST NOT TRY TO GUESS WHAT THE ANSWER

21    MIGHT HAVE BEEN.

22    SOMETIMES I MAY ORDER THAT EVIDENCE BY STRICKEN FROM THE

23    RECORD AND THAT YOU DISREGARD IT OR IGNORE THAT EVIDENCE.  THAT

24    MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

25    CONSIDER THE STRICKEN EVIDENCE FOR ANY PURPOSE.

1        NOW, IN DECIDING THE FACTS OF THE CASE, YOU MAY HAVE TO

2    DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

3    BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF

4    IT, OR NONE OF IT.

5        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU CAN TAKE

6    INTO ACCOUNT A NUMBER OF THINGS, INCLUDING THE FOLLOWING:

7        1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

8    HEAR OR KNOW THE THINGS TESTIFIED TO;

9        2.  THE WITNESS'S MEMORY;

10       3.  THE WITNESS'S MANNER WHILE TESTIFYING;

11       4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF

12   ANY;

13       5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

14       6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

15   TESTIMONY;

16       7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

17   OF ALL OF THE EVIDENCE; AND,

18       8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

19       SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

20   CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

21   DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

22   HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

23   THEY REMEMBER.

24       ALSO, TWO PEOPLE MAY SEE THE SAME EVENT, BUT REMEMBER IT

25   DIFFERENTLY.

1        YOU MAY CONSIDER THESE DIFFERENCES, BUT DO NOT DECIDE THAT

2   TESTIMONY IS UNTRUE JUST BECAUSE IT DIFFERS FROM OTHER

3   TESTIMONY.

4        HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

5   TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

6   CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.

7        ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED

8   UNTRUTHFULLY ABOUT SOME THINGS, BUT TOLD THE TRUTH ABOUT

9   OTHERS, YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE

10  THE REST.

11       THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

12  NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

13  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

14  MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

15       NOW I'LL SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

16       FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT

17  DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

18  JURORS HAVE COMPLETED YOUR DELIBERATIONS, WHICH TAKE PLACE AT

19  THE END OF THE CASE.

20       SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

21  THE EVIDENCE RECEIVED HERE IN THE COURTROOM AND ON MY

22  INSTRUCTIONS AS TO THE LAW THAT APPLIES, YOU MUST NOT BE

23  EXPOSED TO ANY OTHER INFORMATION ABOUT THE CASE OR TO THE

24  ISSUES IT INVOLVES DURING THE COURSE OF YOUR JURY DUTY.

25       THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

1    OTHERWISE:

2         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, AND DO NOT LET

3    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

4    THE CASE OR ANYTHING TO DO WITH IT.

5         OUR JUROR NUMBER 2, YOU NEED -- YOU NEED SOME WATER.

6              THE CLERK:  RIGHT HERE.

7         (PAUSE IN PROCEEDINGS.)

