1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5  WHATSAPP LLC AND META            )  C-19-07123 PJH
   PLATFORMS, INC.,                 )
6                                   )  OAKLAND, CALIFORNIA
               PLAINTIFFS,          )
7                                   )  APRIL 30, 2025
          VS.                       )
8                                   )  VOLUME 3
   NSO GROUP TECHNOLOGIES LIMITED   )
9  AND Q CYBER TECHNOLOGIES         )  PAGES 517-635
   LIMITED,                         )
10                                  )
               DEFENDANTS.          )
11  _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14             UNITED STATES DISTRICT JUDGE

15

16  A P P E A R A N C E S:

17  FOR THE PLAINTIFFS:    DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                             ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

1

2      <u>APPEARANCES (CONTINUED)</u>

3

4      FOR THE DEFENDANTS:      KING & SPALDING
                                BY:  JOSEPH N. AKROTIRIANAKIS
5                                    AARON S. CRAIG
                                633 WEST FIFTH STREET, SUITE 1600
6                               LOS ANGELES, CALIFORNIA  90071

7                               BY:  MATTHEW V. NOLLER
                                50 CALIFORNIA STREET, SUITE 3300
8                               SAN FRANCISCO, CALIFORNIA  94111

9

10     ALSO PRESENT:           CURT EVANS
                               BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF WITNESSES

PLAINTIFFS'

**CLAUDIU GHEORGHE**
        CROSS-EXAM BY MR. AKROTIRIANAKIS (RES.)     P. 531
        REDIRECT EXAM BY MR. PEREZ                   P. 550
        RECROSS-EXAM BY MR. AKROTIRIANAKIS           P. 561


**TAMIR GAZNELI**
        VIDEOTAPED DEPOSITION PLAYED                 P. 565


**YARON SHOHAT**
        VIDEOTAPED DEPOSITION PLAYED                 P. 568


**RAMON ESHKAR**
        VIDEOTAPED DEPOSITION PLAYED                 P. 570


**ANDREW ROBINSON**
        DIRECT EXAM BY MR. BLOCK                     P. 572
        CROSS-EXAM BY MR. AKROTIRIANAKIS             P. 589
        REDIRECT EXAM BY MR. BLOCK                   P. 619

1

2                              INDEX OF EXHIBITS

3                                        MARKED        ADMITTED

4       PLAINTIFFS'

5       44, 59, 60, 62, 64,                             568
            66, 34, AND 65
6       36                                              569
        932                                             575
7       930                                             577

8

        DEFENDANTS'
9
        1156                                            536
10      1131                                            543
        1204                                            606
11      1511                                            615

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    OAKLAND, CALIFORNIA                      APRIL 30, 2025

 2                      P R O C E E D I N G S

 3         (COURT CONVENED AT 8:19 A.M.)

 4         (JURY OUT AT 8:19 A.M.)

 5              THE COURT:  GOOD MORNING.  KELLY IS STILL DOING

 6    THINGS, BUT I KNOW THAT YOU ALL HAVE SOME ITEMS THAT YOU WANTED

 7    TO DISCUSS, SO I'M READY.

 8              YOU CAN ALL BE SEATED.

 9              WE'RE CALLING THIS CASE.

10              MR. ANDRES:  GOOD MORNING, YOUR HONOR.

11              THE COURT:  GOOD MORNING.

12              MR. ANDRES:  JUST THREE ISSUES THAT WE WANTED TO

13    RAISE THIS MORNING.

14              ONE IS WE NOW HAVE A STIPULATION FOR THE ADMISSION OF

15    THOSE FINANCIAL DOCUMENTS THAT WE DISCUSSED YESTERDAY.  I CAN

16    HAND IT UP.  IT'S PRETTY STRAIGHTFORWARD.  AND WE'VE GIVEN A

17    COPY TO THE DEFENDANTS.

18              SO IT'S OKAY IF I COME AROUND, YOUR HONOR?

19              THE COURT:  SURE.

20              MR. ANDRES:  (HANDING.)

21              THE COURT:  OKAY.  AND THE PARTIES STIPULATE TO THIS.

22              MR. CRAIG:  YES, YOUR HONOR.

23              THE COURT:  OKAY.  THANK YOU.

24         DO YOU WANT THIS -- DO YOU PLAN TO SUBMIT THEM TO THE JURY

25    AT THE BEGINNING OF YOUR PRESENTATION, OR AT SOME POINT LATER?
```

1          MR. ANDRES:  LET'S DO IT AFTER ONE OF THE BREAKS,

2     YOUR HONOR, IF THAT'S OKAY.

3          THE COURT:  OKAY.  ALL RIGHT.

4          MR. ANDRES:  JUST SO WE CAN GET STARTED.

5          THE COURT:  ALL RIGHT.  AND THE DOCUMENTS HAVE ALL

6     BEEN MARKED AND HAVE BEEN LODGED, OR ARE YOU GOING TO LODGE

7     THEM, OR WHAT?

8          MR. ANDRES:  THEY'VE BEEN MARKED, AND WE'LL LODGE

9     THEM.

10         MR. BLOCK:  ACTUALLY, I THINK THEY WOULD HAVE BEEN

11    LODGED.  ARE YOU ASKING IF WE WOULD HAND A HARD COPY TO THE

12    JURY?

13         THE COURT:  YEAH.  IS THAT WHAT YOU PLAN ON DOING, OR

14    DO YOU WANT TO --

15         MR. ANDRES:  WELL, FIRST WE WANTED TO MAKE SURE WE

16    HAD THE STIPULATION.  NOW THAT WE HAVE YOUR HONOR'S -- WE'LL

17    PUT THEM IN BINDERS AND HAND THEM OUT TO THE JURY.  I THINK

18    THAT MAKES SENSE.  WE'LL GET THAT PREPARED FOR LATER ON TODAY.

19         THE COURT:  ALL RIGHT.  THEN THAT'S WHAT WE'LL DO.

20       KELLY, HERE, THESE ARE THE FOUR EXHIBITS THAT, BY

21    STIPULATION, WILL BE ADMITTED, AND THEY'LL -- HARD COPIES WILL

22    BE GIVEN TO THE JURY.  COUNSEL WILL PREPARE THOSE LATER THIS

23    MORNING.

24         MR. ANDRES:  CORRECT.

25         THE COURT:  OKAY.

1          MR. ANDRES:  YOUR HONOR, THE SECOND ISSUE IS A LITTLE

2     MORE COMPLICATED, AND I JUST WANTED TO PREVIEW IT FOR YOU, AND

3     MAYBE WE CAN DISCUSS IT AT A BREAK.

4          BUT OBVIOUSLY, AS YOU KNOW, AND I THINK YOU AGREED, THE

5     OPENING YESTERDAY VIOLATED THE COURT'S ORDER IN A NUMBER OF

6     WAYS, AND SO WE'RE GOING TO ASK THE COURT FOR AN INSTRUCTION.

7          AMONG OTHER THINGS, THE COURT -- WELL, ACTUALLY, I HAVE A

8     COPY, BUT I HAVEN'T GIVEN IT TO THE DEFENDANTS YET, SO I DON'T

9     WANT TO -- I WANT TO GIVE THEM A CHANCE TO READ IT.

10         BUT AMONG OTHER THINGS, THE DEFENDANTS REFERRED TO U.S.

11    CUSTOMERS IN THEIR OPENING, WHICH THEY'RE NOT ALLOWED TO DO

12    UNDER THE COURT'S ORDER.

13         THEY ALSO TALKED ABOUT HAVING EXCLUSIVE GOVERNMENT

14    CLIENTS, WHICH THEY'RE ALSO NOT ALLOWED TO DO.  THEY'RE ALLOWED

15    TO TALK ABOUT GOVERNMENT CUSTOMERS, BUT NOT EXCLUSIVELY BECAUSE

16    WE KNOW THAT THAT'S NOT TRUE, AND THAT GOES INTO THE WHOLE

17    ISSUE WITH RESPECT TO THE ABUSES THAT WE DIDN'T GET DISCOVERY

18    ABOUT THAT WE TALKED ABOUT.

19         THERE'S ALSO AN ISSUE WITH RESPECT TO THEM SAYING THAT

20    THEY DIDN'T INTEND TO VIOLATE THE CALIFORNIA LAW.  I THINK

21    MR. AKROTIRIANAKIS SAID THEY DIDN'T EVEN -- THEY WEREN'T EVEN

22    AWARE OF THE CALIFORNIA LAW, THEY WERE A WORLD AWAY IN ISRAEL,

23    AND THAT IS CLEARLY INCONSISTENT WITH THE COURT'S RULINGS WITH

24    RESPECT TO, TO THE FINDING OF LIABILITY HERE.

25         THEY TALKED ABOUT THE FACT THAT THERE WERE DOZENS OF

1    VERSIONS OF PEGASUS THAT HAVE NOTHING TO DO WITH WHATSAPP AND

2    THAT WERE LEGAL, THAT WERE NEVER FOUND TO HAVE VIOLATED THE

3    LAW.

4         THAT IS COMPLETELY IRRELEVANT TO THIS CASE, AND THE NOTION

5    THAT ANYTHING RELATING TO PEGASUS IS LAWFUL IS INAPPROPRIATE IN

6    THIS CASE BECAUSE IN THIS CASE YOUR HONOR HAS FOUND THAT

7    PEGASUS, THE USE OF PEGASUS HERE WAS UNLAWFUL.

8         THEY ALSO MISLEADINGLY SUGGESTED THAT LOSSES FOR -- THAT

9    ARE RECOVERABLE HAVE TO RELATE TO DAMAGE TO THE WHATSAPP

10   SERVER.

11        THAT'S NOT THE LAW.  WE'RE ASKING FOR DAMAGES RELATING TO

12   THE WORK THAT WAS DONE TO FIX THE CYBER ATTACK.  IT DOESN'T

13   MEAN THAT THERE HAS TO BE SOME PERMANENT DAMAGE TO THE SERVERS,

14   THAT THEY HAVE TO BE DENTED, IN NON-TECHNICAL TERMS.  SORRY,

15   YOUR HONOR.

16        BUT THAT'S NOT THE LAW, AND SO THAT'S INAPPROPRIATE.

17        THEY ALSO, AS YOU KNOW, WE TALKED YESTERDAY, RAISED THE

18   ISSUE OF STEALING PEGASUS CODE OR STEALING INTELLECTUAL

19   PROPERTY.  THERE'S NO EVIDENCE OF THAT.

20        AND EVEN IF THERE WAS, I THINK IT WOULD BE PRECLUDED UNDER

21   403.

22        AND THEN, FINALLY, THIS ISSUE THAT THE HEAD OF WHATSAPP,

23   WILL CATHCART, WANTS TO DAMAGE NSO AS MUCH AS POSSIBLE IS ALSO

24   IRRELEVANT BECAUSE THE PLAINTIFFS' INTENT HERE IS NOT RELEVANT.

25        AND THIS WHOLE NOTION OF A SHOW TRIAL AND A PR STUNT AND

525

```
 1          THE LIKE IS NOT APPROPRIATE, YOUR HONOR.

 2              OBVIOUSLY WE BROUGHT THIS LAWSUIT, YOUR HONOR -- WE'VE

 3      BEEN AT IT FOR SIX YEARS.  YOUR HONOR RULED IN OUR FAVOR ON

 4      SUMMARY JUDGMENT.  WE HAVEN'T VIOLATED ANY COURT ORDERS OR

 5      ANYTHING ALONG THOSE LINES.

 6              THE WHOLE NOTION THAT WE'RE USING THIS COURT AS SOME SORT

 7      OF PR STUNT I THINK IS ALSO PREJUDICIAL AND INAPPROPRIATE.

 8              SO WE WILL HAVE -- WE NOW HAVE THE INSTRUCTION, WHICH

 9      WE'LL GIVE TO THE DEFENDANTS, WE'LL GIVE TO THE COURT, AND

10      MAYBE AT A BREAK -- BUT I WANTED TO PREVIEW THAT, BECAUSE I

11      DON'T WANT TO GO INTO THOSE ISSUES AGAIN TODAY.  I DON'T WANT

12      THERE TO BE SOME CROSS-EXAMINATION ABOUT NOBODY KNOWING ABOUT

13      CALIFORNIA LAW OR THE LIKE.

14              THE COURT:  ALL RIGHT.  YOU RAISED MANY OF THESE

15       THINGS YESTERDAY.

16              LET'S DEAL WITH IT WHEN WE'RE READY TO DEAL WITH IT.

17              ARE YOU GETTING DAILY TRANSCRIPTS?

18              MR. ANDRES:  WE ARE.  WE GOT IT LAST NIGHT, SO THAT'S

19      WHY WE WROTE THE INSTRUCTION.

20              THE COURT:  OKAY.  SO YOU HAVE THE OPENING

21      STATEMENTS?

22              MR. ANDRES:  I HAVE THEM.

23              THE COURT:  AND I CAN HAVE THAT WHEN I AM DETERMINING

24      WHETHER OR NOT THERE HAVE BEEN THESE VIOLATIONS.

25              MR. ANDRES:  CORRECT.  DO YOU WANT US TO -- DO YOU
```

```
1        HAVE A COPY AS WELL, YOUR HONOR?

2              THE COURT:  NO.  THAT'S OKAY.

3              MR. ANDRES:  WE'LL GET IT FOR YOU, YOUR HONOR.  THANK

4        YOU.

5          MY --

6              THE COURT:  LOOK, WE WANT TO START ON TIME.  I

7        APPRECIATE THAT YOU'VE GIVEN ME THIS LIST, SO I WILL BE

8        PREPARED WHEN YOU MAKE THE FORMAL REQUEST.

9          BUT NOW IS NOT THE TIME --

10             MR. ANDRES:  UNDERSTOOD.

11             THE COURT:  -- TO TALK ABOUT THESE -- TO TALK ABOUT

12       THIS PARTICULAR ISSUE.  WE DON'T HAVE ENOUGH TIME TO RESOLVE

13       IT.

14             MR. ANDRES:  THANK YOU, YOUR HONOR.

15             THE COURT:  AND, MR. AKROTIRIANAKIS, I KNOW YOU'RE

16       DYING TO RESPOND TO THIS, BUT CAN YOU PLEASE JUST HOLD IT UNTIL

17       WE ARE ABLE TO TALK ABOUT THE ISSUE --

18             MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.

19             THE COURT:  -- IN FULL.

20             MR. AKROTIRIANAKIS:  I WOULD APPRECIATE IN THE

21       FUTURE, IT SEEMS LIKE THERE WILL BE A FUTURE OF THESE CONSTANT

22       AD HOMINEM ATTACKS AGAINST ME, IF THERE'S, WELL, WE HAVEN'T

23       SHOWED THIS TO THE DEFENSE, THAT WE AT LEAST SHOW IT TO THE

24       DEFENSE AND MEET AND CONFER ABOUT IT BEFORE TAKING UP ALL THE

25       TIME THAT WE HAVE NOW.
```

1          THE COURT:  OKAY.

2          MR. AKROTIRIANAKIS:  THERE IS AN ISSUE THAT DOES

3     RELATE TO THE PRESENTATION THIS MORNING, YOUR HONOR.

4          THAT IS, THAT AFTER HAVING TOLD US FOR DAYS WE'RE GOING TO

5     PLAY, WE'RE GOING TO PLAY THESE EXCERPTS AND SO ON, NOW THEY'RE

6     GOING TO READ THE EXCERPTS, WHICH I GUESS THAT'S, IN AND OF

7     ITSELF IS NOT A PROBLEM, BUT THE -- THE DOCUMENTS THAT THEY

8     WANT TO DISPLAY DURING THE READING OF THE EXCERPTS HAVE NOT

9     BEEN REDACTED PER THE COURT'S ORDER.

10         THE COURT:  OKAY.

11         MR. AKROTIRIANAKIS:  AND I THINK THE REASON THEY'RE

12    READING INSTEAD OF PLAYING IS BECAUSE IT'S KIND OF HARD TO

13    DISPLAY AT THE SAME TIME, SO I JUST OBJECT TO THEM DISPLAYING

14    UNREDACTED EXHIBITS THAT DON'T COMPLY.

15         MR. PEREZ:  THAT'S INCORRECT, YOUR HONOR.

16         SO THERE'S ONLY -- WE HAVE A NUMBER OF VIDEO DEPOSITION

17    DESIGNATIONS THAT WE WANT TO PLAY.  THERE'S ONE WHO -- WHICH

18    WE'RE USING ONLY FOR THE AUTHENTICATION OF DOCUMENTS.  IT'S

19    LITERALLY THE PORTION IS JUST, DO YOU RECOGNIZE THIS DOCUMENT,

20    YES, THAT'S A WHATSAPP MESSAGE I RECEIVED.

21         NEXT DOCUMENT, BLAH, BLAH, BLAH.

22         VERY, VERY STRAIGHTFORWARD.

23         WE'VE ASKED THEM TO STIPULATE TO ADMISSIBILITY.  IF THAT'S

24    DONE, WE DON'T NEED TO READ IT INTO THE RECORD.  OUR THOUGHT

25    WAS IT WOULD BE FASTER TO READ THAN TO MAKE THE JURY SIT

1    THROUGH THAT.  SO I DON'T THINK THERE'S ANY ISSUE HERE.

2            MR. AKROTIRIANAKIS:  I DON'T EVEN KNOW WHAT THE

3    EXCERPTS ARE, YOUR HONOR.

4            MR. PEREZ:  I GAVE THE LIST TO THEM.

5            MR. AKROTIRIANAKIS:  FIVE MINUTES AGO WE HEARD THIS.

6            MR. CRAIG:  WE HAVE A LIST OF THE EXHIBITS.  WE DON'T

7    HAVE A LIST OF THE EXCERPTS THAT THEY PLAN TO READ.  THEY

8    HAVEN'T TOLD US WHICH PORTIONS OF THE DEPOSITION THEY WANT TO

9    READ BEFORE THEY READ THEM.

10            MR. PEREZ:  OKAY.  WE CAN GET THAT TO YOU.  THAT'S NO

11    PROBLEM.  IT WAS PART OF THE PRIOR DESIGNATIONS TO WHICH YOU

12    HAD NO COUNTERS AND NO OBJECTIONS.

13            THE COURT:  YOU ALL SHOULD BE HAVING THESE

14    DISCUSSIONS WITHOUT ME.

15            MR. PEREZ:  AGREED, YOUR HONOR.

16            THE COURT:  I'VE NEVER HAD TO BE SO INVOLVED IN THE

17    PRESENTATION.

18            MR. CRAIG:  THIS WAS --

19            THE COURT:  LISTEN, I SAID YESTERDAY, DOCUMENTS NEED

20    TO BE REDACTED IF THEY RUN AFOUL OF PRETRIAL RULINGS ON THE

21    CASE.

22            MR. ANDRES:  UNDERSTOOD.

23            THE COURT:  MAKE SURE YOUR DOCUMENTS ARE REDACTED

24    BEFORE THEY'RE PUBLISHED TO THE JURY.

25            MR. PEREZ:  WE WILL DO THAT, YOUR HONOR.  THANK YOU

```
 1          VERY MUCH.

