1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4

5   WHATSAPP LLC AND META            )  C-19-07123 PJH
    PLATFORMS, INC.,                 )
6                                    )  OAKLAND, CALIFORNIA
                 PLAINTIFFS,         )
7                                    )  MAY 1, 2025
           VS.                       )
8                                    )  VOLUME 4
    NSO GROUP TECHNOLOGIES LIMITED   )
9   AND Q CYBER TECHNOLOGIES         )  PAGES 636-847
    LIMITED,                         )
10                                   )
                 DEFENDANTS.         )
11  _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14             UNITED STATES DISTRICT JUDGE

15

16  A P P E A R A N C E S:

17  FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                          BY:  GREG D. ANDRES
18                             ANTONIO J. PEREZ
                          450 LEXINGTON AVENUE
19                        NEW YORK, NEW YORK  10017

20                        BY:  MICAH G. BLOCK
                          900 MIDDLEFIELD ROAD, SUITE 200
21                        REDWOOD CITY, CALIFORNIA  94063

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25           TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANTS:    KING & SPALDING
                              BY:  JOSEPH N. AKROTIRIANAKIS
5                                  AARON S. CRAIG
                              633 WEST FIFTH STREET, SUITE 1600
6                             LOS ANGELES, CALIFORNIA  90071

7                             BY:  MATTHEW V. NOLLER
                              50 CALIFORNIA STREET, SUITE 3300
8                             SAN FRANCISCO, CALIFORNIA  94111

9

10     ALSO PRESENT:          CURT EVANS
                              BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX OF WITNESSES

3       PLAINTIFFS'

4       ANDREW ROBINSON

5            REDIRECT EXAM BY MR. BLOCK (RES.)        P. 647
             RECROSS-EXAM BY MR. AKROTIRIANAKIS       P. 656

6

7       SARIT BIZINSKY GIL
             VIDEOTAPED DEPOSITION                    P. 664

8

9       DANA TREXLER
             DIRECT EXAM BY MR. BLOCK                 P. 668
10           CROSS-EXAM BY MR. AKROTIRIANAKIS         P. 709
             REDIRECT EXAM BY MR. BLOCK               P. 747
11           RECROSS-EXAM BY MR. AKROTIRIANAKIS       P. 751

12

13      DEFENDANTS'

14      YARON SHOHAT
             DIRECT EXAM BY MR. AKROTIRIANAKIS        P. 752
15           CROSS-EXAM BY MR. ANDRES                 P. 809

16

17

18

19

20

21

22

23

24

25

1

2                            INDEX OF EXHIBITS

3                                    MARKED        ADMITTED

4          PLAINTIFFS'

5

           1779, 1780, 1781, AND 1782            665
6          287, 288, 289, 290, 291, 292,         684
                293, 295, 296, 297, 299,
7               300, 301, 302, 303, 304,
                307, 310, 312, 314, 324
8          288                                   681
           322                                   685
9          323                                   690
           319 (PROVISIONALLY)                   697
10         320                                   700
           321                                   708
11         308                                   708

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        OAKLAND, CALIFORNIA                       MAY 1, 2025

 2                         P R O C E E D I N G S

 3            (COURT CONVENED AT 8:14 A.M.)

 4            (JURY OUT AT 8:14 A.M.)

 5                THE CLERK:  THANK YOU.  PLEASE BE SEATED.

 6            CALLING CIVIL CASE 19-7123-PJH, WHATSAPP INC., ET AL.

 7        VERSUS NSO GROUP TECHNOLOGIES LIMITED, ET AL.

 8            COUNSEL, PLEASE STATE YOUR APPEARANCES.

 9                MR. ANDRES:  GREG ANDRES, TONY PEREZ, AND MICAH BLOCK

10        FOR WHATSAPP AND META.

11                GOOD MORNING, YOUR HONOR.

12                THE COURT:  GOOD MORNING.

13                MR. NOLLER:  MATTHEW NOLLER, JOE AKROTIRIANAKIS,

14        AARON CRAIG FOR DEFENDANTS.

15                THE COURT:  OKAY.  I WANTED TO TALK TO YOU BEFORE ANY

16        ADDITIONAL WITNESSES WERE CALLED BEYOND MR. ROBINSON THIS

17        MORNING.

18            I KNOW THAT YESTERDAY I INDICATED TO YOU THAT AFTER THE

19        CLOSE OF THE TRIAL TODAY WE WOULD TALK ABOUT THE ISSUES THAT

20        PERTAIN TO THE FILING THAT YOU ALL MADE THE OTHER NIGHT ABOUT

21        THE EXPORT CONTROLS AND ABOUT THE LIST OF INSTRUCTIONS THAT YOU

22        THINK, CURATIVE INSTRUCTIONS THAT YOU THINK ARE REQUIRED.

23            AND I REALIZE THAT THE WITNESSES THAT NSO WILL CALL TODAY

24        ARE WITNESSES THAT WILL SPEAK TO THOSE ISSUES.

25            I'M PREPARED TO RULE ON IT.  I DON'T WANT OR NEED ANY
```

1    ADDITIONAL ARGUMENT.  I'VE READ YOUR PAPERS.  THE ISSUES HAVE

2    BEEN ARGUED AD NAUSEAM IN THIS CASE.

3         MY RULING IS THAT THE EXPORT CONTROL INFORMATION AND THE

4    GOVERNMENT OF ISRAEL'S INVOLVEMENT IN THIS CASE MAY NOT BE

5    INTRODUCED IN THIS TRIAL, FOR THE REASONS STATED IN MY PRETRIAL

6    ORDER, FOR THE REASONS STATED IN THE PLAINTIFFS' OPPOSITION

7    THAT WAS FILED FOR AT THE SAME TIME, AND FOR THE ADDITIONAL

8    REASON THAT IF I WERE TO PERMIT THAT INFORMATION, I WOULD HAVE

9    TO REDO -- REVERSE AND REDO SEVERAL OF THE OTHER RULINGS,

10   INCLUDING THE FACT THAT NSO WAS ON THE ENTITY LIST IN THIS

11   COUNTRY.

12        SO I'M NOT WILLING TO DO THAT.

13        IT'S, IN MY VIEW, IN THE SAME CATEGORY AS MUCH OF THE

14   OTHER EVIDENCE.  I, FRANKLY, ASSUMED IT WAS INCLUDED IN THE

15   CATEGORIES OF EXCLUDED INFORMATION.

16        SO THAT'S THE RULING.  MAKE SURE YOU DO NOT ENCROACH UPON

17   THAT RULING IN THE EXAMINATION TODAY.

18             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

19             MR. ANDRES:  THANK YOU, YOUR HONOR.

20             THE COURT:  WITH REGARD TO THE OTHER ISSUES --

21             MR. PEREZ:  YOUR HONOR, MAY I RAISE ONE ISSUE ON THE

22   FIRST?  I UNDERSTAND THE COURT'S RULINGS, BUT THERE'S A

23   DOCUMENT THAT THEY DISCLOSED AS A POTENTIAL EXHIBIT TODAY,

24   WHICH IS A SAMPLE OF -- PURPORTED SAMPLE OF ONE OF THEIR

25   CONTRACTS.

1          AND IT RAISES THE ISSUE THAT THE COURT JUST RULED ON.  IT

2     TALKS ABOUT CERTIFICATES TO BE PROVIDED TO GOVERNMENTAL

3     AUTHORITIES, ALLEGED LEGAL APPROVAL OF THE --

4               THE COURT:  I'VE MADE MY RULING.  IT CAN'T COME IN.

5               MR. PEREZ:  THANK YOU, YOUR HONOR.

6               MR. ANDRES:  THANK YOU, YOUR HONOR.

7               THE COURT:  THE INFORMATION CAN'T COME IN.  PERIOD.

8          ALL RIGHT.  I NEED A FEW MINUTES BEFORE WE START OUR

9     TRIAL.

10              MR. ANDRES:  TWO MINUTES, I PROMISE.

11         THERE'S A WITNESS IN THE COURTROOM, MR. ESHKAR, WHO WAS ON

12    THEIR WITNESS LIST.  I UNDERSTAND THEY MAY NOT CALL HIM YET --

13    MAY NOT CALL HIM NOW.

14         BUT YOUR HONOR HAS EXCLUDED ALL THE WITNESSES.  WE MAY

15    CALL HIM AS A REBUTTAL WITNESS, SO WE'D ASK THAT HE BE EXCLUDED

16    FROM THE COURTROOM.

17              THE COURT:  YES, ALL WITNESSES SHOULD BE EXCLUDED,

18     EXCEPT FOR THE EXCEPTION THAT YOU ALL AGREED TO, WHICH WAS YOUR

19     EXPERTS AND YOUR REPRESENTATIVES.

20              MR. AKROTIRIANAKIS:  YOUR HONOR, SO WE'VE

21     WITHDRAWN -- IT'S NOT THAT WE MIGHT NOT CALL HIM.  AS I TOLD

22     COUNSEL BEFORE SESSION, WE'VE WITHDRAWN MR. ESHKAR FROM OUR

23     WITNESS LIST, SO HE WON'T BE CALLED.  HE WON'T BE CALLED BY US.

24     I DON'T KNOW WHAT HE WOULD BE REBUTTING.  HE DID TRAVEL HERE

25     FROM ISRAEL, BUT WE DON'T NEED TO CALL HIM IN LIGHT OF THE

```
1     CLIPS THAT FINALLY WERE PLAYED YESTERDAY.  SO HE WOULD LIKE TO

2     BE A MEMBER OF THE PUBLIC WITH THE COURT'S PERMISSION.

3            MR. ANDRES:  YOUR HONOR, WE PUT HIS VIDEO UP FOR THE

4     JURY TO SEE HIM AND SEE THAT THE POTENTIAL IS THAT WE WOULD

5     CALL HIM LIVE.  IN EITHER CASE, WE DON'T KNOW WHETHER OR NOT

6     WE'RE GOING TO HAVE A REBUTTAL CASE.

7            THE COURT:  HE'S EXCLUDED.  HE'S EXCLUDED.

8            MR. ANDRES:  THANK YOU.

9        LASTLY, YOUR HONOR -- SORRY -- WE WERE EXCHANGING LAST

10    NIGHT SOME DEPOSITION CLIPS ABOUT MS. GLICK.  I DON'T KNOW IF

11    THEY'RE GOING TO PLAY THOSE TODAY.  IF THEY DO, WE OBJECT TO

12    THEIR TESTIMONY.  WE CAN DO THAT THE APPARENTLY A BREAK.

13           THE COURT:  YOU OBJECT TO HER BEING CALLED AS A

14    WITNESS?

15           MR. ANDRES:  ENTIRELY, AND THE DOCUMENTS THAT THEY

16    PRODUCED.

17           THE COURT:  OKAY.  IS SHE GOING TO BE CALLED?

18           MR. CRAIG:  YOUR HONOR, HER VIDEO IS SEVEN MINUTES

19    LONG, AND WE RECEIVED -- WE DISCLOSED OUR DESIGNATIONS WEEKS

20    AGO.  WE RECEIVED FOR THE FIRST TIME, LAST NIGHT AT 7:30,

21    OBJECTIONS TO EVERY CLIP.  LITERALLY EVERY CLIP EXCEPT THE ONE

22    WHERE SHE SAID, CAN YOU PLEASE STATE YOUR NAME, MS. GLICK.

23        AND I AGREE, WE CAN DEAL WITH IT AT THE BREAK.  BUT WE

24    THINK THAT HER TESTIMONY IS RELEVANT.  ALL THEIR OBJECTIONS ARE

25    ONLY 402, 403, AND THEY OBJECT TO THE EXHIBIT, 1021, WHICH WE
```

1    DEALT WITH FOR ABOUT 10 MINUTES OR 15 MINUTES THE OTHER DAY,

2    AND YOUR HONOR HEARD THE ARGUMENT AND RULED THAT THERE WAS

3    NOTHING OBJECTIONABLE ABOUT THE EXHIBIT.

4         MR. ANDRES:  YOUR HONOR, OBVIOUSLY THERE'S NO

5    EXCLUSION TO INAPPROPRIATE EVIDENCE, WHETHER IT'S 2 MINUTES OR

6    20 MINUTES OR 3 HOURS.

7         THEY ASKED HER QUESTIONS ABOUT HER LAW DEGREE, WHICH SHE

8    GOT AFTER SHE WORKED AT META, AND MR. AKROTIRIANAKIS QUESTIONED

9    HER ABOUT HER LAW SCHOOL CLASSES, WHETHER SHE REMEMBERED THINGS

10   FROM EVIDENCE CLASS.

11        THEY WANT TO BE ABLE TO ASK HER IF META HAS A LEGAL

12   OBLIGATION TO NOTIFY ITS CUSTOMERS, AND THEY WANT TO PLAY ON

13   THE FACT THAT SHE'S A LAWYER.

14        THE MAIN REASON THEY WANT TO GET IT IN IS BECAUSE SHE -- I

15   AGREE, YOUR HONOR, BUT THERE'S MORE.  IT GETS BETTER.

16        THE MAIN REASON THEY WANT TO GET IN THIS EMAIL IS THAT SHE

17   DRAFTS AN EMAIL TO MARK ZUCKERBERG AND SHERYL SANDBERG, WHO ARE

18   SENIOR OFFICIALS AT FACEBOOK, NOBODY KNOWS IF IT EVER GOES, AND

19   IT LAYS OUT A VARIETY OF DIFFERENT RISKS ABOUT DISCLOSURE, ALL

20   OF WHICH ARE NOW REDACTED.

21        SO THAT TALKS ABOUT CIVIL RIGHTS ACTIVISTS AND

22   JOURNALISTS.  IT TALKS ABOUT CITIZENS LAB.  THAT'S WHAT THE

23   EMAIL IS ABOUT, AND THEY'VE REDACTED TWO-THIRDS OF THAT.  SO IT

24   HAS A VERY SMALL PORTION THAT TALKS ABOUT A SECURITY FLAW.

25   THAT'S NOT RELEVANT, EITHER, BECAUSE WHAT THEY'RE DOING IS

645

```
1        ATTACKING META'S SYSTEMS.

2             THERE'S NOTHING ABOUT HER TESTIMONY THAT'S RELEVANT,

3        EXCEPT THAT THEY WANT TO GET IN MARK ZUCKERBERG'S NAME.

4             BY THE WAY, SHE TESTIFIED -- THEY ASKED HER IF SHE EVER

5        TALKED TO MARK ZUCKERBERG, EVER, ABOUT NSO, AND SHE SAID NEVER.

6             SO THE CLIP ITSELF IS TAKEN OUT OF CONTEXT.  WE'VE

7        COUNTERED.

8             BUT THERE'S NOTHING ABOUT HER TESTIMONY THAT IS RELEVANT.

9             THE COURT:  OKAY.  ALL RIGHT.

10            MR. AKROTIRIANAKIS:  YOU'VE ALREADY RULED ON THIS,

11       YOUR HONOR.  SHE WROTE AN EMAIL TO HER CEO, MR. CATHCART,

12       TALKING ABOUT WHEN IT WAS THAT THEY RESOLVED THE VULNERABILITY.

13       THIS WAS -- THE REMEDIATION, THIS WAS ALL DEALT WITH THE OTHER

14       DAY AND YOUR HONOR RULED ON THIS.

15            AND AS FAR AS THE REFERENCE TO HER BEING IN LAW SCHOOL OR

16       THE COMMENT ABOUT HER BEING IN LAW SCHOOL, SHE TESTIFIES BEFORE

17       THAT THAT HER RESPONSIBILITY WAS FOR THE -- AT FACEBOOK WHEN

18       SHE WAS WORKING THERE, BEFORE SHE WENT TO LAW SCHOOL, WAS IN

19       RESPECT OF THE PRIVACY RULES LIKE THE GDPR AND THINGS LIKE,

20       THAT AND SHE KNOWS OF NO --

21            THE COURT:  IS SHE INSIDE COUNSEL AT FACEBOOK?

22            MR. ANDRES:  NO.  SHE WASN'T A LAWYER.  AND THAT'S

23       THE POINT.  WHAT IS THE RELEVANCE OF THE GDPR TO THIS CASE?

24       THERE'S ZERO.

25            THE COURT:  I DON'T SEE ANY.
```

```
1              MR. ANDRES:  YOUR HONOR, I'M HAPPY TO HAND UP THE --

2              THE COURT:  IS SHE ON THE WITNESS LIST FOR TODAY?

3              MR. AKROTIRIANAKIS:  WE WERE GOING TO PLAY HER

4   DEPOSITION CLIPS TODAY.  IT'S 17 MINUTES.

5              MR. CRAIG:  SEVEN.

6              MR. AKROTIRIANAKIS:  SEVEN, I'M SORRY, SEVEN MINUTES,

7   YOUR HONOR.

8              THE COURT:  HMM.  PERHAPS I'LL LOOK AT IT BEFORE IT'S

9   PLAYED FOR THE JURY --

10             MR. AKROTIRIANAKIS:  WE CAN PROBABLY --

11             THE COURT:  -- TO DETERMINE IF THERE'S ANY RELEVANCE.

12             MR. AKROTIRIANAKIS:  THE --

13             MR. ANDRES:  THANK YOU, YOUR HONOR.

14             MR. AKROTIRIANAKIS:  THE ONLY STATEMENT ABOUT --

15  THAT'S IN THE DESIGNATIONS ABOUT HER BEING -- EVER HAVING GONE

16  TO LAW SCHOOL OR BEING A LAWYER IS SOMETHING LIKE, AND THEN YOU

17  LEFT FACEBOOK AND YOU WENT TO LAW SCHOOL, BECAUSE WE HAD TO

18  TRAVEL ACROSS THE COUNTRY.

19             THE COURT:  I'LL TAKE A LOOK AT IT.

20             MR. AKROTIRIANAKIS:  WE CAN PROBABLY DO SURGERY ON

21  THAT.

22             MR. ANDRES:  THANK YOU, YOUR HONOR.

23             THE COURT:  I'LL TAKE A LOOK AT IT BEFORE YOU -- DO

24  NOT PLAY IT UNTIL I'VE HAD A CHANCE TO PREVIEW IT.

25             MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
```

1          THE COURT:  ALL RIGHT.  WE'LL RECONVENE AT 8:30 ON

2     TIME.  I NEED SOME TEA.

3          MR. ANDRES:  THANK YOU, YOUR HONOR.

4       (RECESS FROM 8:23 A.M. UNTIL 8:32 A.M.)

5       (JURY IN AT 8:32 A.M.)

6       (PAUSE IN PROCEEDINGS.)

7          THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES AND

8     GENTLEMEN OF THE JURY.  ONCE AGAIN, THANK YOU ALL FOR BEING

9     HERE AND FOR BEING ON TIME.

10         GOOD MORNING, MR. ROBINSON.

11         YOU'RE STILL UNDER OATH.

12       **(PLAINTIFFS' WITNESS, ANDREW ROBINSON, WAS PREVIOUSLY**

13     **SWORN.)**

14          THE COURT:  ALL RIGHT.  CONTINUE.

15          MR. BLOCK:  THANK YOU, YOUR HONOR.

16              **REDIRECT EXAMINATION (RESUMED)**

17     BY MR. BLOCK:

18     Q.   GOOD MORNING, MR. ROBINSON.

19     A.   GOOD MORNING.

20     Q.   MR. AKROTIRIANAKIS ASKED YOU SOME QUESTIONS YESTERDAY

21     ABOUT YOUR JOB RESPONSIBILITIES IN 2019.

22         DO YOU RECALL THAT?

23     A.   I DO.

24     Q.   DID YOU PARTICIPATE IN ON-CALL ROTATIONS IN THAT

25     TIMEFRAME?

1    A.    I DID.

2    Q.    HOW OFTEN WERE YOU ON CALL?

3    A.    I DON'T RECALL EXACTLY.  IT VARIES DEPENDING ON HOW MANY

4    OTHER PEOPLE ARE IN THE ROTATION.  BUT IT WOULD HAVE BEEN

5    APPROXIMATELY I THINK AROUND EVERY SIX TO EIGHT WEEKS, ONCE

6    EVERY SIX TO EIGHT WEEKS, FOR A WEEK AT A TIME.

7    Q.    AND WHEN YOU WERE ON CALL, HOW WAS YOUR TIME TYPICALLY

8    DIVIDED BETWEEN TASKS RELATED TO THE ON-CALL ROTATION AS

9    OPPOSED TO WORKING ON YOUR REGULAR PROJECTS?

10   A.    SO NORMALLY DURING MY ON-CALL TIME, I WOULD ONLY NEED TO

11   WORK ON ISSUES THAT AROSE THAT WERE ASSIGNED TO OUR ON CALL.

12        SO IF THERE WERE A PROBLEM WITH ONE OF OUR AUTOMATIC DATA

13   PIPELINES, I MIGHT NEED TO ADDRESS THAT.  THAT MIGHT TAKE A

14   BRIEF PERIOD OF TIME, USUALLY AN HOUR OR TWO.

15        OR IN THE INSTANCE OF THIS WHERE SOMETHING MORE SEVERE

16   COMES ABOUT, WE HAVE TO DEVOTE ALL OF OUR TIME TO THAT, AND WE

17   HAVE TO BASICALLY FORGO ALL OF OUR OTHER RESPONSIBILITIES.

18   Q.    OKAY.  AND IN THIS PARTICULAR CASE, I THINK YOU MAY HAVE

19   SAID IT, BUT DID YOU HAVE TO FORGO ALL YOUR OTHER

20   RESPONSIBILITIES?

21   A.    I DID.

22   Q.    OKAY.  MR. AKROTIRIANAKIS ASKED YOU SOME QUESTIONS ABOUT

23   THE PREPARATION YOU DID BEFORE YOU GAVE YOUR DEPOSITION

24   TESTIMONY IN THIS CASE.

25        DO YOU RECALL THAT?

1    A.   I DON'T -- I'M NOT SURE IF I RECALL THAT.

2    Q.   OKAY.  IN ANY EVENT, THINKING BACK TO THAT DEPOSITION, DID

3    YOU SPEAK WITH ANY OTHER WHATSAPP AND META EMPLOYEES AS PART OF

4    YOUR PREPARATION?

5    A.   I DID.

6    Q.   DO YOU REMEMBER WHO THOSE PEOPLE WERE?

7    A.   I RECALL SOME OF THEM, YES.

8    Q.   WOULD IT HELP TO REFRESH YOUR RECOLLECTION IF I SHOWED YOU

9    YOUR DEPOSITION TESTIMONY?

10   A.   IT WOULD.

11   Q.   OKAY.

12        YOUR HONOR, PERMISSION TO REFRESH?

13             THE COURT:  YES.

14             MR. BLOCK:  THANK YOU.

15        MAY I APPROACH THE WITNESS?

16             THE COURT:  YES.

17             MR. BLOCK:  (HANDING.)

18        WOULD THE COURT LIKE A COPY?

19             THE COURT:  SURE.

20             MR. BLOCK:  (HANDING.)

21   Q.   MR. ROBINSON, CAN I DIRECT YOU TO PAGE 29 OF YOUR

22   DEPOSITION.

23   A.   I AM THERE.

24   Q.   OKAY.  SO THIS IS NOT FOR THE JURY FOR NOW.  YOU'RE JUST

25   TO READ TO YOURSELF.  I WOULD DIRECT YOU TO PAGE 29, LINES 2 TO

1    7.  YOU'RE WELCOME TO READ AROUND THAT, THERE'S SOME STUFF

2    ABOVE IT ON 27.

3        BUT WHEN YOU'VE HAD A CHANCE TO READ THAT, JUST LET ME

4    KNOW.

5        (PAUSE IN PROCEEDINGS.)

6            THE WITNESS:  I HAVE READ IT.

7    BY MR. BLOCK:

8    Q.   OKAY.  WOULD YOU CLOSE THAT AND SET IT ASIDE.

9        DID THAT REFRESH YOUR RECOLLECTION REGARDING THE EMPLOYEES

10   WHO YOU SPOKE TO IN PREPARATION FOR YOUR DEPOSITION?

11   A.   IT DID.

12   Q.   AND WHO WERE THEY?

13   A.   SO THAT WOULD HAVE BEEN CORTNEY PADUA, CLAUDIU GHEORGHE,

14   OTTO EBELING, AASHIN -- I'M SORRY, I CAN NEVER REMEMBER HOW TO

15   SAY HIS LAST NAME.

16   Q.   IS IT GAUTAM?

17   A.   GAUTAM, YES.

18       AND YUANYUAN WANG, OR YUANYUAN WANG.

19   Q.   OKAY.  THANK YOU VERY MUCH.

20       OKAY.  MR. AKROTIRIANAKIS ASKED YOU QUESTIONS ABOUT THE

21   WORK YOU DID TO UNDERSTAND THE PRIMARY PAYLOAD IN THESE NSO

22   ATTACKS WE'VE BEEN DISCUSSING.

23       DO YOU RECALL THAT?

24   A.   YES.

25   Q.   OKAY.  AND JUST TO SITUATE US, WHAT IS THE PRIMARY

1    PAYLOAD?

2    A.   SO THE PRIMARY PAYLOAD, THE INITIAL PAYLOAD WAS THAT FIRST

3    SET OF COMMANDS AND THAT ELF EXECUTABLE FILE THAT WE LOGGED ON

4    OUR CHATD SERVERS.

5    Q.   OKAY.  AND MR. AKROTIRIANAKIS ASKED YOU ABOUT THE ANALYSIS

6    TOOLS YOU USED TO UNDERSTAND THAT INITIAL PAYLOAD FILE THAT

7    TRAVERSED THE WHATSAPP SERVERS.

8         DO YOU RECALL THAT?

9    A.   I DO.

10   Q.   MR. AKROTIRIANAKIS DESCRIBED THAT AS REVERSE ENGINEERING.

11        DO YOU RECALL THAT?

12   A.   I DO.

13   Q.   OKAY.  HOW, IF AT ALL, DID YOUR WORK TO UNDERSTAND THAT

14   INITIAL PAYLOAD INFORM WHATSAPP'S ABILITY TO MITIGATE THE NSO

15   ATTACKS IN THIS CASE?

16   A.   SO IN PART IT LET US KNOW WHERE OR HOW THE VULNERABILITY

17   WAS OPERATING.

18        SO THE FACT THAT THEY WERE ABLE TO EXECUTE CODE LET US

19   KNOW THAT THE VULNERABILITY, THAT THE VULNERABILITY WE WERE

20   LOOKING FOR IN THE WHATSAPP CLIENT WAS A REMOTE CODE EXECUTION

21   VULNERABILITY, SO ONE THAT ENABLED ADDITIONAL CODE TO RUN.

22        SO THAT HELPED INFORM WHERE THE OTHER INDIVIDUALS WERE

23   LOOKING FOR THAT VULNERABILITY, AS WELL AS STEPS THAT WE COULD

24   TAKE TO -- THEY COULD TAKE TO MITIGATE AND PATCH AND PREVENT

25   THAT FROM WORKING.

1    Q.   WHO DO YOU MEAN IN THAT ANSWER BY "OTHER INDIVIDUALS"?

2    A.   SO THAT WOULD HAVE LARGELY -- I CONFERRED LARGELY WITH

3    OTTO EBELING ON THAT TOPIC.

4    Q.   OKAY.  MR. ROBINSON, DO YOU KNOW WHETHER OR NOT WHATSAPP'S

5    TERMS OF SERVICE INCLUDE A PROHIBITION AGAINST REVERSE

6    ENGINEERING WHATSAPP SOFTWARE?

7    A.   I'M NOT CERTAIN, BUT I BELIEVE IT DOES.

8    Q.   WHAT ARE THE SECURITY RELATED REASONS FOR HAVING SUCH A

9    PROHIBITION.

10              MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION AND

11   IRRELEVANT.

12              THE COURT:  SUSTAINED -- OVERRULED ON IRRELEVANT, BUT

13   PLEASE ESTABLISH A FOUNDATION.

14              MR. BLOCK:  SURE.

15   Q.   ARE YOU -- DO YOU HAVE SOME FAMILIARITY WITH THE WHATSAPP

16   TERMS OF SERVICE, MR. ROBINSON?

17   A.   SOME, YES.

18   Q.   OKAY.  AND TO THE EXTENT OF THAT FAMILIARITY, ARE YOU

19   AWARE THAT THEY HAVE A PROHIBITION REGARDING REVERSE

20   ENGINEERING?

21   A.   I BELIEVE WE DO.

22   Q.   OKAY.  AND WHAT ARE THE SECURITY RELATED REASONS FOR THAT

23   PROHIBITION?

24   A.   SO THE SECURITY RELATED REASONS THAT WE WOULD NOT WANT

25   SOMEONE TO REVERSE ENGINEER OUR CODE AND IT WOULD BE PROHIBITED

1    ARE THAT -- SO THEY CAN EXTRACT THE MANNERS AND MECHANISMS

2    THROUGH WHICH THEY CAN INTERACT WITH OUR SERVERS, AND THEY CAN

3    RECREATE THAT TO -- OR REMAKE THAT TO CREATE WHAT WE WOULD CALL

4    UNAUTHORIZED CLIENTS AND DO THINGS THAT WE DO NOT WANT PEOPLE

5    TO BE ABLE TO DO IN THE WHATSAPP SERVERS AND SERVICES.

6    Q.   OKAY.  SO THIS WILL OVERLAP, BUT I WANT TO MAKE SURE I

7    UNDERSTAND.

8        WHAT KINDS OF SECURITY PROBLEMS CAN YOU FORESEE ARISING IF

9    SOMEONE VIOLATES THAT PROHIBITION AGAINST REVERSE ENGINEERING

10   IN THE WHATSAPP TERMS OF SERVICE?

11   A.   SURE.  SO ONE EXAMPLE IS EXACTLY WHAT WE EXPERIENCED HERE,

12   WHICH IS SOMEBODY COULD CREATE AN ATTACK AGAINST OUR SERVICES,

13   OUR CLIENTS.

14       THEY CAN ALSO DO THINGS LIKE CREATE CLIENTS THAT ARE

15   INTENDED TO GENERATE A LARGE AMOUNT OF SPAM OR UNWANTED

16   MESSAGES THAT WE DO NOT WANT ON OUR SERVICES.

17       THEY COULD CREATE JUNK DATA THAT WOULD CAUSE DENIALS OF

18   SERVICE FOR OUR USERS POTENTIALLY.  THAT IS ANOTHER -- THEY

19   COULD FIND WAYS TO MAKE OUR CLIENT NOT WORK IN A WAY THAT IS

20   APPROPRIATE AND DENY SERVICE TO CERTAIN USERS.

21   Q.   OKAY.  DO YOU STILL HAVE WITH YOU THE BINDER THAT

22   MR. AKROTIRIANAKIS GAVE YOU YESTERDAY?

23   A.   I BELIEVE SO, YES.

24   Q.   WOULD YOU FLIP TO EXHIBIT 1204, PLEASE.

25       AND CAN WE HAVE THAT ON THE SCREEN, PLEASE, MR. EVANS.

1          DO YOU RECALL DISCUSSING THIS TIMELINE, STANZAMING

2     TIMELINE DOCUMENT WITH MR. AKROTIRIANAKIS?

3     A.   I DO.

4     Q.   OKAY.  ONE QUICK QUESTION TO BEGIN.  IF WE CAN SEE ENTRY

5     NUMBER 4, DO YOU SEE THE NAME XI DENG -- AND I APOLOGIZE IF I'M

6     MISPRONOUNCING THAT -- IN THE RIGHT-HAND COLUMN?

7     A.   I DO SEE THAT.

8     Q.   OKAY.  DOES READING THAT ENTRY TRIGGER ANY FURTHER

9     RECOLLECTION FOR YOU ABOUT THE SORTS OF THINGS MR. DENG DID IN

10    THE INVESTIGATION AND RESPONSE WORK?

11    A.   SO I BELIEVE MR. DENG WAS ALSO LOOKING INTO WHERE THE

12    VULNERABILITY WAS IN OUR CODE BASE.

13    Q.   OKAY.  LET'S FLIP TO PAGE 2 OF EXHIBIT 204, AND I WANT TO

14    GO ALL THE WAY DOWN TO ENTRY, I THINK IT'S 42, TALKING ABOUT A

15    CVE.

16    A.   I SEE THAT.

17    Q.   CAN YOU EXPLAIN THIS PARTICULAR ENTRY TO THE JURY, PLEASE?

18    A.   SURE.  SO WHEN WE -- OR WHEN ANY COMPANY REALLY HAS A

19    VULNERABILITY IN THEIR PRODUCTS, IT IS A -- THERE'S A COMMON

20    PRACTICE TO GO TO AN ORGANIZATION CALLED MITRE, WHICH RUNS A

21    PUBLIC VULNERABILITY DATABASE THAT INFORMS THE PUBLIC ABOUT

22    WHAT VULNERABILITIES EXIST IN WHAT VERSIONS OF PRODUCTS SO THAT

23    PEOPLE CAN MAKE SURE THAT THEY'RE PATCHED AND UP TO DATE WITH

24    THE MOST CURRENT VERSIONS OF SOFTWARE AND UNDERSTAND, LIKE,

25    WHAT THEIR SECURITY POSTURE IS WITH RESPECT TO THE SOFTWARE

1       THAT THEY HAVE WITHIN THEIR ORGANIZATION.

2           SO AT THIS TIME WE HAD GONE TO MITRE AND PUBLISHED

3       INFORMATION ABOUT THE VULNERABILITY WITHIN THEIR -- IN THEIR

4       CVE PROGRAM SO THAT THE PUBLIC WAS MADE AWARE OF THE

5       VULNERABILITY AND WHAT VERSIONS OF WHATSAPP IT AFFECTED.

6       Q.   DO YOU HAPPEN TO RECALL WHAT CVE STANDS FOR?

7       A.   COMMON VULNERABILITY, I THINK IT'S ENUMERATION.  I DON'T

8       RECALL EXACTLY.

9       Q.   AS A SECURITY ENGINEER, DO YOU CONSULT MITRE'S CVE

10      REGISTER, IF THAT'S THE RIGHT TERM, IN YOUR SECURITY PRACTICES?

11      A.   I DO.

12      Q.   HOW, IF AT ALL, DOES THAT CONTRIBUTE TO YOUR ABILITY TO

13      MAKE PRODUCTS MORE ARE SECURE?

14      A.   SO AT TIMES WHEN WE SEE THINGS LIKE -- WE MAY SEE MALWARE

15      OR OTHER ATTACK DOCUMENTS TRANSITING FROM ACTORS THAT WE TRACK,

16      TRANSITING OUR PLATFORM.  SO WE MAY REFER TO THE CVE DATABASE

17      TO UNDERSTAND WHAT VERSIONS OF SOFTWARE THEY ARE TARGETING AND

18      HOW WE CAN WRITE SIGNATURES TO DETECT AND PREVENT THOSE ATTACKS

19      FROM TRANSITING OUR NETWORKS OR OUR PRODUCTS.

20          IF I WERE STILL ON THE INTERNAL SECURITY TEAM, I WOULD USE

21      IT AS WELL TO MAKE SURE THAT OUR INTERNAL SYSTEMS WERE ALL

22      PATCHED AGAINST THE VULNERABILITIES THAT EXISTED TO SOME

23      THRESHOLDS THAT WE MAY DETERMINE INTERNALLY, SUCH AS WE WOULD

24      GIVE HIGHER PRIORITY TO PATCHING TO A VULNERABILITY THAT CAUSES

25      REMOTE CODE EXECUTION LIKE THE ONE HERE, AS OPPOSED TO ONE THAT

1    IS SOMETHING LIKE A DENIAL OF SERVICE OR AN INFO LEAK

2    VULNERABILITY.

3    Q.   DID YOUR ANALYSIS OF NSO'S MALICIOUS PAYLOAD INFORM WHAT

4    WHATSAPP AND META CONTRIBUTED TO THE PUBLIC THROUGH THIS CVE?

5    A.   IN THE SENSE THAT IT HELPED INFORM WHERE THE VULNERABILITY

6    WAS WITHIN OUR CODE, AND THE MITIGATING STEPS THAT WE TOOK

7    AGAINST IT, YES.

8    Q.   DOES INFORMING THE PUBLIC ABOUT A PREVIOUSLY EXISTING

9    VULNERABILITY IN WHATSAPP'S CODE HELP OTHERS BECOME MORE

10   SECURE?

11   A.   IT CAN, ESPECIALLY IF THE VULNERABILITY EXISTS WITHIN A

12   LIBRARY OR SOMETHING LIKE THAT THAT WE USE.  IF OTHERS ALSO

13   UTILIZE THAT LIBRARY, THEN IT HELPS THEM NOT MAKE THE SAME

14   MISTAKES THAT WE DID.

15            MR. BLOCK:  THANK YOU, MR. ROBINSON.

16        NO MORE QUESTIONS, YOUR HONOR.

17            THE COURT:  ALL RIGHT.

18        ANYTHING ELSE FROM THE DEFENDANT?

19            MR. AKROTIRIANAKIS:  JUST VERY BRIEFLY IF I MAY,

20   YOUR HONOR.

21                     **RECROSS-EXAMINATION**

22   BY MR. AKROTIRIANAKIS:

23   Q.   GOOD MORNING, MR. ROBINSON.

24        THE LIBRARIES OF CODE THAT YOU JUST TESTIFIED ABOUT, WHAT

25   DOES THAT MEAN?

1    A.   SO SOME PARTS OF SOFTWARE YOU DON'T NECESSARILY OFFER ALL

2    OF THE CODE.  IF THERE'S A COMMON FEATURE THAT YOU WANT TO

3    UTILIZE, SOMEONE ELSE MAY HAVE ALREADY WRITTEN CODE WHICH

4    PERFORMS THAT FEATURE FOR YOU.

5         SO YOU MAY BRING THAT LIBRARY INTO YOUR CODE AND IMPLEMENT

6    IT SO THAT YOU DON'T HAVE TO RECREATE A LOT OF WORK THAT'S

7    ALREADY BEEN DONE.

8    Q.   IS THAT WHAT WHATSAPP DID WHEN IT WROTE THE CODE FOR

9    WHATSAPP?

10   A.   I BELIEVE WE HAD -- WE'VE UTILIZED SOME LIBRARIES WITHIN

11   OUR CODE, BUT THE MAJORITY OF IT, TO MY KNOWLEDGE, IS ALL

12   WRITTEN BY WHATSAPP ENGINEERS.

13   Q.   SURE.  DO YOU KNOW WHETHER OFF THE SHELF, WOULD THAT BE

14   THE RIGHT TERMINOLOGY, OFF THE SHELF CODE SOMETIMES IS KNOWN TO

15   CONTAIN VULNERABILITIES?

16   A.   WHAT DO YOU MEAN BY OFF THE SHELF?

17   Q.   WELL, THIS CODE THAT YOU GET FROM SOME OTHER PLACE THAT

18   THE WHATSAPP ENGINEERS DON'T THEMSELVES WRITE?

19   A.   I WOULD SAY THAT LIBRARIES SOMETIMES CONTAIN

20   VULNERABILITIES.  ANY CODE THAT WE HAVE OR ANY CODE REALLY THAT

21   EXISTS MAY CONTAIN VULNERABILITIES.

22   Q.   AND DO YOU KNOW WHEN THE WHATSAPP CODE BASE WAS WRITTEN?

23   A.   NO.  I DO KNOW WHEN IT WAS ORIGINALLY -- WHEN IT WAS FIRST

24   AUTHORED.

25   Q.   SOME PERIOD OF TIME IT COVERED; RIGHT?

1    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

2    Q.   SURE.  IT WAS WRITTEN --

3              MR. BLOCK:  OBJECTION.  FOUNDATION, YOUR HONOR.

4              THE COURT:  SUSTAINED.

5    BY MR. AKROTIRIANAKIS:

6    Q.   YOU TESTIFIED JUST A FEW MINUTES AGO ABOUT BEING ON CALL.

7    A.   I DID.

8    Q.   THAT'S PART OF THE JOB IS THAT YOU TAKE A CALL FROM TIME

9    TO TIME; RIGHT?

10   A.   IT -- WE ARE SOMETIMES EXPECTED, DEPENDING ON THE ROLE, TO

11   BE ON CALL.  IN MY ROLE THERE, I WAS THE MALWARE ANALYST ON

12   CALL.

13   Q.   RIGHT.  BUT MY POINT, MR. ROBINSON, IS YOU ARE SCHEDULED

14   TO BE ON CALL, AND THEN WHEN YOUR PERIOD OF CALL IS OVER,

15   ANOTHER PERSON IS SCHEDULED TO BE ON CALL, AND THEN WHEN THEIRS

16   IS OVER, ANOTHER PERSON IS SCHEDULED TO BE ON CALL; CORRECT?

17   A.   IT IS A ROTATION WHERE THE MEMBERS OF THAT CHANGE ON A

18   WEEKLY BASIS.

19   Q.   SURE.  AND THAT IS PART OF YOUR JOB THAT YOU DO AT

20   FACEBOOK IS TO BE PERIODICALLY ON CALL YOURSELF; CORRECT?

21   A.   I AM PERIODICALLY THE MEMBER OF CURRENTLY TWO ON CALLS.

22   Q.   RIGHT.  AND YOU DON'T GET PAID ANY EXTRA FOR THE PERIOD

23   THAT YOU'RE ON CALL?

24   A.   NO.  THE ONLY -- THE ONLY THINGS THAT WE ARE COMPENSATED

25   FOR IS OUR PERFORMANCE -- DURING OUR PERFORMANCE ON THAT.

1    Q.   ALL RIGHT.  YOU TESTIFIED ABOUT YOUR PREPARATION FOR YOUR

2    DEPOSITION THAT YOU GAVE IN THIS CASE.

3    A.   YES.

4    Q.   OKAY.  AND YOU WERE ABLE TO INTERVIEW -- YOU WEREN'T

5    DENIED ACCESS TO ANYBODY WHO YOU THOUGHT YOU NEEDED TO

6    INTERVIEW TO PREPARE YOURSELF TO TESTIFY ON BEHALF OF THE

7    COMPANY, WERE YOU?

8    A.   I DON'T BELIEVE SO, NO.

9    Q.   SO YOU INTERVIEWED WHOEVER YOU THOUGHT YOU NEEDED TO

10   INTERVIEW IN ORDER TO EXPRESS THE COMPANY'S POSITION AS TO THE

11   WORK DONE BY THE PEOPLE FOR WHOM IT'S CLAIMING DAMAGES IN THIS

12   CASE; CORRECT?

13   A.   I TALKED TO SEVERAL INDIVIDUALS WHO WORKED ON THE

14   RESPONSE, ON OUR RESPONSE TO THIS ATTACK, AND GOT THE -- FROM

15   THEM THE AMOUNT OF TIME THAT THEY HAD SPENT WORKING ON THE

16   RESPONSE.

17   Q.   YOU TALKED TO WHOEVER YOU THOUGHT YOU NEEDED TO TALK TO;

18   CORRECT?

19   A.   I TALKED TO INDIVIDUALS THAT WERE WELL SUITED TO TALK

20   ABOUT THE TIME THAT THEY HAD SPENT ON THE TASK.

21   Q.   WAS THERE ANYBODY WHO YOU THOUGHT YOU NEEDED TO TALK TO

22   THAT YOU JUST DIDN'T GET AROUND TO TALKING TO BEFORE YOUR

23   DEPOSITION?

24   A.   THERE WERE A -- IT WOULD BE IMPRACTICAL FOR ME TO HAVE

25   TALKED TO EVERYBODY THAT WAS A PARTICIPANT IN THIS CASE WHICH

1     WILL BE RELEVANT.

2     Q.   DO YOU RECALL YOUR TESTIMONY AT YOUR DEPOSITION THAT YOU

3     WERE ASKED WHETHER YOU HAD PREPARED AND YOU SAID YOU HAD?

4     A.   I HAD TALKED TO SEVERAL INDIVIDUALS PRIOR TO MY

5     DEPOSITION.

6     Q.   TO PREPARE FOR YOUR DEPOSITION?

7     A.   IN PREPARATION FOR MY DEPOSITION, I TALKED TO SEVERAL

8     INDIVIDUALS.

9     Q.   AND YOUR DEPOSITION WAS GIVEN ON A THURSDAY; IS THAT

10    RIGHT, MR. ROBINSON?

11         AND IF YOU DON'T REMEMBER, YOU CAN REFER TO THE HELPFUL

12    DEPOSITION TRANSCRIPT YOUR COUNSEL GAVE YOU.

13    A.   I SEE -- OH, YES, I SEE IT WAS THURSDAY, SEPTEMBER 19TH.

14    Q.   YES.  AND ON TUESDAY, SEPTEMBER 17TH, YOU INTERVIEWED THE

15    PEOPLE WHO YOU THOUGHT YOU NEEDED TO INTERVIEW; CORRECT?

16    A.   I TALKED TO SEVERAL INDIVIDUALS.

17    Q.   ON TUESDAY, SEPTEMBER 17TH, TWO DAYS BEFORE YOUR

18    DEPOSITION?

19    A.   YES, I BELIEVE IT WAS TUESDAY.

20    Q.   AND YOU SPOKE WITH THEM WITH COUNSEL THERE; RIGHT?

21    A.   I SPOKE TO THEM IN FRONT OF COUNSEL, YES.

22    Q.   OKAY.  AND YOU SPOKE WITH THEM FOR APPROXIMATELY FIVE

23    MINUTES EACH?

24    A.   THEY WERE BRIEF CONVERSATIONS.

25    Q.   APPROXIMATELY FIVE MINUTES?

1       A.   UM --

2       Q.   LET ME ASK A DIFFERENT QUESTION.

3            YOU TESTIFIED AT YOUR DEPOSITION ON SEPTEMBER 19TH, 2024

4       THAT YOUR INTERVIEWS WERE ABOUT FIVE MINUTES EACH; IS THAT

5       RIGHT?

6       A.   THAT SOUNDS APPROPRIATE.

7       Q.   OKAY.  AND IN ADDITION TO THAT PREPARATION, YOU BROUGHT

8       KIND OF LIKE A CHEAT SHEET WITH YOU TO THE DEPOSITION; RIGHT,

9       MR. ROBINSON?

10      A.   I HAD A MEMORY AID.

11      Q.   A MEMORY AID, FINE.

12           WOULD YOU OPEN THE BOOK IN FRONT OF YOU TO EXHIBIT 1517,

13      PLEASE.

14      A.   I HAVE IT IN FRONT OF ME.

15      Q.   OKAY.  DO YOU RECOGNIZE THIS AS YOUR -- I'M SORRY --

16      MEMORY AID; RIGHT?

17      A.   YES.

18      Q.   IS, IN FACT, EXHIBIT 1517 YOUR MEMORY AID FOR THE

19      DEPOSITION?

20      A.   I BELIEVE SO, YES.

21      Q.   DID YOU PREPARE EXHIBIT 1517?

22      A.   I DID NOT.

23      Q.   WHO GAVE IT TO YOU?

24      A.   THAT WOULD HAVE BEEN OUR COUNSEL.

25      Q.   DO YOU KNOW WHO?

```
1    A.   I BELIEVE IT WAS LUCA.

2    Q.   MR. MARZORATI?

3    A.   I BELIEVE SO.

4    Q.   DO YOU SEE THE GENTLEMAN IN THE COURTROOM TODAY?

5    A.   YES.

6    Q.   CAN YOU POINT HIM OUT FOR THE RECORD.

7    A.   (INDICATING).

8    Q.   OKAY.  HE'S IN THE THIRD ROW --

9         THE COURT:  WELL, YOU WANT HIM TO POINT HIM OUT,

10   DON'T YOU?

11        MR. AKROTIRIANAKIS:  HE DID POINT HIM OUT,

12   YOUR HONOR, AND MR. MARZORATI WAVED.  I'M JUST, FOR THE

13   RECORD --

14        THE COURT:  THANK YOU.  PROCEED.

15   BY MR. AKROTIRIANAKIS:

16   Q.   OKAY.  AND MR. MARZORATI REPRESENTED YOU AT YOUR

17   DEPOSITION; CORRECT?

18   A.   HE WAS PRESENT AT THE DEPOSITION, YES.

19   Q.   AS YOUR REPRESENTATIVE MAKING OBJECTIONS ON BEHALF OF THE

20   COMPANY AND CONSULTING WITH YOU DURING THE BREAKS AND THE LIKE;

21   RIGHT?

22   A.   I'M NOT --

23        MR. BLOCK:  OBJECTION, YOUR HONOR.  RELEVANCE, 403.

24        THE COURT:  YEAH.  I DON'T KNOW THAT THIS IS --

25        MR. AKROTIRIANAKIS:  OKAY.  I'LL MOVE ON, YOUR HONOR.
```

1    Q.   YOU TESTIFIED ABOUT SPAM AND JUNK.  I DIDN'T CATCH THE

2    JUNK PART, BUT YOU SAID SPAM AND THEN JUNK SOMETHING.

3        DO YOU RECALL THAT TESTIMONY?

4    A.   I SAID SPAM AND DENIAL OF SERVICE I BELIEVE IS WHAT YOU'RE

5    REFERRING TO AS THE POSSIBLE TYPES OF ATTACKS THAT REVERSE

6    ENGINEERING HELPS US DEFEND AGAINST.

7    Q.   TYPES OF ATTACKS, DIFFERENT TYPES OF ATTACKS?

8    A.   YES, ALSO TO INCLUDE THE REMOTE CODE EXECUTION

9    VULNERABILITY THAT WAS CONDUCTED BY NSO.

10   Q.   SURE.  YOU DON'T KNOW ANYTHING ABOUT SPAM RELATED TO THIS

11   CASE?  YOU'RE NOT ASSERTING THAT ANYBODY WAS SENT SPAM, ARE

12   YOU?

13   A.   I AM NOT ASSERTING THAT NSO GROUP SENT SPAM IN THEIR TEXT.

14           MR. AKROTIRIANAKIS:  ALL RIGHT.  THANK YOU.  NOTHING

15   FURTHER, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  THANK YOU.  I ASSUME WE'RE

17   DONE?

18           MR. BLOCK:  WE ARE DONE, YOUR HONOR.

19           THE COURT:  ALL RIGHT.  THANK YOU, MR. ROBINSON.  YOU

20   MAY STEP DOWN.

21       CALL YOUR NEXT WITNESS, PLEASE.

22           MR. ANDRES:  THANK YOU, YOUR HONOR.

23       WHATSAPP CALLS -- WE'RE GOING TO PLAY A VIDEO.  I THINK

24   IT'S ABOUT FIVE MINUTES.  WE'RE GOING TO CALL SARIT BIZINSKY

25   GIL, WHO'S NSO'S VICE PRESIDENT OF GLOBAL BUSINESS OPERATIONS.

```
1          THANK YOU, YOUR HONOR.

2          MAY WE PROCEED, YOUR HONOR?

3              THE COURT:  YES.

4          (THE VIDEOTAPED DEPOSITION OF SARIT BIZINSKY GIL WAS

5       PLAYED IN OPEN COURT, BUT NOT REPORTED.)

6              MR. ANDRES:  THAT'S IT, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  THANK YOU.

8          AND YOUR NEXT WITNESS?

9              MR. ANDRES:  THE NEXT LIVE WITNESS IS OUR EXPERT

10      WITNESS, DANA TREXLER.

11          BUT BEFORE WE DO THAT, YOUR HONOR, I WANTED TO NOW HAVE

12      YOUR HONOR -- I'M HAPPY TO DO IT -- JUST READ IN THE

13      STIPULATION ABOUT THE DEFENDANTS' FINANCIAL STATEMENTS THAT WE

14      TALKED ABOUT YESTERDAY.

15              THE COURT:  ALL RIGHT.

16          LADIES AND GENTLEMEN OF THE JURY, WE HAVE -- THE PARTIES

17      HAVE AGREED TO CERTAIN EXHIBITS, TO THE ADMISSIBILITY OF

18      CERTAIN EXHIBITS, AND, THEREFORE, THOSE EXHIBITS HAVE BEEN

19      ADMITTED BY THE COURT AND WILL BE PROVIDED.

20          ARE YOU GOING TO DO IT ELECTRONICALLY OR GIVE THEM PAPER

21      COPIES?

22              MR. ANDRES:  I HAVE BINDERS NOW, YOUR HONOR.

23      WHATEVER YOU PREFER.

24              THE COURT:  OKAY.  THE FOUR EXHIBITS SHOW THE

25      DEFENDANTS' FINANCIAL STATEMENTS FOR THE YEAR-ENDED 2024, FOR
```

665

```
 1        LAST YEAR, ESSENTIALLY.

 2            YEAH, I THINK IT'S PREFERABLE IF YOU HAND THEM OUT.

 3                MR. ANDRES:  OKAY.  THANK YOU.

 4            EXCUSE ME.

 5            YOU WANT TO JUST PASS THAT BACK (HANDING).

 6            (PAUSE IN PROCEEDINGS.)

 7                THE COURT:  ALL RIGHT.

 8                MR. ANDRES:  OKAY.

 9                THE COURT:  AND I BELIEVE THE RECORD ALREADY REFLECTS

10        THIS, BUT I'LL REPEAT THEM AGAIN, IT'S EXHIBIT A-1779, A-1780,

11        A-1781, AND A-1782.

12            (PLAINTIFFS' EXHIBITS 1779, 1780, 1781, AND 1782 WERE

13        ADMITTED IN EVIDENCE.)

14                MR. ANDRES:  THANK YOU, YOUR HONOR.  I'M GOING TO

15        TURN THINGS BACK OVER TO MR. BLOCK.

16                MR. BLOCK:  YOUR HONOR, PLAINTIFFS CALL DANA TREXLER

17        TO THE STAND.

18                THE COURT:  ALL RIGHT.

19                THE CLERK:  IF YOU WOULD PLEASE JUST -- THANK YOU.

20            **(PLAINTIFFS' WITNESS, DANA TREXLER, WAS SWORN.)**

21                THE WITNESS:  I AFFIRM.

22                THE CLERK:  THANK YOU.  PLEASE BE SEATED.

23            PLEASE SPEAK CLEARLY INTO THE MICROPHONE.

24            PLEASE STATE YOUR NAME AND SPELL YOUR NAME FOR THE RECORD.

25                THE WITNESS:  GOOD MORNING.
```

1          MY NAME IS DANA TREXLER, D-A-N-A, TREXLER, T-R-E-X-L-E-R.

2               MR. BLOCK:  MAY WE APPROACH WITH BINDERS, YOUR HONOR?

3               THE COURT:  YES.

4               MR. AKROTIRIANAKIS:  YOUR HONOR, IT LOOKS LIKE

5     THERE'S A POWERPOINT DECK ON THE SCREEN, AND IF I'M RIGHT ABOUT

6     THAT, I HAVE NOT SEEN IT UNTIL RIGHT NOW.

7               MR. BLOCK:  THAT'S TRUE, YOUR HONOR, THERE WAS NO

8     EXCHANGE OF DEMONSTRATIVES.  SO THEY HAVE IT NOW.  I DON'T

9     THINK THERE WILL BE ANYTHING OBJECTIONABLE.

10         WE HAD OFFERED TO DO A COMPLETE EXCHANGE, AND DEFENDANTS

11    DECLINED.

12              MR. AKROTIRIANAKIS:  WELL --

13              THE COURT:  OKAY.  YOU CAN OBJECT TO EACH EXHIBIT

14    IF -- OR YOU CAN ASK FOR TIME TO REVIEW IT.

15              MR. AKROTIRIANAKIS:  IF I MAY, YOUR HONOR?

16              THE COURT:  UM-HUM.

17         (PAUSE IN PROCEEDINGS.)

18              MR. AKROTIRIANAKIS:  SO, YOUR HONOR, THIS IS AN

19    EXHIBIT WE HADN'T RECEIVED.  THERE IS A COURT ORDER ABOUT

20    EXCHANGING EXHIBITS.

21              THE COURT:  ARE YOU USING THIS AS AN EXHIBIT TO BE

22    ADMITTED INTO EVIDENCE?  OR SIMPLY TO GUIDE THE TESTIMONY?

23              MR. BLOCK:  AS YOU --

24              THE COURT:  WHAT'S THE PURPOSE OF THIS?

25              MR. BLOCK:  THIS IS A DEMONSTRATIVE THAT THE WITNESS

```
 1       PREPARED TO HELP HER IN PRESENTING HER OPINIONS TO THE JURY,

 2       YOUR HONOR.

 3             THE COURT:  OKAY.  HAS ALL THE UNDERLYING INFORMATION

 4       BEEN PROVIDED TO THE DEFENDANT?

 5             MR. BLOCK:  ALL OF THE UNDERLYING INFORMATION HAS

 6       BEEN PROVIDED.  IT IS NOT ALL YET IN EVIDENCE, BUT THE PLAN IS

 7       TO MOVE IT IN BEFORE WE WOULD READ OR PUBLISH A SLIDE THAT

 8       CONTAINS ANYTHING.

 9             THE COURT:  OKAY.

10             MR. AKROTIRIANAKIS:  SO, YOUR HONOR, THESE ARE NOT

11       ALL OUT OF MS. TREXLER'S REPORT WHICH, OF COURSE, WE DID

12       RECEIVE.

13         BUT THE THIRD LAST PAGE IS FROM THE REPORT, SO THAT'S NOT

14       OBJECTIONABLE.

15         THE SIXTH LAST PAGE, I THINK, WAS PROVIDED WITH THE

16       REPORT, AS WAS THE EIGHTH LAST PAGE.

17         AND I DON'T HAVE AN OBJECTION TO THE COVER PAGE OR THE

18       FIFTH PAGE, OR THE LAST PAGE, YOUR HONOR.

19             THE COURT:  OKAY.

20             MR. AKROTIRIANAKIS:  I'M SORRY, THE SECOND -- THE

21       LAST PAGE, YES.

22             THE COURT:  ALL RIGHT.  THIS IS JUST A DEMONSTRATIVE

23       EXHIBIT?

24             MR. BLOCK:  YES, YOUR HONOR.

25             THE COURT:  OKAY.  AND HAVE YOU GIVEN -- HAVE YOU
```

1    MADE AN EXCHANGE OF YOURS TO HIM, ONES THAT YOU PLAN TO USE FOR

2    YOUR EXPERT?

3            MR. AKROTIRIANAKIS:  OUR EXPERT'S NOT BEING CALLED

4    TODAY, YOUR HONOR.

5            THE COURT:  SO YOU WERE GOING TO GIVE IT TO HIM

6    TODAY?

7            MR. AKROTIRIANAKIS:  WELL, NO.  WE WERE GOING TO GIVE

8    IT TO HIM, IF WE HAVE ONE, WHICH WE DON'T AT THE MOMENT, THE

9    DAY BEFORE AFTER COURT, AS WAS THE INSTRUCTION.

10           THE COURT:  OKAY.

11       WELL, THE DEMONSTRATIVE CAN BE USED THROUGHOUT THE COURSE

12   OF THE EXAMINATION.  BUT IT WON'T BE ADMITTED INTO EVIDENCE.

13           MR. BLOCK:  THANK YOU, YOUR HONOR.

14           THE COURT:  ALL RIGHT.

15       YOUR OBJECTION IS NOTED, COUNSEL.

16           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

17                        **DIRECT EXAMINATION**

18   BY MR. BLOCK:

19   Q.   SO, MS. TREXLER, WOULD YOU PLEASE TAKE A LOOK AT THE FIRST

20   TAB OF THE BINDER THAT YOU HAVE THERE AND LET US KNOW WHAT YOU

21   SEE.

22   A.   THESE ARE THE SLIDES THAT I PREPARED TO ASSIST MY

23   TESTIMONY TODAY.

24           MR. BLOCK:  MAY WE NOW PUBLISH THOSE SLIDES TO THE

25   JURY, YOUR HONOR, OR THE FIRST PAGE?

```
 1              THE COURT:  YES, YOU CAN USE THEM FOR THE

 2     EXAMINATION.

 3              MR. BLOCK:  THANK YOU.

 4     Q.   MR. EVANS, MAY WE HAVE MS. TREXLER'S SLIDES UP.

 5          AND, MS. TREXLER, DO YOU HAVE A CLICKER TO CONTROL IT?

 6     A.   I DO, YES.  THANK YOU.

 7     Q.   SO JUST TO GET STARTED, MS. TREXLER, AT THE HIGHEST LEVEL,

 8     WHAT IS THE SUBJECT OF THE EXPERT OPINIONS THAT YOU PREPARED

 9     FOR THIS CASE?

10     A.   I'VE BEEN ASKED TO QUANTIFY THE PLAINTIFFS' RESPONSE COSTS

11     TO THE NSO ATTACKS.

12     Q.   LET'S TALK ABOUT YOUR QUALIFICATIONS.

13          WOULD YOU PLEASE TELL THE JURY ABOUT YOUR EDUCATIONAL

14     BACKGROUND?

15     A.   I RECEIVED MY BACHELOR OF SCIENCE UNDERGRADUATE DEGREE IN

16     ACCOUNTING FROM BUCKNELL UNIVERSITY, AND I WENT ON TO GET MY

17     MASTER'S IN BUSINESS ADMINISTRATION, MY M.B.A., FROM THE

18     WHARTON SCHOOL OF THE UNIVERSITY OF PENNSYLVANIA.

19     Q.   DO YOU HAVE ANY CERTIFICATIONS THAT ARE PARTICULARLY

20     RELEVANT TO THE WORK YOU'VE DONE IN THIS CASE?

21     A.   YES, I HAVE TWO.

22          THE FIRST IS I AM A CPA, CERTIFIED PUBLIC ACCOUNTANT.

23     Q.   WHAT ARE THE REQUIREMENTS TO BECOME AND MAINTAIN THAT

24     CERTIFICATION?

25     A.   FIRST, I NEEDED TO COMPLETE REQUIRED COURSES AS PART OF MY
```

1    UNDERGRADUATE DEGREE, WHICH I DID.

2         AND THEN IN ORDER TO BECOME A CPA, YOU NEED TO TAKE A

3    FOUR-PART EXAM.  BACK WHEN I TOOK IT, I HAD TO TAKE IT OVER THE

4    COURSE OF TWO DAYS.  THERE WERE TWO PARTS EACH DAY, AND THEY

5    WERE FULL DAYS.  THAT'S CHANGED A LITTLE BIT NOW, THE SAME

6    NUMBER OF HOURS, BUT THEY CAN SPREAD IT OUT A LITTLE BIT MORE.

7         AFTER PASSING THE EXAM, IN ORDER TO RECEIVE THE CPA

8    CERTIFICATION, YOU NEED TO COMPLETE TWO YEARS OF PRACTICAL WORK

9    EXPERIENCE IN PERFORMING ACCOUNTING TYPE FUNCTIONS, WHICH I

10   DID.

11        AND THEN IN ORDER TO MAINTAIN THE CPA, I AM REQUIRED TO

12   RECEIVE 80 HOURS OF CONTINUING EDUCATION EVERY 2 YEARS, WHICH

13   I'VE DONE FOR THE LAST 30 YEARS.

14   Q.  AND YOU MENTIONED A SECOND CERTIFICATION, I THINK.  WHAT

15   WAS THAT?

16   A.  I'M ALSO CERTIFIED IN FINANCIAL FORENSICS.  THIS IS AN

17   ADDITIONAL CERTIFICATION AVAILABLE TO CPA'S WHO PERFORM

18   FORENSIC TYPE ACCOUNTING WORK, WHICH IS WORK THAT IS PERFORMED

19   IN -- IT'S A SPECIALIZED FORM OF ACCOUNTING WHERE WE LOOK AT

20   UNDERLYING FINANCIAL RECORDS AND DOCUMENTS IN FRAUD AND

21   FORENSIC INVESTIGATIONS WHERE THERE MAY BE FINANCIAL ANOMALIES

22   IN FINANCIAL STATEMENTS, OR IN LITIGATION, SUCH AS THIS ONE, TO

23   CALCULATE DAMAGES.

24        IT'S ESSENTIALLY PUZZLE SOLVING WITH NUMBERS.

25   Q.  AND WOULD YOU PLEASE GIVE THE JURY A BRIEF OVERVIEW OF

1      YOUR PROFESSIONAL BACKGROUND?

2      A.   YES.

3           I BEGAN MY CAREER WITH COOPERS & LYBRAND, WHICH EVENTUALLY

4      MERGED WITH PRICEWATERHOUSECOOPERS TO BECOME PWC.  I SPENT 18

5      YEARS OF MY CAREER WITH PWC.

6           I SPENT THE FIRST THREE AND A HALF YEARS ON THEIR AUDIT

7      STAFF, WHICH MEANS THAT I WAS RESPONSIBLE FOR AUDITING PUBLIC

8      COMPANIES AND SOME PRIVATE COMPANIES' FINANCIAL STATEMENTS,

9      WHICH ESSENTIALLY IS DOING TESTING OF THE UNDERLYING ACCOUNTING

10     RECORDS TO CONFIRM THAT THE FINANCIAL INFORMATION IS PRESENTED

11     IN THE FINANCIAL STATEMENTS WITHIN A REASONABLE DEGREE OF

12     PROFESSIONAL CERTAINTY, OR REASONABLE DEGREE OF CERTAINTY

13     WITHOUT MATERIAL MISSTATEMENTS.

14     Q.   AND WHAT DID YOU DO AFTER PWC?

15     A.   WELL, TO FILL IN THE REMAINING YEARS AT PWC, I THEN

16     TRANSFERRED INTO OUR FORENSIC SERVICES PRACTICE WHERE I DID A

17     LOT OF FRAUD AND FORENSIC INVESTIGATIONS, AND I ALSO WORKED ON

18     MANY, MANY DISPUTE MATTERS IN ASSISTING TO CALCULATE DAMAGES.

19          AFTER PWC, I MOVED TO TWO REGIONAL ACCOUNTING FIRMS,

20     REALLY PERFORMING THE SAME TYPE OF FORENSIC ACCOUNTING WORK,

21     BEFORE I JOINED STOUT IN JUNE OF 2020, WHICH I CONTINUE TO DO

22     THE SAME TYPE OF WORK TODAY.

23     Q.   AND DO YOU HAVE A LEADERSHIP ROLE AT STOUT?

24     A.   I DO.  I CO-LEAD STOUT'S INTELLECTUAL PROPERTY DISPUTES

25     AND VALUATIONS PRACTICE.

1    Q.   DOES YOUR WORK INVOLVE MATTERS OUTSIDE OF LITIGATION?

2    A.   IT DOES.  I CONSULT WITH COMPANIES WHO MAY BE TRYING TO

3    ENTER INTO TRANSACTIONS TO EITHER IN-LICENSE OR OUT-LICENSE

4    SOME OF THEIR INTELLECTUAL PROPERTY, AND I WORK WITH THEM TO

5    COME UP WITH RATES, PAYMENT AMOUNTS FOR USE OF THAT TECHNOLOGY,

6    STRUCTURE OF THOSE AMOUNTS.

7         I ALSO WORK WITH COMPANIES TO ASSIST IN FRAUD AND FORENSIC

8    TYPE INVESTIGATIONS AS WELL.

9    Q.   BEFORE THIS CASE, DO YOU HAVE PAST EXPERIENCE CALCULATING

10   DAMAGES BASED ON WORK CONDUCTED BY CORPORATE EMPLOYEES?

11   A.   YES, I DO.  THIS ISSUE COMES UP IN MANY OF THE CASES THAT

12   I'VE WORKED ON OVER THE LAST 25, 30 YEARS.

13        MR. BLOCK:  YOUR HONOR, PLAINTIFFS OFFER MS. TREXLER

14   AS AN EXPERT IN FORENSIC ACCOUNTING AND THE CALCULATION OF

15   ECONOMIC REMEDY AMOUNTS.

16        THE COURT:  ALL RIGHT.  THANK YOU.

17        ANY OBJECTION OTHER THAN AS STATED PRETRIAL?

18        MR. AKROTIRIANAKIS:  NOT AS TO THE LATTER.  I'M NOT

19   SURE ABOUT THE RELEVANCE OF THE FORMER.

20        BUT I WOULD AGREE THAT SHE CAN BE RECEIVED AS AN EXPERT,

21   YOUR HONOR.

22        THE COURT:  ALL RIGHT.  THANK YOU.

23        MR. BLOCK:  THANK YOU.

24   Q.   BEFORE WE MOVE ON, MS. TREXLER, WERE YOU COMPENSATED FOR

25   YOUR WORK ON THIS MATTER?

 1      A.   MY COMPANY, STOUT, WAS COMPENSATED FOR MY WORK ON THIS

 2      MATTER.

 3      Q.   IS STOUT'S COMPENSATION FOR YOUR WORK TIED IN ANY WAY TO

 4      THE SUBSTANCE OF YOUR OPINIONS OR TO THE OUTCOME OF THIS CASE?

 5      A.   NO.  I'M HERE AS AN INDEPENDENT EXPERT.  SO I NEED TO FORM

 6      MY OWN PROFESSIONAL OPINIONS ABOUT THE PLAINTIFFS' RESPONSE

 7      COST, AND MY COMPANY BENEFITS IN NO WAY WHATSOEVER BASED ON THE

 8      AMOUNTS I COME UP WITH OR ANYTHING LIKE THAT.

 9      Q.   LET'S DIVE INTO YOUR ANALYSIS.

10           SO, MS. TREXLER, WHAT ANALYSIS DID YOU CONDUCT IN THIS

11      CASE?

12      A.   I WAS ASKED TO CALCULATE THE PLAINTIFFS' LABOR COSTS IN

13      RESPONDING TO NSO'S ATTACKS.

14           SO ESSENTIALLY WHAT THAT MEANS IS I CALCULATED THE COST TO

15      WHATSAPP AND META OF HAVING THEIR EMPLOYEES SPENDING TIME

16      RESPONDING TO THE NSO ATTACKS.

17      Q.   WHAT MATERIALS DID YOU CONSIDER IN CONNECTION WITH YOUR

18      ANALYSIS?

19      A.   I CONSIDERED DOCUMENTS THAT WERE FILED WITH THE COURT BY

20      BOTH PARTIES.

21           I REVIEWED MANY, MANY DOCUMENTS THAT WHATSAPP, NSO, AND

22      META PRODUCED.  THAT INCLUDES UNDERLYING FINANCIAL INFORMATION,

23      PAYROLL TYPE RECORDS, INTERNAL CHATS, THE SEV THAT YOU HEARD

24      ABOUT, AND MANY, MANY OTHER DOCUMENTS.

25           I ALSO REVIEWED PUBLICLY AVAILABLE INFORMATION, LIKE

1    META'S 10-K, WHICH IS ITS PUBLICLY FILED FINANCIAL STATEMENTS.

2         I READ DEPOSITION TESTIMONY THAT WITNESSES GAVE IN THE

3    CASE.  I, LIKE YOU, HAVE BEEN SITTING HERE FOR THE ENTIRETY OF

4    TRIAL, SO I'VE HEARD THE DEPOSITION TESTIMONY OF THE WITNESSES

5    THAT HAVE PREVIOUSLY TESTIFIED.

6         AND THEN I ALSO HAD THE OPPORTUNITY TO SPEAK WITH CERTAIN

7    INDIVIDUALS AT WHATSAPP AND META IN FORMING MY OPINIONS.

8    Q.   WHAT STEPS DID YOU TAKE TO QUANTIFY THE RESPONSE COSTS?

9    A.   SO TO BREAK DOWN MY ANALYSIS TO QUANTIFY THE RESPONSE

10   COSTS, I FIRST WORKED WITH WHATSAPP AND META TO DETERMINE THE

11   EMPLOYEES, THE RELEVANT EMPLOYEES WHO WERE WORKING ON THE

12   MATTER TO DETERMINE WHO TO INCLUDE IN MY ANALYSIS.

13        I THEN HAD TO DETERMINE A LABOR ESTIMATE OF THE LABOR

14   HOURS FOR EACH ONE OF THOSE INDIVIDUALS.

15        I HAD TO THEN QUANTIFY THE COST OF THOSE LABOR HOURS.  SO

16   FOR EACH EMPLOYEE, BECAUSE THEY'RE SALARIED, I NEEDED TO

17   CONVERT THEIR TOTAL COMPENSATION THAT META AND WHATSAPP PAY TO

18   THEM TO AN HOURLY RATE BECAUSE MY CALCULATION IS BASED ON A

19   SPECIFIC NUMBER OF HOURS THAT THESE INDIVIDUALS SPENT WORKING

20   IN RESPONSE TO THE NSO ATTACKS.

21        AND THEN I PUT IT ALL TOGETHER, I TOOK THE NUMBER OF HOURS

22   FOR EACH EMPLOYEE RESPONDING TO THE NSO ATTACKS, TIMES EACH

23   EMPLOYEE'S HOURLY LABOR RATE TO COME UP WITH THE LABOR COST TO

24   THE PLAINTIFFS FOR WORK ON THE RESPONSE, AND I ADDED THEM ALL

25   UP FOR EACH EMPLOYEE INCLUDED IN MY ANALYSIS.

1    Q.   SO AS NOT TO BURY THE LEAD, MS. TREXLER, DID YOU REACH A

2    CONCLUSION?

3    A.   I DID, YES.  I DETERMINED THAT THE PLAINTIFFS SPENT AT

4    LEAST $444,719 IN RESPONDING TO THE NSO ATTACKS.

5    Q.   SO LET'S TALK ABOUT THE FIRST STEP YOU DESCRIBED.

6         HOW DID YOU DETERMINE WHICH EMPLOYEES TO INCLUDE IN YOUR

7    ANALYSIS?

8    A.   I WORKED WITH INDIVIDUALS AT WHATSAPP AND META TO

9    DETERMINE WHO SOME OF THE KEY PEOPLE WERE WHO WERE WORKING IN

10   RESPONSE TO THE ATTACKS.

11        THE INDIVIDUALS THAT I INCLUDE IN MY ANALYSIS ARE

12   CERTAINLY NOT EVERYBODY.  AS YOU HEARD FROM MR. GHEORGHE AND

13   MR. ROBINSON, THERE WERE, YOU KNOW, CROSS-FUNCTIONAL TEAMS FROM

14   ACROSS THE COUNTRY, YOU KNOW, ACROSS, YOU KNOW, GEOGRAPHIES WHO

15   WERE ALL RESPONDING TO THIS.

16        SO I FOCUSSED ON A SUBSET OF EMPLOYEES TO INCLUDE IN MY

17   ANALYSIS.

18   Q.   YOUR NEXT STEP WAS TO ESTIMATE LABOR HOURS.

19        HOW DID YOU DO THAT?

20   A.   I HELD DISCUSSIONS WITH EIGHT OF THE META AND/OR WHATSAPP

21   EMPLOYEES TO UNDERSTAND WHAT THEIR TITLES WERE, THEIR

22   RESPONSIBILITIES, THE ROLE THAT THEY WERE PERFORMING IN

23   RESPONSE TO THE NSO ATTACKS, THE TIME PERIODS DURING WHICH THEY

24   WERE RESPONDING.

25        AND THEN I ALSO HAD THE OPPORTUNITY TO SPEAK WITH

1    MR. GHEORGHE, WHO YOU HEARD TESTIFY, BECAUSE HE WAS OVERSEEING

2    AND COORDINATING A TEAM OF PEOPLE, AND HE WAS ABLE TO PROVIDE

3    ME SOME INFORMATION REGARDING A TEAM OF ADDITIONAL PEOPLE THAT

4    HE WAS WORKING VERY CLOSELY WITH DURING THE RESPONSE, AND HE

5    DESCRIBED TO ME THEIR ROLES, AS HE DESCRIBED THEM TO YOU AS

6    WELL, AND PROVIDED ME WITH AN ESTIMATE OF THE NUMBER OF HOURS

7    THAT THEY WERE PERFORMING THROUGHOUT THE INVESTIGATION AND

8    REMEDIATION AND RESPONSE.

9    Q.   ASIDE FROM THOSE INTERVIEWS, DID YOU DO ANY OTHER ANALYSIS

10   TO UNDERSTAND WHO WAS WORKING ON THE RESPONSE TO THE ATTACKS IN

11   THIS CASE?

12   A.   I DID.  I REVIEWED SOME OF THE UNDERLYING RECORDS JUST TO

13   CONFIRM MY UNDERSTANDING OF WHAT THE INDIVIDUAL EMPLOYEES WERE

14   DOING.

15        I REVIEWED RECORDS LIKE THE SEV, WHICH YOU HAVE SEEN, AND

16   THERE WERE MANY COMMUNICATIONS BETWEEN THE EMPLOYEES

17   DOCUMENTING THE WORK THAT THEY WERE PERFORMING, AND I SAW MANY,

18   MANY OF THE NAMES IN THERE.

19        I REVIEWED SOME OF THE INTERNAL CHAT LOGS DOCUMENTING WORK

20   THAT WAS BEING PERFORMED BY THE INDIVIDUALS INCLUDED IN MY

21   ANALYSIS.

22        SO THAT AND OTHER TYPES OF RECORDS THAT I REVIEWED

23   CONFIRMED MY UNDERSTANDING.

24   Q.   DID YOU NEED ANY ADDITIONAL STEPS TO GET FROM THE

25   INFORMATION THAT YOU LEARNED IN THE INTERVIEWS TO AN ACTUAL

1    COUNT OF HOURS FOR MANY OF THESE PEOPLE?

2    A.   I DID.

3         SOME OF THE EMPLOYEES PROVIDED ME WITH, YOU KNOW, THEIR

4    ESTIMATE OF THE HOURS.  OTHERS GAVE ME RANGES.  THEY MAY HAVE

5    SAID, I SPENT BETWEEN 30 AND 40 HOURS, OR I SPENT 25 TO 50

6    PERCENT OF MY TIME.

7         SO WHAT I HAD TO DO IS TAKE THE INFORMATION THAT I

8    OBTAINED FROM THE INTERVIEWS AND DETERMINE HOW MANY HOURS I WAS

9    INCLUDING.

10        SO WHAT I DID IS I TOOK THE LOW END OF THE RANGE, FOR

11   EXAMPLE, IF SOMEBODY SAID THEY SPENT 25 TO 50 PERCENT OF THEIR

12   TIME, I ONLY INCLUDED 25 PERCENT OF THE AVAILABLE HOURS IN MY

13   CALCULATION.

14        THE OTHER THING THAT I DID TO MAKE A CONSERVATIVE

15   ASSUMPTION -- AND BY "CONSERVATIVE," I MEAN IT GIVES A LOWER

16   RESPONSE COST AMOUNT -- IS I DID NOT INCLUDE ANY HOURS ABOVE

17   AND BEYOND AN EIGHT HOUR WORKDAY FIVE DAYS A WEEK.

18        SO YOU HEARD MR. GHEORGHE SAY THAT HE WAS BASICALLY

19   WORKING CONSTANTLY IN RESPONSE TO THE ATTACKS AND MAYBE

20   SLEEPING FIVE OR SIX HOURS A NIGHT BETWEEN WORKING WITH THE

21   TEAMS IN THE U.S. AND COORDINATING WITH THE LONDON TEAM.  I

22   ONLY ASSUMED THAT MR. GHEORGHE WORKED EIGHT HOURS A DAY WHEN

23   CLEARLY HE WAS WORKING MORE.

24        AND I ALSO DID NOT ASSUME ANY WEEKEND WORK.

25        SO I TOOK THE VERY LOW END OF THESE RANGES WHEN PERFORMING

 1      MY CALCULATIONS.

 2      Q.   LET'S LOOK A LITTLE MORE CLOSELY AT THAT EXAMPLE FOR

 3      MR. GHEORGHE.

 4           SO I TAKE IT HE'S ONE OF THE PEOPLE YOU INTERVIEWED?

 5      A.   YES.

 6      Q.   AND WHAT DID YOU LEARN FROM HIM?

 7      A.   SO AS MR. GHEORGHE TESTIFIED, HE WAS RESPONSIBLE FOR

 8      COORDINATING THE INVESTIGATION AND REMEDIATION OF THE ATTACKS,

 9      AND HE WAS IN A MANAGERIAL OVERSIGHT ROLE OF MANY OF THESE

10      CROSS-FUNCTIONAL TEAM MEMBERS.

11           SO IF I START WITH THE WORK THAT MR. GHEORGHE PERFORMED

12      HIMSELF, HE SAID THAT HE WAS BASICALLY SPENDING ALL OF HIS

13      WORKING HOURS FROM MAY 2ND THROUGH MAY 13TH WORKING IN RESPONSE

14      TO THE ATTACKS, AND THEN 50 PERCENT OF HIS TIME FOR TWO WEEKS

15      FOLLOWING MAY 13TH.

16           SO I CONSERVATIVELY ESTIMATED THAT HE SPENT 104 HOURS IN

17      RESPONSE TO THE ATTACKS.

18           IN ADDITION, MR. GHEORGHE ALSO PROVIDED ME WITH THE NAMES

19      OF INDIVIDUALS THAT HE WAS WORKING WITH IN THESE

20      CROSS-FUNCTIONAL TEAMS AND ESTIMATED THE NUMBER OF HOURS FOR

21      THOSE INDIVIDUALS, IN ADDITION TO PROVIDING ME WITH SOME

22      INSIGHT INTO THE TYPE OF WORK THAT THEY WERE PERFORMING.

23           AND SO I INCLUDED THOSE INDIVIDUALS IN MY ANALYSIS AS

24      WELL.

25      Q.   OKAY.  SO AT THIS POINT IN THE ANALYSIS, YOU HAVE YOUR

1    LIST OF EMPLOYEES AND YOUR ESTIMATE, YOUR COUNT OF HOURS FOR

2    EACH OF THEM.

3          WHAT DID YOU DO NEXT?

4    A.   SO THE NEXT STEP IS TO FIGURE OUT WHAT THE COST TO

5    WHATSAPP AND META IS FOR EACH AND EVERY ONE OF THESE EMPLOYEES.

6          SO I FIRST HAD TO DETERMINE WHAT COMPENSATION CATEGORIES

7    TO INCLUDE.  I INCLUDED SALARY; PERFORMANCE BONUS; THERE IS THE

8    PORTION OF THE 401(K) CONTRIBUTION THAT META AND WHATSAPP MAKES

9    TO THE EMPLOYEE'S 401(K) ACCOUNT.

10         META AND WHATSAPP ALSO PAY TAXES AND HEALTH CARE

11   CONTRIBUTIONS FOR EACH ONE OF THESE EMPLOYEES, AND THAT'S THE

12   META/WHATSAPP EXPENSE.  THIS ISN'T THE EMPLOYEE SIDE OF IT.

13         AND THEN IN ADDITION TO THAT, AS YOU HEARD FROM BOTH

14   MR. GHEORGHE AND MR. ROBINSON, RESTRICTED STOCK UNITS ARE A

15   COMPONENT OF THEIR COMPENSATION AS WELL FOR MANY OF THESE

16   EMPLOYEES.

17         SO THOSE ARE THE CATEGORIES OF COMPENSATION THAT I

18   INCLUDED IN COMING UP WITH MY HOURLY RATE.

19   Q.   AND WHAT SOURCES DID YOU USE TO DETERMINE THOSE CATEGORIES

20   FOR THESE PEOPLE?

21   A.   I USED INFORMATION, INCLUDING RECORDS PROVIDED TO ME BY

22   THE PAYROLL DEPARTMENT, WHICH PROVIDED ME WITH SALARY, BONUS,

23   TAX INFORMATION, 401(K) CONTRIBUTION.

24         I ALSO OBTAINED INFORMATION FROM META'S EQUITY DEPARTMENT

25   THAT PROVIDED ME WITH THE INFORMATION ON THE RESTRICTED STOCK

1    UNITS THAT VESTED DURING 2019.  SO IT'S THAT VESTING THAT

2    CAUSES AN EXPENSE TO META.

3         SO I REVIEWED THAT INFORMATION.

4         ADDITIONALLY, I HAD SOME QUESTIONS ABOUT SOME OF THE

5    UNDERLYING RECORDS THAT WERE PROVIDED TO ME, SO I INTERVIEWED

6    META EMPLOYEES FROM THE PAYROLL DEPARTMENT.  I INTERVIEWED A

7    WOMAN BY THE NAME OF PRIMA DOLES FROM PAYROLL.

8         AND THEN I ALSO SPOKE TO TWO INDIVIDUALS IN THE EQUITY

9    PROGRAM AND SECURITIES AND DISCLOSURE EQUITY OPERATIONS TEAMS,

10   TWO INDIVIDUALS BY THE NAME OF ISMA CHOWDERY AND

11   LILLIAN NGUYEN.

12   Q.   WHY DID YOU HAVE TO DEVELOP AN ESTIMATED HOURLY RATE?

13   A.   BECAUSE I WAS -- I AM FOCUSSED JUST ON A SUBSET OF THE

14   HOURS THAT THESE EMPLOYEES SPENT IN RESPONSE TO THE NSO

15   ATTACKS.  THEY HAD OTHER RESPONSIBILITIES, AS YOU'VE HEARD, AND

16   THEY WORKED ON THEM THROUGHOUT THE COURSE OF THE YEAR.

17        SO IT WOULD BE UNFAIR FOR ME TO LOOK AT THE TOTAL AMOUNT

18   OF TIME THAT THESE INDIVIDUALS SPENT.  I'M FOCUSSED ON A SMALL

19   SUBSET OF HOURS.

20        BECAUSE THESE EMPLOYEES ARE HOURLY -- I'M SORRY.

21        BECAUSE THESE EMPLOYEES ARE SALARY, I NEEDED TO TAKE THE

22   TOTAL COMPENSATION EXPENSE THAT META HAS FOR THE EACH, FOR EACH

23   ONE OF THESE EMPLOYEES AND BREAK IT DOWN INTO AN HOURLY RATE SO

24   I COULD FAIRLY ATTRIBUTE EACH INDIVIDUAL'S EMPLOYEE COST TO THE

25   HOURS THAT THEY SPENT IN RESPONSE TO THE NSO ATTACKS.

1       AND THIS IS A FAIRLY COMMON, STANDARD METHODOLOGY THAT'S

2    EMPLOYED BY EXPERTS SUCH AS ME.

3    Q.   OKAY.  SO BEFORE WE ADVANCE THE SLIDES, WOULD YOU PLEASE

4    TURN TO THE TAB IN YOUR WITNESS BINDER MARKED PLAINTIFFS' TRIAL

5    EXHIBIT 288.

6    A.   YES.

7    Q.   AND ONCE YOU'RE THERE, WOULD YOU JUST LET THE JURY KNOW

8    WHAT EXHIBIT 288 IS?

9    A.   THIS IS AN EXAMPLE FOR MR. ROBINSON OF THE PAYROLL

10   REGISTER THAT INCLUDES INFORMATION OF SALARY, EMPLOYER PAID

11   TAXES, ET CETERA.  SO IT'S A PAYROLL RECORD SPECIFIC TO

12   MR. ROBINSON.

13          MR. BLOCK:  YOUR HONOR, PLAINTIFFS MOVE TO ADMIT

14   EXHIBIT 288 INTO EVIDENCE AND REQUEST PERMISSION TO PUBLISH IT

15   TO THE JURY.

16          THE COURT:  ANY OBJECTION?

17          MR. AKROTIRIANAKIS:  MAY I HAVE JUST ONE MOMENT,

18   YOUR HONOR?  I'M SORRY.

19       (PAUSE IN PROCEEDINGS.)

20          MR. AKROTIRIANAKIS:  NO OBJECTION, YOUR HONOR.  THANK

21   YOU.

22          THE COURT:  ALL RIGHT.  ADMITTED.

23       (PLAINTIFFS' EXHIBIT 288 WAS ADMITTED IN EVIDENCE.)

24   BY MR. BLOCK:

25   Q.   OKAY.  SO LET'S LOOK A LITTLE MORE CLOSELY AT EXHIBIT 288.

1        AND MY QUESTION IS, COULD YOU PLEASE EXPLAIN WHAT YOU USED

2    DOCUMENTS LIKE THIS ONE FOR TO THE JURY.

3    A.   ESSENTIALLY I WAS ABLE TO OBTAIN INFORMATION ABOUT THE

4    COST TO WHATSAPP AND META FOR EACH INDIVIDUAL EMPLOYEE INCLUDED

5    IN MY ANALYSIS.  THIS ONE IS PARTICULAR TO MR. ROBINSON.

6        SO WHAT I WAS ABLE TO DO IS DETERMINE THE EMPLOYEE THAT IT

7    RELATES TO, AND THIS IS THE EMPLOYEE NUMBER.

8    Q.   IS IT NOT --

9    A.   OH, SORRY.  THERE WAS A LITTLE BIT OF A DELAY HERE, SO LET

10   ME GO BACK.

11       I'M ABLE TO OBTAIN THE SALARY INFORMATION; THE EMPLOYER

12   PAID 401(K) MATCH, SO THAT'S THE CONTRIBUTION THAT THE COMPANY

13   MAKES TO THE INDIVIDUAL EMPLOYEE'S 401(K) ACCOUNT; THE TAXES

14   THAT ARE PAID BY META AND WHATSAPP, THIS IS THEIR

15   RESPONSIBILITY, NOT JUST TAXES THAT ARE BEING WITHHELD TO THE

16   EMPLOYEE, THIS IS THE COST TO META AND WHATSAPP FOR SOCIAL

17   SECURITY, MEDICARE, ET CETERA.

18   Q.   OKAY.

19   A.   SORRY.  LET ME GO BACK.

20   Q.   THAT'S ALL RIGHT.  YOU CAN ACTUALLY -- IT'S OKAY TO

21   ADVANCE.

22   A.   OKAY.

23   Q.   DID YOU USE -- DID YOU RELY ON EXHIBIT 288 FOR YOUR

24   ANALYSIS?

25   A.   I DID, AND MANY OTHER DOCUMENTS LIKE 288, BUT THAT WERE

1    SPECIFIC TO THE OTHER EMPLOYEES IN MY ANALYSIS.

2    Q.   SO WHAT ARE YOU SHOWING ON SLIDE 11?

3    A.   THIS IS A LIST OF THE TRIAL EXHIBIT NUMBERS FOR THE

4    PAYROLL RECORDS THAT I RELIED UPON FOR THE OTHER INDIVIDUALS IN

5    MY ANALYSIS.

6             MR. BLOCK:  YOUR HONOR, PLAINTIFFS MOVE TO ADMIT INTO

7    EVIDENCE PLAINTIFFS' TRIAL EXHIBITS 287, 288, 289, 290, 291,

8    292, 293, 295, 296, 297, 299, 300, 301, 302, 303, 304, 307,

9    308, 310, 312, 314, AND 324.

10             THE COURT:  ANY OBJECTION?

11             MR. AKROTIRIANAKIS:  IF I COULD JUST CHECK FOR JUST

12   ONE SECOND, YOUR HONOR?

13        (PAUSE IN PROCEEDINGS.)

14             THE COURT:  ALL RIGHT.  ANY OBJECTION?

15             MR. AKROTIRIANAKIS:  THE LIST THAT WAS RECITED BY

16   COUNSEL DID NOT INCLUDE 298, RIGHT, YOUR HONOR?

17             MR. BLOCK:  THAT'S CORRECT.

18             THE COURT:  298 IS NOT INCLUDED.

19             MR. AKROTIRIANAKIS:  OKAY.  AND 309, I JUST NEED TO

20   HAVE ANOTHER LOOK AT.

21        BUT AS TO EVERYTHING ELSE, NO OBJECTION, YOUR HONOR.

22             MR. BLOCK:  309 IS ALSO NOT ON THE LIST.

23             THE COURT:  RIGHT.

24             MR. AKROTIRIANAKIS:  OKAY.  THEN I WITHDRAW MY

25   OBJECTION TO 309.

```
 1              THE COURT:  ALL RIGHT.  ADMITTED.

 2          (PLAINTIFFS' EXHIBITS 287, 288, 289, 290, 291, 292, 293,

 3      295, 296, 297, 299, 300, 301, 302, 303, 304, 307, 310, 312,

 4      314, AND 324 WERE ADMITTED IN EVIDENCE.)

 5              MR. AKROTIRIANAKIS:  SORRY.  308 WAS THE ONE I MEANT,

 6      YOUR HONOR.  I'M SORRY.

 7          IT'S DIFFERENT FROM THE OTHERS, SO I JUST WANTED TO LOOK

 8      AT IT A LITTLE BIT MORE QUICKLY.

 9              THE COURT:  OKAY.  LET'S GO FORWARD WITH ALL OF THEM

10      EXCEPT 308.

11              MR. BLOCK:  THANK YOU, YOUR HONOR.

12      Q.   SO BEFORE WE GO FURTHER -- WELL, LET ME JUST ASK FOR THE

13      RECORD, ALL OF THOSE EXHIBITS WE JUST MOVED IN, WHAT ARE THEY?

14      A.   THEY'RE THE PAYROLL RECORDS THAT ARE VERY SIMILAR TO THE

15      ONE THAT WE JUST LOOKED AT FOR MR. ROBINSON, BUT THEY PERTAIN

16      TO EACH OF THE SPECIFIC INDIVIDUALS THAT YOU SEE LISTED ON YOUR

17      SCREEN WHO ARE ALSO INCLUDED IN MY ANALYSIS.

18          BUT I OBTAINED THE SAME TYPES OF INFORMATION FROM THESE

19      PAYROLL RECORDS.

20      Q.   OKAY.  SO BEFORE WE ADVANCE THE SLIDES, WOULD YOU PLEASE

21      TURN TO THE TAB IN YOUR WITNESS BINDER MARKED PLAINTIFFS' TRIAL

22      EXHIBIT 322?

23      A.   I AM THERE.

24      Q.   WHAT IS EXHIBIT 322?

25      A.   THIS IS A SUMMARY THAT WAS PROVIDED TO ME FROM THE PAYROLL
```

1    DEPARTMENT FOR EACH OF THE INDIVIDUALS INCLUDED IN MY ANALYSIS,

2    AND FROM THIS DOCUMENT, I WAS ABLE TO OBTAIN INFORMATION ABOUT

3    THE COSTS TO META AND WHATSAPP FOR THE EMPLOYER HEALTH CARE

4    CONTRIBUTION.  SO, AGAIN, THAT'S THE PIECE THAT META PAYS TO

5    MAKE IT LESS EXPENSIVE FOR THE EMPLOYEE FOR THEIR HEALTH CARE

6    COSTS, AND ALSO THE BONUS AMOUNTS THAT PERTAIN TO PERFORMANCE

7    FROM THE WORK PERFORMED IN 2019.

8         MR. BLOCK:  YOUR HONOR, PLAINTIFFS MOVE TO ADMIT

9    TRIAL EXHIBIT 322 INTO EVIDENCE AND REQUEST PERMISSION TO

10   PUBLISH IT TO THE JURY.

11        THE COURT:  ANY OBJECTION?

12        MR. AKROTIRIANAKIS:  NO OBJECTION, YOUR HONOR.

13        THE COURT:  ALL RIGHT.  ADMITTED.

14   (PLAINTIFFS' EXHIBIT 322 WAS ADMITTED IN EVIDENCE.)

15   BY MR. BLOCK:

16   Q.   OKAY.  WOULD YOU PLEASE EXPLAIN EXHIBIT 322, AND HOW YOU

17   USED IT, TO THE JURY.

18   A.   FOR EACH OF THE EMPLOYEES IN MY ANALYSIS, I OBTAINED THE

19   EMPLOYER HEALTH CARE CONTRIBUTION AMOUNT FROM 2019 FROM THIS

20   DOCUMENT THAT WAS PROVIDED TO ME BY PAYROLL.

21        I ALSO OBTAINED THE INFORMATION THAT RELATED TO THE BONUS

22   AMOUNTS THAT WERE PAID TO EACH EMPLOYEE IN MY ANALYSIS THAT

23   RELATED TO PERFORMANCE IN 2019.

24        NOW, YOU MIGHT BE ASKING YOURSELF, WHY DOES THIS SAY 2020

25   BONUS, AND I CAN EXPLAIN THAT.  I HAD THE SAME QUESTION MYSELF.

```
 1              SO WHEN I SPOKE TO META'S PAYROLL DEPARTMENT, I ASKED THE

 2    QUESTION, AND THEY EXPLAINED TO ME THAT THE PERFORMANCE BONUS

 3    THAT RELATES TO THE WORK PERFORMED IN 2019 IS ACTUALLY PAID IN

 4    2020.  AND SO THEY SAID THAT WAS THE PROPER COLUMN TO LOOK AT.

 5    Q.   IN ADDITION TO THE FORMS OF COMPENSATION THAT WE JUST

 6    DISCUSSED, DID YOU INCLUDE ANY OTHER FORMS OF COMPENSATION IN

 7    YOUR ANALYSIS?

 8    A.   I DID, YES.

 9              I INCLUDED THE COST TO META OF ISSUING RESTRICTED STOCK

10    UNITS TO THE EMPLOYEES IN MY ANALYSIS THAT WERE PART OF THE

11    RESTRICTED STOCK COMPENSATION PLAN.

12    Q.   WHAT ARE RESTRICTED STOCK UNITS?

13    A.   THAT'S A GOOD QUESTION.

14              ESSENTIALLY WHAT RESTRICTED STOCK UNITS ARE -- THE WAY

15    THAT THEY WORK -- AND I HAVE A SLIDE ON THIS THAT I THINK MIGHT

16    MAKE THIS DISCUSSION A LITTLE BIT EASIER.

17              SO AS YOU HEARD FROM THE TESTIMONY OF MR. GHEORGHE AND

18    MR. ROBINSON, THE RESTRICTED STOCK UNITS ARE VERY MUCH A PART

19    OF THE EMPLOYEE COMPENSATION PLAN.

20              AND THE WAY THAT THEY WORK IS A GRANT OF RESTRICTED STOCK

21    UNITS WILL BE PROVIDED TO AN EMPLOYEE, BUT THEY DON'T GET THOSE

22    STOCK UNITS ON DAY 1.  IT'S -- IT'S -- THOSE STOCK UNITS VEST,

23    WHICH ESSENTIALLY MEANS THEY TURN FROM A PROMISE TO RECEIVE

24    STOCK FOR FUTURE PERFORMANCE INTO AN ACTUAL STOCK CERTIFICATE

25    THAT'S HELD BY THE EMPLOYEE.
```

1          IT'S AT THAT POINT IN TIME WHEN THE RESTRICTED STOCK UNIT

2     VESTS THAT THE EMPLOYEE THEN OWNS THE STOCK.

3          AND SO THE WAY META'S PROGRAM WORKS IS THAT WHEN THERE IS

4     A GRANT, WHICH IS THE PROMISE WITH FUTURE PERFORMANCE THAT YOU

5     RECEIVE THE STOCK UNITS, THOSE UNITS VEST OVER A FOUR YEAR

6     PERIOD EACH QUARTER.

7          SO OVER THE COURSE OF 16 QUARTERS, THAT PROMISE GETS

8     FULFILLED IF THE EMPLOYEE STAYS WITH META.

9          THE STOCK ONLY IS A COST TO META WHEN IT VESTS, WHEN IT

10    TURNS INTO THAT ACTUAL STOCK CERTIFICATE HELD BY THE EMPLOYEE.

11         SO WHAT I DO IN MY ANALYSIS IS SAY, OKAY, EMPLOYEES NEEDED

12    TO STAY AND WORK IN 2019, FOR A PORTION OF THE STOCK,

13    RESTRICTED STOCK UNITS TO VEST, WHAT PORTION OF THAT EXPENSE TO

14    META OCCURRED IN 2019 RELATING TO THE PERFORMANCE IN 2019?

15         AND SO THAT'S THE PIECE THAT I PICK UP IN MY ANALYSIS.

16         IT'S ALSO AT THAT POINT IN TIME THAT THE EMPLOYEE HAS

17    TAXABLE INCOME FOR NOW HOLDING THAT STOCK UNIT.

18         SO THAT'S WHEN THE COST HAPPENS TO META.  IT'S ALSO WHEN

19    THE EMPLOYEE GETS TAXED IN RECEIVING COMPENSABLE INCOME.

20    Q.   HOW DO YOU CONVERT THAT COST TO WHATSAPP AND META OF A

21    RESTRICTED STOCK UNIT INTO AN HOURLY LABOR RATE?

22    A.   SURE.  SO I LOOKED AT THE EXPENSE THAT META HAD IN 2019

23    FOR THESE PARTICULAR EMPLOYEES -- AND WHEN I SAY AN EXPENSE,

24    THIS IS AN EXPENSE THAT META IS REQUIRED TO RECORD IN ITS

25    FINANCIAL STATEMENTS AND REPORT ON IT.  THAT'S REQUIRED.

1           SO WHAT I DID IS I LOOKED AT THE TOTAL DOLLARS FOR THESE

2     INDIVIDUALS THAT META RECORDED AND REPORTED IN THEIR PUBLIC

3     FINANCIAL STATEMENTS, AND I DIVIDED THAT BY 2,080 HOURS TO COME

4     UP WITH AN HOURLY RATE FOR EACH OF THE EMPLOYEES AS IT RELATES

5     TO THIS RESTRICTED STOCK UNIT EXPENSE.

6     Q.   WHY DID YOU CHOOSE TO LOOK AT THE RSU'S THAT VESTED IN

7     2019 INSTEAD OF RSU'S THAT WERE AWARDED IN OR AFTER 2019 FOR

8     WORK PERFORMED AT THAT TIME?

9     A.   A COUPLE OF REASONS.

10          FIRST, IT WOULD BE IMPROPER FOR ME TO LOOK AT THE UNITS

11    THAT WERE GRANTED IN 2019 IF THEY DON'T VEST BECAUSE IT'S A

12    PROMISE FOR FUTURE STOCK UNITS IF THE EMPLOYEES STAY.  IT'S A

13    WAY FOR META TO RETAIN EMPLOYEES.  THEY WANT THEM TO STAY, THEY

14    WANT TO GET THE BENEFIT OF THEIR WORK, AND WITH THAT

15    PERFORMANCE, THEY THEN GET THE STOCK UNIT.

16          SO IF UNITS WERE GRANTED IN 2019, THEY HAVEN'T VESTED.

17    YOU DON'T KNOW IF THAT EMPLOYEE WILL STAY OR LEAVE.

18          SO IF I WOULD RECOGNIZE THAT ENTIRE EXPENSE FOR THE GRANT

19    IN 2019, IT WOULD OVERSTATE MY ANALYSIS, AND WE DON'T KNOW HOW

20    MANY OF THESE EMPLOYEES MIGHT MOVE ON, AND SOME OF THEM HAVE,

21    AS WE'VE HEARD IN THE TESTIMONY.

22    Q.   SO TO THE EXTENT PLAINTIFFS INCURRED A COST THROUGH

23    OFFERING STOCK BASED COMPENSATION FOR THE WORK THAT THEY HIRED

24    THEIR EMPLOYEES, THAT THEY PAID THEIR EMPLOYEES TO DO IN 2019,

25    WHICH PORTION OF THE RSU'S RELATES TO THAT WORK IN 2019?

1     A.   ONLY THOSE THAT VESTED.  SO ONLY THOSE THAT RESULTED IN AN

2     ACTUAL STOCK UNIT THAT IS NOW HELD BY THE EMPLOYEE THAT WAS

3     GIVEN TO THEM IN 2019 BECAUSE IT REQUIRED THEM TO CONTINUE

4     WORKING WITH META IN 2019.

5          SO THAT'S THE ONLY PORTION THAT I TOOK.

6     Q.   OKAY.  BEFORE WE ADVANCE THE SLIDES, WOULD YOU PLEASE TURN

7     TO THE TAB IN YOUR WITNESS BINDER MARKED PLAINTIFFS' TRIAL

8     EXHIBIT 323.

9     A.   I AM THERE.

10    Q.   AND WHAT IS EXHIBIT 323?

11    A.   THIS IS A SUMMARY FOR EACH OF THE INDIVIDUALS IN MY

12    ANALYSIS OF THE RSU EXPENSE TO META FOR THE WORK PERFORMED IN

13    2019.

14         SO, AGAIN, THIS IS THE COST OF ONLY THOSE UNITS THAT

15    VESTED THAT ULTIMATELY ROLLS UP INTO THE EXPENSE, THE RSU

16    COMPENSATION EXPENSE, THAT META REPORTED IN ITS 2019 PUBLIC

17    FINANCIAL STATEMENTS.

18    Q.   AND DID YOU RELY ON PLAINTIFFS TRIAL EXHIBIT 323 IN YOUR

19    ANALYSIS?

20    A.   YES, I DID.

21         MR. BLOCK:  YOUR HONOR, PLAINTIFFS MOVE EXHIBIT 323

22    INTO EVIDENCE AND REQUEST PERMISSION TO PUBLISH IT TO THE JURY.

23         THE COURT:  ANY OBJECTION?

24         MR. AKROTIRIANAKIS:  HEARSAY, YOUR HONOR.  IT'S NOT A

25    BUSINESS RECORD.  IT'S PREPARED FOR LITIGATION.

```
1              THE COURT:  233?  I'M SORRY.  IT IS --

2              MR. AKROTIRIANAKIS:  323.

3              THE COURT:  323.

4              MR. BLOCK:  CORRECT, YOUR HONOR.

5              THE COURT:  THIS WAS PREPARED BY THIS WITNESS;

6   CORRECT?

7              MR. BLOCK:  NO.  IT WAS PROVIDED TO THE WITNESS BY A

8   PAYROLL EMPLOYEE AND IT'S WITHIN A BUSINESS RECORD

9   CERTIFICATION THAT I CAN HAND UP OR READ IN, HOWEVER YOU WOULD

10  LIKE.

11         I DON'T THINK THERE'S AN OBJECTION TO AUTHENTICITY.

12             THE COURT:  HE OBJECTED THAT IT WAS NOT A BUSINESS

13  RECORD, THAT IT WAS HEARSAY.

14         DO YOU HAVE A CERTIFICATION?

15             MR. BLOCK:  I DO, YOUR HONOR.

16         SHOULD I HAND IT TO THE COURT?

17             THE COURT:  YES.

18             MR. BLOCK:  (HANDING.)

19             THE COURT:  OKAY.

20             MR. BLOCK:  AND --

21             THE COURT:  ALL RIGHT.  I'LL ADMIT IT.

22         (PLAINTIFFS' EXHIBIT 323 WAS ADMITTED IN EVIDENCE.)

23             MR. BLOCK:  THANK YOU, YOUR HONOR.  OKAY.

24             MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR, AT SOME

25  POINT WILL I GET A CHANCE TO LOOK AT THE CERTIFICATION?
```

```
 1              THE COURT:  YOU HAVEN'T SEEN THIS?

 2              MR. AKROTIRIANAKIS:  NO, NO.

 3              MR. BLOCK:  YES, YOU HAVE.  IT WAS DISCLOSED LAST

 4      NIGHT.  IT'S ALSO PLAINTIFFS' EXHIBIT 929.  IT'S IN YOUR BINDER

 5      FROM SEVERAL MONTHS AGO.

 6      Q.   WILL YOU PLEASE EXPLAIN EXHIBIT 323 TO THE JURY,

 7      MS. TREXLER?

 8      A.   SURE.

 9              SO WHAT THIS SHOWS IS IT'S THE RSU EXPENSE TO META FOR THE

10      WORK PERFORMED IN 2019 FOR EACH OF THE RELEVANT EMPLOYEES IN MY

11      ANALYSIS.

12              AND THE REASON I FOCUSSED ON 2019 IS BECAUSE THAT'S WHEN

13      THE INVESTIGATION OF THE NSO ATTACKS WAS OCCURRING.  THAT'S THE

14      TIME PERIOD INCLUDED IN MY ANALYSIS.

15      Q.   DID YOU CONDUCT ANY INTERVIEWS IN CONNECTION WITH YOUR

16      ANALYSIS OF THE STOCK PORTION OF PLAINTIFFS' COSTS IN

17      RESPONDING TO NSO'S ATTACKS IN THIS CASE?

18      A.   I DID, YES.

19              I HELD DISCUSSIONS WITH MS. ISMA CHOWDERY AND

20      MS. LILLIAN NGUYEN, WHO ARE IN META'S EQUITIES DEPARTMENT, AND

21      THEY WERE ABLE TO DISCUSS THIS DOCUMENT WITH ME.

22      Q.   WHY DO THESE RSU EXPENSES IN THE COLUMN YOU'RE SHOWING ON

23      YOUR SLIDE ADD UP TO $6.2 MILLION?  IS THAT A FIGURE YOU USED

24      IN YOUR ANALYSIS?

25      A.   NO, I DIDN'T.  THERE ARE A FEW EMPLOYEES THAT WERE
```

1        INCLUDED IN THE DOCUMENT THAT ARE NOT INCLUDED IN MY ANALYSIS.

2            SO I ONLY PICKED UP THE LINE ITEMS, WHICH IS THE ANNUAL

3    2019 EXPENSE, FOR THE INDIVIDUALS THAT ARE PART OF MY ANALYSIS.

4    Q.   EARLIER IN YOUR TESTIMONY, YOU PROVIDED A HIGH LEVEL

5    FORMULA FOR YOUR CALCULATION.

6            WOULD YOU JUST REMIND US WHAT THAT WAS?

7    A.   YES.  IT -- I DID THIS FOR EACH OF THE EMPLOYEES AND THEN

8    ADDED THEM UP TO COME UP WITH MY TOTAL RESPONSE COST.

9            IT IS THE NUMBER OF HOURS WORKED ON THE RESPONSE, TIMES

10   THE HOURLY LABOR RATE THAT I CALCULATED, THAT GIVES US THE

11   LABOR COST TO THE PLAINTIFFS FOR WORK ON THE RESPONSE TO THE

12   NSO ATTACKS.

13   Q.   AND HAVING NOW DISCUSSED THE ANALYSIS YOU UNDERTOOK TO

14   PERFORM THAT CALCULATION, WHAT CONCLUSION, IF ANY, DID YOU

15   REACH ABOUT THE LABOR COSTS THAT PLAINTIFFS INCURRED TO RESPOND

16   TO NSO'S ATTACKS?

17   A.   THE PLAINTIFFS INCURRED AT LEAST $444,719 IN LABOR COSTS

18   TO RESPOND TO THE NSO ATTACKS.

19   Q.   WHY DO YOU SAY "AT LEAST"?

20   A.   WELL, AS I EXPLAINED, I DIDN'T INCLUDE ANY HOURS ABOVE AND

21   BEYOND AN EIGHT HOUR WORKDAY, FIVE DAYS A WEEK, EVEN THOUGH

22   EMPLOYEES TOLD ME THAT THEY WERE WORKING MANY MORE HOURS THAN

23   THAT.

24           I ALSO DIDN'T INCLUDE OTHER EMPLOYEES IN MY CALCULATIONS

25   THAT I SAW IN THE DOCUMENTS WHO WERE CLEARLY RESPONDING TO THE

1    ATTACKS AND WERE INVOLVED.

2        SO THIS IS A SUBSET OF THE MANY EMPLOYEES WHO WERE

3    INVOLVED.

4    Q.   AND WHY DID YOU CONSIDER LABOR ONLY?

5    A.   WELL, ESSENTIALLY I WAS FOCUSSED ON THE TIME THAT THE

6    EMPLOYEES HAD TO SPEND WORKING ON THESE ATTACKS VERSUS WORKING

7    ON THE OTHER PROJECTS THAT THEY HAD ON THEIR PLATE.

8    Q.   OKAY.

9        ONE MOMENT, YOUR HONOR?  IF I MAY CONFER WITH COUNSEL?

10           THE COURT:  YES.

11           MR. BLOCK:  THANK YOU.

12       (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

13           MR. BLOCK:  YOUR HONOR?

14           THE COURT:  YES.

15           MR. BLOCK:  I MADE A MISTAKE.  SO PLAINTIFFS' TRIAL

16   EXHIBIT 323 IS NOT ADDRESSED IN THE BUSINESS RECORD

17   CERTIFICATION THAT I GAVE YOU.

18       THERE ARE OTHER RELATED DOCUMENTS THAT ARE.

19       SO WE'VE NOW SHOWN AN EXCERPT TO IT.  I'M HAPPY TO

20   WITHDRAW IT OR DEAL WITH IT HOW YOUR HONOR WANTS TO.

21           THE COURT:  OKAY.  323 IS THE LAST ONE THAT WE WERE

22   LOOKING AT WITH THE YELLOW COLUMN?

23           MR. BLOCK:  CORRECT.  THE JURY HAS SEEN ONE COLUMN

24   FROM IT.

25           THE COURT:  OKAY.  AND THAT'S NOT PART -- I ASSUME

1    THAT THE CERTIFICATION GOES TO THE DOCUMENTS THAT ARE LISTED ON

2    THE BACK.

3              MR. BLOCK:  IT DOES GO TO THE DOCUMENTS THAT ARE

4    LISTED ON THE BACK, AND I ESSENTIALLY MADE THAT REPRESENTATION

5    TO YOU, YOUR HONOR.  I DID THAT IN ERROR.  I APOLOGIZE.

6              THE COURT:  ALL RIGHT.  WE'LL DECIDE WHAT, IF

7    ANYTHING, NEEDS TO BE DONE.

8              MR. BLOCK:  VERY WELL.  OKAY.

9    Q.  MS. TREXLER, YOU HAD LOOKED AT PLAINTIFFS' TRIAL

10   EXHIBIT 323 IN YOUR BINDER; YES?

11   A.  YES.

12   Q.  ASIDE FROM THAT DOCUMENT, DID YOU DO ANYTHING ELSE TO

13   CONFIRM THE ACCURACY OF THE INFORMATION YOU RECEIVED FROM THE

14   META EMPLOYEES REGARDING THE RESTRICTED STOCK UNIT COMPENSATION

15   IN THIS CASE?

16   A.  YES, I DID.

17            THERE WERE OTHER DOCUMENTS THAT WERE PROVIDED TO ME THAT

18   INCLUDED THE DETAIL AROUND THE GRANT DATES, THE VESTING DATES,

19   THE AMOUNT OF THE AWARDS.

20            AND SO I TOOK THAT UNDERLYING DETAILED INFORMATION AND I

21   WORKED WITH MY TEAM TO RE-PERFORM THE CALCULATION, BECAUSE I

22   JUST WANTED TO GET COMFORTABLE THAT THE NUMBERS THAT WERE

23   INCLUDED IN THE DOCUMENT PROVIDED TO ME BY THE EQUITY

24   DEPARTMENT, THAT THEY SEEMED REASONABLE.

25            SO I PERFORMED MY OWN CALCULATIONS.  I LOOKED UP THE VALUE

1    OF THE META STOCK AT THE GRANT DATES, AND I DID MY OWN

2    CALCULATION OF THE EXPENSE TO SEE HOW IT COMPARED TO THE

3    AMOUNTS ON THE DOCUMENT THAT WE JUST LOOKED AT.

4         AND I WAS WITHIN 2.6 PERCENT AFTER PERFORMING MY OWN

5    INDEPENDENT ANALYSIS, AND SO I WAS VERY COMFORTABLE WITH THE

6    NUMBERS THAT I UTILIZED IN MY ANALYSIS.

7    Q.   AND WERE THE NUMBERS IN EXHIBIT 323 REPORTED TO YOU IN

8    CONVERSATIONS -- SORRY.  LET ME TRY THAT AGAIN.

9         DID YOU HAVE CONVERSATIONS -- I THINK YOU MAY HAVE COVERED

10   THIS -- WITH THOSE META EQUITY PROGRAM EMPLOYEES ABOUT THE

11   NUMBERS THAT WERE IN THE EXHIBIT WE LOOKED AT EARLIER?

12   A.   YES.  WE -- IN MY DISCUSSIONS WITH MS. CHOWDERY AND

13   MS. NGUYEN, I WENT THROUGH THE 2019 EXPENSE NUMBERS FOR EACH OF

14   THE EMPLOYEES.

15        AND THEN I ALSO DISCUSSED SOME OF THE OTHER UNDERLYING

16   DOCUMENTS WITH THEM THAT I USED TO PERFORM MY OWN CALCULATION

17   TO SEE HOW CLOSE I GOT, BECAUSE I WANTED TO MAKE SURE THAT WHAT

18   I WAS RELYING ON, YOU KNOW, SEEMED REASONABLE TO ME.

19   Q.   OKAY.  SO WOULD YOU PLEASE TURN TO THE TAB IN YOUR BINDER

20   MARKED PLAINTIFFS' TRIAL EXHIBIT 319.

21   A.   OKAY.  I'M THERE.

22   Q.   WHAT IS THIS DOCUMENT?

23   A.   THIS IS A GRANT AWARD ACTIVITY REPORT FOR META.

24   Q.   FROM WHOM DID YOU OBTAIN THIS DOCUMENT?

25   A.   I BELIEVE THIS WAS -- WELL, I OBTAINED IT FROM COUNSEL

1     BECAUSE I HAVE TO GET THE RECORDS FROM YOU.  I CAN'T GO

2     DIRECTLY TO THE EMPLOYEES.

3          BUT THIS WAS PROVIDED BY META'S EQUITY DEPARTMENT, AND

4     IT'S FOR THE PERIOD JANUARY 1ST, 2019 THROUGH DECEMBER 31ST,

5     2019.

6          AND IT INCLUDES A LIST OF THE INDIVIDUALS IN MY ANALYSIS,

7     ALONG WITH THE PLAN, THE AWARD DATE, THE AWARD TYPE, THE DOLLAR

8     EQUIVALENT OF THE UNITS AT THE TIME OF GRANT, THE AWARD AMOUNT

9     VESTED, ET CETERA.

10         SO IT HAS ALL -- IT HAS THE INFORMATION THAT I NEEDED TO

11    PERFORM THE ANALYSIS THAT I DISCUSSED TO CHECK THE

12    REASONABLENESS OF THE SUMMARY DOCUMENT THAT WAS PROVIDED TO ME

13    BY THE PAYROLL -- OR THE EQUITY DEPARTMENT.

14              MR. BLOCK:  YOUR HONOR, MAY I HAND A BUSINESS RECORD

15    CERTIFICATION TO THE COURT SO YOU CAN READ ALONG?

16              THE COURT:  YES.

17              MR. BLOCK:  (HANDING.)

18              THE COURT:  IS IT IN THE FILE?

19              MR. BLOCK:  IT IS 930 IN THE -- OH, YOU HAVE THE

20    BINDER.  IT'S NOT 930.  IT'S 928.

21              THE COURT:  IT'S -- THE ONE THAT YOU GAVE ME LOOKED

22    LIKE THE 929.

23              MR. BLOCK:  YES, YOUR HONOR.

24              THE COURT:  AND THIS ONE IS A DIFFERENT

25    CERTIFICATION?

```
 1            MR. BLOCK:  CORRECT.  THEY ARE VERY SIMILAR IN FORM,

 2    BUT IT'S DIFFERENT.

 3            THE COURT:  OKAY.  928?

 4            MR. BLOCK:  YES, YOUR HONOR.

 5    Q.  AND, MS. TREXLER, IF YOU CAN SEE IN YOUR BINDER A BATES

 6    NUMBER, WOULD YOU MIND READING THAT INTO THE RECORD FOR

 7    EXHIBIT 319.

 8    A.  OH, 319.

 9    Q.  IT SHOULD BE ON THE SLIP SHEET --

10    A.  YES.

11    Q.  -- AFTER THE COURT'S STAMPED SHEET.

12    A.  IT IS BATES NUMBER WA-NSO-00192850.

13            MR. BLOCK:  YOUR HONOR, PLAINTIFFS OFFER EXHIBIT 319

14    INTO EVIDENCE.

15            THE COURT:  ANY OBJECTION?

16            MR. AKROTIRIANAKIS:  I HAVE AN OBJECTION, YOUR HONOR,

17    BUT I'LL RESERVE IT UNTIL AFTER I'VE HAD AN OPPORTUNITY TO

18    CROSS-EXAMINE THE WITNESS, WHICH I CAN DO THAT, IF THAT'S OKAY?

19        IN OTHER WORDS, I DON'T MIND IT BEING PROVISIONALLY

20    ACCEPTED, SUBJECT TO MY OBJECTION.

21            THE COURT:  OKAY.  ALL RIGHT.  PROVISIONALLY

22    ADMITTED.

23        (PLAINTIFFS' EXHIBIT 319 WAS PROVISIONALLY ADMITTED IN

24    EVIDENCE.)

25            MR. BLOCK:  COULD WE HAVE THE MONITOR?
```

1          BECAUSE, BECAUSE THIS -- WE'RE GOING TO DISPLAY IT THROUGH

2     THE GRAPHICS PERSON AND IT CONTAINS INDIVIDUALS NOT TESTIFYING

3     HERE, THEIR FINANCIAL INFORMATION, SO THE JURY WILL SEE IT,

4     WE'LL JUST KEEP IT FROM THE PUBLIC WITH YOUR HONOR'S

5     PERMISSION.

6               THE COURT:  YES, I AGREE.

7               MR. BLOCK:  CAN WE PLEASE HAVE PLAINTIFFS' TRIAL

8     EXHIBIT 319 ON THE SCREEN, AND 319.2.  VERY GOOD.

9     Q.   OKAY.  MS. TREXLER, WOULD YOU JUST EXPLAIN TO THE JURY

10    WHAT'S IN THIS DOCUMENT?

11    A.   YES.  SO THIS IS THE GRANT AWARD ACTIVITY REPORT, AND YOU

12    CAN SEE UP AT THE TOP, ABOUT HALFWAY DOWN IN THE HEADER, IT

13    SHOWS THAT THE AWARD DATE IS BETWEEN JANUARY 1ST, 2019 AND

14    DECEMBER 31ST, 2019.

15         AND THEN BELOW THAT WE HAVE THE AWARD I.D.; PARTICIPANT

16    I.D., THE LAST NAME, FIRST NAME; THE PLAN, WHICH IS THE RSU

17    PLAN THIS PERTAINS TO; THE AWARD DATE; THE AWARD TYPE; THE

18    DOLLAR EQUIVALENT OF THE UNITS AT THE TIME OF GRANT; THE AWARD

19    DATE FAIR MARKET VALUE; AWARD AMOUNT; THE AMOUNT VESTED.

20         NOW, THIS IS GOING TO BE THE AMOUNT VESTED AS OF THE DATE

21    OF THE REPORT, WHICH WAS FEBRUARY 20TH, 2024, SO I DIDN'T

22    REALLY USE THAT IN MY ANALYSIS.  I DETERMINED, YOU KNOW, THE

23    VESTING AS OF 2019.

24         BUT IT GOES ON TO SHOW THE UNVESTED, THE FORFEITED, THE

25    OUTSTANDING, AND THE EMPLOYEE STATUS.

1    Q.   OKAY.  WOULD YOU PLEASE TURN TO PLAINTIFFS' EXHIBIT 320 IN

2    YOUR BINDER.

3    A.   I AM THERE.

4    Q.   WHAT IS THIS DOCUMENT?

5    A.   THIS DOCUMENT IS SOME ADDITIONAL INFORMATION THAT WAS

6    PROVIDED TO ME, AGAIN, FROM THE EQUITIES DEPARTMENT, OR I

7    UNDERSTAND IT WAS PREPARED BY THE EQUITIES DEPARTMENT.

8         AND IT PROVIDES ME WITH THE -- SOME OF THE REPORTABLE

9    INCOME THAT -- THE SUM OF THE REPORTABLE INCOME FOR EACH OF THE

10   EMPLOYEES IN MY ANALYSIS.

11        AND IT MAY INCLUDE A COUPLE OTHERS THAT WERE ALSO NOT IN

12   MY ANALYSIS.

13   Q.   OKAY.  AND WITH REFERENCE TO THE CERTIFICATION -- NOT IN

14   EVIDENCE, YOUR HONOR, PLAINTIFFS' TRIAL EXHIBIT 928 --

15   MS. TREXLER, WOULD YOU READ INTO THE RECORD THE BATES NUMBER ON

16   PLAINTIFFS' TRIAL EXHIBIT 320?

17   A.   YES.  IT'S WA-NSO-00192851.

18        MR. BLOCK:  PLAINTIFFS MOVE PLAINTIFFS' TRIAL

19   EXHIBIT 320 INTO EVIDENCE.

20        THE COURT:  ANY OBJECTION?

21        MR. AKROTIRIANAKIS:  IT DOESN'T HAVE ANY NAMES ON IT,

22   YOUR HONOR.

23        THE COURT:  DO THE ROLE LABELS REFER TO EMPLOYEE

24   I.D.'S?  OR THE MIDDLE LABEL, THE MIDDLE COLUMN?

25   BY MR. BLOCK:

1    Q.   FLIPPING FORWARD CERTAINLY TO TAB 5 -- LET ME ASK,

2    MS. TREXLER, WHERE IN TRIAL EXHIBIT 320 DO YOU LINK TO THE

3    INDIVIDUALS, IF AT ALL, DO YOU LINK TO THE INDIVIDUALS FOR WHOM

4    YOU PERFORMED THE ANALYSIS?

5    A.   SURE.

6         ON PTX-320-0002, YOU SEE EEID.  THAT'S THE EMPLOYEE I.D.

7    NUMBER.

8         IF YOU GO TO THE SUBSEQUENT PAGES BEHIND THAT, YOU WILL

9    ALSO SEE THE PARTICIPANT I.D. NUMBER.

10        AND IF WE WOULD GO BACK TO PTX-319, YOU SEE THAT THERE'S A

11   LIST OF NAMES THAT CORRESPOND TO AN EMPLOYEE I.D. NUMBER, SO

12   YOU CAN MAP THEM BETWEEN THE TWO.

13             MR. BLOCK:  YOUR HONOR?

14             THE COURT:  OKAY.  ALL RIGHT.

15             MR. BLOCK:  IS THAT DOCUMENT RECEIVED INTO EVIDENCE?

16             THE COURT:  YES.

17        (PLAINTIFFS' EXHIBIT 320 WAS ADMITTED IN EVIDENCE.)

18             MR. BLOCK:  PERMISSION TO PUBLISH?

19             THE COURT:  YES.

20   BY MR. BLOCK:

21   Q.   MAY WE SEE EXHIBIT 320, PAGE 5 -- 320.5 ON THE SCREEN,

22   PLEASE.

23        MS. TREXLER, HOW DID YOU USE THIS DOCUMENT IN YOUR

24   ANALYSIS OF THE RSU EXPENSE?

25   A.   SO THIS IS THE DETAIL UNDERLYING THE ANALYSIS THAT I

1        EXPLAINED THAT I DID TO VERIFY, OR TO TEST THE REASONABLENESS

2        OF THE SUMMARY DOCUMENT OF THE META EXPENSE RELATED TO RSU'S

3        THAT VESTED DURING 2019.

4             AND, I MEAN, THIS IS A PRETTY THICK REPORT, BUT IT LISTS

5        THE DETAIL FOR EACH OF THE PARTICIPANTS.

6             AND THEN I'M ABLE TO SEE THE AWARD DATE, WHICH IS THE

7        GRANT, AND THEN I CAN ALSO SEE THE TRANSACTION DATE, THE VEST

8        DATE, AND THE NUMBER OF SHARES THAT VESTED.

9             AND SO I WAS ABLE TO OBTAIN THIS INFORMATION AND CREATE MY

10       OWN SCHEDULE TO TEST THE AMOUNTS THAT WERE PROVIDED TO ME

11       INDIVIDUAL BY INDIVIDUAL, GRANT DATE BY GRANT DATE, VEST DATE

12       BY VEST DATE.

13       Q.   SO WHEN YOU DID YOUR ANALYSIS AS A COMPARISON TO THE

14       NUMBERS YOU GAVE EARLIER FROM THE SUMMARY THAT THE EQUITY TEAM

15       PROVIDED YOU, WHAT WAS THE RESULT OF YOUR ANALYSIS?

16       A.   I WAS WITHIN 2.6 PERCENT OF THE NUMBER THAT THE EQUITY

17       TEAM INCLUDED IN THE SUMMARY SCHEDULE.

18       Q.   WERE YOU HIGHER OR LOWER?

19       A.   I WAS A LITTLE BIT HIGHER, AND THE REASON FOR THAT IS

20       THERE ARE A FEW INDIVIDUALS THAT HAVE SOME ACCELERATED VESTING

21       AS PART OF THE PLAN THAT THEY ARE IN.

22            AND SO META HAD THE INFORMATION THAT ALLOWED THEM TO

23       PRECISELY TRACK THE EXACT EXPENSE.  I JUST ASSUMED THAT THEY

24       VESTED EQUALLY OVER THE 16 QUARTERS IN MY ANALYSIS, SO IT MADE

25       SENSE TO ME THAT I WAS JUST A LITTLE BIT HIGHER.

1        BUT I USED META'S NUMBER BECAUSE, OF COURSE, THEY HAVE THE

2    PRECISE INFORMATION, AND THEY ALSO HAVE THE REQUIREMENTS BY THE

3    S.E.C. TO PROPERLY -- TO REPORT THEIR NUMBER WITHOUT MATERIAL

4    MISSTATEMENT.

5    Q.   OKAY.  ALL RIGHT.

6        YOUR HONOR, WOULD THIS BE A GOOD TIME TO TAKE A BREAK?

7            THE COURT:  IT'S OUR REGULAR TIME FOR THE BREAK, SO

8    YES, IT'S AS GOOD AS ANY OTHER TIME.

9        ALL RIGHT.  LADIES AND GENTLEMEN OF THE JURY, YOU ARE

10   EXCUSED FOR 15 MINUTES.  JUST LEAVE THOSE ON YOUR SEAT.

11           THE CLERK:  ALL RISE FOR THE JURY.

12       (JURY OUT AT 9:59 A.M.)

13       (RECESS FROM 9:59 A.M. UNTIL 10:16 A.M.)

14           THE COURT:  ALL RIGHT.  WHAT'S THE PROBLEM NOW?

15           MR. BLOCK:  I APOLOGIZE, YOUR HONOR.  IT'S VERY

16    BRIEF.

17       THE JURORS NOW HAVE IN FRONT OF THEM THOSE FOUR FINANCIAL

18   DOCUMENTS, AND I DON'T KNOW IF YOU OBSERVED, BUT THEY SEEM TO

19   BE FLIPPING THROUGH THEM.

20       SO THESE, AS YOU KNOW, WERE PRODUCED LATE.  NEITHER EXPERT

21   HAD DISCLOSED OPINIONS ON THEM.

22       I THOUGHT IT MIGHT BE HELPFUL TO THE JURY TO JUST LET OUR

23   EXPERT SAY THIS IS WHAT A BALANCE SHEET AND AN INCOME STATEMENT

24   ARE AND THE NUMBERS THEY SAY.

25       OF COURSE, THEIR EXPERT, WHEN HE GETS UP, COULD DO THE

1    SAME JUST TO MAKE IT HELPFUL FOR THE JURY.

2        BUT AS I SAID BEFORE, THESE CAME IN LATE.  NEITHER EXPERT

3    HAS ACTUALLY GIVEN A RULE 26 DISCLOSURE ON THEM.

4        THE COURT:  OKAY.

5        I ASSUME YOU OBJECT.

6        MR. AKROTIRIANAKIS:  WELL, THE OTHER DAY, YOUR HONOR,

7    WHEN THIS TOPIC CAME UP ABOUT THESE FOUR FINANCIAL DOCUMENTS,

8    COUNSEL SAID THAT THEY WERE NOT GOING TO GO INTO THEM WITH

9    MS. TREXLER ON DIRECT AND THEY SAID SOMETHING ABOUT, WELL, IF I

10   SAID SOMETHING ON CROSS, MAYBE THEY WOULD WANT TO DO SOMETHING

11   ON REDIRECT.

12       I DON'T PLAN TO GO INTO THEM ON CROSS, OF COURSE.  I

13   HAVEN'T PREPARED ANY CROSS-EXAMINATION BASED ON THESE DOCUMENTS

14   BASED ON THAT REPRESENTATION.

15       AND I THINK THAT THE METHOD IS JUST TO TAKE IT AWAY FROM

16   THE JURY IF COUNSEL IS CONCERNED THAT THEY'RE BEING DISTRACTED

17   FLIPPING THROUGH THE BOOKS THAT THEY WERE GIVEN, NOT TO SPRING

18   ON US THIS.

19       THERE'S NO OPINIONS ABOUT THIS IN HER REPORT OR OTHERWISE.

20       THE COURT:  HOW DID YOU ALL PLAN TO USE THEM?

21       MR. BLOCK:  WE --

22       THE COURT:  BOTH SIDES?  IT WAS A STIPULATION.  HOW

23   DID BOTH SIDES PURPORT TO USE THESE DOCUMENTS?

24       MR. AKROTIRIANAKIS:  I WAS GOING TO HAVE MR. SHOHAT

25   WALK THROUGH THE DOCUMENT AND SAY HOW HE USES IT AS THE CEO OF

1      THE DEFENDANTS.

2           THE COURT:  AND WHAT WERE YOU GOING TO DO?

3           MR. BLOCK:  SO WE DIDN'T HAVE A WITNESS TO USE, SO WE

4      WILL CROSS MR. SHOHAT.

5           BUT THE PLAN OTHERWISE IS TO ARGUE FROM THE DOCUMENTS,

6      WHICH IS WHY I THINK IT MIGHT BE USEFUL FOR THE JURY TO HAVE AN

7      ACCOUNTING EXPERT AND AN ECONOMIST JUST TO SAY -- AN ECONOMIST

8      ABLE TO DO HIS OWN JUST TO SAY TO THEM, HERE'S WHAT THESE

9      DOCUMENTS ARE.

10          SO IT ARISES LATE BECAUSE OF THE WAY THAT THEY WERE

11     DISCLOSED.

12          THE COURT:  I UNDERSTAND THAT.

13          THEY DO NEED TO KNOW WHAT THEY ARE, FOR SURE.  BOTH SIDES

14     CAN EXPLAIN WHAT THEY ARE.

15          THE DEVIL IS ALWAYS IN THE DETAILS, THOUGH, WITH YOU ALL,

16     AND I DON'T WANT IT TO GO ANY FURTHER THAN THAT IF THERE IS NO

17     WITNESS WHO CAN TESTIFY ABOUT THE ACTUAL DETAILS OF IT.

18          I ASSUME MR. SHOHAT --

19          MR. AKROTIRIANAKIS:  MR. SHOHAT --

20          THE COURT:  HE DIDN'T PREPARE THEM, BUT SOMEONE ON

21     HIS STAFF DID, RIGHT?

22          MR. AKROTIRIANAKIS:  RIGHT.  HE, AS THE CEO, RELIES

23     ON THESE.  THESE ARE THE BUSINESS RECORDS AND SO ON.

24          MY ISSUE IS WE WERE TOLD SPECIFICALLY IT WASN'T GOING TO

25     BE BROUGHT UP ON HER DIRECT EXAMINATION.  I'VE NOT PREPARED ANY

1      CROSS-EXAMINATION FOR THIS WITNESS.

2          I THINK THAT IF THE COURT IS GOING TO LET THE WITNESS DO

3      ANYTHING MORE THAN SAY THIS IS A PROFIT AND LOSS STATEMENT,

4      THIS IS A BALANCE SHEET, THEN SHE SHOULD BE RECALLED OR

5      SOMETHING LIKE THAT AFTER I'VE HAD SOME NOTICE SO THAT I CAN

6      PREPARE.

7                  THE COURT:  OKAY.

8                  MR. ANDRES:  IT'S ALL THE SAME, YOUR HONOR.  SHE'S

9      JUST GOING TO SAY JUST EXACTLY THAT, AND SHE'S GOING TO SAY,

10     HERE ARE THE REVENUES, HERE ARE THE LIABILITIES, HERE ARE THE

11     NET ASSETS.

12         I MEAN, IT'S MATH.

13                 MR. AKROTIRIANAKIS:  THAT'S NOT WHAT IT IS,

14     YOUR HONOR.

15                 MR. ANDRES:  DO YOU WANT US TO DO THAT LATER?

16                 THE COURT:  LOOK --

17                 MR. ANDRES:  EITHER WAY --

18                 THE COURT:  SHE CAN BE RECALLED AFTER YOUR WITNESS

19     TESTIFIES.

20                 MR. AKROTIRIANAKIS:  THANK YOU.

21                 THE COURT:  I DON'T SEE THE POINT IF SHE'S GOING TO

22     EXPLAIN WHAT THEY ARE.

23         BUT I UNDERSTAND THERE'S NO COOPERATION BETWEEN THE TWO

24     SIDES, SO WE'LL DO IT THAT WAY.

25                 MR. ANDRES:  THANK YOU, YOUR HONOR.

1          THE COURT:  YOU CAN RECALL HER AFTER HE TESTIFIES.

2       ALL RIGHT.  MADAM CLERK, WOULD YOU --

3          MR. AKROTIRIANAKIS:  YOUR HONOR, I DON'T HAVE AN

4   OBJECTION IF WHAT SHE WAS GOING TO DO IS JUST IDENTIFY THE

5   DOCUMENTS.

6       BUT IT SOUNDS, FROM WHAT MR. ANDRES JUST SAID, THAT THEY

7   DO INTEND TO DO MORE THAN THAT AND SAY THIS IS WHAT THIS MEANS,

8   AND THOSE ARE OPINIONS.

9          THE COURT:  MR. ANDRES, IT'S YOUR CHOICE.  YOU CAN

10  HAVE HER DO IT NOW SIMPLY BY IDENTIFYING WHAT'S IN THE BOOK,

11  OR, IF YOU WANT HER TO GET INTO MORE DETAIL, YOU CAN RECALL

12  HER.

13         MR. ANDRES:  WE'LL RECALL HER, JUDGE.  THAT'S FINE.

14  I DON'T WANT TO UPSET MR. AKROTIRIANAKIS.

15         THE COURT:  ANY MORE THAN YOU ALREADY HAVE.

16         MR. ANDRES:  THAN HE IS.

17         THE COURT:  OKAY.  ALL RIGHT.

18         MR. AKROTIRIANAKIS:  I'M ONLY UPSET BY THE

19  SANDBAGGING, YOUR HONOR.  THAT'S ALL.

20         THE COURT:  ALL RIGHT.

21      KELLY.

22      MS. TREXLER, YOU'RE -- OKAY.

23      (PAUSE IN PROCEEDINGS.)

24         THE CLERK:  ALL RISE FOR THE JURY.

25      (JURY IN AT 10:21 A.M.)

1          THE CLERK:  THANK YOU.  PLEASE BE SEATED.

2          MR. BLOCK:  MAY I PROCEED, YOUR HONOR?

3          THE COURT:  YES.

4          MR. BLOCK:  THANK YOU.  JUST A COUPLE MORE DOCUMENTS.

5     Q.   MS. TREXLER, WOULD YOU PLEASE TURN TO PLAINTIFFS' TRIAL

6     EXHIBIT 321 IN YOUR BINDER.

7     A.   I'M THERE.

8     Q.   AND WHAT IS PLAINTIFFS' TRIAL EXHIBIT 321?

9     A.   SORRY.  THIS IS REALLY SMALL.

10         THIS IS THE TRANSACTION TAX DETAIL FOR VARIOUS

11    INDIVIDUALS.  IT LOOKS LIKE IT'S A REPORT THAT'S GENERATED OUT

12    OF THEIR -- OUT OF WHATSAPP AND META'S SYSTEM FROM JANUARY 1ST,

13    2019 THROUGH DECEMBER 31ST, 2019.

14    Q.   AND WITH RESPECT TO THE U.K. EMPLOYEE, DO YOU SEE THERE'S

15    SUMS HERE IN BRITISH POUNDS, GBR, SOCIAL, ET CETERA?

16    A.   I DO, YES.

17    Q.   AND SO HOW DID YOU GO ABOUT FIGURING OUT THE RSU EXPENSE

18    FOR OTTO EBELING?

19    A.   I REALLY DID IT IN THE SAME WAY.  I JUST WAS DEALING WITH

20    BRITISH POUND CONVERSION TO U.S. DOLLARS BASED ON THE

21    CONVERSION RATE AT THE RELEVANT DATES.

22    Q.   OKAY.  AND DOES PLAINTIFFS' TRIAL EXHIBIT 321, DID YOU

23    RELY ON THAT IN YOUR ANALYSIS FOR MR. EBELING'S RSU'S?

24    A.   YES, I DID.

25    Q.   AND FOR THE RECORD -- AND THIS IS WITH REFERENCE TO THE

1    BUSINESS RECORD CERTIFICATION -- THE BATES STAMP FOR

2    EXHIBIT 321 IS WA-NSO-00192852.

3    A.   AND --

4    Q.   PLEASE.

5    A.   I BELIEVE THIS GOES MORE TO HIS INCOME, LIKE, SALARY,

6    TAXES, THAT TYPE OF THING.

7    Q.   THANK YOU.  I APPRECIATE THAT.

8    A.   SURE.

9         I'M SORRY.  IT'S REALLY SMALL.  BUT AS I'M LOOKING AT THIS

10   AND MY EYES ARE ADJUSTING, I THINK THIS GOES TO HIS SALARY AND

11   COMPENSATION VERSUS RSU'S.

12   Q.   GOT IT.  AND WE DID 324 SEPARATELY.

13   A.   YEP.

14   Q.   OKAY.

15        YOUR HONOR, PLAINTIFFS MOVE PLAINTIFFS' TRIAL EXHIBIT 321

16   INTO EVIDENCE.

17             MR. AKROTIRIANAKIS:  NO OBJECTION.

18             THE COURT:  ADMITTED.

19        (PLAINTIFFS' EXHIBIT 321 WAS ADMITTED IN EVIDENCE.)

20             MR. BLOCK:  AND I BELIEVE 308 HAD BEEN ADMITTED

21   PROVISIONALLY TO GIVE THEM TIME TO LOOK, SO I JUST WANTED TO

22   CONFIRM THAT 308 IS IN EVIDENCE, YOUR HONOR.

23             MR. AKROTIRIANAKIS:  YES, NO OBJECTION.

24             THE COURT:  ADMITTED.

25        (PLAINTIFFS' EXHIBIT 308 WAS ADMITTED IN EVIDENCE.)

1            MR. BLOCK:  CAN WE SEE MS. TREXLER'S SLIDES BACK UP

2    ON SCREEN, PLEASE.

3    Q.   SO JUST TO FINISH UP, MS. TREXLER, WHAT CONCLUSION DID YOU

4    ULTIMATELY COME TO IN YOUR CALCULATIONS IN THIS CASE?

5    A.   THAT THE PLAINTIFFS HAD TOTAL RESPONSE COST TO THE NSO

6    ATTACKS OF $444,719.

7            MR. BLOCK:  AND IF I COULD HAVE ONE MOMENT TO MAKE

8    SURE -- OKAY.

9        YOUR HONOR, NO FURTHER QUESTIONS AT THIS TIME.

10           THE COURT:  ALL RIGHT.  THANK YOU.

11       COUNSEL.

12           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

13                      **CROSS-EXAMINATION**

14   BY MR. AKROTIRIANAKIS:

15   Q.   GOOD MORNING, MS. TREXLER.

16   A.   GOOD MORNING.

17   Q.   MY NAME IS JOE AKROTIRIANAKIS, AS I THINK YOU KNOW FROM

18   BEING HERE THIS WEEK.  I REPRESENT THE DEFENDANTS IN THIS CASE.

19   A.   NICE TO MEET YOU.

20   Q.   LIKEWISE, FROM THIS DISTANCE, OR IN PERSON LATER.

21       OKAY.  I HAD SOME FOLLOW-UP TO MR. BLOCK'S QUESTIONS.

22       IT SOUNDS, FROM YOUR DIRECT TESTIMONY, THAT YOU LOOKED AT

23   A NUMBER -- A LOT, REALLY -- OF THINGS IN TERMS OF PREPARING

24   YOUR REPORT AND OPINIONS IN THIS CASE.

25   A.   YES.

1    Q.   AND YOU'VE BEEN HERE, AS YOU MENTIONED, THROUGHOUT THE

2    TRIAL; RIGHT?

3    A.   YES, I HAVE.

4    Q.   HAVE YOU READ -- IS ONE OF THE THINGS THAT YOU CONSIDERED

5    THE JURY INSTRUCTION ON COMPENSATORY DAMAGES?

6    A.   I DON'T BELIEVE I'VE READ THE JURY INSTRUCTION.  THAT

7    WOULD BE OUTSIDE OF MY PURVIEW.

8    Q.   OKAY.

9    A.   THAT'S BETWEEN THE LAWYERS AND THE COURT.

10   Q.   EXHIBIT 288 WAS ONE THAT YOU WERE SHOWN.

11        COULD YOU REFER TO IT, PLEASE?

12        I DON'T NEED IT ON THE SCREEN.

13        DO YOU HAVE NUMBER 288 BEFORE YOU, MS. TREXLER?

14   A.   I DO, YES.

15   Q.   THIS DOCUMENT -- ACTUALLY, WHY DON'T WE PUBLISH IT, JUST

16   THE -- SORRY.

17        IS THIS ONE THAT WE NEED TO TURN OFF?

18        THIS IS MORE -- AS MUCH TO HELP ME AS ANYBODY ELSE TO SEE

19   IT.

20        BUT THIS IS A DOCUMENT THAT RELATES TO MR. ROBINSON'S

21   INFORMATION.

22        DO YOU SEE THAT, MS. TREXLER?

23   A.   I DO, YES.

24   Q.   AND THEN THERE WAS A LONG LIST OF DOCUMENTS THAT, ONE

25   EACH, FOR 22 PEOPLE; RIGHT?

1    A.   YES, THAT'S CORRECT.

2    Q.   ALL RIGHT.  NOTHING IN THESE DOCUMENTS TELLS YOU WHAT

3    THESE PEOPLE WERE DOING OR HOW MUCH TIME THEY SPENT DOING IT.

4    IS THAT FAIR?

5    A.   THAT'S FAIR.  THIS RELATES TO THE PAYROLL INFORMATION, THE

6    COMPENSATION.  I USED THIS FOR MY HOURLY LABOR RATE

7    CALCULATION.

8    Q.   RIGHT.  AND THE SAME WOULD BE TRUE FOR ALL THE INDIVIDUAL

9    REPORTS, LIKE EXHIBIT 289, 290, AND SO ON AND SO FORTH; RIGHT?

10   A.   THE LIST OF PAYROLL REPORTS FOR EACH OF THE INDIVIDUALS,

11   YES.

12   Q.   OKAY.  NOW, YOU ARE A MANAGING DIRECTOR AT A FIRM CALLED

13   STOUT RISIUS ROSS LLC; IS THAT RIGHT?

14   A.   STOUT RISIUS ROSS.  WE JUST GO BY STOUT.

15   Q.   OKAY.  STOUT IS THE MARKETING NAME FOR THE FIRM?

16   A.   IT IS, YES.

17   Q.   AS A MANAGING DIRECTOR, YOU'RE PART OF THE FIRM'S

18   SHAREHOLDER BASE?

19   A.   YOU DON'T HAVE TO BE.  I AM.  BUT WE HAVE MANAGING

20   DIRECTORS WHO ARE NOT STOCKHOLDERS.

21   Q.   RIGHT.  BUT MY POINT IS THAT YOU ARE A SHAREHOLDER OF THE

22   COMPANY?

23   A.   YES, I AM.

24   Q.   OKAY.  AND YOU SHARE THE PROFITS OF THE COMPANY?

25   A.   WE ACTUALLY DON'T GET PROFIT DISTRIBUTIONS.

1    Q.   WELL, IF THE COMPANY IS PROFITABLE, THE SHAREHOLDERS

2    BENEFIT FROM THAT IN SOME WAY?

3    A.   IT COULD INCREASE THE VALUE.  SO I -- I BENEFIT FROM THE

4    VALUE OF THE STOCK ON THE DATE THAT IT'S SOLD.

5         BUT WE'RE NOT A PUBLIC COMPANY, SO OUR STOCK IS NOT

6    READILY TRADEABLE.  IT WOULD HAPPEN IF THERE IS A TRANSACTION

7    WITH OUR FIRM.

8    Q.   OKAY.  YOU LIVE IN PHILADELPHIA?

9    A.   I LIVE IN THE SUBURBS OF PHILADELPHIA, YES.

10   Q.   OKAY.  AND YOU REFERENCED A STAFF HELPING YOU WORK ON THIS

11   CASE.

12   A.   YES.

13   Q.   AND DID ANY OF YOUR STAFF COME WITH YOU?

14   A.   ONE OF THEM DID, YES.

15   Q.   OKAY.  THAT'S THE GENTLEMAN YOU'VE BEEN SITTING WITH?

16   A.   YES.

17   Q.   OKAY.  HOW MANY -- YOU SAID THAT'S ONE OF YOUR STAFF.  HOW

18   MANY PEOPLE ARE ON YOUR STAFF THAT WORKED ON THIS MATTER?

19   A.   THERE WERE TWO PRIMARY PEOPLE THAT I WORKED WITH, AND THEN

20   WE HAD SOME ANALYSTS AND ASSOCIATES THAT THEIR JOB WAS

21   ESSENTIALLY TO GO BACK THROUGH THE WORK THAT WE PERFORMED AND

22   THEY FACT CHECK IT.  THEY VERIFY IT BACK TO THE UNDERLYING

23   DOCUMENTS TO MAKE SURE THAT THERE ARE NO CALCULATION ERRORS,

24   THAT WE'VE PROPERLY INPUT THE INFORMATION INTO THE ANALYSIS.

25   THEY CONFIRM THAT THE DATES WE INCLUDE IN MY REPORT ARE

1    CORRECT.

2        SO THERE WERE PROBABLY TWO OR THREE OTHER INDIVIDUALS WHO

3    ASSISTED.

4    Q.   SO TWO OR THREE ANALYSTS, YOURSELF AND THE GENTLEMAN WHO'S

5    HERE WITH YOU, AND THEN TWO OTHERS?  DID I COUNT RIGHT?

6    A.   NO.  I WOULD SAY IT WAS -- IT WAS ME, THE TWO PRIMARY

7    PEOPLE, AND THEN MAYBE TWO OR THREE OTHER PEOPLE WHO ASSISTED

8    IN THE QUALITY CONTROL CHECK.  SO THAT WOULD BE THE TOTAL.

9    Q.   OKAY.  ALTOGETHER, HOW MANY HOURS DO YOU THINK THAT YOU

10   AND YOUR TEAM SPENT WORKING ON THIS ENGAGEMENT?

11   A.   I ACTUALLY DIDN'T LOOK AT THAT, THE TOTAL NUMBER OF HOURS.

12   Q.   I'LL TAKE A BALLPARK.

13   A.   I HONESTLY CAN'T BALLPARK.  I DIDN'T LOOK AT THAT DETAIL

14   OF OUR UNDERLYING BILLING SYSTEM.

15   Q.   YOU HAVE NO IDEA?

16   A.   SITTING HERE TODAY?  I WOULD BE HESITANT TO GIVE AN

17   ESTIMATE BECAUSE I DON'T KNOW.

18       WE HAVE THE DETAIL.  I JUST DIDN'T LOOK AT IT.

19   Q.   OKAY.  WOULD YOU BE WILLING TO, LIKE, MAKE A PHONE CALL AT

20   A BREAK OR SOMETHING LIKE THAT?

21   A.   IF ASKED TO DO SO, I COULD LOOK IT UP.

22   Q.   ALL RIGHT.  I WILL ASK YOU TO DO THAT.

23       ALL RIGHT.  NOW, YOU UNDERSTAND THAT AS PART OF BEING AN

24   EXPERT TESTIFYING IN FEDERAL COURTS, YOU PREPARE A REPORT;

25   RIGHT?

1    A.   YES, I HAVE AN EXPERT REPORT.

2    Q.   OKAY.  AND ONE OF THE THINGS -- THERE'S A LIST OF THINGS

3    THAT YOU'RE REQUIRED TO PUT IN THE REPORT; RIGHT?

4    A.   YES.

5    Q.   AND THE REPORT IS MADE UNDER PENALTY OF PERJURY; IS THAT

6    RIGHT?

7    A.   YES.

8    Q.   AND YOUR REPORT IN THIS CASE YOU MADE UNDER PENALTY OF

9    PERJURY?

10   A.   YES.

11   Q.   AND ONE OF THE RULES, AS YOU KNOW, IS THAT THE REPORT IS

12   SUPPOSED TO INCLUDE A COMPLETE STATEMENT OF ALL OPINIONS THE

13   WITNESS WILL EXPRESS AND THE BASIS AND REASONS FOR THEM.

14       AM I RIGHT?

15   A.   THAT'S MY UNDERSTANDING.

16   Q.   OKAY.  WAS THAT YOUR UNDERSTANDING WHEN YOU DID YOUR

17   REPORT IN THIS CASE AND SIGNED IT UNDER PENALTY OF PERJURY?

18   A.   YES.

19   Q.   ALL RIGHT.  NOW, DO YOU BELIEVE IT WAS A COMPLETE

20   STATEMENT OF THE OPINIONS THAT YOU INTENDED TO EXPRESS?

21   A.   YES.

22   Q.   IS THE 2.6 PERCENT NUMBER THAT YOU REFERENCED AT LEAST

23   TWICE IN YOUR DIRECT EXAMINATION ANYWHERE IN YOUR REPORT,

24   MS. TREXLER?

25   A.   NO, THAT'S NOT IN MY REPORT BECAUSE THAT'S ANALYSIS THAT I

 1    DID TO GET COMFORTABLE WITH THE RSU EXPENSE NUMBER THAT I HAVE

 2    IN MY REPORT, AND I RELY ON THE NUMBER THAT'S IN MY REPORT FROM

 3    THE META DOCUMENTS.

 4        SO I DIDN'T PUT FORWARD THE OTHER NUMBER BECAUSE I'M NOT

 5    USING IT.

 6    Q.   IS THERE ANY MENTION OF EXHIBITS 319 AND 320 NOW IN

 7    EVIDENCE IN YOUR REPORT?

 8    A.   LET ME --

 9    Q.   AND I'LL REFER YOU JUST TO THE -- IT'S EXHIBIT 293 IN THE

10    BINDER THAT'S BEFORE YOU.  I'M SORRY, 2093.

11    A.   I BELIEVE THOSE WERE LISTED IN MY DOCUMENTS CONSIDERED.  I

12    DON'T HAVE IT IN FRONT OF ME, BUT I DO BELIEVE THEY WERE

13    INCLUDED.

14    Q.   OKAY.  THERE WAS -- YOU WROTE A 49-PAGE ANALYSIS IN THIS

15    CASE?

16    A.   I DON'T REMEMBER HOW LONG MY REPORT WAS.

17    Q.   PLEASE, IT'S EXHIBIT 2093.

18    A.   OH, I'M SORRY.  I DIDN'T REALIZE YOU WERE REFERENCING IT

19    IN THIS BINDER.

20        SO THE WRITTEN PART OF THE REPORT IS 47 PAGES, AND THEN I

21    HAVE QUITE A NUMBER OF PAGES OF EXHIBITS, WHICH ARE MY CV, THE

22    DOCUMENTS I RELIED UPON, AND MY EXCEL SCHEDULES THAT SUPPORT MY

23    CALCULATIONS IN FORMING MY OPINIONS.

24        SO WITHOUT COUNTING THEM, I DON'T KNOW HOW MANY THERE ARE.

25    Q.   SURE.  WELL, WE CAN JUST COUNT THE PAGE NUMBERS ON THE

1    BOTTOM AND TRUST THE MATH.

2         IT WOULD BE FROM PAGE 51 TO PAGE 91, RIGHT?  THAT WOULD BE

3    40 PAGES?

4    A.   YOU MEAN THE EXHIBIT?

5    Q.   THE EXHIBITS ARE 40 PAGES; AND YOUR REPORT ITSELF, YOUR

6    ANALYSIS, IS 49 PAGES, INCLUDING THE COVER SHEET AND THE TABLE

7    OF CONTENTS, SO I SUPPOSE 47 PAGES OF ANALYSIS; RIGHT?

8    A.   OF WRITTEN, WRITTEN WORDS, YES.

9    Q.   OKAY.  AND HOW MANY HOURS WOULD YOU ESTIMATE THAT YOU AND

10   YOUR STAFF SPENT PREPARING THIS REPORT?

11   A.   I DON'T HAVE AN ESTIMATE SITTING HERE.  WE WORKED ON THIS

12   REPORT OVER THE COURSE OF SEVERAL WEEKS, BUT I DON'T KNOW HOW

13   MANY HOURS.

14   Q.   DO YOU -- ARE YOU COMFORTABLE WITH, LIKE, A CONSERVATIVE

15   FIGURE?  YOU TALKED ABOUT CONSERVATIVE FIGURES ON YOUR DIRECT

16   EXAMINATION.

17   A.   I'M NOT.  I JUST DIDN'T LOOK AT THE NUMBER OF HOURS THAT I

18   AND MY TEAM SPENT IN PREPARING THE REPORT.  THAT'S NOT

19   SOMETHING THAT I WOULD TYPICALLY LOOK AT TO PREPARE FOR MY

20   TESTIMONY.

21   Q.   DOESN'T FEDERAL RULE OF CIVIL PROCEDURE 26 REQUIRE EXPERTS

22   WHO PREPARE A REPORT ALSO TO PROVIDE, QUOTE, A STATEMENT OF THE

23   COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY IN THE

24   CASE, UNQUOTE?

25   A.   I UNDERSTAND THAT TO BE DISCLOSURE OF THE HOURLY RATE,

1     WHICH IS IN MY REPORT.

2     Q.   AND YOU HAVE NO IDEA HOW MANY HOURS AT ALL WERE SPENT

3     EITHER PREPARING THE REPORT, PREPARING TO TESTIFY TODAY,

4     SITTING IN THE GALLERY THROUGHOUT THIS TRIAL, AND YOUR

5     TESTIMONY TODAY?

6           MR. BLOCK:  YOUR HONOR, I OBJECT.  ASKED AND

7     ANSWERED.

8           THE COURT:  ASKED AND ANSWERED, SUSTAINED.

9     BY MR. AKROTIRIANAKIS:

10    Q.   ALL RIGHT.  YOUR HOURLY RATE IS $795 PER HOUR; IS THAT

11    RIGHT?  IT'S PARAGRAPH 11.

12    A.   OH, THANK YOU.  I WAS ONE PAGE OFF.

13         YES, $795 AN HOUR.

14    Q.   IS THAT STILL YOUR RATE TODAY?

15    A.   YES.

16    Q.   ARE YOU COMFORTABLE SAYING THAT YOUR AMOUNT THAT STOUT HAS

17    BILLED, OR WILL BILL, META FOR YOUR WORK AND YOUR TEAM'S WORK

18    IN THIS ENGAGEMENT IS MORE THAN THE $444,719 THAT IS THE

19    SUBJECT OF YOUR OPINION?

20          MR. BLOCK:  OBJECTION, YOUR HONOR.

21          THE COURT:  ON WHAT BASIS?

22          MR. BLOCK:  WHAT'S THE RELEVANCE?

23          THE COURT:  OVERRULED.

24          THE WITNESS:  YEAH, I DON'T KNOW SITTING HERE RIGHT

25    NOW.  I WOULD BE SURPRISED IF IT WAS THAT MUCH.

1    BY MR. AKROTIRIANAKIS:

2    Q.   OKAY.  I WOULD LIKE YOU TO MAKE THAT PHONE CALL AT THE

3    NEXT BREAK.

4         YOU ARE BILLING --

5             MR. BLOCK:  YOUR HONOR, I OBJECT TO THE INSTRUCTION

6    TO THE WITNESS.

7             THE COURT:  I -- I TOTALLY AGREE.  YOU HAVE TO ACCEPT

8    THE ANSWER SHE GAVE HERE.  IF SHE DIDN'T KNOW, SHE DIDN'T KNOW.

9         I DON'T KNOW THAT WE ARE GOING TO MAKE HER GO MAKE A PHONE

10   CALL AND THEN COME BACK AND GIVE YOU THE ANSWER.

11            MR. AKROTIRIANAKIS:  RULE 26 --

12            THE COURT:  LET'S MOVE ON.  LET'S MOVE ON.

13            MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

14   Q.   HAS STOUT HAD OTHER ENGAGEMENTS FOR EITHER FACEBOOK OR

15   WHATSAPP OR META OR ANY OF THE FAMILY OF COMPANIES?

16   A.   I DON'T KNOW.  I MEAN, STOUT IS A DECENT SIZED COMPANY,

17   AND THERE ARE QUITE A NUMBER OF MY COLLEAGUES.  I WOULD HAVE TO

18   QUERY OUR SYSTEM TO ANSWER THAT QUESTION.

19   Q.   YOU DIDN'T HAVE TO DO A CONFLICT CHECK AT THE BEGINNING OF

20   THIS ENGAGEMENT?

21   A.   I DID DO A CONFLICT CHECK PRIOR TO TAKING ON THIS

22   ENGAGEMENT.

23        I DON'T REMEMBER IF STOUT HAS EVER DONE ANY CASES ON

24   BEHALF OF META OR FACEBOOK.  I KNOW I DIDN'T HAVE ANY CONFLICTS

25   TAKING THE WORK.

1    Q.   DO YOU HOPE TO DO OTHER CASES IN THE FUTURE?

2    A.   I WILL EVALUATE OTHER CASES IN THE FUTURE TO THE EXTENT

3    THAT THE OPPORTUNITY IS MADE AVAILABLE.

4    Q.   SO IN THE BOOK THAT HAS YOUR REPORT, THERE'S SOME, SOME

5    OTHER EXHIBITS BEHIND YOUR REPORT THAT ARE EXHIBITS 2015

6    THROUGH 2019.

7    A.   OKAY, I SEE THOSE.

8    Q.   OKAY.  YOU RECOGNIZE THOSE AS INDIVIDUAL TABLES THAT WERE

9    PART OF YOUR REPORT?

10   A.   GIVE ME A MINUTE TO LOOK, PLEASE.

11   Q.   SURE.

12       (PAUSE IN PROCEEDINGS.)

13         THE WITNESS:  I'M GOING TO GO ONE BY ONE HERE.

14       ONE OF THEM APPEARS TO BE A TABLE 3 EXCERPTED FROM MY

15   REPORT.

16   BY MR. AKROTIRIANAKIS:

17   Q.   EXHIBIT 2015 FOR THE RECORD.

18   A.   OKAY.

19         MR. AKROTIRIANAKIS:  I BEG YOUR PARDON, YOUR HONOR.

20   I SAID 2015.  I MEANT 2105.

21         THE WITNESS:  EXHIBIT 2106 APPEARS TO BE AN EXCERPT

22   OF EXHIBIT 1.1 FROM MY REPORT.

23       EXHIBIT 2107 APPEARS TO BE AN EXCERPT OF EXHIBIT 2.1 FROM

24   MY REPORT.

25       AND I SHOULD SPECIFY, IT'S THE AUGUST 30TH, 2024 REPORT

```
 1    WHEN I SAY "MY REPORT."

 2    BY MR. AKROTIRIANAKIS:

 3    Q.  DO YOU RECOGNIZE EXHIBIT 2108 AS EXHIBIT 2.2 FROM YOUR

 4    AUGUST 30, 2024 REPORT?

 5    A.  I'M SORRY.  WHICH EXHIBIT?

 6    Q.  2108.

 7    A.  OH, I'M CHECKING THAT RIGHT NOW.

 8    Q.  IT'S IN THE TOP LEFT CORNER.

 9    A.  I'M JUST DOUBLE CHECKING THAT THE NUMBERS SEEM TO LINE UP.

10        SO EXHIBIT 2108 ALSO APPEARS TO BE AN EXCERPT OF

11    EXHIBIT 2.2 OF MY REPORT.

12        EXHIBIT 2109 APPEARS TO BE AN EXCERPT OF EXHIBIT 3.1 FROM

13    MY REPORT.

14    Q.  OKAY.  AND EXHIBIT 2093 IN THE BINDER BEFORE YOU THAT IS

15    RIGHT BEFORE ALL THE EXHIBITS WE JUST TALKED ABOUT IS, IN FACT,

16    YOUR AUGUST 30, 2024 REPORT; CORRECT?

17    A.  YES.

18    Q.  ALL RIGHT.  AND PRIOR TO THE TIME THAT YOU -- WELL, YOU

19    TESTIFIED ON DIRECT EXAMINATION THAT YOU SPOKE WITH EIGHT

20    EMPLOYEES OF EITHER FACEBOOK OR WHATSAPP.

21        DID I HEAR YOU CORRECTLY?

22    A.  NO.

23    Q.  HOW MANY EMPLOYEES DID YOU SPEAK WITH?

24    A.  I SPOKE WITH 11.

25    Q.  SURE.  BUT YOU SPOKE WITH EIGHT PEOPLE WHO WERE ACTUALLY
```

1    WORKING ON THIS PROJECT AND THEIR PICTURES WERE ON THE SLIDE

2    DECK THAT YOU WERE USING.

3        DO YOU RECALL THAT?

4    A.   I SPOKE WITH EIGHT INDIVIDUALS WHO WERE INCLUDED IN MY

5    CALCULATION OF THE PLAINTIFFS' RESPONSE COST.

6    Q.   OKAY.  AND YOU SPOKE TO THEM; RIGHT?

7    A.   YES, I DID.

8    Q.   AND YOU SPOKE WITH BOTH MR. ROBINSON AND MR. GAUTAM.  IS

9    THAT YOUR TESTIMONY?

10   A.   YES.

11   Q.   AND YOU WOULD HAVE SPOKEN TO THEM AT OR ABOUT AUGUST 30TH,

12   2024 WHEN YOU PREPARED YOUR REPORT?

13   A.   I WOULD HAVE SPOKEN TO THEM IN ADVANCE OF PREPARING MY

14   REPORT BECAUSE I NEEDED THE INFORMATION FROM THEM IN ORDER TO

15   PERFORM MY CALCULATIONS AND PREPARE MY EXHIBITS.

16   Q.   YOU WOULD HAVE -- YOU WOULD HAVE SPOKEN TO THEM AT LEAST

17   BY THE DATE THAT YOU -- THAT YOU SIGNED YOUR REPORT, AUGUST 30,

18   2024; CORRECT?

19   A.   YES.  IT WOULD -- IT WOULD HAVE BEEN BEFORE THAT DATE.

20   Q.   OKAY.  NOW, I THINK THIS IS ESTABLISHED, BUT I'LL JUST ASK

21   YOU, EVERYBODY OF THE, THE 22 EMPLOYEES THAT ARE THE SUBJECT

22   OF -- WHOSE WORK IS THE SUBJECT OF YOUR TESTIMONY ARE SALARIED

23   EMPLOYEES; CORRECT?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND SO WHILE YOU'VE ASCRIBED TO THEM AN HOURLY RATE, THEY

1    DON'T, IN FACT, HAVE AN HOURLY BILLING RATE THAT THEY BILL TO

2    THE COMPANY; CORRECT?

3    A.   THAT'S CORRECT.  THEY'RE SALARIED EMPLOYEES, WHICH IS WHY

4    I HAD TO DO THE CALCULATIONS TO COME UP WITH WHAT THE HOURLY

5    RATE WOULD BE SO I COULD, SO I COULD APPLY THE NUMBER OF HOURS

6    THAT THEY WORKED RESPONDING TO THE NSO ATTACKS TO THAT HOURLY

7    RATE THAT I CALCULATED.

8    Q.   ALL 22 OF THE EMPLOYEES WERE HIRED -- WELL, THE EVENTS IN

9    THE CASE START ON MAY 2ND, 2019; CORRECT?

10   A.   WELL, I UNDERSTAND THERE WAS SOME TESTIMONY THAT THERE

11   WERE THINGS GOING ON IN THE SYSTEM WHERE NSO MAY HAVE BEEN

12   DOING SOME TESTING IN 2018 ON THE WHATSAPP SYSTEMS.

13        BUT THE -- I UNDERSTAND THAT THE INCIDENT -- THAT THE

14   MALWARE WAS DETECTED BEGINNING MAY 2ND, 2019.

15   Q.   HMM.  I'M NOT SURE YOU UNDERSTOOD THE 2018 TESTIMONY THE

16   WAY I DID.

17        BUT LET ME ASK YOU, YOUR OPINIONS ARE RELATED TO PEOPLE

18   WHO DID WORK DURING A DEFINED PERIOD OF TIME; CORRECT?

19   A.   YES.

20   Q.   OKAY.  AND THAT DEFINED PERIOD OF TIME BEGINS WITH

21   MAY 2ND, 2019?

22   A.   YES, THAT'S CORRECT.

23   Q.   ALL RIGHT.  AND ALL OF THOSE EMPLOYEES ALREADY WERE

24   WORKING FOR FACEBOOK ON MAY 2ND, 2019; CORRECT?

25   A.   YES.

1    Q.   IN OTHER WORDS, NEITHER FACEBOOK NOR WHATSAPP HAD HIRED

2    ANY OF THE 22 EMPLOYEES IN ORDER FOR THEM TO WORK ON THIS

3    MATTER; CORRECT?

4    A.   CORRECT.

5    Q.   AND IF YOU LOOK AT EXHIBIT 3.1.1 TO YOUR REPORT --

6    A.   OKAY, I'M THERE.

7    Q.   -- THAT'S THE SAME AS EXHIBIT 2109; CORRECT?

8    A.   NO.

9    Q.   PARDON ME.

10        LET'S JUST USE YOUR REPORT THEN.

11        IT'S EXHIBIT 3.1.1 TO YOUR REPORT.  AND JUST FOR THE

12   RECORD, WHAT'S THE PAGE NUMBER DOWN IN THE BOTTOM CENTER?

13   A.   EX.A2093-073.

14   Q.   OKAY.  AND IN THIS CHART, YOU PUT FORWARD A GROSS SALARY

15   ENTRY FOR 2019 FOR EACH OF THE 22 WITNESSES -- 22 EMPLOYEES?

16   A.   YES.  I HAVE, AS ONE OF THE LINE ITEMS, A GROSS SALARY

17   AMOUNT FOR EACH OF THE INDIVIDUALS IN MY CALCULATION.

18   Q.   AND TO YOUR KNOWLEDGE, THAT GROSS SALARY AMOUNT WAS THE

19   SAME THROUGHOUT THE YEAR 2019?

20   A.   THAT'S MY UNDERSTANDING.

21   Q.   AND FACEBOOK AND WHATSAPP'S POOL FOR CASH BONUSES FOR 2019

22   WOULD HAVE BEEN SET AT THE BEGINNING OF THE BONUS CYCLE FOR

23   THAT YEAR; IS THAT RIGHT, MS. TREXLER?

24   A.   I DON'T UNDERSTAND YOUR QUESTION.

25   Q.   THE POOL OF CASH THAT GETS DISTRIBUTED TO THE EMPLOYEES OF

1    THE CORPORATIONS AS BONUSES IS SET AT THE OUTSET OF THE BONUS

2    ACCRUAL PERIOD?  OR DO YOU NOT KNOW?

3    A.   I DON'T KNOW WHEN AND HOW FACEBOOK, OR WHEN THE COMPANY

4    SETS THE BONUS POOL, WHEN THEY COME UP WITH THAT.  I JUST KNOW

5    WHAT THE BONUS AMOUNTS WERE.

6    Q.   YOU DON'T HAVE ANY INFORMATION TO SUGGEST THAT THE POOL

7    FOR CASH BONUSES WAS INCREASED IN SOME WAY AS A RESULT OF THE

8    EVENTS THAT WE'RE HERE TALKING ABOUT TODAY, DO YOU?

9    A.   I HAVE NO INSIGHT INTO THAT ONE WAY OR THE OTHER.  I DON'T

10   KNOW HOW THE COMPANY DETERMINES WHAT ITS BONUS POOL LOOKS LIKE.

11   Q.   WOULD YOU TURN TO THE PRIOR PAGE OF YOUR REPORT.  IT'S THE

12   ONE THAT ENDS IN 72.

13   A.   I'M SORRY.  ARE YOU REFERRING TO EXHIBIT 3.1 OF MY REPORT?

14   Q.   YEAH.  IT'S 3.1, SO IT'S -- IT'S ON PAGE 72 OF YOUR

15   REPORT.  OR IF IT'S EASIER --

16   A.   I'M THERE.  I JUST WANTED TO CONFIRM WE WERE ON THE SAME

17   PAGE.

18   Q.   RIGHT.  THIS SHOWS BOTH AN HOURLY BONUS AND AN HOURLY

19   TOTAL RATE.

20        DO YOU SEE THAT?

21   A.   CAN YOU REFER TO THE COLUMN HEADINGS?  BECAUSE THERE ARE A

22   COUPLE OF DIFFERENT COLUMNS HERE.  I WANT TO MAKE SURE THAT

23   WE'RE REFERRING TO THE SAME ONES.

24   Q.   SO BY HOURLY BONUS, I'M REFERRING TO THE COLUMN WITH THE

25   HEADING "HOURLY BONUS."

1    A.   YES, I SEE THAT COLUMN.

2    Q.   OKAY.  AND TOTAL HOURLY RATE, I'M REFERRING TO THE COLUMN

3    THAT SAYS "TOTAL HOURLY RATE" IN IT.

4    A.   THE LAST COLUMN ON THE PAGE, YES, I SEE THAT, TOO.

5    Q.   ALL RIGHT.  NOW, FOUR OF THE EMPLOYEES RECEIVED NO BONUS;

6    IS THAT RIGHT?  SORRY, FIVE.

7    A.   LET ME GO BACK AND LOOK AT THE EXHIBIT THAT THIS IS

8    REFERENCING.  IT MAY NOT BE THAT THEY DIDN'T RECEIVE A BONUS.

9    IT MAY BE THAT I DIDN'T HAVE THE INFORMATION.  LET ME GO SEE.

10   Q.   IN ANY EVENT, YOU -- YOU CAN GO SEE, BUT IN YOUR CHART,

11   YOU LISTED NO AMOUNT FOR AN HOURLY BONUS FOR FIVE OF THE 22?

12   A.   THAT'S CORRECT.  EITHER I DIDN'T HAVE THE INFORMATION,

13   THEY DIDN'T RECEIVE A BONUS, OR IT'S POSSIBLE -- I THINK SOME

14   OF THESE EMPLOYEES MAY HAVE LEFT BEFORE THE END OF THE YEAR, IN

15   WHICH CASE THEY WOULDN'T HAVE RECEIVED THEIR BONUS.

16   Q.   OKAY.  DO YOU KNOW WHY IT IS, JUST LOOKING AT EXHIBIT 3.1,

17   THAT YOU DON'T HAVE ANYTHING IN THAT -- IN THE BONUS CATEGORY

18   FOR THOSE PEOPLE?

19   A.   WELL, IT WOULD BE ONE OF THOSE THREE REASONS.  I EITHER

20   DIDN'T HAVE THE INFORMATION; THEY DIDN'T RECEIVE A BONUS; OR

21   THEY LEFT BEFORE THE END OF THE YEAR AND DIDN'T RECEIVE A

22   BONUS.

23   Q.   OKAY.

24   A.   SO I INCLUDED A ZERO IN THAT COLUMN.

25   Q.   ALL OF THE RESTRICTED STOCK UNITS, OR RSU'S, THAT YOU

1    TESTIFIED ABOUT WERE GRANTED PRIOR TO MAY 2, 2019; RIGHT?

2    A.   I BELIEVE THAT'S THE CASE.

3         AND, AGAIN, THE GRANT IS THE PROMISE WITH FUTURE

4    EMPLOYMENT.  SO THE GRANT IS NOT THE VEST.

5    Q.   RIGHT.  YOU CAN LOOK AT EXHIBIT 320, STARTING WITH PAGE 5.

6         AND IT'S ON THE SCREEN, YOUR HONOR, BUT THE PUBLIC SCREEN

7    IS OFF.

8         TURN IT OFF, PLEASE.  THANK YOU.

9         STARTING WITH PAGE 5, AND THIS WAS THE ONE THAT YOU HAVE

10   TO SORT OF TIE UP THE PARTICIPANT I.D. WITH ANOTHER DOCUMENT TO

11   KNOW WHO THE PERSON IS.

12        BUT THIS DOCUMENT SETS FORTH IN THE COLUMN, THE FIFTH

13   COLUMN, AWARD DATE, THE DATES ON WHICH THESE GRANTS WERE

14   AWARDED; IS THAT RIGHT, MS. TREXLER?

15   A.   YES.  IT'S ABOVE -- ABOVE THE AWARD DATE, IT SAYS GRANT

16   DATE, SO THAT'S THE DATE WHEN THE EMPLOYEE RECEIVED,

17   ESSENTIALLY, THE PROMISE FOR SHARES IF THEY STAY OVER THE

18   COURSE OF THE NEXT FOUR YEARS, YOU KNOW, THROUGH ALL 16 VESTING

19   PERIODS, OR THROUGH A PORTION OF THEM.

20   Q.   RIGHT.  AND THAT'S THE -- THAT'S THE EXTRA REQUIREMENT,

21   RIGHT, JUST THAT THEY STAY AT THE COMPANY?

22   A.   RIGHT.  THE -- PART OF THE PURPOSE OF RSU'S IS EMPLOYEE

23   RETENTION, SO YOU DON'T WANT TO GIVE THEM A BUNCH OF STOCK IN

24   THE COMPANY ON DAY 1.  YOU'RE INCENTIVIZING THEM TO CONTINUE

25   WORKING WITH THE COMPANY BECAUSE THE COMPANY WANTS FUTURE

1    PERFORMANCE AND WORK OUT OF THESE PEOPLE.

2    Q.   RIGHT.  BUT THERE'S NOT ANOTHER ADDITIONAL REQUIREMENT

3    THAT YOU HAVE TO DO IN ADDITION TO STAYING AT THE COMPANY?  IS

4    THAT YOUR UNDERSTANDING?

5         FOR EXAMPLE, YOU DON'T HAVE TO WORK ON THE NSO CASE IN

6    ORDER TO GET THE RESTRICTED STOCK UNITS AND HAVE THEM VEST?

7    YOU JUST NEED TO KEEP BEING EMPLOYED BY THE COMPANY; RIGHT?

8    A.   YOU NEED TO BE EMPLOYED BY THE COMPANY THROUGH THE VEST

9    DATES IN ORDER TO GET THE STOCK.

10   Q.   ALL RIGHT.

11        NOW, WHAT WE SEE, THE VERY FIRST PART OF PAGE 5 THAT'S NOW

12   ON THE SCREEN HAS NO DATES IN THE GRANT DATE COLUMN THAT ARE

13   AFTER MAY 2, 2019.

14        DO YOU SEE THAT?

15   A.   WHAT ARE YOU REFERRING TO, MAY 2, 2019?

16   Q.   DO YOU SEE THE HIGHLIGHTED COLUMN, MS. TREXLER?

17   A.   YES.

18   Q.   OKAY.  THERE'S NO DATES IN IT THAT ARE AFTER MAY 2, 2019;

19   CORRECT?

20   A.   YES, THAT'S CORRECT.

21   Q.   THEY'RE ALL DATES PRIOR TO MAY 2, 2019?

22        IN FACT, WHAT WE'RE LOOKING AT NOW HAS NO DATES THAT ARE

23   EVEN IN THE YEAR 2019; CORRECT?

24   A.   YES, THAT'S CORRECT.

25   Q.   ALL RIGHT.  NOW, META AND ITS FAMILY OF COMPANIES ISSUE

1      THEIR AWARDS IN MARCH EVERY YEAR; IS THAT RIGHT?

2      A.   YES, THAT'S MY UNDERSTANDING.

3      Q.   OKAY.

4      A.   WELL, LET ME CLARIFY, BECAUSE YOU SAID "AWARDS."

5          META GRANTS THE STOCK UNITS IN MAY (SIC) AND, AGAIN, THE

6      GRANT IS THE PROMISE FOR FUTURE STOCK WITH CONTINUED

7      EMPLOYMENT.

8      Q.   THAT'S THE REASON THAT ALL THE DATES IN THE COLUMN START

9      WITH A MARCH DATE; CORRECT, MS. TREXLER?

10     A.   YES, AT LEAST WITH RESPECT TO THESE TRANCHE OF AWARDS.

11         I'M UNSURE IF THINGS HAVE CHANGED, BUT THESE WERE THE ONES

12     THAT WERE RELEVANT AS OF 2019.

13     Q.   WHEN YOU SAY "THESE," YOU'RE REFERRING TO ALL OF THE RSU'S

14     THAT ARE RELEVANT TO YOUR OPINIONS IN THIS CASE; CORRECT?

15     A.   THE RSU'S THAT VESTED DURING 2019.

16     Q.   OKAY.  ALL OF THEM WERE GRANTED ON A DATE IN MARCH 2019 OR

17     PRIOR; CORRECT?

18     A.   NO.

19     Q.   OKAY.  I'M JUST LOOKING AT YOUR DOCUMENT AND IT SAYS

20     "GRANT DATE," AND THEN IT SAYS ALL THESE DATES THAT ARE IN

21     MARCH 2015, 2016, AND AT SOME POINT THERE WILL BE ONE IN MARCH

22     2019, BUT IT'LL BE IN MARCH 2019, NOT MAY; CORRECT?

23     A.   IF THERE'S AN AWARD -- IF THERE'S AN ADDITIONAL GRANT, MY

24     UNDERSTANDING IS IT WOULD HAVE BEEN IN MARCH OF 2019.

25     Q.   OKAY.  AND SO -- I MEAN, YOU DON'T EVEN NEED TO LOOK,

1    ALTHOUGH YOU'RE WELCOME TO PAGE THROUGH THIS INFINITESIMALLY

2    SMALL EXHIBIT 320, BUT THERE ARE NO DATES IN THE GRANT DATE

3    COLUMN THAT ARE AFTER MARCH 2019; CORRECT, MS. TREXLER?

4         BECAUSE YOU'RE NOT RELYING ON ANY RSU'S GRANTED AT ANY

5    OTHER TIME OTHER THAN MARCH 2019 AND PRIOR; CORRECT?

6    A.   I MEAN, WITHOUT PAGING THROUGH THIS REALLY LENGTHY

7    DOCUMENT PAGE BY PAGE, MY RECOLLECTION IS THAT THERE WERE NO

8    GRANT DATES INCLUDED IN HERE AFTER MARCH OF 2019.

9    Q.   OKAY.  AND IN MOST CASES, THERE'S NOT EVEN A 2019;

10   CORRECT?

11   A.   THERE ARE SOME.  I MEAN, IT'S UP ON THE SCREEN.  THERE WAS

12   ONE ON MARCH 20TH, 2019.

13   Q.   YEAH, YOU'RE RIGHT.  AND THERE IS ONE, TWO, THREE, FOUR ON

14   THE SCREEN.

15   A.   BUT THERE MAY BE OTHERS IF WE WOULD SCROLL THROUGH OTHER

16   PAGES OF THIS.  I MEAN, THIS DOCUMENT ITSELF, ACCORDING TO

17   THE -- THIS IS A 96-PAGE DOCUMENT.

18   Q.   IN YOUR REPORT, YOU DIDN'T IDENTIFY ANY PROJECT THAT WAS

19   NOT COMPLETED BECAUSE OF NSO AND PEGASUS.  AM I CORRECT AS TO

20   THE CONTENT OF YOUR REPORT?

21   A.   LET ME REFERENCE MY REPORT.

22   Q.   DO YOU RECALL AT ANY TIME HAVING HEARD OF -- WELL, LET'S

23   JUST -- YOUR REPORT IS A COMPLETE STATEMENT OF YOUR OPINIONS IN

24   THE CASE; RIGHT?

25   A.   IT IS, YES.

1          I RECALL SOME OF THESE EMPLOYEES SAYING SOMETHING TO THE

2    EFFECT OF, YOU KNOW, THAT THEY DROPPED EVERYTHING TO FOCUS ON

3    RESPONDING TO THE NSO ATTACKS, AND THAT'S CONSISTENT WITH THE

4    TESTIMONY OF MR. GHEORGHE AND MR. ROBINSON WHO WENT INTO

5    GREATER DETAIL.

6    Q.   CAN YOU TURN TO TABLE 3 ON PAGE 31 OF YOUR REPORT.  OR, IF

7    YOU LIKE, YOU CAN GO TO EXHIBIT 2105.  IT'S THE SAME.

8    A.   OKAY.

9    Q.   AND HERE YOU -- HERE'S WHERE YOU ASCRIBE AN HOURLY RATE.

10         DO YOU SEE THAT?

11   A.   YES.  THIS TABLE IS A SUMMARY OF THE PLAINTIFFS' LABOR

12   EXPENSE TO RESPOND TO THE DEFENDANTS EXPLOITS.

13   Q.   AND IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, YOU -- WE

14   COULD MULTIPLY THE HOURLY RATE THAT YOU DETERMINED HERE BY 2080

15   HOURS, AND THEN FACTOR IN THE NUMBER OF HOURS WORKED AS YOU'VE

16   DETERMINED THEM IN ORDER TO GET THE HOURLY RATE -- OR IN ORDER

17   TO GET THE EXPENSE, THE COST OF LABOR, AS YOU PUT IT, FOR EACH

18   WORKER?

19   A.   NO, THAT'S AN INCORRECT FORMULA THAT YOU JUST STATED.

20   Q.   ALL RIGHT.  WHAT'S THE FORMULA THAT YOU WERE TALKING ABOUT

21   ON DIRECT WHERE YOU MULTIPLY SOMETHING BY 2080 HOURS?

22   A.   I DON'T MULTIPLY ANYTHING BY 2080 HOURS.  THAT WASN'T MY

23   DIRECT.

24   Q.   YOU SAID SOMETHING ABOUT 2080 HOURS.  MAYBE I WASN'T

25   FOLLOWING.

1              CAN YOU REMIND US WHAT THAT IS?

2    A.    SURE.

3              TO COME UP WITH CERTAIN COMPONENTS OF THE HOURLY LABOR

4    RATE, I NEED TO DIVIDE THE TOTAL ANNUAL EXPENSE BY 2080 HOURS.

5    Q.    OKAY.  DIVIDE, EXCUSE ME, DIVIDE BY 2080 HOURS.

6              SO THEN WE COULD GO BACK TO THAT TOTAL NUMBER BY

7    MULTIPLYING THE NUMBER OF -- THE HOURLY RATE THAT YOU FIND BY

8    2080 HOURS; CORRECT?

9    A.    THAT WOULD GIVE YOU WHAT?  I'M NOT FOLLOWING YOUR

10   QUESTION.  I'M SORRY.

11   Q.    THAT WOULD GIVE US THE ANNUAL COST?

12   A.    I'M SORRY.  I'M NOT FOLLOWING YOUR QUESTION.

13   Q.    YOU DON'T KNOW WHAT I'M TALKING ABOUT?

14   A.    YOU'RE SAYING THE ANNUAL COST.  THE ANNUAL COST OF WHAT?

15   Q.    YOU CAME UP WITH AN ANNUAL COST FOR EACH PERSON AND YOU

16   MADE IT INTO AN HOURLY RATE, AND YOU MULTIPLIED IT BY THE

17   NUMBER OF HOURS THAT YOU SAY EACH PERSON WORKED.

18             THAT'S HOW YOU FIGURED OUT THE COST OF LABOR FOR EACH OF

19   THOSE PEOPLE?  YOU ADDED THEM UP AND THAT'S HOW YOU GET 444 --

20   NO, THAT'S NOT WHAT YOU DID?

21   A.    THAT MISREPRESENTS WHAT I DID.  THERE ARE DIFFERENT

22   COMPENSATION COMPONENTS TO MY CALCULATION.

23             FOR EXAMPLE, IF I LOOK AT -- THE TOTAL BONUS AMOUNT WOULD

24   BE A GOOD EXAMPLE.  I HAVE AN ANNUAL AMOUNT FOR THE TOTAL BONUS

25   AMOUNT FOR EACH INDIVIDUAL THAT HAD A BONUS.

1          I DIVIDED THAT BY 2080 HOURS TO COME UP WITH THE HOURLY

2     COST THAT RELATE TO THE BONUS COMPONENT.

3          THERE'S CERTAIN INFORMATION THAT I DIDN'T TAKE THE TOTAL

4     ANNUAL EXPENSE AND DIVIDE BY 2080 HOURS.

5          THAT'S WHY I'M HAVING TROUBLE ANSWERING YOUR QUESTION,

6     BECAUSE THERE ARE MULTIPLE COMPONENTS TO MY ANALYSIS AND THEY

7     WERE JUST DONE A LITTLE BIT DIFFERENTLY.

8     Q.   BUT ONE COULD TAKE THE HOURLY RATES AS YOU PUT THEM HERE

9     IN EXHIBIT 2105, TABLE 3 FROM YOUR REPORT, AND MULTIPLY THEM BY

10    2080 HOURS IN ORDER TO GET THE ANNUAL NUMBER THAT YOU

11    CALCULATED; IS THAT RIGHT?

12    A.   NO, THAT -- I DIDN'T CALCULATE AN ANNUAL NUMBER IN MY

13    ANALYSIS.

14         I CALCULATED THE COST OF EACH ONE OF THESE EMPLOYEES

15    WORKING ON THE NSO ATTACKS.  I LOOKED AT THE NUMBER OF HOURS

16    THAT THOSE EMPLOYEES SPENT DOING THAT, CAME UP WITH AN HOURLY

17    LABOR RATE, AND I MULTIPLIED THE HOURS BY THE RATE TO GET THE

18    COST OF EACH INDIVIDUAL EMPLOYEE TO META IN RESPONDING TO THE

19    NSO ATTACK.

20    Q.   REMIND US HOW IT IS THAT YOU GOT THE HOURLY RATE, PLEASE.

21    A.   A COUPLE OF --

22    Q.   YOU HAD SOME THINGS, YOU MULTIPLIED THEM BY 2080, OR YOU

23    DIVIDED THEM BY 2080; RIGHT?

24         MR. BLOCK:  YOUR HONOR, I OBJECT.  HE HAD ASKED A

25    QUESTION, SHE HAD BEGUN TO ANSWER, AND THEN HE DIDN'T GIVE HER

```
 1      AN OPPORTUNITY.

 2              MR. AKROTIRIANAKIS:  I'LL WITHDRAW MY QUESTION,

 3      YOUR HONOR.

 4              THE COURT:  OKAY.

 5      BY MR. AKROTIRIANAKIS:

 6      Q.  I SAID MULTIPLY.  YOU DIVIDED BY 2080; RIGHT?

 7      A.  IN CERTAIN COMPONENTS OF MY CALCULATION.

 8      Q.  ALL RIGHT.  SO YOU ADDED SOME THINGS TOGETHER, YOU CAME UP

 9      WITH A BIG NUMBER, YOU DIVIDED IT BY 2080, AND YOU CAME UP WITH

10      A SMALLER NUMBER.  CORRECT?

11      A.  NO.

12      Q.  OKAY.

13      A.  THAT'S AN OVERSIMPLIFICATION OF MY ANALYSIS.

14      Q.  I'M JUST TRYING TO FIGURE OUT HOW YOU GOT THE HOURLY RATES

15      THAT WE SEE HERE IN THE CHART ON TABLE 3 AND WHETHER SOMEONE

16      COULD FIGURE WHAT THE ANNUAL EXPENSE, AS I THINK YOU PUT IT,

17      WOULD BE FOR, FOR EXAMPLE, MR. WANG, IF WE USE THE LAST ONE, BY

18      MULTIPLYING THE $561.38 HOURLY RATE BY 2080 HOURS?

19      A.  ARE YOU SAYING THE ANNUAL EXPENSE OF META OR WHATSAPP FOR

20      HAVING MR. WANG AS AN EMPLOYEE?

21      Q.  THAT'S WHAT I'M GETTING AT, BUT IF I'M MISUNDERSTANDING

22      WHAT YOU DID, THEN I'D LIKE YOU TO EXPLAIN IT.

23      A.  OKAY.  BUT THAT -- BUT WHAT YOU'RE ASKING ME IS DIFFERENT

24      THAN THE CALCULATION I DID.  YOU KEEP ASKING ME ABOUT MY

25      CALCULATION.
```

1        YOU'RE ASKING ME ABOUT SOMETHING DIFFERENT.

2        SO I WANT TO MAKE SURE -- I'M HAPPY TO ANSWER YOUR

3     QUESTION.  I JUST --

4     Q.  DO YOU THINK --

5     A.  YOU'RE ASKING TWO DIFFERENT THINGS.  YOU'RE SAYING MY

6     ANALYSIS, BUT THAT'S NOT THE ANALYSIS THAT I PERFORMED.

7     Q.  DO YOU THINK YOU UNDERSTAND MY QUESTION?

8     A.  ARE YOU ASKING ME HOW -- IF ONE WERE TO CALCULATE THE

9     ANNUAL EXPENSE FOR YUANYUAN WANG, HOW YOU COULD DO THAT

10    UTILIZING INFORMATION IN MY REPORT?

11    Q.  YES.

12    A.  THEN YOU COULD TAKE THE $561.38 TIMES 2080 HOURS.  THAT

13    WOULD BE THE TOTAL COST TO META OF HAVING YUANYUAN WANG AS AN

14    EMPLOYEE.

15        BUT THAT'S DIFFERENT THAN THE CALCULATION THAT I DID.

16    Q.  OKAY.  BUT THAT'S HOW YOU ARRIVED AT THE $561.38 HOURLY

17    RATE; CORRECT?

18    A.  NO.  I -- I'VE EXPLAINED WHAT I'VE DONE TO GET TO THAT

19    RATE.

20    Q.  THAT'S FINE, MS. TREXLER.  NEVER MIND.

21        IN YOUR FIELD, DO ECONOMISTS LIKE YOURSELF OFTEN REFER TO

22    THE CONCEPT OF THE BUT-FOR WORLD?

23    A.  BEFORE I ANSWER YOUR QUESTION, I JUST DON'T WANT TO

24    MISREPRESENT MY CREDENTIALS.  I'M A CPA.  I AM NOT AN

25    ECONOMIST.

1    Q.   ARE YOU FAMILIAR WITH THE CONCEPT OF THE BUT-FOR WORLD?

2    A.   YES, I AM.

3    Q.   CAN YOU PLEASE EXPLAIN IT TO THE JURY?

4    A.   SURE.

5         A BUT-FOR WORLD WOULD COME INTO PLAY IN CALCULATION OF

6    LOST PROFIT DAMAGES WHERE ESSENTIALLY WHAT MY JOB WOULD BE IS

7    TO FIGURE OUT IF THE BAD ACT -- IT COULD BE A BREACH OF

8    CONTRACT -- IF THAT DIDN'T HAPPEN, WHAT FINANCIAL POSITION THE

9    PLAINTIFF WOULD BE IN WITHOUT THAT BAD ACT.

10   Q.   WERE YOU HERE YESTERDAY -- THANK YOU FOR THAT.

11        WERE YOU HERE YESTERDAY WHEN EXHIBIT 1204, THAT TIMELINE,

12   WAS SHOWN?  AND I THINK IT WOULD HAVE BEEN IN YOUR DIRECT

13   EXAMINATION AS WELL.

14   A.   I WAS HERE YESTERDAY.  I DON'T REMEMBER WHAT EXHIBIT 1204

15   WAS.  I WOULD NEED TO SEE IT.

16   Q.   SURE.

17        IT'S IN EVIDENCE, YOUR HONOR.  MAY I PUBLISH IT?

18             THE COURT:  YES.

19             MR. AKROTIRIANAKIS:  AND IF WE COULD JUST MAYBE BLOW

20   UP COLUMN A AT THE TOP THERE SO WE CAN ALL SEE IT.

21   Q.   ALL RIGHT.  IT'S IN YOUR BOOK, TOO, MS. TREXLER, IF YOU

22   WANT TO LOOK AT THE WHOLE DOCUMENT.

23   A.   WHERE IS IT IN MY BOOK?

24   Q.   IT'S BEHIND TAB --

25   A.   OH, 1204, YOU SAID?

1     Q.   YEAH.

2     A.   OKAY.  IT'S MUCH EASIER TO SEE ON THE SCREEN.

3     Q.   I AGREE WITH YOU.

4          OKAY.  YOU CAN SEE THAT MANY OF THE ENTRIES HERE HAVE BOTH

5     DATE AND TIME STAMPS; CORRECT?

6     A.   YES, SOME DO.  SOME DON'T.

7     Q.   ALL RIGHT.  WELL, THAT'S FINE.

8          HOW ABOUT MAY 2ND -- IT'S LINE 27.  LINE 27.  THERE YOU

9     GO.

10         SO LINE 27, "INVESTIGATION STARTS," THAT ONE HAS A TIME

11    STAMP; CORRECT?

12    A.   IT DOES, YES.

13    Q.   AND YOU READ IT AS 16:45 PACIFIC DAYLIGHT TIME, WHICH IS

14    4:45 P.M. HERE IN CALIFORNIA; CORRECT?

15    A.   YES.

16    Q.   ALL RIGHT.  AND ANOTHER ONE IS MAY 13TH, LINE 40.  ARE YOU

17    ABLE TO SEE IT ON THE SCREEN OR IN YOUR BOOK?

18    A.   I CAN SEE IT ON THE SCREEN.

19    Q.   OKAY, AND I CAN SEE IT ON THE SCREEN.

20         AND THE TIME STAMP FOR THAT ONE IS 09:00 PACIFIC DAYLIGHT

21    TIME, WHICH WOULD BE 9:00 A.M. HERE IN CALIFORNIA; CORRECT?

22    A.   YES.

23    Q.   NOW, YOU SAID YOU DID A CONSERVATIVE CALCULATION OF THE

24    HOURS WORKED; RIGHT?

25    A.   YES.

1    Q.   AND YOU CALCULATED HOURS OVER AN EIGHT DAY PERIOD?  EIGHT

2    WORKING DAYS PERIOD, MAY 2ND, 3RD, 4TH -- I'M SORRY.  MAY 2ND,

3    3RD, 6TH, 7TH, 8TH --

4    A.   I DON'T HAVE THE CALENDAR IN FRONT OF ME, BUT IT WOULD

5    HAVE BEEN THE WEEKDAYS BETWEEN MAY 2ND AND MAY 13TH THAT WERE

6    IN MY CALCULATION FOR MANY OF THE EMPLOYEES.

7         THERE WERE SOME EMPLOYEES THAT HAD TIME AFTER THE MAY 13TH

8    DATE AS WELL.

9    Q.   RIGHT.  BUT -- SORRY.  I DIDN'T MEAN TO INTERRUPT YOU

10   THERE.

11        BUT THE ONES THAT WERE FOR THAT PERIOD OF TIME, THE

12   MAXIMUM YOU WOULD HAVE CALCULATED WOULD HAVE BEEN 64 HOURS, OR

13   EIGHT DAYS TIMES EIGHT HOURS; CORRECT?

14   A.   YES, THAT'S CORRECT.

15   Q.   ALL RIGHT.  THE RSU'S REPRESENT $178,761, OR 42.22 PERCENT

16   OF YOUR $444,719 TOTAL; IS THAT RIGHT?

17   A.   I NEED TO LOOK AT MY REPORT.

18   Q.   PLEASE.  AND IF DON'T WANT TO DO MATH ON THE FLY, I GET

19   THAT.  IF YOU'RE JUST COMFORTABLE WITH A LITTLE BIT MORE THAN

20   40 PERCENT, THAT'S FINE.

21        (PAUSE IN PROCEEDINGS.)

22         THE WITNESS:  I DON'T -- I DON'T LOOK AT IT THAT WAY

23   IN MY REPORT, SO I CAN'T TELL YOU WHAT THE TOTAL ADDS UP TO FOR

24   JUST THE RSU EXPENSE.

25        I HAVE THE COMPONENTS, BUT I WOULD NEED TO SIT HERE AND DO

1        SOME CALCULATIONS.

2        BY MR. AKROTIRIANAKIS:

3        Q.   OKAY.  SO YOU'RE NOT ABLE TO READILY SAY, IF YOU JUST TOOK

4        OUT THE RSU PART OF IT, WHAT THE REMAINDER WOULD BE?

5        A.   I DON'T HAVE IT BROKEN OUT THAT WAY IN MY REPORT.  I HAVE

6        EACH OF THE INDIVIDUAL COMPONENTS AND THEN HOW THEY ROLL UP.

7        BUT I DIDN'T TOTAL THE RSU COMPONENT IS X DOLLARS, THE BONUS

8        COMPONENT IS Y DOLLARS.

9             I COULD DO THE CALCULATIONS WITH WHAT I HAVE IN FRONT OF

10       ME, IT WOULD JUST TAKE ME LONGER THAN YOU WOULD PROBABLY WANT

11       TO SIT HERE AND WATCH ME DO IT.

12       Q.   I WON'T MAKE YOU DO MATH ON THE FLY.

13            LET ME MOVE TO A DIFFERENT AREA.

14            WHERE IN -- LET ME ASK YOU A DIFFERENT QUESTION.

15            ON HOW MANY DIFFERENT OCCASIONS IN THE ENTIRETY OF YOUR

16       47-PAGE ANALYSIS DO YOU EVEN MAKE REFERENCE TO RSU'S?

17       A.   YOU'RE ASKING ME TO GO THROUGH AND COUNT HOW MANY TIMES I

18       SAY RSU IN MY REPORT AND MY EXHIBITS?

19       Q.   NO.  I'M ASKING YOU ABOUT YOUR 47-PAGE ANALYSIS OF YOUR

20       REPORT.  DO YOU REMEMBER WHETHER YOU EVEN INCLUDED RSU'S IN

21       YOUR REPORT?

22       A.   YES, I INCLUDE RSU'S IN MY REPORT AND MY EXHIBITS.

23       Q.   ALL RIGHT.  SO IF YOU GO TO PARAGRAPH 84, YOU DISCUSS YOUR

24       CALCULATION OF EMPLOYEES BURDENED LABOR RATE.

25            DO YOU SEE THAT IN EXHIBIT -- SORRY -- IN PARAGRAPH 84 OF

1        EXHIBIT 2093?

2        A.   YES, I DO.

3        Q.   ALL RIGHT.  AND I'LL JUST READ WHAT YOU WROTE:  "THE

4        CALCULATION OF AN EMPLOYEE'S BURDENED LABOR RATE NOT ONLY

5        CONSIDERS THE EMPLOYEE'S SALARY, BUT ALSO CONSIDERS OTHER

6        EXPENDITURES PAID BY AN EMPLOYER TO OR ON BEHALF OF AN

7        EMPLOYEE.  THESE ADDITIONAL EXPENDITURES CAN BE PAID DIRECTLY

8        TO AN EMPLOYEE, E.G., PERFORMANCE BONUS OR RETIREMENT

9        CONTRIBUTIONS, OR PAID ON BEHALF OF AN EMPLOYEE, E.G., THE

10       EMPLOYER'S SHARE OF HEALTH CARE INSURANCE PREMIUMS OR PAYROLL

11       TAXES.  IN ADDITION TO BASE SALARY, THE INCLUSION OF EMPLOYER'S

12       ADDITIONAL EXPENDITURES TO OR ON BEHALF OF AN EMPLOYEE REFLECTS

13       THE EMPLOYER'S TOTAL ECONOMIC COST INCURRED IN CONNECTION WITH

14       THE SUBJECT EMPLOYEE'S TIME."

15            DID I READ IT CORRECTLY?

16       A.   YES, YOU DID.

17       Q.   OKAY.  YOU DON'T MENTION ANYTHING ABOUT RSU'S OR

18       RESTRICTED STOCK UNITS IN THAT DESCRIPTION; CORRECT?

19       A.   NOT SPECIFICALLY.  THE RSU'S ARE BULLETED IN THE NEXT

20       PARAGRAPH.

21            BUT RSU'S WOULD FALL INTO THE ADDITIONAL EXPENDITURES.

22       I'M JUST PROVIDING SOME EXAMPLES IN THIS PARAGRAPH OF THE TYPES

23       OF THINGS THAT WOULD GO INTO THE EMPLOYEE'S BURDENED LABOR

24       RATE.

25       Q.   IN THE NEXT PARAGRAPH, 85, THE PARAGRAPH ITSELF ALSO MAKES

TREXLER CROSS BY MR. AKROTIRIANAKIS

1    NO MENTION OF RSU'S CORRECT?

2    A.   NO, I DISAGREE WITH THAT.  I HAVE A LEAD IN, AND THEN I

3    HAVE FIVE BULLETS UNDERNEATH THAT SAY, IN PART, I CONSIDERED

4    THE FOLLOWING COSTS INCURRED BY PLAINTIFFS:  SALARY;

5    PERFORMANCE BONUS; EMPLOYER PAYROLL TAXES; EMPLOYER PORTION OF

6    HEALTH CARE BENEFITS; RESTRICTED STOCK UNIT, QUOTE, RSU;

7    GRANTS.

8    Q.   AND THAT IS THE ONLY MENTION OF RESTRICTED STOCK UNITS, OR

9    RSU'S, IN THE ENTIRETY OF YOUR 47-PAGE ANALYSIS; CORRECT,

10   MS. TREXLER?

11   A.   I DON'T KNOW WITHOUT GOING THROUGH AND LOOKING.

12        BUT I, AGAIN, ALSO HAVE EXHIBITS THAT ARE ATTACHED THAT

13   SHOW MY CALCULATION OF THE HOURLY RATE COMPONENT THAT RELATES

14   TO RSU'S.

15        AND I HAVE DOCUMENTS IN MY EXHIBITS CONSIDERED LIST THAT

16   ARE LISTED, WHICH ARE THE ONES THAT WE WENT THROUGH AND

17   PUBLISHED TO YOU EARLIER.

18   Q.   BUT YOU CAN THINK OF NO OTHER PLACE IN YOUR 47-PAGE

19   ANALYSIS WHERE YOU MENTION EVEN THE CONCEPT OF RSU'S; CORRECT?

20   A.   WITHOUT GOING THROUGH AND LOOKING AT THE 47 PAGES, I DON'T

21   KNOW.

22        BUT THEY'RE IN THERE, AND THEN THERE'S A WHOLE SET OF

23   EXHIBITS AND DOCUMENTS THAT SUPPORT THE INCLUSION OF THE RSU'S.

24   Q.   ALL RIGHT.  SO CAN YOU TURN TO EXHIBIT 3.1.4 IN YOUR

25   REPORT, WHICH IS PAGE 79.

1     A.   OKAY, I'M THERE.

2     Q.   AND THERE'S A FOOTNOTE.

3          DO YOU SEE IT?

4     A.   I'M SORRY.  3.1.4?

5     Q.   YES.

6     A.   OKAY, I'M THERE.

7     Q.   THERE'S A FOOTNOTE.

8          DO YOU SEE THAT?

9     A.   YES.

10    Q.   AND THAT REFERS TO A PRODUCTION NUMBER IN THIS LITIGATION;

11    IS THAT RIGHT?

12    A.   THE FIRST FOOTNOTE, YES.

13    Q.   ALL RIGHT.  AND THE PRODUCTION NUMBER IS THE SAME AS

14    EXHIBIT 323?

15         THIS WAS THE ONE THAT MR. BLOCK HAD YOU READ INTO THE

16    RECORD.  IT'S 323, IF I DIDN'T SAY IT.

17    A.   OKAY.  I'M GETTING THERE.

18    Q.   SURE.  AND JUST FOR EASE OF YOUR REFERENCE, THE PRODUCTION

19    NUMBER ON 323 IS ON THE SECOND PAGE.  IT'S THE SLIP SHEET.

20    A.   IT LOOKS LIKE THEY'RE SLIGHTLY DIFFERENT.

21    Q.   ALL RIGHT.  SO YOU'RE LOOKING AT THIS DOCUMENT, RIGHT,

22    MS. TREXLER, EXHIBIT 323 (INDICATING)?

23    A.   THAT'S REALLY FAR AWAY.

24         DOES IT SAY RSU EXPENSES?

25    Q.   WE CAN PUT IT ON THE SCREEN.  IT'S IN EVIDENCE.  IT'S

1       EXHIBIT 323.

2       A.   OKAY.

3       Q.   IF YOU GO TO PAGE 2, AND WE'RE GOING TO HAVE TO --

4       A.   YOU KNOW WHAT?  I AM SO SORRY.  I WAS LOOKING AT

5       EXHIBIT 3.1.3.

6            ON FOOTNOTE 1 OF 3.1.4, YES, IT HAS THE SAME BATES NUMBER.

7            MY APOLOGIES.

8       Q.   OKAY.  AND THE DOCUMENT THAT IS -- TAKE IT OFF THE SCREEN,

9       PLEASE.

10           THE DOCUMENT THAT WE'RE NOW TALKING ABOUT, EXHIBIT 323,

11      YOU UNDERSTAND TO BE A DOCUMENT THAT WAS, IN FACT, PREPARED FOR

12      THE PURPOSES OF THIS LITIGATION; CORRECT?

13      A.   MY UNDERSTANDING IS THAT THE -- THAT META'S EQUITY GROUP,

14      THAT THEY PREPARED THIS SUMMARY OF THE RSU EXPENSE FOR THE

15      PARTICULAR EMPLOYEES IN MY ANALYSIS.

16      Q.   RIGHT.  THAT'S WHY IT'S GOT THIS CONCEPT OF THE RELEVANT

17      EMPLOYEE AT THE TOP OF THE YELLOW COLUMN?

18      A.   YES, THAT'S IN THE TITLE.

19      Q.   SO IT SOUNDS LIKE YOU AGREE WITH ME THAT THIS DOCUMENT,

20      EXHIBIT 323, WAS PREPARED SPECIFICALLY FOR THE LITIGATION.

21      A.   THAT WOULD BE SOMETHING THAT WOULD HAVE BEEN DISCUSSED

22      WITH THE META EMPLOYEES AND COUNSEL.  I'M OUTSIDE OF IT.

23           THIS IS INFORMATION THAT WAS PROVIDED TO ME FROM THE

24      EQUITIES DEPARTMENT AND IT'S A SUMMARY FOR THE INDIVIDUALS THAT

25      I NEEDED.

1    Q.   DID YOU TALK TO ANY OF THE 22 EMPLOYEES ABOUT THEIR RSU'S?

2    A.   I -- I MAY HAVE HAD A -- I BELIEVE I HAD A CONVERSATION

3    WITH MR. GHEORGHE AND MR. ROBINSON, AND MAYBE OTHERS, ABOUT RSU

4    COMPENSATION.  I CAN'T RECALL SPECIFICALLY.  IT'S BEEN A WHILE

5    SINCE WE HAD THOSE CONVERSATIONS.

6         BUT THEY BOTH TESTIFIED THAT THE RSU'S ARE PART OF THEIR

7    COMPENSATION PACKAGE, AND THAT'S CONSISTENT WITH MY DISCUSSION

8    WITH THE INDIVIDUALS IN META'S EQUITY DEPARTMENT AS WELL.

9    Q.   DO YOU HAVE EXHIBIT 1517 IN YOUR NOTEBOOK THERE?

10   A.   THE ONE YOU HANDED ME?

11   Q.   YES, THE SKINNY ONE.

12   A.   I DO, YES.

13   Q.   IS -- DO YOU RECOGNIZE THE DOCUMENT?

14   A.   NO.  IT MAY HAVE BEEN SOMETHING I'VE SEEN.  I LOOKED AT A

15   LOT OF DOCUMENTS IN THIS CASE.

16        BUT THIS ISN'T JUMPING OUT AT ME.

17   Q.   SO YOU DON'T THINK THAT THIS IS A DOCUMENT THAT YOU AND

18   YOUR TEAM PREPARED?

19   A.   I DON'T KNOW.  IS THIS AN EXCERPT FROM MY REPORT?

20   Q.   IT IS NOT.  I'M JUST ASKING IF YOU RECOGNIZE IT AS A

21   DOCUMENT THAT YOU AND YOUR TEAM PREPARED.

22   A.   I'M NOT SURE.  THERE'S NOT A HEADER ON THIS.  I'M NOT SURE

23   WHERE THIS COMES FROM.  I DON'T SEE A BATES NUMBER.

24   Q.   AND YOU DON'T RECOGNIZE IT JUST BY LOOKING AT IT?

25   A.   I DON'T SITTING HERE.  I MEAN, I LOOKED AT THOUSANDS OF

1    DOCUMENTS IN THIS CASE.

2    Q.   OKAY.  AND YOU DIDN'T PREPARE A TESTIMONIAL AID FOR

3    MR. ROBINSON IN HIS DEPOSITION?

4    A.   I DID NOT.

5    Q.   OKAY.  DO YOU KNOW IF YOUR TEAM DID?

6    A.   I DON'T KNOW.

7    Q.   OKAY.  YOU WERE HERE FOR MR. GHEORGHE'S TESTIMONY WHEN HE

8    WAS TESTIFYING ABOUT THE DIFFERENT ROLES THAT DIFFERENT OF THE

9    22 EMPLOYEES PLAYED YESTERDAY?

10   A.   YES.

11   Q.   IN YOUR REPORT, OR THROUGHOUT YOUR REPORT REALLY, YOU

12   BREAK OUT THE DISCUSSION OF WHAT THE FACEBOOK EMPLOYEES DID

13   INTO TWO DIFFERENT TIME PERIODS:  BEFORE AND INCLUDING

14   MAY 13TH, AND THEN AFTER MAY 13TH; IS THAT RIGHT?

15   A.   GIVE ME A SECOND TO GO BACK TO MY REPORT, PLEASE.

16   Q.   YEAH, AND I'LL HELP YOU.  IF YOU GO TO PARAGRAPH 59, I

17   BELIEVE THAT'S AN EXAMPLE OF THIS.

18   A.   THANK YOU.

19        OKAY.  I'M SORRY.  COULD YOU ASK YOUR QUESTION AGAIN?

20   Q.   SURE.  DO YOU HAVE PARAGRAPH 59 ON PAGE 25 OF

21   EXHIBIT 2093?

22   A.   I DO, YES.

23   Q.   ALL RIGHT.  AND THIS ONE RELATES TO MS. PADUA, P-A-D-U-A;

24   CORRECT?

25   A.   YES.

1    Q.   ALL RIGHT.  AND YOU WRITE THAT MS. PADUA HAD WORKED 44

2    HOURS, OR YOU ALLOCATED 44 HOURS TO THE PERIOD MAY 2 THROUGH

3    MAY 13TH, AND 52 HOURS TO THE PERIOD AFTER MAY 13TH.

4         DO YOU SEE THAT?

5    A.   YES, THAT'S A SUMMARY OF WHAT I WROTE.

6    Q.   SURE.  AND YOU DID THE SAME, FOR EXAMPLE, IN PARAGRAPH 62

7    WITH RESPECT TO MICHAEL SCOTT IN TERMS OF BREAKING OUT HIS

8    HOURS INTO THOSE TWO PERIODS, UP TO AND INCLUDING MAY 13TH, AND

9    AFTER MAY 13TH; RIGHT?

10   A.   YES, THAT'S CORRECT.

11   Q.   AND IN PARAGRAPH 65, FOR EXAMPLE, YOU DID THE SAME WITH

12   RESPECT TO DREW ROBINSON; CORRECT?

13   A.   YES.

14   Q.   AND IN PARAGRAPH 71, AS ANOTHER EXAMPLE, YOU DID THIS WITH

15   RESPECT TO OTTO EBELING; IS THAT RIGHT?

16   A.   YES.

17   Q.   AND IN PARAGRAPH 77, YOU DID THE SAME WITH RESPECT TO

18   CLAUDIU GHEORGHE; CORRECT?

19   A.   YES.

20   Q.   AND IN EXHIBIT 2.1 TO YOUR REPORT, WHICH IS MARKED AS

21   EXHIBIT 2107, YOU PREPARED A TABLE THAT BROKE OUT THE

22   CALCULATIONS OF LABOR PERFORMED INTO TWO CATEGORIES:  BEFORE

23   AND AFTER MAY 13TH, 2019; CORRECT?

24   A.   YES.

25   Q.   AND THE REASON YOU DID THAT WAS BECAUSE OF THE NOTION THAT

1    IF TIME AFTER MAY 13TH, 2019 WERE PERTINENT WERE REJECTED, YOU

2    WOULD STILL HAVE A CALCULATION OF THE TIME UP TO AND INCLUDING

3    MAY 13TH, 2019; CORRECT?

4    A.   I WOULDN'T NECESSARILY SAY THAT'S THE REASON I DID IT.

5         I DID IT BECAUSE THE EMPLOYEES TENDED TO THINK ABOUT THE

6    WORK STREAM IN THE TIMEFRAME OF WHAT THEY WERE DOING FROM THE

7    DISCOVERY OF THE ATTACKS UP THROUGH THE PATCH; AND THEN WHAT

8    HAPPENED AFTER THE FACT, BECAUSE IT JUST SEEMED -- EACH AND

9    EVERY ONE OF THESE EMPLOYEES WAS VERY FOCUSSED ON WHAT WAS

10   HAPPENING DURING THAT INITIAL DISCOVERY PERIOD, INVESTIGATION

11   AND REMEDIATION PERIOD, AND THEN MANY OF THEM TALKED ABOUT SOME

12   ADDITIONAL WORK THAT THEY HAD BEYOND THAT MAY 13TH PATCH DATE.

13        AND IT'S THE WAY THEY CHARACTERIZED IT TO ME, AND SO

14   THAT'S HOW I LAID IT OUT IN MY REPORT.

15             MR. AKROTIRIANAKIS:  OKAY.  YOUR HONOR, MAY I HAVE

16   JUST ONE SECOND?

17             THE COURT:  YES.

18        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

19             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

20        NO FURTHER QUESTIONS.

21             THE COURT:  ALL RIGHT.  ANY REDIRECT?

22             MR. BLOCK:  YES, YOUR HONOR, BRIEFLY.

23             THE COURT:  OKAY.

24   ///

25   ///

| | |
|---|---|
| 1 | **REDIRECT EXAMINATION** |
| 2 | BY MR. BLOCK: |
| 3 | Q.   MS. TREXLER, FIRST, WE TALKED ABOUT A NUMBER OF DOCUMENTS |
| 4 | ON YOUR DIRECT EXAMINATION. |
| 5 |     ALL OF THAT WAS DISCLOSED IN YOUR REPORT; RIGHT?  WE DON'T |
| 6 | HAVE TO GO THROUGH EVERY EXHIBIT, BUT -- |
| 7 | A.   YES, THAT'S CORRECT. |
| 8 | Q.   OKAY.  AND YOU WERE AVAILABLE FOR -- IN FACT, SCHEDULED A |
| 9 | DEPOSITION FOR THIS CASE; IS THAT RIGHT? |
| 10 | A.   IT WAS SCHEDULED.  IT NEVER OCCURRED. |
| 11 | Q.   OKAY.  AND SO DEFENSE COUNSEL HAD THE OPPORTUNITY TO SIT |
| 12 | YOU DOWN, ASK YOU ALL THESE QUESTIONS, MAKE YOU DO MATH IF THEY |
| 13 | WANTED TO. |
| 14 |     THEY NEVER TOOK THAT OPPORTUNITY IN DISCOVERY? |
| 15 | A.   THAT'S CORRECT.  THEY CANCELLED THE DEPOSITION AND IT WAS |
| 16 | NEVER RESCHEDULED. |
| 17 | Q.   OKAY.  DO YOU OFTEN CONDUCT EMPLOYEE INTERVIEWS IN YOUR |
| 18 | WORK? |
| 19 | A.   YES.  YEAH, IT'S A NECESSARY ELEMENT OF THE TYPE OF WORK |
| 20 | THAT I PERFORM. |
| 21 | Q.   AND WOULD IT SURPRISE YOU IF ONE OF THE ENGINEERS YOU |
| 22 | INTERVIEWED DIDN'T REMEMBER YOUR NAME? |
| 23 | A.   NO. |
| 24 |     MR. AKROTIRIANAKIS:  OBJECTION. |
| 25 |     THE WITNESS:  NOT AT ALL.  I GUESS I'M NOT MEMORABLE, |

1        BECAUSE IT HAPPENS.

2                MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR.  OBJECTION.

3        IT'S BEYOND THE SCOPE OF THE CROSS.

4                THE COURT:  OVERRULED.

5        BY MR. BLOCK:

6        Q.   WHAT WOULD HAVE HAPPENED TO YOUR DAMAGES FIGURE IF YOU HAD

7        TRIED TO CALCULATE AN HOURLY VALUE USING THE RSU'S THAT WERE

8        AWARDED IN 2019 INSTEAD OF USING RSU'S THAT VESTED IN 2019?

9        A.   SO I JUST WANT TO MAKE SURE I UNDERSTAND THE QUESTION

10       YOU'RE ASKING ME.

11               YOU ARE SAYING IF I LOOKED AT THE RSU GRANT THAT OCCURRED

12       IN MARCH OF 2019, WHICH IS THE PROMISE OF FUTURE STOCK AWARDS

13       WITH CONTINUED EMPLOYMENT OVER 16 QUARTERS?

14       Q.   YES.

15       A.   IF I HAD INCLUDED THE TOTALITY OF THE EXPENSE OF THOSE

16       UNITS IN 2019 THAT HADN'T BEEN EARNED?  IS THAT WHAT YOU'RE

17       ASKING ME?

18       Q.   SURE.  ESSENTIALLY IF YOU WERE TO TRY AND FIGURE OUT WHICH

19       STOCK, WHICH PROMISES WERE MADE IN 2019 INSTEAD OF WHAT VALUE

20       WAS RECEIVED AND COSTS INCURRED IN 2019.

21       A.   IT WOULD HAVE -- IT WOULD HAVE MADE THE RSU EXPENSE HIGHER

22       AND, FRANKLY, INACCURATE, BECAUSE I WOULD BE ASSUMING -- OR I

23       WOULD EITHER BE ASSUMING THAT 100 PERCENT OF THOSE GRANTED

24       UNITS ACTUALLY VEST.

25               BUT SITTING THERE, I DON'T KNOW IF EMPLOYEES ARE GOING TO

 1    MOVE ON AND GO TO ANOTHER COMPANY OR QUIT OR SOMETHING ELSE

 2    HAPPENS.

 3         SO IT WOULD -- IT WOULD BE AN IMPROPER ANALYSIS BECAUSE I

 4    WOULD BE OVERSTATING THE RSU AWARD THAT MAY NEVER TURN INTO A

 5    COST FOR META.

 6    Q.   OKAY.  YOU WERE ASKED QUESTIONS ABOUT A BUT-FOR WORLD.

 7         DO YOU RECALL THAT?

 8    A.   YES.

 9    Q.   OKAY.  WHAT WOULD HAPPEN TO WHATSAPP AND META'S COST

10    STRUCTURE IF THEY DID NOT HAVE TO DEFEND AGAINST CYBER

11    ATTACKERS LIKE NSO?

12              MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION.

13              THE COURT:  I'M GOING TO ALLOW THIS ONE.

14              THE WITNESS:  I MEAN, ESSENTIALLY IF THERE WEREN'T

15    ATTACKERS OUT THERE LIKE NSO WHO WERE TRYING TO UNLAWFULLY

16    PENETRATE INTO META'S AND WHATSAPP'S SYSTEM, YOU WOULDN'T HAVE

17    A NEED FOR SECURITY-TYPE PERSONNEL WHO WERE TRYING TO THWART

18    THESE EFFORTS, AND THAT WOULD MEAN THAT META WOULD NO LONGER

19    NEED THESE PEOPLE ON THEIR PAYROLL AND WOULDN'T HAVE THE

20    EMPLOYEE EXPENSE IF WE ALL LIVED IN THIS BEAUTIFUL WORLD.

21    BY MR. BLOCK:

22    Q.   SO WOULD THERE BE AN INCREMENTAL COST TO TECHNOLOGY

23    COMPANIES THAT THEY -- IS THERE, I SHOULD ASK, SOME INCREMENTAL

24    COST THAT TECHNOLOGY COMPANIES HAVE TO BEAR BECAUSE THEY HAVE

25    TO DEFEND AGAINST ATTACKERS LIKE NSO IN GENERAL?

1    MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  THAT IS

2    AN IRRELEVANT QUESTION, AND THE WITNESS STILL -- I THINK THE

3    LAST ANSWER MADE CLEAR -- HAS NO FOUNDATION.

4    THE COURT:  ALL RIGHT.  I WILL OVERRULE THAT

5    OBJECTION.  THE PRIOR ANSWER MAY STAND.

6    SHE MAY ANSWER.

7    THE WITNESS:  SO THERE IS AN ADDITIONAL COST TO

8    WHATSAPP AND META FOR HAVING TO EMPLOY SECURITY PERSONNEL TO

9    PREVENT OR PATCH ATTACKS SUCH AS THE NSO ATTACK.

10   BY MR. BLOCK:

11   Q.  AND IF YOU WANTED TO CALCULATE THE PORTION OF THAT COST

12   THAT'S ATTRIBUTABLE TO ONE PARTICULAR ATTACK BY ONE PARTICULAR

13   ATTACKER, HOW WOULD YOU GO ABOUT DOING THAT?

14   A.  I WOULD LOOK AT THE NUMBER OF HOURS THAT THE EMPLOYEES WHO

15   WORKED ON THAT PARTICULAR ATTACK SPENT, AND THEN I WOULD

16   CALCULATE THE HOURLY LABOR COST TO WHATSAPP AND META FOR EACH

17   EMPLOYEE'S TIME, WHICH IS WHAT I'VE DONE HERE.

18   MR. BLOCK:  OKAY.  PURSUANT TO A PREVIOUS DISCUSSION,

19   PLAINTIFFS EXPECT TO RECALL MS. TREXLER LATER IN THE

20   PROCEEDINGS.

21   BUT WE HAVE NO MORE QUESTIONS NOW.

22   THE COURT:  OKAY.  THANK YOU.

23   ANYTHING?

24   ///

25   ///

1                         **RECROSS-EXAMINATION**

2      BY MR. AKROTIRIANAKIS:

3      Q.    MS. TREXLER, YOU JUST TESTIFIED THAT META WOULD HAVE TO

4      EMPLOY SECURITY PERSONNEL IN CERTAIN CIRCUMSTANCES.

5           DO YOU RECALL THAT?

6      A.    WELL, I THINK WHAT I SAID IS META EMPLOYS SECURITY

7      PERSONNEL BECAUSE OF ACTORS LIKE NSO WHO ARE TRYING TO

8      UNLAWFULLY ATTACK AND PENETRATE THEIR SYSTEM.

9      Q.    RIGHT.  THEY ALREADY EMPLOY THOSE PEOPLE; CORRECT,

10     MS. TREXLER?

11     A.    THEY EMPLOY THOSE PEOPLE BECAUSE OF ACTORS LIKE NSO WHO

12     ARE TRYING TO TUNNEL INTO THEIR SYSTEM.

13               MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14               THE COURT:  ALL RIGHT.

15          ALL RIGHT.  THANK YOU, MS. TREXLER.  YOU MAY STEP DOWN.

16               THE WITNESS:  THANK YOU.

17               THE COURT:  NEXT WITNESS?

18               MR. ANDRES:  YES, YOUR HONOR.

19          AS MR. BLOCK SAID, WHATSAPP RESTS, WITH THE CAVEAT THAT

20     THE PARTIES HAVE AGREED, BASED ON NSO'S PREFERENCE, THAT WE

21     DEAL WITH THESE FINANCIAL DOCUMENTS IN THE REBUTTAL CASE.

22          SO SO LONG AS MS. TREXLER CAN COME BACK, WE REST.

23          THANK YOU, YOUR HONOR.

24               THE COURT:  YES, THANK YOU.

25          ALL RIGHT.  CALL YOUR FIRST WITNESS, MR. AKROTIRIANAKIS.

```
 1            MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

 2       YARON SHOHAT.

 3            THE CLERK:  PLEASE REMAIN STANDING.

 4       (DEFENDANTS' WITNESS, YARON SHOHAT, WAS SWORN.)

 5            THE WITNESS:  I DO.

 6            THE CLERK:  PLEASE BE SEATED.

 7       SPEAK CLEARLY INTO THE MICROPHONE.  PLEASE STATE YOUR FULL

 8  NAME AND SPELL YOUR NAME FOR THE RECORD.

 9            THE WITNESS:  HELLO.  MY NAME IS YARON SHOHAT.  THIS

10  IS Y-A-R-O-N, S-H-O-H-A-T.

11                          DIRECT EXAMINATION

12  BY MR. AKROTIRIANAKIS:

13  Q.  IF YOU COULD JUST REMEMBER TO SPEAK SLOWLY FOR THE BENEFIT

14  OF THE COURT REPORTER, MR. SHOHAT.

15  A.  I WILL DO MY BEST.

16  Q.  MR. SHOHAT, HOW OLD ARE YOU TODAY?

17  A.  I AM 54 TODAY.

18  Q.  AND WHERE DO YOU LIVE?

19  A.  I LIVE IN ISRAEL.

20  Q.  DID YOU GROW UP IN ISRAEL?

21  A.  YES.  I WAS BORN IN ISRAEL.

22  Q.  AND IS ENGLISH YOUR FIRST LANGUAGE?

23  A.  ENGLISH IS MY SECOND LANGUAGE.  MY FIRST LANGUAGE IS

24  HEBREW.

25  Q.  AND IF THERE'S ANY OF MY QUESTIONS THAT YOU WOULD LIKE ME
```

```
1     TO RESTATE OR TRY AND FRAME IN A DIFFERENT WAY, PLEASE LET ME

2     KNOW.  OKAY?

3     A.   I WILL DO THAT.

4     Q.   OKAY.  CAN YOU PLEASE TELL THE JURY A LITTLE BIT ABOUT

5     YOUR PROFESSIONAL BACKGROUND.

6     A.   YES, OF COURSE.

7          SO IN MY PROFESSIONAL BACKGROUND, I'M COMPUTER ENGINEER.

8     I STARTED MY CAREER AS A SOFTWARE DEVELOPER, AND SINCE -- AND

9     THEN MOVED ON IN MAJOR ROLES.

10         SINCE THE YEAR 2000, I'VE BEEN WORKING IN CYBERSECURITY,

11    IN THE CYBERSECURITY INDUSTRY.  I STARTED IN A START-UP, WHICH

12    WAS LATER ACQUIRED BY RSA SECURITY.  THAT'S ACTUALLY THE SAME

13    COMPANY THAT IS DOING THE RSA CONFERENCE IN SAN FRANCISCO THIS

14    WEEK.

15         SO IF, IN FACT, YOU TRAVEL OR TRAFFIC A LITTLE BIT, IT'S

16    THE SAME COMPANY.  I SPENT FIVE YEARS.  IT'S AN AMERICAN

17    COMPANY HEADQUARTERED IN BOSTON.

18         LATER ON I CONTINUED IN OTHER CYBERSECURITY COMPANIES.  I

19    WORKED FOR EMC, ANOTHER LARGE AMERICAN COMPANY, AND NICE, WHICH

20    IS AN ISRAELI COMPANY, AND THEN I JOINED NSO.

21    Q.   AND THE NAME OF THE ISRAELI COMPANY THAT YOU JUST

22    MENTIONED IS NICE, N-I-C-E?

23    A.   NICE SYSTEMS, YES.

24    Q.   WHO IS YOUR PRESENT EMPLOYER?

25    A.   MY PRESENT EMPLOYER IS Q CYBER TECHNOLOGIES, AN ISRAEL
```

1    COMPANY.

2    Q.   OKAY.  AND THAT'S THE DEFENDANT IN THIS CASE, OR ONE OF

3    THEM?

4    A.   THIS IS ONE OF THEM, YES.

5    Q.   AND WHEN DID YOU START AT Q CYBER?

6    A.   I STARTED AT Q CYBER IN APRIL 2018, SEVEN YEARS AGO.

7    Q.   WHAT WAS YOUR POSITION AT THAT TIME?

8    A.   I JOINED AS CHIEF OPERATING OFFICER.

9    Q.   AND YOUR POSITION TODAY?

10   A.   TODAY I'M THE CEO OF Q CYBER TECHNOLOGIES, AND NSO, WHICH

11   IS A PARENT COMPANY.

12   Q.   Q CYBER IS THE PARENT COMPANY OF NSO?

13   A.   SO NSO IS THE DAUGHTER COMPANY.  SO Q CYBER IS THE PARENT

14   COMPANY, WHICH FULLY OWNS NSO.  I'M THE CEO OF BOTH OF THEM,

15   BOTH DEFENDANTS.

16   Q.   WHAT KIND OF COMPANIES ARE Q CYBER AND NSO?

17   A.   SO WE ARE A GOVERNMENT CONTRACTOR.  WE DEVELOP CYBER

18   INTELLIGENCE TOOLS, OR SOLUTIONS, FOR GOVERNMENT AND GOVERNMENT

19   AGENCIES.

20        MR. ANDRES:  OBJECTION, YOUR HONOR, PURSUANT TO YOUR

21   MOTIONS IN LIMINE.

22        THE COURT:  I'M GOING TO ALLOW THAT ANSWER TO STAND.

23   BUT KEEP IN MIND WHERE THE LINE WAS DRAWN.

24        MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

25        MR. ANDRES:  THANK YOU, YOUR HONOR.

 1                    THE COURT:  OKAY.

 2      BY MR. AKROTIRIANAKIS:

 3      Q.   IS NSO A HACKING COMPANY, MR. SHOHAT?

 4      A.   NO, DEFINITELY NOT.  WE ARE A PROVIDER OF CYBER

 5      INTELLIGENCE DEFENSE SYSTEMS.

 6           I -- IN MY MIND, AND IN MY VIEW, I FEEL HACKING IS

 7      NEGATIVE CONNOTATION, AND WE ARE, AS I MENTIONED, A GOVERNMENT

 8      CONTRACTOR.

 9      Q.   SAME QUESTION WITH RESPECT TO SPYWARE.  IS NSO A SPYWARE

10      COMPANY IN YOUR VIEW, MR. SHOHAT?

11      A.   NOT IN MY VIEW.  AGAIN, SAME REASON, BECAUSE WE DEVELOP

12      CYBER APPLICATION TOOLS, AND IN MY MIND, SPYWARE HAS SOME

13      NEGATIVE CONNOTATION.

14           AND AS I MENTIONED, WE DEVELOP DEFENSE SYSTEMS FOR

15      GOVERNMENTS.

16      Q.   HAS NSO EVER LICENSED PEGASUS TO A CUSTOMER OTHER THAN A

17      GOVERNMENT AGENCY?

18      A.   NEVER.

19      Q.   LET ME ASK --

20                    MR. ANDRES:  OBJECTION, YOUR HONOR.  I ASK THAT THAT

21      QUESTION AND ANSWER BY STRICKEN FROM THE RECORD.

22                    THE COURT:  OVERRULED.

23      BY MR. AKROTIRIANAKIS:

24      Q.   LET ME ASK THE SAME QUESTION IN THE OTHER DIRECTION.

25           HAS NSO EVER LICENSED PEGASUS TO A PRIVATE COMPANY OR AN

1      INDIVIDUAL?

2      A.   NEVER.

3              MR. ANDRES:  OBJECTION, YOUR HONOR.

4              THE COURT:  MR. AKROTIRIANAKIS, YOU KNOW, WE HAVE NOT

5      DEALT WITH THE ISSUES THAT WERE RAISED YESTERDAY, AND THIS IS

6      REALLY VERY, VERY CLOSE TO THE FIRST ISSUE THAT WAS RAISED.

7              MR. AKROTIRIANAKIS:  YOUR HONOR, I THINK THIS IS

8      EXACTLY --

9              THE COURT:  AND I'M NOT SURE WHAT THE DISCOVERY WAS

10     ON THIS, WHAT THE DISCLOSURES WERE ON THIS SUBJECT.

11             MR. AKROTIRIANAKIS:  I'M PERFECTLY HAPPY --

12             MR. ANDRES:  THERE WASN'T ANY, YOUR HONOR.

13        EXCUSE ME.

14        THERE WASN'T ANY.

15             MR. AKROTIRIANAKIS:  I'M PERFECTLY HAPPY TO EXPLAIN

16     TO THE COURT WHAT IT WAS, YOUR HONOR.

17             THE COURT:  WE CAN DO THAT OUTSIDE OF THE PRESENCE OF

18     THE JURY.

19        BUT NO MORE OF THESE STATEMENTS.

20             MR. AKROTIRIANAKIS:  I WAS DONE, YOUR HONOR.

21             THE COURT:  OKAY.

22             MR. AKROTIRIANAKIS:  THANK YOU.

23             THE COURT:  ALL RIGHT.  I'LL DETERMINE WHETHER OR NOT

24     I'M GOING TO ALLOW THOSE ANSWERS TO STAND AFTER I RULE ON THE

25     OBJECTIONS THAT ARE STILL PENDING --

```
1           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

2           THE COURT:  -- THE ONES THAT YOU RESPONDED TO IN

3     WRITING AND THAT MR. ANDRES RAISED.

4           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

5           THE COURT:  OKAY.

6     BY MR. AKROTIRIANAKIS:

7     Q.    WHERE IN ISRAEL ARE NSO'S OFFICES?

8     A.    SO OUR OFFICES IS IN A CITY CALLED HERZLYA.  I'LL TRY

9     TO -- I'M NOT SURE I KNOW HOW TO --

10    Q.    I CAN OFFER AN ENGLISH SPELLING FOR YOU.

11    A.    THANK YOU TO HELP ME.

12    Q.    IN ENGLISH, IT WOULD BE H-E-R-Z-L-Y-A.  IS THAT

13    PHONETICALLY THE WORD YOU SAID?

14    A.    YEAH.  SO HERZLYA IS THE CITY ABOUT TEN MILES NORTH OF

15    TEL AVIV.  IT'S OFTEN CONSIDERED ISRAEL'S SILICON VALLEY

16    BECAUSE THERE ARE A LOT OF HIGH-TECH COMPANIES CONCENTRATED IN

17    THAT AREA.  MANY LARGE COMPANIES THAT YOU MIGHT HAVE HEARD OF

18    HAVE THEIR RESEARCH AND DEVELOPMENT CENTERS OVER THERE, LIKE

19    MICROSOFT, EMC, CISCO.

20          FACEBOOK ACTUALLY HAS A LARGE DEVELOPMENT CENTER, NOT IN

21    HERZLYA, BUT A FEW MILES AWAY.

22          APPLE -- SORRY -- APPLE ACTUALLY RESIDES IN THE SAME

23    BUILDING THAT WE DO.  SO WE, WE OCCUPY A BUILDING WHICH IS 14

24    FLOORS HIGH, NSO OCCUPIES THE TOP FIVE FLOORS, AND APPLE

25    OCCUPIES THE REST OF THE BUILDING.
```

1    Q.   DO YOU EVER HIRE PEOPLE FROM APPLE, OR THEY FROM NSO?

2    A.   WE HIRE PEOPLE FROM APPLE, APPLE HIRES PEOPLE FROM US,

3    FACEBOOK HIRES PEOPLE FROM US OFTEN, ACTUALLY.  AND MANY OF THE

4    OTHER NAMES I MENTIONED.

5    Q.   WHERE DOES NSO DESIGN ITS TECHNOLOGIES?

6    A.   WE DESIGN TECHNOLOGIES IN THE SAME BUILDING I MENTIONED IN

7    HERZLYA.

8    Q.   DOES NSO HAVE ANY OFFICES ANYWHERE OTHER THAN ISRAEL?

9    A.   WE DON'T HAVE ANY OFFICES OUTSIDE OF ISRAEL.

10   Q.   WE HAVE HEARD EVIDENCE ABOUT THREE VERSIONS OF PEGASUS

11   THAT WERE INSTALLED IN PART BY SENDING A MESSAGE THAT WENT

12   THROUGH A WHATSAPP SERVER.

13        YOU'VE BEEN HERE FOR THAT EVIDENCE; CORRECT?

14   A.   YES.

15   Q.   ALL RIGHT.  AND IN DOING THE ACTIONS THAT WE'VE HEARD

16   ABOUT, DID NSO INTEND TO CAUSE ANY HARM TO WHATSAPP SERVERS?

17   A.   WE NEVER INTEND TO CAUSE ANY HARM OR --

18        MR. ANDRES:  OBJECTION, YOUR HONOR.  EXCUSE ME.

19   SORRY, I WAS LATE TO THAT.  THAT VIOLATES YOUR COURT ORDER.

20        THE COURT:  YEAH, I THINK WE'RE GOING TO HAVE TO DEAL

21   WITH THIS EARLIER RATHER THAN LATER.

22        LADIES AND GENTLEMEN OF THE JURY, I'M GOING TO EXCUSE YOU.

23   I NEED TO TALK TO THE LAWYERS.  I'M GOING TO EXCUSE YOU FOR A

24   FEW MINUTES.

25        THE CLERK:  ALL RISE FOR THE JURY.

```
 1              (JURY OUT AT 11:42 A.M.)

 2                   THE COURT:  MR. SHOHAT, YOU CAN STEP DOWN.

 3                   THE WITNESS:  THANK YOU, YOUR HONOR.

 4                   THE COURT:  OKAY.  ALL RIGHT.

 5          I THINK, IN ORDER TO GET THROUGH THIS WITNESS, WE'RE GOING

 6      TO HAVE TO DEAL WITH SOME OF THE ISSUES THAT WERE RAISED FIRST,

 7      OBVIOUSLY --

 8                   MR. ANDRES:  YOUR HONOR, I --

 9                   THE COURT:  -- THAT I THOUGHT WE WERE GOING TO DEAL

10      WITH AFTER THE SESSION TODAY.

11                   MR. ANDRES:  I'M HAPPY TO.

12                   MR. AKROTIRIANAKIS:  THAT IS -- THAT QUESTION --

13                   MR. ANDRES:  EXCUSE ME.

14          I'M HAPPY TO.

15          I HAVEN'T -- I RECEIVED A BRIEF FROM THE DEFENDANTS THIS

16      MORNING.

17                   THE COURT:  YOU HAVEN'T READ IT YET?

18                   MR. ANDRES:  IT'S A LITTLE LONG, AND I REALLY DON'T

19      KNOW WHAT IT SAYS.

20          I'M NOT SAYING OTHER PEOPLE HAVEN'T READ IT.  I'M NOT

21      MAKING ANY EXCUSE.  I JUST HAVEN'T SEEN IT, OR READ IT.

22                   THE COURT:  I HAVEN'T READ IT, EITHER, BUT I KNOW

23      THAT IT DEALS WITH THE LIST THAT YOU GAVE US, YOU GAVE ME.

24          AND I THINK YOU GOT A COPY, OR AT LEAST YOU READ IT OUT IN

25      COURT.
```

```
 1        AND --

 2             MR. AKROTIRIANAKIS:  I DO HAVE A COPY OF MR. ANDRES'S

 3   LIST, YOUR HONOR.

 4             THE COURT:  OKAY.  AND IT RAISES SOME SIGNIFICANT

 5   ISSUES --

 6             MR. AKROTIRIANAKIS:  WHICH IS WHY --

 7             THE COURT:  -- STARTING FIRST WITH THE EXCLUSIVITY

 8   ARGUMENT.

 9        I THINK IT ALSO RAISES THE INTENT ARGUMENT.  AND I DON'T

10   KNOW HOW WE GET THROUGH THE EXAMINATION OF THIS WITNESS WITHOUT

11   RESOLVING THAT FIRST.

12             MR. AKROTIRIANAKIS:  WELL, THE LAST QUESTION,

13   YOUR HONOR, IS DIRECTLY FROM THE PUNITIVE DAMAGES JURY

14   INSTRUCTION.  THE BURDEN OF PROOF IS BY CLEAR AND CONVINCING

15   EVIDENCE THAT THEY INTENDED TO CAUSE HARM.  THAT'S THE

16   DEFINITION OF MALICE, YOUR HONOR.

17        AND SO I THINK IT'S, LIKE, RIGHT IN THE MIDDLE OF FAIR

18   PLAY FOR ME TO BE ABLE TO ASK THE CEO OF THE DEFENDANT COMPANY

19   WHETHER HE ADMITS OR DENIES THAT HE INTENDED TO HARM THE

20   PLAINTIFFS.  THAT'S WHAT THE CASE IS ABOUT, YOUR HONOR.  IT'S A

21   DAMAGES CASE.

22             MR. ANDRES:  YOUR HONOR, THE CONCERN FROM THE OPENING

23   WAS THAT THERE WAS A SUGGESTION THAT WE WEREN'T ENTITLED TO --

24   IT'S SORT OF THE LINE BETWEEN OUR SECURITY NOT -- YOU KNOW,

25   THEM ATTACKING OUR SECURITY AS SAYING THAT WE FAILED TO REPEL
```

1      THEIR ATTACK, AND TO MY MIND, THAT UNDERMINES THE COURT'S

2      FINDINGS WITH RESPECT TO -- WITH RESPECT TO THAT ISSUE.  I

3      THINK THERE WAS A MOTION IN LIMINE.

4          I UNDERSTAND MAYBE THEY HAVE A DIFFERENT PURPOSE, AND I

5      CONCEDE THAT THAT IS PART OF THE PUNITIVE DAMAGES, WHETHER THEY

6      TRIED TO HARM US.

7          I JUST DON'T WANT TO -- I DON'T WANT THE JURY TO

8      UNDERSTAND -- WHICH WAS PART OF THE OPENING, I THINK -- THAT

9      THEY HAD TO HARM US TO GET COMPENSATORY DAMAGES, BECAUSE THAT'S

10     CLEARLY NOT THE CASE.

11         SO THERE -- I MAY BE MISCONSTRUING WHAT THE DEFENSE IS

12     DOING, BUT THAT'S WHAT I HEARD IN THE OPENING AND THAT'S WHAT

13     MY CONCERN IS.

14             THE COURT:  YEAH, I -- HAVING READ THE TRANSCRIPT OF

15     THE OPENING, I THINK THAT A NUMBER OF THE INSTRUCTIONS HAVE TO

16     BE MODIFIED BASED ON WHAT I UNDERSTAND YOUR ARGUMENTS TO BE

17     NOW.

18         BUT I'M NOT SURE THAT IT CAN'T -- THAT THE ISSUES CAN'T BE

19     CORRECTED IN THE CLOSING INSTRUCTIONS.

20         MR. ANDRES, DO I HEAR YOU AGREEING WITH THAT?

21             MR. ANDRES:  YOUR HONOR, LOOK, I THINK, BASED ON MY

22     RESEARCH LAST NIGHT, IT'S CERTAINLY WITHIN YOUR DISCRETION.  SO

23     LET'S -- THAT'S YOUR CHOICE.

24         BUT JUST SO THAT YOU UNDERSTAND WHAT MY CONCERN IS, THE

25     FIRST DAY MR. AKROTIRIANAKIS GETS UP THERE AND SAYS A BUNCH OF

```
1     THINGS THAT ARE -- THAT CROSS THE LINE -- I THINK WE ALL AGREE

2     WITH THAT NOW -- IN HIS OPENING.

3           AND SO IDEALLY -- AGAIN, WITHIN YOUR DISCRETION -- A

4     CORRECTIVE INSTRUCTION TO THE JURY TO SAY THAT HE MISSTATED THE

5     LAW AND THAT HE SAID THINGS THAT WERE OUTSIDE THE COURT'S

6     RULINGS WOULD HAVE BEEN PREFERABLE TO ME.

7           I'M NOT GOING TO -- THAT'S WHAT I WAS ASKING FOR.

8           BUT IF THE SOLUTION AT THIS POINT IS TO RESOLVE THOSE AT

9     THE END, THAT'S FINE, TOO.

10          MY PREFERENCE WOULD HAVE BEEN BOTH, BECAUSE I DON'T WANT

11    JUST A JURY INSTRUCTION, I WANT AN INSTRUCTION THAT SAYS

12    COUNSEL'S OPENING -- IN HIS OPENING, HE SAID THAT INTENT WASN'T

13    RELEVANT, OR HE TALKED ABOUT WHAT WAS HAPPENING IN THE U.S. --

14                THE COURT:  THAT'S NOT EXACTLY --

15                MR. AKROTIRIANAKIS:  THAT'S NOT WHAT I SAID,

16    YOUR HONOR.

17                THE COURT:  HE DIDN'T SAY INTENT WAS IRRELEVANT.  HE

18    SAID THEY HAD NO INTENT.

19                MR. ANDRES:  HE SAID THEY CAME OVER FROM ISRAEL, HAD

20    NO IDEA WHAT CALIFORNIA LAW WAS.

21                MR. AKROTIRIANAKIS:  THAT'S NOT WHAT I SAID.

22                MR. ANDRES:  THE --

23                THE COURT:  THAT'S A LITTLE BIT DIFFERENT FROM SAYING

24    THAT IT'S IRRELEVANT.

25          I'M GOING TO INSTRUCT THEM ON WHAT'S RELEVANT OR NOT.  HIS
```

 1        ARGUMENTS ARE JUST HIS ARGUMENTS.

 2            I THINK THAT MOST OF -- THE PROBLEM CAN BE ADDRESSED IN

 3     THE JURY INSTRUCTIONS.

 4            HAVING REVIEWED THE TRANSCRIPT, THOUGH, I HAVE CHANGED MY

 5     MIND ON A NUMBER OF THE JURY INSTRUCTIONS THAT I FORMERLY

 6     APPROVED GIVEN HOW YOU WERE ARGUING THE CASE.

 7            I'M TRYING TO GIVE YOU AS MUCH LEEWAY AS POSSIBLE TO ARGUE

 8     YOUR CASE, AS LONG AS IT DOESN'T RUN AFOUL.  I THINK THAT YOU

 9     COME RIGHT UP AGAINST, AND SOMETIMES STEP OVER, THE LINES THAT

10     I'VE DRAWN.

11            BUT YOU CERTAINLY, I THINK, INJECTED ENOUGH INTO THE

12     ARGUMENT FOR ME TO MAKE SURE THE JURY UNDERSTANDS WHAT INTENT

13     HAS BEEN FOUND BY THE COURT, WHAT ACTIVITY HAS BEEN FOUND,

14     ALREADY FOUND BY THE COURT.

15            SO MUCH OF THE EVIDENCE REALLY SUGGESTS THE SORT OF

16     IMPROPRIETY OF THE COURT'S LIABILITY DETERMINATION.

17                MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

18                THE COURT:  YES, IT DOES.  YES, IT DOES.  I READ THE

19     TRANSCRIPT.

20            AND EVEN THOUGH A COUPLE OF THINGS GOT MY ATTENTION DURING

21     THE COURSE OF YOUR ARGUMENT, READING IT IN BLACK AND WHITE

22     REALLY DID CLARIFY A NUMBER OF THE INSTRUCTIONS THAT HAVE TO BE

23     DIFFERENT, INCLUDING HOW COMPENSATORY -- WHAT COMPENSATORY

24     DAMAGES ARE COMPRISED OF.

25            IT WAS MY INTENT TO TALK WITH YOU ALL ABOUT THAT AFTER THE

1    END OF THE DAY, AND I'D LIKE TO BE ABLE TO GET THROUGH THE NEXT

2    HOUR AND A HALF SO THAT WE CAN MAKE USE OF THIS TIME BEFORE WE

3    DISCUSS IT.

4         SO MY PLAN IS TO TALK ABOUT IT, AND I'LL PUT YOU ON NOTICE

5    AS TO WHICH -- THE DIFFERENT DIRECTION I'M TAKING WITH REGARD

6    TO THE CLOSING JURY INSTRUCTIONS.

7         MR. ANDRES, I'M NOT INCLINED AT THIS TIME TO GIVE ANY

8    INSTRUCTION WITH REGARD TO THE IMPACT OF THE OPENING STATEMENT.

9    SO I'M NOT GOING TO DO THAT.

10        BUT I'D LIKE TO BE ABLE TO GET THROUGH THIS WITNESS

11   WITHOUT THERE BEING ANY MORE INCURSIONS.  ARE WE GOING TO BE

12   ABLE TO DO THAT?  I DON'T KNOW.

13             MR. AKROTIRIANAKIS:  WELL, I -- I INTEND TO ASK --

14    AND MAYBE I CAN JUST -- I MEAN, I'D LIKE TO PROCEED WITHOUT

15    INTERRUPTION, OF COURSE.

16        I DON'T THINK THAT I'M -- LOOK, I ARGUED TO THE COURT, AT

17   THE MOTIONS IN LIMINE STAGE, THAT I WANTED TO ESTABLISH MY

18   CLIENT'S INTENT NOT TO HARM BY EVIDENCE FROM WHICH THE JURY

19   COULD INFER THAT THEY HAD OTHER INTENTIONS.

20        YOU EXCLUDED THAT EVIDENCE, YOUR HONOR.

21        NOW, THE INTENT TO VIOLATE THE LAW IS NOT AN ELEMENT OF

22   ANY OF THE CLAIMS AS TO WHICH THE COURT HAS FOUND MY CLIENT

23   LIABLE.

24        INTENT TO VIOLATE THE LAW IS PLAINLY RELEVANT, HOWEVER, TO

25   THE REPREHENSIBILITY OF A DEFENDANTS' CONDUCT, AND I'VE PUT THE

1    AUTHORITIES, OR SOME OF THEM, ANYWAY -- I TRIED TO MAKE IT

2    SHORT AT THE COURT'S REQUEST, AND I APOLOGIZE, I CAN'T EVEN SAY

3    THAT A NINE PAGE BRIEF IS SHORT -- BUT SOME OF -- EIGHT PAGE

4    BRIEF, YOUR HONOR.

5         BUT SOME OF THE AUTHORITIES THAT SAY THIS -- AND I HAVE

6    CITED, FOR EXAMPLE, A SUPREME COURT CASE THAT TALKS ABOUT

7    WHETHER AN INTENTIONAL VIOLATION OF THE LAW WOULD BE A BASIS

8    FOR PUNITIVE DAMAGES.

9         AND SO I THINK IT'S 100 PERCENT FAIR FOR ME TO ASK THE CEO

10   OF THE DEFENDANT COMPANY, WHO FACES THE PROSPECT OF PUNITIVE

11   DAMAGES, WHETHER THEY INTENDED TO --

12         THE COURT:  THIS IS JUST ONE OF THE ISSUES.  THIS IS

13    JUST ONE OF THE ISSUES.

14         MR. AKROTIRIANAKIS:  AND I'VE ADDRESSED THEM POINT BY

15    POINT, YOUR HONOR.

16         FOR EXAMPLE, THE ISSUE ABOUT THE --

17         THE COURT:  BUT YOU'RE PROCEEDING WITH YOUR

18    EXAMINATION AS THOUGH I'VE ALREADY READ THE BRIEF AND ALREADY

19    AGREED.

20         MR. AKROTIRIANAKIS:  ONLY --

21         MR. ANDRES:  JUST TO -- YOUR HONOR --

22         THE COURT:  WHICH I HAVEN'T DONE.

23         MR. AKROTIRIANAKIS:  YOUR HONOR, IF I COULD,

24    YOUR HONOR --

25         THE COURT:  HOLD ON.  LET HIM FINISH.

1          MR. AKROTIRIANAKIS:  THIS ISSUE, FOR EXAMPLE, THAT

2     MR. -- AND I DON'T WANT TO, LIKE, SAY I'M LIMITING, I'M

3     PREPARED TO ADDRESS ALL OF THESE, BUT THIS ISSUE ABOUT THE

4     GOVERNMENT -- THE CUSTOMERS BEING GOVERNMENT AGENCIES, THE

5     COURT SAID THAT IN ITS RULING, THAT WE COULD SAY THAT THEIR --

6     THAT THEIR CUSTOMERS ARE --

7          THE COURT:  AND I ALLOWED THE ANSWER TO STAND.

8        HIS OBJECTION IS TO THE EXCLUSIVITY PART BECAUSE THEY

9     HAVEN'T BEEN GIVEN ANY DISCOVERY ON THAT.

10         MR. AKROTIRIANAKIS:  WELL, NO.  YOUR HONOR, I'VE

11    ATTACHED HERE A PUBLIC FILING IN THIS CASE TO THE COURT.

12    THE -- THE PACER LEGEND IS DOCUMENT 45-13 AND 14.

13         THE COURT:  OKAY.

14         MR. AKROTIRIANAKIS:  IT IS AN INDEPENDENT AUDITOR'S

15    REPORT.

16         THE COURT:  I'VE BEEN SITTING IN THIS COURTROOM.  I

17    DON'T HAVE TIME TO LOOK UP THE STUFF.  I DON'T HAVE TIME TO

18    READ THIS.  I'M TRYING TO PAY ATTENTION HERE IN THE COURTROOM.

19         MR. AKROTIRIANAKIS:  BUT THIS IS MY BASIS,

20    YOUR HONOR.

21         THE COURT:  MY QUESTION TO YOU NOW IS, IS THERE A WAY

22    TO PROCEED WITH THIS WITNESS OR ANOTHER WITNESS UNTIL WE'VE HAD

23    OUR DISCUSSION?

24         MR. ANDRES:  CAN I -- I DON'T WANT TO SPEAK OUT OF --

25         MR. AKROTIRIANAKIS:  AND I --

```
 1              MR. ANDRES:  GO AHEAD.

 2              MR. AKROTIRIANAKIS:  I THINK THERE IS, YOUR HONOR.

 3         BUT FRANKLY -- I'M NOT TRYING TO VIOLATE COURT ORDERS OR

 4    GIVE YOU THE IMPRESSION THAT I AM.  I HAVE READ YOUR ORDERS.  I

 5    HAVE WHAT I THINK IS A PLAIN LANGUAGE UNDERSTANDING OF THEM.

 6         I THINK THAT MAYBE YOU AND I ARE NOT ON THE SAME PAGE,

 7    WHICH IS WHY I PUT MY AUTHORITIES HERE.

 8              THE COURT:  I THINK --

 9              MR. AKROTIRIANAKIS:  I SHOULD SAY, I'M NOT ON YOUR

10    PAGE.  I'M NOT SUGGESTING THE COURT NEEDS TO BE ON MY PAGE.

11              THE COURT:  YOU'RE CORRECT, WE'RE NOT ON THE SAME

12    PAGE, FOR SURE.

13              MR. AKROTIRIANAKIS:  OKAY.  THEN I -- FOR EXAMPLE,

14    THE ISSUE ABOUT --

15              THE COURT:  LOOK, LOOK, LOOK, ARE WE GOING TO -- CAN

16    YOU DO ANOTHER WITNESS OR TAKE -- DO THEM OUT OF ORDER SO THAT

17    WE CAN HAVE OUR DISCUSSION AT -- WHEN THE TRIAL DAY IS OVER AT

18    1:30?  I DON'T WANT TO WASTE THE JURY'S TIME.

19         BUT I ALSO DON'T WANT OPPOSING COUNSEL JUMPING UP AT EVERY

20    CHANGE OF SUBJECT HERE, AND I WANT TO BE ABLE TO GIVE YOU -- TO

21    DRAW THE LINE SOMEWHERE THAT BOTH -- SO THAT BOTH SIDES CAN

22    UNDERSTAND WHAT I EXPECT.

23              MR. AKROTIRIANAKIS:  I MEAN, I -- I DON'T THINK IT'S,

24    IT'S, LIKE, THE RIGHT THING TO JUST SWITCH WITNESSES,

25    YOUR HONOR.
```

```
 1           I CAN TELL YOU WHAT I PLAN TO DO AND YOU CAN MAYBE TELL ME

 2      IF IT'S -- I ALSO DON'T THINK THAT WE SHOULD BE HAVING THESE

 3      INTERRUPTIONS CONSTANTLY JUST BECAUSE MR. ANDRES IS UPSET.

 4           CLEARLY, AS WE POINT OUT HERE, AS THE COURT HAS ALREADY

 5      POINTED OUT IN THIS DISCUSSION, HE'S NOT TALKING ABOUT WHAT

 6      ACTUALLY HAPPENED DURING MY OPENING STATEMENT.

 7           HE'S JUST MAKING OBJECTIONS TO EVIDENCE HE DOESN'T LIKE.

 8                MR. ANDRES:  THAT --

 9                MR. AKROTIRIANAKIS:  YOU SAID WE COULD SAY THAT --

10                THE COURT:  HOLD ON.  HOLD ON.  HOLD ON.

11           YOU DID SAY -- I DID SAY THAT YOU COULD, INDEED, DESCRIBE

12      YOUR CUSTOMERS AS GOVERNMENTS.  I MEAN, I SAID THAT.  I AGREE,

13      GOVERNMENTS AND GOVERNMENT AGENCIES, THAT'S NOT A PROBLEM.

14      THERE HAS NOT BEEN A VIOLATION.

15           AS I UNDERSTAND IT, I BELIEVE THE OBJECTION WAS THE

16      EXCLUSIVITY PART.

17           CORRECT?

18                MR. ANDRES:  YES.

19                THE COURT:  AND I DON'T REALLY KNOW WHAT THE

20       DISCOVERY WAS ON THIS.

21                MR. ANDRES:  NOT --

22                MR. AKROTIRIANAKIS:  I HAVE --

23                MR. ANDRES:  YOUR HONOR --

24                THE COURT:  HOLD ON.

25                MR. AKROTIRIANAKIS:  I HAVE A REPORT --
```

1          THE COURT:  HOLD ON.  HOLD ON.

2          SO IT'S GOING TO BE A LITTLE BIT DIFFICULT TO CONTINUE

3     WITH THIS WITHOUT -- I MEAN, BOTH SIDES HAVE A RIGHT TO MAKE

4     YOUR RECORD, RIGHT?

5          THERE'S GOING TO BE AN APPEAL.  SOME HIGHER COURT IS GOING

6     TO DETERMINE WHETHER OR NOT WHAT YOUR CLIENT DOES IS EXCEPTED

7     FROM THE LAW THAT I HAVE FOUND THAT'S BEEN VIOLATED.  ALL

8     RIGHT?

9          BUT I'VE ALREADY MADE MY FINDING, AND THAT'S GOING TO

10    STAND, AT LEAST AS LONG AS THE COURT -- AS LONG AS YOUR CASE IS

11    IN FRONT OF MY COURT.

12          MR. AKROTIRIANAKIS:  I'M NOT CONTESTING THAT.

13          THE COURT:  A HIGHER COURT WILL MAKE A DETERMINATION

14     WHETHER OR NOT THERE'S LIABILITY OR NOT OR WHETHER OR NOT WHAT

15     YOUR CLIENTS DO IS PERFECTLY LEGAL IN THIS COUNTRY.

16          THAT IS NOT SOMETHING THAT I'M AWARE OF, AND THAT'S GOING

17     TO STAND.

18          AND YOU DO, A LOT OF YOUR QUESTIONS, AND YOUR -- AND

19     CERTAINLY YOUR ARGUMENT DID RAISE ISSUES THAT SUGGEST TO ME

20     THAT YOU ARE ESSENTIALLY TRYING TO PAINT A PICTURE TO THE JURY

21     THAT WHAT YOUR CLIENT DOES IS PERFECTLY LAWFUL, AND I HAVE

22     ALREADY DETERMINED IT TO NOT BE LAWFUL.

23          MR. AKROTIRIANAKIS:  AND YOU TOLD THE JURY THAT, AND

24     I TOLD THE JURY THAT, YOUR HONOR, AND YOU'RE GOING TO TELL THEM

25      THAT AGAIN.

1            THE COURT:  OH, YEAH, YOU'RE -- LISTEN, WE'RE NOT

2     MAKING ANY HEADWAY HERE.

3            MR. AKROTIRIANAKIS:  LET ME --

4            THE COURT:  SO MY QUESTION IS, WHAT DO WE DO DURING

5     THE NEXT HOUR AND A HALF?  CAN YOU DO SOMETHING ELSE WITH THE

6     ORDER OF YOUR WITNESSES SO THAT WE CAN RESOLVE THIS AND THE

7     TESTIMONY CAN COME IN?

8            MR. AKROTIRIANAKIS:  YOUR HONOR, I REALLY DON'T WANT

9     TO JUST CHANGE WITNESSES NOW THAT WE'VE HAD THIS KERFUFFLE IN

10    FRONT OF THE JURY AND NOW YOU'VE SENT THEM OUT.

11            AND I WOULD JUST ASK THE COURT, JUST BECAUSE MR. ANDRES

12    SAYS THAT THEY DIDN'T GET DISCOVERY, THAT DOESN'T MEAN THEY

13    DIDN'T GET DISCOVERY.  I'M TELLING YOU, THERE'S DISCOVERY.

14            I SUBMITTED AN INDEPENDENT AUDITOR'S REPORT THAT WAS

15    PUBLICLY FILED IN THIS CASE ESTABLISHING THAT ALL OF OUR

16    CUSTOMERS ARE, IN FACT -- AND DURING THE RELEVANT TIME PERIOD,

17    ARE, IN FACT, GOVERNMENT CUSTOMERS.

18            IN ADDITION, THEY QUESTIONED JOSH SHANER ABOUT THAT.

19            THE COURT:  I ALLOWED THAT ANSWER TO STAND.  HE

20    OBJECTED AND I OVERRULED IT.

21            MR. AKROTIRIANAKIS:  IT'S A LARGER POINT, YOUR HONOR.

22            EVERY TIME THAT HE GETS UP, HE SAYS, WELL, WE DIDN'T GET

23    ANY DISCOVERY ON THIS, AND THAT'S JUST WRONG.

24            AND I CAN TELL THE COURT WHERE ALL THE DISCOVERY IS.  I

25    DON'T WANT TO TAKE THE TIME TO DO IT EITHER NOW, AND CERTAINLY

 1          NOT IN FRONT OF THE JURY IN THE MIDDLE OF AN EXAMINATION.

 2          BUT THE FACT THAT HE'S JUST COMPLAINING THAT THERE WASN'T

 3     DISCOVERY DOESN'T MEAN THAT THERE WASN'T DISCOVERY.  I KNOW

 4     WHAT THE DISCOVERY WAS.

 5          I REALIZE THAT THE COURT DOESN'T HAVE THE BENEFIT OF THAT

 6     BECAUSE WE'RE HERE FOR TRIAL AND THIS IS THE FIRST TIME THE

 7     COURT IS, IN ALMOST EVERY CASE, IS GOING TO FIND OUT THE SCOPE

 8     OF THE DISCOVERY.

 9          BUT IN EVERY CASE YOU DON'T HAVE COUNSEL JUST COMPLAINING

10     CONSTANTLY EVERY TIME THERE'S EVIDENCE THAT HE DOESN'T LIKE AND

11     IS UNHELPFUL TO HIS CASE.

12          BUT I AM NOT --

13              MR. ANDRES:  YOUR HONOR --

14              MR. AKROTIRIANAKIS:  EXCUSE ME.

15          -- CONTESTING THE COURT'S FINDING OF LIABILITY.  I GET

16     THAT.

17          I ALSO UNDERSTAND WHAT THE ELEMENTS ARE FOR THE -- WHAT

18     THE COURT HAS DETERMINED LIABILITY AND WHAT THE ELEMENTS ARE

19     UPON WHICH THE COURT IS GOING TO INSTRUCT THE JURY IN THIS

20     DAMAGES TRIAL, AND ONE OF THOSE IS INTENT, YOUR HONOR.

21              THE COURT:  RIGHT.

22              MR. ANDRES:  YOUR HONOR, COULD I JUST BRIEFLY?

23          I MADE LEGAL OBJECTIONS.  YOUR HONOR HAS RULED ON THEM.

24          YOUR HONOR HAS HAD EXTENSIVE BRIEFING, WHICH

25     MR. AKROTIRIANAKIS HAS VIOLATED REPEATEDLY.

1          SO HE CAN CALL ME WHINING, COMPLAINING, WHATEVER IT IS.  I

2     MADE OBJECTIONS, YOU SUSTAINED THEM.

3          WE DO NOT HAVE DISCOVERY, AS YOU KNOW FROM OUR

4     DISCUSSIONS, ABOUT THE GOVERNMENTS, ABOUT WHO THE GOVERNMENTS

5     ARE, ABOUT WHAT PROCESS THEY WENT THROUGH, WHETHER THEY WERE

6     INVOLVED IN SAUDI ARABIA AND "THE WASHINGTON POST" REPORTER,

7     WHETHER THEY WERE INVOLVED WITH THE PRINCESS.

8          WE DON'T KNOW ANY OF THAT.

9          SO -- AND BY THE WAY, WHAT HE SAID IN BLACK AND WHITE IN

10    THE OPENING, WHICH IS NOT APPROPRIATE, IS THAT PEGASUS, IN

11    OTHER VERSIONS, IS LEGAL.

12             MR. AKROTIRIANAKIS:  THAT'S NOT WHAT I SAID.

13             MR. ANDRES:  EXCUSE ME.

14        I -- WE CAN ALL LOOK AT THE TRANSCRIPT.

15             THE COURT:  I SAW IT.

16             MR. ANDRES:  RIGHT?  I MEAN, THAT'S NOT AT ISSUE IN

17     THIS CASE.

18          THIS IS A CASE ABOUT THE RULING THAT WHAT NSO DID VIOLATED

19    FEDERAL LAW AND CALIFORNIA LAW, AND WHATEVER HAPPENED IN ISRAEL

20    OR SAUDI ARABIA OR IN ANY OTHER COUNTRY, OR WHAT HAPPENED IS

21    COMPLETELY IRRELEVANT, IT'S COMPLETELY PREJUDICIAL, AND IT'S

22    COMPLETELY INAPPROPRIATE.

23          AND THE REASON THAT I'M TROUBLED WITH GOING FORWARD TODAY

24    IS THAT MR. AKROTIRIANAKIS KNOWS THE RULES AND KEEPS BREAKING

25    THEM.

1      LET ME JUST GIVE YOU AN EXAMPLE.  WE HAVE MR. YARON

2  TALKING ABOUT HOW THEIR BUILDING IS IN WITH APPLE AND WITH

3  MICROSOFT AND THEY'RE JUST ANOTHER COMPANY DOING BUSINESS.

4      GUESS WHAT?  APPLE SUED THEM.  I ASSUME I CAN BRING THAT

5  OUT ON CROSS-EXAMINATION.  HE TALKED ABOUT APPLE.

6          MR. AKROTIRIANAKIS:  HE MENTIONED APPLE IS IN THE

7   BUILDING.

8          MR. ANDRES:  RIGHT.  HE DID -- THEY DIDN'T DO IT

9   BECAUSE WE ALL NEED TO KNOW THE GEOGRAPHY --

10          THE COURT:  I KNOW.

11          MR. ANDRES:  -- OF WHO THE TENANTS ARE OF THEIR

12   BUILDING.

13      THEY DID IT SHOW THAT SOMEHOW APPLE AND SOMEHOW FACEBOOK

14  IS -- WE'RE ALL PART OF THE SAME FAMILY.

15      WELL, GUESS WHAT?  WE'RE IN THIS COURTROOM AND WE HAVEN'T

16  BEEN FOUND TO HAVE VIOLATED ANY LAW.

17      MR. AKROTIRIANAKIS HAS ACCUSED US, INAPPROPRIATELY, AGAIN,

18  OF STEALING THEIR INTELLECTUAL PROPERTY.

19      SO THIS IS NOT TWO LAWYERS COMPLAINING.  THIS IS ONE SIDE

20  MAKING VALID, LEGAL OBJECTIONS WHICH YOUR HONOR HAS GRANTED,

21  AND THE OTHER SIDE THAT'S NOT FOLLOWING THE RULES.

22      AND, AGAIN, HE CAN SIT HERE AND SAY THAT HE'S BEEN

23  PRACTICING FOR 200 YEARS AND HE'S NEVER HAD A VIOLATION.

24      IN THIS CASE, THEY DIDN'T PRODUCE DISCOVERY.

25      SO I DON'T WANT TO MAKE THIS PERSONAL.

1          BUT I CAN'T SIT HERE AND NOT OBJECT ON BEHALF OF MY CLIENT

2     WHEN THE ENTIRETY OF HIS TESTIMONY IS GOING TO BE CROSSING THE

3     LINE.

4          THAT'S WHY HE'S TESTIFYING.  HE'S GOING TO GET UP THERE

5     AND SAY, WE DIDN'T TRY TO HARM WHATSAPP.  WE'RE IN THE SAME

6     BUILDING AS WHATSAPP.  WE WORK WITH APPLE AND MICROSOFT.  WE

7     DIDN'T KNOW WHAT CALIFORNIA LAW IS BECAUSE WE LIVE IN ISRAEL.

8          AND IT ALL IS INAPPROPRIATE.

9          MR. AKROTIRIANAKIS:  I DON'T UNDERSTAND WHAT THE

10     OBJECTION TO THAT EVIDENCE IS, YOUR HONOR.  LIKE, WHAT IS THE

11     OBJECTION?  IF THERE'S AN OBJECTION, HE SHOULD MAKE IT, OF

12     COURSE, AND THE COURT SHOULD RULE ON IT.

13          BUT HE IS RAISING, AND HE HAS THROUGHOUT THIS CASE, JUST

14     DEMONIZING MY CLIENT IN EVERY WAY POSSIBLE, AND I THINK --

15          THE COURT:  COME ONE.  COME ON.  BOTH SIDES ARE

16     DEMONIZING EACH OTHER.

17          MR. AKROTIRIANAKIS:  EXACTLY, YOUR HONOR, TO THE

18     EXTENT THAT I GET TO ANSWER TO THAT.

19          I DON'T JUST HAVE TO TAKE THE DEMONIZATION AND SAY, YOU

20     KNOW WHAT, YOU'RE RIGHT, MY CLIENTS ARE DEMONS.

21          I AM REPRESENTING MY CLIENT, THEY ARE A LEGITIMATE

22     BUSINESS, AND I THINK THAT I'M ENTITLED TO BRING OUT FACTS,

23     SIMPLE FACTS, AND IF THE JURY WANTS TO INFER SOMETHING FROM IT,

24     IF HE THINKS -- THEN THAT'S HIS ARGUMENT TO MAKE.

25          BUT THIS IS MY TIME TO PUT ON THE EVIDENCE.  IT'S MY

1    CLIENT'S OPPORTUNITY TO PUT ON EVIDENCE OF WHO THEY ARE AND

2    WHAT THEY DO AND WHAT THEY INTENDED WITHIN THE PARAMETERS OF

3    THE COURT'S ORDERS, WHICH I BELIEVE I AM, YOUR HONOR.

4           AND I CAN POINT THE COURT --

5               MR. ANDRES:  YOUR HONOR --

6               MR. AKROTIRIANAKIS:  I CAN POINT THE COURT TO WHERE

7    IN ITS ORDERS I AM.  I HAVE NOT -- I'M NOT JUST SHOOTING FROM

8    THE HIP HERE, YOUR HONOR.  I HAVE PLANNED THIS OUT WITHIN THE

9    PARAMETERS OF THE COURT'S ORDERS AND THEY ARE LISTED IN THE

10   BRIEF THAT I SUBMITTED TO YOU.

11              MR. ANDRES:  YOUR HONOR, TO YOUR POINT ABOUT HOW

12   WE'RE GOING TO -- MY -- I WANT TO BE DONE, AS I'M SURE

13   YOUR HONOR DOES, TOO.  I THINK WE ALL DO.

14          SO WE HAVE TO GET THROUGH ALL THE EVIDENCE ON FRIDAY SO WE

15   CAN CLOSE ON MONDAY.

16          WE HAVE TO HAVE A CHARGE CONFERENCE SO WE KNOW WHAT THE

17   CHARGES ARE GOING TO BE.

18              THE COURT:  RIGHT.

19              MR. ANDRES:  I DON'T REALLY KNOW WHAT

20   MR. AKROTIRIANAKIS HAS ON HIS LIST OF WITNESSES.

21          I DO THINK THAT THEY'RE PROBABLY A LOT FURTHER AHEAD OF US

22   ON THE TIME, ON THE NINE HOURS, BECAUSE FOR MOST OF THE 15

23   MINUTE DIRECTS --

24              THE COURT:  OKAY.

25              MR. ANDRES:  SO I DON'T KNOW WHO ELSE IS ON THE LIST.

```
 1            I KNOW WHO ELSE WAS DISCLOSED FOR TODAY.  I THINK

 2      MR. GAZNELI.

 3            I DON'T KNOW WHAT TO DO.

 4            BUT I'M UNCOMFORTABLE GOING FORWARD UNTIL WE HAVE SOME

 5      DIRECTION INTO WHAT THE LINES ARE, BECAUSE MR. AKROTIRIANAKIS

 6      DOES NOT -- AS HE ADMITS -- UNDERSTAND WHAT THEY ARE.

 7                  MR. AKROTIRIANAKIS:  THAT'S NOT --

 8                  THE COURT:  RIGHT, RIGHT.

 9            WELL, I'LL JUST TELL YOU, THEN, JUST BRIEFLY, BEFORE I

10      HEARD YOUR ARGUMENTS, IN LOOKING AT THE HEADINGS IN

11      MR. AKROTIRIANAKIS'S LATEST FILING COMPARED WITH THE LIST THAT

12      YOU GAVE ME, COUNSEL --

13                  MR. AKROTIRIANAKIS:  THE FIRST ONE IS A DISCOVERY

14      DISPUTE, YOUR HONOR, AND I CAN POINT THE COURT TO THE

15      DISCOVERY.

16                  THE COURT:  THE EXCLUSIVITY OF THE GOVERNMENT

17      CLIENTS, I'M NOT BOTHERED BY THAT, COUNSEL.

18                  MR. ANDRES:  THAT'S NOT --

19                  THE COURT:  I UNDERSTAND.  IF I UNDERSTAND IT

20      CORRECTLY, YOUR ARGUMENT IS AS TO THE EXCLUSIVITY CLAIM.

21                  MR. ANDRES:  THAT'S NOT WHAT YOUR HONOR SAID IN THE

22      MIL.  YOUR HONOR SAID THAT THEY COULD SAY THAT THEY SOLD TO

23      GOVERNMENT CLIENTS.

24            THEY NEVER SAID THEY COULD DO IT EXCLUSIVELY.

25            FINE, I'LL CROSS-EXAMINE ON THAT.
```

```
1              THE COURT:  YEAH, I --

2              MR. ANDRES:  THAT'S FINE.

3              THE COURT:  THAT, TO ME, IS A MUCH SMALLER, MUCH

4     SMALLER POINT.

5              AND ANY QUESTIONS WITH RESPECT TO THE -- THAT CALL INTO

6     QUESTION THE EXCEEDING THEIR AUTHORIZATION WITH REGARD TO THE

7     FEDERAL -- THE FEDERAL AND CALIFORNIA STATUTES, IT DOES SEEM TO

8     ME THAT SOME OF THE ARGUMENTS SUGGESTED THAT THE -- I GUESS

9     YOUR -- THE DISTINCTION THAT YOU JUST MADE BETWEEN THEIR

10    INTENT -- THEIR KNOWING OR INTENTIONAL VIOLATION OF THE LAW IS

11    A LITTLE BIT DIFFERENT THAN THEIR INTENT TO ENGAGE IN THE

12    CONDUCT, WHICH IS WHAT I FOUND, THAT THEY INTENTIONALLY ENGAGED

13    IN THE CONDUCT, THAT DISTINCTION NEEDS TO BE MADE CLEAR TO THE

14    JURY.  I'M NOT SURE THAT IT HAS.

15             I'M NOT SURE THAT PEOPLE UNSCHOOLED IN THE LAW WILL

16    UNDERSTAND THE DIFFERENCE BETWEEN AN INTENT TO VIOLATE THE LAW

17    OR THE INTENT TO ENGAGE IN THE CONDUCT THAT AMOUNTS TO A

18    VIOLATION OF THE LAW.

19             THAT'S SOMETHING, HOWEVER, I THINK THAT, ASSUMING YOUR

20    WITNESS TESTIFIES THAT HE HAD NO INTENT TO VIOLATE THE CDAFA,

21    THAT WILL HAVE TO BE MADE CLEAR IN THE JURY INSTRUCTIONS.

22             SO THE CONCESSIONS -- WELL --

23             MR. AKROTIRIANAKIS:  YOUR HONOR --

24             THE COURT:  THE JURY INSTRUCTIONS THAT I LIMITED

25    WILL -- I'M GOING TO CHANGE THAT.  I'M GOING TO GIVE FAR MORE
```

1        DETAIL ABOUT WHAT THE INTENT REQUIREMENTS ARE IN THE PUNITIVE

2        DAMAGES, AS WELL AS IN THE COMPENSATORY DAMAGES INSTRUCTION.

3             ADDITIONALLY, WITH REGARD TO THE INSISTENCE -- I MEAN, YOU

4        MENTIONED NINE TIMES, NINE TIMES IN YOUR OPENING THAT THERE WAS

5        NO INTENT TO HARM, THERE WAS NO HARM, THERE WAS NO COMPROMISE,

6        ET CETERA.

7             THAT'S OBVIOUSLY A HUGE PART OF YOUR ARGUMENT.

8                  MR. AKROTIRIANAKIS:  AND THE --

9                  THE COURT:  AND I'VE ALREADY RULED, I'VE ALREADY

10       RULED THAT COMPENSATORY DAMAGES -- AND EVEN IF YOU -- I MEAN,

11       YOU DISAGREE WITH ME.  I UNDERSTAND THAT.

12            BUT I'VE ALREADY MADE THE DETERMINATION THAT THE

13       REMEDIATION, THE INVESTIGATION AND REMEDIATION IS SUFFICIENT

14       DAMAGE, THAT THERE DOES NOT HAVE TO BE PROOF OF HARM.

15            THE JURY IS GOING TO HAVE TO BE TOLD THAT IN A DIFFERENT

16       WAY WHICH THE CURRENT INSTRUCTIONS THAT I'VE APPROVED TELL THEM

17       THAT.

18                  MR. AKROTIRIANAKIS:  YOUR HONOR, THE INSTRUCTION THAT

19       THE COURT -- AND IT'S THE FORM INSTRUCTION ON PUNITIVE

20       DAMAGES -- SAYS -- I MEAN, IN EVERY DEFINITION OF HOW YOU PROVE

21       PUNITIVE DAMAGES IN THAT INSTRUCTION FROM CACI, IT SAYS THE

22       DEFENDANT'S INTENTION WITH RESPECT TO HARMING THE PLAINTIFF.

23                  THE COURT:  YEAH.  BUT HARM CAN TAKE LOTS OF FORMS

24       OTHER THAN A COMPROMISE OF THE SERVERS.  THAT'S THE ISSUE IN

25       THIS CASE.

1           MR. AKROTIRIANAKIS:  AND I CAN ARGUE THAT MY CLIENT

2      DID NOT HAVE INTENT TO HARM, YOUR HONOR, AND HE CAN ARGUE THAT

3      MY CLIENT DID HAVE INTENT TO HARM.

4           I AGREE WITH THE COURT THAT, THAT THERE ARE FINE

5      DISTINCTIONS --

6           THE COURT:  I DIDN'T SAY THAT YOU COULDN'T.

7           I'M SAYING THAT IT IS GOING TO RESULT, HOWEVER, IN A

8      REVERSAL OF SOME OF THE CHOPPING UP OF THE PLAINTIFFS' PROPOSED

9      INSTRUCTIONS THAT I PERMITTED BASED UPON YOUR ARGUMENTS NOW

10     THAT I'VE ACTUALLY HEARD THE EVIDENCE.

11          IT'S BEEN -- IT'S ALWAYS BEEN MY EXPERIENCE, THE CASES

12     LOOK A LOT DIFFERENT WITH WITNESSES SITTING ON THE STAND AND

13     TALKING AND LAWYERS ARGUING THAN THEY LOOK ON PAPER, AND THIS

14     CASE LOOKS VERY DIFFERENT TO ME TODAY THAN IT DID WHEN WE WERE

15     ARGUING ABOUT THESE AT THE SECOND PRETRIAL CONFERENCE.

16          SO THERE ARE GOING TO BE BIG DIFFERENCES.

17          I THINK THAT WE CAN MAKE MOST OF THE ADJUSTMENTS THAT WILL

18     BE NECESSARY IN THE FINAL JURY INSTRUCTIONS.

19          SO WITH REGARD TO THE RULING I MADE ON SUFFICIENCY OF THE

20     SECURITY MEASURES, WE'VE HAD SO MUCH DISCUSSION ALREADY ABOUT

21     FLAWS, VULNERABILITIES, AND THE RESPONSE TO THAT.

22          THE RULING WAS INTENDED TO, TO PRECLUDE THE ARGUMENT THAT

23     SOMEHOW THE PLAINTIFFS WERE AT FAULT.

24          MR. AKROTIRIANAKIS:  AND I'M NOT MAKING THAT

25     ARGUMENT.

1            THE ONLY ARGUMENT I'M MAKING, YOUR HONOR, IS --

2            THE COURT:  I DON'T WANT TO HEAR ANYTHING ABOUT THE

3    SUFFICIENCY OF THEIR SECURITY MEASURES.

4            MR. AKROTIRIANAKIS:  YOUR HONOR, I'M NOT ARGUING

5    ABOUT THAT.

6        ALL I SAID WAS THAT MY CLIENT DID NOT -- THEY'RE TRYING TO

7    CREATE THIS, I THINK, THE INFERENCE THAT MY CLIENT HACKED INTO

8    THEIR SERVER BY, LIKE, DECODING THE PASSWORD OR CHANGING THE

9    CODE, AND THERE ARE VULNERABILITIES IN THE SYSTEM, AND MY POINT

10   ONLY IS THAT MY CLIENT DID NOT CREATE THE VULNERABILITIES.  THE

11   VULNERABILITIES EXISTED ALREADY, AND THEY PUT IN THAT EVIDENCE,

12   EXHIBITS 10 AND 13.

13           THE COURT:  THEY DID.  BUT YOUR CLIENT TOOK ADVANTAGE

14   OF THEM.  I MEAN, NO ONE OFFERING ENCRYPTION SERVICES IS

15   INVITING SOMEBODY IN.

16           MR. ANDRES:  AND MORE IMPORTANTLY, YOUR HONOR --

17           MR. AKROTIRIANAKIS:  AND THE --

18           MR. ANDRES:  EXCUSE ME.

19       MORE IMPORTANTLY, YOUR HONOR FOUND THAT THEY VIOLATED THE

20   CALIFORNIA AND FEDERAL COMPUTER FRAUD AND ABUSE STATUTES.

21           THE COURT:  I DID.

22           MR. ANDRES:  WHAT THEY'RE SAYING IS THAT WE JUST --

23   WE, AD NAUSEAM, HAD THESE DISCUSSIONS ABOUT OPEN DOORS AND

24   LOCKED DOORS AND STEALING HOUSES.

25       THEY WERE NOT INVITED IN.  THEY CAME IN AND THEY AFFECTED

1    OUR SERVERS.  WHETHER THEY LEFT DENTS IN THERE OR SOMEHOW BROKE

2    THE FURNITURE, THEY CAME IN, NOT APPROPRIATELY.

3           MR. AKROTIRIANAKIS'S OPENING SLIDE --

4              THE COURT:  AND NOT WITH AN INVITATION.

5              MR. ANDRES:  RIGHT.

6       -- SUGGEST THAT IT'S JUST SOME BENIGN COMPUTER -- YOU

7    KNOW, THAT THEY SENT -- AND MR. YARON IS GOING TO TESTIFY, AS

8    HE HAS BEFORE, THAT HE SENT A WHATSAPP MESSAGE LIKE ANY OTHER.

9           THAT IS NOT TRUE, AND THAT IS WHAT IS DIRECTLY IN

10   CONTRADICTION WITH THIS COURT'S RULINGS THAT THEY VIOLATED THE

11   LAW.

12          THAT'S WHY -- I'M NOT HERE TO CALL NAMES.

13          BUT WE DIDN'T VIOLATE THE LAW.  THAT'S NOT WHY WE'RE HERE.

14          SO THE NOTION THAT THERE'S SOME EQUIVALENCE BETWEEN THE

15   PARTIES HERE -- THIS IS A DAMAGES TRIAL.  IT'S A DAMAGES TRIAL

16   ABOUT HOW MUCH THEY'RE GOING TO PAY TO META AND WHATSAPP IN

17   DAMAGES BASED ON YOUR HONOR'S FINDING.

18          AND IF WE KEEP GOING BACK AND SAYING, THEY APPROPRIATELY

19   MADE THEIR WAY INTO META'S SERVERS, WHICH THEY'VE BEEN SAYING

20   SINCE DAY ONE, THAT VIOLATES THE COURT'S FINDING AND THAT LEADS

21   TO THE VERY --

22              MR. AKROTIRIANAKIS:  I'VE NEVER SAID THAT.

23              MR. ANDRES:  EXCUSE ME.

24              THE COURT:  YOU SUGGESTED THAT.

25              MR. ANDRES:  OF COURSE HE HAS.

```
1           MR. AKROTIRIANAKIS:  YOUR HONOR, IF THIS CASE WAS

2     ONLY ABOUT COMPENSATORY DAMAGES, NONE OF THIS WOULD BE

3     RELEVANT.

4           BUT THEY'RE SEEKING PUNITIVE DAMAGES, SO THEY HAVE PUT IN

5     ISSUE WHAT MY CLIENT KNEW AND WHAT MY CLIENT INTENDED, AND ALL

6     OF THIS IS SPECIFICALLY DIRECTED TO THAT.

7           OTHERWISE WE COULD END THE TRIAL NOW.  IF WE WERE -- IF

8     THEY WERE ONLY SEEKING COMPENSATORY DAMAGES, WE CAN CALL OUR

9     EXPERT, MR. PINSONNEAULT, THEY COULD FIGHT ABOUT, YOU KNOW,

10    DUELING EXPERTS ABOUT DO YOU INCLUDE RSU'S OR NOT OR WHAT.

11          THAT OBVIOUSLY IS NOT WHY WE'RE HERE, $444,000.

12          THE COURT:  OKAY.  OKAY.  OKAY.

13          THERE ARE SOME LINES THAT I WANT TO TALK ABOUT.

14          MR. ANDRES:  THANK YOU, YOUR HONOR.

15          THE COURT:  THE -- ANY ARGUMENTS WITH REGARD TO THE

16    SUFFICIENCY OF PLAINTIFFS' SECURITY MEASURES I'M NOT GOING TO

17    PERMIT.

18          AND ANY ARGUMENTS OR SUGGESTION THAT THE USE OF PEGASUS

19    WAS LAWFUL IN THIS INSTANCE -- I DON'T CARE IF IT'S LAWFUL IN

20    ISRAEL OR SAUDI ARABIA OR SOMEWHERE ELSE.  WE'RE TALKING ABOUT

21    AMERICA.

22          THE LAW ENFORCEMENT CARVE OUT FOR THIS OFFENSE ONLY

23    APPLIES TO U.S. COMPANIES, OR THE USE IN THE UNITED STATES.

24          MR. AKROTIRIANAKIS:  YOUR HONOR --

25          MR. ANDRES:  U.S. LAW --
```

```
 1              THE COURT:  U.S. LAW ENFORCEMENT.

 2              MR. ANDRES:  U.S. LAW ENFORCEMENT.

 3              THE COURT:  I'M SORRY.  U.S. LAW ENFORCEMENT.

 4              MR. ANDRES:  NO, NO.  FINE, YOUR HONOR.

 5              THE COURT:  AND THIS IS NOT THE SITUATION WE HAVE

 6      HERE.

 7          SO AS FAR AS I'M CONCERNED AND AS FAR AS I'VE RULED, IT'S

 8      UNLAWFUL.

 9          AND SO MANY OF THE ARGUMENTS THAT ARE BEING MADE --

10          I DON'T THINK YOU CAN BOTH LISTEN TO ME AND TALK TO EACH

11      OTHER AT THE SAME TIME.

12              MR. AKROTIRIANAKIS:  I AM LISTENING TO YOU,

13      YOUR HONOR.

14              THE COURT:  OKAY.  SO ANY, ANY ARGUMENT OR SUGGESTION

15      THAT IT WAS LAWFUL, THAT THE USE IN THIS INSTANCE WAS LAWFUL,

16      I'M GOING TO SUSTAIN THE OBJECTION.

17          ANY ARGUMENTS THAT SUGGEST THAT DAMAGE TO THE, TO THE

18      SERVERS IS REQUIRED IN ORDER FOR THE DEFENDANTS TO -- IN ORDER

19      FOR THE PLAINTIFFS TO PREVAIL ON PUNITIVE DAMAGES, I'M NOT --

20      I'M NOT GOING TO PERMIT.

21              MR. AKROTIRIANAKIS:  I'M NOT SAYING --

22              THE COURT:  YOU CAN CERTAINLY ARGUE THAT THERE WAS NO

23      DAMAGE AS A WAY TO TRY TO MINIMIZE THE COMPENSATORY DAMAGES.

24          BUT NO SUGGESTION THAT COMPENSATORY DAMAGES ARE -- HAVE TO

25      BE BASED ON SOME, SOME HARM.
```

1        I MEAN, I THINK THAT THE HARM IS -- THE ENCROACHMENT IS

2    THE HARM.  THE -- THE -- AFFECTING THE PLAINTIFFS' ABILITY TO

3    PROVIDE THE SORT OF PRIVATE COMMUNICATIONS THAT THEY PRIDE

4    THEMSELVES ON, THAT'S THE HARM.

5        IT DOESN'T HAVE TO BE ANY INJURY -- MY RULING IS IT DOES

6    NOT HAVE TO BE ANY INJURY TO THE ACTUAL SERVER ITSELF.

7            MR. AKROTIRIANAKIS:  AND THE TESTIMONY IS THAT THERE

8    WAS NOT INJURY.  THAT WAS MR. GHEORGHE'S TESTIMONY, YOUR HONOR.

9            THE COURT:  YES, I KNOW THAT.

10       BUT ANY SUGGESTION THAT THE JURY CAN'T AWARD DAMAGES FOR

11   HARM BECAUSE THERE WAS NO HARM, AS YOU DEFINE IT, IS

12   INAPPROPRIATE.

13           MR. AKROTIRIANAKIS:  THEY'RE NOT CLAIMING DAMAGES FOR

14   HARM TO THE SERVER, YOUR HONOR, AND THAT WOULD BE REPUTATIONAL

15   HARM ANYWAY, WHICH THEY HAVE FORESWORN --

16           THE COURT:  THAT'S EXACTLY MY POINT.

17       BUT YOU MENTIONED NINE TIMES IN YOUR OPENING THAT THERE

18   WAS NO HARM TO THEIR SERVERS.

19           MR. AKROTIRIANAKIS:  BECAUSE IT'S RELEVANT -- IT'S

20   SQUARELY RELEVANT TO PUNITIVE DAMAGES, YOUR HONOR.

21       MY CLIENT DIDN'T INTEND TO CAUSE ANY HARM, AND

22   MR. GHEORGHE'S TESTIMONY IS, AS THE LEAD INVESTIGATOR AND THE

23   HEAD OF SERVERS OR WHATEVER, THAT THERE WAS NO HARM.  THERE WAS

24   NO HARM TO THE SERVICE, THERE WAS NO HARM TO THE SERVERS, IT

25   WASN'T UNAVAILABLE, THERE WAS NO DATA DELETED.

 1           HE TESTIFIED TO ALL THOSE THINGS, YOUR HONOR, AND THOSE

 2      ARE DIRECTLY RELEVANT TO PUNITIVE DAMAGES.

 3           THEY'RE NOT RELEVANT TO COMPENSATORY DAMAGES, BUT WHAT'S

 4      RELEVANT TO COMPENSATORY DAMAGES IS ALREADY IN THE BOOK, EXCEPT

 5      FOR OUR EXPERT TESTIFYING ABOUT IT.

 6           EVERYTHING ELSE IS RELEVANT TO PUNITIVE DAMAGES,

 7      YOUR HONOR.  THE TIME THAT THEY SPENT TRYING TO REMEDIATE THE,

 8      THIS EVENT AND WHETHER THAT IS MAY 2 TO MAY 13 OR IF IT GOES TO

 9      OCTOBER, THOSE ARE ALL JUST DIFFERENT THINGS, YOUR HONOR.

10           BUT THIS, WHAT WE INTENDED TO DO AND WHAT THE HARM WAS

11      THAT THE PLAINTIFFS ACTUALLY SUFFERED, THAT IS SQUARELY

12      RELEVANT TO PUNITIVE DAMAGES, AND I DON'T KNOW HOW WE CAN HAVE

13      A TRIAL ABOUT PUNITIVE DAMAGES WITHOUT TALKING ABOUT THOSE

14      THINGS, INCLUDING MY CLIENT'S INTENTIONS ABOUT THEM, BECAUSE

15      THAT'S JUST IN EVERY ONE OF THE DEFINITIONS IN THE PUNITIVE

16      DAMAGES INSTRUCTION.

17               THE COURT:  AND I DON'T -- I DON'T ENTIRELY DISAGREE.

18           BUT IT'S -- YOU'RE NOT MAKING ANY DISTINCTION, NO ONE IS

19      MAKING ANY DISTINCTION AT THIS POINT BETWEEN COMPENSATORY AND

20      PUNITIVE DAMAGES IN TERMS OF THE ARGUMENTS THAT ARE BEING MADE.

21               MR. AKROTIRIANAKIS:  BUT THAT'S FOR CLOSING ARGUMENT.

22               THE COURT:  HOLD ON.

23               MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.

24               THE COURT:  HOLD ON.

25           WE WILL NEED TO HAVE THIS SETTLED BEFORE CLOSING ARGUMENTS

```
 1        AND OBVIOUSLY BEFORE THE FINAL JURY INSTRUCTIONS ARE

 2    DETERMINED, AND THAT'S WHAT I'M TELLING YOU.  THAT'S WHAT I'M

 3    TELLING YOU NOW, THAT I'M GOING TO CHANGE THE EMPHASIS OF THE

 4    INSTRUCTIONS BACK TO THE ORIGINAL.

 5        AND ANOTHER THING IS THE WAY IN WHICH THE INCURSION IS

 6    BEING DESCRIBED ISN'T -- I ASSUMED THIS WAS GOING TO BE A

 7    NON-ISSUE, WHICH IS WHY I SAID I DIDN'T WANT THE REAL

 8    DEFINITION -- THE LONG FINDING THAT THE COURT MADE IN THE

 9    SUMMARY JUDGMENT ORDER WITH REGARD TO THE CONDUCT.

10        BUT EVERYTHING I'VE HEARD, YOU ALL FORGET THE SECOND PART

11    OF IT.  IT'S JUST, YOU KNOW, YEAH, WE KIND OF TRANSITED THROUGH

12    THE WHATSAPP SERVERS.

13        BUT NOBODY TALKS ABOUT THE, THE CAPTURING OF THE METADATA,

14    SENDING IT BACK THROUGH WHATSAPP SERVERS AND THEN BACK TO THE

15    WIS.

16            MR. AKROTIRIANAKIS:  MR. GAZNELI WILL TESTIFY ABOUT

17    THAT.

18            THE COURT:  NOBODY TALKS ABOUT THAT.

19        SO BOTH SIDES --

20            MR. AKROTIRIANAKIS:  BUT THE --

21            THE COURT:  EXCUSE ME.  BOTH SIDES ARE OBVIOUSLY

22    TRYING TO SPIN THE EVIDENCE IN THE BEST -- TO ESTABLISH YOUR

23    BEST CASE, AND I UNDERSTAND THAT.

24        BUT THE WAY THAT THE EVIDENCE IS COMING IN I THINK IS

25    GOING TO BE INCREDIBLY CONFUSING TO THE JURY, AND WHAT
```

```
 1        ARGUMENTS APPLY TO WHICH CAUSE OF ACTION.

 2             SO I WILL GIVE YOU SOME BRIGHT LINE RULES, WHICH I'M

 3        TRYING TO DO NOW, AND ONE OF THE THINGS I TALKED -- THAT I

 4        MENTIONED THE OTHER DAY, I -- BASED UPON THE -- WHATEVER IT WAS

 5        YOU SHOWED ME, IT WASN'T A DEPOSITION, IT WAS SOMETHING ON THE

 6        QUESTION OF THE STEALING, THAT'S -- I'VE MADE A DETERMINATION

 7        ON THAT.

 8                  MR. AKROTIRIANAKIS:  AND I DIDN'T GO ANYWHERE CLOSE

 9        TO THAT.

10                  THE COURT:  AND YOU MAY NOT.

11                  MR. AKROTIRIANAKIS:  YES, YOUR HONOR, I UNDERSTAND

12        THAT.

13             ALTHOUGH I DID, FOR THE COURT'S BENEFIT, INCLUDE THE

14        DEFINITION OF THEFT UNDER CALIFORNIA PENAL CODE AND HOW IT

15        APPLIED TO THE --

16                  THE COURT:  I DON'T CARE ABOUT THAT.

17                  MR. AKROTIRIANAKIS:  I UNDERSTAND.

18                  THE COURT:  BUT THE ALLEGATION THAT THE COMPANY THAT

19        YOUR CLIENTS INTRUDED UPON, WITHOUT AUTHORIZATION, THAT

20        THEIR -- IN ATTEMPTING TO DISCOVER WHAT -- HOW YOU WERE ABLE TO

21        ACCOMPLISH THAT BY GETTING AHOLD OF PEGASUS, OF THE SOFTWARE,

22        AND TRYING TO FIGURE THAT OUT THEMSELVES IS THEFT IS, IN MY

23        VIEW, AN OUTLANDISH CLAIM TO MAKE.

24                  MR. AKROTIRIANAKIS:  WELL, YOUR HONOR, I DON'T THINK

25        THAT --
```

1          THE COURT:  AND BECAUSE STEALING AND THEFT IS SUCH A

2     LOADED WORD IN THE CONTEXT OF A TRIAL, I'M SIMPLY NOT GOING TO

3     PERMIT YOU TO USE THAT.  I DON'T BELIEVE THE EVIDENCE SUPPORTS

4     THAT, AND I DON'T -- AND I'M NOT GOING TO PERMIT YOU TO USE

5     THAT.

6          MR. AKROTIRIANAKIS:  THAT'S FINE, YOUR HONOR.

7          MR. ANDRES:  YOUR HONOR, CAN I JUST GET A CHANCE?

8     HE ALREADY DID, RIGHT?  SO THAT'S FINE.

9          THE COURT:  HE DID IN HIS OPENING.

10         MR. ANDRES:  RIGHT.  HOPEFULLY HE UNDERSTANDS THAT HE

11    CAN'T USE IT AGAIN.

12         WE NEED AN INSTRUCTION TO CLEAR THAT UP SOMEHOW, THAT THAT

13    WAS INAPPROPRIATE, THAT HE USED THOSE WORDS.

14         EVEN IF THERE WAS ANY EVIDENCE -- THERE'S NONE -- IT WOULD

15    BE 403.  IT'S NOT RELEVANT TO THIS IN ANY WAY.

16         THE COURT:  OKAY.

17         MR. ANDRES:  WE NEED AN INSTRUCTION ON THAT.

18         MR. AKROTIRIANAKIS:  IT WASN'T RULED ON -- I DIDN'T

19    VIOLATE A COURT ORDER BY SAYING THAT, YOUR HONOR.  THAT'S MY

20    INTERPRETATION OF THE EVIDENCE.  I HAVE POINTED OUT TO THE

21    COURT MY GOOD FAITH BASIS IN NUMBER 7 HERE ON PAGE -- BEGINNING

22    ON PAGE 7 OF MY BRIEF.

23         MR. ANDRES:  BUT --

24         MR. AKROTIRIANAKIS:  EXCUSE ME.

25         THE COURT:  YOU AND I AREN'T ON THE SAME PAGE.

```
1          MR. AKROTIRIANAKIS:  I UNDERSTAND WE DISAGREE ON

2    THAT, AND I HAVEN'T GONE ANYWHERE CLOSE TO IT SINCE YOU TOLD ME

3    THAT, YOUR HONOR.

4          THE COURT:  I KNOW IT'S YOUR UNDERSTANDING, AND YOUR

5    UNDERSTANDING IS DIFFERENT THAN MINE.  I'M TRYING TO GIVE YOU

6    AS MUCH LEEWAY AS POSSIBLE.

7          SO I'VE JUST GIVEN YOU ABOUT FIVE OR SIX DIFFERENT THINGS

8    THAT YOU HAVE TO STAY AWAY FROM.

9          MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

10         THE COURT:  IN TERMS OF THE INTENT ISSUE, I DON'T

11   DISAGREE THAT THERE IS A SEPARATE KIND OF INTENT ISSUE ON

12   PUNITIVE DAMAGES THAN EXISTS ON LIABILITY, THAN EXISTS ON

13   COMPENSATORY DAMAGES, AND I'LL DO MY BEST TO TRY TO CLEAR THAT

14   UP IN INSTRUCTIONS.

15         SO THAT ONE, YES, YOUR CLIENT CAN TESTIFY WHAT HIS INTENT

16   WAS WITH REGARD TO THE HARM ISSUE AND HIS NOT KNOWING ABOUT --

17   ALTHOUGH I DO KIND OF FIND IT HARD TO BELIEVE THAT A COMPANY

18   ENGAGED -- AN INTERNATIONAL COMPANY ENGAGED IN THIS KIND OF --

19         MR. ANDRES:  SPYWARE.

20         THE COURT:  -- SPYWARE OR, YOU KNOW, INTELLIGENCE

21   TOOLS WOULDN'T KNOW THAT THERE'S A FEDERAL LAW THAT PROHIBITS

22   THAT KIND OF USE IN THE UNITED STATES.

23         BUT IN ANY EVENT, SINCE WE ACTUALLY DON'T EVEN KNOW WHERE

24   THE INTRUSIONS OCCURRED BECAUSE YOU HAVEN'T GIVEN US ANY, ANY

25   INFORMATION ON IT, I MEAN, THIS WHOLE CASE IS SHROUDED IN SO
```

1        MUCH SECRECY, THERE'S SO MUCH THAT'S NOT KNOWN.

2            BUT ANYWAY, SO THOSE ARE MY PRELIMINARY DETERMINATIONS,

3        OKAY?  SO WE'RE GOING TO CONTINUE NOW.

4            MR. ANDRES, YOU CAN MAKE WHATEVER OBJECTIONS -- YOU CAN

5        OBJECT WHEN YOU SEE FIT.

6            I THINK THAT AS LONG AS HE CONFORMS WITH WHAT I'VE JUST

7        SAID, I'LL PROBABLY ALLOW IT.

8            AND WE CAN TALK MORE ABOUT IT LATER.  OKAY?

9            I'D LIKE TO USE THE NEXT HOUR AND TEN MINUTES TO GET SOME

10       MORE TRIAL IN.

11           MR. AKROTIRIANAKIS:  YOUR HONOR, CAN I SAY JUST ONE

12       THING, AND THAT IS THIS:  I JUST TAKE UMBRAGE TO THE CONSTANT

13       ACCUSATION THAT I ACTED INAPPROPRIATELY IN OPENING STATEMENT BY

14       GIVING MY INTERPRETATION OF THE EVIDENCE THAT -- I DON'T MEAN

15       THE COURT -- I'M SAYING CONSTANTLY BEING ACCUSED.  NOT THAT I

16       WAS WRONG AFTER THE FACT, BUT IT WAS INAPPROPRIATE, AS IF I HAD

17       VIOLATED A COURT ORDER THAT HAD EXISTED.

18           NOW THE COURT HAS GIVEN ITS RULING ON THIS STEALING ISSUE.

19       BUT THAT IS, I THINK, SUPPORTED -- IT'S NOT -- IT'S --

20           THE COURT:  I'VE ALREADY RULED.  I DON'T NEED TO HEAR

21       ANY MORE ON IT.  LET'S MOVE ON.  LET'S MOVE ON.

22           MR. ANDRES:  YOUR HONOR, CAN WE TAKE A BATHROOM

23       BREAK?  I'M SORRY.

24           THE COURT:  YES, YES.

25           EVERYBODY TAKE UNTIL 12:30.  WE HAVE AN HOUR UNINTERRUPTED

```
1    TO FINISH TODAY.

2            MR. ANDRES:  AND JUST SO WE UNDERSTAND, ARE WE JUST

3    GOING TO HAVE MR. SHOHAT TODAY?  OR IS THAT GOING TO TAKE AN

4    HOUR?

5            THE COURT:  YOU GUYS TALK ABOUT IT.

6            MR. ANDRES:  OKAY, YOUR HONOR.  THANK YOU.

7    (RECESS FROM 12:21 P.M. UNTIL 12:31 P.M.)

8            THE CLERK:  ALL RISE FOR THE JURY.

9    (JURY IN AT 12:31 P.M.)

10           THE CLERK:  THANK YOU.  PLEASE BE SEATED.

11    CAN WE GET THE WITNESS BACK ON THE STAND?  THANK YOU.

12    (PAUSE IN PROCEEDINGS.)

13           THE COURT:  ALL RIGHT.  SORRY, LADIES AND GENTLEMEN.

14    IT TOOK JUST A LITTLE LONGER THAN I ANTICIPATED, BUT THANK YOU

15    FOR YOUR PATIENCE.

16    CONTINUE, COUNSEL.

17           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

18    WITH THE COURT'S PERMISSION, MAY I ASK THE REPORTER WHAT

19    THE LAST QUESTION I ASKED WAS, AND WHETHER THERE WAS AN ANSWER?

20           THE COURT:  LEE-ANNE, THAT'S FINE.

21    (THE RECORD WAS READ BY THE COURT REPORTER.)

22           MR. ANDRES:  YOUR HONOR, JUST TO BE CLEAR, NOT TO GET

23    OFF TO THE WRONG FOOT, THAT'S A QUESTION THAT OBVIOUSLY I THINK

24    THERE WAS AN OBJECTION TO AND, AND IF NOT, WE OBJECT TO THAT

25    QUESTION.
```

1          THE COURT:  ALL RIGHT.  YOUR OBJECTION'S NOTED.

2          MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR.  I LOST MY

3   PLACE.

4          (PAUSE IN PROCEEDINGS.)

5   BY MR. AKROTIRIANAKIS:

6   Q.  OKAY.  MR. SHOHAT, I AM NOT SURE THAT YOU ANSWERED THIS

7   QUESTION, SO FORGIVE ME IF I'M ASKING IT A SECOND TIME.

8          THE QUESTION I BELIEVE I ASKED YOU WAS THAT WE HAD HEARD

9   EVIDENCE ABOUT THREE VERSIONS OF PEGASUS THAT WERE INSTALLED,

10  IN PART BY SENDING MESSAGES THROUGH WHATSAPP SERVERS.

11         AND MY QUESTION TO YOU WAS WHETHER NSO INTENDED PEGASUS TO

12  CAUSE ANY HARM TO WHATSAPP SERVERS?

13  A.  OKAY.  WE NEVER INTENDED TO CAUSE ANY HARM TO WHATSAPP.

14  Q.  OKAY.  NOW, YOU ARE NOT CONTESTING THAT YOU DID DO THE

15  CONDUCT THAT WAS THE BASIS FOR THE COURT'S FINDING OF LIABILITY

16  IN THIS CASE, OR THE FINDING OF LIABILITY ITSELF; CORRECT?

17  A.  CORRECT.  I UNDERSTAND THE COURT FOUND US LIABLE.

18  Q.  RIGHT.  AND NOW WE'RE HERE TALKING ABOUT --

19  A.  I RESPECT THAT.

20  Q.  YES.  OKAY.

21         WAS PEGASUS INTENDED TO TAKE ANY DATA FROM WHATSAPP?

22  A.  ABSOLUTELY NOT.

23         MR. ANDRES:  OBJECTION, YOUR HONOR.  THAT CONTRADICTS

24  THE COURT'S PRIOR RULING.

25         THE COURT:  HMM, I'M NOT SURE.

1           MR. ANDRES:  SUMMARY JUDGMENT, YOUR HONOR.

2           THE COURT:  YEAH, I DID MAKE A FINDING WITH REGARD TO

3      THE TRANSMISSION AND WHAT WAS ATTAINED AT THE OTHER END, SO --

4      AND SENT BACK THROUGH THE WHATSAPP SERVERS TO THE WIS.

5           AND SO I THINK THAT THAT DOES INFRINGE UPON THE COURT'S

6      PRIOR FINDING.

7           SO I'M GOING TO SUSTAIN THE OBJECTION.

8      BY MR. AKROTIRIANAKIS:

9      Q.   YOU TESTIFIED, MR. SHOHAT, THAT PEGASUS WAS NOT INTENDED

10     TO CAUSE ANY HARM TO WHATSAPP SERVERS.  I ASKED YOU, WAS

11     PEGASUS INTENDED TO HARM -- IT CAUSE ANY HARM TO WHATSAPP AT

12     ALL?

13     A.   NO.  WE DIDN'T INTEND TO CAUSE ANY HARM TO WHATSAPP AT

14     ALL, OR TO THE SERVERS.

15     Q.   TO YOUR KNOWLEDGE, HAS NSO EVER MADE ANY FALSE STATEMENTS

16     TO ANYONE FROM META OR WHATSAPP THAT RELATED TO PEGASUS?

17     A.   ABSOLUTELY NOT.

18     Q.   STATEMENTS MADE IN THIS LAWSUIT ASIDE, TO YOUR KNOWLEDGE

19     HAS NSO EVER MADE ANY STATEMENTS OF ANY KIND TO ANYONE FROM

20     META OR WHATSAPP THAT RELATED TO PEG?

21     A.   NO.

22           MR. ANDRES:  OBJECTION.  RELEVANCE.

23           THE COURT:  OVERRULED.  I DON'T KNOW WHAT IT IS.  I

24     ASSUME YOU WILL LEAD US IN THAT DIRECTION.

25           MR. AKROTIRIANAKIS:  IT'S IN THE JURY INSTRUCTIONS,

1     YOUR HONOR.

2     Q.   THIS LAWSUIT ASIDE, HAS NSO, TO YOUR KNOWLEDGE, EVER HAD

3     ANY INTERACTIONS WITH ANY PERSON FROM META OR WHATSAPP THAT

4     RELATED TO PEGASUS?

5     A.   NO.

6     Q.   DO YOU, MR. SHOHAT, BEAR ANY ILL WILL TOWARDS THE

7     PLAINTIFFS IN THIS CASE?

8     A.   I DON'T HAVE ANY ILL WILL TO THE PLAINTIFFS.

9     Q.   ARE THERE ANY TECHNICAL LIMITATIONS ON PEGASUS IN TERMS OF

10    THE ABILITY TO USE IT IN THE UNITED STATES?

11    A.   YES.

12    Q.   CAN YOU PLEASE EXPLAIN?

13    A.   PEGASUS WAS DESIGNED --

14           MR. ANDRES:  OBJECTION, YOUR HONOR.  THE REFERENCE TO

15    THE UNITED STATES.

16           THE COURT:  WELL, WE SAW A MAP THE OTHER DAY.

17       WAS THAT IN THE OPENING?

18           MR. ANDRES:  YEAH, WHICH WE OBJECTED TO IN OUR

19    DISCUSSION BEFORE WHILE THE JURY WAS OUT.

20           MR. AKROTIRIANAKIS:  THAT'S A MISSTATEMENT,

21     YOUR HONOR.

22       COUNSEL REFERENCED THAT PEGASUS COULD BE USED AGAINST ALL

23    OF WHATSAPP'S 3 BILLION USERS, AND THAT'S NOT TRUE WITH RESPECT

24    TO THEM IN THE UNITED STATES.

25           THE COURT:  I'M GOING TO ALLOW IT.

1       BY MR. AKROTIRIANAKIS:

2       Q.   PLEASE EXPLAIN, MR. SHOHAT.

3       A.   SO PEGASUS IS DESIGNED TO NOT WORK ON MOBILE DEVICES, U.S.

4       MOBILE DEVICES.  THIS RESTRICTION IS IMPLEMENTED IN TWO WAYS.

5       FIRST OF ALL, IT CANNOT TARGET A PLUS 1 U.S. NUMBER.

6            SECONDLY -- SO EVEN IF IT'S NOT IN THE UNITED STATES, EVEN

7       IF IT'S SOME OTHER CARRIER IN THE WORLD, IT WON'T TARGET THAT

8       NUMBER.

9            SECONDLY, PEGASUS CANNOT TARGET A MOBILE DEVICE WHICH IS

10      IN U.S. TERRITORY, EVEN IF IT'S NOT A PLUS 1 NUMBER.  IT WILL

11      NOT TARGET IT.

12           SO THESE TWO RESTRICTIONS EXIST IN ALL OF OUR CUSTOMER

13      SYSTEMS.

14                MR. AKROTIRIANAKIS:  PARDON ME, SIR.

15           EXCUSE ME, YOUR HONOR.  I NEED TO GET THAT EXHIBIT.

16           (PAUSE IN PROCEEDINGS.)

17      BY MR. AKROTIRIANAKIS:

18      Q.   MR. SHOHAT, DO YOU HAVE BEFORE YOU A BOOK THAT LOOKS LIKE

19      THIS AND IT HAS FOUR DOCUMENTS IN IT?

20      A.   YES, I DO.

21      Q.   OKAY.

22           AND IF THE JURY STILL HAS THEM, YOUR HONOR, IT'S THE SAME

23      BOOK.

24                THE COURT:  OKAY.

25                MR. AKROTIRIANAKIS:  AND I RECALL THESE ARE IN

1     EVIDENCE, YOUR HONOR?

2                THE COURT:  THEY ARE IN EVIDENCE.

3                MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

4          WOULD YOU PUBLISH, PLEASE, EXHIBIT 1781 IN EVIDENCE.

5     Q.   MR. SHOHAT, DO YOU HAVE BEFORE YOU IN THE BOOK AND ON THE

6     SCREEN EXHIBIT 1781?

7     A.   I DO.

8     Q.   AND CAN YOU TURN ALSO, JUST IN YOUR BOOK, TO EXHIBIT 1782.

9     A.   I HAVE IT.

10    Q.   OKAY.  AND THEY'RE THE SAME KIND OF DOCUMENT, JUST ONE FOR

11    THE ONE COMPANY AND ONE FOR THE OTHER; RIGHT?

12    A.   YES.

13    Q.   ALL RIGHT.  DO YOU, AS THE CEO OF Q CYBER AND NSO, USE

14    DOCUMENTS LIKE EXHIBIT 1781 AND 1782 IN THE COURSE OF YOUR

15    DUTIES FOR THE COMPANIES?

16    A.   YES, I DO.

17    Q.   ARE YOUR INTERNAL FINANCIAL DOCUMENTS STATED IN TERMS OF

18    U.S. DOLLARS?

19    A.   YES.  ALL OF OUR FINANCIALS ARE IN U.S. DOLLARS.

20    Q.   WHY IS -- WHY IS THAT THAT THEY'RE STATED IN U.S. -- WELL,

21    U.S. DOLLARS IS NOT THE CURRENCY OF ISRAEL; RIGHT?

22    A.   IT'S NOT THE CURRENCY, NOT THE MAIN CURRENCY OF ISRAEL.

23    BUT IT'S COMMON PRACTICE FOR I.P. COMPANIES AT LEAST IN ISRAEL

24    TO STATE THE NUMBERS IN U.S. DOLLARS.  ALSO, MOST OF OTHER

25    PROCEEDINGS WITH CUSTOMERS ARE IN U.S. DOLLARS.

1    Q.   AND WE SEE SOME OF THE NUMBERS HERE.  AN EXAMPLE WOULD BE

2    THE SECOND LINE, COST OF SALES.  THE NUMBER ITSELF IS IN

3    PARENTHESES.

4         DO YOU SEE THAT?

5    A.   YES.

6    Q.   WHAT IS MEANT BY PARENTHESES AROUND A NUMBER IN THESE

7    FINANCIAL DOCUMENTS?

8    A.   SO ANY NUMBER IN PARENTHESES IS A NEGATIVE NUMBER.  SO

9    THINK ABOUT IT HAVING A MINUS BEFORE IT.

10   Q.   AND I SHOULD HAVE HAD -- I SHOULD HAVE HAD YOU IDENTIFY

11   THIS BEFORE.

12        WHAT IS EXHIBIT 1781?

13   A.   SO THE HEADER STATES P&L YTD, IT'S A PROFIT AND LOSS

14   REPORT, YEAR TO DATE, FOR THE YEARS 2023 AND 2024.

15        SO WE SEE TWO COLUMNS HERE.  THE LEFT COLUMN WITH THE

16   NUMBERS IS THE P&L, PROFIT AND LOSS REPORT, FOR 2023.

17        THE NEXT ONE IS 2024.

18   Q.   OKAY.  AND IN THE TOP RIGHT CORNER, THERE'S A BOX THAT

19   SAYS AMOUNTS BY, COLON, THOUSANDS, AND THEN A DOLLAR SIGN.

20        DO YOU SEE THAT?

21   A.   CORRECT.

22   Q.   WHAT DOES THAT MEAN?

23   A.   BASICALLY ANY NUMBER THAT YOU SEE, IT HAS THREE ZEROS

24   AFTER IT.  IT'S IN THOUSANDS.

25   Q.   OKAY.  NOW, CAN YOU WALK THE JURY THROUGH HOW THIS PROFIT

 1    AND LOSS STATEMENT IS ORGANIZED?  AND MAYBE WE CAN FOCUS JUST

 2    ON THE TOP PART OF IT BECAUSE THEN YOU'LL BE ABLE TO MAKE IT

 3    BIGGER ON THE SCREEN.  THERE WE GO.

 4    A.    THANK YOU.

 5          SO THIS IS A STANDARD STRUCTURE FOR PROFIT AND LOSS

 6    REPORT, P&L REPORT.

 7          THE FIRST LINE SHOWS THE REVENUE OR THE PROCEEDINGS FROM

 8    CUSTOMERS DURING THE YEAR.

 9          THE NEXT LINE IS COST OF SALES.  COST OF SALES IS COSTS

10    WHICH ARE DIRECTLY ASSOCIATED WITH THIS SALE, FOR INSTANCE, THE

11    HARDWARE FOR THE SPECIFIC -- THAT WAS SHIPPED IN A SPECIFIC

12    SALE.

13          IF WE SUBTRACT THE COST OF SALES FROM THE REVENUES, IT

14    GIVES US A NUMBER CALLED GROSS PROFIT.

15          AFTER THAT, THERE ARE DIFFERENT EXPENSES OF THE COMPANY,

16    OTHER EXPENSE OF THE COMPANY, LIKE THE COST OF THE R&D, WHICH

17    IS MAINLY SALARIES; SELLING AND MARKETING, WHICH, AGAIN, COULD

18    BE SALES PEOPLE; MARKETING, POSSIBLY COMMISSIONS PAID; GENERAL

19    AND ADMINISTRATIVE EXPENSES, ALL OF THAT TOGETHER IS THE

20    OPERATING EXPENSE OF THE COMPANY.

21          AND IF WE TAKE THE GROSS PROFIT AND SUBTRACT THE OPERATING

22    EXPENSES, THIS GIVES US A NUMBER CALLED OPERATING INCOME.

23          THIS IS THE INCOME OF THE COMPANY IF YOU DON'T TAKE OTHER

24    TYPE OF EXPENSES, WHICH ARE THE NEXT THREE LINES, WHICH

25    BASICALLY IT'S FINANCIAL INCOME IS, LIKE, THE COST IF YOU PAY

1    ANY INTEREST OR RECEIVABLE INTEREST, RECEIVABLE AND PAY ANY

2    INTEREST ON THAT, OR LOANS, AND TAX PAYMENTS.

3         AND IF WE SUBTRACT THAT ALSO FROM WHAT I PREVIOUSLY

4    DESCRIBED AS THE OPERATING INCOME, WE GET THE NET INCOME, OR

5    LOSS, AND THAT'S WHAT USUALLY WE CONSIDER PROFIT OF THE COMPANY

6    OR LOSS OF THE COMPANY.

7         SO THIS IS PROBABLY THE MOST IMPORTANT LINE HERE, HOW MUCH

8    THE COMPANY MADE IN PROFIT OR LOSS DURING THE YEAR.

9    Q.   OKAY.  AND WE NO LONGER SEE THE HEADINGS, BUT THE FIRST

10   COLUMN THAT SHOWS A LOSS OF $8,988,000 WOULD BE THE NET INCOME

11   OR NET LOSS FOR THE YEAR-ENDING 12/2023?

12   A.   THAT'S RIGHT.  THAT MEANS THAT WE LOST ABOUT $9 MILLION IN

13   '23.

14   Q.   AND THE SAME WITH RESPECT TO 2024, BUT THE NUMBER IS

15   $12,686,000?

16   A.   YEAH, WE LOST MORE THAN $12 MILLION IN '24.

17   Q.   ALL RIGHT.  WOULD YOU PLEASE TURN TO EXHIBIT 1782.

18   A.   I HAVE IT.

19   Q.   AND IN THE UPPER RIGHT-HAND CORNER OF THIS DOCUMENT, WE

20   SEE THAT IT SAYS COMPANY, Q CYBER ISRAEL?

21   A.   CORRECT.

22   Q.   OKAY.  SO THIS IS THE SAME TYPE OF PROFIT AND LOSS

23   STATEMENT, BUT NOW RATHER THAN FOR THE DEFENDANT NSO GROUP,

24   IT'S FOR DEFENDANT Q CYBER?

25   A.   THIS IS CORRECT.

1    Q.   OKAY.  AND IT'S SET UP IN THE SAME WAY AND ALL OF THAT;

2    RIGHT?

3    A.   YEAH.

4    Q.   SO LET'S JUST GO DOWN, I GUESS, TO NET INCOME, PLEASE.

5    THANK YOU.

6         AND IF YOU COULD HIGHLIGHT THAT LINE.

7         THIS IS THE -- THIS SHOWS THE NET INCOME RESPECTIVELY IN

8    THE YEAR-ENDING 12/2023 AND THE YEAR PENDING 12/2024; IS THAT

9    RIGHT, MR. SHOHAT?

10   A.   THIS IS CORRECT.

11   Q.   OKAY.  AND IT LOOKS TO SHOW A LOSS IN 2024 OF $359,000?

12   A.   CORRECT.

13   Q.   AND IN 2023?

14   A.   WE HAD A MODEST PROFIT OF $313,000.

15   Q.   ALL RIGHT.  NOW, WOULD YOU TURN, PLEASE, TO EXHIBIT 1779

16   AND 1780 ALSO IN EVIDENCE.

17        NOW, AT THE TOP OF THESE DOCUMENTS IT SAYS BALANCE --

18   THESE DOCUMENTS.

19        ON THE SCREEN IS EXHIBIT 1779.  BEFORE YOU, MR. SHOHAT, IS

20   EXHIBIT 1779 AND 1780.

21        DO YOU HAVE THOSE?

22   A.   YES, I DO.

23   Q.   OKAY.  AND THE ONE ON THE SCREEN ON THE TOP SAYS BALANCE

24   12/2023 VERSUS 12/2024, WHAT'S CALLED A YEAR-OVER-YEAR BALANCE

25   SHEET; IS THAT RIGHT?

1      A.   YES, CORRECT.

2      Q.   OKAY.  NOW, COULD YOU PLEASE TELL THE JURY WHAT, WHAT IS

3      SHOWN ON THE BALANCE SHEET GENERALLY?

4      A.   YEAH.  SO BALANCE SHEET IS BASICALLY A SNAPSHOT IN TIME OF

5      THE ASSETS AND LIABILITIES OF A GIVEN COMPANY.

6           THE WAY IT WORKS IS THAT ASSETS ALWAYS EQUAL THE

7      LIABILITIES, THAT'S WHY IT'S CALLED A BALANCE SHEET.

8           AND WHAT WE CAN SEE HERE, THE TOP PART, IS THAT ASSETS OF

9      THE COMPANY, AND BELOW THAT WOULD BE THE LIABILITIES, AGAIN,

10     THE TOTAL OF THE ASSETS ALWAYS EQUAL TO THE TOTAL OF THE

11     LIABILITIES.

12     Q.   OKAY.  AND WHERE IN THE BALANCE SHEET IS THE INFORMATION

13     ABOUT NSO'S ASSETS FOUND?

14     A.   SO AS I MENTIONED, THE TOP PART.

15     Q.   SO ENDING WITH THE LINE THAT SAYS TOTAL ASSETS?

16     A.   EXACTLY.

17     Q.   OKAY.  SO -- OKAY.

18          AND WHAT IS INCLUDED IN THE CATEGORY OF ASSETS?

19     A.   SO ASSETS ARE DIVIDED INTO TWO CATEGORIES.  THE FIRST ONE

20     IS CALLED CURRENT ASSETS AND NON-CURRENT ASSETS.

21          EXCUSE MY ACCENT.

22     Q.   THAT'S OKAY.

23     A.   CURRENT ASSETS ARE ASSETS THAT CAN BE EASILY CONVERTED

24     INTO CASH IN THE NEXT YEAR.  NON-CURRENT ASSETS CANNOT BE

25     CONVERTED TO CASH IN THE NEXT YEAR.

1    Q.   OKAY.  AND THE FIRST, THE FIRST LINE, OR THE FIRST ROW, I

2    SHOULD SAY, WITHIN CURRENT ASSETS IS CASH?

3    A.   CORRECT.  THAT'S BASICALLY HOW MUCH CASH WE HAD IN THE

4    BANK ACCOUNT IN THE RESPECTIVE DATE, MEANING END OF '23 AND END

5    OF '24.

6    Q.   AND HOW MUCH CASH DID NSO HAVE ON HAND AT THE END OF '23

7    AND '24?

8    A.   SO END OF '23, WE HAD $8.8 MILLION IN THE BANK, AND AT THE

9    END OF '24, WE HAD $5.119 MILLION.

10   Q.   AND WHAT DOES THAT CASH GO TO PAY FOR?

11   A.   THIS CASH PAYS OUR ONGOING EXPENSES.  ACTUALLY, THE -- ON

12   THE MONTHLY BASIS, WE SPEND OVER -- IF WE TAKE NSO AND Q CYBER

13   TOGETHER, WE SPEND OVER $10 MILLION.

14        SO THAT WOULD BE LESS THAN WHAT WE SPEND IN ONE MONTH FOR

15   SALARIES AND OTHER EXPENSES.

16   Q.   THE -- ON THE TOPIC OF SALARIES, HOW MANY PEOPLE WORK FOR

17   NSO AND Q CYBER COLLECTIVELY?

18   A.   SO COLLECTIVELY, IT'S SOMEWHERE BETWEEN 350 AND 380

19   PEOPLE, WHERE Q HAS ABOUT 50, AND THE REST IS NSO.

20   Q.   THE NEXT LINE IS TRADE ACCOUNTS RECEIVABLE.

21        WHAT DOES THAT MEAN?

22   A.   OKAY.  THAT'S AN INTERESTING ONE.

23        THERE'S SOMETHING INTERESTING ABOUT BALANCE SHEET, BECAUSE

24   IT REFLECTS ACCOUNTING WORLD, WHICH IS VERY DIFFERENT FROM THE

25   REAL WORLD.

```
 1              WHAT WE SEE IS BASICALLY THIS NUMBER REPRESENTS MONEY OWED

 2       TO THE COMPANY, IN THIS CASE NSO, AND IN THIS CASE THIS MONEY,

 3       THIS LARGE AMOUNT OF 158 MILLION DOLLARS AND 24 IS MONEY OWED

 4       TO IT FROM OTHER AFFILIATE COMPANIES IN THE LARGER ORGANIZATION

 5       STRUCTURE OF THE GROUP.

 6              SO THERE ARE OTHER COMPANIES IN THIS ORGANIZATIONAL

 7       STRUCTURE WHO HAVE DEBT TO NSO IN THAT AMOUNT, OR CLOSE TO THAT

 8       AMOUNT.

 9       Q.   AND WHAT, IF ANY, EXPECTATIONS DOES NSO HAVE WITH RESPECT

10       TO WHETHER OR WHEN NSO WOULD EVER RECEIVE SOME OR ALL OF THAT

11       MONEY?

12       A.   WE -- I DON'T -- WE DON'T EXPECT TO RECEIVE ANY OF THAT

13       MONEY, AND THAT'S WHY I MADE THE COMMENT ABOUT THE ACCOUNTING

14       WORLD AND THE REAL WORLD.

15              THE FACT IS THAT THE COMPANY, THE COMPANIES THAT OWE US

16       THAT MONEY DON'T HAVE ANY MEANS TO PAY, AND, IN FACT, HAVE

17       OTHER COMMITMENTS WHICH TAKE PRIORITY EVEN ON WHAT THEY OWE US.

18              SO WE WILL NOT SEE THAT MONEY AND DON'T EXPECT TO SEE IT

19       ANY TIME.

20              ACTUALLY, I EXPECT THAT AT SOME POINT IN TIME, OUR

21       ACCOUNTING TEAM, ACCOUNTING CONSULTANT WILL TELL US TO WIPE IT

22       OFF FROM THE BALANCE SHEET.

23       Q.   WHEN YOU REFER TO COMMITMENTS, YOU'RE TALKING ABOUT LENDER

24       COMMITMENTS?

25       A.   YES.
```

1    Q.   AND THOSE ARE MADE BY OTHER COMPANIES IN THE CHAIN?

2    A.   OTHER COMPANIES IN THE CHAIN THAT OWE VERY LARGE DEBT TO

3    BANKS, BASICALLY, TO LENDERS, MUCH LARGER THAN THE AMOUNT WE

4    SEE HERE.

5         AND THAT DEBT IS SECURED, MEANING THEY FIRST NEED TO PAY

6    THE SECURED DEBT BEFORE THEY'LL BE ABLE TO PAY, TO PAY US.  AND

7    THEY DON'T HAVE ANY MEANS TO PAY, NOT TO THE FINANCIAL

8    INSTITUTION, AND DEFINITELY NOT TO US.

9    Q.   SO WOULD THAT $158 MILLION IN TRADE ACCOUNTS RECEIVABLE,

10   WOULD THAT BE AN ASSET THAT NSO COULD USE FOR ANY PURPOSE?

11   A.   NO.  IT'S LIKE PAPER MONEY.

12   Q.   THE NEXT ASSET IS INVENTORIES.  WHAT IS INVENTORIES?

13   A.   SO INVENTORIES IS TYPICALLY HARDWARE THAT WE BOUGHT BUT

14   DID NOT SELL YET.  SO THEY SIT IN OUR INVENTORY IN OUR

15   WAREHOUSE.

16   Q.   THE NEXT ASSET IS ACCOUNTS RECEIVABLE.

17        WHAT IS ACCOUNT RECEIVABLE AS USED HERE IN THE OTHER

18   ACCOUNTS RECEIVABLE LINE?

19   A.   SO THAT, THAT WOULD BE OTHER COMMITMENTS TO THE COMPANY.

20   IT MIGHT BE OTHER DEBT WE HAVE FROM OTHER COMPANIES IN THE

21   STRUCTURE, OR FROM CUSTOMERS THAT ARE SUPPOSED TO PAY US.

22   Q.   OKAY.  SO IS THAT OTHER ACCOUNTS RECEIVABLE MONEY THAT

23   YOU, NSO AND Q CYBER, EXPECT TO RECEIVE?

24   A.   I THINK PART OF IT WE DO.  AS I MENTIONED, WE SPEND OVER

25   10 MILLION A MONTH, SO WE DO EXPECT TO GET SOME MONEY FROM

1      CUSTOMERS TO BE ABLE TO PAY THAT.

2      Q.   THE NEXT SORT OF BLOCK HERE IS TOTAL NON-CURRENT ASSETS?

3      A.   YES.

4      Q.   WHAT ARE NON-CURRENT ASSETS?

5      A.   SO AS I MENTIONED, NON-CURRENT ASSETS ARE ASSETS THAT WILL

6      NOT BE ABLE TO CONVERT TO CASH.

7      Q.   AND JUST IN SUMMARY, ARE THOSE ASSETS THAT ARE AVAILABLE

8      TO NSO TO USE FOR ANY PURPOSE?

9      A.   NO.

10     Q.   AND DIRECTING YOU TO THE BOTTOM PART OF THE PAGE,

11     THERE'S -- THE LAST LINE SAYS TOTAL LIABILITIES.

12          DO YOU SEE THAT?

13     A.   YES.

14     Q.   AND DOES EXHIBIT 1779, THE BOTTOM LINE, REFLECT THE TOTAL

15     LIABILITIES THAT THE COMPANY HAD AS OF THE END OF 2023 AND

16     2024?

17     A.   THAT'S CORRECT.

18          AND AS I MENTIONED, THIS IS EQUAL TO THE ASSETS ON THE

19     BALANCE SHEET.

20     Q.   OKAY.  PLEASE TURN TO EXHIBIT 1780.

21     A.   YES.

22     Q.   IS THIS THE BALANCE SHEET FOR Q CYBER ISRAEL?

23     A.   CORRECT.

24     Q.   OKAY.  AND WOULD WE READ IT -- I GET THAT THE NUMBERS ARE

25     DIFFERENT, BUT WOULD WE READ THE DOCUMENT THE SAME WAY AS THE

```
1     DOCUMENT YOU JUST WALKED US THROUGH?

2     A.   YES.

3          MR. ANDRES:  APOLOGIES, YOUR HONOR.  I'M SORRY.  WHAT

4     EXHIBIT NUMBER IS THIS?

5          MR. AKROTIRIANAKIS:  I'M SORRY IF I DIDN'T SAY THIS.

6     IT'S 1780.

7          MR. ANDRES:  THANK YOU.

8          MR. AKROTIRIANAKIS:  IT'S THE Q CYBER BALANCE SHEET.

9     Q.   OKAY.  WHAT WERE Q CYBER'S CASH AT THE END OF -- EXCUSE

10    ME.  WHAT WAS Q CYBER'S CASH AT THE END OF 2023 AND 2024?

11    A.   END OF 2023, WE HAD $3.2 MILLION IN THE BANK ACCOUNT.

12         END OF '24, A LITTLE BIT LESS.

13    Q.   OKAY.  AND WOULD THIS MONEY, THIS CASH AVAILABLE, BE

14    COMBINED WITH THE CASH SHOWN ON THE NSO BALANCE SHEET IN TERMS

15    OF YOUR ABILITY TO MEET THAT $10 MILLION OF SALARIES AND SO ON

16    THAT YOU MENTIONED?

17    A.   YES, EXACTLY.

18    Q.   IN ISRAEL, BY THE WAY, WHEN ARE -- WELL, WHEN WOULD BE THE

19    SPECIFIC DATE OF THESE -- OR THE AS OF DATE OF THESE FINANCIAL

20    DOCUMENTS WE'RE LOOKING AT?

21    A.   SO THIS IS THE LAST DAY OF THE YEAR, DECEMBER 31ST.

22    Q.   AND IN ISRAEL, IS -- WHAT'S THE NORMAL COURSE OF PAYROLL?

23    A.   YEAH.  SO IN ISRAEL, WE PAY ALL SALARIES ONCE A MONTH.  I

24    KNOW HERE IT'S TWICE A MONTH.  WE PAY ONCE A MONTH, AND WE PAY,

25    AT LEAST IN OUR COMPANIES, ON THE 9TH OF THE MONTH.
```

SHOHAT DIRECT BY MR. AKROTIRIANAKIS                               807

```
1        SO WE -- IN THIS CASE YOU SEE THE CASH ON THE FIRST DAY OF

2   THE YEAR, AND NINE DAYS LATER, ON THE 9TH OF AUGUST -- OF

3   JANUARY, SORRY, JANUARY 9TH, WE WOULD PAY SALARIES.

4   Q.   THE -- AFTER CASH, WE SEE AGAIN TRADE ACCOUNTS RECEIVABLE?

5   A.   CORRECT.

6   Q.   IS THAT THE SAME TYPE OF ASSET THAT YOU DESCRIBED WITH

7   RESPECT TO NSO'S OWN TRADE ACCOUNTS RECEIVABLE?

8   A.   YES, CORRECT.  I THINK I EVEN CHECKED IT LAST NIGHT AND

9   THE $8 MILLION THERE IS A DEBT OF Q CYBER TO NSO, OR THE OTHER

10  WAY.  SO, YEAH.

11  Q.   OKAY.

12  A.   IT'S BETWEEN THE TWO COMPANIES.

13  Q.   AND WOULD THE AMOUNTS THAT WE SEE HERE IN THE TRADE

14  ACCOUNTS RECEIVABLE LINE BE AVAILABLE TO Q CYBER FOR USE FOR

15  ANY PURPOSE?

16  A.   NO.

17  Q.   DIRECTING YOU TO THE VERY LAST LINE OF THE BALANCE SHEET,

18  AND IT READS TOTAL LIABILITIES?

19  A.   YES.

20  Q.   DOES EXHIBIT 1780 REFLECT THE -- Q CYBER'S TOTAL

21  LIABILITIES AS OF 12/31/2023 AND 12/31/2024?

22  A.   CORRECT.

23  Q.   ALL RIGHT.  YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS

24  CASE ARE SEEKING PUNITIVE DAMAGES; RIGHT?

25  A.   I DO.
```

1    Q.   OKAY.  WOULD THE TWO COMPANIES TOGETHER, THE TWO DEFENDANT

2    COMPANIES, BE ABLE TO PAY A PUNITIVE DAMAGES AWARD?

3    A.   TO BE HONEST, I DON'T THINK WE'RE ABLE TO PAY ANYTHING.

4    WE ARE STRUGGLING TO KEEP OUR HEAD ABOVE WATER.  I'VE -- WE'RE

5    COMMITTING TO MY CFO JUST TO PRIORITIZE EXPENSES AND TO MAKE

6    SURE THAT WE HAVE ENOUGH MONEY TO MEET OUR COMMITMENTS, AND

7    OBVIOUSLY ON A WEEKLY BASIS.

8         WE DON'T HAVE ANY MONEY TO SPARE, TO BE HONEST.

9    Q.   YOU UNDERSTAND THAT THE PUNITIVE DAMAGES ALLEGATION IN

10   THIS CASE IS MADE PURSUANT TO A CALIFORNIA LAW CALLED THE

11   CDAFA, OR THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND

12   FRAUD ACT?

13   A.   I UNDERSTAND THAT.

14   Q.   OKAY.  PRIOR TO THIS LAWSUIT HAVING BEEN FILED, HAD YOU

15   EVER HEARD OF THAT CALIFORNIA LAW BEFORE?

16   A.   UM --

17             MR. ANDRES:  OBJECTION, YOUR HONOR.

18             THE COURT:  OVERRULED.

19             THE WITNESS:  I DID NOT KNOW ABOUT THIS LAW BEFORE

20   THE LAWSUIT WAS MADE.

21   BY MR. AKROTIRIANAKIS:

22   Q.   DID NSO INTEND TO VIOLATE ANY LAWS WITH RESPECT TO ITS

23   DEVELOPMENT OR LICENSING OF PEGASUS?

24   A.   WE DON'T INTEND TO BREAK ANY LAWS AT ALL.

25   Q.   BUT YOU DO NOT CONTEST THE FACT THAT THE COURT IN THIS

1    CASE HAS FOUND YOU LIABLE UNDER THE STATUTES THAT HER HONOR HAS

2    INSTRUCTED THE JURY; CORRECT?

3    A.   I UNDERSTAND WE WERE FOUND TO BE LIABLE, AND I RESPECT

4    THAT AND ACCEPT THAT.

5           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

6           THE COURT:  ALL RIGHT.

7        CROSS-EXAMINATION?

8           MR. ANDRES:  THANK YOU, YOUR HONOR.

9                            **CROSS-EXAMINATION**

10   BY MR. ANDRES:

11   Q.   GOOD AFTERNOON, MR. SHOHAT.

12   A.   GOOD AFTERNOON.

13   Q.   I JUST WANT TO ASK YOU A COUPLE OF QUESTIONS.

14       YOU JUST WENT THROUGH A WHOLE SERIES OF FINANCIAL

15   DOCUMENTS WITH MR. AKROTIRIANAKIS; ISN'T THAT RIGHT?

16   A.   CORRECT.

17   Q.   AND THOSE DOCUMENTS ARE YOUR INTERNAL DOCUMENTS; IS THAT

18   CORRECT?

19   A.   YES, THIS IS OUR INTERNAL DOCUMENTS FOR THE FINANCIAL

20   THINGS.

21   Q.   YEAH.  THEY'RE NOT AUDITED BY ANY THIRD PARTY?

22   A.   ACTUALLY, THE 2023 REPORT IS AUDITED.

23   Q.   THAT DOCUMENT THAT YOU PROVIDED US DIDN'T COME FROM

24   OUTSIDE, ANY OUTSIDE AUDITOR?  THAT'S AN INTERNAL DOCUMENT?

25   A.   THIS IS CORRECT.  WE JUST RECENTLY, LIKE, GOT THE AUDITOR

SHOHAT CROSS BY MR. ANDRES

1    APPROVAL, THE AUDITOR'S APPROVAL OF THE REPORTS.  IT'S THE SAME

2    NUMBER.

3    Q.   SO --

4    A.   SO THIS DOCUMENT IS NOT FROM AN AUDITED REPORT, IF THAT'S

5    YOUR QUESTION.

6    Q.   SO YOU HAVE THOSE DOCUMENTS AVAILABLE TO YOU NOW IN AN

7    AUDITED 2023 FINANCIAL REPORT?

8    A.   MY CFO SHOULD HAVE IT, TOLD ME YESTERDAY THAT SHE RECEIVED

9    THE AUDITOR'S SIGNATURE ON THE AUDITED REPORTS.

10   Q.   SO YOU NOW WERE NOT SURE ABOUT THOSE DOCUMENTS UNTIL

11   YESTERDAY?

12   A.   I AM SURE ABOUT THEM.

13       THE WAY IT WORKS, WE CREATE OR FOLLOW THESE REPORTS.  ON A

14   QUARTERLY BASIS I REVIEW THE REPORTS.

15       ONCE A YEAR, THEY NEED TO BE AUDITED.  WE HAVE A YEAR,

16   EVEN MORE SOMETIMES, TO GET THE AUDITOR'S APPROVAL ON THE

17   REPORTS.

18       SO I REVIEW THESE REPORTS QUARTERLY AT LEAST, IF NOT MORE.

19       IF YOU ASK ME ABOUT AUDITING OF THE REPORTS, THE 2023 WAS

20   AUDITED, AND WE GOT THE AUDITOR'S APPROVAL THIS WEEK.

21       THE 2024 REPORT WILL BE AUDITED IN A FEW MONTHS.

22   Q.   OKAY.  LET'S START OVER.

23       THE DOCUMENTS THAT MR. AKROTIRIANAKIS SHOWED YOU WERE NOT

24   PROVIDED BY ANY INDEPENDENT THIRD PARTY; IS THAT CORRECT?

25   A.   THIS IS CORRECT.

1    Q.   AND THOSE WERE NOT AUDITED OR PROVIDED BY AN AUDITOR?

2    A.   THEY WERE NOT PROVIDED BY AN AUDITOR.  WHAT I SAID IS THE

3    2023 REPORT IS IDENTICAL TO THE AUDITED REPORT.

4    Q.   I UNDERSTAND WHAT YOU SAID, BUT I'D LIKE YOU TO JUST

5    ANSWER MY QUESTIONS.  YOU'LL HAVE A CHANCE TO SPEAK WITH YOUR

6    LAWYERS.

7         THOSE DOCUMENTS COME FROM NSO AND Q CYBER; RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   THEY DO NOT COME FROM AN AUDITOR?

10   A.   THEY DO NOT COME FROM AN AUDITOR.

11   Q.   AND THEY DO NOT COME FROM A THIRD PARTY?

12   A.   THE VERSION YOU SEE HERE, NO.

13   Q.   AND DURING MR. AKROTIRIANAKIS'S TIME TO ASK YOU ABOUT THE

14   EXPENSES AND ISSUES, HE NEVER ASKED YOU ABOUT THE EXPENSES FOR

15   R&D, DID HE?

16   A.   HE DID NOT.

17   Q.   AND THOSE ARE AMONG NSO'S LARGEST EXPENSES; ISN'T THAT

18   RIGHT?

19   A.   YES, OF COURSE.

20   Q.   AND THAT R&D IS WHAT'S USED FOR PEGASUS AND TO INSTALL

21   PEGASUS ON PEOPLE'S PHONES?

22   A.   THAT IS USED TO DEVELOP PEGASUS, YES, AMONG OTHER THINGS.

23   Q.   AND TO IMPROVE IT --

24        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I THINK

25   WE ALREADY HAD A RULING ABOUT CURRENT THINGS.

1                    THE COURT:  YES.

2                    MR. ANDRES:  I --

3                    THE COURT:  YES, CURRENT ACTIVITY IS OUT.

4          CURRENT STATUS, FINANCIAL STATUS IS IN.

5      BY MR. ANDRES:

6      Q.   NOT WITH -- WITH RESPECT TO THE R&D -- I'M JUST ASKING A

7      QUESTION ABOUT THE DOCUMENTS THAT HE JUST PUT IN.

8          SO I'M ASKING ABOUT THE R&D ON THOSE DOCUMENTS.  THAT IS

9      AMONG THE HIGHEST COSTS FOR NSO; CORRECT?

10     A.   THAT'S CORRECT.

11     Q.   AND WHETHER FOR TODAY OR BACK IN 2018, R&D IS WHAT'S USED

12     TO DEVELOP PEGASUS; RIGHT?

13                   MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  THAT'S

14     NOT A QUESTION ABOUT FINANCIAL DOCUMENTS.

15                   THE COURT:  OVERRULED.  I THINK IT'S FAIR FROM THE

16     DOCUMENTS THAT WERE SHOWN.

17                   THE WITNESS:  WE INVESTED A LOT IN OUR R&D.  WE HIRE

18     AND EMPLOY TOP TALENT.  AND, YES, THE R&D IS A VERY LARGE

19     EXPENSE.

20     BY MR. ANDRES:

21     Q.   AGAIN, THAT EXPENSE IS USED TO DEVELOP PEGASUS?

22     A.   AMONG OTHER DEVELOPMENT THAT R&D DOES, YES.

23     Q.   AND PEGASUS IS THE, IS THE PROGRAM THAT'S PUT ON PEOPLE'S

24     DEVICES TO GET THEIR INFORMATION; IS THAT RIGHT?

25     A.   PEGASUS IS A TOOL USED BY GOVERNMENT AGENCIES TO EXTRACT

1    INTELLIGENCE INFORMATION FROM TARGET DEVICES, TARGETS OF THOSE

2    GOVERNMENTS.

3    Q.   TARGETED DEVICES THAT PEOPLE OWN?

4         DID YOU UNDERSTAND MY QUESTION?

5    A.   I UNDERSTAND.  I THINK THAT YOU TRIED TO SUGGEST IT'S

6    REGULAR PEOPLE.  I DON'T CONSIDER THEM REGULAR PEOPLE.

7         BUT I WOULD NOT GO INTO THAT.

8    Q.   I'M GOING TO ASK YOU --

9              THE COURT:  WELL, WE DON'T NEED TO DEFINE REGULAR

10   PEOPLE.  JUST PEOPLE.

11   BY MR. ANDRES:

12   Q.   I'M SAYING IT DOESN'T ATTACK A SERVER THAT'S SITTING IN A

13   WAREHOUSE SOMEPLACE.  IT'S A PHONE THAT SOMEBODY IS HOLDING?

14   A.   TOTALLY AGREE WITH YOU, WE DON'T ATTACK ANY SERVER.  THE

15   TECHNOLOGY IS TARGETING PHONE DEVICES ONLY.

16   Q.   AND THAT GETS PEOPLE'S TEXT MESSAGES?

17   A.   THAT GETS TEXT MESSAGES FROM THOSE DEVICES.

18   Q.   IT GETS THEIR PHONE CALLS?

19   A.   IT MIGHT GET PHONE CALLS.

20   Q.   YOU CAN TURN ON THE MICROPHONE?

21   A.   I CANNOT, BUT MY GOVERNMENT CUSTOMERS CAN TURN ON.

22   Q.   THE TECHNOLOGY THAT YOU DEVELOPED ALLOWS YOU TO TURN ON

23   THE MICROPHONE?

24   A.   THE TECHNOLOGY THAT WE DEVELOP ALLOWED OUR GOVERNMENT

25   AGENCIES, CUSTOMERS, TO DO WHAT YOU'RE SUGGESTING.

1    Q.   YOU CAN SAY GOVERNMENT AGENCIES AS MUCH AS YOU WANT, BUT

2    THOSE GOVERNMENT AGENCIES EXIST ALL OVER THE WORLD; RIGHT?

3    A.   YEAH.  BUT YOU SAID I.  I CANNOT DO.

4         THE GOVERNMENT AGENCIES CAN DO IT.  YOU ASKED ME ABOUT ME,

5    ABOUT MY COMPANY.

6    Q.   LET'S JUST -- I'LL LET YOU ANSWER YOUR QUESTION -- YOU LET

7    ME ASK MY QUESTION.  I'LL LET YOU GIVE THE ANSWER.  LET'S HELP

8    EVERYBODY OUT HERE, OKAY?  YOU AGREE ON THAT?

9    A.   YEP.

10             MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

11             THE COURT:  OVERRULED.

12   BY MR. ANDRES:

13   Q.   SO I'M GOING TO COME BACK TO THAT ABOUT THE R&D, BECAUSE

14   THE R&D EXPENSES IN 2023 AND 2024 WERE OVER $50 MILLION; ISN'T

15   THAT RIGHT?

16   A.   I CANNOT SAY.  BUT I DON'T CONTEST THAT R&D IS A LARGE

17   EXPENSE.

18   Q.   OKAY.  WELL, LET'S LOOK AT THE DOCUMENT THEN.

19        OOPS, I DON'T KNOW IF I HAVE THAT.

20        CAN YOU PUT UP 1781.

21        DO YOU HAVE THAT ON YOUR SCREEN, MR. SHOHAT?

22   A.   I DO.

23   Q.   I'M JUST GOING TO STAND OVER HERE SO I CAN SEE IT.  IS

24   THAT OKAY, JUDGE?

25             THE COURT:  SURE.  SURE.  YOU HAVE TO SPEAK UP,

1      THOUGH, SO THAT --

2                  MR. ANDRES:  OKAY.  I'LL TRY.

3                  THE COURT:  OKAY.

4                  MR. ANDRES:  I HAVEN'T HAD A PROBLEM FOR ME.

5      Q.   RESEARCH AND DEVELOPMENT, MR. SHOHAT, DO YOU SEE THAT

6      RIGHT HERE (INDICATING)?

7      A.   I DO.

8      Q.   AND THESE NUMBERS ARE IN MILLIONS?

9      A.   CORRECT.

10     Q.   THAT IS $52 MILLION SPENT ON R&D IN 2023?

11     A.   SO YOU ASKED ME IF THAT'S THE EXPENSE ON R&D.  THE ANSWER

12     IS NO BECAUSE THAT LINE INCLUDES OTHER DEPARTMENTS THAT I'LL

13     EXPLAIN, OTHER DEPARTMENTS THAT ARE NOT PEOPLE OR ACCOUNTANTS

14     LIKE TO PUT IT TOGETHER.  TO GIVE AN EXAMPLE --

15     Q.   I'M SORRY, MR. SHOHAT.  I'M GOING TO ASK YOU TO ANSWER MY

16     QUESTION.  MR. AKROTIRIANAKIS CAN ASK YOU ALL THE QUESTIONS HE

17     WANTS.

18          IT SAYS RESEARCH AND DEVELOPMENT.

19          DO YOU SEE THAT?

20     A.   YES.

21     Q.   AND NSO SPENT $52 MILLION IN 2023 FOR RESEARCH AND

22     DEVELOPMENT?  YES OR NO?

23     A.   NO.

24     Q.   OKAY.  HOW ABOUT IN 2024, THEY SPENT $59 MILLION IN

25     RESEARCH AND DEVELOPMENT?

1    A.   NO.

2    Q.   OKAY.  SO THIS DOCUMENT IS INACCURATE BECAUSE IT SAYS

3    RESEARCH AND DEVELOPMENT AND IT SAYS $52 AND $59 MILLION?

4    A.   I WOULD BE HAPPY TO EXPLAIN.

5    Q.   I'M ASKING IF THIS DOCUMENT IS INACCURATE.

6    A.   THIS DOCUMENT INCLUDES THE I.T. DEPARTMENT, FOR INSTANCE.

7         BUT I WILL AGREE THAT R&D IS THE MAJORITY OF THIS NUMBER.

8    Q.   THE MAJORITY OF THE 52 MILLION?

9    A.   I AGREE.

10   Q.   AND THAT R&D IS WHAT'S USED TO DEVELOP PEGASUS, WHICH

11   ALLOWS YOUR CLIENTS TO SPY ON PEOPLE'S PHONES?

12   A.   THIS R&D DEVELOPED PEGASUS, AMONG OTHER THINGS, AND

13   PEGASUS ALLOWS GOVERNMENT AGENCIES TO GATHER INTELLIGENCE FROM

14   THE TARGETS.

15   Q.   AND THAT MONEY, THE $50 MILLION FROM 2023 AND $59 MILLION

16   IS THE MONEY THAT'S USED TO DEVELOP THAT?

17   A.   I THINK I ANSWERED.  I CAN EXPLAIN AGAIN.

18   Q.   I'M ASKING YOU, YES OR NO, THAT MORE THAN $100 MILLION IS

19   USED FOR TECHNOLOGY DEVELOPMENT, LIKE PEGASUS?

20   A.   SO MY ANSWER WAS NO, AND I EXPLAINED WHY I DON'T VIEW IT

21   EXACTLY AS DESCRIBED.

22   Q.   YOU SAID IT'S ALSO FOR I.T. AND THAT I.T. IS USED WITH

23   RESPECT TO PEGASUS.

24   A.   I.T. IS ALSO WHAT'S MAKING, KEEPING MY EMAIL SERVER, AND

25   ALLOWING ME TO SEND EMAILS AND OTHER STUFF.  THAT'S WHY IT'S

1    NOT JUST R&D IN THE SENSE OF DEVELOPING PRODUCT.

2        BUT I AGREE, IT'S THE MAJORITY -- THE MAJORITY OF THIS

3    EXPENSE GOES TO RESEARCH AND DEVELOPMENT AS YOU WANT TO DEFINE

4    IT.

5    Q.   AND IF NSO DIDN'T SPEND $50 MILLION, $52 MILLION ON R&D,

6    IT MIGHT HAVE A LARGER OPERATING INCOME; RIGHT?  IF THEY DIDN'T

7    SPEND $52 MILLION HERE, THIS NUMBER, WHICH YOU SAY IS LOSING

8    MONEY, WOULD BE HIGHER?

9    A.   SO THAT IS NOT, BECAUSE IF WE WOULDN'T HAVE DEVELOPED

10   PEGASUS, THE REVENUE LINE ON THE TOP WOULD SHIFT MUCH MORE, WE

11   WOULD BE LOSING MUCH MORE MONEY.

12   Q.   IF YOU STOP SPYING ON PEOPLE, YOU MIGHT HAVE A PROFIT?

13   A.   I NEVER -- DON'T ACCUSE ME OF SPYING, I NEVER SPIED ON

14   ANYONE.  AND MY COMPANY NEVER SPIED ON ANYONE.

15   Q.   THAT'S YOUR WORD.  YOU UNDERSTAND THAT?

16   A.   I SWORE TO SAY THE TRUTH, AND THIS IS MY TESTIMONY.  I

17   NEVER SPIED ON ANYONE.  MY COMPANY NEVER SPIED ON ANYONE.

18   PLEASE DON'T ACCUSE ME OF THAT.

19   Q.   THE PRODUCTS THAT YOU CREATED, THAT YOU SOLD TO YOUR

20   CUSTOMERS, SPIED ON INDIVIDUALS?

21   A.   THE PRODUCT THAT I DEVELOPED AND LICENSED TO GOVERNMENTS

22   ALLOWED THOSE GOVERNMENTS TO COLLECT INTELLIGENCE FROM TARGETS.

23   Q.   YOU CALL IT INTELLIGENCE, BUT AT THE END OF THE DAY, IT'S

24   STILL PEOPLE'S TEXT MESSAGES; RIGHT?

25   A.   IT'S THE TEXT MESSAGES OF CERTAIN PEOPLE.

1    Q.   AND IT'S THE TELEPHONE CALLS OF CERTAIN PEOPLE?

2    A.   OF CERTAIN PEOPLE.

3    Q.   IT'S ALL THE INFORMATION ON PEOPLE'S PHONES?

4    A.   IT'S INFORMATION FROM THE PHONE DEVICES THAT ARE TARGETS

5    OF GOVERNMENTS FOR VERY SPECIFIC REASONS.

6    Q.   WHATEVER THAT IS, YOU UNDERSTAND THAT THE WORK THAT YOUR

7    COMPANY DID VIOLATED THE LAW IN THE UNITED STATES?  YOU

8    UNDERSTAND THAT; RIGHT?

9    A.   I UNDERSTAND THIS COURT FOUND US LIABLE FOR THAT.

10   Q.   SO WHATEVER IT IS THAT YOU SAY ABOUT FOREIGN GOVERNMENTS

11   OR WHOEVER YOU THINK YOUR CLIENTS ARE, IN THIS COURTROOM, YOU

12   UNDERSTAND THAT JUDGE HAMILTON FOUND, IN CALIFORNIA, IN THE

13   UNITED STATES, THAT NSO VIOLATED FEDERAL COMPUTER FRAUD AND

14   ABUSE STATUTES?  YOU UNDERSTAND THAT; RIGHT?

15   A.   I UNDERSTAND EXACTLY WHAT THE COURT DECIDED, YES.

16   Q.   AND YOU UNDERSTAND -- AND YOU UNDERSTAND THAT

17   JUDGE HAMILTON HAS FOUND THAT IN THIS COURTROOM, AND IN THE

18   UNITED STATES, YOU HAVE VIOLATED THE CALIFORNIA STATE COMPUTER

19   FRAUD AND ABUSE ACT; CORRECT?

20   A.   I UNDERSTAND, IN THE CONTEXT OF CALIFORNIA, THAT'S

21   CORRECT, YES.

22   Q.   AND YOU UNDERSTAND THAT IN THIS COURTROOM, YOU HAVE

23   VIOLATED THE TERMS OF SERVICE OF THE CONTRACT THAT NSO ENTERED

24   INTO WITH WHATSAPP; CORRECT?

25   A.   I UNDERSTAND THAT'S THE DECISION, YES.  YES.

1    Q.   NOW, YOU TESTIFIED -- YOU'VE BEEN HERE IN COURT; CORRECT?

2    A.   YES.

3    Q.   AND YOU'RE HERE AS A REPRESENTATIVE OF Q CYBER; IS THAT

4    CORRECT?

5    A.   Q CYBER AND NSO, YES.

6    Q.   OKAY.  SO YOU SERVE AS THE CEO OF Q CYBER; IS THAT RIGHT?

7    A.   CORRECT.

8    Q.   AND THE CEO OF THE NSO GROUP?

9    A.   THAT'S CORRECT.

10   Q.   AND YOU'VE HAD THAT JOB AT NSO SINCE AUGUST 2022?

11   A.   YES.

12   Q.   BEFORE THAT, YOU SERVED AS THE COO OF NSO; CORRECT?

13   A.   CORRECT, BOTH COO -- BOTH NSO AND Q CYBER.

14   Q.   OKAY.  SO -- AND COO IS THE CHIEF OPERATING OFFICER?

15   A.   YES.

16   Q.   AND YOU'VE HAD THAT JOB SINCE AT LEAST MAY OF 2018?

17   A.   YES.

18   Q.   SO IS IT FAIR TO SAY THAT YOU'VE HAD AN ASSOCIATION WITH

19   NSO OR Q CYBER AT LEAST SINCE -- AT LEAST FOR SEVEN YEARS OR

20   SO?

21   A.   YES.

22   Q.   OKAY.  INCLUDING THE TIME IN 2018 TO 2020 IN TERMS OF THE

23   ACTIVITY ALLEGED IN THE COMPLAINT IN THIS CASE?

24   A.   I WAS IN THE COMPANY AT THAT TIME.

25   Q.   YOU WERE AWARE AT THAT TIME THAT NSO WAS DEPLOYING

```
 1          PEGASUS; CORRECT?

 2     A.   YES.

 3     Q.   AND YOU WERE AWARE OF THE FACTS IN THE COMPLAINT?

 4     A.   I'M AWARE OF THE FACTS OF THE COMPLAINT.

 5     Q.   AND YOU WERE RESPONSIBLE --

 6     A.   YES.

 7     Q.   YOU WERE RESPONSIBLE FOR THAT CONDUCT AS A RESULT OF YOUR

 8          POSITION AT NSO OR Q CYBER?

 9     A.   I'M NOT SURE I WAS RESPONSIBLE FOR THAT CONDUCT BACK AT

10          THE TIME WHEN I WAS COO.

11               BUT I WAS PART OF THE MANAGEMENT TEAM, SO I WAS AWARE OF

12          IT.

13     Q.   YOU WERE AN OFFICER OF THE COMPANY?

14     A.   YES.

15     Q.   AND YOU WERE INVOLVED IN MANAGEMENT?

16     A.   YES.

17     Q.   AND NSO IS A FOR-PROFIT COMPANY; CORRECT?

18     A.   JUST LIKE ANY OTHER COMPANY, NO?  MOST COMPANIES -- YES,

19          WE ARE FOR -- YES, WE ARE A FOR-PROFIT COMPANY.

20     Q.   AND SO I THINK I JUST -- I DON'T HAVE THE TRANSCRIPT, BUT

21          YOU SAID THAT, JUST LIKE META?

22     A.   META, WHATSAPP, FACEBOOK, YEAH, ANY KIND, YEAH.

23     Q.   DO YOU UNDERSTAND THAT IN THIS COURTROOM, THERE'S NO

24          EQUIVALENCE BETWEEN WHATSAPP AND NSO?

25     A.   WE CAN ARGUE ABOUT IT.
```

1    Q.   WELL, BUT YOU UNDERSTAND IN THIS COURTROOM, NOBODY HAS

2    FOUND THAT META OR WHATSAPP VIOLATED ANY LAW?

3         YOU UNDERSTAND THAT?

4    A.   NOT IN THIS COURTROOM.

5    Q.   OKAY.  SO YOU UNDERSTAND THAT FOR THIS, FOR THIS

6    PROCEEDING, THIS JURY IS DECIDING ABOUT THE VIOLATIONS OF LAW

7    THAT NSO WAS INVOLVED IN?

8    A.   I'M -- I PERFECTLY UNDERSTAND THAT I'M REPRESENTING THE

9    DEFENDANTS IN THIS CASE.

10   Q.   AND YOU UNDERSTAND THAT IN THIS COURTROOM, FOR THIS

11   PROCEEDING, THAT THERE ARE NO ALLEGATIONS, NO EVIDENCE

12   WHATSOEVER, THAT WHATSAPP OR META VIOLATED THE LAW?  DO YOU

13   UNDERSTAND THAT?

14   A.   I DIDN'T SAY ANYTHING LIKE THAT.

15   Q.   SIR, I'M ASKING YOU WHETHER YOU UNDERSTAND, FOR THIS

16   PROCEEDING, THAT THERE ARE NO ALLEGATIONS --

17   A.   I UNDERSTAND.

18   Q.   -- CAN I JUST FINISH?

19        THERE ARE NO ALLEGATIONS THAT META OR WHATSAPP VIOLATED

20   FEDERAL COMPUTER LAW.

21        DO YOU UNDERSTAND THAT?

22   A.   OF COURSE.

23   Q.   AND YOU UNDERSTAND THAT IN THIS PROCEEDING, THERE IS NO

24   EVIDENCE OR ALLEGATION THAT WHATSAPP VIOLATED CALIFORNIA LAW?

25        DO YOU UNDERSTAND THAT?

1    A.   I UNDERSTAND.

2    Q.   AND YOU UNDERSTAND THAT IN THIS PROCEEDING, THERE IS NO

3    EVIDENCE OR ALLEGATION THAT WHATSAPP VIOLATED ITS OWN TERMS OF

4    SERVICE OR ANY CONTRACT?

5         DO YOU UNDERSTAND THAT?

6    A.   I UNDERSTAND THAT.

7    Q.   THAT'S FAIR?

8    A.   THAT'S FAIR.

9    Q.   SO LET ME ASK YOU THAT QUESTION AGAIN.

10        NSO IS A FOR-PROFIT COMPANY; CORRECT?

11   A.   NSO IS A FOR-PROFIT COMPANY, ALMOST LIKE ANY OTHER COMPANY

12   I KNOW.

13   Q.   THIS PROCEEDING, SIR, THIS MIGHT TAKE US LESS TIME.  I

14   DON'T HAVE QUESTIONS ABOUT ANY OTHER COMPANIES.  I HAVE

15   QUESTIONS ABOUT Q CYBER AND NSO BECAUSE THAT'S WHAT THIS JURY

16   NEEDS TO DECIDE ABOUT.

17        SO IF YOU COULD CONFINE YOUR ANSWERS TO THE QUESTIONS, I

18   THINK WE'D GET THIS DONE QUICKER.

19        DO YOU UNDERSTAND THAT?

20            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  HE'S

21   JUST ANSWERING THE QUESTIONS.

22            THE COURT:  SUSTAINED.

23            MR. ANDRES:  SORRY, YOUR HONOR.  IF I COULD JUST HAVE

24   A MINUTE?

25            (PAUSE IN PROCEEDINGS.)

1    BY MR. ANDRES:

2    Q.   YOU UNDERSTAND -- AS YOU SAID, YOU'VE BEEN HERE IN THE

3    COURTROOM, SO YOU SAW THE TESTIMONY OF MS. GIL ABOUT HOW MUCH

4    PEGASUS SELLS ITS PRODUCTS FOR; CORRECT?

5    A.   I SAW IT.

6    Q.   OKAY.  AND SHE WORKS FOR YOU?

7    A.   YES.

8    Q.   YOU KNOW HER?

9    A.   I KNOW HER.

10   Q.   AND SHE SAID THAT IT COULD COST MILLIONS OF DOLLARS TO BUY

11   PEGASUS FOR A PARTICULAR CUSTOMER OF YOURS; IS THAT RIGHT?

12   A.   YES.

13   Q.   YOU ALSO TESTIFIED ABOUT PRICING IN YOUR DEPOSITION.

14        DO YOU REMEMBER THAT?

15   A.   I REMEMBER.

16   Q.   OKAY.  AND YOU SAID THAT IT COULD COST A CUSTOMER BETWEEN

17   $3 MILLION AND 10 TIMES THAT.

18        DO YOU REMEMBER ANSWERING THAT QUESTION?

19        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I THINK

20   WE'VE HAD RULINGS ON THIS GENERAL SUBJECT.

21        MR. ANDRES:  THAT'S NOT RIGHT, YOUR HONOR.  IT'S

22   CONSISTENT WITH MS. GIL'S TESTIMONY.

23        THE COURT:  YEAH, WE JUST HEARD THIS FROM HER.

24        MR. AKROTIRIANAKIS:  I DON'T THINK WE DID.

25        BUT THANK YOU, YOUR HONOR.

```
 1                    THE COURT:  OKAY.

 2       BY MR. ANDRES:

 3       Q.   SO DO YOU REMEMBER TESTIFYING THAT A CUSTOMER COULD PAY

 4       3 MILLION, AND ANOTHER CUSTOMER COULD PAY 10 TIMES THAT?

 5       A.   I DO.

 6       Q.   OKAY.  SO $3 MILLION FOR ONE CUSTOMER, AND 10 TIMES

 7       3 MILLION IS 30 MILLION FOR ANOTHER CUSTOMER?

 8       A.   CORRECT.  I'M NOT FAMILIAR WITH ANY CUSTOMER PAYING

 9       30 MILLION.

10       Q.   BUT YOU ANSWERED THE QUESTION, THE QUESTION, "CAN YOU GIVE

11       ME AN EXAMPLE?"

12            AND YOU SAID "ONE CUSTOMER WOULD PAY 3 MILLION AND ANOTHER

13       WOULD PAY 10 TIMES THAT."

14       A.   THAT WAS MY DEPOSITION, YES.

15       Q.   WE'RE NOT DISPUTING THAT 10 TIMES 3 IS 30?

16       A.   NO.

17       Q.   DO YOU WANT ME TO SHOW YOU YOUR DEPOSITION TESTIMONY?

18       A.   NO, NO.  I SAID I DON'T DISPUTE IT.  I JUST GAVE YOU A

19       RANGE, SOMEWHERE IN THE RANGE, YES.

20       Q.   THERE'S BEEN TESTIMONY AT THIS TRIAL ABOUT META'S BUG

21       BOUNTY PROGRAM.  DID YOU HEAR THAT WHILE YOU WERE HERE?

22       A.   I HEARD THAT.

23       Q.   ARE YOU FAMILIAR WITH THAT PROGRAM?

24       A.   I'M FAMILIAR WITH BUG BOUNTY PROGRAMS IN GENERAL, YES.

25       Q.   ARE YOU FAMILIAR WITH META'S BUG BOUNTY?
```

1    A.   NOT SPECIFICALLY.  I DON'T KNOW WHAT THEY HAD.

2    Q.   YOU WOULD AGREE WITH ME THAT NSO DID NOT PROVIDE

3    INFORMATION TO WHATSAPP ABOUT ITS SECURITY PURSUANT TO ANY

4    BUG BOUNTY PROGRAM?

5    A.   I AGREE.

6    Q.   I'M SORRY?

7    A.   I AGREE WITH YOU.

8    Q.   NSO WASN'T KNOWINGLY POINTING OUT ANY SECURITY FLAWS OR

9    ISSUES WITH WHATSAPP'S SYSTEMS; ISN'T THAT CORRECT?

10   A.   THIS IS CORRECT.

11   Q.   BECAUSE YOU WERE EXPLOITING THEM?  CORRECT?

12   A.   WHAT WAS THE QUESTION?

13   Q.   YOU WERE EXPLOITING THEM?

14   A.   WE DID NOT EXPLOIT.  WE DEVELOPED CYBER DEFENSE TEST

15   SYSTEMS FOR GOVERNMENTAL CUSTOMERS, AND WHATEVER THEY DO WITH

16   IT --

17   Q.   YOU TESTIFIED EARLIER THAT YOU HAD NO ILL WILL TOWARDS

18   WHATSAPP.  IS THAT CORRECT?

19   A.   THIS IS CORRECT.

20   Q.   IS THAT ALSO TRUE ABOUT THE INDIVIDUALS WHOSE PHONES YOUR

21   TECHNOLOGY WAS INSTALLED ON?  DO YOU HAVE ILL WILL TOWARDS

22   THEM?

23   A.   I DON'T EVEN KNOW WHO THEY ARE.

24   Q.   RIGHT.  AND YOU DIDN'T INTEND TO DO ANY HARM TO THEM?

25   A.   OF COURSE NOT.

1    Q.   EVEN THOUGH YOU DEVELOPED THE TECHNOLOGY THAT ALLOWED

2    GOVERNMENTS TO TAKE THEIR INDIVIDUAL INFORMATION?  THAT'S NOT

3    HARM TO YOU?

4    A.   I -- AGAIN, I'M -- I'M ACTING AS A GOVERNMENT CONTRACTOR

5    THAT DEVELOPS CYBER TOOLS FOR GOVERNMENT.  I DON'T INTEND TO

6    HARM ANYONE.

7    Q.   YOU JUST PROVIDE THE TECHNOLOGY THAT ALLOWS PEOPLE TO SPY,

8    BUT YOUR VIEW IS THAT YOU'RE NOT HURTING ANYBODY?

9    A.   IT'S NOT PEOPLE TO SPY.  IT'S GOVERNMENT TO COLLECT

10   INTELLIGENCE.

11   Q.   I THINK YOU ALSO TESTIFIED THAT YOU BECAME AWARE -- I

12   THINK YOU TESTIFIED YOU BECAME AWARE -- YOU'RE AWARE OF THE

13   COURT'S RULINGS; CORRECT?

14   A.   OF COURSE.

15   Q.   AND ON QUESTIONS BY YOUR COUNSEL, YOU WERE ASKED ABOUT

16   WHETHER YOU EVEN KNEW ABOUT CALIFORNIA LAW.

17   A.   I WAS ASKED THAT, YES.

18   Q.   RIGHT.  AT SOME POINT, YOU BECAME AWARE OF THIS LAWSUIT BY

19   NSO; RIGHT?

20   A.   BY --

21   Q.   SORRY.  THIS LAWSUIT BY WHATSAPP AND META; CORRECT?

22   A.   RIGHT.

23   Q.   I'M SORRY.  WE'RE BOTH -- IT'S THE END OF THE DAY, EVEN

24   THOUGH IT'S 1:30.  I'LL TRY TO GO A LITTLE SLOWER.

25        YOU'RE AWARE OF THIS LAWSUIT?

1    A.   I'M AWARE.

2    Q.   AND CERTAINLY BY THE TIME OF THIS LAWSUIT, YOU WERE AWARE

3    OF THE ALLEGATIONS OF VIOLATIONS OF LAW; RIGHT?

4    A.   AT SOME TIME AFTER THE LAWSUIT WAS SUBMITTED, YES.

5    Q.   AND YOU HEARD THE TESTIMONY FROM MR. GAZNELI THAT NSO

6    CONTINUED ITS ACTIVITY AS TO WHATSAPP EVEN AFTER THAT LAWSUIT

7    WAS FILED?

8    A.   AFTER THE LAWSUIT WAS FILED, I'M NOT SURE THAT MEANS WE

9    BECAME AWARE.  THAT'S NOT THE SAME THING.

10   Q.   YOU DIDN'T BECOME AWARE OF THIS LAWSUIT WHEN IT WAS FILED?

11   A.   I BELIEVE THAT NSO AND Q CYBER SHOWED UP TO THE LAWSUIT

12   SOMEWHERE IN 2020.

13   Q.   YOU UNDERSTAND THAT THE TESTIMONY FROM MR. GAZNELI WAS

14   THAT THE CONDUCT AT ISSUE IN THIS LAWSUIT CONTINUED AFTER THE

15   LAWSUIT WAS FILED?

16   A.   I UNDERSTAND.  AND I SAID THAT WE WERE NOT AWARE, EVEN

17   THOUGH IT WAS FILED.  WE BECAME AWARE OF IT AT A LATER STAGE.

18   SO THERE'S A GAP BETWEEN IT WAS FILED AND WE BECAME AWARE.

19   IT'S NOT THE SAME POINT IN TIME.

20   Q.   AND YOU HAVE LAWYERS IN THIS COURTROOM THAT HAVE BEEN

21   FIGHTING THIS LAWSUIT; CORRECT?

22   A.   YES.

23   Q.   AND YOU TESTIFIED THAT YOU HAD NO ILL WILL TOWARDS

24   WHATSAPP OR META, BUT YOU DIDN'T CONCEDE THE ALLEGATIONS IN

25   THIS LAWSUIT WHENEVER IT IS THAT YOU FOUND OUT ABOUT IT?

```
 1    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

 2            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

 3            THE COURT:  WHAT'S YOUR OBJECTION?

 4            MR. AKROTIRIANAKIS:  I THINK THAT THIS IS IRRELEVANT.

 5    IT'S NOT EVEN A QUESTION.  HE'S JUST MAKING AN ARGUMENT.

 6            MR. ANDRES:  I'M NOT -- YOUR HONOR, THERE WAS

 7    TESTIMONY THAT SOMEHOW THEY DIDN'T INTEND TO HARM WHATSAPP, BUT

 8    THEY HAVE FOUGHT THIS LAWSUIT TOOTH AND NAIL SINCE IT STARTED.

 9            THE COURT:  OKAY.  BUT THOSE ARE TWO DIFFERENT

10    ISSUES.

11       ONE IS LEGAL, MORE LEGAL THAN FACTUAL.

12       SUSTAINED.  PLEASE MOVE ON TO SOMETHING ELSE.

13    BY MR. ANDRES:

14    Q.   YOU UNDERSTAND NOW THAT THERE HAVE BEEN RULINGS WITH

15    RESPECT TO NSO VIOLATING THE LAW.  WE'RE CLEAR ABOUT THAT?

16    A.   I'M CLEAR, AND I DON'T INTEND TO VIOLATE IT IN ANY WAY.

17    Q.   AND YOU UNDERSTAND, AS A RESULT OF FINDING THAT YOUR

18    COMPANY VIOLATED STATE AND FEDERAL LAW, HAVE YOU TAKEN ANY

19    ACTION AT YOUR COMPANY IN TERMS OF FIRING THE PEOPLE THAT WERE

20    INVOLVED IN THAT CONDUCT?

21    A.   WE DON'T VIOLATE THE COURT RULING IN ANY WAY.

22    Q.   OKAY.  IS MR. GAZNELI, WHO WAS INVOLVED IN THE VIOLATIONS

23    THAT THE COURT FOUND, HAS HE BEEN FIRED?

24    A.   MR. GAZNELI IS A SENIOR MANAGEMENT OF OUR MANAGEMENT TEAM.

25    Q.   HAS HE BEEN SUSPENDED AS A RESULT OF THE CONDUCT VIOLATING
```

1    STATE AND FEDERAL LAW?

2    A.   I DON'T SEE A REASON, AND THE ANSWER IS NO.

3    Q.   YOU DON'T SEE A REASON BECAUSE YOU DON'T CARE THAT YOU

4    VIOLATED STATE AND FEDERAL LAW?

5    A.   I DIDN'T SAY THAT.

6    Q.   BUT NOBODY HAS HAD ANY REPERCUSSIONS AS A RESULT OF THOSE

7    VIOLATIONS OF LAW, FOR EXAMPLE, MR. GAZNELI?  CORRECT?  THERE

8    HAVE BEEN NO REPERCUSSIONS FOR HIS EMPLOYMENT?

9    A.   I SAID HE'S EMPLOYED IN THE COMPANY, YES.

10   Q.   THERE HAVE BEEN NO REPERCUSSIONS AS A RESULT OF THIS

11   COURT'S FINDING THAT NSO VIOLATED STATE AND FEDERAL LAW?

12   A.   OH.

13   Q.   CORRECT?

14   A.   CORRECT.

15   Q.   AND YOU UNDERSTAND THAT THIS LAWSUIT IS NOT ABOUT A

16   BUSINESS DISPUTE BETWEEN META AND NSO; CORRECT?

17   A.   I'M NOT SURE I UNDERSTAND.

18   Q.   META SUED NSO BECAUSE THEY WERE THE VICTIM OF A CYBER

19   ATTACK?

20   A.   I UNDERSTAND THAT'S THE COURT RULING, YEAH.

21   Q.   THAT META WAS THE VICTIM OF A CYBER ATTACK; CORRECT?

22   A.   I'M NOT SURE THIS IS THE RIGHT DEFINITION.

23   Q.   I ASK BECAUSE DURING HIS OPENING STATEMENT, YOUR LAWYER

24   SAID THAT THERE WAS A BUSINESS DISPUTE BETWEEN WHATSAPP AND

25   NSO; IS THAT CORRECT?

1           MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

2           MR. ANDRES:  YOU HEARD HIM SAYING THAT.

3           MR. AKROTIRIANAKIS:  HE'S NOT CONTROVERTING THE

4    COURT'S OPENING INSTRUCTIONS TO THE JURY.

5           THE COURT:  WELL, NO, HE'S ASKING A QUESTION ABOUT

6    SOMETHING YOU SAID IN YOUR OPENING.  YOU DESCRIBED IT AS A

7    BUSINESS DISPUTE.  SO THIS IS FAIR.

8    BY MR. ANDRES:

9    Q.   THIS -- YOU UNDERSTAND THAT META -- LET ME JUST ASK THE

10   QUESTION.  I'M SORRY.  I PROMISE I'LL LET YOU ANSWER.

11          YOU UNDERSTAND THAT THERE'S NO BUSINESS BETWEEN NSO AND

12   WHATSAPP; CORRECT?

13   A.   I BELIEVE IT WAS A BAD BUSINESS REASON TO SUE NSO.

14   Q.   OKAY.  I HAD A DIFFERENT QUESTION.

15   A.   SO I'M NOT SURE WHAT YOU SAY BUSINESS DISPUTE.  I VIEW

16   THIS AS BUSINESS DISPUTE BECAUSE THE REASONS FOR THE LAWSUIT

17   ARE BUSINESS.

18   Q.   NSO AND WHATSAPP, ASIDE FROM THE TERMS OF SERVICE, DON'T

19   HAVE ANY CONTRACTS WITH ONE ANOTHER?

20   A.   BUT YOU SUED US ABOUT THIS AGREEMENT, SO -- YOU SAID THAT

21   THE TERMS OF SERVICE IS A BUSINESS AGREEMENT, AND YOU BLAME US

22   OF VIOLATING IT.  SO I GUESS WE HAVE SOME BUSINESS RELATIONSHIP

23   HERE, ACCORDING TO YOU AT LEAST.

24   Q.   WELL, THAT BUSINESS DISPUTE RELATES TO NSO SIGNING UP FOR

25   WHATSAPP; CORRECT?  YOUR COMPANY USED WHATSAPP'S ACCOUNTS?

1    A.   SO I'M NOT SURE WE SIGNED, BECAUSE IF WE DIDN'T SIGN,

2    MAYBE NEXT, NEXT, NEXT.

3         BUT WE WERE FOUND TO VIOLATE THE TERMS OF SERVICE.  I

4    DON'T DISPUTE THAT.

5    Q.   WELL, I THINK YOU JUST DID.

6         YOU HAD A CONTRACT THAT WAS THE TERMS OF SERVICE; CORRECT?

7    A.   YOU SAID WE SIGNED IT.  WE DIDN'T SIGN AN AGREEMENT.

8    THAT'S WHAT YOU SAID.

9    Q.   YOU AGREED TO A TERMS OF SERVICE THAT YOU VIOLATED; RIGHT?

10   A.   WE VIOLATED THE TERMS OF SERVICE.

11   Q.   OKAY.  SO THERE -- ASIDE FROM THAT, THERE IS NO BUSINESS

12   RELATIONSHIP BETWEEN WHATSAPP AND NSO; CORRECT?

13   A.   THIS IS NOT A BUSINESS RELATIONSHIP.  BUT I THINK THE

14   REASON FOR THIS LAWSUIT IS BUSINESS.  I DON'T -- I DO NOT -- I

15   DON'T KNOW HOW TO DESCRIBE IT OTHERWISE.

16   Q.   EVEN THOUGH THERE'S NO BUSINESS BETWEEN THE TWO COMPANIES?

17   A.   IT'S DEFINITELY NOT -- WHAT OTHER KIND OF DISPUTE IS IT?

18   A BUSINESS DISPUTE.

19   Q.   IT'S A DISPUTE BECAUSE WHATSAPP IS THE VICTIM OF A CYBER

20   ATTACK AS THE COURT RULED; RIGHT?

21   A.   I'M NOT SURE IT -- I DON'T WANT TO BE MISTAKEN.  I'M NOT

22   SURE THAT THE COURT DECIDED THAT WHATSAPP IS A VICTIM.

23        THE COURT RULED THAT WE VIOLATED THE AGREEMENT.

24        MR. ANDRES:  YOUR HONOR, IT'S TIME, BUT I JUST -- CAN

25   I ASK ONE MORE QUESTION?

```
 1                    THE COURT:  YES.

 2                    MR. ANDRES:  OKAY.

 3              DO WE HAVE THE, THE EXHIBIT FROM MR. SHOHAT'S DEPOSITION

 4       VIDEO?  THE SLIDE?  CAN YOU PUT THAT UP?  CAN YOU PUT IT UP

 5       THERE?

 6              OH, YOUR HONOR, THIS IS JUST FROM MR. SHOHAT'S VIDEO

 7       YESTERDAY, SO IT'S ALREADY BEEN ADMITTED.

 8                    THE COURT:  ALL RIGHT.

 9                    MR. ANDRES:  CAN WE PUT IT UP ON THE SCREEN?

10                    THE COURT:  YES.

11       BY MR. ANDRES:

12       Q.   OKAY.  MR. SHOHAT, THIS IS THE LAST QUESTION I'M GOING TO

13       ASK TODAY, OR LAST SERIES OF QUESTIONS.  THERE'S MORE THAN ONE

14       QUESTION.

15              YOU WERE HERE YESTERDAY WHEN YOUR DEPOSITION WAS PLAYED?

16       A.   YES, I WAS.

17       Q.   THAT'S YOU?  I MEAN, THAT'S NOT --

18       A.   THAT WAS ME.

19       Q.   AND THAT DEPOSITION WAS TAKEN IN AUGUST OF 2024; CORRECT?

20       A.   CORRECT.

21       Q.   AND PRIOR TO ANSWERING THOSE QUESTIONS IN THAT DEPOSITION,

22       YOU TOOK AN OATH TO TELL THE TRUTH; RIGHT?

23       A.   YES.

24       Q.   AND THAT WAS UNDER THE PENALTY OF PERJURY?

25       A.   YES.
```

1      Q.   RIGHT?

2           AND SO YOU TOLD THE TRUTH IN THAT VIDEO WHEN YOU WERE

3      DEPOSED; RIGHT?

4      A.   I DID, YEAH.

5                MR. ANDRES:  OKAY.  YOUR HONOR, I'M GOING TO HAVE A

6      LITTLE MORE TOMORROW, BUT I'M HAPPY TO STOP AND TAKE A BREAK AT

7      THAT POINT.

8                THE COURT:  ALL RIGHT.

9                MR. ANDRES:  I DON'T WANT TO BE THE ONE THAT KEEPS

10     ANYBODY LATER.

11               THE COURT:  ALL RIGHT.

12          LADIES AND GENTLEMEN OF THE JURY, WE ARE NOW AT THE END OF

13     OUR TRIAL DAY.  YOU ARE EXCUSED.

14          KEEP IN MIND THE INSTRUCTION THAT I GIVE YOU EVERY SINGLE

15     DAY.

16          YES, LEAVE THE EXHIBITS ON YOUR SEATS, AND THEY WILL BE

17     COLLECTED.

18          AND WE'LL SEE YOU TOMORROW MORNING.  THANK YOU.

19               THE CLERK:  ALL RISE FOR THE JURY.

20          (JURY OUT AT 1:31 P.M.)

21               THE COURT:  ALL RIGHT.  THANK YOU.

22          MR. SHOHAT, YOU CAN STEP DOWN.

23               THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR.

24               THE COURT:  OKAY.  ALL RIGHT.

25          COUNSEL, ARE THERE ISSUES THAT YOU WOULD LIKE TO TALK

```
 1    ABOUT?

 2              MR. CRAIG:  YOUR HONOR, THIS IS AARON CRAIG.

 3         I BELIEVE THAT -- WELL, TO KNOW THE ORDER OF WITNESSES

 4    WE'RE GOING TO CALL TOMORROW AND WHICH ONES THERE ARE, THE VERY

 5    BELATED OBJECTIONS ABOUT MS. GLICK'S VIDEO THAT WE JUST GOT --

 6              THE COURT:  OH, I DID -- YOU KNOW, I HAD A CHANCE TO

 7     READ HER -- THE TRANSCRIPT.

 8         I DON'T UNDERSTAND, WHAT'S THE PURPOSE -- THIS SEEMS LIKE

 9    AN OPENING, TO EITHER SIDE, I DON'T QUITE UNDERSTAND WHY YOU

10    WANT IT IN AND WHY THERE'S AN OBJECTION.

11         WHAT IS -- WHAT'S IMPORTANT ABOUT MS. GLICK'S TESTIMONY?

12              MR. AKROTIRIANAKIS:  WELL, SHE MAKES TWO POINTS.

13         ONE IS THAT THEY DIDN'T HAVE A LEGAL OBLIGATION TO ENGAGE

14    IN THIS NOTIFICATION PROJECT THAT IS THE SECOND HALF OF THE

15    POST-MAY 13TH, 2019 PART OF THE CASE, YOUR HONOR.

16         AND THE OTHER ONE IS THAT, RELATEDLY, THAT SHE INFORMED

17    THE CEO OF THE COMPANY, MR. CATHCART, THAT THEY HAD RESOLVED,

18    REMEDIATED THE ISSUES RELATIVE TO THIS CASE IN MAY 2019.

19              THE COURT:  OKAY.  THOSE ARE THE TWO POINTS.

20              MR. AKROTIRIANAKIS:  YES, AND THAT'S WHY IT'S SO

21     BRIEF, YOUR HONOR.

22              MR. ANDRES:  YOUR HONOR --

23              THE COURT:  OKAY.  AND WITH REGARD TO 1021, THE

24     EXHIBIT, I DON'T REMEMBER.  IS THIS IN OR OUT?

25              MR. AKROTIRIANAKIS:  IT'S NOT IN YET BECAUSE WE
```

1    HAVEN'T PLAYED THE VIDEO.  BUT THE COURT HAS ALREADY RULED ON

2    THE OBJECTIONS THAT WERE MADE TO THAT, YOUR HONOR.  WE'VE

3    REDACTED IT CONSISTENT WITH THE COURT'S OTHER RULING AT THE

4    FURTHER, SECOND PRETRIAL -- SECOND FINAL PRETRIAL CONFERENCE,

5    AND THE COURT HEARD ARGUMENT AND RULED ON THE ADMISSIBILITY, OR

6    THE OBJECTIONS, I SHOULD SAY, TO THAT, WHICH I THINK IS AMPLY

7    AUTHENTICATED IN TERMS OF ITS ADMISSIBILITY BY MS. GLICK'S

8    TESTIMONY AS SHE WAS THE AUTHOR OF IT.

9            THE COURT:  OKAY.  ALL RIGHT.

10       IS THAT IT?

11           MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

12           MR. ANDRES:  JUST BRIEFLY, YOUR HONOR.  NOBODY IS

13   ARGUING THAT THERE WAS A LEGAL OBLIGATION.  COUNSEL IS ONCE

14   AGAIN MISCONSTRUING THE REQUIREMENTS FOR COMPENSATORY DAMAGES.

15       THERE DOESN'T HAVE TO BE A LEGAL OBLIGATION TO NOTIFY

16   ONE'S USERS.

17       AND BY THE WAY, MS. GLICK IS NOT A LAWYER, AND NOTHING

18   ABOUT THE GDPR, WHICH THEY'VE INCLUDED, THE EUROPEAN PRIVACY

19   LAW, IS RELEVANT.

20       THEY WANT TO SAY THAT THERE'S A LEGAL OBLIGATION, WHICH IS

21   WHY THEY INCLUDE THE PART ABOUT HOW SHE WENT TO LAW SCHOOL

22   AFTER SHE LEFT META, WHICH IS, YOU KNOW, AGAIN, ABSURD.

23       THEY WANT TO SAY SHE'S A LAWYER.  THEY WANT TO ASK HER

24   ABOUT A LEGAL OBLIGATION.  NONE OF THAT IS RELEVANT.

25           MR. AKROTIRIANAKIS:  IT'S ALREADY EXCISED FROM THE

1       TRANSCRIPT.

2               THE COURT:  HOLD ON.  LET HIM FINISH.

3               MR. ANDRES:  THEY ALSO ARE TRYING TO RAISE

4       MARK ZUCKERBERG'S NAME IN THIS CASE.  I DON'T KNOW WHY.

5               BUT SHE DRAFTED AN EMAIL TO GO TO HER BOSS.  THERE'S NO

6       EVIDENCE THAT THAT EMAIL EVER WENT TO MARK ZUCKERBERG OR

7       SHERYL SANDBERG.  IT'S A SIDE SHOW.

8               BY THE WAY, THAT EMAIL SHOULD ALSO BE EXCISED BECAUSE YOU

9       SEE THE LAST LINE IN THE EMAIL, IT TALKS ABOUT THESE RISKS,

10      RIGHT?  AFTER THAT YOU SEE ALL BLACK, BECAUSE AFTER THAT IS

11      CITIZENS LAB, WHICH YOUR HONOR SAID IS OUT.  IT TALKS ABOUT

12      INDIA, WHICH YOUR HONOR RULED CAN'T COME IN.  IT TALKS ABOUT

13      MEXICO.

14              IT TALKS ABOUT THE CIVIL RIGHTS INDIVIDUALS, THE

15      JOURNALISTS, AND ALL OF THE VICTIMS THAT AREN'T SUPPOSED TO

16      COME IN IN THIS CASE THAT THEIR CLIENT WAS TARGETING IN THIS

17      HACK.

18              SO TO CUT UP THE EMAIL IN THIS WAY AND INCLUDE THAT LINE

19      THAT TALKS ABOUT RISKS AND THEN BLACK EVERYTHING OUT, IT'S ALL

20      IRRELEVANT.

21              SUSAN GLICK HAS NOTHING RELEVANT TO SAY ABOUT THIS CASE,

22      AND HER ENTIRE TESTIMONY SHOULD BE EXCLUDED, AS SHOULD THAT

23      EMAIL, WHETHER OR NOT YOUR HONOR HAS RULED ON IT OR NOT.

24              MR. NOLLER:  YOUR HONOR, PLAINTIFFS LIKE TO ACCUSE

25      DEFENDANTS OF RELITIGATING DECISIONS YOUR HONOR HAS ALREADY

837

```
 1         MADE.  YOUR HONOR REJECTED THEIR OBJECTIONS TO THIS EXHIBIT

 2         YESTERDAY, RULED THAT IT CAN COME IN, AND YOU'RE HEARING

 3         RE-LITIGATION OF THAT SAME ISSUE ONCE MORE.

 4              AND WE'RE NOT -- THE REASON FOR THE DOCUMENT IS NOT TO

 5         RAISE MARK ZUCKERBERG'S NAME.  IT'S NOT TO RAISE

 6         SHERYL SANDBERG'S NAME.  IT'S TO SHOW THAT MS. GLICK SENT THAT

 7         EMAIL, ACTUALLY SENT, NOT DRAFTED AND MAYBE SENT, ACTUALLY SENT

 8         THAT EMAIL TO HER BOSS, THE CEO OF WHATSAPP, WILL CATHCART,

 9         DESCRIBING WHAT WAS HAPPENING IN THE INVESTIGATION THAT IS THE

10         VERY SUBJECT OF THE DAMAGES CLAIM THAT PLAINTIFFS ARE SEEKING

11         IN THIS CASE.

12              WE'VE REDACTED THE INFORMATION THAT COUNSEL WAS JUST

13         COMPLAINING ABOUT.  NONE OF THAT IS GOING TO BE SHOWN TO THE

14         JURY.  ALL THAT'S GOING TO BE SHOWN TO THE JURY IS THE

15         STATEMENT THAT THE REMEDIATION WAS FINISHED IN MAY.

16              AND AS FOR THE LEGAL OBLIGATION TO INFORM PLAINTIFF'S

17         USERS, WE'RE NOT ARGUING, WE'RE NOT GOING TO TELL THE JURY THAT

18         FACEBOOK OR WHATSAPP HAD TO HAVE A LEGAL OBLIGATION FOR THOSE

19         EXPENSES TO BE COMPENSABLE, BUT WE THINK IT'S RELEVANT.

20              AND IF YOU LOOK AT THE INSTRUCTION THAT THIS COURT HAS

21         APPROVED ON THE LOSSES THAT ARE COMPENSABLE UNDER THE COMPUTER

22         FRAUD AND ABUSE ACT, I UNDERSTAND YOUR HONOR MAY MAKE SOME

23         CHANGES TO THAT, BUT THE ACTUAL CATEGORIES OF COMPENSABLE

24         LOSSES, WHICH COME STRAIGHT FROM THE STATUTE, I THINK IF YOU

25         LOOK AT THOSE, YOU'LL SEE THERE'S NOTHING IN THERE THAT
```

1    SPECIFICALLY ADDRESSES NOTIFYING USERS, THINGS LIKE THAT.

2         AND, AGAIN, THAT DOESN'T MEAN IT'S CATEGORICALLY

3    UNAVAILABLE.  BUT IT DOES GIVE THE PARTIES THE RIGHT TO ARGUE

4    TO THE JURY WHETHER, IN NOTIFYING THEIR USERS, THEY WERE DOING

5    THAT BECAUSE THEY HAD TO, BECAUSE THEY NEEDED TO AS A RESPONSE

6    TO THE CONDUCT IN THIS CASE, OR FOR SOME OTHER REASON, SOME

7    BUSINESS REASON OR SOME REASON UNRELATED TO NSO, AND THAT'S A

8    QUESTION FOR THE JURY TO DECIDE.

9         IT'S NOT A QUESTION TO BE EXCLUDED SIMPLY BECAUSE THE

10   PLAINTIFFS DON'T AGREE WITH DEFENDANTS' THEORY OF THE CASE.

11   THAT'S THE JURY'S JOB.

12        MR. ANDRES:  YOUR HONOR, TWO SECONDS.

13        FIRST OF ALL, WE ARE RELITIGATING THE EMAIL.  NO QUESTION.

14   GUILTY AS CHARGED.

15        BUT IT'S COMING IN IN THE CONTEXT OF HER TESTIMONY, WHICH

16   WE'VE NEVER RAISED BEFORE, AND HER TESTIMONY ABOUT THE EUROPEAN

17   PRIVACY ACT AND THAT SHE WENT TO LAW SCHOOL.

18        MR. NOLLER:  COUNSEL, COUNSEL.

19        MR. ANDRES:  EXCUSE ME.

20        THE COURT:  HOLD ON.

21        MR. ANDRES:  BY THE WAY, THE FACT THAT ONE GUY GETS

22   UP HERE, GUY B, AND SAYS THE OPPOSITE OF GUY A, DOESN'T MEAN

23   THAT THEY'RE NOT ARGUING THAT THERE IS SOME --

24   MR. AKROTIRIANAKIS JUST SAID, WE'RE GOING TO ARGUE THAT THERE

25   WAS A LEGAL OBLIGATION TO NOTIFY THE CUSTOMERS.

```
1              MR. AKROTIRIANAKIS:  I SAID NO LEGAL OBLIGATION.

2              MR. ANDRES:  AND THIS GENTLEMEN JUST SAID THE

3     OPPOSITE.  BY THE WAY, IT IS NOT THE LAW.  SO THEY ARE TRYING

4     TO MISLEAD THE JURY AGAIN.

5              MR. NOLLER:  MR. ANDRES IS SPEAKING --

6              THE COURT:  ALL RIGHT.  BUT ONE OF THE CLAIMS OF

7     DAMAGES IS ON -- PART OF THE COMPENSATORY DAMAGES ARE BASED

8     UPON ACTIVITIES SURROUNDING THE NOTIFICATION OF USERS IN

9     SEPTEMBER OF 2019, IS IT NOT?  ISN'T THAT PART OF THE

10    COMPENSATORY DAMAGES THEORY?

11             MR. ANDRES:  YES.

12             THE COURT:  OKAY.  ALL RIGHT.

13             MR. ANDRES:  AND THERE IS ONE LITTLE PIECE IN THERE

14    ABOUT HER TESTIMONY.  SO IF YOU WANT TO PLAY THAT ONE LINE FOR

15    HER TESTIMONY, THAT'S FINE.

16         BUT THAT'S NOT RELEVANT TO THE EMAIL BECAUSE THE EMAIL

17    TALKS ABOUT NOTIFYING CITIZENS LAB, WHICH IS OUT; AND NOTIFYING

18    JOURNALISTS, WHICH I ASSUME THEY DON'T WANT TO COME IN.

19             THE COURT:  WELL, THE --

20             MR. ANDRES:  YOU HAVE THE REDACTED VERSION.

21             THE COURT:  THIS HAS BEEN HEAVILY REDACTED.

22             MR. ANDRES:  IT -- IT'S NOT RELEVANT, YOUR HONOR.

23             THE COURT:  I'VE READ IT.  THEY'RE ENTITLED TO MAKE

24    WHATEVER ARGUMENTS THEY WANT.

25         I WILL REQUIRE TWO EXCISIONS, HOWEVER.  ONE IS THAT THE
```

840

1    REFERENCE THAT SHE WENT TO LAW SCHOOL AFTERWARDS.  SHE'S NOT

2    OFFERED AS ANY KIND OF A LEGAL EXPERT, SHE'S NOT COUNSEL.

3    THAT'S IRRELEVANT.

4         AND THE LAST SENTENCE, THE LAST QUESTION AND ANSWER NEED

5    TO BE EXCISED.

6              MR. NOLLER:  UNDERSTOOD.

7              THE COURT:  THAT ANSWER IS NOT RESPONSIVE TO THE

8    QUESTION, AND IT POTENTIALLY OPENS UP A WHOLE DOOR ABOUT USERS,

9    WHICH I DO NOT WISH TO DO.

10             MR. NOLLER:  THANK YOU, YOUR HONOR.

11             MR. ANDRES:  AND THE LAST LINE OF THE EMAIL,

12   YOUR HONOR, THAT TALKS ABOUT RISK, THAT'S NOT RELEVANT TO THE

13   ISSUE THAT YOU JUST IDENTIFIED.

14             THE COURT:  WHAT RISK?

15             MR. ANDRES:  THE LAST LINE OF THE EMAIL THAT'S IN

16   BOLD TALKS ABOUT THE RISKS.

17             THE COURT:  OH, RIGHT.

18             MR. ANDRES:  RIGHT?  THEY --

19             THE COURT:  NO, NO, NO YOU'RE RIGHT.  AND THAT

20   ACTUALLY REFERS TO THE REDACTED PART, SO THAT SENTENCE SHOULD

21   BE REDACTED AS WELL.

22             MR. NOLLER:  THAT CAN BE REDACTED AS WELL.  THANK

23   YOU, YOUR HONOR.

24             THE COURT:  BUT OTHERWISE YOU CAN PLAY THE SNIP WITH

25   THOSE TWO EXCISIONS AND THE DOCUMENT WILL BE ADMITTED WITH THAT

1    ADDITIONAL REDACTION OF THE LAST LINE.

2            MR. NOLLER:  UNDERSTOOD, YOUR HONOR.  THANK YOU.

3            THE COURT:  OKAY.  ALL RIGHT.

4        NOW, I'D LIKE TO TAKE A BREAK.  AND I REALLY HAVE SORT OF

5    HAD ENOUGH TODAY, BUT IF THERE ARE OTHER ISSUES, HAVING HEARD

6    THE TESTIMONY, WHICH WAS QUITE INTERESTING THIS AFTERNOON,

7    HAVING HEARD THE TESTIMONY, DO WE NEED TO GO OVER ANY OF THE

8    OTHER ISSUES ON YOUR LIST?

9            MR. ANDRES:  YOUR HONOR, I'M HAPPY TO BREAK FOR THE

10    DAY.  THE ONLY THING I'D LIKE TO UNDERSTAND IS THE SCHEDULE,

11    AND HERE'S MY ONLY -- WHATEVER, WHATEVER WORKS FOR THE COURT.

12            BEFORE WE CLOSE, I'D LIKE TO UNDERSTAND AND HAVE THE

13    CHARGING CONFERENCE, UNDERSTAND WHAT THE JURY INSTRUCTIONS SAY.

14    SO PRESUMABLY WE CAN DO THAT TOMORROW.  BUT I DON'T KNOW IF

15    YOUR HONOR WAS PLANNING ON PROVIDING THE REVISED INSTRUCTIONS

16    SO THAT WE CAN LOOK AT THEM AND ARGUE ABOUT THEM, OR WHAT --

17    HOW WE SHOULD PLAY IT -- THAT'S THE ONLY ISSUE I HAVE.  WE'LL

18    BE READY TO GO TOMORROW AND READY TO CLOSE ON MONDAY IF NSO IS

19    GOING TO REST TOMORROW.

20            THE COURT:  OKAY.  I ASSUME -- I'M HOPEFUL THAT NSO

21    WILL REST TOMORROW, AND I WAS PLANNING TO SPEND PART OF THE

22    AFTERNOON WITH YOU ALL SETTLING THE JURY INSTRUCTIONS.

23            MR. ANDRES:  WONDERFUL.

24            THE COURT:  SO THAT WE COULD GO RIGHT INTO CLOSING

25    ARGUMENTS AND INSTRUCTIONS ON MONDAY MORNING AND GIVE THE JURY

1        THE AFTERNOON -- AT LEAST PART OF -- MOST OF THE AFTERNOON, AT

2    LEAST, TO BEGIN THEIR DELIBERATIONS.

3            SO THAT'S WHAT I'D LIKE TO DO.

4            SO I DO WANT TO KNOW WHO THE WITNESSES WILL BE TOMORROW.

5            IN TERMS OF THE INSTRUCTIONS, I HAVEN'T HAD -- I JUST MADE

6    THE DECISION TODAY THAT I THOUGHT THAT WAS THE WAY TO KIND OF

7    CURE IT.  I READ THIS TRANSCRIPT LAST NIGHT, AND I THOUGHT,

8    HMM, I NEED TO REVISIT SOME OF THOSE.

9            I'M GOING TO GO BACK AND LOOK AT FORMER PRIOR VERSIONS OF

10   THE SUBMITTED INSTRUCTIONS AND COMPARE THEM.  I RECALL THE MAIN

11   INSTRUCTIONS ARE THE PUNITIVE DAMAGES INSTRUCTION, THE

12   DEFENDANTS' NUMBER 2, AND PLAINTIFFS' 2, 3, AND 4 ON THE

13   ELEMENTS OF THE VIOLATIONS, AND COMPENSATORY DAMAGES.

14           SO WE'RE TALKING ABOUT ROUGHLY FOUR OR FIVE INSTRUCTIONS,

15   ALL THE ORIGINAL ONES, BECAUSE I REJECTED THEM AS HAVING TOO

16   MUCH DETAIL, BUT NOW I THINK THERE PROBABLY NEEDS TO BE EVEN

17   MORE DETAIL, FRANKLY.

18           BUT I NEED TO THINK ABOUT IT IN CONTEXT OF WHAT WAS

19   SUBMITTED.

20           SO WE HAVE TO -- WE HAVE SOME WORK TO DO TOMORROW.

21               MR. ANDRES:  SOUNDS GREAT.

22               THE COURT:  AND WE MIGHT HAVE TO REWRITE THEM.

23               MR. ANDRES:  SOUNDS GREAT.  THANK YOU, YOUR HONOR.

24   THAT WORKS FOR US.

25               THE COURT:  OKAY.

843

1        MR. NOLLER:  YOUR HONOR, I JUST WANTED TO, FOR

2    CLARITY ON ONE POINT AS TO THE JURY INSTRUCTIONS, WE HAD

3    ORIGINALLY SUBMITTED, I THINK IT WAS INSTRUCTION NUMBER 2 ON

4    THE FINDINGS ON CFAA.  THE COURT REJECTED THAT ONE AS TO --

5        THE COURT:  SKIMPY.

6        MR. NOLLER:  SKIMPY WAS, YES, THE WORD YOU USED.

7      SO I THINK FOR PURPOSES WHAT YOU LOOK AT IN THE FUTURE, IT

8    MIGHT BE BETTER TO LOOK AT THE ONE WE SUBMITTED AFTER THAT,

9    BECAUSE WE'D BE HAPPY FOR THAT TO BE THE ONE THAT WE GO WITH,

10   YOUR HONOR.

11       THE COURT:  ACTUALLY, MY INTENT WAS TO LOOK AT -- I

12   THINK I HAVE THREE OR FOUR VERSIONS OF SOME OF THEM, TO LOOK AT

13   ALL OF THEM BEFOREHAND.

14       MR. NOLLER:  THANK YOU, YOUR HONOR.

15       THE COURT:  AND TO COMPARE IT WITH THE LANGUAGE IN

16   THE SUMMARY JUDGMENT ORDER.

17       MR. NOLLER:  UNDERSTOOD.

18       MR. ANDRES:  THANKS, YOUR HONOR.  HAVE A NICE

19   AFTERNOON.

20       THE COURT:  IS THAT ENOUGH?

21       MR. ANDRES:  WE'RE ALL GOOD.  WE APPRECIATE YOUR TIME

22   AS ALWAYS, YOUR HONOR.  THANK YOU.

23       THE COURT:  ALL RIGHT.

24       MR. ANDRES:  HAVE A NICE AFTERNOON.

25       MR. NOLLER:  THANK YOU, YOUR HONOR.

```
 1              THE COURT:  AND FOR YOU ALL, TOO.

 2              THE CLERK:  JUDGE, DID YOU WANT THEM TO TELL YOU THE

 3    WITNESSES FOR TOMORROW?

 4              THE COURT:  OH, YES.  WAIT.  WITNESSES FOR TOMORROW?

 5              MR. ANDRES:  OH, YES.

 6              MR. AKROTIRIANAKIS:  SO I DON'T KNOW HOW MUCH LONGER

 7    WE HAVE WITH MR. SHOHAT'S CROSS-EXAMINATION.  I HAVE BRIEF -- I

 8    THINK, FRANKLY, THAT THE CROSS-EXAMINATION HAS OPENED THE DOOR

 9    NOW TO SOME ISSUES, YOUR HONOR, SO I'LL HAVE SOME BRIEF

10    REDIRECT EXAMINATION, AND THEN IT WAS MY INTENTION TO CALL

11    MR. GAZNELI NEXT TO TESTIFY THAT HE STILL WORKS AT NSO AND SOME

12    OF THE OTHER THINGS ABOUT THE DEFENSE OF THE CASE.

13          AND THEN WE'LL PLAY THE GLICK VIDEO AT SOME POINT WHEN

14    THERE'S SEVEN MINUTES TO SPARE, OR -- IT'LL BE LESS THAN THAT

15    NOW WITH THE COURT'S NEW EXCISIONS.

16          AND THEN THERE WILL PROBABLY BE -- I HAD HOPED THAT WE'D

17    BE FURTHER ALONG TODAY.  MR. BARCONS PALAU WAS SUPPOSED TO BE

18    HERE TODAY.  I ASSUME HE IS.

19          AND THERE MAY BE A COUPLE OF OTHER SHORT EMPLOYEE

20    WITNESSES THAT'LL BE CALLED FOR -- ADVERSELY, YOUR HONOR -- OH,

21    AND THEN MR. PINSONNEAULT.

22              THE COURT:  THIS IS ALL SO CLOUDY.

23              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

24              THE COURT:  WHO'S GOING TO -- I MEAN, WE HAVE ONE

25    MORE DAY OF TRIAL.  WHO ARE THE WITNESSES?  WE SHOULD KNOW THAT
```

```
 1          BY NOW.

 2                  MR. AKROTIRIANAKIS:  I THOUGHT I JUST LISTED THEM,

 3          YOUR HONOR.

 4                  THE COURT:  BUT YOU'RE NOT SURE WHO'S GOING TO BE

 5          CALLED.  JUST TELL ME, WHO DO YOU PLAN TO CALL?

 6                  MR. AKROTIRIANAKIS:  AS I SAID, MR. SHOHAT IS STILL

 7          ON THE STAND, I HAVE A LITTLE BIT MORE TO DO WITH HIM; I HAVE

 8          MR. GAZNELI; THEN WE HAVE THE GLICK VIDEO THAT WE JUST TALKED

 9          ABOUT; WE HAVE MR. PINSONNEAULT, OUR --

10                  THE COURT:  DAMAGES.

11                  MR. AKROTIRIANAKIS:  -- ECONOMIST THAT OF COURSE IS

12          PROBABLY GOING TO TESTIFY NEAR THE END; AND THERE ARE PROBABLY

13          THREE, THREE, TWO, OR ONE VERY SHORT, I HOPE, CROSSES OF

14          EMPLOYEES WHO WORKED ON THE PROJECT, AND THERE IS -- I ASKED

15          THAT MR. BARCONS PALAU -- NO, THE OTHER GENTLEMAN,

16          MR. ROBINSON, AND I THINK I CAN DO IT WITH THIS MUCH OF HIS

17          DEPOSITION.  HE DOESN'T NEED TO COME BACK.

18                  THE COURT:  AND ON THE 2, 3, OR 4, YOU'RE TALKING

19          ABOUT VIDEO EXCERPTS?

20                  MR. AKROTIRIANAKIS:  NO, THEY'RE LIVE WITNESSES.

21                  MR. ANDRES:  I'M NOT SAYING THEY'RE NOT GOING TO TELL

22          US, BUT WE NEED TO KNOW.

23                  MR. AKROTIRIANAKIS:  I CAN TELL YOU WHO THEY ARE.

24          IT'S MR. BARCONS PALAU THAT WE JUST MENTIONED, AND MR. GAUTAM,

25          AND MR. WANG, YOUR HONOR.
```

846

```
 1              MR. ANDRES:  SO WE'RE SUPPOSED TO HAVE THOSE PEOPLE

 2      IN THE COURTROOM TOMORROW?

 3              THE COURT:  IS THAT WHAT YOU'RE ASKING THEM TO DO?

 4              MR. AKROTIRIANAKIS:  YEAH, THOSE PEOPLE HAVE BEEN

 5      SUBPOENAED, YOUR HONOR.

 6              THE COURT:  OKAY.

 7              MR. ANDRES:  YES, BUT THEY HAVEN'T BEEN TOLD WHEN

 8      THEY'RE SUPPOSED TO BE HERE.

 9              THE COURT:  TOMORROW MORNING, 8:30.

10              MR. AKROTIRIANAKIS:  AND, YOUR HONOR, IF -- I WILL,

11      OF COURSE, CONSIDER THE CASE AS A WHOLE THIS EVENING AND SO ON,

12      AND IF ANY OF THOSE PEOPLE ARE UNNECESSARY, I DON'T MEAN TO PUT

13      THEM TO TROUBLE, I WILL SEND TO MR. ANDRES INDIVIDUALLY AN

14      EMAIL SO STATING.

15              MR. ANDRES:  YEAH, THAT'S NOT HELPFUL.  HE CAN SEND

16      IT TO THE WHOLE TEAM.  JUST FOR THE SKETCHY PART THAT I WAS

17      CONCERNED ABOUT WAS NOT -- THEM NOT NAMING THE WITNESSES, BUT

18      THAT THIS SOMEHOW OPENED THE DOOR TO SOME NEW ISSUES THAT

19      YOUR HONOR HAS RULED ON.  I DON'T THINK I DID THAT, BUT IF

20      THAT'S GOING TO BE AN ISSUE, WE CAN'T BE IN A POSITION THAT WE

21      WERE TODAY WHERE NSO'S LAWYERS ARE ASKING THINGS THAT ARE NOT

22      CONSISTENT WITH THE COURT'S ORDER.

23          SO HE DOESN'T HAVE TO DO IT NOW, BUT IF THERE ARE SOME

24      THINGS THAT HE THINKS NOW HAVE TO BE RELITIGATED IN LIGHT OF

25      YOUR COURT'S RULINGS, I THINK WE NEED TO KNOW WHAT THAT IS.
```

```
 1              THE COURT:  I DON'T THINK ANYTHING NEEDS TO BE

 2      RELITIGATED.  I'M NOT INTERESTED IN RELITIGATING ANYTHING.

 3          SO I'VE MADE MY POSITION CLEAR ON THESE ITEMS.  I CAN'T

 4      IMAGINE, COUNSEL, THAT YOU --

 5              MR. AKROTIRIANAKIS:  I DON'T NEED CLARITY,

 6      YOUR HONOR.

 7              THE COURT:  YOU DON'T NEED ANY MORE CLARITY THAN WHAT

 8      I'VE GIVEN.

 9              MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE ADJOURNED.

11              MR. ANDRES:  GOOD NIGHT, YOUR HONOR.  OR GOOD

12      AFTERNOON.

13              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

14          (THE EVENING RECESS WAS TAKEN AT 1:48 P.M.)

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18

19        _____
          LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  MAY 1, 2025

22

23

24

25