1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4

5   WHATSAPP LLC AND META          )   C-19-07123 PJH
    PLATFORMS, INC.,               )
6                                  )   OAKLAND, CALIFORNIA
                                   )
            PLAINTIFFS,            )
7                                  )   MAY 5, 2025
            VS.                    )
8                                  )   VOLUME 6
    NSO GROUP TECHNOLOGIES LIMITED )
9   AND Q CYBER TECHNOLOGIES       )   PAGES 1176-1369
    LIMITED,                       )
10                                 )
            DEFENDANTS.            )
11  _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14            UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

1

2      <u>APPEARANCES (CONTINUED)</u>

3

4      FOR THE DEFENDANTS:     KING & SPALDING
                               BY:  JOSEPH N. AKROTIRIANAKIS
5                                   AARON S. CRAIG
                               633 WEST FIFTH STREET, SUITE 1600
6                              LOS ANGELES, CALIFORNIA  90071

7                              BY:  MATTHEW V. NOLLER
                               50 CALIFORNIA STREET, SUITE 3300
8                              SAN FRANCISCO, CALIFORNIA  94111

9

10     ALSO PRESENT:           CURT EVANS
                               BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX OF WITNESSES

3       DEFENDANTS'

4       **SUSAN GLICK**
             VIDEOTAPED DEPOSITION PLAYED              P. 1186
5

6

7       PLAINTIFFS' REBUTTAL

8       **DANA TREXLER**
             DIRECT EXAM BY MR. BLOCK                  P. 1187
             CROSS-EXAM BY MR. AKROTIRIANAKIS          P. 1198
9            REDIRECT EXAM BY MR. BLOCK                P. 1206

10

11      DEFENDANTS' REBUTTAL

12      **GREG PINSONNEAULT**
             DIRECT EXAM BY MR. CRAIG                  P. 1211
             VOIR DIRE EXAM BY MR. BLOCK               P. 1213
13           DIRECT EXAM BY MR. CRAIG (RES.)           P. 1215
             CROSS-EXAM BY MR. BLOCK                   P. 1229
14

15

16
        CLOSING ARGUMENT BY MR. ANDRES                 P. 1240
17
        CLOSING ARGUMENT BY MR. AKROTIRIANAKIS         P. 1285
18
        REBUTTAL ARGUMENT BY MR. ANDRES                P. 1332
19

20

21

22

23

24

25

1

2                          INDEX OF EXHIBITS

3

4                                    MARKED        ADMITTED

    PLAINTIFFS'

5

    264 (REDACTED)                                 1210

6

7

8   DEFENDANTS'

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1180

```
 1      OAKLAND, CALIFORNIA                         MAY 5, 2025

 2                        P R O C E E D I N G S

 3          (COURT CONVENED AT 8:25 A.M.)

 4          (JURY OUT AT 8:25 A.M.)

 5              THE CLERK:  CALLING CIVIL CASE 19-7123-PJH, WHATSAPP

 6      INC., ET AL., VERSUS NSO GROUP TECHNOLOGIES, LIMITED, ET AL.

 7          COUNSEL, PLEASE STATE YOUR APPEARANCES.

 8              MR. PEREZ:  GOOD MORNING, YOUR HONOR.

 9          ANTONIO PEREZ FOR WHATSAPP AND META, AND HERE WITH ME IS

10      GREG ANDRES AND MICAH BLOCK.

11              THE COURT:  OKAY.  GOOD MORNING.

12              MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.

13          JOE AKROTIRIANAKIS, AARON CRAIG, AND MATTHEW NOLLER FOR

14      THE DEFENDANTS.

15              THE COURT:  GOOD MORNING.

16          WHAT'S THE ISSUE?

17              MR. PEREZ:  ONE EVIDENTIARY ISSUE.  THERE WAS AN

18      EXHIBIT, PTX 264, THAT WE USED IN THE EXAMINATION OF

19      MR. GAZNELI, BUT I DID NOT MOVE IT INTO EVIDENCE.  WE WOULD

20      LIKE TO DO SO.

21          DEFENDANTS HAVE INDICATED THEY OBJECT.

22          THERE WAS, INDEED, AN OBJECTION TO THE QUESTIONING ON THIS

23      TOPIC, BUT THE COURT OVERRULED THAT OBJECTION.  THE EXHIBIT IS

24      THE 2019 FINANCIAL STATEMENTS, AND THE COURT MAY RECALL THAT

25      MR. AKROTIRIANAKIS OBJECTED THAT THIS HAD BEEN THE SUBJECT OF A
```

1    PRIOR COURT RULING.

2        I NOTED THAT THE COURT HAD -- THAT THEY HAD OPENED THE

3    DOOR TO THIS QUESTIONING BY ASKING MR. GAZNELI ABOUT THE R&D

4    EXPENSES IN THE MORE RECENT PERIOD, AND THE COURT AGREED THAT

5    THEY HAD OPENED THE DOOR.

6        SO WE BELIEVE THE TOPIC IS FAIR GAME, AND WE WOULD LIKE TO

7    MOVE THAT EXHIBIT INTO EVIDENCE.

8        THE COURT:  IS THIS IN THE BINDER WITH ALL THE

9    FINANCIAL STATEMENTS?

10        MR. AKROTIRIANAKIS:  NO, I DON'T THINK SO.

11        I HAVE A COPY THAT I CAN PROVIDE THE COURT.

12        THE COURT:  OKAY.  I MEAN, I DON'T KNOW WHAT EXHIBIT

13    WE'RE TALKING ABOUT EXACTLY.

14        MR. PEREZ:  I CAN PASS UP A COPY.

15        IF I MAY APPROACH, YOUR HONOR, OR PASS IT TO MS. COLLINS.

16        THE COURT:  OKAY.

17        MR. PEREZ:  THIS IS THE 2019 CONSOLIDATED FINANCIALS

18    OF NSO GROUP.

19        AND MR. GAZNELI IDENTIFIED THEM IN HIS TESTIMONY.  THERE

20    SHOULDN'T BE ANY OBJECTIONS.  IT'S PRODUCED BY THEM.  IT'S

21    AUTHENTIC.  HE IDENTIFIED WHAT IT WAS.  THEY OBJECTED THAT IT

22    HAD BEEN EXCLUDED.  THE COURT AGREED WITH OUR POINT THAT THEY

23    HAD OPENED THE DOOR, SO IT'S THE ISSUES IN THE CASE, AND

24    THERE'S NO REASON THE JURY SHOULDN'T HAVE THE DOCUMENT.

25        THE COURT:  OKAY.

1          MR. AKROTIRIANAKIS:  YOUR HONOR, THIS IS AN EFFORT

2    TO -- WHAT THEY ASKED MR. GAZNELI ABOUT WAS HISTORICAL RESEARCH

3    AND DEVELOPMENT EXPENSES THAT ARE IN THIS DOCUMENT.

4          WHAT THIS DOCUMENT IS, IS THE CONSOLIDATED FINANCIAL

5    STATEMENTS FOR THE ENTIRE THEN-EXISTING GROUP OF COMPANIES THAT

6    THE COURT SAW IN THE CORPORATE FAMILY TREE THAT'S, I THINK,

7    EXHIBIT 2019, OR IT'S ONE OF THE EXHIBITS.

8          BUT THIS -- THE REASON THAT THEY WANT THIS IN IS SO THAT

9    THEY CAN POINT TO THE HISTORICAL PROFITABILITY OF THE COMPANY,

10   WHICH IS, OF COURSE, NOT RELEVANT.

11         WHAT'S RELEVANT NOW FOR PUNITIVE DAMAGES PURPOSES IS THE

12   CURRENT FINANCIAL STATEMENT.

13         AND I DON'T HAVE -- I WOULDN'T HAVE AN OBJECTION IF THEY

14   HAD REDACTED OUT ALL OF THE DETAILED FINANCIAL INFORMATION OF

15   THE SORT THAT THE COURT HAS ALREADY EXCLUDED, SAVE THE PART

16   ABOUT WHICH THEY WERE ASKING MR. GAZNELI, WHICH WAS THE R&D

17   BUDGET WHICH IS, OF COURSE, THE ONLY PART THAT WAS RELEVANT TO

18   HIS TESTIMONY.

19         MR. PEREZ:  YOUR HONOR, I THINK THAT'S A LITTLE BIT

20   OF A SLEIGHT OF HAND BECAUSE THE DETAILED FINANCIAL INFORMATION

21   WAS REALLY ON A SEPARATE ISSUE, WHICH WAS THE PROFITS THAT THEY

22   EARNED FROM SELLING PEGASUS.

23         SO THIS ISN'T ON THAT TOPIC.  THAT WAS A TOTALLY SEPARATE

24   ISSUE.

25         THE RELEVANCE OF THIS DOCUMENT IS INDEED THE R&D EXPENSE,

1   AND THE COURT PREVIOUSLY AGREED THAT THEY HAD OPENED THE DOOR

2   TO QUESTIONING ON THAT TOPIC.

3            THE COURT:  SO WHY ISN'T IT REDACTED JUST TO REFLECT

4   THAT?

5            MR. PEREZ:  WE CAN CERTAINLY PROPOSE SOME REDACTIONS,

6   YOUR HONOR.

7            THE COURT:  OKAY.

8            MR. PEREZ:  WE -- I THINK THAT THE WHOLE PAGE ON

9   WHICH HE WAS QUESTIONED, HOWEVER, PAGE 4, SHOULD BE FAIR GAME.

10           THE COURT:  PAGE 4.

11           MR. PEREZ:  YES.  IT'S PAGE 5 OF THE EXHIBIT, PAGE 4

12   OF THE FINANCIALS.

13           MR. AKROTIRIANAKIS:  YEAH, AGAIN, YOUR HONOR, IF IT'S

14   JUST THE R&D BUDGET, WHICH WAS THE PART ABOUT WHICH MR. GAZNELI

15   WAS --

16           THE COURT:  I THINK YOU'RE WINNING ON THIS.  YES, THE

17   R&D PART CAN COME IN.  OKAY?

18           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

19           THE COURT:  I HAVEN'T LOOK AT THIS DOCUMENT CLOSELY,

20   BUT I ASSUME YOU ALL KNOW WHICH ONES -- WHICH ENTRIES REFER TO

21   THE R&D BUDGET.

22           MR. AKROTIRIANAKIS:  YES.  THEY'RE VERY CLEARLY

23   MARKED AS RESEARCH AND DEVELOPMENT EXPENSES.

24           THE COURT:  OKAY.  WE CAN GET STARTED.

25       OH, THE CLOCK ISN'T WORKING.

```
1              MR. ANDRES:  THAT'S A BAD THING, YOUR HONOR.

2              THE COURT:  I KNOW.

3              MR. AKROTIRIANAKIS:  WE'VE ALREADY GIVEN OUR

4      ARGUMENTS, YOUR HONOR, ACCORDING TO THIS CLOCK.

5              MR. ANDRES:  I JUST NOTICED THAT.

6              THE COURT:  CAN WE GET SOMEONE TO COME AND CHANGE

7      THAT?

8              THE CLERK:  WE'VE ASKED.  WE'RE JUST WAITING FOR

9      SOMEONE.

10         (PAUSE IN PROCEEDINGS.)

11             THE COURT:  WELL, EVERYBODY HAS A WATCH ON, I ASSUME,

12     SO YOU CAN, OKAY, TIME YOURSELF.

13             MR. ANDRES:  YOUR HONOR, JUST THREE THINGS.

14         ONE, I PASSED BY A JUROR THIS MORNING, I WAS SITTING

15     OUTSIDE THE COURTROOM, DIDN'T TALK TO HER OR ANYTHING, BUT

16     OBVIOUSLY I DON'T WANT TO BE RUDE.

17         I ASSUME THERE'S SOME STANDARD INSTRUCTION YOU GIVE THAT

18     LAWYERS AREN'T ALLOWED TO TALK TO JURORS, IF THEY SEE YOU IN

19     THE HALL, BLAH, BLAH, IF WE CAN DO THAT.  MAYBE WE'RE GOING TO

20     RUN INTO THE JURY IN DELIBERATIONS.  I'D APPRECIATE THAT.

21         THAT'S ONE.

22         TWO, JUST TO CONFIRM THE ORDER OF THE DAY, I THINK WE'RE

23     PUTTING ON MS. TREXLER, AND THEN -- OR, I'M SORRY, YOU'RE GOING

24     TO PLAY A VIDEO FIRST?

25             MR. AKROTIRIANAKIS:  I CAN PLAY IT AT ANY TIME,
```

```
 1        YOUR HONOR.  IT'S 5 MINUTES AND 53 SECONDS, INCLUDING THE

 2    DESIGNATIONS AND COUNTER-DESIGNATIONS.

 3             THE COURT:  OKAY.

 4             MR. ANDRES:  I THINK THEY SHOULD PLAY IT IN THEIR

 5    CASE.  THEY SHOULD PLAY THAT AND REST.

 6        WE'LL CALL MS. TREXLER, THEY'LL CALL MR. PINSONNEAULT, AND

 7    THEN WE'RE GOING TO CLOSE.  DOES THAT SOUNDS RIGHT?

 8             THE COURT:  SOUNDS RIGHT.

 9             MR. ANDRES:  THANK YOU, YOUR HONOR.

10             THE COURT:  OKAY.  ARE WE READY TO GET STARTED ON

11    TIME THEN?

12             MR. ANDRES:  WHATEVER TIME IT IS.

13             THE COURT:  IT'S 8:30.  LET'S GO.

14        (PAUSE IN PROCEEDINGS.)

15             THE CLERK:  ALL RISE FOR THE JURY.

16        (JURY IN AT 8:32 A.M.)

17             THE CLERK:  THANK YOU.  PLEASE BE SEATED.

18             THE COURT:  ALL RIGHT.  GOOD MORNING, MEMBERS OF THE

19    JURY.

20        THANK YOU AGAIN FOR COMING IN AND BEING ON TIME.

21        AND I'M SURE EVERYONE IS IN A GOOD MOOD THIS MORNING

22    BECAUSE OF THE WARRIOR'S VICTORY LAST NIGHT.

23        OKAY.  WE'RE READY TO GET STARTED THIS MORNING.

24        MR. AKROTIRIANAKIS?

25             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
```

```
1              DEFENDANTS WILL CALL BY WAY OF VIDEO RECORDED DEPOSITION

2     TESTIMONY, SUSAN GLICK, G-L-I-C-K.

3              THE COURT:  ALL RIGHT.

4              MR. AKROTIRIANAKIS:  MAY WE PROCEED, YOUR HONOR?

5              THE COURT:  YES.

6              MR. AKROTIRIANAKIS:  THANK YOU.

7              (THE VIDEOTAPED DEPOSITION OF SUSAN GLICK WAS PLAYED IN

8     OPEN COURT, BUT NOT REPORTED.)

9              MR. AKROTIRIANAKIS:  YOUR HONOR, I THINK WE NEED AN

10    ADJUSTMENT TO THE SOUND SYSTEM.

11             THE CLERK:  IT'S WORKING ON MY END.

12        THE VOLUME IS ON.

13             MR. AKROTIRIANAKIS:  THE VOLUME -- THERE WASN'T

14    VOLUME.

15        TRY IT AGAIN.

16        (PAUSE IN PROCEEDINGS.)

17             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  THANK YOU.

19        NEXT WITNESS?

20             MR. AKROTIRIANAKIS:  SUBJECT TO ADDING UP ON THE

21    EXHIBITS IN EVIDENCE, YOUR HONOR, THE REDACTIONS, THERE ARE

22    TWO, AND THE DEFENDANTS REST.

23             THE COURT:  ALL RIGHT.  THANK YOU.

24        DO PLAINTIFFS HAVE A REBUTTAL CASE, OR A FOLLOW-UP -- IT'S

25    NOT TECHNICALLY REBUTTAL, I GUESS.
```

```
1            YES?  ARE THE PLAINTIFFS --

2                 MR. BLOCK:  YOUR HONOR, I WAS DISTRACTED.

3                 THE COURT:  I'M SORRY.  YOU'RE INTENDING TO RECALL

4       MS. TREXLER; RIGHT?

5                 MR. BLOCK:  THAT'S EXACTLY RIGHT, YOUR HONOR.

6                 THE COURT:  OKAY.  READY TO DO THAT.

7                 MR. BLOCK:  YES.  THANK YOU, YOUR HONOR.

8            THE PLAINTIFFS RECALL MS. TREXLER TO THE STAND.

9                 MR. BLOCK:  DOES MS. TREXLER NEED TO BE SWORN AGAIN,

10      YOUR HONOR?

11                THE COURT:  SHE'S BEEN HERE THE WHOLE TIME.

12           YOU'RE STILL UNDER OATH, MS. TREXLER.

13           (PLAINTIFFS' WITNESS, DANA TREXLER, WAS PREVIOUSLY SWORN.)

14                THE WITNESS:  THANK YOU.

15                          DIRECT EXAMINATION

16      BY MR. BLOCK:

17      Q.   GOOD MORNING AGAIN, MS. TREXLER.

18      A.   GOOD MORNING.

19      Q.   WELCOME BACK.

20           THERE WERE FOUR FINANCIAL DOCUMENTS THAT CAME INTO

21      EVIDENCE AFTER YOU TESTIFIED, AND I'D LIKE TO ASK YOU A FEW

22      QUESTIONS ABOUT THEM.

23           SO CAN WE HAVE 1779 ON SCREEN, PLEASE.

24           MS. TREXLER, DO YOU HAVE A COPY IN YOUR HAND OR IS THE

25      SCREEN ENOUGH?
```

1    A.   THE SCREEN IS ENOUGH.

2    Q.   MS. TREXLER, WHAT IS EXHIBIT A-1779?

3    A.   THIS IS THE NSO TECHNOLOGIES BALANCE SHEET FOR THE YEARS

4    ENDED DECEMBER 2023 AND 2024.

5    Q.   WHAT IS A BALANCE SHEET?

6    A.   ESSENTIALLY A BALANCE SHEET SHOWS THE COMPANY'S ASSETS,

7    LIABILITIES, AND EQUITY, AND THERE'S A BASIC FORMULA IN

8    ACCOUNTING FOR THE BALANCE SHEET BECAUSE IT HAS TO BALANCE.

9         AND SO WHAT THAT MEANS IS TOTAL ASSETS NEED TO EQUAL TOTAL

10   LIABILITIES, PLUS TOTAL EQUITY.

11        SO IF WE LOOK AT THIS BALANCE SHEET, YOU CAN SEE THE TOTAL

12   ASSETS LINE ITEM OF $244.3 MILLION.

13        IF I TAKE THE TOTAL CURRENT LIABILITIES OF $84.3 MILLION,

14   ADD THAT TO TOTAL NON-CURRENT LIABILITIES OF $26.2 MILLION, I

15   THINK THAT'S APPROXIMATELY $110.4 MILLION.

16        AND THAT, PLUS THE EQUITY OF $133.9 MILLION, EQUALS

17   $244.3 MILLION OF TOTAL LIABILITIES, PLUS EQUITY.

18        SO YOU CAN SEE THE TOTAL ASSETS EQUAL THE TOTAL

19   LIABILITIES, PLUS EQUITY.

20   Q.   WOULD IT HELP YOU TO HAVE A CALCULATOR, MS. TREXLER?

21   A.   IF I COULD?  THEN I CAN CONFIRM MY MENTAL MATH HERE.

22             MR. BLOCK:  MAY I APPROACH, YOUR HONOR.

23             THE COURT:  YES.

24             THE WITNESS:  THANK YOU.

25             MR. BLOCK:  (HANDING.)

```
 1              THE WITNESS:  SO I'M GOING TO TAKE THE TOTAL CURRENT

 2      LIABILITIES OF 84.3 MILLION, ADD THE 26.2 MILLION, AND IT GIVES

 3      ME ABOUT $111 MILLION.

 4          WHEN I ADD THAT TO 133.9, THAT GIVES ME THE 244.3 MILLION

 5      IN TOTAL LIABILITIES AND EQUITY.

 6          NOW, I DO WANT TO POINT OUT, IF YOU LOOK AT THE LAST LINE

 7      OF THIS BALANCE SHEET WHERE IT HAS THE $244.3 MILLION, THAT

 8      JUST SAYS TOTAL LIABILITIES.

 9          I BELIEVE THAT'S A TYPO FOR THE EQUITY PIECE THAT CUT OFF,

10      BECAUSE THAT REPRESENTS TOTAL LIABILITIES, PLUS EQUITY, WHICH I

11      JUST SHOWED YOU THROUGH THE MATH.

12          SO THERE'S -- I JUST THINK THERE'S A TYPO ON THIS

13      DOCUMENT.

14      BY MR. BLOCK:

15      Q.   DO YOU SEE AT THE TOP OF THIS DOCUMENT, THERE'S A SMALL

16      INDICATION THAT SAYS GAAP.

17      A.   YES, IN THE SOURCE FILE CODE IT SAYS GAAP.  THAT STANDS

18      FOR GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, WHICH ARE

19      ESSENTIALLY THE RULES THAT ARE FOLLOWED IN ACCOUNTING WHICH

20      MAKE FINANCIAL STATEMENTS COMPARABLE FROM PERIOD TO PERIOD AND

21      BETWEEN COMPANY TO COMPANY.  YOU KNOW THAT THEY'RE FOLLOWING

22      THE SAME RULES.

23      Q.   DOES YOUR EXPERTISE AS A CERTIFIED PUBLIC ACCOUNTANT

24      INCLUDE EXPERIENCE WITH THE GENERALLY ACCEPTED ACCOUNTING

25      PRINCIPLES?
```

1    A.   YES, THAT'S WHAT I'VE DEALT WITH THROUGH ALL OF MY

2    SCHOOLING AND MY ENTIRE CAREER.

3    Q.   OKAY.  I THINK WE'VE DONE NOW THE NUMBERS FOR NSO GROUP AS

4    OF THE END OF 2023.

5         BUT WAS THERE ANYTHING ELSE FOR THAT YEAR THAT YOU WANTED

6    TO HIGHLIGHT FOR THE JURY?

7    A.   I THINK THAT'S IT WITH RESPECT TO THE NUMBERS.

8         THERE'S SOME OTHER THINGS THAT I THINK WE NEED TO CLEAR UP

9    WITH RESPECT TO THE TRADE ACCOUNTS RECEIVABLE.

10        THERE WAS SOME TESTIMONY THAT THE TRADE ACCOUNTS

11   RECEIVABLE OF $189.7 MILLION WAS UNCOLLECTIBLE, AND I THINK

12   THAT IT WAS PAPER MONEY.

13        THAT IS INCONSISTENT WITH WHAT AN AUDITED FINANCIAL

14   STATEMENT WOULD SHOW, AND MR. SHOHAT TESTIFIED THAT THE NUMBERS

15   ON THIS BALANCE SHEET FOR 2023 ARE IDENTICAL TO THE NUMBERS ON

16   THE AUDITOR'S AUDITED FINANCIAL STATEMENTS THAT THEY RECEIVED A

17   FEW DAYS AGO.

18        AND THE PURPOSE OF AN AUDIT IS TO TEST THE BALANCES IN THE

19   COMPANY'S FINANCIAL STATEMENTS TO MAKE SURE THAT THEY ARE NOT

20   MATERIALLY MISSTATED.

21        WHAT DOES THAT MEAN FROM A BALANCE SHEET PERSPECTIVE?

22        IT MEANS THAT WHAT'S REPORTED AS AN ASSET HAS TO BE

23   COLLECTIBLE.  IT HAS TO BE REAL.

24        AND SO THE AUDITOR SIGNING OFF ON A $189.7 MILLION TRADE

25   ACCOUNTS RECEIVABLE MEANS THAT THEY TESTED THAT BALANCE, THEY

1        CONFIRMED THAT THE BALANCE IS REAL, AND THAT IT'S COLLECTIBLE.

2             IF IT WEREN'T, THE AUDITORS WOULD HAVE REQUIRED THE

3        COMPANY TO WRITE OFF ON COLLECTABLE RECEIVABLES, AND THEY

4        WOULDN'T BE ALLOWED TO REPORT THEM.  IT WOULD BE A MATERIAL

5        MISSTATEMENT IF $189.7 MILLION WASN'T COLLECTIBLE.

6             THE OTHER THING TO NOTE IS TRADE ACCOUNTS RECEIVABLE ARE A

7        CURRENT ASSET, AND WHAT A CURRENT ASSET IS IS AN ASSET THAT IS

8        EXPECTED TO BE COLLECTED WITHIN A 12 MONTH PERIOD DURING THE

9        NORMAL BUSINESS OPERATING CYCLE.

10            SO NOT ONLY IS $189.7 MILLION COLLECTIBLE, IT'S EXPECTED

11       TO CONVERT TO CASH WITHIN 12 MONTHS.

12       Q.  IS THERE ANYTHING ELSE IN THESE FINANCIAL STATEMENTS THAT

13        BEARS ON YOUR UNDERSTANDING OF THAT TRADE ACCOUNTS RECEIVABLE

14        LINE ITEM?

15       A.  YES.  MR. SHOHAT ALSO TESTIFIED THAT THE COMPANY SPENDS

16        ABOUT $10 MILLION A MONTH, OR $120 MILLION A YEAR, ON ITS

17        EXPENSES.

18            AND THE TRADE ACCOUNTS RECEIVABLE IS THE LARGEST ASSET

19       THAT IS ON THE NSO BALANCE SHEET, AND IF THAT WAS NOT

20       CONVERTING TO CASH, NSO WOULD BE UNABLE TO PAY THAT $10 MILLION

21       A MONTH, $120 MILLION A YEAR UNLESS THEY WERE TAKING ON

22       ADDITIONAL DEBT, WHICH I CAN SEE FROM THIS BALANCE SHEET THAT

23       THEY WEREN'T.

24            THEIR DEBT'S RELATIVELY LOW.  AND IF WE LOOK AT THE LOANS

25       PAYABLE AMOUNT IN CURRENT LIABILITIES, IT'S $19.5 MILLION.

```
 1          SO I'M GOING TO DO SOME MATH HERE.  SO IT'S THE 19.5, I

 2   ADD THAT TO THE LONG-TERM LOAN NET OF $13.1 MILLION -- OH, AND

 3   I'M SORRY, I ALSO FORGOT, IF WE GO BACK UP TO CURRENT

 4   LIABILITIES, THERE'S THE CURRENT MATURITIES OF LONG-TERM LOAN,

 5   THAT'S 18.4.

 6          THAT SHOWS ABOUT $51 MILLION IN DEBT.

 7          NOW, THE REASON I KNOW THEY'RE NOT TAKING ON MORE IS IF WE

 8   MOVE OVER TO 2024 AND YOU LOOK AT THE LOANS PAYABLE AMOUNT,

 9   THEY PAID OFF THE $19.5 MILLION IN DEBT.  THAT TAKES CASH TO

10   PAY IT OFF.

11          YOU CAN SEE THAT THEIR CURRENT MATURITIES ARE

12   $21.1 MILLION, AND THEN IF I LOOK AT THE LONG-TERM LOAN, THAT'S

13   $8 MILLION.

14          SO THEIR DEBT FROM 2023 WENT FROM 51 MILLION TO

15   29 MILLION.  SO THEY PAID OFF $22 MILLION OF DEBT.  THEY'RE NOT

16   TAKING ON MORE DEBT, THEY'RE PAYING IT DOWN, AND THAT MEANS

17   THAT THESE RECEIVABLES ARE BEING COLLECTED.  THEY'RE CONVERTING

18   TO CASH.

19   Q.   MS. TREXLER, WHAT IS A -- I THINK YOU DISCUSSED CURRENT

20   ASSETS.

21          WHAT'S A NON-CURRENT ASSET?

22   A.   SO A CURRENT ASSET IS ONE THAT'S EXPECTED TO CONVERT TO

23   CASH WITHIN A 12 MONTH PERIOD.

24          A NON-CURRENT ASSET IS AN ASSET THAT'S EXPECTED TO CONVERT

25   TO CASH IN A PERIOD THAT TAKES LONGER THAN 12 MONTHS, BUT IT'S
```

1    STILL EXPECTED TO TURN INTO CASH.  JUST LIKE WITH THE TRADE

2    ACCOUNTS RECEIVABLE, IF THE AUDITORS DIDN'T BELIEVE THAT THE

3    CURRENT ASSETS WERE -- OR THE NON-CURRENT ASSETS WEREN'T

4    CONVERTIBLE TO CASH, THEY WOULD NOT ALLOW NSO TO REPORT THAT

5    BALANCE ON THE FINANCIAL STATEMENTS, OR IT WOULD BE MATERIAL --

6    MATERIALLY MISSTATING THE BALANCE SHEET.

7    Q.   DID YOU HEAR MR. SHOHAT'S TESTIMONY ABOUT THE DEFINITION

8    OF NON-CURRENT ASSETS?

9    A.   YES.  MR. SHOHAT SAID THAT NON-CURRENT ASSETS WERE NOT

10   EXPECTED TO BE CONVERTED TO CASH, AND THAT'S JUST FACTUALLY

11   INCORRECT.

12       HE ALSO TESTIFIED THAT TOTAL ASSETS EQUAL TOTAL

13   LIABILITIES, WHICH IS NOT THE FORMULA FOR THE BALANCE SHEET.

14       SO I THINK THERE WAS SOME, YOU KNOW, MISUNDERSTANDING OF

15   SOME OF THE ACCOUNTING DEFINITIONS IN THE WAY THAT THE BALANCE

16   SHEET WORKS.

17   Q.   ARE YOU FAMILIAR WITH THE CONCEPT OF NET WORTH?

18   A.   YES, I AM.

19   Q.   WHAT IS THAT?

20   A.   NET WORTH IS THE -- THE FORMULA FOR IT IS TOTAL ASSETS

21   MINUS TOTAL LIABILITIES, AND WHAT IT REPRESENTS IS ESSENTIALLY

22   THE OWNER'S INTEREST IN THE REMAINING ASSETS AFTER LIABILITIES

23   ARE DEDUCTED FROM THOSE ASSETS.

24   Q.   DOES THIS DOCUMENT, WHICH I THINK IS 1779, SHOW YOU NSO'S

25   NET WORTH FOR -- AS OF THE END OF 2023?

1      A.   YES.  IT SHOWS TOTAL NET WORTH OF $133.9 MILLION, WHICH IS

2      REPRESENTED BY THE TOTAL EQUITY LINE.

3           SO IT'S TOTAL ASSETS MINUS TOTAL CURRENT LIABILITIES MINUS

4      TOTAL NON-CURRENT LIABILITIES, THAT GIVES YOU THE TOTAL EQUITY

5      AMOUNT, WHICH IS THE SAME THING AS NET WORTH.

6      Q.   WILL YOU PLEASE TAKE THE JURY THROUGH NSO'S BALANCE SHEET

7      FIGURES AS OF THE END OF 2024?

8      A.   YES.  TOTAL ASSETS ARE $221.2 MILLION, TOTAL LIABILITIES

9      ARE CALCULATED AS THE TOTAL CURRENT LIABILITIES OF

10     78.5 MILLION, PLUS THE TOTAL NON-CURRENT LIABILITIES OF

11     21.1 MILLION, WHICH IS ABOUT $100 MILLION IN LIABILITIES.

12          TOTAL EQUITY IS 121.7 MILLION, AND WHEN I ADD 100 MILLION

13     AND THE $121 MILLION OF TOTAL EQUITY, I GET TOTAL LIABILITIES

14     AND EQUITY OF 120 -- SORRY -- $221.2 MILLION.

15     Q.   DOES THIS SHOW NSO'S NET WORTH AS OF THE END OF 2024?

16     A.   YES.  THAT'S THE $121.7 MILLION THAT'S REPRESENTED BY THE

17     TOTAL EQUITY LINE ITEM.

18     Q.   OKAY.  LET'S LOOK AT Q CYBER.

19          CAN WE SEE A-1780 ON SCREEN, PLEASE.

20          MS. TREXLER, WHAT IS THIS DOCUMENT?

21     A.   THIS IS THE Q CYBER ISRAEL BALANCE SHEET FOR THE YEAR

22     ENDED -- THE YEARS ENDED DECEMBER 2023 AND 2024.

23     Q.   WHAT'S THE LAST LINE ITEM LABELED ON THIS DOCUMENT?

24     A.   THIS IS ALSO LABELED TOTAL LIABILITIES, AND THAT SHOULD

25     READ TOTAL LIABILITIES AND EQUITY.

1    Q.   OKAY.  WOULD YOU PLEASE WALK THE JURY THROUGH Q CYBER'S

2    2023 NUMBERS?

3    A.   Q CYBER HAD TOTAL ASSETS OF $216.2 MILLION; THEY HAVE

4    CURRENT LIABILITIES OF $17 MILLION; TOTAL NON-CURRENT

5    LIABILITIES OF $2.1 MILLION.  SO THAT'S TOTAL LIABILITIES OF

6    ABOUT $19.1 MILLION.

7         AND THEY HAVE TOTAL EQUITY OF $197.1 MILLION.

8         SO WHEN I TAKE THE $19 MILLION IN LIABILITIES, PLUS THE

9    EQUITY, THAT GIVES ME TOTAL LIABILITIES AND EQUITY OF

10   $216.2 MILLION.

11   Q.   AND DOES THIS SHOW Q CYBER'S NET WORTH AS OF THE END OF

12   2023?

13   A.   IT DOES.  THAT'S THE TOTAL EQUITY LINE ITEM OF

14   $197.1 MILLION.

15        SO, AGAIN, THE NET WORTH IS THE OWNER'S INTEREST IN THE

16   EXTRA ASSETS AFTER YOU SUBTRACT ALL LIABILITIES.

17   Q.   WOULD YOU PLEASE WALK THE JURY THROUGH THE KEY FIGURES FOR

18   Q CYBER FOR 2024.

19   A.   TOTAL ASSETS ARE $203.6 MILLION; TOTAL CURRENT LIABILITIES

20   ARE 17.1 MILLION; TOTAL NON-CURRENT LIABILITIES ARE

21   2.1 MILLION.

22        SO ADDING THOSE TOGETHER, THAT'S ABOUT 19.2 MILLION IN

23   TOTAL LIABILITIES.

24        TOTAL EQUITY IS $184.5 MILLION.

25        AND WHEN I ADD THE TOTAL LIABILITIES AND THE TOTAL EQUITY,

1    THAT EQUALS $203.6 MILLION.

2    Q.   WHAT WAS THE NET WORTH OF Q CYBER AS OF THE END OF 2024,

3    JUST A FEW MONTHS AGO?

4    A.   $184.5 MILLION AT THE END OF 2024.

5    Q.   LOOKING BACK OVER THESE BALANCE SHEETS FOR NSO AND

6    Q CYBER, DO THEY SHOW DEFENDANTS' LEVEL OF DEBT?

7    A.   THEY DO, AND THE DEBT IS RELATIVELY LOW.  I WALKED YOU

8    THROUGH THE DEBT FROM NSO'S BALANCE SHEET, AND AS YOU CAN SEE,

9    NSO WAS PAYING IT DOWN BETWEEN 2023 AND 2024.

10   Q.   OKAY.  CAN WE SEE A-1781 ON SCREEN, PLEASE, THIRD DOCUMENT

11   OF FOUR.

12        MS. TREXLER, WHAT IS EXHIBIT A-1781?

13   A.   THIS IS NSO TECHNOLOGIES PROFIT AND LOSS, OTHERWISE KNOWN

14   AS AN INCOME STATEMENT, FOR THE PERIOD ENDING DECEMBER 2023,

15   AND ALSO THE PERIOD ENDING DECEMBER 2024.

16   Q.   AND WILL YOU WALK THE JURY THROUGH SOME OF THE KEY FIGURES

17   FOR THE YEAR-ENDED 2023, PLEASE?

18   A.   NSO HAD REVENUES OF $91.3 MILLION; THEY REPORTED GROSS

19   PROFIT OF $79.1 MILLION, WHICH IS AN 87 PERCENT GROSS PROFIT

20   MARGIN.  SO ESSENTIALLY WHAT THAT MEANS IS FOR EVERY DOLLAR IN

21   REVENUE, THEY -- AFTER DEDUCTING COSTS, THEY HAVE 87 CENTS IN

22   PROFIT.

23        THEY REPORTED AN OPERATING LOSS OF $3.9 MILLION, AND A NET

24   LOSS OF APPROXIMATELY $9 MILLION.

25   Q.   WHAT'S THE DIFFERENCE BETWEEN OPERATING INCOME OR LOSS AND

1    NET INCOME OR LOSS?

2    A.    OPERATING INCOME BASICALLY INCLUDES ALL OF THE COSTS OF

3    OPERATING THE BUSINESS, THE COST OF SALES, SELLING AND

4    MARKETING, RESEARCH AND DEVELOPMENT.

5         AND THEN THE NET INCOME ALSO THEN DEDUCTS OUT THINGS LIKE

6    TAXES, INTEREST EXPENSE, THINGS LIKE THAT.

7    Q.    WHAT WAS NSO'S BIGGEST EXPENSE CATEGORY FOR 2023?

8    A.    RESEARCH AND DEVELOPMENT, AND THAT WAS $52.3 MILLION.

9    Q.    OKAY.  CAN YOU TAKE US THROUGH THE KEY FIGURES FOR NSO FOR

10   THEIR 2024 INCOME STATEMENT?

11   A.    YES.  NSO HAD REVENUES OF $95.9 MILLION; GROSS PROFIT OF

12   $84.7 MILLION; AND ITS GROSS PROFIT PERCENTAGE IS 88 PERCENT.

13        SO, YOU KNOW, YOU CAN SEE THE REVENUES HAVE GONE UP BY

14   ABOUT, YOU KNOW, 4 AND A HALF, $4.6 MILLION, AND THEIR GROSS

15   PROFIT HAS ALSO GONE UP BY $5.6 MILLION FROM 2023 TO 2024.

16        OPERATING INCOME -- I'M SORRY, IT WAS AN OPERATING LOSS OF

17   $8.3 MILLION, AND IT WAS A NET LOSS OF $12.7 MILLION.

18   Q.    WHAT WAS NSO'S LARGEST EXPENSE CATEGORY IN 2024?

19   A.    AGAIN, IT WAS RESEARCH AND DEVELOPMENT, WHICH WAS

20   APPROXIMATELY $60 MILLION.

21   Q.    OKAY.  LAST ONE.

22        CAN WE SEE A-1782 ON THE SCREEN, PLEASE.

23        MS. TREXLER, WHAT IS EXHIBIT A-1782?

24   A.    THIS IS Q CYBER'S ISRAEL INCOME STATEMENT FOR THE YEARS

25   ENDED DECEMBER 2023 AND 2024.

1    Q.   AND DOES YOUR PREVIOUS EXPLANATION OF THIS KIND OF FORM

2    APPLY TO THIS DOCUMENT AS WELL?

3    A.   YES, IT DOES.

4    Q.   OKAY.

5         JUST ONE MOMENT, PLEASE.

6         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

7              MR. BLOCK:  NO MORE QUESTIONS AT THIS TIME.

8         THANK YOU, MS. TREXLER.

9              THE COURT:  THANK YOU.

10        CROSS?

11                          **CROSS-EXAMINATION**

12   BY MR. CRAIG:

13   Q.   I DON'T THINK I NEED ANY OF THE EXHIBITS, OTHER THAN THE

14   ONES MS. TREXLER HAS IN FRONT OF HER, BUT IF I DO, I'D ASK THE

15   COURT'S PERMISSION TO GO GET MY BINDER.

16             THE COURT:  SURE.

17   BY MR. CRAIG:

18   Q.   MS. TREXLER, YOU'RE STILL A MANAGING DIRECTOR AT STOUT;

19   CORRECT?

20   A.   YES.

21   Q.   AND YOU'RE STILL PART OF THE SHAREHOLDER BASE?

22   A.   YES.

23   Q.   AND YOUR FIRM IS STILL CHARGING FACEBOOK $795 AN HOUR FOR

24   YOUR TIME?

25   A.   YES.

1    Q.   AND YOU STILL HAVE A STAFF OF FIVE OR SIX PEOPLE WORKING

2    WITH YOU ON THIS PROJECT AND BILLING BY THE HOUR?

3    A.   NO.  I ONLY HAVE TWO PEOPLE WHO HAVE BEEN ASSISTING ME

4    WHILE WE'RE AT TRIAL.

5    Q.   MR. AKROTIRIANAKIS ASKED YOU LAST WEEK HOW MUCH MONEY

6    STOUT HAD BILLED YOUR CLIENTS ON THIS CASE AND YOU WEREN'T ABLE

7    TO ANSWER.

8             MR. BLOCK:  OBJECTION, YOUR HONOR.

9    BY MR. CRAIG:

10   Q.   DO YOU HAVE ANY IDEA NOW?

11            THE COURT:  BEYOND THE SCOPE?

12            MR. BLOCK:  CERTAINLY BEYOND THE SCOPE, AND ALSO YOUR

13   PRIOR INSTRUCTION.

14            MR. CRAIG:  IT GOES TO BIAS, YOUR HONOR.

15            THE COURT:  YES.  SUSTAINED.  SUSTAINED.

16            MR. CRAIG:  OKAY.

17   Q.   YOU WENT TO BUCKNELL FOR YOUR UNDERGRADUATE EDUCATION.

18   DID YOU TAKE ANY CLASSES THAT DEALT WITH ISRAELI ACCOUNTING OR

19   AUDITING?

20   A.   NO.

21   Q.   SAME QUESTION ABOUT WHEN YOU DID YOUR M.B.A. AT THE

22   UNIVERSITY OF PENNSYLVANIA.  DID YOU TAKE ANY CLASSES THAT

23   DEALT WITH ISRAELI ACCOUNTING OR AUDITING?

24   A.   NO.

25   Q.   HAVE YOU EVER BEEN HIRED BY ANY ISRAELI COMPANIES TO GIVE

```
1    OPINIONS ABOUT THEIR BALANCE SHEETS?

2    A.   I HESITATE BECAUSE I AUDITED INTERNATIONAL COMPANIES, AND

3    I DON'T RECALL WHETHER OR NOT THERE WERE ANY ISRAELI ENTITIES

4    THAT CONSOLIDATED UP INTO THOSE FINANCIAL STATEMENTS.

5         YOU KNOW, I HAD SOME U.S.-BASED COMPANIES WITH OPERATIONS

6    OUTSIDE OF THE COUNTRY.  I HAD SOME FRENCH-BASED COMPANIES THAT

7    HAD ENTITIES ALL OVER THE WORLD.

8         SO I HESITATE BECAUSE I DID A LOT OF WORK WITH THESE

9    INTERNATIONAL COMPANIES, AND WE HAD TO LOOK AT AND RECEIVE

10   INFORMATION AS WE DID THE AUDIT TO CONSOLIDATE UP INTO THE

11   PARENT COMPANY, WHICH IS WHERE I WAS WORKING, AND WE RELIED ON

12   OUR AUDIT TEAMS FROM ACROSS THE WORLD TO RECEIVE THEIR

13   STATUTORY FINANCIAL STATEMENTS IS WHAT THEY'RE CALLED.

14        IT'S -- I JUST DON'T RECALL WHETHER ANY OF THOSE WERE

15   ISRAELI.  THEY MAY HAVE BEEN.

16   Q.   I'LL ASK IT A DIFFERENT WAY AND MAYBE THAT WILL HELP.

17        DO YOU HAVE ANY -- HAVE YOU EVER BEEN HIRED TO GIVE AN

18   OPINION ABOUT THE BALANCE SHEETS OF ANY ISRAELI COMPANIES?

19   A.   I THINK MY PREVIOUS ANSWER WOULD STAND.

20   Q.   SAME ANSWER?

21   A.   YES.

22   Q.   DO YOU HAVE ANY FORMAL EDUCATION OR TRAINING ON WHAT THE

23   DIFFERENCE IS BETWEEN U.S. AND ISRAELI GENERALLY ACCEPTED

24   ACCOUNTING PRINCIPLES?

25   A.   THERE ARE INTERNATIONAL ACCOUNTING STANDARDS REFERRED TO
```

1      AS IFRS THAT STUDY -- THAT SHOW DIFFERENCES BETWEEN U.S. GAAP

2      AND THE GAAP THAT'S FOLLOWED IN OTHER COUNTRIES.  THERE'S SOME

3      INTERNATIONAL STANDARDS.

4           SO I AM FAMILIAR WITH, YOU KNOW, SOME OF THOSE.  I'VE

5      TAKEN CONTINUING EDUCATION COURSES ON -- IT'S REFERRED TO AS

6      IFRS.  SO I DO HAVE SOME UNDERSTANDING.

7      Q.   OKAY.  I'M GOING TO ASK YOU TO TURN BACK TO EXHIBIT 1779.

8      THIS IS ONE OF THE DOCUMENTS YOU JUST TESTIFIED ABOUT.

9           AND LET'S START WITH THE BOTTOM HALF OF THE DOCUMENT.

10          YOU TESTIFIED ABOUT A POSSIBLE TYPO.

11          DO YOU REMEMBER THAT TESTIMONY?

12     A.   YES.

13     Q.   YOU WEREN'T CONFUSED AT ALL THAT THE BOTTOM HALF OF THE

14     DOCUMENT DESCRIBED NOT JUST NSO'S LIABILITIES, BUT ALSO ITS

15     EQUITIES; RIGHT?

16     A.   NO.  I KNOW HOW TO READ A BALANCE SHEET, AND I KNOW WHAT

17     ONLY BALANCE IS.  IF YOU TAKE YOUR TOTAL ASSETS AND THEN YOUR

18     TOTAL LIABILITIES, PLUS EQUITY, THEY NEED TO EQUAL EACH OTHER,

19     AND SO THE TOTAL LINE ITEM DOWN THERE NEEDS TO READ TOTAL

20     LIABILITIES AND EQUITY.

21     Q.   YOU DON'T KNOW WHETHER IT'S CUSTOMARY IN ISRAELI

22     ACCOUNTING PRACTICE FOR THE BOTTOM LINE TO BE SHORTHANDED AS

23     LIABILITIES RATHER THAN LIABILITIES AND RETAINED EARNINGS OR

24     LIABILITIES AND EQUITIES AS IT IS IN THIS COUNTRY, DO YOU?

25     A.   WELL, IT'S JUST FACTUALLY INCORRECT.  IT CAN'T POSSIBLY BE

1        TOTAL LIABILITIES.  IF IT WERE, YOU WOULD BE ADDING TOTAL

2        CURRENT LIABILITIES OF, FOR 2023, 84.2 MILLION AND TOTAL

3        NON-CURRENT LIABILITIES OF 26.2 MILLION.  THAT EQUALS

4        $111 MILLION.

5            IT DOESN'T EQUAL 244.3 MILLION.

6        Q.   OKAY.  I ASKED A SLIGHTLY DIFFERENT QUESTION, MS. TREXLER.

7            YOU DON'T KNOW IF IT'S CUSTOMARY FOR INTERNAL DOCUMENTS OF

8        ISRAELI COMPANIES TO SHORTHAND THE PHRASE "LIABILITIES AND

9        EQUITIES" OR "LIABILITIES AND RETAINED EARNINGS" INTO JUST

10       LIABILITIES AT THE BOTTOM OF A BALANCE SHEET, DO YOU?

11       A.   NO, BUT THAT WOULDN'T MAKE ANY SENSE BECAUSE IT'S

12       FACTUALLY INCORRECT OF WHAT THAT LINE ITEM IS.

13       Q.   WELL, THE BALANCE SHEET SAYS PLANNING IN BOLD THAT

14       INCLUDES BOTH LIABILITIES AND EQUITIES IN THE BOTTOM HALF OF

15       THE DOCUMENT; CORRECT?

16       A.   I'M NOT FOLLOWING WHAT YOU -- IT JUST SAYS TOTAL

17       LIABILITIES AT THE BOTTOM.

18       Q.   I SAID, THE DOCUMENT SAYS, IN THE BOLD HEADINGS THAT YOU

19       SEE, THAT IT SAYS BOTH LIABILITIES AND TOTAL EQUITY; CORRECT?

20       A.   WELL, THERE ARE -- THERE ARE THREE BOLDED LINE ITEMS.  ONE

21       IS TOTAL CURRENT LIABILITIES, ONE IS TOTAL NON-CURRENT

22       LIABILITIES, AND ONE IS TOTAL EQUITIES.

23       Q.   YOU'RE NOT CLAIMING THAT THE TOTAL EQUITY FIGURE IS CASH,

24       ARE YOU?

25       A.   NO.  THAT REPRESENTS THE TOTALITY OF THE CURRENT AND

```
1       NON-CURRENT ASSETS, WHICH ARE A MIXTURE OF CASH, ACCOUNTS

2       RECEIVABLE -- I CAN'T SEE SOME OF THE OTHERS THAT ARE AT THE

3       TOP.

4            IT'S THE PORTIONS OF THOSE BALANCES THAT ARE LEFT OVER

5       AFTER REDUCING THE TOTAL LIABILITY AMOUNT.

6       Q.   YEAH.  YOU'RE NOT CLAIMING THAT EQUITIES ARE AVAILABLE TO

7       NSO FOR ITS CURRENT OPERATIONS; RIGHT?

8       A.   WELL, SOME OF THEM ARE.  IT'S, IT'S -- THERE ARE EXCESS

9       ASSETS ABOVE THE LIABILITY AMOUNTS, AND SOME OF THOSE CAN BE

10      CONVERTED INTO CASH.  IF YOU GO BACK UP TO THE TOP OF THIS

11      BALANCE SHEET, YOU CAN SEE THAT THE MAJORITY OF THE ASSETS THAT

12      ARE REPORTED ARE NON -- I'M SORRY -- ARE CURRENT ASSETS.

13      THEY'RE EXPECTED TO CONVERT TO CASH WITHIN 12 MONTHS.

14      Q.   MS. TREXLER, I'M TALKING ABOUT THE BOTTOM SECTION OF THE

15      DOCUMENT OVER THE BOLD HEADING TOTAL EQUITY, WHICH, FOR 2024

16      YEAR-END, WAS 121,665,000.

17           YOU'RE NOT CLAIMING THAT'S CASH OR AVAILABLE TO NSO FOR

18      ITS CURRENT OPERATIONS, ARE YOU?

19      A.   IT IS.  AS I JUST EXPLAINED, THAT IS COMPRISED OF THE

20      EXCESS OF THE CURRENT ASSETS AND THE NON-CURRENT ASSETS AFTER

21      LIABILITIES ARE REDUCED, AND THE VAST MAJORITY OF NSO'S ASSETS

22      SIT IN THE CURRENT ASSET BUCKET, WHICH IS EXPECTED TO BE

23      CONVERTED TO CASH WITHIN A 12 MONTH PERIOD.

24      Q.   OKAY.  LET'S LOOK AT THAT ASSET CATEGORY.

25           SO MR. SHOHAT TESTIFIED ABOUT THE TRADE ACCOUNTS
```

1    RECEIVABLE, AND IT SOUNDED LIKE YOU WERE QUESTIONING THE

2    VERACITY OF HIS TESTIMONY, WITHOUT SO MUCH AS COMING OUT AND

3    SAYING IT.

4         IS THAT WHAT YOU'RE DOING?

5    A.   IT IS INCON -- THAT TESTIMONY IS INCONSISTENT WITH AN

6    AUDIT REPORT THAT HAS IDENTICAL NUMBERS IN 2023 THAT MR. SHOHAT

7    TESTIFIED TO.

8         AN AUDITOR'S REPORT WOULD NOT ALLOW $189.7 MILLION OF

9    TRADE RECEIVABLES TO BE REPORTED ON A BALANCE SHEET IF THEY

10   WERE DETERMINED NOT TO BE COLLECTIBLE.

11   Q.   YOU HAVE NO INFORMATION ABOUT THE CONVERSATIONS NSO HAS

12   WITH ITS AUDITORS ON AN ONGOING BASIS, DO YOU?

13   A.   I DON'T NEED TO KNOW WHAT CONVERSATION NSO HAS WITH ITS

14   AUDITORS IF THE AUDITORS ALLOWED NSO TO REPORT THE

15   $189.7 MILLION IN ITS 2023 BALANCE SHEET, BECAUSE AUDITORS ONLY

16   ALLOW FOR COMPANIES TO REPORT ASSETS THAT ARE REAL AND

17   COLLECTIBLE.

18        OTHERWISE THERE WOULD BE A MATERIAL MISSTATEMENT IN THE

19   FINANCIALS.

20   Q.   MS. TREXLER, I'M ASKING YOU A DIFFERENT QUESTION.  I'M

21   ASKING YOU, YOU DON'T KNOW ANYTHING ABOUT THE CONVERSATIONS

22   THAT NSO HAS WITH ITS AUDITORS, DO YOU?  YES OR NO?

23   A.   NO, I DON'T.

24        BUT I DON'T NEED TO.

25   Q.   YOU AGREE THAT THIS IS MONEY OWED TO NSO, RIGHT, IN THE

1    TRADE ACCOUNTS RECEIVABLE LINE?

2    A.   YES, THAT'S CORRECT.   YES.

3    Q.   AND YOU DON'T KNOW WHO OWES THAT MONEY TO NSO, DO YOU?

4    A.   I DON'T HAVE A LIST OF THE CUSTOMERS.   THAT HASN'T BEEN

5    PROVIDED TO ME.

6    Q.   YOU DON'T EVEN KNOW THAT IT'S CUSTOMERS, DO YOU?

7    A.   WELL, IT SAYS TRADE ACCOUNTS RECEIVABLE.

8    Q.   AND MR. SHOHAT TESTIFIED THAT IT'S AN INTERNAL BALANCE;

9    ISN'T THAT RIGHT?

10   A.   WELL, HE SAID IT COULD BE COMING FROM INTERNAL ENTITIES,

11   AND I UNDERSTAND FROM LOOKING AT THE ORGANIZATIONAL STRUCTURE

12   THAT THERE MAY BE INTERNAL COMPANIES INVOLVED IN THE SALE OF

13   PEGASUS TO CUSTOMERS.

14   Q.   AND YOU HAVE NO INFORMATION ABOUT THE FINANCIAL CONDITION

15   OF THE ENTITY THAT OWES THIS TRADE ACCOUNTS RECEIVABLE, THE

16   $158 MILLION THAT COMPRISES THE VAST MAJORITY OF THE TOTAL

17   CURRENT ASSETS, DO YOU?

18   A.   WELL, I KNOW ENOUGH THAT THE AUDITORS DID THEIR TESTING

19   AND DETERMINED THAT $189.7 MILLION IN 2023 WAS THE COLLECTIBLE

20   AMOUNT.

21        OTHERWISE THEY WOULD NOT HAVE AN AUDIT -- AUDITED

22   FINANCIAL STATEMENT THAT REPORTS THAT BALANCE.

23   Q.   BUT, AGAIN, YOU DON'T KNOW ANYTHING ABOUT THE

24   CONVERSATIONS NSO WAS HAVING WITH ITS AUDITORS, DO YOU?

25   A.   I DON'T KNOW THE CONVERSATIONS, BUT BASED ON THE AUDIT

```
1    TESTING, THEY VERIFIED THAT NUMBER.

2             MR. CRAIG:  THANK YOU, YOUR HONOR.  NOTHING FURTHER.

3             THE COURT:  ALL RIGHT.  THANK YOU.

4        ANY REDIRECT?

5             MR. BLOCK:  YES, YOUR HONOR.

6        YOUR HONOR, MAY I HAND A DOCUMENT TO THE WITNESS?

7             THE COURT:  CERTAINLY.

8             MR. BLOCK:  (HANDING.)

9             THE WITNESS:  THANK YOU.

10                      REDIRECT EXAMINATION

11   BY MR. BLOCK:

12   Q.  MS. TREXLER, I JUST HANDED YOU PLAINTIFFS' TRIAL EXHIBIT

13   264, WHICH IS IN EVIDENCE.

14        THIS IS REDACTED, YOUR HONOR.

15        MAY I PUBLISH IT?

16             MR. CRAIG:  YOUR HONOR, I JUST RECEIVED IT.  MAY I

17   HAVE ONE MOMENT?

18             THE COURT:  YES, YOU CAN LOOK AT IT.

19        (PAUSE IN PROCEEDINGS.)

20   BY MR. BLOCK:

21   Q.  AND I'LL JUST DIRECT YOUR ATTENTION, WHILE WE'RE WAITING

22   FOR MR. CRAIG, TO PAGE PTX 264.3, MS. TREXLER.

23        AND THAT'S THE ONLY PAGE I NEED TO PUBLISH FOR WHAT I

24   HAVE.

25             THE COURT:  OKAY.
```

```
 1              MR. CRAIG:  OKAY.  NO OBJECTION, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  THANK YOU.

 3              MR. BLOCK:  CAN WE SEE PLAINTIFFS' TRIAL EXHIBIT 264,

 4     WITH THE PAGE DOT 3 ON THE SCREEN, PLEASE.

 5         AND WOULD YOU HIGHLIGHT THE LAST PARAGRAPH.

 6     Q.   MS. TREXLER, WHAT IS PLAINTIFFS' TRIAL EXHIBIT 264?

 7     A.   THIS IS THE AUDITOR'S OPINION OF NSO GROUP TECHNOLOGIES'

 8     FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31ST, 2019,

 9     AND ALSO 2018.

10     Q.   WE DON'T -- WE HAVEN'T RECEIVED THE AUDIT FROM 2023 OR

11     2024; RIGHT?

12     A.   THAT'S CORRECT.

13     Q.   OKAY.  DOES THIS DOCUMENT INFORM YOUR UNDERSTANDING --

14     WELL, LET ME ASK THIS FIRST.

15         YOU WERE ASKED SOME QUESTIONS ABOUT ISRAELI ACCOUNTING

16     PROCEDURES.

17         DO YOU RECALL THAT?

18     A.   YES.

19     Q.   OKAY.  DOES THIS DOCUMENT INFORM YOUR UNDERSTANDING, AT

20     LEAST AS OF 2018 AND '19, AS TO WHAT KIND OF GAAP RULES THE

21     DEFENDANTS WERE USING?

22     A.   IT DOES.  I JUST SAW IT, SO LET ME FIND IT HERE.

23         SO IT SAYS, IN THE PARAGRAPH A LITTLE BIT UP, "WE

24     CONDUCTED OUR AUDIT IN ACCORDANCE WITH AUDITING STANDARDS

25     GENERALLY ACCEPTED IN ISRAEL."
```

1    Q.   GREAT.  AND THEN AT THE BOTTOM, WHAT DOES IT SAY ABOUT

2    CONFORMITY WITH U.S. GAAP?

3    A.   IT -- IN THE VERY LAST LINE IT SAYS, "FOR EACH OF THE

4    YEARS ENDED ON THOSE DATES IN CONFORMITY WITH THE GENERALLY

5    ACCEPTED ACCOUNTS PRINCIPLES IN THE U.S., GAAP."

6    Q.   OKAY.  MS. TREXLER, DOES ANYTHING THAT YOU DISCUSSED ON

7    CROSS-EXAMINATION CHANGE YOUR UNDERSTANDING AS TO NSO'S NET

8    WORTH AS OF THE END OF 2023 AND THE END OF 2024?

9    A.   NO.

10   Q.   DOES ANYTHING YOU DISCUSSED ON CROSS-EXAMINATION CHANGE

11   YOUR UNDERSTANDING AS TO Q CYBER'S NET WORTH AS OF THE END OF

12   2023 AND THE END OF 2024?

13   A.   NO.

14        MR. BLOCK:  THANK YOU.

15      NO MORE QUESTIONS, YOUR HONOR.

16        THE COURT:  ALL RIGHT.  ANYTHING ELSE?

17        MR. BLOCK:  OH, I BEG YOUR PARDON.

18      I JUST WANTED TO CONFIRM THAT 264 IS IN EVIDENCE,

19   YOUR HONOR.

20        THE COURT:  AS IT'S BEEN REDACTED.

21        MR. CRAIG:  YOUR HONOR, WE OBJECT.  THIS DOCUMENT

22   SHOWS THE RESEARCH AND DEVELOPMENT EXPENSES NOT JUST OF NSO AND

23   Q CYBER, BUT OF THE CONSOLIDATED ENTITY THAT INCLUDES LOTS OF

24   OTHER COMPANIES, INCLUDES SOME OTHER COMPANIES BEYOND NSO AND

25   Q CYBER.

1          THE COURT:  WELL, IT'S ONLY THIS ONE PAGE THAT'S

2     GOING TO BE ADMITTED.

3          MR. CRAIG:  BUT, YOUR HONOR, THAT PAGE HAS A RESEARCH

4     AND DEVELOPMENT NUMBER THAT IS NOT LIMITED TO NSO AND Q CYBER,

5     AND IT SAYS IN THE PART MR. BLOCK JUST SHOWED THIS IS A

6     CONSOLIDATED STATEMENT WITH OTHER COMPANIES INVOLVED.

7          THE COURT:  BUT THERE ARE NO FIGURES ON THIS PAGE.

8          MR. CRAIG:  THERE IS IN THE, IN PART OF THE

9     UNREDACTED -- THERE IS A LITTLE BIT OF THE DOCUMENT THAT'S

10    UNREDACTED THAT INCLUDES NUMBERS THAT IS NOT LIMITED TO NSO AND

11    Q CYBER, AND IT'S MISLEADING AND IF THEY'RE GOING TO USE IT IN

12    CLOSING, WE OBJECT.

13         MR. BLOCK:  YOUR HONOR, FIRST OF ALL, IT SAYS IT'S

14    CONSOLIDATED OF THIS ENTITY, NSO GROUP TECHNOLOGIES LIMITED.

15    AND SO YOU CAN COMPARE THAT TO THE ORG STRUCTURE, BUT THIS IS

16    NOT SOME PARENT.  THAT IS THE DEFENDANTS' ENTITY ACCORDING TO

17    THE FACE OF THE DOCUMENT.

18        WE ALSO NOW, I THINK, HAVE GROUNDS TO HAVE THE ENTIRE

19    DOCUMENT IN EVIDENCE BECAUSE IT STANDS FOR THE PRINCIPLES THAT

20    THEY TRIED TO ATTACK ON CROSS AND THAT WE BROUGHT OUT THROUGH

21    THE WITNESS.

22        SO THIS STANDS FOR THE ACCOUNTING PRACTICES, NOT JUST THE

23    R&D DOCUMENT, SO WE MOVE TO ADMIT THE ENTIRE UNREDACTED

24    DOCUMENT INTO THE RECORD.

25         MR. AKROTIRIANAKIS:  YOUR HONOR, I DIDN'T SAY

```
 1        ANYTHING --
 2                MR. BLOCK:  SORRY, AS REDACTED.
 3                THE COURT:  OKAY.
 4                MR. BLOCK:  I'M SORRY.  I MISUNDERSTOOD.  WHAT WE'RE
 5        MOVING FOR IS THE DOCUMENT AS REDACTED, BUT THAT INCLUDES THE
 6        CERTIFICATION AND THE AUDITOR'S REPORT THAT WE JUST DISCUSSED.
 7                THE COURT:  ALL RIGHT.  AND THE FIGURES, THOUGH, ARE
 8        JUST R&D FIGURES; CORRECT?
 9                MR. BLOCK:  CORRECT, AS YOU FLIP THROUGH IT, I DON'T
10        THINK THERE'S ANY DISAGREEMENT ON THAT.  WE REDACTED EVERYTHING
11        EXCEPT -- IN THE FIGURES EVERYTHING EXCEPT REFERENCES TO R&D.
12                THE COURT:  ALL RIGHT.  OBJECTION OVERRULED.
13                MR. CRAIG:  THANK YOU.
14                THE COURT:  AS REDACTED, IT MAY COME IN.
15            (PLAINTIFFS' EXHIBIT 264, REDACTED, WAS ADMITTED IN
16        EVIDENCE.)
17                MR. BLOCK:  THANK YOU, YOUR HONOR.
18                THE COURT:  DO YOU HAVE ANYTHING ELSE, MR. CRAIG?
19                MR. CRAIG:  NO, YOUR HONOR.
20                THE COURT:  ALL RIGHT.
21            THANK YOU, MS. TREXLER.  YOU MAY STEP DOWN.
22                THE WITNESS:  THANK YOU.
23                THE COURT:  ALL RIGHT.  AND DOES THE DEFENSE RECALL,
24        IN THIS SORT OF UNUSUAL PROCEDURE WE'VE AGREED TO, RECALL
25        MR. PINSONNEAULT?
```

 1                MR. CRAIG:  YES, YOUR HONOR.

 2                THE COURT:  ALL RIGHT.

 3            **(DEFENDANTS' WITNESS, GREG PINSONNEAULT, WAS PREVIOUSLY**

 4       **SWORN.)**

 5                MR. ANDRES:  YOUR HONOR, WE DON'T WANT TO DO THIS IN

 6       FRONT OF THE JURY, BUT WE OBVIOUSLY WANT TO MAKE A RULE 50

 7       MOTION.  SO WE CAN DO THAT AFTER?

 8                THE COURT:  YOU CAN DO IT AFTER.

 9                MR. ANDRES:  THANK YOU.

10                THE COURT:  ALL RIGHT.  HAVE YOU BEEN HERE THE ENTIRE

11       TIME?

12                THE WITNESS:  YES.

13                THE COURT:  ALL RIGHT.  MR. PINSONNEAULT, YOU'RE

14       STILL UNDER OATH.

15                THE WITNESS:  YES.  I SHOULD BE CLEAR, THE ENTIRE

16       TIME SINCE MY TESTIMONY.

17                THE COURT:  YES.

18                THE WITNESS:  YES.

19                            **DIRECT EXAMINATION**

20       BY MR. CRAIG:

21       Q.   GOOD MORNING, MR. PINSONNEAULT.

22            DO YOU HAVE A BINDER IN FRONT OF YOU THAT SAYS MAY 5TH,

23       EXPERT EXHIBITS?

24       A.   I DO NOT.

25                (PAUSE IN PROCEEDINGS.)

1      BY MR. CRAIG:

2      Q.   MR. PINSONNEAULT, WELCOME BACK.

3      A.   THANK YOU.

4      Q.   DO YOU FREQUENTLY REVIEW AND ANALYZE FINANCIAL STATEMENTS?

5      A.   YES, I DO, BOTH IN MY WORK AS AN EXPERT DAMAGES

6      CONSULTANT, AND ALSO IN MY ROLE AS CEO OF LITINOMICS.

7      Q.   LET'S TALK ABOUT YOUR WORK AS AN ECONOMICS DAMAGES EXPERT

8      FIRST.

9           CAN YOU EXPLAIN HOW YOU REVIEW AND ANALYZE FINANCIAL

10     STATEMENTS IN THAT WORK?

11     A.   YES.  SO FINANCIAL STATEMENTS ARE PRODUCED, AND OTHER

12     FINANCIAL INFORMATION AS WELL, ARE PRODUCED IN ALMOST EVERY

13     CASE I WORK ON.  THEY TYPICALLY ARE THE BASIS OF THE OPINIONS

14     THAT I TEND TO -- THAT I REACH.

15          I WOULD SAY OVER MY 23 YEAR CAREER, I'VE PROBABLY REVIEWED

16     FINANCIAL STATEMENTS IN AT LEAST 150 DIFFERENT MATTERS.

17          SO THEY'RE COMING UP OFTEN.  SOMETIMES THEY'RE AUDITED

18     FINANCIALS, OFTENTIMES THEY'RE UNAUDITED OR INTERNAL FINANCIAL

19     STATEMENTS.

20     Q.   AND YOU ALSO MENTIONED YOU ANALYZE FINANCIAL STATEMENTS IN

21     YOUR ROLE AS CEO.  CAN YOU EXPLAIN WHAT YOU MEAN?

22     A.   SURE.  SO I'VE BEEN THE CEO OF LITINOMICS SINCE 2011.  SO

23     OVER THAT ROUGHLY 14 YEAR PERIOD, I HAVE REVIEWED OUR FINANCIAL

24     STATEMENTS MONTHLY TO MAKE MANAGEMENT DECISIONS FOR LITINOMICS.

25          AND THEN IN 2016, OUR CFO STEPPED DOWN FROM THE CFO ROLE.

1    SO SINCE THAT TIME PERIOD, I'VE ACTUALLY BEEN THE EXECUTIVE

2    RESPONSIBLE FOR PUTTING TOGETHER THE FINANCIAL STATEMENTS OF

3    LITINOMICS, AS WELL AS PREPARING THEM FOR TAX PURPOSES.

4    Q.   MR. PINSONNEAULT, WERE YOU IN THE COURTROOM DURING THE

5    TESTIMONY OF MR. SHOHAT ABOUT THE 2023 --

6         MR. BLOCK:  YOUR HONOR, WE OBJECT TO THE

7    QUALIFICATIONS OF THIS WITNESS TO PRESENT TESTIMONY IN REBUTTAL

8    TO WHAT WE JUST HEARD FROM MS. TREXLER.

9         THE COURT:  OKAY.  YOU DIDN'T OFFER ANYTHING -- DID

10   YOU WANT TO VOIR DIRE THE WITNESS?

11        MR. BLOCK:  I'M HAPPY TO DO THAT, YOUR HONOR.

12        THE COURT:  ON HIS QUALIFICATIONS?

13        MR. BLOCK:  YES.

14        THE COURT:  OKAY.

15        MR. CRAIG:  I SUPPOSE NO OBJECTION, BUT --

16        THE COURT:  ALL RIGHT.  AND YOU CAN FOLLOW UP IF YOU,

17   IF YOU WISH TO TAKE A COUNTER POSITION.

18        MR. CRAIG:  YES, YOUR HONOR.

19        THE COURT:  BUT THEY'RE ENTITLED.

20                        **VOIR DIRE EXAMINATION**

21   BY MR. BLOCK:

22   Q.   MR. PINSONNEAULT, GOOD MORNING.

23   A.   GOOD MORNING.

24   Q.   I APOLOGIZE FOR RETREADING GROUND, BUT I THINK IT'S

25   IMPORTANT FOR THIS EXAM.

1        YOU ARE NOT AN ACCOUNTANT; CORRECT?

2   A.   THAT'S CORRECT, I DO NOT HOLD THE CPA CERTIFICATE,

3   CERTIFICATION.

4   Q.   RIGHT.  YOU'VE NEVER BEEN A CPA; RIGHT?

5   A.   THAT'S CORRECT.

6   Q.   YOU'RE NOT AN AUDITOR?

7   A.   I AM NOT AN AUDITOR, THAT'S CORRECT.

8   Q.   YOU'VE NEVER BEEN AN AUDITOR?

9   A.   THAT'S ALSO CORRECT.

10  Q.   YOU'VE NEVER CONDUCTED AN AUDIT OF A COMPANY'S FINANCIAL

11  STATEMENTS?

12  A.   THAT'S CORRECT.

13  Q.   YOU'VE NEVER TAUGHT ACCOUNTING?

14  A.   THAT'S CORRECT.

15  Q.   YOU NEVER PUBLISHED A PAPER OR GAVE A PRESENTATION ON

16  ACCOUNTING STANDARDS?

17  A.   THAT'S CORRECT.

18       MR. BLOCK:  YOUR HONOR, EVERYTHING THAT WAS IN

19  MS. TREXLER'S EXAM WAS ABOUT ACCOUNTING STANDARDS.  THIS

20  WITNESS IS NOT QUALIFIED TO PRESENT TESTIMONY IN REBUTTAL TO

21  THAT TESTIMONY.

22       THE COURT:  OKAY.

23       MR. CRAIG:  YOUR HONOR, HE'S TESTIFYING IN REBUTTAL

24  TO MS. TREXLER'S ANALYSIS OF THE PROFIT AND LOSS STATEMENT AND

25  THE BALANCE SHEET, WHICH HE HAS JUST TESTIFIED ABOUT HIS

1    EXPERTISE IN OVER 14 YEARS OF DOING, AS WELL AS AS AN EXPERT

2    AND IN HIS CAPACITY IN RUNNING HIS COMPANY.  WE BELIEVE HE'S

3    MORE THAN QUALIFIED TO REBUT MS. TREXLER'S TESTIMONY.

4         THE COURT:  WELL, I THINK YOU NEED TO ESTABLISH A

5    FOUNDATION FOR HIS ABILITY TO REVIEW AND OPINE ON FINANCIAL

6    STATEMENTS.  I MEAN, WE DON'T HAVE ANYTHING IN THE RECORD YET

7    THAT WOULD ESTABLISH THAT HE HAS ANY EXPERTISE IN THAT REGARD.

8         MR. CRAIG:  I WILL DO THAT, YOUR HONOR.

9                    **DIRECT EXAMINATION (RESUMED)**

10   BY MR. CRAIG:

11   Q.   MR. PINSONNEAULT, HAVE YOU PROVIDED EXPERT TESTIMONY ABOUT

12   REVIEWING AND ANALYZING THE FINANCIAL STATEMENTS OF THE TYPE WE

13   LOOKED AT IN THIS CASE?

14        MR. BLOCK:  OBJECTION, YOUR HONOR.  ASKED AND

15   ANSWERED.

16        THE COURT:  I DON'T REMEMBER THE ANSWER, SO I'M GOING

17   TO LET HIM ANSWER.

18        THE WITNESS:  YES.  SO I -- SO IT OFTEN -- AS PART OF

19   MY EXPERT ROLE, I OFTEN HAVE TO EVALUATE THE FINANCIAL

20   CONDITION OF A COMPANY.  AND AS I SAID, GENERALLY INFORMATION

21   IS PRODUCED IN FINANCIAL STATEMENTS, LIKE ACCOUNTING

22   STATEMENTS, AND THAT'S THE INFORMATION I HAVE TO RELY UPON TO

23   MAKE THOSE -- TO OFFER THOSE OPINIONS AND MAKE CONCLUSIONS.

24        SO THIS IS -- THIS IS SOMETHING THAT COMES UP IN A LARGE

25   NUMBER OF CASES.

1     SO I'M NOT THE ONE THAT'S AUDITING THE, THE DIFFERENT

2   REPORTS THAT ARE PRODUCED.  BUT I HAVE TO USE THOSE, THAT

3   INFORMATION AND UNDERSTAND THAT INFORMATION IN ORDER TO REACH

4   THE OPINION THAT I ULTIMATELY OFFER IN CASES SUCH AS THIS ONE.

5   BY MR. CRAIG:

6   Q.   MS. TREXLER TESTIFIED ABOUT THE NET WORTH OF THE

7   DEFENDANTS.

8        IS THAT AN ISSUE IN WHICH YOU HAVE HAD OCCASION TO ANALYZE

9   AND GIVE OPINIONS IN YOUR PROFESSIONAL CAREER?

10  A.   YES.  SO LOOKING AT METRICS SUCH AS NET WORTH OR WORKING

11  CAPITAL BALANCE, WHICH IS A DIFFERENT METRIC THAT MS. TREXLER

12  DID NOT MENTION, OR AVERAGE DAYS OUTSTANDING IS ANOTHER

13  ACCOUNTING METRIC THAT SHE DID NOT MENTION IN HER TESTIMONY,

14  THESE ARE ALL COMMON METRICS THAT I HAVE TO REVIEW AND EVALUATE

15  IN FORMING THE OPINIONS THAT I OFFER.

16       MR. CRAIG:  YOUR HONOR, I'D LIKE TO PROCEED WITH MY

17  EXAMINATION.

18       THE COURT:  YEAH.  I'M GOING TO OVERRULE YOUR

19  OBJECTION.

20       HE MAY TESTIFY.  IT GOES TO THE WEIGHT, IN MY VIEW.

21       MR. CRAIG:  THANK YOU, YOUR HONOR.

22       THE COURT:  ALL RIGHT.

23  BY MR. CRAIG:

24  Q.   WERE YOU IN THE COURTROOM DURING THE TESTIMONY OF

25  MR. SHOHAT ABOUT THE 2023 AND 2024 FINANCIALS OF THE

1      DEFENDANTS?

2      A.   YES, I WAS.

3      Q.   I'D LIKE TO START WITH THE P&L STATEMENTS FIRST.

4           AND, BRIAN, WOULD YOU PLEASE PUT UP TRIAL EXHIBIT 1781.

5           WE'RE ALL NOW FAMILIAR WITH THIS DOCUMENT, BUT PLEASE

6      REMIND US, WHAT DOES A PROFIT AND LOSS STATEMENT SHOW?

7      A.   SO A PROFIT AND LOSS STATEMENT REFLECTS THE REVENUES AND

8       THE COSTS OR EXPENSES OF A COMPANY.

9           AND TYPICALLY THERE ARE DIFFERENT PROFITABILITY METRICS

10     THAT ARE LISTED.  I THINK MS. TREXLER WALKED THROUGH SOME OF

11     THEM, THE GROSS PROFIT, THE OPERATING INCOME, THE NET INCOME,

12     AND THEN OTHERS, EVEN EBITDA IS ANOTHER PROFIT METRIC THAT

13     COULD BE USEFUL IN SOME CASES.

14     Q.   IS THE EXHIBIT 1781 PRESENTATION OF THE PROFIT AND LOSS

15      STATEMENT THE SAME AS HOW IT WOULD LOOK IN AN AUDITED FINANCIAL

16      STATEMENT?

17     A.   NOT EXACTLY.  IT INCLUDES SIMILAR INFORMATION, BUT I THINK

18      WE'VE HEARD FROM MR. SHOHAT, THIS IS AN INTERNAL REPORT THAT

19      WAS PRODUCED.

20           AND YOU CAN SEE BY SOME OF THE FILTERS ON THE TOP THAT

21     THIS IS, THIS IS PULLED OUT OF AN INTERNAL SYSTEM.

22           THERE'S SLIGHT DIFFERENCES IN THE PRESENTATION HERE.  FOR

23     EXAMPLE, THE COST -- THE COST AND THE EXPENSES ARE REFLECTED AS

24     NEGATIVE NUMBERS ON THIS DOCUMENT.  TYPICALLY THEY WOULD BE

25     RECORDED AS A POSITIVE NUMBER IN AN AUDITED FINANCIAL REPORT.

1          AND IT'S KNOWN THAT THE EXPENSES OR COSTS ARE DEDUCTED

2     FROM THE REVENUES WHEN CALCULATING PROFIT.

3          THIS DOCUMENT SHOWS THOSE AS NEGATIVES, JUST AS AN

4     EXAMPLE, THE COST OF SALES IS A NEGATIVE 12.2 MILLION IN 2023.

5     THAT JUST MEANS THERE WERE 12.2 MILLION COST OF SALES.

6          SOME OF THE NAMING CONVENTIONS -- AGAIN, THE OPERATING

7     INCOME TYPICALLY WOULD BE CALLED OPERATING PROFITS.  YOU OFTEN

8     DON'T SEE SOME OF THE LINES THAT ARE BELOW THE NET INCOME LINE.

9          SO THERE ARE SLIGHT DIFFERENCES.

10          BUT OVERALL, THIS IS INFORMATION THAT I UNDERSTAND WOULD

11     NORMALLY SHOW UP ON A PROFIT AND LOSS STATEMENT.

12     Q.   NOW, DESPITE THE SLIGHT DIFFERENCES, WERE YOU ABLE TO

13     READILY UNDERSTAND THE PROFIT AND LOSS STATEMENT?

14     A.   YES.  I -- AS I SAID, I REVIEW UNAUDITED FINANCIALS QUITE

15     FREQUENTLY BECAUSE NOT ALL FINANCIALS ARE AUDITED.  SO THIS IS

16     THE TYPE OF REPORT THAT I SEE IN NEARLY EVERY CASE.

17     Q.   IN TERMS OF ANALYZING WHETHER A COMPANY IS PROFITABLE OR

18     NOT, WHAT ARE THE MOST RELEVANT LINE ITEMS IN A P&L STATEMENT?

19     A.   SO FOR THIS, FOR THIS CASE, I THINK MS. TREXLER TESTIFIED

20     ABOUT THE SAME -- I WOULD -- IT'S MY OPINION THAT OPERATING

21     INCOME AND NET INCOME WOULD BE THE TWO MOST RELEVANT PROFIT

22     METRICS.

23          SO NET INCOME IS SHOWING THE PROFIT OF THE ENTIRE COMPANY,

24     INCLUDING, INCLUDING EVERYTHING.  SO THAT'S INCLUDING INTEREST

25     THAT THEY EITHER HAVE TO PAY OR THAT'S PAYABLE TO THEM.

1          WHEREAS OPERATING INCOME OR OPERATING PROFIT REALLY

2     FOCUSES ON THE OPERATIONS OF THE COMPANY.  SO IT WILL EXCLUDE,

3     YOU KNOW, PROFITS OR LOSS THAT'S UNRELATED TO THE OPERATIONS.

4          SO AS AN EXAMPLE, THE INTEREST, OR IF THEY HAPPEN TO SELL

5     A BUILDING -- FOR EXAMPLE, HERE, NSO IS NOT IN THE BUSINESS OF

6     SELLING BUILDINGS.  IF THEY MADE A PROFIT OR A LOSS FROM

7     SELLING A BUILDING, THAT WOULD NOT BE INCLUDED IN THE OPERATING

8     INCOME.

9     Q.   SO IN TERMS OF OPERATING INCOME, WHAT WAS THE PERFORMANCE

10    OF NSO IN 2023 AND 2024?

11    A.   SO AT THE OPERATING INCOME LEVEL, NSO SUFFERED A LOSS OF

12    3.2 -- SORRY, 3.9 MILLION IN 2023, AND A LOSS OF 8.3 MILLION IN

13    2024.

14    Q.   AND SAME QUESTION ABOUT NET INCOME.  HOW WAS NSO'S

15    PERFORMANCE?

16    A.   AND AT THE NET INCOME LEVEL, NSO SUFFERED A LOSS OF NEARLY

17    $9 MILLION IN 2023, AND ABOUT $12.7 MILLION IN 2024.

18    Q.   I'D LIKE TO QUICKLY TURN TO 1782, WHICH SHOULD ALSO BE IN

19    YOUR BOOK, WHICH IS THE -- WELL, WHAT IS 1782?

20    A.   SO IT'S ANOTHER INTERNAL PROFIT AND LOSS STATEMENT.  THIS

21    ONE IS FOR Q CYBER ISRAEL COVERING 2023 AND 2024.

22    Q.   AND WHAT WAS THE PERFORMANCE OF Q CYBER FOR OPERATING --

23    AS FAR AS OPERATING INCOME AND NET INCOME GOES?

24    A.   SO AT THE OPERATING INCOME LEVEL, Q CYBER EARNED A PROFIT

25    OF 634,000 IN 2023, AND 146,000 IN 2024.

1          AND THEN AT THE NET INCOME LEVEL, Q CYBER EARNED A PROFIT

2     OF 313,000 IN 2023 AND SUFFERED A LOSS OF 359,000 IN 2024.

3     Q.   SO PUTTING THESE TOGETHER, DO EXHIBITS 1781 AND 1782

4     INDICATE THAT THE DEFENDANTS ARE PROFITABLE OR UNPROFITABLE?

5     A.   SO CERTAIN -- COLLECTIVELY THE DEFENDANTS ARE

6     UNPROFITABLE.

7          ON THE -- FOR NSO, WE SAW PRETTY LARGE LOSSES AT BOTH THE

8     OPERATING INCOME LEVEL AND AT THE NET INCOME LEVEL.

9          Q CYBER EARNED A SMALL PROFIT AT THE OPERATING INCOME

10    LEVEL, AND ESSENTIALLY BROKE EVEN OVER THE LAST COUPLE YEARS AT

11    THE NET INCOME LEVEL.

12    Q.   DO YOU RECALL THAT BOTH MR. SHOHAT AND MS. TREXLER WERE

13    QUESTIONED ABOUT NSO'S RESEARCH AND DEVELOPMENT EXPENSE?

14    A.   YES.

15    Q.   IS IT SURPRISING TO YOU THAT DEFENDANTS HAVE RELATIVELY

16    HIGH RESEARCH AND DEVELOPMENT EXPENSE IN COMPARISON TO THEIR

17    INCOME?

18    A.   NOT AT ALL.  IT'S TYPICAL FOR HIGH-TECH COMPANIES TO HAVE

19    A HIGH R&D EXPENSE RELATIVE TO ITS REVENUE, AND THAT'S

20    ESPECIALLY THE CASE FOR SOFTWARE COMPANIES BECAUSE THERE'S NOT

21    A LOT OF COST OF -- SO THE COST OF SALES OF A COMPANY IS

22    ESSENTIALLY HOW MUCH IT MAKES -- IT COSTS TO MAKE AN INDIVIDUAL

23    PRODUCT, OR THE SALE -- THE REVENUE OF THE COMPANY, WHAT THE

24    COST IS OF PRODUCING THAT REVENUE.

25          FOR SOFTWARE, THERE'S COSTS IN RESEARCHING AND DEVELOPING

1    THE SOFTWARE, BUT ONCE IT'S DEVELOPED, THERE'S VERY LITTLE

2    ONGOING COSTS IN TERMS OF LICENSING THAT REVENUE, OR THAT

3    SOFTWARE TO ADDITIONAL COMPANIES.  THEREFORE, YOU SEE A VERY

4    HIGH RESEARCH AND DEVELOPMENT EXPENSE AND RELATIVELY LOW COST

5    OF SALES FOR SOFTWARE COMPANIES.

6    Q.   DO YOU RECALL MR. ANDRES QUESTIONING MR. SHOHAT AND

7    SUGGESTING THAT NSO COULD MAKE A PROFIT IF IT SIMPLY STOPPED

8    SPENDING ITS MONEY ON RESEARCH AND DEVELOPMENT?

9    A.   I DO RECALL SOME QUESTIONING ALONG THOSE LINES.

10   Q.   WOULD THAT BE A NORMAL BUSINESS STRATEGY FOR A TECHNOLOGY

11   COMPANY TO SIMPLY STOP ITS R&D ACTIVITIES TO BECOME PROFITABLE?

12        MR. BLOCK:  OBJECTION, YOUR HONOR.  FOUNDATION AND

13   QUALIFICATION.

14        THE COURT:  SUSTAINED.

15        MR. CRAIG:  I'LL MOVE ON.

16   Q.   I'D LIKE TO TURN TO, LASTLY, TO THE BALANCE SHEETS.

17        AND IF WE COULD PUBLISH EXHIBIT 1779 IN EVIDENCE.

18        DO YOU BELIEVE EXHIBIT 1779 HIDES OR MISSTATES NSO'S

19   LIABILITIES IN ANY WAY?

20   A.   NO.  I THINK -- I THINK THE LIABILITIES AND THE ASSETS ARE

21   CLEARLY LAID OUT IN EXHIBIT 1779.

22   Q.   LET'S DISCUSS THE TRADE ACCOUNTS RECEIVABLE ACCOUNT THAT

23   HAS BEEN DISCUSSED HERE AT TRIAL.

24        WERE YOU IN THE COURTROOM WHEN MR. SHOHAT TESTIFIED ABOUT

25   THIS LINE ON HIS BALANCE SHEET?

1    A.   YES, I WAS.

2    Q.   AND WHAT WAS YOUR TAKEAWAY FROM MR. SHOHAT'S TESTIMONY

3    ABOUT NSO'S TRADE ACCOUNTS RECEIVABLE?

4    A.   SO MY TAKEAWAY WAS THAT MR. SHOHAT WAS EXPLAINING THAT THE

5    MAJORITY OF THE BALANCE OF THIS ACCOUNT IS -- RELATES TO

6    RELATED PARTIES, SO OTHER COMPANIES WITHIN THE ENTIRE CORPORATE

7    STRUCTURE.

8         AND OF THAT PORTION OF THE BALANCE -- SO NOT ALL OF THE

9    BALANCE, BUT OF THAT PORTION THAT'S WITH -- THAT'S RELATED TO

10   THESE RELATED COMPANIES, THAT THE DEFENDANTS DO NOT -- OR NSO

11   DOES NOT EXPECT TO BE ABLE TO COLLECT THAT AMOUNT.

12   Q.   AND HAVE YOU DONE ANYTHING TO CHECK THE ACCURACY OF

13   MR. SHOHAT'S TESTIMONY?

14   A.   YES.  SO I HAD A CONVERSATION WITH NSO'S --

15        MR. BLOCK:  OBJECTION, YOUR HONOR.  THIS IS NOT IN

16   EVIDENCE.  IT'S HEARSAY.

17        MR. CRAIG:  EXPERTS ARE ALLOWED TO RELY ON HEARSAY,

18   YOUR HONOR.

19        THE COURT:  SUSTAINED.

20   YES, YOU'RE CORRECT.  HE MAY ANSWER.

21        MR. CRAIG:  SO THE OBJECTION IS OVERRULED,

22   YOUR HONOR?

23        THE COURT:  YES.

24        MR. BLOCK:  YOUR HONOR --

25   BY MR. CRAIG:

1    Q.  DO YOU NEED THE QUESTION AGAIN, MR. PINSONNEAULT?

2    A.  YES.

3           MR. BLOCK:  YOUR HONOR, MAY I GIVE THE OBJECTION ONCE

4    MORE?

5        AN EXPERT IS ALLOWED TO -- AN EXPERT IS ALLOWED TO RELY ON

6    HEARSAY, BUT NOT TO BE A MOUTHPIECE FOR HEARSAY.  HE'S GOING TO

7    PRESENT A FACT WE HAVEN'T HAD AN OPPORTUNITY TO CROSS.

8           THE COURT:  REPEAT THE QUESTION.

9    BY MR. CRAIG:

10   Q.  HAVE YOU DONE ANYTHING TO CHECK THE ACCURACY OF

11   MR. SHOHAT'S TESTIMONY?

12          THE COURT:  OVERRULED.  I'M GOING TO ALLOW HIM TO

13   ANSWER.

14          THE WITNESS:  YES.  SO I SPOKE TO DEFENDANTS' CFO,

15   YIFA IDISIS.

16          THE COURT:  OKAY.  WELL, HE CAN'T TESTIFY AS TO ANY

17   OUT OF COURT STATEMENT MADE BY THE PERSON HE SPOKE TO.

18          MR. CRAIG:  UM --

19          THE COURT:  SO THAT'S A HEARSAY OBJECTION, WHICH I

20   WOULD SUSTAIN.

21          MR. CRAIG:  OKAY.  MY UNDERSTANDING WAS THAT --

22          THE COURT:  YES, BUT WE'RE NOT GOING TO ALLOW -- HE

23   CAN RELY ON IT IN COMING UP WITH HIS REPORT, BUT HE CAN'T

24   TESTIFY IN OPEN COURT TO SOMETHING JUST BECAUSE HE RELIED UPON

25   IT.

1      BY MR. CRAIG:

2      Q.   DID YOU DEVELOP ANY OPINIONS BASED ON YOUR DISCUSSIONS

3      WITH MS. IDISIS?

4              MR. BLOCK:  YOUR HONOR, OBJECTION.

5              THE COURT:  THAT'S A LITTLE BIT DIFFERENT.  HE CAN'T

6      SAY WHAT THE OUT OF COURT STATEMENTS WERE, BUT IF HE'S CHANGED

7      HIS OPINION BASED UPON SOMETHING THAT HE HEARD --

8              MR. BLOCK:  BUT, YOUR HONOR, I AM CONCERNED THAT HE'S

9      JUST GOING TO RELY THAT HEARSAY.

10          BUT MY OBJECTION NOW IS THAT WE AGREED THERE WOULD NOT BE

11     OPINION TESTIMONY.  IT WAS JUST GOING TO BE EXPLANATION OF

12     THESE FOUR DOCUMENTS.  THAT'S WHAT MS. TREXLER DID.

13          AND SO THIS WOULD BE OUTSIDE THE SCOPE OF THE EVIDENCE

14     THAT YOU'RE ALLOWING AT THIS PHASE.

15              MR. CRAIG:  I CAN REFRAME THE QUESTION.

16              THE COURT:  THAT'S -- THAT IS CORRECT, WE DID AGREE

17      THAT THERE WOULD BE NO ADDITIONAL OPINION TESTIMONY ON THE

18      LIMITED ISSUE OF THE FINANCIAL STATEMENTS.

19          SO I'M GOING TO HAVE TO SUSTAIN THAT, COUNSEL.

20              MR. CRAIG:  ONE MOMENT, YOUR HONOR.

21          (PAUSE IN PROCEEDINGS.)

22      BY MR. CRAIG:

23      Q.   MS. TREXLER TESTIFIED TO THE EFFECT THAT GAAP REQUIRES

24      THAT THE TRADE ACCOUNT RECEIVABLE ACCOUNT WOULD NEED TO BE

25      ADJUSTED TO REFLECT UNCERTAINTY OVER COLLECTIONS.

1        DO YOU RECALL THAT TESTIMONY?

2    A.   YES, I DID HEAR THAT TESTIMONY.

3    Q.   DOES MS. TREXLER'S TESTIMONY SUGGEST TO YOU THAT THE FULL

4    AMOUNT OF THE TRADE ACCOUNTS RECEIVABLE BALANCE MUST BE

5    COLLECTIBLE?

6         MR. BLOCK:  OBJECTION, YOUR HONOR.  NOW HE'S ASKING

7    FOR ACCOUNTING STANDARDS TESTIMONY, WHICH IS EXACTLY WHAT HE'S

8    NOT QUALIFIED ON.

9         THE COURT:  WELL, I'M NOT SURE.  I DON'T UNDERSTAND

10   THE QUESTION.

11        MR. CRAIG:  I'LL ASK A --

12        THE COURT:  YOU'RE ASKING WHAT MS. TREXLER'S

13   TESTIMONY SUGGESTS TO HIM, BUT THE JURY HAS HEARD HER TESTIMONY

14   AND WILL MAKE THEIR OWN INFERENCES.

15        MR. CRAIG:  ALL RIGHT.  I'LL ASK A DIFFERENT

16   QUESTION, YOUR HONOR.

17   Q.   IS THERE ANY EVIDENCE YOU REVIEWED ON NSO'S FINANCIAL

18   DOCUMENTS THAT ARE IN EVIDENCE THAT CORROBORATES THAT THERE

19   WOULD BE SIGNIFICANT CONCERNS OVER THE COLLECTABILITY OF THE

20   TRADE ACCOUNTS RECEIVABLE LINE?

21   A.   YES.

22   Q.   CAN YOU EXPLAIN WHAT THAT IS?

23   A.   SO AS I MENTIONED EARLIER, ONE OF THE TYPICAL METRICS TO

24   LOOK AT FOR AN ACCOUNTS RECEIVABLE BALANCE IS THE AVERAGE DAYS

25   OUTSTANDING OF THE BALANCE.

1          SO WHEN COMPANIES SEND INVOICES, TYPICALLY THEIR CUSTOMERS

2     WILL PAY WITH SOME DELAY, MAYBE A ONE TO THREE MONTH DELAY.  SO

3     THAT WOULD SAY A 30 TO 90 DAY AVERAGE DAYS OUTSTANDING BALANCE

4     OF THE ACCOUNTS RECEIVABLE.

5          SO HERE WHEN WE DO THAT CALCULATION FOR NSO, THEIR -- JUST

6     AS AN EXAMPLE, THEIR TRADE ACCOUNTS RECEIVABLE BALANCE IS

7     $158.8 MILLION IN 2024.  THEIR REVENUE IS 90 -- SORRY, I HAVE

8     TO GET THE EXACT NUMBERS -- IS $95.9 MILLION, SO THAT'S MORE --

9     ESSENTIALLY THE ACCOUNTS RECEIVABLE IS MORE THAN 150 PERCENT OF

10    THE REVENUES OF THE COMPANY.

11         SO THAT MEANS THERE'S ACTUALLY MORE THAN AN 18 MONTH

12    BALANCE IN THAT ACCOUNTS RECEIVABLE BALANCE, SO THAT BY ITSELF

13    WOULD SUGGEST SIGNIFICANT RISK OF UNCOLLECTABILITY.  WE'RE NOT

14    TALKING ABOUT 30 TO 90 DAY ACCOUNT RECEIVABLE BALANCE.  THIS IS

15    OVER A YEAR AND A HALF THAT THOSE HAVE BEEN OUTSTANDING.

16    Q.   MS. TREXLER SAID NSO PAID OFF ITS LOAN PAYABLE BASED ON

17     THE CONTENT OF THE FINANCIAL DOCUMENTS.

18         DO YOU AGREE WITH THAT?

19    A.   WELL, SO THERE ARE OTHER -- WE SEE THERE'S ACTUALLY A

20     PRETTY BIG REDUCTION IN THE TRADE ACCOUNTS, TRADE ACCOUNTS

21     RECEIVABLE BALANCE AS WELL.

22         SO THERE -- I THINK MS. TREXLER POINTED OUT THAT THE

23    LOAN'S PAYABLE BALANCE WENT FROM 19 AND A HALF MILLION OR

24    19.55 MILLION DOWN TO ZERO, AND THAT THE LONG-TERM LOAN NET

25    GROW WAS REDUCED BY ABOUT $5 MILLION.  I THINK THAT'S WHAT HER

 1    TESTIMONY WAS ABOUT.

 2         BUT IF YOU SCROLL BACK UP HIGHER ON THE BALANCE SHEET, WE

 3    ALSO SEE THAT THE TRADE ACCOUNTS RECEIVABLE BALANCE WAS ALSO

 4    REDUCED -- WAS REDUCED BY ABOUT 30 MILLION.

 5         SO AS I UNDERSTAND, THOSE WERE ESSENTIALLY OFFSET AND THAT

 6    WAS PART OF A TRANSACTION THAT --

 7              MR. BLOCK:  OBJECTION, YOUR HONOR.

 8              THE COURT:  AND YOUR OBJECTION IS?

 9              MR. BLOCK:  THE OBJECTION IS THAT'S NOT ON THE FACE

10    OF THE DOCUMENT.  SO HE'S TRYING TO BRING FACTS THAT AREN'T

11    HERE THAT WE DON'T HAVE AN OPPORTUNITY TO CROSS.  THAT'S NOT AN

12    INFERENCE FROM THE NUMBERS.

13              THE COURT:  OKAY.  ESTABLISH A FOUNDATION FOR HIS

14    ABILITY TO DO SO.

15    BY MR. CRAIG:

16    Q.   MR. PINSONNEAULT, IS YOUR ANSWER THAT YOU JUST GAVE BASED

17    ENTIRELY ON THE FOUR CORNERS OF EXHIBIT 1779, OR IS IT BASED ON

18    SOMETHING ELSE?

19    A.   SO YOU CAN -- OBVIOUSLY THESE REDUCTIONS IN THESE ACCOUNTS

20    ARE ON THE FOUR CORNERS OF THIS EXHIBIT.

21    Q.   THANK YOU.

22         DO YOU AGREE THAT NSO'S DEBT IS LOW, AS MS. TREXLER JUST

23    TESTIFIED?

24    A.   WELL, IT HAS TO BE -- YOU HAVE TO CONSIDER DEBT RELATIVE

25    TO ASSETS.

1          SO FOR NSO, IF YOU INCLUDED ALL OF THESE TRADE ACCOUNTS

2     RECEIVABLE IN THE BALANCE, THAT WOULD TELL ONE STORY.

3          BUT AS MR. SHOHAT TESTIFIED, AND AS I CONFIRMED WITH THIS

4     AVERAGE DAYS OR AVERAGE MONTHS OUTSTANDING OF THIS TRADE

5     ACCOUNTS RECEIVABLE BALANCE, THAT'S A VERY DOUBTFUL ACCOUNT TO

6     BE COLLECTED.

7          SO WHEN THAT IS REMOVED, NOW THE ASSETS OR THE LOANS ARE

8     MUCH HIGHER THAN THE ASSETS.

9          AND THE OTHER -- MS. TREXLER IN HER TESTIMONY REALLY

10    FOCUSSED ON THE TOTAL ASSETS VERSUS THE TOTAL LIABILITIES.

11         BUT THAT INCLUDES WHAT ARE HERE AS NON-CURRENT ASSETS AND

12    NON-CURRENT LIABILITIES, AND I THINK THERE'S BEEN TESTIMONY

13    HERE THAT CURRENT ASSETS, OR CURRENT LIABILITIES, ARE THOSE

14    THAT ARE EXPECTED TO BE TRANSACTED IN THE NEXT YEAR.

15         NON-CURRENT ASSETS AND NON-CURRENT LIABILITIES ARE THOSE

16    THAT ARE EXPECTED TO BE TRANSACTED AFTER -- MORE THAN A YEAR

17    OUT.  SO THAT COULD BE A YEAR AND A HALF, THAT COULD BE FIVE

18    YEARS.  THOSE COULD BE LOANS THAT HAVE NO TERM, AND SO THERE'S

19    NO REQUIREMENT TO REPAY BY CERTAIN DATES.

20         SO WHEN YOU, WHEN YOU -- ESPECIALLY FOR Q CYBER, WHEN WE

21    LOOK AT Q CYBER, IT TELLS A VERY DIFFERENT PICTURE WHEN YOU

22    LOOK AT THE CURRENT ASSETS AND CURRENT LIABILITIES VERSUS WHEN

23    YOU LOOK AT THE TOTAL ASSETS AND TOTAL LIABILITIES AS

24    MS. TREXLER FOCUSSED ON.

25    Q.   LAST QUESTION, MR. PINSONNEAULT.  IS NET WORTH RELEVANT TO

1        NSO'S ABILITY TO PAY A PUNITIVE DAMAGES AWARD?

2                 MR. BLOCK:  OBJECTION, YOUR HONOR.

3                 THE COURT:  AND THE OBJECTION IS?

4                 MR. BLOCK:  CALLS FOR A LEGAL CONCLUSION.  NOT WITHIN

5        THE SCOPE.

6                 THE COURT:  I THINK IT'S A FAIR QUESTION.  OVERRULED.

7                 THE WITNESS:  SO AS I JUST EXPLAINED, NET WORTH

8        INCLUDES THESE NON-CURRENT ASSETS AND NON-CURRENT LIABILITIES.

9            WHEN YOU FOCUS ON CURRENT ASSETS AND CURRENT LIABILITIES,

10       IT LOOKS -- IT TELLS A VERY DIFFERENT STORY, A MORE RELEVANT

11       STORY GIVEN THAT WE'RE TALKING ABOUT THE NEXT 1 YEAR RATHER

12       THAN THE NEXT 5, 10, 20 YEARS OF ASSETS AND LIABILITIES.

13                MR. CRAIG:  NO MORE QUESTIONS, YOUR HONOR.

14                THE COURT:  ALL RIGHT.

15           ANY CROSS?

16                MR. BLOCK:  YES, YOUR HONOR.

17                MR. ANDRES:  MAY WE HAVE JUST A MOMENT, YOUR HONOR?

18                MR. BLOCK:  MAY WE HAVE JUST A MOMENT?

19                THE COURT:  YES.

20                MR. BLOCK:  THANK YOU.

21           (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

22                            **CROSS-EXAMINATION**

23       BY MR. BLOCK:

24       Q.   GOOD MORNING, MR. PINSONNEAULT.

25       A.   GOOD MORNING.

1    Q.   WE ESTABLISHED, YOU DON'T HOLD YOURSELF OUT AS AN EXPERT

2    IN ACCOUNTING?

3    A.   THAT'S CORRECT.

4    Q.   AND YOU WEREN'T QUALIFIED ON ACCOUNTING STANDARDS IN THIS

5    CASE?

6    A.   I THINK THAT'S ALSO CORRECT, YES.

7    Q.   OKAY.  WE'VE BEEN TALKING ABOUT FOUR FINANCIAL DOCUMENTS

8    THAT DEFENDANTS NSO GROUP AND Q CYBER PRODUCED IN THIS

9    LITIGATION; RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   THOSE ARE EXHIBITS 1779, 1780, 1781, 1782; RIGHT?

12   A.   THAT'S CORRECT, YES.

13   Q.   NOW, YOU'RE NOT TELLING THE JURY THAT THOSE FINANCIAL

14   DOCUMENTS ARE INACCURATE; RIGHT?

15   A.   NO, I'M NOT SAYING THOSE ARE INACCURATE, NO.

16   Q.   OKAY.  JUDGE HAMILTON HAS ALREADY DETERMINED THAT NSO AND

17   Q CYBER VIOLATED U.S. AND CALIFORNIA LAW IN THIS CASE.

18        BUT YOU'RE NOT SUGGESTING THAT THEY'RE ALSO GUILTY OF

19   ACCOUNTING FRAUD, ARE YOU?

20   A.   NO.

21   Q.   OKAY.  MR. SHOHAT TESTIFIED THAT THE 2023 NUMBERS THAT WE

22   SAW IN THOSE EXHIBITS HAVE BEEN SUBJECT TO AN AUDIT AND THE

23   NUMBERS WE SAW ARE IDENTICAL TO THE NUMBERS IN THE AUDITED

24   REPORT.

25        DO YOU UNDERSTAND THAT?

1      A.   I DO RECALL THAT TESTIMONY, YES.

2      Q.   OKAY.  AND YOU'RE NOT DISPUTING THAT; RIGHT?

3      A.   I'M NOT DISPUTING THAT, NO.

4      Q.   OKAY.  WHEN NSO'S COUNSEL WAS EXAMINING MR. SHOHAT, THEY

5      POINTED TO NSO'S CASH BALANCE, AROUND 5 MILLION AT THE END OF

6      2024, SUGGESTS THAT NSO LACKED THE ABILITY TO PAY A PUNITIVE

7      DAMAGES AWARD.

8           DO YOU RECALL THAT TESTIMONY?

9      A.   I DO REMEMBER QUESTIONS ABOUT THE CASH BALANCE, YES.

10     Q.   NOW, I KNOW YOU'RE NOT AN ACCOUNTANT, BUT DO YOU AGREE

11     WITH ME THAT A COMPANY'S CASH BALANCE ON A BALANCE SHEET AT A

12     POINT IN TIME IS NOT A MEANINGFUL CAP ON THEIR ABILITY TO PAY;

13     RIGHT?

14     A.   SO I WOULD SAY THAT CAP -- THE CASH BALANCE IS ONE OF THE

15     METRICS THAT'S OFTEN LOOKED AT WHEN CONSIDERING ABILITY TO PAY

16     AND FINANCIAL CONDITION.

17     Q.   JUST ONE?

18     A.   YES, ONE OF THE -- YES, THAT'S CORRECT.

19     Q.   AND YOU UNDERSTAND THAT NSO NOT ONLY CAN, BUT DOES, SPEND

20     WELL MORE THAN $5 MILLION EVERY MONTH; RIGHT?

21     A.   I THINK WE DID HEAR TESTIMONY TO THAT EFFECT, YES.

22     Q.   YEAH.  YOU HEARD MR. SHOHAT TESTIFY THAT THEY SPEND

23     $10 MILLION EVERY MONTH, WHICH IS $120 MILLION A YEAR; RIGHT?

24     A.   I THINK HE WAS TALKING ABOUT ROUGHLY.  BUT, YES, I DO

25     RECALL SOME QUESTION AND ANSWER ABOUT $10 MILLION.

1    Q.   OKAY.  YOU'RE AWARE THAT THIS COURT FOUND NSO'S SOFTWARE

2    ILLEGAL?  IT VIOLATES CALIFORNIA LAW; RIGHT?

3    A.   I RECALL -- I RECALL A FINDING THAT THERE WAS LIABILITY.

4    I GUESS -- I DON'T KNOW IF THAT MEANS IT'S ILLEGAL OR NOT.  I

5    DON'T KNOW IF THAT WAS PART OF YOUR QUESTION.

6    Q.   IS IT COMMON FOR A COMPANY TO SPEND MILLIONS AND MILLIONS

7    OF DOLLARS IN R&D ON A PRODUCT THAT VIOLATES U.S. LAW?

8                MR. CRAIG:  OBJECTION.  FOUNDATION.

9                THE COURT:  SUSTAINED.

10               MR. BLOCK:  WITHDRAWN, YOUR HONOR.

11         NO MORE QUESTIONS.

12               THE COURT:  ALL RIGHT.

13         ARE YOU FINISHED WITH THE WITNESS?

14               MR. CRAIG:  YES, YOUR HONOR.

15               THE COURT:  ALL RIGHT.  THANK YOU, MR. PINSONNEAULT.

16   YOU MAY STEP DOWN.

17         ALL RIGHT.  HAVE WE RECEIVED ALL OF THE EVIDENCE THAT

18   WE'RE GOING TO RECEIVE IN THIS TRIAL?

19               MR. ANDRES:  YES, THANKFULLY, YOUR HONOR.

20               MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

21               THE COURT:  ALL RIGHT.

22         MEMBERS OF THE JURY, I'M GOING TO EXCUSE YOU FOR A FEW

23   MINUTES SO WE CAN TAKE UP BUSINESS AND TALK ABOUT THE ORDER OF

24   THE REMAINDER OF THE CASE.

25               THE CLERK:  ALL RISE FOR THE JURY.

```
 1              (JURY OUT AT 9:42 A.M.)

 2                 THE COURT:  ALL RIGHT.  THE PLAINTIFFS WANTED TO MAKE

 3       A MOTION.

 4                 MR. BLOCK:  YES, YOUR HONOR.

 5              UNDER RULE 50(A), PLAINTIFFS MOVE FOR JUDGMENT AS A MATTER

 6       OF LAW UNDER RULE 50(A) AFTER THIS EVIDENCE ON TWO ISSUES.

 7              SO YOUR HONOR HAS FOUND IN THE INSTRUCTIONS, AND WE'RE NOT

 8       RELITIGATING THOSE, BUT ON THE COMPENSATORY DAMAGES PIECE YOU

 9       INCLUDED THE "IF ANY" LANGUAGE, WHICH WOULD ALLOW FOR A FINDING

10       THAT THERE WAS NOT PROOF OF THE FACT OF COMPENSATORY DAMAGES,

11       AND WE THINK NO REASONABLE JURY COULD REACH THAT CONCLUSION.

12              SO THE FIRST MOTION IS, AS A MATTER OF LAW, ZERO

13       COMPENSATORIES WOULD NOT BE A PERMISSIBLE FINDING FOR THE JURY

14       TO RETURN.

15              THE SECOND ONE ON PUNITIVES, YOUR HONOR, SAME THING.  WE

16       DON'T THINK ANY -- THE MOTION IS THAT NO REASONABLE JURY COULD

17       RETURN A VERDICT THAT THIS EVIDENCE DOES NOT ESTABLISH

18       ENTITLEMENT TO PUNITIVE DAMAGES, MALICE, OPPRESSION, OR FRAUD.

19       THE AMOUNT WILL BE WITHIN THE JURY'S DISCRETION, BUT THE

20       ENTITLEMENT TO PUNITIVE DAMAGES IS ESTABLISHED AS A MATTER OF

21       LAW.

22                 THE COURT:  OKAY.

23                 MR. AKROTIRIANAKIS:  DID YOU WANT ME TO RESPOND,

24       YOUR HONOR?

25                 THE COURT:  I DO.
```

1          MR. AKROTIRIANAKIS:  ON THE COMPENSATORY DAMAGES,

2     YOUR HONOR, I THINK THAT THE JURY EASILY, OR A JURY EASILY

3     COULD FIND UNDER THE CIRCUMSTANCES THAT THERE ARE NO

4     COMPENSATORY DAMAGES.

5          I THINK THAT THE EVIDENCE IS -- OR THAT THE CORRECT

6     STANDARD, OF COURSE, BEING AND PERMISSIBLE INTERPRETATION OF

7     THE EVIDENCE WILL BE, BUT I WOULD SUGGEST THAT THE MOST

8     PERMISSIBLE INTERPRETATION, OR THE MOST LOGICAL INTERPRETATION

9     OF THE EVIDENCE IS THAT THERE WAS NO ADDITIONAL FINANCIAL

10    LOSSES OF THE TYPE THAT ARE COMPENSABLE UNDER THE STATUTORY

11    VIOLATIONS THAT ARE PLEADED HERE.

12         THERE WAS NO EXTRA SALARY PAID TO ANY PERSON, THERE WAS NO

13    EXTRA BONUS PAID TO ANY PERSON.  THERE'S A SERIOUS QUESTION

14    ABOUT WHETHER RSU'S ARE INCLUDED PROPERLY IN ANY EVENT, BUT

15    THERE WAS NO EVIDENCE THAT EXTRA RSU'S WERE PAID TO ANYBODY.

16         THERE'S NO EVIDENCE OF WORK THAT WENT WITHOUT HAVING BEEN

17    COMPLETED BECAUSE OF THIS.

18         AT BEST I WOULD SAY THAT THERE'S EVIDENCE THAT WORK WAS

19    RE-PRIORITIZED, BUT THERE'S ABSOLUTELY NO EVIDENCE BEFORE THE

20    JURY THAT ANY WORK WAS NOT COMPLETED.

21         SO I THINK THAT CONSIDERING THAT THERE'S NO ADDITIONAL OUT

22    OF POCKET EXPENSE TO THE PLAINTIFFS, THEY EASILY COULD -- THE

23    JURY EASILY COULD RETURN A VERDICT OF, IF ANY, NO -- ZERO

24    PUNITIVE DAMAGES -- I'M SORRY, ZERO COMPENSATORY DAMAGES.

25         ON THE ISSUE OF PUNITIVE DAMAGES, I WOULD SAY THAT

1235

```
 1   THERE'S -- LOOKING AT -- LOOKING CAREFULLY AT THE DEFINITIONS

 2   IN THE JURY INSTRUCTION ABOUT PUNITIVE DAMAGES AND THE

 3   DEFINITION OF MALICE AND OPPRESSION AND FRAUD IN THOSE, IN

 4   THOSE SPECIFIC DEFINITIONS, THAT THE MOST LOGICAL CONCLUSION

 5   WOULD BE THAT THERE IS NO INTENT TO HARM -- OF COURSE THERE WAS

 6   NO HARM.

 7        AND SO THE JURY WOULD EASILY BE ABLE, ON THIS RECORD, TO

 8   MAKE A FINDING THAT THERE WAS NO MALICE BECAUSE THERE WAS NO

 9   INTENT TO HARM; THAT THERE WAS NO OPPRESSION BECAUSE THERE WAS

10   NO CRUEL HARDSHIP, LET ALONE ANY HARDSHIP, BUT NO CRUEL

11   HARDSHIP VISITED UPON THE PLAINTIFFS IN THIS CASE.

12        AND WITH RESPECT TO FRAUD, THE COURT WILL RECALL THE

13   TESTIMONY THAT -- EXCUSE ME, YOUR HONOR -- THAT THERE WERE NOT

14   ANY INTERACTIONS AT ALL, LET ALONE COMMUNICATIONS TO OR

15   MISREPRESENTATIONS OR ANY REPRESENTATIONS MADE BY THE

16   DEFENDANTS TO THE PLAINTIFFS AT ANY PERTINENT POINT IN TIME UP

17   TO THE FILING OF THIS LAWSUIT.

18        ON CONCEALMENT, YOUR HONOR, THE TESTIMONY FROM THE

19   WITNESSES THAT THE PLAINTIFF HAVE CALLED WAS THAT THE CODE THAT

20   THIS IS ALL ABOUT WAS AN UNENCRYPTED, PLAIN TEXT, THAT IT WAS

21   IMMEDIATELY AND VERY OBVIOUS TO THEM ONCE THEY STARTED LOOKING

22   AT IT.

23        SO I WOULD SUBMIT THAT THE, THAT THE EVIDENCE EASILY IS

24   OPEN TO AN INTERPRETATION THAT THERE WAS NO FRAUD OR

25   CONCEALMENT, YOUR HONOR.
```

1        IF THE COURT HAS ANY SPECIFIC QUESTIONS, I'M HAPPY TO

2   ADDRESS THEM.  BUT I THINK THAT THE -- THAT THE EVIDENCE EASILY

3   WOULD SUPPORT A VERDICT ON -- IN FAVOR OF THE DEFENDANTS ON THE

4   POINTS THAT MR. BLOCK IS RAISING.

5        THE COURT:  OKAY.

6   ANYTHING ELSE?

7        MR. BLOCK:  SURE.

8   ON COMPENSATORY, YOUR HONOR, THEIR OWN EXPERT TESTIFIED

9   THAT HE WOULD NOT GIVE AN OPINION THAT DAMAGES WERE ZERO.  THAT

10  WAS NOT HIS BELIEF.

11       AND ON PUNITIVES, WE NEED ONLY SATISFY ONE OF THE THREE,

12  AND WITHOUT DOING THE ENTIRE CLOSING THAT YOU WOULD HEAR, I

13  THINK THAT THERE'S NO WAY, ON THE BASIS OF THAT EVIDENCE, LET

14  ME JUST SAY IN SUMMARY, THAT A JURY CAN FIND THAT THEY RUN THE

15  TABLE, THAT NONE OF THOSE ARE SATISFIED.

16       THE COURT:  OKAY.

17       MR. AKROTIRIANAKIS:  YOUR HONOR, MR. PINSONNEAULT, AS

18  I THINK HE CLEARLY TESTIFIED, AT LEAST TO ME, AS I WAS HEARING

19  HIS TESTIMONY, IT IS THAT HE WAS HERE TO CRITIQUE THE ANALYSIS

20  THAT MS. TREXLER DID ABOUT, YOU KNOW, SHOULD THIS OR THAT BE

21  WITHIN THE NUMBER THAT SHE CALCULATES TO BE 444,719.

22       HE WASN'T SAYING -- HE WASN'T ANSWERING THE QUESTION IF

23  THERE WERE DAMAGES BECAUSE THERE WAS OR WAS NOT A FINANCIAL

24  LOSS TO THE PLAINTIFFS.

25       SO THAT IS JUST A MISREPRESENTATION OF MR. PINSONNEAULT'S

```
1    ROLE IN THE CASE.

2         IN THE SCOPE OF WHAT HE WAS TALKING ABOUT, WHAT HE WAS

3    HERE TO TALK ABOUT, WHAT HE TOLD THE JURY ABOUT, HE SAID THAT

4    HE THOUGHT THAT MS. TREXLER'S CALCULATIONS WERE INFLATED IN A

5    NUMBER OF WAYS AND THAT THE NUMBER THAT SHE WAS TAKING AIM AT

6    SHOULD RATHER BE AROUND $70,000, NOT THE $444,719 THAT SHE

7    CALCULATED BECAUSE HER INPUTS ARE WRONG.

8         BUT HE WASN'T SAYING THAT THERE MUST BE SOME HARM IN THE

9    CASE.  THAT JUST WASN'T HIS TESTIMONY.

10        AND I THINK I WOULD BE REPEATING MYSELF IF I ADDRESSED

11   FURTHER ON THAT PUNITIVE DAMAGES ISSUE.

12             THE COURT:  OKAY.

13             MR. BLOCK:  YOUR HONOR, THAT JUST CONFIRMS THAT THE

14   ONLY EXPERT OPINION IN THE RECORD WITH RESPECT TO DAMAGES IS

15   THAT THERE ARE SOME, AND THAT WAS UNREBUTTED.

16             THE COURT:  OKAY.  ALL RIGHT.

17        YOU KNOW, IT'S UNUSUAL TO HAVE A RULE 50 MOTION MADE BY A

18   PLAINTIFF AS OPPOSED TO A DEFENDANT ON AN ISSUE AS OPPOSED TO

19   ON THE ENTIRETY OF THE CLAIM.

20        BUT -- SO I'LL -- THAT'S TO SAY, REALLY, THAT IT IS

21   UNUSUAL.

22        BUT THE RULE PERMITS IT.

23        IN THIS CASE, I'M GOING TO LET IT GO TO THE JURY.  BOTH

24   SIDES HAVE MADE REASONABLE ARGUMENTS, AND I, FRANKLY, AM NOT

25   PREPARED TO SAY THAT NO REASONABLE JURY COULD FIND IN FAVOR OF
```

```
 1        DEFENDANTS ON EITHER OF THOSE ISSUES.

 2             SO THE MOTION IS DENIED.

 3                  MR. BLOCK:  THANK YOU, YOUR HONOR.

 4                  THE COURT:  OKAY.  YOU'RE WELCOME.

 5             ALL RIGHT.  NOW, IT'S TEN MINUTES UNTIL.  YOU ALL PROBABLY

 6        NEED TO SET UP FOR YOUR CLOSINGS.

 7             THERE WERE JUST A COUPLE THINGS I WANTED TO ADDRESS WITH

 8        REGARD TO INSTRUCTIONS BECAUSE I'LL GIVE THE INSTRUCTIONS AS

 9        SOON AS THE CLOSINGS ARE DONE.

10             THANK YOU ALL FOR SUBMITTING THIS CLEAN SET.  I DID

11        REQUEST THAT ALL OF THE ORIGINAL JOINTLY SUBMITTED INSTRUCTIONS

12        BE INCLUDED, EXCLUDING THOSE THAT I'VE ALREADY GIVEN, BUT I SEE

13        YOU GAVE ME A COMPLETE SET, EVEN THOSE THAT I'VE ALREADY GIVEN.

14             I'M NOT GOING TO RE-GIVE THOSE.  SO I'M ONLY GOING TO GIVE

15        THE ONES THAT I AGREED TO ON FRIDAY.

16             SO YOU WON'T BE HEARING ME -- I'M GOING TO PULL THE

17        DUPLICATIVE NUMBER ONES OUT.  I'LL GO OVER THEM AND NUMBER THEM

18        DURING OUR BREAK, AND WE'LL BE READY, I THINK, IN -- WHAT, 15,

19        15, 20 MINUTES?

20                  MR. ANDRES:  WHENEVER YOU'RE READY, YOUR HONOR.

21                  MR. AKROTIRIANAKIS:  THAT'S FINE.

22             DID I HEAR THE COURT TO SAY THAT YOU INTENDED TO INSTRUCT

23         THE JURY AFTER ARGUMENT?

24                  THE COURT:  YES.

25                  MR. AKROTIRIANAKIS:  EITHER WAY.  I JUST NEEDED TO
```

```
1        KNOW SO I KNOW HOW TO SAY IT.

2                THE COURT:  I'LL GO THROUGH THEM, NUMBER THEM, PUT A

3        COVER SHEET ON IT, MAKE SURE THAT EACH SIDE HAS A COPY, WE'RE

4        GOING TO MAKE COPIES FOR THE ENTIRE JURY PANEL SO EACH ONE OF

5        THEM WILL HAVE THEM AS WELL.  WE'LL DO THAT NOW.

6            SO WHY DON'T WE TAKE, SAY, 20 MINUTES, SO I CAN ACCOMPLISH

7        THAT AND YOU ALL CAN SET UP AND GET READY.

8                MR. ANDRES:  YOUR HONOR, I'M JUST GOING TO MOVE THE

9        PODIUM.

10               THE COURT:  SURE.

11               MR. ANDRES:  I JUST WANT TO HAVE A SCREEN THAT I CAN

12       SEE FOR THE SLIDES.

13               THE COURT:  YEAH, THAT'S FINE.

14               MR. ANDRES:  THANK YOU, YOUR HONOR.

15               THE COURT:  OKAY.

16               MR. NOLLER:  THANK YOU, YOUR HONOR.

17               MR. ANDRES:  OKAY.  THANK YOU.

18           (RECESS FROM 9:52 A.M. UNTIL 10:17 A.M.)

19               THE COURT:  ALL RIGHT.  LET'S SEAT THE JURY.

20           (PAUSE IN PROCEEDINGS.)

21               THE CLERK:  ALL RISE FOR THE JURY.

22           (JURY IN AT 10:18 A.M.)

23               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

24               THE COURT:  ALL RIGHT.  MEMBERS OF THE JURY, WE'RE

25       READY FOR THE CLOSING ARGUMENTS IN THIS CASE.
```

1        MR. ANDRES WILL GO FIRST.

2            MR. ANDRES:  THANKS, YOUR HONOR.

3        **(MR. ANDRES GAVE HIS CLOSING ARGUMENT ON BEHALF OF**

4    **PLAINTIFFS.)**

5            MR. ANDRES:  NSO IS A COMMERCIAL SPYWARE COMPANY THAT

6    LAUNCHED A SERIES OF CYBER ATTACKS AGAINST WHATSAPP AND ITS

7    USERS SOMETIME BEFORE OCTOBER 2018, AND THEN AGAIN IN 2019, AND

8    YET AGAIN IN 2020.

9        NSO USED TERMS LIKE EDEN, HEAVEN, AND ERISED, WHICH IS

10   DESIRE SPELLED BACKWARDS.  THOSE WORDS DON'T CARRY THEIR COMMON

11   MEANING IN TERMS OF NSO.  THEY'RE DANGEROUS WORDS.  THEY ARE

12   CODE NAMES FOR DIFFERENT INSTALLATION VECTORS AS PART OF THEIR

13   MALICIOUS PEGASUS CYBER TOOL WHICH ALLOWS SPYING ON PHONES OF

14   PEOPLE THAT USE WHATSAPP, IN THIS CASE, 1400 PEOPLE'S PHONES IN

15   A TWO-WEEK PERIOD ALONE.

16       THAT ATTACK WAS EFFECTUATED THROUGH THE CALIFORNIA

17   SERVERS, AND THAT'S WHY WE'RE HERE IN COURT IN CALIFORNIA.

18       BASED ON THE EVIDENCE IN THIS CASE, THE UNDISPUTED

19   EVIDENCE, YOU KNOW ALL OF THAT TO BE TRUE.

20       NOW, EXACTLY A WEEK AGO, IF YOU CAN REMEMBER BACK ON THE

21   FIRST DAY OF THIS TRIAL, MR. PEREZ, MY COLLEAGUE, GAVE YOU A

22   PREVIEW OF WHAT THE EVIDENCE WOULD SHOW.

23       HE TOLD YOU THAT THE ENGINEERS WOULD TALK ABOUT A UNIQUE

24   ATTACK THAT WHATSAPP ENGINEERS DISCOVERED.

25       HE TOLD YOU THAT WHATSAPP RECOGNIZED THAT THAT ATTACK WAS

1    EXCEPTIONALLY SOPHISTICATED.

2         HE TOLD YOU THAT WHATSAPP WORKED HARD, 24/7, TO

3    INVESTIGATE THAT ATTACK AND TO REMEDIATE AND TO PREVENT IT FROM

4    HAPPENING AGAIN.

5         MR. PEREZ TOLD YOU ABOUT THE DETAILS OF THAT ATTACK.  HE

6    NOTED THAT NSO WAS USING WHATSAPP TO TRIGGER THE INSTALLATION

7    OF PEGASUS ON MOBILE DEVICES, SPECIFICALLY ANDROID DEVICES.

8         HE TOLD YOU ABOUT THE CODE THAT WAS SENT THROUGH WHATSAPP

9    SERVERS, AND HERE IT IS.  YOU MAY REMEMBER THAT.

10        THAT CODE INJECTED INTO DATA -- INJECTED INTO THE DATA

11   TRANSMITTED THROUGH WHATSAPP SERVERS AND WOULD TRIGGER THE

12   TARGET DEVICES TO REACH OUT TO A SERVER SET UP BY NSO AND

13   DOWNLOAD THE PEGASUS SPYWARE.

14        YOU'VE HEARD THAT CODE REFERRED TO AS THE AGENT.

15        MR. PEREZ PREVIEWED FOR YOU THE WHOLE CONCEPT OF

16   ZERO-CLICK VECTORS, MEANING THAT A PERSON'S PHONE COULD BE

17   INFECTED BY PEGASUS WITHOUT THEM DOING ANYTHING, WITHOUT HIM OR

18   HER, OR HER OR HIM, ANSWERING THE PHONE, OR DOING ANYTHING AT

19   ALL.

20        HE TOLD YOU ABOUT THE CAPABILITIES OF PEGASUS, AND WE'VE

21   HEARD ABOUT THAT REPEATEDLY, AND THEY'RE SHOCKING.  THEY'RE

22   SHOCKING:  THE ABILITY TO READ MESSAGES, LISTEN TO CALLS,

23   PINPOINT LOCATION, ACTIVATE THE MICROPHONE, TAKE PHOTOGRAPHS OR

24   SCREENSHOTS.

25        PEGASUS ALLOWS SPYING BEYOND ANY MEANINGFUL DEFINITION OF

1        THE WORD "SPYING" AND THEN SOME.

2            AND YOU KNOW THAT IN THE COURSE OF THIS CONDUCT -- AND

3        YOU'VE HEARD ALL OF THE FACTS -- MR. PEREZ TOLD YOU THAT HE

4        WOULD DESCRIBE NOT ONLY WHAT NSO DID, BUT HOW THEY DID IT AND

5        WHY.

6            AND YOU SEE HERE THAT THEY DID IT DELIBERATELY.  THEY DID

7        IT INTENTIONALLY; THAT IS, THIS WAS NOT AN ACCIDENT.  THEY DID

8        IT SECRETLY.  THEY DID IT WITHOUT ANY REGARD FOR WHATSAPP'S

9        RIGHTS, AND THEY DID IT REPEATEDLY, ATTACK AFTER ATTACK AFTER

10       ATTACK.

11           SO LET ME GO THROUGH THOSE BRIEFLY.

12           NSO ACTED DELIBERATELY HERE FOR THE PURPOSES OF THIS

13       SPYWARE IN SELLING IT FOR MILLIONS AND MILLIONS OF DOLLARS TO

14       THEIR GOVERNMENT CUSTOMERS, WHAT THEY CLAIM ARE THEIR

15       GOVERNMENT CUSTOMERS ENGAGING IN RESEARCH AND DEVELOPMENT.

16       THAT'S NSO'S R&D, AND THEY CALLED SOME OF THIS TECHNOLOGY A

17       BREAKTHROUGH.

18           NSO OPERATED SECRETLY.  THEY DELIBERATELY CONCEALED THEIR

19       ATTACKS FOR THE SIMPLE REASON THAT IF WHATSAPP UNDERSTOOD THE

20       ATTACKS OR DETECTED THEM, THEY WOULD TRY TO STOP THEM.

21           AND IF YOU JUST STEP BACK AND THINK IT AND USE YOUR COMMON

22       SENSE, YOU CAN'T REALLY SPY ON SOMEBODY TO TELL THEM YOU'RE

23       GOING TO SPY ON THEM.  THAT DOESN'T MAKE SENSE.

24           SO NSO OPERATED SECRETLY.  THEY ANONYMIZED SERVERS.  THEY

25       HAD A WHOLE TEAM OF PEOPLE CALLED OPERATIONAL SECURITY THAT WAS

1    INTENDED TO KEEP THEIR OPERATIONS SECRET, TO CONCEAL IT, AND

2    THEY HAD A SERIES OF OTHER STRATEGIES AS WELL.

3        NSO ACTED WITHOUT REGARD TO WHATSAPP'S RIGHTS AND KEPT THE

4    SOFTWARE SECRET TO WHATSAPP, SECRET FROM WHATSAPP BECAUSE THEY

5    FULLY KNEW THAT IF IT WASN'T SECRET, WHATSAPP WOULD STOP IT,

6    AND THEY DID IT REPEATEDLY, AS I SAID.  YOU'VE HEARD ABOUT THE

7    ATTACKS HAPPENING OVER AND OVER AND OVER AGAIN.  WHATSAPP TRIED

8    TO PATCH IT AND NSO COMES BACK WITH A NEW VECTOR OR A NEW

9    OPPORTUNITY OR A NEW WAY TO GET IN.

10        AND THAT'S THEIR BUSINESS.  THEY'RE IN THE BUSINESS OF

11    SPYWARE.  SO WHEN THEY'RE BLOCKED, IN ORDER FOR THEIR BUSINESS

12    TO PROGRESS, THEY HAVE TO KEEP TRYING, AND YOU HEARD ABOUT THAT

13    TESTIMONY OVER AND OVER.

14        NONE OF THAT IS DISPUTED, LADIES AND GENTLEMEN.

15        AND ULTIMATELY YOU KNOW THAT THEY DID ALL OF THAT FOR

16    PROFIT AND MONEY.  NSO IS A FOR-PROFIT COMPANY, AND THEY MADE

17    MILLIONS OF DOLLARS.

18        NOW, EACH ONE OF THESE FACTS THAT MR. PEREZ PREVIEWED FOR

19    YOU IN HIS OPENING WE'VE NOW PROVEN DURING TRIAL.

20        AND OVER THE COURSE OF THE NEXT HOUR OR SO, AND MAYBE

21    LESS -- AND YOU MAY NOTICE THE CLOCK HAS NOW BEEN FIXED.  THIS

22    MORNING IT WAS BROKEN AND NOW IT'S BEEN FIXED, SO YOU CAN

23    ACTUALLY KEEP TIME.  I THINK WE'RE ALL REALLY HAPPY ABOUT THAT.

24        BUT OVER THE NEXT HOUR OR SO, I'M GOING TO GO THROUGH THE

25    EVIDENCE.

1    LET ME TELL YOU WHAT I MEAN BY EVIDENCE BECAUSE IT IS

2    CRITICALLY IMPORTANT.  CRITICALLY IMPORTANT.

3    EVIDENCE IS THE WITNESS TESTIMONY THAT CAME IN THROUGH

4    THIS WITNESS STAND, IT'S THE VIDEOS, IT'S THE DOCUMENTS.

5    THAT'S WHAT'S EVIDENCE.

6    HERE'S WHAT'S NOT EVIDENCE.  WHAT I SAY IS NOT EVIDENCE,

7    AND JUDGE HAMILTON WILL TELL YOU THAT.  WHAT LAWYERS SAY IN AN

8    AMERICAN COURTROOM IS NOT EVIDENCE, AND THAT MEANS WHAT NSO

9    SAYS IN THEIR ARGUMENT IS NOT EVIDENCE, EITHER.  THAT'S

10   ABSOLUTELY TRUE.

11   SO WHAT I'M GOING TO DO IS FOCUS ON THE EVIDENCE AS WE GO

12   THROUGH THESE DIFFERENT ISSUES TODAY AND TALK ABOUT WHAT IT

13   MEANS.

14   AND SOME OF THESE FACTS, AS I'VE SAID, ARE NOT DISPUTED.

15   SO IT'S NOT DISPUTED THAT NSO USED WHATSAPP'S SERVERS,

16   INCLUDING THE CALIFORNIA SERVERS, TO TRIGGER THE INSTALLATION

17   OF PEGASUS.

18   IT'S NOT DISPUTED THAT PEGASUS, ONCE INSTALLED, HAD THESE

19   AMAZING, AMAZING AND SCARY CAPABILITIES.

20   IT'S NOT DISPUTED THAT NSO INTENTIONALLY CONCEALED THOSE

21   ACTIVITIES FROM WHATSAPP AND FROM THE PEOPLE WHOSE PHONES WERE

22   TARGETED.

23   IT'S NOT DISPUTED THAT NSO -- THAT WHATSAPP WOULD HAVE

24   STOPPED THEM, AND TRIED TO STOP THEM WHEN THEY COULD.

25   AND IT'S NOT DISPUTED THAT NSO LAUNCHED THESE ATTACKS OVER

1    AND OVER AND OVER AGAIN.

2         AS I SAID, WE'RE NOW GOING TO REVIEW THE EVIDENCE THAT

3    ESTABLISHES THESE FACTS.

4         AND AS A RESULT OF THOSE FACTS, WE'RE GOING TO ASK YOU TO

5    RETURN A VERDICT WITH RESPECT TO COMPENSATORY DAMAGES OF

6    $444,719 AS YOU'VE HEARD EARLIER.

7         WE'RE ALSO GOING TO ASK FOR A SUBSTANTIAL PUNITIVE DAMAGE

8    AWARD, AN AWARD THAT, IN YOUR JUDGMENT, HOLDS NSO ACCOUNTABLE

9    AND PUNISHES THEM FOR THEIR CONDUCT.  A PUNITIVE DAMAGES AWARD

10   THAT'S SUFFICIENT TO DETER THEM FROM DOING SOMETHING SIMILAR IN

11   THE FUTURE, A PUNITIVE DAMAGES AWARD THAT'S SUFFICIENT TO SEND

12   A POWERFUL BUT SIMPLE MESSAGE:  THAT HACKING AND SPYING DOES

13   NOT PAY.

14        AND THAT THE CONSEQUENCES FOR THOSE WHO VIOLATE THE LAW IN

15   THIS COUNTRY, AND IN CALIFORNIA SPECIFICALLY, AS TO PUNITIVE

16   DAMAGES, THAT THE COURT HAS ALREADY RULED, HAS ALREADY RULED

17   THAT NSO VIOLATED THE LAW, THAT THOSE CONSEQUENCES WILL BE

18   SEVERE.

19        SO I'M GOING TO GO AND REVIEW THE EVIDENCE WITH YOU OVER

20   AND OVER AGAIN.

21        BUT FIRST, LET ME SAY THANK YOU FOR YOUR TIME.  TOGETHER

22   WITH MY COLLEAGUES, MR. BLOCK, MR. PEREZ, MR. WOOG FROM

23   WHATSAPP, WE WANT TO THANK YOU.  WE KNOW YOU PUT YOUR LIVES ON

24   PAUSE FROM YOUR FAMILIES AND FRIENDS AND WORK TO BE HERE AND

25   LISTEN TO THE EVIDENCE.  WE KNOW YOU'VE DONE THAT DILIGENTLY.

1              JURY SERVICE IS CRITICALLY IMPORTANT TO OUR AMERICAN

2     SYSTEM AND THE RULE OF LAW, AND THAT'S WHAT THIS CASE IS ABOUT.

3              NSO HAS BEEN FOUND LIABLE FOR VIOLATING THE LAW, AND YOUR

4     JOB IS TO MAKE A DECISION ABOUT WHAT THEY SHOULD PAY WITH

5     RESPECT TO THOSE VIOLATIONS.

6              SO THANK YOU VERY MUCH.

7              SO AS A RESULT OF THOSE VIOLATIONS OF LAW, WHATSAPP IS

8     ENTITLED, UNDER THE LAW, TO HOLD NSO ACCOUNTABLE FOR THAT

9     CONDUCT, TO COLLECT DAMAGES, AND TO HAVE NSO FACE THE

10    CONSEQUENCES, TO HAVE YOU, THE JURY, SEND A MESSAGE THAT

11    SPYWARE INSTALLED THROUGH WHATSAPP SERVERS HERE IN CALIFORNIA

12    IS NOT LEGAL AND NOT APPROPRIATE.

13             AND THAT'S THE MOST IMPORTANT PART.  SEND A MESSAGE TO

14    UPHOLD THE RULE OF LAW.  THERE MUST BE CONSEQUENCES IN THIS

15    COUNTRY FOR PEOPLE THAT VIOLATE THE LAW, AND THAT FACT IS NOT

16    IN DISPUTE.

17             NOW, AS YOU KNOW FROM THE EVIDENCE THAT HAS COME IN,

18    WHATSAPP HAS BEEN AT THIS FOR SIX YEARS OR SO.  THIS LAWSUIT

19    WAS FILED IN OCTOBER OF 2019, AND FROM DAY ONE, NSO PLEDGED TO

20    FIGHT IT EVERY STEP OF THE WAY.  YOU KNOW THAT FROM THE PRESS

21    RELEASE.

22             AND YOU KNOW THAT FROM WHAT'S HAPPENED IN THIS COURTROOM,

23    THAT THEY'VE FOUGHT TOOTH AND NAIL TO PROTECT PEGASUS, THEIR

24    SPYING, THEIR HACKING.

25             AS THE VICTIM OF THAT CYBER ATTACK, WHATSAPP HAS A RIGHT

1      TO COME TO COURT, AND THAT'S WHAT WE'VE DONE.

2          YOU KNOW THAT WHATSAPP TRIED TO STOP THESE ATTACKS FROM A

3      TECHNICAL STANDPOINT, AND THAT DIDN'T ALWAYS WORK.  YOU KNOW

4      THAT WE BROUGHT THIS LAWSUIT, THAT WE PREVAILED WITH RESPECT TO

5      LIABILITY.  YOU KNOW THAT WE'VE NOW COME TO TRIAL PRESENTING

6      THE FACTS, AND NOW WE'RE SEEKING RELIEF.

7          AND EVEN DESPITE THE FACT THAT WE FILED THIS LAWSUIT, YOU

8      KNOW THAT THE EVIDENCE SHOWS THAT WHATSAPP'S ACTIVITY

9      CONTINUED.  THERE WAS TESTIMONY, AND WE'LL SEE IT TODAY, THAT

10     WHATSAPP (SIC) CONTINUED AFTER THE FILING OF THIS LAWSUIT, AND

11     THAT'S SHOCKING, THAT NSO, PUT ON NOTICE THAT THEY WERE --

12     THERE WERE ISSUES WITH CALIFORNIA AND FEDERAL LAW, CONTINUED.

13         THEY'RE NOT GOING TO STOP, LADIES AND GENTLEMEN.  WE'RE

14     ASKING YOU TO SEND A MESSAGE TODAY TO HAVE NSO PAY A PUNITIVE

15     DAMAGES AMOUNT THAT WILL DISABLE THEIR ABILITY TO CONTINUE WITH

16     THIS SPYWARE.

17         NOW, AS I SAID, WE'RE GOING TO TALK ABOUT COMPENSATORY AND

18     PUNITIVE DAMAGES.  THE COMPENSATORY DAMAGES ARE TO COMPENSATE

19     WHATSAPP FOR THEIR EXPENSES THAT THEY USED IN REPAIRING AND

20     INVESTIGATING THESE ATTACKS.

21         AND THE PUNITIVE DAMAGES I'VE ALREADY TALKED ABOUT ARE FOR

22     PUNISHMENT.  THEY'RE FOR DETERRENCE.

23         AND IT'S IMPORTANT TO CONSIDER THE JURY INSTRUCTIONS WITH

24     RESPECT TO PUNITIVE DAMAGES.  THOSE DAMAGES ARE NOT MEANT TO

25     COMPENSATE WHATSAPP.  THAT'S NOT THE PURPOSE.

1          THE PURPOSE IS TO PUNISH NSO, OR SEND A MESSAGE.

2          SO NOTHING IN THE JURY INSTRUCTIONS, WHEN YOU READ THEM,

3    WILL SAY ANYTHING ABOUT THE PLAINTIFF AS TO PUNITIVE DAMAGES.

4    IT'S NOT ANYTHING -- IT DOESN'T RELATE TO WHATSAPP.  IT RELATES

5    TO NSO.

6          THE PURPOSE OF PUNITIVE DAMAGES, AS THE WORD IMPLIES, IS

7    TO PUNISH NSO FOR THEIR HACKING AND SPYWARE.

8          THIS CASE IS ABOUT TAKING AWAY THE MONEY AND POWER TO HACK

9    AND SPY FROM NSO.

10         IT'S NOT ANY ISSUE WITH RESPECT TO META'S FINANCING OR

11   CONFUSING -- EXCUSE ME -- OR ENRICHING META OR WHATSAPP.

12   THAT'S NOT THE ISSUE.

13         AND DON'T BE CONFUSED ABOUT THAT.  PUNITIVE DAMAGES RELATE

14   TO THE CONDUCT OF NSO.

15         NOW, I'VE ALREADY BEEN TALKING FOR ABOUT 12 MINUTES, ABOUT

16   48 LEFT.

17         SO JUST TO GIVE YOU A HEADS UP, I'M SHOOTING FOR AN HOUR,

18   AND OVER THE COURSE OF THAT HOUR, LET ME TELL YOU WHAT I'M

19   GOING TO TALK ABOUT.

20         I'M GOING TO WALK THROUGH THE EVIDENCE, AS I'VE SUGGESTED.

21         I'M GOING TO REVIEW JUDGE HAMILTON'S INSTRUCTIONS.  AT THE

22   END OF THE CLOSING STATEMENTS, YOU'RE GOING TO HEAR

23   INSTRUCTIONS FROM JUDGE HAMILTON.  I BELIEVE SHE'S GOING TO

24   GIVE THOSE TO YOU, THE JURY, TO BRING THEM BACK FOR YOUR

25   DELIBERATIONS.  THEY'RE CRITICALLY IMPORTANT.  THEY'RE

1    CRITICALLY IMPORTANT TO THIS CASE.  SO I WANT TO PREVIEW FOR

2    THOSE A LITTLE.

3         THEN I'LL REVIEW THE EVIDENCE WITH RESPECT TO COMPENSATORY

4    DAMAGES, AND I'LL REVIEW THE EVIDENCE AS IT RELATES TO PUNITIVE

5    DAMAGES.

6         SO LET ME START WITH THE JURY INSTRUCTIONS.

7         THEY'RE SIMILAR IN SOME REGARD TO THE JURY INSTRUCTIONS

8    THAT YOU GOT AT THE BEGINNING OF THE CASE.  JUDGE HAMILTON WILL

9    NOW GIVE YOU MORE DETAILED INSTRUCTIONS FOR YOUR DELIBERATION,

10   AND THEY'RE GOING TO BE MORE SPECIFIC IN IMPORTANT WAYS,

11   BECAUSE JUDGE HAMILTON IS GOING TO SET OUT CERTAIN THINGS THAT

12   SHE HAS DETERMINED ALREADY, AND THOSE ARE THINGS THAT YOU

13   SHOULD CONSIDER TO BE PROVEN AND TRUE.  AND, AGAIN, YOU'LL SEE

14   THOSE IN THE JURY INSTRUCTIONS, BUT LET ME JUST GO THROUGH A

15   COUPLE OF THEM QUICKLY.

16        WITH RESPECT TO THE BREACH OF CONTRACT, YOU REMEMBER THE

17   TERMS OF SERVICE THAT MR. WOOG TESTIFIED ABOUT?  THERE WAS A

18   REFERENCE TO REVERSE ENGINEERING IN WHATSAPP'S TERMS OF

19   SERVICE.

20        JUDGE HAMILTON WILL INSTRUCT YOU IN HER INSTRUCTIONS THAT

21   NSO BREACHED THE TERMS OF SERVICE, AND NOW SHE'S GOING TO TELL

22   YOU THAT THEY DID IT BY REVERSE ENGINEERING AND DECOMPILING

23   WHATSAPP'S SOFTWARE.  SO THAT'S A NEW INSTRUCTION AND YOU'RE

24   GOING TO GET IT.

25        YOU'RE ALSO GOING TO GET INSTRUCTIONS ABOUT HOW NSO

1    VIOLATED THE FEDERAL COMPUTER FRAUD AND ABUSE ACT, AND IN

2    PARTICULAR, YOU'RE GOING TO GET INSTRUCTIONS THAT NSO ACTED

3    INTENTIONALLY, THAT THEY ACTED KNOWINGLY, AND THEY ACTED WITH

4    THE INTENT TO DEFRAUD, AND THEY EXCEEDED THEIR ACCESS IN

5    WHATSAPP'S SERVERS AND OBTAINED INFORMATION.

6          SO, AGAIN, INTENTIONALLY, KNOWINGLY, INTENT TO DEFRAUD.

7    NONE OF WHAT HAPPENED HERE WAS AN ACCIDENT.  THIS IS ALL

8    DELIBERATE CONDUCT.

9          YOU'RE ALSO GOING TO HEAR SOME OF THE DETERMINATIONS THAT

10   JUDGE HAMILTON MADE ABOUT THE WIS, WHICH IS THE WHATSAPP

11   INSTALLER SERVER, THAT NSO CREATED.  IT'S NOT WHATSAPP'S

12   PRODUCT.  IT'S SOMETHING THAT NSO CREATED FOR THE PROCESS OF

13   INSTALLING THEIR HACKING AND INSTALLING PEGASUS.

14         AND YOU'RE GOING TO LEARN THAT THAT WIS, JUDGE HAMILTON

15   WILL TELL YOU THAT IT WAS USED TO OBTAIN PROTECTED INFORMATION

16   BY HAVING IT SENT TO THE TARGET USERS THROUGH WHATSAPP AND BACK

17   TO THE WIS.

18         AS I SAID, JUDGE HAMILTON WILL INSTRUCT YOU ABOUT

19   INTENTIONAL -- THE INTENT TO DEFRAUD BY NSO.

20         SHE'S ALSO GOING TO INSTRUCT YOU THAT NSO OBTAINED

21   INFORMATION, AND THAT NSO EXCEEDED ACCESS IN WHATSAPP'S

22   SERVERS.

23         SHE'S ALSO GOING TO GIVE YOU AN INSTRUCTION ABOUT DECEIT

24   AND CHEATING, AND SPECIFICALLY, SHE'S GOING TO INSTRUCT YOU

25   THAT NSO ACTED KNOWINGLY, WITH INTENT TO DEFRAUD.

1      TO ACT KNOWINGLY MEANS NSO DID IT ON PURPOSE, AND THE

2  INTENT TO DEFRAUD MEANS THAT NSO HAD THE INTENT TO DECEIVE AND

3  TO CHEAT.

4      NOW, AS I SAID, YOU SHOULD REVIEW JUDGE HAMILTON'S

5  INSTRUCTIONS ON THAT, BUT THAT'S NOT SURPRISING TO ANYBODY WHO

6  SAT THROUGH THIS TRIAL, RIGHT?

7      THE ENTIRE WAY THAT NSO IS ABLE TO PUT -- IS ABLE TO HACK

8  INTO WHATSAPP'S SERVERS AND PUT THEIR SOFTWARE, THEIR PEGASUS

9  SPYWARE ON PEOPLE'S PHONES IS THROUGH DECEIT, RIGHT?  THEY'RE

10 DECEIVING THE WHATSAPP SERVERS TO DO SOMETHING THAT THEY'RE NOT

11 INTENDED TO DO.  SO THAT'S NOT SURPRISING TO YOU AT ALL.

12     AND, AGAIN, JUDGE HAMILTON WILL INSTRUCT YOU ABOUT NSO'S

13 INTENT TO DECEIVE AND TO CHEAT, AND THAT THEY OBTAINED

14 SOMETHING OF VALUE.

15     LASTLY, AS YOU KNOW, THERE'S THE FEDERAL COMPUTER FRAUD

16 AND ABUSE ACT, BUT THERE'S ALSO A CALIFORNIA EQUIVALENT, AND

17 THEY'RE DIFFERENT IN SOME REGARDS.  BUT JUDGE HAMILTON HAS

18 FOUND THAT NSO VIOLATED BOTH AND THAT NSO VIOLATED THE

19 CALIFORNIA STATUTE WITH REGARD -- IN THE SAME FASHION THAT THEY

20 DID THE FEDERAL STATUTE.

21     BUT IMPORTANTLY, SHE'S GOING TO GIVE YOU AN INSTRUCTION

22 THAT THAT CONDUCT INVOLVED CONDUCT IN CALIFORNIA.  YOU MAY

23 REMEMBER, YOU SAW A MAP FROM NSO'S COUNSEL WHEN THEY CAME UP

24 HERE.

25     NOW, JUDGE HAMILTON IS GOING TO INSTRUCT YOU THAT THE WIS

1    TARGETED CALIFORNIA SERVERS AND THE PEGASUS CODE WAS SENT

2    THROUGH PLAINTIFFS' WHATSAPP'S CALIFORNIA-BASED SERVERS 43

3    TIMES IN THE MONTH OF MAY ALONE.  FORTY-THREE TIMES HERE IN

4    CALIFORNIA.

5         OKAY.  LET ME MOVE ON TO COMPENSATORY DAMAGES.

6         AND I THINK, LADIES AND GENTLEMEN, YOU'LL SEE THAT THE

7    FACTS AND THE LAW WITH RESPECT TO COMPENSATORY DAMAGES IS

8    REALLY VERY STRAIGHTFORWARD.

9         WHATSAPP SEEKS TO BE COMPENSATED IN THE AMOUNT OF $444,719

10   FOR THE COSTS ASSOCIATED WITH THEIR INVESTIGATION AND

11   REMEDIATION OF THE ATTACK FROM NSO.

12        YOU'VE HEARD THAT THAT ATTACK WAS SOPHISTICATED, REPEATED

13   THAT IT WAS A RARE EVENT, AND THAT ENGINEERS AT WHATSAPP AND

14   META HAD TO RESPOND 24/7.  IT WAS AN EMERGENCY.  IT'S JUST THAT

15   SIMPLE.  THEY ATTACKED WHATSAPP, WHATSAPP RESPONDED, AND

16   WHATSAPP IS SEEKING TO BE COMPENSATED FOR THOSE EXPENSES.

17        JUDGE HAMILTON WILL INSTRUCT YOU THAT COMPENSATORY DAMAGES

18   ARE AVAILABLE UNDER ALL THREE OF THE VIOLATIONS FROM NSO:  THE

19   FEDERAL COMPUTER FRAUD LAW; THE CALIFORNIA; AND ALSO THE BREACH

20   OF CONTRACT.

21        SO LET ME TELL YOU A LITTLE BIT ABOUT THOSE INSTRUCTIONS

22   AND WHAT'S RECOVERABLE.

23        JUDGE HAMILTON WILL INSTRUCT YOU THAT THE PURPOSE OF

24   COMPENSATORY DAMAGES, AS I SAID, IS TO PUT THE PERSON, OR THE

25   PARTY, IN THE SAME POSITION THEY WOULD HAVE BEEN IF THERE

1    WASN'T THIS LAWSUIT OR THERE WASN'T THIS HACKING AND SPYING.

2        SHE'LL TELL YOU WHAT THE BURDEN OF PROOF IS -- THAT IS,

3    WHAT WHATSAPP HAS TO PROVE IN THIS CASE.  SHE'LL TELL YOU THAT

4    THE BURDEN OF PROOF IS BY A PREPONDERANCE OF THE EVIDENCE, AND

5    JUDGE HAMILTON WILL TELL YOU THAT THAT MEANS THAT YOU MUST BE

6    PERSUADED BY THE EVIDENCE THAT THE CLAIM OF DAMAGES IS MORE

7    PROBABLY TRUE THAN NOT.

8        WITH RESPECT TO THE FEDERAL COMPUTER AND FRAUD ACT,

9    JUDGE HAMILTON WILL INSTRUCT YOU THAT YOU CAN AWARD DAMAGES FOR

10   A VARIETY OF CATEGORIES THAT INCLUDES PLAINTIFFS' COSTS OF

11   RESPONDING TO THE VIOLATION; PLAINTIFFS' COSTS OF CONDUCTING A

12   DAMAGE ASSESSMENT; PLAINTIFFS' COSTS OF RESTORING THE DATA,

13   PROGRAM, SYSTEM, OR INFORMATION; AND, VERY IMPORTANTLY,

14   PLAINTIFFS' COSTS OF INVESTIGATING THE VIOLATION.

15       BY "THE VIOLATION," WE'RE TALKING ABOUT NSO'S HACK.

16       AND YOU CAN ALSO COMPENSATE WHATSAPP FOR THE COST OF

17   IDENTIFYING THE VIOLATION.

18       TO RECOVER COMPENSATORY DAMAGES ON THE BREACH OF CONTRACT

19   CLAIM, AGAIN, THE STANDARD IS PREPONDERANCE OF THE EVIDENCE,

20   AND THERE'S A FORESEEABILITY ASPECT THAT BOTH PARTIES KNEW OR

21   COULD HAVE FORESEEN THAT DAMAGES WERE LIKELY TO OCCUR IN THE

22   ORDINARY COURSE OF EVENTS THAT RESULTED IN NSO'S BREACH OF THE

23   CONTRACT.

24       AND THAT'S REALLY EASY.  FIRST OF ALL, THE DAMAGES THAT

25   WE'RE SEEKING FOR ALL THREE OF THESE ARE THE SAME.  AND WE'RE

1    NOT ASKING TO BE PAID THREE TIMES THAT 444,719.  JUST ONE TIME.

2         BUT YOU CAN FIND, OR YOU CAN AWARD THAT COMPENSATION FOR

3    ANY ONE OF THOSE THREE STATUTES.

4         SO, AGAIN, THE DAMAGES HERE ARE THE SAME.

5         YOU HEARD IN THIS CONTRACT INSTRUCTION THAT THERE'S --

6    THERE IS A CONCEPT OF FORESEEABILITY, WHETHER THE TYPE OF

7    CONDUCT THAT BREACHED THE CONTRACT WAS FORESEEABLE.  AND OF

8    COURSE IT WAS.

9         NSO KNEW ON THE DAY THAT THEY SIGNED UP FOR WHATSAPP THAT

10   THEY WERE GOING TO VIOLATE THAT CONTRACT BECAUSE THEIR WHOLE

11   PURPOSE WAS TO INSTALL THEIR SPYWARE THROUGH HACKING.

12        AND YOU ALSO HEARD THAT THE REASON THAT WHATSAPP PUT THIS

13   REVERSE ENGINEERING CONCEPT INTO THEIR CONTRACT WAS TO PROTECT

14   AGAINST THE TYPE OF HARM THAT NSO CAUSED.

15        SO BOTH SIDES, THERE'S FORESEEABILITY WITH RESPECT TO

16   THAT.

17        WITH RESPECT TO THE CALIFORNIA STATUTE, JUDGE HAMILTON

18   WILL INSTRUCT YOU THAT UNDER THE CALIFORNIA COMPUTER FRAUD

19   STATUTE, YOU CAN INCLUDE EXPENDITURE REASONABLY AND NECESSARILY

20   INCURRED, INCURRED BY PLAINTIFFS TO VERIFY -- THAT IS, WHAT

21   WHATSAPP HAD TO DO TO VERIFY THAT ITS COMPUTERS, ITS COMPUTER

22   SYSTEMS, COMPUTER NETWORK, COMPUTER PROGRAM, OR DATA WAS OR WAS

23   NOT ALTERED, DAMAGED, OR DELETED.

24        AND THAT'S NOT AN EXCLUSIVE LIST.  THAT IS AN ILLUSTRATIVE

25   LIST OF THE TYPE OF DAMAGES THAT YOU COULD PROVIDE.

1      SO THAT'S WHAT THE LAW IS.  AGAIN, YOU WILL GET THOSE

2   INSTRUCTIONS FROM JUDGE HAMILTON, AND I ASK YOU TO REVIEW THOSE

3   CAREFULLY.

4      LET'S TALK ABOUT THE EVIDENCE THAT CAME IN WITH RESPECT TO

5   THE COMPENSATORY DAMAGES.

6      YOU KNOW THAT THERE WERE FOUR WITNESSES ON THE WHATSAPP'S

7   SIDE WHO TESTIFIED ABOUT THE ATTACK AND ABOUT THE DAMAGES:

8   CARL WOOG; CLAUDIU GHEORGHE; DREW ROBINSON; AND THEN

9   DANA TREXLER.

10      AND YOU SAW EACH OF THEM TESTIFY HERE, SO YOU HAVE THE

11   ABILITY TO JUDGE THEIR CREDIBILITY.

12      YOU'RE GOING TO GET AN INSTRUCTION FROM JUDGE HAMILTON

13   ABOUT HOW YOU JUDGE THE CREDIBILITY OF WITNESSES.  SO THESE

14   WITNESSES AND NSO'S WITNESSES, IT'S IN YOUR DISCRETION TO

15   BELIEVE THEM OR NOT.  AND JUDGE HAMILTON WILL ADVISE YOU ON HOW

16   YOU CAN DO THAT.

17      NOW, THE NSO WITNESSES WERE ALSO OBVIOUSLY RELEVANT FOR

18   THE PURPOSES OF COMPENSATORY DAMAGES BECAUSE THEY ADMITTED THAT

19   THEY WERE INVOLVED IN THE HACKING AND THE SPYING.

20      AND THEY ALSO TOLD YOU, TESTIFIED -- I THINK PROUDLY --

21   THAT THEIR OWN SOFTWARE WAS SOPHISTICATED AND THAT IT WAS STATE

22   OF THE ART, AND YOU'LL SEE THAT TESTIMONY.

23      SO THE TESTIMONY OF THEIR OWN WITNESSES ALSO DEMONSTRATES

24   HOW SOPHISTICATED THE ATTACK IS, AND NOW YOU KNOW WHY THE

25   RESPONSE REQUIRED 22 PEOPLE, OR MORE, ON THE WHATSAPP SIDE.

1          LET ME SAY A QUICK WORD ABOUT MR. PINSONNEAULT.  YOU SAW

2    HIM AGAIN THIS MORNING.  HE WAS NSO'S DAMAGES EXPERT, AND I'LL

3    ADDRESS THAT LATER, BUT JUST REMEMBER, THERE'S REALLY NOT MUCH

4    TO ADDRESS BECAUSE HE DOESN'T OPPOSE THE AWARDING OF

5    COMPENSATORY DAMAGES.  HE JUST SORT OF QUIBBLED ABOUT THE

6    AMOUNT, AND MOSTLY COMPLAINS ABOUT THE WAY THAT MS. TREXLER

7    CALCULATES DAMAGES.

8          HE DOESN'T SUGGEST THAT DAMAGES ARE INAPPROPRIATE.

9          HE ALSO DOESN'T CONTEST THAT NSO'S ATTACK WAS, IN FACT,

10   SOPHISTICATED.

11         AND I RAISE THAT BECAUSE YOU MAY REMEMBER -- AND IT WAS A

12   LITTLE SURPRISING, YOU MAY REMEMBER THAT MR. PINSONNEAULT

13   ADMITTED THAT HE'D BE CONCERNED IF, IN FACT SCARED, IF HE HAD

14   PEGASUS ON HIS OWN PHONE.

15         I RAISE THAT NOT TO CRITICIZE MR. PINSONNEAULT AT ALL, BUT

16   I THINK IT, AGAIN, SHOWS AND CONFIRMS THE THREAT THAT WAS POSED

17   BY PEGASUS, WHICH IS THE THREAT THAT NSO (SIC) HAD TO RESPOND

18   TO, AND THAT'S THE ISSUE FOR WHICH WE'RE ASKING FOR

19   COMPENSATORY DAMAGES.

20         LET ME TURN TO WHATSAPP'S RESPONSE TO NSO'S CYBER ATTACK.

21         AND AS YOU SEE HERE, THERE WERE TWO PARTS:  THERE WAS

22   FIRST THIS SPRINT IN MAY THAT WAS INTENDED TO ADDRESS THE

23   ATTACK; AND THEN THERE WAS WORK THAT WAS DONE AFTER THAT

24   BECAUSE THE WORK WITH RESPECT TO THE ATTACK CONTINUED.

25         REMEMBER THAT THERE WAS TESTIMONY THAT WHATSAPP WASN'T

1    LOOKING FOR A QUICK FIX.  THEY DIDN'T WANT TO JUST PATCH THE

2    NSO ATTACK AND HAVE IT COME BACK.  THEY WANTED TO UNDERSTAND IT

3    SO THEY HAD A COMPREHENSIVE RESPONSE.

4         AND THEN YOU KNOW THAT THERE WAS ALSO, IN THE SECOND

5    PERIOD OF TIME, THERE WAS ALSO WORK WITH VICTIM NOTIFICATION.

6         SO LET'S TALK ABOUT THE ATTACK AND HOW SOPHISTICATED IT

7    WAS AND THE TESTIMONY YOU HEARD FROM WHATSAPP'S ENGINEERS.

8         SO, FIRST YOU HEARD FROM MR. CLAUDIU GHEORGHE, AND HERE'S

9    HIS TESTIMONY.

10        HE TESTIFIED THAT THIS ATTACK WAS A VERY UNIQUE EVENT.  IT

11   WAS NOT RUN OF THE MILL.  IT WAS VERY UNIQUE, AND AS A RESULT,

12   IT REQUIRED A CROSS-FUNCTIONAL INITIATIVE AT WHATSAPP TO

13   RESPOND.

14        WHAT THAT MEANS, CROSS-FUNCTIONAL, IS DIFFERENT PEOPLE

15   FROM DIFFERENT PARTS OF THE COMPANY HAD TO COME TOGETHER TO

16   RESPOND.  SOME PEOPLE FROM FACEBOOK HELPED WITH IT, TOO.

17        SO THERE WERE PEOPLE WORKING ON THE RESPONSE THAT WEREN'T

18   INVOLVED IN THEIR DAY JOBS.  WHAT THEY WERE DOING WAS SOMETHING

19   DIFFERENT THAN WHAT THEY WERE PAID FOR, AND THAT'S HIS

20   TESTIMONY.

21        HE ALSO TESTIFIED -- AND I THINK THIS IS IMPORTANT -- HE

22   SAID IT WAS A REALLY UNIQUE EVENT, AND HE SAID I HAVEN'T HAD TO

23   DEAL WITH SOMETHING AS SERIOUS OR EXTREME AS THIS EVER IN MY

24   CAREER.

25        AND I THINK THAT'S IMPORTANT AND IT AGAIN SHOWS YOU THE

1    SOPHISTICATION OF THIS ATTACK.

2         AGAIN, IT'S NOT SOMETHING THAT NSO REALLY DISPUTES.

3    MR. SHOHAT TESTIFIED THAT IT WAS SOPHISTICATED AND DIFFERENT

4    FROM WHAT HAPPENS EVERY DAY.

5         NOW, ALSO REMEMBER THAT DREW ROBINSON TESTIFIED.  HE WAS

6    THE OTHER ENGINEER.  AND HE TESTIFIED THAT THE ATTACK WAS ALSO

7    SOMETHING THAT HAPPENED RARELY, ON THE ORDER OF ABOUT EVERY

8    FIVE YEARS.

9         AND, AGAIN, AS I SAID, I'M TRYING TO RELY SPECIFICALLY ON

10   THE TESTIMONY AND THE EVIDENCE AND THE DOCUMENTS.  THAT'S WHAT

11   WE'RE ASKING YOU TO REVIEW WHEN YOU GO BACK TO THE JURY ROOM.

12        AS I SAID, YOU ALSO SAW TESTIMONY FROM NSO'S WITNESSES.

13   MR. SHOHAT TESTIFIED THAT IT WAS VERY SOPHISTICATED.  I ASKED

14   HIM THIS ONE, MEANING THIS ATTACK, WAS MORE SOPHISTICATED THAN

15   THE OTHER ONES?

16        IT WAS VERY SOPHISTICATED, I'LL GIVE YOU THAT.

17        THAT WAS HIS TESTIMONY IS THAT HE'S GIVING ME SOME GIFT OR

18   HE'S NOT ABLE TO JUST ADMIT TO WHAT ARE THE FACTS HERE.  HE

19   DOES ADMIT THAT IT'S SOPHISTICATED, AND THEN HE GOES ON TO SAY,

20   "NSO IS STATE OF THE ART TECHNOLOGY."

21        NOW, BECAUSE THESE ATTACKS WERE SO SOPHISTICATED, NSO HAD

22   TO RESPOND IN KIND.

23        AND, YES, THERE WERE A LOT OF PEOPLE INVOLVED.  THERE WERE

24   MORE THAN 22 PEOPLE INVOLVED.  YOU'LL SEE THAT FROM THE

25   EVIDENCE.

1          BUT WHATSAPP IS ASKING TO BE COMPENSATED ONLY FOR 22 OF

2     THOSE PEOPLE THAT WERE INVOLVED.

3          AND LET'S TALK ABOUT THOSE INDIVIDUALS.

4          YOU'RE GOING TO SEE A RANGE OF EVIDENCE ABOUT THAT.  WE

5     SAW TESTIMONY FROM MR. GHEORGHE, MR. ROBINSON, FROM

6     DANA TREXLER.

7          BUT YOU ALSO SAW DOCUMENTARY EVIDENCE.  SO HERE'S ONE

8     EXAMPLE, PLAINTIFF'S EXHIBIT NUMBER 10, WHICH SHOWS THE VARIOUS

9     PEOPLE WHO WERE INVOLVED IN DISCUSSING THE ATTACK.

10         AND I'LL GET TO THE NAMES IN A MINUTE, BUT I WANT TO JUST

11    MAKE ONE OTHER POINT.  THIS IS CORROBORATION, RIGHT?  SO WHEN

12    YOU GET A PIECE OF EVIDENCE, YOU DON'T HAVE TO JUST JUDGE IT ON

13    ITS OWN.  YOU TAKE IT AND COMPARE IT TO OTHER EVIDENCE.  YOU

14    LISTEN TO WHAT A WITNESS SAYS AND SEE IF THERE ARE DOCUMENTS

15    THAT SUPPORT IT THAT GIVES YOU THE ABILITY TO CREDIT THAT

16    TESTIMONY, RIGHT?  NOBODY IS ASKING YOU TO JUST RELY ON THE

17    SAY-SO OF ANY WITNESS.  WE'RE ASKING YOU TO USE THE EVIDENCE

18    TOGETHER TO MAKE DECISIONS ABOUT ITS CREDIBILITY.

19         AND I THINK THESE DOCUMENTS -- AND, AGAIN, IF YOU'RE

20    TAKING NOTES, THIS IS PLAINTIFFS' EXHIBIT NUMBER 10, BUT

21    THERE'S ALSO PLAINTIFFS' EXHIBIT NUMBER 13, AND ALSO

22    PLAINTIFFS' EXHIBIT NUMBER 932.

23         THESE DOCUMENTS SHOW THE PEOPLE WHO WERE WORKING ON THESE

24    ATTACKS, AND IT'S ADDITIONAL EVIDENCE.

25         SO HERE ARE A COUPLE PEOPLE FROM THESE DOCUMENTS.  YOU

1    HAVE JESUS BARCONS, YOU HAVE DREW ROBINSON, YOU HAVE XI DENG,

2    OTTO EBELING, YOU HAVE BRENDON TISZKA, YUANYUAN WANG.

3         SO THAT'S WHAT THOSE DOCUMENTS DEMONSTRATE, THAT THERE ARE

4    PEOPLE THAT ARE WORKING ON IT.

5         AND BY THE WAY, THERE WERE OTHERS INVOLVED.  LET ME GO

6    THROUGH THOSE OTHER PEOPLE.

7         NOW, WE'VE CREATED THIS CHART OF THE 22 PEOPLE THAT WE'RE

8    CLAIMING COMPENSATORY DAMAGES FOR, AND EACH ONE OF THESE

9    PEOPLE, 22, WE ALSO LIST THEIR INVOLVEMENT BASED ON THE

10   EVIDENCE IN THE CASE.  I'M NOT GOING TO GO THROUGH ALL 22, BUT

11   LET ME GO THROUGH A COUPLE.

12        AASHIN GAUTAM, HE WORKED TO HELP GET INFORMATION TO THE

13   VICTIMS OF THE ATTACK.  YOU HEARD THAT FROM MR. WOOG.

14        MICHAEL SCOTT IS AN INVESTIGATOR WHO WAS ALSO INVOLVED,

15   AND YOU HEARD ABOUT THAT FROM DREW ROBINSON.

16        OTTO EBELING IS A SECURITY ENGINEER WHO HELPED THROUGHOUT

17   THE INVESTIGATION.  YOU HEARD THAT FROM MR. GHEORGHE.

18        ANDY YANG, HE PROVIDED US CONTEXT AND GUIDANCE WITH AN

19   UNDERSTANDING ON THE EXPLOIT.  YOU HEARD THAT FROM

20   MR. GHEORGHE.

21        ARAVIND THANGAVEL WAS ALSO A MEMBER OF THE INTERNAL TOOLS

22   TEAM.  YOU HEARD TESTIMONY FROM MR. GHEORGHE.

23        IGOR MILYAKOV WAS A MEMBER OF THE WHATSAPP TEAM AS WELL.

24        JON SHELLER, HE WAS A MEMBER OF THE ANDROID TEAM.

25        MINGSONG BI WAS ANOTHER SOFTWARE ENGINEER THAT

1    MR. GHEORGHE TESTIFIED ABOUT.

2        XI DENG WAS A MEMBER OF THE CLIENT TEAM WHO WAS WORKING

3    ALONG WITH YUANYUAN, AND MR. GHEORGHE TESTIFIED ABOUT HIM.

4        OKAY.  THAT'S IT.

5        THOSE ARE THE 22.

6        REMEMBER ALSO THAT DREW ROBINSON TESTIFIED ABOUT A

7    PRESENTATION THAT HE GAVE TO THE ENGINEERS THAT WAS CALLED "NSO

8    DAYS" THAT HE USED IN TERMS OF TALKING AND EDUCATING PEOPLE

9    ABOUT THE NSO ATTACK.  THE PRESENTATION WAS CALLED "NSO DAYS,"

10   AND THE FIRST SLIDE, THE FIRST SLIDE HE HAS ENTITLED "UPFRONT

11   CREDIT."

12       THIS IS PLAINTIFFS' EXHIBIT 930.  IF YOU'RE TAKING NOTES,

13   WRITE IT DOWN.  YOU'LL BE ABLE TO REVIEW THESE EXHIBITS DURING

14   YOUR DELIBERATION.

15       TAKE A LOOK AT THIS DOCUMENT.  AND WHY IS IT IMPORTANT?

16   HE SAYS "UPFRONT."  THIS REPRESENTS THE WORK OF A HUGE NUMBER

17   OF PEOPLE.  THAT'S MR. ROBINSON TALKING TO HIS COLLEAGUES,

18   IDENTIFYING THE FACT THAT THERE WERE A LOT OF PEOPLE INVOLVED

19   IN THAT.

20       AND HERE'S HIS TESTIMONY.  SO THIS SLIDE IS JUST ME

21   RECOGNIZING THAT THERE WAS A VERY LARGE NUMBER OF PEOPLE WHO

22   WORKED ON THE PROJECT, AND HE DID NOT INTERACT WITH ALL OF

23   THEM, SO THIS WAS JUST ME ATTEMPTING TO GIVE CREDIT TO THE

24   LARGE NUMBER OF PEOPLE THAT WERE INVOLVED.

25       AGAIN, THIS MAKES THE SAME POINT ABOUT CORROBORATION.

1    HERE'S A DOCUMENT THAT WAS CREATED BEFORE THIS LITIGATION EVER

2    STARTED.  IT WASN'T CREATED FOR THIS LITIGATION.  BUT IT'S A

3    DOCUMENT THAT YOU CAN LOOK AT, AND WHEN YOU EVALUATE WHETHER

4    THE TESTIMONY IS CREDIBLE THAT NSO HAD A LOT OF PEOPLE

5    INVOLVED, YOU CAN RELY ON THIS.

6         NOW, WHY -- NSO IS SAYING THAT WHATSAPP SPENT TOO MUCH

7    MONEY ON THEIR RESPONSE, CLAIMS THAT THE DAMAGE REQUEST IS TOO

8    HIGH.

9         BUT WHEN YOU'RE CONSIDERING THAT, REMEMBER THIS:  REMEMBER

10   THAT NSO -- WHATSAPP IS ASKING FOR 22 PEOPLE THAT WORKED OVER A

11   MONTH, AND THEN SOME WORK BEYOND THAT.

12        THEY'RE RESPONDING TO AN ATTACK BASED ON SOPHISTICATED

13   SOFTWARE.

14        AND YOU KNOW HOW MUCH TIME NSO SPENT TO DEVELOP THAT

15   SOFTWARE?  WELL, MR. GAZNELI TOLD YOU.  HE SPENT MORE THAN A

16   YEAR OF RESEARCH AND DEVELOPMENT, MORE THAN A YEAR ON THIS

17   SOPHISTICATED SOFTWARE, SPYWARE, AND HE USED FOUR ENGINEERS.

18        SO NSO IS -- SORRY.

19        WHATSAPP IS RESPONDING TO THIS ATTACK THAT NSO ITSELF

20   SPENT MORE THAN A YEAR WITH FIVE PEOPLE DEVELOPING.  IT WAS

21   SOPHISTICATED.

22        AND THAT'S MR. GAZNELI'S TESTIMONY.

23        NOW WE TURN TO THE WORK AFTER MAY 13TH, THE REMEDIATION

24   WORK.  THERE WAS VICTIM OUTREACH, AND AS I SAID, AASHIN GAUTAM

25   WAS INVOLVED IN THAT, AND YOU HEARD FROM MR. WOOG IN THIS

1    COURTROOM.

2         WHATSAPP, BY THE WAY, IS NOT ASKING TO BE COMPENSATED FOR

3    MR. WOOG'S WORK BECAUSE IT FELL WITHIN SOME OF HIS OTHER

4    RESPONSIBILITIES AND DUTIES.

5         BUT I THINK IT'S IMPORTANT TO REMEMBER WHAT MR. WOOG SAID

6    ABOUT VICTIM OUTREACH AND WHY THAT OCCURRED.

7         SO HE TESTIFIED THAT WHATSAPP WANTED TO COMMUNICATE WITH

8    THOSE DIRECTLY INVOLVED THAT THEY KNEW THEY HAD COME UNDER

9    SURVEILLANCE.  THEY WANTED TO LET THEM KNOW WHAT THEY COULD DO,

10   AGAIN, TO PROTECT THEMSELVES.

11        THAT'S WHY -- THAT'S WHY WHATSAPP IS REACHING OUT TO THESE

12   VICTIMS, THE PEOPLE WHOSE PHONES WERE INFECTED, THE VICTIMS,

13   AND THOSE ARE PEOPLE.

14        NOW, WHATSAPP CALLS THEM TARGETS OR SOMETHING ELSE, BUT

15   THEY'RE PEOPLE.  AND WHATSAPP WAS REACHING OUT TO THOSE PEOPLE

16   TO LET THEM KNOW THAT THEIR PHONES HAD BEEN HACKED.

17        AND I THINK IT'S ALSO IMPORTANT TO REMEMBER WHAT MR. WOOG

18   SAID ABOUT PRIVACY AND ENCRYPTION AND WHY IT'S IMPORTANT TO

19   WHATSAPP.

20        SO HERE HE TESTIFIED, FUNDAMENTALLY, PRIVACY IS THE

21   FOUNDATION OF WHATSAPP.  IT'S BEEN PART OF OUR APP FROM THE

22   BEGINNING.  AND WE BELIEVE PEOPLE SHOULD BE ABLE TO HAVE A

23   PRIVATE CONVERSATION ONLINE, JUST LIKE YOU WOULD HAVE IN YOUR

24   LIVING ROOM.

25        HE WENT ON TO SAY WE ALL REMEMBER COVID, A TIME WHERE WE

1    COULDN'T BE TOGETHER.  BUT, OF COURSE, MANY OF US HAVE LOVED

2    ONES AROUND THE WORLD, AND YOU WANT TO BE ABLE TO COMMUNICATE

3    WITH THEM PRIVATELY, SAFE IN THE KNOWLEDGE THAT NO ONE ELSE

4    WILL BE ABLE TO HEAR.

5         THAT'S WHY THIS VICTIM OUTREACH IS HAPPENING.

6         OKAY.  THE LAST WITNESS WAS MS. TREXLER, AND SHE'S A CPA,

7    AND SHE TOLD YOU WHAT HER JOB WAS.  SHE WAS ASKED TO QUANTIFY

8    THE PLAINTIFFS' RESPONSE COSTS TO NSO.

9         SHE TOLD YOU WHAT SHE DID TO DO THAT IN TERMS OF HER

10   HOMEWORK.  SHE LOOKED AT COURT DOCUMENTS, SHE LOOKED AT

11   DOCUMENTS THAT WERE PROVIDED BY THE PARTIES, SHE LOOKED AT

12   PUBLICLY AVAILABLE INFORMATION, SHE READ DEPOSITIONS AND SHE

13   SAW TRIAL TESTIMONY AND SHE DID INTERVIEWS.

14        AND BY THE WAY, HERE ARE THE EIGHT PEOPLE THAT SHE

15   INTERVIEWED.  YOU SAW THAT IN HER PRESENTATION:  CORTNEY PADUA,

16   MICHAEL SCOTT, DREW ROBINSON, AASHIN GAUTAM, OTTO EBELING,

17   JESUS BARCONS PALAU, GHEORGHE, AND YUANYUAN WANG.

18        IF MY COLLEAGUES OVER HERE ARE LAUGHING AT ME, IT'S

19   BECAUSE I'M NOT SO GOOD AT PRONOUNCING NAMES AND THEY LIKE TO

20   MAKE FUN.  SO I'M DOING MY BEST, BUT I SUSPECT THAT THERE MAY

21   BE SOME SMILES BACK HERE.

22        NOW, AGAIN, IN ADDITION TO THESE INDIVIDUALS AND THE

23   TESTIMONY THAT THEY WERE INTERVIEWED, YOU CAN LOOK AT ALL THE

24   DOCUMENTS AND SEE THAT THEY'RE IN THE DOCUMENTS THAT

25   CORROBORATES THE TESTIMONY OF THEIR INVOLVEMENT.

1       NOW, HERE IS THE FORMULA THAT MS. TREXLER USED, AND IT'S

2   VERY SIMPLE AND IT MAKES SENSE.

3       SHE ASCERTAINED THE NUMBER OF HOURS AT ISSUE, SHE

4   QUANTIFIED THE COST TO WHATSAPP, AND THAT'S JUST NOT THE COST

5   OF THEIR PEOPLE'S SALARY, BUT IT'S THE COST TO META OR WHATSAPP

6   FOR THESE PEOPLE'S TIME.  SO THERE'S HEALTH CARE COSTS, THERE'S

7   TAXES, THERE'S THE ISSUE WITH THE RSU'S, THE RESTRICTED STOCK.

8       THAT'S WHAT SHE DID.  AND SHE MULTIPLIED THAT NUMBER BY

9   THE RELEVANT HOURLY LABOR RATE TO COME UP WITH WHAT THE COSTS

10  WOULD BE TO WHATSAPP FOR THE RESPONSE HERE.

11      AND THAT JUST MAKES SENSE, AND IT WAS VERY

12  STRAIGHTFORWARD, AND YOU HEARD HER TESTIMONY.

13      YOU'VE HEARD THAT THERE'S BEEN A LOT OF BACK AND FORTH

14  ABOUT THIS RSU ISSUE, THE RESTRICTED STOCK UNITS.

15      IT'S NOT COMPLICATED, EITHER.  THAT'S HOW THESE PEOPLE GET

16  PAID.  AND MR. GHEORGHE AND MR. ROBINSON TESTIFIED ABOUT THAT.

17  PEOPLE IN SOCIAL MEDIA GET -- SOCIAL MEDIA COMPANIES GET PAID

18  THAT WAY.

19      SO SHE WAS OBLIGATED TO CONSIDER THAT.

20      BUT IN ALL CASES, SHE CONSIDERED THE MOST CONSERVATIVE

21  ISSUES, AND HERE IS HER TESTIMONY.

22      SHE TOOK THE LOW END OF RANGES.  SHE DIDN'T INCLUDE ANY

23  HOURS BEYOND EIGHT HOURS AND WORKDAYS FIVE DAYS A WEEK, EVEN

24  THOUGH YOU HEARD FROM WITNESSES THAT THEY TESTIFIED ABOUT.  SHE

25  DIDN'T INCLUDE WEEKEND HOURS.

1        AND ON THE RSU DATE, SHE ONLY INCLUDED THOSE THAT WERE

2    VESTED, AND SHE ALWAYS INCLUDED THE LOWER NUMBER.

3        AS I SAID, MR. PINSONNEAULT DID NOT DISPUTE MUCH OF THIS,

4    NSO'S DAMAGES EXPERT.  HE DIDN'T CHALLENGE ANY OF THE NEED FOR

5    WHATSAPP TO INVESTIGATE, DIDN'T HAVE AN ISSUE WITH VICTIM

6    OUTREACH.

7        HE REALLY DIDN'T HAVE A PROBLEM.

8        REALLY, AT THE END OF THE DAY, NSO AND MR. PINSONNEAULT

9    ARE COMPLAINING THAT SALARIED EMPLOYEES WERE COMPENSATED, OR

10   THAT WE'RE ASKING FOR THAT.

11       BUT JUST REMEMBER THIS:  THOSE SALARIED EMPLOYEES WERE NOT

12   DOING THE WORK THAT THEY WERE PAID TO DO.  THEY WERE DOING

13   ADDITIONAL WORK BECAUSE OF THE UNIQUE AND SOPHISTICATED NATURE

14   OF THE WHATSAPP ATTACK.

15       YOU SAW THAT ALL THESE PEOPLE WERE DOING WORK BEYOND WHAT

16   THEY DO IN THEIR NORMAL DAY JOB.  MR. GHEORGHE SAID I HAD TO

17   DROP EVERYTHING I WAS DOING, HE HAD TO CANCEL TEAM MEETINGS,

18   CANCEL INTERVIEWS.

19       WE HAD SIMILAR TESTIMONY FROM MR. ROBINSON.  HE SAID IT

20   JUST MEANT HIS OTHER WORK HAD TO GIVE WAY BECAUSE HE HAD TO

21   CONCENTRATE ON THIS.

22       PEOPLE WEREN'T WORKING ON WHAT THEY WERE BEING PAID TO

23   WORK ON.  THEY WERE WORKING ON SOMETHING NEW.

24       SO THAT'S THE STORY WITH COMPENSATORY DAMAGES.  IT'S VERY

25   STRAIGHT FORWARD.  THE SOFTWARE AND THE SPYWARE FOR NSO WAS

1    COMPLICATED, WHATSAPP HAD TO SPEND TIME AND MONEY WITH ITS

2    EMPLOYEES TO RESPOND AND TO NOTIFY VICTIMS, AND FOR ALL OF

3    THAT, THEY'RE ASKING FOR $444,719 IN COMPENSATORY DAMAGES.

4         WHEN YOU GET TO THE VERDICT FORM, WE'RE ASKING TO YOU FILL

5    IN THAT NUMBER, $444,719.

6         NOW, LET ME TURN TO PUNITIVE DAMAGES, AND I'M GOING TO

7    START AGAIN BY GOING THROUGH THE LAW, AND THEN I'M GOING TO GO

8    THROUGH THE RELEVANT FACTS AND I'M GOING TO TALK ABOUT

9    DIFFERENT CONSIDERATIONS IN TERMS OF WHAT YOU SHOULD THINK

10   ABOUT WITH RESPECT TO THE NUMBER.

11        BUT LET ME BE VERY CLEAR ABOUT SOMETHING.  WHATSAPP IS NOT

12   ASKING FOR A SPECIFIC NUMBER FOR PUNITIVE DAMAGES.  WE'RE NOT.

13   WE COULD, BUT WE'RE NOT.  WE'RE GOING TO LEAVE THAT IN THE

14   JUDGMENT OF THIS JURY, HAVING SAT IN THAT COURTROOM AND

15   LISTENED TO THE EVIDENCE.  WE'RE GOING TO ASK YOU TO RETURN A

16   NUMBER THAT IS SIGNIFICANT, THAT ALLOWS FOR PUNISHMENT OF NSO,

17   THAT STOPS THEM FROM HACKING AND SPYING.

18        MAYBE WHEN YOU THINK ABOUT THAT, IF YOU THINK ABOUT

19   NUMBERS LIKE THEIR R&D NUMBERS, $52 AND $59 MILLION THAT ARE

20   DIRECTLY RELATED TO THEIR ABILITY TO MAKE SPYWARE AND SPY ON

21   PEOPLE, THOSE ARE NUMBERS THAT YOU CAN THINK ABOUT.

22        BUT WE'RE NOT GOING TO ASK FOR A PARTICULAR NUMBER BECAUSE

23   WE WANT THE JURY TO DO THAT.  AND WE WANT YOU TO USE YOUR

24   JUDGMENT.

25        SO LET ME GO THROUGH THE FACTS.

1        AND THOSE OF YOU WHO ARE KEEPING TIME, I THINK I'M AT 39

2   MINUTES.  THAT PHONE CALL HAPPENED TO BE FROM MY DAUGHTER, SO

3   SORRY ABOUT THAT.

4        I HAVE ABOUT 20 MINUTES LEFT, AND I'M GOING TO SPEND MY

5   TIME ON THE PUNITIVE DAMAGES.

6        THE CONDUCT HERE IS EXACTLY THE CONDUCT THAT

7   JUDGE HAMILTON IS GOING TO INSTRUCT YOU ABOUT.  IT'S THE

8   HACKING, IT'S THE SPYING, AND IT'S THE TARGETING, BECAUSE IT'S

9   THE CALIFORNIA LAW, THE TARGETING OF THE CALIFORNIA SERVERS,

10  AND JUDGE HAMILTON WILL TELL YOU THAT SHE'S MADE A

11  DETERMINATION THAT THE PEGASUS INSTALLATION MESSAGES CAME

12  THROUGH CALIFORNIA 43 TIMES IN JUST TEN DAYS IN MAY 2019.

13       THAT'S THE CONDUCT THAT'S AT ISSUE.

14       NOW, THE STANDARD OF PROOF FOR PUNITIVE DAMAGES IS CLEAR

15  AND CONVINCING EVIDENCE, AND THAT'S HIGHER THAN THE

16  PREPONDERANCE STANDARD THAT'S USED FOR COMPENSATORY DAMAGES.

17  SO BE AWARE OF THAT.

18       THAT'S NOT AN ISSUE FOR US.  WE THINK WE'VE MET THAT

19  STANDARD AND THEN SOME, THAT THE EVIDENCE HERE IS OVERWHELMING

20  AND FAR BEYOND CLEAR AND CONVINCING EVIDENCE.

21       BUT YOU'LL HEAR THAT WHAT THAT MEANS IS THAT YOU HAVE A

22  FIRM BELIEF OF CONVICTION THAT IS HIGHLY PROBABLE THAT OUR

23  FACTUAL CONTENTIONS ARE TRUE.

24       AND, AGAIN, YOU'LL HEAR THAT FROM JUDGE HAMILTON.  SHE'S

25  THE JUDGE OF THE LAW, AND SHE WILL INSTRUCT YOU ON ALL THOSE

1    THINGS.

2          WHAT WE ASK IS THAT YOU, AND WE KNOW YOU WILL, PAY

3    ATTENTION TO THOSE AND READ THOSE.  THEY'RE IMPORTANT.

4          NOW, TO QUALIFY FOR PUNITIVE DAMAGES, WHATSAPP MUST PROVE

5    THAT NSO'S CONDUCT WAS DONE WITH MALICE OR OPPRESSION OR FRAUD.

6    YOU DON'T HAVE TO FIND ALL THREE.  YOU HAVE TO FIND ONE OF THE

7    THREE.  WE THINK WE HAVE PROVED ALL THREE.

8          WHATSAPP MUST PROVE THAT NSO'S EXECUTIVES, ITS OFFICERS,

9    DIRECTORS, MANAGERS ACTED ON BEHALF OF NSO.

10         THAT'S NOT A COMPLICATED ISSUE.  YOU HEARD FROM THOSE

11   PEOPLE HERE, THAT THEY EITHER ACTED ON BEHALF OF NSO, THAT THEY

12   COMMITTED THESE ACTS, THAT THEY AUTHORIZED THEM, OR THAT THEY

13   KNEW OF THEM AND ADOPTED THEM AND APPROVED THEM AFTER THE FACT.

14         SO THAT ISSUE WITH RESPECT TO MANAGING AGENTS OR

15   EXECUTIVES, YOU KNOW THAT BECAUSE MR. SHOHAT PROUDLY TOLD YOU

16   THAT HE'S THE CEO BOTH OF Q CYBER AND NSO, AND HE WAS INVOLVED

17   IN THESE EVENTS, AND APPROVED OF THEM, AS HE DOES TODAY.

18         YOU ALSO HEARD FROM MR. GAZNELI.  I'LL COME BACK TO THAT

19   IN A MINUTE.

20         LET'S TALK ABOUT MALICE.

21         MALICE.  MALICE, JUDGE HAMILTON WILL INSTRUCT YOU, MEANS

22   THAT DEFENDANTS ACTED WITH INTENT TO CAUSE INJURY OR THAT

23   DEFENDANTS' CONDUCT WAS DESPICABLE.  IT WAS KNOWING AND WAS

24   DONE WITH A WILLFUL AND KNOWING DISREGARD OF WHATSAPP'S RIGHTS.

25         SHE'LL FURTHER INSTRUCT YOU THAT A PERSON ACTS WITH

1    KNOWING DISREGARD WHEN A PERSON IS AWARE OF THE PROBABLE

2    DANGEROUS CONSEQUENCES OF A PERSON'S CONDUCT AND DELIBERATELY

3    FAILS TO AVOID THAT CONDUCT.

4         JUDGE HAMILTON WILL ALSO TELL YOU THAT OPPRESSION MEANS

5    THAT DEFENDANTS' CONDUCT WAS DESPICABLE, SUBJECTED THE

6    PLAINTIFFS TO CRUEL AND UNJUST HARDSHIP IN KNOWING DISREGARD OF

7    WHATSAPP'S RIGHTS.

8         AND SHE'LL DEFINE DESPICABLE CONDUCT AS SO VILE, BASE, OR

9    CONTEMPTIBLE THAT IT WOULD BE LOOKED DOWN UPON OR DESPISED BY

10   REASONABLE PEOPLE THE WAY THAT REASONABLE PEOPLE WOULD VIEW

11   SPYING ON SOMEBODY'S PHONE IN THE WAY THAT NSO SPIES.

12        JUDGE HAMILTON WILL INSTRUCT YOU THAT FRAUD MEANS THAT THE

13   DEFENDANTS INTENTIONALLY MISREPRESENTED OR CONCEALED A MATERIAL

14   FACT.

15        YOU KNOW THAT THERE WAS FRAUD IN THIS CASE.  YOU KNOW THAT

16   THERE WAS DECEIT AND CHEATING.

17        AGAIN, JUST WITH THIS ISSUE ABOUT MANAGING AGENTS, YOU

18   HEARD THE TESTIMONY OF MR. SHOHAT.  YOU HEARD THE TESTIMONY OF

19   MR. GAZNELI.  THEY ARE SENIOR EXECUTIVES.

20        YOU ALSO HEARD THE TESTIMONY OF MS. GIL.  SHE WAS BY

21   VIDEO.  SHE TESTIFIED ABOUT THE FACT THAT THEY SELL, I THINK

22   SHE SAID HAD A BUSINESS, A BUSINESS DEPARTMENT AND THEY SELL

23   PEGASUS, ON AVERAGE, FOR $7 MILLION, AND SOMETIMES THEY HAVE TO

24   CHARGE MORE THAN $7 MILLION IF THE PARTY BUYING IT WANTS TO BE

25   ABLE TO SURVEIL PEOPLE OUTSIDE OF THEIR COUNTRY.

1        SO YOU HEARD FROM HER.

2        YOU ALSO HEARD FROM MR. ESHKAR, WHO'S A SENIOR EXECUTIVE.

3        SO LET ME TURN TO THE QUESTIONS OF WHETHER NSO ACTED WITH

4   MALICE, OPPRESSION, OR FRAUD.  AND THEY DID.

5        FIRST, YOU KNOW WHAT NSO DID IN THIS CASE.  THEY ATTACKED

6   WHATSAPP'S SERVERS.  I'M REPEATING MYSELF, BUT IT'S IMPORTANT

7   THAT WE GO THROUGH THESE ONE BY ONE.

8        YOU KNOW THAT THEY DID THAT ATTACK ON WHATSAPP'S SERVERS

9   HERE IN CALIFORNIA 43 TIMES.  ALL YOU NEED TO DO TO VERIFY THAT

10  FACT IS READ THE JURY INSTRUCTIONS.

11       YOU KNOW THAT THE PURPOSE OF THE VECTORS NSO ATTACKED HERE

12  WAS TO PUT THE SPYWARE ON THE PHONE.  ATTACKING FOR THE PURPOSE

13  OF SPYING.

14       AND YOU KNOW THAT THEY TARGETED AND SENT THIS MALICIOUS

15  SPYWARE ONTO THE PHONES OF 1400 PEOPLE.

16       NOW, LET ME STOP FOR ONE SECOND.

17       THAT'S 1400 PEOPLE IN A TWO-WEEK TIME PERIOD.  OKAY?  SO

18  I'M NOT GOING TO DO THE MATH FOR YOU.  THAT'S NOT MY SPECIALTY.

19  BUT THAT 1400 PEOPLE THAT ARE THE VICTIMS OF THIS SPYWARE

20  ATTACK HAPPENED IN A TWO-WEEK PERIOD.

21       NOW, THOSE VICTIMS, BY THE WAY, YOU'VE HEARD TESTIMONY,

22  NSO DOES NOT KNOW WHO THOSE VICTIMS ARE, AND MR. SHOHAT

23  TESTIFIED TO THAT.  I ASKED HIM THAT SPECIFICALLY ON

24  CROSS-EXAMINATION.  I ASKED HIM, YOU'RE SAYING NO, NSO, AT THE

25  TIME OF PEGASUS, DID NOT KNOW THE IDENTITIES OF PEOPLE WHOSE

1     PHONES ARE BEING SPIED UPON?

2          THIS IS A CORRECT STATEMENT.

3          AND JUDGE HAMILTON IS GOING TO TELL YOU THAT -- INSTRUCT

4     YOU THAT THE IDENTITIES OF VICTIMS ARE NOT RELEVANT.

5          AND SO REGARDLESS OF WHATEVER GOVERNMENTS NSO SELLS TO,

6     WHATEVER THAT MEANS, NSO IS NOT A GOVERNMENT, THEY'RE A

7     FOR-PROFIT COMPANY, AND THEY DON'T KNOW WHO THEY'RE SPYING ON.

8          MR. SHOHAT TESTIFIED TO THAT.  YOU SHOULD RELY ON THAT,

9     AND YOU CERTAINLY CAN RELY ON THE INSTRUCTION OF

10    JUDGE HAMILTON.

11         NOW, YOU KNOW THAT THEY USED THIS ZERO-CLICK TECHNOLOGY

12    THAT WE TALKED ABOUT.  YOU HAVE HEARD THAT THESE ATTACKS, THE

13    MALWARE INSTALLATION, HEAVEN, EDEN, ERISED, THAT IS THE HEART

14    OF NSO'S OPERATION, AND YOU SEE THAT THERE'S -- YOU CAN LOOK AT

15    THESE DOCUMENTS, PLAINTIFFS' EXHIBIT 59, YOU'RE HAPPY TO LOOK

16    AT THIS -- THIS IS A DOCUMENT WHERE YOU CAN SEE ALL OF THE, ALL

17    OF THE CAPABILITIES OF PEGASUS.

18         YOU KNOW ABOUT THE PEGASUS INSTALLATION AND WHAT IT DOES

19    AND HOW IT SPIES.  I'M NOT GOING TO DO THAT.

20         REMEMBER THIS.  THIS ONE CAME IN THROUGH A VIDEO, BUT

21    RAMON ESHKAR, HE'S THE VICE PRESIDENT OF CLIENT EXECUTIVES, HE

22    WAS ASKED, WHAT CAN PEGASUS DOWNLOAD FROM THE PHONE?

23         HE SAID -- WAS THE CASE WITH RESPECT TO THE OPERATION OF

24    PEGASUS IN 2018 AND '19, EVERY KIND OF USER DATA ON THE PHONE

25    AS IT EXISTS.  THIS IS MY UNDERSTANDING.

1        EVERYTHING ON THE PHONE.

2        NOW, YOU KNOW THAT THEY DO THIS FOR MONEY, AND WE'LL TALK

3    ABOUT THAT IN A MINUTE.

4        BUT THERE'S ANOTHER DOCUMENT, PLAINTIFFS' EXHIBIT 264,

5    WHERE YOU CAN LOOK AND SEE THE AMOUNT OF MONEY IN 2018 AND

6    2019, DURING THIS TIME PERIOD WHEN THE SPYING OCCURRED, THAT

7    NSO SPENT MORE THAN $110 MILLION.  I BELIEVE THAT'S ON PAGE 5

8    OF 264.  TAKE IT, LOOK AT IT.

9        YOU'VE HEARD FROM MS. GIL, I SAID, ABOUT HOW MUCH MONEY

10   THEY CHARGE.

11       MR. SHOHAT, WHEN HE WAS ASKED ABOUT HOW MUCH THEY CHARGE

12   FOR PEGASUS, HE SAID BETWEEN 3 MILLION AND ANOTHER CUSTOMER

13   COULD PAY TEN TIMES THAT.

14       SO THAT MATH I CAN DO.  MR. SHOHAT TESTIFIED BETWEEN $3

15   AND $30 MILLION THEY CHARGE FOR THE PEGASUS SOFTWARE.

16       NOW, HOW DO YOU KNOW THAT WHAT NSO DID BEARS ON MALICE,

17   OPPRESSION, FRAUD?  BECAUSE THEY DID THIS DELIBERATELY.  THEY

18   DID IT SECRETLY.  THEY DID IT KNOWINGLY IN DISREGARD OF

19   WHATSAPP'S RIGHTS.

20       YOU KNOW THAT'S TRUE.  THEY DID IT DELIBERATELY.  THIS

21   WASN'T AN ACCIDENT.  IT WASN'T SOME KID HACKING IN THEIR

22   BASEMENT.

23       THIS IS THE MOST SIGNIFICANT, MOST SOPHISTICATED, AS

24   MR. SHOHAT SAID, THE MARKET LEADER IN THIS TECHNOLOGY.

25       YOU KNOW ABOUT ALL THE MONEY THAT NSO SPENDS IN R&D.  YOU

1      KNOW, FOR EXAMPLE, THAT MR. GAZNELI TESTIFIED THAT IN 2019, THE

2      RESEARCH AND DEVELOPMENT EXPENSES OF NSO WERE $67 MILLION.

3      THAT IS WHERE THEY DEVELOPED THIS HACKING AND SPYING

4      TECHNOLOGY.

5           NOW, YOU KNOW THAT THEY DID THIS SECRETLY.  YOU KNOW THAT

6      THEY CONCEALED THEIR FRAUD.

7           AND WHEN THEY WERE COMMUNICATING WITH THE WHATSAPP

8      SERVERS, THEY WERE DOING IT DECEPTIVELY SO THAT WHATSAPP

9      WOULDN'T FIND OUT ABOUT IT.

10          AND, AGAIN, IT'S COMMON SENSE THAT YOU DON'T TELL THE

11     PERSON THAT YOU'RE SPYING ON THAT YOU'RE SPYING.

12          AND LET ME JUST SAY ONE WORD ABOUT THAT.

13          WHEN YOU GO INTO THAT JURY ROOM, LADIES AND GENTLEMEN, WE

14     WANT YOU, WE BEG YOU TO USE YOUR COMMON SENSE.  YOU DON'T LEAVE

15     IT OUTSIDE THE DOOR.  THAT IS CRITICALLY IMPORTANT, AND WE

16     BELIEVE THAT AS YOU USE YOUR COMMON SENSE, YOU'RE GOING TO

17     UNDERSTAND THAT MANY OF THESE ARGUMENTS THAT NSO ARE MAKING

18     MAKE NO SENSE.

19          SO RELY ON YOUR COMMON SENSE.

20          I'VE ALREADY TALKED ABOUT TRICKERY AND DECEPTION.

21          THOSE ARE THE ELEMENTS, AND THEY'RE IMPORTANT.  THEY GO TO

22     THE ISSUE ABOUT WHETHER NSO'S CONDUCT WAS REPREHENSIBLE.  YOU

23     KNOW THAT NSO TRICKED WHATSAPP TO GET INTO THEIR SERVERS.  YOU

24     KNOW THAT THEY TRICKED WHATSAPP BY DELIBERATELY CONCEALING

25     THEIR CONDUCT.  THEY'VE ADMITTED TO THAT.  IT'S ALL UNDISPUTED.

CLOSING ARGUMENT BY MR. ANDRES                    1275

1          YOU HAVE HEARD THROUGHOUT THIS TRIAL THAT NSO DIDN'T TRY

2     TO HARM WHATSAPP.  DIDN'T TRY TO PHYSICALLY HARM THEM.

3          BASICALLY WHAT THEY WANT TO SAY IS THIS ISN'T LIKE A CAR

4     ACCIDENT WHERE YOU LEFT WITH A DENT IN YOUR CAR.  OF COURSE

5     THEY DIDN'T.  OF COURSE THEY DIDN'T.  BECAUSE IF THEY SOMEHOW

6     BROKE WHATSAPP'S SERVER, THEY WOULDN'T USE IT TO GET TO THE

7     PHONES TO DO THE SPYWARE.

8          BUT THAT DOESN'T MEAN THAT WHATSAPP WASN'T HARMED.  THEY

9     ABSOLUTELY WERE HARMED BECAUSE NSO INTRODUCED THIS MALWARE INTO

10    THEIR SYSTEM, AND YOU KNOW THAT THEY -- WE TALKED ABOUT WHAT

11    THEY HAD TO DO TO RESPOND.

12         SO WHEN WE TALK ABOUT HARM, THINK ABOUT WHAT WHATSAPP HAD

13    TO DO IN RESPONSE.

14         NOW, AGAIN, YOU KNOW THAT NSO'S CONDUCT WAS IN THE KNOWING

15    DISREGARD OF WHATSAPP'S RIGHTS.  NSO KNEW THAT WHATSAPP WOULD

16    STOP THIS, STOP THESE ATTACKS IF THEY KNEW ABOUT IT, SO THEY

17    DIDN'T TELL THEM.

18         THAT'S A REALLY IMPORTANT POINT, BECAUSE THAT'S A QUESTION

19    THAT YOU'RE GOING TO HAVE TO ANSWER WITH RESPECT TO THE JURY

20    INSTRUCTIONS.

21         YOU'RE GOING TO HAVE TO ANSWER WHETHER NSO ACTED IN THE

22    KNOWING DISREGARD OF PLAINTIFFS' RIGHTS.  AND OF COURSE THEY

23    DID.  OF COURSE THEY DID.

24         NOW, AGAIN, THE STANDARD HERE IS CLEAR AND CONVINCING

25    EVIDENCE.

1          BUT WHAT COULD BE MORE CLEAR AND CONVINCING EVIDENCE THAN

2     THE ADMISSION FROM THIS WITNESS, MR. GAZNELI, THE ADMISSION OF

3     A SENIOR OFFICER, THEIR HEAD OF RESEARCH AND DEVELOPMENT WHO

4     LED THE DEVELOPMENT OF THESE SOFTWARE VECTORS THAT THEY KNEW

5     THAT WHATSAPP WOULD STOP IF WHATSAPP KNEW WHAT THEY WERE DOING,

6     AND THEY DID IT ANYWAY?  AND HERE IS THE TESTIMONY.

7          MR. GAZNELI'S TRIAL TESTIMONY, HE TESTIFIED THAT THEY

8     WOULD STOP AND THAT THEY -- YOU KNOW, IF WHATSAPP TRIED TO

9     STOP -- IF THEY TOLD WHATSAPP, THEY WOULD TRY TO STOP.

10          NOW, I WANT TO MAKE JUST ONE OTHER POINT.

11          YOU KNOW THAT MR. GAZNELI WAS DIRECTLY INVOLVED IN THE

12     CONDUCT WITH RESPECT TO THE SPYWARE, THE HEAD OF R&D.  HE GAVE

13     YOU CHAPTER AND VERSE ABOUT HIS INVOLVEMENT.

14          I WANT TO MAKE A VERY IMPORTANT POINT.  MR. GAZNELI

15     CONTINUES TO WORK AT NSO BECAUSE NSO HAS BEEN COMPLETELY -- HAS

16     SHOWN NO REMORSE FOR THE FACT THAT THIS COURT AND THIS COUNTRY

17     HAS FOUND THEM TO VIOLATE THE LAW, FEDERAL LAW AND CALIFORNIA

18     LAW.

19          AND GUESS WHAT HAPPENED TO MR. GAZNELI?  HE KEPT HIS JOB.

20     HE DIDN'T GET SUSPENDED.  DIDN'T LOSE ANY MONEY.  MAYBE EVEN

21     GOT A RAISE.  I DON'T KNOW.

22          BUT I KNOW THAT HE'S STILL WORKING AT NSO.

23          THERE HAVE BEEN NO CONSEQUENCES, NONE, FOR THE VIOLATION

24     OF LAWS IN THIS COUNTRY AND THIS STATE BY NSO.

25          AND YOU KNOW THAT BECAUSE MR. GAZNELI CAME IN HERE AND

1     TESTIFIED TO THAT.

2            AND YOU KNOW WHAT MR. SHOHAT SAID ABOUT THAT?  YOU KNOW

3     WHAT HE SAID ABOUT THAT?  I ASKED HIM, HAS THERE BEEN ANY

4     CONSEQUENCES?

5            HE SAID NO.  HE'S A SENIOR MANAGER OF OUR MANAGEMENT TEAM.

6            I ASKED THIS QUESTION, HAS HE BEEN SUSPENDED AS A RESULT

7     OF THE CONDUCT?

8            HE SAID, I DON'T SEE A REASON, AND THE ANSWER IS NO.

9            I DON'T SEE A REASON.

10           WELL, HERE'S THREE REASONS:  THERE'S THE VIOLATION OF

11    FEDERAL COMPUTER FRAUD ACT, THAT'S REASON ONE; THE VIOLATION OF

12    THE CALIFORNIA COMPUTER FRAUD ACT, REASON TWO; THERE IS THE

13    VIOLATION OF THE BREACH OF -- THE BREACH OF CONTRACT, THAT'S

14    THREE.

15           I'LL GIVE YOU ANOTHER THOUSAND, WHICH ARE THE 1400 PEOPLE

16    WHOSE PHONES WERE INFECTED WITH PEGASUS DURING THIS TIME

17    PERIOD.

18           THAT'S A LOT OF REASONS TO FIRE MR. GAZNELI.  YOU'LL HAVE

19    THE ABILITY TO TAKE AWAY THE MONEY AND THE POWER OF PEGASUS,

20    AND OF NSO, TO DO THIS WORK BY A PUNITIVE DAMAGES AWARD.

21           NOW, AS I SAID, AS TO THE ISSUE OF WHETHER THERE'S A

22    REPEATED PATTERN, I'VE TALKED ABOUT THE FACT THAT THERE ARE

23    THESE 43 INCURSIONS THAT GO IN THERE.  YOU'LL SEE IT IN THE

24    JUDGE'S JURY INSTRUCTION.

25           BUT THERE'S MORE.  YOU'LL SEE THAT THERE WERE 1568

1    INSTANCES THAT THESE MESSAGES IN THE PERIOD THAT YOU WERE

2    LOGGING, RIGHT, THAT'S THE TESTIMONY FROM CLAUDIU GHEORGHE, AND

3    YOU HAVE EVIDENCE TO CORROBORATE THAT.

4        REMEMBER, COMPARE THE DOCUMENTS TO THE WITNESSES, JUDGE

5    CREDIBILITY.

6        HERE IS JESUS BARCONS, AND HE SAYS ADDING ALL THE

7    MALICIOUS OFFER STANZAS SINCE WE STARTED LOGGING TOGETHER,

8    TOTAL NUMBER 1568.

9        THIS WAS A PATTERN.

10        AND YOU KNOW -- THAT, I BELIEVE, IS -- THAT IS PLAINTIFFS'

11    EXHIBIT 13.  YOU CAN ASK TO LOOK AT IT.

12        AND I HAVE ALREADY TALKED ABOUT THE VICTIMS, THERE WERE

13    1400 IN 2 WEEKS ALONE.

14        LADIES AND GENTLEMEN, THIS IS JUST THE TIP OF THE ICEBERG.

15    YOU DON'T HAVE TO TAKE MY WORD.  LET'S HEAR WHAT MR. GAZNELI

16    SAID WHEN HE WAS ASKED THIS QUESTION.

17        NSO HAS USED HUMMINGBIRD, WHICH IS ONE OF THE VECTORS, TO

18    SUCCESSFULLY INSTALL PEGASUS IN BETWEEN HUNDREDS AND TENS OF

19    THOUSANDS OF TIMES BETWEEN APRIL '18 AND MAY 2020.

20        LET'S JUST THINK ABOUT THAT, AND YOU SHOULD THINK ABOUT

21    THAT AND CONSIDER THAT TESTIMONY WHEN YOU'RE DECIDING WHETHER

22    THERE WAS A PATTERN OR PRACTICE HERE.

23        IN BETWEEN HUNDREDS AND TENS OF THOUSANDS.

24        YOU KNOW THIS WENT ON FOR YEARS.  YOU KNOW THAT NSO WAS

25    INVOLVED IN DELIBERATE, DELIBERATE CIRCUMVENTION OF THE RIGHTS

1    OF WHATSAPP.

2         THEY CALL IT A CAT AND MOUSE GAME.  YOU HEARD THAT

3    REPEATEDLY.

4         LADIES AND GENTLEMEN, THIS IS NOT A GAME.  IT'S NOT A

5    GAME.  IT'S NOT A GAME TO HACK.  IT'S NOT A GAME TO SPY.

6         BUT THAT'S WHAT THE TESTIMONY FROM NSO HAS BEEN OVER AND

7    OVER AGAIN.

8         AND YOU KNOW THE CAT AND MOUSE GAME THEY REFERRED TO.

9    THEY HAVE A VECTOR CALLED HEAVEN.  IT'S BLOCKED.  THEY HAVE A

10   VECTOR CALLED EDEN.  IT'S BLOCKED.  AND THEN THEY COME UP WITH

11   ANOTHER.

12        CAT AND MOUSE GAME.  THOSE AREN'T OUR WORDS, BECAUSE

13   WHATSAPP DOESN'T THINK THIS IS A GAME.  AND THIS LAWSUIT IS NOT

14   A GAME.

15        THIS WAS THEIR BUSINESS, AND THEY DIDN'T STOP WHEN THEY

16   WERE BLOCKED FROM A TECHNICAL STANDPOINT.  THEY DIDN'T STOP

17   WHEN THEY WERE -- WHEN THIS LAWSUIT WAS FILED.

18        IN FACT, THEIR CONDUCT CONTINUED AFTER THE LAWSUIT.  WE

19   KNEW THAT.  WE'VE HEARD TESTIMONY ABOUT THAT REPEATEDLY, THAT

20   THIS LAWSUIT DID NOT CAUSE THEM TO STOP.

21        AND BY THE WAY, YOU KNOW VERY WELL THAT NSO KNOWS THE

22   EXACT DATE THIS LAWSUIT WAS FILED.  MR. SHOHAT TRIED TO TALK

23   ABOUT A GAP.

24        BUT THE PRESS RELEASE SHOWS THAT NSO RESPONDED THEY WOULD

25   FIGHT VIGOROUSLY ON THE SAME DAY THE LAWSUIT WAS FILED.

1          SO WHEN YOU COME TO THE JURY VERDICT FORM, WHEN YOU COME

2     TO QUESTION 2(A), WHICH ASKS WHETHER WHATSAPP HAS PROVEN BY

3     CLEAR AND CONVINCING EVIDENCE THAT NSO ENGAGED IN MALICE,

4     OPPRESSION, OR FRAUD, ANSWER YES.

5          YOU SHOULD CONCLUDE THAT NSO'S ATTACKS ON CALIFORNIA

6     SERVERS WAS MALICIOUS, OPPRESSIVE, AND FRAUD BECAUSE THEY DID

7     IT DELIBERATELY, DID IT SECRETLY, DID IT REPEATEDLY WITHOUT

8     REGARD TO WHATSAPP'S RIGHTS.

9          AND THEN WHEN YOU COME TO THE NEXT QUESTION, QUESTION (B),

10    WHICH ASKS WHETHER PUNITIVE DAMAGES SHOULD BE IMPOSED, YOU

11    SHOULD ANSWER YES AGAIN, AN EMPHATIC YES, BECAUSE THE PURPOSE

12    OF PUNITIVE DAMAGES IS TO PUNISH AND DETER.

13         THAT LEAVES QUESTION 3 AND THE AMOUNT.  AND, LADIES AND

14    GENTLEMEN, WE ARE GOING TO ASK THE JURY TO RETURN A SUBSTANTIAL

15    VERDICT, BUT THAT'S FOR YOU TO DECIDE.

16         NOW, WHEN YOU'RE DECIDING THE AMOUNT, JUDGE HAMILTON WILL

17    GIVE YOU SOME INSTRUCTIONS ABOUT THAT.  SHE'LL SAY THAT YOU CAN

18    CONSIDER WHETHER THERE WAS A PATTERN OR PRACTICE, WHETHER THERE

19    WAS TRICKERY.  WE TALKED ABOUT THOSE ISSUES.  SHE'S GOING TO

20    GIVE YOU INSTRUCTIONS ABOUT WHETHER THERE'S A REASONABLE

21    RELATIONSHIP BETWEEN THE AMOUNT OF PUNITIVE DAMAGES AND

22    PLAINTIFFS' HARM.

23         AND OF COURSE THERE IS, BECAUSE THE ATTACKS ON WHATSAPP'S

24    SERVERS, THOSE ATTACKS ARE DIRECTLY RELATED TO THE R&D SPEND

25    FROM NSO.

1        AND YOU KNOW WHAT THAT IS.  YOU KNOW IT'S MORE THAN

2   $100 MILLION IN 2018 AND 2019.  YOU HEARD THE TESTIMONY OF

3   MR. GAZNELI THAT'S IN EVIDENCE.

4        I'M JUST GOING TO ASK YOU TO CONSIDER NSO'S FINANCIAL

5   CONDITION, AND I UNDERSTAND THAT THEY'VE CRIED POVERTY HERE.

6   BUT YOU CAN RELY ON THE DOCUMENTS IN THIS CASE, AND WE'LL TALK

7   ABOUT THAT IN A MINUTE.

8        AND REMEMBER THAT WHEN YOU'RE EVALUATING THE TESTIMONY AND

9   THE DOCUMENTS FROM NSO, THEY ARE IN THE BUSINESS OF DECEPTION

10  AND CONCEALMENT.  THAT IS WHAT THEY DO.  AND YOU SHOULD

11  CONSIDER THAT.  THEY USE ANONYMIZED SERVES, WHITE SERVICES.

12  AUTHORIZATIONS AND SECURITY.  THINK ABOUT THE CONTRADICTIONS IN

13  MR. SHOHAT'S TESTIMONY.  HE TESTIFIED, FOR EXAMPLE, THAT THEY

14  WERE A DEFENSIVE COMPANY.  MR. GAZNELI SAID THE OPPOSITE, THAT

15  THEY WERE OFFENSIVE IN NATURE.

16       HE TRIED TO TELL YOU THERE WAS A GAP IN TIME BETWEEN THE

17  LAWSUIT AND WHEN NSO KNEW ABOUT IT.  YOU KNOW THAT'S NOT TRUE.

18       HE TRIED TO DISTRACT YOU WITH THIS IDEA THAT THEY'RE

19  FRIENDS WITH APPLE BECAUSE THEY'RE IN THE SAME BUILDING WHEN,

20  IN FACT, HE LATER TESTIFIED THAT THEIR TECHNOLOGY IS ALSO USED

21  AGAINST APPLE.  AND HE ADMITTED THAT APPLE CALLED THEM HACKERS

22  AND AMORAL.

23       THIS IS ALL SORT OF THIS DOUBLE TALK.  CUT THROUGH IT.

24  THIS WHOLE IDEA THAT IT'S NOT SPYING, IT'S INTELLIGENCE

25  GATHERING, AND IT'S NOT FOR PEOPLE, IT'S FOR TARGETS OR CERTAIN

1    PEOPLE.

2        YOU SHOULD CUT THROUGH ALL OF THOSE LABELS ABOUT SPYWARE,

3    SOFTWARE.  YOU KNOW WHAT PEGASUS DOES.  IT DOES SPYING BY EVERY

4    IMAGINABLE DEFINITION OF THAT WORD, AND THEN SOME.

5        SO LET'S TALK ABOUT THOSE FINANCIAL RECORDS.

6        I ASK THAT YOU TAKE A LOOK AT THEM IN YOUR DELIBERATION.

7    WE HEARD FIRST FROM MR. SHOHAT ABOUT THOSE, AND THERE'S BEEN

8    SOME BACK AND FORTH WITH MS. TREXLER THIS MORNING AND

9    MR. PINSONNEAULT.

10        LOOK AT THE DOCUMENTS AND LOOK AT THE NUMBERS.  THEY'RE IN

11    EVIDENCE AS PLAINTIFFS' EXHIBITS 1779, 1780, 1781, AND 1782.

12    TAKE A LOOK AT THEM.  ASK TO SEE THEM.  THE NUMBERS ARE THE

13    NUMBERS.

14        NOW, I ASK THAT YOU CONSIDER THOSE WHEN YOU ARE THINKING

15    ABOUT -- AND HERE YOU HAVE THEM -- WHEN YOU'RE THINKING ABOUT

16    THE APPROPRIATE AWARD.

17        SO RESEARCH AND DEVELOPMENT, $52 MILLION AND $59 MILLION.

18    THINK ABOUT THAT WHEN YOU'RE TRYING TO DISABLE WHATSAPP --

19    NSO'S ABILITY TO SPY.  THAT'S A GOOD PLACE TO START.

20        YOU KNOW THAT, FOR EXAMPLE, THAT -- I ALREADY TALKED ABOUT

21    THE MONEY THEY SPENT.

22        YOU KNOW ABOUT THEIR TOTAL ASSETS.  DO WE HAVE THOSE?

23    TOTAL EQUITY IS 133 MILLION IN 2023, AND 121 MILLION IN TOTAL

24    EQUITY.

25        THINK ABOUT THAT WHEN YOU'RE TRYING TO FIGURE OUT AN

1    APPROPRIATE NUMBER.

2          WITH RESPECT TO THE OTHER INFORMATION, YOU KNOW IN THE

3    LAST SIX MONTHS, SINCE DECEMBER 2024, THEY HAVE TOTAL EQUITY OF

4    $121 MILLION.

5          YOU KNOW ABOUT THEIR PROFITS IN 2023, $91 MILLION, 79 IN

6    2024.

7          THEY HAVE A PROFIT MARGIN OF 87 PERCENT.  IF YOU'VE EVER

8    RUN A BUSINESS OR BEEN INVOLVED IN A BUSINESS, THAT IS VERY

9    HIGH.  AND IT MAKES SENSE BECAUSE THEY DEVELOP THE SOFTWARE

10   ONCE AND THEN THEY SELL IT AGAIN AND AGAIN AND AGAIN.

11         NOW, THEY'VE CLAIMED A LOSS, AND YOU CAN LOOK AT THOSE.

12   BUT YOU KNOW THAT IF THEY PAID LESS MONEY IN R&D, LESS THAN

13   $50 MILLION, THEY WOULD ACTUALLY MAKE A PROFIT.

14         YOU'VE HEARD ALL THESE ISSUES FROM MS. TREXLER THIS

15   MORNING.  I'LL LEAVE YOU WITH THAT.

16         LET ME SAY ONE OTHER THING.  I HAVEN'T EVEN GONE THROUGH

17   ANY OF THE FINANCIAL DOCUMENTS FROM Q CYBER.  AND REMEMBER, NSO

18   AND Q CYBER ARE BOTH DEFENDANTS HERE.  SO THERE'S A WHOLE OTHER

19   SET IN THOSE DOCUMENT NUMBERS I GAVE YOU THAT I DIDN'T HAVE

20   TIME TO GO THROUGH THAT YOU SHOULD ALSO CONSIDER.

21         ALL RIGHT.  I'M ONE MINUTE OVER.  I HAVE ONE MINUTE TO GO.

22         THE FACTS HERE, LADIES AND GENTLEMEN, THEY'RE UNDISPUTED.

23   WHATSAPP RESPONDED TO A SOPHISTICATED AND COMPLICATED ATTACK.

24   IT DID IT WITH 22 EMPLOYEES.  THEY DID IT WITH MORE THAN 22

25   EMPLOYEES, BUT THEY'RE ASKING FOR COMPENSATORY DAMAGES FOR

1     THOSE IN THE NUMBER OF $444,719.

2          PUNITIVE DAMAGES.  WE ASK THAT YOU AWARD PUNITIVE DAMAGES

3     THAT YOU, THE JURY, BELIEVE ARE SUFFICIENT TO PUNISH NSO

4     BECAUSE THEY VIOLATED THE LAW AS JUDGE HAMILTON HAS TOLD YOU

5     AND WILL INSTRUCT YOU.

6          ISSUE AN AWARD OF PUNITIVE DAMAGES BECAUSE THE RULE OF LAW

7     IN THIS COUNTRY MATTERS, PARTICULARLY AT THIS TIME.  IT MEANS

8     SOMETHING WHEN YOU VIOLATE THE LAW.

9          WE'RE ASKING YOU TO AWARD AN AMOUNT OF PUNITIVE DAMAGES

10    THAT WILL DETER NSO'S CONDUCT IN THE FUTURE.  WE'RE ASKING YOU

11    TO SEND A MESSAGE LOUD AND CLEAR, AND IN PUBLIC, NOT IN THE

12    SHADOWS OF SPYING AND SECRECY WHERE NSO OPERATES.

13         A PUNITIVE DAMAGE AMOUNT THAT SAYS SPYING IS ILLEGAL AND

14    IT'S NOT APPROPRIATE, NOT HERE IN THE UNITED STATES.  CERTAINLY

15    NOT HERE IN CALIFORNIA, CONSISTENT WITH JUDGE HAMILTON'S

16    FINDINGS.

17         LADIES AND GENTLEMEN, NSO DIDN'T STOP WHEN THERE WAS A

18    TECHNOLOGICAL FIX FROM WHATSAPP.  THEY DIDN'T STOP AFTER THIS

19    LAWSUIT WAS FILED.

20         WE ARE ASKING THIS JURY TO ASSESS A PUNITIVE DAMAGE AWARD

21    IN THIS AMERICAN, CALIFORNIA COURTHOUSE THAT SENDS A MESSAGE

22    AND WILL HAVE NSO STOP ATTACKING ITS SPYWARE.

23         THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.

24         THANK YOU, YOUR HONOR.

25              THE COURT:  THANK YOU.

1      ALL RIGHT.  MR. AKROTIRIANAKIS?

2           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

3      (PAUSE IN PROCEEDINGS.)

4           MR. AKROTIRIANAKIS:  MAY I PROCEED?

5           THE COURT:  UM-HUM, SURE.

6      **(MR. AKROTIRIANAKIS GAVE HIS CLOSING ARGUMENT ON BEHALF**

7   **OF DEFENDANTS.)**

8           MR. AKROTIRIANAKIS:  MEMBERS OF THE JURY, I WANT YOU

9   TO THINK BACK TO LAST TUESDAY WHEN YOU FIRST HEARD THE NUMBER

10  $444,719.

11       DID YOU THINK TO YOURSELF, DID I HEAR THAT CORRECTLY?

12  THAT'S GOT TO BE A MISTAKE, RIGHT?  AM I GOING TO SPEND MORE

13  THAN A WEEK OF MY LIFE WITH ALL OF THESE LAWYERS IF FACEBOOK'S

14  CLAIMED LOSSES ARE SO SMALL?

15       IT'S BECAUSE THIS LAWSUIT IS NOT ABOUT SEEKING

16  COMPENSATION FOR LOSSES OR DAMAGE OR INJURY THAT FACEBOOK MAY

17  HAVE HAD.

18       THIS LAWSUIT IS ABOUT PUBLICITY.  YOU JUST HEARD THAT, SAY

19  IT PUBLICLY.

20       FACEBOOK WANTED TO MAKE HEADLINES ABOUT HOW DEEPLY AND

21  STRONGLY AND HOW GENUINELY THEY BELIEVED IN PROTECTING USER

22  PRIVACY, AND THEY VIEWED SUING NSO AS AN EASY WAY TO GET THOSE

23  GOOD HEADLINES.

24       AND IF THEY COULD DAMAGE NSO AS MUCH AS POSSIBLE IN THE

25  PROCESS AS WHATSAPP'S CEO, WILL CATHCART, WANTED TO DO, SO MUCH

1      THE BETTER.

2          THE FACE OF THE COMPANY HERE FOR THIS TRIAL, MR. WOOG, THE

3      GLOBAL HEAD OF COMMUNICATIONS.  NOT A CYBERSECURITY PERSON OR A

4      FINANCE PERSON.  CERTAINLY NOT THE CEO.  BUT THE HEAD OF

5      COMMUNICATIONS.

6          BUT LET'S TAKE THE CASE AT FACE VALUE FOR THE MOMENT.

7      LET'S PRETEND THAT FACEBOOK GENUINELY BELIEVES THAT IT LOST

8      $444,719, AND THAT IT WANTS TO PUNISH NSO FOR SENDING MESSAGES

9      THROUGH ITS SERVERS.

10          THE CASE IS WEAK AND IT DEPENDS ENTIRELY ON YOUR EMOTION,

11     NOT REASON.  THAT'S WHY YOU HEARD THE KIND OF CLOSING ARGUMENT

12     THAT YOU JUST HEARD.

13          LOOKING AT THE EVIDENCE THAT'S BEEN PRESENTED TO YOU,

14     THERE ARE NO ECONOMIC LOSSES.  THERE HAS BEEN NO DAMAGE TO

15     WHATSAPP'S SERVERS, AND THERE'S BEEN NO EVIDENCE THAT WOULD

16     SUPPORT YOU PUTTING A NUMBER OTHER THAN A ZERO IN THE VERDICT

17     FORM, AND I'M GOING TO EXPLAIN WHY.

18          WHATSAPP IS SIMPLY COUNTING ON A JURY HATING, AS MUCH AS

19     THEY SAY THEY DO, THE FACT THAT NSO MAKES AND GOVERNMENT

20     AGENCIES USE A TOOL LIKE PEGASUS.

21          TO DO THAT, TO GO ALONG WITH THAT, YOU WOULD HAVE TO

22     ABANDON THE PROMISE THAT YOU MADE TO WELL AND TRULY TRY THIS

23     CASE ACCORDING TO THE LAW THAT WOULD BE GIVEN TO YOU, AND HAS

24     BEEN GIVEN TO YOU AND WILL BE GIVEN TO YOU AGAIN, BY THE COURT.

25          AS THE COURT WILL INSTRUCT YOU, YOU CANNOT DECIDE THIS

1    CASE BASED ON EMOTION OR FEAR.

2         YOU MUST DECIDE THIS CASE ONLY BASED ON THE EVIDENCE.  AND

3    EVIDENCE DOES NOT SUPPORT FACEBOOK, BOTH WITH RESPECT TO HOW

4    PEGASUS WORKS AND WHAT FACEBOOK DID IN RESPONSE.

5         NOW, AS YOU'VE HEARD AGAIN AND AGAIN, THIS COURT FOUND, IN

6    DECEMBER OF 2024, FIVE MONTHS AGO, THAT NSO HAD VIOLATED THE

7    LAW AND BREACHED THE TERMS OF SERVICE BECAUSE YEARS AGO, THREE

8    VERSIONS, THREE VERSIONS OF NSO'S INTELLIGENCE PRODUCT,

9    PEGASUS, USED WHATSAPP SERVERS.

10         PEGASUS DID NOT COMPROMISE, DAMAGE, REWRITE THE CODE OF,

11    MODIFY, SLOW DOWN, IMPAIR, OR INTERFERE WITH WHATSAPP SERVERS

12    IN ANY WAY.

13         BUT THE COURT FOUND THAT THOSE VERSIONS OF PEGASUS DID

14    VIOLATE A FEDERAL STATUTE, A CALIFORNIA STATUTE, AND THE TERMS

15    OF SERVICE AND, OF COURSE, WE ACCEPT THAT.  MR. SHOHAT TOLD YOU

16    THAT.  MR. GAZNELI TOLD YOU THAT.

17         AS A RESULT, FACEBOOK HAS THE RIGHT TO SEEK DAMAGES, EVEN

18    THOUGH, AS FACEBOOK'S ENGINEERS CONCLUDED, THE SERVERS WERE NOT

19    COMPROMISED.

20         THE LACK OF ANY DAMAGE TO WHATSAPP'S SERVERS IS IMPORTANT.

21    FACEBOOK CAN SEEK COMPENSATORY DAMAGES BUT FOR CERTAIN

22    FINANCIAL LOSSES.

23         MR. ANDRES SAYS THAT THE JURY INSTRUCTIONS ARE CRITICALLY

24    IMPORTANT, AND I AGREE, AND I WANT YOU TO READ THEM AND I WANT

25    YOU TO READ THEM CLOSELY.

1          I'M GOING TO POINT OUT -- GO BACK A SLIDE, PLEASE -- I'M

2     GOING TO POINT OUT SOME OF THE ONES THAT I THINK ARE REALLY

3     IMPORTANT FOR YOU TO FOCUS ON AS YOU CONSIDER, CONSIDER THE

4     EVIDENCE.

5          ALL RIGHT.  PUNITIVE -- GO BACK, PLEASE.

6          FOR CERTAIN LOSSES, THIS IS THE COMPENSATORY DAMAGES,

7     COMPUTER FRAUD AND ABUSE ACT INSTRUCTION.  IT'S THE SAME FOR

8     THE CALIFORNIA STATUTE.

9          NEXT SLIDE, PLEASE.

10         FOR PUNITIVE DAMAGES, THOSE MUST BE BASED ON, AND THE

11    AMOUNT NEEDS TO BE RELATED TO, SOME HARM OR INTENDED HARM TO

12    PLAINTIFFS, AND ONLY TO PLAINTIFFS.

13         SPECULATED HARM TO THIRD PARTIES, LIKE THE TARGETS OF

14    NSO'S GOVERNMENT CUSTOMERS, IS IRRELEVANT.  THAT IS THIS

15    INSTRUCTION.  THE JUDGE WILL TELL YOU THAT.

16         THE ONLY HARM THAT MATTERS IS HARM TO FACEBOOK.

17         HERE, FACEBOOK IS NOT ENTITLED TO ANY COMPENSATORY DAMAGES

18    BECAUSE IT HASN'T SUFFERED ANY FINANCIAL LOSS.  ALL 22

19    EMPLOYEES WERE SALARIED.  AND FACEBOOK DIDN'T PAY THEM ONE

20    PENNY MORE THAN IT WOULD HAVE IN THAT BUT-FOR WORLD -- WE

21    TALKED ABOUT THIS CONCEPT WITH MS. TREXLER -- THAT BUT-FOR

22    WORLD WHERE THERE IS NO NSO AND THERE IS NO PEGASUS.

23    FACEBOOK'S FINANCES ARE EXACTLY THE SAME IN THAT WORLD.

24         AND AS THE COURT ALSO INSTRUCTED YOU, ANY PURPORTED

25    REPUTATIONAL HARM CANNOT BE CONSIDERED.  NOT THAT THERE WAS ANY

1    EVIDENCE OF THAT, EITHER.

2         BUT EVEN IF YOU DISAGREE WITH ME ABOUT THE ABSENCE OF ANY

3    FINANCIAL LOSSES, I HOPE THAT YOU AGREE WITH ME THAT

4    MS. TREXLER'S NUMBER IS HUGELY OVERSTATED, FOR THE REASONS THAT

5    MR. PINSONNEAULT EXPLAINED, JUST ONE EXAMPLE BEING THAT OVER

6    40 PERCENT OF THE TOTAL IN RSU'S PAID IN 2019, PAID IN 2019

7    WERE FOR WORK DONE YEARS EARLIER.  SHE TESTIFIED ABOUT THIS.

8    MR. GHEORGHE TESTIFIED ABOUT IT.

9         THESE ARE TWO EXAMPLES -- IN THESE TWO EXAMPLES, IT'S MUCH

10   MORE THAN 50 PERCENT THAT THE RSU'S INFLATE THE NUMBER.

11        ANOTHER REASON WHY THE DAMAGES FACEBOOK IS CLAIMING ARE

12   INFLATED IS BECAUSE -- THIS IS EXHIBIT 10, PAGE 3 -- FACEBOOK

13   LEARNED ABOUT PEGASUS ON MAY 2 AND A FIX WAS READY ON MAY 6TH,

14   AS WE SEE, AND THEY DIDN'T PUSH THE FIX BECAUSE THEY HAD THEIR

15   OWN OPSEC CONCERNS.  OPSEC.  THEIR OPSEC.

16        AND AS FOR THE 230,000 NOTIFICATION PROJECT, FACEBOOK HAS

17   THE LIST OF PHONE NUMBERS ON MAY 8 AS WE SEE IN THIS TIMELINE

18   DOCUMENT.  BUT THEY DIDN'T NOTIFY THE TARGETS UNTIL OCTOBER 29

19   SO THAT FACEBOOK COULD USE IT FOR A BIG PR SPLASH, ALONG WITH

20   THE FILING OF THIS LAWSUIT, PUTTING AN OP ED IN "THE WASHINGTON

21   POST."  YOU HEARD ABOUT THAT.  I'LL SHOW YOU SOME MORE ABOUT

22   THAT.

23        FACEBOOK IS NOT ENTITLED TO PUNITIVE DAMAGES FOR THREE

24   REASONS:

25        FIRST, BECAUSE DEFENDANTS DIDN'T ACT WITH MALICE,

1    OPPRESSION, OR FRAUD; BECAUSE THEY DIDN'T INJURE FACEBOOK OR

2    INTEND TO DO SO; AND VIRTUALLY NONE OF NSO'S CONDUCT WAS IN

3    CALIFORNIA.

4         I'LL TAKE YOU THROUGH THE JURY INSTRUCTIONS.

5         NOW, MUCH OF LAST WEEK WAS SPENT ON FACEBOOK'S EFFORTS --

6    NOT JUST LAST WEEK, TODAY, TOO -- FACEBOOK'S EFFORTS TO

7    DEMONIZE NSO.

8         BUT THE EVIDENCE IS THAT NSO IS A GOVERNMENT CONTRACTOR IN

9    THE HIGH-TECH SECTOR.  NSO DESIGNS INTELLIGENCE TECHNOLOGIES

10   THAT IT LICENSES EXCLUSIVELY TO GOVERNMENTS.

11        NSO IS A RELATIVELY SMALL COMPANY, WE HEARD 350 EMPLOYEES

12   IN ONE OFFICE IN ISRAEL'S SILICON VALLEY, IF YOU WILL.  A MUCH

13   SMALLER SILICON VALLEY, OF COURSE, THAN WHAT WE HAVE.  IT'S A

14   PLACE CALLED HERZLIYA.

15        NSO EXISTS IN THE SAME CIRCLES AS OTHER HIGH-TECH

16   COMPANIES.  MR. SHOHAT NAMED A FEW OF THE MORE WELL-KNOWN ONES.

17        NSO AND THESE COMPANIES, INCLUDING FACEBOOK, HIRE EACH

18   OTHERS' EMPLOYEES; THEY LICENSE AND USE THE SAME SOFTWARE

19   DEVELOPMENT TOOLS, LIKE JEB AND IDA; NSO EMPLOYS OPSEC,

20   FACEBOOK EMPLOYS OPSEC, WE JUST SAW THAT; NSO USES ANONYMIZING

21   SERVICES, AND MR. ROBINSON TESTIFIED THAT HE ALSO USED

22   ANONYMIZING SERVICES WHEN HE WAS TRYING TO FETCH THE PEGASUS

23   AGENT.

24        MR. ROBINSON TESTIFIED ABOUT JEB AND IDA.  HIS TESTIMONY

25   ON THAT POINT IS ON THE SCREEN.

1        THEY DON'T JUST SELL THEM TO ANYBODY.

2        NOW, FACEBOOK SAYS THAT NSO IS EVIL BECAUSE IT LICENSES

3   ITS TECHNOLOGY FOR PROFIT.

4        MR. WOOG TESTIFIED FACEBOOK IS, OF COURSE, ALSO A

5   FOR-PROFIT COMPANY.  MR. WOOG AGREES, AS DO I THINK WE ALL,

6   THAT A COMPANY DOESN'T HAVE BAD MOTIVES JUST BECAUSE IT SEEKS

7   TO MAKE A PROFIT.

8        THAT IS NO LESS TRUE FOR NSO.

9        AGAIN AND AGAIN -- I DIDN'T TRY TO COUNT THIS MORNING --

10  FACEBOOK HAS CALLED PEGASUS SPYWARE.  SPYWARE.  SPYWARE.

11  HACKING.  SPYWARE.

12       BUT YOU'VE NEVER HEARD ANYONE GIVE A DEFINITION OF

13  SPYWARE, AND THAT'S BECAUSE FACEBOOK WANTS TO PUT A FALSE IMAGE

14  IN YOUR HEAD.  THEY WANT YOU TO PICTURE A VILLAIN IN A BLACK

15  HOODIE TRYING TO STEAL BANK ACCOUNT NUMBERS AND CREDIT CARD

16  INFORMATION.

17       BUT THAT IMAGE BEARS NO RELATION TO THE REALITY OF WHAT

18  NSO DOES.  MR. GAZNELI, IN FACT, TESTIFIED THAT PEGASUS DOESN'T

19  EVEN HAVE THAT CAPABILITY.

20       AS YOU HEARD FROM MR. SHOHAT DURING FACEBOOK'S

21  CROSS-EXAMINATION, THE TECHNOLOGY IS NOT DESIGNED FOR MASS

22  SURVEILLANCE.

23       COUNSEL MADE REFERENCE TO THE TESTIMONY OF SARIT GIL, WHO

24  YOU'LL RECALL IS THE ONE LADY WHO TESTIFIED ON THE -- BY WAY OF

25  VIDEO DEPOSITION.  MS. GIL TESTIFIED THAT IT WASN'T EXACTLY HOW

 1    IT WAS REPRESENTED.  SHE TESTIFIED THAT SOME CUSTOMERS IN

 2    EUROPE HAVE PAID $7 MILLION FOR LICENSES TO USE PEGASUS AGAINST

 3    15 TARGETS.

 4         NOW, THOSE WERE EXEMPLAR SORT OF PRICES.

 5         BUT THE -- THOSE ARE NOT MASS SURVEILLANCE PRICES.

 6         BEFORE WE MOVE ON, LET ME COMMENT FOR JUST A SECOND ON

 7    DISPUTES ABOUT WHAT YOU REMEMBER ABOUT THE TESTIMONY OR WHAT

 8    THE TESTIMONY THAT COUNSEL PUT UP AND WHETHER THAT WAS

 9    COMPLETE, OR TESTIMONY THAT I PUT UP.  OKAY?

10         YOUR MEMORY OF THE TESTIMONY GIVEN ON THE STAND DURING THE

11    TRIAL, THAT'S WHAT CONTROLS.  OKAY?  SO WHAT YOU REMEMBER,

12    THAT'S WHAT YOU GO WITH.  WHAT I SAY, WHAT HE SAYS, THE COURT'S

13    GOING TO INSTRUCT YOU THAT THE WORDS OF THE LAWYERS ARE NOT

14    TESTIMONY -- ARE NOT EVIDENCE.

15         OKAY.  NOW, BACK TO MS. GIL.

16         EXCUSE ME.

17         THE NEXT SLIDE, PLEASE.

18         PEGASUS HAS LIMITATIONS ON ITS SCOPE, INCLUDING, AS

19    MR. SHOHAT TESTIFIED, IT CANNOT BE USED IN THE UNITED STATES.

20    IT CANNOT BE USED ON A UNITED STATES PHONE NUMBER WITH A

21    PLUS 1.  IT CAN'T BE USED ON ANY PHONE IN THE GEOGRAPHY OF THE

22    UNITED STATES, REGARDLESS OF THE PHONE NUMBER.

23         SO IT CAN'T BE USED ON MR. ANDRES'S PHONE, IT CAN'T BE

24    USED ON MY PHONE.

25         AND, WHEN HE SAID SPYING IS ILLEGAL, OR SPYING IN THE

1     UNITED STATES IS ILLEGAL, I THINK, PEGASUS CANNOT BE USED IN

2     THE UNITED STATES.  THAT TESTIMONY IS UNCONTRADICTED.  SO THIS

3     IS NOT ALEXA OR SIRI IN YOUR LIVING ROOM LISTENING TO LOVED

4     ONES AND WHAT EVERYONE IS SAYING IN MASS SURVEILLANCE AS WAS

5     IMPLIED LAST WEEK AND AGAIN TODAY.

6          NOW, PART OF YOUR ROLE IS TO ACCESS THE CREDIBILITY OF

7     WITNESSES.  THERE'S AN INSTRUCTION ON THIS.  AND YOU ARE, AS

8     MR. ANDRES SAID -- ANOTHER THING WE AGREE ON -- MAKE UP YOUR

9     OWN MIND ABOUT WHO YOU FIND CREDIBLE.  THERE'S A NUMBER OF

10    FACTORS THE COURT IS GOING TO GIVE YOU, AND SHE'S GOING TO

11    INSTRUCT YOU ABOUT SOME OF THE THINGS THAT YOU CAN CONSIDER

12    WHEN DECIDING CREDIBILITY, INCLUDING ONE OF THEM, MY FAVORITE

13    ONE'S, NUMBER 3, THE WITNESS'S MANNER WHILE TESTIFYING.

14         I MENTION THIS TO YOU BECAUSE PLAINTIFFS HAVE ASKED YOU

15    NOT TO BELIEVE NSO'S WITNESSES, JUST DON'T BELIEVE THEM.

16    THAT'S WHAT THEY'VE ASKED YOU TO DO.

17         BUT YOU WILL DECIDE WHETHER MR. SHOHAT AND MR. GAZNELI,

18    WHO CAME FROM HALF THE WORLD AWAY TO GIVE THEIR TESTIMONY TO

19    YOU, WERE BEING TRUTHFUL OR TRYING TO BE TRUTHFUL.

20         YOU WILL CONSIDER HOW THEY PRESENTED THEMSELVES AND HOW

21    THEY ANSWERED QUESTIONS PUT TO THEM.

22         AND I LEAVE IT TO YOU TO COMPARE THEIR DEMEANORS TO THOSE

23    OF OTHER WITNESSES, LIKE MR. WOOG, LIKE MR. GHEORGHE, AND EVEN

24    MR. ROBINSON, MS. TREXLER WHO, AT TIMES, REFUSED TO GIVE

25    STRAIGHTFORWARD QUESTIONS -- STRAIGHTFORWARD ANSWERS TO

1    STRAIGHTFORWARD QUESTIONS.

2         MS. TREXLER, FOR EXAMPLE, ASKED YOU TO BELIEVE THAT

3    ALTHOUGH SHE IS AN OWNER OF HER FIRM AND AN ACCOUNTANT, SHE HAS

4    NO IDEA, NO IDEA HOW MUCH MONEY SHE AND HER TEAM HAVE BILLED

5    FOR THEIR WORK IN THIS CASE.  SHE COULDN'T -- WOULDN'T -- GIVE

6    ANY KIND OF ESTIMATE EVEN.

7         ALL RIGHT.  LET'S TALK ABOUT PEGASUS AND HOW IT INTERACTED

8    WITH WHATSAPP'S SERVERS.

9         NOW, A WORD THAT YOU HEARD FACEBOOK USE OVER AND OVER WAS

10   "ATTACK," THAT NSO ATTACKED WHATSAPP'S SERVERS.

11        BUT THE EVIDENCE YOU HEARD SHOWED THAT THAT SIMPLY ISN'T

12   TRUE.  THE EVIDENCE SHOWED THAT NSO SPECIFICALLY DESIGNED

13   PEGASUS NOT TO CAUSE HARM TO WHATSAPP'S SERVERS, AND FACEBOOK'S

14   OWN WITNESSES AGREED THAT THE SERVERS WERE NOT HARMED.

15        ALTHOUGH THE TECHNOLOGY IS COMPLICATED IN MANY WAYS, ITS

16   INTERACTION WITH WHATSAPP'S SERVERS WAS AS I SHOWED IN MY

17   OPENING STATEMENT.  PEGASUS GAVE NSO'S CUSTOMERS THE ABILITY TO

18   SEND SPECIFICALLY CONFIGURED WHATSAPP MESSAGES TO A TARGET

19   PHONE.

20        WHATSAPP'S SERVERS PROCESSED THOSE MESSAGES THE SAME WAY

21   THAT THEY PROCESS HUNDREDS OF BILLIONS OF WHATSAPP MESSAGES

22   EVERY DAY.  THIS IS HOW IT WENT:  PEGASUS SENT INSTALLATION

23   MESSAGES WITH COMPUTER CODE, UNENCRYPTED, IN PLAIN TEXT -- THAT

24   WAS THE TESTIMONY FROM ALL OF THE WITNESSES -- TO TARGET

25   DEVICES.  THOSE MESSAGES PASSED THROUGH WHATSAPP SERVERS.  WE

1    SAID THAT.  THAT IS NOT DISPUTED.

2          BUT EVERYTHING ELSE, EVERYTHING ELSE HAPPENS OUTSIDE,

3    TOTALLY OUTSIDE THE WHATSAPP ENVIRONMENT.  THESE MESSAGES PASS

4    THROUGH WHATSAPP'S SERVERS FOR MILLISECONDS AND WITHOUT

5    INCIDENT.

6          THIS IS THE TESTIMONY OF CLAUDIU GHEORGHE.  PEGASUS DIDN'T

7    TAKE ANYTHING FROM WHATSAPP'S SERVERS, IT DIDN'T LEAVE ANYTHING

8    BEHIND, IT DIDN'T EXECUTE ANY CODE ON THE SERVERS.  IT DID NOT

9    DELETE, CHANGE, OR CORRUPT ANY DATA.  IT DID NOT SLOW DOWN OR

10   IMPAIR WHATSAPP'S SERVERS.

11         AND THAT'S NOT MY SAY-SO.  THAT COMES FROM PLAINTIFFS' OWN

12   WITNESSES.  YOU HEARD MR. GHEORGHE, FACEBOOK'S PRIMARY

13   TECHNICAL WITNESS, AGREE TO ALL OF WHAT I JUST SAID, ALTHOUGH I

14   HAD TO READ IT FROM HIS DEPOSITION, THE TESTIMONY THAT YOU SAW

15   IN OPENING STATEMENT, BECAUSE HE REFUSED TO AFFIRM THAT

16   TESTIMONY WHEN HE CAME BEFORE YOU AND TOOK THE WITNESS'S OATH.

17         YOU ALSO HEARD MR. GHEORGHE TESTIFY, IN HIS OWN WORDS,

18   THAT WHATSAPP'S SERVERS BASICALLY JUST PASSED, TO USE HIS

19   PHRASE, THE PEGASUS CODE TO THE TARGET DEVICE.

20         EVEN FACEBOOK'S FORMAL INVESTIGATION IN 2019 CONCLUDED

21   THAT WHATSAPP'S SERVERS WERE NOT COMPROMISED BY PEGASUS.

22   PLAINTIFFS NEVER INTRODUCED ANY EVIDENCE INCONSISTENT WITH THAT

23   CONCLUSION FROM THEIR OWN ENGINEERS.

24         NOW FACEBOOK SAYS, NOW, FOR THIS TRIAL, THAT PEGASUS

25   TRICKED THE WHATSAPP SERVERS.

CLOSING ARGUMENT BY MR. AKROTIRIANAKIS                    1296

1          THAT, I SUBMIT TO YOU, IS NONSENSE.  SERVERS CANNOT BE

2     TRICKED.  THEY DO NOT THINK.  THEY DO NOT HAVE DISCRETION

3     WHETHER TO FORWARD A MESSAGE OR NOT TO FORWARD A MESSAGE.  AS

4     MR. ROBINSON TESTIFIED, SERVERS ACT ACCORDING TO PREPROGRAMMED

5     RULES.  THEY CAN ONLY DO WHAT THOSE RULES ALLOW, AND THEY

6     CANNOT DO WHAT THOSE RULES DO NOT ALLOW.  SERVERS CANNOT BE

7     TRICKED INTO VIOLATING THEIR PROGRAMMED RULES.  IF THE RULES

8     PROHIBIT MESSAGES, THE MESSAGES DON'T GET DELIVERED.  IF THE

9     RULES ALLOW MESSAGES, THE MESSAGES GET PASSED ALONG TO THE

10    TARGET DEVICE AS MR. GHEORGHE TESTIFIED.

11         WHICH IS WHY, AS MR. GHEORGHE TESTIFIED, FACEBOOK'S FIX IN

12    THIS CASE WAS TO REVISE THE SERVER RULES TO STOP THE SERVERS

13    FROM PASSING PEGASUS MESSAGES THROUGH.  IT'S THAT SIMPLE.  NO

14    TRICKING INVOLVED.

15         NOW, YOUR ROLE, AS THE COURT HAS INSTRUCTED YOU, IS TO

16    DETERMINE WHETHER FACEBOOK IS ACTUALLY ENTITLED TO RECOVER ANY

17    OF ITS CLAIMED FINANCIAL LOSSES, AND YOU PROMISED YOU WOULD

18    MAKE THAT DECISION DISPASSIONATELY AND BASED ON, AND ONLY ON,

19    THE EVIDENCE PRESENTED TO YOU.

20         WHEN YOU WEIGH THE EVIDENCE BASED ON THE COURT'S

21    INSTRUCTIONS, YOU WILL SEE THAT FACEBOOK DOES NOT HAVE

22    FINANCIAL LOSSES, AND CERTAINLY NOT THE $445,000 THAT IT'S

23    ASKING FOR.

24         AS YOU EVALUATE FACEBOOK'S CLAIMS, THERE ARE A FEW

25    IMPORTANT LIMITATIONS TO BE MINDFUL OF.

1          FIRST, FACEBOOK IS ONLY SEEKING COMPENSATION FOR ITS

2    INVESTIGATION AND REMEDIATION COSTS.

3          THE COURT INSTRUCTED YOU THAT FACEBOOK CANNOT RECOVER ANY

4    DAMAGES FOR SUPPOSED HARM TO ITS REPUTATION.

5          FACEBOOK ALSO CANNOT RECOVER FOR SPECULATED HARMS TO

6    TARGETS.

7          SO ALL YOU MAY CONSIDER IS FACEBOOK'S OWN, OWN CLAIMED

8    FINANCIAL LOSSES.

9          NEXT, FACEBOOK CAN ONLY RECOVER FINANCIAL LOSSES THAT NSO

10   CAUSED.  IF FACEBOOK WANTS TO RECOVER FOR ITS EXPENSES, IT HAS

11   TO PROVE THAT IT WOULD NOT HAVE INCURRED THOSE EXPENSES

12   OTHERWISE.  THAT'S THEIR BURDEN OF PROOF.

13         NOW, WHEN MR. ANDRES WAS UP HERE, HE SAID THEY WERE

14   HARMED, AND THEN HE SAID OF COURSE THEY WERE.

15         WELL, "OF COURSE THEY WERE" IS NOT THE BASIS OF A DECISION

16   IN A COURT.  IT HAS NO PLACE IN A COURT.

17         IT'S THE BURDEN OF PROOF, THE EVIDENCE, AND THE

18   INSTRUCTIONS AS THE COURT GIVES THEM TO YOU.  I URGE YOU,

19   PLEASE, TO FOLLOW THEM.

20         NOW, NOTWITHSTANDING FACEBOOK'S ATTEMPTS TO PLAY ON YOUR

21   EMOTIONS, FOLLOWING THE COURT'S INSTRUCTIONS WILL BE A FAIRLY

22   STERILE TASK.

23         YOU HAVE BEEN INSTRUCTED ON THE PURPOSE -- I'M SORRY --

24   YOU WILL BE INSTRUCTED ON THE PURPOSE OF COMPENSATORY DAMAGES.

25   THIS IS THE INSTRUCTION, AND THIS INSTRUCTION ABOUT

1    COMPENSATORY DAMAGES CUTS ACROSS ALL OF THE CLAIMS.

2          THE PURPOSE IS TO PUT PLAINTIFFS IN AS GOOD A POSITION AS

3    THEY WOULD HAVE BEEN IF THE DEFENDANTS HAD NOT VIOLATED THE

4    CFAA, THE CDAFA, OR WHATSAPP'S TERMS OF SERVICE.

5          WHAT THAT MEANS IS THAT YOU SHOULD COMPARE WHAT HAPPENED

6    IN THIS WORLD WITH WHAT WOULD HAVE HAPPENED IN A HYPOTHETICAL

7    WORLD WHERE PEGASUS NEVER EXISTED, NEVER INTERACTED WITH

8    WHATSAPP'S SERVERS.

9          IF FACEBOOK WOULD STILL HAVE INCURRED THE SAME EXPENSES IN

10   THAT HYPOTHETICAL WORLD, THEY CAN'T RECOVER THEM HERE BASED ON

11   THESE INSTRUCTIONS.

12         AND HERE THE EVIDENCE SHOWS THAT FACEBOOK WOULD HAVE

13   INCURRED ALL THE EXPENSES THAT IT IDENTIFIED, ALL, NO MATTER

14   WHAT NSO DID.

15         YOU WILL SEE THAT IF YOU FOCUS ON THREE KEY FACTS:

16         FIRST, FACEBOOK EMPLOYEES ARE ALL PAID A FIXED SALARY

17   EVERY YEAR.  THAT SALARY DIDN'T CHANGE IN 2019 BASED ON THE

18   SPECIFIC WORK THEY WERE WORKING ON.

19         THEIR SALARIES DID NOT INCREASE BECAUSE OF THE WORK THEY

20   DID IN CONNECTION WITH PEGASUS.  AND MS. TREXLER AGREED WITH

21   THIS.

22         HERE'S THE TESTIMONY.

23         SO EVEN IF THOSE EMPLOYEES HADN'T DISCOVERED AND FIXED THE

24   VULNERABILITY USED BY PEGASUS, FACEBOOK STILL WOULD HAVE PAID

25   THEM THE EXACT SAME AMOUNT IN QUESTION IN 2019.

1          FACEBOOK'S EMPLOYEES, SOME OF THEM, ALSO SOMETIMES GOT

2     SMALL BONUSES.  BUT FACEBOOK DIDN'T INTRODUCE ANY EVIDENCE THAT

3     THOSE BONUSES WERE RELATED TO PEGASUS.

4          TO THE CONTRARY, MR. ROBINSON ADMITTED THAT HIS BONUS WAS

5     NOT SPECIFIC TO HIS WORK IN CONNECTION WITH PEGASUS.  AND

6     FACEBOOK NEVER ARGUED, LET ALONE PROVED, THAT IT PAID MORE

7     TOTAL BONUSES IN 2019 BECAUSE OF PEGASUS THAN IT OTHERWISE

8     WOULD HAVE.

9          YOU REMEMBER THE QUESTION I ASKED MS.  TREXLER ABOUT

10    WHETHER THE BONUS SIZE OF THE BONUS POOL WAS ANY LARGER, SHE

11    SAID SHE DIDN'T KNOW, AND THERE WAS NO EVIDENCE.

12         SO EVEN IF PEGASUS HAD NEVER EXISTED, FACEBOOK'S EMPLOYEES

13    WOULD HAVE ALL BEEN PAID EXACTLY THE SAME AMOUNTS.  FACEBOOK

14    DIDN'T PAY EVEN A PENNY MORE DUE TO PEGASUS THAN IT WOULD HAVE

15    PAID IF PEGASUS HAD NEVER EXISTED.

16         NOW, IN THIS TRIAL, FACEBOOK HAS ARGUED THAT EVEN THOUGH

17    IT PAYS ITS EMPLOYEES A FIXED SALARY AND THAT THOSE EMPLOYEES

18    DID NO MORE WORK -- WERE NOT PAID MORE DURING THE INVESTIGATION

19    THAN THEY NORMALLY DO IN THEIR JOBS, THAT IS THE CLAIM IN THIS

20    TRIAL.

21         BUT FACEBOOK DID NOT PAY THEM MORE FOR THEIR WORK ON

22    PEGASUS THAN IT WOULD HAVE PAID THEM FOR ANY OTHER WORK THAT

23    THEY WOULD DO.

24         MR. GHEORGHE AND MR. ROBINSON BOTH TOLD YOU, AS WE SEE ON

25    THE SCREEN, FACEBOOK DOESN'T PAY OVERTIME.

1           AND I WANT TO COMMENT ABOUT THIS FOR A SECOND.

2           IT'S NOT THE EMPLOYEES, LIKE MR. GHEORGHE, LIKE

3     MR. ROBINSON, LIKE THE OTHERS, WHO ARE SEEKING COMPENSATION

4     HERE.  OKAY?  SO YOU'RE NOT BEING ASKED TO DECIDE WHETHER

5     FACEBOOK SHOULD HAVE PAID MR. GHEORGHE OR MR. ROBINSON

6     OVERTIME.  OKAY?  PAID THEM EXTRA.

7           YOUR ROLE IS TO DETERMINE WHETHER FACEBOOK, IN FACT, PAID

8     ITS EMPLOYEES MORE FOR INVESTIGATING PEGASUS THAN IT WOULD HAVE

9     PAID THEM OTHERWISE, AND THE EVIDENCE IS CLEAR THAT FACEBOOK'S

10    COST FOR THOSE EMPLOYEES WOULD HAVE BEEN THE SAME NO MATTER HOW

11    MUCH OR HOW LITTLE WORK THEY DID ON PEGASUS IN 2019, OR IF

12    THERE WAS A PEGASUS AT ALL.

13          THE SECOND FACT:  NSO DID NOT CREATE THE VULNERABILITY

14    THAT FACEBOOK FIXED IN THIS CASE.  IT EXISTS IN WHATSAPP'S CODE

15    BEFORE HEAVEN, THE FIRST IN TIME HUMMINGBIRD VECTOR.

16          MR. GHEORGHE TESTIFIED THAT BOTH VULNERABILITIES THAT ARE

17    AT ISSUE IN THE CASE EXISTED IN WHATSAPP'S CODE UNRELATED TO

18    ANYTHING NSO DID.  THEY WERE PREEXISTING, AS HE PUT IT.

19          THE THIRD FACT YOU SHOULD CONSIDER IS THAT PLAINTIFFS HAVE

20    ENTIRE TEAMS OF SALARIED EMPLOYEES WHOSE JOB IT IS TO FIND AND

21    FIX VULNERABILITIES LIKE THE ONE PEGASUS USED, EVEN ON AN

22    EMERGENCY BASIS AS MR. ROBINSON TOLD US.  MR. GHEORGHE,

23    MR. ROBINSON, MR. WOOG ALL TESTIFIED THOSE EMPLOYEES SEARCH FOR

24    AND FIX VULNERABILITIES, EVEN IF WHATSAPP HAS NO INFORMATION

25    THAT AN EXPLOIT IS BEING USED -- THAT THERE IS AN EXPLOIT OUT

1        THERE USING THE VULNERABILITY.

2            IN ADDITION, WHATSAPP HAS AN INTERNAL RED TEAM.  DO YOU

3        REMEMBER THAT TESTIMONY?  IT CONDUCTS WHAT MR. GHEORGHE CALLS

4        PENETRATION TESTING THAT MIMICS SECURITY ATTACKS.

5            AND FACEBOOK EVEN HAS A BUG BOUNTY PROGRAM THAT PAYS

6        OUTSIDE RESEARCHERS WHO FIND VULNERABILITIES.

7            THE POINT IS THAT MR.  GHEORGHE AND MR. ROBINSON BOTH

8        TESTIFIED THAT PLAINTIFFS FOLLOWED THE SAME PROCESS IN

9        RESPONDING TO A VULNERABILITY NO MATTER HOW THEY DISCOVER IT.

10            SO EVEN IF NSO AND PEGASUS NEVER EXISTED, THE HYPOTHETICAL

11        WORLD, FACEBOOK EMPLOYEES WOULD STILL HAVE ULTIMATELY FOUND THE

12        RELEVANT VULNERABILITY AND FIXED IT BECAUSE, AS MR. GHEORGHE

13        AND MR. ROBINSON TESTIFIED, THAT IS WHAT THEY DO.  THAT IS

14        THEIR JOB, WHAT THEY ARE PAID TO DO.

15            NOW, FACEBOOK ADMITTED, IN RESPONSE TO THIS REQUEST FOR

16        INFORMATION, THAT -- REQUEST FOR ADMISSION, PARDON ME, THAT I

17        READ TO YOU LATE FRIDAY, OR LATE IN THE DAY, LATE IN THE

18        MORNING, I SUPPOSE, ON FRIDAY.  PLAINTIFFS ADMIT THAT AS AN

19        ORDINARY PART OF PLAINTIFFS' BUSINESS, THEY INVESTIGATE AND

20        REMEDIATE ACTUAL OR POTENTIAL SECURITY THREATS.

21            THE CONCLUSION YOU SHOULD DRAW FROM THIS IS THAT NSO DID

22        NOT CAUSE FACEBOOK TO INCUR ANY OF THE EXPENSES IT NOW CLAIMS

23        ARE ITS FINANCIAL LOSSES.

24            THIS CASE, MEMBERS OF THE JURY, IS ABOUT DOLLARS AND

25        CENTS.  IT IS A DAMAGES TRIAL, AND FACEBOOK DID NOT PAY A

1    SINGLE PENNY MORE BECAUSE OF PEGASUS THAN IT WOULD HAVE PAID TO

2    THOSE WORKERS IF PEGASUS NEVER EXISTED.

3         FACEBOOK WOULD HAVE INCURRED THE SAME EXPENSES REGARDLESS

4    OF ANYTHING NSO DID.

5         AND BECAUSE NSO DID NOT CAUSE -- IT WOULD HAVE EXISTED

6    REGARDLESS OF -- AND, THEREFORE, NSO COULD NOT HAVE CAUSED

7    THOSE EXPENSES, FACEBOOK CANNOT RECOVER THEM IN THIS CASE.

8         NOW, THE THIRD LIMITATION ON COMPENSATORY DAMAGES IS

9    REASONABLENESS.  FACEBOOK CAN ONLY RECOVER REASONABLE EXPENSES,

10   AMOUNTS REASONABLY INCURRED AS A RESULT OF NSO'S ACTIONS.

11        THIS IS ANOTHER REASON YOU SHOULD NOT AWARD FACEBOOK THE

12   COMPENSATORY DAMAGES IT SEEKS, BECAUSE EVEN IF YOU THINK THAT

13   NSO CAUSED FACEBOOK SOME FINANCIAL LOSSES AND YOU DISAGREE WITH

14   ME THAT THE NUMBER IS ZERO, THE $445,000 THAT FACEBOOK IS

15   ASKING YOU FOR IS NOT REASONABLE.  IT'S GROSSLY INFLATED FOR

16   MULTIPLE REASONS I WILL DISCUSS WITH YOU.

17        RECALL THAT FACEBOOK'S OWN EXPERT CATEGORIZED FACEBOOK'S

18   EXPENSES INTO TWO PERIODS:  BEFORE MAY 13TH, 2019, AND AFTER.

19   THAT WAS THE DATE THEY SAY THEY FIXED THE VULNERABILITY, AND

20   THE EVIDENCE SHOWS THAT'S CORRECT.

21        FACEBOOK'S CLAIMED DAMAGES BEFORE MAY 13TH ARE INFLATED.

22   OKAY?  SEVERAL EMPLOYEES STARTED CREATING A PATCH TO FIX THE

23   VULNERABILITY ON MAY 2, A FRIDAY.

24        THIS IS EXHIBIT 1204.  IT'S THIS REALLY HARD TO READ,

25   FRANKLY, BECAUSE THE TEXT IS SO SMALL, TIMELINE.  OKAY?

1           BUT IT'S GOT DATES.  IT HAS TIMESTAMPS IN MOST CASES.

2    OKAY?

3           MAY 2, INVESTIGATION STARTS.

4           MAY 6, THEY COMPLETED THE PATCH THE FOLLOWING TUESDAY,

5    MAY 6TH.

6           DESPITE THAT, FACEBOOK IS CLAIMING LOSSES NOT JUST FOR THE

7    LIMITED TIME THAT IT TOOK A FEW EMPLOYEES TO CREATE THOSE

8    PATCHES OVER A FEW DAYS -- NEXT SLIDE, PLEASE -- BUT FOR THE

9    TIME OF 22 EMPLOYEES BETWEEN MAY 2 AND MAY 13TH.  THAT INCLUDES

10   A FULL WEEK AFTER WHATSAPP FINISHED THE PATCHES ON MAY 6TH.

11          AND, YOU KNOW, A WEEK IS A WEEK.

12          BUT COUNT THE DAYS.  THERE'S EIGHT DAYS.  FIVE OF THEM ARE

13   IN THAT WEEK, MORE THAN HALF.

14          ALL RIGHT.  FACEBOOK SEEKS $215,000 FOR THESE EMPLOYEES'

15   TIME FOR THE PERIOD PRIOR TO MAY 13TH, WHICH I SUBMIT TO YOU

16   SIMPLY ISN'T REASONABLE.  IT DIDN'T TAKE THEM ANYWHERE CLOSE TO

17   $215,000 WORTH OF TIME TO PATCH THE VULNERABILITIES AS WE SAW,

18   AND FACEBOOK BROUGHT UP NO EVIDENCE WHAT ALL THOSE PEOPLE WERE

19   DOING WHEN THEY WEREN'T WRITING THE PATCH.

20          SO WHAT DOES THAT $215,000 REPRESENT?  WE DON'T REALLY

21   KNOW, BECAUSE FACEBOOK MOSTLY DIDN'T TELL YOU.

22          IT DIDN'T INTRODUCE EVIDENCE ON WHAT THOSE EMPLOYEES WERE

23   DOING, HOW LONG IT TOOK THEM.  IT'S FACEBOOK'S BURDEN TO

24   PROVIDE THAT EVIDENCE, AND THEY DIDN'T DO IT.

25          ONE THING WE DO KNOW THAT MR. GHEORGHE AND MR. ROBINSON

1    WERE DOING, AND WHICH THEY NOW WANT NSO TO PAY FOR, WAS THEIR

2    EFFORTS TO FETCH THE PEGASUS AGENT.

3         THE PEGASUS AGENT, REMEMBER, WAS NEVER SENT ACROSS

4    WHATSAPP'S SERVERS.  NOT EVEN A REQUEST FOR THE PEGASUS AGENT

5    WAS EVER SENT ACROSS THE SERVERS.

6         FACEBOOK KNEW THAT THE AGENT BELONGED TO NSO AND NOT TO

7    THEM -- THAT WAS MR. ROBINSON'S TESTIMONY -- BUT FACEBOOK TRIED

8    TO GET IT ANYWAY.

9         FACEBOOK HID ITS ATTEMPTS USING ANONYMIZATION AND OTHER

10   OPSEC MEASURES THAT HE TESTIFIED TO, FOR EXAMPLE, AS HE SAID,

11   MAKING ITS REQUESTS LOOK LIKE THEY WERE COMING FROM OTHER

12   COUNTRIES.  AND FACEBOOK WAS DISAPPOINTED WHEN THOSE EFFORTS

13   FAILED.

14        IT'S UP TO YOU TO DECIDE WHETHER NSO SHOULD HAVE TO PAY

15   FOR THOSE EFFORTS TO OBTAIN THE PEGASUS AGENT.

16        WE ALSO KNOW THAT WHATSAPP KEPT THE VULNERABILITY OPEN

17   BECAUSE THEY WANTED TO TURN THIS INTO A PR WHIP.  THEY

18   IMPLEMENTED AND PUBLICIZED THE FIX JUST TEN MINUTES BEFORE THE

19   RELEASE OF A NEWS ARTICLE ON MAY 13TH, 2019.

20        WE ARE BACK WITH THAT VERY DETAILED EXHIBIT 1204, AND YOU

21   SEE HERE, CVE IS MADE PUBLIC, 3:20 P.M.  "FINANCIAL TIMES"

22   ARTICLE, WHAT MR. WOOG TESTIFIED ABOUT, DESCRIBING THE ATTACK

23   GOES OUT AT 3:30 P.M.

24        IT'S UP TO YOU TO DECIDE WHETHER NSO SHOULD HAVE TO PAY

25   FOR THAT AS WELL.

1          WHAT ABOUT THE EXPENSES AFTER MAY 13TH?  THOSE ALSO ARE

2     INFLATED.

3          FACEBOOK SAYS IT SPENT ALMOST $230,000, MOST OF WHICH IS

4     THE SALARIES AND THE RSU'S OF THREE EMPLOYEES, THEIR EFFORTS TO

5     NOTIFY TARGET USERS.  THREE EMPLOYEES -- NOT MR. WOOG, BY THE

6     WAY.  THREE EMPLOYEES.

7          FACEBOOK DIDN'T BRING ANY OF THOSE EMPLOYEES HERE TO

8     TESTIFY ABOUT WHAT THEY DID, AND NOBODY ELSE DID, EITHER.

9          FACEBOOK INTRODUCED BARELY ANY EVIDENCE OF THE WORK ANYONE

10    DID IN CONNECTION WITH NOTIFYING USERS.

11         BASED ON WHAT LITTLE EVIDENCE WAS INTRODUCED, HOWEVER, WE

12    KNOW THAT WHATSAPP WAS ABLE TO USE ITS SERVER LOGS TO COLLECT

13    THE USERS' PHONE NUMBERS BY MAY 8TH.

14         THIS IS MR. LABUNETS'S ENTRY HERE ON MAY 8TH.  SCOPE

15    AFFECTED USERS.  WE GOT A LIST OF AFFECTED PEOPLE BASED ON

16    PHONE NUMBERS.

17         THEY CAN TELL WHICH ONES ARE TESTING TARGETS AND WHICH

18    ONES ARE REAL TARGETS.  THAT'S LESS THAN ONE WEEK SINCE THEY

19    SAY THEY LEARNED ABOUT PEGASUS ON MAY 2.  IT'S EVEN BEFORE

20    MAY 13TH, THE NOTIFICATION PERIOD.

21         ONCE THEY HAVE THESE NUMBERS, AS MR. WOOG TESTIFIED, THEY

22    WAITED ALMOST SIX MONTHS TO SEND THOSE USERS A SHORT MESSAGE

23    THROUGH A WHATSAPP CHAT.

24         MR. GLICK -- MS. GLICK, SUSAN GLICK, TESTIFIED, IN A VIDEO

25    WE SAW THIS MORNING, SHE WASN'T AWARE THERE WAS ANY LEGAL

1    OBLIGATION TO DO THAT.

2         BUT WHY DID IT TAKE SIX MONTHS?

3         FACEBOOK'S GIVEN NO EXPLANATION.

4         BUT I SUBMIT TO YOU THAT IT IS JUST NOT BELIEVABLE TO

5    THINK THAT A COMPANY OF FACEBOOK'S SIZE, RESOURCES, AND

6    EXPERTISE NEEDED SIX MONTHS AND $230,000 TO PREPARE A SINGLE

7    WHATSAPP CHAT MESSAGE.  THAT TIME GAP IS STRONG CIRCUMSTANTIAL

8    EVIDENCE THAT THAT NOTIFICATION WAS NOT REQUIRED LEGALLY AND

9    WAS NOT A NECESSARY RESPONSE TO PEGASUS.

10        SO WHAT'S GOING ON HERE?  A CLUE COMES FROM MR. WOOG, WHO

11   TESTIFIED THAT WHATSAPP SENT THAT SHORT TEXT MESSAGE NOTICE ON

12   APRIL 29, 2019, THE SAME DATE THEY FILED THIS LAWSUIT AND THE

13   SAME DAY IT PUBLISHED AN OP ED ATTACKING NSO IN "THE WASHINGTON

14   POST."  THAT IS NOT A COINCIDENCE.

15        THE NOTIFICATION WAS A KEY PART OF FACEBOOK'S PR STRATEGY.

16   THE NOTICE TO THE TARGETS, THE OP ED, THIS LAWSUIT, ALL OF IT.

17        MEMBERS OF THE JURY, FACEBOOK HAS NOT MET ITS BURDEN EVEN

18   TO PROVE WHAT ITS EMPLOYEES DID AFTER MAY 13TH, LET ALONE THAT

19   WHAT THEY DID WAS REASONABLE AND NECESSARY.

20        THEY BROUGHT BEFORE YOU MS. TREXLER TO OPINE ABOUT THE

21   AMOUNT OF MONEY PLAINTIFFS SUPPOSEDLY PAID TO THEIR EMPLOYEES.

22        AS MR. PINSONNEAULT EXPLAINED, THOSE CALCULATIONS ARE

23   OVERSTATED.

24        NOW, BECAUSE THERE WAS ARGUMENT ABOUT THIS, I WOULD LIKE

25   TO TAKE A MOMENT TO EXPLAIN MR. PINSONNEAULT'S EXPERTISE AND

1      HIS ROLE IN THIS CASE.

2          MR. PINSONNEAULT IS AN EXPERT ECONOMIST.  FACEBOOK TRIED

3      TO CRITICIZE HIM BECAUSE HE IS NOT AN ACCOUNTANT.

4          BUT THE WORK THAT BOTH EXPERTS DID IN THIS CASE IS NOT

5      ACCOUNTING WORK.  IT IS ECONOMIC ANALYSIS OF FACEBOOK'S ALLEGED

6      ECONOMIC LOSSES.  AN ECONOMIST IS EXACTLY THE SORT OF EXPERT

7      YOU WOULD WANT TO DO THAT WORK.

8          YOU WILL RECALL THAT I REFERRED TO, AT ONE POINT IN MY

9      QUESTIONS OF MS. TREXLER, AS BEING AN ECONOMIST, AND SHE

10     SPECIFICALLY SAID, NO, NO, NO, I'M NOT AN ECONOMIST.

11         NOW, WHAT COUNSEL WAS SAYING A LITTLE BIT AGO WAS, YOU

12     KNOW, MR. PINSONNEAULT, YOU KNOW, HE SAYS -- YOU KNOW, HE SAYS

13     IT'S NOT ZERO.

14         ACTUALLY, WHAT HE SAID IS IN HIS ANALYSES, HE CAME UP

15     WITH -- HE SAID I CONSIDERED NUMBERS BETWEEN ZERO AND WHATEVER

16     THE UPPER NUMBER WAS.  I THINK BY REDUCING THE RSU'S, WHICH ARE

17     INAPPROPRIATELY INCLUDED, HE HAD A NUMBER IN THE 200,000S.

18     YOU'LL RECALL IT.

19         WHEN HE REDUCED FOR ALL THE DIFFERENT ERRORS AND

20     INFLATIONS, HIS NUMBER WAS $70,000.  OKAY?

21         NOW, WHAT HE WAS DOING, HIS ROLE IN THIS CASE WAS NOT TO

22     INDEPENDENTLY COME UP WITH SOME DAMAGES FIGURE.  WHAT HE WAS

23     DOING WAS, AS HE TESTIFIED, EVALUATING MS. TREXLER'S ANALYSIS

24     AND EXPLAINING WHY HE THOUGHT HER CONCLUSIONS DIDN'T HOLD UP,

25     EVEN WITH THE ASSUMPTION OF LIABILITY THAT, AS HE TESTIFIED,

1   ECONOMISTS, TESTIFYING ABOUT ECONOMIC LOSSES, ALWAYS MAKE THAT

2   ASSUMPTION, WHETHER THEY REPRESENT THE PLAINTIFF OR THE

3   DEFENDANT.  IT IS FUNDAMENTAL TO WHAT THEY DO IN LITIGATION

4   ANALYSIS.

5          BEFORE I TELL YOU -- I SUMMARIZE FOR YOU, I SHOULD SAY,

6   THE THREE GENERAL REASONS WHY MS. TREXLER'S CALCULATIONS ARE

7   INFLATED AND UNRELIABLE, LET ME MAKE ONE COMMENT, AND THAT

8   IS -- AND I SAID THIS BEFORE -- YOUR RECOLLECTION OF THE

9   TESTIMONY CONTROLS.  OKAY?  COUNSEL PUT UP SOME TESTIMONY FROM

10  MR. PINSONNEAULT WHEN HE WAS ASKING, WELL, WOULD YOU BE SCARED?

11  WOULD YOU BE SCARED IF YOU LEARNED THAT PEGASUS WAS ON YOUR

12  PHONE?

13         AND YOU REMEMBER THAT SLIDE?  HE PUT IT UP THERE, AND IT

14  WAS HIS TESTIMONY, AND HE SAID SOMETHING SCARED, DOT, DOT, DOT,

15  THAT'S SOMETHING WE CALLED AN ELLIPSIS, IT MEANS THERE'S

16  SOMETHING ELSE THERE.  AT LEAST THEY PUT THE ELLIPSIS.

17         YOU'LL RECALL MR. PINSONNEAULT'S TESTIMONY THAT WHAT HE

18  SAID IS THAT HE WOULD BE SCARED ABOUT IT, WHAT IT MIGHT MEAN

19  FOR HIM IF PEGASUS WAS ON HIS PHONE BECAUSE -- THIS IS NOT HIS

20  TESTIMONY NOW, THIS IS JUST MY UNDERSTANDING OF IT, YOU MAKE

21  YOUR OWN INFERENCES FROM IT -- BECAUSE THAT WOULD MEAN THAT HE

22  IS BEING TARGETED BY ONE OF NSO'S GOVERNMENT AGENCY CUSTOMERS.

23  HE WOULD BE SCARED ABOUT THAT FACT, AS I THINK I WOULD BE, TOO.

24         WHY WOULD I BE, BE AN INTELLIGENCE TARGET?

25         ALL RIGHT.  THE FIRST POINT HERE ABOUT THE INFLATION OF

1    MS. TREXLER'S OPINIONS IS THAT, AS I ALREADY MENTIONED, ALL OF

2    THE RELEVANT EMPLOYEES ARE SALARIED.  NOTHING ABOUT THEIR WORK

3    RESPONDING TO PEGASUS LED FACEBOOK TO PAY THEM ANY MORE THAN IT

4    WOULD HAVE IF PEGASUS HAD NEVER EXISTED.  I KNOW I KEEP

5    REPEATING THIS.  I'M EVEN TIRED OF HEARING MYSELF SAY IT, BUT

6    IT IS FUNDAMENTAL TO THIS CASE AND YOUR ROLE IN THIS CASE TO

7    CALCULATE FINANCIAL LOSSES.

8         AND FACEBOOK PROVIDED NO EVIDENCE -- THIS PART IS

9    DIFFERENT AND REALLY IMPORTANT.  THERE IS NO EVIDENCE OF ANY

10   PROJECT THAT MR. GHEORGHE OR MR. ROBINSON OR ANY OF THE REST

11   WOULD HAVE HANDLED, BUT THAT THEY NEVER GOT TO BECAUSE OF

12   PEGASUS.  THERE WAS NO EVIDENCE OF THAT FROM ANYONE.

13        AND THE REASON THAT THERE WAS NO EVIDENCE IS BECAUSE THERE

14   WERE NO PROJECTS THAT DIDN'T GET DONE.  THERE'S JUST NO

15   EVIDENCE OF ECONOMIC LOSS.

16        DID THEY HAVE TO RE-PRIORITIZE THINGS IN THE MEANTIME?

17   YES.  DID THEY SAY THAT THAT WAS PART OF THEIR NORMAL JOB?

18   THEY ALSO AGREED WITH THAT.

19        MR. PINSONNEAULT TESTIFIED THAT THAT ABSENCE OF ECONOMIC

20   LOSS IS A SUBSTANTIAL PROBLEM WITH MS. TREXLER'S ANALYSIS.

21        SECOND, THE LACK OF EVIDENCE ABOUT MANY OF THE EMPLOYEES.

22        THIS IS PARTICULARLY THE PROBLEM WITH ONE GROUP OF

23   FACEBOOK EMPLOYEES.  FACEBOOK PRESENTED NO EVIDENCE SUPPORTING

24   THE AMOUNT OF TIME MS. TREXLER CLAIMED FACEBOOK'S EMPLOYEES

25   SPENT ON THE INVESTIGATION.

1          MS. TREXLER INCLUDED THE TIME OF 22 EMPLOYEES IN HER

2     CALCULATION OF FINANCIAL LOSSES.  HERE, AGAIN, IS A SLIDE THAT

3     HAS ALL OF THEIR NAMES ON IT.

4          AND FOR THOSE HERE ON THIS LIST WHO DID NOT TESTIFY, THINK

5     ABOUT HOW LITTLE YOU SAW OR HEARD ABOUT WHAT THEY ACTUALLY WERE

6     DOING.  THERE WAS REFERENCE IN THE ARGUMENT EARLIER, ONE

7     SENTENCE FOR SOME ONLY OF THE PEOPLE, VAGUE REFERENCES TO WHAT

8     THEY'RE DOING.

9          YOU KNOW WHAT'S NOT VAGUE?  WHAT MR. ROBINSON TESTIFIED TO

10    ABOUT THESE, THESE EMPLOYEES.

11         IT'S FACEBOOK'S BURDEN TO JUSTIFY THAT THESE EMPLOYEES'

12    TIME IS RECOVERABLE, AND THEY DIDN'T SATISFY THAT BURDEN IN

13    THIS CASE.

14         OF THIS LIST, ONLY TWO TESTIFIED.

15         NOW, I SAID A MINUTE AGO, IT'S NOT VAGUE WHAT MR. ROBINSON

16    TESTIFIED TO.  YOU'LL RECALL HIS TESTIMONY THAT HE WAS THE

17    PERSON SPECIFICALLY DESIGNATED TO GIVE BINDING TESTIMONY ON

18    BEHALF OF THE PLAINTIFFS ABOUT THE WORK THEIR EMPLOYEES DID.

19         YOU'LL REMEMBER THAT AS TO 13, HE DID NOT KNOW.  I DON'T

20    KNOW WAS HIS ANSWER.

21         HE DIDN'T KNOW ANYTHING ABOUT 11 OF THOSE 13.  THE 12TH,

22    MR. DENG, WE SAW HIS NAME EARLIER, XI, SPELLED X-I, DENG,

23    D-E-N-G, MR. ROBINSON DIDN'T KNOW THE EXTENT OF HIS WORK.

24         AND THE 13TH, MR. TISZKA, ACCORDING TO MR. ROBINSON, HIS

25    WORK ON THE EFFORT WAS -- THIS IS 932, EXHIBIT 932, COUNSEL

1    REFERRED TO IT ALSO -- MR. ROBINSON TESTIFIED THAT MR. TISZKA'S

2    WORK WAS TO BE A PARTY TO THIS WORK CHAT OVER A PERIOD OF THREE

3    HOURS.

4         YOU SEE IT STARTS AT 6:45, AND IT ENDS AT 9:42.  SO

5    ACTUALLY 2 HOURS AND 57 MINUTES.

6         I THINK MS. TREXLER HAS HIM DOWN FOR 64 HOURS IN THE SAME

7    PERIOD.

8         NOR COULD MR. GHEORGHE SUBSTANTIATE MS. TREXLER'S

9    CALCULATIONS FOR ANY OTHER EMPLOYEE.  HE DIDN'T OFFER ANY

10   TESTIMONY AS TO THE HOURS THOSE EMPLOYEES WORKED, AND HE AGREED

11   THAT MANY OF THEM ONLY WORKED, AS YOU WILL RECALL HIS WORDS,

12   SPORADICALLY OR FOR MINIMAL HOURS.

13        SO ALL YOU'RE LEFT WITH IS MS. TREXLER'S SAY-SO, WHICH HAS

14   NO EVIDENTIARY SUPPORT AND IS CONTRADICTED BY WHAT LITTLE

15   EVIDENCE FACEBOOK DID OFFER.

16        NOW, THE THIRD PROBLEM IS THAT NEARLY HALF OF

17   MS. TREXLER'S CALCULATED EXPENSES COME FROM RSU'S.  THESE ARE

18   THE SHARES OF STOCK THAT FACEBOOK GIVES ITS EMPLOYEES.

19        BUT AS FACEBOOK'S EMPLOYEES TESTIFIED -- AND THIS IS

20   MR. GHEORGHE -- THE RSU'S MS. TREXLER CONSIDERED HAD BEEN

21   AWARDED BY FACEBOOK TO ITS EMPLOYEES FOR WORK THAT THEY HAD

22   PERFORMED BEFORE 2019, IN SOME CASES AS FAR BACK AS 2014.

23        SO THOSE RSU'S HAVE NOTHING WHATSOEVER TO DO WITH THE

24   EMPLOYEES' WORK IN 2019, MUCH LESS ANYTHING ABOUT INVESTIGATING

25   PEGASUS.

1        AND FURTHERMORE, JUST AS WITH THE EMPLOYEES' SALARIES,

2    THEY WOULD HAVE RECEIVED EXACTLY THE SAME RSU'S EVEN IF PEGASUS

3    HAD NEVER EXISTED.

4        SO AS MR. PINSONNEAULT EXPLAINED, IT IS ENTIRELY

5    INAPPROPRIATE TO INCLUDE THOSE RSU'S IN FACEBOOK'S CLAIMED

6    FINANCIAL LOSSES.

7        ACROSS ALL CASES IN WHICH MR. PINSONNEAULT HAS PERFORMED

8    HOURLY LABOR RATE CALCULATIONS LIKE THOSE IN THIS CASE, HE HAS

9    NEVER SEEN ANYONE, YOU WILL RECALL HIM TESTIFYING, TRIED TO

10   INCLUDE RSU'S IN A FINANCIAL LOSSES CALCULATION LIKE

11   MS. TREXLER TRIED TO DO HERE, AND YOU CAN QUESTION FOR YOURSELF

12   WHY THAT MIGHT BE?  WHY WOULD YOU NEED TO INFLATE THAT NUMBER?

13       AS MR. PINSONNEAULT TESTIFIED, RSU'S INFLATED BY

14   MS. TREXLER'S HOURLY RATE -- INFLATED THE HOURLY RATES BY MORE

15   THAN 40 PERCENT.  IT WAS 40 PERCENT POINT SOMETHING.

16       ALL RIGHT.  SO THAT'S COMPENSATORY DAMAGES.  REMEMBER THE

17   LIMITATIONS ON COMPENSATORY DAMAGES.  THEY'RE LIMITED TO

18   FINANCIAL LOSSES, FINANCIAL LOSSES.  THEY'RE LIMITED TO

19   FINANCIAL LOSSES THAT ARE CAUSED, WERE CAUSED, BY NSO.  AND

20   THEY MUST BE REASONABLY AND NECESSARILY INCURRED.

21       WHEN YOU RECEIVE YOUR VERDICT FORM, YOU'LL SEE THERE'S A

22   SERIES OF QUESTIONS.  COUNSEL SHOWED IT AS WELL.

23       THE FIRST QUESTION IS WHAT AMOUNT OF COMPENSATORY DAMAGES

24   HAS WHATSAPP PROVEN THAT NSO SHOULD PAY?

25       FOR THE REASONS I'VE GIVEN, WHAT YOU SHOULD WRITE IS A

1    ZERO.  THEY SPENT NO MORE MONEY THAN THEY OTHERWISE WOULD HAVE

2    IN THAT HYPOTHETICAL WORLD WE TALKED ABOUT.

3        FACEBOOK HAS NOT SATISFIED ITS BURDEN THAT IT SPENT

4    ADDITIONAL MONIES IT WOULD NOT HAVE SPENT OTHERWISE.

5        AND EVEN IF YOU THINK THAT FACEBOOK SHOULD GET SOME

6    COMPENSATORY DAMAGES, I WOULD REQUEST, HUMBLY, THAT YOU THINK

7    REALLY HARD ABOUT WHAT I'VE SAID HERE.  AND IF YOU DO THAT,

8    YOU'LL CONCLUDE THAT FACEBOOK'S MATH JUST DOESN'T ADD UP.  IT

9    ISN'T ENTITLED TO ANYWHERE CLOSE TO THE $445,000 IT SEEKS.

10       SO EVEN IF THE NUMBER YOU WRITE DOWN ISN'T A ZERO, AS I

11   HAVE HERE, IT SHOULD BE SMALL.  PERHAPS THE $1, UP TO $1 IN

12   WHAT'S CALLED NOMINAL DAMAGES IS ALSO IN THE INSTRUCTIONS THAT

13   YOU WILL RECEIVE FROM THE COURT.

14       NOW, THE NEXT TWO QUESTIONS ON THE VERDICT FORM RELATE TO

15   PUNITIVE DAMAGES.

16       YOU ARE INSTRUCTED THAT THE PURPOSE OF PUNITIVE DAMAGES --

17   OR YOU WILL BE INSTRUCTED, IT'S BEEN ARGUED TO YOU A BUNCH,

18   THAT THE PURPOSE OF PUNITIVE DAMAGES IS TO PUNISH A DEFENDANT,

19   NOT TO COMPENSATE A PLAINTIFF.

20       AND HERE, FACEBOOK CAN ONLY SEEK PUNITIVE DAMAGES -- ONLY

21   FACEBOOK CAN SEEK PUNITIVE DAMAGES, FACEBOOK AND -- NOT OTHER

22   PEOPLE AS WELL, AND ONLY UNDER THE CALIFORNIA STATUTE, NOT THE

23   OTHER CLAIMS IN THE CASE.  SO THIS IS THE CDAFA.

24       AND YOU WILL BE INSTRUCTED THAT YOU CANNOT AWARD PUNITIVE

25   DAMAGES UNDER THE FEDERAL CFAA STATUTE OR THE TERMS OF SERVICE.

1      SO WHEN YOU'RE CONSIDERING PUNITIVE DAMAGES, YOU SHOULD

2  CONSIDER ONLY THE CONDUCT THAT THE COURT HAS FOUND TO VIOLATE

3  THE CDAFA, OR THAT CALIFORNIA LAW.

4      THE COURT'S FINDING -- FINDINGS ARE -- THIS IS IN THE

5  INSTRUCTIONS -- THAT ONE VERSION OF PEGASUS SENT MESSAGES

6  THROUGH CALIFORNIA-BASED SERVERS 43 TIMES IN MAY 2019.

7      YOU WILL ALSO BE INSTRUCTED THAT YOU CANNOT AWARD PUNITIVE

8  DAMAGES FOR ANY CLAIMED HARMS TO THE TARGETS OR TO ANY OTHER

9  THIRD PARTIES.

10      YOU MAY ONLY CONSIDER HARM TO FACEBOOK OR WHATSAPP, AND

11  YOU HAVE BEEN INSTRUCTED THAT YOU CANNOT CONSIDER ANY ASSERTION

12  OF REPUTATIONAL HARM, BUT ONLY FINANCIAL LOSSES THAT YOU

13  CONCLUDE NSO CAUSED.

14      THE VERDICT FORM'S FIRST QUESTION ON PUNITIVE DAMAGES IS

15  QUESTION --

16      MR. ANDRES:  YOUR HONOR, I'M GOING TO OBJECT TO THE

17  MISSTATEMENT OF THE JURY INSTRUCTIONS.  FINANCIAL LOSSES IS

18  NOT -- I DON'T THINK THAT WORD IS USED ANYWHERE IN THE JURY

19  INSTRUCTIONS, AND IT'S MISLEADING.

20      WE COULD HAVE AN INSTRUCTION, BUT --

21      THE COURT:  THE JURY WILL -- I'M GOING TO GIVE YOU AN

22  INSTRUCTION, LADIES AND GENTLEMEN, THAT THE JURY INSTRUCTIONS

23  THAT I GIVE YOU, SHORTLY AFTER WE HEAR THE ARGUMENTS, CONTROLS

24  IN THIS CASE AND NOT WHAT THE LAWYERS ARGUE IN THE CASE.

25      MR. ANDRES:  THANK YOU, YOUR HONOR.

```
1           THE COURT:  OKAY.  GO AHEAD.

2           MR. AKROTIRIANAKIS:  AND THEY SAY CERTAIN LOSS, AND

3    IN THE DESCRIPTION OF THE LOSSES, THEY ARE ALL DIFFERENT TYPES

4    OF FINANCIAL LOSSES.

5           THANK YOU, YOUR HONOR.

6           BUT HE'S RIGHT, IT DOESN'T USE THE WORD FINANCIAL LOSSES,

7    BUT THEY ARE ALL FINANCIAL LOSSES, SO I'M MAKING AN ARGUMENT

8    THAT THEY HAVE TO PROVE FINANCIAL LOSSES.

9           AND HE WON'T ARGUE ANYTHING ELSE, BECAUSE THE COURT IS

10   GOING TO INSTRUCT YOU THAT REPUTATION AND ALL THOSE THINGS THAT

11   YOU CANNOT CONSIDER.

12          ALL RIGHT.  ALLEGED REPUTATIONAL HARMS.

13          OKAY.  SO BACK TO WHAT I WAS SAYING.  THE VERDICT FORM'S

14   FIRST QUESTION ABOUT PUNITIVE DAMAGES IS QUESTION 2, THERE'S

15   2(A), 2(B).  THE FIRST QUESTION IS, HAS WHATSAPP PROVEN BY

16   CLEAR AND CONVINCING EVIDENCE THAT NSO ENGAGED IN MALICE,

17   OPPRESSION, OR FRAUD IN VIOLATING THIS CALIFORNIA STATUTE?

18          AND LET ME BREAK THAT DOWN FOR YOU, BECAUSE LIKE I SAID,

19   IT'S PRETTY IMPORTANT THAT YOU REALLY PAY ATTENTION TO SOME OF

20   THESE FINER POINTS IN THE INSTRUCTION AND NOT GET CARRIED AWAY

21   ON EMOTION LIKE YOU'VE BEEN ASKED TO DO.

22          FIRST, FACEBOOK HAS TO PROVE IT'S ENTITLEMENT TO PUNITIVE

23   DAMAGES BY CLEAR AND CONVINCING EVIDENCE.  YOU HAVE BEEN -- YOU

24   WILL BE INSTRUCTED ON WHAT THAT MEANS, AND WHAT IT MEANS IS

25   THAT FACEBOOK MUST PRESENT EVIDENCE THAT LEAVES YOU WITH A FIRM
```

1    BELIEF OR CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE

2    FACTUAL CONTENTIONS OF THE CLAIM ARE TRUE.

3         FIRM BELIEF.  HIGHLY PROBABLE.  THAT IS A HIGH BURDEN.  IT

4    IS MUCH HIGHER THAN THE OTHER BURDENS THAT WE'VE DISCUSSED.

5         SECOND, THE ONLY CONDUCT PERTINENT TO PUNITIVE DAMAGES IS

6    THE CONDUCT THAT THE COURT FOUND VIOLATED THE CDAFA STATUTE,

7    AND THAT'S BECAUSE THAT STATUTE IS A CALIFORNIA STATUTE AND IT

8    PROTECTS CALIFORNIA-BASED COMPUTERS.

9         JUDGE HAMILTON HAS INSTRUCTED YOU, OR WILL INSTRUCT YOU --

10   PARDON ME -- THAT PUNITIVE DAMAGES CANNOT BE AWARDED TO PUNISH

11   NSO FOR CONDUCT THAT DID NOT OCCUR IN CALIFORNIA.

12        SO WHILE FACEBOOK HAS MADE A LOT OF CLAIMS ABOUT NSO'S

13   CONDUCT IN THIS CASE, THE CONDUCT THAT IS RELEVANT TO PUNITIVE

14   DAMAGES IS THE SENDING OF MESSAGES THROUGH WHATSAPP SERVERS --

15   AND YOU HEARD THAT THERE ARE TWO LOCATIONS IN CALIFORNIA --

16   IT'S A TINY PORTION OF WHATSAPP'S OVER, AS MR. GHEORGHE

17   TESTIFIED, 100 SERVER LOCATIONS WORLDWIDE.  OKAY?  TWO

18   LOCATIONS IN CALIFORNIA.

19        THIRD, WHATSAPP HAS TO PROVE BY CLEAR AND CONVINCING

20   EVIDENCE THAT NSO ENGAGED IN THAT CONDUCT THAT VIOLATED CDAFA

21   WITH MALICE, OPPRESSION, OR FRAUD.

22        THESE ARE SPECIFIC LEGAL TERMS, AND THEY HAVE SPECIFIC

23   LEGAL MEANINGS.  BECAUSE THIS IS SO IMPORTANT, I WILL RISK

24   BELABORING WHAT THOSE LEGAL TERMS ARE.  I URGE YOU TO REFER TO

25   THEM AS EARLY AND OFTEN AS YOU NEED TO.

1        I'M GOING TO ASK YOU TO REALLY FOCUS ON THESE DEFINITIONS

2   BECAUSE I THINK THAT, IF YOU DO, IT WILL BE EASY TO DETERMINE

3   THAT FACEBOOK HAS NOT SATISFIED THEM.

4        SO MALICE.

5        MALICE REQUIRES A SHOWING THAT NSO ACTED WITH INTENT TO

6   CAUSE HARM TO FACEBOOK, OR WITH KNOWING DISREGARD OF FACEBOOK'S

7   RIGHTS.

8        THIS IS ANOTHER ONE, BY THE WAY -- ACTUALLY, LET ME WAIT

9   FOR A MINUTE BEFORE I SAY THAT.

10       KNOWING DISREGARD HAS ITS OWN SPECIAL DEFINITION.  IT

11  REQUIRES A SHOWING THAT NSO DELIBERATELY EXPOSED FACEBOOK TO

12  PROBABLE, DANGEROUS TO FACEBOOK, CONSEQUENCES.

13       NOW, HE KIND OF GLOSSED OVER THIS WHEN HE WAS MAKING HIS

14  ARGUMENT.  THIS IS ANOTHER TIME WHEN HE SAID KNOWING DISREGARD.

15       WAS THERE KNOWING DISREGARD?

16       AND, QUOTE, OF COURSE THEY DID.

17       THAT'S NOT EVIDENCE.

18       AND I SUBMIT TO YOU THAT THERE'S NO -- THERE HASN'T BEEN

19  EVIDENCE OF ANYTHING THAT WAS EVER DANGEROUS TO FACEBOOK IN

20  THIS CASE.

21       OPPRESSION IS NEXT.

22       OPPRESSION REQUIRES A SHOWING OF CONDUCT THAT ANY

23  REASONABLE PERSON WOULD DESPISE, ANYONE WOULD FIND IT

24  DESPICABLE.

25       AND MOREOVER, THAT THE CONDUCT SUBJECTED FACEBOOK TO CRUEL

1    HARDSHIP AND WITH A KNOWING DISREGARD OF ITS RIGHTS.  CRUEL

2    HARDSHIP.

3         FRAUD.  THAT MEANS THAT DEFENDANTS INTENTIONALLY

4    MISREPRESENTED OR CONCEALED A MATERIAL FACT, AND DID SO

5    INTENDING TO CAUSE HARM TO FACEBOOK.

6         ALL RIGHT.  INTENDED TO CAUSE HARM TO FACEBOOK, I'M GOING

7    TO COME BACK TO THAT, BECAUSE THAT'S REALLY IMPORTANT.

8         BUT LET'S START WITH MALICE.

9         FIRST, THERE'S NO EVIDENCE TO SUGGEST THAT NSO EVER ACTED

10   WITH ANY INTENT TO HARM PLAINTIFFS.  MR. SHOHAT TESTIFIED THAT

11   PEGASUS WAS SPECIFICALLY DESIGNED NOT TO HAVE ANY HARMFUL

12   EFFECT, OR ANY EFFECT AT ALL, ON WHATSAPP'S SERVERS.

13        SO DID MR. GAZNELI, WHO LED THE TEAM THAT DESIGNED THE

14   VERSIONS OF PEGASUS THAT ARE AT ISSUE IN THIS CASE.  AND WHAT

15   HE TESTIFIED TO WERE THE GREAT LENGTHS NSO WENT TO IN ORDER TO

16   AVOID THERE BEING ANY AFFECT AT ALL ON WHATSAPP'S SERVERS,

17   BECAUSE DAMAGING WHATSAPP'S SERVERS WOULD UNDERMINE PEGASUS'S

18   UTILITY AS A GOVERNMENT CYBER INTELLIGENCE TOOL.  IF INSTALLING

19   PEGASUS MESSED UP WHATSAPP'S SERVERS, WHATSAPP WOULD FIND OUT

20   ABOUT IT RIGHT AWAY AND THEY WOULD FIX THE VULNERABILITY.

21        SO THAT WOULD BE REALLY BAD BUSINESS TO SPEND ALL THIS

22   EFFORT THAT YOU HEARD ABOUT DEVELOPING A NEW INSTALLATION

23   VECTOR, ONLY TO HAVE IT GET SHUT DOWN IMMEDIATELY BECAUSE IT IS

24   CAUSING OR IS INTENDED TO CAUSE ANY HARM.

25        GOING TO THOSE GREAT LENGTHS TO AVOID HARM IS CALLED

1    OPERATIONAL SECURITY, OR OPSEC.  BUT IT'S REALLY JUST COMMON

2    SENSE IF YOU THINK ABOUT IT.

3         NOW, FACEBOOK DIDN'T SHOW YOU ANY EVIDENCE OF INTENT TO

4    CAUSE HARM TO THE SERVERS.  REMEMBER, FACEBOOK'S OWN

5    INVESTIGATION CONCLUDED THAT PEGASUS DID NOT COMPROMISE

6    WHATSAPP'S SERVERS.

7         AND AS MR. GHEORGHE ADMITTED, PEGASUS DID NOT AFFECT

8    WHATSAPP'S SERVERS OR SERVICE IN ANY WAY.

9         THERE'S ALSO NO EVIDENCE THAT NSO ACTED WITH KNOWING

10   DISREGARD OF FACEBOOK'S RIGHTS ARISING UNDER THIS CALIFORNIA

11   STATUTE.

12        AND THERE WAS NO DANGEROUS CONSEQUENCES TO FACEBOOK.  IN

13   FACT, THERE'S NO DANGER TO FACEBOOK ANYWHERE HERE.  THIS ISN'T

14   A CASE WHERE NSO'S PRODUCT EXPOSED THE PLAINTIFFS TO SOME SORT

15   OF PHYSICAL DANGER OR A HEALTH RISK.

16        THE COURT HAS FOUND THAT THEY VIOLATED THE LAW, BUT NOT IN

17   A WAY THAT WAS DANGEROUS TO FACEBOOK IN ANY WAY.

18        FURTHERMORE, THERE'S NO EVIDENCE THAT NSO KNOWINGLY

19   DISREGARDED ANY DANGER.  THE EVIDENCE IS THAT NSO DID NOT KNOW

20   THAT THEY WERE VIOLATING THE CDAFA, OR EVEN THAT THAT LAW

21   EXISTED, AND THEY CERTAINLY DIDN'T INTEND TO VIOLATE IT.

22        NOW, NSO ACKNOWLEDGES THAT IT MEANT TO ENGAGE IN THE

23   CONDUCT THAT THE COURT FOUND TO BE UNLAWFUL.  BUT IT DID NOT

24   KNOW OR INTEND THAT THAT CONDUCT WOULD VIOLATE THIS LAW THAT

25   THEY DIDN'T KNOW ABOUT OR ANY OF FACEBOOK'S RIGHTS UNDER THAT

1    LAW, AND THAT MAY SEEM LIKE A SMALL DISTINCTION, BUT IT'S A

2    CRUCIALLY IMPORTANT ONE WHEN YOU'RE CONSIDERING THAT QUESTION.

3         THE ONLY EVIDENCE OF ANYONE'S INTENT TO CAUSE HARM TO ANY

4    OTHER PERSON COMES FROM EXHIBIT 1156.  THIS IS WHATSAPP'S CEO,

5    WILL CATHCART, AND HE'S TALKING ABOUT HIS DESIRE TO CAUSE

6    DAMAGE TO NSO AS MUCH AS POSSIBLE.

7         BUT THAT'S THE ONLY EVIDENCE OF ANYONE'S INTENT TO CAUSE

8    HARM IN THIS CASE.

9         OPPRESSION.

10        FACEBOOK DIDN'T SUFFER ANY HARDSHIP, MUCH LESS A CRUEL

11   HARDSHIP.  THIS IS A CASE ABOUT NSO'S GOVERNMENT AGENCY

12   CUSTOMERS SENDING MESSAGES THROUGH COMPUTER SERVERS TO TARGETS,

13   NOT ANY DESPICABLE CONDUCT DIRECTED TOWARD FACEBOOK.

14        FRAUD.

15        WITH RESPECT TO FRAUD, THERE'S SIMPLY NOTHING LIKE THAT IN

16   THIS CASE.  FRAUD IS LIKE WHEN A CAR DEALER LIES TO YOU AND

17   TELLS YOU THAT THE CAR YOU'RE LOOKING AT HAS A NEW ENGINE SO

18   YOU DON'T NEED TO WORRY ABOUT THE 100,000 MILES THAT ARE ON IT,

19   OR WHEN SOME DRUG COMPANY FABRICATES THE RESULTS OF A CLINICAL

20   TRIAL AND THEN PUBLISHES THOSE TO THE MARKET, STATEMENTS

21   INTENDED TO INDUCE RELIANCE AND TO CAUSE HARM.

22        THAT'S NOT THE CASE HERE.  NSO'S WITNESSES TESTIFIED,

23   WITHOUT CONTRADICTION, THAT THEY NEVER SPOKE TO OR EVEN

24   INTERACTED WITH, MUCH LESS MADE ANY REPRESENTATIONS OR TOLD ANY

25   LIES TO, ANYONE FROM FACEBOOK OR WHATSAPP.

1          AND NOTHING ABOUT PEGASUS MISLED OR CONCEALED ANY FACTS

2     FROM FACEBOOK.

3          THIS IS THE TESTIMONY ABOUT THE CODE THAT WE SAW IN THE

4     CASE.  IT WAS ON A WHITE PIECE OF PAPER, THE TESTIMONY -- OR

5     THE ARGUMENT THIS MORNING AND THE OPENING STATEMENT, IT WAS

6     BLACK, KIND OF A MATRIX LOOKING BACKGROUND, GREEN LIGHTS, AND

7     SO ON.

8          WELL, MR. GHEORGHE AND MR. ROBINSON TESTIFIED THAT IT WAS

9     READABLE TO HUMAN EYES.  MAYBE NOT TO US, BUT SOMEONE WHO READS

10    COMPUTER CODE, IT WAS READABLE TO HUMAN EYES.

11         AND MOREOVER, THEY TESTIFIED THAT FACEBOOK COULD TELL VERY

12    EASILY THAT THAT WAS NOT NORMAL, VERY EASILY AND VERY

13    IMMEDIATELY WAS MR. GHEORGHE'S TESTIMONY.

14         PLAINTIFFS FIRST STARTED LOOKING FOR THESE MISFORMED,

15    MALFORMED STANZAS THEY CALL IT.  YOU MIGHT RECALL THE TESTIMONY

16    ABOUT STANZAS.  THEY STARTED LOOKING FOR THOSE ON MAY 2.

17         THEY HAD SOME EARLIER PROJECT THAT THEY'D BEEN WORKING ON

18    GOING WAY BACK MONTHS BEFORE BASED ON SOME INFORMATION IN SOME

19    DOCUMENT FROM SOME OUTSIDE RESEARCHER, THEY GOT AROUND IN LATE

20    APRIL, EARLY MAY, STARTING TO LOG THESE STANZAS, AND

21    IMMEDIATELY THEY NOTICED THE PROBLEM ONCE THEY STARTED THE

22    PROJECT FOR LOOKING FOR THOSE KIND OF STANZAS.

23         AND MR. GHEORGHE TESTIFIED, HERE'S HIS TESTIMONY NOW, THAT

24    HE COULD EASILY AND IMMEDIATELY TELL THE CODE WAS SUSPICIOUS AS

25    SOON AS FACEBOOK SAW IT.

1          THAT'S THE OPPOSITE OF A MISREPRESENTATION OR A

2     CONCEALMENT.

3          NSO DIDN'T HIDE ANYTHING FROM FACEBOOK.

4          NOW, FACEBOOK SAYS THAT THERE WAS FRAUD HERE BECAUSE NSO

5     REDESIGNED PEGASUS IN 2018 WHEN A WHATSAPP SOFTWARE UPDATE

6     CAUSED THE HEAVEN VECTOR TO STOP WORKING.

7          AND IT'S TRUE THAT THE COURT RELIED ON THAT CONDUCT WHEN

8     FINDING, BY A PREPONDERANCE OF THE EVIDENCE, THAT NSO ACTED

9     WITH INTENT TO DEFRAUD AS THAT PHRASE IS -- APPLIES IN THIS

10    SPECIAL CONTEXT OF THE CFAA.

11         NOW, YOU'LL GET THESE INSTRUCTIONS.  NUMBER 16 IS THE ONE

12    THAT'S THE CFAA, AND ON MY COPY HERE, I HIGHLIGHTED THE PART

13    THAT TALKS ABOUT INTENT TO DEFRAUD AND WHAT THAT MEANS IN THE

14    SPECIAL CONTEXT OF THAT STATUTE.

15         THERE'S ANOTHER ONE -- THIS IS EXHIBIT -- I'M SORRY --

16    THIS IS JURY INSTRUCTION NUMBER 27.  OKAY?  IT'S THE PUNITIVE

17    DAMAGES JURY INSTRUCTION.

18         AND ON THE SECOND PAGE OF IT, IN THE MIDDLE, IT SAYS FRAUD

19    AND WHAT THE DEFINITION IS.  AND THEY'RE DIFFERENT.  THEY'RE

20    DIFFERENT IN ONE SUPER IMPORTANT WAY.  THIS ONE, THE PUNITIVE

21    DAMAGES ONE, REQUIRES THAT YOU HAD TO INTEND TO CAUSE HARM TO

22    THE PLAINTIFF.  THAT HAD TO BE YOUR INTENTION.

23         THEY'RE DIFFERENT, AND THEY'RE DIFFERENT IN AN IMPORTANT

24    WAY.

25         NOW, THE COURT HAS -- OR WILL INSTRUCT YOU, RATHER, THAT A

1    FINDING UNDER THE FEDERAL CFAA, THE FIRST INSTRUCTION THAT I

2    SAID, 16, IS DIFFERENT THAN THE FINDING YOU WOULD NEED TO MAKE

3    TO AWARD PUNITIVE DAMAGES, AND YOU MUST FIND FRAUD AS IT'S

4    DEFINED IN 27, THE INSTRUCTION ON PUNITIVE DAMAGES, IN ORDER TO

5    AWARD PUNITIVE DAMAGES IN THIS CASE.

6         AND AS I MENTIONED, THEY ARE DIFFERENT.

7         SO ANY ARGUMENT TO SAY, OH, WELL, THERE'S A FINDING OF

8    INTENT, THAT'S A LITTLE BIT OF SLEIGHT OF HAND HERE.

9         ALL RIGHT.  ALSO, YOU MUST FIND THAT PLAINTIFFS PROVED

10   FRAUD BY CLEAR AND CONVINCING EVIDENCE, AND YOU ARE INSTRUCTED

11   THAT THAT'S A SIGNIFICANTLY HIGHER BURDEN.

12        LET'S LOOK BACK AT THE INSTRUCTION.

13        INTENTIONAL CONCEALMENT, MISREPRESENTATION OR CONCEALMENT

14   OF A MATERIAL FACT, AND WITH THE INTENT TO CAUSE HARM TO

15   FACEBOOK.

16        AS I SAID, THERE'S NOTHING HERE LIKE THAT.

17        LET'S GO TO THE NEXT SLIDE.

18        MR. GAZNELI EXPLAINED, IN RELATION TO THIS 2018 DECEMBER

19   CHANGE, THAT HE DIDN'T KNOW WHY HEAVEN STOPPED WORKING, BUT

20   THEY JUST RECEIVED THIS GENERAL ERROR MESSAGE WITH NO

21   EXPLANATION.

22        SO NSO WASN'T TRYING TO HARM OR MISLEAD FACEBOOK BY

23   UPDATING PEGASUS -- IN ITS EFFORTS TO UPDATE PEGASUS TO COMPLY

24   WITH WHATSAPP'S UPDATED SERVER RULES.

25        AND THERE WERE NO INTENTIONAL MISSTATEMENTS.  AS I

1     MENTIONED, THERE WEREN'T ANY STATEMENTS AT ALL.

2          GO TO THE NEXT SLIDE.

3          THE HEIGHTENED FRAUD STANDARD NECESSARY FOR PUNITIVE

4     DAMAGES IS WHY YOU HEARD THIS WEIRD TESTIMONY FROM MR. GHEORGHE

5     AND MR. WOOG REPEATEDLY TRYING TO WORK THE WORD "TRICKED" INTO

6     THEIR ANSWERS.  FACEBOOK WANTS YOU TO CONSIDER THAT TO BE A

7     FRAUDULENT MISREPRESENTATION.  BUT, AGAIN, SERVERS CAN'T BE

8     TRICKED, AS I ALREADY DESCRIBED.

9          FACEBOOK HAS ALSO SUGGESTED TO YOU -- NEXT SLIDE -- THAT

10    SOMEHOW ANONYMIZATION OF WHATSAPP ACCOUNTS IS FRAUD.  MR. WOOG,

11    YOU'LL RECALL, TESTIFIED EARLY ON IN THE CASE THAT WHATSAPP

12    DOESN'T REQUIRE ANYBODY TO USE REAL NAMES.  THEY DON'T CARE

13    WHAT NAMES YOU GIVE.  THEY DON'T CARE WHAT YOUR IDENTITIES ARE.

14    SO THERE'S NOTHING MISLEADING ABOUT CREATING ANONYMIZED

15    ACCOUNTS.

16         NEXT SLIDE.

17         YOU HEARD FACEBOOK SUGGEST THAT THERE WAS FRAUD COMMITTED

18    BY THE USE OF VPN SERVERS.  THIS IS THE WHITE SERVICES

19    TESTIMONY FROM MR. ESHKAR.  WELL, THAT DIDN'T CONCEAL -- HE

20    TESTIFIED THAT THE VPN'S AND ALL THAT ANONYMIZATION WAS TO

21    PROTECT THE CUSTOMERS' IDENTITIES FROM THEIR TARGETS.  THEY

22    DIDN'T CONCEAL ANYTHING FROM OR MISREPRESENT ANYTHING THAT

23    WOULD HAVE MATTERED TO FACEBOOK.

24         NEXT SLIDE.

25         FOR ALL THESE REASONS, I'D ASK YOU TO CONCLUDE THAT

1    FACEBOOK HAS NOT SATISFIED ITS BURDEN WITH CLEAR AND CONVINCING

2    EVIDENCE WITH RESPECT TO MALICE, FRAUD, OR OPPRESSION IN THE

3    CALIFORNIA STATUTE AND YOU SHOULD ANSWER NO TO QUESTION 2(A).

4         EVEN IF YOU FIND THAT THE ANSWER TO THAT IS "YES," BY THE

5    WAY, YOU'RE NOT REQUIRED TO FIND PUNITIVE DAMAGES.  YOU WOULD

6    STILL NEED TO DECIDE WHETHER THEY SHOULD BE IMPOSED.  I WOULD

7    ASK YOU TO ANSWER THAT QUESTION ALSO "NO" BASED ON EVERYTHING

8    I'VE ALREADY SAID.

9         AND THEN IF YOU DO THAT, YOU CAN STOP AND TELL THE COURT

10   YOU'RE FINISHED.

11        BUT IF YOU DISAGREE AND YOU FIND THAT FACEBOOK SHOULD

12   RECEIVE PUNITIVE DAMAGES, THEN YOU WOULD MOVE TO THE NEXT

13   QUESTION, WHICH IS THE AMOUNT OF PUNITIVE DAMAGES.  I'LL COVER

14   THIS VERY QUICKLY.

15        THERE'S A NUMBER OF FACTORS THE COURT IS GOING TO GIVE

16   YOU.  THEY'RE SET OUT -- NEXT SLIDE, PLEASE -- IN THE JURY

17   INSTRUCTIONS.  THE FIRST ONE IS HOW REPREHENSIBLE WAS THE

18   CONDUCT?  IN CONSIDERING THAT QUESTION, YOU'RE ASKED TO LOOK AT

19   FOUR THINGS.  THE FIRST ONE -- SORRY, THREE THINGS.

20        DID THE CONDUCT CAUSE PHYSICAL HARM?  WE'VE ALREADY TALKED

21   ABOUT THAT.

22        WERE THE PLAINTIFFS FINANCIALLY WEAK OR VULNERABLE?  I

23   THINK THAT ONE SPEAKS FOR ITSELF IN THIS CASE.

24        THE THIRD ONE WAS WHETHER THE DEFENDANTS' CONDUCT INVOLVED

25   A PATTERN OR PRACTICE?  THIS IS THE ONE THAT THEY'RE ASKING YOU

1    TO PUT A LOT OF WEIGHT ON.  BUT THERE CERTAINLY ISN'T A PATTERN

2    OR PRACTICE HERE THAT INVOLVES CALIFORNIA LAW.

3        TO DO SO, I NEED TO POINT OUT TO YOU THAT THERE'S TWO

4    KINDS OF WHATSAPP SERVERS, SIGNALLING SERVERS AND RELAY

5    SERVERS.  THIS WAS LATE FRIDAY.

6        MR. GHEORGHE TESTIFIED, AS I ALREADY SAID, THAT THERE ARE

7    100 RELAY LOCATIONS ALL AROUND THE WORLD, TWO OF THEM ARE IN

8    CALIFORNIA.

9        MR. GAZNELI TESTIFIED THAT OUT OF THE THREE VERSIONS OF

10   PEGASUS THAT WE'VE TALKED ABOUT IN THIS CASE, ONLY ONE, EDEN,

11   THE MIDDLE ONE, USED WHATSAPP RELAY SERVERS.  OKAY?

12       THE OTHER TWO VECTORS, HEAVEN AND ERISED, AS MR. GAZNELI

13   TESTIFIED, USED ONLY WHATSAPP SIGNALLING SERVERS, NONE OF WHICH

14   WERE IN CALIFORNIA.

15       MR. GHEORGHE TESTIFIED AT HIS DEPOSITION -- THIS WAS THE

16   PART I READ FROM THE DEPOSITION, HE WASN'T ON THE STAND ON

17   FRIDAY -- THAT WHATSAPP'S SIGNALLING SERVERS WERE NOT IN

18   CALIFORNIA.  NONE OF THEM WERE.  THEY WERE IN ALTOONA,

19   PENNSYLVANIA, VIRGINIA, AND NEW MEXICO.

20       SO THE ONLY PEGASUS VERSION THAT USED WHATSAPP SERVERS IN

21   CALIFORNIA WAS EDEN, AND THE COURT FOUND THAT EDEN SENT

22   MESSAGES THROUGH THOSE CALIFORNIA-BASED SERVERS JUST 43 TIMES

23   IN MAY 2019.

24       NONE OF THE OTHER TWO VERSIONS DID ANYTHING IN CALIFORNIA.

25       SO THERE'S JUST NO EVIDENCE OF ANY PATTERN OR PRACTICE

1    TARGETING WHATSAPP SERVERS IN CALIFORNIA.

2        AND I WOULD SUBMIT TO YOU THAT BY DESIGNING THREE VERSIONS

3    OF PEGASUS OVER A RELATIVELY SHORT PERIOD OF TIME, MANY YEARS

4    AGO NOW, DOES NOT CONSTITUTE THE SORT OF PATTERN OR PRACTICE

5    THAT COULD DEMONSTRATE REPREHENSIBLE CONDUCT, PARTICULARLY WHEN

6    IT'S UNDISPUTED THAT NONE OF THOSE VERSIONS OF PEGASUS WERE

7    INTENDED TO HARM OR DID HARM WHATSAPP SERVERS IN ANY WAY.

8        THE LAST FACTOR UNDER REPREHENSIBILITY IS THIS ACTING WITH

9    TRICKERY OR DECEIT.  I ALREADY EXPLAINED THAT.  THIS WAS

10   UNENCRYPTED, PLAIN TEXT AS MR. -- AS THE WITNESSES TESTIFIED.

11       THE NEXT FACTOR IS THE RELATIONSHIP WITH COMPENSATORY

12   DAMAGES.  MR. ANDRES TALKED ABOUT THIS.

13       FACEBOOK IS NOT ASKING YOU FOR A NUMBER, BUT THEY'RE SORT

14   OF PUTTING OUT THERE THE SUGGESTION THAT THE R&D BUDGET IN 2023

15   AND 2024 IS RELATED TO CONDUCT, IT WASN'T USED TO DEVELOP THESE

16   VECTORS, BUT IT'S SOMEHOW RELATED TO CONDUCT ABOUT THEM.

17       THAT'S NOT A REASONABLE RELATIONSHIP.

18       A REASONABLE RELATIONSHIP MEANS THAT YOU THINK ABOUT

19   PUNITIVE DAMAGES AS LIKE A FRACTION OR A MULTIPLIER OF

20   COMPENSATORY DAMAGES.

21       AND IF YOU AWARD PUNITIVE DAMAGES, YOU MIGHT AWARD THEM IN

22   AN AMOUNT EQUAL TO, FOR EXAMPLE, HALF THE COMPENSATORY DAMAGES,

23   OR 1.5 X, SOME REASONABLE RELATIONSHIP TO.  THAT'S WHAT THIS IS

24   TALKING ABOUT.

25       AND IN A CASE LIKE THIS WHERE THERE'S NO EVIDENCE REALLY

1    OF ANY TYPE OF INJURY OR REPREHENSIBILITY, NO INJURY TO

2    FACEBOOK, I WOULD SUBMIT THAT AN AWARD OF PUNITIVE DAMAGES, IF

3    ANY, SHOULD BE A VERY SMALL MULTIPLIER OF COMPENSATORY DAMAGES,

4    LIKELY LESS THAN THE COMPENSATORY DAMAGES, BUT CERTAINLY NO

5    MORE THAN TWO TIMES COMPENSATORY DAMAGES AWARD.

6         THE THIRD FACTOR IS ABOUT THE DEFENDANTS' FINANCIAL

7    CONDITION.  I'M NOT GOING TO SPEND A LOT OF TIME ON THIS, BUT

8    YOU WILL BE INSTRUCTED THAT ANY AWARD YOU IMPOSE MAY NOT EXCEED

9    THE DEFENDANTS' ABILITY TO PAY.

10        AND HERE THE DEFENDANTS' CURRENT FINANCIAL CONDITION IS

11   WEAK.  YOU HEARD THAT TESTIMONY FROM MR. SHOHAT.  THEY'RE NOT

12   PROFITABLE NOW.  THEY WEREN'T IN 2023.

13        IN 2024, THERE WAS A MODEST PROFIT OF $313,000.  FOR ONE

14   OF THE DEFENDANTS IN 2023, THE LOSS OF THE OTHERS WELL MORE

15   THAN BALANCE THAT TO A ZERO.  AND THEY HAVE MINIMAL ABILITY TO

16   PAY.  THEY'RE LOSING MONEY.  THEY HAVE SIGNIFICANT DEBTS, AND

17   THEY LACK FUNDS TO SATISFY A PUNITIVE DAMAGES JUDGMENT.

18        MR. SHOHAT TESTIFIED THEY EVEN STRUGGLE TO MAKE PAYROLL

19   WITH THEIR EMPLOYEES.

20        YOU WILL BE INSTRUCTED THAT YOU CANNOT AWARD MORE IN

21   PUNITIVE DAMAGES THAN THE DEFENDANTS ARE ABLE TO PAY, AND THAT

22   ABILITY IS MINIMAL TO NONE.

23        SO, FINALLY, YOU WILL BE INSTRUCTED THAT PUNITIVE DAMAGES

24   CANNOT BE USED TO PUNISH DEFENDANTS FOR THEIR -- FOR THE IMPACT

25   OF THEIR CONDUCT ON PERSONS OTHER THAN THE PLAINTIFFS.

1        YOU CAN'T CONSIDER, AS FACEBOOK HAS BEEN TRYING TO SCARE

2    YOU INTO DOING, ANY CLAIMED EFFECT ON THE TARGETS OR ANY THIRD

3    PARTY.

4        ALL YOU CAN CONSIDER IS THE EFFECT NSO HAD ON FACEBOOK,

5    AND FOR ALL THE REASONS I'VE GIVEN YOU, THAT IS EFFECTIVELY

6    NONE.

7        YOU WILL ALSO BE INSTRUCTED, AS I NOTED BEFORE, THAT

8    PUNITIVE DAMAGES MAY NOT BE USED TO PUNISH DEFENDANTS FOR ACTS

9    COMMITTED OUTSIDE OF CALIFORNIA.  AND THE VAST MAJORITY OF THE

10   CONDUCT IN THIS CASE HAD NOTHING TO DO WITH CALIFORNIA.

11       DEFENDANTS DON'T DESIGN OR LICENSE PEGASUS IN CALIFORNIA.

12   THE THREE VERSIONS AT ISSUE, AS I MENTIONED, ONLY ONE EVER USED

13   THE CALIFORNIA-BASED SERVERS.

14       AND THE COURT HAS FOUND THAT THOSE SERVERS, THERE WAS 43

15   MESSAGES THAT WENT THROUGH THEM IN MAY OF 2019.

16       SO BOTTOM LINE HERE IS THAT YOU DIDN'T HEAR ANY EVIDENCE

17   THAT WOULD SUPPORT A FINDING, LET ALONE A FINDING BY CLEAR AND

18   CONVINCING EVIDENCE, THAT NSO ACTED REPREHENSIBILITY --

19   REPREHENSIBLY IN CALIFORNIA FOR THE PURPOSE OF HURTING FACEBOOK

20   OR KNOWINGLY DISREGARDING ANY RIGHT THAT IS ACCORDED TO

21   FACEBOOK UNDER THAT CALIFORNIA STATUTE.

22            THE COURT:  COUNSEL --

23            MR. AKROTIRIANAKIS:  MEMBERS OF THE JURY --

24            THE COURT:  YOU NEED TO WRAP UP.

25            MR. AKROTIRIANAKIS:  I'M SITTING DOWN NOW.  THANK

1      YOU.  MY APOLOGIES, YOUR HONOR.

2          YOU'VE BEEN MORE THAN PATIENT.  I THANK YOU FOR PAYING

3      CLOSE ATTENTION.  THIS IS MY LAST CHANCE TO SPEAK WITH YOU.

4      COUNSEL WILL HAVE ANOTHER CHANCE TO GET UP.  I WON'T BE ABLE TO

5      RESPOND TO THOSE ARGUMENTS, BUT I HOPE YOU'LL KEEP THESE

6      ARGUMENTS IN MIND.  I TRIED TO RESPOND TO EVERYTHING THAT HAS

7      OR WILL BE ARGUED.

8          I DON'T WANT TO REPEAT MYSELF EXCEPT AGAIN TO SAY THAT I

9      DON'T THINK THIS CASE WAS BROUGHT BY FACEBOOK BECAUSE IT

10     BELIEVES IT SUFFERED ANY FINANCIAL LOUSES.  THEY BROUGHT THIS

11     CASE BECAUSE THEY WANT TO HURT NSO, BECAUSE THEY WANT TO GET

12     SOME GOOD HEADLINES IN THE PRESS, AND THAT'S NOT AN APPROPRIATE

13     USE OF THE COURT SYSTEM OR YOUR VALUABLE TIME, AND I HOPE YOU

14     AGREE WHEN YOU GIVE YOUR VERDICT IN THIS CASE.

15         THANK YOU, MEMBERS OF THE JURY.

16         THANK YOU, YOUR HONOR.

17             THE COURT:  ALL RIGHT.

18         (PAUSE IN PROCEEDINGS.)

19             THE COURT:  LADIES AND GENTLEMEN, OUR COURT

20     REPORTER -- YOU HEAR HOW FAST HE TALKS, RIGHT?  OUR COURT

21     REPORTER HAS BEEN BUSY TRYING TO KEEP UP.  WE'RE GOING TO TAKE

22     A SHORT BREAK, SAY TEN MINUTES, AND THEN WE'LL FINISH UP.

23             THE CLERK:  ALL RISE FOR THE JURY.

24         (JURY OUT AT 12:34 P.M.)

25             THE COURT:  ALL RIGHT.  WE HAVE ANOTHER SET OF THE

1        JURY INSTRUCTIONS.  THEY WERE MISORDERED, AND THERE WAS THE --

2   ONE REPETITIVE INSTRUCTION THAT I DID NOT WANT TO GIVE INCLUDED

3   IN THE FIRST, SO WE RENUMBERED THEM AND CHANGED THE ORDER.

4        NOW WE'RE GOING TO GIVE THEM TO YOU IN THE -- THE

5   INSTRUCTIONS ARE THE SAME, BUT WE'VE REORDERED THEM.  SO WHEN

6   YOU READ ALONG WITH THE JURY, YOU'LL HAVE THE EXACT ORDER SO

7   YOU DON'T HAVE TO BE FLIPPING THROUGH.

8             MR. AKROTIRIANAKIS:  SO THE ONES THAT I JUST TOLD

9   THEM, 16 AND 27 --

10            THE COURT:  NO, NO.  THE NUMBERS MAY HAVE CHANGED.

11   LET'S SEE.  THE PUNITIVE DAMAGES NUMBER DIDN'T.

12            MR. AKROTIRIANAKIS:  WHAT ABOUT THE ONE FOR THE CFAA?

13            THE COURT:  I THINK IT DID.  IT WENT FROM 17 TO 14.

14            MR. ANDRES:  YOUR HONOR, I WASN'T AWARE THAT THERE

15   EVER WERE NUMBERS.

16            THE COURT:  I PUT THE NUMBERS IN.

17            MR. ANDRES:  BUT I'M JUST NOT SURE WE WERE -- DID YOU

18   DO THAT THIS MORNING?

19            THE COURT:  YEAH.

20            MR. ANDRES:  OH, OKAY.  I DIDN'T SEE THAT.

21            THE COURT:  YEAH.  ANYWAY, WE HAVE ANOTHER SET TO

22   GIVE YOU, AND YOU CAN LOOK AT THAT DURING THE BREAK.

23        OKAY.  THAT'S ENOUGH.  I DON'T WANT TO HEAR ANOTHER WORD.

24            MR. ANDRES:  NOPE.

25            THE COURT:  LEE-ANNE NEEDS A BREAK.  TAKE A BREAK.

1        (RECESS FROM 12:35 P.M. UNTIL 12:45 P.M.)

2            THE COURT:  ALL RIGHT.  KELLY, LET'S BRING THE JURY

3    IN.

4            MR. ANDRES:  FIFTEEN MINUTES, YOUR HONOR, WITH A FIVE

5    MINUTE GRACE PERIOD, RIGHT?

6            THE COURT:  YEAH.

7            MR. ANDRES:  OKAY.  THANK YOU.

8        (PAUSE IN PROCEEDINGS.)

9            THE CLERK:  ALL RISE FOR THE JURY.

10       (JURY IN AT 12:46 P.M.)

11           THE COURT:  ALL RIGHT.  EVERYONE, BE SEATED.

12       MR. ANDRES, YOU MAY PROCEED.

13           **(MR. ANDRES GAVE HIS REBUTTAL ARGUMENT ON BEHALF OF**

14   **PLAINTIFFS.)**

15           MR. ANDRES:  SORRY, ME AGAIN.  JUST 15 MINUTES THIS

16   TIME, SO I'LL BE QUICK, BUT THIS IS THE TIME TO RESPOND TO

17   NSO'S COUNSEL, AND AGAIN I'LL TRY TO BE QUICK.

18       THERE WAS A LOT OF DISCUSSION ABOUT CONDUCT IN CALIFORNIA

19   AND THE LIKE.

20       YOU SHOULD DISMISS THOSE ARGUMENTS.  YOU SHOULD READ THE

21   JURY INSTRUCTIONS.  IT SAYS SPECIFICALLY FROM JUDGE HAMILTON

22   THAT THERE WERE AT LEAST 43, OR THERE WERE 43 ATTACKS ON

23   SERVERS IN CALIFORNIA.  THAT'S PLENTY.  THAT IS PLENTY.

24           AND BY THE WAY, THERE IS ALSO A JURY INSTRUCTION THAT SAYS

25   THAT YOU CAN CONSIDER CONDUCT OUTSIDE OF CALIFORNIA THAT

1    RESULTS IN HARM HERE.  SO WHATEVER HAPPENED IN ISRAEL WITH THE

2    SPYWARE, SOFTWARE, CALL IT WHATEVER YOU WANT, IT AFFECTED

3    WHATSAPP SERVERS HERE IN CALIFORNIA.

4         SO YOU SHOULD DISMISS THIS ARGUMENT ABOUT CALIFORNIA

5    BECAUSE THE JURY INSTRUCTIONS ARE VERY CLEAR.

6         AND LET ME JUST BE VERY, VERY CLEAR ABOUT SOMETHING.  WHAT

7    YOU HEAR REPEATEDLY FROM NSO AND THEIR COUNSEL ARE A BUNCH OF

8    DISTRACTIONS.  THEY WANT TO DISTRACT YOU FROM THE LAW.  THEY

9    WANT TO TELL YOU THAT THIS IS A PR LAWSUIT AND THAT WHATSAPP

10   WANTS TO DAMAGE NSO.

11        I'LL TAKE THE LAST ONE FIRST.

12        WHATSAPP ABSOLUTELY WANTS TO HOLD NSO ACCOUNTABLE.  IT

13   WANTS TO HOLD THEM ACCOUNTABLE, AND THEY'RE ASKING YOU TO SEND

14   A MESSAGE WITH YOUR VERDICT.

15        WE'RE NOT TRYING TO DAMAGE THEM, WE'RE TRYING TO GET THEM

16   TO STOP WITH THEIR SPYWARE, RIGHT?

17        THIS IS A PR TRIAL, LADIES AND GENTLEMEN?  THIS IS THE

18   UNITED STATES DISTRICT FEDERAL COURT FOR THE NORTHERN DISTRICT

19   OF CALIFORNIA.  THERE ARE NO PR LAWSUITS HERE.

20        AND BY THE WAY, WHATSAPP PREVAILED.

21        SO THE IDEA THAT THIS IS SOME, SOME PR, SHOW TIME LAWSUIT,

22   WE WON.  AND YOU KNOW THAT BECAUSE THE JUDGE FOUND THAT THEY

23   VIOLATED THE LAW.

24        SO THIS IS NOT A SHOW TRIAL OR A PR TRIAL.  IT'S A TRIAL

25   ABOUT THE VIOLATION OF LAW THAT THE JUDGE FOUND, AND THEY DON'T

1    RESPECT THAT.  THEY DON'T RESPECT THAT.  AND THAT'S WHAT WE'RE

2    ASKING YOU TO DO IS TO SEND THEM A MESSAGE THAT THAT MATTERS,

3    THAT THE LAW MATTERS.

4         SO YOU HAVE ALL OF THESE DISTRACTIONS.  YOU HAVE THE SHOW

5    TRIAL NONSENSE.  YOU HAVE THE STUFF ABOUT APPLE, WHICH IS

6    COMPLETELY IRRELEVANT, BUT, AGAIN, APPLE DID CALL THEM NAMES.

7    BUT LET'S PUT THAT ASIDE.

8         THEN YOU HAVE THIS OTHER ISSUE ABOUT THE WORD "FINANCIAL

9    CONDITION."

10        MR. AKROTIRIANAKIS SAID IT A LOT.  I DON'T KNOW HOW MANY

11   TIMES.  I DIDN'T COUNT.  YOU KNOW WHY?  IT DOESN'T MATTER.  IT

12   IS NOT RELEVANT.  THAT WORD "FINANCIAL CONDITION" IS NOT IN THE

13   JURY INSTRUCTIONS AS IT RELATES TO COMPENSATORY DAMAGES.  WE'RE

14   NOT --

15        FINANCIAL LOSSES.  IT'S NOT RELEVANT.  WE'RE NOT ASKING

16   FOR FINANCIAL LOSSES.  WE'RE ASKING FOR THE, FOR THE MONEY THAT

17   WHATSAPP HAD TO PAY FOR ITS EMPLOYEES TO RESPOND.

18        THERE'S THIS CONSTANT, LOOK OVER HERE.  THOSE WORDS ARE

19   NOT IN THE JURY INSTRUCTIONS, AND THEY'RE NOT RELEVANT.

20        BUT HERE'S A JURY INSTRUCTION THAT I'M GOING TO ASK YOU TO

21   READ.  I'M GOING TO ASK YOU TO READ IT TWICE.  THIS IS --

22   JUDGE HAMILTON WILL GIVE YOU THIS ABOUT ARGUMENTS TO DISREGARD.

23        I HAVE INSTRUCTED YOU THAT YOU ARE TO DECIDE TO THIS CASE

24   SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.  DURING DEFENDANTS'

25   OPENING STATEMENT, NSO'S OPENING STATEMENT, YOU HEARD AN

1    ALLEGATION BY DEFENDANTS THAT PLAINTIFFS TRIED TO STEAL

2    DEFENDANTS' INTELLECTUAL PROPERTY.  THERE WAS NO EVIDENCE TO

3    SUPPORT THAT ALLEGATION THAT PLAINTIFFS TRIED TO STEAL

4    DEFENDANTS' INTELLECTUAL PROPERTY.  YOU SHOULD DISREGARD THAT

5    ALLEGATION IN YOUR DELIBERATIONS.

6         THAT'S WHAT YOU SHOULD DO WITH MOST, IF NOT ALL, OF

7    MR. AKROTIRIANAKIS'S ARGUMENT.  YOU SHOULD DISREGARD THEM,

8    BECAUSE JUST LIKE THAT ARGUMENT ABOUT INTELLECTUAL PROPERTY,

9    THERE WAS NO EVIDENCE IN THIS TRIAL ABOUT IT.  IT'S NOT

10   RELEVANT AND IT'S NOT APPROPRIATE, AND THE JUDGE WILL GIVE YOU

11   THAT INSTRUCTION TO DISREGARD THAT.

12        NOW, THERE WAS ALSO SOME DISCUSSION OF JUDGE -- I FORGOT

13   TO PUT ON MY TIMER.

14        DO YOU KNOW WHAT TIME I STARTED.

15             THE COURT:  THAT'S OKAY.  WE'LL REMIND YOU.

16             MR. ANDRES:  I'M SURE YOU WILL.

17        THERE WAS ALL THIS STUFF ABOUT THEY DIDN'T CONCEAL

18   ANYTHING AND THE CODE WAS OBVIOUS.

19        THAT'S NOT TRUE.  THAT IS NOT WHAT THE EVIDENCE IN THIS

20   TRIAL IS.  YOU CAN'T SPY ON PEOPLE, AND YOU CAN'T HACK THEIR

21   SERVERS UNLESS YOU DO IT IN A WAY THAT'S CONCEALING OR TRICKING

22   OR FRAUDULENT.

23        THOSE ARGUMENTS SHOULD BE DISMISSED AS WELL.  THEY DON'T

24   HOLD ANY MERIT.

25        YOU KNOW, NSO KEEPS ARGUING THAT THEY WEREN'T HARMED.  BUT

1    THEY TRESPASSED ON TO WHATSAPP SERVERS AND TOOK INFORMATION.

2    IT SAYS THAT IN THE JURY INSTRUCTIONS.

3              MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR, THAT'S A

4    MISSTATEMENT OF THE LAW AND THE RECORD IN THIS CASE.

5              THE COURT:  ALL RIGHT.

6              MR. ANDRES:  THANK YOU, YOUR HONOR.

7              THE COURT:  LADIES AND GENTLEMEN, YOU'RE -- YOU WILL

8    BE REMINDED TIME AND AGAIN THAT WHAT THE LAWYERS SAY IS MERELY

9    ARGUMENT.

10       GO AHEAD, COUNSEL.

11             MR. ANDRES:  THANK YOU.

12       CAN I HAVE THE SLIDES, PLEASE.  OKAY.  GO AHEAD.  CAN I

13   GET THE FIRST ONE.

14       AGAIN, THIS IS THE ISSUE OF THE RSU'S.  THIS IS HOW PEOPLE

15   WERE PAID IN THIS CASE, AND THAT'S WHY WE INCLUDED THE RSU'S IN

16   THE ULTIMATE.

17       NEXT SLIDE.

18       THERE WAS INFORMATION, AGAIN, ABOUT HOW, ABOUT HOW NSO WAS

19   OBTAINING INFORMATION FROM WHATSAPP SERVERS, WHICH THIS IS ALSO

20   IN THE JURY INSTRUCTIONS.  SO YOU CAN RELY ON THE TESTIMONY OF

21   MR. GAZNELI, OR YOU CAN RELY ON THE JURY INSTRUCTIONS, BUT THAT

22   CERTAINLY IS TRUE.

23       HERE'S ANOTHER THING THAT YOU CAN CONSIDER -- NEXT

24   SLIDE -- IS THE TESTIMONY OF MR. PINSONNEAULT.  YOU REMEMBER

25   THAT MR. AKROTIRIANAKIS PUT A BIG ZERO IN THE COMPENSATORY

1    DAMAGES LINE OF THE JURY FORM.

2         THAT'S NOT EVEN CONSISTENT WITH WHAT HIS OWN EXPERT SAID.

3    I ASKED HIM, YOU'RE NOT GIVING AN OPINION THAT DAMAGES HERE ARE

4    ZERO; RIGHT?

5         AND HE SAID, I HAVEN'T REACHED AN OPINION THAT THE DAMAGES

6    ARE ZERO.

7         NEXT SLIDE.

8         HERE'S ANOTHER EXAMPLE OF ALL THE WORK THAT WAS DONE FOR

9    THE DEVELOPMENT AND RESEARCH OF PEGASUS.  YOU SEE IT TOOK A

10   LONG TIME.  AND RELATIVE TO ALL THE TIME IT TOOK TO DEVELOP

11   PEGASUS, THERE'S NOT A LOT OF TIME -- THE TIME THAT WHATSAPP

12   USED TO RESPOND WAS NOT SIGNIFICANT AT ALL GIVEN HOW THIS

13   INVESTIGATION SPIRALLED.

14        GO AHEAD, THE NEXT ONE.

15        AGAIN, THE PURPOSES OF PEGASUS IS TO OBTAIN INFORMATION

16   FROM THE TARGET DEVICES.  THERE'S NO QUESTION ABOUT THAT.

17        NEXT ONE.

18        AGAIN, IT'S DONE FOR THE PURPOSES OF CONCEALMENT.

19        I THINK YOU HAVE A DIFFERENT LIST THAN I DO,

20   MR. MARZORATI.  BUT GO AHEAD, GIVE US THE NEXT ONE.

21        HERE, THEY TALK ABOUT HOW THEY DIDN'T WANT TO HARM

22   WHATSAPP.  BUT THEY VIEWED WHATSAPP AS A THREAT ACTOR, AND THEY

23   ACCUSE US OF TRYING TO DAMAGE THEM WHEN IT'S NSO THAT'S DOING

24   THE DAMAGE HERE.

25        NEXT SLIDE.

1          AGAIN, WE ASKED THAT YOU SEND A MESSAGE BECAUSE NSO HASN'T

2     STOPPED, AND HERE'S TESTIMONY FROM MR. GAZNELI THAT WHILE THIS

3     LAWSUIT WAS PENDING THEY'RE ACTIVELY MAKING ITS CUSTOMERS A

4     ZERO-CLICK EXPLOIT.

5          DO YOU SEE THAT?  AND HE ANSWERS YES.

6          SO THEY HAVEN'T STOPPED.

7          NEXT SLIDE.

8          THIS IS THE ISSUE OF THE RSU'S, RIGHT?  WHY WERE THEY

9     INCLUDED BY MS. TREXLER?  SHE WASN'T TRYING TO INFLATE.  THIS

10    IS HOW THE WHATSAPP EMPLOYEES GET PAID, AND YOU KNOW THAT

11    TESTIMONY FROM MR. GHEORGHE AND FROM MR. ROBINSON.

12         NEXT SLIDE.

13         MR. AKROTIRIANAKIS ASKED FOR A DEFINITION OF SPYING.  THIS

14    IS WHAT PEGASUS DOES, AND THIS IS IN EXHIBIT 59.  ASK TO SEE

15    IT.  THIS IS WHAT SPYING IS, PLUS EVERY OTHER POSSIBLE THING.

16    ASK TO SEE IT.  THIS IS WHAT SPYING IS.

17         YOU WANT A DEFINITION OF SPYING?  IT'S GLOBAL COVERAGE,

18    UNLIMITED ACCESS, HANDLE ENCRYPTED CONTENT, UNCOVER VIRTUAL

19    IDENTITIES, OPERATE TARGET DEVICES, INTERCEPT CALLS, PINPOINT

20    TARGETS, MONITOR MOBILE APPLICATIONS.

21         THAT'S WHAT PEGASUS DOES.  YOU CAN CALL IT SPYWARE OR

22    ANYTHING ELSE, BUT THAT'S WHAT THE PRODUCT AT ISSUE HERE IS,

23    AND THAT'S WHY NSO HACKS INTO WHATSAPP'S SERVERS.

24         NEXT SLIDE.  THAT'S THE LAST ONE?  OKAY.

25         I JUST WANT TO REMIND YOU OF A FEW OTHER THINGS.

1        YOU'VE, AGAIN, HAD THIS ARGUMENT THAT NSO HAS NO ABILITY

2    TO PAY BECAUSE THEY'RE POOR.

3        BUT YOU HEARD THE TESTIMONY, NOT ON DIRECT EXAMINATION,

4    BUT ON CROSS-EXAMINATION.  MR. SHOHAT SAID THAT THEIR EXPENSES

5    ARE $10 MILLION A MONTH.  THAT MEANS THAT THEY SPENT

6    $120 MILLION A YEAR ON EXPENSES, ALL OF WHICH WOULD BE

7    AVAILABLE WHEN YOU CONSIDER, CONSIDER PUNITIVE DAMAGES IN THIS

8    CASE.

9        THERE WAS SOME DISCUSSION ABOUT THE SIZE OF THE COMPANIES.

10    WHEN YOU READ THROUGH THE JURY INSTRUCTIONS, THERE IS NOTHING

11    IN THOSE JURY INSTRUCTIONS THAT ASKS YOU TO COMPARE THE SIZE OF

12    THE TWO PARTIES HERE.  THERE'S NOTHING IN THERE THAT ASKS YOU

13    TO CONSIDER THE FINANCIAL CONDITION OF BOTH PARTIES.

14        THERE'S ONLY, IN THE PUNITIVE DAMAGES, ONLY DISCUSSION

15    ABOUT THE DEFENDANT.  AND REMEMBER THAT AND DON'T BE

16    DISTRACTED, OR DON'T BE CONFUSED BASED ON THE ARGUMENTS THAT

17    NSO HAS MADE.

18        THERE WAS REFERENCE TODAY TO, IN THEIR CLOSING, ABOUT

19    SUSAN GLICK.  I'M HAPPY TO HAVE YOU CONSIDER THE TESTIMONY OF

20    SUSAN GLICK.  THEY PUT HER IN TODAY THROUGH VIDEO.  I THINK IT

21    WAS ABOUT THREE MINUTES.

22        ALL SHE TESTIFIED ABOUT WAS THE DATE THAT, IN HER VIEW,

23    WHICH SHE SAID SHE DIDN'T KNOW VERY MUCH ABOUT, THE SECURITY

24    WAS, WAS CORRECTED.  BUT YOU HAVE THAT FROM A VARIETY OF OTHER

25    PEOPLE AND AT THE END OF THE DAY, IT'S NOT PARTICULARLY

1    RELEVANT, NOT SOMETHING THAT YOU SHOULD SPEND A LOT OF TIME ON.

2        AT THE END OF THE DAY, LADIES AND GENTLEMEN -- BY THE WAY,

3    THERE WAS ALSO QUITE A BIT OF VICTIM BLAMING IN THIS CLOSING.

4    WHATSAPP IS THE VICTIM OF A CYBER ATTACK.  WE'RE NOT THE

5    SAME -- WE'RE NOT ON THE SAME FOOTING WITH NSO IN THE CONTEXT

6    OF THIS LAWSUIT.

7        WE -- THERE'S BEEN NO FINDING BY THIS COURT THAT WE

8    VIOLATED THE LAW AT ALL.

9        THE COURT HAS FOUND THAT NSO VIOLATED THE LAW.  SO ALL

10   THIS BLAMING THAT OUR SECURITY WASN'T ROBUST ENOUGH OR

11   VULNERABILITIES OR WE LET THEM IN, WE DID NOT.  AND YOU KNOW

12   THAT SPECIFICALLY BASED ON THE TESTIMONY OF THE ENGINEERS.

13       YOU KNOW ABOUT THE SPYING IN THIS CASE.  YOU KNOW WHAT IT

14   MEANS.

15       YOU KNOW ABOUT THEIR FINANCIAL CONDITION.

16       AND, AGAIN, I ASK YOU TO LOOK AT THE EXHIBITS, PLAINTIFFS'

17   EXHIBIT 1779, 1780, 1781, 1782.  THOSE ARE THE FINANCIAL

18   DOCUMENTS AS THEY RELATE TO NSO AND Q CYBER.

19       LADIES AND GENTLEMEN, END THE CAT AND MOUSE GAME.  AWARD

20   THE COMPENSATORY DAMAGES OF 444,719, $444,719, AND AWARD A

21   PUNITIVE DAMAGES NUMBER THAT SENDS A MESSAGE THAT SPYING IS NOT

22   OKAY.  IT'S NOT APPROPRIATE.

23       YOU KNOW THE COURT HAS FOUND IT VIOLATED THE LAW, THAT

24   THIS HACKING AND SPYING IS NOT OKAY.

25       SEND THAT MESSAGE.

1              THANK YOU FOR YOUR TIME.

2                   THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

3              ALL RIGHT.  MEMBERS OF THE JURY, NOW IS THE TIME FOR ME TO

4     GIVE YOU THE INSTRUCTIONS.  I AM REQUIRED TO READ THE

5     INSTRUCTIONS IN THE RECORD, BUT WE HAVE FOUND IT HELPFUL FOR

6     YOU TO HAVE A COPY OF THE INSTRUCTIONS SO THAT YOU CAN READ

7     ALONG WITH ME, AND IT -- I THINK THE THINKING IS THAT IT WILL

8     SINK IN MORE IF YOU'RE ABLE TO READ IT AS WELL.

9              SO MS. COLLINS WILL HAND EVERYBODY A COPY OF THE

10    INSTRUCTIONS THAT APPLY IN THIS CASE.

11              (PAUSE IN PROCEEDINGS.)

12                   THE COURT:  ALL RIGHT.

13              MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

14     EVIDENCE AND THE ARGUMENTS OF THE ATTORNEYS, IT IS MY DUTY TO

15     INSTRUCT YOU ON THE LAW THAT APPLIES TO THIS CASE.

16              EACH OF YOU HAS RECEIVED A COPY OF THESE INSTRUCTIONS THAT

17    YOU MAY TAKE WITH YOU TO THE JURY ROOM TO CONSULT DURING YOUR

18    DELIBERATIONS.

19              NOW, IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

20    EVIDENCE IN THE CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS

21    I GIVE IT TO YOU.  AND YOU MUST FOLLOW THE LAW AS I GIVE IT TO

22    YOU, WHETHER YOU AGREE WITH IT OR NOT.  AND YOU MUST NOT BE

23    INFLUENCED BY ANY PERSONAL LIKES OR DISLIKES, OPINIONS,

24    PREJUDICES, OR SYMPATHY.  THAT MEANS THAT YOU MUST DECIDE THE

25    CASE SOLELY ON THE EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT

1    YOU TOOK AN OATH TO DO SO.

2         PLEASE DO NOT READ INTO THESE INSTRUCTIONS ANYTHING THAT I

3    MAY SAY OR DO, OR HAVE SAID OR DONE, THAT I HAVE AN OPINION

4    REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.  IN

5    FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM AND NOT

6    SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.

7         NOW, WHEN A PARTY HAS THE BURDEN OF PROOF BY A

8    PREPONDERANCE OF THE EVIDENCE ON ANY ISSUE, IT MEANS THAT YOU

9    MUST BE PERSUADED BY THE EVIDENCE THAT THE PARTY'S FACTUAL

10   CONTENTION IS MORE PROBABLY TRUE THAN NOT TRUE.

11        YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE,

12   REGARDLESS OF WHICH PARTY SUBMITTED IT.

13        WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR

14   DEFENSE BY CLEAR AND CONVINCING EVIDENCE, IT MEANS THAT THE

15   PARTY MUST PRESENT EVIDENCE THAT LEAVES YOU WITH A FIRM BELIEF

16   OR CONVICTION THAT IT IS HIGHLY PROBABLE THAT THE FACTUAL

17   CONTENTIONS OF THE CLAIM OR DEFENSE ARE TRUE.  THIS IS A HIGHER

18   STANDARD OF PROOF THAN PROOF BY A PREPONDERANCE OF THE

19   EVIDENCE, BUT IT DOES NOT REQUIRE PROOF BEYOND A REASONABLE

20   DOUBT.

21        NOW, THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

22   FACTS CONSIST OF ARE:

23        THE SWORN TESTIMONY OF ANY WITNESS;

24        THE EXHIBITS THAT ARE ADMITTED INTO EVIDENCE;

25        ANY FACTS TO WHICH THE LAWYERS HAVE AGREED; AND,

1    ANY FACTS THAT I HAVE INSTRUCTED YOU TO ACCEPT AS PROVED.

2    IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

3    TESTIMONY AND EXHIBITS AS I DESCRIBED.

4    CERTAIN THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER

5    THEM IN DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

6    1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE.

7    THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID IN THEIR

8    OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS

9    INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT

10   EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE

11   WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

12   SECOND.  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT

13   EVIDENCE.  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

14   WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

15   EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY

16   THE COURT'S RULING ON IT.

17   3.  TESTIMONY THAT IS EXCLUDED OR STRICKEN, OR THAT YOU

18   HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND MUST NOT

19   BE CONSIDERED; AND,

20   4.  ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS

21   NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

22   SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.

23   I HAVE INSTRUCTED YOU THAT YOU ARE TO DECIDE THIS CASE

24   SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.  AND DURING THE

25   DEFENDANTS' OPENING STATEMENT, YOU HEARD AN ALLEGATION BY

1    DEFENDANTS THAT PLAINTIFFS TRIED TO STEAL DEFENDANTS'

2    INTELLECTUAL PROPERTY.  THERE WAS NO EVIDENCE TO SUPPORT THE

3    ALLEGATION THAT PLAINTIFFS TRIED TO STEAL DEFENDANTS'

4    INTELLECTUAL PROPERTY.  YOU SHOULD DISREGARD THAT ALLEGATION IN

5    YOUR DELIBERATIONS.

6         A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

7    BEFORE TRIAL.  THE WITNESS WAS PLACED UNDER OATH TO TELL THE

8    TRUTH AND LAWYERS FOR EACH PARTY WERE PERMITTED TO ASK

9    QUESTIONS.  THE QUESTIONS AND ANSWERS WERE RECORDED.

10        WHEN A PERSON IS UNAVAILABLE TO TESTIFY AT TRIAL, OR IS A

11   REPRESENTATIVE OF A COMPANY, THE DEPOSITION OF THAT PERSON MAY

12   BE USED AT TRIAL.

13        THE DEPOSITION OF CLAUDIU GHEORGHE WAS TAKEN ON

14   AUGUST 16TH, 2024.

15        THE DEPOSITION OF YARON SHOHAT WAS TAKEN ON AUGUST 29TH,

16   2024.

17        THE DEPOSITION OF TAMIR GAZNELI WAS TAKEN ON

18   SEPTEMBER 4TH, 2024.

19        THE DEPOSITION OF RAMON ESHKAR WAS TAKEN ON AUGUST 27TH,

20   2024.

21        THE DEPOSITION OF SARIT BIZINSKY GIL WAS TAKEN ON

22   SEPTEMBER 6TH, 2024.

23        THE DEPOSITION OF SUSAN GLICK WAS TAKEN ON SEPTEMBER 9TH,

24   2024.

25        AND THE DEPOSITION OF ANDREW ROBINSON WAS TAKEN ON

1345

1    SEPTEMBER 19TH, 2024.

2         INSOFAR AS POSSIBLE, YOU SHOULD CONSIDER DEPOSITION

3    TESTIMONY PRESENTED TO YOU IN COURT IN THE SAME WAY AS IF THE

4    WITNESS HAD TESTIFIED IN COURT.

5         DO NOT PLACE ANY SIGNIFICANCE ON THE BEHAVIOR OR TONE OF

6    VOICE OF ANY PERSON READING THE QUESTIONS OR ANSWERS OF ANY

7    WRITTEN DEPOSITION.

8         OKAY.  NOW, YOU HAVE HEARD TESTIMONY FROM DANA TREXLER AND

9    GREGORY PINSONNEAULT WHO TESTIFIED ABOUT THEIR OPINIONS AND THE

10   REASONS FOR THEIR OPINIONS.  THIS OPINION TESTIMONY IS ALLOWED

11   BECAUSE OF SPECIALIZED KNOWLEDGE, SKILL, EXPERIENCE, TRAINING,

12   OR EDUCATION OF THESE WITNESSES.

13        SUCH OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY

14   OTHER TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS

15   MUCH WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

16   SPECIALIZED KNOWLEDGE, SKILL, EXPERIENCE, TRAINING, OR

17   EDUCATION, THE REASONS GIVEN FOR THE OPINIONS, AND ALL THE

18   OTHER EVIDENCE IN THE CASE.

19        THE LAW ALLOWS EXPERT WITNESSES TO BE ASKED QUESTIONS THAT

20   ARE BASED ON ASSUMED FACTS.  THESE ARE SOMETIMES CALLED

21   "HYPOTHETICAL QUESTIONS."

22        IN DETERMINING THE WEIGHT TO GIVE TO THE EXPERT'S OPINION

23   THAT IS BASED ON THE ASSUMED FACTS, YOU SHOULD CONSIDER WHETHER

24   THE ASSUMED FACTS ARE TRUE.

25        DURING THE TRIAL, YOU HAVE HEARD REFERENCES MADE TO

1    DEFENDANTS' CUSTOMERS.  I HAVE RULED THAT THE IDENTITIES OF THE

2    DEFENDANTS' CUSTOMERS ARE NOT RELEVANT TO THE ISSUES IN THIS

3    TRIAL.  YOU SHOULD NOT MAKE ANY INFERENCES OR ASSUMPTIONS AS TO

4    THE IDENTITIES OF DEFENDANTS' CUSTOMERS.

5         DURING TRIAL, YOU HEARD REFERENCES TO THE USERS ON WHOSE

6    PHONES PEGASUS WAS INSTALLED VIA WHATSAPP.  I HAVE RULED THAT

7    THE IDENTITIES OF THESE USERS IS NOT RELEVANT TO THE ISSUES IN

8    THIS TRIAL.  YOU SHOULD NOT MAKE ANY INFERENCES AS TO THE

9    IDENTITIES OF THE USERS ON WHOSE PHONES PEGASUS WAS INSTALLED

10   VIA WHATSAPP.

11        NOW, CERTAIN DOCUMENTS RECEIVED IN EVIDENCE MAY HAVE

12   PORTIONS BLACKED OUT OR OTHERWISE REDACTED.  REDACTIONS MAY BE

13   NECESSARY FOR A VARIETY OF LEGAL OR EVIDENTIARY REASONS.  YOU

14   SHOULD NOT SPECULATE OR CONSIDER WHAT MIGHT -- WHAT WOULD HAVE

15   BEEN INCLUDED IN THE DOCUMENT ABSENT THOSE REDACTIONS.  YOU

16   SHOULD NOT CONSIDER THE REDACTIONS DURING YOUR DELIBERATIONS.

17        ALL PARTIES ARE EQUAL BEFORE THE LAW AND A CORPORATION IS

18   ENTITLED TO THE SAME FAIR AND CONSCIENTIOUS CONSIDERATION BY

19   YOU AS ANY PARTY.

20        ALL RIGHT.  NOW TURNING TO THE SPECIFIC VIOLATIONS AT

21   ISSUE.

22        THE COURT HAS ALREADY DETERMINED THAT DEFENDANTS VIOLATED

23   THE FEDERAL COMPUTER FRAUD AND ABUSE ACT BY INTENTIONALLY,

24   KNOWINGLY, AND WITH AN INTENT TO DEFRAUD, EXCEEDING THEIR

25   AUTHORIZED ACCESS TO WHATSAPP'S SERVERS.  SPECIFICALLY, THE

1347

1    COURT FOUND THAT DEFENDANTS' WHATSAPP INSTALLATION SERVER, OR

2    WIS, SENT MESSAGES THROUGH WHATSAPP SERVERS THAT CAUSED PEGASUS

3    TO BE INSTALLED ON TARGET USERS' DEVICES, AND THAT THE WIS WAS

4    ABLE TO OBTAIN PROTECTED INFORMATION BY HAVING IT SENT --

5    EXCUSE ME -- FROM THE TARGET USERS, THROUGH THE WHATSAPP

6    SERVERS, AND BACK TO THE WIS.  THE COURT CONCLUDED THAT THE

7    SENDING OF PROTECTED INFORMATION THROUGH THE SERVERS

8    CONSTITUTED OBTAINING IT FROM THE SERVERS.

9        THE COURT ALSO FOUND THAT DEFENDANTS ACTED WITH THE INTENT

10   TO DEFRAUD REQUIRED BY THE COMPUTER FRAUD AND ABUSE ACT BECAUSE

11   DEFENDANTS REDESIGNED PEGASUS TO EVADE DETECTION AFTER

12   PLAINTIFFS FIRST FIXED THE SECURITY BREACH.

13       THE COURT HAS ALREADY DETERMINED THAT THE DEFENDANTS

14   VIOLATED THE COMPUTER FRAUD AND ABUSE ACT BY INTENTIONALLY

15   EXCEEDING AUTHORIZED ACCESS TO A COMPUTER AND THEREBY OBTAINING

16   INFORMATION FROM ANY PROTECTED COMPUTER.

17       SPECIFICALLY, THE COURT HAS DETERMINED:

18       FIRST, THAT DEFENDANTS INTENTIONALLY ACCESSES WHATSAPP'S

19   SERVERS.  DEFENDANTS ACTED "INTENTIONALLY," WHICH MEANS THAT IT

20   WAS DEFENDANTS' CONSCIOUS DESIRE OR PURPOSE TO ACT IN A CERTAIN

21   WAY OR TO CAUSE A CERTAIN RESULT, OR DEFENDANTS KNEW THAT THEY

22   WERE ACTING IN THAT WAY OR WOULD BE PRACTICALLY CERTAIN TO

23   CAUSE THAT RESULT.

24       SECOND, DEFENDANTS EXCEEDED THEIR AUTHORIZED ACCESS TO

25   WHATSAPP'S SERVERS, WHICH MEANS THAT THE DEFENDANTS ACCESSED

1    WHATSAPP'S SERVERS WITH AUTHORIZATION AND USED SUCH ACCESS TO

2    OBTAIN OR ALTER INFORMATION ON THE WHATSAPP SERVERS AND TARGET

3    DEVICES THAT DEFENDANTS ARE NOT ENTITLED TO OBTAIN OR ALTER.

4         THIRD, DEFENDANTS' WHATSAPP INSTALLATION SERVER, OR WIS,

5    SENT MESSAGES THROUGH WHATSAPP SERVERS THAT CAUSED PEGASUS TO

6    BE INSTALLED ON TARGET USERS' DEVICES, AND THE WIS WAS ABLE TO

7    OBTAIN PROTECTED INFORMATION BY HAVING IT SENT FROM THE TARGET

8    USERS, THROUGH THE WHATSAPP SERVERS, AND BACK TO THE WIS.  THE

9    COURT CONCLUDED THAT THE SENDING OF PROTECTED INFORMATION

10   THROUGH THE SERVERS CONSTITUTED OBTAINING IT FROM THE SERVERS;

11   AND,

12        FOURTH, THE INFORMATION WAS FROM A PROTECTED COMPUTER,

13   WHICH MEANS A COMPUTER USED IN OR AFFECTING INTERSTATE OR

14   FOREIGN COMMERCE OR COMMUNICATION.

15        ALL RIGHT.  THE COURT HAS ALREADY DETERMINED THAT

16   DEFENDANTS VIOLATED THE FEDERAL COMPUTER FRAUD AND ABUSE ACT BY

17   KNOWINGLY AND WITH INTENT TO DEFRAUD EXCEEDING AUTHORIZED

18   ACCESS TO A PROTECTED COMPUTER, AND BY MEANS OF SUCH CONDUCT

19   FURTHERING THE INTENDED FRAUD AND OBTAINING ANYTHING OF VALUE.

20        SPECIFICALLY, THE COURT DETERMINED THAT:

21        FIRST, DEFENDANTS ACCESSED WHATSAPP'S SERVERS, WHICH ARE

22   PROTECTED COMPUTERS.  A PROTECTED COMPUTER MEANS A COMPUTER

23   USED IN OR AFFECTING INTERSTATE OR FOREIGN COMMERCE OR

24   COMMUNICATION.

25        SECOND, DEFENDANTS EXCEEDED THEIR AUTHORIZED ACCESS TO

1    WHATSAPP'S SERVERS, WHICH MEANS THAT DEFENDANTS ACCESSED

2    WHATSAPP'S SERVERS WITH AUTHORIZATION AND USED SUCH ACCESS TO

3    OBTAIN OR ALTER INFORMATION ON THE WHATSAPP SERVERS AND TARGET

4    DEVICES THAT DEFENDANTS ARE NOT ENTITLED TO OBTAIN OR ALTER.

5         THIRD, DEFENDANTS ACTED KNOWINGLY AND WITH INTENT TO

6    DEFRAUD.  DEFENDANTS ACTED "KNOWINGLY," WHICH MEANS THAT THEY

7    WERE AWARE OF THE ACT AND DID NOT ACT THROUGH IGNORANCE,

8    MISTAKE, OR ACCIDENT.  DEFENDANTS ACTED WITH AN "INTENT TO

9    DEFRAUD," WHICH MEANS AN INTENT TO DECEIVE AND CHEAT, MEANING

10   THE INTENT TO DEPRIVE A VICTIM OF MONEY OR PROPERTY BY

11   DECEPTION.  DEFENDANTS ACTED WITH AN INTENT TO DEFRAUD BASED ON

12   THE FACT THAT DEFENDANTS REDESIGNED PEGASUS TO EVADE DETECTION

13   AFTER PLAINTIFFS FIRST FIXED THE SECURITY BREACH.

14        FOURTH, BY EXCEEDING AUTHORIZED ACCESS TO WHATSAPP'S

15   SERVERS, NSO FURTHERED THE INTENDED FRAUD AND OBTAINED ANYTHING

16   OF VALUE.

17        THE COURT HAS ALREADY DETERMINED THAT DEFENDANTS VIOLATED

18   THE CALIFORNIA COMPREHENSIVE COMPUTER DATA AND ACCESS FRAUD

19   ACT.  THE CALIFORNIA COMPREHENSIVE COMPUTER DATA AND ACCESS

20   FRAUD ACT IS A CALIFORNIA LAW EQUIVALENT OF THE FEDERAL

21   COMPUTER FRAUD AND ABUSE ACT, WITH THE ADDITIONAL REQUIREMENT

22   THAT A COMPUTER BE UNLAWFULLY ACCESSED IN CALIFORNIA.

23        I CONCLUDED THAT DEFENDANTS VIOLATED THE CALIFORNIA

24   COMPREHENSIVE COMPUTER DATA AND ACCESS FRAUD ACT FOR THE SAME

25   REASONS THAT THEY VIOLATED THE FEDERAL COMPUTER FRAUD AND ABUSE

1   ACT, AND BECAUSE DEFENDANTS UNLAWFULLY ACCESSED A COMPUTER IN

2   CALIFORNIA.  SPECIFICALLY, I FOUND THAT DEFENDANTS' WHATSAPP

3   INSTALLATION SERVER, OR WIS, TARGETED CALIFORNIA SERVERS AND

4   THAT DEFENDANTS' PEGASUS CODE WAS SENT THROUGH PLAINTIFFS'

5   CALIFORNIA-BASED SERVERS 43 TIMES IN MAY 2019.

6       THE COURT HAS ALREADY DETERMINED THAT DEFENDANTS BREACHED

7   A CONTRACT WITH PLAINTIFFS.  SPECIFICALLY, I DETERMINED THAT

8   DEFENDANTS BREACHED WHATSAPP'S TERMS OF SERVICE BY

9   REVERSE-ENGINEERING AND/OR DECOMPILING WHATSAPP'S SOFTWARE.

10      ALL RIGHT.  TURNING TO DAMAGES IN THIS CASE.

11      NOW THAT I HAVE TOLD YOU WHAT HAS ALREADY BEEN

12  ESTABLISHED, I WILL EXPLAIN YOUR ROLE IN THE CASE.

13      YOUR ROLE IN THIS CASE IS TO DECIDE WHAT DAMAGES, IF ANY,

14  PLAINTIFFS ARE ENTITLED TO RECEIVE BECAUSE OF DEFENDANTS'

15  VIOLATIONS OF THE LAW.  YOU SHOULD BASE YOUR DECISION ON ALL

16  THE EVIDENCE, REGARDLESS OF WHICH PARTY PRESENTED IT.

17      THERE ARE TWO CATEGORIES OF DAMAGES IN THIS CASE THAT YOU

18  MAY AWARD.  I WILL SUMMARIZE EACH OF THESE CATEGORIES BEFORE

19  PROVIDING INSTRUCTIONS ON EACH CATEGORY.

20      THE FIRST CATEGORY OF DAMAGES THAT YOU MUST CONSIDER ARE

21  CALLED COMPENSATORY DAMAGES.  THE PURPOSE OF COMPENSATORY

22  DAMAGES IS TO PUT PLAINTIFFS IN AS GOOD A POSITION AS THEY

23  WOULD HAVE BEEN IF DEFENDANTS HAD NOT VIOLATED THE FEDERAL

24  FRAUD AND ABUSE ACT, OR THE CALIFORNIA COMPREHENSIVE COMPUTER

25  DATA AND ACCESS FRAUD ACT, AND HAD NOT BREACHED THE WHATSAPP

1    TERMS OF SERVICE.

2         PLAINTIFFS HAVE THE BURDEN OF PROVING COMPENSATORY DAMAGES

3    BY A PREPONDERANCE OF THE EVIDENCE.  THIS MEANS THAT YOU MUST

4    BE PERSUADED BY THE EVIDENCE THAT THE CLAIM OF DAMAGES IS MORE

5    PROBABLY TRUE THAN NOT TRUE.

6         THE SECOND CATEGORY THAT YOU MAY CONSIDER IS "PUNITIVE

7    DAMAGES."

8         PLAINTIFFS MAY BE ELIGIBLE TO RECOVER PUNITIVE DAMAGES

9    BECAUSE DEFENDANTS HAVE BEEN FOUND LIABLE FOR VIOLATING THE

10   CALIFORNIA COMPREHENSIVE COMPUTER DATA AND ACCESS FRAUD ACT.

11   YOU MAY AWARD PUNITIVE DAMAGES IF YOU FIND THAT PLAINTIFFS HAVE

12   PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANTS'

13   CONDUCT THAT VIOLATED THE CALIFORNIA COMPUTER DATA ACCESS AND

14   FRAUD ACT AND HARMED WHATSAPP WAS DONE WITH FRAUD, OPPRESSION,

15   OR MALICE.

16        IN DETERMINING THE AMOUNT OF DAMAGES, IF ANY, TO AWARD,

17   YOU SHOULD BE GUIDED BY DISPASSIONATE COMMON SENSE.  YOU MUST

18   USE SOUND DISCRETION IN FIXING AN AWARD OF DAMAGES, DRAWING

19   REASONABLE INFERENCES FROM THE FACTS IN THE EVIDENCE.

20        YOU MAY NOT AWARD DAMAGES BASED ON SYMPATHY, SPECULATION,

21   OR GUESSWORK.

22        ON THE OTHER HAND, THE LAW DOES NOT REQUIRE PLAINTIFFS TO

23   PROVE THE AMOUNT OF THEIR LOSSES WITH MATHEMATICAL PRECISION,

24   BUT ONLY WITH AS MUCH DEFINITENESS AND ACCURACY AS

25   CIRCUMSTANCES PERMIT.

1352

1          OKAY.  NOW, AS I INSTRUCTED YOU PREVIOUSLY, I HAVE FOUND

2     THAT DEFENDANTS ARE LIABLE UNDER CLAIMS FOR VIOLATING THE

3     COMPUTER FRAUD AND ABUSE ACT, AND THE CALIFORNIA COMPREHENSIVE

4     COMPUTER DATA ACCESS AND FRAUD ACT, AND WHATSAPP'S TERMS OF

5     SERVICES, AND YOU WILL BE ASKED TO DETERMINE WHAT COMPENSATORY

6     DAMAGES, IF ANY, DEFENDANTS OWE PLAINTIFFS FOR THESE

7     VIOLATIONS.

8          ALTHOUGH PLAINTIFFS SEEK COMPENSATORY DAMAGES UNDER MORE

9     THAN ONE CLAIM, HERE IT'S THREE SEPARATE CLAIMS, THE

10    COMPENSATORY DAMAGES MAY ONLY BE AWARDED ONCE, REGARDLESS OF

11    THE NUMBER OF LEGAL CLAIMS ALLEGED.

12         YOU MAY AWARD PLAINTIFFS COMPENSATORY DAMAGES FOR ANY LOSS

13    PLAINTIFFS SUFFERED AS A RESULT OF DEFENDANTS' VIOLATION OF THE

14    FEDERAL COMPUTER FRAUD AND ABUSE ACT.

15         UNDER THE FEDERAL COMPUTER FRAUD AND ABUSE ACT, A

16    PLAINTIFF CAN RECOVER EITHER FOR DAMAGE TO A COMPUTER OR FOR

17    CERTAIN LOSSES.

18         IN THIS CASE, PLAINTIFFS SEEK TO RECOVER FOR ALLEGED

19    LOSSES RATHER THAN DAMAGE TO A COMPUTER.  PLAINTIFFS NEED NOT

20    PROVE DAMAGE TO A COMPUTER TO RECOVER FOR LOSSES UNDER THE

21    FEDERAL COMPUTER FRAUD AND ABUSE ACT.

22         FOR PURPOSES OF THIS ACT, RECOVERABLE LOSSES MAY INCLUDE:

23         1.  PLAINTIFFS' COSTS OF RESPONDING TO THE VIOLATION;

24         2.  PLAINTIFFS' COSTS OF CONDUCTING A DAMAGE ASSESSMENT;

25         3.  PLAINTIFFS' COSTS OF RESTORING THE DATA, PROGRAM,

1    SYSTEM, OR INFORMATION TO ITS PRIOR CONDITION;

2         4.  PLAINTIFFS' COSTS OF INVESTIGATING THE VIOLATION; AND,

3         5.  PLAINTIFFS' COSTS OF IDENTIFYING THE VIOLATION.

4    YOU MAY AWARD PLAINTIFFS COMPENSATORY DAMAGES FOR

5    DEFENDANTS' VIOLATIONS OF THE CALIFORNIA COMPREHENSIVE COMPUTER

6    DATA AND ACCESS FRAUD ACT.

7         UNDER THAT ACT, A PLAINTIFF CAN RECOVER EITHER FOR DAMAGE

8    TO A COMPUTER OR FOR CERTAIN LOSSES.  IN THIS CASE, PLAINTIFFS

9    SEEK TO RECOVER FOR ALLEGED LOSSES RATHER THAN DAMAGE TO A

10   COMPUTER.  PLAINTIFFS NEED NOT PROVE DAMAGE TO A COMPUTER TO

11   RECOVER LOSSES -- RECOVER FOR LOSSES UNDER THE CALIFORNIA

12   COMPREHENSIVE COMPUTER DATA AND ACCESS FRAUD ACT.

13        FOR PURPOSES OF THIS ACT, RECOVERABLE LOSSES INCLUDE

14   AMOUNTS SUFFICIENT TO COMPENSATE PLAINTIFFS FOR THE HARM THEY

15   SUFFERED AS A RESULT OF ANY VIOLATIONS, INCLUDING ANY

16   EXPENDITURE REASONABLY AND NECESSARILY INCURRED BY PLAINTIFFS

17   TO VERIFY THAT THEIR COMPUTERS, COMPUTER SYSTEM, COMPUTER

18   NETWORK, COMPUTER PROGRAM, AND/OR DATA WAS OR WAS NOT ALTERED,

19   DAMAGED, OR DELETED BY THE ACCESS.

20        AS I PREVIOUSLY INSTRUCTED YOU, YOU MAY AWARD PLAINTIFFS

21   COMPENSATORY DAMAGES FOR DEFENDANTS' BREACH OF WHATSAPP'S TERMS

22   OF SERVICE.  YOU MUST DECIDE HOW MUCH MONEY WILL REASONABLY

23   COMPENSATE PLAINTIFFS FOR THE HARM CAUSED BY THE BREACH.  THE

24   PURPOSE OF THESE COMPENSATORY DAMAGES IS TO PUT PLAINTIFFS IN

25   AS GOOD A POSITION AS THEY WOULD HAVE BEEN IN IF DEFENDANTS HAD

1    NOT VIOLATED WHATSAPP'S TERMS OF SERVICE.

2        TO RECOVER COMPENSATORY DAMAGES FOR BREACH OF CONTRACT,

3    PLAINTIFFS MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT

4    THE DAMAGES THEY SEEK WERE CAUSED BY DEFENDANTS' BREACH OF

5    WHATSAPP'S TERMS OF SERVICE.

6        PLAINTIFFS MUST ALSO PROVE BY A PREPONDERANCE OF THE

7    EVIDENCE THAT WHEN THE CONTRACT WAS MADE, BOTH PARTIES KNEW OR

8    COULD REASONABLY HAVE FORESEEN THAT THE DAMAGES WERE LIKELY TO

9    OCCUR IN THE ORDINARY COURSE OF EVENTS AS A RESULT OF

10   DEFENDANTS' BREACH OF CONTRACT.

11       PLAINTIFFS DO NOT HAVE TO PROVE THE EXACT AMOUNT OF

12   DAMAGES, BUT YOU MUST NOT SPECULATE OR GUESS IN AWARDING

13   DAMAGES.

14       NOW, PLAINTIFFS ARE NOT ENTITLED TO RECOVER DAMAGES FOR

15   HARM CAUSED BY DEFENDANTS' BREACH OF WHATSAPP'S TERMS OF

16   SERVICE THAT DEFENDANTS PROVE PLAINTIFFS COULD HAVE AVOIDED

17   WITH REASONABLE EFFORTS OR EXPENDITURES.  YOU SHOULD CONSIDER

18   THE REASONABLENESS OF PLAINTIFFS' EFFORTS IN LIGHT OF THE

19   CIRCUMSTANCES FACING PLAINTIFFS AT THE TIME, INCLUDING

20   PLAINTIFFS' ABILITY TO MAKE THE EFFORTS OR EXPENDITURES WITHOUT

21   UNDUE RISK OR HARDSHIP.

22       IF PLAINTIFFS MADE REASONABLE EFFORTS TO AVOID HARM CAUSED

23   BY DEFENDANTS' BREACH OF WHATSAPP'S TERMS OF SERVICE, THEN YOUR

24   AWARD SHOULD INCLUDE REASONABLE AMOUNTS THAT PLAINTIFFS SPENT

25   FOR THIS PURPOSE.

1355

```
 1          THE COURT HAS DECIDED THAT DEFENDANTS BREACHED WHATSAPP'S

 2     TERMS OF SERVICE, BUT YOU MAY DECIDE THAT PLAINTIFFS DID NOT

 3     INCUR ANY RESULTING DAMAGES.  IF YOU SO DECIDE, YOU MAY STILL

 4     AWARD PLAINTIFFS NOMINAL DAMAGES OF UP TO ONE DOLLAR FOR

 5     DEFENDANTS' BREACH OF WHATSAPP'S TERMS OF SERVICE.

 6          ALL RIGHT.  IN ADDITION TO COMPENSATORY DAMAGES, YOU MAY,

 7     BUT ARE NOT REQUIRED TO, AWARD PLAINTIFFS PUNITIVE DAMAGES

 8     UNDER THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND

 9     FRAUD ACT.  PUNITIVE DAMAGES MAY NOT BE AWARDED FOR DEFENDANTS'

10     BREACH OF THE COMPUTER FRAUD AND ABUSE ACT OR WHATSAPP'S TERMS

11     OF SERVICE.

12          THE PURPOSE OF PUNITIVE DAMAGES ARE TO PUNISH A WRONGDOER

13     FOR THE CONDUCT THAT HARMED THE PLAINTIFF AND TO DISCOURAGE

14     SIMILAR CONDUCT IN THE FUTURE.  PUNITIVE DAMAGES MAY NOT BE

15     AWARDED TO COMPENSATE PLAINTIFFS.

16          EVEN THOUGH THE COURT HAS ALREADY DETERMINED, BY A

17     PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANTS ACCESSED

18     PLAINTIFFS' SERVERS INTENTIONALLY, KNOWINGLY, AND WITH AN

19     INTENT TO DEFRAUD UNDER THE FEDERAL COMPUTER FRAUD AND ABUSE

20     ACT, AS EXPLAINED IN INSTRUCTION NUMBER 14, IT IS UP TO THE

21     JURY TO DECIDE WHETHER PLAINTIFFS HAVE PROVEN BY CLEAR AND

22     CONVINCING EVIDENCE THAT DEFENDANTS ACTED WITH MALICE,

23     OPPRESSION, OR FRAUD AS DEFINED BELOW IN CONNECTION WITH THE

24     CONDUCT THAT VIOLATED THE CALIFORNIA COMPUTER DATA ACCESS AND

25     FRAUD ACT.
```

1356

1        YOU MAY AWARD PUNITIVE DAMAGES ONLY IF YOU FIND THAT

2    PLAINTIFFS HAVE PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT

3    DEFENDANTS' CONDUCT THAT VIOLATED THE CALIFORNIA COMPUTER DATA

4    ACCESS AND FRAUD ACT WAS DONE WITH MALICE, OPPRESSION, OR

5    FRAUD.

6        TO DO THIS, PLAINTIFFS MUST PROVE ONE OF THE FOLLOWING BY

7    CLEAR AND CONVINCING EVIDENCE:

8        1.  THAT THE CONDUCT CONSTITUTING MALICE, OPPRESSION, OR

9    FRAUD WAS COMMITTED BY ONE OR MORE OFFICERS, DIRECTORS, OR

10   MANAGING AGENTS OF DEFENDANTS, WHO ACTED ON BEHALF OF

11   DEFENDANTS; OR,

12       2.  THAT THE CONDUCT CONSTITUTING MALICE, OPPRESSION, OR

13   FRAUD WAS AUTHORIZED BY ONE OR MORE OFFICERS, DIRECTORS, OR

14   MANAGING AGENTS OF DEFENDANTS; OR,

15       3.  THAT ONE OR MORE OFFICERS, DIRECTORS, OR MANAGING

16   AGENTS OF DEFENDANTS KNEW OF THE CONDUCT CONSTITUTING MALICE,

17   OPPRESSION, OR FRAUD AND ADOPTED OR APPROVED THAT CONDUCT AFTER

18   IT OCCURRED.

19       "MALICE" MEANS THAT DEFENDANTS ACTED WITH INTENT TO CAUSE

20   INJURY, OR THAT DEFENDANTS' CONDUCT WAS DESPICABLE AND WAS DONE

21   WITH A WILLFUL AND KNOWING DISREGARD OF THE RIGHTS OF

22   PLAINTIFFS.  A PERSON ACTS WITH KNOWING DISREGARD WHEN THE

23   PERSON IS AWARE OF THE PROBABLE DANGEROUS CONSEQUENCES OF THE

24   PERSON'S CONDUCT AND DELIBERATELY FAILS TO AVOID THOSE

25   CONSEQUENCES.

1    "OPPRESSION" MEANS THAT DEFENDANTS' CONDUCT WAS DESPICABLE

2    AND SUBJECTED PLAINTIFFS TO CRUEL AND UNJUST HARDSHIP IN

3    KNOWING DISREGARD OF PLAINTIFFS' RIGHTS.

4        "DESPICABLE CONDUCT" IS CONDUCT THAT IS SO VILE, BASE, OR

5    CONTEMPTIBLE THAT IT WOULD BE LOOKED DOWN ON AND DESPISED BY

6    REASONABLE PEOPLE.

7        "FRAUD" MEANS THAT DEFENDANTS INTENTIONALLY MISREPRESENTED

8    OR CONCEALED A MATERIAL FACT AND DID SO INTENDING TO HARM THE

9    PLAINTIFF.

10       AN EMPLOYEE IS A "MANAGING AGENT" IF THE EMPLOYEE

11   EXERCISES SUBSTANTIAL INDEPENDENT AUTHORITY AND JUDGMENT IN

12   CORPORATE DECISION-MAKING SUCH THAT THE EMPLOYEE'S DECISIONS

13   ULTIMATELY DETERMINE CORPORATE POLICY.

14       THERE IS NO FIXED FORMULA FOR DETERMINING THE AMOUNT OF

15   PUNITIVE DAMAGES, AND YOU ARE NOT REQUIRED TO AWARD PUNITIVE

16   DAMAGES.

17       IF YOU FIND THAT PUNITIVE DAMAGES ARE APPROPRIATE, YOU

18   MUST USE REASON IN SETTING THE AMOUNT.  PUNITIVE DAMAGES, IF

19   ANY, SHOULD BE IN AN AMOUNT SUFFICIENT TO FULFILL THEIR

20   PURPOSES OF PUNISHMENT AND DETERRENCE, BUT SHOULD NOT REFLECT

21   BIAS, PREJUDICE, OR SYMPATHY TOWARD ANY PARTY.

22       IF YOU DECIDE TO AWARD PUNITIVE DAMAGES, YOU SHOULD

23   CONSIDER ALL OF THE FOLLOWING FACTORS IN DETERMINING THE

24   AMOUNT:

25       (A)  HOW REPREHENSIBLE WAS DEFENDANTS' CONDUCT?  IN

1    DECIDING HOW REPREHENSIBLE DEFENDANTS' CONDUCT WAS, YOU MAY

2    CONSIDER, AMONG OTHER FACTORS:

3        1.  WHETHER THE CONDUCT CAUSED PHYSICAL HARM;

4        2.  WHETHER PLAINTIFFS WERE FINANCIALLY WEAK OR VULNERABLE

5    AND DEFENDANTS KNEW PLAINTIFFS WERE FINANCIALLY WEAK OR

6    VULNERABLE AND TOOK ADVANTAGE OF THEM;

7        3.  WHETHER DEFENDANTS' CONDUCT INVOLVED A PATTERN OR

8    PRACTICE; AND,

9        4.  WHETHER DEFENDANTS ACTED WITH TRICKERY OR DECEIT.

10       (B)  IS THERE A REASONABLE RELATIONSHIP BETWEEN THE AMOUNT

11   OF PUNITIVE DAMAGES AND PLAINTIFFS' HARM?

12       (C)  IN VIEW OF DEFENDANTS' FINANCIAL CONDITION, WHAT

13   AMOUNT IS NECESSARY TO PUNISH THEM AND DISCOURAGE FUTURE

14   WRONGFUL CONDUCT?

15       YOU MAY NOT INCREASE THE PUNITIVE DAMAGES AWARD ABOVE AN

16   AMOUNT THAT IS OTHERWISE APPROPRIATE MERELY BECAUSE DEFENDANTS

17   HAVE SUBSTANTIAL FINANCIAL RESOURCES.  ANY AWARD YOU IMPOSE MAY

18   NOT EXCEED DEFENDANTS' ABILITY TO PAY.

19       PUNITIVE DAMAGES MAY NOT BE USED TO PUNISH DEFENDANTS FOR

20   IMPACT OF THEIR MISCONDUCT ON PERSONS OTHER THAN PLAINTIFFS OR

21   FOR ACTS COMMITTED OUTSIDE OF CALIFORNIA, ALTHOUGH OUT-OF-STATE

22   CONDUCT MAY BE PROBATIVE IF IT HAS A NEXUS TO THE SPECIFIC HARM

23   SUFFERED BY PLAINTIFFS AND DEMONSTRATES THE DELIBERATENESS AND

24   CULPABILITY OF DEFENDANTS' ACTIONS IN CALIFORNIA.

25       ALL RIGHT.  PLAINTIFFS DO NOT SEEK DAMAGES BASED ON ANY

```
 1      CLAIM OF HARM TO PLAINTIFFS' REPUTATION, AND YOU MAY NOT

 2      CONSIDER ANY HARM TO PLAINTIFFS' REPUTATION IN YOUR CALCULATION

 3      OF DAMAGES IN THIS CASE.

 4          ALL RIGHT.  BEFORE YOU BEGIN YOUR DELIBERATIONS, ELECT ONE

 5      MEMBER OF THE JURY TO BE YOUR PRESIDING JUROR.  THE PRESIDING

 6      JUROR WILL PRESIDE OVER THE DELIBERATIONS AND SERVE AS THE

 7      SPOKESPERSON FOR THE JURY HERE IN THE COURTROOM.

 8          YOU SHALL DILIGENTLY STRIVE TO REACH AGREEMENT WITH ALL OF

 9      THE OTHER JURORS IF YOU CAN DO SO BECAUSE YOUR VERDICT MUST BE

10      UNANIMOUS.

11          EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT YOU

12      SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE

13      EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

14      LISTENED TO THEIR VIEWS.  IT IS IMPORTANT THAT YOU ATTEMPT TO

15      REACH A UNANIMOUS VERDICT BUT, OF COURSE, ONLY IF EACH OF YOU

16      CAN DO SO AFTER HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.

17      DO NOT BE UNWILLING TO CHANGE YOUR OPINION IF THE DISCUSSION

18      PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

19      SIMPLY BECAUSE OTHER JURORS THINK THAT IT IS RIGHT, OR CHANGE

20      AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

21      SIMPLY TO REACH A VERDICT.

22          OKAY.  NOW, BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE

23      EVIDENCE RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I

24      REMIND YOU THAT YOU MUST NOT BE EXPOSED TO ANY OTHER

25      INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES.
```

1    EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS DURING

2    YOUR DELIBERATIONS:

3         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

4    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

5    THE CASE OR ANYTHING TO DO WITH IT.  THIS INCLUDES DISCUSSING

6    THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET, COMPUTER, OR

7    ANY OTHER MEANS, VIA EMAIL, VIA TEXT MESSAGING, OR ANY INTERNET

8    CHAT ROOM, BLOG, WEBSITE OR APPLICATION, INCLUDING BUT NOT

9    LIMITED TO FACEBOOK, YOUTUBE, TWITTER/X, INSTAGRAM, LINKEDIN,

10   SNAPCHAT, TIKTOK, OR ANY OTHER FORMS OF SOCIAL MEDIA.  THIS

11   APPLIES TO COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR

12   EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE INVOLVED IN THE

13   TRIAL.

14        IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

15   SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

16   HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

17   CONTACT TO THE COURT.

18        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

19   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

20   IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

21   SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS; AND

22   DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN

23   ABOUT THE CASE ON YOUR OWN.

24        DO NOT VISIT OR VIEW ANY PLACE DISCUSSED IN THIS CASE, AND

25   DO NOT USE INTERNET PROGRAMS OR OTHER DEVICES TO SEARCH FOR OR

```
1        VIEW ANY PLACE DISCUSSED DURING THE TRIAL.

2            ALSO, DO NOT DO ANY RESEARCH ABOUT THIS CASE, THE LAW, OR

3        THE PEOPLE INVOLVED -- INCLUDING THE PARTIES, THE WITNESSES,

4        AND THE LAWYERS -- UNTIL YOU HAVE BEEN EXCUSED AS JURORS.  IF

5        YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THIS CASE IN

6        THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS POSSIBLE.

7            THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS CASE

8        DECIDED ONLY ON EVIDENCE THAT HAS BEEN PRESENTED HERE IN COURT.

9        WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH, AND THE

10       ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE TRIAL

11       PROCESS.

12           IF YOU DO ANY RESEARCH OR INVESTIGATION OUTSIDE THE

13       COURTROOM, OR GAIN ANY INFORMATION THROUGH IMPROPER

14       COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY

15       INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT

16       BEEN TESTED BY THE TRIAL PROCESS.

17           EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN

18       IMPARTIAL JURY, AND IF YOU DECIDE THE CASE BASED ON INFORMATION

19       NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE PARTIES A FAIR

20       TRIAL.

21           REMEMBER, YOU HAVE TAKEN AN OATH TO FOLLOW THE RULES, AND

22       IT IS VERY IMPORTANT THAT YOU FOLLOW THESE RULES.

23           A JUROR WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE

24       FAIRNESS OF THESE PROCEEDINGS AND A MISTRIAL COULD RESULT THAT

25       WOULD REQUIRE THE ENTIRE TRIAL PROCESS TO START OVER.  ALL
```

1    RIGHT.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION,

2    PLEASE NOTIFY THE COURT IMMEDIATELY.

3        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

4    COMMUNICATE WITH ME, YOU MAY SEND A NOTE, THROUGH

5    MS. COLLINS -- ACTUALLY, I THINK WE'LL HAVE A COURT SECURITY

6    OFFICER OUTSIDE THE DOOR, SO YOU CAN SEND A MESSAGE WITH HIM OR

7    HER, AND IT SHOULD BE SIGNED BY THE FOREPERSON, OR BY ANY OF

8    YOU, FRANKLY.

9        NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO COMMUNICATE

10   WITH ME, EXCEPT IN A SIGNED WRITING.  AND I WILL NOT

11   COMMUNICATE WITH ANY MEMBER OF THE JURY ON ANYTHING CONCERNING

12   THE CASE EXCEPT IN WRITING OR HERE IN OPEN COURT.

13       IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

14   LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

15   CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

16   QUESTION.

17       REMEMBER THAT YOU ARE NOT TO TELL ANYONE -- INCLUDING THE

18   COURT -- HOW THE JURY STANDS, WHETHER IN TERMS OF VOTE COUNT OR

19   OTHERWISE, UNTIL YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE

20   BEEN OTHERWISE DISCHARGED.

21       AND PLEASE DO NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE THAT

22   YOU MIGHT SEND TO THE COURT.

23       A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

24   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR PRESIDING JUROR,

25   OR FOREPERSON, SHOULD COMPLETE THE VERDICT FORM ACCORDING TO

1    YOUR DELIBERATIONS, SIGN IT, DATE IT, AND ADVISE THE COURT

2    SECURITY OFFICER THAT YOU ARE READY TO RETURN TO THE COURTROOM.

3         ALL RIGHT.  SO WITH THAT, YOU'RE WELCOME TO TAKE YOUR

4    INSTRUCTIONS WITH YOU INTO THE JURY ROOM AND TO RETIRE FOR

5    DELIBERATIONS.

6         AND UNLESS WE HEAR FROM YOU FIRST, WE WILL SEE YOU BACK

7    HERE AT 4:00 O'CLOCK, WHICH IS THE END OF OUR DAY TODAY.

8         THANK YOU.

9              THE CLERK:  CAN THEY TAKE THE BINDERS WITH THEM?

10        (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

11   CLERK.)

12             THE COURT:  YEAH, THE OTHER EXHIBITS ARE ON -- IN AN

13   ELECTRONIC FORMAT.  BUT YOU CAN TAKE THOSE, WHICH ARE NOT, THE

14   FINANCIAL RECORDS, IF YOU WISH, IN THE BINDERS WITH YOU.

15             THE CLERK:  ALL RISE FOR THE JURY.

16        (JURY OUT AT 1:36 P.M.)

17             THE COURT:  ALL RIGHT.  COUNSEL, YOU'LL JUST NEED TO

18   LEAVE YOUR CELL PHONE NUMBERS.

19             EVERYBODY CAN SIT.

20        YOU JUST NEED TO LEAVE YOUR CELL PHONE NUMBERS SO THAT

21   KELLY CAN GET IN TOUCH WITH YOU IF A QUESTION ARISES BETWEEN

22   NOW AND 4:00 O'CLOCK.

23        THERE IS ONE THING THAT I WANTED TO DISCUSS WITH YOU,

24   THOUGH, AND THAT IS ABOUT TOMORROW.  ASSUMING THE JURY DOESN'T

25   REACH A VERDICT BY 4:00 O'CLOCK, THEY'LL NEED TO COME BACK

1    TOMORROW.

2         IT'S MY INTENTION TO EXPAND THE TRIAL DAY BECAUSE I'M

3    GOING TO BE UNAVAILABLE AFTER WEDNESDAY, AND I -- SO I'M GOING

4    TO EXPAND THE TRIAL DAY TO AS LONG AS THEY WANT ON TUESDAY,

5    COMMENCING AT 8:30.

6         WHAT DO YOU ALL THINK ABOUT -- IF, INDEED, THEY NEED MORE

7    THAN THE EIGHT HOURS THAT WE'LL GIVE THEM TOMORROW, I REALLY

8    DON'T WANT TO ADVISE THEM AT THE END OF A LONG DAY THAT THEY

9    HAVE TO COME BACK THE FOLLOWING MONDAY IF THEY DON'T REACH A

10   VERDICT BY THE END OF THE DAY.

11        SO SO AS TO AVOID SEEMINGLY PUTTING ANY PRESSURE, I WAS

12   THINKING OF ADVISING THEM TODAY THAT I WON'T BE AVAILABLE

13   WEDNESDAY THROUGH FRIDAY THIS WEEK, AND THEY'D HAVE TO RETURN.

14        THAT SEEMS TO BE, TO ME -- AND THAT THEY HAVE THE ENTIRE

15   DAY TOMORROW INSTEAD OF JUST 8:30 TO 1:30.  THEY HAVE FROM 8:30

16   UNTIL AS LONG AS THEY NEED, 4:00, 5:00, 6:00.

17        WOULDN'T THAT SEEM TO BE, LIKE, LESS PRESSURE PUT ON THEM,

18   RATHER THAN SPRINGING IT ON THEM?  I MEAN, MOST OF THEM HAVE

19   JOBS AND FAMILIES AND PROBABLY NEED A LITTLE TIME TO REWORK

20   THEIR SCHEDULES IF THEY KNOW THEY COULDN'T COME IN ON

21   WEDNESDAY?

22        WHAT'S YOUR VIEWS?

23            MR. ANDRES:  YOUR HONOR, JUST TO CLARIFY, I KNOW -- I

24    DON'T HAVE AT THE READY THE RULE, BUT SORT OF LIKE IF THE

25    COURT'S NOT AVAILABLE, THERE ARE CIRCUMSTANCES IN WHICH YOU CAN

1365

```
 1          ASK ANOTHER JUDGE TO TAKE A VERDICT.

 2               I GET IT THAT YOU SHOULD BE INVOLVED IN ANY SUBSTANTIVE,

 3          BUT IF IT'S JUST A RETURN OF VERDICT, ISN'T IT POSSIBLE TO ASK

 4          A JUDGE TO DO THAT?

 5               I DON'T KNOW THE PRACTICE IN THIS COURTHOUSE.  I'VE JUST

 6          SEEN IT DONE.

 7                    THE COURT:  IT'S POSSIBLE, AND WE'VE DONE IT, BUT WE

 8          DON'T GENERALLY DO IT IN CASES WHERE THERE ARE LIKELY TO BE

 9          QUESTIONS.

10                    MR. ANDRES:  YEAH, UNDERSTOOD.

11                    THE COURT:  OTHER JUDGES WOULDN'T BE ABLE TO ASSIST

12          WITH THAT --

13                    MR. ANDRES:  NO QUESTION.

14                    THE COURT:  -- GIVEN WHAT'S HAPPENED IN THIS CASE.

15                    MR. ANDRES:  NO QUESTION.

16                    THE COURT:  SO I WOULD FEEL MORE COMFORTABLE BEING

17          THE PERSON TO TAKE THE VERDICT.

18                    MR. ANDRES:  YEAH.

19               I GUESS THE ONE THING I WOULD SAY, YOUR HONOR, AND NOT TO

20          PUT THIS OFF, BUT THAT SOUNDS -- ALL OF THIS SOUNDS LIKE A

21          TOMORROW PROBLEM MORE THAN A TODAY PROBLEM, AND WE'RE HAPPY TO

22          THINK ABOUT IT TONIGHT, AND IF WE HAVE TO COME BACK TOMORROW,

23          WE CAN DISCUSS IT.

24                    THE COURT:  HMM.  ALL RIGHT.

25               I'M JUST INQUIRING BECAUSE I -- I WOULD -- IF I'M GOING TO
```

1366

```
1    TELL THEM THAT, I WOULD RATHER TELL THEM THAT TODAY THAN

2    TOMORROW.  I MEAN, I JUST THINK IT -- THEY'LL BE VERY SURPRISED

3    IF THEY HEAR IT FOR THE FIRST TIME AT 5:00 O'CLOCK TOMORROW

4    EVENING.

5              MR. ANDRES:  I ASSUME WE'RE ALL GOING TO -- SORRY,

6    JOE.

7         REGARDLESS OF WHETHER WE HEAR FROM THE JURY AGAIN, WILL WE

8    ALL MEET -- WILL YOUR HONOR HAVE US IN --

9              THE COURT:  I'LL DISCHARGE THEM AT 4:00 AND GIVE THEM

10   INSTRUCTIONS.

11             MR. ANDRES:  AND THEN MAYBE WE CAN DEAL WITH IT AT

12   THAT TIME.

13             THE COURT:  I'M JUST PUTTING IT OUT THERE SO THAT YOU

14   CAN TALK ABOUT IT.  I WASN'T INTENDING TO DO ANYTHING BEFORE I

15   DISCHARGE THEM, EXCEPT WHEN I DISCHARGE THEM TODAY.  BUT I

16   WANTED TO RUN IT BY YOU.

17             MR. ANDRES:  MAKES SENSE.

18             THE COURT:  IF YOU WOULD PREFER TO SPRING IT ON THEM

19   TOMORROW IF THEY'RE UNABLE TO REACH A VERDICT, THAT'S WHAT I'LL

20   DO IF THAT'S WHAT YOU ALL WANT TO DO, AND WE'LL SEE WHAT

21   HAPPENS.

22        IF I WERE IN THEIR PLACE, I'D RATHER KNOW IN ADVANCE SO

23   THAT I COULD ARRANGE MY SCHEDULE.

24        OKAY.  WHY DON'T I JUST LEAVE IT OUT THERE.  YOU GUYS

25   THINK ABOUT IT.
```

1          MR. ANDRES:  THANKS, YOUR HONOR.

2          THE COURT:  TALK ABOUT IT, IF YOU'RE STILL SPEAKING

3    TO EACH OTHER, AND WE'LL SEE YOU BACK HERE AT 4:00 UNLESS WE

4    HEAR SOMETHING FROM THE JURY BEFORE THAT.

5          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

6          MR. ANDRES:  THANK YOU, YOUR HONOR.

7          THE COURT:  OKAY.  MS. COLLINS, WE'RE GOING TO BE --

8    I BELIEVE THE ATTORNEYS LOUNGE IS CLOSED.

9          THE CLERK:  YEAH, THEY SAID THAT THEY WERE NOTIFIED

10   THAT YOU HAD TO HAVE EVERYTHING OUT BY 1:00.

11         MR. AKROTIRIANAKIS:  I THINK WE HAVE.

12         THE COURT:  THERE'S A COURT FUNCTION GOING ON.  WE'LL

13   BE THERE -- WE'LL BE THERE FOR ABOUT A HALF AN HOUR.

14     BUT YOU'RE FREE TO STAY HERE AND TO DO WHATEVER YOU WISH

15   TO DO HERE, AS LONG AS YOU'RE NOT DISTRACTING.

16         MR. ANDRES:  THANK YOU, YOUR HONOR.

17         MR. AKROTIRIANAKIS:  YES, YOUR HONOR.

18         THE COURT:  OKAY.  THANK YOU.

19     (A RECESS WAS TAKEN PENDING THE JURY'S DELIBERATIONS.)

20     (JURY OUT AT 4:28 P.M.)

21         THE COURT:  ALL RIGHT.

22     COUNSEL, WE ARE GOING TO EXCUSE THE JURY FOR THE EVENING.

23     I'VE GIVEN SOME THOUGHT TO THE ISSUE I RAISED, AND I'M NOT

24   GOING TO SAY ANYTHING.  WE'LL SEE WHAT HAPPENS TOMORROW.

25         MR. ANDRES:  HAVE A NICE NIGHT, YOUR HONOR.  THANK

1368

```
 1        YOU.

 2                THE COURT:  WELL, I'M GOING TO BRING THEM IN.

 3                MR. ANDRES:  YEAH, OKAY.

 4            (PAUSE IN PROCEEDINGS.)

 5                THE CLERK:  ALL RISE FOR THE JURY.

 6            (JURY IN AT 4:30 P.M.)

 7                THE COURT:  ALL RIGHT.

 8            GOOD AFTERNOON, MEMBERS OF THE JURY.

 9            WE'RE GOING TO EXCUSE YOU FOR THE EVENING, AND WE EXPECT

10     YOU BACK HERE TOMORROW MORNING TO RECOMMENCE YOUR

11     DELIBERATIONS.

12            WHEN YOU COME IN IN THE MORNING, YOU DO NOT HAVE TO WAIT

13     TO BE CHECKED IN, BUT YOU CANNOT RESUME DELIBERATIONS UNTIL ALL

14     EIGHT OF YOU ARE PRESENT IN THE MORNING.

15            AND WE'LL HAVE A COURT SECURITY OFFICER, SO WE'LL KNOW

16     WHO'S COMING IN AND WHO'S NOT.

17            KEEP IN MIND THE INSTRUCTION I'VE GIVEN YOU EVERY DAY

18     SINCE YOU WERE EMPANELED AS A JURY TO NOT TALK ABOUT THE CASE.

19     IT'S DOUBLY IMPORTANT FOR YOU TO KEEP THAT ADMONITION IN MIND

20     NOW THAT YOU'VE COMMENCED YOUR DELIBERATIONS.

21            IF -- WHEN YOU'RE WALKING THROUGH THE COURTHOUSE, YOU

22     MIGHT SEE ONE OF THE ATTORNEYS OR PARTIES.  OBVIOUSLY THEY

23     WON'T SAY ANYTHING TO YOU, AND YOU ARE OBVIOUSLY NOT TO SAY

24     ANYTHING TO THEM IF YOU SEE THEM.

25            TOMORROW WILL BE ANOTHER LONG DAY, IF YOU NEED IT.  WE
```

1369

```
1    WILL BE HERE AND AVAILABLE.  THE COURT -- WELL, THE COURTROOM

2    AND THE JURY ROOM WILL BE AVAILABLE UNTIL 4:30 TOMORROW AS

3    WELL.  SO IT'S NOT AN ABBREVIATED DAY.  IT'S A LONG DAY, IF YOU

4    NEED IT.

5         OKAY?  ALL RIGHT.

6         THANK YOU.  WE'LL SEE YOU TOMORROW MORNING.

7              THE CLERK:  ALL RISE FOR THE JURY.

8         (JURY OUT AT 4:32 P.M.)

9              THE CLERK:  YOU MAY BE SEATED.

10             THE COURT:  ALL RIGHT.  COUNSEL, YOU JUST NEED TO BE

11   ON STANDBY.  YOU DON'T HAVE TO BE HERE AT 8:30 BECAUSE THEY'LL

12   GET STARTED WITHOUT ANY FURTHER INSTRUCTIONS FROM ME.

13        WE'LL BE IN TOUCH AS SOON AS WE HEAR FROM THEM.  JUST MAKE

14   SURE THAT KELLY HAS YOUR CONTACT INFORMATION.

15        HAVE A GOOD EVENING.

16             MR. ANDRES:  THANK YOU, JUDGE.

17             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

18        (THE EVENING RECESS WAS TAKEN AT 4:32 P.M.)

19

20

21

22

23

24

25
```

1

2

3                           CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  MAY 5, 2025

22

23

24

25