Greg D. Andres
Antonio J. Perez-Marques
Gina Cora
Craig T. Cagney
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
         antonio.perez@davispolk.com
         gina.cora@davispolk.com
         craig.cagney@davispolk.com
         luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC and METE PLATFORMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR REMITTITUR OR A NEW TRIAL**<br><br>Date: July 17, 2025<br>Time: 1:30 pm<br>Ctrm: 3<br>Judge: Hon. Phyllis J. Hamilton<br>Action Filed: October 29, 2019 |

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................................1

LEGAL STANDARD...................................................................................................................2

ARGUMENT .................................................................................................................................3

    I.    NSO Fails to Justify Its Requested Reduction in Punitive Damages..........................3

        A.    NSO's Misconduct Was Reprehensible.........................................................3

        B.    NSO's Conduct was "Particularly Egregious"...............................................7

        C.    Comparable Penalties Do Not Support the Reduction in Punitive Damages That NSO Seeks ...................................................................................8

    II.    The Punitive Damages Award Did Not Reflect the Jury's Reliance on Improper Factors..........................................................................................................9

        A.    The Punitive Damages Award Properly Reflects NSO's Ability To Pay........9

        B.    Punitive Damages Were Supported by Substantial Evidence at Trial of NSO's Misconduct Towards Plaintiffs .............................................................11

CONCLUSION............................................................................................................................13

# TABLE OF AUTHORITIES

<u>CASES</u>

PAGE(S)

*Anglo-Am. Gen. Agents v. Jackson Nat'l Life Ins. Co.*,
 83 F.R.D. 41 (N.D. Cal. 1979) ............................................................................................... 2

*Bains LLC v. Arco Prods. Co.*,
 405 F.3d 764 (9th Cir. 2005) ................................................................................................. 8

*Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*,
 2011 WL 672640 (N.D. Cal. Feb. 17, 2011) ......................................................................... 2

*BMW of N. Am., Inc. v. Gore*,
 517 U.S. 559 (1996) ....................................................................................................... passim

*Delegat's Wine Est. Ltd. v. Am. Wine Distribs., Inc.*,
 2012 WL 1925664 (N.D. Cal. May 24, 2012) ....................................................................... 9

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
 95 F.3d 1422 (9th Cir. 1996) ................................................................................................. 2

*Diaz v. Tesla, Inc.*,
 598 F. Supp. 3d 809 (N.D. Cal. 2022) ................................................................................... 3

*Digidyne Corp. v. Data Gen. Corp.*,
 734 F.2d 1336 (9th Cir. 1984) ............................................................................................... 9

*Erickson Prods. Inc. v. Kast*,
 2024 WL 3956317 (N.D. Cal. Aug. 26, 2024) ...................................................................... 2

*Escriba v. Foster Poultry Farms, Inc.*,
 743 F.3d 1236 (9th Cir. 2014) ......................................................................................... 10, 12

*Fleming v. Safeco Ins. Co.*,
 206 Cal. Rptr. 313 (Cal. Ct. App. 1984) ............................................................................... 11

*Hardeman v. Monsanto Co.*,
 997 F.3d 941 (9th Cir. 2021) ................................................................................................. 8

*Hemmings v. Tidyman's Inc.*,
 285 F.3d 1174 (9th Cir. 2002) ............................................................................................... 12

*Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*,
 2017 WL 3382316 (N.D. Cal. Aug. 7, 2017) ........................................................................ 3

*Johnson v. Ford Motor Co.*,
 35 Cal. 4th 1191(2005) .......................................................................................................... 6

*LivePerson, Inc. v. [24]7.ai, Inc.*,
   2022 WL 3723117 (N.D. Cal. July 28, 2022) ................................................................. 8

*Lompe v. Sunridge Ptrs., LLC*,
   818 F.3d 1041 (10th Cir. 2016) .................................................................................... 8

*Mitri v. Walgreen Co.*,
   660 F. App'x 528 (9th Cir. 2016) ................................................................................. 8

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ....................................................................................... 2

*Myers v. City of Hermosa Beach*,
   2009 WL 10715819 (C.D. Cal. Aug. 14, 2009) .......................................................... 10

*Perez v. State Farm Mut. Auto. Ins. Co.*,
   2011 WL 8601203 (N.D. Cal. 2011) ........................................................................... 10

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ..................................................................................................... 13

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
   422 F.3d 949 (9th Cir. 2005) ................................................................................... 6, 8

