# EXHIBIT 1

265

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                          OAKLAND DIVISION

 4

 5    WHATSAPP LLC AND META          )   C-19-07123 PJH
      PLATFORMS, INC.,               )
 6                                   )   OAKLAND, CALIFORNIA
                  PLAINTIFFS,        )
 7                                   )   APRIL 29, 2025
            VS.                      )
 8                                   )   VOLUME 2
      NSO GROUP TECHNOLOGIES LIMITED )
 9    AND Q CYBER TECHNOLOGIES       )   PAGES 265-516
      LIMITED,                       )
10                                   )
                  DEFENDANTS.        )
11    _____)

12

13                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14                UNITED STATES DISTRICT JUDGE

15

16    A P P E A R A N C E S :

17    FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                            BY:  GREG D. ANDRES
18                               ANTONIO J. PEREZ
                            450 LEXINGTON AVENUE
19                          NEW YORK, NEW YORK  10017

20                          BY:  MICAH G. BLOCK
                            900 MIDDLEFIELD ROAD, SUITE 200
21                          REDWOOD CITY, CALIFORNIA  94063

22    OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                   CERTIFICATE NUMBER 9595
23                                 IRENE RODRIGUEZ, CSR, RMR, CRR
                                   CERTIFICATE NUMBER 8074
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER
```

UNITED STATES COURT REPORTERS

266

```
 1

 2    APPEARANCES (CONTINUED)

 3

 4    FOR THE DEFENDANTS:    KING & SPALDING
                        BY:  JOSEPH N. AKROTIRIANAKIS
 5                           AARON S. CRAIG
                        633 WEST FIFTH STREET, SUITE 1600
 6                      LOS ANGELES, CALIFORNIA  90071

 7                      BY:  MATTHEW V. NOLLER
                        50 CALIFORNIA STREET, SUITE 3300
 8                      SAN FRANCISCO, CALIFORNIA  94111

 9

10    ALSO PRESENT:     CURT EVANS
                        BRIAN BAKALE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES COURT REPORTERS

267

```
 1

 2                  INDEX OF PROCEEDINGS

 3    OPENING STATEMENT BY MR. PEREZ              P. 281

 4    OPENING STATEMENT BY MR. AKROTIRIANAKIS       P. 298

 5

 6

 7

 8                  INDEX OF WITNESSES

 9    PLAINTIFFS'

10    CARL WOOG
         DIRECT EXAM BY MR. ANDRES              P. 319
11       CROSS-EXAM BY MR. AKROTIRIANAKIS         P. 345
         REDIRECT EXAM BY MR. ANDRES             P. 364
12

13    CLAUDIU GHEORGHE
         DIRECT EXAM BY MR. PEREZ               P. 368
14       CROSS-EXAM BY MR. AKROTIRIANAKIS         P. 415

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES COURT REPORTERS

268

```
 1

 2                  INDEX OF EXHIBITS

 3                   MARKED     ADMITTED

 4    PLAINTIFFS'

 5    112                       329
      13                        375
 6    10                        388

 7

 8    DEFENDANTS'

 9    1148, COVER PAGE                452
      1083, PAGE 1 AND               458
10       REDACTED PAGE 4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES COURT REPORTERS

381

1  ABILITY TO MODIFY?

2  A.  NO, NEVER.  THAT FIELD WAS SUPPOSED TO BE FILLED IN ONLY

3  BY THE SIGNALLING SERVER.  IT WAS NEVER SUPPOSED TO BE SENT BY

4  THE CLIENT.

5  Q.  AND WHEN YOU SAY "THE CLIENT," WHAT DO YOU MEAN?

6  A.  I MEAN THE WHATSAPP APPLICATION THAT INITIATES THE CALL.

7  Q.  IS THIS A FIELD THAT A REGULAR WHATSAPP USER WOULD HAVE

8  THE ABILITY TO SEE?

9  A.  NO.  THIS IS PART OF THE METADATA THAT IS BEING EXCHANGED

10  WHEN THE RINGING PROCESS STARTS IN THE CALL.  SO NONE OF THIS

11  WOULD BE VISIBLE.

12  Q.  AND WHAT -- THERE'S A SERIES -- AFTER THE FIRST THREE

13  LINES, THERE'S SORT OF A SERIES OF LINES, MANY OF WHICH START

14  WITH THE LETTER X AND THEN SOME NUMBERS.

15       WHAT DOES THAT PORTION REFLECT?

16  A.  THAT PORTION IS ESSENTIALLY BINARY CODE.  SO BINARY CODE

17  IS ESSENTIALLY, THEY'RE A SET OF INSTRUCTIONS THAT ARE MEANT TO

18  BE READ ONLY BY COMPUTERS.  SO IT'S -- IT'S A PROGRAM MEANT TO

19  BE EXECUTED BY A COMPUTER, BUT IT'S UNREADABLE BY HUMANS.

20  Q.  WHAT WAS DONE WITH THAT ENCODED INFORMATION?

21  A.  SO WE DID SOME RESEARCH AND WE TOOK THIS BINARY CODE AND

22  WE REVERSE ENGINEERED IT INTO A FORMAT THAT WAS READABLE TO

23  HUMANS, AND BASED ON MY RECOLLECTION, I REMEMBER THIS CODE WAS

24  ESSENTIALLY CONNECTING TO AN EXTERNAL SERVER OUTSIDE OF THE

25  CONTROL THAT WE HAD.  IT WAS DOWNLOADING SOME DATA AND THEN IT

382

1  WAS EXECUTING THAT DATA.

2  Q.  DO YOU RECALL WHO DID THAT WORK OF REVERSE ENGINEERING

3  THIS CODE?

4  A.  YES.  THAT WORK WAS PERFORMED BY THE MALWARE ANALYSIS

5  TEAM, WHICH WAS A TEAM IN THE FACEBOOK SECURITY TEAM, AND THE

6  ENGINEER WHO WORKED ON IT WAS DREW ROBINSON.

7  Q.  OKAY.  IF WE GO TO PAGE 0011, IN THE MIDDLE OF THE PAGE

8  THERE IS AN ENTRY FROM MR. PALAU, AND HE WRITES, "THESE ARE ALL

9  THE FAILED STANZAS (USING THE NEW VALIDATION METHOD) FOR THE

10  PAST HOUR."

11       WHAT DOES THAT REFLECT?

12  A.  SO JESUS POSTED AN UPDATE ON THE NUMBER OF FAILED

13  VALIDATIONS WE WERE SEEING.  AND THIS COMMENT WAS POINTING TO

14  ANOTHER DOCUMENT THAT HAD MORE DETAILS ABOUT WHERE THE FAILURE

15  HAPPENED AND HOW MANY OF THEM WERE THEY.

16  Q.  AND WHEN DID WHATSAPP START LOGGING THESE STANZAS?

17  A.  I BELIEVE THAT WE STARTED LOGGING IT EXACTLY THE SAME DAY.

18  SO I THINK WITH HIS CHANGE THAT HE MENTIONED HERE, THIS IS WHEN

19  WE ACTUALLY STARTED LOGGING FAILURES RELATED TO THIS ATTACK.

20  Q.  IF WE GO TO THE PAGE ENDING IN 0014, MR. PALAU WRITES AT

21  THE TOP OF WHAT YOU HOPEFULLY SEE ON YOUR SCREEN, "ADDING ALL

22  THE MALICIOUS OFFER STANZAS SINCE WE STARTED LOGGING THEM.

23  TOTAL NUMBER:  1568."

24       WHAT DOES THAT MEAN?

25  A.  JESUS WAS PROVIDING AN UPDATE ON --

383

1       MR. AKROTIRIANAKIS:  OBJECTION.  FOUNDATION,

2  YOUR HONOR.

3       THE COURT:  YEAH, YOU NEED TO ESTABLISH A FOUNDATION.

4  BY MR. PEREZ:

5  Q.  DO YOU HAVE AN UNDERSTANDING --

6       THE COURT:  HIS UNDERSTANDING.

7  BY MR. PEREZ:

8  Q.  DO YOU HAVE AN UNDERSTANDING OF WHAT THIS REFLECTS?

9  A.  YES.

10  Q.  WHAT DOES IT REFLECT?

11       MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

12  FOUNDATION.

13       THE COURT:  WHAT IS HIS UNDERSTANDING BASED ON?

14  BY MR. PEREZ:

15  Q.  WHAT IS YOUR UNDERSTANDING BASED ON?

16  A.  MY UNDERSTANDING IS BASED ON HAVING MANY DETAILS, LIKE, I

17  HAD A LOT OF INSIGHTS INTO WHAT JESUS'S WORK WAS RELATED IN

18  THIS TASK.

19  Q.  WHAT WAS YOUR ROLE WITH RESPECT TO THIS INVESTIGATION WORK

20  THAT WAS GOING ON AT THIS TIME?

21  A.  MY ROLE WAS TO COORDINATE ALL THE ENGINEERING WORK FROM

22  THE WHATSAPP SIDE IN ORDER TO UNBLOCK THE -- UNDERSTANDING OF

23  THE ATTACK, AND TO DEPLOY A REMEDIATION AS SOON AS POSSIBLE.

24  Q.  AND WHAT WAS YOUR REPORTING RELATIONSHIP WITH MR. PALAU?

25  A.  JESUS WAS A MEMBER OF MY TEAM.  HE WAS A MEMBER OF THE

384

1  VOICE AND VIDEO CALLING INFRASTRUCTURE TEAM.

2  Q.  SO YOU WERE OVERSEEING HIS WORK ON THIS INVESTIGATION?

3  A.  YES.

4  Q.  AND IN THAT CONTEXT, DID YOU DEVELOP AN UNDERSTANDING OF

5  WHAT HE WAS COUNTING HERE WITH THE 1568 MALICIOUS OFFER

6  STANZAS?

7  A.  YES.  SO THESE ARE THE TOTAL NUMBER --

8       MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  HEARSAY.

9       THE COURT:  OVERRULED.

10  BY MR. PEREZ:

11  Q.  WHAT ARE THEY?

12  A.  THESE ARE TOTAL NUMBER OF FAILED VALIDATIONS THAT WE WERE

13  SEEING IN PRODUCTION FROM THE MOMENT WE STARTED LOGGING UNTIL

14  THE MOMENT HE POSTED THIS UPDATE, WHICH WAS MAY 6TH.

15  Q.  AND COULD THOSE BE FAILED VALIDATIONS FOR ANY REASON?

16  A.  NO.  THIS SPECIFIC LOGGING -- THIS LOGGING WAS VERY

17  SPECIFIC TO THE SUSPICIOUS MESSAGES THAT JESUS FOUND.  SO WE

18  ADDED DEDICATED LOGGING FOR DETECTING THESE, AND ALL OF THESE

19  WERE RELATED TO THOSE.

20  Q.  AND SO 1568 INSTANCES OF THAT MESSAGE IN THE PERIOD THAT

21  YOU WERE LOGGING?

22  A.  YES, STARTING FROM THE MOMENT WE STARTED -- INITIATED THE

23  LOGGING UNTIL THE MOMENT HE GAVE THE UPDATE ON MAY 6TH.

24  Q.  SO FOUR DAYS?

25  A.  YES.

385

1  Q.    DO YOU HAVE ANY UNDERSTANDING OF HOW MANY TIMES THIS SHELL
2  CODE TRANSITED WHATSAPP'S SERVERS, IF ANY, BEFORE THE LOGGING
3  STARTED?
4  A.    NO, WE HAVE NO INSIGHT INTO THAT BECAUSE WE WERE NOT AWARE
5  OF THIS HAPPENING, SO WE HAD NO LOGGING FOR IT.
6  Q.    WHAT WAS YOUR REACTION TO SEEING THE NUMBER OF INSTANCES
7  IN WHICH THIS MALICIOUS STANZA HAD GONE THROUGH WHATSAPP
8  SERVERS?
9  A.    SO IT WAS VERY WORRISOME.  OUR INITIAL EXPECTATION WAS
10 THAT WE WILL SEE A VERY LOW NUMBER.  WE THOUGHT THAT THERE WAS
11 JUST SOMEONE ON THE INTERNET, LIKE, MESSING AROUND WITH OUR
12 SIGNALLING SERVER AND TRYING SOME THINGS, YOU KNOW, OUT.
13      BUT WHEN WE SAW THIS NUMBER, WE REALIZED THAT THIS IS
14 NOT -- THIS IS NOT, YOU KNOW, SOMEONE TESTING SOMETHING OR
15 PLAYING WITH IT.  LIKE, IT'S SOMETHING THAT THERE IS A CONSTANT
16 STREAM OF EVENTS GOING, AND IT -- AT THE SAME TIME, IT WASN'T
17 PROPORTIONAL WITH THE LEVEL OF TRAFFIC.  LIKE, WE WERE
18 PROCESSING PROBABLY EVEN BILLIONS OF MESSAGES EVERY DAY.  SO
19 IT'S MUCH LOWER THAN THAT.
20      SO IT REALLY POINTS TO THE WORST CASE SCENARIO, WHICH WAS
21 A HIGHLY TARGETED ATTACK THAT WAS DEPLOYED IN PRODUCTION.
22 Q.    AND WHAT DO YOU MEAN BY "DEPLOYED IN PRODUCTION"?
23 A.    LIKE, IT WAS NOT TESTING.  LIKE, IT WAS NOT JUST ONE
24 PERSON JUST, YOU KNOW, LIKE A SECURITY RESEARCHER TRYING TO
25 FIND SOME THINGS IN WHATSAPP AND TESTING THINGS OUT.

UNITED STATES COURT REPORTERS

386

1       LIKE, IT WAS SOMETHING THAT WAS FUNCTIONAL AND IT WAS
2  DEPLOYED.
3  Q.    AND SO WHAT WAS YOUR UNDERSTANDING OF WHAT YOUR TEAM HAD
4  DISCOVERED AT THIS POINT?
5  A.    SO ON MAY 6TH, I BELIEVE WE HAD A GOOD LEVEL OF
6  UNDERSTANDING.  BUT WE DID NOT HAVE FULL UNDERSTANDING OF HOW
7  THE ATTACK WORKED.  WE KNEW THAT WE WERE DEALING WITH A SERIOUS
8  ATTACK, THAT IT WAS AFFECTING USERS IN REAL TIME, LIKE, AT THE
9  SAME TIME.
10      BUT WE DIDN'T HAVE FULL UNDERSTANDING YET OF HOW THE
11 ATTACK WORKS, AND WE WERE NOT READY TO REMEDIATE IT YET.
12 Q.    MR. EVANS, WE CAN TAKE DOWN THAT EXHIBIT.
13      MR. GHEORGHE, WERE YOU INVOLVED IN ANY WORK THAT FOLLOWED
14 THE IDENTIFICATION OF THIS EXPLOIT?
15 A.    YES, I WAS INVOLVED DEEPLY WITH ALL THE WORK REQUIRED FOR
16 US TO, TO UNDERSTAND HOW THE ATTACK WORKS, AND ALSO TO
17 REMEDIATE IT.
18 Q.    WHAT WERE THE GOALS OF THE WORK THAT YOU WERE OVERSEEING?
19 A.    THE GOAL WAS ESSENTIALLY TO PROTECT WHATSAPP USERS, SO WE,
20 WE HAD TO FIRSTLY FULLY UNDERSTAND THE ATTACK, AND THEN BASED
21 ON THAT UNDERSTANDING, COME UP AS SOON AS POSSIBLE WITH A
22 REMEDIATION TO PREVENT FURTHER ABUSE.
23 Q.    WHY WAS IT PART OF YOUR GOAL TO FULLY UNDERSTAND THE
24 ATTACK?
25 A.    FULLY UNDERSTANDING THE ATTACK IS AN ESSENTIAL STEP, THAT

UNITED STATES COURT REPORTERS

387

1  IT'S MANDATED BY PROCESS, BY STANDARD PRACTICE IN REGARDS TO
2  INCIDENT RESPONSE FOR SECURITY ISSUES.
3       SO IF YOU -- IF YOU GO AND REMEDIATE TOO QUICKLY, YOU MAY
4  LOSE YOUR ABILITY TO UNDERSTAND HOW THE ATTACK WORKS IN ITS
5  FULL SHAPE.
6       SO WE -- AT THE SAME TIME, YOU CANNOT JUST, YOU KNOW,
7  SPEND FOREVER TIME TRYING TO INVESTIGATE IT.  LIKE, YOU HAVE TO
8  SPEND ALL THE TIME REQUIRED TO INVESTIGATE AND UNDERSTAND AND
9  THEN REMEDIATE SO THAT YOU CAN REMEDIATE AS SOON AS POSSIBLE.
10 Q.    IF YOU COULD TURN IN YOUR BINDER TO PLAINTIFFS'
11 EXHIBIT 10, OR PTX-10, AND LET ME KNOW WHEN YOU HAVE IT.
12 A.    YEP, I HAVE IT.
13 Q.    MR. GHEORGHE, DO YOU RECOGNIZE PTX-10?
14 A.    YES.  THIS IS WHAT WE CALLED INTERNALLY AT FACEBOOK AT
15 THAT TIME A SEV.  SO SEV IS A DOCUMENT THAT WE USE TO KEEP
16 TRACK OF ALL THE PROGRESS ON INCIDENTS INSIDE THE COMPANY FROM
17 AN ENGINEERING POINT OF VIEW.
18 Q.    IS THAT A FORM OF DOCUMENT THAT'S COMMONLY USED BY
19 WHATSAPP?
20 A.    YES, IT WAS COMMONLY USED BY WHATSAPP AND BY ANY TEAM IN
21 FACEBOOK.
22 Q.    AND THAT'S TO KEEP A, AN ONGOING RECORD OF THE WORK BEING
23 DONE WITH RESPECT TO THE INCIDENT?
24 A.    YES.
25      MR. PEREZ:  YOUR HONOR, WE'D LIKE TO OFFER PTX-10

UNITED STATES COURT REPORTERS

388

1  INTO EVIDENCE AND ASK THAT IT BE PUBLISHED TO THE JURY.
2       THE COURT:  ANY OBJECTION?
3       MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.
4       THE COURT:  ALL RIGHT.  IT'S ADMITTED.
5       (PLAINTIFFS' EXHIBIT PTX-10 WAS ADMITTED IN EVIDENCE.)
6  BY MR. PEREZ:
7  Q.    MR. GHEORGHE, WHO IS THE OWNER OF THE SEV THAT IS MARKED
8  THERE OR ENTERED INTO EVIDENCE AS PTX-10?
9  A.    THE OWNER OF THE SEV IS JOAQUIN MORENO GARIJO.  HE WAS A
10 MEMBER OF THE INCIDENT RESPONSE TEAM, AND HE WAS THE PERSON WHO
11 WAS ON CALL IN THAT TEAM AT THE MOMENT THAT WE FOUND THE
12 SUSPICIOUS MESSAGES.  HE'S THE ONE THAT FILED THIS INCIDENT
13 REPORT.
14 Q.    AND A FEW LINES DOWN FROM THAT, THERE'S A LINE THAT SAYS
15 STARTED.
16      WHAT DOES THAT LINE REFLECT?
17 A.    IT'S THE MOMENT THAT WE DECLARED THAT WE HAVE AN
18 INVESTIGATION, A SECURITY INVESTIGATION HAPPENING, AND IT'S THE
19 MOMENT THAT JOAQUIN FILED THIS SEV.
20 Q.    AND WHAT'S THE TIME AND DATE THAT'S IDENTIFIED THERE?
21 A.    IT'S MAY 2ND, 6:25 P.M.
22 Q.    AND WHAT IS -- HOW DOES THAT TIMING CORRESPOND WITH WHEN
23 YOUR TEAM IDENTIFIED THE SHELL CODE THAT WE WERE LOOKING AT
24 EARLIER?
25 A.    WE FIRSTLY IDENTIFIED THE SHELL CODE, AND THEN WE FILED

UNITED STATES COURT REPORTERS

1  COMPANY WHAT WAS HAPPENING BECAUSE IT WAS SOMETHING WE WERE

2  DOING IN A PRIVATE SETTING.

3      SO WE HAD SOME PEOPLE THAT WERE, AGAIN, ALL THE TIME IN

4  THE WAR ROOM, THEY WERE PRESENT, PEOPLE LIKE OTTO AND ME AND

5  JESUS AND SAISH.

6      BUT THERE WERE SOME OTHER FOLKS THAT WERE INVOLVED IN THE

7  INVESTIGATION THAT WE DIDN'T NEED THEM ALL THE TIME.  SO WE

8  ONLY HAD A NEED FOR THEM FOR GETTING A SPECIFIC TASK DONE, AND

9  AFTER THAT TASK WAS DONE, WE WOULD TELL THEM TO GO BACK TO

10  THEIR REGULAR PROJECTS AND NOT BE PART OF THE INVESTIGATION.

11  Q.    YOU MENTIONED OTTO.  WHO IS OTTO?

12  A.    OTTO EBELING IS A SECURITY ENGINEER WHO HELPED US

13  THROUGHOUT THE INVESTIGATION.

14      AND HE WAS ALSO ONE OF THE SECURITY ENGINEERS THAT

15  SUGGESTED THE VALIDATION WORK THAT WE DID THAT LED TO THE

16  DISCOVERY OF THE ATTACK.

17  Q.    GOING BACK TO THE SAME SERIES OF QUESTIONS, IGOR MILYAKOV,

18  WHAT WAS HIS ROLE, IF ANY, IN THE INVESTIGATION?

19  A.    IGOR WAS A MEMBER OF THE WHATSAPP CHAT TEAM.  HE -- WE

20  NEEDED HIM TO DO SOME -- TO MAKE SOME CHANGES IN THE CHAT

21  LOGIC.

22      I CAN'T REMEMBER THE ACTUAL CHANGES HE MADE, BUT THERE

23  WERE SOME CHANGES THAT JESUS COULD NOT DO, AND WE -- I HAD TO

24  GO AND TALK TO HIS MANAGER, MIKHAIL VORONTSOV, AND WE HAD TO

25  HAVE HIM WORK WITH US FOR A DAY OR TWO, I CAN'T REMEMBER

1  EXACTLY, BUT HE -- YEAH, HE WORKED ON A PROJECT, HE GOT IT

2  DONE, AND HE WASN'T INVOLVED IN IT ANYMORE.

3  Q.    WHAT ABOUT ARAVIND THANGAVEL?

4  A.    ARAVIND WAS A MEMBER OF THE INTERNAL TOOLS TEAM, AND WE

5  NEEDED HIM IN ORDER TO UNDERSTAND AND IN ORDER TO COLLECT AND

6  ANALYZE SOME OF THE CRASH LOGS THAT WE DETECTED THAT ARE

7  RELATED TO THE INVESTIGATION.  SO WE NEEDED MORE INFORMATION

8  ABOUT THE CRASH LOGS AND HOW MANY OF THEM WERE HAPPENING, AND

9  ALSO WE NEEDED THE DETAILS OF THE CRASHES IN ORDER TO MAKE

10  PROGRESS WITH THE INVESTIGATION.

11      AND ARAVIND HELPED US TO COLLECT ALL THAT INFORMATION.  HE

12  WAS VERY INVOLVED, BUT I DON'T THINK HE WAS A FULL-TIME

13  INVOLVEMENT.

14  Q.    WHEN YOU SAY "CRASH LOGS," WHAT DO YOU MEAN?

15  A.    THESE ARE ESSENTIALLY RECORDS OF INSTANCES OF THE WHATSAPP

16  APPLICATION CRASHING THAT WERE RECORDED ON THE WHATSAPP SERVER.

17      SO JUST TO BE CLEAR, THIS EXPLOIT WAS NOT RELIABLE 100

18  PERCENT OF THE TIME.  SO IT WOULD CAUSE CRASHES IN SOME OF THE

19  CASES BECAUSE IT'S VERY SOPHISTICATED.

20      AND THOSE CRASHES ACTUALLY HELPED US TO FURTHER UNDERSTAND

21  HOW IT WORKS.

22  Q.    LAST NAME, ABY JOHN, DID THAT PERSON HAVE A ROLE?  AND IF

23  SO, WHAT WAS IT?

24  A.    ABY JOHN WAS A PRODUCT MANAGER, IF I REMEMBER CORRECTLY.

25  SO HE HELPED US WITH THE COORDINATION WORK THROUGHOUT THE

1  INVESTIGATION, MORE IN THE LATTER PART OF THE INVESTIGATION,

2  NOT INITIALLY.  HE WASN'T INVOLVED WITH THE UNDERSTANDING.

3  Q.    IF WE COULD GO BACK TO PTX-10, WHICH YOU SHOULD STILL HAVE

4  ON YOUR SCREEN, AND GO TO PAGE 0006, AND THERE'S A MESSAGE FROM

5  YOU ON FRIDAY, MAY 10TH, AT 5:04 P.M. PACIFIC, AND YOU SAY, "WE

6  CONFIRMED THAT THE EXISTING EXPLOIT IS FIXED."

7      WHAT WAS THE STATE OF THE INVESTIGATION AT THIS TIME?

8  A.    SO ON FRIDAY, MAY 10TH IS THE MOMENT WHEN WE STOPPED

9  THE -- WE MADE THE EXPLOIT NOT WORK ANYMORE.

10      SO AFTER THIS MOMENT, USERS WERE NOT AFFECTED ANYMORE, AND

11  WE DID IT BY ROLLING OUT A FIX ON OUR RELAY SERVER THAT MADE

12  THE EXPLOIT LOOK LIKE IT WAS BROKEN, BUT IT WASN'T OBVIOUS THAT

13  IT WAS -- THAT WE DETECTED IT.

14  Q.    WAS THERE FURTHER REMEDIATION AFTER THAT POINT?

15  A.    YES.  THE LEFT -- THE COMPLETE REMEDIATION HAPPENED ON

16  MONDAY, THE FOLLOWING MONDAY, ON MAY 13TH WHEN WE ROLLED OUT

17  NEW VERSIONS OF THE WHATSAPP APPLICATION FOR ANDROID AND IOS,

18  AND WE INSTRUCTED ALL THE USERS TO UPDATE THEIR APPS

19  IMMEDIATELY.

20      AND WE ALSO MADE ANOTHER FIX IN THE SIGNALLING SERVER THAT

21  WOULD PREVENT THESE MALICIOUS CALLS EVEN TO HAPPEN.  SO THE

22  USERS WOULD NOT EVEN SEE ANYTHING AT THAT POINT.

23  Q.    OKAY.  SO CAN YOU EXPLAIN TO THE JURY, AT A HIGH LEVEL,

24  THE FULL SCOPE OF THE REMEDIATION WORK THAT WHATSAPP UNDERTOOK

25  WITH RESPECT TO THIS ATTACK?  THE MOMENTS OF IT I MEAN.

1  A.    YES.  SO THERE WERE THREE PARTS OF THE REMEDIATION.

2      ONE WAS ON THE WHATSAPP APPLICATION.  SO WE PATCHED THE

3  WHATSAPP APPLICATION TO AVOID THE ATTACK FROM BEING EFFECTIVE.

4  SO THAT WAS ONE PART.

5      THE SECOND PART WAS IN THE SIGNALLING SERVER, WHENEVER WE

6  WERE DETECTING THOSE SUSPICIOUS MESSAGES THAT LED TO THE

7  DISCOVERY OF THE ATTACK, WE WOULD NOT ALLOW THEM TO GO THROUGH.

8  SO WE WOULD JUST STOP THEM.

9      AND THE THIRD ONE WAS IN THE RELAY SERVER.  WE WOULD

10  PREVENT THAT SPECIFIC -- WE WOULD PREVENT THE USE OF THE CLIENT

11  VULNERABILITY.  SO THE CLIENT VULNERABILITY WAS BEING MISUSED

12  THROUGH THE RELAY, AND WE FOUND SOME WAYS TO DETECT THE WAY

13  THEY WERE MISUSING IT, AND WE HAD A SPECIFIC LOGIC THAT WE PUT

14  IN PLACE IN THE RELAY THAT WOULD NOT ALLOW THE ATTACKER TO

15  MISUSE THE CLIENT VULNERABILITY.

16      SO ESSENTIALLY EVEN PEOPLE WHO WOULD NOT BE UPDATING THEIR

17  APP WOULD STILL BE PROTECTED IN THIS CASE.

18  Q.    AND CAN YOU EXPLAIN TO THE JURY WHY THIS REMEDIATION WORK

19  WAS UNDERTAKEN?

20  A.    WE TOOK THIS REMEDIATION WORK AS PART OF THE INCIDENT

21  RESPONSE PROCESS WE WERE FOLLOWING.  SO WE DETECTED AN ATTACK,

22  AND WE TOOK ALL THE STEPS TO REMEDIATE AS SOON AS POSSIBLE.

23  Q.    DID THERE COME A TIME WHEN WHATSAPP ATTRIBUTED THE ATTACK

24  TO NSO?

25  A.    I REMEMBER VAGUELY THROUGHOUT THE INVESTIGATION, THE WEEK

**401**

1  OF THE INVESTIGATION, THAT WE WERE BRIEFED ON THE FACT THAT NSO

2  WAS BEHIND THE ATTACK.

3      BUT I DON'T -- I DON'T REMEMBER EXACTLY WHEN.

4  Q.   THROUGH YOUR WORK ON THE INVESTIGATION, DID YOU DEVELOP AN

5  UNDERSTANDING OF HOW NSO'S EXPLOIT WORKED?

6  A.   YES, I DEVELOPED A GOOD UNDERSTANDING OF HOW THE EXPLOIT

7  WORKED.

8  Q.   AND WHAT WAS THAT UNDERSTANDING?

9  A.   SHOULD I EXPLAIN HOW THE --

10 Q.   IF YOU COULD.

11 A.   SURE.

12     SO JUST AS A DISCLAIMER, THIS IS A VERY SOPHISTICATED,

13 SOPHISTICATED ATTACK AND EXPLOIT.

14     IT ALL STARTED WITH THE VIDEO CALL.  SO THEY WERE USING A

15 FAKE CLIENT, AND THE FAKE CLIENT WOULD START THE VIDEO CALL

16 WITH THE DEVICE OF THE VICTIM.

17     AND IN THE FIRST STEP OF THE ATTACK, IT WOULD INJECT SOME

18 MALICIOUS CODE IN THE MEMORY OF THE VICTIM'S APPLICATION, THE

19 WHATSAPP APPLICATION.

20     AND THERE ARE SEVERAL STEPS THAT FOLLOWED THAT THAT

21 ESSENTIALLY THEY USED TO EXECUTE THAT MALICIOUS CODE THAT THEY

22 INJECTED IN THE FIRST STEP.

23     AND THEY USED MANY MECHANISMS, MECHANISMS TO ACHIEVE THAT.

24 IT'S A VERY HARD THING TO DO.

25     FOR INSTANCE, THE FIRST THING THAT THEY WERE DOING, THAT

UNITED STATES COURT REPORTERS

**402**

1  THE ATTACKER WAS DOING WAS TO LEARN THE LAYOUT OF THE MEMORY OF

2  THE WHATSAPP APPLICATION, WHICH MAY SOUND SIMPLE, BUT IT'S

3  ACTUALLY EXTREMELY COMPLICATED.  THEY BYPASSED SYSTEM LEVEL

4  PROTECTIONS THAT THE APPLICATION HAD FROM THE ANDROID OPERATING

5  SYSTEM, AND JUST THAT ON ITS OWN IS A VERY HARD THING TO DO.

6  IT'S NOT SOMETHING YOU WOULD NORMALLY SEE.  IT'S A VERY, VERY

7  HARD TASK.

8      AND AFTER THEY LEARNED, LIKE, THE LAYOUT OF THE MEMORY OF

9  THE APPLICATION, THEY STARTED MODIFYING THE INSTRUCTIONS IN THE

10 PROGRAM OF THE APPLICATION, SO THEY STARTED DOING MODIFICATIONS

11 TO THE APPLICATION ITSELF, THE LOGIC IN THE APPLICATION.

12     AND THE WAY THEY DID THAT IS VERY CREATIVE.  SO THE VIDEO

13 CALL WAS ELEVATED TO A GROUP CALL ACTUALLY THROUGHOUT THIS

14 PROCESS, SO IT WAS A SECOND ATTACKER THAT WAS BEING ADDED TO

15 THE GROUP CALL.  AND THEY USED THAT AS A WAY TO ESSENTIALLY

16 CHANGE THE MEMORY INSIDE OF THE APPLICATION.

17     AND THEN THEY FOUND A WAY TO EXECUTE, TO EXECUTE THE

18 MALICIOUS CODE BY RELYING ON A SYSTEM CALL FROM A DATABASE

19 SOFTWARE THAT WE WERE USING INSIDE THE WHATSAPP APPLICATION

20 CALLED SQLITE.

21     SO THEY USED A SYSTEM THAT WAS AVAILABLE INSIDE SQLITE, IT

22 WAS COMPLETELY UNRELATED, AND WE WERE USING SQLITE FOR STORAGE

23 MESSAGES INTERNALLY IN THE APP, SO THEY USED THAT AS A WAY TO

24 EXCLUDE THE CODE.

25     AND THE WAY THEY HIJACKED THE EXECUTION WAS BY TERMINATING

UNITED STATES COURT REPORTERS

**403**

1  THE CALL.  SO THE LAST STEP OF THE ATTACK WAS THE CALL WILL BE

2  TERMINATED SUDDENLY.

3      THE WHOLE ATTACK PROBABLY TOOK, LIKE, MAYBE FIVE -- THREE

4  TO FIVE SECONDS.  I THINK ALL OF THIS WAS HAPPENING IN A FEW

5  SECONDS.

6      AND THE LAST STEP WAS, AGAIN, TERMINATING THE CALL.  SO

7  THE ATTACKER WOULD TERMINATE THE CALL, AND AFTER ALL THE MEMORY

8  HAS BEEN MODIFIED SO THAT WHEN THE, WHEN THE CALL FINISHED,

9  THEY HAD THE CLEAN-UP ROUTINE.

10     SO WHENEVER WE FINISH A CALL, WE DO SOME CLEAN UP AFTER

11 EVERYTHING FINISHES.  AND INSTEAD OF THAT CLEAN UP, THEY

12 ACTUALLY MANAGED TO RUN THEIR OWN CODE.

13     SO AT THAT POINT, WE KIND OF LOST THE EXECUTION OF THE

14 APP, AND THEY KIND OF TOOK OVER AT THAT POINT.

15 Q.   WHAT ROLE DID WHATSAPP'S SIGNALLING SERVERS PLAY IN THE

16 ATTACK?

17 A.   SO THE SIGNALLING SERVER WAS BASICALLY TRICKED TO PASS

18 THIS MALICIOUS CODE TO THE WHATSAPP APPLICATION.  SO IT WAS, IT

19 WAS USED TO INJECT THE MALICIOUS CODE IN THE APP'S MEMORY.

20     LIKE, THE -- THE WHATSAPP APPLICATION OF THE VICTIM

21 TRUSTED THE SERVER, LIKE, WE DESIGNED WHATSAPP WITH THE FACT

22 THAT WE TRUST THE SERVER.

23     SO IT WAS TAKING THIS MESSAGE THAT WOULD NORMALLY BE

24 PROVIDED ONLY BY THE SERVER AND WOULD KEEP IT INSIDE THE

25 MEMORY.

UNITED STATES COURT REPORTERS

**404**

1  Q.   AND WHAT ROLE, IF ANY, DID THE WHATSAPP RELAY SERVERS PLAY

2  IN THE ATTACK?

3  A.   SO THE WHATSAPP RELAY SERVER WAS USED IN ALL THE STEPS

4  REQUIRED TO TAKE OVER THE EXECUTION.  SO THEY WERE USING THE

5  WHATSAPP RELAY SERVER TO LEARN ABOUT THE MEMORY AND TO DO ALL

6  THAT MEMORY MANIPULATION INSIDE THE WHATSAPP APPLICATION.

7  Q.   LAST QUESTION, MR. GHEORGHE.  HOW WOULD YOU ASSESS THE

8  SOPHISTICATION OF NSO'S ATTACK?

9  A.   I THINK IT'S HIGHLY SOPHISTICATED.  IT'S SOMETHING THAT

10 I'VE NEVER -- IT'S THE MOST SOPHISTICATED ATTACK THAT I'D KNOWN

11 OF AT THAT TIME.  WE CONSIDERED IT STATE OF THE ART.  IT WAS

12 HIGHLY SOPHISTICATED.  IT TOOK US A REALLY LONG TIME TO, TO

13 DECIPHER AND LEARN HOW IT WORKED.

14     WE THOUGHT INITIALLY THAT IT WAS GOING TO TAKE 45, 48

15 HOURS.  THAT WAS OUR GOAL, FIND HOW IT WORKS IN 24 HOURS, HAVE

16 ANOTHER 24 HOURS TO REMEDIATE, AND BE DONE WITH IT.

17     BUT WE JUST COULDN'T DO IT.  LIKE, WE HAD FOUR CLASS

18 SECURITY EXPERTS WORKING ESSENTIALLY NON-STOP TO FIND THIS, AND

19 THAT'S WHY WE INVOLVED PEOPLE IN LONDON AND MENLO PARK, BECAUSE

20 WE WEREN'T MAKING ENOUGH PROGRESS.  SO IT WAS VERY

21 SOPHISTICATED.

22     MR. PEREZ:  OKAY.  NO MORE QUESTIONS AT THIS TIME,

23 YOUR HONOR.

24     THE COURT:  ALL RIGHT.  THANK YOU.

25 ARE YOU READY TO START YOUR CROSS?

UNITED STATES COURT REPORTERS

405

1    MR. AKROTIRIANAKIS:  I CAN BE, YOUR HONOR.
2    THE COURT:  OKAY.  WOULD YOU RATHER WE TAKE OUR 15
3  MINUTE BREAK BEFORE YOU START?
4    MR. AKROTIRIANAKIS:  THAT'S FINE.
5    THE COURT:  OKAY.  ALL RIGHT.
6    LADIES AND GENTLEMEN, WE'LL TAKE OUR SECOND 15 MINUTE
7  BREAK OF THE MORNING.
8    WE'LL BE BACK AT 12:05.
9    THE CLERK:  ALL RISE FOR THE JURY.
10   (JURY OUT AT 11:49 A.M.)
11   THE COURT:  ALL RIGHT.  MR. GHEORGHE, YOU CAN STEP
12  DOWN.
13   YES, COUNSEL?
14   MR. ANDRES:  JUST THAT THE WITNESS -- BEFORE THEIR
15  CROSS-EXAMINATION STARTS, AMONG THE OTHER THINGS THAT
16  MR. AKROTIRIANAKIS MENTIONED IN HIS OPENING WAS SOME NOTION
17  THAT META WAS STEALING THE INTELLECTUAL PROPERTY OF NSO.
18   THAT'S COMPLETELY INAPPROPRIATE IN THIS TRIAL.  THIS IS
19  NOT -- THERE'S BEEN NO EVIDENCE ABOUT THAT.  THEY'RE MERE
20  ALLEGATIONS THAT HE WANTS TO PUT IN FRONT OF THE JURY, AND IT'S
21  NOT APPROPRIATE.
22   THE COURT:  MR. AKROTIRIANAKIS, IS THERE -- IS THERE
23  EVIDENCE IN THE RECORD?
24   MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I SHOWED SOME
25  OF IT TO THE JURY.  THIS IS WHAT WE WERE DOING BETWEEN MAY 6TH

UNITED STATES COURT REPORTERS

406

1  AND MAY 13TH, THE TIME THAT THEY ARE CLAIMING DAMAGES FOR.
2    AND I WOULD ADD, I THINK I UNDERSTAND THE COURT'S RULINGS
3  IN TERMS OF SUSTAINING HIS OBJECTIONS AND THE POWERPOINT THAT I
4  SHOWED IN OPENING, YOUR HONOR.
5    THEY -- THIS IS THEIR EXHIBIT BOOK UNREDACTED.  THEY GAVE
6  US -- THEY SAID THESE ARE GOING TO BE THE EXHIBITS.
7    AND NOW THEY'RE UPSET WITH ME AND TRYING TO GET ME IN
8  TROUBLE WITH YOU --
9    THE COURT:  HOLD ON.  WE HAVE TWO SEPARATE ISSUES.
10  FIRST ISSUE, THE THEFT, IS THERE EVIDENCE IN THE RECORD?
11   MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
12   THE COURT:  IF SO, WHERE IS IT?
13   MR. AKROTIRIANAKIS:  IT'S IN SOME OF THE EXHIBITS
14  THAT I SHOWED DURING THE OPENING.  THERE ARE OTHERS.
15   THIS GENTLEMAN -- THIS GENTLEMAN WAS SPEAKING WITH
16  MR. ROBINSON ABOUT SOME OF THOSE EFFORTS.  MR. ROBINSON WAS
17  SPEAKING WITH OTHERS ABOUT WHAT THEY WERE DOING DURING THE TIME
18  THAT THEY'RE SAYING, FULL TIME, THESE PEOPLE WERE WORKING ON
19  THIS REMEDIATION PROJECT.
20   MR. ANDRES:  THAT'S MR. AKROTIRIANAKIS TESTIFYING
21  ABOUT HOW HE -- THERE ISN'T ANY EVIDENCE, NO ONE HAS EVER BEEN
22  ASKED ANY OF THOSE QUESTIONS, EVER.
23   THE COURT:  IF THERE'S SOMETHING -- IF THERE'S
24  SOMETHING IN THE RECORD FROM WHICH HE CAN MAKE THAT ARGUMENT,
25  THEN IT'S APPROPRIATE.

