1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
      *jakro@kslaw.com*
2   AARON S. CRAIG (Bar No. 204741)
      *acraig@kslaw.com*
3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1600
4   Los Angeles, CA 90071
    Telephone: (213) 443-4355
5   Facsimile: (213) 443-4310

6   Attorneys for Defendants
    NSO GROUP TECHNOLOGIES LIMITED and
7   Q CYBER TECHNOLOGIES LIMITED

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12  WHATSAPP INC., a Delaware corporation,        Case No. 4:19-cv-07123-PJH
    and    FACEBOOK,    INC.,    a    Delaware
13  corporation,                                  **SUPPLEMENTAL DECLARATION OF
                                                  YARON SHOHAT IN SUPPORT OF
14                          Plaintiffs,           DEFENDANTS' REVISED OPPOSITION
          v.                                      TO PLAINTIFFS' MOTION FOR
15                                                PERMANENT INJUNCTION**
    NSO   GROUP   TECHNOLOGIES   LIMITED
16  and Q CYBER TECHNOLOGIES LIMITED,             **REDACTED VERISON OF DOCUMENT
                                                  FILED UNDER SEAL**
17                          Defendants.

18

19                                                Action Filed: 10/29/2019

20

21

22

23

24

25

26

27

28

SUPP. DECLARATION OF YARON SHOHAT                           Case No. 4:19-cv-07123-PJH

1    I, Yaron Shohat, hereby declare as follows:

2    1.    I am a citizen and resident of Israel. I served as Chief Operating Officer of

3  Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (together,

4  "NSO") from approximately May 2018 until August 2022. I have served as NSO's Chief Executive

5  Officer since August 2022. Q Cyber Technologies Ltd. is NSO Group Technologies Limited sole

6  director and shareholder. As Defendants' CEO, I am an employee of Q Cyber Technologies Ltd..

7  I am familiar with NSO's products, as well as its business practices, policies, and procedures.

8    2.    I have personal knowledge of the facts set forth in this declaration and, except as

9  otherwise stated, could testify competently to each of them.

10    3.    NSO is a government contractor and technology company that designs and licenses

11 technology exclusively to governments and government agencies for national security and law

12 enforcement purposes.   The fact that NSO's customers are exclusively governments and

13 government agencies has been confirmed by an Ernst & Young Global "Independent Accountant's

14 Report." (Dkt. 45-13). This remains true today. Among NSO's products are a suite of different

15 technologies and functions that are collectively branded and marketed as "Pegasus."

16    4.    NSO markets and licenses its Pegasus technology exclusively to sovereign

17 governments and government agencies for the purposes above, and it does so only after receiving

18 required export control licenses from the Israeli Ministry of Defense. NSO does not now market

19 or sell, and has never marketed or sold, its Pegasus technology for use by any non-governmental

20 entity.

21    5.    The different technologies marketed under the "Pegasus" brand name provide

22 NSO's foreign sovereign customers the ability to collect evidence and intelligence from different

23 mobile devices. One subset of those technologies permitted governments and government agencies

24 to collect evidence and intelligence from mobile devices that run the Android operating system and

25 operate as "zero click," meaning the end user of the mobile device is not required to take any action,

26 such as opening a link, for installation of Pegasus. These "covert Android" technologies are

27 completely different from the Pegasus technologies that can gather evidence and intelligence from

28

1

1  devices running other (i.e., non-Android) operating systems or that require some engagement by

2  the end user of the mobile device (i.e., "one click").

3      6.      I understand that earlier in the course of the lawsuit, the Court issued rulings that

4  determined which NSO technologies were relevant to Plaintiffs' claims.  Based on those rulings,

5  NSO ███████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████  These three

7  covert installation vectors represent a very small fraction of Pegasus' overall capabilities with

8  respect to obtaining information from Android devices.

9      7.      Had the Court expanded those rulings, and the scope of information that NSO was

10 required to produce, ███████████████████████████████████████

11     8.      Access to NSO's Pegasus technology—including Heaven, Eden, and Erised—was

12 and is subject to many legal, ethical, contractual, and technical safeguards.  These safeguards

13 function together to maximize the proven benefits of Pegasus, while minimizing the potential for

14 its misuse.  They are detailed below.

