JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>            Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF JOSHUA J. MINKLER IN SUPPORT OF DEFENDANTS' REVISED OPPOSITION TO PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**<br><br>Action Filed: 10/29/2019 |

I, Joshua J. Minkler, hereby declare as follows:

1.      I am an attorney and am currently a partner at the law firm Barnes & Thornburg LLP.  In that role, I represent clients in matters relating to white-collar, compliance, and criminal investigations.  Before joining Barnes & Thornburg, I served in various state and federal prosecutorial positions for more than thirty years, culminating in a presidential appointment to the role of United States Attorney for the Southern District of Indiana.  I have personal knowledge of the facts in this declaration, and I could and would testify competently to these facts if called as a witness.

2.      I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to offer testimony based on my experience, including conducting investigation and prosecuting criminal cases using surveillance technologies.

3.      In connection with my engagement, I considered a variety of government, industry, and media publications, as well as certain documents produced in this litigation.

4.      I then prepared a report setting forth (among other things) my qualifications, my opinions, the basis and reasons for my opinions, and the facts and data that I considered when forming my opinions.

5.      Attached as **Exhibit A** is a true and correct copy of the report that I prepared, dated December 18, 2024.

6.      I affirm that the information, statements, and opinions set forth in Exhibit A were, and are, true and correct.  If called as a witness at trial, I could and would testify to the information, statements, and opinions set forth in Exhibit A.


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of March 2025.

JOSHUA J. MINKLER

1

# Exhibit A

**REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC, and FACEBOOK, INC., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 4:19-cv-07123-PJH |
| ) | |
| NSO GROUP TECHNOLOGIES LIMITED, ) | |
| and Q CYBER TECHNOLOGIES LIMITED, ) | |
| ) | |
| *Defendants.* ) | |

**REPORT OF JOSHUA J. MINKLER**

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### I.  INTRODUCTION

1.      My name is Joshua James Minkler. I have been engaged to offer testimony based on my specialized experience conducting investigations and prosecuting criminal cases based on surveillance technology. The scope of my testimony includes: (1) the lawful interception and surveillance of communications by federal law enforcement officers; (2) the unique investigatory challenges presented to state and federal law enforcement by end-to-end encryption and endpoint encryption; and (3) the benefits of tools such as Pegasus in law enforcement and national security operations.

2.      This report explains my understanding of the technology in this case and details my testimony concerning using such lawful intercept capabilities. The views expressed herein are my own and are based on my investigation into

1

this matter and the education, experience, training, and skills I have accumulated as a lawyer and a federal law enforcement official.

## II.    QUALIFICATIONS

3.    My resume is attached as Appendix A. It includes my qualifications, and sets forth significant investigations and prosecutions in which I was involved.[1]

4.    I am currently a Partner at the law firm Barnes & Thornburg LLP. In that role, I represent clients in matters relating to white-collar, compliance, and criminal investigations.

5.    Before joining Barnes & Thornburg, I served as the United States Attorney for the Southern District of Indiana from 2014-2020, as the Acting US Attorney, Attorney General Appointed US Attorney, Court Appointed US Attorney, and Presidentially Appointed, Senate confirmed US Attorney. Before serving as US Attorney, I served in various roles in the Office of the United States Attorney for the Southern District of Indiana from 1994 to 2015. These roles include: 1994 to 2010 – Assistant United States Attorney; 2010-2011 – Chief, Drug and Violent Crimes Unit/Lead; and 2011-2014 – First Assistant United States Attorney. Before that, I was an Assistant Prosecuting Attorney for the Kent County (Michigan) Prosecuting Attorney from 1989 to 1994.

6.    With over thirty years of law enforcement experience, I have led more than fifty investigations, resulting in the prosecution of more than 500 criminal

---

[1] I have authored no publications in the last ten years.

defendants in federal court. I have significant experience obtaining authorization for the lawful interception of communications at the state and federal levels, supervising the use of those law enforcement techniques, and working with federal law enforcement agencies, including the Federal Bureau of Investigation (FBI), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the US Drug Enforcement Administration (DEA).

7.      I have led and supervised complex investigations, including those involving organized crime, child exploitation, terrorism, and human trafficking, where sophisticated technical capabilities were deployed, such as remote surveillance and the interception of communications. I have also been involved in investigations where no such capabilities were available, but they would have been helpful to the investigation had they been available. Accordingly, I am familiar with existing lawful interception tools and the need for next-generation solutions to address technological advancements available to suspected criminals and terrorists.

8.      I have significant familiarity with the interception and use of communications in criminal prosecution.

9.      For example, beginning in the Fall of 1998, I led a joint FBI and Indianapolis Metropolitan Police Department investigation into a violent organized group of drug distributors operating in the Brightwood neighborhood on the northeast side of Indianapolis. Using court authorized interception of phone calls and pager messages, law enforcement seized 78 weapons, 12 kilograms of cocaine, and $200,000 in cash during the investigation. Twenty-

one defendants were charged. During the spring and summer of 2000, ten of the defendants were tried in a seven-week trial. Over 100 witnesses and 1,200 exhibits were presented to the jury. Murders that were at a record high in the Brightwood neighborhood in 1998, declined in 1999, 2000, and 2001. I received an award from the FBI's Special Agent in Charge for the investigation and prosecution of this matter.

10.    From December 2004 until March 2005, I led a team of DEA agents and Indiana State Police investigators in an investigation that involved four court-authorized wire intercepts with three extensions under the Department of Justice's Special Operations Division's ("SOD") "Operation Money Clip." Operation Money Clip was a SOD-supported, multi-jurisdictional, multi-agency Organized Crime Drug Enforcement Task Force (OCDETF) investigation targeting the Henry and Tony Franco-Arrellano poly-drug trafficking organization. SOD initiated Operation Money Clip after intelligence identified a defined Mexican criminal organization being supplied by Regional Priority Target (RPOT)[2] Ignacio Coronel-Villareal. Operation Money Clip received intelligence from our law enforcement counterparts in Mexico, including communications intelligence. In addition, evidence obtained from legal electronic surveillance in the United States was provided to and used by law enforcement counterparts in Mexico.

11.    As a result of this investigation, 16 defendants were indicted, arrested, convicted, and sentenced in the Southern District of Indiana. In

[2] RPOT—Regional Priority Target is an OCDETF term for high-level targets as determined by the Department of Justice.

addition, 48 kilograms of cocaine, 875 pounds of marijuana, seven guns, and assets valued at $1,450,000 were seized and forfeited. More importantly, three Mexico-based sources of supply were indicted and convicted in this investigation, including OCDETF Priority Target Juan Carlos Bermudez. On June 14, 2005, Bermudez was arrested on the outstanding arrest warrant issued in the Southern District of Indiana during a trip from the Mexico to Chicago, Illinois. Bermudez was the first multi-jurisdictional RPOT target to be indicted and convicted in the Southern District of Indiana. My team received a 2006 United States Attorney Award. Additionally, the case was recognized as the Great Lakes OCDETF case of the year at a Department of Justice Ceremony in Washington, D.C., on July 31, 2007. I received an award from the Assistant Attorney General for the Criminal Division. All defendants were arrested, pled guilty, and were sentenced to prison. The denials of motions to suppress were appealed. The judgments were affirmed on appeal. *United States v. Evarardo Lira-Esquivel*, 509 F.3d 820 (7th Cir. 2007).

12.    In 2015, I also supervised the investigation and prosecution of Jared S. Fogle and Russell C. Taylor for distributing and receiving Child Sexual Abuse Material (CSAM) and conspiring to do so, as well as repeatedly traveling to engage in commercial sex acts with underage minors. Between March 2001 and May 2015, Fogle received and viewed CSAM given to him by Taylor. Taylor secretly produced CSAM of victims between 9 and 16 years old in his house. Taylor also obtained and shared CSAM videos made outside of the United States showing the sexual abuse of victims as young as six years old through Internet sources.

Fogle also repeatedly utilized the Internet to solicit minors for commercial sexual acts. He did this using an email account, social networking websites, online messaging, and text messages. After victimizing a minor, Fogle sent messages to the victim offering to pay her a fee, if she could find another underage girl to have sex with him – indicating that "the younger" the next victim was "the better."

