JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:   (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR REMITTITUR OR NEW TRIAL**<br><br>Date:  July 17, 2025<br>Time: 10:00 a.m.<br>Place: Courtroom 3, Ronald V. Dellums Federal Building & U.S. Courthouse, 1301 Clay Street, Oakland, California<br><br>Action Filed: 10/29/2019 |

**TABLE OF CONTENTS**

Introduction .................................................................................................................................... 1

Argument ....................................................................................................................................... 3

    I.    The punitive damages award is unconstitutionally excessive. ......................................... 3

        A.    The award reflects an unconstitutional ratio of punitive damages to compensatory damages. ............................................................................................................. 3

        B.    The "reprehensibility" of NSO's conduct does not support the jury's award. ........ 4

        C.    CDAFA's civil penalty does not support the jury's award. .................................. 10

    II.    The punitive damages award reflects the jury's reliance on improper factors. ........... 11

Conclusion ................................................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Murakami*,
　54 Cal. 3d 105 (1991) ............................................................................................................ 11

*Bains LLC v. Arco Prods. Co.*,
　405 F.3d 764 (9th Cir. 2005) ................................................................................................ 2, 3

*BMW of N. Am. v. Gore*,
　517 U.S. 559 (1996) ....................................................................................................... 7, 8, 10

*Hardeman v. Monsanto*,
　997 F.3d 941 (9th Cir. 2021) ............................................................................................ 3, 4, 5

*Johnson v. Ford Motor Co.*,
　135 Cal. App. 4th 137 (2005) ........................................................................................... 2, 6, 9

*Johnson v. Ford Motor Co.*,
　35 Cal. 4th 1191 (2005) ...................................................................................................... 5, 9

*LivePerson, Inc. v. [24]7.ai, Inc.*,
　2022 WL 3723117 (N.D. Cal. July 28, 2022) .................................................................. 10, 11

*Lompe v. Sunridge Partners*,
　818 F.3d 1041 (10th Cir. 2016) .............................................................................................. 3, 4

*Mitri v. Walgreen Co.*,
　660 F. App'x 528 (9th Cir. 2016) ..................................................................................... 2, 3, 10

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
　422 F.3d 949 (9th Cir. 2005) ............................................................................................ 2, 3, 6

*Ramirez v. TransUnion LLC*,
　951 F.3d 1008 (9th Cir. 2020), *rev'd on other grounds*, 594 U.S. 413 (2021) ................. 1, 4, 5

*Riley v. Volkswagen Grp. of Am., Inc.*,
　51 F.4th 896 (9th Cir. 2022) .......................................................................................... *passim*

*State Farm Mut. Auto Ins. Co. v. Campbell*,
　538 U.S. 408 (2003) .......................................................................................................... 3, 4, 10

*In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab. Litig.*,
　445 F. Supp. 3d 535 (N.D. Cal. 2020) .................................................................................... 6

*Weeks v. Baker & McKenzie*,
    63 Cal. App. 4th 1128 (1998) ........................................................................................ 2, 11

**Statutes**

Cal. Penal Code § 502(d) ................................................................................................... 10, 11

# INTRODUCTION

Plaintiffs offer no argument for upholding the jury's blatantly unconstitutional award of $167,254,000 in punitive damages. The Court should take notice that Plaintiffs, while opposing the specific remittitur that Defendants request and arguing that the motion should be denied, never argue that the jury's actual award of **376 times** compensatory damages satisfies due process. It plainly does not. No court in any jurisdiction has ever held that due process permits such a disproportionate award, and binding Supreme Court and Ninth Circuit precedent establishes beyond dispute that the jury's award must be reduced. Plaintiffs ignore or mischaracterize that precedent, relying instead on irrelevant factual assertions that have no bearing on the constitutional analysis (and Plaintiffs distort the record while doing so). But even if all of Plaintiffs assertions were correct, Defendants would *still* be entitled to a remittitur or new trial on punitive damages.[1]

***First***, Plaintiffs cannot seriously dispute that the punitive damages award is not unconstitutionally excessive. (Mot. 3-8.) Plaintiffs do not cite *any* case from *any* court upholding a punitive damages award that exceeds a single-digit multiplier of compensatory damages. And for good reason. The Ninth Circuit has held that "[a] ratio higher than 4 to 1 may be upheld where a particularly egregious act has resulted in only a small amount of economic damages," but "when compensatory damages are substantial, a ratio lower than 4 to 1 may be the limit." *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1037 (9th Cir. 2020), *rev'd on other grounds*, 594 U.S. 413 (2021). Even for particularly "egregious behavior" (which does not exist here), punitive damages may not exceed "six to nine times compensatory damages." *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022) (cleaned up). Plaintiffs claim that punitive damages could hypothetically exceed a single-digit ratio in cases with "insignificant" compensatory damages (Opp. 8), but the Ninth Circuit has never approved such an award—and Plaintiffs' compensatory damages were plainly not insignificant.

