Greg D. Andres
Antonio J. Perez-Marques
Gina Cora
Craig T. Cagney
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    greg.andres@davispolk.com
          antonio.perez@davispolk.com
          gina.cora@davispolk.com
          craig.cagney@davispolk.com
          luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:    micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC and<br>META PLATFORMS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**PLAINTIFFS' REVISED REPLY BRIEF IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**<br><br>Date:    August 28, 2025<br>Time:    10:00 am<br>Ctrm:    3<br>Judge:  Hon. Phyllis J. Hamilton<br>Action Filed: October 29, 2019 |

1

**TABLE OF CONTENTS**

2

PAGE

3

INTRODUCTION ...................................................................................................1

4

PROCEDURAL HISTORY .....................................................................................2

5

ARGUMENT ...........................................................................................................2

6

    I.    Plaintiffs Satisfy the Requirements for Injunctive Relief ...........................2

7

        A.    NSO Threatens Plaintiffs with Ongoing Harm ................................2

8

        B.    There Is No Adequate Legal Remedy for Plaintiffs' Harm ............6

9

        C.    The Balance of Hardships Favors an Injunction .............................8

10

        D.    An Injunction Is in the Public Interest ...........................................10

11

    II.    The Scope of the Proposed Injunction Is Appropriate ...............................11

12

    III.    California Law Does Not Preclude the Relief Plaintiffs Seek ...................14

13

CONCLUSION ......................................................................................................15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>CASES</u>

<u>PAGE(S)</u>

*Adobe Sys., Inc. v. Taveira,*
2009 WL 506861 (N.D. Cal. Feb. 27, 2009) .................................................................. 7

*Apple Inc. v. Psystar Corp.,*
673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd,* 658 F.3d 1150 (9th Cir. 2011) ........................ 8, 13

*Arizona Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) .................................................................................. 6

*Bowler v. Home Depot USA Inc.,*
2011 WL 166140 (N.D. Cal. Jan. 19, 2011) ................................................................... 3

*City of Carlsbad v. Shah,*
850 F. Supp. 2d 1087 (S.D. Cal. 2012) ....................................................................... 8

*Commodity Futures Trading Comm'n v. Ooki DAO,*
2023 WL 5321527 (N.D. Cal. June 8, 2023) ................................................................. 6

*Corelogic Sols., LLC v. Geospan Corp.,*
2020 WL 7786537 (C.D. Cal. Aug. 21, 2020) ............................................................... 9

*Craigslist, Inc. v. Kerbel,*
2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) ................................................................. 6

*Craigslist, Inc. v. Naturemarket, Inc.,*
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ...................................................................... 15

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) .................................................................................. 9

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) .................................................................................. 7

*In re Est. of Ferdinand Marcos Hum. Rts. Litig.,*
94 F.3d 539 (9th Cir. 1996) .................................................................................. 14

*Facebook, Inc. v. Power Ventures, Inc.,*
844 F.3d 1058 (9th Cir. 2016) ............................................................................... 12

*Facebook, Inc. v. Power Ventures, Inc.,*
252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd,* 749 F. App'x 557 (9th Cir. 2019) ..... 6, 8, 9, 11, 12

*In re Google Play Store Antitrust Litig.,*
2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ................................................................. 6

*Haskell v. Brown,*
677 F. Supp. 2d 1187 (N.D. Cal. 2009) ...................................................................... 11

ii

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
 571 F.3d 873 (9th Cir. 2009) ................................................................. 14

*Meta Platforms, Inc. v. Ates*,
 2023 WL 4035611 (N.D. Cal. May 1, 2023), *report and recommendation adopted*,
 2023 WL 4995717 (N.D. Cal. June 27, 2023)......................................... 15

*Meta Platforms, Inc. v. Nguyen*,
 2023 WL 8686878 (N.D. Cal. Aug. 22, 2023), *report and recommendation adopted*,
 2023 WL 8686913 (N.D. Cal. Oct. 10, 2023) ...........................................6

*Meta Platforms, Inc. v. Nguyen*,
 2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ......................................... 15

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
 518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................... 7

*Michener v. Wells Fargo Home Mortg.*,
 2012 WL 3027538 (N.D. Cal. July 24, 2012) ......................................... 15

*NLRB v. Express Pub. Co.*,
 312 U.S. 426 (1941) ................................................................................. 13

*Oracle USA, Inc. v. Rimini St., Inc.*,
 81 F.4th 843 (9th Cir. 2023) .................................................................... 12

*Softketeers, Inc. v. Regal W. Corp.*,
 2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) ..............................................9

*Sprint Nextel Corp. v. Welch*,
 2014 WL 68957 (E.D. Cal. Jan. 8, 2014), *report and recommendation adopted*, 2014 WL
 2106683 (E.D. Cal. May 20, 2014) .......................................................4, 13

*Sprint Sols., Inc. v. Cell Wholesale, Inc.*,
 2015 WL 13919095 (C.D. Cal. Dec. 10, 2015) ....................................... 13

*United States v. Holtzman*,
 762 F.2d 720 (9th Cir. 1985) .............................................................. 11, 12

*United States v. Marc*,
 2020 WL 6064793 (M.D. Fla. Sept. 1, 2020) ............................................ 9

*United States v. U.S. Gypsum Co.*,
 340 U.S. 76 (1950) ................................................................................... 12

*White v. Univ. of Cal.*,
 2012 WL 12335354 (N.D. Cal. Oct. 9, 2012), *aff'd*, 765 F.3d 1010 (9th Cir. 2014) ................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ..................................................................................... 11

