1    JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
       *jakro@kslaw.com*
2    AARON S. CRAIG (Bar No. 204741)
       *acraig@kslaw.com*
3    KING & SPALDING LLP
     633 West Fifth Street, Suite 1700
4    Los Angeles, CA 90071
     Telephone:    (213) 443-4355
5    Facsimile:    (213) 443-4310

6    Attorneys for Defendants
     NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.
7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                             OAKLAND DIVISION

11

12   WHATSAPP INC., a Delaware corporation,      Case No. 4:19-cv-07123-PJH
     and FACEBOOK, INC., a Delaware
13   corporation,                                **MOTION TO STRIKE THE
                                                 SUPPLEMENTAL EXPERT REPORT OF
14              Plaintiffs,                       DANA TREXLER, CPA/CFF**

15        v.                                     Date:  February 13, 2025
                                                 Time:  2:00 p.m.
16   NSO GROUP TECHNOLOGIES LIMITED              Place: Courtroom 3, Ronald V. Dellums
     and Q CYBER TECHNOLOGIES LIMITED,                  Federal Building & U.S. Courthouse,
17                                                      1301 Clay Street, Oakland, California
                Defendants.
18                                               Action Filed: 10/29/2019
19

20

21

22

23

24

25

26

27

28

**PLEASE TAKE NOTICE** that on February 13, 2025 at 2:00 p.m., Defendants NSO Group Technologies Ltd. and Q Cyber Technologies Ltd. (collectively "NSO") will bring on for hearing before the Honorable Phyllis J. Hamilton, United States District Judge, in the United States Courthouse, 1301 Clay Street, Courtroom 3, Oakland, California, a motion to strike the Supplemental Expert Report of Dana Trexler, CPA/CFF ("Supplemental Trexler Report" or "Trexler Supp."). NSO's Motion is based on this Notice of Motion, the following Points and Authorities, the accompanying Declaration of Aaron S. Craig and exhibits thereto, and such other written or oral argument as may be presented at or before the time this Motion is taken under submission by the Court.

## POINTS AND AUTHORITIES

Plaintiffs served the Rule 26 disclosure of their damages expert Dana Trexler on August 30, 2024. The report disclosed three opinions: that Plaintiffs have suffered $444,719 in damages, that the value to Defendants of the use of Plaintiffs' systems was worth more than $5,000 in one year, and that Defendants' profits should be disgorged using a methodology whereby revenues were either $15,000,000 or $48,000,000, the product of (1) the 1,500 devices allegedly targeted multiplied by (2) a per-device figure of either $10,000 or $32,000.

The very same day that rebuttal reports were due (and the day that Defendants' rebuttal expert, Greg Pinsonneault, served his rebuttal to Ms. Trexler's initial report), Ms. Trexler filed a "supplemental" report that *completely changed* the methodology by which she calculated Defendants' revenues—this time using a document that Defendants had produced several days prior to her initial report and ***upon which Ms. Trexler had relied for other purposes in her initial report!***

As a result of this sequence of events, particularly the fact that Plaintiffs waited until the evening that Mr. Pinsonneault's rebuttal report was due before serving a "supplemental" Trexler report with an entirely new and different methodology for calculating Defendants' revenues, the approximately $25,000 spent by Defendants on the portion of Mr. Pinsonneault's initial report rebutting Plaintiffs' initial disgorgement opinions were completely wasted. The timing of Ms. Trexler's supplemental report, and Plaintiffs' failure even to notify Defendants that a supplemental report was coming, reflect rank gamesmanship on Plaintiffs' part. In addition to the wasted time

and expense of Mr. Pinsonneault's rebuttal of Ms. Trexler's now discarded initial disgorgement opinion, Plaintiffs' conduct has necessitated Mr. Pinsonneault's preparation of two further supplemental reports. There is no justification, much less the required "substantial justification" for Plaintiffs' delay until the evening rebuttal reports were due to provide Defendants with notice of the Supplemental Trexler Report, and Plaintiffs' misconduct has inflicted clear harm on Defendants. Accordingly, the Court should strike the Supplemental Trexler Report.

