JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:     (213) 443-4355
Facsimile:     (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>                Plaintiffs,<br><br>        v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>                Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY OF GREGORY A. PINSONNEAULT**<br><br>Date:  April 10, 2025<br>Time:  2:00 p.m.<br>Place:  Courtroom 3, Ronald V. Dellums<br>        Federal Building & U.S. Courthouse,<br>        1301 Clay Street, Oakland, California<br><br>Action Filed: 10/29/2019 |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................... 1

II.     RELEVANT BACKGROUND ...................................................................... 3

        A.      Mr. Pinsonneault's Experience and Expertise ........................................ 3

        B.      Mr. Pinsonneault's Relevant Rebuttal Opinions ................................... 4

III.    RELEVANT LEGAL STANDARDS ........................................................... 10

IV.     ARGUMENT ................................................................................................ 11

        A.      Mr. Pinsonneault's Opinions Exposing Flaws in Ms. Trexler's Damages Opinion
                Are Admissible Rebuttal Testimony. ..................................................... 11

        B.      Mr. Pinsonneault's Opinions Rebutting Ms. Trexler's Opinions Regarding
                Defendants' Profits Should Be Admitted ................................................ 18

V.      CONCLUSION ............................................................................................. 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Branch Banking & Trust Company v. Pahrump 194*,
   2015 WL 10098615 (D. Nev. Dec. 15, 2015) ........................................................................ 11

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
   923 F. Supp. 2d 1245 (S.D. Cal. 2013) ................................................................................ 21

*Calvert v. Ellis*,
   2014 WL 3897949 (D. Nev. Aug. 8, 2014) ............................................................ 10, 14, 16

*Clougher v. Home Depot, U.S.A, Inc.*,
   696 F. Supp. 2d 285 (E.D.N.Y. 2010) .................................................................................. 18

*Dana Corp. v. American Standard, Inc.*,
   866 F. Supp. 1481 (N.D. Ind. 1994) ..................................................................................... 11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................................................... 10

*Den Norske Bank AS v. First Nat. Bank of Boston*,
   75 F.3d 49 (1st Cir. 1996) ..................................................................................................... 17

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ................................................................................................. 11

*Humphreys v. Regents of University of California*,
   2006 WL 1867713 (N.D. Cal. July 6, 2006) .......................................................... 10, 14, 16

*Ji v. Bose Corp.*,
   538 F. Supp. 2d 354 (D. Mass. 2008) ................................................................................... 17

*Kovary v. Honeywell Int'l, Inc.*,
   2014 WL 12564090 (C.D. Cal. Mar. 17, 2014) ............................................................. 10, 14

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   830 F. Supp. 2d 815 (N.D. Cal. 2011) ........................................................................... 10, 14

*Moribe v. American Water Heater Co.*,
   2024 WL 708562 (D. Haw. Feb. 21, 2024) .......................................................................... 11

*Mullins v. Premier Nutrition Corp.*,
   178 F. Supp. 3d 867 (N.D. Cal. 2016) .................................................................................. 17

*NetFuel, Inc. v. Cisco Sys. Inc.*,
   2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ..................................................................... 20

ii

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
   2016 WL 7319524 (S.D. Cal. Jan. 12, 2016) ...................................................... 11, 14

*Schachter v. Citigroup, Inc.*,
   218 P.3d 262 (Cal. 2009) ................................................................................. 18

*Self v. Perspecta Enterprise Solutions, LLC*,
   2023 WL 6020792 (S.D. Cal. Jan. 31, 2023) ............................... 10, 12, 14, 16

*Talkdesk, Inc. v. Pham*,
   2024 WL 4866690, at *10 (C.D. Cal. Aug. 9, 2024) ...................................... 18

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C. D. Cal. 2018) ......................................................... 11

*In re Toyota Motor Corp. Unintended Acceleration Marketing Sales Practices and*
   *Products Liability Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) .......................................................... 11

*Trust v. Apple Inc.*,
   2013 WL 12094821 (S.D. Cal. May 7, 2013) ........................................... 11, 14

*United States v. 1014.16 Acres of Land*,
   558 F. Supp. 1238 (W.D. Mo. 1983) .............................................................. 11

*United States v. Holguin*,
   51 F.4th 841 (9th Cir. 2022) ........................................................................... 17

*United States v. Middleton*,
   231 F.3d 1207 (9th Cir. 2000) ........................................................................ 14

DEF'TS' OPP TO MOT. TO EXCLUDE CERTAIN
PINSONNEAULT EXPERT TESTIMONY

# I.    INTRODUCTION

Plaintiffs' Motion to Exclude Certain Expert Testimony of Gregory A. Pinsonneault under Federal Rule of Evidence 702 should be denied.  It is important to note that Plaintiffs only seek to exclude certain portions of Mr. Pinsonneault's opinion, and there are substantial portions that Plaintiffs have not challenged (*e.g.*, Dkt. 508-4 Exh. B at ¶¶ 56-63, 64-67; 115-120).

As to the portions of Mr. Pinsonneault's opinion that Plaintiffs challenge, Plaintiffs misconstrue Mr. Pinsonneault's opinions in order to attack them.  But Mr. Pinsonneault is not opining, for example, that certain items "are not actual damages."  (Mot. at 3:11 and 6:4-5 (citing Block Decl. Exh. B at 21).)  Rather, Mr. Pinsonneault's opinion is that Plaintiffs' damages expert Dana Trexler has failed to adequately establish that the items she counts *are* actual damages.  (Block Decl. Exh. B at 21.)  Notwithstanding Plaintiffs' numerous strawman mischaracterizations like that one, Mr. Pinsonneault has not offered opinions outside the scope of his expertise.  The opinions Plaintiffs challenge appropriately rebut opinions offered by Ms. Trexler, that purport to "quantify *Plaintiffs' actual damages* in the form of the *expenditure of resources to respond to and remediate Defendants' conduct* described in the Complaint . . .."  (Dkt. 487-3, ¶ 50 (emphasis added)), principally by identifying flaws in Ms. Trexler's analyses and her failure to consider and account for facts in the record that undercut her testimony that many categories of expenses included in her "damages" computation were incurred as the result of "Defendants conduct."  The jury will be asked to determine the quantum of Plaintiffs' claimed damages that were reasonably caused by Defendants.  Mr. Pinsonneault's testimony is based on a reliable methodology, supported by his vast experience, and it will be helpful to the jury.

Over and over, Plaintiffs mischaracterize Mr. Pinsonneault's disclosure to ask the Court to exclude opinions that he is not planning to give.  By way of another illustration, Plaintiffs erroneously accuse Mr. Pinsonneault of exceeding the bounds of his expertise by offering opinions that (i) WhatsApp had no legal obligation to notify users whose devices may have been targeted for installation of Pegasus and (ii) Plaintiffs should and would have discovered the security vulnerabilities in their code and incurred any costs associated with remediation of those vulnerabilities whether or not Defendants had acted to "exploit" those pre-existing vulnerabilities.

1

1    Mr. Pinsonneault has never planned to offer those opinions.  What he does plan to do is point to

2    witness testimony in the record on these subjects and explain that Ms. Trexler's failure to consider

3    and account for such evidence undermines her contention that all of Plaintiffs' claimed expenses

4    allegedly incurred in those efforts are appropriately included in a computation of alleged damages

5    attributable to and caused by Defendants' conduct.  The jury can then decide whether it believes

6    those expenses were reasonable and whether they were caused by Defendants.  These are not "legal

7    opinions" any more than are Ms. Trexler's corresponding opinions that the expenses at issue are

8    properly included in her "quantif[ication of] Plaintiffs' *actual damages*."  (*Id.* (emphasis added.))

