JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:    (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JOSHUA J. MINKLER**<br><br>Date:    April 10, 2025<br>Time:    2 PM<br>Place:    Courtroom 3, Ronald V. Dellums Federal Building & U.S. Courthouse, 1301 Clay Street, Oakland, California<br><br>Judge:    Hon. Phyllis J. Hamilton<br><br>Action Filed:    10/29/2019 |

Contents

I.      INTRODUCTION ...................................................................................... 1

II.     BACKGROUND ....................................................................................... 2

III.    RELEVANT LEGAL STANDARDS ........................................................ 4

IV.     ARGUMENT............................................................................................ 4

        A.      Mr. Minkler is qualified to offer his opinions. ............................ 5

        B.      Mr. Minkler's opinions are all relevant. ...................................... 8

                1.      Mr. Minkler's opinions are relevant to punitive damages. .................. 8

                2.      Mr. Minkler's opinions are relevant to injunctive relief.................... 11

        C.      Mr. Minkler's opinions are reliable. ............................................ 12

                1.      Domestic use of Pegasus.................................................... 13

                2.      Foreign use of Pegasus ...................................................... 13

                3.      Trivial Disclosures ............................................................ 14

                4.      Law-enforcement trends .................................................... 16

                5.      Customer contracts ........................................................... 17

                6.      Mental state..................................................................... 19

                7.      Benefits of Pegasus........................................................... 20

        D.      None of Mr. Minkler's opinions should be excluded under Rule 403. ............................................................................................... 21

V.      CONCLUSION....................................................................................... 22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013) ............................................................................4, 12

*Am. Honda Motor Co. v. Allen*,
    600 F.3d 813 (7th Cir. 2010) ...................................................................................18

*Buell-Wilson v. Ford Motor Co.*,
    73 Cal. Rptr. 3d 277 (Cal. Ct. App. 2008) ..............................................................10

*Caldwell v. City of San Francisco*,
    2021 WL 1391464 (N.D. Cal. Apr. 13, 2021) ..........................................................17

*Cave Consulting Grp., LLC v. Optuminsight, Inc.*,
    No. 5:11-cv-469-EJD, Dkt. 294 (N.D. Cal. Feb. 23, 2015)......................................12

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
    532 U.S. 424 (2001)...................................................................................................21

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).....................................................................................................4

*Dep't of Toxic Substances Control v. Technichem, Inc.*,
    2016 WL 1029463 (N.D. Cal. Mar. 15, 2016)..........................................................14

*Doe v. Bridges to Recovery, LLC*,
    2021 WL 4690830 (C.D. Cal. May 19, 2021) ..........................................................22

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ...................................................................................18

*Giganews, Inc. v. Perfect10, Inc.*,
    2019 WL 1422723 (C.D. Cal. Mar. 13, 2019)..........................................................21

*Gold v. Lumber Liquidators, Inc.*,
    323 F.R.D 280 (N.D. Cal. 2017)................................................................................19

*Hadley v. Kellogg Sales Co.*,
    2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ............................................................9

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) ......................................................................................9

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
    87 F. Supp. 3d 928 (N.D. Cal. 2015) ........................................................................15

*Illuminia, Inc. v. BGI Genomics Co., Ltd.*,
    2021 WL 4979799 (N.D. Cal. Oct. 27, 2021)...........................................................................12

*Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.*,
    185 F. Supp. 2d 1103 (C.D. Cal. 2001) ................................................................................16

*Krause v. Hawaiian Airlines, Inc.*,
    2019 WL 13225251 (E.D. Cal. June 7, 2019) ......................................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................................4

*Laux v. Mentor Worldwide, LLC*,
    295 F. Supp. 3d 1094 (C.D. Cal. 2017) ...............................................................................20

*In re Leap Wireless Int'l, Inc.*,
    301 B.R. 80 (Bankr. S.D. Cal. 2003) ...................................................................................19

*Lin v. Solta Med., Inc.*,
    2024 WL 51999905 (N.D. Cal. Dec. 23, 2024)....................................................................19

*Pac. Gas & Elec. Co. v. Super. Ct.*,
    24 Cal. App. 5th 1150 (2018) .................................................................................................9

*Pfeifer v. John Crane, Inc.*,
    220 Cal. App. 4th 1270 (2013) ...............................................................................................9

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    480 F. Supp. 3d 1000 (N.D. Cal. 2020)...............................................................................21

*Riley v. Volkswagen Grp. of Am.*, Inc., 51 F.4th 896 (9th Cir. 2022) ............................................8

*S.E.C. v. Reyes*,
    2007 WL 963422 (N.D. Cal. Mar. 30, 2007)........................................................................15

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................................................14

*Stambolian v. Novartis Pharm. Corp.*,
    2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) .........................................................................7

*Stanley v. Novartis Pharms. Corp.*,
    2014 WL 12573393 (C.D. Cal. May 6, 2014) ......................................................................19

*Takeda Pharms. U.S.A., Inc. v. Par Pharm. Cos.*,
    2015 WL 13877466 (D. Del. Nov. 24, 2015) .........................................................................7

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) .........................................................................................19

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
2018 WL 5013580 (N.D. Cal. Oct. 16, 2018)................................................................7

*United States v. Cerna*,
2010 WL 11627594 (N.D. Cal. Dec. 17, 2010).........................................................12

*United States v. Hankey*,
203 F.3d 1160 (9th Cir. 2000) .................................................................................13

*United States v. Holguin*,
51 F.4th 841 (9th Cir. 2022) ............................................................................6, 7, 9, 12

*United States v. Plunk*,
153 F.2d 1011 (9th Cir. 1998) ...................................................................................19

*United States v. Simmons*,
923 F.2d 934 (2d Cir. 1991) ......................................................................................19

*United States v. Valencia-Lopez*,
971 F.3d (9th Cir. 2020) ...........................................................................................12

*United States v. W.R. Grace*,
504 F.3d 745 (9th Cir. 2007) ......................................................................................4

*VIA Techs., Inc. v. ASUS Comp. Int'l*,
2017 WL 3051048 (N.D. Cal. July 19, 2017)............................................................18

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) ...................................................................................11

*Waymo LLC v. Uber Techs., Inc.*,
2018 WL 646701 (N.D. Cal. Jan. 30, 2018).............................................................21

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
445 F. Supp. 3d 508 (N.D. Cal. 2020) .......................................................................18

*Williams v. Illinois*,
567 U.S. 50 (2012)......................................................................................................17

**Statutes**

Cal. Civ. Code § 3294(c)(1)..............................................................................................8

Cal. Penal Code § 502(e)(4)..............................................................................................8

Electronic Communications Privacy Act Title III, 18 U.S.C. § 2510, *et seq.* ..................2, 6, 7, 13

**Other Authorities**

Fed. R. Civ. P. 26 ............................................................................................................15

Fed. R. Civ. P. 37(c)(1) .................................................................................................15

Fed. R. Evid. 403 ...................................................................................................20, 21

Fed. R. Evid. 602 .........................................................................................................16

Fed. R. Evid. 702 ..................................................................................................... *passim*

Fed. R. Evid. 703 .........................................................................................................17

