JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>            Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF COL. TY SHEPARD**<br><br>Action Filed:   10/29/2019 |

1

# **TABLE OF CONTENTS**

2

**Page(s)**

3    I.    INTRODUCTION ........................................................................................................ 1

4    II.   RELEVANT LEGAL STANDARDS ......................................................................... 2

5    III.  ARGUMENT ............................................................................................................... 2

6        A.    Col. Shepard's extensive military, intelligence, and cybersecurity
7              experience qualify him to testify under Rule 702. .......................................... 2

8        B.    Col. Shepard does not rely on classified information. ...................................... 5

9        C.    Col. Shepard's opinions are reliable. ............................................................... 7

10            1.    Col. Shepard has a reliable basis to opine that threat actors
11                  use encrypted messaging. ...................................................................... 7

12            2.    Col. Shepard has a reliable basis to opine that the United
                    States and its allies use surveillance tools like Pegasus ...................... 9

13            3.    Col. Shepard has a reliable basis to opine on the
14                  marketplace for cybersurveillance tools and WhatsApp's
15                  work with law enforcement. ................................................................ 11

16            4.    Col. Shepard has a reliable basis to testify about
                    government compliance with terms of service. ................................... 13

17            5.    Col. Shepard has a reliable basis to opine that many
18                  cybersurveillance technologies do not offer the safeguards
19                  that Pegasus offers. ............................................................................ 14

              6.    Col. Shepard's opinions are relevant and helpful to the
20                  trier of fact. ........................................................................................ 15

21   IV.   CONCLUSION .......................................................................................................... 19

22

23

24

25

26

27

28

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*,
  2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) ..........................................................................12

*Avila v. Willits Envt'l Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ...................................................................................................12

*Buell-Wilson v. Ford Motor Co.*,
  73 Cal. Rptr. 3d 277 (Cal. Ct. App. 2008) ..............................................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...................................................................................................................2

*Elosu v. Middlefork Ranch Inc.*,
  26 F.4th 1017 (9th Cir. 2022) ....................................................................................................2

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007).............................................................................................7

*Hadley v. Kellogg Sales Co.*,
  2019 WL 3804661 (N.D. Cal. Aug. 13, 2019) ........................................................................17

*Hardeman v. Monsanto Co.*,
  997 F.3d 941 (9th Cir. 2021) ..............................................................................................16, 17

*Illuminia, Inc. v. BGI Genomics Co., Ltd.*,
  2021 WL 4979799 (N.D. Cal. Oct. 27, 2021)..........................................................................18

*Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.*,
  185 F. Supp. 2d 1103 (C.D. Cal. 2001) .....................................................................................6

*Krause v. Hawaiian Airlines, Inc.*,
  2019 WL 13225251 (E.D. Cal. June 7, 2019) ...........................................................................6

*In re Leap Wireless Int'l., Inc.*,
  301 B.R. 80 (Bankr. S.D. Cal. 2003) ......................................................................................6, 7

*Pac. Gas & Elec. Co. v. Super. Ct.*,
  24 Cal. App. 5th 1150 (2018) ..................................................................................................16

*In re PFA Ins. Mktg. Litig.*,
  696 F. Supp. 3d 788 (N.D. Cal. 2021) .....................................................................................12

DEFENDANTS' OPPOSITION TO
SHEPARD DAUBERT MOTION

Case No. 4:19-cv-07123-PJH

*Pfeifer v. John Crane, Inc.*,
   220 Cal. App. 4th 1270 (2013) ...................................................................................16

*Riley v. Volkswagen Grp. of Am.*, Inc., 51 F.4th 896 (9th Cir. 2022) ...........................16

*ThermoLife Int'l v. Gaspari Nutrition Inc.*,
   648 F. App'x 609 (9th Cir. 2016) ...............................................................................10

*Thomas v. Newton Int'l Enters.*,
   42 F.3d 1266 (9th Cir. 1994) ....................................................................................2, 3

*United States v. Cerna*,
   2010 WL 11627594 (N.D. Cal. 2010) ..........................................................................4

*United States v. Garcia*,
   7 F.3d 885 (9th Cir. 1993) ..........................................................................................12

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) .................................................................................2, 15

*United States v. Holguin*,
   51 F.4th 841 (9th Cir. 2022) ............................................................................... *passim*

*United States v. Nelson*,
   2021 WL 75757 (N.D. Cal. Jan. 8, 2021) ....................................................................8

*United States v. Valencia-Lopez*,
   971 F.3d 891 (9th Cir. 2020) ........................................................................................9

*V3 World Mgmt., Inc. v. Synergy Worldwide, Inc.*,
   2019 WL 2325968 (D. Utah May 31, 2019) ................................................................7

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) .....................................................................................18

**Statutes**

Cal. Civ. Code § 3294 ........................................................................................1, 15, 16

Cal. Penal Code § 502(e)(4) .........................................................................................15

**Other Authorities**

Fed. R. Civ. P. 26 ...........................................................................................................6, 7

Fed. R. Evid. 702 ................................................................................................... *passim*

Fed. R. Evid. 703 ................................................................................................................7

DEFENDANTS' OPPOSITION TO
SHEPARD DAUBERT MOTION

## I.    INTRODUCTION

Plaintiffs' motion to exclude NSO's expert, Colonel Ty Shepard (ret.), ignores Col. Shepard's qualifications, misrepresents his testimony and sources, and generally misconstrues Rule 702, under which "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments.  None of Plaintiffs' arguments provides a basis for excluding Col. Shepard.

**First**, Col. Shepard is qualified to offer opinions on the use of encrypted messaging applications by threat actors, the utility of tools like NSO's Pegasus for the United States and its allies to counter such threats, related military and intelligence practices, and the market for cybersurveillance tools.  He is a retired United States Army Colonel with more than twenty years of experience in prominent cybersecurity and intelligence roles.  In his report and during his deposition, Col. Shepard described his experience testing, implementing, and working with cybersecurity and surveillance technologies, including Pegasus specifically.  That "specialized experience" with the exact expert qualifications.  Fed. R. Civ. P. 702; *see United States v. Holguin*, 51 F.4th 841, 854-56 (subject-matter of this case easily clears Rule 702's low bar for 9th Cir. 2022).  Plaintiffs attempt to undermine Col. Shepard's experience by claiming that he relies extensively on classified information.  But the record does not bear this out—the only information Col. Shepard could not disclose pertained to ancillary details that are immaterial, if not wholly irrelevant, to his actual opinions.

