1    JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
       *jakro@kslaw.com*
2    AARON S. CRAIG (Bar No. 204741)
       *acraig@kslaw.com*
3    KING & SPALDING LLP
     633 West Fifth Street, Suite 1600
4    Los Angeles, CA 90071
     Telephone:    (213) 443-4355
5    Facsimile:    (213) 443-4310

6    Attorneys for Defendants
     NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12   WHATSAPP INC., a Delaware corporation,        Case No. 4:19-cv-07123-PJH
     and FACEBOOK, INC., a Delaware
13   corporation,                                  **OPPOSITION TO PLAINTIFFS'
                                                   MOTION TO EXCLUDE THE EXPERT
14              Plaintiffs,                         TESTIMONY OF TERRANCE MCGRAW**

15        v.                                       Date:   April 10, 2025
                                                   Time:   2:00 p.m.
16   NSO GROUP TECHNOLOGIES LIMITED                Place:  Courtroom 3, Ronald V. Dellums
     and Q CYBER TECHNOLOGIES LIMITED,                     Federal Building & U.S. Courthouse,
17                                                         1301 Clay Street, Oakland, California
                Defendants.
18

19

20                                                 Action Filed: 10/29/2019

21

22

23

24

25

26

27

28

---

OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE          Case No. 4:19-cv-07123-PJH
EXPERT TESTIMONY OF TERRANCE MCGRAW

# TABLE OF CONTENTS

I.     INTRODUCTION................................................................................................. 1

II.    BACKGROUND................................................................................................... 3

III.   RELEVANT LEGAL STANDARDS.................................................................. 5

IV.    ARGUMENT........................................................................................................ 6

       A.    The opinions Mr. McGraw will offer at trial do not contradict the Court's
             summary judgment order. ................................................................................ 6

       B.    Mr. McGraw's opinions on Pegasus are reliable. ....................................... 8

             1.    Mr. McGraw's opinions on the effect of Pegasus on WhatsApp
                   servers are reliable. ............................................................................... 8

             2.    Mr. McGraw's opinions about the operation of Pegasus on target
                   devices are reliable............................................................................. 11

             3.    Mr. McGraw does not opine on NSO's development of Pegasus............... 12

             4.    Additional sanctions are unavailable and unwarranted............................... 13

       C.    Mr. McGraw's opinions on the lawful intercept industry are reliable. ................. 13

             1.    Mr. McGraw is an expert in lawful intercept tools and their use................ 13

             2.    Mr. McGraw does not opine on NSO customers or Pegasus targets. .......... 16

             3.    Mr. McGraw's opinions have sufficient "intellectual rigor." ..................... 17

       D.    Mr. McGraw's opinions are relevant to remedies..................................... 18

             1.    Mr. McGraw's opinions are relevant to compensatory damages................. 18

             2.    Mr. McGraw's opinions are relevant to punitive damages......................... 19

             3.    Mr. McGraw's opinions are relevant to injunctive relief............................ 21

             4.    Mr. McGraw's opinions on the lawful intercept industry and the
                   value of technologies like Pegasus are relevant........................................... 22

             5.    If Mr. McGraw's opinions are excluded as irrelevant, then Mr.
                   Youssef's and Dr. Vance's expert opinions should be too. ........................ 23

       E.    Mr. McGraw does not opine on ultimate legal issues. ........................... 24

i

V.     CONCLUSION ................................................................................................ 25

OPPOSITION TO PLAINTIFFS' MOTION TO
EXCLUDE TESTIMONY OF TERRANCE MCGRAW

Case No. 4:19-cv-07123-PJH

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013)..................................................................... 6, 18

*Autotech Technologies Ltd. Partnership v. Autmationdirect.com, Inc.*,
  2005 WL 3180147 (N.D. Ill. Nov. 23, 2005)................................................ 11

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017)......................................................................... 18

*Brice v. Haynes Invs., LLC.*,
  548 F. Supp. 3d 882 (N.D. Cal. 2021) ........................................................ 23

*Buell-Wilson v. Ford Motor Co.*,
  73 Cal. Rptr. 3d 277 (Cal. Ct. App. 2008) .................................................. 23

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)......................................................................................... 6

*Hadley v. Kellogg Sales Co.*,
  2019 WL 3804661 (N.D. Cal. Aug. 13, 2019)............................................. 23

*Hangarter v. Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004)................................................................... 18, 24

*Hyer v. City & Cty. of Honolulu*,
  118 F.4th 1044 (9th Cir. 2024)..................................................................... 24

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)......................................................................................... 6

*Maldonado v. Apple, Inc*,
  2021 WL 1947512 (N.D. Cal. May 14, 2021) .............................................. 11

*Mighty Enters., Inc. v. She Hong Indus. Co.*,
  745 F. App'x 706 (9th Cir. 2018).................................................................. 18

*Morgan v. City of L.A.*,
  2020 WL 6048831 (C.D. Cal. June 23, 2020)............................................. 24

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  978 F. Supp. 2d 1053 (C.D. Cal. 2013)....................................................... 23

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000)...................................................................... 17

iii

*United States v. Holguin,*
  51 F.4th 841 (9th Cir. 2022).................................................................. 17, 23

*United States v. Saini,*
  23 F.4th 1155 (9th Cir. 2022)........................................................................ 7

*United States v. W.R. Grace,*
  504 F.3d 745 (9th Cir. 2007)......................................................................... 6

*Veritas Operating Corp. v. Microsoft Corp.,*
  2008 WL 687118 (W.D. Wash. Mar. 11, 2008)........................................ 11

*Volkswagen Grp. of Am.*, Inc., 51 F.4th 896, 902 (9th Cir. 2022) ................. 20

*Vox Marketing Group., LLC v. Prodigy Promos L.C.,*
  521 F. Supp. 3d 1135 (D. Utah 2021).......................................................... 10

*W. Watersheds Project v. Abbey,*
  719 F.3d 1035 (9th Cir. 2013)................................................................ 22, 23

**Statutes**

Cal. Civ. Code § 3294(c)............................................................................. 7, 20

Cal. Penal Code § 502(e)(4)........................................................................... 19

**Other Authorities**

Fed. R. Evid. 702................................................................................... 5, 6, 17

Fed. R. Evid. 704(a)........................................................................................ 24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

While the Court's grant of summary judgment reduces the scope of the expected testimony of Lt. Col. Terrence McGraw (ret.), it does not eliminate the need for it altogether. Plaintiffs concede as much by seeking to call their own technical experts, David Youssef and Anthony Vance, as trial witnesses. The Court should permit Mr. McGraw to testify at the damages trial because his opinions are reliable, relevant, and helpful to the jury.

Plaintiffs break Mr. McGraw's testimony into six general categories, each of which Plaintiffs contend is barred by the summary judgment order: (1) whether NSO targeted WhatsApp's California servers, (2) whether NSO exceeded authorized access to WhatsApp servers, (3) whether NSO fraudulently programmed Pegasus to evade detection, (4) whether Pegasus took information stored on WhatsApp servers from those servers, (5) what, if any, damages or loss Pegasus caused to WhatsApp, (6) the benefits to society from lawful intercept technologies and the negative public consequences that could result from prohibiting such technologies. Plaintiffs' challenge to the first two categories is moot; NSO agrees this Court resolved those issues on summary judgment (while respectfully disagreeing with the Court's conclusions), so Mr. McGraw will not opine on them at trial except as necessary to rebut opinions Mr. Youssef and Dr. Vance offer on those same issues. Plaintiffs' challenges to the other four categories are meritless, based on mischaracterizations of Mr. McGraw's opinions as well as the Court's summary judgment ruling. Mr. McGraw's opinions address issues this Court did not decide on summary judgment, and which remain important to questions of compensatory damages, punitive damages, and injunctive relief.[1]

Plaintiffs also challenge the reliability of Mr. McGraw's opinions, arguing primarily that he has no basis to offer them because he did not review a full copy of Pegasus's source code. But if reviewing Pegasus source code is required to testify reliably about Pegasus, then *no witness* can offer reliable testimony—including *Plaintiffs'* technical experts, Mr. Youssef and Dr. Vance. NSO was not permitted to produce in the United States full Pegasus source code, so no witness in the

---

[1] Plaintiffs have abandoned their claim for disgorgement, and in reliance, NSO has excluded arguments pertaining to disgorgement from this opposition. (Dkt. 595.)

