1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
     *jakro@kslaw.com*
2   AARON S. CRAIG (Bar No. 204741)
     *acraig@kslaw.com*
3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1600
4   Los Angeles, CA 90071
    Telephone: (213) 443-4355
5   Facsimile: (213) 443-4310

6   Attorneys for Defendants
    NSO GROUP TECHNOLOGIES LIMITED and
7   Q CYBER TECHNOLOGIES LIMITED

8                        UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                             OAKLAND DIVISION

11

12  WHATSAPP INC., a Delaware corporation,      Case No. 4:19-cv-07123-PJH
    and FACEBOOK, INC., a Delaware
13  corporation,                                **DEFENDANTS' REVISED OPPOSITION
                                                TO PLAINTIFFS' MOTION FOR
14              Plaintiffs,                      PERMANENT INJUNCTION**

15       v.

16  NSO GROUP TECHNOLOGIES LIMITED
    and Q CYBER TECHNOLOGIES LIMITED,
17
                Defendants.
18
                                                Date:  July 17, 2025
19                                              Time:  10:00 a.m.
                                                Place: Courtroom 3, Ronald V. Dellums
20                                                     Federal Building & U.S. Courthouse,
                                                       1301 Clay Street, Oakland, California
21
                                                Action Filed: 10/29/2019
22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.    Introduction ........................................................................................................... 1

II.   Background ........................................................................................................... 2

      A.    NSO's Pegasus technology. ....................................................................... 2

      B.    The history of this litigation. ..................................................................... 5

III.  Argument ............................................................................................................. 7

      A.    Plaintiffs do not satisfy the requirements for injunctive relief. ................ 7

            1.    Plaintiffs have not proved irreparable harm. ................................. 8

            2.    Plaintiffs have not proved they lack an adequate legal remedy. ... 10

            3.    The balance of hardships does not favor an injunction. ............... 13

            4.    The public interest would be disserved by an injunction. ............ 15

      B.    Plaintiffs' requested injunction is grossly overbroad. ............................. 16

      C.    California law bars any injunction on Plaintiffs' contract claim. .......... 21

            1.    Plaintiffs seek an injunction to enforce WhatsApp's Terms. ..................... 21

            2.    Plaintiffs may not receive an injunction to enforce WhatsApp's Terms. .. 23

IV.   Conclusion .......................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*ACT 898 Prods. v. WS Indus.*,
5    774 F. App'x 1012 (9th Cir. 2019) ................................................................. 8, 10

6
*Allied Portables, LLC v. Youmans*,
7    2015 WL 6813669 (M.D. Fla. Nov. 6, 2015) ..................................................... 9, 12

8
*Bansbach Easylift of N.A. v. Reve*,
     2009 WL 10670230 (M.D. Fla. Mar. 25, 2009) ................................................. 9, 12

9
*Benn v. Allstate Ins. Co.*,
10    569 F. Supp. 3d 1029 (C.D. Cal. 2021) ............................................................ 23, 24

11
*Big Country Foods, Inc. v. Bd. of Educ.*,
     868 F.2d 1085 (9th Cir. 1989) ............................................................................. 10

12
*Califano v. Yamasaki*,
13    442 U.S. 682 (1979) ............................................................................................ 16

14
*Castellano Cosmetic Surgery Ctr. v. Rashae Doyle, P.A.*,
15    2021 WL 3188432 (M.D. Fla. July 28, 2021) .............................................. 9, 10, 12

16
*Chegg v. Doe*,
     2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ...................................................... 10

17
*Colonial Life & Acc. Ins. Co. v. Stentorians-L.A. Cnty. Black Fire Fighters*,
18    2014 WL 794571 (C.D. Cal. Feb. 24, 2014) ....................................................... 24

19
*Connerly v. Schwarzenegger*,
20    146 Cal. App. 4th 739 (2007) ............................................................................. 11

21
*Corelogic Sols., LLC v. Geospan Corp.*,
     2020 WL 7786537 (C.D. Cal. Aug. 21, 2020) ...................................................... 14

22
*Dominguez v. Andrew Corp.*,
23    2007 WL 4259480 (N.D. Cal. Dec. 4, 2007) ...................................................... 24

24
*eBay Inc. v. MercExchange, L.L.C.*,
25    547 U.S. 388 (2006) .............................................................................................. 9

26
*Energy Power Co. v. Xiaolong Wang*,
     2013 WL 6234625 (D. Mass. Dec. 3, 2013) ......................................................... 9

27
*In re Estate of Ferdinand Marcos Human Rights Litig.*,
28    94 F.3d 539 (9th Cir. 1996) ................................................................................ 20

ii

*Facebook, Inc. v. Power Ventures, Inc.*,
    252 F. Supp. 3d 765 (N.D. Cal. 2017) ........................................................................ 9, 10, 14

*Facebook, Inc. v. Sluchevsky*,
    2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) .................................................................. 10, 12

*Fansler Found. v. Am. Realty Investors, Inc.*,
    2007 WL 1302742 (E.D. Cal. May 2, 2007) .......................................................................... 11

*Gallagher Benefit Servs., Inc. v. De La Torre*,
    283 F. App'x 543 (9th Cir. 2008) ....................................................................................... 16

*Haskell v. Brown*,
    677 F. Supp. 2d 1187 (N.D. Cal. 2009) ................................................................................ 15

*Herb Reed Enters. v. Fla. Ent. Mgmt.*,
    736 F.3d 1239 (9th Cir. 2013) ..................................................................................... 9, 10, 16

*Herbalife Int'l of Am. Inc. v. Ford*,
    287 F. App'x 600 (9th Cir. 2008) ....................................................................................... 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ..................................................................................... 13, 15, 16

*Holdings v. Miva, Inc.*,
    2016 WL 4943048 (S.D. Cal. Sept. 16, 2016) ..................................................................... 24

*Int'l Medcom, Inc. v. S.E. Int'l, Inc.*,
    2015 WL 7753267 (N.D. Cal. Dec. 2, 2015) ......................................................................... 24

*Jarvis v. State Farm Gen. Ins. Co.*,
    2024 WL 4003319 (C.D. Cal. July 26, 2024) ................................................................ 8, 10, 25

*Joshua David Mellberg LLC v. Will*,
    2019 WL 6711480 (D. Ariz. Nov. 25, 2019) ........................................................................ 8

*Katzman v. Allstate Ins. Co.*,
    2010 WL 11515454 (C.D. Cal. Feb. 22, 2010) ..................................................................... 23

*Keene v. City & Cty. of S.F.*,
    2025 WL 341831 (9th Cir. Jan. 30, 2025) ............................................................................ 23

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    634 F.2d 1197 (9th Cir. 1980) ............................................................................................ 8

*Long Beach Drug Co. v. United Drug Co.*,
    13 Cal. 2d 158 (1939) ................................................................................................... 23, 24

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ............................................................................................ 8

iii

*In re MacBook Keyboard Litig.*,
   2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ........................................................................ 8

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ........................................................................................... 20

*Meta Platforms, Inc. v. Ates*,
   2023 WL 4035611 (N.D. Cal. May 1, 2023) ........................................................................ 9

*Meta Platforms, Inc. v. Nguyen*,
   2023 WL 8686878 (N.D. Cal. Aug. 22, 2023) ............................................................... 9, 19

*Mulcahy v. Cheetah Learning LLC*,
   386 F.3d 849 (8th Cir. 2004) ........................................................................................... 19

*Mycogen Corp. v. Monsanto Co.*,
   28 Cal. 4th 888 (Cal. Ct. App. 2002) .............................................................................. 24

*Nida v. Allcom*,
   2020 WL 2405251 (C.D. Cal. Mar. 11, 2020) .................................................................. 12

*Open Text, S.A. v. Box, Inc.*,
   36 F. Supp. 3d 885 (N.D. Cal. 2014) ................................................................................ 9

*PDF Print Commc'ns Inc. v. Fed. Mut. Ins. Co.*,
   2022 WL 2189631 (C.D. Cal. Mar. 29, 2022) .................................................................. 24

*People v. Clymer*,
   107 Cal. App. 5th 131 (2024) ......................................................................................... 18

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ............................................................................. 16, 22, 23

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ............................................................................................ 8

*Rep. of the Philippines v. Pimentel*,
   553 U.S. 851 (2008) ....................................................................................................... 19

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) .......................................................................................... 5

*Simon Prop. Grp., LP v. mySIMON, Inc.*,
   282 F.3d 986 (7th Cir. 2002) ............................................................................................ 8

*Sims Snowboards, Inc. v. Kelly*,
   863 F.2d 643 (9th Cir. 1988) ......................................................................................... 23

*Softketeers, Inc. v. Regal W. Corp.*,
   2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) ............................................................. 13, 14

iv

*Sprint Nextel Corp. v. Welch*,
  2014 WL 68957 (E.D. Cal. Jan. 8, 2014) .................................................................. 9, 18, 19, 23

*Sprint Sols., Inc. v. Cell Wholesale, Inc.*,
  2015 WL 13919095 (C.D. Cal. Dec. 10, 2015) ...................................................... 18, 19, 23

*State v. Chebegwen*,
  2020 WL 3124648 (Ohio Ct. App. June 12, 2020) ............................................................ 18

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ............................................................................................ 17

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
  982 F.2d 363 (9th Cir. 1992) .............................................................................................. 12

*United States v. Barrett*,
  2025 WL 371084 (S.D.N.Y. Feb. 3, 2025) ........................................................................ 18

*United States v. Ciuca*,
  2018 WL 6528498 (D. Nev. Oct. 9, 2018) ......................................................................... 18

*United States v. Eldarir*,
  681 F. Supp. 3d 43 (E.D.N.Y. July 6, 2023) ..................................................................... 18

*United States v. Frommelt*,
  971 F.3d 823 (8th Cir. 2020) .............................................................................................. 18

*United States v. Ibanez-Molina*,
  759 F. Supp. 3d 1272 (S.D. Fla. 2024) .............................................................................. 18

