1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                OAKLAND DIVISION

4    _____

     WHATSAPP, INC., a Delaware      | DOCKET NO. 4:19-CV-7123-PJH
5    corporation, and FACEBOOK,      |
     INC., a Delaware corporation,   | (Pages 1 through 222)
6                                     |
              Plaintiffs,             |
7                                     |
              vs.                     |
8                                     |
     NSO GROUP TECHNOLOGIES LIMITED | Oakland, California
9    and Q CYBER TECHNOLOGIES        | Thursday, August 28, 2025
     LIMITED,                        | 10:04 a.m.
10                                    |
              Defendants.             |
11   _____

12

13           TRANSCRIPT OF MOTION HEARING PROCEEDINGS
                 MOTION FOR PERMANENT INJUNCTION
14                 and MOTION FOR NEW TRIAL

15

16        **BEFORE THE HONORABLE PHYLLIS J. HAMILTON**
                **UNITED STATES DISTRICT JUDGE**

17

18

19

20

21

22         *MELANIE L. HUMPHREY-SONNTAG, RDR, CRR, CRC*
                 *Federal Official Court Reporter*
23     *2120 Capitol Avenue, Room 2228, Cheyenne, WY 82001*
              *307.433.2169 * MelanieSonntagCRR@gmail.com*
24

25     *Proceedings reported remotely with realtime stenography;*
        *transcript produced with computer-aided transcription.*

```
 1   APPEARANCES:
     For the Plaintiffs:      GREG D. ANDRES
 2                            ANTONIO J. PEREZ-MARQUES
                              LUCA E. MARZORATI
 3                            DAVIS POLK & WARDWELL, LLP
                              450 Lexington Avenue
 4                            New York, NY 10017

 5                            MICAH G. BLOCK
                              DAVIS POLK & WARDWELL, LLP
 6                            900 Middlefield Road, Suite 200
                              Redwood City, CA 94063
 7
     For the Defendants:      JOSEPH N. AKROTIRIANAKIS
 8                            AARON S. CRAIG
                              KING & SPALDING, LLP
 9                            633 West Fifth Street, Suite 1700
                              Los Angeles, CA 90071
10
                              MATTHEW V. NOLLER
11                            MATHEW H. DAWSON
                              KING & SPALDING, LLP
12                            50 California Street, Suite 3300
                              San Francisco, CA 94111
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

                                                    PAGE
2    MOTION FOR PERMANENT INJUNCTION
     PRELIMINARY MATTERS                              4
3
     OPENING STATEMENT BY MR. PEREZ-MARQUES           10
4
     **PLAINTIFFS' WITNESSES:**
5    **ANDREW BLAICH**
     Direct Examination by Mr. Andres                 17
6
     **LANDER BRANDT**
7    Direct Examination by Mr. Marzorati              59

8    **DEFENSE WITNESSES:**
     **JOSHUA J. MINKLER**
9    Direct Examination by Mr. Akrotirianakis         76
     Voir Dire Examination by Mr. Andres              92
10   Direct Examination (Resumed)                    104
      by Mr. Akrotirianakis
11   Cross-Examination by Mr. Andres                 117
     Redirect Examination by Mr. Akrotirianakis      130
12
     Argument by Mr. Perez-Marques                   141
13   Argument by Mr. Akrotirianakis                  173
     Argument by Mr. Perez-Marques                   193
14
     MOTION FOR NEW TRIAL OR REMITTITUR
15   Argument by Mr. Akrotirianakis                  195
     Comments by the Court                           196
16   Argument by Mr. Akrotirianakis                  198
     Argument by Mr. Perez-Marques                   199
17   Argument by Mr. Akrotirianakis                  200
     Comments by the Court                           202
18   Argument by Mr. Craig                           219

19


20                       E X H I B I T S
                                    IDENTIFIED   RECEIVED
21   PLAINTIFFS' EXHIBITS
         A    Screenshot                 37         38
22       B    Video                      45         46
         C    Image                      49         51
23
     DEFENSE EXHIBITS
24       1093  Transcript of Obama Remarks  107     110

25

```
 1        (Proceedings commenced 10:04 a.m., August 28, 2025.)

 2            THE COURTROOM DEPUTY:  District Court is now in

 3   session, the Honorable Phyllis J. Hamilton presiding.

 4            Thank you.  Please be seated.

 5            Calling Civil Case 19-7123-PJH, WhatsApp, Inc.,

 6   et al., versus NSO Group Technologies, Limited, et al.

 7            Counsel, please step forward and state your

 8   appearances.

 9            MR. PEREZ-MARQUES:  Good morning, Your Honor.

10            It's Antonio Perez-Marques for the plaintiffs, Meta

11   Platforms and WhatsApp.  And I'm here joined by Greg Andres,

12   Micah Block, and Luca Marzorati.

13            THE COURT:  All right.  Good morning.

14            MR. AKROTIRIANAKIS:  Good morning, Your Honor.

15            Joe Akrotirianakis, Matt Noller, Aaron Craig, and

16   Matthew Dawson on behalf of the defendants.

17            THE COURT:  All right.  Good morning.

18            All right.  We're here for two matters.  We're going

19   to start first, obviously, with the -- the evidentiary hearing

20   on the injunction because that's likely to take a little time

21   to get through since you all have witnesses.

