**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Exhibit 3

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES
LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **DECLARATION OF TERRENCE MCGRAW IN SUPPORT OF DEFENDANTS NSO GROUP TECHNOLOGIES LIMITED AND Q CYBER TECHNOLOGIES LIMITED'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** <br><br> Action Filed:   10/29/2019 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

I, Terrence McGraw, declare as follows:

1.      I am an Executive Consultant in Cybersecurity for Gray Analytics, and I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") as an expert in this matter.

2.      In connection with my engagement, I have reviewed and evaluated technical materials produced by WhatsApp Inc. ("WhatsApp" or "WA), Meta Platforms, Inc. f.k.a. Facebook, Inc ("Facebook" or "FB"), and NSO.   I have personal knowledge of the facts in this declaration, and I would and could testify competently to these facts if called as a witness.

**Qualifications**

3.      I hold a MSA in Information Systems Resource Management from Central Michigan University.  Additionally, I am a graduate of the U.S. Army School of Information Technology Telecommunications Systems Engineering program, a Master's Degree equivalent provided and endorsed by Georgia Southern University and the University of Pittsburgh.

4.       In 2008, I was assigned to the Army Global Network Operations and Security Command (which in 2010 became the Army Cyber Command Operations Center), where I remained assigned until 2012 when I deployed for my second tour in Afghanistan.  I had three major leadership roles during this time:

5.      I served as the Future Operations Chief of the Army Global Network Operations and Security Center between 2008 and 2010. Future Operations is the planning and management of operations outside a 72-hour window.  My responsibilities included planning for Army Cyber operations, incident response actions, and infrastructure and operational changes for which Army Cyber was responsible.

6.      My next role was leading a highly classified small counterintelligence joint task force composed of military and civilian members of the Army, Navy, Air Force, Marines and civilian analysts from the National Security Agency ("NSA").  The mission goals of this task force were to develop new systems and processes to improve counterintelligence capabilities within the NSA and Cyber Command.  This program required the highest level of authorization and oversight

1   of the intelligence community.

2       7.    My last role before deployment was Chief of the Joint Mission Assurance Cyber

3   Cell, another civilian and military task force created to conduct cyber-security assessments of

4   critical infrastructure and systems with the North American Area of Operations and provide

5   recommendations for the Army Cyber Commander in support of the NORTHCOM commanders'

6   mission to protect said systems, such as the space and missile defense capabilities.

7       8.    My culminating assignment in the Army was Director of Operations, Task Force

8   Signal AFGN, 160th Signal Bde Fwd.  I was responsible for all communications infrastructure

9   within the area of operations and the defense thereof.

10      9.    I retired from the armed forces in 2014 as a Lieutenant Colonel and went to work

11   for Dell SecureWorks, where I was Vice President of Global Cyber Threat Research and Analysis.

12   In this capacity I led the teams that conducted the daily intrusion analysis and threat research for

13   SecureWorks' customer base of 4300 companies and state and local governments.  As the

14   executive overseeing these operations, I was also the senior Incident Response Commander for the

15   largest of these engagements, such as for the city of Atlanta, other municipalities, and several

16   global companies.

17   **WhatsApp's VoIP System**

18       **(1)    VoIP Basics**

19      10.    Voice over Internet Protocol (VoIP) is a ubiquitous technology that allows real-

20   time voice and video communications over the Internet. Instead of using traditional circuit-

21   switched telephony, VoIP relies on packet-switched networking (such as the Internet), which is

22   more efficient and flexible.

23      11.    Placing a VoIP call frequently involves two additional technologies: XMPP

24   (Extensible Messaging and Presence Protocol) and WebRTC (Web Real-Time Communication).

25   XMPP is an Extensible Markup Language (XML)-based messaging protocol that is frequently

26   used to exchange the messages (called "stanzas") immediately after the call is initiated that are

27   necessary to establish a call connection. WebRTC is a real-time streaming protocol used to perform

28

---

1  the real-time exchange of data packet streams during the call.

2      12.    To begin a call, the caller's and callee's "client" applications[1] must establish a

3  connection. To do so, the caller side starts by sending the callee a XMPP message stanza

4  sometimes referred to as the "offer." This call offer contains information needed to establish the

5  offered call, such as IP addresses, ports and media capabilities. Once the callee side receives the

6  offer message, it typically responds with an acknowledgement message, and the caller and callee

7  then exchange various XMPP messages to "negotiate" the details of how to connect the call. This

8  negotiation involves negotiating session parameters, such as which codecs will be used for

9  encoding/decoding voice data.  All of this takes a few milliseconds to complete. Because XMPP

10  is an extensible standard, any given VoIP implementation may utilize any number of standard or

11  custom messages/stanzas.

