# Exhibit H

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                         OAKLAND DIVISION

5      --------------------------------X

6      WHATSAPP INC.                    :

7      a Delaware corporation, and      :

8      META PLATFORMS INC,              :

9      a Delaware Corporation:

10                     Plaintiffs       :

11          v.                          :    Case No.

12     NSO GROUP TECHNOLOGIES LTD       :    4:19-cv-07123-PJH

13     and                             :

14     Q CYBER TECHNOLOGIES LTD         :

15                   Defendants         :

16     --------------------------------X

17          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18                  Deposition of YARON SHOHAT

19                           LONDON

20                 THURSDAY, AUGUST 29TH, 2024

21                     9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1          Deposition of YARON SHOHAT, held at the

2    offices of:

3

4

5          DAVIS POLK & WARDWELL LLP

6          5 ALDERMANBURY SQUARE

7          LONDON

8          EC2 7HR

9          UNITED KINGDOM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

```
 1          defendants.  Also here in the room with us are Shmuel
 2          Sunray, S-H-M-U-E-L, S-U-N-R-A-Y; Chaim Gelfand,
 3          C-H-A-I-M, G-E-L-F-A-N-D; and Shira Plotnik, S-H-I-R-A,
 4          P-L-O-T-N-I-K, all from NSO.
 5     THE VIDEOGRAPHER:  Please can all parties on the Zoom video
 6          link please introduce themselves for the record.
 7     MR. BLOCK:  Just the interpreters, I think we named the
 8          others.
 9      THE INTERPRETER:  Mor Ilan, interpreter.
10      THE INTERPRETER:  Varda Yaari, interpreter, both for
11          European Depositions.
12     THE VIDEOGRAPHER:  The Court reporter today is Chris Lang
13          representing Veritext Legal Solutions.  Please will the
14          court reporter firstly swear in the interpreters and
15          then afterwards please swear in the witness.
16     THE COURT REPORTER:  Will counsel please stipulate that in
17          lieu of formally swearing in the witness, the reporter
18          will instead ask the witness to acknowledge that their
19          testimony will be true under the penalties of perjury,
20          that counsel will not object to the admissibility of the
21          transcript based on proceeding in this way, and that the
22          witness has verified that he is in fact Yaron Shohat.
23     MR. AKROTIRIANAKIS:  That's fine.
24     MR. BLOCK:  Fine.
25     THE COURT REPORTER:  Would the interpreters please
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                                        Page 10
 1        acknowledge that they will translate the questions and
 2        answers in this deposition to the best of their ability,
 3        under penalty of perjury?
 4      THE INTERPRETER:  I do.
 5      THE INTERPRETER:  I do.
 6    THE COURT REPORTER:  Mr. Shohat, do you hereby acknowledge
 7        that your testimony will be true under the penalties of
 8        perjury?
 9    A.  I do.
10    THE COURT REPORTER:  Please proceed.
11                          YARON SHOHAT
12    having acknowledged their testimony will be true under the
13    penalties of perjury testified as follows:
14    MR. BLOCK:  Good morning, Mr. Shohat.
15    A.  Good morning.
16    By Mr. Block:
17    Q.  We met a short while ago off the record, but my name is
18        Micah Block and I will be asking you some questions.
19    A.  Nice too meet you.
20    Q.  Would you start by stating your full name and spelling
21        it for the record please.
22    A.  Yes.  My first name is Yaron, Y-A-R-O-N; last name is
23        Shohat, S-H-O-H-A-T.
24    Q.  Mr. Shohat, have you ever given deposition testimony
25        under the rules of United States courts before?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 20

```
 1   A.   Correct.
 2   Q.   Okay.  In general terms, what did you and Mr. Gelfand
 3        discuss?
 4   MR. AKROTIRIANAKIS:  I think that, as phrased, is
 5        problematic, Micah.
 6   Q.   Subject to the same limitation I gave you before.  For
 7        all of my questions today I never want you to reveal to
 8        me legal advice that your counsel gave you.
 9             So please tell me what facts Mr. Gelfand related to
10        you in order to prepare you to testify on topic 43?
11   A.   I asked him to refresh my memory about some specific
12        cases that we have investigated, of misuse, of
13        customers.
14   Q.   Which cases are those?
15   MR. AKROTIRIANAKIS:  In referring to the customers, you
16        shouldn't refer to them by their name, the actual name
17        of the country or agency.
18   MR. BLOCK:  So, sorry, will you just make clear that you are
19        instructing the witness not to identify customers, if
20        that's what you are doing?
21   MR. AKROTIRIANAKIS:  By name or agency, yes.
22   MR. BLOCK:  Okay.
23             So we take that instruction under objection.
24        However, let me ask the question again.
25   MR. AKROTIRIANAKIS:  Actually, Micah, could I state for the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 21

```
1       record, I don't mean for you to struggle to refer to
2       them by any particular, you know, code name or anything
3       like that, I think that it is fine for you to discuss in
4       a hypothetical sense, like, you know, customer 1,
5       customer A.
6   MR. BLOCK:  I am sorry, Joe, that's --
7   MR. AKROTIRIANAKIS:  I am giving him an instruction that
8       will hopefully help him answer your question.
9   MR. BLOCK:  Did you finish?
10  MR. AKROTIRIANAKIS:  I don't know.  It is not up on the
11      screen.
12          What I said was I am giving him an instruction that
13      will hopefully help him answer your question, while
14      staying within the limitations of the court's order.
15          By Mr. Block:
16  Q.  Mr. Shohat, for the specific investigations that you
17      asked for information to refresh your recollection from
18      Mr. Gelfand, are there code names that the defendants
19      use to refer to the customers who were involved in those
20      investigations?
21  A.  The questions I had for him were more general, about the
22      number of investigations.  There was only one which was
23      discussed specifically, the code name for it is Dutton.
24  Q.  Data?  Like --
25  A.  Dutton.  D-U-T-T-O-N.
```

Page 22

1   Q.   D-U-T-T-O-N?

2   A.   I believe that's the correct spelling.

3   Q.   Okay, when did the Dutton investigation occur?

4   MR. AKROTIRIANAKIS:  Objection.  Foundation.

5   A.   I don't know the specific date.  Or year.

6   Q.   Do you know, was it 2024?

7   A.   No.

8   Q.   Was it after 2019?

9   MR. AKROTIRIANAKIS:  Objection.  Foundation.

10  A.   I don't know.

11  Q.   Okay, was it after 2015?

12  MR. AKROTIRIANAKIS:  Same objection.

13  A.   Maybe.

14  Q.   You don't know whether it occurred --

15  A.   I don't know the exact year.

16  Q.   Okay.  I know you don't know the exact year, I am asking

17       whether you are capable of founding it in time in any

18       way?

19  A.   Since I don't know for sure, I don't want to make

20       a mistake.

21  Q.   Okay.  Let me -- fair enough.

22            Did it happen while you were CEO?

23  A.   No.

24  Q.   Okay, so it happened before you became CEO?

25  A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

```
 1      defendants do to investigate Dutton?
 2   MR. AKROTIRIANAKIS:  I think that for you to ask him that
 3      question in his capacity as a representative of the
 4      company, I need to finish what I was doing before we
 5      decided to continue with the deposition.  Because that,
 6      I think, is, number 44, isn't it?
 7   MR. BLOCK:  Okay.  Let's go off the record.
 8   THE VIDEOGRAPHER:  Going off the record.  The time is
 9      09.48 a.m.
10    (9:48 a.m.)
11                        (break taken.)
12    (9:53 a.m.)
13   THE VIDEOGRAPHER:  Going back on the record.  The time is
14      09.53 a.m.  Thank you.
15   By Mr. Block:
16   Q.  Welcome back, Mr. Shohat.  I understand that you and
17      counsel conferred about the topics while we were off the
18      record, correct?
19   A.  Correct.
20   Q.  Okay.  Do you understand that you have been designated
21      to provide corporate representative testimony on behalf
22      of defendants for topic 44, with respect to
23      non-privileged aspects of the process by which
24      investigations are conducted by defendants into the use
25      of the accused technologies?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

 1   A.   I do.

 2   Q.   Okay.  And obviously, Joe, for the record, we don't

 3        accept that framing of the topic, but let me use it for

 4        the purposes of this question.

 5             I will ask you again, Mr. Shohat: please explain to

 6        me the process by which defendants investigated Dutton?

 7   MR. AKROTIRIANAKIS:  Okay, I am going to object that that is

 8        outside the scope for which the witness has been

 9        designated, which is limited to the process by which

10        investigations are conducted.

11   MR. BLOCK:  Okay.  So, to be clear, you are not providing

12        a witness to discuss the process of any particular

13        investigation, and you will provide a witness only on

14        the process generally?  Is that the defendants'

15        position?

16   MR. AKROTIRIANAKIS:  Well that is what our objections and

17        responses state we will do, and that is the limitation

18        for which this witness is designated.  So if you have

19        questions that are within that designation, that's fine,

20        you can ask them and he will answer on behalf of the

21        defendants.  If you have questions that are outside of

22        that -- I mean, you know how 30(b)(6) depositions work.

23   Q.   Okay.  Let me just ask the same question and get your

24        answer, sir: Mr. Shohat, please explain to me what you

25        know about the process by which defendants investigated

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 27

1      Dutton?

2    MR. AKROTIRIANAKIS:  Objection.  Foundation.

3    A.    I will tell you the process we follow whenever there is

4          an investigation, regardless of who the customer is.

5          When we get an indication that there might have been

6          a misuse of our system, in the way it was used, it has

7          been targeted, or anything else, we open

8          an investigation.  The first step would be to understand

9          which of our customers may have conducted it.  If we

10         don't know, if there is no such indication, we would

11         contact the customer, asking for clarifications.

12         Sometimes the information that we get in response is

13         enough to conclude that there was no misuse.  Some.  In

14         other cases we might require additional information, and

15         we expect full cooperation by the customer.

16             If we conclude that the customer operated the system

17         not for the purpose, or not according to the limitations

18         defined in the contract, we will take measures, which

19         can range, but the most extreme is we will disconnect

20         the customer's system.

21             As part of the investigation we might ask the

22         customer to allow us to access -- first, to allow us to

23         receive information regarding the operation and, in some

24         cases, also to allow us access to the system logs

25         themselves, so we can verify whether a certain device

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          was a target of the system or not.

2               Again, we expect full cooperation from the

3          customers, according to their obligations to us, and if

4          we do not receive the right level of cooperation, we are

5          entitled to disconnect the system and make it

6          inoperational.

7     Q.   Do the defendants have a contractual right to demand

8          access from customers to the system logs you mentioned?

9     MR. AKROTIRIANAKIS:   Objection.   Foundation.

10    A.   I don't recall the exact language in the contract.   If

11         you want, we can look at it.   But we definitely have the

12         right to conduct the investigation and take the measures

13         that I mentioned.

14    Q.   Which include requesting access to the system logs?

15    A.   Requesting.   The customer needs to -- cannot do it

16         without the customer's permission, of course.

17    Q.   And those system logs include the phone number of target

18         devices, correct?

19    MR. AKROTIRIANAKIS:   Objection.   Misstates his testimony.

20    A.   The system logs include, as far as I understand, not the

21         explicit phone number, but -- and I will use a technical

22         term here -- a hash of the number, which means the way

23         to verify whether a certain number is on the list

24         without seeing the explicit number.

25    Q.   So if you have the hash, you can't tell what phone

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

```
 1       number represents, but you can check whether it
 2       represents a phone number that you have and want to
 3       investigate, is that what you are saying?
 4  MR. AKROTIRIANAKIS:   Objection.   Misstates testimony.
 5  A.   What I am saying, that if I am given a phone number --
 6       a whistle blower, for instance, claiming that a certain
 7       number was targeted for the wrong reasons -- and we open
 8       an investigation, I can take that number, generate
 9       a hash from it, and, with the customer's permission,
10       check if that hash exists on the system logs.
11  Q.   I think you said words to the effect -- and I am not
12       reading from the transcript here -- that if you identify
13       misuse in an investigation -- by "you" I mean
14       defendants -- then defendants will take measures which
15       may arise, up to disconnecting the customer's access to
16       Pegasus.   I don't want to put words in your mouth, but
17       was that more or less accurate?
18  A.   I will repeat what I said.
19  Q.   Please.
20  A.   I said that if the conclusion is that the customer
21       misused the system, we can take certain measures.   And
22       obviously the most severe measure would be to disconnect
23       the customer.
24  Q.   Have there ever been occasions when defendants confirmed
25       that there had been misuse but did not disconnect the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     customer?

