# EXHIBIT 1

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WHATSAPP INC., et al,. <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED, et al., <br><br> Defendants. | Case No.: 19-cv-07123-PJH |

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Expert Report of David Youssef

August 30, 2024

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

August 30, 2024

# EXPERT REPORT OF DAVID J. YOUSSEF

IN RE: WHATSAPP INC., ET AL., (PLAINTIFFS), V. NSO GROUP TECHNOLOGIES LIMITED, ET AL., (DEFENDANTS)

CASE NO.: 19-CV-07123-PJH

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

## RELEVANT BACKGROUND

### Overview of NSO Group

28. NSO Group Technologies Limited is a private Israeli technology and cyber-surveillance company. Q Cyber Technologies Limited was, during the relevant time period, its sole director and majority shareholder.[18]

29. Defendants are primarily known for their Spyware product, "Pegasus," which is designed to "remotely and covertly" extract information from "virtually any mobile device, as well as to surveil and eavesdrop on the users."[19] [20] Notably, Pegasus can be delivered to Target Devices, specifically iOS and Android mobile devices, without any required user interaction; this is known as "zero-click" exploitation. With this capability, Defendants' Spyware can be installed on targeted devices without targeted users' knowledge and without the need to trick the user into performing any particular action, such as clicking on a malicious link (known as "one-click" exploitation). Target Devices can be exploited by simply receiving a text message, or in this case, a WhatsApp voice call offer.

30. Once a Target Device has been compromised by Defendants, their Pegasus Spyware can be installed on the device and used to surreptitiously access and extract sensitive information such as voice calls, messages, multimedia including photos and videos, emails, location history, etc. Pegasus is also capable of passively monitoring, activating phone settings to collect data, and defining triggers to initiate data collection.[21]

31. It is my understanding that Defendants invest considerable resources in the identification of software vulnerabilities, specifically "zero-day"[22] and "zero-click" vulnerabilities, and the development of exploits for those vulnerabilities which can facilitate the delivery and installation of Defendants' Spyware on targeted devices. Defendants have in the past, and continue to, maintain staff dedicated to the intensive research and identification of novel security vulnerabilities in various commonly used applications, such as WhatsApp, in

---

[18] Declaration of Shalev Hulio in Support of Defs' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

[19] Compl. Ex. 10, Dkt. No. 1.

[20] Defs' Apr. 17, 2023 Responses & Objections to Pls' Requests for Admission, Response to RFA No. 14 (admitting "Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012").

[21] Compl. Ex. 10, Dkt. No. 1.

[22] A zero-day exploit is the delivery of a security flaw in a particular piece of software or hardware which is unknown to the vendor and to the public, for which no fix has been made available.

order to continuously propagate their malware products to the extent desired by Defendants or their customers.[23]

## Overview of WhatsApp

32.  WhatsApp is a communication service and associated application which offers its users multiple forms of encrypted Internet-based communications such as text/multimedia messaging and voice over Internet Protocol ("VoIP")[24] telephony. WhatsApp enables these communications with official client-side applications across multiple different platforms (including iOS, Android, Windows, macOS, and web browsers). Communications between users are mediated and facilitated by WhatsApp Servers.

33.  WhatsApp comes at no cost to the consumer, and the application is available for users to download for free from app stores. A prospective user must create an account and agree to the WhatsApp Terms of Service in order to begin using the WhatsApp service.

34.  WhatsApp's user base has grown significantly over the past decade. The table below illustrates the platform's rapid adoption by users worldwide:

| Date | Number of WhatsApp Users |
|---|---|
| December 19, 2013 | 400,000,000[25] |
| April 22, 2014 | 500,000,000[26] |
| February 1, 2016 | 1,000,000,000[27] |
| February 12, 2020 | 2,000,000,000[28] |

35.  WhatsApp is marketed as a secure, reliable, and private communication method due to its use of end-to-end encryption ("E2EE").[29] Specifically, WhatsApp is designed to ensure messages and calls between WhatsApp users are accessible to only the parties involved in the communication; as part of this model, no entity positioned between the "ends" of the communication, inclusive of WhatsApp systems and staff, is capable of decrypting and

---

[23] Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

[24] VoIP is a communication technology that allows users to make voice calls over broadband Internet connections rather than traditional analog telephony services.

[25] https://blog.whatsapp.com/400-million-stories.

[26] https://blog.whatsapp.com/500-000-000.

[27] https://blog.whatsapp.com/one-billion.

[28] https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

[29] End-to-end encryption is a secure messaging feature designed to keep messages private from all third parties, including the messaging service. A message will only appear in readable form to the sender and recipient of the message.

Docusign Envelope ID: 6E56B0BD-8069-4B97-8A24-E353D98B4824

reading the associated message contents.[30] WhatsApp achieves this level of security by leveraging encryption keys known only by the WhatsApp Client Applications operated by the users partaking in a given communication exchange.

36.    In my opinion, the nature of the service provided by WhatsApp as a privacy-oriented communications platform, together with its widespread global adoption, is what made WhatsApp a high-priority target for Defendants in seeking to identify mechanisms through which to deliver their Malware to Target Devices.

## Overview of WhatsApp VoIP Architecture

37.    I understand from Plaintiffs that the WhatsApp VoIP infrastructure uses a proprietary call management system to establish and process voice call communications between users. WhatsApp's call management system and VoIP infrastructure is supported by WhatsApp's Signaling Servers[31] and Relay Servers,[32] and underpinned by protocols and standards including Real-time Transport Protocol ("RTP"),[33] Real-time Transport Control Protocol ("RTCP"),[34] Session Traversal Utilities for NAT ("STUN"),[35] and WhatsApp's proprietary variant of the Extensible Messaging and Presence Protocol ("XMPP") referred to internally by Plaintiffs as "FunXMPP."

38.    WhatsApp Signaling Servers facilitate the initiation of VoIP calls between user devices hosting the WhatsApp Client, whereas WhatsApp Relay Servers facilitate data transmissions, such as call audio to and from the user devices.[36] To clarify, when referencing the WhatsApp Client, I am referring to the legitimate WhatsApp Client Application developed and distributed by Plaintiffs through authorized channels.

39.    It is my understanding that a call relay session occurs when a user (the "sender" or the "caller") initiates a call. WhatsApp Signaling Servers notify the directed user (the

---

[30] https://faq.whatsapp.com/820124435853543.

[31] Signaling Servers handle the initiation of voice calls, which involves making the recipient's device "ring" or receive notification of an incoming call; if the recipient accepts the call, the Signaling Server will connect the call. After that point, the Signaling Server handles any actions which alter the state of the call, such as a participant ending the call.

[32] Relay Servers maintain the connections of voice calls controlling the manner in which packets containing the call audio are transmitted back and forth between participants' devices.

[33] Real-time Transport Protocol ("RTP") is a network protocol that handles traffic involving audio and video over the Internet.

[34] Real-time Transport Control Protocol ("RTCP") is a control protocol that supports RTP, with the main function of monitoring the quality and delivery of data.

[35] Session Traversal Utilities for NAT ("STUN") is a standard, including a network protocol, for maintaining connectivity across Network Address Translation ("NAT") gateways.

[36] Gheorghe Dep. at 31:13-32:22.

insert computer code into memory and precisely overwrite pieces of data in memory to manipulate the legitimate running process's logic to execute that code.

43. I reviewed the materials made available to me to develop a comprehensive understanding of the exploitation activity observed by Plaintiffs beginning on May 2, 2019. These materials are reflective of the exploitation having been conducted by an automated process Defendants referred to as "heaven," which was specifically designed to compromise Android mobile devices, WhatsApp Servers, and the WhatsApp Client Application. Defendants' Malware leveraged WhatsApp infrastructure to manipulate the WhatsApp Client Application running on those Target Devices through a series of actions which I will refer to as the "exploit chain."

44. I have broken down the observed exploit chain into eight stages or "steps," each of which I understand to have been crucial to Defendants' successful compromise of a Target Device. My understanding of each step based on my review and analysis is as follows.

**Step 1: Fingerprinting of Target Device**

45. Defendants first conducted "fingerprinting" of the Target Device. Fingerprinting is a technique used to identify certain hardware and software characteristics of a Target Device and associated WhatsApp Client Application, which can then inform an attackers' subsequent exploitation.

46. I was able to confirm fingerprinting activity was successful, based on log evidence that showed the collected information about the Target Device, which included operating system, WhatsApp Client Application version, and the make and model of the Target Device.

**Step 2: Delivery of Malicious Call Offer to Target Device**

47. If the fingerprinting step determined that the Target Device was susceptible to exploitation, the second step involved "heaven" sending a call offer message with manipulated settings[40] to the Signaling Server for delivery to the Target Device. One of these manipulated call settings enabled an XOR cipher,[41] a basic method of encryption intended to obfuscate the content of a message, for subsequent RTCP transmissions. The XOR encryption allowed for subsequent messages sent by "heaven" to resemble legitimate RTCP packets, thereby concealing the malicious nature of the traffic. I understand that the option to enable an XOR cipher was implemented within the WhatsApp infrastructure but was not in use by ordinary WhatsApp users and was not

---

[40] A call offer message is sent by device to initiate a communication session with a recipient.

[41] XOR Encryption is a form of symmetric encryption that leverages the same key for encryption and decryption of a message.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-E852D98B4824
Case 4:19-cv-07123-PJH    Document 796-3    Filed 09/15/25    Page 8 of 201

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    14

publicly documented. Furthermore, I understand that the legitimate WhatsApp Client Application did not afford users the ability to enable the XOR cipher.

48. The second manipulated call setting was the "connecting_tone_desc" field, which I understand was no longer used for any legitimate purpose as of 2019. The "heaven" malware inserted a malicious bash script[42] into this field. Upon receipt of the malicious call offer by the WhatsApp Client Application on the Target Device, the malicious bash script contained within this field was loaded into the memory of the Target Device while the Target Device was still ringing and before the call could have been accepted or declined. The malicious bash script remained present in the Target Device's memory throughout the remainder of the attack, specifically in the memory region used by libwhatsapp.so, which is a software library used by the WhatsApp Client Application for various functionalities. The proximity of the "connecting_tone_desc" variable and other variables which "heaven" was able to control, to other components of libwhatsapp.so is of significance to later stages of the exploit chain.

49. The malicious script was inserted into memory of a Targeted Device, but not executed until a subsequent phase of the attack, as achieving code execution through a buffer overflow against modern systems and applications requires the gathering of additional information (specifically, the device's architecture and the version and base address of libwhatsapp.so) in order to compute the address of "connecting_tone_desc" in memory and subsequently interact with its content.

**Step 3: Identification of Target Device Architecture**

50. As the third step in the exploit chain, "heaven" transmitted packets through the WhatsApp Relay Servers which were crafted to induce the victim's WhatsApp Client Application to disclose information about the underlying architecture of the Target Device. Specifically, determining whether the Target Device was a 64-bit device or an older 32-bit device was required for "heaven" to carry out subsequent stages of the attack, as 64-bit devices and 32-bit devices handle the allocation of memory and processing of instructions differently. When I refer to a device's "architecture" in this section of the report, I am referring to the 32-bit or 64-bit nature of the relevant device.

51. While the Target Device was ringing in response to the call offer sent by "heaven" and received from the WhatsApp Signaling Server, but before the victim could have accepted or declined the call offer, the Target Device began relay negotiation and bandwidth estimation with "heaven" via a WhatsApp Relay Server. This is a legitimate function of

---

[42] A bash script is a common form of program on Linux computers, which comprises a series of commands to be interpreted by the operating system's shell interpreter. The Android operating system is based on Linux, so Android devices can execute bash scripts.

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-F853D98B4824

WhatsApp's VoIP infrastructure, known as "bit width detection," which allows for the two devices to estimate the volume of data which can be efficiently sent and received over a given interval. At this stage, "heaven" exploited the buffer overflow by sending an oversized bit width detection packet to the Target Device via the WhatsApp Relay Server, effectively abusing the legitimate function of the Relay Server.

52.     Due to the fact that the oversized bit width negotiation packet sent by "heaven" was stored in a buffer in close proximity to other types of call context data in the Target Device's memory, the overflowed buffer could overwrite the values of some other call context variables in memory. One of these variables was the "Af" variable, which ordinarily stores information affecting the Target Device's bandwidth estimation. Given the different manners of memory allocation between devices of different architectures, an oversized buffer of a given size would overwrite "Af" on a 32-bit phone, but not on a 64-bit phone. If "Af" was overwritten, the Target Device's bandwidth estimation data returned to "heaven" would change, and "heaven" could detect this change, enabling it to identify the architecture of the Target Device.

53.     After the devices exchanged bandwidth estimation packets, "heaven" sent a duplicate call offer message to the Target Device through the WhatsApp Signaling Server. This duplicate call offer message, which is not sent during an ordinary WhatsApp call establishment process, triggered a transport restart and resulted in the reset of areas of the Target Device's internal memory related to the state of the VoIP call, since some of this data had been overwritten during the malicious bandwidth estimation exchange.

**Step 4: Memory Information Disclosure**

54.      As the fourth step in the exploit chain, "heaven" was designed to exploit the same buffer overflow again, this time to overwrite certain pointers[43] in the Target Device's memory. The "heaven" malware sent a bandwidth estimation packet of an unexpectedly large size, overflowing the buffer on the Target Device, and resulting in unintended behavior by the Target Device's WhatsApp Client Application. In this instance, the packet sent by "heaven" was precisely and specifically crafted to overwrite a pointer to a certain area of memory such that it pointed to an area of memory slightly offset from the original area. The "heaven" malware was designed to repeat this process until the targeted WhatsApp Client Application returned to "heaven" a specific area of memory containing information which could be used to calculate the locations of code used by WhatsApp in the Target Device's memory, specifically the base address of libwhatsapp.so.

---

[43] In computing, a pointer is a variable which stores (or "points to") the memory address of a piece of data, such as a function or another variable.

made available to me, the "abs.log" file records that the exploit resulted in the "LEAKED ADDR" for "libwhatsapp_addr" (i.e., the address of libwhatsapp.so in the Target Device's memory) in each instance of a successful attack by "heaven" against a WhatsApp user.



**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

89. In the next step of the exploit, Defendant utilized two phone numbers ("Phone A" and "Phone B") to convert the call to a group video call. After initiating the call with Phone A, Defendant invited Phone B to join the call, which provides the "capability_bit_mask" buffer. Ordinarily, this buffer describes all the VoIP capabilities it supports, but in the exploit, Defendants' Malware sends a modified bitmask buffer using the buffer memory layout and full pointer values gleaned from the Target Device.

90. The "abs.log" file indicates that the part of the attack involves adding another attacker account through a group call and the log contains evidence of the initial capabilities buffer sent to the second account.



**Step 6: Delivery of Second Malicious Capabilities Buffer**

91. As stated in Step 5, the voice call is converted into a group voice call including an additional participant controlled by Defendants. This secondary participant then sends a secondary capabilities buffer following inclusion into the group video call.

92. The "abs.log" also records the second malicious capabilities buffer sent by the second attacker account added in Step 5. Notably, the second message is returned less than one

second later, confirming that this process is automated and part of the exploit chain, and not the introduction of an independent second actor.



**Step 7 & 8: Call Termination and Compromise of Target Device**

93.    As noted previously, the partial set of files from the AWS Server do not record the buffering messages over Plaintiffs' Relay Servers, such as those used in Step 7 to overwrite the pointers, but the "abs.log" file does record the identified indicators of voice call being terminated shortly after completing the steps above and before the call is answered.



94.    In the figure above, after terminating the call, the log records that the "Call . . . was loud for 14.415701 seconds," which demonstrates Defendants' focus on stealth, and is consistent with the call termination marking the end of a covert zero-click exploit intended to be executed before the Target Device can accept the call.

# DETAILED OPINIONS

## Defendant's Exploitation of WhatsApp Infrastructure

**Defendants' WhatsApp User Registration and Extraction of Region Token**

95.    For Defendants' "heaven" malware to successfully interact with WhatsApp's Signaling and Relay Servers and carry out their exploit chain, "heaven" must appear to these servers as a legitimate WhatsApp user or users operating the official WhatsApp Client. In my opinion, Defendants had to create WhatsApp user accounts and extract the Region Token to enable their Malware to gain access to WhatsApp's Servers and carry out their attack.

96.    There are certain steps which must be completed before an individual can successfully register and subsequently utilize the WhatsApp services. This includes the user's acceptance of WhatsApp's Terms of Service, which must be done before completing the WhatsApp registration process. Only once the sign-up process has been completed can

the user access the WhatsApp services and the full functionality of the WhatsApp Client Application.

97. According to the deposition transcript of Claudiu Gheorghe, the registration process results in the creation of a Region Token, which informs the process through which the WhatsApp Servers attempt to assign requests from the account to the applicable geographical region. It is my understanding that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token.[56]

98. The programs found on Defendants' AWS Server do not contain any functionality to "forge" a WhatsApp Region Token. Therefore, it is my opinion Defendants must have created at least two WhatsApp user accounts and extracted the Region Tokens assigned to those accounts in order to use them with their Malware. Defendants then extracted the WhatsApp Client Region Tokens assigned to those accounts in order to use them as part of their "heaven" application.

99. In my opinion, by extracting the Region Tokens, "heaven" was configured to emulate the official WhatsApp Client from the perspective of the WhatsApp Signaling and Relay Servers. As a result, Defendants were able to make their Malware appear to the WhatsApp Servers as a legitimate WhatsApp user or users operating the WhatsApp Client.

**Defendants' Engineered Malware to Access and Exploit WhatsApp Servers and Target Devices**

100. In my opinion, Defendants' "heaven" malware is designed to interface with WhatsApp's Client Applications and Servers to successfully achieve remote code execution on the Target Device by camouflaging manipulated voice call messages as legitimate messages from a user running the WhatsApp Client Application.

101. In fact, Defendants were not using the official WhatsApp Client Application to carry out the exploit. The official WhatsApp Client does not enable users to create the types of malformed messages intrinsic to the exploit. In place of a genuine WhatsApp Client Application, Defendants designed and used their own system, a component of "heaven" referred to internally by Defendants as the "WhatsApp Installation Service" or "WIS,"[57] to emulate the official WhatsApp Client and send messages to the Target Device via the WhatsApp Signaling and Relay Servers, using authentication credentials taken from a registered WhatsApp Client to gain access to the servers.

---

[56] Gheorghe Dep. at 94:6-95:12.

[57] NSO_WHATSAPP_00008957.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A34-5353D98B4824

102. As acknowledged by Defendants, their illegitimate client does not behave like a typical WhatsApp user; Defendants' illegitimate client instead "only sends very specific messages (call messages \ text messages)."[58]

103. Defendants' Malware was also designed to enable XOR encryption and insert a malicious bash script within the RTCP packet's "connecting_tone_desc" field, resulting in a malformed call offer message that the WhatsApp Client Application cannot create. Because Defendants' extraction of the registration token caused the Malware's messages to appear as if they came from the WhatsApp Client Application, this malformed message, which contains a malicious bash script, was then delivered to the Target Device.

104. Defendants' "heaven" malware also used multiple methods to carefully manipulate WhatsApp Servers and WhatsApp Client Applications running on Target Devices in order to achieve unimpeded access to and control over those devices. Defendants' Malware leveraged undocumented features of the WhatsApp call offer message to inject the malicious bash script into the Target Device's memory, as well as to enable the XOR encryption. Defendants' Malware, via the WhatsApp Servers, performed "fingerprinting" of the Target Device, which collected the user's online status, make, model, and operating systems. The fingerprinting allowed for Defendants' Malware to determine the manner in which to proceed with exploitation of the Target Device, based on extensive knowledge of the WhatsApp Client Application's internal workings which Defendants had apparently amassed. If the Target Device was determined to be vulnerable through fingerprinting, Defendants' Malware continued its actions by leveraging RTCP packets to overflow buffers on the Target Device, inserting further malicious data into the memory space used by the WhatsApp Client Application and manipulating this data, along with data natively present within the Application, to execute malicious code on the Target Device.

**Defendants' Malware Operated in a Manner Which Exceeded the Capabilities Afforded by WhatsApp to an Ordinary User**

105. It is my understanding that an ordinary user will download WhatsApp, create an account, and begin communications. This communication can include voice calls and multimedia messages, between two users or a group of users. The messages can include text or media.

106. It is my understanding that an ordinary user will typically have little to no knowledge of the WhatsApp infrastructure, let alone the intricacies of the function of a Signaling Server, Relay Server, RTP, and RTCP packets. The ordinary person will likely understand the

---

[58] NSO_WHATSAPP_00008957.

Docusign Envelope ID: 5E56B0BD-3069-4897-8A34-5353D98B4824
Case 4:19-cv-07123-PJH    Document 796-3    Filed 09/15/25    Page 14 of 201

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    33

monitor and collect information from Target Devices.[65] Defendants' business model entails the delivery and installation of malware they have engineered for the purposes of remotely monitoring their specified targets. As mentioned above, Defendants go to great lengths to reliably deploy their exploit payloads and to obfuscate or destroy evidence of this intrusion. Thus, it is my opinion that Defendants and/or their customers did leverage this exploit to target specific WhatsApp end users with the end goal of surreptitiously collecting information from these users' devices, including their WhatsApp communications.

## Evading Detection

**Concealment of Defendants' Malware**

126. Defendants' "heaven" malware was designed to interact with WhatsApp Servers and targeted WhatsApp Client Applications by creating messages which appeared to be from a legitimate WhatsApp Client. During this process, "heaven" imitated characteristics of transmissions generated by the genuine WhatsApp Client, and used credentials and keys derived from authentic WhatsApp user accounts. Defendants' "heaven" malware took steps to conceal the malformed and malicious nature of its communications from Plaintiff's official WhatsApp Servers and targeted WhatsApp Clients.

127. Defendants engineered their Malware to conceal its access to and use of WhatsApp Servers and Target Devices. Defendants' Malware interacted with WhatsApp Servers as well as with the WhatsApp Client installed on Target Devices by creating messages that appeared to be from a legitimate WhatsApp Client Application. During this process, Defendants' engineered malware, which in my opinion should be considered spyware, reproduced transmission properties of the WhatsApp Client Application, and used credentials and keys retrieved from authentic WhatsApp user applications. This activity was used to disguise Defendants' Malware as a valid WhatsApp user application in order to access and use both WhatsApp's Servers and the Target Devices. As described in this process, Defendants' Malware deceived WhatsApp Servers and Target Devices' WhatsApp Client Applications about the type of and the source of the transmission between Defendants' Malware and those devices.

128. Defendants at various points leveraged XOR encryption to obfuscate the data transmitted by their Malware to targeted devices by way of the WhatsApp Relay Servers. This technique served to mask the malicious nature of certain RTCP packets crafted and transmitted by Defendants. Defendants' Malware used the RTCP packet header, which normally contains transportation information for the packet, as a key with which to

---

[65] Compl. Ex. 10, Dkt. No. 1.

enable encryption. The resultant packets resembled RTCP_REMB packets, which are used by the legitimate WhatsApp systems to control media congestion by indicating the rate at which media can be sent. The XOR encryption ultimately served to "camouflage" the appearance of Defendants' packets among normal network traffic, limiting the probability of detection by WhatsApp engineers and/or security mechanisms.

129. Upon exploiting the buffer overflow vulnerability, Defendants' Malware took discernible and deliberate actions to "clean up" evidence of exploitation which may have remained on the Targeted Devices. The first callback pointer overwritten by "heaven" pointed to a regular function of the WhatsApp application which organized and resets certain parts of the process' memory. This function removed information from the memory of the Target Device as well as data related to Defendants' Malware activity, which may have been indicative of Defendants' Malware's previous behavior. After resetting these portions of memory space, the affected system would have appeared closer to the baseline of a running WhatsApp application.

130. Each of the executable files which were written to the disk by Defendants' various exploit payloads were erased after completing their functions. In addition, based upon my study of the full exploit chain, it appears that Defendants' final-stage payload was intended to be loaded directly into executable memory rather than written to the device's storage. This is a common technique used by cyber threat actors to evade detection and inhibit efforts by incident responders or forensic analysts to identify and analyze their malicious software.

**Defendants' Malware Altered, Damaged, or Deleted Data from WhatsApp Servers and Target Devices**

131. While executing the buffer overflow exploits, Defendants were inherently altering or damaging targeted WhatsApp Client Applications. As demonstrated in previous sections, the buffer overflow altered and corrupted memory on Target Devices, causing them to behave in ways not designed or intended by Plaintiffs when developing the Applications.

132. Further, when Defendants' malicious code was executed against Target Devices, this triggered other actions which reset the Target Device's memory, deleted temporary files, and downloaded a second-stage payload to complete the compromise of the Target Device.

## Defendants' Malware Development and Circumvention

**Defendants' Reverse Engineered and Tested the Design of its Software to Work Against WhatsApp Infrastructure**

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A34-5353D98B4824
Case 4:19-cv-07123-PJH    Document 796-3    Filed 09/15/25    Page 16 of 201

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    35

133. I have not received or reviewed Defendants' financials or any other materials directly related to the organization of Defendants' business. However, based on the evidence at hand, including the deposition of the NSO's CEO, my expert opinion is that while the stated core of Defendants' business is in developing and marketing the Pegasus Spyware, Defendants' business is in large part dedicated to the discovery and weaponization of zero-day software exploits with which to deliver their Malware. I assess that Defendants maintain and invest massively in an in-house exploit research and development apparatus, and that the "heaven" exploit chain and associated software discussed here is a product of that apparatus.

134. The legitimate WhatsApp Client Application does not provide users with the functionality necessary to activate the XOR cipher setting, nor to set the value of the "connecting_tone_desc" field within the call offer message, nor to add freeform text to that field. The manipulated offer message prepared during step two of the exploit chain therefore had to have been prepared and sent using a modified or fake WhatsApp client, i.e., a program intended to emulate a WhatsApp Client Application from the perspective of the WhatsApp Servers, in order to circumvent the technological limitations of the legitimate WhatsApp Client Application. My understanding is that Defendants' "heaven" malware and/or its associated "WIS" component did in fact serve in part to emulate a genuine WhatsApp Client Application in order to carry out the attacks.

135. The buffer overflow vulnerability at the center of the exploit chain would have required a significant amount of time and effort dedicated to testing in order to be discovered and leveraged to achieve arbitrary code execution against the targeted device. Achieving arbitrary code execution through a buffer overflow attack against modern systems and applications requires a great deal of precision, as corrupting the wrong pieces of data in the targeted system's memory is likely to result in an application or system crash.

136. The exploit chain demonstrates that Defendants possessed a detailed understanding of the memory layout of the WhatsApp Client Application for Android, and particularly of its library component libwhatsapp.so. Defendants maintained knowledge of the memory offsets for various pieces of data and functions within libwhatsapp.so applicable to each of multiple different versions of the WhatsApp Client Application and two underlying device architectures (32-bit and 64-bit). These memory offsets were essential to Defendants in their carrying out of the exploitation against WhatsApp users, as without an intimate understanding of the memory layout, the buffer overflow vulnerability could not feasibly have been made to execute malicious code. This type of information is not publicly documented by Plaintiffs, and in my opinion could only have been derived from Defendants' methodical reverse engineering of each relevant version of the WhatsApp Client Application.

137. The "heaven" malware's interactions with WhatsApp's Signaling Servers and Relay Servers demonstrate that Defendants possessed a detailed understanding of WhatsApp's proprietary VoIP architecture and infrastructure, to include knowledge of multiple unused and undocumented features. Plaintiffs generally do not publicize detailed information about their proprietary VoIP architecture, and in my opinion this level of understanding could only have been achieved by intercepting and decrypting network traffic from a genuine WhatsApp Client Application in order to analyze its interactions with the WhatsApp Server-side infrastructure.

138. Furthermore, based on my review of the computer scripts and logs which I was provided from the Defendants' AWS Server, my understanding is that "heaven" is a sophisticated suite of malware designed for the express purpose of carrying out attacks against WhatsApp users and infrastructure reliably, efficiently, and stealthily. I assess that a significant amount of resources were invested by Defendants in developing this malware such that the relevant exploitation could be conducted repeatedly and consistently, and such that the relevant vulnerability would remain unnoticed by Plaintiffs for as long as possible.

139. The exploit discussed within this report is complex and sophisticated by nature and would require a non-public understanding of how WhatsApp Servers and Client Applications operate to ensure successful execution. The exploit leveraged specific vectors of attack and utilized specific Relay Servers within the United States in order to execute successfully. Certain vectors were closed, based on change management logs from Plaintiffs, which potentially inhibited Defendants' activities and required them to circumvent such updates to ensure the success of the exploit.

140. As detailed earlier in the report, the logs which I reviewed from Defendants' AWS Server also demonstrate multiple exploitation attempts being carried out by the "heaven" prior to its identification by Plaintiffs in May 2019.

141. While I have not had an opportunity to analyze the documents produced by Defendants, I have reviewed certain documentation produced by Defendants that provide specific details on how to successfully operate the "heaven" exploit on WhatsApp services. This demonstrated their intricate knowledge of the WhatsApp architecture and specific areas to ensure successful execution of the exploit.

**Defendants' Access to the IP Addresses for WhatsApp's Servers; Location Attribution**

142. Plaintiffs' businesses are operationally headquartered in Menlo Park, California. It is commonly known that Plaintiffs are based within the "Silicon Valley" region of the Northern District of California.

143. Log files from Defendants' AWS Server indicate that Defendants designed their Malware to access and use Plaintiffs' infrastructure based in the United States. Defendants' Malware contains hard-coded WhatsApp domain names associated with WhatsApp's Signaling Servers, and I understand that in 2019, all of WhatsApp's Signaling Servers were located at U.S. data centers.[66] Furthermore, during the ordinary operation of a VoIP call on WhatsApp, the Signaling Servers provide IP addresses for a few potential Relay Server options to the WhatsApp Client, which then selects which to use.[67]

144. Because Defendants were not using the genuine WhatsApp Client Application, and I have been provided with an incomplete version of Defendants' Malware; I am unable to reach any opinion about whether or how Defendants intentionally selected those Relay Servers. However, the WhatsApp Relay Servers selected and used by Defendants' Malware are logged by their IP addresses in the logs from the AWS Server, of which I identified four which appear to be registered to Plaintiffs and based in the United States according to the American Registry for Internet Numbers.[68] [69] Each of these IP addresses was accessed via TCP and/or UDP ports 3478, which is used by the STUN protocol, a component of WhatsApp's VoIP infrastructure. In addition, Plaintiffs' logs demonstrate that the exploits they observed utilized several U.S. based Relay Servers, including servers located in San Jose and Los Angeles, California.[70] [71] Out of the 173 servers located within the US, 43 California were listed as a part of this exploit.[72]

**Changes to the WhatsApp Infrastructure Interrupted Defendants' Malware Prior to May 2019**

145. Based on my review of WhatsApp diff[73] D9650871, which was published on September 3, 2018, updates were instituted into the code to add a check for stanzas containing the VoIP settings element. The update would check for stanzas sent by clients that contained VoIP settings and block any stanza that was deemed invalid while logging this information, preventing any malformed or invalid stanza from being accepted by the Signaling Server.

---

[66] Gheorghe Dep. at 184:20-185:9.

[67] Gheorghe Dep. at 206:8-208:7; 246:16-249:11.

[68] https://search.arin.net/rdap/?query=157.240.0.0%2F16.

[69] https://search.arin.net/rdap/?query=179.60.192.48.

[70] WA-NSO-00166473.
[71] Gheorghe Dep. at 206:8-19.

[72] WA-NSO-00166473.

[73] In software development, a "diff" (from shorthand for "difference") refers to a line-by-line comparison of a code sample before and after an update was made.

146. I reviewed the internal Task – T33535414[74] filed on September 3, 2018, which details an identified issue, allowing a WhatsApp Client Application to generate and send "voip_settings" values in signaling messages via group calls. It is my understanding that this issue was initially identified by an external security researcher and brought to Plaintiffs' attention for remediation. The Task mentioned a diff, D13309896, which, as I understand it, is in response to this identified issue.

147. I also reviewed diff D13309896, which was published on December 3, 2018, a further update was added into the WhatsApp application code to additionally check for stanza's with "group update" in VoIP settings. In this instance, a call was created, where a "group update" was being initiated by the WhatsApp Client Application. This function should only originate from a WhatsApp server. When a "group update" was created by the WhatsApp Client Application, the group update would be followed with a forbidden error. The update that followed would reject stanzas with group updates sent from the WhatsApp Client Application. Review of the subsequent logs from the AWS Server following the publishing of both of these code changes demonstrated that on December 5, 2018, there were call offers received that resulted in a "403" error code. As I understand it, the "403" error code is an internally defined code at WhatsApp, meaning the call offer in this case, is forbidden. My understanding of the "403" error code is that it is thrown from the server side of the exchange when a WhatsApp Client Application is performing an action that the server has deemed inappropriate or is not expected, in this instance, sending "voip_settings" in signaling messages (i.e., call offers). Following the deployment of diff D13309896, Task -T33535414 also has communications that detailing that an external security researcher performed a test and confirmed that the diff fixed the issue that they identified.

148. Based on my review of these diffs and corresponding log records from NSO's AWS Server, and my understanding of the Task, it is my opinion that Defendants were potentially testing their exploit on WhatsApp infrastructure in 2018. It is my opinion that in order for the 2019 attack described in Plaintiffs' complaint to work, Defendants would have needed to research and develop a solution to bypass the security measures implemented by WhatsApp.

149. Based on the availability of the aforementioned diffs and associated Task, and subsequent logs from the AWS Server, it is my understanding that the updates and changes made to the WhatsApp Servers and WhatsApp Client Applications would have restricted or

---

[74] Tasks is an internal ticketing system utilized by Plaintiffs to track and discuss remediation activities (WA-NSO-00166464).

interrupted certain operations of Defendants' Malware prior to the exploit that Plaintiffs identified in May 2019.

## Defendants' Continued Actions Following Plaintiffs' Remediation

**Defendants Continued to Attempt Exploitation After Plaintiffs' May 2019 Remediation**

150. I understand based on the evidence made available for my review that on May 10, 2019, Plaintiffs implemented specific remediations to address the vulnerability and to prevent further propagation of Defendant's Malware via WhatsApp infrastructure. These remediations included software patches applied to the WhatsApp Signaling such that they would reject offer messages which did not conform to the predetermined data structures.[75] This resulted in the Signaling Servers rejecting any malformed or manipulated offer messages, thereby preventing the "heaven" malware from continuing to operate. Plaintiffs also released an updated version of the WhatsApp Client Application to end users on May 13, 2019, which eliminated the buffer overflow vulnerability which was leveraged during Defendants' exploitation activity.[76]

151. Following remediation of the vulnerability, I understand that Plaintiff's security engineers identified new malformed messages which originated, in at least some instances, from attacker accounts utilized by Defendants during the May 2019 exploit. It is my understanding, based on review of the associated security ticket or "SEV,"[77] that Plaintiffs took additional remediation actions in November 2019 to prevent potential new exploits.[78]

152. A review of the SEV S182393[79] revealed suspicious activity was observed when a number of malformed messages were sent from the same attacker accounts or IP addresses identified during the May 2019 exploit to suspected test devices. The exploit developer was causing the Target Device to download a media file from the exploit developer servers. In an attempt to block this activity, two issues were mitigated. The first issue was a stanza that caused a client's message counter to be reset. When this action occurred a spoofed message could be sent from the attacker to a client which was believed to have

---

[75] Gheorghe Dep. at 270:21-271:8, 273:12-274:21.

[76] Gheorghe Dep. at 271:9-20, 272:13-21.

[77] I understand that a "SEV" is a type of ticket used internally by Plaintiffs to track and respond to identified issues specifically related to security.

[78] SEV S182393 was produced by WhatsApp and titled "Suspicious iq stanzas." This documents the activity, which was detected and investigated, and some potentially associated issues which were later remediated.

[79] WA-NSO-00192765.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A34-5353D98B4824

been originated from a WhatsApp Server, since the message counter was successfully brute forced. These two issues were both remediated.

153. Despite continued monitoring and active remediation efforts, it is my opinion that Defendants are likely to continue to target WhatsApp in the future. As I have discussed earlier within this report, Defendants' business model requires them to continuously identify new software vulnerabilities, particularly zero-day vulnerabilities, with which to maintain uninterrupted capabilities for the delivery of their Malware to Target Devices.

154. The activity observed by Plaintiffs after May 2019 is consistent with some of the scripts from Defendants' AWS Server which I have reviewed; this indicates that Defendants attempted to either salvage or repurpose aspects of the "heaven" exploit, to utilize additional exploits that Plaintiffs had not yet discovered, or to develop a new exploit for WhatsApp following the closure of their "heaven" attack vector. Furthermore, I assess that Defendants' development of workarounds for WhatsApp's remediations in 2018 prior to the May 2019 exploit also demonstrates Defendants' persistence, intent, and ability to circumvent WhatsApp's security mechanisms.

155. Given the worldwide popularity of WhatsApp and its security features that attract a multitude of groups, it is my opinion that WhatsApp is a natural target for Defendants, given their business model, and in the absence of a significant deterrent, Defendants are likely to continue targeting, researching, and developing exploits for WhatsApp Servers and clients.

## CONCLUSION

156.  Based on the evidence available to me that I have had a reasonable opportunity to analyze as of the date of this report, including evidence provided by Plaintiffs, evidence provided by Defendants, and evidence provided to Counsel by DOJ, I have reached the conclusion that Defendants accessed, modified, and exploited, without authorization from Plaintiffs, Plaintiffs' software and infrastructure in May 2019. I have further concluded that Defendants continuously worked to circumvent any technical measures implemented by Plaintiffs in order to maintain access to Plaintiffs' servers and Target Devices for the purpose of deploying spyware.

157.  I concluded that Defendants' Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices.

158.  I concluded that Defendants' Malware is spyware, in that it was implemented to collect information from Target Devices without the Target Devices' users' awareness, and was used to deliver an additional malicious payload which I assess was likely Defendants' Pegasus Spyware product.

159.  I concluded that Defendants' Malware was designed to evade detection by Plaintiffs and was designed over time to adapt to changes and updates in Plaintiffs' infrastructure, including technical measures specifically intended to prevent such activity. I determined that Defendants' exploitation was, in fact, successful due to an optimization, or update, in Android Target Devices, which allowed Defendants to manipulate communications and deliver the exploitation.

160.  I concluded that Defendants conducted extensive reverse engineering of Plaintiffs' software and infrastructure in order to develop more effective malware.

161.  Finally, I came to the conclusion that at least 1,500 Target Devices users appeared to have been targeted, exploited, and impacted by Defendants' Malware during the specific timeframe, making them victims to Defendants' Malware through Defendants' unauthorize access of and use of Plaintiffs' servers. Further, based on Defendants' business model, I have no reason to suspect Defendants stopped this activity after May 2019.

Dated: August 30, 2024

DocuSigned by:

*David Youssef*

75FB98DF156B485...

David Youssef

# EXHIBIT 5

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
     *jakro@kslaw.com*
2  AARON S. CRAIG (Bar No. 204741)
     *acraig@kslaw.com*
3  KING & SPALDING LLP
   633 West Fifth Street, Suite 1700
4  Los Angeles, CA 90071
   Telephone: (213) 443-4355
5  Facsimile: (213) 443-4310

6  Attorneys for Defendants NSO GROUP TECHNOLOGIES
   LIMITED and Q CYBER TECHNOLOGIES LIMITED
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11 | WHATSAPP INC., a Delaware corporation,     Case No. 4:19-cv-07123-PJH
   | and FACEBOOK, INC., a Delaware
12 | corporation,                               **DEFENDANT NSO GROUP**
   |                                            **TECHNOLOGIES LIMITED'S**
13 |                 Plaintiffs,                 **SUPPLEMENTAL OBJECTIONS AND**
   |                                            **RESPONSES TO PLAINTIFFS' FIRST**
14 |         v.                                  **SET OF INTERROGATORIES NOS. 1-3,**
   |                                            **6-9**
15 | NSO GROUP TECHNOLOGIES LIMITED
   | and Q CYBER TECHNOLOGIES LIMITED,          **HIGHLY CONFIDENTIAL –**
16 |                                            **ATTORNEYS' EYES ONLY**
   |                 Defendants.
17 |                                            Action Filed:   10/29/2019
18
19
20
21
22
23
24
25
26
27
28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Pursuant to Federal Rules of Civil Procedure 26 and 33, and to this Court's orders (Dkt. No. 292), Defendant NSO Group Technologies Limited ("NSO") hereby serves supplemental objections and responses to Plaintiff WhatsApp LLC's ("WhatsApp") First Set of Interrogatories ("Interrogatories") Nos. 1-3 and 6-9.

## PRELIMINARY STATEMENT

Nothing in these objections and responses should be construed as an admission with respect to the admissibility or relevance of any fact or document, or of the truth or accuracy of any characterization or statement of any kind contained in Plaintiff WhatsApp's Interrogatories. NSO has not completed its investigation of the facts relating to this case, discovery, or preparation for trial. The responses set forth below are based only upon information and documents that are currently available, and specifically known, to NSO. Further discovery, independent investigation, legal research, and analysis may supply additional facts, add meaning to known facts, and establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the responses set forth herein.

The following objections and responses are given without prejudice to NSO's right to produce evidence, at trial or otherwise, regarding any subsequently discovered facts or information. NSO reserves the right to modify and amend any responses herein as additional facts are ascertained, as analysis and contentions are made, or as research is completed.

The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as are presently known but should in no way prejudice NSO in relation to further discovery, research, or analysis.

By submitting these objections and responses, NSO does not consent to jurisdiction of the Court and does not waive its defenses that the Court lacks personal jurisdiction. To the contrary, NSO hereby preserves any related defenses.

NSO reserves the right to redact information from certain documents as may be necessary to comply with Israeli or other foreign law or contractual obligations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## **GENERAL OBJECTIONS**

NSO interposes the following general objections into each of the responses that follows as if the general objections were set forth in full in each specific response. These objections therefore form a part of the response to every interrogatory, including any subparts.

1.      NSO objects to the extent that any interrogatory seeks information that exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure or seeks to impose obligations upon NSO beyond those required by the Federal Rules of Civil Procedure.

2.      NSO objects to the extent that any interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated lawful intercept technology "targeting or directed at Whatsapp servers, or using Whatsapp in any way to access Target Devices" between April 29, 2018 and May 10, 2020.  (Dkt. No. 292 at 3-4.)  In complying with the Court's ordered scope of discovery, NSO does not waive any objection that relevance should be limited to the software called "Pegasus" as allegedly operated with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during the timeframe specified in the Complaint.

3.      NSO objects to the extent that any interrogatory is unreasonably cumulative or duplicative.

4.      NSO objects to the extent that any interrogatory seeks information outside of its possession, custody, or control. To the extent that NSO provides a substantive response below, it will only include information that is in its possession, custody, or control and that NSO could identify after a reasonable investigation.

5.      NSO objects to the extent that any interrogatory seeks information obtainable from some other source that is more convenient, less burdensome, or less expensive. NSO objects to the extent that any interrogatory seeks information already in the possession, custody, or control of Plaintiffs; information that is available from public sources; or information that is as readily available to Plaintiffs as to Defendants on the grounds that it would be unduly burdensome and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

oppressive to require Defendants to obtain, process, and reproduce such documents.

6.      NSO objects to the extent that any interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure.

7.      NSO objects to the extent that any interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information.

8.      NSO objects to the extent that any interrogatory seeks information that may be protected by a right of privacy under the United States Constitution, Article I, Section 1 of the Constitution of the State of California, Israeli privacy laws, or any other applicable law.

9.      NSO objects to the extent that any interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO intends to withhold information, documents, and communications that it is not permitted to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

10.      NSO objects to the extent that any interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are best answered after related discovery has been completed.

11.      NSO objects that the interrogatories require it to participate in this lawsuit despite Plaintiffs' failure to establish personal jurisdiction over NSO. Nothing herein should be interpreted as a waiver of the burden Plaintiffs have to prove that NSO is subject to personal jurisdiction in California.

12.      NSO objects to the extent that any interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

13.      NSO objects to the extent that any interrogatory contains unproven assumptions or

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    premises and is thus argumentative.

2                                    **OBJECTIONS TO DEFINITIONS**

3          1.      Definition No. 5 ("Device"): NSO objects to the definition of "Device" as vague,

4    ambiguous, and overbroad because it encompasses any "electronic device." Using the word device

5    to define the term device renders the definition vague and ambiguous. To the extent the definition

6    intended to encompass any electronic object, the definition would be overbroad and responding to

7    any interrogatory that incorporates the definition would be unduly burdensome and not

8    proportional to the needs of the case. NSO will interpret the term "Device" to mean a computer,

9    mobile phone, or server.

10         2.      Definition No. 6 ("Document" or "Documents"): NSO objects to the definition of

11   "Document" or "Documents" to the extent that they impose any obligation to produce materials

12   not requested and agreed to in separate requests for production. NSO further objects to the

13   definitions to the extent that they would require it to access media from which information cannot

14   be obtained directly or cannot be translated into a reasonably useable form without undue burden

15   on NSO.

16         3.      Definition No. 8 ("Identify," "Identity," or "Describe"): NSO objects to the

17   definitions of "Identify," "Identity," and "Describe" as overly broad and unduly burdensome. NSO

18   further objects that any interrogatories incorporating these definitions are compound and that the

19   number of interrogatories and subparts propounded exceeds the limit set forth in Federal Rule of

20   Civil Procedure 33(a)(1). NSO will assign to the terms above their plain and ordinary meaning and

21   reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should these definitions

22   be incorporated into the interrogatories below.

23         4.      Definition No. 10 ("NSO Customer"): NSO objects to the definition of "NSO

24   Customer" to the extent that it includes Persons who did not (1) execute an agreement with NSO

25   or other entity authorized to license NSO technology; (2) obtain access to NSO technology; and

26   (3) use NSO technology. NSO further objects to this definition to the extent that it incorporates

27   the term "NSO Spyware" for the reasons set forth below in Paragraph 5. NSO expressly

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

incorporates by reference those objections here.

5. Definition No. 11 ("NSO Spyware"): Defendants object to the definition of "NSO Spyware" as biased and prejudicial. The term "Spyware" is an inherently pejorative term that baselessly maligns Defendants' products. Defendants will not refer to its products—which are used by law enforcement to catch the worst of criminals—as "Spyware." Defendants further object to the overly broad scope of this definition. Defendants further object to the definition of "NSO Spyware" because that definition results in every Topic incorporating it to be requesting information related to technologies other than the Pegasus technology that was used with respect to the approximately 1,400 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7). Unless otherwise indicated, Defendants will use the phrase "Accused Technology" or "Accused Technologies" in any response to the Topic containing the term "NSO Spyware." Defendants define "Accused Technology" or "Accused Technologies" as any NSO Technology targeting or directed at WhatsApp servers or using WhatsApp in any way to access Target Devices, from April 29, 2018 through May 10, 2020, in accordance with the definition set forth by the Court in its Order dated February 23, 2024.

6. Definition No. 12 ("Person(s)"): NSO objects to the definition of "Person(s)" as vague, ambiguous, and overbroad. The definition includes 16 distinct roles or types of entities. Responding to any interrogatory that relies on such a broad definition of "Person," moreover, would be unduly burdensome and not proportional to the needs of the case. NSO further objects to the extent that the proposed definition seeks information outside of its possession, custody, or control (e.g., the corporate structure, ownership, or members of third-party companies).

7. Definition No. 14 ("Technology"): NSO objects to the definition of "Technology" as vague, ambiguous, and overbroad. The definition is extremely expansive and responding to any interrogatories that incorporate this definition would be unduly burdensome and not proportional to the needs of the case.

8. Definition No. 15 ("WhatsApp Computers"): NSO objects to the definition of "WhatsApp Computer" as vague, ambiguous, and overbroad—particularly to the extent that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

definition purports to include and encompass the WhatsApp mobile and desktop applications. NSO interprets "WhatsApp Computers" as any computer or server Defendants know are owned, operated or controlled by Plaintiffs. NSO further objects to the extent that the definition requests information outside of NSO's possession, custody, or control. NSO, for example, may have no ability to determine whether a particular computer or server was owned, operated, or controlled by Plaintiffs or whether any particular device had the WhatsApp mobile or desktop applications installed.

9. Definition No. 16 ("You" or "Your"): NSO objects to the definition of "You" and "Your" as vague, ambiguous, and overbroad. The definition improperly includes a host of people and entities, including NSO's "current and former directors, employees, subsidiaries, corporate parents, affiliates, agents, representatives, and all other persons acting or purporting to act on its behalf." Responding to any interrogatory that incorporates this term would be unduly burdensome and not proportional to the needs of the case. Unless otherwise indicated, any response to an interrogatory containing the term "You" or "Your" is limited to Defendant NSO and its employees.

## **INSTRUCTIONS**

1.     NSO objects to the instructions to the extent that they seek to impose obligations, requirements, or procedures beyond those required under applicable federal rules, federal laws, local rules, or judicial standing orders.

2.     NSO objects to the extent that the instructions render the interrogatories compound or create subparts that exceed the limit set forth in Federal Rule of Civil Procedure 33(a)(1). NSO reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should Plaintiff seek to compel compliance with any such instructions.

## **INTERROGATORIES**

### **INTERROGATORY NO. 1:**

Identify all NSO Spyware that You directly or indirectly developed, marketed, promoted, distributed, maintained, sold, licensed, tested, deployed, operated, acquired, used, or for which You provided technical or operational support, from January 1,2018 through the present, including

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   but not limited to Pegasus and Phantom. Your response should identify any and all brand or

2   marketing name(s) for each NSO Spyware and, without limiting the foregoing, explain the

3   differences (if any) between each NSO Spyware.

4          **RESPONSE TO INTERROGATORY NO. 1:**

5          NSO objects that the interrogatory seeks information that is neither relevant nor

6   proportional to the needs of the case. Plaintiffs' claims are based on allegations that Defendants

7   operated a software called "Pegasus" that was deployed against certain "Target Devices" described

8   in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. Information regarding other

9   NSO products is neither relevant nor proportional to the needs of the case. NSO incorporates by

10  reference its objection to the defined terms "Identify" and "NSO Spyware."  NSO objects that the

11  interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary,

12  or competitively sensitive business information. NSO objects to the extent that the interrogatory

13  seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or

14  directive, or any other applicable law, regulation, or governmental order or directive. NSO objects

15  that the interrogatory contains compound questions or subparts that causes the number of written

16  interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

17         **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

18         NSO objects that the interrogatory seeks information that is neither relevant nor

19  proportional to the needs of the case.  The Court has limited the scope of discovery to the Accused

20  Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates

21  by reference its objection to the defined terms "Identify," "NSO Spyware," and "You."  NSO

22  objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other

23  confidential, proprietary, or competitively sensitive business information. NSO objects to the

24  extent that the interrogatory seeks information prohibited from disclosure by Israeli law,

25  regulation, or governmental order or directive, or any other applicable law, regulation, or

26  governmental order or directive.  NSO objects that the interrogatory contains compound questions

27  or subparts that causes the number of written interrogatories to exceed the limits set forth in the

28  SUPPLEMENTAL OBJECTIONS AND              7              Case No. 4:19-cv-07123-PJH
    RESPONSES TO PLAINTIFFS' FIRST
    SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    Federal Rule of Civil Procedure.  NSO objects to the extent that the interrogatory is duplicative or

2    cumulative of Interrogatory No. 2.

3              Subject to these objections, and without waiving them, NSO identifies the Accused

4    Technologies as follows:  The Accused Technologies consist of three versions of Pegasus referred

5    to internally at NSO as Heaven, Eden, and Erised.  Pegasus consists of a suite of different

6    technologies and functions that are branded and marketed together.  The different technologies

7    that fall under the "Pegasus" brand name provide law enforcement, military, and intelligence

8    agencies of NSO's government customers with the ability to gain access to mobile devices for the

9    purposes of preventing or investigating terrorism and serious crime.

10             Two principal differences among the versions of Pegasus are the vector through which the

11   ultimate Pegasus software is installed on a mobile device, and the applicable type/operating system

12   of device.  Heaven transmitted information via WhatsApp's signaling servers to Android devices

13   in order to trigger the installation of Pegasus on such devices; Eden transmitted information via

14   WhatsApp's signaling and relay servers to Android devices to trigger the installation of Pegasus

15   on such devices; and Erised transmitted information through WhatsApp's signaling servers to

16   trigger the installation of Pegasus on Samsung Android devices.  Additional differences between

17   these installation vectors are described below in response to Interrogatory No. 2.

18             Furthermore, based on the information currently available to NSO, Phantom was a trade

19   name used by Westbridge Technologies, Inc., when it marketed Pegasus (with necessary

20   configuration modifications) to potential government customers in the United States.

21   **INTERROGATORY NO. 2:**

22             Describe how each of the NSO Spyware identified in response to Interrogatory No. 1

23   functioned, including how it was designed to be installed on a Device, the methods used to install

24   it on a Device, how it was used after being installed on a Device, how it exfiltrated data from a

25   Device on which it was installed, and how it accessed or used any WhatsApp Computers.

26   **RESPONSE TO INTERROGATORY NO. 2:**

27             NSO objects to the extent that the interrogatory seeks information that is neither relevant

28   SUPPLEMENTAL OBJECTIONS AND                     8                    Case No. 4:19-cv-07123-PJH
     RESPONSES TO PLAINTIFFS' FIRST
     SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any of its technologies "accessed or used any WhatsApp Computers") and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control.  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers."  NSO will interpret those phrases as defined above.  NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control.  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  interrogatory contains compound questions or subparts that causes the number of written

2  interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

3      Subject to and without waiving these objections, NSO responds that Pegasus was generally

4  configured to operate in three stages: (1) a government Pegasus user would trigger an installation

5  process to initiate contact with a target device to install a Pegasus agent, (2) pursuant to those

6  instructions, the target device would eventually reach out to a third-party server to obtain and

7  install the Pegasus agent, and (3) the government Pegasus user would interact with the Pegasus

8  agent on the target device to perform the desired surveillance activity.  With respect to the Accused

9  Technologies—Heaven, Eden, and Erised—only the initial installation phase made use of any

10  WhatsApp Computer.  The Pegasus agent was ultimately installed on a monitored device and no

11  WhatsApp Computer was involved in any data exfiltration.

12      **1. <u>Eden</u>**

13      The Eden installation process began with a "fingerprinting" stage, whereby Eden would

14  gather information about the callee (target) device. This information gathering included querying

15  the WhatsApp server whether the callee device was associated with an active WhatsApp account,

16  using normal APIs that the server made available, using the exact same process that occurs every

17  time a WhatsApp user inputs a new phone number and attempts to contact that callee device. Eden

18  also obtained information about the callee device (such as whether the callee device was online)

19  by exchanging messages with that callee device over WhatsApp servers.  None of this activity

20  accessed any part of the WhatsApp servers that was off limits to WhatsApp users.

21      After the information gathering described above, Pegasus would establish a VoIP call

22  connection with the callee device through WhatsApp servers. Specifically, Pegasus would send a

23  "call offer" to a WhatsApp signaling server (which is the server responsible for establishing VoIP

24  call connections between clients) requesting to be connected to the callee device. WhatsApp

25  signaling servers are configured to pass that request to the callee device.

26      The WhatsApp signaling server permitted the call offer to include values for various call

27  settings and parameters. These included a string parameter named "connecting_tone_desc" and a

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  call setting for enabling an XOR cipher. Eden set the value of the "connecting_tone_desc"

2  parameter to a string defining a shell script and executable, which the callee device would later

3  execute.  Eden would also enable the XOR cipher made available by the WhatsApp server. The

4  WhatsApp signaling server was configured to simply pass the call offer, including those parameter

5  values, to the callee device.  The WhatsApp server did not execute or interpret the shell script or

6  executable. Nor did the WhatsApp server perform any function that it was not programmed to

7  perform on behalf of all users.

8      The WhatsApp signaling server did not execute any Eden code, and thus, Eden did not

9  obtain any access to the signaling server that exceeded its authorization. Rather, Eden simply used

10  the signaling server as a conduit through which to pass parameter values to the callee device.

11      Eden then exchanged additional messages with the callee device to obtain additional

12  information about that device, such as whether it was a 32-bit or 64-bit device. Eden exchanged

13  these additional messages with the callee device using traditional and legitimate functions of the

14  WhatsApp relay server, including those enabling relay negotiation and bandwidth estimation

15  between devices.

16      After Eden determined whether the callee device was 32-bit or 64-bit, it would send a

17  duplicate call offer message to the callee device through the WhatsApp servers to do a transport

18  restart.

19      Eden then exchanged additional messages with the callee device to configure the callee

20  device to disclose certain memory information. These messages included oversized bandwidth

21  estimation packets that caused the callee device to overwrite certain pointers.

22      Eden then upgraded the call to a group call, wherein the participating devices exchange

23  additional messages, including capability buffers and pre-accept messages (standard procedures in

24  the WhatsApp VoIP system). These messages included parameter values that pointed to and

25  enabled execution of the shell script sent in the "connecting_tone_desc" parameter earlier in the

26  process.

27      Finally, Eden would terminate the calls by sending the standard call termination message

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to the WhatsApp signaling server. This would cause the callee device to initiate its normal termination procedure, and cause the callee device to execute the shell script that Eden had sent to the callee device in the initial call offer at the start of the process.

The shell script instructs the callee device to reach out to third-party servers to download and install additional data packets, including the Pegasus agent. Subsequently, the Pegasus user could interact with the Pegasus agent directly, again, without use of any WhatsApp servers or client software.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

### 2.  Heaven

Heaven and Eden leveraged the same client-side vulnerability in the operating system of the callee-device. The primary difference between those two delivery vectors was the identity of the relay servers Pegasus used to communicate with the target device.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

### 3.  Erised

Erised followed Heaven and Eden, and it targeted a completely different client-side vulnerability—specifically, a vulnerability in the way certain Android devices rendered images at the time. That vulnerability existed in those devices, and so the delivery mechanism did not rely on any vulnerability in WhatsApp. In other words, the vulnerability could have been exploited through many other applications.

Like Heaven and Eden, Erised used the WhatsApp signaling servers to perform the initial fingerprinting and to communicate messages to the callee device during the initial stage of the

SUPPLEMENTAL OBJECTIONS AND
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

Case No. 4:19-cv-07123-PJH

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   installation process. Erised sent many types of messages to the callee device over those signaling

2   servers (e.g., image messages, contact lists, etc.) to prepare the device's memory layout in a

3   manner that enabled eventual access to the client-side vulnerability described above. Again, the

4   messages sent by Erised over the WhatsApp signaling servers were permitted by those servers,

5   and none caused any impermissible execution on the servers.

6      ***

7      Once installed, the capabilities of Pegasus were variable and customizable, in part so that

8   government customers could configure data collection to conform to any local legal restrictions.

9   Pegasus could be configured to collect historical data, passively to monitor new data, and actively

10  to collect other new or real-time data.  The relevant data would be transmitted to the government

11  customer's "backend" server using the active communication method.

12  **INTERROGATORY NO. 3:**

13      Describe how You developed, maintained, improved, tested, acquired, marketed,

14  promoted, distributed, sold, licensed, deployed, operated, or provided technical or operational

15  support for each of the NSO Spyware identified in response to Interrogatory No. 1 from January

16  1, 2018 through the present, including a description of any change, upgrade, or update to each

17  NSO Spyware.

18  **RESPONSE TO INTERROGATORY NO. 3:**

19      NSO objects that this interrogatory is vague, ambiguous, and overly broad such that

20  providing a response would be unduly burdensome. NSO objects that the interrogatory contains

21  compound questions or subparts that causes the number of written interrogatories to exceed the

22  limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the

23  interrogatory seeks information that is neither relevant nor proportional to the needs of the case—

24  including, but not limited to, information that is not relevant to Plaintiffs' allegations that

25  Defendants operated a software called "Pegasus" that was deployed against certain "Target

26  Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO

27  incorporates by reference its objections to the defined terms "Describe," "You" and "NSO

28  
SUPPLEMENTAL OBJECTIONS AND                13                Case No. 4:19-cv-07123-PJH
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

NSO objects that this interrogatory is vague, ambiguous, and overly broad such that providing a response would be unduly burdensome. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case— including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Describe," "You" and "NSO Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

Subject to these objections, and without waiving them, NSO responds as follows.

Research and development activities are generally not documented, including the development process for any particular exploit or installation vector. Generally, however, the development of the Accused Technologies identified in response to Interrogatory No. 1 involved NSO identifying pre-existing anomalies that would permit buffer overflows, as described in response to Interrogatory No. 2. NSO also conducted "black box" research by sending WhatsApp messages from one NSO-controlled device to another. NSO then evaluated the communications sent between the devices and the WhatsApp server, created an internal testing environment, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  continued the development using purely internal infrastructure and devices.  As noted in response

2  to Interrogatory Nos. 1 and 2, NSO developed three covert installation vectors for Pegasus for

3  Android devices over the relevant time period defined by the Court: Heaven, Eden, and Erised.

4  The differences between those installation vectors is described above in response to Interrogatory

5  No. 2.

6      Once NSO developed the installation programs, it tested the programs using an internal,

7  NSO-controlled caller device to install Pegasus on a second NSO-controlled callee device.

8      The marketing, promotion, distribution, sale, and licensing of Pegasus—including the

9  capability to conduct zero-click or covert installations on Android devices using the Accused

10 Technologies—was overseen by both an internal business ethics committee and the Government

11 of Israel's Ministry of Defense.  NSO only markets and licenses Pegasus to governments and

12 governmental entities for legitimate law enforcement, counterterrorism, and intelligence purposes.

13 The business ethics committee assessed prospective governments and government agencies,

14 including the potential for misuse of Pegasus.  If the committee approved a customer, NSO would

15 then apply to the Government of Israel's Defense Export Control Agency for a marketing license.

16 If a marketing license was granted, NSO would then be permitted to demonstrate Pegasus to the

17 prospective government customer.  These demonstrations were conducted using devices owned or

18 controlled by NSO or by the government customer.  Where licensing terms were agreed upon,

19 NSO would then seek an export license from the Defense Export Control Agency.  As part of the

20 approval process, the government customer would be required to certify that it would only use

21 Pegasus in compliance with all applicable laws; would only use Pegasus for the prevention and

22 investigation of crimes and terrorism; and would ensure that Pegasus is not used in violation of

23 human rights.

24     Upon receiving an export license from the Israeli Defense Export Control Agency and upon

25 executing all applicable contracts and certifications with the government customer, NSO would

26 deploy the hardware and software that comprises the Pegasus system on the government

27 customer's premises.  NSO would provide initial training to the government customer, but at all

28

SUPPLEMENTAL OBJECTIONS AND          15          Case No. 4:19-cv-07123-PJH
RESPONSES TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  times would be prohibited from participating or assuming any role in the activation, operation, or

2  use of the system.

3      Upon successful deployment of the Pegasus system, NSO's role would be limited to

4  providing technical support to government customers, pursuant to the terms of the applicable

5  license.  Depending on the terms, NSO would potentially retain the discretion to issue periodic

6  software releases or patches addressing product features, bug fixes, compatibility issues, and

7  support for newly-released versions of operating systems.

8      **INTERROGATORY NO. 6:**

9      Identify the basis for Your Sixth Separate and Additional Defense in Your Answer, which

10  stated that "Plaintiffs' claims are barred on the grounds that Defendants acted in good faith and

11  pursuant to legitimate law enforcement, national security, intelligence and business justifications"

12  (Answer at 9), including all Documents and Communications you received analyzing how NSO

13  Customers used NSO Spyware, whether NSO Customers complied with any conditions, criteria,

14  or limitations imposed by You on the use of NSO Spyware, and whether NSO Spyware complied

15  with all applicable laws, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the

16  California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502.

17      **RESPONSE TO INTERROGATORY NO. 6:**

18      NSO objects to the extent that the interrogatory seeks information that is neither relevant

19  nor proportional to the needs of the case—including, but not limited to, information that is not

20  relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was

21  deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during

22  April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify,"

23  "Your," "Documents," "NSO Customers," and "NSO Spyware." NSO objects to the extent that

24  the interrogatory seeks information protected from disclosure by the attorney-client privilege, the

25  attorney work-product doctrine, or any other privilege or protection against disclosure. NSO

26  objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or

27  other confidential, proprietary, or competitively sensitive business information. NSO objects to

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  the extent that the interrogatory seeks information prohibited from disclosure by Israeli law,

2  regulation, or governmental order or directive, or any other applicable law, regulation, or

3  governmental order or directive. NSO objects to the extent that the interrogatory contains

4  compound questions or subparts that causes the number of written interrogatories to exceed the

5  limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an

6  opinion or contention that relates to fact or the application of law to fact. Such interrogatories are

7  best answered after related discovery has been completed.

8          NSO is willing to meet and confer regarding the most appropriate timeframe for providing

9  a response to this interrogatory, including the factual basis for the identified affirmative defense.

10  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

11          NSO objects that the interrogatory seeks information that is neither relevant nor

12  proportional to the needs of the case—including, but not limited to, information about NSO

13  product or technologies other than the Accused Technologies, as defined above and in the Court's

14  Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms

15  "Identify," "Your," "Documents," "NSO Customers," and "NSO Spyware."  NSO objects that the

16  interrogatory is overly broad and unduly burdensome to the extent that it requests the identification

17  of "all" documents or communications received by NSO on the stated subject matter.  NSO objects

18  to the extent that the interrogatory seeks information protected from disclosure by the attorney-

19  client privilege, the attorney work-product doctrine, or any other privilege or protection against

20  disclosure. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets,

21  state secrets, or other confidential, proprietary, or competitively sensitive business information.

22  NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by

23  Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation,

24  or governmental order or directive. NSO objects to the extent that the interrogatory contains

25  compound questions or subparts that causes the number of written interrogatories to exceed the

26  limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an

27  opinion or contention that relates to fact or the application of law to fact. Such interrogatories are

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

best answered after related discovery has been completed, and as of the date of this supplemental response, neither fact nor expert discovery has been completed.

Subject to these objections, and without waiving them, NSO identifies the following facts as relevant to Plaintiffs' inability to prove essential elements of its case, as well as to NSO's sixth and other related affirmative defenses:

NSO designed the Pegasus technology to be used solely by governments and government agencies in connection with lawful law-enforcement and intelligence investigations, and solely to the extent authorized by the domestic laws of those governments and government agencies.  In this respect, the Pegasus technology is no different from wiretaps or other surveillance tools used by the U.S., state, and local governments subject to court-ordered warrants. The marketing and licensing of Pegasus is also overseen by the Government of Israel, consistent with the Israeli Defense Export Control Law.  The Ministry of Defense, and more specifically the Defense Export Control Agency within the Ministry of Defense, will only grant export licenses to government end users.  NSO's contracts with its government customers thus require those customers to use Pegasus only in connection with lawful law enforcement and intelligence investigations, and only to the extent authorized by the domestic laws of those governments and government agencies. In addition, NSO's business ethics committee, staffed by former high-ranking U.S. national security officials, conducts in-depth reviews of potential Pegasus sales for consistency with the technology's law-enforcement purposes and with international human rights standards, including the U.N. Guiding Principles on Business and Human Rights.

Among other contracts, in 2018, Westbridge Technologies, Inc., entered into contracts to license Pegasus to the Federal Bureau of Investigation (after having received previous requests for assistance from the Bureau).  NSO understands from Westbridge that these contracts required NSO to keep Pegasus updated so that the FBI (and other sovereign government customers that were approved to license the technology) could continue to use Pegasus effectively in foreign law-enforcement and intelligence operations.

These facts are relevant to Plaintiffs' inability to prove the essential elements of their

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

claims under the Computer Fraud and Abuse Act ("CFAA") the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"). ***First***, to the extent that any U.S. government entity licensed Pegasus, activities relating to any such contract would constitute "lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States . . . or of an intelligence agency of the United States," which the CFAA "does not prohibit." 18 U.S.C. § 1030(f). ***Second***, legal authorization by the governments that used the Pegasus technology prevents Plaintiffs from proving that any use of Pegasus by those governments was "without authorization" or "without permission" under the CFAA and CDAFA. ***Third***, the CFAA cannot properly be interpreted to prohibit foreign governments and government agencies from accessing computers located outside the United States as part of law-enforcement and intelligence investigations authorized by those foreign governments' own laws. The presumption against extraterritoriality prohibits any interpretation of the CFAA that would construe it as applying to a foreign government's access to foreign computers. The doctrine of constitutional avoidance leads to the same conclusion, because a statute that did apply to such purely foreign conduct would exceed Congress's constitutional authority under the Foreign Commerce Clause. Similarly, the CDAFA must be interpreted to apply only to California computers because a broader interpretation would violate the presumption against extraterritoriality and exceed California's regulatory authority under the Dormant Commerce Clause and Due Process Clause. ***Fourth***, NSO's intent and belief that any use of the Pegasus technology would be in connection with a lawful government investigation authorized by that government's laws prevents WhatsApp from proving that NSO "intentionally" or "knowingly" accessed any computer "without authorization" or "without permission," as the CFAA and CDAFA require. 18 U.S.C. § 1030(a); Cal. Penal Code § 502(c).

To the extent that the Court construes any of these issues to constitute affirmative defenses (including but not limited to NSO's sixth affirmative defense) rather than elements of Plaintiffs' claims, the same facts would be relevant to those affirmative defenses.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

**INTERROGATORY NO. 7:**

2   Identify and describe annual sales, licensing fees, profits and/or revenues that You derived

3 directly or indirectly from the development, marketing, promotion, distribution, maintenance, sale,

4 licensing, testing, deployment, operation, acquisition, provision of technical or operational

5 support, or other commercialization of each of the NSO Spyware identified in response to

6 Interrogatory No. 1 from January 1, 2018 through the present.

7

**RESPONSE TO INTERROGATORY NO. 7:**

8   NSO objects to the extent that the interrogatory seeks information that is neither relevant

9 nor proportional to the needs of the case—including, but not limited to, information that is not

10 relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was

11 deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during

12 April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify,"

13 "Describe," "You," and "NSO Spyware." NSO objects to the extent that the interrogatory seeks

14 the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively

15 sensitive business information. NSO objects to the extent that the interrogatory seeks information

16 that may be protected by Israeli privacy laws or any other applicable law.  NSO objects to the

17 extent that the interrogatory seeks information prohibited from disclosure by Israeli law,

18 regulation, or governmental order or directive, or any other applicable law, regulation, or

19 governmental order or directive. NSO objects to the extent that the interrogatory contains

20 compound questions or subparts that causes the number of written interrogatories to exceed the

21 limits set forth in the Federal Rule of Civil Procedure.

22

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

23   NSO objects to the extent that the interrogatory seeks information that is neither relevant

24 nor proportional to the needs of the case—including, but not limited to, information about NSO

25 product or technologies other than the Accused Technologies, as defined above and in the Court's

26 Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms

27 "Identify," "Describe," "You," and "NSO Spyware." NSO objects to the extent that the

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information that may be protected by Israeli privacy laws or any other applicable law.  NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.  NSO objects that the interrogatory prematurely seeks expert opinion or testimony.

Subject to and without waiving those objections, NSO responds that it has undertaken a detailed financial analysis and has calculated the revenues it earned from the zero-click Pegasus for Android version in operation at the time of the events set forth in the Complaint (April-May 2019) as $7,161,342.17.  The amount of profit associated with that revenue is a subject of expert testimony.

**INTERROGATORY NO. 8:**

Describe how You reverse engineered the WhatsApp client, including but not limited to downloading and testing different versions of the WhatsApp client and using the WhatsApp service.

**RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. NSO objects that the term "WhatsApp client" is vague and ambiguous. NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative.  NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO objects that the terms "reverse engineered" and "WhatsApp client" are vague and ambiguous. NSO will interpret the term "reverse engineered" to mean "examining a product in order to determine its construction, composition, or operation, typically with a view to manufacturing a similar product."  NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative.  NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

Subject to and without waiving these objections, NSO responds that when researching and developing the Accused Technologies, it did not reverse engineer the WhatsApp client as NSO understands that term.  NSO studied the WhatsApp client, including by using the client to send messages and studying the content of those messages and responses. NSO also used commercially available analysis tools to understand the function of the WhatsApp client application.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    **INTERROGATORY NO. 9:**

2        Identify all WhatsApp accounts associated with or used for the development, testing, or

3    transmission of NSO Spyware.

4    **RESPONSE OT INTERROGATORY NO. 9:**

5        NSO objects to the extent that the interrogatory seeks information that is neither relevant

6    nor proportional to the needs of the case—including, but not limited to, information that is not

7    relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was

8    deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during

9    April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify"

10   and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on unproven

11   assumptions (e.g., that any WhatsApp accounts were associated with or used for the purposes

12   indicated) and is thus argumentative. NSO objects to the extent that the interrogatory seeks

13   information outside of its possession, custody, or control. NSO objects to the extent that the

14   interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary,

15   or competitively sensitive business information. NSO objects to the extent that the interrogatory

16   seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or

17   directive, or any other applicable law, regulation, or governmental order or directive.

18   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

19       NSO objects that the interrogatory seeks information that is neither relevant nor

20   proportional to the needs of the case—including, but not limited to, information about NSO

21   product or technologies other than the Accused Technologies, as defined above and in the Court's

22   Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms

23   "Identify" and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on

24   unproven assumptions (e.g., that any WhatsApp accounts were associated with or used for the

25   purposes indicated) and is thus argumentative. NSO objects to the extent that the interrogatory

26   seeks information outside of its possession, custody, or control. NSO objects to the extent that the

27   interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary,

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  NSO further objects to the extent this interrogatory seeks disclosure of NSO's third-party clients, as the Court has ordered that Defendants need not disclose those clients (Dkt. No. 292 at 5).

Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), NSO responds that it is in the process of producing unredacted documents from Production Volume 8 (and potentially other volumes) that contain information responsive to this interrogatory.   This includes, but is not limited, to NSO_WHATSAPP_00012913 and NSO_WHATSAPP_00044814, which were reproduced to the plaintiffs on September 13, 2024.

Dated: September 13, 2024

KING & SPALDING LLP

By:    */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

### **VERIFICATION**

2    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

3  United States of America that I am Yaron Shohat; that I am the Chief Executive Officer of NSO

4  Group Technologies Limited; that I have reviewed the supplemental interrogatory responses set

5  forth above; and that based on reasonable inquiry the foregoing answers are true and correct to

6  the best of my knowledge, information, and belief.

7    Executed on September 13, 2024.

8

9                                                      YARON SHOHAT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California. I am employed in the County of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

On September 13, 2024, I served the following documents in the manner described below:

**DEFENDANT NSO GROUP TECHNOLOGIES LIMITED'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES NOS. 1-3, 6-9**

☑      BY ELECTRONIC MAIL:  I caused the document(s) to be sent to the person(s) at their e-mail address(es).  I did not receive, within a reasonable amount of time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

On the following part(ies) in this action:

### **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 13, 2024, at Los Angeles, California.

By:  _____
MINA TUNSON

## SERVICE LIST

Greg D. Andres
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4724
Email: greg.andres@davispolk.com

Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4559
Email: antonio.perez@davispolk.com

Craig T. Cagney
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-3162
Email: craig.cagney@davispolk.com

Micah G. Block
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Email: micah.block@davispolk.com

# EXHIBIT 6

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          H I G H L Y   C O N F I D E N T I A L

2                  ATTORNEYS' EYES ONLY

3              NORTHERN DISTRICT OF CALIFORNIA

4                    OAKLAND DIVISION

5                        Case No. 4-19-cv-07123-PJH

6     -----------------------------------

7     WHATSAPP INC., a Delaware corporation,

8     and META PLATFORMS INC., a Delaware corporation,

9              Plaintiffs,

10    v.

11    NSO GROUP TECHNOLOGIES LTD and

12    Q CYBER TECHNOLOGIES LTD,

13              Defendants.

14    -----------------------------------

15        Deposition of TAMIR GAZNELI, taken by AILSA

16      WILLIAMS, Certified Court Reporter, held at the

17      offices of Davis Polk & Wardwell, London, United

18         Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1 testimony on behalf of both the defendants?
2      A   Yes.
3      Q   If I refer to NSO Group as NSO and I
4 refer to Q Cyber as Q, will that be clear to you.
5      A   Yes.
6      Q   What did you do to prepare to
7 testify as to defendants' knowledge on your
8 designated topics?
9      A   Well, I read hundreds of documents,
10 piles of them, and of course meeting with lawyers.
11      Q   Generally, what types of documents
12 did you review to prepare for your testimony?
13      A   Technical documents, everything
14 which was related to the topic.
15      Q   Were the documents you reviewed all
16 documents that have been produced to the
17 plaintiffs in this case?
18      MR. AKROTIRIANAKIS:  Objection, no
19 foundation.
20      A   Our company's documents.  Documents
21 that were produced by NSO.
22      Q   Do you know one way or another
23 whether the documents you have reviewed have been
24 made available to the plaintiffs in this case?
25      MR. AKROTIRIANAKIS:  Objection, no

Page 11

1 foundation.
2      A   I am not aware whether every
3 document was available, but as far as I
4 understood -- I don't have the --
5      Q   You don't know one way or the other?
6      A   I don't know whether every document
7 that I reviewed was presented to plaintiffs.
8      Q   Did you review source code as part
9 of your preparation?
10      MR. AKROTIRIANAKIS:  Objection, vague.
11      A   Which source code do you refer to?
12      Q   Did you review any code as part of
13 your preparation?
14      A   Again, I think -- which code you
15 refer to?
16      Q   Well, I am not referring to any
17 specific code.  I am asking you whether you
18 reviewed any code at all as part of your
19 preparation?
20      A   I refer the parts that I thought may
21 be relevant.
22      Q   So did you review code?
23      MR. AKROTIRIANAKIS:  Objection, vague.
24      A   As I said, part.
25      Q   You did review some?

Page 12

1      MR. AKROTIRIANAKIS:  Objection, vague.
2      A   As I said, some.
3      Q   Some, yes.  Which code did you
4 review?
5      MR. AKROTIRIANAKIS:  Objection, vague.
6      A   Can you clarify whether you ask
7 questions for specific code.
8      Q   Well, what I am asking about is the
9 code that you reviewed.  You said you reviewed
10 some and I am asking you which code did you
11 review?
12      MR. AKROTIRIANAKIS:  And I will object
13 again that the question is vague.  It might be
14 easier if maybe we have it interpreted.  I think
15 you guys are talking past each other.
16      THE INTERPRETER:  Shall I interpret the
17 question?
18      MR. PEREZ-MARQUES:  Sure.
19      (Question interpreted).
20      MR. AKROTIRIANAKIS:  Sorry, which
21 question?  Where did you start?
22      THE INTERPRETER:  "What I am asking
23 about is the code that you reviewed.  You said you
24 reviewed some and I am asking which code did you
25 review?"

Page 13

1      A   Okay.  So I reviewed the code, part
2 of the fingerprinting.
3      Q   The fingerprinting code?
4      A   Yes.
5      Q   In connection with which exploit?
6      A   The ones that were here.
7      Q   We understand that there are a
8 number of 0 click installation vectors that were
9 used via WhatsApp servers.  Is that generally
10 consistent with your understanding?
11      A   No.
12      Q   No?  In what way is that different
13 from your understanding?
14      MR. AKROTIRIANAKIS:  Objection, no
15 foundation.
16      A   I don't understand any relation to
17 WhatsApp servers for 0 click.
18      Q   When you say that -- you made
19 reference to -- well, let me take a step back.
20      You referenced reviewing fingerprinting
21 code?
22      A   Yes.
23      Q   And I thought you said the ones that
24 are at issue in this case, or something to that
25 effect.  Is that right?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

1        MR. AKROTIRIANAKIS:  Objection,
2  misstates his testimony.
3        Q   Is that what you said?
4        A   You asked whether the code relates
5  to the 0 click vectors.  Can you repeat what you
6  asked about?
7        Q   I am abandonning that question to
8  try to clarify and get an answer from you.
9        You said you reviewed code for
10  fingerprinting.  Is that right?
11        MR. AKROTIRIANAKIS:  Objection,
12  misstates his testimony.
13        Q   Yes?
14        A   I said -- you asked whether I
15  reviewed some of the code.
16        Q   Mm hmm.
17        A   If that was not your question,
18  please repeat the question?
19        Q   I asked you whether you reviewed
20  some code.  You said "yes".  You agree with that
21  so far?
22        A   Yes.
23        Q   And then I asked you which code and
24  Varda helped translated that, and you said
25  "fingerprinting", right.  Then I asked you which

Page 15

1  fingerprinting code, and you said "the one that we
2  are here to discuss" or words to that effect.  Is
3  that right?
4        A   No, I didn't.
5        Q   That is the piece I would like you
6  to clarify, so which fingerprinting code did you
7  review?
8        MR. AKROTIRIANAKIS:  Objection, vague.
9  No foundation.
10        A   I reviewed the code that was
11  relevant for the specific timeframe we are talking
12  about.
13        Q   Okay.  Was it fingerprinting code in
14  connection with Pegasus?
15        A   I don't have access to any other
16  code.
17        Q   Do you know whether the code you
18  reviewed is used in connection with Pegasus?
19        A   Can you please clarify the
20  timeframes you are asking about.
21        Q   At any timeframe?
22        A   As far as I understand, we are here
23  to discuss specific timeframes.
24        Q   Okay, but my question is not limited
25  to any particular timeframe.  My question is just

Page 16

1  about the code that you reviewed.  Is it code that
2  is used in connection or was ever used in
3  connection with Pegasus?
4        A   The code I reviewed was specific to
5  Pegasus for very specific timeframe.
6        Q   And what timeframe was that?
7        A   Again, I reviewed specific instance
8  of code from about 2019.
9        Q   2019?
10        A   Yes.
11        Q   Did the code you reviewed have a
12  file name?
13        A   It clearly has a file name but I
14  don't recall its name.
15        Q   Did you review any other code
16  besides the one you mentioned?
17        A   No.
18        Q   What else did you review as part of
19  your preparation to testify as a corporate
20  representative?
21        A   I reviewed the documents that we
22  produced for this case in terms of our code, our
23  documents.
24        Q   Were the documents you reviewed
25  provided to you by counsel or did you gather any

Page 17

1  documents on your own?
2        A   It was by counsel.
3        Q   You didn't do any investigation or
4  collection of documents on your own?
5        A   You refer to a specific document or
6  specific types of documents?
7        Q   No, I am not referring to any
8  specific documents.  I am asking you whether you
9  did any investigation or collection of documents
10  on your own as part of your preparation to testify
11  as a corporate representative today?
12        MR. AKROTIRIANAKIS:  Objection, vague.
13        A   Besides what I said, no.
14        Q   So the only ones you reviewed were
15  the ones provided by counsel, is that right?
16        A   Yes.
17        Q   Did you talk to anyone as part of
18  your preparation, besides counsel, anyone else to
19  prepare for your testimony?
20        A   No.
21        Q   And when did you first meet with
22  counsel or speak with counsel as part of your
23  preparation to testify today?
24        A   Two days ago.
25        Q   And how long -- was that in person

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1    Q   Okay, and which applications were
2 you working on understanding at that time?
3        MR. AKROTIRIANAKIS:  Vague as to time.
4        MR. PEREZ-MARQUES:  In your time as
5 security researcher.
6    A   Browsers.
7    Q   Only browsers?
8    A   Yes.
9    Q   Which browsers?
10   A   Back then I think there were two of
11 them only.
12   Q   Which ones?
13   A   The one I remember is Chrome.
14   Q   Chrome?
15   A   Yes.
16   Q   For what purpose were you working to
17 understand Android and these browsers?
18   A   I think I answered the question, in
19 order to understand, get the in-depth
20 understanding of how they function and what are
21 the related functionalities.
22   Q   And for what purpose were you
23 seeking to understand and develop the in-depth
24 understanding of how they function?
25   A   To be able to develop the tools that

Page 27

1 the company develops for the customers.
2    Q   What tools?
3    A   Software that enables the customers
4 to get the information they need for doing their
5 job.
6    Q   Let me ask it this way.  Were you
7 seeking to understand these browsers and operating
8 systems in order to identify vulnerabilities that
9 could be used to develop installation vectors?
10       MR. AKROTIRIANAKIS:  Do you need it
11 translated?
12   A   No.
13       MR. AKROTIRIANAKIS:  Okay.
14   Q   Can you repeat the question?
15   Q   Were you seeking to understand these
16 browsers and operating systems in order to
17 identify vulnerabilities that could be used to
18 develop installation vectors?
19   A   Yes.
20   Q   And were those installation vectors
21 for Pegasus?
22   A   Yes.
23   Q   During your time as security
24 researcher -- let me withdraw that.
25       It says on your bio that you were

Page 28

1 security researcher from November 2015 to
2 December 2017.  Is that correct?
3    A   Yes.
4    Q   And during that period as security
5 researcher, did you do any work to develop
6 installation vectors that would operate via
7 WhatsApp?
8    A   No.
9    Q   In December 2017 you were promoted
10 to Security Research Team Leader.  Is that
11 correct?
12   A   Yes.
13   Q   And what were your responsibilities
14 as Security Research Team Leader?
15   A   I was responsible for the team --
16 one of the research teams in the research group.
17   Q   And what did that research team
18 focus on?
19   A   Android applications.
20   Q   Which Android applications?
21   A   Not specific, just any.
22   Q   Did that work relate at all to
23 WhatsApp, the work of that team?
24       MR. AKROTIRIANAKIS:  Objection, vague.
25   A   Part of the team.

Page 29

1    Q   Okay.  Which part of the team
2 related to WhatsApp or did work that related to
3 WhatsApp?
4    A   You mean by number, you mean by
5 name?  What is the question?
6    Q   How many people -- why don't we
7 start with how many about people were working on
8 WhatsApp as part of the team that you led as
9 Security Research Team Leader?
10       MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12   A   Four.
13   Q   Do you recall their names?
14   A   Yes.
15   Q   Who were they?
16   A   Shmaryahu Rubinstein, Ofir Tadmore,
17 Oved Beychan, Shaked Barkan.
18   Q   I suspect Ailsa may want spellings
19 on those but we will just make a note and come
20 back to that.
21       And you supervised that team that was
22 working on WhatsApp during your time as Security
23 Team Research Leader.
24   A   Yes.
25   Q   And what were they doing with

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1 respect to WhatsApp?
2      A   Research application.
3      Q   Again for the purpose of developing
4 installation vectors?
5      A   I will say it is developing the
6 software required for gaining access.
7      Q   As I understand it, installation
8 vectors are software required to gain access.  Is
9 that consistent with your definition of what an
10 installation vector is?
11          MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13      A   Can you define access?  When you say
14 "access" what do you mean by access?
15      Q   You said access.  "I will say it is
16 developing the software required for gaining
17 access."  What did you mean by access?
18      A   Access to the data which resides on
19 the endpoint.
20      Q   That reside on the endpoint?
21      A   Yes.
22      Q   Meaning the target device?
23      A   Yes.
24      Q   Now we have also heard endpoint used
25 to refer to Pegasus.  Is that -- do you use

Page 31

1 endpoint in that sense or no?
2          MR. AKROTIRIANAKIS:  Objection, vague.
3      A   I use endpoint as target device.
4      Q   Okay.  And so the team that was
5 working on WhatsApp that you supervised as
6 Security Research Team Leader was investigating
7 WhatsApp in order to develop software that could
8 be used to gain access to target devices?
9          MR. AKROTIRIANAKIS:  Objection,
10 misstates his testimony.
11      A   The team was researching Android
12 related applications and services in order to gain
13 access to the endpoint data.
14      Q   Okay.  Now, you testified previously
15 that they were doing work -- you gave us the four
16 names who were doing work related to WhatsApp?
17      A   Yes.
18      Q   And what work were they doing
19 related to WhatsApp?
20          MR. AKROTIRIANAKIS:  Objection,
21 compound.
22      A   Which question do you want me to
23 answer?
24      Q   The one that you didn't answer.  I
25 said you gave us four names doing work related to

Page 32

1 WhatsApp.  You answered that question, you said
2 yes, and then I asked you "What work were they
3 doing related to WhatsApp?"  That is the question
4 I would like you to answer?
5      A   To understand how the application
6 works.
7      Q   For what purpose?
8      A   As I stated before, in order to
9 build the software that gets access to the
10 endpoint's data.
11      Q   And when you say software that gets
12 access to the endpoint's data, is that different
13 than an installation vector?
14      A   Installation vector is like -- your
15 definition for it -- the main purpose for it is to
16 gain access to endpoints data.
17      Q   That is the main purpose of an
18 installation vector?
19          MR. AKROTIRIANAKIS:  Objection,
20 misstates his testimony.
21      A   That was -- that is the purpose of
22 these types of software tools.
23      Q   And when you say this type of
24 software tools you mean installation vectors?
25          MR. AKROTIRIANAKIS:  Objection,

Page 33

1 misstates his testimony.
2          MR. PEREZ-MARQUES:  I'm just not
3 understanding your testimony.  That is why I am
4 following up.  You said:
5          "Installation vector is like -- your
6 definition of the main purpose for it is to gain
7 access to endpoint's data."
8          I am trying to understand that answer.
9 Are you saying that the purpose of an installation
10 vector is to gain access to an endpoint data.
11          MR. AKROTIRIANAKIS:  Objection,
12 misstates his testimony.
13      A   Installation vector is just the part
14 of gaining the access.  This is not the purpose of
15 the software.
16      Q   You said "Installation vector is
17 just the part of gaining access".  Then did you
18 say "this is not the purpose of the software"?
19      A   Software is built, designed and
20 built in order to gain access to the data on the
21 endpoints or endpoint.  Installations vector --
22      Q   Are you familiar with -- and when
23 you refer to software are you referring to
24 Pegasus?
25          MR. AKROTIRIANAKIS:  Objection, vague.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

1    A  Any software that deals with domain.
2    Q  The team that you were supervising
3 that was doing work related to WhatsApp, were they
4 working on Pegasus?
5    A  Yes.
6    Q  Okay.  Are you familiar with a piece
7 of software referred to as "Heaven"?
8    A  Yes.
9    Q  What type of software would you call
10 Heaven?
11    A  Which terminology do you want me to
12 answer?
13    Q  I am asking you, in your own words,
14 what type of software you would call Heaven?
15    A  We can call it installation vector
16 that enables.
17    Q  So the team that you were
18 supervising that was working on WhatsApp was not
19 working on installation vectors.  Is that right?
20    MR. AKROTIRIANAKIS:  Objection,
21 misstates his testimony.
22    A  No.
23    Q  They were working on installation
24 vectors?
25    A  They were working on Android

Page 35

1 framework software.
2    Q  For the purpose of developing
3 installation vectors?
4    MR. AKROTIRIANAKIS:  Object to the form
5 of the question.
6    A  For the purpose of developing
7 capabilities which may or my not become
8 installation vectors.
9    Q  Got it.  And I take it besides this
10 four member team that was working on WhatsApp,
11 were there other teams that you supervised as
12 Security Research Team Leader?
13    A  No.
14    MR. AKROTIRIANAKIS:  Object to the form.
15    Q  So you were just overseeing the
16 WhatsApp team?
17    A  No.  There was a team I supervised.
18 You asked before which part of them worked on
19 WhatsApp.
20    Q  Mm hmm.
21    A  This part worked on WhatsApp.
22    Q  But there were other researchers who
23 were working on other applications?
24    MR. AKROTIRIANAKIS:  Object to the form
25 of the question.

Page 36

1    A  There was no other team.  There were
2 other researchers in the team.  You asked was
3 there another team I was --
4    Q  Let me read you back my question.
5 There were other researchers who were working on
6 other applications.  Is that right?
7    MR. AKROTIRIANAKIS:  Object to the form
8 of the question.
9    A  Inside my team?
10    Q  Within your team, as Security
11 Research Team Leader from December 2017 to
12 January 2020, were there other researchers working
13 on applications other than WhatsApp?
14    A  Yes.
15    Q  And what applications were those
16 team members working on?
17    A  Browsers.
18    Q  Do you recall which browsers?
19    A  Yes.
20    Q  And were they similarly -- which
21 browsers was it?
22    A  Chrome and Samsung browser.
23    Q  Samsung browser?
24    A  Yes.
25    Q  Were they also doing that research

Page 37

1 for the purpose of it potentially turning into
2 installation vectors?
3    A  Yes.
4    Q  And so fair to say that when you
5 were Security Research Team Leader your work
6 focused on research and support of the development
7 of installation vectors?
8    MR. AKROTIRIANAKIS:  Object to the form
9 of the question.
10    A  Can you repeat the question?
11    Q  Is it fair to say that when you were
12 Security Research Team Leader your work focused on
13 research in support of the development of
14 installation vectors?
15    MR. AKROTIRIANAKIS:  Same objection.
16    A  When you say "in support of", can
17 you please explain?
18    Q  For the purpose of potentially
19 developing installation vectors?
20    A  Yes.
21    Q  Are you familiar with the
22 terminology "0 click exploit"?
23    A  Yes.
24    Q  What is a 0 click exploit?
25    A  An exploit that does not require any

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1 interaction from the target.
2    Q  Was the research that your team was
3 doing during your time as Security Research Team
4 Leader for the purpose, at the least in part, of
5 developing 0 click exploits?
6    MR. AKROTIRIANAKIS:  Object to the form.
7 No foundation.
8    A  I will say it this way.  The team's
9 responsibility was to develop, research and
10 develop capabilities for installation vectors.
11 Whether it is 0 click or not is a matter of
12 capability itself.
13    Q  Did the team during the time that
14 you supervised it develop 0 click exploits?
15    A  Part of the time.
16    Q  Did that include 0 click exploits
17 that worked via WhatsApp?
18    MR. AKROTIRIANAKIS:  Object to the form
19 of the question.  Vague.
20    A  Can you explain?  What do you mean
21 by "via"?
22    Q  You have read the complaint in this
23 case?
24    A  Yes, although I don't remember the
25 exact wording.

Page 39

1    Q  Let me ask it this way.  You
2 understand that Heaven -- you are familiar with
3 the Heaven installation vector?
4    A  Yes.
5    Q  And that worked via WhatsApp, is
6 that right?  That used WhatsApp messages as part
7 of the installation?
8    MR. AKROTIRIANAKIS:  Objection, no
9 foundation.
10    A  Yes.
11    Q  And so when I say "via WhatsApp",
12 what I mean is the relationship between the
13 installation vector and WhatsApp, such as the one
14 that Heaven had.  Is that clear to you?
15    MR. AKROTIRIANAKIS:  Objection, vague.
16    A  Yes.
17    Q  And so with that clarification, did
18 the team that you supervised as Security Research
19 Team Leader develop 0 click exploits that worked
20 via WhatsApp?
21    A  It developed 0 click vectors
22 which -- one of the ways was via WhatsApp.
23    Q  Okay.  Did those vectors that they
24 developed have names?
25    A  Heaven, Eden and ERISED.

Page 40

1    Q  And so Heaven, Eden and ERISED were
2 developed by the researchers on the team that you
3 supervised as Security Research Team Leader?
4    A  Yes.
5    Q  You were promoted to -- let me ask
6 this.  What was your role in the development of
7 those vectors, Heaven, Eden and ERISED?
8    A  I was a team leader.
9    Q  And as team leader what role did you
10 have in the development of those vectors?
11    MR. AKROTIRIANAKIS:  Objection, vague.
12    A  I was responsible for the employee
13 allocation on the development procedures, research
14 procedures and development of the vector itself.
15    Q  So you are very familiar personally
16 with those exploits?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19    (Fire alarm test.)
20    THE VIDEOGRAPHER:  Going off the record.
21 The time is 10:00 a.m.
22    (A short break)
23    THE VIDEOGRAPHER:  This is the beginning
24 of media card number two, volume one, in the video
25 deposition of Tamir Gazneli.  Going on the record.

Page 41

1 The time is 10:12.
2    MR. PEREZ-MARQUES:  Mr. Gazneli, do you
3 understand you are still under oath?
4    A  Yes.
5    Q  When we broke for the fire alarm, I
6 believe we had a question pending.  I had asked
7 you whether you would agree that you are very
8 familiar personally with the Eden, Heaven and
9 ERISED exploits?
10    MR. AKROTIRIANAKIS:  Objection, vague.
11    A  I would say that I am familiar with
12 the exploits but not each and every line in the
13 code.
14    Q  But you led the team that developed
15 them, right?
16    A  Yes.
17    Q  You were promoted to Director of R&D
18 in January 2020.  Is that correct?
19    A  Yes.
20    Q  Who did you replace as Director of
21 R&D?
22    A  Oz Golan.
23    Q  Oz Golan?
24    A  Yes.
25    Q  What were your duties as Director of

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1 R&D?
2      A  I was leading the R&D of the entire
3 Android framework.
4      Q  Only Android?
5      A  Yes.
6      Q  Was there another -- were there
7 multiple Directors of R&D.?
8      A  Yes.
9      Q  And was your work at that time as
10 Director of R&D also focused on installation
11 vectors for Pegasus?
12      MR. AKROTIRIANAKIS:  Objection, vague.
13      A  Development of installation vectors
14 is responsibility of part of the teams, yes.
15      Q  What other responsibilities did the
16 team or teams that you supervised as Director R&D
17 have?  What other responsibilities did they have?
18      A  The development of an agent, Android
19 agent, development of the backend server and QA.
20      Q  So you mentioned Android agent,
21 backend server and QA?
22      A  Yes.
23      Q  And when you say Android agent, what
24 do you mean?
25      A  The software that resides on the

Page 43

1 target's device and collects in all the required
2 information.
3      Q  And you refer to that as the agent?
4 Is that a good shorthand for us to use today?
5      A  Yes.
6      Q  And when you say "backend server"
7 what do you mean by that?
8      A  It is a piece of software that
9 resides on the customer's infrastructure and is
10 responsible for managing the installation flow.
11      Q  Managing the installation flow?
12      A  Yes.
13      Q  Installation flow of Pegasus?
14      A  Part of Pegasus.  Not the whole
15 Pegasus.
16      Q  Which part?
17      A  For android.
18      Q  For Android.  So would you consider
19 that one version of Pegasus or how would you refer
20 to that?
21      A  It is one of the parts.
22      Q  And when you say "QA", what do you
23 mean by that?
24      A  Quality assurance.
25      Q  Quality assurance?

Page 44

1      A  Yes.
2      Q  What did the team -- what was the
3 quality assurance work that the team you
4 supervised did?
5      A  Functionality, statistics.
6      Q  Functionality of what?
7      A  Of the agent and the installation
8 flows.
9      Q  Who did you report to as Director of
10 R&D?
11      A  To the VP R&D.
12      Q  Who was that?
13      A  During that period there were three,
14 so to which period do you refer.
15      Q  Let's go through all three.
16      A  The name of the first one I don't
17 remember.  The second one was Yuval Barkan and the
18 third one was Rami Dabush.
19      Q  During your time as Director of R&D,
20 were any researchers that you supervised working
21 on installation vectors via WhatsApp?
22      A  Yes.
23      Q  Which vectors were those?
24      A  When I was of R&D it was ERISED.
25      Q  Any others besides ERISED, during

Page 45

1 your time as Director R&D?
2      MR. AKROTIRIANAKIS:  I am going to
3 object.  That exceeds the timeframe of the court's
4 order which is the limiting factor of the witness'
5 ability to testify about the technology.
6      MR. PEREZ-MARQUES:  So is that an
7 instruction not to answer?
8      MR. AKROTIRIANAKIS:  Yes.
9      Q  ERISED was developed after January
10 2020, is that correct?
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates testimony.  Also vague.
13      A  I didn't answer when it was
14 developed.
15      Q  But after January 2020, members of
16 your team were working on ERISED?
17      MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.  Also vague.
19      A  I would say that after January 2020
20 some of the team members maintained ERISED.
21      Q  And were doing work to maintain
22 ERISED in that post January 2020 period?
23      A  It depends on the specific timeframe
24 and it depends on whether it required any work to
25 be maintained.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1      Q   After January 2020, to the extent
2  work was required, work on ERISED was done by
3  members of the team you supervised?
4          MR. AKROTIRIANAKIS:  Objection,
5  foundation.
6      A   Part of the time.
7      Q   Other than ERISED, and your counsel
8  may instruct on this but I just want to have a
9  clear record, other than ERISED, in that post
10 January 2020 period, did researchers that you
11 supervised work on other installation vectors that
12 would operate via WhatsApp?
13         MR. AKROTIRIANAKIS:  You can answer to
14 the extent it is within the time period April 29,
15 2018 to May 10, 2020.
16     A   In this timeframe, no.
17     Q   And subsequent to May 2020, did
18 members of the team you supervised work on any
19 installation vectors that would work via WhatsApp?
20         MR. AKROTIRIANAKIS:  He is not able to
21 talk about timeframes after the timeframe
22 delineated in the court order?
23         MR. PEREZ-MARQUES:  So is that an
24 instruction not to answer?
25         MR. AKROTIRIANAKIS:  Yes.

Page 47

1          MR. PEREZ-MARQUES:  And you will follow
2  your counsel's instruction and decline to answer
3  as to whether members of your team worked on the
4  development of WhatsApp installation vectors after
5  May 2020?
6      A   Yes.
7      Q   In November 2022, you were promoted
8  to VP R&D, correct?
9      A   Yes.
10     Q   How did your responsibilities change
11 at that point?
12     A   Now I am leading the entire R&D of
13 the company.
14     Q   Who do you report to as VP R&D?
15     A   To the CEO.
16     Q   Would you say -- are you the senior
17 most technological employee at NSO?
18         MR. AKROTIRIANAKIS:  Objection, vague.
19     A   What do you mean by senior and what
20 do you mean by technologically capable?
21     Q   Okay.  What is your working
22 relationship with Yaron Shohat?
23         MR. AKROTIRIANAKIS:  Objection, vague.
24     A   He is my manager.
25     Q   How often do you speak?

Page 48

1      A   A couple of times per week.
2      Q   What about Omri Lavie, what is your
3  working relationship with him?
4          MR. AKROTIRIANAKIS:  Objection,
5  foundation.
6      A   Omri?
7      Q   I may be pronouncing it wrong.
8      A   Omri?
9      Q   L-A-V-I-E?
10     A   I have no --
11     Q   You don't know who that is.
12     A   I know who Omri is but I don't know
13 for sure that you are referring to the same one.
14     Q   Omri, one of the founders of NSO?
15     A   Okay.
16     Q   That is who I am referring to?
17     A   Okay.  I have no continuous
18 connection with him.
19     Q   When was the last time you spoke
20 with him?
21     A   Two months ago, one and a half
22 months ago.
23     Q   What about Ramon Eshkar?  What is
24 your working relationship with him?
25     A   He is one of the members in the

Page 49

1  management of the company.
2      Q   And how often do you speak with him?
3      A   Also a couple of times per week.
4      Q   On what types of issues?
5      A   Customer related and product
6  related.
7      Q   Do you interact with NSO or Q's
8  customers at all?
9      A   Yes.
10     Q   In what capacities and what
11 circumstances do you interact with customers?
12     A   Whenever they demand technical
13 representative.  It is not something I initiate.
14     Q   Is that for existing customers or
15 prospective customers or both?
16     A   Both.
17     Q   Do you participate in the marketing
18 of NSO's products?
19     A   No.
20     Q   So when you talk to prospective
21 customers, in what capacity are you speaking with
22 them?
23         MR. AKROTIRIANAKIS:  Objection, vague.
24     A   Can you explain "capacity"?
25     Q   For what purpose are you speaking

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 62

1 between them.
2      Q   Got it.  So there were people
3 working on one or people working on the other but
4 functionally, in terms of structure they were part
5 of the research group?
6      A   Yes.
7      Q   You said one Development Group.  How
8 is that different from today?  I thought there was
9 only one Development Group today?
10     A   The Platform Group is also a
11 Development Group but back then they were residing
12 in the same group.
13     Q   Any other differences in the
14 structure of the R&D group back in 2018?
15     A   Not that I recall an important
16 difference, no.
17     Q   Is the R&D group currently working
18 on any installation vectors that would operate via
19 WhatsApp?
20     MR. AKROTIRIANAKIS:  I am going to
21 instruct the witness not to answer that question
22 as it is outside the court's balancing on the
23 (inaudible) factors and he is unable to testify to
24 that.
25     MR. PEREZ-MARQUES:  And are you going to

Page 63

1 follow that instruction?
2      A   Yes.
3      Q   So you won't tell me whether as we
4 speak NSO is actively working to develop
5 installation vectors that would operate via
6 WhatsApp?
7      A   I cannot.
8      Q   Based on your client's instruction?
9 I mean your counsel's instruction?
10     A   And regulation for me.
11     Q   You know the answer to that
12 question, right?
13     A   Yes.
14     Q   Are you involved in hiring employees
15 for the R&D group?
16     A   Yes.
17     Q   What qualifications do you look for
18 in the people you recruit for the R&D group?
19     A   Which group?
20     Q   I take it the answer depends on
21 which group, is that right?
22     A   The answer depends on which group,
23 yes.
24     Q   And so for what you call the
25 research groups, Android and iOS, what

Page 64

1 qualifications do you look for?
2      A   It depends which type of research.
3      Q   What are some examples of the type
4 of research around the capabilities you would look
5 for?
6      A   In case of uni research, we search
7 for potential and ability to be able to gain the
8 in-depth understanding of ecosystems and
9 frameworks.  In terms of experts, the ones that
10 already have some kind of in-depth understanding
11 of the ecosystem.
12     Q   And what is the mix within those
13 research groups, Android and iOS, between senior
14 hires who come in with expertise and more junior
15 hires that are hired more on the basis of
16 potential?
17     A   In which timeframe?
18     Q   Let's say now, to start.
19     MR. AKROTIRIANAKIS:  Object to the form
20 of the question.
21     A   The mixture by percentage between
22 experts and non-experts.
23     Q   Mm hmm.
24     A   About 30/40% experts and
25 non-experts, complementary.

Page 65

1      Q   Do you give potential hires any kind
2 of tests?
3      A   Tasks?
4      Q   Tests?
5      A   No.
6      Q   What is the process for researching
7 and developing installation vectors?
8      MR. AKROTIRIANAKIS:  Objection, vague.
9 Vague as to time.  You can answer within the
10 timeframe.
11     MR. PEREZ-MARQUES:  Why don't we do
12 this.  Fair enough.  Let's say during the period
13 from 2018 to 2020, What was the process for
14 researching and developing installation vectors?
15     MR. AKROTIRIANAKIS:  I am sorry, give me
16 a minute if you don't mind.  As I understand your
17 question, I think that is outside the court's
18 order also and his ability under Israeli law to
19 answer the question.
20     MR. PEREZ-MARQUES:  So you are going to
21 instruct him not to answer that?
22     MR. AKROTIRIANAKIS:  Yes.
23     MR. PEREZ-MARQUES:  Let me ask you this.
24 What was the process to develop and test NSO
25 spyware or NSO -- I am sorry.  Let me start over

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1  are.
2        What was the process to develop and test
3  installation vectors in use between April 29, 2018
4  and May 10, 2020?
5        MR. AKROTIRIANAKIS:  You can answer that
6  as it relates to the category in the court's order
7  which itself is limited to, as requested by
8  counsel, "any NSO spyware targeting or directed at
9  WhatsApp servers, or using WhatsApp in any way to
10  access target devices".
11       Q   Do you have that definition in mind
12  Mr. Gazneli?  So the installation vectors I am
13  asking you about are installation vectors that
14  used WhatsApp in any way.  Do you understand that?
15       A   Yes.
16       Q   And so Heaven, Eden, ERISED would be
17  examples of such installation vectors, correct?
18       A   Yes.
19       Q   And so now I am asking you what was
20  the process to develop and test installation
21  vectors that used WhatsApp that were in use during
22  the period between April 29, 2018 and May 10,
23  2020?
24       MR. AKROTIRIANAKIS:  Objection, vague.
25  If you understand you can answer.  Also compound.

Page 67

1        A   I will try to answer based on
2  Israeli law and my restrictions because of it.
3        The process was developed in internal
4  environment, in order to be able to work on our
5  devices on which we investigated the application.
6        Q   Let me just take a step back for a
7  moment to see if I can make our terminology clear.
8  Eden, Heaven and ERISED are all installation
9  vectors that worked via WhatsApp, correct?
10       MR. AKROTIRIANAKIS:  Objection,
11  misstates his testimony.
12       A   Heaven, Eden and ERISED were
13  installation vectors that were activated via
14  WhatsApp.
15       Q   During the period April 29, 2018 to
16  May 10, 2020, were any installation vectors in use
17  besides Heaven, Eden and ERISED that were
18  activated via WhatsApp?
19       A   No.
20       Q   So those are the three, yes?
21       A   Yes.
22       Q   And am I right that NSO sometimes
23  refers to them collectively as Hummingbird?
24       A   Yes.
25       Q   And does the term Hummingbird

Page 68

1  include any vectors other than those three?
2        A   No.
3        Q   So if I refer to the Hummingbird
4  vectors, you will understand that I am referring
5  to those three?
6        A   In respect to the timeframe, yes.
7        Q   Because you are not answering as to
8  anything outside those timeframes, right?
9        A   Yes.
10       Q   And so you referred to -- when I was
11  asking you about the development, you mentioned
12  developing an "internal environment in order to be
13  able to work on our devices on which we
14  investigated the application".  What did you mean
15  by that?
16       A   I mean by -- developing an
17  environment using which you can use the WhatsApp
18  application.
19       Q   And what does that involve?  How do
20  you do that?
21       MR. AKROTIRIANAKIS:  Objection,
22  compound.
23       A   It is like -- it involves the
24  understanding of the functionality of the WhatsApp
25  ecosystem.

Page 69

1        Q   And when you say the WhatsApp
2  ecosystem, what do you mean?
3        A   All the parts that WhatsApp uses in
4  order to communicate between two peers.
5        Q   And so that does that include the
6  WhatsApp client?
7        A   Yes.
8        Q   But it would also include server
9  architecture?
10       MR. AKROTIRIANAKIS:  Objection, vague.
11       A   What do you mean by "architecture"?
12       Q   Why don't I leave the terminology to
13  you.  What else is part of the ecosystem you
14  described, besides the WhatsApp client?
15       A   As I answered before, the parts
16  which are relevant and required in order to
17  communicate between peer to peer.
18       Q   And what parts are those?
19       A   The required server functionality
20  that enables you to send messages from one side to
21  another.
22       Q   So the WhatsApp client, the server
23  functionality.  Is anything else part of the
24  ecosystem you described that enables one WhatsApp
25  clients to communicate with another?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1    A  No.
2    Q  And so as part of the development of
3  the Hummingbird installation vectors, NSO
4  investigated that ecosystem.  Is that right?
5       MR. AKROTIRIANAKIS:  Misstates his
6  testimony.
7    A  We developed an internal environment
8  that enabled us to work on our devices.
9    Q  What does that mean?
10    A  That means that we used WhatsApp
11  clients that were installed on company owned
12  devices and used the functionality that was
13  developed internally which enabled communication
14  between the clients that were used in this
15  internal environment.
16    Q  And that functionality that was
17  developed internally, that is different than the
18  WhatsApp client?
19    A  You are asking about what is
20  applied?
21    Q  I am asking you when you refer to
22  the functionality that was developed internally,
23  that is different from the WhatsApp client.  Is
24  that right?
25       MR. AKROTIRIANAKIS:  Objection,

Page 71

1  misstates his testimony.
2    A  Part of the development, as you
3  asked before, was to develop the functionality
4  that enabled us to communicate between the clients
5  that were installed on company-owned devices.
6    Q  Okay.  And when you say the clients
7  that were installed, you mean the WhatsApp
8  application?
9    A  Yes.
10    Q  Okay.  Are you familiar with the
11  term "emulator"?
12    A  Yes.
13    Q  What is an emulator?
14    A  Emulator is a software that emulates
15  the functionality of specific ecosystem framework
16  application.  It depends what you refer to.
17    Q  And as part of the development of
18  the Hummingbird vectors, NSO created an emulator
19  for the WhatsApp client.  Isn't that right?
20    A  No.
21    Q  Were any emulators used in the
22  development of the Hummingbird vector?
23       MR. AKROTIRIANAKIS:  Objection, vague.
24  Object to the form of the question.
25    A  We used Android emulator, which is

Page 72

1  like Open Source.
2    Q  Any other emulators that were used
3  in the development of the Hummingbird vectors
4  besides the Android emulator?
5    A  By saying "used" you mean?
6    Q  I am not sure how to make that
7  broader or clearer.  Used in any way in the
8  development of the Hummingbird vectors?
9    A  We developed functionality that
10  enabled to communicate, as I said before, between
11  two peers in that internal environment.
12    Q  I am not sure you are answering my
13  question though.  You referenced an Android
14  emulator, right?
15    A  Yes.
16    Q  Were any other emulators used in the
17  development of the Hummingbird vectors?
18    A  I wouldn't call it an emulator.  It
19  is a piece of code that enabled us to send
20  messages from one side, one peer in that internal
21  environment to another one.
22    Q  And the peer that you were sending
23  messages from was a piece of software created by
24  NSO?
25    A  Yes.

Page 73

1    Q  And the peer on the other side would
2  be a target's actual WhatsApp client?
3       MR. AKROTIRIANAKIS:  Objection,
4  misstates testimony.
5    A  The software on the endpoint in the
6  internal environment was WhatsApp client.  It was
7  customized to be used for the internal
8  environment.
9    Q  And in what respect was it
10  customized, the WhatsApp client on the endpoint,
11  in the testing environment?
12    A  It used the connection to the
13  WhatsApp server which was deployed internally.
14    Q  So was there, in effect, a copy of
15  the WhatsApp servers within NSO's system?
16    A  No.
17    Q  So what do you mean when you say it
18  was deployed internally?
19    A  It is not a copy.  It is a software.
20  It supports and uses only the relevant parts that
21  the capability required for communication.
22    Q  But it is designed to replicate the
23  functionality of WhatsApp's servers, in pertinent
24  part?
25    A  We don't have access to WhatsApp

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

1 servers. Therefore I cannot replicate anything.
2     Q   But it is designed to allow you to
3 send messages within NSO as if they were going
4 through WhatsApp servers.  Isn't that the purpose?
5     A   Yes.
6     Q   And so as part of that you developed
7 servers that, to the best extent you can, aim to
8 replicate the functionality of the WhatsApp
9 servers?
10    A   Yes.
11    Q   And the purpose is to investigate or
12 research how messages would be treated by WhatsApp
13 servers.  Right?
14    A   No.
15    Q   What is the purpose?
16    A   The purpose was to research the
17 WhatsApp client on the target's device, and in
18 order to build the software to eventually gain
19 access to the data that resides on it.
20    Q   And why was it necessary to create
21 that internal version of the WhatsApp servers as
22 part of the R&D process?
23    A   This is a practice done by any cyber
24 company, whether defensive or offensive, in order
25 to work in the internal environments.

Page 75

1     MR. AKROTIRIANAKIS:  I don't want to
2 interrupt your question, but the answer that the
3 court reporter asked for clarification on, "to the
4 data", and then he also said "that resides on it",
5 and I think you didn't hear --
6     MR. PEREZ-MARQUES:  We have a video and
7 recording so we can clear that all up.
8     I asked you why it was necessary to
9 create that internal version of the WhatsApp
10 servers as part of the R&D process.  You answered
11 that this is a practice done by any cyber company.
12 I would like to understand why is that, why is
13 that part of the research and development process?
14    MR. AKROTIRIANAKIS:  Object to the form
15 of the question.  Also misstates his testimony.
16    A   So the question is why it is
17 required?
18    Q   Yes.
19    A   In order to work on a controlled
20 environment.
21    Q   Is the purpose of that to understand
22 how the messages would be treated when sent
23 through WhatsApp's actual servers?
24    A   No, because it didn't work
25 from using the WhatsApp's actual server.  The

Page 76

1 purpose is to investigate and research the
2 WhatsApp client.
3     Q   Got it.  During this phase of the
4 development?
5     A   Yes.
6     Q   Right.  And then at some point does
7 the testing progress to actually testing it
8 through WhatsApp's actual ecosystem?
9     A   After reaching the capability in the
10 internal server, then there is a phase of testing
11 in the real environment, yes.
12    Q   And with respect to the Hummingbird
13 vectors, when did NSO reach the point of testing
14 the installation vectors in WhatsApp's actual
15 ecosystem?
16    MR. AKROTIRIANAKIS:  Objection,
17 foundation.
18    A   I don't recall the exact month this
19 was done.
20    Q   Approximately?
21    A   Approximately, it was near
22 April 2018.
23    Q   Around April 2018 is when NSO
24 reached the point of testing the Hummingbird
25 vectors in WhatsApp's actual environment?

Page 77

1     A   As I said before, I don't recall the
2 exact month but it was near April.
3     Q   How does NSO determine when a
4 potential installation vector is ready to use?  I
5 mean ready to be deployed to clients, to
6 customers?
7     MR. AKROTIRIANAKIS:  Object to the form
8 of the question.
9     A   As for any product, you want to
10 deliver it to the customer when it stands and has
11 statistical performance and functionality
12 standards.
13    Q   As part of the research and
14 development that led to the Hummingbird vectors,
15 did NSO create WhatsApp accounts?
16    MR. AKROTIRIANAKIS:  Objection,
17 foundation.  Object to the form of the question.
18    A   What do you mean by NSO created
19 WhatsApp accounts?
20    Q   Did NSO sign up for WhatsApp
21 accounts as part of the R&D process that led to
22 the Hummingbird vectors?
23    A   When the internal environment was
24 used, the answer is no.
25    Q   So there was no actual client,

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

1 WhatsApp client that was being used as part of the
2 R&D?
3        A  They were not activated against the
4 real WhatsApp server because about they were used
5 in the internal server.
6        Q  So the endpoint WhatsApp client that
7 was being tested during that phase when you were
8 working in the internal environment, that was not
9 an actual WhatsApp client?
10       MR. AKROTIRIANAKIS:  Object to the form
11 of the question.  Also misstates his testimony.
12       A  I would say towards the actual
13 WhatsApp client, it was connected and activated
14 towards the internal WhatsApp server.
15       Q  And as part of that phase of the
16 development, did NSO create WhatsApp accounts?
17       MR. AKROTIRIANAKIS:  Object to the form
18 of the question.  Also vague.
19       A  How to define WhatsApp account?  Is
20 WhatsApp account a live WhatsApp account that is
21 connected to a real WhatsApp server?
22       Q  Do you have WhatsApp?
23       A  Yes.
24       Q  Did you create an account when you
25 signed up for WhatsApp?

Page 79

1        A  Yes.
2        Q  So you understand what that means,
3 in terms of creating a WhatsApp account?
4        A  I understand what you mean in this
5 question.  That is why I asked the previous
6 question.
7        Q  So --
8        A  When you say activating WhatsApp
9 account, it is not real if it is not connected to
10 a real WhatsApp server.
11       Q  So in the sense that you created a
12 WhatsApp account -- before I ask that, what phone
13 number is your WhatsApp account associated with?
14       A  With my personal phone number.
15       Q  And what is that phone number?  The
16 reason I ask is because we have some WhatsApp
17 chats that have numbers without names and so we
18 would like to be able to determine whether you are
19 the person on them.
20       A  Okay.  So you ask for my phone
21 number?
22       Q  Yes, please?
23       A  0508803185.
24       Q  Thank you.  Again, it is not to
25 invade your privacy.  It is so we can match it to

Page 80

1 documents.
2        Were any live WhatsApp accounts created
3 during any phase of the testing of the Hummingbird
4 vectors by NSO?
5        A  Yes.
6        Q  Could you say approximately how
7 many?
8        MR. AKROTIRIANAKIS:  Objection,
9 foundation.
10       Q  You understand you are designated as
11 a corporate representative on the research and
12 development of the relevant spyware, right?
13       A  I wouldn't call it spyware.
14       Q  I am just reading from the actual
15 topic.  You understand you are designated on that?
16       MR. AKROTIRIANAKIS:  He is designated on
17 the topics as phrased in NSO Group Technologies
18 and Q Cyber Technology Limited's objection and
19 responses to the notice of deposition.
20       Q  And you understand that that
21 includes research and development of software
22 including the Hummingbird vectors?
23       A  Yes.
24       Q  You are here to present NSO and Q
25 Cyber's full corporate knowledge on those topics,

Page 81

1 right?
2        A  Yes.
3        Q  And so could you say approximately
4 how many WhatsApp accounts were created as part of
5 the testing of the Hummingbird vectors?
6        A  I don't have the exact number, but I
7 can estimate it is about 50 numbers.
8        Q  And then when the Hummingbird
9 vectors are actually used, are additional WhatsApp
10 accounts created at that point?
11       A  At the customer?
12       Q  In connection with use by a
13 customer, if that is how you would like to phrase
14 it?
15       A  Yes.
16       Q  Do you have any understanding of
17 approximately how many times -- let me put it this
18 way -- on how many target devices the Hummingbird
19 vectors have been successfully used by NSO?
20       MR. AKROTIRIANAKIS:  No foundation.
21       A  When you say Hummingbird was used,
22 what do you mean by that?
23       Q  Used as -- successfully used as an
24 installation vector to cause the installation of
25 the agent?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1    A  In which timeframe?
2    Q  What I will call the relevant
3  timeframe, so April 2018 to May 2020?
4        MR. AKROTIRIANAKIS:  Object to the form
5  of the question.
6    A  I don't have an exact number.
7    Q  Approximately?
8        MR. AKROTIRIANAKIS:  No foundation.
9    A  So you ask in terms of how many
10 times customers tried to use Hummingbird?
11   Q  Successfully?
12   A  Customers?  The question is about
13 customers?
14   Q  How many times the Hummingbird
15 vectors were successfully used to install the
16 agent on a target device during the relevant
17 period?
18       MR. AKROTIRIANAKIS:  No foundation.
19   A  I don't have the exact number.
20   Q  I understand you don't have the
21 exact number.  I am asking for an approximate
22 number.  Tens, hundreds, thousands, tens of
23 thousands?
24       MR. AKROTIRIANAKIS:  No foundation.
25   A  It is not tens of thousands but it

Page 83

1  is not hundreds.
2    Q  So thousands?
3    A  In between, yes.
4    Q  In between hundreds and hundreds of
5  thousands?
6    A  No.
7        MR. AKROTIRIANAKIS:  Objection,
8  misstates his testimony?
9    Q  In between what?
10   A  In between hundreds and tens of
11 thousands.
12   Q  Got it.  When NSO researchers
13 created live WhatsApp accounts, as part of the R&D
14 that led to the Hummingbird vectors, did they
15 install WhatsApp via web, via mobile or how did
16 they install it?
17   A  On the device itself.
18       MR. AKROTIRIANAKIS:  Objection,
19 misstates his testimony.
20   Q  So via mobile?  On a mobile device?
21   A  On mobile device.
22   Q  The term "Pegasus", does that to you
23 mean the agent or is it broader than the agent?
24   A  This is the name of the product.
25   Q  And does that include the

Page 84

1  installation vectors or would Pegasus be the agent
2  itself?
3        MR. AKROTIRIANAKIS:  Objection, vague.
4        MR. PEREZ-MARQUES:  I just want to
5  clarify our terminology so I can make the
6  questions clearer.
7    A  The product that is called Pegasus
8  eventually delivers the data to the customers
9  which are sent to the customers by the agent, and
10 and the agent installed using installation
11 investigators.
12   Q  And so the agent is part of Pegasus?
13   A  Yes.
14   Q  And the installation vectors are
15 part of Pegasus?
16   A  Yes.
17   Q  And the agent is the piece of
18 Pegasus that actually delivers information to
19 customers?
20   A  Yes.
21   Q  And that information is obtained
22 from the target devices?
23   A  Yes.
24   Q  And so you are familiar with
25 Pegasus, yes?

Page 85

1        MR. AKROTIRIANAKIS:  Objection, vague.
2    A  In what terms?
3    Q  I mean you are the head of R&D at
4  NSO.  You are familiar with Pegasus?
5    A  Yes.
6    Q  And you are familiar with the agent?
7    A  Yes.
8    Q  Did you have any role in the
9  development of the agent?
10   A  No.
11   Q  Are you familiar with the source
12 code for the installation vectors, the Hummingbird
13 vectors?
14   A  As I said before, part of it, but
15 not all of it.
16   Q  What part are you familiar with?
17   A  No specific part.  I said I don't
18 recall any -- each of the lines of the --
19   Q  You mean you are generally familiar
20 with the source code for the Hummingbird vectors?
21   A  Yes.
22   Q  And you are familiar with how the
23 agent functions?
24       MR. AKROTIRIANAKIS:  Objection, vague.
25   A  Because I was never part of agent

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1 teams and development teams, I am familiar with
2 the concepts, not the implementation.
3        Q   And you understand that you have
4 been designated as a corporate representative on
5 the full functionality of what is defined as the
6 relevant spyware?
7        MR. AKROTIRIANAKIS:   Again, I don't want
8 keep saying this but he is designated as stated in
9 our responses to the notice of deposition.
10       MR. PEREZ-MARQUES:   Yes, okay.  And as
11 stated by your counsel that includes defendant's
12 understanding of the full functionality of what
13 they call the accused technology.  Yes?
14       A   Yes.
15       Q   Again with the same time period,
16 which I won't keep repeating, April 2018 to
17 May 2020.
18       I would like to show you -- and you are
19 prepared to testify as to NSO and Q Cyber's
20 corporate knowledge on that functionality of the
21 relevant spyware?
22       A   Yes.
23       Q   One follow-up.  We were talking
24 about the creation of the WhatsApp accounts as
25 part of the R&D process.  When were those accounts

Page 87

1 created?
2        A   When you move to phase of testing in
3 the real word.
4        Q   In the real environment?
5        A   Yes.
6        Q   I think you previously estimated
7 that was around April 2018?
8        A   I said near.
9        Q   When was the testing complete, such
10 that the first of the Hummingbird vectors could be
11 deployed?
12       A   As I said before, I don't recall the
13 exact month.
14       Q   Okay.  Was it also in 2018, the
15 following year?
16       A   Heaven?
17       Q   Mm hmm.
18       A   2018.
19       Q   I would like to show you what we
20 have marked as Exhibit 2032.
21       (Exhibit 2032 marked for identification)
22       This is a multipage document with the
23 Bates stamp NSO_WHATSAPP_00045678.  Do you
24 recognize this document?
25       A   Do you want me to go over it?

Page 88

1        Q   Feel free to flip through it.  The
2 first question is just whether you recognize it.
3        Do you recognize this document?
4        A   Yes.
5        Q   What is it?
6        A   Some kind of training material,
7 training -- customer facing material.
8        Q   Customer facing material or training
9 material?
10       A   Training.
11       Q   Training.  Is it a product
12 description for Pegasus?
13       A   Yes.
14       Q   So the endpoint solution that is
15 referred to here is Pegasus?
16       MR. AKROTIRIANAKIS:   Objection, vague.
17       Withdrawn.
18       A   Yes.
19       Q   Did you have any role in preparing
20 Exhibit 2032?
21       A   No.
22       Q   I would like to direct you to page
23 one where there is an "Overview" section.  Do you
24 see that?  Are you on that page?  It is after the
25 table of contents.  There you go.

Page 89

1        A   Yes.
2        Q   The third paragraph there revs to
3 Pegasus as a "breakthrough solution, developed by
4 veterans of elite intelligence agencies".  Do you
5 see that?  It is the third paragraph under
6 "Overview"?
7        A   Yes.
8        Q   And do you agree with the
9 characterization of Pegasus as a breakthrough
10 solution?
11       A   As for the date, I think it was
12 breakthrough, yes.
13       Q   It is a highly innovative product?
14       A   Yes.
15       Q   Highly sophisticated?
16       A   I think it depends on the definition
17 of sophisticated.  By what means?
18       Q   Would you consider it a very
19 sophisticated product?
20       A   Yes.
21       Q   Is it accurate that it was developed
22 by veterans of elite intelligence agencies?
23       MR. AKROTIRIANAKIS:   Objection, vague.
24       A   The company was established in 2010,
25 so it depends on who it refers to in this

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1      Q   So you don't know about the legal
2  authorization of NSO's customers, or you do?  If
3  you do I might have questions.  Is that a topic
4  you are familiar with?
5      A   I don't think that I am here to
6  answer the legal questions about it.
7      Q   And it is not a topic that you have
8  personal knowledge about either, is it?
9      MR. AKROTIRIANAKIS:  Objection, vague.
10     A   No.
11     Q   So let's put that to the side.  The
12 purpose of Pegasus, in terms of how it functions,
13 in terms its full functionality, is that it
14 provides access to encrypted communications, among
15 other things.  Right?
16     MR. AKROTIRIANAKIS:  Objection,
17 misstates his testimony.
18     A   The purpose of Pegasus is to enable
19 customers to get access to the data which resides
20 on their targets' smartphones.
21     Q   Including encrypted communications,
22 right?
23     MR. AKROTIRIANAKIS:  Misstates his
24 testimony.
25     A   The data is not encrypted on the

Page 95

1  target device.
2      Q   Got it.  Including communications
3  that would be encrypted if they were gathered from
4  another -- other than from the endpoint.  Is that
5  right?
6      A   But Pegasus is a software that gains
7  access to the target's device, the data that
8  resides on the device.
9      Q   Got it, and so that is what it means
10 when it refers to encryption under the header of
11 "overcoming smartphone data interception
12 challenges", is that right, that by getting it
13 from the target device you are able to overcome
14 encryption?
15     MR. AKROTIRIANAKIS:  Object to the form
16 of the question.
17     A   I mean that after the endpoint
18 encryption was introduced in the industry, then
19 data interception practically got irrelevant.
20 Therefore Pegasus was designed to get for the
21 customers -- it enabled them to access the data on
22 the endpoint.
23     Q   The next section on page 2 refers to
24 "Limitations of standard interception solutions".
25 Do you see that?

Page 96

1      A   Yes.
2      Q   And the purpose of this section is
3  to illustrate how Pegasus is superior to standard
4  interception solutions, right?
5      MR. AKROTIRIANAKIS:  Objection,
6  foundation.
7      A   I think, as it states, it describes
8  limitations of standard interception solutions.
9      Q   Right.  Limitations that don't apply
10 to Pegasus, right?
11     A   Those that are written here, no.
12     Q   And one of the standard interception
13 solutions discussed here is lawful interception,
14 right?
15     A   Yes.
16     Q   And the point is to show how Pegasus
17 is superior to lawful interception, right?
18     MR. AKROTIRIANAKIS:  Objection,
19 misstates the document.
20     A   This paragraph defines and describes
21 the lawful interception challenges.
22     Q   And those are constraints that don't
23 apply to Pegasus, right?
24     MR. AKROTIRIANAKIS:  Objection, vague.
25 No foundation.

Page 97

1      A   Pegasus is a different solution,
2  lawful interception solution.
3      Q   Right, and the point of this section
4  of the product description is to suggest that
5  Pegasus is superior to lawful interception.
6  Right?
7      A   I would say --
8      MR. AKROTIRIANAKIS:  Objection,
9  misstates the document and his testimony.
10     A   I would say Pegasus is different
11 than lawful interception solution and isn't
12 constrained to the limitations for this specific
13 paragraph that you are talking about.
14     Q   On page 3, under "Cyber Intelligence
15 for the Mobile World".  Do you see that section?
16     A   Yes.
17     Q   The second paragraph states "EPS".
18 EPS means endpoint solution, right?
19     A   Yes.
20     Q   And that means Pegasus, in the
21 context of this document?
22     A   Yes.
23     Q   "EPS silently deploys an invisible
24 software (SW) component (agent) on a target's
25 device which extracts and securely transmits data

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1 for intelligence analysis."
2        Do you see that?
3        A   Yes.
4        Q   And what does it mean that the agent
5 is deployed silently?
6        A   This defines how the agent is
7 installed, not the installation vector itself.
8        Q   And what does it mean that the agent
9 is deployed silently?
10       A   It means that the target is not
11 aware that the agent is being installed.
12       Q   Right.  And the other services that
13 are part of the broader ecosystem are also
14 unaware.  Isn't that part of it as well, as we
15 discussed earlier?
16       MR. AKROTIRIANAKIS:  Object to the form.
17       A   This activity should be concealed,
18 yes.
19       Q   And NSO designed Pegasus with the
20 objective that it be concealed, isn't that right?
21       MR. AKROTIRIANAKIS:  Objection, vague.
22       A   It is part of being software that is
23 being used by the type of customers that are using
24 these cyber intelligence tools, the product should
25 be as concealed as possible.

Page 99

1        Q   It also says that -- it refers to
2 the software component as "invisible".  Do you see
3 that in that same sentence?
4        A   Yes.
5        Q   And that means that the software
6 component is invisible to the target, right?
7        A   Yes.
8        Q   And also invisible to other services
9 involved in the ecosystem, right?
10       MR. AKROTIRIANAKIS:  Objection, vague.
11 Compound.
12       A   It is invisible to the target, as by
13 nature of the product, and the agent is invisible.
14 Yes, the answer is yes.
15       Q   And that is by design, is that
16 right?  NSO designed the product so that it would
17 be invisible not only to the target but to others
18 as well?
19       A   This is a requirement of such
20 software capabilities.
21       Q   The next sentence refers to
22 installation vectors, and we have talked about
23 what that means.  Those are the mechanisms by
24 which Pegasus is installed on a target's device,
25 right?

Page 100

1        A   Yes.
2        Q   I want to ask a question that is not
3 about this document.  Did you review, as part of
4 your preparation, an expert report submitted by
5 NSO and Q Cyber?
6        A   The experts from the company, from
7 NSO.
8        Q   No, an external expert.  I think his
9 name is Terence McGrough.  Did you review a report
10 that was submitted by NSO and Q Cyber by such an
11 external expert regarding the spyware?
12       A   Yes.
13       Q   Mr. McGrough, is that the right
14 name?
15       A   I saw it but I don't remember.
16       Q   Mr. McGrough stated that:
17 "Over the years NSO has provided many
18 types of delivery mechanisms for the Pegasus
19 agent, including 1 click and 0 click variants."
20       Is that correct?
21       A   You ask whether that is what he was
22 writing in his report or whether that is what
23 happened?
24       Q   Whether that is what happened.  Is
25 it correct that over the years NSO has provided

Page 101

1 many types of delivery mechanisms for the Pegasus
2 agent, including 1 click and 0 click variants?
3        A   Yes.
4        Q   How many installation vectors
5 roughly has NSO developed for Pegasus?
6        MR. AKROTIRIANAKIS:  Objection,
7 foundation.  It is also beyond the scope of the
8 designation and beyond the scope of the court's
9 order.
10       A   So for the Android ecosystem, except
11 that we were talking about, which are 0 click
12 solutions, there were additional 1 click solutions
13 which I don't recall the exact number, but I would
14 say about three or four.
15       Q   So in the 2018 time period, how many
16 installation vectors were in place for Pegasus?
17       A   2018?
18       Q   Mm hmm.
19       A   In Android, two.
20       Q   What about in 2019?
21       A   Also in Android, two.
22       Q   So are those two both 0 click or one
23 0 click and one 1 click?
24       A   One 0 click and one 1 click.
25       Q   Defendants' expert also stated:

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1 require any interaction by the target.
2    Q   And why is that preferable?
3       MR. AKROTIRIANAKIS:  Objection,
4 misstates his testimony.
5       A   From the customer's point of view, 0
6 click installation vectors are more concealed and
7 they enable them to execute their operations in
8 more concealed ways.
9       Q   Is it harder to research and develop
10 a 0 click installation vector than a 1 click?
11      A   It is not a matter of harder or not.
12 It is different expertise.
13      Q   In what sense is it a different
14 expertise?
15      A   The researchers working on 0 click
16 vectors installation flows are required to think
17 of ways how the installation vector can be
18 executed without the need for the target to
19 interact with the device.
20      Q   I understand it is a different
21 question that they are trying to answer, but why
22 is the expertise different?
23      A   When I say expertise I mean that the
24 researchers that are required to research these
25 type of vectors have additional questions to

Page 107

1 answer and one of the questions is the
2 interaction, as we discussed, and that requires
3 additional capabilities in terms of their
4 expertise.
5       Q   So I would like to go back to
6 Exhibit 2032, which you still have in front of
7 you.  The next section on page 3 has a section
8 titled "Benefits of our endpoint solution".  Do
9 you see that?
10      A   Yes.
11      Q   And the first benefit identified is
12 global coverage.  Is that right?
13      A   Yes.
14      Q   It states:
15      "Monitor targets' devices while they
16 connect to the internet from any location."
17 Right?
18      A   Yes.
19      Q   And there are no geographical
20 locations identified, right?
21      A   It defines the potential factor.  It
22 does not define anything that relates to a
23 specific customer.
24      Q   And there are no geographical
25 limitations identified there, right?

Page 108

1       A   As I said, this defines the
2 potential capability of this vector, yes.
3       Q   Of Pegasus?
4       A   Of the solution.
5       Q   Is that an accurate statement of
6 Pegasus' capabilities?
7       MR. AKROTIRIANAKIS:  Objection, vague.
8       A   Different vectors have different
9 limitations, so it is not a general statement that
10 you can make about each and every capability in
11 Pegasus.
12      Q   But this is not a statement about
13 vectors, is it?  It is about the agent, isn't it?
14      A   I will have to read it.
15      Q   It says "Monitor target's devices
16 while they connect to the internet from any
17 location."
18      A   But this is one sentence.  Out of
19 context, I am not sure it answers the question.
20      Q   It is the agent that monitors target
21 devices, right, not the vector?
22      A   The agent is the one that monitors
23 target devices, yes.
24      Q   And is it correct that Pegasus can
25 monitor a target's devices from any location?

Page 109

1       A   As for the potential of the agent,
2 yes.
3       Q   The next bullet states:
4       "Unlimited access to targets' mobile
5 devices.  Remotely and covertly collect
6 information about a target's relationships,
7 locations, phone calls, plans and activities."
8       Do you see that?
9       A   Yes.
10      Q   And is that an accurate statement of
11 Pegasus' capabilities?
12      A   Yes, it is like.
13      Q   A few bullets down there is a bullet
14 that begins "Operate target devices".  Do you see
15 that?
16      A   Yes.
17      Q   It says:
18      "Activate the microphone to listen in on
19 a target's environment.  Turn on the camera to
20 take snapshots and take screenshots to collect
21 non-communications data of high intel value."
22      Is that an accurate statement of
23 Pegasus' capabilities?
24      A   Yes.
25      Q   Is it fair to say that the purpose

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

1 of Pegasus is to obtain information from a
2 target's devices?
3      A  Yes.
4      Q  And among other capabilities Pegasus
5 has the ability to turn on a device microphone?
6      A  In some types of agents, yes.
7      Q  And to take photos with a device
8 camera, that is also a capability of Pegasus?
9      A  Yes.
10      Q  And it had those capabilities in
11 2019?
12      A  Yes.
13      Q  And it continues to have those
14 capabilities today?
15      A  As I said before, it depends on
16 agents, the specifics of the agent.
17      Q  How so?
18      A  Eventually the vector defines what
19 are the capabilities that the agent can ask.
20      Q  So certain vectors can only make
21 available certain functionality of the agent?
22      A  Yes.
23      Q  And with respect to Pegasus as
24 installed by the Hummingbird vectors, did Pegasus
25 in 2019 have the capability to turn on device

Page 111

1 microphones and take snapshots?
2      A  Yes.
3      Q  The section I read also describes
4 the information obtained as having high intel
5 value.  Do you see that?
6      A  Yes.
7      Q  And do you agree that the
8 information obtained by Pegasus is valuable?
9      MR. AKROTIRIANAKIS:  Objection, beyond
10 the scope of the designation of this witness.
11      A  The value of the intel is in the
12 eyes of the customer.
13      Q  And the information is valuable to
14 NSO's customers, yes?
15      MR. AKROTIRIANAKIS:  Objection, beyond
16 the scope of the designation.  No foundation.
17      A  Eventually the customers seek to get
18 access to the data that is on the device, and part
19 of it is using microphone and camera, snapshots,
20 as it states here.
21      Q  And not limited to microphone and
22 snapshots, but the information obtained through
23 Pegasus is valuable to NSO's customers.  Isn't
24 that right?
25      MR. AKROTIRIANAKIS:  Object to the form

Page 112

1 of the question.  It is beyond the scope of the
2 designation.  Also no foundation.
3      A  We believe that this is information
4 that customers would like to get access to.  That
5 is why we developed the capabilities.
6      Q  Right, and because they consider it
7 valuable, they are willing to pay NSO typically
8 millions of dollars to license the Pegasus
9 technology.  Right?
10      MR. AKROTIRIANAKIS:  Objection, beyond
11 the scope of the designation for this witness.
12      A  Because they value the information
13 they are willing to buy the software in order to
14 use it.
15      Q  Do you know whether they buy the
16 software versus license the software?
17      A  From my point of view, this is a
18 legal term.
19      Q  Okay, not your area.  Right?
20 Section 2.2 on the next page is titled "Technology
21 Highlights".  Do you see that section?
22      A  Yes.
23      Q  It says:
24      "The EPS solution uses cutting edge
25 technology."

Page 113

1      Do you agree with that characterization?
2      A  Yes.
3      Q  If we go to page 6, there is a
4 section 3.2 titled "Agent Installation Vectors".
5 Do you see that?
6      A  Yes.
7      Q  It states that:
8      "Installing an agent on a target's
9 device is the heart of any intelligence operation
10 using EPS."
11      Do you see the language I just read?
12      A  Yes.
13      Q  Do you agree with that?
14      MR. AKROTIRIANAKIS:  Objection, beyond
15 the scope of the designation of the witness.
16      A  This is what it says.
17      Q  Do you agree with it?
18      MR. AKROTIRIANAKIS:  Same objection.  No
19 foundation.
20      A  I would read the entire sentence,
21 which states "Installing the agent on target's
22 device is the heart of any intelligence operation
23 using EPS, and each installation is carefully
24 planned to ensure success."
25      Q  Do you agree with that?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1        MR. AKROTIRIANAKIS:  Same objections.
2        A   Again, it states the operations from
3   the customer's eyes and the value of the
4   intelligence from the customer's eyes.
5        Q   But from your perspective, as the
6   head of R&D at NSO, do you agree that installing
7   an agent on the target's device is the heart of
8   any intelligence operation using EPS or using
9   Pegasus?
10       MR. AKROTIRIANAKIS:  Objection, no
11  foundation.  Beyond the scope of the designation
12  of this witness.
13       A   Being the agent of the software
14  enables the access to the data which customers
15  value and need to get for their operations.  This
16  is the beginning of the operation.
17       Q   The installation is the beginning?
18       A   Installing the agent.
19       Q   Why is installation so important to
20  an intelligence operation using Pegasus?
21       MR. AKROTIRIANAKIS:  Objection,
22  misstates his testimony.  Also no foundation.
23       A   Customers seek to get access to data
24  and these type of solutions are one of the ways
25  for them to get access.

Page 115

1        Q   The installation is what makes the
2   information extraction possible, right?
3        A   Yes.
4        Q   One category of installation vectors
5   here is "covert".  Do you see that language on the
6   document?
7        A   Yes.
8        Q   And covert, as used here, means the
9   same as 0 click?
10       A   I will have to read this in order to
11  answer the question.
12       Q   Please go ahead.
13       A   Okay.
14       Q   Yes.  So does covert, as used there,
15  mean the same as 0 click?
16       A   Yes.
17       Q   It states:
18       "A covert message is sent to a mobile
19  device.  The target is not engaged.  There is no
20  need to click a link or open a message."
21       Is that an accurate description of NSO's
22  0 click installation vectors?
23       A   This is a description for any 0
24  click installation vector.
25       Q   Including the Hummingbird vectors,

Page 116

1   right?
2        A   Yes.
3        Q   Specifically, when it says "a covert
4   message is sent to a mobile device", in 2018 and
5   2019, NSO was sending such covert messages via
6   WhatsApp.  Isn't that right?
7        MR. AKROTIRIANAKIS:  Objection,
8   misstates his testimony.
9        A   In 2018 and 2019 the solutions
10  used -- the solution was communicating with
11  target's device in order to activate the
12  vulnerability.
13       Q   But this language here says "a
14  covert message is sent to a mobile device".  Do
15  you see that language?
16       A   Yes.
17       Q   And in the Hummingbird vectors that
18  message was being sent via WhatsApp.  Isn't that
19  right?
20       A   This was the only way to communicate
21  between peer to peer.
22       Q   And so it was being sent via
23  WhatsApp in the Hummingbird vector via WhatsApp?
24       A   Messages were sent to target's
25  device.

Page 117

1        Q   Via WhatsApp, right?
2        A   Yes, via WhatsApp.
3        Q   That is how the Hummingbird vectors
4   worked?
5        A   In this timeframe, yes.
6        Q   The next sentence states that:
7        "The message triggers the smartphone to
8   download and install the agent."
9        Correct?  Do you see that language?
10       A   Yes.
11       Q   As to the Hummingbird vectors, is
12  that correct, that the message transmitted via
13  WhatsApp would trigger a target device to download
14  the Pegasus agent?
15       A   Yes.
16       Q   It states:
17       "The installation is completely
18  invisible and cannot be stopped."
19       Do you see that under number 3?
20       A   Yes.
21       Q   And "invisible" there again means
22  invisible to the target and to other services like
23  WhatsApp?
24       A   No.
25       MR. AKROTIRIANAKIS:  Objection, no

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1    Q   Why can't you describe the research
2 techniques?
3        A   Because, as my counsel stated, I am
4 restricted by Israeli law to talk about it.
5    Q   So there is nothing further that you
6 are willing to testify as to the research
7 techniques that went into identifying
8 vulnerabilities in WhatsApp client?
9        MR. AKROTIRIANAKIS:  Objection.
10       A   It doesn't have anything to do with
11 willingness.  I am restricted by Israeli law to
12 talk about it.
13       MR. AKROTIRIANAKIS:  I will object to
14 the form of that question.  If you want to ask him
15 questions he can tell you whether he can testify
16 about or not.  I think it is a fair question.  It
17 is the way you just stated it.
18    Q   My fundamental question is how did
19 the R&D team at NSO go about finding
20 vulnerabilities in the WhatsApp client?
21       A   They researched the activity of the
22 WhatsApp client in order to find flaws and to
23 build the installation vectors which, as I said,
24 is built to eventually deliver the agent payload.
25    Q   How did the team research the

Page 143

1 activity of the WhatsApp client?
2        A   What does the question refer to in
3 how?
4    Q   That is my question.  How did they
5 do that?  You said they researched the activity of
6 the WhatsApp client.  How did they do that?
7        A   So I will get back to the
8 explanation about the ecosystem we built
9 internally.  We built internal ecosystem of
10 WhatsApp server that enabled us internally to send
11 messages between two peers between customer owned
12 devices, and having this ability enables us to
13 research the activity of the WhatsApp client.
14    Q   How did you know how to build that
15 internal ecosystem?
16       A   What do you mean by how?
17    Q   How did you determine what the
18 characteristics of that internal ecosystem should
19 be in order to operate like a WhatsApp client?
20       A   We have the client and we have the
21 server between them.
22    Q   And so how do you go from having the
23 client to building an ecosystem that replicates
24 it?
25       A   So as a researcher, especially in

Page 144

1 Android, you have the ability to gain the
2 routabilities on any Android devices.  These
3 abilities are stated for anyone using the web.
4 Whenever you have route access on a device, you
5 have the ability to monitor the traffic that is in
6 and out the monitored device, and then you have
7 access to the traffic from peer to peer.  Using
8 this knowledge you can use it to build the
9 ecosystem which is required for this activity.
10    Q   Is there anything else that the NSO
11 R&D team did to find vulnerabilities in the
12 WhatsApp client?
13       A   We, the R&D research group, used all
14 the tools it should use in order to be able to
15 find the vulnerabilities.
16    Q   What are those tools?
17       A   Basically, there are two types of
18 tools, called IDA and JEB.
19    Q   Can you spell those?
20       A   I-D-A.
21    Q   And what was the other?
22       A   J-E-B.
23    Q   And what is IDA?
24       A   These are tools available for
25 procurement -- anyone can buy it -- which enable

Page 145

1 you to analyze code.
2    Q   What is the difference between IDA
3 and JEB?
4        A   IDA enables you to analyse native
5 code and JEB analyzes Java code.
6    Q   Other than using those two tools,
7 what else did the R&D team do to find
8 vulnerabilities in the WhatsApp client?
9        A   As I said before, it monitored the
10 transmission between peer to peer as for the
11 communication, in order to understand the
12 responses and the message content that should be
13 sent from side to side.
14    Q   Through that testing, did NSO
15 develop an understanding of the functioning of
16 WhatsApp's servers that were involved in the peer
17 to peer transmission?
18       MR. AKROTIRIANAKIS:  Objection,
19 misstates his testimony.
20       A   Through this activity the aim was to
21 find vulnerability on the Android ecosystem, and
22 then find a way to make it work remotely.
23    Q   With respect to that second part of
24 making it work remotely, through its internal
25 testing, did NSO develop an understanding of how

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

1 WhatsApp's servers functioned in connection with
2 peer to peer communications?
3      A   As for the terminology functions,
4 I will say that we worked to understand what are
5 the limitations in terms of sending messages from
6 peer to peer.
7      Q   What do you mean by that?  What are
8 the limitations in terms of sending messages peer
9 to peer?
10     A   What are the messages and the
11 content of messages that can be sent from peer to
12 peer.
13     Q   As part of this work did NSO
14 researchers reverse engineer any WhatsApp code?
15     MR. AKROTIRIANAKIS:  Objection, vague.
16     A   Do you want to define what reverse
17 engineering is?
18     Q   What do you understand reverse
19 engineering to mean?
20     A   I would say that using these tools I
21 talked about, IDA and JEB, the research group had
22 the ability to understand how the code functions,
23 some of the parts.
24     Q   Mm hmm.  What do you understand
25 reverse engineering to mean?

Page 147

1      MR. AKROTIRIANAKIS:  Objection, no
2 foundation.
3      A   I would talk about the aim of this
4 activity, and the aim is to learn the mechanisms
5 and the way client functions.
6      Q   And that is something NSO's research
7 group did with respect to WhatsApp client, as part
8 of the development of the Hummingbird vectors?
9      A   Yes.
10     MR. PEREZ-MARQUES:  Why don't we pause
11 here and grab lunch and then we can resume.
12     THE VIDEOGRAPHER:  Going off the record.
13 The time is 13:02.  End of media card number
14 three, volume one, of the video deposition of
15 Tamir Gazneli.
16          (Break for lunch.)
17     This is the beginning of media card
18 number four, volume one, in the video deposition
19 of Tamir Gazneli.  Going on the record.  The time
20 is 13:52.
21     MR. PEREZ-MARQUES:  Mr. Gazneli, do you
22 understand you are still under oath?
23     A   Yes.
24     Q   Before we broke we were talking a
25 bit about the research and development that went

Page 148

1 into the development of the Hummingbird vectors.
2 Do you recall that generally?
3      A   Yes.
4      Q   At one point in that examination you
5 said that there were issues that you couldn't
6 discuss because of your understanding of Israeli
7 legal restrictions.  Is that right?
8      A   I was addressing to specific
9 research techniques.
10     Q   The specific research techniques you
11 understand yourself not to be at liberty to
12 discuss?
13     A   I am not allowed to discuss here.
14     Q   When you say you are not allowed,
15 that is because of Israeli law, as you understand
16 it?
17     A   Yes.
18     Q   Is it a specific Israeli law that
19 you are referring to?
20     A   To the restrictions.  I don't know
21 specifically.
22     Q   The Defense Expert Control Act.
23 Okay.  Not a specific order in this case but the
24 expert control law generally.
25     A   Yes.

Page 149

1      Q   So when you were describing the
2 research that went into the development of the
3 Hummingbird vectors, there is an aspect of the
4 research techniques that you have not included in
5 your testimony.  Right?
6      MR. AKROTIRIANAKIS:  Objection,
7 misstates his testimony.
8      A   Pardon?  I talked about my
9 disability in terms of defining the specific and
10 in-depth techniques of research.
11     Q   And those research techniques that
12 went into the development of the Hummingbird
13 vectors, you are not at liberty to discuss?
14     A   Yes, I am not allowed to discuss.
15     Q   You also testified early in the day
16 about having reviewed some code as part of your
17 preparation to testify here today?
18     A   Yes.
19     Q   And I believe you said it was
20 fingerprinting or related to fingerprinting?
21     A   Yes.
22     Q   Was that in connection with a
23 particular Hummingbird vector?
24     A   No.  I said that it was around the
25 timeframe, the relevant timeframe.

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1    Q   But was it fingerprinting code that
2 was used in connection with either Heaven, Eden
3 ERISED or all of them?
4    A   Yes, it was -- if I remember right,
5 for Eden.
6    Q   And and why did you look at the
7 source code for the fingerprinting?
8    A   To recall, to get a recollection of
9 how it worked.
10    Q   And so to understand how it worked
11 you went to the source code?
12    A   Yes.
13    Q   And fair to say that to understand a
14 piece of software, the code itself is the best
15 source for to understand how it works?
16    A   As for the code that was developed
17 by us, yes.
18    Q   It is the best source to understand
19 how the software works?
20    MR. AKROTIRIANAKIS:  Objection, vague.
21    A   As I said before, if this is a code
22 that you wrote, this is the best way.
23    Q   Did you write that fingerprinting
24 code?
25    A   No.

Page 151

1    Q   But you still considered it a useful
2 source to consult to understand how that software
3 worked?
4    A   As I said, our research group wrote
5 this code.  Therefore I am familiar with the code.
6 As so, this is the best way to understand the
7 code.
8    Q   And fair to say you didn't commit
9 that code to memory.  Right?
10    A   What do you mean?
11    Q   You have not memorized the source
12 code, right?
13    A   Of course not.
14    Q   Of course not.  Did you consult any
15 other pieces of source code associated with the
16 Hummingbird vectors as parts of your preparation
17 to testify here today?
18    I want to make sure they get your
19 answer.
20    A   No.
21    Q   And you have not committed to memory
22 any other aspect of the source code for the
23 Hummingbird vectors.  Is that right?
24    A   No.
25    Q   Do you recall the names of the files

Page 152

1 that comprise the Hummingbird vectors source code?
2    A   Not all of them.
3    Q   Or the function of all the files
4 that comprise the Hummingbird vector source code?
5    A   Functions, for sure, no.
6    Q   Or the specific commands that that
7 source code gave to the target device?
8    A   It is a very general question.  To
9 which part, to which state of the device or state
10 of installation flow.
11    Q   Do you recall any of the commands
12 that any of the Hummingbird vectors gave to the
13 target device in their operation?
14    A   The installation flow consists of
15 several messages and content of messages.  So I
16 can't see a way to recall every message that was
17 sent and its content.
18    Q   I'm sorry, you said you can't see a
19 way to recall?
20    A   Yes.
21    Q   So we would need to look at the
22 source code to understand that level of detail?
23    A   Yes.
24    Q   Let me show you what we will mark --
25 I think we are up to 2033.

Page 153

1    (Exhibit 2033 marked for identification)
2    This is Exhibit 2033.  This is
3 a multipage document beginning on
4 NSO_WHATSAPP_00008957 through 8962.  It has the
5 title at the top "Heaven OpSec."  Do you recognize
6 Exhibit 2033?
7    A   Yes.
8    Q   What is it?
9    A   It is an OpSec document for Heaven
10 vector.
11    Q   What does that mean, an OpSec
12 document?
13    A   It is OpSec team's analysis results
14 and suggestions how will be the best in terms of
15 this vector to be developed and used.
16    Q   And concealed, right?
17    A   Yes.
18    MR. AKROTIRIANAKIS:  Objection,
19 misstates the document.
20    Q   Again I don't think the reporter got
21 your answer.  You said "yes", right?
22    A   Yes.
23    Q   And so was this a document that was
24 prepared by the operational security team within
25 R&D?

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1    A  Yes.
2    Q  Did you have any role in preparing
3 this document?
4    A  No.
5    Q  Do you know approximately when it
6 was prepared?
7    A  Not the exact date but if I remember
8 right it was around the beginning of 2018.
9    Q  The first section there says "Assets
10 we want to protect".  Do you see that?
11    A  Yes.
12    Q  And "protect" means protect from
13 discovery by third parties?
14    MR. AKROTIRIANAKIS:  Object to the form.
15    A  Protect from being discovered at
16 all.
17    Q  The first one listed there says:
18 "Resources of value we want to protect."
19    The first one is:
20    "Exploits and techniques that are being
21 used as part of the installation vector.  The most
22 important asset we want to protect, the WhatsApp
23 exploit."
24    Do you see that?
25    A  Yes.

Page 155

1    Q  And that refers to the 0 click
2 WhatsApp exploit that was known at this time as
3 Heaven?
4    MR. AKROTIRIANAKIS:  Objection.  The
5 question is vague.
6    A  At that particular time that was the
7 exploit.
8    Q  Why was the Heaven exploit the most
9 important asset that this team wanted to protect?
10    MR. AKROTIRIANAKIS:  Objection,
11 misstates the document.
12    A  Again, this is the OpSec team's
13 assessment of the specific capability, and he was
14 directed to assess the Heaven capability, and as
15 part of all the resources which are listed here,
16 and we can go over each and every one of them,
17 protecting the exploit is the most important in
18 this list.
19    Q  More important even than the
20 clients' identities?
21    A  Yes --
22    Q  More important than target
23 awareness?
24    A  In order to be able to handle the
25 risks in terms of client's identity, so target

Page 156

1 awareness, you wanted to start having the ability,
2 the vulnerability, so yes.
3    Q  Below that there is a section titled
4 "Solution Highlights", and the first thing under
5 that says with some asterisks "New silent
6 fingerprint".  What does that refer to?
7    MR. AKROTIRIANAKIS:  Objection,
8 foundation.
9    A  I need to review it.
10    Q  Please.
11    A  So this is the description of new
12 silent fingerprint that was suggested at that
13 time.
14    Q  And what was the new silent
15 fingerprint?  What does that refer to?
16    A  To a way of implementing the
17 fingerprint.  The "new" comes in terms of new way
18 to implement it.
19    Q  And what was new about it?
20    A  Different number of messages,
21 different type of activities in terms of client
22 endpoint and target, yes.
23    Q  Before we continue with that
24 section, in the resources of value we want to
25 protect, number 5 says "Live systems (IS\PS\WIS)."

Page 157

1    A  Yes.
2    Q  What is IS?
3    A  Installation server.
4    Q  Installation server.  And what is
5 PS?
6    A  Pegasus server.
7    Q  What is WIS?
8    A  This is the acronym of WhatsApp
9 installation server, but it means an Android
10 server which is responsible for installing the end
11 solution.
12    Q  And installing it by transmitting a
13 message through WhatsApp?
14    MR. AKROTIRIANAKIS:  Objection,
15 misstates testimony.
16    A  Installing it by sending the
17 required messages to the target's WhatsApp client.
18    Q  And you understand that those
19 WhatsApp messages travel through WhatsApp's
20 ecosystem?
21    A  Any message in the WhatsApp
22 ecosystem travels through WhatsApp's ecosystem.
23    Q  Including the ones that were being
24 sent as part of the Hummingbird installation
25 vectors, right?

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1    A  Yes.
2    Q  Under "New silent fingerprint", it
3  says:
4        "In order to get target's device, OS
5  details plus WA client version, we need to send a
6  fingerprint request."
7        Do you see that?
8    A  Yes.
9    Q  And OS is operating system, right.
10    A  Yes.
11    Q  And WA client version, that is what
12  version of WhatsApp the target is running?
13    A  Yes.
14    Q  It says:
15        "Fingerprint is done by sending a forged
16  request from a client that mimics a server
17  response to the target WA client."
18        What does that mean?
19        MR. AKROTIRIANAKIS:  Objection.  No
20  foundation.
21    A  As I read it, it means send specific
22  message from one client to the target client.
23    Q  What does it mean that it is a
24  forged request?
25        MR. AKROTIRIANAKIS:  Objection, no

Page 159

1  foundation.
2    A  Again, as I read it --
3    Q  Before you continue, you are
4  designated as the corporate representative on the
5  full functionality of Pegasus during this time
6  period.  Yes?
7    A  Yes.
8    Q  And you are prepared to bring to
9  bear NSO and Q Cyber's full corporate knowledge on
10  that topic?
11    A  Yes.
12    Q  Okay.  So what does "forged request"
13  mean?
14        MR. AKROTIRIANAKIS:  Objection, no
15  foundation.  You also misstated the witness'
16  obligation and the company's obligation under rule
17  30(b)(6).  If you understand the question you can
18  answer it.  You can go ahead.
19    A  It says that it mimics servers
20  response to the client's target.
21    Q  What does it mean -- sorry, were you
22  finished?
23    A  Yes.
24    Q  What does it mean that it mimics the
25  server response?

Page 160

1    A  This is a response that the server
2  generates, and it mimics that message towards the
3  client, the target's client.
4    Q  So it sends a message that appears
5  to be a server response?
6    A  Yes.
7    Q  But is not an actual server
8  response?
9    A  It could be a server response but it
10  was generated by the source client.
11    Q  And the source client is a client
12  that NSO developed, right?
13    A  Yes.
14    Q  Did that source client have a name
15  by which you referred to it?
16    A  This is implemented inside the WIS
17  server.
18    Q  So within the WIS server there is a
19  source client created by NSO.  Is that right?
20        MR. AKROTIRIANAKIS:  Objection,
21  misstates his testimony.
22    A  It includes the required
23  functionalities that are relevant and required for
24  this purpose of this vector.  Not an entire
25  client.

Page 161

1    Q  Got it.  So it doesn't necessarily
2  have everything that a real WhatsApp client would
3  have, correct?
4        MR. AKROTIRIANAKIS:  Objection.
5    Q  But it has sufficient aspects --
6        MR. AKROTIRIANAKIS:  Objection.  The
7  question is vague.
8    Q  But it has the aspects of the
9  WhatsApp client that are necessary to carry out
10  the installation vector?
11        MR. AKROTIRIANAKIS:  Object to the form
12  of the question.
13    A  It has the ability to send messages
14  from that source to the target's client
15  application.
16    Q  And would you refer to that source
17  client as the WIS or would you have another way to
18  refer to it?
19    A  WIS.
20    Q  Got it.  Okay.  To be clear, the WIS
21  is not an actual WhatsApp client, correct?
22    A  This is not an actual WhatsApp
23  client.  It uses part of the protocol capabilities
24  to be sent from one source to the target.
25    Q  So NSO created its own source client

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

1  in WIS that had certain of those same
2  capabilities?
3      A  Yes.
4      Q  And the forged request that is
5  referred to there, that is the same thing as the
6  mimicked server response, or are those two
7  different things?
8      A  This is the same one.
9      Q  So it is a message sent by WIS that
10 appears to be legitimate WhatsApp traffic but is
11 not, right?
12     MR. AKROTIRIANAKIS:  Objection,
13 misstates the document.
14     A  This is legitimate by the target
15 that received it and by the ecosystem that
16 transferred the message from peer to peer.
17     Q  But it is not an actual response
18 from the WhatsApp server, right?
19     A  It could be.
20     Q  Right.  It appears to be, right?
21     A  No, it could be.
22     MR. AKROTIRIANAKIS:  Objection.
23     Q  So then I am going to have to go
24 back because you lost me.  When it says it is a
25 forged request that mimics a server response, you

Page 163

1  are saying that could be a legitimate WhatsApp
2  server response, so it is not forged or mimicked.
3  It actually could just be a WhatsApp server
4  response?
5      A  It is mimicked and forged in terms
6  of maybe sequence, maybe timing, maybe content,
7  but it for sure can be a valid response from the
8  server.
9      Q  Right, except that it doesn't
10 originate from the WhatsApp server.  It originates
11 from WIS?
12     A  You stated before that everything is
13 transferred -- transformed throughout the WhatsApp
14 servers, so it practically originated from -- got
15 sent through and landed on the WhatsApp client, on
16 the target's device.
17     Q  Right, originating from WIS?
18     A  Yes, and transferring to WhatsApp
19 ecosystem.
20     Q  But it is not a request that the
21 WhatsApp client, the standard WhatsApp client
22 would have the ability to send?
23     MR. AKROTIRIANAKIS:  Object to the form
24 of the question.
25     A  We will have to discuss what is --

Page 164

1  who is using and what are the capabilities of
2  WhatsApp client.
3      Q  But I couldn't open up my WhatsApp
4  and send this forged request right now, could I?
5      A  No.
6      Q  So it is something that NSO, through
7  its R&D function, developed the capability to
8  transmit.
9      A  Yes.
10     Q  How did NSO obtain the information
11 necessary to mimic a WhatsApp server response?
12     A  So we get back to what you just
13 discussed before, in terms of having company owned
14 devices which can be routed by procedures that
15 anyone can access in the web, and having this type
16 of router devices you can get access to anything
17 that is transmitted from and to the smartphone.
18     Q  The last bullet in that same section
19 says:
20     "The messages are non-standard messages
21 that are sent by our unique WhatsApp client."
22     Do you see that?
23     A  Yes.
24     Q  In what respect are these messages
25 non-standard?

Page 165

1      A  As I said in the sequence, timing
2  content.
3      Q  All of the above?  Sequence, content
4  and timing?
5      A  It depends on the message, specific
6  message.
7      Q  Meaning that on some occasions that
8  Heaven is used it might be non-standard, in terms
9  of sequence, in other times it might be
10 non-standard in terms of content?
11     MR. AKROTIRIANAKIS:  Objection,
12 misstates the document.
13     A  Again, this line refers to the
14 specific new fingerprint that was described here
15 and addresses the messages that are sent using
16 this new fingerprint.  I cannot and don't have any
17 way to understand what that specific team that
18 analysed and described this or did the document
19 referred to the message.
20     Q  You don't know, having prepared for
21 this or based on your personal knowledge either in
22 what respect those messages were non-standard?
23     A  No.
24     Q  You don't dispute that the messages
25 sent as part of new silent fingerprint were

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1    A   Okay.  Yes, in this step, yes.
2    Q   In this context.  The second payload
3 you mentioned, so the one that came before
4 download of the agent, that enables the privilege
5 escalation, does that payload have a name?
6    A   It is referred as PE, which is
7 acronym of privilege escalation.
8    Q   Got it.  Where does the agent
9 payload come from to be downloaded on to the
10 device?
11    A   From servers which are under
12 customer's custody, the ecosystem of
13 infrastructure that is deployed.
14    Q   Those are part of the anonymized
15 servers established by NSO as part of the
16 anonymizing transmission network for a customer?
17    A   Yes.
18    Q   If we go back to Exhibit 2033, there
19 is a few bullets under "Attack".  Do you see that?
20    A   This is as I said his termination --
21 terminology, and how he calls this space.
22    Q   I am just asking if you see it.
23    A   I see it.
24    Q   Am I right in understanding, based
25 on what you have just described, that the bullets

Page 183

1 that follow "attack" here are what you call phase
2 one, gaining remote access?
3    A   Yes.
4    Q   And so it says:
5    "In order to attack we initiate a
6 WhatsApp voice call with target."
7    Do you see that?
8    A   Yes.
9    Q   And that is the first step of what
10 you call phase one?
11    A   Yes.
12    Q   And that WhatsApp voice call is
13 initiated from NSO's WIS.  Is that right?
14    MR. AKROTIRIANAKIS:  Objection,
15 misstates his testimony.
16    A   NSO's WIS code is able to send
17 messages that initiates the WhatsApp voice call,
18 on the endpoint WhatsApp target, WhatsApp client.
19    Q   It continues:
20    "As part of the call, initiation
21 handshake between our WIS client and target's
22 WhatsApp client."
23    Let me pause there.  What does that
24 refer to, "Initiation handshake between our WIS
25 client and target's WhatsApp client"?

Page 184

1    A   As I said, this is part of protocol
2 messages which are required to initiate the
3 WhatsApp call.  It is not a single message.  It is
4 back and forth messages which are handshaked
5 between the source and the target.
6    Q   And that occurs through the WhatsApp
7 servers?
8    A   As we said before, every
9 transmission between two peers have to be
10 transmitted through WhatsApp servers.
11    Q   Including this transmission that we
12 are talking about here?
13    A   Including this, yes.
14    Q   Except a normal peer to peer
15 communication through WhatsApp would be with one
16 WhatsApp client and another, correct?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.  Vague.
19    A   Would you call bot originating a
20 call normal activity?
21    Q   No.
22    A   Okay.
23    Q   A standard, regular WhatsApp call
24 would be from one WhatsApp client to another.
25 Right?

Page 185

1    MR. AKROTIRIANAKIS:  No foundation.
2    A   As I said before, we were initiating
3 a call, a WhatsApp call, between two peers.
4 Whether it is normal or not, it is like -- I don't
5 have any way to answer this question.
6    Q   My question was different.  I asked
7 you in a normal WhatsApp voice call, one WhatsApp
8 user calls another WhatsApp user, that would be a
9 WhatsApp client on both sides.  Right?
10    A   Yes.
11    Q   And so what NSO is doing as part of
12 the Heaven and Eden exploits was different than
13 that.  Right?
14    MR. AKROTIRIANAKIS:  Objection,
15 misstates testimony.
16    Q   Because on one side of the call
17 wasn't a WhatsApp client, right?
18    A   There was code which was able to
19 send messages using WhatsApp client on one side
20 source to the second endpoint which is target's
21 WhatsApp client.
22    Q   Right, but as we have talked about
23 at length already, on the source side it is not a
24 WhatsApp client, right?  It is the WIS which NSO
25 created, correct?

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1      A  I would clarify.
2      Q  Can I just get a yes or no to that
3 so we are all on the same page?
4      A  The answer is no.
5      MR. AKROTIRIANAKIS:  He is going to
6 answer the question --
7      Q  Go ahead then.
8      A  Go ahead with the question.  The
9 question was --
10     Q  You were going to answer.  On the
11 source side, it is not a WhatsApp client, it is
12 the WIS which NSO created.  Isn't that correct?
13     A  The messages are built and sent from
14 the WIS client.  These messages have to be sent
15 from an application.  Client is notified, which he
16 uses to connect to the application and sends the
17 messages through a real and active client.
18     Q  Through an active WhatsApp account?
19     A  Yes.
20     Q  And whose account would that be?
21     A  Accounts were established for the
22 customer.
23     Q  So the message is generated by the
24 WIS?
25     A  Yes.

Page 187

1      Q  But it is put into the WhatsApp
2 servers by an actual WhatsApp client?
3      A  WIS has a connection to a client
4 which is activated through the normal procedures
5 of client activation.
6      Q  Meanings it uses like an
7 authentication token from an actual account?
8      MR. AKROTIRIANAKIS:  Had you completed
9 your answer before he --
10     A  No.
11     Q  Go ahead.
12     A  WIS crafts messages which are
13 required to initiate the call and test
14 connectivity with the client which was activated
15 for each and every customer.  It was connected to
16 the WhatsApp system as a normal client because it
17 is a normal client, and sent, and the message is
18 sent by normal client from one peer to a normal
19 client that target's device.
20     Q  And so in addition to the WIS there
21 is a stand-alone client, genuine WhatsApp client
22 on the source side of this transmission?
23     A  Yes.
24     Q  And so the message is created by the
25 WIS but transmitted through that WhatsApp client?

Page 188

1      A  Yes.
2      Q  And when you said it has
3 connectivity, the WIS has connectivity to a
4 genuine WhatsApp client, what did you mean by
5 that?
6      A  I mean that it has to be -- it has
7 to have a way to connect the target and send the
8 message to the target.
9      Q  So the WIS is able to send the
10 message it created through that WhatsApp client?
11     A  Yes.
12     Q  Got it.  And that WhatsApp client on
13 the initiating side would be one that -- an
14 account that NSO created?
15     A  As part of deployment, each customer
16 has his own set of WhatsApp clients that were used
17 for this operation.
18     Q  Created by NSO, right?
19     A  Yes.
20     Q  Through the White Services team?
21     A  Yes.
22     Q  And those would be anonymized as
23 well?
24     A  Yes, as part of the operation
25 requirements for the customer to be anonymized.

Page 189

1      Q  Going back to that second bullet, it
2 says:
3      "As part of the call, initiation
4 handshake between our WIS client and target's
5 WhatsApp."
6      First of all, do you agree that as part
7 of the call there is an initiation handshake
8 between NSO's WIS client and the target WhatsApp
9 client?
10     A  Again the question?
11     Q  Do you agree that as part of the
12 call -- that as part of the call -- it says here
13 as part of the call that there is an initiation
14 handshake between the WIS client and the target
15 client?
16     A  For operations done by customer
17 deployment was done on customer's infrastructure
18 before initiation is between the code that is
19 deployed on customer side with targets he chooses
20 to install.
21     Q  Not my question.  But there is a
22 handshake between the WIS and the target client?
23     A  There is a connection between WIS
24 and WhatsApp client on the target's device.
25     Q  It says:

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 190

1        "As part of the call we add to a
2   specific field (property) of the messages request
3   payload that is named relay servers and usually
4   contains five constant IP addresses of relay
5   servers."
6        What does that mean?
7        A   As part of the initiation of the
8   WhatsApp voice call, the data that is transmitted
9   during the voice call is transmitted to relay
10  servers which are designed to transmit data from
11  peer to peer.  What it states, that we had the
12  ability to add specific field to the property and
13  to the payload request sent, which is named relay
14  servers, which usually contains five constant IPs
15  and an additional one.
16       Q   And so the message, as sent from
17  WIS, would be different than what would have been
18  sent from the WhatsApp client?
19       A   No, this is not the case.
20       Q   So what does it mean when it says
21  "It usually contains five and we add an additional
22  relay server"?
23       A   The relay server at least is
24  received from the server side, the target, target
25  WhatsApp client.  We had the ability to add

Page 191

1   additional one to that list.
2        Q   Right.  So you would add it to the
3   message that went to the target client?
4        A   We had the ability to add that one
5   additional relay server IP to the target.  As it
6   was sent, the target was applied.
7        Q   In a normal WhatsApp communication,
8   there would only be the five relay servers.
9   Right?
10       A   Yes.
11       Q   That is what it means by "usually
12  has five relay servers", right?
13       A   Yes.
14       Q   And it continues:
15       "When a standard WhatsApp client
16  initiates a voice call, it goes out with 5 IP
17  addresses."
18       And that is what you were referring to,
19  right?
20       A   Yes.
21       Q   So the message as sent from WIS was
22  different than what is called here as a
23  standard -- what would come from a standard
24  WhatsApp client, right?
25       A   A standard WhatsApp client would --

Page 192

1   as it states here, five IP addresses.
2        Q   And the message sent from WIS would
3   have six?
4        A   The message sent from WIS enforces
5   to add additional one.
6        Q   Sorry, enforces?
7        A   Yes, enforces to add to that list
8   additional one relay server --
9        Q   Right, so the message sent by WIS is
10  different.  It has six relay servers instead of
11  five, right?
12       A   Yes.
13       Q   What do you mean when you say it
14  enforces to add to this list one additional relay
15  server?
16       MR. AKROTIRIANAKIS:  Objection,
17  misstates his testimony.
18       Q   Is that what you said?  I was not
19  sure I heard you correctly.  Is the word
20  "enforces"?
21       A   I used the word enforces.  What I
22  was talking about is -- it is read from the
23  written text, the usual at least contains five,
24  and then it says we had the ability to add one
25  additional relay servers list, which is forcing or

Page 193

1   adding an additional one.
2        Q   Okay.  It continues:
3        "WhatsApp servers override the first
4   five servers with their own relay servers."
5        Do you see that?
6        A   Yes.
7        Q   What does that mean?
8        A   That no matter what is sent from the
9   client, WhatsApp servers are all writing the
10  five -- first five relay server addresses.
11       Q   And then it says:
12       "We assign an RTT equals zero value with
13  these servers, leading the target's WhatsApp
14  client to choose our 'relay server' instead of a
15  real one, which serves target client with payloads
16  containing exploitation flow that enable initial
17  code execution."
18       Do you see that?
19       A   Yes.
20       Q   What does it mean when it says "we
21  assign an RTT equals zero value with these
22  servers"?
23       A   As we said before, normally what is
24  sent from the WhatsApp source, WhatsApp client,
25  the WhatsApp servers are overwriting the list of

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1 five first relay server addresses with their list
2 of addresses, and we had a way to direct the
3 target's WhatsApp client code not to use these
4 five -- first five relay server addresses, but use
5 the additional one that we managed to add.
6     Q   What is RTT?
7     A   I think it is referring to round
8 trip time.
9     Q   Round trip time.  So was that
10 causing some aspect of this system to believe that
11 the first five servers are not going to be able to
12 transmit a message efficiently?
13     A   Yes.
14     Q   And that is -- I am going to say
15 who, which is obviously not the right word because
16 it is not a person, but who in this chain is
17 selecting the sixth server instead of the first
18 five?
19     A   The target WhatsApp line.
20     Q   The target WhatsApp client?
21     A   Yes.
22     Q   So when it chooses the sixth, the
23 server that is selected is actually not a relay
24 server, right?
25     A   Not WhatsApp's relay server.

Page 195

1     Q   Is it an actual relay server?  I
2 mean is it a relay server?
3     A   It is a server.  Relay server is
4 just a fancy name for a server.
5     Q   And is it the server that contains
6 the PE payload?
7     A   No.
8     Q   So what server is it that this step
9 we just discussed points to?
10     A   This is the server that serves as a
11 relay server that transmits data from peer, source
12 peer to the destination peer, and will transmit
13 the voice call data.
14     Q   So then through that server is WIS
15 transmitting additional data or code to the target
16 WhatsApp client?
17     MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19     Q   Let me ask it this way.  What is
20 transmitted via that sixth relay server?
21     A   Additional messages.
22     Q   From where?
23     A   Generated, as we said, from the WIS
24 server through the source WhatsApp client it is
25 connected to to transmit the messages to the

Page 196

1 target WhatsApp client.
2     Q   Okay.  When it says "It leads the
3 target's WhatsApp client to choose our 'relay'
4 server instead of a real one", that means instead
5 of an actual WhatsApp relay server?
6     A   Yes.
7     Q   It says:
8     "... which serves target's client with
9 payloads containing exploitation flow that enable
10 initial code execution (stager)."
11     What does that refer to, the payloads
12 containing exploitation flow that enable initial
13 code enable execution?
14     A   As we talked before, additional
15 messages are sent to -- have to be sent from the
16 source to the destination.  It is not a matter of
17 single message.  As part of these messages, there
18 is additional code, part of the code which is
19 called -- addressed as "stager", which is
20 downloaded using this server, and that part of
21 code will be responsible for downloading the next
22 phase.
23     Q   Which is the PE?
24     A   Privilege escalation.
25     Q   Got it.  And then it says:

Page 197

1     "After initial code execution,
2 pre-exploit is pulled with a raw TCP socket."
3     What does that mean?
4     A   Pre-exploit practically can be
5 addressed as an initial part of the PE, which is a
6 privilege escalation code, which its
7 responsibilities are to detect and send back
8 additional fingerprinting or advanced
9 fingerprinting on the device itself which is
10 required to determine which privilege escalation
11 code to send to the target.
12     Q   Who would own the relay server, the
13 sixth relay server.
14     A   This is any part of the
15 infrastructure deployed to the customer's
16 ecosystem, which the customer has its own
17 ecosystem.
18     Q   Right, but it wouldn't be in the
19 name of the customer, right?
20     MR. AKROTIRIANAKIS:  Objection,
21 foundation.
22     A   It depends on the procurement
23 procedures that each customer defines for himself.
24     Q   Are there instances you are aware of
25 in which the relay server used in the attack would

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1    Q   And what purpose does that serve in
2 the installation flow?
3        MR. AKROTIRIANAKIS:  Objection, assumes
4 facts not in evidence.  Misstates his testimony.
5 No foundation.
6    A   So I don't recall for which specific
7 step it was used.
8    Q   Is that something we would be able
9 to see from the source code?
10   A   I think so.
11   Q   And the non-standard encryption that
12 is referred to, again that is a message that is
13 different than what would be sent from a regular
14 WhatsApp client?
15   A   Again, it really depends on the
16 changes described here.  It can be even the fact
17 that you enable using encryption in the WhatsApp
18 client currently is not supporting the encryption
19 also may be relevant for this case.
20   Q   Would I have --
21   A   It is difficult to understand from
22 this context whether it refers to encryption that
23 is the encryption itself is not standard or the
24 usage of encryption was not standard.
25   Q   Okay.  You are also prepared to

Page 203

1 testify as to the full functionality of Pegasus,
2 right?
3    A   Yes, as I said before, I don't
4 recall the specific part which was used.
5    Q   So we would need the source code for
6 that?
7    A   Yes.
8    Q   If I wanted to send a message from
9 my WhatsApp that is encrypted in a non-standard
10 way, can I do that?
11       MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13   A   No.
14   Q   No, right.  So that is something
15 that was done by WIS?
16   A   Yes.
17   Q   The next section down under "WIS
18 client activity", it says:
19       "Our WIS client does not exactly behave
20 a legitimate subscriber of WhatsApp."
21       Do you see that?
22   A   Yes.
23   Q   And that is an accurate statement,
24 right, that the WIS does not behave exactly like a
25 legitimate subscriber of WhatsApp?

Page 204

1    A   I would like to continue the
2 sentence, and says that it only sends very
3 specific messages, call messages and text
4 messages, and it refers to the fact that it
5 doesn't send all the other messages which are sent
6 by normal WhatsApp client.
7    Q   But those are not the only ways in
8 which WIS does not behave exactly like a
9 legitimate WhatsApp client, is it?
10       MR. AKROTIRIANAKIS:  Objection,
11 misstates his testimony.
12   A   We are currently referring to the
13 sentence.
14   Q   But that is not the only way WIS is
15 different from a legitimate subscriber of
16 WhatsApp, right?
17       MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19   A   As we said now, WIS server enables
20 you to send crafted messages with crafted content
21 which is required to enable the remote execution
22 ability on the target's phone or WhatsApp client.
23   Q   I doubt she got a word of that.  Why
24 don't you say it again, see if we can get that
25 down before we go to the next question.

Page 205

1    A   I was saying that --
2    Q   Let me repeat the question in case
3 it helps her or you.  I am not sure it is relevant
4 to your answer but let me ask it.  That feature
5 here, that it only sends specific messages, that
6 is not the only way the WIS is different from a
7 legitimate subscriber of WhatsApp, is it?
8        MR. AKROTIRIANAKIS:  Same objections.
9    A   So my answer was WIS server
10 implements and enables to craft end messages and
11 content that is required for the installation
12 phase or gaining remote code execution on the
13 target's WhatsApp client.
14   Q   And those messages are different
15 than the messages that would be sent by a regular
16 WhatsApp subscriber, right?
17   A   If by "regular" you mean one that
18 holds device in hand, the answer is yes.
19   Q   It adds a sixth relay server, yes?
20   A   Yes.
21   Q   It encrypts the message in a
22 non-standard way, right?
23   A   Yes.
24   Q   Are there other ways in which the
25 messages sent by WIS are different from what would

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 206

1 be sent by a legitimate WhatsApp subscriber?
2     A   There are additional messages were
3 sent.  I can't recall whether each and every one
4 is legitimate or not.
5     Q   You don't remember one way or the
6 other?
7     A   As you said there are messages which
8 differ in content and in sequence from the
9 legitimate usage, but I cannot say that the
10 illegitimacy is relevant for each and every
11 message which is sent.
12     Q   The next section down there is sort
13 of a header there that says "Threat Actors
14 Involved".  Do you see that?
15     A   Yes.
16     Q   And that refers to parties that
17 might compromise the secrecy of the WhatsApp
18 installation vector?
19     A   I would have to read it.
20     Q   Go for it.  Go ahead.
21     A   Okay.
22     Q   So "threat actors" there refers to
23 parties that might compromise the operational
24 security of the installation vector.  Is that
25 right?

Page 207

1     A   As titled maybe, but I don't think
2 the content is relevant for this headline.
3     Q   So maybe it refers to -- what do you
4 understand "threat actors" to mean, as NSO and Q's
5 corporate representative?
6     A   Threat actors is as you said, but I
7 said that the content of the paragraph doesn't
8 necessarily address the "threat actors" as the
9 headline states.
10     Q   But we agree that threat actors
11 means parties that might compromise operational
12 security?
13     A   Yes.
14     Q   Meaning parties that might detect
15 and seek to prevent the exploit?
16     A   Yes.
17     Q   And one of those is WhatsApp itself,
18 right?
19     A   Yes.
20     Q   In fact, there are three identified;
21 first WhatsApp, then WhatsApp anti-spamming model
22 and measures and then target.  Right?
23     A   Yes.
24     Q   That is what is identified as threat
25 actors to operational security in this document?

Page 208

1     A   Yes.
2     Q   And you understood during your time
3 working on the Hummingbird vectors that WhatsApp
4 would try to shut down the installation vectors if
5 they were detected.  Right?
6     MR. AKROTIRIANAKIS:  Objection, no
7 foundation.  Incomplete hypothetical.
8     A   WhatsApp would shut down or close
9 any vulnerability it knew about or exists.
10     Q   Including the vulnerabilities that
11 were being exploited for the Hummingbird vectors,
12 right?
13     MR. AKROTIRIANAKIS:  Objection, no
14 foundation.  Incomplete hypothetical.
15     A   If it discovered it, yes.
16     Q   And so that discovery by WhatsApp is
17 something that the OpSec team worked to avoid.  Is
18 that right?
19     A   OpSec team, as I said at the
20 beginning document, are placing new suggestions
21 that from their point of view would like to be
22 implemented.  Whether any suggestion here is
23 implemented or not, it really depends on the
24 capability and whether it can be applied or not.
25     Q   But my question was more general,

Page 209

1 not about specific suggestions, that discovery of
2 the exploits by WhatsApp is something that the
3 OpSec team worked to avoid.  Isn't that right?
4     A   They suggested ways so that the
5 capability would prolong much longer time.
6     Q   How many members did the OpSec team
7 have in 2018/19?
8     A   2018, it was one.
9     Q   What about 2019?
10     A   Less than 10.
11     Q   Why did it increase from one to less
12 than 10?
13     MR. AKROTIRIANAKIS:  Objection, no
14 foundation.
15     A   The OpSec increased because it
16 needed to address, besides this vector, additional
17 vectors for abilities and infrastructure related
18 analyses, monitoring and investigations.
19     MR. AKROTIRIANAKIS:  Counsel, whenever
20 you get to a convenient stopping point in the not
21 too distant future --
22     Q   Sure.  So under the WhatsApp section
23 of actors it says "We know WhatsApp has spam
24 solving measures".  Do you see that?
25     A   Yes.

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

1    Q  And what does that refer to, spam
2  solving measures?
3        MR. AKROTIRIANAKIS:  Objection, no
4  foundation.
5        A  As it states afterward:  "Users can
6  block people from messaging when something fishy
7  is noticed about them."
8        Q  And that is your understanding of
9  spam solving measures?
10        A  As far as I understand it, it talks
11  about the ability WhatsApp added to client to
12  block specific users.
13        Q  The next section here is "WhatsApp
14  - Anti-spamming Model and Measures".  Do you see
15  that section there?  At the very bottom of the
16  page and the text is on the following.  Do you see
17  that?
18        A  Yes.
19        Q  This is a summary of measures that
20  NSO understood WhatsApp took to avoid improper
21  messages being sent?
22        MR. AKROTIRIANAKIS:  Objection,
23  misstates the document.
24        A  As I said before, it states
25  suggestions by the person that wrote the report.

Page 211

1        Q  So when it says "WhatsApp encourages
2  users to report spam", that is a suggestion from
3  the OpSec team?
4        A  It is essentially what WhatsApp are
5  doing.
6        Q  Right, but it is not a suggestion
7  from the OpSec team, is it?
8        A  This specific one sentence, no.
9        Q  It says:
10        "This could be demonstrated by the
11  following ways:
12        Policy.
13        WhatsApp prompts an immediate 'SPAM or
14  block' option when receiving message, added to
15  group by unidentified number."
16        That is not a suggestion from the OpSec
17  team, is it?
18        MR. AKROTIRIANAKIS:  Where are you
19  reading from?
20        MR. PEREZ-MARQUES:  A, also numbered 1,
21  but the second sub-bullet on page 959.  Also not a
22  suggestion from the OpSec team, right?
23        A  Right.
24        Q  The next one, B:
25        "In case number is reported as spam it

Page 212

1  is added to a watchlist."
2        That is not a suggestion from the OpSec
3  team, is it?
4        A  I was referring to the document as a
5  whole.
6        Q  Okay.  But what we have in this
7  section here, these are not suggestions from the
8  OpSec team.  These are observations about
9  WhatsApp's anti-spamming measures, correct?
10        A  Observations, and his understanding
11  of the features.
12        Q  Understanding of WhatsApp's
13  anti-spamming features, right?
14        A  Yes.
15        Q  And the purpose of reciting them
16  here was to formulate a strategy for how those
17  features could be avoided.  Isn't that right?
18        MR. AKROTIRIANAKIS:  Objection, no
19  foundation.  Misstates the document.
20        A  I would say these are his
21  understandings how these mechanisms work in order
22  to be taken under consideration during the
23  installation flow implementation.
24        Q  In order to avoid detection, right?
25        A  This could be understandings that

Page 213

1  may even relate to not avoid measures but to even
2  be able to finish and complete the installation
3  flow successfully.
4        Q  Okay.  Despite WhatsApp's security
5  measures, right?
6        MR. AKROTIRIANAKIS:  Objection,
7  misstates the document and the testimony.  No
8  foundation.
9        MR. PEREZ-MARQUES:  Let's take a step
10  back.
11        The whole purpose -- this is an
12  Operation Security document, right?
13        MR. AKROTIRIANAKIS:  Objection,
14  misstates the testimony.
15        A  This is a draft.
16        Q  Prepared by -- you identified the
17  individual.  A member of the Operation Security
18  team, right?
19        A  Yes.
20        Q  And you said the purpose of this is
21  suggestions for operational security, right.  That
22  was your testimony, right?
23        A  Yes.
24        Q  Right.  And suggestions for
25  operational security means ways to maintain the

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 218

1  themselves on describing such measures.
2       Q   Could be the source, right?
3       A   Could be.
4       Q   Could be but you don't know for
5  sure?
6       A   No.
7       Q   So, in terms of what work the OpSec
8  team to understand WhatsApp's anti-spamming
9  measures, you don't know the details of what work
10 was done?
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates his testimony.
13      A   You asked whether human resources
14 were used --
15      Q   You answered that question.  I am
16 asking whether you know the work that was done by
17 the OpSec team to understand WhatsApp's
18 anti-spamming measures?
19      A   No.
20      Q   The last item under F -- let me read
21 F first.  It says:
22      "WhatsApp maintain predetermined metrics
23 to detect a spammer and ban him from using the
24 service.  Some of the metrics are the following."
25      Do you see what I just read?

Page 219

1       A   Yes.
2       Q   And then item 11 in that list is:
3  "Using third party modified WhatsApp."
4       Do you see that?
5       A   Yes.
6       Q   What does "third party modified
7  WhatsApp" mean?
8       A   Applications which are created by
9  engineers based on WhatsApp's original application
10 and used in the Android Play Store.
11      Q   So that would include applications
12 like the WIS?
13      MR. AKROTIRIANAKIS:  Objection,
14 misstates his testimony.
15      A   No.
16      Q   Would WIS be an example of a third
17 party modified WhatsApp?
18      A   No.
19      Q   How so?  What is the distinction?
20      MR. AKROTIRIANAKIS:  Objection.  No
21 foundation.
22      A   You cannot install WIS server on
23 your Android device.
24      Q   Why not?
25      A   It is not an application.

Page 220

1       Q   What is it?  What would you call it?
2       A   It is a piece of code which resides
3  on the server side of the customer infrastructure
4  that is able to connect to the source WhatsApp
5  client, the original source WhatsApp client to
6  send messages.
7       Q   And when it says "WhatsApp
8  explicitly claim against reversing their app",
9  what do you understand that to mean?
10      A   I understand, according to his
11 understanding, WhatsApp specifically claimed
12 against reversing this app.
13      Q   What does that mean?
14      A   I don't know what he meant by this
15 message.
16      Q   So as NSO and Q's corporate
17 designee, you can't shed any light as to what that
18 means here?
19      MR. AKROTIRIANAKIS:  I don't think he is
20 designated as to that category, counsel.  It is
21 beyond the scope of the designation.
22      MR. PEREZ-MARQUES:  I believe it refers
23 to topic 20, 21 and 22.  Go ahead.
24      MR. AKROTIRIANAKIS:  I don't think you
25 are within those topics.  You can ask the question

Page 221

1  and I will object, as this is how this goes, and
2  say it has no foundation and exceeds the scope of
3  his designation and we will do the whole
4  litigation thing after that.
5       Q   As NSO and Q's corporate
6  representative, you cannot shed any light as to
7  what that reference to reversing their app means
8  here?
9       MR. AKROTIRIANAKIS:  Objection, no
10 foundation.  Beyond the scope of the designation.
11      A   I cannot define specifically what he
12 meant by stating this in this sentence.
13      Q   Can you define generally what he
14 meant by stating that?
15      MR. AKROTIRIANAKIS:  Same objections.
16      Q   Was it your understanding at the
17 time that you were working on the Hummingbird
18 vectors that WhatsApp prohibited reverse
19 engineering the WhatsApp client?
20      MR. AKROTIRIANAKIS:  Objection, no
21 foundation.
22      A   From my understanding, reverse
23 engineering prohibited by WhatsApp is a legal
24 term, which is not under my possibility to define
25 or address.

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1    Q  I am just asking for your
2 understanding.  Did you understand when you were
3 working on the Hummingbird vectors that WhatsApp
4 prohibited reverse engineering the WhatsApp
5 client?
6    A  I didn't read the terms of service.
7    Q  You didn't read the terms of
8 service?
9    A  No.
10    Q  And you made no effort to comply
11 with them?
12    MR. AKROTIRIANAKIS:  Objection.  No
13 foundation.
14    A  Terms of service is a legal
15 document, as far as I understand the word.  I am
16 not familiar with it.
17    Q  You have never read it?
18    A  No.
19    Q  Not familiar with it, right?
20    A  I never read it.
21    Q  Made no effort to comply with it, in
22 the course of developing the Hummingbird vectors.
23 Isn't that right?
24    MR. AKROTIRIANAKIS:  Objection,
25 misstates his testimony.

Page 223

1    A  As I said before, reverse
2 engineering is a legal term.  I don't have the
3 tools to address legal terms.
4    Q  That was not my question.  Is it
5 right that in the course of working on the
6 Hummingbird vectors you made no effort to comply
7 with the WhatsApp terms of service?
8    MR. AKROTIRIANAKIS:  Object to the form
9 of the question.
10    A  No.
11    Q  No it is not correct or no you
12 didn't make such effort?
13    A  It was not under my obligation to do
14 so.
15    Q  It was not part of your role to try
16 to comply with the terms of service?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19    A  I will say it this way.  Due to the
20 fact that we were working on company owned
21 devices, activated WhatsApp client on those
22 devices, I was in charge of developing the
23 installation vectors.
24    Q  And in the course of developing the
25 installation vectors did you make any effort,

Page 224

1 sitting here under oath, did you make an effort to
2 comply with the WhatsApp terms of service?
3    A  No.
4    Q  Sitting here today, do you know one
5 way or the other whether the steps that your team
6 took in developing the Hummingbird vectors
7 violated the terms of service?
8    MR. AKROTIRIANAKIS:  Objection, calls
9 for a legal conclusion.  No foundation.
10    A  As I have said before, I don't have
11 the legal tools to answer the question.
12    Q  And so you have no answer to that
13 question.  You don't know one way or the other?
14    A  No.
15    MR. PEREZ-MARQUES:  Why don't we take a
16 short break.
17    THE VIDEOGRAPHER:  Going off the record.
18 The time is 15:29.  End of media card number four,
19 volume one, of the video deposition of Tamir
20 Gazneli.
21    (A short break.)
22    THE VIDEOGRAPHER:  This is the beginning
23 of media card number five, volume one, in the
24 video deposition of Tamir Gazneli.  Going on the
25 record.  The time is 15:53.

Page 225

1    MR. PEREZ-MARQUES:  Mr. Gazneli, do you
2 understand you are still under oath?
3    A  Yes.
4    Q  I would like to continue with
5 Exhibit 2033.  Before I do, you testified earlier
6 about -- I think what you said are some publically
7 available applications called JEB and IDA?
8    A  I did.
9    Q  And those were used as part of the
10 development of the Hummingbird vectors?
11    A  Yes.
12    Q  And were those JEB and IDA run on
13 the WhatsApp client?
14    A  No, the software runs on Linux or
15 Windows machines.
16    Q  So how were they used?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19    MR. PEREZ-MARQUES:  In connection with
20 the development of the Hummingbird vectors?
21    A  You just load the target's the
22 client's application code inside this software.
23    Q  Which application code?
24    A  The APK files.
25    Q  For what?

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

1      A   For WhatsApp client.
2      Q   So that is what I meant by run.  I
3  realize my wording was ambiguous.  That is what I
4  meant by run on the WhatsApp client, meaning that
5  the WhatsApp client code was run through JEB and
6  IDA as part of the development of the Hummingbird
7  vectors?
8      A   I want to make it clear.  You cannot
9  run, like executing the WhatsApp client code
10 through these applications.  You just load the
11 code inside these applications.
12     Q   What do JEB and IDA do with the
13 code?
14     A   Enable you to visualize closed
15 source code as code which maybe is readable to
16 human eyes as possible.
17     Q   Would you agree with the
18 characterization of JEB and and ITA as decompilers
19 or extractors?
20     A   Decompilers may be close to the
21 definition.
22     Q   I am sorry, it is close to the
23 definition?
24     A   Yes.
25     Q   But not extractor?

Page 227

1      A   Extractor is like, as I understand,
2  more wide, wider word.  What does it extract?
3      Q   So you are not sure what that means?
4      A   No.  I think that decompiling the
5  code is the exact -- the more accurate word.
6      Q   Decompiling, right.  Okay.  Is
7  decompiling code something that you consider
8  reverse engineering?
9      MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11     A   These tools enable you to
12 practically -- I wouldn't say only but tools which
13 enable you to be able to read closed source codes
14 in a basically readable manner.
15     Q   Do you consider that reverse
16 engineering?
17     A   As I said before --
18     MR. AKROTIRIANAKIS:  Object to the form
19 of the question.
20     A   As far as I am understanding reverse
21 engineering is a legal term.  I don't know how to
22 apply it on specific development and research
23 activity.
24     Q   Do you consider that a legal term,
25 not a software engineering term?

Page 228

1      A   It is a legal term.
2      Q   And you don't know what it means?
3      A   It would be estimating.
4      Q   Going back to Exhibit 2033, there is
5  a section at the bottom of page 959 titled "Threat
6  Landscape".  Do you see that?
7      A   Yes.
8      Q   And this identifies aspects of the
9  exploit that could lead to detection risk.  Isn't
10 that right?
11     MR. AKROTIRIANAKIS:  Misstates the
12 document.
13     A   Again the question?
14     Q   This identifies aspects of the
15 exploit that could lead to detection risk.  Isn't
16 that right?
17     A   I will have to read it.
18     Q   Please read it.
19     A   Okay.  So the question is --
20     Q   You should not read from the
21 real-time but I can repeat the question for you,
22 which is that this section, "Threat Landscape",
23 identifies aspects of the exploit that could lead
24 to detection risk.  Is that right?
25     MR. AKROTIRIANAKIS:  Misstates the

Page 229

1  document.
2      A   As far as I understand it, it states
3  or lists the parts in the flow which are most
4  exposed.
5      Q   To the risk of compromising
6  operational security, right?
7      A   Yes.
8      Q   And the first one mentioned there is
9  "non-standard requests sent by the WIS server and
10 and routed through WA servers", and it continues:
11     "Assuming the requests that are sent by
12 the WIS, their flow traffic rate and sources may
13 be inspected by WhatsApp, content may not be
14 inspected due to end to end encryption."
15     Do you see that?
16     A   Yes.
17     Q   And so again you would agree that
18 non-standard requests are sent in connection
19 with -- let me start over.
20     You agree that in connection with the
21 Hummingbird vectors, non-standard requests were
22 sent by the WIS server and routed through WhatsApp
23 servers?
24     MR. AKROTIRIANAKIS:  Objection,
25 misstates testimony.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 230

1    A  I would say that WIS server creates
2 messages, that some of them may be non-standard
3 and routed through (inaudible) servers, and those
4 servers had all the right and ability to decide
5 whether to route them or not.
6    Q  And when you say all the right, are
7 you talking in legal terms?
8    A  No.
9    Q  And it is identifying the risk that
10 the requests might be inspected by WhatsApp,
11 right, as a threat to operational security?
12    A  It is a fact.
13    Q  The second risk identified as the
14 non-standard activity of the WIS client doesn't
15 send standard data to WhatsApp, sends only very
16 specific requests, and that was another aspect of
17 the exploit that risked compromising operational
18 security?
19    MR. AKROTIRIANAKIS:  Objection,
20 compound.  Object to the form of the question.
21    A  This is one of the aspects of the
22 WIS client.  As we said, it only implements
23 specific requests and messages relevant for the
24 installation flow.
25    Q  And the third risk identified is

Page 231

1 that "target's device WhatsApp crash logs sent to
2 WhatsApp servers for analysis".  Do you see that?
3    A  Yes.
4    Q  And what do you understand that to
5 mean?
6    A  If the standard procedure
7 application crashes, it sends the crash logs
8 content files to the application specific servers.
9    Q  And that also created a risk of
10 WhatsApp detecting the exploit?
11    MR. AKROTIRIANAKIS:  Objection,
12 misstates the document.
13    A  If somehow the installation flow may
14 lead to a WhatsApp client crash on the target
15 device, then according to the statement and the
16 standing of how things in this domain work the
17 WhatsApp crash would be uploaded to the servers.
18    Q  Creating a risk of detection, right?
19    A  That depends on the content of the
20 message -- of the crash and the ability of the
21 other side to understand what is in the crash.
22    Q  But potentially creating a risk of
23 detection, creating a risk of potential detection,
24 right?
25    A  Yes.

Page 232

1    Q  To be clear, this was written --
2 this document was written by the individual at NSO
3 who was in charge of operational security with
4 respect to these installation vectors?
5    MR. AKROTIRIANAKIS:  Objection,
6 misstates testimony.
7    A  This was written by -- for in the
8 company, in the OpSec team, and he was in charge
9 of creating an assessment of the vector and all
10 the measures required to be -- for it to be as
11 concealed in terms of the capability and in terms
12 of the customer activity.
13    Q  Right, and I think you said that in
14 2018 the OpSec team was one person, right?
15    A  Yes.
16    Q  And is that the person who wrote
17 this document?
18    A  Yes.
19    Q  Then if you go to the next page,
20 there is a section titled "Countermeasure and
21 mitigations".  Do you see that?
22    A  Yes.
23    Q  And countermeasures refers to NSO's
24 efforts to avoid or mitigate the operational
25 security risks that were just identified, right?

Page 233

1    MR. AKROTIRIANAKIS:  Objection,
2 misstates testimony.
3    A  No.
4    Q  What does countermeasures mean?
5    A  As I said before, there are sections
6 of this report and this might be one of them that
7 includes suggestions on how from his understanding
8 of the ecosystem installation flow should be
9 implemented or which parts need to be taken across
10 the installation.
11    Q  So suggestions for how NSO might
12 avoid or mitigate the operational security risks
13 that we just identified, correct?
14    MR. AKROTIRIANAKIS:  Misstates the
15 document.
16    A  These are suggestions from his
17 understanding what might compromise the
18 installation flow activity --
19    Q  And how to avoid compromise, right?
20    MR. AKROTIRIANAKIS:  Objection.  You
21 have got to let the witness finish his answer,
22 counsel.
23    MR. PEREZ-MARQUES:  Keep going if you
24 were not finished.  You said "these are
25 suggestions from his understanding what might

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1 compromise the installation flow activity", but
2 continue.
3        A   And whether it voids or not is a
4 matter of if they were implemented or if it can be
5 implemented in the code or not.
6        Q   Whether the countermeasures can be
7 implemented?
8        A   Yes.
9        Q   Right, but they were suggestions,
10 subject to whether they could be implemented, of
11 how to avoid compromise of the exploit from an
12 operational security perspective, right?
13       A   I would say no, in a way that in
14 order to avoid security mechanisms, those security
15 mechanisms have to be implemented on the server
16 side, and whether he knows or he does not,
17 practically he is not familiar with the code
18 itself on the WhatsApp server side, and these
19 suggestions are from his understanding and his
20 investigation or reading he done -- he did on how
21 these mitigations or mechanisms are working, so
22 whether avoiding or not is a matter of whether he
23 is told any mechanism needs to be avoided.
24       Q   So they are suggestions for how to
25 avoid security mechanisms such as the author

Page 235

1 understood them?
2        MR. AKROTIRIANAKIS:  Objection,
3 misstates the testimony.
4        Q   That is your point, right?  He may
5 have been wrong in his understanding of the
6 security mechanisms, correct?
7        MR. AKROTIRIANAKIS:  Objection,
8 misstates the testimony.
9        A   The only state he is understanding
10 of the mechanisms first and second there are also
11 parts in here which are not related to mechanisms,
12 security mechanisms at all, but relating to
13 operational security at all.
14       Q   But do relate to operational
15 security or do not relate to operational security?
16       A   Relate to operational security
17 regardless of whether avoiding security mechanisms
18 or not.
19       Q   But you agree that some of these are
20 suggestions for how to avoid WhatsApp's security
21 mechanisms as the author understood those security
22 mechanisms?
23       MR. AKROTIRIANAKIS:  Objection,
24 misstates testimony.
25       A   Some of them, if those specific

Page 236

1 mechanisms were implemented on the server side,
2 may potentially detect unusual activity on the
3 servers.
4        Q   And these are suggestions for how to
5 avoid such detection, right?
6        A   I wouldn't say avoid but minimize
7 the risk.
8        Q   And were certain of these
9 countermeasures implemented?
10       A   I would have to read through.
11       Q   Take a moment.  I know it is two
12 pages of countermeasures here, but go ahead.
13       A   Are you asking about the whole
14 section?
15       Q   Yes, the countermeasures and
16 mitigations starts on page 8960 and continues on
17 to 961.
18       A   For now I can address the
19 fingerprint stage if you want and then I can
20 continue.
21       Q   You can answer just yes or no, were
22 any of the suggested counter measures in the
23 fingerprint section implemented by NSO?
24       A   For any the answer is yes, but in
25 order to answer exactly which and how many, I

Page 237

1 would have to read it all.
2        Q   Fair enough.  So let's drop that.
3 Would you agree, as a general matter, that NSO
4 took steps to minimize the risk of detection by
5 WhatsApp of the Hummingbird vectors?
6        A   Yes.
7        Q   If you look at page 961, under
8 "Deployment OpSec Requirements".  Do you see that?
9        A   Yes.
10       Q   It says:
11       "Each WIS WhatsApp client requires
12 credentials extracted from a phone with a whitened
13 SIM."
14       What does that mean?
15       A   So as I explained before the WIS
16 server works in a way that it communicates with an
17 activated source WhatsApp -- source WhatsApp
18 client, which activated using a normal SIM card.
19 This is addresses that -- in order to WIS work
20 properly and send messages, it is connected to a
21 client which uses credentials that were extracted
22 from the SIM card.
23       Q   Right.  Here it doesn't say
24 "connected to a client"?
25       A   Yes.

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 238

1    Q   It just says "using credentials
2  extracted" from such a client, correct?
3    A   Yes.
4    Q   And is that an accurate statement of
5  how WIS worked?
6    MR. AKROTIRIANAKIS:  Object to the form
7  of the question.
8    A   It is inaccurate description.
9    Q   It is an accurate or inaccurate?
10   A   It is inaccurate, yes.
11   Q   So the WhatsApp work -- the WIS did
12 not require credentials extracted from a phone
13 with a whitened SIM?
14   A   WIS required but it required
15 connecting to the source WhatsApp client as I
16 said.
17   Q   And is it right that the Heaven
18 installation vector would use a different
19 credential for the fingerprint stage and the
20 attack stage?
21   A   Yes.
22   Q   And that was for operational
23 security purposes?
24   A   Yes.
25   Q   And was that also true with respect

Page 239

1  to Eden?
2    A   Yes.
3    Q   And ERISED?
4    A   Yes.
5    Q   We are looking at that -- why don't
6  we take a look at this quickly.
7    (Exhibit 2034 marked for identification.)
8    This is 2034, and it is another
9  Confluence document labeled "Abuse Prevention" on
10 the Bates starting NSO_WHATSAPP ending 8916.  Do
11 you see that?  I am not going to ask you any
12 questions about the parts that you don't want me
13 to ask you questions about.
14   MR. AKROTIRIANAKIS:  I'm just going to
15 point out for the record that 2033 and 2034, the
16 document just presented to the witness have been
17 clawed back and replaced with an overlay.  So I am
18 going to ask you again to follow the protective
19 order in respect of the documents that you put --
20   MR. PEREZ-MARQUES:  Do you have the
21 overlay version I can put to the witness?
22   MR. AKROTIRIANAKIS:  I can ask for it to
23 be sent but it has been provided days ago to your
24 team.
25   MR. PEREZ-MARQUES:  Okay.

Page 240

1    MR. AKROTIRIANAKIS:  So here's my
2  request.  In what the court reporter attaches to
3  the transcript you should not be using documents
4  that have been clawed back.  That would be a
5  violation of the protective order.  So if we can
6  get a different version of this that is from the
7  overlay and mark it and stipulate that that will
8  be the version of Exhibit 2033 and 2034 that is
9  attached to the transcript, then fine, and with
10 respect to these versions your obligations are
11 described in the protective order.
12   MR. PEREZ-MARQUES:  Let's discuss that
13 when we are off the record.
14   MR. AKROTIRIANAKIS:  We just discussed
15 it.  There is no further discussion.
16   MR. PEREZ-MARQUES:  Let's go off the
17 record then.
18   MR. AKROTIRIANAKIS:  I don't need to go
19 off the record.
20   MR. PEREZ-MARQUES:  I would like to go
21 off the record.
22   MR. AKROTIRIANAKIS:  Okay.  If you want
23 to go off the record go ahead.  You have my
24 permission.
25   MR. PEREZ-MARQUES:  Thank you. I don't

Page 241

1  need your permission.
2    MR. AKROTIRIANAKIS:  You do actually.
3  Both counsel have to agree to go off the record,
4  but you have my permission, Tony, so we don't need
5  to fight about it.
6    MR. PEREZ-MARQUES:  Excellent. Let's go
7  off the record.
8    THE VIDEOGRAPHER:  Going off the record.
9  The time is 16:15.
10   (A short break.)
11   THE VIDEOGRAPHER:  Back on the record.
12 The time is 16:16.
13   MR. PEREZ-MARQUES:  We had a discussion
14 off the record about how to deal with these
15 clawback documents which I believe we are agreed
16 on and so we will implement that at the end of
17 today's session.  Exhibit 2034 that I showed you,
18 Mr. Gazneli, is titled "Abuse Prevention".  Do you
19 see that.
20   A   Yes.
21   Q   But if you look at the content of
22 this document, it refers to operational security
23 issues.  Isn't that fair?
24   MR. AKROTIRIANAKIS:  Object to the form
25 of the question.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1 to the vulnerabilities part, it is the research
2 team.
3        Q    For which part?
4        A    Vulnerabilities part.
5        Q    Is the research team?
6        A    Yes.
7        Q    And what process would they
8 undertake to update the Hummingbird vectors in
9 response to WhatsApp updates?
10       A    Download the new version to the
11 internal ecosystem, execute the installation flow
12 and, if it works right, just update the version
13 numbers supported and if not then to be adjusted
14 accordingly to the changes that were done in the
15 application.
16       Q    And so even if no change was
17 required you would update the version number of
18 Pegasus?
19       A    Yes.
20       Q    And would IDA and JEB be used as
21 part of that updating process?
22       A    It depends what was updated and what
23 has to be done in order to adjust to it.
24       Q    So with respect to some updates,
25 yes?

Page 247

1        A    Some updates.
2        MR. AKROTIRIANAKIS:  Object to the form
3 of the question.
4        Q    Let's do tab 32, please.  By the
5 way, Mr. Gazneli, we talked earlier about the
6 information that Pegasus allows a customer to
7 access from a target device.  Do you recall that
8 generally?
9        A    Yes.
10       Q    Is that generally the same
11 information that you could access if you had a
12 password to the device?
13       A    Password in terms of --
14       Q    Mm hmm.
15       A    -- physical access to the device?
16       Q    Yes?
17       A    Yes.
18       Q    This is going to be Exhibit 2036.
19    (Exhibit 2036 marked for identification)
20       Exhibit 2036 is a WhatsApp chat between
21 Terry DiVittorio and Greg Rose.  Are you familiar
22 with those names?
23       A    No.
24       MR. AKROTIRIANAKIS:  Do you mind if I
25 get a copy.

Page 248

1        MR. PEREZ-MARQUES:  Sure.  Are you
2 familiar with those names --
3        A    No.
4        Q    The date of this exchange is May 1,
5 2018.  Do you see that?
6        A    Yes.
7        Q    In the third message down
8 Mr. DiVittorio says:
9        "We are likely losing 0 click on both
10 platforms, Android and iOS."
11       Do you see that?
12       A    Yes.
13       Q    What does that refer to?
14       MR. AKROTIRIANAKIS:  Objection, no
15 foundation.
16       Q    Do you recall?
17       A    I don't know these persons.
18       Q    Forget the people.  Do you recall an
19 instance around May 2018 when NSO was unable to
20 use the Hummingbird vectors on Android?
21       A    As I said WhatsApp, were releasing
22 versions every once in two weeks so there might be
23 occurrences once in a while where the support
24 might be broken.
25       Q    You understand you have been

Page 249

1 designated, subject to your counsel's objections,
2 as to the impact of the April 2018 WhatsApp update
3 on the relevant spyware?
4        MR. AKROTIRIANAKIS:  He is not
5 designated for that.  What category is that?
6        MR. PEREZ-MARQUES:  It is topic 28,
7 which is one of the ones you recited at the
8 outset.
9        MR. AKROTIRIANAKIS:  The designation is
10 "Efforts to develop new covert lawful intercept
11 technologies during the time period at issue in
12 this case that could be used with respect to
13 Android devices."
14       MR. PEREZ-MARQUES:  Okay.  So you are
15 not prepared to offer anything with respect to the
16 impact of the April 2018 WhatsApp update on the
17 relevant spyware?
18       MR. AKROTIRIANAKIS:  He is designated as
19 stated.
20       MR. PEREZ-MARQUES:  So you are
21 designated, subject to your counsel's objections,
22 on topic 28, right?
23       A    Yes.
24       MR. AKROTIRIANAKIS:  He is designated
25 exactly as I just read it into the record.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

1      MR. PEREZ-MARQUES:  You are also
2  designated on topic 29, defendant's efforts to
3  circumvent the April 2018 WhatsApp update?
4      MR. AKROTIRIANAKIS:  The description in
5  respect of Exhibit 29 is defendant's efforts to
6  develop new covert lawful intercept technologies
7  during the time period at issue in this case that
8  could be used with respect to Android devices.  It
9  is the same designation.
10     MR. PEREZ-MARQUES:  Okay, and so that is
11 a yes, you are designated on that topic?
12     A  Yes.
13     Q  And so do you recall in May 2018 the
14 vectors losing their functionality, the
15 Hummingbird vectors?
16     A  As I said, if you wanted to
17 introduce me the exact change that was done then I
18 can address the question, but as I said, version
19 was released every two weeks, so whether it is
20 relevant to the exploitation or not, things may be
21 changed and need to be addressed, so I cannot
22 recall the exact specific changes that happened on
23 that version.
24     Q  Is it right to assume that most
25 WhatsApp updates did not compromise the

Page 251

1  functionality of the vectors?
2      MR. AKROTIRIANAKIS:  Objection,
3  over-broad.  Compound.
4      A  No.
5      Q  No?  Many of them did?
6      A  Yes.
7      Q  The majority did?
8      A  I don't know the exact distribution.
9      Q  You said it wasn't right to say most
10 didn't compromise the vectors?
11     A  Most, as my understanding, more than
12 80%.
13     Q  Did more than half of the WhatsApp
14 updates --
15     A  It depends.
16     Q  -- compromise the vectors?
17     A  It depends on the vector.
18     Q  In those instances up to the time
19 period at least of May 2019, when a WhatsApp
20 software update compromised the functionality of
21 the Hummingbird vectors, NSO was able to find a
22 way to restore their functionality.  Isn't that
23 right?
24     A  Yes.
25     Q  Let's take a look at the next

Page 252

1  exhibit.  One more question on this.  Greg Rose
2  asked for how long, any estimates, and DiVittorio
3  says "Smodi doesn't know".  Do you know who Smodi
4  is?
5      A  Smodi is Uri Somorudiniski if I
6  remember right and pronounce right.  He was some
7  kind of VP R&D or CTO at that point.
8      Q  For NSO?
9      A  Yes.
10     Q  Okay.  Let's do the next one.
11     (Exhibit 2037 marked for identification.)
12     This will be 2037, which is a WhatsApp
13 chat between various participants on July 9, 2018.
14 Do you see that?
15     A  Okay, yes.
16     Q  The second page includes a message,
17 the third one down, from Yossi Monsingo.  Do you
18 see that?
19     A  Yes.
20     Q  Do you know who that is?
21     A  Yes.
22     Q  Who is that?
23     A  I don't recall his exact position at
24 that same time but he worked in customer facing or
25 NOC.

Page 253

1      Q  Like customer support of some kind?
2      A  Yes.
3      Q  Not a member of the R&D team?
4      A  No.
5      Q  And he writes -- his message
6  includes an update that WhatsApp released a new
7  version two days ago that is not yet supported but
8  probably tomorrow R&D will release a new package.
9  Do you see that?
10     A  Yes.
11     Q  And that again reflects NSO updating
12 its installation vectors in response to software
13 updates from WhatsApp?
14     A  Yes.
15     Q  And the two or three day timeframe,
16 is that typical of how long it would take the R&D
17 department to update the vectors in response to a
18 WhatsApp update.
19     MR. AKROTIRIANAKIS:  Objection,
20 over-broad.
21     A  No.
22     Q  How long would be typical?
23     A  It depends on the changes.
24     Q  What would the range be?
25     A  It may be from one day to half a

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 year.
2     Q   This was previously marked as
3 Exhibit 2007, which is a WhatsApp message between
4 various participants on December 5, 2018.
5     A   Yes.
6     Q   It states in the second message
7 down:
8         "WhatsApp has made changes in their
9 servers that currently fail all installations and
10 can cause crashes that risk the Hummingbird
11 vector."
12        Do you see that?
13    A   Yes.
14    Q   And do you recall in December 2018 a
15 WhatsApp update that caused all Hummingbird
16 installations to crash?
17    A   Yes.
18    Q   What do you recall about that?
19    A   I recall that that specific change
20 was around our ability to end that specific relay
21 server that we talked about previously, and
22 controlling the target's WhatsApp client to choose
23 that specific relay server for communication.
24    Q   And the reference here, when it says
25 "can cause crashes that risk the Hummingbird

Page 255

1 vector", that relates back to what we saw in the
2 OpSec document about crashes potentially
3 generating logs that would be reviewed by
4 WhatsApp?
5         MR. AKROTIRIANAKIS:  Objection, no
6 foundation.
7     A   This relates to crashes that after
8 the change may occur on the target's devices.
9     Q   And the reason they would risk the
10 Hummingbird vector is potentially, among other
11 reasons, because they could be reviewed by
12 WhatsApp, the crash logs?
13        MR. AKROTIRIANAKIS:  Objection,
14 misstates testimony.
15    A   They are uploaded to the server of
16 the vendor and whether they review them or not is
17 their decision to make.
18    Q   It states on the next page, a few
19 lines down, that the team is working on a solution
20 in top priority hoping to provide a solution ASAP.
21 That is signed Oz, Dana and Moran.  Do you know
22 who those are?
23    A   Yes.
24    Q   Who are they?
25    A   Oz was -- which year?

Page 256

1     Q   December 2018?
2     A   Let me look back to my years.  Okay.
3 Oz back then was the Director of Android R&D.
4     Q   Android R&D?
5     A   Yes.  Moran was product manager and
6 also Dana.  Dana was her team leader.
7     Q   As a product manager as well?
8     A   Yes.
9     Q   For which product?
10    A   If I remember right, for the entire
11 Pegasus, and Moran was for Android.
12    Q   So Oz was part of your team?
13    A   He was my manager.
14    Q   So you reported to him?
15    A   Yes.
16    Q   Did the NSO R&D team in fact work on
17 a solution to restore the Hummingbird vectors
18 after this December 2018 update?
19    A   Yes.
20    Q   And was that successful, that
21 effort?
22    A   That was Eden.
23    Q   So Heaven was made not operational
24 by the December 2018 update.  Is that right?
25    A   Yes.

Page 257

1     Q   And subsequently NSO released Eden?
2     A   Yes.
3     Q   If we look at -- I am going to show
4 you another document.  This is 2038.
5     (Exhibit 2038 marked for identification)
6         This is a WhatsApp chat on January 15,
7 2019 among various participants.  In the first
8 message someone named Gilad says in the last line:
9         "Bottom line, Eden works fine on S3 and
10 can be demonstrated" with a sort of smiley
11 emoticon.  Do you see that?
12    A   Yes.
13    Q   What is S3.
14    A   Sales 3.
15    Q   What is sales 3?
16    A   It is an infrastructure for making
17 demonstrations for our services.
18    Q   And is this the approximate timing
19 of when Eden became ready for use at least for
20 demonstration purposes.
21    A   For demonstration, yes.
22    Q   And then when did Eden go live for
23 use by customers?
24    A   If I remember right, about a month
25 after.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

1     Q   So this reflects NSO's fix or
2 response to the problem that was created by the
3 December 2018 update?
4     A   This is we doing our job to
5 delivering the customers the software they needed.
6     Q   Right.  So after the December 2018
7 update, NSO customers couldn't use the 0 click
8 Android installation vectors, right?
9     A   Right.
10     Q   And Eden, once it was released,
11 allowed them to do so again, right?
12     A   Right.
13     Q   And between Heaven and Eden was
14 there any other -- was there any 0 click Android
15 installation vector in operation?
16     A   No.
17     Q   How did Eden differ from Heaven?
18     A   The main difference was in the
19 installation flow that in Eden we had to use --
20 the transmission of the data between the source
21 and the target, WhatsApp client, needs to go
22 through WhatsApp server relay servers.
23     Q   And how was -- I am sorry -- so in
24 Eden --
25     A   Yes.

Page 259

1     Q   -- the transmission had to go
2 through WhatsApp relay servers?
3     A   Yes.
4     Q   Okay, and that was not the case with
5 respect to Heaven?
6     A   Right.
7     Q   Was that the only difference between
8 Heaven and Eden?
9     A   This is the major difference.
10     Q   In terms -- do you recall we spent
11 some time earlier today walking through the steps
12 of an installation attack using the Hummingbird
13 vectors.  Do you recall that?
14     A   Yes.
15     Q   And does that description we were
16 walking through apply to Eden as well?
17     A   Except the fact that -- except the
18 part that talked about controlling the relay
19 servers adding one to the list and directing the
20 target WhatsApp client to select a specific one.
21     Q   And so what did Eden do instead?
22     A   It just couldn't anymore change the
23 way the target selects the relay servers,
24 therefore it used -- the communication was done
25 through the WhatsApp relay servers in order to

Page 260

1 deliver the payloads required for the remote code
2 execution part.
3     Q   Would that be the stager?
4     A   The payload of stager was the same
5 in Heaven and Eden.  The part that changed was the
6 part that delivered the stager to --
7     Q   Right, so I think you testified
8 earlier that with Heaven the stager was downloaded
9 from a non-WhatsApp server.  Is that right?
10     MR. AKROTIRIANAKIS:  Objection,
11 misstates testimony.
12     A   No.  No.  I stated that the
13 privilege escalation payload --
14     Q   Got it.  So the stager even under
15 Heaven was delivered via a WhatsApp message?
16     MR. AKROTIRIANAKIS:  Counsel, I know it
17 is getting long in the day, but you've got to let
18 him finish his answers.
19     A   In Heaven the stager payload was
20 delivered using WhatsApp messages, yes.
21     Q   Okay.  And in Eden the stager
22 payload was also delivered via WhatsApp message?
23     A   Yes.
24     Q   And in Heaven the PE payload was
25 delivered not through WhatsApp servers, right?

Page 261

1     A   Right.
2     Q   And under Eden was the PE payload
3 delivered via WhatsApp servers?
4     A   No.
5     Q   So what is the difference?
6     A   The difference is that in Heaven the
7 stager payload is delivered using WhatsApp
8 messages that go through non-WhatsApp relay
9 servers, and in Eden the same payload is delivered
10 using WhatsApp messages that go through WhatsApp
11 relay servers.
12     Q   Got it.  So the distinction is with
13 respect to through which servers the stager
14 payload is delivered?
15     A   Which relay servers, yes.
16     Q   Which relay servers, got it.
17 I think you said that was the principal difference
18 between Heaven and Eden.  Are there any other
19 important differences?
20     A   Not important enough that I
21 remember.
22     Q   Nothing else that you remember?
23     A   No.
24     Q   Based on your preparation, nothing
25 else that you are aware of?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

1    A  No.
2    (Exhibit 2039 marked for identification.)
3    Q  This is Exhibit 2039, which is a
4 WhatsApp chat from May 12, 2019.  Again various
5 participants.  In the second page Tomer Timor has
6 a message.  Who is Mr. Timor?
7    A  He was, if I am right, at that stage
8 presales employee.
9    Q  Presales?
10    A  Yes.
11    Q  He says in the sort of third
12 paragraph down:
13    "So bottom line, Eden has finished its
14 duty with us as a patch was done on the server
15 side with the application it works with."
16    Do you recall this event?
17    A  Yes.
18    Q  And what does that refer to?  What
19 is the event that is being described here?
20    A  Closure of ability to trigger the
21 vulnerability on the target's WhatsApp client.
22    Q  So this reflect WhatsApp's
23 remediation of the exploit that is described in
24 the complaint?
25    MR. AKROTIRIANAKIS:  Objection, calls

Page 263

1 for a legal conclusion.  No foundation.
2    A  It refers to changes that were done,
3 whether on the server side and the client side, in
4 order to prevent us from triggering the
5 vulnerabilities.
6    Q  And so after this point, after that
7 update in May 12 or around May 12, 2019, was NSO
8 able to use Eden after that point?
9    A  No.
10    Q  In the next paragraph down he said:
11    "I heard some sales managers talking in
12 a dramatic way.  Your job is to make sure they
13 remember that along the years NSO has proven time
14 after time that one of its biggest value is the
15 ability to 'survive' this harsh environment of the
16 cat and mouse game."
17    Do you see that.
18    A  Yes.
19    Q  What does that refer to?
20    MR. AKROTIRIANAKIS:  Objection, no
21 foundation.
22    A  This is a domain that you are not in
23 control how long your capability will prolong at
24 least for total control, and that is why he quotes
25 cat and mouse game.  The ecosystem that you were

Page 264

1 working or acting makes changes eventually, forces
2 you to adjust it.
3    Q  So NSO designs an exploit, the
4 exploit gets shut down.  NSO designs another,
5 right?
6    MR. AKROTIRIANAKIS:  Objection,
7 misstates his testimony.
8    Q  Is that generally the cat and mouse
9 game?
10    MR. AKROTIRIANAKIS:  Misstates
11 testimony.
12    A  This is the domain that you have to
13 stay -- to keep and find new vulnerabilities after
14 the systems get changed.
15    Q  That is just inherent to the domain
16 in which NSO operates, right?
17    A  Yes.
18    Q  When something gets shut down, you
19 have to work to develop another?
20    MR. AKROTIRIANAKIS:  Objection,
21 misstates his testimony.
22    A  Eventually you have to provide --
23 you want to provide the 1 click and 0 click
24 solutions to customers, and it doesn't relate to a
25 specific service or application.

Page 265

1    Q  And at this point in May 2019 when
2 the WhatsApp update prevented Eden from working
3 did NSO have any 0 click Android solutions?
4    A  No.
5    Q  Did the R&D group subsequently find
6 another 0 click installation vector for Android
7 devices?
8    A  Yes.
9    Q  What was that?
10    A  ERISED.
11    Q  When was ERISED approved for
12 production?
13    A  I don't recall the exact date.
14    Q  If we back to the exhibit we were
15 looking at, in that same message from Mr. Timor he
16 says:
17    "R&D are working hard on different
18 directions.  Hopefully we will have good news
19 soon, but please remember that our technological
20 status is still great as we as a company have the
21 resources to find something new in a relatively
22 short time."
23    Do you agree with his statement, sir?
24    A  He was optimistic.
25    Q  Is it accurate that at this point,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

1  in May 2019, NSO's R&D group was working hard on
2  potential solutions to restore 0 click capability?
3      A  As a research group and development
4  team, you constantly work on research in order to
5  find possible ways, rapid solutions.  As I
6  explained before, eventually we are producing a
7  product for customers.
8      Q  And that is still true today, right?
9      MR. AKROTIRIANAKIS:  Objection, vague.
10     A  This is our business.
11     Q  So you don't remember when ERISED
12  was approved for production?
13     A  No, not the exact time.
14     Q  Do you remember when ERISED began to
15  be used by customers, approximately?
16     A  It is really not an exact time.  I
17  couldn't tell.
18     Q  What is your best estimate?
19     A  If I recall right, it was close to
20  the end of the year.
21     Q  So late 2019?
22     A  If I recall right.
23     Q  And I understand you are only
24  answering questions up to May 2020.  Is that
25  right?

Page 267

1      A  Yes.
2      Q  And up to that date in May 2020, did
3  ERISED remain in use?
4      A  Yes.
5      Q  So as to whether NSO has ever
6  stopped using ERISED, I assume that is a question
7  you are not willing to answer?
8      A  Regarding ERISED, the
9  vulnerabilities in ERISED was not in WhatsApp at
10  all and that part was eventually closed.
11     Q  So you are willing to answer that
12  question about after May 2020?
13     A  I am answering a question about
14  ERISED capability --
15     Q  Where was the vulnerability that was
16  exploited by ERISED?
17     A  Specific part in one of Samsung
18  related code.
19     Q  So was ERISED limited to Samsung
20  devices?
21     A  Yes.
22     Q  But did it also work by transmitting
23  WhatsApp messages?
24     A  It was our decision whether to
25  trigger it using WhatsApp messages or not.

Page 268

1      Q  So it could be triggered using
2  WhatsApp messages?
3      A  Yes.
4      Q  And were those WhatsApp messages
5  sent via WhatsApp servers?
6      A  Yes.
7      Q  And similar to what we saw about
8  Heaven, those were non-standard WhatsApp messages?
9      MR. AKROTIRIANAKIS:  Object to the form.
10     A  As I said before, some of them maybe
11  were non-standard but not all of them.
12     Q  Were the messages, the WhatsApp
13  messages that were sent as part of ERISED
14  installation, were those also originated from the
15  WIS?
16     A  Yes.
17     Q  So just at a high level if you can,
18  how was ERISED different from Eden?
19     A  So ERISED didn't use any voice or
20  video call to be established, and didn't use any
21  relay server for communication in the installation
22  flow.  As I explained before, it triggered
23  vulnerability which was outside the application of
24  WhatsApp and only used WhatsApp messages to be
25  able to trigger the specific code in which the

Page 269

1  vulnerability resides.
2      Q  So under ERISED NSO used WhatsApp
3  messages to trigger a vulnerability in the Samsung
4  system?
5      A  Yes.
6      Q  And then triggering that
7  vulnerability would then cause the further steps
8  of the installation flows?
9      A  Yes.
10     Q  Was a stager delivered through
11  WhatsApp servers as part of ERISED?
12     A  Not the exact same but modifications
13  of it.
14     Q  Just to be clear, after -- and were
15  the same fingerprinting methods used?
16     A  Part of it, because as we talked
17  before ERISED required also additional information
18  whether the vendor is Samsung or not.
19     Q  Just to be clear, after WhatsApp
20  closed the vulnerability that was being exploited
21  by Eden in May 2019, NSO worked on developing a
22  new 0 click exploit that also worked, at least in
23  part, by transmitting WhatsApp messages.  Yes?
24     MR. AKROTIRIANAKIS:  Misstates
25  testimony.

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1    A  We researched for a new solution.
2  We found vulnerability in the system which was
3  specific for Samsung and we decided to implement
4  it and build installation flow based on WhatsApp
5  application.
6    Q  And after WhatsApp closed the
7  vulnerability that was being exploited by Eden,
8  NSO succeeded in developing a new 0 click
9  installation vector that operated in part through
10  delivering WhatsApp messages, yes?
11    MR. AKROTIRIANAKIS:  Misstates
12  testimony.
13    A  We found additional vulnerability
14  which we were able to build installation for using
15  that.
16    Q  And that installation vector,
17  ERISED, which used WhatsApp servers and WhatsApp
18  messages remained in use by NSO customers as of at
19  least May 2020.  Is that right?
20    A  Yes.
21    Q  So, with this lawsuit pending, NSO
22  was actively making available to its customers a 0
23  click exploit that involved the transmission of
24  messages over WhatsApp servers?
25    MR. AKROTIRIANAKIS:  No foundation.

Page 271

1    A  I don't recall the exact time that
2  the lawsuit was filed.
3    Q  It was filed in October 2019.  So
4  with that context, with this lawsuit pending NSO
5  was actively making available to its customers a 0
6  click exploit that involved the transmission of
7  messages over WhatsApp servers.  Correct?
8    A  Yes.
9    Q  And as to NSO continues to make
10  available to its customers a 0 click exploit that
11  uses WhatsApp servers, you are not willing to tell
12  me.
13    A  No.
14    Q  No, you are not willing to tell me?
15    MR. AKROTIRIANAKIS:  We already had this
16  conversation, counsel.
17    MR. PEREZ-MARQUES:  Is that right?  I
18  just want to make sure I understand the "no".  The
19  no is you won't tell me, right?
20    A  I can't tell you.
21    MR. PEREZ-MARQUES:  Okay.  Why don't we
22  take a short break.
23    THE VIDEOGRAPHER:  Going off the record.
24  The time is 16:57.  End of media card five, volume
25  one, of the video deposition of Tamir Gazneli.

Page 272

1    (A short break.)
2    This is the beginning of media card
3  number six, volume one, in the video deposition of
4  Tamir Gazneli.  Going on the record.  The time is
5  17:14.
6    Q  Do you understand you are still
7  under oath?
8    A  Yes.
9    Q  I would like to show you another
10  exhibit.  This is Exhibit 2040.
11    (Exhibit 2040 marked for identification).
12    It is another Confluence document
13  labelled or titled "Deviate installations on white
14  environment from 12/01/2020".  Do you see that?
15    A  Yes.
16    Q  Do you recognize this document?
17    A  Yes.
18    Q  What is it?
19    A  This is the output of QA team that
20  was responsible for testing the capabilities or
21  statistical behavior.
22    Q  Capabilities or statistical behavior
23  of what?
24    A  In this timeframe it is for ERISED.
25    Q  And so what is -- the second column

Page 273

1  here in the chart says "ERISED ID".  What does
2  that reflect?
3    A  It is numbering of the devices that
4  were used for ERISED testing.
5    Q  Test target device?
6    A  No.  Our devices that were used to
7  test the behavior, statistical behavior of the
8  vector.
9    Q  Got it.  What I meant when I said
10  "test target device", I meant that on the target
11  side of the exploit you were using a test device?
12    MR. AKROTIRIANAKIS:  Object to the form
13  of the question.
14    Q  Do you understand what I mean?
15    A  We use device on which we test how
16  the installation vector works and behaves.
17    Q  Okay.  And is the test device acting
18  as the sender of the exploit or the recipient of
19  the exploit?
20    A  Recipient.
21    Q  That is what I meant by test target
22  device.
23    A  Okay.
24    Q  So these are all NSO-controlled
25  devices on which the ERISED is being tested?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

1     A   Owned and controlled, yes.
2     Q   And some of the numbers it looks
3 like repeat.  Do you see that?  For instance ER11
4 shows up a couple of times on page 1?
5     A   Yes.
6     Q   And so that reflects that it is
7 being tested more than once on the same device?
8     A   Yes.
9     Q   Do these reflect the results of the
10 testing?
11     A   I don't see the results here.
12     Q   It looks like the document may be
13 cut off.  It looks like there is another column
14 that we can only see part of, right?
15     A   I expect it to be results for each
16 attempt, but I don't see any results here.
17     Q   And typically in this type of
18 document, based on your experience, you would
19 expect to see results of the tests?
20     A   At least the outcome of the attempt.
21     Q   And you don't see that here, as
22 produced?  I am not sure we got your answer.
23     A   I cannot see the result here.
24     Q   And the column that is headed "QA
25 version" that would be the version of WhatsApp

Page 275

1 that is being run on the target device or the test
2 device?
3     A   Yes.
4     Q   Okay.  When it says "Deviate
5 installations", what does that mean?
6     A   Deviate was just part of the ERISED
7 used -- part of the code.
8     Q   What part was that?
9     A   It was specific part for the
10 exploitation flow, that was part of the
11 general remote code execution capability in
12 ERISED.
13     Q   Part of the remote code execution
14 capability?
15     A   Yes.
16     Q   And so was Deviate the part of the
17 code that worked with the Samsung vulnerability?
18     THE VIDEOGRAPHER:  Sorry, one second.
19 It is okay.
20     Q   My question was was Deviate the part
21 of the code that worked with the Samsung
22 vulnerability?
23     A   Yes.
24     Q   And so this chart here reflects
25 attempts to install Deviate on test devices?

Page 276

1     MR. AKROTIRIANAKIS:  Objection,
2 misstates the document.
3     A   It is a list of attempts to define
4 what is the statistical behavior of this part of
5 the installation, yes.
6     Q   And so with respect to these
7 WhatsApp versions, would that reflect that ERISED
8 was being used at least at the time that those
9 versions of WhatsApp were released?
10     MR. AKROTIRIANAKIS:  Objection,
11 misstates the document.  Also vague.
12     A   Can you repeat the question, please?
13     Q   Yes.  With respect to those WhatsApp
14 version numbers that go along with at least many
15 of these tests, this would reflect that ERISED was
16 being at least tested during the time that those
17 WhatsApp versions were available?
18     A   Yes, tested, for sure.
19     Q   You can put that aside.  Are you
20 aware that the Heaven exploit in its code included
21 hard coded references to S.WhatsApp.net?
22     A   S.WhatsApp.net is a domain name.
23     Q   Mm hmm.  And are you aware that that
24 was coded into the Heaven source code.
25     MR. AKROTIRIANAKIS:  Object to the form

Page 277

1 of the question.  Assumes facts not in evidence.
2     A   Which code.
3     Q   The Heaven code?
4     A   Yes, if I recall right, yes.
5     Q   Yes, it was coded in there?
6     A   Yes.
7     Q   And you said S.WhatsApp.net is a
8 domain.  Is that right?
9     A   It is a domain name, yes.
10     Q   And where would that domain take the
11 traffic?
12     A   I don't know.
13     Q   But a WhatsApp server, is that
14 right?
15     A   This is, if I recall right, the
16 domain name of the signaling WhatsApp server.
17     Q   Okay.  So that is -- S.WhatsApp.net
18 is the domain name of a WhatsApp signaling server?
19     A   If I recall right.
20     Q   And so including S.WhatsApp.net in
21 the Heaven source code would do what, with respect
22 to the WhatsApp signaling server?
23     A   Communicate through that WhatsApp
24 signaling server.
25     Q   It would direct the communication to

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1 that server specifically?
2      A  Yes.
3      Q  You, as part of the preparation of
4 defendant's expert reports, you spoke with
5 Mr. McGrough, right, defendant's expert?
6      MR. AKROTIRIANAKIS:  Objection to the
7 form of the question.
8      A  I was interviewed by him.
9      Q  You were interviewed by him?
10      A  Yes.
11      Q  Did you tell him that the Heaven
12 exploit hard coded the domain name of the WhatsApp
13 signaling server?
14      A  I don't recall whether it was said
15 or not.
16      Q  And defendants needed WhatsApp
17 credentials to gain access to the WhatsApp
18 servers.  Isn't that right?
19      A  We need WhatsApp credentials in
20 order to connect to the real WhatsApp environment
21 as a legitimate client.
22      Q  As if you were a legitimate client?
23      A  Yes.
24      Q  And without those credentials the
25 installation vector wouldn't work?

Page 279

1      A  Without these credentials there is
2 no source worth applying.
3      Q  Without those credentials you would
4 be unable to communicate with the WhatsApp
5 signaling server?
6      A  With WhatsApp at all.
7      Q  And defendants use the same coding
8 protocol used by the WhatsApp signaling servers.
9 Isn't that right?
10      A  Coding protocol?
11      Q  Or coding language?
12      MR. AKROTIRIANAKIS:  Object to the form
13 of the question.
14      A  I don't know how -- what was
15 implemented and what specific language.
16      Q  Are you familiar with a language
17 called XMPP?
18      A  This is not a language, this is a
19 protocol.
20      Q  I think I said protocol the first
21 time and you corrected me?
22      A  You said language to implement the
23 protocol.
24      Q  Let me repeat the question as I said
25 it initially, which was defendants used the same

Page 280

1 coding protocol used by the WhatsApp signaling
2 servers.  Correct?
3      A  This is the protocol that WhatsApp
4 uses, so there is no other way to use any other
5 protocol.
6      Q  Right.  WhatsApp uses a version of
7 XMPP internally.  Is that right?
8      MR. AKROTIRIANAKIS:  Object to the form
9 of the question.  No foundation.
10      A  WhatsApp uses XMPP as its
11 communication protocol.
12      Q  And it uses specifically a version
13 called fun XMPP.  Correct?
14      A  Yes.
15      MR. AKROTIRIANAKIS:  No foundation.
16      Q  And are you aware that defendants
17 had a file also called FUN XMPP.PY?
18      A  Yes.
19      Q  And what is FUN XMPP.PY?
20      A  This is the implementation of the
21 specific parts of the XMPP protocol which were
22 required and used in very specific messages that
23 we use in the installation vectors.
24      Q  So defendants used the FUN XMPP
25 coding protocol that was used by WhatsApp

Page 281

1 internally, right?
2      MR. AKROTIRIANAKIS:  No foundation.
3      A  I don't know what WhatsApp used
4 internal.  We used the protocol that enables us to
5 build and send messages through WhatsApp system to
6 the target client.
7      Q  So defendants used FUN XMPP
8 specifically for the purposes of being able to
9 communicate with WhatsApp servers?
10      MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12      A  There is no other way to
13 communicate.
14      Q  So that is a yes, you use that
15 language in order to communicate with the WhatsApp
16 servers or that protocol rather?
17      A  We used it to communicate with the
18 WhatsApp client on the target's device.
19      Q  Through the WhatsApp servers, right?
20      A  The messages are sent through the
21 WhatsApp servers.
22      Q  Right, including the S.WhatsApp.net
23 server that was hard coded into the Heaven code?
24      MR. AKROTIRIANAKIS:  Misstates his
25 testimony.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 282

1    A   The question is whether the messages
2 was transmitted through S.WhatsApp.com?
3        Q   Yes.
4        A   Yes, this is the signaling server,
5 so yes.
6        Q   And is that also true for Eden?
7        A   Yes.
8        Q   And did the Eden code also hard code
9 the domain name of WhatsApp signaling server?
10       A   If I recall right, yes.
11       Q   What about ERISED?
12       A   For ERISED I don't recall whether
13 this was hard coded or not.
14       Q   You would need to look at the code
15 for that?
16       A   Yes.
17       Q   The Pegasus system also relied on
18 the use of command and control servers.  Isn't
19 that right?
20       A   Yes.
21       Q   If I call those C2 servers, will
22 that be comprehensible to you?  I can say command
23 and control if you prefer.
24       A   No, C2 is fine.
25       Q   What are C2 servers?

Page 283

1    A   Additional servers, as part of the
2 ecosystem that was deployed for the customer that
3 enabled the agent communication and installation
4 flow to be executed on the target's device.
5        Q   What role did the C2 servers play in
6 the Pegasus system?
7        A   It is a combination of servers and
8 it depends on which specific server you address.
9        Q   So they play different roles?
10       A   Yes.
11       Q   And what are the different roles
12 that the C2 servers play in the Pegasus system
13 during the 2018/20 time period?
14       A   So there are servers which are
15 responsible for -- on which the privilege
16 escalation and the whole relevant payloads are
17 held, to be transmitted through the -- during the
18 installation vector.
19       Q   Are there servers, C2 servers that
20 play other roles?
21       A   There are also servers through which
22 the data was transmitted to the customer's back
23 end.
24       Q   Do you mean the data obtained from
25 the target devices?

Page 284

1    A   Yes.
2        Q   And when you say "the relevant
3 payloads", is that only for privilege escalation
4 or also for deployment of the agent that the C2
5 servers were used?
6        A   The agent too.
7        Q   So C2 servers are part of the
8 installation phase, is that right?
9        MR. AKROTIRIANAKIS:  Objection,
10 misstates testimony.
11       A   No, as part of the installation
12 procedure and data extraction.  Installation
13 phase, you asked installation vector, this is not
14 related to it.
15       Q   Okay.  So you don't consider
16 privileged escalation part of the installation
17 phase?
18       A   I am trying to stay under your
19 terminology.
20       Q   Right.  I want to understand yours.
21 So when you refer to the installation phase, that
22 doesn't include privilege escalation?
23       A   In my terminology, installation of
24 an agent is the whole procedure from the beginning
25 of the remote code execution, it continues to

Page 285

1 privilege escalation payload to the fact the agent
2 is installed.
3        Q   Okay.  So the C2 servers are used
4 during what you just defined as the installation
5 phase?
6        A   For part of, yes.
7        Q   Did defendants ever operate C2
8 servers?
9        A   No.
10       Q   Did defendants set up C2 servers for
11 defendant's customers?
12       A   What do you mean by set up?
13       Q   Lease them, buy them, anonymize
14 them?
15       A   As I said before, the White Services
16 team, it is possible for White Services, if they
17 were eventually deployed on customer's ecosystem
18 as part of his solution.
19       Q   Are you familiar with an AWS, Amazon
20 Web Services server that was used, that was
21 housed, located in Germany in connection with the
22 Pegasus exploit or Pegasus system?
23       A   Yes.
24       Q   What do you know about that server?
25       A   This was a server that was used for

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

1 would NSO do as part of the demonstration of the
2 Pegasus software?
3      A  Use an ecosystem which was built for
4 the demonstrations, for example, we saw the sales
5 3, and used company owned devices in order to
6 demonstrate the behavior and the abilities on it.
7      Q  When you say used company owned
8 devices, you mean as the target, right?
9      MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11      A  As the device on which the
12 installation was conducted.
13      Q  And so in terms of -- if we imagine
14 a demonstration of Pegasus, that would work
15 through WhatsApp's servers the same as if it was
16 an actual use by a customer.  Is that right?
17      A  In terms of WhatsApp server, yes.
18      Q  And is the same true with respect to
19 testing, that that would operate through WhatsApp
20 servers the same way as an actual use by a
21 customer?
22      A  Testing in an external environment?
23      Q  Yes.
24      A  Yes.
25      Q  If you know, what service providers

Page 291

1 did defendants use to procure servers for use in
2 connection with Pegasus?
3      A  I don't know.
4      Q  I believe that is a topic on which
5 you are designated, but let me just check.  The
6 topic was "you or any relevant spyware's use of
7 any third party server, including the AWS server
8 to access plaintiff's computer", and your counsel
9 said that you would testify as to defendant's
10 understanding of the development of the accused
11 technology in use between April 29, 2018 and
12 May 10, 2020, including general information about
13 defendant's use of third party servers in the
14 accused technology.  Are you prepared to testify
15 on that topic?
16      MR. AKROTIRIANAKIS:  Only if it was in
17 the original topics.  In light of his testimony?
18      MR. PEREZ-MARQUES:  Do you have my
19 question, Mr. Gazneli?
20      A  I remember that the -- saying that I
21 was testifying about the use.
22      Q  The use of third party servers?
23      A  Use, not which specific third party
24 servers they were.
25      Q  Okay.  So you don't know which third

Page 292

1 parties were used?
2      A  No.
3      Q  Do defendants have policies about
4 which service providers it uses for servers in
5 connection with Pegasus?
6      MR. AKROTIRIANAKIS:  Same objection.
7 Beyond the scope of the designation.
8      A  This is the same answer.
9      Q  What is the same answer?
10      A  I don't know.
11      Q  Did defendants ever lease servers or
12 other computer infrastructure from Quadranet
13 Enterprises LLC?
14      MR. AKROTIRIANAKIS:  Object to the form
15 of the question.  No foundation.  Beyond the scope
16 of designation.
17      A  Can you repeat the question?
18      Q  Did defendants ever lease servers or
19 other computer infrastructure from Quadranet
20 Enterprises LLC of Los Angeles, California?
21      A  I don't know if a server was leased
22 by that company or not.
23      Q  If you wanted to find out the answer
24 to that question, who would you ask?
25      A  The White Services.

Page 293

1      Q  Who is in charge of the White
2 Services group?
3      A  Ramon.
4      Q  Ramon.  Did defendants ever lease
5 servers or other computer infrastructure from 365
6 Online Technology JSC in Hanoi, Vietnam?
7      A  No.
8      Q  Did defendants ever lease servers or
9 other computer infrastructure from Green Cloud
10 Technology?
11      A  Again, it is under White Services
12 responsibility.
13      Q  When you say Ramon, you mean Ramon
14 Eshkar?
15      A  Yes.
16      Q  Going back to the fingerprinting
17 stage of the Hummingbird vectors, the information
18 that NSO is obtaining regarding the target device,
19 you gave a few examples, operating system, whether
20 it is online, whether it has WhatsApp installed.
21 Do you recall that, generally?
22      A  Yes.
23      Q  From where is NSO obtaining that
24 information?
25      MR. AKROTIRIANAKIS:  Object to the form.

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

1    A  Except the parameter about whether
2 the target has an active WhatsApp account, all the
3 other information parts are from the target's
4 client application.
5    Q  The target's WhatsApp client?
6    A  Yes.
7    Q  And does that go through the
8 WhatsApp servers?
9    A  As any other message.
10    Q  And what about the information about
11 whether the target is an active WhatsApp client?
12 Where does that information come from?
13    A  This comes from WhatsApp server, as
14 it comes for any other normal user when he enters
15 new phone number in his contacts list.
16    Q  And when you say whether the target
17 has an active WhatsApp account, what do you mean?
18    A  Activated WhatsApp account.
19    Q  That is different from whether like
20 the app is in the foreground?
21    A  Yes.  Whether it ever has been
22 activated WhatsApp account in a WhatsApp
23 ecosystem.
24    Q  Apologies, because I know we covered
25 this before, but for the Hummingbird vectors, did

Page 295

1 the fingerprinting work through the transmission
2 of WhatsApp messages?
3    A  Yes.
4    Q  Okay.  And so prior to sending the
5 WhatsApp message, that would tell you, the
6 operating system, whether the app is in the
7 foreground, would NSO first have to confirm from
8 the WhatsApp server whether the user had an active
9 WhatsApp account?
10    A  The first stage in the WhatsApp
11 fingerprint was first checking that the target
12 device number has an activated WhatsApp account.
13 Then check the other three preliminary parameters,
14 which is whether the target device is Android
15 device, whether he is online, meaning it is
16 connected to a network, and whether he is in
17 foreground or not.
18    Q  And if the target was in foreground
19 would you proceed with the installation?
20    A  No.
21    Q  And so before proceeding to the --
22 I will call it the second piece of the
23 fingerprinting --
24    A  Yes.
25    Q  -- NSO would first have to confirm

Page 296

1 that the target had an activated WhatsApp account?
2    MR. AKROTIRIANAKIS:  Object to the form
3 of the question.
4    A  This is one of the parts in the
5 fingerprinting.
6    Q  And is it right to think of it as
7 sequential, that you would only proceed to sending
8 a message to the target's WhatsApp client only
9 after you had first confirmed that the client had
10 an activated WhatsApp account?
11    MR. AKROTIRIANAKIS:  Object to the form
12 of the question.
13    A  There is no ability to send any
14 message to a client which does not exist.
15    Q  So the first piece of information
16 obtained as part of fingerprinting comes from the
17 WhatsApp server?
18    A  Yes, as it comes to any other number
19 that you have in list --
20    Q  And then the installation flow would
21 not proceed -- would or would not proceed,
22 depending on the answer, the information that NSO
23 got from the WhatsApp server.  Right?
24    MR. AKROTIRIANAKIS:  Object to the form
25 of the question.

Page 297

1    A  It was a decision of customer
2 whether to proceed or not to the installation.
3    Q  If there is no WhatsApp activated
4 account you could not proceed?
5    A  If there is no WhatsApp, no.  If
6 there is a WhatsApp, the answer still may be no.
7    Q  And once the fingerprinting flow has
8 confirmed that the client has an activated
9 WhatsApp account, does it proceed automatically
10 with the rest of the fingerprinting or is there a
11 separate decision that gets made by an operator?
12    A  When you say "separate", which part
13 do you mean?
14    Q  I mean one possibility is --
15 everything I just described happens in three
16 milliseconds, and yes, the first step is to
17 confirm whether there is an activated account, but
18 then it immediately goes on to the remaining
19 steps.  The other option is there is someone
20 sitting at a computer, and they get a response
21 that says this target has an activated account,
22 and then they press a separate button that
23 triggers the rest of the fingerprinting.  That is
24 what I meant.
25    A  For information part, I explain

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1 whether he has -- the target has WhatsApp account
2 activated, whether he is online or not, Android
3 device, or is foreground or not, and done in one
4 single attempt, but of course it depends on each
5 part of preceding step.
6      Q   Got it.  That answers my question,
7 thank you.
8      So once the fingerprinting is done, the
9 next step is sending a call offer.  Is that right?
10 The next step of the installation flow?
11     A   Yes.
12     Q   And the call offer used an XOR
13 cipher.  Is that right?
14     A   Yes.
15     Q   What is an XOR cipher?
16     A   It is an encryption that WhatsApp
17 uses for communications.
18     Q   And so why did defendants call up or
19 use an XOR cipher?
20     A   In order to encrypt the
21 communication.
22     Q   And is that the non-standard
23 encryption that we talked about before?
24     A   Back then it was not standard.
25     Q   Back when?

Page 299

1      A   In Heaven.
2      Q   And then what about with Eden and
3 ERISED?
4      A   I don't recall whether this part was
5 changed in Eden, but eventually it was changed and
6 it became standard.
7      Q   For ERISED?
8      A   As I said, I don't recall the exact
9 time that it changed from Eden, non-standard to
10 standard.
11     Q   And why did defendants want to
12 encrypt the message?
13     MR. AKROTIRIANAKIS:  Assumes facts not
14 in evidence.
15     A   Part of measure to conceal the
16 messages content.
17     Q   Can WhatsApp user using the standard
18 WhatsApp client app send a call offer using an XOR
19 cipher?
20     A   No.
21     Q   The call offer, at least for some of
22 the Hummingbird vectors, manipulated the
23 connecting tone DESC field.  Is that right?
24     A   Yes.
25     Q   And is that true of all three of the

Page 300

1 Hummingbird vectors?
2      A   No.
3      Q   Which ones is it true of?
4      A   For Heaven and Eden.
5      Q   And who at defendants came up with
6 the idea to manipulate that particular field?
7      A   The research team.
8      Q   When did defendants come up with
9 that idea?
10     A   During the research efforts that
11 were done as part of the vulnerability research
12 and the exploitation research.
13     Q   And roughly what was the time period
14 when that work was being done?
15     A   Beginning of 2018 or end of 2017.
16     Q   And defendants, as part of at least
17 the Eden and Heaven vectors, would insert a bash
18 script in the connecting tone desc field?
19     A   Yes.
20     Q   And WhatsApp users using the
21 official WhatsApp client app could not use the
22 connecting tone desc field.  Is that right?
23     A   Right.
24     Q   The next step was inducing the
25 victim's WhatsApp client to disclose whether It

Page 301

1 was 32 bit or 64 bit.  Is that right?
2      A   Yes.
3      Q   Is that true for all three
4 Hummingbird vectors?
5      A   No.
6      Q   Just Eden and Heaven?
7      A   Yes.
8      Q   And defendants needed that
9 information to determine next steps in the attack.
10 Is that right?
11     A   To determine which payload to
12 continue with and which messages sequence to use.
13     Q   And defendants obtained that
14 information, 32 bit versus 64 bit, through relay
15 negotiation and bandwidth estimation.  Is that
16 right?
17     A   Yes.
18     Q   And defendants would send an
19 oversized bit width detection packet to the target
20 device.  Is that right?
21     A   Right.
22     Q   And again that is for Eden and
23 Heaven?
24     A   Yes.
25     Q   And that oversized bit width

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 302

1 detection packet overwrote certain variables. Is
2 that correct?
3      A  On the target client application?
4      Q  Yes.
5      A  Yes.
6      Q  Including the AF variable, is that
7 correct?
8      A  Yes.
9      Q  And whether the AF variable was
10 overwritten determined whether it was a 32 bit
11 phone or a 64 bit phone. Is that right?
12      A  Yes.
13      Q  WhatsApp users using the official
14 WhatsApp client could not send an oversized bit
15 width detection packet, correct?
16      A  Correct.
17      Q  And could not overwrite the AF
18 variable, correct?
19      A  Yes.
20      Q  And defendants obtained that
21 information of 32 bit versus 64 bit from WhatsApp
22 servers?
23      A  No.
24      Q  From the target device?
25      A  Yes.

Page 303

1      Q  Transmitted through WhatsApp
2 servers?
3      A  Yes.
4      MR. AKROTIRIANAKIS:  Object to the form
5 of that question.
6      Q  Defendants took that information and
7 used it to design the next stages of the attack?
8      MR. AKROTIRIANAKIS:  Object to the form
9 of the question.
10      Q  Such as choosing which payload to
11 deliver?
12      MR. AKROTIRIANAKIS:  Same objection.
13      A  It was used to define how to proceed
14 with the installation flow.
15      Q  And who made the decision as to how
16 to proceed with the installation flow?
17      MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19      A  Who in terms of person?
20      Q  Sure. Was that decision made by a
21 person?
22      A  No.
23      Q  So how was that decision made?
24      A  By the installation server.
25      Q  It was made by the software

Page 304

1 developed by NSO?
2      A  Yes.
3      Q  A regular WhatsApp user using the
4 WhatsApp client app can't obtain this 32 versus 64
5 bit information, can it?
6      A  Again the question?
7      Q  A regular WhatsApp user using the
8 WhatsApp client app cannot obtain this
9 information?
10      A  They can obtain it by other means on
11 the device.
12      Q  But not through the WhatsApp client
13 app?
14      A  Not through WhatsApp client app.
15      Q  And WhatsApp servers are not
16 intended to disclose that information, is that
17 right?
18      MR. AKROTIRIANAKIS:  Object to the form
19 of the question.
20      A  WhatsApp servers are intended to
21 block any unusual activity they would like to
22 detect and block.
23      Q  After determining the bit width,
24 defendants sent a duplicate call offer message.
25 Is that right?

Page 305

1      A  Yes.
2      Q  And that was to reset the target
3 device's internal memory?
4      MR. AKROTIRIANAKIS:  Object to the form
5 of the question.
6      A  You would need to define what
7 internal memory you refer to.
8      Q  Can you help me with that? You are
9 the expert.
10      A  It was used to reset the specific
11 memory area that was used in the application,
12 WhatsApp application.
13      Q  And that would allow the next stage
14 of the attack?
15      A  Yes.
16      Q  And WhatsApp users using the
17 official WhatsApp client could not send the
18 duplicate call offer message. Right?
19      A  Right.
20      Q  Did you explain those steps to
21 defendants' expert?
22      A  I don't recall reviewing each and
23 every step of the steps.
24      Q  The next step was to calculate the
25 location of the LIB WhatsApp.SO file, right?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 306

1    A  Yes.
2        Q  That relied on a buffer overflow, is
3  that correct?
4    A  Yes.
5        Q  So the victim's phone would point to
6  a certain area of memory offset from the original
7  area.  Is that right?
8        MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10    A  The target client WhatsApp
11  application --
12        Q  I can skip victim.  The target phone
13  would point to a certain area of memory offset
14  from the original area?
15    A  Yes.
16        Q  And that allowed defendants to
17  obtain the location of the LIB WhatsApp.SO file,
18  correct?
19    A  Yes.
20        Q  And that information came from the
21  WhatsApp servers?
22    A  No.
23        Q  From the target device?
24    A  Yes.
25        Q  Via the WhatsApp servers?

Page 307

1    A  Yes.
2        Q  And a regular WhatsApp user using
3  the WhatsApp client app cannot obtain that
4  information, right?
5        A  Again, using WhatsApp client, no,
6  but there are ways to obtain this information.
7        Q  Why was it important for defendants
8  to be able to determine the location of the
9  LIB.WhatsApp.SO or LIBWhatsApp.SO file?
10        A  In order to find -- for the
11  exploitation to work, you need to be able to
12  determine the memory allocation space in the
13  current instance of the application of the
14  target's device, in order to be able to write and
15  execute the payload you are downloading.
16        Q  Now, was the next step to convert to
17  a group call?
18        MR. AKROTIRIANAKIS:  Object to the form
19  of the question.
20    A  If I recall right, yes.
21        Q  Yes?
22    A  Yes.
23        Q  For Heaven and Eden?
24        A  For Heaven there was voice call that
25  were used, but along the way the implementation of

Page 308

1  the installation phase has changed.
2        Q  Meaning during the life of the Eden
3  exploit how it worked changed?
4    A  Yes.
5        Q  But at a certain point Eden worked
6  by converting to a group call?
7    A  Yes.
8        Q  And defendants would do that by
9  adding another participant to the call, is that
10  right?
11    A  Yes.
12        Q  But this other was a simulated
13  participant, right, not an actual WhatsApp client?
14        A  This was as the first client, it was
15  used to generate the initial call.
16        Q  So WIS?
17    A  Yes.
18        Q  And converting to a group call
19  allowed defendants to obtain more information
20  about the target device.  Is that correct?
21    A  Yes.
22        Q  And defendants --
23        MR. AKROTIRIANAKIS:  Object to the form
24  of the question.
25        Q  Defendants sent a set of malicious

Page 309

1  data to the target device.  Is that correct?
2        MR. AKROTIRIANAKIS:  Object to the form
3  of the question.
4        A  What is malicious data?
5        Q  Let's skip malicious.  Defendants
6  sent a set of data to the target device, right, a
7  data payload?
8        MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10        A  As part of the installation flow,
11  there are data payloads and messages sent to the
12  target device, yes.
13        Q  And that information was in the
14  outbound capabilities buffer?
15    A  Yes.
16        Q  And that goes beyond what WhatsApp
17  users using the client app -- the WhatsApp client
18  app could include in the outbound capabilities
19  buffer, is that right?
20    A  Yes.
21        Q  And later in the group call
22  defendants overwrite certain callback pointers so
23  that they point to values that defendants have
24  created.  Is that right?
25        MR. AKROTIRIANAKIS:  Object to the form

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 310

1 of the question.
2    A  Yes.
3    Q  And that is also true as to Eden and
4 Heaven?
5    MR. AKROTIRIANAKIS:  Object to the form.
6    A  If I recall right, yes.
7    Q  And that forces the target device to
8 execute functions inserted by defendants, correct?
9    MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11    A  Yes.
12    Q  The final step was called
13 "Termination", right?
14    A  Yes.
15    Q  And when the call ended the target
16 device triggered the modified pointers.  Is that
17 correct?
18    A  Yes.
19    Q  And those modified pointers gave
20 instructions on what to do when the call
21 terminated, correct?
22    A  Yes.
23    Q  And one callback operation was to
24 reset certain parts of the application's memory.
25 Is that right?

Page 311

1    A  Yes.
2    Q  Why did defendants include a
3 function to reset certain parts of the
4 application's memory?
5    A  The same as before, in order to be
6 able to control the memory allocations base to be
7 able to write specific code to be downloaded and
8 executed.
9    Q  Did you tell defendants' expert that
10 the callback operations reset certain parts of the
11 application's memory?
12    A  I don't remember saying that.
13    Q  Another callback operation was to
14 execute the bash script inserted earlier, correct.
15    A  Yes.
16    Q  And that bash script stopped the
17 voice FG service from running?
18    A  This means that the call was ended.
19    Q  And it created an ELF file in the
20 WhatsApp client directory?
21    A  Yes.
22    Q  And the ELF filed connected to a C2
23 server?
24    A  To download the next payload, yes.
25    Q  And then deleted that ELF file,

Page 312

1 right?
2    A  Yes.
3    Q  What happens after the ELF file
4 directs the phone to the C2 server?
5    A  The next payload is downloaded and
6 executed.
7    Q  And what is the next payload?
8    A  Privilege escalation.
9    Q  And so is what we just walked
10 through what you would call the stager?
11    A  The last part.
12    Q  The last part, the running of the
13 ELF script?
14    A  The bash script was used to build
15 the stager.
16    MR. PEREZ-MARQUES:  Why don't we take a
17 quick break and see, we may be just about
18 finished.
19    A  Okay.
20    THE VIDEOGRAPHER:  Going off the record.
21 The time is 18:01.
22    (A short break)
23    THE VIDEOGRAPHER:  Going back on the
24 record.  The time is 18:12.
25    MR. PEREZ-MARQUES:  Now, you understand

Page 313

1 that there is a trial that has been scheduled in
2 this matter for March 2025?
3    A  Yes.
4    Q  Are you prepared to appear at that
5 trial if called as a witness?
6    A  Yes.
7    Q  And you intend to do so if called?
8    A  Yes.
9    MR. PEREZ-MARQUES:  That is all I have
10 at this time.
11    Examined by MR. AKROTIRIANAKIS:
12    MR. AKROTIRIANAKIS:  I just have a
13 couple of questions.  Early in your testimony
14 today you were asked about whether you reviewed
15 code and then later, much later you were asked
16 questions about the AWS server.  Do you recall the
17 two different points in the day that I am talking
18 about?
19    A  Yes.
20    Q  So in terms of the code --
21    MR. PEREZ-MARQUES:  Can I pause for one
22 second because I am frozen out.
23    Q  In terms of the code that you
24 testified that you reviewed in connection --
25    In terms of the code that you testified

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 322

1      MR. AKROTIRIANAKIS: Objection,
2  misstates his testimony.
3      A   The image is the instance in time,
4  so it couldn't contain all the code from two years
5  of the --
6      Q   Right, because the code changed from
7  time to time, right?
8      A   There are certain parts of it that
9  changed, yes.
10      Q   And so the code that was being used
11  in April 2018 is likely not the code that was
12  being used in May 2019?
13      MR. AKROTIRIANAKIS: Object to the form
14  of the question.
15      A   The messages that were implemented
16  in it, the messages are implemented as part of the
17  protocol that WhatsApp requires, so this
18  practically will not change a lot. As for the
19  fingerprint, as I said it was used for Heaven and
20  Eden. The other parts of the code I said it
21  depends on the exact timing of the image.
22      Q   Right, because the code changed over
23  time, right?
24      MR. AKROTIRIANAKIS: Objection,
25  misstates his testimony.

Page 323

1      A   The code may change. I don't know
2  if it changed in specific timing before and after.
3      Q   And you don't know when the snapshot
4  was taken, right?
5      A   I don't recall.
6      Q   We talked about the S.WhatsApp.net
7  domain. You recall that?
8      A   Yes.
9      Q   And I think when I was examining you
10  said that that was the domain for WhatsApp
11  signaling server. Is that right?
12      A   Domain name.
13      Q   The domain name for WhatsApp
14  signaling server?
15      A   Also Google.com is the domain name
16  for Google signaling.
17      Q   Got it. Okay. Is that one
18  signaling server or multiple signaling servers?
19      A   It depends on WhatsApp to decide.
20      Q   Could be either one, right?
21      A   I don't -- this is not a single
22  server. That is why they use a domain name.
23      Q   As part of developing the
24  Hummingbird exploits, did you take any steps to
25  ascertain where the WhatsApp signaling servers

Page 324

1  were located. No?
2      A   No.
3      Q   Did you take any steps to ascertain
4  where the WhatsApp relay servers were located?
5      A   No.
6      Q   You understood that what WhatsApp is
7  based in California?
8      MR. AKROTIRIANAKIS: Objection.
9      A   As a company?
10      Q   Yes.
11      A   So does everybody else in the US but
12  the server --
13      Q   Not my question. Were you aware
14  when you were working on the --
15      A   No.
16      Q   -- hummingbird vectors that WhatsApp
17  was based in California?
18      A   No.
19      Q   You were not aware of that?
20      A   No.
21      Q   Did you take any steps to assure
22  yourself that the servers that were being used as
23  part of the Hummingbird vectors were not in
24  California?
25      MR. AKROTIRIANAKIS: Object to the form

Page 325

1  of the question.
2      A   Can you repeat?
3      Q   Did you take any steps to make sure
4  that the messages that were being transmitted as
5  part of the Pegasus software, that those servers
6  were not in California? Did you take any steps to
7  check that?
8      A   No.
9      Q   Sitting here today, do you know, one
10  way or the other, whether any of WhatsApp's
11  signaling or relay servers used in connection with
12  the Hummingbird vectors actually are in
13  California?
14      A   No.
15      Q   You don't know that at all sitting
16  here today?
17      A   No.
18      Q   So if some of those servers were in
19  California, you wouldn't know anything to the
20  contrary?
21      A   It was not required for the -- it
22  was not a requirement in terms of the capability.
23      Q   But accessing the WhatsApp signaling
24  servers was a requirement of the capability.
25  Right?

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326

1    A  As a domain name, behind which there
2 is a real server, which is deployed in any
3 location on WhatsApp decision.
4    Q  And accessing WhatsApp relay servers
5 was also necessary for the Hummingbird vectors.
6 Isn't that right?
7    A  No.
8    Q  No?
9    A  No.
10    Q  Okay.  What about for ERISED?
11    A  No.
12    Q  I think you testified earlier that
13 the messages for ERISED had to be transmitted
14 through the WhatsApp relay servers?
15    A  No.  I testified that for Heaven and
16 Eden they were transferred through relay servers.
17    Q  Got it.  And it was necessary for
18 the operation of Heaven and Eden?
19    A  Yes.
20    Q  You were asked just now by your
21 counsel some questions about geographical
22 restrictions.  Do you recall that?
23    A  Yes.
24    Q  I just want to make sure
25 I understand this.  I will give you a

Page 327

1 hypothetical.  If I am, say, a Mexican citizen and
2 just hypothetically NSO has as a client a Mexican
3 law enforcement agency, and Mexico is within their
4 territorial license, they are permitted to install
5 on my phone.  Is that correct?
6    A  Under their lawful authorization.
7 Under their rules.  Yes.
8    Q  And those rules you are not familiar
9 with?
10    A  No.
11    Q  So I am a target.  I have been
12 permissibly infected with Pegasus.  I then travel
13 to the United States.
14    A  Yes.
15    Q  Does the customer then lose access
16 to my information?
17    A  Yes.
18    Q  Now, what if I am a US person, okay,
19 so completely new hypothetical.  I am a US person.
20 I am a US citizen.  I live most of the year in New
21 York.
22    A  With US number?
23    Q  With a US number.
24    A  Okay.
25    Q  But I am working in Dubai.  If you

Page 328

1 had a customer that had a territorial license that
2 covered Dubai, could it be installed on that
3 number?
4    A  No.
5    Q  So not US numbers and not US
6 territory?
7    A  Yes.
8    Q  Okay.  But that is on a customer by
9 customer basis, depending on the territorial
10 restrictions of particular contracts?
11    A  No customer has US enabled for
12 installation.
13    Q  And that is with respect to Pegasus?
14    A  Yes.
15    Q  What about with respect to Phantom?
16    A  I am not aware.  I don't know what
17 Phantom is.
18    Q  You are not familiar with Phantom?
19    A  No.
20    Q  Are you familiar with a company
21 called Westbridge?
22    A  Yes.
23    Q  What is Westbridge?
24    A  US like --
25    MR. AKROTIRIANAKIS:  Object to the form

Page 329

1 of the question.  No foundation.
2    A  It is a US company trying to market
3 the product.
4    Q  Trying to market NSO's products,
5 right?
6    A  Yes.
7    Q  Including Pegasus?
8    A  I am not familiar with their
9 activity.
10    Q  But certainly Westbridge was
11 authorized by NSO to market NSO products?
12    MR. AKROTIRIANAKIS:  Object to the form
13 of the question.  No foundation.
14    A  No.
15    Q  Is it your understanding that
16 Westbridge was operating without permission?
17    MR. AKROTIRIANAKIS:  Objection, no
18 foundation.
19    A  I don't know.
20    Q  Okay.  And when Westbridge
21 demonstrated NSO software, were those
22 demonstrations supported by NSO personnel?
23    MR. AKROTIRIANAKIS:  Objection, no
24 foundation.
25    A  I don't know.

83 (Pages 326 - 329)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1      CERTIFICATE OF COURT REPORTER
2
3  I, AILSA WILLIAMS, an Accredited LiveNote
4  Reporter, hereby certify that Tamir Gazneli was
5  duly sworn, that I took the Stenograph notes of
6  the foregoing deposition and that the transcript
7  thereof is a true and accurate record transcribed
8  to the best of my skill and ability.  I further
9  certify that I am neither counsel for, related to,
10 nor employed by any of the parties to the action
11 in which the deposition was taken, and that I am
12 not a relative or employee of any attorney or
13 counsel employed by the parties hereto, nor
14 financially or otherwise interested in the outcome
15 of the action.
16 Before completion of the deposition, review of the
17 transcript was requested.  Any changes made by the
18 deponent (and provided to the reporter) during the
19 period allowed are appended hereto.
20
21
22 *Ailse Yn Williams*
23 AILSA WILLIAMS
24 Dated:   September 6, 2024.
25

Page 335

1
2          E R R A T A
3        Deposition of Tamir Gazneli
4  (Please show all corrections on this page, not in
5  the transcript.)
6  Page/Line No.      Description      Reason for
7  change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22 Signed:   ...................
23 Name:
24 Date:       ...................
25

85 (Pages 334 - 335)

# EXHIBIT 8

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                    OAKLAND DIVISION
 3
      - - - - - - - - - - - - - - - - -
 4                                    )
      WHATSAPP INC., a Delaware       )
 5    corporation, and META PLATFORMS,)
      INC., a Delaware corporation,   )
 6                                    )
                       Plaintiffs,   )
 7                                    )  Case No.:
      v.                              )  4:19-cv-07123-PJH
 8                                    )
      NSO GROUP TECHNOLOGIES LIMITED  )
 9    and Q CYBER TECHNOLOGIES LIMITED,)
                                      )
10                     Defendants.   )
      - - - - - - - - - - - - - - - - -
11      Highly Confidential - Subject to Protective Order
12              VIDEO DEPOSITION OF RAMON ESHKAR
13                  Tuesday, August 27, 2024
14                  Commencing:  9:17 a.m. BST
15
16                  Davis Polk & Wardwell LLP
                      5 Aldermanbury Square
17                      London, EC2 7HR
                         United Kingdom
18
19
20
21
22
23
24      Court Reporter:
        Chanelle Malliff, CLR
25
```

HIGHLY CONFIDENTIAL

Page 14

1  colleague.
2      Q.  Who is that colleague?
3      A.  An employee of mine.
4      Q.  What is that employee's name?
5      A.  Avi.
6      Q.  And the surname?
7      A.  Itzhak.
8      Q.  Itzhak, like "Isaac"?
9      A.  Yes.
10     Q.  What is Mr. Itzhak's job?
11     A.  He's responsible for the customer support.
12     Q.  Do you know Mr. Itzhak's title?
13     A.  Yeah, it's VP, customer support.
14     Q.  Mr. Itzhak reports to you?
15     A.  Yes.
16     Q.  When did you review your understanding with
17  Mr. Itzhak?
18     A.  During my stay at the -- in Israel, like a
19  few days ago.
20     Q.  How long was the conversation that you had in
21  preparation for this deposition with Mr. Itzhak?
22     A.  Not more than an hour.
23     Q.  And what did you and Mr. Itzhak discuss?
24     A.  Just the processes related to this topic.
25     Q.  And by "this topic" you mean?

Page 15

1      A.  I mean creation, what's related to the
2  opening account.
3      Q.  On WhatsApp?
4      A.  Yeah.
5      Q.  And why is Mr. Itzhak, as VP of customer
6  support, an appropriate person to talk to about the
7  processes that defendants follow related to creating
8  accounts on WhatsApp?
9          MR. AKROTIRIANAKIS:  Objection: misstates the
10  witness's testimony.
11         THE WITNESS:  I'm sorry?
12         MR. AKROTIRIANAKIS:  If you understand his
13  question you can answer.
14         THE WITNESS:  Can you please repeat?
15  BY MR. BLOCK:
16     Q.  Is creating accounts on WhatsApp part of
17  Mr. Itzhak's job.
18     A.  No, it's part of one of his department's job.
19     Q.  Which department is that?
20     A.  The white services department.
21     Q.  What is the white services department?
22     A.  It's a department responsible for creating
23  accounts and purchasing other services that we need.
24     Q.  Why is it called white services?
25         MR. AKROTIRIANAKIS:  Objection: foundation.

Page 16

1          THE WITNESS:  I'm sorry?
2  BY MR. BLOCK:
3      Q.  Why is it called white services?
4          MR. AKROTIRIANAKIS:  Same objection.
5          THE WITNESS:  Actually the name was decided
6  before I join so I can't recall the reason.
7  BY MR. BLOCK:
8      Q.  Do you have an understanding of what makes a
9  service a white service?
10     A.  I do.
11     Q.  What is that?
12     A.  It means that the service is being set up in
13  an anonymized way.
14     Q.  Is one of the services that defendants set up
15  in an anonymized way WhatsApp?
16         MR. AKROTIRIANAKIS:  Objection: vague.
17         THE WITNESS:  Again?  Again, sorry?
18  BY MR. BLOCK:
19     Q.  What are the services that the white services
20  department deals in?
21     A.  There are a few services.
22     Q.  Is WhatsApp one of them?
23         MR. AKROTIRIANAKIS:  Objection: vague.
24         THE WITNESS:  What?
25         MR. AKROTIRIANAKIS:  I said "objection:

Page 17

1  vague".  If you understand his question though you
2  can answer.
3          THE WITNESS:  Okay.  Sorry, come again?
4  BY MR. BLOCK:
5      Q.  Sure.  Is WhatsApp one of the services that
6  the white services department of defendants deals
7  with?
8          MR. AKROTIRIANAKIS:  Same objection.
9          THE WITNESS:  Yes, they deal with it.
10  BY MR. BLOCK:
11     Q.  Okay, tell me how the white services
12  department -- so, withdrawn.
13         Does the white services department set up
14  WhatsApp accounts in an anonymized way?
15     A.  They do.
16     Q.  And what does it -- what do you mean by in
17  an anonymized way?
18     A.  It means that they're created in a way that
19  will be secure an obstacle where -- to the use of the
20  service later on.
21     Q.  What do you mean by secure?
22     A.  I mean that the infrastructure will protect
23  the customer when using the account.
24     Q.  Does that mean protect the customer from
25  having its identity discovered?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1      A.  What do you mean by his identity?
2          MR. AKROTIRIANAKIS:  Sorry, is this a
3    realtime tablet?  It's not working.
4          (Pause)
5    BY MR. BLOCK:
6      Q.  Why do your -- is it accurate that your
7    customers want their WhatsApp accounts to be set up
8    in an anonymized way?
9          MR. AKROTIRIANAKIS:  Objection: no
10   foundation.
11         THE WITNESS:  What do you mean?
12   BY MR. BLOCK:
13     Q.  I'm asking why you set up anonymized WhatsApp
14   accounts for your customers?
15     A.  The entire infrastructure is anonymized to
16   protect the customer and the infrastructure that
17   they're using.
18     Q.  Is that to protect the customer from being
19   identified?
20         MR. AKROTIRIANAKIS:  Objection: vague.
21         THE WITNESS:  What do you mean by identified?
22   BY MR. BLOCK:
23     Q.  Let me just ask you.  In what regard are you
24   trying to protect the customer by anonymizing the
25   WhatsApp service?

Page 19

1      A.  We want to [Hebrew] to.
2          MR. BLOCK:  May we have help from the
3    translators, please?
4          THE INTERPRETER:  Distance.  We would like to
5    distance.
6          THE WITNESS:  Would like to distance --
7    I'm not sure it's the word, but to, let's say,
8    distance the customer.
9    BY MR. BLOCK:
10     Q.  From whom?
11     A.  From the environment so that they can run
12   their operation in a secured way, not to expose their
13   operation.
14     Q.  You also said you create the accounts in a
15   way that will be "op sec aware" to the use of the
16   service later on.  Did I get that right?
17     A.  Op sec, operational security.
18     Q.  Okay, and what does it mean to be op sec
19   aware to the use of the service later on?
20     A.  What I mean is that you apply all the measure
21   that you can in order to protect the activity, the
22   operation.
23     Q.  And that's again to protect it from being
24   discovered by third parties?
25         MR. AKROTIRIANAKIS:  Objection: misstates

Page 20

1    testimony.
2          THE WITNESS:  By another one.
3    BY MR. BLOCK:
4      Q.  By another one?  Someone other than the
5    customer who is operating the service and NSO itself?
6          MR. AKROTIRIANAKIS:  Objection: misstates
7    testimony.
8    BY MR. BLOCK:
9      Q.  Correct?
10     A.  The customer.
11     Q.  Someone other than the customer?
12     A.  Someone other than the customer.
13     Q.  Do you create the WhatsApp services for the
14   customer in a way that can be traced back to NSO?
15         MR. AKROTIRIANAKIS:  Objection: vague.
16         THE WITNESS:  What do you mean by "can be
17   traced back"?
18   BY MR. BLOCK:
19     Q.  So that another can identify NSO as the
20   entity that created the WhatsApp account?
21     A.  So the question is?
22         MR. AKROTIRIANAKIS:  Object to the form of
23   the question.
24   BY MR. BLOCK:
25     Q.  Do you create the WhatsApp services for the

Page 21

1    customer in a way that can be traced back to NSO?
2          MR. AKROTIRIANAKIS:  Object to the form of
3    the question.  Vague.
4          THE WITNESS:  We create services in
5    an anonymous way.
6    BY MR. BLOCK:
7      Q.  Anonymous for the customer and anonymous for
8    NSO; is that right?
9          MR. AKROTIRIANAKIS:  Objection: misstates
10   testimony.
11         THE WITNESS:  Anonymous mean anonymous, so in
12   an anonymous way.
13   BY MR. BLOCK:
14     Q.  Okay, so why don't we start at the beginning.
15   In what circumstance will NSO create an anonymized
16   WhatsApp account?
17     A.  In what ways?
18     Q.  When does it happen?
19     A.  When does it happen.  Okay.  Either for
20   demonstrations, for real system, customer systems.
21         (Reporter clarification.)
22   For real systems.
23     Q.  Real systems, is that what you said?
24     A.  Systems that are being used by the customer.
25     Q.  So just to clarify my record because we had

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1  some cross talk, which I appreciate.  Let me ask the
2  question again, is that okay?
3      A.  Please.
4      Q.  In what circumstances will NSO create
5  anonymized WhatsApp accounts?
6      A.  So for the use of demonstration, to set up a
7  customer system, and for internal use mainly for
8  testing.
9      Q.  Is the internal use research and development?
10     A.  Yes, all preparation for demo training.
11     Q.  Okay, let's focus on the research and
12  development use case.  Has NSO in fact created
13  anonymized WhatsApp accounts for its own use for
14  research and development?
15     MR. AKROTIRIANAKIS:  Objection.  It's beyond
16  the scope of this witness's designation.  We have
17  another designee for that.  If you know the answer to
18  the question you can answer in your personal
19  capacity.
20     THE WITNESS:  In that sense we provide a
21  service to our colleagues.  So we are being asked to
22  provide, and we provide.
23     MR. BLOCK:  Joe, who will be the witness on
24  that?
25     MR. AKROTIRIANAKIS:  Mr. Gazneli.

Page 23

1  BY MR. BLOCK:
2      Q.  When you say provide a service to colleagues,
3  which colleagues are you talking about?
4      A.  I wanted to refer to R&D as a department.  So
5  when they approach my department, and my department
6  provide them with the account that they're asking.
7      Q.  And specifically Mr. Itzhak's department
8  within your department provides that account?
9      A.  Correct.
10     Q.  Okay, and how does that happen?
11     MR. AKROTIRIANAKIS:  Objection: no
12  foundation.
13  BY MR. BLOCK:
14     Q.  Let me pull back.  You spoke with Mr. Itzhak
15  to confirm the processes that defendants used to
16  create these anonymized accounts as part of your
17  preparation to testify today; is that right?
18     A.  I discussed with Avi my understanding of the
19  processes to make sure that I am ready for this
20  session.
21     Q.  Please explain the process of setting up
22  an anonymized WhatsApp account at NSO?
23     A.  So we get a request.  The team that
24  responsible for the creation of the accounts get a
25  request, and they follow, create the accounts as

Page 24

1  requested, and provide it back.
2      Q.  Okay, I want to focus on the part of the
3  process where they create the account as requested.
4  What happens step-by-step?
5      MR. AKROTIRIANAKIS:  Objection: no
6  foundation.
7      THE WITNESS:  So I'm not creating the
8  account -- the accounts myself, so I gave a general
9  description of that, okay?  So for example they're
10 being asked to provide one account so the relevant
11 employee will create the account, like anyone
12 creating a WhatsApp account, follow the same steps,
13 and provide the details to the one that asked it.
14 BY MR. BLOCK:
15     Q.  Will the relevant employee when creating this
16 account use a real name?
17     A.  He will use a name.  It can be like two
18 letters.  It can be something else.
19     Q.  Is this done on a mobile interface or a web
20 interface, or in some different way?
21     A.  In most cases it is being done by mobile.
22     Q.  So let me see if I understand.  The employee
23 on Mr. Itzhak's team will download a WhatsApp mobile
24 application on to a mobile device and register a
25 WhatsApp account, is that accurate?

Page 25

1      A.  In most of the cases, yes.
2      Q.  And in doing so that NSO employee will follow
3  the normal WhatsApp process for registration through
4  the WhatsApp application downloaded from
5  an application store; is that accurate?
6      MR. AKROTIRIANAKIS:  Objection: vague.
7      THE WITNESS:  He will follow the steps it
8  need in order to create the account.
9  BY MR. BLOCK:
10     Q.  However they'll use a fake name, is that
11 accurate?
12     MR. AKROTIRIANAKIS:  Objection: misstates
13 testimony.
14     THE WITNESS:  They will put a name.
15 BY MR. BLOCK:
16     Q.  A name that is not the real name of the
17 person creating the account or of the person who
18 requested it; correct?
19     A.  Not the name of the one creating and not the
20 one that -- the one receiving.
21     Q.  Is there any special process for deciding
22 what name to use?
23     A.  No.
24     Q.  Okay.  Why does a relevant employee create
25 the account instead of the colleague creating it

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

1  he is an employee of mine. And the other were
2  related to what we are talking now.
3      Q. Okay. Did you discuss any other topics with
4  Mr. Itzhak that were specifically to prepare for your
5  testimony today besides the WhatsApp account creation
6  topics?
7      A. That was the main -- the main topic. We also
8  covered other topics such as training.
9      Q. Any others?
10      A. Maybe. It's like a normal call between us so
11  I don't remember them all but --
12      Q. I'm just trying to discover what information
13  you received from Mr. Itzhak for purposes of
14  testifying today. So you discussed training. We'll
15  talk about that in a moment.
16      A. Sure.
17      Q. Can you think of any others that you
18  discussed with him to prepare for your testimony?
19      A. Again, it was more to, in a way, just make
20  sure that I'm up to speed from my perspective because
21  I am aware of those processes anyway, so I just
22  wanted to make sure I'm aligned.
23      Q. What did you discuss about training?
24      A. You know like the agenda, the duration,
25  things like that.

1      Q. Of a particular training?
2      A. No, in general.
3      Q. Okay. What is the agenda and duration of
4  training in general that you discussed with
5  Mr. Itzhak?
6      A. It's like a four-days training that will be
7  the average. Some will be less, some will be more.
8      Q. Is this training for customers or training
9  for NSO employees or something different?
10      A. For customers.
11      Q. Do defendants train customers to create
12  anonymized WhatsApp accounts?
13      A. No, we do not train. To the best of my
14  recollection we do not do that.
15      Q. But defendants do create anonymized WhatsApp
16  accounts for use by customers; is that accurate?
17      A. We do create accounts for the customers.
18      Q. And when is the most recent occasion when
19  defendants created an anonymized WhatsApp account for
20  use by a customer of which you are aware, sir?
21      MR. AKROTIRIANAKIS: Objection: no
22  foundation. Hold on, I've got to object first. No
23  foundation and it's beyond the scope of the
24  designation of this witness.
25      THE WITNESS: I think we talked about the

1  timelines before, right? So I know that we have
2  created during the EU but not specifically a date
3  within.
4  BY MR. BLOCK:
5      Q. And you know you created anonymized WhatsApp
6  accounts for customers -- strike that.
7      You know that defendants created anonymized
8  WhatsApp accounts for use by customers in 2024;
9  correct?
10      MR. AKROTIRIANAKIS: Objection: no
11  foundation. Also beyond the scope of the designation
12  of this witness.
13      THE WITNESS: I would say for customers.
14  BY MR. BLOCK:
15      Q. You did it for customers or you did it for
16  four customers?
17      MR. AKROTIRIANAKIS: Object to the form of
18  the question.
19  BY MR. BLOCK:
20      Q. Let me just ask my question again. You know
21  that defendants created anonymized WhatsApp accounts
22  for use by defendants' customers during calendar year
23  2024; is that correct?
24      MR. AKROTIRIANAKIS: Objection: no
25  foundation. Also beyond the scope of the designation

1  of this witness.
2      THE WITNESS: I'm not sure it's correct.
3  BY MR. BLOCK:
4      Q. When is the most recent occasion of which you
5  were aware when defendants created anonymized
6  WhatsApp accounts for use by one of defendants'
7  customers?
8      MR. AKROTIRIANAKIS: Objection: no
9  foundation. Also beyond the scope of the designation
10  of this witness.
11      THE WITNESS: I don't have a specific date in
12  mind.
13  BY MR. BLOCK:
14      Q. Do you know whether that occurred in 2018?
15      MR. AKROTIRIANAKIS: Objection: no
16  foundation.
17      THE WITNESS: In 2018 the department wasn't
18  under my responsibility.
19  BY MR. BLOCK:
20      Q. Do you know whether it occurred in 2019?
21      MR. AKROTIRIANAKIS: Same objection.
22      THE WITNESS: Same they were not part of my
23  department in 2019.
24  BY MR. BLOCK:
25      Q. Do you know whether it occurred in 2020?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 62

1 roughly two years ago maybe. Time flies but more or
2 less.
3    Q. As a director were you director of client
4 executive, is that how you say it?
5    A. Yes.
6    Q. And then you became VP client executive?
7    A. Correct.
8    Q. And now SVP client executive?
9    A. No, I'm SVP for what we called the CBD. It's
10 actually the customer based division.
11    Q. Customer base division?
12    A. We call it customer base division.
13    Q. Business?
14    A. Division.
15    Q. Okay. And that includes client executive as
16 one of the departments within your purview?
17    A. Indeed.
18    Q. Okay. How did you come to work for NSO?
19       MR. AKROTIRIANAKIS: Objection: vague.
20       THE WITNESS: Can you please repeat or
21 explain?
22       MR. AKROTIRIANAKIS: Do you want it in
23 Hebrew? That's an English way of speaking. Do you
24 understand his question?
25       THE WITNESS: I'm not sure.

Page 63

1 BY MR. BLOCK:
2    Q. Let me try to ask... How were you introduced
3 to the opportunity to work at NSO?
4    A. NSO made contact.
5    Q. Who at NSO made contact?
6    A. I don't remember the lady from HR at the time
7 but --
8    Q. Someone in a recruiting function?
9    A. Yes.
10    Q. Reached out to you over LinkedIn or email?
11    A. She reached out via LinkedIn and then a phone
12 call.
13    Q. Before you started that application process,
14 did you know anybody at NSO?
15    A. I came aware of the fact that there is
16 someone that I know at NSO after, okay. I didn't
17 know in advance that he works there.
18    Q. I understand. Who is that person?
19    A. Nachum.
20    Q. Nachum is a first name or a last name?
21    A. Yeah, a first name.
22    Q. N-A-C-H-U-M?
23    A. Yes.
24    Q. Last name?
25    A. Falk, F-A -- I'm not sure I'm spelling it

Page 64

1 correctly. F-A-L-K, I think.
2    Q. So you knew Nachum before you joined NSO but
3 only learned after you joined NSO that Nachum was
4 also employed there?
5    A. (Witness nods).
6    Q. Okay.
7    A. During the process, not after. During the
8 process.
9    Q. Fair enough. Do you work in a particular
10 physical location for NSO, your office?
11    A. Yes.
12    Q. Tel Aviv?
13    A. Herzliya.
14       MR. AKROTIRIANAKIS: H-E-R-Z-L-I-Y-A in
15 English.
16 BY MR. BLOCK:
17    Q. Do you travel on business for NSO?
18    A. Yeah, I travel.
19    Q. Have you traveled to the United States on
20 business for NSO?
21    A. No, not that I recall.
22    Q. How do you communicate with your co-workers
23 for business purposes?
24       MR. AKROTIRIANAKIS: Objection: vague.
25       THE WITNESS: How do I --

Page 65

1 BY MR. BLOCK:
2    Q. Communicate?
3    A. We talk. We meet. We use phone calls.
4    Q. You meet in person?
5    A. Yeah, we meet in person.
6    Q. You use the telephone?
7    A. We use the telephone.
8    Q. Videoconferencing?
9    A. We use videoconferencing.
10    Q. Do you communicate with your co-workers at
11 NSO using email?
12    A. Yes.
13    Q. And do you communicate with your co-workers
14 at NSO using messaging services?
15    A. Yes.
16    Q. Which messaging services do you use for
17 business purposes at NSO?
18    A. What do you mean for business purposes like
19 our communication between employees of the company?
20    Q. Yes.
21    A. We use the various types of popular IMs.
22    Q. Such as?
23    A. Such as Signal.
24    Q. Any others?
25    A. Yeah, can be WhatsApp. Can be WebEx.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1      Q. Do you have a smartphone?
2      A. Yes.
3      Q. What kind is it?
4      A. Samsung.
5      Q. Did NSO provide that smartphone to you?
6      A. So I'm not so sure what -- I don't want to
7    confuse the legal terms here.  From one side they do,
8    and the other side there is something with the like
9    we buy it.  So I don't want what's the right term to
10   use, but at the end of the day I get it from the
11   company.  But there is something in the background
12   with regards to the taxation or something like that
13   with regards to giving to someone a phone.
14     Q. Did you go to a store and purchase the
15   device?
16     A. No.
17     Q. Did NSO hand the device to you?
18     A. Yes.
19     Q. Does NSO pay for the service on the device?
20     A. Yes.
21     Q. In -- has that been your arrangement ever
22   since you joined NSO in 2015?
23     MR. AKROTIRIANAKIS:  Objection: vague.
24     THE WITNESS:  My arrangement you mean for the
25   phone to be provided?

Page 67

1    BY MR. BLOCK:
2      Q. Yes.
3      A. Yeah, it was the same when I joined.
4      Q. So for as long as you have been an NSO
5    employee, NSO has provided you with a phone to use
6    for work and paid for the service; correct?
7      MR. AKROTIRIANAKIS:  Objection: no
8    foundation.
9      THE WITNESS:  The moment I left the army and
10   started, every company provided a phone.
11   BY MR. BLOCK:
12     Q. Okay.  Did you download a WhatsApp
13   application on to that phone?
14     A. I have.
15     Q. And do you use that for business purposes at
16   NSO?
17     A. What do you mean by business purposes?
18     Q. To engage in business-related communications?
19     A. Yes.
20     Q. Did you set up that WhatsApp account
21   yourself?
22     A. Yes.
23     Q. Do you recall going through the regular
24   registration process?
25     A. Yes, it was long ago.  I think I had it even

Page 68

1    before I joined so I just kept the same account.
2      Q. Have you ever used a white services
3    anonymized WhatsApp account yourself?
4      A. No, not that I recall.
5      Q. Do you know whether NSO generally provides
6    smartphones to all of its employees?
7      MR. AKROTIRIANAKIS:  Objection: foundation.
8      THE WITNESS:  As much as that they were
9    provided to some of our employees.
10   BY MR. BLOCK:
11     Q. Do you know where the line is drawn who gets
12   smartphones and who doesn't?
13     MR. AKROTIRIANAKIS:  Objection: no
14   foundation.
15     THE WITNESS:  I don't know in other
16   departments.  I know for my department.
17   BY MR. BLOCK:
18     Q. So tell me for your department?
19     A. For my department we provide phones.
20     Q. And that includes everyone in the white
21   services department?
22     A. Yes.
23     Q. Okay.  And --
24     A. An employee might choose not to have a phone
25   so I don't know if right now at this moment all of

Page 69

1    them with a phone that we have provided, but they do
2    have this option.
3      Q. Okay.  Have you ever sent a WhatsApp message
4    other than through the WhatsApp client application on
5    a mobile device?
6      MR. AKROTIRIANAKIS:  Objection: foundation.
7      THE WITNESS:  Just to make sure, have I ever
8    sent a WhatsApp messages not using the phone?
9    I've used the web interface, if this is what you
10   mean, but not more than that, so it's coming out from
11   my phone.
12   BY MR. BLOCK:
13     Q. Okay.  And when you have used the web
14   interface you logged in with your personal WhatsApp
15   credentials, which are the same ones associated with
16   the WhatsApp application on your smartphone; is that
17   accurate?
18     MR. AKROTIRIANAKIS:  Objection: foundation.
19   Vague.  Compound.
20     THE WITNESS:  Just operated a web interface
21   using the barcode scanning.
22   BY MR. BLOCK:
23     Q. Barcode scanning, okay.  You haven't operated
24   the emulator that we discussed earlier to send a
25   WhatsApp message; correct?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    A.  Correct.
2    Q.  Have you observed operation of the emulator
3  to send a WhatsApp message?
4    A.  Not that I recall.
5    Q.  Okay.  Do you know whether the emulator is
6  capable of sending WhatsApp messages?
7      MR. AKROTIRIANAKIS:  Objection: foundation.
8      THE WITNESS:  If I'm aware that what?
9  BY MR. BLOCK:
10    Q.  Whether the emulator that we discussed
11  earlier is capable of sending WhatsApp messages?
12      MR. AKROTIRIANAKIS:  Same objection.
13  Foundation.
14      THE WITNESS:  I would understand it does.
15  BY MR. BLOCK:
16    Q.  Do you have knowledge of the extent to which
17  defendants personnel have agreed to the WhatsApp
18  terms of service?
19      MR. AKROTIRIANAKIS:  Objection: calls for a
20  legal conclusion.  No foundation.  Also beyond the
21  scope of the designation of this witness.
22      THE WITNESS:  I'm not sure I follow.
23  BY MR. BLOCK:
24    Q.  Okay.  We talked about the process that the
25  white services department uses when it creates

Page 71

1  anonymized accounts.  Do you remember that?
2    A.  Yes, I do.
3      MR. AKROTIRIANAKIS:  Objection: misstates his
4  testimony.
5  BY MR. BLOCK:
6    Q.  Do you know whether or not the white services
7  department employees agreed to WhatsApp terms of
8  service when they create anonymized accounts?
9      MR. AKROTIRIANAKIS:  Objection: foundation,
10  vague, and it calls for a legal conclusion.  It's
11  also beyond the scope of the designation of this
12  witness.
13      THE WITNESS:  They established the account so
14  they follow the steps required in order to establish
15  the account.
16  BY MR. BLOCK:
17    Q.  So you would understand if agreeing to the
18  terms of services is a normal step, then that's a
19  step that they take?
20    A.  No --
21      MR. AKROTIRIANAKIS:  Objection --
22      MR. BLOCK:  Did you say "no"?
23      MR. AKROTIRIANAKIS:  Hold on, I get to make a
24  record too.  Objection: it misstates his testimony,
25  no foundation, it's vague and it calls for a legal

Page 72

1  conclusion, it's Beyond the scope of the designation
2  of this witness.
3  BY MR. BLOCK:
4    Q.  So the question was you would understand that
5  agreeing to the terms of service -- strike that.
6    The question was, you would understand that if
7  agreeing to the WhatsApp terms of service is a normal
8  step required in order to establish the account, then
9  that's a step that the white services department
10  employees take; correct?
11      MR. AKROTIRIANAKIS:  All of the same
12  objections and, as phrased, it's also an incomplete
13  hypothetical.
14      THE WITNESS:  They would follow the steps in
15  order to establish the account, so.
16  BY MR. BLOCK:
17    Q.  You're not aware of any way in which the
18  white services department personnel deviate from the
19  normal process for establishing a WhatsApp account
20  when they set up anonymized WhatsApp accounts for
21  defendants?
22      MR. AKROTIRIANAKIS:  Objection: foundation;
23  vague; beyond the scope of the designation of this
24  witness.
25      THE WITNESS:  I'm not sure I can answer that.

Page 73

1  BY MR. BLOCK:
2    Q.  Okay.
3    (Exhibit 2002 marked for identification.)
4      Mr. Eshkar, you've been handed a document
5  that's been marked Exhibit 2002.  It's dated
6  March 25, 2019 and bears the Bates stamp
7  DIVITTORIO_WHATSAPP_[a bunch of zeros and then]65.
8    A.  Okay.
9    Q.  Do you recognize this document?
10    A.  I do not recall this document.
11    Q.  Okay.  Under "Other Recipients", on the
12  bottom line, do you see where it says
13  "972549225336@s.whatsapp.net;Ramon"?
14    A.  Yeah, I see that.
15    Q.  Is that your MSISDN?
16    A.  It is my phone number.
17    Q.  Have you used the same phone number for
18  WhatsApp since you joined NSO in 2015?
19    A.  I haven't changed my number.
20    Q.  Have you ever used a different phone number
21  for WhatsApp in NSO-related business communications?
22    A.  I'm not sure I follow.  If I have another
23  device?
24    Q.  Correct.
25    A.  I have another device.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 78

1    MR. AKROTIRIANAKIS:  Objection: foundation.
2    THE WITNESS:  I don't know how successful he
3  was in that time but it was his job to do that.
4  BY MR. BLOCK:
5    Q.  Okay.  Who at NSO supervised Mr. DiVittorio's
6  work?
7    MR. AKROTIRIANAKIS:  Objection: foundation.
8  Assumes facts not in evidence.
9    A.  I don't know who was responsible to
10  supervise.
11  BY MR. BLOCK:
12    Q.  Okay.  You had a client executive's role at
13  this time in 2019 that we're looking at on
14  Exhibit 2002; correct?
15    A.  Yes, at that time I was, yes.
16    Q.  Did your job responsibilities include
17  anything to do with the US market?
18    A.  No, we were to provide the needed help to the
19  team at the US, not to anyone else.
20    Q.  Does the client executive team at NSO work on
21  sales?
22    MR. AKROTIRIANAKIS:  Objection: vague.
23    THE WITNESS:  We need to define sales
24  actually.
25  BY MR. BLOCK:

Page 79

1    Q.  Here's my understanding and I'm going to ask
2  you to give it in your own words.  It sounds like you
3  would support a demonstration, help the sales team
4  who needed you to come do a demonstration, and then
5  also support install systems but you weren't sales
6  people per se.  I don't know if that's right.  What
7  was the relation -- so here's my question to you.
8    What was -- what is the relation between the
9  client executive team at NSO and the sales
10  organization at NSO today?
11    MR. AKROTIRIANAKIS:  Objection: foundation.
12  Also vague.
13    THE WITNESS:  Who do you mean by relations?
14  They work together.  In general terms the client
15  executive's job are -- is to execute the contract
16  once done and maintain the relationship with the
17  customer, to represent the customer within -- sorry
18  the company within the customer area and vice versa.
19  As a result there might be aware to what we call
20  an app sale opportunity, which in that case they will
21  bring this information to the sales team which takes
22  the commercial responsibility from that moment on.
23  And they will be responsible for the renewal of the
24  contracts once they're done.
25  BY MR. BLOCK:

Page 80

1    Q.  Is the client executive team involved in
2  original contracts for new customers?
3    A.  What's original contracts?
4    Q.  You just talked about contract renewal?
5    A.  That's right.
6    Q.  A brand new contract for a new customer,
7  instead of a renewal?
8    A.  Okay.
9    Q.  Is the client executive team involved in
10  negotiating and executing a new contract for a new
11  customer?
12    A.  They will not be -- general they will not be
13  involved in what we call a new customer or a new
14  logo, so this process is led by sales.
15    Q.  Referring back to Exhibit 2002.  Do you know
16  who sent the message that's written here as from
17  "MICH-" and then a phone number?
18    A.  I'm trying to look at the upper side of the
19  document but also there I don't see -- I don't think
20  I know -- I don't recall this name.
21    Q.  Do you recall who is Marcelo Comité?
22    A.  I do.
23    Q.  Who is Marcelo Comité?
24    A.  He was a salesperson.
25    Q.  Was he an NSO employee?

Page 81

1    MR. AKROTIRIANAKIS:  No foundation.
2    THE WITNESS:  Again I don't know who his
3  contract were with so.
4  BY MR. BLOCK:
5    Q.  And do you know if Marcelo Comité had sales
6  responsibility in a particular geography?
7    MR. AKROTIRIANAKIS:  Objection: foundation.
8    THE WITNESS:  To the best of my knowledge he
9  was responsible for Latin America at the time, but
10  since he wasn't my employee so I don't know if he was
11  assigned to additional areas but this is my
12  understanding.
13  BY MR. BLOCK:
14    Q.  Okay.  In the first message in the table in
15  Exhibit 2002, on the third line, do you see where it
16  says "PGS"?
17    A.  Yes, I see.
18    Q.  Do you understand that to be shorthand for
19  Pegasus?
20    A.  In general we use PGS as Pegasus.
21    Q.  In the next line Mr. DiVittorio says -- he
22  uses the letter CL.  Do you see that?
23    A.  Yes.
24    Q.  Do you understand that to refer to
25  Citizen Lab?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1     MR. AKROTIRIANAKIS: Objection: foundation.
2     THE WITNESS: I am aware that CL stands for
3  Citizen Lab. I'm not sure if this is in the context
4  of that particular document, so I can take the time
5  to read it but --
6     Q. Not necessary.
7     A. I do know that we do use CL as Citizen Lab.
8     Q. "We", NSO?
9     A. Generally.
10    Q. Yes. Do you know who -- and again please
11 forgive my pronunciation -- Tami Mazel Shachar is?
12    A. I do.
13    Q. Who is that?
14    A. Tami used to work at NSO as a -- well, she
15 had several roles so I'm not so sure on that
16 particular date. What the date here? 2018. So,
17 from overall responsibility of sales to what we call
18 at the time CBO, which is chief business officer.
19    (Exhibit 2003 marked for identification.)
20    MR. AKROTIRIANAKIS: Maybe you can state what
21 comprises the document?
22    MR. BLOCK: Did I give you something other
23 than 58 and 59?
24    (Off the record discussion.)
25 BY MR. BLOCK:

Page 83

1     Q. Mr. Eshkar, you've been handed Exhibit 2003,
2  which is dated January 31, 2019 and is Bates stamped
3  DiVittorio_WhatsApp_00000058. It's a two-page
4  document that also includes the page numbered 59?
5     A. The page 59?
6     Q. Yeah, the Bates numbered page 58 --
7     A. Yes, sorry, got it.
8     Q. Do you understand Exhibit 2003 to be a record
9  of a WhatsApp communication?
10    MR. AKROTIRIANAKIS: Objection: foundation.
11    THE WITNESS: I can see it's a communication.
12 BY MR. BLOCK:
13    Q. And the third line on the document says:
14 "Application: WhatsApp"?
15    A. Sorry, what?
16    Q. The third line on the first page of the
17 document says "Application: WhatsApp". Do you see
18 that?
19    A. Yes, I see that.
20    Q. And under "Other Recipients", do you see your
21 phone number and name on the fourth line?
22    A. The fourth line. It's not my phone number.
23    Q. 972549225336 is not your phone number?
24    A. It is but the number unless -- let me see it.
25 It's like 542 -- ah, no, it's the other one. Sorry,

Page 84

1  it goes on the left. Yes, sorry, yes I see my
2  number.
3     Q. Okay. So do you recognize Exhibit 2003 as
4  a WhatsApp communication that you were included on in
5  January 2019?
6     MR. AKROTIRIANAKIS: Objection: foundation.
7     THE WITNESS: I can see my name as part of
8  the communication presenting to me.
9  BY MR. BLOCK:
10    Q. Do you remember this communication?
11    A. Can I take a moment to read it?
12    Q. Yes. (Pause.)
13    A. I don't recall the specific communication.
14    Q. On the second page do you see the name
15 Tomer Timor?
16    A. Yes, I do.
17    Q. Do you know who Tomer Timor is?
18    A. Yes, I do.
19    Q. Who is that?
20    A. Tomer Timor is a former employee of NSO.
21    Q. What did Tomer Timor do for NSO?
22    A. At the time that I knew Tomer he was -- at
23 the end of it he was responsible for the pre-sale
24 team. I just don't remember if he was a team manager
25 and then managed the pre-sales team, but, anyway, he

Page 85

1  was in the pre-sales team.
2     Q. What does pre-sales do?
3     MR. AKROTIRIANAKIS: Objection: foundation.
4     THE WITNESS: They support sales process.
5  BY MR. BLOCK:
6     Q. Do you know who Sivan Brook is?
7     A. Yes.
8     Q. Who is Sivan Brook?
9     A. Also a former employee of NSO.
10    Q. In what role?
11    MR. AKROTIRIANAKIS: No foundation.
12    THE WITNESS: If my memory serves me well she
13 was the private assistant -- Personal Assistant of
14 Tami.
15 BY MR. BLOCK:
16    Q. How about Sarit Gil?
17    A. Yes, I know Sarit.
18    Q. And who is Sarit?
19    A. Sarit is an employee of NSO.
20    Q. What does she do?
21    A. She runs the department of what we call sales
22 operation.
23    Q. What does sales operations do generally?
24    MR. AKROTIRIANAKIS: Objection: foundation.
25    THE WITNESS: The way that I'm familiar with

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1  the department job is that they were unfocused.
2  BY MR. BLOCK:
3      Q. Who is Naor Bashran?
4      A. Naor is a former employee of NSO.
5      Q. In what role?
6      A. Sales.
7      Q. Do you know what geography or customers Naor
8  was responsible for?
9      A. He shifted a lot.
10     Q. Do you happen to know what he was doing in
11 January 2019?
12     MR. AKROTIRIANAKIS: Objection: foundation.
13     THE WITNESS: Specifically '19 I do not
14 recall.
15 BY MR. BLOCK:
16     Q. Okay. Who is Moshe Faran?
17     A. Moshe Faran is a former employee of NSO.
18     Q. In what role?
19     A. Sales as well.
20     Q. And do you know what Moshe Faran's
21 responsibilities were in January 2019?
22     MR. AKROTIRIANAKIS: Objection: foundation.
23     THE WITNESS: He was part of the sales team
24 of the -- again if I remember correctly the African
25 region. At the end of it he managed the region.

Page 87

1  I don't remember if he managed it from the early
2  beginning of his arrival or later on during his work
3  at NSO.
4  BY MR. BLOCK:
5      Q. Okay. Do you know who Tama -- or Tamara
6  Miller is? She's the last name under "other
7  recipients"?
8      A. She's the last name. The last name confuse
9  me but if I'm not -- if this is who I think she is
10 then she was a sales -- sales. She was doing sales,
11 salesperson.
12     Q. And do you recall the scope of her
13 responsibilities?
14     MR. AKROTIRIANAKIS: Objection: vague.
15 Foundation.
16     THE WITNESS: Again if I am correct she was
17 doing sales. Later on she was doing marketing
18 I think. I might be wrong.
19 BY MR. BLOCK:
20     Q. Okay. The first message on Exhibit 2003 from
21 Tami Mazel Shachar is in Hebrew. Do you see that?
22     A. I do.
23     Q. I believe the second word is [Hebrew: ayin
24 dalet nun] which is Eden; is that correct?
25     A. It is correct.

Page 88

1      Q. And what -- I realize it's in Hebrew but
2  could you explain to me in English what the first
3  sentence of the message says?
4      A. It looks like it's either misprinted or
5  because of right to left and left to right. So do
6  you think there is any way to get like sorted to the
7  right side, because I think there is a mismatch at
8  the beginning. Do you have like the soft copy? Can
9  you like --
10     Q. This is how it was produced to us. So you're
11 not able to read the Hebrew from right to left?
12     A. I can read the Hebrew.
13     Q. Why don't you just read the Hebrew for me,
14 just the first sentence up to the ellipsis, the three
15 dots. And I would just ask the interpreters if
16 they're able to interpret what you read to me.
17     MR. AKROTIRIANAKIS: You're asking him to
18 read it in Hebrew?
19     MR. BLOCK: Yes, please read in Hebrew to the
20 interpreter.
21     MR. AKROTIRIANAKIS: You want him to read it
22 from left to right for the record?
23     MR. BLOCK: No, I believe it reads from right
24 to left.
25     A. Right to left.

Page 89

1      Q. Are you able to?
2      A. I can read it but I think like it will not
3  make -- I can do it, right, but --
4      Q. It won't make sense?
5      A. I don't think because you need to move it to
6  the right and I think because of the -- how do you
7  call it, the star?
8      Q. The asterisk?
9      A. Yes, the asterisk. I think, right, it's --
10 I can read it. It's Hebrew, I can read it, but --
11     Q. Are you able to get the sense of the first
12 sentence from looking at it in Hebrew notwithstanding
13 the problems that you're describing?
14     MR. AKROTIRIANAKIS: Objection: foundation.
15     THE WITNESS: It's not.
16 BY MR. BLOCK:
17     Q. You should read the left word first, the left
18 most word first and then --
19     A. Yeah but it's like -- if only move to the
20 right I wouldn't bother you but I think that because
21 of the Hebrew to English part it got -- okay,
22 I'll try. Let's do it like that.
23         So the first sentence?
24     Q. Please.
25     A. So just give me a moment. I give just

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 118

1 record so we can move on. I think I'm referring to
2 something from the transcript not from the order. Do
3 we need to go off the record?
4      MR. AKROTIRIANAKIS: We can go off the record
5 or on the record I'm trying to explain the legal
6 issue to my client. It's up to you.
7      MR. BLOCK: How much time do you need?
8      MR. AKROTIRIANAKIS: I'm trying to explain it
9 to my client.
10      MR. BLOCK: Let's go off the record.
11      VIDEOGRAPHER: Going off the record. The
12 time is 1:02.
13           (A short break)
14      VIDEOGRAPHER: On the record. The time is
15 13:10. Thank you.
16      MR. AKROTIRIANAKIS: So, I think that you're
17 either misrecalling or misstating the court's
18 comments but in any event what you're referring to
19 does not find its way into this order. However,
20 I think that you can ask some questions that relate
21 to the subject that you're getting at. But I don't
22 think that -- so in any event I think you can ask the
23 question you were asking but in general this order is
24 directed to a specific time frame and more
25 specifically to targeting or directing at WhatsApp

Page 119

1 servers or using WhatsApp in a way to access target
2 devices. So with that go ahead.
3      MR. BLOCK: Okay, I'll just refer to page 4
4 of 7 in docket 292, lines 4-7 which I think assumed
5 that there would be a production of the relevance by
6 way of, pursuant to the order, timely. But it says:
7      "If after reviewing the relevance by
8      where from that time frame plaintiffs
9      are able to provide evidence that any
10     attack lasted beyond that time frame
11     plaintiffs may seek further discovery at
12     that time."
13      MR. AKROTIRIANAKIS: Right and I agree --
14 sorry, I didn't mean to interrupt you.
15      MR. BLOCK: That's okay. I'll just say.
16      MR. AKROTIRIANAKIS: That's not what you
17 stated before though. You said before or after.
18 We're talking before, many years before. I don't
19 agree the court ever said before or after. Clearly
20 she said what you just read. We can read it here
21 today. Anyway, go ahead, ask your question.
22      MR. BLOCK: I appreciate it. I don't think
23 she's barred this line of questioning and if we end
24 up with a disagreement about that, that is the thing
25 that happens in litigations from time to time. So

Page 120

1 let me ask a question.
2 BY MR. BLOCK:
3      Q. What were defendants' vectors for zero-click
4 installation of Pegasus in 2015?
5      MR. AKROTIRIANAKIS: Objection: no
6 foundation.
7      THE WITNESS: So it's way back but I would
8 say there were both what we called triggered
9 capabilities and covert capabilities.
10 BY MR. BLOCK:
11      Q. Triggered and covert?
12      A. Yes.
13      Q. What were the covert capabilities in 2015?
14      MR. AKROTIRIANAKIS: No foundation. And to
15 the extent you're -- this is beyond the scope of the
16 designation, just so that's clear. I don't think
17 that you're intending to ask this as part of the
18 30(b)(6) but I want to be clear he's not being
19 designated for this. Another witness would be.
20      THE WITNESS: So again I don't recall the
21 various specific vectors but there were vectors.
22 BY MR. BLOCK:
23      Q. And do you recall whether any of the
24 zero-click vectors in 2015 involved WhatsApp in any
25 way?

Page 121

1      A. As much as I know, no, it didn't involve
2 WhatsApp.
3      Q. And do you recall whether any of the
4 triggered vectors in 2015 involved WhatsApp in any
5 way?
6      A. What do you mean by "any way"? Sending a
7 link to a target via WhatsApp, it's "any way"?
8      Q. Yes.
9      A. So I would say that as much as I know for the
10 trigger we do not use that. The customer might
11 choose to take the link and use his own, either
12 WhatsApp or a different system, to send the link.
13      Q. So from a user interface standpoint when the
14 user elects to pursue a triggered installation does
15 that happen through the user interface or do they
16 then walk over to a mobile phone and send a WhatsApp
17 message; how does that work?
18      MR. AKROTIRIANAKIS: Objection: vague.
19 Compound.
20      THE WITNESS: When they choose to proceed
21 with a trigger installation, the system produce a
22 link. It is then up to the customer to decide if he
23 sends it over a regular SMS which at a certain point
24 of time he could have done via the system, or he
25 extract the link, either copy or whatever, and then

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    send using any other method that he has.
2    BY MR. BLOCK:
3        Q.  At this time in 2015 did the system enable
4    sending the link by WhatsApp message through the user
5    interface?
6        MR. AKROTIRIANAKIS:  Objection: foundation.
7        THE WITNESS:  As much as I recall, no.
8    BY MR. BLOCK:
9        Q.  Did there come a later time when the system
10   enabled the user to initiate a triggered installation
11   by sending a WhatsApp message through the user
12   interface?
13       A.  The trigger installation, right?
14       Q.  Yes.
15       A.  As much as I know, no.
16       Q.  When did it become possible for the user to
17   send a covert installation that involved WhatsApp?
18       MR. AKROTIRIANAKIS:  Objection: vague.  No
19   foundation.
20       THE WITNESS:  As much as I understand around
21   summer 2018, maybe close to the end of it.  I don't
22   know the exact date, but somewhere there.
23   BY MR. BLOCK:
24       Q.  And do you recall a name for that
25   WhatsApp-related zero-click installation vector that

Page 123

1    came online some time around 2018?
2        A.  So internal names were like Eden, or Heaven.
3        Q.  Are those the same?
4        A.  What do you mean by the same.
5        Q.  I mean is Eden one thing and Heaven a
6    different thing or are those used interchangeably?
7        A.  For myself and the team as you know those are
8    covert vectors.  I don't know if the technology
9    behind them is different.
10       Q.  Okay, but you and your team would discuss
11   them separately as different vectors no matter how
12   they operate?
13       A.  As different vectors.
14       Q.  Okay.  And you had an understanding that Eden
15   used WhatsApp in some way but you don't know the
16   details; is that correct?
17       MR. AKROTIRIANAKIS:  Objection: vague.
18   Foundation.  Beyond the scope of the designation.
19       THE WITNESS:  My understanding would be that,
20   yes.
21   BY MR. BLOCK:
22       Q.  What is your understanding, if any, as to how
23   Heaven used WhatsApp?
24       MR. AKROTIRIANAKIS:  Vague.  No foundation.
25   Beyond the scope of the designation.

Page 124

1        THE WITNESS:  I'm trying to understand.  You
2    mean how it worked?
3    BY MR. BLOCK:
4        Q.  Sure.
5        A.  So I don't know how it worked.  So --
6        Q.  But do you have an understanding that however
7    it worked involved WhatsApp?
8        A.  That's my understanding.
9        Q.  So we spoke about Eden and Heaven.  Are you
10   aware of any other names for defendants' installation
11   vectors that involved WhatsApp?
12       MR. AKROTIRIANAKIS:  Objection: foundation.
13       THE WITNESS:  Yes.
14   BY MR. BLOCK:
15       Q.  What are the other names that you're aware
16   of?
17       A.  Erised.
18       Q.  Like desire but spelt backwards?
19   E-R-I-S-E-D, correct?
20       A.  Yes.
21       Q.  We have Eden, Heaven and Erised.  Any others?
22       A.  Not that I recall.
23       Q.  Have you heard the term Hummingbird?
24       A.  Yes, I have heard the term Hummingbird.
25       Q.  Do you know one way or another whether

Page 125

1    Hummingbird used WhatsApp?
2        A.  I think we are confusing here with terms.
3        Q.  How so?
4        A.  Because there are different names being used
5    so like I said before, from the customer perspective
6    it would be covert, right.  And there are names that
7    we use internally and there are names that we use
8    sometimes externally.  So in that regard Hummingbird,
9    as much as I remember from the period, would be like
10   an umbrella name for the family of such covert
11   vectors.
12       Q.  The family of installation vectors that use
13   WhatsApp?
14       A.  Again, as much as I understand, Hummingbird
15   is the name that we've used externally in some cases.
16       Q.  For the family of installation vectors that
17   use WhatsApp?
18       MR. AKROTIRIANAKIS:  Objection: no
19   foundation.
20       THE WITNESS:  As much as I can understand.
21   BY MR. BLOCK:
22       Q.  Is that a yes?
23       MR. AKROTIRIANAKIS:  No foundation.
24       THE WITNESS:  Yes.
25   BY MR. BLOCK:

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1    Q.  And in the Hummingbird family, what are
2  the -- strike that.  What are the names you know of
3  installation vectors in the Hummingbird family?
4    A.  So I don't recall when we introduced the name
5  Hummingbird but I don't think, as much as I remember,
6  that there will be other names than what we said
7  before.
8    Q.  And the ones we said before were Eden, Heaven
9  and Erised?
10   A.  Yes, I just don't remember when we started
11 with the Hummingbird term so it may not be the whole
12 three of them, maybe just one or two of them.
13   Q.  And Erised from Eden, Heaven and Erised you
14 don't recall knowledge of another installation vector
15 that used WhatsApp?
16   A.  I don't remember.
17   Q.  You said you first became aware of
18 an installation vector that used WhatsApp around
19 2018, maybe late I think those were your words,
20 something like that?
21   A.  Something like that, yes.
22   Q.  When is the latest point in time that you're
23 aware of defendants using an installation vector that
24 used WhatsApp?
25   A.  I would say somewhere around 2019 maybe a

Page 127

1  little bit into 2020 but I'm not sure of the exact
2  date so that would be like a ballpark.
3    Q.  Okay.  Is that something Mr. Gazneli would
4  know?
5        MR. AKROTIRIANAKIS:  Objection: no
6  foundation.
7        THE WITNESS:  He might.
8    Q.  What's the latest point in time when you're
9  aware of defendants trying to defendant a zero-click
10 installation using WhatsApp?
11       MR. AKROTIRIANAKIS:  Objection: no
12 foundation.
13       THE WITNESS:  I have no knowledge of that.
14 BY MR. BLOCK:
15   Q.  We may have asked this before.  Was Eden to
16 your knowledge specific to a particular operating
17 system such as Android, iOS, BlackBerry?
18   A.  As much as I recall, it's for Android
19 platform.
20   Q.  And was Heaven specific to a specific
21 operating system such as Android, iOS or BlackBerry?
22   A.  Same here, as much as I remember it's
23 an Android platform.
24   Q.  And was Erised specific to a particular
25 operating system?

Page 128

1    A.  Same for as much as I know, for Android
2  platform.
3    Q.  Are you aware of WhatsApp ever using
4  WhatsApp -- sorry.  Let me try again.  Are you aware
5  of defendants ever using an installation vector that
6  involved WhatsApp to install Pegasus on an iOS
7  device?
8    A.  Not that I recall, no.
9    Q.  And we're talking about zero-click exploits
10 versus sending messages, right?
11   A.  So again I'm less comfortable with the know
12 how because myself or my team do not develop so it's
13 hard for me to say.  But as much as I know it was not
14 used for iOS.
15   Q.  Are you general familiar with the user
16 interface that customers see when they operate
17 Pegasus?
18   A.  Generally aware, yes.
19   Q.  During an agent installation process, is it
20 possible it see in the user interface the phone
21 numbers of the target devices identified for
22 installation?
23   A.  The customer enters the number so the number
24 is presented on the user interface what we call the
25 UI.

Page 129

1    Q.  Are you aware of something called a
2  whitelist, a whitelist of numbers?
3    A.  Yes.
4    Q.  What is the concept of a whitelisted phone
5  number as it relates to Pegasus?
6    A.  So it might be used in other departments of
7  different use.  So I would say from the perspective
8  that I have, okay.  Because it's a general term, it
9  might be used also by other departments.  But it will
10 means that there are certain numbers that their flow
11 of the installation is a bit different.
12   Q.  Can you give me an example?
13   A.  Yes.  If the customer hold a test device,
14 which they usually do, it's a common practice before
15 they go on a real operation to run a test.  Then the
16 test, the test device, might have been on the
17 whitelist.  So they can install and maybe install
18 again in, you know, some time later.
19   Q.  And perhaps install again, sometimes later in
20 a manner that the system would prevent had the number
21 not been on a whitelist?
22   A.  Can you explain that?
23   Q.  Yeah, you said a test device number might be
24 whitelisted so Pegasus can be installed and then
25 installed again.  Is that what you said?

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1    A. Yeah, it can be installed and then installed
2    again, yes.
3    Q. Why does it have to be on a whitelist in
4    order to be installed and then installed again?
5        MR. AKROTIRIANAKIS: Objection: no
6    foundation.
7        THE WITNESS: Because from -- because when
8    you send -- when the customer send installation to a
9    real target there are some operational security
10   measures that they should apply. One of them is the
11   time in between the installation. Clearly for a test
12   device if he had to wait a few days then by the time
13   he will finish his test then the operation will not
14   be relevant.
15   BY MR. BLOCK:
16   Q. And as we discussed, op sec measures are
17   measures to make sure the operation remains secret,
18   right?
19   A. Secured.
20   Q. Secured including against disclosure to
21   others?
22       MR. AKROTIRIANAKIS: Objection: vague.
23       THE WITNESS: I tend to agree.
24   BY MR. BLOCK:
25   Q. Let's look at page 34 of 46 in Exhibit 2004,

Page 131

1    titled Exhibit D Service Level Agreement. Do you see
2    that?
3    A. Thirty --
4    Q. 34 of 46.
5    A. Exhibit D. Yes, I see that.
6    Q. What is a service level agreement generally
7    in defendants' contracts for Pegasus?
8        MR. AKROTIRIANAKIS: Objection: misstates the
9    document.
10       THE WITNESS: So generally talking about what
11   we call SLAs, or service level agreement, not in the
12   context of this contract but in general service level
13   agreement will be our way to define the service that
14   we provide to our customer like how long they will
15   wait for an answer for a phone call, what our service
16   covers in means of for example the hardware, so on so
17   forth, and what is the definitions of minor or major
18   or critical, so on so forth. I have more examples if
19   you need but this is more or less. How they can
20   contact us. At what times.
21   BY MR. BLOCK:
22   Q. If you take a moment to look at -- strike
23   that. In Exhibit 2004 the service level agreement
24   runs from page 34 of 46 through page 46 of 46;
25   correct?

Page 132

1        MR. AKROTIRIANAKIS: Objection: no
2    foundation.
3        THE WITNESS: I'm not so sure about the
4    clarification part, the 7. But the rest looks like
5    they are part of the SLA.
6    BY MR. BLOCK:
7    Q. Okay. And do defendants use standard terms
8    in their SLAs that they repeat with multiple
9    customers?
10   A. If we use what?
11   Q. The same terms over and over again?
12   A. Some of the terms are being used again and
13   again.
14       MR. BLOCK: I have received a request for a
15   lunch break and so I suggest that we go off the
16   record.
17       MR. AKROTIRIANAKIS: Okay. That's fine.
18       VIDEOGRAPHER: Going off the record. The
19   time is 13:34. End of media card 3, volume 1 of the
20   video deposition of Ramon Eshkar.
21       (Lunch recess.)
22       VIDEOGRAPHER: This is the beginning of media
23   card 4, volume 1 in the deposition of Ramon Eshkar.
24   Going on the record the time is 14:17. Thank you.
25       MR. AKROTIRIANAKIS: Before we get started

Page 133

1    again I wanted to designate the transcript as highly
2    confidential under the protective order, and also the
3    witness would like to read and sign. And let me know
4    before the end and I'll let you know if you need to
5    send it directly to him or to me to send to him
6    because it might be -- there might be a difference.
7    BY MR. BLOCK:
8    Q. Okay, thank you. Welcome back, Mr. Eshkar.
9    Just a couple looking over my notes. I think you
10   mentioned that the name Hummingbird was used
11   externally by defendants with customers. Was it?
12   A. It was used externally.
13   Q. But Eden, and Heaven, and Erised were not
14   used externally with customers; is that correct?
15   A. They were not meant to use externally.
16   Q. That was a matter of defendants' policy?
17       MR. AKROTIRIANAKIS: Objection: vague; no
18   foundation.
19       THE WITNESS: I mean they were internal names
20   so people were not supposed to use it externally.
21   BY MR. BLOCK:
22   Q. I understand. Can you give me an example how
23   Hummingbird was used externally?
24   A. An example?
25   Q. Yes, please.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    A. If the customer and the one he, let's say the
2  client executive that he is talking to would like to
3  talk about the same topic, then they can say
4  Hummingbird.
5    Q. And how much information did defendants share
6  with customers about what Hummingbird means?
7      MR. AKROTIRIANAKIS: Objection: vague.
8      THE WITNESS: The concept is that it means
9  the covert vector.
10  BY MR. BLOCK:
11   Q. So defendants customers understood that
12  Hummingbird was a label for a covert vector for
13  installation of Pegasus end device agents?
14     MR. AKROTIRIANAKIS: Objection: foundation.
15     THE WITNESS: Can you please repeat?
16  BY MR. BLOCK:
17   Q. Yeah let me -- was the Hummingbird family
18  of vectors used to install products other than
19  Pegasus?
20   A. No.
21   Q. Did defendants' customers understand that
22  Hummingbird was a name to refer to covert
23  installation of Pegasus?
24     MR. AKROTIRIANAKIS: Objection: foundation.
25     THE WITNESS: Customers will understand that

Page 135

1  Hummingbird is a covert vector.
2  BY MR. BLOCK:
3    Q. And did defendants disclose -- I'm sorry.
4  You said customers will understand that Hummingbird
5  is a covert vector. My question is, did defendants'
6  customers understand that Hummingbird was a name for
7  a covert vector for Pegasus?
8      MR. AKROTIRIANAKIS: Objection: foundation.
9      THE WITNESS: I'm trying to understand what's
10  the difference. Maybe it's better to translate.
11  BY MR. BLOCK:
12   Q. You excised Pegasus. I asked you a question;
13  you skipped Pegasus when I read it back. I was
14  trying to figure out if you meant something by that.
15  Did customers not know that Hummingbird was for
16  Pegasus?
17     MR. AKROTIRIANAKIS: Objection: foundation.
18     THE WITNESS: I would assume they understand
19  that it's for Pegasus.
20  BY MR. BLOCK:
21   Q. Because defendants communicated to their
22  customers that Hummingbird referred to covert
23  installation vector or vectors for Pegasus?
24     MR. AKROTIRIANAKIS: Object to the form of
25  the question.

Page 136

1      THE WITNESS: You mean if they will make the
2  linkage because of the way that we present vectors to
3  the customers?
4  BY MR. BLOCK:
5    Q. My question is about what defendants
6  communicated to their customers about Hummingbird.
7  Did defendants communicate to their customers that
8  Hummingbird referred to a family of vectors?
9      MR. AKROTIRIANAKIS: Objection: vague. Go
10  ahead.
11     THE WITNESS: No, it was for a covert vector.
12  BY MR. BLOCK:
13   Q. Okay. Did defendants communicate to their
14  customers that Hummingbird was for a covert vector
15  for Pegasus?
16   A. Yes.
17   Q. Do you still have Exhibit 2004 in front of
18  you?
19   A. Yes.
20   Q. Will you please turn to the page numbered 12
21  of 46. Are you there?
22   A. 12 of 46. Yes I'm there.
23   Q. Just to situate you, in case you have to flip
24  back, we're in Exhibit A-1 to Exhibit A. And
25  Exhibit A is the description of the system and

Page 137

1  services. And on page 8 --
2    A. Okay.
3    Q. -- it says:
4      "The System Provider's Pegasus system is
5      comprised of the following (the
6      'System'): (a) the features and
7      capabilities detailed in the
8      table attached hereto as Exhibit A-1."
9      Did I read that correctly?
10   A. Where are you at? I see Exhibit A-1 under
11  "The System" (a) and I see -- but I don't see what
12  you just read.
13   Q. Sure. On page 8 of 46 it says:
14      "The System: The System Provider's
15      Pegasus system is comprised of the
16      following (the 'System'): (a) ..."
17   A. Page 8 of 46?
18   Q. Yes. Read from the top of the page. Do me a
19  favor. Please read page 8 of 46, starting with
20  Exhibit A, and getting to the end of the first
21  subparagraph (a).
22   A. So from paragraph (a), right?
23   Q. No, please read from Exhibit A, at the top.
24   A. Okay:
25      "Description of the System and Services"

35 (Pages 134 - 137)

Page 150

1    A. Yes.
2    Q. Do those connect to the NOC?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So we do provide email access
5    and phone access I just don't know if those are the
6    exact email and phone number at the time since --
7    I don't know again it's not our contract so I don't
8    know if there was something there, but we do provide
9    email access and phone number. Today there is a
10   dedicated system for this communication so email is
11   hardly ever used.
12   BY MR. BLOCK:
13   Q. What is that dedicated system called?
14   A. It's the NSD. NSD.
15   Q. What does NSD stand for?
16   A. Okay. I think it's NSO support -- I don't
17   recall exactly but something like that.
18   Q. Something like that?
19   A. It's initials that describe a support system.
20   Q. What function do the tunnels and VPS you just
21   mentioned serve relative to Pegasus?
22   A. So to the best of my knowledge they are part
23   of the infrastructure required in order to connect
24   between the system to the outside and back and forth.
25   Q. Earlier we talked about the white services

Page 151

1    department, do you recall that?
2    A. Yes.
3    Q. And one of the things that the white services
4    department will do is set up VPS servers for a
5    customer; is that accurate?
6    A. They will not set it up. They will procure
7    the service. There is another team that will set it
8    up.
9    Q. Okay so let me start with the procurement.
10   And to set the stage a customer is setting up
11   an installation of Pegasus and requires VPS as part
12   of the infrastructure to operate Pegasus; is that
13   accurate?
14      MR. AKROTIRIANAKIS: Objection. Object to
15   the form of the question. Vague. No foundation.
16      THE WITNESS: So can you please clarify?
17   BY MR. BLOCK:
18   Q. Yeah. I think you testified to the effect
19   that customers need VPS to operate Pegasus. Is that
20   accurate?
21      MR. AKROTIRIANAKIS: Objection: misstates his
22   testimony.
23      THE WITNESS: VPS are part of the
24   infrastructure required for the system.
25   BY MR. BLOCK:

Page 152

1    Q. And one job of the white services department
2    is to procure anonymized VPS; is that accurate?
3    A. This is part of the job.
4    Q. And what steps are involved when someone in
5    the white services department procures anonymized
6    VPS?
7       MR. AKROTIRIANAKIS: Objection: no
8    foundation.
9       THE WITNESS: They will pick a provider that
10   provides the VPS, and they will choose the service
11   that they want from that provider, and they will have
12   to follow the procurement process required according
13   to that specific supplier.
14   BY MR. BLOCK:
15   Q. In what sense is the service anonymized?
16   A. In the sense that it cannot be linked to
17   either the customer or NSO.
18   Q. And how do defendants achieve that
19   anonymization with respect to VPS?
20      MR. AKROTIRIANAKIS: Objection: foundation.
21      THE WITNESS: They use an anonymized --
22   I don't know what to call it -- way in order to gain
23   a service.
24   BY MR. BLOCK:
25   Q. And I would like to know what you know about

Page 153

1    the details of that anonymized way. Can you explain
2    it?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So to the best of my knowledge
5    they will use financial means which are not directly
6    related to the customer or to the company. That's
7    I think the main point here that will allow them to
8    establish an anonymized VPS account.
9    BY MR. BLOCK:
10   Q. Can you give me an example of financial means
11   not directly related to the customer or the company
12   that the white services department uses for these
13   purposes?
14   A. It can be like a credit card.
15   Q. A credit card registered in the name other
16   than the customer or defendants I presume; is that
17   accurate?
18   A. Sounds to me, yes.
19   Q. And do you know the details about how the
20   white services department procures credit cards and
21   names not related to defendants or their customers?
22      MR. AKROTIRIANAKIS: Objection: foundation.
23      THE WITNESS: How exactly they are doing
24   that, no.
25   BY MR. BLOCK:

39 (Pages 150 - 153)

Page 154

1    Q.  Okay.  Does NSO use cryptocurrency as
2  a financial means for setting up anonymized VPS?
3        MR. AKROTIRIANAKIS:  Objection: foundation.
4        THE WITNESS:  If I'm not mistaken, yes.
5  BY MR. BLOCK:
6    Q.  Bitcoin for example?
7        MR. AKROTIRIANAKIS:  Foundation.
8        THE WITNESS:  Bitcoin for example.
9  BY MR. BLOCK:
10    Q.  Have you ever heard of Quadranet?
11    A.  Sounds familiar.
12    Q.  Is Quadranet familiar to you as a VPS
13  provider?
14    A.  No, I don't recall no.
15    Q.  Okay.  Do you recall anything about
16  Quadranet?
17    A.  Not that I recall, no.
18    Q.  Have you heard of Green Cloud VPS?
19    A.  I heard the name but I don't have more
20  details than that.
21    Q.  Do you recall having heard it in connection
22  with your work for defendants?
23    A.  Yes.
24    Q.  And what else do you recall about how you
25  heard the name, if anything?

Page 155

1    A.  Just the name.  I mean nothing in particular.
2    Q.  How about the name Choopa, C-H-O-O-P-A, is
3  that familiar to you?
4    A.  No.
5    Q.  Can you name any VPS servers that you know
6  defendants use when setting up anonymized VPS for
7  customers?
8        MR. AKROTIRIANAKIS:  Objection: foundation.
9        THE WITNESS:  Not that come in mind.
10  BY MR. BLOCK:
11    Q.  Do customers select the VPS provider, or
12  does -- do defendants?
13        MR. AKROTIRIANAKIS:  Objection: overboard.
14  No foundation.
15        THE WITNESS:  Some customers choose to set up
16  the infrastructure themselves so they will do it A to
17  Z.
18  BY MR. BLOCK:
19    Q.  I'm going to ask a question that I think your
20  counsel has an objection to but I just want to be
21  clear for the record.  Can you name customers that
22  handled the infrastructure themselves A to Z?
23        MR. AKROTIRIANAKIS:  Are you asking him a yes
24  or no question or are you asking him to name the
25  customers?

Page 156

1        MR. BLOCK:  Let's start with yes or no.
2  BY MR. BLOCK:
3    Q.  Are you able to name customers who handle the
4  installation and infrastructure themselves?
5    A.  Yes.
6    Q.  Will you please identify them for the record?
7        MR. AKROTIRIANAKIS:  Okay, that I will
8  instruct him not to answer.
9  BY MR. BLOCK:
10    Q.  Are you able to name customers for whom
11  defendants performed the infrastructure procurement
12  and installation?
13    A.  If I can?
14        MR. AKROTIRIANAKIS:  He's asking you yes or
15  no, if you can.
16    A.  Yes, I can.
17  BY MR. BLOCK:
18    Q.  Will you please identify for the record the
19  customers for whom defendants did the infrastructure
20  installation that you are able to name?
21        MR. AKROTIRIANAKIS:  Again I'm going to
22  instruct him not to answer for the same reason.
23  BY MR. BLOCK:
24    Q.  Can you tell me how many customers defendants
25  have performed infrastructure installation for?

Page 157

1        MR. AKROTIRIANAKIS:  Objection: foundation.
2        THE WITNESS:  Throughout which period of
3  time?
4  BY MR. BLOCK:
5    Q.  Let's start with the entire life of the
6  company?
7        MR. AKROTIRIANAKIS:  Objection: foundation.
8        THE WITNESS:  I don't have exact number in
9  mind.
10  BY MR. BLOCK:
11    Q.  Can you estimate it by order of magnitude?
12        MR. AKROTIRIANAKIS:  Objection: foundation.
13        THE WITNESS:  More than ten.  I mean tens.
14  BY MR. BLOCK:
15    Q.  Tens?
16    A.  Around.
17    Q.  More than 100?
18        MR. AKROTIRIANAKIS:  Objection: foundation.
19        THE WITNESS:  I don't know.
20  BY MR. BLOCK:
21    Q.  You can't rule it out, not sure.
22        MR. AKROTIRIANAKIS:  Objection: foundation.
23  Compound.  Vague.
24        THE WITNESS:  I need to count the number that
25  we had each career and then to sum it.  So ...

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 270

1  I meant is that if there is a demonstration for a
2  customer then we would like to show that part of the
3  information that the system can extract is
4  WhatsApp-related, therefore we will have a test
5  device with a WhatsApp account with basic
6  communication so during the demo we can show that we
7  can collect the data.
8  BY MR. AKROTIRIANAKIS:
9      Q.  You just used the term WhatsApp-related.  Is
10 there any other relation to WhatsApp, other than
11 demonstrating the ability to extract WhatsApp
12 messages from the demo client phone that you're
13 using?
14     MR. BLOCK:  Objection to form.
15     THE WITNESS:  Come again?  I lost you.  It
16 was very long.
17     Q.  Sorry.  In your answer you just used the term
18 WhatsApp-related.  Other than demonstrating the
19 ability to extract a WhatsApp message from the demo
20 phone that you're talking about, is there any other
21 relation to WhatsApp?
22     MR. BLOCK:  Objection to form.
23     THE WITNESS:  No.
24     MR. AKROTIRIANAKIS:  All right, thank you.
25     MR. BLOCK:  I assume, Joe, you'll permit

Page 271

1  questions about that testimony but not about other
2  topics?
3      MR. AKROTIRIANAKIS:  I asked two questions.
4  If you've got two questions, or one question as some
5  kind of recross-examination, then you can ask that
6  but we're well beyond 7 hours and it's well after
7  7 p.m. now.
8      MR. BLOCK:  I do not have re-cross.  I have
9  many other questions.
10     MR. AKROTIRIANAKIS:  Then if you don't have
11 any re-cross then I think we're done.
12     MR. BLOCK:  Then we obviously object to the
13 closure of the deposition but we'll allow it to
14 proceed, subject to that objection.
15     VIDEOGRAPHER:  Going off the record.  The
16 time is 19:08.  End of media card 6, volume 1 and
17 this is the end of the video deposition of Ramon
18 Eshkar.  If I could ask about the video and
19 transcript, if you could state that please?
20     MR. AKROTIRIANAKIS:  Is it possible if
21 I could tell you after because someone else manages
22 that and I inevitably will mess it up.
23     MR. BLOCK:  Same answer.
24 (Whereupon, the deposition concluded at 7:09 pm)
25

Page 272

1           CERTIFICATE OF COURT REPORTER
2
3      I, CHANELLE M.L. MALLIFF, a Certified
4  LiveNote Reporter, Certified Shorthand Stage IV
5  stenographic reporter, RPR and CRR (*NCRA 2003 and
6  2004), hereby certify that:
7           RAMON ESHKAR appeared on Tuesday, August 27,
8  2024, agreed to tell the truth, the whole truth, and
9  nothing but the truth, under the penalties of perjury,
10 and was thereupon examined by counsel; that the
11 testimony of RAMON ESHKAR was recorded by me
12 stenographically and was thereafter transcribed by me;
13 that the foregoing transcript is a true, accurate and
14 verbatim record to the best of my skill and ability.
15      I further certify that I am not a relative or
16 employee of any party to the action; nor am I an
17 employee or relative of any attorney or counsel to any
18 party to the action; nor am I in any way financially or
19 otherwise interested in the outcome of the action.
20
21
22
23         CHANELLE M.L. MALLIFF
24            CLR, CSSIV(NZ)
25

Page 273

1  Joseph N. Akrotirianakis, Esq.
2  jakro@kslaw.com
3               August 30, 2024
4  RE:   Whatsapp LLC., Et Al. v. NSO Group Technologies
          Limited, Et Al.
5  8/27/2024, Ramon Eshkar (#6878149)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com
16 Return completed errata within 30 days from
17 receipt of testimony.
18 If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22     Yours,
23     Veritext Legal Solutions
24
25

69 (Pages 270 - 273)

# EXHIBIT 10

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                         OAKLAND DIVISION

5    -------------------------------X

6    WHATSAPP INC.                    :

7    a Delaware corporation, and      :

8    META PLATFORMS INC,              :

9    a Delaware Corporation:

10                   Plaintiffs        :

11          v.                        :    Case No.

12   NSO GROUP TECHNOLOGIES LTD       :    4:19-cv-07123-PJH

13   and                             :

14   Q CYBER TECHNOLOGIES LTD         :

15                   Defendants       :

16   -------------------------------X

17          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18               Deposition of YARON SHOHAT

19                        LONDON

20             THURSDAY, AUGUST 29TH, 2024

21                   9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1  Q. Yes.
2  A. Okay. Which page, please?
3  Q. Page 6, please.
4  A. Page 6.
5     Yes.
6  Q. Under section 2 in the second paragraph, do you see
7     where it says:
8        "Pegasus deploys an invisible software (SW)
9     component agent on a target's device which extracts and
10    securely transmits data for intelligence analysis."
11 A. I see it.
12 Q. What does it mean that the agent was invisible?
13 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
14 A. I didn't write it. I don't know what it refers to.
15 Q. Are you familiar with the Pegasus technology that the
16    defendants offer?
17 A. Of course.
18 Q. Okay. Does that technology deploy a software component
19    that defendants describe as "invisible"?
20 A. It deploys an agent which the owner or user of the
21    targeted device is not aware of. If that's what
22    "invisible" means ...
23 Q. Does it deploy it in a manner that's invisible to the
24    infrastructure used to install it?
25 MR. AKROTIRIANAKIS: Objection. Vague.

Page 47

1  A. I am not sure what you mean by "infrastructure".
2  Q. Okay, when you said "agent", what did you mean?
3  A. Piece of software.
4  Q. And what is the agent in the context of Pegasus?
5  A. The software of Pegasus, which is running on the
6     targeted device.
7  Q. Okay, and what's an installation vector?
8  A. It is the way, the method, to deliver that agent on to
9     the device.
10 Q. The second to last bullet on page 6 says:
11       "Cooperation with local MNO is not required."
12     Do you see that?
13 A. Where, exactly?
14 Q. The second to last bullet on page 6. On exhibit 2016 it
15    says:
16       "Cooperation with local MNO is not required."
17     Do you see that?
18 A. I see that.
19 Q. Do you know what "MNO" stand for?
20 A. Yes.
21 Q. What is it?
22 A. Mobile network operator.
23 Q. Why does NSO highlight the fact that cooperation with
24    the local mobile network operator is not required?
25 MR. AKROTIRIANAKIS: Objection. No foundation.

Page 48

1  A. Because competing solutions do require MNO cooperation.
2     Some of the competing.
3  Q. Have defendants sometimes used Whatsapp infrastructure
4     as part of an installation vector for Pegasus?
5  A. I wouldn't call it Whatsapp infrastructure. But if you
6     ask if we -- if it might send Whatsapp messages, the
7     answer's yes.
8  Q. Including with respect to zero click installation?
9  A. Yes.
10 Q. Does the operation of that Whatsapp related zero click
11    installation vector require cooperation from Whatsapp?
12 A. No.
13 Q. Before operating that Whatsapp related zero click
14    installation vector, did defendants ever inform Whatsapp
15    about what they were doing?
16 MR. AKROTIRIANAKIS: No foundation.
17 A. I don't know if there were any discussions with Whatsapp
18    personnel. Might. I am not aware of.
19 Q. So if it happened, you don't know about it?
20 A. I don't know about it.
21 Q. And now, as CEO of defendants, you have never become
22    aware of a communication that defendants had with
23    Whatsapp before deploying the Hummingbird installation
24    vectors; correct?
25 A. If such discussions did occur, they were before the

Page 49

1     relevant period of 2019. So since then, there were not
2     such discussions.
3  Q. And I am asking about whether those discussions occurred
4     before 2019?
5  MR. AKROTIRIANAKIS: Objection. The question's incomplete.
6     Or maybe not even a question at all.
7  A. I didn't say that there were discussions before 2019.
8     I said that, if there were discussions, they were before
9     2019.
10 Q. But you are not aware of any discussion between
11    defendants and Whatsapp before 2019; correct?
12 A. I am not aware. But it is definitely possible.
13 Q. Are you aware of any instance in which defendants have
14    asked permission from a third party whose technology
15    defendants are using as part of an installation vector
16    for Pegasus?
17 MR. AKROTIRIANAKIS: Objection. No foundation.
18 A. I am not aware.
19 Q. Do defendants have installation vectors for Pegasus
20    today?
21 A. Yes.
22 MR. AKROTIRIANAKIS: I am actually going to instruct the
23    witness not to answer that question. The witness has
24    now answered the question, but ...
25 Q. Have defendants sought permission from any third party

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1    whose technology is involved in the provision of the
2    installation vectors defendants used for Pegasus today?
3 MR. AKROTIRIANAKIS: I am going to instruct the witness not
4    to answer that question, on the basis of the court's
5    order docket number 292.
6 MR. BLOCK: Joe, we discussed this before.
7 MR. AKROTIRIANAKIS: We did.
8 MR. BLOCK: And I want to just state for the record, our
9    understanding of that order is not a "limitation ordered
10    by the court under rule 30 C2". It made no mention of
11    any depositions and gives no basis for you to instruct
12    the witness not to answer. You have referred, in
13    relation to those instructions, to the court's Richmark
14    analysis. The threshold question is whether the witness
15    is prohibited from answering my question because of
16    a non-US legal obligation. So if the defendants assert
17    that a non-US law prohibits the witness from answering
18    my question, please say so. We can decide later whether
19    to ask the court to consider, under Richmark, what the
20    result should be for the defendants' discovery and
21    obligations in this case. But at this deposition,
22    I respectfully request a clear statement from defendants
23    as to the threshold issue.
24        So is it your position that a non-US law prohibits
25    the witness from answering the question I asked?

Page 51

1 MR. AKROTIRIANAKIS: My position is that the court's order
2    states that -- the court's order adopts the definition
3    requested by you, with a time limitation imposed by the
4    court, and says that you can seek further discovery from
5    the court.
6 MR. BLOCK: Are you stating that the defendant is prohibited
7    by a foreign legal obligation from answering the
8    question that I asked? I understand, because I asked
9    you that question before and you didn't, that you have
10    not given that instruction. And so we object to your
11    instruction to the witness not to answer as a violation
12    of rule 30.
13 By Mr. Block:
14 Q. Mr. Shohat, do defendants have an installation vector
15    for Pegasus today that uses Whatsapp technology in any
16    way?
17 MR. AKROTIRIANAKIS: I am sorry, I am going to need to catch
18    up with the transcript here.
19        Okay, go ahead.
20 A. Go ahead?
21 MR. AKROTIRIANAKIS: Do you have his question in mind?
22 A. Yes, I do. Can you repeat it, please?
23 Q. Yes. Do defendants have an installation vector for
24    Pegasus today that uses Whatsapp technology in any way?
25 A. No.

Page 52

1 Q. Do defendants have an installation vector for Pegasus
2    today that uses Facebook technology in any way?
3 A. No.
4 Q. Do defendants use an emulator capable of sending
5    Whatsapp messages in connection with Pegasus today?
6 MR. AKROTIRIANAKIS: Objection. No foundation.
7 A. I don't think I am the right person to answer that.
8 Q. Do you know the answer?
9 A. I don't know.
10 Q. Okay.
11        What are the internal names that defendants use for
12    every installation vector that you are aware of that use
13    Whatsapp technology?
14 MR. AKROTIRIANAKIS: Objection. Foundation. Also vague as
15    to time.
16 A. Actually, I don't know. We are not -- like, the
17    internal code names for vectors are internal and mostly
18    used by the R&D and support teams, and less of
19    an interest for, of me. You mentioned before the name
20    Hummingbird, which is the general name we use for zero
21    click installation, regardless of whether it is using
22    Whatsapp or other methods. That's the term that I am
23    using.
24 Q. So do you know which Hummingbird installation vectors
25    use Whatsapp?

Page 53

1 MR. AKROTIRIANAKIS: Objection. Vague.
2 A. I was told that as part of the preparation for this
3    deposition. I am not sure if my counsel --
4 MR. AKROTIRIANAKIS: He is not asking about conversations
5    that you had with lawyers for the company about the
6    lawsuit.
7 A. Before that, I did not know, or did not recall, which
8    codes were referring to Whatsapp or other vectors.
9 Q. Okay. Before that, did you know, setting aside the code
10    names, which vectors used Whatsapp technology and which
11    did not?
12 MR. AKROTIRIANAKIS: Objection. Vague.
13 A. I might have knew, but I did not recall before meeting
14    with my lawyers in the last few days.
15 Q. Okay.
16        Are you aware of any installation vectors that use
17    Facebook or Facebook Messenger?
18 A. I am not aware.
19 Q. You don't know which installation vectors do or do not
20    use those services?
21 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
22 A. I am not aware of any usage of Facebook Messenger.
23 Q. Is there any policy at defendants with respect to
24    conducting research and development on Whatsapp
25    technology?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1  A.  Yes.
2  Q.  And then it says:
3       "Pegasus 2.70 (android and P2 platform)."
4       Do you see that?
5  A.  Mm-hm.
6  Q.  Do you know what "P2 platform" means in that line?
7  MR. AKROTIRIANAKIS:  Objection.  Foundation.
8  A.  I am not sure.
9  Q.  Do you recall using the term "P2 platform" in your work
10     at NSO?
11 A.  I don't recall using "P2".
12 Q.  Do you know --  strike that.
13     I think I am finished with that document.  I will
14     ask you if I want to refer you to it.
15     Thinking back to the 2018/19 time frame, did NSO
16     provide customers the ability to choose which specific
17     installation vector to use when trying to put Pegasus on
18     a target device?
19 MR. AKROTIRIANAKIS:  Objection.  No foundation.
20 A.  I don't recall what -- how do UI -- what UI allowed
21     customers in 2018/19.
22 Q.  I have seen distinctions between zero click or covert,
23     and triggered or social engineering one click
24     installation vectors generally.  Do those terms make
25     sense to you?

Page 67

1  A.  Yes.
2  Q.  Is it okay with you if I use covert and zero click
3       interchangeably?
4  A.  I prefer zero click in this context.
5  Q.  Zero click, okay.  And as to the alternative, social
6       engineering, or triggered, or one click --
7  A.  Triggered, one click.
8  Q.  Sorry, let me just ask the question.
9  A.  Sorry.
10 Q.  As to the alternative, one click, social engineering,
11     triggered; what do you prefer?
12 A.  Let's stick with one click and zero click.
13 Q.  Okay.
14     Aside from an option to choose between a zero click
15     and a one click installation vector, are you aware of
16     Pegasus ever providing a customer a choice of which zero
17     click vector to use?
18 A.  I am not aware such option was given.
19 Q.  Okay.  Do you know that such option was never given or
20     you simply don't know whether or not it ever happened?
21 A.  I would be very surprised if such option existed.
22 Q.  Okay.  So thinking back to your knowledge of the UI in
23     2018/19, you are not aware of that option having existed
24     at that time?
25 A.  I am not aware.

Page 68

1  Q.  And thinking of your knowledge of the UI as it exists
2       today, you have also never seen Pegasus give a customer
3       an option to choose which zero click installation vector
4       to use; right?
5  A.  Correct.
6  Q.  And that's been true consistently over the course of
7       your time at NSO?
8  A.  Yes.
9  Q.  Why would you be surprised if Pegasus gave a customer
10     an option to choose which zero click installation vector
11     to use?
12 A.  Because customers don't care which vector they use, as
13     long as they get the intelligence they need.
14 Q.  That's a matter for NSO and the system to take care of,
15     not a matter for customers to operate?
16 A.  Correct.
17 MR. AKROTIRIANAKIS:  Objection.  Vague.  No foundation.
18 A.  I said "correct".
19 Q.  Okay.  Thank you.
20     Have you seen the complaint in this lawsuit?
21 A.  I don't recall.
22 Q.  Do you understand that plaintiffs accuse defendants of
23     being responsible for technology that used Whatsapp
24     infrastructure as an installation vector for Pegasus, at
25     least in the April to May 2019 timeframe?

Page 69

1  MR. AKROTIRIANAKIS:  Objection.  No foundation.
2  A.  I understand that the complaint is about that timeframe.
3       About, actually, an event that happened in,
4       I believe, April 2019.
5  Q.  Setting aside the question of whether it was the
6       defendants themselves or the defendants' customers who
7       operated the technology at issue, do you admit that NSO
8       created the technology that was used to implement the
9       attacks that the complaint describes?
10 MR. AKROTIRIANAKIS:  Objection.  Vague.  No foundation.
11 A.  NSO developed the technology that our customers are
12     using.
13 Q.  And that's the technology that was used in the events
14     that the complaint in this lawsuit describes in April
15     and May 2019; correct?
16 MR. AKROTIRIANAKIS:  Objection.  No foundation.
17 A.  NSO developed the technology that was used in the event
18     that the complaint refers to.
19 Q.  Okay.
20 MR. AKROTIRIANAKIS:  I am also going to object to the
21     question as vague.
22 Q.  As part of its Pegasus technology, NSO developed
23     an installation vector called Heaven that uses Whatsapp
24     signaling as part of a process that achieves zero click
25     installation of the Pegasus endpoint on a mobile phone;

18 (Pages 66 - 69)

true?
MR. AKROTIRIANAKIS: Objection. Compound. Vague. No foundation.
A. NSO developed -- can you repeat, please?
Q. Yes. As part of its Pegasus technology, NSO developed an installation vector called Heaven that uses Whatsapp signaling as part of a process that achieves zero click installation of the Pegasus endpoint agent on a mobile phone; true?
MR. AKROTIRIANAKIS: Objection. Compound. Vague. No foundation.
A. I am not sure about what Whatsapp signaling means, but NSO developed technology, developed installation vector for Pegasus, that involved Whatsapp messages, to install the agent on a target device.
Q. NSO also sold technology that constituted an installation vector for Pegasus that involved Whatsapp messages to install the agent on a target device; true?
MR. AKROTIRIANAKIS: Objection. Vague.
A. No. NSO licensed its technology.
Q. Okay. Licensed and obtained revenues from customers in exchange for a license to technology Pegasus created, that used Whatsapp messages to install the Pegasus agent on a target device; correct?

A. No.
MR. AKROTIRIANAKIS: Objection. Vague.
A. Not correct. Customers pay us for the capabilities they get, not for the technology itself. They really don't care if it's Whatsapp or anything else involved. They pay us for the capability to obtain intelligence which is needed for them to fight crime and terror.
Q. And all the rest is NSO's operation under the hood?
MR. AKROTIRIANAKIS: Objection. The question is incomprehensible. And argumentative.
A. Definitely not NSO operation. You might claim technology, not operation.
Q. Right. NSO, you said, doesn't sell any of its technology to customers, and retains ownership of all of that technology; correct?
MR. AKROTIRIANAKIS: Objection. It is a compound question. It is a vague question. There is no foundation for this witness, among other reasons because it calls for a legal conclusion.
A. NSO does not sell its technology, but licenses its technology.
Q. Do you have information about the content of the Whatsapp messages that NSO technology sent as part of the Heaven and Eden installation vectors?
MR. AKROTIRIANAKIS: Objection. The question assumes facts

not in evidence. And there is no foundation.
A. Do you mean what's the content of the Whatsapp messages sent?
Q. Yes.
A. I don't.
Q. Okay. So if I asked you about a payload in a call offer stanza, would you know anything about that?
MR. AKROTIRIANAKIS: Objection. Vague.
A. Payload and?
Q. In a call offer stanza. Are these terms familiar to you?
A. No.
Q. Do you know how the Heaven and Eden installation vectors caused a target device to download the Pegasus agent?
MR. AKROTIRIANAKIS: Objection. No foundation.
A. I don't recall.
Q. Okay. Is this information that you once knew but do not recall, or never had occasion to know?
A. Might have heard, knew. I don't recall.
Q. You don't recall whether or not you ever knew that information?
MR. AKROTIRIANAKIS: Objection. Misstates the witness' testimony.
A. If I knew, I don't recall it.
Q. Okay.

What legal entity is your employer?
A. Q Cyber Technologies Ltd.
Q. That's Q Cyber of Israel?
A. Yes.
Q. Has that been true throughout your employment with defendants, since 2018?
A. Yes.
Q. As a corporate representative, what is the relationship between Q Cyber Technologies Limited and NSO Group Technologies Limited?
A. Q Cyber Technologies Limited is the owner of the shares, the full owner of NSO.
Q. And who is the owner of Q Cyber Technologies Limited?
A. The owner of Q Cyber Technologies Limited is a company by the name OSY SARL, based in Luxembourg.
Q. Is OSY an acronym?
A. It is. I don't remember what it stands for.
Q. Okay.
A. I once -- I don't recall. I once knew.
Q. NSO is an acronym, right?
A. Yes.
Q. For?
A. NSO is an acronym for the first letter of the first names of the three founders of the company: Shalev Hulio, Omri Lavie and Niv. NSO.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1  Q.  Okay.  And that includes the agent that will ultimately
2     be installed on a mobile device, correct?
3  A.  Correct.
4  Q.  It includes installation vectors, correct?
5  A.  Correct.
6  Q.  It includes the user interface?
7  A.  Correct.
8  Q.  It includes storage and monitoring related software?
9  A.  Correct.
10 Q.  Anything else you can think of?
11 A.  These are the main components.
12 Q.  Okay.
13     Who is Nir Peisakhov?
14 A.  I am not familiar with the name.
15 Q.  Who is Michael Herman?
16 A.  Michael Herman used to be a product manager, and
17    I believe even ran the product management group, up,
18    more or less, to the time that I joined the company.
19 Q.  Did Michael Herman have responsibility for Pegasus in
20    that role?
21 A.  For some of the components that we mentioned.
22 Q.  Okay.
23     By the way, I would like to spell the name I gave
24    you a moment before, for the court reporter's benefit,
25    and in case I mispronounced it, so that you might know

Page 175

1  the person, notwithstanding the way the name came out of
2  my mouth, okay.  Nir, N-I-R; Peisakhov,
3  P-E-I-S-A-K-H-O-V.  Do you know Nir Peisakhov?
4  A.  I do not know this person.
5  Q.  Okay.  Have you ever heard that name aside from this
6     deposition?
7  A.  Not before preparing for this deposition.
8  Q.  How did you hear it in connection with your preparation?
9  MR. AKROTIRIANAKIS:  Don't reveal communications with
10    counsel.  If you read it in a document or something like
11    that you can say it.
12 A.  I heard it from my counsel.
13 Q.  You don't recall seeing that name in any document you
14    reviewed?
15 A.  No.
16 Q.  You don't recall seeing that name in the complaint in
17    this lawsuit?
18 A.  No.
19 Q.  Okay.  Who is Yossi Monsingo?
20 A.  Yossi was one of the support team members, or managers,
21    for Q.
22 Q.  What do you mean by "support"?
23 A.  Support, you mentioned before tier 1, tier 2, tier 3.
24    He is probably in all of those.
25 Q.  Is it Mr. Monsingo?

Page 176

1  A.  Okay, yes.
2  Q.  Oh, I am asking you.  I didn't know if Yossi was male or
3     a female?
4  A.  Yes, Yossi is a male.  Yes.
5  Q.  Do you know whether Mr. Monsingo did any work related to
6     defendants' use of Whatsapp technology for installation
7     vectors?
8  A.  He supported Pegasus throughout the relevant period, so
9     I assume he was familiar with the vectors.
10 Q.  Okay.  Who is Alon Yudis?
11 A.  It is another person on the support team.
12 Q.  Do you know what Mr. Yudis' responsibilities were at
13    NSO?
14 A.  Similar to Yossi's.
15 Q.  I know we mentioned this name, who is Avi Itzhak?
16 A.  He is the manager of what we call the success teams,
17    which includes the support teams.
18 Q.  Mr. Itzhak has knowledge of NSO client relations?
19 A.  The support team interacts with clients, so to that
20    extent, yes.
21 Q.  Do you know whether Mr. Itzhak worked on research and
22    development for Pegasus?
23 A.  He did not work for research and development.
24 Q.  How about customer support for Pegasus?
25 A.  Customer support for Pegasus reported to him.

Page 177

1  Q.  Okay.  Guy Mohlo, M-O-H-L-O?
2  A.  Mohlo.
3  Q.  Mohlo.  Thank you.
4  A.  The name rings a bell, but I don't know his role.
5  MR. AKROTIRIANAKIS:  There was a name you said, Alon --
6  A.  Yudis.
7  Q.  The reporter might appreciate your spelling, if you have
8     it.
9  MR. AKROTIRIANAKIS:  I have A-L-O-N, Y-U-D-I-S.  And I will
10    trust my friends across the table to correct me if
11    I have that wrong.
12 By Mr. Block:
13 Q.  Cast your mind back to April or May 2019, if you will?
14 A.  Okay.
15 Q.  We have discussed Hummingbird, do you recall that?
16 A.  Yes.
17 Q.  What does Hummingbird mean to you?
18 A.  Hummingbird is the general name for zero click vector
19    over and through the operating system.
20 Q.  Do you remember when Hummingbird went offline
21    in May 2019?
22 A.  Hummingbird goes online and offline many times a year.
23    I don't remember specific dates.
24 Q.  Do you remember the events that are described in the
25    complaint in this lawsuit?

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 Q.  Right, you were --
2 A.  We became, we were brought in to the loop only after
3    Francisco Partners and the potential acquired became
4    agreed on the terms and they were about to conclude the
5    transaction, only then we became aware that such
6    presentations were conducted.
7 Q.  You were asked a lot of questions, both numerically and
8    time wise, about the P&L statements of WestBridge and
9    involvement about any payments made to WestBridge,
10    I think the question actually related to a decision that
11    you were asked to make about whether or not to send the
12    money to the company, do you remember that line of
13    questions?
14 A.  Yes, I remember.
15 Q.  Okay.  And in your answers to that, they were not really
16    attached in time to any particular period, but are you
17    able to say when it was at all that you became ever
18    involved with, like, reviewing the P&L for WestBridge,
19    or anything like that?
20 MR. BLOCK:  I object to the form of the question and the
21    coaching of the witness.
22 A.  I became aware of it, of the request to make money
23    transfers to WestBridge, only after I became CEO, which
24    means all of my answers were for a period after August
25    '22.

Page 255

1 Q.  August 2022?
2 MR. BLOCK:  Objection to form.
3 A.  Yes.  After August 2022.
4 Q.  Okay.  And you were asked a lot of questions about trips
5    that you made to the United States, to Washington DC,
6    with a stop over in New York, and meetings with, in DC,
7    reporters, policymakers and service providers, do you
8    recall that testimony?
9 MR. BLOCK:  Objection to form.
10 A.  Yes.
11 Q.  When were those trips to Washington DC that you
12    testified about in relation to you becoming the CEO of
13    the company?
14 A.  All of those trips to Washington were after August 2022.
15 MR. AKROTIRIANAKIS:  Alright, thank you.
16 THE VIDEOGRAPHER:  Going off the record.  The time is 19:22.
17    End of media card number 6 volume 1 and this is the end
18    of the video deposition of Yaron Shohat.
19 (7:22 p.m.)
20    (Whereupon, the deposition concluded at 7:22 p.m.)
21
22
23
24
25

Page 256

1    CERTIFICATE OF COURT REPORTER
2
3 I, CHRIS LANG, an Accredited Real-time Reporter, hereby
4 certify that the testimony of the witness YARON SHOHAT in
5 the foregoing transcript, taken on this 29TH day of AUGUST,
6 2024 was recorded by me in machine shorthand and was
7 thereafter transcribed by me; and that the foregoing
8 transcript is a true and accurate verbatim record of the
9 said testimony.
10
11 I further certify that I am not a relative, employee,
12 counsel or financially involved with any of the parties to
13 the within cause, nor am I an employee or relative of any
14 counsel for the parties, nor am I in any way interested in
15 the outcome of the within cause.
16
17
18
19 Name:   CHRIS LANG
20 Date:  8/29/24
21
22
23
24
25

Page 257

1
2    CERTIFICATE OF DEPONENT
3
4 I, YARON SHOHAT, hereby certify that I have read the
   foregoing pages, numbered 1  through 259, of my deposition
5 of testimony taken in these proceedings on 29TH, AUGUST,
   2024 and, with the exception of the changes listed on the
6 next page and/or corrections, if any, find them to be a true
   and accurate transcription thereof.
7
8
9
10
11 Signed:  ......................
12 Name:   YARON SHOHAT
13 Date:   ......................
14
15
16
17
18
19
20
21
22
23
24
25

65 (Pages 254 - 257)

# EXHIBIT 17

## FILED UNDER SEAL

⚠ You no longer have access to Support and Updates. Renew online, remind me later or never remind me again.

Dashboard / MEPA Android Exploit Validation Home / ERISED

# Deviate installations on white environment - from 12/01/2020

Created by Unknown User (danielgo), last modified by Unknown User (guyme) on Jun 07, 2020

⚠ **You are viewing an old version of this page.** View the current version.

Compare with Current　·　Restore this Version　·　View Page History

« Previous　**Version 1719**　Next »



| | Count |
|---|---|
| Total | 725 |



Pivot Table settings ⚙ ⌄
Row labels
Click and start typing...
Column labels
Click and start typing...
Calculated column
ErisedID
Operation type
Count

Start adding filters in the filter tools menu. ⚙ ⌄

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ER-32 | 46721594330 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1768 | | | |
| 2 | ER-23 | 46733966375 | SM-J400F | 8 | 3.18.14 | 2.20.157 | 1767 | | | |
| 3 | ER-09 | 46732331676 | SM-A730F | 8 | 4.4.13 | 2.20.172 | 1766 | | | |
| 4 | ER-05 | 46766038304 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1765 | | | |
| 5 | ER-05 | 46766038304 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1764 | | | |
| 6 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1763 | | | |
| 7 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1762 | | | |
| 8 | ER-09 | 46732331676 | SM-A730F | 8 | 4.4.13 | 2.20.172 | 1755 | | | |
| 9 | ER-05 | 46766038304 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1753 | | | |
| 10 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1751 | | | |
| 11 | ER-09 | 46732331676 | SM-A730F | 8 | 4.4.13 | 2.20.172 | 1747 | | | |
| 12 | ER-41 | 46733928445 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1746 | | | |
| 13 | ER-39 | 46721675303 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1745 | | | |
| 14 | ER-38 | 46732308094 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1744 | | | |
| 15 | ER-34 | 46768721551 | SM-M305F | 9 | 4.4.111 | 2.20.157 | 1743 | | | |
| 16 | ER-32 | 46721594330 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1741 | | | |
| 17 | ER-23 | 46733966375 | SM-J400F | 8 | 3.18.14 | 2.20.157 | 1740 | | | |
| 18 | ER-05 | 46766038304 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1739 | | | |
| 19 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1738 | | | |
| 20 | ER-09 | 46732331676 | SM-A730F | 8 | 4.4.13 | 2.20.172 | 1737 | | | |
| 21 | ER-33 | 46734093049 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1713 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY　　　　NSO_WHATSAPP_00044814

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 22 | ER-03 | 46766294025 | SM-G960F | 9 | 4.9.59 | 2.20.157 | 1709 | | | |
| 23 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1703 | | | |
| 24 | ER-14 | 46731434038 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1702 | | | |
| 25 | ER-33 | 46734093049 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1701 | | | |
| 26 | ER-03 | 46766294025 | SM-G960F | 9 | 4.9.59 | 2.20.157 | 1700 | | | |
| 27 | ER-32 | 46721594330 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1699 | | | |
| 28 | ER-31 | 46731430677 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1698 | | | |
| 29 | ER-05 | 46766038304 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1697 | | | |
| 30 | ER-33 | 46734093049 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1696 | | | |
| 31 | ER-34 | 59899866184 | SM-M305F | 9 | 4.4.111 | 2.20.157 | 1695 | | | |
| 32 | ER-03 | 46766294025 | SM-G960F | 9 | 4.9.59 | 2.20.157 | 1694 | | | |
| 33 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1693 | | | |
| 34 | ER-23 | 46733966375 | SM-J400F | 8 | 3.18.14 | 2.20.157 | 1691 | | | |
| 35 | ER-14 | 46731434038 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1690 | | | |
| 36 | ER-39 | 46721675303 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1688 | | | |
| 37 | ER-11 | 46768721512 | SM-A530F | 8 | 4.4.13 | 2.20.123 | 1687 | | | |
| 38 | ER-38 | 46732308094 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1685 | | | |
| 39 | ER-02 | 46768721241 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1684 | | | |
| 40 | ER-23 | 46733966375 | SM-J400F | 8 | 3.18.14 | 2.20.157 | 1683 | | | |
| 41 | ER-33 | 46734093049 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1682 | | | |
| 42 | ER-41 | 46733928445 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1681 | | | |
| 43 | ER-03 | 46766294025 | SM-G960F | 9 | 4.9.59 | 2.20.140 | 1676 | | | |
| 44 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1663 | | | |
| 45 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1660 | | | |
| 46 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1657 | | | |
| 47 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1650 | | | |
| 48 | ER-03 | 31645706266 | SM-G960F | 9 | 4.9.59 | 2.20.140 | 1649 | | | |
| 49 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1646 | | | |
| 50 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1645 | | | |
| 51 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1644 | | | |
| 52 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1642 | | | |
| 53 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1639 | | | |
| 54 | ER-33 | 31645762912 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1587 | | | |
| 55 | ER-33 | 31645762912 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1586 | | | |
| 56 | ER-33 | 31645762912 | SM-N960F | 8.1 | 4.9.59 | 2.20.157 | 1585 | | | |
| 57 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1572 | | | |
| 58 | ER-11 | 447716008148 | SM-A530F | 8 | 4.4.13 | 2.20.123 | 1571 | | | |
| 59 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.140 | 1570 | | | |
| 60 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1568 | | | |
| 61 | ER-34 | 59899866184 | SM-M305F | 9 | 4.4.111 | 2.20.64 | 1566 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044815

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 62 | ER-32 | 31645566784 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1565 | | | |
| 63 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1564 | | | |
| 64 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1563 | | | |
| 65 | ER-11 | 447716008148 | SM-A530F | 8 | 4.4.13 | 2.20.123 | 1562 | | | |
| 66 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1561 | | | |
| 67 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.140 | 1560 | | | |
| 68 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.140 | 1559 | | | |
| 69 | ER-09 | 447554685661 | SM-A730F | 8 | 4.4.13 | 2.20.89 | 1558 | | | |
| 70 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1557 | | | |
| 71 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1556 | | | |
| 72 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1555 | | | |
| 73 | ER-03 | 31645706266 | SM-G960F | 9 | 4.9.59 | 2.20.140 | 1554 | | | |
| 74 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1553 | | | |
| 75 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1552 | | | |
| 76 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1550 | | | |
| 77 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1549 | | | |
| 78 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1548 | | | |
| 79 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1547 | | | |
| 80 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1546 | | | |
| 81 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1545 | | | |
| 82 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1544 | | | |
| 83 | ER-11 | 447716008148 | SM-A530F | 8 | 4.4.13 | 2.20.123 | 1543 | | | |
| 84 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1542 | | | |
| 85 | ER-09 | 447554685661 | SM-A730F | 8 | 4.4.13 | 2.20.89 | 1541 | | | |
| 86 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.108 | 1539 | | | |
| 87 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1534 | | | |
| 88 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1533 | | | |
| 89 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.108 | 1532 | | | |
| 90 | ER-34 | 59899866184 | SM-M305F | 9 | 4.4.111 | 2.20.64 | 1531 | | | |
| 91 | ER-33 | 31645762912 | SM-N960F | 8.1 | 4.9.59 | 2.20.89 | 1530 | | | |
| 92 | ER-32 | 31645566784 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1529 | | | |
| 93 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1528 | | | |
| 94 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1527 | | | |
| 95 | ER-11 | 447716008148 | SM-A530F | 8 | 4.4.13 | 2.20.123 | 1526 | | | |
| 96 | ER-09 | 447554685661 | SM-A730F | 8 | 4.4.13 | 2.20.89 | 1525 | | | |
| 97 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1522 | | | |
| 98 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1521 | | | |
| 99 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1520 | | | |
| 100 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1519 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00044816

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 101 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1518 | | | |
| 102 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1517 | | | |
| 103 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1516 | | | |
| 104 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1515 | | | |
| 105 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1513 | | | |
| 106 | ER-03 | 31645706266 | SM-G960F | 9 | 4.9.59 | 2.20.140 | 1511 | | | |
| 107 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1510 | | | |
| 108 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1509 | | | |
| 109 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1505 | | | |
| 110 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1504 | | | |
| 111 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1503 | | | |
| 112 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1502 | | | |
| 113 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1501 | | | |
| 114 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.140 | 1500 | | | |
| 115 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1499 | | | |
| 116 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1498 | | | |
| 117 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1497 | | | |
| 118 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1496 | | | |
| 119 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1495 | | | |
| 120 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1494 | | | |
| 121 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1464 | | | |
| 122 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1463 | | | |
| 123 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1462 | | | |
| 124 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1461 | | | |
| 125 | ER-09 | 447554685661 | SM-A730F | 9 | 4.4.13 | 2.20.89 | 1459 | | | |
| 126 | ER-32 | 31645566784 | SM-M205F/DS | 9 | 4.4.111 | 2.20.140 | 1458 | | | |
| 127 | ER-03 | 31645706266 | SM-G960F | 9 | 4.9.59 | 2.20.140 | 1457 | | | |
| 128 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.140 | 1456 | | | |
| 129 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 2.20.140 | 1455 | | | |
| 130 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.140 | 1454 | | | |
| 131 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.140 | 1453 | | | |
| 132 | ER-41 | 31682549068 | SM-G570F | 8 | 3.18.14 | 2.20.123 | 1451 | | | |
| 133 | ER-39 | 31682703511 | SM-J330F | 8 | 3.18.14 | 2.20.108 | 1450 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044817

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 134 | ER-38 | 31682565328 | SM-A600FN | 9 | 3.18.91 | 2.20.123 | 1449 | | | |
| 135 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1448 | | | |
| 136 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1447 | | | |
| 137 | ER-23 | 31682700413 | SM-J400F | 8 | 3.18.14 | 2.20.89 | 1446 | | | |
| 138 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 20.20.64 | 1443 | | | |
| 139 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.108 | 1442 | | | |
| 140 | ER-06 | 59899863730 | SM-G965F | 9 | 4.9.59 | 2.20.64 | 1440 | | | |
| 141 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.123 | 1438 | | | |
| 142 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.47 | 1437 | | | |
| 143 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.64 | 1436 | | | |
| 144 | ER-35 | 31645017094 | SM-G965F | 9 | 4.9.59 | 2.20.89 | 1435 | | | |
| 145 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.47 | 1434 | | | |
| 146 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.64 | 1433 | | | |
| 147 | ER-33 | 31645762912 | SM-N960F | 8.1 | 4.9.59 | 2.20.89 | 1432 | | | |
| 148 | ER-31 | 31645741727 | SM-G955FD | 8 | 4.4.111 | 20.20.64 | | | | |
| 149 | ER-14 | 59899861766 | SM-A530F | 9 | 4.4.111 | 2.20.47 | 1430 | | | |
| 150 | ER-13 | 447435217370 | SM-G950F | 9 | 4.4.111 | 2.20.47 | 1429 | | | |
| 151 | ER-06 | 59899863730 | SM-G965F | 9 | 4.9.59 | 2.20.64 | 1427 | | | |
| 152 | ER-05 | 447436794025 | SM-A730F | 9 | 4.4.111 | 2.20.64 | 1426 | | | |
| 153 | ER-03 | 31645706266 | SM-G960F | 9 | 4.9.59 | 2.20.11 | 1425 | | | |
| 154 | ER-02 | 447716008158 | SM-G950F | 9 | 4.4.111 | 2.20.89 | 1424 | | | |
| 155 | ER-23 | 31682700413 | SM-J400F | 8 | | 2.20.89 | 1386 | | | |
| 156 | ER-23 | 31682700413 | SM-J400F | 8 | | 2.20.89 | 1385 | | | |
| 157 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1370 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044818

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 158 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.123 | 1369 | | | |
| 159 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.123 | 1368 | | | |
| 160 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1366 | | | |
| 161 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.123 | 1365 | | | |
| 162 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.123 | 1364 | | | |
| 163 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | | | | |
| 164 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1361 | | | |
| 165 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.89 | 1360 | | | |
| 166 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1359 | | | |
| 167 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1358 | | | |
| 168 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1357 | | | |
| 169 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1356 | | | |
| 170 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1355 | | | |
| 171 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.108 | 1329 | | | |
| 172 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.108 | 1328 | | | |
| 173 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1321 | | | |
| 174 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1319 | | | |
| 175 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1318 | | | |
| 176 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1317 | | | |
| 177 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1316 | | | |
| 178 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1314 | | | |
| 179 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.89 | 1313 | | | |
| 180 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1312 | | | |
| 181 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1310 | | | |
| 182 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1309 | | | |
| 183 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1308 | | | |
| 184 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1306 | | | |
| 185 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1305 | | | |
| 186 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1304 | | | |
| 187 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.64 | 1303 | | | |
| 188 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1302 | | | |
| 189 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1301 | | | |
| 190 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1300 | | | |
| 191 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1299 | | | |
| 192 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1298 | | | |
| 193 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1297 | | | |
| 194 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1293 | | | |
| 195 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1288 | | | |
| 196 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1287 | | | |
| 197 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1286 | | | |
| 198 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1285 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044819

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 199 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1284 | | | |
| 200 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1283 | | | |
| 201 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1282 | | | |
| 202 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1281 | | | |
| 203 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1280 | | | |
| 204 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1279 | | | |
| 205 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1278 | | | |
| 206 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1277 | | | |
| 207 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1276 | | | |
| 208 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1275 | | | |
| 209 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1274 | | | |
| 210 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1273 | | | |
| 211 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1272 | | | |
| 212 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1271 | | | |
| 213 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1270 | | | |
| 214 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1269 | | | |
| 215 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1267 | | | |
| 216 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1266 | | | |
| 217 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1263 | | | |
| 218 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1262 | | | |
| 219 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1260 | | | |
| 220 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1259 | | | |
| 221 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1258 | | | |
| 222 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1257 | | | |
| 223 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1256 | | | |
| 224 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1255 | | | |
| 225 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1254 | | | |
| 226 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1253 | | | |
| 227 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1252 | | | |
| 228 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1251 | | | |
| 229 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1245 | | | |
| 230 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1244 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY — NSO_WHATSAPP_00044820

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 231 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1242 | | | |
| 232 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1241 | | | |
| 233 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1239 | | | |
| 234 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.89 | 1238 | | | |
| 235 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1237 | | | |
| 236 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1236 | | | |
| 237 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1234 | | | |
| 238 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1233 | | | |
| 239 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1232 | | | |
| 240 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1230 | | | |
| 241 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.89 | 1229 | | | |
| 242 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1228 | | | |
| 243 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1227 | | | |
| 244 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1226 | | | |
| 245 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1225 | | | |
| 246 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1224 | | | |
| 247 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1222 | | | |
| 248 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1221 | | | |
| 249 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1220 | | | |
| 250 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1218 | | | |
| 251 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1215 | | | |
| 252 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1214 | | | |
| 253 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.89 | 1212 | | | |
| 254 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.89 | 1210 | | | |
| 255 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1209 | | | |
| 256 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.89 | 1208 | | | |
| 257 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.89 | 1207 | | | |
| 258 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.64 | 1206 | | | |
| 259 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1204 | | | |
| 260 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1203 | | | |
| 261 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.64 | 1201 | | | |
| 262 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.64 | 1199 | | | |
| 263 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1190 | | | |
| 264 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1188 | | | |
| 265 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1187 | | | |
| 266 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.64 | 1186 | | | |
| 267 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1185 | | | |
| 268 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.64 | 1184 | | | |
| 269 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.64 | 1183 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044821

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 270 | ER-01 | 31645134912 | SM-G955F | 9 | | 2.20.64 | 1182 | | | |
| 271 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1181 | | | |
| 272 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.64 | 1180 | | | |
| 273 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1179 | | | |
| 274 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.64 | 1178 | | | |
| 275 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1177 | | | |
| 276 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.64 | 1176 | | | |
| 277 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.64 | 1175 | | | |
| 278 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.64 | 1174 | | | |
| 279 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.64 | 1173 | | | |
| 280 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1172 | | | |
| 281 | ER-01 | 31645134912 | SM-G955F | 9 | | 2.20.64 | 1171 | | | |
| 282 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1170 | | | |
| 283 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.64 | 1169 | | | |
| 284 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.64 | 1167 | | | |
| 285 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.64 | 1166 | | | |
| 286 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.64 | 1165 | | | |
| 287 | ER-01 | 31645134912 | SM-G955F | 9 | | 2.20.64 | 1164 | | | |
| 288 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1163 | | | |
| 289 | ER-01 | 31645134912 | SM-G955F | 9 | | 2.20.64 | 1162 | | | |
| 290 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1161 | | | |
| 291 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1160 | | | |
| 292 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1159 | | | |
| 293 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.64 | 1124 | | | |
| 294 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.64 | 1123 | | | |
| 295 | Redacted – Per Court Order | 971564663989 | SM-G960W | 8 | | | 1120 | | | |
| 296 | | 971564663989 | SM-G960W | 8 | | | 1119 | | | |
| 297 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.11 | 1118 | | | |
| 298 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 1116 | | | |
| 299 | | | | | | | | | | |
| 300 | | | | | | | | | | |
| 301 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 1115 | | | |
| 302 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 1113 | | | |
| 303 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1112 | | | |
| 304 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 1111 | | | |
| 305 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.47 | 1110 | | | |
| 306 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1109 | | | |
| 307 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1108 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044822

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 308 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1107 | | | |
| 309 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1106 | | | |
| 310 | ER-12 | 31645201302 | SM-G935T | 7 | | 2.20.27 | 1105 | | | |
| 311 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.11 | 1104 | | | |
| 312 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1103 | | | |
| 313 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.47 | 1102 | | | |
| 314 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1101 | | | |
| 315 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.47 | 1100 | | | |
| 316 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1098 | | | |
| 317 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1097 | | | |
| 318 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 1096 | | | |
| 319 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 1095 | | | |
| 320 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.47 | 1094 | | | |
| 321 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.11 | 1093 | | | |
| 322 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 1092 | | | |
| 323 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1091 | | | |
| 324 | ER-15 | 34675881927 | SM-G930F | 7 | | 2.20.27 | 1090 | | | |
| 325 | ER-12 | 31645201302 | SM-G935T | 7 | | 2.20.27 | 1089 | | | |
| 326 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1088 | | | |
| 327 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1087 | | | |
| 328 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1086 | | | |
| 329 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1085 | | | |
| 330 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1084 | | | |
| 331 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.47 | 1083 | | | |
| 332 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1082 | | | |
| 333 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.47 | 1081 | | | |
| 334 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 1080 | | | |
| 335 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1079 | | | |
| 336 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1078 | | | |
| 337 | ER-15 | 34675881927 | SM-G930F | 7 | | 2.19.360 | 1075 | | | |
| 338 | ER-12 | 31645201302 | SM-G935T | 7 | | 2.19.330 | 1074 | | | |
| 339 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.47 | 1073 | | | |
| 340 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.47 | 1072 | | | |
| 341 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.47 | 1070 | | | |
| 342 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.47 | 1069 | | | |
| 343 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.47 | 1068 | | | |
| 344 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1066 | | | |
| 345 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1065 | | | |
| 346 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 1063 | | | |
| 347 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.11 | 1062 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY NSO_WHATSAPP_00044823

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 348 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1061 | | | |
| 349 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2.20.11 | 1060 | | | |
| 350 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1059 | | | |
| 351 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1058 | | | |
| 352 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1057 | | | |
| 353 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1055 | | | |
| 354 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1054 | | | |
| 355 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1053 | | | |
| 356 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1052 | | | |
| 357 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1051 | | | |
| 358 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1049 | | | |
| 359 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1048 | | | |
| 360 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1047 | | | |
| 361 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1044 | | | |
| 362 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1043 | | | |
| 363 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1042 | | | |
| 364 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1041 | | | |
| 365 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1040 | | | |
| 366 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1039 | | | |
| 367 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1037 | | | |
| 368 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1036 | | | |
| 369 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1034 | | | |
| 370 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1033 | | | |
| 371 | ER-33 | 31645762912 | SM-N960F | 8.1 | | 2..20.11 | 1032 | | | |
| 372 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.19.330 | 1031 | | | |
| 373 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.11 | 1030 | | | |
| 374 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.19.330 | 1029 | | | |
| 375 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 1028 | | | |
| 376 | ER-08 | 447436794320 | SM-G925F | 7 | | 2.19.330 | 1027 | | | |
| 377 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.11 | 1026 | | | |
| 378 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 1025 | | | |
| 379 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1024 | | | |
| 380 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1023 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044824

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 381 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1022 | | | |
| 382 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 1020 | | | |
| 383 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.11 | 1018 | | | |
| 384 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 1017 | | | |
| 385 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 1015 | | | |
| 386 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1014 | | | |
| 387 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 1013 | | | |
| 388 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 1012 | | | |
| 389 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 1011 | | | |
| 390 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 1008 | | | |
| 391 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 1007 | | | |
| 392 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1005 | | | |
| 393 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 1004 | | | |
| 394 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 1003 | | | |
| 395 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 1002 | | | |
| 396 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 1001 | | | |
| 397 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 1000 | | | |
| 398 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 999 | | | |
| 399 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 998 | | | |
| 400 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 997 | | | |
| 401 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 995 | | | |
| 402 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 994 | | | |
| 403 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 993 | | | |
| 404 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 991 | | | |
| 405 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 988 | | | |
| 406 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 987 | | | |
| 407 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 986 | | | |
| 408 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 985 | | | |
| 409 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 984 | | | |
| 410 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 983 | | | |
| 411 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 982 | | | |
| 412 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.11 | 981 | | | |
| 413 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 980 | | | |
| 414 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 979 | | | |
| 415 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 978 | | | |
| 416 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 977 | | | |
| 417 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 976 | | | |
| 418 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 975 | | | |
| 419 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 974 | | | |
| 420 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 973 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY      NSO_WHATSAPP_00044825

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 421 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 972 | | | |
| 422 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 971 | | | |
| 423 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 970 | | | |
| 424 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 969 | | | |
| 425 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 968 | | | |
| 426 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 966 | | | |
| 427 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 964 | | | |
| 428 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 963 | | | |
| 429 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 962 | | | |
| 430 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 961 | | | |
| 431 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 960 | | | |
| 432 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 959 | | | |
| 433 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 957 | | | |
| 434 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 952 | | | |
| 435 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 950 | | | |
| 436 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 949 | | | |
| 437 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 948 | | | |
| 438 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 947 | | | |
| 439 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 945 | | | |
| 440 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 944 | | | |
| 441 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 943 | | | |
| 442 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 942 | | | |
| 443 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.11 | 940 | | | |
| 444 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 939 | | | |
| 445 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 938 | | | |
| 446 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.20.27 | 937 | | | |
| 447 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 936 | | | |
| 448 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 935 | | | |
| 449 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.20.27 | 934 | | | |
| 450 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 933 | | | |
| 451 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 932 | | | |
| 452 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 931 | | | |
| 453 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 930 | | | |
| 454 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 927 | | | |
| 455 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.11 | 926 | | | |
| 456 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 925 | | | |
| 457 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 924 | | | |
| 458 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 923 | | | |
| 459 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 922 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044826

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 460 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 921 | | | |
| 461 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.20.27 | 920 | | | |
| 462 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 919 | | | |
| 463 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.27 | 918 | | | |
| 464 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 916 | | | |
| 465 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 914 | | | |
| 466 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 912 | | | |
| 467 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 911 | | | |
| 468 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 910 | | | |
| 469 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 909 | | | |
| 470 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 907 | | | |
| 471 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 906 | | | |
| 472 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 905 | | | |
| 473 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 904 | | | |
| 474 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 903 | | | |
| 475 | ER-32 | 31645566784 | SM-M205F/DS | 9 | | 2.20.27 | 902 | | | |
| 476 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.11 | 896 | | | |
| 477 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 895 | | | |
| 478 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.19.360 | 894 | | | |
| 479 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 893 | | | |
| 480 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 892 | | | |
| 481 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.19.330 | 891 | | | |
| 482 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 890 | | | |
| 483 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.19.360 | 889 | | | |
| 484 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 888 | | | |
| 485 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 887 | | | |
| 486 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | 2.19.330 | 886 | | | |
| 487 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 885 | | | |
| 488 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.11 | 883 | | | |
| 489 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 882 | | | |
| 490 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.20.11 | 881 | | | |
| 491 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.19.330 | 880 | | | |
| 492 | ER-34 | 59899866184 | SM-M305F | 9 | | 2.20.11 | 879 | | | |
| 493 | ER-31 | 31645741727 | SM-G955FD | 8 | | 2.20.11 | 878 | | | |
| 494 | ER-09 | 447554685661 | SM-A730F | 8 | | 2.20.11 | 877 | | | |
| 495 | ER-05 | 447436794025 | SM-A730F | 9 | | 2.20.11 | 876 | | | |
| 496 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.19.330 | 874 | | | |
| 497 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 873 | | | |
| 498 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 872 | | | |
| 499 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | 2.19.330 | 871 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    NSO_WHATSAPP_00044827

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 500 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.19.330 | 870 | | | |
| 501 | ER-35 | 31645017094 | SM-G965F | 9 | | 2.19.360 | 869 | | | |
| 502 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.20.11 | 868 | | | |
| 503 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.19.330 | 867 | | | |
| 504 | | 351935103401 | SM-G950F | 9 | | 2.20.11 | 866 | | | |
| 505 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.19.360 | 865 | | | |
| 506 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.20.11 | 864 | | | |
| 507 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | 2.19.330 | 863 | | | |
| 508 | | 527227922786 | SM-G930F | 8 | | 2.20.11 | 861 | | | |
| 509 | | 24104142053 | SM-G960F | 9 | | 2.20.11 | 860 | | | |
| 510 | | 24104146517 | SM-N960F | 8.1 | | 2.20.11 | 859 | | | |
| 511 | ER-14 | 59899861766 | SM-A530F | 9 | | 2.20.11 | 858 | | | |
| 512 | ER-06 | 59899863730 | SM-G965F | 9 | | 2.20.11 | 857 | | | |
| 513 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 856 | | | |
| 514 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 855 | | | |
| 515 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 854 | | | |
| 516 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 851 | | | |
| 517 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 850 | | | |
| 518 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 846 | | | |
| 519 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.20.11 | 845 | | | |
| 520 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.19.330 | 842 | | | |
| 521 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 841 | | | |
| 522 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 840 | | | |
| 523 | | 527227922786 | SM-G930F | 8 | | 2.20.11 | 839 | | | |
| 524 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 838 | | | |
| 525 | | 527227922786 | SM-G930F | 8 | | 2.20.11 | 837 | | | |
| 526 | ER-04 | 447436794290 | SM-A530F | 8 | | 2.19.330 | 834 | | | |
| 527 | ER-11 | 447716008148 | SM-A530F | 8 | | 2.19.330 | 832 | | | |
| 528 | | 447463172405 | Iphone 11 | | | | | | | |
| 529 | | 527227922786 | SM-G930F | 8 | | 2.20.11 | 831 | | | |
| 530 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.19.330 | 830 | | | |
| 531 | ER-13 | 447435217370 | SM-G950F | 9 | | 2.19.330 | 829 | | | |
| 532 | ER-03 | 31645706266 | SM-G960F | 9 | | 2.19.330 | 826 | | | |
| 533 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | 2.19.330 | 825 | | | |
| 534 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | 2.19.330 | 823 | | | |
| 535 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 822 | | | |
| 536 | Rooted Device | 447716011569 | SM-N950F | 9 | | 2.20.11 | 821 | | | |
| 537 | ER-02 | 447716008158 | SM-G950F | 9 | | 2.19.360 | 820 | | | |
| 538 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 819 | | | |
| 539 | Rooted Device | 24106836823 | SM-G950F | 9 | | 2.20.11 | 811 | | | |
| 540 | Rooted Device | 31629253787 | SM-G950F | 9 | | 2.20.11 | 810 | | | |
| 541 | Rooted Device | 31629253787 | SM-G950F | 9 | | 2.20.11 | 809 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044828

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 542 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 805 | | | |
| 543 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 804 | | | |
| 544 | ER-02 | 447716008158 | SM-G950F | 9 | | | 803 | | | |
| 545 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 790 | | | |
| 546 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 789 | | | |
| 547 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 788 | | | |
| 548 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 786 | | | |
| 549 | ER-04 | 447436794290 | SM-A530F | 8 | | | 785 | | | |
| 550 | ER-14 | 59899861766 | SM-A530F | 9 | | | 784 | | | |
| 551 | ER-13 | 447435217370 | SM-G950F | 9 | | | 783 | | | |
| 552 | ER-03 | 31645706266 | SM-G960F | 9 | | | 782 | | | |
| 553 | ER-35 | 31645017094 | SM-G965F | 9 | | | 781 | | | |
| 554 | ER-04 | 447436794290 | SM-A530F | 8 | | | 780 | | | |
| 555 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 778 | | | |
| 556 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 776 | | | |
| 557 | ER-11 | 447716008148 | SM-A530F | 8 | | | 774 | | | |
| 558 | ER-02 | 447716008158 | SM-G950F | 9 | | | 773 | | | |
| 559 | ER-13 | 447435217370 | SM-G950F | 9 | | | 772 | | | |
| 560 | ER-03 | 31645706266 | SM-G960F | 9 | | | 770 | | | |
| 561 | ER-14 | 59899861766 | SM-A530F | 9 | | | 768 | | | |
| 562 | ER-11 | 447716008148 | SM-A530F | 8 | | | 767 | | | |
| 563 | ER-02 | 447716008158 | SM-G950F | 9 | | | 766 | | | |
| 564 | ER-04 | 447436794290 | SM-A530F | 8 | | | 765 | | | |
| 565 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 764 | | | |
| 566 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 763 | | | |
| 567 | ER-13 | 447435217370 | SM-G950F | 9 | | | 761 | | | |
| 568 | ER-03 | 31645706266 | SM-G960F | 9 | | | 759 | | | |
| 569 | ER-04 | 447436794290 | SM-A530F | 8 | | | 758 | | | |
| 570 | ER-02 | 447716008158 | SM-G950F | 9 | | | 756 | | | |
| 571 | ER-13 | 447435217370 | SM-G950F | 9 | | | 755 | | | |
| 572 | ER-03 | 31645706266 | SM-G960F | 9 | | | 752 | | | |
| 573 | ER-31 | 31645741727 | SM-G955FD | 8 | | | 751 | | | |
| 574 | ER-05 | 447436794025 | SM-A730F | 9 | | | 750 | | | |
| 575 | ER-09 | 447554685661 | SM-A730F | 8 | | | 746 | | | |
| 576 | ER-04 | 447436794290 | SM-A530F | 8 | | | 743 | | | |
| 577 | ER-14 | 59899861766 | SM-A530F | 9 | | | 742 | | | |
| 578 | ER-13 | 447435217370 | SM-G950F | 9 | | | 741 | | | |
| 579 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 739 | | | |
| 580 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 738 | | | |
| 581 | ER-03 | 31645706266 | SM-G960F | 9 | | | 736 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    NSO_WHATSAPP_00044829

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 582 | ER-35 | 31645017094 | SM-G965F | 9 | | | 735 | | | |
| 583 | ER-02 | 447716008158 | SM-G950F | 9 | | | 734 | | | |
| 584 | ER-11 | 447716008148 | SM-A530F | 8 | | | 733 | | | |
| 585 | ER-04 | 447436794290 | SM-A530F | 8 | | | 732 | | | |
| 586 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 731 | | | |
| 587 | ER-14 | 59899861766 | SM-A530F | 9 | | | 730 | | | |
| 588 | ER-13 | 447435217370 | SM-G950F | 9 | | | 727 | | | |
| 589 | ER-03 | 31645706266 | SM-G960F | 9 | | | 726 | | | |
| 590 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 725 | | | |
| 591 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 720 | | | |
| 592 | ER-03 | 31645706266 | SM-G960F | 9 | | | 717 | | | |
| 593 | ER-02 | 447716008158 | SM-G950F | 9 | | | 715 | | | |
| 594 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 714 | | | |
| 595 | ER-13 | 447435217370 | SM-G950F | 9 | | | 713 | | | |
| 596 | ER-03 | 31645706266 | SM-G960F | 9 | | | 712 | | | |
| 597 | ER-14 | 59899861766 | SM-A530F | 9 | | | 711 | | | |
| 598 | ER-04 | 447436794290 | SM-A530F | 8 | | | 709 | | | |
| 599 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 708 | | | |
| 600 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 706 | | | |
| 601 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 697 | | | |
| 602 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 696 | | | |
| 603 | ER-11 | 447716008148 | SM-A530F | 8 | | | 693 | | | |
| 604 | ER-02 | 447716008158 | SM-G950F | 9 | | | 689 | | | |
| 605 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 688 | | | |
| 606 | ER-11 | 447716008148 | SM-A530F | 8 | | | 687 | | | |
| 607 | ER-14 | 59899861766 | SM-A530F | 9 | | | 686 | | | |
| 608 | ER-04 | 447436794290 | SM-A530F | 8 | | | 683 | | | |
| 609 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 681 | | | |
| 610 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 678 | | | |
| 611 | ER-14 | 59899861766 | SM-A530F | 9 | | | 677 | | | |
| 612 | ER-04 | 447436794290 | SM-A530F | 8 | | | 676 | | | |
| 613 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 674 | | | |
| 614 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 673 | | | |
| 615 | ER-35 | 31645017094 | SM-G965F | 9 | | | 672 | | | |
| 616 | ER-03 | 31645706266 | SM-G960F | 9 | | | 671 | | | |
| 617 | ER-11 | 447716008148 | SM-A530F | 8 | | | 669 | | | |
| 618 | ER-02 | 447716008158 | SM-G950F | 9 | | | 668 | | | |
| 619 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 667 | | | |
| 620 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 666 | | | |
| 621 | ER-13 | 447435217370 | SM-G950F | 9 | | | 662 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00044830

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 622 | ER-11 | 447716008148 | SM-A530F | 8 | | | 660 | | | |
| 623 | ER-02 | 447716008158 | SM-G950F | 9 | | | 659 | | | |
| 624 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 658 | | | |
| 625 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 657 | | | |
| 626 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 654 | | | |
| 627 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 653 | | | |
| 628 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 652 | | | |
| 629 | ER-04 | 447436794290 | SM-A530F | 8 | | | 650 | | | |
| 630 | ER-03 | 31645706266 | SM-G960F | 9 | | | 648 | | | |
| 631 | ER-04 | 447436794290 | SM-A530F | 8 | | | 647 | | | |
| 632 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 645 | | | |
| 633 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 644 | | | |
| 634 | ER-13 | 447435217370 | SM-G950F | 9 | | | 643 | | | |
| 635 | ER-13 | 447435217370 | SM-G950F | 9 | | | 642 | | | |
| 636 | ER-13 | 447435217370 | SM-G950F | 9 | | | 641 | | | |
| 637 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 640 | | | |
| 638 | ER-11 | 447716008148 | SM-A530F | 8 | | | 639 | | | |
| 639 | ER-02 | 447716008158 | SM-G950F | 9 | | | 638 | | | |
| 640 | ER-05 | 447436794025 | SM-A730F | 9 | | | 637 | | | |
| 641 | Rooted Device | 447716011569 | SM-N950F | 9 | | | 634 | | | |
| 642 | ER-13 | 447435217370 | SM-G950F | 9 | | | 633 | | | |
| 643 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 631 | | | |
| 644 | ER-11 | 447716008148 | SM-A530F | 8 | | | 630 | | | |
| 645 | ER-35 | 31645017094 | SM-G965F | 9 | | | 629 | | | |
| 646 | ER-14 | 59899861766 | SM-A530F | 9 | | | 628 | | | |
| 647 | ER-04 | 447436794290 | SM-A530F | 8 | | | 627 | | | |
| 648 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 626 | | | |
| 649 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 625 | | | |
| 650 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 624 | | | |
| 651 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 622 | | | |
| 652 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 621 | | | |
| 653 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 620 | | | |
| 654 | ER-13 | 447435217370 | SM-G950F | 9 | | | 619 | | | |
| 655 | ER-13 | 447435217370 | SM-G950F | 9 | | | 618 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044831

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 656 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 617 | | | |
| 657 | ER-05 | 447436794025 | SM-A730F | 9 | | | 614 | | | |
| 658 | ER-19 | 31645272469 | SM-G920F | 6.0.1 | | | 613 | | | |
| 659 | ER-26 | 31649520246 | ANE-LX1 | 8 | | | 612 | | | |
| 660 | ER-25 | 31645518834 | LG-D855 | 5 | | | 611 | | | |
| 661 | ER-02 | 447716008158 | SM-G950F | 9 | | | 606 | | | |
| 662 | ER-08 | 447436794320 | SM-G925F | 7 | | | 605 | | | |
| 663 | ER-35 | 31645017094 | SM-G965F | 9 | | | 604 | | | |
| 664 | ER-35 | 31645017094 | SM-G965F | 9 | | | 603 | | | |
| 665 | ER-11 | 447716008148 | SM-A530F | 8 | | | 601 | | | |
| 666 | ER-35 | 31645017094 | SM-G965F | 9 | | | 600 | | | |
| 667 | ER-14 | 59899861766 | SM-A530F | 9 | | | 599 | | | |
| 668 | ER-02 | 447716008158 | SM-G950F | 9 | | | 598 | | | |
| 669 | ER-02 | 447716008158 | SM-G950F | 9 | | | 597 | | | |
| 670 | ER-35 | 31645017094 | SM-G965F | 9 | | | 596 | | | |
| 671 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 590 | | | |
| 672 | ER-04 | 447436794290 | SM-A530F | 8 | | | 589 | | | |
| 673 | ER-14 | 59899861766 | SM-A530F | 9 | | | 588 | | | |
| 674 | ER-02 | 447716008158 | SM-G950F | 9 | | | 587 | | | |
| 675 | ER-01 | 31645134912 | SM-G955F | 9 | | | 586 | | | |
| 676 | ER-02 | 447716008158 | SM-G950F | 9 | | | 585 | | | |
| 677 | ER-13 | 447435217370 | SM-G950F | 9 | | | 584 | | | |
| 678 | ER-03 | 31645706266 | SM-G960F | 9 | | | 581 | | | |
| 679 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 580 | | | |
| 680 | ER-14 | 59899861766 | SM-A530F | 9 | | | 579 | | | |
| 681 | ER-05 | 447436794025 | SM-A730F | 9 | | | 577 | | | |
| 682 | ER-01 | 31645134912 | SM-G955F | 9 | | | 576 | | | |
| 683 | ER-03 | 31645706266 | SM-G960F | 9 | | | 575 | | | |
| 684 | ER-13 | 447435217370 | SM-G950F | 9 | | | 573 | | | |
| 685 | ER-31 | 31645741727 | SM-G955FD | 8 | | | 572 | | | |
| 686 | ER-06 | 59899863730 | SM-G965F | 9 | | | 570 | | | |
| 687 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 563 | | | |
| 688 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 560 | | | |
| 689 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 559 | | | |
| 690 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 558 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044832

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 691 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 557 | | | |
| 692 | Rooted Device | 31629253787 | SM-G950F | 9 | | | 556 | | | |
| 693 | ER-03 | 31645706266 | SM-G960F | 9 | | | 555 | | | |
| 694 | ER-13 | 447435217370 | SM-G950F | 9 | | | 554 | | | |
| 695 | ER-01 | 31645134912 | SM-G955F | 9 | | | 553 | | | |
| 696 | ER-05 | 447436794025 | SM-A730F | 9 | | | 552 | | | |
| 697 | ER-01 | 31645134912 | SM-G955F | 9 | | | 551 | | | |
| 698 | ER-05 | 447436794025 | SM-A730F | 9 | | | 549 | | | |
| 699 | ER-05 | 447436794025 | SM-A730F | 9 | | | 548 | | | |
| 700 | ER-01 | 31645134912 | SM-G955F | 9 | | | 547 | | | |
| 701 | ER-13 | 447435217370 | SM-G950F | 9 | | | 546 | | | |
| 702 | ER-03 | 31645706266 | SM-G960F | 9 | | | 545 | | | |
| 703 | ER-31 | 31645741727 | SM-G955FD | 8 | | | 542 | | | |
| 704 | ER-09 | 447554685661 | SM-A730F | 8 | | | 543 | | | |
| 705 | ER-04 | 447436794290 | SM-A530F | 8 | | | 542 | | | |
| 706 | ER-14 | 59899861766 | SM-A530F | 9 | | | 541 | | | |
| 707 | ER-06 | 59899863730 | SM-G965F | 9 | | | 540 | | | |
| 708 | ER-34 | 59899866184 | SM-M305F | 9 | | | 539 | | | |
| 709 | ER-32 | 31645566784 | SM-M205F/DS | 8.1.0 | | | 538 | | | |
| 710 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 536 | | | |
| 711 | ER-05 | 447436794025 | SM-A730F | 9 | | | 535 | | | |
| 712 | ER-01 | 31645134912 | SM-G955F | 9 | | | 534 | | | |
| 713 | ER-13 | 447435217370 | SM-G950F | 9 | | | 533 | | | |
| 714 | ER-03 | 31645706266 | SM-G960F | 9 | | | 531 | | | |
| 715 | | 447463118645 | SM-N950F | 9 | | | | | | |
| 716 | | 31629253787 | SM-G950F | 9 | | | 530 | | | |
| 717 | ER-31 | 31645741727 | SM-G955FD | 8.0.0 | | | 527 | | | |
| 718 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 526 | | | |
| 719 | ER-03 | 31645706266 | SM-G960F | 9 | | | 525 | | | |
| 720 | ER-04 | 447436794290 | SM-A530F | 8 | | | 524 | | | |
| 721 | ER-09 | 447554685661 | SM-A730F | 8.0.0 | | | 523 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044833

| | ErisedID | Phone # | Model | OS / Bitness | Kernel | WA Version | Installation Instance ID | Text | Image | Voice |
|---|---|---|---|---|---|---|---|---|---|---|
| 722 | ER-31 | 31645741727 | SM-G955FD | 8.0.0 | | | 522 | | | |
| 723 | ER-33 | 31645762912 | SM-N960F | 8.1.0 | | | 521 | | | |
| 724 | ER-13 | 447435217370 | SM-G950F | 9 | | | 520 | | | |
| 725 | ER-03 | 31645706266 | SM-G960F | 9 | | | 519 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
NSO_WHATSAPP_00044834

No labels

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Produced in litigation to WhatsApp LLC and Meta Platforms Inc.

pursuant to Protective Order of the

Honorable Phyllis J. Hamilton, United States District Judge

4:19-cv-07123-PJH

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00044835

# EXHIBIT 21

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4       --------------------------------X

5       WHATSAPP INC.                    :

6       a Delaware corporation, and      :

7       META PLATFORMS INC.,             :

8       a Delaware Corporation           :

9                   Plaintiffs,          :

10           v.                          :   Case No.

11      NSO GROUP TECHNOLOGIES LTD.      :   4:19-cv-07123-PJH

12      and                             :

13      Q CYBER TECHNOLOGIES LTD.,       :

14                   Defendants.         :

15      --------------------------------X

16

17           Deposition of SARIT BIZINSKY GIL

18                      LONDON

19           FRIDAY, SEPTEMBER 6TH, 2024

20                   8:19 A.M. BST

21

22      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1    materials?
2    MR. CRAIG: Objection. Vague.
3    A. I don't know.
4    Q. Did you ever talk to customers?
5    A. Um, not about that.
6    Q. Okay. What would you talk to them about?
7    A. I am not sure I can say.
8    Q. Are you not allowed to say under Israeli law?
9    A. Yes.
10   (Exhibit 2003          marked for identification)
11   Q. Okay. I want to show you a document that has previously
12      been marked as exhibit 2003.
13   MR. CRAIG: Thank you.
14   Q. And for the record, this is a document with Bates stamp
15      DIVITTORIO_WhatsApp_00000058. I will represent to you
16      that this is the way that WhatsApp messages are produced
17      in litigation.
18   A. Okay.
19   Q. So this is a WhatsApp message.
20   A. Okay.
21   Q. And I will let you read the document, but I want to give
22      you a flag on the first message, which is -- this is the
23      way the document was produced to us by your lawyers, but
24      I understand, knowing no Hebrew myself, that --
25   A. Yes, it is like --

Page 91

1    Q. -- it may be difficult to read.
2    A. Yes, it is difficult to read.
3    Q. Okay.
4       The first name under "other recipients", at the top,
5       is that you and your WhatsApp number?
6    MR. CRAIG: Objection. Vague.
7    A. Yeah, I can see my number and my name.
8    Q. ██████████████
9    A. Yes.
10   Q. Okay. Do you use that WhatsApp number for work
11      purposes?
12   A. Yes.
13   Q. Okay.
14   MR. CRAIG: Sorry, Luca, I just want to note here for the
15      record, again, that we are continuing to designate this
16      transcript highly confidential, attorneys' eyes only.
17      Especially in light of now containing her personal phone
18      number.
19   Q. Okay.
20      Do you have another WhatsApp account that you use
21      for personal or do you have just one WhatsApp account?
22   A. Should I answer?
23   MR. CRAIG: Yes.
24   A. I have only this one.
25   Q. Okay. Do you have the WhatsApp app on your phone?

Page 92

1    A. Yes.
2    Q. And you communicate with other people who work for
3       defendants via the WhatsApp app on your phone?
4    A. Yes.
5    Q. And you used the normal -- you downloaded it from the
6       App Store? Tell me how you got the WhatsApp app on your
7       phone?
8    A. It was so many years ago, I don't remember.
9    Q. Do you remember agreeing to the terms of service?
10   MR. CRAIG: Objection. Legal conclusion.
11   A. I don't think I read it.
12   Q. Okay. Whatever you needed to do to install it, you did
13      it?
14   A. Okay, yes.
15   Q. So this is a WhatsApp message that was sent to a group
16      of participants, including you, is that correct?
17   A. Yes. This is what I see, what I read here.
18   Q. And the date is January 31, 2019, right?
19   A. This is what I read.
20   Q. Okay, but you don't remember this WhatsApp message?
21   A. No.
22   Q. Okay. But you have no reason to doubt that you actually
23      received this message, right?
24   A. Yes.
25   Q. Okay. I understand that the first message is, in the

Page 93

1       way that your lawyers gave it to us, a little garbled.
2       But I am going to try to summarize what it says, and you
3       can tell me if that's kind of what it says, is that
4       alright?
5    MR. CRAIG: Well, you have a translator here that I think is
6       in a much better position to do that than the witness
7       is.
8    THE INTERPRETER: I can read it in the Hebrew.
9    MR. MARZORATI: Okay.
10   THE INTERPRETER: Okay.
11   A. Okay.
12   By Mr. Marzorati:
13   Q. Do you understand, generally, what this message means or
14      is it incomprehensible?
15   A. No, it is understandable.
16   Q. Great. This is announcing that the Eden installation
17      vector has been developed for Android, is that right?
18      Eden for Android?
19   MR. CRAIG: Objection to form.
20   A. This is what I read.
21   Q. Okay. And it was scheduled for deployment in
22      early February?
23   A. This is what I read here.
24   Q. And at the end of the message it says something like
25      "great success"?

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1  A.  Yes.
2  Q.  And when did Mr. Gazneli send you those dates?
3  A.  I don't recall.
4  Q.  Within the last month?
5  A.  No, before.  A few months ago.
6  Q.  A few months ago?
7  A.  Yes, when I started to work on it.
8  Q.  And Mr. Gazneli sent you those dates from a company
9     email address?
10 A.  Yes.
11 Q.  To your company email address?
12 A.  Yes.
13 Q.  Did you ask him for the dates or did you just get
14    an email saying -- with dates in it?
15 A.  No, I just asked him and he sent me the email.
16 Q.  What did you ask him for?
17 A.  Sorry?
18 Q.  What did you ask him for?
19 MR. CRAIG:  Hang on, this is all information done at the
20    request of counsel.  This is attorney-client privileged.
21    I am going to instruct you not to answer that question.
22 Q.  This spreadsheet uses the term "relevant revenue".  What
23    does it mean to be relevant revenue?
24 A.  Um --
25 MR. CRAIG:  Object to form.  Foundation.  To the extent it

Page 179

1     calls for a legal conclusion, I am going to object to
2     that ground as well.
3  A.  Okay, so this is the associated revenues for customers
4     that has covert Android vectors, and this is the pro
5     rata, as I said, of the periods of time from the
6     original revenue that was recognized within the relevant
7     quarters.
8  Q.  But the term "relevant", is that your word or someone
9     else's word?
10 A.  Yes, my word.
11 Q.  Okay.  Do you mean in any sort of legal way, or just in
12    the way you described?
13 A.  This is the way I described.
14 Q.  Okay.  I want to go back to when you reached out to
15    Mr. Gazneli.  Did a lawyer tell you to reach out to
16    Mr. Gazneli?
17 MR. CRAIG:  Don't answer that.  That's a -- you are asking
18    for a communication with counsel.
19 MR. MARZORATI:  You are going to protect all?  I am asking
20    yes or no, did a lawyer --
21 MR. CRAIG:  That's asking for her -- that's asking to
22    divulge her communications with counsel.
23 MR. MARZORATI:  I am not asking for a communication, I am
24    asking yes or no.  Was there a communication with
25    counsel --

Page 180

1  MR. CRAIG:  She cannot answer that without divulging her
2     communications with counsel.
3  MR. MARZORATI:  And you are going to assert work product
4     over the whole creation of the spreadsheet?
5  MR. CRAIG:  No, absolutely not.
6  MR. MARZORATI:  Okay.
7  MR. CRAIG:  You are asking a question about a communication
8     she made at the direction of counsel.
9  MR. MARZORATI:  I don't know if it is at the direction of
10    counsel, that's why I am asking her.
11 MR. CRAIG:  Okay, I am representing that it is.  That's why
12    I am asserting the privilege.
13 MR. MARZORATI:  Okay.
14    By Mr. Marzorati:
15 Q.  Okay, so returning to your work on the spreadsheet, it
16    is basically plugging in the dates that you received
17    from your lawyers and multiplying it by the revenue from
18    each column, correct?
19 A.  Yes.
20 Q.  Okay.
21 A.  It is taking, again, the pro rata out of the total
22    number of days, let's say 92 or 91 per quarter, and then
23    multiplying by the revenues --
24 Q.  Okay.
25 A.  -- of this quarter.

Page 181

1  Q.  Are you aware of -- your understanding is that these are
2     dates on which the covert Android vector was available
3     to defendants' customers, correct?
4  A.  Yes.
5  Q.  Okay.  Are you aware of -- so outside of those dates,
6     the defendants' customers were unable to use Pegasus
7     using the installation vector covert for Android,
8     correct?
9  MR. CRAIG:  Objection.  Lacks foundation.
10 A.  According to the information that I got, this is my
11    understanding.
12 MR. CRAIG:  Please don't reveal communications you had with
13    your lawyers.
14 A.  Okay.
15 MR. CRAIG:  He doesn't want to you to do that, I don't want
16    you to do that.
17 A.  Okay.
18 Q.  I want to ask you about row -- let's take a look at row
19    25.
20 A.  Okay.
21 Q.  Okay, let me pick another row, give me a second.
22    Let's go to row 37.  I want to make sure I am
23    understanding this.
24 A.  37?
25 Q.  37, yes.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 182

1 MR. CRAIG: That's on page 2.
2 A. Okay, so this is a customer --
3 MR. CRAIG: He hasn't asked a question yet.
4 A. Oh, sorry.
5 MR. CRAIG: That's okay.
6 MR. MARZORATI: Row 37. I am looking now at columns R, S, T
7    and U. It is blank as to whether covert iOS was
8    provided, triggered iOS was provided, or triggered
9    Android was provided. Correct?
10 A. Yes.
11 Q. What does that mean, "blank"?
12 A. "Blank" means, in this case, that it is not relevant.
13 Q. What does that mean, "not relevant"?
14 A. Because the entire upsell was on covert Android. You
15    can see here, "yes".
16 Q. Understood. So in rows where it is just "yes" for
17    covert Android and it is an upsell and the rest is
18    blank, it is fair to say that's an upsell based on just
19    a covert Android, correct?
20 A. Correct.
21 Q. Okay. So all this person was buying in the contract was
22    covert Android, correct?
23 A. As an upsell, yes.
24 Q. As an upsell. So the company recognized revenue of
25    $5,680,000 in Q3/2018, correct?

Page 183

1 A. Yes.
2 Q. And during Q3/2018, there were only certain days in
3    which there was a covert Android vector available,
4    correct?
5 A. There were no vectors.
6 MR. CRAIG: Objection. Lack foundation.
7 Q. There were no vectors?
8 A. No covert vectors.
9 Q. Okay. So under the calculation that your lawyer had you
10    do, you are counting zero relevant revenue for that
11    period, correct?
12 A. For Q3/2018, correct.
13 Q. Okay. Even though this person paid $5.68 million for
14    covert Android vector?
15 A. They paid more, but we recognized on the day we provided
16    them with the ability to use such covert.
17 Q. Okay. What were they paying for in those $5.68 million?
18 A. The --
19 MR. CRAIG: Object to form. Lacks foundation.
20 A. They are paying for the ability to use covert Android
21    vectors when they are available.
22 Q. And did defendants refund their money for the days they
23    weren't available?
24 A. No.
25 Q. And you understand that defendants' employees have

Page 184

1    testified that, during the relevant period, 2018 to
2    2020, the only covert vector were the ones -- covert
3    vector for Android -- were, Heaven, Eden and Erised, the
4    ones for the days that your lawyers gave you, correct?
5 MR. CRAIG: Hold on. Give me a second to look at the
6    question.
7 Q. Ms. Gil do you understand my question or should I try
8    again?
9 MR. CRAIG: I am going to object to form. But you can
10    answer.
11 A. Please clarify the question.
12 Q. Okay. So you understand that Mr. Gazneli and Mr. Eshkar
13    and Mr. Shohat sat where you are sitting and testified,
14    correct?
15 A. Correct.
16 Q. And they testified that, during this period -- can
17    I call it the "relevant period"?
18 A. Yes.
19 Q. Okay. The only available vectors for Android, covert,
20    were Heaven, Eden, and Erised, okay? And you understand
21    those are the vectors that used WhatsApp?
22 MR. CRAIG: Objection. That's two questions.
23 MR. MARZORATI: Okay.
24 MR. CRAIG: She wasn't here for their testimony.
25 MR. MARZORATI: Okay.

Page 185

1 MR. CRAIG: So I don't know how she could understand.
2 By Mr. Marzorati:
3 Q. Is it your understanding that, outside of the days that
4    your lawyer provided you, in the dates between the time
5    periods that your lawyer provided you, that no covert
6    vector for Android was available at all?
7 A. This is my understanding; that, apart the periods that
8    I got that there was a covert Android available, in the
9    rest of the periods there were no covert Android
10    available.
11 Q. Okay. So defendants recognized $5.68 million of revenue
12    for a contract that only dealt with covert Android
13    vectors, correct? And that was recognized in Q3/2018,
14    correct?
15 MR. CRAIG: Object to form.
16 Q. And you are only using -- this table, according to the
17    math that your lawyers had you do -- only counts 334,000
18    of that as relevant revenue, correct?
19 MR. CRAIG: Object to form.
20 A. Are you looking at column X?
21 Q. I am looking at column M.
22 A. M. Because this is the relevant revenue in these -- in
23    the quarter that it is relevant, in Q4/2018. And, as
24    I explained before, customers buy capabilities and pay
25    for it no matter if there is an available vector at the

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1    CERTIFICATE OF COURT REPORTER
2  I, CHRIS LANG, an Accredited Real-time Reporter, hereby
3  certify that the testimony of the witness SARIT GIL in the
4  foregoing transcript, taken on this 6TH day of SEPTEMBER,
5  2024 was recorded by me in machine shorthand and was
6  thereafter transcribed by me; and that the foregoing
7  transcript is a true and accurate verbatim record of the
8  said testimony.
9
10  I further certify that I am not a relative, employee,
11  counsel or financially involved with any of the parties to
12  the within cause, nor am I an employee or relative of any
13  counsel for the parties, nor am I in any way interested in
14  the outcome of the within cause.
15
16
17  Name:  CHRIS LANG
18  Date:  9/6/24
19
20
21
22
23
24
25

Page 247

1  WHATSAPP INC., et al. vs.
   NSO GROUP TECHNOLOGIES LTD. et al.
2  9/6/2024 - SARIT BIZINSKY GIL
3    ACKNOWLEDGEMENT OF DEPONENT
4  I, SARIT BIZINSKY GIL , do hereby declare that I
5  have read the foregoing transcript, I have made
6  any corrections, additions, or changes I deemed
7  necessary as noted on the Errata to be appended
8  hereto, and that the same is a true, correct and
9  complete transcript of the testimony given by me.
10
11  _____  _____
12  SARIT BIZINSKY GIL          Date
13  *If notary is required
14    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15    _____ DAY OF _____, 20___.
16
17
18    _____
19    NOTARY PUBLIC
20
21
22
23
24
25

Page 248

1  WHATSAPP INC., et al. vs.
   NSO GROUP TECHNOLOGIES LTD. et al.
2  9/6/2024 - SARIT BIZINSKY GIL
3    E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  SARIT BIZINSKY GIL          Date
25

63 (Pages 246 - 248)

# EXHIBIT 25

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ) | |
| ) | |
| WHATSAPP INC. and ) | |
| META PLATFORMS, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | Case No. 19-cv-07123-PJH |
| v. ) | |
| ) | |
| ) | |
| NSO GROUP TECHNOLOGIES ) | |
| LIMITED and Q CYBER ) | |
| TECHNOLOGIES LIMITED, ) | |
| ) | |
| Defendants. | |

---

**EXPERT REPORT OF ANTHONY VANCE**

August 30, 2024

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

---

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

for NSO until 2020,[21] sent a WhatsApp message to a group of 30 recipients:

> Hib team,
>
> No heaven installations till [sic] further notice please. In continue [sic] to ███████ mail.[22]

"Heaven" is the code name for a covert or "zero-click" installation vector related to Pegasus that worked by exploiting WhatsApp.[23] This has been acknowledged by an NSO witness in deposition testimony, and is also evident from code residing on an Amazon Web Services (AWS) server involved in the May 2019 attack (the "AWS Server"). NSO previously stated that, "At certain times prior to January 2021, the AWS Server was being used by NSO's research and development department, to house computer code that **comprised part of the Pegasus system**" (emphasis added).[24] Files produced by NSO from this server include the Python program "████████" which contains the documentation string:

████████████████████████████████

The program also contains a statement that imports the "exploit" function from the "exploits" and "heaven" submodules within the "attackVectors" module:

████████████████████████████

Approximately nine minutes after ████████████████████████████████, a key member of the technology support team at NSO,[27] sent a WhatsApp message to 54 recipients :

> Hi all,
>
> WhatsApp had [sic] made changes in their servers that currently fail all installations and can cause crashes that risk the Hummingbird vector.
>
> We need to immediately pause all Hummingbird installations cross [sic] all systems (Customer sites (P2 &P3, Tactical covert), Sales) until [NSO's] Android research team will be able to provide a solution.
>
> Official message to clients was synced with CEs (BoaT).

---

[21] See Plaintiffs' Notice of Motion and Motion for Issuance of a Letter Rogatory Pursuant to the Hague Convention; Memorandum of Points and Authorities and Support, (Dkt. 335-2) at p. 7.
[22] SHANER_WHATSAPP_00001100.
[23] Eshkar Dep. 122:24 – 123:2; 124:6 – 8; In cybersecurity, an attack vector is a method or means of attacking a victim computer. See *DRAFT NIST Special Publication 800-154: Guide to Data-Centric System Threat Modeling*, p. 5, https://csrc.nist.gov/pubs/sp/800/154/ipd, accessed 8/30/2024.
[24] See Decl. of Chaim Gelfand in Support , filed 7/15/2024.
[25] WA-NSO-00016952, line 2. The files of the AWS Server produced were acquired November 9, 2020. *See* Decl. of Chaim Gelfand Supp. Defs. Opp. To Pls. Mot. to Compel Discovery Regarding AWS Server (Dkt. 339-1), at 3:16.
[26] WA-NSO-00016952, line 10.
[27] See *Plaintiffs' Notice of Motion and Motion for Issuance of a Letter Rogatory Pursuant to the Hague Convention; Memorandum of Points and Authorities and Support*, (Dkt. 335-2) at p. 7.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

The team is working on a solution in top priority, hoping to provide a solution ASAP.

We will keep you updated.[28]

I know "Hummingbird" to be an umbrella name that NSO uses for the family of installation vectors that use WhatsApp, including the Heaven attack vector.[29] In my opinion, ███████ ████████████ referring to the changes that WhatsApp implemented as part of the remediation described in "T33535414 - Malformed Whatsapp voip_settings."[30]

This remediation apparently impeded Defendants' ability to install Heaven and/or Hummingbird for some time. For example, on December 7, 2018, Josh Shaner a former employee of Westbridge Technologies, NSO's US sales affiliate,[31] sent a WhatsApp message to ████████ ████████

Hey man, is there any update on when heaven will be back online?

████████ responds:

Not yet
Hopefully by the end of next week[32]

The above NSO communications, which took place shortly after the remediation of the ""T33535414 - Malformed Whatsapp voip_settings" vulnerability establishes that WhatsApp's changes to the WhatsApp client application and WhatsApp servers prevented, restricted, or interrupted the operation of NSO malware prior to May 2019.

To further reinforce this point, Plaintiffs changes to WhatsApp server source code made to block malicious stanzas resulted in a "403" error code message that was sent to the attackers, providing notice that their access was forbidden. These error code messages are recorded in a log file on the Pegasus installation server (the AWS Server).

For example, I reviewed a change in the WhatsApp server code with a "Diff" number of D9650871, which was deployed in September 2018.[33] This code blocked call offer stanzas that attempted to set the "voip_settings" XML element, which legitimate WhatsApp clients would not do. After this change was implemented, any call offer stanza with a "voip_settings" XML element would be blocked by the WhatsApp server and an error code of "403" would be

---

[28] SHANER_WHATSAPP_00001098-SHANER_WHATSAPP_00001099.
[29] Eshkar Dep. Rough Draft, Aug. 27, 2024, at 124:23-125:11. On 6/12/2019, shortly after the May 2019 vulnerability was remediated, "Gilad" with the phone number 352691350209 sent a WhatsApp message to Josh Shaner and #30 other participants as follows: "Eden/ Heaven/ Hummingbird R.I.P announcement," equating or associating these products or code names. See SHANER_WHATSAPP_00001513.
[30] WA-NSO-00166464.
[31] Ibid., Eshkar Dep. Rough Draft, Aug. 27, 2024, at 77:19-22 ("Westbridge is an entity that could promote and sell NSO product."); NSO_WHATSAPP_00000176 (org chart showing Westbridge affiliation); Shohat Dep., Aug. 24, 2024, at 68:1-71:9.
[32] See SHANER_WHATSAPP_00001102.
[33] WA-NSO-00192815 (referencing D9650871, which was addressed in September 2018).

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

returned.



The fact that this 403 error code was received in response to an attempt to set the "voip_settings" XML element demonstrates that the D9650871 diff code change was successful in preventing, restricting, or interrupting the operation of NSO Malware.

Similarly, I reviewed another code change in the WhatsApp server code with a "Diff" number of D13309896 that was deployed in December 2018.[37] This code change was designed to block stanzas that attempted to set an XML "group_update" element, which legitimate WhatsApp clients would not do. After this change was implemented, any stanza with a "group_update" XML element would be blocked by the WhatsApp server and an error code of "403" would be returned.

---

[34] WA-NSO-00017140.
[35] Ibid., line 1167.
[36] Ibid., line 1170.
[37] WA-NSO-00192812: D13309896 (December 2018)

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



In response, the following acknowledgement (known as an "ACK" message) was received by the Pegasus installation server from the WhatsApp server containing a "403" code indicating that the message was forbidden (emphasis added):



Again, that this 403 "forbidden" error code was received in response to an attempt to set the "group_update" XML element demonstrates that the D13309896 diff code change was successful in preventing, restricting, or interrupting the operation of NSO Malware.

## VII. Defendants intentionally circumvented WhatsApp's December 5, 2018 changes to the WhatsApp client application and WhatsApp servers prior to the May 2019 attacks

As noted in the previous section, WhatsApp's December 5, 2018 security update disrupted the operation of NSO malware. As also described in the previous section, on December 5, 2018, ███████████ said in a WhatsApp group message that "WhatsApp had made changes in their servers that currently fail all installations and can cause crashes that risk the Hummingbird vector," but that "The team is working on a solution in top priority, hoping to provide a solution ASAP."[41] ███████████ in a WhatsApp message to Josh Shaner said he expected NSO to bring "heaven" back online "Hopefully by the end of next week."[42] These communications show NSO's intention to circumvent the technological, code-based measures added to WhatsApp's

---

[38] WA-NSO-00017140.
[39] Ibid., line 4205.
[40] Ibid., line 4207.
[41] See SHANER_WHATSAPP_00001098.
[42] See SHANER_WHATSAPP_00001102.

servers so NSO could regain access to them again for purposes of installing Heaven and/or Hummingbird.

On February 4, 2019, "████ sent a WhatsApp message to Josh Shaner and +30 other people:

> guys *Eden is back* and operational on sales 3! Thanks ████

████" responded:

> 👍 have fun

████████" replied:

> Starting internal demo: including Armageddon and Eden installations

> Both installation completed succesfuly [sic] 😄 thanks![43]

"Eden" is an upgraded version of Heaven, and like Heaven, is a covert or zero-click installation vector for NSO Malware that used WhatsApp.[44] These communications establish that at least by February 4th, Defendants were able once again to circumvent WhatsApp's December 5, 2018 updates or changes to the WhatsApp servers in order to carry out the attacks in May 2019 described in the complaint.

## VIII.    The May 2019 attacks described in the Complaint were conducted by NSO (d)

It is my opinion that the May 2019 attacks were performed using NSO malware. First, NSO's CEO, Yaron Shohat, admitted at his deposition that NSO malware was the source of the allegations in Plaintiffs' complaint.[45] This was verified in the malicious scripts observed in the May 2019 attack would cause target devices to retrieve additional malware from various third-party servers, one of which has been conclusively tied to NSO. As stated previously in Section VI, an Amazon Web Services (AWS) server was one of the third-party servers involved in the May 2019 attack (the "AWS Server"). Defendants have admitted that "[a]t certain times prior to January 2021, the AWS Server was being used by NSO's research and development department, to house computer code that **comprised part of the Pegasus system**" (emphasis added).[46]

Additionally, in a document produced by Amazon Web Services, the IP address assigned to the AWS Server (54.93.81.200) is shown to be assigned to NSO Technologies Group Ltd., with the "lease range" from "2018-12-06T14:52:02Z - Present".[47] Because the May 2019 attack involved a server under NSO's control that contained Heaven files, it is my expert opinion that the May

---

[43] SHANER_WHATSAPP_00001194– SHANER _WHATSAPP_00001196
[44] NSO_WHATSAPP_00008643 (describing another NSO malware called "Erised" as "a covert Android installation vector, replacing Eden (which replaced Heaven)"); see also SHANER_WHATSAPP_00001513, p. SHANER_WHATSAPP_00001513 ("Eden/ Heaven/ Hummingbird R.I.P announcement," equating or associating Eden with Heaven and Hummingbird).
[45] NSO's CEO Yaron Shohat has admitted "NSO develops the technology that was used in the event that the complaint refers to." Shohat Dep. Rough Draft, Aug. 24, 2024, at 169:17-18.
[46] See Decl. of Chaim Gelfand in Support , filed 7/15/2024.
[47] WA-NSO-00000121

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

2019 attacks were caused by Heaven, or very similar malware created by Defendants.

My opinion is confirmed by Defendants' internal response to WhatsApp's efforts to remediate those attacks. As explained further in Section XI below, Plaintiffs applied a software update to its relay servers on May 10, 2019, that blocked the attacks described in the complaint, but did not publicly disclose the incident until May 13, 2019 in connection with releasing an update to the WhatsApp client application. Yet, in a May 12, 2019 WhatsApp chat, NSO employees indicated they were already aware of the non-public server fix because it had stopped their exploit:

███████████ wrote:

    Eden will not work…

████" responded:

    Wont [sic] it still work with earlier WA versions?

███████████ responded:

    No, per r&d they close vector from the server side .. [sic] so please don't try to install hummingbird[48]

In a separate WhatsApp message later that day, ████████ wrote, "I am sure most of you already heard about Eden," and confirmed "Eden has finished its duty with us as a patch was done on server side with the application it works with."[49]

As further evidence of NSO's involvement in the May 2019 attacks, on May 14, 2019 (four days after the server-side update was deployed) a WhatsApp exchange between ████████ (a/k/a ████████) and Facebook employee in Hebrew.[50] According to an English translation of the exchange, ████████ says to the Facebook employee (identified as "FB" in the translation):

███

    You just closed our biggest remote for cellular [Israeli slang for "mobile" - DM] today
    It's on the news all over the world

FB:

    Ah, I didn't know you were associated with that bro
    Do you work for NSO?

███

    I have always wondered if I can even talk to you hhh [Hebrew shorthand for "hahaha"]
    Good morning??? [Israeli slang for "obviously", in relation to the question of his

---

[48] SHANER_WHATSAPP_00001487 – SHANER_WHATSAPP_00001487.
[49] SHANER_WHATSAPP_00001489, at SHANER_WHATSAPP_00001490.
[50] WA-NSO-00016432.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

employment at NSO - DM][51]

The exchange between NSO employee ███████████████ and the Facebook employee is a clear admission of NSO's involvement in the May 2019 attack.

## IX. Defendants used or tested NSO malware on WhatsApp servers and clients (e)

Evidence demonstrates that at least sixteen of the attacks (illustrated in the tables below) against the WhatsApp platform were conducted directly by employees of Defendants or their U.S. affiliate Westbridge Technologies.[52] On April 4, 2019, Josh Shaner sent a WhatsApp message to "NOC 2" ("NOC" stands for "network operations center" and was NSO's technical support[53]):

> Hey, I'm trying to install Eden on Sales 3. I received the group call, but it seems stuck at 1/4. Can you see what might be wrong? It's agent ID 3146

NOC 2 later responds:

> Phonenumber

> 12027655322

To which Shaner replies:

> Yup[54]

On May 9, 2019, at the time of the May 2019 attack, Shaner used WhatsApp to send a photo of a computer screen to "NOC 2" (Figure 1):

---

[51] WA-NSO-00016429

[52] *Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited's Opposition to Plaintiffs' Motion for Issuance of a Letter Rogatory Pursuant to the Hague Convention*, (Dkt. 336) at 5: 3–5(explaining the ties of Mr. Shaner and Mr. DiVittorio to NSO affiliate Westbridge).

[53] *See, e.g.*, Eshkar Dep. Rough Draft, Aug. 27, 2024, at 142:11-23 (disclosing that "NOC" is "network operations center").

[54] SHANER_WHATSAPP_00001453.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



Figure 1. Photo of computer screen showing an installation status panel for Pegasus with the phone number "12027655322."[55]

As shown above, the image sent to NOC 2 had the words "Installation Status" at the top of the screen and showed phone number 12027645322 and the name "Steve Grover." In my opinion, the images showed an installation status panel for Pegasus.[56] The photo indicates that the "Installation Method" is "Covert," which is how Ramon Eshkar explained Pegasus's zero-click exploit appears to customers. Eshkar Dep. at 97:23-98:8 (explaining that "when a customer initiates an agent installation on Pegasus," "he will choose the vector that he is using. He will not like see the names, it will be like covert or other means.").

Continuing WhatsApp conversation, NOC 2 responded:

Hi checking

---

[55] SHANER_WHATSAPP_00001486.
[56] The user interface from the screenshot is similar to the user interfaced demonstrated in Pegasus product descriptions such as WESTBRIDGE_WHATSAPP_00002330 at WESTBRIDGE_WHATSAPP_00002338.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

> For how long have you experience this?

Shaner:

> The two install attempts today

Later in the exchange, NOC 2 asks:

> Are you trying HB?

Shaner:

> HB?

NOC 2:

> Hummingbird – Eden

Shaner:

> Yeah

NOC 2:

> The credentials are different for every enviorment [sic]
>
> Just talked with Yossi and he said he was aware of this
>
> It seems that Eden is currently isnt up on sales6

Shaner:

> Oh ok. All good
>
> I'll use Sales 3 for the demo

NOC 2:

> [57]

In the log of the May 2019 attack activity on WhatsApp servers, it is shown that phone numbers 35796286767, 35796287063, and 35796287063 were used to target a device using the same phone number of the device that Shaner stated he was attempting to attack: 12027655322.

| date | attacker | victim |
|---|---|---|
| 2019/05/09-06:46:43 | 35796286767 | 12027655322 |
| 2019/05/09-12:30:42 | 35796287063 | 12027655322 |

---

[57] SHANER_WHATSAPP_00001484–SHANER_WHATSAPP_00001485.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

| 2019/05/09-12:31:55 | 35796287063 | 12027655322 |
|---|---|---|

Similarly, two days earlier on May 7 at 12:10am (also during the period of the May 2019 attack), "█████ sent a WhatsApp message to a group of 55 recipients, including ████████ ████████████████████████████████████████████████████

> Hey, you can inatall [sic] eden now

Later in the exchange, ██████ responds:

> Hi, I have a demo in Porsche at 24hs IL time.

> Will use Sales 3 for Eden.

██████ replies:

> hey ████ FYI Eden is back on sales 6. so if you're planning on using that environment, you can do so with Eden as well[58]

Later at 7:28pm, ██████ sent a photo of a computer screen showing an installation status panel for Pegasus that displayed an "installation failed" message and phone number 51937742505 with the Peruvian country code +51 (Figure 2):

---

[58] SHANER_WHATSAPP_00001476.

16

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



Figure 2. Photo of computer screen showing an installation status panel for Pegasus for
with the Peruvian phone number "51937742595."[59]

██████ replied:

>    Now it's ok[60]

The WhatsApp server log for May 6–7, 2019, Pacific Standard Time. shows that someone using
phone numbers 35796287063, 35796012181, and 35796286767 targeted a device using the same
phone number of the device that Martin states he was attempting to attack: 51937742505.

| date | attacker | victim |
|---|---|---|
| 2019/05/06-20:18:53 | 35796287063 | 51937742595 |
| 2019/05/07-12:50:36 | 35796012181 | 51937742595 |
| 2019/05/07-14:29:52 | 35796286767 | 51937742595 |

According to the messages exchanged between ████████████████████ was using the

---

[59] SHANER_WHATSAPP_00001478.
[60] SHANER_WHATSAPP_00001477–SHANER_WHATSAPP_00001477.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

same "Sales 3" and "Sales 6" units for the demonstrations on May 7, 2019 that Josh Shaner used on May 9, 2019. Likewise, according to the WhatsApp server logs on May 6–7, 2019, phone numbers 35796287063 and 35796286767 were used to target a device using phone number 51937742505, which phone numbers match the phone numbers used to target the device using the phone number 12027655322 on May 9, 2019.

In addition, on April 15, 2019, someone using phone number ████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

> Team anyone available for a quick Q&A pls? I have a demo in under two hours and I'm stuck[61]

Nineteen hours later the same person sent the message:

> buenos dias team, could anyone tell me why my agents which were working fine yesterday will not communicate anymore?[62]

The same person then sent a photo of a computer screen showing an installation status panel for Pegasus that showed the status of various installations of NSO malware on victim devices (Figure 3):

---

[61] SHANER_WHATSAPP_00001411.
[62] SHANER_WHATSAPP_00001411, at SHANER_WHATSAPP_00001414.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY



Figure 3. Photo of a computer screen showing an installation status panel for Pegasus showing the status of various installations of NSO malware on victim devices.[63]

---

[63] SHANER_WHATSAPP_00001416

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

Figure 3 contains the Peruvian phone number 5511989292947 as shown in this detail screenshot:



Figure 4. Detail of Figure 3 showing the Peruvian phone number 5511989292947.

WhatsApp server logs shows that phone numbers 35796071303, 35796012181, and 35796286767 were used to target a device with the same phone number (5511989292947) that the NSO employee in the previously cited messages claimed to be attempting to attack:

| date | attacker | victim |
|---|---|---|
| 2019/05/07-07:09:47 | 35796071303 | 5511989292947 |
| 2019/05/07-07:12:04 | 35796071303 | 5511989292947 |
| 2019/05/07-07:19:50 | 35796012181 | 5511989292947 |
| 2019/05/07-07:20:52 | 35796012181 | 5511989292947 |
| 2019/05/07-07:50:56 | 35796286767 | 5511989292947 |
| 2019/05/07-07:54:42 | 35796286767 | 5511989292947 |
| 2019/05/07-11:36:56 | 35796071303 | 5511989292947 |
| 2019/05/07-11:39:49 | 35796071303 | 5511989292947 |
| 2019/05/09-03:14:41 | 35796012181 | 5511989292947 |
| 2019/05/09-03:17:58 | 35796012181 | 5511989292947 |

The phone number 35796286767 also matches phone numbers associated with Josh Shaner's demonstrations on May 9, 2019, and ▮▮▮▮▮▮▮ demonstrations on May 7, 2019. The foregoing demonstrates that in at least these sixteen attacks, Defendants' employees themselves, rather than Defendants' customers, used the malware to access WhatsApp's servers and conducted the attacks using the WhatsApp platform.

X.    **The May 2019 attacks described in the Complaint were used to install Pegasus or similar NSO malware on Target Devices for the purpose of extracting information from those devices**

It is my opinion that the May 2019 attacks described in the Complaint were used to install Pegasus or similar NSO malware on Target Devices for the purpose of extracting information from those devices.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

The Pegasus software is described by NSO CEO Yaron Shohat as "a cyber intelligence tool, which is designed to extract intelligence from a target device."[64] A sales document for Pegasus describes Pegasus as "a highly sophisticated and invisible software solution that extracts the most sensitive and valuable intelligence, for an extended length of time."[65] As such, Pegasus extracts information including WhatsApp messages, SMS text messages, emails, photos, from devices it has compromised.[66]

NSO also marketed and sold Pegasus in the U.S. with the name "Phantom" through its sales affiliate Westbridge Technologies. According to Shohat, "Phantom is name, a marketing name for Pegasus in North America."[67]

Pegasus/Phantom is installed on victim's target devices by means of various "installation attack vectors," which are methods of exploitation that also install Pegasus. For example, an internal NSO support document for Pegasus 2.50 contains the following:

> Pegasus 2.50 is officially approved for production.
>
> This version introduces:
>
> • Heaven - the first 0-clicks installation vector for Broad Android devices![68]

Other installation attack vectors used by Pegasus/Phantom are "Eden" and "Erised," and these and Heaven are referred to by the umbrella term "Hummingbird," all of which exploit WhatsApp in order to install Pegaus/Phantom.[69]

It is my opinion that Pegasus/Phantom was installed on victims' Target Devices. This opinion is based on the following evidence. First, as mentioned previously in Section VI, NSO stated of the AWS Server (emphasis added):

> "At certain times prior to January 2021, the AWS Server was being used by NSO's research and development department, to house computer code that **comprised part of the Pegasus system**."[70]

Furthermore, as described previously in Section VI, files produced by NSO from this server include the Python program ▮▮▮▮▮▮▮ which contains the documentation string:

---

[64] Shohat Dep., Aug. 29, 2024, at 38:17-19.

[65] WESTBRIDGE_WHATSAPP_00000660, at WESTBRIDGE_WHATSAPP_00000663 – WESTBRIDGE_WHATSAPP_00000663.

[66] Ibid., p. WESTBRIDGE_WHATSAPP_00000663– WESTBRIDGE_WHATSAPP_00000664.

[67] Shohat Dep. Rough Draft, Aug. 27, 2024 at 149:24–150:1.

[68] NSO_WHATSAPP_ 00000287.

[69] Eshkar Dep. Rough Draft, Aug. 29, 2024, at 122:24–125:24.

[70] See Decl. of Chaim Gelfand in Support , filed 7/15/2024.

HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY

/s/ Anthony Vance

August 30, 2024

# EXHIBIT 29

## FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WHATSAPP INC., et al,. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.:  19-cv-07123-PJH |
| NSO GROUP TECHNOLOGIES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**Expert Rebuttal Report of David Youssef**

**September 21, 2024**

HIGHLY CONFIDENTIAL | ATTORNEYS EYES ONLY | EXPERT REPORT OF DAVID YOUSSEF          ii

September 21, 2024



# DAVID YOUSSEF

# EXPERT REBUTTAL REPORT

*IN RE: WHATSAPP INC., ET AL (PLAINTIFFS), V. NSO GROUP TECHNOLOGIES*
*LIMITED, ET AL., (DEFENDANTS),*
*CASE NO.: 19-CV-07123-PJH*

a long time before the attack" and "was not in use at the time of the attack."[57]  In my opinion, by using a legacy call settings field that Defendants would have known was not in active use at the time was not an effort to place the code "in plain sight," as Mr. McGraw contends, but in fact was intended to conceal their malicious code within the call settings. Mr. McGraw is also incorrect that the bash script sent through the WhatsApp Signaling Servers was the only "malicious" message sent by Defendants' Exploit.[58]  As described above and in the Youssef Report, the malformed messages sent over the Relay Servers to overflow the buffer, identify the location of libwhatsapp.so in the target device's memory, and activate the bash script were equally malicious.

**Mr. McGraw misrepresents Defendants' willful blindness to the locations of WhatsApp servers when accessing them.**

68. In Section of VI.A of his report, titled "NSO did not target computers in California", Mr. McGraw mischaracterizes the use of WhatsApp servers by the NSO Group. For the Defendants' spyware to function properly, the use of WhatsApp servers is essential to gain access to a target device. Defendants' spyware functions such as "initial lookup and fingerprint", "WhatsApp user list management", "server retries"[59] are all functions that take place utilizing WhatsApp Signaling Servers and/or WhatsApp Relay Servers. It is inevitable that during the course of deploying the Defendants' malware a server in the United States, including California where Plaintiffs reside, would be used.

69. Further, there is mention of specific WhatsApp servers being utilized in the course of the deployment of the Defendants' malware. As noted in the Youssef Report, I documented that "signaling.py" listed WhatsApp server hostnames and server ports. These WhatsApp server host names and server ports are not available on the internet and would only be available internally to WhatsApp. To discover this information, Defendants must have gained access to the server-side infrastructure to discover these servers and what ports to utilize in the deployment of their malware.

70. Mr. McGraw argues that Defendants' malware was not designed to target servers in the United States or in California, but this mischaracterizes the record. The Youssef Report details how Defendants' malware was intentionally designed to target WhatsApp's servers including because, as noted above, it was designed to specifically target the domain names for WhatsApp's servers.

---

[57] Gheorghe Dep. Tr. at 151-152.

[58] McGraw Report ¶ 134, at 27.

[59] NSO_WHATSAPP_00000870

HIGHLY CONFIDENTIAL | ATTORNEYS EYES ONLY | EXPERT REPORT OF DAVID YOUSSEF          21

71. Additional contradictions to Mr. McGraw's conclusions in Section of VI.A 2 of his report
are present in the fact that the Defendants' malware was specifically designed and used
to exploit WhatsApp Relay Servers. Mr. Gazneli testified that NSO intentionally designed
Eden to use WhatsApp's Relay Servers to bypass changes made to WhatsApp's Signaling
Servers in September and December 2018, since these changes rendered the simulated
relay servers used by Heaven ineffective.[60] For Defendants' malware to function it utilized
a "buffer overflow vulnerability in WhatsApp VOIP stack [allowing] remote code execution
via [a] specially crafted series of RTCP packets sent to a target phone number."[61] To
reaffirm this, the WhatsApp VoIP stack (i.e., architecture) by nature includes server-side
infrastructure.

72. Logging from the AWS Server which Defendants have admitted was used during "certain
times prior to January 2021 . . . to house computer code that comprised part of the Pegasus
system"[62] also records the IP addresses of certain WhatsApp Relay Servers which were
leveraged during the attacks. Geolocation of IP addresses is trivial, and Defendants'
engineers would have had enough information to target (or avoid) specific servers if they
wished to do so. During my analysis of Plaintiffs' WhatsApp logging, I observed at least
three attacks on May 2, 2019 which were recorded in log output from Defendants'
malware hosted on this server. These attacks can be correlated based on their unique call
IDs contained within WhatsApp call offer stanzas.

73. Contrary to Mr. McGraw's contention that "it appears the Pegasus client application was
designed to select its relay server using the same or similar logic as the WhatsApp client
application,"[63] I have seen no evidence confirming the manner by which the Eden exploit
selected which WhatsApp Relay Servers to use.  Defendants' internal documentation
describes a process in which the Heaven exploit was able to manipulate WhatsApp
Signaling Servers to force them to select a server controlled by Defendants' software
instead of a legitimate Relay Server, thereby inducing the Target Device to use that
malicious server for subsequent communications.[64] This indicates that Defendants
understood the manner in which the WhatsApp Signaling Servers selected the Relay
Servers to be used for a call. I understand that this exploit mechanism was rendered
ineffectual by updates made to the WhatsApp Signaling Servers during 2018, resulting in
Defendants' development of Eden. In my opinion, the fact that Defendants understood

---

[60] Gazneli Dep. Tr. at 258-59.

[61] https://nvd.nist.gov/vuln/detail/CVE-2019-3568

[62] Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server, at 2-3.

[63] McGraw Report ¶ 113, at 22.

[64] NSO_WHATSAPP_00008957.

and managed to manipulate the manner in which Relay Servers were selected provides some evidence to suggest that Defendants might have, or could have, controlled which Relay Servers were used for the Eden exploit. Additionally, the fact that Heaven needed to control the server used as a relay by the Target Device, and that Eden was developed to leverage a legitimate WhatsApp Relay Server in place of the Heaven-controlled server, affirms my point that exploitation of the WhatsApp server-side infrastructure was intrinsic to successful execution of these exploits.

74. Mr. McGraw acknowledges that two WhatsApp Relay Servers were physically located in California during the exploitative activity. These Relay Servers were located in San Jose and Los Angeles, California, during at least the relevant time period in 2019. These California servers were observed to be utilized during the execution of the Defendants' spyware. Mr. McGraw also omits that all of WhatsApp's Signaling Servers and many other Relay Servers utilized during the execution of the Defendants' spyware were located in the United States. Defendants' engineers would have known where WhatsApp servers were located.

75. In addition, Mr. McGraw claims there is no evidence that NSO chose to lease the California-based Quadranet server at IP address 104.223.76.220.[65]  It is unsurprising that there would be no evidence linking the registration of that server to NSO if it was used for operational purposes, because according to Ramon Eshkar, NSO's White Services Team set up this infrastructure through anonymous means so they "cannot be linked to either the customer or NSO."[66]  In my opinion, the fact that the IP address for the Quadranet server was hard coded into the encrypted payloads sent by Defendants' Exploit indicates that NSO set up that server for use with its technology.  I have seen no evidence that NSO provided its customers with the technological details about its installation vectors necessary to include specific IP addresses in the payloads, and in my opinion, it would be very surprising if they did.  Mr. McGraw also points to no evidence that the Quadranet server was located anywhere but in California.

**Mr. McGraw misrepresents the degree to which Defendants accessed WhatsApp servers without authorization and to which the level of access exceeded authorization.**

76. In Section VI.B of his report, Mr. McGraw argues that "[n]either NSO nor its customers accessed any WhatsApp server without authorization or exceeded their authorized access," and attempts to assert that Defendants' exploitation "used WhatsApp [S]ignaling and [R]elay servers only for their ordinary and intended purpose of shuttling data between

---

[65] McGraw Report at 23-24.

[66] Eshkar Dep. Tr. at 47-48, 150-155; *see also* Gazneli Dep. at 292-293.

Docusign Envelope ID: 230FFEED-17B2-426D-B32B-685288A06BEC

client devices."[67] As an initial matter, I understand that the terms "without authorization" and "exceeds authorized access" are legal terms of art, and I offer no opinion on the meaning of those legal terms. To the extent Mr. McGraw is offering a legal opinion about how the facts apply to the law, that is inappropriate. However, Mr. McGraw's characterization of the facts is incorrect, and I disagree that WhatsApp's servers were used "only for their ordinary and intended purpose." For VoIP communications, the WhatsApp Signaling Servers and Relay Servers are designed to transmit data related to voice calls to and from legitimate WhatsApp Client Applications, but this data could not be arbitrarily set, supplied, or controlled by the user of the Application. Under ordinary and intended circumstances, this data would be generated only by the WhatsApp Client Application, based in part on user input and call context, but subject to the technological limitations built into the Application.

77. Defendants circumvented those technological limitations by developing and using malicious software meticulously crafted to mimic a legitimate WhatsApp Client Application, generate manipulated messages related to their exploit, access the WhatsApp Signaling and Relay Servers, and cause the Servers to transmit that data to Target Devices in order to carry out the exploitation. None of this data would have or could have been sent by a WhatsApp user using the legitimate WhatsApp Client Application, and the WhatsApp Servers were never intended to transmit such data.

78. Upon making the spurious claim that Defendants did not access WhatsApp Servers without authorization or exceed their authorized level of access, Mr. McGraw goes on to acknowledge[68] that Plaintiffs responded to the observed exploitative activity by applying changes to both the Signaling Servers and Relay Servers in order to detect and prevent the transmission of Defendants' malicious data. This response alone directly implies that the conduct was forbidden. Mr. Gazneli's testimony about the efforts NSO took to avoid detection indicated that NSO understood that its conduct was prohibited,[69] and Mr. McGraw appears to reference NSO's interest in and actions taken toward shielding its unauthorized conduct from detection by the operators of platforms under exploitation.[70] Furthermore, in my opinion, Mr. McGraw's acknowledgement throughout his report of the fact that Defendants exploited a "vulnerability," which he defines as a "flaw in the software system that permits an actor to make the system behave in unexpected ways,"[71] is itself

---

[67] McGraw Report ¶ 101, at 20.

[68] McGraw Report ¶ 102-106, at 20-21.

[69] Gazneli Dep. Tr. at 54-58; id. at 153-156.

[70] McGraw Report ¶ 143, at 30.

[71] McGraw Report ¶ 31, at 7.

# IV.    CONCLUSION

100. In the McGraw Report, Mr. McGraw details five (5) opinions regarding Defendants' use of WhatsApp servers in the delivery of its malware to Target Devices. After reviewing the McGraw Report, the cited materials, additional material provided by Counsel, and after conducting my own additional research, some of which is detailed in the Youssef Report, it is my opinion that Mr. McGraw incorrectly concludes that Defendants activity, notably its access and use of WhatsApp servers, falls within the boundaries of lawful intercept as defined in this report. Further, Mr. McGraw understates the degree to which Defendants sought to circumvent technical and procedural measures put in place by Plaintiffs to prevent such activity.

101. It is my conclusion that Defendants did not merely use WhatsApp servers or the WhatsApp Client Application as they were intended to be used, as Mr. McGraw opines, but deliberately researched and reverse-engineered WhatsApp servers to exploit them in unintended and impermissible ways to convert them into a delivery mechanism for Pegasus to Target Devices.

102. It is my conclusion that Mr. McGraw disregards the evidence that Defendants intentionally targeted WhatsApp servers and were willfully blind to the location of such servers, including those located in the United States and specifically in California.

103. It is my conclusion that Mr. McGraw mischaracterizes the manner in which Defendants gained access to WhatsApp servers and disregards the technological barriers that Defendants circumvented in the process of using WhatsApp servers to deliver Pegasus to Target Devices.

104. Further, it is my conclusion that Mr. McGraw improperly downplays the harm that Defendants caused to WhatsApp and the degree to which the activity was performed by Defendants rather than Defendants' customers.


Dated: September 21, 2024                    _____

                                                              David Youssef

# EXHIBIT 30

## FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH |
| Plaintiffs, | |
| v. | |
| NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, | |
| Defendants. | |

**REBUTTAL REPORT OF TERRENCE MCGRAW**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1        have teams dedicated to malware incidents. As previously mentioned, NIST and

2        other established frameworks such as ISO 27001 and 27002 dictate that these cyber

3        security operations and similar capabilities are provided continuously either

4        organically or through third-party support. The reverse engineering of malware is

5        a skill that companies may not maintain on staff organically, but security operations

6        and incident response most certainly should be.

7     d.   Much of the detection and response were based on the simple identification of

8        malformed stanzas that could have been prevented if the plaintiffs had availed

9        themselves of the controls inherent to XMPP or detected them with proper log

10       analysis.

11     83. Best practices for security operations within an organization are best summarized by

12 NIST Cyber Security Framework: Identify, Protect, Detect, Respond, Recover. WhatsApp was

13 lacking in the Protect and Detect categories. Proper Protection is predicated on Access Control,

14 Data Security, Protective Technologies, and maintenance among others, and it has been clearly

15 demonstrated that WhatsApp was not validating traffic across trust boundaries, was not proactively

16 and properly assessing the integrity of its code and underlying protocols and did not have sufficient

17 tools to do so. In the category of Detect, even the most basic log analysis would have identified

18 the malformed stanzas in question, as they are easily identifiable upon a human visual inspection.

19 A "deny all, permit by exception" methodology for server operations would have precluded the

20 initial access vectors alleged by WhatsApp and Facebook.

21     84. After comparing WhatsApp's security practices to industry guidelines and industry

22 standard best practices, WhatsApp's security measures were not reasonable.

23     **B.**    **WhatsApp Did Not Institute Any Changes in Late 2018 to Prevent Pegasus**

24          **Use of WhatsApp Servers**

25     85. Like Youssef, Vance describes two changes to WhatsApp's server code, the first in

26 September 2018 and the second in December 2018. The first he describes as a code change (Diff

27 D9650871) intended to block certain stanzas from setting the "voip_settings" element. The second

28 he describes as a code change (Diff D13309896) intended to block stanzas from setting the

"group_update" element.

86. I have not yet been provided the opportunity to review the code changes described by Vance. I understand from King & Spalding that WhatsApp did not provide the source code files relating to these changes until Saturday, August 31, 2024, after I submitted my initial report and opinions. I am told that WhatsApp will only allow me or members of my team at Gray Analytics to view source code snippets as PDF files, at the New York, NY offices of its lawyers. Given various professional obligations, and the late disclosure of these materials, the earliest date my team is available to travel to New York and to view those source code documents is September 24, 2024. As a result, I reserve the right to update, amend, or supplement any of my opinions if additional information becomes available or apparent after reviewing the source code itself.

87. There is no evidence that either the September 2018 changes or the December 2018 changes were made in response to any detection of NSO's lawful-intercept technologies. In fact, on page 6, Vance states that any effect on Heaven was "unbeknownst to WhatsApp." Given that WhatsApp was unaware of Pegasus in 2018, any changes that WhatsApp made to its code or infrastructure that may have impacted NSO's lawful intercept technologies would have been purely coincidental.

88. Vance's opinion that the September 2018 and December 2018 changes to WhatsApp's server code interrupted the operation of Heaven is based primarily on anecdotal, non-technical evidence. His sole technical support consists of several error code messages that he claims were retrieved from log files residing on a "Pegasus installation server."

89. First, Vance incorrectly asserts that the files on which he relies were produced by *NSO* from an Amazon Web Services (AWS) server. Youssef's report makes clear that the files were provided by *WhatsApp*, which claims to have received them from the United States Department of Justice and which claims that the materials were retrieved from an AWS server leased by NSO. Vance does not provide any evidence verifying the source of the files referenced or that the source code was used in the 2019 incident to interact with third-party devices not owned or controlled by NSO, its corporate affiliates, or its government customers.

90. Second, the error messages identified by Vance do not indicate why any particular

request was forbidden.[88] RFC 7231 defines error response codes and section 6.5.3 discusses "403" error codes specifically.[89] An error code reading "403 Forbidden" simply "indicates that the server understood the request but refuses to authorize it."  The server can provide this error code for any reason. The reason that the request was refused is only made public if the server includes a description in the response payload, which is not required. The log files cited by Vance do not include any such description. As a result, the error messages provide no context as to why the server refused the traffic.

91. Having reviewed the evidence cited by Vance, it does not indicate that WhatsApp was aware of Heaven in late 2018 or that any of the changes discussed were directed at Heaven. Vance's technical There is also little technical evidence supporting Vance's opinion that the code changes interfered with the operation of Heaven.[90]

## C.    Pegasus (Eden) Did Not Bypass Any Technical Access Barriers on WhatsApp's Servers, Including December 2018 Code Changes

92. Vance provides no evidence that NSO intentionally circumvented any December 2018 technical limitations to access confidential portions of a WhatsApp server.

93. As a threshold matter, nothing in Vance's report alters my opinion that Eden did not access any parts of the WhatsApp servers that were "off limits" to Pegasus users (or in any way impeded the operation of those servers). As Mr. Gheorghe testified, the activities of Pegasus users "d[id] not impair the availability of the servers" and "did not corrupt any data on the … servers."[91] Eden used WhatsApp servers *only as a channel to deliver code to target devices*, and it did this in accordance with the rules provided by those WhatsApp servers. Neither the exploit nor the Pegasus

---

[88] WA-NSO-00017140.

[89] https://datatracker.ietf.org/doc/html/rfc7231#section-6.5.3

[90] As a practical matter, since Vance's opinions were prepared, I understand that testimony from NSO's Tamir Gazneli confirms that a December 2018 WhatsApp update had a coincidental affect the operation of Heaven.  (Gazneli Tr., at 254:14-23, 256:23-25).  To the extent that Vance is permitted to issue an opinion incorporating or addressing any such evidence, I reserve the right to update, amend, or supplement any opinion in response.

[91] Gheorghe Tr., 183:11-12 and 184:6-7.

1    agent itself executed on any WhatsApp server. As Mr. Robinson confirmed at his deposition, the

2    Pegasus installation process did not involve any remote code execution on WhatsApp servers.[92]

3    That is why WhatsApp's own internal analysis concluded that "WhatsApp servers were not

4    compromised."[93]

5            94. Rather than "hack" those servers, both Heaven and Eden simply followed the rules

6    those WhatsApp servers set for access, as coded into those servers by WhatsApp. The September

7    2018 and December 2018 changes to WhatsApp's code that Vance identifies simply changed the

8    access rules set by WhatsApp servers. In response to those rule changes, NSO modified its

9    software *to comply with the new rules*. For example, the rule changes in December 2018 simply

10   prevented Heaven from requiring the targeted device to use relay servers controlled by the Pegasus

11   user.[94] Eden did not circumvent that restriction. Instead, it accepted that the targeted device would

12   use relay servers controlled by WhatsApp.[95] Eden was therefore a modification made *to comply*

13   with the new rules of the road.

14           95. It is incorrect to suggest that changing a client application to comply with a server's

15   new rules is somehow "hacking" the server. Indeed, it is routine for software companies to update

16   their products to accommodate updates made to related, linked, integrated, or interconnected

17   products. This is true for WhatsApp as well. For example, Mr. Robinson testified that WhatsApp

18   can integrate with third-party applications (like Shopify) through WhatsApp's software

19   development kit (SDK).[96] And Mr. Robinson testified that, when WhatsApp updates the SDK,

20   those updates can "break" the integration and thus force the third-party application provider to

21   update its own application to maintain compatibility.[97]

22

---

23   [92]  Robinson Tr. (rough) at 193:6-14.

24   [93]  Ex. 1083 (WA-NSO-00125122).

25   [94]  Gazneli Tr., 254:14-23.

26   [95]  Gazneli Tr., 258:17-261:21.

27   [96]  Robinson Tr. (rough), 126-135.

28   [97]  Same.

certain types of data. Since XML is a readable format, developers often use common terms to represent the same types of data even if they are not working in the same company. In addition, the example traffic and references to full_fingerprint.py do not conclusively establish timing. There is no timestamp in the example traffic, and the code in full_fingerprint.py does not make any reference to timing. The code in full_fingerprint.py does not contain any indicators that it was used to bypass restrictions or remediations imposed "after Plaintiffs remediated the May 2019 attacks."

123. Second, Vance's opinion that NSO will continue to make use of the plaintiffs' products as installation vectors is purely speculative.

a. Vance offers no evidence whatsoever that NSO has ever made use of any of the plaintiffs' products, other than WhatsApp, as an installation vector.

b. With respect to WhatsApp specifically, Vance only relies on a limited pattern of conduct in 2018 and 2019, and cites only sporadic activity after Heaven and Eden were closed in May 2019, to draw broad conclusions regarding potential NSO activities more than five years later.

c. Vance relies heavily on generic (and non-technical) statements about NSO's continued pursuit of new vulnerabilities. None of those statements focus on WhatsApp. To the contrary, the quotations provided by Vance indicate that NSO prefers newer, less established software and software features.

September 21, 2024

_____
Terrence McGraw

GRAY ANALYTICS
4240 Balmoral Dr., Suite 400
Huntsville, AL 35801