# EXHIBIT N

***Unredacted Version
of Document
Proposed to be Filed
Under Seal***

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          H I G H L Y   C O N F I D E N T I A L

2                  ATTORNEYS' EYES ONLY

3              NORTHERN DISTRICT OF CALIFORNIA

4                    OAKLAND DIVISION

5                        Case No. 4-19-cv-07123-PJH

6    ----------------------------------

7    WHATSAPP INC., a Delaware corporation,

8    and META PLATFORMS INC., a Delaware corporation,

9            Plaintiffs,

10   v.

11   NSO GROUP TECHNOLOGIES LTD and

12   Q CYBER TECHNOLOGIES LTD,

13            Defendants.

14   ----------------------------------

15       Deposition of TAMIR GAZNELI, taken by AILSA

16    WILLIAMS, Certified Court Reporter, held at the

17    offices of Davis Polk & Wardwell, London, United

18        Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1 testimony on behalf of both the defendants?
2     A   Yes.
3     Q   If I refer to NSO Group as NSO and I
4 refer to Q Cyber as Q, will that be clear to you.
5     A   Yes.
6     Q   What did you do to prepare to
7 testify as to defendants' knowledge on your
8 designated topics?
9     A   Well, I read hundreds of documents,
10 piles of them, and of course meeting with lawyers.
11     Q   Generally, what types of documents
12 did you review to prepare for your testimony?
13     A   Technical documents, everything
14 which was related to the topic.
15     Q   Were the documents you reviewed all
16 documents that have been produced to the
17 plaintiffs in this case?
18     MR. AKROTIRIANAKIS:  Objection, no
19 foundation.
20     A   Our company's documents.  Documents
21 that were produced by NSO.
22     Q   Do you know one way or another
23 whether the documents you have reviewed have been
24 made available to the plaintiffs in this case?
25     MR. AKROTIRIANAKIS:  Objection, no

Page 11

1 foundation.
2     A   I am not aware whether every
3 document was available, but as far as I
4 understood -- I don't have the --
5     Q   You don't know one way or the other?
6     A   I don't know whether every document
7 that I reviewed was presented to plaintiffs.
8     Q   Did you review source code as part
9 of your preparation?
10     MR. AKROTIRIANAKIS:  Objection, vague.
11     A   Which source code do you refer to?
12     Q   Did you review any code as part of
13 your preparation?
14     A   Again, I think -- which code you
15 refer to?
16     Q   Well, I am not referring to any
17 specific code.  I am asking you whether you
18 reviewed any code at all as part of your
19 preparation?
20     A   I refer the parts that I thought may
21 be relevant.
22     Q   So did you review code?
23     MR. AKROTIRIANAKIS:  Objection, vague.
24     A   As I said, part.
25     Q   You did review some?

Page 12

1     MR. AKROTIRIANAKIS:  Objection, vague.
2     A   As I said, some.
3     Q   Some, yes.  Which code did you
4 review?
5     MR. AKROTIRIANAKIS:  Objection, vague.
6     A   Can you clarify whether you ask
7 questions for specific code.
8     Q   Well, what I am asking about is the
9 code that you reviewed.  You said you reviewed
10 some and I am asking you which code did you
11 review?
12     MR. AKROTIRIANAKIS:  And I will object
13 again that the question is vague.  It might be
14 easier if maybe we have it interpreted.  I think
15 you guys are talking past each other.
16     THE INTERPRETER:  Shall I interpret the
17 question?
18     MR. PEREZ-MARQUES:  Sure.
19         (Question interpreted).
20     MR. AKROTIRIANAKIS:  Sorry, which
21 question?  Where did you start?
22     THE INTERPRETER:  "What I am asking
23 about is the code that you reviewed.  You said you
24 reviewed some and I am asking which code did you
25 review?"

Page 13

1     A   Okay.  So I reviewed the code, part
2 of the fingerprinting.
3     Q   The fingerprinting code?
4     A   Yes.
5     Q   In connection with which exploit?
6     A   The ones that were here.
7     Q   We understand that there are a
8 number of 0 click installation vectors that were
9 used via WhatsApp servers.  Is that generally
10 consistent with your understanding?
11     A   No.
12     Q   No?  In what way is that different
13 from your understanding?
14     MR. AKROTIRIANAKIS:  Objection, no
15 foundation.
16     A   I don't understand any relation to
17 WhatsApp servers for 0 click.
18     Q   When you say that -- you made
19 reference to -- well, let me take a step back.
20     You referenced reviewing fingerprinting
21 code?
22     A   Yes.
23     Q   And I thought you said the ones that
24 are at issue in this case, or something to that
25 effect.  Is that right?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

1        MR. AKROTIRIANAKIS:  Objection,
2  misstates his testimony.
3        Q   Is that what you said?
4        A   You asked whether the code relates
5  to the 0 click vectors.  Can you repeat what you
6  asked about?
7        Q   I am abandonning that question to
8  try to clarify and get an answer from you.
9        You said you reviewed code for
10  fingerprinting.  Is that right?
11        MR. AKROTIRIANAKIS:  Objection,
12  misstates his testimony.
13        Q   Yes?
14        A   I said -- you asked whether I
15  reviewed some of the code.
16        Q   Mm hmm.
17        A   If that was not your question,
18  please repeat the question?
19        Q   I asked you whether you reviewed
20  some code.  You said "yes".  You agree with that
21  so far?
22        A   Yes.
23        Q   And then I asked you which code and
24  Varda helped translated that, and you said
25  "fingerprinting", right.  Then I asked you which

Page 15

1  fingerprinting code, and you said "the one that we
2  are here to discuss" or words to that effect.  Is
3  that right?
4        A   No, I didn't.
5        Q   That is the piece I would like you
6  to clarify, so which fingerprinting code did you
7  review?
8        MR. AKROTIRIANAKIS:  Objection, vague.
9  No foundation.
10        A   I reviewed the code that was
11  relevant for the specific timeframe we are talking
12  about.
13        Q   Okay.  Was it fingerprinting code in
14  connection with Pegasus?
15        A   I don't have access to any other
16  code.
17        Q   Do you know whether the code you
18  reviewed is used in connection with Pegasus?
19        A   Can you please clarify the
20  timeframes you are asking about.
21        Q   At any timeframe?
22        A   As far as I understand, we are here
23  to discuss specific timeframes.
24        Q   Okay, but my question is not limited
25  to any particular timeframe.  My question is just

Page 16

1  about the code that you reviewed.  Is it code that
2  is used in connection or was ever used in
3  connection with Pegasus?
4        A   The code I reviewed was specific to
5  Pegasus for very specific timeframe.
6        Q   And what timeframe was that?
7        A   Again, I reviewed specific instance
8  of code from about 2019.
9        Q   2019?
10        A   Yes.
11        Q   Did the code you reviewed have a
12  file name?
13        A   It clearly has a file name but I
14  don't recall its name.
15        Q   Did you review any other code
16  besides the one you mentioned?
17        A   No.
18        Q   What else did you review as part of
19  your preparation to testify as a corporate
20  representative?
21        A   I reviewed the documents that we
22  produced for this case in terms of our code, our
23  documents.
24        Q   Were the documents you reviewed
25  provided to you by counsel or did you gather any

Page 17

1  documents on your own?
2        A   It was by counsel.
3        Q   You didn't do any investigation or
4  collection of documents on your own?
5        A   You refer to a specific document or
6  specific types of documents?
7        Q   No, I am not referring to any
8  specific documents.  I am asking you whether you
9  did any investigation or collection of documents
10  on your own as part of your preparation to testify
11  as a corporate representative today?
12        MR. AKROTIRIANAKIS:  Objection, vague.
13        A   Besides what I said, no.
14        Q   So the only ones you reviewed were
15  the ones provided by counsel, is that right?
16        A   Yes.
17        Q   Did you talk to anyone as part of
18  your preparation, besides counsel, anyone else to
19  prepare for your testimony?
20        A   No.
21        Q   And when did you first meet with
22  counsel or speak with counsel as part of your
23  preparation to testify today?
24        A   Two days ago.
25        Q   And how long -- was that in person

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1 R&D?
2      A  I was leading the R&D of the entire
3 Android framework.
4      Q  Only Android?
5      A  Yes.
6      Q  Was there another -- were there
7 multiple Directors of R&D.?
8      A  Yes.
9      Q  And was your work at that time as
10 Director of R&D also focused on installation
11 vectors for Pegasus?
12      MR. AKROTIRIANAKIS:  Objection, vague.
13      A  Development of installation vectors
14 is responsibility of part of the teams, yes.
15      Q  What other responsibilities did the
16 team or teams that you supervised as Director R&D
17 have?  What other responsibilities did they have?
18      A  The development of an agent, Android
19 agent, development of the backend server and QA.
20      Q  So you mentioned Android agent,
21 backend server and QA?
22      A  Yes.
23      Q  And when you say Android agent, what
24 do you mean?
25      A  The software that resides on the

Page 43

1 target's device and collects in all the required
2 information.
3      Q  And you refer to that as the agent?
4 Is that a good shorthand for us to use today?
5      A  Yes.
6      Q  And when you say "backend server"
7 what do you mean by that?
8      A  It is a piece of software that
9 resides on the customer's infrastructure and is
10 responsible for managing the installation flow.
11      Q  Managing the installation flow?
12      A  Yes.
13      Q  Installation flow of Pegasus?
14      A  Part of Pegasus.  Not the whole
15 Pegasus.
16      Q  Which part?
17      A  For android.
18      Q  For Android.  So would you consider
19 that one version of Pegasus or how would you refer
20 to that?
21      A  It is one of the parts.
22      Q  And when you say "QA", what do you
23 mean by that?
24      A  Quality assurance.
25      Q  Quality assurance?

Page 44

1      A  Yes.
2      Q  What did the team -- what was the
3 quality assurance work that the team you
4 supervised did?
5      A  Functionality, statistics.
6      Q  Functionality of what?
7      A  Of the agent and the installation
8 flows.
9      Q  Who did you report to as Director of
10 R&D?
11      A  To the VP R&D.
12      Q  Who was that?
13      A  During that period there were three,
14 so to which period do you refer.
15      Q  Let's go through all three.
16      A  The name of the first one I don't
17 remember.  The second one was Yuval Barkan and the
18 third one was Rami Dabush.
19      Q  During your time as Director of R&D,
20 were any researchers that you supervised working
21 on installation vectors via WhatsApp?
22      A  Yes.
23      Q  Which vectors were those?
24      A  When I was of R&D it was ERISED.
25      Q  Any others besides ERISED, during

Page 45

1 your time as Director R&D?
2      MR. AKROTIRIANAKIS:  I am going to
3 object.  That exceeds the timeframe of the court's
4 order which is the limiting factor of the witness'
5 ability to testify about the technology.
6      MR. PEREZ-MARQUES:  So is that an
7 instruction not to answer?
8      MR. AKROTIRIANAKIS:  Yes.
9      Q  ERISED was developed after January
10 2020, is that correct?
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates testimony.  Also vague.
13      A  I didn't answer when it was
14 developed.
15      Q  But after January 2020, members of
16 your team were working on ERISED?
17      MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.  Also vague.
19      A  I would say that after January 2020
20 some of the team members maintained ERISED.
21      Q  And were doing work to maintain
22 ERISED in that post January 2020 period?
23      A  It depends on the specific timeframe
24 and it depends on whether it required any work to
25 be maintained.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1    Q   After January 2020, to the extent
2 work was required, work on ERISED was done by
3 members of the team you supervised?
4        MR. AKROTIRIANAKIS:  Objection,
5 foundation.
6    A   Part of the time.
7    Q   Other than ERISED, and your counsel
8 may instruct on this but I just want to have a
9 clear record, other than ERISED, in that post
10 January 2020 period, did researchers that you
11 supervised work on other installation vectors that
12 would operate via WhatsApp?
13        MR. AKROTIRIANAKIS:  You can answer to
14 the extent it is within the time period April 29,
15 2018 to May 10, 2020.
16    A   In this timeframe, no.
17    Q   And subsequent to May 2020, did
18 members of the team you supervised work on any
19 installation vectors that would work via WhatsApp?
20        MR. AKROTIRIANAKIS:  He is not able to
21 talk about timeframes after the timeframe
22 delineated in the court order?
23        MR. PEREZ-MARQUES:  So is that an
24 instruction not to answer?
25        MR. AKROTIRIANAKIS:  Yes.

Page 47

1        MR. PEREZ-MARQUES:  And you will follow
2 your counsel's instruction and decline to answer
3 as to whether members of your team worked on the
4 development of WhatsApp installation vectors after
5 May 2020?
6    A   Yes.
7    Q   In November 2022, you were promoted
8 to VP R&D, correct?
9    A   Yes.
10    Q   How did your responsibilities change
11 at that point?
12    A   Now I am leading the entire R&D of
13 the company.
14    Q   Who do you report to as VP R&D?
15    A   To the CEO.
16    Q   Would you say -- are you the senior
17 most technological employee at NSO?
18        MR. AKROTIRIANAKIS:  Objection, vague.
19    A   What do you mean by senior and what
20 do you mean by technologically capable?
21    Q   Okay.  What is your working
22 relationship with Yaron Shohat?
23        MR. AKROTIRIANAKIS:  Objection, vague.
24    A   He is my manager.
25    Q   How often do you speak?

Page 48

1    A   A couple of times per week.
2    Q   What about Omri Lavie, what is your
3 working relationship with him?
4        MR. AKROTIRIANAKIS:  Objection,
5 foundation.
6    A   Omri?
7    Q   I may be pronouncing it wrong.
8    A   Omri?
9    Q   L-A-V-I-E?
10    A   I have no --
11    Q   You don't know who that is.
12    A   I know who Omri is but I don't know
13 for sure that you are referring to the same one.
14    Q   Omri, one of the founders of NSO?
15    A   Okay.
16    Q   That is who I am referring to?
17    A   Okay.  I have no continuous
18 connection with him.
19    Q   When was the last time you spoke
20 with him?
21    A   Two months ago, one and a half
22 months ago.
23    Q   What about Ramon Eshkar?  What is
24 your working relationship with him?
25    A   He is one of the members in the

Page 49

1 management of the company.
2    Q   And how often do you speak with him?
3    A   Also a couple of times per week.
4    Q   On what types of issues?
5    A   Customer related and product
6 related.
7    Q   Do you interact with NSO or Q's
8 customers at all?
9    A   Yes.
10    Q   In what capacities and what
11 circumstances do you interact with customers?
12    A   Whenever they demand technical
13 representative.  It is not something I initiate.
14    Q   Is that for existing customers or
15 prospective customers or both?
16    A   Both.
17    Q   Do you participate in the marketing
18 of NSO's products?
19    A   No.
20    Q   So when you talk to prospective
21 customers, in what capacity are you speaking with
22 them?
23        MR. AKROTIRIANAKIS:  Objection, vague.
24    A   Can you explain "capacity"?
25    Q   For what purpose are you speaking

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 130

1 the agent to the customer's backend.
2     Q   And that includes how the data is
3 transmitted through the internet?
4     MR. AKROTIRIANAKIS:  Object to the form
5 of the question.  Vague.
6     A   This includes the ability of the
7 agent to transmit data from the target device to
8 the customer's backend, and all this
9 infrastructure is under customer's -- it is the
10 customer's.
11     Q   What was NSO's role in establishing
12 an anonymizing transmission network for a
13 particular customer back in 2018/19?
14     MR. AKROTIRIANAKIS:  Objection, beyond
15 the scope of the designation of this witness.
16 Also vague.  No foundation.
17     A   So as for the infrastructure which
18 is deployed on the customer side, it involves
19 purchases of infrastructure which are done by the
20 White Services teams and eventually deployed on
21 the target customers' ecosystem in order to enable
22 them to use the software.
23     Q   Would it also involve leasing
24 third-party servers?
25     MR. AKROTIRIANAKIS:  Object to the form

Page 131

1 of the question.  Also beyond the scope of the
2 designation of this witness.
3     A   It involves working with third-party
4 providers in order to get the infrastructure
5 required.
6     Q   And doing so in a way that could not
7 be traced back to NSO or the customer?
8     MR. AKROTIRIANAKIS:  Object to the form
9 of the question.  Also beyond the scope of the
10 designation of the witness.
11     A   As it says here, the goal is
12 deniability of the customer and includes the
13 deniability of the company.
14     Q   And the White Services team that you
15 mentioned, what is their role?
16     A   To make those purchases for
17 infrastructure in an anonymized way.
18     Q   I would like to -- you can close
19 that document.  I am going to show you a different
20 one.
21     (Exhibit 2017 marked for identification)
22     I am showing you what has been marked as
23 Exhibit 2017.  This is a Confluence document, is
24 that right?
25     A   Yes.

