# EXHIBIT 5

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          H I G H L Y   C O N F I D E N T I A L

2                   ATTORNEYS' EYES ONLY

3              NORTHERN DISTRICT OF CALIFORNIA

4                    OAKLAND DIVISION

5                         Case No. 4-19-cv-07123-PJH

6    -----------------------------------

7    WHATSAPP INC., a Delaware corporation,

8    and META PLATFORMS INC., a Delaware corporation,

9           Plaintiffs,

10   v.

11   NSO GROUP TECHNOLOGIES LTD and

12   Q CYBER TECHNOLOGIES LTD,

13           Defendants.

14   -----------------------------------

15       Deposition of TAMIR GAZNELI, taken by AILSA

16    WILLIAMS, Certified Court Reporter, held at the

17    offices of Davis Polk & Wardwell, London, United

18       Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1    Q   Okay, and which applications were
2 you working on understanding at that time?
3        MR. AKROTIRIANAKIS:  Vague as to time.
4        MR. PEREZ-MARQUES:  In your time as
5 security researcher.
6    A   Browsers.
7    Q   Only browsers?
8    A   Yes.
9    Q   Which browsers?
10    A   Back then I think there were two of
11 them only.
12    Q   Which ones?
13    A   The one I remember is Chrome.
14    Q   Chrome?
15    A   Yes.
16    Q   For what purpose were you working to
17 understand Android and these browsers?
18    A   I think I answered the question, in
19 order to understand, get the in-depth
20 understanding of how they function and what are
21 the related functionalities.
22    Q   And for what purpose were you
23 seeking to understand and develop the in-depth
24 understanding of how they function?
25    A   To be able to develop the tools that

Page 27

1 the company develops for the customers.
2    Q   What tools?
3    A   Software that enables the customers
4 to get the information they need for doing their
5 job.
6    Q   Let me ask it this way.  Were you
7 seeking to understand these browsers and operating
8 systems in order to identify vulnerabilities that
9 could be used to develop installation vectors?
10        MR. AKROTIRIANAKIS:  Do you need it
11 translated?
12    A   No.
13        MR. AKROTIRIANAKIS:  Okay.
14    Q   Can you repeat the question?
15    Q   Were you seeking to understand these
16 browsers and operating systems in order to
17 identify vulnerabilities that could be used to
18 develop installation vectors?
19    A   Yes.
20    Q   And were those installation vectors
21 for Pegasus?
22    A   Yes.
23    Q   During your time as security
24 researcher -- let me withdraw that.
25        It says on your bio that you were

Page 28

1 security researcher from November 2015 to
2 December 2017.  Is that correct?
3    A   Yes.
4    Q   And during that period as security
5 researcher, did you do any work to develop
6 installation vectors that would operate via
7 WhatsApp?
8    A   No.
9    Q   In December 2017 you were promoted
10 to Security Research Team Leader.  Is that
11 correct?
12    A   Yes.
13    Q   And what were your responsibilities
14 as Security Research Team Leader?
15    A   I was responsible for the team --
16 one of the research teams in the research group.
17    Q   And what did that research team
18 focus on?
19    A   Android applications.
20    Q   Which Android applications?
21    A   Not specific, just any.
22    Q   Did that work relate at all to
23 WhatsApp, the work of that team?
24        MR. AKROTIRIANAKIS:  Objection, vague.
25    A   Part of the team.

Page 29

1    Q   Okay.  Which part of the team
2 related to WhatsApp or did work that related to
3 WhatsApp?
4    A   You mean by number, you mean by
5 name?  What is the question?
6    Q   How many people -- why don't we
7 start with how many about people were working on
8 WhatsApp as part of the team that you led as
9 Security Research Team Leader?
10        MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12    A   Four.
13    Q   Do you recall their names?
14    A   Yes.
15    Q   Who were they?
16    A   ████████████████████████████
   ████████████████████████████
18    Q   I suspect Ailsa may want spellings
19 on those but we will just make a note and come
20 back to that.
21        And you supervised that team that was
22 working on WhatsApp during your time as Security
23 Team Research Leader.
24    A   Yes.
25    Q   And what were they doing with

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1 respect to WhatsApp?
2      A   Research application.
3      Q   Again for the purpose of developing
4 installation vectors?
5      A   I will say it is developing the
6 software required for gaining access.
7      Q   As I understand it, installation
8 vectors are software required to gain access.  Is
9 that consistent with your definition of what an
10 installation vector is?
11      MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13      A   Can you define access?  When you say
14 "access" what do you mean by access?
15      Q   You said access.  "I will say it is
16 developing the software required for gaining
17 access."  What did you mean by access?
18      A   Access to the data which resides on
19 the endpoint.
20      Q   That reside on the endpoint?
21      A   Yes.
22      Q   Meaning the target device?
23      A   Yes.
24      Q   Now we have also heard endpoint used
25 to refer to Pegasus.  Is that -- do you use

Page 31

1 endpoint in that sense or no?
2      MR. AKROTIRIANAKIS:  Objection, vague.
3      A   I use endpoint as target device.
4      Q   Okay.  And so the team that was
5 working on WhatsApp that you supervised as
6 Security Research Team Leader was investigating
7 WhatsApp in order to develop software that could
8 be used to gain access to target devices?
9      MR. AKROTIRIANAKIS:  Objection,
10 misstates his testimony.
11      A   The team was researching Android
12 related applications and services in order to gain
13 access to the endpoint data.
14      Q   Okay.  Now, you testified previously
15 that they were doing work -- you gave us the four
16 names who were doing work related to WhatsApp?
17      A   Yes.
18      Q   And what work were they doing
19 related to WhatsApp?
20      MR. AKROTIRIANAKIS:  Objection,
21 compound.
22      A   Which question do you want me to
23 answer?
24      Q   The one that you didn't answer.  I
25 said you gave us four names doing work related to

Page 32

1 WhatsApp.  You answered that question, you said
2 yes, and then I asked you "What work were they
3 doing related to WhatsApp?"  That is the question
4 I would like you to answer?
5      A   To understand how the application
6 works.
7      Q   For what purpose?
8      A   As I stated before, in order to
9 build the software that gets access to the
10 endpoint's data.
11      Q   And when you say software that gets
12 access to the endpoint's data, is that different
13 than an installation vector?
14      A   Installation vector is like -- your
15 definition for it -- the main purpose for it is to
16 gain access to endpoints data.
17      Q   That is the main purpose of an
18 installation vector?
19      MR. AKROTIRIANAKIS:  Objection,
20 misstates his testimony.
21      A   That was -- that is the purpose of
22 these types of software tools.
23      Q   And when you say this type of
24 software tools you mean installation vectors?
25      MR. AKROTIRIANAKIS:  Objection,

Page 33

1 misstates his testimony.
2      MR. PEREZ-MARQUES:  I'm just not
3 understanding your testimony.  That is why I am
4 following up.  You said:
5      "Installation vector is like -- your
6 definition of the main purpose for it is to gain
7 access to endpoint's data."
8      I am trying to understand that answer.
9 Are you saying that the purpose of an installation
10 vector is to gain access to an endpoint data.
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates his testimony.
13      A   Installation vector is just the part
14 of gaining the access.  This is not the purpose of
15 the software.
16      Q   You said "Installation vector is
17 just the part of gaining access".  Then did you
18 say "this is not the purpose of the software"?
19      A   Software is built, designed and
20 built in order to gain access to the data on the
21 endpoints or endpoint.  Installations vector --
22      Q   Are you familiar with -- and when
23 you refer to software are you referring to
24 Pegasus?
25      MR. AKROTIRIANAKIS:  Objection, vague.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1 interaction from the target.
2     Q  Was the research that your team was
3 doing during your time as Security Research Team
4 Leader for the purpose, at the least in part, of
5 developing 0 click exploits?
6     MR. AKROTIRIANAKIS:  Object to the form.
7 No foundation.
8     A  I will say it this way.  The team's
9 responsibility was to develop, research and
10 develop capabilities for installation vectors.
11 Whether it is 0 click or not is a matter of
12 capability itself.
13     Q  Did the team during the time that
14 you supervised it develop 0 click exploits?
15     A  Part of the time.
16     Q  Did that include 0 click exploits
17 that worked via WhatsApp?
18     MR. AKROTIRIANAKIS:  Object to the form
19 of the question.  Vague.
20     A  Can you explain?  What do you mean
21 by "via"?
22     Q  You have read the complaint in this
23 case?
24     A  Yes, although I don't remember the
25 exact wording.

Page 39

1     Q  Let me ask it this way.  You
2 understand that Heaven -- you are familiar with
3 the Heaven installation vector?
4     A  Yes.
5     Q  And that worked via WhatsApp, is
6 that right?  That used WhatsApp messages as part
7 of the installation?
8     MR. AKROTIRIANAKIS:  Objection, no
9 foundation.
10     A  Yes.
11     Q  And so when I say "via WhatsApp",
12 what I mean is the relationship between the
13 installation vector and WhatsApp, such as the one
14 that Heaven had.  Is that clear to you?
15     MR. AKROTIRIANAKIS:  Objection, vague.
16     A  Yes.
17     Q  And so with that clarification, did
18 the team that you supervised as Security Research
19 Team Leader develop 0 click exploits that worked
20 via WhatsApp?
21     A  It developed 0 click vectors
22 which -- one of the ways was via WhatsApp.
23     Q  Okay.  Did those vectors that they
24 developed have names?
25     A  Heaven, Eden and ERISED.

Page 40

1     Q  And so Heaven, Eden and ERISED were
2 developed by the researchers on the team that you
3 supervised as Security Research Team Leader?
4     A  Yes.
5     Q  You were promoted to -- let me ask
6 this.  What was your role in the development of
7 those vectors, Heaven, Eden and ERISED?
8     A  I was a team leader.
9     Q  And as team leader what role did you
10 have in the development of those vectors?
11     MR. AKROTIRIANAKIS:  Objection, vague.
12     A  I was responsible for the employee
13 allocation on the development procedures, research
14 procedures and development of the vector itself.
15     Q  So you are very familiar personally
16 with those exploits?
17     MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19        (Fire alarm test.)
20     THE VIDEOGRAPHER:  Going off the record.
21 The time is 10:00 a.m.
22        (A short break)
23     THE VIDEOGRAPHER:  This is the beginning
24 of media card number two, volume one, in the video
25 deposition of Tamir Gazneli.  Going on the record.

Page 41

1 The time is 10:12.
2     MR. PEREZ-MARQUES:  Mr. Gazneli, do you
3 understand you are still under oath?
4     A  Yes.
5     Q  When we broke for the fire alarm, I
6 believe we had a question pending.  I had asked
7 you whether you would agree that you are very
8 familiar personally with the Eden, Heaven and
9 ERISED exploits?
10     MR. AKROTIRIANAKIS:  Objection, vague.
11     A  I would say that I am familiar with
12 the exploits but not each and every line in the
13 code.
14     Q  But you led the team that developed
15 them, right?
16     A  Yes.
17     Q  You were promoted to Director of R&D
18 in January 2020.  Is that correct?
19     A  Yes.
20     Q  Who did you replace as Director of
21 R&D?
22     A  ████████████
23   ██ ████████████
24     A  Yes.
25     Q  What were your duties as Director of

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1 R&D?
2       A  I was leading the R&D of the entire
3 Android framework.
4       Q  Only Android?
5       A  Yes.
6       Q  Was there another -- were there
7 multiple Directors of R&D.?
8       A  Yes.
9       Q  And was your work at that time as
10 Director of R&D also focused on installation
11 vectors for Pegasus?
12       MR. AKROTIRIANAKIS:  Objection, vague.
13       A  Development of installation vectors
14 is responsibility of part of the teams, yes.
15       Q  What other responsibilities did the
16 team or teams that you supervised as Director R&D
17 have?  What other responsibilities did they have?
18       A  The development of an agent, Android
19 agent, development of the backend server and QA.
20       Q  So you mentioned Android agent,
21 backend server and QA?
22       A  Yes.
23       Q  And when you say Android agent, what
24 do you mean?
25       A  The software that resides on the

Page 43

1 target's device and collects in all the required
2 information.
3       Q  And you refer to that as the agent?
4 Is that a good shorthand for us to use today?
5       A  Yes.
6       Q  And when you say "backend server"
7 what do you mean by that?
8       A  It is a piece of software that
9 resides on the customer's infrastructure and is
10 responsible for managing the installation flow.
11       Q  Managing the installation flow?
12       A  Yes.
13       Q  Installation flow of Pegasus?
14       A  Part of Pegasus.  Not the whole
15 Pegasus.
16       Q  Which part?
17       A  For android.
18       Q  For Android.  So would you consider
19 that one version of Pegasus or how would you refer
20 to that?
21       A  It is one of the parts.
22       Q  And when you say "QA", what do you
23 mean by that?
24       A  Quality assurance.
25       Q  Quality assurance?

Page 44

1       A  Yes.
2       Q  What did the team -- what was the
3 quality assurance work that the team you
4 supervised did?
5       A  Functionality, statistics.
6       Q  Functionality of what?
7       A  Of the agent and the installation
8 flows.
9       Q  Who did you report to as Director of
10 R&D?
11       A  To the VP R&D.
12       Q  Who was that?
13       A  During that period there were three,
14 so to which period do you refer.
15       Q  Let's go through all three.
16       A  The name of the first one I don't
17 remember.  The second one was ██████████ and the
18 third one was ████████.
19       Q  During your time as Director of R&D,
20 were any researchers that you supervised working
21 on installation vectors via WhatsApp?
22       A  Yes.
23       Q  Which vectors were those?
24       A  When I was of R&D it was ERISED.
25       Q  Any others besides ERISED, during

Page 45

1 your time as Director R&D?
2       MR. AKROTIRIANAKIS:  I am going to
3 object.  That exceeds the timeframe of the court's
4 order which is the limiting factor of the witness'
5 ability to testify about the technology.
6       MR. PEREZ-MARQUES:  So is that an
7 instruction not to answer?
8       MR. AKROTIRIANAKIS:  Yes.
9       Q  ERISED was developed after January
10 2020, is that correct?
11       MR. AKROTIRIANAKIS:  Objection,
12 misstates testimony.  Also vague.
13       A  I didn't answer when it was
14 developed.
15       Q  But after January 2020, members of
16 your team were working on ERISED?
17       MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.  Also vague.
19       A  I would say that after January 2020
20 some of the team members maintained ERISED.
21       Q  And were doing work to maintain
22 ERISED in that post January 2020 period?
23       A  It depends on the specific timeframe
24 and it depends on whether it required any work to
25 be maintained.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1      Q   After January 2020, to the extent
2  work was required, work on ERISED was done by
3  members of the team you supervised?
4        MR. AKROTIRIANAKIS:  Objection,
5  foundation.
6      A   Part of the time.
7      Q   Other than ERISED, and your counsel
8  may instruct on this but I just want to have a
9  clear record, other than ERISED, in that post
10  January 2020 period, did researchers that you
11  supervised work on other installation vectors that
12  would operate via WhatsApp?
13        MR. AKROTIRIANAKIS:  You can answer to
14  the extent it is within the time period April 29,
15  2018 to May 10, 2020.
16      A   In this timeframe, no.
17      Q   And subsequent to May 2020, did
18  members of the team you supervised work on any
19  installation vectors that would work via WhatsApp?
20        MR. AKROTIRIANAKIS:  He is not able to
21  talk about timeframes after the timeframe
22  delineated in the court order?
23        MR. PEREZ-MARQUES:  So is that an
24  instruction not to answer?
25        MR. AKROTIRIANAKIS:  Yes.

Page 47

1        MR. PEREZ-MARQUES:  And you will follow
2  your counsel's instruction and decline to answer
3  as to whether members of your team worked on the
4  development of WhatsApp installation vectors after
5  May 2020?
6      A   Yes.
7      Q   In November 2022, you were promoted
8  to VP R&D, correct?
9      A   Yes.
10      Q   How did your responsibilities change
11  at that point?
12      A   Now I am leading the entire R&D of
13  the company.
14      Q   Who do you report to as VP R&D?
15      A   To the CEO.
16      Q   Would you say -- are you the senior
17  most technological employee at NSO?
18        MR. AKROTIRIANAKIS:  Objection, vague.
19      A   What do you mean by senior and what
20  do you mean by technologically capable?
21      Q   Okay.  What is your working
22  relationship with Yaron Shohat?
23        MR. AKROTIRIANAKIS:  Objection, vague.
24      A   He is my manager.
25      Q   How often do you speak?

Page 48

1      A   A couple of times per week.
2      Q   What about Omri Lavie, what is your
3  working relationship with him?
4        MR. AKROTIRIANAKIS:  Objection,
5  foundation.
6      A   Omri?
7      Q   I may be pronouncing it wrong.
8      A   Omri?
9      Q   L-A-V-I-E?
10      A   I have no --
11      Q   You don't know who that is.
12      A   I know who Omri is but I don't know
13  for sure that you are referring to the same one.
14      Q   Omri, one of the founders of NSO?
15      A   Okay.
16      Q   That is who I am referring to?
17      A   Okay.  I have no continuous
18  connection with him.
19      Q   When was the last time you spoke
20  with him?
21      A   Two months ago, one and a half
22  months ago.
23      Q   What about Ramon Eshkar?  What is
24  your working relationship with him?
25      A   He is one of the members in the

Page 49

1  management of the company.
2      Q   And how often do you speak with him?
3      A   Also a couple of times per week.
4      Q   On what types of issues?
5      A   Customer related and product
6  related.
7      Q   Do you interact with NSO or Q's
8  customers at all?
9      A   Yes.
10      Q   In what capacities and what
11  circumstances do you interact with customers?
12      A   Whenever they demand technical
13  representative.  It is not something I initiate.
14      Q   Is that for existing customers or
15  prospective customers or both?
16      A   Both.
17      Q   Do you participate in the marketing
18  of NSO's products?
19      A   No.
20      Q   So when you talk to prospective
21  customers, in what capacity are you speaking with
22  them?
23        MR. AKROTIRIANAKIS:  Objection, vague.
24      A   Can you explain "capacity"?
25      Q   For what purpose are you speaking

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1  are.
2      What was the process to develop and test
3  installation vectors in use between April 29, 2018
4  and May 10, 2020?
5      MR. AKROTIRIANAKIS:  You can answer that
6  as it relates to the category in the court's order
7  which itself is limited to, as requested by
8  counsel, "any NSO spyware targeting or directed at
9  WhatsApp servers, or using WhatsApp in any way to
10 access target devices".
11     Q  Do you have that definition in mind
12 Mr. Gazneli?  So the installation vectors I am
13 asking you about are installation vectors that
14 used WhatsApp in any way.  Do you understand that?
15     A  Yes.
16     Q  And so Heaven, Eden, ERISED would be
17 examples of such installation vectors, correct?
18     A  Yes.
19     Q  And so now I am asking you what was
20 the process to develop and test installation
21 vectors that used WhatsApp that were in use during
22 the period between April 29, 2018 and May 10,
23 2020?
24     MR. AKROTIRIANAKIS:  Objection, vague.
25 If you understand you can answer.  Also compound.

Page 67

1      A  I will try to answer based on
2  Israeli law and my restrictions because of it.
3      The process was developed in internal
4  environment, in order to be able to work on our
5  devices on which we investigated the application.
6      Q  Let me just take a step back for a
7  moment to see if I can make our terminology clear.
8  Eden, Heaven and ERISED are all installation
9  vectors that worked via WhatsApp, correct?
10     MR. AKROTIRIANAKIS:  Objection,
11 misstates his testimony.
12     A  Heaven, Eden and ERISED were
13 installation vectors that were activated via
14 WhatsApp.
15     Q  During the period April 29, 2018 to
16 May 10, 2020, were any installation vectors in use
17 besides Heaven, Eden and ERISED that were
18 activated via WhatsApp?
19     A  No.
20     Q  So those are the three, yes?
21     A  Yes.
22     Q  And am I right that NSO sometimes
23 refers to them collectively as Hummingbird?
24     A  Yes.
25     Q  And does the term Hummingbird

Page 68

1  include any vectors other than those three?
2      A  No.
3      Q  So if I refer to the Hummingbird
4  vectors, you will understand that I am referring
5  to those three?
6      A  In respect to the timeframe, yes.
7      Q  Because you are not answering as to
8  anything outside those timeframes, right?
9      A  Yes.
10     Q  And so you referred to -- when I was
11 asking you about the development, you mentioned
12 developing an "internal environment in order to be
13 able to work on our devices on which we
14 investigated the application".  What did you mean
15 by that?
16     A  I mean by -- developing an
17 environment using which you can use the WhatsApp
18 application.
19     Q  And what does that involve?  How do
20 you do that?
21     MR. AKROTIRIANAKIS:  Objection,
22 compound.
23     A  It is like -- it involves the
24 understanding of the functionality of the WhatsApp
25 ecosystem.

Page 69

1      Q  And when you say the WhatsApp
2  ecosystem, what do you mean?
3      A  All the parts that WhatsApp uses in
4  order to communicate between two peers.
5      Q  And so that does that include the
6  WhatsApp client?
7      A  Yes.
8      Q  But it would also include server
9  architecture?
10     MR. AKROTIRIANAKIS:  Objection, vague.
11     A  What do you mean by "architecture"?
12     Q  Why don't I leave the terminology to
13 you.  What else is part of the ecosystem you
14 described, besides the WhatsApp client?
15     A  As I answered before, the parts
16 which are relevant and required in order to
17 communicate between peer to peer.
18     Q  And what parts are those?
19     A  The required server functionality
20 that enables you to send messages from one side to
21 another.
22     Q  So the WhatsApp client, the server
23 functionality.  Is anything else part of the
24 ecosystem you described that enables one WhatsApp
25 clients to communicate with another?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1       A   No.
2       Q   And so as part of the development of
3   the Hummingbird installation vectors, NSO
4   investigated that ecosystem.  Is that right?
5       MR. AKROTIRIANAKIS:  Misstates his
6   testimony.
7       A   We developed an internal environment
8   that enabled us to work on our devices.
9       Q   What does that mean?
10      A   That means that we used WhatsApp
11  clients that were installed on company owned
12  devices and used the functionality that was
13  developed internally which enabled communication
14  between the clients that were used in this
15  internal environment.
16      Q   And that functionality that was
17  developed internally, that is different than the
18  WhatsApp client?
19      A   You are asking about what is
20  applied?
21      Q   I am asking you when you refer to
22  the functionality that was developed internally,
23  that is different from the WhatsApp client.  Is
24  that right?
25      MR. AKROTIRIANAKIS:  Objection,

Page 71

1   misstates his testimony.
2       A   Part of the development, as you
3   asked before, was to develop the functionality
4   that enabled us to communicate between the clients
5   that were installed on company-owned devices.
6       Q   Okay.  And when you say the clients
7   that were installed, you mean the WhatsApp
8   application?
9       A   Yes.
10      Q   Okay.  Are you familiar with the
11  term "emulator"?
12      A   Yes.
13      Q   What is an emulator?
14      A   Emulator is a software that emulates
15  the functionality of specific ecosystem framework
16  application.  It depends what you refer to.
17      Q   And as part of the development of
18  the Hummingbird vectors, NSO created an emulator
19  for the WhatsApp client.  Isn't that right?
20      A   No.
21      Q   Were any emulators used in the
22  development of the Hummingbird vector?
23      MR. AKROTIRIANAKIS:  Objection, vague.
24  Object to the form of the question.
25      A   We used Android emulator, which is

Page 72

1   like Open Source.
2       Q   Any other emulators that were used
3   in the development of the Hummingbird vectors
4   besides the Android emulator?
5       A   By saying "used" you mean?
6       Q   I am not sure how to make that
7   broader or clearer.  Used in any way in the
8   development of the Hummingbird vectors?
9       A   We developed functionality that
10  enabled to communicate, as I said before, between
11  two peers in that internal environment.
12      Q   I am not sure you are answering my
13  question though.  You referenced an Android
14  emulator, right?
15      A   Yes.
16      Q   Were any other emulators used in the
17  development of the Hummingbird vectors?
18      A   I wouldn't call it an emulator.  It
19  is a piece of code that enabled us to send
20  messages from one side, one peer in that internal
21  environment to another one.
22      Q   And the peer that you were sending
23  messages from was a piece of software created by
24  NSO?
25      A   Yes.

Page 73

1       Q   And the peer on the other side would
2   be a target's actual WhatsApp client?
3       MR. AKROTIRIANAKIS:  Objection,
4   misstates testimony.
5       A   The software on the endpoint in the
6   internal environment was WhatsApp client.  It was
7   customized to be used for the internal
8   environment.
9       Q   And in what respect was it
10  customized, the WhatsApp client on the endpoint,
11  in the testing environment?
12      A   It used the connection to the
13  WhatsApp server which was deployed internally.
14      Q   So was there, in effect, a copy of
15  the WhatsApp servers within NSO's system?
16      A   No.
17      Q   So what do you mean when you say it
18  was deployed internally?
19      A   It is not a copy.  It is a software.
20  It supports and uses only the relevant parts that
21  the capability required for communication.
22      Q   But it is designed to replicate the
23  functionality of WhatsApp's servers, in pertinent
24  part?
25      A   We don't have access to WhatsApp

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1     Q   Why can't you describe the research
2 techniques?
3     A   Because, as my counsel stated, I am
4 restricted by Israeli law to talk about it.
5     Q   So there is nothing further that you
6 are willing to testify as to the research
7 techniques that went into identifying
8 vulnerabilities in WhatsApp client?
9         MR. AKROTIRIANAKIS:  Objection.
10    A   It doesn't have anything to do with
11 willingness. I am restricted by Israeli law to
12 talk about it.
13        MR. AKROTIRIANAKIS:  I will object to
14 the form of that question.  If you want to ask him
15 questions he can tell you whether he can testify
16 about or not.  I think it is a fair question.  It
17 is the way you just stated it.
18    Q   My fundamental question is how did
19 the R&D team at NSO go about finding
20 vulnerabilities in the WhatsApp client?
21    A   They researched the activity of the
22 WhatsApp client in order to find flaws and to
23 build the installation vectors which, as I said,
24 is built to eventually deliver the agent payload.
25    Q   How did the team research the

Page 143

1 activity of the WhatsApp client?
2     A   What does the question refer to in
3 how?
4     Q   That is my question.  How did they
5 do that?  You said they researched the activity of
6 the WhatsApp client.  How did they do that?
7     A   So I will get back to the
8 explanation about the ecosystem we built
9 internally.  We built internal ecosystem of
10 WhatsApp server that enabled us internally to send
11 messages between two peers between customer owned
12 devices, and having this ability enables us to
13 research the activity of the WhatsApp client.
14    Q   How did you know how to build that
15 internal ecosystem?
16    A   What do you mean by how?
17    Q   How did you determine what the
18 characteristics of that internal ecosystem should
19 be in order to operate like a WhatsApp client?
20    A   We have the client and we have the
21 server between them.
22    Q   And so how do you go from having the
23 client to building an ecosystem that replicates
24 it?
25    A   So as a researcher, especially in

Page 144

1 Android, you have the ability to gain the
2 routabilities on any Android devices.  These
3 abilities are stated for anyone using the web.
4 Whenever you have route access on a device, you
5 have the ability to monitor the traffic that is in
6 and out the monitored device, and then you have
7 access to the traffic from peer to peer.  Using
8 this knowledge you can use it to build the
9 ecosystem which is required for this activity.
10    Q   Is there anything else that the NSO
11 R&D team did to find vulnerabilities in the
12 WhatsApp client?
13    A   We, the R&D research group, used all
14 the tools it should use in order to be able to
15 find the vulnerabilities.
16    Q   What are those tools?
17    A   Basically, there are two types of
18 tools, called IDA and JEB.
19    Q   Can you spell those?
20    A   I-D-A.
21    Q   And what was the other?
22    A   J-E-B.
23    Q   And what is IDA?
24    A   These are tools available for
25 procurement -- anyone can buy it -- which enable

Page 145

1 you to analyze code.
2     Q   What is the difference between IDA
3 and JEB?
4     A   IDA enables you to analyse native
5 code and JEB analyzes Java code.
6     Q   Other than using those two tools,
7 what else did the R&D team do to find
8 vulnerabilities in the WhatsApp client?
9     A   As I said before, it monitored the
10 transmission between peer to peer as for the
11 communication, in order to understand the
12 responses and the message content that should be
13 sent from side to side.
14    Q   Through that testing, did NSO
15 develop an understanding of the functioning of
16 WhatsApp's servers that were involved in the peer
17 to peer transmission?
18        MR. AKROTIRIANAKIS:  Objection,
19 misstates his testimony.
20    A   Through this activity the aim was to
21 find vulnerability on the Android ecosystem, and
22 then find a way to make it work remotely.
23    Q   With respect to that second part of
24 making it work remotely, through its internal
25 testing, did NSO develop an understanding of how

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

1 WhatsApp's servers functioned in connection with
2 peer to peer communications?
3      A   As for the terminology functions,
4 I will say that we worked to understand what are
5 the limitations in terms of sending messages from
6 peer to peer.
7      Q   What do you mean by that?  What are
8 the limitations in terms of sending messages peer
9 to peer?
10      A   What are the messages and the
11 content of messages that can be sent from peer to
12 peer.
13      Q   As part of this work did NSO
14 researchers reverse engineer any WhatsApp code?
15      MR. AKROTIRIANAKIS:  Objection, vague.
16      A   Do you want to define what reverse
17 engineering is?
18      Q   What do you understand reverse
19 engineering to mean?
20      A   I would say that using these tools I
21 talked about, IDA and JEB, the research group had
22 the ability to understand how the code functions,
23 some of the parts.
24      Q   Mm hmm.  What do you understand
25 reverse engineering to mean?

Page 147

1      MR. AKROTIRIANAKIS:  Objection, no
2 foundation.
3      A   I would talk about the aim of this
4 activity, and the aim is to learn the mechanisms
5 and the way client functions.
6      Q   And that is something NSO's research
7 group did with respect to WhatsApp client, as part
8 of the development of the Hummingbird vectors?
9      A   Yes.
10      MR. PEREZ-MARQUES:  Why don't we pause
11 here and grab lunch and then we can resume.
12      THE VIDEOGRAPHER:  Going off the record.
13 The time is 13:02.  End of media card number
14 three, volume one, of the video deposition of
15 Tamir Gazneli.
16          (Break for lunch.)
17      This is the beginning of media card
18 number four, volume one, in the video deposition
19 of Tamir Gazneli.  Going on the record.  The time
20 is 13:52.
21      MR. PEREZ-MARQUES:  Mr. Gazneli, do you
22 understand you are still under oath?
23      A   Yes.
24      Q   Before we broke we were talking a
25 bit about the research and development that went

Page 148

1 into the development of the Hummingbird vectors.
2 Do you recall that generally?
3      A   Yes.
4      Q   At one point in that examination you
5 said that there were issues that you couldn't
6 discuss because of your understanding of Israeli
7 legal restrictions.  Is that right?
8      A   I was addressing to specific
9 research techniques.
10      Q   The specific research techniques you
11 understand yourself not to be at liberty to
12 discuss?
13      A   I am not allowed to discuss here.
14      Q   When you say you are not allowed,
15 that is because of Israeli law, as you understand
16 it?
17      A   Yes.
18      Q   Is it a specific Israeli law that
19 you are referring to?
20      A   To the restrictions.  I don't know
21 specifically.
22      Q   The Defense Expert Control Act.
23 Okay.  Not a specific order in this case but the
24 expert control law generally.
25      A   Yes.

Page 149

1      Q   So when you were describing the
2 research that went into the development of the
3 Hummingbird vectors, there is an aspect of the
4 research techniques that you have not included in
5 your testimony.  Right?
6      MR. AKROTIRIANAKIS:  Objection,
7 misstates his testimony.
8      A   Pardon?  I talked about my
9 disability in terms of defining the specific and
10 in-depth techniques of research.
11      Q   And those research techniques that
12 went into the development of the Hummingbird
13 vectors, you are not at liberty to discuss?
14      A   Yes, I am not allowed to discuss.
15      Q   You also testified early in the day
16 about having reviewed some code as part of your
17 preparation to testify here today?
18      A   Yes.
19      Q   And I believe you said it was
20 fingerprinting or related to fingerprinting?
21      A   Yes.
22      Q   Was that in connection with a
23 particular Hummingbird vector?
24      A   No.  I said that it was around the
25 timeframe, the relevant timeframe.

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

```
1      A  Yes.
2      Q  Did you have any role in preparing
3  this document?
4      A  No.
5      Q  Do you know approximately when it
6  was prepared?
7      A  Not the exact date but if I remember
8  right it was around the beginning of 2018.
```



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-279-9424              www.veritext.com              212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1      A   Okay.  Yes, in this step, yes.
2      Q   In this context.  The second payload
3   you mentioned, so the one that came before
4   download of the agent, that enables the privilege
5   escalation, does that payload have a name?
6      A   It is referred as PE, which is
7   acronym of privilege escalation.
8      Q   Got it.  Where does the agent
9   payload come from to be downloaded on to the
10   device?
11      A   From servers which are under
12   customer's custody, the ecosystem of
13   infrastructure that is deployed.
14      Q   Those are part of the anonymized
15   servers established by NSO as part of the
16   anonymizing transmission network for a customer?
17      A   Yes.

Page 183

Page 184

Page 185

6      Q   My question was different.  I asked
7   you in a normal WhatsApp voice call, one WhatsApp
8   user calls another WhatsApp user, that would be a
9   WhatsApp client on both sides.  Right?
10      A   Yes.
11      Q   And so what NSO is doing as part of
12   the Heaven and Eden exploits was different than
13   that.  Right?
14      MR. AKROTIRIANAKIS:  Objection,
15   misstates testimony.
16      Q   Because on one side of the call
17   wasn't a WhatsApp client, right?
18      A   There was code which was able to
19   send messages using WhatsApp client on one side
20   source to the second endpoint which is target's
21   WhatsApp client.
22      Q   Right, but as we have talked about
23   at length already, on the source side it is not a
24   WhatsApp client, right?  It is the WIS which NSO
25   created, correct?



47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1      A  I would clarify.
2          Q  Can I just get a yes or no to that
3  so we are all on the same page?
4      A  The answer is no.
5          MR. AKROTIRIANAKIS:  He is going to
6  answer the question --
7          Q  Go ahead then.
8      A  Go ahead with the question.  The
9  question was --
10         Q  You were going to answer.  On the
11 source side, it is not a WhatsApp client, it is
12 the WIS which NSO created.  Isn't that correct?
13         A  The messages are built and sent from
14 the WIS client.  These messages have to be sent
15 from an application.  Client is notified, which he
16 uses to connect to the application and sends the
17 messages through a real and active client.
18         Q  Through an active WhatsApp account?
19     A  Yes.
20         Q  And whose account would that be?
21     A  Accounts were established for the
22 customer.
23         Q  So the message is generated by the
24 WIS?
25     A  Yes.

Page 187

1          Q  But it is put into the WhatsApp
2  servers by an actual WhatsApp client?
3      A  WIS has a connection to a client
4  which is activated through the normal procedures
5  of client activation.
6          Q  Meanings it uses like an
7  authentication token from an actual account?
8          MR. AKROTIRIANAKIS:  Had you completed
9  your answer before he --
10     A  No.
11         Q  Go ahead.
12     A  WIS crafts messages which are
13 required to initiate the call and test
14 connectivity with the client which was activated
15 for each and every customer.  It was connected to
16 the WhatsApp system as a normal client because it
17 is a normal client, and sent, and the message is
18 sent by normal client from one peer to a normal
19 client that target's device.
20         Q  And so in addition to the WIS there
21 is a stand-alone client, genuine WhatsApp client
22 on the source side of this transmission?
23     A  Yes.
24         Q  And so the message is created by the
25 WIS but transmitted through that WhatsApp client?

Page 188

1      A  Yes.
2          Q  And when you said it has
3  connectivity, the WIS has connectivity to a
4  genuine WhatsApp client, what did you mean by
5  that?
6      A  I mean that it has to be -- it has
7  to have a way to connect the target and send the
8  message to the target.
9          Q  So the WIS is able to send the
10 message it created through that WhatsApp client?
11     A  Yes.
12         Q  Got it.  And that WhatsApp client on
13 the initiating side would be one that -- an
14 account that NSO created?
15     A  As part of deployment, each customer
16 has his own set of WhatsApp clients that were used
17 for this operation.
18         Q  Created by NSO, right?
19     A  Yes.
20         Q  Through the White Services team?
21     A  Yes.
22         Q  And those would be anonymized as
23 well?
24     A  Yes, as part of the operation
25 requirements for the customer to be anonymized.

Page 189



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 190

Page 192

Page 191

Page 193

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1    Q  And what purpose does that serve in
2  the installation flow?
3        MR. AKROTIRIANAKIS:  Objection, assumes
4  facts not in evidence.  Misstates his testimony.
5  No foundation.
6        A  So I don't recall for which specific
7  step it was used.
8        Q  Is that something we would be able
9  to see from the source code?
10       A  I think so.
11       Q  And the non-standard encryption that
12  is referred to, again that is a message that is
13  different than what would be sent from a regular
14  WhatsApp client?
15       A  Again, it really depends on the
16  changes described here.  It can be even the fact
17  that you enable using encryption in the WhatsApp
18  client currently is not supporting the encryption
19  also may be relevant for this case.
20       Q  Would I have --
21       A  It is difficult to understand from
22  this context whether it refers to encryption that
23  is the encryption itself is not standard or the
24  usage of encryption was not standard.
25       Q  Okay.  You are also prepared to

Page 203

1  testify as to the full functionality of Pegasus,
2  right?
3        A  Yes, as I said before, I don't
4  recall the specific part which was used.
5        Q  So we would need the source code for
6  that?
7        A  Yes.
8        Q  If I wanted to send a message from
9  my WhatsApp that is encrypted in a non-standard
10  way, can I do that?
11       MR. AKROTIRIANAKIS:  Objection, no
12  foundation.
13       A  No.
14       Q  No, right.  So that is something
15  that was done by WIS?
16       A  Yes.



Page 204

7        Q  But those are not the only ways in
8  which WIS does not behave exactly like a
9  legitimate WhatsApp client, is it?
10       MR. AKROTIRIANAKIS:  Objection,
11  misstates his testimony.
12       A  We are currently referring to the
13  sentence.
14       Q  But that is not the only way WIS is
15  different from a legitimate subscriber of
16  WhatsApp, right?
17       MR. AKROTIRIANAKIS:  Objection,
18  misstates his testimony.
19       A  As we said now, WIS server enables
20  you to send crafted messages with crafted content
21  which is required to enable the remote execution
22  ability on the target's phone or WhatsApp client.
23       Q  I doubt she got a word of that.  Why
24  don't you say it again, see if we can get that
25  down before we go to the next question.

Page 205

1        A  I was saying that --
2        Q  Let me repeat the question in case
3  it helps her or you.  I am not sure it is relevant
4  to your answer but let me ask it.  That feature
5  here, that it only sends specific messages, that
6  is not the only way the WIS is different from a
7  legitimate subscriber of WhatsApp, is it?
8        MR. AKROTIRIANAKIS:  Same objections.
9        A  So my answer was WIS server
10  implements and enables to craft end messages and
11  content that is required for the installation
12  phase or gaining remote code execution on the
13  target's WhatsApp client.
14       Q  And those messages are different
15  than the messages that would be sent by a regular
16  WhatsApp subscriber, right?
17       A  If by "regular" you mean one that
18  holds device in hand, the answer is yes.
19       Q  It adds a sixth relay server, yes?
20       A  Yes.
21       Q  It encrypts the message in a
22  non-standard way, right?
23       A  Yes.
24       Q  Are there other ways in which the
25  messages sent by WIS are different from what would

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 206

1  be sent by a legitimate WhatsApp subscriber?
2       A   There are additional messages were
3  sent.  I can't recall whether each and every one
4  is legitimate or not.
5       Q   You don't remember one way or the
6  other?
7       A   As you said there are messages which
8  differ in content and in sequence from the
9  legitimate usage, but I cannot say that the
10  illegitimacy is relevant for each and every
11  message which is sent.

Page 208

Page 207

Page 209

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 238

Page 239

5      Q   We are looking at that -- why don't
6  we take a look at this quickly.
7      (Exhibit 2034 marked for identification.)
8      This is 2034, and it is another
9  Confluence document labeled "Abuse Prevention" on
10  the Bates starting NSO_WHATSAPP ending 8916.  Do
11  you see that?  I am not going to ask you any
12  questions about the parts that you don't want me
13  to ask you questions about.
14      MR. AKROTIRIANAKIS:  I'm just going to
15  point out for the record that 2033 and 2034, the
16  document just presented to the witness have been
17  clawed back and replaced with an overlay.  So I am
18  going to ask you again to follow the protective
19  order in respect of the documents that you put --
20      MR. PEREZ-MARQUES:  Do you have the
21  overlay version I can put to the witness?
22      MR. AKROTIRIANAKIS:  I can ask for it to
23  be sent but it has been provided days ago to your
24  team.
25      MR. PEREZ-MARQUES:  Okay.

Page 240

1      MR. AKROTIRIANAKIS:  So here's my
2  request.  In what the court reporter attaches to
3  the transcript you should not be using documents
4  that have been clawed back.  That would be a
5  violation of the protective order.  So if we can
6  get a different version of this that is from the
7  overlay and mark it and stipulate that that will
8  be the version of Exhibit 2033 and 2034 that is
9  attached to the transcript, then fine, and with
10  respect to these versions your obligations are
11  described in the protective order.
12      MR. PEREZ-MARQUES:  Let's discuss that
13  when we are off the record.
14      MR. AKROTIRIANAKIS:  We just discussed
15  it.  There is no further discussion.
16      MR. PEREZ-MARQUES:  Let's go off the
17  record then.
18      MR. AKROTIRIANAKIS:  I don't need to go
19  off the record.
20      MR. PEREZ-MARQUES:  I would like to go
21  off the record.
22      MR. AKROTIRIANAKIS:  Okay.  If you want
23  to go off the record go ahead.  You have my
24  permission.
25      MR. PEREZ-MARQUES:  Thank you. I don't

Page 241

1  need your permission.
2      MR. AKROTIRIANAKIS:  You do actually.
3  Both counsel have to agree to go off the record,
4  but you have my permission, Tony, so we don't need
5  to fight about it.
6      MR. PEREZ-MARQUES:  Excellent. Let's go
7  off the record.
8      THE VIDEOGRAPHER:  Going off the record.
9  The time is 16:15.
10      (A short break.)
11      THE VIDEOGRAPHER:  Back on the record.
12  The time is 16:16.
13      MR. PEREZ-MARQUES:  We had a discussion
14  off the record about how to deal with these
15  clawback documents which I believe we are agreed
16  on and so we will implement that at the end of
17  today's session.  Exhibit 2034 that I showed you,
18  Mr. Gazneli, is titled "Abuse Prevention".  Do you
19  see that.
20      A   Yes.
21      Q   But if you look at the content of
22  this document, it refers to operational security
23  issues.  Isn't that fair?
24      MR. AKROTIRIANAKIS:  Object to the form
25  of the question.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1 to the vulnerabilities part, it is the research
2 team.
3      Q   For which part?
4      A   Vulnerabilities part.
5      Q   Is the research team?
6      A   Yes.
7      Q   And what process would they
8 undertake to update the Hummingbird vectors in
9 response to WhatsApp updates?
10      A   Download the new version to the
11 internal ecosystem, execute the installation flow
12 and, if it works right, just update the version
13 numbers supported and if not then to be adjusted
14 accordingly to the changes that were done in the
15 application.
16      Q   And so even if no change was
17 required you would update the version number of
18 Pegasus?
19      A   Yes.
20      Q   And would IDA and JEB be used as
21 part of that updating process?
22      A   It depends what was updated and what
23 has to be done in order to adjust to it.
24      Q   So with respect to some updates,
25 yes?

Page 247

1      A   Some updates.
2      MR. AKROTIRIANAKIS:  Object to the form
3 of the question.
4      Q   Let's do tab 32, please.  By the
5 way, Mr. Gazneli, we talked earlier about the
6 information that Pegasus allows a customer to
7 access from a target device.  Do you recall that
8 generally?
9      A   Yes.
10      Q   Is that generally the same
11 information that you could access if you had a
12 password to the device?
13      A   Password in terms of --
14      Q   Mm hmm.
15      A   -- physical access to the device?
16      Q   Yes?
17      A   Yes.
18      Q   This is going to be Exhibit 2036.
19      (Exhibit 2036 marked for identification)
20      Exhibit 2036 is a WhatsApp chat between
21 Terry DiVittorio and Greg Rose.  Are you familiar
22 with those names?
23      A   No.
24      MR. AKROTIRIANAKIS:  Do you mind if I
25 get a copy.

Page 248

1      MR. PEREZ-MARQUES:  Sure.  Are you
2 familiar with those names --
3      A   No.
4      Q   The date of this exchange is May 1,
5 2018.  Do you see that?
6      A   Yes.
7      Q   In the third message down
8 Mr. DiVittorio says:
9      "We are likely losing 0 click on both
10 platforms, Android and iOS."
11      Do you see that?
12      A   Yes.
13      Q   What does that refer to?
14      MR. AKROTIRIANAKIS:  Objection, no
15 foundation.
16      Q   Do you recall?
17      A   I don't know these persons.
18      Q   Forget the people.  Do you recall an
19 instance around May 2018 when NSO was unable to
20 use the Hummingbird vectors on Android?
21      A   As I said WhatsApp, were releasing
22 versions every once in two weeks so there might be
23 occurrences once in a while where the support
24 might be broken.
25      Q   You understand you have been

Page 249

1 designated, subject to your counsel's objections,
2 as to the impact of the April 2018 WhatsApp update
3 on the relevant spyware?
4      MR. AKROTIRIANAKIS:  He is not
5 designated for that.  What category is that?
6      MR. PEREZ-MARQUES:  It is topic 28,
7 which is one of the ones you recited at the
8 outset.
9      MR. AKROTIRIANAKIS:  The designation is
10 "Efforts to develop new covert lawful intercept
11 technologies during the time period at issue in
12 this case that could be used with respect to
13 Android devices."
14      MR. PEREZ-MARQUES:  Okay.  So you are
15 not prepared to offer anything with respect to the
16 impact of the April 2018 WhatsApp update on the
17 relevant spyware?
18      MR. AKROTIRIANAKIS:  He is designated as
19 stated.
20      MR. PEREZ-MARQUES:  So you are
21 designated, subject to your counsel's objections,
22 on topic 28, right?
23      A   Yes.
24      MR. AKROTIRIANAKIS:  He is designated
25 exactly as I just read it into the record.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

1        MR. PEREZ-MARQUES:  You are also
2  designated on topic 29, defendant's efforts to
3  circumvent the April 2018 WhatsApp update?
4        MR. AKROTIRIANAKIS:  The designation in
5  respect of Exhibit 29 is defendant's efforts to
6  develop new covert lawful intercept technologies
7  during the time period at issue in this case that
8  could be used with respect to Android devices.  It
9  is the same designation.
10       MR. PEREZ-MARQUES:  Okay, and so that is
11 a yes, you are designated on that topic?
12       A  Yes.
13       Q  And so do you recall in May 2018 the
14 vectors losing their functionality, the
15 Hummingbird vectors?
16       A  As I said, if you wanted to
17 introduce me the exact change that was done then I
18 can address the question, but as I said, version
19 was released every two weeks, so whether it is
20 relevant to the exploitation or not, things may be
21 changed and need to be addressed, so I cannot
22 recall the exact specific changes that happened on
23 that version.
24       Q  Is it right to assume that most
25 WhatsApp updates did not compromise the

Page 251

1  functionality of the vectors?
2        MR. AKROTIRIANAKIS:  Objection,
3  over-broad.  Compound.
4        A  No.
5        Q  No?  Many of them did?
6        A  Yes.
7        Q  The majority did?
8        A  I don't know the exact distribution.
9        Q  You said it wasn't right to say most
10 didn't compromise the vectors?
11       A  Most, as my understanding, more than
12 80%.
13       Q  Did more than half of the WhatsApp
14 updates --
15       A  It depends.
16       Q  -- compromise the vectors?
17       A  It depends on the vector.
18       Q  In those instances up to the time
19 period at least of May 2019, when a WhatsApp
20 software update compromised the functionality of
21 the Hummingbird vectors, NSO was able to find a
22 way to restore their functionality.  Isn't that
23 right?
24       A  Yes.
25       Q  Let's take a look at the next

Page 252

1  exhibit.  One more question on this.  Greg Rose
2  asked for how long, any estimates, and DiVittorio
3  says "Smodi doesn't know".  Do you know who Smodi
4  is?
5        A  Smodi is Uri Somorudiniski if I
6  remember right and pronounce right.  He was some
7  kind of VP R&D or CTO at that point.
8        Q  For NSO?
9        A  Yes.
10       Q  Okay.  Let's do the next one.
11       (Exhibit 2037 marked for identification.)
12       This will be 2037, which is a WhatsApp
13 chat between various participants on July 9, 2018.
14 Do you see that?
15       A  Okay, yes.
16       Q  The second page includes a message,
17 the third one down, from Yossi Monsingo.  Do you
18 see that?
19       A  Yes.
20       Q  Do you know who that is?
21       A  Yes.
22       Q  Who is that?
23       A  I don't recall his exact position at
24 that same time but he worked in customer facing or
25 NOC.

Page 253

1        Q  Like customer support of some kind?
2        A  Yes.
3        Q  Not a member of the R&D team?
4        A  No.
5        Q  And he writes -- his message
6  includes an update that WhatsApp released a new
7  version two days ago that is not yet supported but
8  probably tomorrow R&D will release a new package.
9  Do you see that?
10       A  Yes.
11       Q  And that again reflects NSO updating
12 its installation vectors in response to software
13 updates from WhatsApp?
14       A  Yes.
15       Q  And the two or three day timeframe,
16 is that typical of how long it would take the R&D
17 department to update the vectors in response to a
18 WhatsApp update.
19       MR. AKROTIRIANAKIS:  Objection,
20 over-broad.
21       A  No.
22       Q  How long would be typical?
23       A  It depends on the changes.
24       Q  What would the range be?
25       A  It may be from one day to half a

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 year.
2      Q   This was previously marked as
3 Exhibit 2007, which is a WhatsApp message between
4 various participants on December 5, 2018.
5      A   Yes.
6      Q   It states in the second message
7 down:
8          "WhatsApp has made changes in their
9 servers that currently fail all installations and
10 can cause crashes that risk the Hummingbird
11 vector."
12         Do you see that?
13     A   Yes.
14     Q   And do you recall in December 2018 a
15 WhatsApp update that caused all Hummingbird
16 installations to crash?
17     A   Yes.
18     Q   What do you recall about that?
19     A   I recall that that specific change
20 was around our ability to end that specific relay
21 server that we talked about previously, and
22 controlling the target's WhatsApp client to choose
23 that specific relay server for communication.
24     Q   And the reference here, when it says
25 "can cause crashes that risk the Hummingbird

Page 255

1 vector", that relates back to what we saw in the
2 OpSec document about crashes potentially
3 generating logs that would be reviewed by
4 WhatsApp?
5      MR. AKROTIRIANAKIS:  Objection, no
6 foundation.
7      A   This relates to crashes that after
8 the change may occur on the target's devices.
9      Q   And the reason they would risk the
10 Hummingbird vector is potentially, among other
11 reasons, because they could be reviewed by
12 WhatsApp, the crash logs?
13     MR. AKROTIRIANAKIS:  Objection,
14 misstates testimony.
15     A   They are uploaded to the server of
16 the vendor and whether they review them or not is
17 their decision to make.
18     Q   It states on the next page, a few
19 lines down, that the team is working on a solution
20 in top priority hoping to provide a solution ASAP.
21 That is signed ████████ and ████████  Do you know
22 who those are?
23     A   Yes.
24     Q   Who are they?
25     A   ████ was -- which year?

Page 256

1      Q   December 2018?
2      A   Let me look back to my years.  Okay.
3 ████ back then was the Director of Android R&D.
4      Q   Android R&D?
5      A   Yes.  ████ was product manager and
6 also ████████ was her team leader.
7      Q   As a product manager as well?
8      A   Yes.
9      Q   For which product?
10     A   If I remember right, for the entire
11 Pegasus, and ████ was for Android.
12     Q   So ████████████████████████
13     A   He was my manager.
14     Q   So you reported to him?
15     A   Yes.
16     Q   Did the NSO R&D team in fact work on
17 a solution to restore the Hummingbird vectors
18 after this December 2018 update?
19     A   Yes.
20     Q   And was that successful, that
21 effort?
22     A   That was Eden.
23     Q   So Heaven was made not operational
24 by the December 2018 update.  Is that right?
25     A   Yes.

Page 257

1      Q   And subsequently NSO released Eden?
2      A   Yes.
3      Q   If we look at -- I am going to show
4 you another document.  This is 2038.
5      (Exhibit 2038 marked for identification)
6          This is a WhatsApp chat on January 15,
7 2019 among various participants.  In the first
8 message someone named ████ says in the last line:
9          "Bottom line, Eden works fine on S3 and
10 can be demonstrated" with a sort of smiley
11 emoticon.  Do you see that?
12     A   Yes.
13     Q   What is S3.
14     A   Sales 3.
15     Q   What is sales 3?
16     A   It is an infrastructure for making
17 demonstrations for our services.
18     Q   And is this the approximate timing
19 of when Eden became ready for use at least for
20 demonstration purposes.
21     A   For demonstration, yes.
22     Q   And then when did Eden go live for
23 use by customers?
24     A   If I remember right, about a month
25 after.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

1    Q   So this reflects NSO's fix or
2 response to the problem that was created by the
3 December 2018 update?
4    A   This is we doing our job to
5 delivering the customers the software they needed.
6    Q   Right.  So after the December 2018
7 update, NSO customers couldn't use the 0 click
8 Android installation vectors, right?
9    A   Right.
10    Q   And Eden, once it was released,
11 allowed them to do so again, right?
12    A   Right.
13    Q   And between Heaven and Eden was
14 there any other -- was there any 0 click Android
15 installation vector in operation?
16    A   No.
17    Q   How did Eden differ from Heaven?
18    A   The main difference was in the
19 installation flow that in Eden we had to use --
20 the transmission of the data between the source
21 and the target, WhatsApp client, needs to go
22 through WhatsApp server relay servers.
23    Q   And how was -- I am sorry -- so in
24 Eden --
25    A   Yes.

Page 259

1    Q   -- the transmission had to go
2 through WhatsApp relay servers?
3    A   Yes.
4    Q   Okay, and that was not the case with
5 respect to Heaven?
6    A   Right.
7    Q   Was that the only difference between
8 Heaven and Eden?
9    A   This is the major difference.
10    Q   In terms -- do you recall we spent
11 some time earlier today walking through the steps
12 of an installation attack using the Hummingbird
13 vectors.  Do you recall that?
14    A   Yes.
15    Q   And does that description we were
16 walking through apply to Eden as well?
17    A   Except the fact that -- except the
18 part that talked about controlling the relay
19 servers adding one to the list and directing the
20 target WhatsApp client to select a specific one.
21    Q   And so what did Eden do instead?
22    A   It just couldn't anymore change the
23 way the target selects the relay servers,
24 therefore it used -- the communication was done
25 through the WhatsApp relay servers in order to

Page 260

1 deliver the payloads required for the remote code
2 execution part.
3    Q   Would that be the stager?
4    A   The payload of stager was the same
5 in Heaven and Eden.  The part that changed was the
6 part that delivered the stager to --
7    Q   Right, so I think you testified
8 earlier that with Heaven the stager was downloaded
9 from a non-WhatsApp server.  Is that right?
10    MR. AKROTIRIANAKIS:  Objection,
11 misstates testimony.
12    A   No.  No.  I stated that the
13 privilege escalation payload --
14    Q   Got it.  So the stager even under
15 Heaven was delivered via a WhatsApp message?
16    MR. AKROTIRIANAKIS:  Counsel, I know it
17 is getting long in the day, but you've got to let
18 him finish his answers.
19    A   In Heaven the stager payload was
20 delivered using WhatsApp messages, yes.
21    Q   Okay.  And in Eden the stager
22 payload was also delivered via WhatsApp message?
23    A   Yes.
24    Q   And in Heaven the PE payload was
25 delivered not through WhatsApp servers, right?

Page 261

1    A   Right.
2    Q   And under Eden was the PE payload
3 delivered via WhatsApp servers?
4    A   No.
5    Q   So what is the difference?
6    A   The difference is that in Heaven the
7 stager payload is delivered using WhatsApp
8 messages that go through non-WhatsApp relay
9 servers, and in Eden the same payload is delivered
10 using WhatsApp messages that go through WhatsApp
11 relay servers.
12    Q   Got it.  So the distinction is with
13 respect to through which servers the stager
14 payload is delivered?
15    A   Which relay servers, yes.
16    Q   Which relay servers, got it.
17 I think you said that was the principal difference
18 between Heaven and Eden.  Are there any other
19 important differences?
20    A   Not important enough that I
21 remember.
22    Q   Nothing else that you remember?
23    A   No.
24    Q   Based on your preparation, nothing
25 else that you are aware of?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

1    A  No.
2    (Exhibit 2039 marked for identification.)
3    Q  This is Exhibit 2039, which is a
4 WhatsApp chat from May 12, 2019.  Again various
5 participants.  In the second page ████████ has
6 a message.  Who is Mr. ████?
7    A  He was, if I am right, at that stage
8 presales employee.
9    Q  Presales?
10    A  Yes.
11    Q  He says in the sort of third
12 paragraph down:
13    "So bottom line, Eden has finished its
14 duty with us as a patch was done on the server
15 side with the application it works with."
16    Do you recall this event?
17    A  Yes.
18    Q  And what does that refer to?  What
19 is the event that is being described here?
20    A  Closure of ability to trigger the
21 vulnerability on the target's WhatsApp client.
22    Q  So this reflect WhatsApp's
23 remediation of the exploit that is described in
24 the complaint?
25    MR. AKROTIRIANAKIS:  Objection, calls

Page 263

1 for a legal conclusion.  No foundation.
2    A  It refers to changes that were done,
3 whether on the server side and the client side, in
4 order to prevent us from triggering the
5 vulnerabilities.
6    Q  And so after this point, after that
7 update in May 12 or around May 12, 2019, was NSO
8 able to use Eden after that point?
9    A  No.
10    Q  In the next paragraph down he said:
11    "I heard some sales managers talking in
12 a dramatic way.  Your job is to make sure they
13 remember that along the years NSO has proven time
14 after time that one of its biggest value is the
15 ability to 'survive' this harsh environment of the
16 cat and mouse game."
17    Do you see that.
18    A  Yes.
19    Q  What does that refer to?
20    MR. AKROTIRIANAKIS:  Objection, no
21 foundation.
22    A  This is a domain that you are not in
23 control how long your capability will prolong at
24 least for total control, and that is why he quotes
25 cat and mouse game.  The ecosystem that you were

Page 264

1 working or acting makes changes eventually, forces
2 you to adjust it.
3    Q  So NSO designs an exploit, the
4 exploit gets shut down.  NSO designs another,
5 right?
6    MR. AKROTIRIANAKIS:  Objection,
7 misstates his testimony.
8    Q  Is that generally the cat and mouse
9 game?
10    MR. AKROTIRIANAKIS:  Misstates
11 testimony.
12    A  This is the domain that you have to
13 stay -- to keep and find new vulnerabilities after
14 the systems get changed.
15    Q  That is just inherent to the domain
16 in which NSO operates, right?
17    A  Yes.
18    Q  When something gets shut down, you
19 have to work to develop another?
20    MR. AKROTIRIANAKIS:  Objection,
21 misstates his testimony.
22    A  Eventually you have to provide --
23 you want to provide the 1 click and 0 click
24 solutions to customers, and it doesn't relate to a
25 specific service or application.

Page 265

1    Q  And at this point in May 2019 when
2 the WhatsApp update prevented Eden from working
3 did NSO have any 0 click Android solutions?
4    A  No.
5    Q  Did the R&D group subsequently find
6 another 0 click installation vector for Android
7 devices?
8    A  Yes.
9    Q  What was that?
10    A  ERISED.
11    Q  When was ERISED approved for
12 production?
13    A  I don't recall the exact date.
14    Q  If we back to the exhibit we were
15 looking at, in that same message from ████████ he
16 says:
17    "R&D are working hard on different
18 directions.  Hopefully we will have good news
19 soon, but please remember that our technological
20 status is still great as we as a company have the
21 resources to find something new in a relatively
22 short time."
23    Do you agree with his statement, sir?
24    A  He was optimistic.
25    Q  Is it accurate that at this point,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

1 in May 2019, NSO's R&D group was working hard on
2 potential solutions to restore 0 click capability?
3     A  As a research group and development
4 team, you constantly work on research in order to
5 find possible ways, rapid solutions.  As I
6 explained before, eventually we are producing a
7 product for customers.
8     Q  And that is still true today, right?
9     MR. AKROTIRIANAKIS:  Objection, vague.
10     A  This is our business.
11     Q  So you don't remember when ERISED
12 was approved for production?
13     A  No, not the exact time.
14     Q  Do you remember when ERISED began to
15 be used by customers, approximately?
16     A  It is really not an exact time.  I
17 couldn't tell.
18     Q  What is your best estimate?
19     A  If I recall right, it was close to
20 the end of the year.
21     Q  So late 2019?
22     A  If I recall right.
23     Q  And I understand you are only
24 answering questions up to May 2020.  Is that
25 right?

Page 267

1     A  Yes.
2     Q  And up to that date in May 2020, did
3 ERISED remain in use?
4     A  Yes.
5     Q  So as to whether NSO has ever
6 stopped using ERISED, I assume that is a question
7 you are not willing to answer?
8     A  Regarding ERISED, the
9 vulnerabilities in ERISED was not in WhatsApp at
10 all and that part was eventually closed.
11     Q  So you are willing to answer that
12 question about after May 2020?
13     A  I am answering a question about
14 ERISED capability --
15     Q  Where was the vulnerability that was
16 exploited by ERISED?
17     A  Specific part in one of Samsung
18 related code.
19     Q  So was ERISED limited to Samsung
20 devices?
21     A  Yes.
22     Q  But did it also work by transmitting
23 WhatsApp messages?
24     A  It was our decision whether to
25 trigger it using WhatsApp messages or not.

Page 268

1     Q  So it could be triggered using
2 WhatsApp messages?
3     A  Yes.
4     Q  And were those WhatsApp messages
5 sent via WhatsApp servers?
6     A  Yes.
7     Q  And similar to what we saw about
8 Heaven, those were non-standard WhatsApp messages?
9     MR. AKROTIRIANAKIS:  Object to the form.
10     A  As I said before, some of them maybe
11 were non-standard but not all of them.
12     Q  Were the messages, the WhatsApp
13 messages that were sent as part of ERISED
14 installation, were those also originated from the
15 WIS?
16     A  Yes.
17     Q  So just at a high level if you can,
18 how was ERISED different from Eden?
19     A  So ERISED didn't use any voice or
20 video call to be established, and didn't use any
21 relay server for communication in the installation
22 flow.  As I explained before, it triggered
23 vulnerability which was outside the application of
24 WhatsApp and only used WhatsApp messages to be
25 able to trigger the specific code in which the

Page 269

1 vulnerability resides.
2     Q  So under ERISED NSO used WhatsApp
3 messages to trigger a vulnerability in the Samsung
4 system?
5     A  Yes.
6     Q  And then triggering that
7 vulnerability would then cause the further steps
8 of the installation flows?
9     A  Yes.
10     Q  Was a stager delivered through
11 WhatsApp servers as part of ERISED?
12     A  Not the exact same but modifications
13 of it.
14     Q  Just to be clear, after -- and were
15 the same fingerprinting methods used?
16     A  Part of it, because as we talked
17 before ERISED required also additional information
18 whether the vendor is Samsung or not.
19     Q  Just to be clear, after WhatsApp
20 closed the vulnerability that was being exploited
21 by Eden in May 2019, NSO worked on developing a
22 new 0 click exploit that also worked, at least in
23 part, by transmitting WhatsApp messages.  Yes?
24     MR. AKROTIRIANAKIS:  Misstates
25 testimony.

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1    A  We researched for a new solution.
2  We found vulnerability in the system which was
3  specific for Samsung and we decided to implement
4  it and build installation flow based on WhatsApp
5  application.
6    Q  And after WhatsApp closed the
7  vulnerability that was being exploited by Eden,
8  NSO succeeded in developing a new 0 click
9  installation vector that operated in part through
10  delivering WhatsApp messages, yes?
11    MR. AKROTIRIANAKIS:  Misstates
12  testimony.
13    A  We found additional vulnerability
14  which we were able to build installation for using
15  that.
16    Q  And that installation vector,
17  ERISED, which used WhatsApp servers and WhatsApp
18  messages remained in use by NSO customers as of at
19  least May 2020.  Is that right?
20    A  Yes.
21    Q  So, with this lawsuit pending, NSO
22  was actively making available to its customers a 0
23  click exploit that involved the transmission of
24  messages over WhatsApp servers?
25    MR. AKROTIRIANAKIS:  No foundation.

Page 271

1    A  I don't recall the exact time that
2  the lawsuit was filed.
3    Q  It was filed in October 2019.  So
4  with that context, with this lawsuit pending NSO
5  was actively making available to its customers a 0
6  click exploit that involved the transmission of
7  messages over WhatsApp servers.  Correct?
8    A  Yes.
9    Q  And as to NSO continues to make
10  available to its customers a 0 click exploit that
11  uses WhatsApp servers, you are not willing to tell
12  me.
13    A  No.
14    Q  No, you are not willing to tell me?
15    MR. AKROTIRIANAKIS:  We already had this
16  conversation, counsel.
17    MR. PEREZ-MARQUES:  Is that right?  I
18  just want to make sure I understand the "no".  The
19  no is you won't tell me, right?
20    A  I can't tell you.
21    MR. PEREZ-MARQUES:  Okay.  Why don't we
22  take a short break.
23    THE VIDEOGRAPHER:  Going off the record.
24  The time is 16:57.  End of media card five, volume
25  one, of the video deposition of Tamir Gazneli.

Page 272

1    (A short break.)
2    This is the beginning of media card
3  number six, volume one, in the video deposition of
4  Tamir Gazneli.  Going on the record.  The time is
5  17:14.
6    Q  Do you understand you are still
7  under oath?
8    A  Yes.
9    Q  I would like to show you another
10  exhibit.  This is Exhibit 2040.
11    (Exhibit 2040 marked for identification).
12    It is another Confluence document
13  labelled or titled "Deviate installations on white
14  environment from 12/01/2020".  Do you see that?
15    A  Yes.
16    Q  Do you recognize this document?
17    A  Yes.
18    Q  What is it?
19    A  This is the output of QA team that
20  was responsible for testing the capabilities or
21  statistical behavior.
22    Q  Capabilities or statistical behavior
23  of what?
24    A  In this timeframe it is for ERISED.
25    Q  And so what is -- the second column

Page 273

1  here in the chart says "ERISED ID".  What does
2  that reflect?
3    A  It is numbering of the devices that
4  were used for ERISED testing.
5    Q  Test target device?
6    A  No.  Our devices that were used to
7  test the behavior, statistical behavior of the
8  vector.
9    Q  Got it.  What I meant when I said
10  "test target device", I meant that on the target
11  side of the exploit you were using a test device?
12    MR. AKROTIRIANAKIS:  Object to the form
13  of the question.
14    Q  Do you understand what I mean?
15    A  We use device on which we test how
16  the installation vector works and behaves.
17    Q  Okay.  And is the test device acting
18  as the sender of the exploit or the recipient of
19  the exploit?
20    A  Recipient.
21    Q  That is what I meant by test target
22  device.
23    A  Okay.
24    Q  So these are all NSO-controlled
25  devices on which the ERISED is being tested?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

1       A   Owned and controlled, yes.
2       Q   And some of the numbers it looks
3   like repeat.  Do you see that?  For instance ER11
4   shows up a couple of times on page 1?
5       A   Yes.
6       Q   And so that reflects that it is
7   being tested more than once on the same device?
8       A   Yes.
9       Q   Do these reflect the results of the
10  testing?
11      A   I don't see the results here.
12      Q   It looks like the document may be
13  cut off.  It looks like there is another column
14  that we can only see part of, right?
15      A   I expect it to be results for each
16  attempt, but I don't see any results here.
17      Q   And typically in this type of
18  document, based on your experience, you would
19  expect to see results of the tests?
20      A   At least the outcome of the attempt.
21      Q   And you don't see that here, as
22  produced?  I am not sure we got your answer.
23      A   I cannot see the result here.
24      Q   And the column that is headed "QA
25  version" that would be the version of WhatsApp

Page 275

1   that is being run on the target device or the test
2   device?
3       A   Yes.
4       Q   Okay.  When it says "Deviate
5   installations", what does that mean?
6       A   Deviate was just part of the ERISED
7   used -- part of the code.
8       Q   What part was that?
9       A   It was specific part for the
10  exploitation flow, that was part of the
11  general remote code execution capability in
12  ERISED.
13      Q   Part of the remote code execution
14  capability?
15      A   Yes.
16      Q   And so was Deviate the part of the
17  code that worked with the Samsung vulnerability?
18      THE VIDEOGRAPHER:  Sorry, one second.
19  It is okay.
20      Q   My question was was Deviate the part
21  of the code that worked with the Samsung
22  vulnerability?
23      A   Yes.
24      Q   And so this chart here reflects
25  attempts to install Deviate on test devices?

Page 276

1       MR. AKROTIRIANAKIS:  Objection,
2   misstates the document.
3       A   It is a list of attempts to define
4   what is the statistical behavior of this part of
5   the installation, yes.
6       Q   And so with respect to these
7   WhatsApp versions, would that reflect that ERISED
8   was being used at least at the time that those
9   versions of WhatsApp were released?
10      MR. AKROTIRIANAKIS:  Objection,
11  misstates the document.  Also vague.
12      A   Can you repeat the question, please?
13      Q   Yes.  With respect to those WhatsApp
14  version numbers that go along with at least many
15  of these tests, this would reflect that ERISED was
16  being at least tested during the time that those
17  WhatsApp versions were available?
18      A   Yes, tested, for sure.
19      Q   You can put that aside.  Are you
20  aware that the Heaven exploit in its code included
21  hard coded references to S.WhatsApp.net?
22      A   S.WhatsApp.net is a domain name.
23      Q   Mm hmm.  And are you aware that that
24  was coded into the Heaven source code.
25      MR. AKROTIRIANAKIS:  Object to the form

Page 277

1   of the question.  Assumes facts not in evidence.
2       A   Which code.
3       Q   The Heaven code?
4       A   Yes, if I recall right, yes.
5       Q   Yes, it was coded in there?
6       A   Yes.
7       Q   And you said S.WhatsApp.net is a
8   domain.  Is that right?
9       A   It is a domain name, yes.
10      Q   And where would that domain take the
11  traffic?
12      A   I don't know.
13      Q   But a WhatsApp server, is that
14  right?
15      A   This is, if I recall right, the
16  domain name of the signaling WhatsApp server.
17      Q   Okay.  So that is -- S.WhatsApp.net
18  is the domain name of a WhatsApp signaling server?
19      A   If I recall right.
20      Q   And so including S.WhatsApp.net in
21  the Heaven source code would do what, with respect
22  to the WhatsApp signaling server?
23      A   Communicate through that WhatsApp
24  signaling server.
25      Q   It would direct the communication to

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1 that server specifically?
2      A  Yes.
3      Q  You, as part of the preparation of
4 defendant's expert reports, you spoke with
5 Mr. McGrough, right, defendant's expert?
6      MR. AKROTIRIANAKIS:  Objection to the
7 form of the question.
8      A  I was interviewed by him.
9      Q  You were interviewed by him?
10      A  Yes.
11      Q  Did you tell him that the Heaven
12 exploit hard coded the domain name of the WhatsApp
13 signaling server?
14      A  I don't recall whether it was said
15 or not.
16      Q  And defendants needed WhatsApp
17 credentials to gain access to the WhatsApp
18 servers.  Isn't that right?
19      A  We need WhatsApp credentials in
20 order to connect to the real WhatsApp environment
21 as a legitimate client.
22      Q  As if you were a legitimate client?
23      A  Yes.
24      Q  And without those credentials the
25 installation vector wouldn't work?

Page 279

1      A  Without these credentials there is
2 no source worth applying.
3      Q  Without those credentials you would
4 be unable to communicate with the WhatsApp
5 signaling server?
6      A  With WhatsApp at all.
7      Q  And defendants used the same coding
8 protocol used by the WhatsApp signaling servers.
9 Isn't that right?
10      A  Coding protocol?
11      Q  Or coding language?
12      MR. AKROTIRIANAKIS:  Object to the form
13 of the question.
14      A  I don't know how -- what was
15 implemented and what specific language.
16      Q  Are you familiar with a language
17 called XMPP?
18      A  This is not a language, this is a
19 protocol.
20      Q  I think I said protocol the first
21 time and you corrected me?
22      A  You said language to implement the
23 protocol.
24      Q  Let me repeat the question as I said
25 it initially, which was defendants used the same

Page 280

1 coding protocol used by the WhatsApp signaling
2 servers.  Correct?
3      A  This is the protocol that WhatsApp
4 uses, so there is no other way to use any other
5 protocol.
6      Q  Right.  WhatsApp uses a version of
7 XMPP internally.  Is that right?
8      MR. AKROTIRIANAKIS:  Object to the form
9 of the question.  No foundation.
10      A  WhatsApp uses XMPP as its
11 communication protocol.
12      Q  And it uses specifically a version
13 called fun XMPP.  Correct?
14      A  Yes.
15      MR. AKROTIRIANAKIS:  No foundation.
16      Q  And are you aware that defendants
17 had a file also called FUN XMPP.PY?
18      A  Yes.
19      Q  And what is FUN XMPP.PY?
20      A  This is the implementation of the
21 specific parts of the XMPP protocol which were
22 required and used in very specific messages that
23 we use in the installation vectors.
24      Q  So defendants used the FUN XMPP
25 coding protocol that was used by WhatsApp

Page 281

1 internally, right?
2      MR. AKROTIRIANAKIS:  No foundation.
3      A  I don't know what WhatsApp used
4 internal.  We used the protocol that enables us to
5 build and send messages through WhatsApp system to
6 the target client.
7      Q  So defendants used FUN XMPP
8 specifically for the purposes of being able to
9 communicate with WhatsApp servers?
10      MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12      A  There is no other way to
13 communicate.
14      Q  So that is a yes, you use that
15 language in order to communicate with the WhatsApp
16 servers or that protocol rather?
17      A  We used it to communicate with the
18 WhatsApp client on the target's device.
19      Q  Through the WhatsApp servers, right?
20      A  The messages are sent through the
21 WhatsApp servers.
22      Q  Right, including the S.WhatsApp.net
23 server that was hard coded into the Heaven code?
24      MR. AKROTIRIANAKIS:  Misstates his
25 testimony.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 282

1    A   The question is whether the messages
2   was transmitted through S.WhatsApp.com?
3        Q   Yes.
4        A   Yes, this is the signaling server,
5   so yes.
6        Q   And is that also true for Eden?
7        A   Yes.
8        Q   And did the Eden code also hard code
9   the domain name of WhatsApp signaling server?
10       A   If I recall right, yes.
11       Q   What about ERISED?
12       A   For ERISED I don't recall whether
13  this was hard coded or not.
14       Q   You would need to look at the code
15  for that?
16       A   Yes.
17       Q   The Pegasus system also relied on
18  the use of command and control servers.  Isn't
19  that right?
20       A   Yes.
21       Q   If I call those C2 servers, will
22  that be comprehensible to you?  I can say command
23  and control if you prefer.
24       A   No, C2 is fine.
25       Q   What are C2 servers?

Page 283

1        A   Additional servers, as part of the
2   ecosystem that was deployed for the customer that
3   enabled the agent communication and installation
4   flow to be executed on the target's device.
5        Q   What role did the C2 servers play in
6   the Pegasus system?
7        A   It is a combination of servers and
8   it depends on which specific server you address.
9        Q   So they play different roles?
10       A   Yes.
11       Q   And what are the different roles
12  that the C2 servers play in the Pegasus system
13  during the 2018/20 time period?
14       A   So there are servers which are
15  responsible for -- on which the privilege
16  escalation and the whole relevant payloads are
17  held, to be transmitted through the -- during the
18  installation vector.
19       Q   Are there servers, C2 servers that
20  play other roles?
21       A   There are also servers through which
22  the data was transmitted to the customer's back
23  end.
24       Q   Do you mean the data obtained from
25  the target devices?

Page 284

1        A   Yes.
2        Q   And when you say "the relevant
3   payloads", is that only for privilege escalation
4   or also for deployment of the agent that the C2
5   servers were used?
6        A   The agent too.
7        Q   So C2 servers are part of the
8   installation phase, is that right?
9        MR. AKROTIRIANAKIS:  Objection,
10  misstates testimony.
11       A   No, as part of the installation
12  procedure and data extraction.  Installation
13  phase, you asked installation vector, this is not
14  related to it.
15       Q   Okay.  So you don't consider
16  privileged escalation part of the installation
17  phase?
18       A   I am trying to stay under your
19  terminology.
20       Q   Right.  I want to understand yours.
21  So when you refer to the installation phase, that
22  doesn't include privilege escalation?
23       A   In my terminology, installation of
24  an agent is the whole procedure from the beginning
25  of the remote code execution, it continues to

Page 285

1   privilege escalation payload to the fact the agent
2   is installed.
3        Q   Okay.  So the C2 servers are used
4   during what you just defined as the installation
5   phase?
6        A   For part of, yes.
7        Q   Did defendants ever operate C2
8   servers?
9        A   No.
10       Q   Did defendants set up C2 servers for
11  defendant's customers?
12       A   What do you mean by set up?
13       Q   Lease them, buy them, anonymize
14  them?
15       A   As I said before, the White Services
16  team, it is possible for White Services, if they
17  were eventually deployed on customer's ecosystem
18  as part of his solution.
19       Q   Are you familiar with an AWS, Amazon
20  Web Services server that was used, that was
21  housed, located in Germany in connection with the
22  Pegasus exploit or Pegasus system?
23       A   Yes.
24       Q   What do you know about that server?
25       A   This was a server that was used for

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 286

1 the deployment of the WIS for testing purpose.
2      Q   And when you say "deployment of
3 WIS", what do you mean?
4      A   Placing the WIS code on that server.
5      Q   And then how was that code used once
6 housed on that server?
7      A   It was connected to the additional
8 part of the ecosystem that were required to
9 complete testing of the capability.
10     Q   Internal testing or testing through
11 WhatsApp's ecosystem?
12     A   Testing through WhatsApp's
13 ecosystem.
14     Q   So messages generated by WIS were
15 sent from the German AWS server through WhatsApp's
16 ecosystem?
17     A   Yes.
18     Q   For test purposes, is that right?
19     A   Yes.
20     Q   To target devices controlled by NSO?
21     MR. AKROTIRIANAKIS:  Object to the form
22 of the question.
23     A   To company owned devices.
24     Q   And when was that?  During what time
25 period was that AWS server being used for that

Page 287

1 purpose?
2      A   I really don't recall the exact
3 times but -- I don't recall the exact time when it
4 was used for testing.  It was repurposed several
5 times.
6      Q   To be clear, the server was
7 repurposed?
8      A   Yes.
9      Q   What other purposes was it used for?
10     A   I don't know.
11     Q   Was it ever used to house the agent?
12     A   No.
13     Q   Are you aware of any other purposes
14 for which it was used?
15     A   I know that it was IT owned server.
16 Sorry, that is what I know.
17     Q   What do you mean IT owned?
18     A   IT owned.
19     Q   I don't know what you mean?
20     A   IT, meaning the team, IT.
21     Q   And what is the IT team at NSO?
22     A   What they do?
23     Q   Yes.
24     A   They are responsible for the
25 infrastructure of the company.

Page 288

1      Q   And so why are you so confident that
2 it was never used to house the agent?
3      A   Because we used it for the testing
4 purposes and we never tested an end to end
5 installation through this, using this server, and
6 the only part that was tested was the remote code
7 execution part.
8      Q   Now, I am not disagreeing with you.
9 I am just trying to understand, because you said
10 after that point it was repurposed and you didn't
11 know what purposes it was used for, but you said
12 it was not used to house the agent.  So I am just
13 trying to understand.  Why do you believe that it
14 was not used at any point after it was repurposed
15 to house the agent?
16     A   Whether it was used or not, it would
17 be done by our research team, and I would know
18 whether it was used for installation of agent or
19 not.  And the purpose of the server was our
20 relation to test the behavior of the installation
21 and specifically the remote code execution part.
22     Q   So you are familiar with which
23 servers were used to house the agent?
24     A   I am familiar -- this was not used
25 to have an agent on it.

Page 289

1      Q   Which servers were used to house the
2 agent?
3      A   In terms of testing purposes?
4      Q   Testing purposes or customer use
5 purposes?
6      A   Customer use, as I said, he gets the
7 ecosystem of servers that he uses for his purposes
8 and the whole system is deployed on it for his
9 control, so I am not familiar which servers are
10 there or where they are located.
11     Q   When you say testing purposes, is
12 that different than demonstration purposes?
13     A   Yes.
14     Q   Was the AWS server used at all for
15 demonstration purposes?
16     A   No.
17     Q   Do you know where the WIS code was
18 housed for demonstration purposes?
19     A   You are asking about location?
20     Q   Server location?
21     A   No.
22     Q   Are you familiar with the process by
23 which NSO demonstrated the Pegasus software?
24     A   Yes.
25     Q   How would that process work?  What

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

1 would NSO do as part of the demonstration of the
2 Pegasus software?
3        A   Use an ecosystem which was built for
4 the demonstrations, for example, we saw the sales
5 3, and used company owned devices in order to
6 demonstrate the behavior and the abilities on it.
7        Q   When you say used company owned
8 devices, you mean as the target, right?
9        MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11       A   As the device on which the
12 installation was conducted.
13       Q   And so in terms of -- if we imagine
14 a demonstration of Pegasus, that would work
15 through WhatsApp's servers the same as if it was
16 an actual use by a customer.  Is that right?
17       A   In terms of WhatsApp server, yes.
18       Q   And is the same true with respect to
19 testing, that that would operate through WhatsApp
20 servers the same way as an actual use by a
21 customer?
22       A   Testing in an external environment?
23       Q   Yes.
24       A   Yes.
25       Q   If you know, what service providers

Page 291

1 did defendants use to procure servers for use in
2 connection with Pegasus?
3        A   I don't know.
4        Q   I believe that is a topic on which
5 you are designated, but let me just check.  The
6 topic was "you or any relevant spyware's use of
7 any third party server, including the AWS server
8 to access plaintiff's computer", and your counsel
9 said that you would testify as to defendant's
10 understanding of the development of the accused
11 technology in use between April 29, 2018 and
12 May 10, 2020, including general information about
13 defendant's use of third party servers in the
14 accused technology.  Are you prepared to testify
15 on that topic?
16       MR. AKROTIRIANAKIS:  Only if it was in
17 the original topics.  In light of his testimony?
18       MR. PEREZ-MARQUES:  Do you have my
19 question, Mr. Gazneli?
20       A   I remember that the -- saying that I
21 was testifying about the use.
22       Q   The use of third party servers?
23       A   Use, not which specific third party
24 servers they were.
25       Q   Okay.  So you don't know which third

Page 292

1 parties were used?
2        A   No.
3        Q   Do defendants have policies about
4 which service providers it uses for servers in
5 connection with Pegasus?
6        MR. AKROTIRIANAKIS:  Same objection.
7 Beyond the scope of the designation.
8        A   This is the same answer.
9        Q   What is the same answer?
10       A   I don't know.
11       Q   Did defendants ever lease servers or
12 other computer infrastructure from Quadranet
13 Enterprises LLC?
14       MR. AKROTIRIANAKIS:  Object to the form
15 of the question.  No foundation.  Beyond the scope
16 of designation.
17       A   Can you repeat the question?
18       Q   Did defendants ever lease servers or
19 other computer infrastructure from Quadranet
20 Enterprises LLC of Los Angeles, California?
21       A   I don't know if a server was leased
22 by that company or not.
23       Q   If you wanted to find out the answer
24 to that question, who would you ask?
25       A   The White Services.

Page 293

1        Q   Who is in charge of the White
2 Services group?
3        A   Ramon.
4        Q   Ramon.  Did defendants ever lease
5 servers or other computer infrastructure from 365
6 Online Technology JSC in Hanoi, Vietnam?
7        A   No.
8        Q   Did defendants ever lease servers or
9 other computer infrastructure from Green Cloud
10 Technology?
11       A   Again, it is under White Services
12 responsibility.
13       Q   When you say Ramon, you mean Ramon
14 Eshkar?
15       A   Yes.
16       Q   Going back to the fingerprinting
17 stage of the Hummingbird vectors, the information
18 that NSO is obtaining regarding the target device,
19 you gave a few examples, operating system, whether
20 it is online, whether it has WhatsApp installed.
21 Do you recall that, generally?
22       A   Yes.
23       Q   From where is NSO obtaining that
24 information?
25       MR. AKROTIRIANAKIS:  Object to the form.

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

1      A   Except the parameter about whether
2  the target has an active WhatsApp account, all the
3  other information parts are from the target's
4  client application.
5      Q   The target's WhatsApp client?
6      A   Yes.
7      Q   And does that go through the
8  WhatsApp servers?
9      A   As any other message.
10      Q   And what about the information about
11  whether the target is an active WhatsApp client?
12  Where does that information come from?
13      A   This comes from WhatsApp server, as
14  it comes for any other normal user when he enters
15  new phone number in his contacts list.
16      Q   And when you say whether the target
17  has an active WhatsApp account, what do you mean?
18      A   Activated WhatsApp account.
19      Q   That is different from whether like
20  the app is in the foreground?
21      A   Yes.  Whether it ever has been
22  activated WhatsApp account in a WhatsApp
23  ecosystem.
24      Q   Apologies, because I know we covered
25  this before, but for the Hummingbird vectors, did

Page 295

1  the fingerprinting work through the transmission
2  of WhatsApp messages?
3      A   Yes.
4      Q   Okay.  And so prior to sending the
5  WhatsApp message, that would tell you, the
6  operating system, whether the app is in the
7  foreground, would NSO first have to confirm from
8  the WhatsApp server whether the user had an active
9  WhatsApp account?
10      A   The first stage in the WhatsApp
11  fingerprint was first checking that the target
12  device number has an activated WhatsApp account.
13  Then check the other three preliminary parameters,
14  which is whether the target device is Android
15  device, whether he is online, meaning it is
16  connected to a network, and whether he is in
17  foreground or not.
18      Q   And if the target was in foreground
19  would you proceed with the installation?
20      A   No.
21      Q   And so before proceeding to the --
22  I will call it the second piece of the
23  fingerprinting --
24      A   Yes.
25      Q   -- NSO would first have to confirm

Page 296

1  that the target had an activated WhatsApp account?
2      MR. AKROTIRIANAKIS:  Object to the form
3  of the question.
4      A   This is one of the parts in the
5  fingerprinting.
6      Q   And is it right to think of it as
7  sequential, that you would only proceed to sending
8  a message to the target's WhatsApp client only
9  after you had first confirmed that the client had
10  an activated WhatsApp account?
11      MR. AKROTIRIANAKIS:  Object to the form
12  of the question.
13      A   There is no ability to send any
14  message to a client which does not exist.
15      Q   So the first piece of information
16  obtained as part of fingerprinting comes from the
17  WhatsApp server?
18      A   Yes, as it comes to any other number
19  that you have in list --
20      Q   And then the installation flow would
21  not proceed -- would or would not proceed,
22  depending on the answer, the information that NSO
23  got from the WhatsApp server.  Right?
24      MR. AKROTIRIANAKIS:  Object to the form
25  of the question.

Page 297

1      A   It was a decision of customer
2  whether to proceed or not to the installation.
3      Q   If there is no WhatsApp activated
4  account you could not proceed?
5      A   If there is no WhatsApp, no.  If
6  there is a WhatsApp, the answer still may be no.
7      Q   And once the fingerprinting flow has
8  confirmed that the client has an activated
9  WhatsApp account, does it proceed automatically
10  with the rest of the fingerprinting or is there a
11  separate decision that gets made by an operator?
12      A   When you say "separate", which part
13  do you mean?
14      Q   I mean one possibility is --
15  everything I just described happens in three
16  milliseconds, and yes, the first step is to
17  confirm whether there is an activated account, but
18  then it immediately goes on to the remaining
19  steps.  The other option is there is someone
20  sitting at a computer, and they get a response
21  that says this target has an activated account,
22  and then they press a separate button that
23  triggers the rest of the fingerprinting.  That is
24  what I meant.
25      A   For information part, I explain

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1  whether he has -- the target has WhatsApp account
2  activated, whether he is online or not, Android
3  device, or is foreground or not, and done in one
4  single attempt, but of course it depends on each
5  part of preceding step.
6       Q   Got it.  That answers my question,
7  thank you.
8       So once the fingerprinting is done, the
9  next step is sending a call offer.  Is that right?
10  The next step of the installation flow?
11      A   Yes.
12      Q   And the call offer used an XOR
13  cipher.  Is that right?
14      A   Yes.
15      Q   What is an XOR cipher?
16      A   It is an encryption that WhatsApp
17  uses for communications.
18      Q   And so why did defendants call up or
19  use an XOR cipher?
20      A   In order to encrypt the
21  communication.
22      Q   And is that the non-standard
23  encryption that we talked about before?
24      A   Back then it was not standard.
25      Q   Back when?

Page 299

1       A   In Heaven.
2       Q   And then what about with Eden and
3  ERISED?
4       A   I don't recall whether this part was
5  changed in Eden, but eventually it was changed and
6  it became standard.
7       Q   For ERISED?
8       A   As I said, I don't recall the exact
9  time that it changed from Eden, non-standard to
10  standard.
11      Q   And why did defendants want to
12  encrypt the message?
13      MR. AKROTIRIANAKIS:  Assumes facts not
14  in evidence.
15      A   Part of measure to conceal the
16  messages content.
17      Q   Can WhatsApp user using the standard
18  WhatsApp client app send a call offer using an XOR
19  cipher?
20      A   No.
21      Q   The call offer, at least for some of
22  the Hummingbird vectors, manipulated the
23  connecting tone DESC field.  Is that right?
24      A   Yes.
25      Q   And is that true of all three of the

Page 300

1  Hummingbird vectors?
2       A   No.
3       Q   Which ones is it true of?
4       A   For Heaven and Eden.
5       Q   And who at defendants came up with
6  the idea to manipulate that particular field?
7       A   The research team.
8       Q   When did defendants come up with
9  that idea?
10      A   During the research efforts that
11  were done as part of the vulnerability research
12  and the exploitation research.
13      Q   And roughly what was the time period
14  when that work was being done?
15      A   Beginning of 2018 or end of 2017.
16      Q   And defendants, as part of at least
17  the Eden and Heaven vectors, would insert a bash
18  script in the connecting tone desc field?
19      A   Yes.
20      Q   And WhatsApp users using the
21  official WhatsApp client app could not use the
22  connecting tone desc field.  Is that right?
23      A   Right.
24      Q   The next step was inducing the
25  victim's WhatsApp client to disclose whether It

Page 301

1  was 32 bit or 64 bit.  Is that right?
2       A   Yes.
3       Q   Is that true for all three
4  Hummingbird vectors?
5       A   No.
6       Q   Just Eden and Heaven?
7       A   Yes.
8       Q   And defendants needed that
9  information to determine next steps in the attack.
10  Is that right?
11      A   To determine which payload to
12  continue with and which messages sequence to use.
13      Q   And defendants obtained that
14  information, 32 bit versus 64 bit, through relay
15  negotiation and bandwidth estimation.  Is that
16  right?
17      A   Yes.
18      Q   And defendants would send an
19  oversized bit width detection packet to the target
20  device.  Is that right?
21      A   Right.
22      Q   And again that is for Eden and
23  Heaven?
24      A   Yes.
25      Q   And that oversized bit width

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 302

1 detection packet overwrote certain variables. Is
2 that correct?
3        A  On the target client application?
4        Q  Yes.
5        A  Yes.
6        Q  Including the AF variable, is that
7 correct?
8        A  Yes.
9        Q  And whether the AF variable was
10 overwritten determined whether it was a 32 bit
11 phone or a 64 bit phone. Is that right?
12       A  Yes.
13       Q  WhatsApp users using the official
14 WhatsApp client could not send an oversized bit
15 width detection packet, correct?
16       A  Correct.
17       Q  And could not overwrite the AF
18 variable, correct?
19       A  Yes.
20       Q  And defendants obtained that
21 information of 32 bit versus 64 bit from WhatsApp
22 servers?
23       A  No.
24       Q  From the target device?
25       A  Yes.

Page 303

1        Q  Transmitted through WhatsApp
2 servers?
3        A  Yes.
4        MR. AKROTIRIANAKIS:  Object to the form
5 of that question.
6        Q  Defendants took that information and
7 used it to design the next stages of the attack?
8        MR. AKROTIRIANAKIS:  Object to the form
9 of the question.
10       Q  Such as choosing which payload to
11 deliver?
12       MR. AKROTIRIANAKIS:  Same objection.
13       A  It was used to define how to proceed
14 with the installation flow.
15       Q  And who made the decision as to how
16 to proceed with the installation flow?
17       MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19       A  Who in terms of person?
20       Q  Sure. Was that decision made by a
21 person?
22       A  No.
23       Q  So how was that decision made?
24       A  By the installation server.
25       Q  It was made by the software

Page 304

1 developed by NSO?
2        A  Yes.
3        Q  A regular WhatsApp user using the
4 WhatsApp client app can't obtain this 32 versus 64
5 bit information, can it?
6        A  Again the question?
7        Q  A regular WhatsApp user using the
8 WhatsApp client app cannot obtain this
9 information?
10       A  They can obtain it by other means on
11 the device.
12       Q  But not through the WhatsApp client
13 app?
14       A  Not through WhatsApp client app.
15       Q  And WhatsApp servers are not
16 intended to disclose that information, is that
17 right?
18       MR. AKROTIRIANAKIS:  Object to the form
19 of the question.
20       A  WhatsApp servers are intended to
21 block any unusual activity they would like to
22 detect and block.
23       Q  After determining the bit width,
24 defendants sent a duplicate call offer message.
25 Is that right?

Page 305

1        A  Yes.
2        Q  And that was to reset the target
3 device's internal memory?
4        MR. AKROTIRIANAKIS:  Object to the form
5 of the question.
6        A  You would need to define what
7 internal memory you refer to.
8        Q  Can you help me with that? You are
9 the expert.
10       A  It was used to reset the specific
11 memory area that was used in the application,
12 WhatsApp application.
13       Q  And that would allow the next stage
14 of the attack?
15       A  Yes.
16       Q  And WhatsApp users using the
17 official WhatsApp client could not send the
18 duplicate call offer message. Right?
19       A  Right.
20       Q  Did you explain those steps to
21 defendants' expert?
22       A  I don't recall reviewing each and
23 every step of the steps.
24       Q  The next step was to calculate the
25 location of the LIB WhatsApp.SO file, right?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 306

1    A  Yes.
2        Q  That relied on a buffer overflow, is
3  that correct?
4    A  Yes.
5        Q  So the victim's phone would point to
6  a certain area of memory offset from the original
7  area.  Is that right?
8        MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10    A  The target client WhatsApp
11  application --
12        Q  I can skip victim.  The target phone
13  would point to a certain area of memory offset
14  from the original area?
15    A  Yes.
16        Q  And that allowed defendants to
17  obtain the location of the LIB WhatsApp.SO file,
18  correct?
19    A  Yes.
20        Q  And that information came from the
21  WhatsApp servers?
22    A  No.
23        Q  From the target device?
24    A  Yes.
25        Q  Via the WhatsApp servers?

Page 307

1    A  Yes.
2        Q  And a regular WhatsApp user using
3  the WhatsApp client app cannot obtain that
4  information, right?
5        A  Again, using WhatsApp client, no,
6  but there are ways to obtain this information.
7        Q  Why was it important for defendants
8  to be able to determine the location of the
9  LIB.WhatsApp.SO or LIBWhatsApp.SO file?
10    A  In order to find -- for the
11  exploitation to work, you need to be able to
12  determine the memory allocation space in the
13  current instance of the application of the
14  target's device, in order to be able to write and
15  execute the payload you are downloading.
16        Q  Now, was the next step to convert to
17  a group call?
18        MR. AKROTIRIANAKIS:  Object to the form
19  of the question.
20    A  If I recall right, yes.
21        Q  Yes?
22    A  Yes.
23        Q  For Heaven and Eden?
24    A  For Heaven there was voice call that
25  were used, but along the way the implementation of

Page 308

1  the installation phase has changed.
2        Q  Meaning during the life of the Eden
3  exploit how it worked changed?
4    A  Yes.
5        Q  But at a certain point Eden worked
6  by converting to a group call?
7    A  Yes.
8        Q  And defendants would do that by
9  adding another participant to the call, is that
10  right?
11    A  Yes.
12        Q  But this other was a simulated
13  participant, right, not an actual WhatsApp client?
14    A  This was as the first client, it was
15  used to generate the initial call.
16        Q  So WIS?
17    A  Yes.
18        Q  And converting to a group call
19  allowed defendants to obtain more information
20  about the target device.  Is that correct?
21    A  Yes.
22        Q  And defendants --
23        MR. AKROTIRIANAKIS:  Object to the form
24  of the question.
25        Q  Defendants sent a set of malicious

Page 309

1  data to the target device.  Is that correct?
2        MR. AKROTIRIANAKIS:  Object to the form
3  of the question.
4    A  What is malicious data?
5        Q  Let's skip malicious.  Defendants
6  sent a set of data to the target device, right, a
7  data payload?
8        MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10    A  As part of the installation flow,
11  there are data payloads and messages sent to the
12  target device, yes.
13        Q  And that information was in the
14  outbound capabilities buffer?
15    A  Yes.
16        Q  And that goes beyond what WhatsApp
17  users using the client app -- the WhatsApp client
18  app could include in the outbound capabilities
19  buffer, is that right?
20    A  Yes.
21        Q  And later in the group call
22  defendants overwrite certain callback pointers so
23  that they point to values that defendants have
24  created.  Is that right?
25        MR. AKROTIRIANAKIS:  Object to the form

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 322

1    MR. AKROTIRIANAKIS: Objection,
2 misstates his testimony.
3    A  The image is the instance in time,
4 so it couldn't contain all the code from two years
5 of the --
6    Q  Right, because the code changed from
7 time to time, right?
8    A  There are certain parts of it that
9 changed, yes.
10    Q  And so the code that was being used
11 in April 2018 is likely not the code that was
12 being used in May 2019?
13    MR. AKROTIRIANAKIS: Object to the form
14 of the question.
15    A  The messages that were implemented
16 in it, the messages are implemented as part of the
17 protocol that WhatsApp requires, so this
18 practically will not change a lot.  As for the
19 fingerprint, as I said it was used for Heaven and
20 Eden.  The other parts of the code I said it
21 depends on the exact timing of the image.
22    Q  Right, because the code changed over
23 time, right?
24    MR. AKROTIRIANAKIS: Objection,
25 misstates his testimony.

Page 323

1    A  The code may change.  I don't know
2 if it changed in specific timing before and after.
3    Q  And you don't know when the snapshot
4 was taken, right?
5    A  I don't recall.
6    Q  We talked about the S.WhatsApp.net
7 domain.  You recall that?
8    A  Yes.
9    Q  And I think when I was examining you
10 said that that was the domain for WhatsApp
11 signaling server.  Is that right?
12    A  Domain name.
13    Q  The domain name for WhatsApp
14 signaling server?
15    A  Also Google.com is the domain name
16 for Google signaling.
17    Q  Got it.  Okay.  Is that one
18 signaling server or multiple signaling servers?
19    A  It depends on WhatsApp to decide.
20    Q  Could be either one, right?
21    A  I don't -- this is not a single
22 server.  That is why they use a domain name.
23    Q  As part of developing the
24 Hummingbird exploits, did you take any steps to
25 ascertain where the WhatsApp signaling servers

Page 324

1 were located.  No?
2    A  No.
3    Q  Did you take any steps to ascertain
4 where the WhatsApp relay servers were located?
5    A  No.
6    Q  You understood that what WhatsApp is
7 based in California?
8    MR. AKROTIRIANAKIS: Objection.
9    A  As a company?
10    Q  Yes.
11    A  So does everybody else in the US but
12 the server --
13    Q  Not my question.  Were you aware
14 when you were working on the --
15    A  No.
16    Q  -- hummingbird vectors that WhatsApp
17 was based in California?
18    A  No.
19    Q  You were not aware of that?
20    A  No.
21    Q  Did you take any steps to assure
22 yourself that the servers that were being used as
23 part of the Hummingbird vectors were not in
24 California?
25    MR. AKROTIRIANAKIS: Object to the form

Page 325

1 of the question.
2    A  Can you repeat?
3    Q  Did you take any steps to make sure
4 that the messages that were being transmitted as
5 part of the Pegasus software, that those servers
6 were not in California?  Did you take any steps to
7 check that?
8    A  No.
9    Q  Sitting here today, do you know, one
10 way or the other, whether any of WhatsApp's
11 signaling or relay servers used in connection with
12 the Hummingbird vectors actually are in
13 California?
14    A  No.
15    Q  You don't know that at all sitting
16 here today?
17    A  No.
18    Q  So if some of those servers were in
19 California, you wouldn't know anything to the
20 contrary?
21    A  It was not required for the -- it
22 was not a requirement in terms of the capability.
23    Q  But accessing the WhatsApp signaling
24 servers was a requirement of the capability.
25 Right?

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326

1    A   As a domain name, behind which there
2 is a real server, which is deployed in any
3 location on WhatsApp decision.
4    Q   And accessing WhatsApp relay servers
5 was also necessary for the Hummingbird vectors.
6 Isn't that right?
7    A   No.
8    Q   No?
9    A   No.
10    Q   Okay.  What about for ERISED?
11    A   No.
12    Q   I think you testified earlier that
13 the messages for ERISED had to be transmitted
14 through the WhatsApp relay servers?
15    A   No.  I testified that for Heaven and
16 Eden they were transferred through relay servers.
17    Q   Got it.  And it was necessary for
18 the operation of Heaven and Eden?
19    A   Yes.
20    Q   You were asked just now by your
21 counsel some questions about geographical
22 restrictions.  Do you recall that?
23    A   Yes.
24    Q   I just want to make sure
25 I understand this.  I will give you a

Page 327

1 hypothetical.  If I am, say, a Mexican citizen and
2 just hypothetically NSO has as a client a Mexican
3 law enforcement agency, and Mexico is within their
4 territorial license, they are permitted to install
5 on my phone.  Is that correct?
6    A   Under their lawful authorization.
7 Under their rules.  Yes.
8    Q   And those rules you are not familiar
9 with?
10    A   No.
11    Q   So I am a target.  I have been
12 permissibly infected with Pegasus.  I then travel
13 to the United States.
14    A   Yes.
15    Q   Does the customer then lose access
16 to my information?
17    A   Yes.
18    Q   Now, what if I am a US person, okay,
19 so completely new hypothetical.  I am a US person.
20 I am a US citizen.  I live most of the year in New
21 York.
22    A   With US number?
23    Q   With a US number.
24    A   Okay.
25    Q   But I am working in Dubai.  If you

Page 328

1 had a customer that had a territorial license that
2 covered Dubai, could it be installed on that
3 number?
4    A   No.
5    Q   So not US numbers and not US
6 territory?
7    A   Yes.
8    Q   Okay.  But that is on a customer by
9 customer basis, depending on the territorial
10 restrictions of particular contracts?
11    A   No customer has US enabled for
12 installation.
13    Q   And that is with respect to Pegasus?
14    A   Yes.
15    Q   What about with respect to Phantom?
16    A   I am not aware.  I don't know what
17 Phantom is.
18    Q   You are not familiar with Phantom?
19    A   No.
20    Q   Are you familiar with a company
21 called Westbridge?
22    A   Yes.
23    Q   What is Westbridge?
24    A   US like --
25    MR. AKROTIRIANAKIS:  Object to the form

Page 329

1 of the question.  No foundation.
2    A   It is a US company trying to market
3 the product.
4    Q   Trying to market NSO's products,
5 right?
6    A   Yes.
7    Q   Including Pegasus?
8    A   I am not familiar with their
9 activity.
10    Q   But certainly Westbridge was
11 authorized by NSO to market NSO products?
12    MR. AKROTIRIANAKIS:  Object to the form
13 of the question.  No foundation.
14    A   No.
15    Q   Is it your understanding that
16 Westbridge was operating without permission?
17    MR. AKROTIRIANAKIS:  Objection, no
18 foundation.
19    A   I don't know.
20    Q   Okay.  And when Westbridge
21 demonstrated NSO software, were those
22 demonstrations supported by NSO personnel?
23    MR. AKROTIRIANAKIS:  Objection, no
24 foundation.
25    A   I don't know.

83 (Pages 326 - 329)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1    CERTIFICATE OF COURT REPORTER
2
3  I, AILSA WILLIAMS, an Accredited LiveNote
4  Reporter, hereby certify that Tamir Gazneli was
5  duly sworn, that I took the Stenograph notes of
6  the foregoing deposition and that the transcript
7  thereof is a true and accurate record transcribed
8  to the best of my skill and ability.  I further
9  certify that I am neither counsel for, related to,
10 nor employed by any of the parties to the action
11 in which the deposition was taken, and that I am
12 not a relative or employee of any attorney or
13 counsel employed by the parties hereto, nor
14 financially or otherwise interested in the outcome
15 of the action.
16 Before completion of the deposition, review of the
17 transcript was requested.  Any changes made by the
18 deponent (and provided to the reporter) during the
19 period allowed are appended hereto.
20
21
22 _Ailse Yh Williams_
23 AILSA WILLIAMS
24 Dated:    September 6, 2024.
25

Page 335

1
2          E R R A T A
3        Deposition of Tamir Gazneli
4  (Please show all corrections on this page, not in
5  the transcript.)
6  Page/Line No.    Description        Reason for
7  change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  Signed:    ...................
23  Name:
24  Date:       ...................
25

85 (Pages 334 - 335)

# EXHIBIT 6

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
     *jakro@kslaw.com*
2  AARON S. CRAIG (Bar No. 204741)
     *acraig@kslaw.com*
3  KING & SPALDING LLP
   633 West Fifth Street, Suite 1700
4  Los Angeles, CA 90071
   Telephone: (213) 443-4355
5  Facsimile: (213) 443-4310

6  Attorneys for Defendants NSO GROUP TECHNOLOGIES
   LIMITED and Q CYBER TECHNOLOGIES LIMITED

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         OAKLAND DIVISION

11  WHATSAPP INC., a Delaware corporation,    Case No. 4:19-cv-07123-PJH
    and FACEBOOK, INC., a Delaware
12  corporation,                              **DEFENDANT NSO GROUP
                                              TECHNOLOGIES LIMITED'S
13             Plaintiffs,                    SUPPLEMENTAL OBJECTIONS AND
                                              RESPONSES TO PLAINTIFFS' FIRST
14      v.                                    SET OF INTERROGATORIES NOS. 1-3,
                                              6-9**
15  NSO GROUP TECHNOLOGIES LIMITED
    and Q CYBER TECHNOLOGIES LIMITED,         **HIGHLY CONFIDENTIAL –
16                                            ATTORNEYS' EYES ONLY**
             Defendants.
17                                            Action Filed:   10/29/2019

18

19

20

21

22

23

24

25

26

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Pursuant to Federal Rules of Civil Procedure 26 and 33, and to this Court's orders (Dkt. No. 292), Defendant NSO Group Technologies Limited ("NSO") hereby serves supplemental objections and responses to Plaintiff WhatsApp LLC's ("WhatsApp") First Set of Interrogatories ("Interrogatories") Nos. 1-3 and 6-9.

## PRELIMINARY STATEMENT

Nothing in these objections and responses should be construed as an admission with respect to the admissibility or relevance of any fact or document, or of the truth or accuracy of any characterization or statement of any kind contained in Plaintiff WhatsApp's Interrogatories. NSO has not completed its investigation of the facts relating to this case, discovery, or preparation for trial. The responses set forth below are based only upon information and documents that are currently available, and specifically known, to NSO. Further discovery, independent investigation, legal research, and analysis may supply additional facts, add meaning to known facts, and establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the responses set forth herein.

The following objections and responses are given without prejudice to NSO's right to produce evidence, at trial or otherwise, regarding any subsequently discovered facts or information. NSO reserves the right to modify and amend any responses herein as additional facts are ascertained, as analysis and contentions are made, or as research is completed.

The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as are presently known but should in no way prejudice NSO in relation to further discovery, research, or analysis.

By submitting these objections and responses, NSO does not consent to jurisdiction of the Court and does not waive its defenses that the Court lacks personal jurisdiction. To the contrary, NSO hereby preserves any related defenses.

NSO reserves the right to redact information from certain documents as may be necessary to comply with Israeli or other foreign law or contractual obligations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**GENERAL OBJECTIONS**

NSO interposes the following general objections into each of the responses that follows as if the general objections were set forth in full in each specific response. These objections therefore form a part of the response to every interrogatory, including any subparts.

1.      NSO objects to the extent that any interrogatory seeks information that exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure or seeks to impose obligations upon NSO beyond those required by the Federal Rules of Civil Procedure.

2.      NSO objects to the extent that any interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated lawful intercept technology "targeting or directed at Whatsapp servers, or using Whatsapp in any way to access Target Devices" between April 29, 2018 and May 10, 2020.  (Dkt. No. 292 at 3-4.)  In complying with the Court's ordered scope of discovery, NSO does not waive any objection that relevance should be limited to the software called "Pegasus" as allegedly operated with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during the timeframe specified in the Complaint.

3.      NSO objects to the extent that any interrogatory is unreasonably cumulative or duplicative.

4.      NSO objects to the extent that any interrogatory seeks information outside of its possession, custody, or control. To the extent that NSO provides a substantive response below, it will only include information that is in its possession, custody, or control and that NSO could identify after a reasonable investigation.

5.      NSO objects to the extent that any interrogatory seeks information obtainable from some other source that is more convenient, less burdensome, or less expensive. NSO objects to the extent that any interrogatory seeks information already in the possession, custody, or control of Plaintiffs; information that is available from public sources; or information that is as readily available to Plaintiffs as to Defendants on the grounds that it would be unduly burdensome and

oppressive to require Defendants to obtain, process, and reproduce such documents.

6.    NSO objects to the extent that any interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure.

7.    NSO objects to the extent that any interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information.

8.    NSO objects to the extent that any interrogatory seeks information that may be protected by a right of privacy under the United States Constitution, Article I, Section 1 of the Constitution of the State of California, Israeli privacy laws, or any other applicable law.

9.    NSO objects to the extent that any interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO intends to withhold information, documents, and communications that it is not permitted to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

10.   NSO objects to the extent that any interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are best answered after related discovery has been completed.

11.   NSO objects that the interrogatories require it to participate in this lawsuit despite Plaintiffs' failure to establish personal jurisdiction over NSO. Nothing herein should be interpreted as a waiver of the burden Plaintiffs have to prove that NSO is subject to personal jurisdiction in California.

12.   NSO objects to the extent that any interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

13.   NSO objects to the extent that any interrogatory contains unproven assumptions or

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    premises and is thus argumentative.

2                    **OBJECTIONS TO DEFINITIONS**

3        1.    Definition No. 5 ("Device"): NSO objects to the definition of "Device" as vague,

4    ambiguous, and overbroad because it encompasses any "electronic device." Using the word device

5    to define the term device renders the definition vague and ambiguous. To the extent the definition

6    intended to encompass any electronic object, the definition would be overbroad and responding to

7    any interrogatory that incorporates the definition would be unduly burdensome and not

8    proportional to the needs of the case. NSO will interpret the term "Device" to mean a computer,

9    mobile phone, or server.

10        2.    Definition No. 6 ("Document" or "Documents"): NSO objects to the definition of

11    "Document" or "Documents" to the extent that they impose any obligation to produce materials

12    not requested and agreed to in separate requests for production. NSO further objects to the

13    definitions to the extent that they would require it to access media from which information cannot

14    be obtained directly or cannot be translated into a reasonably useable form without undue burden

15    on NSO.

16        3.    Definition No. 8 ("Identify," "Identity," or "Describe"): NSO objects to the

17    definitions of "Identify," "Identity," and "Describe" as overly broad and unduly burdensome. NSO

18    further objects that any interrogatories incorporating these definitions are compound and that the

19    number of interrogatories and subparts propounded exceeds the limit set forth in Federal Rule of

20    Civil Procedure 33(a)(1). NSO will assign to the terms above their plain and ordinary meaning and

21    reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should these definitions

22    be incorporated into the interrogatories below.

23        4.    Definition No. 10 ("NSO Customer"): NSO objects to the definition of "NSO

24    Customer" to the extent that it includes Persons who did not (1) execute an agreement with NSO

25    or other entity authorized to license NSO technology; (2) obtain access to NSO technology; and

26    (3) use NSO technology. NSO further objects to this definition to the extent that it incorporates

27    the term "NSO Spyware" for the reasons set forth below in Paragraph 5. NSO expressly

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    incorporates by reference those objections here.

2        5. Definition No. 11 ("NSO Spyware"): Defendants object to the definition of "NSO

3    Spyware" as biased and prejudicial. The term "Spyware" is an inherently pejorative term that

4    baselessly maligns Defendants' products. Defendants will not refer to its products—which are

5    used by law enforcement to catch the worst of criminals—as "Spyware." Defendants further object

6    to the overly broad scope of this definition. Defendants further object to the definition of "NSO

7    Spyware" because that definition results in every Topic incorporating it to be requesting

8    information related to technologies other than the Pegasus technology that was used with respect

9    to the approximately 1,400 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7).

10   Unless otherwise indicated, Defendants will use the phrase "Accused Technology" or "Accused

11   Technologies" in any response to the Topic containing the term "NSO Spyware." Defendants

12   define "Accused Technology" or "Accused Technologies" as any NSO Technology targeting or

13   directed at WhatsApp servers or using WhatsApp in any way to access Target Devices, from April

14   29, 2018 through May 10, 2020, in accordance with the definition set forth by the Court in its

15   Order dated February 23, 2024.

16       6. Definition No. 12 ("Person(s)"): NSO objects to the definition of "Person(s)" as vague,

17   ambiguous, and overbroad. The definition includes 16 distinct roles or types of entities.

18   Responding to any interrogatory that relies on such a broad definition of "Person," moreover,

19   would be unduly burdensome and not proportional to the needs of the case. NSO further objects

20   to the extent that the proposed definition seeks information outside of its possession, custody, or

21   control (e.g., the corporate structure, ownership, or members of third-party companies).

22       7. Definition No. 14 ("Technology"): NSO objects to the definition of "Technology" as

23   vague, ambiguous, and overbroad. The definition is extremely expansive and responding to any

24   interrogatories that incorporate this definition would be unduly burdensome and not proportional

25   to the needs of the case.

26       8. Definition No. 15 ("WhatsApp Computers"): NSO objects to the definition of

27   "WhatsApp Computer" as vague, ambiguous, and overbroad—particularly to the extent that the

28   SUPPLEMENTAL OBJECTIONS AND                        5                    Case No. 4:19-cv-07123-PJH
     RESPONSES TO PLAINTIFFS' FIRST
     SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

definition purports to include and encompass the WhatsApp mobile and desktop applications. NSO interprets "WhatsApp Computers" as any computer or server Defendants know are owned, operated or controlled by Plaintiffs. NSO further objects to the extent that the definition requests information outside of NSO's possession, custody, or control. NSO, for example, may have no ability to determine whether a particular computer or server was owned, operated, or controlled by Plaintiffs or whether any particular device had the WhatsApp mobile or desktop applications installed.

9. Definition No. 16 ("You" or "Your"): NSO objects to the definition of "You" and "Your" as vague, ambiguous, and overbroad. The definition improperly includes a host of people and entities, including NSO's "current and former directors, employees, subsidiaries, corporate parents, affiliates, agents, representatives, and all other persons acting or purporting to act on its behalf." Responding to any interrogatory that incorporates this term would be unduly burdensome and not proportional to the needs of the case. Unless otherwise indicated, any response to an interrogatory containing the term "You" or "Your" is limited to Defendant NSO and its employees.

## INSTRUCTIONS

1.       NSO objects to the instructions to the extent that they seek to impose obligations, requirements, or procedures beyond those required under applicable federal rules, federal laws, local rules, or judicial standing orders.

2.       NSO objects to the extent that the instructions render the interrogatories compound or create subparts that exceed the limit set forth in Federal Rule of Civil Procedure 33(a)(1). NSO reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should Plaintiff seek to compel compliance with any such instructions.

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify all NSO Spyware that You directly or indirectly developed, marketed, promoted, distributed, maintained, sold, licensed, tested, deployed, operated, acquired, used, or for which You provided technical or operational support, from January 1,2018 through the present, including

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

but not limited to Pegasus and Phantom. Your response should identify any and all brand or marketing name(s) for each NSO Spyware and, without limiting the foregoing, explain the differences (if any) between each NSO Spyware.

**RESPONSE TO INTERROGATORY NO. 1:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. Plaintiffs' claims are based on allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. Information regarding other NSO products is neither relevant nor proportional to the needs of the case. NSO incorporates by reference its objection to the defined terms "Identify" and "NSO Spyware."  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case.  The Court has limited the scope of discovery to the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates by reference its objection to the defined terms "Identify," "NSO Spyware," and "You."  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Federal Rule of Civil Procedure.  NSO objects to the extent that the interrogatory is duplicative or

2  cumulative of Interrogatory No. 2.

3         Subject to these objections, and without waiving them, NSO identifies the Accused

4  Technologies as follows:  The Accused Technologies consist of three versions of Pegasus referred

5  to internally at NSO as Heaven, Eden, and Erised.  Pegasus consists of a suite of different

6  technologies and functions that are branded and marketed together.  The different technologies

7  that fall under the "Pegasus" brand name provide law enforcement, military, and intelligence

8  agencies of NSO's government customers with the ability to gain access to mobile devices for the

9  purposes of preventing or investigating terrorism and serious crime.

10        Two principal differences among the versions of Pegasus are the vector through which the

11  ultimate Pegasus software is installed on a mobile device, and the applicable type/operating system

12  of device.  Heaven transmitted information via WhatsApp's signaling servers to Android devices

13  in order to trigger the installation of Pegasus on such devices; Eden transmitted information via

14  WhatsApp's signaling and relay servers to Android devices to trigger the installation of Pegasus

15  on such devices; and Erised transmitted information through WhatsApp's signaling servers to

16  trigger the installation of Pegasus on Samsung Android devices.  Additional differences between

17  these installation vectors are described below in response to Interrogatory No. 2.

18        Furthermore, based on the information currently available to NSO, Phantom was a trade

19  name used by Westbridge Technologies, Inc., when it marketed Pegasus (with necessary

20  configuration modifications) to potential government customers in the United States.

21  **INTERROGATORY NO. 2:**

22        Describe how each of the NSO Spyware identified in response to Interrogatory No. 1

23  functioned, including how it was designed to be installed on a Device, the methods used to install

24  it on a Device, how it was used after being installed on a Device, how it exfiltrated data from a

25  Device on which it was installed, and how it accessed or used any WhatsApp Computers.

26  **RESPONSE TO INTERROGATORY NO. 2:**

27        NSO objects to the extent that the interrogatory seeks information that is neither relevant

28  SUPPLEMENTAL OBJECTIONS AND              8              Case No. 4:19-cv-07123-PJH
    RESPONSES TO PLAINTIFFS' FIRST
    SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any of its technologies "accessed or used any WhatsApp Computers") and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control.  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers."  NSO will interpret those phrases as defined above.  NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control.  NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   interrogatory contains compound questions or subparts that causes the number of written

2   interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

3    Subject to and without waiving these objections, NSO responds that Pegasus was generally

4   configured to operate in three stages: (1) a government Pegasus user would trigger an installation

5   process to initiate contact with a target device to install a Pegasus agent, (2) pursuant to those

6   instructions, the target device would eventually reach out to a third-party server to obtain and

7   install the Pegasus agent, and (3) the government Pegasus user would interact with the Pegasus

8   agent on the target device to perform the desired surveillance activity.  With respect to the Accused

9   Technologies—Heaven, Eden, and Erised—only the initial installation phase made use of any

10   WhatsApp Computer.  The Pegasus agent was ultimately installed on a monitored device and no

11   WhatsApp Computer was involved in any data exfiltration.

12    **1.   Eden**

13    The Eden installation process began with a "fingerprinting" stage, whereby Eden would

14   gather information about the callee (target) device. This information gathering included querying

15   the WhatsApp server whether the callee device was associated with an active WhatsApp account,

16   using normal APIs that the server made available, using the exact same process that occurs every

17   time a WhatsApp user inputs a new phone number and attempts to contact that callee device. Eden

18   also obtained information about the callee device (such as whether the callee device was online)

19   by exchanging messages with that callee device over WhatsApp servers.  None of this activity

20   accessed any part of the WhatsApp servers that was off limits to WhatsApp users.

21    After the information gathering described above, Pegasus would establish a VoIP call

22   connection with the callee device through WhatsApp servers. Specifically, Pegasus would send a

23   "call offer" to a WhatsApp signaling server (which is the server responsible for establishing VoIP

24   call connections between clients) requesting to be connected to the callee device. WhatsApp

25   signaling servers are configured to pass that request to the callee device.

26    The WhatsApp signaling server permitted the call offer to include values for various call

27   settings and parameters. These included a string parameter named "connecting_tone_desc" and a

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

call setting for enabling an XOR cipher. Eden set the value of the "connecting_tone_desc" parameter to a string defining a shell script and executable, which the callee device would later execute.  Eden would also enable the XOR cipher made available by the WhatsApp server. The WhatsApp signaling server was configured to simply pass the call offer, including those parameter values, to the callee device.  The WhatsApp server did not execute or interpret the shell script or executable. Nor did the WhatsApp server perform any function that it was not programmed to perform on behalf of all users.

The WhatsApp signaling server did not execute any Eden code, and thus, Eden did not obtain any access to the signaling server that exceeded its authorization. Rather, Eden simply used the signaling server as a conduit through which to pass parameter values to the callee device.

Eden then exchanged additional messages with the callee device to obtain additional information about that device, such as whether it was a 32-bit or 64-bit device. Eden exchanged these additional messages with the callee device using traditional and legitimate functions of the WhatsApp relay server, including those enabling relay negotiation and bandwidth estimation between devices.

After Eden determined whether the callee device was 32-bit or 64-bit, it would send a duplicate call offer message to the callee device through the WhatsApp servers to do a transport restart.

Eden then exchanged additional messages with the callee device to configure the callee device to disclose certain memory information. These messages included oversized bandwidth estimation packets that caused the callee device to overwrite certain pointers.

Eden then upgraded the call to a group call, wherein the participating devices exchange additional messages, including capability buffers and pre-accept messages (standard procedures in the WhatsApp VoIP system). These messages included parameter values that pointed to and enabled execution of the shell script sent in the "connecting_tone_desc" parameter earlier in the process.

Finally, Eden would terminate the calls by sending the standard call termination message

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to the WhatsApp signaling server. This would cause the callee device to initiate its normal termination procedure, and cause the callee device to execute the shell script that Eden had sent to the callee device in the initial call offer at the start of the process.

The shell script instructs the callee device to reach out to third-party servers to download and install additional data packets, including the Pegasus agent. Subsequently, the Pegasus user could interact with the Pegasus agent directly, again, without use of any WhatsApp servers or client software.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

**2. Heaven**

Heaven and Eden leveraged the same client-side vulnerability in the operating system of the callee-device. The primary difference between those two delivery vectors was the identity of the relay servers Pegasus used to communicate with the target device.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

**3. Erised**

Erised followed Heaven and Eden, and it targeted a completely different client-side vulnerability—specifically, a vulnerability in the way certain Android devices rendered images at the time. That vulnerability existed in those devices, and so the delivery mechanism did not rely on any vulnerability in WhatsApp. In other words, the vulnerability could have been exploited through many other applications.

Like Heaven and Eden, Erised used the WhatsApp signaling servers to perform the initial fingerprinting and to communicate messages to the callee device during the initial stage of the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  installation process. Erised sent many types of messages to the callee device over those signaling

2  servers (e.g., image messages, contact lists, etc.) to prepare the device's memory layout in a

3  manner that enabled eventual access to the client-side vulnerability described above. Again, the

4  messages sent by Erised over the WhatsApp signaling servers were permitted by those servers,

5  and none caused any impermissible execution on the servers.

6        ***

7        Once installed, the capabilities of Pegasus were variable and customizable, in part so that

8  government customers could configure data collection to conform to any local legal restrictions.

9  Pegasus could be configured to collect historical data, passively to monitor new data, and actively

10 to collect other new or real-time data.  The relevant data would be transmitted to the government

11 customer's "backend" server using the active communication method.

12 **INTERROGATORY NO. 3:**

13       Describe how You developed, maintained, improved, tested, acquired, marketed,

14 promoted, distributed, sold, licensed, deployed, operated, or provided technical or operational

15 support for each of the NSO Spyware identified in response to Interrogatory No. 1 from January

16 1, 2018 through the present, including a description of any change, upgrade, or update to each

17 NSO Spyware.

18 **RESPONSE TO INTERROGATORY NO. 3:**

19       NSO objects that this interrogatory is vague, ambiguous, and overly broad such that

20 providing a response would be unduly burdensome. NSO objects that the interrogatory contains

21 compound questions or subparts that causes the number of written interrogatories to exceed the

22 limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the

23 interrogatory seeks information that is neither relevant nor proportional to the needs of the case—

24 including, but not limited to, information that is not relevant to Plaintiffs' allegations that

25 Defendants operated a software called "Pegasus" that was deployed against certain "Target

26 Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO

27 incorporates by reference its objections to the defined terms "Describe," "You" and "NSO

28 SUPPLEMENTAL OBJECTIONS AND                    13                    Case No. 4:19-cv-07123-PJH
   RESPONSES TO PLAINTIFFS' FIRST
   SET OF INTERROGATORIES (1-3, 6-9)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

NSO objects that this interrogatory is vague, ambiguous, and overly broad such that providing a response would be unduly burdensome. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case— including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Describe," "You" and "NSO Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

Subject to these objections, and without waiving them, NSO responds as follows.

Research and development activities are generally not documented, including the development process for any particular exploit or installation vector. Generally, however, the development of the Accused Technologies identified in response to Interrogatory No. 1 involved NSO identifying pre-existing anomalies that would permit buffer overflows, as described in response to Interrogatory No. 2. NSO also conducted "black box" research by sending WhatsApp messages from one NSO-controlled device to another. NSO then evaluated the communications sent between the devices and the WhatsApp server, created an internal testing environment, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

continued the development using purely internal infrastructure and devices.  As noted in response to Interrogatory Nos. 1 and 2, NSO developed three covert installation vectors for Pegasus for Android devices over the relevant time period defined by the Court: Heaven, Eden, and Erised. The differences between those installation vectors is described above in response to Interrogatory No. 2.

Once NSO developed the installation programs, it tested the programs using an internal, NSO-controlled caller device to install Pegasus on a second NSO-controlled callee device.

The marketing, promotion, distribution, sale, and licensing of Pegasus—including the capability to conduct zero-click or covert installations on Android devices using the Accused Technologies—was overseen by both an internal business ethics committee and the Government of Israel's Ministry of Defense.  NSO only markets and licenses Pegasus to governments and governmental entities for legitimate law enforcement, counterterrorism, and intelligence purposes. The business ethics committee assessed prospective governments and government agencies, including the potential for misuse of Pegasus.  If the committee approved a customer, NSO would then apply to the Government of Israel's Defense Export Control Agency for a marketing license. If a marketing license was granted, NSO would then be permitted to demonstrate Pegasus to the prospective government customer.  These demonstrations were conducted using devices owned or controlled by NSO or by the government customer.  Where licensing terms were agreed upon, NSO would then seek an export license from the Defense Export Control Agency.  As part of the approval process, the government customer would be required to certify that it would only use Pegasus in compliance with all applicable laws; would only use Pegasus for the prevention and investigation of crimes and terrorism; and would ensure that Pegasus is not used in violation of human rights.

Upon receiving an export license from the Israeli Defense Export Control Agency and upon executing all applicable contracts and certifications with the government customer, NSO would deploy the hardware and software that comprises the Pegasus system on the government customer's premises.  NSO would provide initial training to the government customer, but at all

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  times would be prohibited from participating or assuming any role in the activation, operation, or

2  use of the system.

3      Upon successful deployment of the Pegasus system, NSO's role would be limited to

4  providing technical support to government customers, pursuant to the terms of the applicable

5  license.  Depending on the terms, NSO would potentially retain the discretion to issue periodic

6  software releases or patches addressing product features, bug fixes, compatibility issues, and

7  support for newly-released versions of operating systems.

8      **INTERROGATORY NO. 6:**

9      Identify the basis for Your Sixth Separate and Additional Defense in Your Answer, which

10  stated that "Plaintiffs' claims are barred on the grounds that Defendants acted in good faith and

11  pursuant to legitimate law enforcement, national security, intelligence and business justifications"

12  (Answer at 9), including all Documents and Communications you received analyzing how NSO

13  Customers used NSO Spyware, whether NSO Customers complied with any conditions, criteria,

14  or limitations imposed by You on the use of NSO Spyware, and whether NSO Spyware complied

15  with all applicable laws, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the

16  California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502.

17      **RESPONSE TO INTERROGATORY NO. 6:**

18      NSO objects to the extent that the interrogatory seeks information that is neither relevant

19  nor proportional to the needs of the case—including, but not limited to, information that is not

20  relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was

21  deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during

22  April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify,"

23  "Your," "Documents," "NSO Customers," and "NSO Spyware." NSO objects to the extent that

24  the interrogatory seeks information protected from disclosure by the attorney-client privilege, the

25  attorney work-product doctrine, or any other privilege or protection against disclosure. NSO

26  objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or

27  other confidential, proprietary, or competitively sensitive business information. NSO objects to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are best answered after related discovery has been completed.

NSO is willing to meet and confer regarding the most appropriate timeframe for providing a response to this interrogatory, including the factual basis for the identified affirmative defense.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms "Identify," "Your," "Documents," "NSO Customers," and "NSO Spyware."  NSO objects that the interrogatory is overly broad and unduly burdensome to the extent that it requests the identification of "all" documents or communications received by NSO on the stated subject matter.  NSO objects to the extent that the interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  best answered after related discovery has been completed, and as of the date of this supplemental

2  response, neither fact nor expert discovery has been completed.

3      Subject to these objections, and without waiving them, NSO identifies the following facts

4  as relevant to Plaintiffs' inability to prove essential elements of its case, as well as to NSO's sixth

5  and other related affirmative defenses:

6      NSO designed the Pegasus technology to be used solely by governments and government

7  agencies in connection with lawful law-enforcement and intelligence investigations, and solely to

8  the extent authorized by the domestic laws of those governments and government agencies.  In

9  this respect, the Pegasus technology is no different from wiretaps or other surveillance tools used

10  by the U.S., state, and local governments subject to court-ordered warrants. The marketing and

11  licensing of Pegasus is also overseen by the Government of Israel, consistent with the Israeli

12  Defense Export Control Law.  The Ministry of Defense, and more specifically the Defense Export

13  Control Agency within the Ministry of Defense, will only grant export licenses to government end

14  users.  NSO's contracts with its government customers thus require those customers to use Pegasus

15  only in connection with lawful law enforcement and intelligence investigations, and only to the

16  extent authorized by the domestic laws of those governments and government agencies. In

17  addition, NSO's business ethics committee, staffed by former high-ranking U.S. national security

18  officials, conducts in-depth reviews of potential Pegasus sales for consistency with the

19  technology's law-enforcement purposes and with international human rights standards, including

20  the U.N. Guiding Principles on Business and Human Rights.

21      Among other contracts, in 2018, Westbridge Technologies, Inc., entered into contracts to

22  license Pegasus to the Federal Bureau of Investigation (after having received previous requests for

23  assistance from the Bureau).  NSO understands from Westbridge that these contracts required NSO

24  to keep Pegasus updated so that the FBI (and other sovereign government customers that were

25  approved to license the technology) could continue to use Pegasus effectively in foreign law-

26  enforcement and intelligence operations.

27      These facts are relevant to Plaintiffs' inability to prove the essential elements of their

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  claims under the Computer Fraud and Abuse Act ("CFAA") the California Comprehensive

2  Computer Data Access and Fraud Act ("CDAFA"). ***First***, to the extent that any U.S. government

3  entity licensed Pegasus, activities relating to any such contract would constitute "lawfully

4  authorized investigative, protective, or intelligence activity of a law enforcement agency of the

5  United States . . . or of an intelligence agency of the United States," which the CFAA "does not

6  prohibit." 18 U.S.C. § 1030(f). ***Second***, legal authorization by the governments that used the

7  Pegasus technology prevents Plaintiffs from proving that any use of Pegasus by those governments

8  was "without authorization" or "without permission" under the CFAA and CDAFA. ***Third***, the

9  CFAA cannot properly be interpreted to prohibit foreign governments and government agencies

10  from accessing computers located outside the United States as part of law-enforcement and

11  intelligence investigations authorized by those foreign governments' own laws. The presumption

12  against extraterritoriality prohibits any interpretation of the CFAA that would construe it as

13  applying to a foreign government's access to foreign computers. The doctrine of constitutional

14  avoidance leads to the same conclusion, because a statute that did apply to such purely foreign

15  conduct would exceed Congress's constitutional authority under the Foreign Commerce Clause.

16  Similarly, the CDAFA must be interpreted to apply only to California computers because a broader

17  interpretation would violate the presumption against extraterritoriality and exceed California's

18  regulatory authority under the Dormant Commerce Clause and Due Process Clause. ***Fourth***,

19  NSO's intent and belief that any use of the Pegasus technology would be in connection with a

20  lawful government investigation authorized by that government's laws prevents WhatsApp from

21  proving that NSO "intentionally" or "knowingly" accessed any computer "without authorization"

22  or "without permission," as the CFAA and CDAFA require. 18 U.S.C. § 1030(a); Cal. Penal Code

23  § 502(c).

24          To the extent that the Court construes any of these issues to constitute affirmative defenses

25  (including but not limited to NSO's sixth affirmative defense) rather than elements of Plaintiffs'

26  claims, the same facts would be relevant to those affirmative defenses.

27

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 7:**

Identify and describe annual sales, licensing fees, profits and/or revenues that You derived directly or indirectly from the development, marketing, promotion, distribution, maintenance, sale, licensing, testing, deployment, operation, acquisition, provision of technical or operational support, or other commercialization of each of the NSO Spyware identified in response to Interrogatory No. 1 from January 1, 2018 through the present.

**RESPONSE TO INTERROGATORY NO. 7:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify," "Describe," "You," and "NSO Spyware." NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information that may be protected by Israeli privacy laws or any other applicable law.  NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO incorporates by reference its objections to the defined terms "Identify," "Describe," "You," and "NSO Spyware." NSO objects to the extent that the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information that may be protected by Israeli privacy laws or any other applicable law. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory prematurely seeks expert opinion or testimony.

Subject to and without waiving those objections, NSO responds that it has undertaken a detailed financial analysis and has calculated the revenues it earned from the zero-click Pegasus for Android version in operation at the time of the events set forth in the Complaint (April-May 2019) as $7,161,342.17. The amount of profit associated with that revenue is a subject of expert testimony.

**INTERROGATORY NO. 8:**

Describe how You reverse engineered the WhatsApp client, including but not limited to downloading and testing different versions of the WhatsApp client and using the WhatsApp service.

**RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. NSO objects that the term "WhatsApp client" is vague and ambiguous. NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative. NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024.  NSO objects that the terms "reverse engineered" and "WhatsApp client" are vague and ambiguous. NSO will interpret the term "reverse engineered" to mean "examining a product in order to determine its construction, composition, or operation, typically with a view to manufacturing a similar product."  NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative.  NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

Subject to and without waiving these objections, NSO responds that when researching and developing the Accused Technologies, it did not reverse engineer the WhatsApp client as NSO understands that term.  NSO studied the WhatsApp client, including by using the client to send messages and studying the content of those messages and responses. NSO also used commercially available analysis tools to understand the function of the WhatsApp client application.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 9:**

Identify all WhatsApp accounts associated with or used for the development, testing, or transmission of NSO Spyware.

**RESPONSE OT INTERROGATORY NO. 9:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify" and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any WhatsApp accounts were associated with or used for the purposes indicated) and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Identify" and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any WhatsApp accounts were associated with or used for the purposes indicated) and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.  NSO further objects to the extent this interrogatory seeks disclosure of NSO's third-party clients, as the Court has ordered that Defendants need not disclose those clients (Dkt. No. 292 at 5).

Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), NSO responds that it is in the process of producing unredacted documents from Production Volume 8 (and potentially other volumes) that contain information responsive to this interrogatory.  This includes, but is not limited, to NSO_WHATSAPP_00012913 and NSO_WHATSAPP_00044814, which were reproduced to the plaintiffs on September 13, 2024.

Dated: September 13, 2024           KING & SPALDING LLP

                                    By:    */s/ Joseph N. Akrotirianakis*
                                           JOSEPH N. AKROTIRIANAKIS
                                           AARON S. CRAIG

                                           Attorneys   for   Defendants   NSO
                                           GROUP TECHNOLOGIES LIMITED
                                           and   Q   CYBER   TECHNOLOGIES
                                           LIMITED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

<u>**VERIFICATION**</u>

2    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

3  United States of America that I am Yaron Shohat; that I am the Chief Executive Officer of NSO

4  Group Technologies Limited; that I have reviewed the supplemental interrogatory responses set

5  forth above; and that based on reasonable inquiry the foregoing answers are true and correct to

6  the best of my knowledge, information, and belief.

7    Executed on September 13, 2024.

8

9    _____

10    YARON SHOHAT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

## **PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California. I am employed in the County of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

On September 13, 2024, I served the following documents in the manner described below:

**DEFENDANT NSO GROUP TECHNOLOGIES LIMITED'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES NOS. 1-3, 6-9**

☑    BY ELECTRONIC MAIL: I caused the document(s) to be sent to the person(s) at their e-mail address(es). I did not receive, within a reasonable amount of time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

On the following part(ies) in this action:

### **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 13, 2024, at Los Angeles, California.

By: _____

MINA TUNSON

**SERVICE LIST**

Greg D. Andres
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4724
Email: greg.andres@davispolk.com

Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4559
Email: antonio.perez@davispolk.com

Craig T. Cagney
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-3162
Email: craig.cagney@davispolk.com

Micah G. Block
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Email: micah.block@davispolk.com

# EXHIBIT 7

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                     OAKLAND DIVISION
 3
      - - - - - - - - - - - - - - - - -
 4                                    )
      WHATSAPP INC., a Delaware       )
 5    corporation, and META PLATFORMS, )
      INC., a Delaware corporation,   )
 6                                    )
                        Plaintiffs,  )
 7                                    )  Case No.:
      v.                              )  4:19-cv-07123-PJH
 8                                    )
      NSO GROUP TECHNOLOGIES LIMITED   )
 9    and Q CYBER TECHNOLOGIES LIMITED,)
                                      )
10                      Defendants.  )
      - - - - - - - - - - - - - - - - -
11       Highly Confidential - Subject to Protective Order
12            VIDEO DEPOSITION OF RAMON ESHKAR
13                 Tuesday, August 27, 2024
14                Commencing:  9:17 a.m. BST
15
16               Davis Polk & Wardwell LLP
                   5 Aldermanbury Square
17                    London, EC2 7HR
                     United Kingdom
18
19
20
21
22
23
24    Court Reporter:
      Chanelle Malliff, CLR
25
```

HIGHLY CONFIDENTIAL

Page 14

1  colleague.
2      Q.  Who is that colleague?
3      A.  An employee of mine.
4      Q.  What is that employee's name?
5      A.  ████
6      Q.  And the surname?
7      A.  ████
8      Q.  ████ like ████
9      A.  Yes.
10     Q.  What is Mr. ████ job?
11     A.  He's responsible for the customer support.
12     Q.  Do you know Mr. ████ title?
13     A.  Yeah, it's VP, customer support.
14     Q.  Mr. ████ reports to you?
15     A.  Yes.
16     Q.  When did you review your understanding with
17  Mr. ████
18     A.  During my stay at the -- in Israel, like a
19  few days ago.
20     Q.  How long was the conversation that you had in
21  preparation for this deposition with Mr. ████
22     A.  Not more than an hour.
23     Q.  And what did you and Mr. ████ discuss?
24     A.  Just the processes related to this topic.
25     Q.  And by "this topic" you mean?

Page 15

1      A.  I mean creation, what's related to the
2  opening account.
3      Q.  On WhatsApp?
4      A.  Yeah.
5      Q.  And why is Mr. ████ as VP of customer
6  support, an appropriate person to talk to about the
7  processes that defendants follow related to creating
8  accounts on WhatsApp?
9          MR. AKROTIRIANAKIS:  Objection: misstates the
10  witness's testimony.
11         THE WITNESS:  I'm sorry?
12         MR. AKROTIRIANAKIS:  If you understand his
13  question you can answer.
14         THE WITNESS:  Can you please repeat?
15  BY MR. BLOCK:
16     Q.  Is creating accounts on WhatsApp part of
17  Mr. ████ job?
18     A.  No, it's part of one of his department's job.
19     Q.  Which department is that?
20     A.  The white services department.
21     Q.  What is the white services department?
22     A.  It's a department responsible for creating
23  accounts and purchasing other services that we need.
24     Q.  Why is it called white services?
25         MR. AKROTIRIANAKIS:  Objection: foundation.

Page 16

1          THE WITNESS:  I'm sorry?
2  BY MR. BLOCK:
3      Q.  Why is it called white services?
4          MR. AKROTIRIANAKIS:  Same objection.
5          THE WITNESS:  Actually the name was decided
6  before I join so I can't recall the reason.
7  BY MR. BLOCK:
8      Q.  Do you have an understanding of what makes a
9  service a white service?
10     A.  I do.
11     Q.  What is that?
12     A.  It means that the service is being set up in
13  an anonymized way.
14     Q.  Is one of the services that defendants set up
15  in an anonymized way WhatsApp?
16         MR. AKROTIRIANAKIS:  Objection: vague.
17         THE WITNESS:  Again?  Again, sorry?
18  BY MR. BLOCK:
19     Q.  What are the services that the white services
20  department deals in?
21     A.  There are a few services.
22     Q.  Is WhatsApp one of them?
23         MR. AKROTIRIANAKIS:  Objection: vague.
24         THE WITNESS:  What?
25         MR. AKROTIRIANAKIS:  I said "objection:

Page 17

1  vague".  If you understand his question though you
2  can answer.
3          THE WITNESS:  Okay.  Sorry, come again?
4  BY MR. BLOCK:
5      Q.  Sure.  Is WhatsApp one of the services that
6  the white services department of defendants deals
7  with?
8          MR. AKROTIRIANAKIS:  Same objection.
9          THE WITNESS:  Yes, they deal with it.
10  BY MR. BLOCK:
11     Q.  Okay, tell me how the white services
12  department -- so, withdrawn.
13         Does the white services department set up
14  WhatsApp accounts in an anonymized way?
15     A.  They do.
16     Q.  And what does it -- what do you mean by in
17  an anonymized way?
18     A.  It means that they're created in a way that
19  will be secure an obstacle where -- to the use of the
20  service later on.
21     Q.  What do you mean by secure?
22     A.  I mean that the infrastructure will protect
23  the customer when using the account.
24     Q.  Does that mean protect the customer from
25  having its identity discovered?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1      A.  What do you mean by his identity?
2          MR. AKROTIRIANAKIS:  Sorry, is this a
3  realtime tablet?  It's not working.
4          (Pause)
5  BY MR. BLOCK:
6      Q.  Why do your -- is it accurate that your
7  customers want their WhatsApp accounts to be set up
8  in an anonymized way?
9          MR. AKROTIRIANAKIS:  Objection: no
10  foundation.
11          THE WITNESS:  What do you mean?
12  BY MR. BLOCK:
13      Q.  I'm asking why you set up anonymized WhatsApp
14  accounts for your customers?
15      A.  The entire infrastructure is anonymized to
16  protect the customer and the infrastructure that
17  they're using.
18      Q.  Is that to protect the customer from being
19  identified?
20          MR. AKROTIRIANAKIS:  Objection: vague.
21          THE WITNESS:  What do you mean by identified?
22  BY MR. BLOCK:
23      Q.  Let me just ask you.  In what regard are you
24  trying to protect the customer by anonymizing the
25  WhatsApp service?

Page 19

1      A.  We want to [Hebrew] to.
2          MR. BLOCK:  May we have help from the
3  translators, please?
4          THE INTERPRETER:  Distance.  We would like to
5  distance.
6          THE WITNESS:  Would like to distance --
7  I'm not so sure it's the word, but to, let's say,
8  distance the customer.
9  BY MR. BLOCK:
10      Q.  From whom?
11      A.  From the environment so that they can run
12  their operation in a secured way, not to expose their
13  operation.
14      Q.  You also said you create the accounts in a
15  way that will be "op sec aware" to the use of the
16  service later on.  Did I get that right?
17      A.  Op sec, operational security.
18      Q.  Okay, and what does it mean to be op sec
19  aware to the use of the service later on?
20      A.  What I mean is that you apply all the measure
21  that you can in order to protect the activity, the
22  operation.
23      Q.  And that's again to protect it from being
24  discovered by third parties?
25          MR. AKROTIRIANAKIS:  Objection: misstates

Page 20

1  testimony.
2          THE WITNESS:  By another one.
3  BY MR. BLOCK:
4      Q.  By another one?  Someone other than the
5  customer who is operating the service and NSO itself?
6          MR. AKROTIRIANAKIS:  Objection: misstates
7  testimony.
8  BY MR. BLOCK:
9      Q.  Correct?
10      A.  The customer.
11      Q.  Someone other than the customer?
12      A.  Someone other than the customer.
13      Q.  Do you create the WhatsApp services for the
14  customer in a way that can be traced back to NSO?
15          MR. AKROTIRIANAKIS:  Objection: vague.
16          THE WITNESS:  What do you mean by "can be
17  traced back"?
18  BY MR. BLOCK:
19      Q.  So that another can identify NSO as the
20  entity that created the WhatsApp account?
21      A.  So the question is?
22          MR. AKROTIRIANAKIS:  Object to the form of
23  the question.
24  BY MR. BLOCK:
25      Q.  Do you create the WhatsApp services for the

Page 21

1  customer in a way that can be traced back to NSO?
2          MR. AKROTIRIANAKIS:  Object to the form of
3  the question.  Vague.
4          THE WITNESS:  We create services in
5  an anonymous way.
6  BY MR. BLOCK:
7      Q.  Anonymous for the customer and anonymous for
8  NSO; is that right?
9          MR. AKROTIRIANAKIS:  Objection: misstates
10  testimony.
11          THE WITNESS:  Anonymous mean anonymous, so in
12  an anonymous way.
13  BY MR. BLOCK:
14      Q.  Okay, so why don't we start at the beginning.
15  In what circumstance will NSO create an anonymized
16  WhatsApp account?
17      A.  In what ways?
18      Q.  When does it happen?
19      A.  When does it happen.  Okay.  Either for
20  demonstrations, for real system, customer systems.
21          (Reporter clarification.)
22  For real systems.
23      Q.  Real systems, is that what you said?
24      A.  Systems that are being used by the customer.
25      Q.  So just to clarify my record because we had

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1  some cross talk, which I appreciate. Let me ask the
2  question again, is that okay?
3      A. Please.
4      Q. In what circumstances will NSO create
5  anonymized WhatsApp accounts?
6      A. So for the use of demonstration, to set up a
7  customer system, and for internal use mainly for
8  testing.
9      Q. Is the internal use research and development?
10     A. Yes, all preparation for demo training.
11     Q. Okay, let's focus on the research and
12  development use case. Has NSO in fact created
13  anonymized WhatsApp accounts for its own use for
14  research and development?
15     MR. AKROTIRIANAKIS: Objection. It's beyond
16  the scope of this witness's designation. We have
17  another designee for that. If you know the answer to
18  the question you can answer in your personal
19  capacity.
20     THE WITNESS: In that sense we provide a
21  service to our colleagues. So we are being asked to
22  provide, and we provide.
23     MR. BLOCK: Joe, who will be the witness on
24  that?
25     MR. AKROTIRIANAKIS: Mr. Gazneli.

Page 23

1  BY MR. BLOCK:
2      Q. When you say provide a service to colleagues,
3  which colleagues are you talking about?
4      A. I wanted to refer to R&D as a department. So
5  when they approach my department, and my department
6  provide them with the account that they're asking.
7      Q. And specifically Mr. Itzhak's department
8  within your department provides that account?
9      A. Correct.
10     Q. Okay, and how does that happen?
11     MR. AKROTIRIANAKIS: Objection: no
12  foundation.
13  BY MR. BLOCK:
14     Q. Let me pull back. You spoke with Mr. Itzhak
15  to confirm the processes that defendants used to
16  create these anonymized accounts as part of your
17  preparation to testify today; is that right?
18     A. I discussed with Avi my understanding of the
19  processes to make sure that I am ready for this
20  session.
21     Q. Please explain the process of setting up
22  an anonymized WhatsApp account at NSO?
23     A. So we get a request. The team that
24  responsible for the creation of the accounts get a
25  request, and they follow, create the accounts as

Page 24

1  requested, and provide it back.
2      Q. Okay, I want to focus on the part of the
3  process where they create the account as requested.
4  What happens step-by-step?
5      MR. AKROTIRIANAKIS: Objection: no
6  foundation.
7      THE WITNESS: So I'm not creating the
8  account -- the accounts myself, so I gave a general
9  description of that, okay? So for example they're
10  being asked to provide one account so the relevant
11  employee will create the account, like anyone
12  creating a WhatsApp account, follow the same steps,
13  and provide the details to the one that asked it.
14  BY MR. BLOCK:
15     Q. Will the relevant employee when creating this
16  account use a real name?
17     A. He will use a name. It can be like two
18  letters. It can be something else.
19     Q. Is this done on a mobile interface or a web
20  interface, or in some different way?
21     A. In most cases it is being done by mobile.
22     Q. So let me see if I understand. The employee
23  on Mr. Itzhak's team will download a WhatsApp mobile
24  application on to a mobile device and register a
25  WhatsApp account, is that accurate?

Page 25

1      A. In most of the cases, yes.
2      Q. And in doing so that NSO employee will follow
3  the normal WhatsApp process for registration through
4  the WhatsApp application downloaded from
5  an application store; is that accurate?
6      MR. AKROTIRIANAKIS: Objection: vague.
7      THE WITNESS: He will follow the steps it
8  need in order to create the account.
9  BY MR. BLOCK:
10     Q. However they'll use a fake name, is that
11  accurate?
12     MR. AKROTIRIANAKIS: Objection: misstates
13  testimony.
14     THE WITNESS: They will put a name.
15  BY MR. BLOCK:
16     Q. A name that is not the real name of the
17  person creating the account or of the person who
18  requested it; correct?
19     A. Not the name of the one creating and not the
20  one that -- the one receiving.
21     Q. Is there any special process for deciding
22  what name to use?
23     A. No.
24     Q. Okay. Why does a relevant employee create
25  the account instead of the colleague creating it

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 38

1 he is an employee of mine. And the other were
2 related to what we are talking now.
3      Q. Okay. Did you discuss any other topics with
4 Mr. Itzhak that were specifically to prepare for your
5 testimony today besides the WhatsApp account creation
6 topics?
7      A. That was the main -- the main topic. We also
8 covered other topics such as training.
9      Q. Any others?
10      A. Maybe. It's like a normal call between us so
11 I don't remember them all but --
12      Q. I'm just trying to discover what information
13 you received from Mr. Itzhak for purposes of
14 testifying today. So you discussed training. We'll
15 talk about that in a moment.
16      A. Sure.
17      Q. Can you think of any others that you
18 discussed with him to prepare for your testimony?
19      A. Again, it was more to, in a way, just make
20 sure that I'm up to speed from my perspective because
21 I am aware of those processes anyway, so I just
22 wanted to make sure I'm aligned.
23      Q. What did you discuss about training?
24      A. You know like the agenda, the duration,
25 things like that.

Page 39

1      Q. Of a particular training?
2      A. No, in general.
3      Q. Okay. What is the agenda and duration of
4 training in general that you discussed with
5 Mr. Itzhak?
6      A. It's like a four-days training that will be
7 the average. Some will be less, some will be more.
8      Q. Is this training for customers or training
9 for NSO employees or something different?
10      A. For customers.
11      Q. Do defendants train customers to create
12 anonymized WhatsApp accounts?
13      A. No, we do not train. To the best of my
14 recollection we do not do that.
15      Q. But defendants do create anonymized WhatsApp
16 accounts for use by customers; is that accurate?
17      A. We do create accounts for the customers.
18      Q. And when is the most recent occasion when
19 defendants created an anonymized WhatsApp account for
20 use by a customer of which you are aware, sir?
21      MR. AKROTIRIANAKIS: Objection: no
22 foundation. Hold on, I've got to object first. No
23 foundation and it's beyond the scope of the
24 designation of this witness.
25      THE WITNESS: I think we talked about the

Page 40

1 timelines before, right? So I know that we have
2 created during the EU but not specifically a date
3 within.
4 BY MR. BLOCK:
5      Q. And you know you created anonymized WhatsApp
6 accounts for customers -- strike that.
7      You know that defendants created anonymized
8 WhatsApp accounts for use by customers in 2024;
9 correct?
10      MR. AKROTIRIANAKIS: Objection: no
11 foundation. Also beyond the scope of the designation
12 of this witness.
13      THE WITNESS: I would say for customers.
14 BY MR. BLOCK:
15      Q. You did it for customers or you did it for
16 four customers?
17      MR. AKROTIRIANAKIS: Object to the form of
18 the question.
19 BY MR. BLOCK:
20      Q. Let me just ask my question again. You know
21 that defendants created anonymized WhatsApp accounts
22 for use by defendants' customers during calendar year
23 2024; is that correct?
24      MR. AKROTIRIANAKIS: Objection: no
25 foundation. Also beyond the scope of the designation

Page 41

1 of this witness.
2      THE WITNESS: I'm not sure it's correct.
3 BY MR. BLOCK:
4      Q. When is the most recent occasion of which you
5 were aware when defendants created anonymized
6 WhatsApp accounts for use by one of defendants'
7 customers?
8      MR. AKROTIRIANAKIS: Objection: no
9 foundation. Also beyond the scope of the designation
10 of this witness.
11      THE WITNESS: I don't have a specific date in
12 mind.
13 BY MR. BLOCK:
14      Q. Do you know whether that occurred in 2018?
15      MR. AKROTIRIANAKIS: Objection: no
16 foundation.
17      THE WITNESS: In 2018 the department wasn't
18 under my responsibility.
19 BY MR. BLOCK:
20      Q. Do you know whether it occurred in 2019?
21      MR. AKROTIRIANAKIS: Same objection.
22      THE WITNESS: Same they were not part of my
23 department in 2019.
24 BY MR. BLOCK:
25      Q. Do you know whether it occurred in 2020?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 78

1     MR. AKROTIRIANAKIS: Objection: foundation.
2     THE WITNESS: I don't know how successful he
3  was in that time but it was his job to do that.
4  BY MR. BLOCK:
5     Q. Okay. Who at NSO supervised Mr. DiVittorio's
6  work?
7     MR. AKROTIRIANAKIS: Objection: foundation.
8  Assumes facts not in evidence.
9     A. I don't know who was responsible to
10 supervise.
11 BY MR. BLOCK:
12    Q. Okay. You had a client executive's role at
13 this time in 2019 that we're looking at on
14 Exhibit 2002; correct?
15    A. Yes, at that time I was, yes.
16    Q. Did your job responsibilities include
17 anything to do with the US market?
18    A. No, we were to provide the needed help to the
19 team at the US, not to anyone else.
20    Q. Does the client executive team at NSO work on
21 sales?
22    MR. AKROTIRIANAKIS: Objection: vague.
23    THE WITNESS: We need to define sales
24 actually.
25 BY MR. BLOCK:

Page 79

1     Q. Here's my understanding and I'm going to ask
2  you to give it in your own words. It sounds like you
3  would support a demonstration, help the sales team
4  who needed you to come do a demonstration, and then
5  also support install systems but you weren't sales
6  people per se. I don't know if that's right. What
7  was the relation -- so here's my question to you.
8     What was -- what is the relation between the
9  client executive team at NSO and the sales
10 organization at NSO today?
11    MR. AKROTIRIANAKIS: Objection: foundation.
12 Also vague.
13    THE WITNESS: Who do you mean by relations?
14 They work together. In general terms the client
15 executive's job are -- is to execute the contract
16 once done and maintain the relationship with the
17 customer, to represent the customer within -- sorry
18 the company within the customer area and vice versa.
19 As a result there might be aware to what we call
20 an app sale opportunity, which in that case they will
21 bring this information to the sales team which takes
22 the commercial responsibility from that moment on.
23 And they will be responsible for the renewal of the
24 contracts once they're done.
25 BY MR. BLOCK:

Page 80

1     Q. Is the client executive team involved in
2  original contracts for new customers?
3     A. What's original contracts?
4     Q. You just talked about contract renewal?
5     A. That's right.
6     Q. A brand new contract for a new customer,
7  instead of a renewal?
8     A. Okay.
9     Q. Is the client executive team involved in
10 negotiating and executing a new contract for a new
11 customer?
12    A. They will not be -- general they will not be
13 involved in what we call a new customer or a new
14 logo, so this process is led by sales.
15    Q. Referring back to Exhibit 2002. Do you know
16 who sent the message that's written here as from
17 "MICH-" and then a phone number?
18    A. I'm trying to look at the upper side of the
19 document but also there I don't see -- I don't think
20 I know -- I don't recall this name.
21    Q. Do you recall who is Marcelo Comité?
22    A. I do.
23    Q. Who is Marcelo Comité?
24    A. He was a salesperson.
25    Q. Was he an NSO employee?

Page 81

1     MR. AKROTIRIANAKIS: No foundation.
2     THE WITNESS: Again I don't know who his
3  contract were with so.
4  BY MR. BLOCK:
5     Q. And do you know if Marcelo Comité had sales
6  responsibility in a particular geography?
7     MR. AKROTIRIANAKIS: Objection: foundation.
8     THE WITNESS: To the best of my knowledge he
9  was responsible for Latin America at the time, but
10 since he wasn't my employee so I don't know if he was
11 assigned to additional areas but this is my
12 understanding.
13 BY MR. BLOCK:
14    Q. Okay. In the first message in the table in
15 Exhibit 2002, on the third line, do you see where it
16 says "PGS"?
17    A. Yes, I see.
18    Q. Do you understand that to be shorthand for
19 Pegasus?
20    A. In general we use PGS as Pegasus.
21    Q. In the next line Mr. DiVittorio says -- he
22 uses the letter CL. Do you see that?
23    A. Yes.
24    Q. Do you understand that to refer to
25 Citizen Lab?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1    MR. AKROTIRIANAKIS: Objection: foundation.
2    THE WITNESS: I am aware that CL stands for
3    Citizen Lab. I'm not sure if this is in the context
4    of that particular document, so I can take the time
5    to read it but --
6    Q. Not necessary.
7    A. I do know that we do use CL as Citizen Lab.
8    Q. "We", NSO?
9    A. Generally.
10   Q. Yes. Do you know who -- and again please
11   forgive my pronunciation -- Tami Mazel Shachar is?
12   A. I do.
13   Q. Who is that?
14   A. Tami used to work at NSO as a -- well, she
15   had several roles so I'm not so sure on that
16   particular date. What the date here? 2018. So,
17   from overall responsibility of sales to what we call
18   at the time CBO, which is chief business officer.
19   (Exhibit 2003 marked for identification.)
20   MR. AKROTIRIANAKIS: Maybe you can state what
21   comprises the document?
22   MR. BLOCK: Did I give you something other
23   than 58 and 59?
24   (Off the record discussion.)
25   BY MR. BLOCK:

Page 83

1    Q. Mr. Eshkar, you've been handed Exhibit 2003,
2    which is dated January 31, 2019 and is Bates stamped
3    DiVittorio_WhatsApp_00000058. It's a two-page
4    document that also includes the page numbered 59?
5    A. The page 59?
6    Q. Yeah, the Bates numbered page 58 --
7    A. Yes, sorry, got it.
8    Q. Do you understand Exhibit 2003 to be a record
9    of a WhatsApp communication?
10   MR. AKROTIRIANAKIS: Objection: foundation.
11   THE WITNESS: I can see it's a communication.
12   BY MR. BLOCK:
13   Q. And the third line on the document says:
14   "Application: WhatsApp"?
15   A. Sorry, what?
16   Q. The third line on the first page of the
17   document says "Application: WhatsApp". Do you see
18   that?
19   A. Yes, I see that.
20   Q. And under "Other Recipients", do you see your
21   phone number and name on the fourth line?
22   A. The fourth line. It's not my phone number.
23   Q. 972549225336 is not your phone number?
24   A. It is but the number unless -- let me see it.
25   It's like 542 -- ah, no, it's the other one. Sorry,

Page 84

1    it goes on the left. Yes, sorry, yes I see my
2    number.
3    Q. Okay. So do you recognize Exhibit 2003 as
4    a WhatsApp communication that you were included on in
5    January 2019?
6    MR. AKROTIRIANAKIS: Objection: foundation.
7    THE WITNESS: I can see my name as part of
8    the communication presenting to me.
9    BY MR. BLOCK:
10   Q. Do you remember this communication?
11   A. Can I take a moment to read it?
12   Q. Yes. (Pause.)
13   A. I don't recall the specific communication.
14   Q. On the second page do you see the name
15   Tomer Timor?
16   A. Yes, I do.
17   Q. Do you know who Tomer Timor is?
18   A. Yes, I do.
19   Q. Who is that?
20   A. Tomer Timor is a former employee of NSO.
21   Q. What did Tomer Timor do for NSO?
22   A. At the time that I knew Tomer he was -- at
23   the end of it he was responsible for the pre-sale
24   team. I just don't remember if he was a team manager
25   and then managed the pre-sales team, but, anyway, he

Page 85

1    was in the pre-sales team.
2    Q. What does pre-sales do?
3    MR. AKROTIRIANAKIS: Objection: foundation.
4    THE WITNESS: They support sales process.
5    BY MR. BLOCK:
6    Q. Do you know who Sivan Brook is?
7    A. Yes.
8    Q. Who is Sivan Brook?
9    A. Also a former employee of NSO.
10   Q. In what role?
11   MR. AKROTIRIANAKIS: No foundation.
12   THE WITNESS: If my memory serves me well she
13   was the private assistant -- Personal Assistant of
14   Tami.
15   BY MR. BLOCK:
16   Q. How about Sarit Gil?
17   A. Yes, I know Sarit.
18   Q. And who is Sarit?
19   A. Sarit is an employee of NSO.
20   Q. What does she do?
21   A. She runs the department of what we call sales
22   operation.
23   Q. What does sales operations do generally?
24   MR. AKROTIRIANAKIS: Objection: foundation.
25   THE WITNESS: The way that I'm familiar with

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1　the department job is that they were unfocused.
2　BY MR. BLOCK:
3　　Q. Who is Naor Bashran?
4　　A. Naor is a former employee of NSO.
5　　Q. In what role?
6　　A. Sales.
7　　Q. Do you know what geography or customers Naor
8　was responsible for?
9　　A. He shifted a lot.
10　　Q. Do you happen to know what he was doing in
11　January 2019?
12　　　MR. AKROTIRIANAKIS: Objection: foundation.
13　　　THE WITNESS: Specifically '19 I do not
14　recall.
15　BY MR. BLOCK:
16　　Q. Okay. Who is Moshe Faran?
17　　A. Moshe Faran is a former employee of NSO.
18　　Q. In what role?
19　　A. Sales as well.
20　　Q. And do you know what Moshe Faran's
21　responsibilities were in January 2019?
22　　　MR. AKROTIRIANAKIS: Objection: foundation.
23　　　THE WITNESS: He was part of the sales team
24　of the -- again if I remember correctly the African
25　region. At the end of it he managed the region.

Page 87

1　I don't remember if he managed it from the early
2　beginning of his arrival or later on during his work
3　at NSO.
4　BY MR. BLOCK:
5　　Q. Okay. Do you know who Tama -- or Tamara
6　Miller is? She's the last name under "other
7　recipients"?
8　　A. She's the last name. The last name confuse
9　me but if I'm not -- if this is who I think she is
10　then she was a sales -- sales. She was doing sales,
11　salesperson.
12　　Q. And do you recall the scope of her
13　responsibilities?
14　　　MR. AKROTIRIANAKIS: Objection: vague.
15　Foundation.
16　　　THE WITNESS: Again if I am correct she was
17　doing sales. Later on she was doing marketing
18　I think. I might be wrong.
19　BY MR. BLOCK:
20　　Q. Okay. The first message on Exhibit 2003 from
21　Tami Mazel Shachar is in Hebrew. Do you see that?
22　　A. I do.
23　　Q. I believe the second word is [Hebrew: ayin
24　dalet nun] which is Eden; is that correct?
25　　A. It is correct.

Page 88

1　　Q. And what -- I realize it's in Hebrew but
2　could you explain to me in English what the first
3　sentence of the message says?
4　　A. It looks like it's either misprinted or
5　because of right to left and left to right. So do
6　you think there is any way to get like sorted to the
7　right side, because I think there is a mismatch at
8　the beginning. Do you have like the soft copy? Can
9　you like --
10　　Q. This is how it was produced to us. So you're
11　not able to read the Hebrew from right to left?
12　　A. I can read the Hebrew.
13　　Q. Why don't you just read the Hebrew for me,
14　just the first sentence up to the ellipsis, the three
15　dots. And I would just ask the interpreters if
16　they're able to interpret what you read to me.
17　　　MR. AKROTIRIANAKIS: You're asking him to
18　read it in Hebrew?
19　　　MR. BLOCK: Yes, please read in Hebrew to the
20　interpreter.
21　　　MR. AKROTIRIANAKIS: You want him to read it
22　from left to right for the record?
23　　　MR. BLOCK: No, I believe it reads from right
24　to left.
25　　A. Right to left.

Page 89

1　　Q. Are you able to?
2　　A. I can read it but I think like it will not
3　make -- I can do it, right, but --
4　　Q. It won't make sense?
5　　A. I don't think because you need to move it to
6　the right and I think because of the -- how do you
7　call it, the star?
8　　Q. The asterisk?
9　　A. Yes, the asterisk. I think, right, it's --
10　I can read it. It's Hebrew, I can read it, but --
11　　Q. Are you able to get the sense of the first
12　sentence from looking at it in Hebrew notwithstanding
13　the problems that you're describing?
14　　　MR. AKROTIRIANAKIS: Objection: foundation.
15　　　THE WITNESS: It's not.
16　BY MR. BLOCK:
17　　Q. You should read the left word first, the left
18　most word first and then --
19　　A. Yeah but it's like -- if only move to the
20　right I wouldn't bother you but I think that because
21　of the Hebrew to English part it got -- okay,
22　I'll try. Let's do it like that.
23　　　So the first sentence?
24　　Q. Please.
25　　A. So just give me a moment. I give just

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 118

1 record so we can move on. I think I'm referring to
2 something from the transcript not from the order. Do
3 we need to go off the record?
4    MR. AKROTIRIANAKIS: We can go off the record
5 or on the record I'm trying to explain the legal
6 issue to my client. It's up to you.
7    MR. BLOCK: How much time do you need?
8    MR. AKROTIRIANAKIS: I'm trying to explain it
9 to my client.
10   MR. BLOCK: Let's go off the record.
11   VIDEOGRAPHER: Going off the record. The
12 time is 1:02.
13      (A short break)
14   VIDEOGRAPHER: On the record. The time is
15 13:10. Thank you.
16   MR. AKROTIRIANAKIS: So, I think that you're
17 either misrecalling or misstating the court's
18 comments but in any event what you're referring to
19 does not find its way into this order. However,
20 I think that you can ask some questions that relate
21 to the subject that you're getting at. But I don't
22 think that -- so in any event I think you can ask the
23 question you were asking but in general this order is
24 directed to a specific time frame and more
25 specifically to targeting or directing at WhatsApp

Page 119

1 servers or using WhatsApp in a way to access target
2 devices. So with that go ahead.
3    MR. BLOCK: Okay, I'll just refer to page 4
4 of 7 in docket 292, lines 4-7 which I think assumed
5 that there would be a production of the relevance by
6 way of, pursuant to the order, timely. But it says:
7      "If after reviewing the relevance by
8      where from that time frame plaintiffs
9      are able to provide evidence that any
10     attack lasted beyond that time frame
11     plaintiffs may seek further discovery at
12     that time."
13   MR. AKROTIRIANAKIS: Right and I agree --
14 sorry, I didn't mean to interrupt you.
15   MR. BLOCK: That's okay. I'll just say.
16   MR. AKROTIRIANAKIS: That's not what you
17 stated before though. You said before or after.
18 We're talking before, many years before. I don't
19 agree the court ever said before or after. Clearly
20 she said what you just read. We can read it here
21 today. Anyway, go ahead, ask your question.
22   MR. BLOCK: I appreciate it. I don't think
23 she's barred this line of questioning and if we end
24 up with a disagreement about that, that is the thing
25 that happens in litigations from time to time. So

Page 120

1 let me ask a question.
2    BY MR. BLOCK:
3    Q. What were defendants' vectors for zero-click
4 installation of Pegasus in 2015?
5    MR. AKROTIRIANAKIS: Objection: no
6 foundation.
7    THE WITNESS: So it's way back but I would
8 say there were both what we called triggered
9 capabilities and covert capabilities.
10   BY MR. BLOCK:
11   Q. Triggered and covert?
12   A. Yes.
13   Q. What were the covert capabilities in 2015?
14   MR. AKROTIRIANAKIS: No foundation. And to
15 the extent you're -- this is beyond the scope of the
16 designation, just so that's clear. I don't think
17 that you're intending to ask this as part of the
18 30(b)(6) but I want to be clear he's not being
19 designated for this. Another witness would be.
20   THE WITNESS: So again I don't recall the
21 various specific vectors but there were vectors.
22   BY MR. BLOCK:
23   Q. And do you recall whether any of the
24 zero-click vectors in 2015 involved WhatsApp in any
25 way?

Page 121

1    A. As much as I know, no, it didn't involve
2 WhatsApp.
3    Q. And do you recall whether any of the
4 triggered vectors in 2015 involved WhatsApp in any
5 way?
6    A. What do you mean by "any way"? Sending a
7 link to a target via WhatsApp, it's "any way"?
8    Q. Yes.
9    A. So I would say that as much as I know for the
10 trigger we do not use that. The customer might
11 choose to take the link and use his own, either
12 WhatsApp or a different system, to send the link.
13   Q. So from a user interface standpoint when the
14 user elects to pursue a triggered installation does
15 that happen through the user interface or do they
16 then walk over to a mobile phone and send a WhatsApp
17 message; how does that work?
18   MR. AKROTIRIANAKIS: Objection: vague.
19 Compound.
20   THE WITNESS: When they choose to proceed
21 with a trigger installation, the system produce a
22 link. It is then up to the customer to decide if he
23 sends it over a regular SMS which at a certain point
24 of time he could have done via the system, or he
25 extract the link, either copy or whatever, and then

31 (Pages 118 - 121)

Page 122

1    send using any other method that he has.
2    BY MR. BLOCK:
3        Q. At this time in 2015 did the system enable
4    sending the link by WhatsApp message through the user
5    interface?
6        MR. AKROTIRIANAKIS: Objection: foundation.
7        THE WITNESS: As much as I recall, no.
8    BY MR. BLOCK:
9        Q. Did there come a later time when the system
10   enabled the user to initiate a triggered installation
11   by sending a WhatsApp message through the user
12   interface?
13       A. The trigger installation, right?
14       Q. Yes.
15       A. As much as I know, no.
16       Q. When did it become possible for the user to
17   send a covert installation that involved WhatsApp?
18       MR. AKROTIRIANAKIS: Objection: vague. No
19   foundation.
20       THE WITNESS: As much as I understand around
21   summer 2018, maybe close to the end of it. I don't
22   know the exact date, but somewhere there.
23   BY MR. BLOCK:
24       Q. And do you recall a name for that
25   WhatsApp-related zero-click installation vector that

Page 123

1    came online some time around 2018?
2        A. So internal names were like Eden, or Heaven.
3        Q. Are those the same?
4        A. What do you mean by the same.
5        Q. I mean is Eden one thing and Heaven a
6    different thing or are those used interchangeably?
7        A. For myself and the team as you know those are
8    covert vectors. I don't know if the technology
9    behind them is different.
10       Q. Okay, but you and your team would discuss
11   them separately as different vectors no matter how
12   they operate?
13       A. As different vectors.
14       Q. Okay. And you had an understanding that Eden
15   used WhatsApp in some way but you don't know the
16   details; is that correct?
17       MR. AKROTIRIANAKIS: Objection: vague.
18   Foundation. Beyond the scope of the designation.
19       THE WITNESS: My understanding would be that,
20   yes.
21   BY MR. BLOCK:
22       Q. What is your understanding, if any, as to how
23   Heaven used WhatsApp?
24       MR. AKROTIRIANAKIS: Vague. No foundation.
25   Beyond the scope of the designation.

Page 124

1        THE WITNESS: I'm trying to understand. You
2    mean how it worked?
3    BY MR. BLOCK:
4        Q. Sure.
5        A. So I don't know how it worked. So --
6        Q. But do you have an understanding that however
7    it worked involved WhatsApp?
8        A. That's my understanding.
9        Q. So we spoke about Eden and Heaven. Are you
10   aware of any other names for defendants' installation
11   vectors that involved WhatsApp?
12       MR. AKROTIRIANAKIS: Objection: foundation.
13       THE WITNESS: Yes.
14   BY MR. BLOCK:
15       Q. What are the other names that you're aware
16   of?
17       A. Erised.
18       Q. Like desire but spelt backwards?
19   E-R-I-S-E-D, correct?
20       A. Yes.
21       Q. We have Eden, Heaven and Erised. Any others?
22       A. Not that I recall.
23       Q. Have you heard the term Hummingbird?
24       A. Yes, I have heard the term Hummingbird.
25       Q. Do you know one way or another whether

Page 125

1    Hummingbird used WhatsApp?
2        A. I think we are confusing here with terms.
3        Q. How so?
4        A. Because there are different names being used
5    so like I said before, from the customer perspective
6    it would be covert, right. And there are names that
7    we use internally and there are names that we use
8    sometimes externally. So in that regard Hummingbird,
9    as much as I remember from the period, would be like
10   an umbrella name for the family of such covert
11   vectors.
12       Q. The family of installation vectors that use
13   WhatsApp?
14       A. Again, as much as I understand, Hummingbird
15   is the name that we've used externally in some cases.
16       Q. For the family of installation vectors that
17   use WhatsApp?
18       MR. AKROTIRIANAKIS: Objection: no
19   foundation.
20       THE WITNESS: As much as I can understand.
21   BY MR. BLOCK:
22       Q. Is that a yes?
23       MR. AKROTIRIANAKIS: No foundation.
24       THE WITNESS: Yes.
25   BY MR. BLOCK:

32 (Pages 122 - 125)

Page 126

1    Q. And in the Hummingbird family, what are
2  the -- strike that. What are the names you know of
3  installation vectors in the Hummingbird family?
4    A. So I don't recall when we introduced the name
5  Hummingbird but I don't think, as much as I remember,
6  that there will be other names than what we said
7  before.
8    Q. And the ones we said before were Eden, Heaven
9  and Erised?
10   A. Yes, I just don't remember when we started
11 with the Hummingbird term so it may not be the whole
12 three of them, maybe just one or two of them.
13   Q. And Erised from Eden, Heaven and Erised you
14 don't recall knowledge of another installation vector
15 that used WhatsApp?
16   A. I don't remember.
17   Q. You said you first became aware of
18 an installation vector that used WhatsApp around
19 2018, maybe late I think those were your words,
20 something like that?
21   A. Something like that, yes.
22   Q. When is the latest point in time that you're
23 aware of defendants using an installation vector that
24 used WhatsApp?
25   A. I would say somewhere around 2019 maybe a

Page 127

1  little bit into 2020 but I'm not sure of the exact
2  date so that would be like a ballpark.
3    Q. Okay. Is that something Mr. Gazneli would
4  know?
5    MR. AKROTIRIANAKIS: Objection: no
6  foundation.
7    THE WITNESS: He might.
8    Q. What's the latest point in time when you're
9  aware of defendants trying to defendant a zero-click
10 installation using WhatsApp?
11   MR. AKROTIRIANAKIS: Objection: no
12 foundation.
13   THE WITNESS: I have no knowledge of that.
14 BY MR. BLOCK:
15   Q. We may have asked this before. Was Eden to
16 your knowledge specific to a particular operating
17 system such as Android, iOS, BlackBerry?
18   A. As much as I recall, it's for Android
19 platform.
20   Q. And was Heaven specific to a specific
21 operating system such as Android, iOS or BlackBerry?
22   A. Same here, as much as I remember it's
23 an Android platform.
24   Q. And was Erised specific to a particular
25 operating system?

Page 128

1    A. Same for as much as I know, for Android
2  platform.
3    Q. Are you aware of WhatsApp ever using
4  WhatsApp -- sorry. Let me try again. Are you aware
5  of defendants ever using an installation vector that
6  involved WhatsApp to install Pegasus on an iOS
7  device?
8    A. Not that I recall, no.
9    Q. And we're talking about zero-click exploits
10 versus sending messages, right?
11   A. So again I'm less comfortable with the know
12 how because myself or my team do not develop so it's
13 hard for me to say. But as much as I know it was not
14 used for iOS.
15   Q. Are you general familiar with the user
16 interface that customers see when they operate
17 Pegasus?
18   A. Generally aware, yes.
19   Q. During an agent installation process, is it
20 possible it see in the user interface the phone
21 numbers of the target devices identified for
22 installation?
23   A. The customer enters the number so the number
24 is presented on the user interface what we call the
25 UI.

Page 129

1    Q. Are you aware of something called a
2  whitelist, a whitelist of numbers?
3    A. Yes.
4    Q. What is the concept of a whitelisted phone
5  number as it relates to Pegasus?
6    A. So it might be used in other departments of
7  different use. So I would say from the perspective
8  that I have, okay. Because it's a general term, it
9  might be used also by other departments. But it will
10 means that there are certain numbers that their flow
11 of the installation is a bit different.
12   Q. Can you give me an example?
13   A. Yes. If the customer hold a test device,
14 which they usually do, it's a common practice before
15 they go on a real operation to run a test. Then the
16 test, the test device, might have been on the
17 whitelist. So they can install and maybe install
18 again in, you know, some time later.
19   Q. And perhaps install again, sometimes later in
20 a manner that the system would prevent had the number
21 not been on a whitelist?
22   A. Can you explain that?
23   Q. Yeah, you said a test device number might be
24 whitelisted so Pegasus can be installed and then
25 installed again. Is that what you said?

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 150

1    A. Yes.
2    Q. Do those connect to the NOC?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So we do provide email access
5    and phone access I just don't know if those are the
6    exact email and phone number at the time since --
7    I don't know again it's not our contract so I don't
8    know if there was something there, but we do provide
9    email access and phone number. Today there is a
10   dedicated system for this communication so email is
11   hardly ever used.
12   BY MR. BLOCK:
13   Q. What is that dedicated system called?
14   A. It's the NSD.  NSD.
15   Q. What does NSD stand for?
16   A. Okay.  I think it's NSO support -- I don't
17   recall exactly but something like that.
18   Q. Something like that?
19   A. It's initials that describe a support system.
20   Q. What function do the tunnels and VPS you just
21   mentioned serve relative to Pegasus?
22   A. So to the best of my knowledge they are part
23   of the infrastructure required in order to connect
24   between the system to the outside and back and forth.
25   Q. Earlier we talked about the white services

Page 151

1    department, do you recall that?
2    A. Yes.
3    Q. And one of the things that the white services
4    department will do is set up VPS servers for a
5    customer; is that accurate?
6    A. They will not set it up.  They will procure
7    the service.  There is another team that will set it
8    up.
9    Q. Okay so let me start with the procurement.
10   And to set the stage a customer is setting up
11   an installation of Pegasus and requires VPS as part
12   of the infrastructure to operate Pegasus; is that
13   accurate?
14      MR. AKROTIRIANAKIS: Objection.  Object to
15   the form of the question.  Vague.  No foundation.
16      THE WITNESS: So can you please clarify?
17   BY MR. BLOCK:
18   Q. Yeah.  I think you testified to the effect
19   that customers need VPS to operate Pegasus.  Is that
20   accurate?
21      MR. AKROTIRIANAKIS: Objection: misstates his
22   testimony.
23      THE WITNESS: VPS are part of the
24   infrastructure required for the system.
25   BY MR. BLOCK:

Page 152

1    Q. And one job of the white services department
2    is to procure anonymized VPS; is that accurate?
3    A. This is part of the job.
4    Q. And what steps are involved when someone in
5    the white services department procures anonymized
6    VPS?
7       MR. AKROTIRIANAKIS: Objection: no
8    foundation.
9       THE WITNESS: They will pick a provider that
10   provides the VPS, and they will choose the service
11   that they want from that provider, and they will have
12   to follow the procurement process required according
13   to that specific supplier.
14   BY MR. BLOCK:
15   Q. In what sense is the service anonymized?
16   A. In the sense that it cannot be linked to
17   either the customer or NSO.
18   Q. And how do defendants achieve that
19   anonymization with respect to VPS?
20      MR. AKROTIRIANAKIS: Objection: foundation.
21      THE WITNESS: They use an anonymized --
22   I don't know what to call it -- way in order to gain
23   a service.
24   BY MR. BLOCK:
25   Q. And I would like to know what you know about

Page 153

1    the details of that anonymized way.  Can you explain
2    it?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So to the best of my knowledge
5    they will use financial means which are not directly
6    related to the customer or to the company.  That's
7    I think the main point here that will allow them to
8    establish an anonymized VPS account.
9    BY MR. BLOCK:
10   Q. Can you give me an example of financial means
11   not directly related to the customer or the company
12   that the white services department uses for these
13   purposes?
14   A. It can be like a credit card.
15   Q. A credit card registered in the name other
16   than the customer or defendants I presume; is that
17   accurate?
18   A. Sounds to me, yes.
19   Q. And do you know the details about how the
20   white services department procures credit cards and
21   names not related to defendants or their customers?
22      MR. AKROTIRIANAKIS: Objection: foundation.
23      THE WITNESS: How exactly they are doing
24   that, no.
25   BY MR. BLOCK:

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1    Q.  Okay.  Does NSO use cryptocurrency as
2    a financial means for setting up anonymized VPS?
3        MR. AKROTIRIANAKIS:  Objection: foundation.
4        THE WITNESS:  If I'm not mistaken, yes.
5    BY MR. BLOCK:
6        Q.  Bitcoin for example?
7        MR. AKROTIRIANAKIS:  Foundation.
8        THE WITNESS:  Bitcoin for example.
9    BY MR. BLOCK:
10       Q.  Have you ever heard of Quadranet?
11       A.  Sounds familiar.
12       Q.  Is Quadranet familiar to you as a VPS
13   provider?
14       A.  No, I don't recall no.
15       Q.  Okay.  Do you recall anything about
16   Quadranet?
17       A.  Not that I recall, no.
18       Q.  Have you heard of Green Cloud VPS?
19       A.  I heard the name but I don't have more
20   details than that.
21       Q.  Do you recall having heard it in connection
22   with your work for defendants?
23       A.  Yes.
24       Q.  And what else do you recall about how you
25   heard the name, if anything?

Page 155

1        A.  Just the name.  I mean nothing in particular.
2        Q.  How about the name Choopa, C-H-O-O-P-A, is
3    that familiar to you?
4        A.  No.
5        Q.  Can you name any VPS servers that you know
6    defendants use when setting up anonymized VPS for
7    customers?
8        MR. AKROTIRIANAKIS:  Objection: foundation.
9        THE WITNESS:  Not that come in mind.
10   BY MR. BLOCK:
11       Q.  Do customers select the VPS provider, or
12   does -- do defendants?
13       MR. AKROTIRIANAKIS:  Objection: overboard.
14   No foundation.
15       THE WITNESS:  Some customers choose to set up
16   the infrastructure themselves so they will do it A to
17   Z.
18   BY MR. BLOCK:
19       Q.  I'm going to ask a question that I think your
20   counsel has an objection to but I just want to be
21   clear for the record.  Can you name customers that
22   handled the infrastructure themselves A to Z?
23       MR. AKROTIRIANAKIS:  Are you asking him a yes
24   or no question or are you asking him to name the
25   customers?

Page 156

1        MR. BLOCK:  Let's start with yes or no.
2    BY MR. BLOCK:
3        Q.  Are you able to name customers who handle the
4    installation and infrastructure themselves?
5        A.  Yes.
6        Q.  Will you please identify them for the record?
7        MR. AKROTIRIANAKIS:  Okay, that I will
8    instruct him not to answer.
9    BY MR. BLOCK:
10       Q.  Are you able to name customers for whom
11   defendants performed the infrastructure procurement
12   and installation?
13       A.  If I can?
14       MR. AKROTIRIANAKIS:  He's asking you yes or
15   no, if you can.
16       A.  Yes, I can.
17   BY MR. BLOCK:
18       Q.  Will you please identify for the record the
19   customers for whom defendants did the infrastructure
20   installation that you are able to name?
21       MR. AKROTIRIANAKIS:  Again I'm going to
22   instruct him not to answer for the same reason.
23   BY MR. BLOCK:
24       Q.  Can you tell me how many customers defendants
25   have performed infrastructure installation for?

Page 157

1        MR. AKROTIRIANAKIS:  Objection: foundation.
2        THE WITNESS:  Throughout which period of
3    time?
4    BY MR. BLOCK:
5        Q.  Let's start with the entire life of the
6    company?
7        MR. AKROTIRIANAKIS:  Objection: foundation.
8        THE WITNESS:  I don't have exact number in
9    mind.
10   BY MR. BLOCK:
11       Q.  Can you estimate it by order of magnitude?
12       MR. AKROTIRIANAKIS:  Objection: foundation.
13       THE WITNESS:  More than ten.  I mean tens.
14   BY MR. BLOCK:
15       Q.  Tens?
16       A.  Around.
17       Q.  More than 100?
18       MR. AKROTIRIANAKIS:  Objection: foundation.
19       THE WITNESS:  I don't know.
20   BY MR. BLOCK:
21       Q.  You can't rule it out, not sure.
22       MR. AKROTIRIANAKIS:  Objection: foundation.
23   Compound.  Vague.
24       THE WITNESS:  I need to count the number that
25   we had each career and then to sum it.  So ...

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 270

1  I meant is that if there is a demonstration for a
2  customer then we would like to show that part of the
3  information that the system can extract is
4  WhatsApp-related, therefore we will have a test
5  device with a WhatsApp account with basic
6  communication so during the demo we can show that we
7  can collect the data.
8  BY MR. AKROTIRIANAKIS:
9      Q.  You just used the term WhatsApp-related.  Is
10  there any other relation to WhatsApp, other than
11  demonstrating the ability to extract WhatsApp
12  messages from the demo client phone that you're
13  using?
14      MR. BLOCK:  Objection to form.
15      THE WITNESS:  Come again?  I lost you.  It
16  was very long.
17      Q.  Sorry.  In your answer you just used the term
18  WhatsApp-related.  Other than demonstrating the
19  ability to extract a WhatsApp message from the demo
20  phone that you're talking about, is there any other
21  relation to WhatsApp?
22      MR. BLOCK:  Objection to form.
23      THE WITNESS:  No.
24      MR. AKROTIRIANAKIS:  All right, thank you.
25      MR. BLOCK:  I assume, Joe, you'll permit

Page 271

1  questions about that testimony but not about other
2  topics?
3      MR. AKROTIRIANAKIS:  I asked two questions.
4  If you've got two questions, or one question as some
5  kind of recross-examination, then you can ask that
6  but we're well beyond 7 hours and it's well after
7  7 p.m. now.
8      MR. BLOCK:  I do not have re-cross.  I have
9  many other questions.
10      MR. AKROTIRIANAKIS:  Then if you don't have
11  any re-cross then I think we're done.
12      MR. BLOCK:  Then we obviously object to the
13  closure of the deposition but we'll allow it to
14  proceed, subject to that objection.
15      VIDEOGRAPHER:  Going off the record.  The
16  time is 19:08.  End of media card 6, volume 1 and
17  this is the end of the video deposition of Ramon
18  Eshkar.  If I could ask about the video and
19  transcript, if you could state that please?
20      MR. AKROTIRIANAKIS:  Is it possible if
21  I could tell you after because someone else manages
22  that and I inevitably will mess it up.
23      MR. BLOCK:  Same answer.
24  (Whereupon, the deposition concluded at 7:09 pm)
25

Page 272

1      CERTIFICATE OF COURT REPORTER
2
3      I, CHANELLE M.L. MALLIFF, a Certified
4  LiveNote Reporter, Certified Shorthand Stage IV
5  stenographic reporter, RPR and CRR (*NCRA 2003 and
6  2004), hereby certify that:
7      RAMON ESHKAR appeared on Tuesday, August 27,
8  2024, agreed to tell the truth, the whole truth, and
9  nothing but the truth, under the penalties of perjury,
10  and was thereupon examined by counsel; that the
11  testimony of RAMON ESHKAR was recorded by me
12  stenographically and was thereafter transcribed by me;
13  that the foregoing transcript is a true, accurate and
14  verbatim record to the best of my skill and ability.
15      I further certify that I am not a relative or
16  employee of any party to the action; nor am I an
17  employee or relative of any attorney or counsel to any
18  party to the action; nor am I in any way financially or
19  otherwise interested in the outcome of the action.
20
21
22
23      CHANELLE M.L. MALLIFF
24      CLR, CSSIV(NZ)
25

Page 273

1  Joseph N. Akrotirianakis, Esq.
2  jakro@kslaw.com
3      August 30, 2024
4  RE:  Whatsapp LLC., Et Al. v. NSO Group Technologies
     Limited, Et Al.
5  8/27/2024, Ramon Eshkar (#6878149)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com
16  Return completed errata within 30 days from
17  receipt of testimony.
18  If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25

69 (Pages 270 - 273)

# EXHIBIT 9

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                 UNITED STATES DISTRICT COURT

3                NORTHERN DISTRICT OF CALIFORNIA

4                      OAKLAND DIVISION

5      -------------------------------X

6      WHATSAPP INC.                   :

7      a Delaware corporation, and     :

8      META PLATFORMS INC,             :

9      a Delaware Corporation:

10                      Plaintiffs     :

11            v.                       :    Case No.

12     NSO GROUP TECHNOLOGIES LTD      :    4:19-cv-07123-PJH

13     and                            :

14     Q CYBER TECHNOLOGIES LTD        :

15                      Defendants     :

16     -------------------------------X

17           HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18                 Deposition of YARON SHOHAT

19                         LONDON

20               THURSDAY, AUGUST 29TH, 2024

21                     9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 22

1 Q. D-U-T-T-O-N?
2 A. I believe that's the correct spelling.
3 Q. Okay, when did the Dutton investigation occur?
4 MR. AKROTIRIANAKIS: Objection. Foundation.
5 A. I don't know the specific date. Or year.
6 Q. Do you know, was it 2024?
7 A. No.
8 Q. Was it after 2019?
9 MR. AKROTIRIANAKIS: Objection. Foundation.
10 A. I don't know.
11 Q. Okay, was it after 2015?
12 MR. AKROTIRIANAKIS: Same objection.
13 A. Maybe.
14 Q. You don't know whether it occurred --
15 A. I don't know the exact year.
16 Q. Okay. I know you don't know the exact year, I am asking
17    whether you are capable of founding it in time in any
18    way?
19 A. Since I don't know for sure, I don't want to make
20    a mistake.
21 Q. Okay. Let me -- fair enough.
22    Did it happen while you were CEO?
23 A. No.
24 Q. Okay, so it happened before you became CEO?
25 A. Yes.

Page 23

1 Q. Did it happen while you were at the company?
2 MR. AKROTIRIANAKIS: Objection. Foundation.
3 A. I'm not sure.
4 Q. Okay. Were you personally involved in the Dutton
5    investigation?
6 A. No.
7 Q. Okay. What did Mr. Gelfand tell you about the Dutton
8    investigation in your conversation?
9 MR. AKROTIRIANAKIS: I think that question is problematic to
10    you, counsel, without further clarification as to what
11    you are asking the witness to relate to you.
12    So I am going to instruct you not to answer the
13    question as phrased.
14 Q. Do you understand that I am not asking for legal advice
15    and I am only asking for the facts that Mr. Gelfand
16    related to you, in the conversation that you had with
17    him, in his capacity as head of compliance, for the
18    purposes of preparing for today's deposition?
19 A. I understand what you are asking. I am concerned that
20    it is mixed, because I asked him about what can
21    I divulge here from that investigation, and I am not
22    sure if that's only in his capacity as compliance
23    officer.
24 Q. Okay.
25 A. So it is on the border, as far as I understand it.

Page 24

1 Q. Set aside what Mr. Gelfand did or did not tell you, or
2    advice he gave you about what you can or cannot divulge,
3    okay. What facts do you know about the Dutton
4    investigation?
5 A. I know that, in that case, the customer misused the
6    system and the company decided to disconnect that
7    customer.
8 Q. How did the company discover the misuse?
9 A. Through a whistle blower.
10 Q. A whistle blower at the customer, or at the company, or
11    elsewhere?
12 A. At the customer.
13 Q. In the course of the investigation, did the company
14    obtain knowledge of the phone numbers that the customer
15    had infected with Pegasus?
16 MR. AKROTIRIANAKIS: Object to the form of the question.
17    And also the foundation.
18 A. I don't know.
19 Q. What did the defendants do to investigate Dutton?
20 MR. AKROTIRIANAKIS: Objection. Foundation.
21 A. I don't have first hand knowledge. I don't know.
22 Q. Okay. I am asking you, in your corporate representative
23    capacity, to include facts you may have learned beyond
24    what you know from your personal knowledge. So let me
25    ask again, as a corporate representative what did the

Page 25

1    defendants do to investigate Dutton?
2 MR. AKROTIRIANAKIS: I think that for you to ask him that
3    question in his capacity as a representative of the
4    company, I need to finish what I was doing before we
5    decided to continue with the deposition. Because that,
6    I think, is number 44, isn't it?
7 MR. BLOCK: Okay. Let's go off the record.
8 THE VIDEOGRAPHER: Going off the record. The time is
9    09.48 a.m.
10 (9:48 a.m.)
11    (break taken.)
12 (9:53 a.m.)
13 THE VIDEOGRAPHER: Going back on the record. The time is
14    09.53 a.m. Thank you.
15 By Mr. Block:
16 Q. Welcome back, Mr. Shohat. I understand that you and
17    counsel conferred about the topics while we were off the
18    record, correct?
19 A. Correct.
20 Q. Okay. Do you understand that you have been designated
21    to provide corporate representative testimony on behalf
22    of defendants for topic 44, with respect to
23    non-privileged aspects of the process by which
24    investigations are conducted by defendants into the use
25    of the accused technologies?

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1 A. I do.

2 Q. Okay. And obviously, Joe, for the record, we don't

3 accept that framing of the topic, but let me use it for

4 the purposes of this question.

5    I will ask you again, Mr. Shohat: please explain to

6 me the process by which defendants investigated Dutton?

7 MR. AKROTIRIANAKIS: Okay, I am going to object that that is

8 outside the scope for which the witness has been

9 designated, which is limited to the process by which

10 investigations are conducted.

11 MR. BLOCK: Okay. So, to be clear, you are not providing

12 a witness to discuss the process of any particular

13 investigation, and you will provide a witness only on

14 the process generally? Is that the defendants'

15 position?

16 MR. AKROTIRIANAKIS: Well that is what our objections and

17 responses state we will do, and that is the limitation

18 for which this witness is designated. So if you have

19 questions that are within that designation, that's fine,

20 you can ask them and he will answer on behalf of the

21 defendants. If you have questions that are outside of

22 that -- I mean, you know how 30(b)(6) depositions work.

23 Q. Okay. Let me just ask the same question and get your

24 answer, sir: Mr. Shohat, please explain to me what you

25 know about the process by which defendants investigated

Page 27

1   Dutton?

2 MR. AKROTIRIANAKIS: Objection. Foundation.

3 A. I will tell you the process we follow whenever there is

4 an investigation, regardless of who the customer is.

5 When we get an indication that there might have been

6 a misuse of our system, in the way it was used, it has

7 been targeted, or anything else, we open

8 an investigation. The first step would be to understand

9 which of our customers may have conducted it. If we

10 don't know, if there is no such indication, we would

11 contact the customer, asking for clarifications.

12 Sometimes the information that we get in response is

13 enough to conclude that there was no misuse. Some. In

14 other cases we might require additional information, and

15 we expect full cooperation by the customer.

16    If we conclude that the customer operated the system

17 not for the purpose, or not according to the limitations

18 defined in the contract, we will take measures, which

19 can range, but the most extreme is we will disconnect

20 the customer's system.

21    As part of the investigation we might ask the

22 customer to allow us to access -- first, to allow us to

23 receive information regarding the operation and, in some

24 cases, also to allow us access to the system logs

25 themselves, so we can verify whether a certain device

Page 28

1   was a target of the system or not.

2    Again, we expect full cooperation from the

3 customers, according to their obligations to us, and if

4 we do not receive the right level of cooperation, we are

5 entitled to disconnect the system and make it

6 inoperational.

7 Q. Do the defendants have a contractual right to demand

8 access from customers to the system logs you mentioned?

9 MR. AKROTIRIANAKIS: Objection. Foundation.

10 A. I don't recall the exact language in the contract. If

11 you want, we can look at it. But we definitely have the

12 right to conduct the investigation and take the measures

13 that I mentioned.

14 Q. Which include requesting access to the system logs?

15 A. Requesting. The customer needs to -- cannot do it

16 without the customer's permission, of course.

17 Q. And those system logs include the phone number of target

18 devices, correct?

19 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.

20 A. The system logs include, as far as I understand, not the

21 explicit phone number, but -- and I will use a technical

22 term here -- a hash of the number, which means the way

23 to verify whether a certain number is on the list

24 without seeing the explicit number.

25 Q. So if you have the hash, you can't tell what phone

Page 29

1   number represents, but you can check whether it

2 represents a phone number that you have and want to

3 investigate, is that what you are saying?

4 MR. AKROTIRIANAKIS: Objection. Misstates testimony.

5 A. What I am saying, that if I am given a phone number --

6 a whistle blower, for instance, claiming that a certain

7 number was targeted for the wrong reasons -- and we open

8 an investigation, I can take that number, generate

9 a hash from it, and, with the customer's permission,

10 check if that hash exists on the system logs.

11 Q. I think you said words to the effect -- and I am not

12 reading from the transcript here -- that if you identify

13 misuse in an investigation -- by "you" I mean

14 defendants -- then defendants will take measures which

15 may arise, up to disconnecting the customer's access to

16 Pegasus. I don't want to put words in your mouth, but

17 was that more or less accurate?

18 A. I will repeat what I said.

19 Q. Please.

20 A. I said that if the conclusion is that the customer

21 misused the system, we can take certain measures. And

22 obviously the most severe measure would be to disconnect

23 the customer.

24 Q. Have there ever been occasions when defendants confirmed

25 that there had been misuse but did not disconnect the

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1    customer?
2 MR. AKROTIRIANAKIS: Objection. Vague.
3 A. I don't know of specific cases, but I am pretty sure
4    there were. I need to clarify that misuse is not
5    a yes/no answer; there is a range, depending on the
6    specific case.
7 Q. What was the nature of the misuse in the Dutton
8    investigation?
9 MR. AKROTIRIANAKIS: You are asking him in his -- I just
10    want to make the record clear. You are asking him in
11    his personal capacity? Because he is not designated
12    for --
13 MR. BLOCK: I am asking him in his corporate representative
14    capacity. Your objection to the question is out of
15    scope and I would like his testimony in whatever
16    capacity he is able to provide it.
17 MR. AKROTIRIANAKIS: Okay, so then I am objecting that it
18    exceeds the scope of the designation of the witness and
19    further that the question lacks foundation from this
20    witness.
21 Q. What was the nature of the misuse in the Dutton
22    investigations?
23 MR. AKROTIRIANAKIS: Same objections.
24 A. I will answer in my personal capacity. It is our
25    understanding that the system was used for a purpose

Page 31

1    other than fighting or preventing crime or terror.
2 Q. What purpose was it used for?
3 MR. AKROTIRIANAKIS: Objection. No foundation, and exceeds
4    the scope of the designation of the witness.
5 A. Other kind of dispute. I don't know how to -- I am not
6    a lawyer, I don't know how to categorize it.
7 Q. You can describe it in lay terms, and you can use the
8    translator if you need to.
9 MR. AKROTIRIANAKIS: Same objections. No foundation, and
10    beyond the scope of the designation of the witness.
11 A. It is not a matter of translation, it is a matter of
12    legal knowledge. But I will try to answer. In the
13    specific case I have in mind, the system was used on
14    a family member of, let's call it a head of state. And
15    despite the fact that some might claim there was
16    an offense, a crime here, we viewed it beyond the scope
17    of the purpose of the system.
18 Q. What's the name of the person whose phone was infected
19    in a manner that defendants determined in the Dutton
20    investigation constituted a misuse?
21 A. Can you please repeat the question?
22 Q. Yes. What is the name of the person whose phone was
23    infected in a manner that defendants determined in the
24    Dutton investigation constituted a misuse?
25 A. I have to correct my previous answer a little bit.

Page 32

1    I told you that it was used to target a family member.
2    My correction is that it was used to target -- what are
3    these beeps?
4 MR. BLOCK: We don't know. Please try to continue. Sorry.
5 A. My correction is that it was used to target, as far as
6    I understand, from my personal knowledge, the attorney
7    of that person. I don't know the name.
8 Q. The attorney of the family member of a head of state?
9    You don't know the name of the attorney?
10 A. Correct.
11 Q. What's the name of the family member?
12 A. I know her as Princess Haya.
13 Q. And what's the name of the head of state?
14 A. The Emir of Dubai.
15 Q. In the course of our discussion of the Dutton
16    investigation, has your recollection been refreshed as
17    to when in time that investigation occurred?
18 A. I do not remember the date, but we can Google it if you
19    want.
20 Q. We can Google it because it is reported publicly?
21 A. Correct.
22 Q. Okay.
23 A. If you remember, I explained that, in my discussion with
24    Mr. Gelfand, I asked him about cases that were public.
25 Q. Okay. Aside from the Dutton investigation, are there

Page 33

1    any other specific investigations that you discussed in
2    preparation for today's deposition?
3 A. I don't recall specific customers or investigations.
4 Q. What other investigations do you recall that are public?
5 MR. AKROTIRIANAKIS: Objection. No foundation.
6 A. I don't recall right now.
7 Q. I think I understood you to say that, in your discussion
8    with Mr. Gelfand in preparation to testify today, you
9    asked about investigations that are already in the
10    public domain. Is that -- well, please give it to me in
11    your own words?
12 A. I asked him, yes, which investigation, or which case of
13    this disconnection of customer became public.
14 Q. My questions today include investigations that have not
15    yet become public. Are you aware of any of those?
16 A. I am aware of investigations, yes.
17 Q. And which are you aware of?
18 MR. AKROTIRIANAKIS: Again, you can answer that question
19    without reference to the names of NSO customers.
20 A. Okay. We have quite a few investigations over the time,
21    the course of time. Investigation can start with
22    an email to a whistle blower mailbox. For instance,
23    someone says "I believe my wife is spying on me with
24    Pegasus." We treat very seriously each and every
25    inquiry that we receive like that, so I think you can

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1    Offensive cyber.
2  Q.  You mentioned the term "spyware".  What is spyware?
3  MR. AKROTIRIANAKIS:  Objection.  Vague.
4  A.  I am using -- I mixed terms, because, I admit it myself,
5    I am not sure of the exact term.  But if you ask me, at
6    least back then, I called it trojan horses.  This is the
7    software designed to secretly install on the victim's
8    device and extract information.  A trojan horse can do
9    other stuff, like even make changes or perform
10   transactions, as I explained before.  There are trojan
11   horses that are designed to actually steal your money
12   from your bank account, so that's a very sophisticated
13   level of threat, and that goes beyond what I call
14   spyware, because it is also performing actions and
15   manipulation on the target site.
16 Q.  Is Pegasus an example of spyware?
17 A.  I refer to Pegasus as a cyber intelligence tool, which
18   is designed to extract intelligence from a target
19   device.
20 Q.  Is Pegasus an example of spyware?
21 MR. AKROTIRIANAKIS:  Objection.  Asked and answered.
22 A.  Do you want to define "spyware" for me?  I told you that
23   I am not sure about the exact definition, so I prefer to
24   stick to the term "cyber intelligence tool".  I am not
25   fully comfortable with the term "spyware" in this case.

Page 39

1    I am not sure it is fully accurate.
2  Q.  Is Pegasus a trojan horse?
3  MR. AKROTIRIANAKIS:  Objection.  Vague.
4  A.  I defined earlier "trojan horse" as a more sophisticated
5    type of threat, which would also make changes to the
6    device and maybe even perform transactions on the
7    device.  These are things that Pegasus is not doing.
8  Q.  Can Pegasus cause a device to turn on its microphone or
9    camera?
10 MR. AKROTIRIANAKIS:  Objection.  No foundation.
11 A.  It is possible.  Which is different from what I defined
12   for "trojan horse".
13 Q.  Do you use the term "trojan horse" to refer exclusively
14   to tools that can make changes to a device up to and
15   including performing transactions?
16 A.  Correct.  Which Pegasus is not doing.
17 Q.  Okay.
18     Let me ask you this: you got your undergraduate degree
19   in 1992 from Technion, the Israel Institute of
20   Technology, in electrical engineering; correct?
21 A.  Correct.
22 Q.  You also have an MBA from Tel Aviv university that you
23   obtained in 1998?
24 A.  Correct.
25 Q.  Have you ever worked professionally as a software

Page 40

1    engineer?
2  A.  Yes.
3  Q.  When did that occur?
4  A.  In the IDF.
5  Q.  Okay.  And were you working in cybersecurity in the IDF?
6  MR. AKROTIRIANAKIS:  Objection.  Vague.
7  A.  I never defined it as cybersecurity, no.
8  Q.  Did your work at the IDF relate in any way to the work
9    that you have done with NSO?
10 MR. AKROTIRIANAKIS:  Objection.  Vague.
11 A.  So I cannot talk much about what I did at the IDF for
12   confidentiality reasons, but I will say that the domain
13   I worked in was electronic warfare.  In some ways there
14   are similarities between electronic warfare and
15   cybersecurity, but they are different.
16 Q.  Okay.  When did you finish your military service?
17 A.  2000.
18 Q.  Have you worked as an electrical engineer or a software
19   engineer since 2000?
20 A.  In a managerial role, yes.  And I definitely managed
21   engineers quite a lot.
22 Q.  Do you have responsibility for the research and
23   development department -- strike that --
24 A.  I have responsibility for the whole company.  But, for
25   instance, in my previous work at NICE Actimize, I was

Page 41

1    directly responsible for an R&D group of, I believe it
2    was 200 or 300 engineers.
3  Q.  When you were COO at NSO Group, was research and
4    development part of your responsibility?
5  A.  No.
6  Q.  Okay.
7  A.  Let me correct that, sorry.  In NSO we have several
8    important clients.  Pegasus is not the only one.  I was
9    not responsible for the R&D of Pegasus.  I was
10   responsible for the R&D of other products.
11 Q.  Which products are those?
12 A.  Products that fall under the Circles companies.
13 Q.  Which products are those?
14 A.  There are several products.  The two main products are,
15   one is called Pixcell, which is a tactical mobile
16   interception tool; and the other one is called Landmark,
17   which is geolocation, mobile geolocation tool.
18 Q.  Do you read computer code as part of your work at NSO
19   Group today?
20 A.  Today, no.
21 Q.  Have you ever, as part of your work at NSO, read
22   computer code?
23 A.  I think I am capable, still capable, of reading computer
24   code.  But I haven't.
25 Q.  Okay.  So are you familiar with how Pegasus operates at

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1  a source code level?
2  A. Can you repeat it, please?
3  Q. Are you familiar with how Pegasus operates at a source
4    code level?
5  A. I am not sure I understand the question. I understand
6    what source code is and I understand how Pegasus
7    operates.
8  Q. Are you familiar with the source code for Pegasus?
9  MR. AKROTIRIANAKIS: Objection. Vague.
10 A. I have not read the Pegasus source code.
11 Q. Have you read any source code related to Hummingbird?
12 A. No.
13 Q. How did you come to work at NSO Group?
14 A. Should I answer?
15 Q. Yes, go ahead.
16 MR. AKROTIRIANAKIS: Objection. Vague.
17 A. I finished my work at NICE Actimize in 2018. I was
18    planning to take a little bit of a break after
19    continuously working for a very long time, but soon
20    after I got approached by NSO. I got, actually,
21    approached by two people, I believe it was on the same
22    day, one was a head hunter, a recruiter, who called me
23    up to let me know that NSO is reorganizing its
24    management team and looking for a COO, chief operating
25    officer. And later the same day I got a call from

Page 43

1  Eran Gorev, who is a partner at Francisco Partners, and
2  which was the fund with the majority stake at NSO.
3    Eran worked before at NICE, which is the former
4  company that I worked with, and although our familiarity
5  was very, very brief, because he left NICE more or less
6  when I joined, we knew of each other. And he called me
7  to let me know that the position for chief operating
8  officer at NSO is available, and that he will put me in
9  contact with the COO at the time, Shalev, and with the
10 chief of human resources.
11   So the same day I got approached by a recruiter and
12 Eran Gorev, and from there we got to know each other and
13 I joined the company.
14 Q. You were COO at NSO Group from May 2019
15    through August 2022, correct?
16 A. Yes.
17 Q. Throughout that time did you report to Shalev Hulio?
18 A. Yes.
19 Q. You became CEO in August 2022? You can refer to your
20    Linkedin, if it helps?
21 A. Yes, I became COO in August 2022. The first couple of
22    months I was defined as acting CEO, because Shalev has
23    left and I still didn't get my formal board appointment,
24    it took another two months. But I acted as CEO.
25 MR. AKROTIRIANAKIS: Micah, I am sorry, whenever's

Page 44

1  convenient can we take just a really short break?
2  MR. BLOCK: We can take a break now.
3  THE VIDEOGRAPHER: Going off the record. The time is
4    10:31 a.m. End of media card volume 1 in the deposition
5    of Yaron Shohat.
6  (10:31 a.m.)
7        (break taken)
8  (10:49 a.m.)
9  THE VIDEOGRAPHER: This is the beginning of media card
10   number 2, volume 1, in the video deposition of Yaron
11   Shohat. Going on the record. The time is 10:49 a.m.
12   Thank you.
13 (Exhibit 2016        marked for identification)
14 By Mr. Block:
15 Q. Mr. Shohat, I have handed you an exhibit that's been
16    marked number 2016 and it is titled "Pegasus product
17    description August 2018 version 3.0". Do you see that?
18 A. I see it.
19 Q. Is this a product description from version 3.0 of the
20    defendants' Pegasus system?
21 A. I haven't read it all and I am not familiar with the
22    specific document.
23 MR. AKROTIRIANAKIS: Can I just state for the record, like
24    I did the other day, that I think this document is
25    unquestionably a technical description of technology

Page 45

1  that is export controlled in the United States, and
2  I sent a letter about this yesterday. I just want to
3  make clear on the record that neither NSO nor
4  King & Spalding is taking part of encouraging,
5  requesting -- in fact all the opposite of those
6  things -- the sharing of export controlled, restricted
7  technical documents with NSO.
8  Q. Do you recognize exhibit 2016, Mr. Shohat?
9  A. I said I do not.
10 Q. You do not, okay. Do you know, is that a Q on the
11    cover?
12 A. Yes.
13 Q. Does that refer to the defendant, Q Cyber Technologies?
14 MR. AKROTIRIANAKIS: Objection. No foundation.
15 A. I don't know.
16 Q. Okay. And on the next page, do you see on the top left,
17    it says, "Q Cyber Technologies" with the same Q?
18 A. It is the same Q.
19 Q. Okay. That's the Q that Q Cyber Technologies uses in
20    its logo?
21 A. Yes.
22 Q. Okay. Will you flip ahead to page 6 of this document.
23 A. Can you tell me where this document is from?
24 Q. Yes, it is from your company's files.
25 A. Did we provide it?

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1 A. Yes.
2 Q. And then it says:
3     "Pegasus 2.70 (android and P2 platform)."
4     Do you see that?
5 A. Mm-hm.
6 Q. Do you know what "P2 platform" means in that line?
7 MR. AKROTIRIANAKIS: Objection. Foundation.
8 A. I am not sure.
9 Q. Do you recall using the term "P2 platform" in your work
10    at NSO?
11 A. I don't recall using "P2".
12 Q. Do you know -- strike that.
13     I think I am finished with that document. I will
14    ask you if I want to refer you to it.
15     Thinking back to the 2018/19 time frame, did NSO
16    provide customers the ability to choose which specific
17    installation vector to use when trying to put Pegasus on
18    a target device?
19 MR. AKROTIRIANAKIS: Objection. No foundation.
20 A. I don't recall what -- how do UI -- what UI allowed
21    customers in 2018/19.
22 Q. I have seen distinctions between zero click or covert,
23    and triggered or social engineering one click
24    installation vectors generally. Do those terms make
25    sense to you?

Page 67

1 A. Yes.
2 Q. Is it okay with you if I use covert and zero click
3    interchangeably?
4 A. I prefer zero click in this context.
5 Q. Zero click, okay. And as to the alternative, social
6    engineering, or triggered, or one click --
7 A. Triggered, one click.
8 Q. Sorry, let me just ask the question.
9 A. Sorry.
10 Q. As to the alternative, one click, social engineering,
11    triggered; what do you prefer?
12 A. Let's stick with one click and zero click.
13 Q. Okay.
14     Aside from an option to choose between a zero click
15    and a one click installation vector, are you aware of
16    Pegasus ever providing a customer a choice of which zero
17    click vector to use?
18 A. I am not aware such option was given.
19 Q. Okay. Do you know that such option was never given or
20    you simply don't know whether or not it ever happened?
21 A. I would be very surprised if such option existed.
22 Q. Okay. So thinking back to your knowledge of the UI in
23    2018/19, you are not aware of that option having existed
24    at that time?
25 A. I am not aware.

Page 68

1 Q. And thinking of your knowledge of the UI as it exists
2    today, you have also never seen Pegasus give a customer
3    an option to choose which zero click installation vector
4    to use; right?
5 A. Correct.
6 Q. And that's been true consistently over the course of
7    your time at NSO?
8 A. Yes.
9 Q. Why would you be surprised if Pegasus gave a customer
10    an option to choose which zero click installation vector
11    to use?
12 A. Because customers don't care which vector they use, as
13    long as they get the intelligence they need.
14 Q. That's a matter for NSO and the system to take care of,
15    not a matter for customers to operate?
16 A. Correct.
17 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
18 A. I said "correct".
19 Q. Okay. Thank you.
20     Have you seen the complaint in this lawsuit?
21 A. I don't recall.
22 Q. Do you understand that plaintiffs accuse defendants of
23    being responsible for technology that used Whatsapp
24    infrastructure as an installation vector for Pegasus, at
25    least in the April to May 2019 timeframe?

Page 69

1 MR. AKROTIRIANAKIS: Objection. No foundation.
2 A. I understand that the complaint is about that timeframe.
3    About, actually, an event that happened in,
4    I believe, April 2019.
5 Q. Setting aside the question of whether it was the
6    defendants themselves or the defendants' customers who
7    operated the technology at issue, do you admit that NSO
8    created the technology that was used to implement the
9    attacks that the complaint describes?
10 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
11 A. NSO developed the technology that our customers are
12    using.
13 Q. And that's the technology that was used in the events
14    that the complaint in this lawsuit describes in April
15    and May 2019; correct?
16 MR. AKROTIRIANAKIS: Objection. No foundation.
17 A. NSO developed the technology that was used in the event
18    that the complaint refers to.
19 Q. Okay.
20 MR. AKROTIRIANAKIS: I am also going to object to the
21    question as vague.
22 Q. As part of its Pegasus technology, NSO developed
23    an installation vector called Heaven that uses Whatsapp
24    signaling as part of a process that achieves zero click
25    installation of the Pegasus endpoint on a mobile phone;

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1    true?
2    MR. AKROTIRIANAKIS: Objection. Compound. Vague. No
3        foundation.
4    A. NSO developed -- can you repeat, please?
5    Q. Yes. As part of its Pegasus technology, NSO developed
6        an installation vector called Heaven that uses Whatsapp
7        signaling as part of a process that achieves zero click
8        installation of the Pegasus endpoint agent on a mobile
9        phone; true?
10   MR. AKROTIRIANAKIS: Objection. Compound. Vague. No
11       foundation.
12   A. I am not sure about what Whatsapp signaling means, but
13       NSO developed technology, developed installation vector
14       for Pegasus, that involved Whatsapp messages, to install
15       the agent on a target device.
16   Q. NSO also sold technology that constituted
17       an installation vector for Pegasus that involved
18       Whatsapp messages to install the agent on a target
19       device; true?
20   MR. AKROTIRIANAKIS: Objection. Vague.
21   A. No. NSO licensed its technology.
22   Q. Okay. Licensed and obtained revenues from customers in
23       exchange for a license to technology Pegasus created,
24       that used Whatsapp messages to install the Pegasus agent
25       on a target device; correct?

Page 71

1    A. No.
2    MR. AKROTIRIANAKIS: Objection. Vague.
3    A. Not correct. Customers pay us for the capabilities they
4        get, not for the technology itself. They really don't
5        care if it's Whatsapp or anything else involved. They
6        pay us for the capability to obtain intelligence which
7        is needed for them to fight crime and terror.
8    Q. And all the rest is NSO's operation under the hood?
9    MR. AKROTIRIANAKIS: Objection. The question is
10       incomprehensible. And argumentative.
11   A. Definitely not NSO operation. You might claim
12       technology, not operation.
13   Q. Right. NSO, you said, doesn't sell any of its
14       technology to customers, and retains ownership of all of
15       that technology; correct?
16   MR. AKROTIRIANAKIS: Objection. It is a compound question.
17       It is a vague question. There is no foundation for this
18       witness, among other reasons because it calls for
19       a legal conclusion.
20   A. NSO does not sell its technology, but licenses its
21       technology.
22   Q. Do you have information about the content of the
23       Whatsapp messages that NSO technology sent as part of
24       the Heaven and Eden installation vectors?
25   MR. AKROTIRIANAKIS: Objection. The question assumes facts

Page 72

1    not in evidence. And there is no foundation.
2    A. Do you mean what's the content of the Whatsapp messages
3        sent?
4    Q. Yes.
5    A. I don't.
6    Q. Okay. So if I asked you about a payload in a call offer
7        stanza, would you know anything about that?
8    MR. AKROTIRIANAKIS: Objection. Vague.
9    A. Payload and?
10   Q. In a call offer stanza. Are these terms familiar to
11       you?
12   A. No.
13   Q. Do you know how the Heaven and Eden installation vectors
14       caused a target device to download the Pegasus agent?
15   MR. AKROTIRIANAKIS: Objection. No foundation.
16   A. I don't recall.
17   Q. Okay. Is this information that you once knew but do not
18       recall, or never had occasion to know?
19   A. Might have heard, knew. I don't recall.
20   Q. You don't recall whether or not you ever knew that
21       information?
22   MR. AKROTIRIANAKIS: Objection. Misstates the witness'
23       testimony.
24   A. If I knew, I don't recall it.
25   Q. Okay.

Page 73

1        What legal entity is your employer?
2    A. Q Cyber Technologies Ltd.
3    Q. That's Q Cyber of Israel?
4    A. Yes.
5    Q. Has that been true throughout your employment with
6        defendants, since 2018?
7    A. Yes.
8    Q. As a corporate representative, what is the relationship
9        between Q Cyber Technologies Limited and NSO Group
10       Technologies Limited?
11   A. Q Cyber Technologies Limited is the owner of the shares,
12       the full owner of NSO.
13   Q. And who is the owner of Q Cyber Technologies Limited?
14   A. The owner of Q Cyber Technologies Limited is a company
15       by the name OSY SARL, based in Luxembourg.
16   Q. Is OSY an acronym?
17   A. It is. I don't remember what it stands for.
18   Q. Okay.
19   A. I once -- I don't recall. I once knew.
20   Q. NSO is an acronym, right?
21   A. Yes.
22   Q. For?
23   A. NSO is an acronym for the first letter of the first
24       names of the three founders of the company: Shalev
25       Hulio, Omri Lavie and Niv. NSO.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

1 Q. I was wondering if OSY was the same O and S from NSO,
2    plus a Y for someone else?
3 A. For Yaron?  Definitely not this Yaron, because I was not
4    there when that name was coined.
5    I don't think, but I really don't know.  I don't
6    recall.  Someone told me once, surprised me that OSY is
7    an acronym, but I don't recall what it was.
8 Q. Okay.
9 A. I assume that if it was Omri and Shalev then I would
10   recall if that was the case.
11 Q. Okay.
12    Can I refer to the OSY entity you just identified as
13   OSY?  Who owns OSY?
14 A. Okay, there is a bunch of companies higher up.  And it
15   changed over time.  So it would be best to refer to the
16   exact time that you are asking.
17 Q. Let's start with 2019.  Do you recall -- and I don't
18   need everybody -- but do you recall the ultimate parent?
19 A. The ultimate parent in early '19 or late '18 was
20   a company called Triangle.  Not the ultimate parent,
21   because there are more higher ups, because there are
22   funds overseas or private equity funds holding the
23   company, but Triangle was the top operational entity
24   that -- of the company.
25 Q. In this early 2019 or late 2018 timeframe, was Triangle

Page 75

1    majority owned by Francisco Partners?
2 A. Definitely in January '19 that was still the case.
3 Q. Okay.  Who is Francisco Partners, to your understanding?
4 A. Francisco Partners is --
5 MR. AKROTIRIANAKIS:  I am sorry, I object to the form of the
6    question and the foundation.
7    Go ahead, if you understand it and can answer it,
8    you can answer it.
9 A. Francisco Partners is an American based private equity
10   firm.
11 Q. It is based in the San Francisco Bay area, right?
12 MR. AKROTIRIANAKIS:  Objection.  No foundation.
13 A. I have never been to their offices, so I don't know
14   where they are located.  I met them in the London
15   offices when I met them.
16 Q. Okay.
17 A. I don't think the partners that dealt with NSO were
18   based where you mentioned.
19 Q. What is the relationship between WestBridge Technologies
20   Inc. and the defendants NSO and Q?
21 MR. AKROTIRIANAKIS:  Objection.  Vague.
22 A. WestBridge is a company in the large family of the
23   corporate structure, which includes way more than
24   a dozen of companies.  It is -- I would call it as
25   a distant cousin, a distant cousin of NSO and Q.

Page 76

1 Q. What's the relationship of WestBridge Technologies to
2    OSY?
3 A. OSY.
4 MR. AKROTIRIANAKIS:  Objection.  No foundation.
5 A. In terms of legal entity, I believe that WestBridge is
6    owned by OSY.
7    (Exhibit 2009          marked for identification)
8 Q. Okay.  I have handed you what was previously marked
9    exhibit 2009.  It is entitled "structure chart as
10   of December 31, 2019".
11 A. Yes.
12 Q. And bears the Bates stamp "NSO_Whatsapp" and then
13   a number that ends 0176.  Do you see that?
14 A. Yes.
15 MR. AKROTIRIANAKIS:  What was the prior exhibit number?
16 MR. BLOCK:  2009.
17 MR. AKROTIRIANAKIS:  Thank you.
18 Q. Do you recognize exhibit 2009?
19 A. I do.
20 Q. Can you confirm that it is an accurate structure chart
21   as of December 31, 2019?
22 A. Yes.
23 Q. Okay.  So at least as at that time in December 2019, OSY
24   Technologies SARL was a 100 percent owner of WestBridge,
25   and also a 100 percent owner of Q Cyber; correct?

Page 77

1 A. Correct.
2 Q. And OSY was 100 percent owned, through a chain of
3    companies, up to Triangle Holdings SA; correct?
4 A. This is correct according to this.  I must say
5    that I am not sure it was correct in December '19.
6    Okay, but correct.
7 Q. Correct as of December 2019?
8 MR. AKROTIRIANAKIS:  Objection.  Misstates the testimony.
9 A. It would be easier for me to say it was correct mid '19,
10   if it would help you, other than December.  Because
11   I know that some companies were added.  I thought they
12   were added late '19, maybe early 2020.  I don't want to
13   confirm that.
14 Q. Okay.
15 A. But I am ready to say that this was correct after May
16   '19, which is what I think you care about.
17 Q. I am trying to be careful not to talk over to you, so
18   I apologize to the extent that I have thought your
19   answer was finished.
20 A. Very good.
21 Q. To be clear for the record, can you confirm that
22   exhibit 2009 accurately depicts the organizational
23   structure for the corporate family that included Q
24   Cyber, NSO, and WestBridge as of the middle of 2019?
25 A. Correct.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 78

1 Q. Okay. What is North Pole Hold Co?

2 A. North Pole Hold Co was -- okay, in early 2019,

3    Novalpina, which was a UK, London based, private equity,

4    acquired a majority stake in the group, replacing,

5    basically, in a way, Francisco Partners. And North Pole

6    was the company headed by them, Novalpina. And as we

7    can see from the chart, North Pole holds 70 percent of

8    the shares, which means that Novalpina, the private

9    equity firm, I believe, holds -- owns, North Pole.

10   Therefore, Novalpina owns 70 percent of the structure we

11   have seen.

12 Q. Exhibit 2019 indicates that, at least as of the middle

13   2019, a group of founders and employers owned

14   approximately 30 percent of the equity in Triangle

15   Holdings, which is the ultimate parent of OSY

16   Technologies, and others we been discussing;

17   correct?

18 A. Correct.

19 MR. AKROTIRIANAKIS: Counsel, you might want to check your

20   question there. Just to show you what a generous person

21   I am. Maybe the first two words of it.

22 MR. BLOCK: Thank you.

23    By Mr. Block:

24 Q. Exhibit 2009 indicates that, at least as of the middle

25   of 2019, a group of founders and employers owned

Page 79

1    approximately 30 percent of the equity in Triangle

2    Holdings, which was the ultimate parent of OSY

3    Technologies, and other entities we have been

4    discussing; correct?

5 A. Correct.

6 Q. Thank you.

7    Were you a stock holder in Triangle Holdings at that

8    time?

9 MR. AKROTIRIANAKIS: Objection. Vague.

10 A. No.

11 Q. Okay. Do you hold an equity interest in defendants

12   today?

13 A. No.

14 Q. Have you ever held an equity interest in defendants?

15 A. No.

16 Q. Have you ever held an equity interest in a parent

17   company of one of the defendant entities?

18 MR. AKROTIRIANAKIS: Objection. Vague.

19 A. Yes.

20 Q. Have you ever held an equity interest in Triangle

21   Holdings?

22 A. No.

23 Q. Will you please describe for me the nature of your

24   equity interest in parent companies as they relate to

25   defendants?

Page 80

1 A. Yes, I will. In this chart, I held options in Triangle.

2 Q. Do you hold options today?

3 A. No.

4 Q. Do you hold stock?

5 A. I will correct my answer, sorry.

6 Q. Please.

7 A. I do hold options in Triangle today. Triangle is not

8    related to the defendants today.

9 Q. Okay.

10 A. In any way. Basically, it is worthless.

11 Q. Whether as an option or a stock or another form of

12   equity interest, do you have any equity interest in the

13   defendant entities as they exist today?

14 A. No.

15 Q. Okay.

16 A. Sorry, stock, options or, what was --

17 Q. Any --

18 A. I don't have any kind of equity in the defendant or

19   above the defendant today.

20 Q. Okay. Do you know who holds the equity, who owns

21   defendants today?

22 MR. AKROTIRIANAKIS: Objection. Vague. Calls for a legal

23   conclusion.

24 A. Today the defendant, through a chain of companies, 100

25   percent ownership of the company called Dufresne, which

Page 81

1    is held 100 percent by Omri Lavie, who is one of the

2    founders.

3 Q. Does Omri Lavie have any operational role with

4    defendants today?

5 A. What do you mean by operational role?

6 Q. Does he participate in governance or operations, aside

7    from holding the equity?

8 A. He is a director of the company.

9 Q. He is a director, okay. You are CEO today of Q Cyber

10   Technologies, which is the parent of both WestBridge and

11   NSO; correct?

12 A. No.

13 MR. AKROTIRIANAKIS: Objection. Misstates the testimony.

14 A. NSO, or Q, is not a parent of WestBridge in any way.

15 Q. I beg your pardon?

16 A. I am the CEO of Q Cyber Israel, let's call it, and NSO.

17 Q. Okay. Do you report to a board of directors?

18 A. Like any CEO.

19 Q. And that's the board of directors of Q Cyber?

20 A. Also, yeah.

21 Q. Who is on the board of directors to which you report?

22 A. In Q Cyber? Omri Lavie.

23 Q. Any other directors?

24 A. No.

25 Q. Who is on the board of directors for OSY?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1 A. It exists, but it is inactive.

2 Q. Okay. Do you know when it became inactive?

3 A. It had less and less activity over the years.

4    Definitely when I became CEO in 2022, I stopped any

5    activity, closed the office, and stopped spending any

6    money in the US.

7 Q. When you became CEO in 2022, you took an action to stop

8    activity, closed the office, stopped spending money in

9    the United States on the defendants' behalf?

10 A. Correct. Almost. I will correct a few things.

11    I stopped making efforts in the US. I believed the

12    level of effort awarded before, at least since 2020 --

13    yes, (inaudible) WestBridge is not owned or part of the

14    defendant.

15 MR. AKROTIRIANAKIS: Micah, in as much as there is 114 more

16    pages in this exhibit, can we take a comfort break?

17 MR. BLOCK: We can. Let's go off the record.

18 THE VIDEOGRAPHER: Going off the record. The time is

19    12:17 p.m. The end of media card 2, volume 1, in the

20    deposition of Yaron Shohat.

21 (12:17 p.m.)

22    (break taken.)

23 (12:37 p.m.)

24 THE VIDEOGRAPHER: This is the beginning of media card

25    number 3 volume 1 in the video deposition of Yaron

Page 95

1    Shohat, going on the record. The time is 12:36 p.m.

2    Thank you.

3 MR. BLOCK: Welcome back, Mr. Shohat.

4 A. Thank you.

5 By Mr. Block:

6 Q. I wanted to circle back to something we were discussing

7    earlier. Why did defendants finally decide to shutdown

8    WestBridge?

9 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.

10 A. It was not successful, WestBridge.

11 Q. What do you mean by unsuccessful?

12 A. The purpose was to penetrate North America and generate

13    sales. Which it didn't.

14 Q. Did that decision the defendants took to shutdown

15    WestBridge relate to the US government's listing NSO on

16    an export restriction list?

17 MR. AKROTIRIANAKIS: Objection. Misstates testimony.

18 A. First, it is not related. Second, the defendant did not

19    take a decision to shutdown WestBridge. If I could,

20    I would shut it down; it still exists.

21 Q. I see.

22 A. It was not in my, or the defendant ... it is not owned

23    by the defendant, so the defendant could not shut it

24    down.

25 Q. Okay. But the decision you took as the defendant's CEO

Page 96

1    was to cut off any further spending in the US?

2 A. It is equivalent to a decision to stop working with the

3    reseller which is not performing.

4 Q. Okay. In the 2019 time frame, did defendants account

5    for Pegasus revenue differently depending on which

6    defendant entity signed the customer contract?

7 A. What do you mean account differently?

8 Q. Like financial accounting?

9 A. I am not sure I understand, but basically the revenue is

10    allocated according to the entity that develops it.

11 Q. According to the entity that develops the sale or

12    develops the product?

13 A. No, the product.

14 MR. AKROTIRIANAKIS: You have to wait until he is done,

15    otherwise you make his job very difficult.

16 A. Sorry, I will repeat.

17    Revenue is allocated according to the entity that

18    develops the product, at least the majority of the

19    revenue. Some of the entities on the way are entitled

20    to some, because they take part in the distribution.

21 Q. Okay. What is the entity that developed Pegasus?

22 A. The defendants.

23 Q. The defendants, plural, Q and NSO?

24 A. Yes.

25 Q. Okay.

Page 97

1 A. The development is, like, NSO, as I mentioned, but the

2    support functions are Q. I am not sure -- I don't know

3    to say how the revenue would be split between Q and NSO.

4 Q. Was it important in any way for NSO's operations to

5    distinguish between a Pegasus contract signed by Q Cyber

6    Luxembourg, for example, versus a Pegasus contract

7    signed by NSO Group limited of Israel, for example?

8 A. It does not really matter. It matters for the

9    accountants and the financial team, because it is more

10    work, but we don't really care with which entity we sign

11    the contract.

12 Q. And when the contract is signed between the end customer

13    and a reseller, is contract revenue allocated to the

14    reseller, or -- strike that, let me ask again.

15    How is revenue allocated when a Pegasus customer

16    contract is signed between the end customer and

17    a reseller?

18 A. So when a contract is signed with the reseller, the

19    reseller signs with the end user and then the reseller

20    signs with the company, let's call it Q. Whatever is on

21    the contract, the value of the contract between the

22    reseller and the company, the reseller pays the company,

23    so the reseller gets money from the end user, the

24    customer, and pays to the company whatever is stated on

25    the contract.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1 vectors" and then it goes on. And in the second column
2 to the right of that question it says, in all caps:
3     "WE WILL NOT GIVE THIS AND DO NOT EVEN GIVE TO
4 CUSTOMERS."
5     Do you see that?
6 A. I do.
7 Q. So my question is was it defendants' policy in 2018 not
8     to provide to its customers information about the
9     available attack vectors for Pegasus?
10 MR. AKROTIRIANAKIS: Objection. No foundation.
11 A. I stated before that we did not tell the customers the
12     exact vectors, we just tell them, remember we agreed to
13     say zero click and one click, and that's it.
14 Q. And has that been true throughout your time working with
15     the defendants?
16 A. That's my understanding.
17 Q. Yes.
18     In the next row on the same second page of
19     exhibit 2020, there is another request related to
20     Pegasus. It says --
21 A. Sorry.
22 Q. No problem.
23 A. Let me locate.
24 Q. Of course. We are on the page that ends 25652, which is
25     the second page of exhibit 2020?

Page 123

1 A. 652.
2 Q. I am looking at the third row of the table on this page,
3     which begins "Pegasus status of Android capability" do
4     you see that?
5 A. Yes.
6 Q. And the response to that request for information about
7     the status of the Android capability of Pegasus says:
8     "SEE ABOVE. WE CAN JUST SHARE GENERAL CHANGE IN OUR
9     ABILITY TO SUPPORT ANDROID NOW AND WHEN WE HAD [A]
10     BREAKTHROUGH."
11     Do you see that?
12 MR. AKROTIRIANAKIS: Objection. The document was misread.
13 A. I see.
14 Q. Do you understand that breakthrough to be the new
15     ability to support zero click for Android on a broad set
16     of Android devices that we discussed earlier today?
17 MR. AKROTIRIANAKIS: Objection. No foundation.
18 A. I don't understand it. I don't. I understand what
19     I read.
20 Q. Okay. Do you remember a breakthrough with respect to
21     the Pegasus Android capability that preceded May 2018?
22 MR. AKROTIRIANAKIS: Objection. No foundation.
23 A. Proceed May '18? I was not in the company. I cannot
24     imagine.
25 Q. Did there come a time when Francisco Partners completed

Page 124

1     a transaction to sell its stake in the defendants?
2 MR. AKROTIRIANAKIS: Objection. No foundation.
3 A. Yes.
4 Q. When did that happen?
5 A. As mentioned before, Francisco Partners sold their stake
6     to Novalpina, it was a transaction that they sold their
7     stake and Novalpina got a stake in the company. I don't
8     remember the exact dates, but the process I believe
9     spanned over the last quarter of '18 and the first
10     quarter of '19.
11     (Exhibit 2021        marked for identification)
12 Q. Okay, I have handed you exhibit 2021 which is a press
13     release from Francisco Partners entitled "NSO Group
14     acquired by its management" dated February 14, 2019. Do
15     you see that?
16 A. I do.
17 Q. Does this refresh your recollection about the timing of
18     Francisco Partners' sale of its stake in the defendants?
19 A. It is in line with the timing they said, yes.
20 Q. Okay. Have you heard of the Jefferies Group?
21 A. Yes.
22 Q. Who is Jefferies Group?
23 A. Jefferies is a financial institution.
24 Q. Do you know whether Jefferies had a role in the
25     transaction through which Francisco Partners sold its

Page 125

1     ownership stake in the defendants?
2 A. Yes. Yes.
3 Q. What was that role, to your understanding?
4 MR. AKROTIRIANAKIS: No foundation.
5 A. Part of the acquisition of resources came through a debt
6     that Novalpina and the company raised. The company,
7     I don't mean the defendant, but the group, the larger
8     group, and Jefferies was the main provider for that
9     debt.
10 Q. When you say the larger group, are you talking about the
11     group of management individuals who participated in the
12     transaction?
13 A. I meant the larger corporate structure, I meant it is
14     not Q or NSO got the debt but some higher up entity.
15 Q. Okay.
16 A. In the corporate structure.
17 Q. Do you know which entity became indebted as part of the
18     transaction?
19 A. I believe the name was a NewCo, NewCo, we can look up
20     the exhibit 2009, so it is called North Pole. It is
21     very hard to read, but North Pole SARL, I believe that's
22     the entity.
23 Q. North Pole NewCo SARL?
24 A. Yes, exactly.
25 Q. The immediate parent to OSY Technologies SARL in 2019?

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

1 Q. Okay. So --

2 A. I will correct my answer. They gave him -- yes, they

3    gave him it for free, but the debt is still there.

4 Q. Do you know if the debt was restructured in connection

5    with Mr. Lavie's taking control of the equity?

6 A. I believe there were some changes to the debt.

7 Q. And do you know what those changes were?

8 MR. AKROTIRIANAKIS: Objection. No foundation. Calls for

9    a legal conclusion.

10 A. I believe they added additional debt, increased the

11    debt.

12 Q. Do you know what the size of the outstanding principal

13    was when Mr. Lavie took over as owner of the equity?

14 A. It was over $500 million.

15 Q. Do you know how much over?

16 A. Between 500 and 6 -- even less. I assume it was 530, or

17    a bit more.

18 Q. Between 530 and 535? $530 million and $535 million?

19 A. I cannot really tell. That's the range for the

20    principal.

21 Q. Okay.

22    Do you know what the amount of outstanding principal

23    is for the debt that the family of companies owes today?

24 MR. AKROTIRIANAKIS: Objection. Foundation.

25 A. No, not exactly.

Page 135

1 Q. Okay. So you are CEO, you don't know how much debt is

2    on the balance sheet?

3 A. When you don't pay your debt, you don't really care how

4    much it is. If it is large enough, the number doesn't

5    really matter.

6 Q. Okay. Are you saying that defendants have outstanding

7    debt and they are not servicing it?

8 A. Correct.

9 Q. What's the collateral for that debt?

10 A. The Group. The equity.

11 Q. The equity that Mr. Lavie holds?

12 A. Yes.

13 Q. Okay. Do you know of any relationship between Mr. Lavie

14    and the current creditors?

15 A. Other than what we discussed, no.

16 Q. Okay. And do you know who the current creditors are?

17 A. It is a group of financial institutions.

18 Q. Can you name any of them?

19 A. The agent for the debt is Wilmington Trust. I believe

20    that's the name of the institution.

21 Q. Do you know the names of any of the debt holders in the

22    group?

23 A. I know the names of creditors that held debt. I don't

24    know if it is -- they are currently still holding it.

25    I know of Jefferies, Credit Suisse, a company by the

Page 136

1    name of Senator.

2 Q. Can you think of any others?

3 A. I can try to think of others. I am not sure I will get

4    the names right.

5 Q. That's okay.

6 A. Whitebox, I believe.

7 Q. Wide? Or White?

8 A. White.

9 Q. Thank you.

10 A. Z Capital. Ellington, I hope I get the name right.

11 Q. Ellington? Like Duke Ellington?

12 A. I think so. Or something close to it.

13 Q. Okay.

14    What was the defendants' biggest selling product in

15    the 2018/19 timeframe?

16 A. Pegasus.

17 Q. What is defendants' biggest selling product today?

18 A. Pegasus.

19 Q. And has that been true consistently from 2018/19 until

20    today?

21 A. Yes.

22 Q. I believe you testified that WestBridge was created

23    before you joined defendants, right?

24 A. Correct.

25 Q. As defendants' corporate representative, do you know

Page 137

1    when WestBridge was created?

2 A. I think -- I believe it happened, took place, in 2015.

3 Q. And do you know why WestBridge was created by defendants

4    in 2015?

5 A. Yes, WestBridge was --

6 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.

7    No foundation.

8 A. WestBridge was created, I believe, by -- as part of

9    Francisco Partners' strategy to expand business in North

10    America, to be a reseller for NSO, for the Group's

11    products in North America.

12 Q. Do you know who was in charge at WestBridge when it was

13    founded in 2015?

14 A. The first person in charge was Omri Lavie.

15 Q. Did Mr. Lavie spend time in the United States as part of

16    his role with WestBridge, to your knowledge?

17 A. Yes.

18 Q. Do you know how much time he spent in the United States?

19 A. He relocated to the United States.

20 Q. Where was he living when he relocated to the

21    United States to work at WestBridge?

22 A. I don't know at the time where he lived.

23 Q. Okay. Do you know --

24 A. I know for sure it was east coast. Put it this way.

25 Q. What do you know about the activities that Mr. Lavie

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1    undertook in connection with his work for WestBridge?
2  MR. AKROTIRIANAKIS: I am going to object that that question
3    is outside the scope of his designation. And so he can
4    answer in his personal capacity, if he knows, but no
5    foundation.
6  A. I don't know.
7  Q. What did WestBridge do in 2015 to market and/or sell
8    defendants' products in the United States?
9  MR. AKROTIRIANAKIS: Same objections. Outside of the scope.
10    No foundation.
11  A. Made effort to sell the product.
12  Q. Do you know the customers to whom it made an effort for
13    those sales?
14  MR. AKROTIRIANAKIS: Objection. Vague.
15  A. NSO sells only to governmental agencies, so WestBridge
16    would meet with governmental agencies, the type of FBI,
17    CIA and the like. But I don't know specifically of
18    specific meetings.
19  Q. Okay. Let me just get that clear for the record. Are
20    you able to identify any specific customer in the
21    United States with whom WestBridge, or any other
22    representative of defendants, met for the purposes of
23    selling Pegasus?
24  MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
25    Exceeds the scope of the designation. No foundation.

Page 139

1  A. So which time period?
2  Q. Let's start with 2015?
3  A. I don't know.
4  Q. 2016?
5  A. I don't know.
6  Q. 2017?
7  A. I don't know.
8  Q. 2018?
9  A. So around '18 or '19, it is a matter of public record
10    that Pegasus was sold to the FBI. The FBI director
11    stated that in Congress, in front of Congress committee.
12    So obviously a meeting has been held with the FBI.
13  Q. 2020?
14  MR. AKROTIRIANAKIS: Same objections.
15  A. I don't know of any other specific meetings.
16  Q. Okay. You don't know, or you are unwilling or unable to
17    disclose?
18  A. I don't know. Had I knew, I wouldn't disclose. But
19    I don't know about specific meetings, no.
20  Q. Okay. With respect to defendants' efforts to market and
21    sell in the United States, including through defendants'
22    affiliates, the accused technology that was in use
23    between April 29, 2018, and May 10, 2020, the only
24    customer you can identify with whom the defendants or
25    their representatives met is the United States Federal

Page 140

1    Bureau of Investigation; is that a true statement?
2  A. I said that it is fair to assume that meetings were held
3    with several intelligence and law enforcement agencies
4    of the US and of the US government. Do I know of
5    specific meetings held? No.
6  Q. Do you know the identities of the customers with whom
7    meetings were held, other than the FBI?
8  A. I know that -- okay, WestBridge is independent -- was
9    and is independent of the defendants. And part of it is
10    because WestBridge, or any US reseller selling to
11    federal agencies, is required to meet classification
12    requirements. And therefore they didn't divulge me, or
13    the company specifically, with who they were meeting.
14    So even if I was told that there is a meeting in
15    Virginia, I can guess, just like you, which federal
16    agency they met. But they did not tell me that. They
17    kept it to themselves. And that's part of the reason
18    that WestBridge was established by Francisco Partners as
19    a completely separate entity, with full autonomy, and it
20    did not report into Q or NSO or its CEO, even not the
21    one before me, because they required independence, and
22    required to not be subjects of foreign company, because
23    they are dealing with US government.
24  Q. Is it your testimony that no one at defendants directed
25    the activities of WestBridge in any way?

Page 141

1  MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
2  A. I am saying that the defendant did not direct
3    WestBridge. WestBridge acted as independent entity and
4    enlisted the help of NSO in knowledge, or whatever, but
5    they didn't report, or they didn't take orders, from Q
6    or NSO.
7  Q. Who was the CEO of OSY at this time, in 2018/19?
8  A. I am not sure there was a CEO over there.
9  Q. Okay.
10  A. There was a director, but not CEO.
11  Q. A director. Are you aware of anybody, any officer, with
12    a management role in OSY or any company above it?
13  A. So --
14  MR. AKROTIRIANAKIS: Objection. No foundation.
15  A.  -- I know that Eran Gorev of Francisco Partners was
16    very involved.
17  Q. Eran Gorev was a director, not an officer. To your
18    knowledge was Eran Gorev -- and I apologize if I am
19    mispronouncing the name -- ever an officer of OSY or one
20    of its parents?
21  A. I am not sure the exact definition of an officer, but he
22    was formally a director.
23  Q. Okay. What was Omri Lavie's role with respect to
24    WestBridge in 2018/19?
25  MR. AKROTIRIANAKIS: No foundation.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1  A. He had no role in WestBridge in '18 and '19.
2  Q. What was Mr. Lavie's role in respect of WestBridge in
3     2015?
4  MR. AKROTIRIANAKIS: No foundation.
5  A. He headed it. I don't know if it was defined as CEO,
6     but he was the head of WestBridge.
7  Q. At that time, was he also an officer of any other entity
8     within the family of companies we have been discussing?
9  A. Again, not sure about the definition of an officer, but
10    he was clearly one of the founders and held significant
11    stake of equity in the Group. And a director in several
12    of the entities.
13 Q. So in 2015, for example, Mr. Lavie was an equity holder
14    and a director with respect to Q Cyber and NSO; true?
15 MR. AKROTIRIANAKIS: Objection. That misstates his
16    testimony. No foundation.
17 A. No. He is a director with responsibility, and equity
18    was higher up in the chain.
19 Q. Mm-hm.
20 A. In 2000 -- if you correct the question, I will answer.
21 Q. In 2015, did Mr. Lavie have a job with Q Cyber or NSO?
22 A. No.
23 MR. AKROTIRIANAKIS: Objection. No foundation.
24 A. Once Omri -- once he moved to WestBridge and established
25    WestBridge, he no longer had a job, was not an employee

Page 143

1  of Q or NSO.
2  Q. Do you know what Mr. Lavie's title was with Q and/or NSO
3     immediately before he became the head of WestBridge?
4  A. I don't know the exact title. Founder plus something.
5  Q. Do you know generally what his responsibilities were as
6     founder plus something?
7  A. Business development.
8  Q. Right. So, Mr. Lavie was working in business
9     development for the defendants immediately before he
10    became the head of WestBridge in the United States?
11 MR. AKROTIRIANAKIS: Objection. Foundation.
12 A. That's my personal understanding. I was not there. But
13    we can check it and get back to you. It is easy to
14    check.
15 Q. Okay. I think you said you know that WestBridge made
16    a sale to the Federal Bureau of Investigation, right?
17 A. Correct.
18 Q. When Pegasus is sold to a customer, what happens next?
19 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
20 A. We sign a contract.
21 Q. After the contract is signed, what happens?
22 MR. AKROTIRIANAKIS: Vague. No foundation.
23 A. Deploy the system.
24 Q. Was a system deployed for the FBI?
25 MR. AKROTIRIANAKIS: Objection. No foundation.

Page 144

1  A. Yes.
2  Q. Who did the deployment?
3  A. Employees of the company.
4  Q. Which company?
5  A. Employees of the defendant were involved.
6  Q. In the deployment of the system to the FBI?
7  A. Yes.
8  Q. Okay. Has WestBridge ever had deployment capability to
9     your knowledge?
10 MR. AKROTIRIANAKIS: Objection. No foundation.
11 A. WestBridge had engineers but they were not capable of
12    doing the deployment on their own.
13 Q. So, for any contract that WestBridge completed,
14    defendants' employees were necessary for deployment?
15 A. That would be true for any Pegasus contract.
16 Q. Any Pegasus contract sold by any reseller, anywhere in
17    the world?
18 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
19    No foundation.
20 A. When we sell anywhere in the world, the reseller does
21    not get the system. The customer gets it. So it is not
22    that we sell it to the reseller, he takes it and deploys
23    it. The deployment is always done directly by our team.
24 Q. Is there a particular team at NSO and/or Q Cyber that's
25    responsible for deployment?

Page 145

1  A. Yes.
2  Q. Does that team have a name?
3  A. The deployment team.
4  Q. Do you recall who was in charge of the deployment team
5     in 2015?
6  A. '15?
7  Q. '15.
8  A. No.
9  Q. 2018/19?
10 MR. AKROTIRIANAKIS: Objection. Compound. No foundation.
11 A. '18/'19. The deployment team in '18 was under my
12    responsibility. In '19 it transitioned to someone else.
13 Q. So as COO, deployment was one of the teams that you
14    supervised in 2018?
15 A. Yes.
16 Q. Do you recall who the head of the deployment group was
17    at that time?
18 A. There were a few levels, managerial levels below me.
19    The direct -- I don't remember the name of the team
20    leader, but the person who reported to me, under which
21    it belonged, his name is Avi Itzhak.
22 Q. Okay. You said the deployment team later transitioned
23    to be not part of your responsibility as COO, but
24    instead reported up through someone else?
25 A. Yes.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1  the FBI, and one deployment of Landmark to a customer
2  whose identity you don't know?
3  A. Correct.
4  Q. Aside from those two, are you aware of any other
5    deployment of any of defendants' products in the
6    United States?
7  A. There might have been another Landmark at some earlier
8    point, which is probably the reason I am confused with
9    the dates. That's it.
10 Q. Do you know the identity of the customer for that third
11   deployment?
12 A. I do not.
13 Q. Do you know where in the United -- withdrawn.
14 A. I do not.
15 Q. You said one of the things WestBridge was capable of
16   doing is giving demonstrations of defendants' products,
17   or something to that effect. Do you recall that?
18 A. WestBridge demoed the system.
19 Q. Okay. Let me start with Pegasus. Did WestBridge
20   demonstrate Pegasus?
21 A. Yes.
22 Q. Do you know who at WestBridge demonstrated Pegasus?
23 MR. AKROTIRIANAKIS: Objection. No foundation.
24 A. I don't know the names. Other than Terry, I don't know
25   the names. Or Josh, which was mentioned. I don't know

Page 155

1  the names or roles of anyone at WestBridge, so the
2  answer is no.
3  Q. Okay. Do you know when is the first time WestBridge
4    demonstrated Pegasus to a US entity?
5  MR. AKROTIRIANAKIS: Objection. Foundation.
6  A. I don't.
7  Q. Do you know how many US customers received
8    demonstrations of Pegasus from WestBridge?
9  A. I don't.
10 Q. Do you know how many California customers received
11   demonstrations of Pegasus from WestBridge?
12 MR. AKROTIRIANAKIS: Objection. Assumes facts not in
13   evidence.
14 A. I am not aware of any California customer.
15 Q. When WestBridge performed a demonstration of the Pegasus
16   system, was it demonstrating the same Pegasus system
17   that defendants offer elsewhere in the world?
18 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
19 A. It is the same system. The same source code. Maybe
20   with slight configuration changes.
21 Q. Again, we have spoken about the FBI. Aside from the
22   FBI, can you identify any other US customer to whom
23   WestBridge demonstrated Pegasus?
24 A. No.
25 Q. I understand you can't remember, as you sit here today,

Page 156

1  the name of any other US customer to whom WestBridge
2  demonstrated Pegasus; did you ever have that knowledge?
3  A. So, as I mentioned before, WestBridge did not share the
4    names of the customers, or the entities, or the
5    agencies, because of the classification requirements
6    they had. I understand that, or assume, that you get
7    information from Terry and you can ask him. He should
8    know.
9  Q. So you don't recall receiving information about the
10   customers to whom they were attempting sales, but
11   obviously you, defendants, did receive information about
12   each completed sale, because defendants were responsible
13   for deployment; correct?
14 A. Yes, we mentioned one sale. Yes.
15 Q. Okay. One for Pegasus, two for Landmark, that you
16   remember?
17 A. One or two for Landmark.
18 Q. Okay. And you don't remember whether or not there were
19   any others beyond those two or three?
20 A. No, I said there was only one Pegasus deployment in the
21   US.
22 Q. Okay. And there were one or two Landmark deployments in
23   the US, that you remember?
24 A. Yes, but Landmark does not necessarily require physical
25   deployment.

Page 157

1  Q. Aside from Landmark and Pegasus, what other of
2    defendants' products were deployed in the United States
3    to your knowledge?
4  A. I don't know of other products that were deployed in the
5    United States.
6  Q. You don't know?
7  A. As far as I know, there were not. No.
8  Q. Okay. Have you heard the name Phantom?
9  A. Yes.
10 Q. What is Phantom?
11 A. Phantom is a name, a marketing name, for Pegasus in
12   North America.
13 Q. Why did defendants elect to use the name Phantom when
14   marketing Pegasus in North America?
15 MR. AKROTIRIANAKIS: Objection. Assumes facts not in
16   evidence. No foundation.
17 A. The defendant did not elect to use the name Pegasus --
18   Phantom. WestBridge elected to use the name Phantom.
19 Q. Was it Omri Lavie who made that choice?
20 MR. AKROTIRIANAKIS: Objection. Foundation.
21 A. I do not know who made this choice.
22 Q. Did the Phantom name precede your time at defendants?
23 MR. AKROTIRIANAKIS: Objection. No foundation.
24 A. I don't know.
25 Q. Do you know why defendants' US reseller chose the

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1   Phantom name?
2   MR. AKROTIRIANAKIS: Foundation.
3   A. No.
4   (Exhibit 2023          marked for identification)
5   Q. This is exhibit 2023.
6       Mr. Shohat, exhibit 2023 is a document bearing the
7   Bates number WA-NSO-00100526 through 00100528. Do you
8   see that?
9   A. Yes.
10  Q. Do you recognize exhibit 2023?
11  A. I never saw it before.
12  Q. So do you know whether this is a document that
13  WestBridge presented to customers in the United States?
14  A. I do not know.
15  Q. Do you see the picture on the second page?
16  A. On the first page, yeah.
17  Q. That's a fair distinction. The first page is a cover
18  sheet which says "attachment 1", correct?
19  A. Correct.
20  Q. And then the first page of the -- I will call it
21  a brochure, is that okay?
22  A. Yes.
23  Q. The first page of the brochure bears Bates number ending
24  100527, and it says:
25      "Phantom. Turn your target's smartphone into

Page 159

1   an intelligence gold mine."
2       Do you see that?
3   A. I see that.
4   Q. And then, on the left-hand side of the image of the
5   phone, it says "instant messaging" and it points to
6   Whatsapp and Skype?
7   A. I see that.
8   Q. And there are a number of icons on the image of the
9   phone, including file retrieval, locations, emails;
10  correct?
11  A. Correct.
12  Q. And then if you read the text below -- withdrawn.
13      Let's move to the next page. This says at the top:
14      "WestBridge Technologies is the North American
15  branch of NSO Group."
16      Do you see that?
17  A. I do.
18  Q. Were you aware that WestBridge was representing itself
19  that way?
20  MR. AKROTIRIANAKIS: Objection. No foundation.
21  A. WestBridge was presenting itself as a branch of NSO
22  Group, not NSO.
23  Q. Oh, okay. So is it accurate, in your view, that
24  WestBridge Technologies was the North American branch of
25  NSO Group?

Page 160

1   MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
2   A. In my understanding, in my view, the term "NSO
3   Group" refers to the whole structure of companies that
4   we saw before, Triangle and below. And WestBridge is
5   a reseller of its technologies in North America, so it
6   is not very far from the description.
7   Q. Okay. The first bullet says:
8       "Based in Bethesda, Maryland."
9       MD, you understand MD to be --
10  A. I understand.
11  Q. You used to live and work in the United States, right?
12  A. Yes.
13  Q. Let me start again. That bullet states:
14      "Based in Bethesda, Maryland, WestBridge
15  Technologies was founded in 2014 as the North American
16  branch of the international company NSO Group."
17      Do you see that?
18  A. I do.
19  Q. 2014/2015, does this refresh your recollection as to
20  when WestBridge was founded?
21  MR. AKROTIRIANAKIS: Objection. No foundation.
22  A. No.
23  Q. Okay.
24  A. Could still be '15.
25  Q. Okay.

Page 161

1       Do you know, over the life of its existence, how
2   much money, if any, other NSO Group companies
3   transferred to WestBridge Technologies?
4   MR. AKROTIRIANAKIS: Objection. Foundation.
5   A. I do not know.
6   Q. Do you know if the NSO Group of companies transferred
7   any money to WestBridge Technologies, other than payroll
8   for its employees?
9   MR. AKROTIRIANAKIS: Objection. Vague.
10  A. WestBridge required money to operate; pay salaries, pay
11  rent, pay for professionals. And since they were hardly
12  making any money, they had to get funded by the Group.
13  Q. And which entity in the group provided that funding?
14  MR. AKROTIRIANAKIS: Objection. Foundation.
15  A. It should be one of the companies in Luxembourg.
16  Q. In your responsibilities for defendants, do you look at
17  P&L statements?
18  A. I do.
19  Q. What's a P&L statement?
20  A. Profit and loss statement.
21  Q. Do you also see a ledger, or similar document, that
22  reflects expenses of defendants?
23  A. Yes.
24  Q. In your work with defendants, have you ever seen line
25  items related to WestBridge in P&L statements, or

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 170

1 Q. What does the pre-sales function do for defendants?
2 A. Pre-sales team is the one conducting demos to customers.
3 Q. Do you know if defendants' pre-sales team participated
4    in demonstrations in the United States?
5 MR. AKROTIRIANAKIS: Objection. Foundation.
6 A. I don't know that it participated. I don't know that it
7    physically participated.
8 Q. When you say "it", you are referring to the pre-sales
9    team?
10 A. Tomer and his team.
11 Q. Okay. And when you say "physically participated" are
12    you distinguishing between physical presence and remote
13    presence?
14 A. Correct.
15 Q. So do you have knowledge of the remote participation of
16    defendants' pre-sales team in demonstrations in the
17    United States?
18 MR. AKROTIRIANAKIS: Objection. Vague as to time. Also
19    foundation.
20 A. At which timeframe?
21 Q. At any time.
22 A. So, in 2018, when Tomer was head of pre-sale, at the
23    minimum -- no, that's not a good way to put it.
24      The pre-sale team was making sure that the team
25    environment is operational, so that, whoever is

Page 171

1    conducting the demo in the States, will manage to do it
2    successfully.
3 Q. When you speak of remote participation, does that
4    include remote participation in a customer facing role?
5 MR. AKROTIRIANAKIS: Objection. Vague.
6 A. I meant behind the scenes.
7 Q. Okay.
8      What does "behind the scenes" mean?
9 A. It means that the customer is not necessarily aware that
10    they participate.
11 Q. You mentioned the demo, the demonstration environment?
12 A. Correct.
13 Q. What is the demonstration environment?
14 A. A Pegasus system which is used for demo.
15 Q. Was there a Pegasus system installed in the
16    United States that was used for demonstrations?
17 A. No.
18 Q. So where is the -- when we think of demonstrations
19    conducted in the United States, is there a single
20    demonstration environment that those demonstrations
21    used?
22 A. I don't know.
23 Q. Okay. Was Pegasus ever installed in the United States
24    other than at a customer site?
25 MR. AKROTIRIANAKIS: Objection. Vague.

Page 172

1 A. Not to the best of my knowledge.
2 Q. Okay. So if it happened, you weren't aware?
3 A. No.
4 MR. AKROTIRIANAKIS: Same objection.
5 Q. No, you were not aware?
6 MR. AKROTIRIANAKIS: Same objection.
7 A. I was not aware.
8 Q. By the way, we talked about the installation for the
9    FBI, do you recall that?
10 A. I do.
11 Q. Do you know where in the United States that installation
12    was?
13 A. I heard it was in New Jersey.
14 Q. Do you recall how you heard that?
15 A. I definitely read it on the media. But I believe I knew
16    it even before.
17 Q. Who would know more than you about the customers to whom
18    WestBridge demonstrated Pegasus in the United States?
19 A. Terry and his team.
20 Q. When Pegasus is deployed, does software that comprises
21    the agent get deployed to the customer site?
22 MR. AKROTIRIANAKIS: Objection. Vague. Foundation.
23 A. The system at the customer site comprises of software
24    that includes the agent, which is delivered from that
25    system to the target device.

Page 173

1 Q. Okay. The agent is delivered from the customer system,
2    on the customer premises, to the target device?
3 A. Correct.
4 Q. Does the software that's deployed on the customer
5    premises include the software for installation vectors?
6 A. Yes.
7 Q. Is there any aspect of the software that you think of as
8    comprising the Pegasus system that is not installed at
9    the customer site?
10 MR. AKROTIRIANAKIS: Objection. Vague. Foundation.
11 A. Can you repeat the question, please?
12 Q. Yes. Is there any aspect of the Pegasus software that
13    doesn't get installed at the customer premises when
14    defendants install Pegasus?
15 MR. AKROTIRIANAKIS: Vague. Foundation.
16 A. It is a matter of how we define Pegasus software.
17 Q. Is there anything within the definition of Pegasus
18    software, as you use that term at NSO, that is software
19    that does not get installed on the customer site?
20 A. The way that I --
21 MR. AKROTIRIANAKIS: Sorry. The question is vague and no
22    foundation.
23      Go ahead.
24 A. The way I define Pegasus software, all the Pegasus
25    software resides on the customer's system.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1  Q.  Right, you were --
2  A.  We became, we were brought in to the loop only after
3     Francisco Partners and the potential acquired became
4     agreed on the terms and they were about to conclude the
5     transaction, only then we became aware that such
6     presentations were conducted.
7  Q.  You were asked a lot of questions, both numerically and
8     time wise, about the P&L statements of WestBridge and
9     involvement about any payments made to WestBridge,
10    I think the question actually related to a decision that
11    you were asked to make about whether or not to send the
12    money to the company, do you remember that line of
13    questions?
14 A.  Yes, I remember.
15 Q.  Okay.  And in your answers to that, they were not really
16    attached in time to any particular period, but are you
17    able to say when it was at all that you became ever
18    involved with, like, reviewing the P&L for WestBridge,
19    or anything like that?
20 MR. BLOCK:  I object to the form of the question and the
21    coaching of the witness.
22 A.  I became aware of it, of the request to make money
23    transfers to WestBridge, only after I became CEO, which
24    means all of my answers were for a period after August
25    '22.

Page 255

1  Q.  August 2022?
2  MR. BLOCK:  Objection to form.
3  A.  Yes.  After August 2022.
4  Q.  Okay.  And you were asked a lot of questions about trips
5     that you made to the United States, to Washington DC,
6     with a stop over in New York, and meetings with, in DC,
7     reporters, policymakers and service providers, do you
8     recall that testimony?
9  MR. BLOCK:  Objection to form.
10 A.  Yes.
11 Q.  When were those trips to Washington DC that you
12    testified about in relation to you becoming the CEO of
13    the company?
14 A.  All of those trips to Washington were after August 2022.
15 MR. AKROTIRIANAKIS:  Alright, thank you.
16 THE VIDEOGRAPHER:  Going off the record.  The time is 19:22.
17    End of media card number 6 volume 1 and this is the end
18    of the video deposition of Yaron Shohat.
19 (7:22 p.m.)
20     (Whereupon, the deposition concluded at 7:22 p.m.)
21
22
23
24
25

Page 256

1        CERTIFICATE OF COURT REPORTER
2
3  I, CHRIS LANG, an Accredited Real-time Reporter, hereby
4  certify that the testimony of the witness YARON SHOHAT in
5  the foregoing transcript, taken on this 29TH day of AUGUST,
6  2024 was recorded by me in machine shorthand and was
7  thereafter transcribed by me; and that the foregoing
8  transcript is a true and accurate verbatim record of the
9  said testimony.
10
11 I further certify that I am not a relative, employee,
12 counsel or financially involved with any of the parties to
13 the within cause, nor am I an employee or relative of any
14 counsel for the parties, nor am I in any way interested in
15 the outcome of the within cause.
16
17
18
19 Name:   CHRIS LANG
20 Date:  8/29/24
21
22
23
24
25

Page 257

1
2        CERTIFICATE OF DEPONENT
3
4  I, YARON SHOHAT, hereby certify that I have read the
   foregoing pages, numbered 1  through 259, of my deposition
5  of testimony taken in these proceedings on 29TH, AUGUST,
   2024 and, with the exception of the changes listed on the
6  next page and/or corrections, if any, find them to be a true
   and accurate transcription thereof.
7
8
9
10
11 Signed: ......................
12 Name:   YARON SHOHAT
13 Date:   ......................
14
15
16
17
18
19
20
21
22
23
24
25

65 (Pages 254 - 257)

# EXHIBIT 22

FILED UNDER SEAL

⚠ You no longer have access Support and Updates. Renew online, remind me later or never remind me again.

Dashboard / MEPA Android Exploit Validation Home / ERISED

# Erised White Devices

Created by Unknown User (danielgo), last modified by Unknown User (guyme) on Mar 19, 2020

⚠ You are viewing an old version of this page. View the current version.

    Compare with Current    ·    Restore this Version    ·    View Page History

« Previous    **Version 147**    Next »

| | NsoID | ErisedID | AdbId | Phone Number | Device | Model | Android Version | WA Version | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | ER-01 | | | SM-G955F | Samsung Galaxy S8+ | 9 | | |
| 2 | | ER-02 | 9889d541575038354f | | SM-G950F | Samsung Galaxy S8 | 9 | | |
| 3 | | ER-03 | | | SM-G960F | Samsung Galaxy S9 | 9 | | |
| 4 | | ER-04 | | | SM-A530F | Samsung Galaxy A8 (2018) | 8.0.0 | 2.20.64 | |
| 5 | | ER-05 | 520030bcf09c15c9 | | SM-A730F | Samsung Galaxy A8+ (2018) | 9 | 2.20.64 | |
| 6 | | ER-06 | | | SM-G965F | Samsung Galaxy S9+ | 9 | | |
| 7 | | ER-07 | | | SM-G935T | Samsung Galaxy S7 edge | 7.0 | | |
| 8 | | ER-08 | | | SM-G925F | Samsung Galaxy S6 edge | 7.0 | | |
| 9 | | ER-09 | | | SM-A730F | Samsung Galaxy A8+ (2018) | 8.0.0 | 2.20.64 | |
| 10 | A2914 | ER-10 | | | SM-G955F | Samsung Galaxy S8+ | 9 | | |
| 11 | | ER-11 | | | SM-A530F | Samsung Galaxy A8 (2018) | 8.0.0 | 2.20.64 | |
| 12 | | ER-12 | | | SM-G935T | Samsung Galaxy S7 edge | 7.0 | | |
| 13 | | ER-13 | | | SM-G950F | Samsung Galaxy S8 | 9 | | |
| 14 | | ER-14 | 520079b8489ea417 | | SM-A530F | Samsung Galaxy A8 (2018) | 9 | 2.20.47 | |
| 15 | | ER-15 | | | SM-G930F | Samsung Galaxy S7 | 7.0 | | |
| 16 | | ER-16 | | | SM-A510F | Samsung Galaxy A5 (2016) | 7.0 | | |
| 17 | | ER-17 | | Redacted – PII | SM-A510F | Samsung Galaxy A5 (2016) | 7.0 | | |
| 18 | | ER-18 | | | SM-A510F | Samsung Galaxy A5 (2016) | 7.0 | | |
| 19 | | ER-19 | | | SM-G920F | Samsung Galaxy S6 | 6.0.1 | | |
| 20 | | ER-20 | | | SM-J510F | Samsung Galaxy J5 (2016) | 7.1.1 | | |
| 21 | | ER-21 | | | SM-J400F | Samsung Galaxy J4 | 8.0.0 | | |
| 22 | | ER-22 | | | SM-J400F | Samsung Galaxy J4 | 8.0.0 | | |
| 23 | | ER-23 | | | SM-J400F | Samsung Galaxy J4 | 8.0.0 | | |
| 24 | | ER-24 | | | SM-J320F | Samsung Galaxy J3 (2016) | 5.1.1 | | |
| 25 | | ER-25 | | | LG-D855 | LG G3 | 5.0 | | |
| 26 | | ER-26 | | | ANE-LX1 | Huawei P20 lite | 8.0.0 | | |
| 27 | | ER-27 | | | M1903C3EG | Xiaomi Redmi 7A | 9 | | |
| 28 | | ER-28 | | | SM-G925F | Samsung Galaxy S6 edge | 7.0 | | |
| 29 | | ER-29 | | | SM-G930F | Samsung Galaxy S7 | 7.0 | | |
| 30 | | ER-30 | | | SM-G950F | Samsung Galaxy S8 | 9 | | |
| 31 | | ER-31 | | | SM-G955FD | Samsung Galaxy S8+ | 8.0.0 | | |
| 32 | | ER-32 | | | SM-M205F/DS | Samsung Galaxy M20 | 8.1.0 / 9 | | |
| 33 | | ER-33 | | | SM-N960F | Samsung Galaxy Note9 | 8.1.0 | | |

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY     NSO_WHATSAPP_00007959

| | NsoID | ErisedID | AdbId | Phone Number | Device | Model | Android Version | WA Version | |
|---|---|---|---|---|---|---|---|---|---|
| 34 | | ER-34 | | | SM-M305F | Samsung Galaxy M30 | ~~8.1.0~~ 9 | | |
| 35 | | ER-35 | 1a73c97514027ece | | SM-G965F | Samsung Galaxy S9+ | 9 | | |
| 36 | | | | | SM-N950F | Samsung Galaxy Note8 | 9 | | |
| 37 | | | | | SM-N950F | | 8.0 | | |
| 38 | | | | **Redacted – PII** | SM-G960F | | 9 | | |
| 39 | colspan | | | **Redacted – Export Controlled** | | | | | |
| 40 | | | | | SM-G955F | | 8 | | |
| 41 | | | | | SM-G950F | Samsung Galaxy S8 | 9 | | |
| 42 | | | | | SM-N950F | Samsung Galaxy Note8 | 9 | | |
| 43 | | ER-36 | | | SM-M205F/DS | Samsung Galaxy M20 | 8.1.0 | | |
| 44 | A3135 | ER-37 | | | SM-M305F | Samsung Galaxy M30 | 8.1.0 | | |

Google Account

**Redacted – PII**

No labels

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY                                            NSO_WHATSAPP_00007960

# EXHIBIT 26

FILED UNDER SEAL



# Board Meeting
# Q2 2018

# August 1-2, 2018

Confidential & Proprietary © Q Cyber Technologies and its affiliates. All rights reserved

Highly Confidential

- CS Endpoint (Israel)

- CS Endpoint Q2 Key Statistics

- CS Network & Tactical (Bulgaria)

- Q2 2018 LDM Customers –
  Success rate per customer, per region



78     Confidential & Proprietary © Q Cyber Technologies and its affiliates. All rights reserved

Highly Confidential

FPM-00015889

# CS Q2 In a Nutshell

- Org Change – Deployment and Operations joined CS; one stop holistic business focused structure

- On going full business support to existing & new customers - Deployments, White services operations, ATP, Training, Upgrades, Tech support, sales support

- Massive introduction of Heaven vector – huge effort (and success!)

- Massive preparations to assimilate PGS3 by all teams (VPNNG, Training, Installations, Environments)

- Introduction of new vectors for POC: Storm and Nighthawk

- 2 CTE team leaders joined for APAC and CIS Africa

- Intensive efforts to recruit LHDs for ME (Apollo and Subaru)

- Completed recruit process for deployment team

- White service operations forecast and detailed expense control process

79    Confidential & Proprietary © Q Cyber Technologies and its affiliates. All rights reserved

# CS Q2 Main Client Efforts

- 2 new clients added: Rolls-Royce and Aziza
- 1 Clients resume to service – Tinkerbell
- Heaven has been deployed at 10 clients
- Nighthawk has been deployed at 1 client – Maira 4 (beta)
- PGS 3 Beta has been deployed at 2 clients: Shemer, Morgan and 1 production client: Aziza.
- 16 trainings have been conducted to 12 clients. 5 PGS and 11 SE
- Storm  - POC for 2 client (Oz and Raven)

 Confidential & Proprietary © Q Cyber Technologies and its affiliates. All rights reserved

Highly Confidential

FPM-00015891

# EXHIBIT 27

FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4

   WHATSAPP INC., et al.,      )

5                              )

            Plaintiffs,        )

6                              )  Case No.

       vs.                     )  4:19-cv-07123

7                              )  -PJH

   NSO GROUP TECHNOLOGIES      )

8   LIMITED, et al.,           )

                               )

9            Defendants.       )

   ------------------------    )

10

11

12                   Tuesday, September 17, 2024

13                   9:11 a.m.

14

15

16           Videotaped Deposition of JOSHUA

17   SHANER, held at the offices of Davis Polk &

18   Wardwell LLP, 901 15th Street NW, Washington,

19   DC, before Stacey L. Daywalt, a Court Reporter

20   and Notary Public of the District of Columbia.

21

22   ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

1    Q.    And where was that?
2    A.    In Rockville, Maryland.
3    Q.    What did you discuss with Mr. Lavie
4  as part of that interview?
5    A.    The role, the responsibilities and
6  that's about it, yeah.
7    Q.    Okay.  What did he tell you about
8  the role and responsibilities?
9    A.    That I'd just be doing
10  demonstrations and, you know, selling product,
11  yeah.
12    Q.    Selling what product?
13    A.    Just the suite of products that
14  WestBridge had.
15    Q.    And what were those products
16  generally?
17    A.    The -- one was called Phantom.
18        And then I can't remember the other
19  two that we talked about at the time.
20    Q.    Okay.  Anything else you recall
21  discussing with Mr. Lavie as part of that
22  interview?
23    A.    No.
24    Q.    Okay.  Did you discuss NSO with
25  Mr. Lavie as part of that interview?

Page 31

1    A.    I can't recall.
2    Q.    Did you discuss with Mr. Lavie what
3  WestBridge was?
4        MR. AKROTIRIANAKIS:  Objection,
5  vague.
6        THE WITNESS:  Yeah, what do you mean
7  by that?
8  BY MR. PEREZ-MARQUES:
9    Q.    What type of company it was.
10    A.    No.  No, not that I recall.
11    Q.    Okay.  What do you recall discussing
12  with Mr. Kaplan?
13    A.    Essentially the same thing I did
14  with Omrie, just roles, responsibilities and
15  what the company does.
16    Q.    And what did he tell you about what
17  the company does?
18    A.    Almost identical to what I mentioned
19  to Omrie from what I remember.
20    Q.    And what was that to the best of
21  your recollection?
22    A.    That, you know, selling products to
23  the government.
24    Q.    That's what WestBridge did or that's
25  what your role would be or both?

Page 32

1    A.    That's both.  Yeah, that's what
2  WestBridge and my role would be.
3    Q.    Had you previously applied for any
4  positions with NSO or any affiliates of NSO?
5    A.    No.
6    Q.    Did you sign an employment agreement
7  or offer letter?
8    A.    I did.
9    Q.    With who?
10    A.    It was -- who do you mean?
11    Q.    Who was the counterparty to your
12  offer letter or agreement?
13    A.    The person?
14    Q.    The entity or person with whom you
15  signed it.
16    A.    It was Oren Kaplan with WestBridge.
17    Q.    Okay.  Did you sign any agreements
18  with NSO in connection with your hire?
19    A.    Not that I remember.
20    Q.    Okay.  Any kind of confidentiality
21  agreements that you had to sign as part of your
22  on-boarding?
23    A.    I'm sure that was part of the
24  on-boarding process, yes.
25    Q.    But you don't recall those

Page 33

1  specifically?
2    A.    Specifically, no.
3    Q.    Did you undergo any training before
4  starting your job work, your responsibilities
5  for WestBridge?
6    A.    Yes, on-the-job training, yes.
7    Q.    What training was that?
8    A.    Just -- just learning about the
9  products, the marketing, I mean, things like
10  that.
11    Q.    When did you do that on-the-job
12  training?
13    A.    Just -- I can't recall exactly.
14    Q.    First few months on the job or --
15    A.    Probably, yes.
16    Q.    Okay.  Who trained you on the
17  products and the marketing?
18    A.    Oren would have been the person to
19  do that.
20    Q.    Anyone besides Oren?
21    A.    No.
22    Q.    Did you travel to Israel at all as
23  part of your training or on-boarding?
24    A.    No.
25        I mean, I wouldn't call it training

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

1  to go to Israel, but I did go to Israel and
2  there was training involved but not as part of
3  the on-boarding.
4      Q.   Okay.  What is the travel to Israel
5  that you're recalling?
6      A.   I mean, which -- the first time I
7  went to Israel?
8      Q.   Yeah.
9           So you went multiple times during
10 your time at WestBridge?
11     A.   I did.
12     Q.   Okay.  Approximately how many times
13 would you say?
14     A.   About six.
15     Q.   So a little more than once a year?
16     A.   Yes.
17     Q.   Okay.  Was it steady throughout your
18 tenure or were there times when you went more
19 often?
20     A.   Yeah, there was no rhyme or reason
21 to it, yeah.
22     Q.   Okay.  So the first time you went, I
23 think you said that, you know, it wasn't
24 necessarily part of training but there was
25 training involved.  You said there was training

Page 35

1  involved but not as part of on-boarding.
2           Tell me about that trip.
3           MR. AKROTIRIANAKIS:  Objection.
4      Q.   What did you do?
5           MR. AKROTIRIANAKIS:  Objection,
6  vague, misstates his testimony.
7           THE WITNESS:  So just learning the
8  system or learning the products a little bit
9  better, you know, so we can, you know, better
10 market and sell them in the US market.
11 BY MR. PEREZ-MARQUES:
12     Q.   And who did you meet with as part of
13 that travel to Israel to learn the products a
14 little better?
15     A.   It would be the presale team mostly.
16     Q.   What is the presale team?
17     A.   They're just the -- like technical
18 sales managers that do the demonstrations and
19 things like that.
20     Q.   Which individuals did you meet with?
21     A.   There was a number of them.
22     Q.   Any names you remember?
23     A.   I would have to look at a list to
24 tell you.
25           Yeah, I would have to look at a list

Page 36

1  and tell you.
2      Q.   There's no name that comes to mind
3  of who you met with?
4      A.   █████████████████
5           Those two I definitely -- probably
6  would have met with there.
7      Q.   And what was Mr. █████ role?
8      A.   He was a --
9           MR. AKROTIRIANAKIS:  Objection, no
10 foundation.
11           Go ahead.
12           THE WITNESS:  He was a presale
13 engineer.
14 BY MR. PEREZ-MARQUES:
15     Q.   Employed by NSO?
16     A.   Yes.
17     Q.   And what about Mr. █████ or
18 Ms. █████
19     A.   Presale engineer as well.
20     Q.   Also with NSO?
21     A.   Yes.
22     Q.   And how did that -- to the extent
23 that they were educating you about the
24 products, how did they do that?
25     A.   I don't exactly recall what we did

Page 37

1  and what we talked about.
2      Q.   Okay.  Did you see product
3  demonstrations during that trip to Israel?
4      A.   I don't recall.
5      Q.   And that would have been 2014?
6      A.   Yes, roughly.
7      Q.   Other than Mr. █████ and Mr. █████
8  are there any other NSO personnel that you
9  recall meeting with as part of that first trip
10 to Israel?
11     A.   Not that I recall.
12     Q.   And so when you said earlier that
13 your training came, I believe you -- I thought
14 you said exclusively from Mr. Kaplan.
15           That's not right.  Correct?
16           MR. AKROTIRIANAKIS:  Objection,
17 misstates his testimony.
18           THE WITNESS:  What do you mean by
19 that?
20 BY MR. PEREZ-MARQUES:
21     Q.   That you received product training
22 not only from Mr. Kaplan but also from NSO
23 employees.  Isn't that right?
24     A.   I can't recall where exactly I got
25 most of my training from.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1 help me understand that testimony.
2         MR. AKROTIRIANAKIS: Objection,
3 misstates his testimony.
4         THE WITNESS: Yeah.
5         No, I can't.
6 BY MR. PEREZ-MARQUES:
7     Q.   Okay.  None of the five employees
8 were R&D.  Is that right?
9     A.   That's true.
10     Q.   So you're not aware of WestBridge
11 having any employees who were engaged in
12 developing products for sale based on your five
13 years with the company?
14     A.   I'm not.
15     Q.   In what geographic regions did
16 WestBridge sell or market NSO products?
17     A.   Mostly the United States.
18         Well, the United States and Canada.
19     Q.   Anywhere besides US and Canada?
20     A.   No.
21     Q.   Okay.  And it did so with NSO's
22 authorization.  Is that right?
23         MR. AKROTIRIANAKIS: Objection,
24 vague.
25         THE WITNESS: We were -- we had

Page 43

1 our -- we were separated out to do what we
2 wanted.  And WestBridge was its own thing, to
3 be able to sell and market to, you know, those
4 markets.
5 BY MR. PEREZ-MARQUES:
6     Q.   All right.  But WestBridge was
7 authorized by NSO to sell its products.  Isn't
8 that right?
9     A.   I have no idea if NSO authorized us
10 to do anything.
11     Q.   Well, you do know that NSO had you
12 travel to Israel to meet with its presale team.
13 Right?
14         MR. AKROTIRIANAKIS: Objection,
15 misstates his testimony.
16         THE WITNESS: I mean, I told you
17 what my testimony was.
18 BY MR. PEREZ-MARQUES:
19     Q.   Fair to say that your understanding
20 was that WestBridge had permission from NSO to
21 sell NSO products?
22     A.   Can you restate that.
23     Q.   Is it fair to say that your
24 understanding was that WestBridge had
25 permission from NSO to sell NSO products?

Page 44

1     A.   I'm not in any position to answer
2 that, so I don't know.
3     Q.   So for all you knew, you were not
4 permitted to sell NSO products and you were
5 doing it freelance?
6     A.   I don't know.  I don't know.
7     Q.   You didn't know one way or the
8 other?
9     A.   No.
10     Q.   You certainly collaborated with NSO
11 personnel as part of your WestBridge role,
12 didn't you?
13         MR. AKROTIRIANAKIS: Objection,
14 vague.
15         THE WITNESS: Yeah, obviously we did
16 talk amongst ourselves, but I wouldn't call
17 that collaboration necessarily.
18 BY MR. PEREZ-MARQUES:
19     Q.   Okay.  Well, we'll get into that in
20 much more detail.
21     A.   Okay.
22     Q.   Did NSO -- did WestBridge have a
23 distribution agreement with NSO to your
24 knowledge?
25     A.   I don't know.

Page 45

1     Q.   You've never seen such an agreement?
2     A.   No.
3     Q.   Are you aware of any geographic
4 restrictions on where WestBridge was permitted
5 to sell NSO products?
6     A.   Can you say that one more time.
7     Q.   Are you aware of any geographic
8 restrictions on where WestBridge was permitted
9 to sell NSO products?
10     A.   I'm not aware of any policy or
11 anything like that.
12     Q.   Do you know, for instance, whether
13 WestBridge was authorized to sell NSO products
14 in South America?
15     A.   I'm not aware of any policy.
16     Q.   And you're not aware of any -- so to
17 your knowledge -- well, let me rephrase that.
18         So to your knowledge, WestBridge was
19 authorized to sell NSO products, for instance,
20 here in Washington, DC?
21     A.   Say that one more time.  I'm sorry.
22     Q.   To your knowledge, WestBridge was
23 authorized to sell NSO products here in
24 Washington, DC?
25     A.   WestBridge was authorized to sell in

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1 the United States, yes.
2    Q.   Including in Washington, DC?
3    A.   Yes.
4    Q.   And California?
5    A.   Well, so I don't know if we were
6 authorized to do anything.
7        I know that we could.
8    Q.   Mm-hmm.
9        You weren't aware of any
10 restrictions that prevented WestBridge from
11 marketing in any state of the United States.
12 Is that right?
13    A.   I don't know of any policy like
14 that.
15    Q.   You were never instructed that there
16 were certain states in which WestBridge was not
17 permitted to sell?
18    A.   I don't know any policy about that.
19    Q.   Okay.  I want to show you a
20 document.  Let's do 5101.
21        (Exhibit 2049, Intercompany
22 Distribution Agreement dated 10/25/17,
23 NSO_WHATSAPP_00046351-359, marked for
24 identification.)
25    Q.   I should have said this as part of

Page 47

1 my intro.  But if you need a break at any time,
2 just let me know.
3    A.   Thanks.
4    Q.   So I'm showing you what's been
5 marked as Exhibit 2049 --
6    A.   Okay.
7    Q.   -- which is a multipage agreement or
8 document beginning on NSO_WHATSAPP_00046351
9 through 359.
10        Do you recognize Exhibit 2049?
11    A.   I do.
12    Q.   Okay.  So it has a header here,
13 Intercompany Distribution Agreement.
14        Do you see that?
15    A.   I do.
16    Q.   And it says: "This intercompany
17 distribution agreement made on October 25th,
18 2017, effective as of September 30th, 2016 (the
19 effective date) is by and among certain
20 subsidiaries of OSY Technologies S.àr.l
21 (parent), a company incorporated under the laws
22 of Luxembourg, which are listed in Group A in
23 Schedule A (collectively, distributors, or each
24 member of the group -- of Group A individually,
25 distributor) and other subsidiaries of Triangle

Page 48

1 which are listed in Group B in Schedule A
2 (collectively, suppliers, or each member of
3 Group B individually as supplier)."
4        Are you familiar with OSY
5 Technologies S.àr.l?
6    A.   I am not.
7    Q.   Have you ever heard that name
8 before?
9    A.   I have heard the name.  I'm just not
10 familiar with anything about that.
11    Q.   In what context have you heard the
12 name?
13    A.   Just in -- in talking with somebody
14 at the -- yeah, I mean, I don't -- I just heard
15 the name before.  That's the extent of it.
16    Q.   Did you have an understanding as to
17 whether OSY was an affiliate of WestBridge?
18    A.   I don't know.
19    Q.   Did you know who owned WestBridge
20 when you were working there?
21    A.   I didn't.
22    Q.   You had no idea who owned the
23 company you were working for?
24    A.   No.  No, I didn't.
25    Q.   Did you have any understanding as to

Page 49

1 the corporate relationship between NSO and
2 WestBridge?
3    A.   I didn't know what the relationship
4 was.
5    Q.   Did you understand that there was a
6 corporate relationship between the two
7 companies?
8    A.   I understood that we --
9        MR. AKROTIRIANAKIS:  Objection,
10 vague.
11        You've got to pause for a second so
12 I can pose objections.
13        THE WITNESS:  Okay.
14        I understood that we resold
15 technologies, but that's the extent of the
16 relationship.
17 BY MR. PEREZ-MARQUES:
18    Q.   Were you aware of any corporate
19 affiliation between the two companies?
20    A.   Again, I was aware that we resold
21 the technologies.
22        But as far as a corporate
23 relationship, that was something I did not deal
24 with, so...
25    Q.   Okay.  For instance, did you have

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 78

1 would be.
2    Q.   For instance, did you -- well, let
3 me ask it this way:  Was it your understanding
4 when you were doing demonstrations that you
5 were an open book and anything you knew about
6 Pegasus was fair game to share?
7    A.   My job was a presale engineer.  I
8 did demonstrations when I was asked to do
9 demonstrations.
10       I don't know any policy with them at
11 all.
12    Q.   I'm not asking about policies.
13       About how many of these meetings did
14 you have during your five years at WestBridge?
15    A.   I can't recall exactly how many.
16    Q.   Approximately?
17    A.   Dozens.
18    Q.   Dozens of these meetings?
19    A.   Yes.
20    Q.   And in the course of these meetings,
21 in addition to presenting on the product, you
22 would also answer questions.  Right?
23    A.   Correct.
24    Q.   And in answering those questions,
25 did you have any understanding as to whether

Page 79

1 there were certain pieces of information that
2 you were not supposed to share with the
3 prospective customers?
4    A.   I can't recall.
5    Q.   You understood when you were working
6 for WestBridge that NSO considered information
7 about its products very confidential.  Is that
8 right?
9       MR. AKROTIRIANAKIS:  Objection,
10 vague.
11       THE WITNESS:  I don't know what the
12 policy is for confidentiality for WestBridge's
13 products.
14 BY MR. PEREZ-MARQUES:
15    Q.   Okay.  Well, you studied
16 intelligence at the Master's level.  Right?
17    A.   What do you mean by "studied
18 intelligence"?
19    Q.   You have a Master's degree in, I
20 believe you said, intelligence?
21    A.   Intelligence studies, yes.
22    Q.   Intelligence studies.  Right?
23       And so you're familiar generally
24 with the protection of confidential
25 information.

Page 80

1       Is that something you've come across
2 in your career?
3    A.   Yes.
4    Q.   And when you were working for
5 WestBridge, did you understand generally that
6 you were dealing with information that NSO
7 considered very confidential?
8       MR. AKROTIRIANAKIS:  Objection,
9 vague.
10       THE WITNESS:  Again, I don't know
11 the -- what's considered confidential with
12 WestBridge.
13 BY MR. PEREZ-MARQUES:
14    Q.   So to the best of your recollection,
15 everything you knew about Pegasus was fair game
16 to leave lying on a park bench?
17       MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19       THE WITNESS:  Again, I don't know
20 what WestBridge's confidentiality policy was.
21 BY MR. PEREZ-MARQUES:
22    Q.   I'm not asking about the policy.
23 I'm asking about your understanding.
24       You spent five years dealing with
25 this information, presenting this information

Page 81

1 to customers.
2       Did you have any understanding as to
3 whether the information that you were dealing
4 in was considered confidential by NSO?
5    A.   Confidential by NSO?
6    Q.   Yes.
7       MR. AKROTIRIANAKIS:  Objection,
8 foundation.
9       THE WITNESS:  I don't know NSO's
10 confidentiality policy.
11 BY MR. PEREZ-MARQUES:
12    Q.   So no understanding as to whether it
13 was considered confidential?
14    A.   I can't recall any idea of what the
15 confidentiality policy or rules were, yeah.
16    Q.   Okay.  Were you given any guidance
17 as to -- either by WestBridge or NSO as to how
18 to protect the information you were presenting?
19       MR. AKROTIRIANAKIS:  Objection,
20 vague.
21       THE WITNESS:  I can't recall any of
22 that.
23 BY MR. PEREZ-MARQUES:
24    Q.   When you did a demonstration of the
25 product, what does that mean as part of these

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1 meetings with prospective customers?
2     A.   Can you specify the question.
3     Q.   What did you do as part of the
4 demonstration? How would a demonstration work?
5     A.   I mean, that's the same -- I mean,
6 can you specify exactly what you want to know
7 from what I did at the demonstration.
8     Q.   I want to know what you did at the
9 demonstration. That's what I would like to
10 know.
11     A.   We would demonstrate how we
12 installed software onto the phones.
13     Q.   Okay. How would you do that?
14     A.   By doing exactly that, just showing
15 how we did that.
16     Q.   How did you show it?
17     A.   I guess I don't know exactly what
18 you're asking.
19         Like can you be more specific.
20     Q.   Well, this is something you did
21 dozens of times during your five years at
22 WestBridge. Right? Yes?
23     A.   Yes. Yeah.
24     Q.   And so when you would walk into the
25 room to do a demonstration, what would you do?

Page 83

1     A.   We would demonstrate how we
2 installed software onto devices.
3     Q.   And how would you demonstrate that?
4     A.   We would do it through a laptop.
5     Q.   Okay. What laptop were you using?
6     A.   A WestBridge laptop.
7     Q.   Okay. And what was on the laptop?
8     A.   Software to -- to use to be able to
9 install the software on those devices.
10     Q.   What software was that?
11     A.   That would be Pegasus.
12     Q.   Okay. And so you would come into
13 the meeting with a laptop that you brought with
14 you. Yes?
15     A.   Yes.
16     Q.   And it had the Pegasus software on
17 it. Right?
18         MR. AKROTIRIANAKIS: Objection,
19 foundation.
20         THE WITNESS: I don't know if it had
21 the Pegasus -- all of the Pegasus software on
22 it. I can't answer to that.
23 BY MR. PEREZ-MARQUES:
24     Q.   Okay. It had some Pegasus software
25 on it?

Page 84

1         MR. AKROTIRIANAKIS: Objection, no
2 foundation.
3         THE WITNESS: I don't understand
4 exactly what it had on the laptop.
5 BY MR. PEREZ-MARQUES:
6     Q.   I asked you two minutes ago -- this
7 was at Page 78, Line 18: "Okay. And what was
8 on the laptop?"
9         You answered: "Software to be able
10 to use -- to be able to install the software on
11 those devices."
12         I asked you: "What software was
13 that?"
14         And you said: "That was Pegasus."
15         Is that still your testimony?
16     A.   As far as I know, it had at least a
17 Pegasus UI on the laptop itself.
18     Q.   Okay. So you came into the meeting
19 with a laptop that had the Pegasus user
20 interface on it?
21     A.   Yes.
22     Q.   Okay. And then what would you do
23 with that laptop as part of the demonstrations
24 you did for WestBridge?
25     A.   Again, we would showcase how we

Page 85

1 installed the software on a device.
2     Q.   And you would do that by actually
3 installing the Pegasus agent on an actual
4 device. Right?
5     A.   We would install the Pegasus
6 software on one of our own devices, yes.
7     Q.   And when you were doing a
8 demonstration of Pegasus, the installation
9 worked the same as if Pegasus were being
10 deployed by a customer. Is that right?
11         MR. AKROTIRIANAKIS: Objection, no
12 foundation.
13         THE WITNESS: I had no visibility
14 into our customers, so I can't answer to that.
15 BY MR. PEREZ-MARQUES:
16     Q.   Well, was it your understanding --
17 did you have an understanding as to whether
18 when you were demonstrating the product,
19 whether you were demonstrating a dummy version
20 that was only for demonstration purposes or
21 whether you were demonstrating the actual
22 Pegasus software?
23         MR. AKROTIRIANAKIS: Objection,
24 vague, no foundation.
25         THE WITNESS: Can you clarify that

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1  again.
2  BY MR. PEREZ-MARQUES:
3     Q.   Yeah.
4          Was your understanding that you were
5  actually demonstrating the actual Pegasus
6  software just as if the customer purchased it
7  and used it on its own?
8          MR. AKROTIRIANAKIS: Same
9  objections.
10         THE WITNESS: I have no visibility
11 in what the customers had, so I can't answer to
12 that.
13 BY MR. PEREZ-MARQUES:
14    Q.   Right. Well, you never sold it to
15 any customers. Right?
16         MR. AKROTIRIANAKIS: Objection,
17 vague.
18         THE WITNESS: Yes, that's true.
19    Q.   Right. And so if a customer asked
20 you during the demonstration, is this the
21 actual Pegasus software that you're running
22 right now, what would your answer to that
23 question be?
24         MR. AKROTIRIANAKIS: Objection,
25 incomplete hypothetical.

Page 87

1          THE WITNESS: I don't know what I
2  said or would say. I can't remember. I can't
3  recall that.
4  BY MR. PEREZ-MARQUES:
5     Q.   You don't recall whether you were
6  running the actual Pegasus software during
7  demonstrations?
8          MR. AKROTIRIANAKIS: Objection, no
9  foundation.
10         THE WITNESS: I don't know if it was
11 the actual Pegasus software that was deployed
12 operationally.
13 BY MR. PEREZ-MARQUES:
14    Q.   Okay. So as far as you knew, it may
15 have been just a demonstration only product
16 that worked differently.
17         That was where you were on that
18 issue?
19    A.   Can you say that again. I'm sorry.
20    Q.   As far as you knew, it might have
21 just been a demonstration only product that
22 worked differently?
23         MR. AKROTIRIANAKIS: Objection,
24 misstates his testimony, no foundation.
25         THE WITNESS: Yes, it could have

Page 88

1  been a demonstration only software.
2          Could I get a tissue?
3          MR. AKROTIRIANAKIS: Sure.
4  BY MR. PEREZ-MARQUES:
5     Q.   As part of your education on
6  Pegasus, did you become familiar with the
7  concept of installation vectors?
8     A.   Loosely, yes.
9     Q.   Okay. What was your general
10 understanding of what installation vectors
11 were?
12    A.   Excuse me.
13         Exactly what that -- that was how we
14 installed the software on devices.
15    Q.   And when demonstrating the product,
16 you would be demonstrating, among other things,
17 the installation vectors. Is that right?
18         MR. AKROTIRIANAKIS: Objection,
19 vague, no foundation.
20         THE WITNESS: Yes.
21    Q.   And you would be demonstrating
22 actual Pegasus installation vectors. Is that
23 right?
24         MR. AKROTIRIANAKIS: Objection, no
25 foundation.

Page 89

1          THE WITNESS: I don't know if they
2  were actual operational Pegasus vectors. I
3  don't know.
4  BY MR. PEREZ-MARQUES:
5     Q.   Am I right that which installation
6  vector you would use might vary from one
7  demonstration to another?
8     A.   Yes.
9     Q.   Are you familiar with the concept of
10 zero-click installation vectors?
11    A.   Excuse me.
12         Yes.
13    Q.   What is a zero-click installation
14 vector?
15    A.   An installation without the need to
16 click on the device for a software
17 installation.
18    Q.   Without requiring any engagement by
19 the target. Is that right?
20    A.   Yes.
21    Q.   And in the demonstrations you ran to
22 market NSO products in the United States, you
23 demonstrated zero-click installation vectors.
24 Isn't that right?
25    A.   Yes.

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1    Q.   Now, you're not aware of any
2  difference between how those installations
3  would work in a demonstration versus how they
4  would work if deployed by a customer.  Is that
5  right?
6         MR. AKROTIRIANAKIS:  Objection, no
7  foundation.
8         THE WITNESS:  Can you say that
9  again, please.
10 BY MR. PEREZ-MARQUES:
11   Q.   You're not aware of any difference
12 between how those zero-click vectors would work
13 in a demonstration and how they would work if
14 deployed by a customer.  Is that right?
15        MR. AKROTIRIANAKIS:  No foundation.
16        THE WITNESS:  I'm not aware of any
17 difference between an operational system and a
18 demo system?
19 BY MR. PEREZ-MARQUES:
20   Q.   Yes.
21        MR. AKROTIRIANAKIS:  No foundation.
22        THE WITNESS:  No, because I was
23 never around an operational system.
24   Q.   Are you familiar with one-click
25 installation vectors?

Page 91

1    A.   Yes.
2    Q.   What is a one-click installation
3  vector?
4    A.   Just like it says, "an interaction
5  from a user for the installation of the
6  software."
7    Q.   Before I continue, I just want to go
8  back to something you said.
9         You said: "I was never around an
10 operational system."
11        What did you mean by that?
12   A.   I was never around any system that
13 was operational at any sort of customer that
14 WestBridge had, if any, because we didn't at
15 the time.
16   Q.   Meaning being deployed by a
17 customer?  You were never around a system that
18 was being operated by a customer?
19   A.   Yes.
20   Q.   Is that right?
21        The only systems you were around
22 were systems that were being operated by
23 WestBridge.  Is that right?
24   A.   Yes.
25   Q.   With support by NSO.  Isn't that

Page 92

1  right?
2         MR. AKROTIRIANAKIS:  Objection,
3  vague, no foundation.
4         THE WITNESS:  What do you mean by
5  "support"?
6  BY MR. PEREZ-MARQUES:
7    Q.   We're going to -- we'll look at a
8  bunch of documents on this.
9         But you were in touch with the NOC
10 at NSO in support -- in connection with your
11 demonstrations.  Isn't that right?
12        MR. AKROTIRIANAKIS:  Objection,
13 vague.
14        THE WITNESS:  I was in contact with
15 the NOC for demonstrations, yes.
16 BY MR. PEREZ-MARQUES:
17   Q.   Right.  And they helped ensure that
18 the demonstrations were successful.
19        Fair?
20   A.   I couldn't answer if that was the
21 case.
22   Q.   Why not?
23        MR. AKROTIRIANAKIS:  Objection, no
24 foundation.
25        THE WITNESS:  They helped us with

Page 93

1  support, so I can't tell you if that led to
2  success or not.
3  BY MR. PEREZ-MARQUES:
4    Q.   Right.  They helped you with support
5  in connection with the demonstrations.  Right?
6         MR. AKROTIRIANAKIS:  Objection,
7  vague.
8         THE WITNESS:  Like I said, they
9  helped us with support, yeah.
10 BY MR. PEREZ-MARQUES:
11   Q.   And they helped you with support for
12 the demonstrations in the United States.  Isn't
13 that right?
14   A.   Yes.
15   Q.   Now, when -- you explained what you
16 meant by whether you were around an operational
17 system.
18        But the systems that you were
19 demonstrating to customers actually worked.
20 Right?
21        MR. AKROTIRIANAKIS:  Objection,
22 vague, no foundation.
23        THE WITNESS:  What do you mean by
24 "worked"?
25

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

1     But those are two reasons.
2     Q.   Okay.  Any other reasons that you
3  can think of --
4     A.   I can't --
5     Q.   -- for changing test phones --
6     A.   I can't --
7     Q.   -- or demonstration phones?
8     A.   I can't think of any.
9     Q.   And beyond just signing up for
10  generally available apps, there was nothing
11  that you did as part of the phone setup to make
12  it -- make the device vulnerable to Pegasus.
13  Is that right?
14        MR. AKROTIRIANAKIS:  Objection,
15  vague, no foundation.
16        THE WITNESS:  Not that I can
17  remember, no.
18  BY MR. PEREZ-MARQUES:
19     Q.   And the phones that you used for
20  demonstration purposes, were they purchased
21  periodically during your time at WestBridge?
22        MR. AKROTIRIANAKIS:  Objection,
23  vague.
24        THE WITNESS:  Yes.
25     Q.   And is it right that depending on

Page 111

1  what installation vector you would be
2  demonstrating, you might use a different target
3  device?
4     A.   Yes.
5     Q.   All right.  And how so?  How did the
6  installation vector you were demonstrating
7  impact which target device you would use?
8     A.   It was only between Apple and
9  Android from what I recall.
10     Q.   Were there certain installation
11  vectors that to your knowledge required the
12  phone to have a WhatsApp account established?
13        MR. AKROTIRIANAKIS:  Objection,
14  vague, no foundation.
15        THE WITNESS:  I can't recall.
16     Q.   Okay.  We'll come back to that.
17        If we go back to, I think it's
18  Exhibit 2051 --
19     A.   Sure.
20     Q.   -- I just want to ask you a few more
21  things about this to see how it tracks with
22  your experience.
23        Towards the bottom of this first
24  page, there is a paragraph that begins and
25  says:  "Now, let's say that I'm an operator..."

Page 112

1        Do you see that paragraph?
2     A.   I do.
3     Q.   And the last sentence there says:
4  "With Pegasus, the number is all I need to
5  infect the device."
6        Is that consistent with your
7  experience in demonstrating with the project --
8  with the product?
9     A.   Yes.
10     Q.   And as part of your demonstration
11  work, you demonstrated Pegasus on Android
12  products, is that right -- or I should say
13  devices running Android?
14     A.   Yes.
15     Q.   Would you show prospective customers
16  the installation screen as part of your
17  demonstrations?
18     A.   I would, yes.
19     Q.   If we look at the top of the second
20  page, it says:  "I'll type in my target's phone
21  number, choose to extract the data from the
22  device."
23        Do you see that?
24     A.   I do.
25     Q.   And as part of the demonstrations

Page 113

1  you ran, would you similarly type in a target's
2  phone number into the installation screen?
3     A.   Yes.
4     Q.   Okay.  And would you also choose to
5  extract data from the device?
6     A.   I can't recall.
7     Q.   Okay.  Then after that, there's a
8  little notation that says:  "Click the Extract
9  Data button."
10        Do you see that?
11     A.   I do.
12     Q.   And is that something you would do
13  as part of your demonstrations?
14     A.   I can't recall exactly.
15     Q.   Okay.  And it says:  "And select the
16  sending method OTA (over the air) which as
17  explained in the presentation, means the
18  installation will be performed remotely and
19  without any engagement by the target."
20        Do you see what I just read?
21     A.   I do.
22     Q.   And that language would reflect the
23  zero-click vector.  Is that right?
24        MR. AKROTIRIANAKIS:  Objection,
25  leading.

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1      THE WITNESS: I don't know.
2      Q.   Well, a zero-click vector is one
3  that does not require engagement by the target
4  by definition. Isn't that right?
5      MR. AKROTIRIANAKIS: Objection,
6  leading.
7      THE WITNESS: Without any engagement
8  from the target, per this document, would mean
9  zero-click, yes.
10  BY MR. PEREZ-MARQUES:
11      Q.   If you look at the paragraphs that
12  follow, it talks generally about obtaining some
13  information about the device, such as country,
14  network and whether the device is roaming.
15      Do you see that?
16      A.   You mean which system is registered?
17      Q.   Yes.
18      A.   Okay. Yes.
19      Q.   It says: "Prior to the
20  installation, I am going to perform a lookup
21  called HLR Lookup which will provide me with
22  information regarding the country and network
23  under which this number is registered."
24      Do you see that language?
25      A.   Yes.

Page 115

1      Q.   And is that something you would do
2  as part of your demonstrations?
3      A.   Yes.
4      Q.   And in the next paragraph, it notes
5  that: "I can also see if the target is roaming
6  to a different network."
7      Is that also information that you
8  would obtain as part of the demonstration?
9      A.   I can't recall if that was part of
10  it.
11      Q.   Okay. And in the paragraph after
12  the underscored paragraph, the last sentence
13  says -- or rather, the whole paragraph says:
14  "At this stage I can also get information about
15  the last time the device was connected to the
16  network. For example, now I have an indication
17  based on WhatsApp that he was last active
18  on..."
19      Do you see that?
20      A.   I do.
21      Q.   And as part of your demonstrations,
22  would you similarly be getting information from
23  WhatsApp as to the target device's last
24  activity?
25      MR. AKROTIRIANAKIS: Objection,

Page 116

1  misstates the document, no foundation.
2      THE WITNESS: I can't recall that
3  paragraph with Pegasus.
4      No, I can't recall that.
5  BY MR. PEREZ-MARQUES:
6      Q.   Okay. A few lines down there's a
7  paragraph that says: "Now I'll simply press
8  Install..."
9      Do you see that?
10      A.   I do.
11      Q.   And it says: "Now I'll simply press
12  Install and Pegasus will install the agent on
13  the device remotely without any engagement with
14  the target."
15      And that reflects a literal pressing
16  of a button in the demonstration room to cause
17  the Pegasus agent to be installed?
18      A.   Based on this document, that would
19  be correct.
20      Q.   And in the demonstrations that you
21  ran, would there similarly be a moment in which
22  you pressed some form of Install button to
23  cause the Pegasus agent to be installed on the
24  target device?
25      A.   Yes.

Page 117

1      Q.   And the person pressing the button
2  in those demonstrations would be you, is that
3  right, for the ones you ran?
4      A.   Yes.
5      Q.   And you did that within the
6  territorial United States?
7      A.   What do you mean by that?
8      Q.   You did that in the physical United
9  States. Right? That's where you did these
10  demonstrations?
11      A.   For WestBridge, yes.
12      Q.   And you did that dozens of times
13  during your time at WestBridge. Is that right?
14      A.   Yes.
15      Q.   And you did that in the course of
16  your responsibilities for WestBridge?
17      MR. AKROTIRIANAKIS: Objection,
18  vague.
19      THE WITNESS: Yes.
20      Q.   And with the support of NSO
21  personnel, such as the NOC. Right?
22      MR. AKROTIRIANAKIS: Objection.
23  It's vague, no foundation and it's also
24  leading.
25      THE WITNESS: Per my testimony

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

1  before -- you know, I'll use my testimony
2  before on the NOC, the N-O-C, on -- they would
3  do some support.
4  BY MR. PEREZ-MARQUES:
5     Q.   Did you take any steps before
6  participating in Pegasus demonstrations within
7  the US to satisfy yourself as to whether you
8  would be breaking US law by doing so?
9        MR. AKROTIRIANAKIS:  Objection,
10  vague.
11        THE WITNESS:  I couldn't recall
12  anything like that, no.
13  BY MR. PEREZ-MARQUES:
14     Q.   No such steps that you recall
15  taking?
16     A.   Can you repeat the question.
17     Q.   Yeah.
18        Did you take any steps before
19  participating in Pegasus demonstrations within
20  the United States to satisfy yourself as to
21  whether you would be breaking US law by doing
22  so?
23        MR. AKROTIRIANAKIS:  Objection,
24  vague, no foundation.
25        THE WITNESS:  I can't recall.

Page 119

1     Q.   Okay.  No such steps you recall
2  taking sitting here today?
3     A.   I can't recall, no.
4     Q.   Did you take any steps to satisfy
5  yourself as to whether you were violating
6  WhatsApp's terms of service by initiating
7  zero-click installations of Pegasus in your
8  demonstrations?
9        MR. AKROTIRIANAKIS:  Objection.
10  There is no foundation.
11        THE WITNESS:  I can't recall.
12     Q.   You don't recall taking any such
13  steps?
14        MR. AKROTIRIANAKIS:  Same
15  objections.
16        THE WITNESS:  No.
17     Q.   Did you make -- as part of your
18  demonstrations of Pegasus, did you make any
19  effort to comply with WhatsApp's terms of
20  service?
21        MR. AKROTIRIANAKIS:  Objection,
22  vague, no foundation.
23        THE WITNESS:  I can't recall.
24     Q.   No such steps that you recall
25  taking?

Page 120

1        MR. AKROTIRIANAKIS:  Objection,
2  vague, leading.
3        THE WITNESS:  Yeah, I can't recall
4  any steps.
5  BY MR. PEREZ-MARQUES:
6     Q.   If we keep looking at the script, a
7  few lines down from where we were reading
8  there's a bracketed paragraph that says:
9  "First, we install the BH.  Then the BH
10  installs the agent on the device."
11        Do you see that?
12        MR. AKROTIRIANAKIS:  Objection, no
13  foundation as to "script."
14     Q.   It's in brackets.
15        Do you see that language?
16     A.   I do.
17     Q.   Do you know what "BH" means?
18     A.   I do not.
19     Q.   It then says:  "The installation is
20  totally silent and invisible and cannot be
21  prevented by the target."
22        Do you see that sentence?
23     A.   I do.
24     Q.   What does it mean that "the
25  installation is totally silent and invisible"?

Page 121

1        MR. AKROTIRIANAKIS:  Objection,
2  vague, no foundation.
3        THE WITNESS:  I don't know what the
4  author is saying in this.
5  BY MR. PEREZ-MARQUES:
6     Q.   In the course of the several or
7  dozens of demonstrations that you ran, did you
8  ever make the point to prospective customers
9  that the installation was silent or invisible
10  to the target?
11     A.   Yes.
12     Q.   Okay.  And when you made that point,
13  what did you mean by it?
14     A.   Likely the same point in this
15  document.
16     Q.   And what point is that?  What did
17  you mean by that?
18     A.   That it's silent and invisible.
19     Q.   And what does that mean?
20     A.   That the software can be loaded on
21  the device without any indication.
22     Q.   Okay.  And then it says -- there's a
23  little notation there that says:  "Only after
24  the blink."
25        And then it says:  "This blink is

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1 the only indication of the installation."
2    Do you recall there being some blink
3 in connection with the installation of Pegasus
4 during the time you were demonstrating it?
5    A.   No, I don't.
6    Q.   At the top of the next page, it
7 says: "From this moment on, the target can't
8 hide from us.  We can track every move he
9 makes."
10    Do you see that sentence?
11    A.   I do.
12    Q.   And is that, based on your
13 experience, an accurate characterization of
14 Pegasus's capabilities?
15    A.   What do you -- I don't -- I don't
16 know what this author of the document is trying
17 to say.
18    "Every move he makes," I don't
19 understand what that is.
20    Q.   Okay.  Would you make any similar
21 points in the course of your demonstrations as
22 to the scope of information that Pegasus
23 afforded customers?
24    A.   I wouldn't make this declaration
25 here.

Page 123

1    Q.   I'm sorry?  You said you wouldn't?
2    A.   I would not.
3    Q.   Okay.  About a third of the page
4 down, it says: "Once the agent is installed,
5 information will be retrieved from the device."
6    Do you see that?
7    A.   I do.
8    Q.   And as part of the demonstrations
9 that you ran, you would similarly demonstrate
10 the ability to extract information from the
11 devices?
12    MR. AKROTIRIANAKIS:  Objection,
13 leading.
14    Q.   Is that right?
15    A.   Can you say that one more time.
16    Q.   Yeah.
17    As part of the demonstrations that
18 you ran, would you similarly demonstrate the
19 ability to extract information from the
20 devices?
21    MR. AKROTIRIANAKIS:  Objection,
22 vague.
23    THE WITNESS:  Yes.
24    Q.   Right.  I think you said earlier
25 that the test devices would have to be

Page 124

1 populated with fake data.  Is that right?
2    A.   Yeah, the test -- our test devices
3 had to be populated with fake data, yes.
4    Q.   And that was, fair to say, for the
5 purpose of demonstrating that that data could
6 be extracted with Pegasus?
7    A.   Yes.
8    Q.   And would you agree that the purpose
9 of Pegasus is to obtain information from the
10 target devices?
11    A.   Yes.
12    Q.   And that's what it does.  Correct?
13    A.   What do you mean by "data"?
14    Just like, do you have specific data
15 in mind.
16    Q.   Well, let's talk about that, because
17 the next couple pages go on about the different
18 types of information that can be obtained.
19    So for instance, on that same page
20 ending in 699, about a third of the page from
21 the bottom, it says: "You can obtain a list of
22 contacts."
23    Are you on the -- it ends in 699.
24    Are you on that page?
25    A.   Oh, sorry.

Page 125

1    MR. AKROTIRIANAKIS:  Sorry.  Where
2 are you reading from, Counsel?
3    MR. PEREZ-MARQUES:  So Page 699.
4    MR. AKROTIRIANAKIS:  Yeah, I'm
5 there.
6    MR. PEREZ-MARQUES:  A little --
7 maybe a quarter of the page from the bottom, or
8 maybe more like a third.
9 BY MR. PEREZ-MARQUES:
10    Q.   It says -- well, in the bold it
11 says: "Now, if you don't have any questions,
12 we can start going through the different types
13 of information the agent sent us."
14    Do you see that?
15    A.   Yes.
16    Q.   And do you need a break, Mr. Shaner?
17    I saw you looking at your watch.
18    A.   No.  No.  I'm just fixing my cuff.
19    Q.   Okay.  And when you did
20 demonstrations, would you similarly demonstrate
21 the types of information that could be obtained
22 from -- through Pegasus?
23    A.   Can you say that one more time,
24 please.
25    Q.   When you did demonstrations, would

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1  for providing software onto the device.
2      Q.   Okay.  Any particular category of
3  devices?
4      A.   Android.
5      Q.   Okay.  And it was a zero-click
6  installation vector.  Is that right?
7      A.   I can't recall if it was or not.
8      Q.   What's your understanding of why a
9  WhatsApp update would impact Heaven's
10 operation?
11         MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13         THE WITNESS:  So because I was on
14 the -- I was the other recipient, I didn't
15 respond to this.
16         I don't know -- I don't have any
17 context of what they're talking about.  I don't
18 know what the version means in this case.
19 BY MR. PEREZ-MARQUES:
20     Q.   Okay.  Are you aware of any
21 connection between Heaven and WhatsApp?
22         MR. AKROTIRIANAKIS:  Objection,
23 vague, no foundation.
24
25

Page 143

1          THE WITNESS:  For Heaven, I don't
2  remember.  I really don't.
3  BY MR. PEREZ-MARQUES:
4      Q.   Did you understand during your time
5  at WestBridge that the Heaven vector operated
6  by transmitting messages through WhatsApp?
7          MR. AKROTIRIANAKIS:  Objection, no
8  foundation.
9          THE WITNESS:  For Heaven, I don't
10 remember.
11 BY MR. PEREZ-MARQUES:
12     Q.   Okay.  Were there other vectors that
13 you recall understanding operated via WhatsApp?
14         MR. AKROTIRIANAKIS:  No foundation.
15         THE WITNESS:  Can you be more
16 specific.
17     Q.   Were there -- just a general
18 question.
19         Were there any other vectors?
20         You said:  "For Heaven, I can't
21 remember."
22         And so I'm asking you:  Were there
23 any other installation vectors that you do
24 remember understanding operated via WhatsApp?
25         MR. AKROTIRIANAKIS:  Objection, no

Page 144

1  foundation.
2          THE WITNESS:  So I didn't develop
3  anything at all as far as creating a vector or
4  anything with Pegasus.
5          So I don't know if I understand the
6  question if WhatsApp was the sole reason that
7  an installation vector might have worked.
8  BY MR. PEREZ-MARQUES:
9      Q.   Okay.  I'm not asking you about sole
10 reason.
11         I just wanted to understand whether
12 you were aware of any NSO installation vectors
13 that operated via WhatsApp.
14         MR. AKROTIRIANAKIS:  Objection,
15 vague, no foundation.
16         THE WITNESS:  Via WhatsApp, I don't
17 know.  I don't know.
18 BY MR. PEREZ-MARQUES:
19     Q.   Were you aware that certain NSO
20 installation vectors operated by transmitting
21 messages through WhatsApp?
22         MR. AKROTIRIANAKIS:  Objection,
23 vague, no foundation.
24         THE WITNESS:  Yes.
25     Q.   Okay.  Which vectors were those?

Page 145

1          MR. AKROTIRIANAKIS:  No foundation.
2      Q.   It's not a question about the
3  document, so you can even put that aside if
4  you'd like.
5      A.   Sure.  Yeah.  Thanks.
6          I think Eden would be the one that I
7  remember that had anything to do with anything
8  with WhatsApp.
9      Q.   Okay.  What was Eden?
10     A.   It was an installation vector.
11     Q.   For what types of devices?
12     A.   For Android.
13     Q.   Okay.  And what was your
14 understanding of how it worked?
15         MR. AKROTIRIANAKIS:  Objection, no
16 foundation.
17         THE WITNESS:  Again, I just sold the
18 system.  I didn't develop any of this.
19         So I just knew if I clicked -- if we
20 wanted to do a zero-click installation, I knew
21 Eden would be a part of that to be able to help
22 us do that.
23 BY MR. PEREZ-MARQUES:
24     Q.   And more specifically in terms of
25 how it achieved a zero-click installation, you

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1  didn't have any understanding?
2      MR. AKROTIRIANAKIS:  Objection.
3      THE WITNESS:  I mean, if you have a
4  specific question, I can answer it.
5    Q.   The specific question is whether you
6  had any understanding of how Eden achieved a
7  zero-click installation.
8      MR. AKROTIRIANAKIS:  Objection.
9      THE WITNESS:  Not from a technical
10  standpoint.
11    Q.   What about from any other
12  standpoint?
13    A.   I just knew it was a zero-click
14  installation vector.
15    Q.   And beyond that, you didn't know
16  anything about how it worked?
17    A.   Not entirely, no.
18    Q.   Okay.  But you knew it had something
19  to do with WhatsApp.  Is that right?
20    A.   That's what I said in my testimony,
21  yes.
22    Q.   And during your time demonstrating
23  Pegasus, you demonstrated zero-click
24  installation.  Correct?
25      I think you said that already.

Page 147

1  Correct?
2    A.   Correct.
3    Q.   And to the extent you were
4  demonstrating zero-click installation on
5  Android devices, which vectors were you using?
6      MR. AKROTIRIANAKIS:  Objection, no
7  foundation.
8      THE WITNESS:  Can you rephrase that
9  question.
10  BY MR. PEREZ-MARQUES:
11    Q.   Yeah.
12    A.   Repeat it.
13    Q.   When you demonstrated zero-click
14  installation on Android devices, which vectors
15  were you using?
16      MR. AKROTIRIANAKIS:  No foundation.
17      THE WITNESS:  From what I remember,
18  Eden would be one of them.
19    Q.   Would Heaven be another?
20    A.   I can't recall.
21    Q.   Okay.  Just briefly, if we look at
22  the last line of this exhibit, 2052, it's --
23  there's a message from a █████████████
24      Do you recognize that name?
25    A.   I do.

Page 148

1    Q.   Who is that?
2    A.   She was a presale engineer.
3    Q.   And she says:  "Hi.  Tomorrow at ten
4  we'll have a demo in Israel for a potential
5  client visit (Smart).  Sales 4, one-click,
6  Diablo and Heaven.  Thanks."
7      Do you see that?
8    A.   I do.
9    Q.   And the demos in Israel, that
10  wouldn't be done by WestBridge.  Right?
11    A.   No.
12    Q.   And the -- in parentheses there
13  where it says "Smart," what does that refer to?
14      MR. AKROTIRIANAKIS:  Objection, no
15  foundation.
16      THE WITNESS:  (Reviewing document.)
17  I don't know.
18  BY MR. PEREZ-MARQUES:
19    Q.   There's a reference there to
20  "sales 4."
21      What does that refer to?
22    A.   That was a server we used.
23    Q.   For what purpose?
24    A.   It was a server that is used for
25  demonstrations.

Page 149

1    Q.   How so?  What role did it play in
2  the demonstrations?
3      MR. AKROTIRIANAKIS:  Objection,
4  foundation.
5      THE WITNESS:  I don't know
6  technically.
7      It was a server that was used for
8  demonstrations.  That's really the extent of my
9  knowledge on it.
10  BY MR. PEREZ-MARQUES:
11    Q.   And we'll see some of these as we
12  look at other documents, but there are also
13  references to sales 1, 2, 3.
14      What was the difference between
15  those -- do you recall those different servers?
16    A.   I do.
17    Q.   And what was the difference between
18  those servers?
19      MR. AKROTIRIANAKIS:  No foundation.
20      THE WITNESS:  They were just
21  different sales servers, just separate ones.
22    Q.   And what was your understanding of
23  why there were multiple such servers?
24      MR. AKROTIRIANAKIS:  Objection, no
25  foundation.

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1    THE WITNESS: I don't know.
2    Q.   How would you decide for a
3  demonstration which server you would be using?
4    Well, let me take a step back.
5    Would you be the one who decided for
6  a demonstration which of those sales servers
7  would be used?
8    A.   Occasionally, yes.
9    Other times, if we couldn't use it,
10 then it would be decided for us.
11   Q.   By who?
12   A.   One of the presale engineers or the
13 NOC mostly.
14   Q.   Okay.  And so the presale engineers
15 and NOC, those are both NSO personnel groups?
16   A.   Yes.
17   Q.   And we've talked about NOC, but I
18 don't think we've defined it.
19   What was the NOC?
20   A.   We had no infrastructure in the US
21 because we were just selling, so all the
22 infrastructure was in Israel and it was managed
23 by the NOC.
24   And so the NOC is who you would call
25 if something happened.  They were just IT, 24/7

Page 151

1  IT, for sales.
2    Q.   And the infrastructure that you said
3  was managed by the NOC, who owned that
4  infrastructure to your knowledge?
5    MR. AKROTIRIANAKIS: Objection, no
6  foundation.
7    THE WITNESS: I have no idea who
8  owned that.
9  BY MR. PEREZ-MARQUES:
10   Q.   Okay.  But your understanding was
11 that it was managed by NOC?
12   MR. AKROTIRIANAKIS: Objection,
13 vague.
14   THE WITNESS: I couldn't tell you it
15 was only managed by NOC, and I wouldn't know
16 who else would be managing it.
17 BY MR. PEREZ-MARQUES:
18   Q.   But that's who you interacted with
19 to the extent you needed support with respect
20 to infrastructure?
21   MR. AKROTIRIANAKIS: Objection,
22 vague.
23   THE WITNESS: Yes.
24   Q.   And you said also on some occasions
25 presale engineers might identify which sale

Page 152

1  server should be used for a demonstration?
2    A.   Yes.
3    Q.   And would you generally make the
4  presales team aware when you were going to be
5  doing a demonstration?
6    A.   Yes.
7    Q.   Consistently?
8    A.   Yes.
9    Q.   Okay.  And why was that?
10   A.   When doing sales, even in the US, we
11 have to de-conflict from other sales folks that
12 might be using the same server.
13   And so de-confliction.
14   Q.   Would you also make NOC aware when
15 you were doing a demonstration in the US?
16   A.   I can't recall that.
17   Q.   Okay.  Let's take a look at what
18 we'll mark as Exhibit 2053.
19   (Exhibit 2053, WhatsApp chat dated
20 5/3/18, SHANER_WHATSAPP_00001751, marked for
21 identification.)
22   Q.   And this is a single page WhatsApp
23 exchange with the Bates stamp
24 SHANER_WHATSAPP_00001751.
25   Do you recognize Exhibit 2053,

Page 153

1  Mr. Shaner?
2    A.   I don't.
3    Q.   Okay.  Do you see your name in the
4  second line there?
5    A.   Yes.
6    Q.   And the active participants in this
7  chat, the first one is ███████.
8    Do you know who that is?
9    MR. AKROTIRIANAKIS: Objection,
10 misstates the document.
11   MR. PEREZ-MARQUES: How so?
12   MR. AKROTIRIANAKIS: I think you
13 meant Shuman.
14   MR. PEREZ-MARQUES: Ah, ███████.
15   MR. AKROTIRIANAKIS: But the record
16 reflected ███████.
17   MR. PEREZ-MARQUES: Yes.  Yes,
18 ███████.
19 BY MR. PEREZ-MARQUES:
20   Q.   Do you know who that is?
21   A.   Yes.
22   Q.   Who was that?
23   A.   He was a presale engineer as well.
24   Q.   And then there's a name that just
25 says ███████.

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    Yes.
2 BY MR. PEREZ-MARQUES:
3    Q.  Okay.  But you don't know all such
4 customers, do you?
5    A.  No, I don't know all such customers.
6    Q.  And am I right in understanding
7 you're not familiar with the policies that NSO
8 may have had around to whom they could and
9 could not market?
10    MR. AKROTIRIANAKIS:  Object to the
11 form of the question.
12    THE WITNESS:  Yeah, can you rephrase
13 that question.
14 BY MR. PEREZ-MARQUES:
15    Q.  Yeah.
16    Are you familiar with the policies
17 that NSO had in place as to who they could and
18 could not market to?
19    MR. AKROTIRIANAKIS:  Assumes facts
20 not in evidence, object to the form of the
21 question, no foundation.
22    THE WITNESS:  I'm familiar that NSO
23 put parameters in place to only sell to
24 customers that aligned with our interests.
25    Outside of that, I don't know

Page 179

1 anything about it.
2 BY MR. PEREZ-MARQUES:
3    Q.  Okay.  What do you know about those
4 policies?
5    A.  All I know is that there was a board
6 that met to discuss, and that's the extent of
7 it.
8    Q.  What board?
9    A.  I don't know.
10    Q.  Board for which entity?
11    A.  For NSO Group.
12    Q.  Okay.  And as a WestBridge employee,
13 you had some understanding of what that board
14 did?
15    A.  The extent of my knowledge I just
16 told you.
17    Q.  And how did that board determine
18 whether sales to a particular customer did or
19 did not align with its interests?
20    MR. AKROTIRIANAKIS:  Misstates his
21 testimony.  Also, no foundation.
22    THE WITNESS:  I don't know.
23    Q.  You referred to NSO putting
24 parameters in place to sell only "to customers
25 that aligned with our interests."

Page 180

1    What are those parameters you're
2 referring to?
3    MR. AKROTIRIANAKIS:  Objection,
4 foundation.
5    THE WITNESS:  I don't know.
6    Q.  Okay.  You're not familiar with
7 those parameters.  Right?
8    A.  No.
9    Q.  And whether there was a written
10 policy, that's not something you're familiar
11 with?
12    A.  No, I'm not familiar with any
13 policy, written policy.
14    Q.  Or whether all of NSO's sales
15 outside the US complied with those parameters.
16    That's not something you would know
17 about?
18    MR. AKROTIRIANAKIS:  Object to the
19 form of the question and no foundation.
20    THE WITNESS:  No, I'm not familiar.
21    Q.  Because you weren't involved in
22 sales efforts outside the United States and
23 Canada.  Is that right?
24    A.  Can you rephrase that question.
25    Q.  You weren't involved in sales

Page 181

1 efforts outside of the United States and
2 Canada.  Is that right?
3    A.  I was involved in presale efforts
4 outside the United States on very rare
5 occasions.
6    Q.  Okay.  Where were you involved in
7 presale efforts outside the United States and
8 Canada?
9    A.  Mexico, Trinidad and Tobago,
10 Paraguay, Lesotho, and that's it.
11    Q.  Did any of those sales efforts
12 result in sales?
13    A.  Not --
14    MR. AKROTIRIANAKIS:  No foundation.
15    THE WITNESS:  Not to my knowledge.
16    Q.  What type of government does
17 Trinidad and Tobago have?
18    MR. AKROTIRIANAKIS:  No foundation.
19    THE WITNESS:  I don't know if I can
20 answer that question.
21    I don't know what you mean.
22 BY MR. PEREZ-MARQUES:
23    Q.  Is it a democracy, a monarchy, a
24 benevolent dictatorship?
25    MR. AKROTIRIANAKIS:  No foundation.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 182

1    Q.   Do you know what type of government
2    they have?
3    A.   I don't know.
4    Q.   What steps did you take to confirm
5    that marketing to Trinidad and Tobago was
6    permissible?
7         MR. AKROTIRIANAKIS:  Object to the
8    form of the question.
9         THE WITNESS:  What steps did I take?
10   Q.   Mm-hmm.
11   A.   That wasn't my responsibility to
12   take the steps to market and sell to them.
13   Q.   Whose responsibility was it?
14   A.   It wasn't WestBridge's.  That's all
15   I know.
16   Q.   Well, you said you were involved.
17        In what way were you involved?
18   A.   Because I knew the system, sometimes
19   I would be asked to conduct demonstrations
20   outside the US if need be.
21   Q.   And you did that on three occasions
22   or more than three occasions?
23   A.   Five occasions.
24   Q.   Five occasions in those three
25   jurisdictions, Mexico, Trinidad and Tobago, and

Page 183

1    Lesotho?
2    A.   And Paraguay.
3    Q.   And Paraguay.
4         So in which one did you do it more
5    than once?
6    A.   Mexico.
7    Q.   And what process -- who asked you to
8    participate in those sales efforts outside the
9    United States?
10   A.   I can't recall who asked me to do
11   it.
12   Q.   Did you coordinate with any NSO
13   personnel in connection with those sales
14   efforts outside the United States?
15        MR. AKROTIRIANAKIS:  Object to the
16   form of the question.
17        THE WITNESS:  What do you mean by
18   "coordinate"?
19   BY MR. PEREZ-MARQUES:
20   Q.   Have any contact with in connection
21   with those demonstrations.
22   A.   There would generally be an NSO
23   salesperson there that I would conduct the demo
24   for.
25   Q.   And is NSO sales different than

Page 184

1    presales?
2    A.   Yes.
3    Q.   Do you recall which NSO salespeople
4    accompanied you on those five visits?
5    A.   The only one I can recall is
6    ████████ (phonetic) in Paraguay.  He was in the
7    Latin American office.  I don't know if he
8    worked directly for NSO.
9         But the others I can't remember.
10   Q.   What's your understanding of the
11   process followed by NSO or WestBridge to get
12   comfortable with marketing to those four
13   countries?
14        MR. AKROTIRIANAKIS:  Object to the
15   form of the question.  It's vague, it's
16   overbroad and it's compound and there's no
17   foundation.
18        THE WITNESS:  Can you ask that
19   again, please.
20   BY MR. PEREZ-MARQUES:
21   Q.   Yeah.
22        What's your understanding of the
23   process followed by NSO or WestBridge to get
24   comfortable with marketing to those four
25   countries?

Page 185

1         MR. AKROTIRIANAKIS:  Same
2    objections.
3         THE WITNESS:  I don't know.
4    Q.   So in terms of what diligence may
5    have been done to say, okay, this is a
6    government that we're comfortable selling our
7    products to, you're not familiar with that
8    diligence process?
9    A.   Only to the extent I mentioned to
10   you earlier.
11   Q.   And what extent is that?
12   A.   Like I said in my testimony, the
13   board, that I didn't know what their criteria
14   was.
15        I did know we had to get a marketing
16   license to be able to go into these countries
17   from the government of Israel, so that was
18   another -- that was another threshold.
19        But outside of that, that's it.
20   Q.   Were you involved in obtaining those
21   marketing licenses from the government of
22   Israel?
23   A.   No.
24   Q.   Do you know one way or another
25   whether marketing licenses were obtained for

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

1  did you use that phone?
2      A.  I can't recall.
3      Q.  Okay.  Do you know one way or
4  another whether you used it for zero-click
5  Android installation?
6      A.  Yeah, I don't know.
7      Q.  Okay.  Well, it says in your
8  message:  "I'm trying to install Eden."
9          So would that suggest that you were
10  trying to install Eden on this device with the
11  202 number?
12      A.  Yeah, that would suggest it, yeah.
13      Q.  This 202 number, if I just call it
14  "the 202 number," will that be clear to you?
15      A.  Yes.
16      Q.  Where was -- or rather, did you
17  purchase the device associated with that
18  number?
19      A.  I don't remember.
20      Q.  Do you know when or where it was
21  purchased?
22      A.  No, I don't remember that.
23      Q.  Okay.  Do you still have the device
24  associated with that 202 number?
25      A.  No.

Page 191

1          I don't have any device from my time
2  at WestBridge.
3      Q.  Okay.  Was a WhatsApp account
4  created for that phone?
5      A.  I don't know.
6      Q.  Okay.  If we go to -- let's go to
7  the next exhibit, which will be 2061.
8          (Exhibit 2061, WhatsApp chat dated
9  5/9/19, SHANER_WHATSAPP_00001483, marked for
10  identification.)
11      Q.  2061 is a single-page WhatsApp
12  exchange, SHANER_WHATSAPP_1483.
13          Do you recognize this Exhibit 2061?
14      A.  I do not.
15      Q.  And you see it's an exchange between
16  the 202 number we were just looking at and the
17  other recipient is the 614 number that I
18  believe you identified as your own.
19      A.  Yes.
20      Q.  And why were you having message
21  exchanges between the test devices and your
22  personal phone?
23          MR. AKROTIRIANAKIS:  Objection, no
24  foundation.
25          THE WITNESS:  When I test, I want to

Page 192

1  see if the messages go through, so I would use
2  my personal phone with the phone with the
3  software installed on it.
4  BY MR. PEREZ-MARQUES:
5      Q.  Okay.
6      A.  And that's what this is.
7      Q.  And when you say "the phone with the
8  software installed on it," what do you mean?
9      A.  With the Pegasus software installed
10  on it.
11      Q.  So to show that it can still send
12  messages after the Pegasus has been installed?
13          MR. AKROTIRIANAKIS:  Objection,
14  leading, assumes facts not in evidence, no
15  foundation.
16          THE WITNESS:  Yes.
17  BY MR. PEREZ-MARQUES:
18      Q.  And would you do that in the course
19  of a client demonstration?
20      A.  No, not typically.
21      Q.  Just as part of your testing, or for
22  what purpose would you do that?
23      A.  If I didn't have another phone with
24  me and I used my phone, that's where this would
25  come in (indicating).

Page 193

1      Q.  Okay.  Let's do 67A.
2          Let me show you what we'll mark as
3  Exhibit 2062.
4          (Exhibit 2062, WhatsApp chat dated
5  5/9/19, SHANER_WHATSAPP_00001484-1485, marked
6  for identification.)
7      Q.  And so this is a two-page WhatsApp
8  exchange for SHANER_WHATSAPP_1484 through 1485.
9          Do you recognize Exhibit 2062?
10      A.  (Reviewing document.)
11          No, I don't recognize this.
12      Q.  Okay.  And if you look at the -- do
13  you see the first message is a JPEG file?
14      A.  Yes.
15      Q.  And so I'm showing you what's been
16  marked as Exhibit 2063, which is Bates-stamped
17  SHANER_WHATSAPP_1486, which I'll represent to
18  you is the JPEG file that's included there.
19          (Exhibit 2063, JPEG file
20  Installation Status, SHANER_WHATSAPP_00001486,
21  marked for identification.)
22      Q.  And actually staying with 2062 for
23  one moment, you see that this is -- 2062 is an
24  exchange between you and NOC.  Is that right?
25      A.  It appears to be, yep.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 194

1    Q.    And the NOC is associated with a
2  number that begins 44?
3    A.    (Reviewing document.)
4        Yes.
5    Q.    And is that a UK number?
6        MR. AKROTIRIANAKIS:  Objection,
7  foundation.
8        THE WITNESS:  I don't know where
9  that country code is.
10  BY MR. PEREZ-MARQUES:
11    Q.    Okay.  And so let's look at 2063,
12  which is the screenshot.
13        What are we seeing here in
14  Exhibit 2063?
15        MR. AKROTIRIANAKIS:  Objection,
16  overbroad, vague.
17        THE WITNESS:  Do you have a specific
18  question?
19  BY MR. PEREZ-MARQUES:
20    Q.    Yeah.
21        What is this?
22    A.    This is the installation status
23  screen for Pegasus.
24    Q.    Okay.  Part of the Pegasus user
25  interface?

Page 195

1    A.    Yes.
2    Q.    Okay.  And it says Installation
3  Status.
4        And then you see below that the 202
5  number we were looking at before?
6    A.    Yes.
7    Q.    And the name Steve Grover.
8        Who is Steve Grover?
9    A.    Steve Grover is just a made up name,
10  yeah.
11    Q.    And was it your practice when you
12  were setting up test devices to set them up
13  with fake names?
14    A.    Yes.
15    Q.    If we look at -- let me show you
16  another exhibit.  This will be 2064.
17        (Exhibit 2064, Wireless Subscriber
18  Information, WA-NSO-00000127-131, marked for
19  identification.)
20    Q.    Which is multipage document
21  beginning on WA-NSO-127 through 131.
22        Do you recognize Exhibit 2064?
23    A.    (Reviewing document.)
24        No, I don't.
25    Q.    Do you see there's a -- the third

Page 196

1  box down is labelled User Information.
2        Do you see that on the first page?
3    A.    I do.
4    Q.    And then you see the MSISDN is that
5  202 number we were looking at?
6    A.    I do.
7    Q.    All right.  And at the top of this,
8  for Name it says:  "Prepaid Customer."
9        Do you see that at the very top of
10  the page under Financial Liable Party?
11    A.    I do.
12    Q.    All right.  And when you would
13  purchase test devices, did you do so on a
14  prepaid basis?
15        MR. AKROTIRIANAKIS:  Object to the
16  form of the question.
17        THE WITNESS:  We would buy phone
18  cards.  So prepaid, yeah.
19  BY MR. PEREZ-MARQUES:
20    Q.    Mm-hmm.
21    A.    Mm-hmm.
22    Q.    And so you would prepay for the
23  phone services?
24    A.    We'd buy monthly -- what do you mean
25  by "prepay"?  Like an account?

Page 197

1    Q.    Yes.
2    A.    Like a monthly account?
3    Q.    Well, would you have a monthly
4  account where you received a bill or would you
5  prepay in advance?
6    A.    In the beginning, we did -- we had
7  our own accounts or we had an account that the
8  company paid for.
9        And then we moved because we had to
10  buy multiple phones and have multiple SIM
11  cards.  And I would top it up, so it
12  wouldn't -- yeah, I would have to top it up
13  every month.
14    Q.    With prepaid cards?
15    A.    Yeah, prepaid cards, yeah.
16    Q.    And why did you have to have
17  multiple SIM cards?
18    A.    Yeah, different carriers.  They had
19  different carriers.  That was one of the
20  biggest things.
21        And then multiple phones, so...
22    Q.    The address that's reflected there
23  under Prepaid Customer, 7101 Democracy
24  Boulevard, Bethesda, Maryland, do you recognize
25  that address?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

1    A.    I don't.
2    Q.    Do you know where that is in
3 Bethesda?
4    A.    I do know roughly where that is in
5 Bethesda.
6    Q.    Okay.  But do you know whether
7 that's a place where you purchased phones, test
8 devices?
9    A.    I can't remember.
10    Q.    Where do you recall purchasing
11 devices for demonstration purposes?
12    A.    I don't recall exactly every place I
13 bought a phone.
14    Q.    Do you recall any places you bought
15 a phone?
16    A.    Online, cell phone store, Best Buy.
17        But outside of that, I can't
18 remember.
19    Q.    Do you know anything about marketing
20 efforts for NSO products in Brazil?
21    A.    No.
22    Q.    What about Peru?
23    A.    No.
24    Q.    Okay.  All right.
25        MR. PEREZ-MARQUES:  Why don't we

Page 199

1 take a break for lunch and then we can press
2 on.
3        THE VIDEOGRAPHER:  Going off the
4 record.  The time is 1320 p.m.
5        (Recess was taken from 1:20 p.m. to
6 2:11 p.m.)
7        THE VIDEOGRAPHER:  Going back on the
8 record.  The time is 1411 p.m.
9 BY MR. PEREZ-MARQUES:
10    Q.    Mr. Shaner, you understand you're
11 still under oath?
12    A.    Yes.
13    Q.    Let me show you what we've marked as
14 Exhibit 2065.
15    A.    Okay.
16        (Exhibit 2065, E-mail chain dated
17 6/6/16, WA-NSO-00100563, marked for
18 identification.)
19    Q.    Which is a one-page e-mail exchange
20 Bates-stamped WA-NSO-00100563.
21        Do you recognize Exhibit 2065?
22    A.    (Reviewing document.)
23        No.
24    Q.    These are e-mails you sent to a
25 Chris Haley.

Page 200

1        Do you recall who that is?
2    A.    I don't know Chris Haley, no.
3    Q.    Do you recall marketing NSO products
4 to agencies in California?
5    A.    I do, but not the specific ones.
6    Q.    Okay.  What do you recall about
7 marketing NSO products in California?
8    A.    I believe they were sheriffs'
9 offices.
10    Q.    Do you recall which ones?
11    A.    I don't.
12    Q.    Or when it was?
13    A.    Not exactly, no.  I don't remember,
14 no.
15    Q.    Let me show you what we'll mark as
16 Exhibit 2066.
17        (Exhibit 2066, Series of e-mails,
18 WA-NSO-00013354-13407, marked for
19 identification.)
20    Q.    Ready, Mr. Shaner?
21    A.    Oh, sorry.
22        Thank you.
23    Q.    Which is a multipage document
24 beginning on WA-NSO-13354 through 13407.
25        And I'd like to just direct your

Page 201

1 attention to the page -- these are a series of
2 e-mails that were just produced to us in this
3 way, so I'm marking it in the way it was
4 produced.
5        But I want to direct you to the page
6 ending 3389, if you could go there.
7    A.    (Complying.)
8    Q.    Actually, let me start you on 3407
9 if you don't mind.
10        And on Page 3407 there's an e-mail
11 from an Alejandro Vargas to you, is that
12 correct, josh@westbridge.com?  That's your
13 e-mail?
14    A.    That is my e-mail.
15    Q.    And it's dated May 4, 2016.
16 Correct?
17    A.    Yes.
18    Q.    With the subject Phantom Brochure
19 and WestBridge Meeting.
20        Do you see that?
21    A.    Yes.
22    Q.    And Mr. Vargas writes to you:
23 "Josh, I am Alex Vargas, Chief Downing's
24 adjutant.  I will be facilitating your
25 presentation here at LAPD."

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1    Then he continues after a sentence:
2    "What time were you thinking on Monday,
3    May 27th" and some additional scheduling notes.
4         Do you see that?
5    A.    I do.
6    Q.    Do you recall making a presentation
7    to the LAPD on NSO products?
8         MR. AKROTIRIANAKIS:  Object to the
9    form of the question.
10        THE WITNESS:  I do recall making a
11   presentation, or at least I was at a
12   presentation at LAPD.
13   BY MR. PEREZ-MARQUES:
14   Q.    Okay.  And demonstrating NSO's
15   products?
16        MR. AKROTIRIANAKIS:  Object to the
17   form of the question.
18        THE WITNESS:  I don't know if we
19   demonstrated any products outside of a
20   presentation.
21        I can't recall if we did or not.
22   BY MR. PEREZ-MARQUES:
23   Q.    Okay.  Let's have you take a look at
24   Page 3389 --
25   A.    (Complying.)

Page 203

1    Q.    -- which is an e-mail from Mark
2    Castillo to oren@westbridge.com with the
3    subject Product Demo on June 30th, 2016.
4         Do you see that?
5    A.    I do.
6    Q.    And he writes:  "Oren, I would like
7    to thank you again for the product demo you put
8    on for us at LAPD headquarters."
9         Does that refresh your recollection
10   at all as to doing a product demo for the LAPD?
11   A.    No, it doesn't.
12        I mean, if we did a product
13   demonstration, I don't remember us doing it.
14        I remember us being there.  But if
15   we did a product demo, I mean, this would show
16   it.
17   Q.    Right.  And you were there for the
18   purpose of trying to sell NSO's products to the
19   LAPD?
20        MR. AKROTIRIANAKIS:  Object to the
21   form of the question.  It's leading and assumes
22   facts not in evidence.
23        THE WITNESS:  We were there as
24   WestBridge trying to sell products, yeah, to
25   the LAPD.

Page 204

1    BY MR. PEREZ-MARQUES:
2    Q.    Sell NSO products.  Right?
3         MR. AKROTIRIANAKIS:  Object to the
4    form of the question.
5         THE WITNESS:  Yeah, they were NSO
6    designed products.
7    BY MR. PEREZ-MARQUES:
8    Q.    And NSO owned products.  Right?
9         MR. AKROTIRIANAKIS:  Object to the
10   form of the question.
11        THE WITNESS:  What do you mean by
12   "owned"?
13   BY MR. PEREZ-MARQUES:
14   Q.    NSO owned the software.  Right?
15        It wasn't owned by WestBridge, was
16   it?
17   A.    NSO, from what I understand, owns
18   the software.
19   Q.    Right.  And when you were marketing
20   NSO products in California, that was within
21   your responsibilities as a WestBridge employee?
22        MR. AKROTIRIANAKIS:  Object to the
23   form of the question.  It's leading.
24        THE WITNESS:  My responsibilities
25   were to demonstrate and market for WestBridge

Page 205

1    in the United States and Canada.
2    BY MR. PEREZ-MARQUES:
3    Q.    Including in California?
4         MR. AKROTIRIANAKIS:  Object to the
5    form of the question, leading.
6         THE WITNESS:  Well, California's
7    part of the United States, so yes.
8    BY MR. PEREZ-MARQUES:
9    Q.    Right.  And that's one of the places
10   where you did in fact engage in marketing
11   efforts of NSO products.  Right?
12        MR. AKROTIRIANAKIS:  Objection,
13   leading.
14        THE WITNESS:  Yes, we were there for
15   at least a presentation.
16   BY MR. PEREZ-MARQUES:
17   Q.    You can put that aside.
18   A.    (Complying.)
19   Q.    Do you recall engaging in marketing
20   efforts towards the San Diego Police
21   Department?
22   A.    Only from a -- only from a news
23   article I saw from a FOIA request that I sent
24   an e-mail.
25        But I never went to San Diego for

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 206

1 anything.
2    Q.   What do you mean when you say only
3 from a news article you saw from a FOIA
4 request?
5    A.   Well, that was in the subpoena that
6 I got for this, that there was e-mails
7 apparently that I sent to someone at the
8 San Diego Police Department, and that's the
9 extent of it.
10    Q.   Okay.  So you sent to someone
11 e-mails in your capacity as a WestBridge
12 employee to someone at the San Diego Police
13 Department.  Is that right?
14    A.   Yes.
15    Q.   All right.  And you did so for the
16 purpose of marketing NSO products?
17        MR. AKROTIRIANAKIS:  Object to the
18 form of the question.
19        THE WITNESS:  I did so in the
20 confines of my job to market and sell, you
21 know, products that NSO has made, yes.
22 BY MR. PEREZ-MARQUES:
23    Q.   Right.  Okay.
24        And you recall you provided written
25 materials to the San Diego Police Department?

Page 207

1        MR. AKROTIRIANAKIS:  Objection,
2 leading.
3        THE WITNESS:  I don't recall if I
4 did or not.
5 BY MR. PEREZ-MARQUES:
6    Q.   All right.  Let's take a look at
7 what I'll mark as Exhibit 2067 --
8        (Exhibit 2067, E-mail chain dated
9 6/6/16, WA-NSO-00014779-791, marked for
10 identification.)
11    Q.   -- which is a multipage document
12 beginning on WA-NSO-00014779 through 14791.
13        And let me just direct your
14 attention.  If you go to 786, there's an e-mail
15 exchange that starts on that page between you
16 and Oren Kaplan and Daniel Meyer.
17        Do you see that?
18    A.   Yes, I do.
19    Q.   All right.  And if we look at the
20 following page, 787, you write: "Sergeant
21 Meyer, great talking with you.  Attached is the
22 two pager that describes Phantom in a bit more
23 detail."
24        Do you see that?
25    A.   I do.

Page 208

1    Q.   And that reflects that you did in
2 fact provide written materials to the San Diego
3 Police Department on NSO products?
4        MR. AKROTIRIANAKIS:  Object to the
5 form of the question.  And also, it's leading.
6        THE WITNESS:  Can you ask me that
7 again.
8 BY MR. PEREZ-MARQUES:
9    Q.   Yeah.
10        That reflects that you did in fact
11 provide written materials to the San Diego
12 Police Department on NSO products, doesn't it?
13        MR. AKROTIRIANAKIS:  Object to the
14 form of the question and it's leading.
15        THE WITNESS:  I don't know if Daniel
16 Meyer is part of the San Diego Police
17 Department.
18        Where is that listed?
19 BY MR. PEREZ-MARQUES:
20    Q.   Well, his e-mail address is
21 redacted.
22        Do you recall a Daniel Meyer?
23    A.   I don't.
24    Q.   Or a Chief Guaderrama?
25    A.   Yeah, I don't.  I don't.

Page 209

1    Q.   If you look on Page 4780 --
2    A.   (Complying.)
3    Q.   -- there's an e-mail to you from
4 Albert Guaderrama on August 8, 2016, where he
5 writes: "Josh, I forwarded your contact info
6 to Sergeant Dan Meyer, who reviews/handles all
7 products for the SDPD."
8        Do you see that?
9    A.   I do.
10    Q.   Right.  And "SDPD" would be the
11 San Diego Police Department.  Correct?
12        MR. AKROTIRIANAKIS:  Object to the
13 form of the question.
14        THE WITNESS:  I don't know.
15        I mean, "SDPD" could mean another
16 police department.  I'm not sure I could answer
17 that.
18 BY MR. PEREZ-MARQUES:
19    Q.   What other SDPD police departments
20 do you recall marketing to?
21    A.   I don't know.
22    Q.   Can you think of any?
23    A.   Not right now, no.
24    Q.   And but you do remember having
25 contact with the San Diego Police Department.

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 210

1 Right?
2     A.   Only through the news article that
3 came out.
4     Q.   What do you mean when you say "only
5 through the news article that came out"?
6     A.   Because I knew it was something in
7 San Diego.
8         But I don't recall any names or
9 anything like that.
10     Q.   The article refreshed your
11 recollection that you marketed to San Diego.
12        Is that what you're trying to say?
13     A.   The article --
14        MR. AKROTIRIANAKIS:  Objection,
15 leading.
16        THE WITNESS:  The article was from
17 San Diego, so...
18 BY MR. PEREZ-MARQUES:
19     Q.   I'm not understanding what relevance
20 the article has.
21        What did you gather from the article
22 about your marketing towards San Diego Police
23 Department?
24     A.   That there was a FOIA request out of
25 San Diego.

Page 211

1        But yeah, I'm not sure -- I'm not
2 sure if it was with the San Diego Police
3 Department.
4     Q.   Other than LAPD and San Diego which
5 we've discussed, are there California agencies
6 that you recall marketing to?
7     A.   Yes.
8     Q.   Which ones?
9     A.   The San Francisco Police Department
10 and the San Bernardino County Sheriff's Office.
11     Q.   When did you market to the
12 San Francisco Police Department?
13     A.   I don't know the dates.
14     Q.   Sometime during your tenure at
15 WestBridge?
16     A.   Yes.
17     Q.   And you were marketing NSO products?
18        MR. AKROTIRIANAKIS:  Object to the
19 form of the question.
20        THE WITNESS:  Yeah, I was marketing
21 products that NSO made.
22 BY MR. PEREZ-MARQUES:
23     Q.   Right.  Do you recall whether it was
24 in 2018 or 2019?
25        MR. AKROTIRIANAKIS:  Object to the

Page 212

1 form of the question.
2        THE WITNESS:  I don't.  Yeah, I
3 don't.
4 BY MR. PEREZ-MARQUES:
5     Q.   Do you recall whether it was early
6 in your tenure or late in your tenure?
7     A.   For marketing to who?
8     Q.   San Francisco Police Department.
9     A.   I don't know the dates on it.
10        Yeah, I don't know whether it was
11 early or later.
12     Q.   What about San Bernardino?  Do you
13 recall when you marketed to them?
14     A.   I don't.
15     Q.   Do you recall how you came to select
16 San Francisco as an agency you would be
17 marketing to?
18        MR. AKROTIRIANAKIS:  Objection, no
19 foundation, assumes facts not in evidence.
20        THE WITNESS:  So I would reach out
21 to major police departments and sheriff offices
22 to see if they'd be interested.
23        And there was no rhyme or reason.
24 It wasn't because it was California or Idaho or
25 anything like that.  If a major police

Page 213

1 department had the money and they saw a use
2 case, I would reach out.
3 BY MR. PEREZ-MARQUES:
4     Q.   So you would -- like effectively a
5 cold call, you would reach out to them and sort
6 of offer a demonstration?
7     A.   Yes.
8     Q.   Okay.  And before doing that, did
9 you have to undergo any kind of process to
10 clear the particular prospective customer you
11 were going to be marketing to?
12     A.   Only talking it over with Oren
13 Kaplan or Terry.
14        But outside of that, no, I didn't
15 know or I didn't have any idea about that.
16     Q.   How did you come to market to
17 San Bernardino Sheriff's Office?
18     A.   I can't remember how I got a lead
19 to talk to them.
20        (Reporter clarification.)
21        THE WITNESS:  How we got the lead to
22 talk to them, how that lead came in for us to
23 meet and talk with them, I don't know.
24     Q.   Okay.  What about Los Angeles?  How
25 did you get the lead to talk to them?

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 286

1  developed, yes.
2      Q.   In general, what was your -- what
3  were your job duties at WestBridge?
4      A.   To market and demonstrate to help
5  make sales in the US market.
6      Q.   And did you demonstrate and
7  market -- well, let me ask that better.
8          Did you demonstrate any products
9  other than Pegasus/Phantom?
10     A.   Occasionally I would demonstrate
11  Landmark, and very occasionally I would
12  demonstrate Pixel.
13         But Phantom/Pegasus was my -- that
14  took up most of my time.
15     Q.   You mentioned a WestBridge employee
16  named ███████
17         What was ███████ job at
18  WestBridge?
19     A.   He was hired on to primarily market
20  and demonstrate Landmark and Pixel.
21     Q.   What types of customers were the
22  prospective customers for the products that you
23  demonstrated on behalf of WestBridge?
24         MR. PEREZ-MARQUES:  Object to the
25  form.

Page 287

1          THE WITNESS:  It ranged from police
2  departments, sheriffs' offices, HIDTA
3  organizations, DOD, intelligence agencies,
4  prisons, anything within the government space
5  that would have the potential authority to
6  operate these particular products.
7  BY MR. AKROTIRIANAKIS:
8      Q.   The DOD is the Department of
9  Defense?
10     A.   Yes.
11     Q.   And HIDTA is H-I-D-T-A?
12     A.   Yes.
13     Q.   And do you understand that to stand
14  for High Impact Drug Task?
15     A.   High Intensity Drug Trafficking
16  Agency, from what I remember, I think.
17     Q.   Okay.  Let me ask that again.
18         HIDTA, H-I-D-T-A, is High
19  Intensity --
20     A.   Drug Trafficking Agency.
21     Q.   Thank you.
22     A.   I believe that's what it is.
23     Q.   And what do you -- what part of the
24  government is HIDTA if you know?
25     A.   I believe it's with DHS.

Page 288

1          And there's certain areas around the
2  US that have higher trafficking of drugs than
3  others, and HIDTA is just a designation for
4  those areas.  And so we were looking at
5  potentially talking to them as well.
6      Q.   DHS is the United States Department
7  of Homeland Security?
8      A.   Yes.
9      Q.   Did either NSO or Q Cyber direct
10  WestBridge as to which entities in the US
11  market it should be approaching?
12         MR. PEREZ-MARQUES:  Object to the
13  form and lack of foundation.
14         THE WITNESS:  No.
15         WestBridge was pretty autonomous.
16  BY MR. PEREZ-MARQUES:
17     Q.   Did anybody from NSO or Q Cyber ever
18  tell you, go market to this person, go market
19  to that person, anything like that?
20     A.   No, we never got that.
21     Q.   What about the marketing to police
22  departments and sheriffs' offices, those sort
23  of local law enforcement agencies?  Whose idea
24  was that?
25         MR. PEREZ-MARQUES:  Object to the

Page 289

1  form and foundation.
2          THE WITNESS:  I was tasked with
3  looking at, you know, the bigger police
4  departments and sheriffs' offices, and so
5  that's -- that was kind of my project.
6          It wasn't only me working on it, but
7  that was WestBridge driven.
8  BY MR. AKROTIRIANAKIS:
9      Q.   Okay.  And who gave you that
10  direction?
11     A.   Oren Kaplan.
12     Q.   And who decided which police
13  departments and sheriff offices qualified as
14  the bigger departments and offices that you
15  were going to market to?
16     A.   The biggest cities have the bigger
17  budgets and the products we sell are expensive.
18  And then the bigger counties for sheriffs'
19  offices, bigger budgets.
20         And so that was kind of where I made
21  the list to go after some of these things.
22     Q.   So you, Josh Shaner, individually
23  made the list of individual police departments
24  and sheriffs' offices to market to?
25     A.   Yes.

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 290

1    Q.   And would that have included the --
2    well, let me ask you.
3          How did you reach out to those
4    police -- how did you reach out to the police
5    departments and county sheriffs that you
6    decided were good candidates to market to?
7    A.   I can't remember.
8          It was mostly e-mail, phone calls,
9    and those are the two primary ways that I
10   reached out.
11   Q.   So you would try and develop either
12   a phone number or an e-mail that you could use
13   to reach out?
14   A.   Exactly, yeah.
15   Q.   And where in the United States --
16   well, did you focus on any particular geography
17   within the United States?
18   A.   No.
19          Again, wherever their budgets were.
20   So East Coast, the state police, I mean, any --
21   almost every state has a state police, for
22   example.
23          It's just where the budgets were,
24   you know, yeah.
25   Q.   Did anyone at either NSO or Q Cyber

Page 291

1    ever give you any kind of sales script that
2    they told you you were supposed to use in
3    marketing meetings?
4          MR. PEREZ-MARQUES:  Object to the
5    form.
6          THE WITNESS:  Are you talking for
7    police departments?  Sheriffs' offices?
8    Q.   Well, at all.
9          MR. PEREZ-MARQUES:  Same objection.
10   Q.   Let me ask a better question.
11   A.   Yeah.
12   Q.   You marketed to local law
13   enforcement agencies and also to federal
14   governmental agencies.  Right?
15   A.   And state, yes.
16   Q.   Okay.  And did you have a similar
17   presentation that you would do regardless,
18   whether the presentation audience was a federal
19   or state or local agency, or was it the same
20   presentation?
21   A.   It would be modified slightly
22   different, but -- due to the audience, but it
23   was essentially the same, yeah.
24   Q.   Did anyone at either NSO or Q Cyber
25   ever give you a script that you were told you

Page 292

1    were supposed to follow as far as these
2    marketing meetings?
3          MR. PEREZ-MARQUES:  Object to the
4    form.
5          THE WITNESS:  I can't recall if they
6    did or not.
7          But again, I kind of developed my
8    own flow.
9    BY MR. AKROTIRIANAKIS:
10   Q.   You developed your own script?
11          MR. PEREZ-MARQUES:  Object to the
12   form.
13          THE WITNESS:  Yes.
14          Can I clarify?
15   BY MR. AKROTIRIANAKIS:
16   Q.   Sure.
17   A.   I didn't develop a script that I
18   wrote, but my own flow on how I would conduct
19   demonstrations.
20   Q.   Did anyone at either NSO or Q Cyber
21   ever tell you, you know, where or when to
22   market either NSO or Circles' products?
23          MR. PEREZ-MARQUES:  Object to the
24   form.
25          THE WITNESS:  No, not that I can

Page 293

1    recall.
2    BY MR. AKROTIRIANAKIS:
3    Q.   Are you able to estimate how many
4    times you've demonstrated Pegasus?
5    A.   Dozens of times.
6          Yeah, I can't give you a number.
7    Q.   And how many times did you conduct a
8    proof of concept of Pegasus?
9    A.   It wasn't that much.
10          Two to three, I believe.
11   Q.   And how would you decide whether to
12   conduct a proof of concept as opposed to a
13   demonstration?
14          Who would it be up to?
15   A.   It would be up to the potential
16   customer, because they want to make sure that
17   we're not pulling a fast one because we're
18   using our phones.
19          So we would allow them to use their
20   phones, again, if brand new, and then we would
21   keep the phone.
22          But yeah, that's -- that was one
23   thing we did.
24   Q.   What equipment would you bring with
25   you when conducting a -- either a demonstration

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 294

1  or a proof of concept of Pegasus/Phantom?
2      A.  I would bring a number of phones,
3  SIM cards, a laptop, power cables, HDMI cables,
4  a speaker.
5          That was pretty much -- that was
6  good enough for most of what we did.
7      Q.  And referring specifically to
8  demonstrations as opposed to proofs of concept,
9  okay, with respect to demonstrations, would you
10  always bring with you the target phone?
11      A.  Do you mean -- can you rephrase.
12          Like when you say "target phone,"
13  you mean our phones that we bought?
14      Q.  So when you would conduct a
15  demonstration as opposed to a proof of concept,
16  you sort of -- in your mind, you separate
17  between demonstrations and proof of concept and
18  demonstrations.  Right?
19      A.  Mm-hmm.
20      Q.  Okay.  So let's focus on
21  demonstrations only for the moment.
22      A.  Mm-hmm.
23      Q.  When you would conduct a
24  demonstration, you would have a phone that you
25  would demonstrate Pegasus or Phantom against.

Page 295

1  Right?
2      A.  We would have a series of phones
3  that we could use.
4      Q.  And with respect to demonstrations,
5  how did those phones comes to be in the room
6  where you were conducting the demonstration?
7      A.  I would bring them in a kit that I
8  had.
9      Q.  And was that true every single time
10  you conducted a demonstration?
11      A.  Yes.
12      Q.  Now, focusing on proofs of concept
13  as opposed to demonstrations for the moment.
14      A.  Mm-hmm.
15      Q.  How would it be that the phones
16  against which you were going to demonstrate
17  Pegasus/Phantom would come into the room if you
18  were going to conduct a proof of concept?
19      A.  The potential partner would let us
20  know what phones they wanted to demonstrate.
21          We would tell them, okay, they have
22  to be brand new in the wrapper, and the
23  potential client would bring them in.
24      Q.  Would they bring them in with the
25  understanding that you were going to leave with

Page 296

1  them?
2      A.  Yes.
3      Q.  And in every case, did you leave
4  with them?
5      A.  Every single case, yeah.
6      Q.  In the stack of documents before you
7  is an Exhibit 2063.  That is this one
8  (indicating).
9      A.  (Reviewing documents.)
10          Yep, I've got it.
11      Q.  Okay.  And this is a document that
12  says Installation Status at the top and it has
13  the name Steve Grover and the phone number
14  1 (202) 765-5322.
15          Do you see that?
16      A.  I do.
17      Q.  And do you recognize the phone
18  number (202) 765-5322?
19      A.  I do.
20      Q.  Do you know whose phone number that
21  was?
22      A.  That was the phone number on a SIM
23  card that we used for our demo devices.
24      Q.  And when you say "we," do you mean
25  WestBridge?

Page 297

1      A.  I mean WestBridge, yes.
2      Q.  Was that phone number and that SIM
3  card that it was assigned to, property of
4  WestBridge?
5      A.  Yes.
6      Q.  Is Steve Grover a real person?
7      A.  Steve Grover is a person I just made
8  up, yes, not real.
9      Q.  Okay.  So Steve Grover is the
10  profile that you used for this demonstration
11  phone?
12      A.  No.
13          So actually you could just type in a
14  random name in Pegasus.  So that name wasn't
15  attached to that SIM card.  That was just a
16  name I put in Pegasus for a demo or a test.
17      Q.  But the phone against which you were
18  demonstrating in this case would have been the
19  phone number that we see?
20      A.  Yes.
21      Q.  So in the demonstration that you
22  conducted -- well, did you conduct one
23  demonstration or more than one demonstration
24  using (202) 765-5322?
25      A.  I mean, I can't recall.

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 298

1    It's more than one, I'm sure, but I
2  can't recall.
3    Q.   Was any data ever removed from that
4  phone without your consent?
5    A.   Can you resay that.
6    Q.   Yeah.
7    When you were operating Pegasus
8  against that phone number (202) 765-5322, were
9  you doing so knowing that you were removing
10  data from your own phone?
11    MR. PEREZ-MARQUES:  Object to the
12  form.
13    THE WITNESS:  Yes.
14    That number was -- yeah.  Yes, that
15  was always and only used to remove data from
16  the demo device itself.
17  BY MR. AKROTIRIANAKIS:
18    Q.   When you worked for WestBridge, did
19  you ever demonstrate vectors for Pegasus other
20  than covert Android?
21    A.   I did.
22    Q.   And is that trigger?
23    MR. PEREZ-MARQUES:  Object to the
24  form.
25    Q.   Did that include trigger Android?

Page 299

1    A.   Like a one -- are you talking about
2  one-click Android?
3    Q.   Sure.
4    Are you familiar with the
5  terminology "triggering"?
6    A.   I don't believe I am.
7    Q.   Are you familiar with the
8  terminology "one-click"?
9    A.   Yes.
10    Q.   And what's "one-click" as opposed to
11  "covert"?
12    MR. PEREZ-MARQUES:  Object to the
13  form.
14    THE WITNESS:  One-click, you have to
15  have someone click on the link on the device
16  and that would install the software on the
17  phone.
18    Covert, or zero-click, would
19  automatically install the software on the
20  device without the need of a click.
21  BY MR. AKROTIRIANAKIS:
22    Q.   Do you know whether there was a
23  covert vector for -- withdraw that.
24    Do you know whether there was a
25  covert vector for Pegasus for iOS before there

Page 300

1  was a covert vector for Pegasus for Android?
2    A.   Yeah, I believe the covert vector
3  for iOS came first before any sort of covert
4  vector for Android.
5    (Exhibit 1403, Installations,
6  SHANER_WHATSAPP_00001416, marked for
7  identification.)
8    Q.   This will be Exhibit 1403.  It's a
9  little bit hard to read.
10    But are you able to make out the --
11  in the fourth and fifth lines, there's a 202
12  number, and it looks like the name is Chris
13  McCloud?
14    A.   Yes.
15    Q.   This is -- is this a screen from the
16  user interface?
17    A.   Yes.
18    Q.   And is that Pegasus/Phantom?
19    A.   Yes.
20    Q.   Is -- who is Chris McCloud?  Is that
21  a real person?
22    A.   No, that's a name I made up.
23    Q.   For purposes of demonstrations?
24    A.   Yes.
25    Q.   What is the phone number that's --

Page 301

1  phone numbers that are associated to Chris
2  McCloud on this exhibit, Exhibit 1403?
3    A.   You want me to read them?
4    Q.   Well, I'll read them into the
5  record.
6    But I'm going to ask you whether
7  those were phones that were -- well, if you
8  know who owned those phone numbers.
9    So the first one is -- associated
10  with Chris McCloud is 1 (202) 695-4312.
11    Do you see that?
12    A.   Yes.
13    Q.   And who owned the phone number
14  1 (202) 695-4312?
15    A.   If it was in Pegasus, any 202 would
16  be a SIM card owned by WestBridge.
17    Q.   Okay.  And would the same be true of
18  the other number that we see, 1 (202) 713-0061?
19    A.   Yes.
20    Q.   And are those SIM cards or phone
21  numbers that you would use during your
22  demonstrations of --
23    A.   I don't recognize these phone
24  numbers.
25    But the 202 would be a WestBridge

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 334

1      THE REPORTER:  Do you need a copy at
2  all?
3      MR. AKROTIRIANAKIS:  I guess, yeah.
4  Can my secretary give you our order?
5  We have like a standard.  I just don't know.
6      THE REPORTER:  Yeah, I'll e-mail.
7      THE VIDEOGRAPHER:  Thank you.  We
8  are off the record at 1745 p.m. Eastern.
9      This concludes today's testimony
10  given by Josh Shaner.  The total number of
11  media units used is nine and will be retained
12  by Veritext.
13      (Deposition adjourned at 5:45 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 336

1  JOSEPH N. AKROTIRIANAKIS, ESQ.
2  jakro@kslaw.com
3              September 25, 2024
4  RE: WHATSAPP INC., et al. vs.
       NSO GROUP TECHNOLOGIES LTD. et al.
5  9/17/2024, Joshua Shaner (#6891978)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16      Return completed errata within 30 days from
17  receipt of testimony.
18      If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 335

1  District of Columbia, to wit:
2      I, Stacey L. Daywalt, a Notary
3  Public of the District of Columbia, do hereby
4  certify that the within-named witness remotely
5  appeared before me at the time and place herein
6  set out, and after having been duly sworn by
7  me, according to law, was examined by Counsel.
8      I further certify that the
9  examination was recorded stenographically by me
10  and this transcript is a true record of the
11  proceedings.
12      I further certify that I am not of
13  counsel to any of the parties, nor an employee
14  of counsel, nor related to any of the parties,
15  nor in any way interested in the outcome of
16  this action.
17      As witness my hand and Notarial Seal
18  this 18th day of September, 2024.
19
20
21  Stacey Dayt
22  Stacey L. Daywalt, Notary Public
23  My Commission Expires:   4/14/2026
24
25

Page 337

1  WHATSAPP INC., et al. vs.
       NSO GROUP TECHNOLOGIES LTD. et al.
2  9/17/2024 - Joshua Shaner (#6891978)
3          E R R A T A  S H E E T
4  PAGE____ LINE____ CHANGE_____
5  _____
6  REASON_____
7  PAGE____ LINE____ CHANGE_____
8  _____
9  REASON_____
10  PAGE____ LINE____ CHANGE_____
11  _____
12  REASON_____
13  PAGE____ LINE____ CHANGE_____
14  _____
15  REASON_____
16  PAGE____ LINE____ CHANGE_____
17  _____
18  REASON_____
19  PAGE____ LINE____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Joshua Shaner            Date
25

85 (Pages 334 - 337)

# EXHIBIT 30

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4    ------------------------------X
      WHATSAPP INC., a Delaware        )
 5    corporation, and FACEBOOK, INC., )
      a Delaware corporation,          )
 6                                     )
                      Plaintiffs,      )
 7                                     )  Case No.
          v.                           )
 8                                     )  4:19-CV-07123-PJH
      NSO GROUP TECHNOLOGIES LIMITED   )
 9    and Q CYBER TECHNOLOGIES         )
      LIMITED,                         )
10                                     )
                      Defendants.      )
11    ------------------------------X
12               **HIGHLY CONFIDENTIAL**
13                ATTORNEYS' EYES ONLY
14             VIDEOTAPED DEPOSITION OF
15            TERRENCE PATRICK DIVITTORIO
16      Wednesday, September 18, 2024; 9:33 a.m. EDT
17
18    Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
      CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
19    NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
      Court Reporter, NY Association Certified Reporter, OR
20    CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
      23005926, Remote Counsel Reporter, LiveLitigation
21    Authorized Reporter, Notary Public
22
```

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 86

1  offering me a very lucrative salary beyond what I
2  was making at VariQ.
3        Also, at that time at VariQ, VariQ
4  was on a track for acquisition, and so they were
5  not going to be -- and they were eventually
6  acquired by Capgemini, so I knew that there might
7  not be a long -- long runway at VariQ, so I
8  was -- I was open to job -- job opportunities.
9     Q.    You said that Westbridge was a
10  technology products company.
11        What products did Westbridge
12  produce?
13    A.    Westbridge didn't produce any
14  products.
15    Q.    None at all?
16    A.    None.  Not one.
17    Q.    During the -- how many years were
18  you there?
19    A.    Three.
20    Q.    During the three years and four
21  months, say, that you were there, did they
22  produce any -- any products at all?

Page 87

1     A.    No.
2     Q.    Not one?
3     A.    Not one.
4     Q.    Throughout that time, the three
5  years and four months, you continued to have
6  relationships and discussions with people at NSO
7  and Q Cyber; is that fair?
8     A.    Yes.
9     Q.    Was that on a daily basis?
10    A.    Daily basis, sure.
11    Q.    And just so I understand this --
12  and I apologize if I asked this, but I didn't
13  understand the answer -- what did you understand
14  the financing to be of Westbridge in terms of
15  capital or who was financing and how much?
16    A.    My understanding is that it was Q
17  that was financing Westbridge, because Westbridge
18  had not sold any products or capability to
19  generate revenue to be self-sustaining.
20    Q.    It was a start-up?
21    A.    It seemed like it was, yes.
22    Q.    I mean, it had three employees --

Page 88

1     A.    Um-hum.
2     Q.    -- so is it fair to say it was a
3  start-up?
4     A.    Not when I joined.  They were
5  already in place before I got there.
6     Q.    And what was happening before you
7  got there?
8     A.    I believe they were --
9        ATTORNEY AKROTIRIANAKIS:
10        Objection: no foundation.
11        THE WITNESS:  -- I believe they
12        were trying to sell with the -- with
13        Omrie and Oren Kaplan to the U.S. market.
14  BY ATTORNEY ANDRES:
15    Q.    Is it fair to say that when you
16  came in to take over as president, you did some
17  due diligence about what was -- what you were
18  taking over and --
19    A.    Of course.
20    Q.    -- and what was happening?
21    A.    Yes.
22    Q.    Explain that to me.

Page 89

1     A.    I met with ███████ and
2  ███████ several times to help me -- help --
3  help me understand, as their board member -- as
4  board members, what Westbridge was doing, what
5  Westbridge was responsible for, what my role and
6  responsibilities would be.
7     Q.    And what did they tell you?
8     A.    They said that it's a technology
9  product company that serves, they believe, the
10  U.S. intelligence community, Department of
11  Defense, Department of Homeland Security and
12  Federal law enforcement; and that they needed
13  someone with a background and relationships in
14  those markets.
15        They said that the company is
16  established, has -- has a certificate of
17  incorporation, all the other required
18  documentation to be an operating U.S. entity.
19  They said it was part of a larger family of
20  companies, and that's where the support for
21  infrastructure would come from: HR, accounting
22  and finance, and -- and funding to -- to fund

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 90

1 payroll.
2     Q.    What did they tell you about the
3 capital available to -- to Westbridge to convince
4 you that it wasn't some fly-by-night operation?
5     A.    Well, I -- I'd worked with████ in
6 the past and trusted his judgment.  And████████
7 is a very reputable former Department of Defense
8 individual.  So I asked them, you know, Is this a
9 six-month run?  A year run?  Did they have the
10 funds and the -- and the capability to support,
11 you know, what's going to take, in my opinion, 12
12 to 15 months to get this strategy that I wanted
13 to put in place launched?  And they said yes.
14     Q.    And what did you think the capacity
15 in terms of funding was to launch in 12 to
16 18 months?
17         ATTORNEY AKROTIRIANAKIS:
18         Objection: vague.
19         THE WITNESS:  I don't understand
20     the question.
21 BY ATTORNEY ANDRES:
22     Q.    What -- what -- what amount of

Page 91

1 money or capital did you think was necessary at
2 that time to continue the launch through 12 to
3 18 months?
4     A.    Not more than they were currently
5 funding.  I didn't need additional employees.
6 What I hired were two consultants who worked on a
7 small retainer but more of a commission or
8 success fee, so I didn't need more working
9 capital other than what was being already funded
10 for the company.
11     Q.    And what was that?
12     A.    Enough to cover payroll for myself,
13 Josh and Oren; enough to cover our
14 infrastructure, supplies, our office space, our
15 travel; and then outsourced 80P services for our
16 benefits and our insurance.
17     Q.    Is that a million dollars?
18     A.    I can't remember the number.
19     Q.    Was it more than 5 million?
20     A.    I don't remember the number.
21     Q.    You were the president of
22 Westbridge.

Page 92

1         You're not aware of what its
2 assets were, what its cash balance was, what
3 loans it had?
4     A.    It was --
5         ATTORNEY AKROTIRIANAKIS:
6         Objection: misstates his testimony.
7         THE WITNESS:  -- it was several
8     years ago.  I don't remember.
9 BY ATTORNEY ANDRES:
10     Q.    So at no time -- you don't
11 currently remember have [sic] been refreshed
12 about what the assets or cash available, capital
13 available to Westbridge was?
14         ATTORNEY AKROTIRIANAKIS:
15         Objection: misstates his testimony; it's
16     also a incomprehensible question.
17 BY ATTORNEY ANDRES:
18     Q.    I'm happy to have you clarify --
19     A.    I don't understand --
20     Q.    -- whatever --
21     A.    -- I don't understand the question.
22     Q.    Okay.  When you got to Westbridge,

Page 93

1 as the president, did you look at its books and
2 records?
3     A.    For our operating costs at
4 Westbridge?
5     Q.    Yes.
6     A.    Yes.
7     Q.    You did review that?
8     A.    Um-hum.
9     Q.    Did you meet with an accountant?
10     A.    No.
11     Q.    Okay.  What was your understanding
12 of Westbridge financial condition?
13         ATTORNEY AKROTIRIANAKIS:
14         Objection: vague.
15         THE WITNESS:  Again, meeting with
16     the Board, they assured me that through
17     the family of companies, that there would
18     be no issues with covering our costs,
19     meeting payroll; ensuring that if we had
20     growth requirements, they could be --
21     they could be met.
22

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 94

1  BY ATTORNEY ANDRES:
2      Q.   Did you file tax returns for
3  Westbridge?
4      A.   No.
5      Q.   Not at all?
6      A.   That was done in support from the
7  infrastructure folks at Q.  They hired attorneys
8  to do that with us.
9      Q.   And so you were the president of
10  Westbridge, but you had nothing to do with
11  reviewing its financial disclosures, tax
12  returns --
13      A.   No.
14      Q.   -- anything?
15      A.   No.
16          ATTORNEY AKROTIRIANAKIS:
17  Objection: it assumes facts not in
18  evidence --
19  BY ATTORNEY ANDRES:
20      Q.   Do you have any sense in terms of
21  the range --
22          ATTORNEY AKROTIRIANAKIS:  Hold on.

Page 95

1  I get to -- I get to interpose
2  objections, too.
3          -- it assumes facts not in
4  evidence; no foundation.
5          ATTORNEY ANDRES:  Which facts are
6  not in evidence?
7          ATTORNEY AKROTIRIANAKIS:  Hold on.
8  The transcript is coming in.
9          (Whereupon, counsel reviews the
10          material provided.)
11          ATTORNEY AKROTIRIANAKIS:  That
12  there were financial disclosures that
13  were required as an example of the fact
14  that you haven't elicited.
15  BY ATTORNEY ANDRES:
16      Q.   You said that Q Cyber filed tax
17  returns for Westbridge?
18          ATTORNEY AKROTIRIANAKIS:
19  Objection: misstates his testimony.
20          THE WITNESS:  I don't remember.
21  BY ATTORNEY ANDRES:
22      Q.   You don't remember who -- you don't

Page 96

1  remember --
2      A.   They --
3      Q.   Let me just finish the question.
4  I'm sorry.
5          -- you don't remember that
6  answer, or you don't remember who filed tax
7  returns for Westbridge?
8      A.   I remember that Q Cyber's finance
9  folks, with local attorneys, managed that for
10  Westbridge.
11      Q.   When you say "local attorneys,"
12  local to what jurisdiction?
13      A.   To Maryland, where we had our
14  offices.
15      Q.   There were people at -- from
16  Q Cyber that came to your offices in Maryland?
17      A.   No.  No.
18          ATTORNEY AKROTIRIANAKIS:
19  Objection: misstates his testimony.
20  BY ATTORNEY ANDRES:
21      Q.   When people from NSO and Q Cyber
22  were in the United States, did they come in your

Page 97

1  offices?
2      A.   Yes.
3      Q.   How frequently?
4      A.   Maybe quarterly.
5      Q.   When you say offices, can you
6  describe -- was it one office, two offices, five,
7  what was -- what was the physical layout?
8      A.   We had a reception area with some
9  couches and a desk and four -- I believe four
10  individual offices and a kitchen area --
11      Q.   Okay.  Who sat --
12      A.   -- and -- I'm sorry -- and -- and a
13  conference room.
14          I'm sorry.
15      Q.   -- who sat in those four offices?
16      A.   I sat in one; Oren Kaplan sat in
17  one; and Josh Shaner sat in one.
18      Q.   And what type of building was it
19  in?
20          In terms of an office building?
21      A.   Yes.
22      Q.   Do you remember what floor it was?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 98

1    A.    I believe it was the second floor.
2    Q.    Okay.  And what was the rent for
3  those facilities?
4    A.    I can't remember how much the rent
5  was.
6    Q.    Was it more than $10,000 --
7    A.    No, no --
8    Q.    -- a month?
9    A.    -- no, no.  No.
10    Q.    Less than $10,000 a month?
11    A.    Probably about -- I believe about
12  1,800 to $2,000 a month.
13    Q.    Okay.  And who paid for that rent?
14    A.    Q Cyber.
15    Q.    Okay.  Was computer equipment in
16  that -- in that facility?
17    A.    We had laptops.
18    Q.    Did you rent those or buy them?
19    A.    They were provided by Q Cyber.
20    Q.    Okay.  How about the office
21  furniture?  Did you buy or rent that?
22    A.    That was already in place when I

Page 99

1  arrived.  I'm not sure how they acquired it.
2    Q.    Did you have business cards made?
3    A.    Yes.
4    Q.    Who paid for the business cards?
5    A.    Q Cyber.
6    Q.    What else did Q Cyber pay for?
7    A.    Office supplies, kitchen supplies,
8  our travel, our payroll.
9    Q.    Is there anything related to
10  Westbridge that wasn't paid for by Q Cyber/NSO?
11        ATTORNEY AKROTIRIANAKIS:
12    Objection: assumes facts not in evidence;
13    also misstates his testimony.
14  BY ATTORNEY ANDRES:
15    Q.    I'm not trying to characterize your
16  testimony or state any other facts.  I'm asking
17  you whether or not there was anything related to
18  Westbridge that Q Cyber didn't pay for.
19        ATTORNEY AKROTIRIANAKIS:
20    Objection: vague.
21        THE WITNESS:  No.
22

Page 100

1  BY ATTORNEY ANDRES:
2    Q.    Okay.  Let's just take a break from
3  Westbridge for a second, finish out your -- your
4  employment history.
5        You left Westbridge at some
6  point?
7    A.    Yes.
8    Q.    By the way -- I'm sorry.  One other
9  question:  Where does the name Westbridge come
10  from?
11        ATTORNEY AKROTIRIANAKIS:
12    Objection: no foundation.
13        THE WITNESS:  I don't know.
14  BY ATTORNEY ANDRES:
15    Q.    You didn't -- you didn't create
16  that name?
17    A.    No, I did not.
18    Q.    Did any of the people on the Board
19  tell you what the name -- where the name came
20  from?
21    A.    No.
22    Q.    Was it near a bridge?

Page 101

1    A.    No.
2    Q.    West of a bridge?
3    A.    I don't know.
4    Q.    Anybody named Westbridge ever
5  associated with the entity?
6    A.    Not that I'm aware of.
7    Q.    Okay.  So as --
8        ATTORNEY AKROTIRIANAKIS:
9    Objection: no foundation.
10        ATTORNEY ANDRES:  Sorry.  Joe, go
11  ahead.
12        ATTORNEY AKROTIRIANAKIS:  -- no
13  foundation.
14        ATTORNEY ANDRES:  No foundation
15  for what?
16        ATTORNEY AKROTIRIANAKIS:  I don't
17  know I'm required to explain my
18  objections, but you asked him if anybody
19  named Westbridge was ever -- something
20  with the entity.
21        ATTORNEY ANDRES:  And what
22  foundation would be required to ask that

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 130

1    ATTORNEY AKROTIRIANAKIS:
2    Objection: vague.
3  BY ATTORNEY ANDRES:
4    Q.    In -- in terms of, like, money you
5  were paid, as opposed to equity or bonuses or --
6  was your -- was your base salary $250,000?
7    A.    Yes.
8    Q.    Okay.  Did you get any incentive
9  bonuses or any commissions, or anything along
10  those lines?
11    A.    An incentive bonus, yes.
12    Q.    What was your incentive bonus?
13    A.    I don't remember the exact amount,
14  but it was for developing and launching the new
15  U.S. market strategy, building a pipeline of
16  opportunities with potential customers.
17    Q.    And how much was it?
18    A.    I don't remember.
19    Q.    Was it more than $20,000?
20    A.    No.
21    Q.    Was it more than $10,000?
22    A.    I don't remember.

Page 131

1    Q.    And those bonuses came from
2  Q Cyber?
3    ATTORNEY AKROTIRIANAKIS:  Object
4  to the form of the question: assumes
5  facts not in evidence.
6    THE WITNESS:  No --
7    ATTORNEY ANDRES:  Just -- sorry --
8  to understand the objection so I can make
9  sure.
10    What -- what facts -- I just want
11  to make sure that the question is
12  appropriate.
13    Could you just articulate what
14  facts you have a concern about?
15    ATTORNEY AKROTIRIANAKIS:  Yeah.
16  You asked him:
17    "Question:  Did you get any
18    incentive bonuses?"
19    He said:
20    "Answer:  An incentive
21    bonus."
22    And now you're talking about

Page 132

1  incentive bonuses.
2    ATTORNEY ANDRES:  Okay.
3  BY ATTORNEY ANDRES:
4    Q.    Did you receive more than one
5  incentive bonus?
6    A.    No.
7    Q.    For the one incentive bonus that
8  you received, was that paid by Q Cyber?
9    ATTORNEY AKROTIRIANAKIS:
10    Objection: no foundation.
11    THE WITNESS:  No; Westbridge.
12  BY ATTORNEY ANDRES:
13    Q.    And how do you know that Westbridge
14  paid that?
15    A.    It was in a -- it was in a -- my
16  payroll check.
17    Q.    Okay.  You testified earlier that
18  Q Cyber funded Westbridge and -- is that right?
19    ATTORNEY AKROTIRIANAKIS:
20    Objection: misstates his testimony.
21    THE WITNESS:  Westbridge had its
22    own bank account, its own banking

Page 133

1    services.  Our payroll was paid from that
2    bank account.
3    Q Cyber would put money in that
4    bank account, but all of our pay -- all
5    of our funding that we used locally was
6    in our Westbridge bank account.
7  BY ATTORNEY ANDRES:
8    Q.    The money in the bank account that
9  Westbridge used to pay salaries came from
10  Q Cyber, right?
11    A.    Some -- one of the parent -- one of
12  the many companies that our -- from one of those
13  companies in the hierarchy of companies in the
14  family.
15    Q.    So that would have been Q Cyber or
16  NSO?
17    A.    Not NSO.  Q Cyber or S.á.r.l --
18    Q.    Orally -- OSY?
19    A.    O- -- OS- -- OSY.
20    Q.    Okay.  So those were the two
21  companies that would put money in -- in
22  Westbridge's bank account?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 134

1    A.    I believe so.
2    Q.    Okay.  You said that one of the --
3  your concerns -- or one of the things that led
4  you to leave Westbridge was this lawsuit that
5  Meta and WhatsApp have filed, and you testified
6  that you had discussions with the board about
7  that.
8            Can you explain what
9  discussions you had with the board relating to
10  the lawsuit?
11        ATTORNEY AKROTIRIANAKIS:
12        Objection: misstates his testimony.
13        THE WITNESS:  I remember meeting
14        with ▓▓▓▓▓ once and at another time
15        with both ▓▓ and ▓ to share with them
16        my concerns that this was another in a
17        series of bad press articles that could
18        impact prospects and our potential sales
19        and that I believe it was going to be
20        more difficult to get appointments, to
21        get meetings, to engage new customers.
22

Page 135

1  BY ATTORNEY ANDRES:
2    Q.    And what was his response?
3    A.    It -- I remember ▓▓▓▓ saying, Yes,
4  this -- this may make it harder, but we need to
5  continue working to close these deals, that --
6  you know, work through it like you have in the
7  past with the 60 Minutes story, with the
8  Khashoggi story, keep us apprised of any contacts
9  from customers or partners that you hear about.
10        But they understood that that --
11  that was creating more challenges.
12    Q.    Did you have any other discussions
13  with ▓▓▓▓▓▓
14    A.    No, not that I recall.
15    Q.    Did you and Mr. ▓▓▓ discuss at
16  any time the substance of the -- of the
17  allegations in the lawsuit?
18    A.    No.
19    Q.    And what about with Mr. ▓▓▓▓
20    A.    No.
21    Q.    Did you have any discussions at all
22  with Mr. ▓▓▓▓

Page 136

1    A.    Not individually --
2    Q.    Yeah.
3    A.    -- I met with him when I met with
4  Dave ▓▓▓▓  And, again, the discussion was
5  around the impact on potential prospects; current
6  sales opportunities in the pipeline; the fact
7  that, you know, we all knew it was difficult
8  already to sell foreign technology into the
9  U.S. Government market, but this was creating
10  even more challenges.
11    Q.    So did either you, anybody on the
12  board or anybody at Westbridge do any
13  investigation as to the validity of the
14  allegations in the lawsuit?
15    A.    No.
16        ATTORNEY AKROTIRIANAKIS:  No
17        foundation.
18  BY ATTORNEY ANDRES:
19    Q.    And as you sit here today, you have
20  no understanding of whether or not those
21  allegations are true or not?
22        ATTORNEY AKROTIRIANAKIS:  No

Page 137

1        foundation.
2        THE WITNESS:  I don't understand
3        the question.
4  BY ATTORNEY ANDRES:
5    Q.    I think you described that your
6  concern with respect to the Meta lawsuit was the
7  press; is that right?
8    A.    Yes.
9    Q.    Were you also concerned about the
10  actual allegations that -- that made up the
11  lawsuit?
12        ATTORNEY AKROTIRIANAKIS:  No
13        foundation.
14        THE WITNESS:  No.
15  BY ATTORNEY ANDRES:
16    Q.    Did you do anything to investigate
17  whether or not those allegations were true or
18  not?
19    A.    No.
20    Q.    Did you have any concerns about
21  whether Westbridge was selling products from NSO
22  that were engaged in conduct that violated the

35 (Pages 134 - 137)

Page 162

1    A.    No.
2    Q.    And you mentioned that Pegasus is
3 used for -- to target certain phones.
4          Have you done demonstrations of
5 -- of Pegasus for clients?
6    A.    No, I have not.
7    Q.    And can you explain specifically
8 how it works?
9    A.    No, I cannot.
10    Q.    Do you know if it involves an
11 installation vector?
12    A.    I've heard that term, but I don't
13 know how that works.
14    Q.    Okay.  When you were explaining the
15 use of Pegasus to your clients in the
16 United States, how did you explain it?
17    A.    That it was a technology that would
18 allow you to find a target's phone, acquire the
19 target's phone and exfiltrate information off the
20 phone.  If they wanted more information, then I
21 would bring Josh in to have a technical
22 discussion about how the system worked.

Page 163

1    Q.    Josh Shaner?
2    A.    Yes.
3    Q.    And would you ever rely on
4 technical advice from people at NSO with respect
5 to your clients?
6    A.    No.
7    Q.    So you never put -- put somebody
8 from -- one of your clients in touch with anyone
9 at NSO to explain the technology?
10    A.    No, not directly.
11          There were clients here in the U.S.
12 who requested deeper technical knowledge than
13 Josh Shaner had --
14    Q.    Okay.
15    A.    -- and they would come from Israel
16 to meet with us and those clients.
17    Q.    And some of the capacity of -- of
18 Pegasus to obtain information involved the
19 infiltration into unauthorized servers; is that
20 correct?
21    A.    I have no idea.
22    Q.    You -- you don't know whether or

Page 164

1 not Pegasus operated through unauthorized access?
2    A.    No, I do not know.
3    Q.    As you sit here today, you don't
4 know that Pegasus, to operate, infiltrated Meta
5 servers or WhatsApp servers?
6    A.    I don't know.
7          ATTORNEY AKROTIRIANAKIS:
8    Objection.  The question is vague and
9    assumes facts not in evidence.
10 BY ATTORNEY ANDRES:
11    Q.    And based on your long-standing
12 work in this cybersecurity community, are you --
13 did you ever have a concern that if Pegasus is
14 operating through unauthorized access, that that
15 would involve illegal conduct?
16          ATTORNEY AKROTIRIANAKIS:
17    Objection: incomplete hypothetical; also,
18    it assumes facts not in evidence; no
19    foundation.
20          THE WITNESS:  I did not know
21    Pegasus was operating in an unauthorized
22    manner.

Page 165

1 BY ATTORNEY ANDRES:
2    Q.    Pegasus has the ability to capture
3 encrypted messages off communication
4 applications, right?
5          ATTORNEY AKROTIRIANAKIS:
6    Objection: no foundation; also misstates.
7          THE WITNESS:  It's one of the
8    features of the -- of the system.
9 BY ATTORNEY ANDRES:
10    Q.    It's an important feature, correct?
11    A.    To some customers, it was an
12 important feature.
13    Q.    Sure.  And do you have any
14 knowledge as to whether when Westbridge sells
15 Pegasus to have encrypted messages captured, that
16 that potentially violates the law?
17          ATTORNEY AKROTIRIANAKIS:
18    Objection: misstates --
19          THE WITNESS:  I don't know.
20          ATTORNEY ANDRES:  Hold on --
21 BY ATTORNEY ANDRES:
22    Q.    You don't know --

42 (Pages 162 - 165)

Page 190

1    THE WITNESS: No.
2 BY ATTORNEY ANDRES:
3    Q.    What was E-Tel?
4    A.    Oh, I apologize. E- -- E-Tel was
5 a -- a reseller partner.
6    Q.    And who worked at E-Tel?
7    A.    Mark Deyle.
8    Q.    Yeah.
9        What about Compass?
10    A.    No.
11    Q    And what is a -- what is a -- in
12 what fashion did E-Tel operate as a reseller?
13        ATTORNEY AKROTIRIANAKIS: Object
14    to the form of the question.
15        THE WITNESS: They facilitated
16    meetings with contacts they had in the
17    U.S. Government.
18 BY ATTORNEY ANDRES:
19    Q.    And you're not familiar with
20 Compass Stratagem?
21    A.    Yes, I am.
22    Q.    Who's that?

Page 191

1    A.    That's Greg Rose's company.
2    Q.    And they were a reseller?
3        ATTORNEY AKROTIRIANAKIS: Object
4    to the form -- well, go ahead.
5        THE WITNESS: No.
6 BY ATTORNEY ANDRES:
7    Q.    Were they an agent of Westbridge?
8    A.    They were a consultant.
9    Q.    And what did they do in terms of
10 consultant?
11    A.    Set up meetings with contacts they
12 had in U.S. Government agencies.
13    Q.    How did Compass Stratagem as a
14 consultant -- how did their role differ from
15 E-Tel as a reseller?
16    A.    E-Tel had contracting vehicles or
17 existing contracts with Government agencies for
18 which their contacts could acquire technologies.
19        Compass was a single propriety
20 consultancy.
21    Q.    How were resellers compensated?
22    A.    Through commissions or success

Page 192

1 fees.
2    Q.    And who paid those commissions or
3 success fees?
4    A.    Westbridge.
5    Q.    And where did Westbridge get the
6 financing to pay those commissions or success
7 fees?
8    A.    From the revenue that was generated
9 from the sale and then paid from OSY or Q into
10 the Westbridge account.
11    Q.    So Q had some role in compensating
12 the resellers?
13        ATTORNEY AKROTIRIANAKIS:
14    Objection: misstates his testimony; no
15    foundation.
16        THE WITNESS: Again, funding from
17    the -- one of the companies -- OSY, Q --
18    into the Westbridge account. And then
19    Westbridge ended up -- ended up paying
20    the consultants and the reseller fees.
21 BY ATTORNEY ANDRES:
22    Q.    So in that regard, Westbridge was a

Page 193

1 pass-through for the payment from Q Cyber or
2 somebody in Israel to the reseller?
3        ATTORNEY AKROTIRIANAKIS: Object
4    to the form of the question -- questions,
5    really: no foundation; also calls for a
6    legal conclusion.
7        THE WITNESS: Again, Westbridge
8    paid the consultants and the resellers.
9        The consultants had retainers.
10    The resellers were based on a commission
11    or success fee.
12 BY ATTORNEY ANDRES:
13    Q.    What about the revenue from these
14 sales? Did that go to Q Cyber?
15        ATTORNEY AKROTIRIANAKIS: Object
16    to the form of the question.
17        THE WITNESS: I believe so, yes.
18 BY ATTORNEY ANDRES:
19    Q.    And just to be clear about the
20 payment of the resellers, the money -- there are,
21 say, two transactions. The money goes from
22 Q Cyber to Westbridge. That's Transaction 1.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 198

1  not approved any payment.  I plan to meet them
2  again in two weeks and bring this up again.
3              That's an e-mail that you
4  wrote.
5              Do you see that?
6      A.    Yes.
7      Q.    When you write, "Management still
8  has not approved this payment," what do you mean
9  by that?
10     A.    The Westbridge board.
11     Q.    Okay.  And do you -- do you have
12  a -- aware that there was a planned meeting two
13  weeks later with the Westbridge board?
14     A.    I was hoping to meet with them
15  again in two weeks.
16     Q.    Okay.  If you go back to this
17  second -- the first page -- the back of the first
18  page says 5203.  Now we're in December,
19  December 24, 2019, and you're writing back to
20  Mark and also somebody named Gerry Burke.
21              It says -- he had asked you
22  about the status, and you write, Unfortunately,

Page 199

1  no, Mark, no updates.  I was at our overseas
2  headquarters this past week and inquired to the
3  status of payment and was told that payment
4  consideration was now with our newly hired
5  general counsel.
6              Do you see that?
7      A.    Yes.
8      Q.    Westbridge Technologies does not
9  have an overseas headquarters, does it?
10     A.    No, it does not.
11     Q.    That reference to overseas
12  headquarters is a reference to NSO or Q Cyber,
13  correct?
14     A.    Yes.
15     Q.    Okay.  And then it says, [as read]
16  Inquired the status of the payment and told that
17  payment consideration was now done newly hired
18  general counsel.
19              Do you see that?
20     A.    Yes.
21     Q.    Did Westbridge -- Westbridge
22  Technologies ever have a general counsel?

Page 200

1      A.    No.
2      Q.    That is a reference to newly hired
3  general counsel at NSO, correct?
4              ATTORNEY AKROTIRIANAKIS:
5      Objection: no foundation.
6              THE WITNESS:  I don't know if it
7      was NSO or Q Cyber.
8  BY ATTORNEY ANDRES:
9      Q.    And so the payments that were going
10  to E-Tel were coming from NSO and Q Cyber; is
11  that correct?
12              ATTORNEY AKROTIRIANAKIS:
13      Objection: leading; no foundation.
14              THE WITNESS:  No; they were
15      being -- they were going to be made from
16      Westbridge, but Westbridge had to receive
17      the money from OSY or Q.
18  BY ATTORNEY ANDRES:
19     Q.    As a pass-through?  Westbridge was
20  a pass-through in that regard?
21              ATTORNEY AKROTIRIANAKIS:
22      Objection to the form of the question.

Page 201

1              THE WITNESS:  Yes.
2  BY ATTORNEY ANDRES:
3      Q.    Okay.  You can put that aside.
4  Thank you.
5              Westbridge was located in
6  Maryland, correct?
7      A.    Yes.
8      Q.    And who chose to put the company in
9  -- in West -- in -- in -- in Maryland in
10  Bethesda?
11     A.    It was there before I started.
12              ATTORNEY AKROTIRIANAKIS:  Object
13      to the form of the question; no
14      foundation; also --
15  BY ATTORNEY ANDRES:
16     Q.    Fair to say you had --
17              ATTORNEY ANDRES:  Sorry.
18              ATTORNEY AKROTIRIANAKIS:  -- also
19      misstates the testimony.
20  BY ATTORNEY ANDRES:
21     Q.    -- fair to say you had no role in
22  deciding where the Westbridge offices would be?

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 210

```
1          ATTORNEY AKROTIRIANAKIS:  Do you
2    want to break for lunch, Greg?
3          Are you done with this document?
4          ATTORNEY ANDRES:  Sure.
5          Does that work?
6          THE WITNESS:  Sure.
7          ATTORNEY ANDRES:  Okay.
8          THE VIDEOGRAPHER:  The time is
9    12:45 p.m.  We're going off the record.
10         --oOo--
11         (Whereupon, at 12:45 p.m. EDT, a
12            luncheon recess was taken.)
13         --oOo--
14
15
16
17
18
19
20
21
22
```

Page 211

```
1    A F T E R N O O N      S E S S I O N
2              (1:40 p.m. EDT.)
3         --oOo--
4       TERRENCE PATRICK DIVITTORIO,
5    was called for continued examination and, after
6    having been previously duly sworn by the certified
7    stenographer to tell the truth, the whole truth and
8    nothing but the truth, was examined and testified
9    further as follows:
10        --oOo--
11        THE VIDEOGRAPHER:  The time is
12   1:40 p.m.  We're going back on the
13   record.
14        Please proceed, Counsel.
15        --oOo--
16   EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFFS
17        --oOo--
18   BY ATTORNEY ANDRES:
19   Q.   Mr. DiVittorio, earlier, you
20   testified that if there were questions from your
21   client's --
22        CERTIFIED STENOGRAPHER:  Excuse
```

Page 212

```
1    me.  I think you don't have your mic on.
2          ATTORNEY ANDRES:  Yes.  Thank you.
3    BY ATTORNEY ANDRES:
4    Q.   -- Mr. DiVittorio, earlier, you
5    testified that if clients had technical questions
6    that you couldn't answer and required deeper
7    technical people, that there were people from NSO
8    that would come from Israel.
9          Do you remember that testimony?
10   A.   Yeah --
11         ATTORNEY AKROTIRIANAKIS:
12   Objection: misstates his testimony.
13         THE WITNESS:  -- yes.
14   BY ATTORNEY ANDRES:
15   Q.   So I have two questions:  One, what
16   clients require more technical people to come
17   from Israel; and, Two, Who would come to Israel
18   to address those technical issues?
19   A.   One client was the FBI; another
20   client was U.S. Cyber Command.
21         I think those are the only two.
22   Q.   And who from Israel came to provide
```

Page 213

```
1    the technical information?
2    A.   ██████████ would come and the CTO,
3    a guy named ████████ I don't know his last
4    name.
5          Another engineer, presales
6    engineer, named ███████████ He came one time.
7          Another engineer named
8    ████████████████
9    Q.   And they were from NSO?
10   A.   Yes.
11   Q.   Okay.  And what were their roles at
12   NSO?
13   A.   So ██ was the CTO, chief
14   technology officer; ████████████████ were
15   presales engineers.
16   Q.   Did you say -- I might have
17   missed -- did you say ██ also came over?
18   A.   ███
19   Q.   ████████████████?
20   A.   I believe that's how you say it.
21   Q.   And he -- he -- or she also came
22   over to the United States?
```

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 214

1    A.    Yes, he did.
2    Q.    To provide technical information?
3    A.    Yes.
4    Q.    And his or her -- is it a him or a
5    her?
6    A.    It's a him.
7    Q.    His nickname was ███████
8    A.    ████
9    Q.    ████ Okay.  Thank you.
10         Okay.  Can I -- you testified
11   earlier about the level of detail that you were
12   aware of in terms of Pegasus and how you
13   described that to your clients.
14         Do you remember that?
15   A.    Yes.
16   Q.    Did you ever ask for additional
17   training from NSO about the details of Pegasus?
18   A.    No.
19   Q.    Never?
20   A.    Never.
21         ATTORNEY ANDRES:  Can I get
22   Tab 44?

Page 215

1         --oOo--
2    (Deposition Exhibit Number 2076,
3         WhatsApp chat, Bates stamped
4         DIVITTORIO_WHATSAPP_00000055
5         through
6         DIVITTORIO_WHATSAPP_00000057,
7         marked for identification, as of
8         this date.)
9         --oOo--
10   BY ATTORNEY ANDRES:
11   Q.    I'm showing you Exhibit 2076.
12        ATTORNEY ANDRES:  Do you have a
13   copy for Joe?
14   BY ATTORNEY ANDRES:
15   Q.    This is a series of text messages,
16   Mr. DiVittorio, between you and ███████
17   Please take a look and read whatever you want.
18   I'm going to ask you a series of questions.
19        (Whereupon, the witness reviews
20         the material provided.)
21   BY ATTORNEY ANDRES:
22   Q.    Have you had a chance to take a

Page 216

1    look at it?
2    A.    Yes.
3    Q.    So this is a WhatsApp communication
4    between you and ███████ on November 20th,
5    2018.
6         Do you see that?
7    A.    Yes.
8    Q.    If you look at the first entry at
9    14:09:30, ████ writes, Hi.  Are you planning to
10   come to Israel?  If so, please send purpose and
11   agenda first.  Any development with FOSIL?
12        Do you see that?
13   A.    Yes.
14   Q.    "FOSIL" is a -- is a reference to
15   the FBI; is that correct?
16   A.    Yes.
17   Q.    It's a code name?
18   A.    Yes.
19   Q.    In the next -- in response,
20   six minutes or so later, you write, Hi ████
21   Yes.  Purpose is, 1), conduct internal kickoff
22   meeting for DACIA with ███████

Page 217

1         Do you see that?
2    A.    Yes.
3    Q.    What is DACIA, and who is ████ and
4    ████
5    A.    DACIA is the code name for the
6    country for which CIA was going to provide
7    Pegasus.
8    Q.    And what country is that?
9    A.    Djibouti.
10   Q.    And who's ███████
11   A.    ███████ were the engineers
12   who were going to be installing the system in
13   Djibouti.
14   Q.    And then you write, Number 2),
15   receive PGSS 3 demonstration training for
16   upcoming U.S. Cyber Command demonstration 7
17   December.
18        Do you see that?
19   A.    Yes.
20   Q.    "PGSS 3" is Pegasus?
21   A.    Yes.
22   Q.    And this reflects that you're

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 246

1    Do you see that?
2    A.    Yes.
3    Q.    What does that relate to?
4    A.    I don't remember.
5    Q.    But it relates to selling Pegasus
6 for a reduced price; is that fair?
7    A.    Yes.
8    Q.    And you only had two Pegasus
9 customers in the United States; is that correct?
10    A.    Yes.
11    Q.    So is it fair to say this relates
12 either to the FBI or the CIA?
13        ATTORNEY AKROTIRIANAKIS:
14    Objection: no foundation; also misstates
15    the document.
16        THE WITNESS:  No.  It could be any
17    number of prospective customers.
18 BY ATTORNEY ANDRES:
19    Q.    Understood.
20        --oOo--
21        (Deposition Exhibit Number 2083,
22        WhatsApp chat, Bates stamped

Page 247

1        DIVITTORIO_WHATSAPP_00000017
2        through
3        DIVITTORIO_WHATSAPP_00000019,
4        marked for identification, as of
5        this date.)
6        --oOo--
7 BY ATTORNEY ANDRES:
8    Q.    Let me show you Exhibit 2083.
9        THE WITNESS: I'm sorry.
10        ATTORNEY AKROTIRIANAKIS:  Thank
11    you.
12 BY ATTORNEY ANDRES:
13    Q.    Okay.  This is a -- an e-mail --
14 I'm sorry -- this is a WhatsApp message between
15 you and ██████ on April 10th, 2018.
16        Do you see in the first
17 message, you say, Hey man, Can we chat in two
18 hours about new thoughts on the Cyber Command
19 700,000 K deal I have?
20        Do you see that?
21    A.    Yes.
22    Q.    Who does that refer to?

Page 248

1    A.    That refers to an opportunity with
2 Cyber Command for a limited proof of concept that
3 we were pursuing.
4    Q.    And then in 10:38 -- 36:39, you
5 say, Okay.  Let's do it after the call with
6 ██████
7 ██████ a reference to the
8 FBI; is that correct?
9    A.    No.  That's a sales representative
10 in Israel.
11    Q.    Okay.  And then it says, How did
12 ██████ react?
13        Do you see that?
14    A.    Yes.
15    Q.    And ██████ writes, So so . . .but I
16 think we can get her to agree.  What we need is
17 exact details of who the customer is, where he is
18 going to use it and our side of a conditions to
19 this very low price.
20        Do you see that?
21    A.    Yes.
22    Q.    That message from ██████ suggests or

Page 249

1 implies that you need the permission of ██████ to
2 sell to a particular customer and know where
3 they're going to use it; is that correct?
4        ATTORNEY AKROTIRIANAKIS:  Object
5    to the form of the question: it misstates
6    the document; also misread the document;
7    no foundation.
8        THE WITNESS:  No.  And ██████ would
9    make recommendations on whether or not
10    they would impact the -- or devalue sale
11    prices for other customers.  So ██████ was
12    worried that if we sell it -- sold it to
13    Cyber Command for 700,000, that every
14    other customer in the U.S. would want it
15    for 700,000.
16 BY ATTORNEY ANDRES:
17    Q.    But in either case, she had a --
18 you were -- she was inputting as to whether the
19 price and customer were appropriate?
20        ATTORNEY AKROTIRIANAKIS:  Object
21    to the form of the question: misstates
22    the testimony and the document.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 250

1    THE WITNESS:  No.  She would only
2    recommend whether she thought it would
3    be -- devalue the price for other
4    customers and also impact outside the
5    U.S. sales if there were any
6    collaboration between U.S. Government
7    agencies and Five Eye customers or other
8    customers around the world.
9    BY ATTORNEY ANDRES:
10    Q.    Where -- where is there some
11    reference to Five Eyes?
12    A.    There isn't.  This is what I
13    remember and what I know from conversations.
14    Q.    And this -- but this is explicitly
15    talking about approval; isn't that correct?
16    ATTORNEY AKROTIRIANAKIS:  Object
17    to the form of the question: it misstates
18    the document.
19    THE WITNESS:  Again, if -- it was
20    more around her recommendation and
21    whether we should move forward with this
22    or not and the impact of the overall

Page 251

1    business.
2    BY ATTORNEY ANDRES:
3    Q.    Okay.  You can put that aside.
4    ATTORNEY ANDRES:  Tab 50.
5    --oOo--
6    (Deposition Exhibit Number 2084,
7    Westbridge Price Quote, Pegasus,
8    Landmark and PiXcell, September
9    3, 2018, Bates stamped
10    DIVITTORIO_WHATSAPP_00000078
11    through
12    DIVITTORIO_WHATSAPP_00000093,
13    marked for identification, as of
14    this date.)
15    --oOo--
16    BY ATTORNEY ANDRES:
17    Q.    I'm showing you Exhibit 2084, which
18    is a document --
19    ATTORNEY AKROTIRIANAKIS:  Can you
20    hand that?
21    BY ATTORNEY ANDRES:
22    Q.    -- Bates Number

Page 252

1    DIVITTORIO_WHATSAPP00000078.
2    I'm just going to ask you to
3    look inside the front page.  There's a cus- --
4    customer reference that says, Dear Mr. Cibas --
5    or Cibas -- I may be -- C-I-B-A-S -- and it's --
6    there's a signature block for you.
7    Who is that?
8    A.    Oh.  He's a special agent with
9    the -- the Drug Enforcement Agency, DEA.
10    Q.    Okay.  And the first page ref- --
11    reflects that this is a price quote for Pegasus,
12    Landmark and PiXcell to the DEA?
13    A.    Um-hum.
14    Q.    Okay.  Put that aside.
15    ATTORNEY ANDRES:  Forty-two --
16    Tab 42.
17    --oOo--
18    (Deposition Exhibit Number 2085,
19    WhatsApp chat, Bates stamped
20    COMPASS_WHATSAPP_00000264, marked
21    for identification, as of this
22    date.)

Page 253

1    --oOo--
2    BY ATTORNEY ANDRES:
3    Q.    Showing you Exhibit 2085.
4    Take a look at this.  This is
5    communications between you and Greg Rose from
6    November 11th, 2018.
7    Do you see that?
8    A.    Yes.
9    Q.    At 4:48:08, you write, Been working
10    most of the day. . . closed to CIA deal, $4
11    million.
12    What does that refer to?
13    A.    The -- the CIA deal --
14    Q.    And it was --
15    A.    -- sale to the CIA.
16    Q.    -- and it was $4 million?
17    A.    Yes.
18    Q.    And then two down, at 4:58:16, it
19    says, So with that and FBI, 7.6 million closed.
20    Do you see that?
21    A.    Yes.
22    Q.    What does that refer to?

64 (Pages 250 - 253)

Page 262

1  be able to ask a question like "Any other
2  thoughts?" if we were in court, which we
3  are.
4          So why don't you ask a question
5  that you would ask in court?  And then
6  the witness can answer.
7  BY ATTORNEY ANDRES:
8      Q.   Mr. DiVittorio --
9          ATTORNEY ANDRES:  Are you
10 finished?
11 BY ATTORNEY ANDRES:
12     Q.   -- I'm asking if you have any other
13 thoughts about the text at 15:17:01.
14     A.   No.
15         ATTORNEY ANDRES:  Tab 10.
16     Okay.  I gotcha.
17     What about this document?
18     (Sotto voce discussion between
19     co-counsel.)
20 BY ATTORNEY ANDRES:
21     Q.   I'm going to show you a document,
22 2087.

Page 263

1          --oOo--
2  (Deposition Exhibit Number 2087,
3  Letter, Bates stamped
4  DIVITTORIO_WHATSAPP_00000132,
5  marked for identification, as of
6  this date.)
7          --oOo--
8          ATTORNEY ANDRES:  It's -- it's the
9  same piece of paper.
10 Doesn't it come with that?
11     (Sotto voce discussion between
12     co-counsel.)
13         ATTORNEY ANDRES:  Give me that
14 one, too.  Mark it separately.
15 BY ATTORNEY ANDRES:
16     Q.   Take a look that.  I'm going to
17 show you another related document.
18     A.   Does Joe get one?
19     Q.   Yeah.
20         --oOo--
21 (Deposition Exhibit Number 2088,
22 End Use/User Certificate, Bates

Page 264

1  stamped
2  DIVITTORIO_WHATSAPP_00000131,
3  marked for identification, as of
4  this date.)
5          --oOo--
6  BY ATTORNEY ANDRES:
7      Q.   I'm going to also show you 2- --
8  2088.
9          The first document is a -- is a
10 letter from the FBI on December 4th, 2018 to the
11 State of Israel, Ministry of Defense, certifying
12 that a Delaware company is authorized to purchase
13 Pegasus on its behalf.
14         Do you see that?
15     A.   Yes.
16     Q.   Is this the sale of Pegasus to the
17 FBI that you were involved in?
18     A.   Yes.
19     Q.   And the second document, 2088, is
20 -- looks like a Defense Export Control
21 certificate.
22         Do you see that?

Page 265

1      A.   Yes.
2      Q.   And the signature of the cosignee
3  is Steven Pandelides, who's a section chief.
4          Do you see that?
5      A.   Yes.
6      Q.   And that is the same name on the
7  letter in 2087.
8          Do you see that?
9      A.   Yes.
10     Q.   And the date of the letter is
11 December 4th, 2018, and the date of the letter is
12 December 7th, '18.
13         Do you see that?
14     A.   Yes.
15     Q.   And with respect to the export
16 license, who secured that?
17         ATTORNEY AKROTIRIANAKIS:  Object
18 to the form of the question.
19         THE WITNESS:  I don't understand
20 the question.
21 BY ATTORNEY ANDRES:
22     Q.   Did somebody -- you were involved

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 274

1    A.    Yes.

2    Q.    Did Westbridge have its own bank

3    account?

4    A.    Yes.

5    Q.    And you mentioned previously that

6    ████et was a member of Westbridge's board of

7    directors.

8          Did Westbridge have other

9    members of its board of directors?

10    A.    Yes.

11    Q.    And I believe you testified to the

12    other gentleman as ████████?

13    A.    Yes.

14    Q.    Westbridge was organized under the

15    laws of some state in the United States?

16    A.    Yes.

17    Q.    And do you remember which one?

18    A.    Delaware.

19    Q.    Did Westbridge have its own annual

20    operating budget?

21    A.    Yes.

22    Q.    And who would -- who would draft

Page 275

1    that budget?

2    A.    I would draft it and share with the

3    board of directors.

4    Q.    And who would approve the budget

5    that you drafted and shared with the board of

6    directors?

7    A.    The board.

8    Q.    What sorts of items would be paid

9    out of Westbridge's annual operating budget?

10    A.    Our payroll, our health insurance,

11    our 401(k), our rent space, any administrative

12    office supplies, taxes, any printing or marketing

13    materials that we needed to generate, conferences

14    or expo fees, travel.

15    Q.    Does Westbridge have its own

16    accountants and lawyers local here in -- in

17    either Maryland or Virginia?

18    A.    No.

19    Q.    I want to show you an exhibit that

20    was previously marked as Exhibit 2009.

21

22

Page 276

1          --oOo--

2          (Deposition Exhibit Number 2009

3          was previously marked for

4          identification and handed to the

5          witness.)

6          --oOo--

7          ATTORNEY AKROTIRIANAKIS:  Thank

8    you.

9          ATTORNEY ANDRES:  I'm trying to

10    avoid the camera.  It's not a great look.

11    BY ATTORNEY AKROTIRIANAKIS:

12    Q.    Now, during your direct

13    examination, you testified to a -- a company

14    called Francisco Partners.

15          Do you recall that testimony?

16    A.    Yes.

17          ATTORNEY ANDRES:  Object.  Before

18    we get to the document, I'll just ask --

19    this doesn't have a Bates number.

20          Was it produced, or where does it

21    come from?

22          ATTORNEY AKROTIRIANAKIS:  Yeah, it

Page 277

1    was previously marked as Exhibit 2009.

2          ATTORNEY ANDRES:  Okay.  Thank

3    you.

4    BY ATTORNEY AKROTIRIANAKIS:

5    Q.    You understood that Francisco

6    Partners was a -- was an investor in one of the

7    family of companies?

8    A.    My understanding was that they

9    acquired NSO and Circles.

10    Q.    And did you understand that they

11    had acquired 100 percent or some other percentage

12    of -- or some lesser percentage of -- of some of

13    these related entities?

14    A.    I believe it was a lesser

15    percentage than 100, but I can't be sure what the

16    number was.

17    Q.    Okay.  Do you know what the name of

18    the holding company was that held the -- the

19    shares to the -- to the entity that was acquired

20    -- majority acquired by Francisco Partners?

21    A.    I don't remember.

22    Q.    Okay.  Do you know where that

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 342

1    I, Cindy L. Sebo, Nationally Certified Court
2  Reporter herein, do hereby certify that the foregoing
3  deposition of TERRENCE PATRICK DIVITTORIO was taken
4  before me pursuant to notice at the time and place
5  indicated; that said witness duly swore to tell the
6  truth, the whole truth, and nothing but the truth
7  under penalties of perjury; that said testimony of
8  witness was correctly recorded to the best of my
9  abilities in machine shorthand, thereafter
10 transcribed under my supervision with computer-aided
11 transcription; that deposition is a true and accurate
12 record of the testimony given by the witness; that I
13 am neither counsel, nor kin to any party in said
14 action, nor interested in the outcome; and that a
15 copy of this transcript obtained from a source other
16 than the court reporting firm, including an adversary
17 or co-counsel in the matter, is uncertified and may
18 not be used

19  _____

    CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
20   RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
    NJ Certified RT 30XR00019500, NM CSR 589, NY
21   Realtime Court Reporter, NY Association Certified
    Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778,
22   WA CSR 23005926, Notary Public

Page 343

1  JOSEPH AKROTIRIANAKIS, ESQ.
2  jakro@kslaw.com
3              September 26, 2024
4  RE: WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
5    9/18/2024, Terrence Patrick Divittorio (#6891990)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16   Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21        Yours,
          Veritext Legal Solutions
22

Page 344

1        E R R A T A  S H E E T
2  WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
3   9/18/2024 - Terrence Patrick Divittorio (#6891990)
4  PAGE   LINE   CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20
21   _____   _____
22  Terrence Patrick Divittorio      Date

Page 345

1        E R R A T A  S H E E T
2  WHATSAPP INC., et al. vs.
    NSO GROUP TECHNOLOGIES LTD. et al.
3   9/18/2024 - Terrence Patrick Divittorio (#6891990)
4  PAGE   LINE   CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20
21   _____   _____
22  Terrence Patrick Divittorio      Date

87 (Pages 342 - 345)