Greg D. Andres
Antonio J. Perez-Marques
Craig T. Cagney
Gina Cora
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    greg.andres@davispolk.com
          antonio.perez@davispolk.com
          craig.cagney@davispolk.com
          gina.cora@davispolk.com
          luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:    micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WHATSAPP LLC and META PLATFORMS, INC., a Delaware corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>                    Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF DAVID J. YOUSSEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Action Filed: October 29, 2019 |

I, David J. Youssef, declare as follows:

1.      I submit this declaration in support of Meta Platforms, Inc. and WhatsApp LLC's (collectively, "Plaintiffs") Motion for Partial Summary Judgment ("Plaintiffs' Motion") and in Opposition to Defendants' Motion for Summary Judgment or Partial Summary Judgment ("NSO's Motion") in the above-captioned action (the "Action").

2.      I am employed as a Managing Director at FTI Consulting, Inc. in its Cybersecurity practice.  I have been engaged by Plaintiffs' counsel to serve as a technical expert in this Action.

3.      Attached as **Exhibit A** is a true and correct copy of my curriculum vitae.

4.      Attached as **Exhibit B** is a true and correct excerpt of the expert report I submitted on August 30, 2024 (the "Opening Report), which was attached as Exhibit 1 to the Declaration of Micah G. Block in Support of Plaintiffs' Motion for Partial Summary Judgment (Dkt. No.  401-1 (the "Block Declaration")).

5.      Attached as **Exhibit C** is a true and correct excerpt of the rebuttal expert report I submitted on September 21, 2024 (the "Rebuttal Report") in response to the report of Terrence McGraw, dated August 30, 2024, which was attached as Exhibit 29 to the Block Declaration.

6.      I have personal knowledge of the facts set forth in this declaration and of the opinions and bases for the opinions set forth in my Opening and Rebuttal Reports, including the excerpts in Exhibits B and C, and if called upon as a witness, I could and would testify truthfully to them.

7.      In preparing this declaration, I have further reviewed the Declaration of Terrence McGraw in Support of NSO's Motion (Dkt. No. 397-2 ("McGraw Decl.")).

8.      Mr. McGraw's contention that "Pegasus addressed the relay servers only by domain names[]," and that "the entry path Pegasus makes into WhatsApp's infrastructure is always through URLs and domain names—not static IP addresses," is unsupported and incorrect.  McGraw Decl. ¶¶ 51-52.  Mr. McGraw relies on code that I understand the U.S. Department of Justice provided to Plaintiffs from an Amazon Web Services server ("AWS Server"), which NSO admitted it controlled.  *See id.* ¶ 52.  But that code uses non-public sub-domain names (i.e. e4.whatsapp.net)

only when referring to WhatsApp's *signaling* servers, not WhatsApp's *relay* servers, as explained in my reports.

9.     In fact, the WhatsApp signaling protocol (XMPP) messages generated by WhatsApp's signaling servers, WhatsApp's legitimate client application, and NSO's modified client application all refer to WhatsApp's relay servers only by their IP addresses, rendered as encoded hexadecimal values. The Pegasus code that NSO used to access WhatsApp's relay servers is not among the files from the AWS Server made available to me, and I understand that NSO has not produced that code. The logs from the AWS Server, however, do record NSO's use of WhatsApp's relay servers.

10.     For example, in the ordinary operation of WhatsApp, the signaling servers will offer a list of relay servers available for the clients' use by IP address. *See, e.g.*, McGraw Decl. ¶ 50. In the AWS log files, NSO recorded all of the relay server options that it received from the signaling servers by their IP address, as demonstrated in the excerpt below:



11.     The value highlighted in yellow above is an encoded representation of the bytes ▮▮ ▮▮▮▮▮▮▮▮ where the first four bytes represent the four octets of an IP address, and the last two bytes represent a numeric network port. ▮▮▮▮▮▮▮▮

DECLARATION OF DAVID YOUSSEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
CASE NO. 4:19-CV-07123-PJH

12.     After receiving these options, the logs also show Eden directing messages to specific WhatsApp's relay servers by their IP addresses, as demonstrated in the excerpt below, which shows NSO selecting the IP address ███████████████ that it had received from the signaling server in the the excerpt above:

13.     As demonstrated by the above log excerpts, no domain name or URL was involved in NSO's selection and use of the relay server by Eden.  Instead, messages were directed to particular servers by IP address.  Moreover, these messages were sent by NSO's modified client application, not by WhatsApp's legitimate client, and therefore NSO alone decided how its own modified client application selected these servers.  The code used to select those servers was not among the files from the AWS Server, and the logs do not provide enough information to determine whether NSO manipulated the relay server options generated by the signaling server, or how it selected which relay server to use among those options.

14.     Even when NSO used sub-domain names to direct messages to WhatsApp's signaling servers, in Internet Protocol computer networking, network communications between two devices (e.g. a client and a server) are never actually conducted "through" domain names.  When a domain name is used to reach a server, a query for that domain name is issued to a third device, a DNS server, which responds with the IP address corresponding to that domain name.  At that point, a connection can be initiated and routed to the server's IP address, and all subsequent transmissions are directed to and from routable IP addresses.  Mr. McGraw ignores that it was necessary for Eden to interface directly with the IP addresses of WhatsApp's servers, whether or not domain names were used to reach them in any given instance.  NSO's malware did not "merely sen[d] traffic to the public WhatsApp URLs and [leave] it to WhatsApp to route the traffic to the servers of its choice." *Id.* ¶ 54.  Instead, the malware continuously, dynamically interfaced with various WhatsApp signaling and relay servers as it operated.  The IP addresses of all WhatsApp servers that

3

1    NSO's malware interacted with were necessarily available to the developers and operators of

2    NSO's malware, readily and at all times.

3        15.    In my opinion, NSO's access to the IP addresses of the servers shows that NSO

4    knew or could have determined with a reasonable degree of certainty which WhatsApp signaling

5    and relay servers it was using and their location.  For example, the IP address 157.240.20.51 is

6    registered to Facebook, Inc. in Menlo Park, California,[1] which would have been obvious to NSO

7    given the way it designed its spyware to operate.  NSO could have determined the location of the

8    servers through simple IP geolocation or route tracing.  It also would have been easy to avoid using

9    servers located in the United States or anywhere else, but I have reviewed no evidence to indicate

10   that NSO made any effort to avoid targeting or leveraging WhatsApp's U.S.-based infrastructure.

11       I declare under penalty of perjury that the foregoing is true and correct.

12       Executed on October 11, 2024 in New York, NY.

David J. Youssef

---

[1] HTTPS://SEARCH.ARIN.NET/RDAP/?QUERY=157.240.20.51.

