# Exhibit D

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                      OAKLAND DIVISION

5    --------------------------------X

6    WHATSAPP INC.                    :

7    a Delaware corporation, and      :

8    META PLATFORMS INC,              :

9    a Delaware Corporation:

10                    Plaintiffs       :

11          v.                         :   Case No.

12   NSO GROUP TECHNOLOGIES LTD        :   4:19-cv-07123-PJH

13   and                              :

14   Q CYBER TECHNOLOGIES LTD          :

15                  Defendants         :

16   --------------------------------X

17        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18              Deposition of YARON SHOHAT

19                      LONDON

20            THURSDAY, AUGUST 29TH, 2024

21                  9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1          Deposition of YARON SHOHAT, held at the

2   offices of:

3

4

5          DAVIS POLK & WARDWELL LLP

6          5 ALDERMANBURY SQUARE

7          LONDON

8          EC2 7HR

9          UNITED KINGDOM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

```
 1        defendants.  Also here in the room with us are Shmuel
 2        Sunray, S-H-M-U-E-L, S-U-N-R-A-Y; Chaim Gelfand,
 3        C-H-A-I-M, G-E-L-F-A-N-D; and Shira Plotnik, S-H-I-R-A,
 4        P-L-O-T-N-I-K, all from NSO.
 5    THE VIDEOGRAPHER:  Please can all parties on the Zoom video
 6        link please introduce themselves for the record.
 7    MR. BLOCK:  Just the interpreters, I think we named the
 8        others.
 9     THE INTERPRETER:  Mor Ilan, interpreter.
10     THE INTERPRETER:  Varda Yaari, interpreter, both for
11        European Depositions.
12    THE VIDEOGRAPHER:  The Court reporter today is Chris Lang
13        representing Veritext Legal Solutions.  Please will the
14        court reporter firstly swear in the interpreters and
15        then afterwards please swear in the witness.
16    THE COURT REPORTER:  Will counsel please stipulate that in
17        lieu of formally swearing in the witness, the reporter
18        will instead ask the witness to acknowledge that their
19        testimony will be true under the penalties of perjury,
20        that counsel will not object to the admissibility of the
21        transcript based on proceeding in this way, and that the
22        witness has verified that he is in fact Yaron Shohat.
23    MR. AKROTIRIANAKIS:  That's fine.
24    MR. BLOCK:  Fine.
25    THE COURT REPORTER:  Would the interpreters please
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

```
 1        acknowledge that they will translate the questions and

 2        answers in this deposition to the best of their ability,

 3        under penalty of perjury?

 4     THE INTERPRETER:  I do.

 5     THE INTERPRETER:  I do.

 6   THE COURT REPORTER:  Mr. Shohat, do you hereby acknowledge

 7        that your testimony will be true under the penalties of

 8        perjury?

 9   A.  I do.

10   THE COURT REPORTER:  Please proceed.

11                         YARON SHOHAT

12   having acknowledged their testimony will be true under the

13   penalties of perjury testified as follows:

14   MR. BLOCK:  Good morning, Mr. Shohat.

15   A.  Good morning.

16   By Mr. Block:

17   Q.  We met a short while ago off the record, but my name is

18        Micah Block and I will be asking you some questions.

19   A.  Nice too meet you.

20   Q.  Would you start by stating your full name and spelling

21        it for the record please.

22   A.  Yes.  My first name is Yaron, Y-A-R-O-N; last name is

23        Shohat, S-H-O-H-A-T.

24   Q.  Mr. Shohat, have you ever given deposition testimony

25        under the rules of United States courts before?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   A.   Correct.

2   Q.   Okay.  In general terms, what did you and Mr. Gelfand

3        discuss?

4   MR. AKROTIRIANAKIS:  I think that, as phrased, is

5        problematic, Micah.

6   Q.   Subject to the same limitation I gave you before.  For

7        all of my questions today I never want you to reveal to

8        me legal advice that your counsel gave you.

9            So please tell me what facts Mr. Gelfand related to

10       you in order to prepare you to testify on topic 43?

11  A.   I asked him to refresh my memory about some specific

12       cases that we have investigated, of misuse, of

13       customers.

14  Q.   Which cases are those?

15  MR. AKROTIRIANAKIS:  In referring to the customers, you

16       shouldn't refer to them by their name, the actual name

17       of the country or agency.

18  MR. BLOCK:  So, sorry, will you just make clear that you are

19       instructing the witness not to identify customers, if

20       that's what you are doing?

21  MR. AKROTIRIANAKIS:  By name or agency, yes.

22  MR. BLOCK:  Okay.

23           So we take that instruction under objection.

24       However, let me ask the question again.

25  MR. AKROTIRIANAKIS:  Actually, Micah, could I state for the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 21

1          record, I don't mean for you to struggle to refer to
2          them by any particular, you know, code name or anything
3          like that, I think that it is fine for you to discuss in
4          a hypothetical sense, like, you know, customer 1,
5          customer A.
6     MR. BLOCK:  I am sorry, Joe, that's --
7     MR. AKROTIRIANAKIS:  I am giving him an instruction that
8          will hopefully help him answer your question.
9     MR. BLOCK:  Did you finish?
10    MR. AKROTIRIANAKIS:  I don't know.  It is not up on the
11         screen.
12             What I said was I am giving him an instruction that
13         will hopefully help him answer your question, while
14         staying within the limitations of the court's order.
15             By Mr. Block:
16    Q.  Mr. Shohat, for the specific investigations that you
17        asked for information to refresh your recollection from
18        Mr. Gelfand, are there code names that the defendants
19        use to refer to the customers who were involved in those
20        investigations?
21    A.  The questions I had for him were more general, about the
22        number of investigations.  There was only one which was
23        discussed specifically, the code name for it is Dutton.
24    Q.  Data?  Like --
25    A.  Dutton.  D-U-T-T-O-N.

