# Exhibit 1

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
*jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
*acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,

Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,

Defendants.

Case No. 4:19-cv-07123-PJH

**DEFENDANT NSO GROUP TECHNOLOGIES LIMITED'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES NOS. 1-3, 6-9**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Action Filed: 10/29/2019

Pursuant to Federal Rules of Civil Procedure 26 and 33, and to this Court's orders (Dkt. No. 292), Defendant NSO Group Technologies Limited ("NSO") hereby serves supplemental objections and responses to Plaintiff WhatsApp LLC's ("WhatsApp") First Set of Interrogatories ("Interrogatories") Nos. 1-3 and 6-9.

**PRELIMINARY STATEMENT**

Nothing in these objections and responses should be construed as an admission with respect to the admissibility or relevance of any fact or document, or of the truth or accuracy of any characterization or statement of any kind contained in Plaintiff WhatsApp's Interrogatories. NSO has not completed its investigation of the facts relating to this case, discovery, or preparation for trial. The responses set forth below are based only upon information and documents that are currently available, and specifically known, to NSO. Further discovery, independent investigation, legal research, and analysis may supply additional facts, add meaning to known facts, and establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the responses set forth herein.

The following objections and responses are given without prejudice to NSO's right to produce evidence, at trial or otherwise, regarding any subsequently discovered facts or information. NSO reserves the right to modify and amend any responses herein as additional facts are ascertained, as analysis and contentions are made, or as research is completed.

The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as are presently known but should in no way prejudice NSO in relation to further discovery, research, or analysis.

By submitting these objections and responses, NSO does not consent to jurisdiction of the Court and does not waive its defenses that the Court lacks personal jurisdiction. To the contrary, NSO hereby preserves any related defenses.

NSO reserves the right to redact information from certain documents as may be necessary to comply with Israeli or other foreign law or contractual obligations.

**GENERAL OBJECTIONS**

NSO interposes the following general objections into each of the responses that follows as if the general objections were set forth in full in each specific response. These objections therefore form a part of the response to every interrogatory, including any subparts.

1. NSO objects to the extent that any interrogatory seeks information that exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure or seeks to impose obligations upon NSO beyond those required by the Federal Rules of Civil Procedure.

2. NSO objects to the extent that any interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated lawful intercept technology "targeting or directed at Whatsapp servers, or using Whatsapp in any way to access Target Devices" between April 29, 2018 and May 10, 2020. (Dkt. No. 292 at 3-4.) In complying with the Court's ordered scope of discovery, NSO does not waive any objection that relevance should be limited to the software called "Pegasus" as allegedly operated with respect to the "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during the timeframe specified in the Complaint.

3. NSO objects to the extent that any interrogatory is unreasonably cumulative or duplicative.

4. NSO objects to the extent that any interrogatory seeks information outside of its possession, custody, or control. To the extent that NSO provides a substantive response below, it will only include information that is in its possession, custody, or control and that NSO could identify after a reasonable investigation.

5. NSO objects to the extent that any interrogatory seeks information obtainable from some other source that is more convenient, less burdensome, or less expensive. NSO objects to the extent that any interrogatory seeks information already in the possession, custody, or control of Plaintiffs; information that is available from public sources; or information that is as readily available to Plaintiffs as to Defendants on the grounds that it would be unduly burdensome and

oppressive to require Defendants to obtain, process, and reproduce such documents.

6. NSO objects to the extent that any interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure.

7. NSO objects to the extent that any interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information.

8. NSO objects to the extent that any interrogatory seeks information that may be protected by a right of privacy under the United States Constitution, Article I, Section 1 of the Constitution of the State of California, Israeli privacy laws, or any other applicable law.

9. NSO objects to the extent that any interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO intends to withhold information, documents, and communications that it is not permitted to produce pursuant to Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

10. NSO objects to the extent that any interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are best answered after related discovery has been completed.

11. NSO objects that the interrogatories require it to participate in this lawsuit despite Plaintiffs' failure to establish personal jurisdiction over NSO. Nothing herein should be interpreted as a waiver of the burden Plaintiffs have to prove that NSO is subject to personal jurisdiction in California.

12. NSO objects to the extent that any interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

13. NSO objects to the extent that any interrogatory contains unproven assumptions or

premises and is thus argumentative.

**OBJECTIONS TO DEFINITIONS**

1. Definition No. 5 ("Device"): NSO objects to the definition of "Device" as vague, ambiguous, and overbroad because it encompasses any "electronic device." Using the word device to define the term device renders the definition vague and ambiguous. To the extent the definition intended to encompass any electronic object, the definition would be overbroad and responding to any interrogatory that incorporates the definition would be unduly burdensome and not proportional to the needs of the case. NSO will interpret the term "Device" to mean a computer, mobile phone, or server.

2. Definition No. 6 ("Document" or "Documents"): NSO objects to the definition of "Document" or "Documents" to the extent that they impose any obligation to produce materials not requested and agreed to in separate requests for production. NSO further objects to the definitions to the extent that they would require it to access media from which information cannot be obtained directly or cannot be translated into a reasonably useable form without undue burden on NSO.

3. Definition No. 8 ("Identify," "Identity," or "Describe"): NSO objects to the definitions of "Identify," "Identity," and "Describe" as overly broad and unduly burdensome. NSO further objects that any interrogatories incorporating these definitions are compound and that the number of interrogatories and subparts propounded exceeds the limit set forth in Federal Rule of Civil Procedure 33(a)(1). NSO will assign to the terms above their plain and ordinary meaning and reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should these definitions be incorporated into the interrogatories below.

4. Definition No. 10 ("NSO Customer"): NSO objects to the definition of "NSO Customer" to the extent that it includes Persons who did not (1) execute an agreement with NSO or other entity authorized to license NSO technology; (2) obtain access to NSO technology; and (3) use NSO technology. NSO further objects to this definition to the extent that it incorporates the term "NSO Spyware" for the reasons set forth below in Paragraph 5. NSO expressly

incorporates by reference those objections here.

5. Definition No. 11 ("NSO Spyware"): Defendants object to the definition of "NSO Spyware" as biased and prejudicial. The term "Spyware" is an inherently pejorative term that baselessly maligns Defendants' products. Defendants will not refer to its products—which are used by law enforcement to catch the worst of criminals—as "Spyware." Defendants further object to the overly broad scope of this definition. Defendants further object to the definition of "NSO Spyware" because that definition results in every Topic incorporating it to be requesting information related to technologies other than the Pegasus technology that was used with respect to the approximately 1,400 "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7). Unless otherwise indicated, Defendants will use the phrase "Accused Technology" or "Accused Technologies" in any response to the Topic containing the term "NSO Spyware." Defendants define "Accused Technology" or "Accused Technologies" as any NSO Technology targeting or directed at WhatsApp servers or using WhatsApp in any way to access Target Devices, from April 29, 2018 through May 10, 2020, in accordance with the definition set forth by the Court in its Order dated February 23, 2024.

6. Definition No. 12 ("Person(s)"): NSO objects to the definition of "Person(s)" as vague, ambiguous, and overbroad. The definition includes 16 distinct roles or types of entities. Responding to any interrogatory that relies on such a broad definition of "Person," moreover, would be unduly burdensome and not proportional to the needs of the case. NSO further objects to the extent that the proposed definition seeks information outside of its possession, custody, or control (e.g., the corporate structure, ownership, or members of third-party companies).

7. Definition No. 14 ("Technology"): NSO objects to the definition of "Technology" as vague, ambiguous, and overbroad. The definition is extremely expansive and responding to any interrogatories that incorporate this definition would be unduly burdensome and not proportional to the needs of the case.

8. Definition No. 15 ("WhatsApp Computers"): NSO objects to the definition of "WhatsApp Computer" as vague, ambiguous, and overbroad—particularly to the extent that the

definition purports to include and encompass the WhatsApp mobile and desktop applications. NSO interprets "WhatsApp Computers" as any computer or server Defendants know are owned, operated or controlled by Plaintiffs. NSO further objects to the extent that the definition requests information outside of NSO's possession, custody, or control. NSO, for example, may have no ability to determine whether a particular computer or server was owned, operated, or controlled by Plaintiffs or whether any particular device had the WhatsApp mobile or desktop applications installed.

9. Definition No. 16 ("You" or "Your"): NSO objects to the definition of "You" and "Your" as vague, ambiguous, and overbroad. The definition improperly includes a host of people and entities, including NSO's "current and former directors, employees, subsidiaries, corporate parents, affiliates, agents, representatives, and all other persons acting or purporting to act on its behalf." Responding to any interrogatory that incorporates this term would be unduly burdensome and not proportional to the needs of the case. Unless otherwise indicated, any response to an interrogatory containing the term "You" or "Your" is limited to Defendant NSO and its employees.

**INSTRUCTIONS**

1. NSO objects to the instructions to the extent that they seek to impose obligations, requirements, or procedures beyond those required under applicable federal rules, federal laws, local rules, or judicial standing orders.

2. NSO objects to the extent that the instructions render the interrogatories compound or create subparts that exceed the limit set forth in Federal Rule of Civil Procedure 33(a)(1). NSO reserves its right to object under Federal Rule of Civil Procedure 33(a)(1) should Plaintiff seek to compel compliance with any such instructions.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify all NSO Spyware that You directly or indirectly developed, marketed, promoted, distributed, maintained, sold, licensed, tested, deployed, operated, acquired, used, or for which You provided technical or operational support, from January 1,2018 through the present, including

but not limited to Pegasus and Phantom. Your response should identify any and all brand or marketing name(s) for each NSO Spyware and, without limiting the foregoing, explain the differences (if any) between each NSO Spyware.

**RESPONSE TO INTERROGATORY NO. 1:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. Plaintiffs' claims are based on allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. Information regarding other NSO products is neither relevant nor proportional to the needs of the case. NSO incorporates by reference its objection to the defined terms "Identify" and "NSO Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. The Court has limited the scope of discovery to the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objection to the defined terms "Identify," "NSO Spyware," and "You." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the

Federal Rule of Civil Procedure. NSO objects to the extent that the interrogatory is duplicative or cumulative of Interrogatory No. 2.

Subject to these objections, and without waiving them, NSO identifies the Accused Technologies as follows: The Accused Technologies consist of three versions of Pegasus referred to internally at NSO as Heaven, Eden, and Erised. Pegasus consists of a suite of different technologies and functions that are branded and marketed together. The different technologies that fall under the "Pegasus" brand name provide law enforcement, military, and intelligence agencies of NSO's government customers with the ability to gain access to mobile devices for the purposes of preventing or investigating terrorism and serious crime.

Two principal differences among the versions of Pegasus are the vector through which the ultimate Pegasus software is installed on a mobile device, and the applicable type/operating system of device. Heaven transmitted information via WhatsApp's signaling servers to Android devices in order to trigger the installation of Pegasus on such devices; Eden transmitted information via WhatsApp's signaling and relay servers to Android devices to trigger the installation of Pegasus on such devices; and Erised transmitted information through WhatsApp's signaling servers to trigger the installation of Pegasus on Samsung Android devices. Additional differences between these installation vectors are described below in response to Interrogatory No. 2.

Furthermore, based on the information currently available to NSO, Phantom was a trade name used by Westbridge Technologies, Inc., when it marketed Pegasus (with necessary configuration modifications) to potential government customers in the United States.

**<u>INTERROGATORY NO. 2:</u>**

Describe how each of the NSO Spyware identified in response to Interrogatory No. 1 functioned, including how it was designed to be installed on a Device, the methods used to install it on a Device, how it was used after being installed on a Device, how it exfiltrated data from a Device on which it was installed, and how it accessed or used any WhatsApp Computers.

**<u>RESPONSE TO INTERROGATORY NO. 2:</u>**

NSO objects to the extent that the interrogatory seeks information that is neither relevant

nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any of its technologies "accessed or used any WhatsApp Computers") and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Describe," "NSO Spyware," "Device," and "WhatsApp Computers." NSO will interpret those phrases as defined above. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects that the

interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

Subject to and without waiving these objections, NSO responds that Pegasus was generally configured to operate in three stages: (1) a government Pegasus user would trigger an installation process to initiate contact with a target device to install a Pegasus agent, (2) pursuant to those instructions, the target device would eventually reach out to a third-party server to obtain and install the Pegasus agent, and (3) the government Pegasus user would interact with the Pegasus agent on the target device to perform the desired surveillance activity. With respect to the Accused Technologies—Heaven, Eden, and Erised—only the initial installation phase made use of any WhatsApp Computer. The Pegasus agent was ultimately installed on a monitored device and no WhatsApp Computer was involved in any data exfiltration.

**1. <u>Eden</u>**

The Eden installation process began with a "fingerprinting" stage, whereby Eden would gather information about the callee (target) device. This information gathering included querying the WhatsApp server whether the callee device was associated with an active WhatsApp account, using normal APIs that the server made available, using the exact same process that occurs every time a WhatsApp user inputs a new phone number and attempts to contact that callee device. Eden also obtained information about the callee device (such as whether the callee device was online) by exchanging messages with that callee device over WhatsApp servers. None of this activity accessed any part of the WhatsApp servers that was off limits to WhatsApp users.

After the information gathering described above, Pegasus would establish a VoIP call connection with the callee device through WhatsApp servers. Specifically, Pegasus would send a "call offer" to a WhatsApp signaling server (which is the server responsible for establishing VoIP call connections between clients) requesting to be connected to the callee device. WhatsApp signaling servers are configured to pass that request to the callee device.

The WhatsApp signaling server permitted the call offer to include values for various call settings and parameters. These included a string parameter named "connecting_tone_desc" and a

call setting for enabling an XOR cipher. Eden set the value of the "connecting_tone_desc" parameter to a string defining a shell script and executable, which the callee device would later execute. Eden would also enable the XOR cipher made available by the WhatsApp server. The WhatsApp signaling server was configured to simply pass the call offer, including those parameter values, to the callee device. The WhatsApp server did not execute or interpret the shell script or executable. Nor did the WhatsApp server perform any function that it was not programmed to perform on behalf of all users.

The WhatsApp signaling server did not execute any Eden code, and thus, Eden did not obtain any access to the signaling server that exceeded its authorization. Rather, Eden simply used the signaling server as a conduit through which to pass parameter values to the callee device.

Eden then exchanged additional messages with the callee device to obtain additional information about that device, such as whether it was a 32-bit or 64-bit device. Eden exchanged these additional messages with the callee device using traditional and legitimate functions of the WhatsApp relay server, including those enabling relay negotiation and bandwidth estimation between devices.

After Eden determined whether the callee device was 32-bit or 64-bit, it would send a duplicate call offer message to the callee device through the WhatsApp servers to do a transport restart.

Eden then exchanged additional messages with the callee device to configure the callee device to disclose certain memory information. These messages included oversized bandwidth estimation packets that caused the callee device to overwrite certain pointers.

Eden then upgraded the call to a group call, wherein the participating devices exchange additional messages, including capability buffers and pre-accept messages (standard procedures in the WhatsApp VoIP system). These messages included parameter values that pointed to and enabled execution of the shell script sent in the "connecting_tone_desc" parameter earlier in the process.

Finally, Eden would terminate the calls by sending the standard call termination message

to the WhatsApp signaling server. This would cause the callee device to initiate its normal termination procedure, and cause the callee device to execute the shell script that Eden had sent to the callee device in the initial call offer at the start of the process.

The shell script instructs the callee device to reach out to third-party servers to download and install additional data packets, including the Pegasus agent. Subsequently, the Pegasus user could interact with the Pegasus agent directly, again, without use of any WhatsApp servers or client software.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

**2. Heaven**

Heaven and Eden leveraged the same client-side vulnerability in the operating system of the callee-device. The primary difference between those two delivery vectors was the identity of the relay servers Pegasus used to communicate with the target device.

During the process described, Pegasus did not inject or execute any code on WhatsApp's signaling servers or relay servers, nor did Pegasus take or alter any data from WhatsApp's signaling servers or relay servers, nor did Pegasus impede or impair the operation of WhatsApp's signaling servers or relay servers in any way.

**3. Erised**

Erised followed Heaven and Eden, and it targeted a completely different client-side vulnerability—specifically, a vulnerability in the way certain Android devices rendered images at the time. That vulnerability existed in those devices, and so the delivery mechanism did not rely on any vulnerability in WhatsApp. In other words, the vulnerability could have been exploited through many other applications.

Like Heaven and Eden, Erised used the WhatsApp signaling servers to perform the initial fingerprinting and to communicate messages to the callee device during the initial stage of the

installation process. Erised sent many types of messages to the callee device over those signaling servers (e.g., image messages, contact lists, etc.) to prepare the device's memory layout in a manner that enabled eventual access to the client-side vulnerability described above. Again, the messages sent by Erised over the WhatsApp signaling servers were permitted by those servers, and none caused any impermissible execution on the servers.

***

Once installed, the capabilities of Pegasus were variable and customizable, in part so that government customers could configure data collection to conform to any local legal restrictions. Pegasus could be configured to collect historical data, passively to monitor new data, and actively to collect other new or real-time data. The relevant data would be transmitted to the government customer's "backend" server using the active communication method.

**INTERROGATORY NO. 3:**

Describe how You developed, maintained, improved, tested, acquired, marketed, promoted, distributed, sold, licensed, deployed, operated, or provided technical or operational support for each of the NSO Spyware identified in response to Interrogatory No. 1 from January 1, 2018 through the present, including a description of any change, upgrade, or update to each NSO Spyware.

**RESPONSE TO INTERROGATORY NO. 3:**

NSO objects that this interrogatory is vague, ambiguous, and overly broad such that providing a response would be unduly burdensome. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Describe," "You" and "NSO

Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

NSO objects that this interrogatory is vague, ambiguous, and overly broad such that providing a response would be unduly burdensome. NSO objects that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO further objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO products or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Describe," "You" and "NSO Spyware." NSO objects that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

Subject to these objections, and without waiving them, NSO responds as follows.

Research and development activities are generally not documented, including the development process for any particular exploit or installation vector. Generally, however, the development of the Accused Technologies identified in response to Interrogatory No. 1 involved NSO identifying pre-existing anomalies that would permit buffer overflows, as described in response to Interrogatory No. 2. NSO also conducted "black box" research by sending WhatsApp messages from one NSO-controlled device to another. NSO then evaluated the communications sent between the devices and the WhatsApp server, created an internal testing environment, and

continued the development using purely internal infrastructure and devices. As noted in response to Interrogatory Nos. 1 and 2, NSO developed three covert installation vectors for Pegasus for Android devices over the relevant time period defined by the Court: Heaven, Eden, and Erised. The differences between those installation vectors is described above in response to Interrogatory No. 2.

Once NSO developed the installation programs, it tested the programs using an internal, NSO-controlled caller device to install Pegasus on a second NSO-controlled callee device.

The marketing, promotion, distribution, sale, and licensing of Pegasus—including the capability to conduct zero-click or covert installations on Android devices using the Accused Technologies—was overseen by both an internal business ethics committee and the Government of Israel's Ministry of Defense. NSO only markets and licenses Pegasus to governments and governmental entities for legitimate law enforcement, counterterrorism, and intelligence purposes. The business ethics committee assessed prospective governments and government agencies, including the potential for misuse of Pegasus. If the committee approved a customer, NSO would then apply to the Government of Israel's Defense Export Control Agency for a marketing license. If a marketing license was granted, NSO would then be permitted to demonstrate Pegasus to the prospective government customer. These demonstrations were conducted using devices owned or controlled by NSO or by the government customer. Where licensing terms were agreed upon, NSO would then seek an export license from the Defense Export Control Agency. As part of the approval process, the government customer would be required to certify that it would only use Pegasus in compliance with all applicable laws; would only use Pegasus for the prevention and investigation of crimes and terrorism; and would ensure that Pegasus is not used in violation of human rights.

Upon receiving an export license from the Israeli Defense Export Control Agency and upon executing all applicable contracts and certifications with the government customer, NSO would deploy the hardware and software that comprises the Pegasus system on the government customer's premises. NSO would provide initial training to the government customer, but at all

times would be prohibited from participating or assuming any role in the activation, operation, or use of the system.

Upon successful deployment of the Pegasus system, NSO's role would be limited to providing technical support to government customers, pursuant to the terms of the applicable license. Depending on the terms, NSO would potentially retain the discretion to issue periodic software releases or patches addressing product features, bug fixes, compatibility issues, and support for newly-released versions of operating systems.

**INTERROGATORY NO. 6:**

Identify the basis for Your Sixth Separate and Additional Defense in Your Answer, which stated that "Plaintiffs' claims are barred on the grounds that Defendants acted in good faith and pursuant to legitimate law enforcement, national security, intelligence and business justifications" (Answer at 9), including all Documents and Communications you received analyzing how NSO Customers used NSO Spyware, whether NSO Customers complied with any conditions, criteria, or limitations imposed by You on the use of NSO Spyware, and whether NSO Spyware complied with all applicable laws, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502.

**RESPONSE TO INTERROGATORY NO. 6:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify," "Your," "Documents," "NSO Customers," and "NSO Spyware." NSO objects to the extent that the interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to

the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are best answered after related discovery has been completed.

NSO is willing to meet and confer regarding the most appropriate timeframe for providing a response to this interrogatory, including the factual basis for the identified affirmative defense.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Identify," "Your," "Documents," "NSO Customers," and "NSO Spyware." NSO objects that the interrogatory is overly broad and unduly burdensome to the extent that it requests the identification of "all" documents or communications received by NSO on the stated subject matter. NSO objects to the extent that the interrogatory seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other privilege or protection against disclosure. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory seeks an opinion or contention that relates to fact or the application of law to fact. Such interrogatories are

best answered after related discovery has been completed, and as of the date of this supplemental response, neither fact nor expert discovery has been completed.

Subject to these objections, and without waiving them, NSO identifies the following facts as relevant to Plaintiffs' inability to prove essential elements of its case, as well as to NSO's sixth and other related affirmative defenses:

NSO designed the Pegasus technology to be used solely by governments and government agencies in connection with lawful law-enforcement and intelligence investigations, and solely to the extent authorized by the domestic laws of those governments and government agencies. In this respect, the Pegasus technology is no different from wiretaps or other surveillance tools used by the U.S., state, and local governments subject to court-ordered warrants. The marketing and licensing of Pegasus is also overseen by the Government of Israel, consistent with the Israeli Defense Export Control Law. The Ministry of Defense, and more specifically the Defense Export Control Agency within the Ministry of Defense, will only grant export licenses to government end users. NSO's contracts with its government customers thus require those customers to use Pegasus only in connection with lawful law enforcement and intelligence investigations, and only to the extent authorized by the domestic laws of those governments and government agencies. In addition, NSO's business ethics committee, staffed by former high-ranking U.S. national security officials, conducts in-depth reviews of potential Pegasus sales for consistency with the technology's law-enforcement purposes and with international human rights standards, including the U.N. Guiding Principles on Business and Human Rights.

Among other contracts, in 2018, Westbridge Technologies, Inc., entered into contracts to license Pegasus to the Federal Bureau of Investigation (after having received previous requests for assistance from the Bureau). NSO understands from Westbridge that these contracts required NSO to keep Pegasus updated so that the FBI (and other sovereign government customers that were approved to license the technology) could continue to use Pegasus effectively in foreign law-enforcement and intelligence operations.

These facts are relevant to Plaintiffs' inability to prove the essential elements of their

claims under the Computer Fraud and Abuse Act ("CFAA") the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"). ***First***, to the extent that any U.S. government entity licensed Pegasus, activities relating to any such contract would constitute "lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States . . . or of an intelligence agency of the United States," which the CFAA "does not prohibit." 18 U.S.C. § 1030(f). ***Second***, legal authorization by the governments that used the Pegasus technology prevents Plaintiffs from proving that any use of Pegasus by those governments was "without authorization" or "without permission" under the CFAA and CDAFA. ***Third***, the CFAA cannot properly be interpreted to prohibit foreign governments and government agencies from accessing computers located outside the United States as part of law-enforcement and intelligence investigations authorized by those foreign governments' own laws. The presumption against extraterritoriality prohibits any interpretation of the CFAA that would construe it as applying to a foreign government's access to foreign computers. The doctrine of constitutional avoidance leads to the same conclusion, because a statute that did apply to such purely foreign conduct would exceed Congress's constitutional authority under the Foreign Commerce Clause. Similarly, the CDAFA must be interpreted to apply only to California computers because a broader interpretation would violate the presumption against extraterritoriality and exceed California's regulatory authority under the Dormant Commerce Clause and Due Process Clause. ***Fourth***, NSO's intent and belief that any use of the Pegasus technology would be in connection with a lawful government investigation authorized by that government's laws prevents WhatsApp from proving that NSO "intentionally" or "knowingly" accessed any computer "without authorization" or "without permission," as the CFAA and CDAFA require. 18 U.S.C. § 1030(a); Cal. Penal Code § 502(c).

To the extent that the Court construes any of these issues to constitute affirmative defenses (including but not limited to NSO's sixth affirmative defense) rather than elements of Plaintiffs' claims, the same facts would be relevant to those affirmative defenses.

**INTERROGATORY NO. 7:**

Identify and describe annual sales, licensing fees, profits and/or revenues that You derived directly or indirectly from the development, marketing, promotion, distribution, maintenance, sale, licensing, testing, deployment, operation, acquisition, provision of technical or operational support, or other commercialization of each of the NSO Spyware identified in response to Interrogatory No. 1 from January 1, 2018 through the present.

