# Exhibit 3

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**



1  JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
     *jakro@kslaw.com*
2  AARON S. CRAIG (Bar No. 204741)
     *acraig@kslaw.com*
3  KING & SPALDING LLP
   633 West Fifth Street, Suite 1600
4  Los Angeles, CA 90071
   Telephone: (213) 443-4355
5  Facsimile: (213) 443-4310

6  Attorneys for Defendants NSO GROUP TECHNOLOGIES
   LIMITED and Q CYBER TECHNOLOGIES LIMITED
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11  | WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH |

12  | | **SUPPLEMENTAL DECLARATION OF TERRENCE MCGRAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

13  Plaintiffs,

14  v.

15  NSO GROUP TECHNOLOGIES LIMITED
16  and Q CYBER TECHNOLOGIES LIMITED,

17  Defendants.

**SUPPLEMENTAL DECLARATION OF TERRENCE MCGRAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**FILED UNDER SEAL**

**[UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL]**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Action Filed:   10/29/2019

18
19
20
21
22
23
24
25
26
27
28

I, Terrence McGraw, declare as follows:

1.    I am an Executive Consultant in Cybersecurity for Gray Analytics, and I have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") as an expert in this matter.

2.    In connection with my engagement, I have reviewed and evaluated technical materials produced by WhatsApp Inc. ("WhatsApp or "WA), Meta Platforms, Inc., f/k/a Facebook, Inc., and NSO. I have personal knowledge of the facts in this declaration, and I could and would testify competently to these facts if called as a witness.

3.    In connection with my engagement, I prepared two reports setting forth (among other things) my qualifications, my opinions, the basis and reasons for my opinions, and the facts and data that I considered when forming my opinions.

4.    Attached as Exhibit X are excerpts from the first report that I prepared, which is dated August 30, 2024.

5.    Attached as Exhibit Y are excerpts from the second report that I prepared, which is dated September 21, 2024.

6.    In preparing this supplemental declaration, I have further reviewed the Declaration of David J. Youssef in Support of Plaintiffs' Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment or Partial Summary Judgment (Dkt. 418-8 ("Youssef Decl.")).

7.    Nothing in Mr. Youssef's declaration changes my opinion that NSO did not intentionally configure Pegasus to target WhatsApp servers physically located in California.

8.    As Mr. Youssef admits, "in the ordinary operation of WhatsApp, the signaling servers will offer a list of relay servers available for the clients' use." (Youssef Decl. ¶ 10). Mr. Youssef thus admits that (as Plaintiffs' corporate designee Claudiu Gheorghe has likewise admitted) it is *WhatsApp's signaling servers* that pick, dynamically for each call, which WhatsApp's many relay servers around the world can be involved in the call.

9.    Mr. Youssef excerpts a portion of one of the AWS logs showing that the signaling

servers offered Pegasus a list of relay server IP addresses, which is consistent with the "ordinary operation" of WhatsApp described by Mr. Youssef. (Youssef Decl. ¶ 10.) Nevertheless, Mr. Youssef goes on to speculate—with no apparent basis—that Pegasus might theoretically have (1) manipulated the list of relay server IP addresses the WhatsApp signaling server offered or (2) chosen from the offered list in some manner that differed from the "ordinary operation" of WhatsApp. (Youssef Decl. ¶ 13 ("the [AWS] logs do not provide enough information to determine [1] whether NSO manipulated the relay server options generated by the signaling server, or [2] how it selected which relay server to use among those options.").)

10.     Mr. Youssef's speculation is not only baseless, but contrary to the evidence. Mr. Youssef excerpts log entries showing WhatsApp offering a set of relay server IP addresses (Youssef Decl. ¶ 10) and a later entry showing the system "using [one of the offered WhatsApp] relay[s]" (at ¶ 12), but he omits the *immediately preceding* entries showing the system taking latency measurements of each of the relay server IP addresses *that WhatsApp offered* (shown below in a decoded format) and then choosing to use the "best" of those—consistent with how WhatsApp's official client operated:



*WA-NSO-00017133 (Heaven.log, lines 193777-83)*
(Measuring latency and choosing best relay)

11.     This process of obtaining relay server IP addresses from WhatsApp and choosing (1) among those offered options, (2) based on performance measurements, appears repeatedly throughout the AWS logs. Thus, Mr. Youssef's speculation that Pegasus theoretically could have "manipulated the relay server options generated by the signaling server" or chosen relay servers

1  based on location is unsupported and contrary to the evidence.

2         12.   Mr. Youssef's opinions that the signaling server specifies the available relay servers

3  by encoded IP addresses (Youseff Decl. ¶ 10) and that Pegasus must ultimately interface with the

4  relay servers through those IP addresses (Youseff Decl. ¶ 14) do not change my opinion that NSO

5  did not intentionally configure Pegasus to target WhatsApp servers physically located in

6  California. It is WhatsApp's signaling server that has sole discretion over which relay IP addresses

7  are available for Pegasus to choose from, and it is in WhatsApp's sole discretion to map those IP

8  addresses to physical server locations—both decisions being subject to change at any time at

9  WhatsApp's discretion.

10         13.   Thus, Mr. Youssef misleads when he opines that NSO "knew or could have

11  determined with a reasonable degree of certainty which WhatsApp signaling and relay servers it

12  was using and their location." (Youseff Decl. ¶ 15.) Even if NSO had observed *during*

13  *development and testing* that WhatsApp made a given relay server IP address available, *and* it

14  could determine that the IP address maps to a physical server in a particular physical location,

15  NSO could not know if and when WhatsApp would make that same server available *to an NSO*

16  *customer* when that customer used Pegasus *in the future*. Nor could NSO predict that WhatsApp

17  would continue to route traffic addressed to that IP address to a server physically located in

18  California. The portion of the log file Mr. Youssef cites merely shows the relay server IP addresses

19  that WhatsApp offered in one run of Pegasus in one instance, at one point in time.

20         14.   I affirm that the information, statements, and opinions set forth above (and in

21  Exhibits X and Y) are true and correct, and that I could and would testify to that information if

22  called as a witness at trial.

23         I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th

24  day of October 2024, in Cape Coral, Florida.

25

26

27                           _____
                           TERRENCE MCGRAW

28

# Exhibit X

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

OAKLAND DIVISION

4

WHATSAPP INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH
and FACEBOOK, INC., a Delaware

5

corporation,

6

Plaintiffs,

7

v.

8

NSO GROUP TECHNOLOGIES LIMITED
and Q CYBER TECHNOLOGIES LIMITED,

9

10

Defendants.

11

12

13

14

**REPORT OF TERRENCE MCGRAW**

15

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

1. I, Terrence McGraw, have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to review and evaluate technical materials produced by WhatsApp Inc. ("WhatsApp" or "WA"), Meta Platforms, Inc. f.k.a. Facebook, Inc ("Facebook" or "FB"), and NSO in the above captioned matter.

2. This report serves as an explanation of my understanding of the relevant technologies in this case and details my findings and opinions concerning the security incidents that are the subject of the lawsuit. The opinions I provide herein are my own and are based on my investigation in this current matter as well as my education, experience, training, and skill I have accumulated during my 25 years in the field of Cyber Security and Operations.

3. A full list of the materials and information I have considered in forming the opinions set forth herein can be found in Appendix 2, below.

# II.    QUALIFICATIONS

4. A copy of my curriculum vitae is attached as Appendix 1. It includes my qualifications, a list of cases in which I have testified at deposition or trial during at least the last four years, and a list of all publications authored by me in the last ten years.

5. I hold a MSA in Information Systems Resource Management from Central Michigan University.  Additionally, I am a graduate of the U.S. Army School of Information Technology Telecommunications Systems Engineering program, a master's level equivalent.

6. In 2008, I was assigned to the Army Global Network Operations and Security Command which eventually became the Army Cyber Command Operations Center in 2010 where I remained assigned until 2012 when I deployed for my second tour in Afghanistan.  I had three major leadership roles during this time:

7. I served as the Future Operations Chief of the Army Global Network Operations and Security Center between 2008 and 2010. Future Operations is the planning and management of operations outside a 72-hour window (for clarity, inside 72 hours is considered Current Operations).  As Future Operations Chief, my responsibilities included planning for Army Cyber operations, incident response actions, such as Buckshot Yankee, and infrastructure and operational

1    changes for which Army Cyber was the authoritative agency to execute.

2        8. My next role was leading a highly classified small counterintelligence joint task force

3    comprised of military and civilian members of the Army, Navy, Airforce, Marines and civilian

4    analysts from the United States National Security Agency ("NSA").  The mission goals of that

5    joint task force were to develop new systems and processes to improve counter-intelligence

6    capabilities within the NSA and Cyber Command leveraging capabilities under the NSAs Signal

7    Intelligence Title 50 mission and telemetry and capabilities within the Title 10 authorities of the

8    armed services.  Because of the many policies, laws and procedural restrictions on the use of Title

9    50 capabilities, this program required the highest level of authorization and oversight of the

10   Intelligence Community.  Other than to describe the mission goals above, I cannot comment

11   further on the mission.

12       9.  My last role before deployment was the Chief of the Joint Mission Assurance Cyber

13   Cell, another civilian and military task force created to conduct cyber security assessments of

14   critical infrastructure and systems with the North American Area of Operations and provide

15   recommendations for the Army Cyber Commander in support of the NORTHCOM commanders'

16   mission to protect said systems, such as the space and missile defense capabilities.

17       10.  My culminating assignment in the Army was Director of Operations, Task Force

18   Signal AFGN, 160th Signal Bde Fwd.  I was responsible for all communications infrastructure

19   within the area of operations and the defense thereof, to include the defense of systems provided

20   within that infrastructure.

21       11. I retired from the armed forces in 2014 as a Lieutenant Colonel and went to work for

22   the commercial Managed Security Services Provider, Dell SecureWorks, where I was Vice

23   President of Global Cyber Threat Research and Analysis.   In this capacity I led the teams that

24   conducted the daily Intrusion Analysis and-Threat research for the SecureWorks customer base of

25   4300 companies and state and local governments.  As the executive overseeing these operations, I

26   was also the senior Incident Response Commander for the largest of these engagements such as

27   the City of Atlanta, other municipalities and several Global companies.  My knowledge of the

28   Cyber Threat landscape is derived from the pragmatic application of intrusion analysis,

identification of tactics, techniques and procedures gathered through the several thousand incident response engagements SecureWorks conducted, and overseeing the Threat Research collected by Counter Threat Unit via Open Source Intelligence, the analysis of our empiric data, and through partnerships with federal law enforcement and intelligence agencies of the United States, the UK and Australia.

12.  My formal education in this area is a MSA in Information Systems Management from Central Michigan University and I am a graduate of the Army School of Information Technology Telecommunications Engineering Course, a Master's Degree equivalent provided and endorsed by Georgia Southern University and University of Pittsburgh.

13. I am being compensated at $425 per hour for my time working on this matter, which is my customary rate. My compensation is not contingent upon the outcome of the case.

## III.    SCOPE AND INFORMATION CONSIDERED

14. This report focuses on the Pegasus exploit described in the Complaint, which purportedly used vulnerabilities in the WhatsApp application to deliver the Pegasus agent to Android devices running that application in April-May 2019, using a zero-click delivery vector. This is the period of time and the technology identified in the Complaint, and it is the only period of time and technology about which WhatsApp has provided substantial information in discovery as of the date this report was prepared. Should WhatsApp further allege that other time periods and versions of Pegasus and/or WhatsApp are relevant to this litigation (and if WhatsApp provides discovery about those other time periods, versions of Pegasus, versions of WhatsApp, and WhatsApp's investigation and remediation of those other vulnerabilities), I reserve the right to submit a supplemental or amended opinion addressing those allegations.

15. In my review of the materials relevant to the scope of this opinion, I was assisted by Rick Hein, Nate Epperson, and Andy Paul. These people worked under my supervision to collect and analyze relevant materials. I used the evidence they provided and evidence from my own review to form opinions about the incidents that are the subject matter of this litigation. A list of

1    the information that I considered appears in Appendix 2 to this report.[1]

2    **IV.    BACKGROUND**

3        **A.    The Lawful Intercept Industry**

4        16. In the United States, the Fourth Amendment and other civil liberties provide critical

5    protections, requiring government and law enforcement to follow strict legal processes and

6    oversight when accessing private data during criminal investigations.

