# EXHIBIT 37

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1      H I G H L Y   C O N F I D E N T I A L

2              ATTORNEYS' EYES ONLY

3         NORTHERN DISTRICT OF CALIFORNIA

4              OAKLAND DIVISION

5                 Case No. 4-19-cv-07123-PJH

6    ----------------------------------

7    WHATSAPP INC., a Delaware corporation,

8    and META PLATFORMS INC., a Delaware corporation,

9         Plaintiffs,

10   v.

11   NSO GROUP TECHNOLOGIES LTD and

12   Q CYBER TECHNOLOGIES LTD,

13        Defendants.

14   ----------------------------------

15      Deposition of TAMIR GAZNELI, taken by AILSA

16    WILLIAMS, Certified Court Reporter, held at the

17   offices of Davis Polk & Wardwell, London, United

18      Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 214

Page 216

24    MR. AKROTIRIANAKIS:  Objection,
25  misstates the document.

Page 215

Page 217

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1        CERTIFICATE OF COURT REPORTER
2
3   I, AILSA WILLIAMS, an Accredited LiveNote
4   Reporter, hereby certify that Tamir Gazneli was
5   duly sworn, that I took the Stenograph notes of
6   the foregoing deposition and that the transcript
7   thereof is a true and accurate record transcribed
8   to the best of my skill and ability.  I further
9   certify that I am neither counsel for, related to,
10  nor employed by any of the parties to the action
11  in which the deposition was taken, and that I am
12  not a relative or employee of any attorney or
13  counsel employed by the parties hereto, nor
14  financially or otherwise interested in the outcome
15  of the action.
16  Before completion of the deposition, review of the
17  transcript was requested.  Any changes made by the
18  deponent (and provided to the reporter) during the
19  period allowed are appended hereto.
20
21
22  *Ailse Yh Williams*
23  AILSA WILLIAMS
24  Dated:   September 6, 2024.
25

Page 335

1
2            E R R A T A
3         Deposition of Tamir Gazneli
4   (Please show all corrections on this page, not in
5   the transcript.)
6   Page/Line No.      Description      Reason for
7   change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  Signed:   ....................
23  Name:
24  Date:       ....................
25

85 (Pages 334 - 335)

# EXHIBIT 38

FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         OAKLAND DIVISION

5    -------------------------------X

6    WHATSAPP INC.                    :

7    a Delaware corporation, and     :

8    META PLATFORMS INC,             :

9    a Delaware Corporation:

10                   Plaintiffs      :

11        v.                         :    Case No.

12   NSO GROUP TECHNOLOGIES LTD      :    4:19-cv-07123-PJH

13   and                             :

14   Q CYBER TECHNOLOGIES LTD        :

15                   Defendants      :

16   -------------------------------X

17        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18              Deposition of YARON SHOHAT

19                       LONDON

20            THURSDAY, AUGUST 29TH, 2024

21                  9:19 A.M. BST

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1 A. I do.
2 Q. Okay. And obviously, Joe, for the record, we don't
3 accept that framing of the topic, but let me use it for
4 the purposes of this question.
5    I will ask you again, Mr. Shohat: please explain to
6 me the process by which defendants investigated Dutton?
7 MR. AKROTIRIANAKIS: Okay, I am going to object that that is
8 outside the scope for which the witness has been
9 designated, which is limited to the process by which
10 investigations are conducted.
11 MR. BLOCK: Okay. So, to be clear, you are not providing
12 a witness to discuss the process of any particular
13 investigation, and you will provide a witness only on
14 the process generally? Is that the defendants'
15 position?
16 MR. AKROTIRIANAKIS: Well that is what our objections and
17 responses state we will do, and that is the limitation
18 for which this witness is designated. So if you have
19 questions that are within that designation, that's fine,
20 you can ask them and he will answer on behalf of the
21 defendants. If you have questions that are outside of
22 that -- I mean, you know how 30(b)(6) depositions work.
23 Q. Okay. Let me just ask the same question and get your
24 answer, sir; Mr. Shohat, please explain to me what you
25 know about the process by which defendants investigated

