JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:     (213) 443-4355
Facsimile:      (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD.  and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>          Defendants. | Case No.  4:19-cv-07123-PJH<br><br>**DEFENDANTS' MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL**<br><br>Action Filed: 10/29/2019 |

# **<u>TABLE OF CONTENTS</u>**

I.      NSO HAS RAISED "SERIOUS LEGAL QUESTIONS" AND A "FAIR PROSPECT"
        OF SUCCESS ON APPEAL. ........................................................................... 2

        A.      The Court erred in granting summary judgment on the issue of liability. .................. 3

        B.      The Court erred in exercising personal jurisdiction over NSO. ................................ 6

        C.      The Court erred in imposing liability without resolving NSO's defenses. ................. 8

        D.      The Court erred in issuing a permanent injunction....................................................... 9

II.     NSO WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A STAY
        PENDING APPEAL. ................................................................................... 13

III.    A STAY WILL NOT IRREPARABLY INJURE PLAINTIFFS. ..................................... 15

IV.     THE PUBLIC INTEREST FAVORS A STAY................................................................. 16

V.      IF THE COURT DENIES A STAY, IT SHOULD EXTEND THE ADMINISTRATIVE
        STAY TO PERMIT NSO TO SEEK A STAY FROM THE NINTH CIRCUIT OR
        SUPREME COURT................................................................................... 18

VI.     CONCLUSION.......................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu v. Dickson*,
   107 F.4th 508 (6th Cir. 2024) .......................................................................... 4

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ........................................................................... 2

*Albert's Organics, Inc. v. Holzman*,
   2020 WL 3892861 (N.D. Cal. July 10, 2020) ................................................. 8

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
   559 F.3d 1046 (9th Cir. 2009) ....................................................................... 14

*Ariz. Democratic Party v. Hobbs*,
   976 F.3d 1081 (9th Cir. 2020) ..................................................................... 1, 2

*Benn v. Allstate Ins. Co.*,
   569 F. Supp. 3d 1029 (C.D. Cal. 2021) ........................................................ 12

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ........................................................................... 5

*Brewster v. City of L.A.*,
   672 F. Supp. 3d 872 (C.D. Cal. 2023) ............................................................ 9

*Briskin v. Shopify, Inc.*,
   135 F.4th 739 (9th Cir. 2025) (en banc) ......................................................... 6

*Broidy Cap. Mgmt. v. Qatar*,
   2018 WL 9943551 (C.D. Cal. Aug. 22, 2018) ................................................ 6

*CBS Inc. v. Merrick*,
   716 F.2d 1292 (9th Cir. 1983) ......................................................................... 9

*Chabolla v. ClassPass Inc.*,
   129 F.4th 1147 (9th Cir. 2025) ........................................................................ 5

*CPC Patent Techs. PTY Ltd. v. Apple, Inc.*,
   2024 WL 393492 (N.D. Cal. Feb. 1, 2024) ................................................... 13

*Creative Computing v. Getloaded.com LLC*,
   386 F.3d 930 (9th Cir. 2004) ......................................................................... 10

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
   444 F. Supp. 3d 1198 (E.D. Cal. 2020) ........................................................ 13

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   2015 WL 4397175 (C.D. Cal. June 8, 2015) ........................................................ 13

*FTC v. Qualcomm Inc.*,
   935 F.3d 752 (9th Cir. 2019) ........................................................ 2, 14, 19

*Gray v. Golden Gate Nat. Recreational Area*,
   2011 WL 6934433 (N.D. Cal. Dec. 29, 2011) ........................................................ 13

*Haskell v. Brown*,
   677 F. Supp. 2d 1187 (N.D. Cal. 2009) ........................................................ 16

*Herb Reed Enters. v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ........................................................ 11

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ........................................................ 12, 14

*Hungerstation LLC v. Fast Choice LLC*,
   857 F. App'x 349 (9th Cir. 2021) ........................................................ 6

*L.A. Unif. Sch. Dist. v. A.O. ex rel. Owens*,
   92 F.4th 1159 (9th Cir. 2024) ........................................................ 11

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ........................................................ 1, 2, 3

*Leslie v. Grupo ICA*,
   198 F.3d 1152 (9th Cir. 1999) ........................................................ 3

*Manrique v. Kolc*,
   65 F.4th 1037 (9th Cir. 2023) ........................................................ 13

*Mulcahy v. Cheetah Learning LLC*,
   386 F.3d 849 (8th Cir. 2004) ........................................................ 11, 12, 13

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   463 U.S. 1311 (1983) ........................................................ 14

*Nomadix, Inc. v. Guest-Tek Interactive Entmt. Ltd.*,
   2020 WL 3023308, at *3 (C.D. Cal. Apr. 24, 2020) ........................................................ 18

*NRA Grp. v. Durenleau*,
   154 F.4th 153 (3d Cir. 2025) ........................................................ 4

*Oracle USA, Inc. v. Rimini St., Inc.*,
   2018 WL 4355154 (D. Nev. Sept. 11, 2018) ........................................................ 19

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   2016 WL 7319538 (S.D. Cal. Sept. 19, 2016) ........................................................ 19

2

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004).......................................................................... 11, 12, 13

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992)................................................................................. 7

*Sealant Sys. Int'l, Inc. v. TEK Global, S.R.L.*,
   2014 WL 5141819 (N.D. Cal. Oct. 13, 2014)...................................................... 2, 15

*Shaw v. United States*,
   580 U.S. 63 (2016).................................................................................................. 4

*Softketeers, Inc. v. Regal W. Corp.*,
   2023 WL 2024701 (C.D. Cal. Feb. 7, 2023)........................................................ 14, 15

*Sprint Nextel Corp. v. Welch*,
   2014 WL 68957 (E.D. Cal. Jan. 8, 2014)........................................................... 11, 12, 13

*Sprint Sols., Inc. v. Cell Wholesale, Inc.*,
   2015 WL 13919095 (C.D. Cal. Dec. 10, 2015) ................................................ 12, 13

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009).............................................................................. 11

*Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp.*,
   2019 WL 6134968 (N.D. Cal. Nov. 19, 2019)...................................................... 7

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020).............................................................................. 4

*United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave.,*
   *Berkeley, Cal.*,
   2015 WL 525711 (N.D. Cal. Feb. 6, 2015) ...................................................... 13

*United States v. Saini*,
   23 F.4th 1155 (9th Cir. 2022) .............................................................................. 4

*Van Buren v. United States*,
   593 U.S. 374 (2021).............................................................................................. 3

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).................................................................................................. 16

*X Corp. v. Ctr. for Countering Digital Hate Ltd.*,
   724 F. Supp. 3d 921 (N.D. Cal. 2024) ................................................................ 6

**Statutes, Rules, and Regulations**

8 U.S.C. § 1029 .......................................................................................................... 4

18 U.S.C. § 1030(e)(6) ........................................................................................... 4

18 U.S.C. § 1030(f) .......................................................................................... 8, 12

Cal. Civ. Proc. Code § 526(b)(5) ....................................................................... 12

