JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHNOLOGIES LIMITED and
Q CYBER TECHNOLOGIES LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**DECLARATION OF YARON SHOHAT IN SUPPORT OF DEFENDANTS' MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL**<br><br>Action Filed: 10/29/2019 |

I, Yaron Shohat, hereby declare as follows:

1. I am a citizen and resident of Israel. I served as Chief Operating Officer of Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (together, "NSO") from approximately May 2018 until August 2022. I have served as NSO's Chief Executive Officer since August 2022. Q Cyber Technologies Ltd. is NSO Group Technologies Limited sole director and shareholder. As Defendants' CEO, I am an employee of Q Cyber Technologies Ltd. I am familiar with NSO's products, as well as its business practices, policies, and procedures.

2. I have personal knowledge of the facts set forth in this declaration and, except as otherwise stated, could testify competently to each of them. I previously signed a Supplemental Declaration in Support of NSO's Revised Opposition to Plaintiffs' Motion for Permanent Injunction. This declaration is identical to that one, and it differs in three respects: (a) it removes certain information that NSO previously filed under seal; (b) it has been updated to account for the imposition of a permanent injunction against NSO; and (c) it indicates the updated number of NSO's personnel who will be affected by the injunction ordered by the Court.

3. NSO is a government contractor and technology company that designs and licenses technology exclusively to governments and government agencies for national security and law enforcement purposes. The fact that NSO's customers are exclusively governments and government agencies has been confirmed by an Ernst & Young Global "Independent Accountant's Report." (Dkt. 45-13). This remains true today. Among NSO's products are a suite of different technologies and functions that are collectively branded and marketed as "Pegasus." In 2025, the Pegasus suite of products represented 100% of NSO and Q Cyber's sales.

4. NSO markets and licenses its Pegasus technology exclusively to sovereign governments and government agencies for the purposes above, and it does so only after receiving required export control licenses from the Israeli Ministry of Defense. NSO does not now market or sell, and has never marketed or sold, its Pegasus technology for use by any non-governmental entity.

5. The different technologies marketed under the "Pegasus" brand name provide NSO's foreign sovereign customers the ability to collect evidence and intelligence from different

1

mobile devices. One subset of those technologies permitted governments and government agencies to collect evidence and intelligence from mobile devices that run the Android operating system and operate as "zero click," meaning the end user of the mobile device is not required to take any action, such as opening a link, for installation of Pegasus. These "covert Android" technologies are completely different from the Pegasus technologies that can gather evidence and intelligence from devices running other (i.e., non-Android) operating systems or that require some engagement by the end user of the mobile device (i.e., "one click").

6. I understand that earlier in the course of the lawsuit, the Court issued rulings that determined which NSO technologies were relevant to Plaintiffs' claims. Based on those rulings, NSO produced documents and testimony related to three "covert Android" Pegasus installation vectors – Heaven, Eden, and Erised. These three covert installation vectors represent a very small fraction of Pegasus' overall capabilities with respect to obtaining information from Android devices.

7. Had the Court expanded those rulings, and the scope of information that NSO was required to produce, NSO would have attempted to produce additional information.

8. Access to NSO's Pegasus technology—including Heaven, Eden, and Erised—was and is subject to many legal, ethical, contractual, and technical safeguards. These safeguards function together to maximize the proven benefits of Pegasus, while minimizing the potential for its misuse. They are detailed below.

**Israel's Defense Export Control Law & Agency**

9. The marketing and licensing of NSO's Pegasus technology, and even its development, are strictly regulated and monitored by the Government of Israel under Israel's Defense Export Control Law ("DECL"). The DECL is administered by the Defense Export Control Agency ("DECA"), an agency within the Israeli Ministry of Defense.

10. Obtaining regulatory approval to market, and then to export, Pegasus involves a multi-step process.

11. First, NSO is required to maintain an active registration with DECA as a registered defense exporter.

12. Second, NSO must provide certain information to DECA in order to receive a product ID for Pegasus and to maintain that product ID. Obtaining and maintaining a product ID is a prerequisite for obtaining the necessary marketing and export licenses for such product described below.

13. Third, NSO is required to obtain a preliminary license each time it intends to market Pegasus to a prospective customer (i.e., a "Defense Marketing License"). NSO is only permitted to market Pegasus to government agencies.

14. Fourth, NSO is required to obtain a separate license in order to export Pegasus technology to a government agency customer (i.e., a "Defense Export License").

15. To obtain Defense Marketing and Defense Export Licenses for Pegasus, NSO must provide DECA with information about the identity of the government agency seeking to license Pegasus. DECA also requires information about the general intended uses of Pegasus and certifications that Pegasus will only be used lawfully to investigate serious crimes, to prevent terrorism, and to gather intelligence. This includes government-to-government certifications sent directly from the requesting government agency to the Israeli Ministry of Defense.

