# Exhibit C

**EXHIBIT**
**2005**

*For Discussion Purposes Only; Pro...*

# AGREEMENT

This Agreement (the "**Agreement**")is entered into on November 11, 2018 (the "**Effective Date**"), by and between Q Cyber Technologies SARL, having its offices at 46A avenue John F Kennedy L-1855 Luxembourg, registration number 203 1 24(the "**Company**") and ▓▓▓▓▓▓▓▓▓▓ (the "**End-User**").

**Whereas,** the Company is engaged in the business of developing, integrating and supplying certain intelligencesolutions, and has developed (through its affiliates) the System (as defined below); and

**Whereas,** the End-User is interested to purchase from the Company a License (as defined below) to use the System, and obtain services related to it, as further set forth herein, and the Company has agreed to provide a License to use the System and related services to the End-User; and

**Whereas,** the parties wish to set forth the terms under which such sale and purchase shall be made.

**Now, therefore,** in consideration of the foregoing premises and the mutual covenants herein contained, and for other good and valuable consideration, the parties agree as follows:

1. <u>Definitions.</u>

　　1.1.　　In this Agreement, unless the context otherwise requires, terms defined in the preamble and the recitals shall have the same meaning when used elsewhere in this Agreement and the following terms shall have the meanings ascribed thereto below:

　　　　"**Agreement**" has the meaning ascribed to it in the preamble.

　　　　"**Approval**" has the meaning ascribed to it in Section 5.1.

　　　　"**Business Day**" means a day (other than a Friday, Saturday or Sunday) on which banks where the End User resides are generally open for normal business.

　　　　"**Certificate**" has the meaning ascribed to it in Section 5.1.

　　　　"**Commissioning Notice**" has the meaning ascribed to it in <u>Exhibit B</u>.

　　　　"**Company**" has the meaning ascribed to it in the preamble.

　　　　"**Confidential Information**" means this Agreement and any information provided by the Company to the End-User.

　　　　"**Deployment**" has the meaning ascribed to it in <u>Exhibit A</u>.

　　　　"**Effective Date**" has the meaning ascribed to it in the preamble.

　　　　"**End-User**" has the meaning ascribed to it in the preamble.

　　　　"**End-User Representative**" has the meaning ascribed to it in Section 18.4.

　　　　"**End-User Responsibilities**" has the meaning ascribed to it in Section 4.

　　　　"**First Installment**" has the meaning ascribed to it in <u>Exhibit B</u>.

　　　　"**Force Majeure**" has the meaning ascribed to it in Section 15.

　　　　"**Hardware Equipment**" has the meaning ascribed to it in <u>Exhibit A</u>.

　　　　"**License**" has the meaning ascribed to it in Section 2.1.

　　　　"**Services**" has the meaning ascribed to it in <u>Exhibit A</u>.

　　　　"**SLA**"has the meaning ascribed to it in Section6.2.

　　　　"**Support Period**" has the meaning ascribed to it in Section 6.1.

　　　　"**Support Service Consideration**" has the meaning ascribed to it in <u>Exhibit B</u>.

　　　　"**Support Services**" has the meaning ascribed to it in Section 6.

　　　　"**Support Service Supplement Consideration**" has the meaning ascribed to it in <u>Exhibit B</u>.

1

NSO_WHATSAPP_00000179

"**System**" has the meaning ascribed to it in <u>Exhibit A</u>.

"**System Consideration**" has the meaning ascribed to it in <u>Exhibit B</u>.

"**Training**" has the meaning ascribed to it in <u>Exhibit A</u>.

"**Warranty Period**" has the meaning ascribed to it in <u>Exhibit A</u>.

1.2.    The following are the exhibits in this Agreement:

Exhibit A – Description of System and Services

Exhibit B – Consideration

Exhibit C – Installation Requirements

Exhibit D – Security Guidelines

Exhibit E – Form of End-User Certificate

Exhibit F – Service Level Agreement

2.    <u>Provision of License and Services.</u>

2.1.    Subject to the terms of this Agreement and the payment of the System Consideration in full, the Company shall (i) grant to the End-User a limited, nonexclusive, non-transferable, non-pledgeable and non-assignable license to use the System for the End-User's internal use only, and solely for the purpose that it is intended for (the "**License**"); and (ii) provide the Services.

Physical copies of the software included in the System are not being sold to the End-User, but are the property of the Company, and are provided to the End-User for its use during the term of this Agreement and in accordance with its terms.

2.2.    Subject to provisions of Sections 2.3 and 5.2 below, within one-hundred (100) Business Days following the occurrence of the later of (i) receipt by the Company of the Approval, and (ii) the receipt by the Company of the First Installment, in full, the Company shall complete the Deployment and shall conduct the Training.

2.3.    The provision of the System, the License and the Services by the Company in accordance with the time schedule set forth in Section 2.2 above and the performance by the Company of all its obligations under this Agreement is conditioned upon (i) the fulfillment by the End-User of all of the End-User Responsibilities when due, and (ii) the actual receipt by the Company of each payment of the System Consideration when due, in full.

