# Exhibit D

## AGREEMENT

This Agreement (the **"Agreement"**) is entered into on June 20, 2019 (the **"Effective Date"**), by and between Q Cyber Technologies SARL, having its offices at 2 Rue Edward Steichen (1er étage) L-2540 Luxembourg, registration number 203124 (the **"Company"**) and ████████████, a company incorporated under the laws of ████████ (company registration number ████), having its registered offices at ████████████████████ (the **"Reseller"**).

**Whereas**,     the Company is engaged in the business of developing, integrating and supplying certain intelligence solutions, and has developed (through its affiliates) the System (as defined below); and

**Whereas**,     the Reseller is interested to purchase from the Company a License (as defined below) to use the System, and obtain services related to it as further set forth herein, solely for the purpose of reselling the same to ████████████ (the "**End-User**") and the Company has agreed to provide a License to use the System and related services to the End-User; and

**Whereas**,     the parties wish to set forth the terms under which such sale and purchase shall be made.

Now, therefore, in consideration of the foregoing premises and the mutual covenants herein contained, and for other good and valuable consideration, the parties agree as follows:

1.     Definitions and Exhibits.

    1.1.     In this Agreement, unless the context otherwise requires, terms defined in the preamble and the recitals shall have the same meaning when used elsewhere in this Agreement and the following terms shall have the meanings ascribed thereto below:

        **"Agreement"** has the meaning ascribed to it in the preamble.

        **"Approval(s)"** has the meaning ascribed to it in Section 5.1.

        **"Business Day"** means a day (other than a Friday, Saturday or Sunday) on which banks where the End User resides are generally open for normal business.

        **"Certificate(s)"** has the meaning ascribed to it in Section 5.1.

        **"Commissioning Notice"** has the meaning ascribed to it in Exhibit B.

        **"Company"** has the meaning ascribed to it in the preamble.

        **"Confidential Information"** means this Agreement and any information provided by one party to another or to the End User pursuant to this Agreement.

        **"Deployment"** has the meaning ascribed to it in Exhibit A.

        **"Dispute"** has the meaning ascribed to it in Section 14.

        **"Effective Date"** has the meaning ascribed to it in the preamble.

        **"End-User"** has the meaning ascribed to it in the preamble.

        **"First Installment"** has the meaning ascribed to it in Exhibit B.

        **"Force Majeure"** has the meaning ascribed to it in Section 16.

        **"Hardware Equipment"** has the meaning ascribed to it in Exhibit A.

        **"License"** has the meaning ascribed to it in Section 2.1.

        **"Reseller"** has the meaning ascribed to it in the preamble.

        **"Reseller Representative"** has the meaning ascribed to it in Section 19.4.

        **"Reseller/End-User Responsibilities"** has the meaning ascribed to it in Section 4.

        **"Services"** has the meaning ascribed to it in Exhibit A.

        **"SLA"** has the meaning ascribed to it in Section 6.2**.**

        **"Support Period"** has the meaning ascribed to it in Section 6.1.

        **"Support Service Consideration"** has the meaning ascribed to it in Exhibit B.

NSO_WHATSAPP_00000200
NSO_WHATSAPP_00000200

**"Support Services"** has the meaning ascribed to it in Section 6.

**"Support Service Supplement Consideration"** has the meaning ascribed to it in Exhibit B.

**"System"** has the meaning ascribed to it in Exhibit A.

**"System Consideration"** has the meaning ascribed to it in Exhibit B.

**"Training"** has the meaning ascribed to it in Exhibit A.

**"Warranty Period"** has the meaning ascribed to it in Exhibit A.

1.2.    The following are the exhibits in this Agreement:

Exhibit A – Description of System and Services

Exhibit B – Consideration

Exhibit C – Installation Requirements

Exhibit D – Form of End-User Certificate(s)

Exhibit E – Service Level Agreement

Exhibit F - Deliverables

2.    <u>Provision of License and Services.</u>

2.1.    Subject to the terms of this Agreement and the payment of the System Consideration by the Reseller in full, the Company shall (i) grant the Reseller a nonexclusive, non-transferable, non-pledge able and non-assignable license to use the System for the sole purpose of reselling the same to the End-User, for the End User internal use only and solely for the purpose that it is intended for (the **"License"**); and (ii) provide the Services for the sole purpose of reselling them to the End-User.

Physical copies of the software included in the System are not being sold to the Reseller, and may not be resold by it to the End-User, but are the property of the Company, and are provided under this Agreement in order to be used by the End-User during the term of this Agreement and in accordance with its terms.

2.2.    Subject to provisions of Sections 2.3 and 5.2 below, within one-hundred (100) Business Days following the occurrence of (i) the receipt by the Company of the Approval, and (ii) the receipt by the Company of the First Installment, in full, the Company shall complete the Deployment and shall conduct the Training.

2.3.    The provision of the System, the License and the Services by the Company in accordance with the time schedule set forth in Section 2.2 above and the performance by the Company of all its obligations under this Agreement is conditioned upon (i) the fulfillment by the Reseller/End-User of all of the Reseller/End-User Responsibilities when due, and (ii) the actual receipt by the Company of each payment of the System Consideration when due, in full.

It is hereby clarified that the Company shall not be held responsible or liable for any delay in the provision of the System, the License and/or the Services, if such delay was due to any midperformance or delay in the fulfillment of any of the Reseller/End-User Responsibilities and/or payment obligations and/or due to a delay in the performance or fulfillment of the pre-requisite conditions set forth in Sections 3, 4 and 5 below. In the event of a delay in the performance of any of the Reseller/End-User Responsibilities and/or payment obligations and/or the performance or achievement of the pre-requisite conditions set forth in Sections 3, 4 and 5 below, the Company's obligations shall be postponed by such number of days equal to number of days by which the time schedule was delayed due to acts or omissions caused by the Reseller/End-User.

2.4.    For the avoidance of any doubt it is hereby clarified that neither the Company nor any of its affiliates (nor the Reseller) shall take any role in the operation, activation and/or use of the System. The End User shall be solely responsible and liable for the use and operation of the System in accordance with the License and the terms of this Agreement.

3.     Consideration; Payment Terms.

3.1.    In consideration for the provision of the License, the System and the Services, the Reseller shall pay the Company the System Consideration as set forth in Exhibit B.

3.2.    The System Consideration shall be paid by the Reseller to the Company in installments as set forth in Exhibit B.

3.3.    Any and all payments made to the Company under this Agreement are exclusive of all state, provincial, municipal or other government, excise, use, sales, VAT or like taxes, tariffs, duties or surcharges, now in force or as may be enacted in the future, which shall be borne by the Reseller, provided, however that the Company shall bear all income taxes imposed on the Company in connection with this Agreement. Each payment under this Agreement shall be paid by the Reseller against an invoice to be issued by the Company.

3.4.    Any and all amounts paid to the Company under this Agreement are non-refundable, and may not be claimed or reclaimed by the Reseller.

3.5.    If any sum payable pursuant to this Agreement is not timely paid to the Company, then, without prejudice to any other right or remedy available to the Company in accordance with the terms of this Agreement or by law, the Company reserves the right to suspend the contractual performance or the use of the System and/or the Services until the Reseller has made payment of the overdue amount in full.

