Greg D. Andres
Antonio J. Perez-Marques
Luca Marzorati
  (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:   greg.andres@davispolk.com
             antonio.perez@davispolk.com
             luca.marzorati@davispolk.com

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email:   micah.block@davispolk.com

*Attorneys for Plaintiffs*
*WhatsApp LLC and Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC and<br>META PLATFORMS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED<br>and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL**<br><br>Judge:  Hon. Phyllis J. Hamilton<br>Action Filed: October 29, 2019 |

# TABLE OF CONTENTS

PAGE

ARGUMENT ....................................................................................................1

I.    NSO Is Unlikely to Succeed on Appeal ........................................2

A.    The Court Properly Granted Summary Judgment .............................3

B.    The Court Properly Exercised Personal Jurisdiction over NSO ....................7

C.    The Court Properly Rejected NSO's Affirmative Defenses .........................10

D.    The Court Properly Issued a Permanent Injunction Enjoining NSO's Unlawful Conduct ...................................................................12

II.   NSO Will Not Suffer Irreparable Harm from Denial of a Stay .................................14

III.  A Stay Would Cause Plaintiffs Irreparable Injury ...................................20

IV.   The Public Interest Does Not Favor a Stay ..............................................21

V.    The Court Should Not Extend the Administrative Stay .................................22

CONCLUSION ....................................................................................22

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Abu v. Dickson,*
    107 F.4th 508 (6th Cir. 2024) ........................................................................... 4

*Al Otro Lado v. Wolf,*
    952 F.3d 999 (9th Cir. 2020) ........................................................................... 2

*Aniel v. HSBC Bank USA, Nat'l Ass'n,*
    633 B.R. 368 (N.D. Cal. 2021) ...................................................................... 19

*Ariz. Contractors Ass'n, Inc. v. Candelaria,*
    2008 WL 486002 (D. Ariz. Feb. 19, 2008) .................................................... 2

*Berman v. Freedom Fin. Network, LLC,*
    30 F.4th 849 (9th Cir. 2022) ........................................................................... 6

*Briskin v. Shopify, Inc.,*
    135 F.4th 739 (9th Cir. 2025) (en banc) ......................................................... 8

*Chabolla v. ClassPass Inc.,*
    129 F.4th 1147 (9th Cir. 2025) ....................................................................... 6

*Cutera, Inc. v. Lutronic Aesthetics, Inc.,*
    444 F. Supp. 3d 1198 (E.D. Cal. 2020) ........................................................ 16

*Deerpoint Grp., Inc. v. Agrigenix, LLC,*
    345 F. Supp. 3d 1207 (E.D. Cal. 2018) ........................................................ 14

*Densmore v. Manzarek,*
    2008 WL 2209993 (Cal. Ct. App. 2 Dist. May 29, 2008) .............................. 14

*Disney Enters., Inc. v. VidAngel, Inc.,*
    869 F.3d 848 (9th Cir. 2017) ......................................................................... 15

*eBay Inc. v. Dig. Point Sols., Inc.,*
    608 F. Supp. 2d 1156 (N.D. Cal. 2009) .......................................................... 5

*E.E.O.C. v. Harris Farms, Inc.,*
    2006 WL 1881236 (E.D. Cal. July 5, 2006) ................................................... 2

*Facebook, Inc. v. MaxBounty, Inc.,*
    274 F.R.D. 279 (N.D. Cal. 2011) .................................................................... 5

*Facebook, Inc. v. Power Ventures, Inc.,*
    252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd,*
    749 F. App'x 557 (9th Cir. 2019). .......................................................... 13, 14

ii

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ................................................................................ 4

*Facebook, Inc. v. Rankwave Co.*,
  2019 WL 8895237 (N.D. Cal. Nov. 14, 2019) ........................................................ 8

*Flores v. Barr*,
  977 F.3d 742 (9th Cir. 2020) ................................................................................ 15

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
  556 F. Supp. 2d 1122 (E.D. Cal. 2008) .................................................................. 5

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ........................................................................... 8, 22

*Ingram v. Pac. Gas & Elec. Co.*,
  2014 WL 295829 (N.D. Cal. Jan. 27, 2014) .......................................................... 11

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) .......................................................................... 1, 15

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .................................................................................. 2

*Mahoney v. Depuy Orthopaedics, Inc.*,
  2007 WL 3341389 (E.D. Cal. Nov. 8, 2007) ......................................................... 12

*Meta Platforms, Inc. v. Nguyen*,
  2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ....................................................... 13

*Mitchell v. 3PL Sys., Inc.*,
  2013 WL 12129616 (C.D. Cal. June 12, 2013) ..................................................... 11

*Multiven, Inc. v. Cisco Sys., Inc.*,
  725 F. Supp. 2d 887 (N.D. Cal. 2010) .................................................................... 6

*Mytee Prods., Inc. v. Harris Rsch., Inc.*,
  2010 WL 11509027 (S.D. Cal. June 25, 2010) ...................................................... 17

*Nat'l Urb. League v. Ross*,
  977 F.3d 698 (9th Cir. 2020) ................................................................................ 22

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................... 1, 2, 3, 15

*NRA Grp. v. Durenleau*,
  154 F.4th 153 (3d Cir. 2025) .................................................................................. 4

*Picot v. Weston*,
  780 F.3d 1206 (9th Cir. 2015) ................................................................................ 8

*Republic Molding Corp. v. B.W. Photo Utils.*,
  319 F.2d 347 (9th Cir. 1963) ................................................................................ 11

*Softketeers, Inc. v. Regal W. Corp.*,
   2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) ............................................................. 17

*Sprint Nextel Corp. v. Welch*,
   2014 WL 68957 (E.D. Cal. Jan. 8, 2014), *report and recommendation adopted*,
   2014 WL 2106683 (E.D. Cal. May 20, 2014) ........................................................... 14

*Stackla, Inc. v. Facebook Inc.*,
   2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ......................................................... 22

*Sweet v. Cardona*,
   657 F. Supp. 3d 1260 (N.D. Cal. 2023) ............................................................... 2, 20

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2003) ................................................................................. 4

*United States v. Bright*,
   2009 WL 10702971 (D. Haw. July 14, 2009) ........................................................ 15

*United States v. Dooley*,
   719 F. App'x 604 (9th Cir. 2018) .......................................................................... 10

*United States v. King Features Ent., Inc.*,
   843 F.2d 394 (9th Cir. 1988) ................................................................................. 12

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) ................................................................................. 4

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
   44 F.3d 1082 (2d Cir. 1994) ................................................................................... 2

*United States v. Saini*,
   23 F.4th 1155 (9th Cir. 2022) ................................................................................. 5

*Vallabharpu-rapu v. Burger King Corp.*,
   276 F.R.D. 611 (N.D. Cal. 2011) ............................................................................ 9

*Van Buren v. United States*,
   593 U.S. 374 (2021) ................................................................................................ 4

*Vanguard Outdoor, LLC v. City of Los Angeles*,
   2010 WL 11531294 (C.D. Cal. Oct. 18, 2010) ..................................................... 17

*Winston-Salem/Forsyth Cty. Bd. of Ed. v. Scott*,
   404 U.S. 1221 (1971) .............................................................................................. 1

*Y.Y.G.M. SA v. Redbubble, Inc.*,
   75 F.4th 995 (9th Cir. 2023) ................................................................................. 21

## STATUTES & RULES

18 U.S.C. § 1029 ................................................................................................. 5

18 U.S.C. § 1030(a)(2)(c) ................................................................................... 4

18 U.S.C. § 1030(a)(4) ....................................................................................... 5

18 U.S.C. § 1030(e)(1) ....................................................................................... 4

18 U.S.C. § 1030(e)(10) ..................................................................................... 5

## OTHER AUTHORITIES

11 Wright & Miller's, Federal Practice & Procedure § 2904 (3d ed.) ............................................... 2

NSO is requesting the extraordinary remedy of a stay of the permanent injunction, relying on arguments that this Court has repeatedly rejected, in service of an appeal that is unlikely to succeed. After more than six years of litigation, the Court issued a permanent injunction prohibiting NSO from continuing its unlawful access to the WhatsApp Platform. The injunction is the result of extensive discovery, motion practice, summary judgment, and trial proceedings, which together produced a comprehensive record and specific findings that conclusively established NSO's unlawful conduct and determined the appropriate remedies.

