JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
 *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
 *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:  (213) 443-4355
Facsimile:  (213) 443-4310

Attorneys for Defendants
NSO GROUP TECHS. LTD. and Q CYBER TECHS. LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP INC., a Delaware corporation, and FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No. 4:19-cv-07123-PJH<br><br>**REPLY IN SUPPORT OF MOTION TO STAY PERMANENT INJUNCTION**<br><br>Action Filed: 10/29/2019 |

**TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ......................................................................................................... 1

II. ARGUMENT ............................................................................................................... 2

    A. Defendants Have Shown Serious Legal Questions as to Summary Judgment. ........ 2

    B. NSO Has Shown Serious Questions as to the Permanent Injunction..................... 10

    C. NSO Has Made a Strong Showing of Irreparable Harm......................................... 11

    D. Plaintiffs Will Not Be Irreparably Harmed by a Stay. ............................................ 13

    E. Staying the Injunction Serves the Public Interest. .................................................. 14

    F. The Administrative Stay Should Remain in Place.................................................. 15

III. CONCLUSION .......................................................................................................... 15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Azurin v. Von Raab*,
  792 F.2d 914 (9th Cir. 1986)......................................................................................... 2

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ......................................................................................... 6

*Cargill, Inc. v. Sears Petrol. & Transp. Corp.*,
  2004 WL 3507329 (N.D.N.Y. Aug. 27, 2004) ............................................................. 2

*E.I. DuPont de Nemours & Co. v. Phillips Petrol. Co.*,
  835 F.2d 277 (Fed. Cir. 1987) ..................................................................................... 11

*Eli Lilly & Co. v. Emisphere Techs., Inc.*,
  2006 WL 1131786 (S.D. Ind. Apr. 25, 2006) ............................................................... 2

*Extreme Networks, Inc. v. Eterasys Networks, Inc.*,
  2009 WL 679602 (W.D. Wis. Mar. 16, 2009) .............................................................. 2

*Facebook, Inc. v. MaxBounty, Inc.*,
  274 F.R.D. 279 (N.D. Cal. 2011) .................................................................................. 5

*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) ...................................................................................... 3

*Flores v. Barr*,
  977 F.3d 742 (9th Cir. 2020) ....................................................................................... 13

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
  556 F. Supp. 2d 1122 (E.D. Cal. 2008) ........................................................................ 5

*Hungerstation LLC v. Fast Choice LLC*,
  857 F. App'x 349 (9th Cir. 2021) ................................................................................. 7

*Illinois Bell Tel. Co. v. Haines & Co.*,
  1989 WL 76012 (N.D. Ill. July 3, 1989) .................................................................... 11

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) .................................................................................... 13

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) ........................................................................................ 2

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) ...................................................................................... 5

*Meta v. Nguyen*,
    2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) .................................................................. 10

*Multiven, Inc. v. Cisco Sys., Inc.*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ............................................................................ 5

*National Urban League v. Ross*,
    977 F.3d 698 (9th Cir. 2020) .......................................................................................... 15

*Sealant Sys. Int'l, Inc. v. TEK Glob., S.R.L.*,
    2014 WL 5141819 (N.D. Cal. Oct. 13, 2014) ............................................................. 2, 12

*Softketeers, Inc. v. Regal W. Corp.*,
    2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) .................................................................. 12

*Standard Haven Prods., Inc. v. Gencor Indus., Inc.*,
    897 F.2d 511 (Fed. Cir. 1990) ........................................................................................ 11

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    2004 WL 1305849 (D. Del. June 9, 2004), *rev'd in part on other grounds*, 425
    F.3d 1366 (Fed. Cir. 2005) ........................................................................................ 2, 11

*United States v. Nosal*,
    844 F.3d 1024 (9h Cir. 2016) .......................................................................................... 3

*United States v. Saini*,
    23 F.4th 1155 (9th Cir. 2022) ......................................................................................... 5

*Van Buren v. United States*,
    593 U.S. 374 (2021) ........................................................................................................ 3

*Vanguard Outdoor, LLC v. City of Los Angeles*,
    2010 WL 11531294 (C.D. Cal. Oct. 18, 2010) ............................................................. 13

**Statutes**

18 U.S.C. § 1030 ................................................................................................... 1, 3, 4, 5

## I. INTRODUCTION

Denying NSO a temporary stay would all but moot its appeal. Each of the four factors the Court must weigh to determine whether a stay is appropriate favors NSO. First, NSO has shown serious questions regarding the Court's decisions on liability, personal jurisdiction, and the ordered injunction. With respect to liability, the Court's determination that NSO exceeded authorized access ignored 18 U.S.C. § 1030(e)(6), which requires NSO to have obtained information *in* (not *via*) WhatsApp's servers. In opposition, WhatsApp repeats an incorrect statutory interpretation (which the Court expressly avoided on summary judgment) and reverts to arguing that NSO lacked any authority to access its servers at all (an argument twice rejected by the Court). The Court also did not make any findings sufficient to support a showing of "intent to defraud," as Congress intended that phrase to be construed (an intent to deprive the plaintiff of money or property) or that NSO (as distinct from its customers) "obtained information." There are also serious questions as to whether the Court's breach of contract finding was supported by admissible evidence.

