No. 25-7380

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――――

WHATSAPP INC., a Delaware corporation; META PLATFORMS, INC.,
FKA FACEBOOK INC.,

*Plaintiffs-Appellees*,

v.

NSO GROUP TECHNOLOGIES LIMITED;
Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants*,

―――――――――

On Appeal from the U.S. District Court for the Northern District of
California, No. 4:19-cv-07123-PJH, Hon. Phyllis J. Hamilton

―――――――――

## DEFENDANTS' MOTION TO
## STAY PERMANENT INJUNCTION PENDING APPEAL

―――――――――

### Relief Needed by February 2, 2026

―――――――――

Matthew Dawson
Matthew V.H. Noller
KING & SPALDING LLP
50 California Street
Suite 3300
San Francisco, CA 94111
(415) 318-1200

Joseph N. Akrotirianakis
Aaron S. Craig
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
jakro@kslaw.com

*Counsel for Defendants-Appellants*

December 26, 2025

# Table of Contents

Background ................................................................................. 1

Legal Standard ........................................................................... 7

Argument .................................................................................... 8

    I.    NSO has a fair probability of success on appeal or, at minimum, has raised serious legal questions. ........................ 8

        A.    The district court erred in granting Plaintiffs summary judgment. ....................................................... 8

        B.    The district court erred in issuing an injunction. ..................................................................... 17

    II.    NSO will face irreparable harm without a stay. ................. 21

    III.    A stay will not irreparably injure Plaintiffs. ....................... 24

    IV.    The public interest favors a stay. ....................................... 25

Conclusion ................................................................................ 28

# Table of Authorities

**Page(s)**

## Cases

*Abu v. Dickson*,
    107 F.4th 508 (6th Cir. 2024) ............................................................. 11

*Am. Trucking Ass'ns v. City of L.A.*,
    559 F.3d 1046 (9th Cir. 2009) ........................................................... 23

*Ariz. Democratic Party v. Hobbs*,
    976 F.3d 1081 (9th Cir. 2020) ............................................................. 7

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ...................................................... 15, 16

*Chabolla v. ClassPass Inc.*,
    129 F.4th 1147 (9th Cir. 2025) ........................................................ 15

*FTC v. Qualcomm Inc.*,
    935 F.3d 752 (9th Cir. 2019) ........................................................ 7, 23

*Godun v. JustAnswer LLC*,
    135 F.4th 699 (9th Cir. 2025) ..................................................... 15, 16

*Herb Reed Enters. v. Fla. Ent. Mgmt.*,
    736 F.3d 1239 (9th Cir. 2013) .................................................... 17, 19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .......................................................... 23

*Jackson v. Amazon.com*,
    65 F.4th 1093 (9th Cir. 2023) .......................................................... 16

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ......................................................... 7, 8

*Leslie v. Grupo ICA*,
    198 F.3d 1152 (9th Cir. 1999) ........................................................... 8

*Manrique v. Kolc,*
    65 F.4th 1037 (9th Cir. 2023) ............................................................... 21

*NCAA v. Bd. of Regents,*
    463 U.S. 1311, (1983) (White, J.) ........................................................ 23

*NRA Grp. v. Durenleau,*
    154 F.4th 153 (3d Cir. 2025) ................................................................ 10

*Price v. City of Stockton,*
    390 F.3d 1105 (9th Cir. 2004) ......................................................... 20, 21

*Ramirez v. Trusper Inc.,*
    2025 WL 2955231 (9th Cir. Oct. 20, 2025) ........................................ 16

*Sealant Sys. Int'l, Inc. v. TEK Glob., S.R.L.,*
    2014 WL 5141819 (N.D. Cal. Oct. 13, 2014) ...................................... 24

*Softketeers, Inc. v. Regal W. Corp.,*
    2023 WL 2024701 (C.D. Cal. Feb. 7, 2023) ........................................ 24

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ............................................................. 20

*United States v. Saini,*
    23 F.4th 1155 (9th Cir. 2022) ......................................................... 12, 13

*Van Buren v. United States,*
    593 U.S. 374 (2021) .................................................................. 9, 10, 11

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ................................................................................. 26

**Statutes**

18 U.S.C. § 1030(a)(4) ............................................................................ 12

18 U.S.C. § 1030(e)(6) ......................................................................... 9, 11

18 U.S.C. § 1030(f) ................................................................................. 14

8 U.S.C. § 1029 ...................................................................................... 12

**Other Authorities**

S. Rep. No. 99-432 (1986) ........................................................................... 13

Defendants ("NSO") move for a stay of the permanent injunction issued by the district court pending NSO's appeal. NSO sought a stay from the district court, which the court denied while granting a 45-day administrative stay. (App.A.[1]) NSO respectfully asks this Court to decide this motion before the administrative stay expires on February 2, 2026, or alternatively to grant a further administrative stay pending this Court's decision.

## Background

### A.    NSO's business.

NSO is an Israeli company that designs and markets to government agencies highly regulated technologies for use in investigating crimes and terrorism. (App.B ¶¶3-4.) This case involves an NSO product called "Pegasus." NSO licenses Pegasus exclusively to select government agencies, subject to rigorous vetting and approval by the company and the Government of Israel. (App.B ¶¶3-4, 9; Dkt.796-2, Exh.H at 138:12-15, Exh.I at 93:13-19.) These facts have been corroborated repeatedly, including by independent third-party Ernst & Young Global. (App.B ¶¶26-32; Dkts.45-13, 45-14.)

---

[1] "App." refers to this motion's Appendix. "Dkt." refers to the district court docket.

NSO itself never operates Pegasus in field operations—only its government customers may do so. (App.B ¶¶14-16.) NSO requires its government customers to agree that they will (1) "fully comply with all privacy and national security related laws and regulations, international standards, and any other laws and regulations that are applicable to the use of [Pegasus], including by way of obtaining all judicial warrants . . . to the extent required by law," (2) use Pegasus "only for the prevention and investigation of crimes and terrorism and ensure that [Pegasus] will not be used for human rights violations," and (3) "immediately notify" NSO of any "misuse or potential misuse." (App.B, Exh.C ¶18.5.) NSO can and does suspend or terminate service to customers that misuse its technology. (App.B ¶12; Dkt.796-2, Exh.H at 21:16-25, 26:23-31:17, 181:10-15.)

Israel also strictly regulates Pegasus and must approve each request for a license. (App.B ¶¶5-7.) Israel requires NSO's government customers to execute end-use certificates promising to use Pegasus only for the "[c]ollection of data from mobile devices for the prevention and investigation of crimes and terrorism, in compliance with privacy and national security laws." (App.B ¶6.)

**B.    NSO's Pegasus technology.**

The Pegasus system has multiple components, including (1) an "agent" designed to reside on a target device and collect information from that device, and (2) installation "vectors" for delivering the agent to "target devices" (*i.e.*, mobile devices belonging to the investigation subjects of NSO's government customers). (Dkt.389-4 ¶¶38, 45.) Between April 2018 and May 2020, NSO licensed three Pegasus vectors that operated by messaging target devices through WhatsApp. (Dkt. 796-9 ¶¶2-12.) All three vectors used WhatsApp to send messages to target devices that, if successful, would cause the target devices to download the Pegasus agent from a third-party server controlled by Pegasus's government operator. (*Id.*; Dkt.796-1 ¶¶30-39.) NSO no longer has any installation vector that uses WhatsApp servers. (App.B ¶46.)

As Plaintiffs admitted, "WhatsApp servers were not compromised by" any vector's use of WhatsApp to send messages. (Dkt.396-5, Exh.P.) Pegasus did not damage, alter, or impair WhatsApp's servers or the servers' code in any way. (Dkt.796-1 ¶¶80-85; Dkt.796-23 ¶10.) As designed, every message Pegasus sent through WhatsApp servers complied fully with every technical requirement imposed by those

3

servers. (Dkt.796-1 ¶¶65-79; Dkt.796-9 ¶9.) Nor did Pegasus access any server information that was off-limits to any other WhatsApp user, let alone breach code-based access barriers protecting such information. (Dkt.796-1 ¶¶65-79.) Pegasus merely used messaging functions that WhatsApp servers made available to it. (*Id.* ¶¶39, 65-79.)

Plaintiffs have thus conceded that Pegasus messages did not access any part of WhatsApp servers that ordinary WhatsApp messages do not access. (Dkt.469 at 24; Dkt.396-5, Exh.L at 129:15-130:23.) Pegasus messages simply traveled through WhatsApp servers in the same way as any other WhatsApp message—akin to mail sent through the postal service. (Dkt.796-1 ¶74; Dkt.796-9 ¶10.)

## C.  Summary judgment.

Plaintiffs claimed Pegasus's use of WhatsApp servers violated the federal Computer Fraud and Abuse Act ("CFAA"), the California Comprehensive Data Access and Fraud Act ("CDAFA"), and WhatsApp's Terms of Service. Plaintiffs sought partial summary judgment as to liability on all three claims. (Dkt.465.) Plaintiffs sought summary judgment on their CFAA and CDAFA claims based solely on the theory that three versions of Pegasus sent messages over WhatsApp servers

4

during the installation process. Plaintiffs did not seek a finding of liability based on Pegasus's ultimate collection of data from user devices, which involves no use of WhatsApp servers. Plaintiffs sought summary judgment on their contract claim based on the theory that NSO violated WhatsApp's Terms by reverse-engineering or decompiling WhatsApp's client application.

The district court granted Plaintiffs' motion. As to CFAA and CDAFA, the court found NSO was authorized to use WhatsApp servers to send WhatsApp messages, but "exceeded authorized access" to the servers because Pegasus "obtain[ed] information about the target user's device via the Whatsapp servers." (App.C at 12-13.) As to WhatsApp's Terms, the court found NSO agreed to the Terms by creating WhatsApp accounts and breached the Terms by reverse-engineering or decompiling the WhatsApp client. (*Id.* at 13-14.)

### D.    Permanent injunction.

After a damages trial, the district court granted Plaintiffs' motion for a permanent injunction. (Apps.D–F.) The court did not dispute NSO's evidence that it no longer has any technology that uses WhatsApp servers. Instead, the court found that Plaintiffs were likely to suffer

irreparable harm from any technology that collects data from user devices, *even if* that technology never uses WhatsApp servers—conduct that Plaintiffs did not challenge at summary judgment and that the court never found unlawful. The court found that any collection of data from user devices irreparably harms WhatsApp by damaging its ability to "deliver[] privacy and security to its users" (App.D at 5), a theory of harm that Plaintiffs had never asserted or submitted any evidence to prove. To the contrary, Plaintiffs expressly abandoned any theory of harm to their "reputation" or "goodwill" in order to avoid discovery into Facebook's history of privacy abuses. (Dkt.591 at 11.)

Nonetheless, the district court issued a sweeping injunction based on its new theory of harm. Among other restrictions, the injunction prohibits NSO from "[d]eveloping, using, selling, offering for sale, distributing, transferring, or licensing … any technology that interacts with … any aspect of the WhatsApp Platform in any way." (App.F.) That prohibition includes the collection of data from user devices, even when performed by a version of Pegasus never found to be unlawful (*i.e.*, all versions whose installation process does not send messages through WhatsApp servers). (*Id.*; App.E at 1.) The injunction also requires NSO

to "delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform," defined to encompass not just WhatsApp servers but also the WhatsApp application. (App.F.)

## Legal Standard

When deciding a motion for stay pending appeal, this Court "consider[s] whether the applicant has made a strong showing of likelihood of success on the merits, whether the applicant will be irreparably injured without a stay, whether a stay will substantially injure the other parties, and where the public interest lies." *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020). To make a strong showing of likelihood of success on the merits, "[a]n applicant for a stay need not demonstrate that it is more likely than not they will win on the merits, but rather must show 'a reasonable probability' or 'fair prospect' of success." *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (cleaned up). An applicant may also show the "likely success necessary to justify a stay" by raising "serious legal questions." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011) (cleaned up).[2]

---

[2] The district court ignored this qualification in its order denying a stay, thus applying the wrong standard of review. (App.A at 1-2.)

"The standard for granting a stay is a 'sliding scale,'" under which "the elements of the test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1086 (cleaned up).

## Argument

### I. NSO has a fair probability of success on appeal or, at minimum, has raised serious legal questions.

NSO's appeal will raise numerous serious legal questions that even the district court, before reversing course and denying a stay, had recognized require resolution by "a higher court." (Dkt.751 at 769:13-15.) This Court should stay the injunction while it considers those questions.

### A. The district court erred in granting Plaintiffs summary judgment.

The district court's cursory summary judgment order, which found NSO liable as a matter of law on each of Plaintiffs' three claims, contains numerous legal errors that cannot be reconciled with binding precedent and the plain text of the relevant statutes. The court also failed to "view the evidence in the light most favorable to" NSO and "assume the truth of the evidence set forth by" NSO. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (cleaned up). NSO's appeal thus has a reasonable probability of success and will, at minimum, present serious legal questions that support a stay.

### 1.    The district court improperly granted summary judgment on Plaintiffs' CFAA and CDAFA claims.

The district court erred by holding as a matter of law that NSO violated CFAA and CDAFA by "exceeding authorized access" to WhatsApp servers. (App.C at 12-13.)[3]

*First*, the district court's conclusion that NSO exceeded authorized access to WhatsApp servers conflicts with CFAA's text and the Supreme Court's decision in *Van Buren v. United States*, 593 U.S. 374 (2021). CFAA provides that "'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). *Van Buren* interpreted that definition to hold that exceeding authorized access requires entering "particular areas in the computer—such as files, folders, or databases—to which [the defendant's] computer access does not extend." 593 U.S. at 378; *accord id.* at 396.[4] The district court's decision cannot be reconciled with these

---

[3] Plaintiffs did not argue, and the district court did not find, that NSO violated CDAFA in any way other than by violating CFAA. (App.C at 13.) The court's finding of liability under the CDAFA thus rises or falls with its finding under CFAA.

[4] *See also id.* at 388 (limiting "exceed[ing] authorized access" to "entering a part of the system to which a computer user lacks access

requirements.

The district court never considered whether NSO "enter[ed] a part of the [WhatsApp servers] to which [it] lack[ed] access privileges," as *Van Buren* requires. 593 U.S. at 388. Without finding that NSO accessed "particular areas" of WhatsApp servers that NSO had no right to access, the district court could not properly hold that NSO exceeded authorized access. *Id.* at 378, 396; *see NRA Grp. v. Durenleau*, 154 F.4th 153, 167-69 (3d Cir. 2025) (defendants did not exceed authorized access because they did not "enter a part of [the] systems to which they had no access").

Moreover, the record *could not* support any such finding. Plaintiffs conceded, and the district court found, that NSO was authorized to use WhatsApp servers for at least the limited purpose of sending messages. (App.C at 11.) And Plaintiffs never disputed that Pegasus messages passed through *only* the exact same areas of WhatsApp servers as ordinary WhatsApp messages. (Dkt.469 at 16-17; Dkt.470 at 11.) NSO thus had at least some authorization to access every part of the

---

privileges"); *id.* at 389-90 (agreeing "the 'exceeds authorized access' clause" applies to "those who access a computer with permission, but then 'exceed' the parameters of authorized access by entering an area of the computer to which that authorization does not extend" (cleaned up)).

WhatsApp servers that Pegasus accessed, which establishes that NSO never exceeded its authorized access to the servers.[5] At a minimum, there were factual questions on that issue that the district court erred by resolving against NSO.

The district court also departed from CFAA's plain text. Instead of finding NSO "obtain[ed] or alter[ed] information in" WhatsApp servers, 18 U.S.C. § 1030(e)(6), the court held NSO exceeded authorized access merely because it "obtain[ed] information about the target user's device *via* the Whatsapp servers." (App.C at 12 (emphasis added).) But transmitting information to or from a third-party device "*via*" WhatsApp servers does not constitute obtaining information stored "*in*" those servers, as CFAA requires. 18 U.S.C. § 1030(e)(6) (emphasis added).[6] It

---

[5] *Van Buren*, 593 U.S. at 376 (the "'exceeds authorized access' clause[] … adopt[s] a gates-up-or-down approach," such that "one either can or cannot access certain areas within the system"); *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024) ("So long as a user is permitted to be on a particular 'area within the system' for some purposes, the gates are up, and the user's access to the system is 'authorized'" for all purposes (cleaned up)).

[6] Later, in the jury instructions, the court rewrote its summary judgment order as "conclud[ing] that the sending of protected information *through* the servers constituted obtaining it *from* the servers." (Dkt.737, Instruction 14 (emphasis added).) But even if that were what the court had found, "through" does not mean "from." If you drive from New York to San Francisco, you might pass *through* Chicago,

was undisputed that the "information about the target user's device" on which the district court relied was stored in the user's device, *not* in WhatsApp's servers. (Dkt.494 at 12.) Even if there were a dispute, the court could not properly resolve it against NSO as a matter of law.[7]

**Second**, the district court's finding that NSO acted with the "intent to defraud" required by 18 U.S.C. § 1030(a)(4) conflicts with the statutory text. (App.C at 12.) This Court has held that the "ordinary meaning of 'intent to defraud'" requires "an intent to deceive *and* cheat," meaning "the intent to deprive a victim of money or property by deception." *United States v. Saini*, 23 F.4th 1155, 1160-61 (9th Cir. 2022). Although *Saini* interpreted "intent to defraud" in the credit-card fraud statute, 8 U.S.C. § 1029, CFAA's "intent to defraud" requirement is "the same as the

---

but you did not come *from* Chicago.

[7] In denying a stay pending appeal, the district court again completely ignored CFAA's text and *Van Buren*. Apparently changing its rationale for a second time, the court observed that NSO "reverse-engineer[ed] the WhatsApp application"—which CFAA does not prohibit—"to surveil Whatsapp's users"—which was not challenged by Plaintiffs on summary judgment or ever found unlawful. (App.A at 2-3.) Moreover, *NSO* never surveilled any WhatsApp user. It is undisputed that only NSO's *government customers* used Pegasus to monitor anyone, and the district court said it did not hold NSO liable "for the conduct of its customers." (App.A at 4.) If that's true, NSO could not be liable for any surveillance of WhatsApp users.

standard used for 8 U.S.C. § 1029." S. Rep. No. 99-432 at 10 (1986). And there is no reason the "plain and ordinary meaning" of "intent to defraud," *Saini*, 23 F.4th at 1160-61, would not govern CFAA's identical language.

The district court ignored the requirement of an "intent to deprive a victim of money or property." *Id.* The court found intent to defraud based solely on its finding that NSO "redesigned Pegasus to evade detection." (App.C at 12.) But that finding, which itself improperly resolved factual disputes against NSO, could suggest at most that NSO intended to "deceive" WhatsApp, not to "cheat" WhatsApp of its "money or property." *Saini*, 23 F.4th at 1160. There is no evidence NSO intended to steal any money or property from anyone. (Dkt.469 at 23.)[8]

***Third***, the district court improperly found NSO liable without addressing its defense that its activities after December 2018 were immunized by CFAA's exemption for "lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the

---

[8] In denying NSO's motion for a stay, the district court did not dispute that NSO had no intent to deprive anyone of money or property. The court simply refused, without explanation, to apply *Saini*'s interpretation of "intent to defraud" to CFAA. (App.A at 3.)

United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States." 18 U.S.C. § 1030(f). In December 2018, the FBI purchased a license for Pegasus. (Dkt.396-5, Exh.G at 236:16-22, 332:3-333:21, Exh.N.) One of the services the FBI contracted for was "maintenance," which required NSO to maintain Pegasus in an operational state through continuous R&D. (Dkt.796-2, Exh.H at 104:3-13; Dkt.396-5, Exh.N; *see* App.B ¶15.) The license, like all Pegasus licenses, also included software updates and "new[] versions" of Pegasus. (*See* App.B, Exh.C at 9, 14-15.)

Accordingly, NSO's R&D activities after December 2018 were required, authorized, and paid for by the FBI, which qualifies them for CFAA's U.S. law-enforcement exemption. At a minimum, and contrary to the district court's statement that NSO submitted no evidence on this point (App.A at 5), NSO submitted more than enough evidence to create a material dispute for the jury.

## 2. The district court improperly granted summary judgment on Plaintiffs' contract claim.

The district court also erred by holding, as a matter of law, that NSO was liable for breaching WhatsApp's Terms. (App.C at 13-14.)

Plaintiffs did not submit sufficient evidence to support a finding

that NSO ever *agreed* to the Terms. This Court has held repeatedly that a plaintiff cannot enforce its terms of service without submitting *evidence* that (1) it "provide[d] reasonably conspicuous notice of the terms," and (2) the defendant "unambiguously manifest[ed] [its] assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *accord Godun v. JustAnswer LLC*, 135 F.4th 699, 709-11 (9th Cir. 2025); *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158-60 (9th Cir. 2025). Plaintiffs submitted no admissible evidence to prove those requirements, and the district court did not find either one satisfied.

Instead, the court relied on Plaintiffs' bare assertion that "agreeing to the terms of service was necessary to create a Whatsapp account." (App.C at 14.)[9] That was improper. "[M]erely clicking on a button" to set up an account "does not signify a user's agreement to anything." *Berman*, 30 F.4th at 857. Rather, proving conspicuous notice requires a notice "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and proving

---

[9] The court did the same in denying a stay pending appeal. (App.A at 3.) The court also seems to have relied on its personal experience with "apps that … ask [you] to agree to the terms of service" (Dkt.464 at 63:6-12), which is plainly improper.

unambiguous consent requires "[t]he presence of an explicit textual notice that continued use will act as a manifestation of the user's intent." *Id.* at 856-58. Those are "fact-intensive analys[e]s" requiring *evidence* of both "the visual design of the webpage[] and the context of the transaction." *Godun*, 135 F.4th at 709-10.

Plaintiffs presented no such evidence with their summary judgment motion (and produced no such evidence in discovery), which precluded granting them summary judgment on contract formation.[10] *Ramirez v. Trusper Inc.*, 2025 WL 2955231, at *2 (9th Cir. Oct. 20, 2025) (party failed to prove mutual assent when it described presentation of terms but "did not provide a screenshot"); *Jackson v. Amazon.com*, 65 F.4th 1093, 1099-1100 (9th Cir. 2023) ("Amazon failed to meet its burden to demonstrate mutual assent" when it "did not provide the court with a copy or description of any [contract] notice"). The district court erred in

---

[10] The court accused NSO of "refus[ing] to produce relevant discovery regarding the phones that were used to create accounts" (App.A at 3), but that is both irrelevant and untrue. It was *Plaintiffs*' burden to prove conspicuous notice through evidence of their *own* website and application, which has nothing to do with NSO's phones. And Plaintiffs admitted NSO *did* produce that "discovery"; Plaintiffs simply complained that NSO would not consent to Plaintiffs *sharing* the discovery with employees not subject to the case's protective order. (Dkt.408.)

holding otherwise.

### B.     The district court erred in issuing an injunction.

NSO has also shown, at minimum, serious legal questions as to the issuance and scope of the permanent injunction.