8              THE COURT:  OKAY.  ALL RIGHT.

9         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, AND DO NOT LET

10   ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

11   THE CASE OR ANYTHING TO DO WITH IT.

12        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

13   BY PHONE, TABLET, COMPUTER, OR OTHER ELECTRONIC MEANS, VIA

14   EMAIL, TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE

15   OR APPLICATION, INCLUDING, BUT NOT LIMITED TO ALL OF THE

16   VARIOUS DIFFERENT PLATFORMS -- I'M NOT GOING TO READ THEM, YOU

17   KNOW WHAT THEY ALL ARE -- AND ANY OTHER FORM OF SOCIAL MEDIA.

18   AND THERE ARE MANY.  THIS APPLIES TO COMMUNICATING WITH YOUR

19   FELLOW JURORS UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND

20   IT APPLIES TO COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR

21   FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, THE PEOPLE

22   INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR EMPLOYER --

23   YOUR FAMILY, OBVIOUSLY, AND YOUR EMPLOYER THAT YOU HAVE BEEN

24   SEATED AS A JUROR IN THE CASE AND HOW LONG YOU EXPECT THE TRIAL

25   TO LAST.  BUT IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT

1    YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND

2    THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND YOU

3    MUST REPORT THAT CONTACT TO THE COURT.

4        BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

5    INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN YOUR VERDICT,

6    DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

7    COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.

8        DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES OR

9    SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS; AND

10    DO NOT MAKE ANY INVESTIGATION OR IN ANY WAY TRY TO LEARN ABOUT

11    THE CASE ON YOUR OWN.

12        DO NOT VISIT OR VIEW ANY PLACE DISCUSSED IN THIS CASE, AND

13    DO NOT USE THE INTERNET OR ANY OTHER RESOURCE TO SEARCH FOR OR

14    VIEW ANY PLACE DISCUSSED DURING THE TRIAL.

15        ALSO, DO NOT DO ANY RESEARCH ABOUT THIS CASE, THE LAW, OR

16    THE PEOPLE INVOLVED, INCLUDING THE PARTIES, WITNESSES, OR THE

17    LAWYERS UNTIL YOU HAVE BEEN EXCUSED AS JURORS.

18        IF YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS

19    CASE IN THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS

20    POSSIBLE.

21        NOW, TO PROTECT -- THESE RULES ARE DESIGNED TO PROTECT

22    EACH PARTY'S RIGHT TO HAVE THE CASE DECIDED ONLY ON THE

23    EVIDENCE THAT HAS BEEN PRESENTED HERE IN COURT.  WITNESSES HERE

24    IN COURT HAVE TO TAKE AN OATH TO TELL THE TRUTH, AND THE

25    ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE TRIAL

1    PROCESS.

2        IF YOU DO ANY RESEARCH OR INVESTIGATION OUTSIDE THE

3    COURTROOM OR GAIN ANY INFORMATION THROUGH IMPROPER

4    COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY

5    INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT

6    BEEN TESTED BY THE TRIAL PROCESS.

7        EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN

8    IMPARTIAL JURY, AND IF YOU DECIDE THE CASE BASED ON INFORMATION

9    NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE PARTIES A FAIR

10   TRIAL.

11       REMEMBER, YOU HAVE TAKEN AN OATH TO FOLLOW THE RULES, AND

12   IT IS VERY IMPORTANT THAT YOU FOLLOW THESE RULES.

13       AND THE JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES

14   THE FAIRNESS OF THESE PROCEEDINGS AND A MISTRIAL COULD RESULT

15   THAT WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.

16       SO IF ANY JUROR IS EXPOSED TO OUTSIDE INFORMATION, PLEASE

17   NOTIFY ME IMMEDIATELY JUST BY CONTACTING MS. COLLINS.

18       OKAY.  NOW, IF THERE'S ANY NEWS MEDIA ACCOUNT OR

19   COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT DURING THE

20   TRIAL, YOU MUST IGNORE IT.  AND THAT MEANS YOU MUST NOT READ,

21   WATCH, OR LISTEN TO ANY NEWS MEDIA ACCOUNT OR COMMENTARY ABOUT

22   THE CASE OR ANYTHING TO DO WITH IT.

23       OKAY.  NOW, I URGE YOU TO PAY CLOSE ATTENTION TO THE TRIAL

24   TESTIMONY AS IT IS GIVEN.  DURING DELIBERATIONS, YOU WILL NOT

25   HAVE A TRANSCRIPT OF THE TRIAL TESTIMONY.

1          IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

2     EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

3     UNTIL YOU GO INTO THE JURY ROOM TO DECIDE THE CASE.

4          DO NOT LET NOTE-TAKING DISTRACT YOU.

5          WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE JURY ROOM

6     EACH NIGHT.  NO ONE WILL READ YOUR NOTES.  THEY'LL BE LOCKED

7     UP.

8          BUT WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR

9     OWN MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR

10    MEMORY.

11         YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THE

12    NOTES OF OTHER JURORS.

13         NOW, FROM TIME TO TIME DURING THE TRIAL, IT MAY BECOME

14    NECESSARY FOR ME TO TALK WITH THE LAWYERS OUT OF THE HEARING OF

15    THE JURY, EITHER BY HAVING A CONFERENCE WHEN YOU'RE PRESENT IN

16    THE ROOM, OR BY CALLING A RECESS AND EXCUSING YOU FROM THE

17    ROOM.

18         PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE

19    WORKING.

20         THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT

21    INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

22    BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION

23    AND ERROR.

24         OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

25    LENGTH OF THESE CONFERENCES TO A MINIMUM.

1          I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A

2     CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST

3     FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

4     WHAT YOUR VERDICT SHOULD BE.

5          NOW, TRIALS PROCEED IN THE FOLLOWING WAY:

6          FIRST, EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN

7     OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO

8     HELP YOU UNDERSTAND WHAT THE PARTY EXPECTS THE EVIDENCE WILL

9     SHOW.

10          A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

11          THE PLAINTIFF WILL THEN PRESENT EVIDENCE, AND COUNSEL FOR

12     THE DEFENDANT MAY CROSS-EXAMINE.

13          THEN THE DEFENDANT MAY PRESENT EVIDENCE, AND COUNSEL FOR

14     THE PLAINTIFF MAY CROSS-EXAMINE.

15          AFTER THE EVIDENCE HAS BEEN PRESENTED, THE ATTORNEYS WILL

16     MAKE CLOSING ARGUMENTS, AND I WILL INSTRUCT YOU ON THE LAW THAT

17     APPLIES TO THE CASE.

18          AND AFTER THAT, YOU GO INTO THE JURY ROOM TO DELIBERATE ON

19     YOUR VERDICT.

20          SO WE ARE NOW ABOUT TO START THE TRIAL, AND WE'D START

21     WITH OPENING STATEMENTS.

22          DO COUNSEL NEED A BREAK BEFORE WE DO THAT?  IT DOESN'T

23     APPEAR -- I'D LIKE TO ADJOURN BY 4:00.  I'M NOT SURE WE'LL BE

24     ABLE TO GET BOTH ARGUMENTS IN.  IT WOULD PROBABLY BE PREFERABLE

25     TO HAVE BOTH ARGUMENTS MADE AT THE SAME TIME.

1          ARE COUNSEL IN AGREEMENT THAT IT MAY BE PREFERABLE TO

2     LEAVE OPENING STATEMENTS UNTIL TOMORROW MORNING?

3               MR. ANDRES:  WE'D LIKE TO PROCEED TODAY, IF POSSIBLE,

4     YOUR HONOR.

5               THE COURT:  WE CAN DO ONE.

6               MR. ANDRES:  YEAH.  WELL, I THINK WE'D WANT TO DO

7     THEM BOTH TOGETHER.  I THINK THAT'S FAIR FOR THE JURY.

8               THE COURT:  WELL, YOU BOTH INDICATED ABOUT 20

9     MINUTES.

10              MR. AKROTIRIANAKIS:  AND WE MIGHT BE SLIGHTLY -- I

11    THINK WE'RE BOTH SLIGHTLY OVER 20 MINUTES, YOUR HONOR.  I THINK

12    THAT WE PROBABLY WOULD NOT HIT 4:00 O'CLOCK, WE'D HAVE TO GO

13    LATER IF WE DID BOTH, WHICH I THINK WE SHOULD.

14              THE COURT:  YOU THINK WE SHOULD DO WHAT?

15              MR. AKROTIRIANAKIS:  WE SHOULD DO BOTH.  I AGREE WITH

16    MR. ANDRES THAT BOTH SHOULD BE HEARD AT THE SAME TIME.

17              THE COURT:  BOTH SHOULD BE HEARD AT THE SAME TIME.  I

18    DON'T THINK WE CAN DO BOTH OF THEM BY 4:00 O'CLOCK TODAY.  OUR

19    JURORS CAME IN SO EARLY.  I WOULD LIKE THEM TO GET A JUMP ON

20    THE TRAFFIC, SO I WOULD PREFER THAT WE WAIT UNTIL TOMORROW

21    MORNING.

22              MR. ANDRES:  THANK YOU, YOUR HONOR.

23              THE COURT:  IT'S COUNTED TO YOUR TIME IN ANY EVENT.

24              MR. ANDRES:  YEAH.

25              THE COURT:  BUT IT TOOK A LITTLE LONGER FOR THE

```
1      SELECTION PROCESS TODAY THAN I ANTICIPATED.

2           ALL RIGHT.  SO, LADIES AND GENTLEMEN, WITH THAT, I'M GOING

3      TO EXCUSE YOU.  I'VE JUST GIVEN YOU THE INSTRUCTION, SO YOU

4      KNOW THAT YOU'RE NOT SUPPOSED TO TALK ABOUT IT, AND ALL KINDS

5      OF OTHER THINGS THAT YOU HAVE TO REMEMBER.

6           WE'LL GET STARTED AT 8:30 TOMORROW MORNING.  I'VE

7      INDICATED OUR TRIAL DAY IS 8:30 TO 1:30.  WE START ON TIME, AS

8      LONG AS YOU'RE HERE.  IT DOESN'T MATTER IF ALL THE ATTORNEYS

9      AREN'T HERE.  WE NEED YOU TO BE HERE, AND I NEED TO BE HERE.

10     THAT'S IT.

11          WE DON'T GO BEYOND 1:30 UNLESS YOU, ONE OF YOU, IS LATE.

12     IF WE CAN'T START -- IF WE'RE 15 MINUTES LATE BECAUSE ONE OF

13     YOU IS LATE, THEN WE'LL STAY -- WE'LL ADD THAT 15 MINUTES ON AT

14     THE END OF THE DAY.  SO AS LONG AS YOU'RE HERE ON TIME, WE CAN

15     GET STARTED ON TIME AND GET YOU OUT BY 1:30 TOMORROW.

16          AND AS I INDICATED, WE TAKE TWO, 15 MINUTE BREAKS DURING

17     THAT TIMEFRAME, SO BRING YOURSELF A SNACK.

18          OKAY.  ALL RIGHT.