 2              MR. AKROTIRIANAKIS:  NOW THAT WE'VE ONLY SEEN

 3     UNREDACTED, COULD WE PLEASE SEE THE UNREDACTED DOCUMENTS BEFORE

 4     THEY'RE PUBLISHED TO THE JURY, YOUR HONOR?

 5              THE COURT:  AREN'T THEY PART OF THE EXCHANGE OF

 6     EXHIBITS?

 7              MR. AKROTIRIANAKIS:  WE HAVEN'T RECEIVED REDACTED

 8     COPIES.  WE ONLY HAVE THE UNREDACTED COPIES.

 9          I UNDERSTAND IT'S THE WITNESS RIGHT AFTER THE ONE THAT'S

10     ON THE STAND RIGHT NOW, THEY INTEND TO DISPLAY UNREDACTED

11     DOCUMENTS.  I WOULD LIKE TO SEE THE REDACTED ONES BEFORE

12     THEY'RE PUBLISHED TO THE JURY SO I CAN CHECK THEM.

13              THE COURT:  YOU WANT TO SEE THE REDACTIONS OR THE

14     UNREDACTED?

15              MR. AKROTIRIANAKIS:  I HAVE THE UNREDACTED.  WHAT I

16     DON'T HAVE IS THE ONE THAT IS APPARENTLY THEY'RE GOING TO SHOW

17     TO THE JURY, WHAT I WOULD LIKE, IN LIGHT OF YESTERDAY, MOVING

18     INTO EVIDENCE THE UNREDACTED DOCUMENTS THAT TALK ABOUT HUMAN

19     RIGHTS AND SO ON TO SEE THE REDACTION SO I CAN CHECK THEM.

20              MR. PEREZ:  I THINK IT WAS DEFENDANTS WHO MOVED INTO

21     EVIDENCE THE USE OF THE SPYWARE TALKING ABOUT HUMAN RIGHTS.

22              MR. AKROTIRIANAKIS:  THEY --

23              MR. ANDRES:  REMEMBER, THEY PUT THAT ON THE SCREEN?

24              THE COURT:  YEAH.  IN ANY EVENT, LET'S FORGET ABOUT

25     PAST MISTAKES.  OKAY?
```

1          MR. PEREZ:  YES, YOUR HONOR.

2          THE COURT:  LET'S JUST, GOING FORWARD, MAKE SURE THE

3     DOCUMENTS ARE REDACTED IN ACCORDANCE WITH THE PRIOR ORDERS, AND

4     MAKE SURE OPPOSING COUNSEL KNOWS WHAT THE REDACTIONS ARE.

5          MR. PEREZ:  ABSOLUTELY, YOUR HONOR.  WE WILL DO THAT.

6     THANK YOU VERY MUCH.

7          THE COURT:  OKAY.  ALL RIGHT.

8       AND IS OUR WITNESS HERE?  WE CAN GET STARTED ON TIME?

9          MR. PEREZ:  YES, YOUR HONOR.

10      (PAUSE IN PROCEEDINGS.)

11         THE COURT:  ALL RIGHT.  GOOD MORNING, MR. GHEORGHE.

12      PLEASE HAVE A SEAT.  YOU ARE STILL UNDER OATH.

13      MADAM CLERK, WOULD YOU BRING THE JURY IN?

14      (PAUSE IN PROCEEDINGS.)

15         THE CLERK:  ALL RISE FOR THE JURY.

16      (JURY IN AT 8:31 A.M.)

17         THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18         THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

19     GENTLEMEN OF THE JURY.  TO OUR JURORS, THANK YOU AGAIN FOR

20     COMING IN AND BEING HERE ON TIME.

21      WE'RE READY TO RESUME WHERE WE LEFT OFF YESTERDAY.

22      MR. AKROTIRIANAKIS, YOU MAY CONTINUE.

23         MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

24     ///

25     ///

1              **CROSS-EXAMINATION (RESUMED)**

2      BY MR. AKROTIRIANAKIS:

3      Q.   MR. GHEORGHE, BEFORE YOU IS A BINDER THAT SAYS GHEORGHE

4      DIRECT, AND THERE'S AN EXHIBIT 10 THAT'S IN IT.  WE LOOKED AT

5      IT A LITTLE BIT YESTERDAY.

6           THIS DOCUMENT IS IN EVIDENCE, YOUR HONOR.  MAY I PUBLISH?

7                THE COURT:  YES.

8                MR. AKROTIRIANAKIS:  THANK YOU.

9                MR. PEREZ:  I JUST WANTED TO CONFIRM, YOUR HONOR,

10     THAT IT'S THE REDACTED VERSION.  WE MET AND CONFERRED AND

11     AGREED ON SOME REDACTIONS TO THIS DOCUMENT.

12               THE COURT:  I'M -- OKAY.

13               MR. AKROTIRIANAKIS:  CAN WE PUBLISH, PLEASE -- WELL,

14     LET'S PUBLISH THE FIRST PAGE, THE TOP PART.

15     Q.   THIS, AGAIN, WAS THE SEV THAT RELATED TO THE EVENTS THAT

16     WE'RE TALKING ABOUT TODAY.

17          DO YOU SEE THAT, MR. GHEORGHE?

18     A.   YES.

19     Q.   ALL RIGHT.  AND IF YOU TURN TO PAGE 3 OF THE DOCUMENT,

20     THERE IS A -- AN ENTRY BY MR. MORENO GARIJO IN THE MIDDLE OF

21     THE PAGE, AND IT'S DATED MAY 6TH, 2019 AT 9:37 A.M.

22          DO YOU SEE THAT?

23     A.   WHAT YOU LISTED EARLIER WAS A MESSAGE FROM ME, NOT FROM

24     JOAQUIN.

25     Q.   I'M SORRY.  CAN WE PUBLISH, IN THE MIDDLE OF THE PAGE,

1      THERE'S A 9:37 A.M. MESSAGE FROM MR. MORENO GARIJO.

2           OKAY.  DO YOU SEE THAT, THE TOP MESSAGE THAT WE SEE,

3      MR. GHEORGHE?

4      A.   YES.

5      Q.   ALL RIGHT.  AND --

6           MAY I EXAMINE FROM HERE FOR JUST A MINUTE, YOUR HONOR?

7                THE COURT:  YOU CAN DO IT ANYWHERE UP THERE THAT YOU

8      WISH.

9                MR. AKROTIRIANAKIS:  THANK YOU VERY MUCH.  I CAN ONLY

10     SEE THE SCREEN.

11     Q.   MR. MORENO GARIJO WRITES, AT THE END OF THE VULNERABILITY

12     A PARAGRAPH THAT WE TALKED ABOUT YESTERDAY HE WRITES, "WE HAVE

13     A FIX READY (FULL STANZA VALIDATION) BUT HAVEN'T PUSHED IT

14     BEFORE THE NECESSARY OPSEC DECISIONS HAVE BEEN MADE."

15          DO YOU SEE THAT?

16     A.   YES.

17     Q.   AND IN THE NEXT PARAGRAPH, IN THE SECOND TO LAST SENTENCE,

18     HE REFERS, WITH RESPECT TO VULNERABILITY B THAT WE DISCUSSED

19     YESTERDAY, THAT "A DIFF TO FIX THIS IS ALSO UP BUT HASN'T BEEN

20     PUSHED YET DUE TO OPSEC CONCERNS."

21          DO YOU SEE THAT?

22     A.   YES.

23     Q.   ALL RIGHT.  NOW, PLEASE TELL THE JURY WHAT A DIFF IS IN

24     THIS SITUATION.

25     A.   A DIFF IS A CHANGE MADE TO THE CODE.  WE MAKE IMPROVEMENTS

1     TO THE SOFTWARE BY MAKING DIFFS, OR CODE CHANGES TO THE

2     SOFTWARE.

3     Q.   OKAY.  SO DIFF JUST MEANS CODE CHANGE?

4     A.   YEAH, IT'S A CODE CHANGE.

5     Q.   RIGHT.  AND IT'S SHORT FOR LIKE DIFFERENCE OR SOMETHING?

6     A.   NO.  IT'S JUST THE WAY WE REFER TO IT INSIDE FACEBOOK.

7     EVERY COMPANY HAS A WAY TO REFER TO THIS INTERNALLY BASED ON

8     THE TOOLS THAT THEY USE, AND WE HAD A TOOL THAT WAS CALLED A

9     DIFF TOOL AND EVERYONE REFERRED TO THESE CHANGES AS DIFFS.

10    Q.   ALL RIGHT.  NOW, AFTER MR. MORENO GARIJO'S MESSAGE HERE ON

11    MAY 6TH, WHATSAPP AND FACEBOOK DID NOT PUSH OUT THESE CHANGES

12    UNTIL LATER THE NEXT WEEK; CORRECT?

13    A.   YES.

14    Q.   LATER THAT WEEK OR EARLY THE NEXT WEEK?

15    A.   YES.  MAY I ADD THE REASON WHY WE DID THAT?

16    Q.   I THINK YOU'VE TESTIFIED ABOUT IT YESTERDAY.  I JUST HAD A

17    QUICK QUESTION ABOUT WHAT YOU MEANT BY THE OPSEC CONCERNS.

18        SO COULD YOU TELL US -- OPSEC STANDS FOR OPERATIONAL

19    SECURITY; CORRECT?

20    A.   I BELIEVE SO.  I CAN'T REMEMBER EXACTLY WHAT'S THE ACTUAL

21    DEFINITION OF IT, BUT IT'S RELATED WITH THE INCIDENT RESPONSE

22    PROCESS.

23    Q.   AND IS IT IMPORTANT FOR A SOFTWARE COMPANY TO PRACTICE

24    OPSEC?

25    A.   WE HAVE INCIDENT RESPONSE PROCESSES, AND WE WERE VERY

 1    SERIOUS ABOUT RESPECTING THEM.

 2    Q.   AND WHAT DOES -- EVEN IF YOU DON'T KNOW THE PRECISE WHAT

 3    OPSEC STANDS FOR IN TERMS OF IS IT OPERATIONAL SECURITY OR NOT,

 4    WHAT GENERALLY DOES IT MEAN IN THIS CONTEXT?

 5    A.   WHAT IT MEANS HERE IS THAT WE, WE HAD TO FOLLOW A SPECIFIC

 6    GUIDANCE, WHICH WAS PART OF THE PROCESS.  WE COULDN'T JUST

 7    DO -- WE COULDN'T JUST GO AND DEPLOY THE FIX IMMEDIATELY.  THAT

 8    WAS ACTUALLY AGAINST THE PROCESS.

 9         AND THE REASON FOR THAT IS BECAUSE WE WANTED TO GAIN AS

10    MUCH UNDERSTANDING OF THE ATTACK BEFORE WE ROLLED OUT THE

11    FIXES.

12    Q.   THE FIXES THAT YOU ULTIMATELY ROLLED OUT, THOSE WERE

13    NOTIFIED TO USERS ON OR ABOUT THE DAY THAT THEY WERE ROLLED

14    OUT; CORRECT?

15    A.   NOT ALL OF THEM.  SO THE FIRST FIX THAT WE MADE ON FRIDAY

16    WAS NOT MODIFIED, IT WAS A SERVER SIDE FIX, AND WE DIDN'T

17    NOTIFY ANYONE ABOUT THAT ONE.

18    Q.   WHEN YOU MADE THE SECOND FIX ON MONDAY, MAY 13TH, THAT'S

19    WHEN YOU NOTIFIED EVERYONE?

20    A.   YES, WE NOTIFIED EVERYONE WHEN WE MADE THE CLIENT FIXES,

21    AND WE MADE THE APP VERSIONS AVAILABLE ON THE APP STORES SO

22    THAT USERS CAN UPDATE THEIR SOFTWARE.

23    Q.   AND YOU WOULD HAVE NOTIFIED ALL OF THE NUMBERS

24    SPECIFICALLY WITH AN IN-APP MESSAGE THAT WAS SENT AT THAT TIME;

25    CORRECT?

1    A.   I'M NOT FAMILIAR WITH ANY NUMBER OR IN-APP MESSAGE TO BE

2    HONEST.  I'M NOT SURE WHAT YOU'RE REFERRING TO.

3    Q.   OKAY.  SO SOMETIMES WHEN THERE'S A SOFTWARE VERSION

4    UPDATE, YOU'LL GET A MESSAGE ON YOUR PHONE THAT THERE'S AN

5    UPDATE AVAILABLE.  YOU DIDN'T DO THAT?  OR DID YOU DO IT?

6    A.   WE DID NOT DO IT.  YES, I DON'T THINK WE DID THAT.

7    Q.   OKAY.  COULD YOU TURN IN THE OTHER BINDER THAT'S BEFORE

8    YOU TO EXHIBIT 1156, PLEASE.

9         DO YOU HAVE IT BEFORE YOU, MR. GHEORGHE?

10   A.   YES, I DO.

11   Q.   OKAY.  INCIDENTALLY, DID YOU DISCUSS WITH COUNSEL OVER THE

12   EVENING BREAK THE SUBJECT OF THIS LAWSUIT?

13   A.   LIKE LAST EVENING?

14   Q.   BETWEEN WHEN YOU LEFT THE STAND YESTERDAY AND WHEN YOU

15   TOOK THE STAND THIS MORNING?

16   A.   NO, ABSOLUTELY I DID NOT TALK TO ANYONE ABOUT THE DETAILS

17   OF THE CASE OR ANYTHING.

18   Q.   THANK YOU, MR. GHEORGHE.

19        THIS EXHIBIT, NUMBER 1156, IS DATED JUNE 20, 2019.

20        DO YOU SEE THAT?

21   A.   YES.

22   Q.   AND THIS IS A FORM OF INSTANT MESSAGING THAT YOU HAVE

23   WITHIN WHATSAPP; CORRECT?  OR WITHIN FACEBOOK, I SHOULD SAY?

24   A.   YES, IT'S AN INTERNAL CHAT TOOL THAT WE USE TO COMMUNICATE

25   WITH OTHER EMPLOYEES INTERNALLY.

1    Q.   AND THE CHAT THAT WE SEE HERE IS A CHAT THAT YOU WERE

2    HAVING WITH A PERSON WHOSE NAME IS COVERED OVER IN THE BOTTOM

3    REDACTING BOX THAT WE SEE ON THE SCREEN?

4    A.   YES.

5    Q.   OKAY.  AND IN THE FOURTH LINE OF YOUR INITIAL MESSAGE, YOU

6    REFER TO A WILL, HEAD OF WHATSAPP.

7         DO YOU SEE THAT?

8    A.   YES.

9    Q.   AND THAT IS A REFERENCE TO WILL CATHCART, THE CEO OF

10   WHATSAPP; IS THAT RIGHT?

11   A.   THAT'S RIGHT.

12            MR. AKROTIRIANAKIS:  OFFER EXHIBIT 1156, YOUR HONOR.

13            THE COURT:  ANY OBJECTION?

14            MR. PEREZ:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  IT'S ADMITTED.

16       (DEFENDANTS' EXHIBIT 1156 WAS ADMITTED IN EVIDENCE.)

17            MR. AKROTIRIANAKIS:  AND MAY WE PUBLISH, YOUR HONOR?

18            THE COURT:  YES.

19            MR. PEREZ:  YOUR HONOR, THIS -- WE ACTUALLY DO HAVE

20   AN OBJECTION TO THIS DOCUMENT FOR 403.

21            THE COURT:  ALL RIGHT.  WHY DID YOU JUST SAY YOU HAD

22   NO OBJECTION AND WE PUBLISHED IT ALREADY?

23            MR. PEREZ:  EXCUSE ME, YOUR HONOR.  I WAS LOOKING AT

24   THE WRONG PORTION OF THE DOCUMENT.

25            THE COURT:  ALL RIGHT.  IS THERE A PORTION OF IT THAT

1    YOU BELIEVE IS IN VIOLATION OF ANY PRETRIAL RULING?

2              MR. PEREZ:  IT'S A RELEVANCE ISSUE THAT WAS

3    IDENTIFIED FOR THE COURT BEFORE THE JURY CAME IN THIS MORNING.

4              THE COURT:  ALL RIGHT.

5              MR. PEREZ:  I STRONGLY SUSPECT THAT'S THE PORTION

6    THAT MR. AKROTIRIANAKIS INTENDS TO FOCUS ON.

7              MR. AKROTIRIANAKIS:  I DON'T INTEND TO ASK ANY MORE

8    QUESTIONS ABOUT THIS, YOUR HONOR.  I JUST WANTED THE JURY TO BE

9    ABLE TO SEE WHAT THE DOCUMENT WAS THAT WE WERE JUST TALKING

10   ABOUT.

11             THE COURT:  ALL RIGHT.  YOU'RE NOT GOING TO PUT IT

12   BACK UP?

13             MR. AKROTIRIANAKIS:  WELL, I DON'T NEED TO,

14   YOUR HONOR.  THAT'S FINE.

15             THE COURT:  OKAY.  ALL RIGHT.

16        THEN THAT'LL TAKE CARE OF YOUR OBJECTION.

17             MR. PEREZ:  THANK YOU, YOUR HONOR.

18             MR. AKROTIRIANAKIS:  I'M SORRY.  THE COURT'S RULING

19   IS THAT IT IS RECEIVED, RIGHT?

20             THE COURT:  IT IS RECEIVED.

21             MR. AKROTIRIANAKIS:  THANK YOU.

22             THE COURT:  WE CAN TALK ABOUT IF IT SHOULD BE

23   REDACTED BEFORE IT GOES TO THE JURY.

24             MR. AKROTIRIANAKIS:  IT'S BEEN REDACTED, YOUR HONOR.

25             THE COURT:  FURTHER?

1          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

2          THE COURT:  OKAY.

3    BY MR. AKROTIRIANAKIS:

4    Q.   YOU WERE A SALARIED EMPLOYEE IN 2019; CORRECT,

5    MR. GHEORGHE?

6    A.   YES.

7    Q.   AND THAT WAS TRUE THROUGHOUT THE TIME THAT YOU WORKED

8    FOR -- IN THE FACEBOOK FAMILY OF COMPANIES?

9    A.   YES.

10   Q.   AND AS FAR AS YOU KNOW, THAT'S ALSO TRUE WITH RESPECT TO

11   ALL THE OTHER NAMES THAT YOU GAVE US YESTERDAY ABOUT OTHER

12   PEOPLE WHO HAD ROLES WITH RESPECT TO THE EVENTS THAT WE'RE

13   TALKING ABOUT?

14   A.   YES, PEOPLE THAT WE WORKED WITH AS PART OF THE

15   INVESTIGATION WERE ALL EMPLOYEES OF FACEBOOK, THE FACEBOOK

16   BRAND COMPANY.

17   Q.   YEAH.  MY POINT IS THAT THEY WERE ALL SALARIED EMPLOYEES?

18   THEY DON'T HAVE, LIKE, AN HOURLY RATE THAT THEY CHARGE TO THE

19   COMPANY FOR THEIR TIME?  THEY JUST RECEIVE A SALARY?

20   A.   I THINK THAT'S GENERALLY TRUE FOR MOST PEOPLE.  BUT I

21   DON'T KNOW, AGAIN, ABOUT EVERY SINGLE PERSON THAT WAS INVOLVED

22   IN THE INVESTIGATION, HOW THEY WERE BEING PAID.

23   Q.   SURE.  MY QUESTION WAS AS FAR AS YOU KNOW --

24   A.   AS FAR AS I KNOW.

25          MR. PEREZ:  OBJECTION.  FOUNDATION.

```
 1              THE COURT:  ESTABLISH A FOUNDATION, PLEASE.

 2     BY MR. AKROTIRIANAKIS:

 3     Q.   WELL, DO YOU HAVE SOME KNOWLEDGE ABOUT SOME OF THESE

 4     PEOPLE WHOSE NAMES YOU GAVE US WHEN YOU WERE TESTIFYING ABOUT

 5     THE WORK THAT THEY DID ABOUT THE INVESTIGATION; RIGHT?

 6     A.   YES, AT LEAST THE ENGINEERS THAT I WORKED WITH WERE

 7     FULL-TIME EMPLOYEES AT FACEBOOK.

 8     Q.   SALARIED EMPLOYEES?

 9     A.   SALARIED EMPLOYEES, I ASSUME, YES.

10     Q.   OKAY.  AND YOU, YOURSELF, DON'T HAVE ANY HOURLY RATE OR

11     SOMETHING LIKE THAT THAT YOU CHARGED TO THE COMPANY OR THAT THE

12     COMPANY PAYS YOU FOR YOUR TIME ON SOME KIND OF HOURLY OR OTHER

13     INCREMENTAL TIMEFRAME; CORRECT?

14     A.   NO, I'M NOT AWARE OF ANY OF THAT KIND OF ARRANGEMENT.

15     Q.   DO YOU REMEMBER WHAT YOUR SALARY WAS IN 2019?

16     A.   I DO NOT REMEMBER MY SALARY THAT I HAD BACK THEN.

17     Q.   OKAY.  DO YOU REMEMBER -- AND I KNOW YOU'RE NOT GOING TO

18     KNOW THIS EXACTLY, BUT APPROXIMATELY HOW MANY HOURS YOU WORKED

19     IN A YEAR?

20     A.   HOW MANY HOURS?

21     Q.   CORRECT.  HOW MANY HOURS WOULD YOU GENERALLY WORK IN A

22     YEAR?

23     A.   I GUESS I HAVE TO MAKE SOME CALCULATIONS, BUT I DON'T KNOW

24     OFF THE TOP OF MY HEAD THE NUMBER OF HOURS THAT I WAS WORKING

25     PER YEAR.
```

1    Q.   OKAY.  ARE YOU AWARE THAT THE EXPERT FOR FACEBOOK AND

2    WHATSAPP IN THIS CASE HAS ASCRIBED TO YOU 2,080 HOURS OF WORK

3    THAT YOU DID IN 2019?

4    A.   I'M NOT AWARE OF THE NUMBER YOU JUST SAID.  I'M NOT AWARE

5    OF IT.

6    Q.   OKAY.  YOU DON'T KEEP TIMECARDS OR ANYTHING LIKE THAT;

7    RIGHT?

8    A.   NO.

9    Q.   YOU DON'T PUNCH IN, PUNCH OUT?

10   A.   NO.  WE JUST DON'T DO THAT.  I DON'T KNOW OF ANY TECH

11   COMPANY THAT DOES THAT.

12   Q.   SURE.  MS. TREXLER, THE ECONOMIST FOR THE PLAINTIFFS, HAS

13   CALCULATED AN HOURLY RATE FOR YOU OF $404.25 FOR THE YEAR 2019.

14        DOES THAT SOUND RIGHT TO YOU?

15           MR. PEREZ:  OBJECTION TO FOUNDATION.

16   A.   I'M --

17           THE COURT:  NO, OVERRULED.  YOU CAN ANSWER.

18           THE WITNESS:  I NEVER CALCULATED MY HOURLY RATE TO BE

19   HONEST.  I JUST DON'T KNOW.

20   BY MR. AKROTIRIANAKIS:

21   Q.   SO THE HOURLY RATE THAT SHE'S ASCRIBING TO YOU, $404.25,

22   MULTIPLIED BY THE NUMBER OF HOURS THAT SHE'S ASCRIBING TO YOU,

23   2,080 HOURS, BUT MY MATH IS $840,840.

24        WAS THAT WHAT YOU EARNED IN 2019?

25   A.   IT'S POSSIBLE.  I JUST DON'T KNOW EXACTLY.  I CAN'T

1    REMEMBER THE EXACT NUMBER.

2    Q.   OKAY.  DO YOU KNOW WHAT RSU'S ARE?

3    A.   YES, I KNOW WHAT RSU'S ARE?

4    Q.   AND HOW MUCH DID YOU EARN IN 2019 FROM RSU'S, IF YOU KNOW?

5    A.   I DON'T KNOW.

6    Q.   OKAY.  MS. TREXLER HAS CALCULATED THAT THERE WAS AN

7    EXPENSE TO META OF $566,705 FOR RSU'S PAID TO YOU IN 2019.

8         DOES THAT SOUND RIGHT TO YOU?

9    A.   IT, IT MAY BE TRUE, YES.  I JUST DON'T REMEMBER.

10        RSU'S WERE PART OF THE COMPENSATION PACKAGE, SO I JUST

11   WANT TO BE TRANSPARENT ABOUT THAT.  IT'S THE WAY ALL THE

12   SOFTWARE ENGINEERS ARE BEING PAID IS A BASE COMPENSATION AND AN

13   ACTIVITY COMPENSATION, AND RSU'S WERE PART OF THAT

14   COMPENSATION.

15   Q.   BUT THOSE RSU'S --

16        THE COURT:  EXCUSE ME.  PERHAPS ONE OF YOU SHOULD

17   DEFINE WHAT AN RSU IS, JUST IN CASE ANY MEMBER OF THE JURY

18   DOESN'T UNDERSTAND.

19   BY MR. AKROTIRIANAKIS:

20   Q.   RSU STANDS FOR RESTRICTED STOCK UNIT; IS THAT RIGHT?

21   A.   THAT SOUNDS RIGHT.

22   Q.   OKAY.  AND THE RSU'S THAT YOU RECEIVED IN 2019 WERE FOR

23   THINGS THAT HAD HAPPENED PRIOR TO 2019?  AM I RIGHT?

24   A.   YES, ABSOLUTELY.  SO THE WAY YOU RECEIVE RSU'S AT THE

25   COMPANY IS YOU GET A PACKAGE OF RSU'S WHEN YOU JOIN THE

```
1       COMPANY, OR WHEN YOU GET A REFRESHER AFTER PERFORMANCE REVIEWS,

2       AND THOSE VEST OVER FOUR YEARS.

3            AND THEY ALSO ACCUMULATE.

4            SO WHAT I WAS GETTING THAT YEAR WAS A RESULT OF WHAT I DID

5       IN THE PREVIOUS, LIKE, FOUR YEARS, ESSENTIALLY.

6       Q.   AND YOU WOULD HAVE GOTTEN THOSE RSU'S WHETHER YOU HAD DONE

7       ANY WORK ON THE PROJECT THAT WE'RE TALKING ABOUT; CORRECT?

8       THEY WERE ALREADY GIVEN TO YOU BEFOREHAND?

9       A.   YES, THAT'S CORRECT.

10      Q.   IN FACT, ALL OF THE AMOUNTS THAT YOU RECEIVED FROM

11      WHATSAPP IN 2019 WERE UNAFFECTED IN TERMS OF YOUR SALARY BY

12      YOUR WORK ON THIS INVESTIGATION; IS THAT CORRECT?

13      A.   THE RSU'S, YES.

14           SO PART OF THE COMPENSATION IS RSU'S -- BASE COMPENSATION

15      IS RSU'S, AND THERE'S ALSO A BONUS, A TARGET BONUS THAT IT'S

16      USUALLY RELATED WITH THE PERFORMANCE YOU HAD THAT YEAR.

17      Q.   LET ME ASK YOU A DIFFERENT QUESTION, MR. GHEORGHE.

18           MR. PEREZ:  I'M SORRY, I'M NOT SURE THE WITNESS WAS

19      FINISHED WITH HIS ANSWER.

20           THE COURT:  HE'S GOING TO ASK HIM ANOTHER QUESTION.

21      LET'S JUST MOVE ON.

22      BY MR. AKROTIRIANAKIS:

23      Q.   YOU DON'T GET PAID FOR -- AS A SALARIED EMPLOYEE, YOU

24      DON'T GET PAID FOR OVERTIME; CORRECT, MR. GHEORGHE?

25      A.   FACEBOOK DOES NOT PAY FOR OVERTIME IN GENERAL.  IT'S NOT
```

1      SOMETHING THAT THE COMPANY DOES.

2      Q.   AND WHEN YOU SAY FACEBOOK IN THAT CONTEXT, YOU MEAN

3      FACEBOOK AND WHATSAPP, YOU HAVING BEEN A WHATSAPP EMPLOYEE;

4      CORRECT?

5      A.   YES, I REFER TO THE FACEBOOK PARENT COMPANY.

6      Q.   WOULD YOU TURN, PLEASE, TO EXHIBIT 1131.

7      A.   WHAT EXHIBIT?  SORRY.

8      Q.   IT'S 1131, 1131.  IT'S IN THE SAME BOOK.

9           DO YOU HAVE IT BEFORE YOU, MR. GHEORGHE?

10     A.   YES.

11     Q.   THIS IS ANOTHER ONE OF THOSE INSTANT MESSAGING CHATS.  AM

12     I RIGHT?

13     A.   YES, THAT'S RIGHT.

14     Q.   AND THIS ONE IS BETWEEN YOURSELF AND A GENTLEMAN NAMED

15     DREW ROBINSON; CORRECT?

16     A.   YES.

17     Q.   ALL RIGHT.  AND THIS WAS A CHAT BETWEEN YOURSELF AND

18     MR. ROBINSON ON MAY 9, 2019?

19     A.   YES, THAT'S TRUE.

20          MR. AKROTIRIANAKIS:  OFFER EXHIBIT 1131, YOUR HONOR.

21          THE COURT:  ANY OBJECTION?

22          MR. PEREZ:  NO OBJECTION, YOUR HONOR, AS LONG AS IT

23     HAS THE REDACTIONS WHICH I HAVE IN MY BINDER.

24          THE COURT:  ALL RIGHT.  ADMITTED.

25          (DEFENDANTS' EXHIBIT 1131 WAS ADMITTED IN EVIDENCE.)

1          MR. AKROTIRIANAKIS:  MAY I PUBLISH, YOUR HONOR?

2          THE COURT:  YES.

3          MR. AKROTIRIANAKIS:  THANK YOU.

4     Q.   SO AT THE TOP OF THE SCREEN HERE, WE SEE THAT MR. ROBINSON

5     AND YOURSELF ARE THE RECIPIENTS OF THIS -- OF THE MESSAGES IN

6     THIS CHAT; IS THAT RIGHT?

7     A.   YES, IT WAS A MESSAGE BETWEEN ME AND DREW.

8     Q.   AND HERE YOU WRITE IN THE FIRST MESSAGE, "BY DUMP OF LOGS

9     YOU MEAN THE ONE MANUALLY FETCHED FROM CHATD."

10         DO YOU SEE THAT?

11    A.   YES.

12    Q.   AND IF WE SCROLL DOWN A LITTLE BIT TO THE MESSAGE THAT IS

13    AT 22:09:12 YOU WRITE TO MR. ROBINSON, "FETCHING THE PAYLOAD

14    FAILED," AND THEN A FROWNING FACE EMOJI; CORRECT?

15    A.   I'M NOT SURE WHAT MESSAGE YOU'RE REFERRING TO.

16    Q.   IT SHOULD BE HIGHLIGHTED ON THE SCREEN FOR YOU.

17    A.   OH, SORRY.  YES.

18    Q.   DO YOU SEE THAT?

19    A.   YES, I SEE IT.

20    Q.   OKAY.  AND THE PAYLOAD THAT YOU'RE REFERRING TO HERE

21    BEFORE THE, BEFORE THE FROWNING EMOJI -- THAT IS WHAT YOU WERE

22    WRITING, RIGHT, A FROWNING EMOJI?

23    A.   YEAH, THAT MEANS I WAS NOT HAPPY ABOUT IT.

24    Q.   DISAPPOINTED?

25    A.   PERHAPS.

1     Q.   OKAY.  AND THE PAYLOAD THAT YOU'RE REFERRING TO

2     MR. ROBINSON'S EFFORTS TO FETCH IS THE SECONDARY PAYLOAD, OR

3     THE PEGASUS AGENT; IS THAT RIGHT?

4     A.   I DON'T KNOW HOW TO CALL IT, BUT WE -- IT WAS THE PAYLOAD

5     THAT -- THE SHELL CODE THAT WE IDENTIFIED WAS DOWNLOADING AND

6     EXECUTING LATER, SO -- I CANNOT SAY IT WAS CALLED AN AGENT

7     OR --

8     Q.   WHAT WERE YOU TRYING TO FETCH, IN YOUR WORDS?

9     A.   WE WERE ESSENTIALLY JUST TRYING TO FURTHER UNDERSTAND THE

10    ATTACK.  LIKE, WE BASICALLY GOT TO A POINT WHERE WE REVERSE

11    ENGINEERED THE BINARY CODE IN THE MALICIOUS SCRIPT THAT WAS

12    SENT, AND THAT -- AFTER WE REVERSE ENGINEERED THAT, WE FOUND

13    THAT IT WAS CONNECTING TO A SERVER, DOWNLOADING THE PAYLOAD,

14    AND THEN EXECUTING IT.

15         AND WE WERE ESSENTIALLY JUST MOVING FURTHER WITH THE

16    UNDERSTANDING OF THE ATTACK AND WE WERE TRYING TO SEE, OKAY,

17    WHAT IS IN THAT PAYLOAD AND WHAT IT DOES TO WHATSAPP.  LIKE, IS

18    IT BEING USED TO ACCESS PRIVATE WHATSAPP MESSAGES?  IS IT USED

19    TO GET -- TO TAKE OVER THE PHONE ENTIRELY?

20         LIKE, WE JUST WANTED TO UNDERSTAND MORE WHAT IT'S DOING.

21    Q.   YOU WERE TRYING TO FETCH THE PAYLOAD THAT WAS BEING

22    DOWNLOADED TO THE TARGET PHONE; CORRECT?

23    A.   YES, THAT PAYLOAD WAS BEING DOWNLOADED ON THE TARGET PHONE

24    TO BE EXECUTED FROM THE WHATSAPP APPLICATION.

25    Q.   WELL, YOU WEREN'T -- YOU WERE TRYING TO GO OUTSIDE OF THE

1    WHATSAPP ENVIRONMENT TO FETCH THE PAYLOAD THAT WAS, THAT WAS

2    GOING FROM THE SECONDARY PAYLOAD SERVER TO THE TARGET PHONE?

3    THAT'S WHY YOU WERE HAVING A HARD TIME DOING IT?  ISN'T THAT

4    RIGHT?

5    A.   I DON'T KNOW IF THAT'S WHY WE WERE HAVING A HARD TIME

6    DOING IT.  WE -- IT WAS BASICALLY JUST AN I.P. ADDRESS AND A

7    PART, AND IT WAS PUBLICLY AVAILABLE, SO IT WAS ACCESSIBLE OVER

8    THE INTERNET, AND WE WERE TRYING TO CONNECT TO IT TO SEE WHAT

9    THE ATTACKER DOES.

10   Q.   LET ME ASK YOU THIS, MR. GHEORGHE --

11           MR. PEREZ:  ONCE AGAIN, YOUR HONOR.  I THINK THE

12   WITNESS WAS STILL SPEAKING.

13           THE COURT:  DO YOU HAVE MORE TO SAY, MR. GHEORGHE?

14           THE WITNESS:  NO, I WAS -- I WAS DONE.

15           THE COURT:  OKAY.

16           MR. AKROTIRIANAKIS:  THANK YOU.

17           THE COURT:  OVERRULED.  GO AHEAD.

18   BY MR. AKROTIRIANAKIS:

19   Q.   MR. GHEORGHE, THE PERSON WHO WAS TRYING TO FETCH THE

20   PAYLOAD WAS MR. ROBINSON; IS THAT RIGHT?

21   A.   YES.  DREW ROBINSON WAS AN EXPERT IN MALWARE ANALYSIS, AND

22   HE WAS ATTEMPTING TO FETCH THE PAYLOAD.

23   Q.   AND WHEN HE SHARED WITH YOU THE FACT THAT HIS EFFORTS TO

24   DO SO HAD NOT BEEN SUCCESSFUL, YOU WERE DISAPPOINTED BY THAT,

25   AS WE SEE IN YOUR MESSAGE THAT'S ON THE SCREEN RIGHT NOW;

1    CORRECT?

2    A.   YES, I WAS, BECAUSE I WAS TRYING TO LEARN MORE ABOUT

3    WHAT -- HOW THIS ATTACK WORKS AND WHAT IT DOES TO WHATSAPP.  SO

4    THAT'S WHY I WAS DISAPPOINTED.

5    Q.   NOW I'M MOVING TO A DIFFERENT TOPIC, SO I DON'T WANT YOU

6    TO THINK THAT THE QUESTION I'M ABOUT TO ASK RELATES TO THIS.

7    OKAY?

8        WHEN WHATSAPP RECEIVES -- WHEN WHATSAPP SERVERS, I SHOULD

9    SAY, RECEIVE A MESSAGE OR A CLIENT REQUEST, THEY PROCESS THAT

10   REQUEST ACCORDING TO THE SERVER SIDE CODE THAT WHATSAPP HAS

11   WRITTEN FOR THE SERVERS; CORRECT?

12   A.   CAN YOU PROVIDE A LITTLE MORE CONTEXT?  BECAUSE I'M -- IT

13   SOUNDS A BIT TOO GENERAL FOR ME.  SO --

14   Q.   SURE.  I'LL JUST READ FROM THE DEPOSITION, YOUR HONOR.

15       PAGE 129, LINE 15 THROUGH 20.

16       "WHEN THE CHATD SERVER RECEIVES A MESSAGE OR CLIENT

17   REQUEST, IT PROCESSES THAT REQUEST USING SERVER SIDE CODE THAT

18   WHATSAPP WROTE?

19       "ANSWER:  YES, THAT'S ACCURATE."

20       DO YOU REMEMBER HAVING GIVEN THAT TESTIMONY IN YOUR

21   DEPOSITION, MR. GHEORGHE?

22   A.   VAGUELY, YES, I REMEMBER.

23       BUT I DO THINK IT MIGHT BE USEFUL TO HAVE THE CONTEXT OF

24   HOW I WAS BEING ASKED THAT QUESTION, BECAUSE JUST THE SIMPLE

25   QUESTION OUT OF, LIKE, SEVEN HOURS OF ANSWERING QUESTIONS IS

1    NOT EXTREMELY -- LIKE, I NEED A LITTLE MORE CONTEXT.

2    Q.   WELL, I'M JUST ASKING IF YOU REMEMBER HAVING GIVEN THAT

3    ANSWER TO THAT QUESTION.

4    A.   VAGUELY I REMEMBER.

5    Q.   OKAY.  THE SERVER DOESN'T DECIDE ON ITS OWN WHICH OF THE

6    CODED INSTRUCTIONS THAT WHATSAPP HAVE GIVEN TO THE SERVER IT'S

7    GOING TO FOLLOW; CORRECT?

8    A.   WILL YOU REPEAT THE QUESTION.

9    Q.   SURE.  A SERVER DOESN'T MAKE DECISIONS ABOUT WHAT CODE

10   THAT WHATSAPP PROGRAMMED INTO THE SERVER IS GOING TO -- THE

11   SERVER IS GOING TO FOLLOW; IS THAT RIGHT?  IT JUST FOLLOWS THE

12   INSTRUCTIONS THAT ARE PROGRAMMED INTO IT?

13   A.   I'M -- I'M CONFUSED.  SO ARE YOU REFERRING TO THE -- LIKE,

14   WHAT PROGRAM ARE YOU REFERRING TO?  LIKE, THE SERVER PROGRAM?

15   Q.   I'M REFERRING TO THE WHATSAPP SERVERS THAT WHATSAPP HAS

16   CODED.

17   A.   YES.

18   Q.   ARE YOU WITH ME SO FAR?

19   A.   YES.

20   Q.   OKAY.  WHATEVER THE INSTRUCTIONS ARE THAT WHATSAPP CODES

21   INTO THE SERVER, THOSE ARE THE INSTRUCTIONS THAT THE SERVER

22   FOLLOWS?

23   A.   FOLLOWS DURING WHAT?

24   Q.   DURING WHATEVER OPERATION THE SERVER IS DOING.

25        LET ME PUT IT TO YOU A DIFFERENT WAY, MR. GHEORGHE.