*Riley v. Volkswagen Grp. of Am., Inc.*,
   51 F.4th 896 (9th Cir. 2022) ............................................................................... *passim*

*Smith v. Kmart Corp.*,
   177 F.3d 19 (1st Cir. 1999), *aff'd*, 743 F. App'x 843 (9th Cir. 2018) ........................... 3

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ........................................................................................... *passim*

*Union Oil Co. v. Terrible Herbst, Inc.*,
   331 F.3d 735 (9th Cir. 2003) ....................................................................................... 2

*United States v. Batts*,
   573 F.2d 599 (9th Cir. 1978) ...................................................................................... 10

*Zhang v. Am. Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) ..................................................................................... 2

<u>STATUTES & RULES</u>

18 U.S.C. § 1030(c) ............................................................................................................ 10

Cal. Penal Code § 502(d) ...................................................................................................... 1

**PRELIMINARY STATEMENT**

After a six-day trial, a unanimous jury awarded Plaintiffs $444,719 in compensatory damages for NSO's violations of the Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Data Access and Fraud Act ("CDAFA"), and breaches of the WhatsApp Terms of Service. The jury also concluded that NSO acted with malice, oppression, or fraud in violating the CDAFA and awarded Plaintiffs $167,254,000 in punitive damages. The verdict reflects an unequivocal repudiation of NSO's egregious and intentional violations of law, and it was based on the extensive and largely undisputed evidence presented at trial. Consistent with the Court's prior findings, the evidence at trial showed that NSO devised and sold a sophisticated exploit used to covertly install its Pegasus spyware through WhatsApp's servers, which allowed NSO and its customers complete access to and control of the phones of targeted WhatsApp users. The evidence also showed that NSO deliberately tried to conceal its conduct from Plaintiffs because NSO knew that Plaintiffs would stop NSO from attacking if it was detected. Moreover, NSO launched new attacks when its exploits were blocked, including after Plaintiffs filed this lawsuit.

In the face of this evidence, NSO did little more than attempt to blame Plaintiffs for being hacked and made a series of spurious claims—including that the case was somehow a publicity stunt and a targeted effort to damage NSO, and that Plaintiffs' engineers tried to steal NSO's intellectual property. The jury's verdict represents a decisive rejection of this conjecture.

NSO has not met its burden of establishing that the Court should order a new trial or reduce the jury's punitive damages award by 99% to $1,770,000 or below. In its motion, NSO fails to put forward any valid basis for a new trial. Instead, much of NSO's brief contests the size of the jury's punitive damages award, as NSO claims that the 4-to-1 ratio between punitive damages and compensatory damages is appropriate under these unique facts and circumstances. NSO engaged in a multi-year campaign to develop multiple versions of its spyware to circumvent WhatsApp's security measures and unlawfully access WhatsApp servers, including after this lawsuit was filed. NSO attempts to minimize its conduct by rehashing the same arguments that it has made throughout the case

1

and that the jury rejected at trial, including by repeating that NSO's Pegasus spyware merely "temporarily functioned by sending harmless messages through WhatsApp servers." Dkt. No. 747 at 6. Both this Court and the jury concluded otherwise.

NSO's argument that the jury relied on "improper factors" in awarding punitive damages, *see id*. at 8–10, fares no better. NSO speculates that the jury's award was an improper attempt to bankrupt NSO, which ignores the extensive evidence that Plaintiffs put forward at trial undermining NSO's purportedly dire financial status. And despite purporting not to challenge the Court's evidentiary rulings or jury instructions, *see id.* at 1 n.1, NSO claims that Plaintiffs' jury addresses at trial and the Court's exclusion of certain evidence warrants "set[ting] aside" the punitive damages award, *id*. at 9. There is no basis to grant the extraordinary relief that NSO seeks.

NSO's motion for a new trial and for remittitur should be denied.

## LEGAL STANDARD

"Rule 59 does not specify the grounds on which a motion for a new trial may be granted," but courts are "bound by [] grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "The Ninth Circuit has held that the grounds on which a new trial may be granted include (1) a verdict that is contrary to the weight of the evidence, (2) a verdict that is based on false or perjurious evidence, or (3) to prevent a miscarriage of justice." *Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, 2011 WL 672640, at *2 (N.D. Cal. Feb. 17, 2011) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)). On a motion for a new trial, "[i]t is not the court[']s place to substitute [its] evaluations for those of the jurors." *Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003). "[T]he burden of proof on a motion for a new trial is on the moving party, and the court should not lightly disturb a plausible jury verdict." *Erickson Prods. Inc. v. Kast*, 2024 WL 3956317, at *3 (N.D. Cal. Aug. 26, 2024) (quoting *Anglo-Am. Gen. Agents v. Jackson Nat'l Life Ins. Co.*, 83 F.R.D. 41, 43 (N.D. Cal. 1979)).