UNITED STATES COURT REPORTERS

407

1  I NEED TO SEE IT, THOUGH.
2    MR. AKROTIRIANAKIS:  I URGE YOU TO SEE IT,
3  YOUR HONOR.
4    THE COURT:  WELL, JUST TELL ME WHERE IT IS.
5    MR. AKROTIRIANAKIS:  WELL, I CAN PROVIDE THE COURT
6  THE EXHIBIT NUMBERS.
7    DO YOU HAVE THEM?  PLEASE WRITE THEM DOWN.
8    WE PROVIDED THEM IN -- WE PROVIDED, AT THE COURT'S
9  DIRECTION, WE HAD ALREADY AGREED TO IT ANYWAY, THE EXHIBIT
10  NUMBERS THAT WE INTENDED TO SHOW IN OPENING.  THEY ARE IN THOSE
11  EXHIBITS.
12   THE COURT:  OKAY.  I DON'T HAVE THEM.
13   MR. ANDRES:  YOUR HONOR --
14   THE COURT:  I REFER -- TELL ME WHERE THEY ARE IN THE
15  RECORD, OR GIVE ME A COPY OF THEM SO THAT I CAN --
16   MR. AKROTIRIANAKIS:  I WILL, YOUR HONOR.  I WILL.
17   THE COURT:  OKAY.  YOU MAY NOT ASK ANY QUESTIONS
18  ABOUT THAT UNTIL I LOOK AT THE DOCUMENT WHICH YOU SAY GIVE RISE
19  TO YOUR ABILITY --
20   MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
21   THE COURT:  -- TO PURSUE THAT.
22   MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
23   MR. ANDRES:  AND JUST BECAUSE HE HAS SOME THEORY
24  DOESN'T MAKE IT RELEVANT.  IT COULD BE PREJUDICIAL.
25   THE COURT:  IT COULD BE, BUT I NEED TO SEE IT FIRST.

UNITED STATES COURT REPORTERS

408

1    MR. ANDRES:  FAIR ENOUGH.
2    THE COURT:  EVERYTHING IS SO THEORETICAL IN THIS
3  CASE.  I DON'T HAVE --
4    MR. ANDRES:  IT'S NOT THEORETICAL FROM OUR SIDE,
5  YOUR HONOR.
6    THE COURT:  I UNDERSTAND YOUR OBJECTION.  BUT I --
7  BEFORE I THINK RULE ON IT, I NEED TO SEE IT.
8    MR. ANDRES:  THANK YOU.
9    MR. AKROTIRIANAKIS:  YOUR HONOR, THE TWO DOCUMENTS
10  THAT THEY JUST MOVED INTO EVIDENCE CONTAIN EXACTLY THE SAME
11  THING THAT YOU WERE SUSTAINING MY OBJECTIONS TO IN MR. WOOG'S
12  TESTIMONY.
13   THE COURT:  I KNOW, I NOTICED IT, TOO.  THE VERY
14  FIRST EXHIBIT THAT YOU PUT ON, MR. PEREZ --
15   MR. AKROTIRIANAKIS:  AND THE SECOND.
16   THE COURT:  -- USED THE WORD "VULNERABILITIES."
17  HIS -- MR. GHEORGHE'S TESTIMONY, OVER AND OVER AGAIN, USED THE
18  WORD, THE EXPLOITING OF THE VULNERABILITY WHICH, INDEED, WAS
19  THE SUBJECT OF A MOTION IN LIMINE.
20   MR. PEREZ:  YOUR HONOR, THE TERM "VULNERABILITY" IS A
21  TERM OF ART, WHICH IF MR. AKROTIRIANAKIS WANTS TO EXPLORE ON
22  CROSS-EXAMINATION, MR. GHEORGHE CAN EASILY EXPLAIN.
23   THE PROBLEM WITH THE EXHIBIT THAT THEY USED ON OPENING IS
24  THAT THEY HAVE SUGGESTED THAT THIS IS CRITICAL OF THE
25  SUFFICIENCY OF WHATSAPP'S SECURITY EFFORTS, AND IN PARTICULAR

UNITED STATES COURT REPORTERS

517

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                       OAKLAND DIVISION

 4

 5   WHATSAPP LLC AND META        )  C-19-07123 PJH
     PLATFORMS, INC.,             )
 6                                )  OAKLAND, CALIFORNIA
                PLAINTIFFS,       )
 7                                )  APRIL 30, 2025
             VS.                  )
 8                                )  VOLUME 3
     NSO GROUP TECHNOLOGIES LIMITED )
 9   AND Q CYBER TECHNOLOGIES     )  PAGES 517-635
     LIMITED,                     )
10                                )
                DEFENDANTS.       )
11   _____)

12

13             TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14           UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                       BY:  GREG D. ANDRES
18                            ANTONIO J. PEREZ
                         450 LEXINGTON AVENUE
19                       NEW YORK, NEW YORK  10017

20                       BY:  MICAH G. BLOCK
                         900 MIDDLEFIELD ROAD, SUITE 200
21                       REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25           TRANSCRIPT PRODUCED WITH COMPUTER


                   UNITED STATES COURT REPORTERS
```

---

518

```
 1

 2   APPEARANCES (CONTINUED)

 3

 4   FOR THE DEFENDANTS:    KING & SPALDING
                       BY:  JOSEPH N. AKROTIRIANAKIS
 5                            AARON S. CRAIG
                         633 WEST FIFTH STREET, SUITE 1600
 6                       LOS ANGELES, CALIFORNIA  90071

 7                       BY:  MATTHEW V. NOLLER
                         50 CALIFORNIA STREET, SUITE 3300
 8                       SAN FRANCISCO, CALIFORNIA  94111

 9

10   ALSO PRESENT:       CURT EVANS
                         BRIAN BAKALE

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                   UNITED STATES COURT REPORTERS
```

---

519

```
 1

 2                  INDEX OF WITNESSES

 3   PLAINTIFFS'

 4   CLAUDIU GHEORGHE
         CROSS-EXAM BY MR. AKROTIRIANAKIS (RES.)   P. 531
 5       REDIRECT EXAM BY MR. PEREZ               P. 550
         RECROSS-EXAM BY MR. AKROTIRIANAKIS       P. 561
 6

 7   TAMIR GAZNELI
         VIDEOTAPED DEPOSITION PLAYED             P. 565
 8

 9   YARON SHOHAT
         VIDEOTAPED DEPOSITION PLAYED             P. 568
10

11   RAMON ESHKAR
         VIDEOTAPED DEPOSITION PLAYED             P. 570
12

13   ANDREW ROBINSON
         DIRECT EXAM BY MR. BLOCK                 P. 572
14       CROSS-EXAM BY MR. AKROTIRIANAKIS         P. 589
         REDIRECT EXAM BY MR. BLOCK               P. 619
15
16
17
18
19
20
21
22
23
24
25
                   UNITED STATES COURT REPORTERS
```

---

520

```
 1

 2                  INDEX OF EXHIBITS

 3                       MARKED      ADMITTED

 4   PLAINTIFFS'

 5   44, 59, 60, 62, 64,                568
     66, 34, AND 65
 6   36                     569
     932                    575
 7   930                    577

 8
     DEFENDANTS'
 9
     1156                   536
10   1131                   543
     1204                   606
11   1511                   615

12
13
14
15
16
17
18
19
20
21
22
23
24
25
                   UNITED STATES COURT REPORTERS
```

577

1    A.    SO THIS IS THE PRESENTATION THAT I PUT TOGETHER TALKING

2    ABOUT THE ATTACKS AS WE SAW THEM.

3         MR. BLOCK:  YOUR HONOR, PLAINTIFFS OFFER TRIAL

4    EXHIBIT 930 INTO EVIDENCE AND REQUEST PERMISSION TO PUBLISH IT.

5         THE COURT:  ANY OBJECTION?

6         MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT,

7    YOUR HONOR?

8         (PAUSE IN PROCEEDINGS.)

9         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.  THANK YOU.

10        THE COURT:  ALL RIGHT.  ADMITTED.

11        (PLAINTIFFS' EXHIBIT 930 WAS ADMITTED IN EVIDENCE.)

12        MR. BLOCK:  MR. EVANS, CAN WE PLEASE HAVE TRIAL

13   EXHIBIT 930 ON SCREEN, AND LET'S GO TO 930.6.

14   Q.    MR. ROBINSON, WOULD YOU PLEASE EXPLAIN TO THE JURY WHAT

15   YOU DEPICTED ON THIS SLIDE?

16   A.    SO THIS IS AN EXAMPLE OF WHAT WAS AT THE OTHER END OF THE

17   LINK THAT BRENDAN TISZKA PROVIDED TO ME.

18   Q.    AND WHAT DO YOU SEE?

19   A.    SO THIS IS -- THESE ARE ALL OF THE -- THESE ARE A BUNCH OF

20   LINUX COMMANDS DESIGNED TO RUN ON ANDROID OPERATING SYSTEMS,

21   WHICH IS A MOBILE PHONE OPERATING SYSTEM, AS WELL AS THE ELF

22   FILE ENCODED WITHIN THIS.

23   Q.    OKAY.  YOU SAID EXAMPLE.  WHY DID YOU SAY THAT?

24   A.    THIS WAS ONE OF MANY THAT WE FOUND, WE FOUND A LARGE

25   NUMBER OF THESE, AND THIS IS JUST AN EXAMPLE OF IT.

578

1    Q.    DO YOU KNOW WHERE IN WHATSAPP'S INFRASTRUCTURE THIS CODE

2    WAS DISCOVERED?

3    A.    SO THIS WAS FOUND BY LOGGING WHAT WE HAD ADDED TO OUR

4    CHATD SERVERS.

5    Q.    DID YOU HAVE A REACTION TO SEEING CODE LIKE THIS ON THE

6    CHATD SERVER LOGS?

7    A.    WELL, THIS SORT OF -- THIS SORT OF CODE DOES NOT BELONG

8    THERE.  IT SHOULD NOT BE POSSIBLE FOR THIS TO HAVE BEEN

9    TRANSMITTED AS A PART OF NORMAL WHATSAPP MESSAGING.

10   Q.    OKAY.  LET'S TAKE AN EXAMPLE.

11        MR. EVANS, CAN YOU FIND THE LINE THAT SAYS STOP SERVICE?

12   I THINK IT'S TOWARDS THE RIGHT.  YOU GOT IT.

13        MR. ROBINSON, WHAT DOES THIS PART OF THE CODE DO?

14   A.    SO THIS PART OF THE CODE IS INTENDED TO TRY AND PREVENT

15   THE NOTIFICATION THAT YOU RECEIVE WHENEVER YOU GET A WHATSAPP

16   CALL FROM ANOTHER WHATSAPP USER.  THIS IS AN ATTEMPT TO STOP

17   THE ABILITY FOR THE PHONE TO SHOW THAT YOU ARE RECEIVING A

18   CALL.

19   Q.    WHAT PURPOSE DOES A COMMAND LIKE THAT SERVE IN A CYBER

20   ATTACK?

21   A.    SO IT'S A WAY FOR SOMEBODY, LIKE NSO GROUP WHO WAS

22   CONDUCTING THE ATTACK, TO HIDE THE FACT THAT THEY ARE USING THE

23   CALLING MECHANISM TO EXPLOIT YOU.

24   Q.    HOW WOULD YOU CHARACTERIZE THE COMPLEXITY OF THESE NSO

25   ATTACKS THAT WHATSAPP DISCOVERED IN MAY OF 2019?

579

1    A.    SO THESE WERE HIGHLY COMPLEX ATTACKS.  THEY NEEDED TWO

2    DIFFERENT VULNERABILITIES THAT WORKED IN TANDEM IN ORDER TO GET

3    ACTUAL EXPLOITATION ON THE USERS' PHONES.

4         SO THE FIRST VULNERABILITY RELIED -- OR NEEDED TO TALK TO

5    THE ACTUAL VULNERABILITY THAT EXISTED ON USERS' PHONES.  AND SO

6    ANY TIME YOU HAVE TO FIND TWO SEPARATE VULNERABILITIES AND MAKE

7    THEM WORK TOGETHER, THAT IS NOT AN EASY TASK.

8         IT REQUIRES A GREAT DEAL OF RESEARCH AND EFFORT.

9         AND ADDITIONALLY, IT WAS MADE MORE COMPLEX BY THE FACT

10   THAT THEY DID NOT HAVE ACCESS, OR SHOULD NOT HAVE HAD ACCESS TO

11   THE SERVER SIDE COMPONENTS THAT HAD A VULNERABILITY ON THEM.

12   SO THEY WOULD HAVE HAD TO HAVE WORKED REALLY HARD TO FIND THAT.

13   Q.    WE'VE HEARD THIS TERM "VULNERABILITY" A NUMBER OF TIMES.

14        WHAT DOES THAT MEAN IN THE SECURITY CONTEXT?

15   A.    SO A VULNERABILITY IS A WAY TO CONVINCE A COMPUTER PROGRAM

16   TO DO SOMETHING THAT IT IS NOT INTENDED TO DO.

17   Q.    DO YOU USE THE WORD "EXPLOIT" IN YOUR WORK?

18   A.    I DO.

19   Q.    DOES THAT WORD RELATE TO VULNERABILITY IN ANY WAY?

20   A.    SURE.  SO YOU WOULD EXPLOIT A VULNERABILITY.  SO THE

21   EXPLOIT IS THE ACT OF DOING SOMETHING WITH THAT VULNERABILITY.

22   Q.    OKAY.  IN YOUR WORK AT META, HOW OFTEN DO YOU SEE AN

23   ATTACK AS SOPHISTICATED AS THIS ONE FROM NSO GROUP?

24   A.    RARELY.  ON THE ORDER OF ABOUT ONCE EVERY FIVE YEARS.

25   Q.    OKAY.  LET'S TALK A LITTLE BIT MORE ABOUT HOW YOU FIGURED

580

1    OUT WHAT WAS GOING ON.

2         WHAT IS A DISASSEMBLER?

3    A.    SO A DISASSEMBLER IS SOMETHING, A PROGRAM THAT YOU CAN

4    TAKE AND YOU CAN LOAD, COMPILE COMPUTER CODE INTO IT, LIKE WHAT

5    IS SHOWN ON THE ELF FILE HERE, AND IT TURNS THOSE UNREADABLE

6    NUMBERS INTO SOMETHING THAT'S MORE READABLE TO A HUMAN SO YOU

7    CAN FIGURE OUT WHAT THAT PROGRAM IS DOING.

8    Q.    WHICH PART IS THE ELF FILE?

9    A.    SO IT'S THE PART THAT STARTS, I THINK IT'S ABOUT SIX LINES

10   DOWN, WITH THE LETTERS 7FELF.

11   Q.    AND WHAT IS AN ELF FILE?

12   A.    SO I THINK IT'S SHORT FOR EXECUTABLE LINKABLE FORMAT.  BUT

13   IT'S AN EXECUTABLE PROGRAM THAT IS DESIGNED TO RUN ON THE LINUX

14   OPERATING SYSTEM.

15   Q.    OKAY.  SO WHEN YOU USED THE DISASSEMBLER WITH THE ELF

16   FILE, WHAT, IF ANYTHING, DID YOU LEARN?

17   A.    SO I LEARNED THAT THIS WAS A -- THIS ELF FILE ITSELF IS

18   RELATIVELY, RELATIVELY SIMPLE.  IT WAS DESIGNED TO JUST REACH

19   OUT TO ANOTHER SERVER AND RETRIEVE ANOTHER EXECUTABLE PAYLOAD

20   AND RUN IT ON THE DEVICES THAT HAD BEEN INFECTED.

21   Q.    OKAY.  AFTER YOU UNDERSTAND -- UNDERSTOOD WHAT THAT

22   EXECUTABLE FILE WAS INTENDED TO DO, WHAT DID YOU DO NEXT?

23   A.    SO AFTER I FIGURED OUT WHAT THIS ONE WAS, WE -- SINCE WE

24   HAD MANY OTHER EXAMPLES OF IT AND THEY WERE ALL VERY SLIGHTLY

25   DIFFERENT, I WROTE A SCRIPT THAT WOULD GO THROUGH AND PROCESS

636

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   WHATSAPP LLC AND META      )  C-19-07123 PJH
     PLATFORMS, INC.,           )
 6                              )  OAKLAND, CALIFORNIA
                 PLAINTIFFS,    )
 7                              )  MAY 1, 2025
             VS.                )
 8                              )  VOLUME 4
     NSO GROUP TECHNOLOGIES LIMITED )
 9   AND Q CYBER TECHNOLOGIES   )  PAGES 636-847
     LIMITED,                   )
10                              )
                 DEFENDANTS.    )
11   _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14            UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER


              UNITED STATES COURT REPORTERS
```

637

```
 1

 2   APPEARANCES (CONTINUED)

 3

 4   FOR THE DEFENDANTS:   KING & SPALDING
                  BY:  JOSEPH N. AKROTIRIANAKIS
 5                       AARON S. CRAIG
                    633 WEST FIFTH STREET, SUITE 1600
 6                  LOS ANGELES, CALIFORNIA  90071

 7                  BY:  MATTHEW V. NOLLER
                    50 CALIFORNIA STREET, SUITE 3300
 8                  SAN FRANCISCO, CALIFORNIA  94111

 9

10   ALSO PRESENT:     CURT EVANS
                       BRIAN BAKALE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              UNITED STATES COURT REPORTERS
```

638

```
 1

 2              INDEX OF WITNESSES

 3   PLAINTIFFS'

 4   ANDREW ROBINSON
        REDIRECT EXAM BY MR. BLOCK (RES.)      P. 647
 5      RECROSS-EXAM BY MR. AKROTIRIANAKIS       P. 656

 6

     SARIT BIZINSKY GIL
 7      VIDEOTAPED DEPOSITION                  P. 664

 8

     DANA TREXLER
 9      DIRECT EXAM BY MR. BLOCK              P. 668
        CROSS-EXAM BY MR. AKROTIRIANAKIS      P. 709
10      REDIRECT EXAM BY MR. BLOCK            P. 747
        RECROSS-EXAM BY MR. AKROTIRIANAKIS     P. 751

11

12

13   DEFENDANTS'

14   YARON SHOHAT
        DIRECT EXAM BY MR. AKROTIRIANAKIS      P. 752
15      CROSS-EXAM BY MR. ANDRES             P. 809
16
17
18
19
20
21
22
23
24
25

              UNITED STATES COURT REPORTERS
```

639

```
 1

 2              INDEX OF EXHIBITS

 3                    MARKED      ADMITTED

 4   PLAINTIFFS'

 5
     1779, 1780, 1781, AND 1782            665
 6   287, 288, 289, 290, 291, 292,         684
       293, 295, 296, 297, 299,
 7       300, 301, 302, 303, 304,
         307, 310, 312, 314, 324
 8   288                      681
     322                      685
 9   323                      690
     319 (PROVISIONALLY)               697
10   320                      700
     321                      708
11   308                      708

12

13

14

15

16

17

18

19

20

21
22
23
24
25

              UNITED STATES COURT REPORTERS
```

800

1    Q.    OKAY.  AND IT'S SET UP IN THE SAME WAY AND ALL OF THAT;

2    RIGHT?

3    A.    YEAH.

4    Q.    SO LET'S JUST GO DOWN, I GUESS, TO NET INCOME, PLEASE.

5    THANK YOU.

6          AND IF YOU COULD HIGHLIGHT THAT LINE.

7          THIS IS THE -- THIS SHOWS THE NET INCOME RESPECTIVELY IN

8    THE YEAR-ENDING 12/2023 AND THE YEAR PENDING 12/2024; IS THAT

9    RIGHT, MR. SHOHAT?

10   A.    THIS IS CORRECT.

11   Q.    OKAY.  AND IT LOOKS TO SHOW A LOSS IN 2024 OF $359,000?

12   A.    CORRECT.

13   Q.    AND IN 2023?

14   A.    WE HAD A MODEST PROFIT OF $313,000.

15   Q.    ALL RIGHT.  NOW, WOULD YOU TURN, PLEASE, TO EXHIBIT 1779

16   AND 1780 ALSO IN EVIDENCE.

17         NOW, AT THE TOP OF THESE DOCUMENTS IT SAYS BALANCE --

18   THESE DOCUMENTS.

19         ON THE SCREEN IS EXHIBIT 1779.  BEFORE YOU, MR. SHOHAT, IS

20   EXHIBIT 1779 AND 1780.

21         DO YOU HAVE THOSE?

22   A.    YES, I DO.

23   Q.    OKAY.  AND THE ONE ON THE SCREEN ON THE TOP SAYS BALANCE

24   12/2023 VERSUS 12/2024, WHAT'S CALLED A YEAR-OVER-YEAR BALANCE

25   SHEET; IS THAT RIGHT?

UNITED STATES COURT REPORTERS

801

1    A.    YES, CORRECT.

2    Q.    OKAY.  NOW, COULD YOU PLEASE TELL THE JURY WHAT, WHAT IS

3    SHOWN ON THE BALANCE SHEET GENERALLY?

4    A.    YEAH.  SO BALANCE SHEET IS BASICALLY A SNAPSHOT IN TIME OF

5    THE ASSETS AND LIABILITIES OF A GIVEN COMPANY.

6          THE WAY IT WORKS IS THAT ASSETS ALWAYS EQUAL THE

7    LIABILITIES, THAT'S WHY IT'S CALLED A BALANCE SHEET.

8          AND WHAT WE CAN SEE HERE, THE TOP PART, IS THAT ASSETS OF

9    THE COMPANY, AND BELOW THAT WOULD BE THE LIABILITIES, AGAIN,

10   THE TOTAL OF THE ASSETS ALWAYS EQUAL TO THE TOTAL OF THE

11   LIABILITIES.

12   Q.    OKAY.  AND WHERE IN THE BALANCE SHEET IS THE INFORMATION

13   ABOUT NSO'S ASSETS FOUND?

14   A.    SO AS I MENTIONED, THE TOP PART.

15   Q.    SO ENDING WITH THE LINE THAT SAYS TOTAL ASSETS?

16   A.    EXACTLY.

17   Q.    OKAY.  SO -- OKAY.

18         AND WHAT IS INCLUDED IN THE CATEGORY OF ASSETS?

19   A.    SO ASSETS ARE DIVIDED INTO TWO CATEGORIES.  THE FIRST ONE

20   IS CALLED CURRENT ASSETS AND NON-CURRENT ASSETS.

21         EXCUSE MY ACCENT.

22   Q.    THAT'S OKAY.

23   A.    CURRENT ASSETS ARE ASSETS THAT CAN BE EASILY CONVERTED

24   INTO CASH IN THE NEXT YEAR.  NON-CURRENT ASSETS CANNOT BE

25   CONVERTED TO CASH IN THE NEXT YEAR.

UNITED STATES COURT REPORTERS

802

1    Q.    OKAY.  AND THE FIRST, THE FIRST LINE, OR THE FIRST ROW, I

2    SHOULD SAY, WITHIN CURRENT ASSETS IS CASH?

3    A.    CORRECT.  THAT'S BASICALLY HOW MUCH CASH WE HAD IN THE

4    BANK ACCOUNT IN THE RESPECTIVE DATE, MEANING END OF '23 AND END

5    OF '24.

6    Q.    AND HOW MUCH CASH DID NSO HAVE ON HAND AT THE END OF '23

7    AND '24?

8    A.    SO END OF '23, WE HAD $8.8 MILLION IN THE BANK, AND AT THE

9    END OF '24, WE HAD $5.119 MILLION.

10   Q.    AND WHAT DOES THAT CASH GO TO PAY FOR?

11   A.    THIS CASH PAYS OUR ONGOING EXPENSES.  ACTUALLY, THE -- ON

12   THE MONTHLY BASIS, WE SPEND OVER -- IF WE TAKE NSO AND Q CYBER

13   TOGETHER, WE SPEND OVER $10 MILLION.

14         SO THAT WOULD BE LESS THAN WHAT WE SPEND IN ONE MONTH FOR

15   SALARIES AND OTHER EXPENSES.

16   Q.    THE -- ON THE TOPIC OF SALARIES, HOW MANY PEOPLE WORK FOR

17   NSO AND Q CYBER COLLECTIVELY?

18   A.    SO COLLECTIVELY, IT'S SOMEWHERE BETWEEN 350 AND 380

19   PEOPLE, WHERE Q HAS ABOUT 50, AND THE REST IS NSO.

20   Q.    THE NEXT LINE IS TRADE ACCOUNTS RECEIVABLE.

21         WHAT DOES THAT MEAN?

22   A.    OKAY.  THAT'S AN INTERESTING ONE.

23         THERE'S SOMETHING INTERESTING ABOUT BALANCE SHEET, BECAUSE

24   IT REFLECTS ACCOUNTING WORLD, WHICH IS VERY DIFFERENT FROM THE

25   REAL WORLD.

UNITED STATES COURT REPORTERS

803

1          WHAT WE SEE IS BASICALLY THIS NUMBER REPRESENTS MONEY OWED

2    TO THE COMPANY, IN THIS CASE NSO, AND IN THIS CASE THIS MONEY,

3    THIS LARGE AMOUNT OF 158 MILLION DOLLARS AND 24 IS MONEY OWED

4    TO IT FROM OTHER AFFILIATE COMPANIES IN THE LARGER ORGANIZATION

5    STRUCTURE OF THE GROUP.

6          SO THERE ARE OTHER COMPANIES IN THIS ORGANIZATIONAL

7    STRUCTURE WHO HAVE DEBT TO NSO IN THAT AMOUNT, OR CLOSE TO THAT

8    AMOUNT.

9    Q.    AND WHAT, IF ANY, EXPECTATIONS DOES NSO HAVE WITH RESPECT

10   TO WHETHER OR WHEN NSO WOULD EVER RECEIVE SOME OR ALL OF THAT

11   MONEY?

12   A.    WE -- I DON'T -- WE DON'T EXPECT TO RECEIVE ANY OF THAT

13   MONEY, AND THAT'S WHY I MADE THE COMMENT ABOUT THE ACCOUNTING

14   WORLD AND THE REAL WORLD.

15         THE FACT IS THAT THE COMPANY, THE COMPANIES THAT OWE US

16   THAT MONEY DON'T HAVE ANY MEANS TO PAY, AND, IN FACT, HAVE

17   OTHER COMMITMENTS WHICH TAKE PRIORITY EVEN ON WHAT THEY OWE US.

18         SO WE WILL NOT SEE THAT MONEY AND DON'T EXPECT TO SEE IT

19   ANY TIME.

20         ACTUALLY, I EXPECT THAT AT SOME POINT IN TIME, OUR

21   ACCOUNTING TEAM, ACCOUNTING CONSULTANT WILL TELL US TO WIPE IT

22   OFF FROM THE BALANCE SHEET.

23   Q.    WHEN YOU REFER TO COMMITMENTS, YOU'RE TALKING ABOUT LENDER

24   COMMITMENTS?

25   A.    YES.

UNITED STATES COURT REPORTERS

804

1  Q.    AND THOSE ARE MADE BY OTHER COMPANIES IN THE CHAIN?

2  A.    OTHER COMPANIES IN THE CHAIN THAT OWE VERY LARGE DEBT TO

3  BANKS, BASICALLY, TO LENDERS, MUCH LARGER THAN THE AMOUNT WE

4  SEE HERE.

5        AND THAT DEBT IS SECURED, MEANING THEY FIRST NEED TO PAY

6  THE SECURED DEBT BEFORE THEY'LL BE ABLE TO PAY, TO PAY US.  AND

7  THEY DON'T HAVE ANY MEANS TO PAY, NOT TO THE FINANCIAL

8  INSTITUTION, AND DEFINITELY NOT TO US.

9  Q.    SO WOULD THAT $158 MILLION IN TRADE ACCOUNTS RECEIVABLE,

10  WOULD THAT BE AN ASSET THAT NSO COULD USE FOR ANY PURPOSE?

11  A.    NO.  IT'S LIKE PAPER MONEY.

12  Q.    THE NEXT ASSET IS INVENTORIES.  WHAT IS INVENTORIES?

13  A.    SO INVENTORIES IS TYPICALLY HARDWARE THAT WE BOUGHT BUT

14  DID NOT SELL YET.  SO THEY SIT IN OUR INVENTORY IN OUR

15  WAREHOUSE.

16  Q.    THE NEXT ASSET IS ACCOUNTS RECEIVABLE.

17        WHAT IS ACCOUNT RECEIVABLE AS USED HERE IN THE OTHER

18  ACCOUNTS RECEIVABLE LINE?

19  A.    SO THAT, THAT WOULD BE OTHER COMMITMENTS TO THE COMPANY.

20  IT MIGHT BE OTHER DEBT WE HAVE FROM OTHER COMPANIES IN THE

21  STRUCTURE, OR FROM CUSTOMERS THAT ARE SUPPOSED TO PAY US.

22  Q.    OKAY.  SO IS THAT OTHER ACCOUNTS RECEIVABLE MONEY THAT

23  YOU, NSO AND Q CYBER, EXPECT TO RECEIVE?

24  A.    I THINK PART OF IT WE DO.  AS I MENTIONED, WE SPEND OVER

25  10 MILLION A MONTH, SO WE DO EXPECT TO GET SOME MONEY FROM

805

1  CUSTOMERS TO BE ABLE TO PAY THAT.

2  Q.    THE NEXT SORT OF BLOCK HERE IS TOTAL NON-CURRENT ASSETS?

3  A.    YES.

4  Q.    WHAT ARE NON-CURRENT ASSETS?

5  A.    SO AS I MENTIONED, NON-CURRENT ASSETS ARE ASSETS THAT WILL

6  NOT BE ABLE TO CONVERT TO CASH.

7  Q.    AND JUST IN SUMMARY, ARE THOSE ASSETS THAT ARE AVAILABLE

8  TO NSO TO USE FOR ANY PURPOSE?

9  A.    NO.

10  Q.    AND DIRECTING YOU TO THE BOTTOM PART OF THE PAGE,

11  THERE'S -- THE LAST LINE SAYS TOTAL LIABILITIES.

12        DO YOU SEE THAT?

13  A.    YES.

14  Q.    AND DOES EXHIBIT 1779, THE BOTTOM LINE, REFLECT THE TOTAL

15  LIABILITIES THAT THE COMPANY HAD AS OF THE END OF 2023 AND

16  2024?

17  A.    THAT'S CORRECT.

18        AND AS I MENTIONED, THIS IS EQUAL TO THE ASSETS ON THE

19  BALANCE SHEET.

20  Q.    OKAY.  PLEASE TURN TO EXHIBIT 1780.

21  A.    YES.

22  Q.    IS THIS THE BALANCE SHEET FOR Q CYBER ISRAEL?

23  A.    CORRECT.

24  Q.    OKAY.  AND WOULD WE READ IT -- I GET THAT THE NUMBERS ARE

25  DIFFERENT, BUT WOULD WE READ THE DOCUMENT THE SAME WAY AS THE

806

1  DOCUMENT YOU JUST WALKED US THROUGH?

2  A.    YES.

3        MR. ANDRES:  APOLOGIES, YOUR HONOR.  I'M SORRY.  WHAT

4  EXHIBIT NUMBER IS THIS?

5        MR. AKROTIRIANAKIS:  I'M SORRY IF I DIDN'T SAY THIS.

6  IT'S 1780.

7        MR. ANDRES:  THANK YOU.

8        MR. AKROTIRIANAKIS:  IT'S THE Q CYBER BALANCE SHEET.

9  Q.    OKAY.  WHAT WERE Q CYBER'S CASH AT THE END OF -- EXCUSE

10  ME.  WHAT WAS Q CYBER'S CASH AT THE END OF 2023 AND 2024?

11  A.    END OF 2023, WE HAD $3.2 MILLION IN THE BANK ACCOUNT.

12        END OF '24, A LITTLE BIT LESS.

13  Q.    OKAY.  AND WOULD THIS MONEY, THIS CASH AVAILABLE, BE

14  COMBINED WITH THE CASH SHOWN ON THE NSO BALANCE SHEET IN TERMS

15  OF YOUR ABILITY TO MEET THAT $10 MILLION OF SALARIES AND SO ON

16  THAT YOU MENTIONED?

17  A.    YES, EXACTLY.

18  Q.    IN ISRAEL, BY THE WAY, WHEN ARE -- WELL, WHEN WOULD BE THE

19  SPECIFIC DATE OF THESE -- OR THE AS OF DATE OF THESE FINANCIAL

20  DOCUMENTS WE'RE LOOKING AT?

21  A.    SO THIS IS THE LAST DAY OF THE YEAR, DECEMBER 31ST.

22  Q.    AND IN ISRAEL, IS -- WHAT'S THE NORMAL COURSE OF PAYROLL?

23  A.    YEAH.  SO IN ISRAEL, WE PAY ALL SALARIES ONCE A MONTH.  I

24  KNOW HERE IT'S TWICE A MONTH.  WE PAY ONCE A MONTH, AND WE PAY,

25  AT LEAST IN OUR COMPANIES, ON THE 9TH OF THE MONTH.

807

1        SO WE -- IN THIS CASE YOU SEE THE CASH ON THE FIRST DAY OF

2  THE YEAR, AND NINE DAYS LATER, ON THE 9TH OF AUGUST -- OF

3  JANUARY, SORRY, JANUARY 9TH, WE WOULD PAY SALARIES.

4  Q.    THE -- AFTER CASH, WE SEE AGAIN TRADE ACCOUNTS RECEIVABLE?

5  A.    CORRECT.

6  Q.    IS THAT THE SAME TYPE OF ASSET THAT YOU DESCRIBED WITH

7  RESPECT TO NSO'S OWN TRADE ACCOUNTS RECEIVABLE?

8  A.    YES, CORRECT.  I THINK I EVEN CHECKED IT LAST NIGHT AND

9  THE $8 MILLION THERE IS A DEBT OF Q CYBER TO NSO, OR THE OTHER

10  WAY.  SO, YEAH.

11  Q.    OKAY.

12  A.    IT'S BETWEEN THE TWO COMPANIES.

13  Q.    AND WOULD THE AMOUNTS THAT WE SEE HERE IN THE TRADE

14  ACCOUNTS RECEIVABLE LINE BE AVAILABLE TO Q CYBER FOR USE FOR

15  ANY PURPOSE?

16  A.    NO.

17  Q.    DIRECTING YOU TO THE VERY LAST LINE OF THE BALANCE SHEET,

18  AND IT READS TOTAL LIABILITIES?

19  A.    YES.

20  Q.    DOES EXHIBIT 1780 REFLECT THE -- Q CYBER'S TOTAL

21  LIABILITIES AS OF 12/31/2023 AND 12/31/2024?

22  A.    CORRECT.

23  Q.    ALL RIGHT.  YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS

24  CASE ARE SEEKING PUNITIVE DAMAGES; RIGHT?

25  A.    I DO.

808

1    Q.   OKAY.  WOULD THE TWO COMPANIES TOGETHER, THE TWO DEFENDANT
2    COMPANIES, BE ABLE TO PAY A PUNITIVE DAMAGES AWARD?
3    A.   TO BE HONEST, I DON'T THINK WE'RE ABLE TO PAY ANYTHING.
4    WE ARE STRUGGLING TO KEEP OUR HEAD ABOVE WATER.  I'VE -- WE'RE
5    COMMITTING TO MY CFO JUST TO PRIORITIZE EXPENSES AND TO MAKE
6    SURE THAT WE HAVE ENOUGH MONEY TO MEET OUR COMMITMENTS, AND
7    OBVIOUSLY ON A WEEKLY BASIS.
8         WE DON'T HAVE ANY MONEY TO SPARE, TO BE HONEST.
9    Q.   YOU UNDERSTAND THAT THE PUNITIVE DAMAGES ALLEGATION IN
10   THIS CASE IS MADE PURSUANT TO A CALIFORNIA LAW CALLED THE
11   CDAFA, OR THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND
12   FRAUD ACT?
13   A.   I UNDERSTAND THAT.
14   Q.   OKAY.  PRIOR TO THIS LAWSUIT HAVING BEEN FILED, HAD YOU
15   EVER HEARD OF THAT CALIFORNIA LAW BEFORE?
16   A.   UM --
17        MR. ANDRES:  OBJECTION, YOUR HONOR.
18        THE COURT:  OVERRULED.
19        THE WITNESS:  I DID NOT KNOW ABOUT THIS LAW BEFORE
20   THE LAWSUIT WAS MADE.
21   BY MR. AKROTIRIANAKIS:
22   Q.   DID NSO INTEND TO VIOLATE ANY LAWS WITH RESPECT TO ITS
23   DEVELOPMENT OR LICENSING OF PEGASUS?
24   A.   WE DON'T INTEND TO BREAK ANY LAWS AT ALL.
25   Q.   BUT YOU DO NOT CONTEST THE FACT THAT THE COURT IN THIS

UNITED STATES COURT REPORTERS

809

1    CASE HAS FOUND YOU LIABLE UNDER THE STATUTES THAT HER HONOR HAS
2    INSTRUCTED THE JURY; CORRECT?
3    A.   I UNDERSTAND WE WERE FOUND TO BE LIABLE, AND I RESPECT
4    THAT AND ACCEPT THAT.
5         MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
6         THE COURT:  ALL RIGHT.
7    CROSS-EXAMINATION?
8         MR. ANDRES:  THANK YOU, YOUR HONOR.
9              CROSS-EXAMINATION
10   BY MR. ANDRES:
11   Q.   GOOD AFTERNOON, MR. SHOHAT.
12   A.   GOOD AFTERNOON.
13   Q.   I JUST WANT TO ASK YOU A COUPLE OF QUESTIONS.
14        YOU JUST WENT THROUGH A WHOLE SERIES OF FINANCIAL
15   DOCUMENTS WITH MR. AKROTIRIANAKIS; ISN'T THAT RIGHT?
16   A.   CORRECT.
17   Q.   AND THOSE DOCUMENTS ARE YOUR INTERNAL DOCUMENTS; IS THAT
18   CORRECT?
19   A.   YES, THIS IS OUR INTERNAL DOCUMENTS FOR THE FINANCIAL
20   THINGS.
21   Q.   YEAH.  THEY'RE NOT AUDITED BY ANY THIRD PARTY?
22   A.   ACTUALLY, THE 2023 REPORT IS AUDITED.
23   Q.   THAT DOCUMENT THAT YOU PROVIDED US DIDN'T COME FROM
24   OUTSIDE, ANY OUTSIDE AUDITOR?  THAT'S AN INTERNAL DOCUMENT?
25   A.   THIS IS CORRECT.  WE JUST RECENTLY, LIKE, GOT THE AUDITOR

UNITED STATES COURT REPORTERS

810

1    APPROVAL, THE AUDITOR'S APPROVAL OF THE REPORTS.  IT'S THE SAME
2    NUMBER.
3    Q.   SO --
4    A.   SO THIS DOCUMENT IS NOT FROM AN AUDITED REPORT, IF THAT'S
5    YOUR QUESTION.
6    Q.   SO YOU HAVE THOSE DOCUMENTS AVAILABLE TO YOU NOW IN AN
7    AUDITED 2023 FINANCIAL REPORT?
8    A.   MY CFO SHOULD HAVE IT, TOLD ME YESTERDAY THAT SHE RECEIVED
9    THE AUDITOR'S SIGNATURE ON THE AUDITED REPORTS.
10   Q.   SO YOU NOW WERE NOT SURE ABOUT THOSE DOCUMENTS UNTIL
11   YESTERDAY?
12   A.   I AM SURE ABOUT THEM.
13        THE WAY IT WORKS, WE CREATE OR FOLLOW THESE REPORTS.  ON A
14   QUARTERLY BASIS I REVIEW THE REPORTS.
15        ONCE A YEAR, THEY NEED TO BE AUDITED.  WE HAVE A YEAR,
16   EVEN MORE SOMETIMES, TO GET THE AUDITOR'S APPROVAL ON THE
17   REPORTS.
18        SO I REVIEW THESE REPORTS QUARTERLY AT LEAST, IF NOT MORE.
19        IF YOU ASK ME ABOUT AUDITING OF THE REPORTS, THE 2023 WAS
20   AUDITED, AND WE GOT THE AUDITOR'S APPROVAL THIS WEEK.
21        THE 2024 REPORT WILL BE AUDITED IN A FEW MONTHS.
22   Q.   OKAY.  LET'S START OVER.
23        THE DOCUMENTS THAT MR. AKROTIRIANAKIS SHOWED YOU WERE NOT
24   PROVIDED BY ANY INDEPENDENT THIRD PARTY; IS THAT CORRECT?
25   A.   THIS IS CORRECT.