15     **Israel's Defense Export Control Law & Agency**

16     9.      The marketing and licensing of NSO's Pegasus technology, and even its

17 development, are strictly regulated and monitored by the Government of Israel under Israel's

18 Defense Export Control Law ("DECL").  The DECL is administered by the Defense Export Control

19 Agency ("DECA"), an agency within the Israeli Ministry of Defense.

20     10.     Obtaining regulatory approval to market, and then to export, Pegasus involves a

21 multi-step process.

22     11.     First, NSO is required to maintain an active registration with DECA as a registered

23 defense exporter.

24     12.     ████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ███████████████████████████████  The presentation of the software vulnerabilities

28 proposed to be exploited by Pegasus, as those vulnerabilities are developed and on an ongoing

2

1    basis, is a necessary step in NSO receiving a product ID for Pegasus from DECA and maintaining

2    that product ID with DECA.  Obtaining and maintaining a product ID is a prerequisite for obtaining

3    the necessary marketing and export licenses for such product described below.

4         13.    Third, NSO is required to obtain a preliminary license each time it intends to market

5    Pegasus to a prospective customer (i.e., a "Defense Marketing License").  NSO is only permitted

6    to market Pegasus to government agencies.

7         14.    Fourth, NSO is required to obtain a separate license in order to export Pegasus

8    technology to a government agency customer (i.e., a "Defense Export License").

9         15.    To obtain Defense Marketing and Defense Export Licenses for Pegasus, NSO must

10   provide DECA with information about the identity of the government agency seeking to license

11   Pegasus.  DECA also requires information about the general intended uses of Pegasus and

12   certifications that Pegasus will only be used lawfully to investigate serious crimes, to prevent

13   terrorism, and to gather intelligence.  This includes government-to-government certifications sent

14   directly from the requesting government agency to the Israeli Ministry of Defense.

15        16.    Ultimately, DECA is empowered to investigate NSO and its business, refuse or

16   cancel NSO's registration, deny NSO's license applications, take disciplinary action against the

17   company and its employees and even refer maters to the state prosecutor to take criminal action

18   against the company.

19        17.    Each and every foreign government agency to which NSO licensed Pegasus—

20   including all such agencies that were licensed Heaven, Eden, or Erised—successfully completed

21   this governmental approval process.

22        **NSO's Business Ethics Committee & Evaluation Process**

23        18.    NSO also independently reviews all potential customers to ensure that only vetted

24   government agencies are approved to use Pegasus for legitimate and legal purposes in an ethical

25   manner.

26        19.    To that end, a Business Ethics Committee was established in July 2015.  Copies of

27   the Committee charter adopted in 2017 and the revised charter adopted in 2019 are attached as

28   **Exhibit A** [Exh. A-1735] and **Exhibit B** [Exh. A-1951], respectively.   The Business Ethics

1    Committee was eventually supplanted by NSO's Management Committee and its Governance, Risk

2    and Compliance Committee in January 2020.  The change was made, in part, to foster an even

3    greater focus on ethical, legal, and human-rights issues when assessing licensing opportunities.  The

4    general guiding principles, however, remain the same.

5           20.    The Government Risk and Compliance Committee, like the Business Ethics

6    Committee before it is comprised of both internal and external members.  External, independent

7    advisors who have served on these Committees include a former U.S. ambassador to Israel, a former

8    CIA chief of staff, and a former Majority Staff Director of the United States House Permanent

9    Select Committee on Intelligence.

10          21.    NSO's Business Ethics Committee, and later its Management and Government Risk

11   and Compliance Committees, review and analyze potential engagements in a multi-stage vetting

12   process consistent with the company's Business Ethics Framework and, later, its Human Rights

13   Policy.  These Committees assesses whether there are legal risks (e.g., laws that would prevent the

14   licensing of Pegasus to a particular government agency); ethical risks (e.g., a prospective

15   government end user's "respect for the rule of law" and other factors that may contribute to the

16   potential for misuse of Pegasus); and reputational risks to NSO.  They also consider Israeli, U.S.,

17   and E.U. legislation and policies.