13.    I supervised the investigation and federal terrorism prosecution of Akram Musleh, who was arrested in 2016 while attempting to board a bus from Indianapolis to New York, where he was to fly to and transit through Morocco to territory controlled by the Islamic State of Iraq and al-Sham (ISIS). The FBI electronically surveilled Musleh as he consumed ISIS propaganda and made contact with more than 12 ISIS fighters, supporters, and facilitators around the world to join the terrorist organization. In his conversations with those contacts, Musleh declared his allegiance to ISIS, expressed his eagerness to join ISIS, and sought to determine the best way to travel from the United States to ISIS-controlled territory in Syria or North Africa. Musleh also sought the advice of his contacts on when to travel and the best routes to avoid detection by law enforcement authorities. When one of his contacts suggested Musleh send money to support the terror organization instead of traveling, Musleh replied that he was afraid sending money would draw law enforcement attention and Musleh "[didn't] want to lose [his] freedom before doing something massive." In searches of Musleh's electronic devices, the FBI recovered numerous files containing ISIS propaganda, including horrific pictures and videos depicting violence inflicted on countless people in the Middle East and North Africa. Also located on Musleh's

electronic devices was a "kill list" of US service members published by ISIS and a pro-jihad video Musleh produced and created, which included a listing of Indiana service members killed in action during Operation Iraqi Freedom.

14. In 2019, I supervised the investigation and prosecution of Moyad Dannon and Mahde Dannon, who agreed to manufacture and sell at least 55 fully automatic "ghost guns" to a buyer located on the American southwest border, believing those weapons would be shipped to the Middle East for use by ISIS and its members. Moyad Dannon had numerous and extensive conversations with an undercover agent who he believed was a member of ISIS then fighting in Syria. During those conversations, Moyad expressed his desire to travel from Indiana to ISIS-controlled areas of Syria, where he sought to utilize his knowledge of firearms and other skills to provide direct military assistance to ISIS in its fight against the United States and the Syrian government. In a search of Dannon's devices following his arrest, FBI agents located approximately 16 gigabytes of ISIS propaganda, including graphically violent videos depicting ISIS fighters beheading civilians and hostages and ISIS snipers killing US military personnel. Identical ISIS propaganda videos were discovered on a laptop computer.

15. In each of these instances, interception of communications was critical to the investigation and prosecution of these crimes. Today, many of these communications likely would have been encrypted, impairing or impeding the investigations and prosecutions.

16.    In addition, I also have significant experience supervising criminal investigations involving end to end (E2E) communications. For example, I supervised an investigation of an organized crime group called "the Mob," which committed at least 26 robberies of pharmacies, and one homicide, in the Indianapolis area from September 12, 2014, through June 6, 2016.  Our investigation determined that the members of the Mob used Facebook Messenger to communicate with each other to recruit new members into the gang, plan the robberies, and sell the prescription drugs that they obtained from the robberies. In that case, my team obtained Facebook Messenger communications through federal search warrants. Given Meta's recent migration to E2E encryption, law enforcement would *not* have obtained these records, the prosecution might not have occurred, and additional crimes might have been committed.

17.    I also supervised the investigation into methamphetamine trafficking activity of Clifford King. King's organization distributed over 500 pounds of pure methamphetamine over a six-month period ranging from late 2019 through March 19, 2020. During the investigation, law enforcement identified two of King's methamphetamine suppliers—Eric Walker and Derrick Granger. Even though Granger regularly supplied large quantities of methamphetamine to King, law enforcement never intercepted them speaking during approximately sixty days of wiretap interceptions over King's cellphone. During the search of Granger's cellphone, law enforcement found screenshots indicated that Granger communicated with King over FaceTime. Like Facebook Messenger (now) and WhatsApp, FaceTime is a communication platform that

features E2E encryption. As a result, it became clear to us that law enforcement did not intercept Granger during the wiretap because he was speaking to King exclusively over FaceTime.

18.    I also supervised the investigation into a methamphetamine trafficking ring operated by Christopher Tate. Tate's organization distributed in excess of 150 pounds of pure methamphetamine in the Indianapolis area. Trial testimony established that Tate communicated with his drug customers and suppliers via FaceTime, another communications platform using E2E encryption, to avoid detection by law enforcement. One of Tate's drug customers, Desiree Evans, testified at trial that Tate communicated with both her and Tate's drug source by FaceTime because "the police couldn't get our conversations that way." Another of Tate's drug customers, Danielle Dowling, testified that Tate wanted her to contact him via FaceTime "[b]ecause you guys weren't supposed to hear his phone calls on FaceTime." Despite our best efforts, the investigation was unable to identify Tate's Indianapolis-based sources of supply because Tate communicated with them through platforms that employed E2E encryption, including possibly WhatsApp or Facebook Messenger.

19.    From February 2019 through November 2020, I supervised the investigation of Jason Betts, the leader of an Indianapolis methamphetamine trafficking group. Later, I became aware that the FBI conducted a court authorized wiretap interception of Betts' cellular telephone from February 19, 2021, through July 14, 2021.  Law enforcement did not intercept any telephone conversations identifying Betts' methamphetamine source during this time

period. Betts' organization distributed over 220 pounds of pure methamphetamine and seven kilograms of fentanyl in the Indianapolis area. After his arrest, Betts revealed that his methamphetamine source was Stephen Grider, a resident of California who traveled back and forth from California to Indiana. Betts' cooperation eventually provided sufficient evidence to indict Grider, who pled guilty to conspiracy to distribute methamphetamine and fentanyl. At the trial, Betts testified that he communicated exclusively with Grider through FaceTime, using E2E. When asked at trial why he only communicated with Grider via FaceTime, Betts testified, "Because he said that's the only way that he would conversate with me because the FaceTime cannot be intercepted about any law enforcement, sir." Betts later testified that he also communicated with Grider's drug courier exclusively via FaceTime. When law enforcement arrested Grider in California, law enforcement seized his cellular telephone and executed a search warrant on the telephone. The cellular telephone showed that Grider had substantial contacts with an individual in California who had an extensive criminal record that involved drug distribution and suggested involvement in the Jalisco New Generation Cartel. The contents of the cellular telephone showed that Grider communicated with this individual exclusively via WhatsApp and Signal via E2E encryption. Since law enforcement could not identify Grider's telephone to tap it or obtain the WhatsApp and Signal messages from his cellphone, and because Grider did not cooperate, law enforcement could not prove a case against Grider's source in court or expand the investigation to the source of supply to Grider California-based drug

trafficking organization (DTO). Law enforcement's inability to intercept telephonic communications using platforms with E2E encryption significantly hampered this investigation. If law enforcement could have intercepted Betts' telephonic FaceTime communications with Grider during the wiretap investigation, it would have identified Grider earlier and identified his communications device. Law enforcement would have used those interceptions to obtain authority to intercept Grider's cellular telephones. If law enforcement had the ability to identify Grider's telephonic communications over WhatsApp and Signal, it would have been able to identify Grider's cartel-based source of methamphetamine and fentanyl.

20. From November 2005 until January 2006, I led DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with two extensions under OCDETF "Operation Motley Crew" focusing on RPOT target John Scruggs who was the kingpin of a cocaine trafficking organization operating in Madison, Indiana. As a result of this investigation, a total of 17 defendants were indicted. During the investigation, kilograms of cocaine, pounds of marijuana, guns, and United States currency were seized. More importantly, the elimination of a large DTO in a relatively small Indiana tourist town (population 13,000) had a tremendous impact on reducing the availability of illegal drugs, reducing the crime rate, and improving the quality of life for all of the law-abiding residents of that town. My team received a United States Attorney Award in 2008. I was recognized with an award from the Special Agent in Charge of the DEA for my work on this case.

21.     During 2001, I led a joint FBI, DEA, United States Department of Health and Human Services (HHS), Indiana Attorney General, and Jennings County, Indiana, Sheriff's Department investigation into the fraudulent prescribing, distribution, and billing of OxyContin by an Indianapolis physician, Dr. Randolph Lievertz, and a Jennings County, Indiana, drug dealer, Melinda Hawkins. Lievertz prescribed more OxyContin to Medicaid recipients in the State of Indiana than any other physician, and Hawkins was the Indiana Medicaid recipient who received the largest amounts of OxyContin. From January 1, 2001 through September 26, 2001, Lievertz caused over $500,000 to be paid by Medicaid for OxyContin. After filling the prescriptions, Hawkins illegally distributed the OxyContin to several individuals, including high school students, in Jennings County, Indiana. This illegal scheme not only bilked taxpayers, it caused an epidemic of OxyContin abuse in rural Jennings County. The five-month investigation employed a variety of law enforcement techniques, including physical surveillance, controlled purchases of OxyContin, a complete financial investigation, court authorized interception of oral communications occurring in Lievertz's examination room, and search warrants. This case won a 2003 United States Attorney Award. HHS Inspector General Janet Rehnquist recognized me with the HHS Public Integrity Award.

22.     I have not testified as an expert at trial or by deposition in any case during the previous four years.

23.     I am being paid $995/hour for my work in this case. My compensation is not contingent upon the outcome of the case.