Rather, Plaintiffs' compensatory damages of nearly $450,000 qualify as "substantial" under binding Ninth Circuit precedent. It is an outright misrepresentation for Plaintiffs to assert that the

---

[1] Plaintiffs' failure to contest that the jury's actual punitive damages award is unconstitutional confirms Defendants' position that no hearing is required on this motion.

1  Ninth Circuit has never decided what constitutes "substantial" compensatory damages. (Opp. 8.)
2  The Ninth Circuit has expressly held that compensatory damages far less than Plaintiffs' are
3  "substantial," and Plaintiffs cite no case to the contrary.  *E.g.*, *Planned Parenthood of*
4  *Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 963-64 (9th Cir. 2005); *Mitri*
5  *v. Walgreen Co.*, 660 F. App'x 528, 530-31 (9th Cir. 2016); *Bains LLC v. Arco Prods. Co.*, 405
6  F.3d 764, 776 (9th Cir. 2005).  Plaintiffs' punitive damages thus should not exceed compensatory
7  damages, and they certainly cannot exceed four times compensatory damages.

8      Plaintiffs also misstate the law and record when arguing that NSO's conduct was
9  "particularly egregious."  Plaintiffs cite cases in which the defendant caused physical injury to
10 financially vulnerable individuals and made affirmative fraudulent misrepresentations, and it is
11 undisputed that NSO did neither.  Plaintiffs simply ignore the many more analogous cases cited in
12 NSO's motion, in which the Ninth Circuit found that defendants' conduct was not sufficiently
13 reprehensible to support any award of punitive damages greater than four times compensatory
14 damages. (Mot. 5-6.)  Even the cases Plaintiffs cite have limited punitive damages to single-digit
15 multipliers of compensatory damages, confirming that the award here is unconstitutionally
16 excessive.  *See Riley*, 51 F.4th at 900 n.2, 902-03; *Planned Parenthood*, 422 F.3d at 958-60;
17 *Johnson v. Ford Motor Co.*, 135 Cal. App. 4th 137, 140, 150 (2005).

18     ***Second***, the punitive damages award clearly reflects the jury's consideration of legally
19 improper factors. (Mot. 8-10.)  Even by Plaintiffs' own (incorrect) calculation of NSO's net worth,
20 the punitive damages award exceeds NSO's ability to pay—and *far* exceeds California's limitation
21 of punitive damages to ten percent of a defendant's net worth.  *Weeks v. Baker & McKenzie*, 63
22 Cal. App. 4th 1128, 1166 (1998).  And the award resulted from Plaintiffs' express request that the
23 jury punish NSO for "spying" on third parties not before the court, even though Plaintiffs admit
24 that punitive damages could not lawfully be awarded for such conduct.  Plaintiffs can argue
25 otherwise only by ignoring their persistent accusations of "spying" and their repeated requests that
26 the jury use punitive damages to "send a message that spying is not okay." (Mot. 9.)  The fact that
27 Plaintiffs offer no defense of these statements confirms that they were entirely improper.

28     For all these reasons, the Constitution requires a remittitur.  The Court should remit the

punitive damages award to $444,719 in addition to compensatory damages (or, at most, to four times compensatory damages) or order a new trial.

## ARGUMENT

**I.    The punitive damages award is unconstitutionally excessive.**

Plaintiffs mischaracterize or ignore the Ninth Circuit's binding precedent, which establishes beyond question that the jury's punitive damages award is unconstitutionally excessive.