*Y.Y.G.M. SA v. Redbubble, Inc.*,
 75 F.4th 995 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024) ............................... 4

1

2

## STATUTES & RULES

3

Cal. Civ. Code § 3423(e) ................................................................................................ 14

4

Cal. Civ. Proc. Code § 526(b)(5) .................................................................................... 14

5

Fed. R. Civ. P. 65 ...........................................................................................................14

6

Fed. R. Civ. P. 65(d)(2) ...................................................................................................9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REVISED REPLY BR. IN SUPP. OF MOT. FOR PERMANENT INJUNCTION - CASE NO. 4:19-CV-07123-PJH

# INTRODUCTION

This Court should enter a permanent injunction prohibiting NSO from continuing its unauthorized access to Plaintiffs' Platforms and to the private messages of Plaintiffs' users. As the Court recognized in finding NSO liable for violating the Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Data Access and Fraud Act ("CDAFA"), the undisputed evidence established that NSO knowingly and with intent to defraud circumvented Plaintiffs' security measures and illegally accessed Plaintiffs' servers and infrastructure. It is undisputed that NSO did so repeatedly—despite knowing that Plaintiffs prohibited such activities—and that its conduct violated the law. In fact, NSO brazenly continued its unlawful conduct even after Plaintiffs filed this suit and after the Court concluded that NSO's conduct was illegal. The discovery record and evidence at trial confirmed that NSO's pattern of unlawful conduct, planned and executed over the course of years, was essential to NSO's business model—one that it admittedly continues to pursue to this day. Indeed, NSO's senior-most executives acknowledged the importance of secrecy to NSO's business, and the tens of millions of dollars that NSO continues to dedicate to finding new installation vectors and avoiding detection. These facts are undisputed, and they are more than sufficient to warrant a permanent injunction. At the upcoming evidentiary hearing, Plaintiffs will present further evidence demonstrating that Plaintiffs continue to face an ongoing threat from NSO, including evidence that NSO has not halted its illegal conduct on Plaintiffs' Platforms and has no intention of doing so without a court order.

The arguments in NSO's revised opposition brief are no more persuasive than the original version. First, NSO's assertions about the public interest in spyware lack any support in the evidentiary record, and are contradicted by the extensive evidence of Pegasus being used against journalists, political dissidents, and human rights lawyers. Second, NSO's attempt to paint Plaintiffs' proposed injunction as overbroad is both wrong on the law and confirmation that an injunction is necessary to prevent NSO from continually developing new ways to illegally access messages from Plaintiffs' users.

Having found that NSO has repeatedly violated federal and state law, this Court should issue a permanent injunction to prevent future illegal activity. While the record from discovery and trial

1  is sufficient for the issuance of an injunction, the evidence that Plaintiffs will present at the August

2  28, 2025 hearing will confirm the need for a court order to stop NSO's ongoing misconduct.

3  **PROCEDURAL HISTORY**

4      Plaintiffs moved for a permanent injunction on February 24, 2025.  *See* Dkt. No. 557-3.  NSO

5  filed its opposition on March 14, 2025, in part arguing that Plaintiffs' motion was "premature" and

6  "procedurally improper."  Dkt. No. 604-2 at 3.  On March 25, 2025, Plaintiffs filed their reply.  Dkt.

7  No. 637.  During a pretrial conference held on April 10, 2025, the Court postponed ruling on the

8  permanent injunction motion until after trial.  Dkt. No. 684 at 19.

9      On May 6, 2025, after a six-day trial, a unanimous jury ruled in favor of Plaintiffs, awarding

10  $444,719 in compensatory damages for NSO's violations of the CFAA and the CDAFA, and for

11  NSO's breach of contract.  The jury also awarded Plaintiffs $167,254,000 in punitive damages, con-

12  cluding that NSO acted with malice, oppression, or fraud in violating the CDAFA.  *See* Dkt. No. 736.

13      On June 18, 2025, NSO filed a revised opposition to Plaintiffs' motion for a permanent in-

14  junction.  Dkt. No. 759-2.  On August 1, 2025, the Court denied Plaintiffs' motion to strike NSO's

15  revised opposition, but allowed Plaintiffs to file a revised reply brief in support of their motion for a

16  permanent injunction.  Dkt. No. 781 at 1.

17  **ARGUMENT**

18  **I.      Plaintiffs Satisfy the Requirements for Injunctive Relief**

19      Plaintiffs have satisfied all four factors necessary to issue a permanent injunction.  First, the

20  facts from discovery and from trial establish ongoing harm to Plaintiffs sufficient to warrant a per-

21  manent injunction against NSO.  Second, Plaintiffs face irreparable harm from NSO's unauthorized

22  access that cannot be redressed with additional monetary damages.  Third, NSO's hardship claims

23  merit no weight: the jury rejected NSO's portrayal of financial hardship in awarding punitive dam-

24  ages, and there is no justification to preserve a business built on breaking the law.  Fourth, NSO has

25  failed to substantiate its repeated claim that the public benefits from illegal spyware, and the factual

26  record contradicts this assertion.

27  **A.      NSO Threatens Plaintiffs with Ongoing Harm**

28      Plaintiffs are irreparably injured by NSO's continuing and imminent threat of harm.  *See*

2

*Bowler v. Home Depot USA Inc.*, 2011 WL 166140, at *3 (N.D. Cal. Jan. 19, 2011) (irreparable injury occurs where "the threat of future harm is immediate").  The evidence revealed in discovery and at trial confirmed the nature of NSO's conduct, that obtaining unauthorized access to computers is the very essence of NSO's business, and that to this day NSO continues to devote massive resources to develop new means of secret, unauthorized installation of its spyware.  The testimony of Plaintiffs' witnesses at the forthcoming evidentiary hearing will further confirm that Plaintiffs face an ongoing threat from NSO that only an injunction can stop.