### Background

Plaintiffs served the expert report of Dana Trexler, CPA/CFF, on the last day allowed by the Court's scheduling order, August 30, 2024. (Craig Decl., Exh. A.) The report disclosed three opinions which she summarized on pages 4–5 of her initial report. First, Ms. Trexler opined that Plaintiffs' expenditure in responding to the discovery of the vulnerability allegedly exploited by Pegasus was $444,719. (*Id.* ¶ 12.) Second, she disclosed her opinion that Defendants' profits subject to disgorgement ranged between $4.3 million and $30.3 million—figures calculated based on the assumption that Defendants' revenues were either $15 million or $48 million. (*Id.* ¶ 122 and Table 8 at 44-45.) Those revenue calculations were derived from a formula assuming that Defendants had sold licenses for Pegasus for 1,500 devices (the number of users Plaintiffs claimed were targeted with Pegasus in April-May 2019), and multiplying 1,500 by either $10,000 or $32,000—figures obtained from an alleged 2013 license of Pegasus to the government of Colombia. (*Id.* ¶¶ 110-114.) Third, Ms. Trexler opined that "the use of Plaintiffs' systems for purposes of Defendants' Exploit was worth $13,877,00 [sic] for these three accounts alone, which exceeds $5,000 in one year." (*Id.* ¶ 126.)

Ms. Trexler's third opinion (Craig Decl. Exh. A ¶¶ 124-127) was based entirely on a spreadsheet produced by Defendants setting forth the revenues Defendants obtained from each customer who had licensed any of Defendants' products during the period for which the Court ordered that discovery be had—April 29, 2018 through May 10, 2020 (the "NSO Revenue Spreadsheet") (Craig Decl. ¶ 5 & Exh. B). Defendants produced the NSO Revenue Spreadsheet to Plaintiffs on August 26, 2024. (Craig Decl. ¶ 5.)

1   Moreover, in Ms. Trexler's analysis of Defendants' revenues purportedly subject to

2   disgorgement, she acknowledged her receipt of the NSO Revenue Spreadsheet, but for reasons

3   known only to her, declined to use the NSO Revenue Spreadsheet to determine Defendants'

4   revenues associated with licensing Pegasus in her initial expert disclosure.  Her report provides:

5       On August 26, 2024, Defendants produced NSO_WHATSAPP_00045858, which

6       is a spreadsheet containing, among other things, quarterly revenue amounts from
    Q2 2018 through Q2 2020 on an account-by-account basis related to a variety of

7       products, including Pegasus. The spreadsheet appears to identify, to the extent
    information is available, whether the revenues relate to accounts that received any

8       of the following four capabilities:

9          • Covert iOS

10         • Triggered iOS
       • Covert Android

11         • Triggered Android

12  (Craig Decl. Exh. A ¶ 96.)  Indeed, Ms. Trexler devoted over two full pages, in her "disgorgement"

13  section, to discussing the NSO Revenue Spreadsheet, but she chose not to use the NSO Revenue

14  Spreadsheet to calculate the revenues of Defendants that were the subject of her disgorgement

15  calculation.  (Id. ¶¶ 96-99.)

16  Between August 30, 2024 and September 21, 2024, Plaintiffs' counsel did not tell

17  Defendants' counsel that Ms. Trexler would be supplementing her report with a complete overhaul

18  of her analysis of Defendants' revenues and profits allegedly subject to disgorgement, despite

19  knowing that Defendants' deadline to rebut Ms. Trexler's report was September 21, 2024.  (Craig

20  Decl. ¶ 8.)  Plaintiffs' counsel also did not ask Defendants' counsel any questions about the NSO

21  Revenue Spreadsheet after receiving it on August 26, 2024, such as what the different rows and

22  columns represented (which Defendants' counsel would have readily answered).  (Id. ¶ 9.)

23  Plaintiffs took the deposition of NSO employee Sarit Gil in London on September 6, 2024, during

24  which Ms. Gil answered all of Plaintiffs' counsel's questions about the NSO Revenue Spreadsheet.

25  (Id. ¶ 10.)

26  Ms. Trexler's description in her initial report of the NSO Revenue Spreadsheet was

27  accurate.  The NSO Revenue Spreadsheet sets forth an anonymizing account number for each NSO

28  customer (Column A), the revenues earned by Defendants in each quarter between 2Q18 and 2Q20

1  (Columns C-K), the product in question (whether Pegasus or other of Defendants' non-Pegasus

2  products) (Column L).  (Craig Decl. ¶ 5.)  It also identifies, for the Pegasus contracts, which

3  installation vectors the customer had licensed the right to use (Columns R-U).  (*Id.*)  It also

4  identifies, for each Pegasus account, the source of the information about the installation vectors

5  (Column Q).  (*Id.*)

6       On September 21, 2024, Defendants disclosed to plaintiff the rebuttal report of Defendants'

7  economist, Greg Pinsonneault, rebutting Ms. Trexler's initial report.  (Craig Decl. Exh. C.)  Mr.