9          Plaintiffs also argue, bizarrely, that Mr. Pinsonneault improperly relies on his decades of

10   experience calculating labor cost damages when opining that Ms. Trexler's inclusion of alleged

11   expenses relating to Plaintiffs' grants of restricted stock units ("RSUs") to certain employees are

12   inappropriately included in her "damages" computation.  But Plaintiffs themselves cite cases

13   holding that an expert with the depth of experience Mr. Pinsonneault has in the relevant subject

14   matter may rely on that experience as the basis for admissible opinion testimony, and Plaintiffs

15   ignore that Mr. Pinsonneault's opinions, based on his expertise, specifically explain why Ms.

16   Trexler has failed to justify her inclusion of the RSU expenses based on the facts of this case.  These

17   include Ms. Trexler's failure to explain the contents of the source data she considers in calculating

18   the alleged expenses and her further failure to demonstrate that the RSU expense amounts she

19   calculates reflect costs Plaintiffs actually paid in connection with employee work undertaken in

20   response to Defendants' alleged conduct.  The grant of stock options does not constitute money

21   paid by the grantor, and Mr. Pinsonneault will explain this to the jury.

22         Finally, Plaintiffs' motion seeks to exclude Mr. Pinsonneault's opinions rebutting Ms.

23   Trexler's calculation of Defendants' alleged profits that Plaintiffs previously claimed should be

24   disgorged to them.  Plaintiffs recently withdrew their claim for disgorgement (Dkt. 600-1, ¶ 5 &

25   Dkt. 600-3), which vastly reduces the importance of Plaintiffs' request to exclude Mr.

26   Pinsonneault's opinions rebutting Ms. Trexler's calculations of Defendants' profits.  The

27   calculation of Defendants' profits now relates only to punitive damages.  Due to its complexity and

28   the amount of time it would require, calculations of Defendants' profits should only be presented

1    to the jury if the jury decides that Plaintiffs are entitled to punitive damages.  Even then, the amount

2    of Defendants' profits is just one of many factors the jury will consider in determining the amount

3    of any punitive damages to award.

4        Plaintiffs do not provide any legitimate reason to exclude Mr. Pinsonneault's opinion setting

5    forth the amount of R&D costs that were and were not involved in developing the covert Android

6    version of Pegasus.  Defendants do not have any internal reports that track their R&D expenses by

7    installation vector.  Mr. Pinsonneault used an apportionment methodology whereby he calculated

8    the percentage of all NSO and Q Cyber R&D engineers whose work involved, in any respect, the

9    covert Android installation vectors, and multiplied that percentage by Defendants' overall R&D

10   expenses.  This methodology is articulated in detail in his September 21, 2024, rebuttal report (the

11   "Rebuttal Report").  Contrary to Plaintiffs' complaints, this methodology is based entirely on

12   evidence that was produced by Defendants in discovery as well as Mr. Pinsonneault's conversations

13   with NSO witness Tamir Gazneli (who Plaintiffs deposed and who will testify in person at trial).

14   Mr. Pinsonneault's methodology is a reliable means of calculating Defendants' R&D expenses that

15   were and were not associated with developing the covert Android version of Pegasus at issue in

16   this case.   Plaintiffs fail to show that the facts and data supporting Mr. Pinsonneault's

17   apportionment opinion are unreliable or otherwise inadequate.

18       For these reasons, and as explained more fully below, Plaintiff's motion should be denied.

19   **II.    RELEVANT BACKGROUND**

20       **A.    Mr. Pinsonneault's Experience and Expertise**

21       Mr. *Pinsonneault* is a Managing Director and the Chief Executive Officer of LitiNomics,

22   Inc., a consulting firm of ten professionals dedicated to supporting corporations, law firms, and

23   financial institutions as they address issues that arise in commercial litigation.  (*See* Rebuttal

24   Report, Dkt. 508-4 Exh. B, ¶ 4.)  Over his consulting career spanning more than 22 years, Mr.

25   Pinsonneault has consulted on more than 230 matters involving the calculation of damages and was

26   engaged as the retained expert or project lead (in non-litigation matters) in more than 100 of those

27   matters.  (*Id.*, ¶ 7.)  He has worked on between 50 and 70 matters that have involved calculation of

28   burdened labor costs (Dkt. 508-4, Exh. C at 319:17–23.), which is one of the subject matters on

which Mr. Pinsonneault offers testimony rebutting Ms. Trexler's opinions.  (*See* Dkt. 508-4 Exh. B, ¶¶ 55–63 & Fig. 10.)

### B.    Mr. Pinsonneault's Relevant Rebuttal Opinions

As *discussed* below, Plaintiffs' motion concerns certain of Mr. Pinsonneault's opinions rebutting Ms. Trexler's opinions about (i) labor costs Plaintiffs allegedly incurred because of Defendants' conduct and (ii) profits allegedly derived from Defendants' covert Android solution sent through WhatsApp servers.  Others of Mr. Pinsonneault's opinions are unchallenged.

### 1.    Opinions Rebutting Trexler's "Labor Cost" Opinions

Plaintiffs' pretrial filings appear to evidence a belief that the Court has already determined that all the damages sought by Plaintiffs were caused by Defendants.  This is not so; if it were, no jury trial on compensatory damages would be necessary.  With respect to the different portions of the compensatory "labor cost" damages sought by Plaintiffs, the jury should decide whether they were reasonably caused by Defendants.  Ms. Trexler has performed calculations of the value of varying amounts of time of 22 employees that she believes comprises damages caused by Defendants, for example 480 hours of Aashin Gautam's time, and 64 hours of YuanYuan Wang's time.  Mr. Pinsonneault is allowed to rebut those opinions by pointing out evidence that Ms. Trexler should have considered, but did not.  Further, because Ms. Trexler is going to argue that the value of stock options granted to employees years before the events in this case are properly included in Plaintiffs' labor costs, Mr. Pinsonneault is allowed to explain to the jury why the value of such stock options are not properly counted as part of employees' burdened labor costs and have been improperly included by Ms. Trexler to inflate the costs of Plaintiffs' engineers' time—in some cases, such as YuanYuan Wang, to over $1,000,000/year.

Mr. Pinsonneault's Rebuttal Report includes opinions rebutting Ms. Trexler's analysis and conclusions regarding employee labor costs Plaintiffs allegedly incurred in response to Defendants' challenged conduct, which Ms. Trexler refers to as "Defendants' Exploit."  (Dkt. 508-4 Exh. B, ¶¶ 47–67.)  Through these opinions, Mr. Pinsonneault shows that Ms. Trexler's calculation of these purported labor costs—which she estimates total $444,719 (Dkt. 487-3 ¶ 86 & Table 3)—includes amounts that neither she nor Plaintiffs have shown are attributable to "Defendants' Exploit," rather

4

than other causes, and therefore that Ms. Trexler's opinion is unsupported.  (Dkt. 508-4 Exh. B, ¶¶ 47–54.)