I.    **INTRODUCTION**

Several key issues must be decided in this case before any punitive damages or injunctive relief can be awarded.  These include (1) whether the intent and conduct of Defendants NSO Group Technologies Ltd. and Q Cyber Technologies Ltd. (collectively, "NSO") in licensing its Pegasus technology to foreign sovereigns were so reprehensible as to warrant punitive damages above and beyond any compensatory relief; and (2) whether the equities between the parties or the public interest warrants any equitable relief.  To help the jury and the Court decide these questions, NSO engaged Joshua J. Minkler—a distinguished former U.S. Attorney with decades of experience in law-enforcement investigations and surveillance techniques—who opines that tools such as Pegasus benefit law enforcement by filling a rapidly increasing gap in law enforcement's ability to intercept the communications of criminals using end-to-end encrypted services such as WhatsApp.[1]

Plaintiffs seek to exclude all of Mr. Minkler's opinions so they can present to the jury a one-sided view that NSO's conduct in licensing Pegasus was harmful.  But Plaintiffs' attacks frequently misconstrue what Mr. Minkler opines or misstate what Rule 702 requires.  Indeed, it is difficult to imagine anyone more qualified to opine on current trends in law-enforcement surveillance than a recent U.S. Attorney with over thirty years of law-enforcement experience at all levels, including leading or supervising dozens of investigations that were hampered by the inability to intercept encrypted communications.  The jury should not be deprived of Mr. Minkler's opinions.  Hearing how Pegasus fills a growing gap in law enforcement's capabilities will help the jury understand, for example, whether NSO intended to benefit law enforcement (or instead to harm Plaintiffs).  And there is no serious question that Mr. Minkler has reliably grounded his opinions in decades of experience leading, supervising, discussing, and researching criminal

---

[1] For four and a half years, Plaintiffs also claimed entitlement to disgorgement of unjust enrichment.  The day before pretrial filings were due, Plaintiffs suddenly and without explanation abandoned any request for that remedy, and their portions of the joint pretrial statement include no reference to disgorgement.  (*See generally* Dkt. 591.)  In reliance on Plaintiffs' representations and pretrial filings, this opposition does not explain why Mr. Minkler's testimony is further relevant to disgorgement.

investigations.  Plaintiffs obviously disagree with his opinions, but they are plainly relevant to issues facing the jury and the Court, and Mr. Minkler is qualified to give them.  It is ultimately for the jury, not Plaintiffs, to decide whether those opinions should be credited.  The Court should deny Plaintiffs' motion.

## II.    BACKGROUND

Mr. Minkler is a decorated former federal prosecutor and U.S. Attorney with "over thirty years of law-enforcement experience," including leading "more than fifty investigations."  (Dkt. 572-4 Exh. A ("Report") ¶¶ 5–6; *see Id.*, App'x A at 2–3 ("Honors and Awards").)  He has extensive experience and expertise in trends in law-enforcement surveillance techniques.  During his time in the Department of Justice ("DOJ"), Mr. Minkler learned about criminal efforts to thwart surveillance by "interview[ing] criminals" as part of proffers, supervising "terrorist investigations," and participating in meetings with FBI "discussing investigative techniques and proffers of terrorists and national security investigations."  (*See* Decl. of Joseph N. Akrotirianakis ¶ 2 & Exh. A ("Minkler Depo." or "Depo.") at 264:5–265:10.)  Mr. Minkler also has extensive experience with how encrypted communications—such as those offered by Plaintiffs—can hamper criminal investigations and prosecutions.  Between 2018 and 2020, Mr. Minkler supervised "20 cases" in which law enforcement was "unable to access . . . communications because they were encrypted, even with a search warrant."  (*Id.* at 182:12–183:1.)  He also participated in many meetings with FBI officials discussing cases where law enforcement "could not gain access to [a criminal's] device because of the encryption," and "everyone discussing that[] favored some technology" for law enforcement to "get access to encrypted devices."  (*Id.* at 168:1–18.)  Drawing on this extensive experience and his own research, Mr. Minkler seeks to offer three main opinions.

*First*, Mr. Minkler opines that the United States has a legal framework—under Title III and the Foreign Intelligence Surveillance Act ("FISA")—that authorizes "law enforcement to lawfully intercept communications using tools like Pegasus."  (Report ¶ 36.)  In other words, Pegasus could be deployed in the United States pursuant to "a valid Title 3 warrant" or a "valid warrant . . . from the FISA court."  (Akro Decl. Exh. A., Depo. at 76:14–23; *see id.* at 76:24–77:6; 79:8–20.)  Mr. Minkler has significant experience with both Title III and FISA:  He has presented "[i]n excess of

30" Title III applications to a federal court (*id.* at 33:17–34:5); has supervised two "national security investigations" that "utilized FISA" over the course of five years, where he learned "the process the agent went through to obtain the FISA warrant" and what materials were obtained (*id.* at 74:2–15); and is familiar with "the criminal and civil penalties for abuse" of both statutes (*id.* at 82:1–12.)

Relatedly, Mr. Minkler opines that "other nations have legal frameworks that permit law enforcement to intercept communications lawfully." (Report ¶ 50.) He grounds this opinion in not only his first-hand experience leading Operation Money Clip, in which Mexican law enforcement's lawful interception of communications "was instrumental in securing arrests and convictions for several of the investigation's targets" (*id.* ¶ 53; *see id.* ¶ 10), but also "independent research" he conducted that included consulting several extensive treatises and databases (*see id.* ¶ 52; Report, App'x B (listing scholarly treatises and chapters considered)).

*Second*, Mr. Minkler opines that there is a rapidly increasing gap in law-enforcement needs regarding, in particular, end-to-end (or "E2E") encryption services such as WhatsApp. (Report ¶¶ 41–49.) In Mr. Minkler's experience, criminals involved in terrorism, child exploitation, and human trafficking have increasingly used end-to-end encryption services because end-to-end encryption "prevents law enforcement from intercepting and deciphering communications." (*Id.* ¶¶ 41–42, 58; *see* Akro Decl. Exh. A., Depo. at 186:11–21 ("in drug cases, in child sexual crimes to include child exploitation crimes, and in terrorism cases, increasingly those individuals used counter-surveillance measures that include end-to-end encryption").) Mr. Minkler opines—based on years of his own experience and several, recent high-profile cases—that end-to-end encryption can, and increasingly does, hamper investigations and prosecutions of serious criminals and terrorists. (*Id.* ¶¶ 42–49, 59.)

*Third*, Mr. Minkler opines that "NSO's Pegasus technology, or similar technology, would allow law enforcement legal access to E2E encrypted communications used in furtherance of criminal activity," as such tools "could provide law enforcement agencies with real-time intelligence of crimes as they are planned." (Report ¶¶ 60–61.) Mr. Minkler bases this opinion on materials he reviewed "summarizing the capabilities of NSO's Pegasus technology" (*id.* ¶ 60),

public remarks by the highest levels of law enforcement including former Attorneys General and a former President (*id.* ¶ 56), and "public reporting" of how "Pegasus itself has been beneficially deployed in several high-profile investigations" in other countries" (*id.* ¶ 62).