**Second**, Col. Shepard reliably grounds his opinions in his extensive military experience and training in cybersurveillance.  Plaintiffs' misleading quibbles with the work Col. Shepard has performed in this case—for example, his colloquial remark during his deposition that in his own experience, "over 99 percent" of threat actors use encrypted messaging applications—may provide Plaintiffs a basis for cross-examination at trial, but they plainly do not justify the extreme remedy of exclusion.

**Third**, Col. Shepard's opinions are relevant to whether Plaintiffs are entitled to punitive damages or an injunction.  To obtain punitive damages, Plaintiffs bear the burden of demonstrating by "clear and convincing evidence" that NSO acted with "oppression, fraud, or malice."  Cal. Civ.

1

Code § 3294.  Col. Shepard's testimony that Pegasus and similar cybersurveillance tools benefit governments and the public by allowing the prevention and investigation of terrorist, intelligence, and criminal threats enabled by WhatsApp bears directly on whether NSO acted with the intent required for punitive damages and whether NSO's conduct was so "reprehensible" that punitive damages should be imposed.  That testimony is also relevant to whether the balance of hardships and public interest support a permanent injunction that would have the effect of prohibiting the use of Pegasus.

For all these reasons, Plaintiffs' motion to exclude Col. Shepard should be denied.

## II.   RELEVANT LEGAL STANDARDS

Rule 702 provides that "a witness who is qualified by knowledge, skill, experience, training, or education" may offer an expert opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  While the Court must ensure expert testimony is reliable, *see Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993), the Ninth Circuit "has cautioned that the district court is a gatekeeper, not a fact finder," *Elosu v. Middlefork Ranch Inc.,* 26 F.4th 1017, 1020 (9th Cir. 2022) (citation omitted).  The Court "is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.,* 738 F.3d 960, 969 (9th Cir. 2013).  Thus, expert "evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Elosu,* 26 F.4th at 1024.

## III.   ARGUMENT

### A.   Col. Shepard's extensive military, intelligence, and cybersecurity experience qualify him to testify under Rule 702.

Col. Shepard is qualified to opine on the use of surveillance technology in military and intelligence operations based on his "specialized experience."  Fed. R. Evid. 702.  Rule 702 "contemplates a *broad conception* of expert qualifications."  *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269 (9th Cir. 1994) (emphasis added); *see also United States v. Hankey,* 203 F.3d

2

1   1160, 1168 (9th Cir. 2000) ("[I]n considering the admissibility of testimony based on some 'other

2   specialized knowledge,' Rule 702 generally is construed liberally."). Under that broad conception,

3   Col. Shepard's significant knowledge of and experience with surveillance technology in military

4   and intelligence operations plainly lays "at least the minimal foundation of knowledge, skill and

5   experience required in order to give 'expert' testimony." *Thomas*, 42 F.3d at 1269.

6          Col. Shepard's specialized experience with cybersecurity and surveillance technology is

7   extensive. He served in the U.S. military for twenty-five years, predominately specializing in

8   intelligence and cybersecurity. (Dkt. 505-2 ("Shepard Rpt.") ¶¶ 3, 8-14.) Throughout his career,

9   he gained experience with a wide range of surveillance and investigation tools and applied them

10  in various investigations. Initially, he focused on "signal intelligence" (abbreviated as SIGINT),

11  the process of gathering intelligence by intercepting and analyzing electronic signals like radio

12  transmissions to monitor enemy network and communications systems. (Declaration of Joseph N.

13  Akrotirianakis ("Akro. Decl.") Exh. A ("Shepard Depo.") at 59:25-60:16.) Then, while working

14  for the U.S. Northern Command, Col. Shepard assisted various federal agencies—including the

15  State Department—with evaluating and implementing numerous intelligence-gathering tools.

16  (Shepard Rpt. ¶ 8; *see also* Akro Decl. Exh. A, Shepard Depo. at 217:13-218:1.) Col. Shepard has

17  also held various cybersecurity roles in the California Military Department, including serving as

18  Cyber Operations Director and assisting in creating a cyber-center to protect California's

19  infrastructure. (Shepard Rpt. ¶ 14; Akro Decl. Exh. A, Shepard Depo. at 132:8-133:17.) And,

20  more recently, Col. Shepard created a cybersecurity exercise known as "Cyber Dawn," during

21  which cyber-protection teams from around the United States come annually to the West Coast to

22  "conduct offensive and defensive" cybersecurity exercises. (Akro Decl. Exh. A, Shepard Depo.

23  at 123:13-124:10.)

24         Col. Shepard was also deployed to the U.S. Embassy in Ukraine in 2017, where he served

25  as the subject-matter expert in "Command, Control, Communications, Computers, Intelligence,

26  Surveillance, and Reconnaissance." (Shepard Rpt. ¶ 9; *see also* Akro Decl. Exh. A, Shepard Depo.

27  16:1-3.) In that capacity, Col. Shepard ████████████████████████████████████████ [1]

28  ████████████████████████████████████████████████████████████. (Akro

───────────────────────────────────────────────

[1] Redacted Portions in Brief are Confidential Military Information that will be Subject of Upcoming Omnibus Motion



1  Decl. Exh. A, Shepard Depo. at 15:14-18, 22:9-23:14, 26:1-25, 27:1-14.)  For example, Col.

2  Shepard helped

3  . (Shepard Rpt. ¶ 9; *see also*

4  Akro Decl. Exh. A, Shepard Depo. at 24:18-25, 25:12-25.)  Additionally, Col. Shepard

5  . (*Id.* at 29:2-18, 30:1-7.)

6          Col. Shepard also has specialized experience

7  .  Throughout the latter half of his career, Col. Shepard

8  . (*Id.* at 74:8-23.)