OPPOSITION TO PLAINTIFFS' MOTION TO                    Case No. 4:19-cv-07123-PJH
EXCLUDE TESTIMONY OF TERRANCE MCGRAW

case has reviewed that source code. But the record contains scores of other reliable evidence about how Pegasus functioned and affected (or not) WhatsApp's servers, which Mr. McGraw, Mr. Youssef, and Dr. Vance all reviewed and rely upon. That evidence includes, among other things, code and server log files the Department of Justice gave to Plaintiffs and identified as Pegasus code, technical data from WhatsApp that clearly demonstrates how Pegasus functioned through WhatsApp servers, numerous NSO documents describing Pegasus's full functionality, extensive deposition testimony from NSO employees describing in detail how Pegasus worked, depositions of Plaintiffs' employees and internal WhatsApp documents reflecting what they learned through their investigations of Pegasus, and much more besides. In combination with Mr. McGraw's decades of experience and expertise in cyber-security and surveillance technology, all of this evidence together provides ample support for Mr. McGraw's testimony. And if it did not, then the same would be true of Mr. Youssef's and Dr. Vance's testimony—so *no expert* could testify at trial as to how Pegasus functioned or affected WhatsApp. Plaintiffs may not seek to exclude Mr. McGraw's testimony while relying on their own witness's testimony based on the same underlying evidence.

Finally, Plaintiffs are wrong that Mr. McGraw's opinions are irrelevant. The issues remaining in this case are: (1) the amount of damages, if any, NSO caused to Plaintiffs; (2) whether NSO acted with the willfulness and malice, oppression, or fraud required to award punitive damages; and (3) whether Plaintiffs are entitled to an injunction, which requires the consideration of issues such as the nature of NSO's conduct, the severity of the harm (if any) WhatsApp suffered, and the social utility of tools like Pegasus. Expert opinions on how NSO designed Pegasus, how Pegasus functioned, how it affected (or not) WhatsApp servers, and whether the public would be benefitted or harmed by prohibiting technologies like Pegasus are relevant to all those issues—as Plaintiffs tacitly concede by offering their *own* technical experts as witnesses in their case-in-chief.

Mr. McGraw, the former chief of the U.S. Army's Joint Mission Assurance Cyber Cell and head of the Global Cyber Threat Analysis Centers at Dell Secureworks, is exceptionally well-qualified to opine on these issues. He will testify, for example, that Pegasus is the product of a legitimate, regulated, lawful-intercept industry—not the work of some rogue hacker stealing credit card information. He will clarify that NSO's updates to Pegasus were standard industry practice

2

rather than fraudulent or malicious. He will explain that, by design, Pegasus did not damage, compromise, or impede any WhatsApp server or service. He will opine that the relevant vulnerability in WhatsApp's software was not created by NSO, but by Plaintiffs' failure to meet basic industry standards—and that Plaintiffs were already in the process of remediating that vulnerability before they ever discovered Pegasus. And Mr. McGraw will explain why Plaintiffs' response to that discovery was unreasonable. These opinions are plainly relevant and helpful to a jury tasked with deciding what portion of Plaintiffs' incident response costs were caused by NSO and whether NSO acted maliciously, oppressively, or fraudulently.

The Court should not withhold Mr. McGraw's useful and reliable insights from the jury. At a minimum, NSO must be able to call Mr. McGraw to rebut the technical opinions Plaintiffs have said they will call Mr. Youssef and Dr. Vance to offer. Accordingly, if the Court were to exclude Mr. McGraw, it must also exclude Mr. Youssef and Dr. Vance.

## II.    **BACKGROUND**

On September 1, 2024, NSO served an opening expert report from Mr. McGraw. (Dkt. 513-4, Exh. A ("McGraw Rpt.").) In his report, Mr. McGraw detailed his 20 years of cybersecurity experience in public service and private industry, from Future Operations Chief of the Army Global Network Operations and Security Center to Vice President of Global Cyber Threat Research and Analysis for Dell SecureWorks. (*Id.* ¶¶ 4-12 and Appx. 1.). He also explained essential background concepts in digital surveillance, the importance of the lawful intercept industry, and the negative policy implications of imposing liability on its participants. (*Id.* ¶¶ 16-48, 149-54.)

Turning to the parties' dispute, Mr. McGraw explained how WhatsApp's VoIP infrastructure operated during the relevant period (*id.* ¶¶ 49-72) and how Pegasus delivered messages to target devices *through* that infrastructure (*id.* ¶¶ 73-81). He explained that this activity did not harm Plaintiffs' infrastructure because it merely used the infrastructure "for [its] ordinary and intended purpose of shuttling data between client devices." (*Id.* ¶¶ 101, 139-44.) Mr. McGraw explained that Pegasus did not compromise, damage, or impair any WhatsApp server or service. (*Id.*) Mr. McGraw then opined that the only reason WhatsApp did not notice the Pegasus messages travelling through its infrastructure any earlier was that WhatsApp was performing almost no

3

1   validation of the traffic crossing its servers, "a significant deviation from standard industry security

2   practices in the 2018-2019 time period." (*Id.* ¶ 85.)

3       McGraw explained that, when WhatsApp finally undertook a project to validate the traffic

4   crossing its servers (as industry standards would have dictated), it easily discovered the Pegasus

5   traffic and decided to block it. (*Id.* ¶¶ 82-106.) Mr. McGraw opined that the Plaintiffs efforts to block

6   the Pegasus traffic should not be considered a "loss" because Plaintiffs' employees were simply

7   doing the same job they had already been hired to do. (*Id.* ¶¶ 145-48.) Finally, Mr. McGraw explained

8   that Plaintiffs could have immediately blocked Pegasus traffic but instead left their vulnerability

9   open so they could study NSO's software and capture confidential NSO code. (*Id.* ¶¶ 92-98.) Mr.

10  McGraw opined that this choice deviated substantially from industry best practices. (*Id.* ¶ 98.)

11      On September 21, 2024, NSO served a report from Mr. McGraw rebutting opinions from

12  Plaintiffs' two experts, Mr. David Youssef and Dr. Anthony Vance. (Dkt. 513-4, Exh. B ("McGraw

13  Rebuttal Rpt.").) Both Mr. Youssef and Dr. Vance appear on Plaintiffs' witness list. (Dkt. 580.)

14      **Youssef.** Mr. McGraw (in relevant part) rebutted Mr. Youssef's mischaracterization of

15  Pegasus as "spyware" as opposed to a legitimate, lawful intercept tool. (*Id.* ¶¶ 33-34.) Mr. McGraw

16  further corrected various errors in Mr. Youssef's description of how Pegasus operated (*id.* ¶¶ 9-12)

17  and rebutted Mr. Youssef's unsupported opinions that Pegasus somehow "compromised"

18  WhatsApp's servers (*id.* ¶¶ 13-15); altered, damaged, or deleted data from those servers (*id.* ¶¶ 46-

19  49); or obtained any data *from* those servers rather than merely *through* them (*id.* ¶¶ 40-41). Mr.

20  McGraw also rebutted Mr. Youssef's opinions that NSO configured Pegasus to evade detection (*id.*

21  ¶¶ 42-45) and that NSO "circumvented" security measures in the fall of 2018 (*id.* ¶¶ 68-70).