*United States v. Scarfo*,
  180 F. Supp. 572 (D.N.J. 2001) ......................................................................................... 18

*United States v. Sollars*,
  2023 WL 4542297 (E.D. Mich. July 14, 2023) ................................................................. 18

*United States v. Swan*,
  2022 WL 1763392 (10th Cir. 2022) .................................................................................... 18

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*,
  2024 WL 1984897 (W.D.N.Y. May 6, 2024) ........................................................... 8, 12, 25

*W. Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) .............................................................................................. 8

*Warner Bros. Int'l Television Distrib. v. Golden Channels & Co.*,
  2003 WL 27384425 (C.D. Cal. Mar. 31, 2003) ................................................................. 25

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..................................................................................................... 13, 15

*White v. Univ. of Cal.*,
    2012 WL 12335354 (N.D. Cal. Oct. 9, 2012) .......................................................................... 20

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) .......................................................................................................... 9, 15

*Zepeda v. INS*,
    753 F.2d 719 (9th Cir. 1983) .............................................................................................. 16

**Statutes**

Cal. Civ. Code § 526(b)(5) .......................................................................................................... 23

Cal. Civ. Code § 3390(e) ............................................................................................................. 24

Cal. Civ. Code § 3423(e) ............................................................................................................. 23

**Other Authorities**

Fed. R. Civ. P. 19 ........................................................................................................................ 19

Fed. R. Civ. P. 65(d) ................................................................................................................... 20

1    **I.    INTRODUCTION**

2        Defendants filed their initial Opposition to Plaintiffs' Motion for Preliminary Injunction on

3    March 14, 2025 (Dkt. 605).  In light of subsequent events, including the jury trial and the Court's

4    related evidentiary and procedural rulings, Defendants hereby submit this revised Opposition and

5    supporting declarations of Joseph N. Akrotirianakis, Yaron Shohat, Tamir Gazneli and Joshua

6    Minkler.  These replace Defendants' previous filings (Dkts. 604-606).[1]

7        This case involves three defunct versions of NSO's "Pegasus" technology.  The Court ruled

8    that those versions violated the CFAA and CDAFA because, for short periods of time in the past,

9    those versions exchanged information with end-user devices by sending messages through

10   WhatsApp servers.  The Court also held that NSO breached WhatsApp's Terms of Service

11   ("Terms") by decompiling and reverse-engineering WhatsApp.  Plaintiffs claimed that they

12   suffered purely economic losses from that conduct.  At trial, the jury awarded Plaintiffs every cent

13   of the losses they claimed they suffered.  That award fully remedies the only conduct by NSO that

14   Plaintiffs challenged and that this Court found to be unlawful.

15       There is no justification *also* to grant Plaintiffs prospective injunctive relief.  The evidence

16   shows that NSO cannot and will not again engage in the conduct this Court held to be unlawful.

17   Plaintiffs thus face no risk of harm, much less irreparable harm, in the absence of an injunction.

18   Yet Plaintiffs request an extraordinarily overbroad injunction that does not track their claims in this

19   case, the Court's summary judgment order, or the conduct that this Court found to be unlawful.

20   Instead of seeking to enjoin the use of WhatsApp servers to install Pegasus, Plaintiffs seek an

21   injunction that reaches the use of *any* technology to collect data from the phones of *any* user of *any*

22   of Plaintiffs' platforms, without regard to whether that technology uses WhatsApp servers in any

23   way.  Such an injunction would prohibit conduct that Plaintiffs have never challenged in this case.

24   It would force NSO out of business.  And it would arrogate to this Court the power to dictate

25   permissible law-enforcement, counterterrorism, and military surveillance techniques for every

26   country in the world.  If the Court were to issue Plaintiffs' requested injunction, it would unilaterally

27   force numerous foreign governments to "go dark" on lawful, authorized surveillance of criminals

28

---

[1] Defendants have no objection to Plaintiffs filing a revised reply.

1

DEFENDANTS' REVISED OPPOSITION TO                                    Case No. 4:19-cv-07123-PJH
MOTION FOR PERMANENT INJUNCTION

1    and terrorists in their own countries.  That would be both bad for the world and beyond the limits

2    of what a U.S. court can properly enjoin.  The Court should deny Plaintiffs' motion.

3    **II.    BACKGROUND**

4        **A.    NSO's Pegasus technology.**

5        **1.**  NSO develops and licenses cybersurveillance, lawful intercept, and other technologies.

6    Its flagship product, Pegasus, allows government law-enforcement and intelligence agencies to

7    collect data from mobile devices as part of authorized law-enforcement and intelligence

8    investigations.  (*See* Supp. Shohat Decl. ¶¶ 3-5.)

9        Pegasus is not synonymous with the use of WhatsApp servers to send code to target devices.

10   No current versions of Pegasus involve transmitting messages across WhatsApp servers or

11   infrastructure or doing anything else that could possibly be construed as an attack on WhatsApp's

12   systems.  (Supp. Shohat Decl. ¶ 46; Gazneli Decl. ¶¶ 3-5.)  For a brief period several years ago,

13   NSO's covert-Android version of Pegasus involved sending messages through WhatsApp servers.

14   But NSO's "one-click Android," "covert ioS," and "one-click ioS" versions of Pegasus have never

15   been installed through WhatsApp servers, and NSO's current covert-Android vectors do not use

16   WhatsApp servers either.  The only contemporary connection between Pegasus and WhatsApp is

17   that the numerous types of data that NSO's customers can access from the devices of the criminals

18   and terrorists who are investigation targets include WhatsApp messages that criminals and terrorists

19   commonly send or receive.  But Pegasus is no longer installed through WhatsApp servers, and no

20   target data is sent over WhatsApp servers during the extraction process.

21       **2.**  Governments need Pegasus (and similar technologies) because WhatsApp's end-to-end

22   encryption is commonly abused by heinous criminals. (Minkler Decl. Exh. A ¶¶ 41-49.) WhatsApp

23   puts powerful encryption technology into the hands of anyone who signs up for an account, and

24   signing up does not even require users to provide their real name (or any name).  End-to-end

25   encryption means that historical government surveillance tools are useless in fighting terrorism, sex

26   trafficking, and other crimes committed via WhatsApp.  WhatsApp knows its platforms are used to

27   recruit terrorists, plan terrorist attacks, and exchange child pornography.  Proof of WhatsApp's

28   knowledge comes in the form of witness testimony about Plaintiffs' employees haplessly trying to

DEFENDANTS' REVISED OPPOSITION TO                          CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

stem the criminal abuse of Plaintiffs' platforms based on voluntary "user reports" made to Plaintiffs' "trust and safety," terrorism, and child exploitative-imagery teams. (Dkt. 596-10 at 37:18–46:13.) But Plaintiffs often choose not to cooperate with law enforcement requests for assistance.

The public record teems with instances of terrorists and other criminals using WhatsApp to commit and shield their crimes from discovery. There have been numerous reports of child pornographers and sexual abusers using Plaintiffs' platforms to commit their crimes.[2] WhatsApp is the messaging app of choice for human traffickers.[3] The ISIS terrorist who attacked London's Westminster Bridge in 2017 used WhatsApp "two minutes before killing five" victims in the attack.[4] Plaintiffs refused to reveal the terrorist's message to authorities, a decision the United Kingdom's Home Secretary called "completely unacceptable."[5] Three months later, terrorists used WhatsApp to plan a "knife rampage" on London Bridge, which "may have prevented the authorities from identifying the plot."[6] Plaintiffs again refused to give authorities access to the terrorists' messages.[7] One of the 1,400 alleged "Target Users" in May 2019 was an Islamic State terrorist who was using WhatsApp to plan an attack; Plaintiffs' warning to the 1,400 users "killed" an investigation into that terrorist by a "team of European law enforcement officials" who had been

---

[2] *E.g.*, BBC, *David Wilson: Sex Offender Who Posed as Girls Online Jailed for 25 Years* (Feb. 10, 2021), https://tinyurl.com/3vxbbnmf; Virkram Dodd, *Facebook under Fire over Encryption Plans as Man Is Jailed for Abusing 52 Children*, The Guardian (Feb. 10, 2021), https://tinyurl.com/c3u569e8; Yahoo Finance, *'Nothing Stopping' Spread of Child Abuse Images on WhatsApp, Sys Safety Group* (Aug. 15, 2024), https://tinyurl.com/4htavrk7; Katherine Blunt, *Facebook and Instagram Steer Predators to Children, New Mexico Attorney General Alleges in Lawsuit*, Wall St. J. (Dec. 6, 2023), https://tinyurl.com/2ws78h7a; Jeff Horwitz & Katherine Blunt, *Meta Staff Found Instagram Tool Enabled Child Exploitation. The Company Pressed Ahead Anyway.*, Wall St. J. (Feb. 22, 2024), https://tinyurl.com/yc8nw6e7

[3] *See, e.g.*, Elizabeth Trovall, *WhatsApp Has Streamlined Business Communication for Human Smuggling*, Texas Public Radio (Aug. 2, 2023), https://tinyurl.com/yp8xy9da.

[4] Ryan Sabey, *Tool of Terror: Social Media Giants Will Be Made to Hand Over Encrypted WhatsApp Messages in Fight Against Terrorism*, The Sun (Sept. 29, 2019), https://bit.ly/2TuLNhK.

[5] Gordon Rayner, *WhatsApp Accused of Giving Terrorists 'A Secret Place to Hide' as It Refuses to Hand over London Attacker's Messages*, The Telegraph (Mar. 27, 2017), https://bit.ly/38uHkjl.

[6] Dipesh Gadher, *London Bridge Terror Attack Planned on WhatsApp*, Sunday Times (May 12, 2019), https://bit.ly/38xG2Uy.

[7] Dan Sabbagh, *Call for Backdoor Access to WhatsApp as Five Eyes Nations Meet*, The Guardian (July 30, 2019), https://bit.ly/2InSNpZ.

DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

1    using Pegasus to monitor the terrorist's messages.[8]

2        Plaintiffs assert that NSO's government customers have occasionally misused Pegasus

3    because some of the roughly 1,400 targets referenced in the complaint were identified by Citizen

4    Lab as "VIPs" or members of "civil society."  But as this Court has noted, "a given individual may

5    be the proper subject of law enforcement or national security efforts even if that individual is also

6    an attorney, journalist, etc."  (Dkt. 305 at 5.)  That is exactly the case here.  Even among the 200

7    targets cherry-picked by Citizen Lab as "VIPs" or "civil society," dozens have been publicly

8    identified as criminals and terrorists.  (Dkt. 314-3.)  For example, a target that Plaintiffs describe

9    as a "journalist" was arrested when caught trying to deliver a car full of explosives to a terrorist

10   organization.[9]   Another purported journalist "supplied confidential and sensitive information to

11   Chinese Intelligence officers in exchange for remuneration thereby compromising the security and

12   national interests of India."[10]  Perhaps worst of all, Citizen Lab "VIP" Abdullah al-Muhaysini is a

13   known Al-Qaeda recruiter.[11]  He is the subject of a video recording in which he salutes the family

14   of a suicide bomber before sending that young man to his death.  (Dkt. 596-19.)

15       **3.**  Because Pegasus allows governments to obtain access to a target's phone after that phone

16   unencrypts encrypted messages, governments use Pegasus to access the phones of their highest-

17   priority terrorist and criminal targets.  Many countries, including "western" democracies, have

18   licensed Pegasus, which benefits both the United States and its allies.  Pegasus has been used to

19   capture high-profile drug kingpins (such as Joaquín "El Chapo" Guzmán), foil terrorist plots, and

20   break up human trafficking rings.  The FBI itself licensed Pegasus, and the press has reported that

21   the United States paid for at least two other countries, including Colombia, to license Pegasus.

22       NSO licenses Pegasus to governments and government agencies that pass a rigorous

23   screening process, and numerous safeguards prevent the misuse of Pegasus. This process has

---

[8] Dov Lieber et al., *Police Tracked a Terror Suspect—Until His Phone Went Dark After a Facebook Warning*, Wall St. J. (Jan. 2, 2020), https://on.wsj.com/38uXk5s.

[9] OpIndia, *Bihar: Three, Including a Journalist, Arrested with Explosives, Naxal Literature Recovered* (June 9, 2019), https://tinyurl.com/ykz3bmvh.

[10] Express News Service, *Journalist Rajeev Sharma 'Supplied Confidential Info to Chinese Intelligence Officers in Exchange for Eemuneration'* (July 3, 2021), https://tinyurl.com/2ynw22a5.

[11] *See* Counter Extremism Project, *Extremist Leaders: Abdallah al-Muhaysini*, https://tinyurl.com/3z2sf579.

4

involved the following: *(1)* Initial review by NSO's Business Ethics Committee, which contains numerous former senior U.S. officials. *(2)* Review and approval by the Israeli Ministry of Defense ("MoD") of *all* of NSO's marketing, licensing, and technologies, including review and approval of the specific vulnerabilities used by NSO's technologies. *(3)* Restrictions in NSO's customer contracts requiring Pegasus customers to use Pegasus only against terrorism and serious crime, and only consistent with applicable legal requirements. *(4)* End-user certifications provided by NSO's customers to the Israeli government, similarly certifying that customers will use Pegasus only against terrorism and serious crime. *(5)* Investigation of all reports of misuse, including termination of licenses for customers who misuse the technology or refuse to cooperate with an investigation. (*See* Supp. Shohat Decl. ¶¶ 8-45 & Exh. H.)

**4.** In short, Pegasus fills a need for governments to gain access to the encrypted communications of the terrorists, drug traffickers, sex traffickers, child pornographers, and other criminals Plaintiffs know use WhatsApp to promote terrorism and crime. The need for lawful intercept technologies to counter terrorists' and other criminals' use of end-to-end encryption is well-recognized, including by President Obama and other U.S. law-enforcement officials from both parties.[12] All of this militates against a decision that the public's interest is best served by any injunction, let alone the sweeping injunction proposed by Plaintiffs.

### B.    The history of this litigation.

**1.** Plaintiffs filed their complaint on October 29, 2019. (Dkt. 1.) Plaintiffs alleged that NSO had unlawfully used WhatsApp servers to install one version of Pegasus in April-May 2019. (Dkt. 1 ¶ 1.) NSO voluntarily appeared in March 2020, before being properly served. (Dkt. 23.)

**2.** At the start of discovery, NSO moved for a protective order under *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), arguing it should not have to produce

---

[12] *See* White House, *Remarks by the President at South by Southwest Interactive* (Mar. 11, 2016), https://bit.ly/446NKF4; The Record, *Encrypted Apps Still a Challenge as FBI Probes Trump Shooter's Devices, Wray Says* (July 24, 2024), https://tinyurl.com/mrxekv65; CNN, *Merrick Garland Cites Domestic Terrorism and Civil Rights in Defending Budget to House Lawmakers* (May 4, 2021), https://bit.ly/4jCX73X; U.S. DOJ, *Attorney General William P. Barr Delivers Keynote Address at the International Conference on Cyber Security* (July 23, 2019), https://bit.ly/449JJ2M.

DEFENDANTS' REVISED OPPOSITION TO                          CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

1    information in violation of Israeli law ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Dkt. 186.)  This Court declined to enter "a blanket order

3    excusing [NSO] from all discovery," but it "concluded that [NSO] may be partially excused from

4    certain discovery obligations." (Dkt. 292 at 2 (citing Dkt. 233).)  The Court held it would consider

5    individual motions to compel to decide whether Plaintiffs sought information that was "sufficiently

6    important and specific" to override NSO's Israeli law obligations. (Dkt. 233 at 10.)

7          Plaintiffs then filed a motion to compel evidence of NSO's technology.  The Court granted

8    that motion but limited the "documents that must be produced" in several important respects. (Dkt.

9    292 at 3-4.)  First, the Court limited the scope of discovery to NSO technologies "targeting or

10   directed at WhatsApp servers, or using WhatsApp in any way to access Target Devices." (*Id.* at

11   3.)  Second, the Court limited "the timeframe of documents that must be produced" to the period

12   "from April 29, 2018, to May 10, 2020." (*Id.* at 4.)  The Court held that "[i]f, after reviewing the

13   relevant spyware from that timeframe, plaintiffs are able to provide evidence that any attack lasted

14   beyond that timeframe, plaintiffs may seek further discovery at that time." (*Id.*)

15         NSO complied with the Court's order by producing evidence related to the three installation

16   vectors that used WhatsApp servers from April 2018 to May 2020. (Supp. Shohat Decl. ¶¶ 6-7.)

17   Those three vectors were internally referenced as "Heaven," "Eden," and "Erised." (*Id.*)  Those

18   vectors used preexisting vulnerabilities that have all been eliminated and can no longer be exploited

19   by anyone—including NSO and its government customers. (Gazneli Decl. ¶ 5.)  Under the Court's

20   limitation on the "timeframe" for discovery, NSO properly did not produce discovery related to

21   versions of Pegasus after May 10, 2020. (Dkt. 292 at 4.)  The Court invited Plaintiffs to move to

22   compel based on "evidence that any attack lasted beyond that timeframe" (*id.*), but Plaintiffs never

23   filed any such motion.  Accordingly, the Court never ordered NSO to produce evidence of Pegasus

24   versions beyond May 10, 2020.  Nonetheless, NSO's CEO testified without contradiction that NSO

25   no longer has *any* "installation vector for Pegasus . . . that uses [Plaintiffs'] technology in any way."

26   (Dkt. No. 396-5, Exh. H at 51:23-52:2; *see also* Supp. Shohat Decl. ¶ 46.)

27         **3.** After the close of discovery, the parties cross-moved for summary judgment.  Plaintiffs

28   sought partial summary judgment *only* on liability.  Accordingly, they submitted evidence solely

1   related to their claims about NSO's past conduct. This Court relied on that evidence of past conduct

2   in granting Plaintiffs' motion, holding NSO liable on narrow grounds. With respect to Plaintiffs'

3   CFAA and CDAFA claims, the Court found NSO liable *solely* because the relevant Pegasus vectors

4   "obtain[ed] information about the target user's device via the WhatsApp servers." (Dkt. 494 at 12-

5   13.) With respect to Plaintiffs' contract claims, the Court found NSO violated WhatsApp's Terms

6   *solely* by "reverse-engineering and/or decompiling" the "WhatsApp software." (*Id.* at 14-15.)

7       **4.** In April and May of this year, the Court held a jury trial on Plaintiffs' damages. Plaintiffs

8   asked the jury to award them compensatory damages of $444,719 and punitive damages. The jury

9   awarded every dollar of compensatory damages Plaintiffs requested, so Plaintiffs have received full

10  compensation for all of their claimed harms. (Dkt. 736.)[13]

11  **III.    ARGUMENT**

12       Plaintiffs are not entitled to any injunction, and certainly not to the grossly overbroad

13  injunction they request. This Court found NSO liable for a limited category of purely past conduct,

14  for which Plaintiffs claimed exclusively economic losses. The jury's award of compensatory

15  damages fully remedies all of the injuries Plaintiffs claim they suffered from the conduct at issue

16  in this case. That conduct ended years ago and cannot be resumed, so Plaintiffs' requested

17  injunction would not protect them from any unlawful conduct. Indeed, Plaintiffs improperly seek

18  to enjoin conduct they never challenged in this case and that neither this Court nor any other has

19  ever held to be unlawful. Plaintiffs also seek to enjoin future breaches of WhatsApp's Terms of

20  Service, but California law prohibits any such injunction. For all these reasons, granting Plaintiffs'

21  requested injunction would be an abuse of discretion. It would violate well-settled limits on

22  injunctive relief, endanger the public, and render WhatsApp and Plaintiffs' other platforms law-

23  free zones in which Plaintiffs' customers are able commit unspeakable crimes with impunity.