22            But I do want to make sure that we have a little time

23   because I have some questions on the motion for a new trial or

24   alternative request for remittitur.  I have a few questions,

25   so I'd like to have some time for that, as well.
```

1          I understand there's a problem with a piece of

2     evidence that plaintiffs want to present this morning.

3          THE COURTROOM DEPUTY:  It's a video for the witness.

4          MR. PEREZ-MARQUES:  Yes, Your Honor.

5          It's a very short video that we're hoping to show a

6     witness, but we can try to navigate that with a laptop.  The

7     video is literally nine seconds long, so I think, even if we

8     have to pass it around, we could navigate that.

9          THE COURT:  All right.  It's -- you know, it's -- we

10    can't connect it to our system, can we?

11         MR. PEREZ-MARQUES:  We understand.  We learned that

12    this morning, Your Honor.

13         THE COURT:  Okay.  All right.  Well, we'll talk about

14    that when it's time, then, for you all to play that.

15         The other -- the only other thing were the

16    outstanding objections.  I've read the papers that you all

17    have submitted, and I'm overruling the objections.

18         You can make any hearsay objection that you wish

19    during the course of the testimony, but I'd like to hear --

20    I'd like to hear from all of the witnesses that both sides

21    are -- are putting forth.

22         And, as I indicated, to the extent that two of the

23    plaintiffs' witnesses were not disclosed previously, the --

24    the order permitted you all to take the depositions.  I'm

25    assuming from your reply -- which I didn't authorize but I did

1    read it -- that you didn't take the depositions in advance.

2         If you determine afterwards, after you've heard the

3    testimony and after they've been cross-examined, that there's

4    still additional information that you think you need to put

5    before the Court, I'll leave the record open and give you an

6    opportunity to do that.

7         But I'd like to hear from the witnesses.  I'd like to

8    conclude this -- this matter.  It's been pending for a long

9    time.

10        So that's my ruling.  Your objections are noted.

11        You've written two briefs on them, and I will allow

12   the reply brief, even though it was unauthorized, to remain on

13   the record.  So that those objections are noted, as well.

14        MR. AKROTIRIANAKIS:  Yeah.  One of them -- I'm not

15   arguing objections.  I understand the Court's ruling.  I'm

16   explaining to the Court.

17        One of the -- there's two disclosure -- there were

18   two disclosure objections.  One was that they weren't

19   disclosed pursuant to Rule 26.  The other one was that these

20   are, in fact, witnesses who will offer opinion testimony under

21   Rule 702, and there was not the required disclosure for -- for

22   those, either.

23        That is the reason why -- we don't know what the

24   testimony is going to be.  That is the reason why we cannot --

25   could not have taken a deposition in advance of this hearing.

1    We -- the Court's order was that we could take the deposition

2    either before or after the hearing and -- and supplement

3    briefing.

4           I don't know -- not knowing what they're going to

5    say, I -- I will -- I do not intend to try to cross-examine or

6    half-cross-examine the witnesses today, Your Honor.  I will

7    take the Court up on its offer to take their depositions

8    when -- when we will be able to -- depends, in part, on what

9    the testimony is, of course.

10          MR. PEREZ-MARQUES:  And, Your Honor, to be clear, we

11   would object to depositions after the hearing.  We very much

12   share the Court's sentiment that we are eager to put this

13   to bed.

14          The only reason they don't have visibility into these

15   witnesses' testimony is because they passed up the opportunity

16   to depose them.  They could have asked them whatever they

17   wanted to ask them.

18          They chose not to do that.  Now they're saying they

19   want to do it afterwards, and they're just kicking the can

20   down the road even further.

21          THE COURT:  All right.  I've already, however, told

22   them in my last order that they could take the depositions

23   afterwards.

24          I did that because it was a pretty short time frame

25   during the month of August that you all could have taken the

1    depositions.  So, out of an abundance of caution, I wanted to

2    give them an opportunity -- assuming that they had some

3    conflict in August -- to take the deposition.

4           I mean, in Federal litigation almost every witness

5    that testifies in open court has been deposed.  That's not

6    un- -- an unusual request on their part.  And, regardless of

7    all the reasons that transpired previously for why they

8    weren't deposed -- I don't care about all that.  I'd like to

9    conclude the case.

10          And so, if they feel they need a deposition

11   afterwards and -- and I've already indicated they could submit

12   an additional brief on the -- following the receipt of the

13   deposition transcripts -- it's fine.  That's what we're going

14   to do.  All right?

15          So I'm going to hear from the witnesses that you all

16   brought with you today, and then I'll entertain some argument

17   on this particular motion, and I will leave the record open

18   for defense.

19          MR. PEREZ-MARQUES:  Understood, Your Honor.

20          THE COURT:  Okay.

21          MR. PEREZ-MARQUES:  I thought -- if -- with the

22   Court's indulgence, I thought it might be helpful just to

23   preview what the Court's going to be hearing and how we plan

24   to use our time today if that would be acceptable.

25          THE COURT:  That's acceptable to me.

1          MR. PEREZ-MARQUES:  All right.  Thank you, Your

2    Honor.

3          So we have two witnesses --

4          THE COURT:  Hold on.  Was there --

5          MR. AKROTIRIANAKIS:  Just before I sit down, on the

6    topic of the objections, I assume that I don't need to keep

7    making those objections, for example, in response to questions

8    and that the Court considers them to be --

9          THE COURT:  No, and specifically your objection with

10   regard to the witnesses being called as experts.  I don't --

11   I don't agree with that.

12         Companies call their own employees all the time, and

13   it's a -- definitely a fine line, obviously, between someone

14   who's developed expertise in the course of their job.  But

15   I -- I tend to think that, when they're testifying based upon

16   their own personal knowledge because they are engaged in that

17   work, they're not in the same category as hired, outside

18   experts who are not engaged or do not work for the particular

19   party.

20         So I'm overruling that objection in its entirety.

21         MR. AKROTIRIANAKIS:  Well, this witness -- or one of

22   these witnesses -- is not going to testify about WhatsApp's

23   technology -- not that that's been disclosed in discovery

24   at all because there's been no production -- even though you

25   ordered one, there's been no production of documents other

1   than the three pictures that were attached to the declaration.

2           He purports to testify about NSO's technology, which

3   is squarely expert testimony.  I believe the other one will,

4   as well, Your Honor.

5           In addition to that, I -- I agree with the Court that

6   often there are -- you know, in a criminal case -- agents who

7   testi- -- who offer opinions, in civil cases employees of one

8   of the parties who offer opinions.  There's a separate

9   disclosure rule for that.

10          They haven't made a disclosure pursuant to that or

11  the more common specially retained expert disclosure rule.

12  That's the objection that we've made.

13          I understand the Court has overruled it.  I won't

14  belabor it, and I won't raise it during the testimony of the

15  witnesses on the basis that --

16          THE COURT:  Your objection's noted.  I've allowed

17  your un- -- unapproved reply brief to be filed, and your

18  objection is clearly stated in that document.  You don't need

19  to belabor it anymore.

20          MR. AKROTIRIANAKIS:  Thank you, Your Honor.

21          MR. PEREZ-MARQUES:  Great.  Thank you, Your Honor.

22          Just very briefly, we thought it would be helpful to

23  introduce what we're going to be presenting today and, also,

24  how we expect to use our time.

25          And an important point that I wanted to make clear at

1   the outset is that, as the Court knows, we sought entry of a

2   permanent junction before the damages trial on the basis that

3   we believed that the summary judgment record on its own was

4   sufficient for entry of a permanent injunction.  That remains

5   our view today.

6           Now, since that time, we've had a five-day damages

7   trial at which the key facts from summary judgment were

8   confirmed, including the fact that repeatedly, over the course

9   of years, NSO used WhatsApp's servers to trigger the

10  installation of Pegasus.  They did that using three different

11  vectors.  Each time one was shut down, they came back with

12  another, whether it was shut down because we identified it or

13  because of a security update that prevented it from working.

14          And they continued doing that through, by their own

15  testimony, at least May 2020, well after this case had been

16  filed.

17          Now, they've admitted, also, that they engaged in

18  that conduct secretly, deliberately trying to conceal it not

19  only from the targets but from WhatsApp, and that they did

20  that specifically because they understood that WhatsApp would

21  stop them if it was identified.

22          All of that is undisputed based on the summary

23  judgment record and the evidence that came out at trial.

24          Now, at trial we learned additional facts that also

25  bear on the permanent injunction, including that NSO continues

1    to maintain a 50- to $60 million R & D budget.  They continue

2    investigating installation vectors for their Pegasus spyware,

3    and they retain the software that they developed that allowed

4    them to engage in these attacks.  As Mr. Gazneli put it in his

5    testimony, in his deposition testimony, this is their

6    business, this is what they do, and that is also undisputed.

7            Now, I review that because it remains our position

8    today that, before we've heard a single witness, the

9    undisputed record is sufficient for the entry of a permanent

10   injunction.

11           It demonstrates irreparable injury that cannot be

12   remedied through monetary damages.  First of all, because the

13   past violations themselves constitute an irreparable injury

14   and, secondarily, because there is a clear evidence of a

15   continuing risk of harm, given the repeated recidivist nature

16   of those attacks by a defendant who has demonstrated

17   themselves to be not easily deterred.

18           Those are precisely the circumstances in which

19   injunctions and strong injunctions are warranted because

20   strong deterrence is necessary.

21           It also demonstrates that the balance of the

22   hardships favors plaintiffs, given, for one, the recognized

23   harm that is inherent in the violation of the hacking

24   statutes; the burden on plaintiffs of seeking to identify,

25   detect, and prevent their continued activity, particularly

1   from a sophisticated actor that is, by its own admission,

2   seeking to conceal its activities; and no hardship to

3   defendants from refraining from illegal activity.

4        And the evidence also demonstrates that an injunction

5   would not disserve the public interest.  As the case law

6   recognizes, the statute itself demonstrates a public interest

7   in avoiding these types of unlawful attacks, and what NSO

8   seeks to put on the other side of the ledger, in terms of the

9   law enforcement interest, has never been evidenced in this

10  courtroom.

11       What they have -- have admitted in the courtroom is

12  that they don't even know the identities of the targets of

13  these attacks, and they've produced no evidence as to who the

14  customers are.  The past abuse of this software, by contrast,

15  is undisputed.

16       So all of that, which is already before the Court, we

17  believe is sufficient.

18       What the Court will hear from our witnesses today

19  will be very brief, two witnesses, probably around 20 minutes

20  each, and is just supplementary to that record, shedding a

21  little more light on what -- on NSO -- on what we believe to

22  be NSO's current activities and some context around Meta's

23  platforms which is relevant to the injunction we're seeking.

24       The Court's going to hear from Andrew Blaich.  He's a

25  security engineer on Meta's counterespionage team, and he will

1    describe attack activity and testing activity that his team

2    have recently detected which they attributed to NSO.

3            And you will hear from Lander Brandt, an applications

4    security engineer, who will provide background on how WhatsApp

5    messages are stored so that the Court can understand that,

6    when NSO admits that to this day they continue collecting

7    WhatsApp messages, that that is something that cannot be

8    accomplished without accessing parts of the devices and parts

9    of the WhatsApp software that are not accessible to normal

10   users.

11           It's not, as NSO would suggest, a benign activity

12   that they should be free to continue.  It's a further

13   incursion into WhatsApp's platforms and a further harm to

14   plaintiff that should be enjoined.

15           As the Court knows, they were granted the right to

16   depose those witnesses and they declined.

17           We understand they're going to be presenting an

18   expert witness, and they're also relying on declarations from

19   company employees, NSO employees, who they're not making

20   available for cross-examination and who, among other things,

21   are putting forward declaration testimony on issues that they

22   decline to answer our questions at deposition, such as the

23   nature of their current activities.

24           After the Court has heard that testimony, we would

25   like to just reserve most of our time for argument on the

1   injunction motion, and then we understand the Court has

2   questions as to the new trial or damages.

3            THE COURT:  Okay.

4            MR. PEREZ-MARQUES:  Thank you, Your Honor.

5            THE COURT:  So you're not calling Carl Woog?

6            MR. PEREZ-MARQUES:  We are not, Your Honor.

7            THE COURT:  Okay.

8            MR. PEREZ-MARQUES:  And we notified NSO of that fact.

9            THE COURT:  Okay.  So are both Mr. Brandt and

10  Mr. Blaich here in court?

11           MR. PEREZ-MARQUES:  They are.

12           THE COURT:  Okay.  Does the defendant want one

13  excluded while the other one's testifying or do you care?

14           MR. PEREZ-MARQUES:  Neither of them is in the

15  courtroom, Your Honor.  They're both outside.

16           THE COURT:  Okay.  So your plan was to --

17           MR. PEREZ-MARQUES:  Yes.

18           THE COURT:  Never mind.  Never mind.

19           MR. AKROTIRIANAKIS:  Our witness, Mr. Minkler, on a

20  different topic entirely, is in the courtroom.  I can ask him

21  to leave if the Court would like.

22           THE COURT:  Does the plaintiff wish to have the

23  defendants' witness --

24           MR. ANDRES:  He's an expert witness, Judge.  We

25  don't -- we don't care.

1              THE COURT:  Okay.

2              Do you care if their witnesses, then --

3    Mr. Akrotirianakis, do you care if their witnesses are here?

4              MR. AKROTIRIANAKIS:  Well, if they're not going to be

5    testifying about the same things -- and my position is that

6    they are expert witnesses -- so I don't -- I don't mind.

7              MR. ANDRES:  We don't need them both here, Your

8    Honor.  It's fine.  It's very short.

9              THE COURT:  Okay.  Okay.

10             MR. ANDRES:  But thank you.  Thank you for that.

11             I'm just going to move the podium back, if it's okay,

12   just so I can . . .

13             Your Honor, this is the witness that has the

14   nine-second video.  So when that comes up, we'll just figure

15   that out --

16             THE COURT:  Okay.

17             MR. ANDRES:  -- but it's -- it's literally

18   nine seconds.

19             THE COURT:  Okay.

20             THE COURTROOM DEPUTY:  If both of you could please

21   remember to identify yourselves for the court reporter.

22             MR. ANDRES:  I apologize.

23             This is Greg Andres from Davis Polk for Meta and

24   WhatsApp.

25             THE COURTROOM DEPUTY:  Raise your right hand.

1      (Witness sworn.)

2           THE WITNESS:  Yes.

3           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

4      Please speak clearly into the microphone.

5           Please state your full name and spell it for the

6      record.

7           THE WITNESS:  My name is Andrew Blaich.  Last name is

8      spelled B-l-a-i-c-h.

9           MR. ANDRES:  May I inquire, Your Honor.

10          THE COURT:  Go ahead.

11          MR. ANDRES:  Good morning, Mr. Blaich.

12     **ANDREW BLAICH, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

13                    **BY MR. ANDRES:**

14     Q.  Can you please describe your educational background after

15     high school.

16     A.  Yes.

17          After high school I received a bachelor's of science

18     and a master's of science from Villanova University, 2005,

19     2006.  And then, following that, I received a PhD in computer

20     science from the University of Notre Dame in 2010.

21     Q.  And after you received those degrees, were you employed?

22     A.  I was, yes.

23     Q.  Where were you employed over the course of your career?

24     A.  I was first employed at Samsung Research of America.

25     Following that I joined a mobile security start-up called

1   Bluebox Security based in San Francisco.  Following that,

2   I joined another mobile security start-up called Lookout

3   Security.

4          And then, after that, I joined Meta.

5   Q.  Okay.  So let me ask you, with respect to each one of

6   those -- at Samsung what were your job responsibilities?

7   A.  I was a security researcher, working on mobile security

8   for the colonel.

9   Q.  Okay.  And at Bluebox Security?

10  A.  At Bluebox Security I was involved in Android product

11  development as well as some security analyst work, analyzing

12  applications.

13  Q.  And at Lookout?

14  A.  At Lookout, a little bit of product work, more into threat

15  intelligence investigations.

16  Q.  And in your work at those various companies, were you

17  involving in tracking or responding to threat actors?

18  A.  Yes, at Lookout.

19  Q.  Okay.  And where are you currently employed?

20  A.  I'm currently employed at Meta.

21  Q.  And when did you begin working at Meta?

22  A.  I began working at Meta in February of 2019.

23  Q.  And what's your current position at Meta?

24  A.  Currently at Meta I'm a security engineer investigator.

25  Q.  Are you part of a larger team?

1    A.   I am, yes.

2    Q.   What's the name of that team?

3    A.   The team is called the espionage team.

4    Q.   And what does the espionage team at Meta do?

5    A.   The espionage team at Meta, we conduct investigations into

6    nation-states that are seeking to do harm against our -- the

7    users of all the applications that we have.

8            We also have a work stream where we look at what

9    we call abusive commercial services, specifically

10   surveillanceware-for-hire firms.

11   Q.   And as a security engineer investigator on the espionage

12   team, what are your specific responsibilities?

13   A.   My specific responsibilities are to track and uncover

14   threats against our users, document, investigate, disable when

15   appropriate, and essentially protect our users from these

16   actors on our platform.

17   Q.   You mentioned earlier -- or you testified about the term

18   "threat actor."

19           Can you explain what a threat actor is?

20   A.   Yeah.

21           A threat actor is a term we use to describe an

22   individual, a group, or an entity that is conducting harm,

23   malicious behavior.

24           The harm could vary based on the problem team that's

25   investigating it, but that's broadly how it's described.

1  Q.  And how, as a security engineer investigator, do you

2  investigate threat actors?

3  A.  Typically for investigating things that we conduct at

4  Meta, we look -- we -- we have signals that we look for to see

5  where we're seeing bad behavior.

6          So if we're looking at a nation-state, we're looking

7  to read reports, indicators to see what they're doing.  We

8  conduct fan-outs and deep investigations on this, and we

9  document everything in our Cases management system.

10 Q.  Okay.  Is NSO one of the threat actors that you track at

11 Meta?

12 A.  They are, yes.

13 Q.  And why do you track NSO as a threat actor?

14 A.  We track it as a part of our abuse of commercial services,

15 surveillanceware-for-hire work stream track, primarily because

16 of the surveillanceware aspect of the -- that the tooling that

17 is produced by them enables.

18 Q.  Is there anything about NSO's history with Meta's platform

19 that also has caused you to track them?

20 A.  Yes.

21          We've -- we've encountered and identified a number of

22 accounts, both used in testing as well as what we believe to

23 be real-world activity, attacking activity.

24 Q.  Prior to joining Meta, had you ever encountered NSO as

25 part of your work as a security engineer?

1  A.  Yes.

2  Q.  Can you please describe the date and circumstances of that

3  interaction with NSO.

4       MR. AKROTIRIANAKIS:  Object to the relevance,

5  Your Honor, if, in fact, he is not an expert witness.

6       THE COURT:  Overruled.

7       MR. ANDRES:  You can answer.

8  A.  Okay.  Back in 2016 I was part of a Lookout investigations

9  team.  We had received a tip from an initial peer to look at a

10  suspicious URL as well as some files that they had managed to

11  collect, and I was involved in reverse engineering that

12  malicious sample along with the team.

13       And we had determined, through the course of that

14  investigation, that this was a sample that was referred to as

15  Pegasus in the industry.

16       And from that work we worked on a number of weeks in

17  reverse engineering it, putting detections in place, and then

18  there was a lot of follow-up and presentations and things

19  after that.

20  BY MR. ANDRES:

21  Q.  How did that investigation that you were involved in at

22  Lookout start?

23  A.  The investigation started with a tip that we got from a

24  partner.

25  Q.  And who was the partner?

1    A.   The partner was Citizen Lab.

2    Q.   And what is Citizen Lab?

3    A.   Citizen Lab is a civil society partner.

4         They have a -- a work stream at the university they

5    operate out of that is focused heavily on surveillanceware-

6    for-hire firms.

7    Q.   And in terms of the specific work that you did at Lookout

8    in this NSO investigation, what specifically did you do and

9    what were your findings?

10        MR. AKROTIRIANAKIS:  Objection, Your Honor.

11        It's both irrelevant and, also, we've received no

12   disclosures or discovery about any of what the witness is

13   talking about, in spite of the Court's order that they provide

14   the -- what he's going to be relying on in his testimony.

15        THE COURT:  I'm not sure that I ordered specifically

16   that he disclose everything that he's going to be relying on

17   in his testimony.

18        But my question -- my question is, with regard to the

19   Citizen Lab references, you know, the prior rulings excluded

20   all of that -- all of that evidence with regard to the targets

21   of the Pegasus attacks.

22        MR. ANDRES:  I understand, Your Honor.  We're -- it's

23   just part of the narrative, that they got a tip from

24   Citizens Lab.  I didn't want to mislead the Court about how

25   they -- we're not going to rely on that or argue anything

 1  about Citizens Lab, but that's how that investigation started

 2  and some of these other ones.

 3          So he's just identifying the source.  We're not

 4  relying on any of the information that Citizens Lab provided

 5  in this case about the victim.  It's just -- it's part of the

 6  narrative.

 7          THE COURT:  Okay.

 8          MR. AKROTIRIANAKIS:  Your Honor --

 9          THE COURT:  All right.  And this question's fine; the

10  last question's fine.

11          Objection overruled.

12          MR. AKROTIRIANAKIS:  All right.  Your Honor, the --

13  whether the Court specifically ordered the disclosure, they

14  said they were going to give us a disclosure of everything

15  that -- that he was going to rely on in his testimony, and

16  what he's now testifying about, apart from that, has nothing

17  to do either with WhatsApp or Meta.

18          He's talking about historical things that there's

19  been no discovery about in the case, there's no allegations in

20  the complaint --

21          THE COURT:  It's back- -- it's just background

22  information from what I can tell at this point, Counsel.

23          MR. ANDRES:  You can answer the question if you -- if

24  you remember it.

25          THE WITNESS:  Could you repeat it?

1        MR. ANDRES:  I'm not sure that I can.

2        Let me -- let me -- let me give it a shot.

3    BY MR. ANDRES:

4    Q.  With respect to the work that you were doing at Lookout,

5    can you explain what that work was and what your findings

6    were?

7    A.  Yes.

8        So that was -- involved reverse engineering the

9    malware that was discovered and obtained, understanding how it

10   operated, and working in conjunction with our partner on the

11   attribution aspects of it, who -- who had made it and the

12   developers of it.

13   Q.  And who did you attribute the attack to?

14   A.  We --

15       MR. AKROTIRIANAKIS:  Objection, Your Honor.  It's

16   hearsay if he's relying on -- on Citizen Lab, and it's also

17   irrelevant for all of the reasons I've already said.

18       THE COURT:  Is he relying on Citizen Lab?

19       MR. ANDRES:  He did the investigation, Your Honor.

20       MR. AKROTIRIANAKIS:  He just said -- he just

21   testified --

22       THE COURT:  Just wait, Counsel.

23       Did you rely upon Citizen Lab during the course of

24   your investigation?

25       THE WITNESS:  We worked with them collaboratively on

1    the attribution aspects.

2              THE COURT:  Okay.  And in terms of your conclusion

3    about the source, how did you come to that conclusion?

4              THE WITNESS:  It was relied on with Citizen Lab.

5    They helped.

6              THE COURT:  Okay.

7              Then I will sustain the objection.

8    BY MR. ANDRES:

9    Q.  When you began working at Meta -- have you done work with

10   respect to NSO at Meta?

11   A.  A little bit, yes.

12   Q.  Can you explain what that is?

13   A.  I have taken over a set of cases that we have, tracking

14   NSO's activity on our platforms that touches a number of our

15   applications.

16   Q.  What does it mean to track NSO's activity?

17   A.  Understanding what they're doing on our platforms,

18   figuring out if it's -- trying to -- trying to identify and

19   categorize the activity.  I mentioned things like testing

20   before and things like attacking -- actual, real-world

21   attacking.  We look at trying to identify that.

22              Also, we look for signals that will help us -- higher

23   liability, attribute the activity to who may be behind it.

24   Q.  And how does Meta track all this information?  Do they

25   store it someplace in terms of the issues with NSO?

1  A.  Yes, we do.

2  Q.  Where?

3  A.  We use a system called Cases to track all this

4  information.  It's a knowledge management system we have

5  internally.

6  Q.  And have you reviewed the -- the -- the file with respect

7  to NSO?

8  A.  Yes.

9  Q.  Okay.  From --

10        MR. AKROTIRIANAKIS:  Objection, Your Honor.  It's not

11  been produced.  That file that he just testified to has not

12  been produced.

13        THE COURT:  Overruled.

14  BY MR. ANDRES:

15  Q.  With respect to your -- your work at Lookout and now at

16  Meta, are you familiar with Pegasus?

17  A.  Yes.

18  Q.  What is Pegasus?

19  A.  Pegasus is a -- a malicious implant.  The part that I'm

20  speaking of is a malicious implant that gets installed on a

21  target's computing device; typically mobile devices is where

22  I've been focused on.

23        And -- and that -- that implant, malicious software,

24  can essentially collect any and all information off of a

25  target's device.

1   Q.   And who makes Pegasus?

2   A.   NSO.

3   Q.   In your work at Meta as a security engineer investigator,

4   do you use the term "recidivist"?

5   A.   We do, yes.

6   Q.   And in what context do you use that term?

7   A.   We use the -- we use the term "recidivist" in the context

8   of a threat actor that comes back onto our platforms after

9   there's been some level of enforcement.

10  Q.   And would you describe NSO as a recidivist?

11          MR. AKROTIRIANAKIS:  Objection.  It's an opinion and

12  it's irrelevant, Your Honor.

13          THE COURT:  Overruled.

14  A.   It's -- yes.  We've disabled accounts before, and we've

15  seen more accounts come back.

16  BY MR. ANDRES:

17  Q.   And why do you view NSO as a recidivist?

18  A.   Continued activity on our platforms.

19  Q.   How does Meta track NSO-related activity on its platforms?

20  A.   We use a number of ways.  We -- we get signals.  We -- we

21  look at public reporting that comes in when folks report on

22  these types of activities publicly.  We get industry leads in

23  where we look at those and identify and see if we see similar

24  activity in our platforms or additional things like that.  So

25  we conduct an investigative deep fan-out on these sorts of

1    indicators.

2         And then we -- we move through our investigators --

3    we look at this information, we connect the dots together and

4    understand what's going on and make an assessment of it.

5    Q.  What is a fan-out?

6    A.  A fan-out is we conduct -- like -- so let's say we have an

7    IP address, for an example.  A fan-out here, we might want to

8    see all the users that have been on that IP address in the

9    last 90 days.

10   Q.  Are you aware of any indication that NSO poses an ongoing

11   threat to Meta's platforms?

12   A.  Yes.  We continue to see them use the platform.

13   Q.  And there are different --

14        MR. AKROTIRIANAKIS:  I didn't hear the answer.

15        THE COURT:  Well, if you'd let him finish.

16        MR. AKROTIRIANAKIS:  Well, I didn't hear the answer

17   he gave and then the question was -- next question was being

18   asked.  I think he was garbled in his answer.

19        THE COURT:  Ask it again, Mr. Perez, if you remember

20   what it was.

21   BY MR. ANDRES:

22   Q.  Are you aware of indications -- are you aware of any

23   indication that NSO poses an ongoing threat to Meta's

24   platforms?

25   A.  Yes.

1    Q.   And what are those ongoing threats?

2    A.   We continue to see testing activity, testing accounts that

3    are connecting testing activity, as well as we've had some

4    fairly recent casework where we identified real-world

5    attacking accounts.

6    Q.   Okay.  So let me start with those two concepts.

7         What is attacker activity?

8    A.   Attacker activity is something we classify where it's a

9    real-world use of -- of the technology to infect or target

10   a -- a real-world victim, essentially.

11        So sending someone a URL that could lead to

12   installation of -- of the implant would be such an example of

13   that.

14   Q.   And you also mentioned tester activity.  What is tester

15   activity?

16   A.   Testing activity is something we identify where we see

17   accounts -- they're mostly fake or inauthentic accounts --

18   that are communicating with other fake and inauthentic

19   accounts to confirm that the -- the implant itself is working

20   and collecting data correctly.

21   Q.   So when we talk about tester activity, can you explain to

22   the Court who's doing the testing and what they're testing?

23   A.   So the testing activity, from our perspective, looks

24   essentially as if someone within the -- the organization, the

25   threat actor's organization, is confirming that the software

1    that they're selling is working as it's supposed to be

2    working.  Sometimes they might be folks that work in quality

3    assurance.  It could be developers or engineers, as well.

4              The type of activity we see typically are

5    transmission of media -- such as images, videos, sound,

6    sometimes texts, as well -- essentially, from our belief, to

7    confirm that this information, if it's sent from one device,

8    A, to another device, B -- and if B is a device that's

9    infected with the implant, the Pegasus -- that that data is

10   collected properly and that they can basically A-B test that

11   this -- this is working correctly on their systems.

12   Q.  So if NSO is conducting testing, who is conducting the

13   testing?

14   A.  Likely the -- the -- likely NSO, yes.

15   Q.  Okay.  And they're conducting that testing to make sure

16   that the Pegasus program is operating correctly?

17             MR. AKROTIRIANAKIS:  Objection; leading and

18   speculation.

19             THE COURT:  Overruled.

20   A.  Yes.  So, essentially, since this is software that's sold

21   as a service, there's a lot of money involved.  Anytime

22   there's a change in the product, proper software practices

23   would -- would mandate that like you test and make sure that

24   any changes haven't affected the ability to collect and do

25   what the software is described as being doing.

1        And so in these cases we see routine testing of

2    things going back and forth between these accounts,

3    essentially to confirm that that collection is working

4    properly.

5    BY MR. ANDRES:

6    Q.   And since you've started working at Meta in 2019, have you

7    found evidence of NSO testing taking place on Meta's platform?

8    A.   Yes.

9    Q.   And have you found that on one occasion or more than one

10   occasion?

11   A.   Multiple occasions.

12   Q.   And how do you identify that activity?

13   A.   We identify the activity through a number of -- of

14   different means.

15        One is, since we conduct what we call long-term

16   threat actor tracking and we've had cases going back many,

17   many years, we identify accounts that might be coming off of

18   infrastructure and then have changed infrastructure over time.

19        We get leads in of -- of email addresses or phone

20   numbers that may be related.  And when we go and investigate,

21   we see if they link back to either our prior casework or new

22   casework.

23        And when we take a look at those through the

24   investigative techniques we use, we see what we can

25   potentially see, and from that we can make an assessment if

 1   the accounts look like they're testing, if they're more

 2   authentic, real world, or not.

 3   Q.  Do these kinds of testing involve devices that are

 4   infected by spyware?

 5          MR. AKROTIRIANAKIS:  Objection; calls for

 6   speculation, no foundation.

 7          THE COURT:  Overruled.

 8   A.  We would assume so, yes.  Otherwise, there wouldn't be any

 9   real reason to be sending the media back and forth.

10          MR. AKROTIRIANAKIS:  I'm going to move to strike on

11   the same basis, Your Honor, based on the answer now.

12          THE COURT:  Yes.  Granted.

13   BY MR. ANDRES:

14   Q.  Based on your experience at Meta, have you seen testing

15   involving infected spyware devices?

16          MR. AKROTIRIANAKIS:  Objection; no foundation.

17          THE COURT:  I agree.

18          Establish the foundation for his knowledge.

19   BY MR. ANDRES:

20   Q.  At Meta you're involved in the investigation of testing of

21   spyware; is that correct?

22   A.  Yes.

23   Q.  And that includes NSO?

24   A.  Yes.

25   Q.  And, based on your experience at Meta, you know that that

1    testing involves devices that have been infected by spyware;

2    correct?

3            MR. AKROTIRIANAKIS:  It's the same question, Your

4    Honor.  There's still no foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Can you repeat the question?

7            MR. ANDRES:  Yes.

8    BY MR. ANDRES:

9    Q.  Based on your experience at Meta, you know that the

10   testing involves a device that is infected by spyware?

11           MR. AKROTIRIANAKIS:  Objection; no foundation.

12           THE COURT:  Okay.  "How do you know" is the --

13   I believe -- the question that you should answer.

14           How do you know?  What's your involvement with the

15   testing?

16           THE WITNESS:  In the data that we've seen, we see

17   media being sent back and forth between accounts.  The

18   activity itself doesn't represent what we would believe, like

19   authentic, real-world conversations and things like that.

20           And so when we look at it, it's -- it's -- it assumes

21   that there's an infected device that would be collecting this

22   information.

23           And from -- screenshots that we've seen in some of

24   the conversations show that there is a -- information being

25   collected that -- that would correspond with this activity.

1        MR. AKROTIRIANAKIS:  Objection, Your Honor.  It's

2   both not responsive to the Court's question, and he has

3   testified that he has no foundation now.  He's just acting on

4   assumptions that he doesn't explain.

5        THE COURT:  All right.  Overruled.  I'll give it what

6   weight I think it's due.

7        MR. ANDRES:  You can answer.

8        THE WITNESS:  Which --

9        MR. ANDRES:  I guess you just did.

10       THE COURT:  I think he just did.

11  BY MR. ANDRES:

12  Q.   Okay.  How does your team identify testing accounts

13  operated by NSO?

14  A.   Yes.

15  Q.   How?  How do they do that?

16  A.   How do we identify or how do we --

17  Q.   How do you identify the testing accounts operated by NSO?

18  A.   So we identify them through a number of different

19  indicators we have.  That can be an IP address; that can be a

20  phone number.

21       And when we look -- put those into our systems to

22  look at what sort of accounts that may have been registered

23  with our systems related to those identifiers, we can take a

24  look to see what those accounts look like, the activity that

25  they're conducting.

1          In some of these testing cases we have seen . . .

2   we've seen instances of -- so they link -- they link back to

3   infrastructure that we've tracked previously to accounts

4   related to NSO.

5          We've also seen content that's been shared in some of

6   the conversations that shows NSO logos in it, as well, which

7   is a further indication that it relates.

8   Q.  On what platforms have you seen NSO testing?  What Meta

9   platforms?

10  A.  We've seen it on Facebook and Instagram, yeah.

11  Q.  How about WhatsApp?

12  A.  Yes.  We've seen activity on WhatsApp, as well.

13  Q.  And based on your work at Meta tracking NSO activity, are

14  you familiar with a testing account called Gil, G-i-l,

15  Daboush, D-a-b-o-u-s-h?

16  A.  Yes.

17  Q.  What is the Gil Daboush account?

18  A.  It is a testing account that we've -- that we uncovered

19  that was sending media back and forth between other -- other

20  testing accounts that we had linked back to NSO activity.

21  Yeah.

22  Q.  How was your team able to review the messages sent by this

23  Gil Daboush account?

24  A.  We have -- the messages themselves were sent unencrypted

25  over our platforms.

1         Because of that and because of our team having the

2    investigative grant to be able to look at certain things,

3    we're able to review the conversations on specific accounts,

4    and, in this case, we were able to see these conversations and

5    media that was sent back and forth.

6    Q.  Did your team observe the Gil Daboush account conducting

7    testing activity?

8    A.  Yes.

9         MR. ANDRES:  Your Honor, I have some exhibits, and

10   I'd like to pass them up to the Court.

11        THE COURT:  All right.

12        MR. ANDRES:  There are three of them, and they are

13   marked A, B, and C for identification.

14        THE COURT:  Do you have a second one for --

15        MR. ANDRES:  I've got one for everybody.

16        THE COURT:  Okay.

17        MR. ANDRES:  I have four.

18        THE COURT:  Are these the same ones that were

19   attached to the --

20        MR. ANDRES:  Yes.