12      13.    XMPP messages, such as the call offer, are not typically sent directly to the callee.

13  Instead (as in WhatsApp's system), the call offer can initially be sent to a "signaling server" that

14  acts as an intermediary between caller and callee client application. The signaling server may

15  perform various functions, such as finding the callee device, enforcing certain constraints on the

16  XMPP messages (e.g., through "stanza validation"), and/or modifying the information in the

17  XMPP messages. Ultimately, the signaling server forwards the messages to the callee' application.

18  None of WhatsApp's signaling servers were, or are, located in California. (Akro. Decl. Exh. L

19  (Gheorghe Tr. 185:3-6).)

20      14.    Once the caller and callee client applications reach agreement on the parameters of

21  their connection, they establish a WebRTC connection using the agreed upon connection settings.

22  WebRTC is an open-source project that provides web browsers and mobile applications with the

23  ability to perform real-time communication (RTC) via simple JavaScript APIs (Application

24  Programming Interfaces in a particular scripting language). It enables peer-to-peer audio, video,

25  and data sharing directly between browsers without requiring plugins or intermediate servers for

26

27  [1] A "client" is a software application that sends requests for service to a "server." For example, a WhatsApp application on a user's device (whether caller or callee) is a "client" of the WhatsApp servers.

28

the media transfer. This makes WebRTC a powerful tool for creating applications like video conferencing, voice calls, and data sharing directly in the browser.   As with the call connection communications, the WebRTC connection between the caller and callee can be direct ("peer-to-peer") or indirect (i.e., through one or more intermediary "relay servers"). A relay server's function is to receive the WebRTC packets from the sender (whether caller or callee) and forward those to the receiver.

15.    During an active call, the signaling server continues to handle control messages, such as putting a call on hold, transferring a call, or adding participants for a conference call. For example, if users want to switch from a voice call to a video call after the voice call has begun, the signaling server coordinates this change by renegotiating the session parameters.

16.    When either party decides to end the call, their device sends a message to the other signaling the end of the call. The signaling server updates its records to reflect that the call is over and frees up any resources allocated for the session. This includes de-registering the clients if necessary and closing any associated media channels.

### (2)    WhatsApp's VoIP System in 2019

17.    In 2019, WhatsApp provided users with VoIP functionality, including audio and video calling.

18.    The following is my understanding of how the relevant parts of WhatsApp's VoIP system operated in 2019. My understanding is informed by the deposition testimony of Claudiu Gheorghe (WhatsApp's head of VoIP infrastructure in 2019), who testified at length and as Plaintiffs' corporate designee about the workings of the WhatsApp VoIP system in 2019 during his deposition in Palo Alto, California, on August 16, 2024.  (I attended the deposition virtually.) My understanding is further informed by my review of the technical documents produced in this litigation.

19.    My understanding is that WhatsApp's VoIP system operated using XMPP and WebRTC protocols similar to those discussed above.

20.    To make a call, the WhatsApp client application (executing on the caller's device)

would send a call offer message to one of WhatsApp's signaling servers, which WhatsApp also refers to as "chatd" servers. In and around 2019, those signaling servers were located exclusively in (1) Prineville, Oregon, (2) Altoona, Iowa, and (3) Forest City, North Carolina.

21.      The choice of which signaling server would handle any particular call was entirely at WhatsApp's discretion. Specifically, the client application would attempt to contact a set URL ("chat.whatsapp.com") by asking a third-party domain name server ("DNS") for the IP address corresponding to that URL. That third-party DNS would then ask a WhatsApp server (e.g., an authoritative name server (ANS)) for the appropriate IP address to provide the client. The WhatsApp server would respond with an IP address of WhatsApp's choosing, depending on WhatsApp's own load balancing and performance considerations.  The device initiating the call has no control over the routing of the call.

22.      Mr. Gheorghe testified that access to WhatsApp signaling servers was controlled using a public-private key scheme. In that scheme, a client could use its own private key to authenticate itself to the signaling server and subsequently use that signaling server.

23.      After receiving the call offer, if the server accepts the traffic, it would enrich the data in the call offer with additional information and then forward the enriched call offer to the callee.

24.      The caller and callee would then participate in the call initiation negotiation (as described above) by exchanging predefined XMPP messages.