2   MR. AKROTIRIANAKIS:  Objection.  Vague.

3   A.  I don't know of specific cases, but I am pretty sure

4     there were.  I need to clarify that misuse is not

5     a yes/no answer; there is a range, depending on the

6     specific case.

7   Q.  What was the nature of the misuse in the Dutton

8     investigation?

9   MR. AKROTIRIANAKIS:  You are asking him in his -- I just

10     want to make the record clear.  You are asking him in

11     his personal capacity?  Because he is not designated

12     for --

13   MR. BLOCK:  I am asking him in his corporate representative

14     capacity.  Your objection to the question is out of

15     scope and I would like his testimony in whatever

16     capacity he is able to provide it.

17   MR. AKROTIRIANAKIS:  Okay, so then I am objecting that it

18     exceeds the scope of the designation of the witness and

19     further that the question lacks foundation from this

20     witness.

21   Q.  What was the nature of the misuse in the Dutton

22     investigations?

23   MR. AKROTIRIANAKIS:  Same objections.

24   A.  I will answer in my personal capacity.  It is our

25     understanding that the system was used for a purpose

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 31

```
 1      other than fighting or preventing crime or terror.
 2   Q.  What purpose was it used for?
 3   MR. AKROTIRIANAKIS:  Objection.  No foundation, and exceeds
 4      the scope of the designation of the witness.
 5   A.  Other kind of dispute.  I don't know how to -- I am not
 6      a lawyer, I don't know how to categorize it.
 7   Q.  You can describe it in lay terms, and you can use the
 8      translator if you need to.
 9   MR. AKROTIRIANAKIS:  Same objections.  No foundation, and
10      beyond the scope of the designation of the witness.
11   A.  It is not a matter of translation, it is a matter of
12      legal knowledge.  But I will try to answer.  In the
13      specific case I have in mind, the system was used on
14      a family member of, let's call it a head of state.  And
15      despite the fact that some might claim there was
16      an offense, a crime here, we viewed it beyond the scope
17      of the purpose of the system.
18   Q.  What's the name of the person whose phone was infected
19      in a manner that defendants determined in the Dutton
20      investigation constituted a misuse?
21   A.  Can you please repeat the question?
22   Q.  Yes.  What is the name of the person whose phone was
23      infected in a manner that defendants determined in the
24      Dutton investigation constituted a misuse?
25   A.  I have to correct my previous answer a little bit.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

1    I told you that it was used to target a family member.
2    My correction is that it was used to target -- what are
3    these beeps?
4    MR. BLOCK:  We don't know.  Please try to continue.  Sorry.
5    A.  My correction is that it was used to target, as far as
6        I understand, from my personal knowledge, the attorney
7        of that person.  I don't know the name.
8    Q.  The attorney of the family member of a head of state?
9        You don't know the name of the attorney?
10   A.  Correct.
11   Q.  What's the name of the family member?
12   A.  I know her as Princess Haya.
13   Q.  And what's the name of the head of state?
14   A.  The Emir of Dubai.
15   Q.  In the course of our discussion of the Dutton
16       investigation, has your recollection been refreshed as
17       to when in time that investigation occurred?
18   A.  I do not remember the date, but we can Google it if you
19       want.
20   Q.  We can Google it because it is reported publicly?
21   A.  Correct.
22   Q.  Okay.
23   A.  If you remember, I explained that, in my discussion with
24       Mr. Gelfand, I asked him about cases that were public.
25   Q.  Okay.  Aside from the Dutton investigation, are there

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1       whose technology is involved in the provision of the

2       installation vectors defendants used for Pegasus today?

3   MR. AKROTIRIANAKIS:  I am going to instruct the witness not

4       to answer that question, on the basis of the court's

5       order docket number 292.

6   MR. BLOCK:  Joe, we discussed this before.

7   MR. AKROTIRIANAKIS:  We did.

8   MR. BLOCK:  And I want to just state for the record, our

9       understanding of that order is not a "limitation ordered

10      by the court under rule 30 C2".  It made no mention of

11      any depositions and gives no basis for you to instruct

12      the witness not to answer.  You have referred, in

13      relation to those instructions, to the court's Richmark

14      analysis.  The threshold question is whether the witness

15      is prohibited from answering my question because of

16      a non-US legal obligation.  So if the defendants assert

17      that a non-US law prohibits the witness from answering

18      my question, please say so.  We can decide later whether

19      to ask the court to consider, under Richmark, what the

20      result should be for the defendants' discovery and

21      obligations in this case.  But at this deposition,

22      I respectfully request a clear statement from defendants

23      as to the threshold issue.

24          So is it your position that a non-US law prohibits

25      the witness from answering the question I asked?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 51

1   MR. AKROTIRIANAKIS:  My position is that the court's order

2       states that -- the court's order adopts the definition

3       requested by you, with a time limitation imposed by the

4       court, and says that you can seek further discovery from

5       the court.

6   MR. BLOCK:  Are you stating that the defendant is prohibited

7       by a foreign legal obligation from answering the

8       question that I asked?  I understand, because I asked

9       you that question before and you didn't, that you have

10      not given that instruction.  And so we object to your

11      instruction to the witness not to answer as a violation

12      of rule 30.

13  By Mr. Block:

14  Q.  Mr. Shohat, do defendants have an installation vector

15      for Pegasus today that uses Whatsapp technology in any

16      way?

17  MR. AKROTIRIANAKIS:  I am sorry, I am going to need to catch

18      up with the transcript here.

19          Okay, go ahead.

20  A.  Go ahead?

21  MR. AKROTIRIANAKIS:  Do you have his question in mind?

22  A.  Yes, I do.  Can you repeat it, please?

23  Q.  Yes.  Do defendants have an installation vector for

24      Pegasus today that uses Whatsapp technology in any way?

25  A.  No.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

1   Q.  Do defendants have an installation vector for Pegasus

2       today that uses Facebook technology in any way?

3   A.  No.

4   Q.  Do defendants use an emulator capable of sending

5       Whatsapp messages in connection with Pegasus today?

6   MR. AKROTIRIANAKIS:  Objection.  No foundation.

7   A.  I don't think I am the right person to answer that.

8   Q.  Do you know the answer?

9   A.  I don't know.

10  Q.  Okay.

11      What are the internal names that defendants use for

12      every installation vector that you are aware of that use

13      Whatsapp technology?

14  MR. AKROTIRIANAKIS:  Objection.  Foundation.  Also vague as

15      to time.

16  A.  Actually, I don't know.  We are not -- like, the

17      internal code names for vectors are internal and mostly

18      used by the R&D and support teams, and less of

19      an interest for, of me.  You mentioned before the name

20      Hummingbird, which is the general name we use for zero

21      click installation, regardless of whether it is using

22      Whatsapp or other methods.  That's the term that I am

23      using.

24  Q.  So do you know which Hummingbird installation vectors

25      use Whatsapp?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

1    MR. AKROTIRIANAKIS:  Objection.  Vague.

2    A.  I was told that as part of the preparation for this

3         deposition.  I am not sure if my counsel --

4    MR. AKROTIRIANAKIS:  He is not asking about conversations

5         that you had with lawyers for the company about the

6         lawsuit.

7    A.  Before that, I did not know, or did not recall, which

8         codes were referring to Whatsapp or other vectors.

9    Q.  Okay.  Before that, did you know, setting aside the code

10        names, which vectors used Whatsapp technology and which

11        did not?

12   MR. AKROTIRIANAKIS:  Objection.  Vague.

13   A.  I might have knew, but I did not recall before meeting

14        with my lawyers in the last few days.

15   Q.  Okay.

16        Are you aware of any installation vectors that use

17        Facebook or Facebook Messenger?

18   A.  I am not aware.

19   Q.  You don't know which installation vectors do or do not

20        use those services?

21   MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.

22   A.  I am not aware of any usage of Facebook Messenger.

23   Q.  Is there any policy at defendants with respect to

24        conducting research and development on Whatsapp

25        technology?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 80

1    A.   Yes, I will.  In this chart, I held options in Triangle.

2    Q.   Do you hold options today?

3    A.   No.

4    Q.   Do you hold stock?

5    A.   I will correct my answer, sorry.

6    Q.   Please.

7    A.   I do hold options in Triangle today.  Triangle is not

8         related to the defendants today.

9    Q.   Okay.

10   A.   In any way.  Basically, it is worthless.

11   Q.   Whether as an option or a stock or another form of

12        equity interest, do you have any equity interest in the

13        defendant entities as they exist today?

14   A.   No.

15   Q.   Okay.

16   A.   Sorry, stock, options or, what was --

17   Q.   Any --

18   A.   I don't have any kind of equity in the defendant or

19        above the defendant today.

20   Q.   Okay.  Do you know who holds the equity, who owns

21        defendants today?

22   MR. AKROTIRIANAKIS:  Objection.  Vague.  Calls for a legal

23        conclusion.

24   A.   Today the defendant, through a chain of companies, 100

25        percent ownership of the company called Dufresne, which

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 81

1      is held 100 percent by Omri Lavie, who is one of the

2      founders.

3  Q.  Does Omri Lavie have any operational role with

4      defendants today?

5  A.  What do you mean by operational role?

6  Q.  Does he participate in governance or operations, aside

7      from holding the equity?

8  A.  He is a director of the company.

9  Q.  He is a director, okay.  You are CEO today of Q Cyber

10     Technologies, which is the parent of both WestBridge and

11     NSO; correct?

12 A.  No.

13 MR. AKROTIRIANAKIS:  Objection.  Misstates the testimony.

14 A.  NSO, or Q, is not a parent of WestBridge in any way.

15 Q.  I beg your pardon?

16 A.  I am the CEO of Q Cyber Israel, let's call it, and NSO.

17 Q.  Okay.  Do you report to a board of directors?

18 A.  Like any CEO.

19 Q.  And that's the board of directors of Q Cyber?

20 A.  Also, yeah.

21 Q.  Who is on the board of directors to which you report?

22 A.  In Q Cyber?  Omri Lavie.

23 Q.  Any other directors?

24 A.  No.

25 Q.  Who is on the board of directors for OSY?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1    A.   Omri Lavie, and another individual by the name of

2         Anthony Levy, who is a Luxembourgish resident.  Because

3         in Luxembourg, I believe the board needs to include

4         a resident, or a citizen.  I am not sure of the exact

5         definition.

6    Q.   How many different boards do you report to?

7    MR. AKROTIRIANAKIS:  Objection.  Vague.

8    A.   Obviously, in each one of the companies in the chain

9         there is a board.  But generally it is one board.  We

10        don't differentiate, really.  I don't.  Like if, as you

11        understand, Omri Lavie is the board member in all of

12        them.

13   Q.   Okay.

14   A.   So I deal with him.

15   Q.   Got it.  And then Anthony Levy with respect to

16        a Luxembourgish entity that requires a local resident.

17        Any other directors?

18   A.   I believe the answer is no.

19   Q.   Okay.  Mr. Lavie is your boss?

20   MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.

21   A.   I don't view it this way, but he can fire me if he wish,

22        I guess.  So, in a way, it might define him as my boss.

23   Q.   Do you conduct regular board meetings with Mr. Lavie?

24   A.   I participate in board meetings whenever he sets them

25        up.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1    Q.   Right.   Let's flip ahead to the page that ends 25681.

2    A.   25681.

3    Q.   This has an internal number 21, slide 21, it's titled:

4              "We have a highly committed and experienced

5         management team."

6              Do you see that?

7    A.   I do.

8    Q.   And you are listed as COO on this chart; correct?

9    A.   Correct.

10   Q.   Some of the bullets on this slide refer to "endpoint

11        division, Q".

12   A.   Where do you see it?

13   Q.   For example, the second bullet under Mr. Hulio's name

14        says "CEO, endpoint division, Q".   Do you see that?

15   A.   Yes.

16   Q.   Do you know what the phrase "endpoint division,

17        Q" refers to?

18   A.   In general, "endpoint" refers to Pegasus.   It is the

19        endpoint products.

20   Q.   Just to make that clear for the record, do defendants

21        sometimes use the term "endpoint" to refer to Pegasus?

22   A.   Sometimes.

23   Q.   Right.

24              On the next slide, which ends 25682, the title says:

25              "Plus 525 employees, approximately [as indicated by

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 87