Page 132

1     Q   What is Confluence?
2     A   It is a software for documenting.
3     Q   The document is dated January 25,
4 2018.  Do you see that?
5     A   Yes.
6     Q   And it has a heading that is
7 partially redacted, "2.50", then a redaction and
8 then "Android".  Do you see that?
9     A   Yes.
10     Q   Do you recognize this document?
11     A   Yes.
12     Q   What is it?
13     A   It is a release page that states
14 that a version is being released.
15     Q   A new version of Pegasus, correct?
16     A   Yes.
17     Q   And so how is Confluence used at
18 NSO?
19     MR. AKROTIRIANAKIS:  Objection,
20 over-broad.
21     A   What do you mean by how?
22     Q   For instance, it seems here, correct
23 me if I am wrong, that it is being used as a
24 communication.  Is that right?
25     A   No.

Page 133

1     Q   It is just a draft document that
2 would be --
3     A   Not communication, yes.
4     Q   So when it says "Thank you all for
5 taking part", et cetera, who is this speaking to?
6     A   In terms of the ecosystem of
7 software you can add and you can subscribe to a
8 page, but it is not used for communication.  We
9 didn't use it in this way.  Eventually, if someone
10 needs to receive this thank you, then you would
11 receive it by mail or something.
12     Q   But there would be people within NSO
13 who subscribe to this Confluence page?
14     MR. AKROTIRIANAKIS:  Objection,
15 foundation.
16     A   There might be.
17     Q   Did you subscribe to this Confluence
18 page?
19     A   I don't recall being subscribed to
20 this page.
21     Q   You don't recall one way or the
22 other?
23     A   No.
24     Q   It states that "Pegasus 2.50 is
25 officially approved for production".  What does

34 (Pages 130 - 133)

Page 134

1 that mean?

2      MR. AKROTIRIANAKIS: Objection, no

3 foundation. Beyond the scope of the designation

4 of the witness.

5      A  I would understand it as ready for

6 release.

7      Q  Ready for shipment to customers?

8      A  No.

9      MR. AKROTIRIANAKIS: Object to the form

10 of the question.

11     A  Not it doesn't state to customers or

12 which customers or how many customers.

13     Q  So what does ready for release mean

14 or ready for production? What can now be done

15 with respect to Pegasus 2.50?

16     MR. AKROTIRIANAKIS: Object to the form

17 of the question.

18     A  You can take it to a demo session.

19 You can take it to a beta customer.

20     Q  A better customer?

21     A  Beta customer.

22     Q  A beta customer?

23     A  Yes.

24     Q  If the customer likes, you know,

25 sees the demonstration and likes the product, is

Page 135

1 the company at this point, January 25, 2018,

2 permitted to actually deploy Pegasus 2.50?

3      MR. AKROTIRIANAKIS: Object to the form

4 of the question. No foundation and beyond the

5 scope of the designation of this witness.

6      A  I would need to read it.

7 What was the question?

8      Q  I am just trying to understand when

9 it says "approved for production" what that means.

10 Does that mean that it can be licensed to a

11 customer?

12     A  No.

13     MR. AKROTIRIANAKIS: Object to the form

14 of the question.

15     Q  Okay. Why not?

16     MR. AKROTIRIANAKIS: No foundation.

17     A  Because whether it can be deployed

18 to a customer or not is a matter of OpSec

19 readiness. It is a matter of decision of the

20 company and matter of readiness in terms of

21 statistics and robustness of the solution. This

22 doesn't state anything I can understand about

23 that.

24     Q  So when it says "approved for

25 production", what does that mean?

Page 136

1      MR. AKROTIRIANAKIS: Same objections.

2      Q  What is it approved for?

3      MR. AKROTIRIANAKIS: Same objections.

4 Beyond the scope of the designation of this

5 witness.

6      A  It means that it can be used as a

7 solution, as the examples I talked or said before,

8 and it enables installation of agent, because that

9 is -- otherwise it won't be approved for

10 production, in terms of Pegasus.

11     Q  I am just not understanding, because

12 I hear you saying even though it is approved for

13 production it cannot be shipped to clients?

14     MR. AKROTIRIANAKIS: Objection,

15 misstates his testimony.

16     A  No, I didn't say that.

17     Q  It can be shipped to customers?

18     MR. AKROTIRIANAKIS: Objection,

19 misstates testimony.

20     Q  Just can it or can it not, once it

21 is approved for production, be shipped to

22 customers?

23     MR. AKROTIRIANAKIS: Object to the form

24 of the question.

25     A  Once it is approved for customer, it

Page 137

1 means that it enables an end to end installation

2 of this type of agent and this type of vector, and

3 from that point on it is a decision that the

4 product, the R&D and the sales team have to make

5 in order to define whether it is ready enough to

6 be deployed for operations or demo sessions or any

7 beta customer which would like to deploy.

8      Q  Got it. So at this point it is

9 still not -- this "approved for production" does

10 not suffice to allow it to be delivered to

11 customers, right? It would still need additional

12 analysis by OpSec and Product and others?

13     A  No, not for GA.

14     Q  I am sorry?

15     A  Not for general deployment.

16     Q  It says "This version introduces

17 Heaven". Do you see that?

18     A  Yes.

19     Q  And it describes it as the first 0

20 click installation vector for broad Android

21 devices!" with an exclamation point. Do you see

22 that?

23     A  Yes.

24     Q  And so if at this point Pegasus 2.50

25 including Heaven was not yet clear to go to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1 customers, when was Heaven clear to go to
2 customers?
3        A  As I recall, I think around
4 April/May this was ready enough to be deployed.
5        Q  Around April or May 2018?
6        A  Yes.  Just a second.  No.  It was
7 around October.
8        Q  October 2018?
9        A  Yes, ready for broad deployment.
10       Q  What do you mean by "broad
11 deployment"?
12       A  All customers could get the
13 solution.
14       Q  When was the first time, to your
15 knowledge, that any NSO customer was able to use a
16 version of Pegasus that included Hummingbird?
17       A  I don't recall the exact month for
18 that.
19       Q  But it would have been between
20 January and October?
21       A  Yes.
22       Q  When it says "The first 0 click's
23 installation vector for broad Android devices", is
24 it right that beyond this before this point others
25 had installation vectors for Android but they were

Page 139

1 not broad?
2        A  No, we didn't have any solution at
3 all for Android.
4        Q  It includes "thanks for putting so
5 much effort to imagine, create and release this
6 complex version".  Do you see that?
7        A  Yes.
8        Q  What were the efforts that went into
9 producing Heaven?
10       MR. AKROTIRIANAKIS:  Objection, no
11 foundation.  Beyond the scope of the designation
12 of the witness.
13       A  I can answer from the R&D side.
14       Q  Mm hmm.
15       A  It is finding vulnerabilities,
16 building the installation chain and chaining
17 altogether to an installation vector of the agent.
18       Q  It notes that this is a significant
19 milestone for Pegasus.  Do you see that?
20       A  Yes.
21       Q  Do you agree with that?
22       MR. AKROTIRIANAKIS:  Objection, no
23 foundation.  Beyond the scope of the designation I
24 of this witness.
25       A  Any 0 click solution whatsoever is a

Page 140

1 significant milestone for Pegasus.
2        Q  When you refer to -- when I asked
3 you about the efforts that went into producing
4 Heaven you said you could answer on the R&D side,
5 the first thing you mentioned was finding
6 vulnerabilities.  What did you mean by that?
7        MR. AKROTIRIANAKIS:  Objection,
8 misstates his testimony.
9        A  I would say that this domain
10 requires finding the flaws in the ecosystem and in
11 the services in order to be able to build the
12 installation floor, the installation vector, and
13 eventually deploy the agent.
14       Q  And with respect to Heaven, the
15 vulnerabilities that the team was working to find
16 were vulnerabilities in WhatsApp's ecosystem?
17       MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19       A  The vulnerabilities in Heaven were
20 in WhatsApp client.
21       Q  How did the team go about
22 identifying those vulnerabilities in the WhatsApp
23 client?
24       A  In terms of research techniques --
25       Q  Yes, in terms of research

Page 141

1 techniques.  How do you do that?
2        A  I cannot talk about research
3 techniques.
4        Q  So despite the fact that you are
5 designated on the R&D that led to the Hummingbird
6 vectors, you can't discuss the research techniques
7 that went into finding vulnerabilities in the
8 WhatsApp client?
9        MR. AKROTIRIANAKIS:  He is designated as
10 stated in our response to the deposition notice.
11 His ability to testify is circumscribed by Israeli
12 law.
13       MR. PEREZ-MARQUES:  Let me repeat my
14 question and you can have your counsel's objection
15 in mind.
16       Despite the fact that you are designated
17 on the R&D that led to the Hummingbird vectors,
18 you cannot discuss the research techniques that
19 went into finding vulnerabilities in the WhatsApp
20 client?
21       A  I cannot talk about the exact
22 research techniques.  As I said before, we
23 developed the internal environment which enables
24 us to work internally on the WhatsApp client on
25 customer owned devices.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1    Q   Why can't you describe the research
2  techniques?
3        A   Because, as my counsel stated, I am
4  restricted by Israeli law to talk about it.
5        Q   So there is nothing further that you
6  are willing to testify as to the research
7  techniques that went into identifying
8  vulnerabilities in WhatsApp client?
9        MR. AKROTIRIANAKIS:  Objection.
10       A   It doesn't have anything to do with
11  willingness. I am restricted by Israeli law to
12  talk about it.
13       MR. AKROTIRIANAKIS:  I will object to
14  the form of that question.  If you want to ask him
15  questions he can tell you whether he can testify
16  about or not.  I think it is a fair question.  It
17  is the way you just stated it.
18       Q   My fundamental question is how did
19  the R&D team at NSO go about finding
20  vulnerabilities in the WhatsApp client?
21       A   They researched the activity of the
22  WhatsApp client in order to find flaws and to
23  build the installation vectors which, as I said,
24  is built to eventually deliver the agent payload.
25       Q   How did the team research the

Page 143

1  activity of the WhatsApp client?
2        A   What does the question refer to in
3  how?
4        Q   That is my question.  How did they
5  do that?  You said they researched the activity of
6  the WhatsApp client.  How did they do that?
7        A   So I will get back to the
8  explanation about the ecosystem we built
9  internally.  We built internal ecosystem of
10  WhatsApp server that enabled us internally to send
11  messages between two peers between customer owned
12  devices, and having this ability enables us to
13  research the activity of the WhatsApp client.
14       Q   How did you know how to build that
15  internal ecosystem?
16       A   What do you mean by how?
17       Q   How did you determine what the
18  characteristics of that internal ecosystem should
19  be in order to operate like a WhatsApp client?
20       A   We have the client and we have the
21  server between them.
22       Q   And so how do you go from having the
23  client to building an ecosystem that replicates
24  it?
25       A   So as a researcher, especially in

Page 144

1  Android, you have the ability to gain the
2  routabilities on any Android devices.  These
3  abilities are stated for anyone using the web.
4  Whenever you have route access on a device, you
5  have the ability to monitor the traffic that is in
6  and out the monitored device, and then you have
7  access to the traffic from peer to peer.  Using
8  this knowledge you can use it to build the
9  ecosystem which is required for this activity.
10       Q   Is there anything else that the NSO
11  R&D team did to find vulnerabilities in the
12  WhatsApp client?
13       A   We, the R&D research group, used all
14  the tools it should use in order to be able to
15  find the vulnerabilities.
16       Q   What are those tools?
17       A   Basically, there are two types of
18  tools, called IDA and JEB.
19       Q   Can you spell those?
20       A   I-D-A.
21       Q   And what was the other?
22       A   J-E-B.
23       Q   And what is IDA?
24       A   These are tools available for
25  procurement -- anyone can buy it -- which enable

Page 145

1  you to analyze code.
2        Q   What is the difference between IDA
3  and JEB?
4        A   IDA enables you to analyse native
5  code and JEB analyzes Java code.
6        Q   Other than using those two tools,
7  what else did the R&D team do to find
8  vulnerabilities in the WhatsApp client?
9        A   As I said before, it monitored the
10  transmission between peer to peer as for the
11  communication, in order to understand the
12  responses and the message content that should be
13  sent from side to side.
14       Q   Through that testing, did NSO
15  develop an understanding of the functioning of
16  WhatsApp's servers that were involved in the peer
17  to peer transmission?
18       MR. AKROTIRIANAKIS:  Objection,
19  misstates his testimony.
20       A   Through this activity the aim was to
21  find vulnerability on the Android ecosystem, and
22  then find a way to make it work remotely.
23       Q   With respect to that second part of
24  making it work remotely, through its internal
25  testing, did NSO develop an understanding of how

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1        Q   But was it fingerprinting code that
2   was used in connection with either Heaven, Eden
3   ERISED or all of them?
4        A   Yes, it was -- if I remember right,
5   for Eden.
6        Q   And and why did you look at the
7   source code for the fingerprinting?
8        A   To recall, to get a recollection of
9   how it worked.
10       Q   And so to understand how it worked
11  you went to the source code?
12       A   Yes.
13       Q   And fair to say that to understand a
14  piece of software, the code itself is the best
15  source for to understand how it works?
16       A   As for the code that was developed
17  by us, yes.
18       Q   It is the best source to understand
19  how the software works?
20       MR. AKROTIRIANAKIS:  Objection, vague.
21       A   As I said before, if this is a code
22  that you wrote, this is the best way.
23       Q   Did you write that fingerprint
24  code?
25       A   No.

Page 151

1        Q   But you still considered it a useful
2   source to consult to understand how that software
3   worked?
4        A   As I said, our research group wrote
5   this code.  Therefore I am familiar with the code.
6   As so, this is the best way to understand the
7   code.
8        Q   And fair to say you didn't commit
9   that code to memory.  Right?
10       A   What do you mean?
11       Q   You have not memorized the source
12  code, right?
13       A   Of course not.
14       Q   Of course not.  Did you consult any
15  other pieces of source code associated with the
16  Hummingbird vectors as parts of your preparation
17  to testify here today?
18       I want to make sure they get your
19  answer.
20       A   No.
21       Q   And you have not committed to memory
22  any other aspect of the source code for the
23  Hummingbird vectors.  Is that right?
24       A   No.
25       Q   Do you recall the names of the files

Page 152

1   that comprise the Hummingbird vectors source code?
2        A   Not all of them.
3        Q   Or the function of all the files
4   that comprise the Hummingbird vector source code?
5        A   Functions, for sure, no.
6        Q   Or the specific commands that that
7   source code gave to the target device?
8        A   It is a very general question.  To
9   which part, to which state of the device or state
10  of installation flow.
11       Q   Do you recall any of the commands
12  that any of the Hummingbird vectors gave to the
13  target device in their operation?
14       A   The installation flow consists of
15  several messages and content of messages.  So I
16  can't see a way to recall every message that was
17  sent and its content.
18       Q   I'm sorry, you said you can't see a
19  way to recall?
20       A   Yes.
21       Q   So we would need to look at the
22  source code to understand that level of detail?
23       A   Yes.
24       Q   Let me show you what we will mark --
25  I think we are up to 2033.

Page 153



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1    Q   And what purpose does that serve in
2  the installation flow?
3        MR. AKROTIRIANAKIS:  Objection, assumes
4  facts not in evidence.  Misstates his testimony.
5  No foundation.
6        A   So I don't recall for which specific
7  step it was used.
8        Q   Is that something we would be able
9  to see from the source code?
10       A   I think so.
11       Q   And the non-standard encryption that
12  is referred to, again that is a message that is
13  different than what would be sent from a regular
14  WhatsApp client?
15       A   Again, it really depends on the
16  changes described here.  It can be even the fact
17  that you enable using encryption in the WhatsApp
18  client currently is not supporting the encryption
19  also may be relevant for this case.
20       Q   Would I have --
21       A   It is difficult to understand from
22  this context whether it refers to encryption that
23  is the encryption itself is not standard or the
24  usage of encryption was not standard.
25       Q   Okay.  You are also prepared to

Page 203

1  testify as to the full functionality of Pegasus,
2  right?
3        A   Yes, as I said before, I don't
4  recall the specific part which was used.
5        Q   So we would need the source code for
6  that?
7        A   Yes.
8        Q   If I wanted to send a message from
9  my WhatsApp that is encrypted in a non-standard
10  way, can I do that?
11       MR. AKROTIRIANAKIS:  Objection, no
12  foundation.
13       A   No.
14       Q   No, right.  So that is something
15  that was done by WIS?
16       A   Yes.

Page 204

14       Q   But that is not the only way WIS is
15  different from a legitimate subscriber of
16  WhatsApp, right?
17       MR. AKROTIRIANAKIS:  Objection,
18  misstates his testimony.
19       A   As we said now, WIS server enables
20  you to send crafted messages with crafted content
21  which is required to enable the remote execution
22  ability on the target's phone or WhatsApp client.
23       Q   I doubt she got a word of that.  Why
24  don't you say it again, see if we can get that
25  down before we go to the next question.