4

# EXHIBIT B

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHATSAPP INC., et al,. | |
| Plaintiffs, | |
| v. | Case No.: 19-cv-07123-PJH |
| NSO GROUP TECHNOLOGIES LIMITED, et al., | |
| Defendants. | |

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Expert Report of David Youssef

August 30, 2024

Docusign Envelope ID: 5E56B0BD-3969-4B87-9A34-F353D98B4824

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef

August 30, 2024

# EXPERT REPORT OF DAVID J. YOUSSEF

*IN RE: WHATSAPP INC., ET AL., (PLAINTIFFS), V. NSO GROUP TECHNOLOGIES LIMITED, ET AL., (DEFENDANTS)*

*CASE NO.: 19-CV-07123-PJH*

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

## RELEVANT BACKGROUND

### Overview of NSO Group

28. NSO Group Technologies Limited is a private Israeli technology and cyber-surveillance company. Q Cyber Technologies Limited was, during the relevant time period, its sole director and majority shareholder.[18]

29. Defendants are primarily known for their Spyware product, "Pegasus," which is designed to "remotely and covertly" extract information from "virtually any mobile device, as well as to surveil and eavesdrop on the users."[19][20] Notably, Pegasus can be delivered to Target Devices, specifically iOS and Android mobile devices, without any required user interaction; this is known as "zero-click" exploitation. With this capability, Defendants' Spyware can be installed on targeted devices without targeted users' knowledge and without the need to trick the user into performing any particular action, such as clicking on a malicious link (known as "one-click" exploitation). Target Devices can be exploited by simply receiving a text message, or in this case, a WhatsApp voice call offer.

30. Once a Target Device has been compromised by Defendants, their Pegasus Spyware can be installed on the device and used to surreptitiously access and extract sensitive information such as voice calls, messages, multimedia including photos and videos, emails, location history, etc. Pegasus is also capable of passively monitoring, activating phone settings to collect data, and defining triggers to initiate data collection.[21]

31. It is my understanding that Defendants invest considerable resources in the identification of software vulnerabilities, specifically "zero-day"[22] and "zero-click" vulnerabilities, and the development of exploits for those vulnerabilities which can facilitate the delivery and installation of Defendants' Spyware on targeted devices. Defendants have in the past, and continue to, maintain staff dedicated to the intensive research and identification of novel security vulnerabilities in various commonly used applications, such as WhatsApp, in

---

[18] Declaration of Shalev Hulio in Support of Defs' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

[19] Compl. Ex. 10, Dkt. No. 1.

[20] Defs' Apr. 17, 2023 Responses & Objections to Pls' Requests for Admission, Response to RFA No. 14 (admitting "Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012").

[21] Compl. Ex. 10, Dkt. No. 1.

[22] A zero-day exploit is the delivery of a security flaw in a particular piece of software or hardware which is unknown to the vendor and to the public, for which no fix has been made available.

Docusign Envelope ID: 5E56B0BD-3069-4B97-8A24-E353D98B4824

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY | Expert Witness Opinion of David Youssef    10

order to continuously propagate their malware products to the extent desired by Defendants or their customers.[23]

## Overview of WhatsApp

32. WhatsApp is a communication service and associated application which offers its users multiple forms of encrypted Internet-based communications such as text/multimedia messaging and voice over Internet Protocol ("VoIP")[24] telephony. WhatsApp enables these communications with official client-side applications across multiple different platforms (including iOS, Android, Windows, macOS, and web browsers). Communications between users are mediated and facilitated by WhatsApp Servers.

33. WhatsApp comes at no cost to the consumer, and the application is available for users to download for free from app stores. A prospective user must create an account and agree to the WhatsApp Terms of Service in order to begin using the WhatsApp service.

34. WhatsApp's user base has grown significantly over the past decade. The table below illustrates the platform's rapid adoption by users worldwide:

| Date | Number of WhatsApp Users |
|------|--------------------------|
| December 19, 2013 | 400,000,000[25] |
| April 22, 2014 | 500,000,000[26] |
| February 1, 2016 | 1,000,000,000[27] |
| February 12, 2020 | 2,000,000,000[28] |

35. WhatsApp is marketed as a secure, reliable, and private communication method due to its use of end-to-end encryption ("E2EE").[29] Specifically, WhatsApp is designed to ensure messages and calls between WhatsApp users are accessible to only the parties involved in the communication; as part of this model, no entity positioned between the "ends" of the communication, inclusive of WhatsApp systems and staff, is capable of decrypting and

---

[23] Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

[24] VoIP is a communication technology that allows users to make voice calls over broadband Internet connections rather than traditional analog telephony services.

[25] https://blog.whatsapp.com/400-million-stories.

[26] https://blog.whatsapp.com/500-000-000.

[27] https://blog.whatsapp.com/one-billion.

[28] https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

[29] End-to-end encryption is a secure messaging feature designed to keep messages private from all third parties, including the messaging service. A message will only appear in readable form to the sender and recipient of the message.

reading the associated message contents.[30] WhatsApp achieves this level of security by leveraging encryption keys known only by the WhatsApp Client Applications operated by the users partaking in a given communication exchange.

36. In my opinion, the nature of the service provided by WhatsApp as a privacy-oriented communications platform, together with its widespread global adoption, is what made WhatsApp a high-priority target for Defendants in seeking to identify mechanisms through which to deliver their Malware to Target Devices.

## Overview of WhatsApp VoIP Architecture

37. I understand from Plaintiffs that the WhatsApp VoIP infrastructure uses a proprietary call management system to establish and process voice call communications between users. WhatsApp's call management system and VoIP infrastructure is supported by WhatsApp's Signaling Servers[31] and Relay Servers,[32] and underpinned by protocols and standards including Real-time Transport Protocol ("RTP"),[33] Real-time Transport Control Protocol ("RTCP"),[34] Session Traversal Utilities for NAT ("STUN"),[35] and WhatsApp's proprietary variant of the Extensible Messaging and Presence Protocol ("XMPP") referred to internally by Plaintiffs as "FunXMPP."

38. WhatsApp Signaling Servers facilitate the initiation of VoIP calls between user devices hosting the WhatsApp Client, whereas WhatsApp Relay Servers facilitate data transmissions, such as call audio to and from the user devices.[36] To clarify, when referencing the WhatsApp Client, I am referring to the legitimate WhatsApp Client Application developed and distributed by Plaintiffs through authorized channels.

39. It is my understanding that a call relay session occurs when a user (the "sender" or the "caller") initiates a call. WhatsApp Signaling Servers notify the directed user (the

---

[30] https://faq.whatsapp.com/820124435853543.

[31] Signaling Servers handle the initiation of voice calls, which involves making the recipient's device "ring" or receive notification of an incoming call; if the recipient accepts the call, the Signaling Server will connect the call. After that point, the Signaling Server handles any actions which alter the state of the call, such as a participant ending the call.

[32] Relay Servers maintain the connections of voice calls controlling the manner in which packets containing the call audio are transmitted back and forth between participants' devices.

[33] Real-time Transport Protocol ("RTP") is a network protocol that handles traffic involving audio and video over the Internet.

[34] Real-time Transport Control Protocol ("RTCP") is a control protocol that supports RTP, with the main function of monitoring the quality and delivery of data.

[35] Session Traversal Utilities for NAT ("STUN") is a standard, including a network protocol, for maintaining connectivity across Network Address Translation ("NAT") gateways.

[36] Gheorghe Dep. at 31:13-32:22.

insert computer code into memory and precisely overwrite pieces of data in memory to manipulate the legitimate running process's logic to execute that code.

43.  I reviewed the materials made available to me to develop a comprehensive understanding of the exploitation activity observed by Plaintiffs beginning on May 2, 2019. These materials are reflective of the exploitation having been conducted by an automated process Defendants referred to as "heaven," which was specifically designed to compromise Android mobile devices, WhatsApp Servers, and the WhatsApp Client Application. Defendants' Malware leveraged WhatsApp infrastructure to manipulate the WhatsApp Client Application running on those Target Devices through a series of actions which I will refer to as the "exploit chain."