Page 22

1    Q.   D-U-T-T-O-N?

2    A.   I believe that's the correct spelling.

3    Q.   Okay, when did the Dutton investigation occur?

4    MR. AKROTIRIANAKIS:   Objection.   Foundation.

5    A.   I don't know the specific date.   Or year.

6    Q.   Do you know, was it 2024?

7    A.   No.

8    Q.   Was it after 2019?

9    MR. AKROTIRIANAKIS:   Objection.   Foundation.

10   A.   I don't know.

11   Q.   Okay, was it after 2015?

12   MR. AKROTIRIANAKIS:   Same objection.

13   A.   Maybe.

14   Q.   You don't know whether it occurred --

15   A.   I don't know the exact year.

16   Q.   Okay.   I know you don't know the exact year, I am asking

17        whether you are capable of founding it in time in any

18        way?

19   A.   Since I don't know for sure, I don't want to make

20        a mistake.

21   Q.   Okay.   Let me -- fair enough.

22             Did it happen while you were CEO?

23   A.   No.

24   Q.   Okay, so it happened before you became CEO?

25   A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

1      defendants do to investigate Dutton?

2  MR. AKROTIRIANAKIS:  I think that for you to ask him that

3      question in his capacity as a representative of the

4      company, I need to finish what I was doing before we

5      decided to continue with the deposition.  Because that,

6      I think, is, number 44, isn't it?

7  MR. BLOCK:  Okay.  Let's go off the record.

8  THE VIDEOGRAPHER:  Going off the record.  The time is

9      09.48 a.m.

10  (9:48 a.m.)

11                      (break taken.)

12  (9:53 a.m.)

13  THE VIDEOGRAPHER:  Going back on the record.  The time is

14      09.53 a.m.  Thank you.

15  By Mr. Block:

16  Q.  Welcome back, Mr. Shohat.  I understand that you and

17      counsel conferred about the topics while we were off the

18      record, correct?

19  A.  Correct.

20  Q.  Okay.  Do you understand that you have been designated

21      to provide corporate representative testimony on behalf

22      of defendants for topic 44, with respect to

23      non-privileged aspects of the process by which

24      investigations are conducted by defendants into the use

25      of the accused technologies?

1   A.   I do.

2   Q.   Okay.  And obviously, Joe, for the record, we don't

3        accept that framing of the topic, but let me use it for

4        the purposes of this question.

5             I will ask you again, Mr. Shohat: please explain to

6        me the process by which defendants investigated Dutton?

7   MR. AKROTIRIANAKIS:  Okay, I am going to object that that is

8        outside the scope for which the witness has been

9        designated, which is limited to the process by which

10       investigations are conducted.

11  MR. BLOCK:  Okay.  So, to be clear, you are not providing

12       a witness to discuss the process of any particular

13       investigation, and you will provide a witness only on

14       the process generally?  Is that the defendants'

15       position?

16  MR. AKROTIRIANAKIS:  Well that is what our objections and

17       responses state we will do, and that is the limitation

18       for which this witness is designated.  So if you have

19       questions that are within that designation, that's fine,

20       you can ask them and he will answer on behalf of the

21       defendants.  If you have questions that are outside of

22       that -- I mean, you know how 30(b)(6) depositions work.

23  Q.   Okay.  Let me just ask the same question and get your

24       answer, sir: Mr. Shohat, please explain to me what you

25       know about the process by which defendants investigated

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1      Dutton?

 2   MR. AKROTIRIANAKIS:  Objection.  Foundation.

 3   A.  I will tell you the process we follow whenever there is

 4       an investigation, regardless of who the customer is.

 5       When we get an indication that there might have been

 6       a misuse of our system, in the way it was used, it has

 7       been targeted, or anything else, we open

 8       an investigation.  The first step would be to understand

 9       which of our customers may have conducted it.  If we

10       don't know, if there is no such indication, we would

11       contact the customer, asking for clarifications.

12       Sometimes the information that we get in response is

13       enough to conclude that there was no misuse.  Some.  In

14       other cases we might require additional information, and

15       we expect full cooperation by the customer.

16           If we conclude that the customer operated the system

17       not for the purpose, or not according to the limitations

18       defined in the contract, we will take measures, which

19       can range, but the most extreme is we will disconnect

20       the customer's system.