**RESPONSE TO INTERROGATORY NO. 7:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify," "Describe," "You," and "NSO Spyware." NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information that may be protected by Israeli privacy laws or any other applicable law. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Identify," "Describe," "You," and "NSO Spyware." NSO objects to the extent that the

interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information that may be protected by Israeli privacy laws or any other applicable law. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure. NSO objects that the interrogatory prematurely seeks expert opinion or testimony.

Subject to and without waiving those objections, NSO responds that it has undertaken a detailed financial analysis and has calculated the revenues it earned from the zero-click Pegasus for Android version in operation at the time of the events set forth in the Complaint (April-May 2019) as $7,161,342.17. The amount of profit associated with that revenue is a subject of expert testimony.

**INTERROGATORY NO. 8:**

Describe how You reverse engineered the WhatsApp client, including but not limited to downloading and testing different versions of the WhatsApp client and using the WhatsApp service.

**RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case. NSO objects that the term "WhatsApp client" is vague and ambiguous. NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative. NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory

seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO objects that the terms "reverse engineered" and "WhatsApp client" are vague and ambiguous. NSO will interpret the term "reverse engineered" to mean "examining a product in order to determine its construction, composition, or operation, typically with a view to manufacturing a similar product." NSO incorporates by reference its objections to the defined terms "Describe" and "You." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that it reverse engineered the WhatsApp client) and is thus argumentative. NSO objects to the extent that the interrogatory is cumulative and duplicative. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO objects to the extent that the interrogatory contains compound questions or subparts that causes the number of written interrogatories to exceed the limits set forth in the Federal Rule of Civil Procedure.

Subject to and without waiving these objections, NSO responds that when researching and developing the Accused Technologies, it did not reverse engineer the WhatsApp client as NSO understands that term. NSO studied the WhatsApp client, including by using the client to send messages and studying the content of those messages and responses. NSO also used commercially available analysis tools to understand the function of the WhatsApp client application.

**INTERROGATORY NO. 9:**

Identify all WhatsApp accounts associated with or used for the development, testing, or transmission of NSO Spyware.

**RESPONSE OT INTERROGATORY NO. 9:**

NSO objects to the extent that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information that is not relevant to Plaintiffs' allegations that Defendants operated a software called "Pegasus" that was deployed against certain "Target Devices" described in the Complaint (Dkt. No. 1 at 2:6-7) during April and May 2019. NSO incorporates by reference its objections to the defined terms "Identify" and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any WhatsApp accounts were associated with or used for the purposes indicated) and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary, or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

NSO objects that the interrogatory seeks information that is neither relevant nor proportional to the needs of the case—including, but not limited to, information about NSO product or technologies other than the Accused Technologies, as defined above and in the Court's Order of February 23, 2024. NSO incorporates by reference its objections to the defined terms "Identify" and "NSO Spyware." NSO objects to the extent that the interrogatory is premised on unproven assumptions (e.g., that any WhatsApp accounts were associated with or used for the purposes indicated) and is thus argumentative. NSO objects to the extent that the interrogatory seeks information outside of its possession, custody, or control. NSO objects to the extent that the interrogatory seeks the disclosure of trade secrets, state secrets, or other confidential, proprietary,

or competitively sensitive business information. NSO objects to the extent that the interrogatory seeks information prohibited from disclosure by Israeli law, regulation, or governmental order or directive, or any other applicable law, regulation, or governmental order or directive. NSO further objects to the extent this interrogatory seeks disclosure of NSO's third-party clients, as the Court has ordered that Defendants need not disclose those clients (Dkt. No. 292 at 5).

Subject to and without waiving these objections, pursuant to Federal Rule of Civil Procedure 33(d), NSO responds that it is in the process of producing unredacted documents from Production Volume 8 (and potentially other volumes) that contain information responsive to this interrogatory. This includes, but is not limited, to NSO_WHATSAPP_00012913 and NSO_WHATSAPP_00044814, which were reproduced to the plaintiffs on September 13, 2024.

Dated: September 13, 2024

KING & SPALDING LLP

By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

Attorneys for Defendants NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that I am Yaron Shohat; that I am the Chief Executive Officer of NSO Group Technologies Limited; that I have reviewed the supplemental interrogatory responses set forth above; and that based on reasonable inquiry the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Executed on September 13, 2024.

YARON SHOHAT

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California. I am employed in the County of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

On September 13, 2024, I served the following documents in the manner described below:

**DEFENDANT NSO GROUP TECHNOLOGIES LIMITED'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES NOS. 1-3, 6-9**

☑ BY ELECTRONIC MAIL: I caused the document(s) to be sent to the person(s) at their e-mail address(es). I did not receive, within a reasonable amount of time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

On the following part(ies) in this action:

**PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 13, 2024, at Los Angeles, California.

By: [signature]
MINA TUNSON

**SERVICE LIST**

Greg D. Andres
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4724
Email: greg.andres@davispolk.com

Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4559
Email: antonio.perez@davispolk.com

Craig T. Cagney
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-3162
Email: craig.cagney@davispolk.com

Micah G. Block
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Email: micah.block@davispolk.com

# Exhibit 2

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

H I G H L Y C O N F I D E N T I A L

ATTORNEYS' EYES ONLY

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

Case No. 4-19-cv-07123-PJH

-----------------------------------

WHATSAPP INC., a Delaware corporation, and META PLATFORMS INC., a Delaware corporation,

Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LTD and Q CYBER TECHNOLOGIES LTD,

Defendants.

-----------------------------------

Deposition of TAMIR GAZNELI, taken by AILSA WILLIAMS, Certified Court Reporter, held at the offices of Davis Polk & Wardwell, London, United Kingdom, on 4 September, 2024 at 9:00 a.m

THE VIDEOGRAPHER: We are going on the record. The time is 09:06 a.m. local time in London, on today's date, September 4, 2024.

My name is Philip Hill representing Veritext Legal Solutions. This deposition is being held at the London offices of Davis Polk and is being taken by counsel for the plaintiff. The caption from this case is WhatsApp LLC et al versus NSO Group Technologies Limited et al.

This case is being held in the United States District Court for the Northern District of California, Oakland Division, case number 419-cv-07123 PJH.

The name of the witness today is Tamir Gazneli.

Please would all counsel appearing on the Zoom conference link and all counsel in the Davis Polk office in London introduce themselves for the record.

MR. PEREZ-MARQUES: Antonio Perez-Marques from Davis Polk & Wardwell for the plaintiffs. I am here with Luca Marzorati and Gersham Johnson. On the Zoom from Davis Polk we have Craig Cagney and Quentin Ulrich as well as a representative of our client, Michael Chmelar. I

should note also we have three representatives from our experts. David Youssef and George Arden from FTI and David Snedarsik of Intuitive, all of whom are authorized under the protective order to receive highly confidential information.

MR. AKROTIRIANAKIS: Joe Akrotirianakis on behalf of defendants. Chaim Gelfand and Shira Plotnik are here from NSO.

THE VIDEOGRAPHER: The court reporter today is Ailsa Williams, also representing Veritext Legal Solutions. Please would the interpreters introduce themselves for the record and state where they are.

MS. YAARI: Varda Yaari for European depositions.

MS. ILAN: Mor Ilan for European depositions.

THE VIDEOGRAPHER: Please would the court reporter firstly swear in the interpreters and thereafter please swear in the witness.

(Interpreters sworn.)

TAMIR GAZNELI

Having been sworn,

Testified as follows:

EXAMINATION BY MR. PEREZ-MARQUES:

the company develops for the customers.

Q What tools?

A Software that enables the customers to get the information they need for doing their job.

Q Let me ask it this way. Were you seeking to understand these browsers and operating systems in order to identify vulnerabilities that could be used to develop installation vectors?

MR. AKROTIRIANAKIS: Do you need it translated?

A No.

MR. AKROTIRIANAKIS: Okay.

A Can you repeat the question?

Q Were you seeking to understand these browsers and operating systems in order to identify vulnerabilities that could be used to develop installation vectors?

A Yes.

Q And were those installation vectors for Pegasus?

A Yes.

Q During your time as security researcher -- let me withdraw that.

It says on your bio that you were

security researcher from November 2015 to December 2017. Is that correct?

A Yes.

Q And during that period as security researcher, did you do any work to develop installation vectors that would operate via WhatsApp?

A No.

Q In December 2017 you were promoted to Security Research Team Leader. Is that correct?

A Yes.

Q And what were your responsibilities as Security Research Team Leader?

A I was responsible for the team -- one of the research teams in the research group.

Q And what did that research team focus on?

A Android applications.

Q Which Android applications?

A Not specific, just any.

Q Did that work relate at all to WhatsApp, the work of that team?

MR. AKROTIRIANAKIS: Objection, vague.

A Part of the team.

Q Okay. Which part of the team related to WhatsApp or did work that related to WhatsApp?

A You mean by number, you mean by name? What is the question?

Q How many people -- why don't we start with how many about people were working on WhatsApp as part of the team that you led as Security Research Team Leader?

MR. AKROTIRIANAKIS: Object to the form of the question.

A Four.

Q Do you recall their names?

A Yes.

Q Who were they?

A [redacted]

[redacted].

Q I suspect Ailsa may want spellings on those but we will just make a note and come back to that.

And you supervised that team that was working on WhatsApp during your time as Security Team Research Leader.

A Yes.

Q And what were they doing with

respect to WhatsApp?

A Research application.

Q Again for the purpose of developing installation vectors?

A I will say it is developing the software required for gaining access.

Q As I understand it, installation vectors are software required to gain access. Is that consistent with your definition of what an installation vector is?

MR. AKROTIRIANAKIS: Objection, no foundation.

A Can you define access? When you say "access" what do you mean by access?

Q You said access. "I will say it is developing the software required for gaining access." What did you mean by access?

A Access to the data which resides on the endpoint.

Q That reside on the endpoint?

A Yes.

Q Meaning the target device?

A Yes.

Q Now we have also heard endpoint used to refer to Pegasus. Is that -- do you use

endpoint in that sense or no?

MR. AKROTIRIANAKIS: Objection, vague.

A I use endpoint as target device.

Q Okay. And so the team that was working on WhatsApp that you supervised as Security Research Team Leader was investigating WhatsApp in order to develop software that could be used to gain access to target devices?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A The team was researching Android related applications and services in order to gain access to the endpoint data.

Q Okay. Now, you testified previously that they were doing work -- you gave us the four names who were doing work related to WhatsApp?

A Yes.

Q And what work were they doing related to WhatsApp?

MR. AKROTIRIANAKIS: Objection, compound.

A Which question do you want me to answer?

Q The one that you didn't answer. I said you gave us four names doing work related to

WhatsApp. You answered that question, you said yes, and then I asked you "What work were they doing related to WhatsApp?" That is the question I would like you to answer?

A To understand how the application works.

Q For what purpose?

A As I stated before, in order to build the software that gets access to the endpoint's data.

Q And when you say software that gets access to the endpoint's data, is that different than an installation vector?

A Installation vector is like -- your definition for it -- the main purpose for it is to gain access to endpoints data.

Q That is the main purpose of an installation vector?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A That was -- that is the purpose of these types of software tools.

Q And when you say this type of software tools you mean installation vectors?

MR. AKROTIRIANAKIS: Objection,

misstates his testimony.

MR. PEREZ-MARQUES: I'm just not understanding your testimony. That is why I am following up. You said:

"Installation vector is like -- your definition of the main purpose for it is to gain access to endpoint's data."

I am trying to understand that answer. Are you saying that the purpose of an installation vector is to gain access to an endpoint data.

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A Installation vector is just the part of gaining the access. This is not the purpose of the software.

Q You said "Installation vector is just the part of gaining access". Then did you say "this is not the purpose of the software"?

A Software is built, designed and built in order to gain access to the data on the endpoints or endpoint. Installations vector --

Q Are you familiar with -- and when you refer to software are you referring to Pegasus?

MR. AKROTIRIANAKIS: Objection, vague.

A Any software that deals with domain.

Q The team that you were supervising that was doing work related to WhatsApp, were they working on Pegasus?

A Yes.

Q Okay. Are you familiar with a piece of software referred to as "Heaven"?

A Yes.

Q What type of software would you call Heaven?

A Which terminology do you want me to answer?

Q I am asking you, in your own words, what type of software you would call Heaven?

A We can call it installation vector that enables.

Q So the team that you were supervising that was working on WhatsApp was not working on installation vectors. Is that right?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A No.

Q They were working on installation vectors?

A They were working on Android

framework software.

Q For the purpose of developing installation vectors?

MR. AKROTIRIANAKIS: Object to the form of the question.

A For the purpose of developing capabilities which may or my not become installation vectors.

Q Got it. And I take it besides this four member team that was working on WhatsApp, were there other teams that you supervised as Security Research Team Leader?

A No.

MR. AKROTIRIANAKIS: Object to the form.

Q So you were just overseeing the WhatsApp team?

A No. There was a team I supervised. You asked before which part of them worked on WhatsApp.

Q Mm hmm.

A This part worked on WhatsApp.

Q But there were other researchers who were working on other applications?

MR. AKROTIRIANAKIS: Object to the form of the question.

A There was no other team. There were other researchers in the team. You asked was there another team I was --

Q Let me read you back my question. There were other researchers who were working on other applications. Is that right?

MR. AKROTIRIANAKIS: Object to the form of the question.

A Inside my team?

Q Within your team, as Security Research Team Leader from December 2017 to January 2020, were there other researchers working on applications other than WhatsApp?

A Yes.

Q And what applications were those team members working on?

A Browsers.

Q Do you recall which browsers?

A Yes.

Q And were they similarly -- which browsers was it?

A Chrome and Samsung browser.

Q Samsung browser?

A Yes.

Q Were they also doing that research

for the purpose of it potentially turning into installation vectors?

A Yes.

Q And so fair to say that when you were Security Research Team Leader your work focused on research and support of the development of installation vectors?

MR. AKROTIRIANAKIS: Object to the form of the question.

A Can you repeat the question?

Q Is it fair to say that when you were Security Research Team Leader your work focused on research in support of the development of installation vectors?

MR. AKROTIRIANAKIS: Same objection.

A When you say "in support of", can you please explain?

Q For the purpose of potentially developing installation vectors?

A Yes.

Q Are you familiar with the terminology "0 click exploit"?

A Yes.

Q What is a 0 click exploit?

A An exploit that does not require any

interaction from the target.

Q Was the research that your team was doing during your time as Security Research Team Leader for the purpose, at the least in part, of developing 0 click exploits?

MR. AKROTIRIANAKIS: Object to the form. No foundation.

A I will say it this way. The team's responsibility was to develop, research and develop capabilities for installation vectors. Whether it is 0 click or not is a matter of capability itself.

Q Did the team during the time that you supervised it develop 0 click exploits?

A Part of the time.

Q Did that include 0 click exploits that worked via WhatsApp?

MR. AKROTIRIANAKIS: Object to the form of the question. Vague.

A Can you explain? What do you mean by "via"?

Q You have read the complaint in this case?

A Yes, although I don't remember the exact wording.

Q Let me ask it this way. You understand that Heaven -- you are familiar with the Heaven installation vector?

A Yes.

Q And that worked via WhatsApp, is that right? That used WhatsApp messages as part of the installation?

MR. AKROTIRIANAKIS: Objection, no foundation.

A Yes.

Q And so when I say "via WhatsApp", what I mean is the relationship between the installation vector and WhatsApp, such as the one that Heaven had. Is that clear to you?

MR. AKROTIRIANAKIS: Objection, vague.

A Yes.

Q And so with that clarification, did the team that you supervised as Security Research Team Leader develop 0 click exploits that worked via WhatsApp?

A It developed 0 click vectors which -- one of the ways was via WhatsApp.

Q Okay. Did those vectors that they developed have names?

A Heaven, Eden and ERISED.

Q And so Heaven, Eden and ERISED were developed by the researchers on the team that you supervised as Security Research Team Leader?

A Yes.

Q You were promoted to -- let me ask this. What was your role in the development of those vectors, Heaven, Eden and ERISED?

A I was a team leader.

Q And as team leader what role did you have in the development of those vectors?

MR. AKROTIRIANAKIS: Objection, vague.

A I was responsible for the employee allocation on the development procedures, research procedures and development of the vector itself.

Q So you are very familiar personally with those exploits?

MR. AKROTIRIANAKIS: Object to the form of the question.

(Fire alarm test.)

THE VIDEOGRAPHER: Going off the record. The time is 10:00 a.m.

(A short break)

THE VIDEOGRAPHER: This is the beginning of media card number two, volume one, in the video deposition of Tamir Gazneli. Going on the record.

The time is 10:12.

MR. PEREZ-MARQUES: Mr. Gazneli, do you understand you are still under oath?

A Yes.

Q When we broke for the fire alarm, I believe we had a question pending. I had asked you whether you would agree that you are very familiar personally with the Eden, Heaven and ERISED exploits?

MR. AKROTIRIANAKIS: Objection, vague.

A I would say that I am familiar with the exploits but not each and every line in the code.

Q But you led the team that developed them, right?

A Yes.

Q You were promoted to Director of R&D in January 2020. Is that correct?

A Yes.

Q Who did you replace as Director of R&D?

A [redacted]

[redacted] [redacted]

A Yes.

Q What were your duties as Director of

R&D?

A I was leading the R&D of the entire Android framework.

Q Only Android?

A Yes.

Q Was there another -- were there multiple Directors of R&D.?

A Yes.

Q And was your work at that time as Director of R&D also focused on installation vectors for Pegasus?

MR. AKROTIRIANAKIS: Objection, vague.

A Development of installation vectors is responsibility of part of the teams, yes.

Q What other responsibilities did the team or teams that you supervised as Director R&D have? What other responsibilities did they have?

A The development of an agent, Android agent, development of the backend server and QA.

Q So you mentioned Android agent, backend server and QA?

A Yes.

Q And when you say Android agent, what do you mean?

A The software that resides on the

target's device and collects in all the required information.

Q And you refer to that as the agent? Is that a good shorthand for us to use today?

A Yes.

Q And when you say "backend server" what do you mean by that?

A It is a piece of software that resides on the customer's infrastructure and is responsible for managing the installation flow.

Q Managing the installation flow?

A Yes.

Q Installation flow of Pegasus?

A Part of Pegasus. Not the whole Pegasus.

Q Which part?

A For android.

Q For Android. So would you consider that one version of Pegasus or how would you refer to that?

A It is one of the parts.

Q And when you say "QA", what do you mean by that?

A Quality assurance.

Q Quality assurance?

A Yes.

Q What did the team -- what was the quality assurance work that the team you supervised did?

A Functionality, statistics.

Q Functionality of what?

A Of the agent and the installation flows.

Q Who did you report to as Director of R&D?

A To the VP R&D.

Q Who was that?

A During that period there were three, so to which period do you refer.

Q Let's go through all three.

A The name of the first one I don't remember. The second one was [REDACTED] and the third one was [REDACTED].

Q During your time as Director of R&D, were any researchers that you supervised working on installation vectors via WhatsApp?

A Yes.

Q Which vectors were those?

A When I was of R&D it was ERISED.

Q Any others besides ERISED, during

your time as Director R&D?

MR. AKROTIRIANAKIS: I am going to object. That exceeds the timeframe of the court's order which is the limiting factor of the witness' ability to testify about the technology.

MR. PEREZ-MARQUES: So is that an instruction not to answer?

MR. AKROTIRIANAKIS: Yes.

Q ERISED was developed after January 2020, is that correct?

MR. AKROTIRIANAKIS: Objection, misstates testimony. Also vague.

A I didn't answer when it was developed.

Q But after January 2020, members of your team were working on ERISED?

MR. AKROTIRIANAKIS: Objection, misstates his testimony. Also vague.

A I would say that after January 2020 some of the team members maintained ERISED.

Q And were doing work to maintain ERISED in that post January 2020 period?

A It depends on the specific timeframe and it depends on whether it required any work to be maintained.

Q After January 2020, to the extent work was required, work on ERISED was done by members of the team you supervised?

MR. AKROTIRIANAKIS: Objection, foundation.

A Part of the time.

Q Other than ERISED, and your counsel may instruct on this but I just want to have a clear record, other than ERISED, in that post January 2020 period, did researchers that you supervised work on other installation vectors that would operate via WhatsApp?

MR. AKROTIRIANAKIS: You can answer to the extent it is within the time period April 29, 2018 to May 10, 2020.

A In this timeframe, no.

Q And subsequent to May 2020, did members of the team you supervised work on any installation vectors that would work via WhatsApp?

MR. AKROTIRIANAKIS: He is not able to talk about timeframes after the timeframe delineated in the court order?

MR. PEREZ-MARQUES: So is that an instruction not to answer?

MR. AKROTIRIANAKIS: Yes.

MR. PEREZ-MARQUES: And you will follow your counsel's instruction and decline to answer as to whether members of your team worked on the development of WhatsApp installation vectors after May 2020?

A Yes.

Q In November 2022, you were promoted to VP R&D, correct?

A Yes.

Q How did your responsibilities change at that point?

A Now I am leading the entire R&D of the company.

Q Who do you report to as VP R&D?

A To the CEO.

Q Would you say -- are you the senior most technological employee at NSO?

MR. AKROTIRIANAKIS: Objection, vague.

A What do you mean by senior and what do you mean by technologically capable?

Q Okay. What is your working relationship with Yaron Shohat?

MR. AKROTIRIANAKIS: Objection, vague.

A He is my manager.

Q How often do you speak?

A Define "some cases"?

Q Well, are there any cases in which the operational security team would be working to avoid exposure of NSO's capabilities to WhatsApp.

MR. AKROTIRIANAKIS: Misstates his testimony.

A I would say in case capabilities related to WhatsApp, then WhatsApp is one of the services that need to be analysed and dealt with.

Q If the capability relates to WhatsApp, then the OpSec team would be working to avoid exposure of that capability to WhatsApp, among others, right?

A The OpSec team will work in suggestions how to do it. There is no ability to really change anything in the ability itself.

Q But the objective, the goal would be to avoid exposure to WhatsApp with respect to capabilities that involve WhatsApp?

A Their goal is to for the best understanding define the measures that need to be taken and the capability in order to not be exposed.

Q Okay. I think the last of the six functions you mentioned within R&D was Project

Management. Is that right?

A Yes.

Q What does the Project Management team do?

A This team is responsible for the execution of the projects.

Q And what does that mean? What do you mean when you say project?

A In the R&D group we have lots of projects we need to execute. They are like orchestrating the operation.

Q Got it. Which of those six teams, if any, would be involved in the development of installation vectors?

A Which installation vectors?

Q Any installation vectors.

A It really depends on where the installation vector or which installation vector you are talking about.

Q Okay. Well, let's talk about all installation vectors or any installation vectors. Which of those six groups does work with respect to the development of any installation vectors?

A Only the research groups.

Q Which are the research groups?

A Android and iOS.
Q And fair to say -- fair to assume that the Android group works on installation vectors for Android devices?
A Yes.
Q And the iOS group works on installation vectors for iOS devices?
A Yes.
Q And so the Development Group is working on the agent itself?
A Part of its responsibilities are agent development.
Q Does the Development Group have any role in the development of installation vectors?
A No, not installation.
Q What is the current budget of defendant's R&D team?
MR. AKROTIRIANAKIS: Objection, foundation.
A What do you mean by "budget"? What budget for what?
Q You oversee this function, right?
A Yes.
Q Do you have a budget that you manage it to?

A Budget for salaries, budget for infrastructure?
Q For all costs?
A I oversee it but I don't recall the exact amount.
Q What is the approximate number?
MR. AKROTIRIANAKIS: Objection, vague as to time.
A I don't recall the exact number.
Q I was asking for the approximate number, current approximate budget for the group that you supervise?
A I would say between 40 and 50 million.
Q The structure that you describe for the R&D team, with the six teams you mentioned, Android, iOS Development, Platform, OpSec and Project Management, was that the same in 2018?
A No.
Q How was it different in 2018?
A There was a research group, one research group and one development group.
Q So no division between Android and iOS back in 2018?
A There was no clear distinction

between them.

Q Got it. So there were people working on one or people working on the other but functionally, in terms of structure they were part of the research group?

A Yes.

Q You said one Development Group. How is that different from today? I thought there was only one Development Group today?

A The Platform Group is also a Development Group but back then they were residing in the same group.

Q Any other differences in the structure of the R&D group back in 2018?

A Not that I recall an important difference, no.

Q Is the R&D group currently working on any installation vectors that would operate via WhatsApp?

MR. AKROTIRIANAKIS: I am going to instruct the witness not to answer that question as it is outside the court's balancing on the (inaudible) factors and he is unable to testify to that.

MR. PEREZ-MARQUES: And are you going to

follow that instruction?

A Yes.

Q So you won't tell me whether as we speak NSO is actively working to develop installation vectors that would operate via WhatsApp?

A I cannot.

Q Based on your client's instruction? I mean your counsel's instruction?

A And regulation for me.

Q You know the answer to that question, right?

A Yes.

Q Are you involved in hiring employees for the R&D group?

A Yes.

Q What qualifications do you look for in the people you recruit for the R&D group?

A Which group?

Q I take it the answer depends on which group, is that right?

A The answer depends on which group, yes.

Q And so for what you call the research groups, Android and iOS, what

qualifications do you look for?

A It depends which type of research.

Q What are some examples of the type of research around the capabilities you would look for?

A In case of uni research, we search for potential and ability to be able to gain the in-depth understanding of ecosystems and frameworks. In terms of experts, the ones that already have some kind of in-depth understanding of the ecosystem.