7        17. To facilitate lawful access to private data, the federal government and numerous law

8    enforcement agencies have invested substantial resources in developing or acquiring tools to assist

9    in criminal investigations and intelligence gathering.

10       18. The industry that develops and implements tools used by governments and law-

11   enforcement agencies to lawfully access private data for criminal investigations is known as the

12   lawful intercept (LI) industry. The LI industry facilitates the authorized monitoring and

13   interception of communications by law enforcement agencies (LEAs) and intelligence

14   organizations. This industry supplies the technology, software, and services that enable

15   governments to lawfully intercept private communications for purposes such as surveillance,

16   investigation, and national security.

17       19. The origins of lawful surveillance date back to the late 19th century with the advent of

18   the telegraph and later the telephone. Governments quickly realized the potential of these

19   communication methods for both criminal activity and espionage. Early forms of wiretapping

20   involved physically tapping into telegraph lines or telephone wires to intercept messages.

21       20. During both World Wars, surveillance became a crucial tool for military intelligence.

22   Governments intercepted enemy communications, including radio transmissions and telegraphs,

23   to gain strategic advantages. This period saw significant advancements in codebreaking and signals

24   intelligence, laying the groundwork for modern surveillance techniques. Following World War II,

25   the National Security Agency was established with Executive Order 12333 in 1947.

26

27   [1] The appendix identifies document productions made by the Plaintiffs and which my team and I
28   have made best efforts to search and review. Due to the volume of these productions, I cannot
     represent that I personally read every document contained in these productions.

21. The rise of the internet and digital communication technologies in the 1990s dramatically expanded the scope of lawful surveillance. Governments adapted their surveillance methods to include email, digital voice communication (like VoIP), and online data.

22. In 1994, the U.S. Communications Assistance for Law Enforcement Act (CALEA) was enacted, requiring telecommunications companies to build surveillance capabilities into their networks, making it easier for law enforcement agencies to conduct lawful interceptions.

23. In 2001, September 11th terrorist attacks led to a significant expansion of lawful surveillance powers worldwide, particularly in the U.S. with the passage of the USA PATRIOT Act. This act gave law enforcement and intelligence agencies broad powers to intercept communications and access personal data for purposes of improving and ensuring the safety of the citizens of the United States and preventing future terrorist attacks.

24. Today, U.S. governmental agencies (like the NSA) are responsible for acquiring, developing, and implementing cutting-edge cryptology tools for the United States—including both Signals Intelligence (SIGINT) and Information Assurance (IA) tools.  These tools are of critical importance for the United States and our allies.

25. For example, the NSA's core mission involves intercepting, deciphering, and analyzing electronic communications and signals from foreign entities to gather intelligence that can be used to inform U.S. national security policy and operations. This includes monitoring foreign communications, cyber activities, and electronic transmissions that may pose threats to U.S. interests, both domestically and abroad. To do so, the NSA utilizes digital surveillance tools that it has developed or acquired from LI specialists.

26. These tools allow governmental agencies like the NSA to monitor and intercept dangerous or criminal activity. For example, General Keith Alexander for the NSA and CYBERCOM explains: "Terrorists use our communications devices. They use our networks. They know how to plan around this. They use Skype. They use Yahoo. They use Google. And they are amongst us and they're trying to kill our people."[2]

---

[2] https://www.nsa.gov/Press-Room/Speeches-Testimony/Article-

### (1) Terminology

31. In most cases, digital surveillance technology operates by taking advantage of a digital system "vulnerability." A "vulnerability" is some flaw in the software system that permits an actor to make the system behave in unexpected ways. For example, if a software application does not check that the inputs it receives conform to certain constraints, this may be a vulnerability because a surveillance actor could potentially provide inputs that cause the system to behave in unexpected ways (e.g., executing computer code written by the surveillance actor). This is called a "code injection" vulnerability. Vulnerabilities can include glitches, security flaws, or bugs that cause the system to behave unexpectedly.

32. When discussing digital surveillance tools, it is useful to distinguish the surveillance tool itself from the delivery mechanism (or delivery "vector") for delivering the tool onto the target computer. The tool itself (which I will refer to generally herein as the "payload") is the software that performs the ultimate goal of the surveillance, such as data exfiltration, data deletion, data corruption, data encryption, service disruption, or system control. But having such a tool is only half the battle. The other half is finding a way to get the tool onto the target computer. To do that, the surveillance engineer must devise a delivery mechanism (or delivery "vector").

33. A "delivery mechanism" or "delivery vector" is the process by which the surveillance tool is delivered to a target system or network—i.e., the means by which the surveillance tool reaches the target system. The same surveillance tool may be delivered using any number of delivery mechanisms. Other delivery vectors may include social engineering (i.e., tricking people with authority to insert the surveillance tool into the target system), phishing (e.g., sending text messages or emails with links to the payload), or other mechanisms.

34. A programmatic delivery mechanism, which takes advantage of a system vulnerability to deliver the payload, is called an "exploit." Exploits are sometimes characterized based on the level of human interaction they require. For example, a delivery mechanism that requires the user to tap on a link in an SMS message might be described as a "one-click" exploit (because it requires the user of the device receiving the message to click on one link). An exploit that can target a computer system without any interaction from the user of the target system is a "zero-click"

exploit.

35. Delivery mechanisms often operate in multiple stages, where the goal of each successive stage is to obtain additional access to the target system. The initial stage used to gain entry into a target system, network, or environment is called an "initial access vector" ("IAV"). The IAV is crucial because this is the stage where the initial foothold in the target system is obtained. The surveillance actor can leverage that initial foothold to obtain additional privileges, move across the network, exfiltrate data, or deploy additional payloads. Some popular IAVs in recent years have included exploitation of a system vulnerability, software introduced through email, and using the credentials of a user.

36. "Encryption" is a process that transforms readable data ("plain text") into an unreadable format (ciphertext) that can only be deciphered back into the original text using a known "key." Encryption is a fundamental aspect of information security, designed to protect sensitive data from outside access, whether the data is stored on a device or transmitted across networks Currently encryption is the single best method of ensuring the integrity and confidentiality of our data.

37. "End-to-end encryption" ("E2EE") is a term used in the communications industry to mean that a message is encrypted at all times while in transit—i.e., the sending encrypts the message before sending it, and the message is not unencrypted until it arrives at the receiver system. In such systems, no third parties (including the service providers) can decrypt the message, although in an article in 2021, WhatsApp represented that it has "teams of contractors in Austin and elsewhere review WhatsApp messages to identify and remove 'the worst' abusers."[3]

**(2)    Stages of surveillance.**

38. The MITRE corporation has published a commonly accepted framework enumerating the stages of a cyber infiltration (the "Cyber Kill Chain"). That framework breaks down a cyber-intrusion into the following stages:

39. In an initial reconnaissance phase, the investigator profiles the surveillance subject's

---

[3] https://www.propublica.org/article/how-facebook-undermines-privacy-protections-for-its-2-billion-whatsapp-users

device by gathering information to understand its vulnerabilities. During this phase, the investigator attempts to learn how the surveillance subject's system is designed, the underlying technologies, and how those technologies are configured. To gain a better understanding of the target system, the developer may also decompile target system code, where the developer has access to such code. Developers may also use open-source intelligence to understand the target system, such as looking at job postings, employee job descriptions and blog posts. The developer may also review documentation of the surveillance subject's system, where available. The key to the reconnaissance phase is identifying a vulnerability in the surveillance subject's system that will enable delivery of the payload. The LI industry specializes in finding vulnerabilities in common technologies and to thus enable lawful surveillance of criminals and terrorists.

40. The developer then uses the knowledge gained in the reconnaissance phase to develop an exploit for delivering the surveillance payload to the surveillance subject's system. The surveillance payload and the exploit are two different things: the exploit is the code that enables delivery of the payload, whereas the payload is the code that operates once the exploit has been completed.

41. In a "delivery" phase, the investigator utilizes some means to deliver the exploit to the surveillance subject's system. This can be done in any number of ways, such as by phishing emails, infected USB drives, or by exploiting interfaces that the surveillance subject's system exposes for public use (e.g., public Web APIs).

42. Once the exploit has been delivered, the operation enters the exploitation phase, in which code is executed on the surveillance subject's system to create a hospitable environment for the surveillance payload. Exploit execution can take many forms as well, such as SQL injection, buffer overflows, RCE, or countless other methods.

43. Once the investigator has gained better access to the surveillance subject's system, the investigator begins an "installation" phase to install the surveillance payload. Common techniques include executing shell scripts, installing remote access tools (RAT), and DLL hijacking.

44. Once the surveillance payload has been installed, the investigation enters a "command and control" phase, where the investigator sets up persistent access to the surveillance subject's

Pegasus agent to the devices of surveillance targets.

### A.    WhatsApp's VoIP System

#### (1)    VOIP Basics

52. Voice over IP (VoIP) is a ubiquitous technology that allows real time voice and video communications over the Internet. Instead of using traditional circuit-switched telephony, VoIP relies on packet-switched networking (such as the Internet), which is more efficient and flexible.

53. Placing a VoIP call frequently involves two additional technologies: XMPP and WebRTC. XMPP is an XML-based messaging protocol that is frequently used to exchange the messages (called "stanzas") immediately after the call is initiated that are necessary to establish a call connection. WebRTC is a real time streaming protocol used to perform the real-time exchange of data packet streams during the call.

54. To begin a call, the caller's and callee's client applications must establish a connection. To do so, the caller side starts by sending the callee an XMPP message called the "offer" stanza. This call offer contains information needed to establish the offered call, such as IP addresses, ports and media capabilities. Once the callee side receives the offer message, it typically responds with an acknowledgement message, and the caller and callee then exchange various XMPP messages to negotiate the details of how to connect the call. This negotiation involves negotiating session parameters, such as which codecs will be used for encoding/decoding voice data.  All of this takes a few milliseconds to complete. Because XMPP is an extensible standard, any given VoIP implementation may utilize any number of standard or custom messages/stanzas.

55. XMPP messages, such as the call offer, are not typically sent directly to the callee. Instead (as in WhatsApp's system), the call offer can initially be sent to a "signaling server" that acts as an intermediary between caller and callee client application. The signaling server may perform various functions, such as finding the callee device, enforcing certain constraints on the XMPP messages (e.g., through "stanza validation"), and/or modifying the information in the XMPP messages. Ultimately, the signaling server forwards the messages to the callee' application. None of WhatsApp's signaling servers were, or are, located in California (Gheorghe Tr. 142)

56. Once the caller and callee client applications reach agreement on the parameters of

their connection, they establish a WebRTC connection using the agreed upon connection settings. WebRTC (Web Real-Time Communication) is an open-source project that provides web browsers and mobile applications with the ability to perform real-time communication (RTC) via simple JavaScript APIs. It enables peer-to-peer audio, video, and data sharing directly between browsers without requiring plugins or intermediate servers for the media transfer. This makes WebRTC a powerful tool for creating applications like video conferencing, voice calls, and data sharing directly in the browser.   As with the call connection communications, the WebRTC connection between the caller and callee can be direct ("peer-to-peer") or indirect (i.e., through one or more intermediary "relay servers"). A relay server's job is to receive the WebRTC packets from the sender (whether caller or callee) and forward those to the receiver.

57. During an active call, the signaling server continues to handle control messages, such as putting a call on hold, transferring a call, or adding participants for a conference call. For example, if users want to switch from a voice call to a video call after the voice call has begun, the signaling server coordinates this change by renegotiating the session parameters.

58. When either party decides to end the call, their device sends a message to the other signaling the end of the call. The signaling server updates its records to reflect that the call is over and frees up any resources allocated for the session. This includes de-registering the clients if necessary and closing any associated media channels.