Page 27

1    Dutton?
2 MR. AKROTIRIANAKIS: Objection. Foundation.
3 A. I will tell you the process we follow whenever there is
4 an investigation, regardless of who the customer is.
5 When we get an indication that there might have been
6 a misuse of our system, in the way it was used, it has
7 been targeted, or anything else, we open
8 an investigation. The first step would be to understand
9 which of our customers may have conducted it. If we
10 don't know, if there is no such indication, we would
11 contact the customer, asking for clarifications.
12 Sometimes the information that we get in response is
13 enough to conclude that there was no misuse. Some. In
14 other cases we might require additional information, and
15 we expect full cooperation by the customer.
16    If we conclude that the customer operated the system
17 not for the purpose, or not according to the limitations
18 defined in the contract, we will take measures, which
19 can range, but the most extreme is we will disconnect
20 the customer's system.
21    As part of the investigation we might ask the
22 customer to allow us to access -- first, to allow us to
23 receive information regarding the operation and, in some
24 cases, also to allow us access to the system logs
25 themselves, so we can verify whether a certain device

Page 28

1    was a target of the system or not.
2    Again, we expect full cooperation from the
3 customers, according to their obligations to us, and if
4 we do not receive the right level of cooperation, we are
5 entitled to disconnect the system and make it
6 inoperational.
7 Q. Do the defendants have a contractual right to demand
8    access from customers to the system logs you mentioned?
9 MR. AKROTIRIANAKIS: Objection. Foundation.
10 A. I don't recall the exact language in the contract. If
11 you want, we can look at it. But we definitely have the
12 right to conduct the investigation and take the measures
13 that I mentioned.
14 Q. Which include requesting access to the system logs?
15 A. Requesting. The customer needs to -- cannot do it
16 without the customer's permission, of course.
17 Q. And those system logs include the phone number of target
18 devices, correct?
19 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
20 A. The system logs include, as far as I understand, not the
21 explicit phone number, but -- and I will use a technical
22 term here -- a hash of the number, which means the way
23 to verify whether a certain number is on the list
24 without seeing the explicit number.
25 Q. So if you have the hash, you can't tell what phone

Page 29

1    number represents, but you can check whether it
2 represents a phone number that you have and want to
3 investigate, is that what you are saying?
4 MR. AKROTIRIANAKIS: Objection. Misstates testimony.
5 A. What I am saying, that if I am given a phone number --
6 a whistle blower, for instance, claiming that a certain
7 number was targeted for the wrong reasons -- and we open
8 an investigation, I can take that number, generate
9 a hash from it, and, with the customer's permission,
10 check if that hash exists on the system logs.
11 Q. I think you said words to the effect -- and I am not
12 reading from the transcript here -- that if you identify
13 misuse in an investigation -- by "you" I mean
14 defendants -- then defendants will take measures which
15 may arise, up to disconnecting the customer's access to
16 Pegasus. I don't want to put words in your mouth, but
17 was that more or less accurate?
18 A. I will repeat what I said.
19 Q. Please.
20 A. I said that if the conclusion is that the customer
21 misused the system, we can take certain measures. And
22 obviously the most severe measure would be to disconnect
23 the customer.
24 Q. Have there ever been occasions when defendants confirmed
25 that there had been misuse but did not disconnect the

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1    customer?

2 MR. AKROTIRIANAKIS: Objection. Vague.

3 A. I don't know of specific cases, but I am pretty sure

4    there were. I need to clarify that misuse is not

5    a yes/no answer; there is a range, depending on the

6    specific case.

7 Q. What was the nature of the misuse in the Dutton

8    investigation?

9 MR. AKROTIRIANAKIS: You are asking him in his -- I just

10    want to make the record clear. You are asking him in

11    his personal capacity? Because he is not designated

12    for --

13 MR. BLOCK: I am asking him in his corporate representative

14    capacity. Your objection to the question is out of

15    scope and I would like his testimony in whatever

16    capacity he is able to provide it.

17 MR. AKROTIRIANAKIS: Okay, so then I am objecting that it

18    exceeds the scope of the designation of the witness and

19    further that the question lacks foundation from this

20    witness.

21 Q. What was the nature of the misuse in the Dutton

22    investigations?