Cal. Civ. Proc. Code § 3423(e) .......................................................................... 12

15 C.F.R. § 744.11(a) .......................................................................................... 17

Fed. R. App. P. 8(a)(2) ........................................................................................ 18

Fed. R. Civ. P. 56(a) ............................................................................................. 3

Fed. R. Civ. P. 62(d) ............................................................................................. 1

Fed. R. Evid. 703 ................................................................................................. 16

DEFENDANTS' MOTION FOR STAY                                    Case No.  4:19-cv-07123-PJH

1    **PLEASE TAKE NOTICE** that Defendants NSO Group Technologies Ltd. and Q Cyber

2    Technologies Ltd. (collectively "NSO") hereby move to stay the Permanent Injunction (Dkt. 809)

3    pending NSO's appeal to the U.S. Court of Appeals for the Ninth Circuit, notice of which was filed

4    today.  The motion is based on the below Points and Authorities; the Declaration of Yaron Shohat

5    and exhibits; and the pleadings, papers, and records on file in this case.

6    The Court has authority to stay the permanent injunction pending appeal under Federal Rule

7    of Civil Procedure 62(d).  When deciding whether to grant a stay, the Court considers whether the

8    applicant has shown "the minimum quantum of likely success necessary to justify a stay," namely

9    that the appeal will raise "serious legal questions."  *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68

10   (9th Cir. 2011) (cleaned up).  The Court should also consider "whether the applicant will be irreparably

11   injured without a stay, whether a stay will substantially injure the other parties, and where the public

12   interest lies."  *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020).

13   These factors favor a stay of the permanent injunction in this case.  NSO's appeal will raise

14   serious and substantial legal questions regarding the correctness of (among other orders) this

15   Court's summary judgment and injunction rulings, many of which the Court has acknowledged

16   raise novel and complicated legal questions.  In the absence of a stay, NSO would suffer irreparable

17   harm that would make ineffective an ultimately successful appeal of the Court's rulings on those

18   novel questions.

19   NSO thus meets the standard for a stay.  Indeed, this Court already decided not to set a

20   deadline for compliance with the injunction in light of "the inevitable appeals process."  (Dkt. 802

21   at 18.)  The same considerations support a stay pending appeal.

22   Finally, if the Court were not to grant the requested stay pending appeal, it should extend

23   the current administrative stay to permit NSO to seek a stay pending appeal from the Ninth Circuit.

24   ## POINTS AND AUTHORITIES

25   The applicable legal test favors a stay.  The Court is to "consider [1] whether the applicant

26   has made a strong showing of likelihood of success on the merits, [2] whether the applicant will be

27   irreparably injured without a stay, [3] whether a stay will substantially injure the other parties, and

28   [4] where the public interest lies."  *Ariz. Democratic Party*, 976 F.3d at 1085.  "An applicant for a

stay need not demonstrate that it is more likely than not they will win on the merits, but rather must show 'a reasonable probability' or 'fair prospect' of success," *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (cleaned up), or "a substantial case on the merits" or "that serious legal questions are raised," *Leiva-Perez*, 640 F.3d at 967-68 (cleaned up). And "[t]he standard for granting a stay is a 'sliding scale,'" under which "the elements of the test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Ariz. Democratic Party*, 976 F.3d at 1086 (cleaned up); *accord Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). Importantly, the mere fact that the Court granted a permanent injunction "does not preclude a granting of a stay of that injunction pending appeal as both issues require different analyses." *Sealant Sys. Int'l, Inc. v. TEK Global, S.R.L.*, 2014 WL 5141819, at *2 (N.D. Cal. Oct. 13, 2014) (cleaned up).

Here, NSO has made the required showing of likelihood of success on appeal. NSO will suffer irreparable, potentially existential injuries if the injunction is not stayed, and none of those injuries can be undone if NSO succeeds on appeal. These injuries will be permanent. In the absence of a stay, therefore, the injunction will effectively moot NSO's appeal—the appeal will be meaningless even if the Ninth Circuit reverses or vacates this Court's judgment. That harm to NSO outweighs the negligible, if any, harm Plaintiffs will suffer if the status quo that has been in effect for the last six years remains in place during NSO's appeal. And the public interest favors staying the injunction—and thus preserving numerous ongoing foreign law-enforcement, intelligence, and counter-terrorism operations—until the Ninth Circuit has the opportunity to address the numerous novel and important questions to be presented by NSO's appeal.

## I. NSO HAS RAISED "SERIOUS LEGAL QUESTIONS" AND A "FAIR PROSPECT" OF SUCCESS ON APPEAL.

To make a strong showing of likelihood of success on the merits, "[a]n applicant for a stay need not demonstrate that it is more likely than not they will win on the merits, but rather must show 'a reasonable probability' or 'fair prospect' of success." *Qualcomm*, 935 F.3d at 755 (cleaned up). An applicant may also show "the minimum quantum of likely success necessary to justify a stay" by showing "a substantial case on the merits" or "that serious legal questions are raised."

1    *Leiva-Perez*, 640 F.3d at 967-68 (cleaned up).

2         NSO satisfies that requirement.  As this Court has recognized, this case involves novel

3    questions on which "a higher court will make a determination."  (Dkt. 751 at 769:13-15; *see also*

4    Dkt. 802 at 18 (declining to set a deadline for compliance with injunction in light of "the inevitable

5    appeals process").)  NSO recognizes that the Court has rejected the arguments it will raise on appeal

6    but, with due respect to the Court, NSO believes that several of the Court's decisions in granting

7    Plaintiffs summary judgment and entering a permanent injunction were erroneous.  NSO is entitled

8    to a meaningful appeal in which to raise these novel and complex issues, and there can be no doubt

9    NSO's appeal will, at a minimum, raise serious legal questions.  The first stay factor thus strongly

10   favors NSO.[1]

11        **A.    The Court erred in granting summary judgment on the issue of liability.**

12        The Court erred in granting summary judgment as to liability on Plaintiffs' three claims.  At

13   summary judgment, a district court "must view the evidence in the light most favorable to the

14   nonmoving party" and "must assume the truth of the evidence set forth by the nonmoving party."