16. Ultimately, DECA is empowered to investigate NSO and its business, refuse or cancel NSO's registration, deny NSO's license applications, take disciplinary action against the company and its employees and even refer matters to the state prosecutor to take criminal action against the company.

17. Each and every foreign government agency to which NSO licensed Pegasus—including all such agencies that were licensed Heaven, Eden, or Erised—successfully completed this governmental approval process.

**NSO's Business Ethics Committee & Evaluation Process**

18. NSO also independently reviews all potential customers to ensure that only vetted government agencies are approved to use Pegasus for legitimate and legal purposes in an ethical manner.

19. To that end, a Business Ethics Committee was established in July 2015. Copies of the Committee charter adopted in 2017 and the revised charter adopted in 2019 are attached as

**Exhibit A** [Exh. A-1735] and **Exhibit B** [Exh. A-1951], respectively.  The Business Ethics Committee was eventually supplanted by NSO's Management Committee and its Governance, Risk and Compliance Committee in January 2020.  The change was made, in part, to foster an even greater focus on ethical, legal, and human-rights issues when assessing licensing opportunities.  The general guiding principles, however, remain the same.

20. The Government Risk and Compliance Committee, like the Business Ethics Committee before it is comprised of both internal and external members.  External, independent advisors who have served on these Committees include a former U.S. ambassador to Israel, a former CIA chief of staff, and a former Majority Staff Director of the United States House Permanent Select Committee on Intelligence.

21. NSO's Business Ethics Committee, and later its Management and Government Risk and Compliance Committees, review and analyze potential engagements in a multi-stage vetting process consistent with the company's Business Ethics Framework and, later, its Human Rights Policy.  These Committees assesses whether there are legal risks (e.g., laws that would prevent the licensing of Pegasus to a particular government agency); ethical risks (e.g., a prospective government end user's "respect for the rule of law" and other factors that may contribute to the potential for misuse of Pegasus); and reputational risks to NSO.  They also consider Israeli, U.S., and E.U. legislation and policies.

22. Company policy also prohibits marketing or sales activities in certain countries due to a pattern of human rights abuses, corruption, and regulatory restrictions.  With respect to certain countries that present a higher risk, NSO previously instituted a process to seek informal insights from people working for the U.S. government.

23. After weighing the various factors associated with each potential sale, NSO's Business Ethics Committee, and later its Management Committee and its Government Risk and Compliance Committee, then approve or reject the opportunity or defers it for further analysis and consideration. In certain cases, the approval is made subject to the implementation of certain compliance requirements to mitigate potential risks that have arisen during the review.

24. Between mid-2018 and present, the committees described above rejected approximately 20 opportunities that would have resulted in approximately $300 million in additional revenue.

25. No customer (i.e., government agency) is issued a Pegasus license without being approved by the appropriate committee(s). Every customer granted rights to use Heaven, Eden, and Erised (or any other version of Pegasus) was assessed by the compliance team and approved by either the Business Ethics Committee or by one or more of the Management Committee and Government Risk and Compliance Committee.

**NSO's Contractual Safeguards**

26. Where both the DECA process and NSO's business processes are satisfied, NSO also builds additional protections against misuse into its licenses.

27. Copies of exemplar licenses from 2018 and 2019 are attached as **Exhibit C** [Exh. A-2005] and **Exhibit D** [Exh. A-1908], respectively.

28. Among other contractual safeguards, NSO requires its customers to provide the end-user certifications required by DECA and to confirm that all necessary permissions have been obtained to license Pegasus. (*E.g.*, Exh. C §§ 4.2-4.3, 5.1; Exh. D §§ 4.2-4.3, 5.1.)

29. NSO also requires its customers, as a provision of their licensing agreements, to represent that they will comply with all applicable laws, rules, and regulations applicable to their use of Pegasus. (*E.g.*, Exh. C § 18.2; Exh. D § 19.2.) Customers must also represent that they and their agents will comply with all privacy, national-security, and other laws applicable to the use of Pegasus, *including obtaining any required judicial warrants, consents, or decrees*. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Customers must represent that Pegasus will only be used to prevent and investigate terrorism and serious crimes, and that the system will not be used to violate human rights. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Finally, customers must notify NSO of misuses or potential misuses of Pegasus. (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.) Should a customer breach any of these obligations, NSO retains the right to suspend or terminate access to Pegasus. (*E.g.*, Exh. C § 8; Exh. D § 8.)

30. All customer licenses executed between 2018 and 2020—including any customers who received a license to Heaven, Erden, or Erised—would have been bound by similar substantive requirements.

31. NSO's current licenses also contain similar provisions designed to ensure that customers only use the Pegasus system for appropriate purposes (e.g., preventing and investigating terrorism and serious crimes) and that customers comply with all applicable laws when doing so.