It is hereby clarified that the Company shall not be held responsible or liable for any delay in the provision of the System, the License and/or the Services, if such delay was due to any misperformance or delay in the fulfillment of any of the End-User Responsibilities and/or payment obligations and/or due to a delay in the performance or fulfillment of the pre-requisite conditions set forth in Sections 3, 4 and 5 below. In the event of a delay in the performance of any of the End-User Responsibilities and/or payment obligations and/or the performance or achievement of the pre-requisite conditions set forth in Sections 3, 4 and 5 below, the Company's obligations shall be postponed by such number of days equal to number of days by which the time schedule was delayed due to acts or omissions caused by the End-User.

2.4.    For the avoidance of any doubt it is hereby clarified that neither the Company nor any of its affiliates shall participate or otherwise assume any role in the operation, activation and/or use of the System. The End User shall be solely responsible and liable for the use and operation of the System, in accordance with the License and the terms of this Agreement.

3.    <u>Consideration; Payment Terms.</u>

2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000180

3.1. In consideration for the provision of the License, the System and the Services, the End-User shall pay the Company the System Consideration as set forth in the Consideration exhibit, attached hereto as <u>Exhibit B</u>.

3.2. The System Consideration shall be paid by the End-User to the Company in installments as set forth in <u>Exhibit B</u>.

3.3. Any and all payments made to the Company under this Agreement are exclusive of all state, provincial, municipal or other government, excise, use, sales, VAT or like taxes, tariffs, duties or surcharges, now in force or as may be enacted in the future, which shall be borne by the End-User, provided, however that the Company shall bear all income taxes imposed on the Company in connection with this Agreement. Each payment under this Agreement shall be paid by the End-User against an invoice to be issued by the Company.

3.4. Any and all amounts paid to the Company under this Agreement are non-refundable, and may not be claimed or reclaimed by the End-User.

3.5. If any sum payable pursuant to this Agreement is not timely paid to the Company, then, without prejudice to any other right or remedy available to the Company in accordance with the terms of this Agreement or by law, the End-User shall pay interest thereon at a daily rate of 0.04%, accumulated on a daily basis, in respect of the period starting on the due date of the delayed payment and ending on the date of the actual payment. In addition, the Company reserves the right to suspend contractual performance or the use of the System or the Services until the End-User has made payment of the overdue amount together with interest that has accrued thereupon, in full.

3.6. The End-User shall not be permitted to use the System, and the License shall not be deemed granted unless (a) the Commissioning Notice was delivered, and (b) each installment which was due on or prior to the date of the Commissioning Notice was paid in full, when due. Following the provision of the Commissioning Notice, in the event that any installment of the Consideration shall not be paid upon the date of its designated payment, the End-User shall not be permitted to continue using the System and the License shall be considered suspended until the payment in full of such installment is made (including any accumulated interest pursuant to Section 3.5 above). In such event, the Company shall be entitled to take all measures available to it (including without limitation legal and technological measures) to prevent the End-User from continuing to use the System and shall not be held responsible for any damage or loss incurred by the End-User with respect thereto.

4. <u>The End-User's Responsibilities.</u> The End-User undertakes to perform all of the following obligations in a timely manner (the **"End-User Responsibilities"**):

4.1. fulfillment of all of the technical and installation requirements listed in <u>Exhibit C</u>, at the End-User's site, prior to the delivery of the Hardware Equipment;

4.2. obtainment and maintenance of all permits and approvals required to be obtained from any regulatory and governmental authority relating to the End-User, under any and all applicable legal requirements for the performance of this Agreement;

4.3. delivery of the Certificate to the Company;

4.4. provision of any and all additional required conditions to enable the performance of the Company's obligations under this Agreement when due, including without limitation, release of the Hardware Equipment from custom (if required) and assuring availability of its personnel for participation in the Training; and

4.5. utilize the System strictly in accordance with the security guidelines set forth in <u>Exhibit D</u>; and

4.6. in the event where the End-User purchases the Support Services (as defined below), it acknowledges, and undertakes to perform, in a timely manner, all of the obligations set forth in the SLA, substantially in the form attached hereto as <u>Exhibit F</u>.

3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000181

5. <u>Pre-Conditions.</u>

5.1. The provision of the License, the System and the Services to the End-User and the performance by the Company of its obligations under this Agreement are subject to (i) the receipt by the Company of the original certificate in accordance with the requirements of any applicable governmental authority confirming the identity of the End-User, substantially in the forms attached hereto as <u>Exhibit E</u> (the "**Certificate**"), and (ii) the receipt by the Company of the approval and/or license of any applicable governmental authority for the provision of the System as set forth herein (the "**Approval**").

5.2. For the avoidance of any doubt, no products, licenses, equipment or services shall be provided by the Company under this Agreement until the Certificate is delivered to the Company and the Approval is obtained. In the event that the Certificate is not received by the Company and/or the Approval is not obtained within six (6) months as of the date hereof, or in the event that the Company receives, earlier, a formal notice from the applicable governmental authority that the application for the Approval is denied, or in the event that the Approval is canceled, terminated or suspended, the Company shall have the right to terminate this Agreement by providing the End-User a written notice, and such termination shall not be considered a breach of this Agreement, and the Company shall not be held responsible or liable for any effect of such termination.