3.6.    The End-User shall not be permitted to use the System, and the License shall not be deemed granted unless (a) the Commissioning Notice was delivered, and (b) each installment which was due on or prior to the date of the Commissioning Notice was paid in full, when due. Following the provision of the Commissioning Notice, in the event that any installment of the Consideration shall not be paid upon the date of its designated payment, the End-User shall not be permitted to continue using the System and the License shall be considered suspended until the payment in full of such installment is made. In such event, the Company shall be entitled to take all measures available to it (including without limitation legal and technological measures) to prevent the End-User from continuing to use the System and shall not be held responsible for any damage or loss incurred by the Reseller and/or the End-User with respect thereto.

3.7.    In the event of a complete System failure in which no capability is operational, for a period exceeding thirty (30) consecutive days (the "**Failure Down Time**"), due to reason(s) under the sole responsibility of the Company and excluding Operational Security and/or Force Majeure events, the Warranty Period will be extended on a day-to-day basis for each day beyond the Failure Down Time, with no additional cost to the Reseller, up to thirty (30) consecutive days, in the aggregate, per annum. I.e. for any day that the System is under complete System failure exceeding the Failure Down Time, and not more than 30 consecutive days in the aggregate, the Reseller shall be entitled to receive a day of the extended Warranty Period for no consideration.

3.8.    In the event that, as per the terms and conditions of Section 3.7 above, the Warranty Period is extended for more than thirty (30) calendar days (the warranty period at the end of such additional 30 calendar days' being referred to as the "**Extended Warranty Termination Date**"), the Reseller shall be entitled to, as liquidated and pre-estimated damage, a penalty equaling US$2,000 for each day exceeding the Extended Warranty Termination Date, to a maximum of 90 days.

4.     The Reseller/End-User's Responsibilities. The Reseller undertakes to perform, or, when applicable, make best effort to cause the End-User to perform, all of the following obligations in a timely manner (the "**Reseller/End-User Responsibilities**"):

4.1.    fulfillment of all of the technical and installation requirements listed in Exhibit C at the End-User's site, prior to the delivery of the Hardware Equipment;

4.2.    obtainment and maintenance of all permits and approvals required to be obtained from any regulatory and governmental authority relating to the End-User, under any and all applicable legal requirements for the performance of this Agreement;

4.3.    delivery of the Certificates to the Company;

4.4.    provision of any and all additional required conditions to enable the performance of the Company's obligations under this Agreement when due, including without limitation, release of the Hardware Equipment from custom (if required) and assuring availability of the End-User's personnel for participation in the Training;

4.5.    to perform, or, when applicable, to make best effort to cause the End-User to perform and acknowledge (i) all of the obligations set forth in the SLA, in a timely manner.

5.    <u>Pre-Conditions</u>.

5.1.    The provision of the License, the System and the Services to the End-User and the performance by the Company of its obligations under this Agreement are subject to (i) the receipt by the Company of original certificates in accordance with the requirements of any applicable governmental authority confirming the identity of the End-User, substantially in the form attached hereto as <u>Exhibit D</u> (the "**Certificate(s)**) and (ii) the receipt by the Company of the approval(s) and/or license(s) of any applicable governmental authority for the provision of the System and the Services as set forth herein (the "**Approval(s)).**

5.2.    For the avoidance of any doubt, no products, licenses, equipment or services shall be provided by the Company under this Agreement until each applicable Certificate is delivered to the Company and the Approval is obtained. In the event that the Certificate(s) are not received by the Company and/or the Approvals are not obtained within six (6) months as of the date hereof, or in the event that the Company receives, earlier, a formal notice from the applicable governmental authority that the applications for the Approval(s) was denied, or in the event that any Approval is canceled, terminated or suspended, the Company shall have the right to terminate this Agreement by providing the Reseller a written notice, and such termination shall not be considered a breach of this Agreement, and the Company shall not be held responsible or liable for any effect of such termination.

5.3.    Without derogating from the aforesaid, Reseller acknowledges and understands, and will notify the End User accordingly, that the provision of the Certificate by the End-User are subject to annual renewal.

6.    <u>Technical Support and Maintenance Services</u>. Following the expiration of the Warranty Period, the Reseller shall be entitled to purchase technical support and maintenance services with respect to the System (the "**Support Services**"), resold by it to the End–User, to be renewed automatically at the end of the Warranty Period and any Support Period, unless terminated for any reason by Reseller or the Company, all in accordance with the following terms:

6.1.    The Reseller may purchase Support Services for periods of twelve (12) consecutive months (each such period – a "**Support Period**"). In the event that either the Reseller or the Company chooses not to purchase or provide Support Services, it shall notify the other party in writing no later than thirty (30) day prior to the expiration of the Warranty Period or any then current Support Period. Reseller shall not have any claims or demands towards the Company for any reduced, weakened or diminished capabilities and/or functionalities of the System due to non-retention of Support Services.

6.2.    The Support Services shall be provided in accordance with the Company's standard services level agreement, as may be amended from time to time. A copy of the Company's current service level agreement is attached hereto as <u>Exhibit E</u> (the "**SLA**").

6.3.    The consideration for the Support Services shall be paid in advance before each Support Period, in accordance with the payment terms set forth in <u>Exhibit B</u>.

7.    <u>Termination</u>.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

7.1.   This Agreement shall commence on the Effective Date and shall remain in full force and effect until terminated in accordance with the terms herein.

7.2.   If either party hereto commits: (i) a material breach of this Agreement (including its exhibits) and/or any other agreement executed between the parties with respect to the End-User (the "**Additional Contract(s)**") or defaults in the performance of any material obligation hereof and/or defaults in the performance of any material obligation specified under any Additional Contract(s), and if such default or breach is not corrected within 14 days after the same has been called to the attention of the defaulting party by a written notice from the other party (provided that with respect to breach of any representation made under Section 19 below and/or with respect to a breach of any representation made under any Additional Contract(s), such 14 days period shall be shortened to 7 days); or (ii) a non-material breach of this Agreement (including its exhibits) and/or of any Additional Contract(s) or defaults in the performance of any other obligation contained in this Agreement and/or under any Additional Contract(s), and such default or breach is not corrected within 30 days after the same has been called to the attention of the defaulting party by a written notice from the other party - then the non-defaulting party, at its option, may thereupon terminate this Agreement, with an immediate effect, by submitting a written notice to the other party.

7.3.   Either party shall have a right to terminate the Agreement, by providing the other party a written notice, upon the occurrence of any of the following events: (i) a receiver is appointed for a party or its property; (ii) a party makes an assignment for the benefit of its creditors; (iii) any proceedings are commenced by, for, or against a party under any bankruptcy, insolvency, or debtors relief law for the purpose of seeking a reorganization of such party's debts, and such proceeding is not dismissed within 60 days of its commencement; or (iv) the liquidation or dissolution of a party.

7.4.   Upon termination of this Agreement the Reseller shall be obligated to pay to the Company any outstanding consideration due prior to the said termination within 14 days as of the date of termination of this Agreement. The provisions of Sections 7.4, 8 10, 11, 12, 13, 14 and 24 of this Agreement shall survive the termination of this Agreement.

8.   <u>Additional Remedy</u>. In the event a breach has occurred with respect to any obligation specified under this Agreement and/or under any Additional Contract(s) (including, without limitation, in the event that the Company has reasonable grounds to suspect a breach of any of the representations made under Section 19 below and/or of any of the representations made under any Additional Contract(s)), in addition to the Company's right to terminate the Agreement, and its other rights and remedies under applicable law and this Agreement, the Company may immediately suspend or cancel the License or the provision of any of the Services, or take such actions necessary to prevent access to the System until such time as it has received confirmation to its satisfaction that such breach was cured. The Company shall not be liable towards the Reseller and/or the End-User for any claim, losses or damages whatsoever related to its decision to suspend or cancel the provision of any of the License, Services, Support Services, or to prevent access to the System under this Section.