Against this backdrop, NSO's motion fails to present any new arguments or valid grounds to stay the Court's permanent injunction. NSO does not identify any legal or factual error in the Court's summary judgment decision; instead, it simply reprises arguments the Court has already considered and rejected. NSO likewise presents no credible challenge to the Court's exercise of personal jurisdiction, no legal or factual support for its affirmative defenses, and no legitimate objection to the scope or foundation of the permanent injunction. Instead of making a "strong showing" or even presenting a "substantial case" for success on appeal, NSO fails to articulate any plausible path to prevailing on appeal.

The remaining factors for granting a stay further reinforce that a stay is unwarranted. NSO fails to demonstrate any irreparable harm that would result from complying with a lawful judgment—while delaying enforcement would cause real, ongoing harm to Plaintiffs and undermine the public interest in preventing continued violations of federal and state anti-hacking law. Because NSO has not met its heavy burden, and because the injunction is necessary to stop the unlawful conduct found by the Court, NSO's request for a stay pending appeal should be denied.

## ARGUMENT

A stay pending appeal "is not a matter of right," *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012), but a form of "extraordinary relief." *Winston-Salem/Forsyth Cty. Bd. of Ed. v. Scott*, 404 U.S. 1221, 1231 (1971); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009) ("A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion . . . ." (internal citation omitted)); *Ariz. Contractors Ass'n, Inc. v. Candelaria*, 2008 WL

486002, at *1 (D. Ariz. Feb. 19, 2008) (a stay "is an extraordinary remedy that should be granted sparingly"). "A party seeking a stay of a lower court's order bears a difficult burden." *E.E.O.C. v. Harris Farms, Inc.*, 2006 WL 1881236, at *1 (E.D. Cal. July 5, 2006) (quoting *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir.1994)). To prevail, a party must show that the circumstances justify an exercise of judicial discretion, and because this burden "is a heavy one, more commonly stay requests will not meet this standard and will be denied." 11 Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2904 (3d ed.).

Courts consider four factors in ruling on a motion to stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1267 (N.D. Cal. 2023) (quoting *Nken*, 556 U.S. at 425). In evaluating these factors, the Ninth Circuit employs a "sliding scale" approach where "[o]nly a stronger showing of one element may offset a weaker showing of another." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010 (9th Cir. 2020) (internal citation and quotation marks omitted). The first two factors—likelihood of success on the merits and irreparable injury—are the most critical. *Id.* at 1007. Where a defendant fails to satisfy those factors, the court need not consider the last two. *See id.* at 1014 ("Because the [defendant] has not satisfie[d] the first two factors, we need not dwell on the final two factors—harm to the opposing party and the public interest." (internal quotation marks & citation omitted)).

Because each of the four factors weighs heavily in Plaintiffs' favor, the Court should deny NSO's motion for a stay.

## I. NSO Is Unlikely to Succeed on Appeal

Under the first factor, NSO must "make a strong showing that [it] is likely to succeed on the merits" on appeal. *Sweet*, 657 F. Supp. 3d at 1277. It is not enough for NSO to show "that the chance of success on the merits [is] better than negligible" and instead "[m]ore than a mere possibility of relief is required." *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (quoting

*Nken*, 556 U.S. at 425) (internal quotation marks omitted).  At a minimum, NSO must show "that [it] has a substantial case for relief on the merits."  *Id.* at 968.  NSO fails to meet its burden: it has not established a substantial issue of law as to any of the rulings it seeks to challenge—summary judgment, personal jurisdiction, its affirmative defenses, or the permanent injunction.

### A.  The Court Properly Granted Summary Judgment

The Court properly granted summary judgment in favor of Plaintiffs on liability.  The Court's ruling rested on a fully developed and undisputed record that conclusively established NSO exceeded its authorized access, acted with fraudulent intent, and breached the WhatsApp Terms of Service.  Far from demonstrating a "substantial case for relief on the merits," NSO fails to identify any legitimate basis for disturbing the Court's carefully reasoned decision.

*First*, the Court did not err in finding that NSO exceeded authorized access to WhatsApp's servers.  *See* Dkt. No. 494 at 12-13.  The undisputed evidence showed that NSO reverse-engineered WhatsApp, designed and used a fake WhatsApp client application (or the "WIS") to send mal-formed messages through WhatsApp's servers, and extracted data from WhatsApp's servers and its users' devices through its exploits.  Dkt. No. 465 at 14-19.  The record also showed that NSO inten-tionally and repeatedly circumvented WhatsApp's security updates—including even after the Com-plaint was filed—to restore its WhatsApp-specific exploits, regain access to WhatsApp's servers, and continue its attacks against WhatsApp and its users.  *See id.* at 18.  NSO conceded that it took all these actions repeatedly, in secret, without WhatsApp's permission, and indeed, with the knowledge that they were prohibited by WhatsApp's terms and policies and that WhatsApp would seek to stop their attacks if they were detected.  *Id.* at 19.  Accordingly, the Court properly found that NSO exceeded authorized access to WhatsApp's servers on the basis of this undisputed evi-dence.  NSO's contrary arguments are meritless.

NSO's argument that this Court's ruling on liability as to CFAA and CDAFA is inconsistent with the holding of *Van Buren v. United States* is also meritless.  *See* Mot. at 3.[1]  Plaintiffs have al-

---

[1] Citations to "Mot." refer to NSO's Motion to Stay Permanent Injunction Pending Appeal.  *See* Dkt. No. 813.

ways maintained that NSO's conduct was without authorization, and the Court held that Defend-

ants' access indeed exceeded their authorization.  *See* Dkt. No. 465 at 13-15; Dkt. No. 494 at 13

(granting summary judgment to Plaintiffs "on the theory that defendants exceeded their authoriza-

tion").  The undisputed record established that NSO exceeded any authorization it had to access

WhatsApp, including by continuing to access WhatsApp after WhatsApp unequivocally revoked its

access through WhatsApp's security updates and during this very litigation.  It is well-settled that

"[o]nce permission has been revoked, technological gamesmanship . . . will not excuse liability."