The same is true for the Court's finding that Plaintiffs incurred irreparable harm warranting an injunction, which was based on the theory that users might be dissuaded from using WhatsApp—a theory Plaintiffs never argued or advanced evidence to support. Further serious questions pervade the Court's granting of summary judgment without adjudicating NSO's affirmative defenses of law enforcement, unclean hands, and waiver, each of which should have been presented at trial. Finally, there are serious questions about the Court's finding that NSO was subject to personal jurisdiction. In response, the Opposition pivots away from the Court's actual rulings to focus on alternative arguments. This alone clearly shows the existence of serious questions.

The other three factors likewise favor NSO. NSO has shown that it will be irreparably harmed without a stay. Its business will be severely disrupted by the injunction. In contrast, Plaintiffs will suffer no concomitant, irreparable harm from a stay. A stay would also serve the public interest.

The Court should stay the injunction pending appeal. If it does not, it should extend the current administrative stay to avoid harms that cannot be undone if NSO prevails on appeal.

II.   **ARGUMENT**

    A.   **Defendants Have Shown Serious Legal Questions as to Summary Judgment.**

NSO is not required to persuade the Court to change its mind about its rulings—if it were otherwise, stays would be exceedingly rare. Whether a permanent injunction should have issued is a "different analys[i]s" from whether a stay is warranted, and a belief in the first does not preclude the second. *Sealant Sys. Int'l, Inc. v. TEK Glob., S.R.L.*, 2014 WL 5141819, at *2 (N.D. Cal. Oct. 13, 2014) (cleaned up).[1] The "minimum quantum of likely success necessary to justify a stay" is whether the appeal will raise "serious legal questions," *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011) (cleaned up), as is the case here. This case has involved novel, nuanced, and technical legal and factual issues. The Court has recognized some uncertainty about its rulings, and NSO has shown serious questions about their correctness. That is more than sufficient.[2]

Indeed, Plaintiffs' opposition itself proves the existence of serious legal questions as to the correctness of this Court's decisions. Tellingly, Plaintiffs for the most part do not defend the decisions this Court actually made, instead relying on arguments on which the Court's orders did not rely, going so far as to advance arguments the Court already *rejected* multiple times. Plaintiffs' failure to defend the Court's actual rulings confirms NSO's appeal will raise serious legal questions.

**1. Exceeding Authorized Access.** As NSO's explained in the motion, the Court's finding that NSO exceeded its authorized access to WhatsApp servers satisfies neither the statutory test for exceeding authorized access—which requires obtaining information "in," not "via," the accessed

---

[1] *See Eli Lilly & Co. v. Emisphere Techs., Inc.*, 2006 WL 1131786, at *3 (S.D. Ind. Apr. 25, 2006) (staying injunction because "although the court believes [plaintiff's] likelihood of success on appeal is not high," "the court must assume that its decision on the merits might be wrong" and "[plaintiff] has colorable arguments"); *Extreme Networks, Inc. v. Eterasys Networks, Inc.*, 2009 WL 679602, at *4 (W.D. Wis. Mar. 16, 2009) (staying injunction despite "disagree[ing] with defendant's challenges to the jury's verdict" because "the court of appeals may see things differently").

[2] *See Azurin v. Von Raab*, 792 F.2d 914, 915 (9th Cir. 1986) (granting stay when appeal "raise[d] a number of serious and complex legal issues," which were "substantial and of public importance"); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 2004 WL 1305849, at *21 (D. Del. June 9, 2004) (staying injunction where "the parties have raised complex issues of law, issues which this court and the parties recognize would ultimately be resolved on appeal"), *rev'd in part on other grounds*, 425 F.3d 1366 (Fed. Cir. 2005); *Cargill, Inc. v. Sears Petrol. & Transp. Corp.*, 2004 WL 3507329, at *12 (N.D.N.Y. Aug. 27, 2004) (staying injunction due to "the sheer number and complexity of the legal and factual issues which have been presented," even though court was "confident of my rulings and the jury's verdict").

computer, 18 U.S.C. § 1030(e)(6) (emphasis added)—nor the Supreme Court's holding that exceeding authorized access requires "entering a part of the [servers] to which [NSO] lack[ed] access privileges," *Van Buren v. United States*, 593 U.S. 374, 388 (2021). Plaintiffs barely dispute that argument. Instead, they raise a series of points that in no way support the correctness of this Court's decisions. To the contrary, Plaintiffs' arguments confirm the existence of serious questions about the Court's finding that NSO exceeded its authorized access to WhatsApp's servers.

*First*, Plaintiffs argue that exceeding authorized access can be satisfied by viewing the events from a macro perspective—that instead of analyzing whether NSO entered a part of any single computer to which it lacked access privileges, the Court should instead focus on whether "WhatsApp would seek to stop their attacks if they were detected" after NSO "circumvented WhatsApp's security updates." (Opp. 3.) But that is not the theory this Court relied on to find that NSO exceeded authorized access. The fact that Plaintiffs can defend this Court's ruling only by making a different argument than the one this Court adopted confirms that the Court's ruling presents serious questions for appeal.