***First***, the district court abused its discretion in finding Plaintiffs were likely to suffer imminent irreparable harm in the absence of an injunction. "[A]ctual irreparable harm must be demonstrated to obtain a permanent injunction," and a court's finding of irreparable harm must be "grounded in … evidence" rather than "platitudes" or "speculation." *Herb Reed Enters. v. Fla. Ent. Mgmt.*, 736 F.3d 1239, 1249-50 (9th Cir. 2013). The district court violated that rule by finding irreparable harm based on a theory that Plaintiffs abandoned early in the case and never submitted any evidence to substantiate.

Specifically, the Court determined that collecting WhatsApp messages using Pegasus irreparably harms WhatsApp by damaging its ability to "deliver[] privacy and security to its users." (App.D at 5.) But Plaintiffs never asserted that theory, and it is not supported by any evidence. Plaintiffs disclaimed seeking relief for any alleged harm to their users, and they affirmatively *abandoned* any theory of harm to their

reputation or goodwill as a provider of secure communications in order to avoid discovery into those issues. (Dkt.591 at 11; Dkt.605-1, Exh.A.) The district court speculated that "users would be dissuaded from using Whatsapp if its encryption were ineffective" (Dkt.802 at 8), but Plaintiffs submitted no evidence of that; to the contrary, they introduced evidence that WhatsApp's userbase has *grown* from 1.5 billion to 3 billion customers since 2019. (Dkt.749 at 325:7-12.) In any event, users avoiding WhatsApp due to concerns about its ability to protect their privacy is the exact sort of reputational injury that Plaintiffs expressly said they would not assert "in support of … injunctive relief." (Dkt.591 at 11.)[11]

By relying on a theory of harm Plaintiffs abandoned and never tried to prove, the court unfairly deprived NSO of any opportunity to rebut that theory. Plaintiffs disclaimed reputational and goodwill harm in order to avoid discovery that NSO would have used to rebut the basis for the court's finding, such as by establishing that any lack of confidence by customers in the security of their data was caused not by NSO but by, for

---

[11] The district court described its theory as constituting "business" rather than "reputational" injury (App.D at 9), but there is no such distinction. All harm to a business's reputation or goodwill is "business" harm.

example, Plaintiffs' own highly publicized violations of their users' privacy. NSO also would have engaged an expert witness on customer privacy. The district court improperly ambushed NSO with a new theory of harm to which NSO had no ability to respond.

The district court, moreover, cited no evidence to support its theory of irreparable harm, instead relying on bare speculation about how it "appear[ed]" to the court that Plaintiffs market their technology. (App.D at 8.) The court cited no evidence to substantiate the existence of damage to WhatsApp's ability to deliver privacy and security—no evidence, for example, of lost customers, lost sales, negative consumer opinions, or any potential customers who considered using WhatsApp but chose not to after they learned about Pegasus. That is because there is no such evidence—the record simply does not contain *any* evidence of the only harm on which the district court relied.[12] By finding irreparable harm based on "platitudes" and "speculation" rather than "evidence," the court abused its discretion. *Herb Reed*, 736 F.3d at 1250.

---

[12] In denying a stay, the court referenced "testimony regarding the primary role of privacy in Whatsapp business" (App.A at 6), but no witness substantiated (or even speculated about) any *harm* to WhatsApp's ability to deliver privacy caused by NSO or Pegasus. The court's theory of injury remains wholly speculative.

**Second**, the district court issued an overbroad injunction that prohibits broad swaths of conduct that the court never found unlawful and that has no connection to the conduct the court found was unlawful. Injunctions "must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (cleaned up). The court "abuse[d] [its] discretion" by violating that rule and issuing an "overbroad injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009).

Most egregiously, the district court enjoined use of the WhatsApp application and all collection of WhatsApp messages and similar information from user devices, even where "no WhatsApp servers are accessed." (App.E at 1.) The sole conduct challenged in this case was the *use of WhatsApp servers* by three defunct versions of Pegasus. NSO no longer has any installation vectors that use WhatsApp servers, and technologies that do *not* access WhatsApp servers could not possibly "exceed authorized access" to WhatsApp servers, were not challenged or found illegal, and have no connection to the conduct that *was* challenged and found illegal. By enjoining the mere use of WhatsApp and the mere

collection of data from WhatsApp users' devices in ways that do not involve WhatsApp servers, the district court abused its discretion by exceeding "the specific harms [claimed] by the plaintiffs." *Price*, 390 F.3d at 1117.

**Third**, the district court refused to carve out an exception for U.S. law-enforcement or intelligence activities. (App.E at 1.) That directly conflicts with CFAA's exemption for such activities. 18 U.S.C. § 1030(f). Because Congress insulated U.S. law-enforcement activity from CFAA liability, the court lacked authority to prohibit it. *Price*, 390 F.3d at 1117.

## II. NSO will face irreparable harm without a stay.

The second stay factor strongly favors NSO because, without a stay, the injunction will force NSO to incur at least two distinct forms of irreparable harm. Those harms will be permanent even if this Court ultimately reverses the district court, which will render NSO's appeal ineffective even if it is successful. Because this "appeal will be moot" absent a stay, the "[i]rreparable injury" to NSO is "obvious." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023).

**First**, the injunction "require[s]" NSO "to delete and destroy any and all computer code or technologies that use, access, or depend on the

WhatsApp Platform." (App.F ¶4.) The harm of being forced to comply with this mandatory provision is obviously irreparable because the deletion and destruction of code and technologies cannot be undone. The district court completely ignored this issue in denying a stay. (App.A at 7-8.)

*Second*, the injunction will put NSO's entire enterprise at risk before its appeal can be resolved. The injunction jeopardizes NSO's principal product, Pegasus, which represented *100 percent* of NSO's sales in 2025. (App.B ¶¶3, 48.) And the injunction prohibits NSO from engaging in lawful conduct to develop, license, and sell products used in authorized government investigations—a prohibition that would devastate NSO's business and could well force it out of business entirely. (*Id.* ¶¶48-50.) NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices. (*Id.* ¶48.) Those competing products can collect WhatsApp messages from the WhatsApp application, among other social-media messages. (*Id.*) The injunction, however, bans NSO from selling or maintaining *any* technology to collect information from user devices if the target information comes from the WhatsApp application—even if the entirety of the process, from installation of Pegasus to the collection of

the target users' messages, never touches WhatsApp servers. That will eliminate most if not all of NSO's current Pegasus sales and could force NSO to stop much if not all of its business.

This "threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (cleaned up). Without a stay, NSO will suffer "fundamental business changes that … cannot easily be undone should [it] prevail on appeal." *Qualcomm*, 935 F.3d at 756; *see NCAA v. Bd. of Regents*, 463 U.S. 1311, 1313-14 (1983) (White, J.) (granting stay where, absent stay, appellant's contracts would be void, putting business at risk); *Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1057-59 (9th Cir. 2009) (finding irreparable harm where order required plaintiff to either (1) sign agreements, causing it to "incur large costs" and "disrupt and change the whole nature of its business" or (2) refuse to sign agreements, causing "a loss of customer goodwill" and potentially entire business).[13]

---

[13] The district court said "harm caused by illegal conduct does not merit significant equitable protection" (App.A at 7-8 (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017)), but that is true only when *entering* an injunction. In the context of *staying* an injunction pending appeal, the district court's reasoning improperly presumes this Court will affirm its liability finding. *Sealant Sys. Int'l, Inc. v. TEK Glob., S.R.L.*, 2014 WL 5141819, at *2 (N.D. Cal. Oct. 13, 2014).

At a minimum, many versions of Pegasus—versions the district court never held unlawful—will abruptly become unavailable to NSO's government customers. (App.B ¶50; Dkt.605-3 ¶7.) In addition to losing its revenues, NSO would likely violate its contracts with those customers. (App.B ¶¶49-50.) Without a stay, therefore, NSO faces "irreversible loss of data, contracts, customers, and market share," *Softketeers, Inc. v. Regal W. Corp.*, 2023 WL 2024701, at *11 (C.D. Cal. Feb. 7, 2023), in addition to the jobs of its 353 employees (App.B ¶51).

## III.  A stay will not irreparably injure Plaintiffs.

Plaintiffs will not suffer any equivalent harm if the injunction is stayed during NSO's appeal. The undisputed evidence shows that the only conduct the court found to be unlawful—the installation of some past versions of Pegasus using WhatsApp servers—stopped years ago and cannot be resumed. (App.B ¶¶46-47.) And the supposed harm on which the court relied to grant the permanent injunction—that WhatsApp users might "be dissuaded from using Whatsapp if its encryption were ineffective" (App.D at 8)—was never asserted or substantiated by

---

Moreover, by the court's own admission, the injunction primarily enjoins activities that have *not* been found unlawful.

Plaintiffs at any point during the entire six years this case has been pending.[14] In fact, Plaintiffs expressly disclaimed any such argument to avoid producing evidence on the point. That demonstrates that Plaintiffs never before viewed the supposed harm on which the district court relied as sufficiently serious to require immediate injunctive relief.

Indeed, Plaintiffs never sought a TRO or preliminary injunction in this case. There has never been any question that NSO's technology permitted its government customers to collect the data of WhatsApp users (without any use of WhatsApp servers). That state of affairs represents the status quo as it has existed for more than six years. Yet Plaintiffs never sought a preliminary injunction or even a finding of liability with respect to the mere collection of user data. That is overwhelming evidence that Plaintiffs were not, and will not be, irreparably injured by preserving the status quo during NSO's appeal.

## IV.    The public interest favors a stay.

The public has a clear interest in government law-enforcement, national-security, and intelligence operations. *See Winter v. NRDC, Inc.*,

---

[14] Nor is there any reason to think that any future "business harm" (App.D at 9) could not be repaired through money damages.

555 U.S. 7, 24 (2008). The injunction, however, would deprive the public of Pegasus's beneficial use in such investigations.

The FBI licensed Pegasus in December 2018 (Dkt.396-5, Exh.N), and other U.S. agencies have assisted foreign governments in obtaining Pegasus licenses (Dkt.759-12 ¶54). As NSO expert Joshua Minkler (a career prosecutor and former U.S. Attorney) testified, U.S. law-enforcement agencies need access to such technology because the unbreakable end-to-end encryption offered by companies like WhatsApp threatens their ability to investigate and prosecute crimes. (Dkt.759-12 ¶¶41-49, 55-62; Dkt.760-3 ¶5.) The injunction here, however, would prevent any U.S. or state agency from entering into another license for any existing version of Pegasus. Allowing the injunction to go into effect would thus deprive U.S. law enforcement of the ability to use the system in the future.

The public would also be harmed by depriving foreign governments of access to Pegasus.[15] NSO's opposition to the permanent injunction

---

[15] The court said the injunction "does not apply to foreign governments" (App.A at 8), but that is irrelevant when the injunction prohibits NSO from *licensing* existing versions of Pegasus to foreign governments and providing them with maintenance and support services.

included evidence from Col. Ty Shepard, a career military officer with an extensive background in intelligence and cybersecurity. (Dkt.759-2 at 15-16; Dkt.505-2, Exh.A ¶¶3-18.) Col. Shepard has specialized experience with Pegasus and is aware of dozens of Pegasus uses by foreign governments. (Dkt.616-3, Exh.A at 74:8-23.) The United States benefits when foreign governments collect evidence using Pegasus, because many of those countries share intelligence with U.S. agencies. (Dkt.505-2, Exh.A ¶¶26-30; Dkt.616-3, Exh.A at 69:23-87:4, 111:16-112:15.) Mr. Minkler corroborated these benefits when describing his firsthand experience in a drug-trafficking investigation that benefitted from the exchange of intelligence with Mexican law-enforcement agencies. (Dkt.759-12 ¶¶10-11.)

By depriving the U.S. public of these beneficial uses of Pegasus, the injunction harms the public interest. That harm supports staying the injunction pending NSO's appeal.

## Conclusion

The Court should stay the permanent injunction pending NSO's appeal. NSO respectfully asks the Court either to decide this motion before the current administrative stay expires on February 2, 2026, or to grant a further administrative stay pending the Court's decision.

Respectfully submitted,

*s/Joseph N. Akrotirianakis*

| | |
|---|---|
| Matthew Dawson | Joseph N. Akrotirianakis |
| Matthew V.H. Noller | Aaron S. Craig |
| KING & SPALDING LLP | KING & SPALDING LLP |
| 50 California Street | 633 West Fifth Street |
| Suite 3300 | Suite 1600 |
| San Francisco, CA 94111 | Los Angeles, CA 90071 |
| (415) 318-1200 | (213) 443-4355 |
| | jakro@kslaw.com |

*Counsel for Defendants-Appellants*

December 26, 2025

## Certificate of Compliance

Pursuant to Fed. R. App. P. 27(d) and 32(g), I certify that:

1. This document complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,585 words, excluding the parts exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f).

2. This document complies with the typeface and type-style requirements of Circuit Rule 27-1(1)(c) and Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font with Microsoft Word.

Date: December 26, 2025

*/s/ Joseph N. Akrotirianakis*
Joseph N. Akrotirianakis

*Counsel for Appellants*

# APPENDIX

# APP. A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

          Plaintiffs,

    v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

          Defendants.

Case No. 19-cv-07123-PJH

**ORDER DENYING MOTION TO STAY PERMANENT INJUNCTION; EXTENDING ADMINISTRATIVE STAY FOR 45 DAYS**

Re: Dkt. 813

Before the court is defendants' motion to stay the court's permanent injunction order pending appeal.  <u>See</u> Dkt. 813.  Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

A.    Legal standard

Federal Rule of Civil Procedure 62(d) provides that, "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."

In evaluating a motion for a stay pending appeal, the court considers "whether the applicant has made a strong showing of likelihood of success on the merits, whether the applicant will be irreparably injured without a stay, whether a stay will substantially injure the other parties, and where the public interest lies."  <u>See</u> <u>Arizona Democratic Party v. Hobbs</u>, 976 F.3d 1081, 1086 (9th Cir. 2020); <u>Al Otro Lado v. Wolf</u>, 952 F.3d 999, 1006-07

(9th Cir. 2020) (citing <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009)).  The first two factors "are the most critical"; the last two are reached only after "an applicant satisfies the first two factors."  <u>Al Otro Lado</u>, 952 F.3d at 1007 (citing <u>Nken</u> at 434-35).

The standard for granting a stay is a "sliding scale," i.e., the elements of the test are "balanced, so that a stronger showing of one element may offset a weaker showing of another."  <u>Arizona Democratic Party</u>, 976 F.3d at 1086 (citing <u>Al Otro Lado</u>, 952 F.3d at 1007).  "A stay is not a matter of right, even if irreparable injury might otherwise result."  <u>Al Otro Lado</u>, 952 F.3d at 1006 (citing <u>Virginian Ry. Co. v. United States</u>, 272 U.S. 658, 672 (1926)).

B.    Analysis

1.    <u>Likelihood of success on the merits</u>

Defendants argue that they are likely to succeed on the merits on the following issues: (1) the court's imposition of liability, (2) the court's finding of personal jurisdiction, (3) the court's treatment of defendants' affirmative defenses, and (4) the court's issuance of a permanent injunction.  <u>See</u> Dkt. 813 at 8-19.

a.    <u>Liability</u>

As to liability, defendants argue that the court "improperly found that NSO exceeded authorized access'" under the CFAA and CDAFA, that the court misapplied the "intent to defraud" standard under the CFAA, that the court had insufficient evidence that NSO had agreed to the Whatsapp terms of service, and that the court improperly held NSO liable for the alleged conduct of its clients.  <u>See</u> Dkt. 813 at 8-12.

The court does not find that defendants have made a strong showing of likelihood of success on the merits of their arguments regarding liability.  Starting with the "exceeds authorized access" issue, even based only on the limited discovery provided by defendants, the undisputed evidence showed that NSO went far beyond their authorized use of Whatsapp by reverse-engineering the application to design a spyware vector which allowed NSO's clients to surveil Whatsapp's users and obtain data from its servers.  <u>See, e.g.</u>, Dkt. 494 at 11-13.  When Whatapp attempted to fix the security vulnerability,

2

defendants designed around the fix to continue their surreptitious access.  See id.; Dkt. 802 at 5-7.  Defendants could not, and do not, argue that they had actual authorization to engage in this conduct – instead, they simply argue that there is not yet a Ninth Circuit or Supreme Court case that directly contradicts their position.  However, given the cutting-edge technology at issue in this case, the lack of similar past cases does not persuade the court that defendants are likely to succeed on the merits of their argument regarding the "exceeds authorized access" prong of the CFAA and CDAFA.

Next, defendants argue that they are likely to succeed on the merits of their argument that they did not have the requisite "intent to defraud."  The essence of defendants' argument is that they did not intend to steal "any money or property from Whatsapp."  See Dkt. 813 at 11.  Defendants cite no authority applying their purported rule to violations of the CFAA or CDAFA.  And on the merits, the court concludes that defendants' view does not present a strong showing that they are likely to succeed.

As to the Whatsapp terms of service, plaintiffs presented testimony regarding the necessity of agreeing to the terms of service before creation of a Whatsapp account, and the notice given to users.  See Dkt. 467 at 2.  Moreover, the court noted in its summary judgment order that defendants refused to produce relevant discovery regarding the phones that were used to create accounts on defendants' behalf.  See Dkt. 494 at 14.  Based on that evidentiary record, the court concluded that "defendants cannot meaningfully dispute that agreeing to the terms of service was necessary to create a Whatsapp account and to use Whatsapp," and defendants' arguments on this motion do not persuade the court that they are likely to succeed on the merits of this argument.

Finally, defendants argue that the court held NSO liable for its clients' conduct, namely, obtaining data from target users.  As mentioned in this and previous orders, defendants withheld significant discovery in this case, and the relationship between NSO and its customers was a topic where evidence was particularly limited.  As a result, conclusions about certain conduct could not be drawn.  As the court stated in a previous order:

United States District Court
Northern District of California

> [T]he evidentiary record did not show (at the time of summary judgment, nor now) the specific details about how exactly the relevant attacks were conducted. Based on that unclear record, the court concluded that even the limited conduct to which defendants admit (i.e., developing Pegasus and providing it to their clients, as well as providing training and ongoing support) along with evidence that appears undisputed that they updated Pegasus to circumvent plaintiffs' security updates, sufficed to establish liability even before reaching the issue of whether evidentiary sanctions were necessary.

See Dkt. 699 at 1-2.

Thus, the court held defendants liable for their own conduct, not for the conduct of its customers. As the court explained, "[w]hile the court's order left open the possibility that defendants engaged in conspiracy to violate the CFAA, as the relevant evidence may indeed support that conclusion – based on the state of the evidentiary record, the court stopped short of an express finding that defendants engaged in conspiracy to violate the CFAA." See id. at 2. Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of their argument that the court improperly found NSO liable for the conduct of its customers.

### b. Personal jurisdiction

Turning to the issue of personal jurisdiction, defendants argue that the court improperly held that the use of California-based servers was sufficient to support personal jurisdiction, and that the court erred by imposing a discovery sanction that defendants intended to use California-based servers. See Dkt. 813 at 12-14.

As the court noted in its previous order, the court had first addressed personal jurisdiction during the pleadings stage and found that it was supported by the complaint's allegations, but defendants argued at summary judgment that the allegations were not supported by the evidence. See Dkt. 494 at 5.

Notably, defendants do not dispute that their code was indeed sent through plaintiffs' California-based servers, defendants dispute only that they had intent to use those servers and/or any control over which servers were used. However, as the court noted in its order granting summary judgment, because "defendants did not produce Pegasus code in a way that was meaningfully accessible to plaintiffs or to the court,

1  plaintiffs were unable to obtain detailed evidence of how the [defendants' code] chose

2  which server(s) to use." See Dkt. 494 at 9.  Accordingly, the court imposed a narrow

3  evidentiary sanction that "the use of plaintiffs' California-based servers was a purposeful

4  choice made by defendants." Id. at 9-10.

5       Defendants appear to now challenge the premise that they should have been

6  required to produce Pegasus code in the first place, but the court finds no basis for those

7  arguments, which attempt to distract from the plain fact that the functionality of the

8  Pegasus code was central to resolving this litigation, and that defendants consistently

9  resisted producing discovery on that topic.  While defendants did and still do claim that

10 they should be excused from the applicable discovery rules, and remain free to present

11 that argument on appeal – the court at this time does not conclude that defendants are

12 likely to succeed on the merits of their personal jurisdiction argument.

13            c.   Affirmative defenses

14      Defendants argue that the court did not resolve their affirmative defenses

15 regarding the law enforcement exception, the unclean hands defense, and the waiver

16 defense. See Dkt. 813 at 14-15.

17      Regarding the law enforcement exception, defendants have repeatedly presented

18 their argument that Pegasus was licensed by the FBI, but have also repeatedly failed to

19 produce any evidence that the conduct challenged in this case was part of a "lawfully

20 authorized investigative, protective, or intelligence activity of a law enforcement agency of

21 the United States, a State, or a political subdivision of a State, or of an intelligence

22 agency of the United States," as required by 18 U.S.C. § 1030(f).  Defendants

23 simultaneously argue that the court "did not address" this defense, and that the court "has

24 made that finding" rejecting the defense but that "there are serious questions as to its

25 correctness." See Dkt. 821 at 13.  In short, the court has indeed resolved defendants'

26 argument regarding the CFAA's law enforcement exception, and while defendants are

27 free to challenge that resolution on appeal, they have not persuaded this court that they

28 are likely to succeed on the merits of that argument.

United States District Court
Northern District of California

As to the unclean hands defense, plaintiffs are correct that the defense is premised on an argument that was rejected at trial – that plaintiffs' investigation into defendants' spyware itself constituted an attempt to steal defendants' code. And finally, as to waiver, the court finds no basis for the argument that plaintiffs allowed defendants' conduct to continue after learning about it. To the extent that defendants complain about the lack of specific written findings on each asserted affirmative defense, the court notes that such specificity is not required. See, e.g., United States v. Dooley, 719 Fed. App'x 604, 606 (9th Cir. 2018). Overall, defendants have not persuaded the court that they are likely to succeed on the merits of their argument regarding affirmative defenses.

####        d.    Injunction

Defendants challenge the court's imposition of a permanent injunction, arguing that the court improperly found irreparable harm, improperly enjoined activities that did not involve Whatsapp servers, failed to carve out a law enforcement exception, and improperly enjoined reverse-engineering and decompiling code from the Whatsapp platform. See Dkt. 813 at 15-19.

Regarding irreparable harm, defendants argue that the court erred in relying on reputational damages, which were expressly disclaimed by plaintiffs. However, the court explained in its previous order that it concluded that the thwarting of end-to-end encryption caused plaintiffs to suffer business harm, and that such harm was properly considered when determining whether to order an injunction. See Dkt. 802 at 7-9. Moreover, plaintiffs presented testimony regarding the primary role of privacy in Whatsapp's business. See, e.g., Dkt. 749 at 325-27. Accordingly, the court is not persuaded that defendants are likely to succeed on the merits of this argument.

The law enforcement exception was previously addressed above, and was also addressed in an order resolving defendants' objections to the proposed injunction. See Dkt. 808 at 1. In short, the court concluded that there was "no evidence that the United States has ever used Pegasus for law enforcement activities," and thus, there was no basis for the "sweeping carveout" proposed by plaintiffs, which went further than the

United States District Court
Northern District of California

1   exception as codified in 18 U.S.C. § 1030(f).  Accordingly, the court is not persuaded that

2   defendants are likely to succeed on the merits of this argument.