19          MS. COLLINS WILL SHOW YOU TO THE JURY ROOM AND WHERE YOU

20     COME IN IN THE MORNING AND GIVE YOU YOUR BADGES, YOUR NOTE PADS

21     AND ALL OF THAT WILL BE IN THE JURY ROOM.

22          PLEASE GO WITH HER.

23          THE CLERK:  ALL RISE FOR THE JURY.

24     (JURY OUT AT 3:26 P.M.)

25          THE COURT:  OKAY.  ALL RIGHT.  COUNSEL, I UNDERSTAND
```

```
 1    THAT THERE NEEDS TO BE SOME ADDITIONAL TECH SET UP AS WELL.

 2    CORRECT?

 3              MR. PEREZ:  YES, YOUR HONOR.

 4              THE COURT:  SO YOU CAN DO THAT BEFORE YOU LEAVE

 5    TODAY.

 6         IF YOU FILE YOUR -- THE STATEMENTS --

 7              MR. ANDRES:  TWO PAGES.

 8              THE COURT:  -- THAT I ASKED YOU TO DO ON THE EXPORT

 9    CONTROL ISSUE, I'LL LOOK AT IT TONIGHT.

10              MR. ANDRES:  YOUR HONOR, I THINK THE BIG ISSUE FOR US

11    FOR TOMORROW IS WE MAY START PLAYING VIDEOS.

12         NOW, WE'RE HAPPY TO TAKE YOUR INSTRUCTIONS TODAY AND THE

13    RULINGS THAT YOU HAD AND WORK WITH COUNSEL FOR NSO ON THAT.

14    BUT WE NEED TO PLAY THOSE TOMORROW.  WE NEED TO CUT THOSE

15    TONIGHT, AND SO WE'RE GOING TO NEED SOME DIRECTION ON A COUPLE

16    OF ISSUES.  MAYBE WE'VE GOTTEN IT.  I HAVEN'T HAD A CHANCE TO

17    TALK TO MY COLLEAGUES.

18         BUT THERE ARE SOME OUTSTANDING ISSUES, I MEAN, SOME OF

19    WHICH I THINK YOU RESOLVED THIS MORNING.  BUT IF I COULD JUST

20    HAVE A MINUTE TO TALK TO MY COLLEAGUES, FOR US, WE NEED TO

21    RESOLVE THAT SO THEY CAN CUT THE VIDEO AS YOU SUGGESTED.

22         BUT IF YOU'LL JUST GIVE ME A MINUTE?

23         (PAUSE IN PROCEEDINGS.)

24              MR. ANDRES:  YOUR HONOR, IN THE VEIN OF YOUR ASK THAT

25    THE PARTIES COOPERATE, I THINK IT WOULD MAKE SENSE FOR US TO
```

```
 1        TALK TO NSO TONIGHT, AND MAYBE IF WE HAVE TO, I THINK WE'LL

 2        PROBABLY AT LEAST HAVE THE LUNCH PERIOD TO, IF THERE ARE ANY

 3        OUTSTANDING ISSUES.  BUT AS YOU KNOW WITH THE VIDEOS, IT'S HARD

 4        TO MAKE CHANGES AT THE LAST MINUTE.

 5            SO MAYBE BEFORE THE JURY, IF THERE'S A BREAK, WE CAN DO IT

 6        THEN.  BUT WE'RE HAPPY TO MEET AND CONFER WITH NSO TONIGHT TO

 7        GET -- BUT THAT'S -- IF WE DON'T HAVE THAT FOR TOMORROW, WE MAY

 8        NOT GET THROUGH THE WHOLE DAY.  THAT'S WHY I DON'T WANT TO

 9        WASTE ANY OF THE JURY'S TIME.

10            THE COURT:  WHAT DO YOU MEAN, YOU WON'T GET THROUGH

11        THE DAY?  ANY DOWN TIME IS COUNTED AGAINST YOU.  YOU'RE NOT

12        GOING TO -- WE'RE NOT JUST GOING TO HAVE EMPTY SPACE.

13            MR. ANDRES:  I UNDERSTAND THAT.  BUT WHAT I'M SAYING

14        IS THAT WE HAVE THREE WITNESSES TOMORROW, AND I DON'T KNOW THAT

15        IN THE ABSENCE OF BEING ABLE TO PLAY THOSE VIDEOS, WE'LL FILL

16        THE SPACE.  SO WE NEED TO RESOLVE THOSE ISSUES WITH THE VIDEOS

17        TONIGHT OR TOMORROW IN ORDER TO FILL THE SPACE.

18            I DON'T KNOW HOW LONG --

19            THE COURT:  YOU'LL HAVE TO FILL THE SPACE WITH OTHER

20        WITNESSES IF YOU DON'T HAVE THE VIDEOS.

21            MR. ANDRES:  WE'RE ONLY CALLING FOUR WITNESSES,

22        YOUR HONOR.

23            THE COURT:  OKAY.

24            MR. ANDRES:  THREE OF WHOM WILL BE TOMORROW.

25            THE COURT:  OH, OKAY.
```

```
1              MR. ANDRES:  SO I THINK WE'RE GOING TO MOVE ALONG.

2     OBVIOUSLY I DON'T KNOW HOW LONG THE CROSSES ARE GOING TO BE,

3     BUT I'M TRYING TO DO MY BEST TO ESTIMATE HOW WE GET THROUGH THE

4     DAY.

5              THE COURT:  OKAY.  SOUNDS GOOD.

6          BUT ANY -- ANY DOWN TIME COUNTS AGAINST YOUR FULL TIME

7     ALLOTMENT, RIGHT?  WE DON'T JUST HAVE DOWN TIME IN A SHORT

8     TRIAL LIKE THIS.

9              MR. ANDRES:  I'M NOT SUGGESTING -- I GUESS WHAT I'M

10    ASKING IS THAT WE JUST NEED SOME TIME WITH THE DEFENSE -- WHAT

11    YOUR HONOR HAD SAID WAS THE NIGHT BEFORE --

12             THE COURT:  RIGHT.

13             MR. ANDRES:  -- THE NEXT DAY WE WOULD SPEND TO

14    RESOLVE THESE EVIDENTIARY ISSUES.  WE NOW HAVE EVIDENTIARY

15    ISSUES WITH THESE VIDEOS, AND I THINK THE BEST WAY TO RESOLVE

16    THAT IS FOR US TO TALK TO NSO TONIGHT, AND TO THE EXTENT THAT

17    THERE ARE ANY REMAINING ISSUES, WE'LL RAISE THEM TOMORROW.

18             THE COURT:  OKAY.  YES.

19             MR. AKROTIRIANAKIS:  THERE'S ONE RELATED ISSUE THAT

20    THE PARTIES HAVE ALREADY CONFERRED ABOUT, YOUR HONOR, AND THAT

21    IS WITH RESPECT TO THE PLAYING OF THE DEPOSITIONS OF TWO

22    WITNESSES WHO ARE THIRD PARTIES, AND SO BOTH SIDES'

23    EXAMINATIONS WOULD BE OF THOSE WITNESSES, AND DURING THE

24    DISCOVERY PHASE OF THIS TRIAL, WE TOOK THE DIRECT AND CROSS OF

25    THOSE WITNESSES ALTOGETHER IN ONE SINGLE DEPOSITION.
```