```
1    A.   IT'S VERY GENERIC WHAT YOU'RE SAYING, SO I DON'T KNOW HOW

2    TO ANSWER IT.

3    Q.   I THINK IT'S REALLY A BASIC QUESTION ABOUT SERVER

4    OPERATION.

5         SERVERS, UNLIKE HUMANS, DON'T THINK ON THEIR OWN.  AM I

6    RIGHT ABOUT THAT?

7    A.   NOT REALLY.  LIKE, SERVERS DO TAKE DECISIONS -- BASICALLY,

8    LIKE THERE ARE A LOT OF HUMANS THAT PUT, YOU KNOW, ALL THEIR

9    THOUGHTS IN AND WE CODIFY INTELLIGENCE INTO THE SERVER AND THE

10   SERVER DOES TAKE DECISION ON ITS OWN.

11   Q.   CODIFY USING THE CODE THAT YOU PROGRAMMED THE SERVER WITH;

12   CORRECT?

13   A.   YES, WE PUT THAT LOGIC INTO THE SOURCE CODE AND THE

14   SOFTWARE, AND WHEN IT RUNS, IT DOES MAKE DECISIONS.

15   Q.   AND ULTIMATELY IN THIS CASE, YOU CODED THE WHATSAPP

16   SERVERS TO BLOCK THE MESSAGES THAT PEGASUS WAS SENDING;

17   CORRECT?

18   A.   WE, WE DID THAT AFTER WE PUT IN THE REMEDIATION.  AS PART

19   OF THE REMEDIATION, WE HAD LOGIC ON THE SERVER TO ESSENTIALLY

20   DROP THE SUSPICIOUS MESSAGES THAT WE WERE SEEING DURING THE

21   ATTACK.

22   Q.   RIGHT.  YOU INSTRUCTED THE SERVER NO LONGER TO PROCESS

23   THOSE MESSAGES; CORRECT?

24   A.   THEY WERE BEING PROCESSED, BUT THEY WERE JUST NOT BEING

25   FORWARDED TO THE CLIENT.
```

1    Q.   PER THE INSTRUCTIONS THAT WERE WRITTEN INTO THE CODE BY

2    WHATSAPP?

3    A.   YES.  SO THE SOURCE CODE HAD THAT LOGIC IN IT TO DROP THE

4    INVALID MESSAGES, OR SUSPICIOUS MESSAGES.

5    Q.   AND YOU HAD PROGRAMMED THAT LOGIC INTO THE SERVERS;

6    CORRECT?

7    A.   AS PART OF THE REMEDIATION.

8    Q.   IS THAT A YES?

9    A.   WELL, IT'S A YES, WITH AN ASTERISK, RIGHT.  SO, YES, IT

10   WAS AFTER WE PUT THE REMEDIATION IN PLACE.

11   Q.   OKAY.  I'LL TAKE THE YES.

12        THANK YOU, MR. GHEORGHE.

13        THANK YOU, YOUR HONOR.

14            THE COURT:  ALL RIGHT.

15        ANY REDIRECT?

16            MR. PEREZ:  YES, YOUR HONOR, JUST BRIEFLY.

17                      REDIRECT EXAMINATION

18   BY MR. PEREZ:

19   Q.   HI, MR. GHEORGHE.

20        YOU WERE ASKED SOME QUESTIONS BY NSO'S LAWYER ABOUT THE

21   TIMING OF REMEDIATION WORK, WHEN THE SERVER FIX WAS READY AND

22   WHEN IT WAS DEPLOYED.

23        DO YOU RECALL THAT QUESTIONING GENERALLY?

24   A.   YES.

25   Q.   AND CAN YOU PLEASE EXPLAIN TO THE JURY WHY IT MIGHT NOT

1       MAKE SENSE TO BLOCK THE EXPLOIT THE FIRST MOMENT THAT THE

2       REMEDIATION IS AVAILABLE?

3       A.   YES.  I THINK IT'S A REALLY IMPORTANT DETAIL.

4            ALL OF US, WHEN WE FOUND THE ATTACK, WE WERE JUST SHOCKED

5       THAT, YOU KNOW, THIS WAS HAPPENING, AND ALL OF US ACTUALLY

6       WANTED TO FIX IT IMMEDIATELY.  LIKE, THAT WAS OUR INTUITION,

7       INCLUDING MINE.  I WANTED TO ROLL OUT THE FIX, LIKE, THAT

8       MONDAY.  WE FOUND IT ON THURSDAY AND WE HAD A FIX, SOME FIXES

9       IN PLACE OVER THE WEEKEND, SO I WANTED TO ROLL OUT THE FIXES ON

10      MONDAY, IMMEDIATELY.

11           HOWEVER, THIS IS A VERY IMPORTANT ANTI-PATTERN WHEN

12      DEALING WITH -- IT'S VERY IMPORTANT MISTAKES THAT ENGINEERS DO

13      WHEN THEY DEAL WITH SECURITY INCIDENTS, THEY REMEDIATE TOO

14      QUICKLY.

15           AND THE REASON WHY THAT IS SO IMPORTANT IS IF YOU

16      REMEDIATE QUICKLY, YOU LIMIT YOUR ABILITY TO CONTINUE TO

17      MONITOR AND LEARN HOW THE ATTACK WORKS IN DETAIL.  SO THESE

18      ATTACKS ARE REALLY SOPHISTICATED, AND YOU HAVE TO SPEND ALL THE

19      TIME NECESSARY IN ORDER TO UNDERSTAND AS MUCH AS POSSIBLE YOU

20      CAN BEFORE YOU PUT ANY REMEDIATION IN PLACE.

21           SO IT'S A REALLY IMPORTANT DETAIL, AND I FOUND THAT -- I

22      WAS CONVINCED ABOUT THAT BY ANDREY LABUNETS, WHO WAS A SECURITY

23      EXPERT IN THE SECURITY INCIDENT RESPONSE TEAM, AND WE -- I

24      AGREED TO IT.

25           AND WE ALSO CONVINCED UPPER MANAGEMENT OF WHATSAPP TO GIVE

1    US MORE TIME TO INVESTIGATE FURTHER BEFORE WE REMEDIATE AND

2    STOP THE ABUSE.

3    Q.    THANK YOU, MR. GHEORGHE.

4        YOU WERE ALSO ASKED SOME QUESTIONS BY NSO'S LAWYER ABOUT

5    WHETHER WORK ON RESPONDING TO NSO'S CYBER ATTACK WAS PART OF

6    CERTAIN EMPLOYEES' REGULAR JOB DUTIES.

7        DO YOU RECALL THAT GENERALLY?

8    A.    YES.

9    Q.    AND BASED ON YOUR NINE AND A HALF YEARS AT FACEBOOK AND

10    WHATSAPP, WAS THERE ANYTHING REGULAR ABOUT THE WORK THAT WAS

11    BEING DONE BY THESE ENGINEERS IN RESPONDING TO NSO'S ATTACK IN

12    MAY 2019?

13    A.    NO.  THIS IS A REALLY UNIQUE EVENT, NOT JUST FOR ME, BUT

14    FOR THE COMPANY, TOO.  IT'S VERY RARE TO FIND THESE EVENTS AND

15    DETECT ATTACKS THAT HAPPEN IN REAL TIME AND HAVE THE ABILITY TO

16    MONITOR IT AND SEE HOW IT WORKS.

17        SO THIS WAS A VERY UNIQUE INCIDENT.

18        WE WERE -- IT'S VERY RARE TO FIND THESE, AGAIN, AND

19    THERE'S NO PRECEDENT TO IT.  SO I HAVEN'T HAD TO DEAL WITH

20    SOMETHING AS SERIOUS AND EXTREME AS THIS EVER IN MY CAREER.

21    Q.    IS IT COMMON IN YOUR WORK TO HAVE TO ASSEMBLE A TEAM OF

22    EXPERTS FROM MENLO PARK AND LONDON, MALWARE EXPERTS, SOFTWARE

23    ENGINEERS, THIS KIND OF CROSS-FUNCTIONAL TEAM AS PART OF YOUR

24    REGULAR RESPONSIBILITIES?

25            MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR.  THAT'S KIND

1    OF LEADING.

2              THE COURT:  KIND OF.

3         SUSTAINED.  BREAK IT DOWN.

4    BY MR. PEREZ:

5    Q.  DO YOU TYPICALLY USE THE TYPE OF CROSS-FUNCTIONAL,

6    MULTI-GEOGRAPHY TEAM THAT WAS USED IN THIS INSTANCE AS PART OF

7    YOUR REGULAR WORK?  DID YOU AT WHATSAPP AND META?

8              MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  SAME

9    OBJECTION.

10             THE COURT:  OVERRULED.

11             THE WITNESS:  NO.  SO THAT'S NOT WHAT, WHAT THE SCOPE

12   OF MY RESPONSIBILITY WAS AT THAT TIME.

13        I WAS A SOFTWARE ENGINEERING MANAGER OF A TEAM THAT WAS

14   BASICALLY RUNNING JUST THE INFRASTRUCTURE OF THE VOICE AND

15   VIDEO CALLING TEAM.

16        AND THIS IS A CROSS-FUNCTIONAL PROJECT THAT WAS OPERATING

17   AT THE COMPANY LEVEL.  IT WAS COMPLETELY -- LIKE, MUCH WIDER

18   SCOPE AND INVOLVED WORKING WITH TEAMS ACROSS DIFFERENT TIME

19   ZONES.

20        I WAS -- WE WERE NOT DOING THAT AS PART OF OUR REGULAR

21   WORK ON THE TEAM.

22   BY MR. PEREZ:

23   Q.  YOU TESTIFIED YESTERDAY, MR. GHEORGHE, THAT A

24   VULNERABILITY EXISTS IN THE MOMENT THAT THERE IS AN ATTACK ON

25   IT.  AND YOU CONTINUED, THE MOMENT THAT VULNERABILITY COMES TO

1    EXISTENCE IS WHEN AN ATTACKER PROVES THAT IT CAN MISUSE IT.

2        DO YOU RECALL THAT TESTIMONY?

3    A.   YES.

4    Q.   WHAT DID YOU MEAN BY THAT?  CAN YOU EXPLAIN THAT TO THE

5    JURY?

6    A.   YES.  SO WE ALL BUILD PRODUCTS FOR PEOPLE TO USE AND SOLVE

7    A PROBLEM THAT THEY HAVE IN THEIR LIVES, LET'S SAY IT'S SENDING

8    A MESSAGE OR CALLING SOMEONE.

9        WE DON'T BUILD THESE PRODUCTS TO BE MISUSED OR BEING

10   ABUSED.

11       SO BECAUSE THEY'RE SO COMPLEX, THERE'S ALWAYS SOME WAYS

12   YOU CAN MISUSE THE LOGIC THAT WE HAD TO BUILD THE PRODUCT IN

13   ORDER TO DO -- MAKE THE PRODUCT DO SOMETHING THAT IT DOESN'T DO

14   NORMALLY.

15   Q.   SO WHEN YOU SAY THERE ARE ALWAYS WAYS THAT THE LOGIC OF A

16   SOFTWARE CAN BE USED TO MISUSE IT, WHAT DID YOU MEAN BY THAT?

17   A.   ANY COMPLEX SOFTWARE THAT WE ALL USE HAS SOME

18   VULNERABILITIES.  AND IN MANY CASES, WE ACTUALLY KNOW ABOUT

19   THEM.  SO THE WAY WE THINK ABOUT SECURITY, WE THINK ABOUT

20   ATTACKS, AND THAT'S HOW WE MEASURE PROGRESS IN TERMS OF

21   SECURITY.

22       THERE'S NO -- TO MEASURE PROGRESS IN SECURITY, THERE'S NO

23   NUMBER.  LIKE, YOU DON'T HAVE A NUMBER THAT IT'S TODAY 5, YOU

24   MAKE SOME IMPROVEMENTS AND IT GOES TO 7 THE NEXT DAY.  IT

25   DOESN'T WORK LIKE THAT.

1          SO THE WAY WE TRACK IT AND WE MAKE IMPROVEMENTS TO

2     SECURITY IS BY LOOKING AT ATTACKS THAT WE CAN PREVENT, OR NOT.

3          AND THAT'S CALLED A THREAT MODEL THAT WE BUILD FOR THE

4     PRODUCT.  IN MANY CASES WE KNOW THAT THERE ARE VULNERABILITIES,

5     WE KNOW THERE ARE ATTACKS THAT ARE POSSIBLE IN THE SOFTWARE, WE

6     JUST DON'T WORK ON THEM BECAUSE WE THINK THEY'RE HIGHLY

7     UNLIKELY OR YOU NEED, LIKE, A LOT OF RESOURCES TO CARRY THAT

8     ATTACK, SO WE JUST DON'T HANDLE IT.

9          SO THERE'S ALWAYS -- ALL THE COMPLEX SOFTWARE THAT YOU USE

10    EVERY DAY HAS SOME VULNERABILITIES IN IT.  I THINK THE QUESTION

11    IS, LIKE, WHO CAN USE IT AND WHAT'S THE COST FOR IT?

12         AND THAT'S THE FRAMEWORK WE USE TO, TO PRIORITIZE AND

13    PREVENT CERTAIN ATTACKS TO HAPPEN.

14    Q.   NSO'S LAWYER SUGGESTED YESTERDAY THAT THE ONLY THING THAT

15     HAPPENED ON WHATSAPP SERVERS WAS MESSAGES JUST PASSING THROUGH.

16         AND IN RESPONDING, YOU DISAGREED AND SAID, THE SERVERS

17    WERE BEING ABUSED IN THE PROCESS.

18         WHAT DID YOU MEAN BY THAT?

19    A.   THE SERVER WAS -- SO IN -- THE WAY WE ARCHITECT WHATSAPP,

20     THE SERVER PLAYS A REALLY IMPORTANT ROLE.  IT IS A TRUSTED

21     ENTITY IN ALL THE PROTOCOLS THAT WE USE, INCLUDING END TO END.

22         SO THE WAY WE DESIGNED THIS PRODUCT IS BY TRUSTING THE

23    SERVER.  WE HAVE TO TRUST THE SERVER.  IF WE DON'T TRUST THE

24    SERVER, THEN WE HAVE TO BUILD A DIFFERENT PRODUCT.  IT IS THAT

25    IMPORTANT.

1          SO IN THIS CASE, THE ATTACKER WAS FILLING A FIELD THAT

2     ONLY THE SERVER COULD SEND.  WE DID NOT DESIGN OUR CALLING

3     PRODUCT WITH IN MIND THAT A FAKE CLIENT COULD SET THIS

4     PARAMETER AND HAVE THE SERVER FORWARD IT.

5          SO THE ATTACKER WAS ABLE TO TRICK THE SERVER IN ORDER TO

6     SET THIS PARAMETER.

7          BUT IT WAS NOT DESIGNED -- OUR SYSTEMS WERE NOT DESIGNED

8     TO DEAL WITH THIS TYPE OF ATTACK.

9     Q.   YOU WERE ASKED SOME QUESTIONS YESTERDAY BY NSO'S LAWYER

10    ABOUT WHETHER THE HIJACKING, CLEAN UP, AND OTHER STEPS OF NSO'S

11    ATTACK OCCURRED ONLY ON THE TARGET DEVICE.

12         DO YOU RECALL THAT?

13    A.   YES.

14    Q.   AND CAN YOU EXPLAIN TO THE JURY HOW NSO USED WHATSAPP'S

15    RELAY SERVERS IN THE COURSE OF THOSE STEPS?

16    A.   YES.

17         SO THE RELAY SERVER WAS BEING USED TO ABUSE THE REMOTE

18    CODE EXECUTION VULNERABILITY ON THE CLIENT.  SO WITHOUT THE

19    RELAY SERVER, IT WOULDN'T HAVE BEEN POSSIBLE.

20         AND I CAN EXPLAIN WHY.

21         THE ONLY WAY THIS VULNERABILITY COULD BE USED IS BY

22    SENDING -- BY THE FAKE -- IS BY THE CALLER SENDING CERTAIN

23    PACKETS THAT WERE CRAFTED SPECIALLY TO MISUSE THIS REMOTE CODE

24    EXECUTION BUG IN THE CLIENT.

25         AND THE ONLY WAY THE CLIENT COULD SEND THOSE PACKETS ARE

1    TWO WAYS, ESSENTIALLY, THERE ARE TWO WAYS TO DO IT.

2         ONE IS TO SEND THE PACKETS DIRECTLY.  SO YOU BASICALLY DO

3    IT, WHAT WE CALL PEER TO PEER.  SO THE FAKE CLIENT WOULD

4    ESSENTIALLY CONNECT DIRECTLY TO THE VICTIM'S DEVICE AND SEND

5    THE PACKET.  SO THAT WOULD BE ONE WAY.

6         THE SECOND WAY WAS THROUGH THE RELAY SERVER.

7         HOWEVER, THE PEER TO PEER IS NOT POSSIBLE UNTIL THE VICTIM

8    ANSWERS THE CALL.  SO WE HAVE LIMITS IN OUR PROTOCOL THAT WE

9    DON'T ALLOW PEER TO PEER BEFORE THE CALLEE HAS ANSWERED THE

10   CALL FOR PRIVACY REASONS.  WE DON'T WANT PEOPLE TO SNOOP ON

11   OTHER PEOPLE'S LOCATION.  SO THERE'S SOME GOOD REASONS BEHIND

12   IT.

13        AND IN THIS CASE, OBVIOUSLY THE ATTACKER COULD NOT USE THE

14   PEER TO PEER.  SO THE ONLY WAY THEY COULD DO IT IS THROUGH THE

15   RELAY, AND THEY USED THE RELAY ESSENTIALLY TO CONDUCT THE

16   MEMORY RECOGNITION AND OVERWRITING DURING THE ATTACK.

17   Q.   OKAY.  MR. GHEORGHE, YOU WERE ASKED SOME QUESTIONS BY

18   NSO'S LAWYER ABOUT META'S BUG BOUNTY PROGRAM.

19        DO YOU RECALL THAT?

20   A.   YES.

21   Q.   AND EFFECTIVELY WHETHER THE PROCESS THAT WHATSAPP FOLLOWED

22   AFTER DISCOVERING NSO'S ILLEGAL HACK WAS SIMILAR TO WHAT IT

23   WOULD HAVE DONE IF A WHITE HAT RESEARCHER HAD BROUGHT A

24   VULNERABILITY TO META'S ATTENTION.

25        DO YOU RECALL THAT QUESTIONING?

1    A.   YES.

2    Q.   FIRST OF ALL, WAS THE PROCESS THAT YOU AND YOUR TEAM

3    FOLLOWED IN MAY 2019 SIMILAR TO THE PROCESS THAT YOU WOULD

4    FOLLOW IF A WHITE HAT SECURITY RESEARCHER BROUGHT A POTENTIAL

5    VULNERABILITY TO YOUR ATTENTION?

6    A.   SO I THINK THERE'S A CONFUSION HERE.  I THINK THERE ARE

7    TWO DIFFERENT PROCESSES THAT WERE IN DISCUSSION THAT ARE BEING

8    CONFUSED.

9         SO ONE PROCESS IS THE INCIDENT RESPONSE PROCESS, WHICH IS

10   THE PROCESS THAT KICKS IN THE MOMENT YOU KNOW THAT THERE'S AN

11   ACTIVE, ONGOING ATTACK.  SO THAT IS THE INCIDENT RESPONSE

12   PROCESS.

13        THE OTHER PROCESS THAT IS MENTIONED HERE IS HOW YOU HANDLE

14   SECURITY VULNERABILITIES.  AND THOSE ARE USUALLY THE ONES -- SO

15   THAT'S THE PROCESS THAT WE USED TO HANDLE BUG BOUNTY,

16   VULNERABILITIES FOUND THROUGH THE BUG BOUNTY PROGRAM.

17        BUT THESE TWO PROCESSES ARE DIFFERENT.  SO THEY'RE NOT THE

18   SAME.  THE PROCESS FOR BUG BOUNTY CAN LEAD TO AN INCIDENT

19   RESPONSE PROCESS IF WE FIND THAT THAT VULNERABILITY IS ACTUALLY

20   BEING USED AT THE MOMENT IN OPERATION.  IF WE FIND ANY EVIDENCE

21   OF MISUSE ON THAT, OTHER THAN THE TESTING THAT THE SECURITY

22   RESEARCHER HAS DONE, THIS IS WHEN WE DECLARE AN INCIDENT AND

23   THIS IS WHEN THE INCIDENT RESPONSE PROCESS KICKS IN.

24        BUT MANY OF THE SECURITY VULNERABILITIES COME -- THE BUG

25   BOUNTY PROGRAM NEVER ENDS IN INCIDENT RESPONSE.  I'D SAY THE

1    VAST MAJORITY OF THEM, I DON'T KNOW OF ANY INCIDENT THAT WE'VE

2    FOUND LIVE BECAUSE A SECURITY RESEARCHER FOUND A

3    VULNERABILITY.

4        SO THESE ARE -- AGAIN, I THINK THERE WAS A CONFUSION

5    BETWEEN THE TWO PROCESSES.

6        SO WHEN I MENTIONED IT IN THE DEPOSITION, I WAS REFERRING

7    TO THE INCIDENT RESPONSE PROCESS.  LIKE, THAT'S THE SAME

8    PROCESS THAT WE WOULD FIND IF WE WOULD FIND A MISUSE FROM A

9    SECURITY VULNERABILITY FOUND BY A RESEARCHER.

10       BUT THE PROCESSES ARE DIFFERENT.

11   Q.   DID NSO EVER NOTIFY WHATSAPP OF ANY VULNERABILITY IN ITS

12   CODE?

13   A.   NO.  NO, I'M NOT AWARE OF THAT.

14   Q.   NO.  AND DID THEY -- WHAT DID THEY DO WITH THE

15   VULNERABILITIES THAT THEY HAD APPARENTLY IDENTIFIED?

16           MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION.

17           THE COURT:  SUSTAINED.

18   BY MR. PEREZ:

19   Q.   THROUGH YOUR INVESTIGATION, DID YOU DEVELOP AN

20   UNDERSTANDING OF HOW NSO EXPLOITED VULNERABILITIES IN

21   WHATSAPP'S CODE?

22   A.   YES.  THEY USED IT TO --

23           MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  THERE'S

24   STILL NO FOUNDATION.

25           THE COURT:  OVERRULED.

1           THE WITNESS:  YES.  SO THEY USED THE VULNERABILITY IN

2    ORDER TO ATTACK OUR USERS.  SO THAT IS HIGHLY PROHIBITED TO DO,

3    OF COURSE, ANY FINDING FROM THE BUG BOUNTY PROGRAM.  IF ANY OF

4    THE SECURITY RESEARCHER DOES THAT, NOT ONLY DO THEY NOT GET

5    REWARDED, THEY MIGHT GET IN TROUBLE, BASICALLY.  IT IS HIGHLY

6    PROHIBITED TO USE THAT AGAINST ANY PRODUCTION TRAFFIC.

7    BY MR. PEREZ:

8    Q.  I CAN'T BELIEVE I HAVE TO ASK THIS, BUT JUST SO IT'S CLEAR

9    TO THE JURY, DO YOU BELIEVE THAT NSO IN ANY WAY HELPED WHATSAPP

10   BY REPEATEDLY ATTACKING WHATSAPP AND ITS USERS OVER A PERIOD OF

11   YEARS?

12   A.  NO, I -- I DON'T BELIEVE THAT IT HAPPENED.  IN WHAT WAY

13   DID IT HELP?

14   Q.  DO YOU BELIEVE THAT IN ANY WAY NSO MADE WHATSAPP OR ITS

15   USERS SAFER OR HAVE MORE PRIVACY BY REPEATEDLY HACKING THEM

16   OVER A PERIOD OF YEARS?  WAS THAT HELPFUL?

17   A.  WELL, I THINK IT GETS BACK TO THE POINT THAT I MADE ABOUT

18   PROGRESS ON SECURITY.  WE -- THE ATTACK THAT WE FOUND FROM NSO

19   WAS NOT JUST PART OF OUR THREAT MODEL.  LIKE, WE DID NOT -- IT

20   IS SO EXPENSIVE AND SO SOPHISTICATED THAT IT WASN'T SOMETHING

21   WE WERE INTERESTED IN TO PROTECT THE VAST MAJORITY OF USERS.

22   WE DIDN'T THINK THAT IT WAS EVEN POSSIBLE.

23           SO, LIKE, WE -- WE HAD -- WE MADE SOME IMPROVEMENTS AFTER

24   WE SAW THIS.

25           BUT, AGAIN, THE WAY YOU TRACK PROGRESS ON SECURITY IS WE

1    MADE IMPROVEMENTS TO OUR SYSTEMS AFTER THIS ATTACK WITH REGARDS

2    TO THIS TYPE OF ATTACK THAT WE FOUND WHERE IT USED A FAKE

3    CLIENT AND USED REMOTE CODES EXECUTION ON THE APPLICATIONS.

4         BUT I DON'T AGREE WITH THE FACT THAT THIS HELPED IN

5    GENERAL, LIKE, YOU KNOW, IMPROVE WHATSAPP SECURITY OR ANYTHING

6    LIKE THAT.  I DON'T AGREE WITH THAT.

7         IT JUST HELPED WITH THIS SPECIFIC ATTACK.

8    Q.  SO WHATSAPP LEARNED FROM THE ATTACK, SORT OF THE WAY YOU

9    MIGHT LEARN ABOUT THE SAFETY OF YOUR HOME FROM EITHER A FIRE

10   INSPECTOR OR AN ARSONIST?  IS THAT RIGHT?

11        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  IT'S

12   LEADING.  IT'S ARGUMENTATIVE.

13        THE COURT:  OVERRULED.

14        MR. PEREZ:  I'LL WITHDRAW IT.

15   NOTHING FURTHER, YOUR HONOR.

16        THE COURT:  ALL RIGHT.  ANY RECROSS?

17        MR. AKROTIRIANAKIS:  JUST 30 SECONDS, YOUR HONOR.

18                       **RECROSS-EXAMINATION**

19   BY MR. AKROTIRIANAKIS:

20   Q.  MR. GHEORGHE, IF AN OUTSIDE RESEARCHER OR A WHITE HAT, AS

21   MR. PEREZ REFERRED TO THEM, HAD BROUGHT THIS TO YOUR ATTENTION,

22   YOU WOULD HAVE FIXED THE VULNERABILITY IN YOUR SOFTWARE;

23   CORRECT?

24   A.  WE WOULD HAVE FIRSTLY SEEN IF IT WAS USED IN OPERATION.

25   WE WOULD HAVE DONE THE LOGGING NECESSARY TO SEE IF THE

```
 1      VULNERABILITY IS IN USE FIRST.

 2           AND THEN WE WOULD HAVE REMEDIATED EVENTUALLY.

 3      Q.   REMEDIATED, YOU WOULD HAVE FIXED IT; RIGHT?

 4      A.   WE WOULD HAVE REMEDIATED, YEAH.

 5      Q.   OKAY.  AND THE SAME IS TRUE IF IT WAS YOUR INTERNAL RED

 6      TEAM THAT HAD BROUGHT THIS TO YOUR ATTENTION?

 7      A.   IF THE -- IS THE QUESTION, LIKE, IF THE RED TEAM WOULD

 8      HAVE FOUND VULNERABILITIES IN OUR SYSTEMS, WOULD WE HAVE -- I

 9      DON'T KNOW WHAT THE QUESTION IS.

10      Q.   MY QUESTION REALLY IS THIS:  WHEN YOU FIND FLAWS IN YOUR

11      SOFTWARE, YOU FIX IT, WHETHER THEY COME TO YOUR ATTENTION FROM

12      WHITE HAT, WHETHER THEY COME TO YOUR ATTENTION FROM RED TEAM,

13      WHETHER THEY COME TO YOUR ATTENTION OF YOUR TEAM BY YOUR OWN

14      TEAM, WHATEVER THEY ARE, WHEN YOU FIND FLAWS AND

15      VULNERABILITIES IN YOUR CODE BASE, YOU FIX THEM?

16      A.   THAT'S NOT GENERALLY TRUE.

17      Q.   YOU LEAVE THEM UNFIXED?

18      A.   YES, SOMETIMES.

19           MR. AKROTIRIANAKIS:  OKAY.  NO QUESTIONS, YOUR HONOR.

20           THE COURT:  ALL RIGHT.  I ASSUME THERE'S NOTHING

21      ELSE, MR. PEREZ?

22           MR. PEREZ:  NO FURTHER QUESTIONS, YOUR HONOR.  THANK

23      YOU.

24           THE COURT:  ALL RIGHT.  THANK YOU, MR. GHEORGHE.

25           YOU MAY STEP DOWN.
```

```
 1              NEXT WITNESS, PLEASE.