A court may also grant a new trial, or remit the jury's verdict, if the damages are excessive. *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). The court must "allow substantial deference to a jury's finding of the appropriate amount of damages" and "must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not

2

supported by the evidence, or based only on speculation or guesswork." *Id*. "Courts should be cognizant that 'in cases involving intangible, non-economic losses' determining damages 'is a matter peculiarly within a jury's ken.'" *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, 2017 WL 3382316, at *2 (N.D. Cal. Aug. 7, 2017) (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999)), *aff'd*, 743 F. App'x 843 (9th Cir. 2018).

## ARGUMENT

### I. NSO Fails to Justify Its Requested Reduction in Punitive Damages

Courts reviewing the constitutionality of punitive damages awards look to three factors: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the actual harm or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and any civil penalties authorized or imposed in comparable cases. *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 900 (9th Cir. 2022) (citing *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)).[1] Applying these principles to the unique facts of this case, the appropriate punitive damages award in this case is not limited, as NSO claims, to four times the compensatory damages award.

#### A. NSO's Misconduct Was Reprehensible

The evidence at trial established that NSO acted reprehensibly. "Reprehensibility is the 'most important indicium of the reasonableness of a punitive damages award.'" *Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809, 842 (N.D. Cal. 2022) (quoting *Gore*, 517 U.S. at 575). In evaluating reprehensibility, courts examine: (1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm*, 538 U.S. at 419. These factors signal that NSO acted reprehensibly and that the punitive damages award should not be reduced on this basis.

---

[1] NSO suggests that the Court can resolve this case without considering these factors. *See* Dkt. No. 747 at 3. However, the Supreme Court has "reiterated the importance of these three guideposts," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003), and NSO cites no cases ignoring them.

*First*, NSO repeatedly targeted Plaintiffs. NSO used WhatsApp's servers to install spyware on WhatsApp users' mobile devices "[i]n between hundreds and tens of thousands" of times between April 2018 and May 2020. Decl. of Antonio J. Perez-Marques in Supp. of Pls.' Opp. ("Perez-Marques Decl."), Ex. 2 (Gazneli Dep.) at 81:16–83:11. WhatsApp engineers observed 1,568 instances of NSO's malicious code being sent across WhatsApp's servers across just *four days* in early May 2019—nearly 400 attempted installations per day. Perez-Marques Decl., Ex. 4 (PTX-0013) at .0014; Trial Tr. (Gheorghe Direct) at 384:19–24.[2] The jury also heard uncontested evidence that NSO developed three distinct installation vectors that targeted WhatsApp's servers: "Heaven," "Eden," and "Erised." *See* Perez-Marques Decl., Ex. 2 (Gazneli Dep.) at 39:17–40:4. As its own executives admitted, NSO developed "Eden" in response to WhatsApp code changes that disabled "Heaven" in December 2018, and developed "Erised" in response to WhatsApp code changes that disabled "Eden" in May 2019. *Id*. at 256:16–257:2, 265:1–10. "Erised" continued to be in use as of May 2020, the most recent date for which NSO was willing to answer questions. *Id*. at 267:2–4. Finally, NSO admitted that it remains in the spyware business, six years after these attacks. *See* Trial Tr. (Shohat Cross) at 811:13–22.

There is no dispute that NSO deliberately and repeatedly attacked Plaintiffs' infrastructure. The Court should therefore reject NSO's attempt to minimize its misconduct to the "one version of Pegasus (Eden)" that used California-based servers. Dkt. No. 747 at 4–5. Further, Plaintiffs have no way of knowing if "Heaven" and "Erised" used California-based servers: NSO successfully hid these installation vectors from Plaintiffs when they were in use and then failed to produce any computer code in this litigation, and were sanctioned by this Court for that very conduct. *See* Dkt. No. 494 at 9 ("[B]ecause defendants did not produce Pegasus code in a way that was meaningfully accessible to plaintiffs or to the court, plaintiffs were unable to obtain detailed evidence of how the WIS chose which server(s) to use . . . ."). Plaintiffs nonetheless concluded that "Eden" was used to attack at least 1,500 WhatsApp users over two weeks in April and May 2019. Trial Tr. (Gheorghe Direct) at 384:19–24. At trial, NSO admitted that "Eden" was in use for months, allowing the jury to conclude