UNITED STATES COURT REPORTERS

811

1    Q.   AND THOSE WERE NOT AUDITED OR PROVIDED BY AN AUDITOR?
2    A.   THEY WERE NOT PROVIDED BY AN AUDITOR.  WHAT I SAID IS THE
3    2023 REPORT IS IDENTICAL TO THE AUDITED REPORT.
4    Q.   I UNDERSTAND WHAT YOU SAID, BUT I'D LIKE YOU TO JUST
5    ANSWER MY QUESTIONS.  YOU'LL HAVE A CHANCE TO SPEAK WITH YOUR
6    LAWYERS.
7         THOSE DOCUMENTS COME FROM NSO AND Q CYBER; RIGHT?
8    A.   THAT'S CORRECT.
9    Q.   THEY DO NOT COME FROM AN AUDITOR?
10   A.   THEY DO NOT COME FROM AN AUDITOR.
11   Q.   AND THEY DO NOT COME FROM A THIRD PARTY?
12   A.   THE VERSION YOU SEE HERE, NO.
13   Q.   AND DURING MR. AKROTIRIANAKIS'S TIME TO ASK YOU ABOUT THE
14   EXPENSES AND ISSUES, HE NEVER ASKED YOU ABOUT THE EXPENSES FOR
15   R&D, DID HE?
16   A.   HE DID NOT.
17   Q.   AND THOSE ARE AMONG NSO'S LARGEST EXPENSES; ISN'T THAT
18   RIGHT?
19   A.   YES, OF COURSE.
20   Q.   AND THAT R&D IS WHAT'S USED FOR PEGASUS AND TO INSTALL
21   PEGASUS ON PEOPLE'S PHONES?
22   A.   THAT IS USED TO DEVELOP PEGASUS, YES, AMONG OTHER THINGS.
23   Q.   AND TO IMPROVE IT --
24        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I THINK
25   WE ALREADY HAD A RULING ABOUT CURRENT THINGS.

UNITED STATES COURT REPORTERS

812

1    THE COURT: YES.

2    MR. ANDRES: I --

3    THE COURT: YES, CURRENT ACTIVITY IS OUT.

4    CURRENT STATUS, FINANCIAL STATUS IS IN.

5    BY MR. ANDRES:

6    Q.    NOT WITH -- WITH RESPECT TO THE R&D -- I'M JUST ASKING A

7    QUESTION ABOUT THE DOCUMENTS THAT HE JUST PUT IN.

8    SO I'M ASKING ABOUT THE R&D ON THOSE DOCUMENTS. THAT IS

9    AMONG THE HIGHEST COSTS FOR NSO; CORRECT?

10   A.    THAT'S CORRECT.

11   Q.    AND WHETHER FOR TODAY OR BACK IN 2018, R&D IS WHAT'S USED

12   TO DEVELOP PEGASUS; RIGHT?

13   MR. AKROTIRIANAKIS: OBJECTION, YOUR HONOR. THAT'S

14   NOT A QUESTION ABOUT FINANCIAL DOCUMENTS.

15   THE COURT: OVERRULED. I THINK IT'S FAIR FROM THE

16   DOCUMENTS THAT WERE SHOWN.

17   THE WITNESS: WE INVESTED A LOT IN OUR R&D. WE HIRE

18   AND EMPLOY TOP TALENT. AND, YES, THE R&D IS A VERY LARGE

19   EXPENSE.

20   BY MR. ANDRES:

21   Q.    AGAIN, THAT EXPENSE IS USED TO DEVELOP PEGASUS?

22   A.    AMONG OTHER DEVELOPMENT THAT R&D DOES, YES.

23   Q.    AND PEGASUS IS THE, IS THE PROGRAM THAT'S PUT ON PEOPLE'S

24   DEVICES TO GET THEIR INFORMATION; IS THAT RIGHT?

25   A.    PEGASUS IS A TOOL USED BY GOVERNMENT AGENCIES TO EXTRACT

UNITED STATES COURT REPORTERS

813

1    INTELLIGENCE INFORMATION FROM TARGET DEVICES, TARGETS OF THOSE

2    GOVERNMENTS.

3    Q.    TARGETED DEVICES THAT PEOPLE OWN?

4    DID YOU UNDERSTAND MY QUESTION?

5    A.    I UNDERSTAND. I THINK THAT YOU TRIED TO SUGGEST IT'S

6    REGULAR PEOPLE. I DON'T CONSIDER THEM REGULAR PEOPLE.

7    BUT I WOULD NOT GO INTO THAT.

8    Q.    I'M GOING TO ASK YOU --

9    THE COURT: WELL, WE DON'T NEED TO DEFINE REGULAR

10   PEOPLE. JUST PEOPLE.

11   BY MR. ANDRES:

12   Q.    I'M SAYING IT DOESN'T ATTACK A SERVER THAT'S SITTING IN A

13   WAREHOUSE SOMEPLACE. IT'S A PHONE THAT SOMEBODY IS HOLDING?

14   A.    TOTALLY AGREE WITH YOU, WE DON'T ATTACK ANY SERVER. THE

15   TECHNOLOGY IS TARGETING PHONE DEVICES ONLY.

16   Q.    AND THAT GETS PEOPLE'S TEXT MESSAGES?

17   A.    THAT GETS TEXT MESSAGES FROM THOSE DEVICES.

18   Q.    IT GETS THEIR PHONE CALLS?

19   A.    IT MIGHT GET PHONE CALLS.

20   Q.    YOU CAN TURN ON THE MICROPHONE?

21   A.    I CANNOT, BUT MY GOVERNMENT CUSTOMERS CAN TURN ON.

22   Q.    THE TECHNOLOGY THAT YOU DEVELOPED ALLOWS YOU TO TURN ON

23   THE MICROPHONE?

24   A.    THE TECHNOLOGY THAT WE DEVELOP ALLOWED OUR GOVERNMENT

25   AGENCIES, CUSTOMERS, TO DO WHAT YOU'RE SUGGESTING.

UNITED STATES COURT REPORTERS

814

1    Q.    YOU CAN SAY GOVERNMENT AGENCIES AS MUCH AS YOU WANT, BUT

2    THOSE GOVERNMENT AGENCIES EXIST ALL OVER THE WORLD; RIGHT?

3    A.    YEAH. BUT YOU SAID I. I CANNOT DO.

4    THE GOVERNMENT AGENCIES CAN DO IT. YOU ASKED ME ABOUT ME,

5    ABOUT MY COMPANY.

6    Q.    LET'S JUST -- I'LL LET YOU ANSWER YOUR QUESTION -- YOU LET

7    ME ASK MY QUESTION. I'LL LET YOU GIVE THE ANSWER. LET'S HELP

8    EVERYBODY OUT HERE, OKAY? YOU AGREE ON THAT?

9    A.    YEP.

10   MR. AKROTIRIANAKIS: OBJECTION, YOUR HONOR.

11   THE COURT: OVERRULED.

12   BY MR. ANDRES:

13   Q.    SO I'M GOING TO COME BACK TO THAT ABOUT THE R&D, BECAUSE

14   THE R&D EXPENSES IN 2023 AND 2024 WERE OVER $50 MILLION; ISN'T

15   THAT RIGHT?

16   A.    I CANNOT SAY. BUT I DON'T CONTEST THAT R&D IS A LARGE

17   EXPENSE.

18   Q.    OKAY. WELL, LET'S LOOK AT THE DOCUMENT THEN.

19   OOPS, I DON'T KNOW IF I HAVE THAT.

20   CAN YOU PUT UP 1781.

21   DO YOU HAVE THAT ON YOUR SCREEN, MR. SHOHAT?

22   A.    I DO.

23   Q.    I'M JUST GOING TO STAND OVER HERE SO I CAN SEE IT. IS

24   THAT OKAY, JUDGE?

25   THE COURT: SURE. SURE. YOU HAVE TO SPEAK UP,

UNITED STATES COURT REPORTERS

815

1    THOUGH, SO THAT --

2    MR. ANDRES: OKAY. I'LL TRY.

3    THE COURT: OKAY.

4    MR. ANDRES: I HAVEN'T HAD A PROBLEM FOR ME.

5    Q.    RESEARCH AND DEVELOPMENT, MR. SHOHAT, DO YOU SEE THAT

6    RIGHT HERE (INDICATING)?

7    A.    I DO.

8    Q.    AND THESE NUMBERS ARE IN MILLIONS?

9    A.    CORRECT.

10   Q.    THAT IS $52 MILLION SPENT ON R&D IN 2023?

11   A.    SO YOU ASKED ME IF THAT'S THE EXPENSE ON R&D. THE ANSWER

12   IS NO BECAUSE THAT LINE INCLUDES OTHER DEPARTMENTS THAT I'LL

13   EXPLAIN, OTHER DEPARTMENTS THAT ARE NOT PEOPLE OR ACCOUNTANTS

14   LIKE TO PUT IT TOGETHER. TO GIVE AN EXAMPLE --

15   Q.    I'M SORRY, MR. SHOHAT. I'M GOING TO ASK YOU TO ANSWER MY

16   QUESTION. MR. AKROTIRIANAKIS CAN ASK YOU ALL THE QUESTIONS HE

17   WANTS.

18   IT SAYS RESEARCH AND DEVELOPMENT.

19   DO YOU SEE THAT?

20   A.    YES.

21   Q.    AND NSO SPENT $52 MILLION IN 2023 FOR RESEARCH AND

22   DEVELOPMENT? YES OR NO?

23   A.    NO.

24   Q.    OKAY. HOW ABOUT IN 2024, THEY SPENT $59 MILLION IN

25   RESEARCH AND DEVELOPMENT?

UNITED STATES COURT REPORTERS

816

1    A.    NO.

2    Q.    OKAY.  SO THIS DOCUMENT IS INACCURATE BECAUSE IT SAYS

3    RESEARCH AND DEVELOPMENT AND IT SAYS $52 AND $59 MILLION?

4    A.    I WOULD BE HAPPY TO EXPLAIN.

5    Q.    I'M ASKING IF THIS DOCUMENT IS INACCURATE.

6    A.    THIS DOCUMENT INCLUDES THE I.T. DEPARTMENT, FOR INSTANCE.

7          BUT I WILL AGREE THAT R&D IS THE MAJORITY OF THIS NUMBER.

8    Q.    THE MAJORITY OF THE 52 MILLION?

9    A.    I AGREE.

10   Q.    AND THAT R&D IS WHAT'S USED TO DEVELOP PEGASUS, WHICH

11   ALLOWS YOUR CLIENTS TO SPY ON PEOPLE'S PHONES?

12   A.    THIS R&D DEVELOPED PEGASUS, AMONG OTHER THINGS, AND

13   PEGASUS ALLOWS GOVERNMENT AGENCIES TO GATHER INTELLIGENCE FROM

14   THE TARGETS.

15   Q.    AND THAT MONEY, THE $50 MILLION FROM 2023 AND $59 MILLION

16   IS THE MONEY THAT'S USED TO DEVELOP THAT?

17   A.    I THINK I ANSWERED.  I CAN EXPLAIN AGAIN.

18   Q.    I'M ASKING YOU, YES OR NO, THAT MORE THAN $100 MILLION IS

19   USED FOR TECHNOLOGY DEVELOPMENT, LIKE PEGASUS?

20   A.    SO MY ANSWER WAS NO, AND I EXPLAINED WHY I DON'T VIEW IT

21   EXACTLY AS DESCRIBED.

22   Q.    YOU SAID IT'S ALSO FOR I.T. AND THAT I.T. IS USED WITH

23   RESPECT TO PEGASUS.

24   A.    I.T. IS ALSO WHAT'S MAKING, KEEPING MY EMAIL SERVER, AND

25   ALLOWING ME TO SEND EMAILS AND OTHER STUFF.  THAT'S WHY IT'S

817

1    NOT JUST R&D IN THE SENSE OF DEVELOPING PRODUCT.

2          BUT I AGREE, IT'S THE MAJORITY -- THE MAJORITY OF THIS

3    EXPENSE GOES TO RESEARCH AND DEVELOPMENT AS YOU WANT TO DEFINE

4    IT.

5    Q.    AND IF NSO DIDN'T SPEND $50 MILLION, $52 MILLION ON R&D,

6    IT MIGHT HAVE A LARGER OPERATING INCOME; RIGHT?  IF THEY DIDN'T

7    SPEND $52 MILLION HERE, THIS NUMBER, WHICH YOU SAY IS LOSING

8    MONEY, WOULD BE HIGHER?

9    A.    SO THAT IS NOT, BECAUSE IF WE WOULDN'T HAVE DEVELOPED

10   PEGASUS, THE REVENUE LINE ON THE TOP WOULD SHIFT MUCH MORE, WE

11   WOULD BE LOSING MUCH MORE MONEY.

12   Q.    IF YOU STOP SPYING ON PEOPLE, YOU MIGHT HAVE A PROFIT?

13   A.    I NEVER -- DON'T ACCUSE ME OF SPYING, I NEVER SPIED ON

14   ANYONE.  AND MY COMPANY NEVER SPIED ON ANYONE.

15   Q.    THAT'S YOUR WORD.  YOU UNDERSTAND THAT?

16   A.    I SWORE TO SAY THE TRUTH, AND THIS IS MY TESTIMONY.  I

17   NEVER SPIED ON ANYONE.  MY COMPANY NEVER SPIED ON ANYONE.

18   PLEASE DON'T ACCUSE ME OF THAT.

19   Q.    THE PRODUCTS THAT YOU CREATED, THAT YOU SOLD TO YOUR

20   CUSTOMERS, SPIED ON INDIVIDUALS?

21   A.    THE PRODUCT THAT I DEVELOPED AND LICENSED TO GOVERNMENTS

22   ALLOWED THOSE GOVERNMENTS TO COLLECT INTELLIGENCE FROM TARGETS.

23   Q.    YOU CALL IT INTELLIGENCE, BUT AT THE END OF THE DAY, IT'S

24   STILL PEOPLE'S TEXT MESSAGES; RIGHT?

25   A.    IT'S THE TEXT MESSAGES OF CERTAIN PEOPLE.

818

1    Q.    AND IT'S THE TELEPHONE CALLS OF CERTAIN PEOPLE?

2    A.    OF CERTAIN PEOPLE.

3    Q.    IT'S ALL THE INFORMATION ON PEOPLE'S PHONES?

4    A.    IT'S INFORMATION FROM THE PHONE DEVICES THAT ARE TARGETS

5    OF GOVERNMENTS FOR VERY SPECIFIC REASONS.

6    Q.    WHATEVER THAT IS, YOU UNDERSTAND THAT THE WORK THAT YOUR

7    COMPANY DID VIOLATED THE LAW IN THE UNITED STATES?  YOU

8    UNDERSTAND THAT; RIGHT?

9    A.    I UNDERSTAND THIS COURT FOUND US LIABLE FOR THAT.

10   Q.    SO WHATEVER IT IS THAT YOU SAY ABOUT FOREIGN GOVERNMENTS

11   OR WHOEVER YOU THINK YOUR CLIENTS ARE, IN THIS COURTROOM, YOU

12   UNDERSTAND THAT JUDGE HAMILTON FOUND, IN CALIFORNIA, IN THE

13   UNITED STATES, THAT NSO VIOLATED FEDERAL COMPUTER FRAUD AND

14   ABUSE STATUTES?  YOU UNDERSTAND THAT; RIGHT?

15   A.    I UNDERSTAND EXACTLY WHAT THE COURT DECIDED, YES.

16   Q.    AND YOU UNDERSTAND -- AND YOU UNDERSTAND THAT

17   JUDGE HAMILTON HAS FOUND THAT IN THIS COURTROOM, AND IN THE

18   UNITED STATES, YOU HAVE VIOLATED THE CALIFORNIA STATE COMPUTER

19   FRAUD AND ABUSE ACT; CORRECT?

20   A.    I UNDERSTAND, IN THE CONTEXT OF CALIFORNIA, THAT'S

21   CORRECT, YES.

22   Q.    AND YOU UNDERSTAND THAT IN THIS COURTROOM, YOU HAVE

23   VIOLATED THE TERMS OF SERVICE OF THE CONTRACT THAT NSO ENTERED

24   INTO WITH WHATSAPP; CORRECT?

25   A.    I UNDERSTAND THAT'S THE DECISION, YES.  YES.

819

1    Q.    NOW, YOU TESTIFIED -- YOU'VE BEEN HERE IN COURT; CORRECT?

2    A.    YES.

3    Q.    AND YOU'RE HERE AS A REPRESENTATIVE OF Q CYBER; IS THAT

4    CORRECT?

5    A.    Q CYBER AND NSO, YES.

6    Q.    OKAY.  SO YOU SERVE AS THE CEO OF Q CYBER; IS THAT RIGHT?

7    A.    CORRECT.

8    Q.    AND THE CEO OF THE NSO GROUP?

9    A.    THAT'S CORRECT.

10   Q.    AND YOU'VE HAD THAT JOB AT NSO SINCE AUGUST 2022?

11   A.    YES.

12   Q.    BEFORE THAT, YOU SERVED AS THE COO OF NSO; CORRECT?

13   A.    CORRECT, BOTH COO -- BOTH NSO AND Q CYBER.

14   Q.    OKAY.  SO -- AND COO IS THE CHIEF OPERATING OFFICER?

15   A.    YES.

16   Q.    AND YOU'VE HAD THAT JOB SINCE AT LEAST MAY OF 2018?

17   A.    YES.

18   Q.    SO IS IT FAIR TO SAY THAT YOU'VE HAD AN ASSOCIATION WITH

19   NSO OR Q CYBER AT LEAST SINCE -- AT LEAST FOR SEVEN YEARS OR

20   SO?

21   A.    YES.

22   Q.    OKAY.  INCLUDING THE TIME IN 2018 TO 2020 IN TERMS OF THE

23   ACTIVITY ALLEGED IN THE COMPLAINT IN THIS CASE?

24   A.    I WAS IN THE COMPANY AT THAT TIME.

25   Q.    YOU WERE AWARE AT THAT TIME THAT NSO WAS DEPLOYING

820

1  PEGASUS; CORRECT?

2  A.    YES.

3  Q.    AND YOU WERE AWARE OF THE FACTS IN THE COMPLAINT?

4  A.    I'M AWARE OF THE FACTS OF THE COMPLAINT.

5  Q.    AND YOU WERE RESPONSIBLE --

6  A.    YES.

7  Q.    YOU WERE RESPONSIBLE FOR THAT CONDUCT AS A RESULT OF YOUR

8  POSITION AT NSO OR Q CYBER?

9  A.    I'M NOT SURE I WAS RESPONSIBLE FOR THAT CONDUCT BACK AT

10  THE TIME WHEN I WAS COO.

11      BUT I WAS PART OF THE MANAGEMENT TEAM, SO I WAS AWARE OF

12  IT.

13  Q.    YOU WERE AN OFFICER OF THE COMPANY?

14  A.    YES.

15  Q.    AND YOU WERE INVOLVED IN MANAGEMENT?

16  A.    YES.

17  Q.    AND NSO IS A FOR-PROFIT COMPANY; CORRECT?

18  A.    JUST LIKE ANY OTHER COMPANY, NO? MOST COMPANIES -- YES,

19  WE ARE FOR -- YES, WE ARE A FOR-PROFIT COMPANY.

20  Q.    AND SO I THINK I JUST -- I DON'T HAVE THE TRANSCRIPT, BUT

21  YOU SAID THAT, JUST LIKE META?

22  A.    META, WHATSAPP, FACEBOOK, YEAH, ANY KIND, YEAH.

23  Q.    DO YOU UNDERSTAND THAT IN THIS COURTROOM, THERE'S NO

24  EQUIVALENCE BETWEEN WHATSAPP AND NSO?

25  A.    WE CAN ARGUE ABOUT IT.

UNITED STATES COURT REPORTERS

821

1  Q.    WELL, BUT YOU UNDERSTAND IN THIS COURTROOM, NOBODY HAS

2  FOUND THAT META OR WHATSAPP VIOLATED ANY LAW?

3      YOU UNDERSTAND THAT?

4  A.    NOT IN THIS COURTROOM.

5  Q.    OKAY.  SO YOU UNDERSTAND THAT FOR THIS, FOR THIS

6  PROCEEDING, THIS JURY IS DECIDING ABOUT THE VIOLATIONS OF LAW

7  THAT NSO WAS INVOLVED IN?

8  A.    I'M -- I PERFECTLY UNDERSTAND THAT I'M REPRESENTING THE

9  DEFENDANTS IN THIS CASE.

10  Q.    AND YOU UNDERSTAND THAT IN THIS COURTROOM, FOR THIS

11  PROCEEDING, THAT THERE ARE NO ALLEGATIONS, NO EVIDENCE

12  WHATSOEVER, THAT WHATSAPP OR META VIOLATED THE LAW?  DO YOU

13  UNDERSTAND THAT?

14  A.    I DIDN'T SAY ANYTHING LIKE THAT.

15  Q.    SIR, I'M ASKING YOU WHETHER YOU UNDERSTAND, FOR THIS

16  PROCEEDING, THAT THERE ARE NO ALLEGATIONS --

17  A.    I UNDERSTAND.

18  Q.    -- CAN I JUST FINISH?

19      THERE ARE NO ALLEGATIONS THAT META OR WHATSAPP VIOLATED

20  FEDERAL COMPUTER LAW.

21      DO YOU UNDERSTAND THAT?

22  A.    OF COURSE.

23  Q.    AND YOU UNDERSTAND THAT IN THIS PROCEEDING, THERE IS NO

24  EVIDENCE OR ALLEGATION THAT WHATSAPP VIOLATED CALIFORNIA LAW?

25      DO YOU UNDERSTAND THAT?

UNITED STATES COURT REPORTERS

822

1  A.    I UNDERSTAND.

2  Q.    AND YOU UNDERSTAND THAT IN THIS PROCEEDING, THERE IS NO

3  EVIDENCE OR ALLEGATION THAT WHATSAPP VIOLATED ITS OWN TERMS OF

4  SERVICE OR ANY CONTRACT?

5      DO YOU UNDERSTAND THAT?

6  A.    I UNDERSTAND THAT.

7  Q.    THAT'S FAIR?

8  A.    THAT'S FAIR.

9  Q.    SO LET ME ASK YOU THAT QUESTION AGAIN.

10      NSO IS A FOR-PROFIT COMPANY; CORRECT?

11  A.    NSO IS A FOR-PROFIT COMPANY, ALMOST LIKE ANY OTHER COMPANY

12  I KNOW.

13  Q.    THIS PROCEEDING, SIR, THIS MIGHT TAKE US LESS TIME.  I

14  DON'T HAVE QUESTIONS ABOUT ANY OTHER COMPANIES.  I HAVE

15  QUESTIONS ABOUT Q CYBER AND NSO BECAUSE THAT'S WHAT THIS JURY

16  NEEDS TO DECIDE ABOUT.

17      SO IF YOU COULD CONFINE YOUR ANSWERS TO THE QUESTIONS, I

18  THINK WE'D GET THIS DONE QUICKER.

19      DO YOU UNDERSTAND THAT?

20      MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  HE'S

21  JUST ANSWERING THE QUESTIONS.

22      THE COURT:  SUSTAINED.

23      MR. ANDRES:  SORRY, YOUR HONOR.  IF I COULD JUST HAVE

24  A MINUTE?

25      (PAUSE IN PROCEEDINGS.)

UNITED STATES COURT REPORTERS

823

1  BY MR. ANDRES:

2  Q.    YOU UNDERSTAND -- AS YOU SAID, YOU'VE BEEN HERE IN THE

3  COURTROOM, SO YOU SAW THE TESTIMONY OF MS. GIL ABOUT HOW MUCH

4  PEGASUS SELLS ITS PRODUCTS FOR; CORRECT?

5  A.    I SAW IT.

6  Q.    OKAY.  AND SHE WORKS FOR YOU?

7  A.    YES.

8  Q.    YOU KNOW HER?

9  A.    I KNOW HER.

10  Q.    AND SHE SAID THAT IT COULD COST MILLIONS OF DOLLARS TO BUY

11  PEGASUS FOR A PARTICULAR CUSTOMER OF YOURS; IS THAT RIGHT?

12  A.    YES.

13  Q.    YOU ALSO TESTIFIED ABOUT PRICING IN YOUR DEPOSITION.

14      DO YOU REMEMBER THAT?

15  A.    I REMEMBER.

16  Q.    OKAY.  AND YOU SAID THAT IT COULD COST A CUSTOMER BETWEEN

17  $3 MILLION AND 10 TIMES THAT.

18      DO YOU REMEMBER ANSWERING THAT QUESTION?

19      MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I THINK

20  WE'VE HAD RULINGS ON THIS GENERAL SUBJECT.

21      MR. ANDRES:  THAT'S NOT RIGHT, YOUR HONOR.  IT'S

22  CONSISTENT WITH MS. GIL'S TESTIMONY.

23      THE COURT:  YEAH, WE JUST HEARD THIS FROM HER.

24      MR. AKROTIRIANAKIS:  I DON'T THINK WE DID.

25      BUT THANK YOU, YOUR HONOR.

UNITED STATES COURT REPORTERS

824

1    THE COURT:  OKAY.

2  BY MR. ANDRES:

3    Q.    SO DO YOU REMEMBER TESTIFYING THAT A CUSTOMER COULD PAY

4  3 MILLION, AND ANOTHER CUSTOMER COULD PAY 10 TIMES THAT?

5    A.    I DO.

6    Q.    OKAY.  SO $3 MILLION FOR ONE CUSTOMER, AND 10 TIMES

7  3 MILLION IS 30 MILLION FOR ANOTHER CUSTOMER?

8    A.    CORRECT.  I'M NOT FAMILIAR WITH ANY CUSTOMER PAYING

9  30 MILLION.

10    Q.    BUT YOU ANSWERED THE QUESTION, THE QUESTION, "CAN YOU GIVE

11  ME AN EXAMPLE?"

12        AND YOU SAID "ONE CUSTOMER WOULD PAY 3 MILLION AND ANOTHER

13  WOULD PAY 10 TIMES THAT."

14    A.    THAT WAS MY DEPOSITION, YES.

15    Q.    WE'RE NOT DISPUTING THAT 10 TIMES 3 IS 30?

16    A.    NO.

17    Q.    DO YOU WANT ME TO SHOW YOU YOUR DEPOSITION TESTIMONY?

18    A.    NO, NO.  I SAID I DON'T DISPUTE IT.  I JUST GAVE YOU A

19  RANGE, SOMEWHERE IN THE RANGE, YES.

20    Q.    THERE'S BEEN TESTIMONY AT THIS TRIAL ABOUT META'S BUG

21  BOUNTY PROGRAM.  DID YOU HEAR THAT WHILE YOU WERE HERE?

22    A.    I HEARD THAT.

23    Q.    ARE YOU FAMILIAR WITH THAT PROGRAM?

24    A.    I'M FAMILIAR WITH BUG BOUNTY PROGRAMS IN GENERAL, YES.

25    Q.    ARE YOU FAMILIAR WITH META'S BUG BOUNTY?

825

1    A.    NOT SPECIFICALLY.  I DON'T KNOW WHAT THEY HAD.

2    Q.    YOU WOULD AGREE WITH ME THAT NSO DID NOT PROVIDE

3  INFORMATION TO WHATSAPP ABOUT ITS SECURITY PURSUANT TO ANY

4  BUG BOUNTY PROGRAM?

5    A.    I AGREE.

6    Q.    I'M SORRY?

7    A.    I AGREE WITH YOU.

8    Q.    NSO WASN'T KNOWINGLY POINTING OUT ANY SECURITY FLAWS OR

9  ISSUES WITH WHATSAPP'S SYSTEMS; ISN'T THAT CORRECT?

10    A.    THIS IS CORRECT.

11    Q.    BECAUSE YOU WERE EXPLOITING THEM?  CORRECT?

12    A.    WHAT WAS THE QUESTION?

13    Q.    YOU WERE EXPLOITING THEM?

14    A.    WE DID NOT EXPLOIT.  WE DEVELOPED CYBER DEFENSE TEST

15  SYSTEMS FOR GOVERNMENTAL CUSTOMERS, AND WHATEVER THEY DO WITH

16  IT --

17    Q.    YOU TESTIFIED EARLIER THAT YOU HAD NO ILL WILL TOWARDS

18  WHATSAPP.  IS THAT CORRECT?

19    A.    THIS IS CORRECT.

20    Q.    IS THAT ALSO TRUE ABOUT THE INDIVIDUALS WHOSE PHONES YOUR

21  TECHNOLOGY WAS INSTALLED ON?  DO YOU HAVE ILL WILL TOWARDS

22  THEM?

23    A.    I DON'T EVEN KNOW WHO THEY ARE.

24    Q.    RIGHT.  AND YOU DIDN'T INTEND TO DO ANY HARM TO THEM?

25    A.    OF COURSE NOT.

826

1    Q.    EVEN THOUGH YOU DEVELOPED THE TECHNOLOGY THAT ALLOWED

2  GOVERNMENTS TO TAKE THEIR INDIVIDUAL INFORMATION?  THAT'S NOT

3  HARM TO YOU?

4    A.    I -- AGAIN, I'M -- I'M ACTING AS A GOVERNMENT CONTRACTOR

5  THAT DEVELOPS CYBER TOOLS FOR GOVERNMENT.  I DON'T INTEND TO

6  HARM ANYONE.

7    Q.    YOU JUST PROVIDE THE TECHNOLOGY THAT ALLOWS PEOPLE TO SPY,

8  BUT YOUR VIEW IS THAT YOU'RE NOT HURTING ANYBODY?

9    A.    IT'S NOT PEOPLE TO SPY.  IT'S GOVERNMENT TO COLLECT

10  INTELLIGENCE.

11    Q.    I THINK YOU ALSO TESTIFIED THAT YOU BECAME AWARE -- I

12  THINK YOU TESTIFIED YOU BECAME AWARE -- YOU'RE AWARE OF THE

13  COURT'S RULINGS; CORRECT?

14    A.    OF COURSE.

15    Q.    AND ON QUESTIONS BY YOUR COUNSEL, YOU WERE ASKED ABOUT

16  WHETHER YOU EVEN KNEW ABOUT CALIFORNIA LAW.

17    A.    I WAS ASKED THAT, YES.

18    Q.    RIGHT.  AT SOME POINT, YOU BECAME AWARE OF THIS LAWSUIT BY

19  NSO; RIGHT?

20    A.    BY --

21    Q.    SORRY.  THIS LAWSUIT BY WHATSAPP AND META; CORRECT?

22    A.    RIGHT.

23    Q.    I'M SORRY.  WE'RE BOTH -- IT'S THE END OF THE DAY, EVEN

24  THOUGH IT'S 1:30.  I'LL TRY TO GO A LITTLE SLOWER.

25        YOU'RE AWARE OF THIS LAWSUIT?

827

1    A.    I'M AWARE.

2    Q.    AND CERTAINLY BY THE TIME OF THIS LAWSUIT, YOU WERE AWARE

3  OF THE ALLEGATIONS OF VIOLATIONS OF LAW; RIGHT?

4    A.    AT SOME TIME AFTER THE LAWSUIT WAS SUBMITTED, YES.

5    Q.    AND YOU HEARD THE TESTIMONY FROM MR. GAZNELI THAT NSO

6  CONTINUED ITS ACTIVITY AS TO WHATSAPP EVEN AFTER THAT LAWSUIT

7  WAS FILED?

8    A.    AFTER THE LAWSUIT WAS FILED, I'M NOT SURE THAT MEANS WE

9  BECAME AWARE.  THAT'S NOT THE SAME THING.

10    Q.    YOU DIDN'T BECOME AWARE OF THIS LAWSUIT WHEN IT WAS FILED?

11    A.    I BELIEVE THAT NSO AND Q CYBER SHOWED UP TO THE LAWSUIT

12  SOMEWHERE IN 2020.

13    Q.    YOU UNDERSTAND THAT THE TESTIMONY FROM MR. GAZNELI WAS

14  THAT THE CONDUCT AT ISSUE IN THIS LAWSUIT CONTINUED AFTER THE

15  LAWSUIT WAS FILED?

16    A.    I UNDERSTAND.  AND I SAID THAT WE WERE NOT AWARE, EVEN

17  THOUGH IT WAS FILED.  WE BECAME AWARE OF IT AT A LATER STAGE.

18  SO THERE'S A GAP BETWEEN IT WAS FILED AND WE BECAME AWARE.

19  IT'S NOT THE SAME POINT IN TIME.

20    Q.    AND YOU HAVE LAWYERS IN THIS COURTROOM THAT HAVE BEEN

21  FIGHTING THIS LAWSUIT; CORRECT?

22    A.    YES.

23    Q.    AND YOU TESTIFIED THAT YOU HAD NO ILL WILL TOWARDS

24  WHATSAPP OR META, BUT YOU DIDN'T CONCEDE THE ALLEGATIONS IN

25  THIS LAWSUIT WHENEVER IT IS THAT YOU FOUND OUT ABOUT IT?

848

```
 1               UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5   WHATSAPP LLC AND META        )  C-19-07123 PJH
     PLATFORMS, INC.,             )
 6                                )  OAKLAND, CALIFORNIA
                 PLAINTIFFS,      )
 7                                )  MAY 2, 2025
          VS.                     )
 8                                )  VOLUME 5
     NSO GROUP TECHNOLOGIES LIMITED )
 9   AND Q CYBER TECHNOLOGIES     )  PAGES 848-1175
     LIMITED,                     )
10                                )
                 DEFENDANTS.      )
11   _____  )

12

13              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14            UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                      BY:  GREG D. ANDRES
18                         ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                    BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER
```

UNITED STATES COURT REPORTERS

---

849

```
 1

 2   APPEARANCES (CONTINUED)

 3

 4   FOR THE DEFENDANTS:    KING & SPALDING
                       BY:  JOSEPH N. AKROTIRIANAKIS
 5                          AARON S. CRAIG
                            633 WEST FIFTH STREET, SUITE 1600
 6                          LOS ANGELES, CALIFORNIA  90071

 7                     BY:  MATTHEW V. NOLLER
                            50 CALIFORNIA STREET, SUITE 3300
 8                          SAN FRANCISCO, CALIFORNIA  94111

 9

10   ALSO PRESENT:          CURT EVANS
                            BRIAN BAKALE
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES COURT REPORTERS

---

850

```
 1

 2                  INDEX OF WITNESSES

 3

 4   DEFENDANTS'

 5

 6   YARON SHOHAT
       CROSS-EXAM BY MR. ANDRES (RES.)       P. 865
       REDIRECT EXAM BY MR. AKROTIRIANAKIS    P. 896
 7     RECROSS-EXAM BY MR. ANDRES             P. 899

 8

 9   TAMIR GAZNELI
       DIRECT EXAM BY MR. AKROTIRIANAKIS      P. 903
       CROSS-EXAM BY MR. PEREZ               P. 942
10     REDIRECT EXAM BY MR. AKROTIRIANAKIS    P. 982

11

12   GREG PINSONNEAULT
       DIRECT EXAM BY MR. CRAIG              P. 991
       VOIR DIRE EXAM BY MR. ANDRES          P. 995
13     DIRECT EXAM BY MR. CRAIG (RES.)       P. 999
       CROSS-EXAM BY MR. ANDRES             P. 1024
14     REDIRECT EXAM MR. CRAIG              P. 1056