18          22.    Company policy also prohibits marketing or sales activities in certain countries due

19   to a pattern of human rights abuses, corruption, and regulatory restrictions.  With respect to certain

20   countries that present a higher risk, NSO previously instituted a process to seek informal insights

21   from people working for the U.S. government.

22          23.    After weighing the various factors associated with each potential sale, NSO's

23   Business Ethics Committee, and later its Management Committee and its Government Risk and

24   Compliance Committee, then approve or reject the opportunity or defers it for further analysis and

25   consideration. In certain cases, the approval is made subject to the implementation of certain

26   compliance requirements to mitigate potential risks that have arisen during the review.

27

28

4

24.    Between mid-2018 and present, the committees described above rejected approximately 20 opportunities that would have resulted in approximately $300 million in additional revenue.

25.    No customer (i.e., government agency) is issued a Pegasus license without being approved by the appropriate committee(s). Every customer granted rights to use Heaven, Eden, and Erised (or any other version of Pegasus) was assessed by the compliance team and approved by either the Business Ethics Committee or by one or more of the Management Committee and Government Risk and Compliance Committee.

**NSO's Contractual Safeguards**

26.    Where both the DECA process and NSO's business processes are satisfied, NSO also builds additional protections against misuse into its licenses.

27.    Copies of exemplar licenses from 2018 and 2019 are attached as **Exhibit C** [Exh. A-2005] and **Exhibit D** [Exh. A-1908], respectively.

28.    Among other contractual safeguards, NSO requires its customers to provide the end-user certifications required by DECA and to confirm that all necessary permissions have been obtained to license Pegasus. (*E.g.*, Exh. C §§ 4.2-4.3, 5.1; Exh. D §§ 4.2-4.3, 5.1.)

29.    NSO also requires its customers, as a provision of their licensing agreements, to represent that they will comply with all applicable laws, rules, and regulations applicable to their use of Pegasus. (*E.g.*, Exh. C § 18.2; Exh. D § 19.2.) Customers must also represent that they and their agents will comply with all privacy, national-security, and other laws applicable to the use of Pegasus, *including obtaining any required judicial warrants, consents, or decrees*. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Customers must represent that Pegasus will only be used to prevent and investigate terrorism and serious crimes, and that the system will not be used to violate human rights. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Finally, customers must notify NSO of misuses or potential misuses of Pegasus. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Should a customer breach any of these obligations, NSO retains the right to suspend or terminate access to Pegasus. (*E.g.*, Exh. C § 8; Exh. D § 8.)

5

30. All customer licenses executed between 2018 and 2020—including any customers who received a license to Heaven, Erden, or Erised—would have been bound by similar substantive requirements.

31. NSO's current licenses also contain similar provisions designed to ensure that customers only use the Pegasus system for appropriate purposes (e.g., preventing and investigating terrorism and serious crimes) and that customers comply with all applicable laws when doing so.

32. Furthermore, NSO limits by contract, as well as through the technical safeguards described below, the number of target devices that can be monitored with Pegasus at any one time. This restriction ensures that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Technical Safeguards**

33. In addition to the guardrails above, NSO employs technical safeguards to ensure that Pegasus is used legally in each jurisdiction in which it is licensed.

34. A true and correct copy of a Pegasus product guide from August 2018 is attached as **Exhibit E** [Exh. A-1734].

35. As that product guide makes clear, Pegasus is capable of collecting a variety of both historical (existing) and current (incoming/outgoing) data from mobile devices. (Exh. E at 14-15.)

36. Those capabilities, however, are designed to be flexible so that the system can be configured to comply with any applicable laws or collection orders. The collection of historical data, for example, can be disabled if a government agency were not permitted to access existing data. (*Id.* at 14.) Government agencies can also issue active commands to obtain certain information based on pre-existing target information and the need to seek specific intelligence. (*Id.* at 15.) Pegasus is thus designed to ensure that it can be used beneficially in numerous jurisdictions, while also complying with any legal frameworks or warrant limitations that govern a particular investigation. (*See id.* at 16.)