### III.   **INFORMATION CONSIDERED**

24.    The content of this report is based on my experience as a prosecutor and a United States Attorney involved in sophisticated investigations, task forces, and steering committees. That experience includes familiarity with intercept capabilities, legal standards, laws, processes, and accountability mechanisms for misconduct or abuses.

25.    In addition, a list of the materials and information that I considered in forming the opinions expressed in this report can be found in Appendix B, below.

26.    Beyond the materials identified above, I do not anticipate needing any exhibits to summarize, support, or aid my testimony. If this changes, I will provide any such exhibits.

### IV.   **BACKGROUND**

27.    Pegasus is a tool developed by the Israeli company NSO Group. Pegasus is designed to be covertly and remotely installed on mobile phones running iOS and Android.

28.    All marketing and licensing activities relating to Pegasus must be approved by the Israeli Ministry of Defense (MoD). NSO Group limits its customer base to governments and government agencies. It also requires those customers to use its products only for criminal and national security investigations and has stated that it has an industry-leading approach to human rights. NSO's marketing and licensing activities are also subject to oversight by an internal business ethics committee.

13

29.    Earlier versions of Pegasus ████████████████████████

████████████████████████████████████████

30.    Subsequent versions of Pegasus ████████████████████

████████████████████████████████████████████

████████████████████████████████████████

31.    While Pegasus's capabilities may vary over time due to software updates, it is generally capable of reading text messages, call recording, location tracking, accessing the target device's microphone and camera, and collecting information from apps.

32.    I have reviewed NSO's Transparency and Responsibility Report for 2023. In this report, NSO explained that it is technologically impossible for Pegasus to add, alter, delete, or otherwise manipulate data on targeted mobile devices or perform any other activities beyond viewing and extracting certain data.

33.    NSO further explained that Pegasus is treated as a "defense article," meaning that Pegasus is subject to strict export control laws. For example, NSO Group must obtain marketing and export licenses from the MoD's Defense Exports Control Agency ("DECA") to engage in any sales discussions regarding Pegasus and ultimately complete its sale. The Report indicates that DECA exercises close regulatory oversight over companies in NSO's industry, conducts monitoring and assessments of human rights risks in countries worldwide, and requires importing governments to sign an end-user declaration addressed to the MoD as a condition to obtain their licenses, among other measures. Based

on public reporting and other materials, ███████████████████████████

████████████████████████████████████████████████ Ronan

Bergman & Mark Mazzetti, *The Battle for the World's Most Powerful*

*Cyberweapon*, The New York Times (last updated June 15, 2023),

https://www.nytimes.com/2022/01/28/-magazine/nso-group-israel-

spyware.html.

34.    NSO also reports its compliance with the United Nations Guiding

Principles on Business and Human Rights ("UNGPs"), the Organisation for

Economic Co-operation and Development Guidelines for Multinational

Enterprises, and the United Nations Counter-Terrorism Legal Training

Curriculum. *See* NSO, *Transparency and Responsibility Report 2023*, (Dec. 31,

2023),        https://www.nsogroup.com/wp-content/uploads/2023/12/2023-

Transparency-and-Responsibility-Report.pdf. In doing so, NSO vets proposed

Pegasus licensees, limits the number of instances in which Pegasus can be used,

and contractually requires customers to respect human rights and use Pegasus

only for legitimate intelligence and law enforcement purposes. *Id.* I have verified

that NSO's contracts contain clauses related to human rights and lawful

intelligence gathering.

## V.    **DISCUSSION**

### A. **Lawful Interception and Surveillance by Federal Law Enforcement Agencies**

35.    The ability to lawfully intercept communications is not just a tool,

but a critical necessity in ensuring public safety and national security. Without

access to real-time communications, law enforcement's ability to prevent

terrorist attacks, conduct criminal investigations, and prosecute criminal activity will be significantly hampered. The inability to use developing technology to conduct the lawful interception of communications puts law enforcement at a disadvantage as technology (and consequently the technology used to evade the law) evolves. Indeed, criminal and terrorist actors are aware of the technologies deployed by law enforcement and counter with increasingly sophisticated technologies to defeat detection, intercept, or capture.

36.    However, federal law provides avenues for law enforcement to lawfully intercept communications using tools like Pegasus, including Title III wiretaps and FISA warrants.

37.    For example, Title III of the Electronic Communications Privacy Act, 18 U.S.C. 2510, *et seq.*, has specific requirements that must be met before a wiretap may be issued, including (1) any wiretap application under Title III must be prepared by an affiant law enforcement agent who has developed the probable cause necessary to support a wiretap and must be signed by a United States Attorney or their designee, 18 U.S.C. § 2518(1)(a); (2) the application must describe with particularity what information is to be intercepted and all other means explored to gather this information, 18 U.S.C. § 2518(1)(b); (3) the application must describe with particularity the probable cause for the specific, predicated offense or offenses, 18 U.S.C. § 2518(1)(b); and (4) a federal judge must approve the application, 18 U.S.C. § 2518(3). And no order for a wiretap "may authorize or approve the interception of any wire, oral, or electronic

communication for any period longer than is necessary to achieve the objective of the authorization." 18 U.S.C. § 2518(5).

38.    The Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801-11, 1821-29, 1841-46, 1861-62, 1871, provides another means by which intelligence agencies can lawfully intercept communications. FISA requires a specialized Foreign Intelligence Surveillance Court to find that probable cause exists that the subject of the FISA warrant is a foreign power or agent of a foreign power and that a "significant purpose" of the warrant is to obtain foreign intelligence. 50 U.S.C. §§ 1804. FISA also requires that all surveillance be "minimized" to the extent possible. *Id.*

39.    In my experience as a federal prosecutor and as the US Attorney, there are significant safeguards that limit the potential for misuse of Title III wiretaps and FISA warrants. For example, federal law provides criminal and civil penalties for abuse of these law enforcement mechanisms. Similarly, the Department of Justice's internal policies provide for penalties for abuse of warrants, including termination. These penalties are a strong deterrent against any potential misuse of surveillance tools.

40.    Based on my experience, federal law enforcement could lawfully deploy Pegasus or similar software capabilities in the United States within these parameters.

## B. Law Enforcement and Intelligence Concerns Regarding Device Encryption

41.    Government access to encrypted communications is not a new issue and has been debated since at least the 1970s. However, in the modern context,

17

end-to-end encryption ("E2E" or "Device Encryption") has put a unique constraint on law enforcement. E2E protects "data in motion" and encrypts the transmission of messages such that only the original sender and intended recipient have the ability to decrypt the communication. E2E encryption contrasts with traditional "end point" encryption, which protects stored information on locked devices such that the contents of the device cannot be read by anyone who does not possess the password. Increasingly, E2E has become the default on many different applications and messaging services, including WhatsApp, Telegram, and Signal. *See About End-to-End Encryption*, WhatsApp, https://faq.whatsapp.com/820124435853543 (last visited December 10, 2024); *End-to-End Encryption FAQ*, Telegram Support Force, https://tsf.telegram.org/manuals/e2ee-simple (last visited December 10, 2024); *Is It Private? Can I Trust It*, Signal Support, https://support.signal.org/hc/en-us/articles/360007320391-Is-it-private-Can-I-trust-it#:~:text=Signal%20conversations%20are%20always%20end,%2C%20every%20call%2C%20every%20time (last visited December 10, 2024).

42.    The E2E encryption that WhatsApp provides its users prevents law enforcement from intercepting and deciphering communications – communications that law enforcement would have previously been able to obtain and review by intercepting mail, telephone calls, electronic communications, etc. WhatsApp itself informs users that it "does not" comply with law enforcement requests for the content of its users' messages. More importantly, WhatsApp informs users that it "cannot" comply with such lawful requests for the content

of their messages.[3] *See* WhatsApp FAQ, "About government requests for user data," (last accessed Dec. 10, 2024) https://faq.whatsapp.com/808280033839222.

43.    As a practical matter, law enforcement also cannot access encrypted messages on a locked device, even when that has been lawfully seized.

44.    Accordingly, law enforcement and intelligence agencies are delayed or unable to prevent terrorist attacks, investigate crimes, and prosecute criminal activity without access to communications—even with a warrant or court order.

45.    The impact of these limitations is present in several cases, including cases of child exploitation. For example, in August 2019, an undercover police officer in Ohio responded to an advertisement on a prostitution website seeking to sell an underage woman who was a victim of sex trafficking. The undercover officer arranged for a meet-up with the seller and—during the meet-up—arrested him, seizing his cell phone in the process. The day after the arrest, the suspect was overheard saying on a jail cell phone, "If [the police] get in my phone, I'm doing time . . . . If they get in my phone, I'm doing time for other [stuff]." Using this evidence, law enforcement obtained a warrant to search the suspect's cell phone, hoping to obtain the names of other sex trafficking victims. However, law enforcement was unable to bypass the device's encryption—meaning law enforcement was *never* able to identify the names of other potential sex offenders, or other potential victims of sex trafficking. *See Lawful Access*, US Department

of Justice Office of Legal Policy (last updated November 18, 2022), https://www.justice.gov/olp/lawful-access.