**A.    The award reflects an unconstitutional ratio of punitive damages to compensatory damages.**

Plaintiffs concede that the Ninth Circuit has "limited punitive damages to a 4 to 1 ratio where there are significant economic damages but behavior is not particularly egregious" and to a 9-to-1 ratio for "more egregious behavior." *Riley*, 51 F.4th at 902 (cleaned up). Plaintiffs do not deny that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). But Plaintiffs argue that their compensatory damages award of $444,719 "falls short of a 'substantial' compensatory damages award" because "[t]he Ninth Circuit has never defined what constitutes a 'substantial' award." (Opp. 8.) That is false. In *Planned Parenthood*, the Ninth Circuit held that compensatory damages awards ranging from $14,000 to $405,000 were "substantial." 422 F.3d at 963-64. In *Bains*, the Ninth Circuit held that an award of $50,000 was "substantial." 405 F.3d at 776. In *Mitri*, the Ninth Circuit held that an award of $88,000 was "substantial." 660 F. App'x at 530-31. These awards are much lower than the compensatory damages award in this case, and conclusively establish that Plaintiffs' compensatory award of $444,719 is substantial.

Plaintiffs cite no case from any court holding that such an award is not substantial. The only case Plaintiffs cite is *Hardeman v. Monsanto*, 997 F.3d 941, 975 (9th Cir. 2021), but that case did not set a $1 million floor for "substantial" damages. *Hardeman* simply held that an award of more than $5 million was "substantial." Supporting the statement that $5 million is a "substantial" award, the *Hardeman* court included a string-cite containing a parenthetical quotation from a Tenth Circuit decision, *Lompe v. Sunridge Partners*, 818 F.3d 1041, 1069 (10th Cir. 2016), which observed that

3

1  "[c]ompensatory damages have often been considered 'substantial' when they are over $1,000,000."
2  It is misleading for Plaintiffs to quote that language as if it were *Hardeman*'s own holding. It is
3  even more misleading for Plaintiffs to omit that *Lompe* also recognized that "in many cases,
4  compensatory damages *less than $1,000,000* have *also* been considered substantial," including one
5  in which the Tenth Circuit "reduced a punitive damages award of $2,000,000 to a 1:1 ratio with the
6  'substantial' compensatory damages of $630,307." 818 F.3d at 1069-70 (emphasis added).

7  So nothing in *Hardeman*, *Lompe*, or any other case suggests that a compensatory damages
8  award of nearly $450,000 is *not* substantial, and the Ninth Circuit has repeatedly held otherwise.[2]
9  At a minimum, Plaintiffs do not and cannot argue that their award is "insignificant" in a way that
10 could support a ratio greater than 9-to-1. (Opp. 8.) Even under Plaintiffs' erroneous argument,
11 therefore, the jury's ratio of 376-to-1 is unconstitutional.

12      **B.    The "reprehensibility" of NSO's conduct does not support the jury's award.**

13 For the reasons above, Plaintiffs' arguments on reprehensibility are largely beside the point.
14 Even if Plaintiffs were correct that NSO's conduct was "particularly egregious," the Ninth Circuit's
15 precedent would *still* limit punitive damages to a 4-to-1 ratio because Plaintiffs recovered more
16 than "a small amount of economic damages." *Ramirez*, 951 F.3d at 1037 (cleaned up).

17 But Plaintiffs arguments on reprehensibility are *not* correct. To begin, it is undisputed that
18 three of the five reprehensibility facts favor NSO. Plaintiffs do not and cannot argue that "the harm
19 caused was physical as opposed to economic" or that they "had a financial vulnerability." *State*
20 *Farm*, 538 U.S. at 419. Plaintiffs also do not and cannot argue that NSO's conduct "evinced an
21 indifference to or a reckless disregard of the health or safety of others." *Id.*; (*see* Akro. Decl. Exh.
22 A [Trial Day 5 Tr.] at 1115-1129). The fact that a majority of the factors undisputedly favor NSO
23 alone proves that NSO's conduct was not particularly egregious, limiting punitive damages to a 4-
24 to-1 ratio. *See Hardeman*, 997 F.3d at 973-76 (limiting punitive damages to 3.8 times compensatory
25 damages even though "four of the five factors support[ed]" reprehensibility).

---

[2] Even if $1 million were the floor for substantiality and thus could support a punitive damages award of no more than $4 million, it would make no sense that a smaller compensatory damages award (like $444,719) could permissibly support a punitive damages award of over *$167 million*, more than *40 times* larger than $4 million.