   *Evidence from discovery and trial.*  The evidence previously adduced about NSO's actions between January 2018 and May 2020 establishes that NSO poses an ongoing threat to Plaintiffs.  *See* Dkt. No. 557-3 at 7–17.  NSO secretly built a sophisticated spyware apparatus that enabled it to use WhatsApp's servers thousands of times without detection to install zero-click spyware on Plaintiffs' users' devices up to "tens of thousands" of times between April 2018 to May 2020.  Dkt. No. 399-4, Ex. 6 at 83:10–11.  To stay ahead of its competition and avoid being blocked, NSO continually modified Pegasus to solve for Plaintiffs' security updates, ensuring NSO's continued access to WhatsApp's servers—and thus the devices of Plaintiffs' users—in excess of its authorization.  *See* Dkt. No. 557-3 at 9–11.  During his deposition, NSO's head of research and development explained that NSO "constantly work[s] on research in order to find possible ways, rapid solutions."  Dkt. No. 399-4, Ex. 6 at 266:3–7.  When asked whether NSO continues to engage in this work today, he replied: "This is our business."  *Id.*, Ex. 6 at 266:10.

   The damages-only trial provided more evidence of the ongoing harm to Plaintiffs.  For example, NSO *continues* to invest heavily in research and development, currently employing over 140 people dedicated to research and development and spending up to $52 million in 2023 and $59 million in 2024 to "find vectors, or ways to access the phone."  Dkt. No. 758-2 at 886:4–5.  Yaron Shohat, NSO's chief executive officer, testified that NSO consistently found an "alternative way to get—to allow the technology to get to the target device."  *Id.*  Tamir Gazneli, NSO's vice president of research and development, acknowledged that NSO's spyware was "undetectable by design." *Id.* at 28.  Both admissions highlight the difficulty of trusting NSO's vow not to access WhatsApp's servers, and the need to ban NSO from Plaintiffs' Platforms altogether.

NSO does not contest this evidence.  In fact, NSO admits that it continues to license Pegasus spyware and continues to rely on covert installation vectors.  Dkt. No. 759-2 at 11; Dkt. No. 759-3 ¶¶ 5–6.  NSO separately confirmed that its Pegasus spyware has been collecting WhatsApp messages from at least 2019 until the present.  *See* Dkt. No. 779 at 4.  Nor does NSO refute the extensive evidence about its ability to quickly circumvent sophisticated technical obstacles.  *See* Dkt. No. 399-4, Ex. 14 at 2 ("NSO has proven time after time that one of its biggest value[s] is the ability to 'survive' this harsh enviorment [*sic*] of the cat and mouse game.").  The undisputed evidence therefore establishes that NSO maintains the technical expertise and commercial incentives not only to access Plaintiffs' servers, but also to hide any access from Plaintiffs.  Given these facts, and the belief of NSO's co-founder, chairman, and current majority owner that NSO didn't do "anything wrong," *see* Dkt. No. 557-3 at 6, NSO's promises to follow this Court's orders ring hollow.[1]

As courts have found, companies in the business of accessing computers without authorization pose a risk of ongoing harm to their targets, even when they claim to have stopped their attacks.  Dkt. No. 557-3 at 11 (citing cases).  The cases that NSO cites in which courts have found no irreparable harm all lack the facts established here.  For instance, in *Sprint Nextel Corp. v. Welch*, the plaintiff made only "vague" allegations about the defendant's wrongdoing despite having "access to records that would identify specific misconduct."  2014 WL 68957, at *9 (E.D. Cal. Jan. 8, 2014), *report and recommendation adopted*, 2014 WL 2106683 (E.D. Cal. May 20, 2014).  The remaining cases that NSO cites, *see* Dkt. No. 759-2 at 9 n.17, all involve singular instances of past unauthorized access.  Here, in spite of NSO's sanctionable refusal to produce key evidence, Plaintiffs established that NSO repeatedly targeted Plaintiffs even after this litigation was filed, all pursuant to a business model that depends on continuously developing new means of unauthorized access.  NSO's cases thus do not apply.[2]

---

[1]    The damages-only trial also cast doubt on NSO's credibility.  For instance, Mr. Shohat testified that NSO only became aware of Plaintiffs' lawsuit months after it was brought, even though NSO issued a statement on the lawsuit the day it was filed.  *See* Dkt. No. 758-2 at 868:6–873:2.

[2]    Plaintiffs did not delay in seeking a permanent injunction.  NSO disclosed that its attacks had continued during the pendency of this lawsuit in September 2024.  *See* Dkt. No. 399-4, Ex. 6 at 271:3–8.  Even if there was a delay, it does not have "equal bearing in the permanent injunction

4

*Supplemental evidence.*  Plaintiffs intend to present additional evidence of ongoing harm at the upcoming evidentiary hearing.

*First*, NSO's continued collection of private information from Plaintiffs' users requires unauthorized access to Plaintiffs' client applications.  Indeed, NSO admits that Pegasus is "capable of collecting a variety of both historical (existing) and current (incoming/outgoing) data from mobile devices," Dkt. No. 759-3 ¶ 35, and "collects information from users of WhatsApp" and "Plaintiffs' other platforms," Dkt. No. 759-2 at 17.  Unsurprisingly, NSO has not described *how* it collects this information, nor did it provide any discovery on this topic.  Lander Brandt, one of Plaintiffs' security engineers, will explain that NSO must access the WhatsApp client application to collect WhatsApp messages.  And in order to collect "current" (i.e., real time) phone and video calls, Dkt. No. 759-3 ¶ 35, NSO would need to covertly inject harmful code into the WhatsApp client application.  Regardless of whether NSO uses Plaintiffs' servers as an installation vector, NSO continues its unauthorized access to Plaintiffs' Platforms.