8  Pinsonneault explained several basic flaws in Ms. Trexler's methodology, including but not limited

9  to the fact that she assumed that NSO had sold licenses to target 1,500 concurrent devices, but that

10  Plaintiffs' internal documents state over and over that Plaintiffs do not know whether Pegasus was

11  successfully installed on any (let alone <u>all</u>) of the 1,500 targeted devices (additional licenses are not

12  required for unsuccessful attempts), nor had Plaintiffs ever alleged that the 1,500 devices were

13  targeted concurrently.  (*Id.* ¶¶ 68–81.)  In his rebuttal, Mr. Pinsonneault performed an alternate

14  calculation of Defendants' revenues associated with the Accused Technology between January 1,

15  2019 and May 19, 2019, based on the NSO Revenue Spreadsheet.  (*Id.* ¶¶ 97-113).

16       Ms. Trexler disclosed her brand-new disgorgement methodology on September 21, 2024 in

17  a "supplemental" report served at 9:14 PM (Craig Decl. ¶ 7 & Exh. D).  In her supplemental report,

18  Ms. Trexler discarded *in its entirety* her prior methodology for calculating Defendants' revenues

19  associated with the Accused Technology that was based on the 2013 Colombia license, stating "it

20  is my opinion that Defendants' Spreadsheet, and the related testimony, provides a more detailed

21  basis upon which to calculate Defendants' profits, than the limited information available to me at

22  the date of the Initial Report."  (Craig Decl. Exh. D ¶ 6.)  Her supplemental report relies entirely

23  on the NSO Revenue Spreadsheet to calculate Defendants' revenues that provide the starting point

24  for her disgorgement analysis.  Ms. Trexler's pretextual justification for not using her new

25  methodology in her initial report appears to be that she was unable to understand the factual

26  information set forth in the NSO Revenue Spreadsheet until reading the September 6, 2024

27  deposition transcript of Ms. Gil.  Ms. Trexler's supplemental report does not reference the fact that

28  neither she nor Plaintiffs' counsel ever asked Defendants' counsel to answer any questions Ms.

Trexler had about the NSO Revenue Spreadsheet, nor does the supplemental report make any effort to justify the 15-day delay between Ms. Gil's deposition and the service of Ms. Trexler's supplemental report—time when Plaintiffs knew Defendants would be preparing a rebuttal to Ms. Trexler's initial report.

## Argument

### I.    Overview of Pertinent Legal Standards

Federal Rule of Civil Procedure 26 provides that expert disclosures must be made *at the times directed by the Court*. *See* Fed. R. Civ. P. 26(a)(2)(D). Rule 37, in turn, provides that if a party fails to provide the information required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). When considering whether an untimely expert report is substantially justified or harmless, the Court may consider various factors, including: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010). The party offering an expert report after the deadline has the burden to prove that its delay was substantially justified or harmless. *Duarte Nursery, Inc. v. United States Army Corps of Engineers*, 2017 WL 3453206, at *7 (E.D. Cal. Aug. 11, 2017). The Court has "particularly wide latitude . . . to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (affirming exclusion of expert testimony due to untimely report).

Rule 26(e) addresses supplementation of expert reports. "Supplementing an expert report under Rule 26 means correcting inaccuracies, or filling the interstices of an incomplete report based on *information that was not available* at the time of the initial disclosure." *Duarte Nursery*, 2017 WL 3453206, at *6 (emphasis added; quotation omitted). The Ninth Circuit has cautioned that Rule 26(e) is not "a loophole" through which a party can change its expert disclosures "after the court's deadline for doing so has passed." *Luke v. Family Care & Urgent Med. Clinics*, 323 Fed. App'x 496, 500 (9th Cir. 2009) (affirming exclusion of untimely expert declarations). In particular,

Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Duarte Nursery*, 2017 WL 3453206, at *6 (quotation omitted). Accordingly, "courts have rejected supplemental expert reports that . . . were significantly different from the expert's original report and effectively altered the expert's theories." *Id.*; *accord Sherwin–Williams Co. v. JB Collision Servs., Inc.*, 2015 WL 4742494, at *3 (S.D. Cal. Aug. 11, 2015).