First, Mr. Pinsonneault opines that Ms. Trexler includes amounts attributable to Plaintiffs' "outreach . . . to notify the identified victims of the exploit" (Dkt. 487-3, ¶ 67 & Table 3) but the evidence shows that this work was not "a required effort," as Ms. Trexler opines (*id.* ¶ 88).  (Dkt. 508-4 Exh. B, ¶¶ 47–49.)  In rebuttal of Ms. Trexler's "required effort" opinion, Mr. Pinsonneault notes that WhatsApp's former Public Policy Manager, Susan Glick, who served in that role from July 2019 through May 2021, testified that WhatsApp *was not required* to notify those victims, but did so simply because it "wanted to." (*Id.*, ¶ 48.)  When asked why WhatsApp chose to notify the 1,470 WhatsApp account holders, Ms. Glick testified that "*We wanted* to make them aware that their phones may have been compromised." (Craig Decl. Exh. A at 64:22–65:1 (emphasis added).) Ms. Glick further testified that she could not recall any other reasons for the outreach besides WhatsApp "want[ing]" to do it and that the reason WhatsApp wanted to notify potentially affected account holders was that "WhatsApp is a private messaging platform, and when a messaging platform gets hacked, you generally owe it to your users to let them know that they may have been the victim of a hack." (*Id.* at 65:2–10.)[1]  Aashin Gautam, who at times relevant to Plaintiffs' claims was WhatsApp's Head of Customer Operations and led WhatsApp's outreach efforts (Dkt. 487-3, ¶¶ 66 & 67), testified that he had *no understanding* as to why WhatsApp decided to notify the potentially affected users and did not understand that WhatsApp had been *required* to notify users. (Craig Decl. Exh. B at 22:20–24:15; *see also* (Dkt. 508-4 Exh. B, ¶ 48.)  Mr. Pinsonneault notes that Ms. Trexler's failure to consider and address this evidence, undercuts her opinion that costs

---

[1] Of course this was not an ordinary "hack," and the purported "victims" were not innocent.  The "hackers" were law enforcement and intelligence agencies of sovereign governments, the purported "victims" were targets of those governments' law enforcement and intelligence investigations, and Plaintiffs' most senior executives, up to and including CEO Mark Zuckerberg and COO Sheryl Sandberg, were aware of these facts, but made the specific choice to proceed with notifying these targets anyway.  (Craig Decl. Exh. F (informing Mark Zuckerberg and Sheryl Sandberg that the "risks we are prepared to face," include "potential backlash from governments for WhatsApp 'outing'" their use of Pegasus; *Id.* Exhs. G-J (showing Plaintiffs' knowledge that NSO's Pegasus customers included foreign governments including Mexico, Saudi Arabia, Uzbekistan and the United Arab Emirates.)

incurred for the outreach efforts were "required" and therefore appropriately attributable to Defendants' actions (*see, e.g.,* Dkt. 487-3, ¶ 88 (opining that the labor costs included in her damages computation resulted from "a ***required*** effort ***in light of Defendants' Exploit***" (emphasis added)), rather than to Plaintiffs' subjective belief that they "owe[d] it to [their] users" to notify them, as Ms. Glick testified. (Dkt. 508-4 Exh. B, ¶¶ 48–49.) And Mr. Pinsonneault further opines that Ms. Trexler fails to otherwise demonstrate that Defendants' conduct caused Plaintiffs to incur the outreach costs. (*Id.*, ¶ 49.)

*Second*, Mr. Pinsonneault explains that Ms. Trexler's labor cost calculation includes amounts associated with employee time spent remediating WhatsApp security vulnerabilities that testimony will show that Plaintiffs would have addressed, whether or not Defendants had done anything to "exploit" the vulnerabilities. (*Id.* ¶¶ 50–54.) He notes that Plaintiffs' own witnesses testified that the Plaintiffs staffed teams of employees responsible for identifying and fixing such security vulnerabilities. (*See, e.g.,* Craig Decl. Exh. C at 44:24–48:21; Exh. D at 17:17–22, 19:24–20:1; *see also* Dkt. 508-4 Exh. B, ¶ 51.) Further, Defendants' cybersecurity expert, Terrence McGraw will testify, based on his significant relevant experience and knowledge, that "[l]arge technology companies like WhatsApp and Facebook maintain large cybersecurity organizations whose sole purpose is to research and close vulnerabilities in the company's software," the costs of which are best understood as fixed costs, and that "in investigating and remediating the vulnerabilities that are the subject of this case, WhatsApp's security personnel were simply doing what they were hired to do, and indeed, what they do every day." (Dkt. 508-4 Exh. B, ¶ 53; Dkt. 513-4 Exh. A, ¶¶ 145–46.) Mr. Pinsonneault opines that Ms. Trexler's failure to consider such factors, or to account for the benefit to Plaintiffs from an enhanced security posture resulting from closing the security vulnerability at the root of their claims in this case, undermines her inclusion of costs relating to both the investigation and the remediation efforts as expenses purportedly caused by Defendants. (Dkt. 508-4 Exh. B, ¶ 54.)

Third, Mr. Pinsonneault opines that Ms. Trexler fails, for several reasons, to explain, let alone justify, her inclusion of purported expenses related to the issuance of RSUs to certain employees among the costs Plaintiffs allegedly incurred as the result of Defendants' conduct. (*Id.*,

6

¶¶ 55–63.)  Mr. Pinsonneault's Rebuttal Report identifies the following shortcomings in Ms. Trexler's analysis and conclusions regarding the purported "RSU expense":

- Neither Ms. Trexler nor Plaintiffs provide any explanation of the source data (contained in a document labeled WA-NSO-00192854) upon which Ms. Trexler relies for her calculations of "hourly RSU expenses," including "what the RSU expense represents, for which time period the RSUs were granted, or any other relevant information" (*id.*, ¶ 56; *see also id.*, ¶ 57 (noting Plaintiffs' refusal to designate a 30(b)(6) witness to testify about the data));

- Based on Mr. Pinsonneault's analysis of WA-NSO-00192854 and disclosures in Plaintiff Meta Platforms, Inc.'s ("Meta") public filings with the U.S. Securities and Exchange Commission ("SEC"), the "RSU expense" values in WA-NSO-00192854 appear to "reflect the vesting of RSU grants that have been awarded several years prior to 2019," rather than RSUs granted *during* 2019, when Plaintiffs were performing work claimed to be in response to "Defendants' Exploit."  (*Id.*, ¶¶ 58–59.)  Mr. Pinsonneault further notes that, given Meta's disclosures in its SEC filings about vesting of RSU grants, "if it is the case that these RSU expenses reported for 2019 reflect the amount granted in 2019, rather than the amount vested, Ms. Trexler has failed to justify the inclusion of such expense because the amounts would not be vested for several years and would be conditional upon service conditions provided in those subsequent years" (*id.*, ¶ 59);

- Further, Mr. Pinsonneault explains that "Ms. Trexler has failed to demonstrate that WhatsApp has incurred actual direct costs relating to the RSU expense that she includes in her analysis," contrary her own report, in which Ms. Trexler opines that the "burdened labor rate" she purports to calculate for employees alleged to have worked on the response is focused on amounts *paid by the employer*, either directly to the employees or on their behalf.  (*Id.*, ¶ 60.)  The value of stock options is not an "amount paid by the employer."  Accordingly, Ms. Trexler's report fails to support the inclusion of the alleged RSU expenses (which are substantial and heavily skew

7

1    her results (*id.*, ¶¶ 62–63 & Fig. 9)) in her burdened labor rate calculation, even as

2    she herself frames the analysis.  (*Id.*, ¶¶ 60–61.)

3        At his deposition, Mr. Pinsonneault testified further that he has been engaged as an expert

4    in between 50 and 75 cases that have involved issues relating to fully burdened labor costs, but he

5    has never included RSU or stock option-related expenses in a calculation of such costs and cannot

6    recall a single case in which an opposing expert did so.  (Dkt. 508-4 Exh. C at 319:17–320:10; *see*

7    *also id.* at 278:11–14; 281:11–18.)