## III.    <u>RELEVANT LEGAL STANDARDS</u>

Under Federal Rule of Evidence 702, expert testimony is permissible if it meets four criteria: (1) it "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) it is "based on sufficient facts or data," and (3) it is the "product of reliable principles and methods" that (4) have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993); *United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007). These criteria are aimed to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

To ensure all expert testimony presented to the jury "rests on a reliable foundation and is relevant to the task at hand," the Court acts as a "gatekeeper" against expert testimony that fails to satisfy Rule 702's criteria. *Daubert*, 509 U.S. at 597. In performing this task, the Court conducts a "holistic" analysis of the testimony for "overall sufficiency of the underlying facts and data, and the reliability of the methods, as well as the fit of the methods to the facts of the case." *W.R. Grace*, 504 F.3d at 762, 765. The Court's goal, however, is to "screen the jury from unreliable nonsense opinions," not to "exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

## IV.    <u>ARGUMENT</u>

With over three decades of experience at DOJ, Mr. Minkler has supervised or led dozens of cases where law enforcement was "unable to access . . . communications because they were encrypted, even with a search warrant." (Akro Decl. Exh. A., Depo. at 182:12–183:1.) Leveraging this experience, Mr. Minkler will help the jury understand (1) avenues for the "lawful interception and surveillance of communications" by law enforcement, (2) "the unique investigatory challenges presented . . . by end-to-end encryption" in services like WhatsApp; and (3) the consequent "benefits of tools such as Pegasus in law enforcement and national security operations." (Report

¶ 1.)  The jury should hear these relevant and reliable opinions.  In seeking to put a one-sided record before the jury, Plaintiffs largely misconstrue what Mr. Minkler actually opines and misstate what Rule 702 actually requires.  The Court should deny Plaintiffs' Motion in its entirety.

### A.    Mr. Minkler is qualified to offer his opinions.

Plaintiffs' attempts (at 10–12) to disqualify Mr. Minkler are unavailing.  There can be no serious dispute that a distinguished former U.S. Attorney with "over thirty years of law-enforcement experience," including leading "more than fifty investigations" (Report ¶¶ 5–6), is qualified to opine on the legal process for lawfully intercepting communications or how tools such as Pegasus fill a gap in current law-enforcement surveillance techniques.  Indeed, Plaintiffs' objections misconstrue the opinions Mr. Minkler offers.

It is undisputed that Mr. Minkler has specialized expertise in trends in law-enforcement surveillance techniques—including how end-to-end encryption services like WhatsApp can *and do* hamper the investigation and prosecution of terrorists and other serious criminals.  During his time at DOJ, Mr. Minkler supervised "20 cases" between 2018 and 2020 in which law enforcement was "unable to access . . . communications because they were encrypted, even with a search warrant." (Akro Decl. Exh. A., Depo. at 182:12–183:1.)  He also "interviewed criminals" as part of proffers, supervised numerous "terrorist investigations," and participated in countless meetings with FBI "discussing investigative techniques and proffers of terrorists and national security investigations." (*Id.* at 264:5–265:10.)  He also discussed in numerous meetings with FBI officials cases where law enforcement "could not gain access to [a criminal's] device because of the encryption," and "everyone discussing that[ ] favored some technology" for law enforcement to "get access to encrypted devices." (*Id.* at 168:1–18.)  To take just one example, law enforcement's inability to "obtain the WhatApp and Signal messages from [a drug trafficker's] phone" in one case prevented the authorities from "prov[ing] a case against" against the trafficker's source "or expand[ing] the investigation to" include that source, a suspected drug cartel.  (Report ¶ 19.)

Plaintiffs misunderstand Mr. Minkler's opinion in challenging (at 10) his qualifications "to opine on whether U.S. or foreign law enforcement could legally use Pegasus."  Mr. Minkler made clear that, contrary to Plaintiffs' characterization, he is *not* offering a legal opinion on "whether

1  NSO's access in this was case was authorized" or legally obtained (Akro Decl. Exh. A., Depo. at

2  124:14–21), or "the legality of" specific uses of Pegasus "in Saudi Arabia or anywhere else" (*id.*

3  at 160:7–11). Rather, he opines only on whether certain countries authorize "law enforcement to

4  lawfully intercept communications using tools like Pegasus." (Report ¶ 36; *see id.* ¶ 50 ("other

5  nations have legal frameworks that permit law enforcement to intercept communications

6  lawfully").) In other words, Mr. Minkler's opinion is that Pegasus could be deployed in the United

7  States pursuant to "a valid Title 3" order or a "valid warrant . . . from the FISA court." (Akro Decl.

8  Exh. A., Depo. at 76:14–23; *see id.* at 79:8–20 (opining that *if* "there's a valid Title 3 or FISA

9  warrant for communications that are encrypted, in my opinion, Title 3 and FISA would be a proper

10 avenue authorizing law enforcement to use Pegasus"); 76:24–77:6 (similar).) Given his decades

11 of experience in lawful surveillance techniques, including under Title III and FISA, Mr. Minkler

12 is qualified to offer that opinion. *See*, *e.g.*, *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir.

13 2022) ("Law enforcement professionals are routinely qualified to offer expert testimony based on

14 their training and experience.").

15       Plaintiffs' contention (at 10–11) that Mr. Minkler "is not an expert on Title III or FISA" is

16 wrong. Mr. Minkler has applied for "[i]n excess of 30" Title III warrants during 10 to 15

17 investigations (*id.* at 33:17–34:5); has supervised two "national security investigations" that

18 "utilized FISA," in which he learned "the process the agent went through to obtain the FISA

19 warrant" and what materials were obtained (*id.* at 74:2–15); and is familiar with "the criminal and

20 civil penalties for abuse" of Title III and FISA warrants (*id.* at 82:1–12). Plaintiffs do not dispute

21 these substantial qualifications, and instead quibble (at 10–11) about his knowledge of Title III's

22 history, familiarity with studies from six decades ago, and reference to "Title III of the Electronic

23 Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*""[2]

24       None of these complaints, however, bears on Mr. Minkler's actual analysis of Title III as

25

26 ─────────────────────
[2] Plaintiffs also misconstrue Mr. Minkler's testimony on FISA. Mr. Minkler merely testified that
27 he had not read every single section included in the long-form title of the statute. (Akro Decl. Exh.
   A., Depo. at 72:16–73:2.) He did not testify, as Plaintiffs imply, that he had not reviewed the
28 specific provisions pertinent to his opinions.

it reads today.  And more importantly, none has anything to do with his qualifications to offer that analysis.  Unlike the proffered expert in Plaintiffs' sole cited authority, not even Plaintiffs suggest Mr. Minkler actually "relied . . . on the wrong regulations."  *See Takeda Pharms. U.S.A., Inc. v. Par Pharm. Cos.*, 2015 WL 13877466, at *1 (D. Del. Nov. 24, 2015).  Nor, as Plaintiffs suggest, is Mr. Minkler required to establish that he the leading expert on Title III or FISA or that he has devoted the entirety of his career to an academic assessment of Title III and FISA.  *See Holguin*, 51 F.4th at 854 ("Rule 702 does not demand distinction in a particular field.").  Mr. Minkler needs only "specialized knowledge beyond the jury's common knowledge of a topic," *id.*—which he plainly has.[3]