9  . (*See Id.* at

10  70:2-21, 73:11-17, 85:17-86:3.)  And several missions took Col. Shepard to

11

12  . (*See Id.* at 73:18-74:3.)

13          Plaintiffs demean Col. Shepard's experience as "operational" rather than "academic" (Mot.

14  at 1), but that distinction has no relevance to whether an expert is qualified to testify under Rule

15  702.  Even Plaintiffs' cited authority acknowledges that a "lack of academic research and writing

16  experience" does not preclude qualifying an expert based on "specialized knowledge, experience,

17  and training."  *United States v. Cerna*, 2010 WL 11627594, at *4 (N.D. Cal. 2010); *see also*

18  *Holguin*, 51 F.4th at 854 ("Law enforcement professionals are routinely qualified to offer expert

19  testimony based on their training and experience.").[1]  And "the text of Rule 702 expressly

20  contemplates that an expert may be qualified on the basis of experience"; indeed, in "certain fields,

21  experience is the predominant, if not the sole basis for a great deal of reliable expert testimony."

22  Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments.  Plaintiffs may try to impeach

23  Col. Shepard at trial based on the nature of his experience, but that experience—extensive first-

24  hand involvement in military intelligence and cybersurveillance—gives him "specialized

25  knowledge beyond the jury's common knowledge of" those areas.  *Holguin*, 51 F.4th at 854.  Col.

26

27  _____

28  [1] Similarly, Plaintiffs' own authority confirms that Col. Shepard having "never been qualified to testify as an expert in federal court does not prevent him from testifying in this case."  *Cerna*, 2010 WL 11627594, at *4.

4

1    Shepard is therefore qualified to offer all of his opinions

2           **B.      Col. Shepard does not rely on classified information.**

3           Plaintiffs next attempt to undermine Col. Shepard's opinions by arguing that they depend

4    on classified information.  That is false.  To argue otherwise, Plaintiffs wrench from context a few

5    isolated instances in which Col. Shepard expressed that he was unable to disclose classified

6    information during his deposition.  (Mot. 6 n.4.)  But the information Plaintiffs sought in these

7    exchanges involved ancillary details that are immaterial, if not wholly irrelevant, to Col. Shepard's

8    actual opinions.

9           For example, Plaintiffs take issue with Col. Shepard's refusal "to provide the names of

10   NSO customers."  *Id.*  But this Court already ruled that Defendants "need not disclose the identities

11   of their third-party clients" because only the "actions" of those clients are relevant.  (Dkt. 292 at

12   5.)  The relevant fact is *that* U.S. allies have used Pegasus to investigate and prevent terrorism and

13   serious crimes.  As this Court recognized (*id.*), the specific identities of *which* allies have done so

14   is not material.  In any event, ███████████████████████████████████████████

15   ██████████████████████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████████████████████████

17   ███████████.  (*See* Akro Decl. Exh. A, Shepard Depo. at 84:7-85:25.)

18          Nor is it true, as Plaintiffs claim, that Col. Shepard refused to discuss ███████████

19   ████████████████████████████████████████  (Mot. at 6 n.4.)  Col. Shepard

20   testified that ███████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████.  (Akro

22   Decl. Exh. A, Shepard Depo. at 101:1-24.)  He also testified that, ████████████████████

23   ██████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████.  (*Id.* at 70:2-21, 73:11-

25   25, 74:1-3, 85:17-25, 86:1-3, 112:1-15.)  That is more than sufficient to support Col. Shepard's

26   opinion that the United States and its allies use Pegasus.  (Shepard Rpt. ¶¶ 26-30.)

27          For their part, Plaintiffs do not explain why they need classified information to further

28   probe the basis for Col. Shepard's opinions or explain how those opinions "inextricably" rely on

classified information—as was the case in the non-binding bankruptcy court decision Plaintiffs cite. *In re Leap Wireless Int'l., Inc.*, 301 B.R. 80, 85 (Bankr. S.D. Cal. 2003). Plaintiffs are able to cross-examine Col. Shepard without access to any of the classified information they cite, and they do not argue otherwise. They may also try to use Col. Shepard's inability to disclose confidential information as a basis to undermine his opinions with the jury. So, even if Plaintiffs' complaints about classified information were "colorable"—and they are not—they are mere grounds for "impeachment" that do not "go to admissibility." *Alaska Rent-A-Car*, 738 F.3d at 969.

In any event, exclusion under Rule 702 would not be the proper remedy for any failure by Col. Shepard to disclose confidential information. Rule 26(a)(2)(B) requires that an expert report contain "a complete statement of all opinions the witness will express and basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). As Plaintiffs' authority recognizes, "generally, the remedy for a deficient expert report is a motion to compel in advance of trial" under Rule 26. *In re Leap Wireless Int'l., Inc.*, 301 B.R. at 83.[2] And "[e]xclusion of expert report or testimony is appropriate only when the failure to provide an adequate expert report is in violation of an order compelling discovery." *Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.*, 185 F. Supp. 2d 1103, 1107 (C.D. Cal. 2001). Here, Plaintiffs did not move to compel Col. Shepard to provide confidential information under Rule 26, and this Court did not order him to do so. Exclusion is therefore inappropriate. *See, e.g.*, *Krause v. Hawaiian Airlines, Inc.*, 2019 WL 13225251, at *4 (E.D. Cal. June 7, 2019) (denying motion to exclude expert despite Rule 26 violation when moving party "move[d] to strike the disclosure in its entirety—rather than promptly seeking to compel supplemental disclosures").

The only case Plaintiffs cite, the "unusual case" of *In re Leap*, does not support a contrary conclusion here. 301 B.R. at 83. In that case—a non-binding decision by a bankruptcy court—the expert conducted a "comparable license sale analysis" that "inextricably relie[d]" on undisclosed confidential information about 18% of the license transactions on which he based his valuation. *Id.* at 84-85. And while the opposing party did not timely file a Rule 26 motion, the

---

[2] Defendants' motion to compel with respect to Plaintiffs' expert David Youssef reflects the proper procedure. (Dkt. 498.)