22      **Vance.** Mr. McGraw (in relevant part) rebutted Dr. Vance's affirmative opinion that

23  WhatsApp took responsible steps to secure its servers. (*Id.* ¶¶ 71-84). Mr. McGraw reiterated that

24  the security changes WhatsApp made in 2018 were in no way directed at NSO or Pegasus (*id.*

25  ¶¶ 85-91) and that the remediation efforts Plaintiffs undertook in 2019—in which Plaintiffs worked

26  for a week to obtain NSO's trade secrets rather than simply block Pegasus traffic—deviated

27  substantially from best practices (*id.* ¶¶ 110-19). Mr. McGraw further pointed out that Dr. Vance

28  had no basis for speculating about the number of user devices from which Pegasus may have

4

extracted data (*id.* ¶¶ 106-09) or about whether NSO's business plans included developing new products that might utilize WhatsApp in some way (*id.* ¶¶ 120-23).

On December 19, 2024, the Court granted partial summary judgment to Plaintiffs on "all issues regarding liability," leaving all remedial questions for trial. (Dkt. No. 494.) The Court found that Pegasus "exceeded authorized access" to WhatsApp servers by transmitting certain information about target user devices *from* those devices *to* a Pegasus server *via* WhatsApp servers. The Court did not find that NSO damaged, impaired, or removed any information from WhatsApp servers.

On December 23, 2024, the parties filed a joint letter brief in which NSO sought additional discovery from Mr. Youssef about issues related to compensatory damages, punitive damages, and injunctive relief. (Dkt. 498 ("Letter Brief") at 1.) In opposition, Plaintiffs argued that Mr. Youssef's testimony had been rendered "irrelevant and unnecessary" by the Court's summary judgment order, which made NSO's request for additional discovery from Mr. Youssef "moot." (*Id.* at 4.) The Court adopted Plaintiffs' position and denied NSO additional discovery from Mr. Youssef. (*See generally* Dkt. 519.)

Plaintiffs' pretrial filings show that their position was disingenuous. Having prevented NSO from deposing Mr. Youssef on topics that remain relevant, Plaintiffs now intend to present him in their case in chief (Dkt. 580 (Plaintiffs' Witness List)), where they will ask to him to testify about the many "technical" documents on Plaintiffs' exhibit list, including 126 files described as computer source code or computer logs (Dkt. 581-1). According to Plaintiffs, Mr. Youssef will testify on topics relevant to damages, which according to Plaintiffs' own filings, include "the operation of NSO's exploit" and the alleged circumvention of WhatsApp security measures. (Dkt. 580 at 3:11-15.) Plaintiffs' list of affirmative trial witnesses also includes their second cybersecurity expert, Dr. Vance. (*Id.* at 3:2-6.) Despite Plaintiffs' motion to exclude Mr. McGraw's technical testimony as moot and irrelevant, they intend to offer Dr. Vance on "damages" topics such as "Plaintiffs' security and remediation measures, the technical operation of NSO's exploit, and NSO's efforts to circumvent WhatsApp's security measures." (*Id.*)

## III.  RELEVANT LEGAL STANDARDS

Under Federal Rule of Evidence 702, expert testimony is permissible if it meets four

5

criteria: (1) it "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) it is "based on sufficient facts or data," and (3) it is the "product of reliable principles and methods" that (4) have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007). These criteria are aimed to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

To ensure all expert testimony presented to the jury "rests on a reliable foundation and is relevant to the task at hand," the Court acts as a "gatekeeper" against expert testimony that fails to satisfy Rule 702's criteria. *Daubert*, 509 U.S. at 597. In performing this task, the Court conducts a "holistic" analysis of the testimony for "overall sufficiency of the underlying facts and data, and the reliability of the methods, as well as the fit of the methods to the facts of the case." *W.R. Grace*, 504 F.3d at 762, 765. The Court's goal, however, is to "screen the jury from unreliable nonsense opinions," not to "exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

## IV.    ARGUMENT

### A.    The opinions Mr. McGraw will offer at trial do not contradict the Court's summary judgment order.

NSO does not deny that the Court's summary judgment order narrowed the issues on which Mr. McGraw will testify at trial. He will not offer any testimony inconsistent with factual issues this Court has already resolved.[2] Specifically, Mr. McGraw will not opine as to whether NSO targeted WhatsApp's California servers or whether NSO exceeded authorized access to WhatsApp servers, except to the extent that doing so is necessary to rebut opinions that Mr. Youssef or Dr. Vance offer in Plaintiffs' case-in-chief. Plaintiffs' attempts to exclude those opinions are moot.

But Plaintiffs go beyond those opinions to argue that Mr. McGraw's other opinions contradict the Court's summary judgment order. Plaintiffs are wrong.

---

[2] To the extent Plaintiffs believe a particular piece of testimony at trial exceeds this limit, that can be dealt with by targeted objections.

6

**Evading detection.** Mr. McGraw does not contradict this Court's summary judgment order by opining that Pegasus did not "evade detection"—whether by (1) sending messages using genuine credentials and complying with the WhatsApp servers' technical requirements, (2) setting a ciphering option, or (3) altering, damaging, or deleting data from WhatsApp servers and target devices. (McGraw Rebuttal Rpt. ¶¶ 42-45.) This Court did not find that NSO evaded detection through those means. What this Court found was that NSO satisfied CFAA's "intent to defraud" element by "*redesign[ing] Pegasus* to evade detection *after plaintiffs first fixed the security breach*." (Dkt. 494 at 12 (emphasis added).) That redesign was unrelated to the three issues on which Mr. McGraw opines.

Moreover, the Court's finding of an "intent to defraud" under the CFAA was made under a different legal standard than the standard the jury must apply to award punitive damages. Under CFAA, an "intent to defraud" requires proof by a preponderance of the evidence of an "intent to deceive and cheat." (*See* Dkt. 587-3 at 6); *United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022). For purposes of punitive damages, by contrast, a finding of fraud requires proof by *clear and convincing evidence* of "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3). Because the jury will be assessing whether NSO committed fraud under a different definition and a different standard of proof, NSO is entitled to introduce evidence on whether NSO's conduct satisfies that definition and standard. This Court did not address that issue, so Mr. McGraw's opinions that are relevant to fraud cannot conflict with the Court's order.

**Obtaining information.** There is no contradiction between the summary judgment order and Mr. McGraw's opinion that Pegasus did not "exfiltrate any information *from* [WhatsApp] servers." (McGraw Rebuttal Rpt. ¶¶ 40-41 (emphasis added).) The Court based its order on Pegasus having caused the transmission of some data *from* user devices *through* WhatsApp servers. (Dkt. 494 at 13.) That is not a holding that Pegasus took data *stored on* WhatsApp servers *from* WhatsApp servers, which this Court did not decide.

**Loss to Plaintiffs.** The Court's finding that Plaintiffs "incurred costs investigating and

remediating defendants' breaches" of WhatsApp's terms of service (Dkt. 494 at 15) does not contradict Mr. McGraw's opinions that NSO did not *cause* at least some of those costs (McGraw Rebuttal Rpt. ¶¶ 145-48).  Nor does the Court's finding, which addressed only Plaintiffs' breach of contract claim, establish that all of Plaintiffs' claimed costs are "loss" under the CFAA, an issue to which Mr. McGraw's opinions are also relevant.  Indeed, the very purpose of the trial is to determine the amount of compensatory damages caused by NSO.

**Prohibiting surveillance technology.** Finally, this Court's finding of liability does not contradict Mr. McGraw's opinions about the societal harms that could result from prohibiting government surveillance technology.  (McGraw Rebuttal Rpt. ¶¶ 149-54.)  While resolving liability, this Court did not address damages or injunctive relief.  Mr. McGraw's opinions about the utility of technology like Pegasus remain relevant to whether NSO should be punished through an award of punitive damages and whether the public interest would be disserved by an injunction.