24  Nothing in Plaintiffs' claims or this Court's findings can justify that outcome.

25      **A.    Plaintiffs do not satisfy the requirements for injunctive relief.**

26       Plaintiffs cannot establish the four requirements for injunctive relief: (1) that they "suffered

27

28     [13] The jury also awarded $167,254,000 in punitive damages, a flagrantly unconstitutional amount
that NSO has moved to reduce or set aside. (Dkt. 747.)

DEFENDANTS' REVISED OPPOSITION TO          CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013).

### 1.    Plaintiffs have not proved irreparable harm.

Plaintiffs have not met their "burden to demonstrate irreparable harm" because they asserted only "economic injury" that has been "remedied by a damage award" and thus "does not support a finding of irreparable harm." *ACT 898 Prods. v. WS Indus.,* 774 F. App'x 1012, 1015-16 (9th Cir. 2019) (cleaned up) (quoting *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).   Plaintiffs' only alleged harms were investigatory and remediation expenses (Dkt. 494 at 15), and the jury awarded them every cent of those claimed losses.  That award fully remedies Plaintiffs' claimed harms.[14]

It is "well-established" that "monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980).  That is true even where (unlike here) a plaintiff proves it is likely to suffer "continuing" monetary harm in the future. *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020).  Plaintiffs do not claim or prove that any injury they assert they could suffer in the future would be any different than the monetary harm they claim to have suffered in the past.  Even if Plaintiffs could prove that such "future harm" were likely, that harm could "be redressed by money damages." *Jarvis v. State Farm Gen. Ins. Co.*, 2024 WL 4003319, at *6 (C.D. Cal. July 26, 2024); *accord ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, 2024 WL 1984897, at *2-3 (W.D.N.Y. May 6, 2024).  Indeed, Plaintiffs filed this case more than five years ago, and they *never* previously sought a preliminary  injunction.  That unexplained "failure to pursue a preliminary injunction . . . undermines their allegation of irreparable harm today." *Joshua David Mellberg LLC v. Will*, 2019 WL 6711480, at *14 (Nov. 25, 2019), *rep. & rec. adopted in relevant part*, 2020 WL 2569908 (D. Ariz. May 21, 2020).[15]

---

[14] Plaintiffs abandoned any claim of non-monetary injury such as reputational harm or loss of goodwill "in support of . . . injunctive relief." (Dkt. 591 at 12; *see* Akro. Decl. ¶ 2 & Exh. A.)

[15] *Accord Simon Prop. Grp., LP v. mySIMON, Inc.*, 282 F.3d 986, 990-91 (7th Cir. 2002); *Lydo*

DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

Because Plaintiffs cannot show irreparable injury through evidence, they assert that *any* past CFAA violation is *always* irreparable injury. (Mot. 8.) But the Supreme Court and Ninth Circuit have held that courts may not presume irreparable injury from the mere fact of a past violation.[16] Rather, a finding of irreparable injury must *always* be "grounded in . . . evidence" specific to each case. *Herb Reed*, 736 F.3d at 1250. Plaintiffs may not rely on "platitudes," "cursory or conclusory" assertions of harm, or "citation to a different case with a different record." *Id.* Accordingly, courts have denied injunctions when a past CFAA violation does not cause future irreparable injury. *Sprint Nextel Corp. v. Welch*, 2014 WL 68957, at *7-9 (E.D. Cal. Jan. 8, 2014).[17]

Sure enough, then, none of the cases Plaintiffs cite adopts or supports a rule of *per se* irreparable injury for CFAA violations. Most of those cases are unpublished default judgments (initiated by these same Plaintiffs against other defendants), which provide negligible precedential value because they are decided without adversarial argument. *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686878 (N.D. Cal. Aug. 22, 2023); *Meta Platforms, Inc. v. Ates*, 2023 WL 4035611 (N.D. Cal. May 1, 2023). Those cases also involved *non-monetary* injuries such as "harm to [Meta's] reputation [and] good will." *Nguyen*, 2023 WL 8686878, at *8; *Ates*, 2023 WL 4035611, at *8.[18] In *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 783 (N.D. Cal. 2017), the defendants *conceded* "that Facebook ha[d] suffered irreparable harm," which is not the case here. The defendants, moreover, violated the CFAA not just by accessing Facebook's computers, but by using that access to steal Facebook's proprietary data, which the defendants then posted on their own website. *Id.* at 768-69. The court thus found irreparable harm not simply from "unauthorized

---

*Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 909 (N.D. Cal. 2014).

[16] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-94 (2006); *Winter v. NRDC, Inc.*, 555 U.S. 7, 22-24 (2008); *Herb Reed Enters. v. Fla. Ent. Mgmt.*, 736 F.3d 1239, 1248-50 (9th Cir. 2013).

[17] *E.g.*, *Castellano Cosmetic Surgery Ctr. v. Rashae Doyle, P.A.*, 2021 WL 3188432, at *10 (M.D. Fla. July 28, 2021); *Allied Portables, LLC v. Youmans*, 2015 WL 6813669, at *4 (M.D. Fla. Nov. 6, 2015); *Bansbach Easylift of N.A. v. Reve*, 2009 WL 10670230, at *5 (M.D. Fla. Mar. 25, 2009).

[18] In *Energy Power Co. v. Xiaolong Wang*, 2013 WL 6234625, at *10 (D. Mass. Dec. 3, 2013), the defendant's CFAA violation "prevented [the plaintiff] from enjoying the uninterrupted use of its property" and "hampered [plaintiff] from further developing [its] product resulting in the loss of goodwill." Plaintiffs admit NSO did not impair WhatsApp's performance and do not claim NSO prevented development of any product. (Dkt. 396-5, Exh. L at 183:1-184:7)

DEFENDANTS' REVISED OPPOSITION TO
MOTION FOR PERMANENT INJUNCTION

CASE NO. 5:24-cv-04660-EJD

1   access of computers," but also from "the acquisition of [Facebook's] data." *Id.* at 782.[19]

2       Here, by contrast, Plaintiffs do not claim, much less prove, that NSO violated the CFAA to

3   steal, exploit, or retain any of Plaintiffs' data.  To the contrary, Plaintiffs admitted that NSO did *not*

4   remove any of Plaintiffs' data from their servers.  (Dkt. No. 419-5, Exh. B at 249:7-250:10, Exh. C

5   at 183:7-184:7, 250:22-251:24, Exh. N. at 4.)  And Plaintiffs do not claim—or submit evidence

6   of—any harm to their reputation or goodwill.  (Dkt. 591 at 12; Akro Decl. Exh. A.)  The cases

7   Plaintiffs cite, therefore, are the exact sort of "different case[s] with a different record" that the

8   Ninth Circuit has held cannot support a finding of irreparable injury.  *Herb Reed*, 736 F.3d at 1250.

9   In *this* case, Plaintiffs lack the "proof of any loss of clients, goodwill, or [other] actual, imminent

10  harm stemming from [NSO]'s prior alleged [CFAA] violations" that are required for irreparable

11  injury.  *Castellano*, 2021 WL 3188432, at *10.  Plaintiffs' assertions of irreparable injury thus have

12  no "ground[ing] in evidence," and cannot support an injunction.  *Herb Reed*, 736 F.3d at 1250.

13              **2.    Plaintiffs have not proved they lack an adequate legal remedy.**

14      For similar reasons, Plaintiffs also have not proved they lack an adequate legal remedy.

15  This Court's summary judgment order focused exclusively on a limited aspect of NSO's past

16  conduct during a narrow time period.  Plaintiffs claim to have suffered only monetary harm from

17  that past conduct, which was fully remedied by the jury's compensatory damages award.  *ACT 898*

18  *Prods.*, 774 F. App'x at 1012.  Plaintiffs submit no evidence that they are likely to suffer *future*

19  harm that cannot be remedied through damages.  They do not claim that any future harm would be

20  different from the financial losses they claim to have suffered in the past, so such "future harm"

21  could also "be redressed by money damages." *Jarvis*, 2024 WL 4003319, at *6.

22      That aside, Plaintiffs do not and cannot establish a "significant threat" of *any* future harm.

23  *Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989).  "The threat of

24  'irreparable harm' must be imminent . . . as opposed to a mere possibility of harm some time in the

25  future: 'An injunction cannot issue in a vacuum based on the proponents' fears about something

26  that may happen in the future.  It must be supported by *actual evidence* that there is a realistic

27  ────────────────

28  [19] *See also Chegg v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023) ("theft of Chegg's content"); *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *9 (N.D. Cal. Aug. 28, 2020) ("scraping of HTTP data").

| DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION | CASE NO. 5:24-cv-04660-EJD |

1    prospect that the party enjoined intends to engage in the prohibited activity.'" *Fansler Found. v.*

2    *Am. Realty Investors, Inc.*, 2007 WL 1302742, at *3 (E.D. Cal. May 2, 2007) (emphasis added);

3    *accord Connerly v. Schwarzenegger*, 146 Cal. App. 4th 739, 750 (2007).

4        Plaintiffs have no such evidence—only speculation based on facts with no connection to

5    Plaintiffs.  Plaintiffs assert that NSO still licenses "Pegasus" (Mot. 9-10), but this case is not about

6    Pegasus generally.  Pegasus is brand name encompassing many different technologies.  (Supp.

7    Shohat Decl. ¶¶ 5-6.)  This case involves only the three covert Android installation vectors

8    "targeting or directed at WhatsApp servers, or using WhatsApp in any way to access Target

9    Devices" between April 2018 and May 2020.  (Dkt. 292 at 3.)  Those three vectors existed for only

10   short periods of time.  (Gazneli Decl. ¶¶ 3-5.)  The vulnerabilities those vectors used are closed,

11   and NSO cannot reopen them.  (*Id.* ¶ 5.)  Nor do Plaintiffs contend that WhatsApp has any other

12   vulnerabilities NSO could use.  Other versions of Pegasus do not use WhatsApp as an installation

13   vector (*id.* ¶¶ 3-4; Supp. Shohat Decl. ¶¶ 5-6) and are accordingly irrelevant.  They certainly pose

14   no risk to Plaintiffs.