21        THE COURT:  Okay.  All right.

22        MR. ANDRES:  Let me see if I can --

23        THE COURT:  That's okay.

24        If they were attached to the brief, we have them.

25        MR. ANDRES:  Yeah.  Okay.

1    BY MR. ANDRES:

2    Q.  Mr. Blaich, I've handed you an exhibit binder.

3            I'd ask you to look at the first exhibit behind

4    Tab A.

5            And it's marked for identification as -- or at least

6    the tab is -- WA-NSO-00195088.

7            Have you seen that document before?

8    A.  Yes.

9    Q.  And what is it?

10   A.  The document here is a screenshot of a chat application

11   that within it also contains a -- a photograph of -- looks to

12   be -- an administrative console.

13   Q.  Okay.  And this is from December 2023?

14   A.  I believe so, yes.

15   Q.  Were these documents prepared in the ordinary scope of

16   business at Meta?

17            MR. AKROTIRIANAKIS:  Objection; no foundation.

18            THE COURT:  I think that's what he's trying to

19   establish.

20            Overruled.  Overruled.

21   A.  Yes.

22   BY MR. ANDRES:

23   Q.  Were these documents stored after they were prepared?

24   A.  Yes.

25   Q.  And were the documents retrieved from Meta?

1   A.  Yes.

2   Q.  It's part of the normal course of business to keep these

3   records?

4   A.  It is, yes.

5   Q.  Are these the types of records that would be kept under

6   the custody and control of Meta?

7   A.  Yes.

8           MR. ANDRES:  Your Honor, I'd move to admit Exhibit A.

9           THE COURT:  Objection?

10          MR. AKROTIRIANAKIS:  Your Honor, I agree that counsel

11  has read the business records foundation, but there's no --

12  there's no foundation from this witness that he's familiar

13  with any of the facts that he just said yes to.  That's the

14  foundation objection.

15          THE COURT:  Overruled.

16          MR. AKROTIRIANAKIS:  And it's also hearsay within

17  hearsay, Your Honor.  Counsel's questions even -- if the Court

18  accepts this as a business record, takes care of one level of

19  hearsay.  As we stated in our written objections, there's --

20  it doesn't at all address the underlying layer.

21          THE COURT:  Okay.

22          MR. ANDRES:  Until --

23          THE COURT:  Overruled.  Received.

24      (Plaintiffs' Exhibit A received into evidence.)

25  ///

1    BY MR. ANDRES:

2    Q.  Sir, can I ask you now to take a look at this image and

3    explain to the Court what you see in the image?

4    A.  Yes.

5            So in . . . in the image itself -- so there is a

6    screenshot of a chat application with the name at the top.

7    Within that there is also a -- a photograph.

8            Within the photograph it's what appears to be an

9    admin console for a surveillanceware piece of software to

10   collect and show information that's been collected from some

11   surveillance malicious implant itself.

12   Q.  Do you recognize that application?

13   A.  The -- the application in -- in the photo or the

14   screenshot?

15   Q.  Yeah, on -- the screenshot on the computer.

16   A.  I mean, it looks like an administrative console for a

17   surveillanceware collection.

18   Q.  And do you believe that this photograph, this screenshot,

19   is evidence of NSO testing activity?

20           MR. AKROTIRIANAKIS:  Objection; leading, no

21   foundation.

22           THE COURT:  Overruled.

23   A.  We believe it is, yes, because this image came from an

24   account that was -- that we had linked to doing testing

25   activity, that we had linked to NSO.

1           And within the image itself there's indications of

2    what -- what you would expect to see in an admin console that

3    is collecting data from a malicious implant.

4           THE COURT:  Excuse me.  I don't understand what he

5    means by "admin console."

6           THE WITNESS:  An admin console here is -- if you're

7    the operator of a Pegasus, for an example, the -- the malware

8    itself is sending data off somewhere.

9           And so someone needs to review that data that gets

10   collected, and it -- typically in these matters it gets sent

11   to a -- what we call -- an admin console but essentially --

12   it's a webpage where the people that are operating it can

13   drill into the data that's been collected for a specific

14   device.

15          And then they can review the content on this console,

16   such as the photos, videos, anything else that's been

17   collected from that phone on this console.

18          THE COURT:  This -- this is a -- a computer monitor;

19   correct?

20          THE WITNESS:  Correct, yes.

21          THE COURT:  And it's reflecting -- there are these

22   two little dialogue boxes -- is the whole image what's being

23   looked at or just what's on the screen below the little blue

24   box?

25          THE WITNESS:  The whole -- the whole image itself,

1   yeah.  Yeah, the whole -- I mean, the whole image that's on

2   the computer monitor.

3           THE COURT:  Including the stuff at the top that looks

4   like a --

5           THE WITNESS:  Sure.  Yes.  Correct.

6           THE COURT:  -- a status bar or something going --

7   I don't know what the technical terms are.

8           THE WITNESS:  Uh-huh.

9           THE COURT:  But is what is being looked at the

10  entirety of what's being shown on the monitor or just those

11  two boxes down at the bottom?

12          THE WITNESS:  I'm describing the entirety of what

13  that photo is showing.

14          So the two boxes that we show -- that are shown there

15  in this photo look to be a messaging conversation that

16  happened.

17          Across the top, above that, though, you can see

18  information such as what device and the name of the device

19  this was collected from, along with an associated phone

20  number.

21          And on top of that you can see these little tabs

22  that -- if we can read them, they essentially -- they show the

23  different types of data that can be collected.

24          So someone that was actually on this console could

25  click on one of those -- those boxes and see the information

1  that's been collected.  So there's like a number count that's

2  next to it, so they could -- if it's greater than zero, it

3  means something has been collected.

4          MR. AKROTIRIANAKIS:  I'm going to -- Your Honor --

5  I object to the answer, Your Honor.  He's talking -- this is

6  not a Meta document that he's looking at.

7          MR. ANDRES:  Your Honor, could I --

8          THE COURT:  Excuse me.  Hold on.  Hold on.

9          What's your response?

10          MR. ANDRES:  I'd just like to ask some follow-up

11  questions.  I'm really not understanding why every question is

12  being objected to.

13          We're -- you know, Mr. Akrotirianakis is going to

14  have the opportunity to depose this witness.  It's a hearing

15  before Your Honor.  Your Honor can judge the weight and

16  credibility of the evidence.

17          THE COURT:  That's what I think I've been trying

18  to do.

19          MR. ANDRES:  Well, but it hasn't sort of --

20          THE COURT:  Well, let him make his record.

21          What's your objection?

22          MR. AKROTIRIANAKIS:  My objection is that this

23  witness is talking about the functionality of the picture

24  within the screenshot.  It's -- he's not testified to anything

25  about this being a Meta computer or anything that he's

1   otherwise familiar with.  He has no foundation.  It's just

2   completely like, "Yeah, it might be this."

3          THE COURT:  Okay.  All right.

4          Overruled.  I'll take that into consideration.

5          All right.  I'm not sure that this testimony is

6   helping me -- helping me in the -- the least bit.  But go

7   ahead.

8   BY MR. ANDRES:

9   Q.  Let me just -- let me just ask you -- you said --

10          MR. ANDRES:  Your Honor, apologies.  We're not able

11   to enlarge it because of -- we're not -- there's not a screen.

12          So I understand and I'm just going to try to walk the

13   witness through.

14   BY MR. ANDRES:

15   Q.  The computer -- first of all, the picture, this

16   screenshot, what does it represent?

17          MR. AKROTIRIANAKIS:  Same objection.

18          THE COURT:  Overruled.

19   A.  The screenshot represents an image that was sent by a

20   testing account.

21   BY MR. ANDRES:

22   Q.  And why would a testing person send a photograph like

23   this?

24          MR. AKROTIRIANAKIS:  Objection; no foundation.

25          MR. ANDRES:  Your Honor --

1           THE COURT:  Overruled.

2           Go ahead.

3   A.  To -- to -- essentially, to confirm that the collection is

4   working correctly.  So this type of image would be sent and

5   received by an infected device and -- and sent back up the

6   console.

7   BY MR. ANDRES:

8   Q.  And the top of the monitor that's hard to see, the very

9   top of it, has a bunch of different tabs.

10          What is that demonstrating -- or your understanding

11  based on your work in this field -- about these tabs at the

12  top?

13          MR. AKROTIRIANAKIS:  Objection; no foundation.

14          THE COURT:  Overruled.

15  A.  The different types of data that can be collected by the

16  malware.

17  BY MR. ANDRES:

18  Q.  From where -- and where are those things being collected

19  from?

20  A.  A device --

21          MR. AKROTIRIANAKIS:  Objection.

22          THE COURT:  All right.

23          Why don't we just have a standing objection to

24  everything that this witness is testifying to with regard to

25  this exhibit.

1              MR. AKROTIRIANAKIS:  Thank you, Your Honor.

2              THE COURT:  You're welcome.

3         (Discussion held at the podium.)

4    BY MR. ANDRES:

5    Q.  Okay.  You can put that aside.  You can take a look at the

6    second exhibit, WA-NSO-00195086.  Do you see that after Tab 2?

7              MR. ANDRES:  There's nothing there because that's --

8    that's a video that we're going to show, Your Honor.

9              Go ahead.  I'm going to show it to the witness first.

10        (Plaintiffs' Exhibit B played.)

11             THE COURT REPORTER:  Your Honor, can you please ask

12   the witness to pause to allow for better transmission.

13   Thank you.

14        (Reporter seeks clarification.)

15             THE COURT:  Okay.  You're welcome.

16             MR. ANDRES:  Okay.  For the record, Your Honor, we've

17   shown the video to the witness, the Court, and defense

18   counsel.  We've also produced it to defense counsel.

19             Now I'm going to address the witness.

20   BY MR. ANDRES:

21   Q.  Mr. Blaich, is this a video that you've seen before?

22   A.  Yes.

23   Q.  Okay.  And is this a video that was prepared in the

24   ordinary course of business at Meta?

25   A.  Yes.

1    Q.  And is the video stored after it was prepared at Meta?

2    A.  Yes.

3    Q.  And where was it retrieved from?

4    A.  Our Cases system.

5    Q.  And it's part of the regular, ordinary course of business

6    that you maintain these records?

7    A.  Yes.

8    Q.  And are these the type of documents that you keep under

9    your custody or control?

10   A.  Yes.

11          MR. ANDRES:  Your Honor, I move to admit Exhibit B,

12   the video.

13          MR. AKROTIRIANAKIS:  Hearsay, no foundation from this

14   witness, Your Honor.

15          THE COURT:  All right.  Overruled.  It may be

16   admitted.

17       (Plaintiffs' Exhibit B received into evidence.)

18          MR. ANDRES:  And can we have the same standing

19   objection, Your Honor, for the rest of this witness?

20          THE COURT:  Yes, we may.

21          MR. ANDRES:  Thank you.

22          THE COURT:  Assuming Mr. Akrotirianakis -- assuming

23   you object to everything this witness says about this exhibit.

24          MR. AKROTIRIANAKIS:  It's not that I object to

25   everything he says, only the questions where there's no

1   foundation.

2           If the Court is willing to just say my objections on

3   the basis of foundation, which I think are well-taken, are

4   preserved -- I understand the Court disagrees -- then I don't

5   have to keep making them.

6           THE COURT:  All right.

7           I agree.  They're preserved.

8   BY MR. ANDRES:

9   Q.  Can you explain to the Court what you observed in this

10  video?

11  A.  Yes.

12          In this video we're seeing a panning across what

13  looks to be a desk that has mobile phone devices on it that

14  are labeled with phone numbers, bar codes, a name.

15          We're also seeing a keyboard, indicating it's at a

16  computer desk, and then next to the phone devices there's a

17  notepad with the NSO logo in the lower corner.

18  Q.  And is -- is this video indicative of testing activity?

19  A.  Yes.

20  Q.  Can you explain why that is?

21  A.  Yes.

22          So in testing activity we see images -- videos,

23  sound, things like that -- that are sent back and forth

24  between testing accounts.  Sometimes the testing accounts will

25  take videos and images of things that are right in front of --

1   the tester will take videos and images of things that are

2   right in front of them.

3           And so in this case we're seeing mobile handset

4   devices, phones, as well as a notepad on the desk, the

5   keyboard.  It's not uncommon to see this activity.

6   Q.  And how is it that you and your team attributed this

7   testing activity to NSO?

8   A.  We had previously attributed the account to NSO that was

9   sending these files.

10          But when we looked further at some of the

11  conversations, we saw within that that there was images being

12  sent and video sent.  And in this case a video with the NSO

13  logo in the corner increased our reliability that this is an

14  NSO account.

15  Q.  And it . . . is it fair to say that you consider NSO to be

16  a sophisticated spyware company?

17  A.  Yes.

18  Q.  And so why is it that a sophisticated spyware company

19  would be sending testing video with their own logo on it?

20  A.  So we look at the sophistication as broken down by

21  different areas.

22          So there's the sophistication of the malicious

23  implant itself that's to be considered.  There's the

24  sophistication of how the implant gets delivered, through

25  different types of zero days, through security products to get

1    it delivered so that that's sophisticated.

2         There's also testing and quality assurance activity

3    to ensure that . . . that the implant is collecting the data

4    correctly and it's working properly.

5         Typically in the testing system -- typically in

6    testing activity that we see, we see potentially less

7    sophistication, potentially less concern around what we would

8    term an operational security, which is determining who's

9    actually behind the activity itself.  And so in those cases,

10   like we see in these examples, we're seeing logos of the

11   company where the activity is coming from.

12        MR. ANDRES:  Okay.  Thank you.

13        I'm going to . . . retrieve that computer.

14   BY MR. ANDRES:

15   Q.  Can I ask you now to look at the final exhibit in the

16   binder, which I'm going to mark for identification as C?

17   That's identified behind the tab WA-NSO-00195078.

18        Do you see that?

19   A.  I do, yes.

20   Q.  Can you explain to me what's depicted in that exhibit?

21   A.  This is a -- another image that we found from the testing

22   account.

23        And within that image we're seeing a bunch of items

24   from a desk, desk toys, cables, as well as an NSO notebook

25   with the logo on it.

1  Q.  And that -- when you say the same "account," what do you

2  mean by that?

3  A.  The Gil Daboush account.

4  Q.  Okay.  And what is the Gil Daboush account?  Who is that

5  associated with?

6  A.  We -- we have it associated with NSO.

7  Q.  Okay.  And in terms of the date when this was -- this

8  photograph was identified, is it fair to say it was on or

9  about October 2024?

10  A.  Yes.

11          MR. AKROTIRIANAKIS:  Leading.

12          THE COURT:  Overruled.

13  A.  (Continuing.)  Yes.

14  BY MR. ANDRES:

15  Q.  Was this document prepared in the ordinary course of

16  business at Meta?

17  A.  Yes.

18  Q.  And was that document stored after it was prepared?

19  A.  Yes.

20  Q.  Where was the document retrieved from?

21  A.  Within Cases.

22  Q.  Is it a regular part of the business to keep and maintain

23  records of this type?

24  A.  Yes.

25  Q.  Are these the documents and types that you'd keep under

 1   custody and control at Meta?

 2   A.  Yes.

 3          MR. ANDRES:  Move to admit Exhibit C, Your Honor.

 4          THE COURT:  Objection?

 5          MR. AKROTIRIANAKIS:  Hearsay, foundation.

 6          THE COURT:  All right.  Those objections are

 7   overruled.  It's admitted.

 8      (Plaintiffs' Exhibit C received into evidence.)

 9          THE COURT:  You said the last two digits were 78.

10   The last two digits are, in fact, 87.

11          MR. ANDRES:  Sorry.  Yes, Your Honor.  Sorry.

12          THE COURT:  Yeah.

13          MR. ANDRES:  Let me just read it from the beginning

14   so the record's clear, WA-NSO-00195087.

15          Thank you for that, Your Honor.

16   BY MR. ANDRES:

17   Q.  Mr. Blaich, can you describe what you see in this exhibit?

18   A.  Yes, I can.

19   Q.  What is it?  Go ahead.

20   A.  Yes.

21          So there's -- there's a notebook which has the NSO

22   logo on it.  We're also seeing what look to be charging cables

23   for different phones and a bunch of desk accessories, as well.

24   Q.  And, based on your investigation at WhatsApp, do you have

25   an understanding if this photograph was an example of testing

1  by NSO?

2  A.  Just to correct, testing on -- not on WhatsApp in this

3  case.

4  Q.  Yeah.  But what -- what -- how does this document reflect

5  testing?

6  A.  Yes.  So this document reflects testing -- this is the

7  type of images that we've talked about with the prior exhibits

8  where a tester would take an image of something that's close

9  to them just to make sure that the image that was taken by

10  this -- by the phone or device is sent -- is captured and is

11  uploaded to the administrative console.

12          So this is the type of thing we see.

13  Q.  Okay.  And what -- what, if anything, does your team do

14  with respect to these accounts that you identify from NSO?

15  A.  First off, what we do is we -- we document what we find,

16  conduct and investigate as much as we possibly can, and

17  understand what other accounts might -- we might uncover from

18  signals from this account, document everything.  We track it

19  into our systems, and then, at some point, we will move to

20  disable or ban the accounts.

21  Q.  Okay.  You can put that exhibit aside.

22          I'm just going to ask you one other question about

23  Exhibit B, the video.

24          Do you remember the approximate date of that video,

25  when it was recovered at NSO -- at Meta?

1   A.  I can't recall the time right now.

2   Q.  Okay.  You testified earlier about both testing activity,

3   which you've just detailed, and, also, attacker activity.

4        Since you started working at Meta, have you reviewed

5   evidence of NSO attacks taking place over Meta's platforms?

6   A.  Yes.

7   Q.  On one occasion or more than one occasion?

8   A.  Multiple occasions.

9   Q.  And how do you identify the attacker activity?

10  A.  Attacker activity is activity where we -- we assess that

11  it is -- it's not testing.  So the opposite of that, where

12  it's a -- where the goal is to send an actual, real-world

13  target, not a testing account, a malicious payload, URL,

14  whether it's malware or not, to infect or steal things from

15  the target -- from the victim's devices, essentially like

16  that.  Yeah.

17  Q.  And when was the last time your team saw NSO-related

18  attacker activity on Meta's platforms?

19  A.  April of this year.

20  Q.  And had -- and with respect to April 2025, what was found

21  with respect to NSO attacker activity?

22  A.  Yes.

23       So we were investigating two phone numbers that we

24  had received from an industry tip.  Those phone numbers, when

25  we looked at them, were impersonation accounts

1   impersonating -- one was impersonating a news organization.

2   The other was impersonating an NGO.

3         And what we discovered from that -- so that was --

4   the impersonations were suspicious for us.  When we went and

5   looked deeper into this, we had noticed that the users -- the

6   WhatsApp users that had received contact from -- some of the

7   WhatsApp users that had received contact from these -- these

8   attacker phone numbers had chosen to report the messages that

9   were sent to them.

10        And what that does is that sends WhatsApp the last

11  five messages unencrypted back to WhatsApp's systems, and then

12  they can be reviewed.  And in this case we saw that there was

13  different types of messages going back and forth.  We saw that

14  there was a -- URLs that were sent in those messages, as well.

15  Q.  And you said that they were impersonating accounts.

16  What's the relevance of that for the purposes of your

17  investigation?

18  A.  An attacker will create an impersonating account to

19  increase the likelihood -- essentially, to social engineer

20  their targets or victims to believe that who they are talking

21  to is who the number is purporting to be.

22  Q.  And in terms of your investigations, what -- what

23  conclusions did you come to after reviewing the -- the

24  relevant material?

25  A.  Yeah.  We believed that this was NSO-related activity.

1    The URLs themselves were indicative of patterns that he had

2    seen in the past for Pegasus URL delivery links, essentially a

3    domain name followed by some sort of short character code

4    following that, as well.

5            That combined with the fact that we saw the

6    impersonation accounts made them highly suspicious.

7    Q.  What did you do with respect to these two counter -- two

8    attacker accounts?

9    A.  We disabled and banned those accounts.

10   Q.  Mr. Blaich, based on your work at Meta, is there ongoing

11   activity related to NSO on Meta's platforms?

12   A.  We believe so, yes.

13   Q.  And what's the last time that your team identified NSO

14   activity on NSO's platforms?

15   A.  On Meta's platforms?

16   Q.  Yes.

17   A.  We -- the last time we saw the attacker accounts were back

18   in April.  Yeah.

19           MR. ANDRES:  Your Honor, can I just have one minute?

20           THE COURT:  Sure.

21       (Discussion held at counsel table.)

22           MR. ANDRES:  Your Honor, I have no further questions.

23           THE COURT:  All right.

24           MR. ANDRES:  And, for the record, if there's going to

25   be no cross-examination, I won't have any redirect.

1           THE COURT:  All right.

2           Mr. Akrotirianakis?

3           MR. AKROTIRIANAKIS:  As I mentioned, Your Honor, I --

4    I'm not in a position to examine the witness, having just

5    heard his expert testimony.

6           I would ask the Court to order the plaintiffs to

7    produce the documents that he -- that he said he -- that he

8    testified he was relying on throughout the course of his

9    examination this morning so that I can take a deposition in

10   the near future.

11          THE COURT:  Hm-m.

12          I -- you're going to have to identify --

13          MR. AKROTIRIANAKIS:  Yes, Your Honor.

14          THE COURT:  -- what documents you're talking about.

15          MR. AKROTIRIANAKIS:  So it would be the info from the

16   Cases database that relate to what he referred to as

17   NSO-related activity.  Hopefully, we'll find out what that

18   means.

19          Documents related to the attacking and testing

20   activity that he testified to, the evidence of testing taking

21   place on Meta's platforms, including this Gil Daboush account.

22          Any evidence linking the account from which

23   Exhibits A and B and C -- that . . . he's saying that they

24   were collected from NSO and that he was able to like string

25   that together in some way, but we don't have any discovery

1    or -- or the documents that he's relying on that.  And it's

2    unclear whether they're all this Gil Daboush account that

3    counsel has identified.

4          Documents related to their findings that related

5    to -- that relate to NSO.  He said that he made findings and

6    documented everything, and those are all with respect to the

7    testing activity that the witness testified to.

8          With respect to the attacking activity, it would be

9    documentation relating to this impersonation that he has

10   testified about and documentation relating to their

11   investigation of the impersonation accounts, as he called

12   them.

13         THE COURT:  Hm-m.  Okay.

14         Response?

15         MR. ANDRES:  Your Honor, can we excuse the witness

16   first?

17         THE COURT:  Oh, sure.

18         MR. ANDRES:  Is that okay?

19         THE COURT:  Sure.

20         You're not going to examine him; is that correct?

21   At all?

22         MR. AKROTIRIANAKIS:  I'm not able to, Your Honor.

23   Without --

24         THE COURT:  Okay.  Is that a no?  Are you going to

25   examine him or not?  Yes or no.

 1              MR. AKROTIRIANAKIS:  No, Your Honor.  I'm going to --

 2              THE COURT:  Thank you.

 3              MR. AKROTIRIANAKIS:  -- take a deposition.

 4              THE COURT:  Thank you.

 5              You're excused, Mr. Blaich.  You're excused.

 6              MR. ANDRES:  Thank you, Your Honor.

 7              Your Honor, I'm happy to address this now or at some

 8    later point.

 9              THE COURT:  Let's get through the witness testimony,

10    and then we can address documents.

11              MR. ANDRES:  Great.  Can I -- I just want to make one

12    point for the record, one sentence -- try in one sentence.

13              If the rules are that discovery is going to be

14    opened, then we'll have similar requests of Mr. Gazneli, who,

15    as you know, submitted an affidavit in this case, did not come

16    to testify, and presents new evidence.

17              So we'll make reciprocal requests and to depose

18    Mr. Gazneli.  Obviously, we don't have to do that now, but if

19    there's going to be an opening of discovery -- which we don't

20    think is necessary -- that's going to be our request.

21              So let's go ahead to the next witness, also another

22    short witness, and we'll move on.

23              Thank you, Your Honor.

24              Go ahead, Luca.

25              MR. MARZORATI:  Luca Marzorati for plaintiffs from

1   Davis Polk.  And this is Lander Brandt.

2       (Witness sworn.)

3           THE WITNESS:  Yes.

4           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

5   Speak clearly into the microphone.

6           Please state your name and spell it for the record.

7           THE WITNESS:  My name is Lander Brandt, L-a-n-d-e-r

8   B-r-a-n-d-t.

9           MR. MARZORATI:  Good morning, Mr. Brandt.

10          THE WITNESS:  Good morning.

11   **LANDER BRANDT, PLAINTIFFS' WITNESS, DIRECT EXAMINATION**

12                   **BY MR. MARZORATI:**

13   Q.  Let's start with your background.  Did you graduate from

14   college?

15   A.  I did.

16   Q.  And what college did you graduate from?

17   A.  Eastern Washington University.

18   Q.  Did you earn any degrees there?

19   A.  I got a bachelor's in computer science.

20   Q.  Where did you work after college?

21   A.  I worked briefly for Nordstrom as a software engineer and

22   then Microsoft as a security engineer.

23   Q.  What were your job responsibilities at Microsoft as a

24   security engineer?

25   A.  I did reviews of web services for security issues and

1  assisted with security investigations.

2  Q.  Where do you work today?

3  A.  Meta.

4  Q.  When did you start working at Meta?

5  A.  September 2021.

6  Q.  And what's your current title at Meta?

7  A.  I'm an applications security engineer.

8  Q.  Can you explain to the Court what your responsibilities

9  are as an applications security engineer?

10  A.  I do security analysis of the code base and automate

11  security -- security analysis, as well.  I do mitigation work

12  to try to prevent security issues, and I also assist with

13  security investigations.

14  Q.  And what would you say is the goal of your work?

15  A.  To make our products more secure.

16  Q.  And is there a specific product that you focus on as an

17  applications security engineer?

18  A.  Since I joined, I've been working on WhatsApp.

19  Q.  So during your time as an applications security engineer,

20  have you encountered this term, "exploit vector"?

21  A.  I have.

22  Q.  And can you explain what an exploit vector is?

23  A.  It is a way of attacking a product through some means in

24  order to kind of manipulate it into -- into doing something

25  unintended.  Generally, launching an exploit.

1  Q.  And, during your time at Meta, have you encountered the

2  term "threat actor"?

3  A.  I have.

4  Q.  And can you explain what a threat actor is?

5  A.  A threat actor is somebody attempting to attack the

6  product for generally a nefarious gain.

7  Q.  And putting those two concepts together, have you

8  encountered threat actors using exploit vectors that are aimed

9  at WhatsApp?

10  A.  I have.

11  Q.  And can you explain when you've encountered those

12  generally?

13  A.  When I first joined, I read our internal 2019 report on

14  the -- I'm sorry -- our internal report on the 2019 NSO

15  incidents.

16          And, through other security investigations,

17  I've encountered exploit vectors.

18  Q.  So how familiar are you with how WhatsApp works on a

19  technical level?

20  A.  Quite familiar.

21  Q.  And can you explain how you got that familiarity?

22  A.  Through reading source code, debugging the products to

23  step through it and understand how it works, as well as

24  meeting with teams to do architectural reviews of features and

25  just changes in the product.

1    Q.   And how familiar are you with the ways that threat actors

2    access WhatsApp or try to collect WhatsApp messages?

3    A.   Fairly familiar.

4    Q.   And what's that familiarity based on?

5    A.   Based on our security investigations.

6    Q.   Okay.  Are you familiar with what's often called the

7    WhatsApp client application?

8    A.   I am.

9    Q.   And can you explain what that means to a nontechnical

10   audience?

11   A.   The client application would be the application that

12   somebody who wishes to use WhatsApp would install from an

13   App Store or download from our website.

14          It could even technically be the WhatsApp web client,

15   which runs in your web browser.

16   Q.   The WhatsApp client app, that's -- fair to say that's what

17   you download from the App Store that's on your phone?

18   A.   Yes.

19   Q.   So can you explain to the Court what role the WhatsApp

20   client app plays in sending and receiving WhatsApp messages?

21   A.   When somebody wishes to just use WhatsApp generally, they

22   would launch the client application, be presented with a user

23   interface displaying the messages that they've sent or

24   received, and there are functions in it for -- for sending

25   media and text messages.

1    Q.  So that's the -- the WhatsApp client app.

2            On the technical side where are WhatsApp messages

3    stored on a user's device?

4    A.  The operating systems generally provide what's called a

5    sandbox, which is a way for an application's data to be

6    logically separated from other applications on the -- on the

7    platform.  Within that sandbox there's a -- a database file

8    which stores the message contents.

9    Q.  So can you describe how that database is structured, what

10   that database looks like that you're describing?

11           MR. AKROTIRIANAKIS:  Objection, Your Honor.  It's now

12   expert testimony about somebody else's computer, not

13   WhatsApp's or Facebook's.

14           MR. MARZORATI:  Your Honor, I think he's explained

15   that it's deep technical knowledge of how the WhatsApp client

16   application works.

17           THE COURT:  Overruled.

18           THE WITNESS:  Sorry.  What was the question?

19   BY MR. MARZORATI:

20   Q.  So you mentioned this database.  Can you explain how it's

21   structured and what it looks like?

22   A.  There is -- it's a SQL database, S-Q-L, and it has what's

23   referred to as a schema, so think of that kind of as like an

24   Excel spreadsheet with a table.

25           That table has the message data encoded in a

1   particular way where we can join the data with other tables

2   for like who sent a message and message contents themselves.

3   It's kind of specific to the application.

4   Q.   So you talked about the WhatsApp client app.  Can -- a

5   regular WhatsApp user just using the WhatsApp client app, can

6   they access this database?

7   A.   No.

8   Q.   Okay.  And how do they read WhatsApp messages, then?

9   A.   Through the client application's interface.

10  Q.   Okay.  Does WhatsApp publish documents or tell the public

11  how this database is structured, the schema you talked about?

12  Is this knowledge that WhatsApp provides to the public?

13  A.   To my knowledge, we have not.

14  Q.   And why not?

15  A.   It's a technical implementation detail that's not relevant

16  for the day-to-day use of the product.

17  Q.   Okay.  So that's WhatsApp messages.

18        Can you describe how at all -- if it does -- WhatsApp

19  stores the contents of phone calls and video calls?

20  A.   We store some metadata about the call, so maybe who called

21  you or who you called, as well as like a time stamp.  But the

22  actual call contents themselves are not recorded.

23  Q.   So that's not living on the database, on the device that

24  you talked about?

25  A.   That's correct.  The -- the contents themselves do not

1   live on -- in the database.

2   Q.  Mr. Brandt, are you familiar with NSO?

3   A.  I am.

4   Q.  And are you familiar with Pegasus?

5   A.  I am.

6   Q.  What is Pegasus?

7   A.  Pegasus is a software suite that is generally used for

8   compromising a user's device and intercepting their

9   communications and running some custom code that's generally

10  referred to as spyware.

11  Q.  And have you encountered NSO or Pegasus during your time

12  at Meta?

13  A.  I have.

14  Q.  Can you explain when that was?

15  A.  The 2019 incident report that I had read as well as in

16  2023 I reviewed code and logs of data provided to us by the

17  DOJ that I understand to be related to Pegasus.

18  Q.  "DOJ" is Department of Justice?

19  A.  Yes.

20  Q.  Okay.  And can you describe what that code did, what

21  conclusions you drew from that code?

22  A.  It was fairly specific to our protocols.  It kind of

23  reimplemented the way that the client application would

24  communicate with our servers and contained custom

25  functionality to trigger unintended side effects in the

1    application for, say, determining if a user is running iOS or

2    Android as well as directly attacking the application.

3    Q.  And, Mr. Brandt, just to be clear, your understanding is

4    that that code was related to this 2019 attack?

5    A.  That's my understanding, yes.

6    Q.  Okay.  So in your experience as an applications security

7    engineer who's focused on WhatsApp, what methods have you seen

8    threat actors use to covertly collect WhatsApp messages?

9    A.  There's a direct method.  So you can directly attack the

10   application and attempt to run -- threat actors would attempt

11   to run their own code that way.

12           Indirectly, so perhaps by attacking another

13   application running on the user's device.  They can then break

14   that sandbox and gain access to the WhatsApp application

15   contents.

16           And maybe even tamper with the app through social

17   engineering people into installing a back-doored version of --

18   of the application that comes preinstalled with the -- the

19   custom code.

20   Q.  Got it.  I'll have some questions about those three

21   methods that you've described.

22           But just based on your review of this WhatsApp --

23   this NSO code that you understand was related to the 2019

24   attack -- of those three buckets of -- of -- those three

25   methods that you talked about, how would you characterize the

 1   code you that reviewed from NSO?

 2   A.   It was a direct installation method for installing the

 3   spyware.

 4   Q.   Okay.  So based on your experience, can you describe this

 5   direct installation method and how it works?

 6   A.   So, generally, the threat actor would discover an

 7   exploitive vector in the application.  And then, through

 8   exploiting that -- that vector, they would gain some means of

 9   running their own code.

10        From there, that code may download more code, but, in

11   general, you're running with the privileges of that

12   application.  And so you would have access to any resources

13   that the application would then have, including the -- the

14   chat database.

15        Additionally, they can hook the -- the means of

16   however the application records audio or video for calls and

17   siphon that off.

18   Q.   So just to be clear, you've seen threat actors use this

19   direct method?

20   A.   Yes, I have.

21   Q.   And does -- this direct method that you've talked about,

22   does that require using WhatsApp servers?

23   A.   It does.

24   Q.   Okay.  And what technical measures, if any, does Meta

25   implement to stop this direct method that you just described?

1  A.  Since the messages and the calls are all end-to-end

2  encrypted, our servers cannot examine that data.  It's

3  referred to as opaque to us.

4          But there is some data that is not end-to-end

5  encrypted, including who it's going to and who it's from, so

6  we do verification of that data on our servers to ensure that

7  someone's not attempting to spoof a message and that the

8  message is generally well-formed.

9          Once that message gets delivered to your device, the

10  application needs to be able to understand it and understand

11  what type of message it is, so that is generally referred to

12  as parsing.  As we parse the message, we will validate that

13  that message is also well-formed -- this all happens on your

14  device -- and, generally, that the message does not look

15  corrupt.  Since that can have unintended consequences.

16  Q.  Got it.  So that's the direct method.

17          I want to ask about the indirect method that you

18  talked about, the second of the three methods that you're

19  aware of.

20          Can you describe how you've seen threat actors use

21  this indirect installation method to collect WhatsApp

22  messages?

23  A.  Sure.

24          So the idea is that there may be another application

25  running on the device that maybe has an exploit vector, such

1   as the web browser.  So if somebody were to navigate to a

2   malicious domain, that domain, that webpage, may try to

3   compromise the web browser.

4           Once the web browser has been compromised, they may

5   then try to attack the operating system itself and elevate

6   privileges.  So, essentially, think of it like on a Windows

7   machine running something as an administrator.  The goal is to

8   run their code as that administrator user.

9           And, from there, there are less security

10  restrictions, and that would allow them to have access to

11  other applications on the device and potentially even tamper

12  with applications and -- and their data.

13  Q.  So this is going through another app, impacting the

14  operating system and then, from there, accessing WhatsApp?

15  A.  Yes.

16  Q.  Okay.  And in your time at Meta, have you seen threat

17  actors use this method?

18  A.  I have.

19  Q.  Okay.  And can you describe briefly or at a high level

20  what measures Meta takes to stop this indirect installation?

21  A.  In general, we have what I'll refer to as onetime out-of-

22  state variation checks, which are essentially just to detect

23  tampering with the application and some things in its

24  environment.

25          And if the application is determined to fail those

1  tamper checks, we will enforce against that user in some way.

2  Q.  And, Mr. Brandt, just to be clear, does this method

3  necessarily require you to go through WhatsApp servers, this

4  indirect method?

5  A.  No.

6  Q.  Okay.  So you've talked about direct, you've talked about

7  indirect.  You've also mentioned social engineering.

8       Can you talk about this method of collecting WhatsApp

9  messages?

10  A.  Yes.

11       So social engineering is essentially trying to trick

12  somebody into -- into installing a back-doored application.

13  So maybe you get a message promising you money for

14  installing it.

15       And the application may even present itself as -- as

16  a legitimate WhatsApp application.  And it may have once been