25.      Once the call parameters were negotiated, the caller and callee would attempt to establish a direct ("peer-to-peer" or "P2P") WebRTC connection for exchanging call data. When successful, the P2P connection obviated the need for either party to use a relay server. Mr. Gheorghe testified that, in the 2019 timeframe, the P2P connection was established for about half the calls on WhatsApp's VoIP system at the time.

26.      When a P2P connection could not be established, the caller and/or callee would establish the WebRTC connection over WhatsApp relay servers. The caller did not have to use the same relay server as the callee.

27.      In 2019, WhatsApp's infrastructure included around 100 "edge locations" worldwide

1    hosting clusters of relay servers. Only two of these "edge locations" were located in California.

2    28.    WhatsApp controlled access to its relay servers using short-lived authorization

3    tokens. When a client application established a connection to another client application using a

4    signaling server, the signaling server would autonomously choose a set of relay servers (based on

5    WhatsApp's own load balancing and performance considerations) and provide the client

6    application with short-lived authorization tokens for those relay servers. Each authorization token

7    permitted the client to utilize the respective relay server. The WhatsApp client application would

8    poll all the relay servers to determine their respective performance (e.g., latency), and it would

9    choose to use the relay server that would provide the best performance (e.g., lowest latency).

10    29.    If a call participant invited a third participant to the call, the call participant would

11    send a group update message to the other party via the signaling server, and the call would be

12    updated to a group call.

13    **Pegasus's Use of WhatsApp VoIP as a Delivery Mechanism**

14    30.    Below I detail my understanding of how the accused Pegasus technology used

15    WhatsApp to deliver the Pegasus agent to target devices in 2019. My understanding is derived

16    from the WhatsApp and Facebook technical analysis documents produced in discovery (including

17    NSO code supposedly provided to Plaintiffs by the FBI), interviews with Tamir Gazneli of NSO,

18    and analysis of open-source materials regarding the operation of Pegasus.

19    31.    The version of Pegasus referenced in the Complaint delivered the Pegasus agent

20    using a zero-click exploit, meaning that the exploit could install the Pegasus agent without any

21    human input on the target device.

22    32.    At the start, Pegasus would obtain information about the target device that was

23    normally exchanged during a WhatsApp VoIP call. This included determinations of whether the

24    mobile number had a WhatsApp account, what operating system the device with that mobile

25    number was running, whether the device was currently online, and whether the WhatsApp

26    application was in the foreground.

27    33.    Pegasus would send a call "offer" to the surveillance subject from a client

28

---

application controlled by the lawful intercept investigator (LI Phone #1). This offer was sent to the external edge of the WhatsApp network, where the internal WhatsApp load balancing code would take over and route the call offer to the signaling server of WhatsApp's choosing.

34.    The call offer included an XMPP offer stanza with a special value for the "connecting_tone_desc" field. The value was a string value defining a "shell script" that could be executed by the Android operating system. The shell script delivered at this stage was not used until the final step, and was never executed on a WhatsApp server.

35.    The LI Phone #1 would then send an SRTP Sender Report / Receiver report packet to trigger the "fingerprint" on the subject's device. The response from the target device back to the LI Phone #1 contained information indicating the version of the operating system on the device and the base memory address of the WhatsApp software on the target device. This information came from the target device, not from WhatsApp's servers.

36.    LI Phone #1 would then change the call to a "group" call and introduce another LI controlled phone (LI Phone #2). When upgrading the call, LI Phone #1 provided all the devices on the call a large list of capabilities. LI Phone #2 then responded that it can only support a specific set of capabilities, which it sent to the target device. This caused the target device to set additional memory pointers to specific locations on the target device.

37.    LI Phone #1 and LI Phone #2 would then close the call, causing the target device to run its call termination routines. Due to the configuration of the memory addresses in the step described above, the call termination routines would cause the target device to execute the shell code that was delivered in the initial stages of the exploit, as discussed above. The shell code execution would cause the target device to connect to a command and control ("C2") server— acting as a "secondary payload server" and controlled by the lawful intercept investigator—and download the Pegasus agent from the C2 server and install it on the target device. The code was only executed on the target device, never on WhatsApp's servers.

38.    Thereafter, the operation of Pegasus did not use or otherwise rely upon the WhatsApp application or any WhatsApp infrastructure. Instead, once deployed on the target

device, the Pegasus agent allowed the lawful intercept investigator to conduct surveillance operations on that target device.