```
 1        a tilde] 50 percent of which are working in R&D."
 2            Do you see that?
 3   A.   Yes, I do.
 4   Q.   On the left there is a chart that says:
 5            "Employees by geography".
 6   A.   Yes.
 7   Q.   And it shows numbers for Israel, Cyprus, Bulgaria and
 8        other?
 9   A.   Yes.
10   Q.   And then below in the footnote it says:
11            "Other includes Luxembourg, US, Latin America and
12        India, do you see that?
13   A.   Yes.
14   Q.   Do you know how many employees Q had in the
15        United States in May 2019?
16   MR. AKROTIRIANAKIS:  Objection.  No foundation.  Assumes
17        facts not in evidence.
18   A.   I am not aware of any use of employees in the
19        United States.  I don't think there were any.
20   Q.   Okay.  So you don't know --
21   A.   I am pretty sure there were no employees.
22   Q.   Did OSY, or its family of companies, have US employees
23        in 2018?
24   A.   I am not aware of any US employee in any of the group
25        affiliates.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 88

1    Q.   Okay.  So whatever this exhibit, 2019, is referring to,

2         you don't know?

3    A.   No.

4    MR. AKROTIRIANAKIS:  Objection.  No foundation.

5    Q.   Did OSY or its affiliated companies have contract

6         workers in the United States in 2018, to your knowledge?

7    A.   I have to, sorry, go with my previous answer.  Because

8         WestBridge do, they have employees in the United States.

9    Q.   Okay.  Do you have an understanding that it is

10        WestBridge employees being referred to on this slide

11        showing US employees in exhibit 2019?

12   MR. AKROTIRIANAKIS:  Objection.  Foundation.

13   A.   It is very likely.

14   Q.   Let's flip a little higher up, earlier in the

15        presentation, to the slide that ends 25666.

16   A.   Yes.

17   Q.   This slide says:

18             "Q operates globally".

19             Do you see that?

20   A.   Yes.

21   Q.   And then there is a line and a box that says:

22             North America local support".

23             Do you see that?

24   A.   Yes.

25   Q.   What was Q's presence in North America in May 2018?

1    A.    Q had no presence in America.

2    Q.    Do you know what this slide means when it says "Q

3          operates globally"?

4    A.    Yes.

5    Q.    And it points to North America local support?

6    A.    Yes, the Francisco Partners wanted to create -- they

7          differentiated between legal structure and, let's call

8          it structure for marketing purposes, or identity, or

9          whatever you call it.  And they wanted to push the

10         notion of one entity, one group, and they called it 1Q.

11         So, regardless of the legal structure or the legal

12         entities, they called it all Q.  Including Circles,

13         including the whole structure we viewed before.  They

14         considered it as one Q, or Q.  It is not related in any

15         way to the legal entities or the defendant, Q, which is

16         part of this much larger concept of one group.

17   Q.    So, thinking of the single entity as the then majority

18         owner Francisco Partners referred to it, do you know

19         what the local support in North America was?

20   MR. AKROTIRIANAKIS:  Objection.  Vague.  No foundation.

21   A.    So, again, this was intention of (inaudible) Francisco

22         Partners, Francisco Partners operates on the Triangle

23         level, not Q.  They look at the whole structure.  My

24         knowledge, in North America there was a reseller

25         function, and that's what existed there.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 90

1    Q.   That reseller function was WestBridge?

2    A.   Yes.

3    Q.   Do you see the footer on the slide ending 25666?  It

4         says:

5              "Confidential and propriety, Q Cyber Technologies

6         and its affiliates"?

7    A.   I do.

8    Q.   Do you know what that refers to?

9    A.   Yes, that's --

10   MR. AKROTIRIANAKIS:  No foundation.

11   A.    -- the template of the presentation.  They most likely

12        took the template, which was used by Q Cyber

13        Technologies, whoever created this presentation, because

14        that's where most of the employees, and probably the

15        people that created the presentation templates, and they

16        put the footnote here.  But if they had to be accurate,

17        they should have changed it, probably, to Triangle and

18        all of its subsidiaries.

19   Q.   The resellers in the United States you just referred to,

20        what were they reselling?

21   A.   WestBridge was a reseller or distributor for the group's

22        products in North America.

23   Q.   Does that include Pegasus?

24   A.   Yes.

25   Q.   Flip ahead to the slide that ends with Bates number

Page 103

```
 1   A.   No.
 2   Q.   Okay.  This may also be a Sarit Gil question, but let me
 3        just ask you if you know.  Were NSO and Q Cyber the only
 4        entities in the family of companies we have been
 5        discussing that received revenues attributable to
 6        Pegasus?
 7   A.   So Q Cyber Luxembourg would get some revenue.  That
 8        would usually be at least one percentage.  And
 9        WestBridge, for whatever it did sell, obviously got --
10        I am not sure with WestBridge.  Either it is, they got
11        the chunk out of our price, or they just marked it up,
12        I don't know.
13             And your question was specific to Pegasus, right,
14        because WestBridge did market other products as well.
15   Q.   Okay.  Alright, I will leave it there for now.
16             Do you still have exhibit 2019 in front of you?
17   A.   Yes.
18   Q.   And are you still at or near the slide that ends in the
19        Bates number 25682?
20   A.   25682.  Okay.
21   Q.   In the gray box at the bottom of the slide the third
22        bullet says:
23             "Ability to rapidly update solutions for newly
24        released mobile platforms; approximately 50 percent of
25        organization in R&D."
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

1           Do you see that?

2   A.   Yes.

3   Q.   What does it mean "the ability to rapidly update

4        solutions for newly released mobile platforms"?

5   MR. AKROTIRIANAKIS:  Objection.  No foundation.

6   A.   So if the mobile platform version changes, for instance

7        Android release a new Android version, it might break

8        our vector, or other capabilities, and then we need to

9        release an updated version to mitigate that.  So it

10       talks about the ability to do it rapidly.

11  Q.   Why was that important?

12  A.   To allow customers to keep getting intelligence in

13       a continuous manner.

14  Q.   And that's your understanding of the value proposition

15       that defendants provided to their customers, it was to

16       allow them to keep getting intelligence in a continuous

17       manner, is that accurate?

18  MR. AKROTIRIANAKIS:  Objection.  Vague.

19           Sorry.

20  A.   As I explained before, it is not possible to provide

21       continuous support of a vector throughout a year, let's

22       say, or a long period.  So you would like to mitigate

23       that by either having an alternative or fixing whatever

24       you can, quickly.

25  Q.   And to serve that end, defendants had, according to this

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

```
 1        slide, 54 percent of their employees in research and
 2        development functions as of 2018, correct?
 3   MR. AKROTIRIANAKIS:  Objection.  No foundation.
 4   A.   So this presentation shows the 54 percent of the staff
 5        is R&D.  I believe this is inaccurate.  First, I note
 6        that this is not just Pegasus R&D, it includes
 7        worldwide.  And I think it is not just R&D in general.
 8   Q.   Are you thinking of something specific in addition to
 9        R&D that you think is included in that?
10   A.   Many functions were thrown into it, like IT, and other
11        functions.
12            In general I think this presentation is not very
13        accurate.
14   Q.   Okay, you can flip ahead to, two slides forward, slide
15        that ends 25684.
16   A.   Yes.
17   Q.   The title is "our R&D headcount has increased, with
18        focus on research".  Do you see that?
19   A.   Yes.
20   Q.   In March 2018 there were 282 people in Q's research and
21        development team, according to exhibit 2019's count,
22        correct?
23   MR. AKROTIRIANAKIS:  Objection.
24   A.   No, not correct.
25   MR. AKROTIRIANAKIS:  No foundation.
```

Page 137

1      when WestBridge was created?

2   A.  I think -- I believe it happened, took place, in 2015.

3   Q.  And do you know why WestBridge was created by defendants

4      in 2015?

5   A.  Yes, WestBridge was --

6   MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.

7      No foundation.

8   A.  WestBridge was created, I believe, by -- as part of

9      Francisco Partners' strategy to expand business in North

10      America, to be a reseller for NSO, for the Group's

11      products in North America.

12  Q.  Do you know who was in charge at WestBridge when it was

13      founded in 2015?

14  A.  The first person in charge was Omri Lavie.

15  Q.  Did Mr. Lavie spend time in the United States as part of

16      his role with WestBridge, to your knowledge?

17  A.  Yes.

18  Q.  Do you know how much time he spent in the United States?

19  A.  He relocated to the United States.

20  Q.  Where was he living when he relocated to the

21      United States to work at WestBridge?

22  A.  I don't know at the time where he lived.

23  Q.  Okay.  Do you know --

24  A.  I know for sure it was east coast.  Put it this way.

25  Q.  What do you know about the activities that Mr. Lavie

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

```
 1       undertook in connection with his work for WestBridge?
 2   MR. AKROTIRIANAKIS:  I am going to object that that question
 3       is outside the scope of his designation.  And so he can
 4       answer in his personal capacity, if he knows, but no
 5       foundation.
 6   A.  I don't know.
 7   Q.  What did WestBridge do in 2015 to market and/or sell
 8       defendants' products in the United States?
 9   MR. AKROTIRIANAKIS:  Same objections.  Outside of the scope.
10       No foundation.
11   A.  Made effort to sell the product.
12   Q.  Do you know the customers to whom it made an effort for
13       those sales?
14   MR. AKROTIRIANAKIS:  Objection.  Vague.
15   A.  NSO sells only to governmental agencies, so WestBridge
16       would meet with governmental agencies, the type of FBI,
17       CIA and the like.  But I don't know specifically of
18       specific meetings.
19   Q.  Okay.  Let me just get that clear for the record.  Are
20       you able to identify any specific customer in the
21       United States with whom WestBridge, or any other
22       representative of defendants, met for the purposes of
23       selling Pegasus?
24   MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.
25       Exceeds the scope of the designation.  No foundation.
```

Page 139

1    A.   So which time period?

2    Q.   Let's start with 2015?

3    A.   I don't know.

4    Q.   2016?

5    A.   I don't know.

6    Q.   2017?

7    A.   I don't know.

8    Q.   2018?

9    A.   So around '18 or '19, it is a matter of public record

10        that Pegasus was sold to the FBI.  The FBI director

11        stated that in Congress, in front of Congress committee.

12        So obviously a meeting has been held with the FBI.

13   Q.   2020?

14   MR. AKROTIRIANAKIS:  Same objections.

15   A.   I don't know of any other specific meetings.

16   Q.   Okay.  You don't know, or you are unwilling or unable to

17        disclose?

18   A.   I don't know.  Had I knew, I wouldn't disclose.  But

19        I don't know about specific meetings, no.

20   Q.   Okay.  With respect to defendants' efforts to market and

21        sell in the United States, including through defendants'

22        affiliates, the accused technology that was in use

23        between April 29, 2018, and May 10, 2020, the only

24        customer you can identify with whom the defendants or

25        their representatives met is the United States Federal

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 140