Page 205

1        A   I was saying that --
2        Q   Let me repeat the question in case
3  it helps her or you.  I am not sure it is relevant
4  to your answer but let me ask it.  That feature
5  here, that it only sends specific messages, that
6  is not the only way the WIS is different from a
7  legitimate subscriber of WhatsApp, is it?
8        MR. AKROTIRIANAKIS:  Same objections.
9        A   So my answer was WIS server
10  implements and enables to craft end messages and
11  content that is required for the installation
12  phase or gaining remote code execution on the
13  target's WhatsApp client.
14       Q   And those messages are different
15  than the messages that would be sent by a regular
16  WhatsApp subscriber, right?
17       A   If by "regular" you mean one that
18  holds device in hand, the answer is yes.
19       Q   It adds a sixth relay server, yes?
20       A   Yes.
21       Q   It encrypts the message in a
22  non-standard way, right?
23       A   Yes.
24       Q   Are there other ways in which the
25  messages sent by WIS are different from what would

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 year.
2      Q   This was previously marked as
3 Exhibit 2007, which is a WhatsApp message between
4 various participants on December 5, 2018.
5      A   Yes.
6      Q   It states in the second message
7 down:
8          "WhatsApp has made changes in their
9 servers that currently fail all installations and
10 can cause crashes that risk the Hummingbird
11 vector."
12          Do you see that?
13      A   Yes.
14      Q   And do you recall in December 2018 a
15 WhatsApp update that caused all Hummingbird
16 installations to crash?
17      A   Yes.
18      Q   What do you recall about that?
19      A   I recall that that specific change
20 was around our ability to end that specific relay
21 server that we talked about previously, and
22 controlling the target's WhatsApp client to choose
23 that specific relay server for communication.
24      Q   And the reference here, when it says
25 "can cause crashes that risk the Hummingbird

Page 255

1 vector", that relates back to what we saw in the
2 ▮▮▮▮▮▮▮▮▮▮ about crashes potentially
3 generating logs that would be reviewed by
4 WhatsApp?
5          MR. AKROTIRIANAKIS:  Objection, no
6 foundation.
7      A   This relates to crashes that after
8 the change may occur on the target's devices.
9      Q   And the reason they would risk the
10 Hummingbird vector is potentially, among other
11 reasons, because they could be reviewed by
12 WhatsApp, the crash logs?
13          MR. AKROTIRIANAKIS:  Objection,
14 misstates testimony.
15      A   They are uploaded to the server of
16 the vendor and whether they review them or not is
17 their decision to make.
18      Q   It states on the next page, a few
19 lines down, that the team is working on a solution
20 in top priority hoping to provide a solution ASAP.
21 That is signed ▮▮▮▮▮▮▮▮▮▮.  Do you know
22 who those are?
23      A   Yes.
24      Q   Who are they?
25      A   Oz was -- which year?

Page 256

1      Q   December 2018?
2      A   Let me look back to my years.  Okay.
3 ▮ back then was the Director of Android R&D.
4      Q   Android R&D?
5      A   Yes.  ▮▮▮ was product manager and
6 also ▮▮▮▮▮ was her team leader.
7      Q   As a product manager as well?
8      A   Yes.
9      Q   For which product?
10      A   If I remember right, for the entire
11 Pegasus, and ▮▮▮▮ was for Android.
12      Q   So ▮ was part of your team?
13      A   He was my manager.
14      Q   So you reported to him?
15      A   Yes.
16      Q   Did the NSO R&D team in fact work on
17 a solution to restore the Hummingbird vectors
18 after this December 2018 update?
19      A   Yes.
20      Q   And was that successful, that
21 effort?
22      A   That was Eden.
23      Q   So Heaven was made not operational
24 by the December 2018 update.  Is that right?
25      A   Yes.

Page 257

1      Q   And subsequently NSO released Eden?
2      A   Yes.
3      Q   If we look at -- I am going to show
4 you another document.  This is 2038.
5      (Exhibit 2038 marked for identification)
6          This is a WhatsApp chat on January 15,
7 2019 among various participants.  In the first
8 message someone named ▮▮▮ says in the last line:
9          "Bottom line, Eden works fine on S3 and
10 can be demonstrated" with a sort of smiley
11 emoticon.  Do you see that?
12      A   Yes.
13      Q   What is S3.
14      A   Sales 3.
15      Q   What is sales 3?
16      A   It is an infrastructure for making
17 demonstrations for our services.
18      Q   And is this the approximate timing
19 of when Eden became ready for use at least for
20 demonstration purposes.
21      A   For demonstration, yes.
22      Q   And then when did Eden go live for
23 use by customers?
24      A   If I remember right, about a month
25 after.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

1    Q   So this reflects NSO's fix or
2  response to the problem that was created by the
3  December 2018 update?
4    A   This is we doing our job to
5  delivering the customers the software they needed.
6    Q   Right.  So after the December 2018
7  update, NSO customers couldn't use the 0 click
8  Android installation vectors, right?
9    A   Right.
10    Q   And Eden, once it was released,
11  allowed them to do so again, right?
12    A   Right.
13    Q   And between Heaven and Eden was
14  there any other -- was there any 0 click Android
15  installation vector in operation?
16    A   No.
17    Q   How did Eden differ from Heaven?
18    A   The main difference was in the
19  installation flow that in Eden we had to use --
20  the transmission of the data between the source
21  and the target, WhatsApp client, needs to go
22  through WhatsApp server relay servers.
23    Q   And how was -- I am sorry -- so in
24  Eden --
25    A   Yes.

Page 259

1    Q   -- the transmission had to go
2  through WhatsApp relay servers?
3    A   Yes.
4    Q   Okay, and that was not the case with
5  respect to Heaven?
6    A   Right.
7    Q   Was that the only difference between
8  Heaven and Eden?
9    A   This is the major difference.
10    Q   In terms -- do you recall we spent
11  some time earlier today walking through the steps
12  of an installation attack using the Hummingbird
13  vectors.  Do you recall that?
14    A   Yes.
15    Q   And does that description we were
16  walking through apply to Eden as well?
17    A   Except the fact that -- except the
18  part that talked about controlling the relay
19  servers adding one to the list and directing the
20  target WhatsApp client to select a specific one.
21    Q   And so what did Eden do instead?
22    A   It just couldn't anymore change the
23  way the target selects the relay servers,
24  therefore it used -- the communication was done
25  through the WhatsApp relay servers in order to

Page 260

1  deliver the payloads required for the remote code
2  execution part.
3    Q   Would that be the stager?
4    A   The payload of stager was the same
5  in Heaven and Eden.  The part that changed was the
6  part that delivered the stager to --
7    Q   Right, so I think you testified
8  earlier that with Heaven the stager was downloaded
9  from a non-WhatsApp server.  Is that right?
10    MR. AKROTIRIANAKIS:  Objection,
11  misstates testimony.
12    A   No.  No.  I stated that the
13  privilege escalation payload --
14    Q   Got it.  So the stager even under
15  Heaven was delivered via a WhatsApp message?
16    MR. AKROTIRIANAKIS:  Counsel, I know it
17  is getting long in the day, but you've got to let
18  him finish his answers.
19    A   In Heaven the stager payload was
20  delivered using WhatsApp messages, yes.
21    Q   Okay.  And in Eden the stager
22  payload was also delivered via WhatsApp message?
23    A   Yes.
24    Q   And in Heaven the PE payload was
25  delivered not through WhatsApp servers, right?

Page 261

1    A   Right.
2    Q   And under Eden was the PE payload
3  delivered via WhatsApp servers?
4    A   No.
5    Q   So what is the difference?
6    A   The difference is that in Heaven the
7  stager payload is delivered using WhatsApp
8  messages that go through non-WhatsApp relay
9  servers, and in Eden the same payload is delivered
10  using WhatsApp messages that go through WhatsApp
11  relay servers.
12    Q   Got it.  So the distinction is with
13  respect to through which servers the stager
14  payload is delivered?
15    A   Which relay servers, yes.
16    Q   Which relay servers, got it.
17  I think you said that was the principal difference
18  between Heaven and Eden.  Are there any other
19  important differences?
20    A   Not important enough that I
21  remember.
22    Q   Nothing else that you remember?
23    A   No.
24    Q   Based on your preparation, nothing
25  else that you are aware of?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

1     A  No.
2     (Exhibit 2039 marked for identification.)
3     Q  This is Exhibit 2039, which is a
4  WhatsApp chat from May 12, 2019.  Again various
5  participants.  In the second page ████████ has
6  a message.  Who is Mr.████
7     A  He was, if I am right, at that stage
8  presales employee.
9     Q  Presales?
10    A  Yes.
11    Q  He says in the sort of third
12 paragraph down:
13    "So bottom line, Eden has finished its
14 duty with us as a patch was done on the server
15 side with the application it works with."
16    Do you recall this event?
17    A  Yes.
18    Q  And what does that refer to?  What
19 is the event that is being described here?
20    A  Closure of ability to trigger the
21 vulnerability on the target's WhatsApp client.
22    Q  So this reflect WhatsApp's
23 remediation of the exploit that is described in
24 the complaint?
25    MR. AKROTIRIANAKIS:  Objection, calls

Page 263

1  for a legal conclusion.  No foundation.
2     A  It refers to changes that were done,
3  whether on the server side and the client side, in
4  order to prevent us from triggering the
5  vulnerabilities.
6     Q  And so after this point, after that
7  update in May 12 or around May 12, 2019, was NSO
8  able to use Eden after that point?
9     A  No.
10    Q  In the next paragraph down he said:
11    "I heard some sales managers talking in
12 a dramatic way.  Your job is to make sure they
13 remember that along the years NSO has proven time
14 after time that one of its biggest value is the
15 ability to 'survive' this harsh environment of the
16 cat and mouse game."
17    Do you see that.
18    A  Yes.
19    Q  What does that refer to?
20    MR. AKROTIRIANAKIS:  Objection, no
21 foundation.
22    A  This is a domain that you are not in
23 control how long your capability will prolong at
24 least for total control, and that is why he quotes
25 cat and mouse game.  The ecosystem that you were

Page 264

1  working or acting makes changes eventually, forces
2  you to adjust it.
3     Q  So NSO designs an exploit, the
4  exploit gets shut down.  NSO designs another,
5  right?
6     MR. AKROTIRIANAKIS:  Objection,
7  misstates his testimony.
8     Q  Is that generally the cat and mouse
9  game?
10    MR. AKROTIRIANAKIS:  Misstates
11 testimony.
12    A  This is the domain that you have to
13 stay -- to keep and find new vulnerabilities after
14 the systems get changed.
15    Q  That is just inherent to the domain
16 in which NSO operates, right?
17    A  Yes.
18    Q  When something gets shut down, you
19 have to work to develop another?
20    MR. AKROTIRIANAKIS:  Objection,
21 misstates his testimony.
22    A  Eventually you have to provide --
23 you want to provide the 1 click and 0 click
24 solutions to customers, and it doesn't relate to a
25 specific service or application.

Page 265

1     Q  And at this point in May 2019 when
2  the WhatsApp update prevented Eden from working
3  did NSO have any 0 click Android solutions?
4     A  No.
5     Q  Did the R&D group subsequently find
6  another 0 click installation vector for Android
7  devices?
8     A  Yes.
9     Q  What was that?
10    A  ERISED.
11    Q  When was ERISED approved for
12 production?
13    A  I don't recall the exact date.
14    Q  If we back to the exhibit we were
15 looking at, in that same message from Mr.████ he
16 says:
17    "R&D are working hard on different
18 directions.  Hopefully we will have good news
19 soon, but please remember that our technological
20 status is still great as we as a company have the
21 resources to find something new in a relatively
22 short time."
23    Do you agree with his statement, sir?
24    A  He was optimistic.
25    Q  Is it accurate that at this point,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

1 in May 2019, NSO's R&D group was working hard on
2 potential solutions to restore 0 click capability?
3     A   As a research group and development
4 team, you constantly work on research in order to
5 find possible ways, rapid solutions.  As I
6 explained before, eventually we are producing a
7 product for customers.
8     Q   And that is still true today, right?
9     MR. AKROTIRIANAKIS:  Objection, vague.
10     A   This is our business.
11     Q   So you don't remember when ERISED
12 was approved for production?
13     A   No, not the exact time.
14     Q   Do you remember when ERISED began to
15 be used by customers, approximately?
16     A   It is really not an exact time.  I
17 couldn't tell.
18     Q   What is your best estimate?
19     A   If I recall right, it was close to
20 the end of the year.
21     Q   So late 2019?
22     A   If I recall right.
23     Q   And I understand you are only
24 answering questions up to May 2020.  Is that
25 right?

Page 267

1     A   Yes.
2     Q   And up to that date in May 2020, did
3 ERISED remain in use?
4     A   Yes.
5     Q   So as to whether NSO has ever
6 stopped using ERISED, I assume that is a question
7 you are not willing to answer?
8     A   Regarding ERISED, the
9 vulnerabilities in ERISED was not in WhatsApp at
10 all and that part was eventually closed.
11     Q   So you are willing to answer that
12 question about after May 2020?
13     A   I am answering a question about
14 ERISED capability --
15     Q   Where was the vulnerability that was
16 exploited by ERISED?
17     A   Specific part in one of Samsung
18 related code.
19     Q   So was ERISED limited to Samsung
20 devices?
21     A   Yes.
22     Q   But did it also work by transmitting
23 WhatsApp messages?
24     A   It was our decision whether to
25 trigger it using WhatsApp messages or not.

Page 268

1     Q   So it could be triggered using
2 WhatsApp messages?
3     A   Yes.
4     Q   And were those WhatsApp messages
5 sent via WhatsApp servers?
6     A   Yes.
7     Q   And similar to what we saw about
8 Heaven, those were non-standard WhatsApp messages?
9     MR. AKROTIRIANAKIS:  Object to the form.
10     A   As I said before, some of them maybe
11 were non-standard but not all of them.
12     Q   Were the messages, the WhatsApp
13 messages that were sent as part of ERISED
14 installation, were those also originated from the
15 WIS?
16     A   Yes.
17     Q   So just at a high level if you can,
18 how was ERISED different from Eden?
19     A   So ERISED didn't use any voice or
20 video call to be established, and didn't use any
21 relay server for communication in the installation
22 flow.  As I explained before, it triggered
23 vulnerability which was outside the application of
24 WhatsApp and only used WhatsApp messages to be
25 able to trigger the specific code in which the

Page 269

1 vulnerability resides.
2     Q   So under ERISED NSO used WhatsApp
3 messages to trigger a vulnerability in the Samsung
4 system?
5     A   Yes.
6     Q   And then triggering that
7 vulnerability would then cause the further steps
8 of the installation flows?
9     A   Yes.
10     Q   Was a stager delivered through
11 WhatsApp servers as part of ERISED?
12     A   Not the exact same but modifications
13 of it.
14     Q   Just to be clear, after -- and were
15 the same fingerprinting methods used?
16     A   Part of it, because as we talked
17 before ERISED required also additional information
18 whether the vendor is Samsung or not.
19     Q   Just to be clear, after WhatsApp
20 closed the vulnerability that was being exploited
21 by Eden in May 2019, NSO worked on developing a
22 new 0 click exploit that also worked, at least in
23 part, by transmitting WhatsApp messages.  Yes?
24     MR. AKROTIRIANAKIS:  Misstates
25 testimony.

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1    A  We researched for a new solution.
2 We found vulnerability in the system which was
3 specific for Samsung and we decided to implement
4 it and build installation flow based on WhatsApp
5 application.
6    Q  And after WhatsApp closed the
7 vulnerability that was being exploited by Eden,
8 NSO succeeded in developing a new 0 click
9 installation vector that operated in part through
10 delivering WhatsApp messages, yes?
11    MR. AKROTIRIANAKIS:  Misstates
12 testimony.
13    A  We found additional vulnerability
14 which we were able to build installation for using
15 that.
16    Q  And that installation vector,
17 ERISED, which used WhatsApp servers and WhatsApp
18 messages remained in use by NSO customers as of at
19 least May 2020.  Is that right?
20    A  Yes.
21    Q  So, with this lawsuit pending, NSO
22 was actively making available to its customers a 0
23 click exploit that involved the transmission of
24 messages over WhatsApp servers?
25    MR. AKROTIRIANAKIS:  No foundation.

Page 271

1    A  I don't recall the exact time that
2 the lawsuit was filed.
3    Q  It was filed in October 2019.  So
4 with that context, with this lawsuit pending NSO
5 was actively making available to its customers a 0
6 click exploit that involved the transmission of
7 messages over WhatsApp servers.  Correct?
8    A  Yes.
9    Q  And as to NSO continues to make
10 available to its customers a 0 click exploit that
11 uses WhatsApp servers, you are not willing to tell
12 me.
13    A  No.
14    Q  No, you are not willing to tell me?
15    MR. AKROTIRIANAKIS:  We already had this
16 conversation, counsel.
17    MR. PEREZ-MARQUES:  Is that right?  I
18 just want to make sure I understand the "no".  The
19 no is you won't tell me, right?
20    A  I can't tell you.
21    MR. PEREZ-MARQUES:  Okay.  Why don't we
22 take a short break.
23    THE VIDEOGRAPHER:  Going off the record.
24 The time is 16:57.  End of media card five, volume
25 one, of the video deposition of Tamir Gazneli.