44.  I have broken down the observed exploit chain into eight stages or "steps," each of which I understand to have been crucial to Defendants' successful compromise of a Target Device. My understanding of each step based on my review and analysis is as follows.

**Step 1: Fingerprinting of Target Device**

45.  Defendants first conducted "fingerprinting" of the Target Device. Fingerprinting is a technique used to identify certain hardware and software characteristics of a Target Device and associated WhatsApp Client Application, which can then inform an attackers' subsequent exploitation.

46.  I was able to confirm fingerprinting activity was successful, based on log evidence that showed the collected information about the Target Device, which included operating system, WhatsApp Client Application version, and the make and model of the Target Device.

**Step 2: Delivery of Malicious Call Offer to Target Device**

47.  If the fingerprinting step determined that the Target Device was susceptible to exploitation, the second step involved "heaven" sending a call offer message with manipulated settings[40] to the Signaling Server for delivery to the Target Device. One of these manipulated call settings enabled an XOR cipher,[41] a basic method of encryption intended to obfuscate the content of a message, for subsequent RTCP transmissions. The XOR encryption allowed for subsequent messages sent by "heaven" to resemble legitimate RTCP packets, thereby concealing the malicious nature of the traffic. I understand that the option to enable an XOR cipher was implemented within the WhatsApp infrastructure but was not in use by ordinary WhatsApp users and was not

---

[40] A call offer message is sent by device to initiate a communication session with a recipient.

[41] XOR Encryption is a form of symmetric encryption that leverages the same key for encryption and decryption of a message.

publicly documented. Furthermore, I understand that the legitimate WhatsApp Client Application did not afford users the ability to enable the XOR cipher.

48.   The second manipulated call setting was the "connecting_tone_desc" field, which I understand was no longer used for any legitimate purpose as of 2019. The "heaven" malware inserted a malicious bash script[42] into this field. Upon receipt of the malicious call offer by the WhatsApp Client Application on the Target Device, the malicious bash script contained within this field was loaded into the memory of the Target Device while the Target Device was still ringing and before the call could have been accepted or declined. The malicious bash script remained present in the Target Device's memory throughout the remainder of the attack, specifically in the memory region used by libwhatsapp.so, which is a software library used by the WhatsApp Client Application for various functionalities. The proximity of the "connecting_tone_desc" variable and other variables which "heaven" was able to control, to other components of libwhatsapp.so is of significance to later stages of the exploit chain.

49.   The malicious script was inserted into memory of a Targeted Device, but not executed until a subsequent phase of the attack, as achieving code execution through a buffer overflow against modern systems and applications requires the gathering of additional information (specifically, the device's architecture and the version and base address of libwhatsapp.so) in order to compute the address of "connecting_tone_desc" in memory and subsequently interact with its content.

**Step 3: Identification of Target Device Architecture**

50.   As the third step in the exploit chain, "heaven" transmitted packets through the WhatsApp Relay Servers which were crafted to induce the victim's WhatsApp Client Application to disclose information about the underlying architecture of the Target Device. Specifically, determining whether the Target Device was a 64-bit device or an older 32-bit device was required for "heaven" to carry out subsequent stages of the attack, as 64-bit devices and 32-bit devices handle the allocation of memory and processing of instructions differently. When I refer to a device's "architecture" in this section of the report, I am referring to the 32-bit or 64-bit nature of the relevant device.

51.   While the Target Device was ringing in response to the call offer sent by "heaven" and received from the WhatsApp Signaling Server, but before the victim could have accepted or declined the call offer, the Target Device began relay negotiation and bandwidth estimation with "heaven" via a WhatsApp Relay Server. This is a legitimate function of

---

[42] A bash script is a common form of program on Linux computers, which comprises a series of commands to be interpreted by the operating system's shell interpreter. The Android operating system is based on Linux, so Android devices can execute bash scripts.

Docusign Envelope ID: 6E56B0BD-3069-4B97-8A24-F852D98B4824

WhatsApp's VoIP infrastructure, known as "bit width detection," which allows for the two devices to estimate the volume of data which can be efficiently sent and received over a given interval. At this stage, "heaven" exploited the buffer overflow by sending an oversized bit width detection packet to the Target Device via the WhatsApp Relay Server, effectively abusing the legitimate function of the Relay Server.

52.    Due to the fact that the oversized bit width negotiation packet sent by "heaven" was stored in a buffer in close proximity to other types of call context data in the Target Device's memory, the overflowed buffer could overwrite the values of some other call context variables in memory. One of these variables was the "Af" variable, which ordinarily stores information affecting the Target Device's bandwidth estimation. Given the different manners of memory allocation between devices of different architectures, an oversized buffer of a given size would overwrite "Af" on a 32-bit phone, but not on a 64-bit phone. If "Af" was overwritten, the Target Device's bandwidth estimation data returned to "heaven" would change, and "heaven" could detect this change, enabling it to identify the architecture of the Target Device.

53.    After the devices exchanged bandwidth estimation packets, "heaven" sent a duplicate call offer message to the Target Device through the WhatsApp Signaling Server. This duplicate call offer message, which is not sent during an ordinary WhatsApp call establishment process, triggered a transport restart and resulted in the reset of areas of the Target Device's internal memory related to the state of the VoIP call, since some of this data had been overwritten during the malicious bandwidth estimation exchange.

**Step 4: Memory Information Disclosure**

54.    As the fourth step in the exploit chain, "heaven" was designed to exploit the same buffer overflow again, this time to overwrite certain pointers[43] in the Target Device's memory. The "heaven" malware sent a bandwidth estimation packet of an unexpectedly large size, overflowing the buffer on the Target Device, and resulting in unintended behavior by the Target Device's WhatsApp Client Application. In this instance, the packet sent by "heaven" was precisely and specifically crafted to overwrite a pointer to a certain area of memory such that it pointed to an area of memory slightly offset from the original area. The "heaven" malware was designed to repeat this process until the targeted WhatsApp Client Application returned to "heaven" a specific area of memory containing information which could be used to calculate the locations of code used by WhatsApp in the Target Device's memory, specifically the base address of libwhatsapp.so.

---

[43] In computing, a pointer is a variable which stores (or "points to") the memory address of a piece of data, such as a function or another variable.

made available to me, the "abs.log" file records that the exploit resulted in the "LEAKED ADDR" for "libwhatsapp_addr" (i.e., the address of libwhatsapp.so in the Target Device's memory) in each instance of a successful attack by "heaven" against a WhatsApp user.



**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

89. In the next step of the exploit, Defendant utilized two phone numbers ("Phone A" and "Phone B") to convert the call to a group video call. After initiating the call with Phone A, Defendant invited Phone B to join the call, which provides the "capability_bit_mask" buffer. Ordinarily, this buffer describes all the VoIP capabilities it supports, but in the exploit, Defendants' Malware sends a modified bitmask buffer using the buffer memory layout and full pointer values gleaned from the Target Device.

90. The "abs.log" file indicates that the part of the attack involves adding another attacker account through a group call and the log contains evidence of the initial capabilities buffer sent to the second account.



**Step 6: Delivery of Second Malicious Capabilities Buffer**

91. As stated in Step 5, the voice call is converted into a group voice call including an additional participant controlled by Defendants. This secondary participant then sends a secondary capabilities buffer following inclusion into the group video call.