21           As part of the investigation we might ask the

22       customer to allow us to access -- first, to allow us to

23       receive information regarding the operation and, in some

24       cases, also to allow us access to the system logs

25       themselves, so we can verify whether a certain device
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

```
 1        was a target of the system or not.
 2            Again, we expect full cooperation from the
 3        customers, according to their obligations to us, and if
 4        we do not receive the right level of cooperation, we are
 5        entitled to disconnect the system and make it
 6        inoperational.
 7   Q.   Do the defendants have a contractual right to demand
 8        access from customers to the system logs you mentioned?
 9   MR. AKROTIRIANAKIS:  Objection.  Foundation.
10   A.   I don't recall the exact language in the contract.  If
11        you want, we can look at it.  But we definitely have the
12        right to conduct the investigation and take the measures
13        that I mentioned.
14   Q.   Which include requesting access to the system logs?
15   A.   Requesting.  The customer needs to -- cannot do it
16        without the customer's permission, of course.
17   Q.   And those system logs include the phone number of target
18        devices, correct?
19   MR. AKROTIRIANAKIS:  Objection.  Misstates his testimony.
20   A.   The system logs include, as far as I understand, not the
21        explicit phone number, but -- and I will use a technical
22        term here -- a hash of the number, which means the way
23        to verify whether a certain number is on the list
24        without seeing the explicit number.
25   Q.   So if you have the hash, you can't tell what phone
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 29

1     number represents, but you can check whether it

2     represents a phone number that you have and want to

3     investigate, is that what you are saying?

4   MR. AKROTIRIANAKIS:  Objection.  Misstates testimony.

5   A.  What I am saying, that if I am given a phone number --

6     a whistle blower, for instance, claiming that a certain

7     number was targeted for the wrong reasons -- and we open

8     an investigation, I can take that number, generate

9     a hash from it, and, with the customer's permission,

10     check if that hash exists on the system logs.

11   Q.  I think you said words to the effect -- and I am not

12     reading from the transcript here -- that if you identify

13     misuse in an investigation -- by "you" I mean

14     defendants -- then defendants will take measures which

15     may arise, up to disconnecting the customer's access to

16     Pegasus.  I don't want to put words in your mouth, but

17     was that more or less accurate?

18   A.  I will repeat what I said.

19   Q.  Please.

20   A.  I said that if the conclusion is that the customer

21     misused the system, we can take certain measures.  And

22     obviously the most severe measure would be to disconnect

23     the customer.

24   Q.  Have there ever been occasions when defendants confirmed

25     that there had been misuse but did not disconnect the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1      customer?

2  MR. AKROTIRIANAKIS:  Objection.  Vague.

3  A.  I don't know of specific cases, but I am pretty sure

4      there were.  I need to clarify that misuse is not

5      a yes/no answer; there is a range, depending on the

6      specific case.

7  Q.  What was the nature of the misuse in the Dutton

8      investigation?

9  MR. AKROTIRIANAKIS:  You are asking him in his -- I just

10      want to make the record clear.  You are asking him in

11      his personal capacity?  Because he is not designated

12      for --

13  MR. BLOCK:  I am asking him in his corporate representative

14      capacity.  Your objection to the question is out of

15      scope and I would like his testimony in whatever

16      capacity he is able to provide it.

17  MR. AKROTIRIANAKIS:  Okay, so then I am objecting that it

18      exceeds the scope of the designation of the witness and

19      further that the question lacks foundation from this

20      witness.

21  Q.  What was the nature of the misuse in the Dutton

22      investigations?

23  MR. AKROTIRIANAKIS:  Same objections.

24  A.  I will answer in my personal capacity.  It is our

25      understanding that the system was used for a purpose

Page 31

1   other than fighting or preventing crime or terror.

2 Q. What purpose was it used for?

3 MR. AKROTIRIANAKIS:  Objection.  No foundation, and exceeds

4   the scope of the designation of the witness.

5 A. Other kind of dispute.  I don't know how to -- I am not

6   a lawyer, I don't know how to categorize it.

7 Q. You can describe it in lay terms, and you can use the

8   translator if you need to.

9 MR. AKROTIRIANAKIS:  Same objections.  No foundation, and

10   beyond the scope of the designation of the witness.

11 A. It is not a matter of translation, it is a matter of

12   legal knowledge.  But I will try to answer.  In the

13   specific case I have in mind, the system was used on

14   a family member of, let's call it a head of state.  And

15   despite the fact that some might claim there was

16   an offense, a crime here, we viewed it beyond the scope

17   of the purpose of the system.

18 Q. What's the name of the person whose phone was infected

19   in a manner that defendants determined in the Dutton

20   investigation constituted a misuse?

21 A. Can you please repeat the question?

22 Q. Yes.  What is the name of the person whose phone was

23   infected in a manner that defendants determined in the

24   Dutton investigation constituted a misuse?

25 A. I have to correct my previous answer a little bit.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 32

```
 1        I told you that it was used to target a family member.
 2        My correction is that it was used to target -- what are
 3        these beeps?
 4   MR. BLOCK:  We don't know.  Please try to continue.  Sorry.
 5   A.   My correction is that it was used to target, as far as
 6        I understand, from my personal knowledge, the attorney
 7        of that person.  I don't know the name.
 8   Q.   The attorney of the family member of a head of state?
 9        You don't know the name of the attorney?
10   A.   Correct.
11   Q.   What's the name of the family member?
12   A.   I know her as Princess Haya.
13   Q.   And what's the name of the head of state?
14   A.   The Emir of Dubai.
15   Q.   In the course of our discussion of the Dutton
16        investigation, has your recollection been refreshed as
17        to when in time that investigation occurred?
18   A.   I do not remember the date, but we can Google it if you
19        want.
20   Q.   We can Google it because it is reported publicly?
21   A.   Correct.
22   Q.   Okay.
23   A.   If you remember, I explained that, in my discussion with
24        Mr. Gelfand, I asked him about cases that were public.
25   Q.   Okay.  Aside from the Dutton investigation, are there
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

```
 1        Pegasus software, correct?
 2   MR. AKROTIRIANAKIS:  Objection.  There is no foundation.
 3        Also assumes facts not in evidence.
 4   A.   I didn't see the list of -- that was claimed to be
 5        targeted by Whatsapp -- by Pegasus over Whatsapp.
 6   Q.   You know Pegasus was installed on an attorney's phone.
 7        We talked about that earlier today, right?
 8   A.   In a certain case that I mentioned, yes.
 9   Q.   Okay.
10   A.   I mentioned that was a misuse of the system, yes.
11   Q.   Right.  One example of the misuse of the system, right?
12   MR. AKROTIRIANAKIS:  Objection.  No foundation.
13   Q.   Right?
14   MR. AKROTIRIANAKIS:  No foundation.
15   A.   It was an example of misuse of the system.
16   Q.   Okay.
17            When you talk about requiring the system to be used
18        for the purposes of fighting crime and terrorism -- was
19        that your phrase?
20   A.   Yes.
21   Q.   Who decides what's crime or terrorism?
22   A.   In general, it is the governmental agency using the
23        system is required, like any agency, to have the right
24        authority to use such a tool against the suspect.
25        I would assume that they seek court orders or warrants,
```

Page 181

1       or whatever's required under the specific laws in that

2       country.

3    Q.  You assume but you don't know?

4    MR. AKROTIRIANAKIS:  Objection.  Argumentative.

5    A.  We require the customers to follow the law.

6    Q.  How do you require the customers to follow the law?

7    A.  Foremost, by statement that they provide in the

8       contract.  But there are many other measures that we

9       take to ensure that that is followed.