Q And what is the mix within those research groups, Android and iOS, between senior hires who come in with expertise and more junior hires that are hired more on the basis of potential?

A In which timeframe?

Q Let's say now, to start.

MR. AKROTIRIANAKIS: Object to the form of the question.

A The mixture by percentage between experts and non-experts?

Q Mm hmm.

A About 30/40% experts and non-experts, complementary.

Q Do you give potential hires any kind of tests?

A Tasks?

Q Tests?

A No.

Q What is the process for researching and developing installation vectors?

MR. AKROTIRIANAKIS: Objection, vague. Vague as to time. You can answer within the timeframe.

MR. PEREZ-MARQUES: Why don't we do this. Fair enough. Let's say during the period from 2018 to 2020, What was the process for researching and developing installation vectors?

MR. AKROTIRIANAKIS: I am sorry, give me a minute if you don't mind. As I understand your question, I think that is outside the court's order also and his ability under Israeli law to answer the question.

MR. PEREZ-MARQUES: So you are going to instruct him not to answer that?

MR. AKROTIRIANAKIS: Yes.

MR. PEREZ-MARQUES: Let me ask you this. What was the process to develop and test NSO spyware or NSO -- I am sorry. Let me start over

are.

What was the process to develop and test installation vectors in use between April 29, 2018 and May 10, 2020?

MR. AKROTIRIANAKIS: You can answer that as it relates to the category in the court's order which itself is limited to, as requested by counsel, "any NSO spyware targeting or directed at WhatsApp servers, or using WhatsApp in any way to access target devices".

Q Do you have that definition in mind Mr. Gazneli? So the installation vectors I am asking you about are installation vectors that used WhatsApp in any way. Do you understand that?

A Yes.

Q And so Heaven, Eden, ERISED would be examples of such installation vectors, correct?

A Yes.

Q And so now I am asking you what was the process to develop and test installation vectors that used WhatsApp that were in use during the period between April 29, 2018 and May 10, 2020?

MR. AKROTIRIANAKIS: Objection, vague. If you understand you can answer. Also compound.

A I will try to answer based on Israeli law and my restrictions because of it.

The process was developed in internal environment, in order to be able to work on our devices on which we investigated the application.

Q Let me just take a step back for a moment to see if I can make our terminology clear. Eden, Heaven and ERISED are all installation vectors that worked via WhatsApp, correct?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A Heaven, Eden and ERISED were installation vectors that were activated via WhatsApp.

Q During the period April 29, 2018 to May 10, 2020, were any installation vectors in use besides Heaven, Eden and ERISED that were activated via WhatsApp?

A No.

Q So those are the three, yes?

A Yes.

Q And am I right that NSO sometimes refers to them collectively as Hummingbird?

A Yes.

Q And does the term Hummingbird

include any vectors other than those three?

A No.

Q So if I refer to the Hummingbird vectors, you will understand that I am referring to those three?

A In respect to the timeframe, yes.

Q Because you are not answering as to anything outside those timeframes, right?

A Yes.

Q And so you referred to -- when I was asking you about the development, you mentioned developing an "internal environment in order to be able to work on our devices on which we investigated the application". What did you mean by that?

A I mean by -- developing an environment using which you can use the WhatsApp application.

Q And what does that involve? How do you do that?

MR. AKROTIRIANAKIS: Objection, compound.

A It is like -- it involves the understanding of the functionality of the WhatsApp ecosystem.

Q And when you say the WhatsApp ecosystem, what do you mean?
A All the parts that WhatsApp uses in order to communicate between two peers.
Q And so that does that include the WhatsApp client?
A Yes.
Q But it would also include server architecture?
MR. AKROTIRIANAKIS: Objection, vague.
A What do you mean by "architecture"?
Q Why don't I leave the terminology to you. What else is part of the ecosystem you described, besides the WhatsApp client?
A As I answered before, the parts which are relevant and required in order to communicate between peer to peer.
Q And what parts are those?
A The required server functionality that enables you to send messages from one side to another.
Q So the WhatsApp client, the server functionality. Is anything else part of the ecosystem you described that enables one WhatsApp clients to communicate with another?

A No.

Q And so as part of the development of the Hummingbird installation vectors, NSO investigated that ecosystem. Is that right?

MR. AKROTIRIANAKIS: Misstates his testimony.

A We developed an internal environment that enabled us to work on our devices.

Q What does that mean?

A That means that we used WhatsApp clients that were installed on company owned devices and used the functionality that was developed internally which enabled communication between the clients that were used in this internal environment.

Q And that functionality that was developed internally, that is different than the WhatsApp client?

A You are asking about what is applied?

Q I am asking you when you refer to the functionality that was developed internally, that is different from the WhatsApp client. Is that right?

MR. AKROTIRIANAKIS: Objection,

misstates his testimony.

A Part of the development, as you asked before, was to develop the functionality that enabled us to communicate between the clients that were installed on company-owned devices.

Q Okay. And when you say the clients that were installed, you mean the WhatsApp application?

A Yes.

Q Okay. Are you familiar with the term "emulator"?

A Yes.

Q What is an emulator?

A Emulator is a software that emulates the functionality of specific ecosystem framework application. It depends what you refer to.

Q And as part of the development of the Hummingbird vectors, NSO created an emulator for the WhatsApp client. Isn't that right?

A No.

Q Were any emulators used in the development of the Hummingbird vector?

MR. AKROTIRIANAKIS: Objection, vague. Object to the form of the question.

A We used Android emulator, which is

like Open Source.

Q Any other emulators that were used in the development of the Hummingbird vectors besides the Android emulator?

A By saying "used" you mean?

Q I am not sure how to make that broader or clearer. Used in any way in the development of the Hummingbird vectors?

A We developed functionality that enabled to communicate, as I said before, between two peers in that internal environment.

Q I am not sure you are answering my question though. You referenced an Android emulator, right?

A Yes.

Q Were any other emulators used in the development of the Hummingbird vectors?

A I wouldn't call it an emulator. It is a piece of code that enabled us to send messages from one side, one peer in that internal environment to another one.

Q And the peer that you were sending messages from was a piece of software created by NSO?

A Yes.

Q And the peer on the other side would be a target's actual WhatsApp client?

MR. AKROTIRIANAKIS: Objection, misstates testimony.

A The software on the endpoint in the internal environment was WhatsApp client. It was customized to be used for the internal environment.

Q And in what respect was it customized, the WhatsApp client on the endpoint, in the testing environment?

A It used the connection to the WhatsApp server which was deployed internally.

Q So was there, in effect, a copy of the WhatsApp servers within NSO's system?

A No.

Q So what do you mean when you say it was deployed internally?

A It is not a copy. It is a software. It supports and uses only the relevant parts that the capability required for communication.

Q But it is designed to replicate the functionality of WhatsApp's servers, in pertinent part?

A We don't have access to WhatsApp

servers. Therefore I cannot replicate anything.

Q But it is designed to allow you to send messages within NSO as if they were going through WhatsApp servers. Isn't that the purpose?

A Yes.

Q And so as part of that you developed servers that, to the best extent you can, aim to replicate the functionality of the WhatsApp servers?

A Yes.

Q And the purpose is to investigate or research how messages would be treated by WhatsApp servers. Right?

A No.

Q What is the purpose?

A The purpose was to research the WhatsApp client on the target's device, and in order to build the software to eventually gain access to the data that resides on it.

Q And why was it necessary to create that internal version of the WhatsApp servers as part of the R&D process?

A This is a practice done by any cyber company, whether defensive or offensive, in order to work in the internal environments.

MR. AKROTIRIANAKIS: I don't want to interrupt your question, but the answer that the court reporter asked for clarification on, "to the data", and then he also said "that resides on it", and I think you didn't hear --

MR. PEREZ-MARQUES: We have a video and recording so we can clear that all up.

I asked you why it was necessary to create that internal version of the WhatsApp servers as part of the R&D process. You answered that this is a practice done by any cyber company. I would like to understand why is that, why is that part of the research and development process?

MR. AKROTIRIANAKIS: Object to the form of the question. Also misstates his testimony.

A So the question is why it is required?

Q Yes.

A In order to work on a controlled environment.

Q Is the purpose of that to understand how the messages would be treated when sent through WhatsApp's actual servers?

A No, because it didn't work from using the WhatsApp's actual server. The

purpose is to investigate and research the WhatsApp client.

Q Got it. During this phase of the development?

A Yes.

Q Right. And then at some point does the testing progress to actually testing it through WhatsApp's actual ecosystem?

A After reaching the capability in the internal server, then there is a phase of testing in the real environment, yes.

Q And with respect to the Hummingbird vectors, when did NSO reach the point of testing the installation vectors in WhatsApp's actual ecosystem?

MR. AKROTIRIANAKIS: Objection, foundation.

A I don't recall the exact month this was done.

Q Approximately?

A Approximately, it was near April 2018.

Q Around April 2018 is when NSO reached the point of testing the Hummingbird vectors in WhatsApp's actual environment?

A As I said before, I don't recall the exact month but it was near April.

Q How does NSO determine when a potential installation vector is ready to use? I mean ready to be deployed to clients, to customers?

MR. AKROTIRIANAKIS: Object to the form of the question.

A As for any product, you want to deliver it to the customer when it stands and has statistical performance and functionality standards.

Q As part of the research and development that led to the Hummingbird vectors, did NSO create WhatsApp accounts?

MR. AKROTIRIANAKIS: Objection, foundation. Object to the form of the question.

A What do you mean by NSO created WhatsApp accounts?

Q Did NSO sign up for WhatsApp accounts as part of the R&D process that led to the Hummingbird vectors?

A When the internal environment was used, the answer is no.

Q So there was no actual client,

WhatsApp client that was being used as part of the R&D?

A They were not activated against the real WhatsApp server because about they were used in the internal server.

Q So the endpoint WhatsApp client that was being tested during that phase when you were working in the internal environment, that was not an actual WhatsApp client?

MR. AKROTIRIANAKIS: Object to the form of the question. Also misstates his testimony.

A I would say towards the actual WhatsApp client, it was connected and activated towards the internal WhatsApp server.

Q And as part of that phase of the development, did NSO create WhatsApp accounts?

MR. AKROTIRIANAKIS: Object to the form of the question. Also vague.

A How to define WhatsApp account? Is WhatsApp account a live WhatsApp account that is connected to a real WhatsApp server?

Q Do you have WhatsApp?

A Yes.

Q Did you create an account when you signed up for WhatsApp?

A Yes.

Q So you understand what that means, in terms of creating a WhatsApp account?

A I understand what you mean in this question. That is why I asked the previous question.

Q So --

A When you say activating WhatsApp account, it is not real if it is not connected to a real WhatsApp server.

Q So in the sense that you created a WhatsApp account -- before I ask that, what phone number is your WhatsApp account associated with?

A With my personal phone number.

Q And what is that phone number? The reason I ask is because we have some WhatsApp chats that have numbers without names and so we would like to be able to determine whether you are the person on them.

A Okay. So you ask for my phone number?

Q Yes, please?

A 0508803185.

Q Thank you. Again, it is not to invade your privacy. It is so we can match it to

documents.

Were any live WhatsApp accounts created during any phase of the testing of the Hummingbird vectors by NSO?

A Yes.

Q Could you say approximately how many?

MR. AKROTIRIANAKIS: Objection, foundation.

Q You understand you are designated as a corporate representative on the research and development of the relevant spyware, right?

A I wouldn't call it spyware.

Q I am just reading from the actual topic. You understand you are designated on that?

MR. AKROTIRIANAKIS: He is designated on the topics as phrased in NSO Group Technologies and Q Cyber Technology Limited's objection and responses to the notice of deposition.

Q And you understand that that includes research and development of software including the Hummingbird vectors?

A Yes.

Q You are here to present NSO and Q Cyber's full corporate knowledge on those topics,

right?

A Yes.

Q And so could you say approximately how many WhatsApp accounts were created as part of the testing of the Hummingbird vectors?

A I don't have the exact number, but I can estimate it is about 50 numbers.

Q And then when the Hummingbird vectors are actually used, are additional WhatsApp accounts created at that point?

A At the customer?

Q In connection with use by a customer, if that is how you would like to phrase it?

A Yes.

Q Do you have any understanding of approximately how many times -- let me put it this way -- on how many target devices the Hummingbird vectors have been successfully used by NSO?

MR. AKROTIRIANAKIS: No foundation.

A When you say Hummingbird was used, what do you mean by that?

Q Used as -- successfully used as an installation vector to cause the installation of the agent?

A In which timeframe?
Q What I will call the relevant timeframe, so April 2018 to May 2020?
MR. AKROTIRIANAKIS: Object to the form of the question.
A I don't have an exact number.
Q Approximately?
MR. AKROTIRIANAKIS: No foundation.
A So you ask in terms of how many times customers tried to use Hummingbird?
Q Successfully?
A Customers? The question is about customers?
Q How many times the Hummingbird vectors were successfully used to install the agent on a target device during the relevant period?
MR. AKROTIRIANAKIS: No foundation.
A I don't have the exact number.
Q I understand you don't have the exact number. I am asking for an approximate number. Tens, hundreds, thousands, tens of thousands?
MR. AKROTIRIANAKIS: No foundation.
A It is not tens of thousands but it

is not hundreds.

Q So thousands?

A In between, yes.

Q In between hundreds and hundreds of thousands?

A No.

MR. AKROTIRIANAKIS: Objection, misstates his testimony?

Q In between what?

A In between hundreds and tens of thousands.

Q Got it. When NSO researchers created live WhatsApp accounts, as part of the R&D that led to the Hummingbird vectors, did they install WhatsApp via web, via mobile or how did they install it?

A On the device itself.

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

Q So via mobile? On a mobile device?

A On mobile device.

Q The term "Pegasus", does that to you mean the agent or is it broader than the agent?

A This is the name of the product.

Q And does that include the

installation vectors or would Pegasus be the agent itself?

MR. AKROTIRIANAKIS: Objection, vague.

MR. PEREZ-MARQUES: I just want to clarify our terminology so I can make the questions clearer.

A The product that is called Pegasus eventually delivers the data to the customers which are sent to the customers by the agent, and and the agent installed using installation investigators.

Q And so the agent is part of Pegasus?

A Yes.

Q And the installation vectors are part of Pegasus?

A Yes.

Q And the agent is the piece of Pegasus that actually delivers information to customers?

A Yes.

Q And that information is obtained from the target devices?

A Yes.

Q And so you are familiar with Pegasus, yes?

MR. AKROTIRIANAKIS: Objection, vague.
A In what terms?
Q I mean you are the head of R&D at NSO. You are familiar with Pegasus?
A Yes.
Q And you are familiar with the agent?
A Yes.
Q Did you have any role in the development of the agent?
A No.
Q Are you familiar with the source code for the installation vectors, the Hummingbird vectors?
A As I said before, part of it, but not all of it.
Q What part are you familiar with?
A No specific part. I said I don't recall any -- each of the lines of the --
Q You mean you are generally familiar with the source code for the Hummingbird vectors?
A Yes.
Q And you are familiar with how the agent functions?
MR. AKROTIRIANAKIS: Objection, vague.
A Because I was never part of agent

teams and development teams, I am familiar with the concepts, not the implementation.

Q And you understand that you have been designated as a corporate representative on the full functionality of what is defined as the relevant spyware?

MR. AKROTIRIANAKIS: [redacted] keep saying this but he is designated as stated in our responses to the notice of deposition.

MR. PEREZ-MARQUES: Yes, okay. And as stated by your counsel that includes defendant's understanding of the full functionality of what they call the accused technology. Yes?

A Yes.

Q Again with the same time period, which I won't keep repeating, April 2018 to May 2020.

I would like to show you -- and you are prepared to testify as to NSO and Q Cyber's corporate knowledge on that functionality of the relevant spyware?

A Yes.

Q One follow-up. We were talking about the creation of the WhatsApp accounts as part of the R&D process. When were those accounts

created?

A When you move to phase of testing in the real word.

Q In the real environment?

A Yes.

Q I think you previously estimated that was around April 2018?

A I said near.

Q When was the testing complete, such that the first of the Hummingbird vectors could be deployed?

A As I said before, I don't recall the exact month.

Q Okay. Was it also in 2018, the following year?

A Heaven?

Q Mm hmm.

A 2018.

Q I would like to show you what we have marked as Exhibit 2032.

(Exhibit 2032 marked for identification)

This is a multipage document with the Bates stamp NSO_WHATSAPP_00045678. Do you recognize this document?

A Do you want me to go over it?

Q Feel free to flip through it. The first question is just whether you recognize it.

Do you recognize this document?

A Yes.

Q What is it?

A Some kind of training material, training -- customer facing material.

Q Customer facing material or training material?

A Training.

Q Training. Is it a product description for Pegasus?

A Yes.

Q So the endpoint solution that is referred to here is Pegasus?

MR. AKROTIRIANAKIS: Objection, vague.

Withdrawn.

A Yes.

Q Did you have any role in preparing Exhibit 2032?

A No.

Q I would like to direct you to page one where there is an "Overview" section. Do you see that? Are you on that page? It is after the table of contents. There you go.

A Yes.

Q The third paragraph there revs to Pegasus as a "breakthrough solution, developed by veterans of elite intelligence agencies". Do you see that? It is the third paragraph under "Overview"?

A Yes.

Q And do you agree with the characterization of Pegasus as a breakthrough solution?

A As for the date, I think it was breakthrough, yes.

Q It is a highly innovative product?

A Yes.

Q Highly sophisticated?

A I think it depends on the definition of sophisticated. By what means?

Q Would you consider it a very sophisticated product?

A Yes.

Q Is it accurate that it was developed by veterans of elite intelligence agencies?

MR. AKROTIRIANAKIS: Objection, vague.

A The company was established in 2010, so it depends on who it refers to in this

definition.

Q I am just asking you whether, based on your understanding and as a corporate representative for NSO and Q Cyber, whether it is accurate that Pegasus was developed by veterans of elite intelligence agencies?

MR. AKROTIRIANAKIS: I'm going to object to the form of the question. That exceeds the designation, including the one that you mentioned which is the full functionality of the software, not whether its developers were elite intelligence agency veterans.

MR. PEREZ-MARQUES: You remember that you are designated on R&D that led to the relevant spyware? You are still designated on that topic, right?

MR. AKROTIRIANAKIS: He is designated as stated in the responses to the notice of deposition.

MR. PEREZ-MARQUES: You recall that you are designated on that topic?

A Yes.

Q So I am asking you, as the person who is presenting NSO's knowledge with respect to the R&D that led to Pegasus, is it accurate that

it was developed by veterans of elite intelligence agencies?

MR. AKROTIRIANAKIS: Objection, no foundation. Beyond the scope of the designation.

A Part of the company that developed the solution were veterans of elite intelligence --

Q Would you agree that Pegasus was developed by personnel with highly specialized expertise?

MR. AKROTIRIANAKIS: No foundation. Also beyond the scope of the designation.

A I would say the development of Pegasus requires, in terms of research, specific capabilities that according to my resume you can see that may be acquired. So what is the question?

Q The question was whether you agree that Pegasus was developed by personnel with highly specialized expertise?

A I would say that the research field which is part of Pegasus requires specialized expertise.

Q What about the development field with respect to the agent itself?

A This is development per se, as any development.

Q And it also requires specialized expertise?

A It requires understanding of internals of the framework. I don't see it as specialized expertise, as any other specialized expertise required for developing any other application.

Q The next section here, 1.1, refers to smartphone data interception challenges. Do you see that? "Overcoming smartphone data interception challenges"?

A Yes.

Q And those are challenges that Pegasus is able to overcome?

MR. AKROTIRIANAKIS: Object to the form of the question.

A Yes.

Q Among the identified challenges is encryption, correct? Do you see that, the first bullet?

A Yes.

Q And you understand that the purpose of encryption is to prevent anyone other than

participants to a communication from seeing the contents. Is that right?

A I would say that encryption is designed to avoid exposure of private data to public which is not authorized to be accessed to the private data.

Q And one of the benefits that Pegasus provides is access to such encrypted communications. Is that right?

A Pegasus is a software that enables the customers which are authorized to get access to that private data even if they are encrypted.

Q Are you familiar with the authorization of NSO's customers to access data. Is that a topic that you are familiar with?

A They are intelligence agencies and law enforcement agencies which act under their laws and regulations in order to be able to use and get access to this data.

Q Right, but you are able to answer questions about the authorization of NSO's customers? You are familiar with that legal authorization?

A I am not familiar for the legal parts of it --

MR. PEREZ-MARQUES: Okay. Shall we go off the record.

MR. AKROTIRIANAKIS: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 11:44. End of media card number two, volume one, of the video deposition of Tamir Gazneli.

(A short break)

THE VIDEOGRAPHER: This is the beginning of media card number three, volume one, in the video deposition of Tamir Gazneli. Going on the record. The time is 12:02.

MR. PEREZ-MARQUES: Mr. Gazneli, do you understand you are still under oath?

A Yes.

MR. PEREZ-MARQUES: Did you have something you wanted to put on the record?

MR. AKROTIRIANAKIS: Defendants designate the transcript as Highly Confidential, Attorneys' Eyes Only, and the witness requests to read and sign.

MR. PEREZ-MARQUES: Mr. Gazneli, what are the advantages of 0 click installation vectors over 1 click installation vectors?

A 0 click installation vectors do not

require any interaction by the target.

Q And why is that preferable?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A From the customer's point of view, 0 click installation vectors are more concealed and they enable them to execute their operations in more concealed ways.

Q Is it harder to research and develop a 0 click installation vector than a 1 click?

A It is not a matter of harder or not. It is different expertise.

Q In what sense is it a different expertise?

A The researchers working on 0 click vectors installation flows are required to think of ways how the installation vector can be executed without the need for the target to interact with the device.

Q I understand it is a different question that they are trying to answer, but why is the expertise different?

A When I say expertise I mean that the researchers that are required to research these type of vectors have additional questions to

answer and one of the questions is the interaction, as we discussed, and that requires additional capabilities in terms of their expertise.

Q So I would like to go back to Exhibit 2032, which you still have in front of you. The next section on page 3 has a section titled "Benefits of our endpoint solution". Do you see that?

A Yes.

Q And the first benefit identified is global coverage. Is that right?

A Yes.

Q It states:

"Monitor targets' devices while they connect to the internet from any location."

Right?

A Yes.

Q And there are no geographical locations identified, right?

A It defines the potential factor. It does not define anything that relates to a specific customer.

Q And there are no geographical limitations identified there, right?

A As I said, this defines the potential capability of this vector, yes.
Q Of Pegasus?
A Of the solution.
Q Is that an accurate statement of Pegasus' capabilities?
MR. AKROTIRIANAKIS: Objection, vague.
A Different vectors have different limitations, so it is not a general statement that you can make about each and every capability in Pegasus.
Q But this is not a statement about vectors, is it? It is about the agent, isn't it?
A I will have to read it.
Q It says "Monitor target's devices while they connect to the internet from any location."
A But this is one sentence. Out of context, I am not sure it answers the question.
Q It is the agent that monitors target devices, right, not the vector?
A The agent is the one that monitors target devices, yes.
Q And is it correct that Pegasus can monitor a target's devices from any location?

customers, when was Heaven clear to go to customers?

A As I recall, I think around April/May this was ready enough to be deployed.

Q Around April or May 2018?

A Yes. Just a second. No. It was around October.

Q October 2018?

A Yes, ready for broad deployment.

Q What do you mean by "broad deployment"?

A All customers could get the solution.

Q When was the first time, to your knowledge, that any NSO customer was able to use a version of Pegasus that included Hummingbird?

A I don't recall the exact month for that.

Q But it would have been between January and October?

A Yes.

Q When it says "The first 0 click's installation vector for broad Android devices", is it right that beyond this before this point others had installation vectors for Android but they were

not broad?

A No, we didn't have any solution at all for Android.

Q It includes "thanks for putting so much effort to imagine, create and release this complex version". Do you see that?

A Yes.

Q What were the efforts that went into producing Heaven?

MR. AKROTIRIANAKIS: Objection, no foundation. Beyond the scope of the designation of the witness.

A I can answer from the R&D side.

Q Mm hmm.

A It is finding vulnerabilities, building the installation chain and chaining altogether to an installation vector of the agent.

Q It notes that this is a significant milestone for Pegasus. Do you see that?

A Yes.

Q Do you agree with that?

MR. AKROTIRIANAKIS: Objection, no foundation. Beyond the scope of the designation I of this witness.

A Any 0 click solution whatsoever is a

significant milestone for Pegasus.

Q When you refer to -- when I asked you about the efforts that went into producing Heaven you said you could answer on the R&D side, the first thing you mentioned was finding vulnerabilities. What did you mean by that?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A I would say that this domain requires finding the flaws in the ecosystem and in the services in order to be able to build the installation floor, the installation vector, and eventually deploy the agent.

Q And with respect to Heaven, the vulnerabilities that the team was working to find were vulnerabilities in WhatsApp's ecosystem?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A The vulnerabilities in Heaven were in WhatsApp client.

Q How did the team go about identifying those vulnerabilities in the WhatsApp client?

A In terms of research techniques --

Q Yes, in terms of research

techniques. How do you do that?

A I cannot talk about research techniques.

Q So despite the fact that you are designated on the R&D that led to the Hummingbird vectors, you can't discuss the research techniques that went into finding vulnerabilities in the WhatsApp client?

MR. AKROTIRIANAKIS: He is designated as stated in our response to the deposition notice. His ability to testify is circumscribed by Israeli law.

MR. PEREZ-MARQUES: Let me repeat my question and you can have your counsel's objection in mind.