### (2) WhatsApp's VoIP System

59. In 2019, WhatsApp provided users with VoIP functionality, including audio and video calling.

60. The following is my understanding of how the relevant parts of WhatsApp's VoIP system operated in 2019. My understanding is informed by the deposition testimony of Claudiu Gheorghe (WhatsApp's head of VoIP infrastructure in 2019), who testified at length about the workings of the WhatsApp VoIP system in 2019 at his deposition in Palo Alto, CA on August 16, 2024 (I attended the deposition virtually). My understanding is further informed by my review of the technical documents produced in this litigation, including but not limited to NSO-WA-00121258 (Ex. 1148 to Mr. Gheorghe's deposition), NSO-WA-00125122 (Ex. 1083 to Mr.

**B.    Pegasus's Use of WhatsApp VoIP as a Delivery Mechanism.**

73. Below I detail my understanding of how the accused Pegasus exploit used WhatsApp to deliver the Pegasus agent to target devices in 2019. My understanding is derived from the WhatsApp and Facebook technical analysis documents produced in discovery (including at least documents with Bates numbers WA-NSO-00165102, WA-NSO-00125178, WA-NSO-00121294, WA-NSO-00017131, WA-NSO-00165189 among many other documents), interviews with Tamir Gazneli of NSO, and analysis of open-source materials regarding the operation of Pegasus.

74. The version of Pegasus referenced in the Complaint delivered the Pegasus agent using a zero-click exploit, meaning that the exploit could install the Pegasus agent without any human input on the target device.

75. At the start, Pegasus would obtain information about the target device that was normally exchanged during a WhatsApp VoIP call. This included determinations of whether the call recipient has a WhatsApp account, what operating system the recipient is running, whether the recipient is currently online, and whether the WhatsApp application was in the foreground.

76. Pegasus would send a call "offer" to the surveillance subject from a client application controlled by the investigator (LI Phone #1). This offer was sent to the external edge of the WhatsApp network, where the internal WhatsApp load balancing code would take over and route the call offer to the signaling server of WhatsApp's choosing.

77. The call offer included an XMPP offer stanza with a special value for the "connecting_tone_desc" field. The value was a string value defining a "shell script" that could be executed by the Android operating system. ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ The shell script and ELF executable delivered at this stage are not used until the final step.

78. The LI Phone #1 would then send an SRTP Sender Report / Receiver report packet to trigger the fingerprint on the subject's device. Due to a buffer overflow vulnerability in the WhatsApp code, the response from the target device back to the LI Phone #1 contains information

indicating the version of the operating system on the device.  The LI Phone #1 then uses the same buffer overflow vulnerability again (possibly multiple times) to calculate the base memory address of the WhatsApp software.

79. LI Phone #1 would then change the call to a "group" call and introduce another LI controlled phone (LI Phone #2). When upgrading the call, LI Phone #1 provided all the devices on the call a large list of capabilities. LI Phone #2 then responded that it can only support a specific set of capabilities, which it sent to the target device. This caused the target device to set additional memory pointers to specific locations.

80. LI Phone #1 and LI Phone #2 would then close the call, causing the target device to run its call termination routines. Due to the configuration of the memory addresses in the step described above, the call termination routines would cause the target device to execute the shell code that was delivered in the initial stages of the exploit, as discussed above. The shell code execution would cause the target device to connect to a C2 server controlled by the lawful intercept investigator and download and install the Pegasus agent. Thereafter, the operation of Pegasus did not use or otherwise rely upon the WhatsApp application or any WhatsApp infrastructure. Instead, once deployed on the target device, the Pegasus agent allowed the lawful intercept investigator to conduct surveillance operations on that device.

81. WhatsApp's internal documents are clear that, throughout this process, "WhatsApp servers were not compromised by this [operation of Pegasus]." WA-NSO-00125125. I agree with that assessment because the Pegasus delivery mechanism merely used the WhatsApp servers to exchange data with the target device, and it did so using functions written by WhatsApp, functioning as WhatsApp had intended those functions to work.

**C.    WhatsApp's Discovery and Investigation of the Pegasus Exploit (S178165).**

82. WhatsApp discovered that Pegasus was exploiting vulnerabilities in the WhatsApp application around May of 2019, and in response, conducted an investigation and made modifications to the WhatsApp application, the WhatsApp signaling servers, and (temporarily) to the WhatsApp relay servers. Below is my understanding of that investigation. This account is based on Mr. Gheorghe's and Ms. Cortney Padua's testimony and my review of WhatsApp internal

documents, including at least those used as exhibits in Mr. Gheorghe's testimony, those produced at bates numbers WA-NSO-00166474, WA-NSO-00164559, WA-NSO-00115239, WA-NSO-00017583, WA-NSO-00020296, WA-NSO-00020306, WA-NSO-00060597, WA-NSO-00060339, WA-NSO-00018449, WA-NSO-00055228, and others contained in the production volumes set forth in Appendix 2 of this report.

83. On October 4, 2018, a WhatsApp developer named Jesus Palau started a work task (T34775320) named "server to validate call stanzas as defined in the protocol" (the "Stanza Validation Project"). It appears that the task was created in response to a security incident (S164677) that Palau believed "could have been prevented by enforcing that [XMPP] stanzas are compliant with the protocol." Mr. Palau therefore set to build capabilities into the WhatsApp signaling servers (also referred to as "chatd servers") to check the validity of all incoming XMPP stanzas.

84. The inception and mandate of the Stanza Validation Project (starting in October 4, 2018) demonstrates that, prior to that date, WhatsApp's signaling servers did not check whether all incoming stanzas conformed to WhatsApp's protocols (i.e., the signaling servers did not "validate" the stanzas), nor did the WhatsApp system (including its signaling/chatd servers) take any enforcement action against any non-conforming stanzas, such as dropping or otherwise blocking those stanzas.  In other words, WhatsApp signaling/chatd servers would pass any stanzas along to the device to which the caller was trying to connect.

85. In my opinion, WhatsApp's failure to validate all stanzas received by its signaling servers and to enforce the validity of those stanzas was a significant deviation from standard industry security practices in the 2018-2019 time period. The Stanza Validation Project was designed to enhance the security of WhatsApp's VoIP system by adding validation and enforcement of stanzas on the WhatsApp signaling servers.

86. At its inception, the priority of the Stanza Validation Project was "none." On December 4, 2018, due to a security researcher revealing some technical issues in the WhatsApp VOIP stack, the priority of this was changed to "Mid" and the progress was changed to "planned." Several

cybersecurity blog posts were presented about WhatsApp and VoIP calling during this time frame.[7]

87. Between October 4, 2018 and around April 29, 2019, Mr. Palau wrote software to determine the validity of various types of stanzas received by the signaling servers, but he wrote no software to take any enforcement action against stanzas that were determined to be invalid.

88. On or around April 29, 2019, Mr. Palau (as part of his work on the Stanza Validation Project) noticed that some offer stanzas were failing validation.

89. On May 2, 2019, Mr. Palau alerted security engineers to an invalid call offer stanza he had identified from a Samsung virtual machine.

90. An employee named Ibrahim Mohamed looked at the call offer stanza and noticed it contained a suspicious value for a parameter named "connecting_tone_desc." At the time, neither WhatsApp's client application nor its server software were configured to include that parameter in the call offer stanzas or to use the value of that parameter for any purpose. Moreover, the value of the connecting_tone_desc parameter was a long string that appeared to include an executable shell script (in human readable plain text) and executable instructions (in hexadecimal) in a format known as Executable and Linkable Format ("ELF").

91. The incident was then escalated to various security teams (including ProdSec, CERT/IR, Corporate Threat Intelligence), and a security incident investigation was opened. The security incident was assigned the identification number S178165, and was named "Stanzaming," in recognition that the problem arose from suspicious "WhatsApp VoIP stanza[s]."

92. Though WhatsApp could have immediately closed the exploit vector by instructing its signaling servers block the suspicious offer stanzas, WhatsApp chose to keep the exploit vector open for about a week in order to study the exploit. A reasonably prudent VoIP provider would have identified that the binary in the "suspicious stanza" was directed at Android Devices and known that the remediation would be multi-pronged. Additionally, WhatsApp's log analysis appears to be from event log storage, allowing suspicious traffic to continue in hopes of catching more malicious traffic incurred unnecessary risk.  If WhatsApp understood the situation clearly

---

[7] https://googleprojectzero.blogspot.com/2018/12/adventures-in-video-conferencing-part-1.html

enough to identify suspicious stanzas, it would have been most prudent for WhatsApp to immediately close the exploit after discovering it and perform its analysis on the logs already captured rather than leaving the vulnerability open to observe it operating.

93. Between May 2, 2019 and May 10, 2019, WhatsApp left the exploit vector open in order to study the exploit. During that time, it collected and analyzed at least the following types of information: (1) activity logs from the signaling servers, (2) activity logs from the relay servers, (3) logs collected from user devices, including crash logs, (4) suspicious stanzas, and (5) purported Pegasus source code, apparently obtained from the FBI.

94. On or around May 5, 2019, WhatsApp determined that only 7 days of certain server logs were easily available and that with some effort, logs up to 70 days old could be retrieved.

95. By May 6, 2019, real time monitoring was instituted on crash logs, but WhatsApp acknowledged that crash logs were a poor indicator of whether a given device was affected because the VoIP thread becomes highly unstable and non-deterministic.

96. During this period, WhatsApp's analysis appeared to include a heuristic examination of server logs, in hopes of correlating event or "crash" logs to Pegasus activity. It was not until a tip was received from an outside party that prompted WhatsApp to investigate the initial linkage between event crash logs, suspicious stanza logs and Pegasus Without this third party information being presented, I am not confident that WhatsApp would have discovered Pegasus.

97. Inspection of these logs eventually revealed the Pegasus "Fingerprinting" binary, and WhatsApp then requested the help of Facebook's Threat researchers and Incident Responders. Drew Robinson was one of the Facebook employees who appears to have played a prominent role in the analysis of said binary. Robinson concluded that the binary contained the IP addresses of third-party servers that Facebook characterized as "C2 servers." This information allowed WhatsApp to correlate IP addresses from the captured logs to IP addresses of the WhatsApp server infrastructure. The list of "C2" servers enumerated by Mr. Robinson in the investigation case management correspondence appears to be derived from this analysis, although we cannot validate that all the servers enumerated are in fact related to Pegasus.

98. During WhatsApp analysis of the suspicious traffic and binary, WhatsApp did not

practice proper Operation Security. It attempted to reach out to the suspicious IP addresses using internal devices, which appears to have caused those devices to become infected and/or to potentially contaminate the data in the server logs that WhatsApp was analyzing. WA-NSO-00015239. This clearly demonstrates a lack of forensic skill or awareness of security best practices.

99. According to WhatsApp's internal documents, WhatsApp concluded that "The main vulnerability being exploited was a <u>client-side heap overflow</u>" that took advantage of "an unchecked memory copy operation to a fixed-size buffer." WA-NSO-00164638.

100. Moreover, WhatsApp determined that, even though the exploit was transiting data over the WhatsApp signaling and relay servers, "[t]he WhatsApp servers were not compromised by this [incident]." WA-NSO-00125125.

101. I agree that WhatsApp's servers were not compromised in this incident because Pegasus used WhatsApp signaling and relay servers only for their ordinary and intended purpose of shuttling data between client devices. As Mr. Gheorghe agreed at his deposition, this use of the WhatsApp servers to shuttle stanzas between client devices did not impair the availability of those servers, corrupt any data on those servers, slow down those servers, or delete any of WA's data from those servers. Thus, Pegasus did not harm the WhatsApp servers in any way.

102. On or about May 10, 2019, WhatsApp rolled out software changes that closed the exploit vector.  These changes did not restore the systems to a previous state. Instead, the changes *enhanced* the systems' security by, for the first time, detecting and blocking certain surveillance traffic.

103. WhatsApp made three software changes in response to the Stanzaming incident: one to the WhatsApp client, another to the WhatsApp signaling server, and a temporary change to the WhatsApp relay server.

104. The change to the WhatsApp client involved a vulnerability in an underlying protocol RTCP that the WhatsApp client application had as a dependency. WhatsApp addressed this vulnerability by limiting memory copy in its application to limit the size of the buffer being sent to a callee to the size of the local buffer, and to thus close the buffer overflow vulnerability used by the Pegasus exploit (*i.e.*, CVE-2019-3568).