23 MR. AKROTIRIANAKIS: Same objections.

24 A. I will answer in my personal capacity. It is our

25    understanding that the system was used for a purpose

Page 31

1    other than fighting or preventing crime or terror.

2 Q. What purpose was it used for?

3 MR. AKROTIRIANAKIS: Objection. No foundation, and exceeds

4    the scope of the designation of the witness.

5 A. Other kind of dispute. I don't know how to -- I am not

6    a lawyer, I don't know how to categorize it.

7 Q. You can describe it in lay terms, and you can use the

8    translator if you need to.

9 MR. AKROTIRIANAKIS: Same objections. No foundation, and

10    beyond the scope of the designation of the witness.

11 A. It is not a matter of translation, it is a matter of

12    legal knowledge. But I will try to answer. In the

13    specific case I have in mind, the system was used on

14    a family member of, let's call it a head of state. And

15    despite the fact that some might claim there was

16    an offense, a crime here, we viewed it beyond the scope

17    of the purpose of the system.

18 Q. What's the name of the person whose phone was infected

19    in a manner that defendants determined in the Dutton

20    investigation constituted a misuse?

21 A. Can you please repeat the question?

22 Q. Yes. What is the name of the person whose phone was

23    infected in a manner that defendants determined in the

24    Dutton investigation constituted a misuse?

25 A. I have to correct my previous answer a little bit.

Page 32

1    I told you that it was used to target a family member.

2    My correction is that it was used to target -- what are

3    these beeps?

4 MR. BLOCK: We don't know. Please try to continue. Sorry.

5 A. My correction is that it was used to target, as far as

6    I understand, from my personal knowledge, the attorney

7    of that person. I don't know the name.

8 Q. The attorney of the family member of a head of state?

9    You don't know the name of the attorney?

10 A. Correct.

11 Q. What's the name of the family member?

12 A. I know her as Princess Haya.

13 Q. And what's the name of the head of state?

14 A. The Emir of Dubai.

15 Q. In the course of our discussion of the Dutton

16    investigation, has your recollection been refreshed as

17    to when in time that investigation occurred?

18 A. I do not remember the date, but we can Google it if you

19    want.

20 Q. We can Google it because it is reported publicly?

21 A. Correct.

22 Q. Okay.

23 A. If you remember, I explained that, in my discussion with

24    Mr. Gelfand, I asked him about cases that were public.

25 Q. Okay. Aside from the Dutton investigation, are there

Page 33

1    any other specific investigations that you discussed in

2    preparation for today's deposition?

3 A. I don't recall specific customers or investigations.

4 Q. What other investigations do you recall that are public?

5 MR. AKROTIRIANAKIS: Objection. No foundation.

6 A. I don't recall right now.

7 Q. I think I understood you to say that, in your discussion

8    with Mr. Gelfand in preparation to testify today, you

9    asked about investigations that are already in the

10    public domain. Is that -- well, please give it to me in

11    your own words?

12 A. I asked him, yes, which investigation, or which case of

13    this disconnection of customer became public.

14 Q. My questions today include investigations that have not

15    yet become public. Are you aware of any of those?

16 A. I am aware of investigations, yes.

17 Q. And which are you aware of?

18 MR. AKROTIRIANAKIS: Again, you can answer that question

19    without reference to the names of NSO customers.