15   *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (cleaned up).  NSO will raise serious legal

16   questions on appeal concerning whether the Court correctly followed these requirements in

17   determining there was "no genuine dispute as to any material fact" and that WhatsApp was "entitled

18   to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

19        ***First***, the Court improperly found that NSO exceeded authorized access to WhatsApp

20   servers within the meaning of the CFAA and CDAFA.  (Dkt. 494 at 12-13.)  The Court never

21   addressed the dispositive point that exceeding authorized access requires "entering a part of the

22   [servers] to which [NSO] lack[ed] access privileges."  *Van Buren v. United States*, 593 U.S. 374,

23   388 (2021).  Plaintiffs never disputed that NSO had some right, even if limited, to access every part

24   of WhatsApp servers that Pegasus allegedly accessed.  That undisputed fact establishes that NSO

25   never exceeded its authorized access to those portions of WhatsApp's servers.[2]

26   _____

     [1] The issues discussed in this motion do not exhaust the arguments NSO plans to raise on appeal,
27   but they are representative.
     [2] *See, e.g.*, *id.* at 396 (defendant "did not 'exceed authorized access'" when he "accessed the law
28   enforcement database system with authorization," "even though he obtained information from the

DEFENDANTS' MOTION FOR STAY                              Case No.  4:19-cv-07123-PJH

1    Instead of applying *Van Buren*'s test for "exceeds authorized access," the Court found NSO

2  exceeded its authorized access because it "obtain[ed] information about the target user's device *via*

3  the Whatsapp servers." (Dkt. 494 at 12 (emphasis added)). The Court later stated, in the jury

4  instructions, that it "concluded that the sending of protected information *through the servers*

5  constituted obtaining it *from the servers*." (Dkt. 737, Instruction No. 14 (emphasis added).) But

6  even if that were what the Court had ruled in its summary judgment order, "through" does not mean

7  "from." (If you drive from New York to San Francisco, you might pass *through* Chicago, but you

8  did not come *from* Chicago.) And "from" is not the statutory test in any event. The CFAA defines

9  "exceeds authorized access" as requiring the defendant to "obtain or alter information *in the*

10  computer" to which the defendant exceeded its access. 18 U.S.C. § 1030(e)(6) (emphasis added).

11  Transmitting information "*via*" (or "*through*") WhatsApp servers does not constitute obtaining

12  information stored "*in*" those servers, as § 1030(e)(6) requires. It was undisputed that the

13  information on which this Court relied in its summary judgment order was not stored *in* WhatsApp

14  servers. At a minimum, the Court could not have properly removed that question from the jury and

15  made such a finding as a matter of law. (Dkt. 468 at 22-23.)

16    ***Second***, with respect to the CFAA and CDAFA claims, the Court ignored that the requisite

17  "intent to defraud" under the CFAA "requires an intent to deceive *and* cheat," meaning "intent to

18  deprive a victim of money or property by deception." *United States v. Saini*, 23 F.4th 1155, 1160

19  (9th Cir. 2022).[3] The Court, however, did not make this requisite finding. "[T]hat defendants

20  redesigned Pegasus to evade detection," as the Court ruled (Dkt. 494 at 12), could support at most

21

22

23  database for an improper purpose"); *NRA Grp. v. Durenleau*, 154 F.4th 153, 167-69 (3d Cir. 2025)
(defendants did not exceed authorized access because they did not "enter a part of [the] systems to

24  which they had no access"); *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024) (holding "[s]o long
as a user is permitted to be on a particular 'area within the system' for some purposes, the gates are

25  up, and the user's access to the system is 'authorized'" for all purposes (cleaned up)).

26    [3] *Saini* involved "intent to defraud" in the credit-card fraud statute, 8 U.S.C. § 1029, but Congress
intended the CFAA's "intent to defraud" to be "the same as the standard used for 8 U.S.C. § 1029

27  relating to credit card fraud." S. Rep. No. 99-432 at 10 (1986). *Saini* also interpreted the phrase
"intent to defraud" based on its "plain and ordinary meaning," 23 F.4th at 1160-61, which would

28  equally apply to the CFAA. *Accord Shaw v. United States*, 580 U.S. 63, 72 (2016); *United States
v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020).

1   a finding of deception—not an intent to cheat WhatsApp out of money or property.[4]  In fact, there

2   has never been any evidence NSO intended to steal *any* money or property from WhatsApp or anyone

3   else.  It was therefore legal error to resolve this essential fact against NSO at summary judgment.

4       ***Third***, the Court found NSO liable for breach of contract without "evidence that [NSO]

5   agreed to the terms of service."  (Dkt. 494 at 13-14.)  That ruling improperly resolved two disputed

6   factual issues: (1) whether WhatsApp "provide[d] reasonably conspicuous notice of the terms to

7   which [NSO] w[ould] be bound" and (2) whether NSO "unambiguously manifest[ed] [its] assent

8   to those terms."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  The

9   Court did not even address the first requirement—on which Plaintiffs presented zero admissible

10  evidence.  (Dkt. 469 at 3-6.)  And the Ninth Circuit has squarely rejected the Court's theory that

11  "agreeing to the terms of service was necessary to create a Whatsapp account."  (Dkt. 494 at 14.)

12      "[M]erely clicking on a button" to set up an account, the Ninth Circuit has explained, "does

13  not signify a user's agreement to anything."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849,

14  857 (9th Cir. 2022).  Rather, "[t]he presence of an explicit textual notice that continued use will act

15  as a manifestation of the user's intent to be bound is critical."  *Id.* at 857-58; *accord, e.g.*, *Chabolla*

16  *v. ClassPass Inc.*, 129 F.4th 1147, 1158-60 (9th Cir. 2025) (finding no consent from enrollment in

17  service because user was not "explicitly advised that the act of clicking w[ould] constitute assent

18  to the terms and conditions of an agreement" (cleaned up)).  Whether creating a WhatsApp account

19  constituted *legally binding consent* to WhatsApp's Terms turned on disputed factual issues about

20  how those terms were presented to persons alleged to have agreed to them.  It was improper for this

21  Court to resolve those factual questions against NSO as a matter of law.[5]

22      ***Finally***, the Court improperly held NSO liable under the CFAA despite the absence of *any*

23  evidence NSO ever operated Pegasus against any "target user."  (Dkt. 469 at 18-20.)  While the

24

25      [4] Whether NSO redesigning Pegasus indicated deceit was also a disputed fact that should have
    been determined by the jury.  This Court erred by resolving that factual question as a matter of law.

26      [5] The Court's personal experience "open[ing] . . . apps that . . . ask [you] to agree to the terms of

27  service" (Dkt. 464 at 63:6-12) cannot substitute for admissible evidence and certainly cannot suffice
    to resolve factual disputes against NSO at summary judgment.  Ninth Circuit law is quite clear that

28  a company cannot bind users to terms of service merely by "advis[ing]" them "that by using this
    app, we're presuming you agree to the terms of service."  (*Id.*); *see Berman*, 30 F.4th at 857.

Court granted summary judgment on the basis that this issue was "fully addressed by section (b) which assigns liability to co-conspirators" (Dkt. 494 at 11), the Court also later ruled that the evidence was insufficient to establish a conspiracy (Dkt. 699)—because, of course, there is no evidence NSO ever agreed with any customer to violate the law (*see* Dkt. 469 at 18-20). Without a conspiracy, there is no basis under the CFAA to hold NSO vicariously liable for its customers' actions—and certainly no basis to do so as a matter of law, despite numerous factual disputes related to NSO's relationship with its customers.