32. Furthermore, NSO limits by contract, as well as through the technical safeguards described below, the number of target devices that can be monitored with Pegasus at any one time. This restriction ensures that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Technical Safeguards**

33. In addition to the guardrails above, NSO employs technical safeguards to ensure that Pegasus is used legally in each jurisdiction in which it is licensed.

34. A true and correct copy of a Pegasus product guide from August 2018 is attached as **Exhibit E** [Exh. A-1734].

35. As that product guide makes clear, Pegasus is capable of collecting a variety of both historical (existing) and current (incoming/outgoing) data from mobile devices. (Exh. E at 14-15.)

36. Those capabilities, however, are designed to be flexible so that the system can be configured to comply with any applicable laws or collection orders. The collection of historical data, for example, can be disabled if a government agency were not permitted to access existing data. (*Id.* at 14.) Government agencies can also issue active commands to obtain certain information based on pre-existing target information and the need to seek specific intelligence. (*Id.* at 15.) Pegasus is thus designed to ensure that it can be used beneficially in numerous jurisdictions, while also complying with any legal frameworks or warrant limitations that govern a particular investigation. (*See id.* at 16.)

37. Pegasus includes auditing mechanisms. These mechanisms permit government customers to designate auditors, who are then responsible for ensuring compliance with country- or investigation-specific legal requirements. (*See id.* at 26.)

38. These same technical guardrails against misuse were also present in all versions of Pegasus licensed between mid-2018 and mid-2020—including Heaven, Eden, and Erised—as well as all versions of Pegasus licensed since.

39. NSO's technical safeguards also limit the number of target devices that can be monitored at any one time, ensuring that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Monitoring & Auditing Process**

40. Finally, NSO itself ensures that customers are complying with their obligations and are not misusing the Pegasus system.

41. NSO compliance, legal, and customer teams review contractual obligations, advise customers on compliance obligations, and conduct investigations into potential misuses.

42. Misuse investigations may be triggered by whistleblower allegations (from internal or external individuals), reports from media or non-governmental organizations, and other sources.

43. NSO has conducted numerous investigations between 2018 and present. In some cases, the perceived misuse was found to be proper. In other cases, there was insufficient evidence to make a determination or evidence indicating misuse. In still other cases, NSO has made findings of misuse. In either of the latter cases, additional corrective actions would be taken. In some cases, the implementation of additional guardrails may be judged sufficient to mitigate future misuse. In other cases, suspension or termination of customer licenses has been deemed necessary.

44. Between 2018 and June 2025, NSO received over 100 reports of misuse, all of which went through a preliminary review, resulting in approximately 25 determinations of credible reports, all of which were thoroughly investigated. This led to 14 determinations of potential misuse, and 16 suspensions (some of which were temporary) or terminations of customers' access to the Pegasus system.

45. Attached as **Exhibit F** [Exh. A-2028], **Exhibit G** [Exh. A-1736] and **Exhibit H** are true and correct copies of NSO's 2021, 2023 and 2024 Transparency Reports, which contain additional information regarding its compliance and enforcement mechanisms.

\*   \*   \*

46. My prior testimony that NSO no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application remains accurate. NSO currently has no products, either in use or development, that use WhatsApp as an installation vector.

47. Although NSO respectfully disagrees with the Court's orders in this matter, and intends to appeal them, NSO does not currently and will not in the future offer versions of Pegasus that use WhatsApp as an installation vector, absent any contrary ruling superseding this Court's ruling.

48. Pegasus is NSO's flagship product. It exists, however, in a competitive market. NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices. Those competing products can and do collect WhatsApp messages, among other social media messages. If NSO were banned from offering versions of Pegasus that have not been found to violate any law that allow its government customers to collect the same messages, it would quickly lose market share to competitors.

49. NSO's government customers rely on Pegasus to fight crime and terrorism and are likely to shift quickly to competing products that offer the widest range of capabilities. NSO's inability to match its competitors' offerings would result in a competitive disadvantage and loss of customers that NSO would be unlikely ever to overcome.

50. At a minimum, the injunction ordered by the Court would force changes to NSO's existing Pegasus products, including those that have not previously been part of this lawsuit. If all versions of Pegasus were rendered unavailable for any substantial period of time, NSO would be at risk of going out of business. In addition, NSO would be at risk of violating its contracts with the government customers who rely on its products to fight terrorism and investigate and prosecute crime. And, even if the disruption were not permanent, those customers would be likely to seek other options to avoid even temporary disruptions to their law-enforcement investigations, military operations, and intelligence activities. Once a customer transitions to a new competing solution, and begins collecting evidence or data, they would be unlikely to transition back to NSO's products.

51. NSO currently employs approximately 353 personnel, the vast majority of whom have responsibilities relating to NSO's Pegasus products. Should NSO lose revenues, contracts, or customers, the employment of all those people would be at risk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, this 19th day of November 2025, at Sde Warburg, Israel.

_____
YARON SHOHAT