5.3. Without derogating from the aforesaid, the End User acknowledges and understands that the provision of the Certificate by the End User is subject to annual renewal and the End User shall be responsible to take any action and submit any document required in connection with maintaining the Approval in effect at all times during the term of this Agreement.

6. <u>Technical Support and Maintenance Services.</u> Following the expiration of the Warranty Period, the End-User shall be entitled to purchase technical support and maintenance services (the "**Support Services**"), to be renewed automatically at the end of the Warranty Period and any Support Period (unless terminated for any reason by the End User or the Company), in accordance with the following terms:

6.1. The End-User may purchase Support Services for periods of twelve (12) consecutive months (each such period – a "**Support Period**"). In the event that either the End User or the Company chooses not to purchase or provide Support Services, it shall notify the other party in writing no later than thirty (30) day prior to the expiration of the Warranty Period or any then current Support Period. End User shall not have any claims or demands towards the Company for any reduced, weakened or diminished capabilities and/or functionalities of the System due to non-retention of Support Services.

6.2. The Support Services shall be provided in accordance with the Company's standard services level agreement, as may be amended from time to time. A copy of the Company's current Services Level Agreement is attached hereto as <u>Exhibit F</u>(the "**SLA**").

6.3. The consideration for the Support Services shall be paid in advance before each Support Period, in accordance with the payment terms set forth in <u>Exhibit B.</u>

7. <u>Termination.</u>

7.1. This Agreement shall commence on the Effective Date and shall remain in full force and effect until terminated in accordance with the terms herein.

7.2. If either party hereto commits: (i) a material breach of this Agreement (including its exhibits) or defaults in the performance of any material obligation hereof, and if such default or breach is not corrected within 14 days after the same has been called to the

4

NSO_WHATSAPP_00000182

attention of the defaulting party by a written notice from the other party (provided that with respect to breach of any representation made under Section 18 below, such 14 days period shall be shortened to 7 days); or (ii) a non-material breach of this Agreement (including its exhibits) or defaults in the performance of any other obligation, and such default or breach is not corrected within 30 days after the same has been called to the attention of the defaulting party by a written notice from the other party - then the non-defaulting party, at its option, may thereupon terminate this Agreement, with an immediate effect, by submitting a written notice to the other party.

7.3.    Upon termination of this Agreement the End-User shall be obligated to pay to the Company any outstanding consideration due under this Agreement within 14 days as of the date of termination of this Agreement. The provisions of Sections 7.3, 8, 9, 10, 11, 12, 13, and 23 and shall survive the termination of this Agreement.

8.    <u>Additional Remedy.</u> In the event a breach has occurred (including without limitation, in the event the Company has reasonable grounds to suspect that a breach of any representation made under Section 18 below has occurred), in addition to the Company's right to terminate the Agreement, and its otherrights and remedies under applicable law and this Agreement, the Company may immediately suspend or cancel the License or the provision of any of the Services and/or Support Services (when applicable), or take such actions necessary to prevent access to the System until such time as it has received confirmation to its satisfaction that such breach was cured. The Company shall not be liable towards the End-User for any claim, losses or damages whatsoever related to its decision to suspend or cancel the provision of any of the License, Services, Support Services, or to prevent access to the System under this Section.

9.    <u>Intellectual Property Rights.</u> All the rights pertaining to the System, the Services and the License, including, but not limited to, all patents, trademarks, copyrights, service marks, trade names, technology, know how, moral rights and trade secrets, all applications for any of the foregoing, and all permits, grants and licenses or other rights relating to the System and the Services are and shall remain the sole property of the Company. The End-User hereby acknowledges that, other than as set forth in Section 2.1, no title to the System (including the software embedded therein) is transferred to it under this Agreement or in connection hereof and it is not granted any right in the System, including without limitation, intellectual property right. The End-User shall not, whether directly or indirectly either by itself or through any other person, reproduce, modify, disassemble or reverse-engineer the System (including any software contained therein).

10.    <u>Confidentiality.</u> The End-User undertakes to keep the Confidential Information in strict confidence and not to disclose it to any third party without the prior written consent of the Company; provided, however, that the End-User may disclose such information to its respective employees and consultants having a need to know such information in order to carry out the provisions of this Agreement. The End-User warrants that any such employees and consultants to which Confidential Information is disclosed will be bound and will abide by terms no less onerous than those contained herein and shall be responsible for any breach of confidentiality by itself and such employees and consultants and for any harm caused to the Company as a result of such breach.

Following the termination of this Agreement for any reason, or upon the Company's first written demand, the End-User shall return to the Companyall Confidential Information, including all records, products and samples received, and any copies thereof, whether in its possession or under its control, and shall erase all electronic records thereof, and shall so certify to the Company in writing.