9.   <u>End-User Acknowledgments and Undertakings</u>. The Reseller undertakes to make best effort to cause the End-User to acknowledge and abide to any term and provision of this Agreement applicable to the End-User, including without limitation to the provisions of Sections 4, 5, 9, 11 and 19, and shall obtain full responsibility and liability to any infringement of such provisions by the End-User.

10.   <u>Intellectual Property Rights</u>. All the rights pertaining to the System, the Services and the License, including, but not limited to, all patents, trademarks, copyrights, service marks, trade names, technology, know how, moral rights and trade secrets, all applications for any of the foregoing, and all permits, grants and licenses or other rights relating to the System and the Services are and shall remain the sole property of the Company. The Reseller hereby acknowledges that, other than as set forth in Section 2.1, no right to the System (including the software embedded therein) is transferred to it or to the End-User under this Agreement or in connection hereof and it is not granted any right in the System, including without limitation, intellectual property right. The

Reseller shall not, and shall make best effort to cause that the End-User shall not, whether directly or indirectly either by itself or through any other person, reproduce, modify, disassemble or reverse-engineer the System (including any software contained therein).

11. <u>Confidentiality</u>. The Reseller undertakes to keep, and to make best effort to cause the End-User to keep, the Confidential Information in strict confidence and not to disclose it to any third party without the prior written consent of the Company; provided, however, that the Reseller and the End-User may disclose such information to their respective employees and consultants having a need to know such information in order to carry out the provisions of this Agreement. The Reseller will make best effort that the End-User and any such employees and consultants to which Confidential Information is disclosed will be bound and will abide by terms no less onerous than those contained herein. The Reseller shall be responsible for any breach of confidentiality by itself, or by such employees and consultants and for any harm caused to the Company as a result of such breach.

Following the termination of this Agreement for any reason, or upon the Company's first written demand, the Reseller shall return to the Company, and shall make best effort to cause the End-User (under the contract with it) to return to the Company, all Confidential Information, including all records, products and samples received, and any copies thereof, whether in its possession or under its control, and shall erase all electronic records thereof, and shall so certify to the Company in writing.

12. <u>Limited Warranty</u>. It should be noted that the Company does not warrant that the License, the System and the Services provided hereunder will be uninterrupted, error-free, or completely secure. The Company does not make, and hereby disclaims, any and all implied warranties, including implied warranties of merchantability, fitness for a particular purpose and non-infringement. The System and Services provided pursuant to this Agreement are provided or performed on an "as is", "as available" basis.

13. <u>Limitation of Liability</u>. In no event shall the Company be liable for any consequential, incidental, special, indirect or exemplary damages whatsoever, including lost profits, loss of business, loss of revenues, or any other type of damages, whether arising under tort, contract or law. The Company's aggregate liability under this Agreement shall be limited to the consideration actually received by the Company under this Agreement.

14. <u>Settling of Disputes and Governing Law</u>. Any and all Disputes concerning this Agreement shall be governed by the laws England and Wales, regardless of its conflict of laws rules and of where this Agreement was executed or is to be performed. This Agreement is made on the basis of mutual confidence, and it is understood that the differences, if any, during the term of this Agreement should freely be discussed between the parties. The parties shall initially attempt in good faith to resolve any significant controversy, claim or dispute arising out of or in relation to this Agreement, or its interpretation, performance, non-performance or any breach of any respective obligations hereunder (other than a dispute over the ownership of intellectual property rights) (a "**Dispute**"), through negotiations between senior executives of the parties. If the Dispute is not resolved within thirty (30) days (or such other period of time mutually agreed upon by the parties) of commencing such face-to-face negotiations, or if the party against refuses to attend such negotiations or does not otherwise participate in such negotiations within thirty (30) days (or such other period of time mutually agreed upon by the parties) from the date of the notice of the Dispute, then the parties agree that the dispute shall, be exclusively settled by binding closed doors arbitration under the Rules of Arbitration of the London Court of International Arbitration by one or more arbitrators appointed in accordance with the said rules. The arbitration shall be conducted in English, in London, England. The prevailing party shall be entitled to reimbursement of its reasonable attorney's fees.

15. <u>Assignment</u>. This Agreement and the rights and obligations hereunder are not transferable, pledgeable or assignable, by either party without the prior written consent of the other party. However, the Company may assign its rights and obligations to a parent, affiliate or subsidiary company and, in the case of a merger or acquisition, to a successor company, and provided that the rights of the Reseller shall not be derogated pursuant to such assignment.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

16. <u>Force Majeure</u>. The Company shall not be liable for any failure to perform its obligations under this Agreement due to any action beyond its control, including without limitation: (i) acts of god, such as fires, floods, electrical storms, unusually severe weather and natural catastrophes; (ii) civil disturbances, such as strikes and riots; (iii) acts of aggression, such as explosions, wars, and terrorism; (iv) acts of government, including, without limitation, the actions of regulatory bodies which significantly inhibits or prohibits the Company from performing its obligations under this Agreement (each, a **"Force Majeure"**). In the event of a Force Majeure, the performance of the Company's obligations shall be suspended during the period of existence of such Force Majeure as well as the period reasonably required thereafter to resume the performance of the obligation.

17. <u>No Third Party Beneficiary</u>. This Agreement shall not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns, except if explicitly written otherwise.

18. <u>Complete Agreement</u>. This Agreement and the Exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

19. <u>Representations</u>.

19.1. The Reseller hereby represents and warrants that the execution and delivery of this Agreement and the fulfillment of its terms: (i) will not constitute a default under or conflict with any agreement or other instrument to which Reseller and/or the End-User are a party or by which they are bound; and (ii) other than as specifically set forth in this Agreement, does not require any further consent of any person or entity.

19.2. The Reseller hereby represents that it shall comply with all laws, rules and regulations applicable to the performance of its undertakings and obligations pursuant to this Agreement in any applicable country, and undertakes that it will obtain and keep current all governmental permits, certificates and licenses necessary for the performance of such undertakings and obligations. The Reseller shall, upon the Company's request, provide evidence reasonably satisfactory to the Company of its compliance with this Section.

19.3. The Reseller hereby represents for both itself and the End User, that the Reseller and End User are fully aware of any applicable export control laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder. Without limiting the foregoing (i) Reseller will obtain all licenses and other consents required for the import/export of the System and Services under any applicable law other than the Approvals; (ii) Reseller will perform, and make best effort to cause the End User to perform, any of the contemplated activities hereunder in full compliance with the terms of the Approvals and any other applicable export license or other consent and permit or authorization received from or issued by any relevant governmental or regulatory authority that has jurisdiction over the contemplated activities hereunder.

19.4. The Reseller hereby represents and warrants that (a) it is fully aware of any applicable anti-corruption and non-bribery laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder, and undertakes to abide and to cause all persons involved in the performance and consummation of this Agreement on its behalf, including any of its employees, consultants, officers, directors and representatives (each, an **"Reseller Representative"**) to abide to such laws and regulations; (b) no action that is prohibited by any anti-corruption laws that may be applicable to the Company and/or to the Reseller and/or to the End-User and/or to any third party involved in the performance and consummation of this Agreement was or will be performed by the Reseller or any Reseller Representative.