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016); *see also United States

v. Nosal*, 844 F.3d 1024, 1034 (9th Cir. 2016) (stating that "unauthorized access" includes "getting

into the computer after categorically being barred from entry").  NSO cites no authority justifying a

contrary result on appeal.[2]

NSO also argues that the Court erred in finding that NSO "obtain[ed] information about the

target user's device via the WhatsApp servers."  Mot. at 3-4.  Not so.  As the Court found and NSO

does not contest, while "the WIS does obtain information directly from the target users' devices, it

also obtains information about the target users' device via the Whatsapp servers."  Dkt. No. 494 at

12.  And it makes no difference whether NSO obtained information from the servers or the target

devices because the CFAA prohibits "access[ing] ***a computer***" and "thereby" obtaining information

"from ***any protected computer***," which need not be the same computer.  18 U.S.C. § 1030(a)(2)(c)

(emphasis added); *see also Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2003).  Moreo-

ver, the CFAA defines "computer" to "include[] any data storage facility or communications facil-

ity directly related to or operating in conjunction with such device," 18 U.S.C. § 1030(e)(1), and

thus includes "computer networks."  *Nosal*, 844 F.3d at 1032 n.2.  There is no dispute that

---

[2] NSO cites a number of inapposite cases where an employee was authorized by their employer to access a computer and was alleged to have violated computer-use policies.  *See* Mot. at 3 n.2.  Unlike here, none of those cases concerned an unambiguous revocation of access.  *See Van Buren v. United States*, 593 U.S. 374, 388 (2021) (officer had authorization to use police database and re-trieve license-plate information but obtained that information for an "improper purpose"); *NRA Grp. v. Durenleau*, 154 F.4th 153, 167-69 (3d Cir. 2025) (rejecting argument that "employees' vio-lation of [] workplace policies means they exceeded their access"); *Abu v. Dickson*, 107 F.4th 508, 516 (6th Cir. 2024) ("An employee . . . does not intentionally exceed authorized access when he de-liberately accesses a protected system but lacks notice that his access is unauthorized.").

4

WhatsApp is a communications network, and the target devices are "directly related to or operating in conjunction with" the servers.  18 U.S.C. § 1030(e)(10).

*Second*, the Court correctly found that NSO acted with the "intent to defraud" Plaintiffs under the CFAA.  18 U.S.C. § 1030(a)(4).  At summary judgment, Plaintiffs presented uncontested evidence of NSO's fraudulent conduct.  This included evidence that NSO: (1) designed a fake WhatsApp client application (i.e., the WIS) to send messages that a legitimate WhatsApp client could not; (2) concealed those messages in hidden fields to deliver malicious code through WhatsApp servers to its users' devices, and (3) repeatedly redesigned Pegasus to evade Plaintiffs' security measures, including after the Complaint was filed.  *See* Dkt. No. 465 at 11, 15.  As the Court correctly held, "the fact that defendants redesigned Pegasus to evade detection after plaintiffs first fixed the security breach is enough to prove intent."  Dkt. No. 494 at 12; *see also* Dkt. No. 802 at 9 (emphasizing the "covert, undetectable nature of defendants' technology, as well as the repeated efforts to circumvent plaintiffs' security measures").

NSO does not dispute this evidence and concedes that its persistent attempts to evade detection "could support" a finding of deception.  Mot. at 4.  Instead, NSO incorrectly asserts that "intent to defraud" requires an "intent to deprive a victim of money or property by deception."  Mot. at 4 (citation omitted).  NSO cites no case applying that standard to the CFAA or CDAFA and Plaintiffs have not found any.[3]  Courts in this Circuit have consistently held that "[t]he term 'defraud' for purposes of § 1030(a)(4) simply means wrongdoing and does not require proof of common law fraud."  *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008); *see also Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) ("This Court has held that fraud 'under the CFAA only requires a showing of unlawful access; there is no need to plead the elements of common law fraud to state a claim under the Act.'" (quoting *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009)));

---

[3] The sole authority NSO cites evaluated the phrase "intent to defraud" as used in a credit-card fraud statute, not the CFAA.  *See United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022) (evaluating 18 U.S.C. § 1029).

5

1   *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892-94 (N.D. Cal. 2010) (holding that for-

2   mer employee acted with the "intent to defraud" when he used his co-worker's password to access

3   plaintiff's computer network, with knowledge of plaintiff's policy prohibiting such access").  And

4   the record contains ample evidence that NSO was obtaining information of value.  *See* Dkt. No.

5   418-5, Ex. 5 (Gazneli Dep.) at 294:10-15; 300:24-304:22; 306:12-307:15 (explaining the kinds of

6   information that the WIS can obtain that a regular WhatsApp user using the WhatsApp client app

7   cannot obtain).

8       *Third*, the Court correctly held that NSO breached the WhatsApp Terms of Service.  Con-

9   trary to NSO's contention (Mot. at 5), the undisputed evidence at summary judgment established

10  that WhatsApp provided reasonably conspicuous notice of the Terms and that NSO unambiguously

11  agreed to them.  When a user downloads and opens the official WhatsApp client application, the

12  welcome screen displays a link to the terms and requires the user to click "agree and continue" to

13  create a WhatsApp account.  Dkt. No. 436-5 at 6; *see* Dkt. No. 467 at 2 (noting that the user is

14  "given the opportunity to agree to the terms of service[] and continue with the registration flow").

15  NSO concedes that it followed these steps to create WhatsApp accounts.  *See* Dkt. No. 339-4 at 99–

16  100, 149–150; *see also* Dkt. No. 399-2 at 12.  Thus, the Court properly observed that NSO "cannot

17  meaningfully dispute that agreeing to the terms of service was necessary to create a Whatsapp ac-

18  count and to use Whatsapp."  Dkt. No. 494 at 14.

19      The cases relied on by NSO only reinforce the Court's conclusion.  *Berman* does not state

20  that "clicking a button" is insufficient to manifest consent; it says the opposite: that a "a user's click

21  of a button can be construed as an unambiguous manifestation" where, as here, "the user is explic-

22  itly advised that the act of clicking will constitute assent to the terms and conditions of an agree-

23  ment."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).  Similarly, the

24  Ninth Circuit in *Chabolla* explained that "[c]ourts routinely enforce" agreements where "the web-

25  site presents its terms of use in a 'pop-up screen' and the user accepts those terms by clicking or

26  checking a box stating she agrees."  *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir.

27  2025).

28

*Finally*, NSO falsely claims that the Court held it "vicariously liable for its customers' actions." Mot. at 6.[4]  The Court held NSO liable for its own misconduct. *See* Dkt. No. 699 at 2 ("[T]he court concludes that there is a sufficient basis to establish direct liability . . . ."). The undisputed evidence showed that NSO's customers played only a minimal role—entering a target's phone number and pressing enter—while the Pegasus installation and extraction process was "a matter for NSO and the system to take care of, not a matter for customers to operate." Dkt. No. 399-2, Ex. 10 (Shohat Dep.) at 68:1-16.  NSO admitted that it reverse engineered WhatsApp to build its exploits, created anonymized WhatsApp accounts for its customers, rented and configured anonymized servers for them, maintained and supported Pegasus, and developed new installation vectors whenever WhatsApp blocked an old one. *See* Dkt. No. 465 at 20; *see also* Dkt. No. 699 at 1-2 ("[T]he court concluded that even the limited conduct to which defendants admit (i.e., developing Pegasus and providing it to their clients, as well as providing training and ongoing support) along with evidence that appears undisputed that they updated Pegasus to circumvent plaintiffs' security updates, sufficed to establish liability even before reaching the issue of whether evidentiary sanctions were necessary.").

## B.  The Court Properly Exercised Personal Jurisdiction over NSO

NSO has no likelihood of success on appeal in challenging the Court's exercise of personal jurisdiction over NSO.  NSO's arguments depend on mischaracterizations of the record that the Court has correctly rejected, and it offers no basis—let alone a substantial one—for claiming the Court committed error.

*First*, NSO distorts the Court's factual finding that "defendants' Pegasus code was sent through plaintiffs' California-based servers 43 times during the relevant period," recasting its conduct as "unknowing and unintentional contact with California-based servers." Mot. at 6.  That assertion is untenable.  NSO admitted that it deliberately sought out WhatsApp servers because its Pegasus messages "had to be transmitted" through them to reach WhatsApp users' devices. *See* Dkt. No. 418-5, Ex. 5 (Gazneli Dep.) at 184:6-10.  As the Ninth Circuit has explained, whether

---

[4] Plaintiffs do not waive any argument on appeal that NSO is liable as a co-conspirator.