Plaintiffs' argument also fails on its own terms. There is **no case** supporting Plaintiffs' theory, which directly conflicts with *Van Buren*'s holding that exceeding authorized access requires "obtaining information **located in particular areas of the computer**—such as files, folders, or databases—that are off-limits to [the defendant]." *Van Buren*, 593 U.S. at 374 (emphasis added). There are no "particular areas" of WhatsApp servers that NSO accessed despite their being "off-limits," *id.*, because the evidence is undisputed that NSO did not access any off-limits areas of the servers. Plaintiffs' novel "circumvent[ing] security updates" theory cannot overcome that fact.

Plaintiffs cite *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), but it both predates *Van Buren* and is a "without authorization" case. *Id.* at 1068. The only other case cited by Plaintiffs, *United States v. Nosal*, 844 F.3d 1024, 1033-34 (9h Cir. 2016), is also a "without authorization" case. Of the cases cited by the parties, only *Van Buren* defines what it means to exceed authorized access. Plaintiffs tacitly acknowledge that NSO's use of WhatsApp servers does not satisfy *Van Buren*'s definition of exceeding authorized access, and they cite no precedent from

3

any court finding similar conduct to constitute exceeding authorized access.³

**Second**, Plaintiffs essentially concede that this Court did not find that NSO obtained information "in" WhatsApp servers, as the CFAA's definition of "exceeds authorized access" requires. 18 U.S.C. § 1030(e)(6). Instead, Plaintiffs argue it does not actually matter whether NSO obtained information from the servers, because the CFAA does not require that the source of the information be the same computer to which a defendant exceeded its authorized access. But that argument is irreconcilable with the statutory text. The CFAA's definition of "exceeds authorized access" requires the defendant "to obtain or alter information **in the computer** that the accesser is not entitled so to obtain or alter," which requires obtaining data from "the computer" to which the defendant exceeded its authorized access. *Id.* (emphasis added.) Moreover, the Court did not adopt Plaintiffs' argument at summary judgment, where it acknowledged "th[e] statutory interpretation question" but declined to resolve it. (Dkt. 494 at 12.) Here too, Plaintiffs' failure to defend the Court's actual holding confirms that serious legal questions exist as to its correctness.

Plaintiffs' only other defense of the Court's decision is to claim, without support, that "the undisputed evidence showed that NSO … extracted data *from WhatsApp servers* and its users' devices through its exploits." (Opp. 3 (emphasis added).) But data from user devices cannot support the Court's liability finding of exceeding authorized access. And as for extracting data from WhatsApp servers, the only information Pegasus obtained from them was whether the target number is associated with an active WhatsApp account—information that NSO was authorized to obtain because is equally available to *any* WhatsApp user who sends messages using WhatsApp. (Dkt. 419-4, Gazneli Decl. ¶ 11.) This is uncontroverted. In any event, obtaining (public) information *from* WhatsApp servers was not the basis for the Court's finding of liability, which was based on target device information being sent to the WIS *via* WhatsApp servers.

**Finally**, Plaintiffs repeat their old argument—*twice* rejected by this Court—that "NSO's

---

³ Plaintiffs argue in a footnote that they unambiguously revoked access, which they contend makes *Van Buren* and its progeny inapposite. (Opp. n.2.) But that argument cannot change *Van Buren*'s definition of "exceeds authorized access," and it is not the argument this Court adopted at summary judgment anyway. And there are, at a minimum, substantial questions that were raised at summary judgment as to whether Plaintiffs *unambiguously* and *completely* revoked authorization, as even *Power Ventures* requires. (*See* Dkt. 419-2 at 14-15.)

conduct was *without authorization*."[4] (Opp. 3-4.) The mere fact that Plaintiffs advance this theory, again, demonstrates serious questions about the correctness of the Court's actual decision.

**2. Intent to Defraud.** While finding that NSO acted with "intent to defraud," the Court did not discuss or cite any evidence satisfying the Ninth Circuit's definition of that phrase: an "intent to deprive a victim of money or property by deception." *United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022). The evidence would not support any such finding. (Mot. 4-5.)

Plaintiffs do not contend that the Court found NSO intended to deprive WhatsApp (or anyone else) of money or property. Plaintiffs instead ask the Court to disregard the Ninth Circuit's definition of "intent to defraud," citing three *district court* cases that predate *Saini*. Those cases obviously cannot override the Ninth Circuit, and they do not support Plaintiffs anyway.[5]

**3. Co-Conspirator Liability and NSO "obtaining" information.** On summary judgment, NSO argued it could not be held liable for any "obtaining" of information by NSO's "government clients," an argument the Court said it rejected based on CFAA § 1030(b)'s conspiracy provision. (Dkt. 494 at 11.) But shortly before trial, the Court clarified that it had *not* found "that defendants engaged in a conspiracy to violate the CFAA." (Dkt. 699 at 2.) That leaves no basis for holding NSO liable for its customers' conduct, or for finding that NSO obtained any information at all that it was not allowed to obtain, which further raises serious questions about the Court's decisions.