3        Finally, the court will address both arguments about the scope of the injunction

4   together.  As stated above, defendants object to the injunction's inclusion of activity that

5   does not access Whatsapp's servers, as well as reverse-engineering and decompiling.

6   The court addressed both arguments in its order granting plaintiffs' motion for permanent

7   injunction, and concluded that both inclusions were warranted as "sufficiently related to

8   defendants' unlawful access of plaintiffs' and their users' data."  See Dkt. 802 at 11, 17;

9   see also Facebook, Inc. v. Power Ventures, Inc., 252 F.Supp.3d 765, 784 (N.D. Cal.

10  2017) ("it is well established that federal courts have the equitable power to enjoin

11  otherwise lawful activity if they have jurisdiction over the general subject matter and if the

12  injunction is necessary and appropriate in the public interest to correct or dissipate the

13  evil effects of past unlawful conduct or to prevent continued violations of the law.").

14  Accordingly, the court is not persuaded that defendants are likely to succeed on the

15  merits of these arguments.

16       Thus, overall, the court concludes that defendants have not made a strong

17  showing of likelihood of success on the merits of the arguments presented.

18       2.    Irreparable injury to applicant

19       Defendants argue that they will be irreparably injured in the absence of a stay, first

20  because the destruction of any code is permanent, and second because an injunction

21  "will put NSO's entire enterprise at risk."  See Dkt. 813 at 19-21.  The court recognizes

22  that the illegal nature of the enjoined conduct does not automatically prevent

23  consideration of the harm that an injunction would impose, but the court also finds

24  persuasive the "long-settled principle that harm caused by illegal conduct does not merit

25  significant equitable protection."  See Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848,

26  867 (9th Cir. 2017); Softketeers, Inc. v. Regal W. Corp., 2023 WL 2024701 at *11 (C.D.

27  Cal. Feb. 7, 2023).

28       Moreover, plaintiffs point to defendants' own evidence on this motion, showing that

1   Whatsapp is just one of many sources from which defendants' software can extract data.

2   See, e.g., Dkt. 813-6 at 8 ("Monitor a multitude of applications including Skype,

3   Whatsapp, Viber, WeChat, Line, Facebook Messenger, Telegram, and Blackberry

4   Messenger (BBM).")

5          As a result, the court gives only slight weight to any injury caused by the absence

6   of a stay.

7          3.      Substantial injury to other parties

8          Defendants argue that plaintiffs will not be irreparably harmed in the absence of a

9   stay.  Plaintiffs argue that this factor is due less weight than the first two factors, and

10  further argue that the court's order granting the injunction set forth the ways in which

11  plaintiffs continue to be harmed by defendants' conduct.  Overall, the court agrees that its

12  previous order set forth the basis for concluding that plaintiffs face at least the same risk

13  of ongoing harm as did the plaintiff in Power Ventures, because, as in that case, the

14  defendants in this case have exhibited "bad faith conduct" indicating that "they will not

15  easily be deterred from attempting to access [plaintiffs'] servers without authorization in

16  violation of the CFAA."  See Dkt. 802 at 4-5 (citing Power Ventures, 844 F.3d at 782).

17         Accordingly, the court concludes that plaintiffs would indeed be substantially

18  injured by a stay.

19         4.      Public interest

20         Defendants argue that the public interest favors a stay, first because "the FBI

21  purchased a license for Pegasus in December 2018," and second because "the U.S.

22  public would also be harmed by depriving foreign governments of access to Pegasus."

23  See Dkt. 813 at 22-24.  Defendants' first argument has been addressed in this order's

24  discussion of the asserted law enforcement exception, and is further undermined by

25  NSO's presence on the U.S. Department of Commerce's Entity List.  As to defendants'

26  second argument, the injunction specifically does not apply to foreign governments.  See

27  Dkt. 802 at 13, 14-15.

28         Instead, the court notes that the Ninth Circuit has held that the public has

1  "substantial interest in thwarting denial-of-service attacks and blocking abusive users,

2  identity thieves, and other ill-intentioned actors." hiQ Labs, Inc. v. LinkedIn Corp., 31

3  F.4th 1180, 1202 (9th Cir. 2022). Accordingly, the court concludes that the public interest

4  weighs against a stay.

5  Thus, having considered the four factors applicable to defendants' motion for a

6  stay pending appeal, the court concludes that defendants have not met their burden on

7  this motion. In particular, the court is not persuaded that defendants have shown that

8  they are likely to succeed on the merits of their appeal. Moreover, as quoted above, the

9  Ninth Circuit has held that "[a] stay is not a matter of right, even if irreparable injury might

10  otherwise result." See Al Otro Lado, 952 F.3d at 1006 (internal citation omitted).

11  Accordingly, defendants' motion to stay the permanent injunction pending appeal is

12  DENIED.

13  The only remaining issue is whether to extend the administrative stay to allow

14  defendants to seek a stay from the Ninth Circuit. The court agrees that a final, limited

15  administrative stay for that purpose is warranted, and thus temporarily stays the

16  permanent injunction order (Dkt. 809) for a period of up to 45 days from the date of this

17  order to allow defendants to seek a stay pending appeal from the Ninth Circuit Court of

18  Appeals in accordance with Federal Rule of Appellate Procedure 8(a)(2). Within five (5)

19  days of the Ninth Circuit's decision on the anticipated motion to stay, defendants shall file

20  a notice of the decision in this court.

21  **IT IS SO ORDERED.**

22  Dated:  December 19, 2025

23  _____/s/ Phyllis J. Hamilton_____

24  PHYLLIS J. HAMILTON
   United States District Judge

25

26

27

28

United States District Court
Northern District of California

9

# APP. B

1   JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
    *jakro@kslaw.com*

2   AARON S. CRAIG (Bar No. 204741)
    *acraig@kslaw.com*

3   KING & SPALDING LLP
    633 West Fifth Street, Suite 1600

4   Los Angeles, CA 90071
    Telephone: (213) 443-4355

5   Facsimile: (213) 443-4310

6   Attorneys for Defendants
    NSO GROUP TECHNOLOGIES LIMITED and

7   Q CYBER TECHNOLOGIES LIMITED

8

9              UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

10

                  OAKLAND DIVISION

11

12   WHATSAPP INC., a Delaware corporation, | Case No. 4:19-cv-07123-PJH
    and    FACEBOOK,    INC.,    a    Delaware

13   corporation,
                          **DECLARATION OF YARON SHOHAT**

14                      **IN SUPPORT OF DEFENDANTS'**
              Plaintiffs,     **MOTION TO STAY PERMANENT**

15                      **INJUNCTION PENDING APPEAL**
         v.

16   NSO  GROUP  TECHNOLOGIES  LIMITED | Action Filed: 10/29/2019
    and Q CYBER TECHNOLOGIES LIMITED,

17
             Defendants.

18

19

20

21

22

23

24

25

26

27

28

I, Yaron Shohat, hereby declare as follows:

1.     I am a citizen and resident of Israel. I served as Chief Operating Officer of Defendants NSO Group Technologies Limited and Q Cyber Technologies Limited (together, "NSO") from approximately May 2018 until August 2022. I have served as NSO's Chief Executive Officer since August 2022. Q Cyber Technologies Ltd. is NSO Group Technologies Limited sole director and shareholder. As Defendants' CEO, I am an employee of Q Cyber Technologies Ltd. I am familiar with NSO's products, as well as its business practices, policies, and procedures.

2.     I have personal knowledge of the facts set forth in this declaration and, except as otherwise stated, could testify competently to each of them. I previously signed a Supplemental Declaration in Support of NSO's Revised Opposition to Plaintiffs' Motion for Permanent Injunction. This declaration is identical to that one, and it differs in three respects: (a) it removes certain information that NSO previously filed under seal; (b) it has been updated to account for the imposition of a permanent injunction against NSO; and (c) it indicates the updated number of NSO's personnel who will be affected by the injunction ordered by the Court.

3.     NSO is a government contractor and technology company that designs and licenses technology exclusively to governments and government agencies for national security and law enforcement purposes.  The fact that NSO's customers are exclusively governments and government agencies has been confirmed by an Ernst & Young Global "Independent Accountant's Report." (Dkt. 45-13). This remains true today. Among NSO's products are a suite of different technologies and functions that are collectively branded and marketed as "Pegasus." In 2025, the Pegasus suite of products represented 100% of NSO and Q Cyber's sales.

4.     NSO markets and licenses its Pegasus technology exclusively to sovereign governments and government agencies for the purposes above, and it does so only after receiving required export control licenses from the Israeli Ministry of Defense. NSO does not now market or sell, and has never marketed or sold, its Pegasus technology for use by any non-governmental entity.

5.     The different technologies marketed under the "Pegasus" brand name provide NSO's foreign sovereign customers the ability to collect evidence and intelligence from different

1

mobile devices. One subset of those technologies permitted governments and government agencies to collect evidence and intelligence from mobile devices that run the Android operating system and operate as "zero click," meaning the end user of the mobile device is not required to take any action, such as opening a link, for installation of Pegasus. These "covert Android" technologies are completely different from the Pegasus technologies that can gather evidence and intelligence from devices running other (i.e., non-Android) operating systems or that require some engagement by the end user of the mobile device (i.e., "one click").

6. I understand that earlier in the course of the lawsuit, the Court issued rulings that determined which NSO technologies were relevant to Plaintiffs' claims. Based on those rulings, NSO produced documents and testimony related to three "covert Android" Pegasus installation vectors – Heaven, Eden, and Erised. These three covert installation vectors represent a very small fraction of Pegasus' overall capabilities with respect to obtaining information from Android devices.

7. Had the Court expanded those rulings, and the scope of information that NSO was required to produce, NSO would have attempted to produce additional information.

8. Access to NSO's Pegasus technology—including Heaven, Eden, and Erised—was and is subject to many legal, ethical, contractual, and technical safeguards. These safeguards function together to maximize the proven benefits of Pegasus, while minimizing the potential for its misuse. They are detailed below.

**Israel's Defense Export Control Law & Agency**

9. The marketing and licensing of NSO's Pegasus technology, and even its development, are strictly regulated and monitored by the Government of Israel under Israel's Defense Export Control Law ("DECL"). The DECL is administered by the Defense Export Control Agency ("DECA"), an agency within the Israeli Ministry of Defense.

10. Obtaining regulatory approval to market, and then to export, Pegasus involves a multi-step process.

11. First, NSO is required to maintain an active registration with DECA as a registered defense exporter.

12.     Second, NSO must provide certain information to DECA in order to receive a product ID for Pegasus and to maintain that product ID.  Obtaining and maintaining a product ID is a prerequisite for obtaining the necessary marketing and export licenses for such product described below.

13.     Third, NSO is required to obtain a preliminary license each time it intends to market Pegasus to a prospective customer (i.e., a "Defense Marketing License").  NSO is only permitted to market Pegasus to government agencies.

14.     Fourth, NSO is required to obtain a separate license in order to export Pegasus technology to a government agency customer (i.e., a "Defense Export License").

15.     To obtain Defense Marketing and Defense Export Licenses for Pegasus, NSO must provide DECA with information about the identity of the government agency seeking to license Pegasus.  DECA also requires information about the general intended uses of Pegasus and certifications that Pegasus will only be used lawfully to investigate serious crimes, to prevent terrorism, and to gather intelligence.  This includes government-to-government certifications sent directly from the requesting government agency to the Israeli Ministry of Defense.

16.     Ultimately, DECA is empowered to investigate NSO and its business, refuse or cancel NSO's registration, deny NSO's license applications, take disciplinary action against the company and its employees and even refer matters to the state prosecutor to take criminal action against the company.

17.     Each and every foreign government agency to which NSO licensed Pegasus— including all such agencies that were licensed Heaven, Eden, or Erised—successfully completed this governmental approval process.

**NSO's Business Ethics Committee & Evaluation Process**

18.     NSO also independently reviews all potential customers to ensure that only vetted government agencies are approved to use Pegasus for legitimate and legal purposes in an ethical manner.

19.     To that end, a Business Ethics Committee was established in July 2015.  Copies of the Committee charter adopted in 2017 and the revised charter adopted in 2019 are attached as

**Exhibit A** [Exh. A-1735] and **Exhibit B** [Exh. A-1951], respectively.   The Business Ethics Committee was eventually supplanted by NSO's Management Committee and its Governance, Risk and Compliance Committee in January 2020.  The change was made, in part, to foster an even greater focus on ethical, legal, and human-rights issues when assessing licensing opportunities.  The general guiding principles, however, remain the same.

20.    The Government Risk and Compliance Committee, like the Business Ethics Committee before it is comprised of both internal and external members.  External, independent advisors who have served on these Committees include a former U.S. ambassador to Israel, a former CIA chief of staff, and a former Majority Staff Director of the United States House Permanent Select Committee on Intelligence.

21.    NSO's Business Ethics Committee, and later its Management and Government Risk and Compliance Committees, review and analyze potential engagements in a multi-stage vetting process consistent with the company's Business Ethics Framework and, later, its Human Rights Policy.  These Committees assesses whether there are legal risks (e.g., laws that would prevent the licensing of Pegasus to a particular government agency); ethical risks (e.g., a prospective government end user's "respect for the rule of law" and other factors that may contribute to the potential for misuse of Pegasus); and reputational risks to NSO.  They also consider Israeli, U.S., and E.U. legislation and policies.

22.    Company policy also prohibits marketing or sales activities in certain countries due to a pattern of human rights abuses, corruption, and regulatory restrictions.  With respect to certain countries that present a higher risk, NSO previously instituted a process to seek informal insights from people working for the U.S. government.

23.    After weighing the various factors associated with each potential sale, NSO's Business Ethics Committee, and later its Management Committee and its Government Risk and Compliance Committee, then approve or reject the opportunity or defers it for further analysis and consideration. In certain cases, the approval is made subject to the implementation of certain compliance requirements to mitigate potential risks that have arisen during the review.

4

24.     Between mid-2018 and present, the committees described above rejected approximately 20 opportunities that would have resulted in approximately $300 million in additional revenue.

25.     No customer (i.e., government agency) is issued a Pegasus license without being approved by the appropriate committee(s).  Every customer granted rights to use Heaven, Eden, and Erised (or any other version of Pegasus) was assessed by the compliance team and approved by either the Business Ethics Committee or by one or more of the Management Committee and Government Risk and Compliance Committee.

**NSO's Contractual Safeguards**

26.     Where both the DECA process and NSO's business processes are satisfied, NSO also builds additional protections against misuse into its licenses.

27.     Copies of exemplar licenses from 2018 and 2019 are attached as **Exhibit C** [Exh. A-2005] and **Exhibit D** [Exh. A-1908], respectively.

28.     Among other contractual safeguards, NSO requires its customers to provide the end-user certifications required by DECA and to confirm that all necessary permissions have been obtained to license Pegasus.  (*E.g.*, Exh. C §§ 4.2-4.3, 5.1; Exh. D §§ 4.2-4.3, 5.1.)

29.     NSO also requires its customers, as a provision of their licensing agreements, to represent that they will comply with all applicable laws, rules, and regulations applicable to their use of Pegasus.  (*E.g.*, Exh. C § 18.2; Exh. D § 19.2.)  Customers must also represent that they and their agents will comply with all privacy, national-security, and other laws applicable to the use of Pegasus, *including obtaining any required judicial warrants, consents, or decrees*.  (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.)  Customers must represent that Pegasus will only be used to prevent and investigate terrorism and serious crimes, and that the system will not be used to violate human rights.  (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.)  Finally, customers must notify NSO of misuses or potential misuses of Pegasus.  (*E.g.*, Exh. C § 18.5; Exh. D § 19.5.)  Should a customer breach any of these obligations, NSO retains the right to suspend or terminate access to Pegasus.  (*E.g.*, Exh. C § 8; Exh. D § 8.)

30.     All customer licenses executed between 2018 and 2020—including any customers who received a license to Heaven, Erden, or Erised—would have been bound by similar substantive requirements.

31.     NSO's current licenses also contain similar provisions designed to ensure that customers only use the Pegasus system for appropriate purposes (e.g., preventing and investigating terrorism and serious crimes) and that customers comply with all applicable laws when doing so.

32.     Furthermore, NSO limits by contract, as well as through the technical safeguards described below, the number of target devices that can be monitored with Pegasus at any one time. This restriction ensures that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Technical Safeguards**

33.     In addition to the guardrails above, NSO employs technical safeguards to ensure that Pegasus is used legally in each jurisdiction in which it is licensed.

34.     A true and correct copy of a Pegasus product guide from August 2018 is attached as **Exhibit E** [Exh. A-1734].

35.     As that product guide makes clear, Pegasus is capable of collecting a variety of both historical (existing) and current (incoming/outgoing) data from mobile devices.  (Exh. E at 14-15.)

36.     Those capabilities, however, are designed to be flexible so that the system can be configured to comply with any applicable laws or collection orders.  The collection of historical data, for example, can be disabled if a government agency were not permitted to access existing data.  (*Id.* at 14.)   Government agencies can also issue active commands to obtain certain information based on pre-existing target information and the need to seek specific intelligence.  (*Id.* at 15.) Pegasus is thus designed to ensure that it can be used beneficially in numerous jurisdictions, while also complying with any legal frameworks or warrant limitations that govern a particular investigation.  (*See id.* at 16.)

37.     Pegasus includes auditing mechanisms.  These mechanisms permit government customers to designate auditors, who are then responsible for ensuring compliance with country- or investigation-specific legal requirements.  (*See id.* at 26.)

6

38.    These same technical guardrails against misuse were also present in all versions of Pegasus licensed between mid-2018 and mid-2020—including Heaven, Eden, and Erised—as well as all versions of Pegasus licensed since.

39.    NSO's technical safeguards also limit the number of target devices that can be monitored at any one time, ensuring that Pegasus cannot be used indiscriminately against improper targets or used to conduct mass surveillance.

**NSO's Monitoring & Auditing Process**

40.    Finally, NSO itself ensures that customers are complying with their obligations and are not misusing the Pegasus system.

41.    NSO compliance, legal, and customer teams review contractual obligations, advise customers on compliance obligations, and conduct investigations into potential misuses.

42.    Misuse investigations may be triggered by whistleblower allegations (from internal or external individuals), reports from media or non-governmental organizations, and other sources.

43.    NSO has conducted numerous investigations between 2018 and present.  In some cases, the perceived misuse was found to be proper.  In other cases, there was insufficient evidence to make a determination or evidence indicating misuse.  In still other cases, NSO has made findings of misuse.  In either of the latter cases, additional corrective actions would be taken.  In some cases, the implementation of additional guardrails may be judged sufficient to mitigate future misuse.  In other cases, suspension or termination of customer licenses has been deemed necessary.

44.    Between 2018 and June 2025, NSO received over 100 reports of misuse, all of which went through a preliminary review, resulting in approximately 25 determinations of credible reports, all of which were thoroughly investigated.  This led to 14 determinations of potential misuse, and 16 suspensions (some of which were temporary) or terminations of customers' access to the Pegasus system.

45.    Attached as **Exhibit F** [Exh. A-2028], **Exhibit G** [Exh. A-1736] and **Exhibit H** are true and correct copies of NSO's 2021, 2023 and 2024 Transparency Reports, which contain additional information regarding its compliance and enforcement mechanisms.

*        *        *

7

46.    My prior testimony that NSO no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application remains accurate.  NSO currently has no products, either in use or development, that use WhatsApp as an installation vector.

47.    Although NSO respectfully disagrees with the Court's orders in this matter, and intends to appeal them, NSO does not currently and will not in the future offer versions of Pegasus that use WhatsApp as an installation vector, absent any contrary ruling superseding this Court's ruling.

48.    Pegasus is NSO's flagship product.  It exists, however, in a competitive market.  NSO has competitors that offer products, similar to Pegasus, that permit the remote collection of information from mobile devices.  Those competing products can and do collect WhatsApp messages, among other social media messages.  If NSO were banned from offering versions of Pegasus that have not been found to violate any law that allow its government customers to collect the same messages, it would quickly lose market share to competitors.

49.    NSO's government customers rely on Pegasus to fight crime and terrorism and are likely to shift quickly to competing products that offer the widest range of capabilities.  NSO's inability to match its competitors' offerings would result in a competitive disadvantage and loss of customers that NSO would be unlikely ever to overcome.

50.    At a minimum, the injunction ordered by the Court would force changes to NSO's existing Pegasus products, including those that have not previously been part of this lawsuit.  If all versions of Pegasus were rendered unavailable for any substantial period of time, NSO would be at risk of going out of business.  In addition, NSO would be at risk of violating its contracts with the government customers who rely on its products to fight terrorism and investigate and prosecute crime.  And, even if the disruption were not permanent, those customers would be likely to seek other options to avoid even temporary disruptions to their law-enforcement investigations, military operations, and intelligence activities.  Once a customer transitions to a new competing solution, and begins collecting evidence or data, they would be unlikely to transition back to NSO's products.

DECLARATION OF YARON SHOHAT                                    Case No. 4:19-cv-07123-PJH

51.    NSO currently employs approximately 353 personnel, the vast majority of whom have responsibilities relating to NSO's Pegasus products.  Should NSO lose revenues, contracts, or customers, the employment of all those people would be at risk.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, this 19th day of November 2025, at Sde Warburg, Israel.

_____
YARON SHOHAT

DECLARATION OF YARON SHOHAT                                    Case No. 4:19-cv-07123-PJH

# Exhibit C

*For Discussion Purposes Only; Pro...*

EXHIBIT
2005

**AGREEMENT**

This Agreement (the **"Agreement"**)is entered into on November 11, 2018 (the **"Effective Date"**), by and between Q Cyber Technologies SARL, having its offices at 46A avenue John F Kennedy L-1855 Luxembourg, registration number 203 1 24(the **"Company"**) and ▮▮▮▮▮▮▮▮▮▮▮ (the **"End-User"**).

**Whereas,** the Company is engaged in the business of developing, integrating and supplying certain intelligencesolutions, and has developed (through its affiliates) the System (as defined below); and

**Whereas,** the End-User is interested to purchase from the Company a License (as defined below) to use the System, and obtain services related to it, as further set forth herein, and the Company has agreed to provide a License to use the System and related services to the End-User; and

**Whereas,** the parties wish to set forth the terms under which such sale and purchase shall be made.

**Now, therefore,** in consideration of the foregoing premises and the mutual covenants herein contained, and for other good and valuable consideration, the parties agree as follows:

1. Definitions.

    1.1.   In this Agreement, unless the context otherwise requires, terms defined in the preamble and the recitalsshall have the same meaning when used elsewhere in this Agreement and the following terms shall have the meanings ascribedthereto below:

    **"Agreement"** has the meaning ascribed to it in the preamble.

    **"Approval"** has the meaning ascribed to it in Section 5.1.

    **"Business Day"** means a day (other than a Friday, Saturday or Sunday) on which banks where the End User resides are generally open for normal business.