1          AGAIN, THESE ARE THIRD PARTIES, SO THEY'RE NOT 30(B)(6)

2     WITNESSES.  THEIR TESTIMONY CAN'T PROPERLY BE PLAYED THE WAY

3     THAT A 30(B)(6) WITNESS COULD BE PURSUANT TO FEDERAL RULE OF

4     CIVIL PROCEDURE 32.

5          AS I UNDERSTAND THE PLAINTIFFS' POSITION IS THAT THEY WANT

6     TO HAVE THE PLAINTIFFS' PART OF THAT WITNESS'S DEPOSITION

7     PLAYED IN THEIR CASE-IN-CHIEF, AND THEN WE DON'T PLAY THE

8     CROSS-EXAMINATION UNTIL OUR CASE-IN-CHIEF WHICH, OF COURSE, IS

9     NOT HOW NORMALLY THINGS WOULD PROCEED, AND I GET THAT THE TIME

10    IS COUNTED AGAINST US.  OF COURSE I ACCEPT THAT.

11         BUT I THINK THAT THE DIRECT AND CROSS-EXAMINATION OF THE

12    WITNESSES SHOULD BE PLAYED TOGETHER.

13              THE COURT:  I THOUGHT THAT WE DISCUSSED THIS.

14              MR. ANDRES:  YOUR HONOR, WE DID DISCUSS IT, BUT WHAT

15    MR. AKROTIRIANAKIS IS PROPOSING IS NOT WHAT YOU RESOLVED.

16         THERE ARE OUR DESIGNATIONS, THEIR COUNTERS.  WE'RE PLAYING

17    THOSE ALL IN OUR CASE.

18         THEY THEN WANT, IN THEIR CASE, TO PLAY DIFFERENT PORTIONS

19    OF THOSE DEPOSITIONS THAT ARE NOT RESPONSIVE TO OURS.

20         YOUR HONOR VERY CLEARLY RULED THAT EACH PARTY WOULD HAVE

21    ITS FLOW.  SO WE'LL PLAY OUR DEPOSITION AND THEIR COUNTERS, AND

22    WHEN IT'S TIME FOR THEIR CASE, THEY CAN PLAY THESE DEPOSITION

23    EXCERPTS, AND IF WE HAVE COUNTERS, THEY CAN INCLUDE THEM.

24         BUT THIS IS EXACTLY WHAT YOUR HONOR RULED UPON ALREADY AND

25    THE WAY THAT IT'S BEING PRESENTED -- WE CERTAINLY HAVEN'T

1    AGREED TO IT, I'LL TELL YOU THAT, AND THE WAY IT'S BEING

2    PRESENTED IS NOT ACCURATE.

3            THE COURT:  WE CAN SHORT CHANGE THIS.  OKAY.  EACH

4    SIDE GETS TO PUT ON THEIR OWN CASE, UNLESS THERE'S AGREEMENT

5    THEY NEED TO BE SEPARATE.  UNLESS THEY AGREE TO PUT THE

6    CROSS-EXAMINATION ON DURING THEIR DIRECT, NO, YOU CAN'T DO

7    THAT.

8            MR. ANDRES:  THANK YOU, YOUR HONOR.

9            MR. AKROTIRIANAKIS:  YOUR HONOR, I'M NOT TALKING

10   ABOUT OUR 30(B)(6) WITNESSES WHERE THERE'S A SPECIAL RULE UNDER

11   THE RULES OF CIVIL PROCEDURE THAT ALLOWS THEM TO DO WHAT

12   THEY'RE DOING, AND THAT WAS THE BASIS OF THE COURT'S RULING

13   LAST WEEK.  WE'RE NOW TALKING ABOUT SEPARATE WITNESSES WHO ARE

14   NOT EMPLOYEES OF MY CLIENT AND NEVER HAVE BEEN.  THEY WERE

15   THIRD PARTY WITNESSES.  SO IF THEY WERE CALLED TO THE STAND,

16   AND THE ONLY REASON THEY'RE NOT IS BECAUSE THEY LIVE IN OTHER

17   STATES, BUT IF THEY WERE CALLED TO THE STAND, THEN MR. ANDRES

18   WOULD DO HIS DIRECT EXAMINATION AND I WOULD DO MY

19   CROSS-EXAMINATION.  WE WOULDN'T HAVE IT WHERE THE WITNESS WOULD

20   COME BACK IN MY CASE-IN-CHIEF THREE DAYS LATER AND DO THAT.

21           THE COURT:  ARE THESE WITNESSES WHO ARE NOT GOING TO

22   APPEAR IN PERSON?

23           MR. AKROTIRIANAKIS:  THEY ARE NOT, YOUR HONOR.  ONE

24   OF THEM LIVES IN VIRGINIA, AND THE OTHER ONE LIVES SOME OTHER

25   PLACE OVER THERE.  THEY CAN'T BE BROUGHT HERE.  WHEN WE DID THE

```
 1    DEPOSITIONS, MR. ANDRES DID HIS DIRECT EXAMINATION AND I DID MY

 2    CROSS-EXAMINATION.  RIGHT THEN.  IT GOES TOGETHER.  IT

 3    SHOULDN'T BE SEPARATED AND THERE'S, FRANKLY, NO AUTHORITY IN

 4    THE RULES FOR DOING WHAT THEY'RE PROPOSING.  THERE IS IF IT WAS

 5    MY CLIENT'S EMPLOYEE, IF IT WAS MY CLIENT'S 30(B)(6) WITNESS.

 6    BUT THAT'S NOT WHAT WE'RE TALKING ABOUT.  WE'RE TALKING ABOUT

 7    THIRD PARTIES.  FEDERAL RULE OF CIVIL PROCEDURE 32 DOES NOT

 8    APPLY TO THIS.

 9            THE COURT:  OKAY.

10            MR. ANDRES:  FIRST OF ALL, YOUR HONOR, THEY ARE

11    AGENTS OF THE DEFENDANTS, SO THEY'RE NOT SOME RANDOM THIRD

12    PARTY.  THESE ARE PEOPLE THAT SELL PEGASUS, AND THEIR

13    INTERACTION WITH NSO ON A DAILY BASIS.  THEY MAY NOT BE

14    TECHNICAL EMPLOYEES, BUT THEY'RE PART OF NSO.  SO, A, THAT'S

15    NOT ACCURATE THAT THEY'RE SOME THIRD PARTIES.

16            THE COURT:  RIGHT.  BUT LET ME MAKE SURE I

17    UNDERSTAND.  YOU'RE GOING TO PLAY THEIR DEPOSITION, VIDEO

18    DEPOSITION.

19            MR. ANDRES:  YES.

20            THE COURT:  RIGHT?  OF YOUR DIRECT EXAMINATION?

21            MR. ANDRES:  YES.

22            THE COURT:  WITH COUNTER-DESIGNATIONS INCLUDED IN;

23    RIGHT?

24            MR. ANDRES:  CORRECT.

25            THE COURT:  BUT ALL OF YOUR DIRECT EXAM.  THE
```