 2              MR. ANDRES:  YOUR HONOR, AT THIS TIME WHATSAPP CALLS

 3    TAMIR GAZNELI, WHO IS THE VICE PRESIDENT IN CHARGE OF RESEARCH

 4    AND DEVELOPMENT AT NSO.  WE'RE GOING TO PLAY HIS VIDEO,

 5    YOUR HONOR.

 6              THE COURT:  OKAY.

 7              MR. ANDRES:  SO YOU'RE AWARE, IT'S APPROXIMATELY AN

 8    HOUR AND A HALF.

 9          THROUGH HIS TESTIMONY, WE ARE ASKING TO ADMIT PLAINTIFFS'

10    EXHIBIT 44, PLAINTIFFS' EXHIBIT 59, PLAINTIFFS' EXHIBIT 60,

11    PLAINTIFFS' EXHIBIT 62, PLAINTIFFS' EXHIBIT 64, AND PLAINTIFFS'

12    EXHIBIT 66.

13              THE COURT:  ALL RIGHT.

14              MR. ANDRES:  THANK YOU, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  AND THOSE -- YOU'VE SEEN

16    THOSE EXHIBITS?

17              MR. AKROTIRIANAKIS:  I'VE NOT SEEN THE ONES PREPARED

18    FOR THE TRIAL, YOUR HONOR.

19          AND COULD I HAVE THE LIST?  I DIDN'T GET THE FIRST TWO.

20    I'M NOT -- I MISSED THE FIRST TWO.

21              THE COURT:  44.

22              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

23              THE COURT:  AND 59.

24              MR. AKROTIRIANAKIS:  44 AND 59, AND THEN THE NEXT ONE

25    WAS 60?
```

564

```
1              THE COURT:  YES.

2              MR. AKROTIRIANAKIS:  OKAY.  IF THEY'RE NOT GOING TO

3    BE SHOWN RIGHT AT THE BEGINNING, YOUR HONOR, THEN I THINK I CAN

4    DO IT WHILE WE WATCH.

5              THE COURT:  ALL RIGHT.  YOU HAVEN'T SEEN THEM

6    PREVIOUSLY?

7              MR. AKROTIRIANAKIS:  WE'VE SEEN THEM PREVIOUSLY.  WE

8    HAVEN'T SEEN THEM IN THE LAST -- SINCE WE'VE BEEN TOLD THESE

9    ARE THE EXHIBITS AND AFTER THE PROCEEDING THAT IS --

10             THE COURT:  OKAY.  SO YOU JUST WANT TO REFRESH YOUR

11   RECOLLECTION?

12             MR. AKROTIRIANAKIS:  AND MAKE SURE THAT THE ORDERS

13   THAT THE COURT IMPOSED ARE FOLLOWED WITH RESPECT TO THESE

14   EXHIBITS.

15             THE COURT:  OKAY.  AND PLAINTIFFS' COUNSEL, THERE

16   HAVE BEEN APPROPRIATE REDACTIONS; CORRECT?

17             MR. ANDRES:  THAT'S CORRECT.

18             THE COURT:  ALL RIGHT.  THEN LET'S BEGIN.

19             THE CLERK:  MR. ANDRES, YOU'RE GOING TO GIVE ME THE

20   TIMES?

21             MR. ANDRES:  EXCUSE ME?

22             THE CLERK:  YOU'RE GOING TO GIVE ME THE TIMES TO TAKE

23   OFF?

24             MR. BLOCK:  YES.

25             THE CLERK:  THANK YOU.
```

```
 1                    THE COURT:  ALL RIGHT.

 2                    MR. ANDRES:  MAY WE PROCEED?

 3                    THE COURT:  YES.

 4              (THE VIDEOTAPED DEPOSITION OF TAMIR GAZNELI WAS PLAYED IN

 5         OPEN COURT, BUT NOT REPORTED.)

 6                    MR. AKROTIRIANAKIS:  THE DOCUMENT IS UNDER SEAL

 7         THAT'S BEING DISPLAYED.

 8                    THE COURT:  I THOUGHT WE HAD TAKEN CARE OF THAT.

 9                    MR. AKROTIRIANAKIS:  IT'S NOT TURNED OFF.

10                    MR. BLOCK:  IT'S A MATTER OF STANDING BEHIND THE

11         MONITOR, YOUR HONOR.

12                    THE COURT:  WELL, THERE'S SOMEONE STANDING BEHIND IT.

13                    MR. BLOCK:  SHE THOUGHT IT WAS OFF.

14                    THE COURT:  ALL RIGHT.

15                    MR. AKROTIRIANAKIS:  IT WAS OFF AND IT WAS NOT TURNED

16         BACK ON FOR THIS.

17                    THE COURT:  IT SHOULD BE TURNED OFF.

18              (THE VIDEOTAPED DEPOSITION OF TAMIR GAZNELI WAS PLAYED IN

19         OPEN COURT, BUT NOT REPORTED.)

20                    THE COURT:  THAT ONE --

21                    JUROR:  IT'S ON OUR MONITORS RIGHT NOW.

22                    THE COURT:  YOU'RE SUPPOSED TO SEE IT.  THE JURY,

23         YOU'RE SUPPOSED TO SEE EVERYTHING.

24                    JUROR:  JUST TRYING TO FOLLOW THE RULES.

25              (THE VIDEOTAPED DEPOSITION OF TAMIR GAZNELI WAS PLAYED IN
```

```
1        OPEN COURT, BUT NOT REPORTED.)

2              MR. PEREZ:  YOUR HONOR, I'M JUST MINDFUL THAT WE'RE

3    AT 10:00 O'CLOCK.

4              THE COURT:  OH, THANK YOU.

5              MR. PEREZ:  THIS MAY BE A GOOD TIME FOR A BREAK.

6              THE COURT:  YOU SAID IT WAS ABOUT AN HOUR AND A HALF

7    TOTAL?

8              MR. PEREZ:  I THINK THAT'S RIGHT.

9              THE COURT:  SO WE'RE ABOUT HALFWAY THROUGH?

10             MR. PEREZ:  ONE HOUR REMAINS, YOUR HONOR.

11             THE COURT:  ONE HOUR REMAINS.

12         OKAY.  LADIES AND GENTLEMEN, WE'LL TAKE OUR FIRST BREAK OF

13    THE MORNING.  YOU'RE EXCUSED FOR 15 MINUTES.

14             THE CLERK:  ALL RISE FOR THE JURY.

15        (JURY OUT AT 10:02 A.M.)

16        (RECESS FROM 10:02 A.M. UNTIL 10:19 A.M.)

17        (JURY IN AT 10:19 A.M.)

18             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

19        (PAUSE IN PROCEEDINGS.)

20             THE COURT:  ALL RIGHT.  LET'S RESUME.

21        (THE VIDEOTAPED DEPOSITION OF TAMIR GAZNELI WAS PLAYED IN

22    OPEN COURT, BUT NOT REPORTED.)

23             THE COURT:  ALL RIGHT.

24        MR. ANDRES.

25             MR. ANDRES:  THANKS, YOUR HONOR.  LET ME FORMALLY
```

```
 1        MOVE TO ADMIT THE EXHIBIT THAT I IDENTIFIED PREVIOUSLY:

 2        EXHIBIT 44, PLAINTIFFS' EXHIBIT 44, PLAINTIFFS' EXHIBIT 59,

 3        PLAINTIFFS' EXHIBIT 60, PLAINTIFFS' EXHIBIT 62, PLAINTIFFS'

 4        EXHIBIT 64, PLAINTIFFS' EXHIBIT 66, AND THERE ARE TWO OTHERS,

 5        PLAINTIFFS' EXHIBIT 34, AND PLAINTIFFS' EXHIBIT 65.

 6                  THE COURT:  OKAY.  WERE ALL OF THOSE --

 7                  MR. ANDRES:  ON THE VIDEO.

 8                  THE COURT:  -- SHOWN ON THE VIDEO?

 9                  MR. ANDRES:  YES.

10                  THE COURT:  THE NUMBERS ARE DIFFERENT, SO I HAVE A

11        HARD TIME.

12                  MR. ANDRES:  YEAH, THOSE WERE FROM THE DEPOSITION.

13                  THE COURT:  COUNSEL?

14                  MR. AKROTIRIANAKIS:  NO OBJECTION TO THEIR ADMISSION

15        INTO EVIDENCE.

16            THE FIRST FOUR MENTIONED BY MR. ANDRES ARE ALL SEALED

17        DOCUMENTS PURSUANT TO THE COURT'S PRIOR ORDERS ON THE OMNIBUS

18        MOTION.

19            THE LAST FOUR HAVE THE NAMES OF NSO EMPLOYEES THAT, IN

20        THESE VERSIONS, HAVE NOT BEEN REDACTED.

21                  THE COURT:  OKAY.

22                  MR. AKROTIRIANAKIS:  AND OF COURSE WE ASK THAT THEY

23        BE SO REDACTED.

24                  THE COURT:  YEAH, THE NAMES CAN, AND SHOULD BE,

25        REDACTED.
```

1           AND WE WILL CONTINUE TO HANDLE THE SEALED DOCUMENTS IN THE

2   SAME WAY.

3           (PLAINTIFFS' EXHIBITS 44, 59, 60, 62, 64, 66, 34, AND 65

4   WERE ADMITTED INTO EVIDENCE.)

5               MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

6               THE COURT:  OKAY.

7               MR. ANDRES:  NEXT, YOUR HONOR, WHATSAPP CALLS

8   YARON SHOHAT -- SHOHAT -- WHO, ON THE VIDEO, IS IDENTIFIED AS

9   NSO'S CEO.

10          HE'S IN THE COURTROOM.  HE'S BEEN IDENTIFIED TO THE JURY

11  AS Q CYBER'S CEO.

12          FOR HIS TESTIMONY, THERE ARE TWO EXHIBITS, PLAINTIFFS'

13  EXHIBIT 36, AND PLAINTIFFS' EXHIBIT 44.

14          THIS VIDEO IS MUCH SHORTER.  I BELIEVE IT'S AROUND 20

15  MINUTES OR SO.

16              THE COURT:  OKAY.

17              MR. ANDRES:  THANK YOU, YOUR HONOR.

18              THE COURT:  ALL RIGHT.

19              MR. ANDRES:  TEN MINUTES, YOUR HONOR.

20              THE COURT:  OKAY.

21          **(THE VIDEOTAPED DEPOSITION OF YORAN SHOHAT WAS PLAYED IN**

22  **OPEN COURT, BUT NOT REPORTED.)**

23              THE COURT:  ALL RIGHT.

24          MR. ANDRES?

25              MR. ANDRES:  THANK YOU, YOUR HONOR.

```
 1            SORRY.  ONE MORE VIDEO, AND THEN WE'LL HAVE A WITNESS

 2       LIVE.

 3            THE NEXT VIDEO IS FROM RAMON ESHKAR, WHO IS NSO'S SENIOR

 4       VICE PRESIDENT FOR CUSTOMER BASE DIVISION.

 5            IN HIS TESTIMONY, WE'RE GOING TO ADMIT PLAINTIFFS'

 6       EXHIBIT 35, AND I UNDERSTAND THAT NSO WOULD LIKE THAT ALSO --

 7       THE SAME -- ALSO WE'RE GOING TO HAVE THE MONITORS OFF FOR THAT

 8       EXHIBIT.

 9            BEFORE I DO THAT, LET ME MAKE SURE THAT I ADMIT THE

10       EXHIBITS FROM THE PRIOR WITNESS THAT I MENTIONED WHEN I

11       ANNOUNCED THEM, MR. SHOHAT, WHICH IS PLAINTIFFS' EXHIBIT 36 AND

12       44.

13            I THINK 44 MIGHT BE IN, BUT --

14            GO AHEAD.

15                MR. CRAIG:  NO OBJECTION.

16                THE COURT:  OKAY.

17                MR. CRAIG:  I BELIEVE 44 IS --

18                MR. ANDRES:  IS IN.

19                THE COURT:  IT'S IN ALREADY?

20                MR. CRAIG:  IT'S ALREADY IN.

21                THE COURT:  OKAY.  AND NO OBJECTION TO THE OTHER AS

22       IT IS?

23                MR. CRAIG:  NO, YOUR HONOR.

24                THE COURT:  OKAY.

25                (PLAINTIFFS' EXHIBIT 36 WAS ADMITTED INTO EVIDENCE.)
```

```
1              MR. ANDRES:  JUST --

2              MR. CRAIG:  JUST THAT IT BE SEALED, AS I STATED

3     BEFORE.

4              THE COURT:  YES.  ALL THE DOCUMENTS THAT WERE

5     PREVIOUSLY SEALED, AS LONG AS THE JURY GETS TO SEE THEM, REMAIN

6     SEALED.

7              MR. ANDRES:  THIS VIDEO IS 17 MINUTES AND 36 SECONDS.

8              THE COURT:  OKAY.

9              MR. ANDRES:  AND THEN I DON'T KNOW IF, YOUR HONOR, WE

10    CAN DECIDE WANTS TO TAKE A BREAK AFTER THAT, AND THEN WE HAVE A

11    LIVE WITNESS.

12             THE COURT:  OKAY.

13             MR. ANDRES:  THANK YOU VERY MUCH.

14        (THE VIDEOTAPED DEPOSITION OF RAMON ESHKAR WAS PLAYED IN

15    OPEN COURT, BUT NOT REPORTED.)

16             THE COURT:  ALL RIGHT.  IS THAT THE CONCLUSION,

17    MR. ANDRES?

18             MR. ANDRES:  YES, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  DO YOU HAVE ANY OTHER VIDEOS?

20             MR. ANDRES:  WE HAVE A WITNESS AND THEN WE HAVE A

21    SHORT VIDEO AFTER THAT, IF THERE'S TIME TODAY.

22         I OBVIOUSLY DON'T KNOW WHAT THE CROSS -- THEY'VE TAKEN

23    LONGER THAN THE DIRECT, SO I'M NOT SURE HOW LONG.

24             THE COURT:  WHO'S YOUR WITNESS TODAY?

25             MR. ANDRES:  OUR -- ANDREW ROBINSON.
```

```
1              THE COURT:  OKAY.  ALL RIGHT.

2              MR. ANDRES:  I JUST WANT TO MOVE, MAKE SURE I MOVE

3      ALL THOSE EXHIBITS IN.  I THINK I DID.

4              THE COURT:  SURE.

5              MR. ANDRES:  THANK YOU, YOUR HONOR.  I APPRECIATE IT.

6              THE COURT:  I THINK YOU DID.  WAS THERE SOMETHING,

7      COUNSEL?

8              MR. CRAIG:  NO.

9              THE COURT:  I THINK WE ALREADY ADMITTED THEM.

10          ALL RIGHT.  WE MAY AS WELL TAKE OUR SECOND 15 MINUTE BREAK

11     AT THIS TIME.  WE'LL SEE YOU BACK HERE AT 12:10.

12             MR. ANDRES:  THANK YOU, YOUR HONOR.

13             THE CLERK:  ALL RISE FOR THE JURY.

14          (JURY OUT AT 11:54 A.M.)

15          (RECESS FROM 11:54 A.M. UNTIL 12:11 P.M.)

16          (JURY IN AT 12:11 P.M.)

17          (PAUSE IN PROCEEDINGS.)

18             THE COURT:  ALL RIGHT.  LET'S PROCEED.

19             MR. BLOCK:  THANK YOU, YOUR HONOR.

20          MICAH BLOCK FOR PLAINTIFFS.

21          JUST BEFORE WE CALL THE WITNESS, THERE WAS ONE MORE

22     EXHIBIT THAT WE FORGOT TO MOVE IN I THINK FROM THE LAST VIDEO.

23          PLAINTIFFS MOVE IN PLAINTIFFS' TRIAL EXHIBIT 35.

24             THE COURT:  MY NOTES SHOW IT WAS ALREADY ADMITTED.

25             MR. CRAIG:  NO OBJECTION EITHER WAY.
```

```
 1          THE COURT:  OKAY.  THANK YOU.  IT'S ADMITTED IF IT

 2   WASN'T BEFORE.

 3          (PLAINTIFFS' EXHIBIT 35 WAS ADMITTED IN EVIDENCE.)

 4          MR. BLOCK:  THANK YOU, YOUR HONOR.

 5      PLAINTIFFS CALL DREW ROBINSON TO THE STAND.

 6          THE CLERK:  IF YOU COULD JUST STEP UP FOR ME AND

 7   REMAIN STANDING.

 8          THE WITNESS:  SURE.

 9          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

10      (PLAINTIFFS' WITNESS, ANDREW ROBINSON, WAS SWORN.)

11          THE WITNESS:  I AFFIRM.

12          THE CLERK:  THANK YOU.

13      PLEASE SPEAK CLEARLY INTO THE MICROPHONE -- YOU CAN HAVE A

14   SEAT.

15      PLEASE STATE YOUR FULL NAME AND SPELL IT FOR THE RECORD.

16          THE WITNESS:  ANDREW STEVEN ROBINSON, A-N-D-R-E-W,

17   R-O-B-I-N-S-O-N.

18                     DIRECT EXAMINATION

19   BY MR. BLOCK:

20   Q.   GOOD AFTERNOON, MR. ROBINSON.

21   A.   GOOD AFTERNOON.

22   Q.   DO YOU NORMALLY GO BY ANDREW?

23   A.   NO.  I NORMALLY GO BY DREW.

24   Q.   OKAY.  HOW ARE YOU EMPLOYED, SIR?

25   A.   I'M A SALARIED EMPLOYEE AT META.
```

1      Q.    WHAT IS YOUR ROLE?

2      A.    I'M A SECURITY ENGINEER.

3      Q.    HOW LONG HAVE YOU BEEN WITH META?

4      A.    I HAVE BEEN WITH META FOR JUST OVER EIGHT YEARS.

5      Q.    DOES YOUR JOB INVOLVE WHATSAPP?

6      A.    IT DOES.

7      Q.    HOW SO?

8      A.    SO AS SECURITY ENGINEERS, OUR JOB IS TO PROTECT ALL

9      PRODUCTS, AND THAT INCLUDES WHATSAPP.

10     Q.    DO YOU WORK ON A PARTICULAR TEAM AT META?

11     A.    I DO.  I'M CURRENTLY ON THE ESPIONAGE TEAM WHERE WE

12     CONDUCT COUNTER ESPIONAGE INVESTIGATIONS.

13     Q.    OKAY.  THINKING BACK TO MAY OF 2019, WHAT WAS YOUR ROLE AT

14     THAT TIME?

15     A.    AT THAT TIME, I WAS ON THE CORPORATE THREAT INTELLIGENCE

16     TEAM WHERE WE WERE RESPONSIBLE FOR INVESTIGATING AND DEFENDING

17     META'S NETWORKS AND OUR EMPLOYEES FROM ATTACKS FROM THREAT

18     ACTORS THAT WE BELIEVED WERE LIKELY TO TARGET THE COMPANY.

19     Q.    OKAY.  ARE YOU FAMILIAR WITH THE DEFENDANTS IN THIS CASE,

20     NSO GROUP?

21     A.    I AM.

22     Q.    HOW DID YOU FIRST BECOME FAMILIAR WITH NSO?

23     A.    I FIRST BECAME FAMILIAR WITH NSO GROUP WHENEVER -- OR

24     PRIOR TO MY EMPLOYMENT AT META, I WORKED FOR A THREAT

25     INTELLIGENCE START-UP DOING MALWARE ANALYSIS AND INVESTIGATIONS

1    OF ESPIONAGE ACTORS THERE AND CAME ACROSS THEIR WORK DURING

2    THAT TIME.

3    Q.   HAVE YOU EVER ENCOUNTERED NSO OR ITS PRODUCTS IN THE

4    COURSE OF YOUR WORK WITH META?

5    A.   I HAVE.

6    Q.   HOW SO?

7    A.   IN 2019, WE BECAME AWARE OF VULNERABILITIES THAT WERE

8    BEING ACTIVELY EXPLOITED BY NSO GROUP THAT WERE TARGETING

9    WHATSAPP AND OUR USERS.

10   Q.   AND DID YOU HAVE A ROLE IN WHATSAPP AND META'S RESPONSE

11   WHEN THEY DISCOVERED THESE NSO ATTACKS IN MAY OF 2019?

12   A.   I DID.

13   Q.   WHAT WAS THAT ROLE?  IF YOU COULD EXPLAIN IT TO THE JURY?

14   A.   SURE.  SO MY ROLE AT THAT TIME WAS TO INITIALLY ANALYZE

15   PARTS OF THE MALWARE, PARTS OF THE PAYLOAD THAT WE INITIALLY

16   FOUND IN THOSE ATTACKS, AND THEN LATER IT TURNED INTO

17   CONDUCTING INVESTIGATIONS -- OR CONDUCTING INVESTIGATION AND

18   TRYING TO ATTRIBUTE THE ATTACK BACK TO WHOEVER WAS CONDUCTING

19   IT, BECAUSE WE DID NOT KNOW WHO IT WAS ORIGINALLY.

20        AND AS WE CAME TO LEARN THAT IT WAS NSO GROUP, IT WAS THEN

21   THAT WE TRIED TO DETERMINE HOW BEST TO DEFEND OUR PRODUCTS

22   AGAINST THE ATTACKS, AND I ENDED UP COORDINATING OUR

23   MITIGATIONS AND OUR RESPONSE TO THE ATTACKS, AS WELL AS HOW WE

24   WOULD GO PUBLIC, OR SOME OF THE DISCUSSIONS AROUND VICTIM

25   NOTIFICATION THAT WE WOULD TAKE.

1    Q.   YOU USED THE WORD "PAYLOAD."   WHAT IS A PAYLOAD IN THIS

2    CONTEXT?

3    A.   A PAYLOAD IS ANY SUPPORTING FILE OR ANOTHER COMPONENT THAT

4    IS USED AS A PART OF AN ATTACK.

5    Q.   OKAY.  MR. ROBINSON, WOULD YOU PLEASE TURN TO THE DOCUMENT

6    IN YOUR WITNESS BINDER MARKED PLAINTIFFS' TRIAL EXHIBIT 932.

7    JUST LET ME KNOW WHEN YOU'RE THERE.

8    A.   I AM THERE.

9    Q.   WHAT IS EXHIBIT 932?

10   A.   SO THIS IS A WORK PLACE CHAT MESSAGE RECORD BETWEEN MYSELF

11   AND ANOTHER INDIVIDUAL.

12        MR. BLOCK:  YOUR HONOR, PLAINTIFFS MOVE TO ADMIT

13   EXHIBIT 932 INTO EVIDENCE.

14        THE COURT:  ANY OBJECTION?

15        MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

16        THE COURT:  ALL RIGHT.  THANK YOU.  ADMITTED.

17    (PLAINTIFFS' EXHIBIT 932 WAS ADMITTED IN EVIDENCE.)

18        MR. BLOCK:  AND COULD WE HAVE 932 ON THE SCREEN,

19   PLEASE.

20   Q.   MR. ROBINSON, HOW DID YOU FIRST LEARN ABOUT THE NSO

21   ATTACKS ON WHATSAPP THAT WE'VE BEEN DISCUSSING IN THIS CASE?

22   A.   SO I FIRST LEARNED ABOUT THE ATTACKS AS THE RESULT OF THIS

23   MESSAGE THAT WAS SENT TO ME BY BRENDON TISZKA.  I WAS THE

24   MALWARE ANALYST ON CALL AT THE TIME, AND HE WAS REACHING OUT

25   WITH A REQUEST FOR MY ASSISTANCE.

1    Q.    WHEN DID THAT OCCUR?

2    A.    THAT WAS ON MAY 2ND OF 2019.

3    Q.    AND, MR. EVANS, CAN WE ZOOM IN ON THE LINE THAT YOU HAVE

4    HIGHLIGHTED.

5          MR. ROBINSON, WOULD YOU PLEASE EXPLAIN TO THE JURY THIS

6    HIGHLIGHTED LINE.

7    A.    SO THIS IS A LINK TO SOMETHING THAT WE HAVE INTERNALLY

8    CALLED A PASTE, AND IT IS A RECORD OR A WAY IN WHICH WE CAN

9    JUST SHARE BLOCKS OF TEXT WITH OTHER ENGINEERS.

10         AND HE WAS DIRECTING ME TO THIS PASTE AS IT CONTAINED A

11   PART OF THE PAYLOAD THAT HE WAS REQUESTING ME TO ANALYZE.

12   Q.    DID YOU FOLLOW THAT PASTE?

13   A.    I DID.

14   Q.    WHAT DID YOU SEE?

15   A.    SO AT THE OTHER END OF THAT PASTE, I SAW A LARGE SET OF

16   COMMANDS, AS WELL AS AN ENCODED ELF FILE, EXECUTABLE -- ELF

17   FILE, WHICH IS AN EXECUTABLE FILE THAT HE WAS REQUESTING THAT I

18   ANALYZE.

19   Q.    OKAY.  MR. ROBINSON, DID YOU DOCUMENT THE RESULTS OF YOUR

20   INVESTIGATION IN A PRESENTATION?

21   A.    I DID.

22   Q.    WOULD YOU PLEASE TURN TO THE DOCUMENT IN YOUR WITNESS

23   BINDER MARKED PLAINTIFFS' TRIAL EXHIBIT 930.

24         AND ONCE YOU'RE THERE, IF YOU WOULD JUST TELL THE JURY

25   WHAT THAT IS.

1    A.   SO THIS IS THE PRESENTATION THAT I PUT TOGETHER TALKING

2    ABOUT THE ATTACKS AS WE SAW THEM.

3              MR. BLOCK:  YOUR HONOR, PLAINTIFFS OFFER TRIAL

4    EXHIBIT 930 INTO EVIDENCE AND REQUEST PERMISSION TO PUBLISH IT.

5              THE COURT:  ANY OBJECTION?

6              MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT,

7    YOUR HONOR?

8         (PAUSE IN PROCEEDINGS.)

9              MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

10             THE COURT:  ALL RIGHT.  ADMITTED.

11        (PLAINTIFFS' EXHIBIT 930 WAS ADMITTED IN EVIDENCE.)

12             MR. BLOCK:  MR. EVANS, CAN WE PLEASE HAVE TRIAL

13   EXHIBIT 930 ON SCREEN, AND LET'S GO TO 930.6.

14   Q.   MR. ROBINSON, WOULD YOU PLEASE EXPLAIN TO THE JURY WHAT

15   YOU DEPICTED ON THIS SLIDE?

16   A.   SO THIS IS AN EXAMPLE OF WHAT WAS AT THE OTHER END OF THE

17   LINK THAT BRENDAN TISZKA PROVIDED TO ME.

18   Q.   AND WHAT DO YOU SEE?

19   A.   SO THIS IS -- THESE ARE ALL OF THE -- THESE ARE A BUNCH OF

20   LINUX COMMANDS DESIGNED TO RUN ON ANDROID OPERATING SYSTEMS,

21   WHICH IS A MOBILE PHONE OPERATING SYSTEM, AS WELL AS THE ELF

22   FILE ENCODED WITHIN THIS.

23   Q.   OKAY.  YOU SAID EXAMPLE.  WHY DID YOU SAY THAT?

24   A.   THIS WAS ONE OF MANY THAT WE FOUND, WE FOUND A LARGE

25   NUMBER OF THESE, AND THIS IS JUST AN EXAMPLE OF IT.

1   Q.   DO YOU KNOW WHERE IN WHATSAPP'S INFRASTRUCTURE THIS CODE

2   WAS DISCOVERED?

3   A.   SO THIS WAS FOUND BY LOGGING WHAT WE HAD ADDED TO OUR

4   CHATD SERVERS.

5   Q.   DID YOU HAVE A REACTION TO SEEING CODE LIKE THIS ON THE

6   CHATD SERVER LOGS?

7   A.   WELL, THIS SORT OF -- THIS SORT OF CODE DOES NOT BELONG

8   THERE.  IT SHOULD NOT BE POSSIBLE FOR THIS TO HAVE BEEN

9   TRANSMITTED AS A PART OF NORMAL WHATSAPP MESSAGING.

10  Q.   OKAY.  LET'S TAKE AN EXAMPLE.

11       MR. EVANS, CAN YOU FIND THE LINE THAT SAYS STOP SERVICE?

12  I THINK IT'S TOWARDS THE RIGHT.  YOU GOT IT.

13       MR. ROBINSON, WHAT DOES THIS PART OF THE CODE DO?

14  A.   SO THIS PART OF THE CODE IS INTENDED TO TRY AND PREVENT

15  THE NOTIFICATION THAT YOU RECEIVE WHENEVER YOU GET A WHATSAPP

16  CALL FROM ANOTHER WHATSAPP USER.  THIS IS AN ATTEMPT TO STOP

17  THE ABILITY FOR THE PHONE TO SHOW THAT YOU ARE RECEIVING A

18  CALL.

19  Q.   WHAT PURPOSE DOES A COMMAND LIKE THAT SERVE IN A CYBER

20  ATTACK?

21  A.   SO IT'S A WAY FOR SOMEBODY, LIKE NSO GROUP WHO WAS

22  CONDUCTING THE ATTACK, TO HIDE THE FACT THAT THEY ARE USING THE

23  CALLING MECHANISM TO EXPLOIT YOU.

24  Q.   HOW WOULD YOU CHARACTERIZE THE COMPLEXITY OF THESE NSO

25  ATTACKS THAT WHATSAPP DISCOVERED IN MAY OF 2019?

1    A.   SO THESE WERE HIGHLY COMPLEX ATTACKS.  THEY NEEDED TWO

2    DIFFERENT VULNERABILITIES THAT WORKED IN TANDEM IN ORDER TO GET

3    ACTUAL EXPLOITATION ON THE USERS' PHONES.

4         SO THE FIRST VULNERABILITY RELIED -- OR NEEDED TO TALK TO

5    THE ACTUAL VULNERABILITY THAT EXISTED ON USERS' PHONES.  AND SO

6    ANY TIME YOU HAVE TO FIND TWO SEPARATE VULNERABILITIES AND MAKE

7    THEM WORK TOGETHER, THAT IS NOT AN EASY TASK.

8         IT REQUIRES A GREAT DEAL OF RESEARCH AND EFFORT.

9         AND ADDITIONALLY, IT WAS MADE MORE COMPLEX BY THE FACT

10   THAT THEY DID NOT HAVE ACCESS, OR SHOULD NOT HAVE HAD ACCESS TO

11   THE SERVER SIDE COMPONENTS THAT HAD A VULNERABILITY ON THEM.

12   SO THEY WOULD HAVE HAD TO HAVE WORKED REALLY HARD TO FIND THAT.

13   Q.   WE'VE HEARD THIS TERM "VULNERABILITY" A NUMBER OF TIMES.

14        WHAT DOES THAT MEAN IN THE SECURITY CONTEXT?

15   A.   SO A VULNERABILITY IS A WAY TO CONVINCE A COMPUTER PROGRAM

16   TO DO SOMETHING THAT IT IS NOT INTENDED TO DO.

17   Q.   DO YOU USE THE WORD "EXPLOIT" IN YOUR WORK?

18   A.   I DO.

19   Q.   DOES THAT WORD RELATE TO VULNERABILITY IN ANY WAY?

20   A.   SURE.  SO YOU WOULD EXPLOIT A VULNERABILITY.  SO THE

21   EXPLOIT IS THE ACT OF DOING SOMETHING WITH THAT VULNERABILITY.

22   Q.   OKAY.  IN YOUR WORK AT META, HOW OFTEN DO YOU SEE AN

23   ATTACK AS SOPHISTICATED AS THIS ONE FROM NSO GROUP?

24   A.   RARELY.  ON THE ORDER OF ABOUT ONCE EVERY FIVE YEARS.

25   Q.   OKAY.  LET'S TALK A LITTLE BIT MORE ABOUT HOW YOU FIGURED

1     OUT WHAT WAS GOING ON.

2           WHAT IS A DISASSEMBLER?

3     A.   SO A DISASSEMBLER IS SOMETHING, A PROGRAM THAT YOU CAN

4     TAKE AND YOU CAN LOAD, COMPILE COMPUTER CODE INTO IT, LIKE WHAT

5     IS SHOWN ON THE ELF FILE HERE, AND IT TURNS THOSE UNREADABLE

6     NUMBERS INTO SOMETHING THAT'S MORE READABLE TO A HUMAN SO YOU

7     CAN FIGURE OUT WHAT THAT PROGRAM IS DOING.

8     Q.   WHICH PART IS THE ELF FILE?

9     A.   SO IT'S THE PART THAT STARTS, I THINK IT'S ABOUT SIX LINES

10    DOWN, WITH THE LETTERS 7FELF.

11    Q.   AND WHAT IS AN ELF FILE?

12    A.   SO I THINK IT'S SHORT FOR EXECUTABLE LINKABLE FORMAT.  BUT

13    IT'S AN EXECUTABLE PROGRAM THAT IS DESIGNED TO RUN ON THE LINUX

14    OPERATING SYSTEM.

15    Q.   OKAY.  SO WHEN YOU USED THE DISASSEMBLER WITH THE ELF

16    FILE, WHAT, IF ANYTHING, DID YOU LEARN?

17    A.   SO I LEARNED THAT THIS WAS A -- THIS ELF FILE ITSELF IS

18    RELATIVELY, RELATIVELY SIMPLE.  IT WAS DESIGNED TO JUST REACH

19    OUT TO ANOTHER SERVER AND RETRIEVE ANOTHER EXECUTABLE PAYLOAD

20    AND RUN IT ON THE DEVICES THAT HAD BEEN INFECTED.

21    Q.   OKAY.  AFTER YOU UNDERSTAND -- UNDERSTOOD WHAT THAT

22    EXECUTABLE FILE WAS INTENDED TO DO, WHAT DID YOU DO NEXT?

23    A.   SO AFTER I FIGURED OUT WHAT THIS ONE WAS, WE -- SINCE WE

24    HAD MANY OTHER EXAMPLES OF IT AND THEY WERE ALL VERY SLIGHTLY

25    DIFFERENT, I WROTE A SCRIPT THAT WOULD GO THROUGH AND PROCESS