---

[2] The trial transcript is attached as Exhibit 1 to the Declaration of Antonio J. Perez-Marques and cited herein as "Trial Tr."

that far more WhatsApp users were attacked. In all events, "evidence of other acts need not be identical to have relevance in the calculation of punitive damages." *State Farm*, 538 U.S. at 423. In *Riley*, the Ninth Circuit considered the defendant's systemic installation of cheat devices on many of its vehicles—not just on the vehicles owned by the consumers who filed the litigation. *See* 51 F.4th at 901. There is no reason for this Court to cabin its analysis to one version of Pegasus given the undisputed evidence that NSO developed and used multiple versions of Pegasus in repetitive attacks on Plaintiffs.

*Second*, NSO acted deliberately, investing up to hundreds of millions of dollars to develop highly sophisticated spyware built to target WhatsApp's servers. The jury heard extensive evidence about the sophistication of NSO's spyware. For instance, NSO spent $67 million on research-and-development in 2019 alone, which included efforts to discover vulnerabilities and design exploits. Trial Tr. (Gazneli Cross) at 947:11–948:25. The evidence at trial also confirmed that it took years for NSO to develop the capability to access WhatsApp's servers, underscoring the sophistication of NSO's spyware. Trial Tr. (Gazneli Recross) at 985:9–13. NSO's chief executive officer admitted that "NSO is state of the art technology" and touted its sophistication. Trial Tr. (Shohat Direct) at 880:10–15. And Plaintiffs' witnesses reinforced the sophistication of NSO's spyware. Claudiu Gheorghe testified that NSO launched "a very sophisticated . . . attack and exploit," which was "the most sophisticated attack that I'd known of at that time" and "state of the art." Trial Tr. (Gheorghe Direct) at 401:11–12, 404:8–11. Drew Robinson testified that he would see an attack of this sophistication "on the order of about once every five years." Trial Tr. (Robinson Direct) at 579:24.

The high prices and significant profits that NSO obtained from selling its spyware underscore the deliberate nature of NSO's misconduct. NSO's witnesses confirmed that NSO charged each customer millions of dollars to license its spyware. *See* Trial Tr. (Shohat Cross) at 824:3–5; Perez-Marques Decl., Ex. 3 (Gil Dep.) at 110:22–111:01, 111:24–112:1. And the jury saw documents showing that NSO made more than $79 million in gross profits in 2023 and almost $85 million in gross profits in 2024, *id*., Ex. 7 (A-1781)—a time period in which NSO was purportedly suffering from financial hardship. NSO's decision to "repeatedly engage[] in profitable but [knowingly]

wrongful conduct tends to show that 'strong medicine is required' to deter the conduct's further repetition." *Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1207 (2005) (citing *Gore*, 517 U.S. at 577).

*Third,* NSO sought to conceal its activity. The evidence at trial established that NSO designed Pegasus to be "undetectable by design." Trial Tr. (Gazneli Cross) at 964:9–10. The undisputed trial testimony established that NSO not only tried to hide its Pegasus spyware from its targets, but also tried to hide it from Plaintiffs. *See id.* at 973:25–974:20. NSO attempted to "minimize the risk of detection" by Plaintiffs "so that the installation vectors [could] be kept going as long as possible." *Id*. at 974:7–10. NSO understood that Plaintiffs would block NSO's activity if they discovered it and took steps to avoid that possibility. *Id*. at 976:13–21. Consistent with this evidence, the Court and the jury found that NSO acted intentionally. In granting Plaintiffs' motion for summary judgment, the Court ruled that NSO acted with the intent to defraud Plaintiffs by "redesign[ing] Pegasus to evade detection after plaintiffs first fixed the security breach." Dkt. No. 494 at 12. And the jury's explicit finding that NSO acted with "oppression, fraud, or malice," Dkt. No. 736 at 1, confirms that NSO's misconduct was not "mere accident," *State Farm*, 538 U.S. at 419. This overwhelming evidence that NSO concealed its misconduct from Plaintiffs confirms that NSO's actions were reprehensible. "[T]rickery or deceit [is] more reprehensible than negligence." *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 954 (9th Cir. 2005) (quoting *Gore*, 517 U.S. at 576); *see also Riley*, 51 F.4th at 902 (finding "high level of reprehensibility" when defendant's actions were the "result of intentional trickery and deceit, not accident or negligence").