15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES COURT REPORTERS

---

851

```
 1

 2                  INDEX OF EXHIBITS

 3                  MARKED    ADMITTED

 4   PLAINTIFFS'

 5   936              869

 6

 7

 8   DEFENDANTS'

 9   1148             1174

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES COURT REPORTERS

868

1   Q.   WELL, THAT WOULD SUGGEST THAT THERE WAS NO GAP BETWEEN THE

2   TIME THE LAWSUIT WAS FILED AND THE TIME THE COMPANY OR YOU

3   BECAME AWARE?

4   A.   AGAIN, I DIDN'T SAY WE WERE NOT AWARE.  I SAID WE SHOWED

5   TO THE LAWSUIT A FEW MONTHS LATER.

6   Q.   OKAY.  SO NOW YOUR TESTIMONY TODAY IS THAT, THAT YOU WERE

7   AWARE WHEN THE LAWSUIT WAS FILED?

8   A.   I -- IF YOU'RE ASKING ME WHEN I BECAME AWARE, I DON'T

9   KNOW.  I DON'T REMEMBER.  I DON'T THINK THE DATE YOU MENTIONED.

10       I DO KNOW WHEN THE COMPANY BECAME PART OF THIS PROCESS.

11  Q.   YESTERDAY YOU TESTIFIED, AND I'M QUOTING, "I UNDERSTAND.

12  AND I SAID THAT WE WERE NOT AWARE, EVEN THOUGH IT WAS FILED.

13  WE BECAME AWARE OF IT AT A LATER STAGE.  SO THERE'S A GAP

14  BETWEEN WHEN IT WAS FILED AND WHEN WE BECAME AWARE.  IT'S NOT

15  THE SAME POINT."

16       DO YOU WANT ME TO SHOW YOU YOUR TESTIMONY?

17  A.   NO.

18  Q.   TODAY YOU'RE SAYING SOMETHING DIFFERENT?

19  A.   NO.

20       MR. ANDRES:  CAN I APPROACH THE WITNESS, YOUR HONOR?

21       THE COURT:  YES.

22       MR. ANDRES:  I'M GOING TO HAND THIS EXHIBIT TO

23  MR. AKROTIRIANAKIS.  IT'S NSO'S STATEMENT ON OCTOBER 29TH, 2019

24  (HANDING).

25       I NEED AN EXHIBIT NUMBER.

UNITED STATES COURT REPORTERS

---

869

1        936.  PLAINTIFFS' EXHIBIT 936, YOUR HONOR.

2        THE COURT:  ALL RIGHT.

3        (PLAINTIFFS' EXHIBIT 936 WAS MARKED FOR IDENTIFICATION.)

4        MR. ANDRES:  AND IT'S REDACTED.

5   Q.   I'LL HAND THIS TO YOU (HANDING).

6        OKAY.  DO YOU SEE THAT?  IT'S REDACTED, BUT IT HAS THE

7   DATE OF THE NSO STATEMENT; CORRECT?  PLEASE TAKE ALL THE TIME

8   YOU NEED TO LOOK AT IT.

9   A.   I SEE IT.  IT'S VERY SHORT.  IT'S REDACTED.

10  Q.   YES, AS MANY DOCUMENTS ARE IN THIS CASE.  YOU UNDERSTAND

11  THAT THOSE ARE CONSISTENT WITH THE COURT'S RULINGS?

12  A.   I UNDERSTAND.

13  Q.   LET'S GO THROUGH THIS.  SO THE DATE OF THIS, IT SAYS "NEWS

14  PROVIDED BY NSO GROUP."  CORRECT?

15  A.   YES.

16  Q.   OKAY.  AND THAT'S YOU?  YOU'RE NSO GROUP?

17  A.   WE'RE NSO GROUP.  I DON'T KNOW -- I'M NOT FAMILIAR WITH

18  THIS DOCUMENT, IF THAT'S YOUR QUESTION.

19  Q.   OKAY.  BUT THERE'S NO DISPUTE THAT YOU WORK FOR NSO GROUP.

20  YOU'RE THE CEO?

21  A.   I'M THE CEO.

22  Q.   OKAY.  AND THE DATE IS OCTOBER 29TH, 2019?

23  A.   CORRECT.

24  Q.   AND THE TOP PARAGRAPH -- THE TOP HEADING, OR HEADLINE,

25  SAYS "NSO GROUP STATEMENT ON FACEBOOK LAWSUIT."

UNITED STATES COURT REPORTERS

---

870

1        DO YOU SEE THAT?

2   A.   YES, I SEE THAT.

3   Q.   DID I READ THAT CORRECTLY?

4   A.   THAT'S WHAT IT SAYS.

5   Q.   NSO STATEMENT ON FACEBOOK LAWSUIT.  THAT'S WHAT WE'RE

6   TALKING ABOUT; CORRECT?

7   A.   YES, UM-HUM.

8   Q.   MY ABILITY TO PRONOUNCE THESE NAMES IS CHALLENGING AT THE

9   LEAST, BUT HERZLIYA?

10  A.   YES.

11  Q.   THAT'S THE NAME THAT YOU WERE TALKING ABOUT YESTERDAY

12  WHERE YOUR COMPANY IS AND YOU SAID IT'S LIKE THE SILICON

13  VALLEY OF --

14  A.   YES.

15  A.   JUST LET ME FINISH.

16  A.   SORRY.

17  Q.   I'LL GIVE YOU A CHANCE, I PROMISE.

18       HERZLIYA, AM I PRONOUNCING THAT CORRECTLY?

19  A.   VERY WELL.

20  Q.   THAT'S WHERE YOUR HEADQUARTERS ARE?

21  A.   CORRECT.

22  Q.   AND THIS STATEMENT COMES FROM HERZLIYA?

23  A.   THAT'S WHAT IT SAYS.

24  Q.   IT SAYS OCTOBER 29TH, 2019.

25       THAT'S THE DAY THIS LAWSUIT WAS FILED?

UNITED STATES COURT REPORTERS

---

871

1   A.   YES, THAT'S THE DATE.

2   Q.   NO GAP BETWEEN THE DATE THE LAWSUIT IS FILED AND THE DATE

3   THAT NSO BECOMES AWARE OF IT?

4   A.   I DIDN'T SAY THAT, BETWEEN THE DATE THAT'S WRITTEN HERE

5   AND THE DATE IT WAS FILED.

6   Q.   IT'S THE SAME DATE?

7   A.   I'M NOT SURE WHO'S QUOTED HERE.  THERE'S START OF

8   QUOTATION AND THEN NO END.  NO -- IT DOESN'T SAY WHO'S BEING

9   QUOTED.  LIKE, I'D LOVE TO SEE WHO'S BEING QUOTED HERE BECAUSE

10  YOU REDACTED THE NAME OF SOMETHING WHICH IS COMPLETELY PUBLIC.

11       I THINK IT COULD HAVE -- I DON'T KNOW.

12  Q.   WELL --

13  A.   I DON'T KNOW WHAT --

14  Q.   WELL, IT'S FROM NSO GROUP.  SOMEBODY AT THE COMPANY KNOWS

15  ABOUT IT?

16  A.   I'D LOVE TO GOOGLE THIS PRESS RELEASE AND SEE WHO'S

17  QUOTED, BECAUSE I CANNOT SEE IT AND I CANNOT SAY WHO'S QUOTED.

18       I KNOW THE COMPANY BECAME AWARE LATER.  MAYBE MY KNOWLEDGE

19  IS INCORRECT OR INCOMPLETE.

20       BUT I'D LOVE TO SEE WHO'S BEING QUOTED, IF IT'S AN

21  EMPLOYEE OF THE COMPANY BECAUSE IT HAS -- IT HAS QUOTATION

22  START, NO END, AND NO NAME OF WHO IS BEING QUOTED.

23       IF IT WAS THE COO OF THE COMPANY, FOR INSTANCE, WHY WOULD

24  YOU REDACT HIS NAME ?

25  Q.   THERE ARE COURT RULES ABOUT THE REDACTIONS.

UNITED STATES COURT REPORTERS

872

1    YOUR HONOR, I'LL MOVE ON.

2    THE POINT IS THAT THIS IS FROM NSO GROUP.  NOBODY DISPUTES

3    THAT?

4    **A.**   I DIDN'T SAY THAT.

5    **Q.**   I'M ASKING IF YOU DISPUTE THAT THIS CAME FROM NSO GROUP?

6    **A.**   I DON'T KNOW THAT.  I KNOW THAT THERE IS THIS PAPER.  I

7    DON'T KNOW WHERE IT'S TAKEN FROM, WHICH SAYS THAT THIS IS FROM

8    NSO.

9    **Q.**   AND IN THE STATEMENT THAT'S NOT REDACTED IT SAYS, CAN YOU

10   READ ALONG WITH ME, "IN THE STRONGEST POSSIBLE TERMS."

11   DO YOU SEE THAT?

12   **A.**   I SEE THAT.

13   **Q.**   IN THE STRONGEST POSSIBLE TERMS, WE DISPUTE TODAY'S

14   ALLEGATIONS AND WILL VIGOROUSLY FIGHT THEM."

15   **A.**   IT --

16   **Q.**   IT SAYS THAT, RIGHT?

17   SORRY.  MR. AKROTIRIANAKIS, I ASSURE YOU, IS GOING TO HAVE

18   QUESTIONS FOR YOU TODAY.  I ASSURE YOU OF THAT.

19   IS THAT WHAT THIS DOCUMENT SAYS?

20   **A.**   IT SAYS IT COULD BE ANYONE IN THIS COURTROOM BEING QUOTED.

21   I DON'T KNOW WHO'S BEING QUOTED HERE.

22   BUT, YES, THIS IS WHAT IT SAYS.

23   **Q.**   OKAY.  OCTOBER 29TH, 2019 NSO SAYS, "IN THE STRONGEST

24   POSSIBLE TERMS, WE DISPUTE TODAY'S ALLEGATIONS AND WILL

25   VIGOROUSLY FIGHT THEM."

UNITED STATES COURT REPORTERS

873

1    CORRECT?

2    **A.**   THIS IS WHAT THIS PAPER SAYS.

3    **Q.**   AND IT'S THE SAME DAY THAT THIS LAWSUIT WAS FILED?

4    THE COURT:  I DON'T HAVE A COPY OF THAT, SO I'M NOT

5    SURE WHAT YOU ALL ARE --

6    MR. ANDRES:  OH, SORRY YOUR HONOR.

7    I'M GOING TO MOVE ON, YOUR HONOR, BUT HAPPY TO (HANDING).

8    **Q.**   OKAY.  I CAN GRAB THAT FROM YOU, MR. SHOHAT.

9    AND JUST SO WE'RE CLEAR, THERE'S NO GAP BETWEEN THE DATE

10   THAT NSO SAYS THEY ARE GOING TO VIGOROUSLY FIGHT THIS LAWSUIT

11   AND THE DATE THAT IT WAS FILED?

12   **A.**   THERE'S NO GAP ON THE DATE ON THAT PAPER, YES.

13   **Q.**   MR. SHOHAT, IN YOUR DEPOSITION, YOU TESTIFIED THAT NSO

14   NEVER KNOWS THE TARGETS OF YOUR CUSTOMERS; CORRECT?

15   **A.**   I DON'T REMEMBER THE EXACT QUOTATION.  BUT I WILL SAY THAT

16   WE DON'T KNOW THE -- CAN YOU REPEAT THE QUESTION SO I HAVE THE

17   EXACT PHRASING?

18   **Q.**   NSO DOES NOT KNOW THE PEOPLE WHOSE PHONES IN WHATSAPP ARE

19   TARGETED BY YOUR CLIENT, WHOEVER YOUR CLIENTS ARE?

20   **A.**   WHEN A CLIENT, A GOVERNMENT AGENCY, TARGETS A PERSON OF

21   INTEREST, WE ARE NOT PART OF IT.  WE DON'T KNOW WHO'S BEING

22   TARGETED.  WE ARE NOT INVOLVED.

23   AND WE DEFINITELY DON'T KNOW WHO IS THE PERSON OR EVEN

24   WHAT'S THE MOBILE PHONE NUMBER WHICH IS BEING TARGETED.

25   **Q.**   OKAY.  I WAS GOING TO ASK YOU ABOUT THAT.

UNITED STATES COURT REPORTERS

874

1    **A.**   THIS IS FROM --

2    **Q.**   EXCUSE ME.

3    I WAS GOING TO ASK ABOUT THE MOBILE PHONES, BUT YOU'VE

4    SAID THAT ALREADY.

5    SO JUST TO BE CLEAR, WITH RESPECT TO THE --

6    MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR.  I DON'T

7    THINK HE HAD FINISHED HIS ANSWER.

8    BY MR. ANDRES:

9    **Q.**   I'M SORRY.  DID YOU FINISH YOUR ANSWER?

10   **A.**   I DIDN'T.

11   THE COURT:  WELL, HE WAS ANSWERING SOMETHING THAT

12   WASN'T ASKED, SO LET'S START AFRESH WITH A NEW QUESTION.

13   BY MR. ANDRES:

14   **Q.**   MR. SHOHAT, NSO DOES NOT KNOW THE PEOPLE, THE IDENTITY OF

15   THE PEOPLE WHOSE PHONES ARE TARGETED WITH PEGASUS; CORRECT?

16   **A.**   NO.  THE REASON I SAY NO IS BECAUSE WE MIGHT LEARN ABOUT

17   IT AFTER THE FACT.

18   BUT AT THE TIME THAT THE GOVERNMENT AGENCY TARGETS

19   SOMEONE, WE DON'T KNOW AND ARE NOT PART OF THAT -- WE DON'T

20   KNOW THE NUMBER OR THE PERSON.

21   **Q.**   ALL RIGHT.

22   YOUR HONOR, THAT'S DIRECTLY INCONSISTENT WITH YOUR RULING

23   THIS MORNING, SO I WOULD ASK TO STRIKE IT AND I CAN TRY AGAIN.

24   THE COURT:  YES.

25   MR. ANDRES:  I CAN --

UNITED STATES COURT REPORTERS

875

1    THE COURT:  YES, LADIES AND GENTLEMEN OF THE JURY,

2    PLEASE DISREGARD MR. SHOHAT'S LAST RESPONSE.

3    RE-ASK THE QUESTION.

4    BY MR. ANDRES:

5    **Q.**   WITH RESPECT TO THE IDENTITIES OF THE PEOPLE WHOSE PHONES

6    ARE TARGETED BY PEGASUS, NSO DOES NOT KNOW THE IDENTITY OF

7    THOSE PEOPLE?

8    **A.**   I'M NOT SURE WHAT I DID WRONG TO -- BECAUSE --

9    THE COURT:  IT'S EITHER A YES OR A NO.

10   THE WITNESS:  OKAY.

11   REPEAT THE QUESTION.  I WILL ANSWER WITH YES OR NO.

12   BY MR. ANDRES:

13   **Q.**   OKAY.  FOR THE THIRD TIME, NSO DOES NOT KNOW THE IDENTITY

14   OF THE PEOPLE WHOSE PHONES AND THEIR WHATSAPP APPLICATIONS ARE

15   TARGETED BY YOUR CLIENTS?

16   **A.**   CAN YOU SAY IT ONE MORE TIME FOR ME, BECAUSE IT'S NOT --

17   **Q.**   HOW ABOUT WITH RESPECT TO THE INDIVIDUALS -- THERE'S 1400

18   INDIVIDUALS IN THIS CASE WHOSE PHONES WERE TARGETED.

19   AT THE TIME THEY WERE TARGETED, NSO DID NOT KNOW THE

20   IDENTITY OF THOSE PEOPLE?

21   **A.**   THANK YOU FOR THE CLARIFICATION.

22   THE ANSWER IS NO.  NO, WE DIDN'T KNOW -- NO.

23   **Q.**   YEAH, I'M SORRY.  AND I DON'T MEAN -- I REALIZE IF YOU

24   NEED HELP WITH THE TRANSLATION OR ANYTHING, WE CAN GET THAT.

25   BUT YOU'RE SAYING NO, NSO, AT THE TIME OF THE PEGASUS AND

UNITED STATES COURT REPORTERS

876

1  THE SPYING, DOES NOT KNOW THE IDENTITIES OF THE PEOPLE WHOSE
2  PHONES ARE BEING SPIED UPON?
3  A.    THIS IS A CORRECT STATEMENT.
4  Q.    THANK YOU.
5  A.    THANK YOU.
6  Q.    AND THEY DON'T KNOW THE PHONE NUMBERS?
7  A.    NO.
8  Q.    YESTERDAY YOU TESTIFIED THAT NSO NEVER INTENDED TO HARM
9  WHATSAPP SERVERS; CORRECT?
10  A.    CORRECT.
11  Q.    AND YOU UNDERSTAND AND YOU'VE SEEN THE TESTIMONY OF THE
12  WHATSAPP ENGINEERS WHO WORKED NIGHT AND DAY TO PATCH THE
13  EXPLOITS FROM NSO; CORRECT?  YOU WERE IN THE COURTROOM FOR
14  THAT?
15  A.    CORRECT.
16  Q.    YOU SAW THE TESTIMONY OF MR. GHEORGHE?
17  A.    CORRECT.
18  Q.    AND YOU SAW THE TESTIMONY OF DREW ROBINSON?
19  A.    I DID.
20  Q.    YOU UNDERSTAND THAT THEY SPENT A CONSIDERABLE AMOUNT OF
21  TIME RESPONDING TO NSO'S ATTACK ON WHATSAPP?  THAT'S A YES OR
22  NO.
23  A.    I DON'T UNDERSTAND THEY SPENT A SPECIFIC AMOUNT OF TIME.
24      SO I'LL CORRECT THAT TO BE MORE ACCURATE.
25      WHATSAPP WAS NOT THE TARGET OF THOSE GOVERNMENT AGENCIES

877

1  OPERATION.
2  Q.    RIGHT.  WHATSAPP WAS THE TARGET OF NSO'S HACK.  THAT'S
3  WHAT THE COURT FOUND.  YOU'RE FAMILIAR THAT THAT'S WHAT THE
4  COURT FOUND, THAT NSO VIOLATED THE CALIFORNIA AND FEDERAL
5  COMPUTER FRAUD ACT BECAUSE OF WHAT THEY INSERTED IN THE
6  WHATSAPP CODE; RIGHT?
7      WE WENT OVER THAT YESTERDAY.  YOU UNDERSTAND THAT.
8      MR. AKROTIRIANAKIS:  OBJECTION.  THAT MISSTATES THE
9  EVIDENCE AND THE COURT'S ORDER, YOUR HONOR.
10      THE COURT:  I THINK SO, TOO.  YOU'RE PARSING IT A
11  LITTLE FINELY.
12      THE TARGETS ARE THE TARGETS.
13      WHATSAPP SERVERS ARE IN BETWEEN --
14      MR. ANDRES:  CORRECT.
15      THE COURT:  -- THE LAUNCH.
16  BY MR. ANDRES:
17  Q.    NSO SENT ITS CODE AND SOFTWARE INTO WHATSAPP SERVERS.
18      THE COURT:  YES.
19      MR. ANDRES:  THAT'S UNDISPUTED, YOUR HONOR.
20  Q.    RIGHT?
21  A.    CORRECT.
22      MR. AKROTIRIANAKIS:  I'M SORRY, YOUR HONOR, THAT'S
23  NOT CORRECT.  THAT'S A MISSTATEMENT OF THE EVIDENCE AND THE
24  COURT'S RULING.
25      MR. ANDRES:  APPARENTLY THE COURT DOESN'T THINK SO.

878

1      THE COURT:  I DON'T THINK SO.  THE TARGETS ARE THE
2  TARGETS.  THE TARGETS ARE THE TARGET USERS.
3      BUT WHATSAPP SERVERS WERE IMPLICATED, PEGASUS WENT THROUGH
4  THE WHATSAPP SERVERS.
5      MR. ANDRES:  EXACTLY.
6      MR. AKROTIRIANAKIS:  YES, YOUR HONOR.
7  BY MR. ANDRES:
8  Q.    AND YOU UNDERSTAND THAT AS A RESULT OF THAT, WHATSAPP
9  ENGINEERS HAD TO RESPOND?
10  A.    I DO.
11  Q.    HAD TO WORK VERY HARD?
12  A.    I DO.
13  Q.    NIGHTS AND WEEKENDS?
14  A.    I DO.
15  Q.    LOTS OF PEOPLE.
16      YOU HAVE TO ANSWER YES, NO.  YOU CAN'T NOD.
17  A.    WHAT IS -- LOTS OF PEOPLE IS RELATIVE, SO IT'S NOT A YES
18  OR A NO.
19      BUT THEY WORKED HARD.  THEY DID.
20  Q.    OKAY.  LET'S NOT QUIBBLE ABOUT THAT.
21      THE -- AND I -- YOU TESTIFIED IN YOUR OWN DEPOSITION THAT
22  WHEN YOU WERE ON THE OTHER SIDE DOING CYBER WORK, YOU WERE
23  INVOLVED IN PATCHES.
24  A.    I WAS INVOLVED IN SIMILAR WORK, YEAH.
25  Q.    YEAH.

879

1  A.    SAME SIZE, YEAH.
2  Q.    WHEN YOU WERE ON THE OTHER SIDE, WHEN SOMEBODY WAS
3  ATTACKING YOUR SYSTEMS, YOU COULD PATCH THEM.  THAT'S WHAT
4  PEOPLE DO, AND YOU EXPECTED WHATSAPP TO DO THAT?
5  A.    THAT'S WHAT I -- THAT'S WHAT YOU DO WHEN YOU DO
6  CYBERSECURITY.
7  Q.    RIGHT.  AND THAT IS A FORM OF HARM BECAUSE WHATSAPP HAD TO
8  HAVE ITS ENGINEERS DIVERT THEMSELVES FROM THEIR NORMAL JOB AND
9  RESPOND, IN YOUR WORDS, TO THE INTRUSION BY NSO; RIGHT?
10  A.    THEY --
11  Q.    THAT'S A FORM OF HARM?
12  A.    SO I --
13  Q.    MY QUESTION IS, YES OR NO, THAT IS A FORM OF HARM?
14      MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR, THIS IS A
15  LEGAL ARGUMENT.
16      THE COURT:  SUSTAINED.
17      THE WITNESS:  I WANT TO --
18      THE COURT:  YOU DON'T HAVE TO ANSWER.
19  BY MR. ANDRES:
20  Q.    YOU DON'T BELIEVE THAT --
21      THE WITNESS:  CAN I?
22      THE COURT:  YOU DON'T NEED TO ANSWER THAT LAST
23  QUESTION.
24  BY MR. ANDRES:
25  Q.    YOU UNDERSTAND THAT WHATSAPP HAD TO DO A LOT OF WORK IN

880

1  RESPONSE TO NSO'S INTRUSION ON THEIR SERVERS?  YES OR NO?  YOU
2  UNDERSTAND THEY HAD TO DO A LOT OF WORK?
3  A.   I KNOW -- I -- INCIDENT RESPONSE TEAMS WORK VERY HARD ALL
4  THE TIME.  THEY'RE ON CALL ALL THE TIME.  THEY TARGET CYBER
5  ATTACKS ALL THE TIME.  I'VE DONE THOUSANDS OF CYBER ATTACKS ALL
6  MY LIFE AND WORKED VERY HARD IN DOING IT, YES.
7  Q.   THIS ONE WAS MORE SOPHISTICATED THAN THE ONES THAT COME IN
8  EVERY DAY?
9  A.   IT WAS VERY SOPHISTICATED.  I'LL GIVE YOU THAT.
10 Q.   NSO IS A MARKET LEADER IN THIS TECHNOLOGY?
11 A.   NSO IS STATE OF THE ART TECHNOLOGY.
12 Q.   IT'S SOPHISTICATED?
13 A.   I DON'T ARGUE THAT.
14 Q.   SO, YES, IT'S SOPHISTICATED?
15 A.   YES, IT'S SOPHISTICATED.
16 Q.   OKAY.  JUST TO BE CLEAR, YOU'RE NOT HERE TO ARGUE.  YOU'RE
17 HERE TO ANSWER QUESTIONS, SO --
18 A.   I DON'T THINK I ARGUED.
19       THE COURT:  EXCUSE ME, GENTLEMEN.  GENTLEMEN.  LET'S
20 BRING IT DOWN A NOTCH.
21 BY MR. ANDRES:
22 Q.   WE WOULD AGREE THAT NSO WASN'T INVITED INTO WHATSAPP'S
23 SERVERS.  FAIR?
24 A.   YES.
25 Q.   AND YOU DIDN'T ASK PERMISSION?

UNITED STATES COURT REPORTERS

881

1  A.   NO.
2  Q.   WE WERE TALKING ABOUT YOUR EXPERIENCE IN THIS FIELD,
3  RIGHT, AND YOU -- LET ME GET THIS RIGHT -- YOU HAVE A HISTORY
4  OF WORKING IN THIS FIELD; CORRECT?
5  A.   YES, I MENTIONED IT YESTERDAY.
6  Q.   AND YOU HAVE A BACKGROUND IN WORKING IN ELECTRONIC
7  WARFARE; CORRECT?
8  A.   THAT I DID NOT MENTION YESTERDAY, BUT, YES, I DO.
9  Q.   AND YOU TESTIFIED TO THAT IN YOUR DEPOSITION; CORRECT?
10 A.   THIS IS CORRECT.
11 Q.   "I WILL SAY THAT THE DOMAIN I WORKED IN WAS ELECTRONIC
12 WARFARE."
13       THOSE ARE YOUR WORDS?
14 A.   YES.  THIS IS BEFORE I JOINED THE CYBERSECURITY INDUSTRY.
15 Q.   FAIR.  AND YOU -- THAT'S FROM YOUR TESTIMONY WHEN YOU TOOK
16 AN OATH AND YOU SAID YOU WERE GOING TO TELL THE TRUTH?
17 A.   YES.
18 Q.   NO DISPUTE ABOUT THAT, YOU'VE BEEN INVOLVED IN ELECTRONIC
19 WARFARE?
20 A.   THIS IS PART OF MY RESUME.
21 Q.   I THINK WE'VE ALREADY ESTABLISHED THAT NSO IS A MARKET
22 LEADER; IS THAT CORRECT?
23 A.   IT IS.
24 Q.   AND THERE WAS TESTIMONY ABOUT THIS ZERO-CLICK VECTOR.
25 THAT EFFECTIVELY MEANS -- YES OR NO -- THAT EFFECTIVELY MEANS

UNITED STATES COURT REPORTERS

882

1  THAT THE USER, OR THE PERSON WHOSE PHONE PEGASUS IS ATTACKING
2  DOESN'T HAVE TO DO ANYTHING; CORRECT?
3  A.   CORRECT.
4  Q.   IN YOUR DEPOSITION, YOU TESTIFIED THAT YOUR CLIENTS DON'T
5  CARE IF THE VECTORS ARE ZERO-CLICK OR ONE-CLICK OR ANYTHING; IS
6  THAT CORRECT?
7  A.   NO.
8  Q.   NO, IT'S NOT CORRECT?
9  A.   IT'S NOT CORRECT.
10 Q.   OKAY.
11 A.   I CAN TELL YOU WHAT I SAID.
12 Q.   WELL, LET'S TAKE A LOOK AT WHAT YOU SAID.
13       YOU WERE ASKED, "WOULD YOU" --
14       MR. AKROTIRIANAKIS:  SORRY, YOUR HONOR.  COULD I HAVE
15 PAGE AND LINE?
16       MR. ANDRES:  SURE.
17       THE COURT:  YES.
18       MR. ANDRES:  PAGE 68:01 TO 68:16.
19 "WOULD YOU BE SURPRISED IF PEGASUS GAVE A CUSTOMER AN
20 OPTION TO CHOOSE WHICH ZERO-CLICK VECTOR TO USE?
21       "ANSWER:  BECAUSE CUSTOMERS DON'T CARE WHICH VECTOR THEY
22 USE, AS LONG AS THEY GET THE INTELLIGENCE THEY NEED."
23 Q.   CORRECT?
24 A.   CORRECT.  THIS IS NOT WHAT YOU JUST ASKED ME ABOUT.
25 Q.   OKAY.  BUT YOU AGREE WITH WHAT I JUST READ?

UNITED STATES COURT REPORTERS

883

1  A.   I WOULD AGREE.
2  Q.   THAT'S THE TESTIMONY YOU GAVE UNDER OATH?
3  A.   I WOULD LIKE TO MAKE A DIFFERENCE BETWEEN THIS AND WHAT
4  YOU ASKED ME BECAUSE THAT'S NOT THE SAME.  YOU ASKED ME IF THE
5  CUSTOMER CARED IF IT WAS ZERO-CLICK OR NOT ZERO-CLICK.
6       THEY DO CARE.  HEARING MY TESTIMONY, I SAID DIFFERENT
7  VECTORS OF THE ZERO-CLICK.  THAT TESTIMONY IS NOT THE SAME.
8  Q.   FAIR ENOUGH.  NSO DECIDES WHICH VECTOR TO USE, NOT THE
9  CUSTOMERS?
10 A.   NOT NSO, BUT THE SYSTEM ITSELF DECIDES WHICH, WHICH VECTOR
11 TO -- IS LAUNCHED.
12 Q.   THAT'S AN NSO DECISION.  THAT'S NOT THE CLIENT.
13 A.   THE TECHNOLOGY, DEPENDING ON THE CERTAIN PART OF THIS, WE
14 USE THE RIGHT VECTOR.  FOR INSTANCE, IF IT'S APPLE DEVICE, IOS,
15 OR ANDROID, OBVIOUSLY THE SYSTEM WILL USE DIFFERENT VECTOR.
16 IT'S NOT NSO.  IT'S NOT SOMEONE AT NSO SITTING BEHIND THE
17 SCENES AND DECIDES.  NO.
18 Q.   BUT NSO CREATES THE SOFTWARE?
19 A.   OF COURSE.
20 Q.   SO IT IS NSO'S SOFTWARE AND THAT SOFTWARE DECIDES?
21 A.   IT'S LOGIC WITHIN THE SOFTWARE THAT WE DEVELOPED.
22 Q.   THANK YOU.  NOW, WE WERE TALKING ABOUT THE VECTORS, WE
23 WERE TALKING ABOUT PATCHES.  WHEN NSO PUTS OUT A VECTOR AND
24 WHATSAPP OR SOMEBODY ELSE PATCHES THAT, NSO THEN TRIES TO BREAK
25 THAT PATCH?

UNITED STATES COURT REPORTERS

884

1    A.    NO, WE DON'T TRY TO BREAK THE PATCH.

2          WE MAKE SURE -- WE TRY TO MAKE SURE THAT THE SYSTEM

3    CONTINUES TO WORK, NOT -- WE NEVER BREAK A PATCH.

4    Q.    AND FOR THE SYSTEM TO WORK, YOU NEED TO FIND ANOTHER WAY

5    INTO WHATSAPP'S SERVERS?

6    A.    WE NEED TO FIND ANOTHER WAY INTO THE MOBILE DEVICE THAT IS

7    BEING TARGETED, NOT NECESSARILY THROUGH WHATSAPP SERVERS.

8    Q.    BUT YOU GET TO THE MOBILE DEVICE THROUGH WHATSAPP SERVERS?

9    THAT'S WHAT THE COURT RULED?

10   A.    ONLY IN VERY SMALL CASES OF THE VECTOR THAT WE HAVE, VERY

11   SMALL, THREE OF THEM AS MENTIONED BEFORE.

12   Q.    AND THAT'S THE CONDUCT THAT IS THE SUBJECT OF THIS LAWSUIT

13   IS THE VIOLATION OF FEDERAL AND STATE LAW IS NSO'S ATTACK ON

14   WHATSAPP'S SERVER.

15         I CAN READ THE --

16   A.    NO, I --

17   Q.    YOU AGREE WITH THAT?

18   A.    I AGREE THAT THIS IS WHAT THE COURT DECIDED.

19         I JUST SAID THAT IF A VECTOR BREAKS, WE WILL NOT

20   NECESSARILY FIND ANOTHER VECTOR THROUGH WHATSAPP SERVERS.  WE

21   HAD DOZENS OF VECTOR SERVER LISTS.  YOU MENTIONED THREE OF THEM

22   THAT USED WHATSAPP.  THERE ARE MANY OTHERS THAT DON'T.

23         SO IF OUR ABILITY TO SEND A MESSAGE THROUGH A WHATSAPP

24   SERVER IS DISABLED, WE MIGHT FIND A DIFFERENT WAY TO SEND THE

25   MESSAGE NOT THROUGH WHATSAPP, BUT SOMETHING DIFFERENT.

UNITED STATES COURT REPORTERS

---

885

1    Q.    AND SO YOU USED THOSE VECTORS FOR OTHER, LIKE, USED THEM

2    FOR APPLE DEVICES, TOO?  YOU SAID THERE WERE OTHER VECTORS

3    OUTSIDE OF PEGASUS, OR OUTSIDE OF WHATSAPP?

4    A.    PEGASUS CAN TARGET, CAN ALLOW GOVERNMENT AGENCIES TO

5    TARGET ALSO IOS DEVICES, YES.

6    Q.    THAT'S APPLE DEVICES, WHEN YOU SAY IOS, APPLE?

7    A.    MY PRONUNCIATION OF APPLE WAS CONFUSING YESTERDAY, SO I'M

8    USING IOS.

9    Q.    FAIR ENOUGH.  AND MY UNDERSTANDING OF COMPUTER SOFTWARE IS

10   NOT AS GOOD AS YOURS.

11   A.    YES.

12   Q.    AND SO THEY KEEP GOING, THERE'S A FIX, AND YOU GO AGAIN TO

13   FIND OUT A WAY AROUND THAT FIX LIKE YOU DID IN THIS CASE?

14   A.    WE FIND AN ALTERNATIVE WAY, NOT NECESSARILY AROUND THE

15   FIX, BUT AN ALTERNATIVE WAY TO GET -- TO ALLOW THE TECHNOLOGY

16   TO GET TO THE TARGET DEVICE, WHICH IS --

17   Q.    THE TECHNOLOGY HERE IS PEGASUS.  SO YOU FIND ANOTHER WAY

18   TO GET PEGASUS ON THE PHONE?

19   A.    YES.

20   Q.    OKAY.  AND THAT HAPPENED ONCE IN THIS CASE, AND YOU HAD TO

21   FIND A SECOND ALTERNATIVE.  FAIR?

22   A.    YES.

23   Q.    AND THEN IT HAPPENED A SECOND TIME AND YOU FOUND A THIRD

24   ALTERNATIVE?

25   A.    YES, AS WE DISCUSSED.

UNITED STATES COURT REPORTERS

---

886

1    Q.    AND PART OF THE $50-PLUS MILLION THAT'S USED FOR R&D IS

2    FOR THIS PROCESS, TO FIND FIXES?  SOME PART OF THAT $52 MILLION

3    IS TO FIND FIXES?

4    A.    WE DON'T FIND FIXES, WE FIND VECTORS, OR WAYS TO ACCESS

5    THE PHONE.  BUT, YES, THE INTENTION IS THAT.

6    Q.    THAT'S WHAT THE R&D MONEY IS FOR?

7    A.    PART OF IT.

8    Q.    AND WHEN THESE FIXES GO IN OR THE SOFTWARE GOES TO THE

9    PHONE, YOU USED THE WORD IN YOUR DEPOSITION THAT THERE'S FULL

10   DENIABILITY; CORRECT?

11   A.    YES.  I MIGHT HAVE USED IT.

12   Q.    FULL DENIABILITY MEANS THAT THE PERSON WHOSE PHONE IS

13   BEING SPIED UPON DOES NOT KNOW WHO'S SPYING ON THEM?

14   A.    THAT'S CORRECT.

15   Q.    THAT'S HARMFUL, ISN'T IT?

16         MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  IT'S,

17   AGAIN, A LEGAL QUESTION.

18         MR. ANDRES:  "HARM" IS NOT A LEGAL TERM, YOUR HONOR.

19         THE COURT:  IN THIS -- IN THE SENSE THAT YOU'RE USING

20   IT, IT'S -- ULTIMATELY IT'LL BE A JURY QUESTION AS TO WHETHER

21   OR NOT IT'S HARM.

22         SO I'M GOING TO SUSTAIN THE OBJECTION.

23         MR. ANDRES:  THANK YOU, YOUR HONOR.

24   Q.    YESTERDAY YOU WERE LOOKING AT THE BALANCE SHEET, AND

25   MR. AKROTIRIANAKIS WAS POINTING OUT THAT THERE'S APPROXIMATELY

UNITED STATES COURT REPORTERS

---

887

1    $5 MILLION IN CASH ON HAND; IS THAT CORRECT?

2    A.    WE HAD IT IN THE BEGINNING OF THE YEAR, YES.

3    Q.    AND YOU SAID THAT TO SORT OF STAY AFLOAT, NSO SPENDS $10

4    MILLION A MONTH TO STAY AFLOAT; CORRECT?

5    A.    YES.

6    Q.    SO THAT'S $5 MILLION, EVERY TWO WEEKS YOU SPEND

7    $5 MILLION?

8    A.    WE SAY $5 MILLION ON THE BALANCE SHEET, SO WE HAD 8 AT

9    THAT POINT IN TIME, BUT MY RECOLLECTION, WE NEED 10.

10   Q.    BUT TO STAY AFLOAT, YOU PAY $10 MILLION A MONTH; IS THAT

11   CORRECT?

12   A.    WE SPEND ABOUT 10 MILLION, YES.

13   Q.    THAT'S APPROXIMATELY $120 MILLION A YEAR?

14   A.    APPROXIMATELY.

15   Q.    AND THAT'S ON TOP OF THE MONEY THAT YOU SPEND ON RESEARCH

16   AND DEVELOPMENT -- RESEARCH AND DEVELOPMENT?

17   A.    NO.  THE RESEARCH AND DEVELOPMENT IS INCLUDED IN THAT.

18   Q.    OKAY.  BUT WHEN --

19   A.    THAT'S WHAT I SAID WHEN I MENTIONED THE 10 MILLION.

20   Q.    WHEN YOUR LAWYER IS SUGGESTING THAT YOU ONLY HAVE

21   $5 MILLION AND THAT'S NOT A FAIR AMOUNT TO PAY IN PUNITIVE

22   DAMAGES, YOU ACTUALLY PAY, OR YOU'RE EXPENDING $120 MILLION A

23   YEAR?

24   A.    THIS IS CORRECT.

25   Q.    OKAY.  YESTERDAY WE WERE TALKING ABOUT, OR I'M SORRY, YOU

UNITED STATES COURT REPORTERS

888

1   WERE TESTIFYING ABOUT THE FACT THAT YOU'RE AN OFFICER OF NSO
2   AND IN THE MANAGEMENT; CORRECT?
3   A.    YES.
4   Q.    AND YOU'RE RESPONSIBLE IN THAT ROLE, AND DURING THE TIME
5   OF THE EVENTS IN THIS LAWSUIT, YOU WERE RESPONSIBLE FOR THE
6   PRACTICES AT NSO; IS THAT CORRECT?
7   A.    AS THE CEO OF THE COMPANY?
8   Q.    YEAH.
9   A.    YES.
10  Q.    WELL, IN MANAGEMENT.
11  A.    SINCE BEING CEO, I'M RESPONSIBLE FOR EVERYTHING.  IF YOU
12  ASK ME BEFORE THAT TIME, I NEED TO KNOW EXACTLY WHICH PRACTICES
13  YOU'RE TALKING ABOUT.
14  Q.    OKAY.  WELL, FOR THE PRACTICES RELATED TO PEGASUS, FOR
15  EXAMPLE?  YOU WERE AWARE OF THAT DURING THE TIME THAT YOU WERE
16  THE COO?
17  A.    I WAS AWARE OF SOME OF THEM.  I WAS NOT RESPONSIBLE FOR
18  THEM.
19  Q.    OKAY.  BUT THAT PEGASUS IS ONE OF YOUR MOST IMPORTANT
20  PRODUCTS; CORRECT?
21  A.    YEAH, BUT IT WAS NOT -- IT WAS NOT UNDER MY
22  RESPONSIBILITY.
23  Q.    IN YOUR ROLE AS CEO, YOU'RE RESPONSIBLE FOR JUDGMENTS AND
24  CORPORATE DECISION MAKING; CORRECT?
25  A.    I THINK IT'S FAIR TO SAY THAT, YES.

UNITED STATES COURT REPORTERS

889

1   Q.    AND THAT ULTIMATELY YOU'RE INVOLVED IN DEVELOPING
2   CORPORATE POLICY; CORRECT?
3   A.    YES.
4   Q.    YOU UNDERSTAND THAT AS AN EMPLOYEE THAT'S A MANAGING AGENT
5   FOR THE PURPOSES OF PUNITIVE DAMAGES, IF THE EMPLOYEE EXERCISED
6   SUBSTANTIAL INDEPENDENT AUTHORITY, JUDGMENT IN CORPORATE
7   DECISION MAKING, THAT EMPLOYEE'S DECISIONS ARE RELEVANT?
8         DO YOU UNDERSTAND THAT?
9   A.    I DO.
10  Q.    JUST A QUICK QUESTION ABOUT THE DOCUMENTS THAT WE SAW
11  YESTERDAY.
12        MR. AKROTIRIANAKIS, AS DID I, SHOWED YOU SOME OF THOSE
13  FINANCIAL RECORDS.
14        DO YOU REMEMBER THOSE?
15  A.    YES.
16  Q.    THERE WAS A BALANCE SHEET AND A P&L?
17  A.    YES.
18  Q.    BOTH FOR NSO AND FOR Q CYBER?
19  A.    CORRECT.
20  Q.    OKAY.  AND THOSE COVER THE FULL YEAR OF 2025?
21  A.    I'M SORRY.  THOSE COVER THE FULL YEARS OF 2023 AND 2024?
22  A.    THIS IS CORRECT.
23  Q.    AND THEY WERE JUST RECENTLY FINALIZED IN 2025?
24  A.    I MENTIONED THAT THE 2023 WAS RECENTLY AUDITED.
25  Q.    OKAY.  BUT THOSE DOCUMENTS WERE RECENTLY PRODUCED IN 2025?

UNITED STATES COURT REPORTERS

890

1   A.    THE 2023 WAS PRODUCED IN 2024 AND AUDITED IN 2025.
2         THE 2024 WAS PRODUCED IN 2025, YES.
3   Q.    RIGHT.  BUT THEY WERE ONLY RECENTLY PRODUCED IN THIS CASE?
4   A.    I PRODUCED -- I DON'T KNOW WHEN THEY WERE PRODUCED.
5   Q.    OKAY.  THAT'S NOT ON YOU.
6         THE -- IT'S FAIR TO SAY THAT YOU TESTIFIED THAT THERE WAS
7   AN AUDIT DONE, I THINK YOU MAYBE SAID YESTERDAY, FOR ONE OF
8   THOSE YEARS; CORRECT?
9   A.    I GOT THE AUDIT REPORT, OR WE GOT, NOT I, THIS WEEK.
10  Q.    YOU'VE BEEN AWARE OF THIS TRIAL FOR SOME TIME, CORRECT, AT
11  LEAST SINCE JANUARY?
12  A.    CORRECT, YES.
13  Q.    AND IS IT FAIR TO SAY THAT THESE DOCUMENTS WERE NOT
14  PRODUCED UNTIL AFTER THERE WAS A TRIAL SET IN THIS MATTER?
15  A.    I DON'T KNOW THE TIME.
16  Q.    YOU'RE POINTING TO THESE DOCUMENTS AS AN INABILITY TO PAY
17  A PUNITIVE DAMAGES AWARD; CORRECT?
18  A.    IT SHOWS THE FINANCIAL STATUS OF THE COMPANY.
19  Q.    YOU'RE NOT AN ACCOUNTANT THOUGH; RIGHT?
20  A.    I'M NOT.  I HAVE AN M.B.A. DEGREE, SO I DID HAVE SEVERAL
21  FINANCE COURSES.  BUT, NO, I'M NOT AN ACCOUNTANT.
22  Q.    WHEN PEGASUS INFECTS A WHATSAPP USER'S PHONE, IT'S ABLE TO
23  GATHER ALMOST ALL OF THE INFORMATION ON THAT PHONE; CORRECT?
24  A.    IT CAN GATHER UP INFORMATION.
25  Q.    SO IF SOMEBODY'S CREDIT CARDS ARE ON THOSE PHONES, ARE YOU

UNITED STATES COURT REPORTERS

891

1   ABLE TO GATHER THAT INFORMATION?
2   A.    I'M NOT FAMILIAR THAT WE ARE GATHERING CREDIT CARD
3   INFORMATION.
4   Q.    WELL, ACCORDING TO YOU, YOU'RE NOT GATHERING ANY OF THE
5   INFORMATION, IT'S YOUR CLIENTS; RIGHT?
6   A.    THANK YOU FOR CORRECTING ME ON THAT.
7         BUT THE TECHNOLOGY, I'M NOT FAMILIAR THAT IT'S GATHERING
8   CREDIT CARD INFORMATION.
9   Q.    HERE'S THE QUESTION:  IT HAS THE POWER TO TAKE CREDIT CARD
10  INFORMATION OFF PEOPLE'S PHONES; CORRECT?
11  A.    WE COULD DEVELOP THE FUNCTIONALITY TO TAKE CREDIT CARD
12  INFORMATION.  I'M NOT FAMILIAR THAT WE DEVELOPED SUCH
13  FUNCTIONALITY.
14  Q.    RIGHT NOW THE TESTIMONY, I THINK YOU OR ONE OF YOUR
15  COLLEAGUES GAVE IT, IS YOU GET ALL OF THE INFORMATION EXCEPT
16  FOR THE OPERATING SYSTEM?
17  A.    I HEARD RAMON'S TESTIMONY.  HE DID SAY THAT.  I THINK HE
18  WAS NOT ACCURATE.
19  Q.    IF SOMEBODY'S CREDIT CARD INFORMATION WAS ON THE PHONE,
20  YOU WOULD HAVE THE ABILITY TO GET THAT INFORMATION?
21  A.    WE WOULD HAVE THE ABILITY TO ADD THIS FUNCTIONALITY TO THE
22  SYSTEM.  I DON'T BELIEVE IT EXISTS TODAY.
23  Q.    YOU HAVE THE ABILITY TO GET SOMEBODY'S DOCUMENTS THAT ARE
24  ON SOMEBODY'S PHONE; CORRECT?
25  A.    THEY -- THE AGENCY HAS THE ABILITY TO GET CERTAIN

UNITED STATES COURT REPORTERS

944

1    TRANSCRIPT, PAGE 333 --

2         MAY I PUBLISH TO THE JURY, YOUR HONOR?

3         THE COURT:  YES.

4         MR. PEREZ:  IT'S JUST THE SIGNATURE PAGE.

5         THE CLERK:  THERE'S JUST A DELAY.

6         MR. PEREZ:  OH, GREAT.

7         IF WE COULD ZOOM IN ON THE CERTIFICATE OF WITNESS THERE,

8    THAT BOTTOM PORTION.

9    Q.    YOU SIGNED THE CERTIFICATION REFLECTING THAT THE

10   TRANSCRIPT WAS ACCURATE; CORRECT?

11   A.    YES.

12   Q.    THAT'S YOUR SIGNATURE THAT WE SEE THERE?

13   A.    YEAH.

14   Q.    AFFIRMING THAT THE TRANSCRIPT WAS CORRECT; RIGHT?

15   A.    YES.

16   Q.    SO IN YOUR TESTIMONY JUST NOW, YOU DON'T MEAN TO

17   CONTRADICT ANYTHING THAT YOU SAID IN YOUR DEPOSITION TESTIMONY;

18   CORRECT?

19   A.    NO.

20   Q.    AND THE JURY CAN RELY ON EVERY WORD OF YOUR DEPOSITION

21   TESTIMONY; IS THAT RIGHT?

22   A.    YEAH.

23   Q.    THANK YOU.

24        NOW, YOU WERE ASKED ABOUT YOUR CURRENT RESPONSIBILITIES AS

25   VICE PRESIDENT OF R&D AND THE EMPLOYEES THAT YOU SUPERVISE.

945

1         DO YOU RECALL THOSE QUESTIONS?

2    A.    YES.

3    Q.    THERE ARE OVER 100 SUCH EMPLOYEES, AREN'T THERE?

4    A.    YES.

5    Q.    HOW MANY PEOPLE ARE IN THE R&D GROUP AT NSO?

6    A.    ABOUT 140.

7    Q.    140 PEOPLE?

8    A.    YES.

9    Q.    CURRENTLY DEVOTED TO RESEARCH AND DEVELOPMENT AT NSO?

10   A.    YES.

11   Q.    AND THAT WORK IS SUPPORTED BY THE $50 MILLION BUDGETS THAT

12   ARE REFLECTED IN NSO'S FINANCIAL STATEMENTS; ISN'T THAT RIGHT?

13   A.    YES.

14   Q.    NOW, YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL AS TO

15   WHETHER THE 50 MILLION, AND ALMOST $60 MILLION BUDGETS FOR R&D

16   THAT WE SAW IN THE 2024 FINANCIAL STATEMENTS, WHETHER ANY OF

17   THAT BUDGET FOR LAST YEAR WENT TOWARDS DEVELOPING THE VECTORS

18   THAT ARE AT ISSUE IN THIS CASE.

19        DO YOU RECALL THOSE QUESTIONS?

20   A.    YES.

21   Q.    ALL RIGHT.  AND THE ANSWER WAS NO, THE MONEY WE SPENT IN

22   2024 DIDN'T PAY FOR WORK IN 2017 OR '18; RIGHT?

23   A.    YEAH.

24   Q.    BUT IN 2018 AND 2019, THERE WAS AN R&D BUDGET, WASN'T

25   THERE?

946

1    A.    YES.

2    Q.    RIGHT.  AND, IN FACT, IF I COULD SHOW THE WITNESS -- THIS

3    IS PLAINTIFFS' EXHIBIT 264.

4         MR. MARZORATI:  CAN I APPROACH?

5         THE COURT:  YES.

6         MR. AKROTIRIANAKIS:  MAY I HAVE A MOMENT TO GET,

7    YOUR HONOR?  IT'S NOT IN MY BINDER.

8         YOUR HONOR, I THINK THAT WE ALREADY TALKED ABOUT THIS.

9         MR. PEREZ:  YOUR HONOR, THEY OPENED THE DOOR --

10        THE COURT:  YEAH.

11        MR. PEREZ:  -- BY ASKING WHETHER THE CURRENT BUDGET

12   WENT TOWARDS THE WORK TO DEVELOP THESE VECTORS.

13        MR. AKROTIRIANAKIS:  I THINK ACTUALLY MR. ANDRES

14   ASKED ABOUT THAT ON MR. SHOHAT'S CROSS-EXAMINATION.  SO I DON'T

15   THINK I OPENED THE DOOR TO ANYTHING, YOUR HONOR.

16        THE COURT:  I'M NOT SURE WHAT IT IS I'M LOOKING AT

17   HERE.

18        MR. PEREZ:  YOUR HONOR, I WOULD DIRECT THE COURT TO

19   PAGE 4, WHICH REFLECTS THE RESEARCH AND DEVELOPMENT EXPENSES

20   FOR 2019 AND 2018.

21        THE COURT:  OKAY.  AND IS THAT WHAT YOU WANT TO ASK

22   HIM ABOUT?

23        MR. PEREZ:  YES, YOUR HONOR.

24        THE COURT:  OKAY.  I'M GOING TO ALLOW IT.

25   BY MR. PEREZ:

947

1    Q.    MR. GAZNELI, YOU RECOGNIZE EXHIBIT 264, PLAINTIFFS'

2    EXHIBIT 264?  THESE ARE THE CONSOLIDATED FINANCIAL STATEMENTS

3    FOR NSO GROUP TECHNOLOGIES, LIMITED, FOR DECEMBER 31ST, 2019;

4    IS THAT RIGHT?

5    A.    YES.

6    Q.    AND IF WE LOOK AT PAGE 4 OF THAT DOCUMENT, IT REFLECTS THE

7    RESEARCH AND DEVELOPMENT EXPENSES FOR 2019 AND 2018?  THAT'S

8    THE TIME PERIOD DURING WHICH THE HUMMINGBIRD VECTORS WERE BEING

9    DEVELOPED AND WORKED ON; CORRECT?

10   A.    RIGHT.

11   Q.    AND IT REFLECTS THAT IN 2019, THE RESEARCH AND DEVELOPMENT

12   EXPENSES OF NSO GROUP WERE $67 MILLION; RIGHT?

13   A.    YES.

14   Q.    SO ACTUALLY EVEN --

15        MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  I'M

16   SORRY, YOUR HONOR.  I HAVE TO OBJECT TO THE FOUNDATION.  THIS

17   IS A CONSOLIDATED -- I JUST WOULD ASK IF HE COULD LAY SOME

18   FOUNDATION FOR THE -- THIS WITNESS'S KNOWLEDGE OF THE

19   CONSOLIDATED COMPANIES.

20        THE COURT:  I AGREE.  I AGREE.

21   BY MR. PEREZ:

22   Q.    ARE THESE FIGURES CONSISTENT WITH YOUR GENERAL

23   RECOLLECTION, HAVING BEEN IN THE R&D DEPARTMENT --

24        MR. AKROTIRIANAKIS:  SAME OBJECTION, YOUR HONOR.

25   BY MR. PEREZ:

948

1  Q.  THAT AT THE TIME PERIOD --

2       THE COURT:  CONSOLIDATED MEANING Q CYBER AS WELL?