37. Pegasus includes auditing mechanisms. These mechanisms permit government customers to designate auditors, who are then responsible for ensuring compliance with country- or investigation-specific legal requirements. (*See id.* at 26.)

6

38.    These same technical guardrails against misuse were also present in all versions of Pegasus licensed between mid-2018 and mid-2020—including Heaven, Eden, and Erised—as well as all versions of Pegasus licensed since.

39.    NSO's technical safeguards also limit the number of target devices that can be monitored at any one time, ensuring that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Monitoring & Auditing Process**

40.    Finally, NSO itself ensures that customers are complying with their obligations and are not misusing the Pegasus system.

41.    NSO compliance, legal, and customer teams review contractual obligations, advise customers on compliance obligations, and conduct investigations into potential misuses.

42.    Misuse investigations may be triggered by whistleblower allegations (from internal or external individuals), reports from media or non-governmental organizations, and other sources.

43.    NSO has conducted numerous investigations between 2018 and present.  In some cases, the perceived misuse was found to be proper.  In other cases, there was insufficient evidence to make a determination or evidence indicating misuse.  In still other cases, NSO has made findings of misuse.  In either of the latter cases, additional corrective actions would be taken.  In some cases, the implementation of additional guardrails may be judged sufficient to mitigate future misuse.  In other cases, suspension or termination of customer licenses has been deemed necessary.

44.    Between 2018 and present, NSO has received over 100 reports of misuse, all of which went through a preliminary review, resulting in approximately 25 determinations of credible reports, all of which were thoroughly investigated.  This led to 14 determinations of potential misuse, and 16 suspensions (some of which were temporary) or terminations of customers' access to the Pegasus system.

45.    Attached as **Exhibit F** [Exh. A-2028], **Exhibit G** [Exh. A-1736] and **Exhibit H** are true and correct copies of NSO's 2021, 2023 and 2024 Transparency Reports, which contain additional information regarding its compliance and enforcement mechanisms.

\*       \*       \*

7

SUPP. DECLARATION OF YARON SHOHAT                    Case No. 4:19-cv-07123-PJH4:19-cv-07123-PJH

46.     My prior testimony that NSO no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application remains accurate.  NSO currently has no products, either in use or development, that use WhatsApp as an installation vector.

47.     Although NSO respectfully disagrees with the Court's order on summary judgment, and intends to appeal that ruling, NSO does not currently and will not in the future offer versions of Pegasus that use WhatsApp as an installation vector, absent any contrary ruling superseding this Court's ruling.

48.     Pegasus is NSO's flagship product.  It exists, however, in a competitive market. NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices.  Those competing products can and do collect WhatsApp messages, among other social media messages.  If NSO were banned from offering versions of Pegasus that have not been found to violate any law that allow its government customers to collect the same messages, it would quickly lose market share to competitors.

49.     NSO's government customers rely on Pegasus to fight crime and terrorism and are likely to shift quickly to competing products that offer the widest range of capabilities.  NSO's inability to match its competitors' offerings would result in a competitive disadvantage and loss of customers that NSO would be unlikely ever to overcome.

50.     At a minimum, the injunction proposed by Plaintiffs would force changes to NSO's existing Pegasus products, including those that have not been part of this lawsuit.  If all versions of Pegasus were rendered unavailable for any substantial period of time, NSO would be at risk of going out of business.  In addition, NSO would be at risk of violating its contracts with the government customers who rely on its products to fight terrorism and investigate and prosecute crime.  And, even if the disruption were not permanent, those customers would be likely to seek other options to avoid even temporary disruptions to their law-enforcement investigations, military operations, and intelligence activities.  Once a customer transitions to a new competing solution, and begins collecting evidence or data, they would be unlikely to transition back to NSO's products.

8

51.     NSO currently employs approximately 380 personnel, the vast majority of whom have responsibilities relating to NSO's Pegasus products.  Should NSO lose revenues, contracts, or customers, the employment of all those people would be at risk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, this 18th day of June 2025, at Sde Warburg, Israel.

_____
YARON SHOHAT

9

# Exhibit A

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit B

**REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

# Exhibit C

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit D

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit E

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit F

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit G

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

# Exhibit H

**REDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**