46.    The issue of warrant-proof encryption spans beyond the sphere of sex trafficking and into the realm of national security. For example, the terrorists in the 2015 Garland, Texas, attack—two Islamic extremists who ultimately carried out an attack for which ISIS claimed responsibility—had been monitored by the FBI for over three years. An undercover agent was on the scene actively monitoring one of them at the time that the first shots were fired. But this was not enough to prevent the attack. And, on the morning of the attack, the terrorists exchanged 109 encrypted messages with an overseas terrorist organization. The FBI could not access the messages and use their contents to halt the attack. Indeed, even years after the terrorist attack, the FBI was not able to access the content of the messages. *See Attorney General William P. Barr Delivers Keynote Address at the International Conference on Cyber Security*, US Department of Justice Office of Public Affairs (July 23, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-keynote-address-international-conference-cyber.

47.    The use of encrypted messaging apps by foreign and domestic terrorist groups has not ceased in the years since the Garland, Texas, terrorist attack. In 2021, E2E was used by the Oath Keepers while planning the January 6th riot on the United States Capitol building. *See, e.g.*, Indictment, *United States v. Rhodes et al.* (D.D.C. January 8, 2021) ("Beginning in November 2020, Rhodes

began disseminating messages on encrypted applications that encouraged his co-conspirators to oppose by force the lawful transfer of presidential power.").

48.    Even more recently, Matthew Crooks planned his attempted assassination of former President Trump using E2E. Although some of these messages have been successfully decrypted, law enforcement still cannot access the entirety of Crooks' messages, and his motivations remain unknown. *See* Testimony of the Honorable Christopher Wray, FBI Director, before the House Judiciary Committee (July 24, 2024), https://judiciary.house.gov/committee-activity/hearings/oversight-federal-bureau-investigation-7 (noting that the FBI is still exploring "a number of digital devices" that belonged to Crooks, and that "it turned out [Crooks] was using some encrypted messaging applications" which the FBI "may never get access to because of the encryption issue that presents an increasingly vexing barrier for law enforcement").

49.    This is only a select set of events, but the list of criminals and terrorists known to be using E2E is extensive. In my experience, criminals and terrorists specifically employ E2E because they are aware that law enforcement has a limited ability to monitor their misconduct. This permits not only the open planning of violent acts, but also allows for the transmission of other criminal activity such as child exploitation, drug trafficking, and cybercrime. And, even if the criminals employing E2E are ultimately identified, encrypted communications are sometimes lost to the government forever and cannot be used as evidence in any resulting prosecutions.

**C. Lawful Surveillance Is Used by Foreign Governments**

50.     Based on my experience working in the US Department of Justice and independent research, I am aware that other nations have legal frameworks that permit law enforcement to intercept communications lawfully. Although I am not an expert in the laws of any particular foreign nation, I am aware that many foreign jurisdictions impose requirements to receive authorization for lawful interceptions that are similar to those in the United States.

51.     Based on my research, at least the United Kingdom, Australia, New Zealand, the United States, Canada, France, Mexico, Jamaica, and the Netherlands generally allow for the lawful interception of communications with prior judicial authorization.

52.     In addition, a publicly available database compiled by Vodafone Group with support from Hogan Lovells provides information for at least fifty-seven counties. *See* Vodafone, *Law Enforcement Disclosure Report*, (June 2014), https://www.vodafone.com/content/dam/vodcom/sustainability/pdfs/vodafone_law_enforcement_disclosure_report.pdf. A sampling of those records, which were last updated between 2017 and 2022, indicates that the vast majority of those countries permitted law enforcement agencies or national security agencies to conduct lawful intercepts as of the date that the online database or relevant entries were last updated.

53.     In my experience, the lawful interception of communications by a foreign nation-state, such as a US ally, can and has facilitated the protection of the United States. For example, in Operation Money Clip, receipt of intercepted

messages from Mexican law enforcement was instrumental in securing arrests and convictions for several of the investigation's targets.

54.    Based on public reporting, Pegasus has been used by several Western-style democracies including Germany, Spain, Belgium, Poland, and Hungary. *See, How Democracies Spy on Their Citizens,* The New Yorker (April 18, 2022), https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.  It has also been publicly reported that the United States has purchased Pegasus, or financed the purchase of Pegasus, to assist American allies in combating crime and terrorism.  This includes Djibouti and Colombia. *See* Michael Levenson, *F.B.I. Secretly Bought Israeli Spyware and Explored Hacking U.S. Phones*, New York Times (Jan. 28, 2022), https://www.nytimes.com/2022/01/28/world/middleeast/israel-pegasus-spyware.html; *Washington Financed Colombia's Purchase Of Pegasus Spy Software*, Barron's (Nov. 8, 2024), https://www.barrons.com/news/washington-financed-colombia-s-purchase-of-pegasus-spy-software-76d6550f.

**D. Interception Technologies Provide the Potential for Significant Benefits to Law Enforcement and the Public**

55.    Based on my experience, lawful real-time access to devices and the data, communications, and information therein is imperative to public safety and national security. Criminal and terrorist actors continue to evolve in their communications to avoid detection, and law enforcement and the intelligence community must outpace this evolution technically.

56.    I am not alone in this belief. Numerous United States Attorneys General—appointed by Democrat and Republican presidents—agree on this issue. *See, e.g.*, *Statement from Attorney General William P. Barr on Introduction of Lawful Access Bill in Senate*, US Department of Justice Office of Public Affairs, (June 23, 2020), https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-introduction-lawful-access-bill-senate#:~:text=While%20strong%20encryption%20provides%20enormous,their%20crimes%20and%20avoid%20detection ("While strong encryption provides enormous benefits to society and is undoubtedly necessary for the security and privacy of Americans, E2E encryption technology is being abused by child predators, terrorists, drug traffickers, and even hackers to perpetrate their crimes and avoid detection. Warrant-proof encryption allows these criminals to operate with impunity. This is dangerous and unacceptable."); Christina Carrega et al., *Merrick Garland Cites Domestic Terrorism and Civil Rights in Defending Budget to House Lawmakers*, CNN Politics (May 4, 2021), https://www.cnn.com/2021/05/04/politics/merrick-garland-hearing/index.html (quoting Attorney General Merrick Garland as stating that "[t]he consequence of the internet and encryption means that [criminals and terrorists] can send information and make plans much more swiftly and in greater secrecy than could have been done before. . . . So, we have an emerging and accelerating threat."). President Obama has made similar statements. *See* The White House Office of Press Secretary, *Remarks by the President at South By Southwest Interactive* (Mar. 11, 2016),

24

https://obamawhitehouse.archives.gov/the-press-office/2016/03/14/remarks-president-south-southwest-interactive ("You cannot take an absolutist view on this. So if your argument is strong encryption, no matter what, and we can and should, in fact, create black boxes, then that I think does not strike the kind of balance that we have lived with for 200, 300 years. And it's fetishizing our phones above every other value. And that can't be the right answer. I suspect that the answer is going to come down to how do we create a system where the encryption is as strong as possible, the key is as secure as possible, it is accessible by the smallest number of people possible for a subset of issues that we agree are important.").

57.    Existing lawful intercept capabilities are typically limited to methods that rely upon E911 data, cell tower pings, and Internet Protocol ("IP") data. As a result, law enforcement is often only able to incept traditional (and often antiquated) de-encrypted methods of communications, such as telephone calls and text messages, application messages, and emails. Currently, federal law enforcement does not have technology capable of intercepting E2E communications.

58.    Individuals engaging in organized crime, child exploitation, terrorism, and human trafficking continue to develop technologies to avoid detection by law enforcement, including detection of their illegal activities by lawful electronic surveillance. In my experience, using E2E encryption is one of the most common technologies utilized to defeat lawful electronic surveillance.

59.    In my opinion, the lack of the ability to intercept E2E communications prevents or hampers considerably the investigation, prevention, and prosecution of organized crime organizations, child exploitation, terrorism, and human trafficking.

60.    I have reviewed materials summarizing the capabilities of NSO's Pegasus technology, and it appears designed to capture more traditional forms of communications or information (e.g., written communications, the content of audio calls, the content of conversations within range of an activated microphone, call logs, location data, etc.), while also providing law enforcement access to new data streams (e.g., text and social media messages, browsing history, installed applications, Wi-Fi networks, etc.). Most importantly, NSO's Pegasus technology, or similar technologies, would allow law enforcement legal access to E2E communications used in furtherance of criminal activity.