4

1    Plaintiffs argue only that NSO's conduct was repeated and intentional (Opp. 3-7), but that would not be sufficient to support a ratio higher than 4-to-1, even if it were true. As NSO explained in its motion (Mot. 5-6), the Ninth Circuit has repeatedly limited punitive damages in cases involving conduct far more reprehensible than even Plaintiffs' descriptions of NSO's conduct. For example, the Ninth Circuit limited punitive damages to 3.8 times compensatory damages in *Hardeman*, even though "four of the five factors support[ed] that [the defendant's] actions were reprehensible" because the defendant caused "serious physical harm" through "repeated actions" that exhibited malice and "indifference to or a reckless disregard of the health or safety of others." 997 F.3d at 973-76 (cleaned up). The Ninth Circuit likewise limited punitive damages to four times compensatory damages in *Ramirez*, even though the defendant engaged in "repeated and willful" misconduct "for more than a decade" against a class of "financially vulnerable" individuals. 951 F.3d at 1036-37. And in *Grube* the Ninth Circuit held the "ratio of punitive to compensatory damages" could not "exceed four to one," even though the defendant caused the plaintiff's *death* through "reckless disregard of [his] safety." 2025 WL 1098549, at *4. The sending of messages across WhatsApp servers is not equivalent to causing death or serious physical harm or targeting financially vulnerable individuals.

Plaintiffs do not acknowledge, let alone distinguish, these or the other cases cited in NSO's motion. As in those cases, Plaintiffs cannot defend the excessive ratio of punitive to compensatory damages merely by arguing that NSO acted "deliberately" or "repeatedly." (Opp. 4-6.) Even the cases Plaintiffs cite make clear that the jury's award here is excessive. Plaintiffs cite *Riley*, but the Ninth Circuit there set the punitive damages award to an 8-to-1 ratio despite finding that the defendant's "reprehensibility was especially high" and the plaintiffs received "relatively low" compensatory damages ranging from $582 to $3,111. 51 F.4th at 900 n.2, 902-03. Here, where Plaintiffs received a substantial compensatory damages award of nearly $450,000, *Riley* cannot support a ratio greater than four times compensatory damages. Plaintiffs also cite *Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1207 (2005), but this Court is not bound by California state courts' interpretation of the federal Constitution. That aside, while the California Supreme Court held in *Johnson* that a punitive damages award could exceed a 3-to-1 ratio, the court still held that the jury's award "was . . . constitutionally excessive," and the Court of Appeal on remand reduced the

5

award to "less than 10 times the compensatory award." *Johnson*, 135 Cal. App. 4th at 140, 150. Moreover, the compensatory award in *Johnson* was $17,811, far less than Plaintiffs' award of nearly $450,000. *Id.* Finally, Plaintiffs cite *Planned Parenthood*, but the Ninth Circuit there also reduced the punitive damages award to a 9-to-1 ratio. 422 F.3d at 959. *Planned Parenthood* and its 9-1 ratio is inapplicable here, because every reprehensibility factor in that case favored the plaintiffs. 422 F.3d at 958-60. The defendants made "true threats" of violence against doctors, which caused physical injury to financially vulnerable individuals. *Id.* at 959.

The conduct in the other cases Plaintiffs cite also bears no resemblance to the conduct for which NSO was held liable. In *Riley*, the defendant "engaged in intentional deceit for years" by making affirmative "misrepresentations" to thousands of individual consumers, 51 F.4th at 901, and the district court found that the defendant "acted with indifference to the health or safety of others," *In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab. Litig.*, 445 F. Supp. 3d 535, 555-56 (N.D. Cal. 2020). Likewise, the defendant in *Johnson* adopted a corporate policy of making affirmative misrepresentations to thousands of individual consumers. 135 Cal. App. 4th at 141-47.

NSO did nothing comparable to the defendants' conduct in *Planned Parenthood*, *Riley*, or *Johnson*. For all of Plaintiffs' rhetoric, it remains undisputed that the conduct for which NSO was found liable was the use of "Eden," by NSO's customers, to send messages and collect metadata via California-based WhatsApp servers between April-May 2019. (*See* Opp. 4-5.) Plaintiffs say they "have no way of knowing if 'Heaven' and 'Erised' used California-based servers" (Opp. 4), but that is both false and irrelevant. It is false because NSO introduced unrebutted evidence—including testimony that *Plaintiffs* elicited during cross-examination of NSO's witnesses—that Heaven and Erised used only WhatsApp *signaling* servers (Akro. Decl. Exh. A [Trial Day 5 Tr.] at 982-83), and Plaintiffs admit WhatsApp had no signaling servers in California.