*Second*, Pegasus is still being installed via WhatsApp.  As Plaintiffs' security engineer Andrew Blaich will explain, Plaintiffs have observed WhatsApp accounts associated with NSO use WhatsApp servers to send malicious links to other WhatsApp users.  If the WhatsApp users were to click on the malicious link, it would cause the malware or spyware (likely Pegasus) to be installed on the user's device.  This directly belies the representations made by Mr. Shohat that NSO lacks any "installation vector for Pegasus . . . that uses [Plaintiffs'] technology in any way, Dkt. No. 396-5, Exh. H at 51:23–52:2; *see also* Dkt. No. 759-3 ¶ 46, and highlights why this Court should issue an injunction and decline to credit NSO's assurances of future compliance with the law.

*Third*, NSO continues to use Plaintiffs' Platforms, including those besides WhatsApp, as part of its research and development activities.  Mr. Blaich will testify about the evidence that Plaintiffs have gathered showing NSO's employees using Facebook and Instagram for testing and development purposes, rather than for "lawful business communications."  Dkt. No. 759-2 at 18; *see* Decl. of Andrew Blaich in Supp. of Pls. Reply Br. in Supp. of Mot. for Permanent Injunction, Exs. A–C.

---

context."  *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824 (2024).

1   Without an injunction barring NSO from accessing all of Plaintiffs' Platforms, NSO is likely to con-

2   tinue to hunt for new ways to continue its misconduct.

3       While NSO's past conduct alone establishes a risk of ongoing harm, this contemporary evi-

4   dence also justifies the issuance of a permanent injunction.  Courts have held that "not only past

5   violations" but also "ongoing violations" are sufficient to establish likelihood of future violations

6   absent permanent injunctive relief.  *Commodity Futures Trading Comm'n v. Ooki DAO*, 2023 WL

7   5321527, at *8 (N.D. Cal. June 8, 2023); *see also In re Google Play Store Antitrust Litig.*, 2024 WL

8   4438249, at *4 (N.D. Cal. Oct. 7, 2024) (ordering a permanent injunction after acknowledging that

9   "harms are ongoing and cannot be made right simply by Google writing Epic a large check").  This

10  is especially true where, as here, NSO has "continued to access [Plaintiffs'] servers after this action

11  commenced"; under such circumstances, courts have found that "an injunction is necessary to prevent

12  continued use." *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686878, at *8 (N.D. Cal. Aug. 22, 2023),

13  *report and recommendation adopted*, 2023 WL 8686913 (N.D. Cal. Oct. 10, 2023).

14      **B.    There Is No Adequate Legal Remedy for Plaintiffs' Harm**

15      The harm that Plaintiffs face from NSO's ongoing misconduct is irreparable, as there "is no

16  adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757

17  F.3d 1053, 1068 (9th Cir. 2014).  NSO's claims that Plaintiffs' only alleged harms are "investigatory

18  and remediation expenses," Dkt. No. 759-2 at 8, are baseless.

19      *First*, NSO fails to meaningfully distinguish the extensive case law finding that "unauthorized

20  access of computers and the acquisition of data . . . constitute irreparable harm." *Facebook, Inc. v.*

21  *Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir.

22  2019); *see* Dkt. No. 557-3 at 11 (citing cases).[3]  NSO asserts that injunctive relief is appropriate only

23  when the malicious actor acquired, stole, exploited, or retained the target's proprietary data.  Dkt.

24  No. 759-2 at 10.  NSO is wrong, and the case law does not support the limitation that NSO posits.

25  *See, e.g.*, *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798, at *2 (N.D. Cal. Aug. 2, 2012) (enjoining

26  defendant who posted ads on plaintiff's platform, and who was not alleged to have stolen, exploited,

27

---

28  [3]   This harm is based on the specific nature of computer hacking violations, and thus beyond the "mere fact of a past violation."  Dkt. No. 759-2 at 9.

1    or retained proprietary data).  An injunction would nonetheless be warranted under NSO's proposed

2    rule: the undisputed facts show that NSO extracted and decompiled code for WhatsApp's client ap-

3    plication, and used this code to build the WIS.  *See* Dkt. No. 557-3 at 12–13.  NSO also used a

4    technically sophisticated process to steal authentication credentials from legitimate WhatsApp ac-

5    counts.  *See id.* at 23.  NSO does not deny that it still possesses this code, or that the WIS remains

6    capable of "crafting WhatsApp messages" based on these stolen credentials.  Dkt. No. 759-2 at 12;

7    *see* Dkt. No. 605-3 ¶ 6.  The undisputed facts about NSO's exploitation of WhatsApp place NSO

8    squarely within the ambit of cases finding irreparable harm for which monetary damages are insuffi-

9    cient.