**II.    The Court Should Strike the Untimely Supplemental Trexler Report.**

This Court's February 23, 2023 Order re Motions to Compel and Motion for Relief from Case Management Order directed the parties to make their Rule 26 expert disclosures by August 30, 2024. *See* Dkt. 292 at 7. The untimely Supplemental Trexler Report, dated September 21, 2024 is not a proper supplemental disclosure as allowed under Rule 26(e)(1) because it seeks to alter Plaintiffs' disgorgement theories and calculations and does so based on ==information that was available before the deadline for expert disclosures and contained in a document Ms. Trexler discussed in detail in her initial report==. Plaintiffs cannot carry their burden to show that their delay in offering the new disgorgement opinions and calculations in the Supplemental Trexler Report was substantially justified or harmless. For these reasons, and as explained more fully below, the Court should strike the Supplemental Trexler Report.

**A.    The Supplemental Trexler Report Is Not Authorized By Rule 26(e).**

The Supplemental Trexler Report is not a proper supplement under Rule 26. It does not correct inaccuracies or fill in interstices of an earlier incomplete report. Instead, it *belatedly offers an entirely new theory and calculation of profits allegedly subject to disgorgement*, and it does so based on ==a document that Ms. Trexler had prior to submitting her Initial Report and discussed extensively therein==. "Rule 26(e) . . . does not give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the supplement label." *Linder v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 640 (D. Haw. 2008); *see also Gerawan Farming, Inc. v. Rehrig Pacific Co.*, 2013 WL 1982797, at *5 (E.D. Cal. May 13, 2013) (purported "supplemental" report that generate[d] an entirely new damages calculation" was not authorized under Rule 26(e)). Less still does Rule 26(e) "permit parties to add new opinions to an expert report

DEFENDANTS' MOTION TO STRIKE
SUPPLEMENTAL EXPERT REPORT                                  Case No. 4:19-cv-07123-PJH

*based on evidence that was available to them at the time the initial expert report was due.*" *Toomey v. Nextel Communications, Inc.*, 2004 WL 5512967, *4 (N.D. Cal. Sept. 23, 2004) (emphasis added); *see also Pac. Info. Res., Inc. v. Musselman*, 2008 WL 2338505, at *1 (N.D. Cal. June 4, 2008) (report was not a proper Rule 26(e) supplement where analysis did not address newly available information and instead should have been included in initial report).

Ms. Trexler's contention that her "supplemental" report is "based on information that became available after the issuance of [her] Initial Report" (*see* Craig Decl. Exh. D ¶ 2) is not well taken. As even a cursory review of the Supplemental Trexler Report makes clear, Ms. Trexler's belated re-do of her calculations of purported "profits subject to disgorgement" is based entirely on data from the NSO Revenue Spreadsheet that was produced to Plaintiffs prior to their submission of Ms. Trexler's initial report, and which Ms. Trexler cites and discusses in that initial report. *See id.*, ¶ 6–7 (increasing estimated range of profits subject to disgorgement based on the NSO Revenue Spreadsheet (NSO_WHATSAPP_00045858), which was produced prior to initial report and cited therein); *see also* Craig Decl. Exh. A ¶ 8 n.5, ¶¶ 96–99 & ¶ 126. And while, Ms. Trexler claims that certain deposition testimony taken after the submission of her initial report enhanced her understanding of the information contained in the NSO Revenue Spreadsheet, that does not justify her belated replacement of her opinion regarding profits subject to disgorgement where the new opinion is based on information previously available to her. Rule 26(e) does not authorize supplementation to address "failures of omission because the expert did an inadequate or incomplete preparation." *Duarte Nursery*, 2017 WL 3453206, at *6; *see also Cave Consulting Group, Inc. v. OptumInsight, Inc.*, 2018 WL 1938555, at *3 (N.D. Cal. Apr. 25, 2018) (striking supplemental reports); *Keener v. United States*, 181 F.R.D. 639, 641 (D. Mont. 1998) (denying leave to submit supplemental report where expert's failure to include opinions in initial report "was one of omission: the information was there to review. He didn't review it in detail before expressing his opinion."); *Sherwin–Williams*, 2015 WL 4742494, at *6 (Rule 26(e) "does not justify supplementing a report because of a party's lack of due diligence"); *accord Ibekwe v. White*, 2016 WL 6963051, at *4 (Feb. 23, 2016) (Rule 26(e) did not authorize expert to belatedly submit report changing opinions based on medical records available at time of initial report).