8        *Finally*, Mr. Pinsonneault adjusted Ms. Trexler's calculation of purported labor costs

9    allegedly associated with the response to "Defendants' Exploit" to exclude amounts associated with

10   the fourteen employees identified in Exhibit 2.2. to Ms. Trexler's August 30, 2024, report because

11   the testimony of WhatsApp's Rule 30(b)(6) designee on the topic of the time spent by Plaintiffs'

12   employees in response to the alleged "exploit" contradicted Ms. Trexler's claim that those

13   employees actually spent the time reflected in that exhibit (or indeed that twelve of these employees

14   spent any time at all) working on the response.[2]  (Dkt. 508-4 Exh. B, ¶¶ 64–67.)

15           **2.    Opinions Rebutting Trexler's Opinions Regarding Defendants' Profits**

16                  **Derived From Their Covert Android Pegasus Solution**

17       In ¶¶ 114–127 of his Rebuttal Report, Mr. Pinsonneault sets forth his opinions rebutting the

18   opinions in ¶¶ 100–123 of Ms. Trexler's August 30, 2024, report concerning Defendants' profits

19   derived from their covert Android solution that is the subject of Plaintiffs' claims in this case.  (Dkt.

20   508-4 Exh. B, ¶¶ 114–127.)

21       While agreeing with Ms. Trexler's opinion that profitability of the covert Android solution

22   should be measured based on operating profit margin data, Mr. Pinsonneault explains his

23   disagreement with Ms. Trexler's election to focus *only* on the profit margin of NSO and to ignore

24   Q Cyber's profit margin.  (*Id.*, ¶¶ 115–120.)  He notes that witness testimony confirms that Q Cyber

25   ─────────────
26   [2] Plaintiffs do not seek to exclude this opinion.  Defendants have separately moved to exclude Ms.
     Trexler's opinions including the $105,469 in costs attributed to the employees listed in Exhibit 2.2
27   to her August 30, 2024, Report and the additional $129,149 in RSU-related expenses for employees
     listed in Exhibit 2.1 to that report as "damages" on grounds that such opinions are not supported by
28   sufficient facts or data, are not the product of reliable principles and methods, and fail to fit the
     facts of this case.  (Dkt. 502-2.)

1   is involved in Pegasus sales and that "both Defendants were involved in development and support

2   functions for Pegasus." (*Id.*, ¶ 119.)  Accordingly, Mr. Pinsonneault opines that it is appropriate to

3   apply a combined operating profit margin for NSO and Q Cyber, which he calculates using financial

4   data produced by Defendants. (*Id.*, ¶¶ 120–125 & Exh. B Schedule 2.0.)[3]

5           Mr. Pinsonneault further notes his disagreement with Ms. Trexler's calculation of a 63%

6   profit margin, because, as a general rule, R&D expenses are properly deductible from a defendant's

7   revenues.  At most, only those R&D expenses relating to the accused products—here, Defendants'

8   covert Android installation vectors—should not be deducted from the profit margin calculation.

9   (*Id.*, ¶ 121.)  He opines that Ms. Trexler's decision to attribute *all* of Defendants' R&D expenses

10  to the covert Android installation vectors when making this calculation rests on "an aggressive

11  assumption, as it implicitly implies that *every* R&D employee is working on projects related to the

12  allegations by Plaintiffs in this case." (*Id.*, ¶ 121 (emphasis added).)  Mr. Pinsonneault opines that

13  it is more reasonable and appropriate to calculate conservatively a maximum portion of Defendants'

14  R&D expense that may be related to the covert Android installation vectors and to allow Defendants

15  to deduct their remaining R&D expenses (*i.e.*, those unrelated to the accused technology) to

16  calculate Defendants' profit margin if the Court decides that R&D expenses relating to the covert

17  Android installation vectors should not be deducted. (*Id.*, ¶ 124.)  Contrary to Plaintiffs' claims,

18  Mr. Pinsonneault made these calculations using only documents that Defendants produced in

19  discovery.  Mr. Pinsonneault also interviewed Defendants' Chief Technology Officer to learn

20  which employees worked on R&D related to the covert Android installation vectors and divided

21  that number (32) by Defendants' average total R&D employee headcount (118, determined by Mr.

22  Pinsonneault using corporate records produced in discovery) to arrive at a 27.1% ratio of

23  Defendants' aggregate R&D expense that is attributable to R&D on the covert Android installation

24  vectors. (*Id.*, ¶¶ 122–123 & Fig. 15.)  He then added that 27.1% portion of Defendants' total R&D

25  expense "to calculate the operating profit margin with no deduction for R&D related to covert

26  Android installation vectors." (*Id.*, ¶¶ 124–125 & Fig. 16.)

27

28
_____
[3] Plaintiffs do not seek to exclude this opinion.

### III.    RELEVANT LEGAL STANDARDS

Expert opinion is admissible if (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under *Daubert v. Merrell Dow Pharms., Inc*., for issues to be tried to a jury, the Court serves a gatekeeping function in excluding expert opinions that do not meet the standards of Rule 702. *See* 509 U.S. 579 (1993).

The core functions of rebuttal expert testimony include "[c]ontradicting expert opinions, questioning methodology, and opining on methods and facts plaintiffs' experts did not consider." *Self v. Perspecta Enterprise Solutions, LLC*, 2023 WL 6020792, at *6 (S.D. Cal. Jan. 31, 2023); *accord Calvert v. Ellis*, 2014 WL 3897949, at *8 (D. Nev. Aug. 8, 2014). In this regard, a rebuttal expert addressing damages issues may offers opinions that expose flaws in the opposing expert's quantification of damages. *See Humphreys v. Regents of University of California*, 2006 WL 1867713, at *6 (N.D. Cal. July 6, 2006) (denying request to exclude rebuttal opinions that plaintiff's expert failed to consider duty to mitigate and based calculations on assumptions conflicting with record evidence); *Calvert*, 2014 WL 3897949, at *7–8 (rebuttal expert permitted to opine on failure of plaintiff's expert to consider plaintiff's medical history and impact on life expectancy when calculating lost income). Any expert may offer opinions that are contingent on findings to be made by the trier of fact. *See Self*, 2023 WL 6020792, at *4 (rebuttal damages expert permitted to offer opinions quantifying plaintiffs' economic loss under alternative scenarios in which Court might determine plaintiff was, or was not, underpaid during her employment by defendant).

Under Federal Rule of Evidence 703, an expert may base "an opinion or inference" on facts "made known to him at or before the hearing." Fed. R. Evid. 703. This obviously includes facts from "evidence generated through discovery in this case, including depositions." *Kovary v. Honeywell Int'l, Inc.*, 2014 WL 12564090, at *4 (C.D. Cal. Mar. 17, 2014) (expert "reasonably relied" on such evidence in forming opinions); *see also Mformation Techs., Inc. v. Research in*

*Motion Ltd.*, 830 F. Supp. 2d 815, 843 (N.D. Cal. 2011) (expert appropriately relied "upon a combination of deposition and documentary evidence"); *In re Toyota Motor Corp. Unintended Acceleration Marketing Sales Practices and Products Liability Litig.*, 978 F. Supp. 2d 1053, 1073 (C.D. Cal. 2013) (deposition transcripts and documents produced in case supplied "sufficient facts and data" upon which to base expert opinion); *Moribe v. American Water Heater Co.*, 2024 WL 708562, at * (D. Haw. Feb. 21, 2024) (same); *Dana Corp. v. American Standard, Inc.*, 866 F. Supp. 1481 (N.D. Ind. 1994) (Rule 703 permits expert to base opinions "on his understanding of what various depositions reported").