Plaintiffs' assertion (at 11–12) that "Mr. Minkler has no qualifications" to opine on lawful surveillance by foreign governments likewise fails.  Mr. Minkler grounds his opinions in his first-hand experience leading Operation Money Clip, in which Mexican law enforcement's lawful interception of communications "was instrumental in securing arrests and convictions for several of the investigations' targets."  (Report ¶ 53; *see id.* ¶ 10.)  He also conducted "independent research," consulting several extensive treatises and databases—not just a single 1975 study as Plaintiffs falsely suggest.  (*See id.* ¶ 52 (describing Vodafone database); Report, App'x B (listing scholarly materials considered)).  There is no dispute that Mr. Minkler, an accomplished prosecutor and attorney, was qualified to conduct that research.  Based on the combination of his experience and his research, he concluded that many other countries "allow for the lawful interception of communications with prior judicial authorization," similar to the United States.  (*See id.* ¶ 51.)  Here too, then, Mr. Minkler's first-hand experience and research in this area give

---

[3] Plaintiffs' related contention (at 7) that Mr. Minkler improperly "opines on the scope of Title III and FISA" is wrong.  In the two paragraphs they cite, Mr. Minkler offers no legal opinions; he merely lists "requirements that must be met before a wiretap may be issued."  (Report ¶¶ 37–38.)  Regardless, testimony on those requirements is admissible, as it "provide[s] valuable background for the jury that is likely unaccustomed" to the "complex regulatory background" of lawful surveillance.  *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 2018 WL 5013580, at *4 (N.D. Cal. Oct. 16, 2018) (Seeborg, J.) (admitting expert testimony on "regulatory structure" of natural gas industry); *see, e.g.*, *Stambolian v. Novartis Pharm. Corp.*, 2013 WL 6345566, at *8 (C.D. Cal. Dec. 6, 2013) (admitting similar expert testimony on FDA "approval and regulation process").

him "specialized knowledge beyond the jury's common knowledge of" lawful surveillance frameworks in other countries. *Holguin*, 51 F.4th at 854. Mr. Minkler is therefore qualified to offer all of his opinions.

**B.    Mr. Minkler's opinions are all relevant.**

Mr. Minkler's opinions are relevant to the availability of punitive damages and injunctive relief.

**1.    Mr. Minkler's opinions are relevant to punitive damages.**

Mr. Minkler's opinions concerning how tools such as Pegasus fill a rapidly expanding gap in law-enforcement needs are essential to the jury's determination of the factual questions underlying the jury's determination of whether punitive damages are warranted. Without that testimony, the jury cannot properly determine whether NSO's conduct in licensing Pegasus was so reprehensible that it warrants imposition of punitive damages. Contrary to Plaintiffs' apparent assumption, the jury should not put on blinders and assess punitive damages based solely on evidence of Pegasus' alleged harms, without any evidence of its benefits.

To be entitled to punitive damages, Plaintiffs will need to "prove[ ] by clear and convincing evidence that [NSO] has been guilty of oppression, fraud, or malice." Cal. Penal Code § 502(e)(4). "Malice" requires either an intent "to cause injury" or "despicable conduct . . . with a willful and conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(1); *see also* CACI 3945 (Punitive Damages—Entity Defendant—Trial Not Bifurcated). "Oppression" similarly requires "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). "Fraud" requires an intent to "depriv[e] a person of property or legal rights or otherwise caus[e] injury." *Id.* § 3294(c)(3). The amount of punitive damages available also would depend on how "egregious" NSO's behavior was. *See Riley v. Volkswagen Grp. of Am.*, Inc., 51 F.4th 896, 902 (9th Cir. 2022). In other words, the jury will need to make a number of factual determinations regarding whether NSO intended to harm others, disregarded their safety, or engaged in objectively reprehensible conduct.

Mr. Minkler's opinions on how NSO's technologies—including the three versions of Pegasus addressed in the Court's order on summary judgment—protect safety by filling an existing

gap in law-enforcement needs are highly relevant to these determinations. These opinions provide context that will help the jury understand how "law enforcement could lawfully deploy Pegasus" (Report ¶¶ 35–40), and how that would make a real-world difference in cases where E2E encrypted "communications [are] used in furtherance of criminal activity" (*id.* ¶¶ 60-61). Mr. Minkler's testimony provides important context that well help the jury decide whether NSO's intent was to harm Plaintiffs or to fill existing gaps in law-enforcement needs by developing a technology that has already "been beneficially deployed in several high-profile investigations." (*Id.* ¶ 62.) *See Hardeman v. Monsanto Co.*, 997 F.3d 941, 971 (9th Cir. 2021) (the requisite intent "can be 'proved either expressly through direct evidence or by implication through indirect evidence'") (quoting *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1299 (2013)).

Mr. Minkler's opinions likewise will help the jury determine whether NSO's conduct was "despicable." This objective standard requires "conduct 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by most ordinary decent people.'" *Hardeman*, 997 F.3d at 971 (quoting *Pac. Gas & Elec. Co. v. Super. Ct.*, 24 Cal. App. 5th 1150, 1158 (2018)); *see also* CACI 3945 (Punitive Damages—Entity Defendant—Trial Not Bifurcated) (similar). The jury cannot properly make this determination by considering only one side of the equation—*i.e.*, the supposed harms of the technologies that NSO created and sold. Rather, the jury also must consider whether the challenged technology has beneficial properties such that most ordinary decent people would not find NSO's conduct despicable. Mr. Minkler's opinions will directly help the jury understand those benefits. Indeed, Plaintiffs themselves intend to argue on this issue that NSO peddles "spyware" and "Malware Vectors" that "posed a substantial risk of harm to thousands of WhatsApp users." (*See* Pls.' Trial Br. (Dkt. 595) at 2, 10–12.) Mr. Minkler's opinions that NSO offers essential lawful-intercept technologies that allow law enforcement to thwart and/or apprehend suspected criminals and terrorists are necessary to rebut Plaintiffs' arguments.

Courts commonly consider similar expert testimony about whether a challenged product or technology is, in fact, harmful or beneficial when assessing punitive damages. *See*, *e.g.*, *Riley*, 51 F.4th at 901 n.4 (noting "'expert testimony that increased NOx emissions increase the risk of

harm to human health'" was "'evidence of the egregiousness of Volkswagen's misconduct'"); *Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *16 (N.D. Cal. Aug. 13, 2019) (Koh, J.) (considering expert testimony on whether "cereal consumption increases the risk of coronary heart disease, diabetes, or obesity" on punitive-damages claim against cereal manufacturer); *Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 312 (Cal. Ct. App. 2008) (jury properly weighed competing "expert testimony" on whether product had "design and safety issues" on punitive-damages claim). These cases all confirm that Mr. Minkler's opinions are relevant.

Plaintiffs cite no contrary authority. And their objections to Mr. Minkler's opinions (Mot. 7-8) misstate the nature of those opinions and how they will help the jury.