DEFENDANTS' OPPOSITION TO                                   Case No. 4:19-cv-07123-PJH
SHEPARD DAUBERT MOTION

1   case's peculiar schedule allowed "extremely limited" time for such motions and made "cur[ing]"

2   the defect impractical.  *Id.* at 83, 85 n.4.  In those "particular circumstances," the bankruptcy court

3   found that the expert's refusal to disclose the data underlying his calculations prevented the

4   opposing party from cross-examining the expert and the court from assessing the reliability of his

5   testimony.  *Id.*

6           The same is not true here, where Plaintiffs had ample time to file a motion to compel under

7   Rule 26, and where Col. Shepard's opinions do not "inextricably rel[y]" on classified information.

8   *Id.* at 84.  Particularly in light of their failure to move to compel following the deposition, Plaintiffs

9   cannot plausibly contend that either their or this Court's assessment of Col. Shepard's opinions

10  requires access to undisclosed confidential information.  *See V3 World Mgmt., Inc. v. Synergy*

11  *Worldwide, Inc.*, 2019 WL 2325968, at *1-2 (D. Utah May 31, 2019) (denying motion to exclude

12  expert who "declined to disclose the details of his professional experience . . . due to the attorney-

13  client privilege" because he still "provided sufficient information to establish his qualifications

14  and the facts or data upon which his opinion is based," about which moving party could "cross-

15  examine" him); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295,

16  334-35 (D. Vt. 2007) (denying motion to exclude expert who did not disclose certain sources and

17  refused to reveal "confidential information," when doing so was "ordinary practice" and expert

18  relied on undisclosed sources to "merely confirm[] his initial analysis").

19          **C.      Col. Shepard's opinions are reliable.**

20                  **1.      Col. Shepard has a reliable basis to opine that threat actors use
                              encrypted messaging.**

21          Plaintiffs challenge Col. Shepard's opinion that "terrorist organizations, narcotics groups,

22  human traffickers" and other threat actors use encrypted messaging applications to conceal their

23  activities (Shepard Rpt. ¶ 23), but they simply ignore the ample support Col. Shepard has provided

24  for that opinion.  To begin, experts may rely on their own experiences, *Holguin*, 51 F.4th at 856,

25  and Col. Shepard testified that he has personally seen threat actors use encrypted messaging

26  applications (*e.g.*, Akro Decl. Exh. A, Shepard Depo. at 173:9-14; 175:2-7).  Col. Shepard even

27  offered to provide specific examples, but Plaintiffs' counsel refused.  (*Id.* at 175:17-22.)  Such

28  "[e]xperience alone is a reliable basis" for Col. Shepard's opinions.  *Holguin*, 51 F.4th at 856; *see*

                                                        7

DEFENDANTS' OPPOSITION TO                                               Case No. 4:19-cv-07123-PJH
SHEPARD DAUBERT MOTION

1  *also* Fed. R. Evid. 703 (allowing reliance on information an "expert has . . . personally observed").

2  Moreover, Col. Shepard has cited an overwhelming number of articles specifically

3  addressing the use of encrypted applications by threat actors around the world.  (*See* Shepard Rpt.

4  App'x I; *e.g.*, Ryan Pereira, *Shining Light on the "Going Dark" Phenomenon: U.S. Efforts to*

5  *Overcome the Use of End-to-End Encryption by Islamic State Supporters*, HARVARD NAT'L

6  SECURITY J. ONLINE (Sep. 3, 2021), *available at* https://harvardnsj.org/wp-

7  content/uploads/sites/13/2021/09/Shining-Light-OnGoing-Dark.pdf.)  For example, it is public

8  knowledge that the perpetrators of the ISIS terror attacks in Paris in November 2015 "taught

9  trainees about secure communications—encrypted applications such as Telegram, WhatsApp and

10 Truecrypt—and set up protocols to contact them when they were in place."  Sebastian Rotella,

11 *ISIS via WhatsApp: 'Blow Yourself Up, O Lion'* PBS FRONTLINE, *available at*

12 https://www.pbs.org/wgbh/frontline/article/isis-via-whatsapp-blow-yourself-up-o-lion/.[3]  The former

13 U.S. Attorney General has described end-to-end encryption services as posing "a grave threat to

14 public safety" and "an unacceptable risk to the country."  U.S. DOJ, *Attorney General William P.*

15 *Barr Delivers Keynote Address at the International Conference on Cyber Security* (July 23, 2019).[4]

16 These "facts and data," particularly when combined with Col. Shepard's extensive personal

17 experience, amply support Col. Shepard's opinions.  *See, e.g.*, *United States v. Nelson*, 2021 WL

18 75757, at *11 (N.D. Cal. Jan. 8, 2021) (expert's "use of such sources as 'books' and 'newspaper

---

[3]  *See also* Robert Graham, *How Terrorists Use Encryption*, CTCSENTINEL, VOL. 9, ISSUE 6 at 23
(2016),    *available    at*    https://ctc.westpoint.edu/wp-content/uploads/2016/06/CTC-
SENTINEL_Vol9Iss69.pdf ("The ubiquity of encryption in commercially available messaging
tools and devices has made it increasingly easy for terrorists to communicate securely.  And it has
become easier for terrorists to use the tools that already exist (Telegram, Whatsapp, Surespot, etc.)
rather than build their own software.").

[4]  *Available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-
keynote-address-international-conference-cyber.  As one example, the Attorney General cited a
Mexican cartel that "use[d] WhatsApp as their primary communication method, preventing U.S.
law enforcement from conducting wiretaps that would enable us to locate fentanyl shipments and
seize them at the border.  We also found that the cartel had used WhatsApp for the specific purpose
of coordinating the murders of Mexico-based police officials.  The cartel ended up murdering
hundreds of these police officers.  Had we been able to gain lawful access to the chat on a timely
basis, we could have saved these lives.  So the costs of not being able to gain lawful access in this
case were the lives of the assassinated officers, as well as the many lives impacted here by
unimpeded entry into the United States of huge amounts of deadly fentanyl."  *Id.*

8

1  articles' as part of his broader intelligence-gathering practice satisfies the methodological-
2  reliability requirement of Rule 702").