**B.    Mr. McGraw's opinions on Pegasus are reliable.**

Plaintiffs also argue that Mr. McGraw's "opinions regarding Pegasus's functionality" and "development" should be excluded for lacking sufficient factual basis.  (Mot. 9-15.)  The Court should reject that argument because (1) Mr. McGraw's opinions about Pegasus functionality are supported by evidence from multiple sources, including WhatsApp's own server logs that confirm how the production code functioned, and (2) Mr. McGraw has offered no opinions about how NSO developed Pegasus.

**1.    Mr. McGraw's opinions on the effect of Pegasus on WhatsApp servers are reliable.**

The thrust of Plaintiffs' argument regarding Mr. McGraw's opinions on the operation of Pegasus is that, because Mr. McGraw did not review all Pegasus production source code, he lacks a sufficient factual basis for providing *any* opinion on the operation of that software or issuing any opinion relying upon his understanding of that operation.  (Mot. 9-12.)  But Mr. McGraw will not opine at trial as to two of those topics to which Plaintiffs object: whether NSO "target[ed] any servers in California" or accessed WhatsApp servers "without authorization."  (Mot. 10).  Plaintiffs' motion is moot as to those topics.

8

As to the third topic—whether Pegasus damaged WhatsApp servers—Plaintiffs' argument fails. As an initial matter, it is odd for Plaintiffs to argue that an expert cannot opine reliably on the operation of Pegasus without having examined that program's full source code, when none of Plaintiffs' own experts reviewed those materials either. If Plaintiffs are correct, then the opinions of Plaintiffs' technical experts (Mr. Youssef and Dr. Vance) should be excluded as unreliable too. But Plaintiffs are wrong because, as Mr. McGraw's opinions demonstrate, an expert can form reliable opinions on the operation of Pegasus based on the combination of other produced evidence.

Plaintiffs tick off three (arbitrarily chosen) sources of evidence— (1) NSO's research-and-development code, (2) the deposition of NSO's head of research-and-development (Mr. Gazneli), and (3) "open source materials"—and argue that none, *considered in isolation*, "is sufficient" to show how Pegasus operated. (Mot. 11-12.) The argument fails because these sources of evidence were *not* considered in isolation, nor were they the only sources of evidence considered. Instead, Mr. McGraw considered all three of these sources of evidence in combination, and together with other sources, to create a full picture supporting his specific opinions.

Mr. McGraw's opinions about how Pegasus interacted with WhatsApp's servers has a sufficient factual basis, including at least (1) hundreds of WhatsApp documents showing Pegasus interaction with WhatsApp servers and WhatsApp's own analysis of that interaction, (2) depositions of WhatsApp engineers who investigated the interactions, (3) depositions of NSO's head of research and development, (4) source code that Plaintiffs claim was downloaded from NSO's R&D server and reflects Pegasus source code, (5) log files from that server detailing Pegasus's actions and showing how the production code functioned, and (6) Mr. McGraw's own 20 years of experience in cybersecurity. (McGraw Rpt. at Appx. 2, Exh. B at Appx. I.) Those sources of evidence build upon and confirm one another to create a reliable picture of how Pegasus interacted with WhatsApp's servers.

Specifically, Mr. McGraw's opinion that Pegasus did not damage WhatsApp servers is supported by numerous categories of evidence, including (1) internal WhatsApp documents, (2) deposition testimony from WhatsApp witnesses, and (3) Mr. McGraw's cybersecurity experience. That evidence amply supports Mr. McGraw's opinion, without requiring him to review *any* Pegasus

9

code, much less the code that was made available to him in discovery. To the extent Plaintiffs disagree, they may explore the basis for Mr. McGraw's opinions through cross-examination, not exclusion.

- **WhatsApp Documents.** While Mr. McGraw could not confirm that the source code produced by Plaintiffs was identical to the final version of the Heaven, Eden, or Erised code, he did have access to AWS server logs produced by WhatsApp showing the messages that Pegasus *generated* and its interactions with WhatsApp's servers. He also had access to WhatsApp's internal discussions and analysis of those messages and their effect (or lack thereof) on WhatsApp's server infrastructure. All of these sources of evidence support Mr. McGraw's conclusion that Pegasus did not damage WhatsApp servers. (*See, e.g.*, Dkt. 396-5, Exh. P at 4; Dkt. 468 at 5.) Indeed, based on the same evidence, Plaintiffs' own expert (Mr. Youssef) likewise concluded that Pegasus "was designed to … avoid inflicting collateral damage to the [WhatsApp] services," and it used those services "without causing destruction." (Dkt. 511-4 ¶ 86.)

- **Depositions.** Mr. McGraw's opinion that Pegasus did not damage WhatsApp's servers or service was confirmed by WhatsApp's own corporate witnesses. They agreed at their depositions that Pegasus did not "corrupt," "alter," "impair the availability of," or "delete any of WhatsApp's data from WhatsApp's servers." (Dkt. 468 at 22:17-18 (quoting Dkt. 396-5, Exh. L at 183:7-184:7, 250:22-251:24).)

- **Experience.** Finally, Mr. McGraw's opinions are informed by his own extensive cybersecurity and national intelligence experience, through which he has come to understand that lawful intercept and surveillance technologies are most useful when they do "*not* perform[] any actions that would degrade or impact network connections or infrastructure." (McGraw Rpt. ¶ 143.) Thus, it was unsurprising for him to find that Pegasus did not damage WhatsApp's infrastructure.

Plaintiffs cite several cases in which they say a court excluded an expert's opinion for failing to review source code (Mot. 10-11), but none is analogous to the facts here. In *Vox Marketing Group., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1152 (D. Utah 2021), the court

10

excluded an expert opinion that a program lacked a given feature not because the expert failed to review the program's source code, but because he *did* review it and admitted that it *did* implement the supposedly missing feature. Mr. McGraw has made no such admission. In *Veritas Operating Corp. v. Microsoft Corp.*, 2008 WL 687118, at *3 (W.D. Wash. Mar. 11, 2008), the expert's failure to review source code supported exclusion only because his testimony was specifically intended to rebut the opposing expert's *"source code analysis"*—and because the expert admitted he was "not an expert with regard to code analysis" or even "a computer science expert." In contrast, Mr. McGraw's opinions are not being introduced to rebut analysis of source code he has never seen, and his qualifications are impeccable.

In *Autotech Technologies Ltd. Partnership v. Autmationdirect.com, Inc.*, 2005 WL 3180147, at *8-9 (N.D. Ill. Nov. 23, 2005), the expert was precluded from opining that a given software product was a "clone" of another because "he did not review the . . . product" *at all*, much less its code. Mr. McGraw is not offering a similarly baseless opinion. Instead, he is opining about how Pegasus interacted with WhatsApp servers, which is based on his analysis of the messages it sent to those servers and of Plaintiffs' documents showing how their servers reacted. In *Maldonado v. Apple, Inc*, 2021 WL 1947512, at *20 (N.D. Cal. May 14, 2021), the court simply held that an expert "cannot opine that [a] particular study is or is not reliable without knowledge of what occurred in the study." Mr. McGraw is not doing anything analogous. Again, he is opining about what happened to WhatsApp's servers based on a thorough analysis of their operation, the messages they received, and the way they reacted.

**2.    Mr. McGraw's opinions about the operation of Pegasus on target devices are reliable.**

Mr. McGraw's opinions on "how the Pegasus agent … functions once it is installed, or the role that NSO plays in this process" (Mot. 14) are also amply supported by multiple data points.