15       Plaintiffs' assertion that NSO developed Erised in late 2019, after this suit was filed, distorts

16   the relevant timeline.  (Mot. 10-11.)  NSO was not *served* with the lawsuit when it was filed.  NSO

17   voluntarily appeared in March 2020 (Dkt. 32), it did not receive a ruling on its motion to dismiss

18   until July 2020 (Dkt. 111), and this Court did not hold that NSO's use of WhatsApp servers was

19   unlawful until December 2024 (Dkt. 494), before which there was an open question as to the

20   legality of NSO's conduct. So it is unremarkable, and hardly indicative of an intent to violate the

21   law, that Erised was operational in May 2020.  Nor does NSO's motion to dismiss Plaintiffs' request

22   for injunctive relief suggest any ill intent.  (Mot. 16-17.)  Plaintiffs had the burden to *plead* facts

23   supporting their standing, so NSO filed its motion based solely on *Plaintiffs' allegations*.  (Dkt.

24   105.) That is routine motion practice, not an indication that NSO would act unlawfully in the future.

25       Equally baseless are Plaintiffs' complaints that NSO did not produce evidence of Pegasus

26   versions after May 2020.  (Mot. 11-12, 17.)  This Court limited discovery to evidence "from April

27   29, 2018 to May 10, 2020."  (Dkt. 292 at 4.)  NSO undertook extraordinary efforts to produce an

28   enormous amount of evidence about the relevant Pegasus versions during that timeframe (*e.g.*,

Dkts. 429-3–16). Plaintiffs never moved to compel discovery related to any versions of Pegasus after May 2020, despite the Court having invited them to do so if warranted. (Dkt. 292 at 4.) Accordingly, this Court never ordered NSO to provide such discovery. The Court may not make any inferences against NSO as a result of its non-production of evidence that the Court never ordered NSO to produce. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367-68 (9th Cir. 1992); *Nida v. Allcom*, 2020 WL 2405251, at *6 (C.D. Cal. Mar. 11, 2020).

In any event, NSO's CEO testified without contradiction that NSO does not have any "installation vector for Pegasus . . . that uses [Plaintiffs'] technology in any way." (Dkt. No. 396-5, Exh. H at 51:23-52:2; *see* Supp. Shohat Decl. ¶ 46.) NSO's witnesses also testified that they will abide by this Court's summary judgment order as long as it remains in effect. (*See* Dkt. 751 at 808:24-809:4; Supp. Shohat Decl. ¶ 47.) Plaintiffs have no evidence suggesting otherwise. The mere fact that NSO's business involves creating government surveillance tools (Mot. 9-10) in no way suggests that NSO will again create a *WhatsApp* installation vector when this Court has found such conduct to be unlawful.[20] Plaintiffs also seek an injunction pertaining to Plaintiffs' technologies other than WhatsApp, but this case has never involved Plaintiffs' "other technologies" (Mot. 11), and the record contains no evidence about them. Whether or not those technologies are "widespread" (Mot. 12) has nothing to do with whether NSO will again engage in the only conduct Plaintiffs challenged: *using WhatsApp servers* to *install* Pegasus on user devices.

Nor are Plaintiffs harmed by NSO's mere possession of the "WIS." (Mot. 12-13.) The "WIS" is a multipurpose technology with many uses other than crafting WhatsApp messages. (Gazneli Decl. ¶¶ 5-6.) That NSO used the "WIS" to craft WhatsApp messages *in the past* does not mean NSO will continue to do so in defiance of this Court's order. *ValveTech*, 2024 WL 1984897, at *2-3; *Bansbach*, 2009 WL 10670230, at *5; *Castellano*, 2021 WL 3188432, at *10; *Allied Portables*, 2015 WL 6813669, at *4. Even the unpublished default judgment Plaintiffs cite requires proof of a "reasonable likelihood of defendant's future violations," *Sluchevsky*, 2020 WL 5823277, at *9, and Plaintiffs offer *no* evidence that NSO will again use the "WIS" in any way that

---

[20] Neither do statements by a single NSO co-founder disagreeing with the Court's order. (Mot. 9.) Even if those statements could be attributed to NSO as an entity (which NSO denies), a mere statement of disagreement cannot be treated as evidence that a party is likely to defy a court order.

1  harms Plaintiffs.  Without any such evidence, there is no basis for Plaintiffs' speculation that they

2  will have to file multiple lawsuits or monitor NSO's conduct in the future.  (Mot. 13-16.)

3           **3.      The balance of hardships does not favor an injunction.**

4        The Court must balance any hardship to Plaintiffs if the injunction is withheld versus the

5  hardship NSO will suffer if the injunction is granted.  *Weinberger v. Romero-Barcelo*, 456 U.S.

6  305, 312 (1982).  Plaintiffs fail to identify any specific hardship that they would face without an

7  injunction, beyond cursory references to irreparable harm.  (Mot. 17.)  NSO, by contrast, would

8  suffer significant hardship from Plaintiffs' requested injunction.

9        ***First***, the "threat of being driven out of business" constitutes irreparable harm, *hiQ Labs,*

10 *Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022),[21] and Plaintiffs' requested injunction

11 would put NSO's entire enterprise at risk.  Pegasus is NSO's flagship product.  (Supp. Shohat Decl.

12 ¶ 48.)  This case involves only a very limited subset of Pegasus versions that were installed through

13 WhatsApp servers years ago.  (Gazneli Decl. ¶¶ 3-5.)  Yet Plaintiffs' injunction encompasses

14 multiple Meta platforms that have nothing to do with this lawsuit.  The injunction would broadly

15 prohibit collecting data from terrorists and other law enforcement and intelligence targets from their

16 WhatsApp mobile applications (which has not been held unlawful), as well as all of Plaintiffs' other

17 platforms (which were not at issue in the litigation)—whether or not the collection was performed

18 using a version of Pegasus installed through WhatsApp.  (Dkt. No. 558-3 ¶¶ 2, 3(c).)  There is no

19 longer any version of Pegasus installed through WhatsApp (Supp. Shohat Decl. ¶ 46), so Plaintiffs'

20 injunction would only interfere with the operation of products that are not even allegedly unlawful.

21       Such an injunction would force NSO out of business.  (Supp. Shohat Decl. ¶¶ 48-51.)  NSO

22 has competitors that offer products, similar to Pegasus, that permit the remote collection of

23 information from mobile devices.  (*Id.*)  Those competing products can collect WhatsApp messages,

24 among other social media messages.  (*Id.*)  The proposed injunction, however, apparently would ban

25 NSO from using *any* technology to collect information from user devices if the information is stored

26 on one of Plaintiffs' platforms—even if the collection had nothing to do with WhatsApp servers.

27

28    [21] This is true even if the conduct at issue is unlawful.  *Softketeers, Inc. v. Regal W. Corp.*, 2023
    WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023).

DEFENDANTS' REVISED OPPOSITION TO                    CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

If NSO were banned from offering versions of Pegasus that could collect such data, even versions as to which there is no claim of a violation of U.S. or California law, it would impose a unique competitive disadvantage on NSO and undermine its entire business model. (*Id.*)

At a minimum, the proposed injunction would result in unchallenged versions of Pegasus abruptly becoming unavailable to NSO's government customers. (Gazneli Decl. ¶ 7; Supp. Shohat Decl. ¶ 50.) In addition to losing its revenues, NSO would likely violate its contracts with the customers who rely on its products to fight crime and terrorism. (Supp. Shohat Decl. ¶¶ 50-51.) Those customers would seek other options to avoid disruptions to their investigations. (*Id.*) Plaintiffs' injunction thus has the potential to cause NSO "irreversible loss of data, contracts, customers, and market share," *Softketeers*, 2023 WL 2024701, at *11, in addition to jeopardizing the jobs of NSO's 380 employees (Supp. Shohat Decl. ¶ 51). Plaintiffs are thus "simply incorrect that the 'only' hardship that Defendants will suffer from this injunction is preventing them 'from engaging in further illegal activity.'" *Softketeers*, 2023 WL 2024701, at *11. Such "dire ramifications" weigh "strongly against" the injunction. *Id.*

**Second**, the proposed injunction would prohibit NSO and its employees from "using Plaintiffs' Platforms *in any way*." (Mot. 19.) This would prohibit NSO employees from using WhatsApp for internal communications, which NSO employees currently do. (Dkt. 399-4, Exh. 6 at 252:12-253:14, Exh. 8 at 65:10-66:20, Exh. 21 at 91:10-92:4.) And the injunction is not limited to a prohibition on *commercial* uses, so it would forbid NSO employees from using Facebook, Instagram, WhatsApp, and other platforms even in their personal capacities—a substantial and unwarranted hardship. *Corelogic Sols., LLC v. Geospan Corp.*, 2020 WL 7786537, at *3 (C.D. Cal. Aug. 21, 2020) (TRO affecting defendants' personal devices and email accounts "would clearly impose significant hardships"). Facebook has conceded as much in another matter by revising injunction terms to prohibit only *commercial* activities. *Power Ventures*, 252 F. Supp. 3d at 781.

**Third**, the proposed injunction would chill NSO's ability to find legal representation across a variety of commercial, transactional, and litigation matters. Plaintiffs' injunction would bar NSO's "attorneys" from using any of Plaintiffs' various platforms in any way, whether personal or commercial. (Mot. 2 n.1, 19.) The injunction would thus prohibit any NSO attorney from

1  maintaining personal and professional accounts on Facebook, Instagram, WhatsApp, and Plaintiffs'

2  other platforms.  Such a restriction would clearly create impediments to NSO retaining counsel,

3  even in matters completely unrelated to this litigation or to Plaintiffs.