17  the genuine WhatsApp application but it's been tampered with

18  in some way to come preinstalled with malicious code.

19  Q.  And just to be clear, you -- have you seen threat actors

20  use social engineering throughout your time at Meta?

21  A.  I have.

22  Q.  Okay.  And to return to a question I asked before, does

23  this method necessarily require the use of WhatsApp or Meta

24  servers?

25  A.  No.

1    Q.   Okay.  And can you describe what measures Meta takes to

2    stop these kind of social engineering attacks?

3    A.   If the messages are sent on platform for -- attempting to

4    social engineer and those messages are reported, we will check

5    those messages and action against the user who sent them.  So

6    that may be a ban against that user, something like that.

7          Additionally, the similar tamper checks that we had

8    mentioned earlier, they still apply.  And so if somebody -- we

9    determine -- is running a nongenuine WhatsApp application, we

10   may enforce against them, as well, and cut off their access in

11   order to get them to install a -- a genuine WhatsApp client

12   application.

13   Q.   So, Mr. Brandt, we've talked about these three methods,

14   the direct, the indirect, and the social engineering.

15          From your perspective, do all of these methods pose a

16   harm, an ongoing harm, to Meta and WhatsApp?

17   A.   I believe they do.

18   Q.   And can you explain why that is?

19   A.   When we detect these sorts of things, we generally spin up

20   resources internally to investigate.  It could be a short-term

21   investigation or a long-term investigation.  Generally, we

22   don't have a whole lot of data to go off of, and so it's kind

23   of ambiguous, how long it will take.

24          It's very randomizing in that regard, too.  Instead

25   of doing proactive security work, we're now doing reactive

1    security work to try to determine the cause of the signals

2    we're seeing as well as, potentially, implementing mitigations

3    against that to prevent it from happening again in the future.

4         And it kind of undermines the security of the

5    platform.  A user who has been compromised through any of

6    those means can then be used to launch attacks against other

7    users on the platform.

8    Q.  And those harms that you mentioned, are they present

9    whether or not NSO's attack or the threat actor goes through

10   WhatsApp or Meta servers?

11   A.  They would be present, yes.

12   Q.  Okay.  Mr. Brandt, just one final question.

13        I'll represent to you that NSO has said in this

14   litigation that, as long as its collection of WhatsApp

15   messages doesn't require the use of Meta or WhatsApp servers,

16   Meta or WhatsApp are not injured.

17        Would you agree with that?

18   A.  No.

19   Q.  And why not?

20   A.  For the reasons I mentioned before.  There's a lot of

21   resourcing involved with investigating these things as well as

22   if -- if the . . . the means of collecting messages tampers

23   with the running state of the operating system or WhatsApp in

24   some way, there may be reliability implications to that.

25        And we occasionally see these things on our servers

1  or in our diagnostic data and would be investigating it.

2  Engineers would investigate it and maybe never find a cause

3  because it's not our code causing reliability issues or

4  performance issues.

5          And, as I mentioned earlier, it also can be used to

6  launch attacks against other users on our platform.

7          MR. MARZORATI:  Thank you, Mr. Brandt.

8          No further questions.

9          THE COURT:  All right.  Thank you.

10          Do you wish to cross-examine?

11          MR. AKROTIRIANAKIS:  Not today, Your Honor.

12          I did have my list of documents, though.

13          That would be the documents supporting the assertion

14  that these direct methods require the use of WhatsApp servers

15  and, also, how the WhatsApp servers are -- are used.

16      (Discussion held at counsel table.)

17          MR. AKROTIRIANAKIS:  And -- and the source code

18  that -- that relates to that that he said he examined as part

19  of that investigation.

20      (Discussion held at counsel table.)

21          MR. AKROTIRIANAKIS:  Oh, and the DOJ stuff.

22          I thought that he was saying that in 2023 he reviewed

23  something that came from the DOJ, but the -- that "something"

24  is from 2019, not from 2023.

25          And I don't believe that we have the -- whatever the

1    "it" is that he's talking about.

2            MR. MARZORATI:  It's the contents of the AWS server,

3    which we've talked about a lot.

4            THE COURT:  Has NSO ever produced its source --

5    source codes to plaintiffs?

6            MR. AKROTIRIANAKIS:  Yes.

7            MR. MARZORATI:  Not in the United States, Your Honor.

8            THE COURT:  In the United States.

9            MR. AKROTIRIANAKIS:  For the AWS server they have the

10   source code, Your Honor.

11           MR. MARZORATI:  We have code from the DOJ.  They've

12   never produced a code from them.

13           THE COURT:  Okay.  All right.  Thank you.

14           You're excused.

15           MR. MARZORATI:  You're excused.

16           THE COURT:  Thank you.

17           All right.  I'm assuming plaintiffs have no

18   additional witnesses.

19           MR. ANDRES:  Correct, Your Honor.

20           THE COURT:  Okay.

21           Your witnesses?  Or witness.

22           Do you anticipate that the testimony will be more

23   than a half hour?

24           MR. AKROTIRIANAKIS:  On direct, no, Your Honor.  Of

25   course, I cannot anticipate the cross.

 1            THE COURT:  How much time do you anticipate on

 2   direct?  I'm trying to determine when we should take a break

 3   for our court reporter.

 4            MR. AKROTIRIANAKIS:  Sure.  Probably a half an hour.

 5   If the Court would want to take a break now, though, I could

 6   use one.

 7            THE COURT:  You could use one, as well?  All right.

 8            Let's take a 10-minute break.

 9            MR. ANDRES:  Thank you, Your Honor.

10            MR. AKROTIRIANAKIS:  Thank you, Your Honor.

11        (A recess was taken from 11:27 a.m. to 11:38 a.m.)

12            THE COURTROOM DEPUTY:  Remain seated and come to

13   order.  The US District Court is back in session.

14            THE COURT:  All right.

15            Counsel.

16            MR. AKROTIRIANAKIS:  Thank you, Your Honor.

17            Joshua Minkler is called by defendants.

18            THE COURTROOM DEPUTY:  Can I ask you to stand.

19        (Witness sworn.)

20            THE WITNESS:  I do.

21            THE COURTROOM DEPUTY:  Thank you.  Please be seated.

22            THE WITNESS:  Thank you.

23            THE COURTROOM DEPUTY:  Speak clearly into the

24   microphone.

25            Please state your full name and spell your name for

1    the record.

2          THE WITNESS:  My name is Joshua J. Minkler.  Joshua,

3    J-o-s-h-u-a; J., the initial; Minkler, M-i-n-k-l-e-r.

4          MR. AKROTIRIANAKIS:  Your Honor, I have a -- an

5    exhibit book for the Court and one for the Court's clerk, if

6    I may.

7          May I inquire.

8          THE COURT:  Sure.

9    **JOSHUA J. MINKLER, DEFENSE WITNESS, DIRECT EXAMINATION**

10                **BY MR. AKROTIRIANAKIS:**

11   Q.  Mr. Minkler, would you briefly summarize your professional

12   background, please.

13   A.  Yes.  After graduating from law school in 1988, I worked

14   from 1988 through 1989 for legal aid in eastern Michigan,

15   representing indigent clients on housing, public benefits, and

16   domestic matters.

17         After that I joined the Kent County, Michigan,

18   prosecuting attorney's office.  That's in Grand Rapids,

19   Michigan.  I was a -- a deputy prosecutor there.

20         I served there from 1989 through 1994, prosecuting

21   mostly violent crimes -- primarily violent crimes -- which

22   would be homicides, rape, robberies.

23         In 1994 I returned home -- I'm from Indiana -- where

24   I joined the United States Attorney's Office for the Southern

25   District of Indiana that covers the lower two-thirds of the

1   state of Indiana.

2           There, from 1994 through 2010, I was a criminal

3   Assistant United States Attorney, serving in the OCDETF unit,

4   Organized Crime Drug Enforcement Task Force unit, investigated

5   and prosecuted the organized crime in the district.  That was

6   until 2010.

7           After 2010 I -- I became the supervisor, the lead

8   attorney for that unit, where I would supervise -- prosecute

9   cases and supervise others that prosecuted that case.

10          In 2011 I became the First Assistant United States

11  Attorney in that office, where I served from 2011 to 2014.

12          In 2014 the -- the US Attorney resigned to run for

13  mayor of the City of Indianapolis and was elected -- he's

14  still the mayor -- and so I became the Acting United States

15  Attorney.  I was the Acting United States Attorney in that

16  district from August 2014 until 2015.

17          There was no nominee, and so the Attorney General at

18  the time, Eric Holder, appointed me as the Attorney General --

19  not Attorney General; sorry -- as the United States Attorney.

20  So I was the United States Attorney, as appointed by the

21  Attorney General.

22          The -- the District Court Judges -- there were

23  seven -- then had to decide whether I got to keep that job.

24  They voted and I kept that job from 2015 through October 2017.

25          In October of 2017 I was unanimously confirmed by the

1  Senate, I was presidentially appointed by then-President

2  Trump, and unanimously confirmed by the United States Senate,

3  and I was the United States Attorney for the District from

4  that point until 2020, November 2020.

5           The second week of November I left the United States

6  Attorney's Office and joined Barnes & Thornburg -- it's a law

7  firm headquartered in Indianapolis -- where I became a partner

8  in that law firm.  I've been a partner in that law firm since.

9  I am currently the cochair of the white collar Government

10  investigations and compliance practice group.

11  Q.  Mr. Minkler, on what topics have you been asked to form

12  opinions in this matter?

13  A.  I've been asked to form opinions on the challenges faced

14  by law enforcement with end-to-end encryption, the usefulness

15  to law enforcement of technology, to include Pegasus, to

16  answer that challenge or to intercept or allow law enforcement

17  to gain access to end-to-end encrypted information or evidence

18  and how that would comply with current laws in the

19  United States of America.

20  Q.  And did you form opinions in response to each of those

21  issues?

22  A.  I did.

23  Q.  Are you familiar with the requirements for offering

24  opinion testimony in Federal Court?

25  A.  I am.

1   Q.  And what is the basis for that familiarity?

2   A.  I have offered expert opinion in Federal Court for the

3   last 30 years.

4   Q.  And do you believe that your training, background,

5   experience as you've described it allows you to offer opinions

6   on the three topics that you've listed for us?

7   A.  I do.

8   Q.  How many -- as a prosecutor -- as -- as a Federal

9   prosecutor, how many investigations did you supervise or lead?

10  A.  Approximately 50.

11  Q.  And which law enforcement agencies did you work with in

12  those investigations?

13  A.  Federally I worked with the Federal Bureau of

14  Investigation, the Drug Enforcement Administration, the ATF.

15  I also worked with -- at that time -- the United States

16  Customs; now it's referred to as, I believe, Homeland

17  Security.  The IRS.  Health and Human Services.  OIG.

18          I also worked closely with state and local law

19  enforcement in the state of Indiana.

20  Q.  Did the investigations that you've testified to result in

21  any criminal prosecutions?

22  A.  They did.

23  Q.  Are you able to estimate how many criminal defendants

24  you've prosecuted in your career?

25  A.  Over the 24 years Federally, approximately 500.

1    Q.  Did any of the investigations that -- that you conducted

2    or supervised involve the interception of realtime restored

3    electronic communications?

4    A.  Many of them did, yes.

5    Q.  And can you give us some examples of the types of subject

6    matters in those investigations?

7    A.  Yes.

8            Organized crime, which include drug trafficking,

9    money laundering, crimes of violence, public corruption, child

10   exploitation, and supervision of terrorism crimes.

11   Q.  Can you give us some examples of the types of

12   investigations that you either supervised or led that involved

13   the interception of either realtime or stored electronic

14   communications?

15   A.  Yes, I can.

16           Two that come to mind.

17           The first would be -- it was an OCDETF operation

18   referred to by a code name, Operation Money Clip.  That was in

19   2003 to 2005.  That investigation was a large drug trafficking

20   organization that operated in Mexico and the United States.

21   The lead target was Juan Carlos Bermudez.  At the time he was

22   referred to as a priority target.  That was a Department of

23   Justice term.

24           Bermudez was the leader of the organization that

25   moved huge quantities of -- of cocaine and marijuana from the

1    Republic of Mexico up through the United States to Chicago,

2    returned the money to the Republic of Mexico.  It was

3    significant because he was tied to -- by SOD, the Special

4    Operations Division of the Department of Justice -- to the

5    Arellano-Felix organization.  The Arellano-Felix organization

6    gained some infamy by the recent Netflix series Narco,

7    where -- Narcos -- where that was profiled.  Not the Bermudez

8    case but that.

9            So in that case, to investigate and to prosecute

10   that, it relied extensively on Title III wiretaps,

11   intercepting their phone conversations.  There were

12   approximately 12 Title III wiretaps at various times on

13   various targets that allowed us to identify the critical

14   members of the organizations, to intercept their

15   communications, to stop the flow of drugs and interdict that

16   and eventually to arrest and successfully prosecute that

17   organization.

18           So that Operation Money Clip, the Juan Carlos

19   Bermudez organization, was a significant prosecution in the

20   region.  It received an award for that.

21   Q.  Did Operation Money Clip involve the sharing of

22   intelligence by the Mexican Government with the United States

23   Government?

24   A.  It did through the Department of Justice Special

25   Operations Division and the Office of International Affairs.

1   Information was shared by United States Federal law

2   enforcement with the Republic of Mexico and by the Republic of

3   Mexico to United States law enforcement.

4          And my understanding is that the Republic of Mexico

5   was able to tap phones following Mexican law based on the

6   intelligence we shared.

7   Q.  You . . . have told us about the interception of realtime

8   communications.

9          Do you have examples in your history as a prosecutor

10  of the interception of stored electronic communications?

11  A.  I do.

12         I supervised, in 2015, an investigation and

13  prosecution of Jared Fogle.  Jared Fogle was the now-infamous

14  Subway pitchman -- pitchman who advertised extreme weight loss

15  through eating Subway sandwiches.

16         During that time he -- he also lived in Indiana.

17         During that time he operated the Jared Fogle

18  Foundation with Russell Taylor.  The Jared Fogle Foundation

19  was also a front for their exploitation of children.  They

20  traded images of children being sexually abused.

21         Fogle also traveled to engage in commercial sex acts

22  with minors.  We obtained stored electronic evidence.  He --

23  he used the internet, phones, and other communications devices

24  to facilitate these crimes.  The evidence was found on

25  computers and mobile phones.

1              And so we did use access to stored electronic

2     communications.  We obtained that evidence through search

3     warrants which were issued by Federal Judges.  The

4     communications were extremely effective in securing the guilty

5     pleas and eventual sentence of Mr. Fogle.

6              I remember one extremely troubling text message which

7     was compelling evidence that led to his conviction where, in

8     his attempt to obtain others for -- other -- younger women for

9     commercial sex acts, minors, he texted "The younger, the

10    better."

11    Q.  Did either Operation Money Clip or Jared Fogle -- the

12    Jared Fogle investigation involve the use by the -- well,

13    involve the interception of end-to-end encrypted

14    communications?

15    A.  No end-to-end encrypted communications were used by the

16    targets in those investigations, nor were they intercepted.

17    Q.  What would have been the effect on those investigations if

18    the criminals involved had been using end-to-end encrypted

19    communications?

20    A.  For Operation Money Clip, this was exclusively a Title III

21    case.  That's really what made the case, the wiretaps.

22             If the end-to-end -- if the communications had been

23    end-to-end encrypted, law enforcement could not have

24    intercepted those.  So the investigation wouldn't have taken

25    place.  Arrests wouldn't have happened, and it wouldn't have

1    been a successful prosecution.

2           The -- the images that Taylor and Fogle had were not

3    end-to-end encrypted.  Had they been end-to-end encrypted when

4    they sent them back and forth or their messages had been

5    end-to-end encrypted, law enforcement could not have obtained

6    that evidence with the search warrant, and Fogle and Taylor

7    would have escaped prosecution and still be allowed to

8    continue their criminal activity today.

9    Q.  In your experience as a Federal prosecutor, have you ever

10   worked on or supervised a matter that involved the recovery of

11   stored communications of an attorney?

12   A.  I have.

13          I've supervised an investigation during 2010 and

14   early 2011 which received some publicity.  It was an

15   investigation into the sitting Marion County prosecutor, Carl

16   Brizzi, and his chief deputy, David Wyser.

17          In that investigation we obtained their email

18   communications and text messages through the use of search

19   warrants.

20   Q.  Are there, to your knowledge, special Department of

21   Justice guidelines that relate to recovering, through the

22   methods you've testified about, attorney communications?

23   A.  Yes.

24          When -- before seeking those search warrants from the

25   Judge, we had to obtain -- because they were attorneys -- had

 1  to obtain the approval of an official at the Office of

 2  Enforcement Operations at main Justice.

 3         I believe that was also approved by an associate -- a

 4  Deputy Associate Attorney General.  That is a requirement of

 5  the Department of Justice for recovering communications

 6  involving lawyers.  The same requirements apply to

 7  journalists.

 8  Q.  Do you have, based on your background and experience that

 9  you've now told us about, an understanding of what end-to-end

10  encryption is?

11  A.  I do know what end-to-end encryption is.

12  Q.  And can you tell us what your understanding is with

13  respect to end-to-end encryption?

14  A.  Communications involving two devices which are encrypted.

15         Only individuals with the two devices know what the

16  communication are -- is -- sorry -- and it cannot be

17  intercepted or obtained by law enforcement.

18  Q.  And what, over the course of your career as a Federal

19  prosecutor, was the prevalence of end-to-end encryption as you

20  observed it in the investigations that you led and supervised?

21  A.  Well, when I started in -- in 1994 -- really, through the

22  '90s -- we were still using wiretaps for landline phones.

23         And then soon after that, mobile phones, which

24  presented, you know, an evolving challenge.  You didn't --

25  couldn't just clip the intercepts to the wires on the phone

1    lines.  You had to figure out technology to -- to go through a

2    switch because the cell phones would talk to a tower, the

3    tower would transmit the information through a switch, and so

4    we would have to get the information from a switch.  But those

5    were not end-to-end encrypted.

6         The evolution then went to smartphones.  Smartphones

7    had -- obviously, you could email in a smartphone, and then

8    the smartphones had applications on them.  That was -- when

9    I became aware of that, that was, I would say, 2018, 2019,

10   2020 period, that those applications were end-to-end encrypted

11   and law enforcement could not intercept or get end-to-end

12   encrypted information.

13        Now, 2025, the economy -- almost everybody I know has

14   an application on their mobile phone.  I have applications on

15   my mobile phone that are end-to-end encrypted.

16   Q.  And based on your experience, what messaging services use

17   end-to-end encryption?

18   A.  The . . . Facebook Messenger, FaceTime, Apple.  WhatsApp

19   and Signal.

20   Q.  And do you have experience with any of those services and

21   the adding of end-to-end encryption functionality?

22   A.  Yes.

23        In 2015 I supervised an investigation of an

24   organization that used juveniles to rob pharmacies of

25   OxyContin and opioids.  The adults used the juveniles because

1  the juveniles did not face serious punishment for armed Hobbs

2  robberies.  The juveniles would give them the pills, and the

3  adults would sell them.

4        We obtained in that investigation, through search

5  warrants, Facebook Messenger communications, which were

6  critical to identifying the adults involved in this crime and

7  prosecuting them.  That was through Facebook Messenger.

8        At the time, 2015, Facebook Messenger was not

9  end-to-end encrypted.  It is my understanding it is now

10 encrypted.

11 Q.  When dealing with a -- a target, a law enforcement target

12 that is using end-to-end encrypted messaging, is there a way,

13 in your experience, for law enforcement to turn off the

14 end-to-end encryption for a particular subject of

15 investigation or target of investigation?

16        MR. ANDRES:  Your Honor, I don't mean to interrupt,

17 but if we're going to start asking about opinions, is the

18 witness going to be qualified as an expert?  Because I'd like

19 some voir dire.

20        THE COURT:  Do you have an objection to him -- you've

21 seen his expert report; correct?

22        MR. ANDRES:  Yeah, I do have an objection.  I'd like

23 to voir dire the witness if at some point he's going to be

24 qualified as an expert.

25        And I would remind Your Honor that you've already

 1    excluded this witness from certain proceedings in the first

 2    place, so I'd like that opportunity.

 3              MR. AKROTIRIANAKIS:  Well --

 4              THE COURT:  Are you going to ask him questions about

 5    his opinion?

 6              MR. AKROTIRIANAKIS:  This question is not -- is about

 7    his experience as a prosecutor, Your Honor.

 8              THE COURT:  I know.  But just in anticipation.

 9              Are you going to ask him any opinion -- for any

10    opinion evidence?

11              MR. AKROTIRIANAKIS:  In my view of what opinion

12    evidence is, I think I would, Your Honor, at some point ask

13    him questions about his opinions.

14              THE COURT:  Okay.  Then let us know when that's going

15    to take place, if it's going to take place, and Mr. Andres

16    will be given an opportunity to voir dire.

17              MR. ANDRES:  Right.  And -- sorry.  Presumably,

18    counsel's also going to move to qualify the witness as an

19    expert.  I think at that point would be the appropriate time

20    for the voir dire.

21              So thank you, Your Honor.

22    BY MR. AKROTIRIANAKIS:

23    Q.  Do you remember my question?

24    A.  I do remember your question.

25              I believe the question was does -- does law

1  enforcement have the ability to turn off end-to-end

2  encryption.  Is that correct?

3  Q.  Based on your experience as a prosecutor.

4  A.  Based on my experience as a prosecutor, law enforcement

5  does not have that ability.

6  Q.  What effects have you observed end-to-end encryption

7  having on the ability of US law enforcement to investigate and

8  prosecute crimes?

9  A.  The impact is that law enforcement is in the dark, both

10  with crimes of terrorism and with domestic crimes, as well.

11  Because of end-to-end encryption, law enforcement no longer

12  has the ability that it had in the past, which is to intercept

13  communications between terrorists and criminals or -- yes --

14  to investigate based on those communications and to prosecute

15  based on those, and that evidence cannot be obtained with

16  valid court orders.

17          So it has had a -- a -- a severe effect on law

18  enforcement's ability to do its job.

19  Q.  And based on your experience as a prosecutor, is it -- do

20  you have knowledge whether criminals who you have investigated

21  or prosecuted are, in fact, aware that law enforcement is

22  limited and unable to access communications that are

23  end-to-end encrypted in the ways you've now described?

24          MR. ANDRES:  Objection, Your Honor.  Surely,

25  Mr. Minkler can't testify about what criminals think.

1           THE COURT:  Sustained.

2    BY MR. AKROTIRIANAKIS:

3    Q.  Have you had cases where you either interviewed

4    cooperating witnesses or took statements from defendants or

5    targets where they related to you their methods of

6    communication as they relate to end-to-end encrypted

7    communications?

8    A.  Yes, two investigations that I supervised as United States

9    Attorney between 2018 and 2020.

10          The first is the Chris Tate investigation.  He was an

11   individual who led an organization in the city of Indianapolis

12   that distributed large quantities of methamphetamine, heroin,

13   and fentanyl.  He gave directions to individuals on how to --

14   to -- to distribute that.  He also had sources of supply,

15   people that supplied him with the drugs that he could then

16   distribute.

17          He was arrested in -- in March of 2020.  Debriefings

18   as well as later testimony indicated that he was aware, as

19   were his confederates, of end-to-end encryption being a useful

20   technique to avoid law enforcement intercepting those

21   communications.

22          In that investigation we obviously did intercept some

23   communications; that's how we were able to prosecute him and

24   some of his sources of supply, so not all of them were

25   end-to-end encrypted.  However, we found out that some of them

1    were, and those individuals in Indianapolis who were supplying

2    Tate, because they used end-to-end encryption, were never

3    vetted or prosecuted.

4    Q.   You had some sources of supply who used end-to-end

5    encrypted communications and other sources of supply who used

6    unencrypted communications?

7    A.   That's correct.

8    Q.   Okay.  And which ones were prosecuted and which ones were

9    not?

10   A.   The ones who did not use end-to-end encrypted

11   communications were prosecuted based on those communications.

12           He did use end-to-end encrypted conversations, Tate

13   did, but we were able to -- his sources of supply who he

14   communicated on end-to-end encryption we did not -- we did not

15   identify and prosecute.

16   Q.   When did you first become aware of difficulties that

17   end-to-end encryption presents to law enforcement?

18   A.   I -- I became aware of it acutely during those

19   investigations in -- in 2018 and 2020, as I've just described.

20   Q.   And when -- going back to your testimony about the Tate

21   case, when a target of investigation is using end-to-end

22   encrypted communications platforms, are -- is law enforcement

23   able to obtain a search warrant or a court order or a

24   Title III order or any type of interception order that would

25   allow law enforcement, based on your experience, to receive

1   the end-to-end encrypted communications?

2   A.   Law enforcement could obtain that order.  It would not be

3   effective.

4   Q.   And why is that?

5   A.   Because there's no means currently available to law

6   enforcement where they could obtain evidence that is

7   end-to-end encrypted either through a wiretap or through a

8   search warrant.

9           MR. AKROTIRIANAKIS:  So, Your Honor, I would tender

10  Mr. Minkler as a -- based on the lengthy experience he's now

11  shared with us -- as an expert on the -- the concerns posed to

12  law enforcement by end-to-end encryption.

13          MR. ANDRES:  Objection --

14          THE COURT:  Mr. Andres.

15          MR. ANDRES:  Objection, Your Honor.  We'd ask for a

16  short voir dire.

17          THE COURT:  You may.

18          MR. ANDRES:  Okay.  Thank you.

19          Good afternoon, Mr. Minkler.

20          THE WITNESS:  Good afternoon.

21                      **VOIR DIRE EXAMINATION**

22                         **BY MR. ANDRES:**

23  Q.   Since the time of your deposition in February 2025, have

24  you done any additional work with respect to your assignment

25  as an expert witness in this case?

1  A.  I have.

2  Q.  What -- what is that extra -- what -- what additionally

3  have you done?

4  A.  I reviewed the Judge's order in this case granting summary

5  judgment.  I also reviewed a declaration of a Mr. Shohat.

6  I met with Mr. Akrotirianakis in preparation for this hearing.

7  Q.  I don't -- I don't mean to interrupt you but --

8  A.  Sure.

9  Q.  -- and you -- and you know as -- I'm not asking for

10  anything that you said or did with a lawyer or --

11  A.  Those were -- those were the two things that I did.

12  Q.  Thank you.

13  A.  Yes.

14  Q.  So you still haven't interviewed anyone at NSO; is that

15  correct?

16  A.  That is correct.

17  Q.  You still haven't operated or observed Pegasus in use?

18  A.  I have not.

19  Q.  You still haven't received or reviewed a client list

20  from NSO?

21  A.  I have not received a client list from NSO.

22  Q.  You're still not aware of any of the specific targets

23  against which Pegasus has been used?

24  A.  No, I am not aware of that.

25  Q.  And you didn't review any of the trial testimony in this

1    matter?

2    A.  I did not review the trial testimony.

3    Q.  And have you done any analysis about whether NSO's

4    activity in this case was legal?

5            MR. AKROTIRIANAKIS:  Your Honor, it's not really

6    voir dire that he's doing now.  He's doing his cross-

7    examination.  This is totally irrelevant to --

8            THE COURT:  Overruled.  Just let him get through it,

9    Counsel.

10   A.  I -- I did review the Judge's order granting summary

11   judgment.

12   BY MR. ANDRES:

13   Q.  Right.  And --

14   A.  I don't know if that's analysis, but I did review the

15   order.

16   Q.  And so you -- you understand, at least, that the Judge has

17   ruled that NSO violated State and Federal rules in this case?

18   A.  I understand that, yes.

19   Q.  With respect to end-to-end encryption, have you ever

20   taught any classes on end-to-end encryption?

21   A.  I've never taught any classes.

22   Q.  Have you ever published any scholarly articles about

23   end-to-end encryption?

24   A.  Scholarly articles?  I've never published scholarly

25   articles.

1   Q.   Have you published any articles about end-to-end

2   encryption?

3   A.   Articles, no.  I've not published articles.

4           I've -- I've written things about it.  But not

5   published articles.

6   Q.   Mr. Minkler, you're being proffered as an expert in a

7   matter relating to your experience in lawful interception,

8   surveillance of communication by Federal law enforcement

9   officers; correct?

10  A.   Yes.  That is one of the topics.

11  Q.   And by "Federal law enforcement officers," you're

12  referring to surveillance in the United States; is that

13  correct?

14  A.   Yes, although I'm also familiar with surveillance in the

15  Republic of Mexico from the -- from the Money Clip case.

16  Q.   So let's talk about that for a minute.

17  A.   Yeah.

18  Q.   The surveillance in Mexico in the money laundering case

19  was in 2004 and 2005?

20  A.   Yes, that's correct.

21  Q.   So that's 20 years old, at least?

22  A.   Yes, that's correct.  Money Clip case.

23  Q.   Money Clip.

24  A.   Yeah.

25  Q.   Are you aware that NSO has argued, as it relates to this

1   case, that there's been no use of Pegasus in the United

2   States?

3   A.  I'm not aware of that argument.

4         And I don't know if that's accurate.

5   Q.  You're aware that there hasn't been any use in an

6   investigation or prosecution by any US law enforcement

7   official in the United States by -- of Pegasus; correct?

8   A.  Yes, that's correct.

9   Q.  You're providing expert testimony about *lawful*

10  *surveillance*; correct?

11  A.  That is one of the topics, yes.

12  Q.  And based on your experience as a Federal prosecutor for

13  more than 20 years, you understand that lawful surveillance

14  requires approval by an Article III Judge?

15  A.  Yes, that's correct.

16  Q.  Are you aware, sir, of any application by NSO or any of

17  its clients ever to use Pegasus that was submitted to an

18  Article III Judge in the United States?

19  A.  I am not.

20  Q.  And, again, you understand that Judge Hamilton has ruled

21  that NSO violated both State and Federal law?

22  A.  Yes.

23  Q.  You understand that, in this case, NSO's surveillance was

24  unlawful and secured by hacking?

25  A.  I don't know.  I -- I -- I do know -- I did read Judge

 1   Hamilton's order, and I do know she found the use of Pegasus

 2   in this case exceeded the authorized use.

 3          MR. AKROTIRIANAKIS:  I'll object that counsel's

 4   question misstates the record.

 5          No -- the Court never made any rulings about the

 6   lawfulness of the surveillance.  In fact, the Court has stated

 7   out loud in this -- in this building that you didn't know

 8   whether it was lawful surveillance in other countries.

 9          MR. ANDRES:  I'll move on, Your Honor.

10          THE COURT:  Thank you.

11   BY MR. ANDRES:

12   Q.  The second opinion you give relates to the unique

13   investigative challenges of State and Federal law

14   enforcement -- is that correct? -- with regard to end-to-end

15   encryption?

16   A.  The challenges posed to Federal law enforcement by

17   end-to-end encryption, correct.

18   Q.  You understand that end-to-end encryption is legal in the

19   United States; correct?

20   A.  It is legal.

21   Q.  Congress has passed no law prohibiting social media

22   companies or any communication from using end-to-end

23   encryption; correct?

24   A.  That is correct.  I use end-to-end encryption.

25   Q.  And your opinions in this case relate to some future use

1  of Pegasus; is that correct?

2  A.  My opinion in this case, one, is the challenge, current

3  challenge, of -- that law enforcement faces with end-to-end

4  encryption and whether Pegasus could be used as a response to

5  that challenge.

6        So, yes, that is -- in answer to your question -- I'm

7  sorry.  I went -- I went around the block on that, but the

8  answer is yes.

9  Q.  Your opinion in this case has nothing to do with the

10  underlying facts in this case; correct?

11  A.  That is correct.

12        That is correct.

13  Q.  And -- and in terms of what you know about this case --

14  you've read the complaint; correct?

15  A.  Correct.

16  Q.  You've seen certain documents provided to you by NSO?

17  A.  Correct.

18  Q.  Less than a dozen?

19  A.  I would say between a dozen and 20, yes.

20  Q.  Okay.  You didn't sign the protective order, so you didn't

21  see any of the confidential information; correct?

22  A.  I just saw the documents that were provided to me by NSO,

23  correct.

24  Q.  And you've now more recently read the Judge's opinion;

25  correct?

1    A.   I have read the Judge's opinion.

2    Q.   Your third opinion relates to the use or the need for

3    national security for -- for law enforcement to use Pegasus in

4    national security and criminal investigations; is that

5    correct?

6    A.   That is correct.

7    Q.   Are you aware of any specific terrorism plot that was

8    foiled because of the use of Pegasus?

9    A.   I have -- I have run -- I have read public reporting that

10   Pegasus was used to locate hostages in Gaza taken by Hamas.

11   I don't know if that fits your definition of foiling a

12   terrorism plot.

13            In this country, if you're qualifying that way,

14   I have not.

15   Q.   You have not -- you're not aware in this country of any

16   use of Pegasus that has foiled a terrorism plot; correct?

17   A.   Correct.

18   Q.   And what you are aware of or what you've testified about

19   is based on public reporting?

20   A.   Correct.

21   Q.   Does that mean the newspaper?

22   A.   The newspaper, journals, publications, yes.

23   Q.   You don't have access to any classified information?

24   A.   Correct.  I do not have access to classified information.

25   Q.   As a Federal prosecutor for more than 20 years, did you

1   rely on press reporting to establish facts in court?

2   A.  Yes.  Sometimes I did.

3   Q.  Did you admit newspaper articles?

4   A.  Yes.  Sometimes I did.

5   Q.  You'd agree that the press doesn't always get it right?

6   A.  The press does not always get it right.

7   Q.  Are you aware of any lawful prosecution resulting from the

8   use of Pegasus in the United States?

9   A.  I am not.

10  Q.  Are you aware -- you're here speaking on behalf of law

11  enforcement; is that correct?

12  A.  I would not say that's correct, no.

13  Q.  You are testifying based on your experience as a Federal

14  prosecutor; correct?

15  A.  That is correct.

16  Q.  And you've given an opinion that law enforcement has a

17  need for Pegasus; is that correct?

18  A.  That is correct.

19  Q.  Are you aware of any Federal law enforcement agency that's

20  filed a motion or a document in this case asking the Judge not

21  to allow for an injunction?

22  A.  I am not aware of any law enforcement agency asking the

23  Judge not to grant an injunction, no.

24  Q.  Are you aware currently of any law enforcement agency in

25  the United States that -- that is in favor of the use of

1  Pegasus in the way that it was used in this case?

2  A.  I -- I know that the FBI in 2018 obtained a license for

3  Pegasus.  I'm not sure what I can infer from that.

4         But to try to directly answer your question, I do not

5  believe the FBI, based on my training and experience, would

6  support use of Pegasus in a way not authorized and approved by

7  Federal law.

8  Q.  Like had happened in this case?

9  A.  That -- that -- I've read the Judge's order.  The Judge

10  determined that there was a violation of the Computer Fraud

11  and Abuse Act.

12  Q.  So you would -- do not believe that the FBI -- and not

13  giving an opinion that the FBI or any Federal law enforcement

14  would use Pegasus the way that it was used in this case in

15  violation of State and Federal law?

16  A.  The FBI, in my opinion, would not use Pegasus in violation

17  of the Computer Fraud and Abuse Act.

18  Q.  Just a few more questions, Mr. Minkler.

19         You're not an expert on surveillance in any foreign

20  country; correct?

21  A.  No.

22  Q.  In your expert report you relied on a treatise that was

23  published in 1975; is that correct?

24  A.  That is one of the sources that I relied on, yes.

25  Q.  And it was published in 1975?

1  A.  That is correct.

2  Q.  You're . . . you're currently working as a lawyer in

3  private practice; is that correct?

4  A.  Yes, sir.

5  Q.  And you're not working in any law enforcement capacity?

6  A.  That is correct.

7  Q.  And you left your job in the Justice Department

8  approximately five years ago?

9  A.  November -- two weeks after the election, November of

10  2020.

11  Q.  So is it fair to say that the opinions that you're

12  rendering about law enforcement are at least five years old?

13  A.  I don't think that's fair.  I have read statements made by

14  law enforcement officials who I respect and admire who share

15  my concerns.  Those are recent opinions.

16       So I wouldn't think that's fair, no.

17  Q.  You, for example, looked at the testimony of Christopher

18  Wray, the former FBI director; correct?

19  A.  Christopher Wray -- comments made by Former Attorney

20  General Barr and Former Attorney General Garland, yes.

21  Q.  So with respect to Mr. Wray, I take it you didn't speak to

22  him at all and your testimony is based merely on reviewing and

23  reiterating what he said before Congress.