39.    WhatsApp's internal documents are clear that, throughout this process, "WhatsApp servers were not compromised by this [operation of Pegasus]." (Akro. Decl. Exh. P (WA-NSO-00125125).)    Multiple WhatsApp witnesses testified to the same effect, *i.e.*, that no code was executed on any WhatsApp server, and the WhatsApp service was not impaired or slowed down. I agree with that assessment because the Pegasus delivery mechanism merely used the WhatsApp servers to exchange data with the target device, and it did so using functions written by WhatsApp, functioning as WhatsApp had written those functions to work.

**Pegasus Did Not Target Computers in California**

40.    I have been asked to provide my opinion about whether, during the time relevant to this report, NSO intentionally configured Pegasus to target computers physically located in California—specifically, WhatsApp signaling servers, WhatsApp relay servers, and third-party "command and control" servers. As explained below, it is my opinion that NSO did not configure Pegasus to intentionally target any computers in California.

> **(1)    Pegasus did not target WhatsApp *signaling* servers in California or the United States.**

41.    During the relevant time period, Pegasus did not target WhatsApp signaling servers in California. Targeting WhatsApp signaling servers in California would have been impossible because, as WhatsApp has stated (through its corporate designee, Mr. Gheorghe), none of WhatsApp's signaling servers were physically located in California in or around 2019. Consequently, NSO could not have configured Pegasus to target any WhatsApp signaling server in California.

42.    I understand that Plaintiffs claim that the code for Pegasus software contains WhatsApp domain names that Plaintiffs contend are associated with WhatsApp signaling servers in the United States (though not in California). But even if it were true that code included WhatsApp *domain names*, that does not mean that NSO directed traffic to *servers* located in any

particular place. WhatsApp's own DNS system alone decides what IP address any given domain name would be resolved into—it is not up to NSO. Moreover, it is WhatsApp infrastructure alone that decides what server will handle requests sent to any given WhatsApp IP address, and it is WhatsApp alone that decides where that server will be located.

43.    I have seen no evidence suggesting that NSO configured any Pegasus installation to target any specific signaling server in California or in the United States. I also see no motivation for NSO to have done so because Pegasus would likely work best by directing its traffic to whatever signaling server was best suited to handle the traffic at the time, as determined at WhatsApp's discretion by WhatsApp's load balancers, in the manner described above.

### (2)    Pegasus did not target WhatsApp *relay* servers in California or the United States.

44.    I have seen no evidence suggesting that NSO configured any Pegasus installation to target WhatsApp relay servers in California, and the evidence I have seen suggests the opposite—that NSO did not configure any Pegasus installation to target WhatsApp relay servers in California or the United States.

45.    An early version of the installation vector for Pegasus, known as "Heaven," did not use WhatsApp's relay servers at all. Instead, it directed target devices to use a relay server *not* owned by WhatsApp. Heaven did not transmit any Pegasus data to target devices through WhatsApp relay servers.  The other two relevant installation vectors, known as "Eden" and "Erised," did send messages that passed through WhatsApp relay servers.

46.    As noted above, WhatsApp's relay servers were located at edge locations at over 100 edge locations around the world, and only two of those were in California.

47.    Moreover, Mr. Gheorghe testified that WhatsApp's signaling servers determined—based on their own load balancing calculations—which relay servers each client application could access. Specifically, Mr. Gheorghe testified that a client would ask the signaling server for access to relay servers, and the signaling server would return authorization tokens for 3-5 relay servers of the signaling server's choice. Mr. Gheorghe testified that a client application could only use a

WhatsApp relay server if it held the appropriate authorization token from the signaling server. Therefore, Pegasus could not target relay servers in California or the United States, even if it wanted to. Rather, the choice of which relay server Pegasus could use was limited by the decisions of WhatsApp's signaling server.

48.    Moreover, I have seen no evidence that Pegasus included programming that would either seek out or choose relay servers in California or the United States. And I can think of no motivation for doing so. Rather, Pegasus used whichever relay servers were offered by the WhatsApp infrastructure. Based on my analysis of logs and scripts produced by WhatsApp, it appears the Pegasus client application was designed to select its relay server using the same or similar logic as the WhatsApp client application (i.e., polling the list of relay server chosen by WhatsApp and using the one with the best latency performance).

49.    Plaintiffs have produced server logs they claim come from an Amazon Web Services server in Germany that Plaintiffs contend was used as part of the operation of Pegasus. If these AWS server logs are genuine, they suggest that NSO did *not* program its software to choose WhatsApp relay servers by location, but instead, by performance measures, similarly to WhatsApp's own client application.