```
 1          Bureau of Investigation; is that a true statement?
 2     A.   I said that it is fair to assume that meetings were held
 3          with several intelligence and law enforcement agencies
 4          of the US and of the US government.  Do I know of
 5          specific meetings held?  No.
 6     Q.   Do you know the identities of the customers with whom
 7          meetings were held, other than the FBI?
 8     A.   I know that -- okay, WestBridge is independent -- was
 9          and is independent of the defendants.  And part of it is
10          because WestBridge, or any US reseller selling to
11          federal agencies, is required to meet classification
12          requirements.  And therefore they didn't divulge me, or
13          the company specifically, with who they were meeting.
14              So even if I was told that there is a meeting in
15          Virginia, I can guess, just like you, which federal
16          agency they met.  But they did not tell me that.  They
17          kept it to themselves.  And that's part of the reason
18          that WestBridge was established by Francisco Partners as
19          a completely separate entity, with full autonomy, and it
20          did not report into Q or NSO or its CEO, even not the
21          one before me, because they required independence, and
22          required to not be subjects of foreign company, because
23          they are dealing with US government.
24     Q.   Is it your testimony that no one at defendants directed
25          the activities of WestBridge in any way?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1    MR. AKROTIRIANAKIS:  Objection.  Vague.  No foundation.

2    A.   I am saying that the defendant did not direct

3         WestBridge.   WestBridge acted as independent entity and

4         enlisted the help of NSO in knowledge, or whatever, but

5         they didn't report, or they didn't take orders, from Q

6         or NSO.

7    Q.   Who was the CEO of OSY at this time, in 2018/19?

8    A.   I am not sure there was a CEO over there.

9    Q.   Okay.

10   A.   There was a director, but not CEO.

11   Q.   A director.  Are you aware of anybody, any officer, with

12        a management role in OSY or any company above it?

13   A.   So --

14   MR. AKROTIRIANAKIS:  Objection.  No foundation.

15   A.    -- I know that Eran Gorev of Francisco Partners was

16        very involved.

17   Q.   Eran Gorev was a director, not an officer.  To your

18        knowledge was Eran Gorev -- and I apologize if I am

19        mispronouncing the name -- ever an officer of OSY or one

20        of its parents?

21   A.   I am not sure the exact definition of an officer, but he

22        was formally a director.

23   Q.   Okay.  What was Omri Lavie's role with respect to

24        WestBridge in 2018/19?

25   MR. AKROTIRIANAKIS:  No foundation.

Page 142

1   A.  He had no role in WestBridge in '18 and '19.

2   Q.  What was Mr. Lavie's role in respect of WestBridge in

3       2015?

4   MR. AKROTIRIANAKIS:  No foundation.

5   A.  He headed it.  I don't know if it was defined as CEO,

6       but he was the head of WestBridge.

7   Q.  At that time, was he also an officer of any other entity

8       within the family of companies we have been discussing?

9   A.  Again, not sure about the definition of an officer, but

10      he was clearly one of the founders and held significant

11      stake of equity in the Group.  And a director in several

12      of the entities.

13  Q.  So in 2015, for example, Mr. Lavie was an equity holder

14      and a director with respect to Q Cyber and NSO; true?

15  MR. AKROTIRIANAKIS:  Objection.  That misstates his

16      testimony.  No foundation.

17  A.  No.  He is a director with responsibility, and equity

18      was higher up in the chain.

19  Q.  Mm-hm.

20  A.  In 2000 -- if you correct the question, I will answer.

21  Q.  In 2015, did Mr. Lavie have a job with Q Cyber or NSO?

22  A.  No.

23  MR. AKROTIRIANAKIS:  Objection.  No foundation.

24  A.  Once Omri -- once he moved to WestBridge and established

25      WestBridge, he no longer had a job, was not an employee

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 147

1          it back, if that's the question.

2     Q.   Okay.  And what do you do?

3     MR. AKROTIRIANAKIS:  Objection.  Vague.

4     A.   We disable the system.

5     Q.   How do you do that?

6     A.   So, there are different methods, depending on what

7          access we are given to the system.  If it is encoded

8          initially with the customer, it would give us access and

9          we would remove permissions so the customer would not be

10         able to use -- to access the system.  Like any other

11         system, you have to have a username and password to log

12         in, and we would block that.

13    Q.   What if the customer -- is the customer able to withhold

14         that access from you?

15    A.   Yes, we need permission to access the system.

16    Q.   How do you disable the system if the customer withholds

17         access?

18    A.   We have a mechanism, a technical mechanism, by which we

19         can prevent the system from installing additional

20         agents.  So that's something we can do remotely, even

21         without access to the system itself.

22    Q.   What is that mechanism?

23    A.   I cannot describe it technically, but if I would --

24         there are ways to design such access, such kill switch.

25         I am sure someone will be able to explain exactly how it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        works.

2   Q.   You cannot because you lack knowledge, or you cannot

3        because of a restriction on your testimony?

4   A.   No, I lack knowledge.  I can assume, but I don't want to

5        assume exactly how it works.

6   Q.   Have you ever -- have defendants ever performed that

7        remote disabling mechanism to which you just referred?

8   A.   Yes.

9   Q.   Okay.

10          I think we established that it is impossible for

11        Pegasus to be deployed without the participation of

12        employees of defendants, right?

13   MR. AKROTIRIANAKIS:  Objection.  Withdrawn.

14   A.   Impossible is too definite, but whenever we deploy

15        a system, it is done by defendant employees.

16   Q.   Other than the system we discussed for the FBI, what

17        systems have defendants deployed in the United States?

18   MR. AKROTIRIANAKIS:  Objection.  That misstates the

19        testimony and assumes facts not in evidence.

20   A.   The system I mentioned was the only deployment done by

21        defendants in the United States for Pegasus.

22   Q.   Who is Terrence DiVittorio?

23   A.   Terry was the head of WestBridge after Mr. Lavie.

24   Q.   Do you know when leadership at WestBridge transitioned

25        from Mr. Lavie to Mr. DiVittorio?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149

```
1    MR. AKROTIRIANAKIS:  Objection.  Assumes facts not in
2        evidence.
3    A.  I do not, but I will give you a range.
4    Q.  Please.
5    A.  It is between 2016 and 2018.
6    Q.  Was Mr. DiVittorio in charge of WestBridge when you
7        joined defendants in early 2018?
8    A.  Yes.
9    Q.  Do you know who Josh Shaner is?
10   A.  I heard the name.
11   Q.  Do you know what Josh Shaner's responsibilities were?
12   A.  I just know he was a WestBridge employee.  I don't know
13       the exact responsibilities.
14   Q.  You said before that WestBridge had engineers, do you
15       remember that?
16   A.  Yes.
17   Q.  Who were you thinking of?
18   A.  I don't know the names.
19   Q.  Okay.
20   A.  I know they had the ability to demonstrate the system
21       and to provide a certain level of support to the system,
22       which would require engineers.
23   Q.  Some of your documents talk about tier 1 or tier 2
24       support.  Are you generally familiar with those
25       concepts?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1      the FBI, and one deployment of Landmark to a customer

2      whose identity you don't know?

3   A.  Correct.

4   Q.  Aside from those two, are you aware of any other

5      deployment of any of defendants' products in the

6      United States?

7   A.  There might have been another Landmark at some earlier

8      point, which is probably the reason I am confused with

9      the dates.  That's it.

10  Q.  Do you know the identity of the customer for that third

11     deployment?

12  A.  I do not.

13  Q.  Do you know where in the United -- withdrawn.

14  A.  I do not.

15  Q.  You said one of the things WestBridge was capable of

16     doing is giving demonstrations of defendants' products,

17     or something to that effect.  Do you recall that?

18  A.  WestBridge demoed the system.

19  Q.  Okay.  Let me start with Pegasus.  Did WestBridge

20     demonstrate Pegasus?

21  A.  Yes.

22  Q.  Do you know who at WestBridge demonstrated Pegasus?

23  MR. AKROTIRIANAKIS:  Objection.  No foundation.

24  A.  I don't know the names.  Other than Terry, I don't know

25     the names.  Or Josh, which was mentioned.  I don't know

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 155

1          the names or roles of anyone at WestBridge, so the

2          answer is no.

3      Q.  Okay.  Do you know when is the first time WestBridge

4          demonstrated Pegasus to a US entity?

5      MR. AKROTIRIANAKIS:  Objection.  Foundation.

6      A.  I don't.

7      Q.  Do you know how many US customers received

8          demonstrations of Pegasus from WestBridge?

9      A.  I don't.

10     Q.  Do you know how many California customers received

11         demonstrations of Pegasus from WestBridge?

12     MR. AKROTIRIANAKIS:  Objection.  Assumes facts not in

13         evidence.

14     A.  I am not aware of any California customer.

15     Q.  When WestBridge performed a demonstration of the Pegasus

16         system, was it demonstrating the same Pegasus system

17         that defendants offer elsewhere in the world?

18     MR. AKROTIRIANAKIS:  Objection.  Vague.  No foundation.

19     A.  It is the same system.  The same source code.  Maybe

20         with slight configuration changes.

21     Q.  Again, we have spoken about the FBI.  Aside from the

22         FBI, can you identify any other US customer to whom

23         WestBridge demonstrated Pegasus?

24     A.  No.

25     Q.  I understand you can't remember, as you sit here today,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 156

```
 1        the name of any other US customer to whom WestBridge
 2        demonstrated Pegasus; did you ever have that knowledge?
 3   A.   So, as I mentioned before, WestBridge did not share the
 4        names of the customers, or the entities, or the
 5        agencies, because of the classification requirements
 6        they had.  I understand that, or assume, that you get
 7        information from Terry and you can ask him.  He should
 8        know.
 9   Q.   So you don't recall receiving information about the
10        customers to whom they were attempting sales, but
11        obviously you, defendants, did receive information about
12        each completed sale, because defendants were responsible
13        for deployment; correct?
14   A.   Yes, we mentioned one sale.  Yes.
15   Q.   Okay.  One for Pegasus, two for Landmark, that you
16        remember?
17   A.   One or two for Landmark.
18   Q.   Okay.  And you don't remember whether or not there were
19        any others beyond those two or three?
20   A.   No, I said there was only one Pegasus deployment in the
21        US.
22   Q.   Okay.  And there were one or two Landmark deployments in
23        the US, that you remember?
24   A.   Yes, but Landmark does not necessarily require physical
25        deployment.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  Q.  What does the pre-sales function do for defendants?

2  A.  Pre-sales team is the one conducting demos to customers.

3  Q.  Do you know if defendants' pre-sales team participated

4      in demonstrations in the United States?

5  MR. AKROTIRIANAKIS:  Objection.  Foundation.

6  A.  I don't know that it participated.  I don't know that it

7      physically participated.

8  Q.  When you say "it", you are referring to the pre-sales

9      team?

10  A.  Tomer and his team.

11  Q.  Okay.  And when you say "physically participated" are

12      you distinguishing between physical presence and remote

13      presence?

14  A.  Correct.

15  Q.  So do you have knowledge of the remote participation of

16      defendants' pre-sales team in demonstrations in the

17      United States?

18  MR. AKROTIRIANAKIS:  Objection.  Vague as to time.  Also

19      foundation.