Page 272

1    (A short break.)
2    This is the beginning of media card
3 number six, volume one, in the video deposition of
4 Tamir Gazneli.  Going on the record.  The time is
5 17:14.
6    Q  Do you understand you are still
7 under oath?
8    A  Yes.
9    Q  I would like to show you another
10 exhibit.  This is Exhibit 2040.
11    (Exhibit 2040 marked for identification).
12    It is another Confluence document
13 labelled or titled "Deviate installations on white
14 environment from 12/01/2020".  Do you see that?
15    A  Yes.
16    Q  Do you recognize this document?
17    A  Yes.
18    Q  What is it?
19    A  This is the output of QA team that
20 was responsible for testing the capabilities or
21 statistical behavior.
22    Q  Capabilities or statistical behavior
23 of what?
24    A  In this timeframe it is for ERISED.
25    Q  And so what is -- the second column

Page 273

1 here in the chart says "ERISED ID".  What does
2 that reflect?
3    A  It is numbering of the devices that
4 were used for ERISED testing.
5    Q  Test target device?
6    A  No.  Our devices that were used to
7 test the behavior, statistical behavior of the
8 vector.
9    Q  Got it.  What I meant when I said
10 "test target device", I meant that on the target
11 side of the exploit you were using a test device?
12    MR. AKROTIRIANAKIS:  Object to the form
13 of the question.
14    Q  Do you understand what I mean?
15    A  We use device on which we test how
16 the installation vector works and behaves.
17    Q  Okay.  And is the test device acting
18 as the sender of the exploit or the recipient of
19 the exploit?
20    A  Recipient.
21    Q  That is what I meant by test target
22 device.
23    A  Okay.
24    Q  So these are all NSO-controlled
25 devices on which the ERISED is being tested?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 318

1 page ending with 960, "Fingerprint Stage" point
2 3A: "Different number from the one that is being
3 used for attack phase", in order to avoid coupling
4 between fingerprint phase and attack phase.
5      Q   Any others?
6      A   Any others, I don't recall were
7 implemented ever.
8      Q   All right.  Just to restate that
9 list and ask if I have understood your testimony
10 correctly. on the first page, which is 8957, Bates
11 number, under the heading "New silent
12 fingerprint"?
13     A   Yes.
14     Q   The first sub-bullet -- I am sorry
15 the second sub-bullet that begins with "Send
16 approximately requests in a short period"?
17     A   Yes.
18     Q   And the rest of that sub-bullet?
19     A   Yes.
20     Q   And then on the same page the
21 section that has the heading "Attack" and five
22 bullets?
23     A   Yes.
24     Q   Then on the next page, which is
25 8958, under the head "Attack", there is 1, 2, 3

Page 319

1 and 4?
2      A   Yes.
3      Q   And then on the page that ends in
4 8960, under "Fingerprint Stage", point 3A.  Did
5 I understand your testimony correctly?
6      A   Yes.
7      Q   All right.  Just a little bit ago
8 you were referred to S.WhatsApp.net, which you
9 identified as a domain.  Do you recall that
10 testimony?
11     A   Yes.
12     Q   And do you know where that domain
13 name leads?
14     A   As for location, no.
15     Q   And wherever it does lead, is that
16 destination controlled by WhatsApp or by NSO or by
17 somebody else?
18     MR. PEREZ-MARQUES:  Object to the form.
19     A   It is controlled only by WhatsApp.
20     MR. AKROTIRIANAKIS:  I don't have any
21 other questions.
22     Further Examination by MR. PEREZ-MARQUES
23     MR. PEREZ-MARQUES:  Just a couple of
24 quick follow-ups.  The code that you reviewed from
25 the AWS server, which Hummingbird vector did that

Page 320

1 relate to?
2      A   It mainly relates to Heaven and
3 Eden.
4      Q   Heaven and Eden, but not ERISED?
5      A   No.
6      Q   So to understand -- to review the
7 ERISED code, that does not reside on the AWS
8 server?
9      A   Parts of it are relevant for ERISED
10 too.
11     Q   Okay.  But there are parts of ERISED
12 that are not on the AWS server?
13     MR. AKROTIRIANAKIS:  Objection, no
14 foundation.
15     A   It depends on the exact time the
16 image was taken.
17     Q   So you don't know one way or the
18 other whether the AWS server contains the entirety
19 of the ERISED code?
20     A   It contains for sure for Heaven and
21 Eden, but ERISED is a matter of question.
22     Q   Okay.  The AWS server, your
23 testimony is it contains the entirety of the
24 Heaven and Eden code?
25     A   It doesn't include the vulnerability

Page 321

1 itself but all the messaging that is required for
2 the transmission and the connection, yes.
3      Q   What about the stager?  Is that
4 housed in the AWS server?
5      A   I don't recall whether it is like --
6 it is included in the image that was taken.
7      Q   So maybe yes, maybe no?
8      A   The stager code is plain text in
9 the -- plain text in the ecosystem, so it should
10 be available regardless of the (inaudible).
11     Q   What do you mean it would be
12 available regardless of the -- I didn't even catch
13 the word you said there.
14     A   The stager shell code was sent plain
15 text as part of the messages that was sent through
16 the WhatsApp ecosystem.
17     Q   So that does reside on the AWS
18 server?
19     A   I said that in addition to the
20 fact -- because I don't recall whether this
21 specific image was taken or the specific timing
22 includes the stager code.
23     Q   So the image may not contain all the
24 code that resides on the AWS server related to the
25 Hummingbird vectors?

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 322

1    MR. AKROTIRIANAKIS: Objection,
2 misstates his testimony.
3    A   The image is the instance in time,
4 so it couldn't contain all the code from two years
5 of the --
6    Q   Right, because the code changed from
7 time to time, right?
8    A   There are certain parts of it that
9 changed, yes.
10    Q   And so the code that was being used
11 in April 2018 is likely not the code that was
12 being used in May 2019?
13    MR. AKROTIRIANAKIS: Object to the form
14 of the question.
15    A   The messages that were implemented
16 in it, the messages are implemented as part of the
17 protocol that WhatsApp requires, so this
18 practically will not change a lot. As for the
19 fingerprint, as I said it was used for Heaven and
20 Eden. The other parts of the code I said it
21 depends on the exact timing of the image.
22    Q   Right, because the code changed over
23 time, right?
24    MR. AKROTIRIANAKIS: Objection,
25 misstates his testimony.

Page 323

1    A   The code may change. I don't know
2 if it changed in specific timing before and after.
3    Q   And you don't know when the snapshot
4 was taken, right?
5    A   I don't recall.
6    Q   We talked about the S.WhatsApp.net
7 domain. You recall that?
8    A   Yes.
9    Q   And I think when I was examining you
10 said that that was the domain for WhatsApp
11 signaling server. Is that right?
12    A   Domain name.
13    Q   The domain name for WhatsApp
14 signaling server?
15    A   Also Google.com is the domain name
16 for Google signaling.
17    Q   Got it. Okay. Is that one
18 signaling server or multiple signaling servers?
19    A   It depends on WhatsApp to decide.
20    Q   Could be either one, right?
21    A   I don't -- this is not a single
22 server. That is why they use a domain name.
23    Q   As part of developing the
24 Hummingbird exploits, did you take any steps to
25 ascertain where the WhatsApp signaling servers

Page 324

1 were located. No?
2    A   No.
3    Q   Did you take any steps to ascertain
4 where the WhatsApp relay servers were located?
5    A   No.
6    Q   You understood that what WhatsApp is
7 based in California?
8    MR. AKROTIRIANAKIS: Objection.
9    A   As a company?
10    Q   Yes.
11    A   So does everybody else in the US but
12 the server --
13    Q   Not my question. Were you aware
14 when you were working on the --
15    A   No.
16    Q   -- hummingbird vectors that WhatsApp
17 was based in California?
18    A   No.
19    Q   You were not aware of that?
20    A   No.
21    Q   Did you take any steps to assure
22 yourself that the servers that were being used as
23 part of the Hummingbird vectors were not in
24 California?
25    MR. AKROTIRIANAKIS: Object to the form

Page 325

1 of the question.
2    A   Can you repeat?
3    Q   Did you take any steps to make sure
4 that the messages that were being transmitted as
5 part of the Pegasus software, that those servers
6 were not in California? Did you take any steps to
7 check that?
8    A   No.
9    Q   Sitting here today, do you know, one
10 way or the other, whether any of WhatsApp's
11 signaling or relay servers used in connection with
12 the Hummingbird vectors actually are in
13 California?
14    A   No.
15    Q   You don't know that at all sitting
16 here today?
17    A   No.
18    Q   So if some of those servers were in
19 California, you wouldn't know anything to the
20 contrary?
21    A   It was not required for the -- it
22 was not a requirement in terms of the capability.
23    Q   But accessing the WhatsApp signaling
24 servers was a requirement of the capability.
25 Right?

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1       CERTIFICATE OF COURT REPORTER

2

3 I, AILSA WILLIAMS, an Accredited LiveNote

4 Reporter, hereby certify that Tamir Gazneli was

5 duly sworn, that I took the Stenograph notes of

6 the foregoing deposition and that the transcript

7 thereof is a true and accurate record transcribed

8 to the best of my skill and ability.  I further

9 certify that I am neither counsel for, related to,

10 nor employed by any of the parties to the action

11 in which the deposition was taken, and that I am

12 not a relative or employee of any attorney or

13 counsel employed by the parties hereto, nor

14 financially or otherwise interested in the outcome

15 of the action.

16 Before completion of the deposition, review of the

17 transcript was requested.  Any changes made by the

18 deponent (and provided to the reporter) during the

19 period allowed are appended hereto.

20

21

22 *Ailse Yh Willians*

23 AILSA WILLIAMS

24 Dated:   September 6, 2024.

25

Page 335

1

2         E R R A T A

3      Deposition of Tamir Gazneli

4 (Please show all corrections on this page, not in

5 the transcript.)

6 Page/Line No.    Description     Reason for

7 change

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22 Signed:   ...................

23 Name:

24 Date:     ...................

25

85 (Pages 334 - 335)