92. The "abs.log" also records the second malicious capabilities buffer sent by the second attacker account added in Step 5. Notably, the second message is returned less than one

second later, confirming that this process is automated and part of the exploit chain, and not the introduction of an independent second actor.



**Step 7 & 8: Call Termination and Compromise of Target Device**

93.  As noted previously, the partial set of files from the AWS Server do not record the buffering messages over Plaintiffs' Relay Servers, such as those used in Step 7 to overwrite the pointers, but the "abs.log" file does record the identified indicators of voice call being terminated shortly after completing the steps above and before the call is answered.



94.  In the figure above, after terminating the call, the log records that the "Call . . . was loud for 14.415701 seconds," which demonstrates Defendants' focus on stealth, and is consistent with the call termination marking the end of a covert zero-click exploit intended to be executed before the Target Device can accept the call.

# DETAILED OPINIONS

## Defendant's Exploitation of WhatsApp Infrastructure

**Defendants' WhatsApp User Registration and Extraction of Region Token**

95.  For Defendants' "heaven" malware to successfully interact with WhatsApp's Signaling and Relay Servers and carry out their exploit chain, "heaven" must appear to these servers as a legitimate WhatsApp user or users operating the official WhatsApp Client. In my opinion, Defendants had to create WhatsApp user accounts and extract the Region Token to enable their Malware to gain access to WhatsApp's Servers and carry out their attack.

96.  There are certain steps which must be completed before an individual can successfully register and subsequently utilize the WhatsApp services. This includes the user's acceptance of WhatsApp's Terms of Service, which must be done before completing the WhatsApp registration process. Only once the sign-up process has been completed can

Docusign Envelope ID: 5E56B0BD-8069-4B97-8A24-E853D98B4824

the user access the WhatsApp services and the full functionality of the WhatsApp Client Application.

97. According to the deposition transcript of Claudiu Gheorghe, the registration process results in the creation of a Region Token, which informs the process through which the WhatsApp Servers attempt to assign requests from the account to the applicable geographical region. It is my understanding that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token.[56]

98. The programs found on Defendants' AWS Server do not contain any functionality to "forge" a WhatsApp Region Token. Therefore, it is my opinion Defendants must have created at least two WhatsApp user accounts and extracted the Region Tokens assigned to those accounts in order to use them with their Malware. Defendants then extracted the WhatsApp Client Region Tokens assigned to those accounts in order to use them as part of their "heaven" application.

99. In my opinion, by extracting the Region Tokens, "heaven" was configured to emulate the official WhatsApp Client from the perspective of the WhatsApp Signaling and Relay Servers. As a result, Defendants were able to make their Malware appear to the WhatsApp Servers as a legitimate WhatsApp user or users operating the WhatsApp Client.

**Defendants' Engineered Malware to Access and Exploit WhatsApp Servers and Target Devices**

100. In my opinion, Defendants' "heaven" malware is designed to interface with WhatsApp's Client Applications and Servers to successfully achieve remote code execution on the Target Device by camouflaging manipulated voice call messages as legitimate messages from a user running the WhatsApp Client Application.

101. In fact, Defendants were not using the official WhatsApp Client Application to carry out the exploit. The official WhatsApp Client does not enable users to create the types of malformed messages intrinsic to the exploit. In place of a genuine WhatsApp Client Application, Defendants designed and used their own system, a component of "heaven" referred to internally by Defendants as the "WhatsApp Installation Service" or "WIS,"[57] to emulate the official WhatsApp Client and send messages to the Target Device via the WhatsApp Signaling and Relay Servers, using authentication credentials taken from a registered WhatsApp Client to gain access to the servers.

---

[56] Gheorghe Dep. at 94:6-95:12.

[57] NSO_WHATSAPP_00008957.

102. As acknowledged by Defendants, their illegitimate client does not behave like a typical WhatsApp user; Defendants' illegitimate client instead "only sends very specific messages (call messages \ text messages)."[58]

103. Defendants' Malware was also designed to enable XOR encryption and insert a malicious bash script within the RTCP packet's "connecting_tone_desc" field, resulting in a malformed call offer message that the WhatsApp Client Application cannot create. Because Defendants' extraction of the registration token caused the Malware's messages to appear as if they came from the WhatsApp Client Application, this malformed message, which contains a malicious bash script, was then delivered to the Target Device.

104. Defendants' "heaven" malware also used multiple methods to carefully manipulate WhatsApp Servers and WhatsApp Client Applications running on Target Devices in order to achieve unimpeded access to and control over those devices. Defendants' Malware leveraged undocumented features of the WhatsApp call offer message to inject the malicious bash script into the Target Device's memory, as well as to enable the XOR encryption. Defendants' Malware, via the WhatsApp Servers, performed "fingerprinting" of the Target Device, which collected the user's online status, make, model, and operating systems. The fingerprinting allowed for Defendants' Malware to determine the manner in which to proceed with exploitation of the Target Device, based on extensive knowledge of the WhatsApp Client Application's internal workings which Defendants had apparently amassed. If the Target Device was determined to be vulnerable through fingerprinting, Defendants' Malware continued its actions by leveraging RTCP packets to overflow buffers on the Target Device, inserting further malicious data into the memory space used by the WhatsApp Client Application and manipulating this data, along with data natively present within the Application, to execute malicious code on the Target Device.

**Defendants' Malware Operated in a Manner Which Exceeded the Capabilities Afforded by WhatsApp to an Ordinary User**

105. It is my understanding that an ordinary user will download WhatsApp, create an account, and begin communications. This communication can include voice calls and multimedia messages, between two users or a group of users. The messages can include text or media.

106. It is my understanding that an ordinary user will typically have little to no knowledge of the WhatsApp infrastructure, let alone the intricacies of the function of a Signaling Server, Relay Server, RTP, and RTCP packets. The ordinary person will likely understand the

---

[58] NSO_WHATSAPP_00008957.

Docusign Envelope ID: 5E56B0BD-8069-4B07-8A24-F852D98B4824

monitor and collect information from Target Devices.[65] Defendants' business model entails the delivery and installation of malware they have engineered for the purposes of remotely monitoring their specified targets. As mentioned above, Defendants go to great lengths to reliably deploy their exploit payloads and to obfuscate or destroy evidence of this intrusion. Thus, it is my opinion that Defendants and/or their customers did leverage this exploit to target specific WhatsApp end users with the end goal of surreptitiously collecting information from these users' devices, including their WhatsApp communications.

## Evading Detection

**Concealment of Defendants' Malware**

126. Defendants' "heaven" malware was designed to interact with WhatsApp Servers and targeted WhatsApp Client Applications by creating messages which appeared to be from a legitimate WhatsApp Client. During this process, "heaven" imitated characteristics of transmissions generated by the genuine WhatsApp Client, and used credentials and keys derived from authentic WhatsApp user accounts. Defendants' "heaven" malware took steps to conceal the malformed and malicious nature of its communications from Plaintiff's official WhatsApp Servers and targeted WhatsApp Clients.

127. Defendants engineered their Malware to conceal its access to and use of WhatsApp Servers and Target Devices. Defendants' Malware interacted with WhatsApp Servers as well as with the WhatsApp Client installed on Target Devices by creating messages that appeared to be from a legitimate WhatsApp Client Application. During this process, Defendants' engineered malware, which in my opinion should be considered spyware, reproduced transmission properties of the WhatsApp Client Application, and used credentials and keys retrieved from authentic WhatsApp user applications. This activity was used to disguise Defendants' Malware as a valid WhatsApp user application in order to access and use both WhatsApp's Servers and the Target Devices. As described in this process, Defendants' Malware deceived WhatsApp Servers and Target Devices' WhatsApp Client Applications about the type of and the source of the transmission between Defendants' Malware and those devices.