10   Q.  But at least ten customers have misused the system so

11      severely that you took your most drastic action, which

12      is to disconnect them, right?

13   MR. AKROTIRIANAKIS:  Objection.  Misstates testimony.  No

14      foundation.

15   A.  Around ten customers, yes.

16   Q.  And in fact you have investigated dozens of allegations

17      of misuse, correct?

18   A.  Most of them became -- turned out to be not a misuse.

19   Q.  And there are other circumstances in which you concluded

20      that there was misuse, but you decided to take steps

21      short of disconnecting the customer; correct?

22   A.  There is a few like that.

23   Q.  At least a few.

24      (Exhibit 2025               marked for identification)

25          This is exhibit 2025, which, by the way, I have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

```
 1        marked out of order.  We will come back to 2024.
 2              Mr. Shohat, exhibit 2025 is a January 26, 2023
 3        article from the Wall Street Journal, entitled:
 4              "Head of Israeli cyber firm NSO Group reaffirms
 5        company commitment to spyware".
 6              Subtitle:
 7              "Yaron Shohat acknowledges mistakes but defends the
 8        technology as vital".
 9              Do you see that?
10   A.   I do.
11   Q.   Do you recognize this article?
12   A.   Yes, I do.
13   Q.   On the second page, in the third paragraph, the article
14        states:
15              "Mr. Shohat said NSO Group had terminated ten
16        customers because of alleged misuse of its technology,
17        adding that the spyware vendor had learned lessons from
18        those experiences.  He didn't name the customers."
19              Do you see that?
20   A.   I do.
21   Q.   Did you provide that information to the Wall Street
22        Journal in January 2023?
23   A.   I did talk to the Wall Street Journal.  I don't recall
24        if I said ten customers or around ten customers.
25        I don't recall if it was a definite number.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 256

1        CERTIFICATE OF COURT REPORTER

2

3    I, CHRIS LANG, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness YARON SHOHAT in

5    the foregoing transcript, taken on this 29TH day of AUGUST,

6    2024 was recorded by me in machine shorthand and was

7    thereafter transcribed by me; and that the foregoing

8    transcript is a true and accurate verbatim record of the

9    said testimony.

10

11   I further certify that I am not a relative, employee,

12   counsel or financially involved with any of the parties to

13   the within cause, nor am I an employee or relative of any

14   counsel for the parties, nor am I in any way interested in

15   the outcome of the within cause.

16

17

18

19   Name:   CHRIS LANG

20   Date:   8/29/24

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit E

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1        H I G H L Y   C O N F I D E N T I A L

2                ATTORNEYS' EYES ONLY

3          NORTHERN DISTRICT OF CALIFORNIA

4                  OAKLAND DIVISION

5                    Case No. 4-19-cv-07123-PJH

6    ----------------------------------

7    WHATSAPP INC., a Delaware corporation,

8    and META PLATFORMS INC., a Delaware corporation,

9          Plaintiffs,

10   v.

11   NSO GROUP TECHNOLOGIES LTD and

12   Q CYBER TECHNOLOGIES LTD,

13          Defendants.

14   ----------------------------------

15      Deposition of TAMIR GAZNELI, taken by AILSA

16    WILLIAMS, Certified Court Reporter, held at the

17    offices of Davis Polk & Wardwell, London, United

18       Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 6

1   should note also we have three representatives

2   from our experts.  David Youssef and George Arden

3   from FTI and David Snedarsik of Intuitive, all of

4   whom are authorized under the protective order to

5   receive highly confidential information.

6           MR. AKROTIRIANAKIS:  Joe Akrotirianakis

7   on behalf of defendants.  Chaim Gelfand and Shira

8   Plotnik are here from NSO.

9           THE VIDEOGRAPHER:  The court reporter

10  today is Ailsa Williams, also representing

11  Veritext Legal Solutions.  Please would the

12  interpreters introduce themselves for the record

13  and state where they are.

14          MS. YAARI:  Varda Yaari for European

15  depositions.

16          MS. ILAN:  Mor Ilan for European

17  depositions.

18          THE VIDEOGRAPHER:  Please would the

19  court reporter firstly swear in the interpreters

20  and thereafter please swear in the witness.

21              (Interpreters sworn.)

22                  TAMIR GAZNELI

23              Having been sworn,

24              Testified as follows:

25          EXAMINATION BY MR. PEREZ-MARQUES:

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                                              Page 7
  1           MR. PEREZ-MARQUES:  Mr. Gazneli, could
  2    you state your name for the record?
  3           A    My name is Tamir Gazneli.
  4           Q    I introduced myself before but it is
  5    Tony Perez from Davis Polk.  Have you been deposed
  6    before?
  7           A    No.
  8           Q    The format today is that I will be
  9    asking questions, your role is to answer them.  We
 10    do need verbal responses to my questions, meaning
 11    that I need more than a nod or a shake of the head
 12    so the reporter can take it down.
 13           If you don't understand my question at
 14    any point please ask me to clarify.  I will be
 15    happy to try to do so.  If you proceed to answer
 16    the question, I will assume you understood it.  Is
 17    that fair?
 18           A    Yes.
 19           Q    As you know, we have an interpreter
 20    in the room with you and a back-up interpreter by
 21    Zoom if you do need to use those services,
 22    although I understand we are going to try to
 23    proceed in English to the extent possible.
 24           Now, let me show you what has been
 25    previously marked as plaintiff's Exhibit or
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 184

1              A    As I said, this is part of protocol

2      messages which are required to initiate the

3      WhatsApp call.  It is not a single message.  It is

4      back and forth messages which are handshaked

5      between the source and the target.

6              Q    And that occurs through the WhatsApp

7      servers?

8              A    As we said before, every

9      transmission between two peers have to be

10     transmitted through WhatsApp servers.

11             Q    Including this transmission that we

12     are talking about here?

13             A    Including this, yes.

14             Q    Except a normal peer to peer

15     communication through WhatsApp would be with one

16     WhatsApp client and another, correct?

17             MR. AKROTIRIANAKIS:  Object to the form

18     of the question.  Vague.

19             A    Would you call bot originating a

20     call normal activity?

21             Q    No.

22             A    Okay.

23             Q    A standard, regular WhatsApp call

24     would be from one WhatsApp client to another.

25     Right?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