Despite the fact that you are designated on the R&D that led to the Hummingbird vectors, you cannot discuss the research techniques that went into finding vulnerabilities in the WhatsApp client?

A I cannot talk about the exact research techniques. As I said before, we developed the internal environment which enables us to work internally on the WhatsApp client on customer owned devices.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Q Why can't you describe the research techniques?

A Because, as my counsel stated, I am restricted by Israeli law to talk about it.

Q So there is nothing further that you are willing to testify as to the research techniques that went into identifying vulnerabilities in WhatsApp client?

MR. AKROTIRIANAKIS: Objection.

A It doesn't have anything to do with willingness. I am restricted by Israeli law to talk about it.

MR. AKROTIRIANAKIS: I will object to the form of that question. If you want to ask him questions he can tell you whether he can testify about or not. I think it is a fair question. It is the way you just stated it.

Q My fundamental question is how did the R&D team at NSO go about finding vulnerabilities in the WhatsApp client?

A They researched the activity of the WhatsApp client in order to find flaws and to build the installation vectors which, as I said, is built to eventually deliver the agent payload.

Q How did the team research the

activity of the WhatsApp client?

A What does the question refer to in how?

Q That is my question. How did they do that? You said they researched the activity of the WhatsApp client. How did they do that?

A So I will get back to the explanation about the ecosystem we built internally. We built internal ecosystem of WhatsApp server that enabled us internally to send messages between two peers between customer owned devices, and having this ability enables us to research the activity of the WhatsApp client.

Q How did you know how to build that internal ecosystem?

A What do you mean by how?

Q How did you determine what the characteristics of that internal ecosystem should be in order to operate like a WhatsApp client?

A We have the client and we have the server between them.

Q And so how do you go from having the client to building an ecosystem that replicates it?

A So as a researcher, especially in

Android, you have the ability to gain the routabilities on any Android devices. These abilities are stated for anyone using the web. Whenever you have route access on a device, you have the ability to monitor the traffic that is in and out the monitored device, and then you have access to the traffic from peer to peer. Using this knowledge you can use it to build the ecosystem which is required for this activity.

Q Is there anything else that the NSO R&D team did to find vulnerabilities in the WhatsApp client?

A We, the R&D research group, used all the tools it should use in order to be able to find the vulnerabilities.

Q What are those tools?

A Basically, there are two types of tools, called IDA and JEB.

Q Can you spell those?

A I-D-A.

Q And what was the other?

A J-E-B.

Q And what is IDA?

A These are tools available for procurement -- anyone can buy it -- which enable

you to analyze code.

Q What is the difference between IDA and JEB?

A IDA enables you to analyse native code and JEB analyzes Java code.

Q Other than using those two tools, what else did the R&D team do to find vulnerabilities in the WhatsApp client?

A As I said before, it monitored the transmission between peer to peer as for the communication, in order to understand the responses and the message content that should be sent from side to side.

Q Through that testing, did NSO develop an understanding of the functioning of WhatsApp's servers that were involved in the peer to peer transmission?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A Through this activity the aim was to find vulnerability on the Android ecosystem, and then find a way to make it work remotely.

Q With respect to that second part of making it work remotely, through its internal testing, did NSO develop an understanding of how

WhatsApp's servers functioned in connection with peer to peer communications?

A As for the terminology functions, I will say that we worked to understand what are the limitations in terms of sending messages from peer to peer.

Q What do you mean by that? What are the limitations in terms of sending messages peer to peer?

A What are the messages and the content of messages that can be sent from peer to peer.

Q As part of this work did NSO researchers reverse engineer any WhatsApp code?

MR. AKROTIRIANAKIS: Objection, vague.

A Do you want to define what reverse engineering is?

Q What do you understand reverse engineering to mean?

A I would say that using these tools I talked about, IDA and JEB, the research group had the ability to understand how the code functions, some of the parts.

Q Mm hmm. What do you understand reverse engineering to mean?

MR. AKROTIRIANAKIS: Objection, no foundation.

A I would talk about the aim of this activity, and the aim is to learn the mechanisms and the way client functions.

Q And that is something NSO's research group did with respect to WhatsApp client, as part of the development of the Hummingbird vectors?

A Yes.

MR. PEREZ-MARQUES: Why don't we pause here and grab lunch and then we can resume.

THE VIDEOGRAPHER: Going off the record. The time is 13:02. End of media card number three, volume one, of the video deposition of Tamir Gazneli.

(Break for lunch.)

This is the beginning of media card number four, volume one, in the video deposition of Tamir Gazneli. Going on the record. The time is 13:52.

MR. PEREZ-MARQUES: Mr. Gazneli, do you understand you are still under oath?

A Yes.

Q Before we broke we were talking a bit about the research and development that went

into the development of the Hummingbird vectors. Do you recall that generally?

A Yes.

Q At one point in that examination you said that there were issues that you couldn't discuss because of your understanding of Israeli legal restrictions. Is that right?

A I was addressing to specific research techniques.

Q The specific research techniques you understand yourself not to be at liberty to discuss?

A I am not allowed to discuss here.

Q When you say you are not allowed, that is because of Israeli law, as you understand it?

A Yes.

Q Is it a specific Israeli law that you are referring to?

A To the restrictions. I don't know specifically.

Q The Defense Expert Control Act. Okay. Not a specific order in this case but the expert control law generally.

A Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

[redacted]

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 162

[redacted]

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 163

[redacted]

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

A [redacted]

[redacted]

misstates his testimony.

A I wouldn't say to avoid. There are sections here which are relevant not for avoidance, as I said, even enabling the completion of the installation flow.

Q Completing the installation flow without it being detected, right?

A As we said --

MR. AKROTIRIANAKIS: Objection. Object to the form.

Q Let me withdraw that because you have said it already. If we look at C, it says:

"WhatsApp engineers claim they have anti-spam systems that analyse behavior for indications that a user might be spamming without access to message content, such as looking at how many messages a user is sending, and will flag a spam if user is sending an unusually high number of messages per minute."

Do you see that?

A Yes.

Q And that is also a description of WhatsApp's security measures, right?

MR. AKROTIRIANAKIS: Objection, misstates the document.

A That is the description of what he understands WhatsApp engineers claim by papers I might think he read that were published by WhatsApp.

Q What they claim with respect to their security measures, right?

MR. AKROTIRIANAKIS: Objection, misstates the document and the testimony.

A With respect to the anti-spam systems they might use.

Q Okay. When it says this is something engineers claim, what is the basis of that?

MR. AKROTIRIANAKIS: Objection, no foundation.

A So the fact that he doesn't state here what he bases his claimings, I have no exact answer that I can answer.

Q Does NSO engage in any human intelligence to understand how WhatsApp works?

A No.

Q So you don't know what the basis of that WhatsApp engineers claim statement is?

A No, but I can say that the paper -- the white papers were employed by WhatsApp

themselves on describing such measures.

Q Could be the source, right?

A Could be.

Q Could be but you don't know for sure?

A No.

Q So, in terms of what work the OpSec team to understand WhatsApp's anti-spamming measures, you don't know the details of what work was done?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A You asked whether human resources were used --

Q You answered that question. I am asking whether you know the work that was done by the OpSec team to understand WhatsApp's anti-spamming measures?

A No.

Q The last item under F -- let me read F first. It says:

"WhatsApp maintain predetermined metrics to detect a spammer and ban him from using the service. Some of the metrics are the following."

Do you see what I just read?

sitting here under oath, did you make an effort to comply with the WhatsApp terms of service?

A No.

Q Sitting here today, do you know one way or the other whether the steps that your team took in developing the Hummingbird vectors violated the terms of service?

MR. AKROTIRIANAKIS: Objection, calls for a legal conclusion. No foundation.

A As I have said before, I don't have the legal tools to answer the question.

Q And so you have no answer to that question. You don't know one way or the other?

A No.

MR. PEREZ-MARQUES: Why don't we take a short break.

THE VIDEOGRAPHER: Going off the record. The time is 15:29. End of media card number four, volume one, of the video deposition of Tamir Gazneli.

(A short break.)

THE VIDEOGRAPHER: This is the beginning of media card number five, volume one, in the video deposition of Tamir Gazneli. Going on the record. The time is 15:53.

MR. PEREZ-MARQUES: Mr. Gazneli, do you understand you are still under oath?

A Yes.

Q I would like to continue with Exhibit 2033. Before I do, you testified earlier about -- I think what you said are some publically available applications called JEB and IDA?

A I did.

Q And those were used as part of the development of the Hummingbird vectors?

A Yes.

Q And were those JEB and IDA run on the WhatsApp client?

A No, the software runs on Linux or Windows machines.

Q So how were they used?

MR. AKROTIRIANAKIS: Object to the form of the question.

MR. PEREZ-MARQUES: In connection with the development of the Hummingbird vectors?

A You just load the target's the client's application code inside this software.

Q Which application code?

A The APK files.

Q For what?

A For WhatsApp client.

Q So that is what I meant by run. I realize my wording was ambiguous. That is what I meant by run on the WhatsApp client, meaning that the WhatsApp client code was run through JEB and IDA as part of the development of the Hummingbird vectors?

A I want to make it clear. You cannot run, like executing the WhatsApp client code through these applications. You just load the code inside these applications.

Q What do JEB and IDA do with the code?

A Enable you to visualize closed source code as code which maybe is readable to human eyes as possible.

Q Would you agree with the characterization of JEB and and ITA as decompilers or extractors?

A Decompilers may be close to the definition.

Q I am sorry, it is close to the definition?

A Yes.

Q But not extractor?

A Extractor is like, as I understand, more wide, wider word. What does it extract?

Q So you are not sure what that means?

A No. I think that decompiling the code is the exact -- the more accurate word.

Q Decompiling, right. Okay. Is decompiling code something that you consider reverse engineering?

MR. AKROTIRIANAKIS: Object to the form of the question.

A These tools enable you to practically -- I wouldn't say only but tools which enable you to be able to read closed source codes in a basically readable manner.

Q Do you consider that reverse engineering?

A As I said before --

MR. AKROTIRIANAKIS: Object to the form of the question.

A As far as I am understanding reverse engineering is a legal term. I don't know how to apply it on specific development and research activity.

Q Do you consider that a legal term, not a software engineering term?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

A It is a legal term.

Q And you don't know what it means?

A It would be estimating.

Q Going back to Exhibit 2033, there is a section at the bottom of page 959 titled "Threat Landscape". Do you see that?

A Yes.

Q And this identifies aspects of the exploit that could lead to detection risk. Isn't that right?

MR. AKROTIRIANAKIS: Misstates the document.

A Again the question?

Q This identifies aspects of the exploit that could lead to detection risk. Isn't that right?

A I will have to read it.

Q Please read it.

A Okay. So the question is --

Q You should not read from the real-time but I can repeat the question for you, which is that this section, "Threat Landscape", identifies aspects of the exploit that could lead to detection risk. Is that right?

MR. AKROTIRIANAKIS: Misstates the

Q And 2.52 refers to a version of Pegasus, is that right?

A Yes.

Q And it notes that 2.52, Pegasus 2.52 is officially approved for production, right?

A Yes.

Q And it notes that among the enhancements included for Heaven specifically is "support for the most updated WhatsApp Version 2.18.46 that was released by WhatsApp less than a week ago". Do you see that?

A Yes.

Q And so this reflects NSO working to quickly update the Heaven vector to respond to a software update by WhatsApp?

A WhatsApp versions are released -- were released every two weeks, so according to what it states -- it doesn't state it has to be updated. Maybe no change was required. Support doesn't mean that any change is required because --

Q What about enhancement? Does that suggest some change was required? "This version introduces the following enhancements for Heaven. Support for the most updated WhatsApp ..."

A As far as I can read this paragraph, the enhancements relates to the adding things to the PE exploit to enable better (inaudible) version. No enhancement that I can detect on the first line.

Q No what?

A No enhancements I can understand from the first line.

Q So you think it is wrong for this document to list support for the most updated WhatsApp version as an example of an enhancement to Heaven?

MR. AKROTIRIANAKIS: Objection, misstates the witness' testimony.

A No. No. I said that saying enhancements doesn't say to which part of the two parts it relates.

Q What is the process to update Pegasus to reflect WhatsApp updates?

A It depends on the version.

Q Which team of individuals are responsible or were responsible in the relevant time period for updating the Hummingbird exploits to respond to WhatsApp updates?

A For all that was required or related

to the vulnerabilities part, it is the research team.

Q For which part?

A Vulnerabilities part.

Q Is the research team?

A Yes.

Q And what process would they undertake to update the Hummingbird vectors in response to WhatsApp updates?

A Download the new version to the internal ecosystem, execute the installation flow and, if it works right, just update the version numbers supported and if not then to be adjusted accordingly to the changes that were done in the application.

Q And so even if no change was required you would update the version number of Pegasus?

A Yes.

Q And would IDA and JEB be used as part of that updating process?

A It depends what was updated and what has to be done in order to adjust to it.

Q So with respect to some updates, yes?

A Some updates.

MR. AKROTIRIANAKIS: Object to the form of the question.

Q Let's do tab 32, please. By the way, Mr. Gazneli, we talked earlier about the information that Pegasus allows a customer to access from a target device. Do you recall that generally?

A Yes.

Q Is that generally the same information that you could access if you had a password to the device?

A Password in terms of --

Q Mm hmm.

A -- physical access to the device?

Q Yes?

A Yes.

Q This is going to be Exhibit 2036.

(Exhibit 2036 marked for identification)

Exhibit 2036 is a WhatsApp chat between Terry DiVittorio and Greg Rose. Are you familiar with those names?

A No.

MR. AKROTIRIANAKIS: Do you mind if I get a copy.

vector", that relates back to what we saw in the OpSec document about crashes potentially generating logs that would be reviewed by WhatsApp?

MR. AKROTIRIANAKIS: Objection, no foundation.

A This relates to crashes that after the change may occur on the target's devices.

Q And the reason they would risk the Hummingbird vector is potentially, among other reasons, because they could be reviewed by WhatsApp, the crash logs?

MR. AKROTIRIANAKIS: Objection, misstates testimony.

A They are uploaded to the server of the vendor and whether they review them or not is their decision to make.

Q It states on the next page, a few lines down, that the team is working on a solution in top priority hoping to provide a solution ASAP. That is signed [REDACTED]. Do you know who those are?

A Yes.

Q Who are they?

A Oz was -- which year?

Q December 2018?
A Let me look back to my years. Okay. Oz back then was the Director of Android R&D.
Q Android R&D?
A Yes. [redacted] was product manager and also Dana. [redacted] was her team leader.
Q As a product manager as well?
A Yes.
Q For which product?
A If I remember right, for the entire Pegasus, and [redacted] was for Android.
Q So [redacted] was part of your team?
A He was my manager.
Q So you reported to him?
A Yes.
Q Did the NSO R&D team in fact work on a solution to restore the Hummingbird vectors after this December 2018 update?
A Yes.
Q And was that successful, that effort?
A That was Eden.
Q So Heaven was made not operational by the December 2018 update. Is that right?
A Yes.

Q And subsequently NSO released Eden?
A Yes.
Q If we look at -- I am going to show you another document. This is 2038.
(Exhibit 2038 marked for identification)
This is a WhatsApp chat on January 15, 2019 among various participants. In the first message someone named [redacted] says in the last line:
"Bottom line, Eden works fine on S3 and can be demonstrated" with a sort of smiley emoticon. Do you see that?
A Yes.
Q What is S3.
A Sales 3.
Q What is sales 3?
A It is an infrastructure for making demonstrations for our services.
Q And is this the approximate timing of when Eden became ready for use at least for demonstration purposes.
A For demonstration, yes.
Q And then when did Eden go live for use by customers?
A If I remember right, about a month after.

working or acting makes changes eventually, forces you to adjust it.

Q So NSO designs an exploit, the exploit gets shut down. NSO designs another, right?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

Q Is that generally the cat and mouse game?

MR. AKROTIRIANAKIS: Misstates testimony.

A This is the domain that you have to stay -- to keep and find new vulnerabilities after the systems get changed.

Q That is just inherent to the domain in which NSO operates, right?

A Yes.

Q When something gets shut down, you have to work to develop another?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A Eventually you have to provide -- you want to provide the 1 click and 0 click solutions to customers, and it doesn't relate to a specific service or application.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Q And at this point in May 2019 when the WhatsApp update prevented Eden from working did NSO have any 0 click Android solutions?
A No.
Q Did the R&D group subsequently find another 0 click installation vector for Android devices?
A Yes.
Q What was that?
A ERISED.
Q When was ERISED approved for production?
A I don't recall the exact date.
Q If we back to the exhibit we were looking at, in that same message from Mr. [REDACTED] he says:
"R&D are working hard on different directions. Hopefully we will have good news soon, but please remember that our technological status is still great as we as a company have the resources to find something new in a relatively short time."
Do you agree with his statement, sir?
A He was optimistic.
Q Is it accurate that at this point,

in May 2019, NSO's R&D group was working hard on potential solutions to restore 0 click capability?

A As a research group and development team, you constantly work on research in order to find possible ways, rapid solutions. As I explained before, eventually we are producing a product for customers.

Q And that is still true today, right?

MR. AKROTIRIANAKIS: Objection, vague.

A This is our business.

Q So you don't remember when ERISED was approved for production?

A No, not the exact time.

Q Do you remember when ERISED began to be used by customers, approximately?

A It is really not an exact time. I couldn't tell.

Q What is your best estimate?

A If I recall right, it was close to the end of the year.

Q So late 2019?

A If I recall right.

Q And I understand you are only answering questions up to May 2020. Is that right?

A Yes.

Q And up to that date in May 2020, did ERISED remain in use?

A Yes.

Q So as to whether NSO has ever stopped using ERISED, I assume that is a question you are not willing to answer?

A Regarding ERISED, the vulnerabilities in ERISED was not in WhatsApp at all and that part was eventually closed.

Q So you are willing to answer that question about after May 2020?

A I am answering a question about ERISED capability --

Q Where was the vulnerability that was exploited by ERISED?

A Specific part in one of Samsung related code.

Q So was ERISED limited to Samsung devices?

A Yes.

Q But did it also work by transmitting WhatsApp messages?

A It was our decision whether to trigger it using WhatsApp messages or not.

Q So it could be triggered using WhatsApp messages?
A Yes.
Q And were those WhatsApp messages sent via WhatsApp servers?
A Yes.
Q And similar to what we saw about Heaven, those were non-standard WhatsApp messages?
MR. AKROTIRIANAKIS: Object to the form.
A As I said before, some of them maybe were non-standard but not all of them.
Q Were the messages, the WhatsApp messages that were sent as part of ERISED installation, were those also originated from the WIS?
A Yes.
Q So just at a high level if you can, how was ERISED different from Eden?
A So ERISED didn't use any voice or video call to be established, and didn't use any relay server for communication in the installation flow. As I explained before, it triggered vulnerability which was outside the application of WhatsApp and only used WhatsApp messages to be able to trigger the specific code in which the

vulnerability resides.

Q So under ERISED NSO used WhatsApp messages to trigger a vulnerability in the Samsung system?

A Yes.

Q And then triggering that vulnerability would then cause the further steps of the installation flows?

A Yes.

Q Was a stager delivered through WhatsApp servers as part of ERISED?

A Not the exact same but modifications of it.

Q Just to be clear, after -- and were the same fingerprinting methods used?

A Part of it, because as we talked before ERISED required also additional information whether the vendor is Samsung or not.

Q Just to be clear, after WhatsApp closed the vulnerability that was being exploited by Eden in May 2019, NSO worked on developing a new 0 click exploit that also worked, at least in part, by transmitting WhatsApp messages. Yes?

MR. AKROTIRIANAKIS: Misstates testimony.

A We researched for a new solution. We found vulnerability in the system which was specific for Samsung and we decided to implement it and build installation flow based on WhatsApp application.

Q And after WhatsApp closed the vulnerability that was being exploited by Eden, NSO succeeded in developing a new 0 click installation vector that operated in part through delivering WhatsApp messages, yes?

MR. AKROTIRIANAKIS: Misstates testimony.

A We found additional vulnerability which we were able to build installation for using that.

Q And that installation vector, ERISED, which used WhatsApp servers and WhatsApp messages remained in use by NSO customers as of at least May 2020. Is that right?

A Yes.

Q So, with this lawsuit pending, NSO was actively making available to its customers a 0 click exploit that involved the transmission of messages over WhatsApp servers?

MR. AKROTIRIANAKIS: No foundation.

A I don't recall the exact time that the lawsuit was filed.

Q It was filed in October 2019. So with that context, with this lawsuit pending NSO was actively making available to its customers a 0 click exploit that involved the transmission of messages over WhatsApp servers. Correct?

A Yes.

Q And as to NSO continues to make available to its customers a 0 click exploit that uses WhatsApp servers, you are not willing to tell me.

A No.

Q No, you are not willing to tell me?

MR. AKROTIRIANAKIS: We already had this conversation, counsel.

MR. PEREZ-MARQUES: Is that right? I just want to make sure I understand the "no". The no is you won't tell me, right?

A I can't tell you.

MR. PEREZ-MARQUES: Okay. Why don't we take a short break.

THE VIDEOGRAPHER: Going off the record. The time is 16:57. End of media card five, volume one, of the video deposition of Tamir Gazneli.

(A short break.)

This is the beginning of media card number six, volume one, in the video deposition of Tamir Gazneli. Going on the record. The time is 17:14.

Q Do you understand you are still under oath?

A Yes.

Q I would like to show you another exhibit. This is Exhibit 2040.

(Exhibit 2040 marked for identification).

It is another Confluence document labelled or titled "Deviate installations on white environment from 12/01/2020". Do you see that?

A Yes.

Q Do you recognize this document?

A Yes.

Q What is it?

A This is the output of QA team that was responsible for testing the capabilities or statistical behavior.

Q Capabilities or statistical behavior of what?

A In this timeframe it is for ERISED.

Q And so what is -- the second column

here in the chart says "ERISED ID". What does that reflect?

A It is numbering of the devices that were used for ERISED testing.

Q Test target device?

A No. Our devices that were used to test the behavior, statistical behavior of the vector.

Q Got it. What I meant when I said "test target device", I meant that on the target side of the exploit you were using a test device?

MR. AKROTIRIANAKIS: Object to the form of the question.

Q Do you understand what I mean?

A We use device on which we test how the installation vector works and behaves.

Q Okay. And is the test device acting as the sender of the exploit or the recipient of the exploit?

A Recipient.

Q That is what I meant by test target device.

A Okay.

Q So these are all NSO-controlled devices on which the ERISED is being tested?

A Owned and controlled, yes.

Q And some of the numbers it looks like repeat. Do you see that? For instance ER11 shows up a couple of times on page 1?

A Yes.

Q And so that reflects that it is being tested more than once on the same device?

A Yes.

Q Do these reflect the results of the testing?

A I don't see the results here.

Q It looks like the document may be cut off. It looks like there is another column that we can only see part of, right?

A I expect it to be results for each attempt, but I don't see any results here.

Q And typically in this type of document, based on your experience, you would expect to see results of the tests?

A At least the outcome of the attempt.

Q And you don't see that here, as produced? I am not sure we got your answer.

A I cannot see the result here.

Q And the column that is headed "QA version" that would be the version of WhatsApp

that is being run on the target device or the test device?

A Yes.

Q Okay. When it says "Deviate installations", what does that mean?

A Deviate was just part of the ERISED used -- part of the code.

Q What part was that?

A It was specific part for the exploitation flow, that was part of the general remote code execution capability in ERISED.

Q Part of the remote code execution capability?

A Yes.

Q And so was Deviate the part of the code that worked with the Samsung vulnerability?

THE VIDEOGRAPHER: Sorry, one second. It is okay.

Q My question was was Deviate the part of the code that worked with the Samsung vulnerability?

A Yes.

Q And so this chart here reflects attempts to install Deviate on test devices?

MR. AKROTIRIANAKIS: Objection, misstates the document.

A It is a list of attempts to define what is the statistical behavior of this part of the installation, yes.

Q And so with respect to these WhatsApp versions, would that reflect that ERISED was being used at least at the time that those versions of WhatsApp were released?

MR. AKROTIRIANAKIS: Objection, misstates the document. Also vague.

A Can you repeat the question, please?

Q Yes. With respect to those WhatsApp version numbers that go along with at least many of these tests, this would reflect that ERISED was being at least tested during the time that those WhatsApp versions were available?

A Yes, tested, for sure.

Q You can put that aside. Are you aware that the Heaven exploit in its code included hard coded references to S.WhatsApp.net?

A S.WhatsApp.net is a domain name.

Q Mm hmm. And are you aware that that was coded into the Heaven source code.

MR. AKROTIRIANAKIS: Object to the form

of the question. Assumes facts not in evidence.

A Which code.

Q The Heaven code?

A Yes, if I recall right, yes.

Q Yes, it was coded in there?

A Yes.

Q And you said S.WhatsApp.net is a domain. Is that right?

A It is a domain name, yes.

Q And where would that domain take the traffic?

A I don't know.

Q But a WhatsApp server, is that right?

A This is, if I recall right, the domain name of the signaling WhatsApp server.

Q Okay. So that is -- S.WhatsApp.net is the domain name of a WhatsApp signaling server?

A If I recall right.

Q And so including S.WhatsApp.net in the Heaven source code would do what, with respect to the WhatsApp signaling server?

A Communicate through that WhatsApp signaling server.

Q It would direct the communication to

A Yes.