105. The change to the WhatsApp signaling server was related to validation of the incoming stanzas (*e.g.*, the call offer stanzas) and to "enforce" the validation by dropping (i.e., not processing) stanzas that did not pass the validation.

106. Finally, the change to the WhatsApp relay servers was temporary—for a time, WhatsApp configured the relay servers to detect and drop the large SRTP packets that Pegasus would send during the exploit stage. Mr. Gheorghe testified that once WhatsApp rolled out the changes to the client application, it removed this change from the WhatsApp relay servers. (Gheorghe Depo. at pp. 274-75).

## VI.    OPINIONS

107. Defendants have asked me to provide my opinion, based on my review of the case materials, regarding five issues relevant to this case: (1) whether NSO targeted computers in California (whether WhatsApp infrastructure or other computers), (2) whether NSO exceeded its authorized access to any WhatsApp server, (3) whether NSO damaged any WhatsApp server, (4) whether NSO's activity harmed WhatsApp, and (5) what would the implications be for the LI industry if hacking statutes like the CFAA imposed liability on *makers* of LI software, rather than on the government *users* of such software. I provide those opinions below.

### A.    NSO did not target computers in California.

108. I have been asked to provide my opinion about whether, during the time relevant to this report, NSO intentionally configured Pegasus to target computers physically located in California—specifically, WhatsApp signaling servers, WhatsApp relay servers, and third-party "command and control" servers. As explained below, it is my opinion that NSO did not configure Pegasus to intentionally target any computers in California.

### (1)    Pegasus did not target WhatsApp signaling servers in California.

109. During the relevant time period, Pegasus did not target WhatsApp signaling servers in California. Targeting WhatsApp signaling servers in California would have been impossible because, as WhatsApp has stated (through its 30(b)(6) witness Mr. Gheorghe), none of WhatsApp's signaling servers were physically present in California in or around 2019 (Gheorghe Deposition at p. 142). Consequently, NSO could not have configured Pegasus to target any

1    WhatsApp signaling servers in California.

2    110. Even if WhatsApp had any signaling servers in California, I have seen no evidence

3    suggesting that NSO configured any Pegasus installation to target that specific server. I also see

4    no motivation for NSO to have done so because Pegasus would likely work best by directing its

5    traffic to whatever signaling server was best suited to handle the traffic at the time, as determined

6    at WhatsApp's discretion by WhatsApp's load balancers, in the manner described above.

7                    **(2)    Pegasus did not target WhatsApp relay servers in California.**

8    111. I have seen no evidence suggesting that NSO configured any Pegasus installation to

9    target WhatsApp relay servers in California, and the evidence I have seen suggests the opposite—

10    that NSO did not configure any Pegasus installation to target WhatsApp relay servers in California.

11    112. As noted above, WhatsApp's relay servers were located at edge locations at over 100

12    edge locations around the world, and only two of those were in California. Moreover, Mr.

13    Gheorghe testified that WhatsApp's signaling servers determined—based on their own load

14    balancing calculations—which relay servers each client application could access. Specifically, Mr.

15    Gheorghe testified that a client would ask the signaling server for access to relay servers, and the

16    signaling server would return authorization tokens for ten relay servers of the signaling server's

17    choice. Mr. Gheorghe testified that a client application could only use a WhatsApp relay server if

18    it held the appropriate token from the signaling server. Therefore, Pegasus could not target relay

19    servers in California, even if it wanted to. Rather, the choice of which relay server Pegasus could

20    use was limited by the decisions of WhatsApp's signaling server.

21    113. Moreover, I have seen no evidence that Pegasus included programming that would

22    either seek out or choose relay servers in California. And I can think of no motivation for doing

23    so. Rather, Pegasus used whichever relay servers were offered by the WhatsApp infrastructure.

24    Based on my analysis of logs and scripts produced by WhatsApp (*see* WA-NSO-00017151 and

25    WA-NSO-00017133), it appears the Pegasus client application was designed to select its relay

26    server using the same or similar logic as the WhatsApp client application (i.e., polling the list of

27    relay server chosen by WhatsApp and using the one with the best latency performance).

28

**B.     Neither NSO nor its customers accessed any WhatsApp server without authorization or exceeded their authorized access.**

123. It is my opinion that neither NSO nor its customers either accessed any WhatsApp server without authorization or exceeded their authorized access to any WhatsApp server. I have been informed that the Court has already held that NSO and its customers did not access any WhatsApp servers without authorization because they signed up with the WhatsApp service and were consequently granted authorization to use the WhatsApp service. I agree with that conclusion. It is my opinion that, further, neither WhatsApp nor its customers (during the operation of Pegasus) accessed any part of a WhatsApp server (including the signaling or relay servers) that was "off limits" to them, where "off limits" means beyond some technological access barrier they were not entitled to cross. I offer no opinion on any contractual restriction or other non-technical access barrier that Plaintiffs may contend NSO or its customers circumvented.

124. I have seen nothing in my review of the materials in this case to suggest that NSO ever operated the Pegasus software to gain access to any target device that NSO did not itself own or control. NSO's customers may well have done that, as the intended use of Pegasus is to covertly gain access to material located on the phones of those suspected to be engaged in terrorism or the commission of serious crime, but even then, the access to WhatsApp servers did not exceed authorization. During the research and development phase, NSO transmitted messages across the WhatsApp servers when testing Pegasus against NSO's own target devices.  It is my opinion that neither NSO nor its customers ever accessed any part of a WhatsApp signaling or relay server that was "off limits" to the Pegasus/WhatsApp user (i.e., was beyond some technological access barrier the Pegasus/WhatsApp user was not entitled to cross).

**(1)     Neither NSO itself nor NSO customers exceeded their authorized access to a WhatsApp signaling server.**

125. It is my opinion that NSO and its customers did not access any WhatsApp signaling server in a manner that exceeded their authorization.

126. As explained above, the only technical access controls that WhatsApp used to limit access to the signaling servers was a public-private key encryption scheme. Under that scheme,

messages sent to the server were encrypted using the sender's private key, and the server would authenticate the message by attempting to decrypt the message using the client's public key. If the decryption was successful, then the server would process the request and thus grant the client access to the signaling server's services.

127. Pegasus did not circumvent this access restriction on the signaling server's services. During the operation of Pegasus, the Pegasus client would encrypt messages to the signaling sever using the client's private key, the signaling server would authenticate those messages using the client's public key, and the signaling server would process the client's requests pursuant to that authentication. Therefore, Pegasus's access to the signaling server's services was authorized and did not involve the circumvention of any technical access restrictions.

128. I understand Plaintiffs may contend that Pegasus users obtained the private-public key credentials to the signaling servers in a manner that did not comply with WhatsApp's terms of service. I have no opinion on whether this contention is correct, but it does not impact my opinion because it does not imply that the user obtained access to the signaling server by circumventing any *technical* access barriers, only potentially contractual or legal ones.

129. The messages (*i.e.*, XMPP stanzas) that Pegasus sent to the signaling servers also did not result in the Pegasus user accessing any part of the signaling servers that was off limits to him or her. As noted above, the Pegasus client sent to the signaling servers stanzas that included values for certain valid parameters, and the signaling servers merely forwarded those stanzas (with the parameter values) to the callee device. The values of the parameters (and the fact that those values were unusual) had no impact on the signaling server's processing of those stanzas. In other words, the signaling server merely provided the service that the Pegasus user was authorized to access.

130. For example, the Pegasus client would send the signaling server a call offer stanza where the value of the "connecting_tone_desc" parameter of the stanza was a string that defined a shell script and ELF executable. But the signaling server did not execute that shell script or ELF executable. In fact, it would be impossible to do so, as the code was written specifically for Android Operating Systems. Instead, it merely passed the string to the callee device as the value of the "connecting_tone_desc" parameter. Indeed, the signaling server performed no processing that

1    depended on the value of the "connecting_tone_desc" parameter. As noted above, the signaling

2    server did not validate the value of the "connecting_tone_desc" parameter. Nor did the signaling

3    server perform any different function in response to receiving any value for the

4    "connecting_tone_desc" parameter. Instead, the signaling server would simply forward the value

5    to the "connecting_tone_desc" parameter to the callee as it would have done had the caller

6    provided *any other* value for the "connecting_tone_desc" parameter.

7    131. Because the Pegasus user's communication with the WhatsApp signaling server

8    merely used services that the Pegasus user was authorized to use, neither NSO nor its customers

9    accessed any part of the signaling server that was off limits to them.

10    **(2)    Neither NSO nor its customers exceeded their authorized access to a**

11    **WhatsApp relay server.**

12    132. It is my opinion that neither NSO nor its customers accessed any WhatsApp relay

13    server in a manner that exceeded the user's authorization.

14    133. As explained above, the only technical access control that WhatsApp used to limit

15    access to the relay servers was that a client must present the relay server with an authorization

16    token for the relay server, which the client could obtain only from the WhatsApp signaling server.

17    I have seen no evidence suggesting that the Pegasus client accessed the Relay server in any way

18    other than by presenting a legitimate authorization token that it obtained from WhatsApp through

19    WhatsApp's signaling server. Thus, I have seen no evidence that Pegasus somehow circumvented

20    this access restriction to the WhatsApp relay servers.

21    134. The messages that Pegasus sent through the relay servers also did not result in the

22    Pegasus user accessing any part of the relay servers that was off limits to him or her. As WhatsApp

23    admitted (through its 30(b)(6) witness Mr. Gheorghe), the relay servers behaved normally during

24    Pegasus use—merely shuttling packets back and forth between the caller and callee. Indeed, the

25    only message exchanged over the WhatsApp servers that WhatsApp even contends was

26    "malicious" was the offer stanza sent from the caller to callee over the *signaling* server. Thus, none

27    of the messages that Pegasus sent over any WhatsApp relay servers traversed or caused the sender

28    to gain access to any part of those servers that was off limits to the Pegasus user (i.e., behind some

technical barrier that the Pegasus user was not authorized to cross). Put another way, the information sent by Pegasus over WhatsApp's relay servers traversed the identical path across WhatsApp relay servers as the VoIP calls made by any other WhatsApp user around that same time.

135. In sum, Pegasus users merely used the WhatsApp servers (both signaling and relay servers) as a delivery mechanism—the way one might use the post office to deliver letters. To use that delivery mechanism, the Pegasus user had to (and did) present access credentials, issued by WhatsApp. I note that WhatsApp performs no checks to verify to whom it is issuing access credentials—it merely issues access credentials to anyone who registers with a phone number. Moreover, the Pegasus user's use did not cause any of the WhatsApp servers to perform any function that WhatsApp had not programmed those servers to perform. The Pegasus software is intended to reach the phone of an end user that is a person of interest to a Law Enforcement or Intelligence agency and Pegasus contains no software code executed by WhatsApp Servers. These facts are clearly acknowledged by WhatsApp in their technical analysis and the personnel associated therein. Thus, Pegasus users did not circumvent or manipulate the server functionality in any way.

136. The Court's order denying Defendants' motion to dismiss (Dkt. No. 111) relied on several WhatsApp allegations that discovery has shown to be untrue. For example, the Court took WhatsApp at its word that "WhatsApp imposes certain limitations on accessing portions of its servers, such as prohibiting access to the technical call settings." *Id.* at 37. But discovery has shown that this allegation is false. Instead, discovery has shown that, at the time of the incidents described in the Complaint, the WhatsApp signaling server was performing *no validation or enforcement* of stanzas (including of offer stanzas), let alone "prohibiting access to the technical call settings," such as the "connecting_tone_desc" parameters.

137. In another example, the Court accepted WhatsApp's allegation that Pegasus users used Pegasus to "avoid the technical restrictions built into WhatsApp Signaling Servers." *Id.* But as I have shown above, this is also false.