20 A. Okay. We have quite a few investigations over the time,

21    the course of time. Investigation can start with

22    an email to a whistle blower mailbox. For instance,

23    someone says "I believe my wife is spying on me with

24    Pegasus." We treat very seriously each and every

25    inquiry that we receive like that, so I think you can

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1 A. He had no role in WestBridge in '18 and '19.
2 Q. What was Mr. Lavie's role in respect of WestBridge in
3    2015?
4 MR. AKROTIRIANAKIS: No foundation.
5 A. He headed it. I don't know if it was defined as CEO,
6    but he was the head of WestBridge.
7 Q. At that time, was he also an officer of any other entity
8    within the family of companies we have been discussing?
9 A. Again, not sure about the definition of an officer, but
10    he was clearly one of the founders and held significant
11    stake of equity in the Group. And a director in several
12    of the entities.
13 Q. So in 2015, for example, Mr. Lavie was an equity holder
14    and a director with respect to Q Cyber and NSO; true?
15 MR. AKROTIRIANAKIS: Objection. That misstates his
16    testimony. No foundation.
17 A. No. He is a director with responsibility, and equity
18    was higher up in the chain.
19 Q. Mm-hm.
20 A. In 2000 -- if you correct the question, I will answer.
21 Q. In 2015, did Mr. Lavie have a job with Q Cyber or NSO?
22 A. No.
23 MR. AKROTIRIANAKIS: Objection. No foundation.
24 A. Once Omri -- once he moved to WestBridge and established
25    WestBridge, he no longer had a job, was not an employee

Page 143

1    of Q or NSO.
2 Q. Do you know what Mr. Lavie's title was with Q and/or NSO
3    immediately before he became the head of WestBridge?
4 A. I don't know the exact title. Founder plus something.
5 Q. Do you know generally what his responsibilities were as
6    founder plus something?
7 A. Business development.
8 Q. Right. So, Mr. Lavie was working in business
9    development for the defendants immediately before he
10    became the head of WestBridge in the United States?
11 MR. AKROTIRIANAKIS: Objection. Foundation.
12 A. That's my personal understanding. I was not there. But
13    we can check it and get back to you. It is easy to
14    check.
15 Q. Okay. I think you said you know that WestBridge made
16    a sale to the Federal Bureau of Investigation, right?
17 A. Correct.
18 Q. When Pegasus is sold to a customer, what happens next?
19 MR. AKROTIRIANAKIS: Objection. Vague. No foundation.
20 A. We sign a contract.
21 Q. After the contract is signed, what happens?
22 MR. AKROTIRIANAKIS: Vague. No foundation.
23 A. Deploy the system.
24 Q. Was a system deployed for the FBI?
25 MR. AKROTIRIANAKIS: Objection. No foundation.

Page 144

1 A. Yes.
2 Q. Who did the deployment?
3 A. Employees of the company.
4 Q. Which company?
5 A. Employees of the defendant were involved.
6 Q. In the deployment of the system to the FBI?
7 A. Yes.
8 Q. Okay. Has WestBridge ever had deployment capability to
9    your knowledge?
10 MR. AKROTIRIANAKIS: Objection. No foundation.
11 A. WestBridge had engineers but they were not capable of
12    doing the deployment on their own.
13 Q. So, for any contract that WestBridge completed,
14    defendants' employees were necessary for deployment?
15 A. That would be true for any Pegasus contract.
16 Q. Any Pegasus contract sold by any reseller, anywhere in
17    the world?
18 MR. AKROTIRIANAKIS: Objection. Misstates his testimony.
19    No foundation.
20 A. When we sell anywhere in the world, the reseller does
21    not get the system. The customer gets it. So it is not
22    that we sell it to the reseller, he takes it and deploys
23    it. The deployment is always done directly by our team.
24 Q. Is there a particular team at NSO and/or Q Cyber that's
25    responsible for deployment?

Page 145

1 A. Yes.
2 Q. Does that team have a name?
3 A. The deployment team.
4 Q. Do you recall who was in charge of the deployment team
5    in 2015?
6 A. '15?
7 Q. '15.
8 A. No.
9 Q. 2018/19?
10 MR. AKROTIRIANAKIS: Objection. Compound. No foundation.
11 A. '18/'19. The deployment team in '18 was under my
12    responsibility. In '19 it transitioned to someone else.
13 Q. So as COO, deployment was one of the teams that you
14    supervised in 2018?
15 A. Yes.
16 Q. Do you recall who the head of the deployment group was
17    at that time?
18 A. There were a few levels, managerial levels below me.
19    The direct -- I don't remember the name of the team
20    leader, but the person who reported to me, under which
21    it belonged, his name is ███████.
22 Q. Okay. You said the deployment team later transitioned
23    to be not part of your responsibility as COO, but
24    instead reported up through someone else?
25 A. Yes.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