**B.    The Court erred in exercising personal jurisdiction over NSO.**

NSO also has a fair prospect of success in arguing on appeal that this Court erred in exercising personal jurisdiction over NSO. The Court predicated that ruling on two apparently independent grounds: (1) "defendants' Pegasus code was sent through plaintiffs' California-based servers 43 times during the relevant period" (Dkt. 494 at 6); and (2) the Court inferred "that the use of plaintiffs' California-based servers was a purposeful choice by defendants" (*id.* at 10). Each ground constitutes legal error or, at a minimum, presents serious legal questions for appeal.

***First***, the Ninth Circuit and other courts have held that this Court's first rationale is insufficient as a matter of law. Merely "remotely accessing servers located in the [forum]," these courts have consistently explained, does not give rise to personal jurisdiction." *Hungerstation LLC v. Fast Choice LLC*, 857 F. App'x 349, 351 (9th Cir. 2021).[6] For purposes of the Court's first rationale, the Court did not find—because there was no evidence—that NSO controlled which WhatsApp servers any Pegasus message passed through or even knew that any Pegasus messages would pass through California servers. Even under the Ninth Circuit's most recent en banc pronouncement on Internet-based jurisdiction, such unknowing and unintentional contact with California-based servers cannot establish that NSO purposefully directed any conduct toward California. *Cf. Briskin v. Shopify, Inc.*, 135 F.4th 739, 755-56 (9th Cir. 2025) (en banc) (finding personal jurisdiction proper where defendant deliberately installed spyware on California-resident

---

[6] *See also X Corp. v. Ctr. for Countering Digital Hate Ltd.*, 724 F. Supp. 3d 921, 939 (N.D. Cal. 2024) (same, when "there [was] no support for the notion that [defendant] specifically sought out any particular servers within the forum"); *Broidy Cap. Mgmt. v. Qatar*, 2018 WL 9943551, at *7 (C.D. Cal. Aug. 22, 2018) (same because "the location of the servers appears to be 'random,' 'fortuitous,' or 'attenuated' to Defendants' purported actions" (citation omitted)).

1    plaintiff's computer *while knowing* the computer was located in California).

2        ***Second***, it was error for the Court to infer as a discovery sanction that NSO purposely

3    targeted California servers.  This is not a case where the record lacked evidence as to whether or

4    not NSO targeted California servers.  To the contrary, the undisputed record proved NSO *could not*

5    target specific WhatsApp signaling or relay servers anywhere, much less in California. At all

6    relevant times, *no WhatsApp signaling servers were in California*.  (*See* Dkt. 491-5, Exh. L at

7    184:21-185:9 (all WhatsApp signaling servers were in Oregon, Iowa, or North Carolina).)  And

8    *Plaintiffs' own Rule 30(b)(6) designee testified* that it was entirely up to WhatsApp which relay

9    servers a WhatsApp call passed through—as the "signaling server . . . pick[ed] the relay servers

10   involved in the call," based on an algorithm WhatsApp designed.  (Dkt. 491-5, Exh. L at 82:3-5,

11   119:3-121:2.)  Given this undisputed record, NSO submits it was an abuse of discretion for the

12   Court to infer, as a discovery sanction, that NSO targeted California-based servers.  No amount of

13   evidence about the Israeli export-controlled Pegasus code could change that it was technologically

14   *impossible* for WhatsApp users, including NSO, to target any servers by location.

15       That aside, the Court's drastic discovery sanction was itself an abuse of discretion.  This

16   Court sanctioned NSO under *Richmark Corp. v. Timber Falling Consultants* for declining to violate

17   Israeli criminal law when "produc[ing] information concerning the full functionality of the relevant

18   spyware"—including not only Pegasus, but also "any NSO spyware targeting or directed at

19   Whatsapp servers."  (Dkt. 292 at 3-4 (cleaned up); *see* Dkt. 494 at 8-9.)  *Richmark* itself, however,

20   makes clear that courts should not "override foreign secrecy laws" where "the outcome of litigation

21   does not stand or fall on the present discovery order."  959 F.2d 1468, 1475 (9th Cir. 1992).  That

22   was the case here because Plaintiffs' claims focused only on Pegasus, and only one version of

23   Pegasus at that. (Dkt. 249-2 at 5-7.)  Because discovery into *other* technologies went "beyond what

24   is necessary to litigate the disputed issues in this case," the first two *Richmark* factors (like the rest)

25   clearly weighed against disclosure.  *Sun Grp. U.S.A. Harmony City, Inc. v. CRRC Corp.*, 2019 WL

26   6134968, at *3 (N.D.  Cal. Nov. 19, 2019).

27       That was especially true when Plaintiffs had already received Pegasus code (including the

28   version of Pegasus actually at issue in the case) from the FBI—a fact Plaintiffs withheld from the

Court when litigating NSO's *Richmark* motion. (*See generally* Dkt Nos. 236, 261 (failing to disclose possession of code).) Plaintiffs' possession of the FBI code rendered the same code held by NSO unimportant under *Richmark*, such that NSO should not have been ordered to produce it. Moreover, the timing of the Court's August 1, 2024 "clarifying" order (Dkt. 358 at 5-6), which compelled NSO for the first time to produce computer code just six weeks before the discovery cutoff, left NSO insufficient time to receive an Israeli export license in any event.[7] It was not fair or proper for the Court to sanction NSO severely for failing to do something that NSO could not, with any amount of effort, do without violating Israeli law.

### C. The Court erred in imposing liability without resolving NSO's defenses.

The Court further erred in granting summary judgment on liability without resolving NSO's pleaded affirmative defenses which were not the subject of Plaintiffs' summary judgment motion.

*First*, the Court did not address NSO's defense under the CFAA's U.S. law enforcement exemption. 18 U.S.C. § 1030(f). NSO opposed summary judgment based on undisputed evidence that (1) the U.S. government, through the FBI, licensed Pegasus in December 2018 and (2) the FBI's license required NSO to maintain Pegasus in an operational state, including ongoing research and development by NSO. (*See* Dkt. 468 at 23-24.) As a result, NSO's research and development activity, in December 2018 and thereafter, that postdated the FBI's Pegasus license would all constitute CFAA-exempted U.S. law-enforcement activity. At a minimum, NSO submitted sufficient evidence to create a triable issue as to this exemption. This Court improperly granted Plaintiffs summary judgment on liability without even addressing NSO's affirmative defense.

*Second*, the Court did not address NSO's unclean hands defense. "[U]nclean hands may provide a complete defense to an action in law," *Albert's Organics, Inc. v. Holzman*, 2020 WL

---

[7] This error was compounded by the fact that the Court's initial discovery order certainly appeared to deny Plaintiffs' motion to compel with respect to RFP No. 30—the only request that sought Pegasus computer code. RFP No. 30 was included in "Category 4" of the document requests. The Court denied the motion to compel (Dkt. 339) with respect to Category 4, before reversing course—at least as to RFP No. 30—just six weeks before the discovery cutoff. The error was further compounded by the fact that NSO in fact did produce the Pegasus code to Plaintiffs' Israeli lawyers, who appeared as counsel of record in this case in March 2023, with the Court's approval (Dkt. 175); who have represented Plaintiffs in this matter continuously from November 2019 to the present; and whose fees Plaintiffs have recently indicated they intend to recover from NSO.