11.    <u>Limited Warranty.</u> It should be noted that the Company does not warrant that the License, the System and the Services provided hereunder will be uninterrupted, error-free, or completely secure. The Company does not make, and hereby disclaims, any and all implied warranties, including implied warranties of merchantability, fitness for a particular purpose and non-infringement. All products, the System and Services provided pursuant to this Agreement are provided or performed on an "as is", "as available" basis.

12.    <u>Limitation of Liability.</u> In no event shall the Company be liable for any consequential, incidental, special, indirect or exemplary damages whatsoever, including lost profits, loss of business, loss

5

of revenues, or any other type of damages, whether arising under tort, contract or law. The Company's aggregate liability shall be limited to the consideration actually received by the Company under this Agreement.

13. <u>Settling of Disputes and Governing Law.</u> Any and all disputes concerning this Agreement shall be governed by the laws England and Wales, regardless of its conflict of laws rules and of where this Agreement was executed or is to be performed. This Agreement is made on the basis of mutual confidence, and it is understood that the differences, if any, during the term of this Agreement should freely be discussed between the parties. The parties shall initially attempt in good faith to resolve any significant controversy, claim or dispute arising out of or in relation to this Agreement, or its interpretation, performance, non-performance or any breach of any respective obligations hereunder (other than a dispute over the ownership of intellectual property rights), through negotiations between senior executives of the parties. If the dispute is not resolved within thirty (30) days (or such other period of time mutually agreed upon by the parties) of commencing such face-to-face negotiations, or if the party against refuses to attend such negotiations or does not otherwise participate in such negotiations within thirty (30) days (or such other period of time mutually agreed upon by the parties) from the date of the notice of the dispute, then the parties agree that the dispute shall, be exclusively settled by a binding closed doors arbitration under the Rules of Arbitration of the London Court of International Arbitration by one or more arbitrators appointed in accordance with the said rules. The arbitration shall be conducted in English in London, England. The prevailing party shall be entitled to reimbursement of its reasonable attorney's fees. However, nothing in this Section shall be deemed as preventing the Company from seeking injunctive relief (or other provisional remedy) from any court having competent jurisdiction.

14. <u>Assignment.</u> This Agreement and the rights and obligations hereunder are not transferable, pledgeable or assignable, by either party without the prior written consent of the other party. However, the Company may assign its rights and obligations to a parent, affiliate or subsidiary company and, in the case of a merger or acquisition, to a successor company and provided that the rights of the End-User shall not be derogated pursuant to such assignment.

15. <u>Force Majeure.</u> The Company shall not be liable for any failure to perform its obligations under this Agreement due to any action beyond its control, including without limitation: (i) acts of god, such as fires, floods, electrical storms, unusually severe weather and natural catastrophes; (ii) civil disturbances, such as strikes and riots; (iii) acts of aggression, such as explosions, wars, and terrorism; (iv) acts of government, including, without limitation, the actions of regulatory bodies which significantly inhibits or prohibits the Company from performing its obligations under this Agreement (each, a **"Force Majeure"**). In the event of a Force Majeure, the performance of the Company's obligations shall be suspended during the period of existence of such Force Majeure as well as the period reasonably required thereafter to resume the performance of the obligation.

16. <u>No Third Party Beneficiary.</u> This Agreement shall not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

17. <u>Complete Agreement.</u> This Agreement and its Exhibits constitute the full and entire understanding and agreement between the parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

18. <u>Representations.</u>

18.1. The End-User hereby represents and warrants that the execution and delivery of this Agreement and the fulfillment of its terms: (i) will not constitute a default under or conflict with any agreement or other instrument to which the End-User is a party or by which it is bound; and (ii) other than as specifically set forth in this Agreement, does not require any further consent of any person or entity.

18.2. The End-User hereby represents that it shall comply with all laws, rules and regulations applicable to the performance of its undertakings and obligations pursuant to this Agreement in any applicable country, and undertakes that it will obtain and keep current

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000184

all governmental permits, certificates and licenses necessary for the performance of such undertakings and obligations. The End-User shall, upon the Company's request, provide evidence reasonably satisfactory to the Company of its compliance with this Section.

18.3. The End-User hereby represents that it is fully aware of any applicable export control laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder. Without limiting the foregoing (i) it will obtain all licenses and other consents required for the export of the System and Services under any applicable law other than the Approval; (ii) it will perform the contemplated activities hereunder in compliance with the terms of the Approval and any other applicable export license or other consent and permit or authorization received from or issued by any relevant governmental or regulatory authority that has jurisdiction over the contemplated activities hereunder.

18.4. The End-User hereby represents and warrants that (a) it is fully aware of any applicable anti-corruption and non-bribery laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder, and undertakes to abide and to cause all persons involved in the performance and consummation of this Agreement on its behalf, including any of its employees, consultants, officers, directors and representatives (each, an **"End-User Representative"**) to abide to such laws and regulations; (b) no action that is prohibited by any anti-corruption laws that may be applicable to the Company and/or to the End-User and/or to any third party involved in the performance and consummation of this Agreement was or will be performed by the End-User or any End-User Representative, and in particular, without derogating from the generality of the aforesaid, no End-User Representative has been or, will be in the future, offered, directly or indirectly, any payment, or anything of value, or was, or will be, promised, or has agreed to receive, or will receive, any such payment or anything of value in consideration for influencing decisions, or making a promise, express or implied to influence decisions, related to the Company and/or its business and/or to this Agreement that would violate any anti-corruption laws; and (c) it shall provide its employees, on an annual basis, training with respect to compliance with anti-corruption laws.