19.5. The Reseller hereby represents that under an agreement to be entered into with the End-User, the End-User will warrant that it and its respective employees and agents shall: (i) fully comply with all privacy national security related laws and regulations, international standards and any other laws and regulations that are applicable to the use of the System, including by way of obtaining all judicial warrants, consents and/or decrees to the extent

NSO_WHATSAPP_00000206
NSO_WHATSAPP_00000200

required by law for each and every use of the System, and (ii) use the System only for prevention and investigation of crimes and terrorism and that the System will not be used for human rights violations, (iii) immediately notify the Company of any knowledge it may have regarding a misuse or potential misuse of the System which may result in human rights violations and/or which could cause the Company to be in breach of any of its legal and ethical obligations. This undertaking on part of the End User shall be provided also with respect to the Company as a third party beneficiary. Upon the Company's request, the Reseller shall provide the Company with the End User's signature for the representations and undertakings contained in this Section 19.5.

19.6.   The Reseller hereby irrevocably waives any and all claims or demands against the Company for (i) any limitations or inability to operate the System due to any applicable legal requirements; and (ii) for any losses suffered by it and/or the End-User, their respective officers, directors, employees and anyone on their behalf in the event that purchasing of the License or using the System will not comply with any applicable legal requirement.

19.7.   Any breach of the representations and warranties in this Section 19 shall constitute a material breach.

20.   No Set-Off. Notwithstanding any right available to the Reseller under law, the Reseller shall not be entitled to set-off any amounts due to the Company under this Agreement.

21.   Severability. Should any court of competent jurisdiction declare any term of this Agreement void or unenforceable, such declaration shall have no effect on the remaining terms hereof.

22.   Interpretation. The titles and headings of the various sections and paragraphs in this Agreement are intended solely for reference and are not intended for any other purpose whatsoever or to explain, modify, or place any construction on any of the provisions of this Agreement.

23.   No Waiver. The failure of either party to enforce any rights granted hereunder or to take action against the other party in the event of any breach hereunder shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

24.   Notices. All notices and demands hereunder shall be in writing and shall be served by personal service or by mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be certified or registered mail, return receipt requested, by nationally-recognized private express courier, or sent by electronic transmission, with confirmation received, to the telecopy numbered specified below, and shall be deemed complete upon receipt.

**In Witness Whereof**, the parties hereto have executed this A_____ y and year first above written.

_____
**Q Cyber Technologies SARL**

By: _____Yuval Somekh_____

Position: _____Mnager_____

23/6/2019

Position: Chief Marketing Officer

### Exhibit A
### Description of the System and Services

The System:

The System is comprised of the Pegasus product as follows:

**Pegasus:**

An end-point agent comprised of (i) a software component, installed on supported mobile devices and controlled remotely, to extract information, and (ii) such hardware equipment required for the installation of this Product ("**Hardware Equipment**").

- License shall be provided with respect to 20 concurrent mobile numbers assigned by a local MNO ▮▮▮▮▮▮ using Company's supported devices running on Company's certified versions of iOS and Android operating systems.

- License for use of the System with new installation vectors for iOS and Android is included on "as available" basis.

- This Product will be provided with five (5) working stations.

  *** All System's features and capabilities shall be as demonstrated to the End-User at the Training, and as may be updated by the Company periodically due to technological and Operation Security reasons.


**Products' Restrictions & Clarifications**

The following restrictions, disclaimers and clarifications apply with respect to the Pegasus Product:

**Pegasus:**

−    Device and OS support are sensitive to different ROMs. Therefore, a certain device model that is supported under specific ROM may not be supported for other ROMs or they may be differences in the supported features.

−    IM structure may be changed periodically by the IM provider, and therefore may not be supported to the fullest extent following each change.

The Services:

The services related to the System include the following (the "**Services**"):

(a) Deployment of the System at the End-User's site, which includes the delivery and provision of the System and the installation thereof (the "**Deployment**");

(b) Training course of up to 21 days (non-consecutive) which shall be held at the End-User's facility, in English (the "**Training**"). The Training sessions shall cover topics relating to the System's operation and handover. For the avoidance of doubt, the Company's training personnel shall at no stage take part in the activation of the System on behalf of the End-User and will not be involved in any aspect of the End-User's actual live intelligence operations.

(c) On-site support during 3 months as of the Commissioning Notice.

(d) 12 months warranty (the "**Warranty Period**") in accordance with the SLA, commencing at the date of the provision of the Commissioning Notice.

**Exhibit B**

**Consideration**

| Consideration Component | Consideration for | Amount in USD |
|---|---|---|
| **"System Consideration"** | provision of the License and Services. | ████████ |
| **"Support Service Consideration"** | any one Support Period. | ████████████████ |
| **"Support Service Supplement Consideration"** | one-time fee which will be added to the Support Service Consideration if the Support Service is not provided immediately following the Warranty Period or subsequent to a previous Support Period. | The pro-rata amount of the Support Service Consideration for the period between the date of expiry of the Warranty Period or the applicable Support Period and the date of purchase of the renewed Support Services. |

**Payment Terms**

Payment Terms
System Consideration

The System Consideration shall be paid by the Reseller to the Company in three (3) installments as follows:

(a) 50% of the System Consideration (the **"First Installment"**) shall be paid within fourteen (14) calendar days' following the Hardware Equipment's arrival at the customs. The Hardware Equipment shall be shipped CIF ████ (IncoTerms 2010).

(b) 30% of the System Consideration shall be paid 7 days following the provision of a written notice from the Company, certifying that the Hardware Equipment was installed at the End-User's site.

(c) 20% of the System Consideration shall be paid 7 days from the provision of a written notice by the Company to the Reseller confirming that the Deployment of the Pegasus product at the End-User's site was completed (the **"Commissioning Notice"**).

Consideration for Support Services

(a) The consideration for any Support Period which is either subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Period Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the end of the Warranty Period or the previous Support Period, as the case may be.

(b) The consideration for any Support Period which is not subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Service Consideration plus the Support Service Supplement Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the date on which the parties agreed that the Support Services will resume.

## Exhibit C
### Pegasus Installation requirements

| Prerequisite | Equipment | Remarks |
| --- | --- | --- |
| **Internet Connection** | **Main location -** 2 symmetric internet lines 60Mbit/60Mbit (from 2 different ISP's) with static IP's of 8 external addresses | 2 internet lines are required for redundancy. |
| **Cellular Reception** | Stable Cellular Reception | ~-95 db |
| **Air Condition** | 18 Degrees | None |
| **Electricity** | 4 X Sicon 32A power socket each - 220V | Server room and operational room drawings are required to accurately specify all wall outlets location. Power generator and Facility environment against hazard dangers are optional |
| **Area needed for server room** | 5X5M, Height 2.5 M | There are 2 48U racks with the following dimensions: Height 2258.00 mm, Width 600.00 mm, Depth 1070.00 mm |
| **Area needed for operator room** | 10X10M, Height 2.5 M | Can be divided into separate rooms |
| **Patch panel** | Depends on the number of stationary stations. Wires from the end stations to the patch panel in the rack | |
| **SIMs** | 2 SIM cards for each network | It is mandatory to use a 3rd party to order the SIMs , also use a postpaid account |
| **Security** | Lockable doors | |

**Exhibit D**

**Form of End-User Certificate**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

- 13 -

**Exhibit E**

**Service Level Agreement**

1.    **Definitions**. All terms used, but not otherwise defined hereunder, have the meaning ascribed to them in the Agreement.