1  conduct is "expressly aimed" at a forum for jurisdictional purposes "depends, to a significant de-

2  gree, on the specific type of tort or other wrongful conduct at issue," *Picot v. Weston*, 780 F.3d

3  1206, 1214 (9th Cir. 2015), and the CFAA-violating conduct for which this Court found NSO liable

4  is "analogous to that of 'breaking and entering.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

5  1196 (9th Cir. 2022) (citation omitted).  The Court therefore correctly concluded that NSO's mis-

6  conduct—including transmitting its malware at least 43 times through WhatsApp's California-

7  based relay servers—"effectuated a breaking and entering of a server in California" supporting the

8  exercise of personal jurisdiction.  Dkt. No. 494 at 6.

9      NSO's recycled claim that there is "no evidence" that it controlled or knew which relay

10  servers Pegasus messages traversed fares no better.  *See* Mot. at 6-7.  As a practical matter, it is im-

11  plausible that NSO was unaware that WhatsApp, a California-based company, maintains Califor-

12  nia-based servers.  *See Facebook, Inc. v. Rankwave Co.*, 2019 WL 8895237, at *6 (N.D. Cal. Nov.

13  14, 2019) (considering it a "well-known fact that Facebook is headquartered in California").  In any

14  event, NSO's argument is irrelevant because the undisputed evidence shows that NSO did control

15  which servers the WIS used.  NSO concedes that, for its Heaven installation vector, it researched

16  how WhatsApp relay servers were selected in order to allow the WIS to trick the legitimate

17  WhatsApp client on users' devices into using NSO's server as the relay server.  *See* Dkt. No. 418-5,

18  Ex. 16.  Then, after WhatsApp's security updates disabled Heaven, NSO designed the Eden instal-

19  lation vector—which specifically used WhatsApp's relay servers, including those in California.

20  *See id.*, Ex. 5 (Gazneli Dep.) at 254:14-23, 259:21-260:2; *id.*, Ex. 6 at 10-12.  Thus, the Court had

21  ample evidence on which to conclude that NSO's contacts with California were its "own choice and

22  not random, isolated, or fortuitous."  *Briskin v. Shopify, Inc.*, 135 F.4th 739, 758 (9th Cir. 2025) (en

23  banc) (citation omitted).[5]

24      *Second*, the Court did not err in sanctioning NSO for its "repeated[] fail[ure] to produce rel-

25  evant discovery" and concluding that Pegasus was designed to deliberately target California serv-

26

27  _____

28  [5] Plaintiffs maintain that personal jurisdiction exists for several additional reasons the Court did not
address, *see* Dkt. No. 466 at 4-16, and reserve those arguments on appeal.

8

ers.  *See* Dkt. No. 494 at 9-10.  NSO's refusal to produce Pegasus source code—its "[m]ost signifi-cant" discovery failure (*id.* at 9)—warranted this adverse inference.  *Id.*  NSO conceded that the un-usable portion of Pegasus code it purports to have "produced" (only in Israel and in violation of the Court's orders) did not "show[] the full picture of how Pegasus functions."  Dkt. No. 473 at 2.  In-deed, NSO's Vice President of Research and Development confirmed only that the code was for "the delivery vector Erised," Dkt. No. 429-18 ¶ 7, but did not state whether that code captured the full functionality of all three Pegasus installation vectors from 2018 to 2020, or even the Eden in-stallation vector which NSO wrongly claims is the only installation vector relevant to Plaintiffs' claims.  *See* Mot. at 7.

Moreover, NSO's sole support for its contention that it did not control which relay servers were selected is the 30(b)(6) testimony of Plaintiffs' witness concerning how legitimate WhatsApp client applications normally select servers.  Mot. at 7.  Clearly, Plaintiffs' witnesses were not able to testify about how NSO's fake client application functioned.  This is especially true when it is un-disputed that the WIS did not function like a legitimate WhatsApp client.  *See* Dkt. No. 418-5, Ex. 5 (Gazneli Dep.) at 294:10-15; 300:24-304:22; 306:12-307:15 (explaining the kinds of information that the WIS can obtain that "a regular WhatsApp user using the WhatsApp client app cannot ob-tain").

Nor did the Court abuse its discretion in concluding that "NSO spyware targeting or di-rected at Whatsapp servers" constituted important and specific discovery under *Richmark*.  *See* Mot. at 7.  Plaintiffs' claims have always been directed at any NSO spyware that targeted or was directed at WhatsApp or its servers, and, as Plaintiffs have repeatedly explained, their claims have more broadly concerned "NSO's entire suite of spyware products," *see, e.g.*, Dkt. No. 181-2 at 25 (citing Dkt. No. 1 (Complaint) ¶ 24).  It was thus not an abuse of discretion for the Court to order discovery into the three relevant Pegasus installation vectors, and NSO's attempts to once again re-litigate its noncompliance with this Court's orders should be given no weight.  *See Vallabharpu-rapu v. Burger King Corp.*, 276 F.R.D. 611, 615 (N.D. Cal. 2011) (holding that plaintiffs are enti-tled to take "discovery regarding their claims generally, not just the specific factual claims pled in their Complaint").

9

1    NSO's final attempt to excuse its discovery violations by claiming Plaintiffs already "re-

2    ceived" Pegasus code from the FBI is meritless. *See* Mot. at 7-8. Plaintiffs had no way of confirm-

3    ing whether the code received from the FBI was the same as the code NSO purports to have pro-

4    duced in Israel, which NSO admits did not show the full functionality of Pegasus. *See* Dkt. No.

5    473 at 5; Dkt. No. 429-18 ¶ 7. Nor can NSO complain about the timing of the Court's order requir-

6    ing it to produce the AWS code when NSO made no effort to obtain an export control license for

7    production to the United States, *see generally* Dkt. No. 475, and when it was willing to prepare its

8    own 30(b)(6) witness using this same AWS code, Dkt. No. 405-4, Ex. N. (Gazneli Dep.) at 12:8-

9    13:2, 15:5-12.

10    Because NSO is highly unlikely to succeed on appeal in challenging the Court's personal

11    jurisdiction determination—and because NSO's arguments concern only well-settled precedent and

12    do not raise serious legal questions—NSO's motion for a stay should be denied.

13    **C.    The Court Properly Rejected NSO's Affirmative Defenses**

14    NSO's contention that the Court "failed to address" its affirmative defenses provides no ba-

15    sis for a stay. *See* Mot. at 8-9. NSO raised each of those affirmative defenses in opposing Plain-

16    tiffs' motion for summary judgment, *see* Dkt. No. 469 at 7-8, 18, 20, 25, which the Court neces-

17    sarily rejected in granting that motion. *See* Dkt. No. 494. That the Court did not address each de-

18    fense in the body of its opinion says nothing. *See United States v. Dooley*, 719 F. App'x 604, 606

19    (9th Cir. 2018) ("[W]e reject Dooley's contention that the district court failed to consider Dooley's

20    affirmative defense. Dooley cites no authority requiring a specific finding on the affirmative de-

21    fense, and the record does not show that the district court failed to consider Dooley's arguments.").

22    The Court was not obligated to make express findings on defenses that lack any basis in fact. Be-

23    cause NSO has no evidentiary basis for the affirmative defenses, NSO cannot make a "strong show-

24    ing" or "substantial case for success" on appeal. NSO's arguments are meritless.