**4. Breach of Contract.** Plaintiffs do not defend this Court's failure to find, for purposes contract liability, that Plaintiffs "provided reasonably conspicuous notice of the terms to which

---

[4] As the Court held, NSO did not access WhatsApp's servers "without authorization," because Plaintiffs have conceded that NSO was authorized to use WhatsApp servers to send at least *some* messages using WhatsApp. The Court therefore followed *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) in holding that "plaintiffs have not stated a claim for a violation of 18 U.S.C. § 1030(a)(2) and (a)(4) by intentionally accessing information on a protected computer 'without authorization.'" (Dkt. 111 at 37.) The Court then reaffirmed on summary judgment that its previous order limited Plaintiffs "to the 'exceeds authorization' theory." (Dkt. 494 at 11.)

[5] The defendant in *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008), was a competitor of the plaintiff that stole the plaintiff's patient list with the intent to steal the plaintiff's business, which is obviously an intent to deprive the plaintiff of money or property. Likewise, the defendant in *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 281 (N.D. Cal. 2011), tried to deprive Facebook of money by creating "fake Facebook [advertising] campaigns" that redirected users away from Facebook's advertisers. And *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892-94 (N.D. Cal. 2010), involved a defendant stealing the plaintiff's "proprietary and copyrighted software."

[NSO] w[ould] be bound" or that NSO "unambiguously manifest[ed] [its] assent to those terms." *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 856 (9th Cir. 2022). Instead, Plaintiffs claim "the undisputed evidence at summary judgment established that WhatsApp provided reasonably conspicuous notice of the terms." (Opp. 6 (citing Dkt. 436-5 at 6).) This evidence took the form of an expert declaration that Plaintiffs submitted for the first time with their *reply brief* and that attached purported screenshots Plaintiffs had neither produced in discovery nor described in their Rule 26 disclosures. NSO objected to this unfair reply evidence, which it had no opportunity to rebut (Dkt. 448), and the Court never resolved those objections (Dkt. 494).

Nor, contrary to Plaintiffs' misrepresentation, was that improper evidence "undisputed." The inadmissible evidence was insufficient on its face to prove that WhatsApp provided conspicuous notice of its Terms to NSO. No evidence links NSO to the specific version of the WhatsApp application in the screenshots (which were in the English language and appeared to be from a US version of WhatsApp, while NSO's employees would have used a version of WhatsApp available on the Israeli app stores). And the screenshots do not reflect conspicuous disclosure, as they are in small font buried at the bottom of the screen and overshadowed by other visual elements. The Ninth Circuit has rejected similar disclosures as insufficient. *See, e.g.*, *Berman v. Freedom Financial Network*, 30 F.4th 849, 856-58 (9th Cir. 2022). At a minimum, there is a material factual dispute over the sufficiency of that disclosure that should have gone to the jury.

Further, Plaintiffs' evidence was not the basis of the Court's grant of summary judgment. The Court relied solely on testimony that WhatsApp users must agree to the Terms to create accounts, without ever considering whether WhatsApp sufficiently disclosed its terms or required unambiguous consent. As NSO showed, that holding was incorrect or at least subject to serious legal questions. Plaintiffs' inability to defend the Court's actual reasoning proves the point.

**5. Personal Jurisdiction.** As set forth in NSO's motion, there are serious legal questions as to the correctness of both aspects of the Court's rationale for exercising personal jurisdiction over NSO: (1) its holding that the mere transmittal of 43 communications through servers in California would support personal jurisdiction, and (2) its discovery sanction presuming that the use of California servers was knowing and intentional. (Mot. 6-8)

***First***, the only evidence of any relationship between Pegasus and California is evidence that Plaintiffs contend show that messages passed through WhatsApp relay servers 43 times in April-May 2019. (Opp. 7.) But NSO has (at a minimum) a strong argument that the mere use of California servers, without any evidence that NSO *knew* where those servers were located or *controlled* which servers any message passed through, would not support personal jurisdiction in California. *E.g.*, *Hungerstation LLC v. Fast Choice LLC*, 857 F. App'x 349, 351 (9th Cir. 2021).

Plaintiffs do not dispute this legal point, instead asserting that NSO controlled (for the "Heaven" installation vector) which (non-WhatsApp) relay servers the WIS used, while also pointing out that the Eden installation vector used WhatsApp's relay servers. It is grossly misleading to imply, from these two distinct facts, that NSO therefore could have selected (in Eden) *which* WhatsApp relay server to use. Mr. Gheorghe testified—as WhatsApp's 30(b)(6) designee—that whenever WhatsApp's own relay servers are used, an algorithm in the WhatsApp system determines, at the signaling server stage, which WhatsApp relay server to use.[6] (Dkt. 491-5, Exh. L at 82 and 119-121.) WhatsApp tries to confuse the Court by conflating aspects of Heaven and Eden. Pegasus never chose which WhatsApp relay server should be used. "[Pegasus] messages traveled through the WhatsApp servers in the same way as any other message sent using a genuine WhatsApp client." (Dkt. 433-3, Gazneli Decl. ¶¶ 10, 11, 15.)