    **"Certificate"** has the meaning ascribed to it in Section 5.1.

    **"Commissioning Notice"** has the meaning ascribed to it in Exhibit B.

    **"Company"** has the meaning ascribed to it in the preamble.

    **"Confidential Information"** means this Agreement and any information provided by the Company to the End-User.

    **"Deployment"** has the meaning ascribed to it in Exhibit A.

    **"Effective Date"** has the meaning ascribed to it in the preamble.

    **"End-User"** has the meaning ascribed to it in the preamble.

    **"End-User Representative"** has the meaning ascribed to it in Section 18.4.

    **"End-User Responsibilities"** has the meaning ascribed to it in Section 4.

    **"First Installment"** has the meaning ascribed to it in Exhibit B.

    **"Force Majeure"** has the meaning ascribed to it in Section 15.

    **"Hardware Equipment"** has the meaning ascribed to it in Exhibit A.

    **"License"** has the meaning ascribed to it in Section 2.1.

    **"Services"** has the meaning ascribed to it in Exhibit A.

    **"SLA"**has the meaning ascribed to it in Section6.2.

    **"Support Period"** has the meaning ascribed to it in Section 6.1.

    **"Support Service Consideration"** has the meaning ascribed to it in Exhibit B.

    **"Support Services"** has the meaning ascribed to it in Section 6.

    **"Support Service Supplement Consideration"** has the meaning ascribed to it in Exhibit B.

1

NSO_WHATSAPP_00000179

"**System**" has the meaning ascribed to it in <u>Exhibit A</u>.

"**System Consideration**" has the meaning ascribed to it in <u>Exhibit B</u>.

"**Training**" has the meaning ascribed to it in <u>Exhibit A</u>.

"**Warranty Period**" has the meaning ascribed to it in <u>Exhibit A</u>.

1.2.    The following are the exhibits in this Agreement:

Exhibit A – Description of System and Services

Exhibit B – Consideration

Exhibit C – Installation Requirements

Exhibit D – Security Guidelines

Exhibit E – Form of End-User Certificate

Exhibit F – Service Level Agreement

2.    <u>Provision of License and Services.</u>

2.1.    Subject to the terms of this Agreement and the payment of the System Consideration in full, the Company shall (i) grant to the End-User a limited, nonexclusive, non-transferable, non-pledgeable and non-assignable license to use the System for the End-User's internal use only, and solely for the purpose that it is intended for (the "**License**"); and (ii) provide the Services.

Physical copies of the software included in the System are not being sold to the End-User, but are the property of the Company, and are provided to the End-User for its use during the term of this Agreement and in accordance with its terms.

2.2.    Subject to provisions of Sections 2.3 and 5.2 below, within one-hundred (100) Business Days following the occurrence of the later of (i) receipt by the Company of the Approval, and (ii) the receipt by the Company of the First Installment, in full, the Company shall complete the Deployment and shall conduct the Training.

2.3.    The provision of the System, the License and the Services by the Company in accordance with the time schedule set forth in Section 2.2 above and the performance by the Company of all its obligations under this Agreement is conditioned upon (i) the fulfillment by the End-User of all of the End-User Responsibilities when due, and (ii) the actual receipt by the Company of each payment of the System Consideration when due, in full.

It is hereby clarified that the Company shall not be held responsible or liable for any delay in the provision of the System, the License and/or the Services, if such delay was due to any misperformance or delay in the fulfillment of any of the End-User Responsibilities and/or payment obligations and/or due to a delay in the performance or fulfillment of the pre-requisite conditions set forth in Sections 3, 4 and 5 below. In the event of a delay in the performance of any of the End-User Responsibilities and/or payment obligations and/or the performance or achievement of the pre-requisite conditions set forth in Sections 3, 4 and 5 below, the Company's obligations shall be postponed by such number of days equal to number of days by which the time schedule was delayed due to acts or omissions caused by the End-User.

2.4.    For the avoidance of any doubt it is hereby clarified that neither the Company nor any of its affiliates shall participate or otherwise assume any role in the operation, activation and/or use of the System. The End User shall be solely responsible and liable for the use and operation of the System, in accordance with the License and the terms of this Agreement.

3.    <u>Consideration; Payment Terms.</u>

2

NSO_WHATSAPP_00000180

3.1.  In consideration for the provision of the License, the System and the Services, the End-User shall pay the Company the System Consideration as set forth in the Consideration exhibit, attached hereto as <u>Exhibit B.</u>

3.2.  The System Consideration shall be paid by the End-User to the Company in installments as set forth in <u>Exhibit B.</u>

3.3.  Any and all payments made to the Company under this Agreement are exclusive of all state, provincial, municipal or other government, excise, use, sales, VAT or like taxes, tariffs, duties or surcharges, now in force or as may be enacted in the future, which shall be borne by the End-User, provided, however that the Company shall bear all income taxes imposed on the Company in connection with this Agreement. Each payment under this Agreement shall be paid by the End-User against an invoice to be issued by the Company.

3.4.  Any and all amounts paid to the Company under this Agreement are non-refundable, and may not be claimed or reclaimed by the End-User.

3.5.  If any sum payable pursuant to this Agreement is not timely paid to the Company, then, without prejudice to any other right or remedy available to the Company in accordance with the terms of this Agreement or by law, the End-User shall pay interest thereon at a daily rate of 0.04%, accumulated on a daily basis, in respect of the period starting on the due date of the delayed payment and ending on the date of the actual payment. In addition, the Company reserves the right to suspend contractual performance or the use of the System or the Services until the End-User has made payment of the overdue amount together with interest that has accrued thereupon, in full.

3.6.  The End-User shall not be permitted to use the System, and the License shall not be deemed granted unless (a) the Commissioning Notice was delivered, and (b) each installment which was due on or prior to the date of the Commissioning Notice was paid in full, when due. Following the provision of the Commissioning Notice, in the event that any installment of the Consideration shall not be paid upon the date of its designated payment, the End-User shall not be permitted to continue using the System and the License shall be considered suspended until the payment in full of such installment is made (including any accumulated interest pursuant to Section 3.5 above). In such event, the Company shall be entitled to take all measures available to it (including without limitation legal and technological measures) to prevent the End-User from continuing to use the System and shall not be held responsible for any damage or loss incurred by the End-User with respect thereto.

4.  <u>The End-User's Responsibilities.</u> The End-User undertakes to perform all of the following obligations in a timely manner (the **"End-User Responsibilities"**):

4.1.  fulfillment of all of the technical and installation requirements listed in <u>Exhibit C</u>, at the End-User's site, prior to the delivery of the Hardware Equipment;

4.2.  obtainment and maintenance of all permits and approvals required to be obtained from any regulatory and governmental authority relating to the End-User, under any and all applicable legal requirements for the performance of this Agreement;

4.3.  delivery of the Certificate to the Company;

4.4.  provision of any and all additional required conditions to enable the performance of the Company's obligations under this Agreement when due, including without limitation, release of the Hardware Equipment from custom (if required) and assuring availability of its personnel for participation in the Training; and

4.5.  utilize the System strictly in accordance with the security guidelines set forth in <u>Exhibit D</u>; and

4.6.  in the event where the End-User purchases the Support Services (as defined below), it acknowledges, and undertakes to perform, in a timely manner, all of the obligations set forth in the SLA, substantially in the form attached hereto as <u>Exhibit F.</u>

3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

5.   Pre-Conditions.

5.1.   The provision of the License, the System and the Services to the End-User and the performance by the Company of its obligations under this Agreement are subject to (i) the receipt by the Company of the original certificate in accordance with the requirements of any applicable governmental authority confirming the identity of the End-User, substantially in the forms attached hereto as Exhibit E (the "**Certificate**"), and (ii) the receipt by the Company of the approval and/or license of any applicable governmental authority for the provision of the System as set forth herein (the "**Approval**").

5.2.   For the avoidance of any doubt, no products, licenses, equipment or services shall be provided by the Company under this Agreement until the Certificate is delivered to the Company and the Approval is obtained. In the event that the Certificate is not received by the Company and/or the Approval is not obtained within six (6) months as of the date hereof, or in the event that the Company receives, earlier, a formal notice from the applicable governmental authority that the application for the Approval is denied, or in the event that the Approval is canceled, terminated or suspended, the Company shall have the right to terminate this Agreement by providing the End-User a written notice, and such termination shall not be considered a breach of this Agreement, and the Company shall not be held responsible or liable for any effect of such termination.

5.3.   Without derogating from the aforesaid, the End User acknowledges and understands that the provision of the Certificate by the End User is subject to annual renewal and the End User shall be responsible to take any action and submit any document required in connection with maintaining the Approval in effect at all times during the term of this Agreement.

6.   Technical Support and Maintenance Services. Following the expiration of the Warranty Period, the End-User shall be entitled to purchase technical support and maintenance services (the "**Support Services**"), to be renewed automatically at the end of the Warranty Period and any Support Period (unless terminated for any reason by the End User or the Company), in accordance with the following terms:

6.1.   The End-User may purchase Support Services for periods of twelve (12) consecutive months (each such period – a "**Support Period**"). In the event that either the End User or the Company chooses not to purchase or provide Support Services, it shall notify the other party in writing no later than thirty (30) day prior to the expiration of the Warranty Period or any then current Support Period. End User shall not have any claims or demands towards the Company for any reduced, weakened or diminished capabilities and/or functionalities of the System due to non-retention of Support Services.

6.2.   The Support Services shall be provided in accordance with the Company's standard services level agreement, as may be amended from time to time. A copy of the Company's current Services Level Agreement is attached hereto as Exhibit F (the "**SLA**").

6.3.   The consideration for the Support Services shall be paid in advance before each Support Period, in accordance with the payment terms set forth in Exhibit B.

7.   Termination.

7.1.   This Agreement shall commence on the Effective Date and shall remain in full force and effect until terminated in accordance with the terms herein.

7.2.   If either party hereto commits: (i) a material breach of this Agreement (including its exhibits) or defaults in the performance of any material obligation hereof, and if such default or breach is not corrected within 14 days after the same has been called to the

4

attention of the defaulting party by a written notice from the other party (provided that with respect to breach of any representation made under Section 18 below, such 14 days period shall be shortened to 7 days); or (ii) a non-material breach of this Agreement (including its exhibits) or defaults in the performance of any other obligation, and such default or breach is not corrected within 30 days after the same has been called to the attention of the defaulting party by a written notice from the other party - then the non-defaulting party, at its option, may thereupon terminate this Agreement, with an immediate effect, by submitting a written notice to the other party.

7.3.    Upon termination of this Agreement the End-User shall be obligated to pay to the Company any outstanding consideration due under this Agreement within 14 days as of the date of termination of this Agreement. The provisions of Sections 7.3, 8, 9, 10, 11, 12, 13, and 23 and shall survive the termination of this Agreement.

8.    **Additional Remedy.** In the event a breach has occurred (including without limitation, in the event the Company has reasonable grounds to suspect that a breach of any representation made under Section 18 below has occurred), in addition to the Company's right to terminate the Agreement, and its otherrights and remedies under applicable law and this Agreement, the Company may immediately suspend or cancel the License or the provision of any of the Services and/or Support Services (when applicable), or take such actions necessary to prevent access to the System until such time as it has received confirmation to its satisfaction that such breach was cured. The Company shall not be liable towards the End-User for any claim, losses or damages whatsoever related to its decision to suspend or cancel the provision of any of the License, Services, Support Services, or to prevent access to the System under this Section.

9.    **Intellectual Property Rights.** All the rights pertaining to the System, the Services and the License, including, but not limited to, all patents, trademarks, copyrights, service marks, trade names, technology, know how, moral rights and trade secrets, all applications for any of the foregoing, and all permits, grants and licenses or other rights relating to the System and the Services are and shall remain the sole property of the Company. The End-User hereby acknowledges that, other than as set forth in Section 2.1, no title to the System (including the software embedded therein) is transferred to it under this Agreement or in connection hereof and it is not granted any right in the System, including without limitation, intellectual property right. The End-User shall not, whether directly or indirectly either by itself or through any other person, reproduce, modify, disassemble or reverse-engineer the System (including any software contained therein).

10.    **Confidentiality.** The End-User undertakes to keep the Confidential Information in strict confidence and not to disclose it to any third party without the prior written consent of the Company; provided, however, that the End-User may disclose such information to its respective employees and consultants having a need to know such information in order to carry out the provisions of this Agreement. The End-User warrants that any such employees and consultants to which Confidential Information is disclosed will be bound and will abide by terms no less onerous than those contained herein and shall be responsible for any breach of confidentiality by itself and such employees and consultants and for any harm caused to the Company as a result of such breach.

Following the termination of this Agreement for any reason, or upon the Company's first written demand, the End-User shall return to the Companyall Confidential Information, including all records, products and samples received, and any copies thereof, whether in its possession or under its control, and shall erase all electronic records thereof, and shall so certify to the Company in writing.

11.    **Limited Warranty.** It should be noted that the Company does not warrant that the License, the System and the Services provided hereunder will be uninterrupted, error-free, or completely secure. The Company does not make, and hereby disclaims, any and all implied warranties, including implied warranties of merchantability, fitness for a particular purpose and non-infringement. All products, the System and Services provided pursuant to this Agreement are provided or performed on an "as is", "as available" basis.

12.    **Limitation of Liability.** In no event shall the Company be liable for any consequential, incidental, special, indirect or exemplary damages whatsoever, including lost profits, loss of business, loss

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000183

of revenues, or any other type of damages, whether arising under tort, contract or law. The Company's aggregate liability shall be limited to the consideration actually received by the Company under this Agreement.

13. Settling of Disputes and Governing Law. Any and all disputes concerning this Agreement shall be governed by the laws England and Wales, regardless of its conflict of laws rules and of where this Agreement was executed or is to be performed. This Agreement is made on the basis of mutual confidence, and it is understood that the differences, if any, during the term of this Agreement should freely be discussed between the parties. The parties shall initially attempt in good faith to resolve any significant controversy, claim or dispute arising out of or in relation to this Agreement, or its interpretation, performance, non-performance or any breach of any respective obligations hereunder (other than a dispute over the ownership of intellectual property rights), through negotiations between senior executives of the parties. If the dispute is not resolved within thirty (30) days (or such other period of time mutually agreed upon by the parties) of commencing such face-to-face negotiations, or if the party against refuses to attend such negotiations or does not otherwise participate in such negotiations within thirty (30) days (or such other period of time mutually agreed upon by the parties) from the date of the notice of the dispute, then the parties agree that the dispute shall, be exclusively settled by a binding closed doors arbitration under the Rules of Arbitration of the London Court of International Arbitration by one or more arbitrators appointed in accordance with the said rules. The arbitration shall be conducted in English in London, England. The prevailing party shall be entitled to reimbursement of its reasonable attorney's fees. However, nothing in this Section shall be deemed as preventing the Company from seeking injunctive relief (or other provisional remedy) from any court having competent jurisdiction.

14. Assignment. This Agreement and the rights and obligations hereunder are not transferable, pledgeable or assignable, by either party without the prior written consent of the other party. However, the Company may assign its rights and obligations to a parent, affiliate or subsidiary company and, in the case of a merger or acquisition, to a successor company and provided that the rights of the End-User shall not be derogated pursuant to such assignment.

15. Force Majeure. The Company shall not be liable for any failure to perform its obligations under this Agreement due to any action beyond its control, including without limitation: (i) acts of god, such as fires, floods, electrical storms, unusually severe weather and natural catastrophes; (ii) civil disturbances, such as strikes and riots; (iii) acts of aggression, such as explosions, wars, and terrorism; (iv) acts of government, including, without limitation, the actions of regulatory bodies which significantly inhibits or prohibits the Company from performing its obligations under this Agreement (each, a **"Force Majeure"**). In the event of a Force Majeure, the performance of the Company's obligations shall be suspended during the period of existence of such Force Majeure as well as the period reasonably required thereafter to resume the performance of the obligation.

16. No Third Party Beneficiary. This Agreement shall not confer any rights or remedies upon any person other than the parties to this Agreement and their respective successors and permitted assigns.

17. Complete Agreement. This Agreement and its Exhibits constitute the full and entire understanding and agreement between the parties with regard to the subject matters hereof and thereof and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

18. Representations.

18.1. The End-User hereby represents and warrants that the execution and delivery of this Agreement and the fulfillment of its terms: (i) will not constitute a default under or conflict with any agreement or other instrument to which the End-User is a party or by which it is bound; and (ii) other than as specifically set forth in this Agreement, does not require any further consent of any person or entity.

18.2. The End-User hereby represents that it shall comply with all laws, rules and regulations applicable to the performance of its undertakings and obligations pursuant to this Agreement in any applicable country, and undertakes that it will obtain and keep current

6

all governmental permits, certificates and licenses necessary for the performance of such undertakings and obligations. The End-User shall, upon the Company's request, provide evidence reasonably satisfactory to the Company of its compliance with this Section.

18.3.   The End-User hereby represents that it is fully aware of any applicable export control laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder. Without limiting the foregoing (i) it will obtain all licenses and other consents required for the export of the System and Services under any applicable law other than the Approval; (ii) it will perform the contemplated activities hereunder in compliance with the terms of the Approval and any other applicable export license or other consent and permit or authorization received from or issued by any relevant governmental or regulatory authority that has jurisdiction over the contemplated activities hereunder.

18.4.   The End-User hereby represents and warrants that (a) it is fully aware of any applicable anti-corruption and non-bribery laws and regulations of any country exercising jurisdiction over the contemplated activities hereunder, and undertakes to abide and to cause all persons involved in the performance and consummation of this Agreement on its behalf, including any of its employees, consultants, officers, directors and representatives (each, an **"End-User Representative"**) to abide to such laws and regulations; (b) no action that is prohibited by any anti-corruption laws that may be applicable to the Company and/or to the End-User and/or to any third party involved in the performance and consummation of this Agreement was or will be performed by the End-User or any End-User Representative, and in particular, without derogating from the generality of the aforesaid, no End-User Representative has been or, will be in the future, offered, directly or indirectly, any payment, or anything of value, or was, or will be, promised, or has agreed to receive, or will receive, any such payment or anything of value in consideration for influencing decisions, or making a promise, express or implied to influence decisions, related to the Company and/or its business and/or to this Agreement that would violate any anti-corruption laws; and (c) it shall provide its employees, on an annual basis, training with respect to compliance with anti-corruption laws.

18.5.   The End-User hereby represents and warrants that it and its respective employees and agents shall: (i) fully comply with all privacy and national security related laws and regulations, international standards, and any other laws and regulations that are applicable to the use of the System, including by way of obtaining all judicial warrants, consents and/or decrees to the extent required by law for each and every use of the System, (ii) use the System only for the prevention and investigation of crimes and terrorism and ensure that the System will not be used for human rights violations, and (iii) immediately notify the Company of any knowledge it may have regarding a misuse or potential misuse of the System which may result in human rights violations and/or which could cause the Company to be in breach of any of its legal and ethical obligations.

18.6.   The End-User hereby irrevocably waives any and all claims or demands against the Company for (i) any limitations or inability to operate the System due to any applicable legal requirements; and (ii) for any losses suffered by the End-User, its respective officers, directors, employees and anyone on its behalf in the event that purchasing of the License or using the System will not comply with any applicable legal requirement.

18.7.   Any breach of the representations and warranties in this Section 18 shall constitute a material breach.

19.   <u>No Set-Off.</u> Notwithstanding any right available to the End-User under law, the End-User shall not be entitled to set-off any amounts due to the Company under this Agreement.

20.   <u>Severability.</u> Should any court of competent jurisdiction declare any term of this Agreement void or unenforceable, such declaration shall have no effect on the remaining terms hereof.

7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000185

21.  Interpretation. The titles and headings of the various sections and paragraphs in this Agreement are intended solely for reference and are not intended for any other purpose whatsoever or to explain, modify, or place any construction on any of the provisions of this Agreement.

22.  No Waiver. The failure of either party to enforce any rights granted hereunder or to take action against the other party in the event of any breach hereunder shall not be deemed a waiver by that party as to subsequent enforcement of rights or subsequent actions in the event of future breaches.

23.  Notices. All notices and demands hereunder shall be in writing and shall be served by personal service or by mail at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be certified or registered mail, return receipt requested, by nationally-recognized private express courier, or sent by electronic transmission, with confirmation received, to the telecopy numbered specified below, and shall be deemed complete upon receipt.

**In Witness Whereof**, the parties hereto have executed this A_____ and year first above written.

K.H.hul

**Q Cyber Technologies SARL**

By:  _____ Kevin Wales

Position:  _____ Managing

Q Cyber Technologies S.à r.L.
46 A avenue John F. Kennedy
L-1855 Luxembourg
RCS Luxembourg B 203124
VAT n. LU28460471

8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

## Exhibit A

### Description of the System and Services

The System:

An end-point agent (the "**System**") comprised of (i) a software component, installed on supported mobile devices and controlled remotely, to extract information, and (ii) such hardware equipment required for the installation of the System ("**Hardware Equipment**").

License shall be provided with respect to five (5) concurrent mobile numbers (assigned by local MNOs in the End-User's home country), using Company's approved devices running on Company's certified versions of the iOS and Android operating systems.

The Company shall provide the End-User with three (3) local working stations for use of the System.

All System's features and capabilities shall be as demonstrated to the End-User at the Training prior to the Commissioning Notice, as may be updated by the Company periodically due to technological and Operation Security reasons.

The Services:

The services related to the System include the following (the "**Services**"):

(a) Deployment of the System at the End-User's site, which includes the delivery and provision of the System and the installation thereof (the "**Deployment**");

(b) Training course of up to five (5) days (non-consecutive) which shall be held at the End-User's facility, in English (the "**Training**"). The Training sessions shall cover topics relating to the System's operation and handover; For the avoidance of doubt, the Company's training personnel shall at no stage take part in the activation of the System on behalf of the End-User and will not be involved in any aspect of the End-User's actual live intelligence operations.

(c) 12 months warranty (the "**Warranty Period**") in accordance with the SLA, commencing at the date of the provision of the Commissioning Notice.

9

**Exhibit B**

**Consideration**

| Consideration Component | Consideration for | Amount in USD |
|---|---|---|
| "System Consideration" | provision of the License and Services. | ███████ |
| "Support Service Consideration" | any one Support Period. | ███████ |
| "Support Service Supplement Consideration" | one-time fee which will be added to the Support Service Consideration if the Support Service is not provided immediately following the Warranty Period or subsequent to a previous Support Period. | The pro-rata amount of the Support Service Consideration for the period between the date of expiry of the Warranty Period or the applicable Support Period and the date of purchase of the renewed Support Services. |

**Payment Terms**

System Consideration

The System Consideration shall be paid by the End-User to the Company in three (3) installments as follows:

    (a)  50% of the System Consideration (the **"First Installment"**) shall be paid within 14 days as of the Effective Date.

    (b)  40% of the System Consideration shall be paid 7 days following the provision of a written notice from the Company, certifying that the Hardware Equipment was delivered to the End-User's site.

    (c)  10% of the System Consideration shall be paid 7 days from the provision of a written notice by the Company to the End-User confirming that the Deployment of the System at the End-User's site was completed (the **"Commissioning Notice"**).

Consideration for Support Services

    (a)  The consideration for any Support Period which is either subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Period Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the end of the Warranty Period or the previous Support Period, as the case may be.