1      COUNTER-DESIGNATIONS ARE ALSO FROM THE DIRECT EXAM?

2            MR. ANDRES:  THE COUNTER DESIGNATIONS ARE THE

3      PORTIONS THAT NSO ASKED US TO INCLUDE.  SO I DON'T REMEMBER,

4      FRANKLY, IF THERE WAS A REDIRECT OR WHAT IT WAS.  BUT THE POINT

5      IS, AS YOUR HONOR RULED, WE'RE GOING TO PUT IN OUR CASE IN OUR

6      CASE.  IF THEY WANT TO ADD OTHER STUFF, THEY CAN DO IT IN THEIR

7      CASE.

8            THE COURT:  BUT WOULDN'T THEY BE ENTITLED TO

9      CROSS-EXAMINE YOUR WITNESSES?

10           MR. ANDRES:  THEY WOULD BE ENTITLED IF THEY CALLED

11     THEM.  THEY HAVE CONTROL OVER THESE PEOPLE.  THERE ARE CERTAIN

12     PEOPLE FROM OTHER STATES THAT HAVE BEEN SUBPOENAED.  WE HAVE A

13     WITNESS FROM OUT OF STATE THAT'S BEING CALLED.  BUT THAT'S

14     NOT --

15           THE COURT:  HOLD ON, COUNSEL.

16       IF, INDEED, THE WITNESS WERE TESTIFYING IN PERSON, A THIRD

17     PARTY WITNESS TESTIFYING IN PERSON, WOULDN'T THE DEFENDANT HAVE

18     A RIGHT TO CROSS-EXAMINE THEM RIGHT AFTER YOUR DIRECT

19     EXAMINATION?

20           MR. ANDRES:  OBVIOUSLY, YOUR HONOR.

21           THE COURT:  OKAY.  SO WHY SHOULD WE DO THIS PART

22     DIFFERENTLY?

23           MR. ANDRES:  WE SHOULD DO THIS PART DIFFERENTLY

24     BECAUSE WE'RE PUTTING IN EXCERPTS OF THEIR DEPOSITION IN OUR

25     CASE, AND BECAUSE YOUR HONOR ADDRESSED THIS ISSUE LAST WEEK AND

```
1        SAID EACH SIDE SHOULD HAVE ITS FLOW.

2              THE COURT:  YEAH, BUT LAST WEEK WE WERE TALKING ABOUT

3     PEOPLE WHO WERE GOING TO BE HERE IN PERSON, AS WELL AS YOU

4     USING THEIR DEPOSITION FOR YOUR OWN PURPOSES IN YOUR DIRECT.

5     THIS IS SOMETHING DIFFERENT AS FAR AS I UNDERSTAND.

6         AND WHEN SHOULD THEY GET TO CROSS-EXAMINE THE WITNESSES

7     WHO ARE ONLY TESTIFYING VIA VIDEO DEPOSITION?

8              MR. ANDRES:  FIRST OF ALL, YOUR HONOR, IT'S NOT AS

9     THOUGH WE'RE PLAYING UNFETTERED OUR VIEW OF WHAT THE BEST

10    EVIDENCE IS OF THIS WITNESS.  WE ARE INCLUDING THEIR COUNTERS.

11             THE COURT:  RIGHT.

12             MR. ANDRES:  SO WE'RE INCLUDING PART OF THAT

13    DEPOSITION VIDEO, INFORMATION THAT THEY WANT TO INCLUDE THAT WE

14    DON'T.

15        IF THEY SEPARATELY WANT TO PUT IN, IN THEIR CASE AND WANT

16    TO CALL THESE WITNESSES IN THEIR CASE, THEY SHOULD DO IT IN

17    THEIR CASE, AND THAT'S --

18             THE COURT:  BUT YOU'RE SUGGESTING THAT THEY -- YOU'RE

19    PUTTING ON THIS EVIDENCE IN YOUR CASE AND THEY DON'T GET TO

20    CROSS-EXAMINE IT?

21             MR. ANDRES:  WHAT I'M SUGGESTING IS THAT THEY GET TO

22    INCLUDE THEIR COUNTERS, RIGHT?  THAT IS HOW THE DEPOSITION

23    PROCESS WORKS.  WE PROPOSE CERTAIN DEPOSITION AND THEY HAVE

24    THEIR COUNTERS.

25             THE POINT IS, IT'S REALLY JUST REARGUING, ONCE AGAIN, A
```