```
 1    THESE IN BULK SO THAT I COULD PULL OUT ALL OF THE SERVERS THAT

 2    WERE USED BY THESE, BY THESE PAYLOADS.

 3    Q.   DO YOU USE THE WORD "ATTRIBUTION" IN YOUR SECURITY

 4    INCIDENT RESPONSE WORK?

 5    A.   I DO.

 6    Q.   WHAT IS ATTRIBUTION IN THIS CONTEXT?

 7    A.   SO ATTRIBUTION IS TRYING TO DETERMINE THE PERPETRATOR

 8    BEHIND AN ATTACK.

 9    Q.   DID YOU DO AN ATTRIBUTION ANALYSIS IN THIS CASE?

10    A.   I DID.

11    Q.   WOULD YOU PLEASE EXPLAIN THAT ANALYSIS TO THE JURY.

12    A.   SO WE TOOK ALL OF THE I.P. ADDRESSES THAT WE PULLED OUT OF

13    THESE ELF FILES AND DETERMINED THAT THEY HAD LINKED BACK TO

14    NSO GROUP DUE TO AN OPERATIONAL SECURITY FAILURE THAT THEY HAD

15    MADE.

16    Q.   AND WHAT DO YOU MEAN BY THAT, AN OPERATIONAL SECURITY

17    FAILURE THAT NSO GROUP HAD MADE?

18            MR. AKROTIRIANAKIS:  OBJECTION.  MISSTATES THE

19    TESTIMONY AS TO THE -- WHO "THEY" IS.

20            MR. BLOCK:  I BEG YOUR PARDON.

21            THE COURT:  SUSTAINED.

22    BY MR. BLOCK:

23    Q.   DID YOU REACH A CONCLUSION --

24        SORRY, YOUR HONOR.  MAY I PROCEED?

25            THE COURT:  PROCEED.
```

1    BY MR. BLOCK:

2    Q.   DID YOU REACH A CONCLUSION ABOUT WHO MADE THE OPERATIONAL

3    SECURITY FAILURE THAT YOU DISCOVERED?

4    A.   YES.  WE FOUND THAT IT WAS THE NSO GROUP.

5    Q.   OKAY.  WHAT DID YOU MEAN WHEN YOU WERE DESCRIBING AN

6    OPERATIONAL SECURITY FAILURE BY THE NSO GROUP?

7    A.   SO AN OPERATIONAL SECURITY FAILURE IS A MISTAKE THAT THEY

8    MADE.  NORMALLY ATTACKERS TAKE STEPS LIKE TRYING TO HIDE THE

9    FACT THAT THEY'RE MAKING A CALL TO A VICTIM, THEY TRIED TO HIDE

10   THE FACT -- THEY TRY TO HIDE WHO IT IS CONDUCTING THE ATTACK.

11        AND SO AN OPERATIONAL SECURITY FAILURE IS JUST A, A

12   FAILURE ON THEIR PART TO COMPLETELY HIDE THEIR IDENTITY.

13   Q.   AND WHAT WAS THE FAILURE HERE?

14   A.   THE FAILURE HERE WAS THAT THERE WAS AN NSO GROUP DOMAIN, A

15   DOMAIN THAT THEY VERY CLEARLY OWNED, WHICH WERE TIED -- WHICH

16   WAS AFFILIATED WITH ONE OF THE I.P. ADDRESSES THAT WE OBSERVED.

17   Q.   OKAY.  DURING THE MAY 2019 RESPONSE TO NSO'S ATTACKS ON

18   WHATSAPP, DID YOU TRY TO DISCOVER THE CONTENTS OF THE SOFTWARE

19   THAT WAS ON THOSE I.P. ADDRESSES THAT THE ELF FILES POINTED AT?

20   A.   I DID.

21   Q.   WHY DID YOU DO THAT?

22   A.   HAVING A FULL AND COMPLETE PICTURE OF WHAT'S GOING ON IN

23   THE ATTACK HELPS US BETTER IMPLEMENT OUR DEFENSES FOR OUR

24   USERS.

25   Q.   WERE YOU ABLE TO GET A COPY OF THAT SOFTWARE?

1   A.   I WAS NOT.

2   Q.   WHY NOT?

3   A.   THEY HAD TAKEN STEPS TO MAKE IT SO THAT ONLY ONE VICTIM,

4   OR ONLY ONCE PER VICTIM WOULD THAT MALWARE BE SERVED UP.

5   Q.   FOR THE PORTION OF THE ATTACK THAT YOU WERE ABLE TO

6   OBSERVE, DID WHATSAPP AND META TAKE STEPS TO STOP THOSE ATTACKS

7   FROM FUNCTIONING?

8   A.   WE DID.

9   Q.   OKAY.  CAN WE HAVE PAGE 930.21, PLEASE.

10       MR. ROBINSON, WOULD YOU JUST EXPLAIN TO THE JURY THE TOPIC

11  OF THIS SLIDE YOU CREATED?

12  A.   SO THIS IS ME GOING OVER THE TOPIC OF THE PATCHING THAT WE

13  PERFORMED ON BOTH OUR SERVER AND THE WHATSAPP APPLICATION

14  ITSELF.

15  Q.   THE FIRST BULLET SAYS, "COORDINATING THE PATCH WAS

16  COMPLICATED."

17       WHAT DID YOU MEAN BY THAT?

18  A.   RIGHT.  SO THERE WERE -- AS I SAID, THERE WERE TWO

19  VULNERABILITIES HERE, AND WE HAD THE MEANS TO PATCH ONE OF THEM

20  BEFORE WE HAD THE ABILITY TO PUSH OUT A FIX FOR THE OTHER.

21       SO THE SERVER SIDE FIX WAS ONE THAT WE CAN PUSH QUICKLY,

22  OR MORE QUICKLY, THAN THE ONE THAT WE COULD PUSH FOR THE ACTUAL

23  APPLICATION ITSELF.

24       BUT IN DOING SO, WE WOULD LET NSO GROUP KNOW THAT WE WERE

25  ON TO THEM, AND WE NEEDED TO MAKE SURE THAT WHATEVER FIXES WE

1    PUSHED WERE COMPLETE AND WOULD NOT ALLOW ANY FURTHER

2    EXPLOITATION OF THE PHONES.

3         SO WE NEEDED TO MAKE SURE THAT -- WE NEEDED TO BE

4    CONFIDENT THAT ONCE WE PUSHED THESE PATCHES, THAT WE WERE

5    PUSHING OUT A FIX THAT WOULD PREVENT FURTHER EXPLOITATION.

6    Q.   OKAY.  CAN WE SEE THE PREVIOUS SLIDE, 930.20.

7         WHAT DID YOU MEAN BY "VICTIM PERSPECTIVE," MR. ROBINSON?

8    A.   SO THIS IS WHAT IT WOULD LOOK LIKE IF YOU WERE THE

9    RECIPIENT OF ONE OF NSO GROUP'S ATTACKS.

10   Q.   AND WHAT IS YOUR UNDERSTANDING OF HOW THAT ATTACK WOULD

11   LOOK IF YOU WERE ONE OF THE RECIPIENTS?

12   A.   SO YOUR PHONE MAY OR MAY NOT START RINGING.  SOMETIMES

13   THAT STOP SERVICE THAT I TALKED ABOUT EARLIER, IT MIGHT NOT

14   WORK.  IT DEPENDS ON THE VERSION OF YOUR PHONE.

15        BUT IF IT DOES START RINGING, IT WILL STOP RINGING BEFORE

16   YOU HAD THE CHANCE TO ANSWER IT, AND AT THAT POINT THERE WAS

17   NOTHING AS A VICTIM THAT YOU COULD DO.  THIS IS WHAT WE CALL A

18   ZERO-CLICK VULNERABILITY.  WITHOUT THE USER DOING ANYTHING, THE

19   PHONE IS THEN INFECTED.

20   Q.   OKAY.  SWITCHING GEARS A LITTLE BIT, MR. ROBINSON.

21        CAN YOU ESTIMATE HOW MUCH TIME YOU PERSONALLY SPENT ON

22   WHATSAPP AND META'S RESPONSE TO NSO'S ATTACKS?

23   A.   APPROXIMATELY 3- TO 400 HOURS.

24   Q.   AND WAS ALL OF THAT TIME IN THE MAY 2 TO MAY 13 PERIOD?

25   A.   NO.

1    Q.   WHAT DID YOU DO AFTER MAY 13TH?

2    A.   SO AFTER MAY 13TH, WE STILL HAD WORK TO DO UNDERSTANDING

3    THE, THE -- WHO ALL WAS PART OF THIS ATTACK.  SO THERE WAS

4    ATTRIBUTION WORK THAT WENT JUST BEYOND NSO GROUP ITSELF.  WE

5    WERE ALSO INTERESTED IN DETERMINING WHO WAS SPONSORING IT.

6    Q.   OKAY.  DID ANY OF YOUR WORK INVOLVE IDENTIFYING THE

7    WHATSAPP USERS WHO WERE TARGETED IN THE ATTACKS THAT YOU WERE

8    ABLE TO OBSERVE?

9    A.   IT DID.

10   Q.   WHY DID YOU WORK ON IDENTIFYING THE TARGETED USERS AS PART

11   OF THE RESPONSE TO THESE ATTACKS?

12   A.   SO THAT LEADS BACK TO UNDERSTANDING WHO THE SPONSORS ARE

13   OF THE ATTACKS.  IF WE UNDERSTAND WHO THE USERS ARE, WE CAN

14   DETERMINE WHO IS LIKELY -- WANTS TO TARGET THOSE INDIVIDUALS.

15   Q.   MR. EVANS, CAN WE PLEASE HAVE PAGE 930.4.

16        MR. ROBINSON, WILL YOU PLEASE EXPLAIN THIS SLIDE 4 TO THE

17   JURY?

18   A.   SO THIS SLIDE IS JUST ME RECOGNIZING THAT THERE WERE A

19   VERY LARGE NUMBER OF PEOPLE WHO WORKED ON THIS PROJECT, AND I

20   DID NOT INTERACT WITH THEM ALL.  SO THIS IS JUST ME ATTEMPTING

21   TO GIVE CREDIT TO THE LARGE NUMBERS, THOSE LARGE NUMBERS OF

22   INDIVIDUALS.

23   Q.   OKAY.  AND DO YOU HAVE A MEMORY OF EVERY INDIVIDUAL WHO

24   PARTICIPATED IN RESPONDING TO NSO'S ATTACKS?

25   A.   NO.

1    Q.   OKAY.  LET'S DISCUSS JUST A FEW.

2         I'M GOING TO ASK YOU SOME NAMES, AND IF YOU KNOW THEIR

3    ROLES IN WHATSAPP AND META'S RESPONSES TO THE ATTACKS BY NSO IN

4    THIS CASE, I'D LIKE YOU TO EXPLAIN THEM TO THE JURY.  OKAY?

5    A.   OKAY.

6    Q.   LET'S START WITH MR. OTTO EBELING.  DO YOU KNOW HIM?  AND

7    WHAT DID HE DO?

8    A.   I DO KNOW OTTO, AND HE WORKED LARGELY ON INVESTIGATING, OR

9    RESEARCHING THE VULNERABILITY ITSELF, AND I BELIEVE HE WORKED

10   ON SOME OF THE FIXING OF THE VULNERABILITIES.

11   Q.   MR. ANDREY LABUNETS?

12   A.   I DO.

13   Q.   WHAT WAS MR. LABUNETS'S ROLE?

14   A.   ANDREY'S ROLE WAS ON THE INTERNAL SECURITY SIDE.  HE WROTE

15   QUITE A BIT OF REPORTING, AS WELL AS THE INVESTIGATING AND

16   MAKING SURE THAT THE ATTACKS HAD NOT COMPROMISED OUR ACTUAL

17   SERVERS AND HE WORKED TO DETERMINE THAT.

18   Q.   MS. CORTNEY PADUA?

19   A.   I DO KNOW HER.

20   Q.   WHAT WAS HER ROLE?

21   A.   SO HER ROLE WAS TAKING ALL OF THE VARIOUS LOGGING THAT WE

22   CREATED AS A RESULT OF THIS INCIDENT AND AGGREGATING IT,

23   AGGREGATING IT AND MAKING IT AVAILABLE TO THE INVESTIGATORS WHO

24   NEEDED THAT DATA.

25   Q.   MR. MICHAEL SCOTT?

1    A.   I DO KNOW MIKE SCOTT.

2    Q.   WHAT DID MR. SCOTT DO IN THIS RESPONSE, TO YOUR KNOWLEDGE?

3    A.   SO TO MY KNOWLEDGE, MICHAEL SCOTT, HE IS THE INVESTIGATOR

4    WHO OWNS THE NSO CASE FOR OUR COMMUNITY THREAT INTELLIGENCE

5    TEAM, AND SO HE -- WE WORKED IN TANDEM WITH HIM ON THE

6    ATTRIBUTION PORTIONS ONCE IT BECAME LATER THAT THIS WAS

7    NSO GROUP, AS WELL AS THE, AS I SAID, THE CUSTOMER AT

8    DISTRIBUTION.

9    Q.   YOU MENTIONED CORPORATE THREAT INTELLIGENCE BEFORE, AND I

10   THINK YOU JUST MENTIONED COMMUNITY THREAT INTELLIGENCE.

11        CAN YOU -- HOW ARE THOSE SIMILAR OR DIFFERENT?

12   A.   SO CORPORATE THREAT INTELLIGENCE, AS I SAID, WAS THE TEAM

13   THAT I WAS ON, AND THAT WAS LOOKING MORE TOWARDS FACEBOOK

14   SERVERS, SERVERS THAT WE OWNED AND CONTROLLED, AS WELL AS

15   PROTECTION OF OUR USERS.  SO WE WERE WORRIED ABOUT -- MORE

16   WORRIED ABOUT THAT SECURITY.

17        WHEREAS OUR COMMUNITY THREAT INTELLIGENCE TEAM, THEY WORK

18   MORE TOWARDS SECURING OUR USERS FROM ATTACKS, FROM OUTSIDE

19   ATTACKERS LIKE NSO.

20   Q.   OKAY.  DO YOU KNOW MR. CARL WOOG?

21   A.   I DO.

22   Q.   DID YOU HAVE OCCASION TO WORK WITH MR. WOOG IN CONNECTION

23   WITH THE RESPONSE TO NSO'S ATTACKS?

24   A.   I DID.

25   Q.   WHAT WAS THE NATURE OF THAT INTERACTION?

1    A.   SO MUCH OF THAT WAS IN TALKING THROUGH OUR EXTERNAL

2    RESPONSE, SO HOW WE WOULD DO VICTIM NOTIFICATION.

3    Q.   OKAY.  BACK IN MAY 2019 -- YOU TOUCHED ON THIS A LITTLE

4    BIT, BUT LET ME JUST ASK, WHAT KINDS OF PROJECTS WERE YOU

5    WORKING ON AS PART OF YOUR REGULAR JOB RESPONSIBILITIES?

6    A.   SURE.  SO MY REGULAR RESPONSIBILITIES AT THAT TIME WERE I

7    WAS RESPONSIBLE FOR A GOOD NUMBER OF INDIVIDUAL THREAT ACTORS

8    THAT WE THOUGHT LIKELY TO TARGET FACEBOOK OR THAT WE BELIEVED

9    TO HAD TARGETED FACEBOOK IN THE PAST, AND WORKING ON NETWORK

10   DETECTION TO MAKE SURE THAT OUR DEFENSES INTERNALLY WERE UP TO

11   SNUFF TO PREVENT THEM FROM BEING ABLE TO SUCCESSFULLY ATTACK

12   US.

13   Q.   IN THAT EARLY PART OF THE RESPONSE TO THE ATTACKS FROM

14   MAY 2ND THROUGH MAY 13TH, WERE YOU ABLE TO WORK ON ANY OF THOSE

15   PROJECTS?

16   A.   I WAS NOT.

17   Q.   AND DID YOUR REMAINING WORK ON THE RESPONSE HAVE ANY

18   IMPACT ON YOUR ABILITY TO WORK ON THOSE PROJECTS?

19   A.   IT DID.

20   Q.   OKAY.  HOW SO?

21   A.   ANY TIME I WAS WORKING ON, ON THE RESPONSE IN ANY PART TO

22   THIS, IT JUST MEANT THAT OTHER WORK HAD TO GIVE WAY BECAUSE

23   THIS WAS AN ACTIVE ATTACK THAT WAS GOING ON AND IT TOOK MORE

24   PRIORITY THAN ATTACKS THAT WEREN'T HAPPENING.

25   Q.   WHY DO YOU PRIORITIZE AN ACTIVE ATTACK, MR. ROBINSON?

1    A.   I MEAN, IT'S AN ACTIVE THREAT TO OUR USERS.  OUR USERS ARE

2    ACTUALLY BEING COMPROMISED AND WE NEED TO MAKE SURE THAT THAT

3    STOPS.

4          MR. BLOCK:  THANK YOU, MR. ROBINSON.

5          I HAVE NO MORE QUESTIONS AT THIS TIME.

6          THE COURT:  ALL RIGHT.  THANK YOU.

7    CROSS-EXAMINATION?

8          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

9                     **CROSS-EXAMINATION**

10   BY MR. AKROTIRIANAKIS:

11   Q.   GOOD AFTERNOON, MR. ROBINSON.

12   A.   GOOD AFTERNOON.

13   Q.   WE'VE MET BEFORE AT YOUR DEPOSITION.  DO YOU REMEMBER?

14   A.   I DO.

15   Q.   THAT WAS SEPTEMBER, I THINK, OF LAST YEAR.

16   A.   SOUNDS RIGHT.

17         MR. AKROTIRIANAKIS:  YOUR HONOR, THIS IS FACE DOWN.

18   MAY I PUT THE MONITOR SO I CAN SEE IT?

19         THE COURT:  YES.

20   BY MR. AKROTIRIANAKIS:

21   Q.   YOU WERE JUST TALKING ABOUT THREAT DETECTION AND HOW THAT

22   WAS PART OF YOUR JOB AT FACEBOOK.

23        DO YOU RECALL THAT TESTIMONY?

24   A.   I WAS TALKING ABOUT HOW I -- MY JOB AT THE TIME WAS TO

25   WORK TO DEFEND OUR NETWORKS FROM THREATS THAT WE FELT LIKELY TO

1      TARGET OUR EMPLOYEES AND OUR SERVERS.

2      Q.   SO THREAT DETECTION IS PART OF YOUR JOB?

3      A.   THREAT DETECTION AGAINST -- AT THE TIME IT WAS THREAT

4      DETECTION TARGETED TOWARDS OUR EMPLOYEES AND USERS.

5      Q.   AND FACEBOOK FIXES THREATS WHERE IT FINDS THEM?  IS THAT

6      FAIR?

7      A.   WE -- YEAH, WHEN WE -- WHEN WE FIND THREATS THAT -- TO OUR

8      USERS OR VULNERABILITIES IN OUR, IN OUR PLATFORMS, WE DEPLOY

9      FIXES FOR THOSE VULNERABILITIES.

10     Q.   YOU DEPLOY -- YOU DEVELOP AND YOU DEPLOY THOSE FIXES WHERE

11     YOU FIND THEM AND WHEN YOU FIND THEM; RIGHT?

12     A.   NOT ALWAYS IMMEDIATELY WHEN WE FIND THEM.  SOMETIMES THERE

13     IS CAUSE TO DELAY A RESPONSE TO MAKE SURE THAT WE HAVE A GOOD

14     UNDERSTANDING OF THE THREAT, BECAUSE ACTING HASTILY SOMETIMES

15     CAUSES MORE NEGATIVE SIDE EFFECTS.

16     Q.   WHAT I MEAN TO SAY TO YOU IS THAT YOU WOULDN'T JUST PUT IT

17     ON THE TO-DO LIST FOR DOWN THE ROAD AT SOME POINT?

18          YOU WOULD ACTIVELY WORK ON ADDRESSING A THREAT WHEN AND

19     WHERE YOU FOUND IT; CORRECT?

20     A.   IF THERE WERE AN ACTIVE THREAT THAT WE KNEW WAS BEING

21     ATTACKED, THAT WOULD NECESSITATE AN IMMEDIATE RESPONSE.

22          BUT SOMETIMES THE WORK THAT WE HAVE TO DO, THERE'S MORE

23     WORK THAN WE HAVE CAPACITY TO IMMEDIATELY WORK ON, SO WE MAY

24     INTERNALLY SERVICE THINGS THAT NEED ADDRESSING THAT WE CAN'T

25     ALWAYS IMMEDIATELY RESPOND TO.

1    Q.   BUT YOUR TEAM WOULD ULTIMATELY ADDRESS THOSE THINGS?  IS

2    THAT FAIR?

3    A.   MY TEAM -- SO THE WORK THAT WE HAVE, IT WOULD SPREAD

4    OVER -- IT WOULD TOUCH A LARGE NUMBER OF TEAMS.  SO IT WOULD

5    DEPEND ON WHETHER THAT WORK FALLS UNDER MY TEAM OR NOT.

6    Q.   YOUR TESTIMONY IS THAT FACEBOOK ULTIMATELY WOULD ADDRESS

7    THOSE THINGS?  IS THAT FAIR?

8    A.   FACEBOOK WOULD ULTIMATELY ADDRESS INSTANCES OF ISSUES OR

9    PROBLEMS THAT WE FOUND.

10   Q.   AND THEY WOULD DO SO THROUGH TEAMS LIKE YOUR TEAM AND THE

11   OTHER TEAMS THAT YOU'VE NOW TESTIFIED ABOUT; CORRECT?

12   A.   I'M SORRY.  REPEAT THAT ONE MORE TIME.

13   Q.   AND THEY WOULD DO SO THROUGH YOURSELF AND YOUR TEAM AND

14   THE OTHER TEAMS THAT YOU'VE NOW TESTIFIED ABOUT; CORRECT?

15   A.   WE -- YEAH.  SO THE VARIOUS TEAMS THAT WE HAVE WOULD -- IF

16   THEY WERE AWARE OF THESE VULNERABILITIES, THEY WOULD WORK TO

17   ADDRESS THEM.

18   Q.   YEAH.  I TAKE THAT AS A YES, BUT I DON'T WANT TO PUT WORDS

19   IN YOUR MOUTH.  SO DO I UNDERSTAND YOU CORRECTLY THAT THAT IS A

20   YES?

21   A.   THE TEAMS THAT WE HAVE AT THE COMPANY WOULD WORK TO

22   ADDRESS THE SECURITY ISSUES THAT WE FOUND.

23   Q.   THANK YOU.

24        NOW, AT YOUR DEPOSITION, YOU WERE DESIGNATED TO BE THE

25   SORT OF OFFICIAL SPOKESPERSON, OR THE DESIGNEE ON BEHALF OF THE

1       TWO CORPORATIONS THAT ARE THE PLAINTIFFS IN THIS CASE.

2           DO YOU RECALL THAT?

3       A.   I RECALL BEING A CORPORATE DESIGNEE IN SOME CAPACITY.  I

4       DON'T RECALL THE ENTIRE CAPACITY.

5       Q.   LET ME SEE IF THIS REFRESHES YOUR RECOLLECTION.

6           YOU WERE DESIGNATED TO TESTIFY ABOUT PLAINTIFFS'

7       UNDERSTANDING OF THE OPERATION OF THE INITIAL INSTALLATION

8       PAYLOAD FOR PEGASUS; PLAINTIFFS' EFFORT TO OBTAIN THE PEGASUS

9       AGENT; AND THE TIME SPENT BY PLAINTIFFS' EMPLOYEES RESPONDING

10      TO THE EVENTS THAT ARE RELEVANT TO THIS CASE.

11          DO YOU RECALL THAT?

12      A.   I BELIEVE I WAS THE DESIGNEE FOR THOSE MATTERS.

13      Q.   THANK YOU.

14          SO LET ME TURN FIRST TO THE EMPLOYEES.

15          AND, YOUR HONOR, I THINK THE FASTEST WAY TO DO THIS WOULD

16      BE IF I JUST REFRESH THE WITNESS'S RECOLLECTION WITH THE

17      DEPOSITION.

18          MAY I APPROACH HIM WITH IT?

19              THE COURT:  WELL, I'M NOT SURE HIS RECOLLECTION NEEDS

20      REFRESHING YET.

21              MR. AKROTIRIANAKIS:  OKAY.

22      Q.   DO YOU RECALL FROM YOUR DEPOSITION THAT YOU WERE UNABLE TO

23      IDENTIFY WHO MANY OF THE WORKERS WERE FOR WHOM FACEBOOK AND

24      WHATSAPP ARE CLAIMING DAMAGES FOR THEIR WORK IN THIS CASE?

25      A.   AS I STATED EARLIER, THERE WERE A LARGE NUMBER OF