*Fourth*, NSO repeatedly acted with knowing disregard of Plaintiffs' rights. *See Gore*, 517 U.S. at 576–77 (finding increased reprehensibility for defendant that "has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful"). Here, after Plaintiffs blocked NSO's "Heaven" installation vector in December 2018, NSO redesigned its exploit and created the "Eden" installation vector to regain access to WhatsApp's servers. *See id.*; *supra* at 4. When Plaintiffs blocked NSO's "Eden" installation vector in May 2019, NSO redesigned its exploit and created the "Erised" installation vector to once again access WhatsApp's servers. *See supra* at 4. Moreover, NSO deployed "Erised" **after this lawsuit was filed**, Trial Tr. (Gazneli Cross) at 962:13–17—even though NSO learned of Plaintiffs' complaint on the day that it was filed, *see id.* (Shohat Cross) at

869:3–873:7 (discussing NSO press release stating that "[i]n the strongest possible terms, we dispute today's allegations and will vigorously fight them").

NSO's attempts to downplay its own reprehensible conduct are unpersuasive. Many of NSO's arguments were presented to the jury and rejected. For instance, NSO argued to the jury that there had been no physical damage to WhatsApp's servers, *id*. (NSO's Closing) at 1287:10–12, and that Pegasus "didn't take anything from WhatsApp's servers," *id.* at 1295:6–7. NSO also asserted that Plaintiffs failed to show any "deliberate false statement" by NSO or that NSO had a "duty to disclose" anything to Plaintiffs. Dkt. No. 747 at 5. The jury necessarily found these arguments unconvincing. NSO next asks the Court to excuse its misconduct because "NSO licenses its technology exclusively for use in government investigations lawful under the laws of those governments' countries." Dkt. No. 747 at 6. NSO's repetition of this narrative does not substitute for actual evidence—and of course, there is not and never has been any evidence in this case about who NSO's clients are and whether they obtain any authorization to use their spyware. Because of the absence of evidence regarding the identity of NSO's customers behind the attack on WhatsApp's servers, the Court excluded NSO from presenting this argument to the jury. *See* Dkt. No. 686 at 3–4 ("[P]laintiffs have not had a meaningful opportunity to review evidence regarding which of defendants' clients were responsible for the alleged attacks.").

### B.    NSO's Conduct was "Particularly Egregious"

The proportionality of a punitive damages award "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425. Thus, the Ninth Circuit has rejected any "bright line rule" for punitive damages and has instead emphasized that "[t]he proportionality of punitive damages must be assessed on a case-by-case basis" and that "there are no rigid benchmarks that a punitive damages award may not surpass." *Riley,* 51 F.4th at 902 (quoting *State Farm*, 538 U.S. at 425).

In *Riley*, the Ninth Circuit sorted its previous decisions on the proportionality of punitive damages awards into three groups. Punitive damages are limited to a 4-to-1 ratio where there are significant economic damages and the behavior is <u>not</u> particularly egregious. 51 F.4th at 902. Punitive damages can range from a 4-to-1 ratio to a 9-to-1 ratio where there are significant economic

7

damages and the behavior is "more egregious." *Id*. Punitive damages can only exceed a 9-to-1 ratio where there are insignificant economic damages and the behavior was "particularly egregious." *Id*. at 902 n.5 (quoting *Planned Parenthood*, 422 F.3d at 962).

The Court need not determine whether the compensatory damages were "substantial" to reject NSO's argument. The Ninth Circuit has never defined what constitutes a "substantial" award, although it recently cited a decision finding that "compensatory damages have often been considered 'substantial' when they are over $1,000,000." *Hardeman v. Monsanto*, 997 F.3d 941, 975 (9th Cir. 2021) (quoting *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1069 (10th Cir. 2016)).[3] Under this standard, the $444,719 in compensatory damages awarded by the jury falls short of a "substantial" compensatory damages award. The Court need not weigh in here: NSO's conduct was "particularly egregious" (and thus easily qualifies as "more egregious" under *Riley*), allowing the Court to uphold a punitive damages award of at least a 4-to-1 ratio.