3       MR. AKROTIRIANAKIS:  NO.  OTHER COMPANIES,

4  YOUR HONOR, THAT THERE'S BEEN NO EVIDENCE ABOUT IN THIS CASE.

5  THESE ARE CONSOLIDATED FINANCIALS OF HISTORICAL GROUPED

6  COMPANIES.

7       THE COURT:  OKAY.  OKAY.  YOU NEED TO --

8       MR. PEREZ:  I'M GOING TO ASK THE QUESTION WITHOUT

9  REFERENCE TO THE DOCUMENT, YOUR HONOR.

10      THE COURT:  OKAY.

11 BY MR. PEREZ:

12 Q.  IS IT CONSISTENT WITH YOUR EXPERIENCE FROM THE R&D GROUP

13 AT NSO THAT DURING THE TIME PERIOD THE HUMMINGBIRD VECTORS WERE

14 BEING DEVELOPED, NSO HAD A R&D BUDGET IN THE TENS OF MILLIONS

15 OF DOLLARS?

16 A.  YES.

17 Q.  THANK YOU.

18      YOU WERE ASKED SOME QUESTIONS ABOUT THE ANDROID TEAM, DO

19 YOU RECALL THAT, AND WHAT APPLICATIONS THE ANDROID TEAM STUDIED

20 IN 2018 AND 2019?  DO YOU REMEMBER THAT?

21 A.  YES.

22 Q.  RIGHT.  AND JUST TO REORIENT THE JURY, THE ANDROID TEAM IS

23 A TEAM WITHIN R&D THAT IS FOCUSSED ON DEVELOPING INSTALLATION

24 VECTORS FOR ANDROID DEVICES; IS THAT RIGHT?

25 A.  YES.

949

1  Q.  OKAY.  AND WHEN YOU WERE ASKED ABOUT WHAT APPLICATIONS

2  THAT ANDROID TEAM STUDIED, YOU POINTED TO AT LEAST FOUR

3  DIFFERENT TYPES OF APPLICATIONS; RIGHT?

4  A.  (NODS HEAD UP AND DOWN.)

5  Q.  YOU MENTIONED INSTANT MESSAGING APPLICATIONS; CORRECT?

6  A.  YES.

7  Q.  BROWSERS?

8  A.  YES.

9  Q.  OPERATING SYSTEMS?

10 A.  YES.

11 Q.  AND OTHER APPLICATIONS; RIGHT?

12 A.  YES.

13 Q.  SO THOSE ARE ALL DIFFERENT WAYS THAT THE R&D GROUP, AND

14 THE ANDROID TEAM SPECIFICALLY, IS STUDYING FOR HOW -- OR WAS

15 STUDYING IN 2018 AND 2019 FOR HOW TO GET PEGASUS ON TO TARGET

16 PHONES; ISN'T THAT RIGHT?

17 A.  YES.

18 Q.  OKAY.  SO THAT, FOR BROWSERS, THAT WOULD INCLUDE THINGS

19 LIKE SAFARI AND GOOGLE CHROME?  THAT'S WHAT BROWSERS MEANS;

20 RIGHT?

21 A.  YEAH, SAFARI WAS FOR IOS.

22 Q.  OKAY.  SO CHROME WOULD BE AN EXAMPLE OF A BROWSER THAT

23 RUNS ON ANDROID DEVICES; RIGHT?

24 A.  FOR EXAMPLE.

25 Q.  AND THAT WOULD BE ALL THESE DIFFERENT PATHS THAT THE

950

1  ANDROID TEAM WAS STUDYING FOR HOW TO GET PEGASUS ON TO TARGET

2  DEVICES; RIGHT?

3  A.  YES.

4  Q.  AND THAT WORK CONTINUES TODAY, DOESN'T IT?

5       MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

6       THE COURT:  SUSTAINED.

7  BY MR. PEREZ:

8  Q.  I'D LIKE TO CLARIFY, IF WE COULD FOR THE JURY, THE

9  TIMELINE OF NSO'S DEVELOPMENT OF THE HUMMINGBIRD VECTORS.

10      NOW, YOU TESTIFIED IN YOUR DEPOSITION THAT THE RESEARCH

11 TEAM CAME UP WITH THE IDEA OF MANIPULATING THE

12 CONNECTING_TONE_DESC FIELD DURING THE RESEARCH PHASE IN LATE

13 2017 OR EARLY 2018; IS THAT CORRECT?

14 A.  WE WEREN'T MANIPULATING ANYTHING.

15 Q.  LET ME PUT IT THIS WAY.  YOU CAME UP WITH THE IDEA OF

16 PUTTING THE CODE THAT WAS TRIGGERING THE INSTALLATION OF

17 PEGASUS IN THE CONNECTING_TONE_DESC FIELD, THAT IDEA WAS

18 GENERATED BY THE RESEARCH DEPARTMENT IN LATE 2017 OR EARLY

19 2018?  THAT'S WHAT YOU TESTIFIED TO; ISN'T THAT RIGHT?

20 A.  YES.

21 Q.  SO AT THAT POINT IN LATE 2017 OR EARLY 2018, THE RESEARCH

22 TEAM WAS ALREADY RESEARCHING HOW TO USE WHATSAPP TO INSTALL

23 PEGASUS; ISN'T THAT RIGHT?

24 A.  THIS WAS IN THE MIDDLE OF STUDYING IT.

25 Q.  SO TOWARDS THE BEGINNING, BUT NOT THE VERY BEGINNING;

951

1  RIGHT?

2  A.  YEAH.

3  Q.  SO EARLIER THAN LATE 2017, EARLY 2018 WAS WHEN THE

4  RESEARCH GROUP STARTED INVESTIGATING WHATSAPP AS A POTENTIAL

5  TOOL TO INSTALL PEGASUS ON TARGET DEVICES; RIGHT?

6  A.  YES.

7  Q.  OKAY.  AND NOW, AFTER THE RESEARCH TEAM CONDUCTED ITS

8  INVESTIGATION, IT BUILT AN INTERNAL ENVIRONMENT IN WHICH TO

9  TEST THE INSTALLATION VECTOR; ISN'T THAT RIGHT?

10 A.  IT'S DEVELOPMENT TEST.

11 Q.  TO DEVELOP AND TEST; RIGHT?  FIRST YOU HAVE TO DEVELOP AND

12 THEN THE NEXT STEP IS TO TEST; RIGHT?

13 A.  YES.

14 Q.  SO THEY DEVELOP THIS INTERNAL ENVIRONMENT THROUGH WHICH

15 NSO CAN SEND WHATSAPP MESSAGES FROM ONE DEVICE TO ANOTHER;

16 CORRECT?

17 A.  YES.

18 Q.  AND YOU USED THAT INTERNAL ENVIRONMENT TO DEVELOP THE

19 INSTALLATION VECTOR; RIGHT?

20 A.  YES.

21 Q.  AND THAT PERIOD -- THAT WORK, THE DEVELOPMENT WORK WENT ON

22 FOR MONTHS; RIGHT?

23 A.  YES.

24 Q.  AND YOU HAD A TEAM OF AT LEAST FOUR ENGINEERS WORKING ON

25 THAT?

960

1   PHONES.  WE CAN DISAGREE AS TO WHETHER THE OWNERS OF THOSE
2   PHONE ARE PEOPLE, BUT IT IS DESIGNED TO GET INFORMATION FROM
3   THEIR PHONES.
4       IT IS ALSO DESIGNED, MR. GAZNELI, TO DO SO WITHOUT THAT
5   PERSON'S KNOWLEDGE; ISN'T THAT RIGHT?
6   A.   THIS IS THE SOFTWARE DEFINITION, TO BE ABLE TO DO -- TO
7   GAIN ACCESS FOR THE INTELLIGENCE AGENCIES WITHOUT THE TARGETS
8   TO BE NOTICED ABOUT IT.
9   Q.   RIGHT.  BUT YOU DON'T CONSIDER SOFTWARE DESIGNED TO GET
10  INFORMATION FROM SOMEONE'S MOBILE DEVICE WITHOUT THEIR
11  KNOWLEDGE, THAT'S JUST NOT YOUR DEFINITION OF SPYWARE; IS THAT
12  RIGHT?
13  A.   I'M -- I'M NOT GOING TO GET INTO DEFINING IT.  THIS IS A
14  SOFTWARE TOOL THAT WE DEVELOPED FOR THESE PURPOSES AS I
15  EXPLAINED.
16  Q.   WELL, YOU JUST TESTIFIED YOU DON'T CONSIDER IT SPYWARE.
17  SO I'M ASKING YOU, YOU DON'T CONSIDER SOFTWARE THAT IS DESIGNED
18  TO GET INFORMATION FROM SOMEONE'S PHONE TO BE INSTALLED WITHOUT
19  THEIR KNOWLEDGE AND TO TAKE THEIR INFORMATION WITHOUT THEIR
20  KNOWLEDGE, YOU DON'T CONSIDER THAT SPYWARE?  IS THAT YOUR
21  TESTIMONY?
22  A.   YES.
23  Q.   OKAY.  I'D LIKE TO ASK YOU ABOUT THE ERISED VECTOR AS TO
24  WHICH YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL.
25      DO YOU RECALL THAT?

961

1   A.   YEAH.
2   Q.   YOU'RE FAMILIAR WITH THE ERISED VECTOR; RIGHT?
3   A.   YES.
4   Q.   IT WAS DEVELOPED DURING YOUR TIME IN THE R&D GROUP AT NSO?
5   A.   YES.
6   Q.   AND I BELIEVE YOU TESTIFIED THAT -- CAN YOU REMIND ME WHEN
7   YOU BECAME VICE PRESIDENT OF RESEARCH AND DEVELOPMENT?
8   A.   IT WAS BEGINNING OF 20 -- VICE PRESIDENT OF RESEARCH AND
9   DEVELOPMENT?
10  Q.   YES.
11  A.   END OF 2022.
12  Q.   END OF 2022.  SO AT THE BEGINNING OF 2020, YOU WERE
13  DIRECTOR OF R&D?
14  A.   NOT THE BEGINNING.  THE MIDDLE.
15  Q.   NOW, ERISED -- AND YOU TESTIFIED ABOUT THIS AT YOUR
16  DEPOSITION -- WAS DEVELOPED AFTER WHATSAPP REMEDIATED THE 2019
17  ATTACKS; IS THAT RIGHT?
18  A.   YEAH.
19  Q.   RIGHT.  SO IN MAY 2019, THIS JURY HAS HEARD A LOT ABOUT
20  THIS, WHATSAPP FIXED THE MECHANISM BY WHICH EDEN, THE SECOND OF
21  THE THREE INSTALLATION, HUMMINGBIRD VECTORS, WAS INSTALLING
22  PEGASUS ON USER'S PHONES; CORRECT?
23  A.   YES.
24  Q.   AND AFTER WHATSAPP PREVENTED EDEN FROM WORKING, NSO'S R&D
25  GROUP DEVELOPED ANOTHER VECTOR TO CONTINUE USING WHATSAPP TO

962

1   INSTALL PEGASUS ON USERS' DEVICES; ISN'T THAT RIGHT?
2   A.   THIS WAS A DIFFERENT VECTOR, IT USED DIFFERENT SERVERS AND
3   TYPE OF SERVERS.
4   Q.   CAN WE AGREE THAT IT TRIGGERED THE INSTALLATION OF
5   WHATSAPP -- OF PEGASUS, AT LEAST IN PART, THROUGH THE SENDING
6   OF WHATSAPP MESSAGES?
7   A.   YES.
8   Q.   YES.  AND THAT WAS AFTER WHATSAPP HAD CLOSED THE
9   VULNERABILITIES, IF THAT'S THE WORD YOU'D LIKE TO USE, THAT
10  ALLOWED THE EDEN VECTOR ALSO TO USE WHATSAPP MESSAGES TO
11  INSTALL PEGASUS; IS THAT WHAT YOU SAID?
12  A.   YES.
13  Q.   AND ERISED WAS IN USE IN 2020; ISN'T THAT CORRECT?
14  A.   YES.
15  Q.   ALL THE WAY UP THROUGH AT LEAST MAY OF 2020; ISN'T THAT
16  CORRECT?
17  A.   YES.
18  Q.   AND THE PURPOSE OF ERISED SENDING MESSAGES THROUGH
19  WHATSAPP SERVERS WAS TO TRIGGER INSTALLATION OF PEGASUS ON
20  TARGET DEVICES; RIGHT?
21  A.   YES.
22  Q.   IN ORDER TO OBTAIN ACCESS TO THOSE USERS AS INFORMATION;
23  RIGHT?
24  A.   YES.
25  Q.   NOW, YOU TESTIFIED UNDER EXAMINATION BY YOUR LAWYERS ABOUT

963

1   SOME OF THE INFRASTRUCTURE THAT THE CUSTOMERS HAVE.
2       DO YOU RECALL THOSE QUESTIONS?
3   A.   YES.
4   Q.   AND THAT INCLUDES COMPUTERS, SERVERS?  IS THAT GENERALLY
5   WHAT IT INCLUDES, THE INFRASTRUCTURE?
6   A.   YES.
7   Q.   AND THAT INFRASTRUCTURE WOULD BE PURCHASED BY, OR LEASED,
8   BY NSO; ISN'T THAT RIGHT?
9   A.   NOT ALL OF IT.
10  Q.   SOME OF THEM AT LEAST; RIGHT?
11  A.   YEAH.
12  Q.   AND THE GROUP AT NSO THAT WAS RESPONSIBLE FOR THE
13  ACQUIRING OF THIS INFRASTRUCTURE WAS CALLED THE WHITE SERVICES
14  GROUP; ISN'T THAT RIGHT?
15  A.   YES.
16  Q.   AND THE PURPOSE OF THE WHITE SERVICES GROUP WAS NOT JUST
17  TO ACQUIRE THIS INFRASTRUCTURE, BUT TO DO IT IN A WAY THAT WAS
18  ANONYMIZED; ISN'T THAT CORRECT?
19  A.   THIS IS REQUIREMENT OF THE CUSTOMERS, YES.
20  Q.   I THINK YOU USED THOSE EXACT WORDS IN YOUR DEPOSITION.
21  IT'S A REQUIREMENT THAT THE ACQUISITION OF THE INFRASTRUCTURE
22  BE ANONYMIZED; RIGHT?
23  A.   YES.
24  Q.   SO THAT IT COULDN'T BE TRACED BACK TO THE CUSTOMER;
25  CORRECT?

964

1    A.    YES.

2    Q.    AND COULDN'T BE TRACED BACK TO NSO; RIGHT?

3    A.    YES.

4    Q.    THAT WAS ONE OF THE WAYS, NOT THE ONLY WAY, BUT ONE OF THE

5    WAYS THAT NSO COVERED ITS TRACKS HERE; ISN'T THAT RIGHT?

6    A.    I'M NOT -- I WON'T COVER TRACKS.  IT'S CUSTOMER'S

7    REQUIREMENT.  THIS IS TO BE, AS I SAID, TO BE UNDETECTABLE IN

8    TERMS OF TARGET, TARGET DEVICES.

9    Q.    RIGHT, IT WAS UNDETECTABLE BY DESIGN; RIGHT?

10   A.    YES.

11   Q.    AND NSO, THROUGH ITS WHITE SERVICES GROUP, WAS THE ONE WHO

12   TOOK RESPONSIBILITY FOR ACHIEVING THAT RESULT OF MAKING IT

13   UNTRACEABLE AND UNDETECTABLE; ISN'T THAT RIGHT?

14   A.    NSO, AS I SAID, THE SERVERS AND THE ECOSYSTEM OF THE

15   INFRASTRUCTURE SITS ON CUSTOMER'S PREMISES.  IT'S OWNED BY

16   THEM.

17   Q.    IT'S ACQUIRED BY NSO ANONYMOUSLY; RIGHT?

18   A.    SOME OF THEM.

19   Q.    YOU WERE ASKED SOME QUESTIONS BY YOUR COUNSEL ABOUT THE

20   HANDSHAKE PROCESS.

21        DO YOU RECALL THAT?

22   A.    YES.

23   Q.    AND THAT REFERS TO THE INFORMATION THAT GETS EXCHANGED

24   BETWEEN TWO DEVICES TO ESTABLISH A CONNECTION BETWEEN THEM; IS

25   THAT GENERALLY CORRECT?

UNITED STATES COURT REPORTERS

965

1    A.    YES.

2    Q.    AND YOU ALSO TESTIFIED ABOUT THE FINGERPRINTING STAGE;

3    RIGHT?

4    A.    YES.

5    Q.    AND THE FINGERPRINTING STAGE OCCURS AS -- DURING THE

6    HANDSHAKE; IS THAT CORRECT?

7    A.    NO -- NOT DURING THE HANDSHAKE, BUT THE HANDSHAKE IS A

8    SUBPROCEDURE OF THE FINGERPRINT.

9    Q.    RIGHT.  AND THE REASON IT'S CALLED FINGERPRINTING IS

10   BECAUSE YOU'RE ACQUIRING INFORMATION ABOUT THE TARGET DEVICE;

11   ISN'T THAT RIGHT?

12   A.    YES, IN ORDER TO DEFINE -- TO DESIGN THE SPECIFIC MESSAGES

13   TO BE SENT TO THAT SPECIFIC TARGET.

14   Q.    EXACTLY.  BECAUSE WITHOUT THAT INFORMATION, YOU CAN'T

15   CRAFT THE MESSAGES THAT WOULD TRIGGER INSTALLATION OF PEGASUS;

16   ISN'T THAT RIGHT?

17   A.    ON THE TARGETS' DEVICES, YES.

18   Q.    RIGHT.  SO THE FINGERPRINTING, THROUGH FINGERPRINTING, YOU

19   ARE OBTAINING INFORMATION FROM -- ABOUT THE TARGET DEVICE FOR

20   PURPOSES OF CRAFTING THE MESSAGE THAT'S GOING TO TRIGGER

21   INSTALLATION OF PEGASUS; ISN'T THAT RIGHT?

22   A.    CRAFTING FOR THE PURPOSE OF DEFINING -- DESIGNING TO THE

23   SPECIFIC TARGET THAT IS BEING INSTALLED.

24   Q.    YOU NEED THAT INFORMATION IN ORDER TO COMPLETE THE

25   INSTALLATION; ISN'T THAT RIGHT?

UNITED STATES COURT REPORTERS

966

1    A.    YES.

2    Q.    WITHOUT THE FINGERPRINTING, THERE IS NO INSTALLATION OF

3    PEGASUS; RIGHT?

4    A.    THERE -- WITHOUT THE FINGERPRINTING, THE INFORMATION WOULD

5    NOT BE SUFFICIENT AND THEN THE, THE SUCCESS RATE WILL NOT BE

6    GOOD.

7    Q.    RIGHT.  IT WOULDN'T WORK WITHOUT THE FINGERPRINTING;

8    RIGHT?

9    A.    YEAH.

10   Q.    AND THEN YOU WOULDN'T BE ABLE TO GET THE PEGASUS ON THE

11   PHONE AND THE CUSTOMER COULDN'T GET THE INFORMATION OFF THE

12   PHONE, ISN'T THAT RIGHT, WITHOUT THE FINGERPRINTING?

13   A.    YES.

14   Q.    AND YOU TESTIFIED AT YOUR DEPOSITION ABOUT MULTIPLE TYPES

15   OF INFORMATION THAT ARE OBTAINED AS PART OF THAT FINGERPRINTING

16   STAGE.

17        DO YOU REMEMBER THAT GENERALLY?

18   A.    YES.

19   Q.    YOU SAID YOU OBTAIN THE OPERATING SYSTEM OF THE TARGET

20   DEVICE; ISN'T THAT RIGHT?

21   A.    YES.

22   Q.    AND THE TYPE OF DEVICE?  YES?

23   A.    YES.

24   Q.    AND THE -- WHICH VERSION OF WHATSAPP IT'S RUNNING;

25   CORRECT?

UNITED STATES COURT REPORTERS

967

1    A.    YES.

2    Q.    AND THAT'S TRUE OF THE HUMMINGBIRD VECTORS?  THEY WOULD

3    OBTAIN INFORMATION ABOUT WHAT VERSION OF WHATSAPP THE TARGET

4    DEVICE WAS RUNNING?

5    A.    YES.  SOME OF THE VECTORS REQUIRED DIFFERENT TYPES OF

6    INFORMATION.  BUT GENERALLY, YES.

7    Q.    OKAY.  YOU WOULD ALSO OBTAIN INFORMATION ABOUT WHETHER THE

8    TARGET DEVICE WAS ONLINE; RIGHT?

9    A.    YES.

10   Q.    AND WHETHER IT HAD A WHATSAPP ACCOUNT; CORRECT?

11   A.    YES.

12   Q.    AND YOU WOULD ALSO GET, AT LEAST IN THE CASE OF ERISED,

13   INFORMATION ABOUT THE VENDOR THAT THE TARGET DEVICE USED;

14   RIGHT?

15   A.    YES.

16   Q.    AND ALL THAT INFORMATION THAT WE JUST RECITED CAME THROUGH

17   WHATSAPP SERVERS FROM THE TARGET DEVICE; RIGHT?

18   A.    THIS IS THE -- THIS IS THE WAY THE MESSAGES ARE

19   TRANSMITTED, ONLY THROUGH WHATSAPP SERVERS.

20   Q.    ONLY THROUGH WHATSAPP SERVERS?  NO WAY TO GET THIS

21   NECESSARY INFORMATION, THERE WAS NO WAY TO GET IT OTHER THAN

22   THROUGH WHATSAPP SERVERS; RIGHT?

23   A.    YES.

24   Q.    AND NOW SOME OF THE INFORMATION COMES FROM THE TARGET

25   DEVICE THROUGH THE SERVERS, BUT SOME OF THE INFORMATION COMES

UNITED STATES COURT REPORTERS

972

1  PEGASUS WAS OBTAINING INFORMATION FROM THE TARGET DEVICES
2  THROUGH WHATSAPP SERVERS; CORRECT?
3  A.    YES.
4  Q.    YES?
5  A.    YES.
6  Q.    AND IT WAS DESIGNED TO GET THAT INFORMATION THROUGH
7  WHATSAPP SERVERS; RIGHT?
8  A.    THIS INFORMATION WAS NOT FROM THE WHATSAPP SERVERS. IN
9  FACT, IT WAS -- IT WAS DEFINED ACCORDING TO THE RESPONSE FROM
10 THE TARGET DEVICE.
11 Q.    IT CAME THROUGH WHATSAPP SERVERS; CORRECT?
12 A.    YES.
13 Q.    AND IT WAS DESIGNED TO DO SO; CORRECT?
14 A.    YES.
15 Q.    I'D LIKE TO ASK YOU SOME QUESTIONS -- YOU WERE ASKED A
16 NUMBER OF QUESTIONS ABOUT WHETHER YOU INTENDED TO HARM
17 WHATSAPP.
18       DO YOU RECALL THAT? IT WENT ON FOR SOME TIME. DO YOU
19 REMEMBER THAT QUESTIONING?
20 A.    YES.
21 Q.    NOW, I WANT TO ASK YOU A LITTLE DIFFERENT PERSPECTIVE ON
22 THAT QUESTION, MR. GAZNELI.
23       ISN'T IT CORRECT THAT WHEN YOUR R&D GROUP DESIGNS A
24 STRATEGY TO INSTALL PEGASUS, YOUR GROUP WANTS TO KEEP IT UP AND
25 RUNNING FOR AS LONG AS POSSIBLE?

973

1  A.    YES.
2  Q.    ALL RIGHT. AND THAT REQUIRES MINIMIZING THE RISK OF
3  DETECTION; ISN'T THAT CORRECT?
4  A.    THIS IS ONLY ONE PART OF IT. I EXPLAINED THE OTHER PART
5  RELATES ALSO FOR THE DISCOVERY TOWARDS THE TARGETS THEMSELVES.
6  Q.    LET'S JUST MAKE SURE WE'RE CLEAR ON THIS, MR. GAZNELI.
7        WE AGREE THAT R&D HAS THE GOAL OF KEEPING ITS INSTALLATION
8  VECTORS UP AND RUNNING FOR AS LONG AS POSSIBLE; RIGHT?
9  A.    YES.
10 Q.    AND PART OF KEEPING THEM UP AND RUNNING AS LONG AS
11 POSSIBLE IS MINIMIZING THE RISK OF THEIR DETECTION; ISN'T THAT
12 CORRECT?
13 A.    AS I SAID, THIS IS ONE PART OF IT.
14       IN ADDITION, IT WAS -- THE GOAL IS TO MINIMIZE THE
15 FOOTPRINT ON THE ECOSYSTEM.
16 Q.    RIGHT. RIGHT. I WANT TO STEP LIGHTLY, NOT LEAVE
17 FOOTPRINTS. THAT'S WHAT YOU'RE SAYING?
18 A.    YES.
19 Q.    OKAY. BECAUSE IN ORDER TO KEEP THE VECTORS UP AND RUNNING
20 AS LONG AS POSSIBLE, YOU DON'T WANT PEOPLE TO TELL YOU'VE BEEN
21 THERE; CORRECT?
22 A.    I CANNOT TELL WHETHER OR NOT I'VE BEEN THERE. BUT IN
23 TERMS OF I USE THE SYSTEM ACCORDING TO THE RULES THAT'S SET,
24 AND TO LOOK AS NORMAL AS POSSIBLE.
25 Q.    RIGHT. IN ORDER TO MINIMIZE THE RISK OF DETECTION; ISN'T

974

1  THAT CORRECT?
2  A.    YES.
3  Q.    BECAUSE -- AND, INDEED, THAT'S THE ROLE OF THE OPSEC
4  GROUP, OR AT LEAST PART OF THE ROLE OF THE OPSEC GROUP;
5  CORRECT?
6  A.    PART OF THE ROLE, YES.
7  Q.    RIGHT, TO MINIMIZE THE RISK OF DETECTION SO THAT THE
8  INSTALLATION VECTORS CAN BE KEPT GOING AS LONG AS POSSIBLE;
9  CORRECT?
10 A.    YES.
11 Q.    SO THAT THEY CAN BE USED AS MANY TIMES AS POSSIBLE; ISN'T
12 THAT RIGHT?
13 A.    AS FAR AS THE CUSTOMERS WOULD LIKE AND HAVE THE RIGHT TO
14 DO IT, YEAH.
15 Q.    OKAY. AND THAT'S -- THE REASON YOU'RE MINIMIZING THE RISK
16 OF DETECTION DELIBERATELY IS THAT NSO UNDERSTANDS THAT THERE
17 ARE ACTORS OUT THERE, SUCH AS WHATSAPP, THAT WOULD TAKE STEPS
18 TO BLOCK THE INSTALLATION IF THEY DETECTED IT; ISN'T THAT
19 RIGHT?
20 A.    YES.
21 Q.    AND THAT'S WHY -- YOU RECALL THE HEAVEN OPSEC DOCUMENT
22 THAT I SHOWED YOU AT YOUR DEPOSITION?
23 A.    YES.
24 Q.    WHY DON'T WE PUT IT UP ON THE SCREEN. IT'S PTX-60.
25       AND MR. EVANS, IF WE CAN GO TO PAGE 2.

975

1        YOU WERE ASKED ALL THESE QUESTIONS BY YOUR COUNSEL ABOUT
2  WHETHER YOU INTENDED TO HARM WHATSAPP.
3        NOW, THE WAY YOU REFERRED TO WHATSAPP IN THE CONTEXT OF
4  OPSEC, IN THE CONTEXT OF DELIBERATELY HIDING WHAT YOU WERE
5  DOING FROM WHATSAPP, WAS YOU CALLED THEM A THREAT ACTOR; ISN'T
6  THAT RIGHT?
7  A.    YEAH, IT'S NOT A DOCUMENT I WROTE. WE TALKED ABOUT THAT
8  AT THE DEPOSITION.
9  Q.    RIGHT. THIS IS A DOCUMENT FROM THE OPSEC TEAM?
10 A.    YES.
11 Q.    AND WHATSAPP WAS VIEWED NOT A FRIEND, NOT A COLLEAGUE,
12 CHARACTERIZED AS A THREAT ACTOR; RIGHT?
13 A.    THIS IS A TERM USED BY OPSEC TOWARDS ANY SERVICE THAT
14 WOULD DISTURB THIS.
15 Q.    RIGHT. AND NSO VIEWED WHATSAPP AS A THREAT BECAUSE THEY
16 WERE A THREAT TO NSO'S CONTINUED -- ABILITY TO CONTINUE
17 PROVIDING THE ABILITY TO INFECT ADDITIONAL DEVICES; ISN'T THAT
18 RIGHT?
19 A.    OKAY.
20 Q.    I'M SORRY?
21 A.    YEAH.
22 Q.    BECAUSE YOU UNDERSTOOD THAT WHATSAPP WOULD BLOCK THE
23 EXPLOIT IF THEY DETECTED IT; RIGHT?
24 A.    IF YOU DAMAGE THE SERVICE AND THE SERVERS, WHICH WE DIDN'T
25 DO PURPOSEFULLY IN ORDER TO ACT AS NORMAL AS POSSIBLE, THEN, OF

976

1    COURSE, THE PROVIDER WOULD BLOCK THE MESSAGES, YES.

2    Q.    ACT AS NORMAL AS POSSIBLE SO NO ONE WOULD KNOW WHAT YOU

3    WERE DOING; RIGHT?

4    A.    AS WE SAW BEFORE, THE CODE WAS SENT PLAIN CORRECT TEXT.

5    SO IF SOMEONE WOULD LIKE TO VIEW THAT CODE, THEY HAVE THE

6    ABILITY.

7    Q.    YOU'RE NOT CHANGING YOUR TESTIMONY, MR. GAZNELI, THAT NSO

8    DELIBERATELY MINIMIZED THE RISK OF DETECTION; CORRECT?

9    A.    NO, I'M NOT CHANGING ANYTHING.

10   Q.    RIGHT.  YOU HAD A TEAM OF PEOPLE WHO WAS DEVOTED TO

11   PREVENTING DETECTION OF THIS; CORRECT?

12   A.    YES.

13   Q.    OKAY.  AND THE REASON -- YOU UNDERSTOOD THAT THE REASON

14   THAT WHATSAPP WOULD BLOCK THIS ACTIVITY IF THEY DETECTED IT WAS

15   THAT NSO KNEW THAT WHATSAPP DID NOT WANT THIS ACTIVITY ON THEIR

16   SERVERS; RIGHT?

17   A.    I DON'T KNOW WHETHER WHATSAPP KNEW IT OR NOT.

18   Q.    WELL, YOU CERTAINLY UNDERSTOOD IF THEY DETECTED IT, THEY

19   WOULD BLOCK IT; RIGHT?

20   A.    THIS IS A STANDARD PROCEDURE IN ANY VECTOR, TO MINIMIZE

21   THE FOOTPRINT AS I SAID BEFORE, YEAH.

22   Q.    AND DESPITE KNOWING THAT WHATSAPP WOULD STOP THIS ACTIVITY

23   IF THEY DETECTED IT, DESPITE KNOWING THAT WHATSAPP DIDN'T WANT

24   THIS ON THEIR SERVERS, NSO DID IT ANYWAY; ISN'T THAT RIGHT?

25   A.    AS I SAID, I DON'T KNOW WHAT WHATSAPP WANTED OR NOT.  HOW

977

1    WOULD I KNOW?

2    Q.    AND NSO DID THAT REPEATEDLY; ISN'T THAT CORRECT?

3    A.    AS I SAID BEFORE, WHEN THE RULES CHANGED, THE PRODUCT WAS

4    ADJUSTED AND ACT ACCORDING TO THE NEW RULES.

5    Q.    WELL, IT WAS REPEATED IN A COUPLE DIFFERENT SENSES; RIGHT?

6          LET ME BREAK IT DOWN FOR YOU.

7          THE HEAVEN INSTALLATION VECTOR, WHICH USED WHATSAPP TO

8    TRIGGER THE INSTALLATION OF PEGASUS ON USERS' DEVICES, THAT

9    WASN'T USED JUST ONCE, WAS IT?

10   A.    HEAVEN.

11   Q.    THE HEAVEN INSTALLATION VECTOR WAS NOT USED ONLY ONE TIME,

12   WAS IT, MR. GAZNELI?

13   A.    BY THE CUSTOMERS?

14   Q.    BY WHOEVER WAS USING IT?

15   A.    BY CUSTOMERS, AS I SAID, AS LONG AS IT WAS ACTIVE, IT WAS

16   USED.

17   Q.    IT WAS USED MANY TIMES; ISN'T THAT RIGHT?

18   A.    AS FAR AS THEY HAD THE RIGHT TO USE IT, YEAH.

19   Q.    I'M SORRY?

20   A.    AS FAR AS THE FOUND RIGHT, THEY NEEDED TO BE USED.

21   Q.    SO IT WAS USED AS MANY TIMES AS THE CUSTOMERS WANTED;

22   RIGHT?

23   A.    NO.  THE CUSTOMERS HAD THE LIMITED ABILITY -- THE LIMITED

24   AMOUNT OF USE TO THEM TO DO.

25   Q.    RIGHT.  AND IF THEY WANT MORE USES, NSO CHARGES THEM MORE;

978

1    ISN'T THAT CORRECT?

2    A.    AGAIN, THIS IS NOT MY --

3    Q.    NOT YOUR AREA?

4    A.    YEAH.

5    Q.    OKAY.  BUT WE AGREE, MR. GAZNELI, THAT HEAVEN WAS USED

6    REPEATEDLY OVER THE COURSE OF MONTHS, AT LEAST, TO TRIGGER THE

7    INSTALLATION OF PEGASUS ON USERS' DEVICES; WASN'T IT?

8    A.    IT WAS USED FROM OCTOBER 2018 TO DECEMBER 2018.

9    Q.    OKAY.  AND AFTER HEAVEN NO LONGER WORKED BECAUSE OF

10   CHANGES THAT WHATSAPP HAD MADE, NSO DEVELOPED A NEW VECTOR THAT

11   ALSO TRIGGERED THE INSTALLATION OF PEGASUS BY TRANSMITTING

12   MESSAGES THROUGH WHATSAPP SERVERS; ISN'T THAT RIGHT?

13   A.    YES.

14   Q.    AND THAT VECTOR WAS EDEN; ISN'T THAT RIGHT?

15   A.    YES.

16   Q.    AND THEN EDEN WAS ALSO USED REPEATEDLY FOR A PERIOD OF

17   MONTHS TO INSTALL PEGASUS ON USERS' PHONES; ISN'T THAT RIGHT?

18   A.    YES.

19   Q.    ALL RIGHT.  AND THEN IN MAY 2019, WHATSAPP BLOCKED, MADE

20   CHANGES THAT BLOCKED EDEN FROM WORKING; ISN'T THAT CORRECT?

21   A.    YES.

22   Q.    AND, AGAIN, NSO DEVELOPED YET ANOTHER VECTOR, ERISED, THAT

23   WOULD TRIGGER INSTALLATION OF PEGASUS BY TRANSMITTING WHATSAPP

24   MESSAGES?

25   A.    THEY'RE NOT SAYING VECTORS.  THAT'S VERY DIFFERENT IN

979

1    ESSENCE.

2    Q.    DIFFERENT VECTORS, MR. GAZNELI, BUT ALSO ACTIVATED THROUGH

3    THE TRANSMISSION OF WHATSAPP MESSAGES, AT LEAST IN SOME

4    INSTANCES; ISN'T THAT RIGHT?

5    A.    SOME OF THEM.  SOME OF THE WHATSAPP SERVERS.  DIFFERENT

6    VECTORS UNITED DIFFERENT WHATSAPP SERVERS.

7    Q.    NOW, YOU WERE ASKED -- WELL, SO YOU WOULD AGREE THAT THIS

8    WASN'T -- THAT THIS WAS A PATTERN OF BEHAVIOR BY NSO; CORRECT?

9    A.    AS I SAID, THE -- THE DIFFERENT -- THE VECTORS WERE

10   DIFFERENT IN ESSENCE OF USING DIFFERENT WHATSAPP SERVERS, AND

11   SOME OF THEM WERE NO SERVERS USED, AT LEAST FOR THE -- EXCEPT

12   FOR THE WHATSAPP SIGNALLING SERVER.

13        SO IF YOU WANT TO TALK ABOUT THE DIFFERENCE, THE

14   DIFFERENCES BETWEEN THEM, WE CAN TALK ABOUT IT.

15   Q.    WELL, WHY DON'T WE TALK ABOUT WHAT'S THE SAME BETWEEN

16   THEM, BECAUSE FOR PURPOSES OF THIS CASE, THEY HAVE ONE VERY

17   IMPORTANT THING IN COMMON, WHICH IS THAT THEY ALL TRIGGERED THE

18   INSTALLATION OF PEGASUS BY TRANSMITTING MESSAGES THROUGH

19   WHATSAPP SERVERS; ISN'T THAT CORRECT?

20   A.    THEY ALL USED WHATSAPP SIGNALLING SERVER IN ORDER TO

21   TRANSMIT.

22   Q.    RIGHT, IN ORDER TO TRIGGER INSTALLATION OF PEGASUS;

23   CORRECT?

24   A.    IT COULDN'T BE DONE ONLY BY USING THE SERVER.  BUT AS PART

25   OF THEM, YES.

980

1  Q.  RIGHT.  AND THE PURPOSE -- I THINK YOU TESTIFIED AT YOUR

2  DEPOSITION, WITHOUT INSTALLATION, THERE IS NO OBTAINING OF

3  INFORMATION; RIGHT?

4  A.  YES.

5  Q.  RIGHT.  SO IT WAS COMMON TO ALL THREE OF THESE VECTORS

6  THAT THEY'RE USING THE SERVERS IN ORDER TO MAKE THE EXTRACTION

7  OF INFORMATION POSSIBLE; CORRECT?

8  A.  YES.

9       (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)

10 BY MR. PEREZ:

11 Q.  MR. GAZNELI, YOU'RE THE VICE PRESIDENT OF RESEARCH AND

12 DEVELOPMENT?

13 A.  YES.

14 Q.  YOU CONSIDER YOURSELF A SENIOR OFFICER OF THE COMPANY?

15 A.  YEAH.

16 Q.  PART OF THE MANAGEMENT TEAM?

17 A.  YES.

18 Q.  SUBSTANTIAL AUTHORITY AT THE COMPANY?

19 A.  YES.

20 Q.  A ROLE IN CORPORATE DECISION MAKING?

21 A.  YEAH.

22 Q.  OKAY.  AND THIS CONDUCT THAT WE DESCRIBED THAT WE'VE JUST

23 RUN THROUGH FOR THE JURY WHEREBY AN INSTALLATION VECTOR WAS

24 BLOCKED AND THEN NSO GOT BACK TO WORK AND DESIGNED A NEW WAY OF

25 USING WHATSAPP SERVERS TO TRIGGER INSTALLATION OF PEGASUS,

981

1  THAT'S WORK THAT YOU WERE PERSONALLY INVOLVED IN; RIGHT?

2  A.  YES.

3  Q.  RIGHT.  THAT'S WORK THAT YOU OVERSAW AND APPROVED?

4  A.  YES.

5  Q.  AND YOU AUTHORIZED?

6  A.  YES.

7  Q.  ARE YOU AWARE OF THE COURT'S RULING THAT NSO'S WORK IN

8  REDESIGNING PEGASUS TO OVERCOME WHATSAPP'S UPDATES REFLECTED AN

9  UNLAWFUL INTENT IN VIOLATION OF UNITED STATES LAW?

10 A.  I'M AWARE OF THE RULING, YEAH.

11 Q.  YEAH.  AND THAT IS -- THAT WORK, REDESIGNING PEGASUS,

12 THAT'S WORK THAT YOU PERSONALLY PARTICIPATED -- PARTICIPATED

13 IN, APPROVED, AND AUTHORIZED; CORRECT?

14 A.  YES.

15      MR. PEREZ:  NO MORE QUESTIONS AT THIS TIME,

16 YOUR HONOR.

17      THE COURT:  ALL RIGHT.  ANY REDIRECT?

18      MR. AKROTIRIANAKIS:  I JUST HAVE ONE QUESTION,

19 YOUR HONOR.  IF I MAY?  I THINK THAT IT'S -- IT WAS PLAINLY --

20      THE COURT:  WHICH?

21      MR. AKROTIRIANAKIS:  THE ONE THAT WE DISCUSSED AT THE

22 BREAK, I THINK IT'S PLAINLY THE SUBJECT OF THAT EXAMINATION AND

23 FAIRY DIRECT.

24      THE COURT:  I'M SORRY, I DON'T REMEMBER WHAT WE

25 DISCUSSED AT THE BREAK.  THAT WAS AN HOUR AGO.

982

1       MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  I'LL JUST ASK

2  THE QUESTION AND IF THERE'S STILL ON OBJECTION --

3       THE COURT:  OKAY.

4            REDIRECT EXAMINATION

5  BY MR. AKROTIRIANAKIS:

6  Q.  IN RESPONSE TO MR. PEREZ'S QUESTIONS, YOU -- WELL, IN

7  MR. PEREZ'S QUESTIONS, YOU WERE ASKED WHICH OF THE VECTORS USED

8  WHATSAPP SERVERS AND SIGNALLING SERVERS VERSUS RELAY SERVERS.

9  I WANT TO ASK YOU A FOLLOW-UP QUESTION TO THAT.

10      WHICH OF THE THREE HUMMINGBIRD VECTORS USED WHATSAPP

11 SIGNALLING SERVERS IN SOME WAY?

12 A.  ALL OF THEM.

13 Q.  AND WHICH OF THE HUMMINGBIRD VECTORS USED WHATSAPP RELAY

14 SERVERS?

15      MR. PEREZ:  OBJECTION, YOUR HONOR.  SAME OBJECTION

16 THAT I MADE BEFORE, AS WELL AS 403.

17      THE COURT:  ALL RIGHT.  I THINK I'M GOING TO ALLOW IT

18 AT THIS TIME GIVEN THE AMOUNT OF TESTIMONY WE'VE HEARD ON THE

19 SIGNALLING -- ON THE TWO DIFFERENT KINDS OF SERVERS.

20      HE MAY ANSWER.

21      THE WITNESS:  ONLY EDEN.

22 BY MR. AKROTIRIANAKIS:

23 Q.  OKAY.  AND TO REORIENTING THE JURY TO YOUR EARLIER

24 TESTIMONY, EDEN WAS THE VECTOR THAT WE SAW WAS CLOSED ON

25 MAY 12TH, 2019; CORRECT?

983

1  A.  YES.

2  Q.  OKAY.  AND NO VECTOR BEFORE -- AND THAT WAS NOT THE FIRST

3  VECTOR?  WHICH WAS THE FIRST IN TIME VECTOR?

4  A.  HEAVEN.

5  Q.  AND WHAT WAS THE TIME PERIOD DURING WHICH THE HEAVEN

6  VECTOR WAS OPEN?

7  A.  OCTOBER 2019 TO DECEMBER 2019.  OCTOBER 2018 TO DECEMBER

8  2018.

9  Q.  OKAY.  AND THAT HAD NOTHING TO DO WITH RELAY SERVERS?

10 A.  NOT WHATSAPP RELAY SERVERS.

11 Q.  ALL RIGHT.  YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER A

12 MOBILE PHONE NUMBER HAD A WHATSAPP ACCOUNT ASSOCIATED TO IT.

13      DO YOU RECALL THOSE QUESTIONS?

14 A.  YES.

15 Q.  ALL RIGHT.  DO YOU USE WHATSAPP?

16 A.  YES.

17 Q.  ME, TOO.

18      IF I CALLED YOU RIGHT NOW USING WHATSAPP AND I HAD YOU AS

19 A CONTACT IN MY PHONE, WOULD THE INFORMATION THAT I RECEIVED ON

20 MY -- IT'S OVER THERE -- IPHONE BE THE SAME INFORMATION THAT

21 YOU WERE TALKING ABOUT, WHETHER THE NUMBER IS A WHATSAPP

22 ACCOUNT?

23 A.  YES.

24 Q.  ALL RIGHT.  AND IF YOU USED YOUR WHATSAPP TO CALL

25 MR. PEREZ ON HIS WHATSAPP, WOULD THAT BE THE SAME INFORMATION

984

1  THAT WOULD RETURN FROM THE SERVER, WHETHER MR. PEREZ'S MOBILE

2  NUMBER HAS A WHATSAPP ACCOUNT?

3  A.    YES.

4  Q.    DOES THAT HAVE ANYTHING TO DO WITH PEGASUS?

5  A.    NO.

6  Q.    ALL RIGHT.  IS THAT INFORMATION THAT WHATSAPP KEEPS SECRET

7  IN ANY WAY?

8  A.    NO.

9        MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

10        THE COURT:  ALL RIGHT.

11        MR. PEREZ:  I THINK JUST ONE QUICK ISSUE.

12              RECROSS-EXAMINATION

13  BY MR. PEREZ:

14  Q.    MR. GAZNELI, NSO'S LAWYER WAS JUST ASKING YOU WHETHER THE

15  INFORMATION THAT NSO OBTAINED AS PART OF THIS FINGERPRINTING

16  PROCESS, WHETHER THAT WAS SIMILAR, AT LEAST WITH RESPECT TO

17  WHETHER THE TARGET HAD A WHATSAPP ACCOUNT, WHETHER THAT WAS

18  SIMILAR TO WHAT YOU OR I WOULD OBTAIN IF WE WERE CALLING ONE

19  ANOTHER BY WHATSAPP.

20        DO YOU RECALL THAT?

21  A.    YES.

22  Q.    IF I USED MY MOBILE PHONE TO CALL YOUR MOBILE PHONE;

23  RIGHT?

24  A.    YES.

25  Q.    THAT WAS THE QUESTION YOU WERE JUST ASKED?

985

1  A.    YES.

2  Q.    BUT WHEN NSO IS SENDING THESE MESSAGES, IT WASN'T USING A

3  MOBILE PHONE; RIGHT?

4  A.    IT WAS USING A CLIENT THAT WAS INSTALLED.

5  Q.    RIGHT.  IT WAS USING THE WIS, CORRECT, TO GENERATE THE

6  MESSAGES?

7  A.    THE MESSAGES WERE GENERATED BY WIS, BUT IT WAS SENT

8  THROUGH A CLIENT THAT WAS INSTALLED ON THE DEVICE.

9  Q.    RIGHT.  AND THAT CAPABILITY TO GENERATE THESE MESSAGES

10  THROUGH THE WIS, THAT WAS PART OF THE CAPABILITY THAT NSO

11  DEVELOPED THROUGH THIS MULTI-MONTH, YEAR LONG R&D PROCESS;

12  ISN'T THAT RIGHT?

13  A.    YES.

14        MR. PEREZ:  THANK YOU.  NOTHING FURTHER, YOUR HONOR.

15        THE COURT:  OKAY.  THANK YOU.

16  I ASSUME THAT'S IT?

17        MR. AKROTIRIANAKIS:  YES.  THANK YOU, YOUR HONOR.

18        THE COURT:  ALL RIGHT.  THANK YOU, MR. GAZNELI.  YOU

19  MAY STEP DOWN.

20        MR. AKROTIRIANAKIS, CALL YOUR NEXT WITNESS, PLEASE.

21        MR. AKROTIRIANAKIS:  YES, YOUR HONOR.  WE'RE GOING TO

22  PLAY A VIDEO, SO --

23        MR. CRAIG:  YOUR HONOR, WE'RE GOING TO PLAY THE VIDEO

24  TESTIMONY OF WITNESS SUSAN GLICK, AND WE'D LIKE TO MOVE INTO

25  EVIDENCE IN ADVANCE OF THE TESTIMONY EXHIBIT 1021, MUCH

986

1  DISCUSSED.

2        THE COURT:  OKAY.  I JUST WANT TO BE SURE, WITH

3  REGARD TO 1021, TWO THINGS.  I WENT BACK TO LOOK AT THE SECOND

4  PRETRIAL ORDER, AND IT SAYS I DISALLOWED THE ADMISSION OF 1026

5  AND ANY EXHIBITS ARRIVING OUT OF THE SAME EMAIL THREAD.

6        IS THIS PART OF THAT EMAIL THREAD?

7        MR. CRAIG:  IT -- THE CONTENT OF EXHIBIT 1026 HAS

8  BEEN REDACTED IN ITS ENTIRETY FROM EXHIBIT 1021.

9        MR. ANDRES:  I'M SORRY, YOUR HONOR.  THE ANSWER TO

10  YOUR QUESTION IS YES.

11        THE COURT:  OKAY.  THAT'S -- THAT'S ALL I'M GETTING

12  AT, BECAUSE I'M TRYING TO BE CONSISTENT THROUGHOUT, AND IT'S

13  REALLY DIFFICULT WITH ALL OF THESE DOCUMENTS.

14        AND YESTERDAY I INDICATED THAT I ALREADY APPROVED THE

15  REDACTIONS OF THIS, BUT THEN WHEN I WENT BACK TO LOOK AT THE

16  SECOND PRETRIAL ORDER, I CLEARLY ALREADY MADE A DETERMINATION

17  WITH REGARD TO ANY PARTS OF THAT EMAIL THREAD.

18        IS THIS PART OF THE EMAIL THREAD?  IF IT IS, THEN IT CAN'T

19  COME IN.

20        MR. CRAIG:  YOUR HONOR, I COULDN'T SAY IT'S PART OF

21  THE SAME EMAIL THREAD.

22        I WOULD SAY THAT YOUR HONOR HADN'T LOOKED AT EXHIBIT 1021

23  BEFORE YOU MADE YOUR RULING BECAUSE IT WASN'T ANYWHERE IN THE

24  RECORD, AND ONCE YOUR HONOR LOOKED AT IT, WE -- I MEAN, WE'VE

25  HAD AMPLE DISCUSSION ABOUT THIS OUTSIDE THE JURY'S PRESENCE.

987

1        THE COURT:  WHO WAS ON THE ORIGINAL THREAD THAT I

2  LOOKED AT?  1026?  WERE THESE SAME PEOPLE ON THAT?

3        MR. CRAIG:  NO.  THERE WERE MANY MORE PEOPLE ON

4  EXHIBIT 1026 THAN --

5        THE COURT:  THIS, TO ME, SEEMS TO BE A PRETTY EASY

6  ISSUE.  I SAID THIS EXHIBIT CAN'T COME IN IF IT'S PART OF THE

7  SAME EMAIL THREAD.  IT EITHER IS OR IT ISN'T.

8        DOES ANYONE KNOW?

9        MR. AKROTIRIANAKIS:  IT ISN'T, YOUR HONOR.  THIS IS

10  ABOVE THAT EMAIL THREAD.  THERE ARE ADDITIONAL MESSAGES ABOUT

11  DIFFERENT TOPICS THAN WHAT IS IN THE LOWER PART, OR THE EARLIER

12  MESSAGES IN TIME.  THAT WAS WHAT WE EXPLAINED TO YOUR HONOR.

13        THE COURT:  OKAY.  DID THIS PRECEDE --

14        MR. AKROTIRIANAKIS:  NO, NO, IT CAME AFTER.  IT CAME

15  AFTER.  IT'S ADDITIONAL INFORMATION THAT CAME LATER IN TIME IN

16  SUBSEQUENT EMAILS, INCLUDING OTHER PEOPLE, OR DIFFERENT PEOPLE,

17  THAN THE EARLIER MESSAGES.

18        THE COURT:  OKAY.

19        MR. ANDRES:  YOUR HONOR, THAT SOUNDS LIKE IT'S PART

20  OF THE SAME THREAD.

21        I'M NOT AN EMAIL THREAD EXPERT, BUT WHEN ALL THE EMAILS

22  COME TOGETHER, THAT'S WHAT A THREAD IS.

23        THIS IS PART OF THE SAME THREAD, WHICH YOUR HONOR RULED IT

24  SHOULDN'T COME IN.

25        I THINK MR. AKROTIRIANAKIS BASICALLY JUST TESTIFIED TO

1176

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                        OAKLAND DIVISION

 4

 5   WHATSAPP LLC AND META          )  C-19-07123 PJH
     PLATFORMS, INC.,               )
 6                                   )  OAKLAND, CALIFORNIA
                    PLAINTIFFS,      )
 7                                   )  MAY 5, 2025
               VS.                   )
 8                                   )  VOLUME 6
     NSO GROUP TECHNOLOGIES LIMITED  )
 9   AND Q CYBER TECHNOLOGIES        )  PAGES 1176-1369
     LIMITED,                        )
10                                   )
                    DEFENDANTS.      )
11   _____ )

12

13               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE PHYLLIS J. HAMILTON
14              UNITED STATES DISTRICT JUDGE

15

16   A P P E A R A N C E S :

17   FOR THE PLAINTIFFS:   DAVIS POLK & WARDWELL
                           BY:  GREG D. ANDRES
18                              ANTONIO J. PEREZ
                           450 LEXINGTON AVENUE
19                         NEW YORK, NEW YORK  10017

20                         BY:  MICAH G. BLOCK
                           900 MIDDLEFIELD ROAD, SUITE 200
21                         REDWOOD CITY, CALIFORNIA  94063

22   OFFICIAL COURT REPORTERS:  LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER


                      UNITED STATES COURT REPORTERS
```