61.    Pegasus technology, or similar technologies, could provide law enforcement agencies with real-time intelligence of crimes as they are planned. This technology is the natural evolution of current lawful intercept tools and has the potential to provide law enforcement with meaningful data to stop bad actors before they cause greater harm to the public. Additionally, it would allow law enforcement to successfully investigate and prosecute individuals involved in organized drug trafficking organizations, child exploitation, terrorism, and human trafficking. Put simply, it would be an affront to national security and the public for law enforcement and the intelligence community to be unable to counter the technologies deployed by criminals and terrorists.

62.     Based on public reporting, Pegasus itself has been beneficially deployed in several high-profile investigations. Among other examples, this includes the capture of an infamous Mexican cartel leader and the thwarting of terrorist plots, organized crime, and a global child-abuse ring; as well as tracking hostages held in Gaza.  Ronan Bergman & Mark Mazzetti, *The Battle for the World's Most Powerful Cyberweapon*, The New York Times (last updated June 15, 2023), https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html; Gwen Ackerman & Marissa Newman, *Israel Is Using Pegasus Spyware Maker to Track Hostages in Gaza*, Bloomberg (Oct. 26, 2023), https://www.bloomberg.com/news/articles/2023-10-26/israel-taps-blacklisted-pegasus-maker-nso-to-track-gaza-hostages-and-hamas.

Executed December 18, 2024.

_____

Joshua J. Minkler

Joshua James Minkler
Parter, Barnes & Thornburg LLP
11 South Meridian
Indianapolis, Indiana 46204


**Education**:

      Indiana University School of Law
      Bloomington, Indiana 47405
      08/1985 - 05/1988
      Juris Doctorate 05/1988

      Wabash College
      Crawfordsville, Indiana 47953
      08/1981 - 05/1985
      Bachelor of Arts 05/1985


**Legal Employment**

| | |
|---|---|
| Employer's Name: | Barnes & Thornburg LLP |
| | 11 S. Meridian |
| | Indianapolis, Indiana 46204 |
| Dates Employed: | 11/2020 – Present |
| Job Title: | Partner |
| Employer's Name: | Office of the United States Attorney for the |
| | Southern District of Indiana |
| | 10 West Market, Suite 2100 |
| | Indianapolis, Indiana 46204 |
| Dates Employed: | 11/1994 – 11/2020 |
| Job Title: | 08/2014 – 11/2020 |
| | United States Attorney |
| Job Title | 04/2011 – 07/2014 |
| | First Assistant United States Attorney |
| Job Title: | 05/2010 - 03/2011 |
| | Chief, Drug and Violent Crimes Unit/Lead |

|  | OCDETF Assistant United States Attorney |
|---|---|
| Job Title: | 11/1994 - 05/2010<br>Assistant United States Attorney |
| Employer's Name: | Office of the Kent County Prosecuting Attorney<br>416 Hall of Justice<br>333 Monroe Avenue, N.W.<br>Grand Rapids, Michigan 49503 |
| Dates Employed: | 12/1989 - 11/01/1994 |
| Job Title: | Assistant Prosecuting Attorney |
| Employer's Name: | Legal Services of Eastern Michigan<br>(Legal Services Corporation)<br>140 East Main Street<br>Midland, Michigan 48640 |
| Dates Employed: | 07/1988 - 12/1989 |
| Job Title: | Staff Attorney |
| Employer's Name: | Cotner, Andrews, Mann & Chapman<br>(No longer in business)<br>528 North Walnut Street<br>Bloomington, Indiana 47402 |
| Dates Employed: | 09/01/1986 - 04/30/1988 |
| Job Title: | Law Clerk |

**Honors and Awards**:

December 2015:  Indianapolis Metropolitan Police Department:  Honorary Chief of Police Award for distinguished service and exceptional performance on behalf of the community of Indianapolis and the Indianapolis Metropolitan Police Department. Presented by the Chief of Police, Indianapolis Metropolitan Police Department.

July 2012:  Office of the Secretary of the Department of Defense:  Patriotic Employer Award for contributing to national security and protecting liberty and freedom by supporting employee participation in America's National Guard and Reserve Force. Presented by the National Chair, Employees Support of Guard and Reserve, Executive Director, Employer Support of Guard and Reserve.

<u>January 2012</u>:  Drug Enforcement Administration: Certificate of Appreciation and Recognition for outstanding contribution in the field of drug law enforcement.  Presented by the Special Agent in Charge, Drug Enforcement Administration, Chicago Field Division.

<u>December 2009</u>:  Federal Bureau of Investigation: Commendation for outstanding work on behalf of the people of the United States.  Presented by the Special Agent in Charge, Federal Bureau of Investigation, Indianapolis Division.

<u>November 2008</u>:  Federal Bureau of Investigation: Commendation for outstanding work on behalf of the people of the United States.  Presented by the Special Agent in Charge, Federal Bureau of Investigation, Indianapolis Division.

<u>August 2007</u>:  Investigation: Award for outstanding prosecution skills and assistance provided to the Federal Bureau of Investigation.  Presented by the Director of the Federal Bureau of Investigation.

<u>July 2007</u>:  Department of Justice: Outstanding OCDETF Case, Great Lakes Region and recognition for outstanding contribution to cooperative law enforcement and the OCDETF program.  Presented by the Assistant Attorney General, Criminal Division, United States Department of Justice.

<u>February 2006</u>:  United States Drug Enforcement Administration: Certificate of Appreciation and Recognition for outstanding contributions in the field of drug law enforcement.  Presented by the Special Agent in Charge, Drug Enforcement Administration, Chicago Field Division.

<u>May 2004</u>:  United States Postal Inspection Service: Certificate of Appreciation in recognition of outstanding service and assistance to the United States Postal Inspection Service.  Presented by the United States Postal Inspector in Charge, Detroit Division

<u>July 2003</u>:  Department of Health and Human Services, Office of Inspector General: Integrity Award in recognition of the investigation and conviction of multiple subjects involved in the fraudulent prescribing, billing, and distribution of OxyContin.  Presented by the Inspector General, Department of Health and Human Services.

<u>August 2000</u>:  Federal Bureau of Investigation: Commendation and Recognition of contributions as lead prosecutor of the Brightwood investigation and prosecution. Presented by Special Agent Franklin S. Fabian, Federal Bureau of Investigation, Indianapolis Division.

<u>August 1999</u>:  United States Department of Justice:  Special Achievement Award in recognition of meritorious acts performed in behalf of the Department.  Presented by the Attorney General of the United States of America.

<u>July 1999</u>:  United States Customs Service, Office of Investigations: Commendation and Recognition in appreciation of vigorous and successful prosecution of a major international narcotics smuggling organization.  Presented by the Regional Agent in Charge, United States Customs Service.

<u>October 1998</u>:  City of Indianapolis, Indiana: Indianapolis Police Department Certificate of Commendation in recognition of distinguished service to the City of Indianapolis and to the Indianapolis Police Department.  Presented by the Mayor, City of Indianapolis, the Director of Public Safety, and the Chief of Police.

<u>July 10, 1998</u>:  Department of Treasury, Bureau of Alcohol, Tobacco and Firearms: Certificate of Appreciation and Recognition for investigation and prosecution. Presented by the Special Agent in Charge, Bureau of Alcohol, Tobacco and Firearms.

## **Department of Justice Assignments and Committees**

Domestic Terrorism Executive Committee
Co-Chair:  11/2017 – 11/2020

Domestic Terrorism Working Group
Chair:  11/2017 – 11/2020

Attorney General Advisory Committee
Member:  11/2017 – 10/2019

Child Exploitation and Obscenity Working Group
Member:  08/2014 – 01/2017
Co-Chair:  04/2016 – 01/2017

Terrorism and National Security Sub Committee
Member:  05/2015 – 01/2017

Violent and Organized Crime Sub Committee
Member:  08/2014 – 01/2017

## **Public Offices**

**United States Attorney; Southern District of Indiana**
Appointed by President Donald J. Trump and Unanimously Confirmed by the United States Senate
10/02/2017 – 11/20/2020

**United States Attorney (Interim) Southern District of Indiana**
Appointed by the District Judges of the United States District Court for the Southern
District of Indiana by Hon. Richard L. Young, Chief Judge, United States District Court,
Southern District of Indiana
06/25/2015 – 10/02/2017

**United States Attorney (Interim); Southern District of Indiana**
Appointed by Attorney General Eric H. Holder, Jr.
02/26/2015 – 06/25/2015

**Hussey-Mayfield Public Library (Zionsville, Indiana, Public Library)**
**Board of Trustees**
Appointed by Zionsville, Indiana, Community School Board March 2009
Reappointed January 2013
Offices Held: Vice President 01/2013 – 07/2014; Secretary 03/2009 – 12/2012
03/2009 – 08/01/2014