That aside, it was *Plaintiffs' burden* to prove reprehensibility, and Plaintiffs have no evidence that NSO ever engaged in any conduct involving Heaven or Erised that violated CDAFA, the only statute that could support punitive damages. And in all events, it is also undisputed that NSO's use of WhatsApp servers—however often it occurred—caused Plaintiffs no non-economic losses, did not damage or impair their servers or services in any way, and did not remove any of

6

1    their data from WhatsApp servers. (*See* Dkt. 419-2 at 16.) Plaintiffs' claims do not involve any
2    harm to any non-corporate person, much less the sort of financially vulnerable individuals at issue
3    in the cases Plaintiffs cite.

4        Plaintiffs assert the jury "rejected" these undisputed facts, but there is no basis for that
5    assertion. (Opp. 7.) Plaintiffs have never argued that NSO impaired, damaged, or removed
6    WhatsApp data from WhatsApp servers, and indeed Plaintiffs *admitted* the opposite. (*See* Dkt.
7    419-2 at 16.) And the conduct for which the Court instructed the jury it could award punitive
8    damages was simply the transfer of messages and metadata through California-based WhatsApp
9    servers. (Dkt. 737 at 18.) The jury found that conduct to support *some* punitive damages, but there
10   is no way to know which specific facts the jury found or rejected in making that finding. What is
11   clear is that the *amount* of the jury's award is unconstitutionally excessive, so the issue for the Court
12   is the amount of punitive damages that could constitutionally be supported by the evidence at trial.
13   Even when interpreted in Plaintiffs' favor, the evidence does not support a conclusion that NSO's
14   conduct was so exceptionally egregious that the *amount* of punitive damages could exceed a 4-to-
15   1 ratio. If the jury found otherwise, that determination violates NSO's due process rights.

16       Nor do Plaintiffs identify the kind of affirmative fraud that supported higher punitive
17   damages awards in *Riley* and *Johnson*. Plaintiffs do not and cannot claim that NSO made any
18   affirmative misrepresentations to them or anyone else. They claim only that NSO "sought to
19   conceal its activity." (Opp. 6.) Of course, what Plaintiffs call concealment was in fact just NSO
20   trying to protect its government customers' sensitive investigations from being discovered by the
21   terrorists and other criminals under investigation. But that aside, the U.S. Supreme Court has
22   rejected Plaintiffs' attempts to conflate "the omission of a material fact" with more reprehensible
23   "deliberate false statement[s]." *BMW of N. Am. v. Gore*, 517 U.S. 559, 580 (1996). As in *Gore*,
24   NSO at minimum had "a good-faith basis for believing that no duty to disclose exist[ed]." *Id.* Indeed,
25   Plaintiffs have never argued that NSO *did* have a duty to disclose its use of WhatsApp servers.
26   Plaintiffs instead argued, and the Court agreed, that they did not need to prove a duty to disclose
27   because they could recover punitive damages on an "omission" theory even if NSO did *not* owe them
28   any such duty. (*See* Dkt. 732-5 at 4; Dkt. 732-3 at 3-5.)

It is thus false for Plaintiffs to assert that the jury rejected NSO's arguments "that Plaintiffs failed to show any 'deliberate false statement' by NSO or that NSO had a 'duty to disclose' anything to Plaintiffs." (Opp. 7.) Plaintiffs never *claimed* NSO made any false statements or violated a duty to disclose, having instead relied solely on an omissions theory. Even if a pure omission could support punitive damages (and NSO maintains its argument that it cannot), the Supreme Court has held that such an omission is "not sufficiently egregious to justify a punitive sanction that is tantamount to a severe criminal penalty." *Gore*, 517 U.S. at 585. Plaintiffs do not address that holding or cite any contrary authority.