10       *Second*, the "very need to file multiple lawsuits" as a result of NSO's misconduct "is itself

11    supportive of an irreparable harm finding."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

12    518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007); *see* Dkt. No. 557-3 at 14.  NSO admits that its employ-

13    ees use "WhatsApp for internal communications," Dkt. No. 759-2 at 14, and therefore agree to the

14    WhatsApp Terms of Service, *see* Dkt. No. 758-2 at 983:15–16 (Mr. Gazneli admitting that he uses

15    WhatsApp).  And in its own words, NSO "*ha[s] never stated or suggested that Pegasus ever stopped*

16    *collecting WhatsApp messages*."  Dkt. No. 779 at 4.  Taken together, these admissions establish that

17    NSO actively violates the WhatsApp Terms of Service, which prohibit WhatsApp users from "di-

18    rectly or through automated means . . . collect[ing] information of or about our users in any imper-

19    missible or unauthorized manner."[4]  Plaintiffs could thus bring a breach-of-contract case against NSO

20    today based solely on NSO's admissions.  Injunctive relief is meant to prevent such repetitious liti-

21    gation.

22       *Third*, even if NSO were correct that Plaintiffs' only alleged harms were "investigatory and

23    remediation expenses," that would be sufficient for an injunction here because "[w]hile economic

24    injury is generally not considered irreparable, it is where the underlying injury does not readily lend

25    itself to calculable money damages."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir.

26    2023) (subsequent history omitted); *see Adobe Sys., Inc. v. Taveira*, 2009 WL 506861, at *7 (N.D.

27    

28    _____

4    WhatsApp, *WhatsApp Terms of Service*, https://www.whatsapp.com/legal/terms-of-service.

Cal. Feb. 27, 2009) (granting permanent injunction where "harm to plaintiff . . . may be difficult to calculate"). That is the case here. As long as NSO continues to collect data from Plaintiffs' users and access Plaintiffs' Platforms for research and development purposes, Plaintiffs will need to spend additional resources detecting and preventing such unauthorized activity by NSO. And given NSO's sophistication and commitment to "operational security" (i.e., secrecy), determining the security-related costs attributable to NSO's activity will be costly and unnecessarily burdensome.

*Finally*, the jury's monetary award does not prevent Plaintiffs from obtaining further relief. Courts routinely enter permanent injunctions even after parties win damages awards. *See, e.g.*, *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949–50 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011); *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1112–18 (S.D. Cal. 2012). In *Psystar*, the court recognized that an injunction was warranted because the award of monetary damages would not prevent future statutory violations. 673 F. Supp. 2d at 950. The court expressly called out the defendant's "actions throughout this litigation and statements at oral argument" that revealed "a dogged determination to continue" its violations. *Id.* As in *Psystar*, NSO's refusal to halt its unauthorized activity after Plaintiffs filed suit, and its refusal to halt its unauthorized access to Plaintiffs' Platforms even after being found liable, signal that it will continue its violations absent a court order to stop.

## C.    The Balance of Hardships Favors an Injunction

The hardship that Plaintiffs face from NSO's continued access to Plaintiffs' services, continued collection of Plaintiffs' users' data, and the threat that NSO will continue its attacks on Plaintiffs outweigh any hardship that NSO will face from simply following the law. *See* Dkt. No. 557-3 at 17–18. In *Power Ventures*, the mere "probability that Defendants will engage in similar conduct in the future" tipped the balance of hardships in the plaintiff's favor. 252 F. Supp. 3d at 784. Here, the evidence establishes that NSO currently engages in unauthorized and illegal access to Plaintiffs' Platforms. NSO's arguments to the contrary, *see* Dkt. No. 759-2 at 13–15, do not warrant a different conclusion.

*First*, NSO claims that it faces an existential risk if it can no longer access Plaintiffs' Platforms and surreptitiously collect Plaintiffs' users private messages. Dkt. No. 759-2 at 13–14. If true,

8

this assertion strongly suggests that NSO's entire business is built on illegal conduct. NSO argues that the threat of being driven out of business still influences the balance of hardships "even if the conduct at issue is unlawful." Dkt. No. 759-2 at 13 & n.21, 14 (quoting *Softketeers, Inc. v. Regal West Corp.*, 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023)). In *Softketeers*, the business at issue could have operated legally as soon as it stopped using the infringing software. By contrast, NSO has not provided any evidence that it has any legal basis for its unauthorized access to Plaintiffs' Platforms. *See United States v. Marc*, 2020 WL 6064793, at *8 (M.D. Fla. Sept. 1, 2020) (enjoining operation of business that "fundamentally depends" on illegal conduct). Nor is there any precedent for protecting NSO from losing market share to competitors in an industry that may "present[] significant counterintelligence and security risks." Exec. Order No. 14,093, 88 Fed. Reg. 18957 (Mar. 27, 2023). As a general matter, "harm caused by illegal conduct does not merit significant equitable protection." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017).

*Second*, NSO asserts hardship from having its employees banned from using Plaintiffs' Platforms. Dkt. No. 759-2 at 14. As an initial matter, these NSO employees necessarily agreed to the WhatsApp Terms of Service, which prohibit the unauthorized access and data collection at the core of NSO's business. In essence, NSO's employees seek an exemption from complying with a contract they agreed to, and continue to benefit from.[5] Moreover, as Plaintiffs will explain at the upcoming hearing, NSO employees continue to use Plaintiffs' Platforms for testing activity, not just in their personal capacities or for innocent business communications.

*Third*, NSO suggests that the proposed injunction would impair its ability to "find legal representation" because NSO attorneys cannot maintain accounts on Plaintiffs' Platforms. Dkt. No. 759-2 at 14–15. The proposed injunction does not restrict NSO from communicating with its attorneys on a wide range of other platforms, and tracks the limitations imposed by Rule 65(d)(2). For the avoidance of doubt, Plaintiffs agree to clarify the proposed permanent injunction to exclude NSO's outside counsel. As for NSO's internal counsel, NSO "brought this risk upon [itself] by violating the law," and "the balance would not shift in favor of Defendants even if there were evidence

---

[5]    Unlike the sole case that NSO cites, Plaintiffs do not seek access to NSO's personal devices. *Corelogic Sols., LLC v. Geospan Corp.*, 2020 WL 7786537, at *3 (C.D. Cal. Aug. 21, 2020).