1      **B.      Plaintiffs Cannot Show Substantial Justification for Belatedly Rewriting Ms.**

2              **Trexler's Disgorgement Opinions.**

3              Because the new disgorgement opinions and calculations in the Supplemental Trexler

4      Report are based entirely on data that was available to Ms. Trexler prior to her Initial report (in a

5      document she cited and discussed therein), Plaintiffs' delay in offering these new opinions well

6      after the expert disclosure deadline is not substantially justified.  *See, e.g., Ibekwe*, 2016 WL

7      6963051, at \*4 (delay in submission of supplemental report not justified where medical records

8      supplying basis for "supplement" were previously available); *Pac. Info. Res.*, 2008 WL 2338505,

9      at \*2 (no substantial justification where analyses in report did not address newly available

10     information and instead should have been included in initial report).  With adequate diligence, Ms.

11     Trexler could and should have submitted these opinions and calculations with her initial report.

12             Indeed, to the extent that Ms. Trexler was unable to understand the relevant portions of the

13     NSO Revenue Spreadsheet, Plaintiffs could have sought clarification regarding those contents of

14     the NSO Revenue Spreadsheet from Defendants, but they failed to do so.  Worse still, even after

15     obtaining the deposition testimony that Ms. Trexler now contends helped her to understand portions

16     of the NSO Revenue Spreadsheet underlying her revamped disgorgement opinions, Plaintiffs

17     concealed from Defendants their intention to "supplement" Ms. Trexler's opinions until serving the

18     Supplemental Trexler Report at 9:14 PM on the same day that rebuttal reports were due.  Plaintiffs

19     had to have known well in advance of that time that they would be seeking to replace Ms. Trexler's

20     disgorgement opinions but kept silent while Defendants incurred approximately $25,000 in

21     expenses relating to Mr. Pinsonneault's rebuttal of initial disgorgement opinions (Craig Decl. ¶ 13)

22     that the Supplemental Trexler Report, if not stricken, would moot.  This Court should not

23     countenance such gamesmanship and sandbagging by Plaintiffs.  *See Duarte Nursery*, 2017 WL

24     3453206, at \*6.

25     **C.      Plaintiffs' Attempt To Replace Ms. Trexler's Disgorgement Opinions Is Not**

26              **Harmless.**

27             Plaintiffs' belated attempt to offer entirely new and different opinions and calculations

28     concerning disgorgement is also not "harmless."  *Id.*, at \*6–7 (belated "supplemental reports" that

8

1    significantly altered calculation of alleged civil penalties were not harmless); *accord Ibekwe*, 2016

2    WL 6963051, at *4 (finding information in belated "supplemental" report that "dramatically

3    affect[ed the] theory of damages" was "highly prejudicial" and granting motion to exclude same).

4         Here, the prejudice to NSO is particularly acute.  Plaintiffs submitted the Supplemental

5    Trexler Report on the *night that rebuttal reports were due* under the schedule established by the

6    Court.  By then, NSO had already incurred approximately $25,000 in expenses in connection with

7    engaging an expert to rebut the disgorgement opinions in Ms. Trexler's Initial Report that she now

8    seeks to abandon and replace.  Such imposition of litigation expenses incurred in connection with

9    an expert's shifting opinions can constitute prejudice sufficient to warrant striking a proposed

10   supplemental expert report.  *See Rovid v. Graco Children's Products Inc.*, 2018 WL 5906075, at

11   *10 (N.D. Cal. Nov. 9, 2018) (striking report where opponent incurred burden and expense of

12   engaging experts to respond to initial report "only for those expert reports to be effectively nullified

13   by [] rebuttal report's about-face"); *see also Gerawan Farming*, (belated report that altered expert's

14   opinions was not harmless where opponent "wasted resources reviewing and preparing for

15   [expert's] old opinions").

16        Had Plaintiffs and Ms. Trexler exercised reasonable diligence, or even spoken up about

17   their intention to re-do Ms. Trexler's disgorgement opinions in the ample time they had to do so

18   before rebuttal reports were due, the prejudice their actions have caused Defendants could have

19   been avoided.  The Court should not reward Plaintiffs' sharp practices and should strike the

20   Supplemental Trexler Report.

21                                    **Conclusion**

22        For the reasons shown above, the Court should strike the Supplemental Trexler Report.

23   Dated: December 18, 2024                KING & SPALDING LLP

24                                           By: */s/ Aaron S. Craig*

25                                           JOSEPH N. AKROTIRIANAKIS
                                             AARON S. CRAIG
26                                           *Attorneys for Defendants*

27

28

DEFENDANTS' MOTION TO STRIKE                          Case No. 4:19-cv-07123-PJH
SUPPLEMENTAL EXPERT REPORT