　　　　"One expert may rely on the testimony and opinions of another expert in forming his own expert opinions." *Trust v. Apple Inc*., 2013 WL 12094821, at *5 (S.D. Cal. May 7, 2013); *see also Branch Banking & Trust Company v. Pahrump 194*, 2015 WL 10098615, at *2 (D. Nev. Dec. 15, 2015) (same); *Barris v. Bob's Drag Chutes & Safety Equip., Inc*., 685 F.2d 94, 101 n.10 (3d Cir. 1982) ("Under Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1035 (C. D. Cal. 2018) ("an expert may validly use another expert's report as a reference point for his own assessments). Of particular relevance here, it is well settled that "expert opinions may find a basis in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.'" *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1066 (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp*., 285 F.3d 609, 613 (7th Cir. 2002)). Thus, "[e]xperts routinely rely upon other experts hired by the party they represent for expertise outside of their field." *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 2016 WL 7319524, at *2 (S.D. Cal. Jan. 12, 2016); *see also United States v. 1014.16 Acres of Land*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983) ("An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion.").

## IV.    ARGUMENT

### A.    Mr. Pinsonneault's Opinions Exposing Flaws in Ms. Trexler's Damages Opinion Are Admissible Rebuttal Testimony.

　　　　Ms. Trexler's August 30, 2024 Report purports to "quantify *Plaintiffs' actual damages* in

the form of the *expenditure of resources to respond to and remediate Defendants' conduct* described in the Complaint . . . ."    (Dkt. 487-3, ¶ 50; *see also id.*, ¶ 52 (opining that "*the cost incurred by Plaintiffs['] response to the exploit includes* the labor cost associated with certain of Plaintiffs' employees involved in the investigation, remediation, and ongoing efforts surrounding Defendants' alleged conduct"); *id.*, ¶ 88 (opining that the labor costs included in her damages computation were undertaken as part of "*a required* effort *in light of Defendants' Exploit*") (all emphasis added).)  At ¶¶ 47–54 of his Rebuttal Report, Mr. Pinsonneault shows that Ms. Trexler fails to consider and account for record evidence undercutting or contradicting her opinions that various expenses she includes in her computation of "actual damages" were, in fact, incurred to "respond to and remediate Defendants' conduct," and that they were "required."    (*See, e.g.,* Dkt. 508-4 Exh. B, ¶ 47 ("Ms. Trexler does not explain how these costs are appropriately included as actual damages to Plaintiffs *caused by Defendants*."); ¶ 49 ("Ms. Trexler has not demonstrated that any costs related to providing these notifications is appropriately considered actual damages to Plaintiffs *caused by Defendants*."); ¶ 54 ("Ms. Trexler fails to consider whether the expenditures she calculates *are expenses that Plaintiffs would have incurred*" irrespective of Defendants' conduct, "and *she does not account for the fact that*" Plaintiffs *benefitted from their work to close the security vulnerability*) (all emphasis added).)  Pointing out that Ms. Trexler failed to consider these important facts, and calculating what the damages would be if the jury agrees that certain items claimed by Ms. Trexler should not be considered, are not "legal conclusions"; they are classic rebuttal expert opinion testimony.  *See Self*, 2023 WL 6020792, at *6 ("Contradicting expert opinions, questioning methodology, and opining on methods and facts plaintiffs' experts did not consider are precisely the type of rebuttal testimony the court would expect."); *id.*, at *4, 6–7 (opinions that plaintiff's expert incorrectly included certain sums in damages calculation, failed to support selection of a key benchmark underlying damages calculation, failed to consider additional relevant factors, and thereby overstated Plaintiffs' relevant economic loss were appropriate rebuttal opinions).

Contrary to Plaintiffs' arguments (Mot. 6-7), Mr. Pinsonneault does not purport to instruct jurors on what amounts are or are not "actual damages" or to tell jurors what damages they can

award; instead, his opinions respond to and rebut *Ms. Trexler's assertions* that certain amounts included in her computation are "Plaintiffs' actual damages in the form of the expenditure of resources to respond to and remediate Defendants' conduct" and were "required" (Dkt. 487-3, ¶ 50, ¶ 88). Thus, to the extent that Plaintiffs' "legal opinion" argument had any merit (and it does not), it would apply with equal force to Ms. Trexler's own opinions that the amounts she identifies are "actual damages" incurred *because of* Defendants' conduct and "required". (*Id.*)  At his deposition, Mr. Pinsonneault testified that his Rebuttal Report uses the term "actual damages" to mean "expense that [Plaintiffs] had to incur or [] revenue that [Plaintiffs] did not earn" as the result of some action. (Craig Decl. Exh. E at 206:12–22.)  His rebuttal opinions highlight the absence of support for, and evidence directly contradicting, Ms. Trexler's opinion that many of the amounts she includes in her "damages" computation are expenses *attributable to Defendants' conduct*.

### 3. Mr. Pinsonneault properly rebuts Ms. Trexler's opinion that damages resulting from Defendants' conduct should include expenses undertaken to remediate security vulnerabilities that Defendants did not create or cause.

Notwithstanding Plaintiffs' strawman, Mr. Pinsonneault has not opined either: (i) that Plaintiffs would have discovered and incurred expenses to remediate the WhatsApp security vulnerabilities from which this case arises whether or not Defendants exploited those vulnerabilities; or (ii) that Plaintiffs' remediation work to close the vulnerabilities made WhatsApp more secure.  (*See* Mot. 7 & 10 (wrongly asserting that he has offered such opinions).)  Instead, Mr. Pinsonneault cites percipient testimony and expert opinion that supports those propositions and criticizes Ms. Trexler for failing to consider and address them when calculating the alleged value of the remediation work in her "damages" computation.  (Dkt. 508-4 Exh. B, ¶¶ 51–54.)  This is classic rebuttal expert testimony.

Plaintiffs' own engineers testified that Plaintiffs had teams of employees whose ordinary job responsibilities were identifying and remediating security vulnerabilities. (*See, e.g.,* Craig Decl. Exh. C at 44:24–48:21; Exh. D at 17:17–22, 19:24–20:1.)  Defendants' cybersecurity expert, Terrence McGraw opined, that "in investigating and remediating the vulnerabilities that are the subject of this case, WhatsApp's security personnel were simply doing what they were hired to do,

1  and indeed, what they do every day." (Dkt. 508-4 Exh. B, ¶ 53; Dkt. 513-4 Exh. A, ¶ 145.) Mr.

2  Pinsonneault appropriately relied on this fact witness testimony and expert opinion in order to point

3  out flaws in Ms. Trexler's opinion and rebut it. *See Kovary*, 2014 WL 12564090, at \*4 (rebuttal

4  expert "reasonably relied on specific evidence generated through discovery in this case, including

5  depositions"); *Mformation Techs.*, 830 F. Supp. 2d at 843 (same); *see also Trust*, 2013 WL

6  12094821, at \*5 ("One expert may rely on the testimony and opinions of another expert in forming

7  his own expert opinions."); *Presidio Components*, 2016 WL 7319524, at \*2 ("[e]xperts routinely

8  rely upon other experts hired by the party they represent for expertise outside of their field"). And

9  it is undisputed that, in closing the vulnerability at the center of this case, Plaintiffs made

10 WhatsApp's communications platform and the Company's own IT infrastructure more secure than

11 it had been before they discovered the existence of the vulnerability (that Plaintiffs themselves

12 created). Mr. Pinsonneault's opinions that Ms. Trexler failed to account for these facts when

13 including alleged remediation expenses in her computation of damages allegedly caused by

14 Defendants' conduct (Dkt. 508-4 Exh. B, ¶¶ 51, 54) are appropriate rebuttal opinions. *See Self*,

15 2023 WL 6020792, at \*6; *Humphreys*, 2006 WL 1867713, at \*6; *Calvert*, 2014 WL 3897949, at

16 \*7–8.