*First*, Mr. Minkler's opinions do not simply "relate to conduct by federal law enforcement." *Contra* Mot. 7. They relate to *NSO* and whether the tools it developed can and do benefit law enforcement. Mr. Minkler's opinions—including on Pegasus' lawful use (*see* Report ¶¶ 35–40), its benefits (*id.* ¶¶ 55–62), and NSO's safeguards against unlawful use (*id.* ¶¶ 28, 33–34)—are relevant to whether the harms of Pegasus outweigh the benefits, and whether NSO's conduct in designing and licensing Pegasus is so "despicable" or "reprehensible" that punitive damages can be assessed against it. This testimony is clearly applicable to Pegasus generally and to the three versions of Pegasus addressed in the Court's order on partial summary judgment. While Plaintiffs complain Mr. Minkler did not consider this Court's order on summary judgment, that order had not issued by the time he prepared his expert report in December 2024 (*compare* Report p. 27 *with* Dkt. 494)—and, regardless, Plaintiffs fail to explain what aspects of that order Mr. Minkler should have later considered.

*Second*, Mr. Minkler's opinions are not "about speculative, hypothetical uses of Pegasus." *Contra* Mot. 8. As he made clear in response to questioning, his opinions discuss benefits to law enforcement that he believes are already accruing. (*See* Akro Decl. Exh. A., Depo. at 236:12–16.) Mr. Minkler provides specific examples of how Pegasus "has been beneficially deployed in several high-profile investigations" (Report ¶ 62), notes the undisputed evidence that the FBI obtained a license to Pegasus covering the time period relevant here (2018-2020), and indicates that other

U.S. government agencies procured Pegasus licenses on behalf of U.S. partners (*id.* ¶¶ 33, 54, 62).[4] All of this corroborates his opinion—based on decades of experience—that Pegasus does, in fact, fill a widening gap in law-enforcement surveillance needs. Again, that is relevant to whether NSO's conduct in creating and licensing the three specific versions of Pegasus found to violate U.S. law was sufficiently reprehensible to warrant the imposition of punitive damages.

### 2.    Mr. Minkler's opinions are relevant to injunctive relief.

For similar reasons, Mr. Minkler's opinions are relevant to the availability of injunctive relief. To obtain such relief, Plaintiffs will need to show, among other things, "that the public interest would not be disserved by a permanent injunction." *W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1054 (9th Cir. 2013). Mr. Minkler's opinions speak directly to this issue, as they show how an injunction could deprive law enforcement of a valuable tool for investigating, apprehending, and prosecuting terrorists and other serious criminals.

Contrary to Plaintiffs' assumption (at 9), this testimony neither is "hypothetical" nor "lacks foundation." It is grounded in real-world facts that "Pegasus has been used by several Western-style democracies including Germany, Spain, Belgium, Poland, and Hungary," and that the United States has "financed the purchase of Pegasus, to assist American allies in combating crime and terrorism," as well as Mr. Minkler's real-world experience that "the lawful interception by . . . a US ally . . . can *and has* facilitated the protection of the United States." (Report ¶¶ 53–54 (emphasis added; citing public reporting).) Mr. Minkler also supported his opinion with similar views publicly expressed by "[n]umerous United States Attorneys General" and then-President Obama. (*Id.* ¶ 56 (quoting statements at length).) Finally, Mr. Minkler explained why President Biden's March 2023 Executive Order does not, in his opinion, prohibit any federal agency from deploying Pegasus – including that NSO has engaged in the remedial measures and established requisite safeguards. (Akro Decl. Exh. A., Depo. at 99:19–104:20.) Plaintiffs may dispute (at 8–

---

[4] Whether the FBI or any other U.S. law enforcement agency has ever deployed Pegasus *directly* is thus irrelevant. Furthermore, the mere fact that the FBI obtained a license to Pegasus, including the three versions of Pegasus the Court considered on summary judgment, supports Mr. Minkler's opinion that U.S. law-enforcement agencies see a need for, and recognize the potential benefits of, tools such as Pegasus.

9 n.6) whether banning the deployment of Pegasus within the United States would harm the public interest; but the parties' dispute on this point only confirms that Mr. Minkler's testimony is relevant and would help the fact-finder.

Although "entitlement to injunctive relief is a question for the Court, not the jury," Mot. 9, that does not make Mr. Minkler's testimony irrelevant.  It remains relevant to punitive damages. Even Plaintiffs' own authority admitted evidence "related to [a] request for permanent injunction" where, as here, that evidence *also* "related to damages." *Illuminia, Inc. v. BGI Genomics Co., Ltd.*, 2021 WL 4979799, at *9 (N.D. Cal. Oct. 27, 2021); *cf. Cave Consulting Grp., LLC v. Optuminsight, Inc.*, No. 5:11-cv-469-EJD, Dkt. 294 at 3 (N.D. Cal. Feb. 23, 2015) (excluding evidence only where it was "solely directed to the issue of whether a permanent injunction should issue").  Furthermore, this Court has suggested that it might resolve any equitable issues by relying, in part, on special interrogatories to the jury.  (*See* Dkt. No. 577 at 2:5–7.)  In that case, the distinction between legal and equitable issues would not provide any basis to keep Mr. Minkler's testimony from the jury.

### C.    Mr. Minkler's opinions are reliable.

Plaintiffs take a scattershot approach on reliability, lodging (at 12–18) seven distinct challenges to parts of Mr. Minkler's testimony.  This "[C]ourt has 'broad latitude to determine' what factors . . . are relevant to the reliability determination." *United States v. Valencia-Lopez*, 971 F.3d at 891, 898 (9th Cir. 2020).  Although an expert does not "satisfy its reliability burden with a chant of 'training and experience,'" *United States v. Cerna*, 2010 WL 11627594, at *6 (N.D. Cal. Dec. 17, 2010), Plaintiffs ignore that "'experience alone—or experience in conjunction with other knowledge, skill, [or] training'" can itself be "'a sufficient foundation for expert testimony,'" *Holguin*, 51 F.4th at 858 (emphases removed) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).  "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

Plaintiffs do not point to any "unreliable nonsense opinions," *see id.*, because there are none.  Rather, Plaintiffs improperly seek to exclude opinions merely because Plaintiffs claim they

are impeachable.  *See id.*

### 1.    Domestic use of Pegasus

Plaintiffs' challenge (at 12–13) to Mr. Minkler's supposed opinion about "the hypothetical use of Pegasus by U.S. law enforcement" overlooks that Mr. Minkler does not speculate whether *in fact* the United States will ever deploy Pegasus.  Instead, he opines that doing so would help solve a critical gap in law-enforcement needs (*see* Report ¶¶ 55–62) and could be pursued under Title III and FISA (*id.* ¶¶ 35–40).  These opinions are not speculative; they are grounded in decades of experience and corroborated by the highest levels of law enforcement.  (*See id.* ¶¶ 35–40; ¶ 56 (Attorneys General and then-President Obama agreed on the need to intercept end-to-end encrypted communications); Akro Decl. Exh. A., Depo. at 168:1–18 ("committee meetings" discussed need "for the surveillance of end-to-end encryption" and how "everyone discussing that . . . favored some technology" like Pegasus); *id.* at 173:9–174:6 (Mr. Minkler's experience includes "aware[ness] of the volume and use of Title 3, electronic surveillance prior to 2020")).  Moreover, Mr. Minkler's opinion that NSO designed a tool compatible with Title III and FISA renders its conduct less (if at all) reprehensible—regardless of whether that tool has yet been deployed under Title III or FISA.