3      Plaintiffs attempt to distract from this ample support by seizing on Col. Shepard's
4  statement during his deposition that, in his personal experience, "over 99 percent" of threat actors
5  use encrypted messaging applications. (Mot. at 8.)  This is a red herring.  Col. Shepard was clearly
6  speaking colloquially, and if he testifies to it at trial, Plaintiffs can cross-examine him about it.
7  (*See* Akro Decl. Exh. A, Shepard Depo. at 173:9-17.)  For this reason, Plaintiffs' focus on Col.
8  Shepard's supposed failure to identify any studies supporting a 99 percent usage rate is beside the
9  point.  So is Plaintiffs' citation to *United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020).
10 In that case, a prosecution for drug transportation and importation, the government's expert
11 testified for the first time at trial that "the likelihood drug trafficking organizations would entrust
12 a large quantity of illegal drugs to the driver of a commercial vehicle who was forced or threatened
13 to comply was '[a]lmost nil, almost none.'"  *Id.* at 895.  The Ninth Circuit found the trial court
14 erred by failing to make *any* reliability determination as to how the agent's experience supported
15 this testimony, in part because the expert offered his opinion for the first time on the witness stand.
16 *Id.* at 898-99.

17     Here, by contrast, the opinion Col. Shepard disclosed in his report and will offer at trial is
18 the well-established fact that threat actors use encrypted messaging applications to conceal their
19 activities (Shepard Rpt. ¶ 23)—not that any particular *percentage* of threat actors do so.  And his
20 actual opinion is well-supported by his personal experiences and by reams of reliable public
21 reports.  Plaintiffs may try to impeach that testimony at trial, but Rule 702 permits Col. Shepard
22 to "generally testif[y] based on [his] experience" without offering the sort of "systemic
23 methodology" that Plaintiffs seem to demand.  *Holguin*, 51 F.4th at 856.

24         **2.    Col. Shepard has a reliable basis to opine that the United States and
                    its allies use surveillance tools like Pegasus.**

25     In challenging the reliability of Col. Shepard's opinion concerning the use of surveillance
26 tools like Pegasus by the United States and its allies, Plaintiffs distort Col. Shepard's testimony.
27 He did not, as Plaintiffs say, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
28

9

1 ████████ (Mot. at 9.)  Rather, Col. Shepard  testified that ████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████

4 ████████████████.  (*See* Akro Decl. Exh. A, Shepard Depo. 83:5-85:2;

5 245:2-9.)    He explained, for example, ████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████.  (*Id.*

8 at 84:7-14.)  In other words, all Col. Shepard disclaimed was ████████████

9 ████████████████████████.  That unremarkable disclaimer is not remotely

10 inconsistent with Col. Shepard's actual opinion—that "U.S. military intelligence agencies, as well

11 as those of U.S. allies, routinely use surveillance tools similar to Pegasus to combat a variety of

12 threat actors."  (Shepard Rpt. ¶ 26.)

13          And to be clear, Col. Shepard provided ample support for that opinion.  He repeatedly

14 testified to his experience with cybersurveillance, both domestically and abroad (*e.g.*, Akro Decl.

15 Exh. A, Shepard Depo. at 59:25- 60:16, 217:13-218:1, 243:13-245-9); described ████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████ (*Id.* at 70:2-21, 73:11-25, 74:1-4, 84:1-86:1, 102:16-22); and

18 identified numerous public reports supporting his testimony, including one confirming that the FBI

19 licensed Pegasus (Shepard Rpt. App'x I; *see, e.g.*, *FBI Confirms It Obtained NSO's Pegasus*

20 *Spyware*, THE GUARDIAN (Feb. 2, 2022)[5]).    That support bears no resemblance to the non-

21 precedential case on which Plaintiffs rely, in which the Ninth Circuit affirmed the exclusion of an

22 expert because the *only* support for the expert's opinion was an excluded report, leaving the jury

23 no way to assess the opinion.  *ThermoLife  Int'l v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614

24 (9th Cir. 2016).    Here, by contrast, the record is replete with evidence demonstrating Col.

25 Shepard's qualifications and supporting his opinions.

26          Plaintiffs also distort Col. Shepard's testimony ████████████████████

27

28

---

[5] https://www.theguardian.com/news/2022/feb/02/fbi-confirms-it-obtained-nsos-pegasus-spyware

1    ██████.  Although  he  was  not  able  to  ████████████████████████████

2    ████████████████████████████████████████████████████████████████████

3    ██████████████████████████████████  (*see* Akro Decl. Exh. A, Shepard Depo. at 81:12-

4    82:24), he provided more than enough information to support his opinion.  He testified that

5    ████████████████████████████████████████████████████████████████████

6    ███████████████  (*see* Dkt. 504-4 at 69:23-70:4);  █████████████████████

7    ██████████████████████████████████████████████████  (Akro Decl. Exh.

8    A, Shepard Depo. at 73:18-74:2); he █████████████████████████████████

9    ██████████████████████████████████  (*see id.* at 84:15-85:1); █████████

10   ████████████████████████████████████████████████████████████████████

11   █████████████████████████████████  (*id.* 85:3-85:22); ████████████████

12   █████████████████████████████  (*id.*);  ██████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ██████████  (Dkt. 504-4 at 91:25-92:16.)  Public reporting reflects much of the same.  (Shepard Rpt.

15   App'x I; *supra* at 5.)  Here too, Col. Shepard's inability to ████████████████████

16   ████████  or to ██████████████████████████████████████████████████████

17   is not a basis for exclusion—it is, at best, grounds for cross-examination at trial.

18        Nor is there any merit to Plaintiffs' rote complaints about NSO not providing a list of its

19   customers in discovery or to Col. Shepard.  (Mot. 11.)  Plaintiffs cannot explain why Col. Shepard

20   would need a complete list of NSO's customers █████████████████████████████████

21   █████████████████████████████████████.  Whether NSO ████████████████████

22   ██████████████████████████████████████  has no bearing on his opinions.

23   Anyway, this Court already held that NSO was not *required* to disclose the identities of its

24   customers (Dkt. 292 at 5), so any lack of disclosure cannot support exclusion.