First, Mr. McGraw clearly lays out the basis for his opinion that "the [post-installation] operation of [the Pegasus agent] did not use or otherwise rely upon the WhatsApp application or any WhatsApp infrastructure." (*See* Mot. 14 (citing McGraw Rpt. ¶ 80).) Just a few paragraphs above the quotation cited by Plaintiffs, Mr. McGraw explains that his "understanding is derived

11

from the WhatsApp and Facebook technical analysis documents produced in discovery (including at least documents with Bates numbers WA-NSO-00165102, WA-NSO-00125178, WA-NSO-00121294, WA-NSO-00017131, WA-NSO-00165189 among many other documents), interviews with Tamir Gazneli of NSO, and analysis of open-source materials regarding the operation of Pegasus." (McGraw Report ¶ 73.) As discussed above, Plaintiffs' sole criticism—that McGraw was unable to review full Pegasus code directly—is not grounds for exclusion.

Second, in his rebuttal report, McGraw addressed various opinions offered by Plaintiffs' experts. In Section II.H of his Rebuttal Report, he rebuts any implication by Mr. Youssef that Pegasus altered, damaged, or deleted any data *from WhatsApp's servers*. (McGraw Rebuttal Report ¶¶ 46-47.) Mr. McGraw then responded to Mr. Youssef's assertions that Pegasus altered, destroyed, or damaged data *on target devices*. (*Id.* ¶¶ 48-49.) All of those opinions were premised on the supposed alteration, destruction, or damaging of data *during the installation process*—and thus have nothing to do with the operation of the final Pegasus agent once it was actually installed on the device. Similarly, in Section III.E of his Rebuttal Report, Mr. McGraw responds to arguments from Plaintiffs' expert Dr. Vance. (*See id.* ¶¶ 106-109.) Mr. McGraw opines that Dr. Vance does not present evidence as to which WhatsApp users were successfully monitored by law enforcement with Pegasus. (*See id.*) Mr. McGraw's opinions in this section are corroborated by testimony from Plaintiffs' own engineers and investigators. (*See id.* ¶ 107 & n.108.) Neither of these two sets of rebuttal opinions require Mr. McGraw to have reviewed any code "showing how the Pegasus agent operates once installed on devices." (*See* Mot. 14.)

All of the opinions identified by Plaintiffs are thus reliable.

### 3.    Mr. McGraw does not opine on NSO's development of Pegasus.

Plaintiffs also seek to preclude Mr. McGraw's opinions from testifying about "how NSO developed Pegasus" (Mot. 12-13), but the argument is a strawman. Mr. McGraw offers no opinions on that topic. Rather, he opines that "WhatsApp makes its client application freely available on the Android store for download *without agreeing to any terms of service*," and that "[o]nce downloaded, it is trivial to analyze." (Mot. 12-13 (citing McGraw Rebuttal Rpt. ¶ 51).) Because neither opinion describes NSO's development efforts, direct knowledge of those efforts is

12

unnecessary.  The Court should deny Plaintiffs' motion on this issue as moot.

**4.    Additional sanctions are unavailable and unwarranted.**

Plaintiffs also ask the Court to preclude Mr. McGraw's testimony as an additional discovery sanction for the constraints Defendants faced in being unable to produce Pegasus code in the United States.  (Mot. 14-15.)  But Plaintiffs have already requested a discrete list of sanctions, and this Court has already chosen which of those sanctions to impose.  (Dkt. 494 at 9, 13.)  Plaintiffs present no rationale or authority permitting them to request sanctions on a "rolling" basis, nor do they provide any reason to reopen that decision now.  To the extent that Plaintiffs seek further sanctions beyond the Court's earlier ruling, such a request is improperly presented in their motion to exclude; instead, they must file a separate motion.  *See* Civ. L.R. 7-8.

Moreover, there is no relationship between Plaintiffs' lack of access to full Pegasus code and Mr. McGraw's testimony.  Mr. McGraw has seen the exact same portions of Pegasus code (those Plaintiffs claim to have received from the Department of Justice) as Plaintiffs have, so there is no unfairness in allowing Mr. McGraw to testify based on that code—just as Plaintiffs' experts purport to do.  If Mr. McGraw had seen documents or electronically stored information to which Plaintiffs were denied access, exclusion of his testimony might be a logical sanction.  But Plaintiffs know from Mr. McGraw's disclosures that this is not the case, so the sanction they seek is unwarranted.

**C.    Mr. McGraw's opinions on the lawful intercept industry are reliable.**

Finally, Plaintiffs again attack Mr. McGraw's opinions about the lawful intercept industry—this time on the bases that (1) Mr. McGraw is not an expert in that field, (2) the opinions are not the product of reliable methodology, and (3) the opinions lack a reliable basis.  (Mot. 15-18.)  Plaintiffs' arguments on all three fronts are meritless.

**1.    Mr. McGraw is an expert in lawful intercept tools and their use.**

Plaintiffs are wrong that Mr. McGraw's experience does not qualify him "to offer opinions on what constitutes 'lawful intercept' technology, whether NSO's Pegasus spyware falls within this category, or the implications of holding NSO liable."  (Mot. 15-16.)  Mr. McGraw's extensive credentials and decades of experience in cybersecurity and national intelligence make him

13

1  exceptionally well-qualified.  (*See* McGraw Rpt. at Appx. 1.)

2      *First*, Mr. McGraw's hands-on experience with intercept technologies and the regulatory

3  frameworks governing them provides him with a robust understanding of what constitutes lawful

4  intercept technology.  For example, during his tenure in the U.S. Army and as a senior leader at the

5  National Security Agency (NSA), Mr. McGraw was directly involved in the development and

6  evaluation of technologies used under Title 50 (intelligence operations) and Title 10 (military

7  operations) authorities.  (*Id.*)  These roles required him to assess and implement surveillance tools

8  for legitimate national security and law enforcement purposes.  (*Id.*)  Moreover, Mr. McGraw's

9  role at Dell Secureworks, where he oversaw global cyber threat analysis and security services,

10  included evaluating and responding to sophisticated cyber tools and software. (*Id.*)  That experience

11  in determining the functionality and lawful use of surveillance and counterintelligence tools equips

12  him to opine on whether Pegasus would be considered lawful intercept technology.

13      As a cybersecurity consultant who has advised Fortune 500 companies, municipalities, and

14  national agencies, Mr. McGraw is also uniquely positioned to evaluate the broader implications of

15  holding legitimate surveillance software makers liable for alleged misuse of their tools.  (*Id.*)  Mr.

16  McGraw has firsthand knowledge of how organizations deploy both offensive and defensive

17  surveillance software, the challenges of balancing operational effectiveness with compliance, and

18  the potential risks of imposing liability on software providers for the actions of their customers.

19  His perspective is grounded in both technical expertise and practical experience navigating legal

20  and ethical considerations in high-stakes cybersecurity environments.

21      Mr. McGraw's distinguished military career, culminating in leadership roles with Army

22  Cyber Command and the NSA, further demonstrates his authority to discuss lawful intercept

23  technology, whether Pegasus qualifies as such, and the broader implications of liability for its

24  misuse.  (McGraw Rpt. ¶ 6-8.)  As Chief of the Joint Mission Assurance Cyber Cell, Mr. McGraw

25  led teams analyzing critical systems for vulnerabilities, which required an in-depth understanding

26  of offensive and defensive surveillance software and technologies used to identify and counteract

27  nation-state cyber threats.  (*Id.* ¶ 9.)  After two decades in both civilian and military cybersecurity

28  settings, Mr. McGraw is qualified to (1) distinguish between lawful intercept and surveillance

technologies (on the one hand) and what Plaintiffs refer to as "spyware" or "malware" on the other;
and (2) opine on the chilling effect that holding technology manufacturers liable could have within
the lawful-intercept and cybersecurity industry.

Plaintiffs list a few objections to Mr. McGraw's background (Mot. 16), but none has merit.