4          **4.      The public interest would be disserved by an injunction.**

5          Finally, "courts of equity should pay particular regard for the public consequences in

6  employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312.  While the

7  evaluation of hardship "focuses on the parties, the public interest inquiry primarily addresses impact

8  on non-parties rather than parties, and takes into consideration the public consequences in

9  employing the extraordinary remedy of injunction." *hiQ Labs*, 31 F.4th at 1202 (cleaned up).

10          Plaintiffs' injunction clearly would affect non-parties and cause negative public

11  consequences.  The evidence is undisputed that NSO licenses its products solely to government

12  agencies for purposes of combating serious crime, antiterrorism efforts, and military and

13  intelligence operations.  (Supp. Shohat Decl. ¶¶ 3-4.)  Versions of Pegasus that do not use

14  WhatsApp are currently being used by governments around the world in sensitive law-enforcement,

15  military, and intelligence operations.  (*Id.* ¶¶ 49-50.)  Licensees of Pegasus have included multiple

16  Western and Western-style democracies, U.S. allies (including at least two licenses financed by the

17  United States), and the FBI.  (Minkler Decl. Exh. A ¶ 54.)  NSO's witnesses have explained the

18  vital function that Pegasus and similar technologies play in today's law-enforcement and

19  antiterrorism operations, given terrorists' and criminals' undisputed abuse of ubiquitous encrypted

20  messaging services.  (Minkler Decl. Exh. A ¶¶ 1, 35, 41-49, 55-62; *see also* Dkt. 505-2, Shepard

21  Report ¶¶ 23-30.)  The public clearly has interests in such national defense and law enforcement

22  operations.  *Winter*, 555 U.S. at 24; *Haskell v. Brown*, 677 F. Supp. 2d 1187, 1203 (N.D. Cal. 2009).

23          Plaintiffs' proposed injunction would hobble the lawful law enforcement and anti-terrorism

24  efforts of sovereign nations around the globe.  The most egregious provision (¶ 3(c)) would prohibit

25  the collection from target devices of messages sent and received by terrorists and criminals via

26  WhatsApp or any of Plaintiffs' other applications—*even using versions of Pegasus that do not*

27  *touch WhatsApp servers*.  Such an injunction would cause government agencies who rely on

28  Pegasus to "go dark" on ongoing investigations within their own territories, despite the fact that the

1   versions of Pegasus they are using have never been found (or even accused) to violate the CFAA,

2   CDAFA, or any other law.  By requiring NSO to cut off access to all versions of Pegasus (even

3   those not adjudged to violate the law) within thirty days, the Court would be impairing active law-

4   enforcement, military, and intelligence operations around the world.  And WhatsApp's proposal

5   that NSO delete "all data obtained or derived" from Plaintiffs' platforms is practically impossible

6   (Gazneli Decl. ¶ 8) and would result in lawfully obtained evidence being destroyed.  For example,

7   if Plaintiffs had obtained such an injunction years ago, it would have required NSO to ensure that

8   Mexico destroyed the evidence that proved essential to arresting and extraditing El Chapo.  (*See*

9   Minkler Decl. Exh. A ¶ 62.)  The injunction would have a similar effect on other countries now.

10  Plaintiffs cite no public interest sufficient to overcome these extreme consequences.[22]

11          **B.      Plaintiffs' requested injunction is grossly overbroad.**

12          The Court held NSO liable for a narrow category of conduct: designing and licensing three

13  Pegasus installation vectors that were transmitted to target devices via WhatsApp servers.  Even if

14  that liability finding supported *some* injunction—and it does not—it would support *only* an

15  injunction prohibiting NSO from using WhatsApp servers to transmit Pegasus installation code.

16  That is because injunctions "must be narrowly tailored . . . to remedy only the specific harms shown

17  by the plaintiffs, rather than to enjoin all possible breaches of the law."  *Price v. City of Stockton*,

18  390 F.3d 1105, 1117 (9th Cir. 2004) (cleaned up) (quoting *Zepeda v. INS*, 753 F.2d 719, 729 n.1

19  (9th Cir. 1983)); *see Herbalife Int'l of Am. Inc. v. Ford*, 287 F. App'x 600, 601 (9th Cir. 2008)

20  (reversing injunction as overbroad); *Gallagher Benefit Servs., Inc. v. De La Torre*, 283 F. App'x

21  543, 546-47 (9th Cir. 2008) (same).[23]  Injunctions must also be "grounded in . . . evidence" specific

22  to the case.  *Herb Reed*, 736 F.3d at 1250.

23          Plaintiffs' requested injunction vastly exceeds both the conduct this Court found to be

24

---

25  [22] While *hiQ Labs* acknowledged an interest in "thwarting denial-of-service attacks and blocking

26  abusive users, identity thieves, and other ill-intentioned actors," 31 F.4th at 1202, NSO does not

    mount denial-of-service attacks or engage in identity theft.  Regardless, *hiQ Labs* found that the

27  interest in thwarting such actors was outweighed by the risks associated with "giving companies

    like LinkedIn free rein to decide, on any basis, who can collect and use data."  *Id.*

28  [23] *See also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no

    more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

DEFENDANTS' REVISED OPPOSITION TO          CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

1    unlawful and the evidence in the record. Plaintiffs seek to enjoin conduct that they never

2    challenged, conduct that neither this Court nor any other has held to be unlawful, supposed conduct

3    about which Plaintiffs have submitted no evidence, and conduct by third parties who are not before

4    the Court, who are not subject to its jurisdiction, and whose conduct is lawful where it occurs. The

5    law prohibits such an injunction. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

6         ***First***, and most egregiously, Plaintiffs' proposed injunction would bar NSO from designing

7    or licensing (and thus bar NSO's government customers from using) technology that collects

8    information from users of WhatsApp or Plaintiffs' other platforms, even if the technology does not

9    access Plaintiffs' servers to do so.[24] For example, if a WhatsApp user sent child pornography over

10   WhatsApp or planned a terrorist attack using WhatsApp messages, Plaintiffs' proposed injunction

11   would prohibit NSO from designing or licensing *any* technology that would allow a government

12   agency to collect those illegal messages from storage on the user's phone—even if that technology

13   did not touch Plaintiffs' servers in any way.

14        Plaintiffs are not entitled to an injunction against such evidence-gathering. The only

15   conduct that this Court found to be unlawful was the use of WhatsApp servers to install three

16   versions of Pegasus. It was specifically *the use of WhatsApp servers* that this Court found violated

17   CFAA and CDAFA. At *Plaintiffs'* urging, the Court held that governments' ultimate use of

18   Pegasus to collect information from users was irrelevant to Plaintiffs' claims. (*E.g.*, Dkt. 753 at

19   1115-29.) Accordingly, the Court never held that governments' collection of user data—even data

20   related to the use of Plaintiffs' services, such as users' WhatsApp messages—violated CFAA,

21   CDAFA, WhatsApp's Terms, or any other law. Nor would Plaintiffs suffer any harm from

22   government collection of users' own data, if that collection were accomplished without any use of

23   Plaintiffs' servers. Plaintiffs do not and cannot argue that they would somehow be damaged merely

24   by a law-enforcement agency using an NSO technology to discover child pornography or evidence

25   of terrorist activities in a WhatsApp user's messages.

26

27   [24] Specifically, the injunction would bar covered parties from "[c]ollecting, or assisting others in
     collecting, data or information from Plaintiffs' Platforms," and from "[d]eveloping, using, selling,

28   offering for sale, distributing, transferring, or licensing . . . *any* technology that uses Plaintiffs'
     Platforms in *any* way." (Dkt. 558-3 ¶¶ 3(a), (c) (emphasis added).)

Indeed, if the collection does not involve the use of Plaintiffs' servers, the collection is no different than collections U.S. law-enforcement agencies regularly conduct. U.S. law enforcement can search suspects' personal devices and collect messages—including WhatsApp messages—stored on the device.[25] U.S. law enforcement can also monitor and collect suspects' phone calls, messages, search histories, and the like through a variety of means.[26] That is the precise kind of investigation and data-gathering that NSO's technologies allow NSO's government customers to conduct. As long as the searches do not require the use of Plaintiffs' servers, Plaintiffs are not injured and have no basis to challenge the searches. Plaintiffs, therefore, cannot receive an injunction against the mere collection of WhatsApp or other messages stored on user devices.

**Second,** Plaintiffs seek an injunction prohibiting NSO from "[c]reating accounts . . . on Plaintiffs' Platforms." (Dkt. 558-3 ¶¶ (g)). But NSO's mere creation of accounts on Plaintiffs' platforms does not even arguably violate any law, and prohibiting it would ban an enormous amount of ordinary unobjectionable conduct, such as NSO's use of WhatsApp for lawful business communications and personal use of Plaintiffs' platforms by NSO's employees and lawyers. *See Sprint Nextel*, 2014 WL 68957, at *9 (rejecting injunction that "would prohibit innocuous activity such as 'purchasing . . . directly or indirectly, any Sprint Products,' or "accessing . . . the software contained in any Sprint Phones"); *Sprint Sols., Inc. v. Cell Wholesale, Inc.*, 2015 WL 13919095, at *14 (C.D. Cal. Dec. 10, 2015) (rejecting "vastly overbroad" injunction that would enjoin "innocuous activities such as 'acquiring . . . directly or indirectly, any new Sprint phone,' 'contacting or communicating with Sprint or any Sprint employees,' or 'advertising any products or services that have any purported connection to Sprint'").

**Third**, Plaintiffs also seek to preclude NSO from "[d]eveloping, using, selling, offering for

---

[25] *E.g.*, *People v. Clymer*, 107 Cal. App. 5th 131, 135-36, 142 (2024); *United States v. Swan*, 2022 WL 1763392, at *1 (10th Cir. 2022); *United States v. Frommett*, 971 F.3d 823, 826 (8th Cir. 2020); *United States v. Ibanez-Molina*, 759 F. Supp. 3d 1272, 1279-80 (S.D. Fla. 2024); *United States v. Eldarir*, 681 F. Supp. 3d 43, 47 (E.D.N.Y. July 6, 2023); *United States v. Sollars*, 2023 WL 4542297, at *2 (E.D. Mich. July 14, 2023); *United States v. Ciuca*, 2018 WL 6528498, at *2-3 (D. Nev. Oct. 9, 2018); *State v. Chebegwen*, 2020 WL 3124648, at *1 (Ohio Ct. App. June 12, 2020).