24  A.  That's correct, yes.

25  Q.  How about with Former Attorney General Barr?  Did you ever

1    speak to him about his concerns?

2    A.   No.

3    Q.   And how about Attorney General Mer- --

4    A.   Garland.

5    Q.   -- Garland?  Sorry.

6    A.   Yeah.

7             No, I did not.

8             MR. ANDRES:  Okay.  Your Honor, I have no further

9    questions at this time and renew our application to exclude

10   Mr. Minkler on the basis that his testimony is not tethered to

11   the facts of this case, as Your Honor held by excluding him

12   previously.

13            I'm not asking, Your Honor, to not let him finish his

14   testimony.  I realize we all don't want to come back and do

15   this.  But I object to it and we can certainly talk about that

16   later.

17            THE COURT:  Okay.

18            Response?

19            Your witness did say that he has no opinion that is

20   related to this case.

21            MR. AKROTIRIANAKIS:  I -- I didn't understand him to

22   say that he has no opinion that's re- -- that's relevant to

23   the stage of proceedings that we're at now --

24            THE COURT:  He didn't say "relevant."  He said

25   "related to the facts of this case."

1          MR. ANDRES:  Your Honor, can we -- can we not do this

2    in front of the witness so he knows what to testify about?

3          THE COURT:  It's one question, Counsel.

4          That's my question to you.  So why is he here?

5          MR. AKROTIRIANAKIS:  The issue for which he's been

6    tendered as an expert is the challenges posed to law

7    enforcement by end-to-end encryption.  That is directly

8    related to one of the factors that they need to prove, which

9    is that the injunction that they're asking the Court to impose

10   would not disserve the public interest.

11         He's testifying about things that are the public

12   interest, which is orderly law enforcement, prosecuting the --

13         THE COURT:  Okay.  Okay.  Okay.  Hold on.  Hold on.

14   Hold on.  Hold on.

15         Let's let him finish his testimony.  I'm going to

16   allow him to testify on this subject.  And let's move on.

17         But I will tell you, both of you -- well, I won't say

18   it in front of the witness.  Let's finish now.

19         Your objection is noted, Counsel.  I'm going to allow

20   him to continue on this subject.

21         MR. ANDRES:  Thank you, Your Honor.

22              **DIRECT EXAMINATION (Resumed)**

23              **BY MR. AKROTIRIANAKIS:**

24   Q.  All right.  Mr. Minkler, the challenges that you have

25   testified about with respect to the use of -- the challenges

1    to law enforcement with respect to the use of end-to-end

2    encryption by targets of criminal investigations, are -- are

3    those unique to law enforcement in the United States?

4    A.  They are not.  The same challenges would be present to law

5    enforcement outside of the United States --

6              MR. ANDRES:  Objection, Your Honor.

7    A.  (Continuing.) -- that is, end-to-end encryption.

8              MR. ANDRES:  Mr. Minkler just testified that he's not

9    an expert in foreign law.

10             THE COURT:  Sustained.

11             MR. AKROTIRIANAKIS:  Your Honor, his -- the question

12   and his answer had --

13             THE COURT:  I sustained the objection.  Please

14   move on.

15   BY MR. AKROTIRIANAKIS:

16   Q.  Mr. Minkler, you were asked a question about the United

17   States being a -- a Pegasus customer.

18             The -- are you aware that the CFAA has an exception

19   that would apply to the use of Pegasus by the FBI or other law

20   enforcement agencies in the United States?

21   A.  Yes.  If a valid court order was obtained allowing law

22   enforcement to install Pegasus and intercept communications,

23   that would be an exception to the Computer Fraud and Abuse

24   Act.

25   Q.  And, by way of reference to Former FBI Director Chris

1  Wray's testimony about the United States' purchase of a

2  license for Pegasus, are you also aware that -- that the FBI

3  has purchased Pegasus for use by other countries?

4  A.  I am aware of that.

5  Q.  You testified about your review in connection with your

6  work in this case of statements by Attorney General Merrick

7  Garland, Attorney General Bill Barr.

8        Could you summarize the -- the statements that you're

9  aware of by those two deputy -- those two attorneys general?

10 A.  Both former attorneys general testified about their

11 growing concern with end-to-end encryption.  Attorney General

12 Barr, I believe, said it was dangerous and unacceptable.  And

13 Attorney General Garland characterized it as a -- I believe --

14 a growing and evolving concern of his, end-to-end encryption.

15 Q.  And are you aware of statements that Former FBI Director

16 Wray had made about the use of end-to-end encryption and the

17 challenges it poses apart from his Senate testimony?

18 A.  Yes.  He's spoken many times on the issue.  Certainly,

19 most recently, I think, after the attempted -- assassination

20 attempt this summer about the assassin's devices were

21 encrypted and they could not recover information.

22        And that, he did say, was -- continued to be a

23 growing challenge, that individuals use encrypted devices and

24 law enforcement cannot get access to that information.

25 Q.  Have you reviewed statements -- the statements of

1    President Barack Obama relative to the -- the . . . the

2    concerns posed to law enforcement and the interests of the

3    United States by the use of end-to-end encryption?

4    A.  I have.

5    Q.  And could you turn in the notebook before you to

6    Exhibit 1093, please?

7    A.  I've done that.

8    Q.  And is this one of the -- the statements of President

9    Obama that you've reviewed in connection with your work in the

10   case?

11   A.  Yes.  This is a statement released by the White House

12   in -- this is a . . . transcript released by the White House

13   of remarks made by President Obama in March of 2016.

14   Q.  And have you reviewed this in preparing to testify today?

15   A.  I have.

16   Q.  Okay.  Would you please page into the document to the

17   14th page.

18   A.  Mine doesn't have pages.

19   Q.  Yeah.  It's the 14th page in.  The President's remarks

20   begin at the bottom of the page with the statement "And the

21   question we now have to ask is."

22   A.  Yes.  I see it.

23   Q.  Okay.  The President's remark -- I'll just read it -- is

24   "And the question we now have to ask is, if technologically it

25   is possible to make an impenetrable device or system where the

1    encryption is so strong that there's no key, there's no door

2    at all, then how do we apprehend the child pornographer?  How

3    do we solve or disrupt a terrorist plot?  What mechanisms do

4    we have available to even do simple things like tax

5    enforcement?  Because if, in fact, you can't crack that all --

6    that at all, Government can't get in, then everyone --

7    everybody is walking around with a Swiss bank account in their

8    pocket -- right?  So there has to be some concession to the

9    need to be able to get into that information somehow."

10          And then on the 15th page he continues, in the third

11    paragraph, "And I've got a bunch of smart people sitting here,

12    talking about it, thinking about it.  We have engaged the tech

13    community aggressively to help solve this problem.  My

14    conclusion so far is that you cannot take an absolutist view

15    on this.  So if your argument is strong encryption, no matter

16    what, and we can and should, in fact, create black boxes, then

17    that, I think, does not strike the kind of balance that we

18    have lived with for 200, 300 years.  And it's fetishizing our

19    phones above every other value.  And that can't be the right

20    answer."

21          Do you see that, Mr. Minkler?

22    A.  I do.

23    Q.  And was that part of the President's statement that you

24    relied on in your -- forming your opinions in this case?

25    A.  It is.

1  Q.  And if companies like WhatsApp and Meta continue to design

2  warrant-proof communications platforms, do you have an opinion

3  as to what the -- what -- what solution is required in order

4  to continue prosecuting people like the ones that you

5  testified you prosecuted who didn't use end-to-end encrypted

6  communications platforms?

7        MR. ANDRES:  Your Honor, excuse me.  Apologies.

8        Are these documents being admitted?

9        THE COURT:  They have not been moved into evidence as

10  of yet.

11        MR. ANDRES:  I don't have any objection to them being

12  moved into evidence.  I'd just like to have them marked in

13  some fashion so I can use them on my cross-examination.

14        THE COURT:  Mr. Akrotirianakis?

15        MR. AKROTIRIANAKIS:  The document I think

16  I identified as Exhibit 1093.

17        THE COURT:  Are you going to move that into evidence?

18        MR. AKROTIRIANAKIS:  Well, now that counsel has

19  stated he doesn't have an objection to it, I'd be happy to,

20  Your Honor.

21        The defendants offer Exhibit 1093.

22        THE COURT:  Do we have an adequate description of

23  what it is?

24        MR. AKROTIRIANAKIS:  The witness identified it as a

25  transcript published by the White House Office of the Press

1    Secretary of President Obama's remarks at South By Southwest

2    Interactive, which is -- I can tell the Court -- is a

3    conference.

4         THE COURT:  I'll allow it in.

5     (Defense Exhibit 1093 received into evidence.)

6         THE COURT:  But, frankly, I don't -- it's not going

7    to have any impact on any decision I make.

8         I -- I don't quite understand what you all are doing

9    here today.  But we'll talk about it later.

10         Let's just finish with the witness, please.

11   BY MR. AKROTIRIANAKIS:

12   Q.  Mr. Minkler, do you have an opinion whether law

13   enforcement needs to have some access to either decryption or

14   interception technologies in order to successfully investigate

15   and prosecute crimes like those that you've described?

16   A.  Yes, I do have an opinion.

17         Law enforcement needs technology.  It -- it is in law

18   enforcement's interests and the public interest to have

19   technology which allows them to intercept end-to-end encrypted

20   communications.

21   Q.  And you testified that you reviewed the -- the declaration

22   of -- counsel asked you if you'd done other work since your

23   deposition in this case, and you said that one of the things

24   that you reviewed was the declaration of Yaron Shohat.

25   A.  I did review the declaration of Mr. Shohat.

1  Q.  Okay.  Did that include a product description guide that

2  detailed the capabilities of Pegasus technology?

3  A.  It did.  And I had previously reviewed the product

4  description guide.

5  Q.  As it relates to end-to-end encryption, how would the

6  product description that you reviewed address the problems

7  described by President Obama and the attorneys general that

8  you testified about?

9  A.  Pegasus, as I understand the product through the product

10  description, would allow law enforcement to intercept

11  end-to-end encrypted communications.  That would be phone

12  calls, text messages, emails.  It would also allow law

13  enforcement to obtain precision location information.  It

14  would also allow law enforcement to obtain stored electronic

15  communications, contacts, calendars.

16          Again, this is information that, when it was not

17  end-to-end encrypted, I did obtain many times in

18  investigations.  It cannot be obtained now.  And Pegasus would

19  allow law enforcement to obtain that information, as

20  I understand the product description, which is, in my opinion,

21  in the best interests of law enforcement.

22  Q.  Having those tools available would be beneficial, in your

23  opinion?

24  A.  Very beneficial.  Currently, law enforcement is in the

25  dark.  They can't obtain that information if it's end-to-end

1    encrypted.  They -- they always used to be able to obtain that

2    information through lawful court orders.  Now it's end-to-end

3    encrypted.  They cannot.

4            And the product, as I understand it described,

5    Pegasus, would allow them to do that.

6    Q.  Based on your review of the product description, is there

7    any feature of Pegasus technology that allows a -- a

8    Government user of Pegasus to obtain something that, prior to

9    the proliferation of end-to-end encrypted communications, law

10   enforcement was unable to obtain either with a search warrant

11   or a -- a subpoena or a Title III order or some other form of

12   legal process?

13   A.  No.  No.  They -- with Pegasus they would obtain the same

14   information that they always have in the past.  Pegasus is

15   just an evolving tool which allows them to continue to obtain

16   the evidence they always have.

17           They can't do it now because it's end-to-end

18   encrypted.  And Pegasus would allow them to respond to that

19   and -- and obtain that evidence.

20   Q.  And based on your study relative to this case, have you

21   found examples of Pegasus having been deployed beneficially to

22   law enforcement?

23   A.  My understanding is that it has been deployed in other

24   countries beneficially.

25           MR. ANDRES:  Objection; lacks foundation for the

 1  basis of that knowledge.

 2          THE COURT:  Overruled.  I'll allow it.

 3  A.  (Continuing.)  I've reviewed, again, public reporting,

 4  which describes law enforcement's use of Pegasus by our allies

 5  in Spain, in Belgium, in Poland, and in the Republic of

 6  Mexico.  It's been public reported -- publicly reported --

 7  that, among other techniques used to locate Joaquin "El Chapo"

 8  Guzmán, a device capable of locating someone using end-to-end

 9  encryption was used.

10  BY MR. AKROTIRIANAKIS:

11  Q.  And Mr. Guzmán -- are you familiar with his story, if you

12  will?

13  A.  I am.

14  Q.  Okay.  And who -- just very briefly -- was Joaquin Guzmán?

15  A.  He was identified by the United States as Public Enemy

16  No. 1.  He was the largest drug trafficker that ever supplied

17  narcotics to the United States, responsible for the deaths

18  of -- of many.

19          Eventually arrested on the United States indictments

20  and prosecuted in the Eastern District of New York.

21  Q.  Where was he arrested, to your knowledge?

22  A.  In Mexico.

23  Q.  Did that involve the use of Pegasus, based on the public

24  reporting you've reviewed?

25  A.  Based on the public reporting I've reviewed.

1  Q.  Again, where was he prosecuted?

2  A.  In -- in the Eastern District of New York in Brooklyn.

3  Q.  And -- and is presently incarcerated in the United States,

4  serving a life sentence?

5  A.  That is correct.

6  Q.  You mentioned intelligence sharing.  In your experience in

7  Operation Money Clip between Mexico and the United States,

8  based on -- on your experience, do any of the other countries

9  you've mentioned, as publicly reported to be Pegasus

10  customers, share intelligence with the United States?

11  A.  Yes.  In my experience, all those countries do share

12  intelligence with the United States.  I've personally been

13  involved in -- when I was with the Department of Justice -- in

14  sharing intelligence and evidence with other countries through

15  the Office of International Affairs in mutual legal assistance

16  treaties.

17  Q.  And so we share information.

18        Do we also receive incoming intelligence information

19  from those countries?

20  A.  Yes, that's correct.  Through the same process.

21  Q.  Are you aware of public reporting that -- regarding

22  alleged misuses of Pegasus?

23  A.  I am.

24  Q.  And do those reports change your -- the opinions that

25  you've expressed today?

1   A.   They do not.

2   Q.   And why is that?

3   A.   Two reasons.  The first is my opinion would allow the use

4   of Pegasus for law enforcement's benefits only pursuant to a

5   court order, either a FISA court order, a warrant under the

6   Fourth Amendment, or a wiretap.  So it would not allow for the

7   human rights or abuses that I have read about.

8           Secondly, I've reviewed information about the

9   exportation or how Pegasus is exported.  That is controlled by

10  the Ministry of Defense in Israel.  They would have to approve

11  anytime NSO exports Pegasus to another Government agency for

12  use in law enforcement.  And so, essentially, a Government

13  agency has to approve the export of this technology.

14          Also, internally at NSO, I'm aware that they have a

15  compliance program which on the front end requires due

16  diligence to make sure the Government agencies who are seeking

17  to purchase the license will not misuse it.

18          I've seen a contract.  That contract has language in

19  it which requires assurances from the end user, the Government

20  agency, that it would be used for law enforcement purposes and

21  not used for abuses.

22          And then I'm aware on the back end that NSO has a

23  program of conducting internal investigations.  So if there

24  are complaints made of misuse, such as illustrated in the

25  public reporting, NSO has a program where they could

1   investigate that, make a determination, and, if found,

2   terminate the agreement of the end user.  According to

3   Mr. Shohat's declaration, which I reviewed, that's -- that

4   has, in fact, happened approximately 16 times.

5   Q.  In spite of all of the guardrails or limitations against

6   the potential misuse of Pegasus, do you have a view whether

7   any tool or technology has the potential for misuse?

8   A.  Any tool or technology has the potential and has a risk of

9   misuse.

10          The current wiretapping capabilities that law

11  enforcement has obviously could be misused for civil rights

12  abuses.  There's -- it's happened in this country.  In the

13  '60s and '70s that did happen.  So there is a potential for

14  abuse for any -- any type of technology.

15          One of the jobs that prosecutors and Judges and we as

16  a society and law enforcement try to do is put up these

17  guardrails to protect that, and I'm thinking that could happen

18  here in this case.

19  Q.  Mr. Minkler, do you have an opinion -- based on your

20  familiarity with the limitations on the use of realtime

21  interception technology and the other law enforcement tools

22  that you've testified about today, do you have an opinion

23  whether Pegasus could be used pursuant to a Title III

24  intercept order or some -- depending on the feature -- some of

25  the other law enforcement processes that you've testified

1    about?

2    A.   Pegasus could be used legally with a proper wiretap order

3    obtained through 18 United States Code, 25 -- 2510, through a

4    FISA warrant or through a search warrant to obtain stored

5    electronic communication.  It could be used legally.

6            MR. AKROTIRIANAKIS:  No further questions, Your

7    Honor.

8            THE COURT:  Cross?

9            MR. ANDRES:  Thank you, Your Honor.

10                      **CROSS-EXAMINATION**

11                      **BY MR. ANDRES:**

12   Q.   Thanks, Mr. Minkler.

13           Do you still have that document, President Obama's

14   speech, in front of you?

15   A.   I do.

16   Q.   Can you point the Court to the part of President Obama's

17   speech which advocates for warrantless surveillance?

18   A.   There is no point in that speech where President Obama

19   advocates for warrantless surveillance.

20   Q.   So that's not applicable to the facts of this case where

21   there was a hack to secure surveillance?

22           MR. AKROTIRIANAKIS:  Objection, Your Honor.  That

23   misstates all of the evidence in this case.  There's never

24   been an allegation even that the surveillance of -- of

25   criminals was done warrantlessly.

1          This case is about the use of -- in historical

2    examples and versions of Pegasus -- of WhatsApp servers for a

3    particular part of the installation layer, not the ultimate

4    recovery of evidence from targets of investigation.

5          There's no evidence in either direction about whether

6    there were warrants or weren't warrants.  The only evidence is

7    that NSO's contracts, in fact, require warrants and require

8    whatever legal processes its clients are supposed to be

9    getting in the countries they're deploying the technology.

10          MR. ANDRES:  There's no evidence because NSO didn't

11    produce it.

12          THE COURT:  You -- there's no evidence that there was

13    a warrant obtained in the case that I tried.  By anybody.

14    Period.

15          So it's a fair question.  You may answer.

16    A.  So under the facts of this case, as I understand them, a

17    warrant was not obtained.

18    BY MR. ANDRES:

19    Q.  And so President --

20    A.  And -- and -- and, to be clear, in my opinion I am not

21    advocating for a warrantless interception of communications.

22    Q.  Which is why your opinion is not relevant to the facts of

23    this case; correct?

24    A.  Well, "relevant" is a -- I'm not sure it's the witness'

25    job to -- to weigh that.  I would proffer, as a witness, that

1   my understanding is one of the factors is whether there is a

2   public benefit to the use of Pegasus.

3          In my opinion, there is a public benefit to law

4   enforcement for the use of Pegasus.  And, because of that,

5   there is a public benefit.

6          If that is a fact in this case that the Judge

7   determines is relevant, I do have an opinion on that, yes.

8   Q.   The lawful use of Pegasus?

9   A.   Correct.

10  Q.   Mr. Minkler, as you sit here today, what evidence do you

11  have that NSO or its clients used Pegasus for law enforcement

12  purposes?

13  A.   In this country?

14  Q.   Anywhere.

15  A.   The -- the information that -- that I have is publicly

16  reported information that I have reviewed.

17  Q.   So you have no personal knowledge that anyone at NSO or

18  any of its clients have ever used Pegasus for terrorism or

19  child pornography or any other use other than what you read in

20  the newspaper?

21  A.   I think your statement is -- other than what I read in the

22  newspaper -- is being used for dramatic effect.  But I do

23  understand why you're asking the question that way.

24         The information that I have about the use of Pegasus

25  in other countries for law enforcement purposes is based on

1    publicly available reading material that I have reviewed.

2    Q.  Yeah.  So, Mr. Minkler, we're trying to get to lunch, so

3    let's avoid the commentary on the questions.  Let me ask you

4    this one.  Yes or no.

5         The information that you have that Pegasus was used

6    for law enforcement is based on publicly available sources?

7    A.  Yes.

8    Q.  You testified that you prosecuted people who engaged in --

9    in -- in encrypted messaging; isn't that correct?

10   A.  Yes.

11   Q.  So, at least in some instances, you were able to

12   successfully prosecute people notwithstanding the fact that

13   they sent messages in an encrypted fashion?  Yes or no.

14   A.  Yes, we were able to use -- we were able to prosecute

15   individuals who also used encrypted messaging.

16   Q.  And you testified that one of the targets -- I think it

17   was the Subway fellow -- that, had you not been able to

18   intercept his messages, he would have gone free.

19         Is that your testimony?

20   A.  Had we not obtained his stored electronic evidence, he

21   would not have been able to be prosecuted.

22   Q.  You're not representing to this Court that Federal

23   prosecutors don't have other means to investigate criminal

24   defendants, are you?

25   A.  No.  There's -- there's lots of other means.  Some are

1    more successful than others.

2    Q.   Search warrants?

3    A.   A search warrant was used in that case.

4    Q.   Pen registers?

5    A.   Yes.

6    Q.   The grand jury?

7    A.   Yes.

8    Q.   Cooperating witnesses?

9    A.   Yes.

10   Q.   In fact, in order to get a wiretap, isn't it true that a

11   Federal prosecutor has to exhaust all other mechanisms before

12   he can make an application to the Court?

13   A.   Necessity is required prior to obtaining a wiretap in the

14   application.

15   Q.   Mr. Minkler, you have no technical understanding of how

16   Pegasus is used in terms of its installation vectors or other

17   computer code; is that correct?

18   A.   Could you clarify "technical understanding"?

19        I have a very high-level understanding from reading

20   the -- the product manual, how it works.  But in terms of

21   training or experience in computer code, no, I don't.

22   Q.   I think you mentioned this before.  But, just for the

23   record, you're not aware of a single law enforcement agency

24   ever using Pegasus lawfully in the United States?

25   A.   That is correct.

1   Q.  You're not aware of a single Federal Judge in the

2   United States who's approved the use of Pegasus; is that

3   correct?

4   A.  That is correct.

5   Q.  And you're not aware of a single instance of the lawful

6   use of Pegasus outside the United States?

7   A.  Other than from reading publicly available information, as

8   we've discussed earlier.

9   Q.  That publicly available information suggested that the use

10  was lawful?

11  A.  I believe so, yes.

12  Q.  That's based on newspapers?

13  A.  Publicly available materials, yes.

14  Q.  You testified earlier that you're not aware of NSO's

15  client list; is that correct?

16  A.  That is correct.

17  Q.  And you didn't speak to any of their customers?

18  A.  I did not.

19  Q.  You agreed during your deposition that the identity of

20  NSO's customers are relevant to determining whether the use of

21  Pegasus is lawful; correct?

22  A.  That is correct.

23  Q.  You testified that it would -- you'd have a different

24  conclusion, for example, if the client of NSO was Iran -- or

25  Iran -- versus Spain; correct?

1    A.   That is correct.

2    Q.   And, as you sit here today, you don't know who any of

3    those clients are?

4    A.   I know one client -- I saw the end use document for one

5    client in 2018.

6    Q.   What client is that?

7    A.   The FBI.

8    Q.   And -- and that was a -- a -- you understand, also, in

9    your report and your review, that the FBI never used Pegasus;

10   isn't that right?

11   A.   That is right.

12   Q.   You're not an expert in FISA; is that correct?

13   A.   I'm not being offered as an expert in FISA -- maybe I can

14   expand here.

15        I -- I can't read the statute word for word --

16   I can't tell you what the statute says word for word.  I will

17   tell you that I did use information obtained through FISA

18   warrants legally, so I do have some understanding greater than

19   a layperson of how FISA evidence is obtained and used.

20   Q.   You had two cases in which FISA warrants were used;

21   correct?

22   A.   Yes.

23   Q.   But you didn't apply for those warrants?  You're not an

24   expert on the FISA law?

25   A.   The -- the Federal prosecutor is not the one applying for

1  a FISA warrant.  The agent does that.

2  Q.  So that would be no?

3  A.  I did not apply for the FISA warrant.  I used the evidence

4  from the FISA warrant.

5  Q.  You're aware of the use of Pegasus for various abuses;

6  correct?

7  A.  I'm aware -- again, from reading newspapers -- of the

8  publicly reporting of abuses of Pegasus.

9  Q.  All right.  The same basis for your testimony that it was

10  used lawfully also provided information it was used

11  unlawfully?

12  A.  Yes, that's correct.

13  Q.  That's the New York Times article entitled "The Battle for

14  the World's Most Powerful Cyberweapon"; correct?

15  A.  I did read that article, yes.

16  Q.  And you're aware that in that article it talks about

17  abuses in Mexico; correct?

18  A.  Yes.

19  Q.  And abuses in the United Arab Emirates?

20  A.  It does discuss those.

21  Q.  And abuses in Saudi Arabia?

22  A.  Yes.

23       MR. ANDRES:  I'm trying to get to the end here,

24  Your Honor.  Apologies.

25  ///

1    BY MR. ANDRES:

2    Q.  You're aware that -- that Pegasus was used against the

3    lawyers of the ex-wife Princess Haya; is that correct?

4    A.  I'm aware of that allegation being made.  I'm not sure if

5    it's accurate.

6    Q.  Are you aware that Mr. Shohat admitted in his deposition

7    that Pegasus was used against Princess Haya's lawyers?

8    A.  I did not review Mr. Shohat's deposition.

9    Q.  Do you understand that in 2021 the United States Commerce

10   Department added NSO to a list of entities blocked from doing

11   business from American companies?

12   A.  I understand that NSO is on the banned entity list, yes.

13   Q.  You're aware that NSO was added to the list engaging in

14   activities that are contrary to the national security or

15   foreign policy interests of the United States?

16   A.  I'm aware that they are added to the banned entity list by

17   the Department of Commerce.  I'm not aware of the reasons for

18   that, for them being added.

19   Q.  Mr. Minkler, your opinion that Pegasus could be used

20   lawfully at some future point, does that take into the

21   consideration that the United States Commerce Department has

22   banned the use of Pegasus in the United States?

23        MR. AKROTIRIANAKIS:  That's a misstatement of the

24   order, Your Honor.  It has nothing to do with the use in the

25   United States.  And if counsel believes it does, he should

1    show it to you.

2              THE COURT:  Overruled.

3    A.  Some -- my understanding of the banned entity list --

4    I don't want to go down too far a rabbit hole here -- is it --

5    is it prohibits the exportation by United States companies of

6    materials, exporting them outside of the United States.  It

7    does not prevent Government agencies in the United States from

8    using NSO or Pegasus.  That's my understanding.

9    BY MR. ANDRES:

10   Q.  Is it irrelevant to your analysis that the United States

11   Government has banned or put on the black list NSO?

12   A.  It -- it is relevant.

13             But that -- I just wanted to clarify my understanding

14   of -- of what the banned entity list is.

15   Q.  During your testimony, during your deposition, you

16   testified that you have no opinion on whether or not there's a

17   risk that others use Pegasus inconsistently.

18             Do you remember that?

19   A.  Would you run that by me again.  I could -- I might have

20   said that, but I don't understand what I meant by it or what

21   you meant by the question, Counsel.

22   Q.  Sure.

23             During your deposition you were asked "You have no

24   opinion with respect to the risk of future harm posed by NSO's

25   spyware; correct?"

1           And your answer, it was "It's my opinion that Pegasus

2   could be used by law enforcement if authorized by a Federal

3   Judge.  I have no opinion on whether or not there's a risk

4   that others would use it inconsistent with my opinion, end

5   users."

6   A.   That is correct.

7   Q.   You've testified about end-to-end encryption; is that

8   correct?

9   A.   Yes.

10  Q.   Do you know if any of the surveillance that occurred in

11  this case was done because of end-to-end encryption?

12  A.   Direct evidence, no.  I'm inferring it was used because of

13  end-to-end encryption.

14          But that's an inference, not anything that I could

15  point to in the Judge's order or the complaint, both of which

16  I've reviewed.

17  Q.   And, just to be clear, you're not suggesting that Federal

18  prosecutors resort to self-help tools like Pegasus to

19  illegally obtain evidence; correct?

20  A.   That is correct.

21  Q.   You were asked questions about the El Chapo case; is that

22  correct?

23  A.   I was.

24  Q.   That's not a case that you were involved in as a Federal

25  prosecutor; is that correct?

1  A.  I was not.

2  Q.  That was prosecuted in the -- in the US Attorney's Office

3  in the Eastern District of New York?

4  A.  That is correct.

5  Q.  And you served in the Southern District of Indiana?

6  A.  That's correct.

7  Q.  And other than what you read in the newspaper, you have no

8  information about the evidence in that case; is that correct?

9  A.  That is correct.

10 Q.  NSO has asserted in its briefs that Governments need

11 Pegasus and similar technologies because WhatsApp's end-to-end

12 encryption is commonly abused by heinous criminals.

13        You understand -- you've testified, in fact -- that

14 end-to-end encryption is legal; correct?

15 A.  End-to-end encryption is legal.

16 Q.  And you're not aware of any Government agency supporting

17 in this case NSO's assertion that Governments need Pegasus?

18 A.  I am not aware of a Government official stating

19 Governments need Pegasus, the word "Pegasus."

20        To qualify that, I am aware and I previously

21 testified that Government officials have said they do need

22 technology which allows them to legally intercept end-to-end

23 encrypted communications.

24 Q.  My question was, are you aware of any Government officials

25 that have intervened in this case to make that argument for

1  wireless surveillance?

2  A.  I'm sorry.  I didn't understand the question.

3          No, I'm not.

4  Q.  And you testified earlier about what you did in terms of

5  the facts of this case.

6          The truth of the matter is your opinions about the

7  future use of Pegasus being used lawfully have nothing to do

8  with the facts of this case?  Yes or no.

9  A.  Again, I -- I have to disagree with that statement.

10  Eventually, this determination will be made by others.

11          But, as a witness, I believe it is relevant that the

12  tool Pegasus, if used lawfully, would benefit law enforcement,

13  and that is in the public benefit, if that is a -- a fact that

14  is in dispute in this case.

15  Q.  So please explain which facts in this case support that

16  opinion.

17  A.  My understanding in this case, it is a dispute whether the

18  use of Pegasus would be in the benefit of law enforcement or

19  the public benefit.  That is -- my understanding, that's one

20  of the factors to determine whether or not a preliminary

21  injunction should be granted.  So that fact, I believe, is in

22  dispute.

23          My opinion, if that fact is in dispute, is that it

24  would be a benefit to law enforcement to have a tool such as

25  Pegasus, and that would benefit the public.

1  Q.  You would agree with me that it is not in dispute and

2  Judge Hamilton has ruled that NSO violated State and Federal

3  statutes in this case?

4  A.  That is not in dispute.

5         MR. ANDRES:  Just one minute, Your Honor.

6      (Discussion held at counsel table.)

7         MR. ANDRES:  I have -- sorry.

8      I have no further questions.  Thank you, Mr. Minkler.

9         THE WITNESS:  Yes.

10        MR. ANDRES:  I have no further questions, Your Honor.

11 Thank you.

12        THE COURT:  Anything else, Counsel, before we take a

13 break?

14        MR. AKROTIRIANAKIS:  Just one question, Your Honor.

15                    **REDIRECT EXAMINATION**

16                    **BY MR. AKROTIRIANAKIS:**

17 Q.  Mr. Minkler, you were asked about search warrants, pen

18 registers, grand jury subpoenas, cooperating witnesses, and

19 Title III intercept orders.

20        Are you aware whether any of those things, without a

21 tool like Pegasus or something that accomplishes the same

22 thing it does, can obtain for law enforcement end-to-end

23 encrypted communications?

24 A.  None of those tools would obtain end-to-end encrypted

25 communications.

1              MR. AKROTIRIANAKIS:   Thank you, Your Honor.

2              THE COURT:  Anything else, Mr. Andres?

3              MR. ANDRES:  No, Your Honor.  Thank you.

4              THE COURT:  Thank you, Mr. Minkler.  You can step

5    down.

6              THE WITNESS:  All right, Judge.

7              THE COURT:  All right.  We're going to break.

8              Be back here at 1:45 for arguments on both motions.

9         (A recess was taken from 1:00 p.m. to 1:46 p.m.)

10             THE COURTROOM DEPUTY:  Remain seated and come to

11   order.

12             The US District Court is back in session.

13             THE COURT:  Okay.  I would like to hear arguments

14   from you all on both motions, but perhaps it might be more

15   efficient to talk about the scope of the evidence that

16   I'm going to consider, including this morning.

17             The defense has raised the whole issue of not only do

18   they want to take the posthearing deposition that I suggested

19   in my order; they want extensive discovery.

20             Mr. Andres indicated, "Well, if they're going to get

21   discovery, we should get additional discovery, as well."

22             I mean, otherwise -- and -- and I agree with that.

23   I mean, if I'm opening up discovery, I'm opening it up to both

24   sides.  Defendants can't simply submit an affidavit and avoid

25   discovery whereas you all bring in live witnesses and have to

1    give discovery.

2          I'll tell you I'm not interested in more discovery

3    battles; I'm not interested in leaving the case open for this

4    purpose.  And -- and I do think it could be fairly extensive,

5    which seems very odd after trial in the case, given the amount

6    of time that's transpired.

7          I'll just tell you I'm -- I was a little surprised at

8    what occurred over the last couple of hours here.

9          First of all, the defense argued strenuously for

10   this, an evidentiary hearing with witnesses.  Plaintiffs, as

11   you mentioned in your opening statement, were able then --

12   and -- and even as late as today -- to submit on the materials

13   that have already been submitted.

14         The defense wanted it, but, yet, I didn't really --

15   I haven't heard anything today -- there's only a couple of

16   things that I wasn't familiar with, and I don't know that any

17   of it's material to the decision that I have to make.

18         The -- most of the factual matters that have been

19   brought forth today are matters about which I read over and

20   over about in this case.  There's really nothing new, nothing

21   that's materially new.  That will affect the outcome of the

22   case.

23         I'm not inclined to go any further beyond this

24   hearing.

25         But if I am to consider, obviously, any new

1   information from your witnesses -- and I have already

2   indicated they can take discovery, and then I'd have to open

3   it up for you all, as well.  I just pulled the affidavits

4   again, and there is information in the affidavits to discovery

5   on, assuming that you haven't already received it.

6         My inclination is to simply ignore everything that

7   was said in this hearing -- I don't think I've heard anything

8   that is essential for me to make a decision on the two motions

9   that are pending -- rather than to reopen everything.

10         That's where I'm going.  So --

11         MR. PEREZ-MARQUES:  Your Honor, as I said before, you

12   know, our position was and remains that an evidentiary hearing

13   on this motion was not necessary.  And we very much agree that

14   this proceeding with respect to the injunction should end

15   today, including for the reasons that Your Honor just

16   mentioned.

17         If they want to take deposition discovery -- that

18   they could have taken before -- from these witnesses about

19   what they believe -- what they understand based on their

20   investigation to be NSO's current activities, then we're going

21   to need to explore what their declarants have said about NSO's

22   current activities, and we're going to end up where we were in

23   2023, with them saying "We can't tell you.  We're not at

24   liberty to share that information."

25         And it's a complete sideshow because the legal

 1   standard, Your Honor, is not whether, on the day of the

 2   argument, they are presently engaged in precisely the same

 3   conduct.  The standard is whether there is a risk of future

 4   harm, and that risk of future harm is amply evidenced by the

 5   evidence that's already before the Court.

 6        So there's absolutely no need for a sideshow and

 7   another phase of discovery about what our witnesses believe

 8   NSO is doing today, what they say NSO is doing today.  That's

 9   not the standard.

10        The evidence already before the Court with respect to

11   the past violations, the recurrence, the repeated nature, the

12   recidivist nature, that demonstrates the risk of future harm.

13        THE COURT:  Well, that's your argument; right?

14        MR. PEREZ-MARQUES:  Yes, Your Honor.

15        THE COURT:  I'm not saying that I agree or disagree

16   with that argument.

17        But I'm only saying that I am more inclined to simply

18   ignore the evidence put on today as being relatively

19   cumulative of -- of other evidence and to simply decide on the

20   basis of the papers that were filed prior to this motion.