50.    As explained above, the WhatsApp client would choose the relay server to use by polling each relay server in the list provided by the signaling server and thus determining the latency for each, and it would then pick the relay server with the lowest latency. My analysis of the purported AWS server logs produced by Plaintiffs shows the Pegasus client performing the same procedure. Those logs show the Pegasus client "Validating network latency for" a list of domain names corresponding to WhatsApp edge locations (e.g., "e1.whatsapp.net"), where WhatsApp's relay servers are located. Pegasus then identified the "server with minimum latency," and chose to use that one. Therefore, if the log provided by Plaintiffs is genuine, it demonstrates that NSO's software chose from the list of relay servers provided by WhatsApp using the same or similar algorithm used by the WhatsApp client—*i.e.*, the lowest latency server—not based on location.

51.    Moreover, the claimed log shows that Pegasus *could not* have chosen a relay server

based on location because Pegasus addressed the relay servers only by *domain names*.  As I discussed above, it was WhatsApp alone that would, in its complete discretion, (1) convert each domain name into an IP address of its choice and (2) decide where to route messages sent to that IP address.  That Pegasus addressed WhatsApp relay servers by domain name further confirms that NSO did not configure Pegasus to choose a relay server based on location, but rather, left the location of the relay server to WhatsApp's sole discretion.



Thus, assuming that the log files are authentic, it seems that Pegasus universally left it to WhatsApp to decide what servers in WhatsApp's infrastructure would handle any particular request from Pegasus users.

53.    Because the internal routing of WhatsApp traffic is strictly determined by WhatsApp, NSO would not need to or desire to direct traffic to any particular portion of WhatsApp's internal architecture; as both a matter of practicality and operational security. By referring to the URLs designated by WhatsApp, NSO's developers allowed the WhatsApp infrastructure to perform as designed with no further effort needed on their side. The URLs listed in the log were returned from WhatsApp infrastructure and are indicative of the infrastructure performing its normal latency calculations and the client acting upon those latency calculations.

54.    Therefore, NSO did not configure its software to target specific WhatsApp servers in any particular location, much less California or the United States.  Pegasus installation vectors merely sent traffic to the public WhatsApp URLs and left it to WhatsApp to route the traffic to the servers of its choice.

**(3)    Pegasus did not configure C2 servers in California.**

55.    I have seen no evidence suggesting that NSO configured any client installation of

the Pegasus to target computers (e.g., C2 servers) physically located in California.

56.    Plaintiffs' analysis identified 38 IP addresses that Plaintiff characterized as "C2 servers." Only one of those IP addresses appears to have been registered to a company located in California in 2019: the IP address 104.223.76.220 was registered in ARIN to QuadraNet Enterprises LLC of Los Angeles, CA (the "QuadraNet IP Address").

57.    I have seen no evidence that NSO ever chose to lease a server from QuadraNet. To the contrary, it is my understanding that NSO never leased any server from QuadraNet. A document produced by WhatsApp in discovery (and apparently received from QuadraNet) shows that the server with the IP address 104.223.76.220 was leased from QuadraNet by a company called 365 Online Technology JSC located in Hanoi, Vietnam, with the email address admin@greencloudvps.com, for the period October 1, 2017, to October 29, 2019.   Further information produced by WhatsApp in discovery (and apparently obtained from Greencloud) does not connect the QuadraNet IP Address to NSO.

58.    I am not aware of any information that would lead me to believe that NSO leased or intended to lease a server at the QuadraNet IP Address or knew or believed that any C2 servers were physically located in California in 2019. I am also unaware of any information that would lead me to believe that NSO ever leased or intended to lease, directly or indirectly, any third-party server located in California in 2019.

59.    For these reasons, it does not appear that NSO purposefully configured any installation of Pegasus, during the relevant time period, to utilize a C2 server that it knew to be in California.

60.    Moreover, though the QuadraNet IP Address was registered to a California-based company in 2019, that does not mean that the hardware (i.e., the physical server) to which the Internet Protocol would route requests to that QuadraNet IP Address was physically present in California. Cloud providers and web hosting companies often use DNS schemes and load balancers (like those used by WhatsApp) to ensure traffic does not bottleneck at any piece of hardware but is, instead, distributed across many devices. Consequently, a public IP address is

often virtual, meaning it does not always relate to a specific piece of hardware in a specific location.  For example, Google's DNS service can be reached at the IP address of 8.8.8.8, and that IP address is registered to Google in California. But requests to that IP address can be routed to and handled by any one of hundreds of servers around the world, depending on Google's routing protocols, infrastructure, and traffic conditions.