20  A.  At which timeframe?

21  Q.  At any time.

22  A.  So, in 2018, when Tomer was head of pre-sale, at the

23      minimum -- no, that's not a good way to put it.

24          The pre-sale team was making sure that the team

25      environment is operational, so that, whoever is

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 171

1       conducting the demo in the States, will manage to do it

2       successfully.

3   Q.  When you speak of remote participation, does that

4       include remote participation in a customer facing role?

5   MR. AKROTIRIANAKIS:  Objection.  Vague.

6   A.  I meant behind the scenes.

7   Q.  Okay.

8            What does "behind the scenes" mean?

9   A.  It means that the customer is not necessarily aware that

10      they participate.

11  Q.  You mentioned the demo, the demonstration environment?

12  A.  Correct.

13  Q.  What is the demonstration environment?

14  A.  A Pegasus system which is used for demo.

15  Q.  Was there a Pegasus system installed in the

16      United States that was used for demonstrations?

17  A.  No.

18  Q.  So where is the -- when we think of demonstrations

19      conducted in the United States, is there a single

20      demonstration environment that those demonstrations

21      used?

22  A.  I don't know.

23  Q.  Okay.  Was Pegasus ever installed in the United States

24      other than at a customer site?

25  MR. AKROTIRIANAKIS:  Objection.  Vague.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

1    A.   Not to the best of my knowledge.

2    Q.   Okay.  So if it happened, you weren't aware?

3    A.   No.

4    MR. AKROTIRIANAKIS:  Same objection.

5    Q.   No, you were not aware?

6    MR. AKROTIRIANAKIS:  Same objection.

7    A.   I was not aware.

8    Q.   By the way, we talked about the installation for the

9         FBI, do you recall that?

10   A.   I do.

11   Q.   Do you know where in the United States that installation

12        was?

13   A.   I heard it was in New Jersey.

14   Q.   Do you recall how you heard that?

15   A.   I definitely read it on the media.  But I believe I knew

16        it even before.

17   Q.   Who would know more than you about the customers to whom

18        WestBridge demonstrated Pegasus in the United States?

19   A.   Terry and his team.

20   Q.   When Pegasus is deployed, does software that comprises

21        the agent get deployed to the customer site?

22   MR. AKROTIRIANAKIS:  Objection.  Vague.  Foundation.

23   A.   The system at the customer site comprises of software

24        that includes the agent, which is delivered from that

25        system to the target device.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 173

1    Q.   Okay.  The agent is delivered from the customer system,

2         on the customer premises, to the target device?

3    A.   Correct.

4    Q.   Does the software that's deployed on the customer

5         premises include the software for installation vectors?

6    A.   Yes.

7    Q.   Is there any aspect of the software that you think of as

8         comprising the Pegasus system that is not installed at

9         the customer site?

10   MR. AKROTIRIANAKIS:  Objection.  Vague.  Foundation.

11   A.   Can you repeat the question, please?

12   Q.   Yes.  Is there any aspect of the Pegasus software that

13        doesn't get installed at the customer premises when

14        defendants install Pegasus?

15   MR. AKROTIRIANAKIS:  Vague.  Foundation.

16   A.   It is a matter of how we define Pegasus software.

17   Q.   Is there anything within the definition of Pegasus

18        software, as you use that term at NSO, that is software

19        that does not get installed on the customer site?

20   A.   The way that I --

21   MR. AKROTIRIANAKIS:  Sorry.  The question is vague and no

22        foundation.

23            Go ahead.

24   A.   The way I define Pegasus software, all the Pegasus

25        software resides on the customer's system.

```
 1        Pegasus software, correct?
 2   MR. AKROTIRIANAKIS:  Objection.  There is no foundation.
 3        Also assumes facts not in evidence.
 4   A.   I didn't see the list of -- that was claimed to be
 5        targeted by Whatsapp -- by Pegasus over Whatsapp.
 6   Q.   You know Pegasus was installed on an attorney's phone.
 7        We talked about that earlier today, right?
 8   A.   In a certain case that I mentioned, yes.
 9   Q.   Okay.
10   A.   I mentioned that was a misuse of the system, yes.
11   Q.   Right.  One example of the misuse of the system, right?
12   MR. AKROTIRIANAKIS:  Objection.  No foundation.
13   Q.   Right?
14   MR. AKROTIRIANAKIS:  No foundation.
15   A.   It was an example of misuse of the system.
16   Q.   Okay.
17        When you talk about requiring the system to be used
18        for the purposes of fighting crime and terrorism -- was
19        that your phrase?
20   A.   Yes.
21   Q.   Who decides what's crime or terrorism?
22   A.   In general, it is the governmental agency using the
23        system is required, like any agency, to have the right
24        authority to use such a tool against the suspect.
25        I would assume that they seek court orders or warrants,
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 181

1    or whatever's required under the specific laws in that

2    country.

3    Q.   You assume but you don't know?

4    MR. AKROTIRIANAKIS:  Objection.  Argumentative.

5    A.   We require the customers to follow the law.

6    Q.   How do you require the customers to follow the law?

7    A.   Foremost, by statement that they provide in the

8         contract.  But there are many other measures that we

9         take to ensure that that is followed.

10   Q.   But at least ten customers have misused the system so

11        severely that you took your most drastic action, which

12        is to disconnect them, right?

13   MR. AKROTIRIANAKIS:  Objection.  Misstates testimony.  No

14        foundation.

15   A.   Around ten customers, yes.

16   Q.   And in fact you have investigated dozens of allegations

17        of misuse, correct?

18   A.   Most of them became -- turned out to be not a misuse.

19   Q.   And there are other circumstances in which you concluded

20        that there was misuse, but you decided to take steps

21        short of disconnecting the customer; correct?

22   A.   There is a few like that.

23   Q.   At least a few.

24        (Exhibit 2025              marked for identification)

25             This is exhibit 2025, which, by the way, I have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

```
 1        marked out of order.  We will come back to 2024.
 2             Mr. Shohat, exhibit 2025 is a January 26, 2023
 3        article from the Wall Street Journal, entitled:
 4             "Head of Israeli cyber firm NSO Group reaffirms
 5        company commitment to spyware".
 6             Subtitle:
 7             "Yaron Shohat acknowledges mistakes but defends the
 8        technology as vital".
 9             Do you see that?
10   A.   I do.
11   Q.   Do you recognize this article?
12   A.   Yes, I do.
13   Q.   On the second page, in the third paragraph, the article
14        states:
15             "Mr. Shohat said NSO Group had terminated ten
16        customers because of alleged misuse of its technology,
17        adding that the spyware vendor had learned lessons from
18        those experiences.  He didn't name the customers."
19             Do you see that?
20   A.   I do.
21   Q.   Did you provide that information to the Wall Street
22        Journal in January 2023?
23   A.   I did talk to the Wall Street Journal.  I don't recall
24        if I said ten customers or around ten customers.
25        I don't recall if it was a definite number.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 233

```
1   MR. AKROTIRIANAKIS:  Objection.  It's over broad.  No
2       foundation.
3   A.  I believe that in '18/'19 most, the vast majority of
4       customers were using the concurrent model.
5   Q.  Also true today?
6   MR. AKROTIRIANAKIS:  Objection.  No foundation.
7   A.  I think it is still true today.
8   MR. BLOCK:  Let's take a short break.
9   A.  Okay.
10  THE VIDEOGRAPHER:  Going off the record.  The time is 18:29.
11  (6:29 p.m.)
12                          (break taken.)
13  (6:42 p.m.)
14  THE VIDEOGRAPHER:  Going back on the record.  The time is
15      18:42.  Thank you.
16  MR. BLOCK:  Welcome back, Mr. Shohat.
17  A.  Thank you.
18  By Mr. Block:
19  Q.  Are you aware that defendants have issued something they
20      call a transparency report?
21  A.  Yes.
22  Q.  The first time defendants issued a transparency report
23      was 2021, correct?
24  A.  Correct.
25  Q.  Did you have any involvement in the 2021 report?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1  A.  I recall it was discussed and reviewed by the management

2      team before being issued, yes.

3  Q.  The management team including you?

4  A.  Including me.

5  Q.  But Mr. Hulio was CEO at that time and signed the

6      report?

7  A.  Yes.

8  Q.  NSO claims it does not operate Pegasus, right?

9  A.  We do not operate Pegasus.

10 Q.  NSO claims it has no visibility into the usage of

11     Pegasus?

12 A.  We have no visibility into the target information.

13 Q.  And NSO says it does not collect information about

14     customers?

15 MR. AKROTIRIANAKIS:   Objection.   Misstates his testimony.

16     No foundation.

17         If you understand the question you can answer it.

18 A.  I don't think it is stated the way it was presented.

19     Obviously we do collect information about the customers,

20     like the financials, how much they owe us, a lot of

21     information, so you need to be more specific.

22 Q.  So it is false that NSO has no visibility into Pegasus,

23     Pegasus' usage, and does not collect information about

24     customers?

25 A.  The defendants do not collect information about the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

```
 1        targets of the customers or the intelligence gathered by

 2        the systems the customers use.

 3   Q.   Okay, so at a minimum if someone were to say that NSO

 4        does not collect information about customers that would

 5        be overstated?

 6   A.   I need to see the context of how it was stated.

 7   Q.   Sure.  This is exhibit 2028.

 8   A.   Okay.

 9        (Exhibit 2028              marked for identification)

10   Q.   Which is the 2021 transparency report.  And I will refer

11        you to page 6.  Under "understanding Pegasus".

12   A.   Page 6, "Understanding Pegasus" yes.

13   Q.   The second sort of stanza says:

14             "Myth: NSO operates Pegasus and collects information

15        about the individuals it is used against..."

16             And then it says:

17             "Fact: NSO licenses Pegasus to sovereign states and

18        state agencies.  Does not operate Pegasus.  Has no

19        visibility into its usage and does not collect

20        information about customers."

21             Do you see that?

22   A.   I see that.  And --

23   Q.   My question for you, sir, is defendants do collect some

24        information about customers, right?

25   MR. AKROTIRIANAKIS:  Objection.  Foundation for this
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

```
 1        document.
 2   A.   In the context of this question the information that NSO
 3        does not collect about customers was stated in the myth,
 4        which is the information about individual, the
 5        individual it is used against.  This information is not
 6        collected, and even not exposed to NSO.
 7   Q.   Okay.
 8             So NSO does not collect information about the
 9        individuals it is used against, do you agree with that?
10   A.   I agree with that.
11   Q.   On page 8.
12   A.   Yes.
13   Q.   Do you see a header, sorry, there is a break in the text
14        and then you read below, the next paragraph begins "as
15        part of our governance framework", do you see that?
16   A.   Mm-hm.
17   Q.   And then in the middle of the next block, eight lines
18        from the bottom, it says "We strictly require ... "
19             Do you see the beginning of the sentence "we
20        strictly require..."?
21   A.   Yes.
22   Q.   That sentence says:
23             "We strictly require that Pegasus is used only where
24        there is a legitimate law enforcement or intelligence
25        driven reason connected to a specific pre identified
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 237

```
 1        phone number and after a process is followed where
 2        a state agency decision maker independent of the user,
 3        such as a court, authorizes that use consistent with
 4        a written domestic law."
 5             Did I read that correctly?
 6   A.   Yes.
 7   Q.   Is it your testimony that every single customer of
 8        Pegasus must, as a prerequisite to obtaining it, show to
 9        NSO that it uses the product only after a process with
10        a state agency decision maker, independent of the user,
11        as described here?
12   MR. AKROTIRIANAKIS:  Objection.  Misstates the document.
13   A.   No, first of all.  Please, give me a minute to read the
14        whole paragraph.
15             Okay, I have read it.
16             So you asked if we require to see a decision maker
17        independent, to see --
18   Q.   Let me just ask, is that okay?
19   A.   Yes.
20   Q.   Does every single NSO customer promise to NSO that it
21        will not infect a mobile device unless "a state agency
22        decision maker independent of the user, such as a court,
23        authorizes that use consistent with a written domestic
24        law"?
25   MR. AKROTIRIANAKIS:  Vague as to time.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 256

1          CERTIFICATE OF COURT REPORTER

2

3    I, CHRIS LANG, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness YARON SHOHAT in

5    the foregoing transcript, taken on this 29TH day of AUGUST,

6    2024 was recorded by me in machine shorthand and was

7    thereafter transcribed by me; and that the foregoing

8    transcript is a true and accurate verbatim record of the

9    said testimony.