# EXHIBIT O

***Unredacted Version
of Document
Proposed to be Filed
Under Seal***

HIGHLY CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                    OAKLAND DIVISION
 3
      - - - - - - - - - - - - - - - - - -
 4                                      )
      WHATSAPP INC., a Delaware         )
 5    corporation, and META PLATFORMS,  )
      INC., a Delaware corporation,     )
 6                                      )
                        Plaintiffs,  )
 7                                      )  Case No.:
      v.                                )  4:19-cv-07123-PJH
 8                                      )
      NSO GROUP TECHNOLOGIES LIMITED    )
 9    and Q CYBER TECHNOLOGIES LIMITED,)
                                        )
10                      Defendants.  )
      - - - - - - - - - - - - - - - - - -
11      Highly Confidential - Subject to Protective Order
12            VIDEO DEPOSITION OF RAMON ESHKAR
13               Tuesday, August 27, 2024
14               Commencing:  9:17 a.m. BST
15
16                Davis Polk & Wardwell LLP
                   5 Aldermanbury Square
17                    London, EC2 7HR
                      United Kingdom
18
19
20
21
22
23
24    Court Reporter:
      Chanelle Malliff, CLR
25
```

HIGHLY CONFIDENTIAL

Page 62

1  roughly two years ago maybe.  Time flies but more or
2  less.
3      Q.  As a director were you director of client
4  executive, is that how you say it?
5      A.  Yes.
6      Q.  And then you became VP client executive?
7      A.  Correct.
8      Q.  And now SVP client executive?
9      A.  No, I'm SVP for what we called the CBD.  It's
10 actually the customer based division.
11     Q.  Customer base division?
12     A.  We call it customer base division.
13     Q.  Business?
14     A.  Division.
15     Q.  Okay.  And that includes client executive as
16 one of the departments within your purview?
17     A.  Indeed.
18     Q.  Okay.  How did you come to work for NSO?
19         MR. AKROTIRIANAKIS:  Objection: vague.
20         THE WITNESS:  Can you please repeat or
21 explain?
22         MR. AKROTIRIANAKIS:  Do you want it in
23 Hebrew?  That's an English way of speaking.  Do you
24 understand his question?
25         THE WITNESS:  I'm not sure.

Page 63

1  BY MR. BLOCK:
2      Q.  Let me try to ask... How were you introduced
3  to the opportunity to work at NSO?
4      A.  NSO made contact.
5      Q.  Who at NSO made contact?
6      A.  I don't remember the lady from HR at the time
7  but --
8      Q.  Someone in a recruiting function?
9      A.  Yes.
10     Q.  Reached out to you over LinkedIn or email?
11     A.  She reached out via LinkedIn and then a phone
12 call.
13     Q.  Before you started that application process,
14 did you know anybody at NSO?
15     A.  I came aware of the fact that there is
16 someone that I know at NSO after, okay.  I didn't
17 know in advance that he works there.
18     Q.  I understand.  Who is that person?
19     A.  ████████████
20     Q.  ██████ is a first name or a last name?
21     A.  Yeah, a first name.
22     Q.  ████████████
23     A.  Yes.
24     Q.  Last name?
25     A.  ████████████  I'm not sure I'm spelling it

Page 64

1  correctly, ████████  I think.
2      Q.  So you knew ██████ before you joined NSO but
3  only learned after you joined NSO that ██████ was
4  also employed then?
5      A.  (Witness nods).
6      Q.  Okay.
7      A.  During the process, not after.  During the
8  process.
9      Q.  Fair enough.  Do you work in a particular
10 physical location for NSO, your office?
11     A.  Yes.
12     Q.  Tel Aviv?
13     A.  Herzliya.
14         MR. AKROTIRIANAKIS:  H-E-R-Z-L-I-Y-A in
15 English.
16 BY MR. BLOCK:
17     Q.  Do you travel on business for NSO?
18     A.  Yeah, I travel.
19     Q.  Have you traveled to the United States on
20 business for NSO?
21     A.  No, not that I recall.
22     Q.  How do you communicate with your co-workers
23 for business purposes?
24         MR. AKROTIRIANAKIS:  Objection: vague.
25         THE WITNESS:  How do I --

Page 65

1  BY MR. BLOCK:
2      Q.  Communicate?
3      A.  We talk.  We meet.  We use phone calls.
4      Q.  You meet in person?
5      A.  Yeah, we meet in person.
6      Q.  You use the telephone?
7      A.  We use the telephone.
8      Q.  Videoconferencing?
9      A.  We use videoconferencing.
10     Q.  Do you communicate with your co-workers at
11 NSO using email?
12     A.  Yes.
13     Q.  And do you communicate with your co-workers
14 at NSO using messaging services?
15     A.  Yes.
16     Q.  Which messaging services do you use for
17 business purposes at NSO?
18     A.  What do you mean for business purposes like
19 our communication between employees of the company?
20     Q.  Yes.
21     A.  We use the various types of popular IMs.
22     Q.  Such as?
23     A.  Such as Signal.
24     Q.  Any others?
25     A.  Yeah, can be WhatsApp.  Can be WebEx.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q. Do you have a smartphone?
2    A. Yes.
3    Q. What kind is it?
4    A. Samsung.
5    Q. Did NSO provide that smartphone to you?
6    A. So I'm not so sure what -- I don't want to
7  confuse the legal terms here. From one side they do,
8  and the other side there is something with the like
9  we buy it. So I don't want what's the right term to
10  use, but at the end of the day I get it from the
11  company. But there is something in the background
12  with regards to the taxation or something like that
13  with regards to giving to someone a phone.
14    Q. Did you go to a store and purchase the
15  device?
16    A. No.
17    Q. Did NSO hand the device to you?
18    A. Yes.
19    Q. Does NSO pay for the service on the device?
20    A. Yes.
21    Q. In -- has that been your arrangement ever
22  since you joined NSO in 2015?
23    MR. AKROTIRIANAKIS: Objection: vague.
24    THE WITNESS: My arrangement you mean for the
25  phone to be provided?

Page 67

1  BY MR. BLOCK:
2    Q. Yes.
3    A. Yeah, it was the same when I joined.
4    Q. So for as long as you have been an NSO
5  employee, NSO has provided you with a phone to use
6  for work and paid for the service; correct?
7    MR. AKROTIRIANAKIS: Objection: no
8  foundation.
9    THE WITNESS: The moment I left the army and
10  started, every company provided a phone.
11  BY MR. BLOCK:
12    Q. Okay. Did you download a WhatsApp
13  application on to that phone?
14    A. I have.
15    Q. And do you use that for business purposes at
16  NSO?
17    A. What do you mean by business purposes?
18    Q. To engage in business-related communications?
19    A. Yes.
20    Q. Did you set up that WhatsApp account
21  yourself?
22    A. Yes.
23    Q. Do you recall going through the regular
24  registration process?
25    A. Yes, it was long ago. I think I had it even

Page 68

1  before I joined so I just kept the same account.
2    Q. Have you ever used a white services
3  anonymized WhatsApp account yourself?
4    A. No, not that I recall.
5    Q. Do you know whether NSO generally provides
6  smartphones to all of its employees?
7    MR. AKROTIRIANAKIS: Objection: foundation.
8    THE WITNESS: As much as that they were
9  provided to some of our employees.
10  BY MR. BLOCK:
11    Q. Do you know where the line is drawn who gets
12  smartphones and who doesn't?
13    MR. AKROTIRIANAKIS: Objection: no
14  foundation.
15    THE WITNESS: I don't know in other
16  departments. I know for my department.
17  BY MR. BLOCK:
18    Q. So tell me for your department?
19    A. For my department we provide phones.
20    Q. And that includes everyone in the white
21  services department?
22    A. Yes.
23    Q. Okay. And --
24    A. An employee might choose not to have a phone
25  so I don't know if right now at this moment all of

Page 69

1  them with a phone that we have provided, but they do
2  have this option.
3    Q. Okay. Have you ever sent a WhatsApp message
4  other than through the WhatsApp client application on
5  a mobile device?
6    MR. AKROTIRIANAKIS: Objection: foundation.
7    THE WITNESS: Just to make sure, have I ever
8  sent a WhatsApp messages not using the phone?
9  I've used the web interface, if this is what you
10  mean, but not more than that, so it's coming out from
11  my phone.
12  BY MR. BLOCK:
13    Q. Okay. And when you have used the web
14  interface you logged in with your personal WhatsApp
15  credentials, which are the same ones associated with
16  the WhatsApp application on your smartphone; is that
17  accurate?
18    MR. AKROTIRIANAKIS: Objection: foundation.
19  Vague. Compound.
20    THE WITNESS: Just operated a web interface
21  using the barcode scanning.
22  BY MR. BLOCK:
23    Q. Barcode scanning, okay. You haven't operated
24  the emulator that we discussed earlier to send a
25  WhatsApp message; correct?

18 (Pages 66 - 69)

Page 94

1    MR. AKROTIRIANAKIS: Objection: foundation.
2    THE WITNESS: I know it was used for Android
3    platform.
4    BY MR. BLOCK:
5    Q. And what was the Eden installation vector
6    used to install?
7    A. Pegasus.
8    Q. Including the Pegasus end-point agent?
9    MR. AKROTIRIANAKIS: Objection: vague.
10    THE WITNESS: I can tell that at the end of
11    the process there was an agent installation. I don't
12    know what all the part of, you know, each element.
13    BY MR. BLOCK:
14    Q. And when you use the term agent in this
15    context at NSO, what do you mean?
16    MR. AKROTIRIANAKIS: Objection: vague;
17    foundation.
18    THE WITNESS: I mean the end-point element
19    that was installed on the target device.
20    BY MR. BLOCK:
21    Q. Okay. You're here to testify as a corporate
22    representative about defendants' communications with
23    customers, subject to your attorney's objections,
24    right?
25    A. Right.

Page 95

1    Q. Do defendants tell customers about
2    defendants' research and development activities?
3    A. What do you mean by research and development
4    activities?
5    Q. Do you use the term research and development?
6    I think you used it earlier in your testimony at NSO?
7    A. We use the term.
8    Q. What does it mean at NSO?
9    A. We have a department that does research and
10    does development.
11    Q. And --
12    A. Yeah, I'm trying. Sorry, maybe the English
13    are not --
14    Q. No, that's okay.
15    A. It's basic department I guess most of the
16    high-tech companies.
17    Q. At NSO does the R&D -- may I refer to it as
18    R&D; will you understand me?
19    A. Yes, I will.
20    Q. Does NSO's R&D department develop new
21    installation vectors?
22    MR. AKROTIRIANAKIS: Objection: no
23    foundation. Do you mean him to be on his 30(b)(6)
24    now?
25    BY MR. BLOCK:

Page 96

1    Q. It's a lead into a 30(b)(6) question but this
2    is an if you know. I understand you're not here to
3    testify about precisely as a corporate representative
4    about precisely what the R&D department does but
5    I'm going to ask you questions about the extent of
6    what NSO communicates to its customers about R&D
7    activities and so I need to know for that purpose
8    what you know about what NSO's R&D department does.
9    So let me ask a question.
10    What do you know about the activities of
11    NSO's R&D department?
12    MR. AKROTIRIANAKIS: Objection: overboard.
13    THE WITNESS: I know that they're responsible
14    to release if this is the word the solution that has
15    been defined to them by the product team.
16    BY MR. BLOCK:
17    Q. Is Pegasus one such solution?
18    A. Pegasus is one of the solutions.
19    Q. Are installation vectors for the Pegasus
20    end-point agent something that the R&D department
21    develops?
22    A. So again "they provided". I don't know if --
23    some of them develop, I guess.
24    Q. As a corporate representative --
25    A. Yes.

Page 97

1    Q. -- in NSO's communications to its customers,
2    how much does it tell them about the activities of
3    NSO's R&D department?
4    MR. AKROTIRIANAKIS: Objection: vague.
5    THE WITNESS: We tell them that we have
6    an R&D and that they develop the product. I'm trying
7    to -- maybe I'll give an example.
8    BY MR. BLOCK:
9    Q. Please.
10    A. So if they have some kind of malfunction,
11    okay, so we might tell our customers that it is now
12    pending with R&D and they will fix it and we would
13    apply the fix. Other than that it will be a general
14    introduction of the company and the various
15    departments of the company to the customer. So we
16    would say that we have an R&D department.
17    Q. Okay. I think you testified earlier, but
18    I want to make sure I understand, you generally don't
19    talk to customers about the details of specific
20    installation vectors like Eden or Hummingbird; is
21    that correct?
22    A. We do not dive into details.
23    Q. And when a customer initiates an agent
24    installation on Pegasus, as part of that process does
25    the customer know what installation vector the system

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1  used to install the agent on the device?
2      MR. AKROTIRIANAKIS: Objection: no
3  foundation. Beyond the scope of the designation of
4  this witness.
5      THE WITNESS: When a customer will initiate
6  an installation he will choose the vector that he is
7  using. He will not like see the names, it will be
8  like covert or other means.
9      (Reporter clarification.)
10  BY MR. BLOCK:
11      Q. Do defendants maintain records of the
12  WhatsApp accounts they have created?
13      MR. AKROTIRIANAKIS: Objection: vague.
14      THE WITNESS: To the best of my knowledge we
15  do not.
16  BY MR. BLOCK:
17      Q. So for example we discussed the situation
18  where R&D or pre-sales or somebody asks the white
19  services department, "Please create an anonymized
20  WhatsApp account for me", the white services
21  department does that and provides either a device or
22  credentials. Accurate so far?
23      A. I would say that there are cases in which the
24  customer prefers to do that.
25      Q. Okay. And when the white services department

Page 99

1  creates that account, there's no log or document at
2  NSO that lists all of the anonymized WhatsApp
3  accounts NSO has created, is there?
4      A. Not that I'm aware of, not that I recall.
5      MR. BLOCK: We'll take a break.
6      MR. AKROTIRIANAKIS: Okay.
7      VIDEOGRAPHER: Going off the record. The
8  time is 11:57. End of media card 2, volume 1 in the
9  video deposition of Ramon Eshkar.
10      (A short break)
11      VIDEOGRAPHER: This is the beginning of media
12  card 3, volume 1 in the video deposition of Ramon
13  Eshkar. Going on the record. The time is 12:20.
14  Thank you.
15  BY MR. BLOCK:
16      Q. Welcome back, Mr. Eshkar. Do you recall
17  earlier you testified about a second phone number
18  that you use for NSO communications?
19      A. Yes, I remember.
20      Q. Is that number ███████████
21      A. Yes, it is.
22      Q. By the way, did you bring any documents with
23  you to the deposition?
24      A. No.
25      Q. Let's mark this next.

Page 100

1      (Exhibit 2004 marked for identification.)
2      Mr. Eshkar, you've been handed a document
3  marked Exhibit 2004 which is an excerpt from
4  a document filed on the docket in this case,
5  a "Document 1-1". It runs from docket pages 66 of
6  111 to 111 of 111. And if you turn to the second
7  page of the document, which is marked "Page 1 of 46",
8  this is a December 17, 2015 agreement between
9  Infraloks and the national communication authority of
10  the Republic of Ghana, and I have shortened the
11  Infraloks name. Do you see that?
12      A. Where do I see that? Yes, I see that.
13      Q. Were you employed at NSO in December 2015?
14      A. December 2015, yes I have been employed.
15      Q. Do you recognize Exhibit 2004?
16      A. I'm not sure I can refer to so-called
17  agreements between customers and the company.
18      Q. Are you saying you're unable to testify for
19  legal reasons?
20      A. I just don't want to maybe breach any other
21  of my other obligation.
22      Q. I'm going to ask you questions and your
23  counsel can instruct you not to answer, or if you
24  need to confer, that's fine, but I need to make a
25  record about what discovery you're willing to give

Page 101

1  and what discovery you're not willing to give so we
2  can figure out what to do about that in the
3  litigation. Does that make sense?
4      A. Yes, I understand. You understand my
5  position as well?
6      Q. Yes, I understand that you may -- you and
7  your counsel may refuse to answer questions. I just
8  need to know what you're refusing so that we can
9  figure out what to do about that in the litigation.
10  Okay? So let me ask you questions about this
11  document. If you need to confer with your American
12  and Israeli counsel, we can go off the record for you
13  to do that. So do you recognize Exhibit 2004?
14      MR. AKROTIRIANAKIS: Objection: vague. No
15  foundation.
16      THE WITNESS: I do not recall this specific
17  document. It does look like an agreement.
18  BY MR. BLOCK:
19      Q. It looks like an agreement of a form that NSO
20  and/or its resellers uses with lots of customers; is
21  that fair?
22      MR. AKROTIRIANAKIS: Objection: no
23  foundation.
24      THE WITNESS: To fairly answer that I would
25  have to review it.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 190

1    provide a solution."
2        Do you see that?
3    A.  I see that.
4    Q.  And then it says:
5        "Official message to clients was synced
6        with CEs (BoazT)."
7        Do you see that?
8    A.  I see that.
9    Q.  And then it says:
10       "The team is working on a solution in
11       top priority, hoping to provide a
12       solution ASAP."
13       Do you see that?
14   A.  I see that.
15   Q.  Do you know who ███ is?
16   A.  I think I do.
17   Q.  Who?
18   A.  So I guess it refers to ███ and last name
19   Tamir.
20       Q.  And what was ███ role in 2018, if
21   you know?
22       A.  It was -- I can check later if you like about
23   the last name but I think it's ███ I can check in
24   my phone.  And sorry again what was the --
25       Q.  What was ███ role in 2018?

Page 191

1    A.  He was a client executive.
2    Q.  Do you have an understanding of what it means
3    to say "Official message to clients was synced with
4    CEs"?
5    A.  Yes.
6    Q.  What does that mean?
7    A.  It means that when there is a certain failure
8    that need to be or notice from with a support nature
9    in this case, that needs to be provided to the
10   customers, to be communicated to the customers.  So,
11   as I said before, the communication with the customer
12   is being done by client executives.  So in such cases
13   the wording or the theme of the message is being
14   agreed with the CEs because there will be cases in
15   which the client executive will not be, I don't know
16   if the right word speedy enough or fast enough to
17   convey the message and the customer experienced a
18   failure with a call and then it's important that the
19   support engineer will provide the same message as if
20   the client executive would be the one to say that.
21   Q.  And do you recall defendants in fact
22   communicating to customers in December 2018 about an
23   event affecting the Hummingbird vector?
24   A.  So again I don't necessarily remember
25   December but I do remember that we have conveyed

Page 192

1    messages to customers related to service
2    availability.
3    Q.  And then what does it mean where it says:
4        "The team is working on a solution in
5        top priority, hoping to provide a