128. Defendants at various points leveraged XOR encryption to obfuscate the data transmitted by their Malware to targeted devices by way of the WhatsApp Relay Servers. This technique served to mask the malicious nature of certain RTCP packets crafted and transmitted by Defendants. Defendants' Malware used the RTCP packet header, which normally contains transportation information for the packet, as a key with which to

---

[65] Compl. Ex. 10, Dkt. No. 1.

enable encryption. The resultant packets resembled RTCP_REMB packets, which are used by the legitimate WhatsApp systems to control media congestion by indicating the rate at which media can be sent. The XOR encryption ultimately served to "camouflage" the appearance of Defendants' packets among normal network traffic, limiting the probability of detection by WhatsApp engineers and/or security mechanisms.

129. Upon exploiting the buffer overflow vulnerability, Defendants' Malware took discernible and deliberate actions to "clean up" evidence of exploitation which may have remained on the Targeted Devices. The first callback pointer overwritten by "heaven" pointed to a regular function of the WhatsApp application which organized and resets certain parts of the process' memory. This function removed information from the memory of the Target Device as well as data related to Defendants' Malware activity, which may have been indicative of Defendants' Malware's previous behavior. After resetting these portions of memory space, the affected system would have appeared closer to the baseline of a running WhatsApp application.

130. Each of the executable files which were written to the disk by Defendants' various exploit payloads were erased after completing their functions. In addition, based upon my study of the full exploit chain, it appears that Defendants' final-stage payload was intended to be loaded directly into executable memory rather than written to the device's storage. This is a common technique used by cyber threat actors to evade detection and inhibit efforts by incident responders or forensic analysts to identify and analyze their malicious software.

**Defendants' Malware Altered, Damaged, or Deleted Data from WhatsApp Servers and Target Devices**

131. While executing the buffer overflow exploits, Defendants were inherently altering or damaging targeted WhatsApp Client Applications. As demonstrated in previous sections, the buffer overflow altered and corrupted memory on Target Devices, causing them to behave in ways not designed or intended by Plaintiffs when developing the Applications.

132. Further, when Defendants' malicious code was executed against Target Devices, this triggered other actions which reset the Target Device's memory, deleted temporary files, and downloaded a second-stage payload to complete the compromise of the Target Device.

## Defendants' Malware Development and Circumvention

**Defendants' Reverse Engineered and Tested the Design of its Software to Work Against WhatsApp Infrastructure**

133. I have not received or reviewed Defendants' financials or any other materials directly related to the organization of Defendants' business. However, based on the evidence at hand, including the deposition of the NSO's CEO, my expert opinion is that while the stated core of Defendants' business is in developing and marketing the Pegasus Spyware, Defendants' business is in large part dedicated to the discovery and weaponization of zero-day software exploits with which to deliver their Malware. I assess that Defendants maintain and invest massively in an in-house exploit research and development apparatus, and that the "heaven" exploit chain and associated software discussed here is a product of that apparatus.

134. The legitimate WhatsApp Client Application does not provide users with the functionality necessary to activate the XOR cipher setting, nor to set the value of the "connecting_tone_desc" field within the call offer message, nor to add freeform text to that field. The manipulated offer message prepared during step two of the exploit chain therefore had to have been prepared and sent using a modified or fake WhatsApp client, i.e., a program intended to emulate a WhatsApp Client Application from the perspective of the WhatsApp Servers, in order to circumvent the technological limitations of the legitimate WhatsApp Client Application. My understanding is that Defendants' "heaven" malware and/or its associated "WIS" component did in fact serve in part to emulate a genuine WhatsApp Client Application in order to carry out the attacks.

135. The buffer overflow vulnerability at the center of the exploit chain would have required a significant amount of time and effort dedicated to testing in order to be discovered and leveraged to achieve arbitrary code execution against the targeted device. Achieving arbitrary code execution through a buffer overflow attack against modern systems and applications requires a great deal of precision, as corrupting the wrong pieces of data in the targeted system's memory is likely to result in an application or system crash.

136. The exploit chain demonstrates that Defendants possessed a detailed understanding of the memory layout of the WhatsApp Client Application for Android, and particularly of its library component libwhatsapp.so. Defendants maintained knowledge of the memory offsets for various pieces of data and functions within libwhatsapp.so applicable to each of multiple different versions of the WhatsApp Client Application and two underlying device architectures (32-bit and 64-bit). These memory offsets were essential to Defendants in their carrying out of the exploitation against WhatsApp users, as without an intimate understanding of the memory layout, the buffer overflow vulnerability could not feasibly have been made to execute malicious code. This type of information is not publicly documented by Plaintiffs, and in my opinion could only have been derived from Defendants' methodical reverse engineering of each relevant version of the WhatsApp Client Application.

137. The "heaven" malware's interactions with WhatsApp's Signaling Servers and Relay Servers demonstrate that Defendants possessed a detailed understanding of WhatsApp's proprietary VoIP architecture and infrastructure, to include knowledge of multiple unused and undocumented features. Plaintiffs generally do not publicize detailed information about their proprietary VoIP architecture, and in my opinion this level of understanding could only have been achieved by intercepting and decrypting network traffic from a genuine WhatsApp Client Application in order to analyze its interactions with the WhatsApp Server-side infrastructure.

138. Furthermore, based on my review of the computer scripts and logs which I was provided from the Defendants' AWS Server, my understanding is that "heaven" is a sophisticated suite of malware designed for the express purpose of carrying out attacks against WhatsApp users and infrastructure reliably, efficiently, and stealthily. I assess that a significant amount of resources were invested by Defendants in developing this malware such that the relevant exploitation could be conducted repeatedly and consistently, and such that the relevant vulnerability would remain unnoticed by Plaintiffs for as long as possible.

139. The exploit discussed within this report is complex and sophisticated by nature and would require a non-public understanding of how WhatsApp Servers and Client Applications operate to ensure successful execution. The exploit leveraged specific vectors of attack and utilized specific Relay Servers within the United States in order to execute successfully. Certain vectors were closed, based on change management logs from Plaintiffs, which potentially inhibited Defendants' activities and required them to circumvent such updates to ensure the success of the exploit.

140. As detailed earlier in the report, the logs which I reviewed from Defendants' AWS Server also demonstrate multiple exploitation attempts being carried out by the "heaven" prior to its identification by Plaintiffs in May 2019.

141. While I have not had an opportunity to analyze the documents produced by Defendants, I have reviewed certain documentation produced by Defendants that provide specific details on how to successfully operate the "heaven" exploit on WhatsApp services. This demonstrated their intricate knowledge of the WhatsApp architecture and specific areas to ensure successful execution of the exploit.

**Defendants' Access to the IP Addresses for WhatsApp's Servers; Location Attribution**

142. Plaintiffs' businesses are operationally headquartered in Menlo Park, California. It is commonly known that Plaintiffs are based within the "Silicon Valley" region of the Northern District of California.