```
 1              MR. AKROTIRIANAKIS:  No foundation.
 2              A   As I said before, we were initiating
 3    a call, a WhatsApp call, between two peers.
 4    Whether it is normal or not, it is like -- I don't
 5    have any way to answer this question.
 6              Q   My question was different.  I asked
 7    you in a normal WhatsApp voice call, one WhatsApp
 8    user calls another WhatsApp user, that would be a
 9    WhatsApp client on both sides.  Right?
10              A   Yes.
11              Q   And so what NSO is doing as part of
12    the Heaven and Eden exploits was different than
13    that.  Right?
14              MR. AKROTIRIANAKIS:  Objection,
15    misstates testimony.
16              Q   Because on one side of the call
17    wasn't a WhatsApp client, right?
18              A   There was code which was able to
19    send messages using WhatsApp client on one side
20    source to the second endpoint which is target's
21    WhatsApp client.
22              Q   Right, but as we have talked about
23    at length already, on the source side it is not a
24    WhatsApp client, right?  It is the WIS which NSO
25    created, correct?
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                                                    Page 186

1              A    I would clarify.

2              Q    Can I just get a yes or no to that

3    so we are all on the same page?

4              A    The answer is no.

5              MR. AKROTIRIANAKIS:  He is going to

6    answer the question --

7              Q    Go ahead then.

8              A    Go ahead with the question.  The

9    question was --

10             Q    You were going to answer.  On the

11   source side, it is not a WhatsApp client, it is

12   the WIS which NSO created.  Isn't that correct?

13             A    The messages are built and sent from

14   the WIS client.  These messages have to be sent

15   from an application.  Client is notified, which he

16   uses to connect to the application and sends the

17   messages through a real and active client.

18             Q    Through an active WhatsApp account?

19             A    Yes.

20             Q    And whose account would that be?

21             A    Accounts were established for the

22   customer.

23             Q    So the message is generated by the

24   WIS?

25             A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

 1            Q    But it is put into the WhatsApp
 2    servers by an actual WhatsApp client?
 3            A    WIS has a connection to a client
 4    which is activated through the normal procedures
 5    of client activation.
 6            Q    Meanings it uses like an
 7    authentication token from an actual account?
 8            MR. AKROTIRIANAKIS:  Had you completed
 9    your answer before he --
10            A    No.
11            Q    Go ahead.
12            A    WIS crafts messages which are
13    required to initiate the call and test
14    connectivity with the client which was activated
15    for each and every customer.  It was connected to
16    the WhatsApp system as a normal client because it
17    is a normal client, and sent, and the message is
18    sent by normal client from one peer to a normal
19    client that target's device.
20            Q    And so in addition to the WIS there
21    is a stand-alone client, genuine WhatsApp client
22    on the source side of this transmission?
23            A    Yes.
24            Q    And so the message is created by the
25    WIS but transmitted through that WhatsApp client?

Page 188

```
 1              A    Yes.
 2              Q    And when you said it has
 3    connectivity, the WIS has connectivity to a
 4    genuine WhatsApp client, what did you mean by
 5    that?
 6              A    I mean that it has to be -- it has
 7    to have a way to connect the target and send the
 8    message to the target.
 9              Q    So the WIS is able to send the
10    message it created through that WhatsApp client?
11              A    Yes.
12              Q    Got it.  And that WhatsApp client on
13    the initiating side would be one that -- an
14    account that NSO created?
15              A    As part of deployment, each customer
16    has his own set of WhatsApp clients that were used
17    for this operation.
18              Q    Created by NSO, right?
19              A    Yes.
20              Q    Through the White Services team?
21              A    Yes.
22              Q    And those would be anonymized as
23    well?
24              A    Yes, as part of the operation
25    requirements for the customer to be anonymized.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 189

1          Q    Going back to that second bullet, it

2     says:

3               "As part of the call, initiation

4     handshake between our WIS client and target's

5     WhatsApp."

6               First of all, do you agree that as part

7     of the call there is an initiation handshake

8     between NSO's WIS client and the target WhatsApp

9     client?

10          A    Again the question?

11          Q    Do you agree that as part of the

12    call -- that as part of the call -- it says here

13    as part of the call that there is an initiation

14    handshake between the WIS client and the target

15    client?

16          A    For operations done by customer

17    deployment was done on customer's infrastructure

18    before initiation is between the code that is

19    deployed on customer side with targets he chooses

20    to install.

21          Q    Not my question.  But there is a

22    handshake between the WIS and the target client?

23          A    There is a connection between WIS

24    and WhatsApp client on the target's device.

25          Q    It says:

Page 267

```
 1              A    Yes.
 2              Q    And up to that date in May 2020, did
 3    ERISED remain in use?
 4              A    Yes.
 5              Q    So as to whether NSO has ever
 6    stopped using ERISED, I assume that is a question
 7    you are not willing to answer?
 8              A    Regarding ERISED, the
 9    vulnerabilities in ERISED was not in WhatsApp at
10    all and that part was eventually closed.
11              Q    So you are willing to answer that
12    question about after May 2020?
13              A    I am answering a question about
14    ERISED capability --
15              Q    Where was the vulnerability that was
16    exploited by ERISED?
17              A    Specific part in one of Samsung
18    related code.
19              Q    So was ERISED limited to Samsung
20    devices?
21              A    Yes.
22              Q    But did it also work by transmitting
23    WhatsApp messages?
24              A    It was our decision whether to
25    trigger it using WhatsApp messages or not.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 268