Q And when you say "the relevant payloads", is that only for privilege escalation or also for deployment of the agent that the C2 servers were used?

A The agent too.

Q So C2 servers are part of the installation phase, is that right?

MR. AKROTIRIANAKIS: Objection, misstates testimony.

A No, as part of the installation procedure and data extraction. Installation phase, you asked installation vector, this is not related to it.

Q Okay. So you don't consider privileged escalation part of the installation phase?

A I am trying to stay under your terminology.

Q Right. I want to understand yours. So when you refer to the installation phase, that doesn't include privilege escalation?

A In my terminology, installation of an agent is the whole procedure from the beginning of the remote code execution, it continues to

privilege escalation payload to the fact the agent is installed.

Q Okay. So the C2 servers are used during what you just defined as the installation phase?

A For part of, yes.

Q Did defendants ever operate C2 servers?

A No.

Q Did defendants set up C2 servers for defendant's customers?

A What do you mean by set up?

Q Lease them, buy them, anonymize them?

A As I said before, the White Services team, it is possible for White Services, if they were eventually deployed on customer's ecosystem as part of his solution.

Q Are you familiar with an AWS, Amazon Web Services server that was used, that was housed, located in Germany in connection with the Pegasus exploit or Pegasus system?

A Yes.

Q What do you know about that server?

A This was a server that was used for

the deployment of the WIS for testing purpose.

Q And when you say "deployment of WIS", what do you mean?

A Placing the WIS code on that server.

Q And then how was that code used once housed on that server?

A It was connected to the additional part of the ecosystem that were required to complete testing of the capability.

Q Internal testing or testing through WhatsApp's ecosystem?

A Testing through WhatsApp's ecosystem.

Q So messages generated by WIS were sent from the German AWS server through WhatsApp's ecosystem?

A Yes.

Q For test purposes, is that right?

A Yes.

Q To target devices controlled by NSO?

MR. AKROTIRIANAKIS: Object to the form of the question.

A To company owned devices.

Q And when was that? During what time period was that AWS server being used for that

purpose?

A I really don't recall the exact times but -- I don't recall the exact time when it was used for testing. It was repurposed several times.

Q To be clear, the server was repurposed?

A Yes.

Q What other purposes was it used for?

A I don't know.

Q Was it ever used to house the agent?

A No.

Q Are you aware of any other purposes for which it was used?

A I know that it was IT owned server. Sorry, that is what I know.

Q What do you mean IT owned?

A IT owned.

Q I don't know what you mean?

A IT, meaning the team, IT.

Q And what is the IT team at NSO?

A What they do?

Q Yes.

A They are responsible for the infrastructure of the company.

Q And so why are you so confident that it was never used to house the agent?

A Because we used it for the testing purposes and we never tested an end to end installation through this, using this server, and the only part that was tested was the remote code execution part.

Q Now, I am not disagreeing with you. I am just trying to understand, because you said after that point it was repurposed and you didn't know what purposes it was used for, but you said it was not used to house the agent. So I am just trying to understand. Why do you believe that it was not used at any point after it was repurposed to house the agent?

A Whether it was used or not, it would be done by our research team, and I would know whether it was used for installation of agent or not. And the purpose of the server was our relation to test the behavior of the installation and specifically the remote code execution part.

Q So you are familiar with which servers were used to house the agent?

A I am familiar -- this was not used to have an agent on it.

Q Which servers were used to house the agent?
A In terms of testing purposes?
Q Testing purposes or customer use purposes?
A Customer use, as I said, he gets the ecosystem of servers that he uses for his purposes and the whole system is deployed on it for his control, so I am not familiar which servers are there or where they are located.
Q When you say testing purposes, is that different than demonstration purposes?
A Yes.
Q Was the AWS server used at all for demonstration purposes?
A No.
Q Do you know where the WIS code was housed for demonstration purposes?
A You are asking about location?
Q Server location?
A No.
Q Are you familiar with the process by which NSO demonstrated the Pegasus software?
A Yes.
Q How would that process work? What

would NSO do as part of the demonstration of the Pegasus software?

A Use an ecosystem which was built for the demonstrations, for example, we saw the sales 3, and used company owned devices in order to demonstrate the behavior and the abilities on it.

Q When you say used company owned devices, you mean as the target, right?

MR. AKROTIRIANAKIS: Object to the form of the question.

A As the device on which the installation was conducted.

Q And so in terms of -- if we imagine a demonstration of Pegasus, that would work through WhatsApp's servers the same as if it was an actual use by a customer. Is that right?

A In terms of WhatsApp server, yes.

Q And is the same true with respect to testing, that that would operate through WhatsApp servers the same way as an actual use by a customer?

A Testing in an external environment?

Q Yes.

A Yes.

Q If you know, what service providers

did defendants use to procure servers for use in connection with Pegasus?

A I don't know.

Q I believe that is a topic on which you are designated, but let me just check. The topic was "you or any relevant spyware's use of any third party server, including the AWS server to access plaintiff's computer", and your counsel said that you would testify as to defendant's understanding of the development of the accused technology in use between April 29, 2018 and May 10, 2020, including general information about defendant's use of third party servers in the accused technology. Are you prepared to testify on that topic?

MR. AKROTIRIANAKIS: Only if it was in the original topics. In light of his testimony?

MR. PEREZ-MARQUES: Do you have my question, Mr. Gazneli?

A I remember that the -- saying that I was testifying about the use.

Q The use of third party servers?

A Use, not which specific third party servers they were.

Q Okay. So you don't know which third

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

A The image is the instance in time, so it couldn't contain all the code from two years of the --

Q Right, because the code changed from time to time, right?

A There are certain parts of it that changed, yes.

Q And so the code that was being used in April 2018 is likely not the code that was being used in May 2019?

MR. AKROTIRIANAKIS: Object to the form of the question.

A The messages that were implemented in it, the messages are implemented as part of the protocol that WhatsApp requires, so this practically will not change a lot. As for the fingerprint, as I said it was used for Heaven and Eden. The other parts of the code I said it depends on the exact timing of the image.

Q Right, because the code changed over time, right?

MR. AKROTIRIANAKIS: Objection, misstates his testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

A The code may change. I don't know if it changed in specific timing before and after.

Q And you don't know when the snapshot was taken, right?

A I don't recall.

Q We talked about the S.WhatsApp.net domain. You recall that?

A Yes.

Q And I think when I was examining you said that that was the domain for WhatsApp signaling server. Is that right?

A Domain name.

Q The domain name for WhatsApp signaling server?

A Also Google.com is the domain name for Google signaling.

Q Got it. Okay. Is that one signaling server or multiple signaling servers?

A It depends on WhatsApp to decide.

Q Could be either one, right?

A I don't -- this is not a single server. That is why they use a domain name.

Q As part of developing the Hummingbird exploits, did you take any steps to ascertain where the WhatsApp signaling servers

were located. No?

A No.

Q Did you take any steps to ascertain where the WhatsApp relay servers were located?

A No.

Q You understood that what WhatsApp is based in California?

MR. AKROTIRIANAKIS: Objection.

A As a company?

Q Yes.

A So does everybody else in the US but the server --

Q Not my question. Were you aware when you were working on the --

A No.

Q -- hummingbird vectors that WhatsApp was based in California?

A No.

Q You were not aware of that?

A No.

Q Did you take any steps to assure yourself that the servers that were being used as part of the Hummingbird vectors were not in California?

MR. AKROTIRIANAKIS: Object to the form

of the question.

A Can you repeat?

Q Did you take any steps to make sure that the messages that were being transmitted as part of the Pegasus software, that those servers were not in California? Did you take any steps to check that?

A No.

Q Sitting here today, do you know, one way or the other, whether any of WhatsApp's signaling or relay servers used in connection with the Hummingbird vectors actually are in California?

A No.

Q You don't know that at all sitting here today?

A No.

Q So if some of those servers were in California, you wouldn't know anything to the contrary?

A It was not required for the -- it was not a requirement in terms of the capability.

Q But accessing the WhatsApp signaling servers was a requirement of the capability. Right?

CERTIFICATE OF COURT REPORTER

I, AILSA WILLIAMS, an Accredited LiveNote Reporter, hereby certify that Tamir Gazneli was duly sworn, that I took the Stenograph notes of the foregoing deposition and that the transcript thereof is a true and accurate record transcribed to the best of my skill and ability. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Before completion of the deposition, review of the transcript was requested. Any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

AILSA WILLIAMS

Dated: September 6, 2024.

# Exhibit 6

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

Expert Witness Opinion of David Youssef re WhatsApp v. NSO Group

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al,.

Plaintiffs,

v.

NSO GROUP TECHNOLOGIES LIMITED, et al.,

Defendants.

Case No.: 19-cv-07123-PJH

# Expert Report of David Youssef

August 30, 2024

#98837269v3

Expert Witness Opinion of David Youssef re WhatsApp v. NSO Group

August 30, 2024

# EXPERT REPORT OF DAVID J. YOUSSEF

*IN RE: WHATSAPP INC., ET AL., (PLAINTIFFS), V. NSO GROUP TECHNOLOGIES LIMITED, ET AL., (DEFENDANTS)*

*CASE NO.: 19-CV-07123-PJH*

## Table of Contents

EXECUTIVE SUMMARY ........ 1
QUALIFICATIONS AND SCOPE ........ 4
Personal Background ........ 4
Assignment and Compensation ........ 5
Methodology & Materials Reviewed ........ 5
Background of the Litigation ........ 7
RELEVANT BACKGROUND ........ 9
Overview of NSO Group ........ 9
Overview of WhatsApp ........ 10
Overview of WhatsApp VoIP Architecture ........ 11
Overview of Defendants' WhatsApp Exploit ........ 12
EVIDENCE VALIDATION ........ 21
DETAILED OPINIONS ........ 26
Defendant's Exploitation of WhatsApp Infrastructure ........ 26
Function and Impact of Defendants' Spyware ........ 29
Evading Detection ........ 33
Defendants' Malware Development and Circumvention ........ 34
Defendants' Continued Actions Following Plaintiffs' Remediation ........ 39
CONCLUSION ........ 41
APPENDIX A: CURRICULUM VITAE ........ 42
APPENDIX B: ABOUT FTI CONSULTING CYBERSECURITY ........ 44
APPENDIX C: MATERIALS CONSIDERED ........ 46

# EXECUTIVE SUMMARY

1. WhatsApp LLC (f/k/a WhatsApp Inc.) is a subsidiary of Meta Platforms Inc. (f/k/a Facebook Inc.) (collectively "Plaintiffs") registered and headquartered in the United States which manages and operates WhatsApp, a free private messaging application with billions of active users globally, making it one of the most, widely used instant messaging applications in the world. WhatsApp allows users to send text messages, make voice and video calls, share photos, videos, and documents, and more, through the Internet.

2. NSO Group Technologies Limited and Q Cyber Technologies Limited (collectively "Defendants"), according to Defendants' website, provides "cyber intelligence for global security and stability,"[1] and are widely known for developing malware.

3. In May 2019, during a security audit, Plaintiffs identified anomalous activity occurring on some of the servers which make up the core communication infrastructure of WhatsApp. Further investigation by Plaintiffs revealed that during and potentially prior to May 2019, Defendants accessed and used, without authorization, WhatsApp Servers in order install Defendants' Malware on mobile devices for the purposes of accessing and exfiltrating information on the mobile devices without authorization.

4. I[2] have been retained as a technical expert on behalf of Davis Polk & Wardwell LLP ("Counsel") in connection with their representation of Plaintiffs in this matter. I have been asked to analyze and opine on the evidence provided by Plaintiffs, provided by Defendants, and provided to Counsel by the United States Department of Justice ("DOJ"). My analysis of the evidence focuses on Defendants' development and use of a malware (herein, the "Malware") designed to interface with Plaintiffs' infrastructure, which was discovered by Plaintiffs and attributed to Defendants in May 2019.

5. The scope of my analysis included eight main points of determination:

- (1) How Defendants' Malware exploited the WhatsApp application and infrastructure;
- (2) How the Malware accessed and used the WhatsApp infrastructure;
- (3) How the Malware subsequently accessed and used targeted users' ("Target Users") WhatsApp accounts and their associated devices ("Target Devices");
- (4) Why the Malware should be considered spyware;

---

[1] https://www.nsogroup.com.

[2] Some of the work described in this report was performed by members of my team at my direction. I have used the pronoun "I" throughout this report to describe both the work I did myself and the work my colleagues performed at my direction.

- (5) How the Malware attempted to evade detection by Plaintiffs and targeted WhatsApp users;
- (6) How the Malware adapted to changes and updates in the WhatsApp infrastructure;
- (7) The efforts required of Defendants to reverse engineer and test the WhatsApp code and infrastructure to successfully conduct this exploitation and develop their Malware; and
- (8) The impacts to Plaintiffs' infrastructure and Target Devices.

6. Regarding how NSO's Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices, it is my opinion that Defendants manipulated network traffic related to WhatsApp voice call communications in order to exploit a buffer overflow vulnerability in the WhatsApp Client Application for Android. This network traffic was transmitted through Plaintiffs' network infrastructure, intended to resemble legitimate WhatsApp traffic, and ultimately served to deliver and execute malicious commands on the Target Devices, thereby abusing the architecture and using it in a manner in which it was not intended or authorized by Plaintiffs.

7. It is my opinion that Defendants' Malware is "spyware." To make this determination, I evaluated the following two characteristics of spyware against the Defendants' Malware: 1) the malware is implemented without the Target Devices' users' awareness; and 2) the malware collects information on Target Devices' users' activity. I determined Defendants' Malware was implemented without the awareness of the Target Devices' users. Yaron Shohat, Chief Executive Officer of NSO Group, stated that Defendants' Malware "deploys an agent which the owner or user of the targeted device is not aware of."[3] Based on Plaintiffs' public statements about their Pegasus product, I determined that Pegasus is designed to collect information from a Target Device related to its user's activity. I did not have access to Pegasus or other code files, which limited my understanding of the ultimate impact to a Target Device after Pegasus or any other spyware had been installed on it. Although I lacked access to Pegasus, I did determine certain information was obtained from the targeted devices during Defendants' exploitation of the relevant vulnerability in WhatsApp, and I concluded that this exploitation most likely served as a delivery and installation vector for Pegasus.

8. It is my opinion that Defendants designed their Malware to evade detection through manipulation of the network traffic supporting Plaintiffs' voice-call communication, causing the traffic to appear as legitimate. Defendants accomplished this by leveraging

[3] Shohat Dep. at 40:1-40:11

Plaintiffs' user account functionality in order to appear as legitimate users and encrypting their activity within the manipulated network traffic.

9. It is my opinion that Defendants updated their Malware to circumvent software updates Plaintiffs made to their servers. Between September and December 2018, Defendants attempted to deliver their exploit to Plaintiffs' servers, but those attempts were blocked by software updates implemented by Plaintiffs. These attempts preceded Defendants' May 2019 attack, which was successful based on apparent changes Defendants made to their Malware to address Plaintiffs' 2018 software updates.

10. It is my opinion that Defendants reverse engineered Plaintiffs' software and tested their Malware on Plaintiffs' servers and mobile client application ("WhatsApp Client Application").

11. Finally, it is my opinion that Defendants' Malware was used to successfully exploit at least 1,500 targeted devices. Further, based on Defendants' business model, it is my opinion that Defendants will continue to develop exploits targeting Plaintiffs servers and client applications.

# QUALIFICATIONS AND SCOPE

12. I, David J. Youssef, am employed as a Managing Director at FTI Consulting, Inc. ("FTI"). I have been retained by Davis Polk & Wardwell LLP ("Counsel") in connection with their representation of Plaintiffs in this matter.

## Personal Background

13. I have more than 15 years of experience working as a cybersecurity professional in both private industry and academia. My extensive knowledge in the fields of incident response, crisis management, advanced threat research, malware analysis, cyber resiliency, cloud security engineering, offensive security, and secure software development has led to my position as a Managing Director with FTI Consulting, specifically in its Cybersecurity practice with the Forensic Litigation & Consulting segment. I have assisted various clients with the analysis of malicious software to determine its entry and exploitation, behavior, and obfuscation tactics. The techniques relied upon in this analysis have applicability across multiple cybersecurity and data privacy engagements I have performed and led.

14. Prior to joining FTI Consulting, I served as Vice President and Global Lead of the Integrated Cyber Threat Analysis Team at Citigroup's Cyber Security Fusion Center. There, I coordinated Citi's intelligence-led, threat-focused approach to incident avoidance and risk reduction. I was the lead coordinator of response efforts during critical cyber events and crises, orchestrating evidence collection, intelligence integration, and mitigation efforts among Fusion Center teams. In addition, I spearheaded the creation of an interdisciplinary Advanced Persistent Threat hunt capability that focused on proactively defending and protecting against advanced malware distributed by sophisticated nation state and cyber-criminal groups.

15. Before my role at Citi's Fusion Center, I served as Assistant Vice President for Citi Security and Investigative Services, responding to global cyber incidents and specializing in digital forensics, electronic crimes, and malware analysis. I actively engaged in liaison activities with various domestic and international law enforcement and government agencies to best understand emerging cyber threats and aided in the disruption of several malware botnets cyber-criminal rings.

16. I was an Adjunct Professor of Cybersecurity at Fordham University, where I taught various graduate and undergraduate courses on topics including incident response, digital forensics, network security, penetration testing, and critical infrastructure. Also at Fordham, I served on the organizing committee of the International Conference on Cyber Security, an annual summit held in partnership with the Federal Bureau of Investigation

in which experts from the government, the private sector, and academia gather to share critical intelligence on issues shaping the future of cybersecurity.

## Assignment and Compensation

17. Due to my expertise in cybersecurity and digital forensics, I have been asked to review the facts about the exploit utilized by Defendants against Plaintiffs' services, Defendants' related conduct, and all materials cited within this expert report, as made available by Counsel. Professionals from FTI, who worked under my direction, have assisted me on this assignment. The fees paid to FTI are not contingent on the outcome of this matter or the opinions expressed herein. I reserve the right to supplement, update, or otherwise modify my opinions and my report. I am not a lawyer and the opinions offered in this report are not legal opinions.

## Methodology & Materials Reviewed

18. In performing this assignment, I have reviewed relevant information made available by Counsel, including logs and code related to the exploit at issue in this litigation. I have also drawn on my own background, experience and expertise in similar matters to form the conclusions and opinions about how the relevant artifacts I inspected were designed and for what purpose.

19. Counsel provided the following materials with which to conduct my analysis and inform my findings. I understand from Counsel that Defendants have not yet produced all relevant information that Plaintiffs sought. I reserve the right to amend my report if new information becomes available.

- Plaintiffs' internal documentation, including technical information relating to Plaintiffs' architecture;
- Plaintiffs' internal engineering tickets;[4]
- Log files derived from Plaintiffs' servers or network infrastructure as part of Plaintiffs' investigation into the exploit; and
- Various computer scripts, related configurations and assets, and log files, which I understand were produced by the U.S. Department of Justice (DOJ) and derived from a cloud computing server controlled by Defendants at the time of the incident. I will refer to this server as Defendants' Server;

[4] A "ticket" here refers to a digital record created within a ticketing system to manage and track issues, requests, or tasks. This is intended to facilitate communication of users and support teams toward the efficient resolution of problems.

- NSO documentation produced during discovery which I believe to have originated from NSO's internal documentation repositories.

20. I reviewed a set of log files and files containing code that I obtained from Plaintiffs related to Defendants' Server, which I understand was produced to Plaintiffs by the DOJ, to analyze and validate the steps taken by Defendants' Malware during the exploitation. While the full list of files reviewed are contained in Appendix C, files of particular relevance are listed below:

[5] WA-NSO-00017151.

[6] WA-NSO-00017151.

[7] Both "abs.log" and "more_human_readable_abs.log" contain identical logged activities. However, "more_human_readable_abs.log" has been reformatted to facilitate review and display.

[8] WA-NSO-00017133.

[9] WA-NSO-00016436.

[10] WA-NSO-00017131.

[11] WA-NSO-00017132.

[12] WA-NSO-00016505.

21. I also reviewed materials related to Defendants' Server including computer scripts. The scripts are stored in three folders, "alternate_copy," "android-backend-server," and "wis." The provided scripts do not appear to constitute the entirety of Defendants' Malware and therefore provide incomplete insight into the exploitation capabilities of Defendants' Malware. It is my understanding that the "android-backend-server" folder maintains the most recent iteration of scripts, and therefore I primarily referred to the scripts stored in the "android-backend-server" folder.

22. The documents upon which I relied in forming my opinions are cited in this report. A full list of the documents and materials considered is attached as Appendix C. I understand additional materials and information may be collected as part of the discovery process which remains ongoing in this proceeding. In particular, I understand from Counsel that Defendants have not permitted me access to code or documents about the apparent exploit, including source code that I am not permitted to access because I am located in the United States, and I am not an Israeli citizen. Furthermore, I understand Defendants prohibited me from reviewing any materials marked as "Highly Confidential-Attorneys Eyes Only" by Defendants or non-parties represented by Defendants' counsel, and the Court only overruled Defendants' objection on August 27, 2024. As such, I have not had an opportunity to analyze "Highly Confidential-Attorney Eyes Only" materials from Defendants' or non-parties represented by Defendants' counsel. It may be necessary for me to supplement or revise the opinions set forth below if I receive more information relevant to my assignment. Nevertheless, I am comfortable with my conclusions at this time based upon the information I have accessed and analyzed as of August 30, 2024.

## Background of the Litigation

23. I understand Plaintiffs filed this action against Defendants on October 29, 2019, asserting claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502, and claims for breach of contract of WhatsApp's Terms of Service.

24. According to the complaint in this action (the "Complaint"), "[b]etween in and around April 2019 and May 2019, Defendants used WhatsApp Servers, located in the United States and elsewhere, to send malware to approximately 1,400 mobile phones and devices… designed to infect the [T]arget [D]evices for the purpose of conducting surveillance of specific WhatsApp users."[13] The Complaint alleges "Defendants' actions were not authorized by Plaintiffs and were in violation of WhatsApp's Terms of Service,"

[13] Compl. ¶ 1, Dkt. No. 1.

and thus violated federal and state law, and breached the parties' agreement reflected in WhatsApp's Terms of Service.[14]

25.    Plaintiffs have asserted claims under the CFAA and CDAFA as well as claims for breach of WhatsApp's Terms of Service. I am not an attorney and I offer no opinions about the law. All of my understanding of legal issues relevant to this case is based on information provided to me by Counsel.

26.    I understand the CFAA imposes civil and criminal penalties when an individual "intentionally accesses a computer without authorization or in a manner which exceeds authorized access, and thereby obtains . . . information from any protected computer,"[15] "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct further the intended fraud and obtains anything of value,"[16] or "knowingly and with intent to defraud traffics . . . in any password or similar information through which a computer may be access without authorization."[17]

27.    I further understand WhatsApp's Terms of Service prohibits users from "exploiting [WhatsApp's] Services in impermissible or unauthorized manners, or in ways that burden, impair, or harm [Plaintiffs], [Plaintiffs'] services, systems, [Plaintiffs'] users, or others." I will detail later in this report the specific sections of WhatsApp's Terms of Service Defendants potentially violated during the 2019 exploit as identified by Plaintiffs.

---

[14] Compl. ¶ 1, Dkt. No. 1.

[15] 18 U.S.C § 1030(a)(2). A "protected computer" is defined as any computer "used in or affecting interstate or foreign commerce or communication." 18 U.S.C § 1030(e)(1).

[16] 18 U.S.C § 1030(a)(4).2q

[17] 18 U.S.C § 1030(a)(6).

# RELEVANT BACKGROUND

## Overview of NSO Group

28. NSO Group Technologies Limited is a private Israeli technology and cyber-surveillance company. Q Cyber Technologies Limited was, during the relevant time period, its sole director and majority shareholder.[18]

29. Defendants are primarily known for their Spyware product, "Pegasus," which is designed to "remotely and covertly" extract information from "virtually any mobile device, as well as to surveil and eavesdrop on the users."[19] [20] Notably, Pegasus can be delivered to Target Devices, specifically iOS and Android mobile devices, without any required user interaction; this is known as "zero-click" exploitation. With this capability, Defendants' Spyware can be installed on targeted devices without targeted users' knowledge and without the need to trick the user into performing any particular action, such as clicking on a malicious link (known as "one-click" exploitation). Target Devices can be exploited by simply receiving a text message, or in this case, a WhatsApp voice call offer.

30. Once a Target Device has been compromised by Defendants, their Pegasus Spyware can be installed on the device and used to surreptitiously access and extract sensitive information such as voice calls, messages, multimedia including photos and videos, emails, location history, etc. Pegasus is also capable of passively monitoring, activating phone settings to collect data, and defining triggers to initiate data collection.[21]

31. It is my understanding that Defendants invest considerable resources in the identification of software vulnerabilities, specifically "zero-day"[22] and "zero-click" vulnerabilities, and the development of exploits for those vulnerabilities which can facilitate the delivery and installation of Defendants' Spyware on targeted devices. Defendants have in the past, and continue to, maintain staff dedicated to the intensive research and identification of novel security vulnerabilities in various commonly used applications, such as WhatsApp, in

---

[18] Declaration of Shalev Hulio in Support of Defs' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

[19] Compl. Ex. 10, Dkt. No. 1.

[20] Defs' Apr. 17, 2023 Responses & Objections to Pls' Requests for Admission, Response to RFA No. 14 (admitting "Exhibit 10 to the Complaint appears to be an authentic copy of a document authored by Defendants titled "Pegasus-Product Description," which described some features of Pegasus at the time it was written, which Defendants believe occurred in 2012").