138. The Court also accepted WhatsApp's allegation that Pegasus users "formatted call

initiation messages containing malicious code to appear like a legitimate call and concealed the code within call settings." But that is false too because the Pegasus exploit code was not "concealed" within the XMPP stanzas at all. To the contrary, it appeared there in plain, human readable text. Indeed, any competent engineer who would have seen the value of the connecting_tone_desc parameter in the call offer Stanzas sent by Pegasus would have immediately recognized that the value was invalid, that the value defined a shell script, and that the shell script performed operations related to access controls (e.g., "chmod777"). And indeed, it appears that the moment WhatsApp engineers saw the value of the connecting_tone_desc parameter on May 2, 2019, they immediately recognized it as an exploit. The reason WhatsApp did not recognize this exploit earlier was simply that, prior to the Stanza Validation Project, WhatsApp was not validating the value of the connecting_tone_desc parameter, or of many other values of the call offer stanzas, or of other stanzas. Thus, Pegasus did not "conceal[] code within code settings." It simply placed the code there in plain sight. Placing code in plain sight is not the circumvention of any technological barrier.

## C.    NSO did not damage any WhatsApp server.

139. For many of the same reasons explained in the previous section, it is my opinion that Pegasus did not impair the integrity or availability of any data, program, system, or information on any WhatsApp server or cause any damage to any computer owned by WhatsApp.

140. As I noted above, I agree with WhatsApp's internal assessment that WhatsApp's servers were not compromised in this incident. That is because, as further explained above, Pegasus used WhatsApp signaling and relay servers only for their ordinary and intended purpose of shuttling data between client devices. As WhatsApp agreed at the 30(b)(6) deposition of Mr. Gheorghe, this use of the WhatsApp servers to shuttle data between client devices did not impair the availability of those servers, corrupt any data on those servers, slow down those servers, or delete any of WA's data from those servers. Thus, Pegasus did not harm the WhatsApp servers in any way.

141. This is unsurprising because the messages Pegasus delivers to the target's device through the WhatsApp servers are crafted specifically for that target device's operating system,

hardware architecture, and configuration. Thus, the messages are simply not executable by the WhatsApp servers. Thus, Pegasus did not impair WhatsApp's server infrastructure in any way.

142. Pegasus also did not slow down the WhatsApp servers because the amount of data generated by the Pegasus system is negligible compared to the amount of data the WhatsApp infrastructure routinely handles. Moreover, some Pegasus messages appear to have been trying to exploit a race condition, which requires precise timing that would be undermined by any impact to the network and systems involved. As such, it appears that NSO made efforts to *not* negatively impact WhatsApp's network infrastructure.

143. Pegasus appears to have actively avoided harming or impacting WhatsApp's servers in any way. This is because the goal of law enforcement is to gather intelligence and to minimize harm to uninvolved third parties. In addition, a major goal of law enforcement and intelligence gathering surveillance is to avoid detection, and any operational impact or impediment to the system prevents achievement of those goals. Indeed, because modern cybersecurity security systems employ analytic engines that look for unusual or suspicious traffic patterns, surveillance professionals try to prevent detection by *not* performing any actions that would degrade or impact network connections or infrastructure. It is best practice to "hide in plain sight" and not stand out from the crowd. If the WhatsApp network infrastructure had been impacted by Pegasus, the impact would be immediate and obvious. Large swaths of the user base would be filing complaints, the help desk would be inundated with requests, and normal logging systems would fail, which would cause alarms to be raised. None of these things occurred.

144. I have seen no evidence indicating that WhatsApp's infrastructure or servers were damaged in any way.

**D.    NSO did not cause WhatsApp any loss.**

145.  It is my opinion that WhatsApp's investigation and remediation action in response to the Stanzaming incident did not harm WhatsApp because in investigating and remediating the vulnerabilities that are the subject of this case, WhatsApp's security personnel were simply doing what they were hired to do, and indeed, what they do every day.

146. Large technology companies like WhatsApp and Facebook maintain large

cybersecurity organizations whose sole purpose is to research and close vulnerabilities in the company's software. New vulnerabilities appear frequently, as these organizations continuously update their software products (sometimes daily) to change features or react to changes in the software environment, such as changes in third-party software libraries or operating systems. Thus, technology companies like WhatsApp incur a fixed cost to maintain full-time staff whose jobs is to identify and remediate security vulnerabilities.

147. In response to discovering the operation of Pegasus, the engineers and programmers working on this task simply did what they were hired to do: they investigated the (pre-existing) vulnerability and remediated it. Indeed, as both Mr. Gheorghe and Ms. Padua noted in their depositions, had a security researcher brought the same vulnerability to WhatsApp's attention, WhatsApp may have *paid* the researcher a bounty, not charged the researcher for the work that WhatsApp's security team then performed to close the vulnerability.

148. It is therefore my opinion that the Stanzaming incident did not cause Plaintiffs to incur any loss.

**E.      Holding software tool makers liable for the actions of users would have widespread negative repercussions.**

149. This lawsuit raises policy concerns for law enforcement, national intelligence, and the lawful intercept industry because it threatens governments' ability to leverage the private sector for the development of critical law enforcement tools.

150. Law enforcement, intelligence analysis, and other legitimate parties frequently leverage the very same software tools leveraged by illegitimate, users such as terrorists, cyber criminals, pedophiles, and human traffickers. For example, Fortra's Cobalt Strike was originally designed for penetration testers and network defenders to emulate advanced adversary tradecraft. But because Cobalt Strike is so good and so easily operated, it has been adopted by numerous cyber-criminal organizations to exploit victim networks.

151. Moreover, some of the most powerful tools available to Network Administrators and Defenders are also leveraged by threat actors, because of their extensive capabilities. Some examples include:

a. **Microsoft Powershell:** Arguably the most used scripting language by network administrators globally, it is a power command line software program that works across operating systems and platforms.  Because of its near ubiquitous presence in organizational networks today, it provides potential intruders with a powerful capability already installed and available for their use.

b. **SpecterOps Bloodhound:** This software tool was designed to enumerate the relationship between users and devices in a network managed by Microsoft's Active Directory. The purpose of this software is to help network administrators ensure appropriate network segmentation is in place, users are only given the access needed to do their jobs and no more, that administrative and service accounts are limited and contained to the appropriate network layer etc.  However, threat actors use this same tool to identify attack paths through a network to gain administrator privileges to take over an organizations network.

c. **AnyDesk Gmbh:** A network remote administration tool that allows a network administrator the ability to execute tasks across their architecture irrespective of where it is located geographically.  There are numerous remote management tools such as these in use today worldwide.  These tools are often used by threat actors to maintain a foothold in an organization and conduct all kinds of illegitimate actions leveraging the native capabilities of these tools and those like it.

d. **Solarwinds:** Solarwinds's flagship product Orion is used by 33,000 organizations worldwide for the management of network operations.  It was used by Revil threat actors to conduct a large-scale attack on Colonial Pipeline in 2020.

e. **Kaseya:** Provides remote network management for over 40,000 companies worldwide and was used by the REvil cyber-crime group in 2021 to infiltrate nearly a thousand organizations, steal data and employ ransomware.

f. **Microsoft 365:** Used by 70% of all the world's public and private organizations in 2023 for email, knowledge management, communications, network operations, and collaboration, it was used by Chinese Threat Actors to infiltrate U.S. Government

organizations in 2023.

g. **7Zip:** Open-source software free for use globally often leveraged by threat actors in data exfiltration operations.

152. WhatsApp and similar E2EE messaging platforms have been used by all types of criminals and terrorists worldwide to commit unspeakable atrocities:

a. https://www.wired.com/story/whatsapp-encryption-child-abuse/

b. https://www.forbes.com/sites/thomasbrewster/2021/04/12/how-the-fbi-unmasked-a-whatsapp-and-whisper-user-in-a-pedophile-sting/

c. https://www.ynetnews.com/articles/0,7340,L-5454720,00.html ("WhatsApp hasn't rooted out this phenomenon, unfortunately," Pressburger says. "This is a phenomenon of our time. Children are contacted by an adult who asks them to film themselves, and they send him a video. It can be really young children. It's important to raise the parents' awareness.")

d. https://www.theverge.com/2023/6/7/23752192/instagrams-recommendation-algorithms-promote-pedophile-networks-investigation (A joint investigation from The Wall Street Journal and academics at Stanford University and the University of Massachusetts Amherst has revealed the extent to which Instagram's recommendation systems "connects pedophiles and guides them to content sellers." Meta noted that in January alone it took down 490,000 accounts that violated its child safety policies and over the last two years has removed 27 pedophile networks. The company, which also owns Facebook and WhatsApp, said it's also blocked thousands of hashtags associated with the sexualization of children and restricted these terms from user searches.

e. https://www.fbi.gov/news/stories/threat-from-pedophiles-online-is-vast-and-extensive -FBI's Violent Crimes Against Children Section. "Pedophiles are very active online," he said. "Their numbers are vast, and their reach is extensive.

f. https://www.counterextremism.com/press/encrypted-messaging-platform-whatsapp%E2%80%99s-role-us-terror-cases - Terror organizations often use

1     encrypted messaging applications to communicate and plan attacks. The U.K.

2     government wants WhatsApp to give security authorities access to encrypted

3     messages that Khalid Masood may have sent over WhatsApp just minutes before

4     carrying out the March 22 Westminster attack that left three pedestrians and one

5     police officer dead and dozens more wounded.

6     g.  https://www.splcenter.org/news/2021/02/16/how-encrypted-messaging-platform-

7     changing-extremist-movements --Pavel Durov, considered by some to be "Russia's

8     Mark Zuckerberg," founded Telegram in 2014. .

9     h.  https://www.reuters.com/technology/meta-asks-russian-court-dismiss-

10     proceedings-extremism-case-reports-2022-03-21/ (A Moscow court said on

11     Monday that Meta (FB.O), was guilty of "extremist activity," but the ruling will

12     not affect its WhatsApp messenger service, focusing on the U.S. firm's already-

13     banned Facebook and Instagram social networks).

14     i.  https://www.counterextremism.com/press/encrypted-messaging-platform-

15     whatsapp%E2%80%99s-role-us-terror-cases (The Counter Extremism Project

16     (CEP) has found that WhatsApp has played a role in a number of U.S. terrorism

17     cases, including: Arafat Nagi, who used WhatsApp to talk about his plans to travel

18     to ISIS held territory; Mufid Elfgeeh, who attempted to recruit people using

19     WhatsApp; and Heather Elizabeth Coffman, who used WhatsApp to send messages

20     to an ISIS facilitator.)

21    153. Just recently, the CEO of Telegram—an E2E encrypted messaging application similar

22 to WhatsApp—was arrested in France for purportedly allowing his platform to be used for criminal

23 activity.

24    154. Concerning policy implications may arise from holding software makers liable for

25 how users decide to employ those tools, as Plaintiffs are seeking. The concern is particularly acute

26 here, where the basic tools of law enforcement and counterterrorism organizations are at issue.

27

28

1

2    August 30, 2024

3

4

5                                                        Terrence McGraw

6                                                        GRAY ANALYTICS
7                                                        4240 Balmoral Dr., Suite 400
                                                         Huntsville, AL 35801
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit Y

**UNREDACTED VERSION OF DOCUMENT PROPOSED**

**TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH |

**<u>REBUTTAL REPORT OF TERRENCE MCGRAW</u>**

**<u>HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY</u>**

## I.    INTRODUCTION

1. I, Terrence McGraw, have been engaged by Defendants NSO Group Technologies, Limited and Q Cyber Technologies Limited (collectively "NSO") to review and evaluate technical materials produced by WhatsApp Inc. ("WhatsApp" or "WA"), Meta Platforms, Inc. f.k.a. Facebook, Inc ("Facebook" or "FB"), and NSO in the above captioned matter.

2. After I prepared an initial report on August 30, 2024, I was asked to review the Reports of David Youssef and Anthony Vance. This additional report provides my assessment of those reports.  I understand from King & Spalding LLP that the parties continued to exchange documents and to obtain testimony after September 1, 2024.  If Youssef, Vance, or both are permitted to supplement their reports to include any such evidence, I reserve the right to amend or supplement my responses below.

3. The opinions I provide are my own and are based on my investigation in this current matter, as well as my education, experience, training, and skill I have accumulated during my 25 years in the field of Cyber Security and Operations. As before, I was assisted by Rick Hein, Nate Epperson, and Andy Paul of Gray Analytics. These people worked under my supervision to collect and analyze relevant materials. I used the evidence that they provided and evidence from my own review to assess the opinions of Youssef and Vance.