1 MR. AKROTIRIANAKIS: Objection. Foundation.
2 A. Do you want to give me specific events?
3 Q. I am talking generally about the events related to
4    Whatsapp discovering and remediating defendants' attacks
5    that used the Whatsapp technology in or around May 2019?
6 MR. AKROTIRIANAKIS: I will object to the form of the
7    question. Also no foundation.
8 A. I know that some time in May 2019 Hummingbird went
9    offline, broke, or whatever you want to call it.
10 Q. Do you recall learning that?
11 A. No.
12 Q. Do you recall conversations that you had at the time?
13 A. No, I don't think it was such a significant event until
14    we got sued.
15 Q. Do you recall news coverage related to NSO Group in or
16    around May 2019?
17 A. All of '19?
18 Q. May 2019.
19 A. The amount of news coverage we get is so vast that
20    I don't remember any specific articles, no.
21 Q. Do you remember any news stories about Whatsapp having
22    discovered and remediated defendants' installation
23    vector that involved accessing Whatsapp's servers?
24 A. I do not recall anything in May '19. I recall later on.
25 Q. What do you recall?

Page 179

1 A. The one news coverage I do recall was an article by,
2    I believe the name is Ronan Farrow, who interviewed --
3    did some cover story about this event.
4 Q. Did you discuss that story at NSO?
5 A. Every time that there is an interesting article, it has
6    been circulated. So this one got circulated. So, yes.
7 Q. Do you recall customer inquiries about the news article?
8 A. I do not.
9 Q. Do you remember learning about Whatsapp's lawsuit
10    against NSO?
11 A. I don't remember the specific event, like when it -- the
12    night it broke and I found out. I do not remember, no.
13 Q. Were you surprised?
14 A. Yes, I think this lawsuit was very surprising.
15 Q. Why?
16 A. Because, until that point in time, it was our
17    understanding that Whatsapp or other technology
18    providers understand the need for those like Pegasus to
19    prevent crime and fight terror. And actually it helps
20    them balance the damage that they are doing to the world
21    by allowing, or having someone else with tools to fight
22    crime.
23 Q. The lawsuit that Whatsapp filed also brought to light
24    the identities of a number of political dissidents,
25    journalists and the like, that had been infected with

Page 180

1    Pegasus software, correct?
2 MR. AKROTIRIANAKIS: Objection. There is no foundation.
3    Also assumes facts not in evidence.
4 A. I didn't see the list of -- that was claimed to be
5    targeted by Whatsapp -- by Pegasus over Whatsapp.
6 Q. You know Pegasus was installed on an attorney's phone.
7    We talked about that earlier today, right?
8 A. In a certain case that I mentioned, yes.
9 Q. Okay.
10 A. I mentioned that was a misuse of the system, yes.
11 Q. Right. One example of the misuse of the system, right?
12 MR. AKROTIRIANAKIS: Objection. No foundation.
13 Q. Right?
14 MR. AKROTIRIANAKIS: No foundation.
15 A. It was an example of misuse of the system.
16 Q. Okay.
17    When you talk about requiring the system to be used
18    for the purposes of fighting crime and terrorism -- was
19    that your phrase?
20 A. Yes.
21 Q. Who decides what's crime or terrorism?
22 A. In general, it is the governmental agency using the
23    system is required, like any agency, to have the right
24    authority to use such a tool against the suspect.
25    I would assume that they seek court orders or warrants,

Page 181

1    or whatever's required under the specific laws in that
2    country.
3 Q. You assume but you don't know?
4 MR. AKROTIRIANAKIS: Objection. Argumentative.
5 A. We require the customers to follow the law.
6 Q. How do you require the customers to follow the law?
7 A. Foremost, by statement that they provide in the
8    contract. But there are many other measures that we
9    take to ensure that that is followed.
10 Q. But at least ten customers have misused the system so
11    severely that you took your most drastic action, which
12    is to disconnect them, right?
13 MR. AKROTIRIANAKIS: Objection. Misstates testimony. No
14    foundation.
15 A. Around ten customers, yes.
16 Q. And in fact you have investigated dozens of allegations
17    of misuse, correct?
18 A. Most of them became -- turned out to be not a misuse.
19 Q. And there are other circumstances in which you concluded
20    that there was misuse, but you decided to take steps
21    short of disconnecting the customer; correct?
22 A. There is a few like that.
23 Q. At least a few.
24    (Exhibit 2025        marked for identification)
25    This is exhibit 2025, which, by the way, I have