3892861, at *5 (N.D. Cal. July 10, 2020) (cleaned up), when the plaintiff "dirtied [his hands] in acquiring the right he now asserts," *Brewster v. City of L.A.*, 672 F. Supp. 3d 872, 1003 (C.D. Cal. 2023).  According to Plaintiffs' own logs, when Plaintiffs first began investigating Pegasus, a server leased by NSO was accessed—*without NSO's authorization*—by Meta employee Michael Scott, whose role in the investigation included "analyzing … the exploit and determining how it was conducted."  (Dkt. 399-4, Exh. 12 at 24; Dkt. 419-5, Exh. O at 25.)  And Plaintiffs' corporate designee Andrew Robinson testified that Plaintiffs' own employees received information about that server's contents from Amazon (Dkt. 419-5, Exh. B at 375:9-377:24)—again, without NSO's authorization—and tried surreptitiously to take NSO's proprietary code from those servers by anonymizing their conduct and hiding it from Plaintiffs' own legal department.  Plaintiffs have continually downplayed this conduct in public, but the two security engineers involved (Michael Scott and Andrew Robinson) were "no longer employed by Plaintiffs" shortly after the trial in this matter ended and the full scope of their conduct came to light.  (*See* Dkt. No. 776 at 9 n.3.)

NSO raised significantly more than a triable issue on this unclean-hands defense.  It was therefore legal error for the Court to grant summary judgment on liability without even addressing the defense.  (Dkt. 737 at 7.)  At minimum, there are serious legal questions on the issue.

*Third*, the Court did not address NSO's waiver defense to Plaintiffs' breach of contract claim.  NSO submitted evidence that Plaintiffs waived the right to enforce the relevant provisions of their Terms because, despite Plaintiffs' knowledge of widespread conduct that would allegedly violate those provisions, Plaintiffs have *never* previously sought to enforce any of those provisions. (*See* Dkt. 469 at 7-8.)  Whether those facts supported waiver was "a fact question" for trial, *CBS Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983), so this Court erred by granting Plaintiffs summary judgment without addressing this affirmative defense.

### D.  The Court erred in issuing a permanent injunction.

NSO has also shown a fair prospect of success or, at a minimum, serious legal questions with respect to the Court's granting of a permanent injunction.

*First*, the Court found irreparable harm to Plaintiffs based on a theory that Plaintiffs long ago abandoned and never even attempted to substantiate.  Specifically, the Court determined that

collecting WhatsApp messages using Pegasus irreparably harms WhatsApp by damaging its ability to "deliver[] privacy and security to its users." (Dkt. 802 at 5.) That theory, however, rested entirely on the Court's own supposition. Plaintiffs never asserted that theory, and it is not supported by any evidence. Plaintiffs long ago abandoned any such goodwill or reputational harm "in support of . . . injunctive relief" (Dkt. 591 at 12), and consequently did not even try "to admit evidence of reputational harm or loss of goodwill" at trial or in their motion for a permanent injunction (Dkt. 605-1, Exh. A). Although this Court described its theory of harm as constituting "business" rather than "reputational" injury (Dkt. 802 at 9), that is a distinction without a difference. By definition, *all* harm to a business's reputation or goodwill would be "business" harm. *See Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004) (holding "loss of . . . business goodwill" constitutes "economic damages" under CFAA). What matters is that the *nature* of the supposed business harm on which the Court relied depends on Plaintiffs' *reputation* or *goodwill* as a provider of encrypted communications.

Moreover, Plaintiffs cannot have suffered any economic injury from a supposed inability to deliver privacy and security to its users, because Plaintiffs do not earn any money from the users of the free WhatsApp messaging service. The *only* injury associated with this alleged harm, therefore, is an injury to Plaintiffs' reputation or goodwill.

That is the exact theory of injury Plaintiffs expressly disclaimed in order to avoid discovery that NSO could have used to rebut the basis for the Court's finding of irreparable harm, such as by establishing that any lack of confidence by customers as to the security of their data was caused not by NSO but by, for example, Plaintiffs' own highly publicized violations of their users' privacy. NSO also would have engaged an expert witness on customer privacy. Plaintiffs disclaimed any theory of reputational harm precisely to avoid discovery into those and related issues.

But even if this theory of harm did not constitute harm to reputation or goodwill, the fact remains that Plaintiffs never asserted that theory of harm or submitted any evidence to prove it. This Court cited no record evidence to substantiate or quantify any damage to WhatsApp's ability to deliver privacy and security—no evidence, for example, of lost customers, lost sales, negative consumer opinions, or any potential customers who would have used WhatsApp but were dissuaded

after they learned about Pegasus.[8]  That is because there is no such evidence—no witness testified about it, and no document supports it.  The record simply does not contain *any* evidence of the only harm on which the Court relied in granting an injunction.

The Ninth Circuit has reversed injunctions based on exactly such unsubstantiated speculation, holding that a district court cannot grant injunctive relief "grounded in platitudes rather than evidence." *Herb Reed Enters. v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).  Yet that is all the Court offered here: speculation that "users would be dissuaded from using Whatsapp if its encryption were ineffective" based on how it "appear[s]" to the Court that Plaintiffs market their technology, despite the complete lack of actual evidence to support that position.  (Dkt. 802 at 8.)  This Court found that it satisfied *Herb Reed* based on evidence of "the covert, undetectable nature of defendants' technology, as well as the repeated efforts to circumvent plaintiffs' security measures" (Dkt. 802 at 9), but that is beside the point.  The record contains no evidence, and this Court cited none, establishing that NSO's conduct *harmed Plaintiffs* in the way this Court presumed.  The Court's finding of irreparable harm to Plaintiffs was therefore erroneous.

**Second**, the Court improperly enjoined the collection of WhatsApp information from user devices, and the sale or licensing of NSO technologies, even where "no WhatsApp servers are accessed."  (Dkt. 808 at 1.)  The sole conduct challenged in this case was NSO's access of WhatsApp servers.  Any conduct that does *not* involve accessing WhatsApp servers thus was not challenged, was not found illegal, and has no connection to the conduct that was challenged and was found illegal.  It is settled that such "overbroad injunction[s]" are "an abuse of discretion.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (citation omitted).  As the Ninth Circuit has emphasized, injunctions "must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (cleaned up).[9]  The Court far exceeded those limits

---

[8] The only thing the Court cited to support its finding of harm was argument by Plaintiffs' counsel (Dkt. 802 at 7-9), which is not evidence at all.  *L.A. Unif. Sch. Dist. v. A.O. ex rel. Owens*, 92 F.4th 1159, 1179 (9th Cir. 2024).