18.5. The End-User hereby represents and warrants that it and its respective employees and agents shall: (i) fully comply with all privacy and national security related laws and regulations, international standards, and any other laws and regulations that are applicable to the use of the System, including by way of obtaining all judicial warrants, consents and/or decrees to the extent required by law for each and every use of the System, (ii) use the System only for the prevention and investigation of crimes and terrorism and ensure that the System will not be used for human rights violations, and (iii) immediately notify the Company of any knowledge it may have regarding a misuse or potential misuse of the System which may result in human rights violations and/or which could cause the Company to be in breach of any of its legal and ethical obligations.

18.6. The End-User hereby irrevocably waives any and all claims or demands against the Company for (i) any limitations or inability to operate the System due to any applicable legal requirements; and (ii) for any losses suffered by the End-User, its respective officers, directors, employees and anyone on its behalf in the event that purchasing of the License or using the System will not comply with any applicable legal requirement.

18.7. Any breach of the representations and warranties in this Section 18 shall constitute a material breach.

19. <u>No Set-Off.</u> Notwithstanding any right available to the End-User under law, the End-User shall not be entitled to set-off any amounts due to the Company under this Agreement.

20. <u>Severability.</u> Should any court of competent jurisdiction declare any term of this Agreement void or unenforceable, such declaration shall have no effect on the remaining terms hereof.

7

21.    Interpretation. The titles and headings of the various sections and paragraphs in this Agreement are intended solely for reference and are not intended for any other purpose whatsoever or to explain, modify, or place any construction on any of the provisions of this Agreement.

22.    No Waiver. The failure of either party to enforce any rights granted hereunder or to take action against the other party in the event of any breach hereunder shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

23.    Notices. All notices and demands hereunder shall be in writing and shall be served by personal service or by mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be certified or registered mail, return receipt requested, by nationally-recognized private express courier, or sent by electronic transmission, with confirmation received, to the telecopy numbered specified below, and shall be deemed complete upon receipt.

**In Witness Whereof,** the parties hereto have executed this ▮▮▮▮▮▮▮ and year first above written.

K.H.hd

**Q Cyber Technologies SARL**

By: _____ Kevin W▮▮▮▮▮

Position: _____ Manager

Q Cyber Technologies S.à r.L.
46 A avenue John F. Kennedy
L-1855 Luxembourg
RCS Luxembourg B 203124
VAT n. LU28460471

8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

### Exhibit A

### Description of the System and Services

**The System:**

An end-point agent (the **"System"**) comprised of (i) a software component, installed on supported mobile devices and controlled remotely, to extract information, and (ii) such hardware equipment required for the installation of the System (**"Hardware Equipment"**).

License shall be provided with respect to five (5) concurrent mobile numbers (assigned by local MNOs in the End-User's home country), using Company's approved devices running on Company's certified versions of the iOS and Android operating systems.

The Company shall provide the End-User with three (3) local working stations for use of the System.

All System's features and capabilities shall be as demonstrated to the End-User at the Training prior to the Commissioning Notice, as may be updated by the Company periodically due to technological and Operation Security reasons.

**The Services:**

The services related to the System include the following (the **"Services"**):

(a) Deployment of the System at the End-User's site, which includes the delivery and provision of the System and the installation thereof (the **"Deployment"**);

(b) Training course of up to five (5) days (non-consecutive) which shall be held at the End-User's facility, in English (the **"Training"**). The Training sessions shall cover topics relating to the System's operation and handover; For the avoidance of doubt, the Company's training personnel shall at no stage take part in the activation of the System on behalf of the End-User and will not be involved in any aspect of the End-User's actual live intelligence operations.

(c) 12 months warranty (the **"Warranty Period"**) in accordance with the SLA, commencing at the date of the provision of the Commissioning Notice.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY        NSO_WHATSAPP_00000187

**Exhibit B**

**Consideration**

| Consideration Component | Consideration for | Amount in USD |
|---|---|---|
| "System Consideration" | provision of the License and Services. | ███████ |
| "Support Service Consideration" | any one Support Period. | ███████ |
| "Support Service Supplement Consideration" | one-time fee which will be added to the Support Service Consideration if the Support Service is not provided immediately following the Warranty Period or subsequent to a previous Support Period. | The pro-rata amount of the Support Service Consideration for the period between the date of expiry of the Warranty Period or the applicable Support Period and the date of purchase of the renewed Support Services. |

**Payment Terms**

Support Service Consideration

The System Consideration shall be paid by the End-User to the Company in three (3) installments as follows:

    (a) 50% of the System Consideration (the "**First Installment**") shall be paid within 14 days as of the Effective Date.