   1.1.    **CRM tool** means the Company's dedicated web portal and CRM management software through which the End User may open a Support Ticket and contact the Company's technical support center.

   1.2.    **Documentation** means the System's user and technical manuals provided by the Company.

   1.3.    **Error** means an error in one or more functions of the System that adversely degrades from the System's functionality description in the Documentation.

   1.4.    **Hardware** means the Hardware provided by the Company (if any) as set forth in the Agreement.

   1.5.    **Response Time** means the amount of time between the End User opening a Support Ticket and the Company support staff's initial response.

   1.6.    **Resolution** means reducing the severity level of an Error, either by a permanent fix or a Workaround until a permanent fix is available.

   1.7.    **Resolution Time** means the amount of time between the Company support staff's initial response and resolution of the reported issue.

   1.8.    **Support Ticket** means any single issue reported via the CRM tool or by email and is identifiable by an assigned case number.

   1.9.    **System** means the System described in the Agreement, including its software and Hardware provided by the Company. For the purposes herein, the term "System" also includes any standalone product as defined under the Agreement.

   1.10.    **Workaround** means a change to followed procedures or data to correct or avoid Error without substantially impairing use of the System.

2.    **End User Obligations**

   2.1.    **System Access.** The End User must provide the Company or its authorized representative with remote access to the System in order for the Company to remotely diagnose and resolve an Error, or remotely install software updates or upgrades to the System. The End User understands that if such access is not provided, then problem determination will be slower, impaired, or impossible.

   2.2.    **On-site Access.** To the extent a certain Error cannot be resolved remotely (as determined by the Company at its sole discretion), the End User will provide the Company or its authorized representative with sufficient and safe access to the End User's facilities in order to permit the Company to fulfill its obligations hereunder. On-site services will not be provided if remote access was not granted by the End-User.

   2.3.    Only End User personnel, who have received training by the Company, are permitted to open a Support Ticket and contact the Company support center.

3.    **Support & Maintenance**

The warranty, support, and maintenance services of the System will be provided by the Company (or a third party designated by it) to the End User via the Company technical support center, in accordance with the following:

   3.1.    **Support.** The Company will provide the End User with technical support for the System, consisting of first-level to fourth-level ("**Tier1 to Tier4**"), all as described below.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

3.2.    **Maintenance.** Maintenance of the System consists of the following:

3.2.1.  <u>Software Upgrade</u>.  Periodical software-releases of different features and bug fixes, which the Company, at its discretion, may make available to the End User subject to and upon general commercial release. Installation of a new software upgrade will be reasonably coordinated in advance with the End User to minimize the System downtime.

3.2.2.  <u>Software Update</u>. Software release or patch provided from time-to-time, at the Company's sole discretion, in order to improve program functionality or fix specific known bugs, outside the periodical SW release, issued at the Company's discretion from time to time. Software updates may also be provided for newly-released versions of operating systems.

3.2.3.  <u>Monitoring System</u>. To the extent a monitoring software is installed with the System, the System will be connected to the Company's 24/7 network operation center (NOC) for around-the-clock monitoring which is configured to do the following:

3.2.3.1. Connects to all major System Hardware components to provide real-time status.

3.2.3.2. Monitors System software components such as tunnels and VPS servers, and issues alerts if any components shutdown.

3.2.3.3. Checks white-account balances and issues alerts if a balance falls below a predefined threshold.

4.      **Software Support**

4.1.    **Scope of Commitment**. The scope of commitment and the extent of the warranty provided by the Company is intended to maintain the System at its functional condition, in accordance with the Documentation and the description of the System under <u>Exhibit A</u> of the Agreement.

4.2.    **On-Site Support.** On-site software support will only be provided for Severity-level 1 Errors that cannot be resolved remotely (and is based solely on Company support staff judgment). If the Company determines that a matter is a Severity-level 1 Error, then the Company and the End User will work diligently until resolution of the Error. The Company may decide, at its sole discretion, to dispatch a Company representative or a partner support representative to the End User's site in order to achieve resolution. On-site support is not provided for troubleshooting or any software or training-related issues.

5.      **Software Support Procedure**

The software support procedure shall be conducted as follows:

5.1.    **Report of Error:** The End User shall promptly notify the Company, in writing, following the discovery of any verifiable and reproducible failure of the System. Notification must be made by opening a Support Ticket via the CRM tool or email (and if by telephone then it will shortly thereafter report the issue also by way of the CRM tool). The End User personnel must provide their unique security code at the outset of each and every contact with the Company support center.

This SLA, and the services provided hereunder, does not apply to bug reports or feature requests that are merely cosmetic or which do not otherwise impair the operation of the System. Such requests will typically be prioritized for handling in a future, regularly-scheduled product release.

5.2.  **Provision of Information**. End User must provide, in the Support Ticket, all information relevant to the question or issue that needs to be resolved. The Company shall have no obligation to provide support services if the End User does not cooperate with the Company in procuring all relevant information. A unique support case number will be assigned to each Support Ticket and delivered to the End User via email or the CRM Tool. This number is used to track any documented issue, from initial contact to final Resolution.

5.3.  The Company agrees to use commercially reasonable efforts to work with the End User on Error Resolution in accordance with the specifications of this SLA. Timely efforts must be made by all involved parties. If the End User does not respond, by the end of five (5) Business Days, to Company attempts to communicate regarding any open Support Ticket, then the Company may, upon providing notice, close such Support Ticket.

5.4.  **Remote Access**. The End User agrees to grant the Company access, via a secure and dedicated VPN tunnel, upon receiving a request from the Company to address issues reported in a Support Ticket. The Company will then have access to the System for a limited period of time in order to reach a Resolution. The Company has no obligation to provide support services if the End User does not provide the VPN connection to the System.

## 6.  <u>Hardware Support</u>

6.1.  **Scope of Commitment**. The Company shall not be obligated to provide any support or maintenance for Hardware equipment not purchased from the Company. For Hardware purchased and provided to the End User by the Company, the Company, to the extent possible, will provide back-to-back warranty accordingly to the standard warranty terms provided to the Company by the relevant third-party Hardware providers.

6.2.  On-Site Hardware Support. To the extent applicable in accordance with the relevant Hardware provider warranty, Hardware support services may include on-site support, subject to the Company's sole discretion and provided that Hardware replacements or repairs shall not be performed outside of the End User's site.

## 7.  <u>Hardware Support Procedure</u>

To the extent applicable, in accordance with the relevant Hardware-provider warranty, the Hardware support services will be conducted as follows:

7.1.  Following the steps outlined in Sections 5.1 and 5.2 above, which also apply to Hardware issues, the Company will attempt to diagnose and resolve any Hardware problems over the phone or via remote access. Upon determination that an issue is related to a Hardware component malfunction, then the Company will, at its sole discretion, either repair or replace the relevant component.

7.2.  Shipping time for Hardware may vary and is dependent, amongst others, on accessibility to the End User's site, and export and import procedures. Transportation costs, incurred by the Company in connection with the delivery of repaired or replacement Hardware to the End User, will be borne by the Company. However, the End User must suitably package, as specified by the Company, and ship the reported, faulty Hardware (or replaceable unit) to a location designated by the Company; the cost for such shipment will be borne by the End User.