25    NSO first argues that the Court erred by not addressing NSO's argument on the CFAA's

26    U.S. law enforcement exception. Mot. at 8. As the Court explained just this month in rejecting this

27    very same defense, the U.S. law enforcement exception is not "applicable to this litigation" because

28

"defendants have provided no evidence that the United States has ever used Pegasus for law enforcement activities."  Dkt. No. 808 at 1; *see Mitchell v. 3PL Sys., Inc.*, 2013 WL 12129616, at *2 (C.D. Cal. June 12, 2013) (denying motion for stay pending appeal where the court "rejected [defendants'] arguments" in "previous orders after reviewing multiple rounds of briefing and oral argument").  NSO offers no new arguments.  It claims again that the FBI licensed Pegasus, and fails again to provide any evidence that the FBI used Pegasus.  Mot. at 8.  And even if it did (which the FBI has stated it did not), NSO again cites no authority supporting its claim that *all* of its unlawful activity after December 2018 "constitute[s] CFAA-exempted U.S. law-enforcement activity."  Mot. at 8.

NSO's unclean hands defense similarly has no basis in fact or the law.  *See* Mot. at 8-9.  NSO's defense is premised on the same argument this Court found baseless at trial—that *Plaintiffs* attempted to steal NSO's "proprietary code" by investigating NSO's spyware.  Mot. at 8-9.  As the Court correctly instructed the jury: "There was no evidence to support the allegation that Plaintiffs tried to steal Defendants' intellectual property. You should disregard that allegation in your deliberations."  Dkt. No. 737 (Instruction No. 6: Argument to Disregard).  NSO takes its improper arguments a step further in its motion by claiming—without any support—that two of Plaintiffs' security engineers are no longer employed by Plaintiffs because "the full scope of their conduct came to light."  Mot. at 9.  No court would credit such rank speculation.

Regardless, NSO's allegations cannot even support an unclean hands defense as a matter of law.  An unclean hands defense requires proof that Plaintiffs acted with "fraud or deceit" in acquiring their claims, or in a manner that renders the claims inequitable to assert.  *Ingram v. Pac. Gas & Elec. Co.*, 2014 WL 295829, at *7 (N.D. Cal. Jan. 27, 2014); *see also Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963) ("What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.").  Plaintiffs did not acquire their claims by logging into an Amazon Web Services server or by requesting Amazon's assistance, and NSO otherwise provides no evidence of fraud or deceit.

1    NSO's final affirmative defense—that Plaintiffs waived their right to enforce the WhatsApp

2    Terms of Service—is equally meritless.  *See* Mot. at 9.  Waiver "is the intentional relinquishment of

3    a known right with knowledge of its existence and the intent to relinquish it.  *United States v. King*

4    *Features Ent., Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).  NSO cites no evidence that Plaintiffs

5    waived enforcement of the Terms *after* Plaintiffs learned of NSO's breaches.  And evidence of se-

6    lective enforcement outside this litigation cannot sustain a waiver defense.  *Mahoney v. Depuy Or-*

7    *thopaedics, Inc.*, 2007 WL 3341389, at \*9 (E.D. Cal. Nov. 8, 2007) (rejecting waiver defense as

8    "frivolous," and explaining that selective enforcement of a forum selection clause in a "completely

9    unrelated case [is] irrelevant to [defendant] exercising the contractual rights it has with [plaintiff] in

10    this case").

11    ### D.    The Court Properly Issued a Permanent Injunction Enjoining NSO's Unlawful

12    ### Conduct

13    The Court has already addressed, on numerous occasions, NSO's supposed "serious legal

14    questions" regarding the propriety of the Court's permanent injunction.  In each instance, this Court

15    has rejected NSO's arguments, and NSO advances no arguments that would compel a different re-

16    sult on appeal.

17    *First*, NSO argues that the Court's finding that Plaintiffs were harmed "when they are not

18    able to offer . . . end-to-end encryption" to their users, Dkt. No. 802 at 7, lacks foundation because

19    Plaintiffs did not claim reputational damages.  Not so.  The Court's finding was grounded in harm

20    to Plaintiffs, as any impact on WhatsApp's ability to offer end-to-end encryption, on which its busi-

21    ness model is predicated, directly harms WhatsApp's ability to offer its messaging platform.  And

22    as the Court explained, "when deciding whether to issue an injunction, the court may consider ways

23    in which plaintiffs have been harmed in the past or will be harmed in the future, which is a different

24    standard than was applicable when considering the issues of compensatory and punitive damages."

25    Dkt. No. 802 at 8–9.

26    NSO's claim that the Court's analysis "is not supported by any evidence" is also belied by

27    the undisputed record.  *See* Mot. at 10.  The Court heard extensive testimony about how central pri-

28    vacy is to WhatsApp's business.  *See, e.g.*, Dkt. No. 749 at 325:12–20 (WhatsApp senior executive

12

testifying at trial that WhatsApp developed end-to-end encryption because "privacy is the foundation of WhatsApp[]"); *id.* at 353:4–5 (testifying at trial that WhatsApp's "fundamental goal is to provide the world with private and secure communication").  Moreover, the WhatsApp Terms of Service explicitly bar users from using WhatsApp to violate the privacy of WhatsApp's users.  *See* Dkt. No. 741-13 at 4.  And, over the course of this case and at trial, the Court heard evidence about how WhatsApp incurred significant costs in responding to NSO's unlawful acts that violated users' privacy.  *See, e.g.*, Dkt. No. 751 at 675:3–4 (Plaintiffs' expert concluding that Plaintiffs "spent at least $444,719 in responding to the NSO attacks").  In all events, NSO ignores that the Court's finding of irreparable harm found that "plaintiffs are harmed . . . when their servers are improperly accessed."  Dkt. No. 802 at 7; *see also Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017) ("Numerous courts have found that unauthorized access of computers and the acquisition of data . . . constitute irreparable harm."), *aff'd*, 749 F. App'x 557 (9th Cir. 2019); *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *10 (N.D. Cal. Nov. 21, 2023) (finding that defendant's violations of the CFAA and CDAFA gave rise to irreparable injury even where defendant's "account takeover scheme" was stopped more than two years earlier).

> *Second*, NSO argues that it cannot be enjoined from collecting WhatsApp messages, or selling or licensing technology that interacts with the WhatsApp Platform, because the Court did not find such conduct unlawful.  Mot. at 11.  The Court already rejected this argument, which "has been fully raised and considered throughout this case," Dkt. No. 808 at 1, and properly concluded that NSO should be enjoined from conduct that is necessary to prevent NSO's continued violations of the law.  *See* Dkt. No. 802 at 8 ("[T]he ultimate purpose of defendants' actions was to obtain data from the target users."); *see also Power Ventures*, 252 F. Supp. 3d at 784 ("[F]ederal courts have the equitable power to enjoin otherwise lawful activity . . . if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct or to prevent continued violations of the law." (internal quotation marks & citations omitted)). Thus, the injunction is far from overbroad, and certainly does not attempt to "enjoin all possible breaches of law."  Mot. at 11.  Instead, the Court narrowly tailored the injunction to prohibit conduct necessary to prevent the recurrence of NSO's unlawful conduct.  *See* Dkt. No. 807 at 5.

13

*Third*, the Court properly omitted reference to the CFAA's U.S. law enforcement exception because—as the Court again stated just this month—the exception is not "applicable to this litigation" and "defendants have provided no evidence that the United States has ever used Pegasus for law enforcement activities."  Dkt. No. 808 at 1; *see also* Dkt. No. 802 at 13; Dkt. No. 684 at 38:10–11.