***Second***, there are serious questions as to the Court's adverse inference that the use of Plaintiffs' California servers was purposeful. The Court did not heed *Richmark's* warnings to not override foreign secrecy laws where the outcome of litigation does not stand or fall on the discovery. But since Plaintiffs already had received a copy of Pegasus source code from the FBI, and since Plaintiffs were able to persuade the Court that no disputed issues of fact stood in the way of granting summary judgment as to liability even without exporting NSO's Pegasus code out of Israel, it is clear that the outcome of the litigation did not stand or fall on ordering the production

---

[6] Plaintiffs contend that Mr. Gheorghe's admission that WhatsApp signaling servers selected which relay server to use through an algorithm written by WhatsApp related only to ordinary (i.e. non-Pegasus) uses of WhatsApp. Were that the case, Mr. Gheorghe had every opportunity to clarify that his description of how WhatsApp functioned could be different for Pegasus messages. He did not, and Plaintiffs' suggestion that Pegasus could have selected the specific WhatsApp relay server to use—is disproven by the declarations of Mr. Gazneli and Mr. McGraw. (Dkt. 433-3. 433-4).

of Israel's export-controlled technology.  The Court also did not give NSO sufficient time to obtain an export license before issuing an outcome-determinative evidentiary sanction.

Plaintiffs' arguments defending the sanction are unpersuasive.  First, they argue that NSO supposedly conceded that what it produced does not show the full picture of how Pegasus functions.  (Opp. 9.)  In support, they cite only their own sanctions argument (Dkt. 473 at 2), inaccurately describing a supposed "admission" that the AWS Server "comprises part of the Pegsaus system."  It is true that the AWS Server is part of the Pegasus system, not the whole thing, but the whole system was never ordered produced (or even asked for in discovery).  Plaintiffs sought a specific AWS server in discovery, precisely because they knew it contained the entirety of the portion of the Pegasus system relevant to this case.  NSO then produced it in Israel to Plaintiffs' counsel of record (and whose fees Plaintiffs now seek to recover).  Moreover, NSO also produced over 100 exhibits, attached to its opposition to the motion for sanctions, that collectively showed the full functionality of Pegasus, as the Court had ordered.  (Dkt. 429-4 through 429-16, inclusive.)

Next, Plaintiffs claim they had no way of confirming whether the code they received from the FBI was the same code NSO produced in Israel.  Why not?  Plaintiffs could have sent the FBI code to their counsel in Israel, Mr. Lehman, and had him (or an expert) compare the code.  This is precisely what Plaintiffs *should* have done before accusing NSO of discovery misconduct.  And in these unique circumstances, where requiring NSO to produce Pegasus code outside of Israel would have violated Israel criminal law, the Court should have asked Plaintiffs to make this comparison and inform the Court of the results before imposing a sanction that led directly to the exercise of personal jurisdiction.  Since the code the FBI obtained and shared with Plaintiffs was very likely acquired from AWS (though Plaintiffs refused to provide discovery about its origin), the results of that comparison likely would have shown that Plaintiffs did not need a second copy.

**6. Affirmative Defenses.**  The summary judgment record included substantial evidence about NSO's affirmative defenses of law enforcement, unclean hands, and waiver.  The Court made no findings as to any of these defenses, but simply granted summary judgment as to liability, which was an error.  Plaintiffs argue that the Court was not obligated to make express findings on defenses that lack any basis in fact.  But each of these defenses has substantial factual basis.

***First***, the evidence showed that the FBI licensed Pegasus starting in December 2018. To perform that contract, NSO was required to maintain Pegasus in a state of operation, and NSO had to, and did, conduct research and development activities in order to do so. (Dkt. 396-5 Exh. G at 332:3-333:21 and Exh. N-O.) Because only NSO's customers, and not NSO, operate Pegasus for the purpose of obtaining information from target devices, NSO's liability could have been based only on these same research and development activities.

Plaintiff argues the Court has rejected the law enforcement exception because of a lack of evidence that Pegasus was used for law enforcement activities. The Court has made that finding, but there are serious questions as to its correctness. Even if FBI never used its Pegasus system in the field (NSO lacks information about this one way or the other), FBI has admitted to using Pegasus to test its capabilities, and NSO's duty to keep Pegasus ready for the FBI did not depend on whether or how the FBI ever *used* the system. Plaintiffs also question whether *all* of NSO's activity after December 2018 would have been exempt, but since NSO does not operate Pegasus, the only conduct for which NSO could have been held liable was research and development required by the FBI license. Plaintiffs fail to explain what actions NSO took to allegedly violate the CFAA unrelated to maintaining an active Pegasus system for the FBI.

***Second***, NSO supported its unclean hands defense with undisputed evidence that Michael Scott and Andrew Robinson tried to access NSO's AWS server to obtain Pegasus code without NSO's authorization. (Dkt. 399-4, Exh. 12 at 24; Dkt. 419-5, Exh. B at 375-77, Exh. O at 25.) That attempt to access NSO's confidential data without authorization plausibly violated the CFAA, and Plaintiffs have never offered any argument to the contrary.[7] Because the evidence could support a finding that Plaintiffs deceptively violated the CFAA while seeking evidence for their claims—and then sought damages for the time Mr. Robinson spent trying to gain access to NSO's servers without NSO's permission—NSO offered a sufficient basis for an unclean hands defense to at least some of Plaintiffs' damages request.