    (b)  The consideration for any Support Period which is not subsequent to the Warranty Period or subsequent to any previous Support Period shall be the Support Service Consideration plus the Support Service Supplement Consideration, and shall be paid in one payment, in advance, no later than 14 Business Days before the date on which the parties agreed that the Support Services will resume.

10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Exhibit C**

**Installation requirements**

*To be provided*

11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000189

**Exhibit D**

**Security Guidelines**

*To be provided*

12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000190

**Exhibit C**

**Installation requirements**

*To be provided*

11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000191

**Exhibit D**
**Security Guidelines**

*To be provided*

12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000192

**Exhibit E**
**Form of End-User Certificate**

13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00000193

**Exhibit F**

**Service Level Agreement**

1. **Definitions**. All terms used, but not otherwise defined hereunder, have the meaning ascribed to them in the Agreement.

   1.1. **CRM tool** means the Company's dedicated web portal and CRM management software through which the End User may open a Support Ticket and contact the Company's technical support center.

   1.2. **Documentation** means the System's user and technical manuals provided by the Company.

   1.3. **Error** means an error in one or more functions of the System that adversely degrades from the System's functionality description in the Documentation.

   1.4. **Hardware** means the Hardware provided by the Company (if any) as set forth in the Agreement.

   1.5. **Response Time** means the amount of time between the End User opening a Support Ticket and the Company support staff's initial response.

   1.6. **Resolution** means reducing the severity level of an Error, either by a permanent fix or a Workaround until a permanent fix is available.

   1.7. **Resolution Time** means the amount of time between the Company support staff's initial response and resolution of the reported issue.

   1.8. **SupportTicket** means any single issue reported via the CRM tool or by email and is identifiable by an assigned case number.

   1.9. **System** means the System described in the Agreement, including its software and Hardware provided by the Company. For the purposes herein, the term "System" also includes any standalone Product as defined under the Agreement.

   1.10.**Workaround** means a change to followed procedures or data to correct or avoid Error without substantially impairing use of the System.

2. **End User Obligations**

   2.1. **SystemAccess**. The End User must provide the Company or its authorized representative with remote access to the System in order for the Company to remotely diagnose and resolve an Error, or remotely install software updates or upgrades to the System. The End User understands that if such access is not provided, then problem determination will be slower, impaired, or impossible.

   2.2. **On-site Access**. To the extent a certain Error cannot be resolved remotely (as determined by the Company at its sole discretion), the End User will provide the Company or its authorized representative with sufficient and safe access to the End User's facilities in order to permit the Company to fulfill its obligations hereunder. On-site services will not be provided if remote access was not granted by the End-User.

   2.3. Only End User personnel, who have received training by the Company, are permitted to open a Support Ticket and contact the Company support center.

3. **Support & Maintenance**

   The warranty, support, and maintenance services of the System will be provided by the Company (or a third party designated by it) to the End User via the Company technical support center, in accordance with the following:

   3.1. **Support**. The Company will provide the End User with technical support for the System, consisting of first-level to fourth-level ("**Tier1 to Tier4**"), all as described below.

   3.2. **Maintenance**. Maintenance of the System consists of the following:

14

NSO_WHATSAPP_00000194

3.2.1. Software Upgrade. Periodical software-releases of different features and bug fixes, which the Company, at its discretion, may make available to the End User subject to and upon general commercial release. Installation of a new software upgrade will be reasonably coordinated in advance with the End User to minimize the System downtime.

3.2.2. Software Update. Software release or patch provided from time-to-time, at the Company's sole discretion, in order to improve program functionality or fix specific known bugs, outside the periodical SW release, issued at the Company's discretion from time to time. Software updates may also be provided for newly-released versions of operating systems.

3.2.3. Monitoring System. To the extent a monitoring software is installed with the System, the System will be connected to the Company's 24/7 network operation center (NOC) for around-the-clock monitoring which is configured to do the following:

3.2.3.1. Connects to all major System Hardware components to provide real-time status.

3.2.3.2. Monitors System software components such as tunnels and VPS servers, and issues alerts if any components shutdown.

3.2.3.3. Checks white-account balances and issues alerts if a balance falls below a predefined threshold.

## 4. Software Support

4.1. **Scope of Commitment**. The scope of commitment and the extent of the warranty provided by the Company is intended to maintain the System at its functional condition, in accordance with the Documentation and the description of the System under Exhibit A of the Agreement.

4.2. **On-Site Support.** On-site software support will only be provided for Severity-level 1 Errors that cannot be resolved remotely (and is based solely on Company support staff judgment). If the Company determines that a matter is a Severity-level 1 Error, then the Company and the End User will work diligently until resolution of the Error. The Company may decide, at its sole discretion, to dispatch a Company representative or a partner support representative to the End User's site in order to achieve resolution. On-site support is not provided for troubleshooting or any software or training-related issues.

## 5. Software Support Procedure

The software support procedure shall be conducted as follows:

5.1. **Report of Error:** The End User shall promptly notify the Company, in writing, following the discovery of any verifiable and reproducible failure of the System. Notification must be made by opening a Support Ticket via the CRM tool or email (and if by telephone then it will shortly thereafter report the issue also by way of the CRM tool). The End User personnel must provide their unique security code at the outset of each and every contact with the Company support center.

This SLA, and the services provided hereunder, does not apply to bug reports or feature requests that are merely cosmetic or which do not otherwise impair the operation of the System. Such requests will typically be prioritized for handling in a future, regularly-scheduled product release.

15

NSO_WHATSAPP_00000195

5.2. **Provision of Information.** End User must provide, in the Support Ticket, all information relevant to the question or issue that needs to be resolved. The Company shall have no obligation to provide support services if the End User does not cooperate with the Company in procuring all relevant information. A unique support case number will be assigned to each Support Ticket and delivered to the End User via email or the CRM Tool. This number is used to track any documented issue, from initial contact to final Resolution.

5.3. The Company agrees to use commercially reasonable efforts to work with the End User on Error Resolution in accordance with the specifications of this SLA. Timely efforts must be made by all involved parties. If the End User does not respond, by the end of five (5) Business Days, to Company attempts to communicate regarding any open Support Ticket, then the Company may, upon providing notice, close such Support Ticket.

5.4. **Remote Access.** The End User agrees to grant the Company access, via a secure and dedicated VPN tunnel, upon receiving a request from the Company to address issues reported in a Support Ticket. The Company will then have access to the System for a limited period of time in order to reach a Resolution. The Company has no obligation to provide support services if the End User does not provide the VPN connection to the System.

## 6. Hardware Support

6.1. **Scope of Commitment.** The Company shall not be obligated to provide any support or maintenance for Hardware equipment not purchased from the Company. For Hardware purchased and provided to the End User by the Company, the Company, to the extent possible, will provide back-to-back warranty accordingly to the standard warranty terms provided to the Company by the relevant third-party Hardware providers.

6.2. **On-Site Hardware Support.** To the extent applicable in accordance with the relevant Hardware provider warranty, Hardware support services may include on-site support, subject to the Company's sole discretion and provided that Hardware replacements or repairs shall not be performed outside of the End User's site.

## 7. Hardware Support Procedure

To the extent applicable, in accordance with the relevant Hardware-provider warranty, the Hardware support services will be conducted as follows:

7.1. Following the steps outlined in Sections 5.1 and 5.2 above, which also apply to Hardware issues, the Company will attempt to diagnose and resolve any Hardware problems over the phone or via remote access. Upon determination that an issue is related to a Hardware component malfunction, then the Company will, at its sole discretion, either repair or replace the relevant component.

7.2. Shipping time for Hardware may vary and is dependent, amongst others, on accessibility to the End User's site, and export and import procedures. Transportation costs, incurred by the Company in connection with the delivery of repaired or replacement Hardware to the End User, will be borne by the Company. However, the End User must suitably package, as specified by the Company, and ship the reported, faulty Hardware (or replaceable unit) to a location designated by the Company; the cost for such shipment will be borne by the End User.

7.3. If the Company determines, at its sole discretion, that the allegedly defective component is not covered by warranty, in accordance with the terms of this SLA or the warranty terms of the Hardware provider, then the cost of the repair or replacement by the Company, including all shipping expenses, will be reimbursed by the End User. The Company shall have no obligation to support and replace Hardware unmonitored by the monitoring system which is installed on the System and connected to the Company technical support center.

16

## 8. Severity Levels

| Severity Level | | Description of Business Impact | Response Time | Resolution Time |
|---|---|---|---|---|
| 1 | Critical Impact | Complete System failure in which no standard procedure resolves the reported Error. A critical application function is unusable or unavailable and no Workaround exists. | 1 hour | 2 Business Days (provided no on-site services are required) |
| 2 | Serious Impact | The System is able to work and is producing major Errors when certain requests sent. A critical application function unusable or unavailable but a Workaround exists. | 1 hour | 10 Business Days |
| 3 | Minor Impact | Error(s) which do not affect the System's main functions. A critical or important application has diminished functionality or performance but the functionality still performs as specified in the Documentation. | 4 hours | The 2nd scheduled SW release |

## 9. Support Levels & Activities

| Severity Level | | Resource Commitment | Support Level provided |
|---|---|---|---|
| 1 | Critical Impact | Company and End User will commit the necessary resources 24/7 until Resolution.<br><br>Top priority is to restore and/or improve functionally and not to debug the Error. If a Workaround cannot be provided, the task will be transferred to the Company's R&D team for further investigation. | Tier 3 – Support activities may include all Tier 1 and Tier 2 activities, as well as in-depth System instructions, advanced diagnostics, and troubleshooting at R&D level. |
| 2 | Serious Impact | Company and End User will commit the necessary resources during normal business hours until Resolution. Top priority is to restore and/or improve functionally and to debug the Error. | Tier 2 – Support activities may include all Tier 1 activities, as well as customization management, configuration changes, diagnostics, advanced troubleshooting and onsite services such as installations or repairs of electronic equipment using standard test instruments. |
| 3 | Minor Impact | Company and End User agree to use their technical resources during normal business hours until Resolution. Priority is to achieve better functionality and an analysis of the Error in order to resolve it in the next scheduled SW release. | Tier 1 – Support activities may include basic software hardware installations, upgrades, basic troubleshooting, configuration changes and/or operation optimization. |

17

NSO_WHATSAPP_00000197

| Tier Support | 4 | Support activities may include all Tier 1, 2 and 3 activities, as well as design level consultation and solutions, software R&D diagnostics, and high level of software and hardware fixes and solutions by a R&D engineer. |
|---|---|---|

## 10. Exclusions

10.1. The Company shall not be obligated to provide support and/or maintenance services in the event of any misuse, abuse, neglect, alteration, modification, improper installation of the System, use of the System for purposes other than those authorized by the Company, or repairs made or attempted to be made by anyone other than the Company or its authorized representatives without the Company prior written approval.

10.2. Without derogating from the generality of Section 10.1 above, the support and maintenance services provided under this SLA do not include the following items or actions:

10.2.1. Any services whatsoever regarding any Hardware components in or related to the System, other than as specifically set forth in this SLA.

10.2.2. Step-by-step installation of software or service packs.

10.2.3. On-site services (other than those explicitly described in this SLA), professional services, managed services, or tutorial services.

10.2.4. Modification of software code, IT network architecture changes, security-policy configuration, audits, or security design.

10.2.5. Support and maintenance with regards to exploits which were closed and resulted in features becoming non-functional.

10.2.6. Requests for new features that are not part of the current System configuration and which will require research and development time.

10.2.7. Requests to support new devices.

10.2.8. Capabilities\Features which were removed due to OpSec.

10.2.9. where network access is unstable, amongst others due to poor 3G coverage or Internet access, or if the End User is not complying with Company Environment Requirements.

10.3. Without derogating from the generality of Section 10.1 above, the Company shall have no obligation to support:

10.3.1. An altered, damaged, or modified System or any portion thereof (including Hardware) incorporated with or into other software, Hardware, or products not specifically approved in advance in writing by the Company.

10.3.2. Errors or problems caused by End User negligence, misuse, misapplication, or use of the System in a way other than as specified in the Documentation.

10.3.3. Components installed on any computer Hardware that is not supported by the Company.

10.3.4. Components not purchased from the Company.

10.3.5. The System, or any portion thereof (including Hardware), was subjected to unusual physical or electrical stress, misuse, negligence, accident, or used in hazardous activities.

10.3.6. The System, or any portion thereof (including Hardware), was used or operated by untrained, End User personnel.

10.4. In addition to all other exclusions in Section 10 and this SLA, the Company shall have no obligation to support the End User or provide maintenance if:

10.4.1. Payment in full for support and maintenance, as agreed under the Agreement, has not been received by the Company; or

10.4.2. The Warranty Period has expired without renewal of an additional annual support term; or

18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

10.4.3.The End-User does not fulfill its obligations under this SLA and/or the Agreement.

11. **End of Life**

11.1.The Company may provide a ninety (90) day prior written notice to the End User, specifying the date on which the version of the System shall expire (the **"End-of-Life Notice"** and **"End of life Date"** respectively), provided however, that (a) the End-of-Life Notice shall not be provided prior to the lapse of twelve (12) months following the Effective Date (as defined in the Agreement); and (b) the version of the System used by the End User is not the most updated version.

11.2.Upon the receipt of an End-of-Life Notice and at any time prior to the End-of-Life Date, if the End User has purchased Support Services (as defined in the Agreement), it shall receive an upgrade to the most updated version of the System.

11.3.If the End User has not purchased Support Services, then it may elect to either: (i) upgrade the System (such that it will include the then most current version of the System), by paying the applicable Support Service Consideration and the Support Service Supplement Consideration, as applicable (as such terms are defined in the Agreement); or (ii) maintain its then licensed version of the System in which case the License granted under the Agreement with respect to the System shall remain in effect for a period of six (6) months as of the End of life Date, and shall automatically terminate at the end of such period, such that the End User shall no longer be entitled to use the System. In such event the Company shall de-activate the System.

12. **Contact Information**

12.1.**Service Availability.** The technical support helpdesk is available 24 hours a day, 7 days a week via the following means:

12.2.**CRM tool / Web Portal.** Preferred way to contact the Company technical support center is by opening a ticket via the Company's dedicated web portal and CRM tool. CRM access is secured with a username and password provided by the Company.

12.3.**Email Support.** helpdesk@globalhelp.support

12.4.**Telephone Support.** +44 203 695 4101

12.1.All communications with the Company must be in English.

19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# APP. C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

              Plaintiffs,

      v.

NSO GROUP TECHNOLOGIES LIMITED, et al.,

              Defendants.

Case No. 19-cv-07123-PJH

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT, MOTION FOR SANCTIONS, AND DISCOVERY LETTER BRIEFS**

Re: Dkt. 381, 383, 387, 397, 401, 406, 408, 409, 411

Plaintiffs' motion for summary judgment, defendants' motion for summary judgment/motion to dismiss, and plaintiffs' motion for sanctions came on for hearing on November 7, 2024. Plaintiffs appeared through their counsel, Antonio Perez-Marques, Craig Cagney, Micah Block, Greg Andres, Gina Cora, and Luca Marzorati. Defendants appeared through their counsel, Joseph Akrotirianakis, Matthew Dawson, and Matthew Noller. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

On October 29, 2019, plaintiffs filed this lawsuit, alleging that defendants sent malware, using WhatsApp's system, to approximately 1,400 mobile phones and devices designed to infect those devices for the purpose of surveilling the users of those phones and devices. Dkt. 1, ¶ 1. The complaint alleges four causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) violation of the California

Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (3) breach of contract; and (4) trespass to chattels.

The court dismissed plaintiffs' fourth cause of action under Rule 12(b)(6), and no amended complaint was filed. See Dkt. 111. That leaves only the first three causes of action as operative claims in this case. The allegations underlying the complaint are set forth in detail in the court's previous order on defendants' motion to dismiss. See Dkt. 111. As relevant to this order, the parties' briefs further explain some technical details regarding the parties' respective technologies. To summarize, when users communicate via plaintiffs' software, plaintiffs use a "signaling server" to create an initial connection between two users, and then use a "relay server" to send the communication data between the parties.

Defendants' relevant software products, collectively referred to as "Pegasus," allow defendants' clients to use a modified version of the Whatsapp application – referred to as the "Whatsapp Installation Server," or "WIS. The WIS, among other things, allows defendants' clients to send "cipher" files with "installation vectors" that ultimately allow the clients to surveil target users. As mentioned above, plaintiffs allege that defendants' conduct was a violation of the CFAA, the CDAFA, and a breach of contract.

Plaintiffs now move for partial summary judgment seeking a finding of liability on all claims, leaving only the issue of damages for trial. Defendants move to dismiss or for summary judgment based on lack of personal jurisdiction and for partial summary judgment on the merits of the asserted claims. Plaintiffs also seek sanctions based on defendants' discovery conduct.

**DISCUSSION**

A.   Legal standard

1.   Motion for summary judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may

2

affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).

Courts recognize two ways for a moving defendant to show the absence of genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim and (2) identify the absence of evidence necessary for plaintiff to substantiate such claim.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.")

"Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists."  Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam).  "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."  Id.

The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  However, when a non-moving party fails to produce evidence rebutting defendants' showing, then an order for summary adjudication is proper.  Nissan Fire, 210 F.3d at 1103 ("If the nonmoving party

United States District Court
Northern District of California

fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."

### 2. Motion for sanctions

Federal Rule of Civil Procedure 37(b)(2)(A) provides for sanctions for not obeying a discovery order, specifically providing that "if a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders," including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," or "rendering a default judgment against the disobedient party."

## B. Legal analysis

The court will first address the threshold jurisdictional issue raised by defendants' motion, and will then address the merits of the three claims asserted by plaintiffs.

### 1. Personal jurisdiction

Defendants' summary judgment motion and their opposition to plaintiffs' motion both argue that the court lacks personal jurisdiction. As an initial matter, defendants' opposition to the sanctions motion also contains a single sentence (without elaboration or citation) stating that five cases were filed against defendants, four of which have been dismissed, three of which were for lack of personal jurisdiction and/or forum non conveniens. At the hearing, the court asked defendants for clarification as to which cases they were referring. Defendants identified a case in this district that was voluntarily dismissed by Apple (case no. 21-9078), as well as three other cases:

- Corallo v. NSO, N.D. Cal. (Seeborg, J.), case no. 22-5229, dismissed on September 30, 2024 based on lack of personal jurisdiction and/or forum non conveniens, as plaintiff was a native of Italy and citizen of the Netherlands who resided in St Maarten in the Caribbean at the time of the alleged attacks. ("Corallo is a foreign citizen suing other foreign citizens for conduct initiated from foreign locations. The litigation does not belong in the courts of this state.")

- Dada v. NSO, N.D. Cal. (Donato, J.), case no. 22-7513, dismissed on March 8,

1   2024 based on forum non conveniens, as plaintiffs were journalists for a

2   newspaper based in El Salvador. ("The nub of this case is entirely foreign, and

3   concerns the use of software produced in Israel to hack devices owned by a

4   Salvadoran news service and used by journalists in El Salvador. Every incident

5   described in the complaint involved Salvadoran journalists covering Salvadoran

6   news stories while working primarily in El Salvador.")

- Elatr Khashoggi v. NSO, E.D. Va., case no. 23-0779, dismissed on October 26,

7   2023 based on lack of personal jurisdiction, as plaintiff was a citizen of Egypt and

8   had not adequately alleged that she was in Virginia during the alleged attacks.

9

The key distinction in all of those cases appears to be the citizenship/residency of

10  the plaintiffs. In this case, defendants do not dispute that plaintiffs are citizens of the

11  United States and residents of this district, making the cited cases inapposite.

12

Turning to the merits of defendants' jurisdictional argument, as was laid out in the

13  court's previous order at the pleadings stage, personal jurisdiction can be established

14  through consent, or by either showing that defendants purposefully directed conduct at

15  the forum state, or that they purposefully availed themselves of the state's laws. See Dkt.

16  111 at 15-32. The court's previous order concluded that plaintiffs had adequately alleged

17  purposeful direction, see Dkt. 111 at 28, but defendants now argue that the allegations

18  are not supported by the evidence.

19

As to purposeful direction, the court's previous order went through the relevant

20  analysis, explaining that the test has three elements (1) defendants committed an

21  intentional act, (2) expressly aimed at the forum state, and (3) caused harm that the

22  defendant knew was likely to be suffered in the forum state. Dkt. 111 at 18 (citing Calder

23  v. Jones, 465 U.S. 783, 789-90 (1984)).

24

The key arguments – both then and now – go to the second element, express

25  aiming. Plaintiffs allege that defendants expressly aimed their conduct at plaintiffs'

26  servers, a significant number of which are in California. Defendants now argue that,

27  while the court was obligated to accept that allegation as true at the pleadings stage,

28

United States District Court
Northern District of California

1   discovery has shown that none of plaintiffs' signaling servers are in California and only

2   some of their relay servers are in California, and more importantly, the choice of which

3   server to use was made by plaintiffs, and thus defendants could not have engaged in any

4   express aiming of servers.

5       Plaintiffs argue that, because defendants did not produce Pegasus code, there is

6   no way of confirming exactly how the WIS chose which server to use.  Defendants self-

7   servingly claim that the WIS functioned in the same way as the official Whatsapp client,

8   but there is no evidence to support that claim.  Plaintiffs also argue that, even if the WIS

9   did indeed function in the same way, that was still an intentional choice made by

10  defendants.  See Dkt. 418-3 at 15-16.

11      The limited evidentiary record before the court does show that defendants'

12  Pegasus code was sent through plaintiffs' California-based servers 43 times during the

13  relevant time period in May 2019.  See, e.g., Dkt. 418-3 at 13.  The evidence before the

14  court is consistent with the court's earlier conclusion, at the pleading stage, that

15  defendants "caused a digital transmission to enter California, which then effectuated a

16  breaking and entering of a server in California." See Dkt. 111 at 23.  Accordingly, the

17  court finds that the evidentiary record supports the conclusion that defendants are subject

18  to personal jurisdiction in this district.

19      Because plaintiffs' argument also implicates defendants' discovery conduct, the

20  court will now address plaintiffs' motion for sanctions.

21      2.      Motion for sanctions

22      The crux of plaintiffs' sanctions motion is that defendants have failed to produce

23  Pegasus source code in a manner that can be used in this litigation, failed to produce

24  internal communications (i.e., email), and wrongfully imposed temporal limitations on their

25  production/testimony.  Plaintiffs ask for terminating sanctions, or in the alternative,

26  evidentiary sanctions.

27      With regard to the Pegasus source code, plaintiffs point out the history of the

28  court's orders regarding defendants' discovery obligations.  In November 2023, the court

1   issued an order balancing (under <u>Richmark</u>) defendants' discovery obligations with its

2   need to comply with Israeli government restrictions, and concluded that defendants would

3   not be entirely excused from discovery, and instead would be required to produce

4   information that was "sufficiently specific and important to the asserted claims in this

5   case." Dkt. 233 at 9.

6       In February 2024, the court considered specific discovery disputes between the

7   parties, one of which involved defendants' argument that they were required to produce

8   only the "installation layer" of the source code, showing how Pegasus was installed on

9   the target users' devices. The court rejected that argument, because "the complaint

10  contains numerous instances alleging not only that spyware was <u>installed</u> on users'

11  devices, but also that information was <u>accessed</u> and/or <u>extracted</u> from those devices."