1    RULING THAT YOU MADE LAST WEEK, WHICH WAS EACH SIDE WAS

2    ENTITLED TO ITS FLOW.

3        THAT'S ALL WE'RE ASKING FOR.  THERE'S NO REASON WHY THEY

4    CAN'T PUT THIS IN.  MY UNDERSTANDING IS IT'S NOT -- I DON'T

5    KNOW HOW LONG IT IS, FRANKLY, BUT WHATEVER IT IS, IT'S THEIR

6    CASE AND THEY SHOULD PUT IT IN IN THEIR CASE, AND THAT'S WHAT

7    YOUR HONOR RULED LAST WEEK.

8        THE COURT:  I DID, BUT I DID WITH REGARD TO EVIDENCE

9    FOR WHICH THERE WERE WITNESSES THAT WERE GOING TO APPEAR

10    PERSONALLY AS WELL.

11        ALL RIGHT.  ANYTHING ELSE ON THIS?

12        MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  BUT THIS IS AN

13    ISSUE WHERE THEY'RE GOING TO NEED TO CUT IN THE CLIPS OF THE

14    DEPOSITION, WHICH IS -- I DON'T THINK IT'LL HAPPEN TOMORROW

15    ANYWAY, IT'LL BE THE DAY AFTER TOMORROW.  BUT AT SOME POINT,

16    THIS IS NOT THE KIND OF THING, LIKE MR. ANDRES SAID, THAT CAN

17    BE DONE JUST IN REAL TIME.  THE PERSON WHO IS GOING TO CUT THE

18    CLIPS, WHOEVER THAT IS, IS GOING TO NEED TO KNOW.

19        THE COURT:  OKAY.  ALL RIGHT.

20        FOR CONSISTENCY SAKE, THEN I'LL STICK WITH THE RULING THAT

21    I MADE THE OTHER DAY WITH REGARD TO WITNESSES WHO ARE GOING TO

22    BE APPEARING IN BOTH FORMATS, IN PERSON AND -- YOU'RE ENTITLED

23    TO PUT ON YOUR OWN CASE.  THE TRIAL IS SHORT ENOUGH, EVERYBODY

24    SHOULD BE ABLE TO PUT ON YOUR CASE IN THE WAY THAT YOU WISH.

25        MR. ANDRES:  THANK YOU, YOUR HONOR.

1          MR. AKROTIRIANAKIS:  SO I UNDERSTAND --

2          THE COURT:  I WILL NOT --

3          MR. AKROTIRIANAKIS:  WE DON'T CROSS-EXAMINE?

4          THE COURT:  I WILL NOT REQUIRE THAT THEY PERMIT YOU

5    TO PLAY YOUR CROSS-EXAMINATION IMMEDIATELY AFTER THEY PLAY IT

6    IN THEIR CASE-IN-CHIEF.

7          MR. ANDRES:  THANK YOU, YOUR HONOR.

8          MR. AKROTIRIANAKIS:  I MEAN -- OKAY.  I -- THE JURY

9    WILL HAVE NOTHING TO RELATE IT TO.  IT'S NOT LIKE A LIVE

10   WITNESS WHERE I CAN SAY, HEY, DO YOU REMEMBER WHEN YOU WERE ON

11   THE STAND IN YOUR DIRECT EXAMINATION AND THIS TOPIC CAME UP.

12   LET ME ASK YOU ABOUT THAT SOME MORE.  I MEAN, THERE JUST WON'T

13   BE ANYTHING TO ANCHOR IT TO IT.  IT WILL MAKE NO SENSE TO THE

14   JURY, WHICH IS WHY THEY WANT TO DO IT THAT WAY, YOUR HONOR,

15   WHICH IS THEY'RE TRYING NOT TO BE ABLE TO MAKE ME PUT ON MY

16   CASE.

17         THE COURT:  OKAY.  TELL ME WHAT THE EVIDENCE IS THAT

18   WE'RE TALKING ABOUT.

19         MR. AKROTIRIANAKIS:  SO TWO OF THE WITNESSES, THE

20   COURT MAY REMEMBER, THERE WAS A COMPANY CALLED WEST BRIDGE.

21   THEY WERE THE SALES AGENT FOR NSO AND OTHER COMPANIES HERE IN

22   THE UNITED STATES.

23       THIS WAS FIVE YEARS, SIX YEARS, SEVEN YEARS AGO THAT THESE

24   PEOPLE WORKED FOR WEST BRIDGE.  SO WE DON'T HAVE ANY ABILITY TO

25   BRING THEM HERE.  THEY LIVE IN VIRGINIA, THEY'VE MOVED ON WITH

1    THEIR LIVES, AND SO ON.  ONE OF THE PEOPLE WAS THE ONE WHO WAS

2    DEMONSTRATING THE TECHNOLOGY TO POTENTIAL U.S. GOVERNMENT

3    CUSTOMERS, AND THE OTHER ONE WAS THE PRESIDENT OF THE COMPANY

4    WHO WOULD NEGOTIATE THE TERMS OF CONTRACTS THAT -- IF THEY HAD

5    ANY, WHICH THEY HAD TWO, THE FBI AND THE CIA.

6         SO THEY WANT TO PLAY, FOR EXAMPLE, WITH THE GENTLEMAN WHO

7    DOES THE DEMONSTRATIONS, THEY WANT TO PLAY, YOU KNOW, HALF THE

8    STORY AND NOT HAVE HIM PLAY THINGS -- NOT HAVE HIM SAY THINGS

9    THAT ARE THE OTHER HALF OF THE STORY, WHICH ORDINARILY THIS

10   WOULD JUST BE HEARD ALTOGETHER IN A CROSS-EXAMINATION.

11        NOW, FOR WITNESSES THAT ARE THE -- THAT ARE THE COMPANY,

12   30(B)(6), MANAGING AGENT, OFFICERS AND DIRECTORS, THERE IS A

13   SPECIAL RULE THAT ALLOWS THEM TO DO WHAT THEY'RE DOING.  IT'S

14   OFTEN NOT A GREAT IDEA.  MOST JUDGES WON'T LET YOU DO THAT.

15        BUT THERE'S NO SPECIAL RULE LIKE THAT THAT APPLIES TO THIS

16   KIND OF TESTIMONY, YOUR HONOR, AND WE HAVE NO ABILITY TO BRING

17   THESE PEOPLE HERE TO TIE TO ANYTHING FOR THE SAKE OF THE JURY

18   WHAT THE TESTIMONY ON CROSS-EXAMINATION IS GOING TO BE.

19   THERE'S NO WAY TO SIGN POST IT TO THE JURY LIKE YOU CAN WITH A

20   LIVE WITNESS.

21        AND I JUST FAIL TO UNDERSTAND WHY IT'S A GOOD IDEA --

22             MR. ANDRES:  WELL, YOUR HONOR.

23             THE COURT:  HOLD ON.  HOLD ON.  I DON'T QUITE