```
 1        INDIVIDUALS WHO WORKED ON THIS PROJECT, AND I DID NOT INTERFACE

 2        WITH ALL OF THEM.

 3        Q.   MY QUESTION IS, DO YOU RECALL, AS YOU'RE SITTING HERE

 4        TODAY, THAT BACK WHEN YOU GAVE YOUR DEPOSITION IN SEPTEMBER,

 5        THERE WERE A GOOD NUMBER OF PEOPLE WHO, WHEN THEY WERE PUT TO

 6        YOU IN TERMS OF WHO IS THIS PERSON AND WHAT DID THEY DO FOR

 7        THIS PROJECT, YOUR ANSWER WAS THAT YOU HAD NO IDEA?

 8        A.   DURING MY DEPOSITION, SEVERAL NAMES CAME UP OF INDIVIDUALS

 9        THAT I HAD NOT DIRECTLY WORKED WITH ON THE MATTER, AND I -- SO

10        I DID NOT RECALL AT THAT TIME WORKING WITH THEM.

11        Q.   ALL RIGHT.  NOW, AS THE DESIGNEE FOR THE COMPANY TO

12        TESTIFY ON ITS BEHALF AS TO THE TIME SPENT BY PLAINTIFFS'

13        EMPLOYEES RESPONDING TO THE EVENTS IN THIS CASE, YOU UNDERSTOOD

14        THAT IT WAS YOUR RESPONSIBILITY TO MAKE YOURSELF KNOWLEDGEABLE

15        ABOUT ANSWERS THAT ARE FAIRLY WITHIN THAT TOPIC; CORRECT?

16             MR. BLOCK:  OBJECTION, YOUR HONOR.  THIS GOES INTO

17        LEGAL MATTERS.  I THINK IT'S A 403.

18             THE COURT:  HMM.  I'M GOING TO ALLOW IT.  OVERRULED.

19             THE WITNESS:  SORRY.  COULD YOU REPEAT THAT?

20        BY MR. AKROTIRIANAKIS:

21        Q.   YOU UNDERSTOOD YOUR OBLIGATION, AS THE COMPANY'S DESIGNEE,

22        WAS TO EDUCATE YOURSELF TO SPEAK ON THE COMPANY'S BEHALF AS TO

23        ITS POSITION IN THIS LITIGATION AS TO WHAT THE TIME SPENT BY

24        PLAINTIFFS' EMPLOYEES RESPONDING TO THE EVENTS IN THIS CASE

25        WAS; CORRECT, MR. ROBINSON?
```

1    A.   MY UNDERSTANDING IS THAT AT THE TIME OF THE DEPOSITION, I

2    WAS THERE TO GIVE TRUTHFUL TESTIMONY ABOUT WHATEVER MATTERS

3    WERE ASKED OF ME.

4    Q.   INCLUDING THE ONES YOU WERE DESIGNATED ON TO SPEAK ON

5    BEHALF OF THE PLAINTIFFS?

6    A.   YES, INCLUDING ONES THAT I HAD BEEN DESIGNATED TO SPEAK

7    ON.

8    Q.   OKAY.  AND FOR LACK OF A BETTER TERM, YOU UNDERSTOOD THAT

9    YOU WERE SUPPOSED TO HAVE STUDIED UP AND KNOW WHAT THOSE FACTS

10   WERE IN PREPARATION FOR YOUR DEPOSITION; CORRECT?

11   A.   I DO NOT RECALL -- OR THERE WAS -- THERE WAS SOME AMOUNT

12   OF STUDYING THAT HAD BEEN DONE.  THERE WAS NOT AN EXAM OR

13   ANYTHING LIKE THAT.

14   Q.   RIGHT.  YOU INTERVIEWED PEOPLE ABOUT WHO WORKED ON THE --

15   WORKED ON THE PROJECT AND HOW MUCH TIME THEY SPENT AND WHAT

16   THEY DID; CORRECT?

17   A.   I SPOKE TO SOME INDIVIDUALS ABOUT HOW MUCH TIME THEY HAD

18   SPENT WORKING ON THE RESPONSE TO NSO'S ATTACKS AND THEIR ROLE

19   IN THE MATTER.

20   Q.   OKAY.  AND YOUR ROLE, AS THE DESIGNEE, WAS TO PUT FORWARD

21   THOSE FACTS ON BEHALF OF THE PLAINTIFFS IN THIS LITIGATION.

22   YOU UNDERSTOOD THAT; CORRECT?

23   A.   I DO UNDERSTAND, YES, THAT I WAS SUPPOSED TO -- SUPPOSED

24   TO TALK ABOUT THAT MATTER, YES.

25   Q.   OKAY.  NOW, AND A NUMBER OF THOSE PEOPLE YOU HAD NO IDEA

```
1    WHO THEY WERE OR WHAT THEY DID, EVEN AFTER YOUR PREPARATION TO

2    TESTIFY ON THE COMPANY'S BEHALF; CORRECT?

3    A.  THERE WERE ONLY SOME THAT I HAD SPOKEN WITH THAT I HAD NOT

4    DIRECTED WITH -- OR INTERACTED WITH, EXCUSE ME, DURING THE

5    COURSE OF OUR RESPONSE.  THERE WERE SEVERAL THAT I HAD WORKED

6    VERY CLOSELY WITH DURING OUR RESPONSE.

7            MR. AKROTIRIANAKIS:  I'M GOING TO JUST READ FROM THE

8    DEPOSITION, I THINK, YOUR HONOR.

9            THE COURT:  WELL, HE ANSWERED THE QUESTION.  I'M NOT

10   SURE WHAT YOU'RE IMPEACHING AT THIS POINT.

11           MR. AKROTIRIANAKIS:  I'M NOT IMPEACHING, YOUR HONOR.

12   HE'S THE CORPORATE DESIGNEE.

13           THE COURT:  OKAY.  GO AHEAD.

14           MR. AKROTIRIANAKIS:  MAY I PROCEED?

15           THE COURT:  YES.

16           MR. AKROTIRIANAKIS:  ABY JOHN -- I'M SORRY.

17       READING FROM PAGE 295, LINE 25, THROUGH PAGE 296, LINE 7.

18       WHAT DID ABY JOHN'S --

19       WHAT WAS ABY JOHN'S TITLE IN 2019?

20       I'M SORRY, COULD YOU REPEAT THE QUESTION?

21       QUESTION:  ABY JOHN, A-B-Y, J-O-H-N?

22       ANSWER:  I DON'T KNOW.

23       WHAT DID ABY JOHN DO IN RESPONDING TO DEFENDANTS' EXPLOIT

24   IN MAY 2019?

25           ANSWER:  I DON'T KNOW.
```

1          296, LINE 8 THROUGH LINE 12.

2          QUESTION:  WHAT WAS ANDY YANG'S TITLE IN 2019?

3          ANSWER:  I DON'T KNOW.

4          QUESTION:  WHAT DID ANDY YANG DO IN RESPONDING TO

5    DEFENDANTS' EXPLOIT IN MAY 2019?

6          ANSWER:  I DON'T KNOW.

7          297, LINE 6.

8          QUESTION:  WHAT WAS ARAVIND THANGAVEL'S TITLE IN 2019?

9          ANSWER:  I DON'T KNOW.

10         QUESTION:  WHAT DID ARAVIND THANGAVEL DO TO RESPOND TO

11   DEFENDANTS' EXPLOIT IN 2019?

12         ANSWER:  I DON'T KNOW.

13         PAGE 298, LINE 25 THROUGH 299, LINE 6.

14         QUESTION:  WHAT WAS IGOR MILYAKOV'S TITLE IN 2019?

15         ANSWER:  I DON'T KNOW.

16         QUESTION:  WHAT DID IGOR MILYAKOV DO WITH RESPECT TO

17   RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

18         ANSWER:  I DON'T KNOW.

19         299, 7, THROUGH 301:5.

20         QUESTION:  WHAT WAS JOHN ALTENMUELLER'S TITLE IN MAY 2019?

21         ANSWER:  I DON'T KNOW.

22         WHAT DID MR. ALTENMUELLER DO TO RESPOND TO NSO'S EXPLOIT

23   IN MAY 2019?

24         ANSWER:  I DON'T KNOW.

25         QUESTION:  WHAT WAS JON SHELLER'S TITLE IN MAY 2019?

1          ANSWER:  I DON'T KNOW.

2          QUESTION:  WHAT DID JON SHELLER DO TO RESPOND TO -- WITH

3     RESPECT TO RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

4          ANSWER:  I DON'T KNOW.

5          QUESTION:  WHAT WAS MANNING CHANG'S TITLE IN 2019?

6          ANSWER:  I DON'T KNOW.

7          QUESTION:  WHAT DID MANNING CHANG DO TO RESPOND TO NSO'S

8     EXPLOIT IN MAY 2019?

9          ANSWER:  I DON'T KNOW.

10         QUESTION:  WHAT WAS MINGSONG BI'S TITLE IN 2019?

11         ANSWER:  I DON'T KNOW.

12         QUESTION:  WHAT DID MINGSONG BI DO IN RESPECT TO

13    RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

14         ANSWER:  I DON'T KNOW.

15         QUESTION:  WHAT WAS NASRIN JALEEL'S TITLE IN MAY 2019?

16         ANSWER:  I DON'T KNOW.

17         QUESTION:  WHAT DID NASRIN JALEEL DO WITH RESPECT TO

18    RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

19         ANSWER:  I DON'T KNOW.

20         QUESTION:  WHAT WAS ROGER SHEN'S TITLE IN MAY 2019?

21         ANSWER:  I DON'T KNOW.

22         QUESTION:  WHAT DID ROGER SHEN DO WITH RESPECT TO

23    RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

24         ANSWER:  I DON'T KNOW.

25         QUESTION:  WHAT WAS SAISH GERSAPPA'S TITLE IN MAY 2019?

1          ANSWER:  I DON'T KNOW.

2          QUESTION:  WHAT DID SAISH GERSAPPA DO WITH RESPECT TO

3     RESPONDING TO NSO'S EXPLOIT IN MAY 2019?

4          ANSWER:  I DON'T KNOW.

5          PAGE 301, LINE 6 THROUGH 12.

6          QUESTION:  WHAT DID XI DENG DO WITH RESPECT TO RESPONDING

7     TO DEFENDANTS' EXPLOIT IN MAY 2019?

8          ANSWER:  I DON'T KNOW THE FULL EXTENT, BUT I BELIEVE HE

9     HAD, LET'S SEE, I BELIEVE HE HAD SOME INVESTIGATION INTO THE --

10    OR SOME WORK AS TO THE VULNERABILITY, BUT I DON'T KNOW -- I

11    DON'T KNOW THE EXTENT OF HIS WORK.

12    Q.   AND, MR. ROBINSON, YOU TESTIFIED THAT MR. TISZKA,

13    BRENDAN TISZKA'S WORK WAS TO PROVIDE YOU THE CODE, AS WE SAW IN

14    EXHIBIT 932; CORRECT?

15    A.   BRENDAN PROVIDED ME WITH THE INITIAL LINK AND REQUESTED MY

16    ANALYSIS.

17    Q.   AND THAT WAS THE TEXT MESSAGING THAT WE SAW IN EXHIBIT

18    932; CORRECT?

19    A.   THAT WAS THE WORK PLACE CHAT RECORD, YES.

20    Q.   SORRY.  IT WASN'T A TEXT MESSAGE.  THAT WAS YOUR INTERNAL

21    INSTANT MESSAGING SYSTEM; RIGHT?

22    A.   IT IS OUR INTERNAL MESSAGING SYSTEM.

23    Q.   NOW, ALL OF THE PEGASUS CODE THAT YOU ARE AWARE OF HAVING

24    BEEN EXECUTED ONLY ON THE TARGET DEVICE AND NOT ON THE WHATSAPP

25    SERVERS; CORRECT, MR. ROBINSON?

1    A.   I AM NOT AWARE OF PEGASUS HAVING BEEN EXECUTED ON THE

2    WHATSAPP SERVERS.

3    Q.   AND THAT IS AS THE LEAD INVESTIGATOR IN FACEBOOK'S

4    INVESTIGATION; CORRECT?

5    A.   I DON'T KNOW THAT I WOULD TITLE MYSELF THE LEAD

6    INVESTIGATOR.

7    Q.   DIDN'T YOU JUST TESTIFY ON DIRECT EXAMINATION THAT YOU

8    WERE TAKING CHARGE OF THE INVESTIGATION TO UNDERSTAND WHAT

9    THE -- HOW THE CODE WORKED?

10   A.   SO THAT -- THE CODE PART IS SEPARATE THAN I THINK THE

11   OVERALL INVESTIGATION.  IT WAS A PART OF THAT INVESTIGATION.

12   Q.   OKAY.  YOU WERE THE CORPORATE REPRESENTATIVE TO TESTIFY ON

13   BEHALF OF THE COMPANY AS TO THE PLAINTIFFS' UNDERSTANDING OF

14   THE OPERATION OF THE INITIAL INSTALLATION PAYLOAD; CORRECT?

15   A.   I BELIEVE I WAS DESIGNATED TO TALK ON THE MATTER.

16   Q.   ALL RIGHT.  NOW, YOU TALKED ABOUT REVERSE ENGINEERING THAT

17   YOU HAD DONE OF THE ELF, OR ELF CODE.

18   A.   THE ELF FILE.

19   Q.   THE TOOL THAT YOU USED TO DO THAT REVERSE ENGINEERING IS A

20   PROGRAM CALLED IDA; IS THAT RIGHT?

21   A.   IDA PRO.

22   Q.   I-D-A, AND THEN PRO?

23   A.   YES, IDA PRO.

24   Q.   AND THERE'S ANOTHER TOOL IN THE MARKET CALLED JEB, J-E-B?

25   A.   YES, JEB IS ANOTHER ANALYSIS TOOL FOR MOBILE APPLICATIONS.

1    Q.   AND THOSE ARE THINGS THAT COMPUTER ENGINEERS LIKE YOURSELF

2    HAVE WIDELY AVAILABLE TO THEM, AND THEY ARE WIDELY USED; IS

3    THAT FAIR?

4    A.   I WOULDN'T SAY THEY'RE WIDELY AVAILABLE.  JEB AND IDA

5    BOTH, YOU HAVE TO GO THROUGH A BIT OF A VETTING PROCESS TO GET

6    THEM.  THEY DON'T JUST SELL THEM TO ANYBODY.  YOU HAVE TO PROVE

7    THAT YOU'RE A REAL PERSON OR SOME CORPORATE ENTITY BEFORE THEY

8    GIVE YOU A LICENSE FOR THOSE PIECES OF SOFTWARE.

9    Q.   AND YOU YOURSELF HAVE THOSE LICENSES?

10    A.   I DO HAVE LICENSES FOR BOTH IDA AND JEB.

11    Q.   NOW, BASED ON THE REVERSE ENGINEERING THAT YOU DID, YOU

12    DETERMINED THAT THE -- THAT WHEN THE TARGET PHONE EXECUTED THE

13    INITIAL PAYLOAD FILE, THAT CAUSED THE TARGET PHONE TO REACH OUT

14    TO A SECONDARY PAYLOAD SERVER AND DOWNLOAD A SECONDARY PAYLOAD;

15    IS THAT CORRECT?

16    A.   YES, THE INITIAL CODE ATTEMPTED TO REACH OUT TO SECOND

17    SERVERS AND RETRIEVE AN ADDITIONAL PIECE OF MALWARE.

18    Q.   AND YOU MADE ATTEMPTS ON BEHALF OF THE PLAINTIFF COMPANIES

19    TO OBTAIN THAT SECONDARY PAYLOAD YOURSELF; CORRECT?

20    A.   I DID ATTEMPT TO RETRIEVE THE MALWARE PAYLOAD ON THE

21    SERVER.

22    Q.   I'M GOING TO COME BACK TO THAT IN JUST A MINUTE.  LET ME

23    ASK YOU A COUPLE OTHER QUESTIONS FIRST.

24         COULD WE -- COULD YOU -- DO YOU HAVE A BINDER IN FRONT OF

25    YOU THAT SAYS ROBINSON DIRECT ON THE COVER?

1    A.   I HAVE A BINDER THAT SAYS ROBINSON DIRECT ON IT.

2    Q.   OKAY.  IS THERE ANOTHER BINDER IN FRONT OF YOU?

3    A.   NO.  JUST THE ONE.

4    Q.   I'LL MOVE ON WHILE WE'RE LOOKING FOR THAT.

5         MR. ROBINSON, YOU -- THE VERY FIRST THING YOU SAID IS THAT

6    YOU'RE A SALARIED EMPLOYEE; IS THAT RIGHT?

7    A.   I AM A SALARIED EMPLOYEE OF META.

8    Q.   AND FACEBOOK HAS A DEDICATED COMPUTER EMERGENCY RESPONSE

9    TEAM, OR CERT, WHOSE JOB IT IS SO RESPOND TO SECURITY

10   INCIDENTS?

11   A.   IN 2019 WE HAD A TEAM THAT WAS TITLED THE CERT TEAM,

12   COMPUTER EMERGENCY RESPONSE TEAM.

13   Q.   AND BASED ON THE INVESTIGATION THAT YOU DID IN THIS CASE,

14   THE OTHER PEOPLE WHO YOU'RE AWARE OF WHO ALSO TOOK PART IN IT

15   ARE, LIKE YOURSELF, SALARIED EMPLOYEES; CORRECT?

16   A.   I DON'T KNOW HOW EVERYONE ELSE IS PAID.  I ASSUME THAT

17   THEY ARE SALARIED.

18   Q.   TO THE BEST OF YOUR KNOWLEDGE, THOSE PEOPLE ARE SALARIED

19   EMPLOYEES?

20   A.   TO THE BEST OF MY KNOWLEDGE.

21   Q.   AND YOU'RE A SALARIED EMPLOYEE?

22   A.   I AM A SALARIED EMPLOYEE.

23   Q.   YOU DON'T RECEIVE OVERTIME FOR YOUR HOURS WORKED IN A

24   PARTICULAR WORK?

25   A.   I DON'T RECEIVE OVERTIME, BUT I DO -- WE ALL RECEIVE

1    BONUSES THAT ARE TIED TO OUR PERFORMANCE.  SO WHENEVER WE GO

2    ABOVE AND BEYOND WHAT IS EXPECTED OF US, WE RECEIVE A BONUS AT

3    THE END OF THE PERFORMANCE CYCLE.

4    Q.   READING FROM THE WITNESS'S DEPOSITION AT PAGE 37, LINE 22

5    TO PAGE 38, LINE 1.

6         "QUESTION:  DID YOU EVER RECEIVE A BONUS SPECIFIC TO YOUR

7    WORK ON THIS PROJECT?

8         "ANSWER:  NO.

9         "QUESTION:  AND TO YOUR UNDERSTANDING, THAT'S NOW HOW IT

10   WORKS AT FACEBOOK; RIGHT?"

11        SORRY, YOUR HONOR.  I WITHDRAW THAT LAST QUESTION.

12        YOU DID NOT RECEIVE A BONUS SPECIFIC TO YOUR WORK ON THIS

13   PROJECT; CORRECT, MR. ROBINSON?

14   A.   SO THE BONUS WAS A PART OF OUR NORMAL PERFORMANCE

15   EVALUATION.  I BELIEVE, AS I RECALL, MY PERFORMANCE WRITE-UP

16   FOR THAT HALF DID MENTION MY WORK IN THE NSO INVESTIGATION, SO

17   IT WAS A -- IT WAS CONSIDERED AS A PART OF THAT BONUS THAT I

18   RECEIVED.

19             MR. BLOCK:  YOUR HONOR?

20             THE COURT:  YES.

21             MR. BLOCK:  COULD I HAVE THE PORTION THAT FOLLOWS

22   WHAT MR. AKROTIRIANAKIS READ INTO THE RECORD WITHOUT THE

23   ATTORNEY COLLOQUY, PLEASE?

24             THE COURT:  YES.

25             MR. AKROTIRIANAKIS:  I READ THE WRONG ONE AND

```
 1      WITHDREW THE QUESTION, YOUR HONOR.  I'M GOING TO READ THE ONE I

 2      MEANT TO READ, WITH THE COURT'S PERMISSION.

 3              THE COURT:  OKAY.  HE CAN DO FOLLOW UP FOR

 4      COMPLETENESS, THOUGH --

 5              MR. AKROTIRIANAKIS:  SURE.

 6              THE COURT:  -- IF HE NEEDS TO AFTER YOU READ THE NEXT

 7      SECTION.

 8              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

 9          READING FROM PAGE 37, LINE 13 TO 24.

10          "QUESTION:  ARE YOU A SALARIED EMPLOYEE OR AN HOURLY

11      EMPLOYEE?

12          "ANSWER:  SALARIED.

13          "QUESTION:  HAS THAT ALWAYS BEEN THE CASE SINCE YOU'VE

14      WORKED WITH THE FACEBOOK FAMILY OF COMPANIES?

15          "ANSWER:  YES.

16          "QUESTION:  AND DID YOU RECEIVE BONUSES?

17          "ANSWER:  YES.

18          "QUESTION:  DID YOU EVER RECEIVE A BONUS SPECIFIC TO YOUR

19      WORK ON THIS PROJECT?

20          "ANSWER:  NO."