  C.  **Comparable Penalties Do Not Support the Reduction in Punitive Damages That NSO Seeks**

Comparing the jury's punitive damages award to the "'civil penalties authorized or imposed in comparable cases,'" *State Farm*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575), does not support the reduction that NSO seeks here. As NSO admits, "this guidepost is less important than the other two." Dkt. No. 747 at 7. Furthermore, NSO fails to offer any meaningful comparison: its brief does not cite any case where a jury found that a defendant acted with oppression, fraud, or malice in violating the CDAFA, and awarded punitive damages. *See id*. at 7–8. And while NSO points to the statutory penalty under CDAFA, it does not provide any context on when (if ever) that fine has been imposed, and whether the underlying conduct bore any similarities to NSO's campaign of hacking. Thus, this guidepost provides minimal direction. *See LivePerson, Inc. v. [24]7.ai, Inc.*, 2022 WL 3723117, at *11 (N.D. Cal. July 28, 2022) ("The Court concludes that this guidepost is of little guidance because there is no relevant civil penalty for comparison here."); *see also Hardeman*, 997 F.3d

---

[3] NSO relies on cases pre-dating *Hardeman*. *See Mitri v. Walgreen Co.*, 660 F. App'x 528, 530 (9th Cir. 2016) (unpublished); *Bains LLC v. Arco Products Co.,* 405 F.3d 764, 776 (9th Cir. 2005); *Planned Parenthood*, 422 F.3d at 963.

at 975 (noting "the need to avoid speculation in analyzing this factor"). To the extent the Court looks to the text of the CDAFA for guidance, the most important aspect is the absence of any statutory limit on punitive damages, which "means that [NSO] was on notice that it would be exposed to significant penalties for its actions." *Riley*, 51 F.4th at 906.

*   *   *

The undisputed evidence at trial showed that NSO acted repeatedly, deliberately, secretly, and without regard for Plaintiffs' rights, establishing NSO's extreme reprehensibility. For that reason alone, punitive damages need not be limited to the amount that NSO claims. Plaintiffs respectfully defer to the Court on any appropriate remittitur.

## II. The Punitive Damages Award Did Not Reflect the Jury's Reliance on Improper Factors

The jury's decision to award punitive damages was not contrary to the weight of the evidence, and there is no basis to conclude that the jury relied upon improper factors. In assessing whether a damages award is against the weight of the evidence, a "stringent standard applies" and a new trial may be granted "only if the verdict is against the great weight of evidence or it is quite clear that the jury has reached a seriously erroneous result." *Delegat's Wine Est. Ltd. v. Am. Wine Distribs., Inc.*, 2012 WL 1925664, at *1 (N.D. Cal. May 24, 2012) (quoting *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)). Here, the jury's determination that Plaintiffs were entitled to punitive damages was supported by substantial evidence at trial. NSO's contention that the jury's verdict reflected a desire to "bankrupt" NSO or punish NSO for harm to nonparties is nothing more than unsupported speculation—and contrary to the evidence established at trial as to NSO's current financial position.

### A. The Punitive Damages Award Properly Reflects NSO's Ability To Pay

NSO points to no evidence supporting its theory that the jury's punitive damages award was meant to "financially destroy[]" NSO, Dkt. No. 747 at 8, rather than punish NSO for its unlawful conduct and deter similar conduct. NSO's own financial statements showed that NSO and Q Cyber had respective net worths of $121.7 million and $184.5 million as of December 2024. *See* Trial Tr. (Trexler Direct) at 1194:6–14, 1196:2–4; Perez-Marques Decl., Exs. 5–8 (A-1779 to A-1782). The

Court properly instructed the jury that "[a]ny award you impose may not exceed Defendants' ability to pay." Dkt. No. 737 at 30. "A jury is presumed to follow the instructions given to it and the presumption is a strong one." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1247 (9th Cir. 2014) (internal citations and quotation marks omitted). NSO does not dispute these facts and instead simply speculates that the jury's award must have been motivated by a desire to bankrupt NSO. *See* Dkt. No. 747 at 8–9.