1177

```
 1

 2   APPEARANCES (CONTINUED)

 3

 4   FOR THE DEFENDANTS:    KING & SPALDING
                     BY:  JOSEPH N. AKROTIRIANAKIS
 5                        AARON S. CRAIG
                     633 WEST FIFTH STREET, SUITE 1600
 6                   LOS ANGELES, CALIFORNIA  90071

 7                   BY:  MATTHEW V. NOLLER
                     50 CALIFORNIA STREET, SUITE 3300
 8                   SAN FRANCISCO, CALIFORNIA  94111

 9

10   ALSO PRESENT:     CURT EVANS
                       BRIAN BAKALE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                      UNITED STATES COURT REPORTERS
```

1178

```
 1

 2                    INDEX OF WITNESSES

 3   DEFENDANTS'

 4   SUSAN GLICK
 5      VIDEOTAPED DEPOSITION PLAYED         P. 1186

 6

 7   PLAINTIFFS' REBUTTAL

     DANA TREXLER
 8      DIRECT EXAM BY MR. BLOCK            P. 1187
        CROSS-EXAM BY MR. AKROTIRIANAKIS      P. 1198
 9      REDIRECT EXAM BY MR. BLOCK          P. 1206

10

11   DEFENDANTS' REBUTTAL

     GREG PINSONNEAULT
12      DIRECT EXAM BY MR. CRAIG            P. 1211
        VOIR DIRE EXAM BY MR. BLOCK         P. 1213
13      DIRECT EXAM BY MR. CRAIG (RES.)     P. 1215
        CROSS-EXAM BY MR. BLOCK             P. 1229
14

15

16

17   CLOSING ARGUMENT BY MR. ANDRES          P. 1240

18   CLOSING ARGUMENT BY MR. AKROTIRIANAKIS    P. 1285

19   REBUTTAL ARGUMENT BY MR. ANDRES         P. 1332

20
21
22
23
24
25

                      UNITED STATES COURT REPORTERS
```

1179

```
 1

 2                    INDEX OF EXHIBITS

 3                         MARKED      ADMITTED

 4   PLAINTIFFS'

 5   264 (REDACTED)                      1210

 6

 7

 8   DEFENDANTS'

 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                      UNITED STATES COURT REPORTERS
```

1188

1   A.    THE SCREEN IS ENOUGH.

2   Q.    MS. TREXLER, WHAT IS EXHIBIT A-1779?

3   A.    THIS IS THE NSO TECHNOLOGIES BALANCE SHEET FOR THE YEARS

4   ENDED DECEMBER 2023 AND 2024.

5   Q.    WHAT IS A BALANCE SHEET?

6   A.    ESSENTIALLY A BALANCE SHEET SHOWS THE COMPANY'S ASSETS,

7   LIABILITIES, AND EQUITY, AND THERE'S A BASIC FORMULA IN

8   ACCOUNTING FOR THE BALANCE SHEET BECAUSE IT HAS TO BALANCE.

9         AND SO WHAT THAT MEANS IS TOTAL ASSETS NEED TO EQUAL TOTAL

10  LIABILITIES, PLUS TOTAL EQUITY.

11        SO IF WE LOOK AT THIS BALANCE SHEET, YOU CAN SEE THE TOTAL

12  ASSETS LINE ITEM OF $244.3 MILLION.

13        IF I TAKE THE TOTAL CURRENT LIABILITIES OF $84.3 MILLION,

14  ADD THAT TO TOTAL NON-CURRENT LIABILITIES OF $26.2 MILLION, I

15  THINK THAT'S APPROXIMATELY $110.4 MILLION.

16        AND THAT, PLUS THE EQUITY OF $133.9 MILLION, EQUALS

17  $244.3 MILLION OF TOTAL LIABILITIES, PLUS EQUITY.

18        SO YOU CAN SEE THE TOTAL ASSETS EQUAL THE TOTAL

19  LIABILITIES, PLUS EQUITY.

20  Q.    WOULD IT HELP YOU TO HAVE A CALCULATOR, MS. TREXLER?

21  A.    IF I COULD?  THEN I CAN CONFIRM MY MENTAL MATH HERE.

22        MR. BLOCK:  MAY I APPROACH, YOUR HONOR.

23        THE COURT:  YES.

24        THE WITNESS:  THANK YOU.

25        MR. BLOCK:  (HANDING.)

1189

1         THE WITNESS:  SO I'M GOING TO TAKE THE TOTAL CURRENT

2   LIABILITIES OF 84.3 MILLION, ADD THE 26.2 MILLION, AND IT GIVES

3   ME ABOUT $111 MILLION.

4         WHEN I ADD THAT TO 133.9, THAT GIVES ME THE 244.3 MILLION

5   IN TOTAL LIABILITIES AND EQUITY.

6         NOW, I DO WANT TO POINT OUT, IF YOU LOOK AT THE LAST LINE

7   OF THIS BALANCE SHEET WHERE IT HAS THE $244.3 MILLION, THAT

8   JUST SAYS TOTAL LIABILITIES.

9         I BELIEVE THAT'S A TYPO FOR THE EQUITY PIECE THAT CUT OFF,

10  BECAUSE THAT REPRESENTS TOTAL LIABILITIES, PLUS EQUITY, WHICH I

11  JUST SHOWED YOU THROUGH THE MATH.

12        SO THERE'S -- I JUST THINK THERE'S A TYPO ON THIS

13  DOCUMENT.

14  BY MR. BLOCK:

15  Q.    DO YOU SEE AT THE TOP OF THIS DOCUMENT, THERE'S A SMALL

16  INDICATION THAT SAYS GAAP.

17  A.    YES, IN THE SOURCE FILE CODE IT SAYS GAAP.  THAT STANDS

18  FOR GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, WHICH ARE

19  ESSENTIALLY THE RULES THAT ARE FOLLOWED IN ACCOUNTING WHICH

20  MAKE FINANCIAL STATEMENTS COMPARABLE FROM PERIOD TO PERIOD AND

21  BETWEEN COMPANY TO COMPANY.  YOU KNOW THAT THEY'RE FOLLOWING

22  THE SAME RULES.

23  Q.    DOES YOUR EXPERTISE AS A CERTIFIED PUBLIC ACCOUNTANT

24  INCLUDE EXPERIENCE WITH THE GENERALLY ACCEPTED ACCOUNTING

25  PRINCIPLES?

1190

1   A.    YES, THAT'S WHAT I'VE DEALT WITH THROUGH ALL OF MY

2   SCHOOLING AND MY ENTIRE CAREER.

3   Q.    OKAY.  I THINK WE'VE DONE NOW THE NUMBERS FOR NSO GROUP AS

4   OF THE END OF 2023.

5         BUT WAS THERE ANYTHING ELSE FOR THAT YEAR THAT YOU WANTED

6   TO HIGHLIGHT FOR THE JURY?

7   A.    I THINK THAT'S IT WITH RESPECT TO THE NUMBERS.

8         THERE'S SOME OTHER THINGS THAT I THINK WE NEED TO CLEAR UP

9   WITH RESPECT TO THE TRADE ACCOUNTS RECEIVABLE.

10        THERE WAS SOME TESTIMONY THAT THE TRADE ACCOUNTS

11  RECEIVABLE OF $189.7 MILLION WAS UNCOLLECTIBLE, AND I THINK

12  THAT IT WAS PAPER MONEY.

13        THAT IS INCONSISTENT WITH WHAT AN AUDITED FINANCIAL

14  STATEMENT WOULD SHOW, AND MR. SHOHAT TESTIFIED THAT THE NUMBERS

15  ON THIS BALANCE SHEET FOR 2023 ARE IDENTICAL TO THE NUMBERS ON

16  THE AUDITOR'S AUDITED FINANCIAL STATEMENTS THAT THEY RECEIVED A

17  FEW DAYS AGO.

18        AND THE PURPOSE OF AN AUDIT IS TO TEST THE BALANCES IN THE

19  COMPANY'S FINANCIAL STATEMENTS TO MAKE SURE THAT THEY ARE NOT

20  MATERIALLY MISSTATED.

21        WHAT DOES THAT MEAN FROM A BALANCE SHEET PERSPECTIVE?

22        IT MEANS THAT WHAT'S REPORTED AS AN ASSET HAS TO BE

23  COLLECTIBLE.  IT HAS TO BE REAL.

24        AND SO THE AUDITOR SIGNING OFF ON A $189.7 MILLION TRADE

25  ACCOUNTS RECEIVABLE MEANS THAT THEY TESTED THAT BALANCE, THEY

1191

1   CONFIRMED THAT THE BALANCE IS REAL, AND THAT IT'S COLLECTIBLE.

2         IF IT WEREN'T, THE AUDITORS WOULD HAVE REQUIRED THE

3   COMPANY TO WRITE OFF ON COLLECTABLE RECEIVABLES, AND THEY

4   WOULDN'T BE ALLOWED TO REPORT THEM.  IT WOULD BE A MATERIAL

5   MISSTATEMENT IF $189.7 MILLION WASN'T COLLECTIBLE.

6         THE OTHER THING TO NOTE IS TRADE ACCOUNTS RECEIVABLE ARE A

7   CURRENT ASSET, AND WHAT A CURRENT ASSET IS IS AN ASSET THAT IS

8   EXPECTED TO BE COLLECTED WITHIN A 12 MONTH PERIOD DURING THE

9   NORMAL BUSINESS OPERATING CYCLE.

10        SO NOT ONLY IS $189.7 MILLION COLLECTIBLE, IT'S EXPECTED

11  TO CONVERT TO CASH WITHIN 12 MONTHS.

12  Q.    IS THERE ANYTHING ELSE IN THESE FINANCIAL STATEMENTS THAT

13  BEARS ON YOUR UNDERSTANDING OF THAT TRADE ACCOUNTS RECEIVABLE

14  LINE ITEM?

15  A.    YES.  MR. SHOHAT ALSO TESTIFIED THAT THE COMPANY SPENDS

16  ABOUT $10 MILLION A MONTH, OR $120 MILLION A YEAR, ON ITS

17  EXPENSES.

18        AND THE TRADE ACCOUNTS RECEIVABLE IS THE LARGEST ASSET

19  THAT IS ON THE NSO BALANCE SHEET, AND IF THAT WAS NOT

20  CONVERTING TO CASH, NSO WOULD BE UNABLE TO PAY THAT $10 MILLION

21  A MONTH, $120 MILLION A YEAR UNLESS THEY WERE TAKING ON

22  ADDITIONAL DEBT, WHICH I CAN SEE FROM THIS BALANCE SHEET THAT

23  THEY WEREN'T.

24        THEIR DEBT'S RELATIVELY LOW.  AND IF WE LOOK AT THE LOANS

25  PAYABLE AMOUNT IN CURRENT LIABILITIES, IT'S $19.5 MILLION.

1192

1 SO I'M GOING TO DO SOME MATH HERE.  SO IT'S THE 19.5, I
2 ADD THAT TO THE LONG-TERM LOAN NET OF $13.1 MILLION -- OH, AND
3 I'M SORRY, I ALSO FORGOT, IF WE GO BACK UP TO CURRENT
4 LIABILITIES, THERE'S THE CURRENT MATURITIES OF LONG-TERM LOAN,
5 THAT'S 18.4.
6 THAT SHOWS ABOUT $51 MILLION IN DEBT.
7 NOW, THE REASON I KNOW THEY'RE NOT TAKING ON MORE IS IF WE
8 MOVE OVER TO 2024 AND YOU LOOK AT THE LOANS PAYABLE AMOUNT,
9 THEY PAID OFF THE $19.5 MILLION IN DEBT.  THAT TAKES CASH TO
10 PAY IT OFF.
11 YOU CAN SEE THAT THEIR CURRENT MATURITIES ARE
12 $21.1 MILLION, AND THEN IF I LOOK AT THE LONG-TERM LOAN, THAT'S
13 $8 MILLION.
14 SO THEIR DEBT FROM 2023 WENT FROM 51 MILLION TO
15 29 MILLION.  SO THEY PAID OFF $22 MILLION OF DEBT.  THEY'RE NOT
16 TAKING ON MORE DEBT, THEY'RE PAYING IT DOWN, AND THAT MEANS
17 THAT THESE RECEIVABLES ARE BEING COLLECTED.  THEY'RE CONVERTING
18 TO CASH.
19 Q.   MS. TREXLER, WHAT IS A -- I THINK YOU DISCUSSED CURRENT
20 ASSETS.
21 WHAT'S A NON-CURRENT ASSET?
22 A.   SO A CURRENT ASSET IS ONE THAT'S EXPECTED TO CONVERT TO
23 CASH WITHIN A 12 MONTH PERIOD.
24 A NON-CURRENT ASSET IS AN ASSET THAT'S EXPECTED TO CONVERT
25 TO CASH IN A PERIOD THAT TAKES LONGER THAN 12 MONTHS, BUT IT'S

1193

1 STILL EXPECTED TO TURN INTO CASH.  JUST LIKE WITH THE TRADE
2 ACCOUNTS RECEIVABLE, IF THE AUDITORS DIDN'T BELIEVE THAT THE
3 CURRENT ASSETS WERE -- OR THE NON-CURRENT ASSETS WEREN'T
4 CONVERTIBLE TO CASH, THEY WOULD NOT ALLOW NSO TO REPORT THAT
5 BALANCE ON THE FINANCIAL STATEMENTS, OR IT WOULD BE MATERIAL --
6 MATERIALLY MISSTATING THE BALANCE SHEET.
7 Q.   DID YOU HEAR MR. SHOHAT'S TESTIMONY ABOUT THE DEFINITION
8 OF NON-CURRENT ASSETS?
9 A.   YES.  MR. SHOHAT SAID THAT NON-CURRENT ASSETS WERE NOT
10 EXPECTED TO BE CONVERTED TO CASH, AND THAT'S JUST FACTUALLY
11 INCORRECT.
12 HE ALSO TESTIFIED THAT TOTAL ASSETS EQUAL TOTAL
13 LIABILITIES, WHICH IS NOT THE FORMULA FOR THE BALANCE SHEET.
14 SO I THINK THERE WAS SOME, YOU KNOW, MISUNDERSTANDING OF
15 SOME OF THE ACCOUNTING DEFINITIONS IN THE WAY THAT THE BALANCE
16 SHEET WORKS.
17 Q.   ARE YOU FAMILIAR WITH THE CONCEPT OF NET WORTH?
18 A.   YES, I AM.
19 Q.   WHAT IS THAT?
20 A.   NET WORTH IS THE -- THE FORMULA FOR IT IS TOTAL ASSETS
21 MINUS TOTAL LIABILITIES, AND WHAT IT REPRESENTS IS ESSENTIALLY
22 THE OWNER'S INTEREST IN THE REMAINING ASSETS AFTER LIABILITIES
23 ARE DEDUCTED FROM THOSE ASSETS.
24 Q.   DOES THIS DOCUMENT, WHICH I THINK IS 1779, SHOW YOU NSO'S
25 NET WORTH FOR -- AS OF THE END OF 2023?