**Description of Legal Career:**

11/1994 – 11/2020
Office of the United States Attorney for the
Southern District of Indiana
10 West Market, Suite 2100
Indianapolis, Indiana 46204

08/2014 – 11/2020
**United States Attorney**
From August 2014 to November 2020 as the United States Attorney, I served as
the Chief Federal Law Enforcement Officer for the Southern District of Indiana and
undertook the following responsibilities: Setting, communicating and
implementing federal law enforcement priorities within the district to reflect
Department of Justice policy and priorities including the prosecution of federal
crimes; maintaining the national security of the district; protecting federal funds
and defending the interests of the United States; developing and maintaining a
budget that maximizes the use of all available resources; managing the personnel
who compose the Office of the United States Attorney; promoting effective external
communications by disseminating information to the media and the public; and,
supervising the First Assistant United States Attorney. I was not assigned any
active criminal or civil cases, but I appeared in federal district and magistrate courts
in the Southern District of Indiana on an occasional basis. I also appeared before
the Seventh Circuit Court of Appeals

04/2011 – 07/2014

**First Assistant United States Attorney**

> From April 2011 to July 2014 as the First Assistant United States Attorney, I was responsible for day-to-day operations of the Office of the United States Attorney including supervising the Criminal Chief, Civil Chief, Drug and Violent Crimes Unit Chief, National Security Unit Chief, two Senior Litigation Counsel, the Administrative Officer, the Public Information/Law Enforcement Coordinator, serving as Acting United States Attorney when the United States Attorney was recused, and all other duties as assigned by the United States Attorney. I was the only direct report to the United States Attorney. I continued to investigate and prosecute OCDETF cases. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

05/2010 - 03/2011

**Chief, Drug and Violent Crimes Unit/Lead**
**OCDETF Assistant United States Attorney**

> From May 2010 to April 2011 as the Chief, Drug and Violent Crimes Unit/Lead OCDETF Assistant United States Attorney, I was Responsible for supervising the attorneys and a paralegal assigned to the Drug and Violent Crimes Unit of the Criminal Division and the oversight of all OCDETF investigations and prosecutions in the Southern District of Indiana on behalf of the United States of America. I continued to investigate and prosecute OCDETF cases. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

11/1994 - 05/2010

**Assistant United States Attorney, Criminal Division**

> From November 1994 to May 2010 as Assistant United States Attorney in the Criminal Division, I was responsible for conducting OCDETF investigations and prosecutions (including motion and appellate practice) of organizations engaged in violations of federal law including drug trafficking, money laundering, public corruption, commercial armed robberies, and firearms offenses on behalf of the United States of America. I appeared in federal district and magistrate courts in the Southern District of Indiana on a weekly basis. I also appeared before the Seventh Circuit Court of Appeals

12/1989 - 11/01/1994
Office of the Kent County Prosecuting Attorney
82 Ionia, NW #450
Grand Rapids, Michigan 49503

**Assistant Prosecuting Attorney**

> From December 1989 to November 1994 as an Assistant Prosecuting Attorney, I was responsible for the filing, preparation, motion practice, and trial of assigned

criminal cases including murder, attempted murder, rape, armed robbery, and felony assaults on behalf of the People of the State of Michigan. I appeared in the state courts in Kent County, Michigan on a daily basis.

07/1988 - 12/1989
Legal Services of Eastern Michigan
(Legal Services Corporation)
140 East Main Street
Midland, Michigan 48640

**Staff Attorney**
From July 1988 to December 1989 with Legal Services, I was responsible for the legal representation of legally indigent civil clients in assigned housing and public benefits matters.  Practiced with three other lawyers including a lead staff attorney who was responsible for the assignment of cases.  The litigation was in state and federal courts in Michigan in the areas of tenant defense, land contract forfeiture, foreclosure defense, consumer protection, and constitutional challenges to federal regulations and policy.  Managed 30 – 50 housing related cases in Midland, Isabella, Clare, Gratiot and Bay Counties in Michigan. I appeared in the state courts in those counties in Michigan on a weekly basis.

**Trial and Appeals Experience:**

I have tried over 30 felony cases to verdict in the state courts of Kent County, Michigan. I was sole counsel on all of those cases.  I have tried 21 cases to verdict in federal district court. I was sole counsel on 8 of those cases, lead counsel on 11 of those cases, and co-counsel on 2 of those cases. I have prepared and filed over 25 appellate briefs in the United States Court of Appeals for the Seventh Circuit.  On over 25 occasions I have presented oral argument before a three judge panel in the United States Court of Appeals for the Seventh Circuit.  Many of those cases resulted in published opinions.

**Ten Significant Litigated Matters**

1. ***United States v. Alberto Santana-Cabrera, et al.***
   1:09-cr-00136-WTL-MJD
   United States District Court, Southern District of Indiana
   Honorable William T. Lawrence, Judge
   Date of Representation: 2009 to 2012

From the beginning of the investigation in 2009 through conclusion of the final appeal in 2012, I represented the United States of America. I was sole counsel on the investigation, lead counsel on all motion practice, the jury trial, and the sentencing hearings. I was sole counsel on the appeal.

During 2009, I led agents of the DEA and officers of the IMPD in an investigation into the illegal distribution of stolen firearms and methamphetamine in the Indianapolis area. The investigation revealed that Alberto Santana-Cabrera, an undocumented citizen of Mexico with a prior felony drug conviction, was selling guns and methamphetamine on the west side of Indianapolis. His supplier for the methamphetamine was Abel Flores-Lopez. After an intensive investigation involving electronic surveillance, a confidential informant, an undercover agent, and the execution of numerous search warrants, both defendants were indicted in December of 2009. The matter was tried in May 2010. A majority of the civilian witnesses and both defendants were fluent in Spanish, but spoke little English. After a one-week jury trial involving Spanish interpreters, a jury convicted both defendants of all charges. Santana-Cabrera was sentenced to 75 years in prison and Flores-Lopez was sentenced to 10 years in prison. The judgments were affirmed on appeal. *United States v. Abel Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012).

*2. United States v. Robert Long, et. al.*
    1:08-cr-00088-LJM-KPF
    United States District Court for the Southern District of Indiana
    Hon. Larry J. McKinney, Judge
    Date of Representation: 03/2008 - 2015
    Co-Counsel: AUSA Joe H. Vaughn

From the beginning of the investigation in March 2008 through post-conviction litigation including direct appeals and collateral attacks that were concluded in 2015, I have represented the United States of America. From March 2008 until June 16, 2008, I led a joint FBI, Indiana State Police, and Indianapolis Metropolitan Police Department (IMPD) investigation into public corruption and drug trafficking activities occurring within the Narcotics and Dangerous Drugs Section of the IMPD. The investigation consisted of court-authorized wiretaps, high-risk undercover operations, sophisticated audio and video surveillance and novel witness interview techniques. The investigation revealed that IMPD Narcotics and Dangerous Drugs Detectives Robert Long and James Edwards and IMPD Patrolman James Davis corruptly abused their positions as IMPD police officers to divert drugs and drug proceeds to their own use, at times using fictitious search warrants to gain access to private property and at other times breaking into residences and stealing the drugs and money therein. This case was tried in the summer of 2009. After a two-week trial, the jury returned convictions. Davis was sentenced to 10 years, Edwards to 17 years, and Long to 25 years in prison. The trial received a 2010 United States Attorney Award. I was recognized by the Special Agent in Charge of the FBI with an award for this case.

The judgments were affirmed on appeal. *United States v. Robert Long*, 639 F.3d 293 (7th Cir. 2011). Edwards' motion for collateral relief pursuant to 28 U.S.C. § 2255 was

denied and that judgment was affirmed on appeal.  *Jason P. Edwards v. United States,* 612 Fed.Appx. 390 (7th Cir. 2015).

**3.** ***United States v. Roy Lampkin et al.,*** **and** ***United States v. Earl Allen, et al.***
1:07-cr-00105-SEB-KPF and 1:07-cr-00106-WTL-DKL
United States District Court for the Southern District of Indiana
Hon. Sarah Evans Barker, Judge
Hon. John D. Tinder, Judge
Hon. David F. Hamilton, Judge
Hon. William T. Lawrence, Judge
Date of Representation:  2006 to 12/2009

From the beginning of the investigation in 2006 until the last defendant was sentenced on December 18, 2009, I represented the United States of America.  I was sole counsel on both cases for all charging decisions, motion practice, and sentencings.  All defendants pled guilty and were sentenced to prison.  There was no appeal of the final judgements.