Finally, Plaintiffs' arguments about NSO's profits miss the mark. All Plaintiffs can establish with respect to the Pegasus versions relevant to this case is that NSO licensed them for some amount of profit. (Opp. 5.) The specific dollar amounts Plaintiffs cite reflect NSO's gross profits in 2023 and 2024, *years after* the only conduct relevant to this case. Moreover, "gross profit" does not reflect anything about a company's operating (or "actual") profit, so it is both misleading and disingenuous for Plaintiffs to cite to NSO's "gross profits" as evidence of Defendants' *actual* profits. Gross profit is calculated by summing a company's revenues and then subtracting only a single cost: the cost of goods sold, which are negligible when the product is software or technology. (Perez Decl. Exhs. 7-8, Dkts. 758-8 & 758-9.) Costs of goods sold represented less than 15% of Defendants' total costs. (*Id.*) The same is true for Meta, both now and throughout its history.[3] Gross profit ignores the far more substantial costs of Research & Development, Selling & Marketing, and General & Administrative. (*Id.*) For technology companies like Defendants (and Meta), "gross profit" is essentially meaningless in determining a company's profitability, because it ignores the vast majority of the company's costs. Much more meaningful is a company's "operating income," and it is uncontroverted that NSO and Q Cyber's combined operating income was negative in 2023 and 2024. (*Id.*)

In addition, NSO's gross profits in 2023 and 2024 are not even limited to Pegasus, much less to versions of Pegasus that used WhatsApp servers—no such versions of Pegasus existed in

---

[3] Meta's annual revenue in 2024 was $164.5 billion; its operating profit was $69.38 billion, but its gross profit was $139.27 billion. In other words, Meta's gross profit was over 84% of its revenues.

8

2023 or 2024. NSO's gross profits for those years thus have no connection to the conduct for which NSO was held liable, and Plaintiffs have no evidence that NSO's other conduct at other time periods violated the law in any way. Even in *Johnson*, the only case Plaintiffs cite, the California Supreme Court held that the plaintiffs could not justify their punitive damages award through evidence of profits for time periods or transactions unrelated to the specific unlawful conduct at issue in the case. 35 Cal. 4th at 1211-12; *see also Johnson*, 135 Cal. App. 4th at 146 (holding the "scale and profitability of a course of wrongful conduct by the defendant cannot justify an award that is grossly excessive in relation to the harm done or threatened *to the present plaintiffs*" (cleaned up) (emphasis in original)). Here Plaintiffs "offer[] no proof at all" that the profits they cite from 2023 and 2024 involved any illegal conduct. *Johnson*, 35 Cal. 4th 1211. Plaintiffs also cite *nothing* to support their preposterous claim that NSO "invest[ed] up to hundreds of millions of dollars to develop highly sophisticated spyware built to target WhatsApp's servers." (Opp. 5.) Plaintiffs have no evidence that all of NSO's "research-and-development" expenses were related to versions of Pegasus that used WhatsApp services. (*Id.*)

Furthermore, Plaintiffs have no evidence of any kind that NSO's conduct was "*knowingly* wrongful." (Opp. 5-6 (cleaned up and emphasis added).) Plaintiffs rely on the fact that NSO updated Pegasus to continue working despite WhatsApp upgrades, but Plaintiffs have no evidence that NSO knew or believed that doing so was unlawful. WhatsApp routinely updates its application, and NSO has no way of knowing why WhatsApp makes any particular update. (*E.g.*, Akro. Decl. Exh. A [Trial Day 5 Tr.] at 939-41.) Accordingly, all the evidence is that NSO believed its conduct was lawful until this Court held otherwise in December 2024.[4] The use of Pegasus by NSO's government customers is permitted by those governments' laws, and NSO believed that it and its customers' actions were also legal under U.S. and California law. Indeed, the undisputed evidence—which was excluded by the Court—is that the FBI contracted with NSO for a license to use Pegasus and required NSO to update Pegasus continually to ensure its continued availability to the FBI, which further supports NSO's belief that it was not acting unlawfully. (Dkt. 396-2 at 4,

---

[4] Indeed, NSO respectfully continues to believe that the Court's summary judgment decision is erroneous. But NSO will of course comply with the Court's ruling as long as it is in effect.

1  23-24; Dkt. 396-5, Exh. N, Exh. G at 332:3-333:21.)  The fact that NSO and its government customers engaged in conduct NSO believed to be lawful despite Plaintiffs' mere allegations to the contrary does not establish that NSO *knowingly* disregarded Plaintiffs' rights.  (Opp. 6-7.)

In sum, Plaintiffs' arguments on reprehensibility are simply arguments that the jury could properly award some amount of punitive damages.  But NSO does not in this motion challenge the *fact* of the jury's punitive damages award.  NSO challenges the *amount* of that award.  And Plaintiffs do not identify any facts or caselaw supporting a conclusion that the jury's award could constitutionally exceed four times compensatory damages.  Under the Ninth Circuit's binding precedent, the Court should reduce the punitive damages award to the same amount as the compensatory damages award, but at most no more than four times compensatory damages.