1    to support this speculative claim." *Power Ventures*, 252 F. Supp. 3d at 785.

2         **D.    An Injunction Is in the Public Interest**

3         The public interest favors enjoining NSO from continuing to surreptitiously collect messages

4    from Plaintiffs' users.  The public has an interest in ensuring compliance with computer hacking

5    statutes and that contracts are upheld and respected.  *See* Dkt. No. 557-3 at 18–19.  The award of

6    punitive damages reflects this interest, as the jury concluded that NSO must pay over $167 million

7    "to fulfill [punitive damage's] purposes of punishment and deterrence."  Dkt. No. 737 at 29.

8         NSO's description of the proposed injunction's "negative public consequences," Dkt. No.

9    759-2 at 15, lacks any evidentiary foundation.  Despite claiming that Pegasus is used "in sensitive

10   law-enforcement, military, and intelligence operations," *id.*, NSO has no ability to see "who [their]

11   clients target" or "what their criminal investigations are," but also "wouldn't want to know that."

12   Dkt. No. 684 at 66:16–67:11.  NSO has produced no evidence that "Western-style democracies,"

13   Dkt. No. 759-2 at 15, or the United States currently use Pegasus to access Plaintiffs' Platforms or the

14   mobile devices of Plaintiffs' users.  The "policy" expert who opines that Pegasus plays a "vital func-

15   tion" in "today's law-enforcement and antiterrorism operations," *id.*, admitted he lacks firsthand

16   knowledge of NSO's clients or their targets, and instead relied upon public reporting, *see* Dkt. No.

17   572-3 at 8–9; Dkt. No. 605-4 ¶ 62.  In all events, neither of NSO's "policy" experts offer any opinions

18   on the use of Pegasus to access Plaintiffs' Platforms or the mobile devices of Plaintiffs' users, which

19   is all the injunction prevents.  *See* Dkt. No. 505 at 6; Dkt. No. 573 at 8.

20        NSO also overlooks the U.S. government's determination that NSO's business is "contrary

21   to the national security or foreign policy interests of the United States and those acting on behalf of

22   such entities."  Addition of Certain Entities to the Entity List, 86 Fed. Reg. 60759 (Nov. 4, 2021).

23   According to the U.S. Department of Commerce, "investigative information has shown that [NSO]

24   developed and supplied spyware to foreign governments that used this tool to maliciously target gov-

25   ernment officials, journalists, businesspeople, activists, academics, and embassy workers."  *Id.*

26        Moreover, the evidentiary record reveals the abuses of NSO's spyware.  Citizen Lab deter-

27   mined that hundreds of the victims of NSO's May 2019 attack on WhatsApp users were attorneys,

28   journalists, human rights activists, and government officials.  The victims included two attorneys

who had been pursuing lawsuits against NSO- and NSO-affiliated entities, along with 14 journalists. *See* Ex. A-1002.[6]  NSO has admitted that its technology has been misused: NSO's CEO admitted that Pegasus was abused so severely in ten instances that the customers' access was disabled, and also admitted that Pegasus was used by the ruler of Dubai against the attorneys of his ex-wife, Princess Haya.  Dkt. No. 436-4, Ex. 38 at 31:18–32:14.  NSO's opposition brief contains additional description about NSO's process for screening customers, but the Court has recognized the inherent limits of NSO's upfront screening when it lacks information about who its spyware is used against.  *See* Dkt. No. 684 at 122:24–123:1 ("How then do you figure out an abuse has been committed per your certi-fication procedure without knowing who's doing what to whom?").

As the cases cited by NSO show, courts recognize a public interest in stopping crime or ter-rorism when there is detailed evidence submitted by government or law enforcement.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[T]he record contains declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat."); *Haskell v. Brown*, 677 F. Supp. 2d 1187, 1200–1201 (N.D. Cal. 2009) (relying on declaration with specific statistics about the number of arrests that stemmed from DNA testing) (subsequent history omitted).  Here, the silence of NSO's purported government and law enforcement customers is striking.

## II.    The Scope of the Proposed Injunction Is Appropriate

Each provision of Plaintiffs' proposed injunction is "'necessary and appropriate in the public interest to' . . . prevent 'continued violations' of the law."  *Power Ventures*, 252 F. Supp. 3d at 784 (quoting *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985)).  NSO's specific objections to the scope of the injunction all lack merit.

*First*, the Court can and should enjoin NSO from collecting information from Plaintiffs' users on Plaintiffs' Platforms, or selling spyware that allows its customers to do the same.  *See* Dkt. No. 558-3 ¶¶ 3(a), (c).  While NSO claims that it no longer uses a WhatsApp-based installation vector, it

---

[6]  In line with the Court's ruling that it will "limit testimony into the topic of the alleged victims' identities" at the forthcoming hearing, Dkt. No. 781 at 3, Plaintiffs intend to call Carl Woog only to rebut NSO's repeated claim that Pegasus is a law enforcement tool aimed at criminals (which, even if true, would not justify the use of illegal means to obtain such evidence).

continues to collect private messages and surveil users through a method it refuses to disclose.  However it currently supports surveillance campaigns, it necessarily involves accessing Plaintiffs' proprietary technology that it is not authorized to access.  In this regard, NSO continues to violate the CFAA and the CDAFA, in addition to the WhatsApp Terms of Service.  *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068–69 (9th Cir. 2016) (affirming liability under CFAA and CDAFA for use of automated scripts to collect information from Facebook users).