17       Further, *United States v. Middleton*, 231 F.3d 1207 (9th Cir. 2000) (cited Dkt. 508-3 at 8)

18 is inapposite and does nothing to undercut Mr. Pinsonneault's rebuttal opinions, much less support

19 excluding them. *Middleton* involved an appeal of a ruling on the sufficiency of evidence of

20 damages, not a ruling regarding the admissibility of expert opinion. The plaintiff in *Middleton* was

21 forced to incur expenses to "repair[] the damage that Defendant had caused to [plaintiff's]

22 computers" including by "chang[ing] all the administrative passwords, alter[ing] the computer's

23 registry, delet[ing] the entire billing system (including programs that ran the billing software), and

24 delet[ing] two internal databases." 231 F.3d at 1209. Here, in contrast, Plaintiffs' remediation

25 efforts were undertaken to fix security vulnerabilities that ***were not (and are not even claimed to***

26 ***have been) caused by Defendants***, but instead ***existed in WhatsApp's own code base before***

27 ***Defendants ever did anything to "exploit" them***. *Middleton* does not support the proposition that

28 any costs associated with the remediation efforts Plaintiffs undertook constitute damages caused

1    by Defendants' conduct.

2    Finally, Mr. Pinsonneault also opines that Ms. Trexler fails to support or justify her

3    inclusion, in her calculation of the purported labor costs associated with the remediation efforts,

4    time attributed to 14 employees listed on Ms. Trexler's Exhibit 2.2., who Plaintiffs have not

5    established spent the listed number of hours working on remediation efforts.  (Dkt. 508-4 Exh. B,

6    ¶¶ 64–67.)  Given the binding testimony of Plaintiffs' 30(b)(6) witness that Plaintiffs do not know

7    who 12 of these 14 employees are or what they supposedly did, Mr. Pinsonneault opines that there

8    is no basis for including the value of their time in a damages computation.  (*Id.*)  Accordingly, Mr.

9    Pinsonneault offers an alternate computation that excludes the time for employees listed on Ms.

10    Trexler's Exhibit 2.2 that has not been shown to have been related to the remediation.  (*Id.*, ¶¶ 66–

11    67.)  Plaintiffs' motion does not articulate any basis for excluding this portion of Mr. Pinsonneault's

12    opinions.

13    **4.    Mr. Pinsonneault appropriately challenges Ms. Trexler's inclusion of**

14    **"victim" notification costs in her damages computation.**

15    Ms. Trexler's report includes the opinion that the damages she calculates were a "required

16    effort in light of Defendants' exploit."  (Dkt. 487-3 ¶ 88.) (One such category included in Ms.

17    Trexler's damages computation is the purported value of 480 hours that Plaintiffs' employee

18    Aashin Gautam estimates he spent working to identify and communicate with "the identified

19    victims of the exploit."  (Dkt. 487-3, ¶¶ 67–68.)  Despite having devoted significant time to these

20    notification efforts, Mr. Gautam testified that had no understanding why WhatsApp undertook the

21    notification efforts, and he did not recall ever hearing that WhatsApp was *obligated* to notify users.

22    (Craig Decl. Exh. B at 22:20–24:4; *see also* Dkt. 508-4 Exh. B, ¶ 48.)  Ms. Glick, who also worked

23    on the notification efforts, likewise failed to support the premise that "Defendants' Exploit"

24    *required* Plaintiffs to notify potential "victims."  Instead, she testified that WhatsApp "wanted" to

25    notify potentially impacted users because the Company felt that it "owe[d]" it to them.  (Craig Decl.

26    Exh. A at 64:22–65:10.)  No witness testified in deposition that Plaintiffs had any obligation to

27    notify the targets that Defendants' customers may have attempted to surveil with Pegasus.

28    Contrary to Plaintiffs' strawman, Mr. Pinsonneault does not "opine on the necessity or

15

1  propriety of Plaintiffs' decision to contact victims." (Dkt. 508-3 at 9.)  Instead, he cites the above

2  testimony *from Plaintiffs' own witnesses* who participated in the notification efforts as undermining

3  Ms. Trexler's opinion that the work for which Plaintiffs seek damages was "required,"[4] and opines

4  that Ms. Trexler's failure to consider and account for this evidence undercuts her opinion to the

5  extent that she includes time spent on the notification efforts in her calculation of damages

6  purportedly caused by Defendants' conduct.  (Dkt. 508-4 Exh. B, ¶¶ 48–49.)  That is proper rebuttal

7  opinion testimony that Mr. Pinsonneault is indisputably qualified to offer.  *See Self*, 2023 WL

8  6020792, at *6 (rebuttal expert may opine on "facts plaintiffs' experts did not consider");

9  *Humphreys*, 2006 WL 1867713, at *6 (rebuttal expert appropriately criticized damages expert's

10  reliance on assumptions conflicting with record evidence); *Calvert*, 2014 WL 3897949, at *7–8

11  (rebuttal expert permitted to opine on failure of plaintiff's expert to consider evidence regarding

12  plaintiff's medical history and impact on life expectancy when calculating lost income).

13        **5.    Mr. Pinsonneault exposes flaws in Ms. Trexler's inclusion of RSU-related**

14              **expenses in her labor coast calculation.**

15        Mr. Pinsonneault's Rebuttal Report identifies several respects in which Ms. Trexler failed

16  to justify her inclusion of RSU-related expenses in her computation of Plaintiffs' alleged labor costs

17  purportedly incurred because of Defendants' conduct.  (*See* Dkt. 508-4 Exh. B, ¶¶ 55–63 & Fig.

18  10.; *see also supra* at 7–8.)  He notes that neither Ms. Trexler, nor Plaintiffs (who refused to

19  designate a 30(b)(6) witness on the topic), provide any explanation of the source data Ms. Trexler

20  uses to calculate the purported RSU expenses, making her calculations based on this ambiguous

21  and unclear data entirely unreliable.  (*See* Dkt. 508-4 Exh. B, ¶¶ 56–57.)  He observes that

22  disclosures in Plaintiffs' SEC filings strongly suggest that (i) the "RSU expense" values in Ms.

23  Trexler's source data reflect vesting or RSU's granted *prior to* 2019, rather than RSUs granted

24

25  [4] Ms. Glick's testimony that WhatsApp notified users because the Company believed that it
   "owe[d]" it to them (Craig Decl. Exh. A at 64:22–65:10) likewise contradicts Plaintiffs' conclusory
26  argument that Plaintiffs notified "victims" in order to "gather additional technical information
   regarding NSO's attack" or for purposes of "conducting a damage assessment, and restoring [any]
27  data, program, system, or information to its condition prior to the offense." (Dkt. 508-3 at 6–7.)
   Plaintiffs cite no evidence (because there is none) supporting the premise that the "victim" outreach
28  was done for such purposes.