In any event, Plaintiffs are wrong (at 12) that "there are no facts or data indicating that U.S. law enforcement actually uses, or even intends to use Pegasus."  As Mr. Minkler reliably explained based on documents produced in this litigation and public reporting, not only did the FBI take a license to Pegasus (Report ¶ 33), the United States "financed the purchase of Pegasus" to assist allies (*id.* ¶ 54).  These facts further confirm the reliability of Mr. Minkler's opinions that Pegasus could be deployed within the parameters of Title III or FISA and that U.S. law enforcement agencies could benefit from Pegasus and similar technologies.  Because Mr. Minkler "fully articulate[s] the basis" for these opinions, including his own personal knowledge, his opinions are reliable. *United States v. Hankey*, 203 F.3d 1160, 1169–70 (9th Cir. 2000).

### 2.    Foreign use of Pegasus

Plaintiffs next contend (at 13) that "Mr. Minkler's opinions on the lawfulness of electronic surveillance by foreign law enforcement are unreliable and do not reflect any specialized

1   expertise."  Plaintiffs' primary argument merely recycles their flawed view that Mr. Minkler "has

2   no expertise in this area."  As explained above, that is incorrect, as Mr. Minkler has substantial

3   knowledge in this area—given his first-hand experience conducting investigations with foreign

4   law enforcement (*see* Report ¶¶ 10, 53) plus his training as a lawyer, and his independent legal

5   research that included a Vodafone database of foreign laws authorizing the interception of

6   communications (*id.* ¶ 52); a Library of Congress treatise on "Wiretapping and Electronic

7   Surveillance Laws in Major Foreign Countries" (*id.* App'x B); and additional "public reporting"

8   on how "Pegasus itself has been beneficially deployed in several high-profile investigations"

9   worldwide (*id.* ¶ 62) and "has been used by several Western-style democracies" (*id.* ¶ 54; *see* Akro

10  Decl. Exh. A., Depo. at 261:24–262:8.

11      Plaintiffs offer no valid basis for questioning Mr. Minkler's own experience or any of the

12  databases, treatises, or public reports he consulted.  While Plaintiffs focus exclusively on the

13  Library of Congress treatise from 1975, they ignore that Mr. Minkler *also* reliably grounded his

14  opinion in a Vodafone database of dozens of countries that was "last updated between 2017 and

15  2022" (Report ¶ 52) and other, more recent public reports that Plaintiffs do not dispute are reliable.

16  Contrary to Plaintiffs' assumption (at 13), Mr. Minkler does not impermissibly "regurgitate

17  information given to him by other sources."  *Dep't of Toxic Substances Control v. Technichem,*

18  *Inc.*, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016)).  He instead permissibly uses his

19  specialized knowledge to *summarize* the relevant facts from a variety of reliable sources and

20  *synthesize* those sources with his first-hand experience of foreign surveillance of communications

21  to opine that "other nations have legal frameworks that permit law enforcement to intercept

22  communications lawfully."  (Report ¶ 50.)  *See also*, *e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*,

23  315 F.R.D. 33, 45 (S.D.N.Y. 2016) (expert testimony is "admissible where it' synthesizes' or

24  'summarizes' data" based on the expert's "'specialized knowledge'") (citation omitted).

25          **3.    Trivial Disclosures**

26      In preparing the "Qualifications" section of his report where he describes his professional

27  experience, Mr. Minkler reviewed undisclosed press releases "to provide the specific dates and

28  spellings of names."  (Akro Decl. Exh. A., Depo. at 185:8–14.)  In a handful of instances in that

same section, he also used quotation marks around certain language without including a corresponding citation. When deposed, he explained that the quotation marks indicated his best recollection of statements made at sentencing hearings or at trial—whether from his own memory or from what AUSAs or agents familiar with the trial had told him "about what [a] witness had said." (*See*, *e.g.*, *id.* at 180:8–15, 199:21–200:5, 284:14–285:7.) On this basis, Plaintiffs argue (at 13–15) that "Mr. Minkler should be precluded from testifying about opinions premised on undisclosed sources." That is baseless.

None of this "violates Rule 26" or "renders [Mr. Minkler's] opinions unreliable." *Contra* Mot. 14–15. Rule 26 requires disclosure of only the "facts or data considered by the [expert] *in forming* [any opinions]." Fed. R. Civ. P. 26(a)(2)(B)(ii) (emphasis added). None of the details that Mr. Minkler confirmed using press releases—specific dates, spellings of names—forms the basis of his substantive opinions. Indeed, Plaintiffs fail to identify any *opinions* based on undisclosed sources and cite only paragraphs in Mr. Minkler's "Qualifications" section highlighting details from his past case experience. (*See* Mot. 14 (citing Report ¶¶ 12-13, 19).)[5] Because none of his actual opinions is tainted by any undisclosed source, neither of Plaintiffs' authorities is apposite. *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 949 (N.D. Cal. 2015) (expert's opinions were based on undisclosed "conversations with witnesses" from the same case in which he was proffering an opinion*); S.E.C. v. Reyes*, 2007 WL 963422, at *1 n.1 (N.D. Cal. Mar. 30, 2007) (requiring "disclosure of all materials considered by . . . a testifying expert in forming his or her opinions").

Plaintiffs' view that quotations marks should only be used to relay "a verbatim quote" (*id.* at 210:11–22) is not supported by any case law and provides no basis for excluding Mr. Minkler's actual opinions—especially given the jury will consider only experts' testimony, not their reports.

Furthermore, Rule 26 is not violated unless undisclosed information is "material." Fed. R.

---

[5] All of the deposition testimony cited by Plaintiffs likewise concerns paragraphs in the "Qualifications" section of Mr. Minkler's Report, where Mr. Minkler relied on undisclosed press releases for trivial details or AUSAs or agents for the substance of witness testimony. (*See* Mot. at 14 n.8 (citing deposition testimony on Paragraphs 12, 14, and 16–19).)

Civ. P. 26(e)(1)(A); *see* Fed. R. Civ. P. 37(c)(1) (parties can rely on undisclosed information if non-disclosure "is harmless"). Here, the precise dates, spelling of names, or even exact wording of years-old witness testimony are immaterial to Mr. Minkler's substantive opinions and whether he has reliably reached those opinions based on his experience. And regardless, Plaintiffs never sought to compel any supplemental disclosures, which prohibits them from seeking to exclude Mr. Minkler's opinions on this basis. *See Krause v. Hawaiian Airlines, Inc.*, 2019 WL 13225251, at *4 (E.D. Cal. June 7, 2019); *accord, e.g.*, *Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.*, 185 F. Supp. 2d 1103, 1107 (C.D. Cal. 2001) (exclusion "is appropriate only when the failure to provide an adequate expert report is in violation of an order compelling discovery"). At most, this is a subject for cross-examination, not grounds for exclusion.