25        **3.    Col. Shepard has a reliable basis to opine on the marketplace for**
             **cybersurveillance tools and WhatsApp's work with law enforcement.**
26

27        In total disregard of Col. Shepard's significant experience as an intelligence operative,

28   Plaintiff mistakenly argues that his opinion on the marketplace for commercial surveillance tools

DEFENDANTS' OPPOSITION TO                                    Case No. 4:19-cv-07123-PJH
SHEPARD DAUBERT MOTION

and WhatsApp's work with law enforcement is unreliable.

*First*, Col. Shepard has a reliable basis to testify about the marketplace for cybersurveillance tools. His experience with intelligence operations and cybersurveillance provide him with an extensive background in commercial surveillance tools, how they are sold and purchased, and how they are used in intelligence and counterterrorism operations—all of which provides a more than sufficient basis for Col. Shepard to opine on such tools' value for governments. (*E.g.*, Shepard Rpt. ¶¶ 8-14; *see also* Akro Decl. Exh. A, Shepard Depo. at 217:13-218:17, 247:9-24, 308:17-20.) Furthermore, Col. Shepard clearly testified that he had experience purchasing tools similar to Pegasus (i.e., "tools that would collect information off of phones or off of computers"), most recently in his cybersecurity role with the State of California. (Dkt. 504-4 at 246:7-248:18.) And, while he had not purchased Pegasus on behalf of the United States, he testified that he was familiar with NSO's licensing process and safeguards because he participated extensively in the procurement process as Pegasus was being licensed by a U.S. partner. (*See* Akro Decl. Exh. A, Shepard Depo. at 254:22-259:13, 308:17-20.)

Plaintiffs' cited authority is readily distinguishable because it involved a clear disconnect between the expert's experience selling life insurance policies and his opinions on the putative class members' reasons for purchasing certain policies—opinions that would have required surveys or a background in consumer behavior. *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 800 (N.D. Cal. 2021). There is no such disconnect between Col. Shepard's experience in testing, developing, using, and purchasing cybersurveillance tools and his opinions about the value of those tools. And, in any event, "lack of particularized expertise goes to the weight accorded [his] testimony, not to the admissibility of [his] opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (holding that an expert's admitted lack of "particularized expertise on the subject of child testimony through closed circuit television" did not preclude her from testifying because of her considerable experience treating abused children); *see also D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) ("So long as the expert's testimony remains within the reasonable confines of his subject area,' it is admissible." (citing *Avila v. Willits Envt'l Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011))). Plaintiffs'

criticisms of that testimony are, yet again, grounds for cross-examination, not exclusion.

*Second*, Col. Shepard's experience supports his opinions that "many encrypted messaging application providers such as WhatsApp do not help the government obtain access to encrypted communications." (*See* Mot. at 12 (citing Shepard Rpt. ¶ 34).)  Based on his personal experience at the southern border, Col. Shepard testified that he knows firsthand that "it's always a battle . . . trying to get the information" from companies like WhatsApp via subpoenas.  (Akro Decl. Exh. A, Shepard Depo. at 188:6-15).  Plaintiffs offer no reason why Col. Shepard would need to have personally requested such information to understand whether or not such requests typically yield responses.  And again, Plaintiffs ignore Col. Shepard's citation to multiple public sources that bolster his opinions regarding encrypted messaging application providers' reluctance to provide law enforcement with encrypted communications—even those used by terrorist groups.  (Shepard Rpt. App'x I; *see, e.g*., Keith Wagstaff, *Paris Attack Could Renew Debate Over Encrypted Messaging Apps*, NBC News (Nov. 16, 2015)[6]).

### 4.  Col. Shepard has a reliable basis to testify about government compliance with terms of service.

Plaintiffs' argument that Col. Shepard lacks a basis to opine on government actors' compliance with terms of service (Mot. at 13) is disingenuous at best.  Plaintiffs are aware that WhatsApp users, government actors or not, are often out of literal compliance with WhatsApp's terms of service.  Plaintiffs' own corporate designee, a security engineer at Meta, testified that users often use fake names when signing up for WhatsApp and that free public tools make decompiling WhatsApp's code simple.  (*E.g.,* Dkt. 419-5, Exh. B at 111:15-114:6.)  This is entirely consistent with Col. Shepard's opinion.  (*See* Shepard Rpt. ¶ 37 ("[U]sers routinely register using pseudonyms and avoid disclosing their true identities or locations even when required by the terms of service, and providers typically do not enforce such policies."))

Setting aside Plaintiffs' own admissions, Col. Shepard nevertheless has a reliable basis to opine on government compliance with cybersurveillance companies' terms of service.   Col.

---

[6]   https://www.nbcnews.com/storyline/paris-terror-attacks/paris-attack-could-renew-debate-over-encrypted-messaging-apps-n464276

Shepard has decades of experience leading and training governments' counterterrorism and crime-prevention cybersecurity efforts. (Shepard Rpt. ¶¶ 3–18; *see also, e.g.*, Akro Decl. Exh. A, Shepard Depo. at 15:14-18, 22:9-23:14, 26:1-25, 27:1-14.) Based on his extensive military and intelligence experience, he testified that it is "commonplace" for government organizations that require discretion (such as intelligence organizations) to take steps to avoid giving away identifying information. (Dkt. No. 504-4 at 382:8-390:11.) This includes the use of altered names or other identifying information, using a "voice over Internet Protocol" phone number to create an encrypted messaging account; and using a VPN to mask a government agent's actual location, among other techniques. (*See id.*)

Col. Shepard has also seen firsthand that "companies that provide messaging applications often design their systems to prevent anyone, including government agencies, from decrypting communications stored or sent using the applications." (Shepard Rpt. ¶ 23.) In order to "overcome such encryption and conduct lawful surveillance," Col. Shepard reliably opines, "government agencies need to develop or purchase licenses to use special surveillance tools." (*Id.*) The Court should reject Plaintiffs' argument that a U.S. Army Colonel with decades of experience training governments in cyber-security and counter-terrorism missions would somehow lack a basis to opine on whether such governments are in strict compliance with technology companies' terms of service.