- That Mr. McGraw's *pre-engagement* knowledge of NSO was based primarily on public reporting (Dkt. 513-4, Exh. C ("McGraw Dep.") at 13:22-14:9) is irrelevant to his qualifications to opine about the "lawful intercept" industry generally and on the implications of applying the CFAA to such companies. It is likewise irrelevant to his *post-engagement* opinion (which followed months of studying NSO and Pegasus) that NSO is one of those companies.

- That Mr. McGraw supervised the use of lawful intercept software—even if it was a member of his team who "operated" the technology (*id.* at 165:16)—only *supports* his expertise about the lawful intercept industry and the implications of liability in that space.

- That Mr. McGraw "can't speak to what legal process, if any, must be followed in the countries in which NSO has customers" (*id.* at 89:21–90:18) is irrelevant. Mr. McGraw is not an attorney, let alone an expert in the laws of every country in which NSO sells, nor is he presented as one. Instead, he is an expert in the lawful intercept industry and how military and intelligence entities use tools produced by that industry.

- Finally, Plaintiffs falsely accuse Mr. McGraw of "know[ing] almost nothing about Pegasus beyond what is enumerated in [NSO's] documentation.'" (Mot. 16 (citing McGraw Dep. at 149:23–25).) That accusation is baseless, and unsupported by the record citation Plaintiffs provide. As shown above, Mr. McGraw's opinions about how Pegasus operated are informed by (1) hundreds of WhatsApp documents showing the Pegasus messages received by WhatsApp servers and WhatsApp's own analysis of those messages and their impact, (2) source code that Plaintiffs argue was downloaded from NSO's R&D server, (3) log files from that R&D server detailing Pegasus's actions, (4) the depositions of WhatsApp engineers and NSO's head of research and development, and (5) Mr. McGraw's own 20 years of experience in cybersecurity and

15

1    national intelligence. (McGraw Rpt. at Appx. 2, Exh. B at Appx. I.)

2        At best, each of Plaintiffs' criticisms is grounds for cross-examination, not exclusion. Mr.

3    McGraw's extensive qualifications qualify him to opine on the lawful intercept industry and its

4    importance for law enforcement and national security organizations.

5        **2.    Mr. McGraw does not opine on NSO customers or Pegasus targets.**

6        Next, Plaintiffs argue that Mr. McGraw lacks a fact basis to opine about (1) "the identities

7    of NSO's customers, or whether NSO vets them," and (2) the identity of "Pegasus targets." (Mot.

8    16-17.) These arguments are misdirected because Mr. McGraw has not provided such opinions.

9        *First*, Mr. McGraw has provided no "expert testimony about the identities of NSO's

10   customers, or whether NSO vets them." (Mot. 16.) Plaintiffs identify Mr. McGraw's background

11   description of the "lawful intercept industry" as an "industry that develops and implements tools

12   used by governments and law enforcement agencies to lawfully access private data for criminal

13   investigations." (Mot. 16 (citing McGraw Rpt. ¶ 18).) But that is not an opinion about the identity

14   of NSO's customers—only an unobjectionable background statement about the lawful intercept

15   industry. Plaintiffs also complain of Mr. McGraw's understanding that "NSO is a lawful-intercept

16   software developer providing a capability to vetted and approved government customers." (Mot.

17   16 (citing McGraw Rebuttal Rpt. ¶ 99).) That statement simply reflects Mr. McGraw's

18   understanding of undisputed facts, confirmed by deposition testimony. That NSO develops

19   surveillance software for sale to governments is not plausibly in doubt, and if Plaintiffs wish to

20   prove it is false, they can do so at trial, not through a *Daubert* motion. At trial, NSO is entitled to

21   explain its business and technology, and this Court has held that it may do so through "generalized

22   evidence that its software was licensed for law enforcement purposes." (Dkt. 305 at 6.)

23       *Second*, Plaintiffs identify no opinion from Mr. McGraw "about Pegasus targets." (Mot. 17.)

24   The only purported example Plaintiffs cite is a background statement that "[t]he LI industry

25   specializes in finding vulnerabilities in common technologies and to thus enable lawful surveillance

26   of criminals and terrorists." (*Id.* (citing McGraw Rpt. ¶ 39).) That does not mention any specific

27   Pegasus targets at all. It is just a general statement about the lawful intercept industry, which Mr.

28   McGraw is well-qualified to offer.

OPPOSITION TO PLAINTIFFS' MOTION TO                Case No. 4:19-cv-07123-PJH
EXCLUDE TESTIMONY OF TERRANCE MCGRAW

### 3.    Mr. McGraw's opinions have sufficient "intellectual rigor."

Finally, Plaintiffs argue that Mr. McGraw has applied an "unreliable methodology to determine whether a product is 'lawful intercept' technology." (Mot. 17.)  But that argument is wholly misplaced for Mr. McGraw, who is testifying on this issue based not on scientific analysis but on his "specialized expertise."  Fed. R. Evid. 702; *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("[I]n considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally.").  Experts routinely opine based on their specialized experience when that testimony aids the factfinder.  *See*, *e.g.*, *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) ("Law enforcement professionals are routinely qualified to offer expert testimony based on their training and experience."); Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments ("the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" and in "certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony").

Mr. McGraw's opinion also follows directly from his two factual premises: that (1) he understands the phrase "lawful intercept technology" as referring to software "tools used by governments and law enforcement agencies to lawfully access private data for criminal investigations,"[3] and (2) "Pegasus software was designed to enable authorized users to conduct lawful surveillance of persons of interest, under the laws and customs of the government customer." (McGraw Rpt. ¶¶ 18, 46.)  From those two premises, it follows as a matter of logic that Pegasus is "lawful intercept technology" within Mr. McGraw's understanding, and it is hard to imagine what additional "methodology" could be required.

Plaintiffs object that Mr. McGraw failed to *support* the premise that Pegasus is sold to authorized government users (rather than for example, to private parties on the dark web[4]) after an

---

[3] Plaintiffs quibble that NSO literature characterizes Pegasus as an "endpoint" technology rather than an "intercept" technology—specifically, because Pegasus obtains data from an "endpoint" (*i.e.*, the target device) rather than by intercepting it in transmission.  (Mot. 18.)  That Mr. McGraw's definition of "lawful intercept" technology sweeps broadly enough to include "endpoint" technologies does not render his *methodology* unreliable.

[4] NSO has never sold Pegasus on the dark web.  As was widely reported, many years ago, a former NSO employee attempted to steal source code and sell it to competitors.  *See*, *e.g.*,

1    extensive internal and regulatory vetting process (Mot. 18), but he has no such obligation.    An

2    expert witness can rely on factual premises or assumptions without "independently verif[ying]

3    the[ir] accuracy."  *Mighty Enters., Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir.

4    2018) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 n.4 (9th Cir. 2004)).

5    If Plaintiffs wish to challenge the factual premises of Mr. McGraw's opinions, they must do so

6    through "cross-examination" and "impeach[ment]" at trial.  *Id.* (citing *Alaska Rent-A-Car*, 738 F.3d

7    at 969).  In any event, all the evidence is uniform that Pegasus is marketed solely to government

8    customers, with regulatory oversight from the Israeli Ministry of Defense, and Plaintiffs have never

9    submitted any evidence suggesting otherwise. (*See, e.g.*, Dkt. 396-3 ¶¶ 3, 5-9, 12.)

10        **D.    Mr. McGraw's opinions are relevant to remedies.**

11        Plaintiffs are wrong that "[a]ll of Mr. McGraw's opinions should be excluded … [as] not

12    relevant to the determination of damages."  (Mot. 1.)  Plaintiffs seek both compensatory and

13    punitive damages, and many of Mr. McGraw's opinions are relevant to those issues.  Mr. McGraw's

14    testimony is also relevant to the injunctive remedies Plaintiffs seek, and which the Court has

15    suggested may be submitted to the jury through interrogatories. (Dkt. 577.)