[26] *E.g.*, *United States v. Barrett*, 2025 WL 371084, at *2-4, 17-19 (S.D.N.Y. Feb. 3, 2025); *In re Application of U.S. for PRTT Order for One WhatsApp Chief Account for Investigation of Violation of 21 U.S.C. § 841*, 2018 WL 1358812 (D.D.C. Mar. 2, 2018); *United States v. Scarfo*, 180 F. Supp. 572, 574, 576-78 (D.N.J. 2001).

1   sale, distributing, transferring, or licensing" the "WIS," but the Court did not find the mere

2   existence of the "WIS" to be unlawful.  The Court instead held that NSO violated the CFAA and

3   CDAFA by *using* the "WIS" to craft Pegasus messages sent over WhatsApp servers.  (Dkt. No.

4   494 at 12:7-18.)  And the "WIS," contrary to Plaintiffs' mischaracterization, does not "emulate[]

5   Plaintiffs' Platforms."  As NSO's witnesses' statements show, the "WIS"—more properly referred

6   to as the Android Backend Server—is an emulated Android environment that can be used for many

7   purposes unrelated to WhatsApp. (Gazneli Decl. ¶ 5.)  The "WIS" thus can be used for many lawful

8   and harmless purposes other than crafting Pegasus messages to be sent over WhatsApp.  (*Id.*)  Now

9   that Plaintiffs have closed the vulnerabilities once used to send messages over WhatsApp servers,

10  the "WIS" does not threaten them harm.

11      **Fourth**, Plaintiffs' proposed injunction improperly applies to many platforms other than

12  WhatsApp, including "Facebook, Instagram, Messenger, Meta AI, Threads, and Meta Horizon

13  platforms, as well as each of those platforms' related client applications." (Dkt. 558-3 at 1.)  Even

14  more broadly, Plaintiffs seek to enjoin the use of *any* of their platforms for *any* "illegal purposes,

15  including violating the [CFAA] or [CDAFA]."  But this case this case has always been limited

16  solely to WhatsApp, and solely to one specific *way* that three versions of Pegasus used WhatsApp's

17  servers.  Plaintiffs have never claimed or proved that NSO used Plaintiffs' other platforms *at all*,

18  much less in any illegal or harmful way.  For this reason, too, the proposed injunction is overbroad.

19  *Sprint Nextel*, 2014 WL 68957, at *9; *Sprint Sols.*, 2015 WL 13919095, at *14.  Indeed, even cases

20  Plaintiffs cite have rejected similar attempts by Plaintiffs to enjoin "any activity that violates the

21  CFAA or [C]DAFA."  *Nguyen*, 2023 WL 8686878, at *9.[27]

22      **Fifth**, Plaintiffs' proposed injunction improperly applies to NSO's government customers.

23  This Court previously recognized that any injunction in this case must be tailored so as not to affect

24  NSO's government customers.  Otherwise, those customers would have been necessary parties who

25  cannot be sued due to their sovereign immunity, which would have required dismissal under Rule

26  19.  (Dkt. 111 at 34); *see Rep. of the Philippines v. Pimentel*, 553 U.S. 851, 865 (2008).  But

27

28      [27] *See also Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2004) (rejecting
    injunction prohibiting "using . . . materials that were not before the court" because "blanket
    injunctions to obey the law are disfavored").

1   Plaintiffs' requested injunction defines "Prohibited Parties" to include "all other persons who are

2   in active concert or participation with Defendants," without excluding NSO's government

3   customers. (Dkt. 558-3 ¶ 2.)  Although Rule 65(d) "makes [an] injunction . . . binding upon persons

4   'in active concert or participation with' parties who have actual notice of the injunction," that does

5   not change the fact that "injunctive relief cannot reach non-parties that are entitled to sovereign

6   immunity." *White v. Univ. of Cal.*, 2012 WL 12335354, at *10 (N.D. Cal. Oct. 9, 2012) (cleaned

7   up) (quoting *In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 545 (9th Cir.

8   1996)).  An injunction cannot be enforced against an immune sovereign, and it is an abuse of

9   discretion to issue an unenforceable injunction.  *Marcos*, 94 F.3d at 544-48.  Accordingly,

10  Plaintiffs' proposed injunction cannot be issued unless it excludes NSO's government customers.

11      **Sixth**, Plaintiffs seek to enjoin under WhatsApp's Terms "[s]ending, storing, or transmitting

12  viruses or other harmful code through Plaintiffs' Platforms" and "using Plaintiffs' Platforms for

13  illegal purposes."  As explained in more detail below, Plaintiffs cannot receive *any* injunction to

14  enforce the Terms. (*Infra* 21-25.)  But even if Plaintiffs' contract claim could support an injunction,

15  this Court made clear before trial that it *did not hold* that NSO violated the Terms by "transmitting

16  viruses or other harmful code" or by "using Plaintiffs' Platforms for illegal purposes."  (Dkt. 684

17  at 103-04.)  The Court "only made a finding with regard to reverse engineering and decompiling."

18  (*Id.* at 103:17-20; *see* Dkt. 494 at 14-15.)  The Court has thus held that Plaintiffs are "limited to"

19  their claims of decompiling and reverse-engineering and cannot "reopen" their other breach

20  theories. (Dkt. 684 at 104:10-20.)  Plaintiffs' requested injunction, however, improperly extends

21  beyond the conduct this Court found to breach WhatsApp's Terms.

22      **Finally**, Plaintiffs overreach by asking the Court to require all "Prohibited Parties . . . to

23  delete and destroy any and all computer code or technologies that use, access, or depend on

24  Plaintiffs' Platforms, . . . to delete all data obtained or derived from Plaintiffs' Platforms, and to

25  disable customer access to any and all computer code or technologies that use, access, or depend

26  on Plaintiffs' Platforms." (Dkt. 558-3 at 2.)  Such mandatory injunctions are highly disfavored and

27  "are not granted unless extreme or very serious damage will result."  *Marlyn Nutraceuticals, Inc.*

28  *v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  Plaintiffs' request would

20

1    require NSO and its customers to delete code and technology that cannot harm Plaintiffs, code and

2    technology used solely for lawful purposes, and data obtained lawfully and without harm to

3    Plaintiffs.  Because Plaintiffs no longer face any threat of harm from the technologies challenged

4    in this case, they cannot come close to justifying such a sweeping and burdensome injunction.

5         **C.    California law bars any injunction on Plaintiffs' contract claim.**

6         Finally, much of Plaintiffs' requested injunction relates to their claim for breach of contract,

7    but that claim cannot support any injunction as a matter of law.

8              **1.    Plaintiffs seek an injunction to enforce WhatsApp's Terms.**

9         Because Plaintiffs know they cannot receive an injunction for breach of contract, they have

10   tried to argue that they seek all of their proposed injunction terms under the CFAA and CDAFA.

11   That is false.  Multiple portions of their injunction seek to bar conduct that is not even arguably unlawful

12   under those statutes.  To enjoin that conduct, Plaintiffs must rely solely on WhatsApp's Terms.

13        ***First***, Plaintiffs seek to enjoin "[r]everse engineering or decompiling code from Plaintiffs'

14   Platforms."  (Dkt. 558-3 ¶ 3(d).)  That request plainly relates to Plaintiffs' contract claim because

15   reverse-engineering and decompiling WhatsApp was the (only) basis for this Court's grant of

16   summary judgment on breach of contract.  Plaintiffs never argued, and this Court did not hold, that

17   decompiling or reverse-engineering WhatsApp violated CFAA or CDAFA.  Those statutes do not

18   prohibit decompiling or reverse-engineering, which involves no unlawful access to WhatsApp's

19   servers.  Rather, as Plaintiffs admitted, WhatsApp can be freely downloaded by anyone, and it can

20   then be decompiled using well-known third-party software (such as IDA and JEB) licensed to

21   numerous technology companies including Plaintiffs and NSO.  (Dkt. 419-5, Exh. B at 111:15-

22   113:11.)  Once the software is decompiled, it can be reverse-engineered solely by reference to the

23   decompiled code.  And all this can be accomplished without *ever* creating a WhatsApp account or

24   agreeing to WhatsApp's Terms.  (*Id.* at 113:6-114:6.)  Such decompiling and reverse-engineering

25   is common practice in the technology industry, and it is not illegal.  Someone who is not bound by

26   WhatsApp's Terms may decompile or reverse-engineer WhatsApp without violating any law.

27        Accordingly, there is no basis to enjoin reverse-engineering or decompiling under CFAA

28   or CDAFA.    Nor is prohibiting reverse-engineering or decompiling necessary to prevent

21

1    reoccurrence of the conduct that this Court held *did* violate those statutes.  Although the Court

2    should not enter any injunction, it could prevent future statutory violations simply by directly

3    enjoining the only conduct it found to be unlawful—the use of WhatsApp servers to install Pegasus.

4    The initial decompiling and reverse-engineering of WhatsApp is far removed from the installation

5    of Pegasus via WhatsApp servers, and it is possible to decompile or reverse-engineer WhatsApp in

6    ways and for reasons that have nothing to do with any use of WhatsApp servers.  Enjoining

7    decompiling and reverse-engineering would thus go far beyond what is necessary to "remedy only

8    the specific harms shown by the plaintiffs" under CFAA and CDAFA.  *Price*, 390 F.3d at 1117.[28]

9        ***Second***, Plaintiffs seek to enjoin "[s]ending, storing, or transmitting viruses or other harmful

10   code through Plaintiffs' Platforms" and "[u]sing Plaintiffs' Platforms for illegal purposes."  (Dkt.