21        MR. PEREZ-MARQUES:  We have no objection to that,

22   Your Honor.

23        THE COURT:  Okay.  That would mean, though, that

24   their affidavit -- you didn't submit any objections to their

25   affidavit.

1          MR. PEREZ-MARQUES:  We did not submit written

2     objections to their affidavits.

3          THE COURT:  All right.

4          And so my question is, given what has transpired, are

5     you willing to allow me to consider those affidavits --

6     I've already read them so -- I've already read the affidavits.

7          MR. PEREZ-MARQUES:  Well, Your Honor, we -- we do

8     think they should be struck.  We have not filed that motion.

9          But, as Your Honor has recognized, they've come in

10    and they've put forth declarations saying "Here's what we're

11    doing today; here's what we're not doing today."

12         On that issue it's a question that I asked

13    Mr. Gazneli in his deposition, and he was not willing to

14    answer the question when it came from me.  And then they show

15    up with a declaration, not bringing him live, no --

16         THE COURT:  Largely because I set the temporal scope

17    of discovery to be much shorter, so they weren't required to

18    give you -- to give additional information.

19         But you would be entitled to depose him on this

20    additional -- on additional -- additional activity if -- if

21    I am going to consider their affidavit evidence, as well.

22         MR. PEREZ-MARQUES:  Yes.

23         Your Honor, we think the affidavits should be

24    disregarded, given that we haven't had an opportunity to look

25    behind them.

1          THE COURT:  Hm-m.

2          MR. AKROTIRIANAKIS:  There's no legal bases to do

3    that, Your Honor.  We followed Rule 7-5, filed affidavits in

4    opposition to the motion.  That's exactly what the rules

5    require.  If they wanted to --

6          THE COURT:  I don't generally have affidavits and

7    testimony.

8          So I thought, when you filed yours, it's because you

9    didn't need testimony.  But then you did insist on having

10   testimony, as well.  Typically motions for the injunctions are

11   decided on the basis of affidavits and not live testimony.

12   But you wanted a hearing.

13         MR. AKROTIRIANAKIS:  I wanted to put on Mr. Minkler's

14   testimony and have him available to the Court if you had

15   questions about it.

16         I am happy to rely on the affidavits that we filed

17   with respect to the other witnesses, none of whom were put on

18   their witness list for this proceeding.  They have the

19   ability, if they wanted to, to have asked that those witnesses

20   be brought here.  There is some process we would probably have

21   to go through with that, getting a license from the Ministry

22   of Defense and so on and so forth.

23         But there's no -- if I'm hearing a motion -- an oral

24   motion to strike the declarations that are appended to our

25   opposition -- there's no legal basis for that at all.

1              THE COURT:  Uh-huh.

2              MR. AKROTIRIANAKIS:  It's entirely proper what we

3      did, Your Honor.

4              THE COURT:  Uh-huh.

5              Well, I'm -- I don't . . . I'm not going to make my

6      decision based solely upon whether or not there's a legal

7      basis.  I have some discretion in determining the body of

8      evidence that I'm going to consider on this motion, and I'm

9      just trying to strike a balance here.

10             I think that both sides are going to have to face the

11     same remedy, so to speak.  So either we're going to open up

12     discovery for both sides -- and that means document production

13     and depositions, and then you'll submit another brief.

14     I'm not going to hear any further argument, but you have to

15     submit another round of briefing, opening brief, an opposition

16     brief, a reply brief on the injunction some months later.

17             Is that what you want?

18             MR. PEREZ-MARQUES:  No, Your Honor.  We believe that

19     the injunction proceedings should end today.

20             THE COURT:  Okay.

21             What do you want?

22             MR. AKROTIRIANAKIS:  I -- I have asked the Court two

23     or three times to strike the testimony of -- of -- or to

24     strike the witnesses that you heard from today.

25             If you're saying that you're not --

1          THE COURT:  Strike their witnesses but not yours?

2          MR. AKROTIRIANAKIS:  To -- they put witnesses on the

3     list.  I think that they had disclosure obligations that they

4     didn't comply with, and on that basis I have two or three

5     times asked Your Honor to strike those witnesses from their

6     list and not hear their testimony today and have it be part of

7     the record.

8          If what the Court is now saying is that "I've heard

9     the testimony of the witnesses; I am not regarding it as

10    evidence in support of the motion that they're -- that they're

11    filing," then that is the same thing I've already asked.

12         If you're not going to rely on the testimony --

13    you're not going to reference it, you're going to wash it out

14    of your mind and not -- and not consider it for purposes of

15    ruling on their motion -- then I am okay with that.

16         However, if --

17         THE COURT:  No.  I would only do that, though, not

18    in -- in response to your motion to strike, which I denied.

19    I would -- I'm simply considering doing it because I haven't

20    found the testimony from your witness or your witnesses to be

21    helpful to me on the questions that I need to answer in order

22    to rule on the injunction motion.

23         MR. AKROTIRIANAKIS:  My point, Your Honor, is only

24    that -- I end up in the same place.

25         If you struck them and didn't let them testify or

1    now, having heard the testimony, you're saying -- and I just

2    need to be really clear for the record, Your Honor.

3         If you're saying that you're not relying on it, it

4    will play no part of your decision on their motion, then I am

5    fine with that.  We don't need to do more depositions, others.

6         I do think that, frankly, we should have the right to

7    file another brief because, if they're going to be relying on

8    evidence that they put forward in their reply brief -- but if

9    that evidence is limited to these two witnesses and the Court

10   is going to disregard their testimony and not rely on it for

11   purposes of the Court's decision, then I am fine with -- with

12   not having more testimony.

13        I am not trying to prolong things; I'm only trying to

14   have due process, Your Honor.

15        THE COURT:  Sure.  But you still want me to consider

16   your affidavits that have not been subject -- some of the

17   subject of those affidavits have not been subject to -- to any

18   sort of discovery.

19        MR. AKROTIRIANAKIS:  I'm not seeing the connection,

20   Your Honor.

21        The local rules are --

22        THE COURT:  Don't -- what -- don't preach to me

23   about it.  I'm trying to come up with a -- a way to approach

24   this to avoid unnecessary litigation, given that I've heard

25   the testimony and I don't find any -- much of anything that

1    I heard today helpful to me at all.

2          And I'm trying to handle whatever the process is

3    going to be equitably.  I'm not going to give you a leg up,

4    and I'm not going to give you a leg up.  Whatever I do is

5    going to apply to both sides, period.  That's it.

6          MR. AKROTIRIANAKIS:  I've -- I think that the normal

7    process, Your Honor, is that parties --

8          THE COURT:  I'm not talking about the normal process.

9    I'm talking about a situation that we happen to find ourselves

10   in because of the way the case has been litigated thus far.

11         MR. PEREZ-MARQUES:  Yeah.  Yes, Your Honor.

12         And we agree with what the Court is suggesting, which

13   is, if the Court does not find it helpful to hear evidence

14   about NSO's -- our understanding of NSO's current activities,

15   then that issue doesn't require further discovery and their

16   declarations on that same issue that -- you know, their

17   current activities, the issue as to which we've been denied

18   discovery -- should also be off the table and that's

19   equitable.

20         THE COURT:  Is there -- I didn't see a lot about

21   their current activities in the --

22         MR. PEREZ-MARQUES:  They just say that they don't

23   currently have -- I suppose as of today -- a vec- --

24   installation vector that uses WhatsApp servers to install

25   code.

1           THE COURT:  That's in their --

2           MR. PEREZ-MARQUES:  Yeah.  They don't say "Facebook

3    servers"; they don't say "Instagram servers."  They say today

4    they don't have a vector that uses -- and, as I said, that's

5    not the legal standard.  It's not whether they're continuing

6    on the date of the motion to engage in this -- in the same

7    conduct.

8           THE COURT:  Okay.  I understand your position.

9           And your position, Counsel?

10          MR. AKROTIRIANAKIS:  My position, Your Honor, is that

11   the Court should consider the declarations that we filed and,

12   if they thought there was the need to have brought the

13   witnesses here because they wanted to cross-examine on these

14   points, then they should have asked for that.

15          THE COURT:  Okay.  All right.

16          I understand your points.

17          Let's hear some argument -- let's hear some legal

18   argument, and I'll let me know what I ultimately decide to do.

19          MR. PEREZ-MARQUES:  Thank you, Your Honor.

20          Well, we've effectively started with what I was going

21   to say first, which is that it remains our position that this

22   motion doesn't turn on anything that was heard today; it turns

23   on the record as it existed before this hearing.

24          Now -- and that evidence -- the undisputed evidence

25   from summary judgment, the evidence that came out at trial,

1    warrants an injunction and supports each provision of the

2    injunction we're seeking.  And I'll explain why.

3         Now, at summary judgment the Court found, based on

4    the undisputed evidence, as the Court knows, that NSO violated

5    Federal and State anti-hacking statutes as well as the terms

6    of service, the WhatsApp terms of service, by hacking into

7    WhatsApp servers in order to trigger the installation of their

8    Pegasus spyware, by reverse engineering WhatsApp's code, to

9    develop those unlawful vectors, and by engaging in this

10   conduct repeatedly, including by redesigning -- and I'm

11   quoting from the summary judgment decision -- redesigning

12   Pegasus to evade detection after plaintiffs first fixed the

13   security breach.

14        Now, at trial -- I'm sorry, Your Honor.  Did you have

15   a question?

16        THE COURT:  No.

17        MR. PEREZ-MARQUES:  At trial an Oakland jury found

18   that NSO acted with oppression, malice, or fraud, and it

19   returned a punitive damages award of over $167 million,

20   reflecting a crystal clear assessment of the reprehensibility

21   of that conduct, and the issue for today is whether and in

22   what form WhatsApp and Meta should be protected from similar

23   misconduct going forward.

24        And I want to be clear at the outset, Your Honor,

25   that this motion, what we're arguing today, is the heart of

1    this litigation.  It's the reason that we have been working on

2    this case since 2019, because what Meta seeks in this

3    litigation is, yes, accountability through money damages and

4    compensation but, most important, is protecting WhatsApp's

5    platforms, servers, and users.  That's why the time and effort

6    and money has been invested in pursuing this case.

7          The central issue here and the reason that an

8    injunction is so important is because the risk of future harm

9    is so clear.  Not only clear, we believe, but demonstrated.

10   They have already demonstrated and admitted a pattern of

11   conduct whereby, when they were stopped from engaging in this

12   conduct, they sought to resume it.

13         And there's been a lot of testimony in this case, but

14   I submit there's one question and answer that we would ask the

15   Court to bear in mind today.

16         When I asked Mr. Gazneli at his deposition whether

17   even today NSO was working hard on potential solutions to

18   restore zero-click functionality, he answered "This is our

19   business.  This is what we do."  Development of the types of

20   vectors that were at issue in this case, they are in the

21   business of repeating that.  They make lots of money doing it,

22   and, unless they are stopped, they will continue doing it.

23         They have demonstrated themselves to be recidivist

24   actors who are not easily deterred, and in those

25   circumstances, under the cases we've cited, Ninth Circuit

1    authority, a strong deterrence is required in the form of a

2    strong injunction.

3          What I'd like to do today is just walk through the

4    elements as to why we're entitled to an injunction, and then

5    I can explain why we're entitled to each provision of the

6    injunction that we are seeking.

7          The standard for an injunction, as the Court knows,

8    is the four-factor test:  Irreparable injury, monetary damages

9    being insufficient, balance of hardships, and public interest.

10          Let me start with irreparable injury and the

11    insufficiency of monetary damages and two points on that.  The

12    first, as we laid out in our papers, is that the past

13    violations on their own suffice.

14          The -- we've cited numerous cases holding that

15    hacking in violation of the CFAA and CDAFA gives rise to an

16    irreparable injury, and we would point the Court in particular

17    to the *Power Ventures*, case which was affirmed by the Ninth

18    Circuit.

19          THE COURT:  Okay.  I agree this is really kind of the

20    nub of -- of the motion.  *Power Ventures* appears to me to be

21    pretty much the only real, direct authority not involving

22    cases where there were default judgments or stipulations or

23    things of that nature.  I mean, it seems to be the closest

24    case.

25          MR. PEREZ-MARQUES:  Your Honor, we do think *Power*

1  *Ventures* -- I'm sorry if the Court wasn't finished.

2          THE COURT:  Yeah.

3          So do you think that that case and its holding -- and

4  you're correct about its holding -- is enough?  Even though it

5  involved the -- as I recall, it involves the obtaining of

6  information directly from Facebook and not using it as a

7  vector for sending Pegasus or some other kind of spyware, for

8  lack of a better term, through to users.  I mean, it seems to

9  me to be factually different in that respect than this case.

10         And that's the only case that I'm aware of that says

11 pretty explicitly that a violation of these two statutes is

12 enough to establish irreparable injury.  And the reason that

13 I'm -- I'm a little ambivalent about that -- that holding is

14 because there's -- there's no other authority that describes

15 that kind of violation.

16         And I'm not exactly sure that that case itself

17 explains to my satisfaction why it is, per se, irreparable

18 injury, particularly in a case such as this, where the injury

19 claimed was fully compensated.

20         MR. PEREZ-MARQUES:  Yes, Your Honor.

21         So there were a few points in there.  Let me try to

22 address them.

23         So *Power Ventures*, we do believe, is probably the

24 best case.

25         THE COURT:  It's the closest case for sure.

1           MR. PEREZ-MARQUES:  It's very -- we believe it's very

2   on point, and, obviously, it was affirmed by the Ninth

3   Circuit, and the injunction -- over many of the same arguments

4   the defendants are making here, the Ninth Circuit affirmed not

5   only the granting of the injunction but the terms of the

6   injunction, which we believe is very important.  We're not

7   relying solely on *Power Ventures*.

8           And one point on the default judgment cases is the --

9   the record here.  To the extent injunctions are appropriate in

10  those cases, they're more appropriate in this case because in

11  those cases you're dealing with a less developed evidentiary

12  record.

13          Here, we've had a robust summary judgment record;

14  we've had a five-day trial.  There is a significant body of

15  evidence that demonstrates not only the past violations but

16  the risk of future harm, including the repeated nature of the

17  violations.

18          So I do want to be clear.  Although we do believe the

19  law supports that the past violations on their own suffice,

20  we're not relying solely on the past violations.  We believe

21  there is independent evidence of future risk of harm here in

22  the form of the nature in which those violations were carried

23  out.

24          And to answer the Court's other question about

25  whether *Power Ventures* is factually distinguishable, they

1    obviously relied very heavily on the idea that that involved

2    obtaining data but so does this case.  And it wasn't only the

3    data that was taken from WhatsApp users through Pegasus but

4    the fact that, in this case, in order to carry out these

5    attacks, they reverse engineered WhatsApp's code.

6           That is how they were able to develop the exploit

7    that was used -- the three exploits that were used over the

8    course of years -- to attack WhatsApp servers.

9           In violation of the terms of service, they reverse

10    engineered the code, they developed their own piece of

11    software with which the Court is familiar, the WhatsApp

12    installation server, which they now call the Android back-end

13    server, and they still have that.  They violated our rights

14    and took possession of information that they weren't entitled

15    to have.

16           THE COURT:  So your -- you're arguing, then, that the

17    reverse engineering and the -- the decompiling is relevant not

18    only to the contract claim but to the -- to the computer

19    claim, as well?

20           MR. PEREZ-MARQUES:  That's exactly right, Your Honor,

21    because it was through reverse engineering that they developed

22    these vectors.  It's part and parcel of the CFAA and CDAFA

23    violations.

24           They -- they were able to get into the servers

25    through reverse engineering and, indeed -- we're jumping a

1    little bit ahead, but every aspect of conduct that we seek to

2    enjoin in the injunction we proposed, it's all part and parcel

3    of those CFAA and CDAFA violations, reverse engineering,

4    sending malicious code, creating WhatsApp accounts.  It's all

5    the means by which they violated CFAA and the CDAFA.

6          THE COURT:  Okay.

7          MR. PEREZ-MARQUES:  Let me speak a bit further about

8    the -- the risk to future harm, which we believe is -- is

9    exceptionally clear in this case.

10         As the Court knows, we have a record of repeated

11   conduct.  By their own estimation, they engaged in these

12   violations tens of -- up to tens of thousands of times.  The

13   Court may remember that testimony from the trial, three

14   different vectors that were used, and each time one was

15   stopped, either because we detected it or just because we

16   changed our software in a way that frustrated it, they came

17   back and they did it again.

18         They were undeterred by our security measures.  They

19   were undeterred by their knowledge that WhatsApp did not want

20   this conduct and would stop it if it was detected, and they

21   were undeterred even by the filing of this lawsuit.

22         Now, they admitted -- the Court may remember -- that,

23   with this lawsuit pending -- and I'm quoting; this is from

24   the -- my question to which Mr. Gazneli agreed -- "With this

25   lawsuit pending, NSO was actively making available to its

1   customers a zero-click exploit that involved the transmission

2   of messages over WhatsApp servers?"  Even after we sued them,

3   they were undeterred.

4           Now, we've cited numerous cases finding a clear risk

5   of future harm when you're dealing with defendants like these,

6   who have shown that they will not be easily deterred, and in

7   many of those cases the example is defendants who don't

8   respond to cease and desist letters.

9           This goes well beyond not responding to a cease and

10  desist letter.  Even after the attacks -- the 2019 attacks

11  that were detected and gave rise to this complaint that was

12  publicized, our efforts to stop that were publicized -- they

13  did it again.  Even after this lawsuit was pending.  That is

14  what makes them this kind of recidivist bad actor that

15  requires the strong deterrence of an injunction under Ninth

16  Circuit authority.

17          And I'd like to address an argument they make, which

18  is, in some ways, the centerpiece of their defense, when they

19  say, "Well, don't worry.  That specific strategy, using

20  WhatsApp servers to install the -- the spyware, we don't do

21  that anymore.  There's nothing -- nothing to worry about

22  because we don't do it anymore."

23          Now, this is effectively the third time in this case

24  that they've come to the Court with the argument, in effect,

25  "Don't worry about us; we don't do that anymore."

1              In 2020 the Court may remember they moved to strike

2      the injunctive relief, and they argued that there was no risk

3      of future harm because this case concerned conduct only over,

4      quote, "approximately 40 days in the spring of 2019."  And

5      again at page 3 -- this is Docket 105, page 3 of that brief --

6      "40 days of past misconduct."  That's how they framed what

7      this action concerned.

8              Now, that was false or, at a minimum, profoundly

9      misleading because what we've learned through discovery and at

10     trial is that, outside those 40 days, they had been doing it

11     since 2018 and they continued doing it even after those days.

12             So when they said -- and this is at page 4 of

13     Docket 105 -- that the -- the "allegations describe only past

14     conduct that will not and cannot recur," that was false.  It

15     not only could recur, it did recur in 2020 and they've

16     admitted that.

17             They didn't tell the Court that it did recur, that

18     they developed another exploit even after what they were

19     trying to assure the Court was not capable of repetition.

20             Just for a moment, on the timing here, they made that

21     motion on June 24th, 2020, and they said "No risk of future

22     harm."  Their witnesses have admitted that Erised, the third

23     of the three vectors, was actively used at least through

24     May of 2020.

25             So they wouldn't answer -- they haven't said when

1    Erised stopped being effective, but it does beg the question

2    of whether the attacks were ongoing at the time that they

3    argued they couldn't recur.

4             They tried the same argument in 2023, and this time

5    it was to limit the scope of discovery.  They argued and their

6    CEO, Yaron Shohat, submitted a declaration under penalty of

7    perjury that this case concerned a specific version of Pegasus

8    that was only in use from April to May 2019.  That's

9    Docket No. 176-3.

10            Again, not the whole truth because we learned in

11   discovery that there were other versions and that they did the

12   same thing both before and after.

13            And now they argue -- this is the current brief,

14   Docket 759-2.  The very first substantive sentence of their

15   brief is that this case involves three defunct versions of

16   NSO's Pegasus technology.

17            So now they concede it's three versions, not a

18   specific version, like Mr. Shohat said in his declaration a

19   couple years ago -- we agree that's not the whole truth --

20   but, again, they argue "No need to worry because that

21   technology is defunct."

22            It's the same argument they have been trying since

23   2020, "It can't recur, nothing to worry about, no need for an

24   injunction."  And when they've made this argument before, it's

25   been proven to be incorrect.

1          Another reason that this argument on their part needs

2    to be taken with a hefty grain of salt is that, while they say

3    they don't use WhatsApp to install anymore -- first of all,

4    they don't say anything about Facebook or Instagram or any

5    other Meta servers, but they acknowledge that they continue to

6    install Pegasus covertly and they continue to collect WhatsApp

7    messages, and they won't tell us how they do it.

8          So the impact is to put back on us the burden of

9    determining how they are engaging in this admitted conduct.

10          Now, they may try and come back and say, "You know,

11    that's not quite what we said, there's some other language,"

12    but it doesn't matter.  The point is clear.  They've

13    repeatedly sought to give the Court comfort that there was no

14    need of -- no risk of recurrence, that this case concerns

15    conduct in a very limited time period, and that wasn't what

16    the facts have shown.

17          Now, here's what we know about their current

18    activities, all of which are admitted or undisputed:  They

19    still collect WhatsApp messages.  That's in their opposition

20    brief at page 2.

21          They still install Pegasus secretly.  They still

22    maintain an enormous R & D function with a budget, as the

23    Court may remember from trial, of 50 to $60 million.

24          Their R & D function continues to develop

25    installation vectors.  They still have the WhatsApp

1    installation server, now folded into what they call the

2    Android back-end server.  It's like a safecracker who still

3    has all his tools.

4          And they still have every economic and commercial

5    incentive to target WhatsApp again.  WhatsApp has 3 billion

6    users.  They've said this is the business they're in.  They've

7    said it's a highly competitive business.  They have every

8    incentive to do exactly what they did before.

9          So as to the risk of recurrence, we believe it's

10   shown not only by the past violations, as in *Power Ventures*,

11   including because they did take data in the form of reverse

12   engineering the software.

13         The pattern of recurrence, we believe that their --

14   their assurances, their say-so that "We -- trust us; we won't

15   do it again" -- is not entitled -- we believe they've

16   forfeited that argument with the way their prior arguments

17   have been disproven on that issue and that there is a -- they

18   are the paradigmatic recidivist bad actor that requires an

19   injunction.

20         Let me turn to balance of hardships.

21         Again, we believe the balance of hardships favor the

22   plaintiffs.  The hardship to us in the lack of an injunction

23   principally is the need.

24         THE COURT:  Wait a minute.

25         MR. PEREZ-MARQUES:  Yes, Your Honor.

1          THE COURT:  Before you leave the question of the

2   irreparable injury, do you think that the -- that the *Power*

3   *Ventures* case -- which I don't think clearly answers my

4   question -- makes any distinction between injury to WhatsApp

5   as opposed to injury to the target users?

6          And what is the -- and the injury to WhatsApp --

7   aside from the remediation and all of that, how would you

8   describe the injury to WhatsApp?  Clearly, with regard to the

9   target users, if we are to count them -- and I think that the

10  *Power Ventures* case did count the -- you know -- the breach of

11  privacy for the target users.

12         But what's your best argument that either or both

13  should be considered by me, the target users and/or WhatsApp,

14  and how would you describe the injury to WhatsApp to make it

15  fit within the meaning of the *Power Ventures*?

16         MR. PEREZ-MARQUES:  Sure, Your Honor.

17         So what I would say about *Power Ventures* is I don't

18  believe *Power Ventures* distinguishes that clearly between

19  harm --

20         THE COURT:  Right.

21         MR. PEREZ-MARQUES:  -- to the company and harm to the

22  users.

23         But it -- it sort of bypasses that distinction in a

24  way that makes it quite analogous to our case because that

25  case concerned scraping.  So it's user information being taken

1    from Facebook.

2            And what the Court ruled on summary judgment is that,

3    yes, this is -- there is user information here, but it's being

4    taken via WhatsApp servers.

5            THE COURT:  Right.

6            MR. PEREZ-MARQUES:  So it's sort of on the -- it's on

7    all fours in the sense that, yes, there's harm to users that

8    we believe should be considered; certainly, for public

9    interest it should be considered.

10           But in terms of whether there's an irreparable

11   injury, we think that's the case, too.  And the reason -- just

12   putting aside sort of the legal analogy, just intuitively the

13   reason that there's an irreparable injury that arises here is

14   that the nature of their violations, including through the

15   reverse engineering of this software, subjects us to an

16   ongoing risk.

17           They have learned something that they weren't

18   entitled to know, and it's information that they continue to

19   possess that puts us at a risk of continued attacks.  And

20   that's why not only does the -- the past violation entail an

21   irreparable injury, but it also demonstrates a significant

22   ongoing risk of harm.

23           THE COURT:  Can you quantify or characterize the harm

24   to WhatsApp that is nonreputation -- injury to reputation?

25           But -- there's something about it that you're not

1    saying but that I sense, having to do with the -- your

2    ability, your client's ability, to protect the privacy of the

3    people that use it and depend upon the encryption working.

4           How does that impact?

5           MR. PEREZ-MARQUES:  Sure, Your Honor.

6           There's no question that there is an impact to the

7    integrity of the platform.  And that was part of -- as the

8    Court heard at trial when our witnesses talked about, you

9    know, whether there was a compromise or whether there wasn't

10   compromise of WhatsApp servers, that is, indeed, part of the

11   compromise, that the expectation of privacy of users of the

12   service is frustrated by bad actors like NSO who seek to

13   collect messages that they're not entitled to.

14          But other aspects of the harm -- so, first of all,

15   there is the ongoing need -- and this also goes to balance of

16   hardships -- the ongoing need to investigate and monitor and

17   detect and prevent and stop.

18          And that is an irreparable injury because so long as

19   they're out there with the ability not subject to an

20   injunction -- and this is -- the Court, Northern District of

21   California, in *Google v. Jackman* said it well that -- in

22   finding irreparable injury -- that "Absent injunction,

23   plaintiffs will need to expend further resources to discover

24   and eliminate defendants' violations."  And that's the same

25   here.

1          And that is -- then -- as well as, Your Honor, the

2     need to file successive lawsuits, which is also found to be

3     irreparable injury.

4          Based on their admissions --

5          THE COURT:  Isn't that just money?  Isn't it just

6     money?

7          MR. PEREZ-MARQUES:  Not, Your Honor, when it's not

8     quantifiable.

9          So it's very -- as the Court well knows, when you

10    have nonquantifiable -- say "Okay.  Well, what -- what number

11    do you put on that in order to fully compensate with monetary

12    damages the fact that indefinitely into the future we need to

13    have security engineers trying to keep tabs on what these guys

14    are doing on our platform?"

15         That is the type of -- that is irreparable injury.

16    It's not . . . something that can be reduced to a specific

17    number and compensated fully with money damages.

18         The money damages that we sought were very limited in

19    nature, which is just "These are the actual costs of

20    remediating this particular attack."

21         It says nothing about the fact that on an ongoing

22    basis we have to retain a staff of security engineers to keep

23    tabs on the likes of NSO and that, when we discover attacks,

24    we need to remediate them and we need to notify users.

25         And all in the context that they're deliberately

1    hiding what they're doing, which the Court in *Google v.*

2    *Jackman* also assigned significance to, and they said the --

3    the hardship is -- is heightened by the prior attempts to

4    evade detection.

5             And, here, we have admittedly prior attempts to evade

6    detection.  And so in that context, what is the harm to us of

7    needing to constantly monitor, try to detect something that

8    they're intentionally trying to conceal from us?

9             So the -- the last element here is the question of

10   public interest and whether the public interest would be

11   disserved.

12            And when liability has been found and there is a risk

13   of continuing harm -- as we believe there is in this case --

14   absent a great public injury a permanent injunction will be

15   granted, and we believe that's the right result here.

16            The key point is that the law itself, the CFAA,

17   CDAFA -- the statutes themselves embody and reflect a public

18   interest.  And that -- the Ninth Circuit so ruled in the

19   *Golden Gate Restaurant Association* case, that the public

20   interest can be declared and set forth in the form of a

21   statute, and that's what you have here.  The conduct they

22   engaged in is, as reflected in the statutes, both Federally

23   and in California, contrary to the state interest.

24            The Ninth Circuit has also recognized that there's a

25   strong public interest in preventing abusive users and

1    ill-intentioned actors, such as NSO, and the Northern

2    District of California in the *Stackla v. Facebook* case also

3    noted a significant public interest in Facebook's ability to

4    police its platforms, that that was also in the public

5    interest, and those are all public interests that would be

6    disserved by -- if an injunction weren't granted here.

7         Now, what they seek to put on the other side of the

8    ledger is this supposed need for the technology on the part of

9    law enforcement, and we believe -- and even after today it

10   remains our view -- that just hasn't been evidenced in this

11   courtroom.

12        Mr. Minkler -- and I know the Court is not inclined

13   to give that much weight, but he testified clearly that he

14   wasn't speaking on behalf of US law enforcement.  He has no

15   knowledge of how Pegasus has been used other than what he's

16   read in the paper.  He has no knowledge of any lawful use of

17   Pegasus.

18        There's been no submission by any actual law

19   enforcement agency that says, "Your Honor, we need this

20   technology in order to do our jobs."  It's really just their

21   say-so, and it hasn't been evidenced, so there's been no

22   showing that the public interest would be disserved by

23   permitting them to continue to engage in conduct that the

24   Court has found to be a violation of law and a violation of

25   our contracts.

1          Now, taking all those factors together, we believe

2     the record establishes that an injunction is warranted, so I'm

3     happy to talk about the specific provisions that we're

4     seeking.

5          So the key point, Your Honor, on the provisions of

6     the injunction we are seeking is that they are all -- as

7     I previewed a moment ago -- they're all tethered to the facts

8     as to the violations that gave rise to liability in this case.

9          What we're seeking to enjoin is the use of our

10    platforms --

11          THE COURT:  Before you get into the --

12          MR. PEREZ-MARQUES:  Yes, Your Honor.

13          THE COURT:  -- the provisions of the injunction,

14    I have a question.

15          And this might be kind of a stupid question.  But --

16    but the statute prohibits the unauthorized access or the

17    access beyond authorization; right?  And "authorization" does

18    suggest permission of some sort.

19          Do you think -- do you think that WhatsApp -- and

20    I was thinking about this in the context of the cease and --

21    the cases involving the cease and desist letters, which wasn't

22    done in this case, as I understand it.  There was no cease and

23    desist letter in this case before litigation was --

24          MR. PEREZ-MARQUES:  Not to my knowledge, Your Honor.

25    I may be forgetting.

1          THE COURT:  But could -- how could WhatsApp -- can

2   WhatsApp simply revoke authorization to any user?  Can you --

3   can you tell any user, "Nope, you can't use our platform"?

4          Have you ever -- has WhatsApp ever been in a

5   position, for instance, of somebody who just downloads the

6   app, abusing it, and then they -- being denied any further

7   use?

8          Can you -- can WhatsApp withdraw authorization?  And,

9   if so, can't you tell NSO, "No, you can't use it anymore"?

10          MR. PEREZ-MARQUES:  Your Honor, I'm going to be

11   getting a little bit outside of my lane here, but my

12   understanding is that Meta and WhatsApp can and do block

13   particular users.  The problem is they come back.  Right?

14          NSO was blocked.  Their exploit in 2019 was stopped.

15   They came back.  They -- they created accounts.  They

16   developed a new exploit.  They came back.  And they're going

17   to keep doing that absent an injunction.

18          So it's not as simple a matter as us asking them

19   "Please don't hack us anymore."

20          Would -- when you have a recidivist actor like

21   this --

22          THE COURT:  But did anybody, once it was discovered,

23   call them up and say, "Hey, we discovered this; we're going to

24   block you" and "Don't come back again or we're going to sue

25   you"?

1    MR. PEREZ-MARQUES:  Well, Your Honor, we did sue them

2   and, through that means, sent a pretty powerful message.

3        And there were also public announcements made at the

4   time that the 2019 attack was detected about how users could

5   protect themselves.

6        It's no secret to them, Your Honor.  They've admitted

7   that they know WhatsApp doesn't want this conduct.  They do it

8   anyway.  That's utterly irrelevant to them.

9        THE COURT:  Well, I said it was a stupid question.

10  Okay.  So --

11       MR. PEREZ-MARQUES:  No, it's not, Your Honor.  The

12  fact that they have acted repeatedly in disregard of

13  WhatsApp's rights is very significant and is very significant

14  as to why an injunction is required, because they don't care.

15  They don't care that WhatsApp doesn't want this activity.

16  They don't care that it's prohibited by the terms of service.

17       They do seem to care about whether the Court enjoins

18  them, and that's why we believe it's necessary.

19       THE COURT:  Because they'd be subject to contempt if

20  they violated.

21       MR. PEREZ-MARQUES:  Exactly, Your Honor.  And that's

22  precisely why in these types of cases, when you have a

23  recidivist bad actor, an injunction is warranted and a strong

24  injunction is warranted.

25       THE COURT:  Okay.

1          Okay.  Go ahead.

2          MR. PEREZ-MARQUES:  So turning to the elements of the

3    injunction, every piece of it is tethered to the facts in this

4    case.

5          Now, they argue that injunctions must be grounded in

6    evidence specific to the case.  That's at page 16 of their

7    brief.  That test is satisfied here.

8          We're seeking to enjoin them from developing

9    technology that uses our platforms, including to install their

10   spyware.  That's what they did in this case.

11         We're seeking to enjoin them from developing

12   technology that emulates our technology.  That's exactly what

13   they did in this case, with the WhatsApp installation server,

14   collection of WhatsApp messages.

15         THE COURT:  Okay.  You're going through them too

16   quickly.  On --

17         MR. PEREZ-MARQUES:  Okay.  Yes, Your Honor.

18         THE COURT:  On the first one, using the -- on the

19   platform, I think in the *Power* -- the *Power Ventures* case, the

20   use -- the proscribed use was narrowed from "any purpose" to

21   "any commercial purpose."

22         MR. PEREZ-MARQUES:  Well, it's -- it's -- there are

23   two provisions of our proposed injunction that are relevant

24   here.