61.    A public IP address is often just the entry point into the architecture that hosts it. Internally a data center, a web hosting service, a government agency or a commercial company may only have a very few public IP addresses, and internal routing is done with private IP addresses and MAC addresses of individual pieces of hardware.  For example, a cloud provider will often assign one public IP address to a company leasing infrastructure, and yet, it will geographically distribute the actual hardware and software across its infrastructure, based on its own unique design. In such systems, the end customer leasing servers may have no idea where geographically their data resides.  Unless a company is specifically leasing actual "hardware" with a known, negotiated location to handle requests to a given IP address, the company has no knowledge or control over what physical server will handle requests directed to the IP address.

**Neither NSO Nor Its Customers Accessed Any WhatsApp Server Without Authorization or Exceeded Their Authorized Access.**

62.    It is my opinion that neither NSO nor its customers either accessed any WhatsApp server without authorization or exceeded their authorized access to any WhatsApp server. I have been informed that the Court has already held that NSO and its customers did not access any WhatsApp servers without authorization because they signed up with the WhatsApp service and were consequently granted authorization to use the WhatsApp service. I agree with that conclusion. It is my further opinion that neither NSO nor its customers (during the operation of Pegasus) accessed any part of a WhatsApp server (including the signaling or relay servers) that was "off limits" to them, where "off limits" means beyond some technological access barrier they were not entitled to cross.

63.    I have seen nothing in my review of the materials in this case to suggest that NSO

ever operated the Pegasus software to gain access to any target device without the consent of that device's owner. NSO's customers may well have done that, as the intended use of Pegasus is to gain access covertly to material located on the phones of those suspected to be engaged in terrorism or criminal activity, but even then, the access to WhatsApp servers did not exceed authorization. During the research and development phase, NSO transmitted messages across the WhatsApp servers when testing Pegasus against NSO's own target devices.  It is my opinion that neither NSO nor its customers ever accessed any part of a WhatsApp signaling or relay server that was "off limits" to the Pegasus/WhatsApp user (i.e., was beyond some technological access barrier the Pegasus/WhatsApp user was not entitled to cross).

> **(1)    Neither NSO itself nor NSO customers exceeded their authorized access to a WhatsApp signaling server.**

64.    It is my opinion that NSO and its customers did not access any WhatsApp signaling server in a manner that exceeded their authorization.

65.    As explained above, the only technical access controls that WhatsApp used to limit access to the signaling servers was a public-private key encryption scheme. Under that scheme, a client with the appropriate private key could authenticate itself to the signaling server and use the signaling server.

66.    Pegasus did not circumvent this access restriction on the signaling server's services. During the operation of Pegasus, the Pegasus clients would encrypt authentication messages to the signaling sever using their private keys, the signaling servers would validate those messages using the client's public key, and the signaling server would process the client's requests pursuant to that authentication. Therefore, Pegasus's access to the signaling server's services was authorized and did not involve the circumvention of any technical access restrictions.

67.    I understand Plaintiffs may contend that Pegasus users obtained the authentication credentials to the signaling servers in a manner that did not comply with WhatsApp's terms of service. I have no opinion on whether this contention is correct, but it does not impact my opinion because it does not imply that the user obtained access to the signaling server by circumventing

any *technical* access barriers.

68.     The messages that Pegasus sent to the signaling servers also did not result in the Pegasus user accessing any part of the signaling servers that was off limits to him or her. As noted above, the Pegasus client sent to the signaling servers stanzas that included values for certain valid parameters, and the signaling servers merely forwarded those stanzas (with the parameter values) to the callee device. The values of the parameters (and the fact that those values were unusual) had no impact on the signaling server's processing of those stanzas. In other words, the signaling server merely provided the service that the Pegasus user was authorized to access.

69.     For example, the Pegasus client would send the signaling server a call offer stanza where the value of the "connecting_tone_desc" parameter of the stanza was a string that defined a shell script and ELF (Executable and Linkable Format) executable. But the signaling server did not execute that shell script or ELF executable. In fact, it would be impossible to do so, as the code was written specifically for Android Operating Systems. Instead, it merely passed the string to the callee device as the value of the "connecting_tone_desc" parameter.  Indeed, the signaling server performed no processing that depended on the value of the "connecting_tone_desc" parameter.  As noted above, the signaling server did not validate the value of the "connecting_tone_desc" parameter. Nor did the signaling server perform any different function in response to receiving any value for the "connecting_tone_desc" parameter. Instead, the signaling server would simply forward the value to the "connecting_tone_desc" parameter to the callee as it would have done had the caller provided *any other* value for the "connecting_tone_desc" parameter.