10

11   I further certify that I am not a relative, employee,

12   counsel or financially involved with any of the parties to

13   the within cause, nor am I an employee or relative of any

14   counsel for the parties, nor am I in any way interested in

15   the outcome of the within cause.

16

17

18

19   Name:    CHRIS LANG

20   Date:    8/29/24

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit I

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1            H I G H L Y    C O N F I D E N T I A L

2                     ATTORNEYS' EYES ONLY

3              NORTHERN DISTRICT OF CALIFORNIA

4                      OAKLAND DIVISION

5                         Case No. 4-19-cv-07123-PJH

6    -----------------------------------

7    WHATSAPP INC., a Delaware corporation,

8    and META PLATFORMS INC., a Delaware corporation,

9            Plaintiffs,

10   v.

11   NSO GROUP TECHNOLOGIES LTD and

12   Q CYBER TECHNOLOGIES LTD,

13            Defendants.

14   -----------------------------------

15       Deposition of TAMIR GAZNELI, taken by AILSA

16    WILLIAMS, Certified Court Reporter, held at the

17    offices of Davis Polk & Wardwell, London, United

18       Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1    should note also we have three representatives

2    from our experts.  David Youssef and George Arden

3    from FTI and David Snedarsik of Intuitive, all of

4    whom are authorized under the protective order to

5    receive highly confidential information.

6              MR. AKROTIRIANAKIS:  Joe Akrotirianakis

7    on behalf of defendants.  Chaim Gelfand and Shira

8    Plotnik are here from NSO.

9              THE VIDEOGRAPHER:  The court reporter

10   today is Ailsa Williams, also representing

11   Veritext Legal Solutions.  Please would the

12   interpreters introduce themselves for the record

13   and state where they are.

14              MS. YAARI:  Varda Yaari for European

15   depositions.

16              MS. ILAN:  Mor Ilan for European

17   depositions.

18              THE VIDEOGRAPHER:  Please would the

19   court reporter firstly swear in the interpreters

20   and thereafter please swear in the witness.

21                   (Interpreters sworn.)

22                     TAMIR GAZNELI

23                   Having been sworn,

24                  Testified as follows:

25            EXAMINATION BY MR. PEREZ-MARQUES:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 7

```
 1              MR. PEREZ-MARQUES:  Mr. Gazneli, could
 2    you state your name for the record?
 3              A    My name is Tamir Gazneli.
 4              Q    I introduced myself before but it is
 5    Tony Perez from Davis Polk.  Have you been deposed
 6    before?
 7              A    No.
 8              Q    The format today is that I will be
 9    asking questions, your role is to answer them.  We
10    do need verbal responses to my questions, meaning
11    that I need more than a nod or a shake of the head
12    so the reporter can take it down.
13              If you don't understand my question at
14    any point please ask me to clarify.  I will be
15    happy to try to do so.  If you proceed to answer
16    the question, I will assume you understood it.  Is
17    that fair?
18              A    Yes.
19              Q    As you know, we have an interpreter
20    in the room with you and a back-up interpreter by
21    Zoom if you do need to use those services,
22    although I understand we are going to try to
23    proceed in English to the extent possible.
24              Now, let me show you what has been
25    previously marked as plaintiff's Exhibit or
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            Q    Okay.  Which part of the team
 2   related to WhatsApp or did work that related to
 3   WhatsApp?
 4            A    You mean by number, you mean by
 5   name?  What is the question?
 6            Q    How many people -- why don't we
 7   start with how many about people were working on
 8   WhatsApp as part of the team that you led as
 9   Security Research Team Leader?
10            MR. AKROTIRIANAKIS:  Object to the form
11   of the question.
12            A    Four.
13            Q    Do you recall their names?
14            A    Yes.
15            Q    Who were they?
16            A    Shmaryahu Rubinstein, Ofir Tadmore,
17   Oved Beychan, Shaked Barkan.
18            Q    I suspect Ailsa may want spellings
19   on those but we will just make a note and come
20   back to that.
21            And you supervised that team that was
22   working on WhatsApp during your time as Security
23   Team Research Leader.
24            A    Yes.
25            Q    And what were they doing with
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1    respect to WhatsApp?

2             A    Research application.

3             Q    Again for the purpose of developing

4    installation vectors?

5             A    I will say it is developing the

6    software required for gaining access.

7             Q    As I understand it, installation

8    vectors are software required to gain access.  Is

9    that consistent with your definition of what an

10   installation vector is?

11            MR. AKROTIRIANAKIS:  Objection, no

12   foundation.

13            A    Can you define access?  When you say

14   "access" what do you mean by access?

15            Q    You said access.  "I will say it is

16   developing the software required for gaining

17   access."  What did you mean by access?

18            A    Access to the data which resides on

19   the endpoint.

20            Q    That reside on the endpoint?

21            A    Yes.

22            Q    Meaning the target device?

23            A    Yes.

24            Q    Now we have also heard endpoint used

25   to refer to Pegasus.  Is that -- do you use

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 31

1    endpoint in that sense or no?

2              MR. AKROTIRIANAKIS:  Objection, vague.

3              A    I use endpoint as target device.

4              Q    Okay.  And so the team that was

5    working on WhatsApp that you supervised as

6    Security Research Team Leader was investigating

7    WhatsApp in order to develop software that could

8    be used to gain access to target devices?

9              MR. AKROTIRIANAKIS:  Objection,

10   misstates his testimony.

11             A    The team was researching Android

12   related applications and services in order to gain

13   access to the endpoint data.

14             Q    Okay.  Now, you testified previously

15   that they were doing work -- you gave us the four

16   names who were doing work related to WhatsApp?

17             A    Yes.

18             Q    And what work were they doing

19   related to WhatsApp?

20             MR. AKROTIRIANAKIS:  Objection,

21   compound.

22             A    Which question do you want me to

23   answer?

24             Q    The one that you didn't answer.  I

25   said you gave us four names doing work related to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 41

1    The time is 10:12.

2              MR. PEREZ-MARQUES:  Mr. Gazneli, do you

3    understand you are still under oath?

4              A    Yes.

5              Q    When we broke for the fire alarm, I

6    believe we had a question pending.  I had asked

7    you whether you would agree that you are very

8    familiar personally with the Eden, Heaven and

9    ERISED exploits?

10              MR. AKROTIRIANAKIS:  Objection, vague.

11             A    I would say that I am familiar with

12    the exploits but not each and every line in the

13    code.

14             Q    But you led the team that developed

15    them, right?

16             A    Yes.

17             Q    You were promoted to Director of R&D

18    in January 2020.  Is that correct?

19             A    Yes.

20             Q    Who did you replace as Director of

21    R&D?

22             A    Oz Golan.

23             Q    Oz Golan?

24             A    Yes.

25             Q    What were your duties as Director of

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1    R&D?

2            A    I was leading the R&D of the entire

3    Android framework.

4            Q    Only Android?

5            A    Yes.

6            Q    Was there another -- were there

7    multiple Directors of R&D.?

8            A    Yes.

9            Q    And was your work at that time as

10   Director of R&D also focused on installation

11   vectors for Pegasus?

12            MR. AKROTIRIANAKIS:  Objection, vague.

13            A    Development of installation vectors

14   is responsibility of part of the teams, yes.

15            Q    What other responsibilities did the

16   team or teams that you supervised as Director R&D

17   have?  What other responsibilities did they have?

18            A    The development of an agent, Android

19   agent, development of the backend server and QA.

20            Q    So you mentioned Android agent,

21   backend server and QA?

22            A    Yes.

23            Q    And when you say Android agent, what

24   do you mean?

25            A    The software that resides on the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 43

```
 1    target's device and collects in all the required
 2    information.
 3              Q    And you refer to that as the agent?
 4    Is that a good shorthand for us to use today?
 5              A    Yes.
 6              Q    And when you say "backend server"
 7    what do you mean by that?
 8              A    It is a piece of software that
 9    resides on the customer's infrastructure and is
10    responsible for managing the installation flow.
11              Q    Managing the installation flow?
12              A    Yes.
13              Q    Installation flow of Pegasus?
14              A    Part of Pegasus.  Not the whole
15    Pegasus.
16              Q    Which part?
17              A    For android.
18              Q    For Android.  So would you consider
19    that one version of Pegasus or how would you refer
20    to that?
21              A    It is one of the parts.
22              Q    And when you say "QA", what do you
23    mean by that?
24              A    Quality assurance.
25              Q    Quality assurance?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 44

```
 1            A    Yes.

 2            Q    What did the team -- what was the

 3    quality assurance work that the team you

 4    supervised did?

 5            A    Functionality, statistics.

 6            Q    Functionality of what?

 7            A    Of the agent and the installation

 8    flows.

 9            Q    Who did you report to as Director of

10    R&D?

11            A    To the VP R&D.

12            Q    Who was that?

13            A    During that period there were three,

14    so to which period do you refer.

15            Q    Let's go through all three.

16            A    The name of the first one I don't

17    remember.  The second one was Yuval Barkan and the

18    third one was Rami Dabush.

19            Q    During your time as Director of R&D,

20    were any researchers that you supervised working

21    on installation vectors via WhatsApp?

22            A    Yes.

23            Q    Which vectors were those?

24            A    When I was of R&D it was ERISED.

25            Q    Any others besides ERISED, during
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1    are.

2              What was the process to develop and test

3    installation vectors in use between April 29, 2018

4    and May 10, 2020?

5              MR. AKROTIRIANAKIS:  You can answer that

6    as it relates to the category in the court's order

7    which itself is limited to, as requested by

8    counsel, "any NSO spyware targeting or directed at

9    WhatsApp servers, or using WhatsApp in any way to

10   access target devices".

11             Q   Do you have that definition in mind

12   Mr. Gazneli?  So the installation vectors I am

13   asking you about are installation vectors that

14   used WhatsApp in any way.  Do you understand that?

15             A   Yes.

16             Q   And so Heaven, Eden, ERISED would be

17   examples of such installation vectors, correct?

18             A   Yes.

19             Q   And so now I am asking you what was

20   the process to develop and test installation

21   vectors that used WhatsApp that were in use during

22   the period between April 29, 2018 and May 10,

23   2020?

24             MR. AKROTIRIANAKIS:  Objection, vague.

25   If you understand you can answer.  Also compound.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 67

```
 1          A   I will try to answer based on

 2   Israeli law and my restrictions because of it.

 3          The process was developed in internal

 4   environment, in order to be able to work on our

 5   devices on which we investigated the application.

 6          Q   Let me just take a step back for a

 7   moment to see if I can make our terminology clear.

 8   Eden, Heaven and ERISED are all installation

 9   vectors that worked via WhatsApp, correct?

10          MR. AKROTIRIANAKIS:   Objection,

11   misstates his testimony.

12          A   Heaven, Eden and ERISED were

13   installation vectors that were activated via

14   WhatsApp.

15          Q   During the period April 29, 2018 to

16   May 10, 2020, were any installation vectors in use

17   besides Heaven, Eden and ERISED that were

18   activated via WhatsApp?