6        solution ASAP"?
7        MR. AKROTIRIANAKIS:  Objection: no foundation
8    from this witness.
9        THE WITNESS:  The way I read it will mean
10   that ███ is communicating that as a support
11   engineer he addressed the issue to the next level,
12   which is probably in this case I would imagine R&D.
13   So the way I see it he is communicating to the team
14   here that he passed the issue because it's not within
15   his capacity and that since it affects more than one
16   customer it is being handled in a top priority and
17   he's hoping that a solution will come fast.
18   BY MR. BLOCK:
19   Q.  And the solution will be a change that
20   enables the Hummingbird vector to be successful
21   again; correct?
22       MR. AKROTIRIANAKIS:  Objection: no
23   foundation.  Calls for speculation.  Also vague.
24       THE WITNESS:  The way I read it if I read it
25   correctly then that what it will mean.

Page 193

1    BY MR. BLOCK:
2    Q.  And do you recall whether in fact defendants
3    were able to get the Hummingbird vector working again
4    after this event in December of 2018?
5    A.  So since I don't remember the specific event,
6    there were events such as the one described here.
7    Some were recovered and eventually I think one was
8    not so I don't know if -- because I don't remember
9    the exact timeline.  It's way back.
10   Q.  What do you remember about events for which
11   Hummingbird stopped working and then NSO was able to
12   make it work again?
13       MR. AKROTIRIANAKIS:  Objection: no
14   foundation.
15       THE WITNESS:  There were events in which we
16   had to suspend the solution and then to bring it back
17   after it was fixed.
18   BY MR. BLOCK:
19   Q.  And by fixed you mean the R&D team found a
20   new way to make it work?
21       MR. AKROTIRIANAKIS:  Objection: no
22   foundation.
23       THE WITNESS:  Not necessarily because there
24   are cases in which it's a configurational issue.
25   Let's say we update our version regardless the

49 (Pages 190 - 193)

Page 214

1 discovered that the Hummingbird vector went down; do
2 you recall that?
3     A. Yes.
4     Q. Were defendants able to prevent a solution's
5 use by customers through technical means?
6     A. We do and it would require --
7     Q. Sorry, please continue.
8     A. It will require us to advise them of the
9 situation, (b) to obtain their approval to connect to
10 the system and (c) to apply to switch it off let's
11 say.
12     Q. And did you in fact do that in this case?
13     MR. AKROTIRIANAKIS: Objection: vague.
14     THE WITNESS: So we did that in case such as
15 this one I just don't remember about May specifically
16 but it makes sense that we did that, yes.
17 BY MR. BLOCK:
18     Q. You don't ▓▓▓▓▓▓▓▓▓▓▓▓▓ you do
19 remember remotely disabling customers from using the
20 Hummingbird vector after it went down as described in
21 Exhibit 2008?
22     MR. AKROTIRIANAKIS: Objection: misstates his
23 testimony.
24 BY MR. BLOCK:
25     Q. Correct?

Page 215

1     A. I do remember that we have communicated to
2 customers that the vector is not functioning and
3 therefore we're asking them to connect and to disable
4 the vector and this is what we have done.
5     Q. Do you recall internal discussions at NSO
6 about the Hummingbird vector becoming no longer
7 valid, to use your phrase?
8     A. I remember there were discussions, I don't
9 remember the specifics but, yes there were
10 discussions.
11     Q. Was there a big discussion like an all-hands
12 meeting, or a memo to employees that you recall?
13     A. I don't recall anyhow did you call it --
14     Q. I say "all hands", everyone?
15     A. No, I don't recall -- sorry. I don't recall
16 all hands with regards to Hummingbird nor a memo to
17 the employees of the company.
18     Q. Who's the most senior person at NSO or Q with
19 whom you recall discussing this event when the
20 Hummingbird vector became no longer valid?
21     A. So again putting the specific date aside. So
22 let's say that it was on that date, I would imagine
23 the CEO of the company.
24     Q. Did you say CEO?
25     A. Yes.

Page 216

1     Q. Who was that in 2019?
2     A. 2019 I think it was Shalev.
3     Q. Shalev Holy, the person we discussed earlier?
4     A. Yes, I just hope I don't remember when the
5 change was but I think this was Shalev.
6     Q. Who was the person, who was the CEO with whom
7 you recall discussing this event when the Hummingbird
8 vector became no longer valid?
9     A. Shalev.
10     Q. What do you remember about what discussion?
11     A. I generally remember that we talked about the
12 fact that it is no longer available and that we need
13 to prioritize to have alternative vector, and I was
14 asking his attention and managerial gravity to apply
15 that more or less. Probably we also have discussed
16 like if there is any maybe feedback coming from the
17 customers or something like that.
18     Q. Do you recall any feedback from customers at
19 that time?
20     A. I do recall that customer were asking if
21 there is any update or when we will restore
22 Hummingbird capability.
23     Q. Do you recall which customers asked yes or
24 no?
25     A. I recall a few, yes.

Page 217

1     Q. And will you tell me which customers asked
2 that question?
3     MR. AKROTIRIANAKIS: Same objection and
4 instruction.
5     MR. BLOCK: What's the instruction?
6     MR. AKROTIRIANAKIS: The same as before.
7     MR. BLOCK: I just want to be clear that
8 you're instructing the witness not to answer the
9 question.
10     MR. AKROTIRIANAKIS: Yeah, based on the
11 disclosure of the identity of third party clients.
12 BY MR. BLOCK:
13     Q. Okay. The conversation you're recalling with
14 Shalev was that one to one or were other people
15 involved?
16     A. Well, I recall that there were like
17 one-on-one, and some that others were in the room.
18     Q. Do you recall reading press reports about the
19 events related to the Hummingbird vector becoming
20 invalid in or around May 2019?
21     A. Press reports you mean --
22     Q. News articles?
23     A. News articles?
24     Q. Yes.
25     A. I remember there were articles. I don't

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1  remember whether they were specific or not but I do
2  remember there were articles.
3      Q. Do you remember that there were articles
4  mentioning NSO?
5      A. If my memory serves me well, yes, there were
6  articles mentioning NSO.
7      Q. Were you surprised that there was public
8  knowledge of NSO's Hummingbird vector after WhatsApp
9  shut it down in May of 2019?
10     MR. AKROTIRIANAKIS:  Objection: vague.
11  Assumes facts not in evidence.  Lacks foundation.
12     THE WITNESS:  I was not aware they were going
13  to publish something so I was surprised the fact
14  there is.
15  BY MR. BLOCK:
16     Q. Did customers communicate to you about the
17  press reports mentioning NSO in connection with the
18  WhatsApp software changes in or around May 2019?
19     A. So without remembering specific report, if
20  there are reports then if we are aware to them then
21  we notified our customers that there is some kind of
22  publication mentioning our name.  And in some cases,
23  yes the customers might ask about a certain something
24  that was published.
25     Q. Instead of what might happen I'm interested

Page 219

1  in your recollection if any about what did happen.
2  Did customers communicate to you about the press
3  reports mentioning NSO in connection with the
4  WhatsApp software changes in or around May 2019?
5      A. I don't remember.
6      (Exhibit 2009 marked for identification.)
7      Q. Mr. Eshkar, you've been handed Exhibit 2009
8  which is a document which bears on its first page the
9  Bates stamp NSO_WHATSAPP_00000176.  In fact it's a
10  one-page document.  Do you see that?
11     A. I see that.
12     Q. The top left it says:
13        "Structure chart as of December 31,
14  2019."
15        Do you see that?
16     A. I see that.
17     Q. Have you seen this chart before?
18     A. I don't remember seeing this one specific but
19  it looks familiar.
20     Q. Do you know if this chart reflects the
21  structure -- the organizational structure that
22  includes Q Cyber, and NSO as they exist today?
23     MR. AKROTIRIANAKIS:  Objection.  The question
24  is vague and also no foundation from this witness.
25     THE WITNESS:  So I'm sorry, may you please

Page 220

1  repeat?
2  BY MR. BLOCK:
3      Q. Does Exhibit 2009 show the corporate
4  structure that includes Q Cyber and NSO today?
5      MR. AKROTIRIANAKIS:  No foundation.
6      THE WITNESS:  I'm sorry, I can't tell.
7  BY MR. BLOCK:
8      Q. Do you have personal knowledge of the
9  corporate structure of Q Cyber Technologies and NSO
10  Technologies today?
11     MR. AKROTIRIANAKIS:  Objection: vague.
12     THE WITNESS:  I have a little understanding
13  of that.
14  BY MR. BLOCK:
15     Q. What's your understanding?
16     A. My understanding is that there is Q Cyber
17  Technology and that there is NSO Technology Ltd,
18  Israel.  And that there is Sycril(?), which is also
19  connected to Q Cyber Technology.  But, as I've said,
20  I'm not in charge of the -- of that structure so my
21  understanding there is very much legal.
22     Q. We can set that aside.  Did you have
23  an understanding that -- have you ever heard of
24  Francisco Partners?
25     A. I have heard of Francisco Partners.

Page 221

1      Q. Who are they?
2      MR. AKROTIRIANAKIS:  Objection: no
3  foundation.
4      THE WITNESS:  My understanding is they are a
5  private equity company or -- company.
6  BY MR. BLOCK:
7      Q. And are you aware of a past relationship
8  between Francisco Partners and NSO?
9      MR. AKROTIRIANAKIS:  Objection: no
10  foundation.  Also vague.
11     THE WITNESS:  I'm aware that they purchased a
12  certain percentage of all the holding of the company.
13  BY MR. BLOCK:
14     Q. What do you mean by "the company"?
15     A. NSO.
16     Q. Was that percentage 70% as reflected in
17  Exhibit 2009, do you know?
18     A. It will be around that number.  I don't know
19  to say if it's like exactly 70 but it will be around
20  that number.
21     Q. Do you hold equity in Q Cyber or NSO or one
22  of their parent entities?
23     A. No.
24     Q. Have you ever held equity -- do you
25  understand what I mean by equity?

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 250

1    around the time the lawsuit was filed?
2        MR. AKROTIRIANAKIS: You shouldn't discuss
3    any conversations with lawyers you may have had with
4    the company, anything you may have discussed with
5    counsel. With that proviso you can answer.
6        THE WITNESS: They were general discussions
7    among the employees.
8    BY MR. BLOCK:
9    Q. What do you recall about those discussions?
10    A. Some were from certain individual asking if
11    it's true. And to other asking question, what does
12    it mean and what is the next step or things like
13    that.
14    Q. Were you responsible for answering those
15    questions?
16    A. No.
17    Q. Who was?
18    A. So we have our legal part, legal team.
19    Q. And I don't want to know about your
20    communications with the lawyers?
21    A. Okay. So okay. And an internal
22    communication team that is responsible for discussing
23    that.
24    Q. And what do you remember about their answers
25    to those questions?

Page 251

1    A. I remember like saying that there is such a
2    process. I remember that saying that it's in at that
3    time in the beginning of the process and we will know
4    more, a bit more as we progress and basically things
5    like that.
6    Q. Do you have plans to come to the
7    United States if there's a trial in this matter?
8    A. I don't have plans but if there will be a
9    need and I will be asked to show up I will show up.
10    Q. You're willing to come to the United States
11    to give live testimony at a trial in this matter?
12    A. If I will be asked to do so, yes.
13    Q. Have you been asked to provide -- do you
14    understand what I mean by custodial documents,
15    documents that you possess does that phrase make
16    sense to you, you're the custodian?
17        MR. AKROTIRIANAKIS: Objection: foundation.
18    Also vague.
19    BY MR. BLOCK:
20    Q. I'm just asking if you understand the term
21    first, otherwise I can explain.
22    A. If you can explain.
23    Q. Sure. I'm thinking of documents that belong
24    to you, such as your email documents that you might
25    maintain on your work computer, physical files in

Page 252

1    your office, documents for which you are the
2    custodian, they're in your custody. Does that
3    concept make sense to you?
4    A. Yeah, I think so.
5    Q. Have you been asked to provide your custodial
6    documents to lawyers for review in this case?
7        MR. AKROTIRIANAKIS: Objection: vague.
8    Foundation.
9        THE WITNESS: Can I talk to the lawyers here?
10        MR. BLOCK: Only if you have a question about
11    the privilege or legal question, otherwise I need
12    an answer.
13        MR. AKROTIRIANAKIS: To the extent you
14    understand his question.
15        THE WITNESS: I'm not so sure that --
16        MR. AKROTIRIANAKIS: You're not sure you
17    understand the question or you're not sure if the
18    answer it it will require you to divulge a privilege?
19        THE WITNESS: There are different processes
20    so I don't know for which one of them.
21    BY MR. BLOCK:
22    Q. What processes do you recall with respect to
23    your documents in relation to this litigation?
24        MR. AKROTIRIANAKIS: Objection: vague.
25    A. So I have submitted data.

Page 253

1    BY MR. BLOCK:
2    Q. To whom?
3    A. To the company.
4    Q. What data?
5        MR. AKROTIRIANAKIS: Objection: vague.
6        THE WITNESS: I'm not sure I'm giving the
7    right answers here so --
8    BY MR. BLOCK:
9    Q. Did you submit your emails?
10        MR. AKROTIRIANAKIS: Objection: vague. No
11    foundation.
12        THE WITNESS: I don't think I have submitted
13    my emails.
14    BY MR. BLOCK:
15    Q. Did anybody at the company ever collect your
16    WhatsApp messages?
17        MR. AKROTIRIANAKIS: Objection: vague. No
18    foundation.
19        THE WITNESS: I think so, yes.
20    BY MR. BLOCK:
21    Q. When do you recall that occurring?
22        MR. AKROTIRIANAKIS: Objection: no
23    foundation.
24        THE WITNESS: Over a year.
25    BY MR. BLOCK:

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL



Page 254

13 BY MR. BLOCK:
14    Q. Do you know if your mobile device was imaged
15 for this litigation?
16     MR. AKROTIRIANAKIS: No foundation.
17     THE WITNESS: I know it was imaged.
18 BY MR. BLOCK:

24     VIDEOGRAPHER: Going off the record. The
25 time is 18:40.

Page 255

1     (A short break)
2     VIDEOGRAPHER: Going back on the record. The
3 time is 18:45. Thank you.
4     MR. BLOCK: Can you answer the question, sir?

Page 256

Page 257

23 BY MR. BLOCK:

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL



Page 258

Page 260

Page 259

Page 261

4        MR. AKROTIRIANAKIS:  I think that's the same.
5    Are we at 7 hours yet?
6        VIDEOGRAPHER:  That's correct, yeah.
7        MR. AKROTIRIANAKIS:  Okay.
8    BY MR. BLOCK:
9        Q.  You mentioned earlier in your testimony a
10   setup team.  Do you recall that?
11       MR. AKROTIRIANAKIS:  Counsel, you need a
12   court order to go beyond 7 hours.  If the reason you
13   think you can keep going now because the witness is
14   designated in his -- to testify on behalf of the
15   company, we can go for a few more minutes because you
16   asked a few minutes of questions about that.  But
17   beyond that, I think that you need a court order to
18   continue beyond 7 hours in 30(b)1.
19       MR. BLOCK:  I think we've got a lot of
20   30(b)(6) stuff here as well and I appreciate the
21   leeway.  Do you recall testifying about defendants'
22   setup team for customer installations.
23       MR. AKROTIRIANAKIS:  Objection: misstates his
24   testimony.
25       THE WITNESS:  Can you refer me to that point?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 270

1  I meant is that if there is a demonstration for a
2  customer then we would like to show that part of the
3  information that the system can extract is
4  WhatsApp-related, therefore we will have a test
5  device with a WhatsApp account with basic
6  communication so during the demo we can show that we
7  can collect the data.
8  BY MR. AKROTIRIANAKIS:
9      Q.  You just used the term WhatsApp-related.  Is
10  there any other relation to WhatsApp, other than
11  demonstrating the ability to extract WhatsApp
12  messages from the demo client phone that you're
13  using?
14      MR. BLOCK:  Objection to form.
15      THE WITNESS:  Come again?  I lost you.  It
16  was very long.
17      Q.  Sorry.  In your answer you just used the term
18  WhatsApp-related.  Other than demonstrating the
19  ability to extract a WhatsApp message from the demo
20  phone that you're talking about, is there any other
21  relation to WhatsApp?
22      MR. BLOCK:  Objection to form.
23      THE WITNESS:  No.
24      MR. AKROTIRIANAKIS:  All right, thank you.
25      MR. BLOCK:  I assume, Joe, you'll permit

Page 271

1  questions about that testimony but not about other
2  topics?
3      MR. AKROTIRIANAKIS:  I asked two questions.
4  If you've got two questions, or one question as some
5  kind of recross-examination, then you can ask that
6  but we're well beyond 7 hours and it's well after
7  7 p.m. now.
8      MR. BLOCK:  I do not have re-cross.  I have
9  many other questions.
10      MR. AKROTIRIANAKIS:  Then if you don't have
11  any re-cross then I think we're done.
12      MR. BLOCK:  Then we obviously object to the
13  closure of the deposition but we'll allow it to
14  proceed, subject to that objection.
15      VIDEOGRAPHER:  Going off the record.  The
16  time is 19:08.  End of media card 6, volume 1 and
17  this is the end of the video deposition of Ramon
18  Eshkar.  If I could ask about the video and
19  transcript, if you could state that please?
20      MR. AKROTIRIANAKIS:  Is it possible if
21  I could tell you after because someone else manages
22  that and I inevitably will mess it up.
23      MR. BLOCK:  Same answer.
24  (Whereupon, the deposition concluded at 7:09 pm)
25

Page 272

1      CERTIFICATE OF COURT REPORTER
2
3      I, CHANELLE M.L. MALLIFF, a Certified
4  LiveNote Reporter, Certified Shorthand Stage IV
5  stenographic reporter, RPR and CRR (*NCRA 2003 and
6  2004), hereby certify that:
7      RAMON ESHKAR appeared on Tuesday, August 27,
8  2024, agreed to tell the truth, the whole truth, and
9  nothing but the truth, under the penalties of perjury,
10  and was thereupon examined by counsel; that the
11  testimony of RAMON ESHKAR was recorded by me
12  stenographically and was thereafter transcribed by me;
13  that the foregoing transcript is a true, accurate and
14  verbatim record to the best of my skill and ability.
15      I further certify that I am not a relative or
16  employee of any party to the action; nor am I an
17  employee or relative of any attorney or counsel to any
18  party to the action; nor am I in any way financially or
19  otherwise interested in the outcome of the action.
20
21
22
23      CHANELLE M.L. MALLIFF
24      CLR, CSSIV(NZ)
25

Page 273

1  Joseph N. Akrotirianakis, Esq.
2  jakro@kslaw.com
3      August 30, 2024
4  RE:   Whatsapp LLC., Et Al. v. NSO Group Technologies
      Limited, Et Al.