Docusign Envelope ID: 6E56B0BD-3069-4B97-8A24-F852D98B4824

143. Log files from Defendants' AWS Server indicate that Defendants designed their Malware to access and use Plaintiffs' infrastructure based in the United States. Defendants' Malware contains hard-coded WhatsApp domain names associated with WhatsApp's Signaling Servers, and I understand that in 2019, all of WhatsApp's Signaling Servers were located at U.S. data centers.[66] Furthermore, during the ordinary operation of a VoIP call on WhatsApp, the Signaling Servers provide IP addresses for a few potential Relay Server options to the WhatsApp Client, which then selects which to use.[67]

144. Because Defendants were not using the genuine WhatsApp Client Application, and I have been provided with an incomplete version of Defendants' Malware; I am unable to reach any opinion about whether or how Defendants intentionally selected those Relay Servers. However, the WhatsApp Relay Servers selected and used by Defendants' Malware are logged by their IP addresses in the logs from the AWS Server, of which I identified four which appear to be registered to Plaintiffs and based in the United States according to the American Registry for Internet Numbers.[68] [69] Each of these IP addresses was accessed via TCP and/or UDP ports 3478, which is used by the STUN protocol, a component of WhatsApp's VoIP infrastructure. In addition, Plaintiffs' logs demonstrate that the exploits they observed utilized several U.S. based Relay Servers, including servers located in San Jose and Los Angeles, California.[70] [71] Out of the 173 servers located within the US, 43 California were listed as a part of this exploit.[72]

**Changes to the WhatsApp Infrastructure Interrupted Defendants' Malware Prior to May 2019**

145. Based on my review of WhatsApp diff[73] D9650871, which was published on September 3, 2018, updates were instituted into the code to add a check for stanzas containing the VoIP settings element. The update would check for stanzas sent by clients that contained VoIP settings and block any stanza that was deemed invalid while logging this information, preventing any malformed or invalid stanza from being accepted by the Signaling Server.

---

[66] Gheorghe Dep. at 184:20-185:9.

[67] Gheorghe Dep. at 206:8-208:7; 246:16-249:11.

[68] https://search.arin.net/rdap/?query=157.240.0.0%2F16.

[69] https://search.arin.net/rdap/?query=179.60.192.48.

[70] WA-NSO-00166473.

[71] Gheorghe Dep. at 206:8-19.

[72] WA-NSO-00166473.

[73] In software development, a "diff" (from shorthand for "difference") refers to a line-by-line comparison of a code sample before and after an update was made.

Docusign Envelope ID: 6E56B0BD-8069-4B97-8A24-E852D98B4824

146. I reviewed the internal Task – T33535414[74] filed on September 3, 2018, which details an identified issue, allowing a WhatsApp Client Application to generate and send "voip_settings" values in signaling messages via group calls. It is my understanding that this issue was initially identified by an external security researcher and brought to Plaintiffs' attention for remediation. The Task mentioned a diff, D13309896, which, as I understand it, is in response to this identified issue.

147. I also reviewed diff D13309896, which was published on December 3, 2018, a further update was added into the WhatsApp application code to additionally check for stanza's with "group update" in VoIP settings. In this instance, a call was created, where a "group update" was being initiated by the WhatsApp Client Application. This function should only originate from a WhatsApp server. When a "group update" was created by the WhatsApp Client Application, the group update would be followed with a forbidden error. The update that followed would reject stanzas with group updates sent from the WhatsApp Client Application. Review of the subsequent logs from the AWS Server following the publishing of both of these code changes demonstrated that on December 5, 2018, there were call offers received that resulted in a "403" error code. As I understand it, the "403" error code is an internally defined code at WhatsApp, meaning the call offer in this case, is forbidden. My understanding of the "403" error code is that it is thrown from the server side of the exchange when a WhatsApp Client Application is performing an action that the server has deemed inappropriate or is not expected, in this instance, sending "voip_settings" in signaling messages (i.e., call offers). Following the deployment of diff D13309896, Task -T33535414 also has communications that detailing that an external security researcher performed a test and confirmed that the diff fixed the issue that they identified.

148. Based on my review of these diffs and corresponding log records from NSO's AWS Server, and my understanding of the Task, it is my opinion that Defendants were potentially testing their exploit on WhatsApp infrastructure in 2018. It is my opinion that in order for the 2019 attack described in Plaintiffs' complaint to work, Defendants would have needed to research and develop a solution to bypass the security measures implemented by WhatsApp.

149. Based on the availability of the aforementioned diffs and associated Task, and subsequent logs from the AWS Server, it is my understanding that the updates and changes made to the WhatsApp Servers and WhatsApp Client Applications would have restricted or

---

[74] Tasks is an internal ticketing system utilized by Plaintiffs to track and discuss remediation activities (WA-NSO-00166464).

Docusign Envelope ID: 6E56B0BD-8069-4B97-8A24-F353D98B4824

interrupted certain operations of Defendants' Malware prior to the exploit that Plaintiffs identified in May 2019.

## Defendants' Continued Actions Following Plaintiffs' Remediation

### Defendants Continued to Attempt Exploitation After Plaintiffs' May 2019 Remediation

150. I understand based on the evidence made available for my review that on May 10, 2019, Plaintiffs implemented specific remediations to address the vulnerability and to prevent further propagation of Defendant's Malware via WhatsApp infrastructure. These remediations included software patches applied to the WhatsApp Signaling such that they would reject offer messages which did not conform to the predetermined data structures.[75] This resulted in the Signaling Servers rejecting any malformed or manipulated offer messages, thereby preventing the "heaven" malware from continuing to operate. Plaintiffs also released an updated version of the WhatsApp Client Application to end users on May 13, 2019, which eliminated the buffer overflow vulnerability which was leveraged during Defendants' exploitation activity.[76]

151. Following remediation of the vulnerability, I understand that Plaintiff's security engineers identified new malformed messages which originated, in at least some instances, from attacker accounts utilized by Defendants during the May 2019 exploit. It is my understanding, based on review of the associated security ticket or "SEV,"[77] that Plaintiffs took additional remediation actions in November 2019 to prevent potential new exploits.[78]

152. A review of the SEV S182393[79] revealed suspicious activity was observed when a number of malformed messages were sent from the same attacker accounts or IP addresses identified during the May 2019 exploit to suspected test devices. The exploit developer was causing the Target Device to download a media file from the exploit developer servers. In an attempt to block this activity, two issues were mitigated. The first issue was a stanza that caused a client's message counter to be reset. When this action occurred a spoofed message could be sent from the attacker to a client which was believed to have

---

[75] Gheorghe Dep. at 270:21-271:8, 273:12-274:21.

[76] Gheorghe Dep. at 271:9-20, 272:13-21.

[77] I understand that a "SEV" is a type of ticket used internally by Plaintiffs to track and respond to identified issues specifically related to security.

[78] SEV S182393 was produced by WhatsApp and titled "Suspicious iq stanzas." This documents the activity, which was detected and investigated, and some potentially associated issues which were later remediated.

[79] WA-NSO-00192765.

Docusign Envelope ID: 5E56B0BD-3069-4B07-8A24-F852D98B4824

been originated from a WhatsApp Server, since the message counter was successfully brute forced. These two issues were both remediated.

153. Despite continued monitoring and active remediation efforts, it is my opinion that Defendants are likely to continue to target WhatsApp in the future. As I have discussed earlier within this report, Defendants' business model requires them to continuously identify new software vulnerabilities, particularly zero-day vulnerabilities, with which to maintain uninterrupted capabilities for the delivery of their Malware to Target Devices.