1            Q    So it could be triggered using
2      WhatsApp messages?
3            A    Yes.
4            Q    And were those WhatsApp messages
5      sent via WhatsApp servers?
6            A    Yes.
7            Q    And similar to what we saw about
8      Heaven, those were non-standard WhatsApp messages?
9            MR. AKROTIRIANAKIS:  Object to the form.
10           A    As I said before, some of them maybe
11     were non-standard but not all of them.
12           Q    Were the messages, the WhatsApp
13     messages that were sent as part of ERISED
14     installation, were those also originated from the
15     WIS?
16           A    Yes.
17           Q    So just at a high level if you can,
18     how was ERISED different from Eden?
19           A    So ERISED didn't use any voice or
20     video call to be established, and didn't use any
21     relay server for communication in the installation
22     flow.  As I explained before, it triggered
23     vulnerability which was outside the application of
24     WhatsApp and only used WhatsApp messages to be
25     able to trigger the specific code in which the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 269

1   vulnerability resides.

2           Q    So under ERISED NSO used WhatsApp

3   messages to trigger a vulnerability in the Samsung

4   system?

5           A    Yes.

6           Q    And then triggering that

7   vulnerability would then cause the further steps

8   of the installation flows?

9           A    Yes.

10          Q    Was a stager delivered through

11  WhatsApp servers as part of ERISED?

12          A    Not the exact same but modifications

13  of it.

14          Q    Just to be clear, after -- and were

15  the same fingerprinting methods used?

16          A    Part of it, because as we talked

17  before ERISED required also additional information

18  whether the vendor is Samsung or not.

19          Q    Just to be clear, after WhatsApp

20  closed the vulnerability that was being exploited

21  by Eden in May 2019, NSO worked on developing a

22  new 0 click exploit that also worked, at least in

23  part, by transmitting WhatsApp messages.  Yes?

24          MR. AKROTIRIANAKIS:  Misstates

25  testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1           A    We researched for a new solution.

2    We found vulnerability in the system which was

3    specific for Samsung and we decided to implement

4    it and build installation flow based on WhatsApp

5    application.

6           Q    And after WhatsApp closed the

7    vulnerability that was being exploited by Eden,

8    NSO succeeded in developing a new 0 click

9    installation vector that operated in part through

10   delivering WhatsApp messages, yes?

11           MR. AKROTIRIANAKIS:  Misstates

12   testimony.

13           A    We found additional vulnerability

14   which we were able to build installation for using

15   that.

16           Q    And that installation vector,

17   ERISED, which used WhatsApp servers and WhatsApp

18   messages remained in use by NSO customers as of at

19   least May 2020.  Is that right?

20           A    Yes.

21           Q    So, with this lawsuit pending, NSO

22   was actively making available to its customers a 0

23   click exploit that involved the transmission of

24   messages over WhatsApp servers?

25           MR. AKROTIRIANAKIS:  No foundation.

Page 293

1          Q    Who is in charge of the White

2   Services group?

3          A    Ramon.

4          Q    Ramon.  Did defendants ever lease

5   servers or other computer infrastructure from 365

6   Online Technology JSC in Hanoi, Vietnam?

7          A    No.

8          Q    Did defendants ever lease servers or

9   other computer infrastructure from Green Cloud

10  Technology?

11         A    Again, it is under White Services

12  responsibility.

13         Q    When you say Ramon, you mean Ramon

14  Eshkar?

15         A    Yes.

16         Q    Going back to the fingerprinting

17  stage of the Hummingbird vectors, the information

18  that NSO is obtaining regarding the target device,

19  you gave a few examples, operating system, whether

20  it is online, whether it has WhatsApp installed.

21  Do you recall that, generally?

22         A    Yes.

23         Q    From where is NSO obtaining that

24  information?

25              MR. AKROTIRIANAKIS:  Object to the form.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            A    Except the parameter about whether

2    the target has an active WhatsApp account, all the

3    other information parts are from the target's

4    client application.

5            Q    The target's WhatsApp client?

6            A    Yes.

7            Q    And does that go through the

8    WhatsApp servers?

9            A    As any other message.

10           Q    And what about the information about

11   whether the target is an active WhatsApp client?

12   Where does that information come from?

13           A    This comes from WhatsApp server, as

14   it comes for any other normal user when he enters

15   new phone number in his contacts list.

16           Q    And when you say whether the target

17   has an active WhatsApp account, what do you mean?

18           A    Activated WhatsApp account.

19           Q    That is different from whether like

20   the app is in the foreground?

21           A    Yes.  Whether it ever has been

22   activated WhatsApp account in a WhatsApp

23   ecosystem.

24           Q    Apologies, because I know we covered

25   this before, but for the Hummingbird vectors, did

Page 295

```
1    the fingerprinting work through the transmission
2    of WhatsApp messages?
3              A    Yes.
4              Q    Okay.  And so prior to sending the
5    WhatsApp message, that would tell you, the
6    operating system, whether the app is in the
7    foreground, would NSO first have to confirm from
8    the WhatsApp server whether the user had an active
9    WhatsApp account?
10             A    The first stage in the WhatsApp
11   fingerprint was first checking that the target
12   device number has an activated WhatsApp account.
13   Then check the other three preliminary parameters,
14   which is whether the target device is Android
15   device, whether he is online, meaning it is
16   connected to a network, and whether he is in
17   foreground or not.
18             Q    And if the target was in foreground
19   would you proceed with the installation?
20             A    No.
21             Q    And so before proceeding to the --
22   I will call it the second piece of the
23   fingerprinting --
24             A    Yes.
25             Q    -- NSO would first have to confirm
```