[21] Compl. Ex. 10, Dkt. No. 1.

[22] A zero-day exploit is the delivery of a security flaw in a particular piece of software or hardware which is unknown to the vendor and to the public, for which no fix has been made available.

order to continuously propagate their malware products to the extent desired by Defendants or their customers.[23]

## Overview of WhatsApp

32. WhatsApp is a communication service and associated application which offers its users multiple forms of encrypted Internet-based communications such as text/multimedia messaging and voice over Internet Protocol ("VoIP")[24] telephony. WhatsApp enables these communications with official client-side applications across multiple different platforms (including iOS, Android, Windows, macOS, and web browsers). Communications between users are mediated and facilitated by WhatsApp Servers.

33. WhatsApp comes at no cost to the consumer, and the application is available for users to download for free from app stores. A prospective user must create an account and agree to the WhatsApp Terms of Service in order to begin using the WhatsApp service.

34. WhatsApp's user base has grown significantly over the past decade. The table below illustrates the platform's rapid adoption by users worldwide:

| Date | Number of WhatsApp Users |
|---|---|
| December 19, 2013 | 400,000,000[25] |
| April 22, 2014 | 500,000,000[26] |
| February 1, 2016 | 1,000,000,000[27] |
| February 12, 2020 | 2,000,000,000[28] |

35. WhatsApp is marketed as a secure, reliable, and private communication method due to its use of end-to-end encryption ("E2EE").[29] Specifically, WhatsApp is designed to ensure messages and calls between WhatsApp users are accessible to only the parties involved in the communication; as part of this model, no entity positioned between the "ends" of the communication, inclusive of WhatsApp systems and staff, is capable of decrypting and

[23] Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

[24] VoIP is a communication technology that allows users to make voice calls over broadband Internet connections rather than traditional analog telephony services.

[25] https://blog.whatsapp.com/400-million-stories.

[26] https://blog.whatsapp.com/500-000-000.

[27] https://blog.whatsapp.com/one-billion.

[28] https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

[29] End-to-end encryption is a secure messaging feature designed to keep messages private from all third parties, including the messaging service. A message will only appear in readable form to the sender and recipient of the message.

reading the associated message contents.[30] WhatsApp achieves this level of security by leveraging encryption keys known only by the WhatsApp Client Applications operated by the users partaking in a given communication exchange.

36.    In my opinion, the nature of the service provided by WhatsApp as a privacy-oriented communications platform, together with its widespread global adoption, is what made WhatsApp a high-priority target for Defendants in seeking to identify mechanisms through which to deliver their Malware to Target Devices.

## Overview of WhatsApp VoIP Architecture

37.    I understand from Plaintiffs that the WhatsApp VoIP infrastructure uses a proprietary call management system to establish and process voice call communications between users. WhatsApp's call management system and VoIP infrastructure is supported by WhatsApp's Signaling Servers[31] and Relay Servers,[32] and underpinned by protocols and standards including Real-time Transport Protocol ("RTP"),[33] Real-time Transport Control Protocol ("RTCP"),[34] Session Traversal Utilities for NAT ("STUN"),[35] and WhatsApp's proprietary variant of the Extensible Messaging and Presence Protocol ("XMPP") referred to internally by Plaintiffs as "FunXMPP."

38.    WhatsApp Signaling Servers facilitate the initiation of VoIP calls between user devices hosting the WhatsApp Client, whereas WhatsApp Relay Servers facilitate data transmissions, such as call audio to and from the user devices.[36] To clarify, when referencing the WhatsApp Client, I am referring to the legitimate WhatsApp Client Application developed and distributed by Plaintiffs through authorized channels.

39.    It is my understanding that a call relay session occurs when a user (the "sender" or the "caller") initiates a call. WhatsApp Signaling Servers notify the directed user (the

---

[30] https://faq.whatsapp.com/820124435853543.

[31] Signaling Servers handle the initiation of voice calls, which involves making the recipient's device "ring" or receive notification of an incoming call; if the recipient accepts the call, the Signaling Server will connect the call. After that point, the Signaling Server handles any actions which alter the state of the call, such as a participant ending the call.

[32] Relay Servers maintain the connections of voice calls controlling the manner in which packets containing the call audio are transmitted back and forth between participants' devices.

[33] Real-time Transport Protocol ("RTP") is a network protocol that handles traffic involving audio and video over the Internet.

[34] Real-time Transport Control Protocol ("RTCP") is a control protocol that supports RTP, with the main function of monitoring the quality and delivery of data.

[35] Session Traversal Utilities for NAT ("STUN") is a standard, including a network protocol, for maintaining connectivity across Network Address Translation ("NAT") gateways.

[36] Gheorghe Dep. at 31:13-32:22.

"recipient") of the incoming call; the recipient then has the option to accept, reject, or ignore the incoming call. If the recipient accepts the call, the WhatsApp Signaling Server establishes the connection and the WhatsApp Relay Server maintains the connection for the duration of the call. During this process, the sender sends a packet to the Relay Server, which then forwards the packet to the recipient.[37] RTP packets are used to transport the audio and video traffic over the Internet, while RTCP packets manage and monitor the delivery of the RTP functionality.

40.  For purposes of the exploit detailed in this expert report, it is my understanding, supported by Plaintiffs' internal analysis of the exploit, that there is an optimization located in the code path prior to the RTCP handler, which is utilized for an early calculation of round-trip time. This code path will store an incoming RTCP Sender Report ("SR") and Receiver Report ("RR") in a temporary buffer. From there, the temporary buffer is used to make the SR and RR immediately available to the RTCP layer when the target user answers a call.

## Overview of Defendants' WhatsApp Exploit

41.  I understand that when Plaintiffs' discovered Defendants' unauthorized activity, Plaintiffs conducted a preliminary investigation into the exploit. Plaintiffs entered the vulnerability into MITRE Corporation's Common Vulnerabilities and Exposures ("CVE") database under the identifier CVE-2019-3568. This was described as a "buffer overflow vulnerability in WhatsApp VOIP stack [allowing] remote code execution via [a] specially crafted series of RTCP packets sent to a target phone number."[38] The vulnerability was considered to be a zero-day vulnerability since it had not been previously disclosed or mitigated.

42.  A "buffer" is an area of computer memory[39] set aside by a process to hold data temporarily. A "buffer overflow" is a type of software vulnerability in which a program can be induced to write more data to a buffer than the buffer is designed to store. When a buffer overflow occurs, the excess data is written to adjacent locations in memory. This may corrupt or overwrite existing data in those locations, resulting in unintended behavior such as a program crash. It may also be leveraged, for malicious purpose, to

---

[37] Gheorghe Dep. at 172:21-173:3.

[38] https://nvd.nist.gov/vuln/detail/CVE-2019-3568.

[39] Computer memory refers to the electronic components of a computer which store data and instructions related to running processes and facilitate the retrieval of this information for processing. Memory should not be confused with storage, e.g. the disk drive of the device; information stored in memory is volatile, meaning that memory is "wiped" when the device is powered off, and repopulated when the device is powered on and used. For the purposes of my report, "memory" specifically refers to the logical space these components in which data can be stored and indexed.

insert computer code into memory and precisely overwrite pieces of data in memory to manipulate the legitimate running process's logic to execute that code.

43. I reviewed the materials made available to me to develop a comprehensive understanding of the exploitation activity observed by Plaintiffs beginning on May 2, 2019. These materials are reflective of the exploitation having been conducted by an automated process Defendants referred to as "heaven," which was specifically designed to compromise Android mobile devices, WhatsApp Servers, and the WhatsApp Client Application. Defendants' Malware leveraged WhatsApp infrastructure to manipulate the WhatsApp Client Application running on those Target Devices through a series of actions which I will refer to as the "exploit chain."

44. I have broken down the observed exploit chain into eight stages or "steps," each of which I understand to have been crucial to Defendants' successful compromise of a Target Device. My understanding of each step based on my review and analysis is as follows.

**Step 1: Fingerprinting of Target Device**

45. Defendants first conducted "fingerprinting" of the Target Device. Fingerprinting is a technique used to identify certain hardware and software characteristics of a Target Device and associated WhatsApp Client Application, which can then inform an attackers' subsequent exploitation.

46. I was able to confirm fingerprinting activity was successful, based on log evidence that showed the collected information about the Target Device, which included operating system, WhatsApp Client Application version, and the make and model of the Target Device.

**Step 2: Delivery of Malicious Call Offer to Target Device**

47. If the fingerprinting step determined that the Target Device was susceptible to exploitation, the second step involved "heaven" sending a call offer message with manipulated settings[40] to the Signaling Server for delivery to the Target Device. One of these manipulated call settings enabled an XOR cipher,[41] a basic method of encryption intended to obfuscate the content of a message, for subsequent RTCP transmissions. The XOR encryption allowed for subsequent messages sent by "heaven" to resemble legitimate RTCP packets, thereby concealing the malicious nature of the traffic. I understand that the option to enable an XOR cipher was implemented within the WhatsApp infrastructure but was not in use by ordinary WhatsApp users and was not

[40] A call offer message is sent by device to initiate a communication session with a recipient.

[41] XOR Encryption is a form of symmetric encryption that leverages the same key for encryption and decryption of a message.

publicly documented. Furthermore, I understand that the legitimate WhatsApp Client Application did not afford users the ability to enable the XOR cipher.

48. The second manipulated call setting was the "connecting_tone_desc" field, which I understand was no longer used for any legitimate purpose as of 2019. The "heaven" malware inserted a malicious bash script[42] into this field. Upon receipt of the malicious call offer by the WhatsApp Client Application on the Target Device, the malicious bash script contained within this field was loaded into the memory of the Target Device while the Target Device was still ringing and before the call could have been accepted or declined. The malicious bash script remained present in the Target Device's memory throughout the remainder of the attack, specifically in the memory region used by libwhatsapp.so, which is a software library used by the WhatsApp Client Application for various functionalities. The proximity of the "connecting_tone_desc" variable and other variables which "heaven" was able to control, to other components of libwhatsapp.so is of significance to later stages of the exploit chain.

49. The malicious script was inserted into memory of a Targeted Device, but not executed until a subsequent phase of the attack, as achieving code execution through a buffer overflow against modern systems and applications requires the gathering of additional information (specifically, the device's architecture and the version and base address of libwhatsapp.so) in order to compute the address of "connecting_tone_desc" in memory and subsequently interact with its content.

**Step 3: Identification of Target Device Architecture**

50. As the third step in the exploit chain, "heaven" transmitted packets through the WhatsApp Relay Servers which were crafted to induce the victim's WhatsApp Client Application to disclose information about the underlying architecture of the Target Device. Specifically, determining whether the Target Device was a 64-bit device or an older 32-bit device was required for "heaven" to carry out subsequent stages of the attack, as 64-bit devices and 32-bit devices handle the allocation of memory and processing of instructions differently. When I refer to a device's "architecture" in this section of the report, I am referring to the 32-bit or 64-bit nature of the relevant device.

51. While the Target Device was ringing in response to the call offer sent by "heaven" and received from the WhatsApp Signaling Server, but before the victim could have accepted or declined the call offer, the Target Device began relay negotiation and bandwidth estimation with "heaven" via a WhatsApp Relay Server. This is a legitimate function of

---

[42] A bash script is a common form of program on Linux computers, which comprises a series of commands to be interpreted by the operating system's shell interpreter. The Android operating system is based on Linux, so Android devices can execute bash scripts.

WhatsApp's VoIP infrastructure, known as "bit width detection," which allows for the two devices to estimate the volume of data which can be efficiently sent and received over a given interval. At this stage, "heaven" exploited the buffer overflow by sending an oversized bit width detection packet to the Target Device via the WhatsApp Relay Server, effectively abusing the legitimate function of the Relay Server.

52. Due to the fact that the oversized bit width negotiation packet sent by "heaven" was stored in a buffer in close proximity to other types of call context data in the Target Device's memory, the overflowed buffer could overwrite the values of some other call context variables in memory. One of these variables was the "Af" variable, which ordinarily stores information affecting the Target Device's bandwidth estimation. Given the different manners of memory allocation between devices of different architectures, an oversized buffer of a given size would overwrite "Af" on a 32-bit phone, but not on a 64-bit phone. If "Af" was overwritten, the Target Device's bandwidth estimation data returned to "heaven" would change, and "heaven" could detect this change, enabling it to identify the architecture of the Target Device.

53. After the devices exchanged bandwidth estimation packets, "heaven" sent a duplicate call offer message to the Target Device through the WhatsApp Signaling Server. This duplicate call offer message, which is not sent during an ordinary WhatsApp call establishment process, triggered a transport restart and resulted in the reset of areas of the Target Device's internal memory related to the state of the VoIP call, since some of this data had been overwritten during the malicious bandwidth estimation exchange.

**Step 4: Memory Information Disclosure**

54. As the fourth step in the exploit chain, "heaven" was designed to exploit the same buffer overflow again, this time to overwrite certain pointers[43] in the Target Device's memory. The "heaven" malware sent a bandwidth estimation packet of an unexpectedly large size, overflowing the buffer on the Target Device, and resulting in unintended behavior by the Target Device's WhatsApp Client Application. In this instance, the packet sent by "heaven" was precisely and specifically crafted to overwrite a pointer to a certain area of memory such that it pointed to an area of memory slightly offset from the original area. The "heaven" malware was designed to repeat this process until the targeted WhatsApp Client Application returned to "heaven" a specific area of memory containing information which could be used to calculate the locations of code used by WhatsApp in the Target Device's memory, specifically the base address of libwhatsapp.so.

[43] In computing, a pointer is a variable which stores (or "points to") the memory address of a piece of data, such as a function or another variable.

55. On modern systems such as Android devices, due to an application security mechanism known as address space layout randomization ("ASLR"), the locations in memory of libraries such as libwhatsapp.so change each time the application using them is started. Their locations are unpredictable and are never intended to be disclosed to other users, as knowledge of a process's memory space layout could facilitate malicious code execution through a buffer overflow. As such, identification of memory addresses for libwhatsapp.so and its components was critical to the success of Defendants' exploit. The "heaven" malware leveraged the technique described above to transmit information necessary to identify the base address of libwhatsapp.so in memory back to Defendants' Servers so that they could access specific functions and data on the Target Device, ultimately in order to achieve the execution of the malicious code delivered earlier.



*Figure 1: I developed this graphic to visualize the layout of the WhatsApp Client Application, libwhatsapp.so, and "connecting_tone_desc" in the Target Device's memory. Note that the graphic is not to scale and memory addresses depicted therein are not directly representative of any actual memory addresses or memory offsets.*

**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

56. Upon determining the location of libwhatsapp.so in memory, for the fifth step in the process, the "heaven" malware upgrades the WhatsApp VoIP call to a group call, by simulating another participant (i.e., a WhatsApp client and user account) also controlled by "heaven." Note that this stage of the exploit appears from the WhatsApp Servers' perspective as carried out by two individual WhatsApp accounts and Client Applications; based on Defendants' code and logging made available to me, however, these users are

simulated, their client Applications are not authentic, and their transmissions are all sent using the same malware.

57. Normally, when a conference call is initiated, I understand that each WhatsApp Client Application undergoes a standard procedure in which the Client shares a set of features it can support during the call, such as live video or high-definition sound. This set of features is typically shared in a standard format known as a capabilities buffer.

58. In this case, in place of a capabilities buffer "heaven" sent a precisely crafted set of malicious data to the other devices, specifically to the Target Device. Owing to the previous step in which "heaven" identified the position of libwhatsapp.so in the Target Device's memory, the "heaven" malware could now calculate the positions of various pieces of information and functions which could enable execution of the bash script inserted into memory as part of the second step. The structure of the malicious capabilities buffer sent by "heaven" included pointers to these pieces of information and functions. Note that the legitimate WhatsApp Client Application does not afford users the ability to insert arbitrary information in the outbound capabilities buffer.

**Step 6: Delivery of Second Malicious Capabilities Buffer**

59. Upon receiving the group call invitation message, the second attacker account controlled by "heaven" automatically sent a "pre-accept" message to join the call. As the sixth step in the process, the second attacker account sends another malicious capabilities buffer containing pointers to additional information required to achieve code execution on the Target Device. Both of the malicious capabilities buffers are temporarily stored in the Target Device's memory while the call was incoming, such that they could be processed by the WhatsApp Client Application under ordinary circumstances.

**Step 7: Hijacking of Callback Pointers**

60. As the seventh step, "heaven" is designed to exploit the critical buffer overflow vulnerability once again in order to achieve code execution on the Target Device. This was accomplished by overwriting two callback pointers[44] in the Target Device's memory such that they instead pointed to the memory address values set by the two simulated attackers in steps five and six. Normally, these pointers allow the WhatsApp software to proceed to its next operation (depending on user input or according to the software's design), such as answering a call or upgrading a voice call to a video call. By overwriting these pointers, "heaven" could induce the WhatsApp Client Application to execute

[44] A callback pointer is a pointer to a function which can be passed to another function, allowing that function to "call back" and execute the pointed-to function. By overwriting a callback pointer, an attacker can potentially modify the logic and execution flow of the program to induce unintended behavior.

functions specified by the addresses in the malicious capabilities buffers, which at this point were present in the Target Device's memory.

**Step 8: Call Termination and Compromise of Target Device**

61. At this point, "heaven" terminated both calls by sending a message to the WhatsApp Signaling Server before the victim could answer or decline; this eighth step in the process caused the victim's device to initiate the hijacked instructions carefully established in steps five through seven. Normally, when a call ends, the phone stops ringing, and certain operations are expected to occur, such as the content displayed on the phone reverting back to the home screen. However, due to the changes made by the "heaven" malware to values in the Target Device's memory, the end of the call triggered the modified pointers, resulting in the execution of the malicious bash script inserted during step two.

62. Both callback pointers overwritten during step seven pointed to a legitimate function present within libwhatsapp.so, which was designed to read two parameters and a function pointer and subsequently execute that function by passing it the two parameters. The enumeration of the Target Device's memory, and manipulation of values stored therein, allowed "heaven" to leverage this function in order to induce the victim's WhatsApp Client Application to execute any function with any two parameters.

63. The first callback operation triggered a routine function within the WhatsApp Client Application which organizes and resets certain parts of the application's memory. This action appears to have been an attempt to conceal evidence the attack. By resetting memory areas, the "heaven" malware made it less likely that the targeted user would notice that an attack had taken place; and furthermore made it such that in the event that the attack was detected by the victim or others, there would be less evidence available to reveal details of the exploit chain described in the preceding paragraphs. It is also likely that this action served in part to limit the risk of the WhatsApp Client crashing due to the presence of corrupted data in memory.

64. The second callback operation led to the execution of a "popen" (pronounced "P-open") instruction referencing the "connecting_tone_desc" variable. A "popen" instruction opens a process by creating a pipe, forking, and invoking the shell, a process which is commonly used to execute shell commands to collect and analyze data from within a program. By invoking the "connecting_tone_desc" variable, the "popen" instruction executed the malicious bash script written to memory during the second step, resulting in control of the Target Device in the context of the WhatsApp Client Application.

65. I note that all of the traffic generated by "heaven" up until this point was transmitted to the Target Device by way of the WhatsApp Signaling Servers and Relay Servers, and thus appeared to the victim's WhatsApp Client Application as legitimate WhatsApp traffic.

**Post-Exploitation of Target Device**

66. In this section, I detail how Defendants are able to compromise the Target Device and deliver additional software payloads to the Target Device following the successful exploitation of the WhatsApp vulnerability. In short, by this time, the Target Device is sufficiently compromised by Defendants such that Defendants could deploy additional software payloads to the device, such as Defendants' Pegasus Spyware. But for exploiting the WhatsApp vulnerability, it is unlikely that these additional payloads would have been able to be delivered to the Target Device without the target user's awareness.

67. Upon its execution by the compromised WhatsApp Client Application, Defendants' bash script from the "connecting_tone_desc" field first used the Android Activity Manager to stop a WhatsApp service called "VoiceFGService" if it was running on the device. The script then created an ELF (Executable and Linkable Format[45]) executable file in an inconspicuous location within the WhatsApp Client directory using inline binary data. This file is marked executable and executed; its output is redirected into a second file in the same directory, which then is itself executed, with four arguments each made up of eight hexadecimal characters. Both of the created files are subsequently deleted.

68. During my review of the malicious WhatsApp call offer messages[46] logged and made available to me by Plaintiffs, I identified 5,822 instances of an apparent malicious bash script present in the "connecting_tone_desc" field of a malformed call offer message. These scripts are highly similar to one another, and differ only in:

- The binary content of their inline ELF payload; and
- Three of the four hexadecimal arguments passed to the second-stage executable.

69. Of the 5,822 total malicious bash scripts observed within the relevant logs, I identified 2,371 unique scripts and corresponding unique sets of ELF payloads and hexadecimal arguments.

70. I examined the ELF payloads and determined that they are largely identical to one another. Upon being reverted to binary format, each is 181 bytes in length, and the files differ from one another only by eight bytes at offsets 0x8C through 0x93. I will refer to these bytes as the "variable bytes."

[45] Executable and Linkable Format (ELF) is a common standard file format for binary executables on Unix-like systems such as Linux and Android. It is roughly analogous to a Portable Executable (PE or "EXE") file on Windows systems.

[46] WA-NSO-00017581.

71. The variability of a small portion of the payload suggests uniformity in program logic across all samples, with a difference in one or more small variable(s) hard coded into the binary.

72. I determined that the first four variable bytes together constitute an IP address, with each byte corresponding to an “octet” of an IP address as written in a human-readable format.

73. The two bytes which precede the IP address represent a network port number, stored as a big-endian short integer.[47] These two bytes happen to be consistent (0xFF01) across all observed samples, and can be converted to the decimal number 65,281 (port 65281).

74. My understanding is that these small ELF payloads from the “connecting_tone_desc” bash script served to fetch a second-stage executable payload from a server controlled by Defendants, which would subsequently be executed by the bash script on the victim device. The IP addresses and port number contained within the ELF payloads constituted locations on the Internet where Defendants’ Server could be reached, and from which the second-stage payload could be downloaded to the victim devices.

75. Between the 2,371 unique ELF payloads, I identified 42 unique IP addresses stored in the first four variable bytes.

76. One of these IP addresses, in human-readable format, is 104.223.76.220. This is the address of a third-party server owned by QuadraNet Enterprises LLC[48] and physically located in the U.S. state of California. This IP address was referenced in 1,724 of the 5,822 manipulated call offer messages which I reviewed from Plaintiffs’ logging.

77. Another of these IP addresses, in human-readable format, is 54.93.81.200. This is the address of a third-party server owned by Amazon Web Services (AWS)[49] and physically located in Germany. In the past, that IP address has resolved to domain names linked to NSO, including subdomains of nsogroup.com. Based on records produced by AWS, the IP address 54.93.81.200 was registered to NSO Technologies Group Ltd. From December 6, 2018 through at least October 5, 2020, with an email address of it@nsogroup.com.[50] Defendants have acknowledged in the litigation that “Pegasus code, Python scripts, [and]

[47] A short integer is a type of computer data which is two bytes in length and represents a decimal integer between 0 and 65,535. “Big-endian” indicates that the byte containing the most significant value is stored first.

[48] https://whois.arin.net/rest/net/NET-104-223-0-0-1/pft?s=104.223.76.220.

[49] https://whois.arin.net/rest/net/NET-54-93-0-0-1/pft?s=54.93.81.200.

[50] WA-NSO-00017151.

configuration files" were "formerly housed on the AWS Server by NSO's research and development department for some periods prior to January 2021."[51]

78. I have been provided with computer scripts, configuration files and logs, which I understand from Counsel were obtained by the U.S. Department of Justice from the AWS Server associated with IP address 54.93.81.200, which I will hereafter refer to as "Defendants' Server" or the "AWS Server." As discussed in further detail below, some of the logs from Defendants' Server overlap with the exploitative activity observed by Plaintiffs against WhatsApp users, Client Applications, and infrastructure, and I understand that computer scripts from that server would have served to run portions of the exploit process which I have described.

## EVIDENCE VALIDATION

79. In this section, I summarize the evidence from Defendants' Server that corroborates and validates the eight-step exploit chain described in the prior section.

**Step 1: Fingerprinting of Target Device**

80. I identified indicators of the fingerprinting activity during my review of the "abs.log"[52] file derived from Defendants' Server obtained by the DOJ. The log event provides the Target Device's "nuserAgent," "appVersion," "osVersion," "manufacturer," "device," "osBuildNumber," "phoneId," "localeLanguage," and "localeCountry."

81. I further identified evidence related to the fingerprinting stage, which occurs prior to the first voice call between Defendants and Target Device. Within the evidence provided by Plaintiffs, Defendants stated, "In order to get target's device OS details + WA client version, we need to send a fingerprint request. We do not want to skip this part since the exploit is WhatsApp-version-sensitive, and in case [sic] attack failed we want to know the reason for failure."[53] Defendants continued to discuss the fingerprinting request, which is defined below:

[51] Declaration of Chaim Gelfand in Supp. of Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server ¶ 6-8) (July 12, 2024) (Dkt. No. 339-1).
[52] WA-NSO-00017151.
[53] NSO_WHATSAPP_00008960.