4. A list of the materials and information that I and my team considered in preparing this additional report can be found in Appendix I.  Specific materials are also cited in the text of my report below.

5. At present, I do not intend to use any other exhibits to summarize or support the opinions that I provide in this report or any related testimony. If I do, I will provide any such materials promptly.

6. My qualifications, as well as any publications and prior testimony as an expert, are described in my initial report dated August 30, 2024, and the curriculum vitae attached to that report.

7. I continue to be compensated at $425 per hour for my time working on this matter. This is my customary rate and my compensation is not contingent upon the outcome of this matter.

authorization).[10] But the reasons he provides in support are self-defeating: that Pegasus users supposedly overcame the WhatsApp servers' technical access requirements by (1) using genuine credentials obtained from WhatsApp and (2) sending messages that complied with all formatting requirements imposed by WhatsApp's servers.[11] That opinion is both facially illogical and plagued with factual inaccuracies: that Pegasus users accessed the WhatsApp servers using legitimate access credentials (and moreover, only sent messages those servers permitted) merely confirms that the Pegasus users accessed the WhatsApp servers *with* authorization (and did not exceed their authorized access).

### (1)    Youssef's Errors Regarding Pegasus's Use of Legitimate Authorization Credentials

17. Youssef acknowledges that Pegasus users accessed WhatsApp servers *using the necessary technical access credentials*.[12] Moreover, Youssef acknowledges that those credentials were not "forge[d]"—that rather, they were obtained from WhatsApp by registering for the service.[13] Because the access credentials were authentic, Pegasus users accessed the WhatsApp servers *with authorization*.

18. I note that Youssef's description of those access credentials as including a "Region Token" contradicts the record. Youssef opines "that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token," and that accessing WhatsApp's servers therefore required NSO to "create WhatsApp user accounts and extract the Region Token."[14] But Youssef's description of the Region Token as an authorization mechanism contradicts the deposition testimony of WhatsApp's corporate designee, Mr. Gheorghe.

---

[10] Youssef Report, ¶ 156.

[11] Youssef Report, ¶¶ 95-107.

[12] Youssef Report, ¶¶ 95-99.

[13] Same.

[14] Same.

19. As Mr. Gheorghe testified, the "region token" described in Youssef's report plays a *routing* function—not an *authorization* function. Mr. Gheorghe testified that, in 2019, WhatsApp's signaling servers were located at three different data centers, and that client requests were distributed among those data centers by WhatsApp's "edge load balancers." Mr. Gheorghe further testified that client requests could optionally include a geographic preference (*i.e.*, the "region token" described in Youssef's report), and the edge load balancer would consider (though not always honor) that preference when choosing a data center to service the request. Mr. Gheorghe thus testified that the "Region Token" played a role in *choosing* signaling servers, not in authorizing a client's access to WhatsApp's signaling servers, let alone to WhatsApp's relay servers.

20. Confirming that the "Region Token" plays no authorization function is Mr. Gheorghe's further testimony that the region token was entirely "optional"—that is, "if you don't send the header at all, the edge server will still try best effort to route it somewhere."[15] Because the Region Token was "optional," Mr. Gheorghe testified that he did not know whether messages Pegasus sent to the WhatsApp servers included the region token.[16]

21. Moreover, because this so-called "Region Token" was only used to choose a data center, and there were no relay servers in the data centers,[17] it appears the "Region Token" had nothing to do with relay servers at all (whether for a routing function or authorization function).

22. Thus, Youssef is clearly wrong "that neither the Signaling Server nor the Relay Server will begin communication without being provided with a valid Region Token," and that accessing WhatsApp's signaling and relay servers therefore required NSO to "create WhatsApp user accounts and extract the Region Token."[18] According to Mr. Gheorghe's testimony, the region token is (1) not even sent to the signaling or relay servers (but rather, to the edge load balancer),

---

[15] Gheorghe Tr., 100:17-101:6.

[16] Gheorghe Tr., 100:4-10.

[17] Gheorghe Tr., 134:11-16.

[18] Youssef Report, ¶¶ 95-99.

(2) plays a *routing* function respecting the signaling servers rather than any *authorization* function, and (3) plays no function—neither routing nor authorization—respecting the relay severs.

### (2)    Youssef's Errors Regarding Pegasus "Camouflaging" Its Traffic as "Legitimate"

23. Equally self-defeating is Youssef's opinion that Pegasus "camouflag[ed]" the messages it sent WhatsApp servers as "legitimate" *by ensuring that those messages satisfied all the technical requirements imposed by those servers*.[19] Youssef admits that all messages Pegasus users sent through the WhatsApp servers—using authentic WhatsApp credentials—satisfied all the technical criteria imposed by those servers. Consequently, he is wrong that Pegasus users accessed those servers "without authorization" (or exceeded authorization).

24. Youssef opines that it was improper for Pegasus users to send *any* message to WhatsApp servers because they did not send those messages from a client application written by WhatsApp. Instead, Youssef characterizes Heaven as "emulat[ing] the official WhatsApp Client from the perspective of the WhatsApp Signaling and Relay Servers."[20] As a threshold matter, this is inaccurate because Heaven and Eden used the WhatsApp client to send its messages through the WhatsApp infrastructure.[21]

25. In any event, Youssef does not explain why it would have been improper for Pegasus users to access WhatsApp's service using a third-party client application. At best, Youssef is speculating that someone at WhatsApp (at some point) did not want third-party applications to access WhatsApp servers. But Youssef does not cite any basis for that assertion. Nor does he cite any terms of service imposing that restriction.

26. Even if Youssef had cited such evidence or terms, that would not show that access to the WhatsApp servers by third-party software is "without authorization," from a *technical* perspective. Such an argument would improperly conflate WhatsApp's presumed business desires

---

[19] Same at ¶¶ 100-104.

[20] Youssef Report, ¶ 99.

[21] Gazneli Tr., 71:2-77:2, 187:20-188:11.

1   with a server's technical access restrictions.

2       27. The same applies to Youssef's opinion that Pegasus "leveraged undocumented features

3   of the WhatsApp call offer message"—specifically, (1) the connecting_tone_desc attribute and (2)

4   the xor_cipher option.[22] But Youssef does not dispute that the WhatsApp servers *permitted* use of

5   those "undocumented" features, so it is unclear what relevance he ascribes to whether these

6   features were "documented" or not.

7       28. For example, WhatsApp's internal documents show that WhatsApp purposefully

8   decided to permit clients to set the connecting_tone_desc parameter, to facilitate backwards

9   compatibility with certain versions of the WhatsApp client.[23] So it is unclear why including that

10  allowed attribute in a message to the server would constitute access to the server without

11  authorization. Because there was no technical restriction against using the "undocumented"

12  features Youssef cites, that Pegasus users used those features (by presenting genuine credentials

13  no less) means those users accessed the WhatsApp servers *with* authorization (and is not in excess

14  of authorization).

15      29. Youssef does not argue that Pegasus users set any of these "undocumented features" to

16  impermissible values either. For example, Youssef opines that Pegasus users sent the WhatsApp

17  servers a message where the value of the connecting_tone_desc attribute was a shell script.[24] But

18  Youssef does not opine that the WhatsApp signaling servers forbid that value for that attribute. To

19  the contrary, because the servers did not process that attribute, they did not care about (and

20  therefore did not check) what its value was.[25] Thus, sending messages with the value of a

21  connecting_tone_desc field set to a shell script was not an access without authorization or in excess

22  of authorization. It was simply doing what was allowed.

23      30. The same analysis holds for enabling the xor_cipher. This was a setting offered by

24

25  [22] Same.

26  [23] Ex. 1206 (WA-NSO-00191340) at Slide 16.

27  [24] Youssef Report, ¶¶ 74, 84, 103-104.

28  [25] Barcons Tr., 143:15-22.

WhatsApp's servers, and Heaven and Eden appear to have set it to a permissible value.[26]

31. Youssef is also wrong to characterize Pegasus's use of the xor_cipher as a means "camouflaging" the nature of the messages it sent to WhatsApp's servers.[27] When enabled, the xor cipher allows the client application to cipher (i.e., scramble) the content of RTCP packets transmitted to WhatsApp's relay servers.[28] But as WhatsApp's corporate designee (Mr. Barcons) testified at his deposition, when the ciphered messages arrive at the relay servers, the relay servers always *de*cipher those messages.[29] Indeed, if the relay server cannot decipher the message, it simply drops the message rather than forward it to the recipient.[30] Thus, because WhatsApp's relay servers necessarily deciphered every RTCP packet Pegasus users sent, Youssef is wrong that setting the xor_cipher for those RTCP packets somehow "camouflaged" the nature of those packets from WhatsApp's relay server.

32. Youssef's conclusion that NSO users "overc[ame] technical limitations in the WhatsApp Client Application and WhatsApp's Servers"[31] is completely unsupported because Youssef does not identify any "technical limitations"—whether on the client or server side—that Pegasus users supposedly overcame.

### D.    Youssef's Errors Regarding Pegasus as Spyware

33. Youssef opines that Pegasus "[o]perates as Spyware."[32] It is unclear to me why Youssef's application of this pejorative to NSO's lawful intercept technology has any relevance to this case or to the opinions in my opening report. In any event, the phrase "spyware" is a loaded term, and it is my opinion that those in the lawful intercept and cybersecurity industry would not

---

[26] Barcons Tr., 182:3-22.

[27] Youssef Report, ¶¶ 47, 83-84, 103-104, 128.

[28] Barcons Tr., Ex. 1122 (WA-NSO-00115558) and accompanying discussion at 185:3-188:25.

[29] Same.

[30] Same.

[31] Youssef Report, ¶¶ 105-107.

[32] Youssef Report, ¶ 108.

1  server. But that is all that Youssef's opinion is based on: that Pegasus users used genuine

2  credentials and enabled permissible settings, like xor_cipher.

3      44. *Second*, Youssef is again mistaken that Pegasus users "leveraged XOR encryption to

4  obfuscate the data transmitted" and somehow used this setting to "camouflage" their activities

5  from WhatsApp.[45] As I have explained above, this contention is wrong because the xor ciphering

6  did not prevent WhatsApp relay servers from reading the ciphered text. None of the documents

7  Youssef cites in his report demonstrates that anything was concealed from WhatsApp servers.

8      45. Lastly, Pegasus's alleged functionality of resetting memory in the target device to

9  appear closer to a baseline running WhatsApp application is not only irrelevant (as it has nothing

10  to do with WhatsApp servers), but it is also not a concealment function. In the field of surveillance,

11  it is common practice to restore and remove any artifacts generated during installation. The reason

12  behind this practice is to help ensure a consistent operation of the exploit delivery mechanism.[46]

13  Removing installation artifacts reduces the chances that the program will malfunction and fail

14  delivery of the exploit. Moreover, removing installation artifacts returns the program to the

15  baseline state and allows for a clean slate if any further installations are required.[47] Failure to

16  remove installation artifacts could leave each intercepted device with a different baseline state,

17  making further delivery of exploits in the future more complicated. Thus, resetting memory in the

18  target device is generally a reproducibility consideration, not a concealment function.

19      **H.**    **Youssef's Errors About Pegasus Altering, Damaging, or Deleting Data from**

20              **WhatsApp Servers and Target Devices**

21      46. In paragraphs 131 and 132, Youssef opines that Pegasus "altered, damaged, or deleted

22  data from WhatsApp Servers and Target Devices." As before, Youssef's explanation omits any

23  supporting explanation or evidence with regards to the WhatsApp servers and instead, focuses

24  entirely on target devices. Accordingly, Youssef's allegations with respect to the WhatsApp

25

26  [45] Youssef Report, ¶ 128.

27  [46] Gazneli Tr., 311:2-8.

28  [47] Gazneli Tr., 304:23-305:15.