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1  marked out of order.  We will come back to 2024.
2      Mr. Shohat, exhibit 2025 is a January 26, 2023
3  article from the Wall Street Journal, entitled:
4      "Head of Israeli cyber firm NSO Group reaffirms
5  company commitment to spyware".
6      Subtitle:
7      "Yaron Shohat acknowledges mistakes but defends the
8  technology as vital".
9      Do you see that?
10 A.  I do.
11 Q.  Do you recognize this article?
12 A.  Yes, I do.
13 Q.  On the second page, in the third paragraph, the article
14  states:
15      "Mr. Shohat said NSO Group had terminated ten
16  customers because of alleged misuse of its technology,
17  adding that the spyware vendor had learned lessons from
18  those experiences.  He didn't name the customers."
19      Do you see that?
20 A.  I do.
21 Q.  Did you provide that information to the Wall Street
22  Journal in January 2023?
23 A.  I did talk to the Wall Street Journal.  I don't recall
24  if I said ten customers or around ten customers.
25  I don't recall if it was a definite number.

Page 183

1 Q.  You understand, by the way, that you are here as
2  a corporate representative regarding NSO's oversight and
3  investigation of customer misuse of relevant spyware?
4 MR. AKROTIRIANAKIS:  Objection.  He is here as a corporate
5  designee, as exactly how that's defined in the
6  responses.  Which we can go through if you want.
7 Q.  Do you understand that your topics include issues of
8  misuse and investigation of NSO's customers?
9 MR. AKROTIRIANAKIS:  Objection.  Misstates the designation.
10 A.  I understand I am covering the topic, I don't remember
11  the number.
12 Q.  43.
13 A.  43, yes, correct.
14 Q.  Okay.
15      Is it true that, by January 26, 2023, defendants had
16  terminated ten customers for misusing Pegasus?
17 A.  Around ten customers, yes.
18 MR. AKROTIRIANAKIS:  Let me interpose an objection.  To the
19  extent that it exceeds the scope of the witness'
20  designation, which is:
21      "Defendants' oversight of its customers' uses of the
22  accused technology in use between April 29, 2018
23  and May 10, 2020, including the conditions that the
24  defendant put on their customers' use of those accused
25  technologies and defendants' ability to suspend or

Page 184

1  terminate service to customers who misused those accused
2  technologies or failed to cooperate with defendants
3  investigations.  Any individual designated with respect
4  to such topics ... "
5      So that is the scope of the designation.  To the
6  extent that it is, I believe, exceeded by your question,
7  I object to the question and indicate that the company
8  will not be bound by the witness' testimony.  To the
9  extent it exceeds the scope of the designation.
10 MR. BLOCK:  Obviously we disagree regarding scope.  Let me
11  ask a question.
12      By Mr. Block:
13 Q.  Was Pegasus in use between April 29, 2018, and May 10,
14  2020?
15 A.  In use where?  In use somewhere?  Yes.
16 Q.  Okay.  Since January 2023, has NSO terminated additional
17  customers?
18 MR. AKROTIRIANAKIS:  Beyond the scope of the designation, to
19  the extent you are purporting to ask him in his
20  representative capacity.
21 A.  Should I answer?
22 MR. AKROTIRIANAKIS:  If you, in your personal capacity, know
23  the answer to that question, you can answer.
24 A.  After January 2023, is that the question?
25 Q.  Yes.