[9] *See, e.g.*, *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2004) (vacating permanent injunction against "using . . . materials that were not before the court"); *Sprint Nextel*

by enjoining the mere collection of data from WhatsApp users' devices in ways that do not involve WhatsApp servers, an injunction that will have substantial effects on how foreign countries that use Pegasus are able to perform their sovereign law enforcement and intelligence functions.[10]

*Third*, the Court's refusal to carve out an exception for U.S. law enforcement activity directly conflicts with the CFAA. Section 1030(f) of the CFAA expressly excepts from the CFAA's prohibitions "any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States . . . or of an intelligence agency of the United States." 18 U.S.C. § 1030(f). Because Congress has made any such U.S. law enforcement activity lawful under the CFAA, this Court lacks authority to prohibit such activity. *See Price*, 390 F.3d at 1117; *Mulcahy*, 386 F.3d at 852 n.1; *Sprint Nextel*, 2014 WL 68957 at *9; *Sprint Sols.*, 2015 WL 13919095 at *14.

*Finally*, the Court improperly enjoined NSO from "[r]everse engineering or decompiling code from the WhatsApp Platform." (Dkt. 809 ¶ 3(c)). The only claim challenging any reverse-engineering was Plaintiffs' breach-of-contract claim under California law. "California law," however, "precludes a court from ordering an injunction to prevent the breach of a contract." *Benn v. Allstate Ins. Co.*, 569 F. Supp. 3d 1029, 1038 (C.D. Cal. 2021). Indeed, two different California statutes prohibit this Court from issuing such an injunction here, when WhatsApp's Terms of Service cannot be specifically enforced. Cal. Civ. Proc. Code § 526(b)(5); Cal. Civ. Code § 3423(e).

The Court disregarded these express prohibitions and instead said Plaintiffs' CFAA claim justifies a reverse-engineering ban. (Dkt. 802 at 17.) But reverse-engineering is not illegal under the CFAA. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) ("[T]he

---

[10] *Corp. v. Welch*, 2014 WL 68957, at *9 (E.D. Cal. Jan. 8, 2014) (rejecting injunction that "would prohibit innocuous activity such as 'purchasing . . . directly or indirectly, any Sprint Products,' or "accessing . . . the software contained in any Sprint Phones"), *adopted*, 2014 WL 2106683 (E.D. Cal. May 20, 2014); *Sprint Sols., Inc. v. Cell Wholesale, Inc.*, 2015 WL 13919095, at *14 (C.D. Cal. Dec. 10, 2015) (rejecting similar injunction as "vastly overbroad").

[10] In response to Defendants' objection that prohibiting the collection of data from target users' phones without any use of WhatsApp servers was untethered to the finding of liability or necessary to prevent a recurrence of the violation, the Court held, surprisingly, that "[t]he Court has already rejected this argument, and defendants present no basis for reconsidering it now." (Dkt. 808 at 1.) However, until last week's ruling, the Court had never before ruled on that argument, and had certainly not rejected it—in fact, on October 17, 2025, without deciding on the propriety of that portion of the injunction, the Court had ordered Plaintiffs to provide "more clarity as to whether or not this provision is intended to cover the collection of data from users' devices." (Dkt. 802 at 17.)

CFAA is best understood as an anti-intrusion statute and not as a 'misappropriation' statute."
(citation omitted)).  Because the Court is *already* prohibiting any CFAA-prohibited conduct for
which that reverse-engineering might be used, the sole purpose of Paragraph 3(c) of the injunction
is to prevent entirely *lawful* conduct—which is improper.[11]  *See Price*, 390 F.3d at 1117; *Mulcahy*,
386 F.3d at 852 n.1; *Sprint Nextel*, 2014 WL 68957 at \*9; *Sprint Sols.*, 2015 WL 13919095 at \*14.

## II.    NSO WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A STAY PENDING APPEAL.

The second stay factor strongly favors NSO because, in the absence of a stay pending
appeal, the Court's permanent injunction will force NSO to incur at least two distinct forms of
irreparable harm.  Those harms will be permanent even if the Ninth Circuit ultimately reverses or
vacates this Court's judgment, which will render NSO's appeal ineffective even if it is successful.
A stay is therefore necessary to avoid mooting NSO's appeal.  *See Manrique v. Kolc*, 65 F.4th 1037,
1041 (9th Cir. 2023) (finding "[i]rreparable injury" to be "obvious" when "appeal will be moot"
absent stay); *CPC Patent Techs. PTY Ltd. v. Apple, Inc.*, 2024 WL 393492, at \*3 (N.D. Cal. Feb.
1, 2024) ("'[T]he risk of mootness by itself is sufficient to show a risk of irreparable harm.'"
(quoting *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley,
Cal.*, 2015 WL 525711, at \*3 (N.D. Cal. Feb. 6, 2015)); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
2015 WL 4397175, at \*4 (C.D. Cal. June 8, 2015) (finding "irreparable harm" when "appeal . . .
will be moot" absent stay); *Gray v. Golden Gate Nat. Recreational Area*, 2011 WL 6934433, at \*3
(N.D. Cal. Dec. 29, 2011) (finding "irreparable harm" where, absent a stay, "the appeal will be
moot, and the[] right to appeal would be meaningless" (cleaned up)).

***First***, the permanent injunction "require[s]" NSO "to delete and destroy any and all
computer code or technologies that use, access, or depend on the WhatsApp Platform."  (Dkt. 809,
¶ 4.)   The deletion and destruction of computer code and technologies cannot be undone or
remedied by money damages—once these are gone, they are gone.  The harm of being forced to
comply with this provision is therefore irreparable.  *See, e.g., Cutera, Inc. v. Lutronic Aesthetics, Inc.*,

---

[11] The same rationale applies to the remaining provisions of the injunction that essentially enforce
WhatsApp's terms of service (e.g., those prohibiting the creation of new accounts).

444 F. Supp. 3d 1198, 1212 (E.D. Cal. 2020) (finding irreparable harm "in the form of lost evidence" that was deleted from the party's computers); *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023) (finding "considerable hardship" from injunction requiring destruction of unlawful software, which "would essentially shut down the [defendant]").

**Second**, the permanent injunction's prohibitions will put NSO's entire enterprise at risk before NSO's appeal can be resolved. Those prohibitions jeopardize NSO's principal product, Pegasus, which represented **100 percent** of NSO's sales in 2025. (Decl. of Y. Shohat ¶¶ 3, 48.) And the injunction prohibits NSO from engaging in entirely lawful conduct to develop, license, and sell products used in authorized government investigations—a prohibition that would devastate NSO's business and could well force it out of business entirely. (*Id.*, ¶¶ 48-50.) NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices. (*Id.* ¶ 48.) Those competing products can collect WhatsApp messages, among other social media messages. (*Id.*) The Court's injunction, however, apparently bans NSO from selling or maintaining *any* technology to collect information from user devices if the target information comes from WhatsApp—even if the collection method never touches WhatsApp servers (or any other servers located in the United States). That will, in effect, eliminate most if not all of NSO's sales and force NSO to stop much if not all of its business during the appeal.