    (b) 40% of the System Consideration shall be paid 7 days following the provision of a written notice from the Company, certifying that the Hardware Equipment was delivered to the End-User's site.

    (c) 10% of the System Consideration shall be paid 7 days from the provision of a written notice by the Company to the End-User confirming that the Deployment of the System at the End-User's site was completed (the "**Commissioning Notice**").

Consideration for Support Services

    (a) The consideration for any Support Period which is either subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Period Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the end of the Warranty Period or the previous Support Period, as the case may be.

    (b) The consideration for any Support Period which is not subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Service Consideration plus the Support Service Supplement Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the date on which the parties agreed that the Support Services will resume.

10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000188

**Exhibit C**

**Installation requirements**

*To be provided*

11

**Exhibit D**

**Security Guidelines**

*To be provided*

12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000190

**Exhibit C**

**Installation requirements**

*To be provided*

11

**Exhibit D**

**Security Guidelines**

*To be provided*

12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000192

**Exhibit E**

**Form of End-User Certificate**

13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Exhibit F**

**Service Level Agreement**

1. **Definitions**. All terms used, but not otherwise defined hereunder, have the meaning ascribed to them in the Agreement.

   1.1. **CRM tool** means the Company's dedicated web portal and CRM management software through which the End User may open a Support Ticket and contact the Company's technical support center.

   1.2. **Documentation** means the System's user and technical manuals provided by the Company.

   1.3. **Error** means an error in one or more functions of the System that adversely degrades from the System's functionality description in the Documentation.

   1.4. **Hardware** means the Hardware provided by the Company (if any) as set forth in the Agreement.

   1.5. **Response Time** means the amount of time between the End User opening a Support Ticket and the Company support staff's initial response.

   1.6. **Resolution** means reducing the severity level of an Error, either by a permanent fix or a Workaround until a permanent fix is available.

   1.7. **Resolution Time** means the amount of time between the Company support staff's initial response and resolution of the reported issue.

   1.8. **SupportTicket** means any single issue reported via the CRM tool or by email and is identifiable by an assigned case number.

   1.9. **System** means the System described in the Agreement, including its software and Hardware provided by the Company. For the purposes herein, the term "System" also includes any standalone Product as defined under the Agreement.

   1.10.**Workaround** means a change to followed procedures or data to correct or avoid Error without substantially impairing use of the System.

2. **End User Obligations**

   2.1. **SystemAccess.** The End User must provide the Company or its authorized representative with remote access to the System in order for the Company to remotely diagnose and resolve an Error, or remotely install software updates or upgrades to the System. The End User understands that if such access is not provided, then problem determination will be slower, impaired, or impossible.

   2.2. **On-site Access.** To the extent a certain Error cannot be resolved remotely (as determined by the Company at its sole discretion), the End User will provide the Company or its authorized representative with sufficient and safe access to the End User's facilities in order to permit the Company to fulfill its obligations hereunder. On-site services will not be provided if remote access was not granted by the End-User.

   2.3. Only End User personnel, who have received training by the Company, are permitted to open a Support Ticket and contact the Company support center.

3. **Support & Maintenance**

   The warranty, support, and maintenance services of the System will be provided by the Company (or a third party designated by it) to the End User via the Company technical support center, in accordance with the following:

   3.1. **Support.** The Company will provide the End User with technical support for the System, consisting of first-level to fourth-level ("Tier1 to Tier4"), all as described below.

   3.2. **Maintenance.** Maintenance of the System consists of the following:

14

3.2.1. <u>Software Upgrade.</u> Periodical software-releases of different features and bug fixes, which the Company, at its discretion, may make available to the End User subject to and upon general commercial release. Installation of a new software upgrade will be reasonably coordinated in advance with the End User to minimize the System downtime.

3.2.2. <u>Software Update.</u> Software release or patch provided from time-to-time, at the Company's sole discretion, in order to improve program functionality or fix specific known bugs, outside the periodical SW release, issued at the Company's discretion from time to time. Software updates may also be provided for newly-released versions of operating systems.

3.2.3. <u>Monitoring System.</u> To the extent a monitoring software is installed with the System, the System will be connected to the Company's 24/7 network operation center (NOC) for around-the-clock monitoring which is configured to do the following:

    3.2.3.1. Connects to all major System Hardware components to provide real-time status.

    3.2.3.2. Monitors System software components such as tunnels and VPS servers, and issues alerts if any components shutdown.

    3.2.3.3. Checks white-account balances and issues alerts if a balance falls below a predefined threshold.

4. **Software Support**

4.1. **Scope of Commitment**. The scope of commitment and the extent of the warranty provided by the Company is intended to maintain the System at its functional condition, in accordance with the Documentation and the description of the System under <u>Exhibit A</u> of the Agreement.

4.2. **On-Site Support.** On-site software support will only be provided for Severity-level 1 Errors that cannot be resolved remotely (and is based solely on Company support staff judgment). If the Company determines that a matter is a Severity-level 1 Error, then the Company and the End User will work diligently until resolution of the Error. The Company may decide, at its sole discretion, to dispatch a Company representative or a partner support representative to the End User's site in order to achieve resolution. On-site support is not provided for troubleshooting or any software or training-related issues.