7.3.  If the Company determines, at its sole discretion, that the allegedly defective component is not covered by warranty, in accordance with the terms of this SLA or the warranty terms of the Hardware provider, then the cost of the repair or replacement by the Company, including all shipping expenses, will be reimbursed by the End User. The Company shall have no obligation to support and replace Hardware unmonitored by the monitoring system which is installed on the System and connected to the Company technical support center.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

8.    **Severity Levels**

| Severity Level | | Description of Business Impact | Response Time | Resolution Time |
|---|---|---|---|---|
| 1 | **Critical Impact** | Complete System failure in which no standard procedure resolves the reported Error. A critical application function is unusable or unavailable and no Workaround exists. | 1 hour | 2 Business Days (provided no on-site services are required) |
| 2 | **Serious Impact** | The System is able to work and is producing major Errors when certain requests sent. A critical application function unusable or unavailable but a Workaround exists. | 1 hour | 21 Business Days |
| 3 | **Minor Impact** | Error(s) which do not affect the System's main functions. A critical or important application has diminished functionality or performance but the functionality still performs as specified in the Documentation. | 4 hours | The 2nd scheduled SW release |

9.    **Support Levels & Activities**

| Severity Level | | Resource Commitment | Support Level provided |
|---|---|---|---|
| 1 | **Critical Impact** | Company and End User will commit the necessary resources 24/7 until Resolution. Top priority is to restore and/or improve functionally and not to debug the Error. If a Workaround cannot be provided, the task will be transferred to the Company's R&D team for further investigation. | **Tier 3** – Support activities may include all Tier 1 and Tier 2 activities, as well as in-depth System instructions, advanced diagnostics, and troubleshooting at R&D level. |
| 2 | **Serious Impact** | Company and End User will commit the necessary resources during normal business hours until Resolution. Top priority is to restore and/or improve functionally and to debug the Error. | **Tier 2** - Support activities may include all Tier 1 activities, as well as customization management, configuration changes, diagnostics, advanced troubleshooting and onsite services such as installations or repairs of electronic equipment using standard test instruments. |
| 3 | **Minor Impact** | Company and End User agree to use their technical resources during normal business hours until Resolution. Priority is to achieve better functionality and an analysis of the Error in order to resolve it in the next scheduled SW release. | **Tier 1** – Support activities may include basic software hardware installations, upgrades, basic troubleshooting, configuration changes and/or operation optimization. |
| | **Tier 4 Support** | Support activities may include all Tier 1, 2 and 3 activities, as well as design level consultation and solutions, software R&D diagnostics, and high level of software and hardware fixes and solutions by a R&D engineer. | |

10.    **Exclusions**

10.1.    The Company shall not be obligated to provide support and/or maintenance services in the event of any misuse, abuse, neglect, alteration, modification, improper installation of the System, use of the System for purposes other than those authorized by the Company, or repairs made or attempted to be made by anyone other than the Company or its authorized representatives without the Company prior written approval.

10.2.    Without derogating from the generality of Section 10.1 above, the support and maintenance services provided under this SLA do not include the following items or actions:

10.2.1.Any services whatsoever regarding any Hardware components in or related to the System, other than as specifically set forth in this SLA.

10.2.2.Step-by-step installation of software or service packs.

10.2.3.On-site services (other than those explicitly described in this SLA), professional services, managed services, or tutorial services.

10.2.4.Modification of software code, IT network architecture changes, security-policy configuration, audits, or security design.

10.2.5.Support and maintenance with regards to exploits which were closed and resulted in features becoming non-functional.

10.2.6.Requests for new features that are not part of the current System configuration and which will require research and development time.

10.2.7.Requests to support new devices.

10.2.8.Capabilities\Features which were removed due to OpSec.

10.2.9.    where network access is unstable, amongst others due to poor 3G coverage or Internet access, or if the End User is not complying with Company Environment Requirements.

10.3.    Without derogating from the generality of Section 10.1 above, the Company shall have no obligation to support:

10.3.1. An altered, damaged, or modified System or any portion thereof (including Hardware) incorporated with or into other software, Hardware, or products not specifically approved in advance in writing by the Company.

10.3.2. Errors or problems caused by End User negligence, misuse, misapplication, or use of the System in a way other than as specified in the Documentation.

10.3.3. Components installed on any computer Hardware that is not supported by the Company.

10.3.4. Components not purchased from the Company.

10.3.5. The System, or any portion thereof (including Hardware), was subjected to unusual physical or electrical stress, misuse, negligence, accident, or used in hazardous activities.

10.3.6. The System, or any portion thereof (including Hardware), was used or operated by untrained, End User personnel.

10.4.    In addition to all other exclusions in Section 10 and this SLA, the Company shall have no obligation to support the End User or provide maintenance if:

10.4.1.Payment in full for support and maintenance, as agreed under the Agreement, has not been received by the Company; or

10.4.2.The Warranty Period has expired without renewal of an additional annual support term; or

10.4.3.The End-User does not fulfill its obligations under this SLA and/or the Agreement.

11.    **End of Life**

11.1.    The Company may provide a ninety (90) day prior written notice to the End User, specifying the date on which the version of the System shall expire (the **"End-of-Life Notice"** and **"End of life Date"** respectively), provided however, that (a) the End-of-Life Notice shall not be provided prior to the lapse of twelve (12) months following the Effective Date (as defined in the Agreement); and (b) the version of the System used by the End User is not the most updated version.

11.2.    Upon the receipt of an End-of-Life Notice and at any time prior to the End-of-Life Date, if the End User has purchased Support Services (as defined in the Agreement), it shall receive an upgrade to the most updated version of the System.

11.3.    If the End User has not purchased Support Services, then it may elect to either: (i) upgrade the System (such that it will include the then most current version of the System), by paying the applicable Support Service Consideration and the Support Service Supplement Consideration, as applicable (as such terms are defined in the Agreement); or (ii) maintain its then licensed version of the System in which case the License granted under the Agreement with respect to the System shall remain in effect for a period of six (6) months as of the End of life Date, and shall automatically terminate at the end of such period, such that the End User shall no longer be entitled to use the System. In such event the Company shall de-activate the System.

12.    **Contact Information**

12.1.    **Service Availability.** The technical support helpdesk is available 24 hours a day, 7 days a week via the following means:

12.2.    **CRM tool / Web Portal.**   Preferred way to contact the Company technical support center is by opening a ticket via the Company's dedicated web portal and CRM tool. CRM access is secured with a username and password provided by the Company.

12.3.    **Email Support.** helpdesk@globalhelp.support

12.4.    **Telephone Support.** +44 203 695 4101

12.1.    All communications with the Company must be in English.

### Exhibit F

**Bill of materials - Pegasus system**

Disclaimer: BOM may change per Network\Regulation\System\Country\Support.