*Lastly*, NSO renews its argument that California law prohibits the Court from enjoining NSO from "[r]everse engineering and decompiling code from the WhatsApp Platform."  *See* Mot. at 12–13.  NSO's reliance on California contract law is misplaced, as the Court found that NSO's CFAA and CDAFA violations justified this provision in the injunction.  *See* Dkt. No. 802 at 17. The Court correctly reasoned that reverse engineering and decompiling are "sufficiently related to defendants' unlawful access of plaintiffs' and their users' data as to warrant injunctive relief on that basis."  *Id.*  In concluding that these acts are necessary prerequisites to NSO's ultimate violations of the CFAA, the Court properly exercised its authority to narrowly tailor the injunction to prevent future unlawful conduct.  *See id.* at 16-17; *see also Power Ventures*, 252 F. Supp. 3d at 784 ("[F]ederal courts have the equitable power to . . . correct or dissipate the evil effects of past unlawful conduct or to prevent continued violations of the law." (internal quotation marks & citations omitted)); *cf. Sprint Nextel Corp. v. Welch*, 2014 WL 68957, at *9 (E.D. Cal. Jan. 8, 2014) (narrowing injunction to permit defendants to engage in "innocuous activity," such as "borrowing someone else's Sprint phone to make a phone call"), *report and recommendation adopted*, 2014 WL 2106683 (E.D. Cal. May 20, 2014).  And, in all events, the Court correctly recognized that there is no categorical rule banning injunctions to enforce contractual rules, and "courts have issued injunctions to enforce contractual terms, on the basis that it was preferable to having the plaintiff file 'lawsuit after lawsuit' to enforce their rights."  Dkt. No. 8-02 at 16 (citing *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1225-26 (E.D. Cal. 2018), and *Densmore v. Manzarek*, 2008 WL 2209993, at *47 (Cal. Ct. App. 2 Dist. May 29, 2008)).

## II.     NSO Will Not Suffer Irreparable Harm from Denial of a Stay

NSO argues that the Court's permanent injunction's requirements—among others, that NSO "delete and destroy any and all computer code or technologies that use, access, or depend on the

14

WhatsApp Platform" and that NSO stop "[c]ollecting, or assisting others in collecting, data or information from the WhatsApp Platform" (Dkt. No. 809 at 2)—will cause it irreparable harm. *See* Mot. at 13–15. Contrary to this argument, NSO has also represented to the Court that it "no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application" and has submitted an exhibit in support of its motion to stay showing that WhatsApp is just *one* of *numerous* sources from which Pegasus can purportedly "extract data." Dkt. No. 813-1 at 8; Dkt. No 813-6 at 8, 16-18, 29. NSO accordingly fails to establish a probability of irreparable harm. Even if the permanent injunction did apply to a broad swath of NSO's business (and NSO's own declaration and exhibits submitted in support of its motion show it does *not*), NSO's argument is otherwise meritless, because unlawful conduct does not warrant equitable protections from the Court.

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citations omitted). Moreover, "simply showing some 'possibility of irreparable injury' fails to satisfy" the requirement of irreparable harm. *Id.* at 434 (citations omitted); *see Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (same). While the Court can consider declarations in its analysis of irreparable harm, the movant still must provide evidence to substantiate its assertions of irreparable harm. *See Flores v. Barr*, 977 F.3d 742, 749 (9th Cir. 2020) (holding that declarations submitted by defendants did not satisfactorily explain how irreparable harm would result absent stay); *United States v. Bright*, 2009 WL 10702971, at *2 (D. Haw. July 14, 2009) (holding that defendant's "self-serving, conclusory assertions" in declaration and "lack of concrete evidence to substantiate th[o]se assertions" failed to establish irreparable harm).

*First*, NSO argues that the permanent injunction provision requiring it "to delete and destroy" technologies that this Court found unlawful would cause it to "suffer irreparable harm." Mot. at 13-14. As a general matter, "harm caused by illegal conduct does not merit significant equitable protection." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017). In any event, NSO has stated that it "no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application." Dkt. No. 813-1 (Shohat Decl.)

1   at 8.  If true, requiring deletion of the associated technologies cannot cause NSO irreparable harm

2   given that it purports to no longer even use those capabilities.

3        Moreover, NSO has repeatedly represented throughout this litigation that its WhatsApp in-

4   stallation vector was a "subset" of its Pegasus suite of products and "represent[ed] a very small

5   fraction of Pegasus' overall capabilities with respect to obtaining information from Android de-

6   vices."  Dkt. No 813-1 at 1-2 (noting that even the broader category of "'covert Android' technolo-

7   gies are completely different from the Pegasus technologies that can gather evidence and intelli-

8   gence from devices running other (i.e., non-Android) operating systems or that require some en-

9   gagement by the end user of the mobile device (i.e., 'one click')"); *see also* Dkt. No 813-6 at 10

10  (listing alternative Pegasus "Agent Installation Vectors" including "Triggered (Social Engineer-

11  ing)"); Dkt. No. 747-2 (Gazneli Cross) at 948:22–950:3 (NSO's head of R&D testifying at trial that

12  NSO's R&D team studied "at least four different types of applications" as methods "for how to get

13  Pegasus on to target devices" including "browsers," "operating systems," and "other applications"

14  such as "Safari and Google Chrome.")  Further, WhatsApp has been only one of numerous sources

15  from which NSO's Pegasus technology extracts data.  Dkt. No 813-6 at 8, 18–20.  As even NSO

16  admits the permanent injunction only applies to a portion of NSO's technologies, NSO fails to

17  show why the permanent injunction's deletion requirement would cause it irreparable harm.

18       NSO relies on *Cutera, Inc. v. Lutronic Aesthetics, Inc.* for the proposition that "lost evi-

19  dence" can constitute irreparable harm.  *See* Mot. at 13-14 (citing 444 F. Supp. 3d 1198, 1212 (E.D.

20  Cal. 2020)).  That case did not involve a motion to stay pending appeal but rather the plaintiff's

21  motion for a TRO and evidence preservation order against defendants who were "deleting evidence

22  relevant to [plaintiff's] trade secrets claims."  *Cutera*, 444 F. Supp. 3d at 1211.  Even if *Cutera*

23  were applicable, NSO *never produced* its Pegasus code in this action.  *See* Dkt. No. 494 at 9-10 (or-

24  dering sanctions because NSO "did not produce Pegasus code in a way that was meaningfully ac-

25  cessible to plaintiffs or to the court").  There is accordingly no rationale for "an order preserving

26  related evidence" (since it was never produced and part of this case) as there was in *Cutera*.  NSO's

27  other authority, *Softketeers, Inc. v. Regal W. Corp.*, is also inapt, as that case involved an injunction

28  ordering defendants to delete software that would cause defendants to be "unable to operate for an

16

1  extended period of time" and was "central[] to their business."  2023 WL 2024701, at *11 (C.D.

2  Cal. Feb. 7, 2023).  Here, NSO's own supporting materials show the permanent injunction applies

3  to only a portion of its overall business.  The Court should accordingly reject NSO's contradictory

4  position that the permanent injunction's deletion requirement would cause it irreparable harm.

5      *Second*, NSO argues, without citation, that the permanent injunction will "put NSO's entire

6  enterprise at risk," Mot. at 14, apparently because the permanent injunction prohibits NSO from

7  "[c]ollecting, or assisting others in collecting, data or information from the WhatsApp Platform."