---

[7] Plaintiffs argue the Court disagreed with NSO's argument and instructed the jury to disregard it, but the evidence remains undisputed that Mr. Scott and Mr. Robinson tried to access the AWS server without NSO's permission. The Court barred NSO from calling that "stealing"—a decision that itself raises serious questions for appeal—but Plaintiffs cannot explain how attempting to access a server NSO controlled, "without authorization," would not violate the CFAA.

1   ***Third***, NSO's waiver defense was supported by Plaintiffs' undisputed failure to have *ever* sued to enforce the relevant provisions of its terms of service against persons it knows or suspects to have violated them. Plaintiffs are constantly aware of violations by thousands of users of the exact same provisions of the terms of service that NSO was found to have breached, both before and after Plaintiffs learned of the alleged breach by NSO, and Plaintiffs have *never* enforced them.

### B. NSO Has Shown Serious Questions as to the Permanent Injunction.

Serious questions exist as to both (1) the Court's grant of a permanent injunction based on a theory of irreparable harm that Plaintiffs never raised (and in fact waived), and (2) the scope of the injunction. (Mot. 9-13.) ***First***, Plaintiffs' defense of the Court's finding of irreparable harm demonstrates the existence of serious questions. Plaintiffs do not dispute, and thus concede, there is no evidence NSO has engaged in the conduct at issue in this case since the closing of the "Erised" installation vector in 2020, and NSO provided ample evidence it has not done so ever since. (*E.g.*, Shohat Decl. ¶ 46, Dkt. 760-1.)[8] Plaintiffs support the Court's ruling, claiming that they are harmed when they are not able to offer end-to-end encryption to their users, by citing to platitudes about user privacy from Carl Woog's testimony. But WhatsApp *does* offer end-to-end encryption and has at all times relevant to this case. The question is therefore whether user confidence in it has been eroded.[9] And no witness testimony or document in the case speaks to that at all—neither the Court nor Plaintiffs cite anything for this. The Court opined that some users may be dissuaded, but that was not based on any evidence, as shown by Plaintiffs' failure to defend this finding with any.

***Second***, Plaintiffs defend enjoining the collection of WhatsApp messages in ways having nothing to do with WhatsApp servers as "necessary to prevent NSO's continued violations of the

---

[8] Plaintiffs cite no precedential case holding that unauthorized access to computers that ceased many years before entry of the injunction can properly constitute irreparable harm. In *Power Ventures*, a district court case, it was not clear when the conduct ceased ("To date, it is not clear whether Defendants have deleted the data acquired from Facebook," 252 F. Supp. at 776). The other case, *Meta v. Nguyen*, 2023 WL 8686924 *10 (N.D. Cal. Nov. 21, 2023), is a default judgment case that, contrary to Plaintiffs' claims, did not contain any finding that the conduct constituting irreparable harm "stopped more than two years earlier" (Opp. 13). The "irreparable harm" section reads as if the account takeover scheme were ongoing, and the "overview" section describes it as "continuing to *at least* June 2021," leaving open that it was ongoing.

[9] WhatsApp's growth from 1.5 billion users at the time of the Complaint (Dkt. 1 ¶ 17) to over 3 billion users at the time of trial, suggests that user confidence in WhatsApp is strong.

law." (Opp. 13.) But the unlawful conduct this Court found was NSO's transmitting "information about the target users' device *via the WhatsApp servers*." (Dkt. 494 at 12) (emphasis added).) The *use of WhatsApp servers* was central to the Court's liability holding. The Court's enjoining of the use of Pegasus to collect WhatsApp messages from terrorists and criminals, even where none of Plaintiffs' computers are even touched, is not "necessary to prevent the recurrence of NSO's unlawful conduct" because it is undisputed that WhatsApp messages can be collected in ways that never require any unlawful interaction with WhatsApp servers.

***Third***, Plaintiffs' only defense of the Court's refusal to carve exempt U.S. law enforcement operations from the injunction is Plaintiffs' assertion that there is no evidence that the United States "ever used Pegasus for law enforcement activities." (Opp. 14.) But that is irrelevant to whether such activities should be prohibited *in the future*, when the CFAA plainly permits them.[10]

  **C. NSO Has Made a Strong Showing of Irreparable Harm.**

Despite Plaintiffs' claims of the supposed inadequacy of NSO's declarations attesting to the irreparable harm an injunction would cause, many courts have found irreparable harm based on similar evidence.[11] NSO's declarations, moreover, are substantiated by the evidence at trial, which confirmed that NSO and Q-Cyber were unprofitable the past two years, and that its business depends on Pegasus. Plaintiffs even emphasized repeatedly at trial that NSO's business depends on Pegasus. So, it is entirely credible that the injunction would cause catastrophic harm to NSO's business, and Plaintiffs have no evidence to the contrary.[12]

Plaintiffs, in arguing Mr. Shohat's declaration is insufficiently pessimistic to support irreparable harm, try to take advantage of a situation hardly unique to NSO. The declaration shows the injunction poses an existential threat to NSO, yet any statement from an executive, who needs to exercise care in such a situation, must be measured to prevent the statement itself from causing

---

[10] Moreover, even looking to the past, there is evidence that the FBI licensed and tested Pegasus, which itself qualifies as "investigative, protective, or intelligence" activities.