12  Dkt. 292 at 4 (emphasis added). Accordingly, the court held that defendants "must

13  produce information concerning the full functionality of the relevant spyware." <u>Id.</u> The

14  court went on to say:

15      Defendants' proposal of producing information showing the functionality of
        only the installation layer of the relevant spyware would not allow plaintiffs
16      to understand how the relevant spyware performs the functions of
        accessing and extracting data, and thus, the court directs defendants to
17      provide information sufficient to show the full functionality of all relevant
        spyware. Under <u>Richmark</u>, that information is sufficiently important and
18      specific such that compliance with discovery obligations may not be
        excused.
19

20      <u>Id.</u> at 4-5.

21      Then, a few months later, plaintiffs moved to compel production of one of

22  defendants' computer servers containing Pegasus source code (referred to as the "AWS"

23  (Amazon web services) server). Defendants claimed that production was not warranted,

24  arguing that the court never technically used the word "granted" in its previous order with

25  respect to the Pegasus code. Defendants argued that they were prepared to file a

26  motion for reconsideration/clarification to pursue their argument that production of source

27  code was not actually required. The court instead issued an order granting plaintiffs'

28  motion to compel the AWS server and "clarify[ing] that the previous order's reference to

'full functionality' was indeed intended to require NSO to produce Pegasus computer code." Dkt. 358 at 5-6. The court then further clarified:

> Accordingly, the court now clarifies that its previous order, dated February 23, 2024, should be read to encompass Pegasus computer code, as well as code that shows the full functionality of any other "relevant spyware." To the extent that information on the AWS server as of November 2020, and which has since been moved to a different server, reflects such computer code, the court orders production of that code under Richmark, as the information is sufficiently important and specific to require production despite the existence of foreign legal restrictions. To be clear, the court is not rebalancing the Richmark factors on this motion, it is simply reiterating the balance that was struck in the previous order. The information showing the full picture of how Pegasus functions – which squarely includes Pegasus computer code – is discoverable under Richmark despite the various restrictions that have been cited.

Id. at 6.

Plaintiffs now argue that defendants have produced Pegasus code in a manner that is unusable in this litigation, as it is viewable only by Israeli citizens while in Israel. And even that production is limited to Pegasus code that was on the one specific AWS server mentioned above, rather than the full set of Pegasus code that would show its full functionality. Plaintiffs cite cases from this district and C.D. Cal. holding that production of source code in a foreign country or "distant" or "relatively inaccessible" location was not compliant with the federal rules. See Dkt. 405 at 19-20 (citing Rambus v. Hynix, 2007 WL 9653194 (N.D. Cal. 2007); Satya v. Martin, 2019 WL 666722 (N.D. Cal. 2019); InTouch Techs. v. VGO, 2012 WL 7783405 (C.D. Cal. 2012)).

Beyond source code, plaintiffs also argue that defendants refused to produce internal communications, including communications about Whatsapp vulnerabilities and about NSO's interactions with the US company Westbridge. Plaintiffs also argue that defendants refused to produce key financial information and refused to answer certain deposition questions.

As mentioned above, plaintiffs ask for terminating sanctions, and alternatively ask for evidentiary sanctions on the following topics: (1) targeting of plaintiffs' California-based servers, (2) location of third-party servers, (3) relationship with Westbridge, (4) use

of Pegasus by NSO's customers, as well as "additional issues to be determined."

Defendants' opposition makes a number of different arguments, including an argument that the court never ordered them to produce any Pegasus source code beyond what was on the AWS server.  See, e.g., Dkt. 429-2 at 8, 17-18.

Defendants also argue that production of the AWS server in Israel is fully compliant with discovery obligations, as plaintiffs could either use Israeli counsel to view the code, or they could seek an export license from the Israeli government to use the code in the US.

Overall, the court concludes that defendants have repeatedly failed to produce relevant discovery and failed to obey court orders regarding such discovery.  Most significant is the Pegasus source code, and defendants' position that their production obligations were limited to only the code on the AWS server is a position that the court cannot see as reasonable given the history and context of the case.  Moreover, defendants' limitation of its production such that it is viewable only by Israeli citizens present in Israel is simply impracticable for a lawsuit that is to be litigated in this district.

Accordingly, the court concludes that plaintiffs' motion for sanctions must be GRANTED.  And while the court concludes that terminating sanctions may be reasonably warranted given that defendants' discovery non-compliance goes to the key facts at issue in this case, the court prefers not to issue such a harsh sanction where lesser ones are available.  Thus, the court will impose evidentiary sanctions when appropriate, but will only address the issue of terminating sanctions if plaintiffs are unable to establish their claims in their absence.

The first topic of possible evidentiary sanctions, mentioned above, is defendants' alleged targeting of plaintiffs' California-based servers.  The court concludes that, because defendants did not produce Pegasus code in a way that was meaningfully accessible to plaintiffs or to the court, plaintiffs were unable to obtain detailed evidence of how the WIS chose which server(s) to use, and thus, an evidentiary sanction is warranted such that the court will conclude that the use of plaintiffs' California-based servers was a

United States District Court
Northern District of California

United States District Court
Northern District of California

purposeful choice made by defendants.  Accordingly, the court reiterates its previous conclusion that the record supports a finding that defendants are subject to personal jurisdiction in this district.

        3.     Merits of the asserted claims

     As mentioned above, plaintiffs assert claims for violation of the CFAA, for violation of the CDAFA, and for breach of contract.

          a.    CFAA

     As to the CFAA, plaintiffs allege that defendants violated sections (a)(2) and (a)(4), and also conspired with their clients in violation of section (b).  The relevant provisions are as follows:

    (a) Whoever—
        …
        (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

            (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

            (B) information from any department or agency of the United States; or

            (C) information from any protected computer;
        …

        (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.
        …

    (b) Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030.

Plaintiffs' motion also argues that defendants have violated section (a)(6), which prohibits trafficking in password-like information, but they acknowledge that they did not plead section (a)(6).  See Dkt. 399-2 at 30, n. 10.  Because any claim under section (a)(6) was not pled in the complaint, the court will not consider it now.

The first big dispute on the CFAA, briefly alluded to above, is that plaintiffs now seek to proceed under either a "without authorization" or "exceeds authorization" theory, even though the court's previous order limited them to the "exceeds authorization" theory.  See Dkt. 111 at 35-39.  The court reasoned that, because all Whatsapp users are authorized to send messages, defendants did not act without authorization by sending their messages, even though the messages contained spyware.  Instead, the court held that the complaint's allegations supported only an "exceeds authorization" theory.

The nub of the fight here is semantic.  Essentially, the issue is whether sending the Pegasus installation vector actually did exceed authorized access.  Defendants argue that it passed through the Whatsapp servers just like any other message would, and that any information that was 'obtained' was obtained from the target users' devices (i.e., their cell phones), rather than from the Whatsapp servers themselves.  (Defendants also argue that any 'obtaining' was done by their government clients, rather than by defendants, but that's a separate argument – and in the court's view, fully addressed by section (b) which assigns liability to co-conspirators).

Defendants point to the statutory definitions set forth in § 1030(e)(6), specifically the definition of "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  Defendants argue that the definition shows that the alleged violator must "obtain or alter" information from the same computer that he "access[es]," as shown by the language "the computer."

For their part, plaintiffs point to section (a)(2) itself, which imposes liability on whoever "accesses a computer" in excess of authorized access, and "thereby obtains information from any protected computer," pointing to the word "any."

11

United States District Court
Northern District of California

1    Neither party cites any case law, either controlling or even persuasive, with a

2 definitive answer to this statutory interpretation question.  Plaintiffs, relying on section

3 (a)(2)(C), argue that liability is present if defendants obtain information from any

4 computer, i.e., either from Whatsapp servers or from the target users' devices directly.

5 Defendants, pointing to section (e)(6), argue that any information was obtained from the

6 target users, not from Whatsapp's servers, and thus the CFAA does not apply.

7    However, the court need not resolve this statutory interpretation question in order

8 to rule on the summary judgment motions.  As the parties clarified at the hearing, while

9 the WIS does obtain information directly from the target users' devices, it also obtains

10 information about the target users' device via the Whatsapp servers.  See Dkt. 464 at 44

11 ("before Pegasus is on the device, in the process of getting the Pegasus agent installed

12 on the target device, there is a whole lot of signaling that goes on. . . . They had to

13 fingerprint the device which used a pretty sophisticated set of messaging to get

14 information back to the WIS via the Whatsapp servers about the precise operating

15 system and memory structure of the [target] phone."); see also Dkt. 399-2 at 27 ("NSO

16 also obtained information via the Whatsapp servers from the target device, such as the

17 structure of its operating system and the location of crucial memory files, which a regular

18 Whatsapp user using the Whatsapp client app cannot obtain.").

19    The analysis for section (a)(4) is largely the same, as it uses the same statutory

20 definition found in section (e)(6).  Plaintiffs argue that the information's value is

21 established by defendants' clients' willingness to pay for Pegasus.  Defendants challenge

22 the mens rea showing for the 'intent to defraud' (as well as the 'intent' requirement of

23 section (a)(2)), but the fact that defendants redesigned Pegasus to evade detection after

24 plaintiffs first fixed the security breach is enough to prove intent.

25    Thus, the court GRANTS summary judgment in plaintiffs' favor on the CFAA claim

26 under both section (a)(2) and (a)(4), on the theory that defendants exceeded their

27 authorization.  Defendants appear to fully acknowledge that the WIS sent messages

28 through Whatsapp servers that caused Pegasus to be installed on target users' devices,

1    and that the WIS was then able to obtain protected information by having it sent from the

2    target users, through the Whatapp servers, and back to the WIS.  Defendants' only

3    arguments go to statutory interpretation (addressed above), and their delegation of

4    Pegasus operation to their clients (addressed by § 1030(b)).  The court need not address

5    plaintiffs' alternative argument, that defendants acted without authorization.

6                    b.      CDAFA

7            The CDAFA is the state-law equivalent of the CFAA, with the additional

8    requirement that a computer be unlawfully accessed in California.  See, e.g., Meta

9    Platforms, Inc. v. BrandTotal Ltd., 605 F.Supp.3d 1218, 1260 (N.D. Cal. 2022).  In the

10   court's view, plaintiffs' evidence regarding California relay servers is sufficient, even

11   without more, and to the extent the statute requires an intent to target a California server,

12   the outcome is the same as it was with respect to the jurisdictional analysis – because

13   defendants' failure to produce Pegasus source code is at least one reason why there is

14   no evidence of exactly how the WIS chose servers, an evidentiary sanction is appropriate

15   to conclude that the WIS did indeed target California servers.  Thus, the court concludes

16   that summary judgment must be GRANTED on the CDAFA claim for the same reasons

17   as the CFAA claim.

18                    c.      Breach of contract

19           The elements of a breach of contract claim are (1) the existence of a contract, (2)

20   plaintiff's performance or excused non-performance, (3) defendant's breach, and (4)

21   resulting damages.  See, e.g., EDC Techs. v. Seidel, 216 F.Supp.3d 1012, 1015 (N.D.

22   Cal. 2016).

23           As mentioned above, the breach of contract claim is based on violation of the

24   terms of service, specifically the provisions prohibiting users from "reverse engineering"

25   or "decompiling" Whatsapp products, from sending "harmful code" through Whatsapp,

26   and from collecting user information, from accessing or attempting to access Whatsapp

27   without authorization, and from using Whatsapp for illegal purposes.

28           Defendants argue that no contract exists because there is no evidence that they

United States District Court
Northern District of California

13

1    agreed to the terms of service.  However, defendants cannot meaningfully dispute that

2    agreeing to the terms of service was necessary to create a Whatsapp account and to use

3    Whatsapp, and moreover, defendants have refused to produce information about the

4    phones that were used to create Whatsapp accounts on defendants' behalf.  <u>See</u> Dkt.

5    408.  Based on controlling Ninth Circuit case law regarding agreement to terms of

6    service, the court concludes that a contract was indeed formed between plaintiffs and

7    defendants.  <u>See, e.g.</u>, <u>Laatz v. Zazzle, Inc.</u>, 2024 WL 377970 at *7 (N.D. Cal. Jan. 9,

8    2024); <u>Sellers v. JustAnswer LLC</u>, 73 Cal.App.5th 444, 472 (2021).

9         Defendants do not dispute that plaintiffs performed their obligations under the

10   contract.  That leaves the last two elements, breach and damages.

11        NSO offers only about two pages of opposition regarding breach.  First, they argue

12   that plaintiffs cannot prove when they reverse-engineered or decompiled the Whatsapp

13   program, and therefore it could have been done before any agreement to the terms of

14   service.  But as plaintiffs point out, they offer no evidence as to when they did such

15   reverse-engineering or decompiling.

16        Next, defendants argue that Pegasus was operated by their clients, and thus

17   defendants did not collect any information.  Defendants further argue that terms such as

18   'illegal,' 'unauthorized,' and 'harmful' as used in the terms of service are vague and

19   ambiguous.  Finally, defendants argue that plaintiffs waived those contractual provisions

20   by failing to enforce them against any other users.  <u>See</u> Dkt. 419-2 at 15-17.

21        The court finds no merit in the arguments raised by defendants.  Defendants do

22   not dispute that they must have reverse-engineered and/or decompiled the Whatsapp

23   software in order to develop the WIS, but simply raise the possibility that they did so

24   before agreeing to the terms of service.  However, as discussed above, defendants have

25   withheld evidence regarding their agreement to the terms of service.  Moreover, common

26   sense dictates that defendants must have first gained access to the Whatsapp software

27   before reverse-engineering and/or decompiling it, and they offer no plausible explanation

28   for how they could have gained access to the software without agreeing to the terms of

United States District Court
Northern District of California

14

service.  Accordingly, the court concludes that plaintiffs have sufficiently established breach.

Finally, as to damages, defendants do not dispute that plaintiffs incurred costs investigating and remediating defendants' breaches, which are sufficient to establish the fourth and final element of a breach of contract claim.  Accordingly, the court GRANTS summary judgment on plaintiffs' claim for breach of contract.

### 4.    Discovery letter briefs

For the reasons set forth above, the court concludes that summary judgment is warranted even without resolving the disputes raised by the parties' various discovery letter briefs.  Thus, the discovery letter briefs (Dkt. 381, 383, 387, 408, 409, 411) are all DENIED as moot, as is the related motion for clarification (Dkt. 404).

### 5.    Motions to seal

At the hearing, the court stated to the parties that it would not seal the material in the parties' briefs, and directed the parties to file unredacted versions of the briefs on the public docket.  See Dkt. 464 at 5-6, 94.  The parties have since filed unredacted versions of the summary judgment briefs, and have filed briefs on the sanctions motion with limited redactions, with plaintiffs having filed a narrowed motion to seal based on defendants' confidentiality designations.  See Dkt. 471.

In light of the court's decision not to seal the summary judgment briefs, the parties are now directed to meet and confer with the purpose of filing an omnibus motion to seal that would cover all material sought to be sealed in the exhibits and declarations in connection with the summary judgment motions.  The parties shall have until **January 17, 2025** to file the omnibus sealing motion.  Any opposition shall be filed by **January 24, 2025**.

The motion to seal the limited material in the briefing on the motion for sanctions (Dkt. 471) is GRANTED.  For the exhibits and declarations filed in connection with the sanctions motion, the parties are similarly directed to meet and confer and to file an omnibus motion with the same briefing schedule as above.

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for partial summary judgment is GRANTED, defendants' motion for summary judgment is DENIED, and plaintiffs' motion for sanctions is GRANTED in part and DENIED in part.

Because this order resolves all issues regarding liability, a trial will proceed only on the issue of damages. The parties have already filed motions related to their experts – specifically, a motion to substitute and a motion to strike – the parties are directed to meet and confer to determine if any expert-related motions are mooted by this order, and to notify the court by **January 17, 2025** which, if any, expert-related motions need to be resolved by the court prior to the trial on damages.

**IT IS SO ORDERED.**

Dated:  December 20, 2024

_____/s/ _Phyllis J. Hamilton_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

# APP. D

1

2          UNITED STATES DISTRICT COURT

3          NORTHERN DISTRICT OF CALIFORNIA

4

5    WHATSAPP INC., et al.,
                                                    Case No. 19-cv-07123-PJH
6                    Plaintiffs,

7          v.                                       **ORDER RE MOTION FOR
                                                    PERMANENT INJUNCTION, MOTION
8    NSO GROUP TECHNOLOGIES                          FOR REMITTITUR OR NEW TRIAL,
     LIMITED, et al.,                               AND MOTION TO SEAL**
9                    Defendants.
                                                    Re: Dkt. 558, 747, 790, 791, 797
10

11

12          Plaintiffs' motion for permanent injunction and defendants' motion for a remittitur or

13   a new trial came on for hearing on August 28, 2025.  Plaintiffs appeared through their

14   counsel, Greg Andres, Antonio Perez-Marques, Luca Marzorati, and Micah Block.

15   Defendants appeared through their counsel, Joseph Akrotirianakis, Aaron Craig, Matthew

16   Noller, and Matthew Dawson.  Having read the papers filed by the parties and carefully

17   considered their arguments and relevant authority, and good cause appearing, the court

18   hereby rules as follows.

19                                      **BACKGROUND**

20          The facts underlying this lawsuit have been presented in numerous previous

21   orders, including this court's order granting partial summary judgment on the issue of

22   liability.  See Dkt. 494.  In short, the court granted partial summary judgment in favor of

23   plaintiffs under the Computer Fraud and Abuse Act ("CFAA") and the California

24   Comprehensive Computer Data Access and Fraud Act ("CDAFA"), as well as for breach

25   of contract.  The evidence showed that defendants reverse-engineered Whatsapp's code

26   to create a modified version of the Whatsapp client application, which they then used to

27   install their software on target users' devices via WhatsApp's servers.  The evidence

28

1   further showed that defendants repeatedly re-designed their software to avoid detection

2   and circumvent plaintiffs' security fixes.  See id.

3        After summary judgment, the court conducted a damages-only trial, in which a jury

4   unanimously awarded plaintiffs the full amount of $444,719 they sought in compensatory

5   damages.  The jury also found that defendants acted with malice, oppression, or fraud,

6   and awarded plaintiffs $167,254,000 in punitive damages.  See Dkt. 736.

7        After trial, the court scheduled an evidentiary hearing on plaintiffs' motion for

8   permanent injunction.  Defendants filed a motion for new trial on the issue of punitive

9   damages, which the court set for hearing on the same day as the evidentiary hearing

10  regarding the injunction motion.

11       Before the hearing, defendants also filed a motion to strike to preclude plaintiffs'

12  witnesses from testifying, on the basis that they had not been properly disclosed.  See

13  Dkt. 770.  After allowing both parties to file briefs on the issue, the court denied the

14  motion, concluding that any imperfect disclosure could be remedied by cross-examination

15  at the hearing and, if necessary, by allowing defendants to depose the challenged

16  witnesses either before or after the hearing.  See Dkt. 781.  At the hearing defendants

17  advised that they had not taken the witnesses' depositions beforehand, but would depose

18  them after the hearing and file supplemental briefing.  They also declined to cross-

19  examine the witnesses at the hearing because they needed document discovery before

20  meaningful depositions could be conducted.  Accordingly, the court heard only direct

21  testimony from plaintiffs' challenged witnesses at the hearing, who testified that

22  defendants continue to collect users' messages through Whatsapp and have been

23  observed using Whatsapp as part of their research and development activities as recently

24  as April 2025.  Notwithstanding this testimony, plaintiffs argued, as they had in the past,

25  that this additional testimony was really unnecessary to support their request for an

26  injunction, as the record contained ample justification for injunctive relief.

27       After hearing much of the evidence, the court expressed surprise at how "most of

28  the factual matters that have been brought forth today are matters about which I read

United States District Court
Northern District of California

2

over and over about in this case," and that "there's really nothing new, nothing that's materially new, that will affect the outcome of this case." See Dkt. 795 at 132. In that sense, the court agrees with the argument made by plaintiffs and by defendants' counsel in their reply brief, that "Pegasus's collection of WhatsApp messages is not a new fact, because all the documentary information produced by Defendants about the functionality of Pegasus touts this as a key feature, and Defendants have never stated or suggested that Pegasus ever stopped collecting WhatsApp messages." Dkt. 779 at 4. Indeed, as will be discussed in further detail below, many of the material facts in this case are undisputed – it is the legal significance of those facts that the parties dispute.

Thus, having determined that the testimony presented by plaintiffs' witnesses (namely, Andrew Blaich and Lander Brandt) at the evidentiary hearing was cumulative in nature, and in order to avoid reopening discovery to permit defendants to effectively depose witnesses not previously deposed, the court hereby STRIKES their testimony from the record. Defendants' counsel confirmed at the hearing that, if the court were to disregard the testimony of plaintiffs' witnesses, there would be no need for further discovery from the witnesses. See Dkt. 795 at 138-39.

Accordingly, the court will now address plaintiffs' motion for permanent injunction on the basis of the factual record presented up to and including trial, as well as defendants' expert witness Joshua Minkler, who testified at the evidentiary hearing. The court will then address defendants' motion for a new trial on the issue of punitive damages.

**DISCUSSION**

Motion for Permanent Injunction

A.    Legal Standard

The CFAA provides that "any person who suffers damage or loss" under the statute can obtain "injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The CDAFA also provides for injunctive or other equitable relief. See Cal. Penal Code § 502(e)(1).

1    A plaintiff seeking a permanent injunction must satisfy a four-factor test before a

2    court may grant such relief, and is required to show the following: (1) that it has suffered

3    an irreparable injury; (2) that remedies available at law, such as monetary damages, are

4    inadequate to compensate for that injury; (3) that, considering the balance of hardships

5    between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

6    public interest would not be disserved by a permanent injunction.  eBay v.

7    MercExchange, 547 U.S. 388 (2006).

8    B.    Analysis

9         1.    Irreparable Injury

10   Plaintiffs argue that their "most important" purpose in this litigation is "protecting

11   WhatsApp's platforms, servers, and users."  Dkt. 795 at 143:4-5.  Plaintiffs assert that

12   "NSO admits that to this day they continue collecting WhatsApp messages, that that is

13   something that cannot be accomplished without accessing parts of the devices and parts

14   of the WhatsApp software that are not accessible to normal users."  Id. at 14:6-10.

15   As a general matter, "[n]umerous courts have found that unauthorized access of

16   computers and the acquisition of data in violation of the CFAA constitute irreparable

17   harm."  See Facebook, Inc. v. Power Ventures, Inc., 252 F.Supp.2d 765, 782 (N.D. Cal.

18   2017) (internal citations omitted).

19   The Power Ventures case involved a claim that the defendant had used

20   Facebook's proprietary data without permission by "inducing Facebook users to provide

21   their login information and then using that information to 'scrape' Facebook's proprietary

22   material" and display it on Power Ventures' own website.  See 252 F.Supp.2d at 768-69.