24   UNDERSTAND WHAT YOU MEAN THAT THERE'S NO WAY TO TIE IT TO --

25   WHY -- WHAT'S THE DIFFICULTY IN YOU RECALLING THEM, REMINDING

1    THE JURY THAT THEY TESTIFIED PREVIOUSLY, AND THAT YOU'RE JUST

2    NOW PRESENTING THE CROSS-EXAMINATION?

3              MR. AKROTIRIANAKIS:  OH, IF THE COURT IS PROPOSING

4    THAT I CAN COMMENT TO THE JURY ABOUT WHAT AREAS WE'RE GOING TO

5    GO INTO WITH A WITNESS SO THAT THEY'RE LIKE, OH, YEAH, NOW I

6    REMEMBER WHAT THE GUY SAID TWO DAYS AGO, THEN THAT MIGHT BE

7    OKAY, YOUR HONOR.

8         BUT FOR US TO JUST HAVE THIS ABSTRACT -- IT'S JUST GOING

9    TO TAKE LONGER BECAUSE I'M, FRANKLY, GOING TO HAVE TO HAVE TO

10   PLAY PART OF THE DIRECT EXAMINATION AGAIN IN ORDER FOR THE

11   CROSS TO MAKE ANY SENSE, SO THE JURY -- WHICH IT'S BORING

12   ENOUGH TO HEAR VIDEO TESTIMONY ANYWAY, AS THE COURT KNOWS -- IS

13   GOING TO HAVE TO HEAR IT TWICE NOW IN ORDER FOR THE

14   CROSS-EXAMINATION TO MAKE ANY SENSE.

15             THE COURT:  HMM.  NOW, IF I WERE TO PERMIT YOU TO GO

16   FORWARD, HAVE YOU ALREADY -- HAVE YOU ALL MET AND CONFERRED

17   ABOUT WHAT THE CROSS-EXAMINATION LOOKS LIKE?

18             MR. AKROTIRIANAKIS:  YEAH, WE HAVE.  IN FACT, I THINK

19   IT'S ALL TIMED OUT AND EVERYTHING.  THERE'S ONE WITNESS THAT'S

20   MAYBE, LIKE, 15 MINUTES, AND THE OTHER ONE IS MUCH SHORTER THAN

21   THAT.

22             MR. ANDRES:  YOUR HONOR --

23             THE COURT:  DOES IT -- HOLD ON.

24        DOES THIS JUST APPLY TO ONE WITNESS OR TO TWO?

25             MR. AKROTIRIANAKIS:  TWO WITNESSES, YOUR HONOR.  IT'S

1      TERRY DIVITTORIO AND JOSH SHANER.  MR. DIVITTORIO WAS THE

2      PRESIDENT OF WEST BRIDGE, AND MR. SHANER WAS WHAT'S CALLED A

3      PRE-SALES ENGINEER, MEANING THAT HE WOULD GO OUT TO THE

4      DEPARTMENT OF DEFENSE AND SHOW THEM WHAT PEGASUS WAS AND THE

5      CAPABILITIES, AND THEN MR. DIVITTORIO WOULD ESSENTIALLY ASK

6      THEM IF THEY WANTED TO BUY IT, AND IF THEY DID, THEY WOULD TRY

7      AND NEGOTIATE TO TERMS.

8              THE COURT:  OKAY.  ALL RIGHT.

9              MR. ANDRES:  YOUR HONOR, IT CAN'T BE THAT EVERY TIME

10     THAT MR. AKROTIRIANAKIS RAISES HIS VOICE AND GETS UPSET, WE

11     REARGUE SOMETHING THAT YOUR HONOR HAS RULED UPON, NOW THREE

12     TIMES.

13             AND SO THEIR CASE IS DIFFERENT FROM OUR CASE, AND THEY

14     WANT TO PLAY DIFFERENT PARTS OF THE VIDEO AND THEY SHOULD DO IT

15     IN THEIR CASE.

16             AND IT'S NOT THAT COMPLICATED.  FIRST OF ALL, YOUR HONOR

17     IS SUGGESTING TO MR. AKROTIRIANAKIS THAT HE CAN SAY TO THE

18     JURY, WHEN THEY CALL THE WITNESS, THAT WE'RE GOING TO PUT

19     MR. DIVITTORIO ON AGAIN, YOU SAW HIS VIDEO EARLIER.  HE TAKES

20     THAT STATEMENT AND SUGGESTS THAT HE'S GOING TO COMMENT TO THE

21     JURY ABOUT THE AREAS OF CROSS-EXAMINATION.

22             SO WHAT YOU SAY TO HIM GETS TRANSLATED IN HIS MIND TO WHAT

23     HE WANTS TO DO AND IT'S NOT CONSISTENT WITH WHAT THE COURT IS

24     SAYING.

25             WE DO THIS OVER AND OVER AND OVER AGAIN.  WE HAVE A FOUR

```
 1   DAY TRIAL.  IT'S 4:30, 4:40.  WE'RE SUPPOSED TO GO HOME AND

 2   RESOLVE THESE ISSUES.

 3         YOUR HONOR HAS SAID THAT EACH SIDE IS ENTITLED TO ITS

 4   FLOW.  THAT'S ALL WE'RE ASKING FOR.  THAT'S IT.

 5             THE COURT:  OKAY.  ALL RIGHT.

 6         ALL RIGHT.  THE RULING STANDS.  I'M NOT GOING TO CHANGE MY

 7   MIND.

 8             MR. ANDRES:  THANK YOU, YOUR HONOR.  GOOD NIGHT.

 9             THE COURT:  I'VE HEARD YOU BOTH OUT.

10         ALL RIGHT.  I WILL BE IN AT 8:00.  OUR COURT REPORTER WILL

11   BE IN HERE BY 8:00.

12             THE REPORTER:  I'LL BE HERE BY 8:00.

13             THE COURT:  WE COULD, IF WE NEED TO, HAVE 15 MINUTES

14    IN THE MORNING IF WE NEED TO GET STARTED, IF THERE'S ANYTHING

15    ABSOLUTELY URGENT THAT YOU CAN'T RESOLVE TONIGHT.

16             MR. ANDRES:  THANK YOU, YOUR HONOR.

17             THE COURT:  OKAY.  ALL RIGHT.

18             MR. ANDRES:  HAVE A NICE NIGHT.  THANK YOU, YOUR

19    HONOR.

20             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

21         (THE EVENING RECESS WAS TAKEN AT 3:42 P.M.)

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, CRR
         CERTIFICATE NUMBER 8076

17

18

19       LEE-ANNE SHORTRIDGE, CSR, CRR
         CERTIFICATE NUMBER 9595

20

21       DATED:  APRIL 28, 2025

22

23

24

25