21              THE COURT:  OKAY.

22          DID YOU WANT TO READ INTO THE RECORD SOMETHING ELSE?

23              MR. BLOCK:  YES, PLEASE, YOUR HONOR.

24              THE COURT:  ALL RIGHT.  DO SO.

25              MR. BLOCK:  IMMEDIATELY FOLLOWING WHAT COUNSEL JUST
```

1        READ, READING AT 37, LINE 25.

2             "QUESTION:  AND TO YOUR UNDERSTANDING, THAT'S NOT HOW IT

3        WORKS IN FACEBOOK; RIGHT?

4             "ANSWER:  HOW WHAT WORKS?

5             "QUESTION:  THE BONUS PROGRAM.

6             "ANSWER:  SO I'M -- YOUR QUESTION IS HOW -- ABOUT HOW OUR

7        BONUS PROGRAM WORKS?

8             "QUESTION:  YES.

9             "ANSWER:  IN RELATION TO WHAT?

10            "QUESTION:  IN RELATION TO GETTING BONUSES OVER AND ABOVE

11       YOUR SALARY."

12            AND THIS IS IT, YOUR HONOR.

13            "ANSWER:  SO OUR BONUSES ARE TIED TO OUR PERFORMANCE, AND

14       WORKING BEYOND, LIKE TO EFFORTS ABOVE AND BEYOND, AS WAS THE

15       CASE HERE, WOULD HAVE BEEN REFLECTED IN PERFORMANCE

16       EVALUATIONS, WHICH WOULD HAVE BEEN REFLECTED IN A BONUS

17       CALCULATION."

18            THE COURT:  OKAY.  THANK YOU.

19        BY MR. AKROTIRIANAKIS:

20        Q.   MR. ROBINSON, RETURNING TO -- IN THE OTHER BOOK THAT'S IN

21        FRONT OF YOU, WILL YOU TURN, PLEASE, TO EXHIBIT 1204.

22            (PAUSE IN PROCEEDINGS.)

23            THE COURT:  ALL RIGHT.  SORRY.  GO AHEAD.

24            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

25        Q.   MR. ROBINSON, BEFORE YOU IS EXHIBIT 1204?

1    A.   I HAVE IT IN FRONT OF ME.

2    Q.   THIS IS SOMETHING THAT YOU IDENTIFIED AS A QUIP, Q-U-I-P;

3    CORRECT?

4    A.   I BELIEVE IT WAS CONTAINED IN QUIP.

5    Q.   I APOLOGIZE THAT IT'S ITTY BITTY TYPE.  THIS IS HOW WE

6    RECEIVED THIS DOCUMENT.

7         ARE YOU ABLE TO READ IT?

8    A.   I THINK I CAN READ IT.

9    Q.   ALL RIGHT.  THIS IS A TIMELINE; IS THAT RIGHT?

10   A.   THIS WOULD BE OUR INCIDENT RESPONSE TIMELINE.

11   Q.   OKAY.  AND YOU YOURSELF CONTRIBUTED TO THIS TIMELINE;

12   CORRECT?

13   A.   UM --

14   Q.   IF YOU LOOK ON THE THIRD LINE IN, I THINK, CELL --

15   COLUMN C, YOU SEE IT SAYS AT DREW?

16   A.   SO I BELIEVE THAT IS SOMETHING QUOTING ME, NOT NECESSARILY

17   AN ENTRY THAT I MADE.

18   Q.   ALL RIGHT.  CAN YOU TURN TO LINE -- ON PAGE 2, LINE 34?

19   AND THERE'S A -- IN CELL C, THERE'S ANOTHER REFERENCE TO DREW.

20   THAT'S SOMETHING THAT YOU WOULD HAVE POPULATED INTO THE

21   DOCUMENT, OR THAT IT REFLECTS YOUR PARTICIPATION; IS THAT

22   RIGHT?

23   A.   AGAIN, I BELIEVE THIS IS SOMEBODY QUOTING ME AND THE WORK

24   THAT I HAD DONE TO TRY AND RETRIEVE THE DATA.

25   Q.   OKAY.  AND YOU'RE FAMILIAR WITH EXHIBIT 1204 AND THE

1     INCIDENT RESPONSE TIMELINE THAT IT CONTAINS?

2     A.   I HAVE IT IN FRONT OF ME.  I RECALL THE MATTERS AT LEAST

3     THAT IT'S CALLING OUT THAT I WORKED ON.

4     Q.   OKAY.  IS IT YOUR TESTIMONY THAT YOU'RE -- THAT YOU DIDN'T

5     EVER SEE THIS DOCUMENT WAY BACK WHEN IN THE EVENTS THAT WE'RE

6     TALKING ABOUT IN THIS CASE?

7     A.   NO, I BELIEVE I SAW IT BACK IN 2019.

8     Q.   OKAY.  YOU RECOGNIZE IT AS AN INTERNAL FACEBOOK DOCUMENT,

9     ONE THAT YOU USED AND RELIED ON, ET CETERA, ET CETERA?

10    A.   I DON'T KNOW IF I RELIED ON IT.  IT WAS MORE OF A RECORD

11    OF WORK THAT WE HAD DONE SO THAT WE COULD MAKE SURE THAT THE

12    STEPS THAT WE WERE -- IT WAS TO KEEP TRACK OF THE RECORD -- OR

13    KEEPING RECORD OF THE STEPS THAT WE WERE TAKING TO ADDRESS

14    EVERYTHING AND TO PUT TOGETHER A COMPLETE -- AS COMPLETE A

15    PICTURE OF WHEN AND HOW THINGS HAD HAPPENED DURING THE COURSE

16    OF OUR INVESTIGATION.

17    Q.   THANK YOU.

18         OFFER EXHIBIT 1204, YOUR HONOR.

19             THE COURT:  ANY OBJECTION?

20             MR. BLOCK:  I'M HAVING A LITTLE BIT OF TROUBLE

21    READING IT, YOUR HONOR.  BUT NO OBJECTION AT THIS TIME.

22         AND IF WE SEE SOMETHING TROUBLESOME, I'LL LET YOU KNOW.

23             THE COURT:  ALL RIGHT.  ADMITTED.

24    (DEFENDANTS' EXHIBIT 1204 WAS ADMITTED IN EVIDENCE.)

25             MR. AKROTIRIANAKIS:  OKAY.  COULD WE PUBLISH THE

1    FIRST PAGE, PLEASE, AND IF POSSIBLE, BLOW UP JUST THE FIRST

2    LINE.

3    Q.   THIS TIMELINE READS, "OCTOBER 2015, THE VULNERABILITY

4    CVE-2019-3568 WAS INTRODUCED INTO THE VOIP CODE BASE."

5         DO YOU SEE THAT, MR. ROBINSON?

6    A.   I SEE THAT STATEMENT.

7    Q.   AND WHAT WAS THE -- IF WE CAN SHOW THE CELL C, YOU SAY

8    THAT THAT IS NOT SOMETHING THAT YOU POPULATED IN THIS DOCUMENT,

9    BUT YOU THINK THAT THE DREW BEING REFERRED TO IS YOURSELF?

10   A.   I BELIEVE THAT'S A QUOTE FROM ME.

11   Q.   ALL RIGHT.  AND LINE 2 ON -- I'M SORRY, ON PAGE 2,

12   LINE 27, THE 27TH ENTRY INTO THE INCIDENT RESPONSE TIMELINE IS

13   ACTUALLY THE INDICATION OF WHEN THE INVESTIGATION STARTED; IS

14   THAT RIGHT, MR. ROBINSON?

15   A.   THIS IS WHEN WE BECAME AWARE OF THE MALWARE BEING SENT

16   OVER THE -- OVER WHATSAPP SERVERS AND WHEN I WAS ASKED TO

17   ANALYZE THE PAYLOAD AND, YES, WHEN OTHER PARTS OF THE

18   INVESTIGATION BEGAN.

19   Q.   OKAY.  IT'S THE START OF THE INVESTIGATION, AS THE ENTRY

20   INDICATES?

21   A.   I --

22   Q.   WITHDRAW THAT, YOUR HONOR.

23            MR. BLOCK:  YOUR HONOR --

24   BY MR. AKROTIRIANAKIS:

25   Q.   THE ENTRY READS, "INVESTIGATION STARTS."

1        DO YOU SEE THAT?

2    A.   I SEE THE ENTRY SAYS INVESTIGATION STARTS.

3    Q.   OKAY.  AND THE DATE IS MAY 2, 2019 AT 4:45 PACIFIC

4    DAYLIGHT TIME; CORRECT?

5    A.   THAT IS THE TIME STAMPED THERE, YES.

6    Q.   OKAY.  AND IF WE GO TO -- IF YOU COULD JUST EXPAND THE BOX

7    SO THAT WE CAN ALSO SEE LINE 30.

8        THE THIRD NEXT ENTRY IS MAY 6TH AND IT READS THAT, "BOTH

9    SERVER AND CLIENT FIXES WERE PREPARED UPFRONT AND READY TO

10   DEPLOY."

11       DO YOU SEE THAT?

12   A.   I SEE THAT ENTRY.

13   Q.   ALL RIGHT.  AND THEN ULTIMATELY THOSE FIXES WERE NOT

14   DEPLOYED UNTIL, IN THE CASE OF ONE OF THEM, MAY 10TH, AND IN

15   THE CASE OF THE OTHER, MAY 13TH; IS THAT RIGHT?

16   A.   YEAH.  AS I STATED BEFORE, WE NEEDED TO MAKE SURE THAT WE

17   HAD A COMPLETE FIX, SO WE DELAYED PUSHING THEM OUT UNTIL WE

18   COULD BE SURE THAT WE WOULD PROPERLY AND COMPLETELY FIX THE

19   ISSUES SO THAT WE WOULDN'T GIVE NSO GROUP TIME TO REACT TO AN

20   INCOMPLETE FIX.

21   Q.   OKAY.  AND ONE OF THE THINGS THAT YOU DID DURING THAT WEEK

22   WAS YOU MADE A NUMBER OF EFFORTS TO OBTAIN THE, WHAT WE'VE BEEN

23   REFERRING TO IN OUR CONVERSATION TODAY AS THE SECONDARY

24   PAYLOAD; CORRECT?

25   A.   I DON'T KNOW -- I DON'T RECALL EXACTLY HOW MANY ATTEMPTS I

1     MADE.  I BELIEVE IT WAS -- IT WAS NOT MANY BECAUSE SIMILARLY,

2     IT WAS SOMETHING THAT I WAS WORRIED WOULD TIP NSO OFF THAT WE

3     KNEW ABOUT THE ATTACKS AND IF THEY WERE TO IDENTIFY THESE

4     ABNORMAL ATTEMPTS TO RETRIEVE IT.

5          SO IT WAS SOMETHING THAT I HAD DONE IN A RESERVED NUMBER

6     OF TIMES.

7     Q.   I'M SORRY.  HOW MANY TIMES?

8     A.   A RESERVED NUMBER, A LIMITED NUMBER OF TIMES.

9     Q.   ARE YOU ABLE TO ESTIMATE?

10    A.   TWO OR THREE.  NO MORE THAN TWO OR THREE.

11    Q.   OKAY.  SO ONE OF THE THINGS YOU DID WAS TO TRY AND GET THE

12    SECONDARY PAYLOAD SERVERS TO SEND YOU THE PEGASUS AGENT;

13    CORRECT?

14    A.   I ATTEMPTED TO GET THE SERVERS TO SEND ME WHAT I PRESUMED

15    WAS PEGASUS.

16    Q.   AND YOU UNDERSTOOD THAT PEGASUS WAS NSO'S SOFTWARE?

17    A.   I UNDERSTAND PEGASUS TO BE THE MALWARE IMPLANT THAT NSO

18    OFFERS TO ITS CUSTOMERS.

19    Q.   AND YOU UNDERSTAND THAT PEGASUS IS NOT WHATSAPP SOFTWARE?

20    A.   NO, PEGASUS IS NOT WHATSAPP SOFTWARE.

21    Q.   AND IT'S NOT FACEBOOK SOFTWARE?

22    A.   NO.  PEGASUS IS NSO'S MALWARE IMPLANT.

23    Q.   AND WHAT YOU WERE TRYING TO OBTAIN, THE PEGASUS AGENT, IS

24    SOMETHING THAT HAD NEVER, TO YOUR KNOWLEDGE, TRANSITED THE

25    WHATSAPP SERVERS; CORRECT?

1    A.    TO MY KNOWLEDGE, IT HAD NOT TRANSITED -- OR TRANSITED

2    WHATSAPP SERVERS.

3         BUT THE LOGGING THAT WE HAD ESTABLISHED ON OUR WHATSAPP

4    SERVERS CAME ABOUT AFTER THE ATTACKS HAD STARTED, WE BELIEVED

5    AFTER THE ATTACKS HAD STARTED.

6         SO THERE WAS A GOOD PERIOD OF TIME WHERE DATA, THINGS

7    LIKE -- SOMETHING LIKE PEGASUS COULD HAVE TRANSITED OUR

8    SERVERS, BUT WE WOULD HAVE BEEN UNAWARE OF IT.

9    Q.    WELL, EVEN NOW, YOU KNOW THAT PEGASUS HAS NEVER -- THE

10   PEGASUS AGENT HAS NEVER TRANSITED WHATSAPP SERVERS; CORRECT?

11   A.    NO, I DON'T KNOW THAT.

12   Q.    OKAY.  IN ALL THE INVESTIGATION YOU DID, YOU NEVER FOUND

13   IT TRANSITING WHATSAPP SERVERS; IS THAT FAIR?

14   A.    AS I SAID, FROM THE TIME WHEN WE TURNED ON LOGGING TO

15   WHERE WE FIXED THE VULNERABILITY AND EVENTUALLY TURNED OFF THE

16   LOGGING, WE DID NOT SEE PEGASUS TRANSITING ACROSS THE SERVERS

17   THAT WE HAD TURNED THE LOGGING ON THEN.

18        BUT PRIOR TO THAT, I DON'T KNOW WHAT WAS TRANSMITTED.

19   Q.    AND THE -- WHERE YOU WERE TRYING TO RETRIEVE THE PEGASUS

20   AGENT FROM, OR FETCH THE PEGASUS AGENT FROM, WAS FROM OUTSIDE

21   OF THE WHATSAPP SERVER ENVIRONMENT; CORRECT?

22   A.    THE SERVERS THAT I ATTEMPTED TO RETRIEVE IT FROM WERE THE

23   SECONDARY PAYLOAD SERVERS THAT WE HAD IDENTIFIED.

24   Q.    AND THEY ARE OUTSIDE OF THE WHATSAPP SERVER ENVIRONMENT;

25   CORRECT?

1    A.   THEY ARE NOT SERVERS THAT WE HAVE IN OUR OWN

2    INFRASTRUCTURE.

3    Q.   SO THAT SOUNDS LIKE I AM CORRECT?

4    A.   THEY ARE NOT WHATSAPP SERVERS.

5    Q.   IT STILL SOUNDS LIKE I AM CORRECT, BUT I THINK I NEED YOU

6    TO SAY YES SO I CAN BE CLEAR WHAT YOUR TESTIMONY IS.  IS IT A

7    YES OR A NO?

8    A.   IT'S -- I DON'T KNOW -- THEY'RE NOT WHATSAPP SERVERS.

9    Q.   OKAY.  DID YOU ENGAGE IN OPERATIONAL SECURITY, OR OPSEC,

10   AROUND YOUR ATTEMPTS TO OBTAIN THE PEGASUS AGENT?

11   A.   NOT REALLY OPSEC.  THERE WAS A LITTLE OPSEC THAT WAS

12   INCIDENTAL TO THE ATTEMPTS THAT I MADE TO RETRIEVE IT.

13        SO I ATTEMPTED TO MIMIC WHAT A VICTIM WOULD LOOK LIKE AND

14   EGRESSED FROM COUNTRIES THAT WERE ALIGNED WITH THE INDIVIDUALS

15   BEING TARGETED.

16        BUT IT WAS NOT MY INTENTION NECESSARILY TO, LIKE, HIDE

17   THAT I WAS ATTEMPTING TO RETRIEVE THE PAYLOAD.

18   Q.   WHAT'S TOR, T-O-R?

19   A.   T-O-R IS THE -- I FORGET THE ACRONYM, BUT IT'S AN

20   ANONYMIZATION NETWORK.

21   Q.   THAT YOU USED IN YOUR EFFORTS TO TRY AND OBTAIN THE

22   PEGASUS AGENT?

23   A.   I DON'T RECALL IF I USED TOR OR A VPN, BUT IT WAS

24   SOMETHING OF THAT NATURE THAT I COULD CHOOSE A LOCATION OR A

25   COUNTRY, A SPECIFIC COUNTRY TO EGRESS FROM.

1    Q.   AND YOU CHOSE TO ANONYMIZE YOURSELF IN DOING SO?

2    A.   NO.  I CHOSE TO LOOK LIKE I WAS IN A SPECIFIC COUNTRY SO

3    THAT I WOULD BE MORE LIKELY TO RECEIVE THE PAYLOAD.

4    Q.   YOU'RE FAMILIAR WITH THE TERM "FALSE FLAG OPERATION,"

5    MR. ROBINSON?

6    A.   I AM.

7    Q.   OKAY.  AND THAT'S WHAT YOU ENGAGED IN TO TRY AND PRETEND

8    THAT YOU'RE SOMEBODY ELSE IN ORDER TO OBTAIN A SECONDARY

9    OBJECTIVE?

10              MR. BLOCK:  403, YOUR HONOR.

11              THE COURT:  OVERRULED.

12              THE WITNESS:  DOES THAT MEAN I NEED TO ANSWER?

13              THE COURT:  YOU CAN ANSWER.

14              THE WITNESS:  I WAS -- I WOULD NOT CLASSIFY IT AS

15   FALSE FLAG.  NORMALLY FALSE FLAGS ARE ATTRIBUTED TO SOMEBODY

16   ATTACKING SOMEBODY, NOT NECESSARILY THOSE LOOKING TO DEFEND

17   THEIR PRODUCTS.

18              MR. AKROTIRIANAKIS:  CAN WE HAVE EXHIBIT 1131, WHICH

19   IS IN EVIDENCE, PLEASE.

20   Q.   THIS IS A WORK CHAT BETWEEN YOURSELF AND MR. GHEORGHE

21   ABOUT YOUR EFFORTS TO, AS HE PUT IT HERE, FETCH THE PEGASUS

22   AGENT; RIGHT?

23        AND IF YOU SEE MR. GHEORGHE HAS AN ENTRY AT 22:13:35 ABOUT

24   HALFWAY DOWN THE FIRST PAGE.

25   A.   I SEE THE ENTRY THAT YOU'RE REFERRING TO.

1    Q.   OKAY.  AND THAT -- THE FETCHING THAT WAS GOING ON WAS AN

2    EFFORT TO OBTAIN THE PEGASUS AGENT; CORRECT?

3    A.   AGAIN, THAT WAS MY ATTEMPT TO RETRIEVE WHATEVER MALWARE

4    WAS ON THE SECONDARY PAYLOAD SERVER.

5    Q.   AND GO UP, PLEASE, TO THE --

6         AND IN THE MIDDLE OF THE PAGE THAT WE'RE LOOKING AT,

7    PAGE 1, WE SEE THAT MR. GHEORGHE WAS DISAPPOINTED IN YOUR

8    INABILITY TO OBTAIN THE PEGASUS PAYLOAD; CORRECT?

9    A.   OH, DO YOU -- DO YOU MEAN BECAUSE OF THE FROWNY FACE.

10   Q.   WELL, DID YOU UNDERSTAND THAT MR. GHEORGHE WAS

11   DISAPPOINTED YOU AND HE WERE UNABLE TO, THROUGH YOUR EFFORTS,

12   OBTAIN THE PEGASUS AGENT?

13   A.   I BELIEVE WE WERE SADDENED BY OUR INABILITY TO GET THAT

14   MALWARE PAYLOAD, BECAUSE THAT MEANT THAT WE COULDN'T BE SURE

15   THAT WE WERE COMPLETELY DEFENDING FROM THE ATTACK.  I THINK

16   THAT'S WHAT I SAID.

17   Q.   YOU WENT TO OTHER EFFORTS TO ATTEMPT TO OBTAIN THE PEGASUS

18   AGENT?

19        MR. BLOCK:  I OBJECT, YOUR HONOR.  IT

20   MISCHARACTERIZES THE TESTIMONY.  HE'S DESCRIBING IT AS THE

21   PEGASUS AGENT.  THERE'S ACTUALLY NO FOUNDATION FOR THAT.

22        THE COURT:  OVERRULED.  IT'S CROSS-EXAMINATION.  HE'S

23   ALLOWED SOME LEEWAY, COUNSEL.

24        THE WITNESS:  SORRY.  COULD YOU REPEAT THE QUESTION?

25   BY MR. AKROTIRIANAKIS:

1    Q.   YOU WENT TO OTHER EFFORTS TO ATTEMPT TO OBTAIN THE PEGASUS

2    AGENT?

3    A.   I'M NOT SURE WHAT YOU MEAN BY OTHER EFFORTS.

4    Q.   WELL, OTHER THAN WHAT YOU WERE DOING WITH THE, I THINK YOU

5    REFERRED TO INDONESIA AND VPN'S AND POSSIBLY USING TOR, YOU DID

6    OTHER THINGS, TOO, RIGHT, MR. ROBINSON?

7    A.   I DON'T RECALL DOING SO.  I ONLY RECALL ATTEMPTS TO

8    DIRECTLY RETRIEVE THE PAYLOAD FROM THE SERVERS.

9    Q.   OKAY.  COULD YOU PLEASE REFER IN THE BOOK THAT'S BEFORE

10   YOU TO EXHIBIT 1511.

11        DO YOU SEE THAT THIS IS A CHAT BETWEEN YOURSELF AND

12   MICHAEL SCOTT, WHO YOU IDENTIFIED DURING YOUR DIRECT

13   EXAMINATION?

14   A.   THIS IS A RECORD OF WORK PLACE CHAT MESSAGES BETWEEN THE

15   TWO OF US.

16   Q.   AND ONE OF THE THINGS THAT YOU AND MR. SCOTT WERE TALKING

17   ABOUT WAS YOUR EFFORTS TO OBTAIN THE PEGASUS AGENT SEPARATE

18   FROM WHAT YOU'VE ALREADY TESTIFIED TO; CORRECT?

19   A.   I DON'T BELIEVE SO.

20   Q.   DO YOU KNOW A PERSON AT AMAZON WEB SERVICES CALLED

21   CHRIS HARROD?

22   A.   I DO.

23   Q.   H-A-R-R-O-D?

24   A.   I DO.

25   Q.   OKAY.  AND THAT IS A PERSON WHO DOESN'T WORK FOR FACEBOOK

1    AND DOESN'T WORK FOR WHATSAPP; CORRECT?

2    A.   NO.  HE WORKED AT THE TIME AT AMAZON.

3    Q.   OKAY.  AND YOU REACHED OUT TO MR. HARROD TO SEE IF HE

4    WOULD LOOK INTO A SERVER THAT YOU BELIEVED BELONGED TO NSO AND

5    TELL YOU WHAT WAS INSIDE IT; CORRECT?

6    A.   NO, THAT IS NOT CORRECT.

7         I REACHED OUT TO CHRIS TO LET HIM KNOW THAT AMAZON SERVERS

8    WERE BEING USED IN AN ATTACK THAT WE WERE SEEING SO THAT THEY

9    COULD TAKE APPROPRIATE ACTION AND -- YEAH.

10   Q.   AND THIS IS WHAT YOU DIDN'T WANT YOUR LEGAL DEPARTMENT TO

11   FIND OUT ABOUT AS REFLECTED IN EXHIBIT 1511; CORRECT?

12   A.   YEAH, THE STATEMENT "LEGAL WASN'T SUPPOSED TO HEAR THAT"

13   WAS IN REFERENCE TO, YEAH, I HAD NOT REACHED -- RECEIVED

14   APPROVAL TO SHARE THAT INFORMATION WITH CHRIS.

15             MR. AKROTIRIANAKIS:  I OFFER EXHIBIT 1511,

16   YOUR HONOR.

17             THE COURT:  ANY OBJECTION?

18             MR. BLOCK:  NO OBJECTION AS REDACTED, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  MY COPY IS ALREADY REDACTED.

20        ALL RIGHT.  ADMITTED.

21        (DEFENDANTS' EXHIBIT 1511 WAS ADMITTED IN EVIDENCE.)

22   BY MR. AKROTIRIANAKIS:

23   Q.   YOU ACTUALLY WROTE SOME CODE IN ORDER TO ATTEMPT TO OBTAIN

24   THE PEGASUS AGENT; CORRECT?

25   A.   I WROTE CODE TO ATTEMPT TO GET THE SERVER TO OFFER UP THE

1    MALWARE.

2    Q.   AND WHAT WAS THE -- WHAT WERE YOU COMMUNICATING IN THE

3    CODE THAT YOU WERE OFFERING TO THE SECONDARY PAYLOAD SERVER?

4    A.   I'M SORRY, I'M NOT SURE I UNDERSTAND THE QUESTION.

5    Q.   WELL, WHAT -- WHAT WERE YOU TRYING TO GET THE SERVER TO

6    DO?

7    A.   OFFER ME UP THE FILE THAT IT WAS SERVING TO VICTIMS.

8    Q.   OKAY.  AND WHAT -- WHAT REPRESENTATIONS, IF YOU WILL, DID

9    YOU MAKE TO THE SERVER IN RESPECT OF TRYING TO GET IT TO DO

10   THAT?

11   A.   I ATTEMPTED TO RECREATE THE REQUESTS THAT WE OBSERVED THE

12   ELF FILES MAKING.

13        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

14        MR. AKROTIRIANAKIS:  I'LL COME BACK TO THAT AFTER

15   HE'S DONE WITH HIS REVIEW.

16   Q.   LET ME ASK YOU, MR. ROBINSON, THE RSU'S THAT YOU RECEIVED

17   IN 2019, YOU RECALL THAT YOU RECEIVED RSU'S?

18   A.   I DID RECEIVE RSU'S IN 2019.

19   Q.   DO YOU RECALL WHAT THE AMOUNT OF THE RSU'S WAS THAT YOU

20   GOT?

21   A.   I DO NOT RECALL THE NUMBER OF RSU'S I RECEIVED.

22   Q.   BUT DO YOU RECALL THAT YOU WERE GRANTED THOSE RSU'S IN

23   MARCH OF 2019; CORRECT?

24   A.   I DON'T RECALL THE MONTH THEY WERE GRANTED.  IT'S USUALLY

25   ON A PREDETERMINED SCHEDULE, BUT I DON'T RECALL THE SCHEDULE AT

1        THE TIME.

2        Q.   SAME MONTH EVERY YEAR; RIGHT?

3        A.   AGAIN, I DON'T RECALL THE SCHEDULE.

4        Q.   AND YOU DON'T RECALL WHETHER IT WAS MARCH 2019?

5        A.   NOT OFF THE TOP OF MY HEAD, NO.

6             MR. AKROTIRIANAKIS:  YOUR HONOR, I WAS GOING TO

7        REFRESH THE WITNESS'S RECOLLECTION IN RESPECT TO THE TOR POINT.

8             THE COURT:  OKAY.

9             MR. AKROTIRIANAKIS:  MAY I APPROACH?

10            THE COURT:  YES.

11            MR. AKROTIRIANAKIS:  AND FOR THE RECORD, IT'S

12       EXHIBIT 1515 (HANDING).

13       Q.   AND COULD YOU JUST BRIEFLY LOOK THAT OVER AND TELL ME,

14       MR. ROBINSON, WHETHER THAT WAS CODE THAT YOU WROTE IN AN

15       ATTEMPT TO OBTAIN THE PEGASUS AGENT FROM THE SECONDARY PAYLOAD

16       SERVER?

17       A.   SORRY.  I'VE REVIEWED IT.

18            WHAT WAS THE QUESTION AGAIN?

19       Q.   IS THAT CODE THAT YOU WROTE IN AN ATTEMPT TO OBTAIN THE

20       PEGASUS AGENT FROM THE SECONDARY PAYLOAD SERVER?

21       A.   THIS IS CODE THAT I WROTE.

22       Q.   OKAY.  AND DID REVIEWING IT HELP YOU REFRESH YOUR

23       RECOLLECTION THAT YOU, IN FACT, WERE USING TOR AS PART OF YOUR

24       PROJECT?  YOU CAN LOOK AT THE WHOLE DOCUMENT.

25       A.   I SEE TOR BEING MENTIONED.  BUT BEYOND THAT, I DON'T