NSO's true complaint appears to be that the jury did not credit the testimony of its CEO or damages expert about NSO's ability to pay a punitive damages award. *See id*. at 9 n.8. The jury had good reason for doing so. Yaron Shohat's testimony was directly contradicted by the evidence of NSO's financial condition and testimony from Plaintiffs' damages expert Dana Trexler.[4] Mr. Shohat admitted that NSO continues to spend $10 million per month on all expenses and more than $50 million per year on research and development. *See* Trial Tr. (Shohat Cross) at 817:5–11, 887:3–5. Ms. Trexler then debunked Mr. Shohat's claims that certain assets on NSO's balance sheets were worthless. *See id*. (Shohat Direct) at 804:9–11; *id*. (Trexler Direct) at 1190:3–1192:18; *see also id*. at 1192:19–1193:6 ("[I]f the auditors didn't believe [that to be true], they would not allow NSO to report that balance on the financial statements, or it would be . . . materially misstating the balance sheet."). Accordingly, the jury had ample reason to discredit Mr. Shohat's testimony that "I don't think we're able to pay anything," Trial Tr. (Shohat Direct) at 808:1–7, and instead rely on the documents and Ms. Trexler's testimony in awarding punitive damages.

---

[4] NSO argues that the Court erred in allowing Ms. Trexler to provide rebuttal testimony regarding NSO's balance sheets, which NSO disclosed one month before trial and discussed during Mr. Shohat's direct examination. *See* Dkt. No. 747 at 9 n.8. Contrary to NSO's contention, it is permissible to ask an expert her opinion on other testimony provided at trial. *See, e.g., Myers v. City of Hermosa Beach*, 2009 WL 10715819, at *1 (C.D. Cal. Aug. 14, 2009) ("Testimony beyond the scope of an expert's report may be admissible when offered in rebuttal to prior trial testimony.") Moreover, the admissibility of rebuttal evidence is "subject to the sound discretion of the trial court" and NSO provides no basis to suggest that the Court abused its discretion. *United States v. Batts*, 573 F.2d 599, 603 (9th Cir. 1978); *see also Perez v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 8601203, at *6 (N.D. Cal. Dec. 7, 2011) ("Courts have wide discretion in determining what may be presented as rebuttal evidence.").

### B. Punitive Damages Were Supported by Substantial Evidence at Trial of NSO's Misconduct Towards Plaintiffs

The jury's decision to award Plaintiffs punitive damages was supported by ample evidence presented at trial of NSO's misconduct *towards Plaintiffs*—not nonparties, as NSO contends. *See* Dkt. No. 747 at 11–12. In evaluating punitive damage findings under California law, courts "look to the record to see whether there is any substantial evidence, contradicted or uncontradicted, which will support a finding of" punitive damages. *Fleming v. Safeco Ins. Co.*, 206 Cal. Rptr. 313, 320 (Cal. Ct. App. 1984).

Here, the trial record includes substantial evidence that NSO's conduct towards Plaintiffs was malicious, oppressive, or fraudulent, including testimony from NSO's own executives that:

- NSO undertook a "multi-month, year long R&D process" to develop its first WhatsApp-specific exploit, which included designing the WhatsApp Installation Server ("WIS") to create forged WhatsApp messages that were transmitted through WhatsApp servers, Trial Tr. (Gazneli Recross) at 985:9–13;

- NSO deliberately concealed its use of WhatsApp's servers to minimize the risk of detection because NSO knew that "WhatsApp would shut down or close any vulnerability [WhatsApp] knew about," Perez-Marques Decl., Ex. 2 (Gazneli Dep.) at 208:8–15;

- NSO had multiple teams dedicated to concealing its WhatsApp-specific exploits, including an "OpSec" team designed to "minimize the risk of detection" by WhatsApp, and a "White Services" team dedicated to procuring anonymized infrastructure for NSO's customers, *id*. at 131:14–17, 153:11–17, 237:2–6;

- When Plaintiffs made changes that closed NSO's exploit, NSO created new WhatsApp-specific exploits, including after the filing of the complaint, Trial Tr. (Gazneli Cross) at 962:8–17, 978:5–979:6;

- NSO used its WhatsApp-specific exploits to install Pegasus "between hundreds and tens of thousands" of times between April 2018 and May 2020, Perez-Marques Decl., Ex. 2 (Gazneli Dep.) at 83:10–11;

11

- NSO specifically targeted Plaintiffs' servers in California and sent its spyware through those California servers 43 times in May 2019 alone, Dkt. No. 737 at 18; and
- Without its WhatsApp-specific exploits, NSO could not install its Pegasus spyware onto WhatsApp users' phones on a zero-click basis and extract information, Trial Tr. (Gazneli Cross) at 980:1–8.