1194

1 A.   YES.  IT SHOWS TOTAL NET WORTH OF $133.9 MILLION, WHICH IS
2 REPRESENTED BY THE TOTAL EQUITY LINE.
3 SO IT'S TOTAL ASSETS MINUS TOTAL CURRENT LIABILITIES MINUS
4 TOTAL NON-CURRENT LIABILITIES, THAT GIVES YOU THE TOTAL EQUITY
5 AMOUNT, WHICH IS THE SAME THING AS NET WORTH.
6 Q.   WILL YOU PLEASE TAKE THE JURY THROUGH NSO'S BALANCE SHEET
7 FIGURES AS OF THE END OF 2024?
8 A.   YES.  TOTAL ASSETS ARE $221.2 MILLION, TOTAL LIABILITIES
9 ARE CALCULATED AS THE TOTAL CURRENT LIABILITIES OF
10 78.5 MILLION, PLUS THE TOTAL NON-CURRENT LIABILITIES OF
11 21.1 MILLION, WHICH IS ABOUT $100 MILLION IN LIABILITIES.
12 TOTAL EQUITY IS 121.7 MILLION, AND WHEN I ADD 100 MILLION
13 AND THE $121 MILLION OF TOTAL EQUITY, I GET TOTAL LIABILITIES
14 AND EQUITY OF 120 -- SORRY -- $221.2 MILLION.
15 Q.   DOES THIS SHOW NSO'S NET WORTH AS OF THE END OF 2024?
16 A.   YES.  THAT'S THE $121.7 MILLION THAT'S REPRESENTED BY THE
17 TOTAL EQUITY LINE ITEM.
18 Q.   OKAY.  LET'S LOOK AT Q CYBER.
19 CAN WE SEE A-1780 ON SCREEN, PLEASE.
20 MS. TREXLER, WHAT IS THIS DOCUMENT?
21 A.   THIS IS THE Q CYBER ISRAEL BALANCE SHEET FOR THE YEAR
22 ENDED -- THE YEARS ENDED DECEMBER 2023 AND 2024.
23 Q.   WHAT'S THE LAST LINE ITEM LABELED ON THIS DOCUMENT?
24 A.   THIS IS ALSO LABELED TOTAL LIABILITIES, AND THAT SHOULD
25 READ TOTAL LIABILITIES AND EQUITY.

1195

1 Q.   OKAY.  WOULD YOU PLEASE WALK THE JURY THROUGH Q CYBER'S
2 2023 NUMBERS?
3 A.   Q CYBER HAD TOTAL ASSETS OF $216.2 MILLION: THEY HAVE
4 CURRENT LIABILITIES OF $17 MILLION: TOTAL NON-CURRENT
5 LIABILITIES OF $2.1 MILLION.  SO THAT'S TOTAL LIABILITIES OF
6 ABOUT $19.1 MILLION.
7 AND THEY HAVE TOTAL EQUITY OF $197.1 MILLION.
8 SO WHEN I TAKE THE $19 MILLION IN LIABILITIES, PLUS THE
9 EQUITY, THAT GIVES ME TOTAL LIABILITIES AND EQUITY OF
10 $216.2 MILLION.
11 Q.   AND DOES THIS SHOW Q CYBER'S NET WORTH AS OF THE END OF
12 2023?
13 A.   IT DOES.  THAT'S THE TOTAL EQUITY LINE ITEM OF
14 $197.1 MILLION.
15 SO, AGAIN, THE NET WORTH IS THE OWNER'S INTEREST IN THE
16 EXTRA ASSETS AFTER YOU SUBTRACT ALL LIABILITIES.
17 Q.   WOULD YOU PLEASE WALK THE JURY THROUGH THE KEY FIGURES FOR
18 Q CYBER FOR 2024.
19 A.   TOTAL ASSETS ARE $203.6 MILLION: TOTAL CURRENT LIABILITIES
20 ARE 17.1 MILLION: TOTAL NON-CURRENT LIABILITIES ARE
21 2.1 MILLION.
22 SO ADDING THOSE TOGETHER, THAT'S ABOUT 19 .2 MILLION IN
23 TOTAL LIABILITIES.
24 TOTAL EQUITY IS $184.5 MILLION.
25 AND WHEN I ADD THE TOTAL LIABILITIES AND THE TOTAL EQUITY,

1196

1  THAT EQUALS $203.6 MILLION.
2  Q.    WHAT WAS THE NET WORTH OF Q CYBER AS OF THE END OF 2024,
3  JUST A FEW MONTHS AGO?
4  A.    $184.5 MILLION AT THE END OF 2024.
5  Q.    LOOKING BACK OVER THESE BALANCE SHEETS FOR NSO AND
6  Q CYBER, DO THEY SHOW DEFENDANTS' LEVEL OF DEBT?
7  A.    THEY DO, AND THE DEBT IS RELATIVELY LOW.  I WALKED YOU
8  THROUGH THE DEBT FROM NSO'S BALANCE SHEET, AND AS YOU CAN SEE,
9  NSO WAS PAYING IT DOWN BETWEEN 2023 AND 2024.
10 Q.    OKAY.  CAN WE SEE A-1781 ON SCREEN, PLEASE, THIRD DOCUMENT
11 OF FOUR.
12       MS. TREXLER, WHAT IS EXHIBIT A-1781?
13 A.    THIS IS NSO TECHNOLOGIES PROFIT AND LOSS, OTHERWISE KNOWN
14 AS AN INCOME STATEMENT, FOR THE PERIOD ENDING DECEMBER 2023,
15 AND ALSO THE PERIOD ENDING DECEMBER 2024.
16 Q.    AND WILL YOU WALK THE JURY THROUGH SOME OF THE KEY FIGURES
17 FOR THE YEAR-ENDED 2023, PLEASE?
18 A.    NSO HAD REVENUES OF $91.3 MILLION: THEY REPORTED GROSS
19 PROFIT OF $79.1 MILLION, WHICH IS AN 87 PERCENT GROSS PROFIT
20 MARGIN.  SO ESSENTIALLY WHAT THAT MEANS IS FOR EVERY DOLLAR IN
21 REVENUE, THEY -- AFTER DEDUCTING COSTS, THEY HAVE 87 CENTS IN
22 PROFIT.
23       THEY REPORTED AN OPERATING LOSS OF $3.9 MILLION, AND A NET
24 LOSS OF APPROXIMATELY $9 MILLION.
25 Q.    WHAT'S THE DIFFERENCE BETWEEN OPERATING INCOME OR LOSS AND

1197

1  NET INCOME OR LOSS?
2  A.    OPERATING INCOME BASICALLY INCLUDES ALL OF THE COSTS OF
3  OPERATING THE BUSINESS, THE COST OF SALES, SELLING AND
4  MARKETING, RESEARCH AND DEVELOPMENT.
5       AND THEN THE NET INCOME ALSO THEN DEDUCTS OUT THINGS LIKE
6  TAXES, INTEREST EXPENSE, THINGS LIKE THAT.
7  Q.    WHAT WAS NSO'S BIGGEST EXPENSE CATEGORY FOR 2023?
8  A.    RESEARCH AND DEVELOPMENT, AND THAT WAS $52.3 MILLION.
9  Q.    OKAY.  CAN YOU TAKE US THROUGH THE KEY FIGURES FOR NSO FOR
10 THEIR 2024 INCOME STATEMENT?
11 A.    YES.  NSO HAD REVENUES OF $95.9 MILLION: GROSS PROFIT OF
12 $84.7 MILLION: AND ITS GROSS PROFIT PERCENTAGE IS 88 PERCENT.
13       SO, YOU KNOW, YOU CAN SEE THE REVENUES HAVE GONE UP BY
14 ABOUT, YOU KNOW, 4 AND A HALF, $4.6 MILLION, AND THEIR GROSS
15 PROFIT HAS ALSO GONE UP BY $5.6 MILLION FROM 2023 TO 2024.
16       OPERATING INCOME -- I'M SORRY, IT WAS AN OPERATING LOSS OF
17 $8.3 MILLION, AND IT WAS A NET LOSS OF $12.7 MILLION.
18 Q.    WHAT WAS NSO'S LARGEST EXPENSE CATEGORY IN 2024?
19 A.    AGAIN, IT WAS RESEARCH AND DEVELOPMENT, WHICH WAS
20 APPROXIMATELY $60 MILLION.
21 Q.    OKAY.  LAST ONE.
22       CAN WE SEE A-1782 ON THE SCREEN, PLEASE.
23       MS. TREXLER, WHAT IS EXHIBIT A-1782?
24 A.    THIS IS Q CYBER'S ISRAEL INCOME STATEMENT FOR THE YEARS
25 ENDED DECEMBER 2023 AND 2024.

1198

1  Q.    AND DOES YOUR PREVIOUS EXPLANATION OF THIS KIND OF FORM
2  APPLY TO THIS DOCUMENT AS WELL?
3  A.    YES, IT DOES.
4  Q.    OKAY.
5       JUST ONE MOMENT, PLEASE.
6       (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFFS' COUNSEL.)
7       MR. BLOCK:  NO MORE QUESTIONS AT THIS TIME.
8  THANK YOU, MS. TREXLER.
9       THE COURT:  THANK YOU.
10 CROSS?
11                 CROSS-EXAMINATION
12 BY MR. CRAIG:
13 Q.    I DON'T THINK I NEED ANY OF THE EXHIBITS, OTHER THAN THE
14 ONES MS. TREXLER HAS IN FRONT OF HER, BUT IF I DO, I'D ASK THE
15 COURT'S PERMISSION TO GO GET MY BINDER.
16       THE COURT:  SURE.
17 BY MR. CRAIG:
18 Q.    MS. TREXLER, YOU'RE STILL A MANAGING DIRECTOR AT STOUT;
19 CORRECT?
20 A.    YES.
21 Q.    AND YOU'RE STILL PART OF THE SHAREHOLDER BASE?
22 A.    YES.
23 Q.    AND YOUR FIRM IS STILL CHARGING FACEBOOK $795 AN HOUR FOR
24 YOUR TIME?
25 A.    YES.

1199

1  Q.    AND YOU STILL HAVE A STAFF OF FIVE OR SIX PEOPLE WORKING
2  WITH YOU ON THIS PROJECT AND BILLING BY THE HOUR?
3  A.    NO.  I ONLY HAVE TWO PEOPLE WHO HAVE BEEN ASSISTING ME
4  WHILE WE'RE AT TRIAL.
5  Q.    MR. AKROTIRIANAKIS ASKED YOU LAST WEEK HOW MUCH MONEY
6  STOUT HAD BILLED YOUR CLIENTS ON THIS CASE AND YOU WEREN'T ABLE
7  TO ANSWER.
8       MR. BLOCK:  OBJECTION, YOUR HONOR.
9  BY MR. CRAIG:
10 Q.    DO YOU HAVE ANY IDEA NOW?
11       THE COURT:  BEYOND THE SCOPE?
12       MR. BLOCK:  CERTAINLY BEYOND THE SCOPE, AND ALSO YOUR
13 PRIOR INSTRUCTION.
14       MR. CRAIG:  IT GOES TO BIAS, YOUR HONOR.
15       THE COURT:  YES.  SUSTAINED.  SUSTAINED.
16       MR. CRAIG:  OKAY.
17 Q.    YOU WENT TO BUCKNELL FOR YOUR UNDERGRADUATE EDUCATION.
18 DID YOU TAKE ANY CLASSES THAT DEALT WITH ISRAELI ACCOUNTING OR
19 AUDITING?
20 A.    NO.
21 Q.    SAME QUESTION ABOUT WHEN YOU DID YOUR M.B.A. AT THE
22 UNIVERSITY OF PENNSYLVANIA.  DID YOU TAKE ANY CLASSES THAT
23 DEALT WITH ISRAELI ACCOUNTING OR AUDITING?
24 A.    NO.
25 Q.    HAVE YOU EVER BEEN HIRED BY ANY ISRAELI COMPANIES TO GIVE

1264

1  COULDN'T BE TOGETHER.  BUT, OF COURSE, MANY OF US HAVE LOVED
2  ONES AROUND THE WORLD, AND YOU WANT TO BE ABLE TO COMMUNICATE
3  WITH THEM PRIVATELY, SAFE IN THE KNOWLEDGE THAT NO ONE ELSE
4  WILL BE ABLE TO HEAR.
5      THAT'S WHY THIS VICTIM OUTREACH IS HAPPENING.
6      OKAY.  THE LAST WITNESS WAS MS. TREXLER, AND SHE'S A CPA,
7  AND SHE TOLD YOU WHAT HER JOB WAS.  SHE WAS ASKED TO QUANTIFY
8  THE PLAINTIFFS' RESPONSE COSTS TO NSO.
9      SHE TOLD YOU WHAT SHE DID TO DO THAT IN TERMS OF HER
10 HOMEWORK.  SHE LOOKED AT COURT DOCUMENTS, SHE LOOKED AT
11 DOCUMENTS THAT WERE PROVIDED BY THE PARTIES, SHE LOOKED AT
12 PUBLICLY AVAILABLE INFORMATION, SHE READ DEPOSITIONS AND SHE
13 SAW TRIAL TESTIMONY AND SHE DID INTERVIEWS.
14     AND BY THE WAY, HERE ARE THE EIGHT PEOPLE THAT SHE
15 INTERVIEWED.  YOU SAW THAT IN HER PRESENTATION:  CORTNEY PADUA,
16 MICHAEL SCOTT, DREW ROBINSON, AASHIN GAUTAM, OTTO EBELING,
17 JESUS BARCONS PALAU, GHEORGHE, AND YUANYUAN WANG.
18     IF MY COLLEAGUES OVER HERE ARE LAUGHING AT ME, IT'S
19 BECAUSE I'M NOT SO GOOD AT PRONOUNCING NAMES AND THEY LIKE TO
20 MAKE FUN.  SO I'M DOING MY BEST, BUT I SUSPECT THAT THERE MAY
21 BE SOME SMILES BACK HERE.
22     NOW, AGAIN, IN ADDITION TO THESE INDIVIDUALS AND THE
23 TESTIMONY THAT THEY WERE INTERVIEWED, YOU CAN LOOK AT ALL THE
24 DOCUMENTS AND SEE THAT THEY'RE IN THE DOCUMENTS THAT
25 CORROBORATES THE TESTIMONY OF THEIR INVOLVEMENT.
                UNITED STATES COURT REPORTERS

1265

1  NOW, HERE IS THE FORMULA THAT MS. TREXLER USED, AND IT'S
2  VERY SIMPLE AND IT MAKES SENSE.
3      SHE ASCERTAINED THE NUMBER OF HOURS AT ISSUE, SHE
4  QUANTIFIED THE COST TO WHATSAPP, AND THAT'S JUST NOT THE COST
5  OF THEIR PEOPLE'S SALARY, BUT IT'S THE COST TO META OR WHATSAPP
6  FOR THESE PEOPLE'S TIME.  SO THERE'S HEALTH CARE COSTS, THERE'S
7  TAXES, THERE'S THE ISSUE WITH THE RSU'S, THE RESTRICTED STOCK.
8      THAT'S WHAT SHE DID.  AND SHE MULTIPLIED THAT NUMBER BY
9  THE RELEVANT HOURLY LABOR RATE TO COME UP WITH WHAT THE COSTS
10 WOULD BE TO WHATSAPP FOR THE RESPONSE HERE.
11     AND THAT JUST MAKES SENSE, AND IT WAS VERY
12 STRAIGHTFORWARD, AND YOU HEARD HER TESTIMONY.
13     YOU'VE HEARD THAT THERE'S BEEN A LOT OF BACK AND FORTH
14 ABOUT THIS RSU ISSUE, THE RESTRICTED STOCK UNITS.
15     IT'S NOT COMPLICATED, EITHER.  THAT'S HOW THESE PEOPLE GET
16 PAID.  AND MR. GHEORGHE AND MR. ROBINSON TESTIFIED ABOUT THAT.
17 PEOPLE IN SOCIAL MEDIA GET -- SOCIAL MEDIA COMPANIES GET PAID
18 THAT WAY.
19     SO SHE WAS OBLIGATED TO CONSIDER THAT.
20     BUT IN ALL CASES, SHE CONSIDERED THE MOST CONSERVATIVE
21 ISSUES, AND HERE IS HER TESTIMONY.
22     SHE TOOK THE LOW END OF RANGES.  SHE DIDN'T INCLUDE ANY
23 HOURS BEYOND EIGHT HOURS AND WORKDAYS FIVE DAYS A WEEK, EVEN
24 THOUGH YOU HEARD FROM WITNESSES THAT THEY TESTIFIED ABOUT.  SHE
25 DIDN'T INCLUDE WEEKEND HOURS.
                UNITED STATES COURT REPORTERS

1266

1  AND ON THE RSU DATE, SHE ONLY INCLUDED THOSE THAT WERE
2  VESTED, AND SHE ALWAYS INCLUDED THE LOWER NUMBER.
3      AS I SAID, MR. PINSONNEAULT DID NOT DISPUTE MUCH OF THIS,
4  NSO'S DAMAGES EXPERT.  HE DIDN'T CHALLENGE ANY OF THE NEED FOR
5  WHATSAPP TO INVESTIGATE, DIDN'T HAVE AN ISSUE WITH VICTIM
6  OUTREACH.
7      HE REALLY DIDN'T HAVE A PROBLEM.
8      REALLY, AT THE END OF THE DAY, NSO AND MR. PINSONNEAULT
9  ARE COMPLAINING THAT SALARIED EMPLOYEES WERE COMPENSATED, OR
10 THAT WE'RE ASKING FOR THAT.
11     BUT JUST REMEMBER THIS:  THOSE SALARIED EMPLOYEES WERE NOT
12 DOING THE WORK THAT THEY WERE PAID TO DO.  THEY WERE DOING
13 ADDITIONAL WORK BECAUSE OF THE UNIQUE AND SOPHISTICATED NATURE
14 OF THE WHATSAPP ATTACK.
15     YOU SAW THAT ALL THESE PEOPLE WERE DOING WORK BEYOND WHAT
16 THEY DO IN THEIR NORMAL DAY JOB.  MR. GHEORGHE SAID I HAD TO
17 DROP EVERYTHING I WAS DOING, HE HAD TO CANCEL TEAM MEETINGS,
18 CANCEL INTERVIEWS.
19     WE HAD SIMILAR TESTIMONY FROM MR. ROBINSON.  HE SAID IT
20 JUST MEANT HIS OTHER WORK HAD TO GIVE WAY BECAUSE HE HAD TO
21 CONCENTRATE ON THIS.
22     PEOPLE WEREN'T WORKING ON WHAT THEY WERE BEING PAID TO
23 WORK ON.  THEY WERE WORKING ON SOMETHING NEW.
24     SO THAT'S THE STORY WITH COMPENSATORY DAMAGES.  IT'S VERY
25 STRAIGHT FORWARD.  THE SOFTWARE AND THE SPYWARE FOR NSO WAS
                UNITED STATES COURT REPORTERS

1267

1  COMPLICATED, WHATSAPP HAD TO SPEND TIME AND MONEY WITH ITS
2  EMPLOYEES TO RESPOND AND TO NOTIFY VICTIMS, AND FOR ALL OF
3  THAT, THEY'RE ASKING FOR $444,719 IN COMPENSATORY DAMAGES.
4      WHEN YOU GET TO THE VERDICT FORM, WE'RE ASKING TO YOU FILL
5  IN THAT NUMBER, $444,719.
6      NOW, LET ME TURN TO PUNITIVE DAMAGES, AND I'M GOING TO
7  START AGAIN BY GOING THROUGH THE LAW, AND THEN I'M GOING TO GO
8  THROUGH THE RELEVANT FACTS AND I'M GOING TO TALK ABOUT
9  DIFFERENT CONSIDERATIONS IN TERMS OF WHAT YOU SHOULD THINK
10 ABOUT WITH RESPECT TO THE NUMBER.
11     BUT LET ME BE VERY CLEAR ABOUT SOMETHING.  WHATSAPP IS NOT
12 ASKING FOR A SPECIFIC NUMBER FOR PUNITIVE DAMAGES.  WE'RE NOT.
13 WE COULD, BUT WE'RE NOT.  WE'RE GOING TO LEAVE THAT IN THE
14 JUDGMENT OF THIS JURY, HAVING SAT IN THAT COURTROOM AND
15 LISTENED TO THE EVIDENCE.  WE'RE GOING TO ASK YOU TO RETURN A
16 NUMBER THAT IS SIGNIFICANT, THAT ALLOWS FOR PUNISHMENT OF NSO,
17 THAT STOPS THEM FROM HACKING AND SPYING.
18     MAYBE WHEN YOU THINK ABOUT THAT, IF YOU THINK ABOUT
19 NUMBERS LIKE THEIR R&D NUMBERS, $52 AND $59 MILLION THAT ARE
20 DIRECTLY RELATED TO THEIR ABILITY TO MAKE SPYWARE AND SPY ON
21 PEOPLE, THOSE ARE NUMBERS THAT YOU CAN THINK ABOUT.
22     BUT WE'RE NOT GOING TO ASK FOR A PARTICULAR NUMBER BECAUSE
23 WE WANT THE JURY TO DO THAT.  AND WE WANT YOU TO USE YOUR
24 JUDGMENT.
25     SO LET ME GO THROUGH THE FACTS.
                UNITED STATES COURT REPORTERS

1268

1    AND THOSE OF YOU WHO ARE KEEPING TIME, I THINK I'M AT 39
2    MINUTES.  THAT PHONE CALL HAPPENED TO BE FROM MY DAUGHTER, SO
3    SORRY ABOUT THAT.
4        I HAVE ABOUT 20 MINUTES LEFT, AND I'M GOING TO SPEND MY
5    TIME ON THE PUNITIVE DAMAGES.
6        THE CONDUCT HERE IS EXACTLY THE CONDUCT THAT
7    JUDGE HAMILTON IS GOING TO INSTRUCT YOU ABOUT.  IT'S THE
8    HACKING, IT'S THE SPYING, AND IT'S THE TARGETING, BECAUSE IT'S
9    THE CALIFORNIA LAW, THE TARGETING OF THE CALIFORNIA SERVERS,
10   AND JUDGE HAMILTON WILL TELL YOU THAT SHE'S MADE A
11   DETERMINATION THAT THE PEGASUS INSTALLATION MESSAGES CAME
12   THROUGH CALIFORNIA 43 TIMES IN JUST TEN DAYS IN MAY 2019.
13       THAT'S THE CONDUCT THAT'S AT ISSUE.
14       NOW, THE STANDARD OF PROOF FOR PUNITIVE DAMAGES IS CLEAR
15   AND CONVINCING EVIDENCE, AND THAT'S HIGHER THAN THE
16   PREPONDERANCE STANDARD THAT'S USED FOR COMPENSATORY DAMAGES.
17   SO BE AWARE OF THAT.
18       THAT'S NOT AN ISSUE FOR US.  WE THINK WE'VE MET THAT
19   STANDARD AND THEN SOME, THAT THE EVIDENCE HERE IS OVERWHELMING
20   AND FAR BEYOND CLEAR AND CONVINCING EVIDENCE.
21       BUT YOU'LL HEAR THAT WHAT THAT MEANS IS THAT YOU HAVE A
22   FIRM BELIEF OF CONVICTION THAT IS HIGHLY PROBABLE THAT OUR
23   FACTUAL CONTENTIONS ARE TRUE.
24       AND, AGAIN, YOU'LL HEAR THAT FROM JUDGE HAMILTON.  SHE'S
25   THE JUDGE OF THE LAW, AND SHE WILL INSTRUCT YOU ON ALL THOSE

UNITED STATES COURT REPORTERS

1269

1    THINGS.
2        WHAT WE ASK IS THAT YOU, AND WE KNOW YOU WILL, PAY
3    ATTENTION TO THOSE AND READ THOSE.  THEY'RE IMPORTANT.
4        NOW, TO QUALIFY FOR PUNITIVE DAMAGES, WHATSAPP MUST PROVE
5    THAT NSO'S CONDUCT WAS DONE WITH MALICE OR OPPRESSION OR FRAUD.
6    YOU DON'T HAVE TO FIND ALL THREE.  YOU HAVE TO FIND ONE OF THE
7    THREE.  WE THINK WE HAVE PROVED ALL THREE.
8        WHATSAPP MUST PROVE THAT NSO'S EXECUTIVES, ITS OFFICERS,
9    DIRECTORS, MANAGERS ACTED ON BEHALF OF NSO.
10       THAT'S NOT A COMPLICATED ISSUE.  YOU HEARD FROM THOSE
11   PEOPLE HERE, THAT THEY EITHER ACTED ON BEHALF OF NSO, THAT THEY
12   COMMITTED THESE ACTS, THAT THEY AUTHORIZED THEM, OR THAT THEY
13   KNEW OF THEM AND ADOPTED THEM AND APPROVED THEM AFTER THE FACT.
14       SO THAT ISSUE WITH RESPECT TO MANAGING AGENTS OR
15   EXECUTIVES, YOU KNOW THAT BECAUSE MR. SHOHAT PROUDLY TOLD YOU
16   THAT HE'S THE CEO BOTH OF Q CYBER AND NSO, AND HE WAS INVOLVED
17   IN THESE EVENTS, AND APPROVED OF THEM, AS HE DOES TODAY.
18       YOU ALSO HEARD FROM MR. GAZNELI.  I'LL COME BACK TO THAT
19   IN A MINUTE.
20       LET'S TALK ABOUT MALICE.
21       MALICE.  MALICE, JUDGE HAMILTON WILL INSTRUCT YOU, MEANS
22   THAT DEFENDANTS ACTED WITH INTENT TO CAUSE INJURY OR THAT
23   DEFENDANTS' CONDUCT WAS DESPICABLE.  IT WAS KNOWING AND WAS
24   DONE WITH A WILLFUL AND KNOWING DISREGARD OF WHATSAPP'S RIGHTS.
25       SHE'LL FURTHER INSTRUCT YOU THAT A PERSON ACTS WITH

UNITED STATES COURT REPORTERS

1270

1    KNOWING DISREGARD WHEN A PERSON IS AWARE OF THE PROBABLE
2    DANGEROUS CONSEQUENCES OF A PERSON'S CONDUCT AND DELIBERATELY
3    FAILS TO AVOID THAT CONDUCT.
4        JUDGE HAMILTON WILL ALSO TELL YOU THAT OPPRESSION MEANS
5    THAT DEFENDANTS' CONDUCT WAS DESPICABLE, SUBJECTED THE
6    PLAINTIFFS TO CRUEL AND UNJUST HARDSHIP IN KNOWING DISREGARD OF
7    WHATSAPP'S RIGHTS.
8        AND SHE'LL DEFINE DESPICABLE CONDUCT AS SO VILE, BASE, OR
9    CONTEMPTIBLE THAT IT WOULD BE LOOKED DOWN UPON OR DESPISED BY
10   REASONABLE PEOPLE THE WAY THAT REASONABLE PEOPLE WOULD VIEW
11   SPYING ON SOMEBODY'S PHONE IN THE WAY THAT NSO SPIES.
12       JUDGE HAMILTON WILL INSTRUCT YOU THAT FRAUD MEANS THAT THE
13   DEFENDANTS INTENTIONALLY MISREPRESENTED OR CONCEALED A MATERIAL
14   FACT.
15       YOU KNOW THAT THERE WAS FRAUD IN THIS CASE.  YOU KNOW THAT
16   THERE WAS DECEIT AND CHEATING.
17       AGAIN, JUST WITH THIS ISSUE ABOUT MANAGING AGENTS, YOU
18   HEARD THE TESTIMONY OF MR. SHOHAT.  YOU HEARD THE TESTIMONY OF
19   MR. GAZNELI.  THEY ARE SENIOR EXECUTIVES.
20       YOU ALSO HEARD THE TESTIMONY OF MS. GIL.  SHE WAS BY
21   VIDEO.  SHE TESTIFIED ABOUT THE FACT THAT THEY SELL, I THINK
22   SHE SAID HAD A BUSINESS, A BUSINESS DEPARTMENT AND THEY SELL
23   PEGASUS, ON AVERAGE, FOR $7 MILLION, AND SOMETIMES THEY HAVE TO
24   CHARGE MORE THAN $7 MILLION IF THE PARTY BUYING IT WANTS TO BE
25   ABLE TO SURVEIL PEOPLE OUTSIDE OF THEIR COUNTRY.

UNITED STATES COURT REPORTERS

1271

1    SO YOU HEARD FROM HER.
2        YOU ALSO HEARD FROM MR. ESHKAR, WHO'S A SENIOR EXECUTIVE.
3        SO LET ME TURN TO THE QUESTIONS OF WHETHER NSO ACTED WITH
4    MALICE, OPPRESSION, OR FRAUD.  AND THEY DID.
5        FIRST, YOU KNOW WHAT NSO DID IN THIS CASE.  THEY ATTACKED
6    WHATSAPP'S SERVERS.  I'M REPEATING MYSELF, BUT IT'S IMPORTANT
7    THAT WE GO THROUGH THESE ONE BY ONE.
8        YOU KNOW THAT THEY DID THAT ATTACK ON WHATSAPP'S SERVERS
9    HERE IN CALIFORNIA 43 TIMES.  ALL YOU NEED TO DO TO VERIFY THAT
10   FACT IS READ THE JURY INSTRUCTIONS.
11       YOU KNOW THAT THE PURPOSE OF THE VECTORS NSO ATTACKED HERE
12   WAS TO PUT THE SPYWARE ON THE PHONE.  ATTACKING FOR THE PURPOSE
13   OF SPYING.
14       AND YOU KNOW THAT THEY TARGETED AND SENT THIS MALICIOUS
15   SPYWARE ONTO THE PHONES OF 1400 PEOPLE.
16       NOW, LET ME STOP FOR ONE SECOND.
17       THAT'S 1400 PEOPLE IN A TWO-WEEK TIME PERIOD.  OKAY?  SO
18   I'M NOT GOING TO DO THE MATH FOR YOU.  THAT'S NOT MY SPECIALTY.
19   BUT THAT 1400 PEOPLE THAT ARE THE VICTIMS OF THIS SPYWARE
20   ATTACK HAPPENED IN A TWO-WEEK PERIOD.
21       NOW, THOSE VICTIMS, BY THE WAY, YOU'VE HEARD TESTIMONY,
22   NSO DOES NOT KNOW WHO THOSE VICTIMS ARE, AND MR. SHOHAT
23   TESTIFIED TO THAT.  I ASKED HIM THAT SPECIFICALLY ON
24   CROSS-EXAMINATION.  I ASKED HIM, YOU'RE SAYING NO, NSO, AT THE
25   TIME OF PEGASUS, DID NOT KNOW THE IDENTITIES OF PEOPLE WHOSE

UNITED STATES COURT REPORTERS

1272

1 PHONES ARE BEING SPIED UPON?

2     THIS IS A CORRECT STATEMENT.

3     AND JUDGE HAMILTON IS GOING TO TELL YOU THAT -- INSTRUCT

4 YOU THAT THE IDENTITIES OF VICTIMS ARE NOT RELEVANT.

5     AND SO REGARDLESS OF WHATEVER GOVERNMENTS NSO SELLS TO,

6 WHATEVER THAT MEANS, NSO IS NOT A GOVERNMENT, THEY'RE A

7 FOR-PROFIT COMPANY, AND THEY DON'T KNOW WHO THEY'RE SPYING ON.

8     MR. SHOHAT TESTIFIED TO THAT.  YOU SHOULD RELY ON THAT,

9 AND YOU CERTAINLY CAN RELY ON THE INSTRUCTION OF

10 JUDGE HAMILTON.

11     NOW, YOU KNOW THAT THEY USED THIS ZERO-CLICK TECHNOLOGY

12 THAT WE TALKED ABOUT.  YOU HAVE HEARD THAT THESE ATTACKS, THE

13 MALWARE INSTALLATION, HEAVEN, EDEN, ERISED, THAT IS THE HEART

14 OF NSO'S OPERATION, AND YOU SEE THAT THERE'S -- YOU CAN LOOK AT

15 THESE DOCUMENTS, PLAINTIFFS' EXHIBIT 59, YOU'RE HAPPY TO LOOK

16 AT THIS -- THIS IS A DOCUMENT WHERE YOU CAN SEE ALL OF THE, ALL

17 OF THE CAPABILITIES OF PEGASUS.

18     YOU KNOW ABOUT THE PEGASUS INSTALLATION AND WHAT IT DOES

19 AND HOW IT SPIES.  I'M NOT GOING TO DO THAT.

20     REMEMBER THIS.  THIS ONE CAME IN THROUGH A VIDEO, BUT

21 RAMON ESHKAR, HE'S THE VICE PRESIDENT OF CLIENT EXECUTIVES, HE

22 WAS ASKED, WHAT CAN PEGASUS DOWNLOAD FROM THE PHONE?

23     HE SAID -- WAS THE CASE WITH RESPECT TO THE OPERATION OF

24 PEGASUS IN 2018 AND '19, EVERY KIND OF USER DATA ON THE PHONE

25 AS IT EXISTS.  THIS IS MY UNDERSTANDING.

UNITED STATES COURT REPORTERS

1273

1     EVERYTHING ON THE PHONE.

2     NOW, YOU KNOW THAT THEY DO THIS FOR MONEY, AND WE'LL TALK

3 ABOUT THAT IN A MINUTE.

4     BUT THERE'S ANOTHER DOCUMENT, PLAINTIFFS' EXHIBIT 264,

5 WHERE YOU CAN LOOK AND SEE THE AMOUNT OF MONEY IN 2018 AND

6 2019, DURING THIS TIME PERIOD WHEN THE SPYING OCCURRED, THAT

7 NSO SPENT MORE THAN $110 MILLION.  I BELIEVE THAT'S ON PAGE 5

8 OF 264.  TAKE IT, LOOK AT IT.

9     YOU'VE HEARD FROM MS. GIL, I SAID, ABOUT HOW MUCH MONEY

10 THEY CHARGE.

11     MR. SHOHAT, WHEN HE WAS ASKED ABOUT HOW MUCH THEY CHARGE

12 FOR PEGASUS, HE SAID BETWEEN 3 MILLION AND ANOTHER CUSTOMER

13 COULD PAY TEN TIMES THAT.

14     SO THAT MATH I CAN DO.  MR. SHOHAT TESTIFIED BETWEEN $3

15 AND $30 MILLION THEY CHARGE FOR THE PEGASUS SOFTWARE.

16     NOW, HOW DO YOU KNOW THAT WHAT NSO DID BEARS ON MALICE,

17 OPPRESSION, FRAUD?  BECAUSE THEY DID THIS DELIBERATELY.  THEY

18 DID IT SECRETLY.  THEY DID IT KNOWINGLY IN DISREGARD OF

19 WHATSAPP'S RIGHTS.

20     YOU KNOW THAT'S TRUE.  THEY DID IT DELIBERATELY.  THIS

21 WASN'T AN ACCIDENT.  IT WASN'T SOME KID HACKING IN THEIR

22 BASEMENT.

23     THIS IS THE MOST SIGNIFICANT, MOST SOPHISTICATED, AS

24 MR. SHOHAT SAID, THE MARKET LEADER IN THIS TECHNOLOGY.

25     YOU KNOW ABOUT ALL THE MONEY THAT NSO SPENDS IN R&D.  YOU

UNITED STATES COURT REPORTERS

1274

1 KNOW, FOR EXAMPLE, THAT MR. GAZNELI TESTIFIED THAT IN 2019, THE

2 RESEARCH AND DEVELOPMENT EXPENSES OF NSO WERE $67 MILLION.

3 THAT IS WHERE THEY DEVELOPED THIS HACKING AND SPYING

4 TECHNOLOGY.

5     NOW, YOU KNOW THAT THEY DID THIS SECRETLY.  YOU KNOW THAT

6 THEY CONCEALED THEIR FRAUD.

7     AND WHEN THEY WERE COMMUNICATING WITH THE WHATSAPP

8 SERVERS, THEY WERE DOING IT DECEPTIVELY SO THAT WHATSAPP

9 WOULDN'T FIND OUT ABOUT IT.

10     AND, AGAIN, IT'S COMMON SENSE THAT YOU DON'T TELL THE

11 PERSON THAT YOU'RE SPYING ON THAT YOU'RE SPYING.

12     AND LET ME JUST SAY ONE WORD ABOUT THAT.

13     WHEN YOU GO INTO THAT JURY ROOM, LADIES AND GENTLEMEN, WE

14 WANT YOU, WE BEG YOU TO USE YOUR COMMON SENSE.  YOU DON'T LEAVE

15 IT OUTSIDE THE DOOR.  THAT IS CRITICALLY IMPORTANT, AND WE

16 BELIEVE THAT AS YOU USE YOUR COMMON SENSE, YOU'RE GOING TO

17 UNDERSTAND THAT MANY OF THESE ARGUMENTS THAT NSO ARE MAKING

18 MAKE NO SENSE.

19     SO RELY ON YOUR COMMON SENSE.

20     I'VE ALREADY TALKED ABOUT TRICKERY AND DECEPTION.

21     THOSE ARE THE ELEMENTS, AND THEY'RE IMPORTANT.  THEY GO TO

22 THE ISSUE ABOUT WHETHER NSO'S CONDUCT WAS REPREHENSIBLE.  YOU

23 KNOW THAT NSO TRICKED WHATSAPP TO GET INTO THEIR SERVERS.  YOU

24 KNOW THAT THEY TRICKED WHATSAPP BY DELIBERATELY CONCEALING

25 THEIR CONDUCT.  THEY'VE ADMITTED TO THAT.  IT'S ALL UNDISPUTED.

UNITED STATES COURT REPORTERS

1275

1     YOU HAVE HEARD THROUGHOUT THIS TRIAL THAT NSO DIDN'T TRY

2 TO HARM WHATSAPP.  DIDN'T TRY TO PHYSICALLY HARM THEM.

3     BASICALLY WHAT THEY WANT TO SAY IS THIS ISN'T LIKE A CAR

4 ACCIDENT WHERE YOU LEFT WITH A DENT IN YOUR CAR.  OF COURSE

5 THEY DIDN'T.  OF COURSE THEY DIDN'T.  BECAUSE IF THEY SOMEHOW

6 BROKE WHATSAPP'S SERVER, THEY WOULDN'T USE IT TO GET TO THE

7 PHONES TO DO THE SPYWARE.

8     BUT THAT DOESN'T MEAN THAT WHATSAPP WASN'T HARMED.  THEY

9 ABSOLUTELY WERE HARMED BECAUSE NSO INTRODUCED THIS MALWARE INTO

10 THEIR SYSTEM, AND YOU KNOW THAT THEY -- WE TALKED ABOUT WHAT

11 THEY HAD TO DO TO RESPOND.

12     SO WHEN WE TALK ABOUT HARM, THINK ABOUT WHAT WHATSAPP HAD

13 TO DO IN RESPONSE.

14     NOW, AGAIN, YOU KNOW THAT NSO'S CONDUCT WAS IN THE KNOWING

15 DISREGARD OF WHATSAPP'S RIGHTS.  NSO KNEW THAT WHATSAPP WOULD

16 STOP THIS, STOP THESE ATTACKS IF THEY KNEW ABOUT IT, SO THEY

17 DIDN'T TELL THEM.

18     THAT'S A REALLY IMPORTANT POINT, BECAUSE THAT'S A QUESTION

19 THAT YOU'RE GOING TO HAVE TO ANSWER WITH RESPECT TO THE JURY

20 INSTRUCTIONS.

21     YOU'RE GOING TO HAVE TO ANSWER WHETHER NSO ACTED IN THE

22 KNOWING DISREGARD OF PLAINTIFFS 'RIGHTS.  AND OF COURSE THEY

23 DID.  OF COURSE THEY DID.

24     NOW, AGAIN, THE STANDARD HERE IS CLEAR AND CONVINCING

25 EVIDENCE.

UNITED STATES COURT REPORTERS

1284

1 THOSE IN THE NUMBER OF $444,719.

2          PUNITIVE DAMAGES.  WE ASK THAT YOU AWARD PUNITIVE DAMAGES

3 THAT YOU, THE JURY, BELIEVE ARE SUFFICIENT TO PUNISH NSO

4 BECAUSE THEY VIOLATED THE LAW AS JUDGE HAMILTON HAS TOLD YOU

5 AND WILL INSTRUCT YOU.

6          ISSUE AN AWARD OF PUNITIVE DAMAGES BECAUSE THE RULE OF LAW

7 IN THIS COUNTRY MATTERS, PARTICULARLY AT THIS TIME.  IT MEANS

8 SOMETHING WHEN YOU VIOLATE THE LAW.

9          WE'RE ASKING YOU TO AWARD AN AMOUNT OF PUNITIVE DAMAGES

10 THAT WILL DETER NSO'S CONDUCT IN THE FUTURE.  WE'RE ASKING YOU

11 TO SEND A MESSAGE LOUD AND CLEAR, AND IN PUBLIC, NOT IN THE

12 SHADOWS OF SPYING AND SECRECY WHERE NSO OPERATES.

13          A PUNITIVE DAMAGE AMOUNT THAT SAYS SPYING IS ILLEGAL AND

14 IT'S NOT APPROPRIATE, NOT HERE IN THE UNITED STATES.  CERTAINLY

15 NOT HERE IN CALIFORNIA, CONSISTENT WITH JUDGE HAMILTON'S

16 FINDINGS.

17          LADIES AND GENTLEMEN, NSO DIDN'T STOP WHEN THERE WAS A

18 TECHNOLOGICAL FIX FROM WHATSAPP.  THEY DIDN'T STOP AFTER THIS

19 LAWSUIT WAS FILED.

20          WE ARE ASKING THIS JURY TO ASSESS A PUNITIVE DAMAGE AWARD

21 IN THIS AMERICAN, CALIFORNIA COURTHOUSE THAT SENDS A MESSAGE

22 AND WILL HAVE NSO STOP ATTACKING ITS SPYWARE.

23          THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.

24          THANK YOU, YOUR HONOR.

25          THE COURT:  THANK YOU.

1285

1          ALL RIGHT.  MR. AKROTIRIANAKIS?

2          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

3          (PAUSE IN PROCEEDINGS.)