In January 2006, United States Attorney Brooks assigned me to the Indianapolis Police Department (IPD) West District with instructions to work with the Deputy Chief and develop a high impact OCDETF case that would reduce violent crime in one of the most challenged neighborhoods of that district.  I led a team composed of FBI Safe Streets agents, ATF Project Achillies agents, and IPD officers in conducting a total of 11 court authorized wiretaps over a period of eight months under OCDETF "Operation Westside Story."  This investigation focused on the Haughville Syndicate, a violent cocaine trafficking organization led by Earl Allen and Roy Lampkin operating exclusively in the Haughville neighborhood of Indianapolis. As a result of this investigation a total of 21 defendants were indicted, convicted, and sentenced to federal prison.

Most significantly, on August 14, 2007, more than 300 law enforcement officers executed 36 federal search warrants and two state search warrants at 38 different locations in Indianapolis.  Approximately $67,000 in cash was seized along with 70 illegally possessed firearms, including a machine gun, an Uzi, assault rifles, a 9-millimeter rifle, and several thousand rounds of ammunition.  Within the first year of the takedown, violent crime in the IPD West District dropped 67%.

About this case, Indianapolis Police Department Chief Spears said, "Last year we had a very difficult year with violence.  This year, our murders are down almost 31 percent and those kinds of decreases don't just happen.  I believe they happen because of investigations like this."  The investigative team received a 2009 United States Attorney Award.  I was recognized by the Special Agent in Charge of the FBI with an award for this case.

**4.** ***United States v. John Scruggs, et.al.***
IP 06-cr-0008-LJM-DKL
United States District Court for the Southern District of Indiana
Hon. Larry J. McKinney, Judge

Date of Representation: 11/2005 – 10/2007

From the beginning of the investigation in November 2005 until the final disposition in district court during October 2007, I was the sole counsel representing the United States of America. I was responsible for the investigation, charging, motion practice, and final disposition of the case. All defendants pled guilty and were sentenced. There was no appeal.

From November 2005 until January 2006, I led DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with two extensions under OCDETF "Operation Motley Crew" focusing on RPOT target John Scruggs who was the Akingpin@ of a cocaine trafficking organization operating in Madison, Indiana. As a result of this investigation, a total of 17 defendants were indicted. Sixteen were arrested and convicted. During the investigation, kilograms of cocaine, pounds of marijuana, guns and United States currency were seized. More importantly, the elimination of a large drug trafficking organization in a relatively small Indiana tourist town (population 13,000) had a tremendous impact on reducing the availability of illegal drugs, reducing the crime rate and improving the quality of life for all of the law-abiding residents of that town. My team received a United States Attorney Award in 2008. I was recognized with an award from the Special Agent in Charge of the DEA for my work on this case.

5. ***United States v. Juan Carlos Bermudez, et. al.***
IP 05-cr-00043-SEB-DML
United States District Court for the Southern District of Indiana
Hon. Sarah Evans Barker, Judge
Co-Counsel: Nathan Judish, Department of Justice, Computer Crimes and Intellectual Property Section,
Date of Representation: 2004 – 12/2007

From the beginning of the investigation during 2004 until the conclusion of the appeal on December 5, 2007, I represented the United States of America. I was sole counsel on the investigation, motion practice, and all sentencing hearings at the district court. I was co-counsel with Mr. Judish on the appeal.

From December 2004 until March 2005, I led a team of DEA agents and Indiana State Police investigators in an investigation that involved four court authorized wire intercepts with three extensions under the Department of Justice's Special Operations Division's ("SOD") "Operation Money Clip." Operation Money Clip was a SOD supported, multi-jurisdictional, multi-agency OCDETF investigation targeting the Henry and Tony Franco-Arrellano poly-drug trafficking organization. Operation Money Clip was initiated by SOD after intelligence identified a defined Mexican criminal organization being supplied by RPOT[1] Ignacio Coronel-Villareal. As a result of this investigation, a total of 16 defendants were indicted, arrested, convicted and sentenced in the Southern District of

---

[1] RPOT – Regional Priority Target is an OCDETF term to identify high-level targets as determined by the Department of Justice.

Indiana. In addition, 48 kilograms of cocaine, 875 pounds of marijuana, seven guns, and assets valued at $1,450,000.00 were seized and forfeited. More importantly, three Mexican based sources of supply were indicted and convicted in this investigation to include OCDETF/ Priority Target Juan Carlos Bermudez. On June 14, 2005, Bermudez was arrested on the outstanding arrest warrant issued in the Southern District of Indiana during a trip he made from the Republic of Mexico to Chicago, Illinois. Bermudez was the first multi-jurisdictional OCDETF RPOT target to be indicted and convicted in the Southern District of Indiana.

My team received a 2006 United States Attorney Award. Additionally, the case was recognized as the Great Lakes OCDETF case of the year at a Department of Justice Ceremony in Washington, D.C. on July 31, 2007. I received an award from the Assistant Attorney General for the Criminal Division. All defendants arrested pled guilty and were sentenced to prison. The denials of motions to suppress were appealed. The judgments were affirmed on appeal. *United States v. Evarardo Lira-Esquivel*, 509 F.3d 820 (7th Cir. 2007).

6. ***United States v. Larry Williams, et al.***
   IP03-CR-0191-M/B
   United States District Court for the Southern District of Indiana
   Hon. Sarah Evans Barker, Judge
   Hon. Larry J. McKinney, Judge
   Date of Representation: 2003 to 2007
   Co-Counsel: John E. Dowd

From the start of the investigation in 2003 through the appeal, remand, and final disposition of the matter in 2007, I represented the United States of America. My co-counsel at trial was AUSA John Dowd.

During the summer of 2003, reacting to heroin overdoses in Bloomington, Indiana, I led an aggressive DEA and Bloomington Police Department investigation that revealed an Indiana University graduate student, Tom Verhovshek, as the source of supply for 1-2 gram quantities of high purity heroin in the Bloomington area. Using Verhovshek's cooperation, the investigation moved up the chain to the sources of supply for the heroin involved in the Bloomington overdoses. Using court authorized wire surveillance, it was determined that Larry D. Williams, Sr., was the leader of a heroin organization in Indianapolis, the members of which distributed in excess of three kilograms of heroin that was approximately 80% pure (heroin is typically diluted and ingested at 2-3% purity) over a period of six months. The investigation continued and Chicago residents Wendell Denson and Herman Cunningham were identified as the sources of supply for the heroin that was shipped to Indianapolis and redistributed in Bloomington.

The seven-month investigation culminated on December 16, 2003, when 150 state, local and federal law enforcement officers executed 17 federal arrest warrants and 15 federal search warrants in the Southern District of Indiana, the Northern District of Illinois, and the Southern District of Ohio. Large quantities of heroin, currency and firearms were seized.

All 17 defendants were indicted, convicted, and sentenced to prison. The three lead defendants were convicted after a three-week jury trial. The trial team was recognized with a United States Attorney Award in 2005. On appeal, the judgments against three of the defendants were reversed and the cases were remanded for a new trial. *United States v. Herman Cunningham, et al.*, 462 F.3d 708 (7th Cir. 2006). After the remand, all three defendants pled guilty before the Honorable Larry J. McKinney and were sentenced to prison. There was no appeal from those judgments.

7. ***United States v. Dr. Randolph Lievertz, et.al.***
IP02-CR-0005-B/F
United States District Court for the Southern District of Indiana
Hon. Sarah Evans Barker, Judge
Date of Representation: 2001 – 2/2003
Co-Counsel: Winfield Ong

From the start of the investigation in 2001 through the final disposition of the matter at sentencing on February 28, 2003, I represented the United States of America.

During 2001, I led a joint FBI, DEA, United States Department of Health and Human Services (HHS), Indiana Attorney General, and Jennings County, Indiana, Sheriff's Department investigation into the fraudulent prescribing, distribution, and billing of OxyContin by an Indianapolis physician, Dr. Randolph Lievertz, and a Jennings County, Indiana, drug dealer, Melinda Hawkins. Lievertz prescribed more OxyContin to Medicaid recipients in the State of Indiana than any other physician, and Hawkins was the Indiana Medicaid recipient who received the largest amounts of OxyContin. From January 1, 2001 through September 26, 2001, Lievertz caused over $500,000 to be paid by Medicaid for OxyContin. From January 1, 2001 through December 17, 2001, Hawkins caused $130,204.91 to be paid by Medicaid for OxyContin prescriptions written by Lievertz to Hawkins outside the scope of professional practice and not for a legitimate medical purpose. After filling the prescriptions, Hawkins illegally distributed the OxyContin to several individuals including high school students in Jennings County, Indiana. This illegal scheme not only bilked taxpayers, it also caused an epidemic of OxyContin abuse in rural Jennings County.