**C.     CDAFA's civil penalty does not support the jury's award.**

Plaintiffs also lack any persuasive response to NSO's showing that the punitive damages award is unconstitutionally excessive when compared to the civil penalties available under CDAFA. (Mot. 7-8.)  Plaintiffs do not dispute that CDAFA's maximum penalty is $10,000.  Cal. Penal Code § 502(d).  Nor do Plaintiffs deny that the jury's punitive damages award is grossly disproportionate to that penalty.  Plaintiffs argue only that NSO "does not provide any context on when (if ever) that fine has been imposed, and whether the underlying conduct bore any similarities to NSO's campaign of hacking." (*Id.*)  But that is irrelevant.  For *any* violation of CDAFA, whatever the conduct involved, California limited the maximum penalty to $10,000.  Cal. Penal Code § 502(d).  That is why the Supreme Court and Ninth Circuit have relied on similar maximum penalties to reduce punitive damages awards, without comparing the conduct involved in different cases.  *E.g.*, *State Farm*, 538 U.S. at 428 ($10,000 penalty could not support $145 million punitive damages); *Gore*, 517 U.S. at 584 ($10,000 maximum fine could not support $2 million punitive damages); *Mitri*, 660 F. App'x at 531 ($10,000 maximum penalty could not support $1.1 million punitive damages).

Plaintiffs cite no case supporting their argument.  In *LivePerson, Inc. v. [24]7.ai, Inc.*, 2022 WL 3723117, at *12 (N.D. Cal. July 28, 2022), there was no civil penalty of any kind for the plaintiff's claims.  The plaintiff brought a claim for trade secret misappropriation, and "there is no

DEFENDANTS' REPLY ISO MOTION                                   Case No. 4:19-cv-07123-PJH
FOR REMITTITUR OR NEW TRIAL

. . . statute imposing civil penalties for trade secret misappropriation." *Id.*[5]  Here, by contrast, the *precise statute* under which Plaintiffs sued imposes a maximum penalty of $10,000.  Cal. Penal Code § 502(d).  Binding precedent requires the Court to compare that penalty to the jury's punitive damages award, which confirms that the award is unconstitutionally excessive.

## II.   The punitive damages award reflects the jury's reliance on improper factors.

Because the amount of the punitive damages award is unconstitutional on its face, this Court need not consider anything else to grant NSO's motion.  But if the Court goes further, Plaintiffs do not persuasively rebut NSO's showing that the award reflects the jury's reliance on improper factors.  (Mot. 8-10.)

***First***, the jury's award plainly exceeds NSO's ability to pay even on Plaintiffs' (erroneous) characterization of the evidence.  Plaintiffs assert that "NSO and Q Cyber had respective net worths of $121.7 million and $184.5 million as of December 2024."  (Opp. 9.)   Defendants contend that those amounts far exceed the actual net worth of NSO and Q Cyber because they are massively inflated by a receivable that Defendants' CEO testified that Defendants have no expectation of collecting.  *Even crediting Plaintiffs' distorted view of Defendants' net worth*, however, the jury's punitive damages award thus *exceeds* NSO's net worth, and nearly matches Plaintiffs' calculation of Q Cyber's net worth.  Plaintiffs offer no plausible explanation for an award that exceeds NSO's net worth other than an improper desire to "financially destroy[]" NSO.  *Adams v. Murakami*, 54 Cal. 3d 105, 112 (1991).  Indeed, under California law, "punitive damages awards generally are not permitted to exceed 10 percent of the defendant's net worth."  *Weeks*, 63 Cal. App. 4th at 1166.  Plaintiffs do not acknowledge or discuss that limit, and the award here egregiously violates it.

***Second***, Plaintiffs cannot honestly deny that they expressly (and improperly) asked the jury to punish NSO for "spying" that was not the conduct at issue in this case.  Although Plaintiffs cite other evidence and statements they made relating to NSO's conduct toward Plaintiffs, they entirely ignore the many improper statements in their opening and closing that expressly urged the jury to

---

[5] *LivePerson* also supports NSO's argument that the award here cannot exceed four times compensatory damages, because the court approved a 3.5-to-1 ratio of punitive to compensatory damages.  2022 WL 3723117, at *11.