In all events, the injunction can cover acts that have not been explicitly found to be unlawful.  *Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 857 (9th Cir. 2023); *see also United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88–89 (1950) (injunctions may cover acts "entirely proper when viewed alone" if doing so will prevent future violations).  Indeed, "it is well established that 'federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct' or to prevent 'continued violations' of the law."  *Power Ventures*, 252 F. Supp. 3d at 784 (quoting *Holtzman*, 762 F.2d at 726).  Here, enjoining NSO from its goal—collecting private messages—is the only way to ensure that NSO will not develop new installation vectors through Plaintiffs' Platforms.[7]

*Second*, the Court can and should enjoin NSO from reverse-engineering, sending harmful code, using Plaintiffs' Platforms for illegal purposes, and creating new accounts on Plaintiffs' Platforms.  *See* Dkt. No. 558-3 ¶¶ 3(d)–3(g).  All of these activities are necessary prerequisites to NSO's ultimate violations of the CFAA and the CDAFA.  For instance, NSO built the WIS—which it used to unlawfully access Plaintiffs' servers—by reverse-engineering and decompiling WhatsApp code.  Dkt. No. 494 at 12–14.  NSO created WhatsApp accounts in order to harvest WhatsApp credentials for its exploits.  Dkt. No. 399-4, Ex. 6 at 278:16–279:6.  The Court recognized that "[t]here clearly

---

[7] This Court should reject NSO's latest attempt to clothe itself in the vestments of U.S. law enforcement.  *See* Dkt. No. 759-2 at 18 (asserting that NSO's collection of private messages is "no different" than U.S. law enforcement).  NSO is not a law-enforcement agency, and the Court has recognized that "there's no evidence" of NSO's products being used by U.S. law enforcement.  Dkt. No. 684 at 38:10–11.

1    was evidence of harmful code sent," Dkt. No. 684 at 104:20–104:21, and concluded NSO used Plain-

2    tiffs' Platforms for illegal purposes (violating the CFAA and the CDAFA). Thus all provisions are

3    warranted to prevent conduct that facilitated NSO's violations of the CFAA and the CDAFA.[8]

4        *Third*, NSO misinterprets the provisions of Plaintiffs' proposed injunction that mention the

5    WIS. The Court held that NSO used the WIS to violate the CFAA and the CDAFA. Dkt. No. 494

6    at 12. NSO claims that the current version of the WIS has no connection to Plaintiffs' Platforms.

7    Dkt. No. 605-3 ¶¶ 5–6. If that is true, and the WIS neither "emulates Plaintiffs' Platforms in any

8    way" or "use[s], access[es], or depend[s] on Plaintiffs' Platforms," Dkt. No. 558-3 ¶¶ 3(b); 4, then

9    the WIS falls outside the scope of Plaintiffs' proposed injunction and NSO should have no objection

10   to this provision. Otherwise, NSO should not be permitted to maintain the WIS. Its unsupported

11   assertion that it now has additional functions is beside the point. Dkt. No. 759-2 at 19.

12       *Fourth*, the Court should enjoin NSO from misconduct on all of Plaintiffs' Platforms, not just

13   WhatsApp. "A federal court has broad power to restrain acts which are of the same type or class as

14   unlawful acts which the court has found to have been committed or whose commission in the future

15   unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *NLRB v. Ex-*

16   *press Publ'g Co.*, 312 U.S. 426, 435 (1941). Despite what NSO says now, this case has not "always

17   been limited *solely* to WhatsApp." Dkt. No. 759-2 at 19. In their complaint, Plaintiffs alleged that

18   Pegasus intercepted "communications over . . . Facebook Messenger, WhatsApp, and others," Dkt.

19   No. 1 ¶ 27, and sought to enjoin NSO from accessing "WhatsApp's and Facebook's service, platform,

20   and computer systems," *id.* at 14. NSO's own marketing materials trumpet its ability to collect in-

21   formation from Plaintiffs' other applications and services. *See, e.g.*, Dkt. No. 1-1 at 85. The focus

22   on WhatsApp-based installation vectors was the result of NSO's own arguments to limit the scope

23   of discovery and does not limit the scope of the injunction that the Court can order. *See Psystar*, 673

24   F. Supp. 2d at 953 (extending permanent injunction to material that was not included within the scope

25   of discovery). Moreover, Plaintiffs will present evidence that NSO continues to conduct testing on

26   _____

27   [8]   NSO has not shown that any of its collection of data from WhatsApp users is "innocuous." *Cf.*
     *Welch*, 2014 WL 68957, at *9 (narrowing injunction to permit defendants to "borrow[] someone
     else's Sprint phone to make a phone call"); *Sprint Sols., Inc. v. Cell Wholesale, Inc.*, 2015 WL

28   13919095, at *14 (C.D. Cal. Dec. 10, 2015) (same).

Facebook and Instagram.

*Fifth*, there is no basis to circumscribe the injunction based on NSO's unsupported assertions about the identities of its customers. In both cases that NSO cites, the sovereign appeared in the litigation to assert its own immunity. *See In re Est. of Ferdinand Marcos Hum. Rts. Litig.*, 94 F.3d 539, 543 (9th Cir. 1996) (foreign nation); *White v. Univ. of Cal.*, 2012 WL 12335354, at *1 (N.D. Cal. Oct. 9, 2012) (Indian tribe), *aff'd*, 765 F.3d 1010 (9th Cir. 2014). By contrast, NSO's unidentified government customers have not asserted any interest here. In addition, the Court has determined that seeking injunctive relief consistent with Rule 65 (as Plaintiffs do now) means "that plaintiffs are not seeking injunctive relief against defendants' foreign sovereign customers." Dkt. No. 111 at 34.