1   *during* 2019, when Plaintiffs were performing work claimed to be in response to "Defendants'

2   Exploit," or (ii) if the RSU expenses do relate to 2019 grants, it would be improper to include the

3   full amounts when calculating any RSU expense attributable to the 2019 response work, given that

4   such grants would vest over several years and would be conditional upon service conditions

5   provided in those subsequent years.  (*Id.*, ¶¶ 58–59.)  Finally, Mr. Pinsonneault opines that "Ms.

6   Trexler has failed to demonstrate that WhatsApp has incurred actual direct costs relating to the

7   RSU expense that she includes in her analysis," which makes her inclusion of the purported "RSU

8   expense" inconsistent with her own opinion that the "burdened labor rate" she calculates includes

9   *amounts paid by the employer*, either directly to the employees or on their behalf.  (*Id.*, ¶ 60.)

10  Plaintiffs do not seek to exclude any of Mr. Pinsonneault's above rebuttal opinions relating to the

11  claimed RSU expenses.

12          Instead, Plaintiffs challenge Mr. Pinsonneault's deposition testimony that, in between 50 to

13  70 matters in which he has been engaged that have involved calculations of burdened labor costs,

14  he has never personally included expenses related to grants of RSUs in such calculations and has

15  never seen an opposing expert do so.  (*See* Dkt. 508-3 at 11–13; *see also* Dkt. 508-4 Exh. C at

16  278:11–14; 281:9–18; & 319:17–320:10.)   Plaintiffs argue that Mr. Pinsonneault's significant

17  experience calculating labor costs over a 22+-year consulting career, *including dozens of*

18  *engagements specifically involving burdened labor cost calculations*, does not suffice to permit

19  him to testify reliably on this issue.  But Plaintiffs' own authorities support precisely the opposite

20  conclusion.  *See United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022) (opinion testimony

21  was admissible based on experts' "years of experience and special knowledge" rather than a

22  systematic methodology); *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 900 (N.D. Cal.

23  2016) (admitting opinions reached based on expert's years of experience); *see also Den Norske*

24  *Bank AS v. First Nat. Bank of Boston*, 75 F.3d 49, 57–58 (1st Cir. 1996) (permitting a banking

25  executive who had worked in banking for forty years to testify about the industry custom to allow

26  minority-participant vetoes); *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359 (D. Mass. 2008) (allowing

27  a casting director for photo shoots to testify about customs and practices in the modeling industry

28  relative to photographer rights).

Further, Plaintiffs are wrong in suggesting that Mr. Pinsonneault has failed to connect his decades of experience reflecting the impropriety of padding "burdened labor costs" with alleged RSU expenses to the facts of this case. (*See* Dkt. 508-3 at 12–13.) Mr. Pinsonneault's opinions set forth in ¶¶ 55–63 of his Rebuttal Report and summarized above, explain why, on the specific facts of this case, Ms. Trexler's inclusion of the purported RSU expense is improper.[5] His testimony that he has never seen such RSU expenses included in a burdened labor cost calculation in 50-70 prior engagements involving the calculation of hourly fully burdened labor costs is a supplement to, and must be read in context with, his specific opinions explaining the impropriety of including those expenses on the facts of this case.

**B.    Mr. Pinsonneault's Opinions Rebutting Ms. Trexler's Opinions Regarding Defendants' Profits Should Be Admitted.**

Plaintiffs also challenge a narrow subset of Mr. Pinsonneault's opinions rebutting Ms. Trexler's estimation of Defendants' profits attributable to the covert Android installation vectors that Plaintiffs contend should be disgorged to them. (Dkt. 508-3 at 2, 13–17 (challenging opinions in ¶¶ 114–127 of Mr. Pinsonneault's Rebuttal Report).) To the extent that Plaintiffs' withdrawal of their request for disgorgement means that Plaintiffs will no longer submit evidence about or make arguments concerning Defendants' alleged profits, this portion of Plaintiffs' motion may now be moot. To the extent that Plaintiffs intend to present to the jury evidence of Defendants' profits

---

[5] In their recently filed Trial Brief, Plaintiffs cite three cases that they contend support Ms. Trexler's inclusion of the RSUs in her burdened labor cost calculation. (Dkt. 595 at 9.) Those cases do not support that proposition and, more importantly, fail to undermine the reliability or admissibility of Mr. Pinsonneault's opinion that alleges RSU amounts are not appropriately included in the burdened labor cost calculation here. *Talkdesk, Inc. v. Pham* addressed an employer's request for disgorgement of stock acquired through the exercise of options, a request the Court declined to grant. *See* 2024 WL 4866690, at *10 (C.D. Cal. Aug. 9, 2024). *Clougher v. Home Depot, U.S.A., Inc.* addressed the issue of whether an employee qualified as an "executive" not required to be paid overtime under New York and federal wage laws. *See* 696 F. Supp. 2d 285, 293 (E.D.N.Y. 2010). *Schachter v. Citigroup, Inc.* addressed a claim that forfeiture provisions in an employer's incentive compensation plan violated sections of the California Labor Code and concluded that they did not. 218 P.3d 262, 265 (Cal. 2009). None of these decisions involved the calculation of fully burdened hourly labor rates.

18

1   (presumably as part of a request for punitive damages[6]), and also seek exclusion of Mr.

2   Pinsonneault's opinions rebutting Ms. Trexler's profits calculations, Plaintiffs' arguments are

3   meritless and should be rejected.

4          Plaintiffs argue that any estimate of NSO's profit margin from its accused technologies

5   should be based on a stand-alone profit-and-loss statement. (Mot. 13:15-17.) But NSO, like most

6   companies, does not have a stand-alone profit-and-loss statement for individual products, let alone

7   individual versions of individual products. (*See* Declaration of Yifa Idisis ("Idisis Decl." ¶ 3.)

8   Plaintiffs next claim that "contrary to the Court's order, NSO refused to produce that financial

9   information in discovery." (Mot. 13:18.) That is a lie. Defendants produced their audited financial

10  statements, on which both experts heavily rely, and there was never a Court order compelling

11  Defendants to produce any Pegasus-specific profit and loss statements (which don't exist in any

12  event). The document Plaintiffs cite in support of this false claim, their sanctions motion (Dkt. No.

13  405-2 at 13-14), was entirely about one single document that had nothing to do with Defendants'

14  costs: a Pegasus price list. And the Court did not grant Plaintiffs' sanctions motion as to the price

15  list because Defendants instead produced information about their actual revenues from each license

16  of Pegasus in the 2018-2020 timeframe, thus making a "price list" irrelevant.

17         Mr. Pinsonneault's methodology for estimating R&D expense attributable to Defendants'

18  development of the covert Android installation vectors based on R&D employee headcount is

19  clearly articulated, reliable, and certainly superior to Ms. Trexler's proposal to simply assume,

20  without any supporting basis whatsoever, that *all* of Defendants' R&D expenses for the relevant

21  time period can be attributed to development of the covert Android installation vectors. Defendants

22  do not track R&D expenditures by product, much less by installation vectors within any given

23  product, and therefore did not have any financial documents that show R&D expenses specifically

24  attributable to development of the covert Android installation vectors. (*See* Idisis Decl., ¶¶ 3-5.)

25  ───────────────

26  [6] The fact that the parties' experts' calculation of Defendants' profits is now (after Plaintiffs'
    eleventh-hour abandonment of their disgorgement claim) only relevant to a determination of

27  punitive damages is a strong argument in favor of bifurcating the trial; such evidence will take a
    long time to present, but it need not be presented at all unless and until the jury makes the predicate

28  findings of willfulness and of malice, oppression, or fraud.