### 4.    Law-enforcement trends

Plaintiffs' attack (at 14–15) on the reliability of Mr. Minkler's "testi[mony] about the particular challenges faced by law enforcement in investigations in which he was not involved" also misses the mark. In fact, Mr. Minkler bases his opinions primarily on decades of his *own* experience leading and supervising criminal investigations and prosecutions—including "20 cases" where law enforcement "was unable to access . . . communications because they were encrypted" (Akro Decl. Exh. A., Depo. 182:12–183:1); "quite a few" child exploitation cases (*id.* at 18:12–18) and countless other cases where he learned of criminal communications methods by "interview[ing] criminals as part of proffers," supervising "terrorist investigations," or held meetings with FBI that "discuss[ed] investigative techniques and proffers of terrorist and national security investigations" (*id.* at 264:5–265:10); and numerous committee meetings discussing still other cases where law enforcement "could not gain access to [a criminal's] device because of the encryption" (*id.* at 168:1–18).

Mr. Minkler could have stopped there and still offered his same opinions, but he went the extra step of corroborating his opinions with additional case information gleaned from authoritative and reliable DOJ sources. (*See*, *e.g.*, Report ¶¶ 45–48 (citing policy statements, public remarks by the Attorney General and FBI director, and formal indictment).) Plaintiffs do not (and cannot) challenge the reliability of these additional authoritative sources. So their critique

effectively boils down to the assertion that it is inherently unreliable for Mr. Minkler to rely on facts for which he has no personal knowledge.  That is not the law:  Unlike fact witnesses, expert witnesses need not "ha[ve] personal knowledge of the matter[s]" to which they testify, Fed. R. Evid. 602, and may base their opinions on otherwise inadmissible facts that "the expert has been made aware of" so long as "experts in the particular field would reasonably rely on those kinds of facts or forming an opinion on the subject," Fed. R. Evid. 703—which indisputably is the case here.  In addition to his specialized experience, and other sources that Plaintiffs do not challenge, Mr. Minkler buttressed his opinions by referring to a few recent, high-profile cases in which law enforcement was stymied by its inability to access encrypted communications—including investigations or prosecutions relating to terrorism, the January 6, 2021, insurrection at the U.S. Capitol, and the attempted assassination of President Trump.  (*See* Report ¶¶ 45–48.)

There is no risk here that Mr. Minkler might become a "conduit" for otherwise inadmissible evidence in the case.  *Contra* Mot. 15–16.  The small handful of cases for which he relies on public sources is dwarfed by the dozens (if not hundreds) of other cases from his own experience that also underpin his opinions.  And Mr. Minkler "display[s] genuine . . . 'specialized knowledge'" in synthesizing those sources with his experience to form a broader opinion that will "help the trier of fact understand" not only the increase in use of end-to-end encryption services by criminals, but also how that can and does impede law enforcement.  *Williams v. Illinois*, 567 U.S. 50, 80 (2012); *cf. Caldwell v. City of San Francisco*, 2021 WL 1391464, at *5 (N.D. Cal. Apr. 13, 2021) (excluding expert testimony where there "[wa]s no indication of how [the expert] applied his purported expertise to synthesize or analyze the facts upon which he relied").

### 5.    Customer contracts

Plaintiffs overreach in challenging (at 16) the reliability of "any opinion by Mr. Minkler related to NSO's customers or contracts with its customers."  Mr. Minkler does not purport to opine on NSO's customer contracts; he says merely that he "verified" that, consistent with NSO's public reporting, "NSO's contracts contain clauses related to human rights and lawful intelligence gathering."  (Report ¶ 34.)  Defendants produced in discovery two nearly-identical NSO contracts from the relevant period, one of which Mr. Minkler consulted in forming his opinion.  (*See* Akro

Decl. Exh. A., Depo. at 119:6–20.)  Plaintiffs concede (as they must) that Mr. Minkler "may assume facts" that "have some support in the record."  (Mot. 16.)  Because the record includes (1) public reporting by NSO, (2) examples of customer contracts consistent with NSO's reporting, and (3) no evidence indicating any other customer contract lacks similar language, Mr. Minkler could properly *assume*—let alone conclude—that "NSO's contracts contain clauses related to human rights and lawful intelligence gathering."  (Report ¶ 34.)

Even if Mr. Minkler's statement were an opinion, Plaintiffs' challenge would go only to weight, not admissibility.  Mr. Minkler's opinion being based on NSO's public reporting and one of the two exemplar contracts in the record would not be "in and of itself, . . . enough to render [that] opinion unreliable."  *VIA Techs., Inc. v. ASUS Comp. Int'l*, 2017 WL 3051048, at *7 (N.D. Cal. July 19, 2017) (deeming a sample size of one "an issue for cross examination," not a basis for exclusion, where sample size was itself "bounded by" other considerations).  Plaintiffs' two cited cases are inapposite, as they both involved data sets several magnitudes larger than the set of NSO's customers and had no apparent restrictions on the sample size.  *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818–19 (7th Cir. 2010) (expert unreliably used methodology not "accepted by anyone" else and "tested a single, used 2006 GL1800, ridden by a single test rider, and extrapolated his conclusions to the fleet of [tens of thousands of] GL1800s produced from 2001 to 2008"); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 530 (N.D. Cal. 2020) (prevailing market rate for contract attorneys' fees could not be based on "four instances of billing over 17 years" from just one firm).

Nor does Mr. Minkler improperly "inject expert testimony on" NSO's customer list.  *Contra* Mot. 17.  Mr. Minkler's testimony about NSO's customers is properly grounded in information produced during discovery and public reporting, the reliability of which Plaintiffs do not question.  (*See*, *e.g.*, Report ¶¶ 33, 62.)  As Plaintiffs' lead authority explains, a court "abuses its discretion if it overlooks relevant data submitted as the foundation of an expert's remarks."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022) (Rule 702 "requires foundation, not corroboration").  Given that Plaintiffs' own experts rely on public reporting for

negative information about Pegasus,[6] it certainly must be fair play for Mr. Minkler to rely on public reporting for positive information about Pegasus—all of which is available to Plaintiffs. Plaintiffs' remaining cases are not persuasive because, unlike here, there was no way to test the expert's foundation. *See In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 85 (Bankr. S.D. Cal. 2003) (expert "relie[d] on confidential information" that could not be "disclose[d]" or "tested by cross-examination"); *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (expert's assumption of "market share" was based on "report" of excluded expert).

### 6. Mental state

Plaintiffs similarly overreach in challenging (at 17–18) Mr. Minkler's supposed "opinion on NSO's state of mind." Unlike Plaintiffs' claimed experts Dr. Anthony Vance and Mr. David Youssef—who purport directly to opine on NSO's past and future "intentions"—Mr. Minkler never opines on NSO's state of mind, and Plaintiffs point to nothing in his report suggesting otherwise. Because Mr. Minkler nowhere opines on what NSO "should have expected," *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D 280, 294 (N.D. Cal. 2017), or "what [NSO] knew,'" *Lin v. Solta Med., Inc.*, 2024 WL 51999905, at *12 (N.D. Cal. Dec. 23, 2024) (Hamilton, J.), Plaintiffs' cases are all distinguishable. *Cf. Stanley v. Novartis Pharms. Corp.*, 2014 WL 12573393, at *8 (C.D. Cal. May 6, 2014) ("declin[ing]" to exclude expert testimony where court could not "determine at this time that the testimony" was state-of-mind testimony).