**5.    Col. Shepard has a reliable basis to opine that many cybersurveillance technologies do not offer the safeguards that Pegasus offers.**

Finally, Col. Shepard has a reliable basis to opine that many cybersurveillance tools do not have the same safeguards as NSO. Contrary to Plaintiffs' claim that Col. Shepard could not identify any cybersurveillance tool comparable to those he references in Paragraph 44 of his report (Mot. at 14), Col. Shepard testified that he could recall "five or six" such tools, while merely noting that many of them have "foreign names" that are "difficult to say" or "translate." (Akro Decl. Exh. A, Shepard Depo. 402:8-403:2).

Nor is Col. Shepard required to conduct an "empirical analysis on the due diligence of other cyber surveillance companies" (Mot. at 14) in order to offer an opinion that many

---

14

cybersurveillance tools do not have the same safeguards as Pegasus. As already explained, an expert who (like Col. Shepard) testifies based on specialized expertise gained from firsthand experience with a wide array of cybersurveillance tools does not *also* need to conduct an empirical analysis. *Holguin*, 51 F.4th at 856. Rule 702 "works well for this type of data gathered from years of experience and special knowledge." *Hankey*, 203 F.3d at 1169.

Moreover, Plaintiffs ignore Col. Shepard's testimony that ==many of the relevant cybersurveillance tools are simply available on the "dark net."== (Akro Decl. Exh. A, Shepard Depo. at 401:11-23, 403:22-407:14.) As such, =="[m]ost of these companies that are building commercial cyber surveillance tools don't have an ethics committee. They don't have a policy. They don't have anything that's transparent. They're just selling . . . to whoever."== (*Id.* at 411:16-22.) Col. Shepard's supposed failure to "understand the due diligence" such companies perform (Mot. 14) is beside the point—Col. Shepard's testimony is that ==these companies *do not perform* due diligence==, and Plaintiffs cannot fault Col. Shepard for not reviewing policies and procedures that do not exist.

### 6.    Col. Shepard's opinions are relevant and helpful to the trier of fact.

Unable persuasively to challenge the reliability of Col. Shepard's opinions, Plaintiffs attempt to challenge their relevance. Contrary to Plaintiffs' arguments, however, Col. Shepard's opinions are directly relevant to whether Plaintiffs are entitled to recover much of the relief they seek: punitive damages and a permanent injunction.

#### a)    Col. Shepard's opinions are relevant to punitive damages.

Col. Shepard's testimony bears on Plaintiffs' claim for punitive damages. Without that testimony, the jury cannot properly determine whether NSO's conduct in licensing Pegasus is so reprehensible that it warrants punitive damages above and beyond any compensatory relief. Contrary to Plaintiffs' apparent assumption, the jury should not put on blinders and assess punitive damages based solely on evidence of Pegasus' alleged harms, without any evidence of its benefits.

To be entitled to punitive damages, Plaintiffs will need to "prove[] by clear and convincing evidence that [NSO] has been guilty of oppression, fraud, or malice." Cal. Penal Code § 502(e)(4). "Malice" requires either an intent "to cause injury" or "despicable conduct . . . with a willful and

1   conscious disregard of that person's rights."  Cal. Civ. Code § 3294(c)(1).  "Oppression" similarly

2   requires "despicable conduct that subjects a person to cruel and unjust hardship in conscious

3   disregard of that person's rights." *Id.* § 3294(c)(2).  "Fraud" requires an intent to "depriv[e] a

4   person of property or legal rights or otherwise caus[e] injury." *Id.* § 3294(c)(3).  The amount of

5   punitive damages available also would depend on how "egregious" NSO's behavior was.  *See*

6   *Riley v. Volkswagen Grp. of Am.*, Inc., 51 F.4th 896, 902 (9th Cir. 2022).  In other words, the jury

7   will need to make a number of factual determinations regarding whether NSO intended to harm

8   others, disregarded their safety, or engaged in objectively reprehensible conduct.

9        Col. Shepard's opinions on how NSO's surveillance technology helps governments

10  prevent and investigate terrorist attacks, assassinations, drug trafficking, and other threats are

11  highly relevant to these determinations.  These opinions, for example, provide context that will

12  help the jury understand how the "U.S. and allied national security agencies" are able to use

13  "[t]ools like Pegasus" to gain "intelligence" insight that allows them to "successfully disrupt

14  attempts to injure or kill people, damage or destroy critical infrastructure, and otherwise threaten

15  public safety and security." (Shepard Rpt. ¶ 28.)  Although Col. Shepard does not directly opine

16  on NSO's intent, his opinions are indirect evidence on that issue—*i.e.*, whether NSO's intent was

17  to harm Plaintiffs or to fill existing gaps in law-enforcement needs by developing a technology

18  that Col. Shepard has personally seen used in beneficial ways.  *See Hardeman v. Monsanto Co.*,

19  997 F.3d 941, 971 (9th Cir. 2021) (the requisite intent "can be 'proved either expressly through

20  direct evidence or by implication through indirect evidence'") (quoting *Pfeifer v. John Crane, Inc.*,

21  220 Cal. App. 4th 1270, 1299 (2013)).

22       Col. Shepard's opinions likewise will help the jury determine whether NSO's conduct was

23  "despicable."  This objective standard requires "conduct 'so vile, base, contemptible, miserable,

24  wretched or loathsome that it would be looked down upon and despised by most ordinary decent

25  people.'" *Hardeman*, 997 F.3d at 971 (quoting *Pac. Gas & Elec. Co. v. Super. Ct.*, 24 Cal. App.

26  5th 1150, 1158 (2018)); *see also* CACI 3945 (Punitive Damages—Entity Defendant—Trial Not

27  Bifurcated) (similar).  The jury cannot properly make this determination by considering only one

28  side of the equation—*i.e.*, the supposed harms of NSO's technology.  Rather, the jury also must

16

1    consider whether the challenged technology has beneficial properties such that most ordinary

2    decent people would not find NSO's conduct despicable.  Col. Shepard's opinions will directly

3    help the jury understand those benefits.  Indeed, Plaintiffs themselves intend to argue on this issue

4    that NSO peddles "spyware" and "Malware Vectors" that "posed a substantial risk of harm to

5    thousands of WhatsApp users."  (Pls.' Trial Br. (Dkt. 595) at 2, 10–12.)  Col. Shepard's opinions

6    that, in fact, NSO offers essential lawful-intercept technologies that allow law enforcement to track

7    suspected criminals and terrorists are necessary to rebut Plaintiffs' arguments.