16        **1.    Mr. McGraw's opinions are relevant to compensatory damages.**

17        Mr. McGraw's opinions are relevant to the jury's calculation of compensatory damages

18    because they inform the level of "concrete loss that the plaintiff has [purportedly] suffered" caused

19    by NSO's activity.  *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 871 (9th Cir. 2017).

20        For example, to determine the amount of such compensatory damages, the jury should hear

21    that Pegasus did not damage, impair, or compromise WhatsApp's servers or service.  (McGraw

22    Rpt. ¶¶ 139-144; McGraw Rebuttal Rpt. ¶¶ 13-15.)  The jury should also hear that Pegasus did not

23    alter, damage, or delete any data on those servers.  (McGraw Rebuttal Rpt. ¶¶ 46-49.)  Plaintiffs

24    will argue that NSO caused them to have to spend money to fix vulnerabilities in WhatsApp code,

25    and Defendants will argue that NSO did not create the vulnerabilities and thus were not cause of

26    those expenses.  Mr. McGraw's on those issues is relevant, and will support NSO's argument that

27    _____

28    https://www.cnbc.com/2018/07/09/nso-group-tracked-the-ex-employee-who-stole-its-code.html.
    That former employee was criminally charged by Israeli authorities.  *See id.*

18

it did not cause at least some of Plaintiffs' claimed damages.

Mr. McGraw's opinions are also relevant to NSO's argument that at least some of the damages claimed by Plaintiffs are not a "loss," as defined by the CFAA. For example:

- Mr. McGraw will opine that NSO did not cause all of Plaintiffs' May 2019 remediation efforts. Among other opinions he will offer in support of that position, Mr. McGraw will explain that the relevant vulnerability in WhatsApp's software was not created by NSO, but by Plaintiffs' failure to meet basic industry standards (McGraw Rebuttal Rpt. ¶¶ 71-84); that WhatsApp was already working to validate the traffic crossing its servers before it learned of NSO's conduct, which would have blocked NSO's use anyway (McGraw Rpt. ¶¶ 82-106); and that NSO's conduct simply prompted some of Plaintiffs' employees to "do[] what they were hired to do," which was "to research and close vulnerabilities in the company's software" (id. ¶¶ 145-48).

- Mr. McGraw will opine that Plaintiffs' remediation efforts were unreasonable because, among other reasons, Plaintiffs could have immediately closed their vulnerability but instead voluntarily kept it open in violation of data-security best practices. (Id. ¶ 92; McGraw Rebuttal Rpt. ¶¶ 110-119.)

- Mr. McGraw will opine that Plaintiffs' remediation efforts should not be considered a "loss" because they *improved* Plaintiffs' software by closing a security hole that NSO did not create but that existed only due to WhatsApp's own "significant deviation from standard industry practice." (McGraw Rpt. ¶¶ 85, 145-48.)

These opinions are relevant to the dispute over what amount of Plaintiffs' compensatory damages were caused by Defendants.

### 2. Mr. McGraw's opinions are relevant to punitive damages.

Many of Mr. McGraw's opinions are also relevant to the jury's determination of whether to authorize punitive damages. To receive punitive damages under CDAFA, Plaintiffs must prove that NSO's conduct was "willful" and prove "by clear and convincing evidence" that NSO acted with "oppression, fraud, or malice." Cal. Penal Code § 502(e)(4). "Malice" requires either an intent "to cause injury" or "despicable conduct . . . with a willful and conscious disregard of that

19

person's rights." Cal. Civ. Code § 3294(c)(1). "Oppression" similarly requires "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). "Fraud" requires an intent to "depriv[e] a person of property or legal rights or otherwise caus[e] injury." *Id.* § 3294(c)(3). The amount of punitive damages available also would depend on how "egregious" NSO's behavior was. *See Riley v. Volkswagen Grp. of Am.*, Inc., 51 F.4th 896, 902 (9th Cir. 2022).

In other words, the jury will need to make a number of factual determinations regarding whether NSO intended to harm others, disregarded their safety, or engaged in objectively reprehensible conduct. Making such determinations will require the jury to understand *how* Pegasus used WhatsApp's service and the extent to which that use affected WhatsApp (or not). Contrary to Plaintiffs' apparent assumption, the jury should not be asked to assess those questions based solely on Plaintiffs' one-sided narrative. NSO, rather, must be able to present its own contrary evidence on punitive damages.

Mr. McGraw's opinions are relevant to those issues. For example:

- Mr. McGraw will help the jury understand the history, legitimacy, and value of digital surveillance technology and the lawful intercept industry. (McGraw Rpt. ¶¶ 16-48.) That testimony is relevant to whether (as Plaintiffs will claim) NSO is a rogue "hacker" acting maliciously, oppressively, and fraudulently or (as NSO will claim) a legitimate, regulated business that provides governments with tools necessary for law enforcement and intelligence investigations. Mr. McGraw's testimony would thus show that NSO's conduct was not "despicable" or "cruel," and it would help the jury understand that any operational security measures NSO took were normal practice involving no intent to injure Plaintiffs.

- Mr. McGraw will testify that Pegasus's use of Plaintiffs' infrastructure (*id.* ¶¶ 49-81) merely involved passing messages *through* that infrastructure without damaging or impairing it (*id.* ¶¶ 139-44). Even though this Court held that conduct violated the CFAA, Mr. McGraw's testimony that it had no negative impact on WhatsApp's service supports a conclusion that NSO did not act maliciously, oppressively, fraudulently, or

20

with the intent to injure Plaintiffs. The same is true of Mr. McGraw's opinion that NSO's activity caused WhatsApp little if any loss. (*Id.* ¶¶ 145-48.)

- Mr. McGraw will rebut testimony from Plaintiffs' witnesses, including Mr. Youssef, that Pegasus is "spyware" by testifying it is instead, a legitimate lawful intercept tool. (McGraw Rebuttal Rpt. ¶¶ 33-34.) That testimony supports finding that NSO was a legitimate, government regulated company rather than a rogue entity acting with malice, oppression, or fraud. (*Id.* ¶¶ 99-105.)

- Mr. McGraw will rebut testimony that Pegasus somehow "compromised" Plaintiffs' servers[5] (*id.* ¶¶ 9-15) or altered, damaged, or deleted data from those servers (*id.* ¶¶ 46-49). That testimony too will show that NSO did not act with malice, oppression, fraud, or intent to damage Plaintiffs.

- Mr. McGraw will explain and contextualize Plaintiffs' allegations that NSO attempted to evade detection. (*Id.* ¶¶ 42-45.) Those opinions will support a finding that, by designing Pegasus to avoid detection, NSO was acting in good faith by following industry standards, not attempting to defraud WhatsApp out of any money or property.

- Mr. McGraw will rebut Plaintiffs' allegations that certain changes Plaintiffs made to its servers in 2018 somehow put NSO on notice that its activities were forbidden, such that NSO's responsive modifications to its own software somehow constitute fraud (*id.* ¶¶ 68-70)—again, an issue relevant to punitive damages.

### 3.    Mr. McGraw's opinions are relevant to injunctive relief.

Mr. McGraw's opinions are likewise relevant to whether the Court should award Plaintiffs a permanent injunction. Although injunctive relief is a question for the Court, this Court has instructed the parties to consider how the evidence related to Plaintiffs' request for an injunction should be introduced and assessed, for example through "an evidentiary hearing or special

---

[5] As set forth in Defendants' Motion in Limine No. 1 (Dkt. 596-3), vague testimony from Plaintiffs' employees or experts that Defendants "compromised" Plaintiffs' servers, if untethered to any tangible effect on those servers, is an attempt to circumvent the parties' agreement that Plaintiffs will not introduce evidence about reputational harm or loss of goodwill. Such testimony should be excluded—full stop.