11   558-3 ¶ 3(e)-(f).)  Those requests also plainly relate to Plaintiffs' contract claim because they

12   address ways in which Plaintiffs' *alleged* that NSO breached WhatsApp's Terms.  But this Court

13   did not hold that NSO breached the Terms by engaging in that conduct, so there is no basis in this

14   Court's findings to enjoin such conduct.  (Dkt. 684 at 103-04.)  Nor can this Court's finding of

15   liability under CFAA and CDAFA—based solely on the use of WhatsApp servers to install Pegasus—

16   support an injunction against *all* "harmful code" or "illegal purposes."  Plaintiffs have never

17   claimed, and have no evidence, that NSO has ever used WhatsApp servers to do anything harmful

18   or illegal other than the specific use of WhatsApp servers that this Court found to be unlawful.  The

19   injunction Plaintiffs seek would thus impermissibly serve to "enjoin all possible breaches of the

20   law," not to "remedy only the specific harms shown by the plaintiffs.  *Price*, 390 F.3d at 1117.[29]

21       ***Third***, Plaintiffs seek to enjoin "[c]reating accounts . . . on Plaintiffs' Platforms."  (Dkt.

22   558-3 ¶ 3(g).)  It is hard to see how even Plaintiffs' contract claim could support this injunction,

23   since it is not a breach of WhatsApp's Terms for NSO to create or use WhatsApp accounts for any

24   number of lawful and permissible purposes, and Plaintiffs otherwise exercise no oversight over the

---

[28] At a minimum, Plaintiffs cannot receive an injunction against decompiling or reverse-engineering platforms other than WhatsApp.  (Dkt. 558-3 ¶ 3(d).)  They have never claimed or proved that NSO ever even *used* Plaintiffs' other platforms, much less that NSO decompiled or reverse-engineered those platforms in a way that would violate their terms of service.

[29] Here too Plaintiffs' requested injunction is overbroad to the extent it would cover platforms other than WhatsApp, none of which have ever been at issue in this case.

| DEFENDANTS' REVISED OPPOSITION TO MOTION FOR PERMANENT INJUNCTION | CASE NO. 5:24-cv-04660-EJD |

1    identities of WhatsApp's users.  Even if Plaintiffs reserve the private right to deny service, they are

2    not entitled to an *injunction* because creating WhatsApp accounts is not prohibited by any contract

3    or law.  That aside, a bar on creating WhatsApp accounts *certainly* cannot be supported by CFAA

4    or CDAFA.  Plaintiffs have never claimed, and this Court did not hold, that NSO violated those

5    statutes merely by creating WhatsApp accounts.  And NSO and its employees can and do use

6    WhatsApp in countless unobjectionable ways—such as ordinary business and personal uses—that

7    have no connection to the specific use of WhatsApp servers that this Court held violated CFAA

8    and CDAFA.  Remedying "the specific harms shown by the plaintiffs," *Price*, 390 F.3d at 1117,

9    does not require prohibiting the use of WhatsApp for lawful business communications and personal

10   use of Plaintiffs' platforms by NSO's employees and lawyers.  *Sprint Nextel*, 2014 WL 68957, at

11   *9; *Sprint Sols.*, 2015 WL 13919095, at *14 (C.D. Cal. Dec. 10, 2015).[30]

12                    **2.      Plaintiffs may not receive an injunction to enforce WhatsApp's Terms.**

13        California law forbids Plaintiffs from receiving any injunction against possible future

14   breaches of contract.  Plaintiffs do not dispute that, as a general matter, "California law precludes

15   a court from ordering an injunction to prevent the breach of a contract." *Benn v. Allstate Ins. Co.*,

16   569 F. Supp. 3d 1029, 1038 (C.D. Cal. 2021).  Two separate California statutes provide that "[a]n

17   injunction *cannot be granted . . .* [t]o prevent the breach of a contract the performance of which

18   would not be specifically enforced." Cal. Civ. Proc. Code § 526(b)(5) (emphasis added); Cal. Civ.

19   Code § 3423(e).  Plaintiffs have half-heartedly questioned whether these statutes apply in federal

20   court, but the Ninth Circuit has held unambiguously that they do apply.  *Sims Snowboards, Inc. v.*

21   *Kelly*, 863 F.2d 643, 647 (9th Cir. 1988); *see Keene v. City & Cty. of S.F.*, 2025 WL 341831, at *1

22   (9th Cir. Jan. 30, 2025) ("California law governs . . . whether injunctive relief is appropriate.").

23        Plaintiffs do not and cannot establish that they are entitled to an injunction under Civil

24   Procedure Code § 526(b)(5) or Civil Code § 3423(e).  To receive such an injunction, Plaintiffs

25   would have to prove that they could receive "specific performance" of WhatsApp's Terms.  *E.g.*,

26   *Long Beach Drug Co. v. United Drug Co.*, 13 Cal. 2d 158, 168-70 (1939); *Katzman v. Allstate Ins.*

27

28        [30] And again, there is no conceivable basis in the record to enjoin the creation of accounts on
     platforms other than WhatsApp.

DEFENDANTS' REVISED OPPOSITION TO                                    CASE NO. 5:24-cv-04660-EJD
MOTION FOR PERMANENT INJUNCTION

*Co.*, 2010 WL 11515454, at *2 (C.D. Cal. Feb. 22, 2010).  But Plaintiffs do not seek specific performance of the Terms and identify no provision that *could* be subject to specific performance. Specific performance is available only for "affirmative covenants" in a contract—that is, requirements *affirmatively to perform* some act, such as selling a house or other piece of property. *Long Beach Drug*, 13 Cal. 2d at 168.  WhatsApp's Terms contain no such "affirmative covenants." Plaintiffs seek only to enforce *negative* covenants *prohibiting* certain conduct.  (Mot. 22.)  Such a claim "to prohibit future breaches of contract" cannot support injunctive relief.  *PDF Print Commc'ns Inc. v. Fed. Mut. Ins. Co.*, 2022 WL 2189631, at *4 (C.D. Cal. Mar. 29, 2022).

Even if Plaintiffs sought to enforce an affirmative covenant in the Terms, specific performance would not be available for multiple reasons.  ***First***, Plaintiffs seek to impose continuing requirements that "cannot be consummated by one transaction," *Long Beach Drug*, 13 Cal. 2d at 171, but would instead "require supervision from the court for many years or for an indefinite period," *Benn*, 569 F. Supp. 3d at 1038 (cleaned up).[31]  ***Second***, the contractual provisions Plaintiffs seek to enforce "are not sufficiently certain to make the precise act which is to be done clearly ascertainable."  Cal. Civ. Code § 3390(e).  For example, Plaintiffs seek to enforce provisions prohibiting "harmful" and "illegal" conduct, but the Terms do not define those or other key terms.[32]  ***Third***, Plaintiffs have received compensatory damages, and they "may not obtain both specific performance and damages for the same breach of contract."  *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 905 (Cal. Ct. App. 2002); *see* 58 Cal. Jur. 3d Specific Performance § 3.

All that aside, Plaintiffs cannot (and do not even try to) satisfy the test for whether specific performance is appropriate.  To receive specific performance, a plaintiff must prove: "(1) the inadequacy of [its] legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which

---

[31] *Accord PDF Print Commc'ns*, 2022 WL 2189631, at *4; *Holdings v. Miva, Inc.*, 2016 WL 4943048, at *5-6 (S.D. Cal. Sept. 16, 2016); *Dominguez v. Andrew Corp.*, 2007 WL 4259480, at *4 (N.D. Cal. Dec. 4, 2007); 58 Cal. Jur. 3d Specific Performance § 43.

[32] *See Cal. Physicians*, 2021 WL 879797, at *4 (denying injunction for contract that "did not define" the "core term"); *Int'l Medcom, Inc. v. S.E. Int'l, Inc.*, 2015 WL 7753267, at *2-3 (N.D. Cal. Dec. 2, 2015) (denying injunction for contract that did "not define" or "clarify" terms); *Colonial Life & Acc. Ins. Co. v. Stentorians-L.A. Cnty. Black Fire Fighters*, 2014 WL 794571, at *8 (C.D. Cal. Feb. 24, 2014) (denying specific performance of contract that was not "sufficiently certain").

are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract." *Warner Bros. Int'l Television Distrib. v. Golden Channels & Co.*, 2003 WL 27384425, at *24 (C.D. Cal. Mar. 31, 2003).

Plaintiffs satisfy none of those elements. **First,** Plaintiffs have received an adequate legal remedy in the form of compensatory damages. Courts recognize that "money damages" are sufficient to compensate a plaintiff for past or future breaches of contract, making an injunction inappropriate. *Jarvis*, 2024 WL 4003319, at *6; *ValveTech*, 2024 WL 1984897, at *2-3. **Second,** as explained above, the Terms are not "sufficiently definite to enable the court to know what it is to enforce." *Warner Bros.*, 2003 WL 27384425, at *24. **Third,** the Terms are not "reasonable," *id.*, because (as the Court has held) they are a "contract of adhesion" that NSO "had no ability to negotiate" (Dkt. No. 111 at 27). Such a "one-sided" contract should not be enforced through specific performance. 58 Cal. Jur. 3d Specific Performance § 32. **Fourth,** the Terms lack mutuality of remedies and "substantial similarity of the requested performance to that promised in the contract." *Warner Bros.*, 2003 WL 27384425, at *24. The injunction Plaintiffs seek would prohibit NSO from ever again using WhatsApp and thus would guarantee that Plaintiffs will *not* perform their end of the bargain under the Terms, which require WhatsApp to provide access to its platform. For NSO to be bound by the Terms, NSO must be a party to them and entitled to use WhatsApp. If Plaintiffs bar NSO from signing up for and using WhatsApp, then NSO is not a party to the Terms and cannot be bound by (or violate) their restrictions. Plaintiffs cannot have it both ways.

## IV.    CONCLUSION

The Court should deny Plaintiffs' motion for a permanent injunction.

Dated: June 18, 2025                                   KING & SPALDING LLP

By:       */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

*Attorneys for Defendants*