25         I believe it's 3A -- it's the first of our proposed

1   injunctions.

2          THE COURT:  Right.

3          MR. PEREZ-MARQUES:  -- would prohibit them from

4   developing technology that uses our platforms, such as to

5   install their spyware.  That's not analogous to the provision

6   that the Court is referring to from *Power Ventures*.

7          There's a separate provision in our proposed

8   injunction that would prohibit them from creating accounts on

9   our services.  That is analogous to the *Power Ventures* case.

10          And the Court is correct that in *Power Ventures* that

11  was limited to creation of accounts for commercial purposes,

12  and that -- that's not in the language we proposed.  It's a --

13  a restriction along those lines, saying "Other than for

14  personal use," for instance, is potentially something that --

15  that we would be amenable to.

16          But -- but the -- the prohibition in 3A on their

17  creation, development, marketing of technology that uses our

18  platforms, such as to install their spyware, that's different

19  than the provision that the Court's referring to in *Power*

20  *Ventures*.

21          THE COURT:  Okay.  Go ahead.

22          MR. PEREZ-MARQUES:  And, indeed, it's actually quite

23  analogous to a provision that was part of the injunction in

24  *Power Ventures*.

25          So ticking through the other provisions, collection

1    of WhatsApp messages, undisputed that that was the object of

2    this entire scheme.  The reason that they were hacking the

3    servers was to get access to the messages.

4            Reverse engineering is how they developed the exploit

5    that was able to attack our servers.

6            Transmission of harmful code.  That's what they were

7    doing through our servers, using it for illegal purposes.

8    Again, what they were doing in this case.

9            And creation of accounts I've sort of already

10   referred to.  They needed, in order to carry out these

11   attacks, to create accounts, harvest the authentication

12   credentials, and use those in order to create messages that

13   would be treated by our servers as if they were legitimate

14   WhatsApp traffic.

15           Now, their main response as to the scope of our

16   injunction is that it's too broad because it would prohibit

17   conduct that's independently -- standing on its own would be

18   lawful.  And, on that, they're both wrong on the law and it's

19   unavailing on this factual record.

20           The key point legally, Your Honor, is that, as the

21   Court stated in *Power Ventures* -- and I can -- I know the

22   Court's familiar with that case -- it's well-established that

23   Federal Courts have the equitable power to enjoin an otherwise

24   lawful activity if they have jurisdiction over the general

25   subject matter and if the injunction is necessary and

1    appropriate in the public interest to correct or dissipate the

2    evil effects of past unlawful conduct or to prevent continued

3    violations of the law.

4           So the Court is entitled to enjoin activity that,

5    standing alone, could be lawful if necessary, if appropriate

6    to prevent future violations.  And the Court in that case, as

7    I've mentioned, issued a broad injunction, which was affirmed

8    on appeal to the Ninth Circuit, over many of the same

9    arguments that NSO is making here.

10          The defendant in that case -- we looked at the appeal

11   brief.  The opposition brief -- in the brief on that appeal,

12   the defendants in that case argued "You're sweeping in conduct

13   that's lawful.  It's going to impact our ability to conduct

14   our business."  The Ninth Circuit rejected that and affirmed

15   the injunction.

16          MR. AKROTIRIANAKIS:  I'm sorry, Your Honor.  That's

17   not at all in the opinion.  He's -- he's quoting from their

18   brief.  That's not how we do this here.

19          He's -- that's not anywhere in the Ninth Circuit's

20   decision.  He's saying that they made an argument in their

21   brief that is discussed nowhere in the Ninth Circuit's

22   decision, and, therefore, the Ninth Circuit rejected it.

23          THE COURT:  Okay.  You'll be given a chance to argue,

24   Counsel.

25          MR. PEREZ-MARQUES:  So the reason that this type of

1   injunction was appropriate in *Power Ventures* is because, as

2   here -- and I'm quoting from *Power Ventures* -- "Defendants

3   have frequently exhibited bad faith conduct that indicates

4   they will not easily be deterred from attempting to access

5   Facebook servers without authorization, in violation of the

6   CFAA."

7          That's the key point in this case.  When you're

8   dealing with a recidivist like NSO, the scope of an injunction

9   is necessarily and appropriately broader and more protective.

10         And a very good analogy was given by the Ninth

11  Circuit in the *Creative Computing versus Getloaded.com* case.

12  And the example that they gave was of a shoplifter, a

13  recidivist shoplifter, and that was another case that involved

14  similar indications of a defendant that was not easily

15  deterred.

16         And in that case the Court -- District Court --

17  granted and the Ninth Circuit affirmed an injunction that

18  barred defendants even from accessing the public portions of

19  the plaintiff's public-facing website -- can't even look at

20  the public portions of the website -- and that was affirmed by

21  the Ninth Circuit.

22         And what the Ninth Circuit said in this very apt

23  analogy is that "Defendant is in a position analogous to one

24  who has repeatedly shoplifted from a particular store, so the

25  Judge prohibits him from entering it again, saving the store's

1    security guards from the burden of having to follow him around

2    whenever he is there."

3              That is the fact pattern here.  These are people who

4    have shown themselves to come back again and again, and a

5    broad injunction is warranted to spare plaintiffs of the

6    burden from effectively following them around the store.

7              And as long as they're permitted to engage in any of

8    the activities that we ask the Court to enjoin, the -- and,

9    again, they're not telling us how they're collecting WhatsApp

10   messages -- the burden is improperly put on the plaintiffs to

11   try to figure out how they're doing it and whether they're

12   accessing our servers, something that they've admitted they

13   tried to conceal when they did it in the past.  We are forced

14   to follow them around the store in a way that the Ninth

15   Circuit in *Creative Computing* said is not -- is not equitable.

16             And as in *Power Ventures* again, "Defendants' actions

17   suggest that defendants may continue to access Facebook

18   servers unless they are strongly deterred," and that's why the

19   broad injunction that we are seeking is -- is warranted.

20             THE COURT:  Okay.  I have -- you're finished?

21             MR. PEREZ-MARQUES:  I can be, Your Honor.

22             THE COURT:  I think I have two questions.

23             One is on -- one of the arguments that NSO makes is

24   that the reverse engineering and the sending the harmful code

25   and the -- using WhatsApp systems for illegal purposes, those

1    three things were -- were raised on the motion for summary

2    judgment in the context of the violation of the terms of

3    service violation out in California law.  And then I think the

4    California law prohibits issuing an injunction for breach of

5    contract terms.

6          I asked you earlier if you viewed the reverse

7    engineering as a way in which the Computer Fraud and Abuse Act

8    violations was able to be carried -- executed, essentially,

9    and you indicated yes, so I assume, then, that your argument

10   would be that the Court can consider these things that would

11   otherwise fall under a violation of the terms of service.

12         The Court can consider that in conjunction with all

13   the other arguments that are raised on the Computer Fraud and

14   Abuse Act?

15         MR. PEREZ-MARQUES:  Yes, Your Honor.  I would make

16   three points on that.

17         The first is we disagree with them that the Court

18   can't enter an injunction based on breach of contract.

19         In our papers we've cited nine Northern District of

20   California cases either issuing an injunction in a case where

21   the sole claim was breach of contract or issuing an injunction

22   that prohibited future breaches of the terms of service of

23   either WhatsApp or Meta or the particular plaintiff in that

24   case.  So Courts do that all the time.

25         Most of those nine cases are in the past three or

1   four years, so that is absolutely within the Court's power to

2   do that.

3           But the Court need not rely on that authority

4   because, as Your Honor indicated, the conduct that we're

5   seeking to enjoin, particularly reverse engineering, it's part

6   and parcel of the conduct that violated the CFAA and CDAFA.

7   It was through reverse they generated the exploit that allowed

8   them to attack our servers.

9           So one provision that we're seeking is they should

10  destroy the code that they created based on reverse

11  engineering of our software, which is sort of like "You're a

12  safecracker; you've got to get rid of your safecracking

13  tools."

14          And this provision is effectively "You can't make new

15  ones."  They can't -- we're trying to deprive them of the

16  ability to generate the type of exploit that they used in this

17  case, and it's because that reverse engineering was part and

18  parcel of the CFAA violation.

19          And the -- the third point I wanted to make on that

20  was just that what's certainly clear is -- the fact that the

21  conduct is independently a contractual violation, it doesn't

22  give them a safe harbor.  It doesn't prevent the Court from

23  enjoining it.  Right?

24          But the injunction, we believe, is warranted under

25  the CFAA, we believe it's warranted on the basis of

1  contractual breaches, and the fact that it's an independent

2  contractual breach doesn't protect them or allow them to avoid

3  the injunction.

4         THE COURT:  Okay.

5         Last question:  You want an injunction that applies

6  to all of Facebook's messaging platforms.

7         MR. PEREZ-MARQUES:  That's right, Your Honor.

8         THE COURT:  Okay.  And I'm not sure you've cited

9  adequate authority to go beyond the parties that were before

10 the Court.

11        I understand Facebook was a plaintiff in the case,

12 along with WhatsApp, but the other platforms were not named,

13 and there was no evidence as to any server that was not a

14 WhatsApp server at issue in the case.

15        MR. PEREZ-MARQUES:  Well --

16        THE COURT:  I'm a little reluctant to go beyond the

17 parties that were named in the complaint in this case,

18 particularly given that there was -- not only were they not

19 named, there wasn't any evidence as to any sort of breach

20 pertaining to -- I don't even -- I don't use any of this

21 stuff, so I don't really know the names but -- Messenger and

22 other things.

23        MR. PEREZ-MARQUES:  Yeah.  Well, a few points on

24 that, Your Honor.

25        First of all, Meta Platforms, Inc., which is the

1    parent company here, is a plaintiff in the case.  So all these

2    servers -- services -- fall under Meta Platforms, Inc., which

3    is a party here.

4          It's not correct that there's been no evidence as to

5    those other servers -- those other services -- because their

6    own evidence, their marketing materials, even -- their

7    marketing materials say "Our technology has the ability to

8    collect messages not only from WhatsApp but things like

9    Facebook Messenger."  They tout that ability, as well.

10         And we believe it would be truly -- well, two points.

11   One is what they're effectively arguing is "Okay.  These are

12   the particular servers that were attacked, so we can be

13   enjoined from attacking those servers again, but it's fine to

14   attack another."

15         That, in our view, would be a tremendous miscarriage

16   of justice if walking out of this hearing and after the

17   Court's ruling on an injunction they were able to go back to

18   their client and say "WhatsApp is off the table but Facebook

19   is fair game."

20         We've invested six years in litigating this case.

21   The particular attack that we discovered was on WhatsApp's

22   servers.  They should be enjoined from doing the same thing to

23   any of Meta Platforms, Inc.'s servers or services, not only

24   the particular attack that we detected.  It would be akin to a

25   bank saying "Okay.  You can't" -- telling a bank "The

1    defendant won't be able to rob that particular branch again.

2    Because that's the one they robbed before, they can't rob that

3    one, but the others are fair game."

4         That would not be an equitable result in this case.

5    They should be enjoined from repeating this conduct across any

6    of the services.

7         THE COURT:  Okay.  Thank you.

8         MR. PEREZ-MARQUES:  Thank you, Your Honor.

9         THE COURT:  All right.

10        And for the defense.

11        MR. AKROTIRIANAKIS:  Even the cases they cite reject

12   injunctions that broad, Your Honor, and even the nine default

13   judgment cases that Mr. Marques -- Mr. Perez -- referred to,

14   *Google versus Jackman* being an example of -- of one of those

15   cases.

16        And in *Google versus Jackman*, the Court refused the

17   broad injunction because Google had, quote, "only shown

18   irreparable harm -- irreparable injury arising out of

19   defendants' improper use of the AdWords program, not from

20   their use of any Google-based program.  The corresponding

21   injunction issued must therefore be narrowly tailored to that

22   demonstrated injury," unquote.

23        There's a couple like overarching --

24        THE COURT:  So, in that instance, since we're on that

25   subject now, Facebook was named as a plaintiff in the case.

1          MR. AKROTIRIANAKIS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. AKROTIRIANAKIS:  And if the Court reads the --

4          THE COURT:  Instagram and Messenger and all those

5    were not.

6          So . . . what -- what limitation do you think the

7    Court should impose if the Court were to grant an injunction?

8          MR. AKROTIRIANAKIS:  Well, I think the limitations

9    the Court should impose are the limitations provided by Ninth

10   Circuit law, which the Court must, of course, follow.

11         But I think the question that you're asking here is

12   what was the role of Facebook in this case, and that is in

13   paragraph 16 of the complaint, where they describe why is

14   Facebook even here because it only ever involved WhatsApp

15   servers.

16         And they say that "Facebook has served as WhatsApp's

17   service provider, which entails providing both infrastructure

18   and security for WhatsApp."

19         So the reason why Facebook is a proper party to the

20   case in first place, Your Honor, is because they owned the

21   servers that are the subject of the litigation.  So the -- the

22   relay servers and the -- the -- the other servers that -- that

23   are -- that the Court did describe in -- in its summary

24   judgment order, those are owned by Facebook.  Okay?

25         And that's Facebook's role in the case, and that's

1    from the complaint.  Again, paragraph 16 on page -- on page 4.

2         Beyond that, Your Honor, it's just -- it's just the

3    injunction that -- that the Court refused even in a default

4    judgment case in -- in *Google versus Jackman*.

5         Almost all of the . . . I'm going to go a little bit

6    backwards or from -- from the end, but then I do want to start

7    sort of at the beginning.

8         But -- but I'll say, you know, these -- these nine

9    Northern District of California cases that Mr. Perez referred

10   to, they're all default judgments, as the Court has already

11   recognized.  There's no engagement with California law on the

12   terms of service issue.

13        They say -- it's just wrong; it's just not the law --

14   that, "Oh, California law doesn't apply here."  That's just

15   not the case.

16        The case is that *Sims* snowboarding case -- it's Judge

17   Farris' opinion -- it's a published Ninth Circuit decision.

18   The citation is 863 F.2d 643.  The pin cite is -- is 647.

19        And unambiguously this Court is obligated to follow

20   substantive California law with respect to the breach of

21   contract claim, which is a claim arising under California law.

22   And where California law has a substantive limitation on its

23   own Courts or on any Court's ability to issue an injunction

24   based on a -- to enforce the terms of a contract, that is a

25   limitation on -- on the Court, as well.

1          That's the point of *Sims*.  Judge Farris was saying

2   "Well, like if -- it's not a different law that applies to you

3   when you're in Federal Court versus State Court."

4          If it's a Federal Judge sitting in diversity

5   jurisdiction or supplemental jurisdiction -- which I can refer

6   to you in the complaint where they've pleaded that being the

7   basis of this Court's jurisdiction over that claim and the

8   CDAFA claim -- then this Court is bound by the limitations of

9   California substantive law.  You file -- you follow Federal

10  procedural rules, but that case, *Sims Snowboards,* says

11  unambiguously this issue is not a procedural issue; it is a

12  substantive California law issue.

13         So there's a published Ninth Circuit decision, it's

14  directly on point, and they just ignore it completely.  And

15  they point the Court instead to default judgment cases before

16  District Courts in this District where there's no engagement

17  on the California law issue at all, and, in many of those

18  cases, it was Facebook who didn't bring that issue to the

19  Court's attention.

20         And in some of those cases the -- the -- one of them

21  being *Google versus Jackman* -- the Court says, "Well, just

22  because there's no other party here, I'm not going to just do

23  what you want."  Like that's overly broad.  It's not -- it's

24  not the law that binds the Court in terms of the scope of

25  injunctions.

1            So . . . there's a lot of -- of what we heard,

2    Your Honor, that is not found in any of the cases cited by

3    either of the parties, like this idea that there's some

4    standard out there that's -- that's a -- he kept saying it and

5    I wrote it down -- the -- the recidivist bad actor standard.

6    There's no -- there's no case that says, "Oh, well, if you

7    make an adjudication that somebody is a recidivist bad actor,

8    then there's some other standards that apply."

9            The standards come from the Supreme Court and the

10    Ninth Circuit, and they provide that the plaintiff has the

11    burden in these proceedings.

12            He said, "Well, they're putting the burden on us."

13    No, I'm not putting the burden or anybody.  The Supreme Court

14    puts the burden on the plaintiff who is seeking an injunction,

15    and they have to establish, as I think is -- is agreed here,

16    irreparable harm and the inadequacy of legal remedies.  And

17    it's not just any harm that can be irreparable harm.  It has

18    to be harm that flows from the conduct that the Court has

19    determined is unlawful.

20            So this part and parcel standard -- what I've read to

21    you comes from the *Price* case that's cited in our brief.  The

22    part and parcel standard is something that counsel has

23    invented for this hearing.

24            I don't know what "part and parcel" means.  It's not

25    enough to say that "In the background of the case there was

1    these things, so that makes it part and parcel and, therefore,

2    the Court can enjoin otherwise lawful conduct."  What the

3    Court can enjoin -- what the Court has the power to enjoin --

4    is limited, and it is limited to harms that flow from the

5    illegal conduct, and the -- the quote from *Price* says that it

6    has to be narrowly tailored to remedy that harm.

7            And, yes, there are cases that say that a Court can

8    enjoin legal -- or lawful conduct but only to prevent the

9    specific unlawful conduct that the Court has found in the

10   case.

11           Now, in terms of the -- the harm that's at issue

12   here, the Court will recall -- this is Docket No. 760-4; it's

13   my declaration attaching a . . . an email from -- from

14   counsel, which is -- and this is also in the parties' joint

15   pretrial statement -- I don't have the docket number handy --

16   actually, I do have that, Docket 591 -- that they are not

17   seeking to establish either the fact or extent of harm or an

18   entitlement to equitable relief based on these noneconomic

19   injuries that are the injuries that the Court has found in

20   most of these default judgment cases that they're relying on

21   and that they are now, in this hearing -- I mean, in some

22   cases -- referring to as justifying the injunction that

23   they're asking for.

24           So an example of that would be when counsel refers to

25   the integrity of the platform.  That's just another way of

1    saying the same type of noneconomic injuries that they have

2    foresworn in -- set forth in pretrial statement in the -- the

3    document that I've referenced the Court to, that they're not

4    going to rely on either to establish an entitlement to damages

5    or the extent of that or an entitlement to equitable relief in

6    this hearing.

7            Even apart from the fact that all the harm that they

8    are entitled to claim based on that statement and that they

9    are claiming is purely economic, the harms that flow from the

10   illegal conduct have to be harms that are based on the use of

11   servers because that is what the Court has determined to be

12   the unlawful conduct.

13           This per se rule that applies to -- or that counsel

14   is sort of trying to tell the Court applies to CFAA cases,

15   there is no per se rule in CFAA cases.  In fact, the -- the --

16   the precedent that binds this Court is to the contrary.  You

17   have to show irreparable harm, and you have to establish that

18   irreparable harm with evidence.

19           Now, what is the evidence that is before the Court?

20           The Court has the declaration of -- of Yaron Shohat,

21   the declaration of Tamir Gazneli.  They both state that

22   there's no NSO technology that interacts with WhatsApp

23   servers, that that has been the case for years, and that they

24   have no plans to do any of that.  And so they haven't -- they

25   haven't been doing it, they're not doing it now, and they have

1    no plans to do it.

2         Now, counsel, you know, tries to get around the

3    absence of any evidence -- any evidence -- and, by the way,

4    Mr. Shohat said that in his deposition.  This is not like some

5    new thing that has just come up.

6         And the Court, when it defined the temporal scope of

7    discovery in this case, specifically told WhatsApp that "If

8    you believe that that temporal scope is too limited, then

9    I want you to come back here and ask the Court for an expanded

10   temporal scope based on evidence," and they've never done

11   that.

12        So, yeah, they have the burden.  The law puts the

13   burden on them now.  But they have -- they're saying, "Oh,

14   well, we don't have evidence now, but you should look the

15   other way of that," even though the case law that -- the Ninth

16   Circuit case law requires this Court's decision to be based on

17   evidence and not just this fear that they're saying, that,

18   "Well, it could happen again because these people know about

19   computers and code and they could come up with something in

20   the future.  Who knows?"  That's not the standard, Your Honor.

21        But the Court gave them the opportunity to try and

22   develop evidence based on a different temporal scope, and they

23   never took you up on it.  So they can't now complain that we

24   don't have evidence of -- that came after 2020, when this

25   Court had defined that as the temporal scope of discovery in

1  this case.

2          But, in any event, Mr. Shohat's statement was part of

3  the discovery in this case.  He made it in his deposition.

4  He's made it in several declarations to the Court, including

5  that filed in opposition to the motion for a preliminary

6  injunction, the initial opposition that we filed in March, and

7  in the revised opposition that followed the trial that we

8  filed on June 18th.

9          All the harms . . . all the harms that are identified

10 in the motion and in the reply brief -- and even in today's

11 proceeding that the Court has indicated it's not regarding --

12 do not relate to WhatsApp servers.  They don't relate to

13 servers at all.  They don't relate to the allegations in the

14 complaint.  They don't relate to the Court's summary judgment

15 ruling or its determination of unlawful conduct in this case.

16         The Court asked some questions about the users, asked

17 counsel about -- about the users.  They didn't pursue a claim

18 based on the users.  Okay?  In fact, they told this Court that

19 who the users were is irrelevant to their claims.  That's why

20 this Court denied discovery about the users' identities.

21         And that was the Citizen Lab-related litigation.  It

22 wasn't just Citizen Lab who was opposing it; it was WhatsApp,

23 as well.

24         All right.  So in the absence of being able to

25 demonstrate any harm that flows from the violations that the

1    Court found in its summary judgment order, counsel and

2    WhatsApp have now tried to sort of rewrite the case to be

3    other than that that was pleaded and other than that which it

4    pursued.

5           You heard counsel talking about, you know, one click

6    and the fact that the current versions of Pegasus that have

7    nothing to do with WhatsApp servers can collect WhatsApp

8    messages.  They do so in a way that has nothing to do with

9    WhatsApp servers.

10          It's not made unlawful by the CFAA, it's not made

11   unlawful by any other law, and they're trying to convince you

12   to enter an injunction that is well beyond the scope and

13   doesn't flow from any of the things that the Court has

14   determined are unlawful, all of which involve servers, and

15   there's been nothing in years that has involved any WhatsApp

16   server.

17          And it's only harm that relates to the servers -- the

18   only harm that is related to servers is counsel's statement

19   and counsel's argument that, because of the nature of NSO's

20   business, there is a fear that they have that it could happen

21   again, and that is not the law.  It has to be an imminent

22   threat, not just the possibility that the same harm could

23   happen in the future.

24          It has to be based on evidence that is brought before

25   the Court and not just based on fear.  That's the *Herb Reed*

1    *Enterprises* case, 736 F.3d 1249.  It's a Ninth Circuit case,

2    Judge McKeown's opinion at page 1251, and it's very clear.

3            I've already addressed the attempts to enforce the

4    terms of service.  There's one more thing I'll say about it.

5            They want to have this terms of service injunction so

6    that we could be in here every week with them complaining that

7    my client is doing something that makes them in contempt, and

8    they -- again, they're just ignoring the law of *Sims*

9    *Snowboards* that says that you cannot have an injunction under

10   California law.  It's an anti-injunction statute, if you will,

11   to attempt to enforce terms of service.  That -- that is the

12   law that this Court is obligated to follow.

13           Now, specifically referring to counsel's comments

14   about irreparable -- irreparable harm, I will start there.

15           The Court asked questions about the *Power Ventures*

16   case.  That's the one case that was not a default judgment

17   case.

18           In *Power Ventures*, however -- and, by the way, the

19   Ninth Circuit's discussion -- we kept hearing, "Oh, Ninth

20   Circuit affirmed it" -- it's like this long.  I urge you to go

21   and read it again.  It doesn't say much.  I'm sure you have,

22   Your Honor.

23           So you would know, then, that the defendant in the

24   *Power Ventures*' conduct was ongoing at the -- at the time that

25   the Court considered an injunction, the same conduct.  They

1    stipulated -- or they conceded, the defendant did -- that

2    there was irreparable harm and they were scraping, as the

3    Court knows, data that belonged to Facebook.

4            None of those are the case here, but that is the

5    basis for the finding of irreparable harm in *Power Ventures*

6    and the Ninth Circuit's analysis this long affirming the

7    injunction imposed by the District Court.

8            Counsel talked about NSO being undeterred and how it

9    changed its software.

10            The Court already pointed out that they didn't send a

11   cease and desist letter.  They also didn't seek a permanent --

12   a preliminary injunction, which itself -- the fact of not

13   seeking a preliminary injunction is a factor that establishes

14   that there is not ongoing irreparable harm.  The filing of a

15   lawsuit, which is something that counsel repeatedly

16   referenced, does not establish any illegality.

17            This Court's determination on summary judgment --

18   with which NSO respectfully disagrees but is following and

19   will follow, and you have the declaration from Mr. Shohat

20   saying that they will follow the Court's ruling, they

21   understand it clearly -- came in December 2024.

22            So when counsel's talking about things in -- in the

23   past and how we are undeterred, none of that testimony relates

24   to the Court's finding of any unlawful conduct.

25            By the way, we heard argument about the users.  The

1    Court had a question about the users.

2          In addition to them having already opposed any

3    discovery about who the users are and informing the Court that

4    the identity of the users is irrelevant to their claims in the

5    case, there's actually no evidence of who the users are that

6    are before the Court.  There's no evidence of who the users

7    are that are before the Court.

8          They don't know who the users are.  And what they did

9    was they gave a list of phone numbers to Citizen Lab, who,

10   through their own means, has some ideas about who the users

11   are.  None of that evidence is -- is -- is before the Court,

12   and the Court specifically precluded us from pursuing it and

13   agreed with the plaintiffs that it was irrelevant.

14         Counsel was referring to three times NSO has lied to

15   the Court and said that we've made false statements to the

16   Court and, on that basis, the Court should apply a different

17   standard than the ones I've now articulated that the Ninth

18   Circuit previously articulated as to what this Court's task is

19   and what the limitations of this Court's authority are --

20   is -- with respect to injunctions.

21         And the first of these false statements that

22   Mr. Perez is asserting was the 2020 -- so five years ago --

23   motion to strike injunctive relief.  And the Court -- the

24   Court never ruled on that motion.  The Court administratively

25   denied the motion when -- I think -- when the case was stayed

1    pending appeal.

2          And that was a motion brought -- it was a motion for

3    judgment on the pleadings.  So it asks the Court, based on

4    their allegations -- which they pleaded that there are no

5    vulnerabilities in WhatsApp and that the vulnerabilities that

6    they allege that were the subject of the exploits in this case

7    had been closed and couldn't be opened again -- so on that

8    basis, those pleaded allegations, we made a motion to dismiss

9    the claim for injunctive relief.  It entirely was based on

10   their own allegations, and it didn't include anything beyond

11   that.

12         The Richmark -- the Richmark ruling was the second

13   time that Mr. Perez claimed that NSO, through Mr. Shohat's

14   declaration, falsely told the Court that -- that the subject

15   matter of this case involved only a single version of

16   WhatsApp.  Again, that was a reference to the allegations in

17   the complaint, which, in fact, refer to a single version of

18   Pegasus that was in use, according to the allegations in the

19   complaint, in April and May of 2019.

20         So there's nothing at all false about the statements

21   that were made about their allegations in the Richmark hearing

22   litigation in this case.

23         The complaint itself refers only to a single version.

24   This Court expanded that to a temporal time period -- or a

25   temporal period that includes -- that included three versions

1    of Pegasus, and we complied with that temporal scope.

2            The Court invited WhatsApp to return to court if a

3    different temporal scope of discovery was needed, and they

4    never did that.

5            So what we are left with in terms of what is before

6    the Court, irreparable harm flowing from the Court's

7    determination of unlawful activity, really is just their

8    statement that they're afraid that -- that a company like NSO

9    has the capability in the future of doing it again.  And under

10   the case law that I've referenced, including the *Herb Reed*

11   *Entertainment*, that is -- it's a Ninth Circuit case -- that is

12   not the standard that this Court is obligated to apply.

13           That -- another case that the Court is obligated to

14   follow is *Big Country Foods*.  It is cited in the briefing, and

15   the standard there is not as stated by counsel.  It is, in

16   fact, that there has to be an imminent risk plus a significant

17   threat, and it has to be based on evidence, not just this sort

18   of untethered fear.  So risk of recurrence, which was

19   repeatedly stated, is not the standard that the Court is

20   obligated to follow.

21           The Court had mentioned users.  I've now said it

22   two different times, and I'm sorry for jumping around.

23           There's no evidence of illegality with respect to the

24   surveillance of -- of any user.  There's no evidence or

25   finding that -- that any access to any user was illegal with

1    respect to that user, and the extraction of evidence from the

2    phones of the users did not involve WhatsApp servers.

3            The Court will recall that their allegations are and

4    the evidence before the Court was that -- that -- that Pegasus

5    exfiltrates data from the targeted users' phones with servers

6    that belonged to NSO's Government customers; they do not go

7    through the WhatsApp servers.

8            Now, I brought up Government customers, and it's come

9    up several times in the case.  It's come up several times

10   today.  Mr. Andres has brought it up; counsel has brought it

11   up many, many times.

12           They keep saying that there's no reason to believe

13   that NSO's customers are Governments or Government agencies or

14   that they have been determined to be Governments or Government

15   agencies.

16           Now, there's no . . . there's no evidence that that

17   is not the case.  Okay?  There's no evidence that -- that NSO

18   has ever sold or licensed Pegasus to an entity that is not a

19   Government or a Government agency.

20           What there is is repeated declarations over the

21   course of the last five years from Shalev Hulio, who at the

22   time was CEO of -- of NSO, at the time of the motion to

23   dismiss, to Mr. Shohat, who testified here in court to this

24   effect and in declarations, including the one that supports

25   our opposition to this motion, that all of NSO's customers, in

1   fact, are Government agencies.

2          Those customers have included, as we know, the -- not

3   just from today but -- but from other evidence that's been

4   before the Court -- the United States, which has procured

5   Pegasus for its own use and for the use of other countries.

6          There's a document that is Docket No. 45.  And

7   I brought this up before, but it occurred to me again during

8   this morning's proceedings.  It is the declaration -- it's

9   45-13 and 14.  It is the declaration of a gentleman named

10  Nachum, N-a-c-h-u-m, Falek, F-a-l-e-k.

11         He, at the time, was, I believe, the CFO of NSO, and

12  he authenticates, in response to -- or in support of -- of our

13  motion -- our initial motion to dismiss from -- from long

14  ago -- an Ernst & Young report -- or -- Ernst & Young

15  independently audited the records of NSO's customers and

16  determined, as is set forth in the exhibit to Mr. Falek's

17  declaration, that they are, in fact, all Government agencies,

18  as Mr. Hulio and Mr. Shohat have many times testified.

19         On harms, Your Honor, Mr. Perez referred to a number

20  of financial harms.  I think even the Court's question to him

21  was confirming that those -- those were financial harms.  They

22  are not sufficient to support an injunction.  Those are just

23  dollars and cents, and the Ninth Circuit case law is very

24  clear about that.

25         In terms of the ongoing employment of security

1    engineers, they are talking about people who work for WhatsApp

2    and/or Meta, that they would be doing anyway the same job, and

3    there's no -- there's no -- there's no evidence of -- of any,

4    you know, harm, financial or otherwise.  But in this case it

5    would be remediable with legal remedies, which, as the Court

6    knows, is not sufficient to support an injunction related to

7    those workers.

8         On the other side of the balance, the injunction that

9    they're asking for and all of this about the WIS or Android

10   back-end server -- and I don't just want to repeat what's in

11   our pleadings, but I will refer the Court to the evidence that

12   is before it on this motion in the form of Mr. Shohat's

13   declaration.

14        If the Court were to impose those terms of

15   service-type terms that are in the -- I'm sorry -- the --

16   the -- the WIS and some of the other things that affect a lot

17   of the legal conduct of -- of NSO's business, that would,

18   first of all, not be accomplishable in -- I think they said

19   30 days.  It wouldn't be accomplishable in 30 days, and it

20   would halt the entirety of NSO's business in the ways

21   described by Mr. Shohat in his declaration.

22        So it would visit considerable and unwarranted

23   hardship on NSO to do a lot of things that do not flow from

24   the harms in this case, which are, again, the use of WhatsApp

25   servers, which is the only conduct that the Court has

1    determined to be unlawful under the CFAA or CDAFA, which is

2    where the Court's authority to impose injunction comes from.

3         On the point of public interest, I won't belabor

4    this, and I won't do it by reference to Mr. Minkler's

5    testimony.  Counsel's argument on public interest is that the

6    CFAA itself reflects the public interest.

7         The CFAA also, Your Honor, contains a law enforcement

8    exception.  If any law enforcement agency in this -- in this

9    country wanted to use Pegasus to -- in aid of a law

10   enforcement or counterterrorism or military intelligence or

11   other investigation, all of those uses would fall into the law

12   enforcement exception to the CFAA.

13        So to say that the -- the CFAA itself defines the

14   relevant public interest in this case without recognizing that

15   the -- it creates an exception to address the very types of

16   interest that we have heard about is not correct.

17        In addition, I have already said that all of NSO's

18   customers are and have been foreign law enforcement

19   counterterrorism agencies, apart, of course, from those that

20   are American law enforcement counterterrorism agencies.

21        The contracts with the -- with those

22   counterparties -- an example of one is attached to

23   Mr. Shohat's declaration -- they all restrict the use of

24   Pegasus to the investigation and prosecution of terrorism and

25   serious crimes.  And they involve the Government-to-

1  Government -- not involving NSO at all but foreign Government-

2  to-Israeli Government -- certifications that that is, in fact,

3  the use to which Pegasus is being put by NSO's customers.

4         So there is a -- a public interest that is implicated

5  here.  I would submit to the Court that that public interest

6  is not limited to the United States, but, even if it would,

7  they haven't carried their burden of showing because of the

8  CFAA exception.