70.     Because the Pegasus user's communication with the WhatsApp signaling server merely used services that the Pegasus user was authorized to use, neither NSO nor its customers accessed any part of the signaling server that was off limits to them.

**(2)     Neither NSO nor its customers exceeded their authorized access to a WhatsApp relay server.**

71.     It is my opinion that neither NSO nor its customers accessed any WhatsApp relay server in a manner that exceeded the user's authorization.

72.    As explained above, the only technical access control that WhatsApp used to limit access to the relay servers was that a client must present the relay server with an authorization token for the relay server, which the client could obtain only from the WhatsApp signaling server. I have seen no evidence suggesting that the Pegasus client accessed the Relay server in any way other than by presenting a legitimate authorization token obtained from WhatsApp through WhatsApp's signaling server. Thus, I have seen no evidence that Pegasus somehow circumvented this access restriction to the WhatsApp relay servers.

73.    The messages that Pegasus sent through the relay servers also did not result in the Pegasus user accessing any part of the relay servers that was off limits to him or her. As WhatsApp admitted (through its corporate designee, Mr. Gheorghe), the relay servers behaved normally during Pegasus use—merely shuttling packets back and forth between the caller and callee. Indeed, the only message exchanged over the WhatsApp servers that WhatsApp even contends was "malicious" was the offer stanza sent from the caller to callee over the *signaling* server. Thus, none of the messages that Pegasus sent over any WhatsApp relay servers traversed or caused the sender to gain access to any part of those servers that was off limits to the Pegasus user (i.e., behind some technical barrier that the Pegasus user was not authorized to cross).   Put another way, the information sent by Pegasus over WhatsApp's relay servers traversed the identical path across WhatsApp relay servers as the VoIP calls made by any other WhatsApp user around that same time.

74.    In sum, Pegasus users merely used the WhatsApp servers (both signaling and relay servers) as a delivery mechanism—the way one might use the post office to deliver letters. To use that delivery mechanism, the Pegasus user had to (and did) present access credentials, issued by WhatsApp. I note that WhatsApp performs no checks to verify anything about a person to whom it issues access credentials—it merely issues access credentials to anyone who provides a mobile phone number, and no information about the WhatsApp user is required. Moreover, the Pegasus user's use did not cause any of the WhatsApp servers to perform any function that WhatsApp had not programmed those servers to perform. The Pegasus software is intended to reach the phone of an end user that is a person of interest to a law enforcement or intelligence agency and Pegasus

contains no software code executed by WhatsApp Servers. These facts are clearly acknowledged by WhatsApp in its technical analysis and by the WhatsApp personnel who conducted that analysis. Thus, Pegasus users did not circumvent or manipulate the server functionality in any way.

75. The Court's order denying Defendants' motion to dismiss (Dkt. No. 111) relied on several WhatsApp allegations that WhatsApp has acknowledged in discovery to be untrue. For example, the Court took WhatsApp at its word that "WhatsApp imposes certain limitations on accessing portions of its servers, such as prohibiting access to the technical call settings." *Id.* at 37. But discovery has shown that this assertion is false. Instead, as discovery has shown, at the time of the incidents described in the Complaint, the WhatsApp signaling server was not validating incoming stanzas (including of offer stanzas) against any formal schema, let alone blocking stanzas that failed such a validation. It is self-evident that the WhatsApp servers were not "prohibiting access to the technical call settings" that Pegasus used (such as the "connecting_tone_desc" parameters) or else Pegasus would not have been able to use them. Instead, WhatsApp servers permitted use of the "connecting_tone_desc" parameters, and they permitted messages containing the values that Pegasus set for those parameters. Indeed, one of WhatsApp's security engineers admitted that WhatsApp *intentionally* permitted client applications to utilize that setting "for backwards compat[ibility] reasons." (Akro. Decl. Exh. K (Robinson Tr. 307:15-309:1).) Thus, before May 2019, WhatsApp servers contained no technical restriction against sending messages of the form sent by the Pegasus client, including with the "connecting_tone_desc" parameters used by Pegasus.

76. In another example, the Court accepted WhatsApp's allegation that Pegasus users used Pegasus to "avoid the technical restrictions built into WhatsApp Signaling Servers." *Id.* But as shown above, this is also false.