19          A   No.

20          Q   So those are the three, yes?

21          A   Yes.

22          Q   And am I right that NSO sometimes

23   refers to them collectively as Hummingbird?

24          A   Yes.

25          Q   And does the term Hummingbird
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 68

1    include any vectors other than those three?

2            A    No.

3            Q    So if I refer to the Hummingbird

4    vectors, you will understand that I am referring

5    to those three?

6            A    In respect to the timeframe, yes.

7            Q    Because you are not answering as to

8    anything outside those timeframes, right?

9            A    Yes.

10           Q    And so you referred to -- when I was

11   asking you about the development, you mentioned

12   developing an "internal environment in order to be

13   able to work on our devices on which we

14   investigated the application".  What did you mean

15   by that?

16           A    I mean by -- developing an

17   environment using which you can use the WhatsApp

18   application.

19           Q    And what does that involve?  How do

20   you do that?

21           MR. AKROTIRIANAKIS:  Objection,

22   compound.

23           A    It is like -- it involves the

24   understanding of the functionality of the WhatsApp

25   ecosystem.

Page 92

1          A    This is development per se, as any

2    development.

3          Q    And it also requires specialized

4    expertise?

5          A    It requires understanding of

6    internals of the framework.  I don't see it as

7    specialized expertise, as any other specialized

8    expertise required for developing any other

9    application.

10          Q    The next section here, 1.1, refers

11    to smartphone data interception challenges.  Do

12    you see that?  "Overcoming smartphone data

13    interception challenges"?

14          A    Yes.

15          Q    And those are challenges that

16    Pegasus is able to overcome?

17          MR. AKROTIRIANAKIS:  Object to the form

18    of the question.

19          A    Yes.

20          Q    Among the identified challenges is

21    encryption, correct?  Do you see that, the first

22    bullet?

23          A    Yes.

24          Q    And you understand that the purpose

25    of encryption is to prevent anyone other than

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 93

```
 1   participants to a communication from seeing the

 2   contents.  Is that right?

 3           A   I would say that encryption is

 4   designed to avoid exposure of private data to

 5   public which is not authorized to be accessed to

 6   the private data.

 7           Q   And one of the benefits that Pegasus

 8   provides is access to such encrypted

 9   communications.  Is that right?

10           A   Pegasus is a software that enables

11   the customers which are authorized to get access

12   to that private data even if they are encrypted.

13           Q   Are you familiar with the

14   authorization of NSO's customers to access data.

15   Is that a topic that you are familiar with?

16           A   They are intelligence agencies and

17   law enforcement agencies which act under their

18   laws and regulations in order to be able to use

19   and get access to this data.

20           Q   Right, but you are able to answer

21   questions about the authorization of NSO's

22   customers?  You are familiar with that legal

23   authorization?

24           A   I am not familiar for the legal

25   parts of it --
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1          Q    So you don't know about the legal

2    authorization of NSO's customers, or you do?  If

3    you do I might have questions.  Is that a topic

4    you are familiar with?

5          A    I don't think that I am here to

6    answer the legal questions about it.

7          Q    And it is not a topic that you have

8    personal knowledge about either, is it?

9          MR. AKROTIRIANAKIS:  Objection, vague.

10         A    No.

11         Q    So let's put that to the side.  The

12   purpose of Pegasus, in terms of how it functions,

13   in terms its full functionality, is that it

14   provides access to encrypted communications, among

15   other things.  Right?

16         MR. AKROTIRIANAKIS:  Objection,

17   misstates his testimony.

18         A    The purpose of Pegasus is to enable

19   customers to get access to the data which resides

20   on their targets' smartphones.

21         Q    Including encrypted communications,

22   right?

23         MR. AKROTIRIANAKIS:  Misstates his

24   testimony.

25         A    The data is not encrypted on the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

1          Q    So this reflects NSO's fix or

2     response to the problem that was created by the

3     December 2018 update?

4          A    This is we doing our job to

5     delivering the customers the software they needed.

6          Q    Right.  So after the December 2018

7     update, NSO customers couldn't use the 0 click

8     Android installation vectors, right?

9          A    Right.

10         Q    And Eden, once it was released,

11    allowed them to do so again, right?

12         A    Right.

13         Q    And between Heaven and Eden was

14    there any other -- was there any 0 click Android

15    installation vector in operation?

16         A    No.

17         Q    How did Eden differ from Heaven?

18         A    The main difference was in the

19    installation flow that in Eden we had to use --

20    the transmission of the data between the source

21    and the target, WhatsApp client, needs to go

22    through WhatsApp server relay servers.

23         Q    And how was -- I am sorry -- so in

24    Eden --

25         A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 259

1          Q     -- the transmission had to go
2     through WhatsApp relay servers?
3          A     Yes.
4          Q     Okay, and that was not the case with
5     respect to Heaven?
6          A     Right.
7          Q     Was that the only difference between
8     Heaven and Eden?
9          A     This is the major difference.
10         Q     In terms -- do you recall we spent
11    some time earlier today walking through the steps
12    of an installation attack using the Hummingbird
13    vectors.   Do you recall that?
14         A     Yes.
15         Q     And does that description we were
16    walking through apply to Eden as well?
17         A     Except the fact that -- except the
18    part that talked about controlling the relay
19    servers adding one to the list and directing the
20    target WhatsApp client to select a specific one.
21         Q     And so what did Eden do instead?
22         A     It just couldn't anymore change the
23    way the target selects the relay servers,
24    therefore it used -- the communication was done
25    through the WhatsApp relay servers in order to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 260

1    deliver the payloads required for the remote code

2    execution part.

3         Q    Would that be the stager?

4         A    The payload of stager was the same

5    in Heaven and Eden.  The part that changed was the

6    part that delivered the stager to --

7         Q    Right, so I think you testified

8    earlier that with Heaven the stager was downloaded

9    from a non-WhatsApp server.  Is that right?

10             MR. AKROTIRIANAKIS:  Objection,

11    misstates testimony.

12        A    No.  No.  I stated that the

13    privilege escalation payload --

14        Q    Got it.  So the stager even under

15   Heaven was delivered via a WhatsApp message?

16             MR. AKROTIRIANAKIS:  Counsel, I know it

17   is getting long in the day, but you've got to let

18   him finish his answers.

19        A    In Heaven the stager payload was

20   delivered using WhatsApp messages, yes.

21        Q    Okay.  And in Eden the stager

22   payload was also delivered via WhatsApp message?

23        A    Yes.

24        Q    And in Heaven the PE payload was

25   delivered not through WhatsApp servers, right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 261

```
 1              A    Right.
 2              Q    And under Eden was the PE payload
 3    delivered via WhatsApp servers?
 4              A    No.
 5              Q    So what is the difference?
 6              A    The difference is that in Heaven the
 7    stager payload is delivered using WhatsApp
 8    messages that go through non-WhatsApp relay
 9    servers, and in Eden the same payload is delivered
10    using WhatsApp messages that go through WhatsApp
11    relay servers.
12              Q    Got it.  So the distinction is with
13    respect to through which servers the stager
14    payload is delivered?
15              A    Which relay servers, yes.
16              Q    Which relay servers, got it.
17    I think you said that was the principal difference
18    between Heaven and Eden.  Are there any other
19    important differences?
20              A    Not important enough that I
21    remember.
22              Q    Nothing else that you remember?
23              A    No.
24              Q    Based on your preparation, nothing
25    else that you are aware of?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 284

1           A    Yes.

2           Q    And when you say "the relevant

3    payloads", is that only for privilege escalation

4    or also for deployment of the agent that the C2

5    servers were used?

6           A    The agent too.

7           Q    So C2 servers are part of the

8    installation phase, is that right?

9           MR. AKROTIRIANAKIS:   Objection,

10    misstates testimony.

11           A    No, as part of the installation

12    procedure and data extraction.   Installation

13    phase, you asked installation vector, this is not

14    related to it.

15           Q    Okay.   So you don't consider

16    privileged escalation part of the installation

17    phase?

18           A    I am trying to stay under your

19    terminology.

20           Q    Right.   I want to understand yours.

21    So when you refer to the installation phase, that

22    doesn't include privilege escalation?

23           A    In my terminology, installation of

24    an agent is the whole procedure from the beginning

25    of the remote code execution, it continues to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                                                        Page 285

1    privilege escalation payload to the fact the agent

2    is installed.

3              Q    Okay.  So the C2 servers are used

4    during what you just defined as the installation

5    phase?

6              A    For part of, yes.

7              Q    Did defendants ever operate C2

8    servers?

9              A    No.

10             Q    Did defendants set up C2 servers for

11   defendant's customers?

12             A    What do you mean by set up?

13             Q    Lease them, buy them, anonymize

14   them?

15             A    As I said before, the White Services

16   team, it is possible for White Services, if they

17   were eventually deployed on customer's ecosystem

18   as part of his solution.

19             Q    Are you familiar with an AWS, Amazon

20   Web Services server that was used, that was

21   housed, located in Germany in connection with the

22   Pegasus exploit or Pegasus system?

23             A    Yes.

24             Q    What do you know about that server?

25             A    This was a server that was used for

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 286

1    the deployment of the WIS for testing purpose.

2              Q    And when you say "deployment of

3    WIS", what do you mean?

4              A    Placing the WIS code on that server.

5              Q    And then how was that code used once

6    housed on that server?

7              A    It was connected to the additional

8    part of the ecosystem that were required to

9    complete testing of the capability.

10             Q    Internal testing or testing through

11   WhatsApp's ecosystem?

12             A    Testing through WhatsApp's

13   ecosystem.

14             Q    So messages generated by WIS were

15   sent from the German AWS server through WhatsApp's

16   ecosystem?

17             A    Yes.

18             Q    For test purposes, is that right?

19             A    Yes.

20             Q    To target devices controlled by NSO?

21             MR. AKROTIRIANAKIS:  Object to the form

22   of the question.

23             A    To company owned devices.

24             Q    And when was that?  During what time

25   period was that AWS server being used for that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 315

1    in the term "lawful interception" can lawful

2    interception, to your knowledge, be done both

3    lawfully and unlawfully?

4            MR. PEREZ-MARQUES:  Object that it is

5    leading.

6            A    Yes.

7            Q    Would you turn to section 2.1 in the

8    same document.  You were asked about the point

9    here where it is the first point that says "Global

10   Coverage"?

11           A    Yes.

12           Q    "Monitor target's devices while they

13   connect to the internet for end location."

14           Do you see that?

15           A    Yes.

16           Q    Do you know whether Pegasus has

17   configuration limitations that can limit

18   geography?

19           A    Yes.

20           Q    Can you give me an example?

21           A    Each customer is configured to the

22   ability to use this software in specific licensed

23   territories, meaning that when you deploy a

24   customer you configure them only in the

25   territories he may use or can use this tool.  For

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 316

1   example, you could configure no way to install an

2   agent on territory like US or UK, or ...

3           Q    Is Pegasus configured for anyone, to

4   your knowledge, in a way that allows it to monitor

5   within the United States?

6           MR. PEREZ-MARQUES:  Object to form.

7           A    No.

8           Q    Throughout the day you were asked a

9   lot of questions about messages being sent.

10          A    Yes.

11          Q    Does NSO ever send messages to

12  target users?

13          A    No.

14          MR. PEREZ-MARQUES:  Object to form.

15          Q    To your knowledge has NSO ever sent

16  a message to a target user?

17          MR. PEREZ-MARQUES:  Object to form.

18          A    No.

19          Q    Same questions with respect to voice

20  calls or video calls?