5  8/27/2024, Ramon Eshkar (#6878149)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

69 (Pages 270 - 273)

# EXHIBIT P

*Unredacted Version*
*of Document*
*Proposed to be Filed*
*Under Seal*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                          OAKLAND DIVISION

5    --------------------------------X

6    WHATSAPP INC.                    :

7    a Delaware corporation, and      :

8    META PLATFORMS INC,              :

9    a Delaware Corporation:

10                    Plaintiffs      :

11          v.                        :    Case No.

12   NSO GROUP TECHNOLOGIES LTD       :    4:19-cv-07123-PJH

13   and                              :

14   Q CYBER TECHNOLOGIES LTD         :

15                    Defendants      :

16   --------------------------------X

17        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18             Deposition of YARON SHOHAT

19                       LONDON

20             THURSDAY, AUGUST 29TH, 2024

21                  9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1 Q. Yes.

2 A. Okay. Which page, please?

3 Q. Page 6, please.

4 A. Page 6.

5     Yes.

6 Q. Under section 2 in the second paragraph, do you see

7     where it says:

8     "Pegasus deploys an invisible software (SW)

9     component agent on a target's device which extracts and

10    securely transmits data for intelligence analysis."

11 A. I see it.

12 Q. What does it mean that the agent was invisible?

13 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.

14 A. I didn't write it. I don't know what it refers to.

15 Q. Are you familiar with the Pegasus technology that the

16    defendants offer?

17 A. Of course.

18 Q. Okay. Does that technology deploy a software component

19    that defendants describe as "invisible"?

20 A. It deploys an agent which the owner or user of the

21    targeted device is not aware of. If that's what

22    "invisible" means ...

23 Q. Does it deploy it in a manner that's invisible to the

24    infrastructure used to install it?

25 MR. AKROTIRIANAKIS: Objection. Vague.

Page 47

1 A. I am not sure what you mean by "infrastructure".

2 Q. Okay, when you said "agent", what did you mean?

3 A. Piece of software.

4 Q. And what is the agent in the context of Pegasus?

5 A. The software of Pegasus, which is running on the

6    targeted device.

7 Q. Okay, and what's an installation vector?

8 A. It is the way, the method, to deliver that agent on to

9    the device.

10 Q. The second to last bullet on page 6 says:

11    "Cooperation with local MNO is not required."

12    Do you see that?

13 A. Where, exactly?

14 Q. The second to last bullet on page 6. On exhibit 2016 it

15    says:

16    "Cooperation with local MNO is not required."

17    Do you see that?

18 A. I see that.

19 Q. Do you know what "MNO" stand for?

20 A. Yes.

21 Q. What is it?

22 A. Mobile network operator.

23 Q. Why does NSO highlight the fact that cooperation with

24    the local mobile network operator is not required?

25 MR. AKROTIRIANAKIS: Objection. No foundation.

Page 48

1 A. Because competing solutions do require MNO cooperation.

2    Some of the competing.

3 Q. Have defendants sometimes used Whatsapp infrastructure

4    as part of an installation vector for Pegasus?

5 A. I wouldn't call it Whatsapp infrastructure. But if you

6    ask if we -- if it might send Whatsapp messages, the

7    answer's yes.

8 Q. Including with respect to zero click installation?

9 A. Yes.

10 Q. Does the operation of that Whatsapp related zero click

11    installation vector require cooperation from Whatsapp?

12 A. No.

13 Q. Before operating that Whatsapp related zero click

14    installation vector, did defendants ever inform Whatsapp

15    about what they were doing?

16 MR. AKROTIRIANAKIS: No foundation.

17 A. I don't know if there were any discussions with Whatsapp

18    personnel. Might. I am not aware of.

19 Q. So if it happened, you don't know about it?

20 A. I don't know about it.

21 Q. And now, as CEO of defendants, you have never become

22    aware of a communication that defendants had with

23    Whatsapp before deploying the Hummingbird installation

24    vectors; correct?

25 A. If such discussions did occur, they were before the

Page 49

1    relevant period of 2019. So since then, there were not

2    such discussions.

3 Q. And I am asking about whether those discussions occurred

4    before 2019?

5 MR. AKROTIRIANAKIS: Objection. The question's incomplete.

6    Or maybe not even a question at all.

7 A. I didn't say that there were discussions before 2019.

8    I said that, if there were discussions, they were before

9    2019.

10 Q. But you are not aware of any discussion between

11    defendants and Whatsapp before 2019; correct?

12 A. I am not aware. But it is definitely possible.

13 Q. Are you aware of any instance in which defendants have

14    asked permission from a third party whose technology

15    defendants are using as part of an installation vector

16    for Pegasus?

17 MR. AKROTIRIANAKIS: Objection. No foundation.

18 A. I am not aware.

19 Q. Do defendants have installation vectors for Pegasus

20    today?

21 A. Yes.

22 MR. AKROTIRIANAKIS: I am actually going to instruct the

23    witness not to answer that question. The witness has

24    now answered the question, but ...

25 Q. Have defendants sought permission from any third party

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1 A. It exists, but it is inactive.

2 Q. Okay. Do you know when it became inactive?

3 A. It had less and less activity over the years.

4    Definitely when I became CEO in 2022, I stopped any

5    activity, closed the office, and stopped spending any

6    money in the US.

7 Q. When you became CEO in 2022, you took an action to stop

8    activity, closed the office, stopped spending money in

9    the United States on the defendants' behalf?

10 A. Correct. Almost. I will correct a few things.

11    I stopped making efforts in the US. I believed the

12    level of effort awarded before, at least since 2020 --

13    yes, (inaudible) WestBridge is not owned or part of the

14    defendant.

15 MR. AKROTIRIANAKIS: Micah, in as much as there is 114 more

16    pages in this exhibit, can we take a comfort break?

17 MR. BLOCK: We can. Let's go off the record.

18 THE VIDEOGRAPHER: Going off the record. The time is

19    12:17 p.m. The end of media card 2, volume 1, in the

20    deposition of Yaron Shohat.

21 (12:17 p.m.)

22        (break taken.)

23 (12:37 p.m.)

24 THE VIDEOGRAPHER: This is the beginning of media card

25    number 3 volume 1 in the video deposition of Yaron

Page 95

1    Shohat, going on the record. The time is 12:36 p.m.

2    Thank you.

3 MR. BLOCK: Welcome back, Mr. Shohat.

4 A. Thank you.

5 By Mr. Block:

6 Q. I wanted to circle back to something we were discussing

7    earlier. Why did defendants finally decide to shutdown

8    WestBridge?

9 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.

10 A. It was not successful, WestBridge.

11 Q. What do you mean by unsuccessful?

12 A. The purpose was to penetrate North America and generate

13    sales. Which it didn't.

14 Q. Did that decision the defendants took to shutdown

15    WestBridge relate to the US government's listing NSO on

16    an export restriction list?

17 MR. AKROTIRIANAKIS: Objection. Misstates testimony.

18 A. First, it is not related. Second, the defendant did not

19    take a decision to shutdown WestBridge. If I could,

20    I would shut it down; it still exists.

21 Q. I see.

22 A. It was not in my, or the defendant ... it is not owned

23    by the defendant, so the defendant could not shut it

24    down.

25 Q. Okay. But the decision you took as the defendant's CEO

Page 96

1    was to cut off any further spending in the US?

2 A. It is equivalent to a decision to stop working with the

3    reseller which is not performing.

4 Q. Okay. In the 2019 time frame, did defendants account

5    for Pegasus revenue differently depending on which

6    defendant entity signed the customer contract?

7 A. What do you mean account differently?

8 Q. Like financial accounting?

9 A. I am not sure I understand, but basically the revenue is

10    allocated according to the entity that develops it.

11 Q. According to the entity that develops the sale or

12    develops the product?

13 A. No, the product.

14 MR. AKROTIRIANAKIS: You have to wait until he is done,

15    otherwise you make his job very difficult.

16 A. Sorry, I will repeat.

17        Revenue is allocated according to the entity that

18    develops the product, at least the majority of the

19    revenue. Some of the entities on the way are entitled

20    to some, because they take part in the distribution.

21 Q. Okay. What is the entity that developed Pegasus?

22 A. The defendants.

23 Q. The defendants, plural, Q and NSO?

24 A. Yes.

25 Q. Okay.

Page 97

1 A. The development is, like, NSO, as I mentioned, but the

2    support functions are Q. I am not sure -- I don't know

3    to say how the revenue would be split between Q and NSO.

4 Q. Was it important in any way for NSO's operations to

5    distinguish between a Pegasus contract signed by Q Cyber

6    Luxembourg, for example, versus a Pegasus contract

7    signed by NSO Group limited of Israel, for example?

8 A. It does not really matter. It matters for the

9    accountants and the financial team, because it is more

10    work, but we don't really care with which entity we sign

11    the contract.

12 Q. And when the contract is signed between the end customer

13    and a reseller, is contract revenue allocated to the

14    reseller, or -- strike that, let me ask again.

15        How is revenue allocated when a Pegasus customer

16    contract is signed between the end customer and

17    a reseller?

18 A. So when a contract is signed with the reseller, the

19    reseller signs with the end user and then the reseller

20    signs with the company, let's call it Q. Whatever is on

21    the contract, the value of the contract between the

22    reseller and the company, the reseller pays the company,

23    so the reseller gets money from the end user, the

24    customer, and pays the company whatever is stated on

25    the contract.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1 Q. Are those contracts generally set up to specify
2    a percentage of the customer revenue that the reseller
3    must pay to the defendants?
4 MR. AKROTIRIANAKIS: Objection. Vague.
5 A. No. The contract defines how much the reseller would
6    pay the defendant.
7 Q. In an absolute dollar amount?
8 A. Yes.
9 Q. Does the contract define the price at which the reseller
10    must sell the product to the customer?
11 A. Sometimes. Today we limit resellers how much mark up
12    they can take. I am not sure if that existed in the
13    relevant period.
14 Q. Okay. Today do defendants maintain a price list for
15    their products?
16 MR. AKROTIRIANAKIS: Objection. Vague.
17 A. We maintain a price list which is a general guideline
18    for the sales people to know how to price the product,
19    but the actual amount at which we sell may vary a lot
20    from the price list.
21 Q. When you said you limit the mark up that a reseller can
22    take, what did you mean?
23 A. Again, I am referring to today, this time period.
24 Q. We can start with today.
25 A. If I want to get a $100 product I want the reseller to

Page 99

1    sell it for a reasonable price, and not for $200. So
2    there will be some range given to the reseller to make
3    sure that it is reasonable.
4 Q. So is there a list of prices and then a percentage mark
5    up, is that the structure?
6 MR. AKROTIRIANAKIS: Objection. Misstates the testimony.
7 A. No.
8 Q. What is the structure?
9 A. The structure is there is a list of how much the company
10    wants to sell its product for, or wishes to sell, and
11    then if there is a reseller involved the reseller,
12    today, these days, would have in his agreement with us
13    a limitation of how many percentages, how much
14    percentages, he can add.
15 Q. And I would like to discover the price that the company
16    wants to sell its product for. So let's start with
17    today. What does that price list say for Pegasus?
18 A. It really depends on a lot of factors. And as I said,
19    at the end the price that we sell the product for might
20    be not really related to what's in the price list.
21 Q. What does the price list say?
22 A. What do you mean say?
23 Q. Is the price list a document?
24 A. Yes.
25 Q. What does the price list say?

Page 100

1 MR. AKROTIRIANAKIS: Objection. Vague.
2 A. I am not sure what you mean by say.
3 Q. What are the words and numbers on the document that is
4    the price list?
5 A. Okay, are you asking me personally, or as the
6    companies', as the defendant?
7 Q. Are you prepared to provide defendants' testimony as
8    a corporate representative on its pricing?
9 A. The right person to talk to that for the defendant would
10    be Sarit Gil.
11 MR. AKROTIRIANAKIS: And that's the person who is designated
12    for that. He is not designated for that.
13 Q. Okay. Do you have personal knowledge -- sorry, is it
14    also true that you are not prepared to provide corporate
15    representative testimony on the defendants' prices for
16    Pegasus in the 2018/19 time frame?
17 A. Correct.
18 Q. Do you have personal knowledge of defendants' prices for
19    Pegasus in the 2018/19 time frame?
20 A. I know some customers, how much they paid.
21 Q. Okay, what do you know?
22 A. It is a wide range of numbers. I am sure you could see
23    it in some of the documents you received.
24 Q. Give me an example?
25 A. One customer would pay $3 million and one might pay ten

Page 101

1    times that.
2 Q. In the $3 million example what does the customer
3    receive?
4 A. Pegasus product.
5 Q. Defined in terms of a number of concurrent targets?
6 MR. AKROTIRIANAKIS: Objection. Incomplete hypothetical.
7 A. There are certain definitions of parameters, but it
8    doesn't really mean that there is some formula that you
9    can take and say that many concurrent users means that
10    would be the amount. As I said, at the end, in
11    any economy, at the end you charge as much as the
12    customer is willing to pay.
13 Q. What are the parameters?
14 A. The key parameters are concurrent users, and
15    territories, there might be a distinction between
16    Android and iOS. These are the key parameters.
17 Q. Some of your customer deals apply for Android only, or
18    iOS only?
19 A. The majority of the contracts are for both. If there is
20    only one, most likely it will be the iOS one.
21 Q. Are your price guidelines higher for some territories
22    than others?
23 MR. AKROTIRIANAKIS: Objection. Vague.
24 A. That would be a question for Sarit.
25 Q. Do you know if your price guidelines are higher for some

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1    collected in this case by the company for possible
2    production?
3  A.  I was not designated as custodian.
4  Q.  You were not?
5  A.  I was not.
6  Q.  So your documents are not subject to the preservation?
7  MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.
8    Also no foundation.
9  A.  I think that everything is subject to preservation.  But
10    if you ask me if my Whatsapp was collected, the answer's
11    no.
12 Q.  Do you know who the custodians are?
13 MR. AKROTIRIANAKIS:  Objection.  No foundation.
14 A.  I don't know the list by heart, no.
15 Q.  Okay, but you know that you are not designated as
16    a custodian?
17 A.  I know -- correct.

Page 196

Page 195

Page 197

Veritext Legal Solutions
212-279-9424              www.veritext.com              212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 249

2 MR. AKROTIRIANAKIS: Alright, we are 12 minutes over,
3 counsel. Can I do my two minutes of redirect?
4 MR. BLOCK: Let me ask a couple more, if that's okay.
5 MR. AKROTIRIANAKIS: We will on a question by question
6 basis, but you are just wasting time now, and it is
7 after 7 o'clock, p.m., and there is plenty to do in this
8 case before tomorrow, so you can ask a question. I will
9 decide whether you are just wasting the CEO of the
10 defendants' time.
11 A. I will just correct my last answer, to note I do not
12 recall.
13 By Mr. Block:
14 Q. In the fifth paragraph, it begins --
15 A. Same page, sorry?
16 Q. Same page, yes.
17 A. One, two, three, four, five, yes.

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

Page 252

1    Alright.

2  By Mr. Akrotirianakis:

3  Q.  Mr. Shohat, I will be brief.  Can you go in, I think it

4    is the biggest exhibit there, by volume, exhibit 2019.

5    Yes, you have it.  This document is entitled "Q

6    Technologies company overview".  Exhibit 2019.  Do you

7    have it before you?

8  A.  Yes.

9  Q.  Alright.  Do you know what this document is, like what

10    the purpose of this document is?

11  A.  I believe this document was prepared by Francisco

12    Partners for the purpose of selling the company.

13  Q.  Do you know whether anybody from NSO or Q Cyber Israel,

14    the two companies that are defendants in this case, had

15    to do with the preparation of this document?

16  MR. BLOCK:  I object, sorry, to the form of the previous

17    question, and on foundation, which I was unable to

18    determine until I saw the answer, and I object to the

19    form of the current question, I will object on

20    foundation provisionally.

21  Q.  Do you remember my question?

22  A.  Yes.

23  Q.  Okay.

24  A.  Actually can you repeat it, please.

25  Q.  My question was do you know whether anybody from NSO or

Page 251

Micah, we are out of time.  Are you

8    going to permit me to do my two minutes of redirect

9    examination, or not.

10  MR. BLOCK:  Of course I will permit it.  Are you calling the

11    deposition?

12  MR. AKROTIRIANAKIS:  Yes, we have exceeded now by 15 minutes

13    the statutory time period, so I have allowed leeway,

14    I hope you can appreciate that, I think on some level

15    you actually do, but I think you are just wasting the

16    witness' time now and you are asking about questions

17    that don't have anything to do with the litigation and

18    that you know he is not permitted to answer.

19  MR. BLOCK:  I have to just respond to that by saying

20    I disagree, and I will leave it at that, but having,

21    with your having called an end to my examination, you

22    may proceed.

23  MR. AKROTIRIANAKIS:  Rule 30 has called an end to your

24    examination and I think we can agree that seven hours

25    and 15 minutes is 15 minutes more than seven hours.

Page 253

1    Q Cyber Israel, the two companies that are defendants in

2    this case, had to do with the preparation of this

3    document?

4  MR. BLOCK:  Objection to form.  And foundation.

5  A.  My recollection is that no defendant, defendants, was

6    aware of this presentation, because it was prepared

7    without the knowledge of the defendants.

8  Q.  Okay, meaning you only found out about the document

9    after the fact?

10  MR. BLOCK:  Objection to form.  Leading.

11  A.  We, I mean management team, realized only after the fact

12    that Francisco Partners were trying to sell the company,

13    and conducted a presentation about the company, without

14    our knowledge.

15  MR. BLOCK:  I will object on foundation as well.

16  MR. AKROTIRIANAKIS:  Okay, he has objected to the question

17    and the answer.

18  MR. BLOCK:  No, that objection was to your question, Joe.

19  MR. AKROTIRIANAKIS:  Okay.