154. The activity observed by Plaintiffs after May 2019 is consistent with some of the scripts from Defendants' AWS Server which I have reviewed; this indicates that Defendants attempted to either salvage or repurpose aspects of the "heaven" exploit, to utilize additional exploits that Plaintiffs had not yet discovered, or to develop a new exploit for WhatsApp following the closure of their "heaven" attack vector. Furthermore, I assess that Defendants' development of workarounds for WhatsApp's remediations in 2018 prior to the May 2019 exploit also demonstrates Defendants' persistence, intent, and ability to circumvent WhatsApp's security mechanisms.

155. Given the worldwide popularity of WhatsApp and its security features that attract a multitude of groups, it is my opinion that WhatsApp is a natural target for Defendants, given their business model, and in the absence of a significant deterrent, Defendants are likely to continue targeting, researching, and developing exploits for WhatsApp Servers and clients.

## CONCLUSION

156. Based on the evidence available to me that I have had a reasonable opportunity to analyze as of the date of this report, including evidence provided by Plaintiffs, evidence provided by Defendants, and evidence provided to Counsel by DOJ, I have reached the conclusion that Defendants accessed, modified, and exploited, without authorization from Plaintiffs, Plaintiffs' software and infrastructure in May 2019. I have further concluded that Defendants continuously worked to circumvent any technical measures implemented by Plaintiffs in order to maintain access to Plaintiffs' servers and Target Devices for the purpose of deploying spyware.

157. I concluded that Defendants' Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices.

158. I concluded that Defendants' Malware is spyware, in that it was implemented to collect information from Target Devices without the Target Devices' users' awareness, and was used to deliver an additional malicious payload which I assess was likely Defendants' Pegasus Spyware product.

159. I concluded that Defendants' Malware was designed to evade detection by Plaintiffs and was designed over time to adapt to changes and updates in Plaintiffs' infrastructure, including technical measures specifically intended to prevent such activity. I determined that Defendants' exploitation was, in fact, successful due to an optimization, or update, in Android Target Devices, which allowed Defendants to manipulate communications and deliver the exploitation.

160. I concluded that Defendants conducted extensive reverse engineering of Plaintiffs' software and infrastructure in order to develop more effective malware.

161. Finally, I came to the conclusion that at least 1,500 Target Devices users appeared to have been targeted, exploited, and impacted by Defendants' Malware during the specific timeframe, making them victims to Defendants' Malware through Defendants' unauthorize access of and use of Plaintiffs' servers. Further, based on Defendants' business model, I have no reason to suspect Defendants stopped this activity after May 2019.

Dated: August 30, 2024

_____

DocuSigned by:

*David Youssef*

75FB98DF156B485...

David Youssef

# EXHIBIT C

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL | ATTORNEYS EYES ONLY | EXPERT REPORT OF DAVID YOUSSEF                i

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WHATSAPP INC., et al,. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.:  19-cv-07123-PJH |
| NSO GROUP TECHNOLOGIES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**Expert Rebuttal Report of David Youssef**

**September 21, 2024**

Docusign Envelope ID: 230EFEED-17B2-426D-B326-685298A96BEC

HIGHLY CONFIDENTIAL | ATTORNEYS EYES ONLY | EXPERT REPORT OF DAVID YOUSSEF          ii

September 21, 2024

# DAVID YOUSSEF

# EXPERT REBUTTAL REPORT

*IN RE: WHATSAPP INC., ET AL (PLAINTIFFS), V. NSO GROUP TECHNOLOGIES LIMITED, ET AL., (DEFENDANTS),*
*CASE NO.: 19-CV-07123-PJH*



a long time before the attack" and "was not in use at the time of the attack."[57]  In my opinion, by using a legacy call settings field that Defendants would have known was not in active use at the time was not an effort to place the code "in plain sight," as Mr. McGraw contends, but in fact was intended to conceal their malicious code within the call settings. Mr. McGraw is also incorrect that the bash script sent through the WhatsApp Signaling Servers was the only "malicious" message sent by Defendants' Exploit.[58]  As described above and in the Youssef Report, the malformed messages sent over the Relay Servers to overflow the buffer, identify the location of libwhatsapp.so in the target device's memory, and activate the bash script were equally malicious.

**Mr. McGraw misrepresents Defendants' willful blindness to the locations of WhatsApp servers when accessing them.**

68. In Section of VI.A of his report, titled "NSO did not target computers in California", Mr. McGraw mischaracterizes the use of WhatsApp servers by the NSO Group. For the Defendants' spyware to function properly, the use of WhatsApp servers is essential to gain access to a target device. Defendants' spyware functions such as "initial lookup and fingerprint", "WhatsApp user list management", "server retries"[59] are all functions that take place utilizing WhatsApp Signaling Servers and/or WhatsApp Relay Servers. It is inevitable that during the course of deploying the Defendants' malware a server in the United States, including California where Plaintiffs reside, would be used.

69. Further, there is mention of specific WhatsApp servers being utilized in the course of the deployment of the Defendants' malware. As noted in the Youssef Report, I documented that "signaling.py" listed WhatsApp server hostnames and server ports. These WhatsApp server host names and server ports are not available on the internet and would only be available internally to WhatsApp. To discover this information, Defendants must have gained access to the server-side infrastructure to discover these servers and what ports to utilize in the deployment of their malware.

70. Mr. McGraw argues that Defendants' malware was not designed to target servers in the United States or in California, but this mischaracterizes the record. The Youssef Report details how Defendants' malware was intentionally designed to target WhatsApp's servers including because, as noted above, it was designed to specifically target the domain names for WhatsApp's servers.

---

[57] Gheorghe Dep. Tr. at 151-152.

[58] McGraw Report ¶ 134, at 27.

[59] NSO_WHATSAPP_00000870

Docusign Envelope ID: 230FEEED-47B2-426D-B336-685298A96BEC

71. Additional contradictions to Mr. McGraw's conclusions in Section of VI.A 2 of his report are present in the fact that the Defendants' malware was specifically designed and used to exploit WhatsApp Relay Servers. Mr. Gazneli testified that NSO intentionally designed Eden to use WhatsApp's Relay Servers to bypass changes made to WhatsApp's Signaling Servers in September and December 2018, since these changes rendered the simulated relay servers used by Heaven ineffective.[60] For Defendants' malware to function it utilized a "buffer overflow vulnerability in WhatsApp VOIP stack [allowing] remote code execution via [a] specially crafted series of RTCP packets sent to a target phone number."[61] To reaffirm this, the WhatsApp VoIP stack (i.e., architecture) by nature includes server-side infrastructure.

72. Logging from the AWS Server which Defendants have admitted was used during "certain times prior to January 2021 . . . to house computer code that comprised part of the Pegasus system"[62] also records the IP addresses of certain WhatsApp Relay Servers which were leveraged during the attacks. Geolocation of IP addresses is trivial, and Defendants' engineers would have had enough information to target (or avoid) specific servers if they wished to do so. During my analysis of Plaintiffs' WhatsApp logging, I observed at least three attacks on May 2, 2019 which were recorded in log output from Defendants' malware hosted on this server. These attacks can be correlated based on their unique call IDs contained within WhatsApp call offer stanzas.