Page 296

```
 1    that the target had an activated WhatsApp account?
 2              MR. AKROTIRIANAKIS:  Object to the form
 3    of the question.
 4         A    This is one of the parts in the
 5    fingerprinting.
 6         Q    And is it right to think of it as
 7    sequential, that you would only proceed to sending
 8    a message to the target's WhatsApp client only
 9    after you had first confirmed that the client had
10    an activated WhatsApp account?
11              MR. AKROTIRIANAKIS:  Object to the form
12    of the question.
13         A    There is no ability to send any
14    message to a client which does not exist.
15         Q    So the first piece of information
16    obtained as part of fingerprinting comes from the
17    WhatsApp server?
18         A    Yes, as it comes to any other number
19    that you have in list --
20         Q    And then the installation flow would
21    not proceed -- would or would not proceed,
22    depending on the answer, the information that NSO
23    got from the WhatsApp server.  Right?
24              MR. AKROTIRIANAKIS:  Object to the form
25    of the question.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 297

1          A    It was a decision of customer

2     whether to proceed or not to the installation.

3          Q    If there is no WhatsApp activated

4     account you could not proceed?

5          A    If there is no WhatsApp, no.  If

6     there is a WhatsApp, the answer still may be no.

7          Q    And once the fingerprinting flow has

8     confirmed that the client has an activated

9     WhatsApp account, does it proceed automatically

10    with the rest of the fingerprinting or is there a

11    separate decision that gets made by an operator?

12         A    When you say "separate", which part

13    do you mean?

14         Q    I mean one possibility is --

15    everything I just described happens in three

16    milliseconds, and yes, the first step is to

17    confirm whether there is an activated account, but

18    then it immediately goes on to the remaining

19    steps.  The other option is there is someone

20    sitting at a computer, and they get a response

21    that says this target has an activated account,

22    and then they press a separate button that

23    triggers the rest of the fingerprinting.  That is

24    what I meant.

25         A    For information part, I explain

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1    whether he has -- the target has WhatsApp account

2    activated, whether he is online or not, Android

3    device, or is foreground or not, and done in one

4    single attempt, but of course it depends on each

5    part of preceding step.

6              Q    Got it.  That answers my question,

7    thank you.

8              So once the fingerprinting is done, the

9    next step is sending a call offer.  Is that right?

10   The next step of the installation flow?

11             A    Yes.

12             Q    And the call offer used an XOR

13   cipher.  Is that right?

14             A    Yes.

15             Q    What is an XOR cipher?

16             A    It is an encryption that WhatsApp

17   uses for communications.

18             Q    And so why did defendants call up or

19   use an XOR cipher?

20             A    In order to encrypt the

21   communication.

22             Q    And is that the non-standard

23   encryption that we talked about before?

24             A    Back then it was not standard.

25             Q    Back when?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 299

```
 1              A    In Heaven.
 2              Q    And then what about with Eden and
 3    ERISED?
 4              A    I don't recall whether this part was
 5    changed in Eden, but eventually it was changed and
 6    it became standard.
 7              Q    For ERISED?
 8              A    As I said, I don't recall the exact
 9    time that it changed from Eden, non-standard to
10    standard.
11              Q    And why did defendants want to
12    encrypt the message?
13              MR. AKROTIRIANAKIS:  Assumes facts not
14    in evidence.
15              A    Part of measure to conceal the
16    messages content.
17              Q    Can WhatsApp user using the standard
18    WhatsApp client app send a call offer using an XOR
19    cipher?
20              A    No.
21              Q    The call offer, at least for some of
22    the Hummingbird vectors, manipulated the
23    connecting tone DESC field.  Is that right?
24              A    Yes.
25              Q    And is that true of all three of the
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 300

1   Hummingbird vectors?

2          A    No.

3          Q    Which ones is it true of?

4          A    For Heaven and Eden.

5          Q    And who at defendants came up with

6   the idea to manipulate that particular field?

7          A    The research team.

8          Q    When did defendants come up with

9   that idea?

10         A    During the research efforts that

11  were done as part of the vulnerability research

12  and the exploitation research.

13         Q    And roughly what was the time period

14  when that work was being done?

15         A    Beginning of 2018 or end of 2017.

16         Q    And defendants, as part of at least

17  the Eden and Heaven vectors, would insert a bash

18  script in the connecting tone desc field?

19         A    Yes.

20         Q    And WhatsApp users using the

21  official WhatsApp client app could not use the

22  connecting tone desc field.  Is that right?

23         A    Right.

24         Q    The next step was inducing the

25  victim's WhatsApp client to disclose whether It

Page 301

1  was 32 bit or 64 bit.  Is that right?

2          A    Yes.

3          Q    Is that true for all three

4  Hummingbird vectors?

5          A    No.

6          Q    Just Eden and Heaven?

7          A    Yes.

8          Q    And defendants needed that

9  information to determine next steps in the attack.

10 Is that right?

11         A    To determine which payload to

12 continue with and which messages sequence to use.

13         Q    And defendants obtained that

14 information, 32 bit versus 64 bit, through relay

15 negotiation and bandwidth estimation.  Is that

16 right?

17         A    Yes.

18         Q    And defendants would send an

19 oversized bit width detection packet to the target

20 device.  Is that right?

21         A    Right.

22         Q    And again that is for Eden and

23 Heaven?

24         A    Yes.

25         Q    And that oversized bit width

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   in the term "lawful interception" can lawful
 2   interception, to your knowledge, be done both
 3   lawfully and unlawfully?
 4           MR. PEREZ-MARQUES:  Object that it is
 5   leading.
 6           A    Yes.
 7           Q    Would you turn to section 2.1 in the
 8   same document.  You were asked about the point
 9   here where it is the first point that says "Global
10   Coverage"?
11           A    Yes.
12           Q    "Monitor target's devices while they
13   connect to the internet for end location."
14           Do you see that?
15           A    Yes.
16           Q    Do you know whether Pegasus has
17   configuration limitations that can limit
18   geography?
19           A    Yes.
20           Q    Can you give me an example?
21           A    Each customer is configured to the
22   ability to use this software in specific licensed
23   territories, meaning that when you deploy a
24   customer you configure them only in the
25   territories he may use or can use this tool.  For
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 316

1    example, you could configure no way to install an

2    agent on territory like US or UK, or ...