- Defendants maintained WhatsApp user accounts, in which they added a Target Device and its associated user into a group chat. This addition into the group chat triggered a request from the Target Device's WhatsApp Client Application, which was then sent to a legitimate WhatsApp Server.
- It is expected that this request is processed by the WhatsApp Server, which will then provide a response back to the Target Device.
- With this expected request and response, Defendants had their WhatsApp Client Application send a request, which mimicked a WhatsApp Server response to the legitimate WhatsApp Server. As a result, the legitimate WhatsApp Server is tricked into forwarding the forged response to the Target Device.
- The request sent by Defendants' WhatsApp Client is sent 40 times within a few milliseconds. This is due to the short time frame in which Defendants are attempting to "race" with the WhatsApp Server in sending a response back to the Target Device.
- The domain listed within the request sent by Defendants' WhatsApp Client takes advantage of a bug within WhatsApp's certificate validation process. Domains owned by Defendants used for the fingerprinting leverage certificates[54] that are signed with a single key, so it is trusted by the Target Device's WhatsApp Client.

**Step 2: Delivery of Malicious Call Offer to Target Device**

82. I identified evidence of manipulated call offer messages during my review of the "abs.log," which contain the two manipulated call settings reflected in the messages recorded in Plaintiffs' logs. An example is set forth in the figure below.

[54] Certificates in this context are used to validate the identity and authenticity of a device in order to mitigate "spoofing" or impersonation, ultimately to ensure a secure and private connection between clients.

83. As indicated in Figure 3 below, the manipulated call offer message from the "abs.log" has enabled the XOR cipher, which the WhatsApp Client Application cannot do.

84. Within the manipulated call offer message, the first manipulated call setting is evidenced. This shows the XOR cipher being enabled.[55] Within the manipulated call offer message, the second manipulated call setting loaded a malicious bash script within the "connecting_tone_desc" field. Within the evidence provided by Plaintiffs, Defendants stated, "In order to attack we initiate a WhatsApp voice call with target. As part of the call – initiation handshake between our WIS client and target's WhatsApp client, we add to a specific field (property) of the message's request payload that is named 'relay servers' and usually contains 5 constant IP addresses of Relay Servers, 1 additional Relay Server. When a standard WhatsApp client initiates a voice call it goes out with 5 IP addresses. There is no validation of the number of IPs that are set there (however WhatsApp Server adds this field as part of the connection – initiation between two clients in case this field is empty). WhatsApp Servers override the first 5 servers with their own Relay Servers[.] We assign an RTT=0 value with these servers, leading the target's WA [WhatsApp] client to choose our 'relay' server instead of a real one."

**Step 3: Identification of Target Device Architecture**

85. I also identified evidence in the "abs.log" file from Defendants' Server of the next third step in the exploit observed on Plaintiffs' servers, in which Heaven determines whether the Target Device is using a "32-bit" or "64-bit" WhatsApp Client. The partial and redacted set of files from the AWS Server from the Department of Justice do not appear to contain

[55] XOR cipher is a type of encryption mechanism, in which the data encrypted by the XOR cipher cannot be decrypted without the key used to encrypt.

logs of the messages sent across Plaintiffs' Relay Servers to exploit the buffer overflow, which were used in the next steps of the attack. However, the logs contain the results of those steps, which confirm that they occurred.

86.     For example, within the logs recorded on May 2, 2019, I identified five instances in which Defendants' exploit began to run, which can be seen by five separate "Response arrived" log events. "Responses" in network traffic are generated when receiving device responds to a server's request for information or an action to be performed.



87.     One of these Responses has a "status" of "Succeeded," with a "reason" of "Exploit successfully completed," and a "cache" that states, "{\\"detect_remote_version\\": {\\"bitness\\": 64." The term "bitness" used in the "cache" field of this Response refers to the Target Device's architecture. In my opinion, this log reflects that the portion of the exploit chain that determines the Target Device's architecture ran successfully and determined that the Target Device is running a "64-bit" version of WhatsApp.



**Step 4: Memory Information Disclosure**

88.     The "abs.log" file also evidences the fourth step of the exploit observed by Plaintiffs, in which Heaven overflows the Target Device's buffer to expose the address for libwhatsapp.so. While the buffering messages are not recorded in the AWS Server files

made available to me, the "abs.log" file records that the exploit resulted in the "LEAKED ADDR" for "libwhatsapp_addr" (i.e., the address of libwhatsapp.so in the Target Device's memory) in each instance of a successful attack by "heaven" against a WhatsApp user.



**Step 5: Conversion to Group Call; Delivery of Malicious Capabilities Buffer**

89.   In the next step of the exploit, Defendant utilized two phone numbers ("Phone A" and "Phone B") to convert the call to a group video call. After initiating the call with Phone A, Defendant invited Phone B to join the call, which provides the "capability_bit_mask" buffer. Ordinarily, this buffer describes all the VoIP capabilities it supports, but in the exploit, Defendants' Malware sends a modified bitmask buffer using the buffer memory layout and full pointer values gleaned from the Target Device.

90.   The "abs.log" file indicates that the part of the attack involves adding another attacker account through a group call and the log contains evidence of the initial capabilities buffer sent to the second account.



**Step 6: Delivery of Second Malicious Capabilities Buffer**

91.   As stated in Step 5, the voice call is converted into a group voice call including an additional participant controlled by Defendants. This secondary participant then sends a secondary capabilities buffer following inclusion into the group video call.

92.   The "abs.log" also records the second malicious capabilities buffer sent by the second attacker account added in Step 5. Notably, the second message is returned less than one

second later, confirming that this process is automated and part of the exploit chain, and not the introduction of an independent second actor.



**Step 7 & 8: Call Termination and Compromise of Target Device**

93.    As noted previously, the partial set of files from the AWS Server do not record the buffering messages over Plaintiffs' Relay Servers, such as those used in Step 7 to overwrite the pointers, but the "abs.log" file does record the identified indicators of voice call being terminated shortly after completing the steps above and before the call is answered.



94.    In the figure above, after terminating the call, the log records that the "Call . . . was loud for 14.415701 seconds," which demonstrates Defendants' focus on stealth, and is consistent with the call termination marking the end of a covert zero-click exploit intended to be executed before the Target Device can accept the call.

# DETAILED OPINIONS

## Defendant's Exploitation of WhatsApp Infrastructure

**Defendants' WhatsApp User Registration and Extraction of Region Token**

95.    For Defendants' "heaven" malware to successfully interact with WhatsApp's Signaling and Relay Servers and carry out their exploit chain, "heaven" must appear to these servers as a legitimate WhatsApp user or users operating the official WhatsApp Client. In my opinion, Defendants had to create WhatsApp user accounts and extract the Region Token to enable their Malware to gain access to WhatsApp's Servers and carry out their attack.

96.    There are certain steps which must be completed before an individual can successfully register and subsequently utilize the WhatsApp services. This includes the user's acceptance of WhatsApp's Terms of Service, which must be done before completing the WhatsApp registration process. Only once the sign-up process has been completed can

the user access the WhatsApp services and the full functionality of the WhatsApp Client Application.

97. According to the deposition transcript of Claudiu Gheorghe, the registration process results in the creation of a Region Token, which informs the process through which the WhatsApp Servers attempt to assign requests from the account to the applicable geographical region. It is my understanding that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token.[56]

98. The programs found on Defendants' AWS Server do not contain any functionality to "forge" a WhatsApp Region Token. Therefore, it is my opinion Defendants must have created at least two WhatsApp user accounts and extracted the Region Tokens assigned to those accounts in order to use them with their Malware. Defendants then extracted the WhatsApp Client Region Tokens assigned to those accounts in order to use them as part of their "heaven" application.

99. In my opinion, by extracting the Region Tokens, "heaven" was configured to emulate the official WhatsApp Client from the perspective of the WhatsApp Signaling and Relay Servers. As a result, Defendants were able to make their Malware appear to the WhatsApp Servers as a legitimate WhatsApp user or users operating the WhatsApp Client.

**Defendants' Engineered Malware to Access and Exploit WhatsApp Servers and Target Devices**

100. In my opinion, Defendants' "heaven" malware is designed to interface with WhatsApp's Client Applications and Servers to successfully achieve remote code execution on the Target Device by camouflaging manipulated voice call messages as legitimate messages from a user running the WhatsApp Client Application.

101. In fact, Defendants were not using the official WhatsApp Client Application to carry out the exploit. The official WhatsApp Client does not enable users to create the types of malformed messages intrinsic to the exploit. In place of a genuine WhatsApp Client Application, Defendants designed and used their own system, a component of "heaven" referred to internally by Defendants as the "WhatsApp Installation Service" or "WIS,"[57] to emulate the official WhatsApp Client and send messages to the Target Device via the WhatsApp Signaling and Relay Servers, using authentication credentials taken from a registered WhatsApp Client to gain access to the servers.

[56] Gheorghe Dep. at 94:6-95:12.

[57] NSO_WHATSAPP_00008957.

102. As acknowledged by Defendants, their illegitimate client does not behave like a typical WhatsApp user; Defendants' illegitimate client instead "only sends very specific messages (call messages \ text messages)."[58]

103. Defendants' Malware was also designed to enable XOR encryption and insert a malicious bash script within the RTCP packet's "connecting_tone_desc" field, resulting in a malformed call offer message that the WhatsApp Client Application cannot create. Because Defendants' extraction of the registration token caused the Malware's messages to appear as if they came from the WhatsApp Client Application, this malformed message, which contains a malicious bash script, was then delivered to the Target Device.

104. Defendants' "heaven" malware also used multiple methods to carefully manipulate WhatsApp Servers and WhatsApp Client Applications running on Target Devices in order to achieve unimpeded access to and control over those devices. Defendants' Malware leveraged undocumented features of the WhatsApp call offer message to inject the malicious bash script into the Target Device's memory, as well as to enable the XOR encryption. Defendants' Malware, via the WhatsApp Servers, performed "fingerprinting" of the Target Device, which collected the user's online status, make, model, and operating systems. The fingerprinting allowed for Defendants' Malware to determine the manner in which to proceed with exploitation of the Target Device, based on extensive knowledge of the WhatsApp Client Application's internal workings which Defendants had apparently amassed. If the Target Device was determined to be vulnerable through fingerprinting, Defendants' Malware continued its actions by leveraging RTCP packets to overflow buffers on the Target Device, inserting further malicious data into the memory space used by the WhatsApp Client Application and manipulating this data, along with data natively present within the Application, to execute malicious code on the Target Device.

**Defendants' Malware Operated in a Manner Which Exceeded the Capabilities Afforded by WhatsApp to an Ordinary User**

105. It is my understanding that an ordinary user will download WhatsApp, create an account, and begin communications. This communication can include voice calls and multimedia messages, between two users or a group of users. The messages can include text or media.

106. It is my understanding that an ordinary user will typically have little to no knowledge of the WhatsApp infrastructure, let alone the intricacies of the function of a Signaling Server, Relay Server, RTP, and RTCP packets. The ordinary person will likely understand the

[58] NSO_WHATSAPP_00008957.

concept of encrypted communication but will unlikely understand the complexity of how to exploit end-to-end communications.

107. With the actions I discussed above, regarding the access and use of WhatsApp Servers and Target Devices, I will note for all activity, it is unreasonable for an ordinary person to have awareness of the concepts or have the technical, networking, scripting, and malicious software development skills to execute the activity. An ordinary person will unlikely understand the following technical concepts, such as the definition of a "buffer overflow," fingerprinting a device in order to inform how an exploitation is to be deployed, the concept of a malformed call offer message with manipulated settings, let alone how to create and transmit one, how to write in bash script, how to create and send modified packets to determine a device's architecture, the awareness of buffering messages and how to manipulate them to execute a buffer overflow, awareness of ASLR to determine where a WhatsApp library is held in a Target Device, and further how to perform remote code execution. Herein, it is my opinion Defendants accessed and used WhatsApp Servers and Target Devices in separate ways than an ordinary person, which includes overcoming technical limitations in the WhatsApp Client Application and WhatsApp's Servers that are beyond an expected user's activity.

## Function and Impact of Defendants' Spyware

### Defendants' Malware, Most Notably Pegasus, Operates as Spyware

108. It is my understanding that spyware involves secretly installing malicious software on a device without the knowledge of its user, which then monitors, captures, and extracts the user's activity on the device.

109. The exploit discussed in this report served as a mechanism to deliver Defendant's "zero-click" mechanism to a Target Device, which then secretly executed a malicious script onto the Target Device's memory.

110. Defendants knowingly designed their exploit to be executed without the target user's awareness. This is seen in both the fingerprinting and attack stages of the exploit, where Defendants explicitly define steps to minimize the target's awareness. In the fingerprinting stage, this is achieved by the following:[59]

- Using the same group chat name in all fingerprinting attempts of a target;
- Using the same mobile number in all fingerprint attempts of a target; and
- Avoiding using the same mobile number repeatedly when adding targets to various groups chats.

[59] NSO_WHATSAPP_00008960.

111.  Similarly, Defendants aim to minimize the target's awareness during the attack stage by:[60]

- Performing fingerprinting prior to the attack to minimize the number of voice calls to the target;

- A limiting of three attack attempts per target, regardless of the reason for failure;

- Waiting roughly one minute, give or take, between each call; and

- Shifting to a "one-click" attack on the target after three failed fingerprinting attempts.

112.  It is my understanding this exploit led to the installation of a final-stage payload; the Defendants do not produce evidence with which to analyze this final-stage payload's function or capabilities. However, it is reasonable to conclude this final-stage payload was likely related to Defendants' Pegasus Spyware.

113.  Defendants state in NSO Group's 2023 Transparency and Responsibility Report[61] they are "most well-known for 'Pegasus,' a system used . . . to surveil and collect data from mobile devices of particular individuals suspected of engaging in terrorist or criminal activity."

114.  Pegasus relies on a delivery mechanism or "installation vector" in order to infect a Target Device. This could include text messages or files sent to the Target Device, or, in this instance, a malicious WhatsApp call offer which contains capabilities for the zero-click exploitation of a software vulnerability. As discussed, zero-click installation vectors can allow for Pegasus Spyware to be installed remotely without the targeted individual's knowledge or consent, and without the need to deceive or compel the individual into performing any particular action. This is reiterated in the deposition of Yaron Shohat: "[The Pegasus technology] deploys an agent which the owner or user of the targeted device is not aware of."[62] As such, my assessment is this delivery mechanism was, and any comparable delivery mechanism would be, of use and of extremely high value to Defendants in conducting their business operations.

115.  Following successful installation on a Target Device, I understand that Pegasus is marketed as, and indeed is, capable of reading and collecting various types of user information by accessing data and running processes within the Target Device. Information collected may include messages, calls, contacts, photos, location services, access to the device's camera and microphone. As stated within Exhibit 10 of the Complaint, Pegasus operates by communicating with Command and Control ("C2")

---

[60] NSO_WHATSAPP_00008961.

[61] https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf.

[62] Shohat Dep. at 40:1-40:11.

servers to relay information collected from the Target Device. This process in full is intended to occur without the target individual's knowledge or ability to intervene.

116. Based on my review of the logging from Plaintiffs' servers and Defendants' backend infrastructure (AWS Server), I determined that there was an unknown C2 server that the final visible installation ("stager") communicates with. My understanding is that Defendants' spyware products, such as Pegasus, require surreptitious installation on Targeted Devices in order to collect information and disseminate it to Defendants and/or Defendants' customers. Furthermore, Defendants have admitted in the litigation that the AWS Server contained "Pegasus code, Python scripts, [and] configuration files" "for some periods prior to January 2021."[63] Given this, it is my opinion that the exploit detailed in this report likely resulted in the successful delivery of a secondary payload by Defendants, and very likely Defendants' flagship product Pegasus.

117. These functionalities surrounding the delivery, installation, and standard operation of Pegasus demonstrates why it is considered spyware and should continue to be categorized as such.

**Defendants' Malware Victimized at least 1,500 WhatsApp Target Devices**

118. Based on the evidence made available to me, Defendants executed the exploit chain against at least 1,500 Target Devices during the May 2019 timeframe in which the activity was logged by Plaintiffs.[64] Based on associated phone numbers, at least one target user appears to have resided within the United States. I cannot state definitively how many Target Devices in total may have been during the timeframe in which this vulnerability existed in WhatsApp and was known to and actively exploited by Defendants.

119. While only one apparent U.S.-based victim was documented by the Plaintiff to have been impacted, Defendants' Malware was designed to use WhatsApp's Servers to relay traffic, regardless of where the targeted user might have been located. Based on evidence I have reviewed, the attacks carried about by the Defendants' Malware actually used WhatsApp infrastructure physically located within the U.S. even in instances where the targeted user had a foreign phone number.

120. Based on my understanding of Defendants' Malware, and the exploit analyzed within this report, the impacted victims would not have realized they were impacted by this attack, nor would WhatsApp's Servers have detected that the messages sent as part of the exploit chain were not sent by a legitimate WhatsApp Client. Given the sophistication of the

---

[63] Declaration of Chaim Gelfand in Supp. of Defs' Opp. to Mot. to Compel Discovery Regarding AWS Server ¶ 6-8 (July 12, 2024) (Dkt. No. 339-1).
[64] WA-NSO-00017582.

exploit, and the use of the WhatsApp Signaling and Relay Server, the victims in this instance would have likely believed they were receiving a legitimate incoming communication via WhatsApp.

**Defendants' Malware Obtained Information from WhatsApp Servers and Target Devices**

121. Regarding the steps mentioned above, it is my opinion that Defendants would have had to develop and test their exploit using WhatsApp Servers and the WhatsApp Client Application. Further, WhatsApp network infrastructure was identified in enough detail to learn the locations of specific Signal and Relay Servers utilized by WhatsApp. This knowledge allowed Defendants' Malware to be deployed onto specific Target Devices for the purposes of extracting data from the Target Device and surveilling its user without the user's awareness.

122. Through the fingerprinting and architecture identification mechanisms of "heaven," Defendants were able to collect information about the Target Devices, including hardware details, installed versions of the WhatsApp Client Application, and the targeted users' activity status within WhatsApp. I note Defendants obtained information about Target Devices through the WhatsApp Servers which was not intended by Plaintiffs to be disclosed by the servers to other users.

123. Defendants' "heaven" malware accessed the Target Device's memory and used information gathered in that manner to identify the position of memory space used by libwhatsapp.so on the Target Device. This position is not intended to be disclosed outside of the WhatsApp Client Application, to any other user, or even to the legitimate user of the Client Application due to its sensitivity; indeed, this information was instrumental to "heaven" in carrying out the subsequent steps of the exploit chain.

124. As previously discussed, Defendants' Pegasus Spyware is designed to covertly install on a Target Device for the purpose of monitoring and collecting sensitive information from the device. I was not provided with copies of Pegasus or other variants of spyware developed by Defendants, which limited my ability to assess the full impact of Defendants' Malware on Target Devices and the WhatsApp Client Applications. However, my opinion is that the exploit and associated malware discussed by this report served as a delivery mechanism for Pegasus and/or other variants of Defendants' Malware, given that the evidence I have reviewed demonstrates that the WhatsApp Servers and Target Devices were specifically targeted by the exploit as the vector for delivery of a final-stage malicious payload.

125. Given Defendants' acknowledged business in the development and marketing of malware, I assess that, as a result of the observed exploitation activity, a final-stage payload such as Pegasus would have enabled Defendants and/or their customers to

monitor and collect information from Target Devices.[65] Defendants' business model entails the delivery and installation of malware they have engineered for the purposes of remotely monitoring their specified targets. As mentioned above, Defendants go to great lengths to reliably deploy their exploit payloads and to obfuscate or destroy evidence of this intrusion. Thus, it is my opinion that Defendants and/or their customers did leverage this exploit to target specific WhatsApp end users with the end goal of surreptitiously collecting information from these users' devices, including their WhatsApp communications.

## Evading Detection

**Concealment of Defendants' Malware**

126. Defendants' "heaven" malware was designed to interact with WhatsApp Servers and targeted WhatsApp Client Applications by creating messages which appeared to be from a legitimate WhatsApp Client. During this process, "heaven" imitated characteristics of transmissions generated by the genuine WhatsApp Client, and used credentials and keys derived from authentic WhatsApp user accounts. Defendants' "heaven" malware took steps to conceal the malformed and malicious nature of its communications from Plaintiff's official WhatsApp Servers and targeted WhatsApp Clients.

127. Defendants engineered their Malware to conceal its access to and use of WhatsApp Servers and Target Devices. Defendants' Malware interacted with WhatsApp Servers as well as with the WhatsApp Client installed on Target Devices by creating messages that appeared to be from a legitimate WhatsApp Client Application. During this process, Defendants' engineered malware, which in my opinion should be considered spyware, reproduced transmission properties of the WhatsApp Client Application, and used credentials and keys retrieved from authentic WhatsApp user applications. This activity was used to disguise Defendants' Malware as a valid WhatsApp user application in order to access and use both WhatsApp's Servers and the Target Devices. As described in this process, Defendants' Malware deceived WhatsApp Servers and Target Devices' WhatsApp Client Applications about the type of and the source of the transmission between Defendants' Malware and those devices.

128. Defendants at various points leveraged XOR encryption to obfuscate the data transmitted by their Malware to targeted devices by way of the WhatsApp Relay Servers. This technique served to mask the malicious nature of certain RTCP packets crafted and transmitted by Defendants. Defendants' Malware used the RTCP packet header, which normally contains transportation information for the packet, as a key with which to

[65] Compl. Ex. 10, Dkt. No. 1.

enable encryption. The resultant packets resembled RTCP_REMB packets, which are used by the legitimate WhatsApp systems to control media congestion by indicating the rate at which media can be sent. The XOR encryption ultimately served to "camouflage" the appearance of Defendants' packets among normal network traffic, limiting the probability of detection by WhatsApp engineers and/or security mechanisms.

129. Upon exploiting the buffer overflow vulnerability, Defendants' Malware took discernible and deliberate actions to "clean up" evidence of exploitation which may have remained on the Targeted Devices. The first callback pointer overwritten by "heaven" pointed to a regular function of the WhatsApp application which organized and resets certain parts of the process' memory. This function removed information from the memory of the Target Device as well as data related to Defendants' Malware activity, which may have been indicative of Defendants' Malware's previous behavior. After resetting these portions of memory space, the affected system would have appeared closer to the baseline of a running WhatsApp application.

130. Each of the executable files which were written to the disk by Defendants' various exploit payloads were erased after completing their functions. In addition, based upon my study of the full exploit chain, it appears that Defendants' final-stage payload was intended to be loaded directly into executable memory rather than written to the device's storage. This is a common technique used by cyber threat actors to evade detection and inhibit efforts by incident responders or forensic analysts to identify and analyze their malicious software.

**Defendants' Malware Altered, Damaged, or Deleted Data from WhatsApp Servers and Target Devices**

131. While executing the buffer overflow exploits, Defendants were inherently altering or damaging targeted WhatsApp Client Applications. As demonstrated in previous sections, the buffer overflow altered and corrupted memory on Target Devices, causing them to behave in ways not designed or intended by Plaintiffs when developing the Applications.

132. Further, when Defendants' malicious code was executed against Target Devices, this triggered other actions which reset the Target Device's memory, deleted temporary files, and downloaded a second-stage payload to complete the compromise of the Target Device.

## Defendants' Malware Development and Circumvention

**Defendants' Reverse Engineered and Tested the Design of its Software to Work Against WhatsApp Infrastructure**

133. I have not received or reviewed Defendants' financials or any other materials directly related to the organization of Defendants' business. However, based on the evidence at hand, including the deposition of the NSO's CEO, my expert opinion is that while the stated core of Defendants' business is in developing and marketing the Pegasus Spyware, Defendants' business is in large part dedicated to the discovery and weaponization of zero-day software exploits with which to deliver their Malware. I assess that Defendants maintain and invest massively in an in-house exploit research and development apparatus, and that the "heaven" exploit chain and associated software discussed here is a product of that apparatus.

134. The legitimate WhatsApp Client Application does not provide users with the functionality necessary to activate the XOR cipher setting, nor to set the value of the "connecting_tone_desc" field within the call offer message, nor to add freeform text to that field. The manipulated offer message prepared during step two of the exploit chain therefore had to have been prepared and sent using a modified or fake WhatsApp client, i.e., a program intended to emulate a WhatsApp Client Application from the perspective of the WhatsApp Servers, in order to circumvent the technological limitations of the legitimate WhatsApp Client Application. My understanding is that Defendants' "heaven" malware and/or its associated "WIS" component did in fact serve in part to emulate a genuine WhatsApp Client Application in order to carry out the attacks.

135. The buffer overflow vulnerability at the center of the exploit chain would have required a significant amount of time and effort dedicated to testing in order to be discovered and leveraged to achieve arbitrary code execution against the targeted device. Achieving arbitrary code execution through a buffer overflow attack against modern systems and applications requires a great deal of precision, as corrupting the wrong pieces of data in the targeted system's memory is likely to result in an application or system crash.

136. The exploit chain demonstrates that Defendants possessed a detailed understanding of the memory layout of the WhatsApp Client Application for Android, and particularly of its library component libwhatsapp.so. Defendants maintained knowledge of the memory offsets for various pieces of data and functions within libwhatsapp.so applicable to each of multiple different versions of the WhatsApp Client Application and two underlying device architectures (32-bit and 64-bit). These memory offsets were essential to Defendants in their carrying out of the exploitation against WhatsApp users, as without an intimate understanding of the memory layout, the buffer overflow vulnerability could not feasibly have been made to execute malicious code. This type of information is not publicly documented by Plaintiffs, and in my opinion could only have been derived from Defendants' methodical reverse engineering of each relevant version of the WhatsApp Client Application.