I.    **Youssef's Errors Regarding the Reverse Engineering of WhatsApp Infrastructure**

50. Youssef reaches several faulty conclusions with respect to the alleged reverse engineering of the WhatsApp software.

51. For example, in paragraph 136, Youssef opines that "the exploit chain demonstrates that Defendants possessed a detailed understanding of the memory layout of the WhatsApp Client Application for Android, and particularly of its library component libwhatsapp.so."[54] But there is nothing untoward about having that knowledge when WhatsApp makes its client application freely available on the Android store for download *without agreeing to any terms of service*. As Mr. Robinson discussed at his deposition, it is highly common for users to download the WhatsApp client application before signing up for a WhatsApp account and agreeing to WhatsApp's terms of service.[55] Once downloaded, it is trivial to analyze it using free and freely available tools. Moreover, the library component of libwhatsapp.so is a C or C++ library and would have been readily accessible to any user that downloaded the WhatsApp client because WhatsApp did not obfuscate that binary—a departure from best industry practices.[56] Accordingly, it is simply wrong to imply that NSO had to go through a tedious research process to understand the WhatsApp client application.

52. A brief internet search also belies Youssef's conclusion that WhatsApp does not publicize its proprietary VoIP architecture and that NSO's level of understanding "could only have been achieved by intercepting and decrypting network traffic."[57] There are many tutorials about WhatsApp infrastructure and software stack readily available on the internet. For example:

- https://play.google.com/store/apps/details?id=cloner.infocus.whatclone.whatsweb&hl=en_US

---

[54] Youssef Report, ¶ 136.

[55] Robinson Tr. (rough), 105:17-106:1, 111:11-23.

[56] Robinson Tr. (rough), 106:2-21.

[57] Youssef Report, ¶ 137.

- https://www.appdupe.com/whatsapp-clone-script
- https://www.youtube.com/watch?v=9_tZEwNk1Jg
- https://www.youtube.com/watch?v=vvhC64hQZMk
- https://www.youtube.com/watch?v=L7LtmfFYjc4
- https://www.youtube.com/watch?v=M6UZ7pVD-rQ&t=1857s
- https://www.youtube.com/watch?v=ovnrSH6G6vw&t=60s
- https://youtu.be/9_tZEwNk1Jg?si=lv2H02_BvJ5r3cw-
- https://www.youtube.com/watch?v=2XJYN7FRD70
- https://www.erlang-factory.com/upload/presentations/558/efsf2012-whatsapp-scaling.pdf
- https://atscaleconference.com/calling-relay-infrastructure-at-whatsapp-scale/

53. Lastly, Youssef concludes that Heaven is "designed for the express purpose of carrying out attacks against WhatsApp users."[58] But Youssef is missing a critical qualifier: "WhatsApp users *who are violent terrorists, human traffickers, child pornographers, drug lords, or otherwise serious violent criminals*." Pegasus is not used to target "WhatsApp users" in general. Instead, it is licensed exclusively to governments and subject to strict limitations on its use.

54. And once again, Youssef's allegations that Pegasus targets "WhatsApp … infrastructure" is categorically false. As I explained in my opening report and above, Heaven and Eden simply used WhatsApp servers, *in accordance with all technical rules established by those servers*, to send lawful intercept and surveillance capabilities to terrorists and other serious criminals. Heaven and Eden do not target WhatsApp infrastructure. Indeed, as Mr. Gheorghe testified, those delivery vectors "d[id] not impair the availability of the [WhatsApp] servers."[59]

### J.    Youssef's Errors About Accessing WhatsApp Servers and Location Attribution

55. In a section entitled "Defendants' Access to the IP Addresses for WhatsApp's Servers;

---

[58] Youssef Report, ¶ 138.

[59] Gheorghe Tr. at 183:11-12.

1    Location Attribution,"[60] Youssef makes a slew of ambiguous statements with false implications.

2        56. Starting with the title of the Section, I note again that "Defendants' Access" is incorrect

3    because Youssef has not identified any evidence that the Defendants in this case ever installed or

4    used Pegasus on a third party's device without that third party's consent.

5        57. Youseff then opines that "Defendants designed their Malware to access and use

6    Plaintiffs' infrastructure based in the United States" including both signaling and relay servers.[61]

7    That analysis too is unsupported and incorrect.

8        58. Regarding the signaling servers, Youssef opines that NSO software contains "hard-

9    coded WhatsApp domain names associated with WhatsApp signaling servers."[62] But Youseff does

10   not cite any such code, so it is unclear how to respond. But even if it were true that NSO code

11   included "hard-coded WhatsApp *domain names*," that does not mean that NSO directed traffic to

12   servers located in any particular place. WhatsApp's own DNS system alone decides what IP

13   address any given domain name would be resolved into—it is not up to NSO. Moreover, it is

14   WhatsApp infrastructure alone that decides what server will handle requests sent to any given

15   WhatsApp IP address, and it is WhatsApp alone that decides where that server will be located. It

16   is therefore incorrect to opine, as Youssef does, that "Defendants designed their Malware to access

17   and use Plaintiffs' infrastructure <u>based in the United States</u>" by including "hard-coded WhatsApp

18   <u>domain names</u> associated with WhatsApp signaling servers."[63]

19       59. Regarding relay servers, Mr. Youssef notes that "the Signaling Servers provide IP

20   addresses for a few potential Relay Server options to the WhatsApp Client, which then selects

21   which to use," but he admits he was "unable to reach any opinion about whether or how Defendants

22   intentionally selected those Relay Servers."[64] Nevertheless, Youssef goes on to note that "the

23

24   [60] Youssef Report, ¶¶ 142-44.

25   [61] Youssef Report, ¶ 143.

26   [62] Youssef Report, ¶ 143.

27   [63] Youssef Report, ¶ 143.

28   [64] Youssef Report, ¶¶ 143-44.

WhatsApp Relay Servers selected and used by Defendants' Malware are logged by their IP addresses in the logs from the AWS Server, of which I identified four which appear to be registered to Plaintiffs and based in the United States."[65]

60. The AWS server logs that Youssef cites were not produced by NSO. Rather, Youssef relies on files that WhatsApp claims to have received from the United States Department of Justice. He further relies on undocumented representations by WhatsApp or its lawyers that the United States Department obtained these materials from an AWS server connected to NSO.

61. Even assuming that the AWS server logs at issue are genuine, the logs that Youssef cites[66] only prove that NSO did *not* program its software to choose WhatsApp relay servers by location, but instead, by performance measures, in the same way as WhatsApp's own client application.

62. For starters, Youssef agrees that it is WhatsApp's signaling servers—at their own, unalterable discretion—that choose which relay servers would be available for use in a given call. This comports with Mr. Gheorghe's testimony that "the signaling server is the one that actually picks the relay servers involved in the call."[67] In Mr. Gheorghe's words, "the signaling server, based on a certain algorithm, picks the relay servers involved in the call and passes that [to] both the caller and the callee."[68] Thus, it was WhatsApp's signaling server, not NSO's program, that chose the relay servers that could be involved in the call.

63. Moreover, the AWS server logs (if authentic) confirm that Eden did *not* chose relay servers by location—that instead, it chose based on the performance of the relay servers, just as WhatsApp's own client did. As Mr. Gheorghe testified, the WhatsApp client would choose the relay server to use by polling each relay server in the list provided by the signaling server and thus

---

[65] Youssef Report, ¶ 144.

[66] WA-NSO-00017151; see also WA-NSO-00016440.

[67] Gheorghe Tr. 82:3-5.

[68] Gheorghe Tr., 82:18-21.

1   what servers in WhatsApp's infrastructure would handle any particular request from Pegasus users.

2       66.  Because the internal routing of traffic is strictly determined by WhatsApp, NSO would

3   not need to or desire to direct traffic to any particular portion of the internal architecture; as both

4   a matter of practicality and operational security. By referring to the URL's designated by

5   WhatsApp, the NSO developers allowed the WhatsApp infrastructure to perform as designed with

6   no further effort needed on their side.  The URLs listed in the log were returned from WhatsApp

7   infrastructure and are indicative of the infrastructure performing its normal latency calculations

8   and the client acting upon those latency calculations.

9       67. Thus, to whatever extent it is Youssef's opinion that NSO configured its software to

10  target specific WhatsApp servers, that opinion is wrong. NSO installation vectors like Heaven and

11  Eden sent traffic to the public WhatsApp URLs and left it to WhatsApp to route the traffic to the

12  servers of its choice.[71]

13      **K.    Youssef's Errors About NSO Allegedly Working Around WhatsApp's**

14          **Server Changes**

15      68. Youssef opines that "Defendants were potentially testing their exploit on WhatsApp

16  infrastructure in 2018," and "would have needed to research and develop a solution to bypass [two]

17  security measures implemented by WhatsApp" in the fall of that year (identified as WhatsApp

18  code changes D9650871 and D13309896).[72]

19      69. This is yet another variation of Mr. Youssef's misunderstanding that accessing a server

20  in compliance with that server's access rules is somehow "hacking" the server. It is not. The

21  WhatsApp "security measures" Mr. Youssef identifies prevented clients from sending messages

22  containing certain call settings. Respecting those new rules, NSO configured its software to *not*

23  send messages containing those call settings. Instead, NSO found a way to deliver Pegasus using

24  *other* messages that *did* comply with WhatsApp's server rules.

25      70. To be clear, NSO did not find some way to *bypass* the new rules, so that Pegasus users

26

---

27  [71] McGraw Opening Report, ¶ 63.

28  [72] Youssef Report, ¶¶ 145-49. I address this same contention by Vance later in this report as well.

1    could nevertheless send messages with the now-forbidden call settings. Instead, NSO respected

2    the rules and *stopped* sending messages with the call settings. It is odd to characterize this

3    compliance with WhatsApp's rules as a form of hacking. It is self-evident that accessing a server

4    according to that server's access rules does not constitute accessing parts of the server that are "off

5    limits."

6    **III.    ANALYSIS OF REPORT BY ANTHONY VANCE**

7        **A.    WhatsApp Did Not Take Reasonable Steps to Secure Its Platform**

8        71. Vance begins with an assessment of the steps that WhatsApp and Facebook took to

9    "secure the WhatsApp platform, including WhatsApp servers and client software."

10       72. None of the steps outlined permit the conclusion that WhatsApp and Facebook

11   complied with industry standard best practices.

12       73. First, the E2EE Signal protocol that Vance touts is a privacy mechanism, not a security

13   mechanism. End-to-end encryption simply means that another person cannot interpret

14   communications in flight—i.e., as those communications travel across the Internet from one client

15   to another. Thus, if the data is intercepted by a party without the correct decryption key, the party

16   cannot interpret the data. So, the use of end-to-end encryption only impacts eavesdropping or man-

17   in-the-middle attacks and does not impact the security of the system in any other way. There are

18   examples of numerous systems that used cryptographically secure communications channels that

19   were still vulnerable to other issues. As an example, the use of end-to-end encryption does not

20   prevent an SQL injection vulnerability in a web application. Because Pegasus leveraged

21   vulnerabilities in the transport of messages (agnostic to the content of the messages themselves),

22   the use of E2EE for user communications thus has little to do with whether WhatsApp took

23   reasonable steps to secure its servers or its client software.

24       74. Second, a single project relating to stanza validation in 2018 and 2019 does not

25   demonstrate reasonable "ongoing measures to strengthen the security of the WhatsApp platform."

26       75. Stanza validation should be common. OWASP (Open Web Application Security

27   Project), which is considered the de-facto industry standard for Web and Mobile Application

28

security, published a set of Top 10 Proactive Controls in 2018.[73] The guidance contains includes control "C5: Validate All Inputs." According to that standard, server-side validation is "fundamental" to security and that "Input validation must always be done on the server-side for security." OWASP identified the same proactive control to "Validate All Inputs" as a Top 10 recommendation in 2014[74] and 2016[75] as well. More generally, it is a well-established cybersecurity practice to consider any data that originates from outside the control of an organization "tainted" and to only consume or use that data after it is sanitized and validated. The appropriate best practice for server security is therefore "deny all, permit by exception." This is the same principle, for example, employed on firewalls.