Page 185

1 A.  Yes.
2 Q.  How many?
3 A.  I don't recall the exact number.
4 Q.  How many approximately?
5 A.  I recall one.
6 Q.  Only one more since January 2023?
7 A.  I don't recall more.
8 Q.  How many times has NSO identified misuse by a customer
9  since January 2023?
10 MR. AKROTIRIANAKIS:  Objection.  Foundation.
11 A.  The company investigated quite a few cases of suspected
12  misuse.  In one case a customer was disconnected.
13 Q.  Have there been other cases where the company identified
14  misuse but elected not to disconnect the customer
15  since January 2023?
16 A.  I don't recall of such case.
17 Q.  On the first page of exhibit 2025, in the paragraph
18  third from the bottom, it says:
19      "The Wall Street Journal and others last year
20  reported that NSO had been considering a pivot to cyber
21  defense or other markets, but Mr. Shohat says the
22  company is now committed to its core Pegasus spyware
23  product."
24      Do you see that?
25 A.  I do.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1 Q. Do you recall saying that?
2 A. I recall saying that we are committed to our core
3     products of cyber intelligence tools. I am not sure it
4     was specific to Pegasus.
5 Q. Okay. A core part of your ability to provide those
6     tools is your ability to provide installation vectors,
7     correct?
8 MR. AKROTIRIANAKIS: Objection. Vague. Foundation.
9 A. The core cyber intelligence capability we rely on, a
10    large part of it is Pegasus. And Pegasus relies on the
11    installation vectors.
12 Q. And Pegasus relies on zero click installation vectors,
13    true?
14 A. I did not say that.
15 Q. Okay. Zero click installation vectors are one kind of
16    installation vector on which Pegasus relies, is that
17    true?
18 MR. AKROTIRIANAKIS: Object to the form of the question.
19 A. Zero click vectors are one type of installation vector.
20 Q. On which Pegasus relies?
21 MR. AKROTIRIANAKIS: Objection. Misstates testimony.
22 A. Is one type of installation vector that is used by
23    Pegasus.
24 Q. Okay. And NSO doesn't make it a practice -- strike
25    that. Let me start over.

Page 187

1     To whom, if anyone, does NSO disclose how its zero
2     click installation vectors operate?
3 A. Ideally, we do not share or expose how the installation
4     vectors work.
5 Q. Why not?
6 A. It is company confidential information.
7 Q. What would happen if the companies whose technologies
8     your zero click installation vectors exploit found out
9     about what you are doing?
10 MR. AKROTIRIANAKIS: Objection. Incomplete hypothetical.
11    Calls for speculation. No foundation.
12 A. Can you please clarify?
13 Q. Sure. Let me give you an example. You know what
14    happened when Whatsapp found out that you were using
15    an installation vector that involved accessing Whatsapp
16    servers, right?
17 MR. AKROTIRIANAKIS: Objection. No foundation. Misstates
18    the witness' testimony.
19 A. No.
20 Q. Whatsapp closed down your ability to operate that vector
21    as soon as it found it, right?
22 MR. AKROTIRIANAKIS: Objection. No foundation. Misstates
23    the witness' testimony.
24 A. I don't know that it was as soon as it found it.
25    I don't know when it found it.

Page 188

1 Q. You know they shut it down?
2 MR. AKROTIRIANAKIS: Objection. No foundation. Also vague.
3 A. I know that, at some point, Whatsapp made changes to its
4     communication protocol, which made the vector
5     inoperable.
6 Q. Whatsapp is not the only company that has sued NSO for
7     using its technology for installation vectors, right?
8 A. Apple sued us after Whatsapp filed suit.
9 Q. And, like Whatsapp, when Apple learned what NSO was
10    doing with Apple technology, Apple shutdown the
11    installation vector, true?
12 MR. AKROTIRIANAKIS: Objection. No foundation. Also vague.
13 A. I am not sure it's true.
14 Q. It is a pretty simple question, I think. Isn't it true,
15    Mr. Shohat, that you don't want the companies whose
16    technology you use in your exploits to know about the
17    exploits, because if they did they would stop those
18    exploits from happening?
19 MR. AKROTIRIANAKIS: Objection. Assumes facts not in
20    evidence. Also argumentative and has an objectionable
21    preamble.
22      If you understand his question, you can answer.
23 A. I think the nature of any zero day exploit, they know of
24    it, seek to keep it zero day.
25 Q. I am afraid I didn't understand your answer.