It is well established that this "threat of being driven out of business" constitutes irreparable harm. *hiQ Labs*, 31 F.4th at 1188. If the injunction is not stayed, NSO will suffer catastrophic business harms and undergo "fundamental business changes that . . . cannot easily be undone should [it] prevail on appeal." *Qualcomm*, 935 F.3d at 756 (finding irreparable harm and granting stay pending appeal); *see also, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 463 U.S. 1311, 1313-14 (1983) (White, Circuit Justice) (granting stay pending appeal where, absent a stay, appellant's contracts would be void and could not be enforced, putting business at risk); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1057-59 (9th Cir. 2009) (finding irreparable harm where order put plaintiff to immediate "Hobson's choice" of either (1) signing agreements that would cause it to "incur large costs" and "disrupt and change the whole nature of its business" or (2) refusing to sign agreements, causing "a loss of customer goodwill" and potentially entire loss of business).

At a minimum, many versions of Pegasus—primarily versions this Court never held unlawful—will abruptly become unavailable to NSO's government customers.  (Dkt. 605-3 ¶ 7; Shohat Decl. ¶50.)  In addition to losing its revenues, NSO would likely violate its contracts with the government customers who rely on its products to fight crime and terrorism.  (Shohat Decl. ¶¶ 49-50.)  Those customers would seek other options to avoid disruptions to their law-enforcement investigations, military operations, and intelligence activities.  (*Id.* ¶¶ 48-50.)  WhatsApp's competitors—who lack the numerous ethical safeguards that NSO and the Israeli government impose on NSO's technology—will rush to fill the gap created by this Court's injunction, taking over NSO's contracts and replacing NSO's highly regulated technology with other, unregulated technologies.  Absent a stay pending appeal, therefore, NSO faces "irreversible loss of data, contracts, customers, and market share," *Softketeers*, 2023 WL 2024701, at *11, in addition to the loss of jobs of NSO's 353 employees (Shohat Decl. ¶ 51).  Such "dire ramifications," which cannot be cured even if NSO ultimately prevails on appeal, weigh "strongly against" allowing the injunction to go into effect.  *Softketeers*, 2023 WL 2024701, at *11.

## III.    A STAY WILL NOT IRREPARABLY INJURE PLAINTIFFS.

In contrast to the truly irreparable injuries NSO will suffer in the absence of a stay, Plaintiffs will not suffer any equivalent harm if the injunction is stayed during NSO's appeal.  The mere fact that this Court found irreparable harm for purposes of granting the injunction is not conclusive because "both issues require different analyses." *Sealant Sys.*, 2014 WL 5141819, at *2.  And the harm on which this Court relied—that WhatsApp users supposedly "would be dissuaded from using Whatsapp if its encryption were ineffective" (Dkt. 802 at 8)—was never raised or substantiated by Plaintiffs at any point during the entire six years this case has been pending.[12]  In fact, Plaintiffs expressly disclaimed any such argument to avoid producing evidence on the point.  As explained above, that creates serious questions for appeal over the propriety of the Court's injunction.  For purposes of irreparable harm, it also demonstrates that Plaintiffs never before viewed the supposed harm on which this Court relied as sufficiently serious to require immediate injunctive relief, as

---

[12] As NSO has established without contradiction, it currently has no means or intent to develop any means to renew the conduct this Court found to be unlawful—licensing a version of Pegasus that is installed using WhatsApp servers. (Shohat Decl. ¶¶ 46-47.)

1    Plaintiffs never sought a temporary restraining order or even a preliminary injunction on that—or

2    any other—basis.

3        There has never been any question that NSO's technology permitted its government

4    customers to collect the data of WhatsApp users (without any use of WhatsApp servers). That state

5    of affairs represents the status quo as it has existed for the more than six years this lawsuit has been

6    pending. Yet Plaintiffs never sought a preliminary injunction or even a finding of liability with

7    respect to the mere collection of user data. That is overwhelming evidence that Plaintiffs were not

8    irreparably injured by the status quo as it existed during the entire pendency of this case and will

9    not be irreparably injured if that status quo remains in effect during NSO's appeal. At a minimum,

10   any injury to Plaintiffs is far outweighed by the truly irreparable—and potentially terminal—harm

11   NSO will suffer in the absence of a stay.

12   **IV.    THE PUBLIC INTEREST FAVORS A STAY.**

13       Finally, the public interest favors a stay. Even Plaintiffs concede that courts "recognize a

14   public interest in stopping crime or terrorism." (Dkt. No. 782 at 11:10-11 (citing *Winter v. Nat.*

15   *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Haskell v. Brown*, 677 F. Supp. 2d 1187, 1200-1201

16   (N.D. Cal. 2009)).[13] In this case, enjoining the use of Pegasus would deprive the public of its

17   benefits in preventing, investigating, and prosecuting serious crimes and terrorism.

18       ***First***, the undisputed evidence showed that the FBI purchased a license for Pegasus in

19   December 2018. (Dkt. 396-5 Ex. N.) NSO also presented evidence that other U.S. government

20   agencies assisted foreign governments in obtaining Pegasus licenses.[14] (Dkt. No. 759-12 ("Minkler

21   Rep.") ¶ 54.) Because the Court refused to carve U.S. law-enforcement operations out of the

22

---

23   [13] Contrary to Plaintiffs' suggestion, there is no requirement that a governmental entity supply
     evidence for this interest to be applicable. The government submitted evidence in the two cited
24   cases because the government or a government official was a party in each case. *See Winter*, 555
     U.S. at 19 (Navy moved to vacate injunction); *Haskell*, 677 F. Supp. 2d at 1192 (plaintiff sued
25   California Attorney General and other state and county law enforcement officers to enjoin
     enforcement of a state statute).
26   [14] The Court declined to consider much of this evidence because it was based on public reporting
     (Dkt. 802 at 12), but fact witnesses testified as to their firsthand knowledge of these activities (Dkt.
27   No. 396-5, Ex. G at 177:3-10). In any event, experts such as Mr. Minkler are entitled to rely on
     hearsay, Fed. R. Evid. 703, and there has never been any indication that the relevant public reports
28   were inaccurate.

1    permanent injunction, that injunction would prevent the FBI (or any other U.S. or state law-

2    enforcement or intelligence agency) from entering into another such license for any existing version

3    of Pegasus.  Regardless of whether the FBI or any other U.S. government agency has made direct,

4    operational use of the system in the past, allowing the injunction to go into effect would thus deprive

5    U.S. law enforcement of the ability to use of the system in the future.  NSO's placement on the

6    Department of Commerce's BIS Entity List, which Plaintiffs continually tout, does not prohibit the

7    FBI (or any other domestic law enforcement agency) from evaluating, licensing, or using NSO's

8    technology.  *See* 15 C.F.R. § 744.11(a).  It merely prevents U.S. individuals and entities from

9    exporting various items to NSO without first obtaining a BIS license—just as King & Spalding

10   LLC obtained a license to share information with its client NSO.  *Id.*  As NSO expert Joshua J.

11   Minkler (a career prosecutor and the former U.S. Attorney for the Southern District of Indiana) has

12   explained, it is critical for U.S. law enforcement agencies to have this or similar technology

13   available to them.  (Dkt. No. 760-3 ¶ 5; Minkler Rep. ¶¶ 41-49, 55-62.)  The unbreakable end-to-end

14   encryption offered by companies like WhatsApp poses a growing risk to U.S. law enforcement's

15   ability to investigate and prosecute crimes.[15]  (Minkler Rep. ¶¶ 41-49.)