5. **Software Support Procedure**

The software support procedure shall be conducted as follows:

5.1. **Report of Error:** The End User shall promptly notify the Company, in writing, following the discovery of any verifiable and reproducible failure of the System. Notification must be made by opening a Support Ticket via the CRM tool or email (and if by telephone then it will shortly thereafter report the issue also by way of the CRM tool). The End User personnel must provide their unique security code at the outset of each and every contact with the Company support center.

This SLA, and the services provided hereunder, does not apply to bug reports or feature requests that are merely cosmetic or which do not otherwise impair the operation of the System. Such requests will typically be prioritized for handling in a future, regularly-scheduled product release.

15

5.2. **Provision of Information**. End User must provide, in the Support Ticket, all information relevant to the question or issue that needs to be resolved. The Company shall have no obligation to provide support services if the End User does not cooperate with the Company in procuring all relevant information. A unique support case number will be assigned to each Support Ticket and delivered to the End User via email or the CRM Tool. This number is used to track any documented issue, from initial contact to final Resolution.

5.3. The Company agrees to use commercially reasonable efforts to work with the End User on Error Resolution in accordance with the specifications of this SLA. Timely efforts must be made by all involved parties. If the End User does not respond, by the end of five (5) Business Days, to Company attempts to communicate regarding any open Support Ticket, then the Company may, upon providing notice, close such Support Ticket.

5.4. **Remote Access**. The End User agrees to grant the Company access, via a secure and dedicated VPN tunnel, upon receiving a request from the Company to address issues reported in a Support Ticket. The Company will then have access to the System for a limited period of time in order to reach a Resolution. The Company has no obligation to provide support services if the End User does not provide the VPN connection to the System.

6. **Hardware Support**

6.1. **Scope ofCommitment**. The Company shall not be obligated to provide any support or maintenance for Hardware equipment not purchased from the Company. For Hardware purchased and provided to the End User by the Company, the Company, to the extent possible, will provide back-to-back warranty accordingly to the standard warranty terms provided to the Company by the relevant third-party Hardware providers.

6.2. On-Site Hardware Support. To the extent applicable in accordance with the relevant Hardware provider warranty, Hardware support services may include on-site support, subject to the Company's sole discretion and provided that Hardware replacements or repairs shall not be performed outside of the End User's site.

7. **Hardware Support Procedure**

To the extent applicable, in accordance with the relevant Hardware-provider warranty, the Hardware support services will be conducted as follows:

7.1. Following the steps outlined in Sections 5.1 and 5.2 above, which also apply to Hardware issues, the Company will attempt to diagnose and resolve any Hardware problems over the phone or via remote access. Upon determination that an issue is related to a Hardware component malfunction, then the Company will, at its sole discretion, either repair or replace the relevant component.

7.2. Shipping time for Hardware may vary and is dependent, amongst others, on accessibility to the End User's site, and export and import procedures. Transportation costs, incurred by the Company in connection with the delivery of repaired or replacement Hardware to the End User, will be borne by the Company. However, the End User must suitably package, as specified by the Company, and ship the reported, faulty Hardware (or replaceable unit) to a location designated by the Company; the cost for such shipment will be borne by the End User.

7.3. If the Company determines, at its sole discretion, that the allegedly defective component is not covered by warranty, in accordance with the terms of this SLA or the warranty terms of the Hardware provider, then the cost of the repair or replacement by the Company, including all shipping expenses, will be reimbursed by the End User. The Company shall have no obligation to support and replace Hardware unmonitored by the monitoring system which is installed on the System and connected to the Company technical support center.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000196

8. **Severity Levels**

| Severity Level | | Description of Business Impact | Response Time | Resolution Time |
|---|---|---|---|---|
| 1 | Critical Impact | Complete System failure in which no standard procedure resolves the reported Error. A critical application function is unusable or unavailable and no Workaround exists. | 1 hour | 2 Business Days (provided no on-site services are required) |
| 2 | Serious Impact | The System is able to work and is producing major Errors when certain requests sent. A critical application function unusable or unavailable but a Workaround exists. | 1 hour | 10 Business Days |
| 3 | Minor Impact | Error(s) which do not affect the System's main functions. A critical or important application has diminished functionality or performance but the functionality still performs as specified in the Documentation. | 4 hours | The 2nd scheduled SW release |