Replacement of the HW can be equivalent or better than listed in the BOM

| Item Description | Manufacturer | Quantity | Device Model |
|---|---|---|---|
| **PowerEdge R740xd Server** | | | |
| OEM PowerEdge R740xd XL Server | | | |
| EX-Works | | | |
| Standard 1U Heatsink (X2) | | | |
| Performance Optimized | | | |
| 2666MT/s RDIMMs | | | |
| No Media Required | | | |
| Performance BIOS Settings | | | |
| OEM PowerEdge R740 XL/R740xd XL Motherboard | | | |
| No Quick Sync | | | |
| ReadyRails Sliding Rails With Cable Management Arm | | | |
| iDRAC Group Manager, Disabled | | | |
| Not Selected in this Configuration | | | |
| Consolidation Fee ESG | | | |
| CSO OEM Solution Advanced Program Support, EMEA | | | |
| No Systems Documentation, No OpenManage DVD Kit | | | |
| Enterprise Order - EMEA. | | | |
| Asset Service - System Shipbox Label (Model, Svc Tag, Order Information, Basic Config Details) | | | |
| Base Warranty | | | |
| 1Yr Parts Only Warranty (Emerging Only) | | | |
| Chassis with Up to 24 x 2.5" Hard Drives for 2CPU | Dell | 1 | DELL-R740XD-26128 |
| PERC H730P RAID Controller, 2GB NV Cache, Adapter, Low Profile | | | |
| 6 Standard Fans for R740/740XD | | | |
| Riser Config 1, 4 x8 slots | | | |
| No Trusted Platform Module | | | |
| Intel Xeon Gold 6128 3.4G, 6C/12T, 10.4GT/s 2UPI, 19.25M Cache, Turbo, HT (115W) DDR4-2666, OEM XL | | | |
| Intel Xeon Gold 6128 3.4G, 6C/12T, 10.4GT/s 2UPI, 19.25M Cache, Turbo, HT (115W) DDR4-2666, OEM XL | | | |
| Brand/Bezel, Standard OS, Dell Branded, PowerEdge R740xd XL | | | |
| PowerEdge R740 Shipping Material | | | |
| PowerEdge R740xd Shipping EMEA2 (English/Slovenian/Slovakian/Polish/Czech/Hungar/Greek/Arab) | | | |
| RAID 1 + RAID 5 | | | |
| 300GB 15K RPM SAS 12Gbps 512n 2.5in Hot-plug Hard Drive (X2) | | | |
| 1TB 7.2K RPM NLSAS 12Gbps 512n 2.5in Hot-plug Hard Drive (X16) | | | |
| UEFI BIOS Boot Mode with GPT Partition | | | |
| Dual, Hot-plug, Redundant Power Supply (1+1), 750W | | | |
| C13 to C14, PDU Style, 10 AMP, 6.5 Feet (2m), Power Cord (X2) | | | |
| Intel Ethernet i350 QP 1Gb Network Daughter Card | | | |
| Intel Ethernet I350 QP 1Gb Server Adapter | | | |
| No Installation Service Selected (Contact Sales Rep for more details) | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| INFO 1Yr ProSupport and Next Business Day Onsite Service (Emerging Only) | | | |
| 39M ProSupport and Next Business Day Onsite Service (Emerging Only) | | | |
| 39M Data Protection - Keep Your Hard Drive | | | |
| iDRAC9,Enterprise | | | |
| iDRAC,Legacy Password | | | |
| 8GB RDIMM, 2666MT/s, Single Rank (X12) | | | |
| No Operating System | | | |
| **PowerEdge R740 Server** | | | |
| OEM PowerEdge R740 XL Server | | | |
| EX-Works | | | |
| Standard 1U Heatsink (X2) | | | |
| Performance Optimized | | | |
| 2666MT/s RDIMMs | | | |
| 32GB RDIMM, 2666MT/s, Dual Rank (X12) | | | |
| No Media Required | | | |
| Performance BIOS Settings | | | |
| OEM PowerEdge R740 XL/R740xd XL Motherboard | | | |
| No Quick Sync | | | |
| ReadyRails Sliding Rails With Cable Management Arm | | | |
| iDRAC Group Manager, Disabled | | | |
| Not Selected in this Configuration | | | |
| Consolidation Fee ESG | | | |
| CSO OEM Solution Advanced Program Support, EMEA | | | |
| No Systems Documentation, No OpenManage DVD Kit | | | |
| Enterprise Order - EMEA. | | | |
| Asset Service - System Shipbox Label (Model, Svc Tag, Order Information, Basic Config Details) | | | |
| Base Warranty | Dell | 3 | DELL-R730-E5-25118 |
| 1Yr Parts Only Warranty (Emerging Only) | | | |
| Chassis with up to 8 x 3.5" SAS/SATA Hard Drives for 2CPU Configuration | | | |
| PERC H730P RAID Controller, 2GB NV Cache, Adapter, Low Profile | | | |
| 6 Performance Fans forR740/740XD | | | |
| Riser Config 1, 4 x8 slots | | | |
| No Trusted Platform Module | | | |
| RAID 1 | | | |
| 300GB 15K RPM SAS 12Gbps 512n 2.5in Hot-plug Hard Drive, 3.5in HYB CARR (X2) | | | |
| iDRAC9,Enterprise | | | |
| Dual, Hot-plug, Redundant Power Supply (1+1), 750W | | | |
| C13 to C14, PDU Style, 10 AMP, 6.5 Feet (2m), Power Cord (X2) | | | |
| No Installation Service Selected (Contact Sales Rep for more details) | | | |
| Intel Ethernet i350 QP 1Gb Network Daughter Card | | | |
| Intel Ethernet I350 QP 1Gb Server Adapter | | | |
| INFO 1Yr ProSupport and Next Business Day Onsite Service (Emerging Only) | | | |
| 39M ProSupport and Next Business Day Onsite Service (Emerging Only) | | | |
| 39M Data Protection - Keep Your Hard Drive | | | |
| Brand/Bezel, Standard OS, Dell Branded, PowerEdge R740 XL | | | |
| PowerEdge R740 Shipping Material | | | |