8  Dkt. No. 809 at 3.  Other than its blanket assertion, NSO provides no specific evidence that a per-

9  manent injunction prohibiting the collection of one—of *numerous*—categories of data will cause

10  NSO substantial financial harm, let alone irreparable harm.

11      The fact that a movant may lose some business, let alone a *conclusory* assertion that a mo-

12  vant will lose business, is insufficient to show irreparable harm.  *See Vanguard Outdoor, LLC v.*

13  *City of Los Angeles*, 2010 WL 11531294, at *3 (C.D. Cal. Oct. 18, 2010) (noting "the risk of bank-

14  ruptcy may constitute irreparable harm" but stating that "the loss of business is generally not 'irrep-

15  arable'" and holding that party's declaration failed to provide sufficient evidence of irreparable

16  harm (citations omitted)).  For example, in *Mytee Prods., Inc. v. Harris Rsch., Inc.*, a patent in-

17  fringement action, Mytee, like NSO, moved for a stay of the permanent injunction entered against it

18  and submitted a declaration by its president "represent[ing] that the injunction is causing a signifi-

19  cant financial hardship to Mytee because it is unable to sell *additional products configured to work*

20  *with the enjoined glides*, as well as causing the loss of *collateral sales of other products* that occur

21  with the sale of those products." 2010 WL 11509027, at *2 (S.D. Cal. June 25, 2010) (emphasis

22  added).  Reasoning that "[o]ne who elects to build a business on a product found to infringe cannot

23  be heard to complain if an injunction against continuing infringement destroys the business so

24  elected," the court held that the "loss of sales dependent on the continued use of an infringing prod-

25  uct does not constitute irreparable harm."  *Id.*

26      Here, the limited evidence NSO submits to support its motion to stay shows that the conduct

27  covered by the permanent injunction represents only a sliver of NSO's spyware enterprise.  *See*

28

17

1   Dkt. No 813-1 (Shohat Decl.) at 6 ("Pegasus is capable of collecting a variety of both historical (ex-

2   isting) and current (incoming/outgoing) data from mobile devices").  For example, Exhibit E to Mr.

3   Shohat's declaration in support of NSO's motion to stay is a Pegasus "Product Description" bro-

4   chure showing that collecting data from WhatsApp is only one of Pegasus's many capabilities.  *See*

5   813-6, Ex. E at 6.  NSO's brochure states that "Benefits of Pegasus" include, among other things,

6   the ability to "[m]onitor target's devices while they connect to the internet," "[c]ollect new and

7   unique types of information—contacts, files, environmental wiretaps, and passwords," "activate the

8   microphone to listen in on a target's environment, turn on the camera to take snapshots, and take

9   screenshots to collect non-communications data of high intel value," "[i]ntercept calls," and to

10  "[m]onitor a multitude of applications including Skype, WhatsApp, Viber, WeChat, Line, Face-

11  book Messenger, Telegram, and Blackberry Messenger (BBM)");  *see also id.* at 16-18.  That same

12  brochure states that Pegasus "[c]ollects textual messages (including group chats)," "[m]onitors all

13  emails from Gmail application and native email application," "[e]xtracts" one's "[b]rowsing his-

14  tory," and collects a range of other information.  *Id.* at 18–20.

15      NSO's claims of irreparable harm therefore ring hollow when its ability to collect data from

16  WhatsApp is only one of the numerous capabilities of Pegasus.  Most significantly, even Mr. Sho-

17  hat's declaration stops short of asserting that the permanent injunction would pose a serious risk to

18  NSO's business.  Instead, it says "[a]t a minimum, the injunction ordered by the Court would force

19  *changes* to NSO's existing Pegasus products, including those that have not previously been part of

20  this lawsuit."  Dkt. No. 813-1 at 8 (emphasis added).  In fact, Mr. Shohat states that Pegasus has

21  "technical safeguards" and "capabilities [that] are designed to be flexible so that the system can be

22  configured to comply with any applicable laws or collection orders."  *See id.* at 6 (stating "[t]he col-

23  lection of historical data, for example, can be disabled if a government agency were not permitted

24  to access existing data").  Where Pegasus "can be configured to comply with any applicable laws or

25  collection orders," such as a restriction on collecting data from one of numerous sources like

26

27

28

1  WhatsApp, Mr. Shohat's declaration accordingly does not go so far as to say NSO will experience
2  a loss of business.[6]

3      Rather than providing specific evidence that the permanent injunction would "put NSO's
4  entire enterprise at risk," as NSO states in its motion without citation, Mr. Shohat provides the fol-
5  lowing straw man: "*If all versions of Pegasus were rendered unavailable* for any substantial period
6  of time, NSO would be at risk of going out of business." *Id.* at 8 (emphasis added).  Mr. Shohat
7  then speculates that its "customers *would be likely* to seek other options" if there were a "disrup-
8  tion" in NSO's product offerings. *Id.* (emphasis added).  Never mind that NSO's product brochures
9  have (contradictorily) asserted that its products are "unique" and "differentiat[ed] . . . from any
10 other solution available in the market," *see* Dkt. No. 1-1 at 36, NSO has provided no specific evi-
11 dence of a serious risk to its business, let alone a risk of bankruptcy due to a flight of customers to
12 competitors.  NSO accordingly fails to establish it will suffer irreparable harm.  *See Aniel v. HSBC*
13 *Bank USA, Nat'l Ass'n*, 633 B.R. 368, 386 (N.D. Cal. 2021) (rejecting plaintiff's motion for a stay
14 based on plaintiff's argument that she "will forfeit the [disputed] Property" absent a stay, because
15 plaintiff "present[ed] no evidence that any of these harms will occur before [the] Court decides her
16 appeal").

17     *Lastly*, NSO fails to explain how other parts of the permanent injunction would cause NSO
18 irreparable harm.  For example, while NSO argues that the deletion requirement and the prohibition
19 on collecting data from WhatsApp would cause NSO significant harm, NSO fails to address how
20 the permanent injunction's prohibition on, for example, "emulat[ing] any aspect of the WhatsApp
21 Platform," Dkt. No. 809 ¶ 3(a), "[r]everse engineering or decompiling code from the WhatsApp
22 Platform," *id.* ¶ 3(c), or "[c]reating accounts . . . on the WhatsApp Platform," *id.* ¶ 3(d), would
23 cause it irreparable injury.  Accordingly, in addition to rejecting NSO's motion to stay in its en-
24 tirety for the reasons discussed above, the Court should reject NSO's motion to stay to the extent it

25 ─────────────
26 [6] Further, NSO's own employees testified at trial to NSO's ability to continually innovate its spy-
   ware in response to roadblocks, indicating that an injunction prohibiting discrete aspects of NSO's
   existing spyware does not constitute an existential threat to NSO's business.  *See* Dkt. No. 747-2
27 (Gazneli Cross) at 978:9–981:2; *see also* See Dkt. No. 399-4, Ex. 14 at 2 ("NSO has proven time
   after time that one of its biggest value[s] is the ability to 'survive' this harsh enviorment [sic] of the
28 cat and mouse game.").

19

1    seeks a stay of portions 3(a), 3(c), and 3(d) of the permanent injunction because NSO fails to ad-

2    dress how these portions would cause it irreparable harm.

3    **III.    A Stay Would Cause Plaintiffs Irreparable Injury**

4    Because NSO has failed to satisfy the first two factors, the Court "need not dwell on the fi-

5    nal two factors," including harm to Plaintiffs.  *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1278 (N.D.

6    Cal. 2023) (citation omitted).  Regardless, the ongoing harm to Plaintiffs from NSO's misconduct

7    weighs heavily against granting a stay.

8    In granting Plaintiffs' permanent injunction, the Court found that the irreparable harm factor

9    weighed "strongly" in Plaintiffs' favor.  Dkt. No. 802 at 10.  Plaintiffs suffered harm from NSO's

10   unauthorized hacking of WhatsApp and the resulting impact on WhatsApp's ability to offer end-to-

11   end encryption to its users.  *See* Dkt. No. 802 at 7 ("[P]laintiffs are harmed not only when their

12   servers are improperly accessed, but also when they are not able to offer the end-to-end encryption

13   that they have promised their users.").  The Court also recognized that there is "no dispute that

14   [NSO's] conduct is ongoing," and that the "undetectable nature of defendants' technol-

15   ogy . . . shows the difficulty of preventing or mitigating" the harm to Plaintiffs.  *Id.* at 10.  Indeed,

16   in its motion, NSO brazenly admits that "during the entire pendency of this case" its technology has

17   continued to "permit[] its government customers to collect the data of WhatsApp users" without

18   explaining how.  Mot. at 16; *see also* Dkt. No. 802 at 7 ("[T]he court agrees with plaintiffs that, 'by

19   not telling us how they're collecting WhatsApp messages - the burden is improperly put on the

20   plaintiffs to try to figure out how they're doing it and whether they're accessing our servers, some-

21   thing that they've admitted they tried to conceal when they did it in the past.'") (citing Dkt. No. 795

22   at 168:9-13).  Staying enforcement of the injunction would thus perpetuate the very harm the in-

23   junction is designed to prevent.

24   NSO's contrary arguments are meritless.  NSO claims that the Court improperly considered

25   harm to Plaintiffs' users.  Mot. at 9-10 (citing Dkt. No. 802 at 5).  As noted above, the Court's find-

26   ing, that Plaintiffs are harmed (1) "when they are not able to offer . . .  end-to-end encryption" to

27   their users and (2) when NSO hacks Plaintiffs' servers, was grounded in harm to Plaintiffs, not its

28

20

users.  Dkt. No. 802 at 7.  NSO also argues, without support, that Plaintiffs did not suffer irrepara-

ble harm because they did not seek immediate injunctive relief.  Mot. at 15-16.  NSO unsurpris-

ingly omits that it only disclosed that its attacks had continued during the pendency of this lawsuit

in September 2024, and Plaintiffs moved for an injunction shortly thereafter on February 24, 2025.

*See* Dkt. No. 399-4, Ex. 6 at 271:3–8.  Regardless, a delay does not have "equal bearing in the per-

manent injunction context."  *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023).

## IV.    The Public Interest Does Not Favor a Stay

The public interest would be disserved by a stay of the injunction.  NSO's contrary argu-

ments continue to rely on speculation, not evidence, including testimony from its purported experts

that this Court has already found to be untethered to the conduct at issue in this case.  *See* Dkt. No.

686 at 13-14 (finding NSO's policy experts to be "overly reliant on the type of generalized testi-

mony regarding law enforcement, military, and intelligence purposes that are not sufficiently teth-

ered to the conduct alleged in this case").

NSO argues that a stay would prevent the FBI or other U.S. law enforcement agencies from

licensing Pegasus.  As discussed already, the Court has repeatedly rejected this argument—includ-

ing NSO's speculative claim that U.S. law enforcement agencies *could* use Pegasus—because NSO

"has provided no evidence that the United States has ever used Pegasus for law enforcement activi-

ties."  Dkt. No. 808 at 1; *see also* Dkt. No. 802 at 13 ("[T]here is no evidence that Pegasus has been

used for law enforcement purposes within the United States.").  NSO also relies on testimony from

its purported expert, Joshua Minkler, to claim that end-to-end encryption poses "a growing risk" to

U.S. law enforcement.  Mot. at 17.  But, as the Court recognized in granting the permanent injunc-

tion, Mr. Minkler "conceded that he had not interviewed anyone at NSO, had not operated Pegasus

or seen it in use, and had no knowledge of NSO's clients or the targets against whom Pegasus has

been used."  Dkt.  No. 802 at 13.

NSO's claim that the public interest would be harmed "by depriving foreign governments of

access to Pegasus" fares no better (and contradicts NSO's separate argument that its government

customers would switch to alternative products).  Mot. at 17.  Here, too, NSO provides no evidence

that foreign governments have used or could use Pegasus.  Instead, it relies on testimony from Col.

21

1   Ty Shepard, who NSO claims is "aware of dozens of Pegasus uses by foreign governments." *Id.*

2   However, like Mr. Minkler, Col. Shepard's testimony lacks any evidentiary foundation and is dis-

3   connected from the facts of this case.  Col. Shepard conceded that he was not aware of the "U.S.

4   utilizing the Pegasus system in any [hands-on] way," and generally declined to provide any details

5   on NSO's customers' use of Pegasus because such information was "classified."  Dkt. No. 648-4,

6   Ex. B at 70:2-14; 82:13-18; 83:10-85:10.  In all events, the Court has already declined to "consider

7   evidence or argument about the use of Pegasus by foreign governments in foreign countries," be-

8   cause the Court carved out foreign governments from the scope of the injunction.  Dkt. No. 802 at

9   13.

10      By contrast, the public interest would be served by denying a stay.  As the Ninth Circuit has

11  recognized, "[i]nternet companies and the public do have a substantial interest in thwarting denial-

12  of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors."

13  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022); *see also Stackla, Inc. v. Fa-*

14  *cebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ("Facebook's ability to decisively

15  police the integrity of its platforms is without question a pressing public interest.  In particular, the

16  public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those

17  platforms for abuses, and Facebook's protection of its users' privacy.").

18  **V.    The Court Should Not Extend the Administrative Stay**

19      The Court should deny NSO's request to extend the administrative stay.  Administrative

20  stays exist to "preserve the status quo" only long enough for the Court to consider the merits of a

21  stay request, *see Nat'l Urb. League v. Ross*, 977 F.3d 698, 700-01 (9th Cir. 2020) (citation omit-

22  ted)—not to provide defendants the very relief they are unable to justify under the governing stand-

23  ard.  Now that the full briefing confirms NSO cannot meet any of the stay factors—most critically,

24  it cannot show a likelihood of success or irreparable harm—there is no basis to prolong a stay that

25  would merely delay enforcement of a lawful judgment and permit the continuation of precisely the

26  conduct the injunction was designed to stop.

27                          **<u>CONCLUSION</u>**

28      For the foregoing reasons, the Court should deny NSO's motion for a stay pending appeal.

1

2  Dated:  November 26, 2025          Respectfully Submitted,

3                                      DAVIS POLK & WARDWELL LLP

4                                      By:  /s/ Greg D. Andres

5                                          Greg D. Andres
                                          Antonio J. Perez-Marques
6                                          Luca Marzorati
                                            (admitted *pro hac vice*)
7                                          DAVIS POLK & WARDWELL LLP
                                          450 Lexington Avenue
8                                          New York, New York 10017
                                          Telephone: (212) 450-4000
9                                          Facsimile: (212) 701-5800
                                          Email: greg.andres@davispolk.com
10                                                 antonio.perez@davispolk.com
11                                                 luca.marzorati@davispolk.com

12                                          Micah G. Block (SBN 270712)
13                                          DAVIS POLK & WARDWELL LLP
                                          900 Middlefield Road, Suite 200
14                                          Redwood City, California 94063
                                          Telephone: (650) 752-2000
15                                          Facsimile:  (650) 752-2111
                                          Email: micah.block@davispolk.com
16

17                                          *Attorneys for Plaintiffs*
                                          *WhatsApp LLC and Meta Platforms, Inc.*
18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PERMANENT INJUNCTION PENDING APPEAL - CASE NO. 4:19-cv-07123-PJH