[11] *E.g.*, *Standard Haven Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515 (Fed. Cir. 1990); *E.I. DuPont de Nemours & Co. v. Phillips Petrol. Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987); *Illinois Bell Tel. Co. v. Haines & Co.*, 1989 WL 76012, at *4 (N.D. Ill. July 3, 1989).

[12] *See Union Carbide*, 2004 WL 1305849, at *21 ("[Plaintiff] can not fairly assert that a permanent injunction would not affect [defendant's] commercial practices as the record clearly demonstrates that the infringing [products] are a substantial source of revenue.").

irreparable harm. Courts recognize the impossible position in which such defendants are placed by finding irreparable injury based on statements such as those made by Mr. Shohat. (Mot. 13-15.)[13]

Requiring destruction of any computer code that merely "access[es]" the WhatsApp Platform (Dkt. 809 ¶ 4) will cause irreparable harm, because it can neither be undone nor remedied by money. Deleted computer code cannot be undestroyed should the Ninth Circuit reverse this Court's judgment. That is the very definition of irreparable harm. While Plaintiffs argue that harm caused by illegal conduct does not merit protection (Opp. 15), that improperly assumes affirmance by the Ninth Circuit. The very purpose of a stay is to protect NSO from irreparable harm *if the Ninth Circuit disagrees* with this Court. *Sealant Sys.*, 2014 WL 5141819, at *2.[14]

Prohibiting collection of WhatsApp messages from target devices will also cause irreparable harm. Pegasus represents 100% of Defendants' sales. (Dkt. 813-1 ¶ 3.) Plaintiffs try to downplay the significance of collecting WhatsApp messages to the law enforcement and intelligence work for which NSO's government customers license Pegasus, but it is undisputed WhatsApp is by far the number one messaging platform in the world. (April 29, 2025 Trial Tr. 324:8-10.) WhatsApp delivers well over 100 billion messages per day. (*Id.* 354:13-15.) The fact Pegasus can also collect messages from niche platforms like Blackberry Messenger and Skype (Opp. 18) is not an adequate substitute to law enforcement agencies that will be forced to "go dark" on the world's most popular messaging platform. If the injunction were to go into effect, NSO would lose market share immediately, resulting in a "competitive disadvantage and loss of customers that NSO would be unlikely ever to overcome." (Dkt. 813-1 ¶ 48.) Loss of customers and market share constitutes irreparable harm. (Mot. 14-15.)

---

[13] Plaintiffs' attempt to distinguish *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701 (C.D. Cal. Feb. 7, 2023), is based on an unpersuasive argument that the software subject to deletion is not central to NSO's business. Pegasus represents 100% of Defemdants' sales, (Dkt. 813-1 ¶ 3). The "possible spillover effects" in *Softketeers*, "potential irreversible loss of data, contracts, customers and market share" and "risks [of] the loss of jobs," are the same as those described by Mr. Shohat.

[14] Plaintiffs also argue that paragraph 4 of the injunction will not cause NSO irreparable harm because NSO does not have any installation vectors for Pegasus that use WhatsApp servers. (Opp. 15-16.) This argument is disingenuous because, as written, paragraph 4 does not appear to be limited to installation vectors. Paragraph 4 requires NSO to delete any computer code that merely uses or accesses the "WhatsApp Platform"—which could include code beyond installation vectors. If paragraph 4 is limited solely to installation, however, it would not cause irreparable harm.

Plaintiffs' other arguments are equally unpersuasive. They cite *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012), to argue that "some possibility of irreparable injury" fails to satisfy the irreparable harm requirement. *Lair* held that the test was satisfied by the movant's showing of "a *probability* of irreparable injury if the stay is not granted," which NSO has amply shown. Plaintiffs also mischaracterize *Flores v. Barr*, 977 F.3d 742, 749 (9th Cir. 2020), as holding that declarations are not sufficient to explain how irreparable harm would result absent a stay. The problem in *Flores* was that not that the evidence came in the form of declarations, but that the declarations submitted were not *plausibl*e. *Id.*[15] In contrast, NSO's theory of harm is not just plausible but self-evident. It more than suffices to show a probability of irreparable harm.

**D.  Plaintiffs Will Not Be Irreparably Harmed by a Stay.**

Plaintiffs downplay the importance of whether the issuance of a stay pending appeal would irreparably harm them, urging the Court to "not dwell" on it (Opp. 20.) The reason is obvious: there is no irreparable harm to Plaintiffs of keeping the status quo. Plaintiffs rely on the same arguments for purposes of the third prong of the test for granting a stay pending appeal as they do to defend the Court's finding of ongoing harm in granting the injunction in the first instance. But as NSO has shown, the Court's findings of ongoing harm were not based on evidence submitted by the parties, and serious questions surround the correctness of those findings.

Plaintiffs' only other argument is that the sending of information via WhatsApp servers by Pegasus satisfies the requirement to show ongoing harm. But those events took place five years ago. It cannot be that the mere showing of some use of a plaintiff's computer at some point in the past automatically satisfies the irreparable harm requirement forever, and no case has ever so held. Plaintiffs argue that NSO has not *disproven* that they continue to access WhatsApp servers, but Mr. Shohat declared under penalty of perjury that NSO does not, and Plaintiffs have provided nothing to gainsay that undisputed testimony. This is not because of any refusal of NSO to provide

---

[15] Plaintiffs also cite *Vanguard Outdoor, LLC v. City of Los Angeles*, 2010 WL 11531294 (C.D. Cal. Oct. 18, 2010). There, the district court delayed its order going into effect to allow the movant to seek a stay from the Ninth Circuit. The business harms to the movant in *Vanguard* were limited to loss of billboard rental income for a few months (or less), *id.* at *3, which has no similarity to the permanent harms NSO would suffer without a stay. Moreover, in *Vanguard*, the movant "ha[d] not raised even serious questions on the merits," *id.* at *2, which is not the case here.

requested discovery, as Plaintiffs never asked the Court to allow for discovery beyond May 10, 2020, despite the Court's having invited Plaintiffs to do so. (Dkt. 292 at 4.)

### E. Staying the Injunction Serves the Public Interest.

NSO's contracts restrict the use of Pegasus "only for the prevention and investigation of crimes and terrorism." (Dkt. 813-4 ¶ 18.5; Dkt. 813-5 ¶ 19.5). Restrictions on Pegasus limit the effectiveness of Pegasus—for the governments that use it—in preventing and investigating crimes and terrorism. This disserves the public interest. The U.S. public is harmed by banning any future use of Pegasus by the United States, as well as the current and future use of Pegasus by U.S. allies.

Joshua Minkler and Col. Ty Shepard explained why the ability to access encrypted devices serves the public interest. Plaintiffs argue that the Court found the Minkler and Shepard testimony to be untethered to the conduct at issue in this case, but the injunction also goes well beyond the conduct for which NSO was held liable—all of which hinged on the transmission of information across WhatsApp servers. The inquiry now is whether the public interest is best served by staying the injunction. Mr. Minkler's and Col. Shepard's opinions are squarely on point and support a stay.

Plaintiffs claim, incredibly, that "NSO provides no evidence that foreign governments have used or could use Pegasus." (Opp. 21.) The dishonesty of that assertion is breathtaking. NSO's witnesses have testified again and again that foreign governments—and only foreign governments—use Pegasus, testimony that is amply supported by other undisputed evidence in the record. (*E.g.*, Dkts. 45-13, 45-14; Dkt. 813-1 ¶ 3.) Plaintiffs next claim that the Court should not consider evidence or argument about the use of Pegasus by foreign governments in foreign countries because the Court carved out foreign governments from the scope of the injunction. But the injunction prohibits NSO from *offering* certain Pegasus features to foreign governments, including, crucially, the ability to collect WhatsApp messages even where no WhatsApp servers are used. Wordsmithing the injunction not to *apply directly* to foreign governments does not mean those governments will be *unaffected*. Those governments plainly will be affected; and, by extension, so will the U.S. public.[16]

---

[16] It is specious for Plaintiffs to imply that foreign governments (and therefore the public interest) will not be affected because foreign governments can switch to alternative products produced by

Plaintiffs' final argument is the quote from *hiQ Labs* about denial-of-service attacks, abusive users, identity thieves, and other ill-intentioned actors. NSO is not an ill-intentioned actor, and it does not engage in DoS attacks or identity theft. NSO never intended to cause any injury to Plaintiffs' servers or service, and Plaintiffs freely admitted their servers were not compromised. That distinguishes the *hiQ Labs* case. Staying the injunction will best serve the public interest.

### F. The Administrative Stay Should Remain in Place

"When considering the request for an administrative stay," the "touchstone is the need to preserve the status quo." *National Urban League v. Ross*, 977 F.3d 698, 702 (9th Cir. 2020). At a minimum, the Court should extend the administrative stay until the Ninth Circuit can decide whether to preserve the status quo. There is at least a reasonable possibility the Ninth Circuit sees the complex issues this Court has acknowledged pervade this case differently from how the Court decided them. There is also a reasonable possibility the harm to Defendants will be irreparable. Extending the administrative stay to allow the Ninth Circuit to pass upon NSO's request would avoid mooting the very relief NSO seeks, and is supported by NSO's cases.[17] (Mot. 18-19.)

## III. CONCLUSION

The Court should stay enforcement of the injunction pending appeal or, alternatively, should extend the administrative stay to enable NSO to seek a stay from the Ninth Circuit.

Dated: December 3, 2025

KING & SPALDING LLP

By: */s/ Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
AARON S. CRAIG

---

one of NSO's competitors. If those governments had wanted to use one of NSO's competitors' products, they would be doing so. The fact that they chose Pegasus over those other products demonstrates that for them, Pegasus was the best option. An inferior option is not a substitute.

[17] Plaintiffs cite just one case in opposition to the request to extend the administrative stay, but there, the Ninth Circuit declined to enter an administrative stay because "the status quo would be seriously disrupted by an immediate stay of the district court's order." *National Urban League*, 977 F.3d at 700-701. The district court had entered an injunction to prevent new deadlines from going into effect that would have necessitated the hiring of hundreds of thousands of census field workers at the height of the COVID-19 pandemic. Staying that injunction would have reinstituted the new aggressive deadlines, disrupting the status quo. Here, by contrast, the administrative stay will preserve the status quo and not force NSO to delete code or to stop providing services to sovereign governments they use to combat terrorism and serious crime.