23   The district court concluded that Facebook had shown irreparable harm because

24   "in accessing Facebook's computers without authorization, defendants have interfered

25   with and acquired data to which the defendants have no lawful right" in violation of the

26   CFAA and CDAFA.  See Power Ventures at 782.

27   The district court further concluded that "unless the court issues a permanent

28   injunction, it is very likely that Facebook will suffer irreparable harm again," because

4

1    defendants' "bad faith conduct" indicated that "they will not easily be deterred from

2    attempting to access Facebook's servers without authorization in violation of the CFAA"

3    and CDAFA.  Power Ventures at 782.

4            The Power Ventures injunction was affirmed by the Ninth Circuit; though, as

5    defendants point out, the Ninth Circuit did not issue a detailed opinion on the case.  844

6    F.3d 1058 (9th Cir. 2016).  However, the Ninth Circuit did cite and discuss Power

7    Ventures with approval in a subsequent case in which it distinguished the "user data that

8    was protected by Facebook's username and password authentication system" in Power

9    Ventures from data that "was available to anyone with a web browser."  See hiQ Labs,

10   Inc. v. LinkedIn Corp., 31 F.4th 1180, 1199 (9th Cir. 2022).

11           The unlawfully-accessed data in this case was not only protected with a username

12   and password authentication system, but further protected by Whatsapp's end-to-end

13   encryption.  See Dkt. 795 at 86:16-19.  Thus, in that sense, the injury in this case is even

14   greater than in Power Ventures – because in addition to accessing plaintiffs' proprietary

15   data and servers, defendants' access also prevents plaintiffs from delivering privacy and

16   security to its users.  As plaintiffs' counsel argued, "the expectation of privacy of users of

17   the service is frustrated by bad actors like NSO who seek to collect messages that they're

18   not entitled to."  Dkt. 795 at 156:11-13.

19           Plaintiffs further argue that, as in Power Ventures, the defendants in this case

20   have exhibited "bad faith conduct" indicating that "they will not easily be deterred from

21   attempting to access [plaintiffs'] servers without authorization."  See 252 F.Supp.3d at

22   782.  As plaintiffs argue, the "central issue here and the reason that an injunction is so

23   important is because the risk of future harm is so clear," as defendants "have already

24   demonstrated and admitted a pattern of conduct whereby, when they were stopped from

25   engaging in this conduct, they sought to resume it."  Dkt. 795 at 143:7-12.

26           Plaintiffs argue that, absent an injunction, defendants would be "like a safecracker

27   who still has all his tools.  And they still have every economic and commercial incentive to

28   target WhatsApp again."  Dkt. 795 at 153:2-6.  Plaintiffs point out that "[b]y their own

United States District Court
Northern District of California

5

estimation, they engaged in these violations tens of -- up to tens of thousands of times,"
and "three different vectors [] were used, and each time one was stopped, either because
we detected it or just because we changed our software in a way that frustrated it, they
came back and they did it again."  Id. at 148:11-17.  "They were undeterred by our
security measures. They were undeterred by their knowledge that WhatsApp did not want
this conduct and would stop it if it was detected, and they were undeterred even by the
filing of this lawsuit."  Id. at 148:10-21.

Finally, plaintiffs argue that "the nature of their violations, including through the
reverse engineering of this software, subjects us to an ongoing risk."  Dkt. 795 at 155:14-
16.  Specifically, plaintiffs argue that defendants "have learned something that they
weren't entitled to know, and it's information that they continue to possess that puts us at
a risk of continued attacks."  Id. at 155:17-19.

Indeed, the prospect of future harm is directly relevant to the irreparable injury
inquiry.  See, e.g., Y.Y.G.M. SA v. Redbubble, Inc., 75 F.4th 995, 1007 (9th Cir. 2023).
And plaintiffs point to defendants' own testimony as evidence that the harm is ongoing.

In August 2024, NSO's CEO Yaron Shohat testified that defendants "have
installation vectors for Pegasus today."  Dkt. 399-4, Ex. 10 at 49.

In September 2024, NSO's vice-president of research and development Tamir
Gazneli testified that Pegasus was still capable of obtaining "unlimited access to targets'
mobile devices" and "remotely and covertly collect[ing] information about a target's
relationships, locations, phone calls, plans and activities," and could also "activate the
microphone to listen in on a target's environment" and "turn on the camera to take
snapshots and take screenshots."  Dkt. 399-4, Ex. 6 at 109.  When asked to clarify
whether defendants still invested efforts in circumventing Whatsapp's security measures,
Gazneli answered "this is our business."  Id. at 266.

The latter statement is similar to that of the Power Ventures defendants, who
responded to the plaintiffs' cease-and-desist letter with a statement that it had "made the
business decision to not prevent the interruption of service to our millions of users."  252

F.Supp.3d at 782.

Defendants' own statements in their opposition brief lead to the same conclusion that plaintiffs face the risk of ongoing harm.  Defendants argue that the requested injunction "would put NSO's entire enterprise at risk" and "force NSO out of business," as "Pegasus is NSO's flagship product."  See Dkt. 759-2 at 21.  And as quoted above, defendants' counsel expressly acknowledged that "Pegasus's collection of WhatsApp messages is not a new fact, because all the documentary information produced by Defendants about the functionality of Pegasus touts this as a key feature, and Defendants have never stated or suggested that Pegasus ever stopped collecting WhatsApp messages." Dkt. 779 at 4.

In other words, while the parties dispute whether plaintiffs have actually been harmed, they do not dispute that any such harm is ongoing.  In defendants' view, because their software purportedly no longer uses Whatsapp servers as an installation vector, their conduct – though ongoing – is legal and not harmful.  As an initial matter, the court agrees with plaintiffs that, "by not telling us how they're collecting WhatsApp messages - the burden is improperly put on the plaintiffs to try to figure out how they're doing it and whether they're accessing our servers, something that they've admitted they tried to conceal when they did it in the past."  See Dkt. 795 at 168:9-13.  But in addition, plaintiffs are harmed not only when their servers are improperly accessed, but also when they are not able to offer the end-to-end encryption that they have promised their users.  See id. at 156:11-13 ("the expectation of privacy of users of the service is frustrated by bad actors like NSO who seek to collect messages that they're not entitled to.").

Defendants argue that plaintiffs are improperly seeking to establish irreparable injury by pointing to harms suffered by the users, rather than to harms suffered by plaintiffs themselves.  Defendants argue that the court previously held that any harm to users was outside the scope of this case.  See, e.g., Dkt. 747 at 11 ("This court held before trial . . . that the only relevant conduct was NSO's use of Whatsapp servers, not the downstream use of Pegasus on target user devices.").  However, defendants'

United States District Court
Northern District of California

United States District Court
Northern District of California

1   argument reaches too far. While the court did indeed exclude "evidence of the identities

2   and occupations of the ~1,400 targets" from the trial (see Dkt. 686 at 9), that ruling simply

3   prevented the jury from considering targets' status as journalists, activists, etc. when

4   deciding the issue of damages – it was not a ruling that the existence of the users and

5   their data are completely irrelevant for all purposes. See also Dkt. 358 at 3 ("Because

6   NSO has not made even an initial showing that the [law enforcement] exception [to the

7   CFAA] applies to any of the alleged victims in this case, the court concludes that the

8   discovery sought in relation to those alleged victims would be disproportionate to the

9   needs of the case.").

10       Consistent with its earlier rulings, the court is not considering the evidence that

11   certain targets were members of 'civil society' – to the contrary, the court approaches this

12   analysis as if the targets were ~1,400 individuals about whom nothing is known. And in

13   this scenario, where ~1,400 individuals' data was unlawfully accessed, and where

14   Whatsapp has over 3 billion users to whom privacy and security were promised in the

15   form of end-to-end encryption, the court concludes that such unlawful access does

16   indeed constitute an irreparable injury to Whatsapp.

17       The idea of a business offering technological privacy as a service is a relatively

18   new one, as evidenced by defendants' expert's discussion of the recent proliferation in

19   end-to-end encryption technology. Plaintiffs appear to have made such encryption, and

20   the privacy and security that it entails, a significant part of its pitch to users, making it

21   reasonable to conclude that users would be dissuaded from using Whatsapp if its

22   encryption were ineffective.

23       And while it is true that the court's consideration of liability and damages was

24   based on NSO's accessing of Whatsapp's servers, the ultimate purpose of defendants'

25   actions was to obtain data from the target users. Accordingly, when considering the

26   issue of a forward-looking injunction, the court may consider the nature of any

27   prospective harm, and how/whether that harm would affect plaintiffs. In other words,

28   when deciding whether to issue an injunction, the court may consider ways in which

8

1   plaintiffs have been harmed in the past or will be harmed in the future, which is a different

2   standard than was applicable when considering the issue of compensatory and punitive

3   damages.

4          In the court's view, any business that deals with users' personal information, and

5   that invests resources into ways to encrypt that personal information, is harmed by the

6   unauthorized access of that personal information – and it is more than just a reputational

7   harm, it's a business harm.  Essentially, part of what companies such as Whatsapp are

8   'selling' is informational privacy, and any unauthorized access is an interference with that

9   sale.  Defendants' conduct serves to defeat one of the purposes of the service being

10  offered by plaintiffs, which constitutes direct harm.

11         Defendants argue that any finding of irreparable injury must be "grounded in []

12  evidence" specific to each case, rather than "cursory and conclusory."  Herb Reed

13  Enters., LLC v. Florida Ent. Mgmt., 736 F.3d 1239, 1250 (9th Cir. 2013).  The court

14  agrees, and places emphasis on the covert, undetectable nature of defendants'

15  technology, as well as the repeated efforts to circumvent plaintiffs' security measures, as

16  described above.

17         Plaintiffs have presented evidence regarding the "zero-click" nature of Pegasus, as

18  well as the specific steps that defendants took to evade detection.  See, e.g., Dkt. 557-3

19  at 21-22.  Given the multiple design-arounds, the covert nature of NSO's work, and the

20  designed undetectability of Pegasus itself, plaintiffs are unable to anticipate all the ways

21  that defendants can access their platform, which is why they seek a broad injunction.  As

22  plaintiffs argue, "reverse engineering[1] is how they developed the exploit that was able to

23  attack our servers," and that "the reason that they were hacking the servers was to get

24  access to the messages."  See Dkt. 795 at 165:2-8.  In the court's view, this is the

25  evidence that grounds the finding of irreparable injury in this case, and keeps any

26  _____

27  [1] While reverse engineering is not expressly covered by the CFAA, the fact that
    defendants breached Whatsapp's terms of service by doing so is a fact that informs the
28  court's understanding of the risk of ongoing harm and the scope of any injunction needed
    to prevent such harm.

United States District Court
Northern District of California

United States District Court
Northern District of California

findings from being "cursory and conclusory."  Defendants reverse engineered plaintiffs' code to evade detection and to defeat encryption, and infected the target users' devices with spyware that no one wanted or expected.  Defendants' arguments seem to presume the "right" to use Whatsapp for their intended purposes, notwithstanding the fact that neither Whatsapp nor the users invited or wanted NSO's software on their devices

This specific evidence regarding the undetectable nature of defendants' technology also shows the difficulty of preventing or mitigating such harm.  See also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F.Supp.2d 1197, 1219 (C.D. Cal. 2007) ("the very need to file multiple lawsuits as a consequence of [defendants' conduct] is itself supportive of an irreparable harm finding.").  In short, the court agrees with plaintiffs' argument that the evidence "establishes that NSO maintains the technical expertise and commercial incentives not only to access plaintiffs' servers, but also to hide any access from plaintiffs."  See Dkt. 782 at 9.

Accordingly, having concluded that defendants' conduct causes irreparable harm, and there being no dispute that the conduct is ongoing, the court concludes that the first factor weighs strongly in favor of granting an injunction.

2.    Adequacy of Monetary Damages

Many courts have found that this factor overlaps with the 'irreparable harm' factor. See, e.g., Rocawear Licensing, LLC v. Branco Enterprises, Inc., 2009 WL 10703523, at *9 (C.D. Cal. July 22, 2009) ("the irreparable injury requirement for a permanent injunction overlaps with lack of an adequate remedy at law") (internal citations omitted).

And in this specific case, the same rationale applies – the irreparable nature of the injury also suggests that the injury cannot be remedied by monetary damages alone. Separate from any reputational damages, which are not properly part of this case, Whatsapp would suffer harm in the form of having its proprietary code and its users' data compromised, along with the loss of any users who migrate to a platform with better protection against unauthorized access.  Technology companies are commonly sued based on allegations that their privacy protections are not strong enough.  In short, as

1    mentioned above, a breach of plaintiffs' encryption serves to defeat one of the purposes

2    of the service that they offer to users.

3          Moreover, as set forth above, defendants freely acknowledge that they continue to

4    use Whatsapp to collect users' messages.  In concluding that monetary damages were

5    inadequate, the <u>Power Ventures</u> court noted that "defendants may still possess the

6    software at issue in this litigation and the data illegally acquired from Facebook."  <u>See</u>

7    252 F.Supp.3d at 783.  The argument for an injunction is even stronger in this case,

8    because there is no dispute that defendants still possess the software at issue in this

9    litigation, as well as the source code and other data illegally acquired from Whatsapp.

10   "Where the plaintiff will have to litigate multiple suits in the future, monetary damages are

11   deemed to be insufficient and thus, an injunction may issue."  <u>United Nat'l Maint., Inc. v.</u>

12   <u>San Diego Convention Ctr. Corp.</u>, 2012 WL 3861946 at *7 (S.D. Cal. Sept. 5, 2012); <u>see</u>

13   <u>also</u> <u>Metro-Goldwyn-Mayer</u>, 518 F. Supp. 2d at 1220 ("A legal remedy is inadequate if it

14   would require a multiplicity of suits.").  Although defendants do dispute that they use

15   plaintiffs' servers to access users' data, the court has previously concluded that plaintiffs

16   themselves are harmed when its users' data is unlawfully accessed.

17         Accordingly, the court concludes that the second factor weighs strongly in favor of

18   granting an injunction.

19         3.    Balance of Hardships

20         The <u>Power Ventures</u> court held that "defendants will suffer no harm from being

21   unable to develop software to engage in illegal conduct."  <u>Power Ventures</u>, 252

22   F.Supp.3d at 785.  Defendants argue that the court must consider the business hardships

23   that they would suffer if an injunction were to issue, "even if the conduct at issue is

24   unlawful."  <u>See</u> Dkt. 759-2 at 21 (citing <u>Softketeers, Inc. v. Regal W. Corp.</u>, 2023 WL

25   2024701, at *11 (C.D. Cal. Feb. 7, 2023)).  As stated above, defendants argue that the

26   requested injunction "would put NSO's entire enterprise at risk" and "force NSO out of

27   business."  <u>See</u> Dkt. 759-2 at 21.

28         Even if the court were to accept defendants' position and consider the hardship

United States District Court
Northern District of California

11

they would suffer if an injunction were to issue, the court must also consider the harm to plaintiffs' business if an injunction were not to issue.  As noted above, plaintiffs tout end-to-end encryption as a feature for users to protect their privacy and security, and their business would be significantly harmed if that feature was rendered ineffective.

Moreover, defendants' argument overlooks the fact that plaintiffs are free to revoke authorization from any user, let alone a user that has already been found liable for wrongdoing.  In the previously-mentioned hiQ Labs case, the Ninth Circuit recognized that "Facebook has tried to limit and control access to its website" by requiring "its users to register with a unique username and password," in contrast to the LinkedIn website, which made data "available to anyone with a web browser." 31 F.4th at 1199.  If, as in hiQ Labs, defendants were simply seeking to access the type of information that was "available to anyone with a web browser," they would have a stronger argument that they would suffer hardship as a result of an injunction.  Instead, defendants are seeking to access data that plaintiffs have protected not only with a username-and-password requirement, but also with end-to-end encryption.

Accordingly, the court concludes that the third factor weighs in favor of granting an injunction.

4.     Public Interest

"Internet companies and the public do have a substantial interest in thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors." hiQ Labs, 31 F.4th at 1202.  Defendants argue that they do not fall into the category of "ill-intentioned actors" because their software is used only for law enforcement purposes such as surveilling criminals and terrorists.

To support their argument, defendants presented testimony from their expert, Joshua Minkler.  At the hearing, defendants' counsel made clear that "the issue for which he's been tendered as an expert is the challenges posed to law enforcement by end to end encryption," which is "directly related to one of the factors that they need to prove, which is that the injunction . . . would not disserve the public interest." Dkt. 795 at 105.

12

Minkler testified about his experience with state and federal law enforcement investigations in Indiana, with a focus on the undesirability of end-to-end encryption as it pertains to law enforcement investigations.  Minkler conceded that he had not interviewed anyone at NSO, had not operated Pegasus or seen it in use, and had no knowledge of NSO's clients or the targets against whom Pegasus has been used.  Dkt. 795 at 93.

During cross-examination, Minkler also conceded that his knowledge of Pegasus's use to combat crime and/or terrorism was based solely on publicly-available information, such as newspaper articles.  See Dkt. 795 at 119-120.  This exchange highlighted one of the unique aspects of this case – because of the sealed nature of much of defendants' evidence, defendants have sought to establish their law-enforcement defense with citations to newspaper articles and similar types of publicly-available, unverified evidence.  See, e.g. Dkt. 759-2 at 11.  However, when plaintiffs seek to undermine the law-enforcement defense by citing articles reporting that Pegasus has been misused for non-law-enforcement purposes, such as surveilling journalists, human rights activists, political dissidents, etc., defendants argue that the court should ignore such unverified evidence.  It would violate basic principles of equity and fairness to allow defendants to rely on such evidence, but to prohibit plaintiffs from doing so.  Accordingly, the court will not consider any such evidence from either party, consistent with the court's rejection of this material at trial.

Nor will the court consider evidence or argument about the use of Pegasus by foreign governments in foreign countries, because as will be further discussed in the next section (regarding the scope of the injunction), the court has already concluded that any foreign sovereign governments should be excluded or carved out from any injunctive relief.  See Dkt. 111 at 34.  Thus, even assuming that foreign governments do use Pegasus for legitimate law enforcement purposes, those uses are not relevant to the court's current analysis.  In contrast, there is no evidence that Pegasus has been used for law enforcement purposes within the United States, and indeed, NSO remains on the U.S. Department of Commerce's Entity List after it was "determined by the U.S.

1   Government to be acting contrary to the foreign policy and national security interests of

2   the United States."  See 86 Fed. Reg. 60759 (Nov. 4, 2021) ("Specifically, investigative

3   information has shown that the Israeli companies NSO Group and Candiru developed

4   and supplied spyware to foreign governments that used this tool to maliciously target

5   government officials, journalists, businesspeople, activists, academics, and embassy

6   workers.").

7       Accordingly, the court concludes that the public interest in the United States

8   weighs in favor of an injunction.

9       5.    Scope of Injunction

10      "A district court has considerable discretion in fashioning suitable relief and

11  defining the terms of an injunction."  Hecox v. Little, 104 F.4th 1061, 1089 (9th Cir. 2024).

12      As an initial matter, defendants argue that the "proposed injunction improperly

13  applies to NSO's government customers," and would "arrogate to this court the power to

14  dictate permissible law-enforcement, counterterrorism, and military surveillance

15  techniques for every country in the world."  See Dkt. 759-2 at 9, 27.

16      In their reply, plaintiffs cite to the court's previous order stating that "the plaintiffs

17  are not seeking injunctive relief against defendants' foreign sovereign customers."  See

18  Dkt. 782 at 19 (citing Dkt. 111 at 34).

19      Indeed, the court's previous order concluded that defendants' customers "are not

20  required parties because the court can craft injunctive relief that excludes or carves out

21  any sovereign nation."  See Dkt. 111 at 34.  Such a carve-out would allay defendants'

22  concern about foreign countries' law-enforcement techniques.

23      Because defendants' foreign sovereign customers are not before the court and

24  have not been named as defendants, and because the court expressly ruled that they are

25  not necessary parties, of course an injunction in this case cannot apply to them.  To the

26  extent that defendants believe that an injunction would indeed cover their foreign

27  sovereign customers, the injunction will be revised to specifically exclude them.

28      Accordingly, plaintiffs shall revise the proposed injunction to exclude defendants'

14

United States District Court
Northern District of California

foreign sovereign customers.  As stated in the proposed injunction, the court shall retain

jurisdiction over any allegations that defendants have failed to comply with their

obligations as set forth in the injunction, and the parties shall submit to the court's

jurisdiction for those purposes.  See 18 U.S.C. § 1030(e)(2) (defining "protected

computer" as a computer "which is used in or affecting interstate or foreign commerce or

communication, including a computer located outside the United States that is used in a

manner that affects interstate or foreign commerce or communication of the United

States"); see also In re Apple Inc. Device Performance Litig., 347 F.Supp.3d 434, 448

(N.D. Cal. 2018) ("the text of the CFAA provides a clear indication of extraterritorial

application."); Alhathloul v. DarkMatter Group, -- F.Supp.3d ---, 2025 WL 2320474 (D. Or.

2025) ("Every court to consider the question has concluded that the CFAA applies

extraterritorially.") (internal citations omitted).

Paragraph 2 of the proposed injunction defines its scope to include "all of plaintiffs'

platforms."  See Dkt. 558-3, ¶ 2.  Defendants argue that any injunction should be limited

to the Whatsapp platform.  Plaintiffs argue that the complaint included Facebook as a

plaintiff and included allegations regarding Facebook Messenger.  See Dkt. 782 at 18.

While plaintiffs' description of the complaint is correct, the evidence throughout the

course of the litigation has been focused solely on Whatsapp, and the court has no

information about the other platforms and whether they have been or are in danger of

being harmed in the same way by Pegasus.

Moreover, plaintiffs' inclusion of the language "but not limited to Whatsapp,

Facebook, Instagram, Messenger, Meta AI, Threads, and Meta Horizon platforms" is

unclear as to what unnamed platforms would also be covered by an injunction.  See Dkt.

558-3, ¶ 2 (emphasis added).  Accordingly, the injunction shall be limited to the

Whatsapp platform.

Paragraph 3 of the proposed injunction sets forth the conduct from which

defendants are enjoined: (a) developing, using, selling, offering for sale, distributing,

transferring, or licensing any technology that uses plaintiffs' platforms in any way, (b)

1  developing, using, selling, offering for sale, distributing, transferring, or licensing any

2  technology that emulates plaintiffs' platforms in any way, (c) collecting data from plaintiffs'

3  platforms, (d) reverse engineering or decompiling code from plaintiffs' platforms, (e)

4  sending viruses or harmful code through plaintiffs' platforms, (f) using plaintiffs' platforms

5  for illegal purposes, and (g) creating new accounts on plaintiffs' platforms.  See Dkt. 558-

6  3, ¶ 3.

7      Defendants argue that the proposed provisions against "using" Whatsapp or

8  creating new accounts are impermissible because they seek to enjoin lawful activity.

9  However, the Power Ventures court and others have observed that "it is well established

10  that federal courts have the equitable power to enjoin otherwise lawful activity if they

11  have jurisdiction over the general subject matter and if the injunction is necessary and

12  appropriate in the public interest to correct or dissipate the evil effects of past unlawful

13  conduct or to prevent continued violations of the law."  See Power Ventures, 252

14  F.Supp.3d at 784 (internal citations and quotations omitted); see also Oracle USA, Inc. v.

15  Rimini St., Inc., 81 F.4th 843, 857 (9th Cir. 2023) ("an injunction is proper if it restrains

16  acts which are of the same type or class as unlawful acts which the court has found to

17  have been committed.").  Moreover, while the court relies only on the CFAA and CDAFA

18  in issuing this injunction, the court notes that some courts have issued injunctions to

19  enforce contractual terms, on the basis that it was preferable to having the plaintiff file

20  "lawsuit after lawsuit" to enforce their rights.  See Deerpoint Group, Inc. v. Agrigenix,

21  LLC, 345 F.Supp.3d 1207, 1225-26 (E.D. Cal. 2018); Densmore v. Manzarek, 2008 WL

22  2209993 at *47 (2008); see also Cal. Civ. Code § 3422, subd. 3 (injunction may be

23  granted when "necessary to prevent a multiplicity of judicial proceedings.").

24      Turning to specific provisions of paragraph 3, the court is unclear how provisions

25  (a) and (b) are different from each other in practice, and also finds the phrasing of (a) to

26  be confusing to the extent it contains the word "uses" multiple times (e.g., "using . . . any

27  technology that uses plaintiffs' platforms . . . including as a method or approach used to

28  install the technology").  Accordingly, the court directs plaintiffs to rephrase provision (a),

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1   and to consider combining it with provision (b).

2      Turning to provision (c), the court agrees that "collecting data" goes to the conduct

3   at the heart of this lawsuit, but the court finds this provision to be vague to the extent that

4   it enjoins "collecting . . . data or information from plaintiffs' platforms, whether directly or

5   through a third party, intermediary, or proxy." Given that the parties have made

6   arguments about whether defendants collect data from plaintiffs' servers or directly from

7   the target users' devices, the court would prefer more clarity as to whether or not this

8   provision is intended to cover the collection of data from users' devices.

9      As to provision (d), covering reverse engineering and decompiling, while the court

10   acknowledges that "the CFAA is best understood as an anti-intrusion statute and not as

11   an anti-misappropriation statute," the court nevertheless concludes that the activities

12   such as reverse engineering or decompiling are sufficiently related to defendants'

13   unlawful access of plaintiffs' and their users' data as to warrant injunctive relief on that

14   basis. See, e.g., Dkt. 795 at 147:21-23 ("it was through reverse engineering that they

15   developed these vectors. It's part and parcel of the CFAA and CDAFA violations.");

16   165:4-5 ("Reverse engineering is how they developed the exploit that was able to attack

17   our servers."). Accordingly, provision (d) is approved.

18      Provision (e) covers the sending of harmful code, and provision (f) covers the use

19   of plaintiffs' platforms for "illegal purposes." The court finds that provision (e) is vague

20   and possibly overbroad, and that provision (f) is essentially circular in that it simply

21   requires compliance with all relevant laws. Accordingly, provisions (e) and (f) shall be

22   removed from any revised proposed injunction.

23      Finally, as to provision (g), while it may remain legal to create new Whatsapp

24   accounts and to use Whatsapp, the facts in this case show that such activities have been

25   used as a precursor to illegal activities, and thus, the court, in its discretion, concludes

26   that such activity must be enjoined.

27      Paragraph 4 of the proposed injunction requires defendants to delete and destroy

28   computer code related to plaintiffs' platforms. The court concludes that this provision is

1    necessary to prevent future violations, especially given the undetectable nature of

2    defendants' technology.

3         Paragraph 5 requires defendants to affirm that it provided notice of the injunction

4    to all affected parties, and paragraph 6 requires defendants to certify compliance with the

5    injunction.  The court has not required defendants to provide such notice and certification

6    in other cases, and will not do so in this case.  Additionally, any deadline the court

7    imposes will undoubtedly necessitate further motion practice once the inevitable appeals

8    process begins.  Accordingly, paragraphs 5 and 6 are to be removed from any revised

9    proposed injunction.

10        Finally, defendants argue that the injunction would place an unreasonable burden

11   on its outside counsel, to the extent it prevents them from using Whatapp, and plaintiffs'

12   reply offers to "clarify the proposed permanent injunction to exclude NSO's outside

13   counsel." Dkt. 782 at 14.  Plaintiffs shall thus revise paragraph 1 to exclude defendants'

14   outside counsel.

15        Accordingly, the court directs plaintiffs to file a revised proposed injunction order,

16   making the changes specified above, namely: (1) exclude defendants' sovereign

17   government customers from the scope of the injunction, and (2) narrow the scope of the

18   injunction to apply only to the Whatsapp platform, (3) clarify paragraphs 3(a), 3(b), and

19   3(c), (4) remove paragraphs 3(e) and 3(f), (5) remove paragraphs 5 and 6, and (6) add

20   language excluding defendants' outside counsel from the injunction.  Plaintiffs shall file

21   the revised proposed injunction order within 14 days of the date of this order.

22   Motion for Remittitur or a New Trial

23        As stated above, the jury in this case awarded plaintiffs compensatory damages in

24   the amount of $444,719, and punitive damages in the amount of $167,254,000, a ratio of

25   over 376/1.  Defendants have filed this motion under Rule 59, asking the court to order a

26   new trial or alter/amend the judgment to reduce the punitive damages award.

27   A.    Legal Standard

28        The first question presented by defendants' motion is whether the $167.25M

United States District Court
Northern District of California

1   punitive damages award is excessive; and if so, the second question is by how much to

2   reduce the award.

3   The seminal Supreme Court cases are <u>BMW v. Gore</u> (1996) and <u>State Farm v.</u>

4   <u>Campbell</u> (2003), which prohibit the imposition of "grossly excessive or arbitrary

5   punishments on a tortfeasor" as inconsistent with the due process requirements of the

6   Fifth and Fourteenth Amendments.  <u>BMW</u>, 517 U.S. 559 (1996); <u>State Farm</u>, 538 U.S.

7   408 (2003).

8   A 2022 opinion from the Ninth Circuit provides a helpful distillation of the due

9   process principles:

> The Supreme Court in <u>BMW of North America, Inc. v. Gore</u> established
> three guidelines governing whether punitive damage awards comply with
> due process: (1) the reprehensibility of the defendant's conduct; (2) the
> disparity between the harm or potential harm suffered by the claimant and
> his punitive damages; and (3) the difference between the punitive damages
> and any civil penalties authorized or imposed in comparable cases.

<u>Riley v. Volkswagen Group of America</u>, 51 F.4th 896, 900 (2022).

Those three prongs will guide the analysis.

B.   Analysis

1.   Reprehensibility

The Supreme Court has said that the degree of reprehensibility is "the most important

indicium of the reasonableness of a punitive damages award."  <u>State Farm</u>, 538 U.S. at

419 (citing <u>BMW</u> at 575).  The Supreme Court went on to articulate how to conduct the

reprehensibility analysis:

> We have instructed courts to determine the reprehensibility of a defendant
> by considering whether: the harm caused was physical as opposed to
> economic; the tortious conduct evinced an indifference to or a reckless
> disregard of the health or safety of others; the target of the conduct had
> financial vulnerability; the conduct involved repeated actions or was an
> isolated incident; and the harm was the result of intentional malice, trickery,
> or deceit, or mere accident.

<u>State Farm</u> at 419.

NSO argues that the only factors that possibly favor plaintiffs are the repeated

nature of the conduct, and the fact that the jury found malice, oppression, or fraud.  NSO

1   argues that the other factors cut against reprehensibility, as all the harm was economic

2   and caused no lasting damage.

3   Plaintiffs argue that (1) NSO repeatedly targeted plaintiffs, (2) NSO acted

4   deliberately, (3) NSO sought to conceal its activity, and (4) NSO repeatedly acted with a

5   knowing disregard of plaintiffs' rights.

6   Defendants cite to cases involving racial discrimination and threats to abortion

7   providers, arguing that the conduct in this case is less reprehensible and thus worthy of a

8   lower punitive damages ratio.  See Zhang v. Am. Gem. Seafoods, Inc., 339 F.3d 1020

9   (9th Cir. 2003); Bains LLC v. Arco Prods. Co., 405 F.3d 764 (9th Cir. 2005); Planned

10  Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists, 422 F.3d 949 (9th

11  Cir. 2005).  However, these cases are far too different from the present case to support

12  any sort of 'apples to apples' comparison.  Therefore, rather than trying to compare the

13  reprehensibility of 'unlawful surveillance' vs. 'racial discrimination,' the court simply

14  concludes that some of the reprehensibility factors support plaintiffs' argument, while

15  some support defendants' argument, and then moves on to the next factor, which

16  provides more guidance regarding the proper size of any punitive damages award in this

17  case.

18  2.   Disparity

19  Courts have rejected any bright-line rule on this factor, but the Ninth Circuit in

20  Riley articulated the relevant precedent regarding proportionality, and set forth three

21  groups: (1) punitive damages are limited to 4/1 where there are significant economic

22  damages and the behavior is not particularly egregious, (2) punitive damages can range

23  from 4/1 to 9/1 where there are significant economic damages and the behavior is more

24  egregious, and (3) punitive damages can exceed 10/1 only if there are insignificant

25  economic damages and the behavior was particularly egregious.

26  The threshold argument between the parties is whether the $444,719

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

compensatory damage award in this case is significant[2] or insignificant.  Plaintiffs argue that the figure should be considered in the context of the size of the companies involved in the litigation – for both of which, $444,719 is a small amount, when compared to their overall capitalization.  Defendants argue that the case law does not allow for such consideration of context, and that the test for whether economic damages are "significant" must be the same in all cases.  Specifically, defendants cite cases in which individuals were awarded amounts such as $15,000, $50,000, and $88,000, and argue that, because those amounts were considered "significant" or "substantial" in those cases, then the award in this case must necessarily be "significant."  See Bains, 405 F.3d at 776; Planned Parenthood, 422 F.3d at 963-64; Mitri v. Walgreen Co., 60 Fed App'x 528, 530 (9th Cir. 2016).  Defendants then argue that, because economic damages were substantial, any punitive damages award ratio is limited to 4/1 under Riley.  See Dkt. 747 at 9.

Having reviewed the authority cited by the parties, the court concurs with defendants that the Ninth Circuit has not held that courts may consider context, such as the financial conditions of the parties, when determining whether a compensatory damages award is "significant" or "substantial."  However, in this court's view, an amount that would be "significant" to an individual plaintiff in a specific case may be very insignificant to a plaintiff such as Whatsapp or its parent company, Meta.  Thus, to best apply the principles articulated in Riley, a "one size fits all" approach to determining significance should be avoided.  And under that rationale, a compensatory damage award of $444,719 to a company the size of Whatsapp and/or Meta strikes the court as relatively insignificant.

However, the court is of course cognizant of stepping beyond Ninth Circuit precedent, and moreover, as will be discussed in further detail below, the court's result

---

[2] Some of the case law uses 'substantial' rather than 'significant' – the Riley case actually uses both at various times.  See 51 F.4th at 902.  The understanding of the court and the parties, as confirmed at hearing, is that the terms are effectively interchangeable in this context.  See Dkt. 795 at 202-03.

on this motion would be the same regardless of whether the compensatory damage award is considered "significant" or insignificant." In short, under <u>Riley</u>, the "significant" vs. "insignificant" distinction comes into play only if a court seeks to approve a punitive damages ratio above 9/1 – in which case, economic damages must be insignificant and the behavior must be "particularly egregious." <u>See</u> 51 F.4th at 902. In this case, the court does not have a sufficient basis for determining that defendants' behavior is "particularly egregious," which means the punitive damages ratio is capped at 9/1, which means it does not matter whether the court concludes that the economic damages are "significant" or "insignificant" – under either conclusion, the ratio is limited to 9/1. Within that range, the court must determine whether defendants' behavior is either (1) "not particularly egregious" (in which case the ratio is capped at 4/1), or (2) "more egregious" (in which case the ratio can be extended up to 9/1). <u>See</u> <u>id.</u>

To be clear, other courts may later determine that behavior such as defendants' is indeed "particularly egregious" and capable of supporting a ratio of even higher than 9/1. In this court's view, at this time, there have simply not yet been enough cases involving unlawful electronic surveillance in the smartphone era for the court to be able to conclude that defendants' conduct was "particularly egregious." As time goes on, more of a shared societal consensus may emerge about the acceptability of defendants' conduct. For now, the court concludes only that defendants' conduct is not so innocuous as to fall in the category of "not particularly egregious," which means that "more egregious" is the most fitting category. Thus, the court concludes that this case falls within category (2) under the <u>Riley</u> framework, which means that the punitive damages ratio cannot exceed 9/1 – in other words, the punitive damages award cannot exceed a maximum of $4,002,471.

Accordingly, based on <u>Riley</u>, the court must conclude that the jury's award was excessive, as it vastly exceeds the $4,002,471, the maximum permissible under <u>Riley</u>. That leaves one question for the court – to what number should the damages award be reduced?

22

3.      Comparable Civil Penalties

The parties appear to agree that this factor is "less important than the other two" in this case, and the court also believes that the lack of any similar cases involving civil penalties limits this factor's usefulness here.

Accordingly, the court's determination must be based on the reprehensibility of defendants' behavior and the disparity between the compensatory damages award and punitive damages award.  And as stated above, based on the latter, the constitutional upper limit of any punitive damages award in this case is 9/1.

Within those constitutional guidelines, the court believes that a high-end award is justified.  In particular, the repeated, deliberate, and covert nature of defendants' intrusions, and the fact that defendants specifically designed around plaintiffs' attempted fixes, persuade the court that the punitive damages award should not be further reduced.

Moreover, contrary to defendants' arguments, the court finds no basis to conclude that the jury relied on improper factors.   To the contrary, in the court's view, the jury displayed an uncommonly high level of attention and engagement, and the court sees no reason to discredit the jurors' reasoning.  In addition, the jury was instructed not to "be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy," and to "decide the case solely on the evidence before you," and the jury is presumed to follow the court's instructions.  See Dkt. 737 at 2.

Accordingly, defendants' motion is GRANTED, and the jury's punitive damages award is remitted to the amount of **$4,002,471**.  Plaintiffs may accept a remittitur to $4,002,471, or the court will order a new trial as to the amount of punitive damages, though the court will be bound by the same constitutional limit on the amount of punitive damages that are set forth in this order, i.e., the 9/1 ratio under Riley.

Remaining motions

Following the court's previous order on the parties' various motions to seal, the parties filed a narrowed joint omnibus motion to seal.  See Dkt. 784, 797.

There is a general principle in favor of public access to federal court records.

United States District Court
Northern District of California

Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 602 (1978).  "[T]he proponent of sealing bears the burden with respect to sealing.  A failure to meet that burden means that the default posture of public access prevails."  Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1182 (9th Cir. 2006).

When a request to seal documents is made in connection with a motion, the court must determine whether the parties are required to overcome that presumption with "compelling reasons" or with "good cause."  A party seeking to seal materials submitted with a motion that is "more than tangentially related to the merits of the case"—regardless of whether that motion is "technically 'dispositive'"—must demonstrate that there are compelling reasons to keep the documents under seal.  Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1101–02 (9th Cir. 2016).  "That the records are connected to a Daubert motion does not, on its own, conclusively resolve the issue."  In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig., 686 F.3d 1115, 1119 (9th Cir. 2012).  For example, the "compelling reasons" standard applies where the "judicial records at issue were filed 'in connection' with pending summary judgment motions."  Id. at 1120 (citing San Jose Mercury News, Inc. v. U.S. Dist. Ct., 187 F.3d 1096, 1102 (9th Cir. 1999)).

"Under this stringent standard, a court may seal records only when it finds a compelling reason and articulates the factual basis for its ruling, without relying on hypothesis or conjecture.  The court must then conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret.  What constitutes a 'compelling reason' is best left to the sound discretion of the trial court.  Examples include when a court record might be used to gratify private spite or promote public scandal, to circulate libelous statements, or as sources of business information that might harm a litigant's competitive standing."  Ctr. for Auto Safety, 809 F.3d at 1096–97 (internal quotation marks and citations omitted).

The parties' joint omnibus motion to seal complies with the court's previous order regarding sealing, and has been sufficiently narrowed to cover only truly sealable material.  Therefore, the parties' joint omnibus motion to seal (Dkt. 797) is GRANTED.

24

1    There are two remaining motions, both filed by defendants.  The first is listed on

2  the docket as a motion to seal (Dkt. 790), but that appears to be an error, because the

3  filed document contains no sealed or redacted material, and is in fact a duplicate of the

4  document filed at Dkt. 791, which is properly listed as a motion for leave to file a

5  supplemental reply brief.

6    Accordingly, the erroneously-filed "motion to seal" at Dkt. 790 is denied as moot,

7  and the motion for leave to file a supplemental reply brief (Dkt. 791) is granted.

8                                 **CONCLUSION**

9    For the foregoing reasons, plaintiffs' motion for permanent injunction is

10  GRANTED, and defendants' motion for remittitur is GRANTED.  The punitive damages

11  award is remitted to the amount of $4,002,471, and plaintiffs shall have 14 days from the

12  date of this order to file a notice stating whether it accepts or rejects the remittitur.

13    And as stated above, plaintiffs shall have 14 days from the date of this order to file

14  a revised proposed injunction order.  Finally, plaintiffs shall file a proposed form of final

15  judgment, to be filed no later than 14 days from the date of this order.

16

17    **IT IS SO ORDERED.**

18  Dated:  October 17, 2025

19                                    ____/s/ *Phyllis J. Hamilton*____
20                                    PHYLLIS J. HAMILTON
                                     United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# APP. E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WHATSAPP INC., et al.,

          Plaintiffs,

     v.

NSO GROUP TECHNOLOGIES
LIMITED, et al.,

          Defendants.

Case No. 19-cv-07123-PJH

**ORDER RESOLVING DEFENDANTS'
RESPONSE AND OBJECTION TO
PROPOSED INJUNCTION ORDER**

Re: Dkt. 805, 807

Defendants filed a response and objection to plaintiffs' proposed injunction order, and plaintiffs filed a response. <u>See</u> Dkt. 807.

Defendants first argue that the proposed injunction should "take into account the provisions of 18 U.S.C. § 1030(f)," covering United States law enforcement activity. However, as plaintiffs argue, defendants have provided no evidence that the United States has ever used Pegasus for law enforcement activities, nor was the law enforcement exception applicable to this litigation. Defendants propose a "sweeping carveout" that is simply not supported by the evidence or findings in this case. <u>See</u> Dkt. 805-1 at 4. Accordingly, defendants' first objection is overruled.

Second, defendants argue that the injunction should not prohibit collection of data from target users' phones if no Whatsapp servers are accessed. This is an argument that has been fully raised and considered throughout this case, particularly at the hearing on the motion for permanent injunction. The court has already rejected this argument, and defendants present no basis for reconsidering it now – accordingly, their second objection is overruled.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants' third and final objection is that "the exclusion of foreign sovereign

2    governments should be meaningful" by, for example, making clear that "the deletion of

3    Whatsapp data does not apply to foreign customers." While the court believes that

4    paragraph 1 of the proposed injunction, as written, already makes clear that

5    "[n]otwithstanding anything herein, neither Defendants' foreign sovereign customers nor

6    Defendants' outside counsel are Prohibited Parties," for the sake of clarity, the court will

7    make the following revisions to paragraph 4 (added language is underlined):

>    The Prohibited Parties are required to delete and destroy any and all
8    computer code or technologies that use, access, or depend on the WhatsApp
     Platform, including the WhatsApp Installation Server ("WIS"), to delete all
9    data obtained or derived from use of or access to the WhatsApp Platform in
     the Prohibited Parties' possession, and to disable customer access to any
10   and all computer code or technologies maintained by the Prohibited Parties
     that use, access, or depend on the WhatsApp Platform.
11

12   To the extent that defendants request further changes to paragraph 4, that

13   objection is overruled.

14   The court will issue a separate order regarding defendants' request to stay the

15   injunction order.

16

17   **IT IS SO ORDERED.**

18   Dated:  November 12, 2025

19
                                        ____/s/ *Phyllis J. Hamilton*____
20                                      PHYLLIS J. HAMILTON
                                        United States District Judge
21

22

23

24

25

26

27

28

                                        2

# APP. F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WHATSAPP LLC and META PLATFORMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NSO GROUP TECHNOLOGIES LIMITED and Q CYBER TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 4:19-cv-07123-PJH <br><br> **ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION** |

The Motion for Permanent Injunction ("Motion") filed by Plaintiffs WhatsApp LLC and Meta Platforms, Inc. (collectively, "Plaintiffs") against Defendants NSO Group Technologies Limited and Q Cyber Technologies (collectively, "Defendants") is before the Court. Having considered the materials and arguments before the Court and for good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED**. The Court determines that Plaintiffs have shown irreparable injury as a result of Defendants' violations of the law for which money damages are inadequate, that the balance of hardships weighs in favor of injunctive relief, and that an injunction is in the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**IT IS FURTHER ORDERED** that Plaintiffs are entitled to a Permanent Injunction as follows:

1. Consistent with Federal Rule of Civil Procedure 65(d)(2), this Permanent Injunction binds Defendants; Defendants' officers, agents, servants, and employees; and all other persons who are in active concert or participation with Defendants and Defendants' officers, agents, servants, and employees (collectively, the "Prohibited Parties"). Notwithstanding anything herein, neither Defendants' foreign sovereign customers nor Defendants' outside counsel are Prohibited Parties.

2. This Permanent Injunction binds the Prohibited Parties with respect to the WhatsApp platform, including WhatsApp servers and the WhatsApp client applications (collectively, the "WhatsApp Platform").

3. The Prohibited Parties are immediately and permanently enjoined from:

    a. Developing, using, selling, offering for sale, distributing, transferring, or licensing, whether directly or through a third party, intermediary, or proxy, any technology that interacts with or emulates any aspect of the WhatsApp Platform in any way, including as a method or approach used to install and deploy the technology (an "installation vector"), without first requesting and obtaining Plaintiffs' express written permission;

1

b.      Collecting, or assisting others in collecting, data or information from the WhatsApp Platform, whether directly or through a third party, intermediary, or proxy, without first requesting and obtaining Plaintiffs' express written permission;

c.      Reverse engineering or decompiling code from the WhatsApp Platform, whether directly or through a third party, intermediary, or proxy, without first requesting and obtaining Plaintiffs' express written permission; and

d.      Creating accounts, whether directly or through a third party, intermediary, or proxy, on the WhatsApp Platform, without first requesting and obtaining Plaintiffs' express written permission.

4.      The Prohibited Parties are required to delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform, including the WhatsApp Installation Server ("WIS"), to delete all data obtained or derived from use of or access to the WhatsApp Platform in the Prohibited Parties' possession, and to disable customer access to any and all computer code or technologies maintained by the Prohibited Parties that use, access, or depend on the WhatsApp Platform.

5.      The Court will retain jurisdiction to enforce the terms of this Permanent Injunction and to address other matters arising out of or regarding this Permanent Injunction, including any allegations that Defendants have failed to comply with their obligations as set forth in this Permanent Injunction, and the parties shall submit to the Court's jurisdiction for those purposes.

**IT IS SO ORDERED.**

Dated:  November 12, 2025          */s/ Phyllis J. Hamilton*
                                   Honorable Phyllis J. Hamilton
                                   United States District Judge

2