```
 1        RECALL -- I DON'T RECALL EXPLICITLY USING TOR.  I RECALL USING

 2        SOME, SOME MEANS TO EGRESS FROM A DIFFERENT I.P., BUT THAT'S

 3        THE EXTENT OF MY RECOLLECTION.

 4               MR. AKROTIRIANAKIS:  MAY I APPROACH THE WITNESS?

 5               THE WITNESS:  OH, YOU WANT IT BACK?

 6               MR. AKROTIRIANAKIS:  PLEASE.

 7               THE WITNESS:  (HANDING.)

 8        BY MR. AKROTIRIANAKIS:

 9        Q.  AND YOU HAD TO GET SOME SORT OF SPECIAL APPROVAL FOR

10        ENGAGING IN THESE EFFORTS TO SEEK TO OBTAIN THE PEGASUS PAYLOAD

11        USING THIS CODE THAT YOU WROTE?

12        A.  I INTERACTED WITH OUR LEGAL DEPARTMENT TO MAKE SURE THAT I

13        WASN'T GOING TO BE BREAKING ANY LAWS IN ATTEMPTS TO RETRIEVE

14        IT.

15        Q.  OKAY.  AND DID YOU OBTAIN THE APPROVAL THAT YOU WERE

16        ASKING?

17        A.  THEY DID GIVE ME APPROVAL TO GET THAT.

18        Q.  JUST NOT FOR THE PART WHERE YOU WERE REACHING OUT TO

19        AMAZON WEB SERVICES?

20        A.  THEY DID NOT APPROVE MY INITIAL INFORMATION SHARE TO

21        AMAZON.  BUT I BELIEVE WE LATER GOT APPROVAL TO SHARE

22        INFORMATION, I'M PRETTY SURE.

23        Q.  NOW, YOU TESTIFIED IN YOUR DEPOSITION THAT COMPUTERS

24        FOLLOW THE RULES OR INSTRUCTIONS THAT ARE PROGRAMMED INTO THEM;

25        CORRECT?
```

1    A.   YES, COMPUTERS WILL DO WHAT THEY ARE PROGRAMMED TO DO,

2    WHAT THE CODE THAT THEY ARE EXECUTING TELLS THEM TO DO.

3         MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

4         THE COURT:  ALL RIGHT.

5    ANY REDIRECT?

6         MR. BLOCK:  YOUR HONOR, WE'RE PREPARED TO START.  I

7    DON'T THINK WE'LL FINISH BEFORE HALF PAST 1:00.

8         THE COURT:  OKAY.  START.

9         MR. BLOCK:  OKAY.

10                     **REDIRECT EXAMINATION**

11   BY MR. BLOCK:

12   Q.   LET ME START WITH MR. TISZKA.  YOU WERE ASKED QUESTIONS

13   ABOUT HIM.

14   A.   I WAS, YES.

15   Q.   DO YOU PERSONALLY KNOW THE FULL EXTENT OF WHAT MR. TISZKA

16   DID OR DID NOT DO IN THE RESPONSE TO NSO'S ATTACKS?

17   A.   NO, I DO NOT.

18   Q.   OKAY.  LOTS OF QUESTIONS ABOUT THIS SECONDARY PAYLOAD.

19        SO, FIRST, JUST TO ORIENT THIS, CAN YOU TALK AGAIN ABOUT

20   HOW THAT FITS IN THE CONTEXT OF THE ATTACK THAT NSO CONDUCTED?

21   A.   SURE.  SO THE SECONDARY PAYLOAD WAS THE, ESSENTIALLY WHAT

22   WE BELIEVED TO BE THE PENULTIMATE, THE ULTIMATE OBJECTIVE OF

23   WHAT NSO WAS TRYING TO ACCOMPLISH IN THE ATTACK.

24        SO THAT WOULD BE THE THING THAT ALLOWS THEM TO GET

25   INFORMATION FROM THE DEVICES.

1           BUT WE DON'T KNOW FOR SURE BECAUSE WE NEVER OBTAINED IT.

2      Q.   OKAY.  AS A SECURITY ENGINEER IN INCIDENT RESPONSE, WHY IS

3      IT RELEVANT TO YOUR WORK TO UNDERSTAND WHAT THE SECONDARY

4      PAYLOAD IS?

5      A.   SURE.  SO HAVING THAT BIT OF INFORMATION HELPS US BETTER

6      OUR PRODUCTS TO HARDEN AGAINST ATTACKS THAT ARE SEEKING TO GET

7      INFORMATION ABOUT OUR USERS.  IF WE KNOW HOW A PIECE OF MALWARE

8      IS ATTEMPTING TO EXFILTRATE OR RETRIEVE INFORMATION FROM PEOPLE

9      THAT IT'S INFECTING, WE CAN BETTER DEVELOP OUR PRODUCTS, OR

10     PROTECT OUR PRODUCTS AND OUR USERS ULTIMATELY.

11     Q.   WERE YOU EVER ABLE TO DEVELOP A COMPLETE PICTURE OF HOW

12     NSO'S ATTACKS AGAINST WHATSAPP IN THIS CASE OPERATED?

13     A.   NO, WE WERE NOT.

14     Q.   OKAY.  AND JUST TO TAKE AN EXAMPLE, DID YOU EVER HAVE AN

15     OPPORTUNITY TO LEARN HOW, IF AT ALL, THAT SECONDARY PAYLOAD

16     INTERACTS WITH, FOR EXAMPLE, THE WHATSAPP CLIENT SOFTWARE, THE

17     APPLICATION ON A MOBILE PHONE?

18     A.   NO, WE WERE NOT.

19     Q.   DO YOU KNOW WHETHER EVEN THAT APPLICATION -- THAT

20     INTERACTION OCCURS?

21     A.   NO.

22     Q.   IF --

23     A.   I MEAN, WE CAN PRESUME SOME OF IT BECAUSE OF HOW IT WAS

24     BEING DELIVERED.

25           BUT BEYOND THAT, WE DON'T KNOW.

1    Q.   WHAT SORTS OF THINGS COULD YOU DO AS A SECURITY RESEARCHER

2    IF YOU HAD OBTAINED THAT SECONDARY PAYLOAD?

3    A.   RIGHT.  SO WE COULD, AGAIN, WRITE BETTER CODE THAT WOULD

4    HARDEN PARTS OF OUR APPLICATION TO PREVENT THE ABILITY OF

5    IMPLANTS LIKE THAT TO EXTRACT THAT INFORMATION AND SEND IT BACK

6    TO ATTACKERS.

7         THAT'S -- THAT WOULD BE THE PRIMARY THING.  SO, LIKE, IT

8    WOULD ALLOW US TO -- OR FIGURE OUT BETTER WAYS TO STORE THINGS

9    LIKE MESSAGE ENCRYPTION KEYS AND THINGS LIKE THAT ON USERS'

10   DEVICES.

11   Q.   OKAY.  NOW, I THINK YOU TESTIFIED THAT THERE WAS A PERIOD

12   OF TIME EARLY ON IN THE RESPONSE WHEN YOU WERE TRYING TO

13   UNDERSTAND THE ATTACK, BUT YOU DIDN'T WANT THE ATTACKERS TO

14   KNOW THAT YOU WERE ON TO THEM.

15        DID YOU TESTIFY TO SOMETHING TO THAT EFFECT?

16   A.   YES.

17   Q.   DID THAT OCCUR?

18   A.   SORRY.  DID WHAT OCCUR?

19   Q.   DID IT OCCUR THAT THERE WAS A PERIOD OF TIME WHEN YOU

20   DIDN'T WANT THEM TO KNOW THAT YOU WERE ON TO THEM?

21   A.   YES.

22   Q.   WHY?

23   A.   AGAIN, LIKE, IF WE -- IF WE LET THEM KNOW BEFORE WE WERE

24   ABLE TO PUSH OUT SOME OF THE FIXES -- SO THE CLIENT SIDE FIX

25   THAT WE WANTED TO PUSH, THERE WERE ACTUALLY LIMITATIONS FROM

1       THE GOOGLE PLAY STORE THE WAY THAT UPDATES WORK FOR PUSHING

2       THOSE OUT WHERE WE COULD NOT IMMEDIATELY PUSH THAT PATCH OUT.

3            AND SO IF WE WERE TO TIP OUR HAND AND LET THEM KNOW THAT

4       WE WERE ON TO THEM PRIOR TO THAT FIX BEING ABLE TO GO OUT, THEY

5       MAY FIND ANOTHER WAY TO FIND AND EXPLOIT THAT VULNERABILITY

6       BEFORE WE HAD THE CHANCE TO FIX IT.

7       Q.   AND HOW DOES THAT AFFECT, IF AT ALL, THE SECURITY OF

8       WHATSAPP'S INFRASTRUCTURE AND ITS USERS?

9       A.   THE USERS WOULD STILL BE AT RISK IS ULTIMATELY WHAT WOULD

10      HAPPEN.

11      Q.   OKAY.  THERE DID COME A TIME WHEN THE FIXES WERE ROLLED

12      OUT, YOU TOLD THE WORLD THAT YOU HAD DISCOVERED THE ATTACKS AND

13      LAUNCHED A REMEDIATION, SOMETHING TO THAT EFFECT?

14      A.   YES.

15      Q.   OKAY.  AFTER THAT OCCURRED, WAS IT OF ANY INTEREST TO YOU

16      WHETHER NSO KNEW OR DIDN'T IF YOU HAD THEIR PAYLOAD, SECONDARY

17      PAYLOAD?

18      A.   NO, IT WAS OF NO CONCERN AT THAT POINT.

19      Q.   SO ON MAY 14TH, IF YOU'D BEEN ABLE TO GET THE SECONDARY

20      PAYLOAD IN A WAY THAT TIPPED NSO OFF, WOULD YOU HAVE DONE THAT?

21      A.   YES, I WOULD -- IF THERE WERE A LEGAL MEANS FOR ME TO

22      OBTAIN IT AFTER THAT, YES, I WOULD HAVE.

23      Q.   IF IT WERE SITTING ON A PUBLIC WEBSITE TODAY AND YOU KNEW

24      THE I.P. ADDRESS AND THE SOCKET AND WERE ABLE TO MAKE A CALL

25      AND GET IT, WOULD IT HAVE VALUE FOR WHATSAPP'S SECURITY TO GO

1       TRY AND GET THAT TODAY?

2       A.   YES, IT WOULD.

3       Q.   OKAY.  YOU WERE SHOWN A DOCUMENT WHERE YOU HAD A PHRASE

4       "LEGAL WASN'T SUPPOSED TO HEAR."

5            DO YOU RECALL THAT?

6       A.   I DO.

7       Q.   CAN YOU TELL THE JURY WHAT WAS GOING ON IN THAT SITUATION?

8       A.   SO THE -- THIS WAS, I THINK, PRETTY EARLY ON, OR

9       IMMEDIATELY AFTER OUR INITIAL RESPONSE, AND SO I HAD -- WE HAD

10      SOME INFORMATION ABOUT THE SERVER THAT WAS BEING USED IN THE

11      ATTACK AND WE WANTED TO TRY AND LET AMAZON KNOW.

12           BUT BEFORE WE RECEIVED APPROVAL, I RECEIVED APPROVAL TO DO

13      SO, I JUST WENT AHEAD AND SHARED IT.

14      Q.   OKAY.  AND THEN DID THERE COME A TIME LATER WHEN APPROVAL

15      WAS SENT?

16      A.   YES.

17      Q.   OKAY.  LET'S TALK ABOUT RSU'S FOR A MOMENT.

18           YOU KNOW WHAT AN RSU IS?

19      A.   I DO, RESTRICTED STOCK UNIT.

20      Q.   DO YOU RECEIVE RSU'S AS PART OF YOUR COMPENSATION?

21      A.   I DO.

22      Q.   AND CAN YOU EXPLAIN TO THE JURY HOW THE RSU COMPENSATION

23      WORKS TO YOUR UNDERSTANDING?

24      A.   SURE.  SO, AGAIN, RSU'S ARE TIED TO YOUR PERFORMANCE.  SO

25      IF YOU PERFORM WELL IN A GIVEN HALF OF A PERFORMANCE CYCLE, YOU

1     WILL RECEIVE RSU'S PROPORTIONAL TO THAT PERFORMANCE EVALUATION.

2     Q.   WHEN AN RSU IS AWARDED, DO YOU GET VALUE FOR IT AT THAT

3     MOMENT?

4     A.   NOT AT THAT MOMENT.  THEY HAVE TO VEST.  THEY VEST OVER A

5     PERIOD OF TIME.

6     Q.   WHAT HAPPENED IF YOU LEAVE BEFORE THE RSU'S -- LEAVE YOUR

7     EMPLOYMENT BEFORE THE RSU'S HAVE VESTED?

8     A.   ANY UNVESTED RSU'S YOU DON'T RECEIVE.

9     Q.   OKAY.  SO TO WHAT EXTENT DO YOU UNDERSTAND THERE TO BE A

10    RETENTION COMPONENT, SO TO SPEAK, IN THE RSU COMPENSATION?

11    A.   THEY ARE A MEANS OF, IN PART, KEEPING PEOPLE TO WANT TO

12    CONTINUE TO WORK FOR THE COMPANY BECAUSE IT IS FUTURE, FUTURE

13    MONEY THAT YOU MAY POTENTIALLY SEE.

14    Q.   SO IN A GIVEN QUARTER WHEN SOME OF YOUR RSU'S ARE VESTING,

15    THE AWARD DATE IS IN THE PAST, THE VESTING DATE IS IN THE

16    FUTURE?  AM I UNDERSTANDING THAT CORRECTLY?

17    A.   YES.

18            MR. AKROTIRIANAKIS:  OBJECTION.  LEADING, YOUR HONOR.

19            THE COURT:  IT IS LEADING.

20            MR. BLOCK:  IT IS.  I APOLOGIZE, YOUR HONOR.  LET ME

21    TRY IT AGAIN.

22    Q.   EXPLAIN, IF YOU WOULD, MR. ROBINSON, YOUR UNDERSTANDING OF

23    THE RSU COMPENSATION THAT YOU ACTUALLY RECEIVE IN A GIVEN

24    QUARTER'S WORK.

25    A.   SO THERE WILL BE SOME PORTION OF THEM THAT VEST AT

1        DIFFERENT -- ON A PREDETERMINED SCHEDULE.  I DON'T RECALL OFF

2        THE TOP OF MY HEAD WHAT THAT SCHEDULE IS, BUT I THINK -- AND

3        IT'S ACTUALLY CHANGED DURING THE COURSE OF MY EMPLOYMENT HERE.

4        SO THAT'S WHY IT'S A LITTLE CONFUSING IS I DON'T RECALL EXACTLY

5        WHAT IT WAS AT THE TIME IN 2019.

6             BUT GENERALLY, SOME FRACTION OF THE RSU'S THAT YOU ARE

7        GRANTED WILL VEST OVER A TOTAL OF FOUR YEARS.

8        Q.   OKAY.  AND WE CAN GET MORE INTO THAT WITH OTHERS.

9             I WANT TO GO BACK TO THE SOPHISTICATION OF NSO'S ATTACK.

10            YOU SAID IN YOUR DIRECT ONCE IN EVERY FIVE YEARS,

11       SOMETHING LIKE THAT.

12       A.   THAT IS CORRECT.

13       Q.   WHAT IS IT THAT SETS THIS ATTACK APART FROM OTHER ATTACKS

14       THAT YOU'VE SEEN IN YOUR WORK?

15              MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  IT'S

16       OUTSIDE THE SCOPE OF CROSS.

17              THE COURT:  YES.  SUSTAINED.

18              MR. BLOCK:  OKAY.  JUST A MOMENT, YOUR HONOR.

19              THE COURT:  OKAY.  THAT'S ALL YOU HAVE?

20              MR. BLOCK:  YES.

21         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

22              MR. BLOCK:  YOUR HONOR, WE ARE AT TIME.  CAN WE START

23       TOMORROW?

24              THE COURT:  YES.  YOU HAVE ADDITIONAL QUESTIONS YOU

25       WANT TO ASK OF THIS WITNESS?

1          MR. BLOCK:  YES, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  THEN, MR. ROBINSON, YOU WILL

3     HAVE TO RETURN TOMORROW MORNING AT 8:30.  THANK YOU.

4          LADIES AND GENTLEMEN, WE'RE AT THE END OF THE TRIAL DAY.

5     YOU ARE EXCUSED.

6          KEEP IN MIND THE INSTRUCTION THAT I GAVE YOU ON THE FIRST

7     DAY, AND YESTERDAY, TO NOT TALK ABOUT THE CASE WITH ANYONE AND

8     TO NOT DO ANY INDEPENDENT RESEARCH OF THE CASE.

9          THANK YOU.  WE'LL SEE YOU TOMORROW.

10          THE CLERK:  ALL RISE FOR THE JURY.

11     (JURY OUT AT 1:31 P.M.)

12          THE COURT:  ALL RIGHT.  MR. ROBINSON, YOU CAN STEP

13     DOWN.

14          ALL RIGHT.  COUNSEL, CAN YOU TELL ME WHAT TO EXPECT

15     TOMORROW IN TERMS OF WITNESSES AND THE ORDER.

16          I IMAGINE YOU'LL BE COMPLETING YOUR CASE TOMORROW.

17          MR. ANDRES:  YEAH, WE'LL FINISH THE REDIRECT OF

18     MR. ROBINSON, WE HAVE A FIVE MINUTE VIDEO, AND THEN EITHER

19     BEFORE OR AFTER THAT, I JUST DON'T KNOW THE -- THEN WE'RE GOING

20     TO CALL MS. TREXLER, OUR DAMAGES EXPERT, AND AFTER THAT WE'LL

21     REST.

22          THE COURT:  OKAY.  AND WE WILL START THE DEFENSE CASE

23     TOMORROW.

24          CAN YOU GIVE ME SOME IDEA OF WHAT TO EXPECT?

25          MR. AKROTIRIANAKIS:  WE -- I THINK THAT WHAT I AM

627

```
 1     ABOUT TO SAY, IT DOESN'T MATTER WHEN WE GET THE LECTERN SO TO
 2     SPEAK, YOUR HONOR.  BUT WE WILL CALL MR. SHOHAT, MR. GAZNELI.
 3     THERE ARE A COUPLE OF ADVERSE WITNESSES THAT ARE UNDER SUBPOENA
 4     THAT I'D LIKE -- THAT I'LL LET COUNSEL KNOW CERTAINLY BEFORE WE
 5     REST WHETHER WE'RE GOING TO NEED THEM OR NOT.  I DON'T KNOW IF
 6     THAT WILL BE TOMORROW OR NOT.
 7           AND THEN PROBABLY OUR LAST WITNESS WOULD BE
 8     MR. PINSONNEAULT, WHO IS --
 9               THE COURT:  YOUR EXPERT?
10               MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
11               THE COURT:  OKAY.
12               MR. AKROTIRIANAKIS:  BUT, I'M SORRY, YOUR HONOR, I
13     DON'T MEAN TO MISLEAD THE COURT.  IT'S POSSIBLE THAT WE MIGHT
14     CALL MR. PINSONNEAULT OTHER THAN LAST.
15           BUT I WILL LET COUNSEL KNOW.
16               THE COURT:  OKAY.
17               MR. AKROTIRIANAKIS:  BUT THOSE ARE OUR WITNESSES.
18               THE COURT:  OKAY.  ALL RIGHT.
19           SO ASSUMING THAT --
20               MR. AKROTIRIANAKIS:  OH, I'M SORRY, YOUR HONOR.  AND
21     MAYBE MR. ESHKAR TOO.
22               THE COURT:  OKAY.  IN PERSON AS OPPOSED TO BY VIDEO?
23               MR. AKROTIRIANAKIS:  YES.  AND MS. GLICK BY VIDEO AS
24     WE DISCUSSED YESTERDAY.
25               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.
```

1          MR. ANDRES:  SORRY, YOUR HONOR.  WE JUST HAVE

2    WITNESSES THAT MIGHT HAVE TO TRAVEL, SO WE HAVE THIS GENTLEMAN,

3    JONATHAN LEE, WHO HAS TRAVELED HERE BECAUSE WE HAVEN'T HEARD

4    THAT HE'S NOT GOING TO BE CALLED AS A WITNESS.

5          THERE WAS SUPPOSED TO BE A POSSIBLE STIPULATION.  MAYBE

6    WE'LL RECEIVE THAT.  I DON'T KNOW.  I DON'T WANT TO SPEAK OUT

7    OF TURN.

8          BUT WHAT'S THE STATUS OF JONATHAN LEE?

9          MR. AKROTIRIANAKIS:  IN LIGHT OF THE COURT'S RULING

10   ON EXHIBIT 1021 AND MS. GLICK'S TESTIMONY, I THINK THAT WE CAN

11   RELEASE MR. LEE, YOUR HONOR.

12         THE COURT:  ALL RIGHT.

13         MR. AKROTIRIANAKIS:  AND --

14         THE COURT:  THANK YOU.

15         MR. AKROTIRIANAKIS:  I UNDERSTAND HE WAS ALREADY HERE

16   YESTERDAY.  IT WASN'T LIKE HE TRAVELED HERE OVERNIGHT.

17         THE COURT:  OKAY.  ALL RIGHT.

18         MR. ANDRES:  YUANYUAN WANG.

19         MR. AKROTIRIANAKIS:  THE REST OF THEM, I CAN'T

20   RELEASE YET, YOUR HONOR.  THEY HAVEN'T EVEN RESTED YET.

21         THE COURT:  OKAY.

22         MR. ANDRES:  ARE WE SUPPOSED TO MAKE THEM AVAILABLE?

23         THE COURT:  THEY HAVE TO TELL YOU WHO THEY'RE GOING

24   TO CALL TOMORROW.  THEY'VE GIVEN YOU SHOHAT, GAZNELI, AND

25   POTENTIALLY PINSONNEAULT.

```
1              MR. AKROTIRIANAKIS:  YEAH.  I THINK TOMORROW ACTUALLY

2    IT WOULD BE SHOHAT, GAZNELI, MR. ESHKAR IF WE'RE GOING TO CALL

3    HIM, AND THEN SOME OF THESE ADVERSE WITNESSES, WHICH I WILL

4    TELL COUNSEL THE ORDER AS WE'VE AGREED.

5              THE COURT:  OKAY.

6              MR. AKROTIRIANAKIS:  AND THEN MR. PINSONNEAULT IS

7    SOMEWHERE IN THERE AFTER THE NSO WITNESSES AND BEFORE THE END

8    OF OUR CASE.

9              THE COURT:  OKAY.  MR. LEE IS RELEASED.

10             MR. ANDRES:  IT'S FINE IF HE WANTS TO TELL US LATER,

11   BUT WE HAVE TO MAKE ARRANGEMENTS TO HAVE THESE PEOPLE COME

12   HERE.  I'M NOT SAYING THEY'RE NOT CLOSE BY, I JUST DON'T KNOW

13   WHO THEY ARE.  AND IF HE'S GOING TO TELL US LATER, THAT'S FINE.

14             THE COURT:  OKAY.  THEN THE TWO OF YOU MEET AND

15   CONFER.

16             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

17             THE COURT:  I DON'T THINK I NEED TO BE INVOLVED IN

18   THIS KIND OF THING.

19             MR. AKROTIRIANAKIS:  I AGREE WITH YOU, YOUR HONOR.

20             THE COURT:  OKAY.  SO WE'LL SEE YOU TOMORROW MORNING,

21   OR --

22             MR. ANDRES:  YOUR HONOR, WE PROVIDED YOUR HONOR WITH

23   A COPY OF THE OPENING.  WE PROVIDED THE COURT WITH A COPY OF

24   THE INSTRUCTION.  IF YOU -- I'M HAPPY TO ADDRESS IT IN THE

25   MORNING.
```

1          BUT I THINK IF YOU REVIEW THE OPENING, OR WHATEVER WORKS

2     FOR YOUR HONOR, BUT THAT'S IMPORTANT TO US THAT THAT BE GIVEN

3     PROXIMATE TO THE TIME OF THE DEFENDANTS' OPENING.

4               THE COURT:  MR. AKROTIRIANAKIS HAS ALREADY GIVEN AN

5     OPENING.

6               MR. ANDRES:  RIGHT, BUT IN THEIR OPENING, THEY

7     VIOLATED THE COURT'S ORDER.

8               THE COURT:  AND I'VE READ YOUR PROPOSED INSTRUCTION,

9     AND THAT WILL BE GIVEN WITH THE OTHER INSTRUCTIONS.  I DON'T

10     SEE ANY REASON THAT IT SHOULD HAVE TO BE GIVEN BEFORE THAT.

11               MR. ANDRES:  BECAUSE IT SHOULD REMEDY THE VIOLATION

12     OF THE COURT'S ORDER SO THE JURY IS NOT SITTING HERE FOR

13     ANOTHER TWO DAYS UNTIL WE GET TO THE JURY INSTRUCTIONS THAT

14     IT'S INTENDED TO BE A CORRECTIVE INSTRUCTION.  IT'S INTENDED TO

15     BE --

16               THE COURT:  ALL RIGHT.  ALL RIGHT.  WE CAN DEAL WITH

17     IT SOMETIME TOMORROW.

18          I HAVE NOT HAD A CHANCE TO LOOK AT THE TRANSCRIPT.  I DID

19     READ YOUR INSTRUCTION.

20               MR. AKROTIRIANAKIS:  YOUR HONOR, I'M SORRY.

21               THE COURT:  YES.

22               MR. AKROTIRIANAKIS:  IN LIGHT OF THE FACT THAT HE'S

23     MAKING ALLEGATIONS DIRECTED TO ME PERSONALLY AND SO ON, AND MY

24     COMPLIANCE WITH COURT ORDERS, WHICH OBVIOUSLY I DON'T AGREE I

25     VIOLATED ANY COURT ORDER, I WOULD LIKE TO SUBMIT SOMETHING FOR

```
 1      YOU TO REVIEW THAT IS IN RESPONSE TO MR. ANDRES'S COMMENTS THIS

 2      MORNING.

 3              THE COURT:  HMM.  WELL, I DON'T HAVE A BRIEF FROM THE

 4      PLAINTIFF.  I ONLY HAVE A PROPOSED INSTRUCTION.

 5          IS IT THE INSTRUCTION THAT YOU WISH TO RESPOND TO?

 6              MR. AKROTIRIANAKIS:  IT IS THE INSTRUCTION I WISH TO

 7      RESPOND TO.

 8          BUT I ALSO WOULD LIKE TO ASSURE THE COURT THAT EVERYTHING

 9      I SAID IS WITHIN PROPER OPENING STATEMENT, AND I'D LIKE TO HAVE

10      YOU CONSIDER THAT WITHOUT ME SHOOTING FROM THE HIP AFTER HE IS

11      CASTING ASPERSIONS AGAINST ME.

12              THE COURT:  SURE.  I THINK I ALREADY TOLD YOU.  I

13      DISAGREED ON ONE OF THEM, THOUGH, WITH REGARD TO THE THEFT

14      ISSUE BASED UPON THE EVIDENCE YOU PRESENTED YESTERDAY.

15              MR. AKROTIRIANAKIS:  WELL, I THINK THAT THE WITNESS

16      HAS NOW MADE CLEAR THAT HE UNDERSTANDS IT WASN'T HIS PROPERTY,

17      HE KNEW IT WAS SOMEBODY ELSE'S PROPERTY, AND HE ACKNOWLEDGED AT

18      LEAST SOME EFFORTS AT SUBTERFUGE IN HIS ATTEMPTS TO OBTAIN IT.

19          AND WHETHER OR NOT HE NOW IS SAYING THAT THAT WAS PART OF

20      THE REMEDIATION, OR IF IT WASN'T PART OF THE REMEDIATION,

21      YOUR HONOR, I DON'T THINK THAT CALLING IT STEALING, IN LIGHT OF

22      HIS TESTIMONY THAT HE JUST GAVE, FOR THE RECORD, MR. ROBINSON,

23      IS BEYOND ANY -- ANYTHING THAT I HAD THE RIGHT TO SAY

24      CONSIDERING MY EXPECTATION OF WHAT THE EVIDENCE WAS, INCLUDING

25      HIS TESTIMONY TO THE SAME EFFECT AT HIS DEPOSITION.
```

1          THE COURT:  I DON'T THINK HIS TESTIMONY CHANGES MY

2     VIEW ABOUT, EVEN CONSIDERED IN CONJUNCTION WITH WHAT YOU SHOWED

3     ME YESTERDAY, ABOUT THAT CHARACTERIZATION.

4          BUT I'LL GIVE YOU ALL AN OPPORTUNITY TO ARGUE IT AFTER

5     I'VE HAD A CHANCE TO READ THE TRANSCRIPT.

6          IT WAS MY IDEA THAT WE WOULD TALK ABOUT IT IN CONJUNCTION

7     WITH INSTRUCTIONS.  I THOUGHT IT WOULD BE IMPORTANT TO HAVE IT

8     BEFORE CLOSING ARGUMENTS AND JURY INSTRUCTIONS.  I DON'T KNOW

9     THAT I THINK WE NEED TO DO IT NECESSARILY BEFORE EITHER

10    MR. SHOHAT OR MR. GAZNELI TESTIFIES.  WE'VE ALREADY HEARD FROM

11    BOTH OF THEM THROUGH VIDEO.

12          I THINK WE CAN DO IT AFTER THEIR TESTIMONY.

13          SO I WOULD BE PREPARED TO HEAR IT AFTER THE COURT

14    TOMORROW.

15          MR. ANDRES:  THAT'S FINE, YOUR HONOR.  AND I'M

16    CERTAINLY NOT CONCEDING THAT THIS WON'T AFFECT OUR VIEW ABOUT

17    WHAT THE FINAL JURY INSTRUCTIONS DO.

18          BUT MY CONCERN, WHICH I THINK YOU APPRECIATE, IS JUST THE

19    PROXIMITY TO THE TIME THAT HE SAID THINGS, LIKE THAT THEY

20    DIDN'T KNOW THAT THEY VIOLATED CALIFORNIA LAW, THAT THEY DON'T

21    KNOW THAT THERE WAS A CALIFORNIA LAW, THAT THEY WERE HALFWAY

22    AROUND THE WORLD.

23          THAT DIRECTLY CONTRADICTS THE FINDINGS THAT YOUR HONOR

24    MADE.

25          AND BEYOND THAT, WE GET THIS WHOLE RIGAMAROLE ABOUT, YOU

1    KNOW, MR. WOOG IS A SHOW MAN AND A PR TRIAL AND A SHAM TRIAL.

2         IT'S ALL, IT'S ALL MISLEADING AND NOT TRUE.

3         AND SO WHAT I'M CONCERNED ABOUT IS AS THE JURORS SIT

4    THERE, THEY CONTINUE TO SATURATE ON THAT INFORMATION WHEN IT IS

5    PLAINLY NOT TRUE.

6         I'M NOT MAKING AD HOMINEM ATTACKS AGAINST

7    MR. AKROTIRIANAKIS.  I'M LOOKING AT THE TRANSCRIPT AND THE

8    OPENING, WHICH I'VE GIVEN TO YOUR HONOR.  BUT HE SITS HERE AND

9    SAYS REPEATEDLY THAT HE'S NEVER VIOLATED THE COURT ORDER, AND

10   IN THIS CASE, IN THIS CASE, THERE ARE DISCOVERY SANCTIONS.

11        SO I'M NOT TRYING TO MAKE THIS UP.  I'M TRYING TO MAKE A

12   RECORD.

13             THE COURT:  OKAY.  OKAY.  I, FRANKLY, WOULD THINK THE

14    INSTRUCTION WOULD HAVE MORE IMPACT IF GIVEN WITH THE FINAL

15    INSTRUCTIONS.

16             MR. ANDRES:  FAIR ENOUGH, YOUR HONOR.

17             THE COURT:  BUT I WILL MAKE MYSELF AVAILABLE TOMORROW

18    AFTERNOON, AFTER THE SESSION, TO FLUSH THIS OUT.

19             MR. ANDRES:  THANK YOU, YOUR HONOR.

20             MR. AKROTIRIANAKIS:  AND MAY I SUBMIT SOMETHING

21    RESPONDING TO THE POINTS IN THE INSTRUCTION, YOUR HONOR?

22             THE COURT:  IF YOU WISH.

23             MR. AKROTIRIANAKIS:  OKAY.  AND CAN I JUST PROVIDE

24    THAT TO --

25             THE COURT:  JUST MAKE IT SHORT.

634

```
 1              MR. AKROTIRIANAKIS:  IT WILL BE SHORT, YOUR HONOR.

 2   WOULD YOU LIKE ME TO PROVIDE IT TO THE COURT AS OPPOSED TO

 3   FILING IT?

 4              THE COURT:  YES, BECAUSE HE JUST HANDED ME A COPY OF

 5   THE PROPOSED INSTRUCTION.  IT HASN'T BEEN FILED YET.  WHAT'S

 6   GOING TO BE IMPORTANT IS THE ARGUMENT YOU MAKE ON THE RECORD.

 7              MR. AKROTIRIANAKIS:  OKAY.  MAY I SUBMIT THAT THROUGH

 8   THE CLERK?

 9              THE COURT:  JUST GIVE IT TO MS. COLLINS TOMORROW

10   MORNING.

11              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

12              MR. ANDRES:  GOOD NIGHT, YOUR HONOR.

13              THE COURT:  WE'LL SEE YOU TOMORROW.

14              MR. ANDRES:  WE'LL SEE YOU IN THE MORNING.

15              THE COURT:  AND PLAN ON AN EXTRA AMOUNT OF TIME AFTER

16   THE COURT DAY TOMORROW.  WE MIGHT EVEN BE CLOSE TO THE POINT

17   WHERE WE WANT TO HAVE A CHARGE CONFERENCE.  BUT WE DON'T KNOW

18   YET.  LET'S WAIT AND SEE HOW TOMORROW TURNS OUT.

19              MR. ANDRES:  I JUST WANT TO BE PREPARED, BUT I DIDN'T

20   UNDERSTAND THE DEFENDANTS TO SUGGEST THAT THEY WERE GOING TO

21   REST TOMORROW.

22              THE COURT:  NO, NO.

23              MR. ANDRES:  YEAH, OKAY.

24              THE COURT:  BUT IF THEY -- I DON'T NECESSARILY WANT

25   TO DO IT FRIDAY AFTERNOON IF WE CAN POSSIBLY DO IT ON THURSDAY
```

1       AFTERNOON IS ALL I'M SUGGESTING, IF WE CAN DO IT.

2                   MR. ANDRES:  THANK YOU, YOUR HONOR.

3                   THE COURT:  ALL RIGHT.  AND THERE ARE ONLY A COUPLE

4       OF INSTRUCTIONS THAT ARE AT ISSUE AT THIS POINT GIVEN MY PRIOR

5       RULINGS.

6           OKAY?

7                   MR. ANDRES:  THANK YOU.

8                   THE COURT:  ALL RIGHT.  SEE YOU IN THE MORNING.

9                   MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  HAVE A GOOD

10      EVENING.

11          (THE EVENING RECESS WAS TAKEN AT 1:41 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    IRENE RODRIGUEZ, CSR, CRR
    CERTIFICATE NUMBER 8076
17

18

19  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
    CERTIFICATE NUMBER 9595
20

21       DATED:  APRIL 30, 2025

22

23

24

25