Plaintiffs' presentation of this evidence properly focused on NSO's unlawful conduct towards Plaintiffs. In their summation, Plaintiffs explained that "the conduct that's at issue" was the "determination that the Pegasus installation messages came through California 43 times in just ten days in May 2019." Trial Tr. (Plaintiffs' Closing) at 1268:11–13. Similarly, Plaintiffs' arguments on the predicate factual findings for punitive damages, such as NSO's intent to defraud, emphasized NSO's intrusions onto WhatsApp's servers. *See id.* at 1274:7–9 ("And when they were communicating with the WhatsApp servers, they were doing it deceptively so that WhatsApp wouldn't find out about it."). Indeed, the final point of Plaintiffs' closing argument on malice, oppression, and fraud properly centered the jury's attention on NSO's tortious conduct that harmed Plaintiffs: "You should conclude that NSO's attacks on California servers w[ere] malicious, oppressive, and fraud[ulent] because they did it deliberately, did it secretly, [and] did it repeatedly[,] without regard to WhatsApp's rights." *Id.* at 1280:5–8. NSO's complaint about Plaintiffs' references to "spying," *see* Dkt. No. 747 at 11, ignores the Court's decision allowing Plaintiffs to present "specific and actual evidence showing what Defendants' WhatsApp-based exploit did," Dkt. No. 708 at 2.[5]

In addition, NSO's arguments about harm to third parties are foreclosed by the Court's instruction to the jury that "[p]unitive damages may not be used to punish Defendants *for the impact of their misconduct on persons other than Plaintiffs* . . . ." Dkt. No. 737 at 30 (emphasis added). "A jury is presumed to follow the instructions given to it, and the presumption is a strong one." *Escriba*, 743 F.3d at 1247 (internal citations and quotation marks omitted). NSO fails to rebut the "strong" presumption that the jury followed the Court's instruction to only consider harm to Plaintiffs in

---

[5] Plaintiffs' closing arguments were not only proper, but NSO also failed to timely object to any of those arguments. Failure to object during closing arguments "strongly suggests that counsel made a strategic decision to gamble on the verdict and suspected that the comments would not sway the jury." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1195 (9th Cir. 2002).

awarding punitive damages. Indeed, the sole authority NSO cites supports Plaintiffs' position. *See Philip Morris USA v. Williams*, 549 U.S. 346 (2007). In *Philip Morris*, the Supreme Court held that punitive damages could not be used to punish a defendant for harm to nonparties where the trial court had rejected the defendant's request for a jury instruction stating the same. *Id.* at 356. Here, unlike *Philip Morris*, the Court expressly admonished the jury to not punish NSO for harm to "persons other than Plaintiffs," Dkt. No. 737 at 30, and nothing in the record suggests that the jury disregarded the Court's proper instruction.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny NSO's motion.

---

[6] Despite disclaiming any intent to challenge the Court's evidentiary rulings, *see* Dkt. No. 747 at 1 n.1, NSO takes issue with Plaintiffs' arguments at trial characterizing the information that NSO obtained from target devices, *id.* at 9. The Court already rejected this same argument from NSO. *See* Dkt. No. 708 at 1. There is no basis to challenge the Court's previous ruling here.

13

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTON FOR REMITTITUR OR A NEW TRIAL
CASE NO. 4:19-cv-07123-PJH

| | |
|---|---|
| Dated:  June 12, 2025 | Respectfully submitted, |
| | DAVIS POLK & WARDWELL LLP |
| | By:  /s/ Antonio J. Perez-Marques |

                Greg D. Andres
                Antonio J. Perez-Marques
                Gina Cora
                Craig T. Cagney
                Luca Marzorati
                  (admitted *pro hac vice*)
                DAVIS POLK & WARDWELL LLP
                450 Lexington Avenue
                New York, New York 10017
                Telephone: (212) 450-4000
                Facsimile: (212) 701-5800
                Email:  greg.andres@davispolk.com
                        antonio.perez@davispolk.com
                        gina.cora@davispolk.com
                        craig.cagney@davispolk.com
                        luca.marzorati@davispolk.com

                Micah G. Block (SBN 270712)
                DAVIS POLK & WARDWELL LLP
                900 Middlefield Road, Suite 200
                Redwood City, California 94063
                Telephone: (650) 752-2000
                Facsimile:  (650) 752-2111
                Email: micah.block@davispolk.com

                *Attorneys for Plaintiffs*
                *WhatsApp LLC and Meta Platforms, Inc.*