4          MR. AKROTIRIANAKIS:  MAY I PROCEED?

5          THE COURT:  UM-HUM, SURE.

6          (MR. AKROTIRIANAKIS GAVE HIS CLOSING ARGUMENT ON BEHALF

7 OF DEFENDANTS.)

8          MR. AKROTIRIANAKIS:  MEMBERS OF THE JURY, I WANT YOU

9 TO THINK BACK TO LAST TUESDAY WHEN YOU FIRST HEARD THE NUMBER

10 $444,719.

11          DID YOU THINK TO YOURSELF, DID I HEAR THAT CORRECTLY?

12 THAT'S GOT TO BE A MISTAKE, RIGHT?  AM I GOING TO SPEND MORE

13 THAN A WEEK OF MY LIFE WITH ALL OF THESE LAWYERS IF FACEBOOK'S

14 CLAIMED LOSSES ARE SO SMALL?

15          IT'S BECAUSE THIS LAWSUIT IS NOT ABOUT SEEKING

16 COMPENSATION FOR LOSSES OR DAMAGE OR INJURY THAT FACEBOOK MAY

17 HAVE HAD.

18          THIS LAWSUIT IS ABOUT PUBLICITY.  YOU JUST HEARD THAT, SAY

19 IT PUBLICLY.

20          FACEBOOK WANTED TO MAKE HEADLINES ABOUT HOW DEEPLY AND

21 STRONGLY AND HOW GENUINELY THEY BELIEVED IN PROTECTING USER

22 PRIVACY, AND THEY VIEWED SUING NSO AS AN EASY WAY TO GET THOSE

23 GOOD HEADLINES.

24          AND IF THEY COULD DAMAGE NSO AS MUCH AS POSSIBLE IN THE

25 PROCESS AS WHATSAPP'S CEO, WILL CATHCART, WANTED TO DO, SO MUCH

1286

1 THE BETTER.

2          THE FACE OF THE COMPANY HERE FOR THIS TRIAL, MR. WOOG, THE

3 GLOBAL HEAD OF COMMUNICATIONS.  NOT A CYBERSECURITY PERSON OR A

4 FINANCE PERSON.  CERTAINLY NOT THE CEO.  BUT THE HEAD OF

5 COMMUNICATIONS.

6          BUT LET'S TAKE THE CASE AT FACE VALUE FOR THE MOMENT.

7 LET'S PRETEND THAT FACEBOOK GENUINELY BELIEVES THAT IT LOST

8 $444,719, AND THAT IT WANTS TO PUNISH NSO FOR SENDING MESSAGES

9 THROUGH ITS SERVERS.

10          THE CASE IS WEAK AND IT DEPENDS ENTIRELY ON YOUR EMOTION,

11 NOT REASON.  THAT'S WHY YOU HEARD THE KIND OF CLOSING ARGUMENT

12 THAT YOU JUST HEARD.

13          LOOKING AT THE EVIDENCE THAT'S BEEN PRESENTED TO YOU,

14 THERE ARE NO ECONOMIC LOSSES.  THERE HAS BEEN NO DAMAGE TO

15 WHATSAPP'S SERVERS, AND THERE'S BEEN NO EVIDENCE THAT WOULD

16 SUPPORT YOU PUTTING A NUMBER OTHER THAN A ZERO IN THE VERDICT

17 FORM, AND I'M GOING TO EXPLAIN WHY.

18          WHATSAPP IS SIMPLY COUNTING ON A JURY HATING, AS MUCH AS

19 THEY SAY THEY DO, THE FACT THAT NSO MAKES AND GOVERNMENT

20 AGENCIES USE A TOOL LIKE PEGASUS.

21          TO DO THAT, TO GO ALONG WITH THAT, YOU WOULD HAVE TO

22 ABANDON THE PROMISE THAT YOU MADE TO WELL AND TRULY TRY THIS

23 CASE ACCORDING TO THE LAW THAT WOULD BE GIVEN TO YOU, AND HAS

24 BEEN GIVEN TO YOU AND WILL BE GIVEN TO YOU AGAIN, BY THE COURT.

25          AS THE COURT WILL INSTRUCT YOU, YOU CANNOT DECIDE THIS

1287

1 CASE BASED ON EMOTION OR FEAR.

2          YOU MUST DECIDE THIS CASE ONLY BASED ON THE EVIDENCE.  AND

3 EVIDENCE DOES NOT SUPPORT FACEBOOK, BOTH WITH RESPECT TO HOW

4 PEGASUS WORKS AND WHAT FACEBOOK DID IN RESPONSE.

5          NOW, AS YOU'VE HEARD AGAIN AND AGAIN, THIS COURT FOUND, IN

6 DECEMBER OF 2024, FIVE MONTHS AGO, THAT NSO HAD VIOLATED THE

7 LAW AND BREACHED THE TERMS OF SERVICE BECAUSE YEARS AGO, THREE

8 VERSIONS, THREE VERSIONS OF NSO'S INTELLIGENCE PRODUCT,

9 PEGASUS, USED WHATSAPP SERVERS.

10          PEGASUS DID NOT COMPROMISE, DAMAGE, REWRITE THE CODE OF,

11 MODIFY, SLOW DOWN, IMPAIR, OR INTERFERE WITH WHATSAPP SERVERS

12 IN ANY WAY.

13          BUT THE COURT FOUND THAT THOSE VERSIONS OF PEGASUS DID

14 VIOLATE A FEDERAL STATUTE, A CALIFORNIA STATUTE, AND THE TERMS

15 OF SERVICE AND, OF COURSE, WE ACCEPT THAT.  MR. SHOHAT TOLD YOU

16 THAT.  MR. GAZNELI TOLD YOU THAT.

17          AS A RESULT, FACEBOOK HAS THE RIGHT TO SEEK DAMAGES, EVEN

18 THOUGH, AS FACEBOOK'S ENGINEERS CONCLUDED, THE SERVERS WERE NOT

19 COMPROMISED.

20          THE LACK OF ANY DAMAGE TO WHATSAPP'S SERVERS IS IMPORTANT.

21 FACEBOOK CAN SEEK COMPENSATORY DAMAGES BUT FOR CERTAIN

22 FINANCIAL LOSSES.

23          MR. ANDRES SAYS THAT THE JURY INSTRUCTIONS ARE CRITICALLY

24 IMPORTANT, AND I AGREE, AND I WANT YOU TO READ THEM AND I WANT

25 YOU TO READ THEM CLOSELY.

1288

1    I'M GOING TO POINT OUT -- GO BACK A SLIDE, PLEASE -- I'M
2    GOING TO POINT OUT SOME OF THE ONES THAT I THINK ARE REALLY
3    IMPORTANT FOR YOU TO FOCUS ON AS YOU CONSIDER, CONSIDER THE
4    EVIDENCE.
5        ALL RIGHT.  PUNITIVE -- GO BACK, PLEASE.
6        FOR CERTAIN LOSSES, THIS IS THE COMPENSATORY DAMAGES,
7    COMPUTER FRAUD AND ABUSE ACT INSTRUCTION.  IT'S THE SAME FOR
8    THE CALIFORNIA STATUTE.
9        NEXT SLIDE, PLEASE.
10       FOR PUNITIVE DAMAGES, THOSE MUST BE BASED ON, AND THE
11   AMOUNT NEEDS TO BE RELATED TO, SOME HARM OR INTENDED HARM TO
12   PLAINTIFFS, AND ONLY TO PLAINTIFFS.
13       SPECULATED HARM TO THIRD PARTIES, LIKE THE TARGETS OF
14   NSO'S GOVERNMENT CUSTOMERS, IS IRRELEVANT.  THAT IS THIS
15   INSTRUCTION.  THE JUDGE WILL TELL YOU THAT.
16       THE ONLY HARM THAT MATTERS IS HARM TO FACEBOOK.
17       HERE, FACEBOOK IS NOT ENTITLED TO ANY COMPENSATORY DAMAGES
18   BECAUSE IT HASN'T SUFFERED ANY FINANCIAL LOSS.  ALL 22
19   EMPLOYEES WERE SALARIED.  AND FACEBOOK DIDN'T PAY THEM ONE
20   PENNY MORE THAN IT WOULD HAVE IN THAT BUT-FOR WORLD -- WE
21   TALKED ABOUT THIS CONCEPT WITH MS. TREXLER -- THAT BUT-FOR
22   WORLD WHERE THERE IS NO NSO AND THERE IS NO PEGASUS.
23   FACEBOOK'S FINANCES ARE EXACTLY THE SAME IN THAT WORLD.
24       AND AS THE COURT ALSO INSTRUCTED YOU, ANY PURPORTED
25   REPUTATIONAL HARM CANNOT BE CONSIDERED.  NOT THAT THERE WAS ANY

UNITED STATES COURT REPORTERS

1289

1    EVIDENCE OF THAT, EITHER.
2        BUT EVEN IF YOU DISAGREE WITH ME ABOUT THE ABSENCE OF ANY
3    FINANCIAL LOSSES, I HOPE THAT YOU AGREE WITH ME THAT
4    MS. TREXLER'S IS HUGELY OVERSTATED, FOR THE REASONS THAT
5    MR. PINSONNEAULT EXPLAINED, JUST ONE EXAMPLE BEING THAT OVER
6    40 PERCENT OF THE TOTAL IN RSU'S PAID IN 2019, PAID IN 2019
7    WERE FOR WORK DONE YEARS EARLIER.  SHE TESTIFIED ABOUT THIS.
8    MR. GHEORGHE TESTIFIED ABOUT IT.
9        THESE ARE TWO EXAMPLES -- IN THESE TWO EXAMPLES, IT'S MUCH
10   MORE THAN 50 PERCENT THAT THE RSU'S INFLATE THE NUMBER.
11       ANOTHER REASON WHY THE DAMAGES FACEBOOK IS CLAIMING ARE
12   INFLATED IS BECAUSE -- THIS IS EXHIBIT 10, PAGE 3 -- FACEBOOK
13   LEARNED ABOUT PEGASUS ON MAY 2 AND A FIX WAS READY ON MAY 6TH,
14   AS WE SEE, AND THEY DIDN'T PUSH THE FIX BECAUSE THEY HAD THEIR
15   OWN OPSEC CONCERNS.  OPSEC.  THEIR OPSEC.
16       AND AS FOR THE 230,000 NOTIFICATION PROJECT, FACEBOOK HAS
17   THE LIST OF PHONE NUMBERS ON MAY 8 AS WE SEE IN THIS TIMELINE
18   DOCUMENT.  BUT THEY DIDN'T NOTIFY THE TARGETS UNTIL OCTOBER 29
19   SO THAT FACEBOOK COULD USE IT FOR A BIG PR SPLASH, ALONG WITH
20   THE FILING OF THIS LAWSUIT, PUTTING AN OP ED IN "THE WASHINGTON
21   POST."  YOU HEARD ABOUT THAT.  I'LL SHOW YOU SOME MORE ABOUT
22   THAT.
23       FACEBOOK IS NOT ENTITLED TO PUNITIVE DAMAGES FOR THREE
24   REASONS:
25       FIRST, BECAUSE DEFENDANTS DIDN'T ACT WITH MALICE,

UNITED STATES COURT REPORTERS

1290

1    OPPRESSION, OR FRAUD; BECAUSE THEY DIDN'T INJURE FACEBOOK OR
2    INTEND TO DO SO; AND VIRTUALLY NONE OF NSO'S CONDUCT WAS IN
3    CALIFORNIA.
4        I'LL TAKE YOU THROUGH THE JURY INSTRUCTIONS.
5        NOW, MUCH OF LAST WEEK WAS SPENT ON FACEBOOK'S EFFORTS --
6    NOT JUST LAST WEEK, TODAY, TOO -- FACEBOOK'S EFFORTS TO
7    DEMONIZE NSO.
8        BUT THE EVIDENCE IS THAT NSO IS A GOVERNMENT CONTRACTOR IN
9    THE HIGH-TECH SECTOR.  NSO DESIGNS INTELLIGENCE TECHNOLOGIES
10   THAT IT LICENSES EXCLUSIVELY TO GOVERNMENTS.
11       NSO IS A RELATIVELY SMALL COMPANY, WE HEARD 350 EMPLOYEES
12   IN ONE OFFICE IN ISRAEL'S SILICON VALLEY, IF YOU WILL.  A MUCH
13   SMALLER SILICON VALLEY, OF COURSE, THAN WHAT WE HAVE.  IT'S A
14   PLACE CALLED HERZLIYA.
15       NSO EXISTS IN THE SAME CIRCLES AS OTHER HIGH-TECH
16   COMPANIES.  MR. SHOHAT NAMED A FEW OF THE MORE WELL-KNOWN ONES.
17       NSO AND THESE COMPANIES, INCLUDING FACEBOOK, HIRE EACH
18   OTHERS' EMPLOYEES; THEY LICENSE AND USE THE SAME SOFTWARE
19   DEVELOPMENT TOOLS, LIKE JEB AND IDA; NSO EMPLOYS OPSEC,
20   FACEBOOK EMPLOYS OPSEC, WE JUST SAW THAT; NSO USES ANONYMIZING
21   SERVICES, AND MR. ROBINSON TESTIFIED THAT HE ALSO USED
22   ANONYMIZING SERVICES WHEN HE WAS TRYING TO FETCH THE PEGASUS
23   AGENT.
24       MR. ROBINSON TESTIFIED ABOUT JEB AND IDA.  HIS TESTIMONY
25   ON THAT POINT IS ON THE SCREEN.

UNITED STATES COURT REPORTERS

1291

1    THEY DON'T JUST SELL THEM TO ANYBODY.
2        NOW, FACEBOOK SAYS THAT NSO IS EVIL BECAUSE IT LICENSES
3    ITS TECHNOLOGY FOR PROFIT.
4        MR. WOOG TESTIFIED FACEBOOK IS, OF COURSE, ALSO A
5    FOR-PROFIT COMPANY.  MR. WOOG AGREES, AS DO I THINK WE ALL,
6    THAT A COMPANY DOESN'T HAVE BAD MOTIVES JUST BECAUSE IT SEEKS
7    TO MAKE A PROFIT.
8        THAT IS NO LESS TRUE FOR NSO.
9        AGAIN AND AGAIN -- I DIDN'T TRY TO COUNT THIS MORNING --
10   FACEBOOK HAS CALLED PEGASUS SPYWARE.  SPYWARE.  SPYWARE.
11   HACKING.  SPYWARE.
12       BUT YOU'VE NEVER HEARD ANYONE GIVE A DEFINITION OF
13   SPYWARE, AND THAT'S BECAUSE FACEBOOK WANTS TO PUT A FALSE IMAGE
14   IN YOUR HEAD.  THEY WANT YOU TO PICTURE A VILLAIN IN A BLACK
15   HOODIE TRYING TO STEAL BANK ACCOUNT NUMBERS AND CREDIT CARD
16   INFORMATION.
17       BUT THAT IMAGE BEARS NO RELATION TO THE REALITY OF WHAT
18   NSO DOES.  MR. GAZNELI, IN FACT, TESTIFIED THAT PEGASUS DOESN'T
19   EVEN HAVE THAT CAPABILITY.
20       AS YOU HEARD FROM MR. SHOHAT DURING FACEBOOK'S
21   CROSS-EXAMINATION, THE TECHNOLOGY IS NOT DESIGNED FOR MASS
22   SURVEILLANCE.
23       COUNSEL MADE REFERENCE TO THE TESTIMONY OF SARIT GIL, WHO
24   YOU'LL RECALL IS THE ONE LADY WHO TESTIFIED ON THE -- BY WAY OF
25   VIDEO DEPOSITION.  MS. GIL TESTIFIED THAT IT WASN'T EXACTLY HOW

UNITED STATES COURT REPORTERS

1292

1 IT WAS REPRESENTED. SHE TESTIFIED THAT SOME CUSTOMERS IN
2 EUROPE HAVE PAID $7 MILLION FOR LICENSES TO USE PEGASUS AGAINST
3 15 TARGETS.
4     NOW, THOSE WERE EXEMPLAR SORT OF PRICES.
5     BUT THE -- THOSE ARE NOT MASS SURVEILLANCE PRICES.
6     BEFORE WE MOVE ON, LET ME COMMENT FOR JUST A SECOND ON
7 DISPUTES ABOUT WHAT YOU REMEMBER ABOUT THE TESTIMONY OR WHAT
8 THE TESTIMONY THAT COUNSEL PUT UP AND WHETHER THAT WAS
9 COMPLETE, OR TESTIMONY THAT I PUT UP. OKAY?
10     YOUR MEMORY OF THE TESTIMONY GIVEN ON THE STAND DURING THE
11 TRIAL, THAT'S WHAT CONTROLS. OKAY? SO WHAT YOU REMEMBER,
12 THAT'S WHAT YOU GO WITH. WHAT I SAY, WHAT HE SAYS, THE COURT'S
13 GOING TO INSTRUCT YOU THAT THE WORDS OF THE LAWYERS ARE NOT
14 TESTIMONY -- ARE NOT EVIDENCE.
15     OKAY. NOW, BACK TO MS. GIL.
16     EXCUSE ME.
17     THE NEXT SLIDE, PLEASE.
18     PEGASUS HAS LIMITATIONS ON ITS SCOPE, INCLUDING, AS
19 MR. SHOHAT TESTIFIED, IT CANNOT BE USED IN THE UNITED STATES.
20 IT CANNOT BE USED ON A UNITED STATES PHONE NUMBER WITH A
21 PLUS 1. IT CAN'T BE USED ON ANY PHONE IN THE GEOGRAPHY OF THE
22 UNITED STATES, REGARDLESS OF THE PHONE NUMBER.
23     SO IT CAN'T BE USED ON MR. ANDRES'S PHONE, IT CAN'T BE
24 USED ON MY PHONE.
25     AND, WHEN HE SAID SPYING IS ILLEGAL, OR SPYING IN THE
UNITED STATES COURT REPORTERS

1293

1 UNITED STATES IS ILLEGAL, I THINK, PEGASUS CANNOT BE USED IN
2 THE UNITED STATES. THAT TESTIMONY IS UNCONTRADICTED. SO THIS
3 IS NOT ALEXA OR SIRI IN YOUR LIVING ROOM LISTENING TO LOVED
4 ONES AND WHAT EVERYONE IS SAYING IN MASS SURVEILLANCE AS WAS
5 IMPLIED LAST WEEK AND AGAIN TODAY.
6     NOW, PART OF YOUR ROLE IS TO ACCESS THE CREDIBILITY OF
7 WITNESSES. THERE'S AN INSTRUCTION ON THIS. AND YOU ARE, AS
8 MR. ANDRES SAID -- ANOTHER THING WE AGREE ON -- MAKE UP YOUR
9 OWN MIND ABOUT WHO YOU FIND CREDIBLE. THERE'S A NUMBER OF
10 FACTORS THE COURT IS GOING TO GIVE YOU, AND SHE'S GOING TO
11 INSTRUCT YOU ABOUT SOME OF THE THINGS THAT YOU CAN CONSIDER
12 WHEN DECIDING CREDIBILITY, INCLUDING ONE OF THEM, MY FAVORITE
13 ONE'S, NUMBER 3, THE WITNESS'S MANNER WHILE TESTIFYING.
14     I MENTION THIS TO YOU BECAUSE PLAINTIFFS HAVE ASKED YOU
15 NOT TO BELIEVE NSO'S WITNESSES, JUST DON'T BELIEVE THEM.
16 THAT'S WHAT THEY'VE ASKED YOU TO DO.
17     BUT YOU WILL DECIDE WHETHER MR. SHOHAT AND MR. GAZNELI,
18 WHO CAME FROM HALF THE WORLD AWAY TO GIVE THEIR TESTIMONY TO
19 YOU, WERE BEING TRUTHFUL OR TRYING TO BE TRUTHFUL.
20     YOU WILL CONSIDER HOW THEY PRESENTED THEMSELVES AND HOW
21 THEY ANSWERED QUESTIONS PUT TO THEM.
22     AND I LEAVE IT TO YOU TO COMPARE THEIR DEMEANORS TO THOSE
23 OF OTHER WITNESSES, LIKE MR. WOOG, LIKE MR. GHEORGHE, AND EVEN
24 MR. ROBINSON, MS. TREXLER WHO, AT TIMES, REFUSED TO GIVE
25 STRAIGHTFORWARD QUESTIONS -- STRAIGHTFORWARD ANSWERS TO
UNITED STATES COURT REPORTERS

1294

1 STRAIGHTFORWARD QUESTIONS.
2     MS. TREXLER, FOR EXAMPLE, ASKED YOU TO BELIEVE THAT
3 ALTHOUGH SHE IS AN OWNER OF HER FIRM AND AN ACCOUNTANT, SHE HAS
4 NO IDEA, NO IDEA HOW MUCH MONEY SHE AND HER TEAM HAVE BILLED
5 FOR THEIR WORK IN THIS CASE. SHE COULDN'T -- WOULDN'T -- GIVE
6 ANY KIND OF ESTIMATE EVEN.
7     ALL RIGHT. LET'S TALK ABOUT PEGASUS AND HOW IT INTERACTED
8 WITH WHATSAPP'S SERVERS.
9     NOW, A WORD THAT YOU HEARD FACEBOOK USE OVER AND OVER WAS
10 "ATTACK," THAT NSO ATTACKED WHATSAPP'S SERVERS.
11     BUT THE EVIDENCE YOU HEARD SHOWED THAT THAT SIMPLY ISN'T
12 TRUE. THE EVIDENCE SHOWED THAT NSO SPECIFICALLY DESIGNED
13 PEGASUS NOT TO CAUSE HARM TO WHATSAPP'S SERVERS, AND FACEBOOK'S
14 OWN WITNESSES AGREED THAT THE SERVERS WERE NOT HARMED.
15     ALTHOUGH THE TECHNOLOGY IS COMPLICATED IN MANY WAYS, ITS
16 INTERACTION WITH WHATSAPP'S SERVERS WAS AS I SHOWED IN MY
17 OPENING STATEMENT. PEGASUS GAVE NSO'S CUSTOMERS THE ABILITY TO
18 SEND SPECIFICALLY CONFIGURED WHATSAPP MESSAGES TO A TARGET
19 PHONE.
20     WHATSAPP'S SERVERS PROCESSED THOSE MESSAGES THE SAME WAY
21 THAT THEY PROCESS HUNDREDS OF BILLIONS OF WHATSAPP MESSAGES
22 EVERY DAY. THIS IS HOW IT WENT: PEGASUS SENT INSTALLATION
23 MESSAGES WITH COMPUTER CODE, UNENCRYPTED, IN PLAIN TEXT -- THAT
24 WAS THE TESTIMONY FROM ALL OF THE WITNESSES -- TO TARGET
25 DEVICES. THOSE MESSAGES PASSED THROUGH WHATSAPP SERVERS. WE
UNITED STATES COURT REPORTERS

1295

1 SAID THAT. THAT IS NOT DISPUTED.
2     BUT EVERYTHING ELSE, EVERYTHING ELSE HAPPENS OUTSIDE,
3 TOTALLY OUTSIDE THE WHATSAPP ENVIRONMENT. THESE MESSAGES PASS
4 THROUGH WHATSAPP'S SERVERS FOR MILLISECONDS AND WITHOUT
5 INCIDENT.
6     THIS IS THE TESTIMONY OF CLAUDIU GHEORGHE. PEGASUS DIDN'T
7 TAKE ANYTHING FROM WHATSAPP'S SERVERS, IT DIDN'T LEAVE ANYTHING
8 BEHIND, IT DIDN'T EXECUTE ANY CODE ON THE SERVERS. IT DID NOT
9 DELETE, CHANGE, OR CORRUPT ANY DATA. IT DID NOT SLOW DOWN OR
10 IMPAIR WHATSAPP'S SERVERS.
11     AND THAT'S NOT MY SAY-SO. THAT COMES FROM PLAINTIFFS' OWN
12 WITNESSES. YOU HEARD MR. GHEORGHE, FACEBOOK'S PRIMARY
13 TECHNICAL WITNESS, AGREE TO ALL OF WHAT I JUST SAID, ALTHOUGH I
14 HAD TO READ IT FROM HIS DEPOSITION, THE TESTIMONY THAT YOU SAW
15 IN OPENING STATEMENT, BECAUSE HE REFUSED TO AFFIRM THAT
16 TESTIMONY WHEN HE CAME BEFORE YOU AND TOOK THE WITNESS'S OATH.
17     YOU ALSO HEARD MR. GHEORGHE TESTIFY, IN HIS OWN WORDS,
18 THAT WHATSAPP'S SERVERS BASICALLY JUST PASSED, TO USE HIS
19 PHRASE, THE PEGASUS CODE TO THE TARGET DEVICE.
20     EVEN FACEBOOK'S FORMAL INVESTIGATION IN 2019 CONCLUDED
21 THAT WHATSAPP'S SERVERS WERE NOT COMPROMISED BY PEGASUS.
22 PLAINTIFFS NEVER INTRODUCED ANY EVIDENCE INCONSISTENT WITH THAT
23 CONCLUSION FROM THEIR OWN ENGINEERS.
24     NOW FACEBOOK SAYS, NOW, FOR THIS TRIAL, THAT PEGASUS
25 TRICKED THE WHATSAP SERVERS.
UNITED STATES COURT REPORTERS

1  THAT, I SUBMIT TO YOU, IS NONSENSE.  SERVERS CANNOT BE
2  TRICKED.  THEY DO NOT THINK.  THEY DO NOT HAVE DISCRETION
3  WHETHER TO FORWARD A MESSAGE OR NOT TO FORWARD A MESSAGE.  AS
4  MR. ROBINSON TESTIFIED, SERVERS ACT ACCORDING TO PREPROGRAMMED
5  RULES.  THEY CAN ONLY DO WHAT THOSE RULES ALLOW, AND THEY
6  CANNOT DO WHAT THOSE RULES DO NOT ALLOW.  SERVERS CANNOT BE
7  TRICKED INTO VIOLATING THEIR PROGRAMMED RULES.  IF THE RULES
8  PROHIBIT MESSAGES, THE MESSAGES DON'T GET DELIVERED.  IF THE
9  RULES ALLOW MESSAGES, THE MESSAGES GET PASSED ALONG TO THE
10 TARGET DEVICE AS MR. GHEORGHE TESTIFIED.
11      WHICH IS WHY, AS MR. GHEORGHE TESTIFIED, FACEBOOK'S FIX IN
12 THIS CASE WAS TO REVISE THE SERVER RULES TO STOP THE SERVERS
13 FROM PASSING PEGASUS MESSAGES THROUGH.  IT'S THAT SIMPLE.  NO
14 TRICKING INVOLVED.
15      NOW, YOUR ROLE, AS THE COURT HAS INSTRUCTED YOU, IS TO
16 DETERMINE WHETHER FACEBOOK IS ACTUALLY ENTITLED TO RECOVER ANY
17 OF ITS CLAIMED FINANCIAL LOSSES, AND YOU PROMISED YOU WOULD
18 MAKE THAT DECISION DISPASSIONATELY AND BASED ON, AND ONLY ON,
19 THE EVIDENCE PRESENTED TO YOU.
20      WHEN YOU WEIGH THE EVIDENCE BASED ON THE COURT'S
21 INSTRUCTIONS, YOU WILL SEE THAT FACEBOOK DOES NOT HAVE
22 FINANCIAL LOSSES, AND CERTAINLY NOT THE $445,000 THAT IT'S
23 ASKING FOR.
24      AS YOU EVALUATE FACEBOOK'S CLAIMS, THERE ARE A FEW
25 IMPORTANT LIMITATIONS TO BE MINDFUL OF.

1      FIRST, FACEBOOK IS ONLY SEEKING COMPENSATION FOR ITS
2  INVESTIGATION AND REMEDIATION COSTS.
3      THE COURT INSTRUCTED YOU THAT FACEBOOK CANNOT RECOVER ANY
4  DAMAGES FOR SUPPOSED HARM TO ITS REPUTATION.
5      FACEBOOK ALSO CANNOT RECOVER FOR SPECULATED HARMS TO
6  TARGETS.
7      SO ALL YOU MAY CONSIDER IS FACEBOOK'S OWN, OWN CLAIMED
8  FINANCIAL LOSSES.
9      NEXT, FACEBOOK CAN ONLY RECOVER FINANCIAL LOSSES THAT NSO
10 CAUSED.  IF FACEBOOK WANTS TO RECOVER FOR ITS EXPENSES, IT HAS
11 TO PROVE THAT IT WOULD NOT HAVE INCURRED THOSE EXPENSES
12 OTHERWISE.  THAT'S THEIR BURDEN OF PROOF.
13      NOW, WHEN MR. ANDRES WAS UP HERE, HE SAID THEY WERE
14 HARMED, AND THEN HE SAID OF COURSE THEY WERE.
15      WELL, "OF COURSE THEY WERE" IS NOT THE BASIS OF A DECISION
16 IN A COURT.  IT HAS NO PLACE IN A COURT.
17      IT'S THE BURDEN OF PROOF, THE EVIDENCE, AND THE
18 INSTRUCTIONS AS THE COURT GIVES THEM TO YOU.  I URGE YOU,
19 PLEASE, TO FOLLOW THEM.
20      NOW, NOTWITHSTANDING FACEBOOK'S ATTEMPTS TO PLAY ON YOUR
21 EMOTIONS, FOLLOWING THE COURT'S INSTRUCTIONS WILL BE A FAIRLY
22 STERILE TASK.
23      YOU HAVE BEEN INSTRUCTED ON THE PURPOSE -- I'M SORRY --
24 YOU WILL BE INSTRUCTED ON THE PURPOSE OF COMPENSATORY DAMAGES.
25 THIS IS THE INSTRUCTION, AND THIS INSTRUCTION ABOUT

1  COMPENSATORY DAMAGES CUTS ACROSS ALL OF THE CLAIMS.
2      THE PURPOSE IS TO PUT PLAINTIFFS IN AS GOOD A POSITION AS
3  THEY WOULD HAVE BEEN IF THE DEFENDANTS HAD NOT VIOLATED THE
4  CFAA, THE CDAFA, OR WHATSAPP'S TERMS OF SERVICE.
5      WHAT THAT MEANS IS THAT YOU SHOULD COMPARE WHAT HAPPENED
6  IN THIS WORLD WITH WHAT WOULD HAVE HAPPENED IN A HYPOTHETICAL
7  WORLD WHERE PEGASUS NEVER EXISTED, NEVER INTERACTED WITH
8  WHATSAPP'S SERVERS.
9      IF FACEBOOK WOULD STILL HAVE INCURRED THE SAME EXPENSES IN
10 THAT HYPOTHETICAL WORLD, THEY CAN'T RECOVER THEM HERE BASED ON
11 THESE INSTRUCTIONS.
12      AND HERE THE EVIDENCE SHOWS THAT FACEBOOK WOULD HAVE
13 INCURRED ALL THE EXPENSES THAT IT IDENTIFIED, ALL, NO MATTER
14 WHAT NSO DID.
15      YOU WILL SEE THAT IF YOU FOCUS ON THREE KEY FACTS:
16      FIRST, FACEBOOK EMPLOYEES ARE ALL PAID A FIXED SALARY
17 EVERY YEAR.  THAT SALARY DIDN'T CHANGE IN 2019 BASED ON THE
18 SPECIFIC WORK THEY WERE WORKING ON.
19      THEIR SALARIES DID NOT INCREASE BECAUSE OF THE WORK THEY
20 DID IN CONNECTION WITH PEGASUS.  AND MS. TREXLER AGREED WITH
21 THIS.
22      HERE'S THE TESTIMONY.
23      SO EVEN IF THOSE EMPLOYEES HADN'T DISCOVERED AND FIXED THE
24 VULNERABILITY USED BY PEGASUS, FACEBOOK STILL WOULD HAVE PAID
25 THEM THE EXACT SAME AMOUNT IN QUESTION IN 2019.

1      FACEBOOK'S EMPLOYEES, SOME OF THEM, ALSO SOMETIMES GOT
2  SMALL BONUSES.  BUT FACEBOOK DIDN'T INTRODUCE ANY EVIDENCE THAT
3  THOSE BONUSES WERE RELATED TO PEGASUS.
4      TO THE CONTRARY, MR. ROBINSON ADMITTED THAT HIS BONUS WAS
5  NOT SPECIFIC TO HIS WORK IN CONNECTION WITH PEGASUS.  AND
6  FACEBOOK NEVER ARGUED, LET ALONE PROVED, THAT IT PAID MORE
7  TOTAL BONUSES IN 2019 BECAUSE OF PEGASUS THAN IT OTHERWISE
8  WOULD HAVE.
9      YOU REMEMBER THE QUESTION I ASKED MS. TREXLER ABOUT
10 WHETHER THE BONUS SIZE OF THE BONUS POOL WAS ANY LARGER, SHE
11 SAID SHE DIDN'T KNOW, AND THERE WAS NO EVIDENCE.
12      SO EVEN IF PEGASUS HAD NEVER EXISTED, FACEBOOK'S EMPLOYEES
13 WOULD HAVE ALL BEEN PAID EXACTLY THE SAME AMOUNTS.  FACEBOOK
14 DIDN'T PAY EVEN A PENNY MORE DUE TO PEGASUS THAN IT WOULD HAVE
15 PAID IF PEGASUS HAD NEVER EXISTED.
16      NOW, IN THIS TRIAL, FACEBOOK HAS ARGUED THAT EVEN THOUGH
17 IT PAYS ITS EMPLOYEES A FIXED SALARY AND THAT THOSE EMPLOYEES
18 DID NO MORE WORK -- WERE NOT PAID MORE DURING THE INVESTIGATION
19 THAN THEY NORMALLY DO IN THEIR JOBS, THAT IS THE CLAIM IN THIS
20 TRIAL.
21      BUT FACEBOOK DID NOT PAY THEM MORE FOR THEIR WORK ON
22 PEGASUS THAN IT WOULD HAVE PAID THEM FOR ANY OTHER WORK THAT
23 THEY WOULD DO.
24      MR. GHEORGHE AND MR. ROBINSON BOTH TOLD YOU, AS WE SEE ON
25 THE SCREEN, FACEBOOK DOESN'T PAY OVERTIME.