The five-month investigation employed a variety of law enforcement techniques, including physical surveillance, controlled purchases of OxyContin, a complete financial investigation, court authorized interception of oral communications occurring in Lievertz's examination room (first time this technique had been utilized in the district), and search warrants. United States Attorney Susan Brooks said, "this joint effort by federal and local law enforcement agencies to identify and address the problem of OxyContin trafficking in a particular area demonstrates the best of proactive law enforcement.".

In early 2002, both Lievertz and Hawkins were indicted, convicted and sentenced to prison. This case won a 2003 United States Attorney Award. Janet Rehnquist, Inspector

General, HHS, recognized me with the HHS Public Integrity Award.  After the case was resolved, United States Attorney Brooks and I did significant outreach on the dangers of prescription pill abuse, including a town hall style meeting at Jennings County High School.  I was the lead counsel on the investigation and co-counsel on the indictment, motion practice, and sentencing hearing.  There was no trial and no appeal.

8.  ***United States v. Lee Williams, et. al.***
    IP99-CR-0059-M/L
    United States District Court for the Southern District of Indiana
    Hon. Larry J. McKinney, Judge
    Date of Representation: 1998 – 11/2002
    Co-Counsel: John Dowd and Brian Jennings

From the start of the investigation in 1998 through the conclusion of the appeal on November 15, 2002, I represented the United States of America.  During the trial, I had two co-counsel, AUSA John Dowd and cross-designated Marion County Deputy Prosecutor and Special AUSA Brian Jennings.

Beginning in the Fall of 1998, I led a joint FBI and Indianapolis Police Department investigation into a violent organized group of drug distributors operating in the Brightwood neighborhood on the northeast side of Indianapolis.  Using court authorized interception of phone calls and pager messages, law enforcement seized 78 weapons, 12 kilograms of cocaine, and $200,000 in cash during the course of the investigation.  Twenty-one defendants were charged.  During the spring and summer of 2000, 10 of the defendants were tried in a seven-week trial.  Over 100 witnesses and 1,200 exhibits were presented to the jury.  One defendant pled guilty mid-trial, and the jury returned guilty verdicts against eight of the remaining nine defendants. All of the defendants charged were convicted by jury or by plea (the defendant who was acquitted at trial subsequently pleaded guilty to a firearm charge) with an average sentence of 170 months' incarceration.  Eight defendants received sentences longer than 20 years in prison.  Murders that were at a record high in the Brightwood neighborhood in 1998, declined in 1999, 2000, and 2001.  I received an award from the Special Agent in Charge of the FBI for the investigation and prosecution of this matter.   I was sole counsel on the investigation, lead counsel at trial and at all sentencing hearings, and the sole counsel on appeal.  While the appeal involved two separate appellate briefs, the cases were combined for the oral argument and opinion.  The judgments of all 13 defendants who appealed were affirmed. *United States v. Marvin Dumes, et al.*, 313 F.3d 372 (7th Cir. 2002).

9.  ***United States v. Morris Carr, et. al.***
    IP97-CR-0063-M/F
    United States District Court for the Southern District of Indiana
    Hon. Larry J. McKinney, Judge
    Date of Representation: 1997 to November 1999

13

Co-Counsel: Melanie C. Conour

From the commencement of the investigation in 1997 through the final appellate judgment rendered on November 18, 1999, I represented the United States of America assisting lead counsel AUSA Melanie C. Conour.

During 1997 and 1998, I co-led a joint DEA, ATF and Indianapolis Police Department investigation with lead counsel AUSA Melanie Conour into members of the Four Corner Vice Lords Gang from Chicago that had infested the City of Indianapolis with drugs and guns.  Twenty-four defendants were charged as a result of the investigation (14 defendants were charged in federal court and 10 defendants were charged in state court in Marion County, Indiana).  After a majority of the defendants entered pleas of guilty, three of the leaders of the organization were tried in a five-week jury trial.  The jury returned verdicts of guilty after hearing evidence that as much as 400 kilograms of cocaine were distributed by the organization that enforced its drug trafficking with violence.  The leaders of the organization were sentenced to life in prison. AUSA Conour and I received awards from the Attorney General, the Mayor of Indianapolis, and the Special Agent in Charge of the ATF for the investigation and prosecution of this matter.  Along with AUSA Conour, I was responsible for the motion practice, trial, sentencing hearings, and defending the judgment on appeal.  I was the sole AUSA responsible for the oral argument before the Seventh Circuit Court of Appeals.  All judgments were affirmed on appeal.  *United States of America v. Thornton, et al.*, 197 F.3d 241 (7th Cir. 1999).

*10.* **People of the State of Michigan v. Tuan Truong and Tai Van Nguyen**
92-59379-FC
17th Circuit Court for the State of Michigan
Hon. Donald Johnston, Judge
Date of Representation: 08/1992 – 1993

As Assistant Prosecuting Attorney, I was sole counsel for the People of the State of Michigan in all preliminary hearings, motion practice, jury trial and disposition hearings in the above case.  Two Vietnamese defendants shot and killed a member of a rival Vietnamese gang member in a Vietnamese restaurant in August 1992.  A majority of the civilian witnesses and both defendants were fluent in Vietnamese, but spoke little English.  There was extensive motion practice to determine the age of the defendants and the admissibility of statements made by one of the defendants.  After a 12-day trial involving Vietnamese interpreters, a jury convicted both defendants of first-degree murder.  Both defendants were sentenced to life without parole and the judgments were affirmed on appeal.  I did not represent the People of the State of Michigan on the appeal.

14

APPENDIX B
LIST OF INFORMATION CONSIDERED

**LAWS**
- 18 U.S.C. 2510, *et seq.*
- 50 U.S.C. §1801, *et seq.*

**POLICIES AND GUIDANCE**
- Justice Manual, Title 9-7.000, U.S. Department of Justice, https://www.justice.gov/jm/justice-manual
- Lawful Access, US Department of Justice Office of Legal Policy (last updated November 18, 2022), https://www.justice.gov/olp/lawful-access
- Executive Order, President Joe Biden, March 27, 2023. https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/27/fact-sheet- president-biden-signs-executive-order-to-prohibit-u-s-government-use-of-commercial- spyware-that-poses-risks-to-national-security/

**SCHOLARLY PUBLICATIONS AND TREATISES**
- Comparative Study on Wiretapping and Electronic Surveillance Laws in Major Foreign Countries, Members of Staff, Law Library, Library of Congress (1975)
- 1 World Online Business Law, Chapter 7: Technology Surveillance
- Country Legal Framework Resources, Provision of Real-time Lawful Interception Assistance, https://clfr.globalnetworkinitiative.org

**DOCUMENTS PRODUCED IN THIS LITIGATION**
- Complaint and Exhibits
- FPM-00021846
- NSO_WHATSAPP_00000078
- NSO_WHATSAPP_00000262
- NSO_WHATSAPP_00045591
- Exhibit 2005
- Exhibit 2028
- Exhibit 2088

**OTHER MATERIALS**
- https://faq.whatsapp.com/808280033839222
- https://faq.whatsapp.com/820124435853543
- https://judiciary.house.gov/committee-activity/hearings/oversight-federal-bureau-investigation-7
- https://obamawhitehouse.archives.gov/the-press-office/2016/03/14/remarks-president-south-southwest-interactive
- https://support.signal.org/hc/en-us/articles/360007320391-Is-it-private-Can-I-trust-it#:~:text=Signal%20conversations%20are%20always%20end,%2C%20every%20call%2C%20every%20time
- https://therecord.media/encrypted-apps-a-challenge-trump-assassination-

attempt-wray- fbin
- https://tsf.telegram.org/manuals/e2ee-simple
- https://www.barrons.com/news/washington-financed-colombia-s-purchase-of-pegasus-spy-software-76d6550f
- https://www.bloomberg.com/news/articles/2023-10-26/israel-taps-blacklisted-pegasus- maker-nso-to-track-gaza-hostages-and-hamas
- https://www.cnn.com/2021/05/04/politics/merrick-garland-hearing/index.html
- https://www.justice.gov/nsd/media/1350236/dl?inline
- https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-introduction-lawful-access-bill-senate#:~:text=While%20strong%20encryption%20provides%20enormous,their%20crimes%20and%20avoid%20detection
- https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-keynote-address-international-conference-cyber
- https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens
- https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf
- https://www.nytimes.com/2022/01/28/magazine/nso-group-israel-spyware.html
- https://www.nytimes.com/2022/01/28/world/middleeast/israel-pegasus-spyware.html
- https://www.nytimes.com/2022/11/12/us/politics/fbi-pegasus-spyware-phones-nso.html
- https://www.vodafone.com/content/dam/vodcom/sustainability/pdfs/vodafone_law_enforcement_disclosure_report.pdf
- Indictment, *United States v. Rhodes et al.* (D.D.C. January 8, 2021)