11

1  consider unproven harms to absent third parties. For example, Plaintiffs falsely told the jury that "the conduct that's at issue" for which it could award punitive damages included "spying." (Akro. Decl. Exh. B [Trial Day 6 Tr.] at 1268.) In arguing that NSO's conduct was despicable, Plaintiffs told the jury that the Court would "define despicable conduct as so vile, base, or contemptible that it would be looked down upon or despised by reasonable people the way that reasonable people would view spying on somebody's phone in the way that NSO spies." (*Id.* at 1270.) Plaintiffs told the jury that NSO's conduct was malicious because it "attacked" WhatsApp "for the purpose of spying" on the "1400 people that are the victims of this spyware attack." (*Id.* at 1271-72.) In arguing that NSO acted with fraud, Plaintiffs told the jury that "you can't really spy on somebody to tell them you're going to spy on them" (*id.* at 1242), and that "it's common sense that you don't tell the person that you're spying on that you're spying" (*id.* at 1274). In rebuttal, Plaintiffs repeated that "you can't spy on people . . . unless you do it in a way that's concealing or tricking or fraudulent." (*Id.* at 1335.)

When Plaintiffs asked the jury to award a particular amount of punitive damages, they focused specifically on NSO's alleged "spying" on third parties—*not* on NSO's conduct toward Plaintiffs. Plaintiffs told the jury that "this case is about taking away the money and power to hack and spy from NSO." (*Id.* at 1248.) Plaintiffs asked the jury to award an amount that would "disable . . . NSO's ability to spy." (*Id.* at 1282; *see also id.* at 1267 (same)). And Plaintiffs asked the jury "to send a message loud and clear, and in public, not in the shadows of spying and secrecy where NSO operates." (*Id.* at 1285.) The message Plaintiffs asked the jury to send was "a powerful but simple message: that hacking and spying does not pay." (*Id.* at 1245.) Indeed, the *very last thing* Plaintiffs told the jury was that the jury should "award a punitive damages number that sends a message that spying is not okay. It's not appropriate. You know the Court has found it violated the law, that this hacking and spying is not okay. Send that message." (*Id.* at 1340.)

Plaintiffs' improper arguments, made over and over, necessitate a new trial on the issue of punitive damages, or at minimum a remittitur. Those and similar statements about "spying" were indefensible, which is why Plaintiffs make no attempt to defend them. Instead, Plaintiffs argue that the jury would have ignored their improper closing and rebuttal arguments because the Court

12

instructed the jury not to punish NSO for harm to third parties. (Opp. 13.) That is wildly implausible. Plaintiffs told the jury, without correction from the Court, that the Court's instructions permitted punitive damages for "spying" and defined "malice, oppression, or fraud" to encompass "spying on somebody's phone in the way that NSO spies." (Akro. Decl. Exh. B [Trial Day 6 Tr.] at 1268.) And if Plaintiffs did not believe the jury would not rely on their accusations of spying when awarding punitive damages, Plaintiffs would not have repeatedly asked the jury to rely on those accusations, including in the very last statements of their argument. (*Id.* at 1340.)[6]

## CONCLUSION

It is undisputed that, since the Supreme Court's decision in *State Farm*, the Ninth Circuit has never approved any punitive damages award larger than nine times compensatory damages, and it has limited punitive damages to four times compensatory damages in all but the most extreme circumstances. Under precedent that binds this Court, Plaintiffs' substantial compensatory damages should limit them to a 1-to-1 ratio of punitive to compensatory damages, and this case certainly does not fall within the category of cases for which a ratio greater than 4-to-1 could satisfy due process. The Court should remit the jury's award of punitive damages or, if Plaintiffs refuse the remittitur, order a new trial.

Dated: June 20, 2025

KING & SPALDING LLP

By: *Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

*Attorneys for Defendants*
NSO GROUP TECHS. LTD. and
Q CYBER TECHS. LTD.

---

[6] At a minimum, Plaintiffs' repeated requests to punish NSO for "spying" drives home the lack of fairness in this Court's evidentiary rulings, which allowed Plaintiffs to seek punitive damages based on the use of Pegasus on target user devices—whether or not that use occurred as part of the relevant conduct in April-May 2019—while prohibiting NSO from explaining the purposes for which it licenses, and its customers use, Pegasus.