*Sixth*, NSO cites no authority for limiting the terms of the injunction to "the conduct this Court found to breach WhatsApp's Terms." Dkt. No. 759-2 at 20. At the pretrial conference, the Court explained that it "did not reach" whether NSO's transmission of harmful code and use of Plaintiffs' Platforms for illegal purposes violated the WhatsApp Terms of Service, but noted that "[t]here clearly was evidence of harmful code sent, user information was collected." Dkt. No. 684 at 103:20–103:22. If anything, NSO's opposition to provisions of the proposed injunction that ban it from sending harmful code or using Plaintiffs' Platforms for illegal purposes signal that NSO will continue to engage in these activities going forward without a judicial prohibition in place.

*Finally*, the Court should order NSO to delete and disable customer access to computer code and data that uses Plaintiffs' Platforms. Dkt. No. 558 ¶ 4. The Ninth Circuit has questioned the use of mandatory *preliminary* injunctions, which, unlike most other preliminary injunctions, do not preserve the status quo. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). But NSO cites no case extending this concern to a permanent injunction, and ignores that many courts have required the deletion of data in response to computer-hacking violations. *See* Dkt. No. 557-3 at 24–25 (citing cases).

## III. California Law Does Not Preclude the Relief Plaintiffs Seek

The California statutes prohibiting a court from enjoining future breaches of contract do not apply here. To begin, it is unclear whether the provisions that NSO cites—California Civil Procedure Code § 526(b)(5) and California Civil Code § 3423(e)—even apply in federal court. This Court has

14

1   found that California law did not provide "the correct legal standard" for a preliminary injunction.

2   *Michener v. Wells Fargo Home Mortg.*, 2012 WL 3027538, at *3–5 (N.D. Cal. July 24, 2012).

3      In any event, Plaintiffs are not asking the Court to enjoin future breaches of contract.  Instead,

4   Plaintiffs request that NSO be prohibited from conduct closely tethered to NSO's violations of the

5   CFAA and the CDAFA, which undisputedly authorize injunctive relief.  NSO should not be able to

6   continue creating accounts, reverse-engineering the WhatsApp application, and sending harmful

7   code simply because this conduct independently violates the WhatsApp Terms of Service.[9]

8      Extensive precedent supports ordering each provision of the proposed injunction based on

9   NSO's violation of the CFAA and the CDAFA.  For instance, in *Craigslist, Inc. v. Naturemarket,*

10  *Inc.*, this Court enjoined a defendant who developed, advertised, and sold software to automate post-

11  ing ads on plaintiff's website in violation of the CFAA, the CDAFA, and the website's terms of

12  service.  694 F. Supp. 2d 1039, 1046, 1055–59 (N.D. Cal. 2010).  The injunction was similar to the

13  one here, prohibiting "creating accounts" and "accessing or using [plaintiff's] website for any com-

14  mercial purpose whatsoever."  *Id.* at 1046–47.  Courts have even mandated adherence to a platform's

15  terms of service based on violations of federal and state anti-hacking laws.  *See, e.g.*, *Meta Platforms,*

16  *Inc. v. Ates*, 2023 WL 4035611, at *9 (N.D. Cal. May 1, 2023) (enjoining defendant from violating

17  "Instagram's Terms, Meta's Commercial Terms, and related policies" based on violation of contract

18  and CDAFA), *report and recommendation adopted*, 2023 WL 4995717 (N.D. Cal. June 27, 2023);

19  *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *11 (N.D. Cal. Nov. 21, 2023) (enjoining

20  defendant from violating Meta's Terms based on violation of contract, CFAA, and CDAFA).  That

21  conduct independently violates a contract is not a reason to exclude it from an injunction.

## CONCLUSION

23     For all these reasons, Plaintiffs ask the Court to grant their motion and enter a permanent

24  injunction.

25

26  ----
    [9] Were it otherwise, CFAA and CDAFA violators could avoid injunctive relief for all attacks on
    WhatsApp, as the WhatsApp Terms of Service allow its use "only for legal, authorized, and ac-

27  ceptable purposes" and prohibit using WhatsApp in ways that "are illegal."  *See* Dkt. No. 1 ¶¶ 20–
    21.  This would be illogical particularly because CDAFA, a California statute, provides for injunc-

28  tive relief.

Dated:  August 7, 2025                    Respectfully submitted,

DAVIS POLK & WARDWELL LLP

By:  /s/ Greg D. Andres
        Greg D. Andres
        Antonio J. Perez-Marques
        Gina Cora
        Craig T. Cagney
        Luca Marzorati
          (admitted *pro hac vice*)
        DAVIS POLK & WARDWELL LLP
        450 Lexington Avenue
        New York, New York 10017
        Telephone: (212) 450-4000
        Facsimile: (212) 701-5800
        Email: greg.andres@davispolk.com
               antonio.perez@davispolk.com
               gina.cora@davispolk.com
               craig.cagney@davispolk.com
               luca.marzorati@davispolk.com

        Micah G. Block (SBN 270712)
        DAVIS POLK & WARDWELL LLP
        900 Middlefield Road, Suite 200
        Redwood City, California 94063
        Telephone: (650) 752-2000
        Facsimile:  (650) 752-2111
        Email: micah.block@davispolk.com

        *Attorneys for Plaintiffs*
        *WhatsApp LLC and Meta Platforms, Inc.*