DEF'TS' OPP TO MOT. TO EXCLUDE CERTAIN                    Case No. 4:19-cv-07123-PJH
PINSONNEAULT EXPERT TESTIMONY

Mr. Pinsonneault's approach was to calculate the proportion of Defendants' aggregate R&D expenses that are attributable to development of the covert Android installation vectors. (Dkt. 508-4 Exh. B, ¶ 121 (noting that Ms. Trexler's decision to apportion *all* R&D expense to the covert Android installation vectors "is an aggressive assumption, as it implicitly implies that every R&D employee is working on projects related to the allegations by Plaintiffs in this case").)

Mr. Pinsonneault apportioned Defendants' R&D expenses based on the percentage of Defendants' total R&D workforce who worked on covert Android installation vectors in the 2018-2019 timeframe. (*Id.*, ¶¶ 122–125.) His Rebuttal Report clearly explains this apportionment methodology and the facts and data underlying it. (*Id.*) Using a roster of Defendants' employees produced to Plaintiffs in discovery, Mr. Pinsonneault interviewed Defendants' Vice President of Research and Development, Tamir Gazneli, to learn the total number of Defendants R&D personnel who worked on development of the covert Android installation vectors during 2018-2019. (*Id.*, ¶ 122.) He then divided this number by the total number of employees with *any* R&D responsibilities over the same period, to calculate a conservatively estimated percentage of total R&D expenses related to the covert Android installation vectors (27.1%). (*Id.*, ¶ 123 & Fig. 15.) Because the vast majority of Defendants' R&D expenses are comprised of (i) direct labor costs (ii) and matters directly related to headcount (such as travel expenses, software license fees and overhead) (*see* Idisis Decl. ¶ 5), the percentage of R&D employees who worked on covert Android Pegasus is an excellent proxy for the percentage of Defendants' R&D expenditures related to covert Android Pegasus. To the extent Plaintiffs disagree with Mr. Pinsonneault's opinion, they can cross-examine Mr. Pinsonneault about it. And again, Mr. Pinsonneault used only materials produced in discovery to form this opinion. Plaintiffs had the opportunity to put Defendants' employee roster in front of Mr. Gazneli during his deposition and ask him which of the R&D engineers worked on covert Android Pegasus. They simply chose to not do so.

This is wholly unlike the opinions in the cases Plaintiffs cite (*see* Dkt. 508-3 at 15), where the experts respectively "failed to provide the methodology underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case" (*NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *9 (N.D. Cal. Mar. 17, 2020)) and relied on an "*ipse dixit*" and facially

20

implausible assumption "that every woman who bought a $20 or $50 knockoff would have paid over $200 for an authentic handbag." *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg*., 923 F. Supp. 2d 1245, 1253, 1255 (S.D. Cal. 2013). Damages cannot always "be calculated with 'absolute exactness,'" and the Court's charge on this motion is not to decide "the *correctness*" of Mr. Pinsonneault's apportionment opinion, but merely to "ensure that his methodology is sound and that his testimony is supported by the underlying facts." *Id.* at 1254–55. Here, Mr. Pinsonneault's apportionment of R&D expenses attributable to the development of the covert Android installation vectors based on verifiable facts about the percentage of Defendants' R&D workforce who contributed to those efforts is sound, supported, and clearly explained, both by Mr. Pinsonneault in his reports and in this Opposition *supra*, all of which supports admission of this opinion.

Plaintiffs' remaining attacks on Mr. Pinsonneault's apportionment opinion fail to support exclusion. Plaintiffs fail to demonstrate that Mr. Gazneli's estimate of the number of employees working on R&D related to the covert Android installation vectors is unreliable, and their argument that during his deposition Mr. Gazneli could not recall (off the top of his head) Defendants' *total R&D employee headcount* is a red herring (Dkt. 508-3 at 16–17). Mr. Pinsonneault did not rely on Mr. Gazneli to tell him the total numbers of R&D personnel employed during relevant time periods; he instead reviewed with Mr. Gazneli pertinent corporate records that Defendants produced in discovery (whose reliability Plaintiffs do not challenge) to obtain both the numerator (the number of engineers who worked on covert Android Pegasus) and the denominator (the total number of R&D employees). (*See* Dkt. 508-4 Exh. B, ¶ 123.)

Plaintiffs' argument that the documents attached as Exhibits E–G of the Block Declaration supporting Plaintiffs' motion (Dkt. 508-4) contradict the R&D headcount numbers on which Mr. Pinsonneault relies (Dkt. 508-3 at 17) is wrong for the very basic reason that those documents are counting R&D personnel who do not work NSO or Q Cyber, but instead work for other affiliated companies on other products. Mr. Pinsonneault's R&D expense allocation and profitability opinions are (properly) limited to the Defendants in this case, NSO and Q Cyber, as are Ms. Trexler's. The documents Plaintiffs cite as supposedly contradicting Mr. Pinsonneault's calculation about the total number of R&D employees, are irrelevant because they plainly include

<hr />

21

not just NSO and Q Cyber, but employees working for the broader umbrella of companies and products within Defendants' corporate family, including CS Circles Solutions Ltd. ("Circles"), which produces the PiXcell and Landmark technologies. (*See, e.g.*, Dkt. 508-4 Exh. F at JEFF00007836 (referencing Circles acquisition and Landmark and PixCell when referencing ~300 R&D employees across the corporate family); *id.* Exh. G at FPM-00026845 (again referencing Landmark and PixCell); *id.* Exh. E at WA-NSO-00075043 (noting that 304 R&D employees include personnel in Cyprus and Bulgaria, where Circles is based, *see* Dkt. 396-3, ¶ 21 (noting that Circles "was within the same corporate family as Defendants but was a distinct corporate entity"); *id.* Exh. C (showing Circles locations in Cyprus and Bulgaria)). Thus, the figures therein (reflecting R&D headcount as high as ~300) are not limited to employees of Defendants, as Mr. Pinsonneault's opinion is, but include R&D personnel employed by other entities within the broader corporate family.

Finally, Plaintiffs confusingly claim that some document that they never identify "indicates that there were 44 R&D employees who NSO internally classified as working on Android." (Dkt. 508-3 at 17.) But this case is not about all of Android Pegasus—it is about *covert* Android Pegasus. There were versions of Pegasus for Android (*e.g.*, one-click) that did not involve exploiting WhatsApp vulnerabilities. Plaintiffs do not argue or offer any support showing that these alleged 44 R&D employees worked on the *covert* Android *installation vectors* and thereby fail to show that this unspecified document (whatever it is) contradicts Mr. Gazneli's estimate of the number of Defendants' employees working on R&D relating to those vectors. In any event, this would be a basis for cross-examination, not exclusion of Mr. Pinsonneault's opinion. Mr. Pinsonneault's opinion that only 27.1% of Defendants' R&D expenses should be excluded from determining Defendants' profits is based on a sound, identified methodology, and on documents that were produced in discovery, and the opinion should not be excluded.

## V.    CONCLUSION

For the reasons shown above, the Court should deny Plaintiffs' Motion to Exclude Certain Expert testimony of Gregory A. Pinsonneault.

1

2    Dated: March 20, 2025                      KING & SPALDING LLP

3                                              By: /s/ Aaron S. Craig
                                               JOSEPH N. AKROTIRIANAKIS
4                                              AARON S. CRAIG
                                               *Attorneys for Defendants*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF'TS' OPP TO MOT. TO EXCLUDE CERTAIN          Case No. 4:19-cv-07123-PJH
PINSONNEAULT EXPERT TESTIMONY