To the extent Plaintiffs challenge Mr. Minkler's statements about Pegasus' design, exclusion is not warranted. Rule 702 permits Mr. Minkler to draw conclusions about Pegasus' design based on his specialized expertise in surveillance techniques and reliable information, so long as he "allow[s] the jurors to determine for themselves the legal significance of [that design] as interpreted." *United States v. Plunk*, 153 F.2d 1011, 1018 (9th Cir. 1998); *see also*, *e.g.*, *United States v. Simmons*, 923 F.2d 934, 947 (2d Cir. 1991) (affirming admission of expert "testimony, which related only to the meaning of unfamiliar narcotics jargon" and "left to the jury the task of

---

[6] Plaintiffs' proffered expert Dr. Anthony Vance relies heavily on press reports when summarizing alleged "misuses" of Pegasus. (*See* Dkt. No. 509-5 at pp. 7-14.)

1   determining whether the decoded terms demonstrated the necessary criminal intent"). That is

2   precisely what Mr. Minkler does: Using NSO materials and his own specialized knowledge to

3   categorize Pegasus' technical capabilities, Mr. Minkler concludes that Pegasus "appears designed

4   to capture" both "traditional forms of communications" and "new data streams" and thus "would

5   allow law enforcement legal access to E2E communications used in furtherance of criminal

6   activity"—while leaving jurors to decide the factual question of whether NSO had the requisite

7   intent to harm Plaintiffs. (Report ¶ 60; *see also* Akro Decl. Exh. A., Depo. at 157:5–17 (Pegasus

8   "provid[e]s a tool for law enforcement to, properly, in compliance with the laws of that country,

9   intercept end-to-end encrypted communications").) If anything, Plaintiffs' arguments are better

10  directed at their own experts, who actually purport to opine on NSO's intent and do so without

11  relying on any specialized expertise or technical information (Dr. Vance) or without any reliable

12  basis for predicting NSO's future business direction (Mr. Youssef).

13              **7.      Benefits of Pegasus**

14              Finally, Plaintiffs' attempt (Mot. 18) to preclude Mr. Minkler from "weighing the benefits

15  . . . versus the risks" of using Pegasus fails. As a threshold matter, Mr. Minkler (unlike Plaintiffs'

16  claimed expert, Dr. Vance) does not purport to *weigh* any benefits or risks. He will merely be

17  providing the jury with information about certain of those benefits. Plaintiffs' argument is further

18  premised on their incorrect assumption that Mr. Minkler cannot "opine on U.S. law enforcement's"

19  use of Pegasus—and therefore fails for the same reasons. (*See supra* Sections IV.B.1, IV.C.1,

20  IV.C.5.) Moreover, unlike in Plaintiffs' cited authority and unlike their unqualified academic

21  expert (Dr. Vance), Mr. Minkler's assessments of the social utility of Pegasus is not based on his

22  own say-so, but is instead grounded in decades of real-world investigations, discussions with law

23  enforcement, and independent research. (*Supra* Sections IV.A, IV.B.1.) Plaintiffs' citation to

24  *Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094, 1102–03 (C.D. Cal. 2017), is totally

25  inapposite, because the expert in *Laux* was excluded for opining that "Plaintiff suffers from 'breast

26  implant toxicity'" without even identifying "the toxic substance at issue, let alone [explaining]

27  how that substance can cause injury") (citation omitted). Mr. Minkler is not proffering any

28  "because I said so" opinions of the type excluded in *Laux*.

**D.      None of Mr. Minkler's opinions should be excluded under Rule 403.**

Plaintiffs seek (Mot. 19) to exclude all of Mr. Minkler's opinions under Rule 403 because, in Plaintiffs' view, those opinions merely recast an "irrelevant policy argument . . . in the guise of expert testimony."  That is wrong for at least two reasons.  Plaintiffs' argument turns entirely on the erroneous assumption that Mr. Minkler's opinions are not relevant—when, in fact, they are all relevant to punitive damages and injunctive relief.  (*Supra* Section IV.B.)  And Plaintiffs ignore the unique, policy-infused nature of punitive damages (and, for that matter, equitable remedies such as injunctive relief).  Unlike other jury determinations, punitive damages are "an expression of [the jury's] moral condemnation" that *intrinsically* requires the jury to weigh policy by determining how much "deterrence," "punishment," or "'expressi[on]'" is needed in a particular case.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 & n. 5, 438–39 (2001) (citations omitted).  Tellingly, none of Plaintiffs cited cases (at 19–20) involved punitive damages.

Plaintiffs also cursorily state (Mot. 16 n.9) that "[t]estimony on child sexual exploitation, national security, or other sensitive issues should be precluded under Rule 403" based on "irrelevance . . . and the substantial risk of unfair prejudice and juror confusion."  But Plaintiffs ignore Mr. Minkler's explanation *why* that evidence is relevant: Those types of crimes are precisely the areas where use of end-to-end encryption is increasing.  (*See* Report ¶ 58 ("Individuals engaging in organized crime, child exploitation, terrorism, and human trafficking continue to develop technologies to avoid detection by law enforcement"—including "E2E encryption"); Akro Decl. Exh. A., Depo. at 186:11–21 ("in drug cases, in child sexual crimes to include child exploitation crimes, and in terrorism cases, increasingly those individuals used counter-surveillance measures that include end-to-end encryption"); *id.* at 18:12–25 (explaining that "[c]hild exploitation crimes" were "the major cyber crimes investigations" he supervised, as they often "required somewhat sophisticated techniques to gather evidence from computers and the internet").)  Plaintiffs also ignore that Mr. Minkler never references Plaintiffs in connection with sexual exploitation or terrorism.

Mr. Minkler's opinions are actually relevant to the issues facing the jury and the Court.  In this respect, Mr. Minkler's testimony differs from those found in Plaintiffs' authorities (at 16 n.9).

*See Giganews, Inc. v. Perfect10, Inc.*, 2019 WL 1422723, at \*5 (C.D. Cal. Mar. 13, 2019) (excluding evidence that "child pornography was uploaded to [plaintiff's] servers" that was "irrelevant" to fraudulent-transfer claim); *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701, at \*22 (N.D. Cal. Jan. 30, 2018) (excluding "salacious and inflammatory details about [opposing party] that have no discernible relevance to the claims in this case"); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 480 F. Supp. 3d 1000, 1010–11 (N.D. Cal. 2020) (excluding "not relevant" evidence relating to "illegality by plaintiffs in their fetal tissue programs" that was subject to "raging debates"); *cf. Doe v. Bridges to Recovery, LLC*, 2021 WL 4690830, at \*8 (C.D. Cal. May 19, 2021) (expert could not "characterize the conduct as 'sexual exploitation'" because "[i]t is the jury's task to decide whether [the party's] conduct rose to that level," but could "explain the facts that support [that] opinion").  They are admissible, accordingly.

## V.    **CONCLUSION**

Because Mr. Minkler's opinions are relevant, helpful, and reliable, the Court should deny Plaintiffs' attempt to exclude them.


DATED: March 20, 2025

KING & SPALDING LLP

By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG
Attorneys for Defendants NSO GROUP
TECHNOLOGIES LIMITED and Q
CYBER TECHNOLOGIES LIMITED