8         Similarly, in deciding whether to award punitive damages, the jury must assess the nature

9    of NSO's conduct, whether it falls so far outside the norm as to require additional punishment, and

10   whether NSO took steps to mitigate any actual, known risks.  *See Hardeman*, 997 F.3d at 971.

11   Col. Shepard's testimony as to the lawful, beneficial use of cybersurveillance tools bears directly

12   on those issues.  So does Col. Shepard's testimony that NSO, unlike some of its peer organizations,

13   uses a number of guardrails to protect against potential misuse of Pegasus.  (Shepard Rpt. ¶¶ 38,

14   43.)  NSO, for instance, prohibits sale of its products to countries and customers "not trusted to

15   use them appropriately."  (*Id*. ¶ 39; *see also id*. ¶ 44 ("I am unaware of a strategic available

16   commercial off-the-shelf (COTS) surveillance tool used internationally that has more safeguards

17   than Pegasus.").)  NSO is entitled to present that testimony to defend against Plaintiffs' claim that

18   it acted despicably and ignored known risks.

19        Courts commonly admit similar expert testimony about whether a challenged product or

20   technology is, in fact, harmful or beneficial when assessing punitive-damages claims.  *See*, *e.g.*,

21   *Riley*, 51 F.4th at 901 n.4 (noting "'expert testimony that increased NOx emissions increase the

22   risk of harm to human health'" was "'evidence of the egregiousness of Volkswagen's

23   misconduct'"); *Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at *16 (N.D. Cal. Aug. 13, 2019)

24   (Koh, J.) (considering expert testimony on whether "cereal consumption increases the risk of

25   coronary heart disease, diabetes, or obesity" on punitive-damages claim against cereal

26   manufacturer); *Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 312 (Cal. Ct. App. 2008) (jury

27   properly weighed competing "expert testimony" on whether product had "design and safety issues"

28   on punitive-damages claim).  These cases all confirm that Col. Shepard's opinions are relevant.

17

1          b)      **Col. Shepard's opinions are relevant to injunctive relief.**

2          For similar reasons, Col. Shepard's testimony is relevant to whether Plaintiffs are entitled

3  to an injunction that would effectively prohibit NSO from licensing Pegasus to governments and

4  force those governments to abandon ongoing investigations of terrorists and criminals.  To obtain

5  such relief, Plaintiffs will need to show, among other things, "that the public interest would not be

6  disserved by a permanent injunction." *W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1054 (9th

7  Cir. 2013).  Col. Shepard's opinions speak directly to this issue, as they show how an injunction

8  could deprive governments of a valuable tool for investigating, preventing, and prosecuting crimes

9  such as "human trafficking, drug smuggling, and terrorist infiltration," as well as "foreign

10  government efforts to carry out assassinations."  (Shepard Rpt. ¶ 30.)  Plaintiffs may dispute

11  whether banning Pegasus would harm the public interest, but the parties' dispute on this point only

12  confirms that Col. Shepard's testimony is relevant and would help the factfinder.  Plaintiffs'

13  disagreement with that testimony is a basis for cross-examination, not exclusion.

14          Plaintiffs say Col. Shepard "offers no specific opinion that bears on whether NSO's

15  continued access *to WhatsApp's servers* will have an impact on the public interest" (Mot. 18), but

16  Plaintiffs' requested injunction goes *far* beyond prohibiting access to WhatsApp's servers. (*See*

17  Dkts. 557-3, 558-3, 604-2.)  Among other broad provisions, Plaintiffs' requested injunction would

18  prohibit NSO's customers from collecting messages that Plaintiffs' criminal users send or receive

19  on *any and all* of Plaintiffs' platforms (WhatsApp, Facebook Messenger, etc.), regardless of

20  whether the collection is performed using a version of Pegasus that has anything to do with

21  WhatsApp servers.  Such a prohibition would effectively eliminate Pegasus.  (*See* Dkt. 604-2 at 16-

22  20.)  Plaintiffs' requested injunction would even require NSO's customers to destroy any evidence

23  they collected in investigations using Pegasus, again regardless of whether that evidence was

24  collected using a version of Pegasus that has any contact with WhatsApp servers.  (*Id.* at 19-20.)

25  Col. Shepard's opinions bear directly on whether those and other injunction terms would serve or

26  undermine the public interest.

27          Although entitlement to injunctive relief is a question for the Court, that does not make

28  Col. Shepard's testimony irrelevant for the jury.  It remains relevant to punitive damages.  *See*

18

*Illuminia, Inc. v. BGI Genomics Co., Ltd.*, 2021 WL 4979799, at \*9 (N.D. Cal. Oct. 27, 2021) (admitting evidence "related to [a] request for permanent injunction" because it was *also* "related to damages"). In addition, this Court has instructed the parties to consider how the evidence related to Plaintiffs' request for an injunction should be introduced and assessed, for example through "an evidentiary hearing or special interrogatories to the jury." (Dkt. 577 at 2.) If the jury is provided special interrogatories, then it plainly needs to hear evidence related to Plaintiffs' request for injunctive relief. Even if this Court resolves factual disputes related to injunctive relief, allowing evidence related to that relief at trial could avoid the need for a second evidentiary hearing following trial.

## IV.   CONCLUSION

Col. Shepard will provide testimony that is relevant and helpful to the jury and Court, based on his extensive qualifications and experience in the precise issues involved in this case. The Court should reject Plaintiffs' attempt to deprive the jury, the Court, and NSO of Col. Shepard's opinions.

DATED:   March 20, 2025

KING & SPALDING LLP

By: /s/ *Joseph N. Akrotirianakis*
    JOSEPH N. AKROTIRIANAKIS
    AARON S. CRAIG

    Attorneys for Defendants NSO GROUP
    TECHNOLOGIES LIMITED and Q
    CYBER TECHNOLOGIES LIMITED