21

1   interrogatories to the jury." (Dkt. 577 at 2.) If the jury is provided special interrogatories, then it

2   plainly needs to hear evidence related to Plaintiffs' request for injunctive relief. Even if this Court

3   resolves factual disputes related to injunctive relief, allowing evidence related to that relief at trial

4   could avoid the need for a second evidentiary hearing following trial.

5       The party seeking a permanent injunction must show "(1) that it has suffered an irreparable

6   injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate

7   for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

8   remedy in equity is warranted; and (4) that the public interest would not be disserved by a

9   permanent injunction." *W. Watersheds Project v. Abbey,* 719 F.3d 1035, 1054 (9th Cir. 2013). Mr.

10  McGraw's opinions regarding the nature of Plaintiff's purported damage or loss are relevant to at

11  least the first two factors. For example, Mr. McGraw's opinions that (1) Plaintiffs' servers and

12  service were not damaged or impeded and (2) Plaintiffs' purported "loss" was merely the salaries

13  it paid for its own employees to improve its own infrastructure—demonstrate that any harm

14  Plaintiffs may have suffered is not "irreparable" and that legal remedies are adequate. Additionally,

15  Mr. McGraw's opinions about the value of surveillance technology and the negative consequences

16  that could result from punishing its creation (McGraw Rpt. ¶¶ 149-54) are relevant to whether the

17  public interest would be disserved by an injunction.

18          **4.    Mr. McGraw's opinions on the lawful intercept industry and the value**

19              **of technologies like Pegasus are relevant.**

20      Plaintiffs are wrong that what they call Mr. McGraw's "public policy" opinions are

21  irrelevant. (Mot. 8-9.) As discussed above, those opinions are relevant to both punitive damages

22  and injunctive relief.

23      *First*, Mr. McGraw's opinions about the lawful intercept industry and public policy are

24  relevant to punitive damages. Plaintiffs argue that those opinions are irrelevant because they are

25  purportedly "high-level opinions about the nature of NSO's conduct and the need for its business."

26  (Mot. 9.) But even accepting that characterization, Plaintiffs fail to explain why high-level opinions

27  about the nature of NSO's conduct and the need for its business are irrelevant to whether NSO

28  acted with malice, oppression, or fraud. Indeed, an explanation that NSO is engaged in an accepted,

22

regulated industry that it believes is a force for social good is highly relevant to a jury determination that NSO's conduct was not "despicable" or "cruel" or "egregious," and that NSO never intended to "injure" or act with "conscious disregard" to anyone's "safety." *See Riley*, 51 F.4th at 902.

The two cases Plaintiffs cite (*Brice* and *Toyota*) are inapposite because neither addresses the relevance of *any* evidence to the issue of punitive damages, let alone of evidence the defendant was engaging in a social good. *See Brice v. Haynes Invs., LLC.*, 548 F. Supp. 3d 882, 902 (N.D. Cal. 2021) (holding that the "social utility" to Tribes of funds they received from defendants was irrelevant to "RICO liability or liability under California law"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1068 (C.D. Cal. 2013) (excluding "general testimony regarding the NHTSA and FMVSS" as irrelevant to specific automotive product liability case.)  By contrast, Courts commonly admit expert testimony about whether a challenged product or technology is, in fact, harmful or beneficial when assessing punitive-damages claims. *See, e.g., Riley*, 51 F.4th at 901 n.4 (noting "'expert testimony that increased NOx emissions increase the risk of harm to human health'" was "'evidence of the egregiousness of Volkswagen's misconduct'"); *Hadley v. Kellogg Sales Co.*, 2019 WL 3804661, at \*16 (N.D. Cal. Aug. 13, 2019) (Koh, J.) (considering expert testimony on whether "cereal consumption increases the risk of coronary heart disease, diabetes, or obesity" on punitive-damages claim against cereal manufacturer); *Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 312 (Cal. Ct. App. 2008) (jury properly weighed competing "expert testimony" on whether product had "design and safety issues" on punitive-damages claim).

*Second*, as explained above, Mr. McGraw's opinions about the lawful intercept industry and the negative consequences of prohibiting surveillance technology (McGraw Rpt. ¶¶ 149-54) is relevant to whether "the public interest would . . . be disserved by a permanent injunction." *W. Watersheds Project,* 719 F.3d at 1054.  Plaintiffs make no argument to the contrary.

### 5.    If Mr. McGraw's opinions are excluded as irrelevant, then Mr. Youssef's and Dr. Vance's expert opinions should be too.

For the reasons above, Mr. McGraw's opinions are relevant and should not be excluded. But if the Court were to agree with Plaintiffs that Mr. McGraw's opinions are irrelevant, then it

23

1    must also exclude Plaintiffs' technical experts, Mr. Youssef and Dr. Vance.  While seeking to

2    exclude Mr. McGraw, Plaintiffs have designated both Mr. Youssef and Dr. Vance to testify about

3    technical issues related to Pegasus.  If Plaintiffs are allowed to introduce that testimony, then NSO

4    must be able to introduce Mr. McGraw's opinions as rebuttal.

5           **E.**    **Mr. McGraw does not opine on ultimate legal issues.**

6          Contrary to Plaintiffs' argument (Mot. 8-9), Mr. McGraw does not offer opinions on any

7    ultimate legal issues.  Mr. McGraw has made clear that he is not offering any legal opinions in this

8    case but is, instead, offering technical opinions about how the relevant versions Pegasus functioned

9    and affected (or not) WhatsApp.  Those opinions may "*concern*[] an ultimate issue," but it is "well-

10   established" that such opinions are not "objectionable."  *Hangarter*, 373 F.3d at 1016 (emphasis

11   added); *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an

12   ultimate issue.");  *Morgan v. City of L.A.*, 2020 WL 6048831, at *3 (C.D. Cal. June 23, 2020) ("an

13   expert may offer testimony on matters that *touch on* legal issues or unavoidably use legal

14   terminology").  Indeed, both of Plaintiffs' experts offer similar opinions, while repeatedly asserting

15   that they are not offering legal opinions. (Dkt. 512-2 (Youssef Deposition) at 77:17-18, 234:3-6;

16   Dkt. 509-6 (Vance Deposition) at 18:18-20:4, 50:10-18, 140:2-141:4, 230:21-231:3.)

17         Moreover, several of the categories of testimony Plaintiffs challenge—whether NSO

18   "'targeted' Plaintiffs' computers" or "acted 'without authorization' or 'exceeded authorized

19   access'"—address opinions that Mr. McGraw will no longer offer in light of the Court's summary

20   judgment order (unless necessary to rebut Mr. Youssef's and Dr. Vance's testimony).  The other

21   category Plaintiffs challenge, "whether Plaintiffs suffered 'damage' or 'loss'" (Mot. 8) does not

22   involve any legal conclusions.  Mr. McGraw does not offer any opinion as to whether Plaintiffs'

23   claimed damages satisfy the CFAA's legal definitions of "damage" or "loss."  He offers opinions

24   solely about the *facts* related to Plaintiffs' claimed damages, which the jury will consider when

25   deciding whether those damages satisfy the legal definitions.  That is permissible expert testimony,

26   not legal opinion.  *See, e.g.*, *Hyer v. City & Cty. of Honolulu*, 118 F.4th 1044, 1059 (9th Cir. 2024)

27   ("testimony is not an impermissible legal conclusion" if it does not "represent an attempt to instruct

28   the jury on the law, or how to apply the law to the facts of the case" (cleaned up)).

# V.   __CONCLUSION__

Because Mr. McGraw's opinions are relevant, helpful, and reliable, the Court should deny Plaintiffs' attempt to exclude them.


Dated: March 20, 2025

KING & SPALDING LLP

By: _/s/ Joseph N. Akrotirianakis_

JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG
_Attorneys for Defendants_

25