9         It's not limited to the United States.  The public

10 interest would be disserved by the injunction that they are

11 asking for, which goes well beyond the conduct that the Court

12 has determined to be unlawful in the case.

13        Let me just look at my notes, if I may.

14        Oh, the per se rule that counsel mentioned, that not

15 only would be inconsistent with the requirements of the *Herb*

16 *Reed Enterprises* decision from the Ninth Circuit, the Supreme

17 Court's decision in *eBay* -- it says that there -- that

18 there's -- there -- well, there wouldn't be a per se rule.

19 All of the harms that counsel said have related to past

20 conduct.

21        Oh, finally -- you know, today there's been

22 discussion of one click, Facebook, Instagram, and other

23 platforms, unlawful collection from -- from target devices;

24 they claimed unlawful collection from target devices.

25        First of all, there's no evidence of the unlawfulness

1   of any of that collection, but, also, none of those things

2   that I mentioned -- all of which are features of the

3   injunction that's being proposed -- none of those involve

4   WhatsApp servers.

5          I believe I've already addressed the collection of

6   WhatsApp messages other than by Pegasus installed through

7   WhatsApp servers.  There's no suggestion -- it's never been

8   part of this case.  It's not been pleaded as part of this

9   case.  It hasn't been part of the discovery.  It hasn't been

10  part of any expert discovery.

11         Nothing before the Court other than the surmise and

12  argument as part of this injunction motion has included any

13  assertion or proof that -- that the collection of WhatsApp

14  messages by Pegasus installed other than through WhatsApp

15  servers is violative of the CFAA, the CDAFA, or other law.

16         And so if the Court has no other questions . . .

17         THE COURT:  No.  All right.

18         All right.  You get the last word.  It's your motion

19  but I don't really need to hear much in terms of rebuttal,

20  please.  I'd like to have a few minutes to talk about the

21  other motion.

22         MR. PEREZ-MARQUES:  Yes, Your Honor.  I think I can

23  be extremely brief.

24         I think, from everything we just heard, there's no

25  dispute as to the key facts that we believe show the risk of

1   future harm, the repeated nature.  All those facts are

2   undisputed.  They remain undisputed.

3         As to the injunction covering Meta's other services,

4   Meta Platforms, Inc., it's the parent company.  WhatsApp is a

5   wholly owned subsidiary.  They effectively conceded the key

6   point, which is some of the security engineers are burdened by

7   the need to surveil bad actors like NSO.  They're Meta

8   engineers.  They're not WhatsApp engineers.  The harm is to

9   them.  They should be protected from that, the same type of

10  harm that they've been -- experienced here.

11        Counsel said quite a bit about, you know, whether the

12  Court can enjoin contractual breaches, whether the Court

13  can't.  I didn't hear any engagement with what was the core of

14  our argument, which is that every provision of the injunction

15  we're seeking is tethered to the particular conduct that

16  violated the CFAA and CDAFA, including the reverse

17  engineering, the transmission of harmful code, et cetera.

18        On this idea that what we seek is to be in here every

19  week, it's the exact opposite, Your Honor.  What we seek is to

20  be rid of these guys and not have to come back, not have to

21  file any other lawsuits, so that they're on a clear notice

22  that they can't do what they've done in the past.

23        And then the last point on the harm for users, let me

24  be very clear.

25        Meta and WhatsApp care deeply about harm to users.

 1    They care deeply about the protection of their users' privacy.

 2    But the harms at issue in this case are harms to the

 3    plaintiffs, Meta and WhatsApp, the need to continue

 4    surveilling, the -- the -- the damage to the products.  It's

 5    all the things we've laid out in our briefing.

 6            So that clearly is part of the picture.  We do think

 7    it's relevant to the public interest, but it's not what we're

 8    relying on here.

 9            And I'll leave it there, Your Honor.

10            THE COURT:  Okay.  Good.

11            All right.  Let's turn to the last motion so that we

12    can conclude this afternoon, and that is the motion for a new

13    trial or for remittitur.  It seems to me, Counsel, that what

14    you're really seeking is a remittitur.

15            You haven't really argued that a new trial should be

16    granted on this, at least you haven't explicitly.

17            So tell me, what is it that you desire?

18            MR. AKROTIRIANAKIS:  Your Honor, in -- a motion for a

19    remittitur, as it is commonly referred, is required

20    procedurally to be made pursuant to Rule 59, which is the --

21    the new trial motion.

22            THE COURT:  Right.

23            MR. AKROTIRIANAKIS:  Then what the -- and I think

24    it's pretty clear -- I know the Court has questions; I won't

25    belabor this -- that like a remittitur is required by the due

1 | process clause in this case in light of the ratio.

2 | So, then, the Court's task -- and this doesn't really

3 | make sense to me, if I'm honest, as a practical matter -- is

4 | that you're supposed to remit the verdict to a particular

5 | amount, but then you give them the choice --

6 | THE COURT: Right.

7 | MR. AKROTIRIANAKIS: -- whether they accept the

8 | remittitur. And if they say, "No, I want" -- them, not me --

9 | "I want a new trial on the issue -- limited to the issue of

10 | punitive damages," and that's -- now, I can't imagine

11 | circumstances where a Court says "The outer limits of the due

12 | process clause are X; do you want to have a new trial?" But

13 | that's what the law says.

14 | And so it doesn't make sense to me, but it has to be

15 | made as a Rule 59 motion for a new trial. That's what it's

16 | called. That's all.

17 | THE COURT: Okay.

18 | Okay. So let's just get to the heart of this issue.

19 | There seems to be no disagreement. We know that the

20 | leading cases are *BMW versus Gore* and *State Farm versus*

21 | *Campbell* on the due process issue and that *Riley versus VW*

22 | sets forth the guidelines for application of a due process

23 | test for the Ninth Circuit.

24 | We look at three factors, the reprehensibility of the

25 | defendants' conduct, disparity between the harm or potential

1    harm and the claimants' damages, and, three, the differential

2    between the punitive damages and the compensatory damages.

3            Okay.  So we have three prongs of this test to

4    evaluate.

5            I'll just say, with regard to reprehensibility,

6    I don't really need to have a lot of argument.  There are --

7    I think both sides have made arguments and it cuts both ways.

8    There are some factors that, in my view, favor the plaintiffs,

9    and there are some factors that, in my view, favor the

10   defendant.  I don't know that there's anything else that you

11   all could say that would help me decide the case.

12           And the only question I have on this prong -- and

13   I'll ask both sides -- is with regard to the requirement -- or

14   that -- the one consideration as to whether the tortious

15   conduct evinced indifference or reckless disregard of the

16   health and safety of others -- who are the others in this --

17   in this criterion?  Who are the others?

18           And I ask that because in other provisions they

19   specify targets; in the third provision, whether or not the

20   target of the conduct had financial vulnerability.  So,

21   obviously, the drafters could distinguish targets from others.

22           Who are the others?  And if . . . and are they the

23   plaintiffs or the -- if not the plaintiffs -- because they

24   don't say "the claimant" or "the plaintiff"; they say

25   "others."  Who are those?  Would that be the third-party

1    targets in this case?

2         MR. AKROTIRIANAKIS:  It wouldn't be, Your Honor.

3    I don't think there's any -- first of all, punitive damages

4    can only be based on conduct within the state of California

5    and conduct directed to the state of California.

6         I don't think there's any dispute -- even if it did

7    include the target users -- and now we're saying the word

8    "target" twice.  The target that they're referring to in the

9    Supreme Court's announcement of these -- of these

10   reprehensibility factors is not like the target users.  Okay?

11        THE COURT:  No.  The target is the -- would be the

12   plaintiff.

13        MR. AKROTIRIANAKIS:  The plaintiff, right.  Okay.

14   And so that --

15        THE COURT:  How do you differentiate that between

16   others in the second criteria?

17        MR. AKROTIRIANAKIS:  Well, so in -- in many cases --

18   and this is not a -- a -- a paradigmatic, you know, punitive

19   damages case, you know, the -- the conduct that a defendant

20   engages into -- let's say they make a product and the product

21   is in the market and it hurt the plaintiff and they knew it

22   was dangerous and they were deliberately indifferent to the

23   fact that it was dangerous to the plaintiff and to others.

24        Then there would have to still be others in

25   California for -- because California can only establish

1  punitive damages for acts within its state.  That's a separate

2  issue.  But that -- that factor doesn't really fit the facts

3  of this case.  They're not arguing that it does fit the facts

4  of this case.

5         But even in like a parallel universe where it was

6  relevant here, the "others" cannot be the persons identified

7  as target users in the complaint because there's no evidence

8  of who those people are, where they are, anything like that,

9  Your Honor.

10        And there's certainly -- and I don't think -- even

11 the absence of evidence aside, I don't think anybody claims

12 that they were in California.

13        THE COURT:  Okay.  Your response?

14        MR. PEREZ-MARQUES:  Yes, Your Honor.

15        Just on reprehensibility, I would just make three

16 points.  First is that that reprehensibility is, of course,

17 something that was assessed by the jury on which they were

18 instructed and on which the jury, in our view, reached quite

19 an emphatic assessment, quite a clear assessment of where they

20 came out on reprehensibility.  And there is in the case law a

21 strong policy against disturbing a jury decision on something

22 like that.

23        THE COURT:  The jury already decided this question,

24 so I don't -- I need not even evaluate where we are.

25        MR. PEREZ-MARQUES:  We believe reprehensibility is

1    established by the finding of the jury.

2          Now, they reached that verdict having been instructed

3    by the Court after extensive back-and-forth between the

4    parties as to the proper and improper considerations on

5    reprehensibility, including the question, I believe, that the

6    Court just posed as to who are these others.  And I believe

7    the way they were instructed was that it had to be harm to

8    plaintiffs and that harm to others should not be considered.

9          And there's, again, in the law a strong presumption

10   that a jury follows the instructions that are provided by the

11   Court.

12         And then the third point I would make, just

13   factually, is that whether "others" there refers to plaintiffs

14   specifically or embraces third parties, so to speak, it

15   doesn't really matter because NSO acted with reckless

16   indifference to the rights of both.  They didn't care that the

17   targets didn't want them on their phone; they didn't care that

18   WhatsApp didn't want their traffic going through our servers.

19         THE COURT:  Okay.

20         MR. AKROTIRIANAKIS:  If I may, Your Honor, I didn't

21   actually get to address this, so I will address it now.

22         It's not the rights of both; it's the health and

23   safety of others.  There's no -- there's no issues -- the

24   Court has already made a finding that the health and safety of

25   Facebook and WhatsApp and Meta is not an issue in this case,

1  and there just isn't any relevant harm to health or safety of

2  any of the -- of the plaintiffs.

3          So it's not the rights of both, which is the

4  misstatement of the standard that we just heard.  The . . .

5  the issue is whether it was deliberate indifference to the

6  health or safety of others, and there's just nothing like that

7  in this case.

8          Also, as far as the jury having determined

9  reprehensibility, that's not true in any event because the

10  jury -- the Court has excluded from the jury's consideration a

11  bunch of evidence on -- on bases that it's 403 or other things

12  like that that the -- that the Court is aware of.

13          And, in any event, the Supreme Court, no less in

14  two cases, *Gore* and *State Farm*, has stated that the Court

15  makes an independent assessment of all of these factors.

16  There's no like, "Oh, well, the jury already took care of it,

17  so, therefore, the Court is relieved of that burden."  That's

18  not what this body of law is about at all.  I don't know --

19  I don't know where that's coming from, that statement.

20          And as far as the . . . the Court's earlier

21  statement -- yes, *Riley* is a Ninth Circuit case.  There are a

22  number of -- of other cases, other than -- than *Riley* that

23  define a number of the issues that the Court, in its

24  independent assessment, is obligated to consider as far as

25  reprehensibility, whether the conduct is, you know,

1   particularly egregious, how many factors that means and so on,

2   and they're -- they're in our -- they're in our briefs.  We

3   can go through them if you want to.

4          THE COURT:  No.  I just had a question as to that one

5   discrete prong.

6          Thank you, both.

7          All right.  And then the next *Riley* factor is the

8   disparity between the harm or potential harm and the punitive

9   damages, and this is the ratio that you all have referred to.

10         Okay.  So do -- do both of you agree -- I mean . . .

11  defendants rely upon the *Ramirez* case, which predates *Riley*.

12  *Riley* -- and it uses the term "substantial" and -- referring

13  to the compensatory damages -- and the *Riley* case uses the

14  term "significant."

15         Do you agree that those are relatively synonymous in

16  this analysis?

17         MR. AKROTIRIANAKIS:  I think that the -- there's

18  different labels that get put on this on different parts of

19  these, and I think they all kind of mean the same thing.

20         Some Courts say "significant"; some Courts say

21  "substantial"; some Courts refer --

22         THE COURT:  That's what I just said.  Do you think

23  that they mean essentially the same thing?

24         MR. AKROTIRIANAKIS:  I think they're intended to mean

25  the same thing, and I think the same is true with respect to

1    Courts that use the word "small" to mean the opposite of those

2    things like "insignificant" or "insubstantial."  Whichever

3    label you put on it I think it's the same.

4             THE COURT:  Do you agree?

5             MR. PEREZ-MARQUES:  We generally agree, Your Honor.

6             THE COURT:  Can you guys just say "yes" sometimes?

7    You know, just every now and then just say "yes" or "no."

8             Okay.  And so in terms of -- do you think,

9    Mr. Akrotirianakis, that there is a conflict between *Riley* and

10   *Ramirez* in terms of the test that should apply?  I mean, the

11   *Riley* test is pretty clear.

12            We know that the 4-to-1 ratio -- not to exceed 4-to-1

13   where there are significant or substantial economic damages

14   but the behavior is not particularly egregious; right?

15            And the 4-to-1 ratio can be increased up to a

16   9-to-1 ratio where there are significant economic damages and

17   the behavior is more egregious.

18            And only can the punies exceed the 10-to-1 ratio

19   where there are insignificant economic damages and the

20   behavior was particularly egregious.

21            Those appear to be the three steps -- right? -- that

22   we look at.

23            Do you all agree that that's the appropriate test?

24   Or are you arguing something else should be applied?

25            MR. AKROTIRIANAKIS:  I think that the -- and I --

1     I may have just misheard the Court, but I want to make sure

2     because this is an important issue.

3              That sort of middle bucket -- I think of it as sort

4     of three buckets and then the sort of separate theoretical

5     bucket.  Right?

6              One is where the conduct is particularly egregious

7     and the damages -- the compensatory damages -- are small.

8              THE COURT:  Yeah.

9              MR. AKROTIRIANAKIS:  And that comes from *Riley*.  And

10    that's the bucket where they say that you're in this 6-to-1 or

11    9-to-1 ratio.  Okay?

12             THE COURT:  I think that -- no.

13             I think that bucket is -- can be -- you -- the Court

14    can exceed the 10-to-1 if the damages are small or

15    insignificant but the behavior was particularly egregious.

16             That's how I read *Riley*.

17             MR. AKROTIRIANAKIS:  So I -- I don't agree but

18    I don't think it matters for the point I'm trying to make.

19             The 4-to-1 bucket, I think, is where conduct is

20    egregious -- perhaps not particularly egregious but it is

21    egregious -- but damages are substantial.  And that comes from

22    *Ramirez* and the *Hardeman* case that they cite.

23             And then the third bucket is where conduct is not

24    particularly egregious and damages are substantial.  And this

25    is -- *Ramirez* refers to this and, more importantly,

1   *State Farm.*  The quote is "When compensatory damages are

2   substantial, then a lesser ratio, perhaps only equal to

3   compensatory damages, can reach the outermost limit of the due

4   process guarantee."

5           And then what I was mentioning as the -- the

6   theoretical bucket would be the case -- *Simmons* -- what's the

7   name of that case? -- *Swinton* -- that predates *State Farm* --

8   is limited by *State Farm*.

9           This was the race discrimination case, Your Honor,

10  where the -- the plaintiff had like a -- a pretty low wage and

11  things like that, was subjected to really -- really horrific

12  abuse at work.  And so his compensatory damages were -- were

13  very low.

14          The reprehensibility factors in that case were that,

15  you know, it was a harm that was very personal to him as a

16  person and, really, every factor, and in that case the Court

17  applied a higher-than-single-digit multiplier.

18          *State Farm* comes later and *State Farm*, of course,

19  limits the early Ninth Circuit precedent, including *Swinton*,

20  and -- and I think that *State Farm* should be read that, if

21  *Swinton* came up today, that it would be capped at -- at 9-to-1

22  under -- under *State Farm*.

23          So there --

24          THE COURT:  I don't think I have to go back that far.

25  I think I can just rely on -- on the latest Ninth Circuit

1    pronouncement, which is *Riley*.

2         MR. AKROTIRIANAKIS:  Well, in the *Riley* case,

3    Your Honor, that was, I believe, 8-to-1 because they fitted

4    the -- the case into the bucket with the particularly

5    egregious.

6         THE COURT:  Okay.  Well, I'm going to follow my

7    reading of *Riley*, and those are the three categories that I'm

8    applying.

9         So the question is, where do -- where do we fall

10   here?  Which formula is the appropriate one here?

11        And they're -- each side I have a question because

12   I want to make sure I understand your position.

13        And, Mr. Akrotirianakis, your position is there

14   should be either no punitive damages or, at the very most, the

15   4-to-1 ratio; is that correct?

16        MR. AKROTIRIANAKIS:  I think that the limit of the

17   Constitution as applied to this case under *State Farm* is

18   1-to-1 and, even if the Court makes a determination that it is

19   egregious, that 4-to-1 would still be the outer constitutional

20   limit.  That's my position.

21        THE COURT:  Okay.  Thank you for clarifying.

22        Now -- and that's because you think the damages --

23   the compensatory damages were significant -- substantial?

24        MR. AKROTIRIANAKIS:  Substantial.

25        THE COURT:  Large?

1          MR. AKROTIRIANAKIS:  Substantial.

2          THE COURT:  Okay.  I'm having a little hard time

3    reconciling your argument now that the damages are substantial

4    with -- I believe it was in your closing argument or somewhere

5    else -- actually, I think it was in your opening statement as

6    well as in your closing argument -- where you characterized

7    the claimed compensatory damages of $440,000 as a mere

8    pittance, that this was a show trial, that this was about

9    publicity, it wasn't about the -- any real monetary loss or --

10   or financial harm.

11         And you referred -- I believe it was in your close --

12   in closing you or one of your team members referred to

13   Face- -- Facebook being a trillion-dollar company and that

14   this was, you know, pennies to them.

15         I don't quite -- how do you reconcile the two with

16   you now saying 400 -- saying previously that it was just a

17   mere pittance and then now saying that the $444,000 was

18   substantial?

19         MR. AKROTIRIANAKIS:  It's two different points

20   entirely, Your Honor.

21         The point I was making to the jury, that the Court

22   has referred to as a show trial --

23         THE COURT:  No, you referred to it as a show trial.

24   I'm just using the language that you all used.  I never

25   referred to it as a show trial.

1      MR. AKROTIRIANAKIS:  Well, I think a show trial has a

2   very specific --

3      THE COURT:  It's something that seemed to have exited

4   midway.  Okay.  It was not a show trial.  It was a real trial.

5   But you used that term over and over again.

6      I mean, I was a little surprised to read now that you

7   thought that those damages that you described as a mere

8   pittance that they were claiming are now so substantial that

9   they should not get any more punitive damages.

10     MR. AKROTIRIANAKIS:  Your Honor, what I was saying to

11  the jury is that "Can you, Jury, really believe a

12  trillion-dollar company like Facebook is dragging you down

13  here for a week or week and a half over $444,000?"  And "There

14  is some ulterior motive that is going -- that exists, and

15  that's why we're -- they're here, not for the 44- --

16  $444,000."

17     In the framework of this case law, the $444,000 is

18  every single penny that they asked for -- okay? -- and it well

19  exceeds many cases -- I've cited several of them in our

20  brief -- where the Ninth Circuit has determined that far

21  lesser awards, such as $14,000, $50,000, $88,000, and the

22  like, all constituted substantial compensatory damages awards.

23     THE COURT:  No -- I have a hard time with the cases

24  you relied upon.  I can't even begin to compare -- we're

25  talking apples and oranges.

1          I can't begin to compare the factual scenarios in

2    those cases involving discrimination and what have you with

3    this kind of case, so I can't apply -- I mean, there's no

4    bright line standard for what's substantial and what isn't.

5          There are cases where a million dollars was

6    determined to be substantial; there may be cases where a half

7    a million dollars was considered to be insubstantial.

8          MR. AKROTIRIANAKIS:  No, there aren't, Your Honor.

9    There is no case like that.

10         THE COURT:  It doesn't matter what the other cases

11   are because their facts are so different.

12         MR. AKROTIRIANAKIS:  Well, it does --

13         THE COURT:  And the facts are different -- well, it

14   doesn't matter to me.

15         MR. AKROTIRIANAKIS:  Well --

16         THE COURT:  But there are other cases that have

17   different amounts.

18         There's no case that I -- that you've cited to me

19   that says in a computer hacking case it -- involving a

20   trillion-dollar company -- that $444,000 is substantial.

21         What I'm trying to get at is understanding both of

22   the positions that you're taking, and they're all based upon

23   your read of other cases in different amounts that don't

24   translate for me into a standard from which I can judge

25   whether $440,000 for a -- a trillion-dollar company is to be

1   considered substantial.

2          Do I not consider the wealth or health of the -- of

3   the company?

4          MR. AKROTIRIANAKIS:  Yes, you do not consider that.

5   There's no sliding scale based on who the plaintiff is or

6   what.  It's just a number.  Is it a substantial number or

7   isn't it a substantial amount of money?  And there is no

8   case --

9          THE COURT:  And who determines if it's substantial

10  or not?

11         MR. AKROTIRIANAKIS:  You.

12         THE COURT:  I do.  Okay.

13         MR. AKROTIRIANAKIS:  Yes.

14         THE COURT:  And given the verdicts I see in this

15  Court, $444,000 is not substantial.

16         MR. AKROTIRIANAKIS:  It's substantial when you

17  consider that it is what they asked for.

18         THE COURT:  Well, you're trying to -- you have to

19  convince me, and I'm just trying to understand the positions.

20  Okay?

21         And a race discrimination case does not provide to me

22  sufficient guidance to determine if $444,000 is substantial

23  or not.

24         Do you have a case that's closer and to the facts to

25  this -- of this case?

1        MR. AKROTIRIANAKIS:  What I can tell the Court is

2   that there is no case -- none, not one -- where the Ninth

3   Circuit has said that an award of $444,000 is not substantial.

4   There's no case like that.  They haven't cited one.  I haven't

5   found one.

6        They purport to put before the Court this *Hardeman*

7   case and assert that *Hardeman* stands for the rule that if the

8   damages are not at least a million dollars then they're not

9   substantial.  That's not what *Hardeman* holds.

10       In fact, in *Hardeman,* as I recall, it was a

11  $5 million compensatory damages award that was determined to

12  be substantial.

13       The $1 million reference that they're making comes

14  from a Tenth Circuit case that is part of a string cite in

15  *Hardeman*.  It's called *Lompe versus Sunridge Partners*,

16  818 F.3d 1041, Tenth Circuit, 2016.

17       In that case the Tenth Circuit observed --

18  observed -- well, determined that the $1 million -- observed

19  that amounts over a million dollars are all substantial, and

20  many awards have been considered substantial even when they

21  are less.

22       And the one that they're referring to in that case

23  is -- I don't have this in my notes, but I seem to recall they

24  referenced a $630,000 -- $630,000 award.

25       But the -- the two important things, I think, for the

1   Court's determination on this issue is, one, there's not --

2   there's not some sliding scale that -- where you take into

3   context the overall wealth of the plaintiff and -- and so on.

4   It's just not judged based on the facts.

5          It's just is the number a substantial number or is it

6   insubstantial.

7          THE COURT:  But is -- but that's subjective, is it

8   not?  What's substantial in the Northern District of

9   California isn't the same thing that's going to be substantial

10  in Des Moines, Iowa, in terms of an award.

11         MR. AKROTIRIANAKIS:  Well, Des Moines, Iowa, is not

12  in the Ninth Circuit, Your Honor.  And the Ninth Circuit has a

13  number of cases.

14         THE COURT:  All I'm doing is just illustrating my

15  point, my point being that it's -- it's subjective unless you

16  can point to a case with fairly analogous or at least close

17  facts.

18         MR. AKROTIRIANAKIS:  You don't judge it based on the

19  facts, Your Honor.  That's my point.  Is the number

20  objectively a substantial number?

21         And there is no Ninth Circuit case that has found

22  that $444,000 is not substantial.

23         THE COURT:  Okay.

24         MR. AKROTIRIANAKIS:  And there are many -- for

25  example, *Planned Parenthood*, one of the largest of the

1    verdicts there -- there were numerous plaintiffs, and they had

2    different verdicts, and, there, $405,000 was determined to be

3    substantial.

4              THE COURT:  Okay.

5              MR. AKROTIRIANAKIS:  Another plaintiff had $14,000

6    that was determined to be substantial.

7              THE COURT:  Okay.

8              Can I hear from you on this?

9              MR. PEREZ-MARQUES:  Your Honor, we really don't have

10   anything to add to our papers on this.  We agree with how the

11   Court laid out the various buckets, and we agree with

12   Your Honor that into which of those buckets this case falls is

13   highly case specific.

14             THE COURT:  But do you agree with him that there is

15   no standard, that there -- that it's not -- it's not

16   appropriate for me to compare the type of causes of action or

17   cases that are at issue or that Facebook's health or wealth is

18   irrelevant?

19             Do you agree?

20             MR. PEREZ-MARQUES:  Well, on the issue of whether the

21   case-specific analysis is required, we do agree.

22             We don't think that there is a bright line on this

23   issue of, you know, where -- to -- that would let you

24   determine which of the buckets it falls into.

25             We agree with Your Honor that this requires a

1    subjective assessment in the context of the particular case.

2            THE COURT:  Okay.  So with regard to where you all

3    stand, you know -- I have your brief in front of me.  This is

4    Document 758.  It's the plaintiffs' opposition.

5            And I just don't understand this provision.  I'll

6    just read from -- on page 8, lines 4 through 12:  "The Court

7    need not determine whether the compensatory damages were

8    substantial to reject NSO's argument.  The Ninth Circuit has

9    never defined what constitutes a substantial award, although

10   it recently cited a decision finding that compensatory damages

11   have often been considered substantial when they are over

12   $1 million."  That's the *Hardeman* case that counsel just

13   referred to.

14           "Under this standard the $444,719 in compensatory

15   damages awarded by the jury falls short of a substantial

16   compensatory damages award."

17           And then this last sentence is what I don't get.

18   "The Court need not weigh in here.  NSO's conduct was

19   particularly egregious" -- parenthetical, "and, thus, easily

20   qualifies as more egregious under *Riley*" -- "allowing the

21   Court to uphold the punitive damages award of at least

22   4-to-1."

23           I don't -- I think I'm confused because the "more

24   egregious" allows a damages award of up to 9-to-1, the

25   substantial and more egregious.

1          MR. PEREZ-MARQUES:  Yeah.

2          THE COURT:  So does that mean that you're not arguing

3     for a particularly egregious award in excess of the 9-to-1?

4          MR. PEREZ-MARQUES:  Well, Your Honor, I think our

5     argument here was directed to the way the plaintiffs argued

6     their motion, which was that it shouldn't go over 4-to-1.  And

7     so we're explaining that's clearly not the case because we

8     have particularly egregious conduct.

9          And we do believe that the conduct here was

10    particularly egregious, but we haven't -- we didn't ask for a

11    specific number from the jury -- for the jury; we're not

12    asking for a specific number or specific ratio from Your

13    Honor.

14         THE COURT:  Are you going to provide any guidance for

15    me at all?

16         MR. PEREZ-MARQUES:  We -- we do believe the conduct

17    qualifies as particularly egregious.  We've made that clear.

18         We think that's a highly case-specific analysis, and

19    we've explained the facts that we believe make this conduct

20    particularly egregious.  And we believe that is relevant.

21         And so those are -- those are the elements of the

22    guidance that we would provide, Your Honor.

23         THE COURT:  Hm-m.  Okay.

24         MR. AKROTIRIANAKIS:  Your Honor, on the question you

25    asked about whether you consider the wealth of the plaintiff,

1    that is pertinent not to the issue whether the compensatory

2    damage award is substantial but the -- whether the target of

3    the conduct had financial vulnerability is a factor.  So that

4    implicates the -- the wealth of that party.

5              But, there, applying that factor, if the party had

6    lower wealth, then it's higher -- more reprehensible.

7              THE COURT:  That doesn't cut in their favor for sure.

8    I understand.

9              MR. AKROTIRIANAKIS:  Yeah.  It goes down.  It's less

10   reprehensible.

11             And as far as the . . . I mean, to fit into the

12   6-to-1, 9-to-1 bucket, Your Honor, they -- you would have to

13   make a determination not just that -- that it's not

14   substantial but that it is objectively small.

15             That's the -- that's the -- the language from,

16   I think, *Riley* that -- that puts it in that -- in that bucket.

17             And, again, that's not -- that's not something

18   where -- where you look at -- you know, you compare the, you

19   know, factors about the -- the plaintiff or -- or the case.

20   It's just an objective determination.

21             THE COURT:  Yeah.  And I -- that's the last thing

22   I did want to --

23             MR. AKROTIRIANAKIS:  They're not arguing --

24   I'm sorry.

25             THE COURT:  No, I did want to ask you while you

1   were -- I mean, you think that you've established that the

2   third bucket applies -- right? -- the -- the exceeding the

3   9-to-1 bucket -- because it was particularly egregious

4   conduct?  Correct?

5        MR. PEREZ-MARQUES:  That's correct, Your Honor.

6        THE COURT:  Okay.  Does that mean that you find the

7   $444,000 in compensatory damages insignificant?

8        MR. PEREZ-MARQUES:  We -- we do --

9        THE COURT:  Or insubstantial?

10        MR. PEREZ-MARQUES:  -- in the facts of this case,

11   Your Honor.

12        THE COURT:  Tell me why.

13        MR. PEREZ-MARQUES:  Well, as the Court noted, it's an

14   amount that the plaintiffs themselves are -- or, sorry,

15   defendants themselves -- argued was a pittance, an amount that

16   rendered it incredible that we would even pursue this case

17   because it was such an insignificant amount of money.

18        So in the context of this case, in the context of

19   these parties, in the context of the overall conduct in

20   dispute --

21        THE COURT:  Do I look at the context?  Defense

22   counsel seems to be suggesting context is irrelevant, that

23   we -- I just pull the number out based upon my view as to

24   what's large and what isn't.

25        MR. PEREZ-MARQUES:  I don't believe that the notion

1    that the context is irrelevant can be reconciled with the case

2    law that even they rely on.

3          If you have cases saying in an employment

4    discrimination context 14,000 is enough and then you have the

5    Ninth -- to be substantial -- and then the Ninth Circuit

6    saying a million dollars is a -- is a pretty good benchmark --

7    obviously, there's some consideration of context that is

8    happening there.

9          MR. AKROTIRIANAKIS:  There's just no authority for

10   that kind of analysis, Your Honor, not in any of those

11   cases -- *Hardeman,* not *Lompe* from the Tenth Circuit -- none of

12   the Ninth Circuit cases analyze it that way.

13         They say that the Court is supposed to do an

14   independent analysis of all of these things.  They talk about

15   substantial is sometimes called significant.  They talk about

16   small or insignificant -- whatever -- but nobody has ever --

17   the Ninth Circuit nor the Supreme Court or any other circuit

18   I'm aware of analyzes it the way the Court is -- is proposing

19   to analyze it.  There's just no authority for that sort of

20   analysis.

21         THE COURT:  Hm-m.  Okay.

22         Okay.  I think those were the questions that I had

23   of you.

24         Let's see if I have anything else.

25         No.  Okay.

1         Anything else?  Two minutes each.

2         MR. AKROTIRIANAKIS:  Mr. Craig wanted to address the

3    Court on the sealing order that you -- that you issued just

4    in -- I think we have an agreement between the parties on the

5    timing.

6         THE COURT:  Can we wrap this up first?

7         Anything else on this --

8         MR. PEREZ-MARQUES:  The only thing that we wanted to

9    wrap up, Your Honor, is not an argument but just to understand

10   where we are in terms of posthearing discovery or if the Court

11   wants to reserve on that because our position, as

12   I've indicated, is that we don't need any more discovery.

13        THE COURT:  Yeah.  I want this case to be over.

14        And so I'll -- I'll let you know.

15        MR. PEREZ-MARQUES:  Thank you, Your Honor.

16        THE COURT:  I'll let you know but it's not like I'm

17   going to reopen discovery and entertain yet another round of

18   briefing in this case.

19        MR. PEREZ-MARQUES:  Thank you, Your Honor.

20        THE COURT:  Okay.  So that motion, then, stands

21   submitted.

22        Let's go, then, to whatever is outstanding.

23        You said there is -- I think I requested another

24   omnibus motion.

25        MR. CRAIG:  Yes, Your Honor.  And this is partly

 1   about that.  And I think this is a joint presentation by the

 2   parties.

 3              THE COURT:  My, something I don't believe I've ever

 4   seen.

 5              MR. CRAIG:  Sure.

 6              MR. MARZORATI:  We're trying to make history here,

 7   Your Honor.

 8              THE COURT:  Oh, thank you.

 9              MR. CRAIG:  Your Honor may remember in the latest

10   sealing order that Your Honor allowed three categories of --

11   of material to be redacted, personally identifiable

12   information, information about foreign proceedings, and

13   computer code.

14              THE COURT:  Right.

15              MR. CRAIG:  We believe there was an implicit

16   additional category of material that was allowed to be

17   redacted, and that is the content of the sealed trial exhibits

18   and the other materials that the Court has previously ordered

19   sealed.

20              In order for those orders to be and remain effective,

21   it wouldn't make sense for the parties to have to file briefs

22   in open court that quoted from those documents.  And so --

23              THE COURT:  We're talking about exhibits that were

24   sealed during the course of the trial?

25              MR. CRAIG:  Yes, Your Honor.

1          THE COURT:  Yeah, they should remain sealed.

2          MR. CRAIG:  Thank you, Your Honor.

3          That was a bit of an ambiguity in the Court's order,

4    so we proceeded with that with the filing of the briefs, and

5    we're going to continue to do that if it comes up again with

6    respect to future redactions.

7          The other issue relates to the timing of the Court's

8    order.

9          We met the Court's first deadline of filing of the --

10   the briefs in the public record.  There's a deadline coming up

11   on September 2nd for the defendants to file the technical

12   documents that were associated with past filings, summary

13   judgment, and sanctions.

14         The Court put it as three weeks from the date of this

15   order, which would be Labor Day, but it's going to be

16   September 2nd, and then there's a September 5th deadline for

17   the omnibus motion.

18         The parties have been laser focused on today's

19   hearing, and so we would ask -- and we have a stipulation that

20   we had drafted and sent to plaintiffs, and they have indicated

21   that they're agreeable to it -- for a two-week continuance of

22   both of those deadlines.

23         THE COURT:  Okay.

24         MR. CRAIG:  So that -- that's fine, Your Honor?

25         Thank you.

1          MR. MARZORATI:  Thank you, Your Honor.

2          THE COURT:  All right.  Anything else?

3          MR. ANDRES:  Have a nice weekend, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          The matter is submitted.

6      (Proceedings adjourned at 3:56 p.m., August 28, 2025.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, MELANIE HUMPHREY-SONNTAG, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that I remotely reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 2nd day of September, 2025.

/s/ Melanie Humphrey-Sonntag

_____

MELANIE HUMPHREY-SONNTAG
RDR, CRR, CRC
Federal Official Court Reporter