77. The Court also accepted WhatsApp's allegation that Pegasus users "formatted call initiation messages containing malicious code to appear like a legitimate call and concealed the code within call settings." But that is false too because the Pegasus exploit code was not "concealed" within the XMPP stanzas at all. To the contrary, it appeared there in plain, human readable text that would have been immediately understood by any competent engineer. And

indeed, it appears that the moment WhatsApp engineers saw the value of the connecting_tone_desc parameter on May 2, 2019, they immediately recognized it as an exploit. The reason WhatsApp did not recognize this exploit earlier was simply that, prior to WhatsApp undertaking a Stanza Validation Project totally unrelated to Pegasus, WhatsApp was not validating the value of the connecting_tone_desc parameter, or of many other values of the call offer stanzas that Pegasus was using, or of most other stanzas. Thus, Pegasus did not "conceal[] code within code settings."

78.    Far from "compromising" WhatsApp servers, Pegasus always used WhatsApp servers in complete compliance with the technical access rules WhatsApp defined for those servers. Pegasus used WhatsApp servers *only as a channel to deliver code to target devices*, and it did this in accordance with the rules set by those WhatsApp servers. Using genuine credentials to send messages that comply with a server's technical requirements is not a form of "hacking"; it is simply use of the servers.

79.    Plaintiffs contend that NSO modified its software after WhatsApp changed the access rules for its servers, but NSO modified its software *to comply with the new rules*, not to circumvent them. For example, WhatsApp changed its server rules in December 2018 in a way that prevented NSO's "Heaven" vector from requiring target devices to use relay servers controlled by the Pegasus user.  Instead of trying to find a way to violate that rule, NSO developed the "Eden" vector, which used relay servers controlled by WhatsApp, *exactly as WhatsApp's code required*. Eden was therefore a modification made to *comply* with WhatsApp's rules. It is nonsensical to claim that changing an application to comply with a server's new rules is somehow "hacking" the server.

**NSO Did Not Damage Any WhatsApp Server.**

80.    For many of the same reasons explained in the previous section, it is my opinion that Pegasus did not impair the integrity or availability of any data, program, system, or information on any WhatsApp server or cause any damage to any computer owned by WhatsApp.

81.    As I noted above, I agree with WhatsApp's internal assessment that WhatsApp's servers were not compromised in this incident. That is because, as further explained above, Pegasus used WhatsApp signaling and relay servers only for their ordinary and intended purpose

of shuttling data between client devices. As WhatsApp agreed through the deposition of Mr. Gheorghe as WhatsApp's corporate designee, this use of the WhatsApp servers to shuttle data between client devices did not impair the availability of those servers, corrupt any data on those servers, slow down those servers, or delete any of WhatsApp's data from those servers. Thus, Pegasus did not harm the WhatsApp servers in any way.

82.    This is unsurprising because the messages Pegasus delivers to the target's device through the WhatsApp servers are crafted specifically for that target device's operating system, hardware architecture, and configuration. Thus, the messages are simply not executable by the WhatsApp servers. Thus, Pegasus did not impair WhatsApp's server infrastructure in any way.

83.    Pegasus also did not slow down the WhatsApp servers because the amount of data generated by the Pegasus system is negligible compared to the amount of data the WhatsApp infrastructure routinely handles. Mr. Gheorghe likewise admitted this while testifying as WhatsApp's corporate designee. (Akro. Decl. Exh. L (Gheorghe Tr. 249:12-250:21).) As such, it appears that NSO made efforts to not negatively impact WhatsApp's network infrastructure.

84.    Pegasus would have actively avoided harming or impacting WhatsApp's servers in any way. This is because the goal of law enforcement is to gather intelligence and to minimize harm to uninvolved third parties. In addition, a major goal of law enforcement and intelligence gathering surveillance is to avoid detection, and any operational impact or impediment to the system would prevent achievement of those goals. Indeed, because modern cybersecurity security systems employ analytic engines that look for unusual or suspicious traffic patterns, surveillance professionals try to prevent detection by *not* performing any actions that would degrade or impact network connections or infrastructure. It is best practice to "hide in plain sight" and not stand out from the crowd.  If the WhatsApp network infrastructure had been impacted by Pegasus, the impact would be immediate and obvious. Large swaths of the user base would complain, the help desk would be inundated with requests, and normal logging systems would fail, which would cause alarms to be raised. None of these things occurred.

85.    I have seen no evidence indicating that WhatsApp's infrastructure or servers were

1    damaged in any way.

2

3        I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th

4    day of September 2024, in Cape Coral Florida.

5

6

7    _____
                    TERRENCE MCGRAW

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit F

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**