21          MR. PEREZ-MARQUES:  Same objection.

22          A    No.

23          Q    To your knowledge, has NSO ever sent

24  any message or voice call or video call to any

25  phone that it was not authorized to access?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              MR. PEREZ-MARQUES:  Object to form.
2         A    No.
3         Q    Can you turn to Exhibit 2033,
4    please.  This is the Heaven OpSec.  In your
5    testimony you mentioned that this document
6    contained suggestions?
7         A    Yes.
8         Q    My question for you is whether any
9    of the suggestions that are referenced in the
10   document to your knowledge were ever implemented?
11             MR. PEREZ-MARQUES:  Object to the form.
12        A    Yes.
13        Q    Which ones?
14        A    Yes, so the ones for sure that were
15   implemented are from the new silent installation,
16   which addressed the getting device operating
17   system and versions, sending about 15 requests in
18   a short period, et cetera.  The section which is
19   under "attack", that line on the first page.  The
20   section which is under "attack" section on the
21   second page.  And there is one suggestion that
22   suggests to use different credentials for
23   fingerprint and one for installation.
24        Q    Which page is that?
25        A    Trying to search this one.  It is on
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 318

1    page ending with 960, "Fingerprint Stage" point

2    3A:  "Different number from the one that is being

3    used for attack phase", in order to avoid coupling

4    between fingerprint phase and attack phase.

5              Q    Any others?

6              A    Any others, I don't recall were

7    implemented ever.

8              Q    All right.  Just to restate that

9    list and ask if I have understood your testimony

10   correctly. on the first page, which is 8957, Bates

11   number, under the heading "New silent

12   fingerprint"?

13             A    Yes.

14             Q    The first sub-bullet -- I am sorry

15   the second sub-bullet that begins with "Send 15

16   approximately requests in a short period"?

17             A    Yes.

18             Q    And the rest of that sub-bullet?

19             A    Yes.

20             Q    And then on the same page the

21   section that has the heading "Attack" and five

22   bullets?

23             A    Yes.

24             Q    Then on the next page, which is

25   8958, under the head "Attack", there is 1, 2, 3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 319

1    and 4?

2              A    Yes.

3              Q    And then on the page that ends in

4    8960, under "Fingerprint Stage", point 3A.  Did

5    I understand your testimony correctly?

6              A    Yes.

7              Q    All right.  Just a little bit ago

8    you were referred to S.WhatsApp.net, which you

9    identified as a domain.  Do you recall that

10    testimony?

11              A    Yes.

12              Q    And do you know where that domain

13    name leads?

14              A    As for location, no.

15              Q    And wherever it does lead, is that

16    destination controlled by WhatsApp or by NSO or by

17    somebody else?

18              MR. PEREZ-MARQUES:  Object to the form.

19              A    It is controlled only by WhatsApp.

20              MR. AKROTIRIANAKIS:  I don't have any

21    other questions.

22         Further Examination by MR. PEREZ-MARQUES:

23              MR. PEREZ-MARQUES:  Just a couple of

24    quick follow-ups.  The code that you reviewed from

25    the AWS server, which Hummingbird vector did that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 320

```
 1   relate to?
 2            A    It mainly relates to Heaven and
 3   Eden.
 4            Q    Heaven and Eden, but not ERISED?
 5            A    No.
 6            Q    So to understand -- to review the
 7   ERISED code, that does not reside on the AWS
 8   server?
 9            A    Parts of it are relevant for ERISED
10   too.
11            Q    Okay.  But there are parts of ERISED
12   that are not on the AWS server?
13            MR. AKROTIRIANAKIS:  Objection, no
14   foundation.
15            A    It depends on the exact time the
16   image was taken.
17            Q    So you don't know one way or the
18   other whether the AWS server contains the entirety
19   of the ERISED code?
20            A    It contains for sure for Heaven and
21   Eden, but ERISED is a matter of question.
22            Q    Okay.  The AWS server, your
23   testimony is it contains the entirety of the
24   Heaven and Eden code?
25            A    It doesn't include the vulnerability
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 322

```
 1              MR. AKROTIRIANAKIS:  Objection,
 2     misstates his testimony.
 3              A   The image is the instance in time,
 4     so it couldn't contain all the code from two years
 5     of the --
 6              Q   Right, because the code changed from
 7     time to time, right?
 8              A   There are certain parts of it that
 9     changed, yes.
10              Q   And so the code that was being used
11     in April 2018 is likely not the code that was
12     being used in May 2019?
13              MR. AKROTIRIANAKIS:  Object to the form
14     of the question.
15              A   The messages that were implemented
16     in it, the messages are implemented as part of the
17     protocol that WhatsApp requires, so this
18     practically will not change a lot.  As for the
19     fingerprint, as I said it was used for Heaven and
20     Eden.  The other parts of the code I said it
21     depends on the exact timing of the image.
22              Q   Right, because the code changed over
23     time, right?
24              MR. AKROTIRIANAKIS:  Objection,
25     misstates his testimony.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 323

```
 1              A    The code may change.  I don't know
 2      if it changed in specific timing before and after.
 3              Q    And you don't know when the snapshot
 4      was taken, right?
 5              A    I don't recall.
 6              Q    We talked about the S.WhatsApp.net
 7      domain.  You recall that?
 8              A    Yes.
 9              Q    And I think when I was examining you
10      said that that was the domain for WhatsApp
11      signaling server.  Is that right?
12              A    Domain name.
13              Q    The domain name for WhatsApp
14      signaling server?
15              A    Also Google.com is the domain name
16      for Google signaling.
17              Q    Got it.  Okay.  Is that one
18      signaling server or multiple signaling servers?
19              A    It depends on WhatsApp to decide.
20              Q    Could be either one, right?
21              A    I don't -- this is not a single
22      server.  That is why they use a domain name.
23              Q    As part of developing the
24      Hummingbird exploits, did you take any steps to
25      ascertain where the WhatsApp signaling servers
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 324

1    were located.  No?

2              A    No.

3              Q    Did you take any steps to ascertain

4    where the WhatsApp relay servers were located?

5              A    No.

6              Q    You understood that what WhatsApp is

7    based in California?

8              MR. AKROTIRIANAKIS:  Objection.

9              A    As a company?

10             Q    Yes.

11             A    So does everybody else in the US but

12    the server --

13             Q    Not my question.  Were you aware

14    when you were working on the --

15             A    No.

16             Q    -- hummingbird vectors that WhatsApp

17    was based in California?

18             A    No.

19             Q    You were not aware of that?

20             A    No.

21             Q    Did you take any steps to assure

22    yourself that the servers that were being used as

23    part of the Hummingbird vectors were not in

24    California?

25             MR. AKROTIRIANAKIS:  Object to the form

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 325

1    of the question.

2            A    Can you repeat?

3            Q    Did you take any steps to make sure

4    that the messages that were being transmitted as

5    part of the Pegasus software, that those servers

6    were not in California?  Did you take any steps to

7    check that?

8            A    No.

9            Q    Sitting here today, do you know, one

10   way or the other, whether any of WhatsApp's

11   signaling or relay servers used in connection with

12   the Hummingbird vectors actually are in

13   California?

14           A    No.

15           Q    You don't know that at all sitting

16   here today?

17           A    No.

18           Q    So if some of those servers were in

19   California, you wouldn't know anything to the

20   contrary?

21           A    It was not required for the -- it

22   was not a requirement in terms of the capability.

23           Q    But accessing the WhatsApp signaling

24   servers was a requirement of the capability.

25   Right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326

```
 1              A    As a domain name, behind which there

 2      is a real server, which is deployed in any

 3      location on WhatsApp decision.

 4              Q    And accessing WhatsApp relay servers

 5      was also necessary for the Hummingbird vectors.

 6      Isn't that right?

 7              A    No.

 8              Q    No?

 9              A    No.

10              Q    Okay.  What about for ERISED?

11              A    No.

12              Q    I think you testified earlier that

13      the messages for ERISED had to be transmitted

14      through the WhatsApp relay servers?

15              A    No.  I testified that for Heaven and

16      Eden they were transferred through relay servers.

17              Q    Got it.  And it was necessary for

18      the operation of Heaven and Eden?

19              A    Yes.

20              Q    You were asked just now by your

21      counsel some questions about geographical

22      restrictions.  Do you recall that?

23              A    Yes.

24              Q    I just want to make sure

25      I understand this.  I will give you a
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 327

1   hypothetical.  If I am, say, a Mexican citizen and

2   just hypothetically NSO has as a client a Mexican

3   law enforcement agency, and Mexico is within their

4   territorial license, they are permitted to install

5   on my phone.  Is that correct?

6           A    Under their lawful authorization.

7   Under their rules.  Yes.

8           Q    And those rules you are not familiar

9   with?

10          A    No.

11          Q    So I am a target.  I have been

12  permissibly infected with Pegasus.  I then travel

13  to the United States.

14          A    Yes.

15          Q    Does the customer then lose access

16  to my information?

17          A    Yes.

18          Q    Now, what if I am a US person, okay,

19  so completely new hypothetical.  I am a US person.

20  I am a US citizen.  I live most of the year in New

21  York.

22          A    With US number?

23          Q    With a US number.

24          A    Okay.

25          Q    But I am working in Dubai.  If you

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 328

1    had a customer that had a territorial license that

2    covered Dubai, could it be installed on that

3    number?

4         A    No.

5         Q    So not US numbers and not US

6    territory?

7         A    Yes.

8         Q    Okay.  But that is on a customer by

9    customer basis, depending on the territorial

10   restrictions of particular contracts?

11        A    No customer has US enabled for

12   installation.

13        Q    And that is with respect to Pegasus?

14        A    Yes.

15        Q    What about with respect to Phantom?

16        A    I am not aware.  I don't know what

17   Phantom is.

18        Q    You are not familiar with Phantom?

19        A    No.

20        Q    Are you familiar with a company

21   called Westbridge?

22        A    Yes.

23        Q    What is Westbridge?

24        A    US like --

25             MR. AKROTIRIANAKIS:  Object to the form

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 329

1    of the question.  No foundation.

2            A    It is a US company trying to market

3    the product.

4            Q    Trying to market NSO's products,

5    right?

6            A    Yes.

7            Q    Including Pegasus?

8            A    I am not familiar with their

9    activity.

10           Q    But certainly Westbridge was

11   authorized by NSO to market NSO products?

12           MR. AKROTIRIANAKIS:  Object to the form

13   of the question.  No foundation.

14           A    No.

15           Q    Is it your understanding that

16   Westbridge was operating without permission?

17           MR. AKROTIRIANAKIS:  Objection, no

18   foundation.

19           A    I don't know.

20           Q    Okay.  And when Westbridge

21   demonstrated NSO software, were those

22   demonstrations supported by NSO personnel?

23           MR. AKROTIRIANAKIS:  Objection, no

24   foundation.

25           A    I don't know.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1              CERTIFICATE OF COURT REPORTER

2

3     I, AILSA WILLIAMS, an Accredited LiveNote

4     Reporter, hereby certify that Tamir Gazneli was

5     duly sworn, that I took the Stenograph notes of

6     the foregoing deposition and that the transcript

7     thereof is a true and accurate record transcribed

8     to the best of my skill and ability.  I further

9     certify that I am neither counsel for, related to,

10    nor employed by any of the parties to the action

11    in which the deposition was taken, and that I am

12    not a relative or employee of any attorney or

13    counsel employed by the parties hereto, nor

14    financially or otherwise interested in the outcome

15    of the action.

16    Before completion of the deposition, review of the

17    transcript was requested.  Any changes made by the

18    deponent (and provided to the reporter) during the

19    period allowed are appended hereto.

20

21

22

23    AILSA WILLIAMS

24    Dated:    September 6, 2024.

25

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520


(a)  If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b)  For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the deposition officer. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the deposition officer and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in SSAE 16 certified facilities.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of deposition services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.