20  By Mr. Akrotirianakis:

21  Q.  Is it your recollection that you only became apprized of

22    this effort by Francisco Partners to sell the company

23    after the fact of the happenings of 8 May, 2018?

24  MR. BLOCK:  Objection to the form of the question.

25  A.  Yes.

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1  Q.  Right, you were --
2  A.  We became, we were brought in to the loop only after
3      Francisco Partners and the potential acquired became
4      agreed on the terms and they were about to conclude the
5      transaction, only then we became aware that such
6      presentations were conducted.
7  Q.  You were asked a lot of questions, both numerically and
8      time wise, about the P&L statements of WestBridge and
9      involvement about any payments made to WestBridge,
10     I think the question actually related to a decision that
11     you were asked to make about whether or not to send the
12     money to the company, do you remember that line of
13     questions?
14 A.  Yes, I remember.
15 Q.  Okay.  And in your answers to that, they were not really
16     attached in time to any particular period, but are you
17     able to say when it was at all that you became ever
18     involved with, like, reviewing the P&L for WestBridge,
19     or anything like that?
20 MR. BLOCK:  I object to the form of the question and the
21     coaching of the witness.
22 A.  I became aware of it, of the request to make money
23     transfers to WestBridge, only after I became CEO, which
24     means all of my answers were for a period after August
25     '22.

Page 255

1  Q.  August 2022?
2  MR. BLOCK:  Objection to form.
3  A.  Yes.  After August 2022.
4  Q.  Okay.  And you were asked a lot of questions about trips
5      that you made to the United States, to Washington DC,
6      with a stop over in New York, and meetings with, in DC,
7      reporters, policymakers and service providers, do you
8      recall that testimony?
9  MR. BLOCK:  Objection to form.
10 A.  Yes.
11 Q.  When were those trips to Washington DC that you
12     testified about in relation to you becoming the CEO of
13     the company?
14 A.  All of those trips to Washington were after August 2022.
15 MR. AKROTIRIANAKIS:  Alright, thank you.
16 THE VIDEOGRAPHER:  Going off the record.  The time is 19:22.
17     End of media card number 6 volume 1 and this is the end
18     of the video deposition of Yaron Shohat.
19 (7:22 p.m.)
20     (Whereupon, the deposition concluded at 7:22 p.m.)
21
22
23
24
25

Page 256

1       CERTIFICATE OF COURT REPORTER
2
3  I, CHRIS LANG, an Accredited Real-time Reporter, hereby
4  certify that the testimony of the witness YARON SHOHAT in
5  the foregoing transcript, taken on this 29TH day of AUGUST,
6  2024 was recorded by me in machine shorthand and was
7  thereafter transcribed by me; and that the foregoing
8  transcript is a true and accurate verbatim record of the
9  said testimony.
10
11 I further certify that I am not a relative, employee,
12 counsel or financially involved with any of the parties to
13 the within cause, nor am I an employee or relative of any
14 counsel for the parties, nor am I in any way interested in
15 the outcome of the within cause.
16
17
18
19 Name:    CHRIS LANG
20 Date:  8/29/24
21
22
23
24
25

Page 257

1
2       CERTIFICATE OF DEPONENT
3
4  I, YARON SHOHAT, hereby certify that I have read the
   foregoing pages, numbered 1  through 259, of my deposition
5  of testimony taken in these proceedings on 29TH, AUGUST,
   2024 and, with the exception of the changes listed on the
6  next page and/or corrections, if any, find them to be a true
   and accurate transcription thereof.
7
8
9
10
11 Signed:  .......................
12 Name:    YARON SHOHAT
13 Date:    .......................
14
15
16
17
18
19
20
21
22
23
24
25

65 (Pages 254 - 257)

# EXHIBIT Q

***Unredacted Version
of Document
Proposed to be Filed
Under Seal***

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4    --------------------------------X

5    WHATSAPP INC.                    :

6    a Delaware corporation, and     :

7    META PLATFORMS INC.,            :

8    a Delaware Corporation          :

9              Plaintiffs,     :

10         v.                  :    Case No.

11   NSO GROUP TECHNOLOGIES LTD.    :    4:19-cv-07123-PJH

12   and                            :

13   Q CYBER TECHNOLOGIES LTD.,     :

14              Defendants.     :

15   --------------------------------X

16

17          Deposition of SARIT BIZINSKY GIL

18                     LONDON

19          FRIDAY, SEPTEMBER 6TH, 2024

20                8:19 A.M. BST

21

22      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1 A. This is what I read, yes.

2 Q. Okay. So fair to say you were sent a message

3   on January 31, 2019, and that was saying that Eden for

4   Android has been developed and was going to be deployed?

5 A. Sorry, again, what did you say?

6 Q. So it is fair to say that you received a message in

7   late January 2019, telling you that Eden had been

8   developed by the Android team and it was scheduled for

9   deployment in early February?

10 A. Yes, this is what I read here.

11 Q. Okay. So someone thought it was important for you to

12   know what was going on?

13 A. Yes.

14 Q. Okay, and it is because, probably, this was an important

15   development for the company?

16 MR. CRAIG: Objection. Lacks foundation.

17 A. Not for me to speculate.

18 Q. Okay. But you didn't receive -- how often did you

19   receive updates on defendants' installation vectors?

20 A. Not a lot. I didn't even remember this one.

21 Q. But you did receive one on January 31, 2019, right?

22 A. This is what I see here.

23 Q. Okay.

24 A. Assuming it's right, yes.

25 Q. Okay. And Terry DiVittorio responds:

Page 95

1     "Awesome news. Mazel tov."

2 A. This is what I read here, yes.

3 Q. Do you know someone with the name Mich, M-I-C-H?

4 A. I don't know.

5 Q. Okay.

6 A. I don't want to speculate.

7 Q. Do you remember any changes in defendants' forecasts as

8   a result of the Eden vector coming back online?

9 A. No.

10 MR. CRAIG: Objection. Vague and ambiguous.

11 A. No.

12 MR. CRAIG: And asked and answered.

13 Q. You have been designated to provide defendants'

14   corporate testimony on the terms of contracts and the

15   payments received under contracts, right? We talked

16   about that?

17 MR. CRAIG: Objection. Misstates -- slightly misstates her

18   scope of designation, but I think the record earlier

19   speaks for itself.

20 A. Yes. So, according to what the lawyer said, under this,

21   I can answer.

22 Q. Okay. We talked before about the presales team and the

23   sales team, do you remember that?

24 A. Yes.

25 Q. Can you describe how the negotiation of the contracts

Page 96

1   fits in with the sales and presales process that you

2   described earlier?

3 A. Okay, so generally speaking about the sales cycle, once

4   there is a connection, either direct or indirect, the

5   sales reps have an initial meeting, then usually they

6   schedule a demo. As I said, with the presales

7   assistance they do the demo, they go together to meet

8   the potential customer, and afterwards there should be,

9   like, a price proposal that should be sent to this

10   potential end user. And then there would be

11   negotiations, and usually, like, a waiting time for

12   internal customer decision, to make a decision to

13   allocate budget for this project. And eventually send

14   contracts, negotiate on the contracts, and eventually,

15   as I said, after the BEC approves the opportunity, then

16   a sale could be done, could be concluded, could be

17   signed. A down payment would be received.

18   An application for export license. That's it.

19 Q. Great. I am going to break that down into chunks, okay.

20     You said there is a price proposal that should be

21   sent to the potential end user. Is that in the contract

22   or is that a separate document?

23 A. It is a separate document.

24 Q. Is the same price proposal sent to every customer?

25 A. No.

Page 97

1 MR. CRAIG: Objection. Vague.

2 A. Sorry.

3     No.

4 Q. And before we go any further, is this the process that

5   was used in 2018 and 2019?

6 A. Yes.

7 Q. So a price proposal is sent to the customer as

8   a separate document, right?

9 A. Yes.

10 Q. Who is involved in creating that price proposal

11   document?

12 A. The sales manager; his boss; potentially the head of

13   sales would review again, if needed. That's it.

14 Q. How does the sales manager go about creating this price

15   proposal document?

16 MR. CRAIG: Objection. Lacks foundation.

17 A. There is a template. They use a template. Put in the

18   numbers and send it to the customer.

19 Q. What is the template? Is that the same thing as the

20   price list?

21 A. No.

22 Q. What is the template?

23 A. It is a template prepared by the Marcom that we talked

24   before, this marketing team, that basically has all the

25   products of the company. It has also some general

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1  information on the cost of the maintenance for the
2  second and third years; some general information on the
3  support we provide, if I recall well; and then they put
4  the numbers of the price for the -- whatever scope was
5  provided, and send it to the customer.
6  Q. So I want to first talk about this, the template that
7    Marcom provides. Is this a document that exists on
8    defendants' computers?
9  A. Sorry, again?
10 Q. Is the Marcom template a document that defendants'
11   employees can find on defendants' computers?
12 A. It is available for the sales reps.
13 Q. Is it available in a centralized file, like a shared
14   drive?
15 A. I don't remember how it was, like, distributed, but
16   every sales manager could get this, or should have
17   gotten this, in order to be able to send, like, a formal
18   price proposal to his end user.
19 Q. I want to ask now specifically about the prices that are
20   put in this price proposal. Where do defendants' sales
21   employees get -- is there a -- let me start over.
22      We have heard testimony about the existence of
23   a price list. Are you familiar with a price list?
24 A. Yes.
25 Q. And what is the price list?

Page 99

1  A. So the price list, in 2018 until 2020, changed within,
2    like, each year. But basically it is composed of the
3    various products and their prices: the standard price;
4    the regional head price, which is the discounted price
5    that they can provide; and, like, the final discounting
6    could be given by the CBO. I think there were three
7    levels of prices with the discounting mechanism.
8      At that time of 2018 to 2020, the price list was
9    also per region, so could be different prices for
10   different geographies. That's mainly it. And it is
11   a reference for their proposals.
12 Q. So, from 2018 to 2020, there was one price list that
13   contained prices, price references, for all of
14   defendants' products? Pegasus and the ones that we are
15   not talking about here?
16 A. There were several price lists that existed in this long
17   timeframe.
18 Q. Was there a -- did anything besides the prices change?
19 MR. CRAIG: Object to the form of the question.
20 A. If there were additional products that were available
21   during this time as the portfolio of the company,
22   products that are irrelevant for what we are here today,
23   then they were added during 2019 and 2020.
24 Q. I understand.
25 A. To the price list.

Page 100

1  Q. Is this price list a Microsoft Word document, an Excel
2    spreadsheet?
3  A. Excel spreadsheet.
4  Q. And is it available to certain members of defendants'
5    employees?
6  A. Yes.
7  Q. Is it in a centralized file?
8  A. No.
9  Q. Okay. Where is it located on defendants' computers?
10 MR. CRAIG: Object to form.
11 A. It is sent as a PDF to the sales managers and to the
12   heads of the regions, and they would save it on their
13   computers.
14 Q. Who has access to the Excel that you have just
15   mentioned?
16 A. Me and my team.
17 Q. Are you in charge of maintaining that Excel document?
18 A. Yes.
19 Q. And that was true from 2018 to 2020?
20 A. Yes.
21 Q. And is that true today?
22 A. Yes.
23 Q. Okay.
24   So you said the price list from 2018 to 2020 had
25   a standard price, right?

Page 101

1  A. Yes.
2  Q. And then it had a regional head price. What was the
3    regional head price?
4  A. There were, like, hierarchies in the sales. So if
5    I remember well, in this, there was, like, head of
6    region, like, regional VP, I think, this was their
7    title. So he could give, like, a 10 percent discount on
8    the price list, on the standard price that the sales
9    manager could offer, and then there was additional
10   discount that could be given by hierarchy, like, the
11   vice president of the entire sales.
12 Q. What was the purpose for giving more senior employees
13   the ability to offer discounts?
14 MR. CRAIG: Objection. Lacks foundation.
15 A. Just the way it works in every company.
16 Q. Okay. Were you able to -- were you able to give
17   discounts to people, or able to instruct sales people,
18   or allow sales people to give discounted prices?
19 MR. CRAIG: Objection. Compound.
20 A. It's not my role.
21 Q. Okay.
22   So you say there is a standard price, a regional
23   head price, and then you say there is final discounting
24   by CBO?
25 A. I think there was also a vice president discounting,

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1    because in some period of time there was a vice
2    president above all of these regional heads.  So you
3    could give, maybe, another discount level, if I remember
4    well.
5 Q.  It would be easier if we had the document, right?
6 MR. CRAIG: Object to the form of the question.  You don't
7    have to answer that.
8 Q.  So the three levels of prices, price discounting
9    mechanisms, is regional head price, VP, CBO?
10 A.  No.  Standard price is the sales manager, then regional,
11    then VP if there was a VP, and then CBO.
12 Q.  Okay.  And those are the columns on the spreadsheet?
13 A.  Columns, yes.
14 Q.  Columns, right.  The -- thank you.
15        And you said there were different price lists for
16    different regions.  How is that reflected in the price
17    list?
18 A.  Um, that you could see the geography, the name of the
19    geography, and then the relevant three prices, as
20    I described, for each region.
21 Q.  Understood.  And what were the geographies in the
22    region?
23 MR. CRAIG: Just make sure that you are not revealing
24    anything that you are not allowed to discuss under
25    export control agencies.

Page 103

1 A.  Sorry, so I don't know if I can ...
2 MR. CRAIG: Maybe you could rephrase your question in a way
3    that makes sure she is not going to mention specific
4    customers.
5 Q.  I know that defendants' position is that Israeli law
6    prohibits you from disclosing the name of your customer.
7 A.  Yes.
8 Q.  And I am asking are they continents, for instance?  Are
9    they regions?
10 A.  Regions, yes.
11 Q.  Okay.  Is North America a region on that price list?
12 A.  I believe so, yes.
13 Q.  Is LATAM a region on that price list?
14 A.  Latin America, yes.
15 Q.  Is Europe a region on the price list?
16 A.  Yes.
17 Q.  Is Africa a region on the price list?
18 A.  Yes.
19 Q.  Is the Middle East a region on the price list?
20 A.  Yes.
21 Q.  Is Asia a region on the price list?
22 A.  Asia Pacific, yes.
23 Q.  Asia Pacific.  Are there other regions that I didn't
24    mention?
25 A.  No.

Page 104

1 Q.  Okay, so six regions.  Three prices for each region.
2    Correct?
3 A.  Yes.
4 Q.  Let's talk about the rows.  What are in the rows of the
5    price list?  Is Pegasus a row, or are there different --
6    can you explain how the price list corresponds for the
7    Pegasus product?
8 MR. CRAIG: Just answer without revealing any information
9    that you are not allowed to reveal.
10 A.  Okay, so usually there was, like, the base, standard
11    package, for a certain amount of concurrent targets,
12    installations.  The basic is triggered only.  And then
13    there was prices for covert vectors, and prices for
14    Landmark, for the various packages of Landmark, for
15    Pixcell, and various options that we had for this
16    product.  So like, the entire -- and as I said, other
17    products that were relevant in 2019/2020 were added to
18    this price list.
19 Q.  And were you responsible for adding those additional
20    products to the price list?
21 A.  Yes.
22 Q.  Okay.  Let's focus on Pegasus.
23 A.  Okay.
24 Q.  You said there was a standard package?
25 A.  Yes.

Page 105

1 Q.  How many concurrent targets were in the standard
2    package?
3 A.  15.  1-5.
4 Q.  1-5?
5 A.  1-5.
6 Q.  Okay.  I will get there in a second.  For triggered --
7    so a customer was able to buy 15 concurrent targets,
8    triggered only?
9 A.  Yes.
10 Q.  And, just to start, is there a certain set of prices
11    that were in multiple regions?  I just want to make this
12    easier as I ask questions about the prices.  But I know
13    you may say it differs by region.
14 A.  Yes, it does.
15 Q.  So I am going to try to ask --
16 A.  Yes, it differs by region.
17 Q.  Okay.  Were there regions that were the same?
18 MR. CRAIG: Object to form.
19 A.  I don't remember.  But I tend to believe yes.
20 Q.  Okay.  Was North America one of the regions that shared
21    prices with other regions?
22 MR. CRAIG: Object to form.
23 A.  I really don't remember.
24 Q.  Okay.  What was the price for the standard package of 15
25    concurrent targets of triggered only in 2018 to 2020?

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1       CERTIFICATE OF COURT REPORTER

2 I, CHRIS LANG, an Accredited Real-time Reporter, hereby

3 certify that the testimony of the witness SARIT GIL in the

4 foregoing transcript, taken on this 6TH day of SEPTEMBER,

5 2024 was recorded by me in machine shorthand and was

6 thereafter transcribed by me; and that the foregoing

7 transcript is a true and accurate verbatim record of the

8 said testimony.

9

10 I further certify that I am not a relative, employee,

11 counsel or financially involved with any of the parties to

12 the within cause, nor am I an employee or relative of any

13 counsel for the parties, nor am I in any way interested in

14 the outcome of the within cause.

15

16

17 Name:  CHRIS LANG

18 Date:  9/6/24

19

20

21

22

23

24

25

Page 248

1 WHATSAPP INC., et al. vs.

  NSO GROUP TECHNOLOGIES LTD. et al.

2 9/6/2024 - SARIT BIZINSKY GIL

3     E R R A T A  S H E E T

4 PAGE_____ LINE_____ CHANGE_____

5 _____

6 REASON_____

7 PAGE_____ LINE_____ CHANGE_____

8 _____

9 REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____  _____

24 SARIT BIZINSKY GIL        Date

25

Page 247

1 WHATSAPP INC., et al. vs.

  NSO GROUP TECHNOLOGIES LTD. et al.

2 9/6/2024 - SARIT BIZINSKY GIL

3     ACKNOWLEDGEMENT OF DEPONENT

4 I, SARIT BIZINSKY GIL , do hereby declare that I

5 have read the foregoing transcript, I have made

6 any corrections, additions, or changes I deemed

7 necessary as noted on the Errata to be appended

8 hereto, and that the same is a true, correct and

9 complete transcript of the testimony given by me.

10

11 _____  _____

12 SARIT BIZINSKY GIL        Date

13 *If notary is required

14     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15     _____ DAY OF _____, 20___.

16

17

18     _____

19     NOTARY PUBLIC

20

21

22

23

24

25

63 (Pages 246 - 248)