73. Contrary to Mr. McGraw's contention that "it appears the Pegasus client application was designed to select its relay server using the same or similar logic as the WhatsApp client application,"[63] I have seen no evidence confirming the manner by which the Eden exploit selected which WhatsApp Relay Servers to use.  Defendants' internal documentation describes a process in which the Heaven exploit was able to manipulate WhatsApp Signaling Servers to force them to select a server controlled by Defendants' software instead of a legitimate Relay Server, thereby inducing the Target Device to use that malicious server for subsequent communications.[64] This indicates that Defendants understood the manner in which the WhatsApp Signaling Servers selected the Relay Servers to be used for a call. I understand that this exploit mechanism was rendered ineffectual by updates made to the WhatsApp Signaling Servers during 2018, resulting in Defendants' development of Eden. In my opinion, the fact that Defendants understood

---

[60] Gazneli Dep. Tr. at 258-59.

[61] https://nvd.nist.gov/vuln/detail/CVE-2019-3568

[62] Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server, at 2-3.

[63] McGraw Report ¶ 113, at 22.

[64] NSO_WHATSAPP_00008957.

and managed to manipulate the manner in which Relay Servers were selected provides some evidence to suggest that Defendants might have, or could have, controlled which Relay Servers were used for the Eden exploit. Additionally, the fact that Heaven needed to control the server used as a relay by the Target Device, and that Eden was developed to leverage a legitimate WhatsApp Relay Server in place of the Heaven-controlled server, affirms my point that exploitation of the WhatsApp server-side infrastructure was intrinsic to successful execution of these exploits.

74. Mr. McGraw acknowledges that two WhatsApp Relay Servers were physically located in California during the exploitative activity. These Relay Servers were located in San Jose and Los Angeles, California, during at least the relevant time period in 2019. These California servers were observed to be utilized during the execution of the Defendants' spyware. Mr. McGraw also omits that all of WhatsApp's Signaling Servers and many other Relay Servers utilized during the execution of the Defendants' spyware were located in the United States. Defendants' engineers would have known where WhatsApp servers were located.

75. In addition, Mr. McGraw claims there is no evidence that NSO chose to lease the California-based Quadranet server at IP address 104.223.76.220.[65]  It is unsurprising that there would be no evidence linking the registration of that server to NSO if it was used for operational purposes, because according to Ramon Eshkar, NSO's White Services Team set up this infrastructure through anonymous means so they "cannot be linked to either the customer or NSO."[66]  In my opinion, the fact that the IP address for the Quadranet server was hard coded into the encrypted payloads sent by Defendants' Exploit indicates that NSO set up that server for use with its technology.  I have seen no evidence that NSO provided its customers with the technological details about its installation vectors necessary to include specific IP addresses in the payloads, and in my opinion, it would be very surprising if they did.  Mr. McGraw also points to no evidence that the Quadranet server was located anywhere but in California.

**Mr. McGraw misrepresents the degree to which Defendants accessed WhatsApp servers without authorization and to which the level of access exceeded authorization.**

76. In Section VI.B of his report, Mr. McGraw argues that "[n]either NSO nor its customers accessed any WhatsApp server without authorization or exceeded their authorized access," and attempts to assert that Defendants' exploitation "used WhatsApp [S]ignaling and [R]elay servers only for their ordinary and intended purpose of shuttling data between

---

[65] McGraw Report at 23-24.

[66] Eshkar Dep. Tr. at 47-48, 150-155; see also Gazneli Dep. at 292-293.

client devices."[67] As an initial matter, I understand that the terms "without authorization" and "exceeds authorized access" are legal terms of art, and I offer no opinion on the meaning of those legal terms. To the extent Mr. McGraw is offering a legal opinion about how the facts apply to the law, that is inappropriate. However, Mr. McGraw's characterization of the facts is incorrect, and I disagree that WhatsApp's servers were used "only for their ordinary and intended purpose." For VoIP communications, the WhatsApp Signaling Servers and Relay Servers are designed to transmit data related to voice calls to and from legitimate WhatsApp Client Applications, but this data could not be arbitrarily set, supplied, or controlled by the user of the Application. Under ordinary and intended circumstances, this data would be generated only by the WhatsApp Client Application, based in part on user input and call context, but subject to the technological limitations built into the Application.

77. Defendants circumvented those technological limitations by developing and using malicious software meticulously crafted to mimic a legitimate WhatsApp Client Application, generate manipulated messages related to their exploit, access the WhatsApp Signaling and Relay Servers, and cause the Servers to transmit that data to Target Devices in order to carry out the exploitation. None of this data would have or could have been sent by a WhatsApp user using the legitimate WhatsApp Client Application, and the WhatsApp Servers were never intended to transmit such data.

78. Upon making the spurious claim that Defendants did not access WhatsApp Servers without authorization or exceed their authorized level of access, Mr. McGraw goes on to acknowledge[68] that Plaintiffs responded to the observed exploitative activity by applying changes to both the Signaling Servers and Relay Servers in order to detect and prevent the transmission of Defendants' malicious data. This response alone directly implies that the conduct was forbidden. Mr. Gazneli's testimony about the efforts NSO took to avoid detection indicated that NSO understood that its conduct was prohibited,[69] and Mr. McGraw appears to reference NSO's interest in and actions taken toward shielding its unauthorized conduct from detection by the operators of platforms under exploitation.[70] Furthermore, in my opinion, Mr. McGraw's acknowledgement throughout his report of the fact that Defendants exploited a "vulnerability," which he defines as a "flaw in the software system that permits an actor to make the system behave in unexpected ways,"[71] is itself

---

[67] McGraw Report ¶ 101, at 20.

[68] McGraw Report ¶ 102-106, at 20-21.

[69] Gazneli Dep. Tr. at 54-58; id. at 153-156.

[70] McGraw Report ¶ 143, at 30.

[71] McGraw Report ¶ 31, at 7.

## IV.    CONCLUSION

100. In the McGraw Report, Mr. McGraw details five (5) opinions regarding Defendants' use of WhatsApp servers in the delivery of its malware to Target Devices. After reviewing the McGraw Report, the cited materials, additional material provided by Counsel, and after conducting my own additional research, some of which is detailed in the Youssef Report, it is my opinion that Mr. McGraw incorrectly concludes that Defendants activity, notably its access and use of WhatsApp servers, falls within the boundaries of lawful intercept as defined in this report. Further, Mr. McGraw understates the degree to which Defendants sought to circumvent technical and procedural measures put in place by Plaintiffs to prevent such activity.

101. It is my conclusion that Defendants did not merely use WhatsApp servers or the WhatsApp Client Application as they were intended to be used, as Mr. McGraw opines, but deliberately researched and reverse-engineered WhatsApp servers to exploit them in unintended and impermissible ways to convert them into a delivery mechanism for Pegasus to Target Devices.

102. It is my conclusion that Mr. McGraw disregards the evidence that Defendants intentionally targeted WhatsApp servers and were willfully blind to the location of such servers, including those located in the United States and specifically in California.

103. It is my conclusion that Mr. McGraw mischaracterizes the manner in which Defendants gained access to WhatsApp servers and disregards the technological barriers that Defendants circumvented in the process of using WhatsApp servers to deliver Pegasus to Target Devices.

104. Further, it is my conclusion that Mr. McGraw improperly downplays the harm that Defendants caused to WhatsApp and the degree to which the activity was performed by Defendants rather than Defendants' customers.

Dated: September 21, 2024                    _____

                                             David Youssef