3              Q    Is Pegasus configured for anyone, to

4    your knowledge, in a way that allows it to monitor

5    within the United States?

6              MR. PEREZ-MARQUES:   Object to form.

7              A    No.

8              Q    Throughout the day you were asked a

9    lot of questions about messages being sent.

10             A    Yes.

11             Q    Does NSO ever send messages to

12   target users?

13             A    No.

14             MR. PEREZ-MARQUES:   Object to form.

15             Q    To your knowledge has NSO ever sent

16   a message to a target user?

17             MR. PEREZ-MARQUES:   Object to form.

18             A    No.

19             Q    Same questions with respect to voice

20   calls or video calls?

21             MR. PEREZ-MARQUES:   Same objection.

22             A    No.

23             Q    To your knowledge, has NSO ever sent

24   any message or voice call or video call to any

25   phone that it was not authorized to access?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 317

1        MR. PEREZ-MARQUES:  Object to form.

2        A    No.



1           A    As a domain name, behind which there

2    is a real server, which is deployed in any

3    location on WhatsApp decision.

4           Q    And accessing WhatsApp relay servers

5    was also necessary for the Hummingbird vectors.

6    Isn't that right?

7           A    No.

8           Q    No?

9           A    No.

10          Q    Okay.  What about for ERISED?

11          A    No.

12          Q    I think you testified earlier that

13    the messages for ERISED had to be transmitted

14    through the WhatsApp relay servers?

15          A    No.  I testified that for Heaven and

16    Eden they were transferred through relay servers.

17          Q    Got it.  And it was necessary for

18    the operation of Heaven and Eden?

19          A    Yes.

20          Q    You were asked just now by your

21    counsel some questions about geographical

22    restrictions.  Do you recall that?

23          A    Yes.

24          Q    I just want to make sure

25    I understand this.  I will give you a

Page 327

1  hypothetical.  If I am, say, a Mexican citizen and

2  just hypothetically NSO has as a client a Mexican

3  law enforcement agency, and Mexico is within their

4  territorial license, they are permitted to install

5  on my phone.  Is that correct?

6              A    Under their lawful authorization.

7  Under their rules.  Yes.

8              Q    And those rules you are not familiar

9  with?

10             A    No.

11             Q    So I am a target.  I have been

12  permissibly infected with Pegasus.  I then travel

13  to the United States.

14             A    Yes.

15             Q    Does the customer then lose access

16  to my information?

17             A    Yes.

18             Q    Now, what if I am a US person, okay,

19  so completely new hypothetical.  I am a US person.

20  I am a US citizen.  I live most of the year in New

21  York.

22             A    With US number?

23             Q    With a US number.

24             A    Okay.

25             Q    But I am working in Dubai.  If you

Page 328

1   had a customer that had a territorial license that
2   covered Dubai, could it be installed on that
3   number?
4           A    No.
5           Q    So not US numbers and not US
6   territory?
7           A    Yes.
8           Q    Okay.  But that is on a customer by
9   customer basis, depending on the territorial
10  restrictions of particular contracts?
11          A    No customer has US enabled for
12  installation.
13          Q    And that is with respect to Pegasus?
14          A    Yes.
15          Q    What about with respect to Phantom?
16          A    I am not aware.  I don't know what
17  Phantom is.
18          Q    You are not familiar with Phantom?
19          A    No.
20          Q    Are you familiar with a company
21  called Westbridge?
22          A    Yes.
23          Q    What is Westbridge?
24          A    US like --
25               MR. AKROTIRIANAKIS:  Object to the form

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 329

```
1   of the question.  No foundation.
2           A    It is a US company trying to market
3   the product.
4           Q    Trying to market NSO's products,
5   right?
6           A    Yes.
7           Q    Including Pegasus?
8           A    I am not familiar with their
9   activity.
10          Q    But certainly Westbridge was
11  authorized by NSO to market NSO products?
12          MR. AKROTIRIANAKIS:  Object to the form
13  of the question.  No foundation.
14          A    No.
15          Q    Is it your understanding that
16  Westbridge was operating without permission?
17          MR. AKROTIRIANAKIS:  Objection, no
18  foundation.
19          A    I don't know.
20          Q    Okay.  And when Westbridge
21  demonstrated NSO software, were those
22  demonstrations supported by NSO personnel?
23          MR. AKROTIRIANAKIS:  Objection, no
24  foundation.
25          A    I don't know.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1          CERTIFICATE OF COURT REPORTER

2

3    I, AILSA WILLIAMS, an Accredited LiveNote

4    Reporter, hereby certify that Tamir Gazneli was

5    duly sworn, that I took the Stenograph notes of

6    the foregoing deposition and that the transcript

7    thereof is a true and accurate record transcribed

8    to the best of my skill and ability.  I further

9    certify that I am neither counsel for, related to,

10   nor employed by any of the parties to the action

11   in which the deposition was taken, and that I am

12   not a relative or employee of any attorney or

13   counsel employed by the parties hereto, nor

14   financially or otherwise interested in the outcome

15   of the action.

16   Before completion of the deposition, review of the

17   transcript was requested.  Any changes made by the

18   deponent (and provided to the reporter) during the

19   period allowed are appended hereto.

20

21   *Ailse Yh Williams*

22

23   AILSA WILLIAMS

24   Dated:    September 6, 2024.

25

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a)  If the deposition testimony is stenographically recorded, the deposition officer shall send written notice to the deponent and to all parties attending the deposition when the Original transcript of the testimony for each session of the deposition is available for reading, correcting, and signing, unless the deponent and the attending parties agree on the record that the reading, correcting, and signing of the transcript of the testimony will be waived or that the reading, correcting, and signing of a transcript of the testimony will take place after the entire deposition has been concluded or at some other specific time.

(b)  For 30 days following each notice under subdivision (a), unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period, the deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the deposition officer. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the deposition officer and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in SSAE 16 certified facilities.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of deposition services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.