137. The "heaven" malware's interactions with WhatsApp's Signaling Servers and Relay Servers demonstrate that Defendants possessed a detailed understanding of WhatsApp's proprietary VoIP architecture and infrastructure, to include knowledge of multiple unused and undocumented features. Plaintiffs generally do not publicize detailed information about their proprietary VoIP architecture, and in my opinion this level of understanding could only have been achieved by intercepting and decrypting network traffic from a genuine WhatsApp Client Application in order to analyze its interactions with the WhatsApp Server-side infrastructure.

138. Furthermore, based on my review of the computer scripts and logs which I was provided from the Defendants' AWS Server, my understanding is that "heaven" is a sophisticated suite of malware designed for the express purpose of carrying out attacks against WhatsApp users and infrastructure reliably, efficiently, and stealthily. I assess that a significant amount of resources were invested by Defendants in developing this malware such that the relevant exploitation could be conducted repeatedly and consistently, and such that the relevant vulnerability would remain unnoticed by Plaintiffs for as long as possible.

139. The exploit discussed within this report is complex and sophisticated by nature and would require a non-public understanding of how WhatsApp Servers and Client Applications operate to ensure successful execution. The exploit leveraged specific vectors of attack and utilized specific Relay Servers within the United States in order to execute successfully. Certain vectors were closed, based on change management logs from Plaintiffs, which potentially inhibited Defendants' activities and required them to circumvent such updates to ensure the success of the exploit.

140. As detailed earlier in the report, the logs which I reviewed from Defendants' AWS Server also demonstrate multiple exploitation attempts being carried out by the "heaven" prior to its identification by Plaintiffs in May 2019.

141. While I have not had an opportunity to analyze the documents produced by Defendants, I have reviewed certain documentation produced by Defendants that provide specific details on how to successfully operate the "heaven" exploit on WhatsApp services. This demonstrated their intricate knowledge of the WhatsApp architecture and specific areas to ensure successful execution of the exploit.

**Defendants' Access to the IP Addresses for WhatsApp's Servers; Location Attribution**

142. Plaintiffs' businesses are operationally headquartered in Menlo Park, California. It is commonly known that Plaintiffs are based within the "Silicon Valley" region of the Northern District of California.

143. Log files from Defendants' AWS Server indicate that Defendants designed their Malware to access and use Plaintiffs' infrastructure based in the United States. Defendants' Malware contains hard-coded WhatsApp domain names associated with WhatsApp's Signaling Servers, and I understand that in 2019, all of WhatsApp's Signaling Servers were located at U.S. data centers.[66] Furthermore, during the ordinary operation of a VoIP call on WhatsApp, the Signaling Servers provide IP addresses for a few potential Relay Server options to the WhatsApp Client, which then selects which to use.[67]

144. Because Defendants were not using the genuine WhatsApp Client Application, and I have been provided with an incomplete version of Defendants' Malware; I am unable to reach any opinion about whether or how Defendants intentionally selected those Relay Servers. However, the WhatsApp Relay Servers selected and used by Defendants' Malware are logged by their IP addresses in the logs from the AWS Server, of which I identified four which appear to be registered to Plaintiffs and based in the United States according to the American Registry for Internet Numbers.[68] [69] Each of these IP addresses was accessed via TCP and/or UDP ports 3478, which is used by the STUN protocol, a component of WhatsApp's VoIP infrastructure. In addition, Plaintiffs' logs demonstrate that the exploits they observed utilized several U.S. based Relay Servers, including servers located in San Jose and Los Angeles, California.[70] [71] Out of the 173 servers located within the US, 43 California were listed as a part of this exploit.[72]

**Changes to the WhatsApp Infrastructure Interrupted Defendants' Malware Prior to May 2019**

145. Based on my review of WhatsApp diff[73] D9650871, which was published on September 3, 2018, updates were instituted into the code to add a check for stanzas containing the VoIP settings element. The update would check for stanzas sent by clients that contained VoIP settings and block any stanza that was deemed invalid while logging this information, preventing any malformed or invalid stanza from being accepted by the Signaling Server.

---

[66] Gheorghe Dep. at 184:20-185:9.

[67] Gheorghe Dep. at 206:8-208:7; 246:16-249:11.

[68] https://search.arin.net/rdap/?query=157.240.0.0%2F16.

[69] https://search.arin.net/rdap/?query=179.60.192.48.

[70] WA-NSO-00166473.

[71] Gheorghe Dep. at 206:8-19.

[72] WA-NSO-00166473.

[73] In software development, a "diff" (from shorthand for "difference") refers to a line-by-line comparison of a code sample before and after an update was made.

146. I reviewed the internal Task – T33535414[74] filed on September 3, 2018, which details an identified issue, allowing a WhatsApp Client Application to generate and send "voip_settings" values in signaling messages via group calls. It is my understanding that this issue was initially identified by an external security researcher and brought to Plaintiffs' attention for remediation. The Task mentioned a diff, D13309896, which, as I understand it, is in response to this identified issue.

147. I also reviewed diff D13309896, which was published on December 3, 2018, a further update was added into the WhatsApp application code to additionally check for stanza's with "group update" in VoIP settings. In this instance, a call was created, where a "group update" was being initiated by the WhatsApp Client Application. This function should only originate from a WhatsApp server. When a "group update" was created by the WhatsApp Client Application, the group update would be followed with a forbidden error. The update that followed would reject stanzas with group updates sent from the WhatsApp Client Application. Review of the subsequent logs from the AWS Server following the publishing of both of these code changes demonstrated that on December 5, 2018, there were call offers received that resulted in a "403" error code. As I understand it, the "403" error code is an internally defined code at WhatsApp, meaning the call offer in this case, is forbidden. My understanding of the "403" error code is that it is thrown from the server side of the exchange when a WhatsApp Client Application is performing an action that the server has deemed inappropriate or is not expected, in this instance, sending "voip_settings" in signaling messages (i.e., call offers). Following the deployment of diff D13309896, Task -T33535414 also has communications that detailing that an external security researcher performed a test and confirmed that the diff fixed the issue that they identified.

148. Based on my review of these diffs and corresponding log records from NSO's AWS Server, and my understanding of the Task, it is my opinion that Defendants were potentially testing their exploit on WhatsApp infrastructure in 2018. It is my opinion that in order for the 2019 attack described in Plaintiffs' complaint to work, Defendants would have needed to research and develop a solution to bypass the security measures implemented by WhatsApp.

149. Based on the availability of the aforementioned diffs and associated Task, and subsequent logs from the AWS Server, it is my understanding that the updates and changes made to the WhatsApp Servers and WhatsApp Client Applications would have restricted or

[74] Tasks is an internal ticketing system utilized by Plaintiffs to track and discuss remediation activities (WA-NSO-00166464).

interrupted certain operations of Defendants' Malware prior to the exploit that Plaintiffs identified in May 2019.

## Defendants' Continued Actions Following Plaintiffs' Remediation

**Defendants Continued to Attempt Exploitation After Plaintiffs' May 2019 Remediation**

150. I understand based on the evidence made available for my review that on May 10, 2019, Plaintiffs implemented specific remediations to address the vulnerability and to prevent further propagation of Defendant's Malware via WhatsApp infrastructure. These remediations included software patches applied to the WhatsApp Signaling such that they would reject offer messages which did not conform to the predetermined data structures.[75] This resulted in the Signaling Servers rejecting any malformed or manipulated offer messages, thereby preventing the "heaven" malware from continuing to operate. Plaintiffs also released an updated version of the WhatsApp Client Application to end users on May 13, 2019, which eliminated the buffer overflow vulnerability which was leveraged during Defendants' exploitation activity.[76]

151. Following remediation of the vulnerability, I understand that Plaintiff's security engineers identified new malformed messages which originated, in at least some instances, from attacker accounts utilized by Defendants during the May 2019 exploit. It is my understanding, based on review of the associated security ticket or "SEV,"[77] that Plaintiffs took additional remediation actions in November 2019 to prevent potential new exploits.[78]

152. A review of the SEV S182393[79] revealed suspicious activity was observed when a number of malformed messages were sent from the same attacker accounts or IP addresses identified during the May 2019 exploit to suspected test devices. The exploit developer was causing the Target Device to download a media file from the exploit developer servers. In an attempt to block this activity, two issues were mitigated. The first issue was a stanza that caused a client's message counter to be reset. When this action occurred a spoofed message could be sent from the attacker to a client which was believed to have

---

[75] Gheorghe Dep. at 270:21-271:8, 273:12-274:21.

[76] Gheorghe Dep. at 271:9-20, 272:13-21.

[77] I understand that a "SEV" is a type of ticket used internally by Plaintiffs to track and respond to identified issues specifically related to security.

[78] SEV S182393 was produced by WhatsApp and titled "Suspicious iq stanzas." This documents the activity, which was detected and investigated, and some potentially associated issues which were later remediated.

[79] WA-NSO-00192765.

been originated from a WhatsApp Server, since the message counter was successfully brute forced. These two issues were both remediated.

153. Despite continued monitoring and active remediation efforts, it is my opinion that Defendants are likely to continue to target WhatsApp in the future. As I have discussed earlier within this report, Defendants' business model requires them to continuously identify new software vulnerabilities, particularly zero-day vulnerabilities, with which to maintain uninterrupted capabilities for the delivery of their Malware to Target Devices.

154. The activity observed by Plaintiffs after May 2019 is consistent with some of the scripts from Defendants' AWS Server which I have reviewed; this indicates that Defendants attempted to either salvage or repurpose aspects of the "heaven" exploit, to utilize additional exploits that Plaintiffs had not yet discovered, or to develop a new exploit for WhatsApp following the closure of their "heaven" attack vector. Furthermore, I assess that Defendants' development of workarounds for WhatsApp's remediations in 2018 prior to the May 2019 exploit also demonstrates Defendants' persistence, intent, and ability to circumvent WhatsApp's security mechanisms.

155. Given the worldwide popularity of WhatsApp and its security features that attract a multitude of groups, it is my opinion that WhatsApp is a natural target for Defendants, given their business model, and in the absence of a significant deterrent, Defendants are likely to continue targeting, researching, and developing exploits for WhatsApp Servers and clients.

## CONCLUSION

156. Based on the evidence available to me that I have had a reasonable opportunity to analyze as of the date of this report, including evidence provided by Plaintiffs, evidence provided by Defendants, and evidence provided to Counsel by DOJ, I have reached the conclusion that Defendants accessed, modified, and exploited, without authorization from Plaintiffs, Plaintiffs' software and infrastructure in May 2019. I have further concluded that Defendants continuously worked to circumvent any technical measures implemented by Plaintiffs in order to maintain access to Plaintiffs' servers and Target Devices for the purpose of deploying spyware.

157. I concluded that Defendants' Malware exploited and accessed Plaintiffs' architecture and subsequently the Target Devices.

158. I concluded that Defendants' Malware is spyware, in that it was implemented to collect information from Target Devices without the Target Devices' users' awareness, and was used to deliver an additional malicious payload which I assess was likely Defendants' Pegasus Spyware product.

159. I concluded that Defendants' Malware was designed to evade detection by Plaintiffs and was designed over time to adapt to changes and updates in Plaintiffs' infrastructure, including technical measures specifically intended to prevent such activity. I determined that Defendants' exploitation was, in fact, successful due to an optimization, or update, in Android Target Devices, which allowed Defendants to manipulate communications and deliver the exploitation.

160. I concluded that Defendants conducted extensive reverse engineering of Plaintiffs' software and infrastructure in order to develop more effective malware.

161. Finally, I came to the conclusion that at least 1,500 Target Devices users appeared to have been targeted, exploited, and impacted by Defendants' Malware during the specific timeframe, making them victims to Defendants' Malware through Defendants' unauthorize access of and use of Plaintiffs' servers. Further, based on Defendants' business model, I have no reason to suspect Defendants stopped this activity after May 2019.

Dated: August 30, 2024

DocuSigned by:

David Youssef

75FB98DF156B485...

David Youssef

## APPENDIX A: CURRICULUM VITAE

At FTI Consulting, Mr. Youssef provides cybersecurity expertise in a broad range of matters involving litigation support and complex investigations, breach response, data privacy, online advertising and tracking technology, crisis management, botnet takedowns, advanced cybersecurity assessments, source code review, cyber-regulatory compliance, and advanced threat detection and prevention. Currently, Mr. Youssef leads North America's incident response efforts and serves as a computer scientist and technology subject matter expert. In this capacity, he guides teams of experts in tackling complex cyber threats, evaluating data privacy and risk, and offering specialized assistance in areas such as sophisticated cyber breaches, global botnets utilizing diverse distribution methods like the online advertising ecosystem, and litigation support pertaining to data privacy issues like advertising trackers and other third-party risks.

Prior to joining FTI Consulting, Mr. Youssef served as Vice President and Global Lead of the Integrated Cyber Threat Analysis Team at Citigroup's Cyber Security Fusion Center. There, he coordinated Citi's intelligence-led, threat-focused approach to incident avoidance and risk reduction. Mr. Youssef was the lead coordinator of response efforts during critical cyber events and crises, orchestrating evidence collection, intelligence integration, and mitigation efforts among Fusion Center teams. In addition, he spearheaded the creation of an interdisciplinary Advanced Persistent Threat hunt capability that focused on proactively defending and protecting against advanced malware distributed by sophisticated nation state and cyber-criminal groups.

Before his role at Citi's Fusion Center, Mr. Youssef served as Assistant Vice President for Citi Security and Investigative Services, responding to global cyber incidents, and specializing in digital forensics, electronic crimes, and malware analysis. He actively engaged in liaison activities with various US-based and international law enforcement and government agencies to best understand emerging cyber threats, and he aided in the disruption of several malware botnets cyber-criminal rings.

Mr. Youssef was an Adjunct Professor of Cybersecurity at Fordham University where he taught various graduate and undergraduate courses on topics including incident response, digital forensics, network security, penetration testing, and critical infrastructure.

Also at Fordham, Mr. Youssef served on the organizing committee of the International Conference on Cyber Security (ICCS), an annual summit held in partnership with the Federal Bureau of Investigation in which experts from the government, the private sector, and academia gather to share critical intelligence on issues shaping the future of cybersecurity.

Expert Witness Opinion of David Youssef re WhatsApp v. NSO Group                    43

## Expert Retention

*United States District Court Southern District of New York (1:23-cv-02219). Google LLC, Plaintiff, v. Zubair Saeed; Raheel Arshad; Mohammad Rasheed Siddiqui; and Does 1-15, Defendants. (S.D.N.Y. Apr. 21, 2023)*

*United States District Court Southern District of New York (23-cv-03369). John Collins, on behalf of himself and all others similarly situated, Plaintiff, v. Pearson Education, Inc.*

# APPENDIX B: ABOUT FTI CONSULTING CYBERSECURITY

Everyday cybersecurity threats bring challenges to your organization. Addressing these challenges requires more than deploying commercial tools or off-the-shelf software. Success demands original, innovative solutions that are tailored to fit your needs – the kind of solutions that FTI Cybersecurity experts deliver for clients daily. Solutions that can instill confidence in your organization's cybersecurity posture, enabling you to manage risk while achieving your overall business goals. Our team can create custom scalable solutions designed to address and combat these threats proactively, while effectively and efficiently maintaining your day-to-day business operations and reputation. Working together, FTI can build your organization's cybersecurity capabilities from threat detection and incident response to risk assessment and security awareness.

## Expertise

FTI Consulting's cybersecurity business is engineered to synthesize cutting-edge, intelligence-led capabilities around a trusted core of comprehensive offerings. This enables clients of any size to address their most critical needs and integrate new solutions atop or alongside pre-existing policies and programs to address cyber threats. We build a safer future by helping organizations understand their own environments, harden their defenses, rapidly and precisely hunt threats, holistically respond to crises, and sustainably recover their operations and reputation after an incident. Our seasoned experts bring deep technical and practical experience to the delivery of these solutions. Our industry experience across forensic investigations, strategic communications, expert testimony, and managed network defense operations, empowers FTI Consulting to meet a full range of technical needs across the globe.

## Experience

At FTI, we apply our unique insight, developed through decades of experience investigating sophisticated cyber incidents, to help clients respond to incidents and enhance their information security systems. We are thoroughly familiar with the current threat environment, and have a deep understanding of the tools, techniques, and protocols attackers use to target your computer network infrastructure. At the same time, we have an appreciation for the technical, organizational, policy and business challenges that companies must address to identify, react to, and mitigate attacks. We use our unrivaled experience and track record of innovative thinking to provide solutions that are holistic in philosophy, practical in application and sensitive to businesses' operational concerns.

## Qualifications

FTI's Cybersecurity consists of 300+ dedicated incident response and cybersecurity consultants, led by those with decades of experience at the highest levels of law enforcement, intelligence

and global private sector institutions. Our team works closely with clients to ensure their cybersecurity approach is consistent with regulatory guidance and represents best practice.

## Industries

Collectively, our cybersecurity team professionals have backgrounds in:

- Law Enforcement
- National and International Security
- Finance
- Policy and Public Affairs
- Fraud Detection
- Incident Response
- Crisis Management and Disaster Recovery
- Strategic Communications
- Forensics and Litigation
- Academia and Training

## Credentials

Certifications held by our professionals include:

- Certified Information System Security Professional (CISSP)
- Certified Information Privacy Professional (CIPP/US)
- Certified Information Security Manager (CISM)
- Certified Information Systems Auditor (CISA)
- Global Information Assurance Certification Certified Incident Handler (GCIH)
- Global Information Assurance Certification Certified Enterprise Defender (GCED)
- Global Information Assurance Certification Security Essentials (GSEC)
- Magnet Certified Forensics Examiner (MCFE)
- Certified Ethical Hacker (CEH)
- CompTIA Security+
- Project Management Professional (PMP)

## APPENDIX C: MATERIALS CONSIDERED

**DEPOSITIONS**

Declaration of Chaim Gelfand in Support of Defendants' Opposition to Motions to Compel Discovery Regarding AWS Server ¶ 6-8 (Dkt. No. 339-1) (July 12, 2024).

Declaration of Shalev Hulio in Support of Defendants' Motion to Dismiss (Dkt. No. 45-11) (Apr. 2, 2020).

Defendants' Opposition to Motion to Compel Discovery Regarding AWS Server (Dkt. No. 339) (Jul.12, 2024).

Defendants' Responses & Objections to Plaintiffs' Requests for Admission, Response to RFA No. 14 (Apr. 17, 2023).

Deposition of Claudiu Gheorghe, WhatsApp Incorporated (Aug. 16, 2024).

Deposition of Yaron Shohat, NSO Group Technologies Limited (Aug. 28, 2024).

Exhibit 1 through 11 – #1, Att. #1 in WhatsApp Inc. v. NSO Group Technologies Limited (N.D. Cal., 4:19-cv-07123).

Pegasus – Product Description, Complaint Ex. 10 (Dkt. No. 1-1).

Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. No. 55-6 through 55-17) (Apr. 23, 2020).

Plaintiffs' [REDACTED] Motion to Compel Discovery Regarding AWS Server (Dkt. No. 332) (Jul. 5, 2024).

Plaintiffs' Reply Memorandum ISO Motion to Compel Regarding AWS Server (Dkt. No. 340) (Jul. 15, 2024).

Press Release, NSO Group Acquired by its Management, Francisco Partners (Compl. Ex. 4 (Dkt. No. 1)).

**DEFENDANTS' INTERNAL DOCUMENTATION**

NSO Group Technologies Limited, Heaven System Architecture Specification, (NSO_WHATSAPP_00000823 – NSO_WHATSAPP_00000826).

NSO Group Technologies Limited, Heaven OpSec, (NSO_WHATSAPP_00008957 – NSO_WHATSAPP_00008962).

**DEFENDANTS' PRODUCTION PERTAINING TO SERVER LOCATIONS**

WA-NSO-00016429 – WA-NSO-00016433.

WA-NSO-00166473.

**HC-AEO - DEFENDANT PRODUCTIONS**

COMPASS_WHATSAPP_00000231 – COMPASS_WHATSAPP_00000231.

COMPASS_WHATSAPP_00000262.

FPM-00015627 – FPM-00015638.

SHANER_WHATSAPP_00000001 – SHANER_WHATSAPP_00001959.

WESTBRIDGE_WHATSAPP_00000653 – WESTBRIDGE_WHATSAPP_00000659.

WESTBRIDGE_WHATSAPP_00001247 – WESTBRIDGE_WHATSAPP_00001251.

WESTBRIDGE_WHATSAPP_00001698.

WESTBRIDGE_WHATSAPP_00002716.

WESTBRIDGE_WHATSAPP_00003572 – WESTBRIDGE_WHATSAPP_00003595.

WA-NSO-00014794 – WA-NSO-00014813.

WA-NSO-00055668.

WA-NSO-00100628 – WA-NSO-00100673.

WA-NSO-00111560 – WA-NSO-00111561.

WA-NSO-00017582.

**MATERIALS FROM DEFENDANTS' AWS SERVER**





WA-NSO-00016434 – WA-NSO-00016473.

WA-NSO-00016475 – WA-NSO-00016499.

WA-NSO-00016502.

WA-NSO-00137014 – WA-NSO-00137016.

**OPEN SOURCE**

American Registry for Internet Numbers (ARIN), ARIN Whois/RDAP,
     https://search.arin.net/rdap/?query=157.240.0.0%2F16.

American Registry for Internet Numbers (ARIN), ARIN Whois/RDAP,
     https://search.arin.net/rdap/?query=179.60.192.48.

American Registry for Internet Numbers (ARIN), WHOIS-RWS,
     https://whois.arin.net/rest/net/NET-104-223-0-0-1/pft?s=104.223.76.220.

American Registry for Internet Numbers (ARIN), WHOIS-RWS, https://whois.arin.net/rest/net/NET-54-93-0-0-1/pft?s=54.93.81.200.

Farrow Ronan, How Democracies Spy on Their Citizens, New Yorker (Apr. 18, 2022), https://www.newyorker.com/magazine/2022/04/25/how-democracies-spy-on-their-citizens.

NIST, CVE-2019-3568 Detail, National Vulnerability Database (May 14, 2019), https://nvd.nist.gov/vuln/detail/CVE-2019-3568.

NSO Group Technologies Limited, https://www.nsogroup.com.

NSO Group Technologies Limited, Transparency and Responsibility Report 2023 (Dec. 31, 2023), https://www.nsogroup.com/wp-content/uploads/2023/12/2023-Transparency-and-Responsibility-Report.pdf.

Meta Platforms, Inc., Whitehat Information, Facebook (Sep. 12, 2018), https://www.facebook.com/whitehat, Internet Archive (Apr. 28, 2019), https://web.archive.org/web/20190428185742/https://www.facebook.com/whitehat.

Shankland, Stephen, Pegasus Spyware and Citizen Surveillance: Here's What You Should Know, CNET (Jul. 19, 2022), https://www.cnet.com/tech/mobile/pegasus-spyware-and-citizen-surveillance-what-you-need-to-know.

WhatsApp LLC, 400 Million Stories, WhatsApp Blog (Dec. 19, 2013), https://blog.whatsapp.com/400-million-stories.

WhatsApp LLC, 500,000,000, WhatsApp Blog (Apr. 22, 2014), https://blog.whatsapp.com/500-000-000.

WhatsApp LLC, One Billion, WhatsApp Blog (Feb. 1, 2016), https://blog.whatsapp.com/one-billion.

WhatsApp LLC, Two Billion Users -- Connecting the World Privately, WhatsApp Blog (Feb. 12, 2020), https://blog.whatsapp.com/two-billion-users-connecting-the-world-privately.

WhatsApp LLC, About end-to-end encryption, WhatsApp Help Center, https://faq.whatsapp.com/820124435853543.

**PLAINTIFFS' INTERNAL DOCUMENTATION**

Infrastructure Related to Exploit Targeting WA VOIP Vulnerability (WA-NSO-00192007 – WA-NSO-00192017).

Lander Brandt, Analyzing Scripts.

Lander Brandt, NSO Script Review.

Lander Brandt, WhatsApp Native Surface Overview.

Meta Platforms, Inc., Relay Signaling.

Meta Platforms, Inc., Signaling.

Meta Platforms, Inc., Technical Analysis of WhatsApp Zero-Click Exploit (WA-NSO-00121258 – WA-NSO-00121269).

Meta Platforms, Inc., Technical analysis of WhatsApp 0-click exploit (WA-NSO-00125122 – WA-NSO-00125149).

**PLAINTIFFS' INTERNAL ENGINEERING TICKETS**

SEV Print - S182393.pdf.

WA-NSO-00059196 – WA-NSO-00059201.

WA-NSO-00166464 – WA-NSO-00166472.

WA-NSO-00192765 – WA-NSO-00192785.

WA-NSO-00192812 – WA-NSO-00192815.

**PLAINTIFFS' INFRASTRUCTURE LOG FILES**

WhatsApp Client Crash Logs, (WA-NSO-00017211 – WA-NSO-00017572).

bash_commands_easy_read.txt, (WA-NSO-00017573 – WA-NSO-00017574).

edgeray_packets_attack_0_64_f_filter.txt, (WA-NSO-00017575).

edgeray_packets_attack_0_32_f_filter.txt, (WA-NSO-00017576).

edgeray_phones_to_ips.csv, (WA-NSO-00017577).

edgeray_phones_to_ips.txt, (WA-NSO-00017578).

stanzaming_crashdumps.csv, (WA-NSO-00017579).

wa_voip_invalid_stanzas.csv, (WA-NSO-00017580).

wa_voip_invalid_stanzas_backfill_final.csv, (WA-NSO-00017581).