76. To comply with these industry guidelines and practices, WhatsApp should have been validating stanzas long before 2018. And yet, the VoIP stanza validation project identified by Vance was not initiated until October 2018; it was assigned a priority of "none"; no work appears to have been undertaken even after an external researcher identified ways to "inject voip_settings"; and no meaningful work was performed until late March 2019.[76]

77. Third, there is not sufficient evidence to determine that WhatsApp employees used secure coding practices. And, in fact, the evidence suggests otherwise.

78. NIST Special Publication 800-218, Secure Software Development Framework (SSDF) Version 1.1, describes a set of fundamental, sound practices for secure software development.[77] The Secure Software Development Framework (SSDF) proposed includes a series of recommended practices for preparing the organization, protecting software, producing well-secured software, and responding to vulnerabilities. Controls PW.7, PW.8, and RV.1 outline the

---

[73] https://top10proactive.owasp.org/archive/2018/0x01-about-owasp/

[74] https://top10proactive.owasp.org/archive/2014/

[75] https://top10proactive.owasp.org/archive/2016/

[76]  Barcons Tr., 78:12-79:5, 84:9-85:19; Ex. 1105 (WA-NSO-00017583).

[77] NIST Special Publication 800-218: Secure Software Development Framework (SSDF) Version 1.1, *available at* https://doi.org/10.6028/NIST.SP.800-218.

1    have teams dedicated to malware incidents. As previously mentioned, NIST and

2    other established frameworks such as ISO 27001 and 27002 dictate that these cyber

3    security operations and similar capabilities are provided continuously either

4    organically or through third-party support. The reverse engineering of malware is

5    a skill that companies may not maintain on staff organically, but security operations

6    and incident response most certainly should be.

7       d.  Much of the detection and response were based on the simple identification of

8    malformed stanzas that could have been prevented if the plaintiffs had availed

9    themselves of the controls inherent to XMPP or detected them with proper log

10   analysis.

11   83. Best practices for security operations within an organization are best summarized by

12   NIST Cyber Security Framework: Identify, Protect, Detect, Respond, Recover. WhatsApp was

13   lacking in the Protect and Detect categories. Proper Protection is predicated on Access Control,

14   Data Security, Protective Technologies, and maintenance among others, and it has been clearly

15   demonstrated that WhatsApp was not validating traffic across trust boundaries, was not proactively

16   and properly assessing the integrity of its code and underlying protocols and did not have sufficient

17   tools to do so. In the category of Detect, even the most basic log analysis would have identified

18   the malformed stanzas in question, as they are easily identifiable upon a human visual inspection.

19   A "deny all, permit by exception" methodology for server operations would have precluded the

20   initial access vectors alleged by WhatsApp and Facebook.

21   84. After comparing WhatsApp's security practices to industry guidelines and industry

22   standard best practices, WhatsApp's security measures were not reasonable.

23   **B.    WhatsApp Did Not Institute Any Changes in Late 2018 to Prevent Pegasus**

24   **Use of WhatsApp Servers**

25   85. Like Youssef, Vance describes two changes to WhatsApp's server code, the first in

26   September 2018 and the second in December 2018. The first he describes as a code change (Diff

27   D9650871) intended to block certain stanzas from setting the "voip_settings" element. The second

28   he describes as a code change (Diff D13309896) intended to block stanzas from setting the

1    "group_update" element.

2        86. I have not yet been provided the opportunity to review the code changes described by

3 Vance. I understand from King & Spalding that WhatsApp did not provide the source code files

4 relating to these changes until Saturday, August 31, 2024, after I submitted my initial report and

5 opinions. I am told that WhatsApp will only allow me or members of my team at Gray Analytics

6 to view source code snippets as PDF files, at the New York, NY offices of its lawyers. Given

7 various professional obligations, and the late disclosure of these materials, the earliest date my

8 team is available to travel to New York and to view those source code documents is September

9 24, 2024. As a result, I reserve the right to update, amend, or supplement any of my opinions if

10 additional information becomes available or apparent after reviewing the source code itself.

11        87. There is no evidence that either the September 2018 changes or the December 2018

12 changes were made in response to any detection of NSO's lawful-intercept technologies. In fact,

13 on page 6, Vance states that any effect on Heaven was "unbeknownst to WhatsApp." Given that

14 WhatsApp was unaware of Pegasus in 2018, any changes that WhatsApp made to its code or

15 infrastructure that may have impacted NSO's lawful intercept technologies would have been

16 purely coincidental.

17        88. Vance's opinion that the September 2018 and December 2018 changes to WhatsApp's

18 server code interrupted the operation of Heaven is based primarily on anecdotal, non-technical

19 evidence. His sole technical support consists of several error code messages that he claims were

20 retrieved from log files residing on a "Pegasus installation server."

21        89. First, Vance incorrectly asserts that the files on which he relies were produced by *NSO*

22 from an Amazon Web Services (AWS) server. Youssef's report makes clear that the files were

23 provided by *WhatsApp*, which claims to have received them from the United States Department of

24 Justice and which claims that the materials were retrieved from an AWS server leased by NSO.

25 Vance does not provide any evidence verifying the source of the files referenced or that the source

26 code was used in the 2019 incident to interact with third-party devices not owned or controlled by

27 NSO, its corporate affiliates, or its government customers.

28        90. Second, the error messages identified by Vance do not indicate why any particular

request was forbidden.[88] RFC 7231 defines error response codes and section 6.5.3 discusses "403" error codes specifically.[89] An error code reading "403 Forbidden" simply "indicates that the server understood the request but refuses to authorize it."  The server can provide this error code for any reason. The reason that the request was refused is only made public if the server includes a description in the response payload, which is not required. The log files cited by Vance do not include any such description. As a result, the error messages provide no context as to why the server refused the traffic.

91. Having reviewed the evidence cited by Vance, it does not indicate that WhatsApp was aware of Heaven in late 2018 or that any of the changes discussed were directed at Heaven. Vance's technical There is also little technical evidence supporting Vance's opinion that the code changes interfered with the operation of Heaven.[90]

### C.    Pegasus (Eden) Did Not Bypass Any Technical Access Barriers on WhatsApp's Servers, Including December 2018 Code Changes

92. Vance provides no evidence that NSO intentionally circumvented any December 2018 technical limitations to access confidential portions of a WhatsApp server.

93. As a threshold matter, nothing in Vance's report alters my opinion that Eden did not access any parts of the WhatsApp servers that were "off limits" to Pegasus users (or in any way impeded the operation of those servers). As Mr. Gheorghe testified, the activities of Pegasus users "d[id] not impair the availability of the servers" and "did not corrupt any data on the … servers."[91] Eden used WhatsApp servers *only as a channel to deliver code to target devices*, and it did this in accordance with the rules provided by those WhatsApp servers. Neither the exploit nor the Pegasus

---

[88] WA-NSO-00017140.

[89] https://datatracker.ietf.org/doc/html/rfc7231#section-6.5.3

[90] As a practical matter, since Vance's opinions were prepared, I understand that testimony from NSO's Tamir Gazneli confirms that a December 2018 WhatsApp update had a coincidental affect the operation of Heaven.  (Gazneli Tr., at 254:14-23, 256:23-25).  To the extent that Vance is permitted to issue an opinion incorporating or addressing any such evidence, I reserve the right to update, amend, or supplement any opinion in response.

[91] Gheorghe Tr., 183:11-12 and 184:6-7.

1   agent itself executed on any WhatsApp server. As Mr. Robinson confirmed at his deposition, the

2   Pegasus installation process did not involve any remote code execution on WhatsApp servers.[92]

3   That is why WhatsApp's own internal analysis concluded that "WhatsApp servers were not

4   compromised."[93]

5       94. Rather than "hack" those servers, both Heaven and Eden simply followed the rules

6   those WhatsApp servers set for access, as coded into those servers by WhatsApp. The September

7   2018 and December 2018 changes to WhatsApp's code that Vance identifies simply changed the

8   access rules set by WhatsApp servers. In response to those rule changes, NSO modified its

9   software *to comply with the new rules*. For example, the rule changes in December 2018 simply

10  prevented Heaven from requiring the targeted device to use relay servers controlled by the Pegasus

11  user.[94] Eden did not circumvent that restriction. Instead, it accepted that the targeted device would

12  use relay servers controlled by WhatsApp.[95] Eden was therefore a modification made *to comply*

13  with the new rules of the road.

14      95. It is incorrect to suggest that changing a client application to comply with a server's

15  new rules is somehow "hacking" the server. Indeed, it is routine for software companies to update

16  their products to accommodate updates made to related, linked, integrated, or interconnected

17  products. This is true for WhatsApp as well. For example, Mr. Robinson testified that WhatsApp

18  can integrate with third-party applications (like Shopify) through WhatsApp's software

19  development kit (SDK).[96] And Mr. Robinson testified that, when WhatsApp updates the SDK,

20  those updates can "break" the integration and thus force the third-party application provider to

21  update its own application to maintain compatibility.[97]

22

---

23  [92]   Robinson Tr. (rough) at 193:6-14.

24  [93]   Ex. 1083 (WA-NSO-00125122).

25  [94]   Gazneli Tr., 254:14-23.

26  [95]   Gazneli Tr., 258:17-261:21.

27  [96]   Robinson Tr. (rough), 126-135.

28  [97]   Same.

96. A company called happyfox, for example, provides companies with "help desk" services that integrate numerous features and platforms.[98] This includes a feature that allows the companies to integrate and manage customer communications sent to their business numbers on WhatsApp.[99] As a result, happyfox periodically issues new releases in order fix bugs and accommodate other technological changes.[100]

97. NSO witnesses also testified that WhatsApp would release a new version every two weeks, and that many of those rote updates required NSO to update its own software.[101] To the extent that Vance suggests otherwise, the versioning of software does not indicate any intentional circumvention of technical safeguards.

98. Mr. Vance cites the error code messages ("403 errors") that WhatsApp servers responded with after certain code changes. I note again that a 403 error would not have provided the recipient with any knowledge of WhatsApp's specific changes, WhatsApp's intent in making those changes, or any indication of why the server declined to service the client's request.

**D.    Vance Presents No Support for His Opinion That NSO Itself Conducted the Surveillance Activity "Described in the Complaint" or Any Other**

99. Much of Section VIII of Vance's report summarizes non-technical documents and testimony, not one of which suggests that NSO itself (rather than NSO customers) "conducted" the "May 2019 attacks described in the Complaint." In fact, in his first sentence under that Paragraph header, Vance narrows his opinion only to the surveillance activity having been "performed using NSO malware." The distinction is significant, as NSO's government customers operate its lawful intercept technologies, not NSO.[102]  NSO is a lawful-intercept software developer providing a capability to vetted and approved government customers.

---

[98] https://www.happyfox.com/help-desk-integration/

[99] https://www.happyfox.com/help-desk-integration/whatsapp/

[100] https://support.happyfox.com/kb/section/21/

[101] Gazneli Tr., 246:7-19, 250:13-251:17.

[102] Gazneli Tr., 316:11-317:2.

certain types of data. Since XML is a readable format, developers often use common terms to represent the same types of data even if they are not working in the same company. In addition, the example traffic and references to full_fingerprint.py do not conclusively establish timing. There is no timestamp in the example traffic, and the code in full_fingerprint.py does not make any reference to timing. The code in full_fingerprint.py does not contain any indicators that it was used to bypass restrictions or remediations imposed "after Plaintiffs remediated the May 2019 attacks."

123. Second, Vance's opinion that NSO will continue to make use of the plaintiffs' products as installation vectors is purely speculative.

a. Vance offers no evidence whatsoever that NSO has ever made use of any of the plaintiffs' products, other than WhatsApp, as an installation vector.

b. With respect to WhatsApp specifically, Vance only relies on a limited pattern of conduct in 2018 and 2019, and cites only sporadic activity after Heaven and Eden were closed in May 2019, to draw broad conclusions regarding potential NSO activities more than five years later.

c. Vance relies heavily on generic (and non-technical) statements about NSO's continued pursuit of new vulnerabilities. None of those statements focus on WhatsApp. To the contrary, the quotations provided by Vance indicate that NSO prefers newer, less established software and software features.

September 21, 2024

_____
Terrence McGraw

GRAY ANALYTICS
4240 Balmoral Dr., Suite 400
Huntsville, AL 35801