Page 189

1 MR. AKROTIRIANAKIS: There is no question pending.
2 Q. You said:
3     "I think the nature of any zero day exploit, they
4     know of it, seek to keep it zero day."
5     What did you mean by that?
6 MR. AKROTIRIANAKIS: I think you have misstated the witness'
7     answer.
8 Q. Let me just ask my question again.
9     Isn't it true, Mr. Shohat, that you don't want the
10    companies whose technology you use in your installation
11    vectors to know about those exploits, because if they
12    did, they would stop those exploits from happening?
13 MR. AKROTIRIANAKIS: Objection. Calls for speculation. No
14    foundation.
15 A. It is true that I prefer that they will not know about
16    it, because they might make changes that will close it.
17 Q. You used the term "zero day exploit". That's different
18    from zero click, right?
19 A. Correct, no relation.
20 Q. What's a zero day exploit?
21 A. Zero day exploit is an exploit that is not known in
22    public.
23 Q. And as someone experienced in the cyber intelligence
24    industry, what happens when a zero day exploit becomes
25    known?

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 Q. Right, you were --
2 A. We became, we were brought in to the loop only after
3    Francisco Partners and the potential acquired became
4    agreed on the terms and they were about to conclude the
5    transaction, only then we became aware that such
6    presentations were conducted.
7 Q. You were asked a lot of questions, both numerically and
8    time wise, about the P&L statements of WestBridge and
9    involvement about any payments made to WestBridge,
10   I think the question actually related to a decision that
11   you were asked to make about whether or not to send the
12   money to the company, do you remember that line of
13   questions?
14 A. Yes, I remember.
15 Q. Okay. And in your answers to that, they were not really
16   attached in time to any particular period, but are you
17   able to say when it was at all that you became ever
18   involved with, like, reviewing the P&L for WestBridge,
19   or anything like that?
20 MR. BLOCK: I object to the form of the question and the
21   coaching of the witness.
22 A. I became aware of it, of the request to make money
23   transfers to WestBridge, only after I became CEO, which
24   means all of my answers were for a period after August
25   '22.

Page 255

1 Q. August 2022?
2 MR. BLOCK: Objection to form.
3 A. Yes. After August 2022.
4 Q. Okay. And you were asked a lot of questions about trips
5    that you made to the United States, to Washington DC,
6    with a stop over in New York, and meetings with, in DC,
7    reporters, policymakers and service providers, do you
8    recall that testimony?
9 MR. BLOCK: Objection to form.
10 A. Yes.
11 Q. When were those trips to Washington DC that you
12   testified about in relation to you becoming the CEO of
13   the company?
14 A. All of those trips to Washington were after August 2022.
15 MR. AKROTIRIANAKIS: Alright, thank you.
16 THE VIDEOGRAPHER: Going off the record. The time is 19:22.
17   End of media card number 6 volume 1 and this is the end
18   of the video deposition of Yaron Shohat.
19 (7:22 p.m.)
20     (Whereupon, the deposition concluded at 7:22 p.m.)
21
22
23
24
25

Page 256

1    CERTIFICATE OF COURT REPORTER
2
3 I, CHRIS LANG, an Accredited Real-time Reporter, hereby
4 certify that the testimony of the witness YARON SHOHAT in
5 the foregoing transcript, taken on this 29TH day of AUGUST,
6 2024 was recorded by me in machine shorthand and was
7 thereafter transcribed by me; and that the foregoing
8 transcript is a true and accurate verbatim record of the
9 said testimony.
10
11 I further certify that I am not a relative, employee,
12 counsel or financially involved with any of the parties to
13 the within cause, nor am I an employee or relative of any
14 counsel for the parties, nor am I in any way interested in
15 the outcome of the within cause.
16
17
18
19 Name:    CHRIS LANG
20 Date:   8/29/24
21
22
23
24
25

Page 257

1
2    CERTIFICATE OF DEPONENT
3
4 I, YARON SHOHAT, hereby certify that I have read the
   foregoing pages, numbered 1  through 259, of my deposition
5 of testimony taken in these proceedings on 29TH, AUGUST,
   2024 and, with the exception of the changes listed on the
6 next page and/or corrections, if any, find them to be a true
   and accurate transcription thereof.
7
8
9
10
11 Signed: .......................
12 Name:    YARON SHOHAT
13 Date:   .......................
14
15
16
17
18
19
20
21
22
23
24
25

65 (Pages 254 - 257)