16       **Second**, the U.S. public would also be harmed by depriving foreign governments of access

17   to Pegasus.  NSO's opposition to the permanent injunction included evidence from Col. Ty

18   Shepard, a career military officer with an extensive background in intelligence and cybersecurity.

19   (Dkt. No. 759-2 at 15-16; Dkt. 505-2 Ex. A ("Shepard Rep.") ¶¶ 3-18.)  Col. Shepard has

20   specialized experience with Pegasus and is aware of dozens of Pegasus uses by foreign

21   governments.  (*See* Dkt. No. 616-3 Ex. A ("Shepard Tr.") at 74:8-23.)  As Col. Shepard's opinions

22   and testimony demonstrate, the U.S. benefits even when foreign governments collect evidence and

23   intelligence using Pegasus, because many of those countries share intelligence with U.S.

24   agencies—including partners and allies that share intelligence while conducting joint operations.

25   (Shepard Rep. ¶¶ 26-30; Shepard Tr. 69:23-70:21, 73:7-74:3, 80:6-81:1, 83:10-85:1, 85:14-87:4,

---

26   [15] The Court criticized Mr. Minkler because he lacks firsthand experience using Pegasus and
27   firsthand knowledge of specific uses of Pegasus.  (*See* Dkt. No. 802 at 12:24-13:8.)  None of those
     criticisms has any bearing on his opinion that end-to-end encryption is a growing problem for U.S.
28   law enforcement and that a product with capabilities like Pegasus is now necessary for law
     enforcement to investigate and prosecute crimes and terrorism effectively.

17

111:16-112:15.) Mr. Minkler corroborated the benefits of intelligence sharing when describing his firsthand experience in Operation "Money Clip," a multiagency investigation into drug trafficking that benefitted from the exchange of intelligence (including communications intelligence) with law enforcement agencies in Mexico. (Minkler Rep. ¶¶ 10-11.) As a result, the U.S. benefits from other governments' uses of Pegasus.[16]

Plaintiffs' interest in thwarting denial-of-service attacks, or blocking ill-intentioned actors from their platforms, does not outweigh the important law-enforcement, counterterrorism, and national security interests described above. (*See* Dkt. No. 802 at 12:18-14:8.) To the contrary, the undisputed evidence in this case shows that NSO is not an "ill-intentioned actor." NSO witnesses have repeatedly testified that Pegasus is only licensed to government agencies for national-security and law-enforcement purposes. (*E.g.*, Shohat Decl. ¶ 3.) These safeguards are built into NSO's contracts with its sovereign government customers. (*Id.* ¶¶ 26-32.) That testimony has been corroborated repeatedly, including by independent third-party Ernst & Young Global. (*See id.*; *see also* Dkt. Nos. 45-13, 45-14.) NSO also submitted unrefuted evidence that it employs a wide variety of ethical, legal, and technical safeguards to prevent the misuse of its products, up to and including strict oversight by the Israeli Ministry of Defense. (Shohat Decl. ¶¶ 8-45.) To combat Plaintiffs' chief complaint—that there have been potential misuses of Pegasus—NSO also monitors for inappropriate uses of its products and has terminated licenses when appropriate. (*Id.* ¶¶ 40-45.) For all these reasons, the public interest favors a stay of the injunction while pending appeal.

## V.     IF THE COURT DENIES A STAY, IT SHOULD EXTEND THE ADMINISTRATIVE STAY TO PERMIT NSO TO SEEK A STAY FROM THE NINTH CIRCUIT OR SUPREME COURT.

If the Court denies NSO a full stay while its appeal is pending, NSO respectfully requests that the Court temporarily continue the existing administrative stay so that NSO can seek a stay from the Ninth Circuit or, if necessary, the Supreme Court. *See* Fed. R. App. P. 8(a)(2); *see also Nomadix, Inc. v. Guest-Tek Interactive Entmt. Ltd.*, 2020 WL 3023308, at *3 (C.D. Cal. Apr. 24,

[16] The use of Pegasus by foreign governments thus affects the public interest, even if the Court has limited its analysis to domestic public interests.

1  2020) (denying full stay pending appeal but granting limited stay to seek relief from the Ninth

2  Circuit); *Oracle USA, Inc. v. Rimini St., Inc.*, 2018 WL 4355154, at *2-*3 (D. Nev. Sept. 11, 2018)

3  (granting temporary stay of up to 60 days so defendant could seek a stay from the Ninth Circuit).

4      Continuing the administrative stay for a limited time is necessary to avoid mooting the very

5  relief that NSO would seek.  *See Qualcomm*, 935 F.3d at 757 (stays pending appeal are intended to

6  suspend judicial alteration of the status quo).  This is particularly true given that the Court's

7  injunction includes both prohibitory and mandatory provisions that, together, would result in the

8  irremovable loss of software and the irreparable harm to NSO's business.  The Court already denied

9  plaintiffs' request to set a deadline for NSO to certify compliance with the injunction because the

10 Court recognized that any such deadline would need to be adjusted while NSO appealed.  (Dkt. No.

11 802 at 18:5-9).  Continuing the administrative stay that is already in place would merely formalize

12 the Court's intention and protect NSO from accusations of non-compliance while it seeks a stay

13 from the Ninth Circuit or Supreme Court.  *See Nomadix*, 2020 WL 3023308, at *3 (granting limited

14 stay to seek full stay from Ninth Circuit because "the Court's judgment requires the parties to take

15 immediate action"); *cf. Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 2016 WL 7319538,

16 at *3 (S.D. Cal. Sept. 19, 2016) ("In granting the motion for a permanent injunction, the Court denied

17 [a] request for a stay pending appeal, *but included a 90-day sunset provision into the permanent*

18 *injunction.*" (emphasis added)).

19 **VI.    CONCLUSION**

20     The Court should stay the permanent injunction pending NSO's appeal to the Ninth Circuit.

21 If the Court denies a stay, it should extend the administrative stay to permit NSO to move the Ninth

22 Circuit or Supreme Court for a stay.

23

24  Dated: November 19, 2025                    KING & SPALDING LLP

25                                             By: */s/ Joseph N. Akrotirianakis*

26                                             JOSEPH N. AKROTIRIANAKIS
                                               AARON S. CRAIG
27                                             *Attorneys for Defendants*

28