9. **Support Levels & Activities**

| Severity Level | | Resource Commitment | Support Level provided |
|---|---|---|---|
| 1 | Critical Impact | Company and End User will commit the necessary resources 24/7 until Resolution.\n\nTop priority is to restore and/or improve functionally and not to debug the Error. If a Workaround cannot be provided, the task will be transferred to the Company's R&D team for further investigation. | **Tier 3** – Support activities may include all Tier 1 and Tier 2 activities, as well as in-depth System instructions, advanced diagnostics, and troubleshooting at R&D level. |
| 2 | Serious Impact | Company and End User will commit the necessary resources during normal business hours until Resolution. Top priority is to restore and/or improve functionally and to debug the Error. | **Tier 2** - Support activities may include all Tier 1 activities, as well as customization management, configuration changes, diagnostics, advanced troubleshooting and onsite services such as installations or repairs of electronic equipment using standard test instruments. |
| 3 | Minor Impact | Company and End User agree to use their technical resources during normal business hours until Resolution. Priority is to achieve better functionality and an analysis of the Error in order to resolve it in the next scheduled SW release. | **Tier 1** – Support activities may include basic software hardware installations, upgrades, basic troubleshooting, configuration changes and/or operation optimization. |

17

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| Tier Support | 4 | Support activities may include all Tier 1, 2 and 3 activities, as well as design level consultation and solutions, software R&D diagnostics, and high level of software and hardware fixes and solutions by a R&D engineer. |
|---|---|---|

### 10. Exclusions

10.1. The Company shall not be obligated to provide support and/or maintenance services in the event of any misuse, abuse, neglect, improper installation, alteration, modification, improper installation of the System, use of the System for purposes other than those authorized by the Company, or repairs made or attempted to be made by anyone other than the Company or its authorized representatives without the Company prior written approval.

10.2. Without derogating from the generality of Section 10.1 above, the support and maintenance services provided under this SLA do not include the following items or actions:

10.2.1. Any services whatsoever regarding any Hardware components in or related to the System, other than as specifically set forth in this SLA.

10.2.2. Step-by-step installation of software or service packs.

10.2.3. On-site services (other than those explicitly described in this SLA), professional services, managed services, or tutorial services.

10.2.4. Modification of software code, IT network architecture changes, security-policy configuration, audits, or security design.

10.2.5. Support and maintenance with regards to exploits which were closed and resulted in features becoming non-functional.

10.2.6. Requests for new features that are not part of the current System configuration and which will require research and development time.

10.2.7. Requests to support new devices.

10.2.8. Capabilities\Features which were removed due to OpSec.

10.2.9. where network access is unstable, amongst others due to poor 3G coverage or Internet access, or if the End User is not complying with Company Environment Requirements.

10.3. Without derogating from the generality of Section 10.1 above, the Company shall have no obligation to support:

10.3.1. An altered, damaged, or modified System or any portion thereof (including Hardware) incorporated with or into other software, Hardware, or products not specifically approved in advance in writing by the Company.

10.3.2. Errors or problems caused by End User negligence, misuse, misapplication, or use of the System in a way other than as specified in the Documentation.

10.3.3. Components installed on any computer Hardware that is not supported by the Company.

10.3.4. Components not purchased from the Company.

10.3.5. The System, or any portion thereof (including Hardware), was subjected to unusual physical or electrical stress, misuse, negligence, accident, or used in hazardous activities.

10.3.6. The System, or any portion thereof (including Hardware), was used or operated by untrained, End User personnel.

10.4. In addition to all other exclusions in Section 10 and this SLA, the Company shall have no obligation to support the End User or provide maintenance if:

10.4.1. Payment in full for support and maintenance, as agreed under the Agreement, has not been received by the Company; or

10.4.2. The Warranty Period has expired without renewal of an additional annual support term; or

18

NSO_WHATSAPP_00000198

10.4.3. The End-User does not fulfill its obligations under this SLA and/or the Agreement.

11. **End of Life**

11.1. The Company may provide a ninety (90) day prior written notice to the End User, specifying the date on which the version of the System shall expire (the **"End-of-Life Notice"** and **"End of life Date"** respectively), provided however, that (a) the End-of-Life Notice shall not be provided prior to the lapse of twelve (12) months following the Effective Date (as defined in the Agreement); and (b) the version of the System used by the End User is not the most updated version.

11.2. Upon the receipt of an End-of-Life Notice and at any time prior to the End-of-Life Date, if the End User has purchased Support Services (as defined in the Agreement), it shall receive an upgrade to the most updated version of the System.

11.3. If the End User has not purchased Support Services, then it may elect to either: (i) upgrade the System (such that it will include the then most current version of the System), by paying the applicable Support Service Consideration and the Support Service Supplement Consideration, as applicable (as such terms are defined in the Agreement); or (ii) maintain its then licensed version of the System in which case the License granted under the Agreement with respect to the System shall remain in effect for a period of six (6) months as of the End of life Date, and shall automatically terminate at the end of such period, such that the End User shall no longer be entitled to use the System. In such event the Company shall de-activate the System.

12. **Contact Information**

12.1. **Service Availability.** The technical support helpdesk is available 24 hours a day, 7 days a week via the following means:

12.2. **CRM tool / Web Portal.** Preferred way to contact the Company technical support center is by opening a ticket via the Company's dedicated web portal and CRM tool. CRM access is secured with a username and password provided by the Company.

12.3. **Email Support.** helpdesk@globalhelp.support

12.4. **Telephone Support.** +44 203 695 4101

12.1. All communications with the Company must be in English.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000199