NSO_WHATSAPP_00000219
NSO_WHATSAPP_00000200

| | | | |
|---|---|---|---|
| PowerEdge R740 Shipping EMEA2 (English/Slovenian/Slovakian/Polish/Czech/Hungar/Greek/Arab) | | | |
| iDRAC,Legacy Password | | | |
| Intel Xeon Gold 5118 2.3G, 12C/24T, 10.4GT/s 2UPI, 16M Cache, Turbo, HT (105W) DDR4-2400, OEM XL | | | |
| Intel Xeon Gold 5118 2.3G, 12C/24T, 10.4GT/s 2UPI, 16M Cache, Turbo, HT (105W) DDR4-2400, OEM XL | | | |
| DVD+/-RW,SATA,Int | | | |
| Emulex LPe32002-M2-D Dual Port 32Gb Fibre Channel HBA | | | |
| No Operating System | | | |
| Dell 18.5in LED KMM DKMMLED185-001 | Dell | 1 | DKMMLED185-001 |
| Mounting bracket for Dell 185FPM & LED KMM Consul | Dell | 1 | 185FPM |
| Dell DMPUIQ-VMCHS-G01 for Dell SIM for VGA, USB | Dell | 8 | DMPUIQ-VMCHS-G01 |
| Dell DAV2108 8-port analog, with 1 local user | Dell | 1 | DAV2108 |
| Fujitsu AF250 S2 SED SSD | Fujitsu | 1 | AF250 S2 |
| FC-Cable OM4, MMF, 5m, LC/LC | | | D:FCKAB-OM4-C05L-L |
| SP 3y TS Sub & Upgr,24x7,4h Rm Rt | | | FSP:G-SW3SI63PRE0C |
| SP HDD Retention for duration of service | | | FSP:GSXA00Z00ILST3 |
| TP 3y OS,24x7,4h Rt | | | FSP:GM3S63Z00ILST3 |
| ET AF250 S2  Base (CE) CM x2 | | | FTS:ET252CU |
| AF250 S2 SED SSD 13* 1.92TB DWPD1 2.5" | | | FTS:ETVSGN2 |
| ETERNUS SF V16 AF250 ALL-IN FLASHPACK | | | FTS:ET251CU-LIC |
| AF250 S2 CA FC 4P 32G | | | FTS:ETVHJFA |
| TP 3y OS,24x7,4h Rt | | | FSP:GM3S63Z00ILST1 |
| ET AF250 S2 DriveEncl. 2.5" IOM x2 | | | FTS:ETVEADAU |
| AF250 S2 SED SSD 12* 1.92TB DWPD1 2.5 | | | FTS:ETVSGN1 |
| Digi Port Server TS 16 port rack mountable RJ-45 Serial to Ethernet Terminal Server | Digium | 2 | TS 16 |
| Cisco ISR 4331 Sec bundle w/SEC license | Cisco | 3 | ISR4331-SEC/K9 |
| IP Base License for Cisco ISR 4330 Series | | | SL-4330-IPB-K9 |
| U.S. Export Restriction Compliance license for 4 | | | FL-4330-HSEC-K9 |
| Performance on Demand License for 4330 Series | | | FL-4330-PERF-K9 |
| 4-port Layer 2 GE Switch Network Interface Module | | | NIM-ES2-4 |
| AC Power Supply for Cisco ISR 4330 | | | PWR-4330-AC |
| POWER CORD | | | CAB-ACE |
| Security License for Cisco ISR 4330 Series | | | SL-4330-SEC-K9 |
| 4G Flash Memory for Cisco ISR 4300 (Soldered on | | | MEM-FLSH-4G |
| 4G DRAM (1 x 4G) for Cisco ISR 4300 | | | MEM-43-4G |
| Blank faceplate for NIM slot on Cisco ISR 4400 | | | NIM-BLANK |
| Removable faceplate for SM slot on Cisco 2900,39 | | | SM-S-BLANK |
| Cisco ISR 4300 Series IOS XE Universal | | | SISR4300UK9-316S |
| 3YR SNTC 8X5XNBD Cisco ISR 4331 Sec bundle w/SEC | | | CON-3SNT-ISR4331S |
| Cisco Catalyst 3850 48 Port Data IP Base | Cisco | 2 | WS-C3850-48T-S |
| UNIVERSAL | | | S3850UK9-163 |
| Catalyst 3K-X 350W AC Secondary Power Supply | | | PWR-C1-350WAC/2 |
| Cisco Catalyst 3850 2 x 10GE Network Module | | | C3850-NM-2-10G |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| Europe AC Type A Power Cable | | | CAB-TA-EU |
| 50CM Type 1 Stacking Cable | | | STACK-T1-50CM |
| Catalyst 3750X and 3850 Stack Power Cable 30 CM | | | CAB-SPWR-30CM |
| 350W AC Config 1 Power Supply | | | PWR-C1-350WAC |
| 3YR SNTC 8X5XNBD Cisco Catalyst 3850 48 Pt Data | | | CON-3SNT-WSC388TS |
| Catalyst 2960-X 48 GigE  4 x 1G SFP  LAN Base<br>3YR SMARTNET 8X5XNBD Catalyst 2960-X 48 G | Cisco | 2 | WS-C2960X-48TS-L<br>CON-3SNT-WSC248TS<br>CAB-ACE |
| Gemalto EHS6T-ETH ( Penta-band 3G & dual-band 2G ) Modem | Gemalto | 10 | EHS6T-ETH |
| DELL 7060 MT<br>I7-8700<br>16GB<br>256G SSD<br>WIN10 PRO 3Y | Dell | 5 | DELL-7060-MT |
| Dell 24" Monitor 60.4cm(23.8") Black EUR | Dell | 10 | DELL-U2417H |
| APC NetShelter SX 42U Deep Enclosure 1200X600 with Roof and Sides Black | APC | 2 | AR3300 |
| Rack PDU 2G, Metered, ZeroU, 32A, 230V, (36) C13 & (6) C19 | APC | 4 | AP8853 |
| PDU Cord Retention Kit for Full-Height & 48U, Basic & LCD-Metered PDU (1 per PDU | APC | 4 | AP9569 |
| Horizontal Cable Organizer 1U w/brush strip | | 10 | AR8429 |
| SEH UTN-250\2500 Professional USB Device Management | SEH | 1 | |
| Cat7 patch cord,0.5m,Blue | | 20 | |
| Cat7 patch cord,1m,BLue | | 40 | |
| Cat7 patch cord,2m,BLue | | 30 | |
| Cat 7 patch cord,3m,Grey | | 30 | |
| Cat 7 patch cord,5m,BLACK | | 20 | |
| Cat 7 patch cord,10m,Grey | | 10 | |
| 24 port Cat 6 patch Panel | | 4 | |
| duplex patch cord,10m - Patch cord Fiber OM3 LC LC 10m | | 8 | |
| duplex patch cord,10m - Patch cord Fiber OM3 LC LC 3m | | 8 | |
| Console Cable 6ft with RJ45 and DB9F | | 2 | |
| Blank plate 1U(10 per pack total 5 packs) | APC | 50 | AR8136BLK |
| Power Cord, C13 to C14, 5m | | 20 | |
| Power Cord, C13 to C14, 3m | | 40 | |
| Power Cord, C13 to C14, 1m | | 20 | |
| Universal shelf | | 3 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| APC Smart-UPS SRT 5kVA Output HW Kit | APC | 4 | SRT001 |
|---|---|---|---|
| power cable 3 meters for ups + Sicon 32A | APC | 4 | |
| APC Smart-UPS SRT 192V 5kVA | APC | 4 | SRT5KRMXLI |
| APC 6kVA RM Battery Pack | APC | 4 | SRT192RMBP |
| Office Home & Business 2016 32-bit/x64 English | Microsoft | 5 | |
| VMware vSphere 6 Essentials Plus Kit for 3 hosts (Max 2 processors per host) | VMware | 1 | VS6-ESP-KIT-C |
| Production Support/Subscription VMware vSphere 6 Essentials Plus Kit for 1 year | VMware | 1 | VS6-ESP-KIT-P-SSS-C |
| Veeam Backup & Replication Enterprise for Vmware and Hyper-V per Socket License | Veeam | 8 Sockets 6/2 | |
| Microsoft Windows Server 2016 Standard Edition (WinSvrSTDCore 2016 SNGL OLP 2Lic NL CoreLic) | Microsoft | 32 | 9EM-00124 |
| Microsoft Windows CAL 2016 (WinSvrCAL 2016 SNGL OLP NL UsrCAL) | Microsoft | 3 | R18-05123 |
| MS SQL 2017 Server Standard core 2 socket License | Microsoft | 2 | 7NQ-01158 |
| Nagios XI (Enterprise version with 100 Nodes license) | Nagios | 1 | |
| BIG-IP Virt Edit.Appl Security Manag 200Mbps V16 | F5 | 1 | F5-BIG-ASMVE200M-V16 |
| Level 1-3 Premium Service for BIG-IP Virtual Edi | F5 | 1 | F5-SVC-BIG-VE+PREL13 |
| BIG-IP Virtual Edition IP Intelligence License 1 | F5 | 1 | F5-SBS-BIGVE-IPI11YR |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY