No. 25-7380

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

WHATSAPP LLC; META PLATFORMS, INC.,

*Plaintiffs-Appellees,*

v.

NSO GROUP TECHNOLOGIES LIMITED;
Q CYBER TECHNOLOGIES LIMITED,

*Defendants-Appellants.*

—————————

On Appeal from the U.S. District Court for the Northern District of
California, No. 4:19-cv-07123, Hon. Phyllis J. Hamilton

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
# STAY PERMANENT INJUNCTION PENDING APPEAL

Greg D. Andres
Antonio J. Perez-Marques
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

Micah G. Block
Davis Polk & Wardwell LLP
900 Middlefield Road
Suite 200
Redwood City, CA 94063
(650) 752-2000

*Attorneys for Plaintiffs-Appellees*

January 5, 2026

# TABLE OF CONTENTS

Background .................................................................................... 2

    A.   WhatsApp ....................................................................... 2

    B.   NSO and Pegasus ........................................................ 3

    C.   Summary Judgment and Sanctions ................................. 5

    D.   Damages Trial .............................................................. 6

    E.   Permanent Injunction ................................................... 6

Legal Standard ............................................................................. 7

Argument ..................................................................................... 8

   I.   NSO Is Unlikely to Succeed on Appeal ............................. 8

    A.   The District Court Properly Granted Summary
       Judgment ..................................................................... 9

    B.   The District Court Properly Granted the Permanent
       Injunction ................................................................. 17

   II.   NSO Will Not Suffer Irreparable Injury from the Denial of
      a Stay ....................................................................... 21

   III.  A Stay Would Cause Plaintiffs Irreparable Injury ................ 25

   IV.  The Public Interest Does Not Favor a Stay ....................... 27

Conclusion ................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Al Otro Lado v. Wolf,*
 952 F.3d 999 (9th Cir. 2020) ..................................................... 11, 12

*Berman v. Freedom Fin. Network, LLC,*
 30 F.4th 849 (9th Cir. 2022) ............................................................ 20

*E.E.O.C. v. Harris Farms, Inc.,*
 2006 WL 1881236 (E.D. Cal. July 5, 2006) ...................................... 10

*Facebook, Inc. v. MaxBounty, Inc.,*
 274 F.R.D. 279 (N.D. Cal. 2011) ...................................................... 17

*Facebook, Inc. v. Power Ventures, Inc.,*
 252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd,*
 749 F. App'x 557 (9th Cir. 2019) ................................................. 21, 22

*Facebook, Inc. v. Power Ventures, Inc.,*
 844 F.3d 1058 (9th Cir. 2016) .......................................................... 15

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,*
 556 F. Supp. 2d 1122 (E.D. Cal. 2008) ............................................. 17

*hiQ Labs, Inc. v. LinkedIn Corp.,*
 31 F.4th 1180 (9th Cir. 2022) ........................................................... 32

*Leiva-Perez v. Holder,*
 640 F.3d 962 (9th Cir. 2011) ............................................................ 12

*Meta Platforms, Inc. v. Nguyen,*
 2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ................................... 21

*Mytee Products, Inc. v. Harris Research, Inc.,*
 2010 WL 11509027 (S.D. Cal. June 25, 2010) ............................. 25, 26

*Nken v. Holder,*
 556 U.S. 418 (2009) .................................................................... 10, 24

*Ramirez v. Trusper Inc.*,
    2025 WL 2955231 (9th Cir. Oct. 20, 2025) ...................................... 20

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ................................... 32

*United States v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) ........................................................... 22

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) ......................................................... 15

*United States v. Saini*,
    23 F.4th 1155 (9th Cir. 2022) ......................................................... 17

*United States v. U.S. Gypsom Co.*,
    340 U.S. 76 (1950) ........................................................................ 22

*Van Buren v. United States*,
    593 U.S. 374 (2021) ................................................................ 14, 15

*Vanguard Outdoor, LLC v. City of Los Angeles*,
    2010 WL 11531294 (C.D. Cal. Oct. 18, 2010) ................................. 25

*Winston-Salem/Forsyth Cnty. Bd. of Ed. v. Scott*,
    404 U.S. 1221 (1971) ..................................................................... 10

*Y.Y.G.M. SA v. Redbubble, Inc.*,
    75 F.4th 995 (9th Cir. 2023) ........................................................... 29

## STATUTES & RULES

18 U.S.C. § 1030(a)(2)(c) ........................................................................ 15

18 U.S.C. § 1030(a)(4) ........................................................................... 16

18 U.S.C. § 1030(f) ............................................................................... 18

<u>O</u>THER <u>A</u>UTHORITIES

11 Charles Alan Wright, Arthur R. Miller, et al., *Fed. Prac. & Proc.* § 2904 (3d ed.)..........................................................................................11

Plaintiffs WhatsApp LLC and Meta Platforms, Inc. submit this opposition to Defendants' motion to stay the permanent injunction pending NSO's appeal.

Defendants ("NSO") seek the extraordinary remedy of a stay of the district court's permanent injunction but cannot satisfy the demanding standard for such relief. The district court properly issued the injunction after years of discovery, motion practice, and summary judgment and trial proceedings that conclusively established NSO's unlawful conduct. Among other things, the undisputed facts showed that NSO reverse-engineered WhatsApp, created a fake WhatsApp client application to send its malware exploits through WhatsApp's servers to surveil WhatsApp's users, and repeatedly developed multiple new WhatsApp-specific malware exploits to circumvent WhatsApp security measures that blocked NSO's spyware—conduct that the district court held violated federal and state anti-hacking law and breached WhatsApp's terms of service, and for which a unanimous jury awarded Plaintiffs over $167 million in compensatory and punitive damages. On this evidence, the district court issued a tailored injunction to prevent the ongoing, irreparable harm from NSO's misconduct.

NSO fails to provide any legitimate basis to stay the district court's injunction. NSO identifies no legal or factual error in the court's summary judgment decision nor any valid objection to the scope of the injunction. Further, NSO's claimed "irreparable harm" is contradicted by its own assertions. Because NSO fails to make a strong showing of likelihood of success on appeal or irreparable injury—and because a stay would prolong the very harms the injunction was designed to stop— NSO's motion should be denied.

## Background[1]

### A.    WhatsApp

WhatsApp provides end-to-end encrypted communication services on mobile devices and computers. To use WhatsApp, users must first install the legitimate WhatsApp client application ("Official Client") and agree to WhatsApp's Terms of Service ("Terms"). App.C at 12-14.

---

[1] "Mot." refers to NSO's motion to stay, "App." refers to the appendix to NSO's motion, "P.App." refers to the appendix attached hereto, and "Dkt." refers to the district court docket. Unless noted, emphasis has been added to quotations, and internal citations and quotation marks have been omitted.

**B.    NSO and Pegasus**

NSO develops and licenses spyware. NSO's principal spyware product is "Pegasus," which refers to several component pieces of software. *Id.* at 2. Pegasus includes the "agent" implanted on a target device, such as a mobile phone, used to extract information from the target device, and the "installation vectors" used to install the agent. Mot. at 3. NSO specifically designed versions of Pegasus that utilize WhatsApp's servers and Official Client to surveil WhatsApp users.

To research and develop Pegasus, NSO decompiled WhatsApp code to understand and circumvent the security measures built into the Official Client and WhatsApp's servers. *See* P.App.A (testimony from Tamir Gazneli, NSO's Head of R&D) at 70:2-15, 226:2-227:14. Through this reverse-engineering, NSO developed installation vectors that targeted WhatsApp using NSO's own modified client application that NSO called the "WhatsApp Installation Server" or "WIS." *Id.* at 157:7-164:9; App.D at 1-2. NSO designed the WIS to impersonate the Official Client and used it to access WhatsApp's servers and write and send messages that the Official Client cannot, such as the code that triggers Pegasus installation. P.App.A at 237:10-238:16, 278:16-279:6; App.C at 2.

NSO also created anonymized WhatsApp accounts and server infrastructure to enable Pegasus deployment.  P.App.B (testimony from Ramon Eshkar, NSO's VP of Client Executives) at 39:15-17, 151:3-153:8.

NSO repeatedly circumvented Plaintiffs' security updates to continue attacking WhatsApp and its users.  In September and December 2018, Plaintiffs' security updates blocked NSO's access to WhatsApp's servers and users' devices.  P.App.A at 254:14-17; App.C at 12.  Each time, NSO developed a new exploit to circumvent Plaintiffs' technological barriers.  P.App.A at 256:16-258:5.  After Plaintiffs detected NSO's activity again in May 2019, they investigated the source of the exploit and blocked NSO through further security updates.  Dkt. 400-2, Ex. 4 at 29:22-25.  NSO then developed yet another Pegasus installation vector for WhatsApp, which it continued using even after Plaintiffs brought this litigation.  P.App.A at 45:15-46:16, 270:21-271:8.

NSO retains the ability to collect WhatsApp messages through methods it refuses to disclose and continues to invest efforts in circumventing WhatsApp's security measures.  App.D at 6.

## C.    Summary Judgment and Sanctions

On December 20, 2024, the district court granted Plaintiffs' motions for summary judgment on liability and for evidentiary sanctions.  App.C. In its order, the court sanctioned NSO for its "repeated[] fail[ure] to produce relevant discovery"—the "[m]ost significant" of which was its refusal to produce Pegasus source code.  *Id.* at 9-10.  The sanctions for NSO's failure to provide necessary discovery included barring NSO from further challenging the evidence establishing that its spyware targeted Plaintiffs' California-based servers.  *Id.* at 9-10, 13.

The district court granted summary judgment in Plaintiffs' favor on their claims under the federal Computer Fraud and Abuse Act ("CFAA"), the California Comprehensive Data Access and Fraud Act ("CDAFA"), and for breach of the Terms.  *Id.* at 16.  The court found that NSO violated the CFAA and CDAFA by "sen[ding] messages through Whats[A]pp servers that caused Pegasus to be installed on target users' devices," enabling the WIS to "obtain protected information."  *Id.* at 12-13.  This information was valuable because of "defendants' clients' willingness to pay for Pegasus," and NSO acted with the requisite "intent to defraud" because it "redesigned Pegasus to evade detection after plaintiffs first

fixed the security breach." *Id.* at 12. The court also found that NSO breached the Terms by reverse-engineering and decompiling WhatsApp code, and rejected NSO's affirmative defenses and efforts to shift liability to its customers. *Id.* at 12-15; *see* App.A at 5-6.

### D.    Damages Trial

At the subsequent damages trial, a jury unanimously awarded Plaintiffs $444,719, the full amount they sought in compensatory damages. Dkt. 736 at 2. The jury also awarded Plaintiffs $167,254,000 in punitive damages after finding that NSO acted with malice, oppression, or fraud in violating the CDAFA. *Id.* at 2-3. The punitive damages award was subsequently remitted to $4,002,471, a 9-times multiple of the compensatory damages award. Dkt. 810.

### E.    Permanent Injunction

Following trial, the district court granted Plaintiffs' motion for a permanent injunction. The court found that NSO's conduct caused ongoing, irreparable harm to Plaintiffs that "weigh[ed] strongly in favor of granting an injunction." App.D at 10. The court also found that money damages were inadequate to remedy the harm caused by NSO's unlawful access to Plaintiffs' platforms and users' data. *Id.* at 11. The court found that Plaintiffs' business "would be significantly harmed" without an

injunction, and that the harm to Plaintiffs outweighed any harm NSO might suffer if enjoined from unlawful activity. *Id.* at 11-12. Finally, the court found that the public interest favored Plaintiffs' requested injunction because "there is no evidence that Pegasus has been used for law enforcement purposes within the United States" and NSO remains on the U.S. Department of Commerce's Entity List because it "act[ed] contrary to the foreign policy and national security interests of the United States." *Id.* at 13-14.

## Legal Standard

A stay pending appeal is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009). Rather, such a stay is a form of "extraordinary relief." *Winston-Salem/Forsyth Cnty. Bd. of Ed. v. Scott*, 404 U.S. 1221, 1231 (1971). "A party seeking a stay of a lower court's order bears a difficult burden." *E.E.O.C. v. Harris Farms, Inc.*, 2006 WL 1881236, at *1 (E.D. Cal. July 5, 2006). The movant must show that the circumstances justify an exercise of judicial discretion, and because this burden "is a heavy one, more commonly stay requests will not meet this standard and will be

denied." 11 Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2904 (3d ed.).

This Court considers four factors in adjudicating a motion to stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006-07 (9th Cir. 2020). In evaluating these factors, this Court employs a "sliding scale" approach where "[o]nly a stronger showing of one element may offset a weaker showing of another." *Id.* at 1010. The first two factors—likelihood of success on the merits and irreparable injury—are the most critical. *Id.* at 1007. Where a defendant fails to satisfy those factors, this Court need not consider the last two. *Id.* at 1014.

## Argument

## I. NSO Is Unlikely to Succeed on Appeal

Under the first factor, NSO bears the burden of making a "sufficiently strong showing of likelihood of success on the merits" on

appeal. *Id.* at 1014. NSO must show that the likelihood of success on the merits is "[m]ore than a mere possibility," meaning "that [NSO] has a substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). NSO fails to meet its burden.[2]

## A. The District Court Properly Granted Summary Judgment

The district court properly granted summary judgment on liability based on an undisputed evidentiary record. NSO offers no legitimate basis for disturbing the district court's rulings.

*First*, the district court properly found that NSO exceeded authorized access to WhatsApp's servers under the CFAA. *See* App.C at 12-13. At summary judgment, the undisputed evidence showed that NSO reverse-engineered WhatsApp, designed and used a fake WhatsApp client application (the WIS) to send messages through WhatsApp's

---

[2] NSO erroneously claims that the district court applied the "wrong standard of review" because it "ignored" that NSO can show a likelihood of success by raising "serious legal questions." Mot. at 7. As NSO's authority makes clear, "[r]egardless of how one expresses the requirement … , a petitioner must show, at a minimum, that she has a substantial case for relief on the merits." *Leiva-Perez*, 640 F.3d at 967-68 (noting that the various formulations are "essentially interchangeable"). The district court appropriately found that NSO did not.

servers that the Official Client could not, and extracted information from WhatsApp's servers and its users' devices through these exploits. *See* App.A at 2-3 ("NSO went far beyond their authorized use of Whats[A]pp by reverse-engineering the application to design a spyware vector which allowed NSO's clients to surveil Whats[A]pp's users and obtain data from its servers.").

The evidence further showed that after Plaintiffs implemented security updates that blocked NSO's WhatsApp-specific exploits in 2018, NSO circumvented them by developing a new WhatsApp-specific exploit. P.App.A at 256:16-258:5, 270:21-271:8. When Plaintiffs again blocked NSO's exploit in May 2019, NSO developed yet another WhatsApp-specific exploit—which it continued to use *after* this litigation was filed. *Id.*; *see* App.A at 2-3 ("When What[sA]pp attempted to fix the security vulnerability, [NSO] designed around the fix to continue their surreptitious access.").

NSO conceded that it took these actions repeatedly, in secret, without WhatsApp's permission, and knowing that they were prohibited by the Terms and that WhatsApp would seek to stop their attacks if it detected them. *See* Dkt. 465 at 19. Accordingly, the district court

correctly found that NSO exceeded authorized access to WhatsApp's servers.  App.A at 3.

NSO's contrary arguments are meritless.  Mot. at 10-11.  NSO claims that it cannot be liable under *Van Buren v. United States*, 593 U.S. 374 (2021) because it did not access areas of WhatsApp's servers through the WIS that the Official Client could not.  But that is not all the CFAA proscribes.  *Van Buren* made clear that the CFAA prohibits NSO from "obtain[ing] *information* located in particular areas of the computer— such as files, folders, or databases—that are off limits to" NSO.  593 U.S. at 396.  NSO did exactly that.  As the district court found and NSO does not contest, the WIS "obtains information about the target users' device via the Whats[A]pp servers," such as the structure of the device's operating system and the location of crucial memory files, App.C at 12— which NSO concedes "a regular WhatsApp user using the [Official Client] cannot obtain," P.App.A at 304:3-14.  That is proscribed under *Van Buren* because that information is "off limits" to NSO.  593 U.S. at 396.  Obtaining that information from WhatsApp's servers suffices to establish NSO's violation of the CFAA, but NSO also violated it by obtaining information from target devices (WhatsApp users' mobile phones)

because the CFAA prohibits "access[ing] a computer" and "thereby" obtaining information "from *any* protected computer," which need not be the same computer.  18 U.S.C. § 1030(a)(2)(c).

NSO further ignores that "a defendant can run afoul of the CFAA when he or she has no permission to access a computer or *when such permission has been revoked explicitly*," and "[o]nce permission has been revoked, technological gamesmanship … will not excuse liability." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067-68 (9th Cir. 2016); *see also United States v. Nosal*, 844 F.3d 1024, 1034-35 (9th Cir. 2016) ("unauthorized access" includes "getting into the computer after categorically being barred from entry").  Here, even assuming NSO had limited authorization, WhatsApp unequivocally revoked that authorization by repeatedly shutting down NSO's exploits and subsequently filing this litigation.  App.C at 12.[3]

---

[3] NSO also incorrectly argues that its reverse-engineering was unrelated to its violation of the CFAA.  The CFAA prohibits circumventing "technological (or 'code-based') limitations on access," *Van Buren*, 593 U.S. at 390 n.8, and it is undisputed that NSO circumvented the technological limitations built into the Official Client by reverse-engineering it to build the WIS, which sends messages through WhatsApp's servers that the Official Client cannot.  *See* Dkt. 467 at 9-10.

*Second*, the district court correctly found that NSO acted with the "intent to defraud" Plaintiffs under the CFAA. *See* 18 U.S.C. § 1030(a)(4); App.C at 12. Plaintiffs established NSO's fraudulent conduct through undisputed evidence that NSO: (1) designed the WIS to send messages through WhatsApp's servers that the Official Client could not; (2) concealed those messages in hidden messaging fields to deliver malware through WhatsApp's servers to its users' devices; and (3) repeatedly redesigned Pegasus to evade Plaintiffs' security measures, including after this litigation was filed. *See* App.C at 12; Dkt. 465 at 11, 15. The district court correctly held that "the fact that defendants redesigned Pegasus to evade detection after plaintiffs first fixed the security breach is enough to prove intent." App.C at 12; *see also* App.D at 9 (emphasizing the "covert, undetectable nature of defendants' technology" and "the repeated efforts to circumvent plaintiffs' security measures").

NSO concedes that its persistent attempts to evade detection "suggest" that it "intended to 'deceive' WhatsApp," but incorrectly asserts that "intent to defraud" requires "an intent to deprive a victim of money or property by deception." Mot. at 12-13. As the district court recognized,

NSO "cite[s] no authority applying [its] purported rule to violations of the CFAA or CDAFA." App.A at 3. Rather, as it did below, NSO cites to one case evaluating the phrase "intent to defraud" as used in a credit-card fraud statute, not the CFAA. *See* Mot. at 12-13; *United States v. Saini*, 23 F.4th 1155, 1160 (9th Cir. 2022). And NSO ignores that courts in this Circuit recognize that "[t]he term 'defraud' for purposes of § 1030(a)(4) [of the CFAA] simply means wrongdoing." *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008); *see also Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) ("This Court has held that fraud 'under the CFAA only requires a showing of unlawful access ....'").

*Third*, the district court correctly rejected NSO's "law enforcement" defense because there is "no evidence that the United States has ever used Pegasus for law enforcement activities." App.E at 1. NSO nonetheless argues that because the FBI purportedly purchased a Pegasus license in December 2018, NSO cannot be liable for *any* conduct after that date. Mot. at 13-14. As a threshold matter, NSO has repeatedly failed to prove that the FBI licensed Pegasus. NSO produced

no license agreement with the FBI,[4] nor evidence that the FBI (or any U.S. law enforcement agency) used Pegasus as a part of a "lawfully authorized investigative" activity.  18 U.S.C. § 1030(f); *see also* App.A at 5 ("[D]efendants have … repeatedly failed to produce any evidence that the conduct challenged in this case was part of a lawfully authorized investigative … activity of a law enforcement agency ….").[5]

Regardless, NSO's research and development activities for Pegasus are not transformed into the *FBI's* "investigative, protective, or intelligence activity," 18 U.S.C. § 1030(f), merely because the FBI purportedly purchased one license.  NSO claims only that the FBI contracted for "maintenance" (Mot. at 14) but does not explain what that required NSO to do, or whether "maintenance" applied to NSO's proven abuses of WhatsApp technology.  Nor does NSO contend that the FBI sanctioned NSO's hacking of WhatsApp, or that NSO hacked WhatsApp

---

[4] NSO instead relies on a letter certifying that a Delaware company is authorized to purchase Pegasus on the FBI's behalf, Dkt. 396-5, Ex. G at 264:7-18, and a certificate submitted to the Israeli government indicating how the FBI intended to use Pegasus, *id.*, Ex. N.

[5] The FBI itself has publicly stated that it never used Pegasus "operationally" or "in any investigation" at all.  Dkt. 422-2, Ex. 44 at 37.

*solely* on behalf of the FBI and not its other purported government customers.

*Finally*, the district court correctly held that NSO breached WhatsApp's Terms. At summary judgment, the undisputed evidence showed that WhatsApp users must agree to the Terms in order to create a WhatsApp account. *See* App.A at 3. The evidence further showed that WhatsApp provided reasonably conspicuous notice of the Terms and that NSO unambiguously agreed to them. When a user downloads and opens the Official Client, the welcome screen displays a link to the terms and requires the user to click "agree and continue" to create a WhatsApp account. *See* Dkt. 436-5 at 6 (screenshots of welcome screen in place during relevant time period); Dkt. 422-2 at 174:4-21 (corporate representative testimony stating "the welcome screen includes links to the terms of service," and that a user must "agree to the terms of service[][to] continue with the registration flow"). NSO admits it followed these steps to create WhatsApp accounts. *See* P.App.B at 71:6-15. Thus, the court correctly observed that NSO "cannot meaningfully dispute" that it agreed to the Terms. App.C at 14.

The cases NSO relies on *support*, rather than undermine, the district court's conclusion. *See* Mot. at 15. *Berman* states that "a user's click of a button can be construed as an unambiguous manifestation" where, as here, "the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). And NSO's reliance on cases like *Ramirez v. Trusper Inc.*, 2025 WL 2955231, at *2 (9th Cir. Oct. 20, 2025) is misplaced because here, unlike those cases, Plaintiffs provided screenshots of the welcome screen at summary judgment. *See* Dkt. 436-5 at 6.

## B.   The District Court Properly Granted the Permanent Injunction

NSO advances no "serious legal questions" regarding the propriety of the district court's permanent injunction.

*First*, NSO argues that the district court abused its discretion by finding that Plaintiffs are harmed "when they are not able to offer … end-to-end encryption" to their users, App.D at 7, because Plaintiffs disclaimed reputational damages. *See* Mot. at 17-19. Not so. The district court's finding was grounded in harm to Plaintiffs because any impact on WhatsApp's ability to offer end-to-end encryption, on which its business

model is predicated, directly harms WhatsApp's ability to offer its messaging platform. *See, e.g.*, Dkt. 749 at 325:12-20 (trial testimony from WhatsApp senior executive that WhatsApp developed end-to-end encryption because "privacy is the foundation of WhatsApp[]"); *id.* at 353:4-5 (testifying that WhatsApp's "fundamental goal is to provide the world with private and secure communication"). And, over the course of this case and at trial, the district court heard evidence about how WhatsApp incurred significant costs in responding to NSO's unlawful acts that violated users' privacy. *See* Dkt. 751 at 675:3-4 (Plaintiffs' expert concluding that Plaintiffs "spent at least $444,719 in responding to the NSO attacks").

Regardless, NSO ignores that the district court's finding of irreparable harm was also based on the fact that "plaintiffs are harmed … when their servers are improperly accessed." App.D at 7. And "[n]umerous courts" in this Circuit "have found that unauthorized access of computers and the acquisition of data … constitute irreparable harm." *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019); *see also Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *10 (N.D. Cal. Nov. 21, 2023)

(defendants' CFAA and CDAFA violations gave rise to irreparable injury even where defendant's "account takeover scheme" was stopped over two years earlier).

*Second*, the district court narrowly tailored the injunction to prevent the recurrence of NSO's unlawful conduct. NSO argues that the provisions of the injunction prohibiting it from using the WhatsApp application or collecting WhatsApp messages through any means are overbroad because NSO was only held liable for hacking WhatsApp's servers. Mot. at 20. NSO ignores that injunctions can cover acts "entirely proper when viewed alone" if doing so will prevent future violations. *United States v. U.S. Gypsom Co.*, 340 U.S. 76, 88-89 (1950). Indeed, "it is well established that 'federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct' or to prevent 'continued violations' of the law." *Power Ventures*, 252 F. Supp. 3d at 784 (quoting *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985)).

Here, the unauthorized exfiltration of WhatsApp messages from the client application—whether via WhatsApp's servers or through some other method that NSO has unfairly hidden via its discovery violations—is the very objective of NSO's unlawful conduct. As NSO's head of research and development testified, "[t]he purpose of Pegasus is to enable [NSO's] customers to get access to the data which resides on their targets' smartphones." P.App.A at 94:11-20; *see also* App.D at 8, 17 (finding "the ultimate purpose of [NSO's] actions was to obtain data from the target users," and that "while it may remain legal to create new Whats[A]pp accounts and to use Whats[A]pp, the facts in this case show that such activities have been used as a precursor to illegal activities"). Therefore, the district court correctly concluded that these provisions are "sufficiently related to defendants' unlawful access of plaintiffs' and their users' data." App.A at 7-8.

*Finally*, the district court correctly omitted reference to the CFAA's U.S. law enforcement exception because, as noted above, NSO "provided no evidence that the United States has ever used Pegasus for law enforcement activities." App.E at 1. And NSO cites no authority, nor could it, for the proposition that courts should craft injunctions to account

for a law breaker's claim that it may seek to act within some statutory safe harbor in the future.

## II.    NSO Will Not Suffer Irreparable Injury from the Denial of a Stay

NSO fails to meet its burden to show more than "some 'possibility of irreparable injury.'" *Nken*, 556 U.S. at 434.  As the district court found, NSO's "own evidence on this motion" contradicts its claims of irreparable harm.  App.A at 7.

*First*, NSO argues the injunction's provision requiring that it "delete and destroy any and all computer code or technologies that use, access, or depend on the WhatsApp Platform" is "irreparable [harm] because the deletion … cannot be undone."  Mot. at 21-22.  That argument contradicts NSO's representations to the district court throughout the litigation that its use of WhatsApp is narrow.  For example, NSO represents that it "no longer has any installation vectors for Pegasus that use WhatsApp, WhatsApp's servers, or WhatsApp's client application."  App.B at 8.[6]  NSO cannot simultaneously claim to

---

[6]  Further, NSO stated that its WhatsApp installation vector "represent[ed] a very small fraction of Pegasus' overall capabilities with respect to obtaining information from Android devices."  App.B at 2.

have ceased exploiting WhatsApp, and credibly argue that it would be irreparably harmed by an injunction requiring it to delete its technologies that use WhatsApp.

*Second*, NSO argues the injunction will "put NSO's entire enterprise at risk," Mot. at 22, apparently because it prohibits NSO from "[c]ollecting, or assisting others in collecting, data or information from the WhatsApp Platform," App.F at 2. However, a movant's "loss of business is generally not 'irreparable.'" *See Vanguard Outdoor, LLC v. City of Los Angeles*, 2010 WL 11531294, at *3 (C.D. Cal. Oct. 18, 2010). For example, in *Mytee Products, Inc. v. Harris Research, Inc.*, Mytee, like NSO, moved for a stay and "represent[ed] that the injunction is causing a significant financial hardship to Mytee because it is unable to sell *additional products configured to work with the enjoined glides*, as well as causing the loss of *collateral sales of other products* that occur with the sale of those products." 2010 WL 11509027, at *2 (S.D. Cal. June 25, 2010). Reasoning that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected," the court held that the "loss of sales dependent on the continued use of an infringing

product does not constitute irreparable harm." *Id.* Here, NSO's use of Pegasus to target WhatsApp violates the law, and NSO is not entitled to continue that use because of some claimed hardship.

Additionally, the limited evidence produced by NSO contradicts its assertion in this motion that its entire business depends on WhatsApp. For example, Exhibit E to NSO's CEO Yaron Shohat's declaration, which NSO omitted from the appendices to its motion before this Court, is a Pegasus "Product Description" brochure showing that collecting data from WhatsApp is only one of Pegasus's many capabilities. *See* P.App.C at 6. According to NSO, Pegasus can also "[c]ollect … contacts, files, environmental wiretaps, and passwords," "[a]ctivate the microphone to listen in on a target's environment, turn on the camera to take snapshots, and take screenshots to collect non-communications data," "[i]ntercept calls," and "[m]onitor a multitude of applications including Skype, WhatsApp, Viber, WeChat, Line, Facebook Messenger, Telegram, and Blackberry Messenger." *Id.* Those capabilities will be enjoined only to the extent they depend on NSO's use of WhatsApp.

NSO argues that the injunction entered by the district court would "put NSO's entire enterprise at risk" (Mot. at 22). But the declaration

submitted by Mr. Shohat in support of NSO's motion is, conspicuously, far more limited, asserting only that: "If *all versions of Pegasus* were rendered unavailable *for any substantial period of time*, NSO would be *at risk* of going out of business." App.B at 8. This misses the mark. Mr. Shohat does not assert, let alone provide evidence, that "all versions of Pegasus [would be] rendered unavailable." *Id*. at 6.[7] And he does not say, let alone provide evidence, that NSO *will* lose business as a result of the injunction. *See id.* Instead, he states the injunction "would force *changes* to NSO's existing Pegasus products," without identifying those changes. *Id.* Thus, NSO's claims of irreparable harm ring hollow. That is particularly so given NSO's assertion that Pegasus "can be configured to comply with any applicable laws or collection orders" (*id.*)—if that is so, then NSO should simply configure it to comply with the injunction and abandon all noncompliant use.

*Lastly*, NSO does not assert that the injunction's other prohibitions—against, e.g., "emulat[ing] any aspect of the WhatsApp Platform," App.F ¶ 3(a), "[r]everse engineering or decompiling code from

---

[7] If there were such evidence, that would only establish that all versions depend on NSO's unlawful abuse of WhatsApp technology.

the WhatsApp Platform," *id.* ¶ 3(c), or "[c]reating accounts … on the WhatsApp Platform," *id.* ¶ 3(d)—would cause it irreparable injury.

## III.    A Stay Would Cause Plaintiffs Irreparable Injury

The ongoing irreparable injury to Plaintiffs from NSO's misconduct weighs heavily against granting a stay.  In granting the injunction, the district court correctly found that the irreparable harm factor weighed "strongly" in Plaintiffs' favor.  App.D at 10.  Plaintiffs suffer harm from NSO's hacking of WhatsApp's servers and the resulting impact on WhatsApp's ability to offer end-to-end encryption to its users.  *Id.* at 7-8.  The district court also recognized that there is "no dispute that [NSO's] conduct is ongoing," and that the "undetectable nature of defendants' technology … shows the difficulty of preventing or mitigating" the harm to Plaintiffs.  *Id.* at 10.  Indeed, NSO admits that "during the entire pendency of this case" its technology has continued to "permit[] its government customers to collect the data of WhatsApp users" without disclosing how.  Dkt. 813 at 22.[8]

---

[8] NSO's continued lack of disclosure or discovery regarding its present conduct is especially troublesome and may explain (though not justify) NSO's fervid arguments in this motion to avoid being enjoined from misusing WhatsApp technology.

NSO argues that the district court improperly considered harm to WhatsApp's users. Mot. at 24-25. As noted above, the district court's findings were grounded in harm to Plaintiffs, not their users. *See* App.D at 7 ("[P]laintiffs are harmed not only when their servers are improperly accessed, but also when they are not able to offer … end-to-end encryption ….").

NSO also suggests, without support, that Plaintiffs were not harmed because they did not seek immediate injunctive relief. Mot. at 25. NSO unsurprisingly omits from its motion that it concealed its post-litigation hacking and surveillance activity from Plaintiffs and the district court, and did not disclose it until September 2024, at the end of the discovery period, that its hacking of WhatsApp had continued during the pendency of this lawsuit. *See* P.App.A at 271:3-8. Plaintiffs then moved for an injunction in February 2025, promptly after summary judgment. Regardless, any delay does not have "equal bearing in the permanent injunction context." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023).

## IV.  The Public Interest Does Not Favor a Stay

The public interest would not be served by a stay of the injunction. NSO's contrary arguments are based in speculation, not evidence, including NSO's reliance on testimony from its purported experts that the district court found to be untethered to the conduct at issue in this case.  *See* Dkt. 686 at 13-14 (finding NSO's policy experts to be "overly reliant on the type of generalized testimony regarding law enforcement, military, and intelligence purposes that are not sufficiently tethered to the conduct alleged in this case").

NSO claims that a stay would prevent the FBI or other U.S. law enforcement agencies from using Pegasus.  Mot. at 26.  There is no evidence to support NSO's assertions.  As noted above, the district court has repeatedly rejected this argument—including NSO's claim that U.S. law enforcement agencies *could use* Pegasus in the future—because NSO "has provided no evidence that the United States has *ever used* Pegasus for law enforcement activities."  App.E at 1.

NSO also relies on testimony from its purported expert, Joshua Minkler, to argue that end-to-end encryption "threatens [U.S. law enforcement's] ability to investigate and prosecute crimes."  Mot. at 26.

But, as the district court recognized in granting the permanent injunction, Mr. Minkler "had not interviewed anyone at NSO, had not operated Pegasus or seen it in use, and had no knowledge of NSO's clients or the targets against whom Pegasus has been used."  App.D at 13. Accordingly, the district court declined to consider Mr. Minkler's testimony at the injunction hearing (*id.*), after previously excluding Mr. Minkler's opinions as irrelevant to damages at trial.  Dkt. 686 at 14.

NSO's claim that the public interest would be harmed because foreign governments would be "depriv[ed]" access to Pegasus fares no better.  Mot. at 26-27.  NSO provides no evidence that foreign governments have used or could use Pegasus.  NSO relies on testimony from its purported expert, Col. Ty Shepard, who NSO claims is "aware of dozens of Pegasus uses by foreign governments," and Mr. Minkler.  *Id.* at 27.  But Col. Shepard conceded that he was not aware of the "U.S. utilizing the Pegasus system in any [hands-on] way" and declined to provide any details on NSO's customers' use of Pegasus because such information was "classified."  Dkt. 648-4, Ex. B at 69:23-70:14, 82:13-18, 83:10-85:10.  Unsurprisingly, the district court declined to consider the opinions of Col. Shepard (which NSO offered via declaration not subject

to cross-examination) and previously excluded his "generalized testimony" at trial as irrelevant. App.D at 13; Dkt. 686 at 14. And Mr. Minkler's participation in an investigation in which Mexican and U.S. law enforcement agencies shared information derived from *lawful wiretaps* has no bearing on the benefits of *Pegasus* to foreign governments. *See* Mot. at 27.

The public interest would be served by denying a stay because, as this Court has recognized, "[i]nternet companies and the public do have a substantial interest in … blocking abusive users, identity thieves, and other ill-intentioned actors." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022); *see also Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ("[T]he public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy.").

## Conclusion

For the foregoing reasons, the Court should deny NSO's motion for a stay.

Dated:  Jan. 5, 2026        Respectfully Submitted,

                            DAVIS POLK & WARDWELL LLP

                            By:  /s/ Micah G. Block
                                 Greg D. Andres
                                 Antonio J. Perez-Marques
                                 DAVIS POLK & WARDWELL LLP
                                 450 Lexington Avenue
                                 New York, New York 10017
                                 Telephone: (212) 450-4000
                                 Facsimile: (212) 701-5800
                                 Email:
                                 greg.andres@davispolk.com
                                 antonio.perez@davispolk.com

                                 Micah G. Block (SBN 270712)
                                 DAVIS POLK & WARDWELL LLP
                                 900 Middlefield Road, Suite 200
                                 Redwood City, California 94063
                                 Telephone: (650) 752-2000
                                 Facsimile:  (650) 752-2111
                                 Email:      micah.block@davispolk.com

                                 *Attorneys for Plaintiffs-Appellees*
                                 *WhatsApp LLC and Meta Platforms,*
                                 *Inc.*

## Certificate of Compliance

Pursuant to Fed. R. App. P. 27(d) and 33(g), I certify that:

1.     This document complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,591 words, excluding the portions exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f).

2.     This document complies with the typeface requirements of Circuit Rule 27-1(1)(c) and Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font with Microsoft Word.

Dated: January 5, 2026

/s/ *Micah G. Block*

31

# P.App.A

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1            H I G H L Y   C O N F I D E N T I A L

2                    ATTORNEYS' EYES ONLY

3              NORTHERN DISTRICT OF CALIFORNIA

4                      OAKLAND DIVISION

5                         Case No. 4-19-cv-07123-PJH

6      -----------------------------------

7      WHATSAPP INC., a Delaware corporation,

8      and META PLATFORMS INC., a Delaware corporation,

9            Plaintiffs,

10     v.

11     NSO GROUP TECHNOLOGIES LTD and

12     Q CYBER TECHNOLOGIES LTD,

13            Defendants.

14     -----------------------------------

15        Deposition of TAMIR GAZNELI, taken by AILSA

16      WILLIAMS, Certified Court Reporter, held at the

17     offices of Davis Polk & Wardwell, London, United

18        Kingdom, on 4 September, 2024 at 9:00 a.m

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1 testimony on behalf of both the defendants?
2     A  Yes.
3     Q  If I refer to NSO Group as NSO and I
4 refer to Q Cyber as Q, will that be clear to you.
5     A  Yes.
6     Q  What did you do to prepare to
7 testify as to defendants' knowledge on your
8 designated topics?
9     A  Well, I read hundreds of documents,
10 piles of them, and of course meeting with lawyers.
11     Q  Generally, what types of documents
12 did you review to prepare for your testimony?
13     A  Technical documents, everything
14 which was related to the topic.
15     Q  Were the documents you reviewed all
16 documents that have been produced to the
17 plaintiffs in this case?
18     MR. AKROTIRIANAKIS:  Objection, no
19 foundation.
20     A  Our company's documents.  Documents
21 that were produced by NSO.
22     Q  Do you know one way or another
23 whether the documents you have reviewed have been
24 made available to the plaintiffs in this case?
25     MR. AKROTIRIANAKIS:  Objection, no

Page 11

1 foundation.
2     A  I am not aware whether every
3 document was available, but as far as I
4 understood -- I don't have the --
5     Q  You don't know one way or the other?
6     A  I don't know whether every document
7 that I reviewed was presented to plaintiffs.
8     Q  Did you review source code as part
9 of your preparation?
10     MR. AKROTIRIANAKIS:  Objection, vague.
11     A  Which source code do you refer to?
12     Q  Did you review any code as part of
13 your preparation?
14     A  Again, I think -- which code you
15 refer to?
16     Q  Well, I am not referring to any
17 specific code.  I am asking you whether you
18 reviewed any code at all as part of your
19 preparation?
20     A  I refer the parts that I thought may
21 be relevant.
22     Q  So did you review code?
23     MR. AKROTIRIANAKIS:  Objection, vague.
24     A  As I said, part.
25     Q  You did review some?

Page 12

1     MR. AKROTIRIANAKIS:  Objection, vague.
2     A  As I said, some.
3     Q  Some, yes.  Which code did you
4 review?
5     MR. AKROTIRIANAKIS:  Objection, vague.
6     A  Can you clarify whether you ask
7 questions for specific code.
8     Q  Well, what I am asking about is the
9 code that you reviewed.  You said you reviewed
10 some and I am asking you which code did you
11 review?
12     MR. AKROTIRIANAKIS:  And I will object
13 again that the question is vague.  It might be
14 easier if maybe we have it interpreted.  I think
15 you guys are talking past each other.
16     THE INTERPRETER:  Shall I interpret the
17 question?
18     MR. PEREZ-MARQUES:  Sure.
19         (Question interpreted).
20     MR. AKROTIRIANAKIS:  Sorry, which
21 question?  Where did you start?
22     THE INTERPRETER:  "What I am asking
23 about is the code that you reviewed.  You said you
24 reviewed some and I am asking which code did you
25 review?"

Page 13

1     A  Okay.  So I reviewed the code, part
2 of the fingerprinting.
3     Q  The fingerprinting code?
4     A  Yes.
5     Q  In connection with which exploit?
6     A  The ones that were here.
7     Q  We understand that there are a
8 number of 0 click installation vectors that were
9 used via WhatsApp servers.  Is that generally
10 consistent with your understanding?
11     A  No.
12     Q  No?  In what way is that different
13 from your understanding?
14     MR. AKROTIRIANAKIS:  Objection, no
15 foundation.
16     A  I don't understand any relation to
17 WhatsApp servers for 0 click.
18     Q  When you say that -- you made
19 reference to -- well, let me take a step back.
20     You referenced reviewing fingerprinting
21 code?
22     A  Yes.
23     Q  And I thought you said the ones that
24 are at issue in this case, or something to that
25 effect.  Is that right?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 14

1        MR. AKROTIRIANAKIS:  Objection,
2  misstates his testimony.
3        Q   Is that what you said?
4        A   You asked whether the code relates
5  to the 0 click vectors.  Can you repeat what you
6  asked about?
7        Q   I am abandonning that question to
8  try to clarify and get an answer from you.
9        You said you reviewed code for
10  fingerprinting.  Is that right?
11        MR. AKROTIRIANAKIS:  Objection,
12  misstates his testimony.
13        Q   Yes?
14        A   I said -- you asked whether I
15  reviewed some of the code.
16        Q   Mm hmm.
17        A   If that was not your question,
18  please repeat the question?
19        Q   I asked you whether you reviewed
20  some code.  You said "yes".  You agree with that
21  so far?
22        A   Yes.
23        Q   And then I asked you which code and
24  Varda helped translated that, and you said
25  "fingerprinting", right.  Then I asked you which

Page 15

1  fingerprinting code, and you said "the one that we
2  are here to discuss" or words to that effect.  Is
3  that right?
4        A   No, I didn't.
5        Q   That is the piece I would like you
6  to clarify, so which fingerprinting code did you
7  review?
8        MR. AKROTIRIANAKIS:  Objection, vague.
9  No foundation.
10        A   I reviewed the code that was
11  relevant for the specific timeframe we are talking
12  about.
13        Q   Okay.  Was it fingerprinting code in
14  connection with Pegasus?
15        A   I don't have access to any other
16  code.
17        Q   Do you know whether the code you
18  reviewed is used in connection with Pegasus?
19        A   Can you please clarify the
20  timeframes you are asking about.
21        Q   At any timeframe?
22        A   As far as I understand, we are here
23  to discuss specific timeframes.
24        Q   Okay, but my question is not limited
25  to any particular timeframe.  My question is just

Page 16

1  about the code that you reviewed.  Is it code that
2  is used in connection or was ever used in
3  connection with Pegasus?
4        A   The code I reviewed was specific to
5  Pegasus for very specific timeframe.
6        Q   And what timeframe was that?
7        A   Again, I reviewed specific instance
8  of code from about 2019.
9        Q   2019?
10        A   Yes.
11        Q   Did the code you reviewed have a
12  file name?
13        A   It clearly has a file name but I
14  don't recall its name.
15        Q   Did you review any other code
16  besides the one you mentioned?
17        A   No.
18        Q   What else did you review as part of
19  your preparation to testify as a corporate
20  representative?
21        A   I reviewed the documents that we
22  produced for this case in terms of our code, our
23  documents.
24        Q   Were the documents you reviewed
25  provided to you by counsel or did you gather any

Page 17

1  documents on your own?
2        A   It was by counsel.
3        Q   You didn't do any investigation or
4  collection of documents on your own?
5        A   You refer to a specific document or
6  specific types of documents?
7        Q   No, I am not referring to any
8  specific documents.  I am asking you whether you
9  did any investigation or collection of documents
10  on your own as part of your preparation to testify
11  as a corporate representative today?
12        MR. AKROTIRIANAKIS:  Objection, vague.
13        A   Besides what I said, no.
14        Q   So the only ones you reviewed were
15  the ones provided by counsel, is that right?
16        A   Yes.
17        Q   Did you talk to anyone as part of
18  your preparation, besides counsel, anyone else to
19  prepare for your testimony?
20        A   No.
21        Q   And when did you first meet with
22  counsel or speak with counsel as part of your
23  preparation to testify today?
24        A   Two days ago.
25        Q   And how long -- was that in person

5 (Pages 14 - 17)

Page 26

1    Q   Okay, and which applications were
2 you working on understanding at that time?
3        MR. AKROTIRIANAKIS:  Vague as to time.
4        MR. PEREZ-MARQUES:  In your time as
5 security researcher.
6    A   Browsers.
7    Q   Only browsers?
8    A   Yes.
9    Q   Which browsers?
10   A   Back then I think there were two of
11 them only.
12   Q   Which ones?
13   A   The one I remember is Chrome.
14   Q   Chrome?
15   A   Yes.
16   Q   For what purpose were you working to
17 understand Android and these browsers?
18   A   I think I answered the question, in
19 order to understand, get the in-depth
20 understanding of how they function and what are
21 the related functionalities.
22   Q   And for what purpose were you
23 seeking to understand and develop the in-depth
24 understanding of how they function?
25   A   To be able to develop the tools that

Page 27

1 the company develops for the customers.
2    Q   What tools?
3    A   Software that enables the customers
4 to get the information they need for doing their
5 job.
6    Q   Let me ask it this way.  Were you
7 seeking to understand these browsers and operating
8 systems in order to identify vulnerabilities that
9 could be used to develop installation vectors?
10       MR. AKROTIRIANAKIS:  Do you need it
11 translated?
12   A   No.
13       MR. AKROTIRIANAKIS:  Okay.
14   Q   Can you repeat the question?
15   Q   Were you seeking to understand these
16 browsers and operating systems in order to
17 identify vulnerabilities that could be used to
18 develop installation vectors?
19   A   Yes.
20   Q   And were those installation vectors
21 for Pegasus?
22   A   Yes.
23   Q   During your time as security
24 researcher -- let me withdraw that.
25       It says on your bio that you were

Page 28

1 security researcher from November 2015 to
2 December 2017.  Is that correct?
3    A   Yes.
4    Q   And during that period as security
5 researcher, did you do any work to develop
6 installation vectors that would operate via
7 WhatsApp?
8    A   No.
9    Q   In December 2017 you were promoted
10 to Security Research Team Leader.  Is that
11 correct?
12   A   Yes.
13   Q   And what were your responsibilities
14 as Security Research Team Leader?
15   A   I was responsible for the team --
16 one of the research teams in the research group.
17   Q   And what did that research team
18 focus on?
19   A   Android applications.
20   Q   Which Android applications?
21   A   Not specific, just any.
22   Q   Did that work relate at all to
23 WhatsApp, the work of that team?
24       MR. AKROTIRIANAKIS:  Objection, vague.
25   A   Part of the team.

Page 29

1    Q   Okay.  Which part of the team
2 related to WhatsApp or did work that related to
3 WhatsApp?
4    A   You mean by number, you mean by
5 name?  What is the question?
6    Q   How many people -- why don't we
7 start with how many about people were working on
8 WhatsApp as part of the team that you led as
9 Security Research Team Leader?
10       MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12   A   Four.
13   Q   Do you recall their names?
14   A   Yes.
15   Q   Who were they?
16   A   Shmaryahu Rubinstein, Ofir Tadmore,
17 Oved Beychan, Shaked Barkan.
18   Q   I suspect Ailsa may want spellings
19 on those but we will just make a note and come
20 back to that.
21       And you supervised that team that was
22 working on WhatsApp during your time as Security
23 Team Research Leader.
24   A   Yes.
25   Q   And what were they doing with

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 30

1 respect to WhatsApp?
2      A   Research application.
3      Q   Again for the purpose of developing
4 installation vectors?
5      A   I will say it is developing the
6 software required for gaining access.
7      Q   As I understand it, installation
8 vectors are software required to gain access.  Is
9 that consistent with your definition of what an
10 installation vector is?
11      MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13      A   Can you define access?  When you say
14 "access" what do you mean by access?
15      Q   You said access.  "I will say it is
16 developing the software required for gaining
17 access."  What did you mean by access?
18      A   Access to the data which resides on
19 the endpoint.
20      Q   That reside on the endpoint?
21      A   Yes.
22      Q   Meaning the target device?
23      A   Yes.
24      Q   Now we have also heard endpoint used
25 to refer to Pegasus.  Is that -- do you use

Page 31

1 endpoint in that sense or no?
2      MR. AKROTIRIANAKIS:  Objection, vague.
3      A   I use endpoint as target device.
4      Q   Okay.  And so the team that was
5 working on WhatsApp that you supervised as
6 Security Research Team Leader was investigating
7 WhatsApp in order to develop software that could
8 be used to gain access to target devices?
9      MR. AKROTIRIANAKIS:  Objection,
10 misstates his testimony.
11      A   The team was researching Android
12 related applications and services in order to gain
13 access to the endpoint data.
14      Q   Okay.  Now, you testified previously
15 that they were doing work -- you gave us the four
16 names who were doing work related to WhatsApp?
17      A   Yes.
18      Q   And what work were they doing
19 related to WhatsApp?
20      MR. AKROTIRIANAKIS:  Objection,
21 compound.
22      A   Which question do you want me to
23 answer?
24      Q   The one that you didn't answer.  I
25 said you gave us four names doing work related to

Page 32

1 WhatsApp.  You answered that question, you said
2 yes, and then I asked you "What work were they
3 doing related to WhatsApp?"  That is the question
4 I would like you to answer?
5      A   To understand how the application
6 works.
7      Q   For what purpose?
8      A   As I stated before, in order to
9 build the software that gets access to the
10 endpoint's data.
11      Q   And when you say software that gets
12 access to the endpoint's data, is that different
13 than an installation vector?
14      A   Installation vector is like -- your
15 definition for it -- the main purpose for it is to
16 gain access to endpoints data.
17      Q   That is the main purpose of an
18 installation vector?
19      MR. AKROTIRIANAKIS:  Objection,
20 misstates his testimony.
21      A   That was -- that is the purpose of
22 these types of software tools.
23      Q   And when you say this type of
24 software tools you mean installation vectors?
25      MR. AKROTIRIANAKIS:  Objection,

Page 33

1 misstates his testimony.
2      MR. PEREZ-MARQUES:  I'm just not
3 understanding your testimony.  That is why I am
4 following up.  You said:
5      "Installation vector is like -- your
6 definition of the main purpose for it is to gain
7 access to endpoint's data."
8      I am trying to understand that answer.
9 Are you saying that the purpose of an installation
10 vector is to gain access to an endpoint data.
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates his testimony.
13      A   Installation vector is just the part
14 of gaining the access.  This is not the purpose of
15 the software.
16      Q   You said "Installation vector is
17 just the part of gaining access."  Then did you
18 say "this is not the purpose of the software"?
19      A   Software is built, designed and
20 built in order to gain access to the data on the
21 endpoints or endpoint.  Installations vector --
22      Q   Are you familiar with -- and when
23 you refer to software are you referring to
24 Pegasus?
25      MR. AKROTIRIANAKIS:  Objection, vague.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 34

1    A   Any software that deals with domain.
2    Q   The team that you were supervising
3  that was doing work related to WhatsApp, were they
4  working on Pegasus?
5    A   Yes.
6    Q   Okay.  Are you familiar with a piece
7  of software referred to as "Heaven"?
8    A   Yes.
9    Q   What type of software would you call
10 Heaven?
11   A   Which terminology do you want me to
12 answer?
13   Q   I am asking you, in your own words,
14 what type of software you would call Heaven?
15   A   We can call it installation vector
16 that enables.
17   Q   So the team that you were
18 supervising that was working on WhatsApp was not
19 working on installation vectors.  Is that right?
20   MR. AKROTIRIANAKIS:  Objection,
21 misstates his testimony.
22   A   No.
23   Q   They were working on installation
24 vectors?
25   A   They were working on Android

Page 35

1  framework software.
2    Q   For the purpose of developing
3  installation vectors?
4    MR. AKROTIRIANAKIS:  Object to the form
5  of the question.
6    A   For the purpose of developing
7  capabilities which may or my not become
8  installation vectors.
9    Q   Got it.  And I take it besides this
10 four member team that was working on WhatsApp,
11 were there other teams that you supervised as
12 Security Research Team Leader?
13   A   No.
14   MR. AKROTIRIANAKIS:  Object to the form.
15   Q   So you were just overseeing the
16 WhatsApp team?
17   A   No.  There was a team I supervised.
18 You asked before which part of them worked on
19 WhatsApp.
20   Q   Mm hmm.
21   A   This part worked on WhatsApp.
22   Q   But there were other researchers who
23 were working on other applications?
24   MR. AKROTIRIANAKIS:  Object to the form
25 of the question.

Page 36

1    A   There was no other team.  There were
2  other researchers in the team.  You asked was
3  there another team I was --
4    Q   Let me read you back my question.
5  There were other researchers who were working on
6  other applications.  Is that right?
7    MR. AKROTIRIANAKIS:  Object to the form
8  of the question.
9    A   Inside my team?
10   Q   Within your team, as Security
11 Research Team Leader from December 2017 to
12 January 2020, were there other researchers working
13 on applications other than WhatsApp?
14   A   Yes.
15   Q   And what applications were those
16 team members working on?
17   A   Browsers.
18   Q   Do you recall which browsers?
19   A   Yes.
20   Q   And were they similarly -- which
21 browsers was it?
22   A   Chrome and Samsung browser.
23   Q   Samsung browser?
24   A   Yes.
25   Q   Were they also doing that research

Page 37

1  for the purpose of it potentially turning into
2  installation vectors?
3    A   Yes.
4    Q   And so fair to say that when you
5  were Security Research Team Leader your work
6  focused on research and support of the development
7  of installation vectors?
8    MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10   A   Can you repeat the question?
11   Q   Is it fair to say that when you were
12 Security Research Team Leader your work focused on
13 research in support of the development of
14 installation vectors?
15   MR. AKROTIRIANAKIS:  Same objection.
16   A   When you say "in support of", can
17 you please explain?
18   Q   For the purpose of potentially
19 developing installation vectors?
20   A   Yes.
21   Q   Are you familiar with the
22 terminology "0 click exploit"?
23   A   Yes.
24   Q   What is a 0 click exploit?
25   A   An exploit that does not require any

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1 interaction from the target.
2      Q   Was the research that your team was
3 doing during your time as Security Research Team
4 Leader for the purpose, at the least in part, of
5 developing 0 click exploits?
6      MR. AKROTIRIANAKIS:  Object to the form.
7 No foundation.
8      A   I will say it this way.  The team's
9 responsibility was to develop, research and
10 develop capabilities for installation vectors.
11 Whether it is 0 click or not is a matter of
12 capability itself.
13      Q   Did the team during the time that
14 you supervised it develop 0 click exploits?
15      A   Part of the time.
16      Q   Did that include 0 click exploits
17 that worked via WhatsApp?
18      MR. AKROTIRIANAKIS:  Object to the form
19 of the question.  Vague.
20      A   Can you explain?  What do you mean
21 by "via"?
22      Q   You have read the complaint in this
23 case?
24      A   Yes, although I don't remember the
25 exact wording.

Page 39

1      Q   Let me ask it this way.  You
2 understand that Heaven -- you are familiar with
3 the Heaven installation vector?
4      A   Yes.
5      Q   And that worked via WhatsApp, is
6 that right?  That used WhatsApp messages as part
7 of the installation?
8      MR. AKROTIRIANAKIS:  Objection, no
9 foundation.
10      A   Yes.
11      Q   And so when I say "via WhatsApp",
12 what I mean is the relationship between the
13 installation vector and WhatsApp, such as the one
14 that Heaven had.  Is that clear to you?
15      MR. AKROTIRIANAKIS:  Objection, vague.
16      A   Yes.
17      Q   And so with that clarification, did
18 the team that you supervised as Security Research
19 Team Leader develop 0 click exploits that worked
20 via WhatsApp?
21      A   It developed 0 click vectors
22 which -- one of the ways was via WhatsApp.
23      Q   Okay.  Did those vectors that they
24 developed have names?
25      A   Heaven, Eden and ERISED.

Page 40

1      Q   And so Heaven, Eden and ERISED were
2 developed by the researchers on the team that you
3 supervised as Security Research Team Leader?
4      A   Yes.
5      Q   You were promoted to -- let me ask
6 this.  What was your role in the development of
7 those vectors, Heaven, Eden and ERISED?
8      A   I was a team leader.
9      Q   And as team leader what role did you
10 have in the development of those vectors?
11      MR. AKROTIRIANAKIS:  Objection, vague.
12      A   I was responsible for the employee
13 allocation on the development procedures, research
14 procedures and development of the vector itself.
15      Q   So you are very familiar personally
16 with those exploits?
17      MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19           (Fire alarm test.)
20      THE VIDEOGRAPHER:  Going off the record.
21 The time is 10:00 a.m.
22           (A short break)
23      THE VIDEOGRAPHER:  This is the beginning
24 of media card number two, volume one, in the video
25 deposition of Tamir Gazneli.  Going on the record.

Page 41

1 The time is 10:12.
2      MR. PEREZ-MARQUES:  Mr. Gazneli, do you
3 understand you are still under oath?
4      A   Yes.
5      Q   When we broke for the fire alarm, I
6 believe we had a question pending.  I had asked
7 you whether you would agree that you are very
8 familiar personally with the Eden, Heaven and
9 ERISED exploits?
10      MR. AKROTIRIANAKIS:  Objection, vague.
11      A   I would say that I am familiar with
12 the exploits but not each and every line in the
13 code.
14      Q   But you led the team that developed
15 them, right?
16      A   Yes.
17      Q   You were promoted to Director of R&D
18 in January 2020.  Is that correct?
19      A   Yes.
20      Q   Who did you replace as Director of
21 R&D?
22      A   Oz Golan.
23      Q   Oz Golan?
24      A   Yes.
25      Q   What were your duties as Director of

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 42

1 R&D?
2     A  I was leading the R&D of the entire
3 Android framework.
4     Q  Only Android?
5     A  Yes.
6     Q  Was there another -- were there
7 multiple Directors of R&D.?
8     A  Yes.
9     Q  And was your work at that time as
10 Director of R&D also focused on installation
11 vectors for Pegasus?
12     MR. AKROTIRIANAKIS:  Objection, vague.
13     A  Development of installation vectors
14 is responsibility of part of the teams, yes.
15     Q  What other responsibilities did the
16 team or teams that you supervised as Director R&D
17 have?  What other responsibilities did they have?
18     A  The development of an agent, Android
19 agent, development of the backend server and QA.
20     Q  So you mentioned Android agent,
21 backend server and QA?
22     A  Yes.
23     Q  And when you say Android agent, what
24 do you mean?
25     A  The software that resides on the

Page 43

1 target's device and collects in all the required
2 information.
3     Q  And you refer to that as the agent?
4 Is that a good shorthand for us to use today?
5     A  Yes.
6     Q  And when you say "backend server"
7 what do you mean by that?
8     A  It is a piece of software that
9 resides on the customer's infrastructure and is
10 responsible for managing the installation flow.
11     Q  Managing the installation flow?
12     A  Yes.
13     Q  Installation flow of Pegasus?
14     A  Part of Pegasus.  Not the whole
15 Pegasus.
16     Q  Which part?
17     A  For android.
18     Q  For Android.  So would you consider
19 that one version of Pegasus or how would you refer
20 to that?
21     A  It is one of the parts.
22     Q  And when you say "QA", what do you
23 mean by that?
24     A  Quality assurance.
25     Q  Quality assurance?

Page 44

1     A  Yes.
2     Q  What did the team -- what was the
3 quality assurance work that the team you
4 supervised did?
5     A  Functionality, statistics.
6     Q  Functionality of what?
7     A  Of the agent and the installation
8 flows.
9     Q  Who did you report to as Director of
10 R&D?
11     A  To the VP R&D.
12     Q  Who was that?
13     A  During that period there were three,
14 so to which period do you refer.
15     Q  Let's go through all three.
16     A  The name of the first one I don't
17 remember.  The second one was Yuval Barkan and the
18 third one was Rami Dabush.
19     Q  During your time as Director of R&D,
20 were any researchers that you supervised working
21 on installation vectors via WhatsApp?
22     A  Yes.
23     Q  Which vectors were those?
24     A  When I was of R&D it was ERISED.
25     Q  Any others besides ERISED, during

Page 45

1 your time as Director R&D?
2     MR. AKROTIRIANAKIS:  I am going to
3 object.  That exceeds the timeframe of the court's
4 order which is the limiting factor of the witness'
5 ability to testify about the technology.
6     MR. PEREZ-MARQUES:  So is that an
7 instruction not to answer?
8     MR. AKROTIRIANAKIS:  Yes.
9     Q  ERISED was developed after January
10 2020, is that correct?
11     MR. AKROTIRIANAKIS:  Objection,
12 misstates testimony.  Also vague.
13     A  I didn't answer when it was
14 developed.
15     Q  But after January 2020, members of
16 your team were working on ERISED?
17     MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.  Also vague.
19     A  I would say that after January 2020
20 some of the team members maintained ERISED.
21     Q  And were doing work to maintain
22 ERISED in that post January 2020 period?
23     A  It depends on the specific timeframe
24 and it depends on whether it required any work to
25 be maintained.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1    Q   After January 2020, to the extent
2 work was required, work on ERISED was done by
3 members of the team you supervised?
4        MR. AKROTIRIANAKIS:  Objection,
5 foundation.
6    A   Part of the time.
7    Q   Other than ERISED, and your counsel
8 may instruct on this but I just want to have a
9 clear record, other than ERISED, in that post
10 January 2020 period, did researchers that you
11 supervised work on other installation vectors that
12 would operate via WhatsApp?
13       MR. AKROTIRIANAKIS:  You can answer to
14 the extent it is within the time period April 29,
15 2018 to May 10, 2020.
16   A   In this timeframe, no.
17   Q   And subsequent to May 2020, did
18 members of the team you supervised work on any
19 installation vectors that would work via WhatsApp?
20       MR. AKROTIRIANAKIS:  He is not able to
21 talk about timeframes after the timeframe
22 delineated in the court order?
23       MR. PEREZ-MARQUES:  So is that an
24 instruction not to answer?
25       MR. AKROTIRIANAKIS:  Yes.

Page 47

1        MR. PEREZ-MARQUES:  And you will follow
2 your counsel's instruction and decline to answer
3 as to whether members of your team worked on the
4 development of WhatsApp installation vectors after
5 May 2020?
6    A   Yes.
7    Q   In November 2022, you were promoted
8 to VP R&D, correct?
9    A   Yes.
10   Q   How did your responsibilities change
11 at that point?
12   A   Now I am leading the entire R&D of
13 the company.
14   Q   Who do you report to as VP R&D?
15   A   To the CEO.
16   Q   Would you say -- are you the senior
17 most technological employee at NSO?
18       MR. AKROTIRIANAKIS:  Objection, vague.
19   A   What do you mean by senior and what
20 do you mean by technologically capable?
21   Q   Okay.  What is your working
22 relationship with Yaron Shohat?
23       MR. AKROTIRIANAKIS:  Objection, vague.
24   A   He is my manager.
25   Q   How often do you speak?

Page 48

1    A   A couple of times per week.
2    Q   What about Omri Lavie, what is your
3 working relationship with him?
4        MR. AKROTIRIANAKIS:  Objection,
5 foundation.
6    A   Omri?
7    Q   I may be pronouncing it wrong.
8    A   Omri?
9    Q   L-A-V-I-E?
10   A   I have no --
11   Q   You don't know who that is.
12   A   I know who Omri is but I don't know
13 for sure that you are referring to the same one.
14   Q   Omri, one of the founders of NSO?
15   A   Okay.
16   Q   That is who I am referring to?
17   A   Okay.  I have no continuous
18 connection with him.
19   Q   When was the last time you spoke
20 with him?
21   A   Two months ago, one and a half
22 months ago.
23   Q   What about Ramon Eshkar?  What is
24 your working relationship with him?
25   A   He is one of the members in the

Page 49

1 management of the company.
2    Q   And how often do you speak with him?
3    A   Also a couple of times per week.
4    Q   On what types of issues?
5    A   Customer related and product
6 related.
7    Q   Do you interact with NSO or Q's
8 customers at all?
9    A   Yes.
10   Q   In what capacities and what
11 circumstances do you interact with customers?
12   A   Whenever they demand technical
13 representative.  It is not something I initiate.
14   Q   Is that for existing customers or
15 prospective customers or both?
16   A   Both.
17   Q   Do you participate in the marketing
18 of NSO's products?
19   A   No.
20   Q   So when you talk to prospective
21 customers, in what capacity are you speaking with
22 them?
23       MR. AKROTIRIANAKIS:  Objection, vague.
24   A   Can you explain "capacity"?
25   Q   For what purpose are you speaking

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 62

1 between them.
2     Q   Got it.  So there were people
3 working on one or people working on the other but
4 functionally, in terms of structure they were part
5 of the research group?
6     A   Yes.
7     Q   You said one Development Group.  How
8 is that different from today?  I thought there was
9 only one Development Group today?
10     A   The Platform Group is also a
11 Development Group but back then they were residing
12 in the same group.
13     Q   Any other differences in the
14 structure of the R&D group back in 2018?
15     A   Not that I recall an important
16 difference, no.
17     Q   Is the R&D group currently working
18 on any installation vectors that would operate via
19 WhatsApp?
20     MR. AKROTIRIANAKIS:  I am going to
21 instruct the witness not to answer that question
22 as it is outside the court's balancing on the
23 (inaudible) factors and he is unable to testify to
24 that.
25     MR. PEREZ-MARQUES:  And are you going to

Page 63

1 follow that instruction?
2     A   Yes.
3     Q   So you won't tell me whether as we
4 speak NSO is actively working to develop
5 installation vectors that would operate via
6 WhatsApp?
7     A   I cannot.
8     Q   Based on your client's instruction?
9 I mean your counsel's instruction?
10     A   And regulation for me.
11     Q   You know the answer to that
12 question, right?
13     A   Yes.
14     Q   Are you involved in hiring employees
15 for the R&D group?
16     A   Yes.
17     Q   What qualifications do you look for
18 in the people you recruit for the R&D group?
19     A   Which group?
20     Q   I take it the answer depends on
21 which group, is that right?
22     A   The answer depends on which group,
23 yes.
24     Q   And so for what you call the
25 research groups, Android and iOS, what

Page 64

1 qualifications do you look for?
2     A   It depends which type of research.
3     Q   What are some examples of the type
4 of research around the capabilities you would look
5 for?
6     A   In case of uni research, we search
7 for potential and ability to be able to gain the
8 in-depth understanding of ecosystems and
9 frameworks.  In terms of experts, the ones that
10 already have some kind of in-depth understanding
11 of the ecosystem.
12     Q   And what is the mix within those
13 research groups, Android and iOS, between senior
14 hires who come in with expertise and more junior
15 hires that are hired more on the basis of
16 potential?
17     A   In which timeframe?
18     Q   Let's say now, to start.
19     MR. AKROTIRIANAKIS:  Object to the form
20 of the question.
21     A   The mixture by percentage between
22 experts and non-experts?
23     Q   Mm hmm.
24     A   About 30/40% experts and
25 non-experts, complementary.

Page 65

1     Q   Do you give potential hires any kind
2 of tests?
3     A   Tasks?
4     Q   Tests?
5     A   No.
6     Q   What is the process for researching
7 and developing installation vectors?
8     MR. AKROTIRIANAKIS:  Objection, vague.
9 Vague as to time.  You can answer within the
10 timeframe.
11     MR. PEREZ-MARQUES:  Why don't we do
12 this.  Fair enough.  Let's say during the period
13 from 2018 to 2020, What was the process for
14 researching and developing installation vectors?
15     MR. AKROTIRIANAKIS:  I am sorry, give me
16 a minute if you don't mind.  As I understand your
17 question, I think that is outside the court's
18 order also and his ability under Israeli law to
19 answer the question.
20     MR. PEREZ-MARQUES:  So you are going to
21 instruct him not to answer that?
22     MR. AKROTIRIANAKIS:  Yes.
23     MR. PEREZ-MARQUES:  Let me ask you this.
24 What was the process to develop and test NSO
25 spyware or NSO -- I am sorry.  Let me start over

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1  are.
2      What was the process to develop and test
3  installation vectors in use between April 29, 2018
4  and May 10, 2020?
5      MR. AKROTIRIANAKIS:  You can answer that
6  as it relates to the category in the court's order
7  which itself is limited to, as requested by
8  counsel, "any NSO spyware targeting or directed at
9  WhatsApp servers, or using WhatsApp in any way to
10  access target devices".
11     Q  Do you have that definition in mind
12  Mr. Gazneli?  So the installation vectors I am
13  asking you about are installation vectors that
14  used WhatsApp in any way.  Do you understand that?
15     A  Yes.
16     Q  And so Heaven, Eden, ERISED would be
17  examples of such installation vectors, correct?
18     A  Yes.
19     Q  And so now I am asking you what was
20  the process to develop and test installation
21  vectors that used WhatsApp that were in use during
22  the period between April 29, 2018 and May 10,
23  2020?
24     MR. AKROTIRIANAKIS:  Objection, vague.
25  If you understand you can answer.  Also compound.

Page 67

1      A  I will try to answer based on
2  Israeli law and my restrictions because of it.
3      The process was developed in internal
4  environment, in order to be able to work on our
5  devices on which we investigated the application.
6      Q  Let me just take a step back for a
7  moment to see if I can make our terminology clear.
8  Eden, Heaven and ERISED are all installation
9  vectors that worked via WhatsApp, correct?
10     MR. AKROTIRIANAKIS:  Objection,
11  misstates his testimony.
12     A  Heaven, Eden and ERISED were
13  installation vectors that were activated via
14  WhatsApp.
15     Q  During the period April 29, 2018 to
16  May 10, 2020, were any installation vectors in use
17  besides Heaven, Eden and ERISED that were
18  activated via WhatsApp?
19     A  No.
20     Q  So those are the three, yes?
21     A  Yes.
22     Q  And am I right that NSO sometimes
23  refers to them collectively as Hummingbird?
24     A  Yes.
25     Q  And does the term Hummingbird

Page 68

1  include any vectors other than those three?
2      A  No.
3      Q  So if I refer to the Hummingbird
4  vectors, you will understand that I am referring
5  to those three?
6      A  In respect to the timeframe, yes.
7      Q  Because you are not answering as to
8  anything outside those timeframes, right?
9      A  Yes.
10     Q  And so you referred to -- when I was
11  asking you about the development, you mentioned
12  developing an "internal environment in order to be
13  able to work on our devices on which we
14  investigated the application".  What did you mean
15  by that?
16     A  I mean by -- developing an
17  environment using which you can use the WhatsApp
18  application.
19     Q  And what does that involve?  How do
20  you do that?
21     MR. AKROTIRIANAKIS:  Objection,
22  compound.
23     A  It is like -- it involves the
24  understanding of the functionality of the WhatsApp
25  ecosystem.

Page 69

1      Q  And when you say the WhatsApp
2  ecosystem, what do you mean?
3      A  All the parts that WhatsApp uses in
4  order to communicate between two peers.
5      Q  And so that does that include the
6  WhatsApp client?
7      A  Yes.
8      Q  But it would also include server
9  architecture?
10     MR. AKROTIRIANAKIS:  Objection, vague.
11     A  What do you mean by "architecture"?
12     Q  Why don't I leave the terminology to
13  you.  What else is part of the ecosystem you
14  described, besides the WhatsApp client?
15     A  As I answered before, the parts
16  which are relevant and required in order to
17  communicate between peer to peer.
18     Q  And what parts are those?
19     A  The required server functionality
20  that enables you to send messages from one side to
21  another.
22     Q  So the WhatsApp client, the server
23  functionality.  Is anything else part of the
24  ecosystem you described that enables one WhatsApp
25  clients to communicate with another?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1    A  No.
2    Q  And so as part of the development of
3  the Hummingbird installation vectors, NSO
4  investigated that ecosystem.  Is that right?
5        MR. AKROTIRIANAKIS:  Misstates his
6  testimony.
7    A  We developed an internal environment
8  that enabled us to work on our devices.
9    Q  What does that mean?
10    A  That means that we used WhatsApp
11  clients that were installed on company owned
12  devices and used the functionality that was
13  developed internally which enabled communication
14  between the clients that were used in this
15  internal environment.
16    Q  And that functionality that was
17  developed internally, that is different than the
18  WhatsApp client?
19    A  You are asking about what is
20  applied?
21    Q  I am asking you when you refer to
22  the functionality that was developed internally,
23  that is different from the WhatsApp client.  Is
24  that right?
25        MR. AKROTIRIANAKIS:  Objection,

Page 71

1  misstates his testimony.
2    A  Part of the development, as you
3  asked before, was to develop the functionality
4  that enabled us to communicate between the clients
5  that were installed on company-owned devices.
6    Q  Okay.  And when you say the clients
7  that were installed, you mean the WhatsApp
8  application?
9    A  Yes.
10    Q  Okay.  Are you familiar with the
11  term "emulator"?
12    A  Yes.
13    Q  What is an emulator?
14    A  Emulator is a software that emulates
15  the functionality of specific ecosystem framework
16  application.  It depends what you refer to.
17    Q  And as part of the development of
18  the Hummingbird vectors, NSO created an emulator
19  for the WhatsApp client.  Isn't that right?
20    A  No.
21    Q  Were any emulators used in the
22  development of the Hummingbird vector?
23        MR. AKROTIRIANAKIS:  Objection, vague.
24  Object to the form of the question.
25    A  We used Android emulator, which is

Page 72

1  like Open Source.
2    Q  Any other emulators that were used
3  in the development of the Hummingbird vectors
4  besides the Android emulator?
5    A  By saying "used" you mean?
6    Q  I am not sure how to make that
7  broader or clearer.  Used in any way in the
8  development of the Hummingbird vectors?
9    A  We developed functionality that
10  enabled to communicate, as I said before, between
11  two peers in that internal environment.
12    Q  I am not sure you are answering my
13  question though.  You referenced an Android
14  emulator, right?
15    A  Yes.
16    Q  Were any other emulators used in the
17  development of the Hummingbird vectors?
18    A  I wouldn't call it an emulator.  It
19  is a piece of code that enabled us to send
20  messages from one side, one peer in that internal
21  environment to another one.
22    Q  And the peer that you were sending
23  messages from was a piece of software created by
24  NSO?
25    A  Yes.

Page 73

1    Q  And the peer on the other side would
2  be a target's actual WhatsApp client?
3        MR. AKROTIRIANAKIS:  Objection,
4  misstates testimony.
5    A  The software on the endpoint in the
6  internal environment was WhatsApp client.  It was
7  customized to be used for the internal
8  environment.
9    Q  And in what respect was it
10  customized, the WhatsApp client on the endpoint,
11  in the testing environment?
12    A  It used the connection to the
13  WhatsApp server which was deployed internally.
14    Q  So was there, in effect, a copy of
15  the WhatsApp servers within NSO's system?
16    A  No.
17    Q  So what do you mean when you say it
18  was deployed internally?
19    A  It is not a copy.  It is a software.
20  It supports and uses only the relevant parts that
21  the capability required for communication.
22    Q  But it is designed to replicate the
23  functionality of WhatsApp's servers, in pertinent
24  part?
25    A  We don't have access to WhatsApp

19 (Pages 70 - 73)

Page 74

1 servers. Therefore I cannot replicate anything.
2      Q   But it is designed to allow you to
3 send messages within NSO as if they were going
4 through WhatsApp servers.  Isn't that the purpose?
5      A   Yes.
6      Q   And so as part of that you developed
7 servers that, to the best extent you can, aim to
8 replicate the functionality of the WhatsApp
9 servers?
10      A   Yes.
11      Q   And the purpose is to investigate or
12 research how messages would be treated by WhatsApp
13 servers.  Right?
14      A   No.
15      Q   What is the purpose?
16      A   The purpose was to research the
17 WhatsApp client on the target's device, and in
18 order to build the software to eventually gain
19 access to the data that resides on it.
20      Q   And why was it necessary to create
21 that internal version of the WhatsApp servers as
22 part of the R&D process?
23      A   This is a practice done by any cyber
24 company, whether defensive or offensive, in order
25 to work in the internal environments.

Page 75

1      MR. AKROTIRIANAKIS:  I don't want to
2 interrupt your question, but the answer that the
3 court reporter asked for clarification on, "to the
4 data", and then he also said "that resides on it",
5 and I think you didn't hear --
6      MR. PEREZ-MARQUES:  We have a video and
7 recording so we can clear that all up.
8      I asked you why it was necessary to
9 create that internal version of the WhatsApp
10 servers as part of the R&D process.  You answered
11 that this is a practice done by any cyber company.
12 I would like to understand why is that, why is
13 that part of the research and development process?
14      MR. AKROTIRIANAKIS:  Object to the form
15 of the question.  Also misstates his testimony.
16      A   So the question is why it is
17 required?
18      Q   Yes.
19      A   In order to work on a controlled
20 environment.
21      Q   Is the purpose of that to understand
22 how the messages would be treated when sent
23 through WhatsApp's actual servers?
24      A   No, because it didn't work
25 from using the WhatsApp's actual server.  The

Page 76

1 purpose is to investigate and research the
2 WhatsApp client.
3      Q   Got it.  During this phase of the
4 development?
5      A   Yes.
6      Q   Right.  And then at some point does
7 the testing progress to actually testing it
8 through WhatsApp's actual ecosystem?
9      A   After reaching the capability in the
10 internal server, then there is a phase of testing
11 in the real environment, yes.
12      Q   And with respect to the Hummingbird
13 vectors, when did NSO reach the point of testing
14 the installation vectors in WhatsApp's actual
15 ecosystem?
16      MR. AKROTIRIANAKIS:  Objection,
17 foundation.
18      A   I don't recall the exact month this
19 was done.
20      Q   Approximately?
21      A   Approximately, it was near
22 April 2018.
23      Q   Around April 2018 is when NSO
24 reached the point of testing the Hummingbird
25 vectors in WhatsApp's actual environment?

Page 77

1      A   As I said before, I don't recall the
2 exact month but it was near April.
3      Q   How does NSO determine when a
4 potential installation vector is ready to use?  I
5 mean ready to be deployed to clients, to
6 customers?
7      MR. AKROTIRIANAKIS:  Object to the form
8 of the question.
9      A   As for any product, you want to
10 deliver it to the customer when it stands and has
11 statistical performance and functionality
12 standards.
13      Q   As part of the research and
14 development that led to the Hummingbird vectors,
15 did NSO create WhatsApp accounts?
16      MR. AKROTIRIANAKIS:  Objection,
17 foundation.  Object to the form of the question.
18      A   What do you mean by NSO created
19 WhatsApp accounts?
20      Q   Did NSO sign up for WhatsApp
21 accounts as part of the R&D process that led to
22 the Hummingbird vectors?
23      A   When the internal environment was
24 used, the answer is no.
25      Q   So there was no actual client,

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1 WhatsApp client that was being used as part of the
2 R&D?
3        A   They were not activated against the
4 real WhatsApp server because about they were used
5 in the internal server.
6        Q   So the endpoint WhatsApp client that
7 was being tested during that phase when you were
8 working in the internal environment, that was not
9 an actual WhatsApp client?
10       MR. AKROTIRIANAKIS:  Object to the form
11 of the question.  Also misstates his testimony.
12       A   I would say towards the actual
13 WhatsApp client, it was connected and activated
14 towards the internal WhatsApp server.
15       Q   And as part of that phase of the
16 development, did NSO create WhatsApp accounts?
17       MR. AKROTIRIANAKIS:  Object to the form
18 of the question.  As to vague.
19       A   How to define WhatsApp account?  Is
20 WhatsApp account a live WhatsApp account that is
21 connected to a real WhatsApp server?
22       Q   Do you have WhatsApp?
23       A   Yes.
24       Q   Did you create an account when you
25 signed up for WhatsApp?

1        A   Yes.
2        Q   So you understand what that means,
3 in terms of creating a WhatsApp account?
4        A   I understand what you mean in this
5 question.  That is why I asked the previous
6 question.
7        Q   So --
8        A   When you say activating WhatsApp
9 account, it is not real if it is not connected to
10 a real WhatsApp server.
11       Q   So in the sense that you created a
12 WhatsApp account -- before I ask that, what phone
13 number is your WhatsApp account associated with?
14       A   With my personal phone number.
15       Q   And what is that phone number?  The
16 reason I ask is because we have some WhatsApp
17 chats that have numbers without names and so we
18 would like to be able to determine whether you are
19 the person on them.
20       A   Okay.  So you ask for my phone
21 number?
22       Q   Yes, please?
23       A   0508803185.
24       Q   Thank you.  Again, it is not to
25 invade your privacy.  It is so we can match it to

1 documents.
2        Were any live WhatsApp accounts created
3 during any phase of the testing of the Hummingbird
4 vectors by NSO?
5        A   Yes.
6        Q   Could you say approximately how
7 many?
8        MR. AKROTIRIANAKIS:  Objection,
9 foundation.
10       Q   You understand you are designated as
11 a corporate representative on the research and
12 development of the relevant spyware, right?
13       A   I wouldn't call it spyware.
14       Q   I am just reading from the actual
15 topic.  You understand you are designated on that?
16       MR. AKROTIRIANAKIS:  He is designated on
17 the topics as phrased in NSO Group Technologies
18 and Q Cyber Technology Limited's objection and
19 responses to the notice of deposition.
20       Q   And you understand that that
21 includes research and development of software
22 including the Hummingbird vectors?
23       A   Yes.
24       Q   You are here to present NSO and Q
25 Cyber's full corporate knowledge on those topics,

1 right?
2        A   Yes.
3        Q   And so could you say approximately
4 how many WhatsApp accounts were created as part of
5 the testing of the Hummingbird vectors?
6        A   I don't have the exact number, but I
7 can estimate it is about 50 numbers.
8        Q   And then when the Hummingbird
9 vectors are actually used, are additional WhatsApp
10 accounts created at that point?
11       A   At the customer?
12       Q   In connection with use by a
13 customer, if that is how you would like to phrase
14 it?
15       A   Yes.
16       Q   Do you have any understanding of
17 approximately how many times -- let me put it this
18 way -- on how many target devices the Hummingbird
19 vectors have been successfully used by NSO?
20       MR. AKROTIRIANAKIS:  No foundation.
21       A   When you say Hummingbird was used,
22 what do you mean by that?
23       Q   Used as -- successfully used as an
24 installation vector to cause the installation of
25 the agent?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1    A   In which timeframe?
2    Q   What I will call the relevant
3 timeframe, so April 2018 to May 2020?
4        MR. AKROTIRIANAKIS:  Object to the form
5 of the question.
6    A   I don't have an exact number.
7    Q   Approximately?
8        MR. AKROTIRIANAKIS:  No foundation.
9    A   So you ask in terms of how many
10 times customers tried to use Hummingbird?
11   Q   Successfully?
12   A   Customers?  The question is about
13 customers?
14   Q   How many times the Hummingbird
15 vectors were successfully used to install the
16 agent on a target device during the relevant
17 period?
18       MR. AKROTIRIANAKIS:  No foundation.
19   A   I don't have the exact number.
20   Q   I understand you don't have the
21 exact number.  I am asking for an approximate
22 number.  Tens, hundreds, thousands, tens of
23 thousands?
24       MR. AKROTIRIANAKIS:  No foundation.
25   A   It is not tens of thousands but it

Page 83

1 is not hundreds.
2    Q   So thousands?
3    A   In between, yes.
4    Q   In between hundreds and hundreds of
5 thousands?
6    A   No.
7        MR. AKROTIRIANAKIS:  Objection,
8 misstates his testimony?
9    Q   In between what?
10   A   In between hundreds and tens of
11 thousands.
12   Q   Got it.  When NSO researchers
13 created live WhatsApp accounts, as part of the R&D
14 that led to the Hummingbird vectors, did they
15 install WhatsApp via web, via mobile or how did
16 they install it?
17   A   On the device itself.
18       MR. AKROTIRIANAKIS:  Objection,
19 misstates his testimony.
20   Q   So via mobile?  On a mobile device?
21   A   On mobile device.
22   Q   The term "Pegasus", does that to you
23 mean the agent or is it broader than the agent?
24   A   This is the name of the product.
25   Q   And does that include the

Page 84

1 installation vectors or would Pegasus be the agent
2 itself?
3        MR. AKROTIRIANAKIS:  Objection, vague.
4        MR. PEREZ-MARQUES:  I just want to
5 clarify our terminology so I can make the
6 questions clearer.
7    A   The product that is called Pegasus
8 eventually delivers the data to the customers
9 which are sent to the customers by the agent, and
10 and the agent installed using installation
11 investigators.
12   Q   And so the agent is part of Pegasus?
13   A   Yes.
14   Q   And the installation vectors are
15 part of Pegasus?
16   A   Yes.
17   Q   And the agent is the piece of
18 Pegasus that actually delivers information to
19 customers?
20   A   Yes.
21   Q   And that information is obtained
22 from the target devices?
23   A   Yes.
24   Q   And so you are familiar with
25 Pegasus, yes?

Page 85

1        MR. AKROTIRIANAKIS:  Objection, vague.
2    A   In what terms?
3    Q   I mean you are the head of R&D at
4 NSO.  You are familiar with Pegasus?
5    A   Yes.
6    Q   And you are familiar with the agent?
7    A   Yes.
8    Q   Did you have any role in the
9 development of the agent?
10   A   No.
11   Q   Are you familiar with the source
12 code for the installation vectors, the Hummingbird
13 vectors?
14   A   As I said before, part of it, but
15 not all of it.
16   Q   What part are you familiar with?
17   A   No specific part.  I said I don't
18 recall any -- each of the lines of the --
19   Q   You mean you are generally familiar
20 with the source code for the Hummingbird vectors?
21   A   Yes.
22   Q   And you are familiar with how the
23 agent functions?
24       MR. AKROTIRIANAKIS:  Objection, vague.
25   A   Because I was never part of agent

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1  teams and development teams, I am familiar with
2  the concepts, not the implementation.
3      Q  And you understand that you have
4  been designated as a corporate representative on
5  the full functionality of what is defined as the
6  relevant spyware?
7      MR. AKROTIRIANAKIS:  Again, I don't want
8  keep saying this but he is designated as stated in
9  our responses to the notice of deposition.
10     MR. PEREZ-MARQUES:  Yes, okay.  And as
11 stated by your counsel that includes defendant's
12 understanding of the full functionality of what
13 they call the accused technology.  Yes?
14     A  Yes.
15     Q  Again with the same time period,
16 which I won't keep repeating, April 2018 to
17 May 2020.
18     I would like to show you -- and you are
19 prepared to testify as to NSO and Q Cyber's
20 corporate knowledge on that functionality of the
21 relevant spyware?
22     A  Yes.
23     Q  One follow-up.  We were talking
24 about the creation of the WhatsApp accounts as
25 part of the R&D process.  When were those accounts

Page 87

1  created?
2      A  When you move to phase of testing in
3  the real word.
4      Q  In the real environment?
5      A  Yes.
6      Q  I think you previously estimated
7  that was around April 2018?
8      A  I said near.
9      Q  When was the testing complete, such
10 that the first of the Hummingbird vectors could be
11 deployed?
12     A  As I said before, I don't recall the
13 exact month.
14     Q  Okay.  Was it also in 2018, the
15 following year?
16     A  Heaven?
17     Q  Mm hmm.
18     A  2018.
19     Q  I would like to show you what we
20 have marked as Exhibit 2032.
21     (Exhibit 2032 marked for identification)
22     This is a multipage document with the
23 Bates stamp NSO_WHATSAPP_00045678.  Do you
24 recognize this document?
25     A  Do you want me to go over it?

Page 88

1      Q  Feel free to flip through it.  The
2  first question is just whether you recognize it.
3      Do you recognize this document?
4      A  Yes.
5      Q  What is it?
6      A  Some kind of training material,
7  training -- customer facing material.
8      Q  Customer facing material or training
9  material?
10     A  Training.
11     Q  Training.  Is it a product
12 description for Pegasus?
13     A  Yes.
14     Q  So the endpoint solution that is
15 referred to here is Pegasus?
16     MR. AKROTIRIANAKIS:  Objection, vague.
17     Withdrawn.
18     A  Yes.
19     Q  Did you have any role in preparing
20 Exhibit 2032?
21     A  No.
22     Q  I would like to direct you to page
23 one where there is an "Overview" section.  Do you
24 see that?  Are you on that page?  It is after the
25 table of contents.  There you go.

Page 89

1      A  Yes.
2      Q  The third paragraph there revs to
3  Pegasus as a "breakthrough solution, developed by
4  veterans of elite intelligence agencies".  Do you
5  see that?  It is the third paragraph under
6  "Overview"?
7      A  Yes.
8      Q  And do you agree with the
9  characterization of Pegasus as a breakthrough
10 solution?
11     A  As for the date, I think it was
12 breakthrough, yes.
13     Q  It is a highly innovative product?
14     A  Yes.
15     Q  Highly sophisticated?
16     A  I think it depends on the definition
17 of sophisticated.  By what means?
18     Q  Would you consider it a very
19 sophisticated product?
20     A  Yes.
21     Q  Is it accurate that it was developed
22 by veterans of elite intelligence agencies?
23     MR. AKROTIRIANAKIS:  Objection, vague.
24     A  The company was established in 2010,
25 so it depends on who it refers to in this

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1      Q   So you don't know about the legal
2  authorization of NSO's customers, or you do?  If
3  you do I might have questions.  Is that a topic
4  you are familiar with?
5      A   I don't think that I am here to
6  answer the legal questions about it.
7      Q   And it is not a topic that you have
8  personal knowledge about either, is it?
9      MR. AKROTIRIANAKIS:  Objection, vague.
10     A   No.
11     Q   So let's put that to the side.  The
12 purpose of Pegasus, in terms of how it functions,
13 in terms its full functionality, is that it
14 provides access to encrypted communications, among
15 other things.  Right?
16     MR. AKROTIRIANAKIS:  Objection,
17 misstates his testimony.
18     A   The purpose of Pegasus is to enable
19 customers to get access to the data which resides
20 on their targets' smartphones.
21     Q   Including encrypted communications,
22 right?
23     MR. AKROTIRIANAKIS:  Misstates his
24 testimony.
25     A   The data is not encrypted on the

Page 95

1  target device.
2      Q   Got it.  Including communications
3  that would be encrypted if they were gathered from
4  another -- other than from the endpoint.  Is that
5  right?
6      A   But Pegasus is a software that gains
7  access to the target's device, the data that
8  resides on the device.
9      Q   Got it, and so that is what it means
10 when it refers to encryption under the header of
11 "overcoming smartphone data interception
12 challenges", is that right, that by getting it
13 from the target device you are able to overcome
14 encryption?
15     MR. AKROTIRIANAKIS:  Object to the form
16 of the question.
17     A   I mean that after the endpoint
18 encryption was introduced in the industry, then
19 data interception practically got irrelevant.
20 Therefore Pegasus was designed to get for the
21 customers -- it enabled them to access the data on
22 the endpoint.
23     Q   The next section on page 2 refers to
24 "Limitations of standard interception solutions".
25 Do you see that?

Page 96

1      A   Yes.
2      Q   And the purpose of this section is
3  to illustrate how Pegasus is superior to standard
4  interception solutions, right?
5      MR. AKROTIRIANAKIS:  Objection,
6  foundation.
7      A   I think, as it states, it describes
8  limitations of standard interception solutions.
9      Q   Right.  Limitations that don't apply
10 to Pegasus, right?
11     A   Those that are written here, no.
12     Q   And one of the standard interception
13 solutions discussed here is lawful interception,
14 right?
15     A   Yes.
16     Q   And the point is to show how Pegasus
17 is superior to lawful interception, right?
18     MR. AKROTIRIANAKIS:  Objection,
19 misstates the document.
20     A   This paragraph defines and describes
21 the lawful interception challenges.
22     Q   And those are constraints that don't
23 apply to Pegasus, right?
24     MR. AKROTIRIANAKIS:  Objection, vague.
25 No foundation.

Page 97

1      A   Pegasus is a different solution,
2  lawful interception solution.
3      Q   Right, and the point of this section
4  of the product description is to suggest that
5  Pegasus is superior to lawful interception.
6  Right?
7      A   I would say --
8      MR. AKROTIRIANAKIS:  Objection,
9  misstates the document and his testimony.
10     A   I would say Pegasus is different
11 than lawful interception solution and isn't
12 constrained to the limitations for this specific
13 paragraph that you are talking about.
14     Q   On page 3, under "Cyber Intelligence
15 for the Mobile World".  Do you see that section?
16     A   Yes.
17     Q   The second paragraph states "EPS".
18 EPS means endpoint solution, right?
19     A   Yes.
20     Q   And that means Pegasus, in the
21 context of this document?
22     A   Yes.
23     Q   "EPS silently deploys an invisible
24 software (SW) component (agent) on a target's
25 device which extracts and securely transmits data

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 98

1 for intelligence analysis."
2      Do you see that?
3      A  Yes.
4      Q  And what does it mean that the agent
5 is deployed silently?
6      A  This defines how the agent is
7 installed, not the installation vector itself.
8      Q  And what does it mean that the agent
9 is deployed silently?
10      A  It means that the target is not
11 aware that the agent is being installed.
12      Q  Right.  And the other services that
13 are part of the broader ecosystem are also
14 unaware.  Isn't that part of it as well, as we
15 discussed earlier?
16      MR. AKROTIRIANAKIS:  Object to the form.
17      A  This activity should be concealed,
18 yes.
19      Q  And NSO designed Pegasus with the
20 objective that it be concealed, isn't that right?
21      MR. AKROTIRIANAKIS:  Objection, vague.
22      A  It is part of being software that is
23 being used by the type of customers that are using
24 these cyber intelligence tools, the product should
25 be as concealed as possible.

Page 99

1      Q  It also says that -- it refers to
2 the software component as "invisible".  Do you see
3 that in that same sentence?
4      A  Yes.
5      Q  And that means that the software
6 component is invisible to the target, right?
7      A  Yes.
8      Q  And also invisible to other services
9 involved in the ecosystem, right?
10      MR. AKROTIRIANAKIS:  Objection, vague.
11 Compound.
12      A  It is invisible to the target, as by
13 nature of the product, and the agent is invisible.
14 Yes, the answer is yes.
15      Q  And that is by design, is that
16 right?  NSO designed the product so that it would
17 be invisible not only to the target but to others
18 as well?
19      A  This is a requirement of such
20 software capabilities.
21      Q  The next sentence refers to
22 installation vectors, and we have talked about
23 what that means.  Those are the mechanisms by
24 which Pegasus is installed on a target's device,
25 right?

Page 100

1      A  Yes.
2      Q  I want to ask a question that is not
3 about this document.  Did you review, as part of
4 your preparation, an expert report submitted by
5 NSO and Q Cyber?
6      A  The experts from the company, from
7 NSO.
8      Q  No, an external expert.  I think his
9 name is Terence McGrough.  Did you review a report
10 that was submitted by NSO and Q Cyber by such an
11 external expert regarding the spyware?
12      A  Yes.
13      Q  Mr. McGrough, is that the right
14 name?
15      A  I saw it but I don't remember.
16      Q  Mr. McGrough stated that:
17 "Over the years NSO has provided many
18 types of delivery mechanisms for the Pegasus
19 agent, including 1 click and 0 click variants."
20      Is that correct?
21      A  You ask whether that is what he was
22 writing in his report or whether that is what
23 happened?
24      Q  Whether that is what happened.  Is
25 it correct that over the years NSO has provided

Page 101

1 many types of delivery mechanisms for the Pegasus
2 agent, including 1 click and 0 click variants?
3      A  Yes.
4      Q  How many installation vectors
5 roughly has NSO developed for Pegasus?
6      MR. AKROTIRIANAKIS:  Objection,
7 foundation.  It is also beyond the scope of the
8 designation and beyond the scope of the court's
9 order.
10      A  So for the Android ecosystem, except
11 that we were talking about, which are 0 click
12 solutions, there were additional 1 click solutions
13 which I don't recall the exact number, but I would
14 say about three or four.
15      Q  So in the 2018 time period, how many
16 installation vectors were in place for Pegasus?
17      A  2018?
18      Q  Mm hmm.
19      A  In Android, two.
20      Q  What about in 2019?
21      A  Also in Android, two.
22      Q  So are those two both 0 click or one
23 0 click and one 1 click?
24      A  One 0 click and one 1 click.
25      Q  Defendants' expert also stated:

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1  require any interaction by the target.
2      Q  And why is that preferable?
3      MR. AKROTIRIANAKIS:  Objection,
4  misstates his testimony.
5      A  From the customer's point of view, 0
6  click installation vectors are more concealed and
7  they enable them to execute their operations in
8  more concealed ways.
9      Q  Is it harder to research and develop
10  a 0 click installation vector than a 1 click?
11      A  It is not a matter of harder or not.
12  It is different expertise.
13      Q  In what sense is it a different
14  expertise?
15      A  The researchers working on 0 click
16  vectors installation flows are required to think
17  of ways how the installation vector can be
18  executed without the need for the target to
19  interact with the device.
20      Q  I understand it is a different
21  question that they are trying to answer, but why
22  is the expertise different?
23      A  When I say expertise I mean that the
24  researchers that are required to research these
25  type of vectors have additional questions to

Page 107

1  answer and one of the questions is the
2  interaction, as we discussed, and that requires
3  additional capabilities in terms of their
4  expertise.
5      Q  So I would like to go back to
6  Exhibit 2032, which you still have in front of
7  you.  The next section on page 3 has a section
8  titled "Benefits of our endpoint solution".  Do
9  you see that?
10      A  Yes.
11      Q  And the first benefit identified is
12  global coverage.  Is that right?
13      A  Yes.
14      Q  It states:
15      "Monitor targets' devices while they
16  connect to the internet from any location."
17  Right?
18      A  Yes.
19      Q  And there are no geographical
20  locations identified, right?
21      A  It defines the potential factor.  It
22  does not define anything that relates to a
23  specific customer.
24      Q  And there are no geographical
25  limitations identified there, right?

Page 108

1      A  As I said, this defines the
2  potential capability of this vector, yes.
3      Q  Of Pegasus?
4      A  Of the solution.
5      Q  Is that an accurate statement of
6  Pegasus' capabilities?
7      MR. AKROTIRIANAKIS:  Objection, vague.
8      A  Different vectors have different
9  limitations, so it is not a general statement that
10  you can make about each and every capability in
11  Pegasus.
12      Q  But this is not a statement about
13  vectors, is it?  It is about the agent, isn't it?
14      A  I will have to read it.
15      Q  It says "Monitor target's devices
16  while they connect to the internet from any
17  location."
18      A  But this is one sentence.  Out of
19  context, I am not sure it answers the question.
20      Q  It is the agent that monitors target
21  devices, right, not the vector?
22      A  The agent is the one that monitors
23  target devices, yes.
24      Q  And is it correct that Pegasus can
25  monitor a target's devices from any location?

Page 109

1      A  As for the potential of the agent,
2  yes.
3      Q  The next bullet states:
4      "Unlimited access to targets' mobile
5  devices.  Remotely and covertly collect
6  information about a target's relationships,
7  locations, phone calls, plans and activities."
8      Do you see that?
9      A  Yes.
10      Q  And is that an accurate statement of
11  Pegasus' capabilities?
12      A  Yes, it is like.
13      Q  A few bullets down there is a bullet
14  that begins "Operate target devices".  Do you see
15  that?
16      A  Yes.
17      Q  It says:
18      "Activate the microphone to listen in on
19  a target's environment.  Turn on the camera to
20  take snapshots and take screenshots to collect
21  non-communications data of high intel value."
22      Is that an accurate statement of
23  Pegasus' capabilities?
24      A  Yes.
25      Q  Is it fair to say that the purpose

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

1 of Pegasus is to obtain information from a
2 target's devices?
3     A  Yes.
4     Q  And among other capabilities Pegasus
5 has the ability to turn on a device microphone?
6     A  In some types of agents, yes.
7     Q  And to take photos with a device
8 camera, that is also a capability of Pegasus?
9     A  Yes.
10     Q  And it had those capabilities in
11 2019?
12     A  Yes.
13     Q  And it continues to have those
14 capabilities today?
15     A  As I said before, it depends on
16 agents, the specifics of the agent.
17     Q  How so?
18     A  Eventually the vector defines what
19 are the capabilities that the agent can ask.
20     Q  So certain vectors can only make
21 available certain functionality of the agent?
22     A  Yes.
23     Q  And with respect to Pegasus as
24 installed by the Hummingbird vectors, did Pegasus
25 in 2019 have the capability to turn on device

Page 111

1 microphones and take snapshots?
2     A  Yes.
3     Q  The section I read also describes
4 the information obtained as having high intel
5 value.  Do you see that?
6     A  Yes.
7     Q  And do you agree that the
8 information obtained by Pegasus is valuable?
9     MR. AKROTIRIANAKIS:  Objection, beyond
10 the scope of the designation of this witness.
11     A  The value of the intel is in the
12 eyes of the customer.
13     Q  And the information is valuable to
14 NSO's customers, yes?
15     MR. AKROTIRIANAKIS:  Objection, beyond
16 the scope of the designation.  No foundation.
17     A  Eventually the customers seek to get
18 access to the data that is on the device, and part
19 of it is using microphone and camera, snapshots,
20 as it states here.
21     Q  And not limited to microphone and
22 snapshots, but the information obtained through
23 Pegasus is valuable to NSO's customers.  Isn't
24 that right?
25     MR. AKROTIRIANAKIS:  Object to the form

Page 112

1 of the question.  It is beyond the scope of the
2 designation.  Also no foundation.
3     A  We believe that this is information
4 that customers would like to get access to.  That
5 is why we developed the capabilities.
6     Q  Right, and because they consider it
7 valuable, they are willing to pay NSO typically
8 millions of dollars to license the Pegasus
9 technology.  Right?
10     MR. AKROTIRIANAKIS:  Objection, beyond
11 the scope of the designation for this witness.
12     A  Because they value the information
13 they are willing to buy the software in order to
14 use it.
15     Q  Do you know whether they buy the
16 software versus license the software?
17     A  From my point of view, this is a
18 legal term.
19     Q  Okay, not your area.  Right?
20 Section 2.2 on the next page is titled "Technology
21 Highlights".  Do you see that section?
22     A  Yes.
23     Q  It says:
24     "The EPS solution uses cutting edge
25 technology."

Page 113

1     Do you agree with that characterization?
2     A  Yes.
3     Q  If we go to page 6, there is a
4 section 3.2 titled "Agent Installation Vectors".
5 Do you see that?
6     A  Yes.
7     Q  It states that:
8     "Installing an agent on a target's
9 device is the heart of any intelligence operation
10 using EPS."
11     Do you see the language I just read?
12     A  Yes.
13     Q  Do you agree with that?
14     MR. AKROTIRIANAKIS:  Objection, beyond
15 the scope of the designation of the witness.
16     A  This is what it says.
17     Q  Do you agree with it?
18     MR. AKROTIRIANAKIS:  Same objection.  No
19 foundation.
20     A  I would read the entire sentence,
21 which states "Installing the agent on target's
22 device is the heart of any intelligence operation
23 using EPS, and each installation is carefully
24 planned to ensure success."
25     Q  Do you agree with that?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 114

1    MR. AKROTIRIANAKIS: Same objections.
2    A   Again, it states the operations from
3  the customer's eyes and the value of the
4  intelligence from the customer's eyes.
5    Q   But from your perspective, as the
6  head of R&D at NSO, do you agree that installing
7  an agent on the target's device is the heart of
8  any intelligence operation using EPS or using
9  Pegasus?
10    MR. AKROTIRIANAKIS: Objection, no
11  foundation. Beyond the scope of the designation
12  of this witness.
13    A   Being the agent of the software
14  enables the access to the data which customers
15  value and need to get for their operations. This
16  is the beginning of the operation.
17    Q   The installation is the beginning?
18    A   Installing the agent.
19    Q   Why is installation so important to
20  an intelligence operation using Pegasus?
21    MR. AKROTIRIANAKIS: Objection,
22  misstates his testimony. Also no foundation.
23    A   Customers seek to get access to data
24  and these type of solutions are one of the ways
25  for them to get access.

Page 115

1    Q   The installation is what makes the
2  information extraction possible, right?
3    A   Yes.
4    Q   One category of installation vectors
5  here is "covert". Do you see that language on the
6  document?
7    A   Yes.
8    Q   And covert, as used here, means the
9  same as 0 click?
10    A   I will have to read this in order to
11  answer the question.
12    Q   Please go ahead.
13    A   Okay.
14    Q   Yes. So does covert, as used there,
15  mean the same as 0 click?
16    A   Yes.
17    Q   It states:
18    "A covert message is sent to a mobile
19  device. The target is not engaged. There is no
20  need to click a link or open a message."
21    Is that an accurate description of NSO's
22  0 click installation vectors?
23    A   This is a description for any 0
24  click installation vector.
25    Q   Including the Hummingbird vectors,

Page 116

1  right?
2    A   Yes.
3    Q   Specifically, when it says "a covert
4  message is sent to a mobile device", in 2018 and
5  2019, NSO was sending such covert messages via
6  WhatsApp. Isn't that right?
7    MR. AKROTIRIANAKIS: Objection,
8  misstates his testimony.
9    A   In 2018 and 2019 the solutions
10  used -- the solution was communicating with
11  target's device in order to activate the
12  vulnerability.
13    Q   But this language here says "a
14  covert message is sent to a mobile device". Do
15  you see that language?
16    A   Yes.
17    Q   And in the Hummingbird vectors that
18  message was being sent via WhatsApp. Isn't that
19  right?
20    A   This was the only way to communicate
21  between peer to peer.
22    Q   And so it was being sent via
23  WhatsApp in the Hummingbird vector via WhatsApp?
24    A   Messages were sent to target's
25  device.

Page 117

1    Q   Via WhatsApp, right?
2    A   Yes, via WhatsApp.
3    Q   That is how the Hummingbird vectors
4  worked?
5    A   In this timeframe, yes.
6    Q   The next sentence states that:
7    "The message triggers the smartphone to
8  download and install the agent."
9    Correct? Do you see that language?
10    A   Yes.
11    Q   As to the Hummingbird vectors, is
12  that correct, that the message transmitted via
13  WhatsApp would trigger a target device to download
14  the Pegasus agent?
15    A   Yes.
16    Q   It states:
17    "The installation is completely
18  invisible and cannot be stopped."
19    Do you see that under number 3?
20    A   Yes.
21    Q   And "invisible" there again means
22  invisible to the target and to other services like
23  WhatsApp?
24    A   No.
25    MR. AKROTIRIANAKIS: Objection, no

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 142

1    Q   Why can't you describe the research
2 techniques?
3        A   Because, as my counsel stated, I am
4 restricted by Israeli law to talk about it.
5    Q   So there is nothing further that you
6 are willing to testify as to the research
7 techniques that went into identifying
8 vulnerabilities in WhatsApp client?
9        MR. AKROTIRIANAKIS:  Objection.
10       A   It doesn't have anything to do with
11 willingness. I am restricted by Israeli law to
12 talk about it.
13       MR. AKROTIRIANAKIS:  I will object to
14 the form of that question. If you want to ask him
15 questions he can tell you whether he can testify
16 about or not. I think it is a fair question. It
17 is the way you just stated it.
18       Q   My fundamental question is how did
19 the R&D team at NSO go about finding
20 vulnerabilities in the WhatsApp client?
21       A   They researched the activity of the
22 WhatsApp client in order to find flaws and to
23 build the installation vectors which, as I said,
24 is built to eventually deliver the agent payload.
25       Q   How did the team research the

Page 143

1 activity of the WhatsApp client?
2        A   What does the question refer to in
3 how?
4        Q   That is my question. How did they
5 do that? You said they researched the activity of
6 the WhatsApp client. How did they do that?
7        A   So I will get back to the
8 explanation about the ecosystem we built
9 internally. We built internal ecosystem of
10 WhatsApp server that enabled us internally to send
11 messages between two peers between customer owned
12 devices, and having this ability enables us to
13 research the activity of the WhatsApp client.
14       Q   How did you know how to build that
15 internal ecosystem?
16       A   What do you mean by how?
17       Q   How do you determine what the
18 characteristics of that internal ecosystem should
19 be in order to operate like a WhatsApp client?
20       A   We have the client and we have the
21 server between them.
22       Q   And so how do you go from having the
23 client to building an ecosystem that replicates
24 it?
25       A   So as a researcher, especially in

Page 144

1 Android, you have the ability to gain the
2 routabilities on any Android devices. These
3 abilities are stated for anyone using the web.
4 Whenever you have route access on a device, you
5 have the ability to monitor the traffic that is in
6 and out the monitored device, and then you have
7 access to the traffic from peer to peer. Using
8 this knowledge you can use it to build the
9 ecosystem which is required for this activity.
10       Q   Is there anything else that the NSO
11 R&D team did to find vulnerabilities in the
12 WhatsApp client?
13       A   We, the R&D research group, used all
14 the tools it should use in order to be able to
15 find the vulnerabilities.
16       Q   What are those tools?
17       A   Basically, there are two types of
18 tools, called IDA and JEB.
19       Q   Can you spell those?
20       A   I-D-A.
21       Q   And what was the other?
22       A   J-E-B.
23       Q   And what is IDA?
24       A   These are tools available for
25 procurement -- anyone can buy it -- which enable

Page 145

1 you to analyze code.
2        Q   What is the difference between IDA
3 and JEB?
4        A   IDA enables you to analyse native
5 code and JEB analyzes Java code.
6        Q   Other than using those two tools,
7 what else did the R&D team do to find
8 vulnerabilities in the WhatsApp client?
9        A   As I said before, it monitored the
10 transmission between peer to peer as for the
11 communication, in order to understand the
12 responses and the message content that should be
13 sent from side to side.
14       Q   Through that testing, did NSO
15 develop an understanding of the functioning of
16 WhatsApp's servers that were involved in the peer
17 to peer transmission?
18       MR. AKROTIRIANAKIS:  Objection,
19 misstates his testimony.
20       A   Through this activity the aim was to
21 find vulnerability on the Android ecosystem, and
22 then find a way to make it work remotely.
23       Q   With respect to that second part of
24 making it work remotely, through its internal
25 testing, did NSO develop an understanding of how

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

1 WhatsApp's servers functioned in connection with
2 peer to peer communications?
3       A   As for the terminology functions,
4 I will say that we worked to understand what are
5 the limitations in terms of sending messages from
6 peer to peer.
7       Q   What do you mean by that?  What are
8 the limitations in terms of sending messages peer
9 to peer?
10      A   What are the messages and the
11 content of messages that can be sent from peer to
12 peer.
13      Q   As part of this work did NSO
14 researchers reverse engineer any WhatsApp code?
15      MR. AKROTIRIANAKIS:  Objection, vague.
16      A   Do you want to define what reverse
17 engineering is?
18      Q   What do you understand reverse
19 engineering to mean?
20      A   I would say that using these tools I
21 talked about, IDA and JEB, the research group had
22 the ability to understand how the code functions,
23 some of the parts.
24      Q   Mm hmm.  What do you understand
25 reverse engineering to mean?

Page 147

1       MR. AKROTIRIANAKIS:  Objection, no
2 foundation.
3       A   I would talk about the aim of this
4 activity, and the aim is to learn the mechanisms
5 and the way client functions.
6       Q   And that is something NSO's research
7 group did with respect to WhatsApp client, as part
8 of the development of the Hummingbird vectors?
9       A   Yes.
10      MR. PEREZ-MARQUES:  Why don't we pause
11 here and grab lunch and then we can resume.
12      THE VIDEOGRAPHER:  Going off the record.
13 The time is 13:02.  End of media card number
14 three, volume one, of the video deposition of
15 Tamir Gazneli.
16         (Break for lunch.)
17      This is the beginning of media card
18 number four, volume one, in the video deposition
19 of Tamir Gazneli.  Going on the record.  The time
20 is 13:52.
21      MR. PEREZ-MARQUES:  Mr. Gazneli, do you
22 understand you are still under oath?
23      A   Yes.
24      Q   Before we broke we were talking a
25 bit about the research and development that went

Page 148

1 into the development of the Hummingbird vectors.
2 Do you recall that generally?
3       A   Yes.
4       Q   At one point in that examination you
5 said that there were issues that you couldn't
6 discuss because of your understanding of Israeli
7 legal restrictions.  Is that right?
8       A   I was addressing to specific
9 research techniques.
10      Q   The specific research techniques you
11 understand yourself not to be at liberty to
12 discuss?
13      A   I am not allowed to discuss here.
14      Q   When you say you are not allowed,
15 that is because of Israeli law, as you understand
16 it?
17      A   Yes.
18      Q   Is it a specific Israeli law that
19 you are referring to?
20      A   To the restrictions.  I don't know
21 specifically.
22      Q   The Defense Expert Control Act.
23 Okay.  Not a specific order in this case but the
24 expert control law generally.
25      A   Yes.

Page 149

1       Q   So when you were describing the
2 research that went into the development of the
3 Hummingbird vectors, there is an aspect of the
4 research techniques that you have not included in
5 your testimony.  Right?
6       MR. AKROTIRIANAKIS:  Objection,
7 misstates his testimony.
8       A   Pardon?  I talked about my
9 disability in terms of defining the specific and
10 in-depth techniques of research.
11      Q   And those research techniques that
12 went into the development of the Hummingbird
13 vectors, you are not at liberty to discuss?
14      A   Yes, I am not allowed to discuss.
15      Q   You also testified early in the day
16 about having reviewed some code as part of your
17 preparation to testify here today?
18      A   Yes.
19      Q   And I believe you said it was
20 fingerprinting or related to fingerprinting?
21      A   Yes.
22      Q   Was that in connection with a
23 particular Hummingbird vector?
24      A   No.  I said that it was around the
25 timeframe, the relevant timeframe.

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1    Q   But was it fingerprinting code that
2  was used in connection with either Heaven, Eden
3  ERISED or all of them?
4    A   Yes, it was -- if I remember right,
5  for Eden.
6    Q   And and why did you look at the
7  source code for the fingerprinting?
8    A   To recall, to get a recollection of
9  how it worked.
10    Q   And so to understand how it worked
11  you went to the source code?
12    A   Yes.
13    Q   And fair to say that to understand a
14  piece of software, the code itself is the best
15  source for to understand how it works?
16    A   As for the code that was developed
17  by us, yes.
18    Q   It is the best source to understand
19  how the software works?
20    MR. AKROTIRIANAKIS:   Objection, vague.
21    A   As I said before, if this is a code
22  that you write, this is the best way.
23    Q   Did you write that fingerprinting
24  code?
25    A   No.

Page 151

1    Q   But you still considered it a useful
2  source to consult to understand how that software
3  worked?
4    A   As I said, our research group wrote
5  this code.  Therefore I am familiar with the code.
6  As so, this is the best way to understand the
7  code.
8    Q   And fair to say you didn't commit
9  that code to memory.  Right?
10    A   What do you mean?
11    Q   You have not memorized the source
12  code, right?
13    A   Of course not.
14    Q   Of course not.  Did you consult any
15  other pieces of source code associated with the
16  Hummingbird vectors as parts of your preparation
17  to testify here today?
18    I want to make sure they get your
19  answer.
20    A   No.
21    Q   And you have not committed to memory
22  any other aspect of the source code for the
23  Hummingbird vectors.  Is that right?
24    A   No.
25    Q   Do you recall the names of the files

Page 152

1  that comprise the Hummingbird vectors source code?
2    A   Not all of them.
3    Q   Or the function of all the files
4  that comprise the Hummingbird vector source code?
5    A   Functions, for sure, no.
6    Q   Or the specific commands that that
7  source code gave to the target device?
8    A   It is a very general question.  To
9  which part, to which state of the device or state
10  of installation flow.
11    Q   Do you recall any of the commands
12  that any of the Hummingbird vectors gave to the
13  target device in their operation?
14    A   The installation flow consists of
15  several messages and content of messages.  So I
16  can't see a way to recall every message that was
17  sent and its content.
18    Q   I'm sorry, you said you can't see a
19  way to recall?
20    A   Yes.
21    Q   So we would need to look at the
22  source code to understand that level of detail?
23    A   Yes.
24    Q   Let me show you what we will mark --
25  I think we are up to 2033.

Page 153

1    (Exhibit 2033 marked for identification)
2    This is Exhibit 2033.  This is
3  a multipage document beginning on
4  NSO_WHATSAPP_00008957 through 8962.  It has the
5  title at the top "Heaven OpSec."  Do you recognize
6  Exhibit 2033?
7    A   Yes.
8    Q   What is it?
9    A   It is an OpSec document for Heaven
10  vector.
11    Q   What does that mean, an OpSec
12  document?
13    A   It is OpSec team's analysis results
14  and suggestions how will be the best in terms of
15  this vector to be developed and used.
16    Q   And concealed, right?
17    A   Yes.
18    MR. AKROTIRIANAKIS:   Objection,
19  misstates the document.
20    Q   Again I don't think the reporter got
21  your answer.  You said "yes", right?
22    A   Yes.
23    Q   And so was this a document that was
24  prepared by the operational security team within
25  R&D?

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 154

1      A   Yes.
2      Q   Did you have any role in preparing
3  this document?
4      A   No.
5      Q   Do you know approximately when it
6  was prepared?
7      A   Not the exact date but if I remember
8  right it was around the beginning of 2018.
9      Q   The first section there says "Assets
10  we want to protect".  Do you see that?
11      A   Yes.
12      Q   And "protect" means protect from
13  discovery by third parties?
14      MR. AKROTIRIANAKIS:  Object to the form.
15      A   Protect from being discovered at
16  all.
17      Q   The first one listed there says:
18  "Resources of value we want to protect."
19      The first one is:
20  "Exploits and techniques that are being
21  used as part of the installation vector.  The most
22  important asset we want to protect, the WhatsApp
23  exploit."
24      Do you see that?
25      A   Yes.

Page 155

1      Q   And that refers to the 0 click
2  WhatsApp exploit that was known at this time as
3  Heaven?
4      MR. AKROTIRIANAKIS:  Objection.  The
5  question is vague.
6      A   At that particular time that was the
7  exploit.
8      Q   Why was the Heaven exploit the most
9  important asset that this team wanted to protect?
10      MR. AKROTIRIANAKIS:  Objection,
11  misstates the document.
12      A   Again, this is the OpSec team's
13  assessment of the specific capability, and he was
14  directed to assess the Heaven capability, and as
15  part of all the resources which are listed here,
16  and we can go over each and every one of them,
17  protecting the exploit is the most important in
18  this list.
19      Q   More important even than the
20  clients' identities?
21      A   Yes --
22      Q   More important than target
23  awareness?
24      A   In order to be able to handle the
25  risks in terms of client's identity, so target

Page 156

1  awareness, you wanted to start having the ability,
2  the vulnerability, so yes.
3      Q   Below that there is a section titled
4  "Solution Highlights", and the first thing under
5  that says with some asterisks "New silent
6  fingerprint".  What does that refer to?
7      MR. AKROTIRIANAKIS:  Objection,
8  foundation.
9      A   I need to review it.
10      Q   Please.
11      A   So this is the description of new
12  silent fingerprint that was suggested at that
13  time.
14      And what was the new silent
15  fingerprint?  What does that refer to?
16      A   To a way of implementing the
17  fingerprint.  The "new" comes in terms of new way
18  to implement it.
19      Q   And what was new about it?
20      A   Different number of messages,
21  different type of activities in terms of client
22  endpoint and target, yes.
23      Q   Before we continue with that
24  section, in the resources of value we want to
25  protect, number 5 says "Live systems (IS\PS\WIS)."

Page 157

1      A   Yes.
2      Q   What is IS?
3      A   Installation server.
4      Q   Installation server.  And what is
5  PS?
6      A   Pegasus server.
7      Q   What is WIS?
8      A   This is the acronym of WhatsApp
9  installation server, but it means an Android
10  server which is responsible for installing the end
11  solution.
12      Q   And installing it by transmitting a
13  message through WhatsApp?
14      MR. AKROTIRIANAKIS:  Objection,
15  misstates testimony.
16      A   Installing it by sending the
17  required messages to the target's WhatsApp client.
18      Q   And you understand that those
19  WhatsApp messages travel through WhatsApp's
20  ecosystem?
21      A   Any message in the WhatsApp
22  ecosystem travels through WhatsApp's ecosystem.
23      Q   Including the ones that were being
24  sent as part of the Hummingbird installation
25  vectors, right?

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1        A   Yes.
2        Q   Under "New silent fingerprint", it
3    says:
4            "In order to get target's device, OS
5    details plus WA client version, we need to send a
6    fingerprint request."
7            Do you see that?
8        A   Yes.
9        Q   And OS is operating system, right.
10       A   Yes.
11       Q   And WA client version, that is what
12   version of WhatsApp the target is running?
13       A   Yes.
14       Q   It says:
15           "Fingerprint is done by sending a forged
16   request from a client that mimics a server
17   response to the target WA client."
18           What does that mean?
19           MR. AKROTIRIANAKIS:  Objection.  No
20   foundation.
21       A   As I read it, it means send specific
22   message from one client to the target client.
23       Q   What does it mean that it is a
24   forged request?
25           MR. AKROTIRIANAKIS:  Objection, no

Page 159

1    foundation.
2        A   Again, as I read it --
3        Q   Before you continue, you are
4    designated as the corporate representative on the
5    full functionality of Pegasus during this time
6    period.  Yes?
7        A   Yes.
8        Q   And you are prepared to bring to
9    bear NSO and Q Cyber's full corporate knowledge on
10   that topic?
11       A   Yes.
12       Q   Okay.  So what does "forged request"
13   mean?
14           MR. AKROTIRIANAKIS:  Objection, no
15   foundation.  You also misstated the witness'
16   obligation and the company's obligation under rule
17   30(b)(6).  If you understand the question you can
18   answer it.  You can go ahead.
19       A   It says that it mimics servers
20   response to the client's target.
21       Q   What does it mean -- sorry, were you
22   finished?
23       A   Yes.
24       Q   What does it mean that it mimics the
25   server response?

Page 160

1        A   This is a response that the server
2    generates, and it mimics that message towards the
3    client, the target's client.
4        Q   So it sends a message that appears
5    to be a server response?
6        A   Yes.
7        Q   But is not an actual server
8    response?
9        A   It could be a server response but it
10   was generated by the source client.
11       Q   And the source client is a client
12   that NSO developed, right?
13       A   Yes.
14       Q   Did that source client have a name
15   by which you referred to it?
16       A   This is implemented inside the WIS
17   server.
18       Q   So within the WIS server there is a
19   source client created by NSO.  Is that right?
20           MR. AKROTIRIANAKIS:  Objection,
21   misstates his testimony.
22       A   It includes the required
23   functionalities that are relevant and required for
24   this purpose of this vector.  Not an entire
25   client.

Page 161

1        Q   Got it.  So it doesn't necessarily
2    have everything that a real WhatsApp client would
3    have, correct?
4            MR. AKROTIRIANAKIS:  Objection.
5        Q   But it has sufficient aspects --
6            MR. AKROTIRIANAKIS:  Objection.  The
7    question is vague.
8        Q   But it has the aspects of the
9    WhatsApp client that are necessary to carry out
10   the installation vector?
11           MR. AKROTIRIANAKIS:  Object to the form
12   of the question.
13       A   It has the ability to send messages
14   from that source to the target's client
15   application.
16       Q   And would you refer to that source
17   client as the WIS or would you have another way to
18   refer to it?
19       A   WIS.
20       Q   Got it.  Okay.  To be clear, the WIS
21   is not an actual WhatsApp client, correct?
22       A   This is not an actual WhatsApp
23   client.  It uses part of the protocol capabilities
24   to be sent from one source to the target.
25       Q   So NSO created its own source client

41 (Pages 158 - 161)

Page 162

1 in WIS that had certain of those same
2 capabilities?
3      A  Yes.
4      Q  And the forged request that is
5 referred to there, that is the same thing as the
6 mimicked server response, or are those two
7 different things?
8      A  This is the same one.
9      Q  So it is a message sent by WIS that
10 appears to be legitimate WhatsApp traffic but is
11 not, right?
12      MR. AKROTIRIANAKIS:  Objection,
13 misstates the document.
14      A  This is legitimate by the target
15 that received it and by the ecosystem that
16 transferred the message from peer to peer.
17      Q  But it is not an actual response
18 from the WhatsApp server, right?
19      A  It could be.
20      Q  Right.  It appears to be, right?
21      A  No, it could be.
22      MR. AKROTIRIANAKIS:  Objection.
23      Q  So then I am going to have to go
24 back because you lost me.  When it says it is a
25 forged request that mimics a server response, you

Page 163

1 are saying that could be a legitimate WhatsApp
2 server response, so it is not forged or mimicked.
3 It actually could just be a WhatsApp server
4 response?
5      A  It is mimicked and forged in terms
6 of maybe sequence, maybe timing, maybe content,
7 but it for sure can be a valid response from the
8 server.
9      Q  Right, except that it doesn't
10 originate from the WhatsApp server.  It originates
11 from WIS?
12      A  You stated before that everything is
13 transferred -- transformed throughout the WhatsApp
14 servers, so it practically originated from -- got
15 sent through and landed on the WhatsApp client, on
16 the target's device.
17      Q  Right, originating from WIS?
18      A  Yes, and transferring to WhatsApp
19 ecosystem.
20      Q  But it is not a request that the
21 WhatsApp client, the standard WhatsApp client
22 would have the ability to send?
23      MR. AKROTIRIANAKIS:  Object to the form
24 of the question.
25      A  We will have to discuss what is --

Page 164

1 who is using and what are the capabilities of
2 WhatsApp client.
3      Q  But I couldn't open up my WhatsApp
4 and send this forged request right now, could I?
5      A  No.
6      Q  So it is something that NSO, through
7 its R&D function, developed the capability to
8 transmit.
9      A  Yes.
10      Q  How did NSO obtain the information
11 necessary to mimic a WhatsApp server response?
12      A  So we get back to what you just
13 discussed before, in terms of having company owned
14 devices which can be routed by procedures that
15 anyone can access in the web, and having this type
16 of router devices you can get access to anything
17 that is transmitted from and to the smartphone.
18      Q  The last bullet in that same section
19 says:
20      "The messages are non-standard messages
21 that are sent by our unique WhatsApp client."
22      Do you see that?
23      A  Yes.
24      Q  In what respect are these messages
25 non-standard?

Page 165

1      A  As I said in the sequence, timing
2 content.
3      Q  All of the above?  Sequence, content
4 and timing?
5      A  It depends on the message, specific
6 message.
7      Q  Meaning that on some occasions that
8 Heaven is used it might be non-standard, in terms
9 of sequence, in other times it might be
10 non-standard in terms of content?
11      MR. AKROTIRIANAKIS:  Objection,
12 misstates the document.
13      A  Again, this line refers to the
14 specific new fingerprint that was described here
15 and addresses the messages that are sent using
16 this new fingerprint.  I cannot and don't have any
17 way to understand what that specific team that
18 analysed and described this or did the document
19 referred to the message.
20      Q  You don't know, having prepared for
21 this or based on your personal knowledge either in
22 what respect those messages were non-standard?
23      A  No.
24      Q  You don't dispute that the messages
25 sent as part of new silent fingerprint were

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 182

1    A   Okay.  Yes, in this step, yes.
2    Q   In this context.  The second payload
3 you mentioned, so the one that came before
4 download of the agent, that enables the privilege
5 escalation, does that payload have a name?
6    A   It is referred as PE, which is
7 acronym of privilege escalation.
8    Q   Got it.  Where does the agent
9 payload come from to be downloaded on to the
10 device?
11    A   From servers which are under
12 customer's custody, the ecosystem of
13 infrastructure that is deployed.
14    Q   Those are part of the anonymized
15 servers established by NSO as part of the
16 anonymizing transmission network for a customer?
17    A   Yes.
18    Q   If we go back to Exhibit 2033, there
19 is a few bullets under "Attack".  Do you see that?
20    A   This is as I said his termination --
21 terminology, and how he calls this space.
22    Q   I am just asking if you see it.
23    A   I see it.
24    Q   Am I right in understanding, based
25 on what you have just described, that the bullets

Page 183

1 that follow "attack" here are what you call phase
2 one, gaining remote access?
3    A   Yes.
4    Q   And so it says:
5        "In order to attack we initiate a
6 WhatsApp voice call with target."
7        Do you see that?
8    A   Yes.
9    Q   And that is the first step of what
10 you call phase one?
11    A   Yes.
12    Q   And that WhatsApp voice call is
13 initiated from NSO's WIS.  Is that right?
14        MR. AKROTIRIANAKIS:  Objection,
15 misstates his testimony.
16    A   NSO's WIS code is able to send
17 messages that initiates the WhatsApp voice call,
18 on the endpoint WhatsApp target, WhatsApp client.
19    Q   It continues:
20        "As part of the call, initiation
21 handshake between our WIS client and target's
22 WhatsApp client."
23        Let me pause there.  What does that
24 refer to, "Initiation handshake between our WIS
25 client and target's WhatsApp client"?

Page 184

1    A   As I said, this is part of protocol
2 messages which are required to initiate the
3 WhatsApp call.  It is not a single message.  It is
4 back and forth messages which are handshaked
5 between the source and the target.
6    Q   And that occurs through the WhatsApp
7 servers?
8    A   As we said before, every
9 transmission between two peers have to be
10 transmitted through WhatsApp servers.
11    Q   Including this transmission that we
12 are talking about here?
13    A   Including this, yes.
14    Q   Except a normal peer to peer
15 communication through WhatsApp would be with one
16 WhatsApp client and another, correct?
17        MR. AKROTIRIANAKIS:  Object to the form
18 of the question.  Vague.
19    A   Would you call bot originating a
20 call normal activity?
21    Q   No.
22    A   Okay.
23    Q   A standard, regular WhatsApp call
24 would be from one WhatsApp client to another.
25 Right?

Page 185

1        MR. AKROTIRIANAKIS:  No foundation.
2    A   As I said before, we were initiating
3 a call, a WhatsApp call, between two peers.
4 Whether it is normal or not, it is like -- I don't
5 have any way to answer this question.
6    Q   My question was different.  I asked
7 you in a normal WhatsApp voice call, one WhatsApp
8 user calls another WhatsApp user, that would be a
9 WhatsApp client on both sides.  Right?
10    A   Yes.
11    Q   And so what NSO is doing as part of
12 the Heaven and Eden exploits was different than
13 that.  Right?
14        MR. AKROTIRIANAKIS:  Objection,
15 misstates testimony.
16    Q   Because on one side of the call
17 wasn't a WhatsApp client, right?
18    A   There was code which was able to
19 send messages using WhatsApp client on one side
20 source to the second endpoint which is target's
21 WhatsApp client.
22    Q   Right, but as we have talked about
23 at length already, on the source side it is not a
24 WhatsApp client, right?  It is the WIS which NSO
25 created, correct?

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1        A   I would clarify.
2        Q   Can I just get a yes or no to that
3   so we are all on the same page?
4        A   The answer is no.
5            MR. AKROTIRIANAKIS:  He is going to
6   answer the question --
7        Q   Go ahead then.
8        A   Go ahead with the question.  The
9   question was --
10       Q   You were going to answer.  On the
11  source side, it is not a WhatsApp client, it is
12  the WIS which NSO created.  Isn't that correct?
13       A   The messages are built and sent from
14  the WIS client.  These messages have to be sent
15  from an application.  Client is notified, which he
16  uses to connect to the application and sends the
17  messages through a real and active client.
18       Q   Through an active WhatsApp account?
19       A   Yes.
20       Q   And whose account would that be?
21       A   Accounts were established for the
22  customer.
23       Q   So the message is generated by the
24  WIS?
25       A   Yes.

Page 187

1        Q   But it is put into the WhatsApp
2   servers by an actual WhatsApp client?
3        A   WIS has a connection to a client
4   which is activated through the normal procedures
5   of client activation.
6        Q   Meanings it uses like an
7   authentication token from an actual account?
8            MR. AKROTIRIANAKIS:  Had you completed
9   your answer before he --
10       A   No.
11       Q   Go ahead.
12       A   WIS crafts messages which are
13  required to initiate the call and test
14  connectivity with the client which was activated
15  for each and every customer.  It was connected to
16  the WhatsApp system as a normal client because it
17  is a normal client, and sent, and the message is
18  sent by normal client from one peer to a normal
19  client that target's device.
20       Q   And so in addition to the WIS there
21  is a stand-alone client, genuine WhatsApp client
22  on the source side of this transmission?
23       A   Yes.
24       Q   And so the message is created by the
25  WIS but transmitted through that WhatsApp client?

Page 188

1        A   Yes.
2        Q   And when you said it has
3   connectivity, the WIS has connectivity to a
4   genuine WhatsApp client, what did you mean by
5   that?
6        A   I mean that it has to be -- it has
7   to have a way to connect the target and send the
8   message to the target.
9        Q   So the WIS is able to send the
10  message it created through that WhatsApp client?
11       A   Yes.
12       Q   Got it.  And that WhatsApp client on
13  the initiating side would be one that -- an
14  account that NSO created?
15       A   As part of deployment, each customer
16  has his own set of WhatsApp clients that were used
17  for this operation.
18       Q   Created by NSO, right?
19       A   Yes.
20       Q   Through the White Services team?
21       A   Yes.
22       Q   And those would be anonymized as
23  well?
24       A   Yes, as part of the operation
25  requirements for the customer to be anonymized.

Page 189

1        Q   Going back to that second bullet, it
2   says:
3            "As part of the call, initiation
4   handshake between our WIS client and target's
5   WhatsApp."
6            First of all, do you agree that as part
7   of the call there is an initiation handshake
8   between NSO's WIS client and the target WhatsApp
9   client?
10       A   Again the question?
11       Q   Do you agree that as part of the
12  call -- that as part of the call -- it says here
13  as part of the call that there is an initiation
14  handshake between the WIS client and the target
15  client?
16       A   For operations done by customer
17  deployment was done on customer's infrastructure
18  before initiation is between the code that is
19  deployed on customer side with targets he chooses
20  to install.
21       Q   Not my question.  But there is a
22  handshake between the WIS and the target client?
23       A   There is a connection between WIS
24  and WhatsApp client on the target's device.
25       Q   It says:

48 (Pages 186 - 189)

Page 190

1        "As part of the call we add to a
2  specific field (property) of the messages request
3  payload that is named relay servers and usually
4  contains five constant IP addresses of relay
5  servers."
6        What does that mean?
7        A   As part of the initiation of the
8  WhatsApp voice call, the data that is transmitted
9  during the voice call is transmitted to relay
10 servers which are designed to transmit data from
11 peer to peer.  What it states, that we had the
12 ability to add specific field to the property and
13 to the payload request sent, which is named relay
14 servers, which usually contains five constant IPs
15 and an additional one.
16       Q   And so the message, as sent from
17 WIS, would be different than what would have been
18 sent from the WhatsApp client?
19       A   No, this is not the case.
20       Q   So what does it mean when it says
21 "It usually contains five and we add an additional
22 relay server"?
23       A   The relay server at least is
24 received from the server side, the target, target
25 WhatsApp client.  We had the ability to add

Page 191

1  additional one to that list.
2        Q   Right.  So you would add it to the
3  message that went to the target client?
4        A   We had the ability to add that one
5  additional relay server IP to the target.  As it
6  was sent, the target was applied.
7        Q   In a normal WhatsApp communication,
8  there would only be the five relay servers.
9  Right?
10       A   Yes.
11       Q   That is what it means by "usually
12 has five relay servers", right?
13       A   Yes.
14       Q   And it continues:
15       "When a standard WhatsApp client
16 initiates a voice call, it goes out with 5 IP
17 addresses."
18       And that is what you were referring to,
19 right?
20       A   Yes.
21       Q   So the message as sent from WIS was
22 different than what is called here as a
23 standard -- what would come from a standard
24 WhatsApp client, right?
25       A   A standard WhatsApp client would --

Page 192

1  as it states here, five IP addresses.
2        Q   And the message sent from WIS would
3  have six?
4        A   The message sent from WIS enforces
5  to add additional one.
6        Q   Sorry, enforces?
7        A   Yes, enforces to add to that list
8  additional one relay server --
9        Q   Right, so the message sent by WIS is
10 different.  It has six relay servers instead of
11 five, right?
12       A   Yes.
13       Q   What do you mean when you say it
14 enforces to add to this list one additional relay
15 server?
16       MR. AKROTIRIANAKIS:  Objection,
17 misstates his testimony.
18       Q   Is that what you said?  I was not
19 sure I heard you correctly.  Is the word
20 "enforces"?
21       A   I used the word enforces.  What I
22 was talking about is -- it is read from the
23 written text, the usual at least contains five,
24 and then it says we had the ability to add one
25 additional relay servers list, which is forcing or

Page 193

1  adding an additional one.
2        Q   Okay.  It continues:
3        "WhatsApp servers override the first
4  five servers with their own relay servers."
5        Do you see that?
6        A   Yes.
7        Q   What does that mean?
8        A   That no matter what is sent from the
9  client, WhatsApp servers are all writing the
10 five -- first five relay server addresses.
11       Q   And then it says:
12       "We assign an RTT equals zero value with
13 these servers, leading the target's WhatsApp
14 client to choose our 'relay server' instead of a
15 real one, which serves target client with payloads
16 containing exploitation flow that enable initial
17 code execution."
18       Do you see that?
19       A   Yes.
20       Q   What does it mean when it says "we
21 assign an RTT equals zero value with these
22 servers"?
23       A   As we said before, normally what is
24 sent from the WhatsApp source, WhatsApp client,
25 the WhatsApp servers are overwriting the list of

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

1 five first relay server addresses with their list
2 of addresses, and we had a way to direct the
3 target's WhatsApp client code not to use these
4 five -- first five relay server addresses, but use
5 the additional one that we managed to add.
6     Q   What is RTT?
7     A   I think it is referring to round
8 trip time.
9     Q   Round trip time.  So was that
10 causing some aspect of this system to believe that
11 the first five servers are not going to be able to
12 transmit a message efficiently?
13    A   Yes.
14    Q   And that is -- I am going to say
15 who, which is obviously not the right word because
16 it is not a person, but who in this chain is
17 selecting the sixth server instead of the first
18 five?
19    A   The target WhatsApp line.
20    Q   The target WhatsApp client?
21    A   Yes.
22    Q   So when it chooses the sixth, the
23 server that is selected is actually not a relay
24 server, right?
25    A   Not WhatsApp's relay server.

Page 195

1     Q   Is it an actual relay server?  I
2 mean is it a relay server?
3     A   It is a server.  Relay server is
4 just a fancy name for a server.
5     Q   And is it the server that contains
6 the PE payload?
7     A   No.
8     Q   So what server is it that this step
9 we just discussed points to?
10    A   This is the server that serves as a
11 relay server that transmits data from peer, source
12 peer to the destination peer, and will transmit
13 the voice call data.
14    Q   So then through that server is WIS
15 transmitting additional data or code to the target
16 WhatsApp client?
17    MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19    Q   Let me ask it this way.  What is
20 transmitted via that sixth relay server?
21    A   Additional messages.
22    Q   From where?
23    A   Generated, as we said, from the WIS
24 server through the source WhatsApp client it is
25 connected to to transmit the messages to the

Page 196

1 target WhatsApp client.
2     Q   Okay.  When it says "It leads the
3 target's WhatsApp client to choose our 'relay'
4 server instead of a real one", that means instead
5 of an actual WhatsApp relay server?
6     A   Yes.
7     Q   It says:
8     "... which serves target's client with
9 payloads containing exploitation flow that enable
10 initial code execution (stager)."
11    What does that refer to, the payloads
12 containing exploitation flow that enable initial
13 code enable execution?
14    A   As we talked before, additional
15 messages are sent to -- have to be sent from the
16 source to the destination.  It is not a matter of
17 single message.  As part of these messages, there
18 is additional code, part of the code which is
19 called -- addressed as "stager", which is
20 downloaded using this server, and that part of
21 code will be responsible for downloading the next
22 phase.
23    Q   Which is the PE?
24    A   Privilege escalation.
25    Q   Got it.  And then it says:

Page 197

1     "After initial code execution,
2 pre-exploit is pulled with a raw TCP socket."
3     What does that mean?
4     A   Pre-exploit practically can be
5 addressed as an initial part of the PE, which is a
6 privilege escalation code, which its
7 responsibilities are to detect and send back
8 additional fingerprinting or advanced
9 fingerprinting on the device itself which is
10 required to determine which privilege escalation
11 code to send to the target.
12    Q   Who would own the relay server, the
13 sixth relay server.
14    A   This is any part of the
15 infrastructure deployed to the customer's
16 ecosystem, which the customer has its own
17 ecosystem.
18    Q   Right, but it wouldn't be in the
19 name of the customer, right?
20    MR. AKROTIRIANAKIS:  Objection,
21 foundation.
22    A   It depends on the procurement
23 procedures that each customer defines for himself.
24    Q   Are there instances you are aware of
25 in which the relay server used in the attack would

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q   And what purpose does that serve in
2  the installation flow?
3        MR. AKROTIRIANAKIS:  Objection, assumes
4  facts not in evidence.  Misstates his testimony.
5  No foundation.
6        A   So I don't recall for which specific
7  step it was used.
8    Q   Is that something we would be able
9  to see from the source code?
10       A   I think so.
11       Q   And the non-standard encryption that
12 is referred to, again that is a message that is
13 different than what would be sent from a regular
14 WhatsApp client?
15       A   Again, it really depends on the
16 changes described here.  It can be even the fact
17 that you enable using encryption in the WhatsApp
18 client currently is not supporting the encryption
19 also may be relevant for this case.
20       Q   Would I have --
21       A   It is difficult to understand from
22 this context whether it refers to encryption that
23 is the encryption itself is not standard or the
24 usage of encryption was not standard.
25       Q   Okay.  You are also prepared to

1  testify as to the full functionality of Pegasus,
2  right?
3        A   Yes, as I said before, I don't
4  recall the specific part which was used.
5        Q   So we would need the source code for
6  that?
7        A   Yes.
8        Q   If I wanted to send a message from
9  my WhatsApp that is encrypted in a non-standard
10 way, can I do that?
11       MR. AKROTIRIANAKIS:  Objection, no
12 foundation.
13       A   No.
14       Q   No, right.  So that is something
15 that was done by WIS?
16       A   Yes.
17       Q   The next section down under "WIS
18 client activity", it says:
19       "Our WIS client does not exactly behave
20 a legitimate subscriber of WhatsApp."
21       Do you see that?
22       A   Yes.
23       Q   And that is an accurate statement,
24 right, that the WIS does not behave exactly like a
25 legitimate subscriber of WhatsApp?

1        A   I would like to continue the
2  sentence, and says that it only sends very
3  specific messages, call messages and text
4  messages, and it refers to the fact that it
5  doesn't send all the other messages which are sent
6  by normal WhatsApp client.
7        Q   But those are not the only ways in
8  which WIS does not behave exactly like a
9  legitimate WhatsApp client, is it?
10       MR. AKROTIRIANAKIS:  Objection,
11 misstates his testimony.
12       A   We are currently referring to the
13 sentence.
14       Q   But that is not the only way WIS is
15 different from a legitimate subscriber of
16 WhatsApp, right?
17       MR. AKROTIRIANAKIS:  Objection,
18 misstates his testimony.
19       A   As we said now, WIS server enables
20 you to send crafted messages with crafted content
21 which is required to enable the remote execution
22 ability on the target's phone or WhatsApp client.
23       Q   I doubt she got a word of that.  Why
24 don't you say it again, see if we can get that
25 down before we go to the next question.

1        A   I was saying that --
2        Q   Let me repeat the question in case
3  it helps her or you.  I am not sure it is relevant
4  to your answer but let me ask it.  That feature
5  here, that it only sends specific messages, that
6  is not the only way the WIS is different from a
7  legitimate subscriber of WhatsApp, is it?
8        MR. AKROTIRIANAKIS:  Same objections.
9        A   So my answer was WIS server
10 implements and enables to craft end messages and
11 content that is required for the installation
12 phase or gaining remote code execution on the
13 target's WhatsApp client.
14       Q   And those messages are different
15 than the messages that would be sent by a regular
16 WhatsApp subscriber, right?
17       A   If by "regular" you mean one that
18 holds device in hand, the answer is yes.
19       Q   It adds a sixth relay server, yes?
20       A   Yes.
21       Q   It encrypts the message in a
22 non-standard way, right?
23       A   Yes.
24       Q   Are there other ways in which the
25 messages sent by WIS are different from what would

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 206

1 be sent by a legitimate WhatsApp subscriber?
2        A   There are additional messages were
3 sent.  I can't recall whether each and every one
4 is legitimate or not.
5        Q   You don't remember one way or the
6 other?
7        A   As you said there are messages which
8 differ in content and in sequence from the
9 legitimate usage, but I cannot say that the
10 illegitimacy is relevant for each and every
11 message which is sent.
12        Q   The next section down there is sort
13 of a header there that says "Threat Actors
14 Involved".  Do you see that?
15        A   Yes.
16        Q   And that refers to parties that
17 might compromise the secrecy of the WhatsApp
18 installation vector?
19        A   I would have to read it.
20        Q   Go for it.  Go ahead.
21        A   Okay.
22        Q   So "threat actors" there refers to
23 parties that might compromise the operational
24 security of the installation vector.  Is that
25 right?

Page 207

1        A   As titled maybe, but I don't think
2 the content is relevant for this headline.
3        Q   So maybe it refers to -- what do you
4 understand "threat actors" to mean, as NSO and Q's
5 corporate representative?
6        A   Threat actors is as you said, but I
7 said that the content of the paragraph doesn't
8 necessarily address the "threat actors" as the
9 headline states.
10        Q   But we agree that threat actors
11 means parties that might compromise operational
12 security?
13        A   Yes.
14        Q   Meaning parties that might detect
15 and seek to prevent the exploit?
16        A   Yes.
17        Q   And one of those is WhatsApp itself,
18 right?
19        A   Yes.
20        Q   In fact, there are three identified;
21 first WhatsApp, then WhatsApp anti-spamming model
22 and measures and then target.  Right?
23        A   Yes.
24        Q   That is what is identified as threat
25 actors to operational security in this document?

Page 208

1        A   Yes.
2        Q   And you understood during your time
3 working on the Hummingbird vectors that WhatsApp
4 would try to shut down the installation vectors if
5 they were detected.  Right?
6        MR. AKROTIRIANAKIS:  Objection, no
7 foundation.  Incomplete hypothetical.
8        A   WhatsApp would shut down or close
9 any vulnerability it knew about or exists.
10        Q   Including the vulnerabilities that
11 were being exploited for the Hummingbird vectors,
12 right?
13        MR. AKROTIRIANAKIS:  Objection, no
14 foundation.  Incomplete hypothetical.
15        A   If it discovered it, yes.
16        Q   And so that discovery by WhatsApp is
17 something that the OpSec team worked to avoid.  Is
18 that right?
19        A   OpSec team, as I said at the
20 beginning document, are placing new suggestions
21 that from their point of view would like to be
22 implemented.  Whether any suggestion here is
23 implemented or not, it really depends on the
24 capability and whether it can be applied or not.
25        Q   But my question was more general,

Page 209

1 not about specific suggestions, that discovery of
2 the exploits by WhatsApp is something that the
3 OpSec team worked to avoid.  Isn't that right?
4        A   They suggested ways so that the
5 capability would prolong much longer time.
6        Q   How many members did the OpSec team
7 have in 2018/19?
8        A   2018, it was one.
9        Q   What about 2019?
10        A   Less than 10.
11        Q   Why did it increase from one to less
12 than 10?
13        MR. AKROTIRIANAKIS:  Objection, no
14 foundation.
15        A   The OpSec increased because it
16 needed to address, besides this vector, additional
17 vectors for abilities and infrastructure related
18 analyses, monitoring and investigations.
19        MR. AKROTIRIANAKIS:  Counsel, whenever
20 you get to a convenient stopping point in the not
21 too distant future --
22        Q   Sure.  So under the WhatsApp section
23 of actors it says "We know WhatsApp has spam
24 solving measures".  Do you see that?
25        A   Yes.

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

1    Q  And what does that refer to, spam
2 solving measures?
3        MR. AKROTIRIANAKIS:  Objection, no
4 foundation.
5    A  As it states afterward:  "Users can
6 block people from messaging when something fishy
7 is noticed about them."
8    Q  And that is your understanding of
9 spam solving measures?
10    A  As far as I understand it, it talks
11 about the ability WhatsApp added to client to
12 block specific users.
13    Q  The next section here is "WhatsApp
14 - Anti-spamming Model and Measures".  Do you see
15 that section there?  At the very bottom of the
16 page and the text is on the following.  Do you see
17 that?
18    A  Yes.
19    Q  This is a summary of measures that
20 NSO understood WhatsApp took to avoid improper
21 messages being sent?
22        MR. AKROTIRIANAKIS:  Objection,
23 misstates the document.
24    A  As I said before, it states
25 suggestions by the person that wrote the report.

Page 211

1    Q  So when it says "WhatsApp encourages
2 users to report spam", that is a suggestion from
3 the OpSec team?
4    A  It is essentially what WhatsApp are
5 doing.
6    Q  Right, but it is not a suggestion
7 from the OpSec team, is it?
8    A  This specific one sentence, no.
9    Q  It says:
10    "This could be demonstrated by the
11 following ways:
12    Policy.
13    WhatsApp prompts an immediate 'SPAM or
14 block' option when receiving message, added to
15 group by unidentified number."
16    That is not a suggestion from the OpSec
17 team, is it?
18        MR. AKROTIRIANAKIS:  Where are you
19 reading from?
20        MR. PEREZ-MARQUES:  A, also numbered 1,
21 but the second sub-bullet on page 959.  Also not a
22 suggestion from the OpSec team, right?
23    A  Right.
24    Q  The next one, B:
25    "In case number is reported as spam it

Page 212

1 is added to a watchlist."
2        That is not a suggestion from the OpSec
3 team, is it?
4    A  I was referring to the document as a
5 whole.
6    Q  Okay.  But what we have in this
7 section here, these are not suggestions from the
8 OpSec team.  These are observations about
9 WhatsApp's anti-spamming measures, correct?
10    A  Observations, and his understanding
11 of the features.
12    Q  Understanding of WhatsApp's
13 anti-spamming features, right?
14    A  Yes.
15    Q  And the purpose of reciting them
16 here was to formulate a strategy for how those
17 features could be avoided.  Isn't that right?
18        MR. AKROTIRIANAKIS:  Objection, no
19 foundation.  Misstates the document.
20    A  I would say these are his
21 understandings how these mechanisms work in order
22 to be taken under consideration during the
23 installation flow implementation.
24    Q  In order to avoid detection, right?
25    A  This could be understandings that

Page 213

1 may even relate to not avoid measures but to even
2 be able to finish and complete the installation
3 flow successfully.
4    Q  Okay.  Despite WhatsApp's security
5 measures, right?
6        MR. AKROTIRIANAKIS:  Objection,
7 misstates the document and the testimony.  No
8 foundation.
9        MR. PEREZ-MARQUES:  Let's take a step
10 back.
11    The whole purpose -- this is an
12 Operation Security document, right?
13        MR. AKROTIRIANAKIS:  Objection,
14 misstates the testimony.
15    A  This is a draft.
16    Q  Prepared by -- you identified the
17 individual.  A member of the Operation Security
18 team, right?
19    A  Yes.
20    Q  And you said the purpose of this is
21 suggestions for operational security, right.  That
22 was your testimony, right?
23    A  Yes.
24    Q  Right.  And suggestions for
25 operational security means ways to maintain the

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 218

1  themselves on describing such measures.
2      Q  Could be the source, right?
3      A  Could be.
4      Q  Could be but you don't know for
5  sure?
6      A  No.
7      Q  So, in terms of what work the OpSec
8  team to understand WhatsApp's anti-spamming
9  measures, you don't know the details of what work
10 was done?
11     MR. AKROTIRIANAKIS:  Objection,
12 misstates his testimony.
13     A  You asked whether human resources
14 were used --
15     Q  You answered that question.  I am
16 asking whether you know the work that was done by
17 the OpSec team to understand WhatsApp's
18 anti-spamming measures?
19     A  No.
20     Q  The last item under F -- let me read
21 F first.  It says:
22     "WhatsApp maintain predetermined metrics
23 to detect a spammer and ban him from using the
24 service.  Some of the metrics are the following."
25     Do you see what I just read?

Page 219

1      A  Yes.
2      Q  And then item 11 in that list is:
3      "Using third party modified WhatsApp."
4      Do you see that?
5      A  Yes.
6      Q  What does "third party modified
7  WhatsApp" mean?
8      A  Applications which are created by
9  engineers based on WhatsApp's original application
10 and used in the Android Play Store.
11     Q  So that would include applications
12 like the WIS?
13     MR. AKROTIRIANAKIS:  Objection,
14 misstates his testimony.
15     A  No.
16     Q  Would WIS be an example of a third
17 party modified WhatsApp?
18     A  No.
19     Q  How so?  What is the distinction?
20     MR. AKROTIRIANAKIS:  Objection.  No
21 foundation.
22     A  You cannot install WIS server on
23 your Android device.
24     Q  Why not?
25     A  It is not an application.

Page 220

1      Q  What is it?  What would you call it?
2      A  It is a piece of code which resides
3  on the server side of the customer infrastructure
4  that is able to connect to the source WhatsApp
5  client, the original source WhatsApp client to
6  send messages.
7      Q  And when it says "WhatsApp
8  explicitly claim against reversing their app",
9  what do you understand that to mean?
10     A  I understand, according to his
11 understanding, WhatsApp specifically claimed
12 against reversing this app.
13     Q  What does that mean?
14     A  I don't know what he meant by this
15 message.
16     Q  So as NSO and Q's corporate
17 designee, you can't shed any light as to what that
18 means here?
19     MR. AKROTIRIANAKIS:  I don't think he is
20 designated as to that category, counsel.  It is
21 beyond the scope of the designation.
22     MR. PEREZ-MARQUES:  I believe it refers
23 to topic 20, 21 and 22.  Go ahead.
24     MR. AKROTIRIANAKIS:  I don't think you
25 are within those topics.  You can ask the question

Page 221

1  and I will object, as this is how this goes, and
2  say it has no foundation and exceeds the scope of
3  his designation and we will do the whole
4  litigation thing after that.
5      Q  As NSO and Q's corporate
6  representative, you cannot shed any light as to
7  what that reference to reversing their app means
8  here?
9      MR. AKROTIRIANAKIS:  Objection, no
10 foundation.  Beyond the scope of the designation.
11     A  I cannot define specifically what he
12 meant by stating this in this sentence.
13     Q  Can you define generally what he
14 meant by stating that?
15     MR. AKROTIRIANAKIS:  Same objections.
16     Q  Was it your understanding at the
17 time that you were working on the Hummingbird
18 vectors that WhatsApp prohibited reverse
19 engineering the WhatsApp client?
20     MR. AKROTIRIANAKIS:  Objection, no
21 foundation.
22     A  From my understanding, reverse
23 engineering prohibited by WhatsApp is a legal
24 term, which is not under my possibility to define
25 or address.

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1    Q  I am just asking for your
2 understanding.  Did you understand when you were
3 working on the Hummingbird vectors that WhatsApp
4 prohibited reverse engineering the WhatsApp
5 client?
6    A  I didn't read the terms of service.
7    Q  You didn't read the terms of
8 service?
9    A  No.
10    Q  And you made no effort to comply
11 with them?
12    MR. AKROTIRIANAKIS:  Objection.  No
13 foundation.
14    A  Terms of service is a legal
15 document, as far as I understand the word.  I am
16 not familiar with it.
17    Q  You have never read it?
18    A  No.
19    Q  Not familiar with it, right?
20    A  I never read it.
21    Q  Made no effort to comply with it, in
22 the course of developing the Hummingbird vectors.
23 Isn't that right?
24    MR. AKROTIRIANAKIS:  Objection,
25 misstates his testimony.

Page 223

1    A  As I said before, reverse
2 engineering is a legal term.  I don't have the
3 tools to address legal terms.
4    Q  That was not my question.  Is it
5 right that in the course of working on the
6 Hummingbird vectors you made no effort to comply
7 with the WhatsApp terms of service?
8    MR. AKROTIRIANAKIS:  Object to the form
9 of the question.
10    A  No.
11    Q  No it is not correct or no you
12 didn't make such effort?
13    A  It was not under my obligation to do
14 so.
15    Q  It was not part of your role to try
16 to comply with the terms of service?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19    A  I will say it this way.  Due to the
20 fact that we were working on company owned
21 devices, activated WhatsApp client on those
22 devices, I was in charge of developing the
23 installation vectors.
24    Q  And in the course of developing the
25 installation vectors did you make any effort,

Page 224

1 sitting here under oath, did you make an effort to
2 comply with the WhatsApp terms of service?
3    A  No.
4    Q  Sitting here today, do you know one
5 way or the other whether the steps that your team
6 took in developing the Hummingbird vectors
7 violated the terms of service?
8    MR. AKROTIRIANAKIS:  Objection, calls
9 for a legal conclusion.  No foundation.
10    A  As I have said before, I don't have
11 the legal tools to answer the question.
12    Q  And so you have no answer to that
13 question.  You don't know one way or the other?
14    A  No.
15    MR. PEREZ-MARQUES:  Why don't we take a
16 short break.
17    THE VIDEOGRAPHER:  Going off the record.
18 The time is 15:29.  End of media card number four,
19 volume one, of the video deposition of Tamir
20 Gazneli.
21    (A short break.)
22    THE VIDEOGRAPHER:  This is the beginning
23 of media card number five, volume one, in the
24 video deposition of Tamir Gazneli.  Going on the
25 record.  The time is 15:53.

Page 225

1    MR. PEREZ-MARQUES:  Mr. Gazneli, do you
2 understand you are still under oath?
3    A  Yes.
4    Q  I would like to continue with
5 Exhibit 2033.  Before I do, you testified earlier
6 about -- I think what you said are some publically
7 available applications called JEB and IDA?
8    A  I did.
9    Q  And those were used as part of the
10 development of the Hummingbird vectors?
11    A  Yes.
12    Q  And were those JEB and IDA run on
13 the WhatsApp client?
14    A  No, the software runs on Linux or
15 Windows machines.
16    Q  So how were they used?
17    MR. AKROTIRIANAKIS:  Object to the form
18 of the question.
19    MR. PEREZ-MARQUES:  In connection with
20 the development of the Hummingbird vectors?
21    A  You just load the target's the
22 client's application code inside this software.
23    Q  Which application code?
24    A  The APK files.
25    Q  For what?

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

1     A   For WhatsApp client.
2     Q   So that is what I meant by run. I
3 realize my wording was ambiguous. That is what I
4 meant by run on the WhatsApp client, meaning that
5 the WhatsApp client code was run through JEB and
6 IDA as part of the development of the Hummingbird
7 vectors?
8     A   I want to make it clear. You cannot
9 run, like executing the WhatsApp client code
10 through these applications. You just load the
11 code inside these applications.
12     Q   What do JEB and IDA do with the
13 code?
14     A   Enable you to visualize closed
15 source code as code which maybe is readable to
16 human eyes as possible.
17     Q   Would you agree with the
18 characterization of JEB and and ITA as decompilers
19 or extractors?
20     A   Decompilers may be close to the
21 definition.
22     Q   I am sorry, it is close to the
23 definition?
24     A   Yes.
25     Q   But not extractor?

Page 227

1     A   Extractor is like, as I understand,
2 more wide, wider word. What does it extract?
3     Q   So you are not sure what that means?
4     A   No. I think that decompiling the
5 code is the exact -- the more accurate word.
6     Q   Decompiling, right. Okay. Is
7 decompiling code something that you consider
8 reverse engineering?
9     MR. AKROTIRIANAKIS: Object to the form
10 of the question.
11     A   These tools enable you to
12 practically -- I wouldn't say only but tools which
13 enable you to be able to read closed source codes
14 in a basically readable manner.
15     Q   Do you consider that reverse
16 engineering?
17     A   As I said before --
18     MR. AKROTIRIANAKIS: Object to the form
19 of the question.
20     A   As far as I am understanding reverse
21 engineering is a legal term. I don't know how to
22 apply it on specific development and research
23 activity.
24     Q   Do you consider that a legal term,
25 not a software engineering term?

Page 228

1     A   It is a legal term.
2     Q   And you don't know what it means?
3     A   It would be estimating.
4     Q   Going back to Exhibit 2033, there is
5 a section at the bottom of page 959 titled "Threat
6 Landscape". Do you see that?
7     A   Yes.
8     Q   And this identifies aspects of the
9 exploit that could lead to detection risk. Isn't
10 that right?
11     MR. AKROTIRIANAKIS: Misstates the
12 document.
13     A   Again the question?
14     Q   This identifies aspects of the
15 exploit that could lead to detection risk. Isn't
16 that right?
17     A   I will have to read it.
18     Q   Please read it.
19     A   Okay. So the question is --
20     Q   You should not read from the
21 real-time but I can repeat the question for you,
22 which is that this section, "Threat Landscape",
23 identifies aspects of the exploit that could lead
24 to detection risk. Is that right?
25     MR. AKROTIRIANAKIS: Misstates the

Page 229

1 document.
2     A   As far as I understand it, it states
3 or lists the parts in the flow which are most
4 exposed.
5     Q   To the risk of compromising
6 operational security, right?
7     A   Yes.
8     Q   And the first one mentioned there is
9 "non-standard requests sent by the WIS server and
10 and routed through WA servers", and it continues:
11     "Assuming the requests that are sent by
12 the WIS, their flow traffic rate and sources may
13 be inspected by WhatsApp, content may not be
14 inspected due to end to end encryption."
15     Do you see that?
16     A   Yes.
17     Q   And so again you would agree that
18 non-standard requests are sent in connection
19 with -- let me start over.
20     You agree that in connection with the
21 Hummingbird vectors, non-standard requests were
22 sent by the WIS server and routed through WhatsApp
23 servers?
24     MR. AKROTIRIANAKIS: Objection,
25 misstates testimony.

58 (Pages 226 - 229)

Page 230

1    A  I would say that WIS server creates
2  messages, that some of them may be non-standard
3  and routed through (inaudible) servers, and those
4  servers had all the right and ability to decide
5  whether to route them or not.
6        Q  And when you say all the right, are
7  you talking in legal terms?
8        A  No.
9        Q  And it is identifying the risk that
10  the requests might be inspected by WhatsApp,
11  right, as a threat to operational security?
12        A  It is a fact.
13        Q  The second risk identified as the
14  non-standard activity of the WIS client doesn't
15  send standard data to WhatsApp, sends only very
16  specific requests, and that was another aspect of
17  the exploit that risked compromising operational
18  security?
19        MR. AKROTIRIANAKIS:  Objection,
20  compound.  Object to the form of the question.
21        A  This is one of the aspects of the
22  WIS client.  As we said, it only implements
23  specific requests and messages relevant for the
24  installation flow.
25        Q  And the third risk identified is

Page 231

1  that "target's device WhatsApp crash logs sent to
2  WhatsApp servers for analysis".  Do you see that?
3        A  Yes.
4        Q  And what do you understand that to
5  mean?
6        A  If the standard procedure
7  application crashes, it sends the crash logs
8  content files to the application specific servers.
9        Q  And that also created a risk of
10  WhatsApp detecting the exploit?
11        MR. AKROTIRIANAKIS:  Objection,
12  misstates the document.
13        A  If somehow the installation flow may
14  lead to a WhatsApp client crash on the target
15  device, then according to the statement and the
16  standing of how things in this domain work the
17  WhatsApp crash would be uploaded to the servers.
18        Q  Creating a risk of detection, right?
19        A  That depends on the content of the
20  message -- of the crash and the ability of the
21  other side to understand what is in the crash.
22        Q  But potentially creating a risk of
23  detection, creating a risk of potential detection,
24  right?
25        A  Yes.

Page 232

1        Q  To be clear, this was written --
2  this document was written by the individual at NSO
3  who was in charge of operational security with
4  respect to these installation vectors?
5        MR. AKROTIRIANAKIS:  Objection,
6  misstates testimony.
7        A  This was written by -- for in the
8  company, in the OpSec team, and he was in charge
9  of creating an assessment of the vector and all
10  the measures required to be -- for it to be as
11  concealed in terms of the capability and in terms
12  of the customer activity.
13        Q  Right, and I think you said that in
14  2018 the OpSec team was one person, right?
15        A  Yes.
16        Q  And is that the person who wrote
17  this document?
18        A  Yes.
19        Q  Then if you go to the next page,
20  there is a section titled "Countermeasure and
21  mitigations".  Do you see that?
22        A  Yes.
23        Q  And countermeasures refers to NSO's
24  efforts to avoid or mitigate the operational
25  security risks that were just identified, right?

Page 233

1        MR. AKROTIRIANAKIS:  Objection,
2  misstates testimony.
3        A  No.
4        Q  What does countermeasures mean?
5        A  As I said before, there are sections
6  of this report and this might be one of them that
7  includes suggestions on how from his understanding
8  of the ecosystem installation flow should be
9  implemented or which parts need to be taken across
10  the installation.
11        Q  So suggestions for how NSO might
12  avoid or mitigate the operational security risks
13  that we just identified, correct?
14        MR. AKROTIRIANAKIS:  Misstates the
15  document.
16        A  These are suggestions from his
17  understanding what might compromise the
18  installation flow activity --
19        Q  And how to avoid compromise, right?
20        MR. AKROTIRIANAKIS:  Objection.  You
21  have got to let the witness finish his answer,
22  counsel.
23        MR. PEREZ-MARQUES:  Keep going if you
24  were not finished.  You said "these are
25  suggestions from his understanding what might

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 234

1 compromise the installation flow activity", but
2 continue.
3          A   And whether it voids or not is a
4 matter of if they were implemented or if it can be
5 implemented in the code or not.
6          Q   Whether the countermeasures can be
7 implemented?
8          A   Yes.
9          Q   Right, but they were suggestions,
10 subject to whether they could be implemented, of
11 how to avoid compromise of the exploit from an
12 operational security perspective, right?
13          A   I would say no, in a way that in
14 order to avoid security mechanisms, those security
15 mechanisms have to be implemented on the server
16 side, and whether he knows or he does not,
17 practically he is not familiar with the code
18 itself on the WhatsApp server side, and these
19 suggestions are from his understanding and his
20 investigation or reading he done -- he did on how
21 these mitigations or mechanisms are working, so
22 whether avoiding or not is a matter of whether he
23 is told any mechanism needs to be avoided.
24          Q   So they are suggestions for how to
25 avoid security mechanisms such as the author

Page 235

1 understood them?
2          MR. AKROTIRIANAKIS:  Objection,
3 misstates the testimony.
4          Q   That is your point, right?  He may
5 have been wrong in his understanding of the
6 security mechanisms, correct?
7          MR. AKROTIRIANAKIS:  Objection,
8 misstates the testimony.
9          A   The only state he is understanding
10 of the mechanisms first and second there are also
11 parts in here which are not related to mechanisms,
12 security mechanisms at all, but relating to
13 operational security at all.
14          Q   But do relate to operational
15 security or do not relate to operational security?
16          A   Relate to operational security
17 regardless of whether avoiding security mechanisms
18 or not.
19          Q   But you agree that some of these are
20 suggestions for how to avoid WhatsApp's security
21 mechanisms as the author understood those security
22 mechanisms?
23          MR. AKROTIRIANAKIS:  Objection,
24 misstates testimony.
25          A   Some of them, if those specific

Page 236

1 mechanisms were implemented on the server side,
2 may potentially detect unusual activity on the
3 servers.
4          Q   And these are suggestions for how to
5 avoid such detection, right?
6          A   I wouldn't say avoid but minimize
7 the risk.
8          Q   And were certain of these
9 countermeasures implemented?
10          A   I would have to read through.
11          Q   Take a moment.  I know it is two
12 pages of countermeasures here, but go ahead.
13          A   Are you asking about the whole
14 section?
15          Q   Yes, the countermeasures and
16 mitigations starts on page 8960 and continues on
17 to 961.
18          A   For now I can address the
19 fingerprint stage if you want and then I can
20 continue.
21          Q   You can answer just yes or no, were
22 any of the suggested counter measures in the
23 fingerprint section implemented by NSO?
24          A   For any the answer is yes, but in
25 order to answer exactly which and how many, I

Page 237

1 would have to read it all.
2          Q   Fair enough.  So let's drop that.
3 Would you agree, as a general matter, that NSO
4 took steps to minimize the risk of detection by
5 WhatsApp of the Hummingbird vectors?
6          A   Yes.
7          Q   If you look at page 961, under
8 "Deployment OpSec Requirements".  Do you see that?
9          A   Yes.
10          Q   It says:
11 "Each WIS WhatsApp client requires
12 credentials extracted from a phone with a whitened
13 SIM."
14          What does that mean?
15          A   So as I explained before the WIS
16 server works in a way that it communicates with an
17 activated source WhatsApp -- source WhatsApp
18 client, which activated using a normal SIM card.
19 This is addresses that -- in order to WIS work
20 properly and send messages, it is connected to a
21 client which uses credentials that were extracted
22 from the SIM card.
23          Q   Right.  Here it doesn't say
24 "connected to a client"?
25          A   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 238

1    Q   It just says "using credentials
2  extracted" from such a client, correct?
3    A   Yes.
4    Q   And is that an accurate statement of
5  how WIS worked?
6    MR. AKROTIRIANAKIS:  Object to the form
7  of the question.
8    A   It is inaccurate description.
9    Q   It is an accurate or inaccurate?
10    A   It is inaccurate, yes.
11    Q   So the WhatsApp work -- the WIS did
12  not require credentials extracted from a phone
13  with a whitened SIM?
14    A   WIS required but it required
15  connecting to the source WhatsApp client as I
16  said.
17    Q   And is it right that the Heaven
18  installation vector would use a different
19  credential for the fingerprint stage and the
20  attack stage?
21    A   Yes.
22    Q   And that was for operational
23  security purposes?
24    A   Yes.
25    Q   And was that also true with respect

Page 239

1  to Eden?
2    A   Yes.
3    Q   And ERISED?
4    A   Yes.
5    Q   We are looking at that -- why don't
6  we take a look at this quickly.
7    (Exhibit 2034 marked for identification.)
8    This is 2034, and it is another
9  Confluence document labeled "Abuse Prevention" on
10  the Bates starting NSO_WHATSAPP ending 8916.  Do
11  you see that?  I am not going to ask you any
12  questions about the parts that you don't want me
13  to ask you questions about.
14    MR. AKROTIRIANAKIS:  I'm just going to
15  point out for the record that 2033 and 2034, the
16  document just presented to the witness have been
17  clawed back and replaced with an overlay.  So I am
18  going to ask you again to follow the protective
19  order in respect of the documents that you put --
20    MR. PEREZ-MARQUES:  Do you have the
21  overlay version I can put to the witness?
22    MR. AKROTIRIANAKIS:  I can ask for it to
23  be sent but it has been provided days ago to your
24  team.
25    MR. PEREZ-MARQUES:  Okay.

Page 240

1    MR. AKROTIRIANAKIS:  So here's my
2  request.  In what the court reporter attaches to
3  the transcript you should not be using documents
4  that have been clawed back.  That would be a
5  violation of the protective order.  So if we can
6  get a different version of this that is from the
7  overlay and mark it and stipulate that that will
8  be the version of Exhibit 2033 and 2034 that is
9  attached to the transcript, then fine, and with
10  respect to these versions your obligations are
11  described in the protective order.
12    MR. PEREZ-MARQUES:  Let's discuss that
13  when we are off the record.
14    MR. AKROTIRIANAKIS:  We just discussed
15  it.  There is no further discussion.
16    MR. PEREZ-MARQUES:  Let's go off the
17  record then.
18    MR. AKROTIRIANAKIS:  I don't need to go
19  off the record.
20    MR. PEREZ-MARQUES:  I would like to go
21  off the record.
22    MR. AKROTIRIANAKIS:  Okay.  If you want
23  to go off the record go ahead.  You have my
24  permission.
25    MR. PEREZ-MARQUES:  Thank you.  I don't

Page 241

1  need your permission.
2    MR. AKROTIRIANAKIS:  You do actually.
3  Both counsel have to agree to go off the record,
4  but you have my permission, Tony, so we don't need
5  to fight about it.
6    MR. PEREZ-MARQUES:  Excellent.  Let's go
7  off the record.
8    THE VIDEOGRAPHER:  Going off the record.
9  The time is 16:15.
10    (A short break.)
11    THE VIDEOGRAPHER:  Back on the record.
12  The time is 16:16.
13    MR. PEREZ-MARQUES:  We had a discussion
14  off the record about how to deal with these
15  clawback documents which I believe we are agreed
16  on and so we will implement that at the end of
17  today's session.  Exhibit 2034 that I showed you,
18  Mr. Gazneli, is titled "Abuse Prevention".  Do you
19  see that.
20    A   Yes.
21    Q   But if you look at the content of
22  this document, it refers to operational security
23  issues.  Isn't that fair?
24    MR. AKROTIRIANAKIS:  Object to the form
25  of the question.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 246

1 to the vulnerabilities part, it is the research
2 team.
3      Q   For which part?
4      A   Vulnerabilities part.
5      Q   Is the research team?
6      A   Yes.
7      Q   And what process would they
8 undertake to update the Hummingbird vectors in
9 response to WhatsApp updates?
10     A   Download the new version to the
11 internal ecosystem, execute the installation flow
12 and, if it works right, just update the version
13 numbers supported and if not then to be adjusted
14 accordingly to the changes that were done in the
15 application.
16     Q   And so even if no change was
17 required you would update the version number of
18 Pegasus?
19     A   Yes.
20     Q   And would IDA and JEB be used as
21 part of that updating process?
22     A   It depends what was updated and what
23 has to be done in order to adjust to it.
24     Q   So with respect to some updates,
25 yes?

Page 247

1      A   Some updates.
2      MR. AKROTIRIANAKIS:   Object to the form
3 of the question.
4      Q   Let's do tab 32, please.  By the
5 way, Mr. Gazneli, we talked earlier about the
6 information that Pegasus allows a customer to
7 access from a target device.  Do you recall that
8 generally?
9      A   Yes.
10     Q   Is that generally the same
11 information that you could access if you had a
12 password to the device?
13     A   Password in terms of --
14     Q   Mm hmm.
15     A   -- physical access to the device?
16     Q   Yes?
17     A   Yes.
18     Q   This is going to be Exhibit 2036.
19     (Exhibit 2036 marked for identification)
20     Exhibit 2036 is a WhatsApp chat between
21 Terry DiVittorio and Greg Rose.  Are you familiar
22 with those names?
23     A   No.
24     MR. AKROTIRIANAKIS:   Do you mind if I
25 get a copy.

Page 248

1      MR. PEREZ-MARQUES:   Sure.  Are you
2 familiar with those names --
3      A   No.
4      Q   The date of this exchange is May 1,
5 2018.  Do you see that?
6      A   Yes.
7      Q   In the third message down
8 Mr. DiVittorio says:
9      "We are likely losing 0 click on both
10 platforms, Android and iOS."
11 Do you see that?
12     A   Yes.
13     Q   What does that refer to?
14     MR. AKROTIRIANAKIS:   Objection, no
15 foundation.
16     Q   Do you recall?
17     A   I don't know these persons.
18     Q   Forget the people.  Do you recall an
19 instance around May 2018 when NSO was unable to
20 use the Hummingbird vectors on Android?
21     A   As I said WhatsApp, were releasing
22 versions every once in two weeks so there might be
23 occurrences once in a while where the support
24 might be broken.
25     Q   You understand you have been

Page 249

1 designated, subject to your counsel's objections,
2 as to the impact of the April 2018 WhatsApp update
3 on the relevant spyware?
4      MR. AKROTIRIANAKIS:   He is not
5 designated for that.  What category is that?
6      MR. PEREZ-MARQUES:   It is topic 28,
7 which is one of the ones you recited at the
8 outset.
9      MR. AKROTIRIANAKIS:   The designation is
10 "Efforts to develop new covert lawful intercept
11 technologies during the time period at issue in
12 this case that could be used with respect to
13 Android devices."
14     MR. PEREZ-MARQUES:   Okay.  So you are
15 not prepared to offer anything with respect to the
16 impact of the April 2018 WhatsApp update on the
17 relevant spyware?
18     MR. AKROTIRIANAKIS:   He is designated as
19 stated.
20     MR. PEREZ-MARQUES:   So you are
21 designated, subject to your counsel's objections,
22 on topic 28, right?
23     A   Yes.
24     MR. AKROTIRIANAKIS:   He is designated
25 exactly as I just read it into the record.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 250

1      MR. PEREZ-MARQUES:  You are also
2  designated on topic 29, defendant's efforts to
3  circumvent the April 2018 WhatsApp update?
4      MR. AKROTIRIANAKIS:  The designation in
5  respect of Exhibit 29 is defendant's efforts to
6  develop new covert lawful intercept technologies
7  during the time period at issue in this case that
8  could be used with respect to Android devices.  It
9  is the same designation.
10      MR. PEREZ-MARQUES:  Okay, and so that is
11 a yes, you are designated on that topic?
12      A  Yes.
13      Q  And so do you recall in May 2018 the
14 vectors losing their functionality, the
15 Hummingbird vectors?
16      A  As I said, if you wanted to
17 introduce me the exact change that was done then I
18 can address the question, but as I said, version
19 was released every two weeks, so whether it is
20 relevant to the exploitation or not, things may be
21 changed and need to be addressed, so I cannot
22 recall the exact specific changes that happened on
23 that version.
24      Q  Is it right to assume that most
25 WhatsApp updates did not compromise the

Page 251

1  functionality of the vectors?
2      MR. AKROTIRIANAKIS:  Objection,
3  over-broad.  Compound.
4      A  No.
5      Q  No?  Many of them did?
6      A  Yes.
7      Q  The majority did?
8      A  I don't know the exact distribution.
9      Q  You said it wasn't right to say most
10 didn't compromise the vectors?
11      A  Most, as my understanding, more than
12 80%.
13      Q  Did more than half of the WhatsApp
14 updates --
15      A  It depends.
16      Q  -- compromise the vectors?
17      A  It depends on the vector.
18      Q  In those instances up to the time
19 period at least of May 2019, when a WhatsApp
20 software update compromised the functionality of
21 the Hummingbird vectors, NSO was able to find a
22 way to restore their functionality.  Isn't that
23 right?
24      A  Yes.
25      Q  Let's take a look at the next

Page 252

1  exhibit.  One more question on this.  Greg Rose
2  asked for how long, any estimates, and DiVittorio
3  says "Smodi doesn't know".  Do you know who Smodi
4  is?
5      A  Smodi is Uri Somorudiniski if I
6  remember right and pronounce right.  He was some
7  kind of VP R&D or CTO at that point.
8      Q  For NSO?
9      A  Yes.
10      Q  Okay.  Let's do the next one.
11      (Exhibit 2037 marked for identification.)
12      This will be 2037, which is a WhatsApp
13 chat between various participants on July 9, 2018.
14 Do you see that?
15      A  Okay, yes.
16      Q  The second page includes a message,
17 the third one down, from Yossi Monsingo.  Do you
18 see that?
19      A  Yes.
20      Q  Do you know who that is?
21      A  Yes.
22      Q  Who is that?
23      A  I don't recall his exact position at
24 that same time but he worked in customer facing or
25 NOC.

Page 253

1      Q  Like customer support of some kind?
2      A  Yes.
3      Q  Not a member of the R&D team?
4      A  No.
5      Q  And he writes -- his message
6  includes an update that WhatsApp released a new
7  version two days ago that is not yet supported but
8  probably tomorrow R&D will release a new package.
9  Do you see that?
10      A  Yes.
11      Q  And that again reflects NSO updating
12 its installation vectors in response to software
13 updates from WhatsApp?
14      A  Yes.
15      Q  And the two or three day timeframe,
16 is that typical of how long it would take the R&D
17 department to update the vectors in response to a
18 WhatsApp update.
19      MR. AKROTIRIANAKIS:  Objection,
20 over-broad.
21      A  No.
22      Q  How long would be typical?
23      A  It depends on the changes.
24      Q  What would the range be?
25      A  It may be from one day to half a

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 254

1 year.
2     Q   This was previously marked as
3 Exhibit 2007, which is a WhatsApp message between
4 various participants on December 5, 2018.
5     A   Yes.
6     Q   It states in the second message
7 down:
8         "WhatsApp has made changes in their
9 servers that currently fail all installations and
10 can cause crashes that risk the Hummingbird
11 vector."
12        Do you see that?
13    A   Yes.
14    Q   And do you recall in December 2018 a
15 WhatsApp update that caused all Hummingbird
16 installations to crash?
17    A   Yes.
18    Q   What do you recall about that?
19    A   I recall that that specific change
20 was around our ability to end that specific relay
21 server that we talked about previously, and
22 controlling the target's WhatsApp client to choose
23 that specific relay server for communication.
24    Q   And the reference here, when it says
25 "can cause crashes that risk the Hummingbird

Page 255

1 vector", that relates back to what we saw in the
2 OpSec document about crashes potentially
3 generating logs that would be reviewed by
4 WhatsApp?
5        MR. AKROTIRIANAKIS:  Objection, no
6 foundation.
7     A   This relates to crashes that after
8 the change may occur on the target's devices.
9     Q   And the reason they would risk the
10 Hummingbird vector is potentially, among other
11 reasons, because they could be reviewed by
12 WhatsApp, the crash logs?
13        MR. AKROTIRIANAKIS:  Objection,
14 misstates testimony.
15    A   They are uploaded to the server of
16 the vendor and whether they review them or not is
17 their decision to make.
18    Q   It states on the next page, a few
19 lines down, that the team is working on a solution
20 in top priority hoping to provide a solution ASAP.
21 That is signed Oz, Dana and Moran.  Do you know
22 who those are?
23    A   Yes.
24    Q   Who are they?
25    A   Oz was -- which year?

Page 256

1     Q   December 2018?
2     A   Let me look back to my years.  Okay.
3 Oz back then was the Director of Android R&D.
4     Q   Android R&D?
5     A   Yes.  Moran was product manager and
6 also Dana.  Dana was her team leader.
7     Q   As a product manager as well?
8     A   Yes.
9     Q   For which product?
10    A   If I remember right, for the entire
11 Pegasus, and Moran was for Android.
12    Q   So Oz was part of your team?
13    A   He was my manager.
14    Q   So you reported to him?
15    A   Yes.
16    Q   Did the NSO R&D team in fact work on
17 a solution to restore the Hummingbird vectors
18 after this December 2018 update?
19    A   Yes.
20    Q   And was that successful, that
21 effort?
22    A   That was Eden.
23    Q   So Heaven was made not operational
24 by the December 2018 update.  Is that right?
25    A   Yes.

Page 257

1     Q   And subsequently NSO released Eden?
2     A   Yes.
3     Q   If we look at -- I am going to show
4 you another document.  This is 2038.
5     (Exhibit 2038 marked for identification)
6         This is a WhatsApp chat on January 15,
7 2019 among various participants.  In the first
8 message someone named Gilad says in the last line:
9         "Bottom line, Eden works fine on S3 and
10 can be demonstrated" with a sort of smiley
11 emoticon.  Do you see that?
12    A   Yes.
13    Q   What is S3.
14    A   Sales 3.
15    Q   What is sales 3?
16    A   It is an infrastructure for making
17 demonstrations for our services.
18    Q   And is this the approximate timing
19 of when Eden became ready for use at least for
20 demonstration purposes.
21    A   For demonstration, yes.
22    Q   And then when did Eden go live for
23 use by customers?
24    A   If I remember right, about a month
25 after.

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 258

1    Q  So this reflects NSO's fix or
2  response to the problem that was created by the
3  December 2018 update?
4    A  This is we doing our job to
5  delivering the customers the software they needed.
6    Q  Right.  So after the December 2018
7  update, NSO customers couldn't use the 0 click
8  Android installation vectors, right?
9    A  Right.
10    Q  And Eden, once it was released,
11  allowed them to do so again, right?
12    A  Right.
13    Q  And between Heaven and Eden was
14  there any other -- was there any 0 click Android
15  installation vector in operation?
16    A  No.
17    Q  How did Eden differ from Heaven?
18    A  The main difference was in the
19  installation flow that in Eden we had to use --
20  the transmission of the data between the source
21  and the target, WhatsApp client, needs to go
22  through WhatsApp server relay servers.
23    Q  And how was -- I am sorry -- so in
24  Eden --
25    A  Yes.

Page 259

1    Q  -- the transmission had to go
2  through WhatsApp relay servers?
3    A  Yes.
4    Q  Okay, and that was not the case with
5  respect to Heaven?
6    A  Right.
7    Q  Was that the only difference between
8  Heaven and Eden?
9    A  This is the major difference.
10    Q  In terms -- do you recall we spent
11  some time earlier today walking through the steps
12  of an installation attack using the Hummingbird
13  vectors.  Do you recall that?
14    A  Yes.
15    Q  And does that description we were
16  walking through apply to Eden as well?
17    A  Except the fact that -- except the
18  part that talked about controlling the relay
19  servers adding one to the list and directing the
20  target WhatsApp client to select a specific one.
21    Q  And so what did Eden do instead?
22    A  It just couldn't anymore change the
23  way the target selects the relay servers,
24  therefore it used -- the communication was done
25  through the WhatsApp relay servers in order to

Page 260

1  deliver the payloads required for the remote code
2  execution part.
3    Q  Would that be the stager?
4    A  The payload of stager was the same
5  in Heaven and Eden.  The part that changed was the
6  part that delivered the stager to --
7    Q  Right, so I think you testified
8  earlier that with Heaven the stager was downloaded
9  from a non-WhatsApp server.  Is that right?
10    MR. AKROTIRIANAKIS:  Objection,
11  misstates testimony.
12    A  No.  No.  I stated that the
13  privilege escalation payload --
14    Q  Got it.  So the stager even under
15  Heaven was delivered via a WhatsApp message?
16    MR. AKROTIRIANAKIS:  Counsel, I know it
17  is getting long in the day, but you've got to let
18  him finish his answers.
19    A  In Heaven the stager payload was
20  delivered using WhatsApp messages, yes.
21    Q  Okay.  And in Eden the stager
22  payload was also delivered via WhatsApp message?
23    A  Yes.
24    Q  And in Heaven the PE payload was
25  delivered not through WhatsApp servers, right?

Page 261

1    A  Right.
2    Q  And under Eden was the PE payload
3  delivered via WhatsApp servers?
4    A  No.
5    Q  So what is the difference?
6    A  The difference is that in Heaven the
7  stager payload is delivered using WhatsApp
8  messages that go through non-WhatsApp relay
9  servers, and in Eden the same payload is delivered
10  using WhatsApp messages that go through WhatsApp
11  relay servers.
12    Q  Got it.  So the distinction is with
13  respect to through which servers the stager
14  payload is delivered?
15    A  Which relay servers, yes.
16    Q  Which relay servers, got it.
17  I think you said that was the principal difference
18  between Heaven and Eden.  Are there any other
19  important differences?
20    A  Not important enough that I
21  remember.
22    Q  Nothing else that you remember?
23    A  No.
24    Q  Based on your preparation, nothing
25  else that you are aware of?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 262

1        A  No.
2        (Exhibit 2039 marked for identification.)
3        Q  This is Exhibit 2039, which is a
4   WhatsApp chat from May 12, 2019.  Again various
5   participants.  In the second page Tomer Timor has
6   a message.  Who is Mr. Timor?
7        A  He was, if I am right, at that stage
8   presales employee.
9        Q  Presales?
10       A  Yes.
11       Q  He says in the sort of third
12  paragraph down:
13       "So bottom line, Eden has finished its
14  duty with us as a patch was done on the server
15  side with the application it works with."
16       Do you recall this event?
17       A  Yes.
18       Q  And what does that refer to?  What
19  is the event that is being described here?
20       A  Closure of ability to trigger the
21  vulnerability on the target's WhatsApp client.
22       Q  So this reflect WhatsApp's
23  remediation of the exploit that is described in
24  the complaint?
25       MR. AKROTIRIANAKIS:  Objection, calls

Page 263

1   for a legal conclusion.  No foundation.
2        A  It refers to changes that were done,
3   whether on the server side and the client side, in
4   order to prevent us from triggering the
5   vulnerabilities.
6        Q  And so after this point, after that
7   update in May 12 or around May 12, 2019, was NSO
8   able to use Eden after that point?
9        A  No.
10       Q  In the next paragraph down he said:
11       "I heard some sales managers talking in
12  a dramatic way.  Your job is to make sure they
13  remember that along the years NSO has proven time
14  after time that one of its biggest value is the
15  ability to 'survive' this harsh environment of the
16  cat and mouse game."
17       Do you see that.
18       A  Yes.
19       Q  What does that refer to?
20       MR. AKROTIRIANAKIS:  Objection, no
21  foundation.
22       A  This is a domain that you are not in
23  control how long your capability will prolong at
24  least for total control, and that is why he quotes
25  cat and mouse game.  The ecosystem that you were

Page 264

1   working or acting makes changes eventually, forces
2   you to adjust it.
3        Q  So NSO designs an exploit, the
4   exploit gets shut down.  NSO designs another,
5   right?
6        MR. AKROTIRIANAKIS:  Objection,
7   misstates his testimony.
8        Q  Is that generally the cat and mouse
9   game?
10       MR. AKROTIRIANAKIS:  Misstates
11  testimony.
12       A  This is the domain that you have to
13  stay -- to keep and find new vulnerabilities after
14  the systems get changed.
15       Q  That is just inherent to the domain
16  in which NSO operates, right?
17       A  Yes.
18       Q  When something gets shut down, you
19  have to work to develop another?
20       MR. AKROTIRIANAKIS:  Objection,
21  misstates his testimony.
22       A  Eventually you have to provide --
23  you want to provide the 1 click and 0 click
24  solutions to customers, and it doesn't relate to a
25  specific service or application.

Page 265

1        Q  And at this point in May 2019 when
2   the WhatsApp update prevented Eden from working
3   did NSO have any 0 click Android solutions?
4        A  No.
5        Q  Did the R&D group subsequently find
6   another 0 click installation vector for Android
7   devices?
8        A  Yes.
9        Q  What was that?
10       A  ERISED.
11       Q  When was ERISED approved for
12  production?
13       A  I don't recall the exact date.
14       Q  If we back to the exhibit we were
15  looking at, in that same message from Mr. Timor he
16  says:
17       "R&D are working hard on different
18  directions.  Hopefully we will have good news
19  soon, but please remember that our technological
20  status is still great as we as a company have the
21  resources to find something new in a relatively
22  short time."
23       Do you agree with his statement, sir?
24       A  He was optimistic.
25       Q  Is it accurate that at this point,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 266

1 in May 2019, NSO's R&D group was working hard on
2 potential solutions to restore 0 click capability?
3      A  As a research group and development
4 team, you constantly work on research in order to
5 find possible ways, rapid solutions.  As I
6 explained before, eventually we are producing a
7 product for customers.
8      Q  And that is still true today, right?
9      MR. AKROTIRIANAKIS:  Objection, vague.
10     A  This is our business.
11     Q  So you don't remember when ERISED
12 was approved for production?
13     A  No, not the exact time.
14     Q  Do you remember when ERISED began to
15 be used by customers, approximately?
16     A  It is really not an exact time.  I
17 couldn't tell.
18     Q  What is your best estimate?
19     A  If I recall right, it was close to
20 the end of the year.
21     Q  So late 2019?
22     A  If I recall right.
23     Q  And I understand you are only
24 answering questions up to May 2020.  Is that
25 right?

Page 267

1      A  Yes.
2      Q  And up to that date in May 2020, did
3 ERISED remain in use?
4      A  Yes.
5      Q  So as to whether NSO has ever
6 stopped using ERISED, I assume that is a question
7 you are not willing to answer?
8      A  Regarding ERISED, the
9 vulnerabilities in ERISED was not in WhatsApp at
10 all and that part was eventually closed.
11     Q  So you are willing to answer that
12 question about after May 2020?
13     A  I am answering a question about
14 ERISED capability --
15     Q  Where was the vulnerability that was
16 exploited by ERISED?
17     A  Specific part in one of Samsung
18 related code.
19     Q  So was ERISED limited to Samsung
20 devices?
21     A  Yes.
22     Q  But did it also work by transmitting
23 WhatsApp messages?
24     A  It was our decision whether to
25 trigger it using WhatsApp messages or not.

Page 268

1      Q  So it could be triggered using
2 WhatsApp messages?
3      A  Yes.
4      Q  And were those WhatsApp messages
5 sent via WhatsApp servers?
6      A  Yes.
7      Q  And similar to what we saw about
8 Heaven, those were non-standard WhatsApp messages?
9      MR. AKROTIRIANAKIS:  Object to the form.
10     A  As I said before, some of them maybe
11 were non-standard but not all of them.
12     Q  Were the messages, the WhatsApp
13 messages that were sent as part of ERISED
14 installation, were those also originated from the
15 WIS?
16     A  Yes.
17     Q  So just at a high level if you can,
18 how was ERISED different from Eden?
19     A  So ERISED didn't use any voice or
20 video call to be established, and didn't use any
21 relay server for communication in the installation
22 flow.  As I explained before, it triggered
23 vulnerability which was outside the application of
24 WhatsApp and only used WhatsApp messages to be
25 able to trigger the specific code in which the

Page 269

1 vulnerability resides.
2      Q  So under ERISED NSO used WhatsApp
3 messages to trigger a vulnerability in the Samsung
4 system?
5      A  Yes.
6      Q  And then triggering that
7 vulnerability would then cause the further steps
8 of the installation flows?
9      A  Yes.
10     Q  Was a stager delivered through
11 WhatsApp servers as part of ERISED?
12     A  Not the exact same but modifications
13 of it.
14     Q  Just to be clear, after -- and were
15 the same fingerprinting methods used?
16     A  Part of it, because as we talked
17 before ERISED required also additional information
18 whether the vendor is Samsung or not.
19     Q  Just to be clear, after WhatsApp
20 closed the vulnerability that was being exploited
21 by Eden in May 2019, NSO worked on developing a
22 new 0 click exploit that also worked, at least in
23 part, by transmitting WhatsApp messages.  Yes?
24     MR. AKROTIRIANAKIS:  Misstates
25 testimony.

68 (Pages 266 - 269)

Page 270

1    A  We researched for a new solution.
2  We found vulnerability in the system which was
3  specific for Samsung and we decided to implement
4  it and build installation flow based on WhatsApp
5  application.
6    Q  And after WhatsApp closed the
7  vulnerability that was being exploited by Eden,
8  NSO succeeded in developing a new 0 click
9  installation vector that operated in part through
10  delivering WhatsApp messages, yes?
11    MR. AKROTIRIANAKIS:  Misstates
12  testimony.
13    A  We found additional vulnerability
14  which we were able to build installation for using
15  that.
16    Q  And that installation vector,
17  ERISED, which used WhatsApp servers and WhatsApp
18  messages remained in use by NSO customers as of at
19  least May 2020.  Is that right?
20    A  Yes.
21    Q  So, with this lawsuit pending, NSO
22  was actively making available to its customers a 0
23  click exploit that involved the transmission of
24  messages over WhatsApp servers?
25    MR. AKROTIRIANAKIS:  No foundation.

Page 271

1    A  I don't recall the exact time that
2  the lawsuit was filed.
3    Q  It was filed in October 2019.  So
4  with that context, with this lawsuit pending NSO
5  was actively making available to its customers a 0
6  click exploit that involved the transmission of
7  messages over WhatsApp servers.  Correct?
8    A  Yes.
9    Q  And as to NSO continues to make
10  available to its customers a 0 click exploit that
11  uses WhatsApp servers, you are not willing to tell
12  me.
13    A  No.
14    Q  No, you are not willing to tell me?
15    MR. AKROTIRIANAKIS:  We already had this
16  conversation, counsel.
17    MR. PEREZ-MARQUES:  Is that right?  I
18  just want to make sure I understand the "no".  The
19  no is you won't tell me, right?
20    A  I can't tell you.
21    MR. PEREZ-MARQUES:  Okay.  Why don't we
22  take a short break.
23    THE VIDEOGRAPHER:  Going off the record.
24  The time is 16:57.  End of media card five, volume
25  one, of the video deposition of Tamir Gazneli.

Page 272

1    (A short break.)
2    This is the beginning of media card
3  number six, volume one, in the video deposition of
4  Tamir Gazneli.  Going on the record.  The time is
5  17:14.
6    Q  Do you understand you are still
7  under oath?
8    A  Yes.
9    Q  I would like to show you another
10  exhibit.  This is Exhibit 2040.
11    (Exhibit 2040 marked for identification).
12    It is another Confluence document
13  labelled or titled "Deviate installations on white
14  environment from 12/01/2020".  Do you see that?
15    A  Yes.
16    Q  Do you recognize this document?
17    A  Yes.
18    Q  What is it?
19    A  This is the output of QA team that
20  was responsible for testing the capabilities or
21  statistical behavior.
22    Q  Capabilities or statistical behavior
23  of what?
24    A  In this timeframe it is for ERISED.
25    Q  And so what is -- the second column

Page 273

1  here in the chart says "ERISED ID".  What does
2  that reflect?
3    A  It is numbering of the devices that
4  were used for ERISED testing.
5    Q  Test target device?
6    A  No.  Our devices that were used to
7  test the behavior, statistical behavior of the
8  vector.
9    Q  Got it.  What I meant when I said
10  "test target device", I meant that on the target
11  side of the exploit you were using a test device?
12    MR. AKROTIRIANAKIS:  Object to the form
13  of the question.
14    Q  Do you understand what I mean?
15    A  We use device on which we test how
16  the installation vector works and behaves.
17    Q  Okay.  And is the test device acting
18  as the sender of the exploit or the recipient of
19  the exploit?
20    A  Recipient.
21    Q  That is what I meant by test target
22  device.
23    A  Okay.
24    Q  So these are all NSO-controlled
25  devices on which the ERISED is being tested?

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 274

1    A   Owned and controlled, yes.
2    Q   And some of the numbers it looks
3 like repeat.  Do you see that?  For instance ER11
4 shows up a couple of times on page 1?
5    A   Yes.
6    Q   And so that reflects that it is
7 being tested more than once on the same device?
8    A   Yes.
9    Q   Do these reflect the results of the
10 testing?
11    A   I don't see the results here.
12    Q   It looks like the document may be
13 cut off.  It looks like there is another column
14 that we can only see part of, right?
15    A   I expect it to be results for each
16 attempt, but I don't see any results here.
17    Q   And typically in this type of
18 document, based on your experience, you would
19 expect to see results of the tests?
20    A   At least the outcome of the attempt.
21    Q   And you don't see that here, as
22 produced?  I am not sure we got your answer.
23    A   I cannot see the result here.
24    Q   And the column that is headed "QA
25 version" that would be the version of WhatsApp

Page 275

1 that is being run on the target device or the test
2 device?
3    A   Yes.
4    Q   Okay.  When it says "Deviate
5 installations", what does that mean?
6    A   Deviate was just part of the ERISED
7 used -- part of the code.
8    Q   What part was that?
9    A   It was specific part for the
10 exploitation flow, that was part of the
11 general remote code execution capability in
12 ERISED.
13    Q   Part of the remote code execution
14 capability?
15    A   Yes.
16    Q   And so was Deviate the part of the
17 code that worked with the Samsung vulnerability?
18    THE VIDEOGRAPHER:  Sorry, one second.
19 It is okay.
20    Q   My question was was Deviate the part
21 of the code that worked with the Samsung
22 vulnerability?
23    A   Yes.
24    Q   And so this chart here reflects
25 attempts to install Deviate on test devices?

Page 276

1    MR. AKROTIRIANAKIS:  Objection,
2 misstates the document.
3    A   It is a list of attempts to define
4 what is the statistical behavior of this part of
5 the installation, yes.
6    Q   And so with respect to these
7 WhatsApp versions, would that reflect that ERISED
8 was being used at least at the time that those
9 versions of WhatsApp were released?
10    MR. AKROTIRIANAKIS:  Objection,
11 misstates the document.  Also vague.
12    A   Can you repeat the question, please?
13    Q   Yes.  With respect to those WhatsApp
14 version numbers that go along with at least many
15 of these tests, this would reflect that ERISED was
16 being at least tested during the time that those
17 WhatsApp versions were available?
18    A   Yes, tested, for sure.
19    Q   You can put that aside.  Are you
20 aware that the Heaven exploit in its code included
21 hard coded references to S.WhatsApp.net?
22    A   S.WhatsApp.net is a domain name.
23    Q   Mm hmm.  And are you aware that that
24 was coded into the Heaven source code.
25    MR. AKROTIRIANAKIS:  Object to the form

Page 277

1 of the question.  Assumes facts not in evidence.
2    A   Which code.
3    Q   The Heaven code?
4    A   Yes, if I recall right, yes.
5    Q   Yes, it was coded in there?
6    A   Yes.
7    Q   And you said S.WhatsApp.net is a
8 domain.  Is that right?
9    A   It is a domain name, yes.
10    Q   And where would that domain take the
11 traffic?
12    A   I don't know.
13    Q   But a WhatsApp server, is that
14 right?
15    A   This is, if I recall right, the
16 domain name of the signaling WhatsApp server.
17    Q   Okay.  So that is -- S.WhatsApp.net
18 is the domain name of a WhatsApp signaling server?
19    A   If I recall right.
20    Q   And so including S.WhatsApp.net in
21 the Heaven source code would do what, with respect
22 to the WhatsApp signaling server?
23    A   Communicate through that WhatsApp
24 signaling server.
25    Q   It would direct the communication to

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1 that server specifically?
2     A  Yes.
3     Q  You, as part of the preparation of
4 defendant's expert reports, you spoke with
5 Mr. McGrough, right, defendant's expert?
6     MR. AKROTIRIANAKIS:  Objection to the
7 form of the question.
8     A  I was interviewed by him.
9     Q  You were interviewed by him?
10    A  Yes.
11    Q  Did you tell him that the Heaven
12 exploit hard coded the domain name of the WhatsApp
13 signaling server?
14    A  I don't recall whether it was said
15 or not.
16    Q  And defendants needed WhatsApp
17 credentials to gain access to the WhatsApp
18 servers.  Isn't that right?
19    A  We need WhatsApp credentials in
20 order to connect to the real WhatsApp environment
21 as a legitimate client.
22    Q  As if you were a legitimate client?
23    A  Yes.
24    Q  And without those credentials the
25 installation vector wouldn't work?

Page 279

1     A  Without these credentials there is
2 no source worth applying.
3     Q  Without those credentials you would
4 be unable to communicate with the WhatsApp
5 signaling server?
6     A  With WhatsApp at all.
7     Q  And defendants use the same coding
8 protocol used by the WhatsApp signaling servers.
9 Isn't that right?
10    A  Coding protocol?
11    Q  Or coding language?
12    MR. AKROTIRIANAKIS:  Object to the form
13 of the question.
14    A  I don't know how -- what was
15 implemented and what specific language.
16    Q  Are you familiar with a language
17 called XMPP?
18    A  This is not a language, this is a
19 protocol.
20    Q  I think I said protocol the first
21 time and you corrected me?
22    A  You said language to implement the
23 protocol.
24    Q  Let me repeat the question as I said
25 it initially, which was defendants used the same

Page 280

1 coding protocol used by the WhatsApp signaling
2 servers.  Correct?
3     A  This is the protocol that WhatsApp
4 uses, so there is no other way to use any other
5 protocol.
6     Q  Right.  WhatsApp uses a version of
7 XMPP internally.  Is that right?
8     MR. AKROTIRIANAKIS:  Object to the form
9 of the question.  No foundation.
10    A  WhatsApp uses XMPP as its
11 communication protocol.
12    Q  And it uses specifically a version
13 called fun XMPP.  Correct?
14    A  Yes.
15    MR. AKROTIRIANAKIS:  No foundation.
16    Q  And are you aware that defendants
17 had a file also called FUN XMPP.PY?
18    A  Yes.
19    Q  And what is FUN XMPP.PY?
20    A  This is the implementation of the
21 specific parts of the XMPP protocol which were
22 required and used in very specific messages that
23 we use in the installation vectors.
24    Q  So defendants used the FUN XMPP
25 coding protocol that was used by WhatsApp

Page 281

1 internally, right?
2     MR. AKROTIRIANAKIS:  No foundation.
3     A  I don't know what WhatsApp used
4 internal.  We used the protocol that enables us to
5 build and send messages through WhatsApp system to
6 the target client.
7     Q  So defendants used FUN XMPP
8 specifically for the purposes of being able to
9 communicate with WhatsApp servers?
10    MR. AKROTIRIANAKIS:  Object to the form
11 of the question.
12    A  There is no other way to
13 communicate.
14    Q  So that is a yes, you use that
15 language in order to communicate with the WhatsApp
16 servers or that protocol rather?
17    A  We used it to communicate with the
18 WhatsApp client on the target's device.
19    Q  Through the WhatsApp servers, right?
20    A  The messages are sent through the
21 WhatsApp servers.
22    Q  Right, including the S.WhatsApp.net
23 server that was hard coded into the Heaven code?
24    MR. AKROTIRIANAKIS:  Misstates his
25 testimony.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 282

1    A   The question is whether the messages
2  was transmitted through S.WhatsApp.com?
3       Q   Yes.
4       A   Yes, this is the signaling server,
5  so yes.
6       Q   And is that also true for Eden?
7       A   Yes.
8       Q   And did the Eden code also hard code
9  the domain name of WhatsApp signaling server?
10      A   If I recall right, yes.
11      Q   What about ERISED?
12      A   For ERISED I don't recall whether
13 this was hard coded or not.
14      Q   You would need to look at the code
15 for that?
16      A   Yes.
17      Q   The Pegasus system also relied on
18 the use of command and control servers.  Isn't
19 that right?
20      A   Yes.
21      Q   If I call those C2 servers, will
22 that be comprehensible to you?  I can say command
23 and control if you prefer.
24      A   No, C2 is fine.
25      Q   What are C2 servers?

Page 283

1       A   Additional servers, as part of the
2  ecosystem that was deployed for the customer that
3  enabled the agent communication and installation
4  flow to be executed on the target's device.
5       Q   What role did the C2 servers play in
6  the Pegasus system?
7       A   It is a combination of servers and
8  it depends on which specific server you address.
9       Q   So they play different roles?
10      A   Yes.
11      Q   And what are the different roles
12 that the C2 servers play in the Pegasus system
13 during the 2018/20 time period?
14      A   So there are servers which are
15 responsible for -- on which the privilege
16 escalation and the whole relevant payloads are
17 held, to be transmitted through the -- during the
18 installation vector.
19      Q   Are there servers, C2 servers that
20 play other roles?
21      A   There are also servers through which
22 the data was transmitted to the customer's back
23 end.
24      Q   Do you mean the data obtained from
25 the target devices?

Page 284

1       A   Yes.
2       Q   And when you say "the relevant
3  payloads", is that only for privilege escalation
4  or also for deployment of the agent that the C2
5  servers were used?
6       A   The agent too.
7       Q   So C2 servers are part of the
8  installation phase, is that right?
9       MR. AKROTIRIANAKIS:  Objection,
10 misstates testimony.
11      A   No, as part of the installation
12 procedure and data extraction.  Installation
13 phase, you asked installation vector, this is not
14 related to it.
15      Q   Okay.  So you don't consider
16 privileged escalation part of the installation
17 phase?
18      A   I am trying to stay under your
19 terminology.
20      Q   Right.  I want to understand yours.
21 So when you refer to the installation phase, that
22 doesn't include privilege escalation?
23      A   In my terminology, installation of
24 an agent is the whole procedure from the beginning
25 of the remote code execution, it continues to

Page 285

1  privilege escalation payload to the fact the agent
2  is installed.
3       Q   Okay.  So the C2 servers are used
4  during what you just defined as the installation
5  phase?
6       A   For part of, yes.
7       Q   Did defendants ever operate C2
8  servers?
9       A   No.
10      Q   Did defendants set up C2 servers for
11 defendant's customers?
12      A   What do you mean by set up?
13      Q   Lease them, buy them, anonymize
14 them?
15      A   As I said before, the White Services
16 team, it is possible for White Services, if they
17 were eventually deployed on customer's ecosystem
18 as part of his solution.
19      Q   Are you familiar with an AWS, Amazon
20 Web Services server that was used, that was
21 housed, located in Germany in connection with the
22 Pegasus exploit or Pegasus system?
23      A   Yes.
24      Q   What do you know about that server?
25      A   This was a server that was used for

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 290

1 would NSO do as part of the demonstration of the
2 Pegasus software?
3     A  Use an ecosystem which was built for
4 the demonstrations, for example, we saw the sales
5 3, and used company owned devices in order to
6 demonstrate the behavior and the abilities on it.
7     Q  When you say used company owned
8 devices, you mean as the target, right?
9     MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11     A  As the device on which the
12 installation was conducted.
13     Q  And so in terms of -- if we imagine
14 a demonstration of Pegasus, that would work
15 through WhatsApp's servers the same as if it was
16 an actual use by a customer.  Is that right?
17     A  In terms of WhatsApp server, yes.
18     Q  And is the same true with respect to
19 testing, that that would operate through WhatsApp
20 servers the same way as an actual use by a
21 customer?
22     A  Testing in an external environment?
23     Q  Yes.
24     A  Yes.
25     Q  If you know, what service providers

Page 291

1 did defendants use to procure servers for use in
2 connection with Pegasus?
3     A  I don't know.
4     Q  I believe that is a topic on which
5 you are designated, but let me just check.  The
6 topic was "you or any relevant spyware's use of
7 any third party server, including the AWS server
8 to access plaintiff's computer", and your counsel
9 said that you would testify as to defendant's
10 understanding of the development of the accused
11 technology in use between April 29, 2018 and
12 May 10, 2020, including general information about
13 defendant's use of third party servers in the
14 accused technology.  Are you prepared to testify
15 on that topic?
16     MR. AKROTIRIANAKIS:  Only if it was in
17 the original topics.  In light of his testimony?
18     MR. PEREZ-MARQUES:  Do you have my
19 question, Mr. Gazneli?
20     A  I remember that the -- saying that I
21 was testifying about the use.
22     Q  The use of third party servers?
23     A  Use, not which specific third party
24 servers they were.
25     Q  Okay.  So you don't know which third

Page 292

1 parties were used?
2     A  No.
3     Q  Do defendants have policies about
4 which service providers it uses for servers in
5 connection with Pegasus?
6     MR. AKROTIRIANAKIS:  Same objection.
7 Beyond the scope of the designation.
8     A  This is the same answer.
9     Q  What is the same answer?
10     A  I don't know.
11     Q  Did defendants ever lease servers or
12 other computer infrastructure from Quadranet
13 Enterprises LLC?
14     MR. AKROTIRIANAKIS:  Object to the form
15 of the question.  No foundation.  Beyond the scope
16 of designation.
17     A  Can you repeat the question?
18     Q  Did defendants ever lease servers or
19 other computer infrastructure from Quadranet
20 Enterprises LLC of Los Angeles, California?
21     A  I don't know if a server was leased
22 by that company or not.
23     Q  If you wanted to find out the answer
24 to that question, who would you ask?
25     A  The White Services.

Page 293

1     Q  Who is in charge of the White
2 Services group?
3     A  Ramon.
4     Q  Ramon.  Did defendants ever lease
5 servers or other computer infrastructure from 365
6 Online Technology JSC in Hanoi, Vietnam?
7     A  No.
8     Q  Did defendants ever lease servers or
9 other computer infrastructure from Green Cloud
10 Technology?
11     A  Again, it is under White Services
12 responsibility.
13     Q  When you say Ramon, you mean Ramon
14 Eshkar?
15     A  Yes.
16     Q  Going back to the fingerprinting
17 stage of the Hummingbird vectors, the information
18 that NSO is obtaining regarding the target device,
19 you gave a few examples, operating system, whether
20 it is online, whether it has WhatsApp installed.
21 Do you recall that, generally?
22     A  Yes.
23     Q  From where is NSO obtaining that
24 information?
25     MR. AKROTIRIANAKIS:  Object to the form.

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 294

1    A   Except the parameter about whether
2  the target has an active WhatsApp account, all the
3  other information parts are from the target's
4  client application.
5    Q   The target's WhatsApp client?
6    A   Yes.
7    Q   And does that go through the
8  WhatsApp servers?
9    A   As any other message.
10   Q   And what about the information about
11 whether the target is an active WhatsApp client?
12 Where does that information come from?
13   A   This comes from WhatsApp server, as
14 it comes for any other normal user when he enters
15 new phone number in his contacts list.
16   Q   And when you say whether the target
17 has an active WhatsApp account, what do you mean?
18   A   Activated WhatsApp account.
19   Q   That is different from whether like
20 the app is in the foreground?
21   A   Yes.  Whether it ever has been
22 activated WhatsApp account in a WhatsApp
23 ecosystem.
24   Q   Apologies, because I know we covered
25 this before, but for the Hummingbird vectors, did

Page 295

1  the fingerprinting work through the transmission
2  of WhatsApp messages?
3    A   Yes.
4    Q   Okay.  And so prior to sending the
5  WhatsApp message, that would tell you, the
6  operating system, whether the app is in the
7  foreground, would NSO first have to confirm from
8  the WhatsApp server whether the user had an active
9  WhatsApp account?
10   A   The first stage in the WhatsApp
11 fingerprint was first checking that the target
12 device number has an activated WhatsApp account.
13 Then check the other three preliminary parameters,
14 which is whether the target device is Android
15 device, whether he is online, meaning it is
16 connected to a network, and whether he is in
17 foreground or not.
18   Q   And if the target was in foreground
19 would you proceed with the installation?
20   A   No.
21   Q   And so before proceeding to the --
22 I will call it the second piece of the
23 fingerprinting --
24   A   Yes.
25   Q   -- NSO would first have to confirm

Page 296

1  that the target had an activated WhatsApp account?
2         MR. AKROTIRIANAKIS:  Object to the form
3  of the question.
4    A   This is one of the parts in the
5  fingerprinting.
6    Q   And is it right to think of it as
7  sequential, that you would only proceed to sending
8  a message to the target's WhatsApp client only
9  after you had first confirmed that the client had
10 an activated WhatsApp account?
11        MR. AKROTIRIANAKIS:  Object to the form
12 of the question.
13   A   There is no ability to send any
14 message to a client which does not exist.
15   Q   So the first piece of information
16 obtained as part of fingerprinting comes from the
17 WhatsApp server?
18   A   Yes, as it comes to any other number
19 that you have in list --
20   Q   And then the installation flow would
21 not proceed -- would or would not proceed,
22 depending on the answer, the information that NSO
23 got from the WhatsApp server.  Right?
24        MR. AKROTIRIANAKIS:  Object to the form
25 of the question.

Page 297

1    A   It was a decision of customer
2  whether to proceed or not to the installation.
3    Q   If there is no WhatsApp activated
4  account you could not proceed?
5    A   If there is no WhatsApp, no.  If
6  there is a WhatsApp, the answer still may be no.
7    Q   And once the fingerprinting flow has
8  confirmed that the client has an activated
9  WhatsApp account, does it proceed automatically
10 with the rest of the fingerprinting or is there a
11 separate decision that gets made by an operator?
12   A   When you say "separate", which part
13 do you mean?
14   Q   I mean one possibility is --
15 everything I just described happens in three
16 milliseconds, and yes, the first step is to
17 confirm whether there is an activated account, but
18 then it immediately goes on to the remaining
19 steps.  The other option is there is someone
20 sitting at a computer, and they get a response
21 that says this target has an activated account,
22 and then they press a separate button that
23 triggers the rest of the fingerprinting.  That is
24 what I meant.
25   A   For information part, I explain

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 298

1 whether he has -- the target has WhatsApp account
2 activated, whether he is online or not, Android
3 device, or is foreground or not, and done in one
4 single attempt, but of course it depends on each
5 part of preceding step.
6      Q   Got it.  That answers my question,
7 thank you.
8          So once the fingerprinting is done, the
9 next step is sending a call offer.  Is that right?
10 The next step of the installation flow?
11     A   Yes.
12     Q   And the call offer used an XOR
13 cipher.  Is that right?
14     A   Yes.
15     Q   What is an XOR cipher?
16     A   It is an encryption that WhatsApp
17 uses for communications.
18     Q   And so why did defendants call up or
19 use an XOR cipher?
20     A   In order to encrypt the
21 communication.
22     Q   And is that the non-standard
23 encryption that we talked about before?
24     A   Back then it was not standard.
25     Q   Back when?

Page 299

1      A   In Heaven.
2      Q   And then what about with Eden and
3 ERISED?
4      A   I don't recall whether this part was
5 changed in Eden, but eventually it was changed and
6 it became standard.
7      Q   For ERISED?
8      A   As I said, I don't recall the exact
9 time that it changed from Eden, non-standard to
10 standard.
11     Q   And why did defendants want to
12 encrypt the message?
13         MR. AKROTIRIANAKIS:  Assumes facts not
14 in evidence.
15     A   Part of measure to conceal the
16 messages content.
17     Q   Can WhatsApp user using the standard
18 WhatsApp client app send a call offer using an XOR
19 cipher?
20     A   No.
21     Q   The call offer, at least for some of
22 the Hummingbird vectors, manipulated the
23 connecting tone DESC field.  Is that right?
24     A   Yes.
25     Q   And is that true of all three of the

Page 300

1 Hummingbird vectors?
2      A   No.
3      Q   Which ones is it true of?
4      A   For Heaven and Eden.
5      Q   And who at defendants came up with
6 the idea to manipulate that particular field?
7      A   The research team.
8      Q   When did defendants come up with
9 that idea?
10     A   During the research efforts that
11 were done as part of the vulnerability research
12 and the exploitation research.
13     Q   And roughly what was the time period
14 when that work was being done?
15     A   Beginning of 2018 or end of 2017.
16     Q   And defendants, as part of at least
17 the Eden and Heaven vectors, would insert a bash
18 script in the connecting tone desc field?
19     A   Yes.
20     Q   And WhatsApp users using the
21 official WhatsApp client app could not use the
22 connecting tone desc field.  Is that right?
23     A   Right.
24     Q   The next step was inducing the
25 victim's WhatsApp client to disclose whether It

Page 301

1 was 32 bit or 64 bit.  Is that right?
2      A   Yes.
3      Q   Is that true for all three
4 Hummingbird vectors?
5      A   No.
6      Q   Just Eden and Heaven?
7      A   Yes.
8      Q   And defendants needed that
9 information to determine next steps in the attack.
10 Is that right?
11     A   To determine which payload to
12 continue with and which messages sequence to use.
13     Q   And defendants obtained that
14 information, 32 bit versus 64 bit, through relay
15 negotiation and bandwidth estimation.  Is that
16 right?
17     A   Yes.
18     Q   And defendants would send an
19 oversized bit width detection packet to the target
20 device.  Is that right?
21     A   Right.
22     Q   And again that is for Eden and
23 Heaven?
24     A   Yes.
25     Q   And that oversized bit width

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 302

1  detection packet overwrote certain variables.  Is
2  that correct?
3       A  On the target client application?
4       Q  Yes.
5       A  Yes.
6       Q  Including the AF variable, is that
7  correct?
8       A  Yes.
9       Q  And whether the AF variable was
10  overwritten determined whether it was a 32 bit
11  phone or a 64 bit phone.  Is that right?
12       A  Yes.
13       Q  WhatsApp users using the official
14  WhatsApp client could not send an oversized bit
15  width detection packet, correct?
16       A  Correct.
17       Q  And could not overwrite the AF
18  variable, correct?
19       A  Yes.
20       Q  And defendants obtained that
21  information of 32 bit versus 64 bit from WhatsApp
22  servers?
23       A  No.
24       Q  From the target device?
25       A  Yes.

Page 303

1       Q  Transmitted through WhatsApp
2  servers?
3       A  Yes.
4       MR. AKROTIRIANAKIS:  Object to the form
5  of that question.
6       Q  Defendants took that information and
7  used it to design the next stages of the attack?
8       MR. AKROTIRIANAKIS:  Object to the form
9  of the question.
10       Q  Such as choosing which payload to
11  deliver?
12       MR. AKROTIRIANAKIS:  Same objection.
13       A  It was used to define how to proceed
14  with the installation flow.
15       Q  And who made the decision as to how
16  to proceed with the installation flow?
17       MR. AKROTIRIANAKIS:  Object to the form
18  of the question.
19       A  Who in terms of person?
20       Q  Sure.  Was that decision made by a
21  person?
22       A  No.
23       Q  So how was that decision made?
24       A  By the installation server.
25       Q  It was made by the software

Page 304

1  developed by NSO?
2       A  Yes.
3       Q  A regular WhatsApp user using the
4  WhatsApp client app can't obtain this 32 versus 64
5  bit information, can it?
6       A  Again the question?
7       Q  A regular WhatsApp user using the
8  WhatsApp client app cannot obtain this
9  information?
10       A  They can obtain it by other means on
11  the device.
12       Q  But not through the WhatsApp client
13  app?
14       A  Not through WhatsApp client app.
15       Q  And WhatsApp servers are not
16  intended to disclose that information, is that
17  right?
18       MR. AKROTIRIANAKIS:  Object to the form
19  of the question.
20       A  WhatsApp servers are intended to
21  block any unusual activity they would like to
22  detect and block.
23       Q  After determining the bit width,
24  defendants sent a duplicate call offer message.
25  Is that right?

Page 305

1       A  Yes.
2       Q  And that was to reset the target
3  device's internal memory?
4       MR. AKROTIRIANAKIS:  Object to the form
5  of the question.
6       A  You would need to define what
7  internal memory you refer to.
8       Q  Can you help me with that?  You are
9  the expert.
10       A  It was used to reset the specific
11  memory area that was used in the application,
12  WhatsApp application.
13       Q  And that would allow the next stage
14  of the attack?
15       A  Yes.
16       Q  And WhatsApp users using the
17  official WhatsApp client could not send the
18  duplicate call offer message.  Right?
19       A  Right.
20       Q  Did you explain those steps to
21  defendants' expert?
22       A  I don't recall reviewing each and
23  every step of the steps.
24       Q  The next step was to calculate the
25  location of the LIB WhatsApp.SO file, right?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 306

1     A  Yes.
2     Q  That relied on a buffer overflow, is
3 that correct?
4     A  Yes.
5     Q  So the victim's phone would point to
6 a certain area of memory offset from the original
7 area. Is that right?
8     MR. AKROTIRIANAKIS: Object to the form
9 of the question.
10     A  The target client WhatsApp
11 application --
12     Q  I can skip victim. The target phone
13 would point to a certain area of memory offset
14 from the original area?
15     A  Yes.
16     Q  And that allowed defendants to
17 obtain the location of the LIB WhatsApp.SO file,
18 correct?
19     A  Yes.
20     Q  And that information came from the
21 WhatsApp servers?
22     A  No.
23     Q  From the target device?
24     A  Yes.
25     Q  Via the WhatsApp servers?

Page 307

1     A  Yes.
2     Q  And a regular WhatsApp user using
3 the WhatsApp client app cannot obtain that
4 information, right?
5     A  Again, using WhatsApp client, no,
6 but there are ways to obtain this information.
7     Q  Why was it important for defendants
8 to be able to determine the location of the
9 LIB.WhatsApp.SO or LIBWhatsApp.SO file?
10     A  In order to find -- for the
11 exploitation to work, you need to be able to
12 determine the memory allocation space in the
13 current instance of the application of the
14 target's device, in order to be able to write and
15 execute the payload you are downloading.
16     Q  Now, was the next step to convert to
17 a group call?
18     MR. AKROTIRIANAKIS: Object to the form
19 of the question.
20     A  If I recall right, yes.
21     Q  Yes?
22     A  Yes.
23     Q  For Heaven and Eden?
24     A  For Heaven there was voice call that
25 were used, but along the way the implementation of

Page 308

1 the installation phase has changed.
2     Q  Meaning during the life of the Eden
3 exploit how it worked changed?
4     A  Yes.
5     Q  But at a certain point Eden worked
6 by converting to a group call?
7     A  Yes.
8     Q  And defendants would do that by
9 adding another participant to the call, is that
10 right?
11     A  Yes.
12     Q  But this other was a simulated
13 participant, right, not an actual WhatsApp client?
14     A  This was as the first client, it was
15 used to generate the initial call.
16     Q  So WIS?
17     A  Yes.
18     Q  And converting to a group call
19 allowed defendants to obtain more information
20 about the target device. Is that correct?
21     A  Yes.
22     Q  And defendants --
23     MR. AKROTIRIANAKIS: Object to the form
24 of the question.
25     Q  Defendants sent a set of malicious

Page 309

1 data to the target device. Is that correct?
2     MR. AKROTIRIANAKIS: Object to the form
3 of the question.
4     A  What is malicious data?
5     Q  Let's skip malicious. Defendants
6 sent a set of data to the target device, right, a
7 data payload?
8     MR. AKROTIRIANAKIS: Object to the form
9 of the question.
10     A  As part of the installation flow,
11 there are data payloads and messages sent to the
12 target device, yes.
13     Q  And that information was in the
14 outbound capabilities buffer?
15     A  Yes.
16     Q  And that goes beyond what WhatsApp
17 users using the client app -- the WhatsApp client
18 app could include in the outbound capabilities
19 buffer, is that right?
20     A  Yes.
21     Q  And later in the group call
22 defendants overwrite certain callback pointers so
23 that they point to values that defendants have
24 created. Is that right?
25     MR. AKROTIRIANAKIS: Object to the form

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 310

1 of the question.
2    A   Yes.
3    Q   And that is also true as to Eden and
4 Heaven?
5    MR. AKROTIRIANAKIS:  Object to the form.
6    A   If I recall right, yes.
7    Q   And that forces the target device to
8 execute functions inserted by defendants, correct?
9    MR. AKROTIRIANAKIS:  Object to the form
10 of the question.
11    A   Yes.
12    Q   The final step was called
13 "Termination", right?
14    A   Yes.
15    Q   And when the call ended the target
16 device triggered the modified pointers.  Is that
17 correct?
18    A   Yes.
19    Q   And those modified pointers gave
20 instructions on what to do when the call
21 terminated, correct?
22    A   Yes.
23    Q   And one callback operation was to
24 reset certain parts of the application's memory.
25 Is that right?

Page 311

1    A   Yes.
2    Q   Why did defendants include a
3 function to reset certain parts of the
4 application's memory?
5    A   The same as before, in order to be
6 able to control the memory allocations base to be
7 able to write specific code to be downloaded and
8 executed.
9    Q   Did you tell defendants' expert that
10 the callback operations reset certain parts of the
11 application's memory?
12    A   I don't remember saying that.
13    Q   Another callback operation was to
14 execute the bash script inserted earlier, correct.
15    A   Yes.
16    Q   And that bash script stopped the
17 voice FG service from running?
18    A   This means that the call was ended.
19    Q   And it created an ELF file in the
20 WhatsApp client directory?
21    A   Yes.
22    Q   And the ELF filed connected to a C2
23 server?
24    A   To download the next payload, yes.
25    Q   And then deleted that ELF file,

Page 312

1 right?
2    A   Yes.
3    Q   What happens after the ELF file
4 directs the phone to the C2 server?
5    A   The next payload is downloaded and
6 executed.
7    Q   And what is the next payload?
8    A   Privilege escalation.
9    Q   And so is what we just walked
10 through what you would call the stager?
11    A   The last part.
12    Q   The last part, the running of the
13 ELF script?
14    A   The bash script was used to build
15 the stager.
16    MR. PEREZ-MARQUES:  Why don't we take a
17 quick break and see, we may be just about
18 finished.
19    A   Okay.
20    THE VIDEOGRAPHER:  Going off the record.
21 The time is 18:01.
22    (A short break)
23    THE VIDEOGRAPHER:  Going back on the
24 record.  The time is 18:12.
25    MR. PEREZ-MARQUES:  Now, you understand

Page 313

1 that there is a trial that has been scheduled in
2 this matter for March 2025?
3    A   Yes.
4    Q   Are you prepared to appear at that
5 trial if called as a witness?
6    A   Yes.
7    Q   And you intend to do so if called?
8    A   Yes.
9    MR. PEREZ-MARQUES:  That is all I have
10 at this time.
11    Examined by MR. AKROTIRIANAKIS:
12    MR. AKROTIRIANAKIS:  I just have a
13 couple of questions.  Early in your testimony
14 today you were asked about whether you reviewed
15 code and then later, much later you were asked
16 questions about the AWS server.  Do you recall the
17 two different points in the day that I am talking
18 about?
19    A   Yes.
20    Q   So in terms of the code --
21    MR. PEREZ-MARQUES:  Can I pause for one
22 second because I am frozen out.
23    Q   In terms of the code that you
24 testified that you reviewed in connection --
25    In terms of the code that you testified

79 (Pages 310 - 313)

1     MR. AKROTIRIANAKIS:  Objection,
2  misstates his testimony.
3     A   The image is the instance in time,
4  so it couldn't contain all the code from two years
5  of the --
6     Q   Right, because the code changed from
7  time to time, right?
8     A   There are certain parts of it that
9  changed, yes.
10     Q   And so the code that was being used
11  in April 2018 is likely not the code that was
12  being used in May 2019?
13     MR. AKROTIRIANAKIS:  Object to the form
14  of the question.
15     A   The messages that were implemented
16  in it, the messages are implemented as part of the
17  protocol that WhatsApp requires, so this
18  practically will not change a lot.  As for the
19  fingerprint, as I said it was used for Heaven and
20  Eden.  The other parts of the code I said it
21  depends on the exact timing of the image.
22     Q   Right, because the code changed over
23  time, right?
24     MR. AKROTIRIANAKIS:  Objection,
25  misstates his testimony.

1     A   The code may change.  I don't know
2  if it changed in specific timing before and after.
3     Q   And you don't know when the snapshot
4  was taken, right?
5     A   I don't recall.
6     Q   We talked about the S.WhatsApp.net
7  domain.  You recall that?
8     A   Yes.
9     Q   And I think when I was examining you
10  said that that was the domain for WhatsApp
11  signaling server.  Is that right?
12     A   Domain name.
13     Q   The domain name for WhatsApp
14  signaling server?
15     A   Also Google.com is the domain name
16  for Google signaling.
17     Q   Got it.  Okay.  Is that one
18  signaling server or multiple signaling servers?
19     A   It depends on WhatsApp to decide.
20     Q   Could be either one, right?
21     A   I don't -- this is not a single
22  server.  That is why they use a domain name.
23     Q   As part of developing the
24  Hummingbird exploits, did you take any steps to
25  ascertain where the WhatsApp signaling servers

1  were located.  No?
2     A   No.
3     Q   Did you take any steps to ascertain
4  where the WhatsApp relay servers were located?
5     A   No.
6     Q   You understood that what WhatsApp is
7  based in California?
8     MR. AKROTIRIANAKIS:  Objection.
9     A   As a company?
10     Q   Yes.
11     A   So does everybody else in the US but
12  the server --
13     Q   Not my question.  Were you aware
14  when you were working on the --
15     A   No.
16     Q   -- hummingbird vectors that WhatsApp
17  was based in California?
18     A   No.
19     Q   You were not aware of that?
20     A   No.
21     Q   Did you take any steps to assure
22  yourself that the servers that were being used as
23  part of the Hummingbird vectors were not in
24  California?
25     MR. AKROTIRIANAKIS:  Object to the form

1  of the question.
2     A   Can you repeat?
3     Q   Did you take any steps to make sure
4  that the messages that were being transmitted as
5  part of the Pegasus software, that those servers
6  were not in California?  Did you take any steps to
7  check that?
8     A   No.
9     Q   Sitting here today, do you know, one
10  way or the other, whether any of WhatsApp's
11  signaling or relay servers used in connection with
12  the Hummingbird vectors actually are in
13  California?
14     A   No.
15     Q   You don't know that at all sitting
16  here today?
17     A   No.
18     Q   So if some of those servers were in
19  California, you wouldn't know anything to the
20  contrary?
21     A   It was not required for the -- it
22  was not a requirement in terms of the capability.
23     Q   But accessing the WhatsApp signaling
24  servers was a requirement of the capability.
25  Right?

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 326

1     A  As a domain name, behind which there
2 is a real server, which is deployed in any
3 location on WhatsApp decision.
4     Q  And accessing WhatsApp relay servers
5 was also necessary for the Hummingbird vectors.
6 Isn't that right?
7     A  No.
8     Q  No?
9     A  No.
10     Q  Okay.  What about for ERISED?
11     A  No.
12     Q  I think you testified earlier that
13 the messages for ERISED had to be transmitted
14 through the WhatsApp relay servers?
15     A  No.  I testified that for Heaven and
16 Eden they were transferred through relay servers.
17     Q  Got it.  And it was necessary for
18 the operation of Heaven and Eden?
19     A  Yes.
20     Q  You were asked just now by your
21 counsel some questions about geographical
22 restrictions.  Do you recall that?
23     A  Yes.
24     Q  I just want to make sure
25 I understand this.  I will give you a

Page 327

1 hypothetical.  If I am, say, a Mexican citizen and
2 just hypothetically NSO has as a client a Mexican
3 law enforcement agency, and Mexico is within their
4 territorial license, they are permitted to install
5 on my phone.  Is that correct?
6     A  Under their lawful authorization.
7 Under their rules.  Yes.
8     Q  And those rules you are not familiar
9 with?
10     A  No.
11     Q  So I am a target.  I have been
12 permissibly infected with Pegasus.  I then travel
13 to the United States.
14     A  Yes.
15     Q  Does the customer then lose access
16 to my information?
17     A  Yes.
18     Q  Now, what if I am a US person, okay,
19 so completely new hypothetical.  I am a US person.
20 I am a US citizen.  I live most of the year in New
21 York.
22     A  With US number?
23     Q  With a US number.
24     A  Okay.
25     Q  But I am working in Dubai.  If you

Page 328

1 had a customer that had a territorial license that
2 covered Dubai, could it be installed on that
3 number?
4     A  No.
5     Q  So not US numbers and not US
6 territory?
7     A  Yes.
8     Q  Okay.  But that is on a customer by
9 customer basis, depending on the territorial
10 restrictions of particular contracts?
11     A  No customer has US enabled for
12 installation.
13     Q  And that is with respect to Pegasus?
14     A  Yes.
15     Q  What about with respect to Phantom?
16     A  I am not aware.  I don't know what
17 Phantom is.
18     Q  You are not familiar with Phantom?
19     A  No.
20     Q  Are you familiar with a company
21 called Westbridge?
22     A  Yes.
23     Q  What is Westbridge?
24     A  US like --
25     MR. AKROTIRIANAKIS:  Object to the form

Page 329

1 of the question.  No foundation.
2     A  It is a US company trying to market
3 the product.
4     Q  Trying to market NSO's products,
5 right?
6     A  Yes.
7     Q  Including Pegasus?
8     A  I am not familiar with their
9 activity.
10     Q  But certainly Westbridge was
11 authorized by NSO to market NSO products?
12     MR. AKROTIRIANAKIS:  Object to the form
13 of the question.  No foundation.
14     A  No.
15     Q  Is it your understanding that
16 Westbridge was operating without permission?
17     MR. AKROTIRIANAKIS:  Objection, no
18 foundation.
19     A  I don't know.
20     Q  Okay.  And when Westbridge
21 demonstrated NSO software, were those
22 demonstrations supported by NSO personnel?
23     MR. AKROTIRIANAKIS:  Objection, no
24 foundation.
25     A  I don't know.

83 (Pages 326 - 329)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 334

1       CERTIFICATE OF COURT REPORTER
2
3   I, AILSA WILLIAMS, an Accredited LiveNote
4   Reporter, hereby certify that Tamir Gazneli was
5   duly sworn, that I took the Stenograph notes of
6   the foregoing deposition and that the transcript
7   thereof is a true and accurate record transcribed
8   to the best of my skill and ability.  I further
9   certify that I am neither counsel for, related to,
10  nor employed by any of the parties to the action
11  in which the deposition was taken, and that I am
12  not a relative or employee of any attorney or
13  counsel employed by the parties hereto, nor
14  financially or otherwise interested in the outcome
15  of the action.
16  Before completion of the deposition, review of the
17  transcript was requested.  Any changes made by the
18  deponent (and provided to the reporter) during the
19  period allowed are appended hereto.
20
21  *Ailse Yh Willians*
22
23  AILSA WILLIAMS
24  Dated:   September 6, 2024.
25

Page 335

1
2           E R R A T A
3        Deposition of Tamir Gazneli
4   (Please show all corrections on this page, not in
5   the transcript.)
6   Page/Line No.      Description       Reason for
7   change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  Signed:   ...................
23  Name:
24  Date:       ...................
25

85 (Pages 334 - 335)

# P.App.B

HIGHLY CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
2                      OAKLAND DIVISION
3
      - - - - - - - - - - - - - - - - - -
4                                    )
      WHATSAPP INC., a Delaware      )
5     corporation, and META PLATFORMS, )
      INC., a Delaware corporation,   )
6                                    )
                       Plaintiffs,  )
7                                    )  Case No.:
      v.                             )  4:19-cv-07123-PJH
8                                    )
      NSO GROUP TECHNOLOGIES LIMITED  )
9     and Q CYBER TECHNOLOGIES LIMITED,)
                                     )
10                     Defendants.  )
      - - - - - - - - - - - - - - - - - -
11       Highly Confidential - Subject to Protective Order
12            VIDEO DEPOSITION OF RAMON ESHKAR
13                 Tuesday, August 27, 2024
14               Commencing:  9:17 a.m. BST
15
16                Davis Polk & Wardwell LLP
                   5 Aldermanbury Square
17                    London, EC2 7HR
                     United Kingdom
18
19
20
21
22
23
24     Court Reporter:
       Chanelle Malliff, CLR
25

Page 14

1  colleague.
2    Q. Who is that colleague?
3    A. An employee of mine.
4    Q. What is that employee's name?
5    A. Avi.
6    Q. And the surname?
7    A. Itzhak.
8    Q. Itzhak, like "Isaac"?
9    A. Yes.
10   Q. What is Mr. Itzhak's job?
11   A. He's responsible for the customer support.
12   Q. Do you know Mr. Itzhak's title?
13   A. Yeah, it's VP, customer support.
14   Q. Mr. Itzhak reports to you?
15   A. Yes.
16   Q. When did you review your understanding with
17 Mr. Itzhak?
18   A. During my stay at the -- in Israel, like a
19 few days ago.
20   Q. How long was the conversation that you had in
21 preparation for this deposition with Mr. Itzhak?
22   A. Not more than an hour.
23   Q. And what did you and Mr. Itzhak discuss?
24   A. Just the processes related to this topic.
25   Q. And by "this topic" you mean?

Page 15

1    A. I mean creation, what's related to the
2 opening account.
3    Q. On WhatsApp?
4    A. Yeah.
5    Q. And why is Mr. Itzhak, as VP of customer
6 support, an appropriate person to talk to about the
7 processes that defendants follow related to creating
8 accounts on WhatsApp?
9     MR. AKROTIRIANAKIS: Objection: misstates the
10 witness's testimony.
11    THE WITNESS: I'm sorry?
12    MR. AKROTIRIANAKIS: If you understand his
13 question you can answer.
14    THE WITNESS: Can you please repeat?
15 BY MR. BLOCK:
16   Q. Is creating accounts on WhatsApp part of
17 Mr. Itzhak's job.
18   A. No, it's part of one of his department's job.
19   Q. Which department is that?
20   A. The white services department.
21   Q. What is the white services department?
22   A. It's a department responsible for creating
23 accounts and purchasing other services that we need.
24   Q. Why is it called white services?
25    MR. AKROTIRIANAKIS: Objection: foundation.

Page 16

1     THE WITNESS: I'm sorry?
2 BY MR. BLOCK:
3    Q. Why is it called white services?
4     MR. AKROTIRIANAKIS: Same objection.
5     THE WITNESS: Actually the name was decided
6 before I join so I can't recall the reason.
7 BY MR. BLOCK:
8    Q. Do you have an understanding of what makes a
9 service a white service?
10   A. I do.
11   Q. What is that?
12   A. It means that the service is being set up in
13 an anonymized way.
14   Q. Is one of the services that defendants set up
15 in an anonymized way WhatsApp?
16    MR. AKROTIRIANAKIS: Objection: vague.
17    THE WITNESS: Again? Again, sorry?
18 BY MR. BLOCK:
19   Q. What are the services that the white services
20 department deals in?
21   A. There are a few services.
22   Q. Is WhatsApp one of them?
23    MR. AKROTIRIANAKIS: Objection: vague.
24    THE WITNESS: What?
25    MR. AKROTIRIANAKIS: I said "objection:

Page 17

1 vague". If you understand his question though you
2 can answer.
3     THE WITNESS: Okay. Sorry, come again?
4 BY MR. BLOCK:
5    Q. Sure. Is WhatsApp one of the services that
6 the white services department of defendants deals
7 with?
8     MR. AKROTIRIANAKIS: Same objection.
9     THE WITNESS: Yes, they deal with it.
10 BY MR. BLOCK:
11   Q. Okay, tell me how the white services
12 department -- so, withdrawn.
13    Does the white services department set up
14 WhatsApp accounts in an anonymized way?
15   A. They do.
16   Q. And what does it -- what do you mean by in
17 an anonymized way?
18   A. It means that they're created in a way that
19 will be secure an obstacle where -- to the use of the
20 service later on.
21   Q. What do you mean by secure?
22   A. I mean that the infrastructure will protect
23 the customer when using the account.
24   Q. Does that mean protect the customer from
25 having its identity discovered?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1      A. What do you mean by his identity?
2          MR. AKROTIRIANAKIS: Sorry, is this a
3   realtime tablet? It's not working.
4          (Pause)
5   BY MR. BLOCK:
6      Q. Why do your -- is it accurate that your
7   customers want their WhatsApp accounts to be set up
8   in an anonymized way?
9          MR. AKROTIRIANAKIS: Objection: no
10  foundation.
11         THE WITNESS: What do you mean?
12  BY MR. BLOCK:
13     Q. I'm asking why you set up anonymized WhatsApp
14  accounts for your customers?
15     A. The entire infrastructure is anonymized to
16  protect the customer and the infrastructure that
17  they're using.
18     Q. Is that to protect the customer from being
19  identified?
20         MR. AKROTIRIANAKIS: Objection: vague.
21         THE WITNESS: What do you mean by identified?
22  BY MR. BLOCK:
23     Q. Let me just ask you. In what regard are you
24  trying to protect the customer by anonymizing the
25  WhatsApp service?

Page 19

1      A. We want to [Hebrew] to.
2          MR. BLOCK: May we have help from the
3   translators, please?
4          THE INTERPRETER: Distance. We would like to
5   distance.
6          THE WITNESS: Would like to distance --
7   I'm not sure it's the word, but to, let's say,
8   distance the customer.
9   BY MR. BLOCK:
10     Q. From whom?
11     A. From the environment so that they can run
12  their operation in a secured way, not to expose their
13  operation.
14     Q. You also said you create the accounts in a
15  way that will be "op sec aware" to the use of the
16  service later on. Did I get that right?
17     A. Op sec, operational security.
18     Q. Okay, and what does it mean to be op sec
19  aware to the use of the service later on?
20     A. What I mean is that you apply all the measure
21  that you can in order to protect the activity, the
22  operation.
23     Q. And that's again to protect it from being
24  discovered by third parties?
25         MR. AKROTIRIANAKIS: Objection: misstates

Page 20

1   testimony.
2          THE WITNESS: By another one.
3   BY MR. BLOCK:
4      Q. By another one? Someone other than the
5   customer who is operating the service and NSO itself?
6          MR. AKROTIRIANAKIS: Objection: misstates
7   testimony.
8   BY MR. BLOCK:
9      Q. Correct?
10     A. The customer.
11     Q. Someone other than the customer?
12     A. Someone other than the customer.
13     Q. Do you create the WhatsApp services for the
14  customer in a way that can be traced back to NSO?
15         MR. AKROTIRIANAKIS: Objection: vague.
16         THE WITNESS: What do you mean by "can be
17  traced back"?
18  BY MR. BLOCK:
19     Q. So that another can identify NSO as the
20  entity that created the WhatsApp account?
21     A. So the question is?
22         MR. AKROTIRIANAKIS: Object to the form of
23  the question.
24  BY MR. BLOCK:
25     Q. Do you create the WhatsApp services for the

Page 21

1   customer in a way that can be traced back to NSO?
2          MR. AKROTIRIANAKIS: Object to the form of
3   the question. Vague.
4          THE WITNESS: We create services in
5   an anonymous way.
6   BY MR. BLOCK:
7      Q. Anonymous for the customer and anonymous for
8   NSO; is that right?
9          MR. AKROTIRIANAKIS: Objection: misstates
10  testimony.
11         THE WITNESS: Anonymous mean anonymous, so in
12  an anonymous way.
13  BY MR. BLOCK:
14     Q. Okay, so why don't we start at the beginning.
15  In what circumstance will NSO create an anonymized
16  WhatsApp account?
17     A. In what ways?
18     Q. When does it happen?
19     A. When does it happen. Okay. Either for
20  demonstrations, for real system, customer systems.
21         (Reporter clarification.)
22  For real systems.
23     Q. Real systems, is that what you said?
24     A. Systems that are being used by the customer.
25     Q. So just to clarify my record because we had

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

1  some cross talk, which I appreciate.  Let me ask the
2  question again, is that okay?
3      A.  Please.
4      Q.  In what circumstances will NSO create
5  anonymized WhatsApp accounts?
6      A.  So for the use of demonstration, to set up a
7  customer system, and for internal use mainly for
8  testing.
9      Q.  Is the internal use research and development?
10     A.  Yes, all preparation for demo training.
11     Q.  Okay, let's focus on the research and
12  development use case.  Has NSO in fact created
13  anonymized WhatsApp accounts for its own use for
14  research and development?
15     MR. AKROTIRIANAKIS:  Objection.  It's beyond
16  the scope of this witness's designation.  We have
17  another designee for that.  If you know the answer to
18  the question you can answer in your personal
19  capacity.
20     THE WITNESS:  In that sense we provide a
21  service to our colleagues.  So we are being asked to
22  provide, and we provide.
23     MR. BLOCK:  Joe, who will be the witness on
24  that?
25     MR. AKROTIRIANAKIS:  Mr. Gazneli.

1  BY MR. BLOCK:
2      Q.  When you say provide a service to colleagues,
3  which colleagues are you talking about?
4      A.  I wanted to refer to R&D as a department.  So
5  when they approach my department, and my department
6  provide them with the account that they're asking.
7      Q.  And specifically Mr. Itzhak's department
8  within your department provides that account?
9      A.  Correct.
10     Q.  Okay, and how does that happen?
11     MR. AKROTIRIANAKIS:  Objection: no
12  foundation.
13  BY MR. BLOCK:
14     Q.  Let me pull back.  You spoke with Mr. Itzhak
15  to confirm the processes that defendants used to
16  create these anonymized accounts as part of your
17  preparation to testify today; is that right?
18     A.  I discussed with Avi my understanding of the
19  processes to make sure that I am ready for this
20  session.
21     Q.  Please explain the process of setting up
22  an anonymized WhatsApp account at NSO?
23     A.  So we get a request.  The team that
24  responsible for the creation of the accounts get a
25  request, and they follow, create the accounts as

1  requested, and provide it back.
2      Q.  Okay, I want to focus on the part of the
3  process where they create the account as requested.
4  What happens step-by-step?
5      MR. AKROTIRIANAKIS:  Objection: no
6  foundation.
7      THE WITNESS:  So I'm not creating the
8  account -- the accounts myself, so I gave a general
9  description of that, okay?  So for example they're
10  being asked to provide one account so the relevant
11  employee will create the account, like anyone
12  creating a WhatsApp account, follow the same steps,
13  and provide the details to the one that asked it.
14  BY MR. BLOCK:
15     Q.  Will the relevant employee when creating this
16  account use a real name?
17     A.  He will use a name.  It can be like two
18  letters.  It can be something else.
19     Q.  Is this done on a mobile interface or a web
20  interface, or in some different way?
21     A.  In most cases it is being done by mobile.
22     Q.  So let me see if I understand.  The employee
23  on Mr. Itzhak's team will download a WhatsApp mobile
24  application on to a mobile device and register a
25  WhatsApp account, is that accurate?

1      A.  In most of the cases, yes.
2      Q.  And in doing so that NSO employee will follow
3  the normal WhatsApp process for registration through
4  the WhatsApp application downloaded from
5  an application store; is that accurate?
6      MR. AKROTIRIANAKIS:  Objection: vague.
7      THE WITNESS:  He will follow the steps it
8  need in order to create the account.
9  BY MR. BLOCK:
10     Q.  However they'll use a fake name, is that
11  accurate?
12     MR. AKROTIRIANAKIS:  Objection: misstates
13  testimony.
14     THE WITNESS:  They will put a name.
15  BY MR. BLOCK:
16     Q.  A name that is not the real name of the
17  person creating the account or of the person who
18  requested it; correct?
19     A.  Not the name of the one creating and not the
20  one that -- the one receiving.
21     Q.  Is there any special process for deciding
22  what name to use?
23     A.  No.
24     Q.  Okay.  Why does a relevant employee create
25  the account instead of the colleague creating it

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 38

1    he is an employee of mine. And the other were
2    related to what we are talking now.
3        Q. Okay. Did you discuss any other topics with
4    Mr. Itzhak that were specifically for your
5    testimony today besides the WhatsApp account creation
6    topics?
7        A. That was the main -- the main topic. We also
8    covered other topics such as training.
9        Q. Any others?
10       A. Maybe. It's like a normal call between us so
11   I don't remember them all but --
12       Q. I'm just trying to discover what information
13   you received from Mr. Itzhak for purposes of
14   testifying today. So you discussed training. We'll
15   talk about that in a moment.
16       A. Sure.
17       Q. Can you think of any others that you
18   discussed with him to prepare for your testimony?
19       A. Again, it was more to, in a way, just make
20   sure that I'm up to speed from my perspective because
21   I am aware of those processes anyway, so I just
22   wanted to make sure I'm aligned.
23       Q. What did you discuss about training?
24       A. You know like the agenda, the duration,
25   things like that.

Page 39

1        Q. Of a particular training?
2        A. No, in general.
3        Q. Okay. What is the agenda and duration of
4    training in general that you discussed with
5    Mr. Itzhak?
6        A. It's like a four-days training that will be
7    the average. Some will be less, some will be more.
8        Q. Is this training for customers or training
9    for NSO employees or something different?
10       A. For customers.
11       Q. Do defendants train customers to create
12   anonymized WhatsApp accounts?
13       A. No, we do not train. To the best of my
14   recollection we do not do that.
15       Q. But defendants do create anonymized WhatsApp
16   accounts for use by customers; is that accurate?
17       A. We do create accounts for the customers.
18       Q. And when is the most recent occasion when
19   defendants created an anonymized WhatsApp account for
20   use by a customer of which you are aware, sir?
21       MR. AKROTIRIANAKIS: Objection: no
22   foundation. Hold on, I've got to object first. No
23   foundation and it's beyond the scope of the
24   designation of this witness.
25       THE WITNESS: I think we talked about the

Page 40

1    timelines before, right? So I know that we have
2    created during the EU but not specifically a date
3    within.
4    BY MR. BLOCK:
5        Q. And you know you created anonymized WhatsApp
6    accounts for customers -- strike that.
7        You know that defendants created anonymized
8    WhatsApp accounts for use by customers in 2024;
9    correct?
10       MR. AKROTIRIANAKIS: Objection: no
11   foundation. Also beyond the scope of the designation
12   of this witness.
13       THE WITNESS: I would say for customers.
14   BY MR. BLOCK:
15       Q. You did it for customers or you did it for
16   four customers?
17       MR. AKROTIRIANAKIS: Object to the form of
18   the question.
19   BY MR. BLOCK:
20       Q. Let me just ask my question again. You know
21   that defendants created anonymized WhatsApp accounts
22   for use by defendants' customers during calendar year
23   2024; is that correct?
24       MR. AKROTIRIANAKIS: Objection: no
25   foundation. Also beyond the scope of the designation

Page 41

1    of this witness.
2        THE WITNESS: I'm not sure it's correct.
3    BY MR. BLOCK:
4        Q. When is the most recent occasion of which you
5    were aware when defendants created anonymized
6    WhatsApp accounts for use by one of defendants'
7    customers?
8        MR. AKROTIRIANAKIS: Objection: no
9    foundation. Also beyond the scope of the designation
10   of this witness.
11       THE WITNESS: I don't have a specific date in
12   mind.
13   BY MR. BLOCK:
14       Q. Do you know whether that occurred in 2018?
15       MR. AKROTIRIANAKIS: Objection: no
16   foundation.
17       THE WITNESS: In 2018 the department wasn't
18   under my responsibility.
19   BY MR. BLOCK:
20       Q. Do you know whether it occurred in 2019?
21       MR. AKROTIRIANAKIS: Same objection.
22       THE WITNESS: Same they were not part of my
23   department in 2019.
24   BY MR. BLOCK:
25       Q. Do you know whether it occurred in 2020?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 62

1　roughly two years ago maybe.  Time flies but more or
2　less.
3　　　Q.  As a director were you director of client
4　executive, is that how you say it?
5　　　A.  Yes.
6　　　Q.  And then you became VP client executive?
7　　　A.  Correct.
8　　　Q.  And now SVP client executive?
9　　　A.  No, I'm SVP for what we called the CBD.  It's
10　actually the customer based division.
11　　　Q.  Customer base division?
12　　　A.  We call it customer base division.
13　　　Q.  Business?
14　　　A.  Division.
15　　　Q.  Okay.  And that includes client executive as
16　one of the departments within your purview?
17　　　A.  Indeed.
18　　　Q.  How did you come to work for NSO?
19　　　　MR. AKROTIRIANAKIS:  Objection: vague.
20　　　　THE WITNESS:  Can you please repeat or
21　explain?
22　　　　MR. AKROTIRIANAKIS:  Do you want it in
23　Hebrew?  That's an English way of speaking.  Do you
24　understand his question?
25　　　　THE WITNESS:  I'm not sure.

Page 63

1　BY MR. BLOCK:
2　　　Q.  Let me try to ask... How were you introduced
3　to the opportunity to work at NSO?
4　　　A.  NSO made contact.
5　　　Q.  Who at NSO made contact?
6　　　A.  I don't remember the lady from HR at the time
7　but --
8　　　Q.  Someone in a recruiting function?
9　　　A.  Yes.
10　　　Q.  Reached out to you over LinkedIn or email?
11　　　A.  She reached out via LinkedIn and then a phone
12　call.
13　　　Q.  Before you started that application process,
14　did you know anybody at NSO?
15　　　A.  I came aware of the fact that there is
16　someone that I know at NSO after, okay.  I didn't
17　know in advance that he works there.
18　　　Q.  I understand.  Who is that person?
19　　　A.  Nachum.
20　　　Q.  Nachum is a first name or a last name?
21　　　A.  Yeah, a first name.
22　　　Q.  N-A-C-H-U-M?
23　　　A.  Yes.
24　　　Q.  Last name?
25　　　A.  Falk, F-A -- I'm not sure I'm spelling it

Page 64

1　correctly.  F-A-L-K, I think.
2　　　Q.  So you knew Nachum before you joined NSO but
3　only learned after you joined NSO that Nachum was
4　also employed there?
5　　　A.  (Witness nods).
6　　　Q.  Okay.
7　　　A.  During the process, not after.  During the
8　process.
9　　　Q.  Fair enough.  Do you work in a particular
10　physical location for NSO, your office?
11　　　A.  Yes.
12　　　Q.  Tel Aviv?
13　　　A.  Herzliya.
14　　　　MR. AKROTIRIANAKIS:  H-E-R-Z-L-I-Y-A in
15　English.
16　BY MR. BLOCK:
17　　　Q.  Do you travel on business for NSO?
18　　　A.  Yeah, I travel.
19　　　Q.  Have you traveled to the United States on
20　business for NSO?
21　　　A.  No, not that I recall.
22　　　Q.  How do you communicate with your co-workers
23　for business purposes?
24　　　　MR. AKROTIRIANAKIS:  Objection: vague.
25　　　　THE WITNESS:  How do I --

Page 65

1　BY MR. BLOCK:
2　　　Q.  Communicate?
3　　　A.  We talk.  We meet.  We use phone calls.
4　　　Q.  You meet in person?
5　　　A.  Yeah, we meet in person.
6　　　Q.  You use the telephone?
7　　　A.  We use the telephone.
8　　　Q.  Videoconferencing?
9　　　A.  We use videoconferencing.
10　　　Q.  Do you communicate with your co-workers at
11　NSO using email?
12　　　A.  Yes.
13　　　Q.  And do you communicate with your co-workers
14　at NSO using messaging services?
15　　　A.  Yes.
16　　　Q.  Which messaging services do you use for
17　business purposes at NSO?
18　　　A.  What do you mean for business purposes like
19　our communication between employees of the company?
20　　　Q.  Yes.
21　　　A.  We use the various types of popular IMs.
22　　　Q.  Such as?
23　　　A.  Such as Signal.
24　　　Q.  Any others?
25　　　A.  Yeah, can be WhatsApp.  Can be WebEx.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q. Do you have a smartphone?
2    A. Yes.
3    Q. What kind is it?
4    A. Samsung.
5    Q. Did NSO provide that smartphone to you?
6    A. So I'm not so sure what -- I don't want to
7    confuse the legal terms here. From one side they do,
8    and the other side there is something with the like
9    we buy it. So I don't want what's the right term to
10   use, but at the end of the day I get it from the
11   company. But there is something in the background
12   with regards to the taxation or something like that
13   with regards to giving to someone a phone.
14   Q. Did you go to a store and purchase the
15   device?
16   A. No.
17   Q. Did NSO hand the device to you?
18   A. Yes.
19   Q. Does NSO pay for the service on the device?
20   A. Yes.
21   Q. In -- has that been your arrangement ever
22   since you joined NSO in 2015?
23   MR. AKROTIRIANAKIS: Objection: vague.
24   THE WITNESS: My arrangement you mean for the
25   phone to be provided?

Page 67

1    BY MR. BLOCK:
2    Q. Yes.
3    A. Yeah, it was the same when I joined.
4    Q. So for as long as you have been an NSO
5    employee, NSO has provided you with a phone to use
6    for work and paid for the service; correct?
7    MR. AKROTIRIANAKIS: Objection: no
8    foundation.
9    THE WITNESS: The moment I left the army and
10   started, every company provided a phone.
11   BY MR. BLOCK:
12   Q. Okay. Did you download a WhatsApp
13   application on to that phone?
14   A. I have.
15   Q. And do you use that for business purposes at
16   NSO?
17   A. What do you mean by business purposes?
18   Q. To engage in business-related communications?
19   A. Yes.
20   Q. Did you set up that WhatsApp account
21   yourself?
22   A. Yes.
23   Q. Do you recall going through the regular
24   registration process?
25   A. Yes, it was long ago. I think I had it even

Page 68

1    before I joined so I just kept the same account.
2    Q. Have you ever used a white services
3    anonymized WhatsApp account yourself?
4    A. No, not that I recall.
5    Q. Do you know whether NSO generally provides
6    smartphones to all of its employees?
7    MR. AKROTIRIANAKIS: Objection: foundation.
8    THE WITNESS: As much as that they were
9    provided to some of our employees.
10   BY MR. BLOCK:
11   Q. Do you know where the line is drawn who gets
12   smartphones and who doesn't?
13   MR. AKROTIRIANAKIS: Objection: no
14   foundation.
15   THE WITNESS: I don't know in other
16   departments. I know for my department.
17   BY MR. BLOCK:
18   Q. So tell me for your department?
19   A. For my department we provide phones.
20   Q. And that includes everyone in the white
21   services department?
22   A. Yes.
23   Q. Okay. And --
24   A. An employee might choose not to have a phone
25   so I don't know if right now at this moment all of

Page 69

1    them with a phone that we have provided, but they do
2    have this option.
3    Q. Okay. Have you ever sent a WhatsApp message
4    other than through the WhatsApp client application on
5    a mobile device?
6    MR. AKROTIRIANAKIS: Objection: foundation.
7    THE WITNESS: Just to make sure, have I ever
8    sent a WhatsApp messages not using the phone?
9    I've used the web interface, if this is what you
10   mean, but not more than that, so it's coming out from
11   my phone.
12   BY MR. BLOCK:
13   Q. Okay. And when you have used the web
14   interface you logged in with your personal WhatsApp
15   credentials, which are the same ones associated with
16   the WhatsApp application on your smartphone; is that
17   accurate?
18   MR. AKROTIRIANAKIS: Objection: foundation.
19   Vague. Compound.
20   THE WITNESS: Just operated a web interface
21   using the barcode scanning.
22   BY MR. BLOCK:
23   Q. Barcode scanning, okay. You haven't operated
24   the emulator that we discussed earlier to send a
25   WhatsApp message; correct?

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    A. Correct.
2    Q. Have you observed operation of the emulator
3  to send a WhatsApp message?
4    A. Not that I recall.
5    Q. Okay. Do you know whether the emulator is
6  capable of sending WhatsApp messages?
7      MR. AKROTIRIANAKIS: Objection: foundation.
8      THE WITNESS: If I'm aware that what?
9  BY MR. BLOCK:
10   Q. Whether the emulator that we discussed
11  earlier is capable of sending WhatsApp messages?
12     MR. AKROTIRIANAKIS: Same objection.
13  Foundation.
14     THE WITNESS: I would understand it does.
15  BY MR. BLOCK:
16   Q. Do you have knowledge of the extent to which
17  defendants personnel have agreed to the WhatsApp
18  terms of service?
19     MR. AKROTIRIANAKIS: Objection: calls for a
20  legal conclusion. No foundation. Also beyond the
21  scope of the designation of this witness.
22     THE WITNESS: I'm not sure I follow.
23  BY MR. BLOCK:
24   Q. Okay. We talked about the process that the
25  white services department uses when it creates

Page 71

1  anonymized accounts. Do you remember that?
2    A. Yes, I do.
3      MR. AKROTIRIANAKIS: Objection: misstates his
4  testimony.
5  BY MR. BLOCK:
6    Q. Do you know whether or not the white services
7  department employees agreed to WhatsApp terms of
8  service when they create anonymized accounts?
9      MR. AKROTIRIANAKIS: Objection: foundation,
10  vague, and it calls for a legal conclusion. It's
11  also beyond the scope of the designation of this
12  witness.
13     THE WITNESS: They established the account so
14  they follow the steps required in order to establish
15  the account.
16  BY MR. BLOCK:
17   Q. So you would understand if agreeing to the
18  terms of services is a normal step, then that's a
19  step that they take?
20   A. No --
21     MR. AKROTIRIANAKIS: Objection --
22     MR. BLOCK: Did you say "no"?
23     MR. AKROTIRIANAKIS: Hold on, I get to make a
24  record too. Objection: it misstates his testimony,
25  no foundation, it's vague and it calls for a legal

Page 72

1  conclusion, it's Beyond the scope of the designation
2  of this witness.
3  BY MR. BLOCK:
4    Q. So the question was you would understand that
5  agreeing to the terms of service -- strike that.
6    The question was, you would understand that if
7  agreeing to the WhatsApp terms of service is a normal
8  step required in order to establish the account, then
9  that's a step that the white services department
10  employees take; correct?
11     MR. AKROTIRIANAKIS: All of the same
12  objections and, as phrased, it's also an incomplete
13  hypothetical.
14     THE WITNESS: They would follow the steps in
15  order to establish the account, so.
16  BY MR. BLOCK:
17   Q. You're not aware of any way in which the
18  white services department personnel deviate from the
19  normal process for establishing a WhatsApp account
20  when they set up anonymized WhatsApp accounts for
21  defendants?
22     MR. AKROTIRIANAKIS: Objection: foundation;
23  vague; beyond the scope of the designation of this
24  witness.
25     THE WITNESS: I'm not sure I can answer that.

Page 73

1  BY MR. BLOCK:
2    Q. Okay.
3    (Exhibit 2002 marked for identification.)
4      Mr. Eshkar, you've been handed a document
5  that's been marked Exhibit 2002. It's dated
6  March 25, 2019 and bears the Bates stamp
7  DIVITTORIO_WHATSAPP_[a bunch of zeros and then]65.
8    A. Okay.
9    Q. Do you recognize this document?
10   A. I do not recall this document.
11   Q. Okay. Under "Other Recipients", on the
12  bottom line, do you see where it says
13  "972549225336@s.whatsapp.net;Ramon"?
14   A. Yeah, I see that.
15   Q. Is that your MSISDN?
16   A. It is my phone number.
17   Q. Have you used the same phone number for
18  WhatsApp since you joined NSO in 2015?
19   A. I haven't changed my number.
20   Q. Have you ever used a different phone number
21  for WhatsApp in NSO-related business communications?
22   A. I'm not sure I follow. If I have another
23  device?
24   Q. Correct.
25   A. I have another device.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 78

1      MR. AKROTIRIANAKIS: Objection: foundation.
2      THE WITNESS: I don't know how successful he
3  was in that time but it was his job to do that.
4  BY MR. BLOCK:
5      Q. Okay. Who at NSO supervised Mr. DiVittorio's
6  work?
7      MR. AKROTIRIANAKIS: Objection: foundation.
8  Assumes facts not in evidence.
9      A. I don't know who was responsible to
10 supervise.
11 BY MR. BLOCK:
12     Q. Okay. You had a client executive's role at
13 this time in 2019 that we're looking at on
14 Exhibit 2002; correct?
15     A. Yes, at that time I was, yes.
16     Q. Did your job responsibilities include
17 anything to do with the US market?
18     A. No, we were to provide the needed help to the
19 team at the US, not to anyone else.
20     Q. Does the client executive team at NSO work on
21 sales?
22     MR. AKROTIRIANAKIS: Objection: vague.
23     THE WITNESS: We need to define sales
24 actually.
25 BY MR. BLOCK:

Page 79

1      Q. Here's my understanding and I'm going to ask
2  you to give it in your own words. It sounds like you
3  would support a demonstration, help the sales team
4  who needed you to come do a demonstration, and then
5  also support install systems but you weren't sales
6  people per se. I don't know if that's right. What
7  was the relation -- so here's my question to you.
8      What was -- what is the relation between the
9  client executive team at NSO and the sales
10 organization at NSO today?
11     MR. AKROTIRIANAKIS: Objection: foundation.
12 Also vague.
13     THE WITNESS: Who do you mean by relations?
14 They work together. In general terms the client
15 executive's job are -- is to execute the contract
16 once done and maintain the relationship with the
17 customer, to represent the customer within -- sorry
18 the company within the customer area and vice versa.
19 As a result there might be aware to what we call
20 an app sale opportunity, which in that case they will
21 bring this information to the sales team which takes
22 the commercial responsibility from that moment on.
23 And they will be responsible for the renewal of the
24 contracts once they're done.
25 BY MR. BLOCK:

Page 80

1      Q. Is the client executive team involved in
2  original contracts for new customers?
3      A. What's original contracts?
4      Q. You just talked about contract renewal?
5      A. That's right.
6      Q. A brand new contract for a new customer,
7  instead of a renewal?
8      A. Okay.
9      Q. Is the client executive team involved in
10 negotiating and executing a new contract for a new
11 customer?
12     A. They will not be -- general they will not be
13 involved in what we call a new customer or a new
14 logo, so this process is led by sales.
15     Q. Referring back to Exhibit 2002. Do you know
16 who sent the message that's written here as from
17 "MICH-" and then a phone number?
18     A. I'm trying to look at the upper side of the
19 document but also there I don't see -- I don't think
20 I know -- I don't recall this name.
21     Q. Do you recall who is Marcelo Comité?
22     A. I do.
23     Q. Who is Marcelo Comité?
24     A. He was a salesperson.
25     Q. Was he an NSO employee?

Page 81

1      MR. AKROTIRIANAKIS: No foundation.
2      THE WITNESS: Again I don't know who his
3  contract were with so.
4  BY MR. BLOCK:
5      Q. And do you know if Marcelo Comité had sales
6  responsibility in a particular geography?
7      MR. AKROTIRIANAKIS: Objection: foundation.
8      THE WITNESS: To the best of my knowledge he
9  was responsible for Latin America at the time, but
10 since he wasn't my employee so I don't know if he was
11 assigned to additional areas but this is my
12 understanding.
13 BY MR. BLOCK:
14     Q. Okay. In the first message in the table in
15 Exhibit 2002, on the third line, do you see where it
16 says "PGS"?
17     A. Yes, I see.
18     Q. Do you understand that to be shorthand for
19 Pegasus?
20     A. In general we use PGS as Pegasus.
21     Q. In the next line Mr. DiVittorio says -- he
22 uses the letter CL. Do you see that?
23     A. Yes.
24     Q. Do you understand that to refer to
25 Citizen Lab?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1    MR. AKROTIRIANAKIS: Objection: foundation.
2    THE WITNESS: I am aware that CL stands for
3  Citizen Lab. I'm not sure if this is in the context
4  of that particular document, so I can take the time
5  to read it but --
6    Q. Not necessary.
7    A. I do know that we do use CL as Citizen Lab.
8    Q. "We", NSO?
9    A. Generally.
10   Q. Yes. Do you know who -- and again please
11  forgive my pronunciation -- Tami Mazel Shachar is?
12   A. I do.
13   Q. Who is that?
14   A. Tami used to work at NSO as a -- well, she
15  had several roles so I'm not so sure on that
16  particular date. What the date here? 2018. So,
17  from overall responsibility of sales to what we call
18  at the time CBO, which is chief business officer.
19   (Exhibit 2003 marked for identification.)
20   MR. AKROTIRIANAKIS: Maybe you can state what
21  comprises the document?
22   MR. BLOCK: Did I give you something other
23  than 58 and 59?
24   (Off the record discussion.)
25  BY MR. BLOCK:

Page 83

1    Q. Mr. Eshkar, you've been handed Exhibit 2003,
2  which is dated January 31, 2019 and is Bates stamped
3  DiVittorio_WhatsApp_00000058. It's a two-page
4  document that also includes the page numbered 59?
5    A. The page 59?
6    Q. Yeah, the Bates numbered page 58 --
7    A. Yes, yes, got it.
8    Q. Do you understand Exhibit 2003 to be a record
9  of a WhatsApp communication?
10   MR. AKROTIRIANAKIS: Objection: foundation.
11   THE WITNESS: I can see it's a communication.
12  BY MR. BLOCK:
13   Q. And the third line on the document says:
14  "Application: WhatsApp"?
15   A. Sorry, what?
16   Q. The third line on the first page of the
17  document says "Application: WhatsApp". Do you see
18  that?
19   A. Yes, I see that.
20   Q. And under "Other Recipients", do you see your
21  phone number and name on the fourth line?
22   A. The fourth line. It's not my phone number.
23   Q. 972549225336 is not your phone number?
24   A. It is but the number unless -- let me see it.
25  It's like 542 -- ah, no, it's the other one. Sorry,

Page 84

1  it goes on the left. Yes, sorry, yes I see my
2  number.
3    Q. Okay. So do you recognize Exhibit 2003 as
4  a WhatsApp communication that you were included on in
5  January 2019?
6    MR. AKROTIRIANAKIS: Objection: foundation.
7    THE WITNESS: I can see my name as part of
8  the communication presenting to me.
9  BY MR. BLOCK:
10   Q. Do you remember this communication?
11   A. Can I take a moment to read it?
12   Q. Yes. (Pause.)
13   A. I don't recall the specific communication.
14   Q. On the second page do you see the name
15  Tomer Timor?
16   A. Yes, I do.
17   Q. Do you know who Tomer Timor is?
18   A. Yes, I do.
19   Q. Who is that?
20   A. Tomer Timor is a former employee of NSO.
21   Q. What did Tomer Timor do for NSO?
22   A. At the time that I knew Tomer he was -- at
23  the end of it he was responsible for the pre-sale
24  team. I just don't remember if he was a team manager
25  and then managed the pre-sales team, but, anyway, he

Page 85

1  was in the pre-sales team.
2    Q. What does pre-sales do?
3    MR. AKROTIRIANAKIS: Objection: foundation.
4    THE WITNESS: They support sales process.
5  BY MR. BLOCK:
6    Q. Do you know who Sivan Brook is?
7    A. Yes.
8    Q. Who is Sivan Brook?
9    A. Also a former employee of NSO.
10   Q. In what role?
11   MR. AKROTIRIANAKIS: No foundation.
12   THE WITNESS: If my memory serves me well she
13  was the private assistant -- Personal Assistant of
14  Tami.
15  BY MR. BLOCK:
16   Q. How about Sarit Gil?
17   A. Yes, I know Sarit.
18   Q. And who is Sarit?
19   A. Sarit is an employee of NSO.
20   Q. What does she do?
21   A. She runs the department of what we call sales
22  operation.
23   Q. What does sales operations do generally?
24   MR. AKROTIRIANAKIS: Objection: foundation.
25   THE WITNESS: The way that I'm familiar with

22 (Pages 82 - 85)

Page 86

1   the department job is that they were unfocused.
2   BY MR. BLOCK:
3       Q.  Who is Naor Bashran?
4       A.  Naor is a former employee of NSO.
5       Q.  In what role?
6       A.  Sales.
7       Q.  Do you know what geography or customers Naor
8   was responsible for?
9       A.  He shifted a lot.
10      Q.  Do you happen to know what he was doing in
11  January 2019?
12      MR. AKROTIRIANAKIS:  Objection: foundation.
13      THE WITNESS:  Specifically '19 I do not
14  recall.
15  BY MR. BLOCK:
16      Q.  Okay.  Who is Moshe Faran?
17      A.  Moshe Faran is a former employee of NSO.
18      Q.  In what role?
19      A.  Sales as well.
20      Q.  And do you know what Moshe Faran's
21  responsibilities were in January 2019?
22      MR. AKROTIRIANAKIS:  Objection: foundation.
23      THE WITNESS:  He was part of the sales team
24  of the -- again if I remember correctly the African
25  region.  At the end of it he managed the region.

Page 87

1   I don't remember if he managed it from the early
2   beginning of his arrival or later on during his work
3   at NSO.
4   BY MR. BLOCK:
5       Q.  Okay.  Do you know who Tama -- or Tamara
6   Miller is?  She's the last name under "other
7   recipients"?
8       A.  She's the last name.  The last name confuse
9   me but if I'm not -- if this is who I think she is
10  then she was a sales -- sales.  She was doing sales,
11  salesperson.
12      Q.  And do you recall the scope of her
13  responsibilities?
14      MR. AKROTIRIANAKIS:  Objection: vague.
15  Foundation.
16      THE WITNESS:  Again if I am correct she was
17  doing sales.  Later on she was doing marketing
18  I think.  I might be wrong.
19  BY MR. BLOCK:
20      Q.  Okay.  The first message on Exhibit 2003 from
21  Tami Mazel Shachar is in Hebrew.  Do you see that?
22      A.  I do.
23      Q.  I believe the second word is [Hebrew: ayin
24  dalet nun] which is Eden; is that correct?
25      A.  It is correct.

Page 88

1       Q.  And what -- I realize it's in Hebrew but
2   could you explain to me in English what the first
3   sentence of the message says?
4       A.  It looks like it's either misprinted or
5   because of right to left and left to right.  So do
6   you think there is any way to get like sorted to the
7   right side, because I think there is a mismatch at
8   the beginning.  Do you have like the soft copy?  Can
9   you like --
10      Q.  This is how it was produced to us.  So you're
11  not able to read the Hebrew from right to left?
12      A.  I can read the Hebrew.
13      Q.  Why don't you just read the Hebrew for me,
14  just the first sentence up to the ellipsis, the three
15  dots.  And I would just ask the interpreters if
16  they're able to interpret what you read to me.
17      MR. AKROTIRIANAKIS:  You're asking him to
18  read it in Hebrew?
19      MR. BLOCK:  Yes, please read in Hebrew to the
20  interpreter.
21      MR. AKROTIRIANAKIS:  You want him to read it
22  from left to right for the record?
23      MR. BLOCK:  No, I believe it reads from right
24  to left.
25      A.  Right to left.

Page 89

1       Q.  Are you able to?
2       A.  I can read it but I think like it will not
3   make -- I can do it, right, but --
4       Q.  It won't make sense?
5       A.  I don't think because you need to move it to
6   the right and I think because of the -- how do you
7   call it, the star?
8       Q.  The asterisk?
9       A.  Yes, the asterisk.  I think, right, it's --
10  I can read it.  It's Hebrew, I can read it, but --
11      Q.  Are you able to get the sense of the first
12  sentence from looking at it in Hebrew notwithstanding
13  the problems that you're describing?
14      MR. AKROTIRIANAKIS:  Objection: foundation.
15      THE WITNESS:  It's not.
16  BY MR. BLOCK:
17      Q.  You should read the left word first, the left
18  most word first and then --
19      A.  Yeah but it's like -- if only move to the
20  right I wouldn't bother you but I think that because
21  of the Hebrew to English part it got -- okay,
22  I'll try.  Let's do it like that.
23      So the first sentence?
24      Q.  Please.
25      A.  So just give me a moment.  I give just

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 118

1  record so we can move on. I think I'm referring to
2  something from the transcript not from the order. Do
3  we need to go off the record?
4        MR. AKROTIRIANAKIS: We can go off the record
5  or on the record I'm trying to explain the legal
6  issue to my client. It's up to you.
7        MR. BLOCK: How much time do you need?
8        MR. AKROTIRIANAKIS: I'm trying to explain it
9  to my client.
10       MR. BLOCK: Let's go off the record.
11       VIDEOGRAPHER: Going off the record. The
12  time is 1:02.
13            (A short break)
14       VIDEOGRAPHER: On the record. The time is
15  13:10. Thank you.
16       MR. AKROTIRIANAKIS: So, I think that you're
17  either misrecalling or misstating the court's
18  comments but in any event what you're referring to
19  does not find its way into this order. However,
20  I think that you can ask some questions that relate
21  to the subject that you're getting at. But I don't
22  think that -- so in any event I think you can ask the
23  question you were asking but in general this order is
24  directed to a specific time frame and more
25  specifically to targeting or directing at WhatsApp

Page 119

1  servers or using WhatsApp in a way to access target
2  devices. So with that go ahead.
3        MR. BLOCK: Okay, I'll just refer to page 4
4  of 7 in docket 292, lines 4-7 which I think assumed
5  that there would be a production of the relevance by
6  way of, pursuant to the order, timely. But it says:
7        "If after reviewing the relevance by
8        where from that time frame plaintiffs
9        are able to provide evidence that any
10       attack lasted beyond that time frame
11       plaintiffs may seek further discovery at
12       that time."
13       MR. AKROTIRIANAKIS: Right and I agree --
14  sorry, I didn't mean to interrupt you.
15       MR. BLOCK: That's okay. I'll just say.
16       MR. AKROTIRIANAKIS: That's not what you
17  stated before though. You said before or after.
18  We're talking before, many years before. I don't
19  agree the court ever said before or after. Clearly
20  she said what you just read. We can read it here
21  today. Anyway, go ahead, ask your question.
22       MR. BLOCK: I appreciate it. I don't think
23  she's barred this line of questioning and if we end
24  up with a disagreement about that, that is the thing
25  that happens in litigations from time to time. So

Page 120

1  let me ask a question.
2        BY MR. BLOCK:
3        Q. What were defendants' vectors for zero-click
4  installation of Pegasus in 2015?
5        MR. AKROTIRIANAKIS: Objection: no
6  foundation.
7        THE WITNESS: So it's way back but I would
8  say there were both what we called triggered
9  capabilities and covert capabilities.
10       BY MR. BLOCK:
11       Q. Triggered and covert?
12       A. Yes.
13       Q. What were the covert capabilities in 2015?
14       MR. AKROTIRIANAKIS: No foundation. And to
15  the extent you're -- this is beyond the scope of the
16  designation, just so that's clear. I don't think
17  that you're intending to ask this as part of the
18  30(b)(6) but I want to be clear he's not being
19  designated for this. Another witness would be.
20       THE WITNESS: So again I don't recall the
21  various specific vectors but there were vectors.
22       BY MR. BLOCK:
23       Q. And do you recall whether any of the
24  zero-click vectors in 2015 involved WhatsApp in any
25  way?

Page 121

1        A. As much as I know, no, it didn't involve
2  WhatsApp.
3        Q. And do you recall whether any of the
4  triggered vectors in 2015 involved WhatsApp in any
5  way?
6        A. What do you mean by "any way"? Sending a
7  link to a target via WhatsApp, it's "any way"?
8        Q. Yes.
9        A. So I would say that as much as I know for the
10  trigger we do not use that. The customer might
11  choose to take the link and use his own, either
12  WhatsApp or a different system, to send the link.
13       Q. So from a user interface standpoint when the
14  user elects to pursue a triggered installation does
15  that happen through the user interface or do they
16  then walk over to a mobile phone and send a WhatsApp
17  message; how does that work?
18       MR. AKROTIRIANAKIS: Objection: vague.
19  Compound.
20       THE WITNESS: When they choose to proceed
21  with a trigger installation, the system produce a
22  link. It is then up to the customer to decide if he
23  sends it over a regular SMS which at a certain point
24  of time he could have done via the system, or he
25  extract the link, either copy or whatever, and then

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  send using any other method that he has.
2  BY MR. BLOCK:
3      Q. At this time in 2015 did the system enable
4  sending the link by WhatsApp message through the user
5  interface?
6      MR. AKROTIRIANAKIS: Objection: foundation.
7      THE WITNESS: As much as I recall, no.
8  BY MR. BLOCK:
9      Q. Did there come a later time when the system
10 enabled the user to initiate a triggered installation
11 by sending a WhatsApp message through the user
12 interface?
13     A. The trigger installation, right?
14     Q. Yes.
15     A. As much as I know, no.
16     Q. When did it become possible for the user to
17 send a covert installation that involved WhatsApp?
18     MR. AKROTIRIANAKIS: Objection: vague. No
19 foundation.
20     THE WITNESS: As much as I understand around
21 summer 2018, maybe close to the end of it. I don't
22 know the exact date, but somewhere there.
23 BY MR. BLOCK:
24     Q. And do you recall a name for that
25 WhatsApp-related zero-click installation vector that

Page 123

1  came online some time around 2018?
2      A. So internal names were like Eden, or Heaven.
3      Q. Are those the same?
4      A. What do you mean by the same.
5      Q. I mean is Eden one thing and Heaven a
6  different thing or are those used interchangeably?
7      A. For myself and the team as you know those are
8  covert vectors. I don't know if the technology
9  behind them is different.
10     Q. Okay, but you and your team would discuss
11 them separately as different vectors no matter how
12 they operate?
13     A. As different vectors.
14     Q. Okay. And you had an understanding that Eden
15 used WhatsApp in some way but you don't know the
16 details; is that correct?
17     MR. AKROTIRIANAKIS: Objection: vague.
18 Foundation. Beyond the scope of the designation.
19     THE WITNESS: My understanding would be that,
20 yes.
21 BY MR. BLOCK:
22     Q. What is your understanding, if any, as to how
23 Heaven used WhatsApp?
24     MR. AKROTIRIANAKIS: Vague. No foundation.
25 Beyond the scope of the designation.

Page 124

1      THE WITNESS: I'm trying to understand. You
2  mean how it worked?
3  BY MR. BLOCK:
4      Q. Sure.
5      A. So I don't know how it worked. So --
6      Q. But do you have an understanding that however
7  it worked involved WhatsApp?
8      A. That's my understanding.
9      Q. So we spoke about Eden and Heaven. Are you
10 aware of any other names for defendants' installation
11 vectors that involved WhatsApp?
12     MR. AKROTIRIANAKIS: Objection: foundation.
13     THE WITNESS: Yes.
14 BY MR. BLOCK:
15     Q. What are the other names that you're aware
16 of?
17     A. Erised.
18     Q. Like desire but spelt backwards?
19 E-R-I-S-E-D, correct?
20     A. Yes.
21     Q. We have Eden, Heaven and Erised. Any others?
22     A. Not that I recall.
23     Q. Have you heard the term Hummingbird?
24     A. Yes, I have heard the term Hummingbird.
25     Q. Do you know one way or another whether

Page 125

1  Hummingbird used WhatsApp?
2      A. I think we are confusing here with terms.
3      Q. How so?
4      A. Because there are different names being used
5  so like I said before, from the customer perspective
6  it would be covert, right. And there are names that
7  we use internally and there are names that we use
8  sometimes externally. So in that regard Hummingbird,
9  as much as I remember from the period, would be like
10 an umbrella name for the family of such covert
11 vectors.
12     Q. The family of installation vectors that use
13 WhatsApp?
14     A. Again, as much as I understand, Hummingbird
15 is the name that we've used externally in some cases.
16     Q. For the family of installation vectors that
17 use WhatsApp?
18     MR. AKROTIRIANAKIS: Objection: no
19 foundation.
20     THE WITNESS: As much as I can understand.
21 BY MR. BLOCK:
22     Q. Is that a yes?
23     MR. AKROTIRIANAKIS: No foundation.
24     THE WITNESS: Yes.
25 BY MR. BLOCK:

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1    Q. And in the Hummingbird family, what are
2 the -- strike that. What are the names you know of
3 installation vectors in the Hummingbird family?
4    A. So I don't recall when we introduced the name
5 Hummingbird but I don't think, as much as I remember,
6 that there will be other names than what we said
7 before.
8    Q. And the ones we said before were Eden, Heaven
9 and Erised?
10    A. Yes, I just don't remember when we started
11 with the Hummingbird term so it may not be the whole
12 three of them, maybe just one or two of them.
13    Q. And Erised from Eden, Heaven and Erised you
14 don't recall knowledge of another installation vector
15 that used WhatsApp?
16    A. I don't remember.
17    Q. You said you first became aware of
18 an installation vector that used WhatsApp around
19 2018, maybe late I think those were your words,
20 something like that?
21    A. Something like that, yes.
22    Q. When is the latest point in time that you're
23 aware of defendants using an installation vector that
24 used WhatsApp?
25    A. I would say somewhere around 2019 maybe a

Page 127

1 little bit into 2020 but I'm not sure of the exact
2 date so that would be like a ballpark.
3    Q. Okay. Is that something Mr. Gazneli would
4 know?
5    MR. AKROTIRIANAKIS: Objection: no
6 foundation.
7    THE WITNESS: He might.
8    Q. What's the latest point in time when you're
9 aware of defendants trying to defendant a zero-click
10 installation using WhatsApp?
11    MR. AKROTIRIANAKIS: Objection: no
12 foundation.
13    THE WITNESS: I have no knowledge of that.
14 BY MR. BLOCK:
15    Q. We may have asked this before. Was Eden to
16 your knowledge specific to a particular operating
17 system such as Android, iOS, BlackBerry?
18    A. As much as I recall, it's for Android
19 platform.
20    Q. And was Heaven specific to a specific
21 operating system such as Android, iOS or BlackBerry?
22    A. Same here, as much as I remember it's
23 an Android platform.
24    Q. And was Erised specific to a particular
25 operating system?

Page 128

1    A. Same for as much as I know, for Android
2 platform.
3    Q. Are you aware of WhatsApp ever using
4 WhatsApp -- sorry. Let me try again. Are you aware
5 of defendants ever using an installation vector that
6 involved WhatsApp to install Pegasus on an iOS
7 device?
8    A. Not that I recall, no.
9    Q. And we're talking about zero-click exploits
10 versus sending messages, right?
11    A. So again I'm less comfortable with the know
12 how because myself or my team do not develop so it's
13 hard for me to say. But as much as I know it was not
14 used for iOS.
15    Q. Are you general familiar with the user
16 interface that customers see when they operate
17 Pegasus?
18    A. Generally aware, yes.
19    Q. During an agent installation process, is it
20 possible it see in the user interface the phone
21 numbers of the target devices identified for
22 installation?
23    A. The customer enters the number so the number
24 is presented on the user interface what we call the
25 UI.

Page 129

1    Q. Are you aware of something called a
2 whitelist, a whitelist of numbers?
3    A. Yes.
4    Q. What is the concept of a whitelisted phone
5 number as it relates to Pegasus?
6    A. So it might be used in other departments of
7 different use. I would say from the perspective
8 that I have, okay. Because it's a general term, it
9 might be used also by other departments. But it will
10 means that there are certain numbers that their flow
11 of the installation is a bit different.
12    Q. Can you give me an example?
13    A. Yes. If the customer hold a test device,
14 which they usually do, it's a common practice before
15 they go on a real operation to run a test. Then the
16 test, the test device, might have been on the
17 whitelist. So they can install and maybe install
18 again in, you know, some time later.
19    Q. And perhaps install again, sometimes later in
20 a manner that the system would prevent had the number
21 not been on a whitelist?
22    A. Can you explain that?
23    Q. Yeah, you said a test device number might be
24 whitelisted so Pegasus can be installed and then
25 installed again. Is that what you said?

33 (Pages 126 - 129)

Page 130

1    A. Yeah, it can be installed and then installed
2  again, yes.
3    Q. Why does it have to be on a whitelist in
4  order to be installed and then installed again?
5       MR. AKROTIRIANAKIS: Objection: no
6  foundation.
7       THE WITNESS: Because from -- because when
8  you send -- when the customer send installation to a
9  real target there are some operational security
10  measures that they should apply. One of them is the
11  time in between the installation. Clearly for a test
12  device if he had to wait a few days then by the time
13  he will finish his test then the operation will not
14  be relevant.
15  BY MR. BLOCK:
16    Q. And as we discussed, op sec measures are
17  measures to make sure the operation remains secret,
18  right?
19    A. Secured.
20    Q. Secured including against disclosure to
21  others?
22       MR. AKROTIRIANAKIS: Objection: vague.
23       THE WITNESS: I tend to agree.
24  BY MR. BLOCK:
25    Q. Let's look at page 34 of 46 in Exhibit 2004,

Page 131

1  titled Exhibit D Service Level Agreement. Do you see
2  that?
3    A. Thirty --
4    Q. 34 of 46.
5    A. Exhibit D. Yes, I see that.
6    Q. What is a service level agreement generally
7  in defendants' contracts for Pegasus?
8       MR. AKROTIRIANAKIS: Objection: misstates the
9  document.
10       THE WITNESS: So generally talking about what
11  we call SLAs, or service level agreement, not in the
12  context of this contract but in general service level
13  agreement will be our way to define the service that
14  we provide to our customer like how long they will
15  wait for an answer for a phone call, what our service
16  covers in means of for example the hardware, so on so
17  forth, and what is the definitions of minor or major
18  or critical, so on so forth. I have more examples if
19  you need but this is more or less. How they can
20  contact us. At what times.
21  BY MR. BLOCK:
22    Q. If you take a moment to look at -- strike
23  that. In Exhibit 2004 the service level agreement
24  runs from page 34 of 46 through page 46 of 46;
25  correct?

Page 132

1       MR. AKROTIRIANAKIS: Objection: no
2  foundation.
3       THE WITNESS: I'm not so sure about the
4  clarification part, the 7. But the rest looks like
5  they are part of the SLA.
6  BY MR. BLOCK:
7    Q. Okay. And do defendants use standard terms
8  in their SLAs that they repeat with multiple
9  customers?
10    A. If we use what?
11    Q. The same terms over and over again?
12    A. Some of the terms are being used again and
13  again.
14       MR. BLOCK: I have received a request for a
15  lunch break and so I suggest that we go off the
16  record.
17       MR. AKROTIRIANAKIS: Okay. That's fine.
18       VIDEOGRAPHER: Going off the record. The
19  time is 13:34. End of media card 3, volume 1 of the
20  video deposition of Ramon Eshkar.
21       (Lunch recess.)
22       VIDEOGRAPHER: This is the beginning of media
23  card 4, volume 1 in the deposition of Ramon Eshkar.
24  Going on the record the time is 14:17. Thank you.
25       MR. AKROTIRIANAKIS: Before we get started

Page 133

1  again I wanted to designate the transcript as highly
2  confidential under the protective order, and also the
3  witness would like to read and sign. And let me know
4  before the end and I'll let you know if you need to
5  send it directly to him or to me to send to him
6  because it might be -- there might be a difference.
7  BY MR. BLOCK:
8    Q. Okay, thank you. Welcome back, Mr. Eshkar.
9  Just a couple looking over my notes. I think you
10  mentioned that the name Hummingbird was used
11  externally by defendants with customers. Was it?
12    A. It was used externally.
13    Q. But Eden, and Heaven, and Erised were not
14  used externally with customers; is that correct?
15    A. They were not meant to use externally.
16    Q. That was a matter of defendants' policy?
17       MR. AKROTIRIANAKIS: Objection: vague; no
18  foundation.
19       THE WITNESS: I mean they were internal names
20  so people were not supposed to use it externally.
21  BY MR. BLOCK:
22    Q. I understand. Can you give me an example how
23  Hummingbird was used externally?
24    A. An example?
25    Q. Yes, please.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    A. If the customer and the one he, let's say the
2  client executive that he is talking to would like to
3  talk about the same topic, then they can say
4  Hummingbird.
5    Q. And how much information did defendants share
6  with customers about what Hummingbird means?
7      MR. AKROTIRIANAKIS: Objection: vague.
8      THE WITNESS: The concept is that it means
9  the covert vector.
10  BY MR. BLOCK:
11    Q. So defendants customers understood that
12  Hummingbird was a label for a covert vector for
13  installation of Pegasus end device agents?
14      MR. AKROTIRIANAKIS: Objection: foundation.
15      THE WITNESS: Can you please repeat?
16  BY MR. BLOCK:
17    Q. Yeah and let me -- was the Hummingbird family
18  of vectors used to install products other than
19  Pegasus?
20    A. No.
21    Q. Did defendants' customers understand that
22  Hummingbird was a name to refer to covert
23  installation of Pegasus?
24      MR. AKROTIRIANAKIS: Objection: foundation.
25      THE WITNESS: Customers will understand that

Page 135

1  Hummingbird is a covert vector.
2  BY MR. BLOCK:
3    Q. And did defendants disclose -- I'm sorry.
4  You said customers will understand that Hummingbird
5  is a covert vector. My question is, did defendants'
6  customers understand that Hummingbird was a name for
7  a covert vector for Pegasus?
8      MR. AKROTIRIANAKIS: Objection: foundation.
9      THE WITNESS: I'm trying to understand what's
10  the difference. Maybe it's better to translate.
11  BY MR. BLOCK:
12    Q. You excised Pegasus. I asked you a question;
13  you skipped Pegasus when I read it back. I was
14  trying to figure out if you meant something by that.
15  Did customers not know that Hummingbird was for
16  Pegasus?
17      MR. AKROTIRIANAKIS: Objection: foundation.
18      THE WITNESS: I would assume they understand
19  that it's for Pegasus.
20  BY MR. BLOCK:
21    Q. Because defendants communicated to their
22  customers that Hummingbird referred to covert
23  installation vector or vectors for Pegasus?
24      MR. AKROTIRIANAKIS: Object to the form of
25  the question.

Page 136

1      THE WITNESS: You mean if they will make the
2  linkage because of the way that we present vectors to
3  the customers?
4  BY MR. BLOCK:
5    Q. My question is about what defendants
6  communicated to their customers about Hummingbird.
7  Did defendants communicate to their customers that
8  Hummingbird referred to a family of vectors?
9      MR. AKROTIRIANAKIS: Objection: vague. Go
10  ahead.
11      THE WITNESS: No, it was for a covert vector.
12  BY MR. BLOCK:
13    Q. Okay. Did defendants communicate to their
14  customers that Hummingbird was for a covert vector
15  for Pegasus?
16    A. Yes.
17    Q. Do you still have Exhibit 2004 in front of
18  you?
19    A. Yes.
20    Q. Will you please turn to the page numbered 12
21  of 46. Are you there?
22    A. 12 of 46. Yes I'm there.
23    Q. Just to situate you, in case you have to flip
24  back, we're in Exhibit A-1 to Exhibit A. And
25  Exhibit A is the description of the system and

Page 137

1  services. And on page 8 --
2    A. Okay.
3    Q. -- it says:
4      "The System Provider's Pegasus system is
5      comprised of the following (the
6      'System'): (a) the features and
7      capabilities detailed in the
8      table attached hereto as Exhibit A-1."
9      Did I read that correctly?
10    A. Where are you at? I see Exhibit A-1 under
11  "The System" (a) and I see -- but I don't see what
12  you just read.
13    Q. Sure. On page 8 of 46 it says:
14      "The System: The System Provider's
15      Pegasus system is comprised of the
16      following (the 'System'): (a) ..."
17    A. Page 8 of 46?
18    Q. Yes. Read from the top of the page. Do me a
19  favor. Please read page 8 of 46, starting with
20  Exhibit A, and getting to the end of the first
21  subparagraph (a).
22    A. So from paragraph (a), right?
23    Q. No, please read from Exhibit A, at the top.
24    A. Okay:
25      "Description of the System and Services"

35 (Pages 134 - 137)

Page 150

1    A. Yes.
2    Q. Do those connect to the NOC?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So we do provide email access
5    and phone access I just don't know if those are the
6    exact email and phone number at the time since --
7    I don't know again it's not our contract so I don't
8    know if there was something there, but we do provide
9    email access and phone number. Today there is a
10   dedicated system for this communication so email is
11   hardly ever used.
12   BY MR. BLOCK:
13   Q. What is that dedicated system called?
14   A. It's the NSD. NSD.
15   Q. What does NSD stand for?
16   A. Okay. I think it's NSO support -- I don't
17   recall exactly but something like that.
18   Q. Something like that?
19   A. It's initials that describe a support system.
20   Q. What function do the tunnels and VPS you just
21   mentioned serve relative to Pegasus?
22   A. So to the best of my knowledge they are part
23   of the infrastructure required in order to connect
24   between the system to the outside and back and forth.
25   Q. Earlier we talked about the white services

Page 151

1    department, do you recall that?
2    A. Yes.
3    Q. And one of the things that the white services
4    department will do is set up VPS servers for a
5    customer; is that accurate?
6    A. They will not set it up. They will procure
7    the service. There is another team that will set it
8    up.
9    Q. Okay so let me start with the procurement.
10   And to set the stage a customer is setting up
11   an installation of Pegasus and requires VPS as part
12   of the infrastructure to operate Pegasus; is that
13   accurate?
14      MR. AKROTIRIANAKIS: Objection. Object to
15   the form of the question. Vague. No foundation.
16      THE WITNESS: So can you please clarify?
17   BY MR. BLOCK:
18   Q. Yeah. I think you testified to the effect
19   that customers need VPS to operate Pegasus. Is that
20   accurate?
21      MR. AKROTIRIANAKIS: Objection: misstates his
22   testimony.
23      THE WITNESS: VPS are part of the
24   infrastructure required for the system.
25   BY MR. BLOCK:

Page 152

1    Q. And one job of the white services department
2    is to procure anonymized VPS; is that accurate?
3    A. This is part of the job.
4    Q. And what steps are involved when someone in
5    the white services department procures anonymized
6    VPS?
7       MR. AKROTIRIANAKIS: Objection: no
8    foundation.
9       THE WITNESS: They will pick a provider that
10   provides the VPS, and they will choose the service
11   that they want from that provider, and they will have
12   to follow the procurement process required according
13   to that specific supplier.
14   BY MR. BLOCK:
15   Q. In what sense is the service anonymized?
16   A. In the sense that it cannot be linked to
17   either the customer or NSO.
18   Q. And how do defendants achieve that
19   anonymization with respect to VPS?
20      MR. AKROTIRIANAKIS: Objection: foundation.
21      THE WITNESS: They use an anonymized --
22   I don't know what to call it -- way in order to gain
23   a service.
24   BY MR. BLOCK:
25   Q. And I would like to know what you know about

Page 153

1    the details of that anonymized way. Can you explain
2    it?
3       MR. AKROTIRIANAKIS: Objection: foundation.
4       THE WITNESS: So to the best of my knowledge
5    they will use financial means which are not directly
6    related to the customer or to the company. That's
7    I think the main point here that will allow them to
8    establish an anonymized VPS account.
9    BY MR. BLOCK:
10   Q. Can you give me an example of financial means
11   not directly related to the customer or the company
12   that the white services department uses for these
13   purposes?
14   A. It can be like a credit card.
15   Q. A credit card registered in the name other
16   than the customer or defendants I presume; is that
17   accurate?
18   A. Sounds to me, yes.
19   Q. And do you know the details about how the
20   white services department procures credit cards and
21   names not related to defendants or their customers?
22      MR. AKROTIRIANAKIS: Objection: foundation.
23      THE WITNESS: How exactly they are doing
24   that, no.
25   BY MR. BLOCK:

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1     Q.  Okay.  Does NSO use cryptocurrency as
2  a financial means for setting up anonymized VPS?
3         MR. AKROTIRIANAKIS:  Objection: foundation.
4         THE WITNESS:  If I'm not mistaken, yes.
5  BY MR. BLOCK:
6     Q.  Bitcoin for example?
7         MR. AKROTIRIANAKIS:  Foundation.
8         THE WITNESS:  Bitcoin for example.
9  BY MR. BLOCK:
10     Q.  Have you ever heard of Quadranet?
11     A.  Sounds familiar.
12     Q.  Is Quadranet familiar to you as a VPS
13  provider?
14     A.  No, I don't recall no.
15     Q.  Okay.  Do you recall anything about
16  Quadranet?
17     A.  Not that I recall, no.
18     Q.  Have you heard of Green Cloud VPS?
19     A.  I heard the name but I don't have more
20  details than that.
21     Q.  Do you recall having heard it in connection
22  with your work for defendants?
23     A.  Yes.
24     Q.  And what else do you recall about how you
25  heard the name, if anything?

Page 155

1     A.  Just the name.  I mean nothing in particular.
2     Q.  How about the name Choopa, C-H-O-O-P-A, is
3  that familiar to you?
4     A.  No.
5     Q.  Can you name any VPS servers that you know
6  defendants use when setting up anonymized VPS for
7  customers?
8         MR. AKROTIRIANAKIS:  Objection: foundation.
9         THE WITNESS:  Not that come in mind.
10  BY MR. BLOCK:
11     Q.  Do customers select the VPS provider, or
12  does -- do defendants?
13         MR. AKROTIRIANAKIS:  Objection: overboard.
14  No foundation.
15         THE WITNESS:  Some customers choose to set up
16  the infrastructure themselves so they will do it A to
17  Z.
18  BY MR. BLOCK:
19     Q.  I'm going to ask a question that I think your
20  counsel has an objection to but I just want to be
21  clear for the record.  Can you name customers that
22  handled the infrastructure themselves A to Z?
23         MR. AKROTIRIANAKIS:  Are you asking him a yes
24  or no question or are you asking him to name the
25  customers?

Page 156

1         MR. BLOCK:  Let's start with yes or no.
2  BY MR. BLOCK:
3     Q.  Are you able to name customers who handle the
4  installation and infrastructure themselves?
5     A.  Yes.
6     Q.  Will you please identify them for the record?
7         MR. AKROTIRIANAKIS:  Okay, that I will
8  instruct him not to answer.
9  BY MR. BLOCK:
10     Q.  Are you able to name customers for whom
11  defendants performed the infrastructure procurement
12  and installation?
13     A.  If I can?
14         MR. AKROTIRIANAKIS:  He's asking you yes or
15  no, if you can.
16     A.  Yes, I can.
17  BY MR. BLOCK:
18     Q.  Will you please identify for the record the
19  customers for whom defendants did the infrastructure
20  installation that you are able to name?
21         MR. AKROTIRIANAKIS:  Again I'm going to
22  instruct him not to answer for the same reason.
23  BY MR. BLOCK:
24     Q.  Can you tell me how many customers defendants
25  have performed infrastructure installation for?

Page 157

1         MR. AKROTIRIANAKIS:  Objection: foundation.
2         THE WITNESS:  Throughout which period of
3  time?
4  BY MR. BLOCK:
5     Q.  Let's start with the entire life of the
6  company?
7         MR. AKROTIRIANAKIS:  Objection: foundation.
8         THE WITNESS:  I don't have exact number in
9  mind.
10  BY MR. BLOCK:
11     Q.  Can you estimate it by order of magnitude?
12         MR. AKROTIRIANAKIS:  Objection: foundation.
13         THE WITNESS:  More than ten.  I mean tens.
14  BY MR. BLOCK:
15     Q.  Tens?
16     A.  Around.
17     Q.  More than 100?
18         MR. AKROTIRIANAKIS:  Objection: foundation.
19         THE WITNESS:  I don't know.
20  BY MR. BLOCK:
21     Q.  You can't rule it out, not sure.
22         MR. AKROTIRIANAKIS:  Objection: foundation.
23  Compound.  Vague.
24         THE WITNESS:  I need to count the number that
25  we had each career and then to sum it.  So ...

40 (Pages 154 - 157)

Page 270

1  I meant is that if there is a demonstration for a
2  customer then we would like to show that part of the
3  information that the system can extract is
4  WhatsApp-related, therefore we will have a test
5  device with a WhatsApp account with basic
6  communication so during the demo we can show that we
7  can collect the data.
8  BY MR. AKROTIRIANAKIS:
9      Q.  You just used the term WhatsApp-related.  Is
10 there any other relation to WhatsApp, other than
11 demonstrating the ability to extract WhatsApp
12 messages from the demo client phone that you're
13 using?
14     MR. BLOCK:  Objection to form.
15     THE WITNESS:  Come again?  I lost you.  It
16 was very long.
17     Q.  Sorry.  In your answer you just used the term
18 WhatsApp-related.  Other than demonstrating the
19 ability to extract a WhatsApp message from the demo
20 phone that you're talking about, is there any other
21 relation to WhatsApp?
22     MR. BLOCK:  Objection to form.
23     THE WITNESS:  No.
24     MR. AKROTIRIANAKIS:  All right, thank you.
25     MR. BLOCK:  I assume, Joe, you'll permit

Page 271

1  questions about that testimony but not about other
2  topics?
3      MR. AKROTIRIANAKIS:  I asked two questions.
4  If you've got two questions, or one question as some
5  kind of recross-examination, then you can ask that
6  but we're well beyond 7 hours and it's well after
7  7 p.m. now.
8      MR. BLOCK:  I do not have re-cross.  I have
9  many other questions.
10     MR. AKROTIRIANAKIS:  Then if you don't have
11 any re-cross then I think we're done.
12     MR. BLOCK:  Then we obviously object to the
13 closure of the deposition but we'll allow it to
14 proceed, subject to that objection.
15     VIDEOGRAPHER:  Going off the record.  The
16 time is 19:08.  End of media card 6, volume 1 and
17 this is the end of the video deposition of Ramon
18 Eshkar.  If I could ask about the video and
19 transcript, if you could state that please?
20     MR. AKROTIRIANAKIS:  Is it possible if
21 I could tell you after because someone else manages
22 that and I inevitably will mess it up.
23     MR. BLOCK:  Same answer.
24 (Whereupon, the deposition concluded at 7:09 pm)
25

Page 272

1      CERTIFICATE OF COURT REPORTER
2
3      I, CHANELLE M.L. MALLIFF, a Certified
4  LiveNote Reporter, Certified Shorthand Stage IV
5  stenographic reporter, RPR and CRR (*NCRA 2003 and
6  2004), hereby certify that:
7      RAMON ESHKAR appeared on Tuesday, August 27,
8  2024, agreed to tell the truth, the whole truth, and
9  nothing but the truth, under the penalties of perjury,
10 and was thereupon examined by counsel; that the
11 testimony of RAMON ESHKAR was recorded by me
12 stenographically and was thereafter transcribed by me;
13 that the foregoing transcript is a true, accurate and
14 verbatim record to the best of my skill and ability.
15     I further certify that I am not a relative or
16 employee of any party to the action; nor am I an
17 employee or relative of any attorney or counsel to any
18 party to the action; nor am I in any way financially or
19 otherwise interested in the outcome of the action.
20
21
22
23     CHANELLE M.L. MALLIFF
24     CLR, CSSIV(NZ)
25

Page 273

1  Joseph N. Akrotirianakis, Esq.
2  jakro@kslaw.com
3                         August 30, 2024
4  RE:   Whatsapp LLC., Et Al. v. NSO Group Technologies
       Limited, Et Al.
5  8/27/2024, Ramon Eshkar (#6878149)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com
16  Return completed errata within 30 days from
17 receipt of testimony.
18  If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22     Yours,
23     Veritext Legal Solutions
24
25

69 (Pages 270 - 273)

**P.App.C**

# Exhibit E



# Pegasus     Version 3.0

## Product Description

August 2018

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045591
NSO_WHATSAPP_00045591


Cyber Technologies

# COPYRIGHT AND DISCLAIMER

Copyright © Q Cyber Technologies SARL and its affiliates. All rights reserved. All other product names and trademarks are the property of their respective owners.

No part of this document may be copied, reproduced, adapted, or redistributed in any form or by any means without the express prior written consent of the copyright owner.

We make no representation or warranty regarding the accuracy or completeness of this document and reserve the right to alter its contents at any time without notice. Functionality and specifications featured in this document are subject to change without prior notice and vary between configurations.

Please contact us for current product features and specifications. Any supply of the products featured in this document will be subject to the terms and conditions of the relevant contract.

# CONFIDENTIALITY

This document contains confidential information and may be used solely for the purpose for which they were provided, that being evaluating the possibility of acquiring a license to use one or more of our solutions or, following purchase, receiving product support, training material, and/or user guides. If you have not received our prior written permission to use this document, you should immediately destroy all copies of it and cease using it in any way.

The licensing, use, sale and implementation of all products referenced in this document is subject to customer provision of the following: signed and stamped End-User Certificate and an import and/or export license issued by the relevant authorities.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045592
NSO_WHATSAPP_00045591



# TABLE OF CONTENTS

1 **Overview** ...................................................................................................... **4**

    1.1    Overcoming Smartphone Data-interception Challenges ........................... 4

    1.2    Limitations of Standard Interception Solutions ...................................... 5

2 **CYBER INTELLIGENCE for the MOBILE WORLD** .................................. **6**

    2.1    Benefits of Pegasus ................................................................................ 6

    2.2    Technology Highlights ............................................................................ 7

    2.3    High-level Architecture .......................................................................... 7

    2.4    System Modules ..................................................................................... 7

3 **TARGET ACQUISITION** ............................................................................ **9**

    3.1    Agent Endpoint ..................................................................................... 9

    3.2    [Redacted – Export Controlled] ...................................................................... 9

           [Redacted – Export Controlled] ...................................................................... 9

           Data Collection ....................................................................................... 9

4 **AGENT INSTALLATION VECTORS** ........................................................ **10**

           Installation Vector Comparison Table ..................................................... 10

    4.1    Remote Installation (Unlimited range) .................................................... 10

           Covert    10

           Triggered (Social Engineering) .............................................................. 10

    4.2    [Redacted – Export Controlled] Field [Redacted – Export Controlled] (Within range) ..................... 11

           Tactical Network Element (PiXcell) ......................................................... 11

           Physical  11

5 **AGENT INSTALLATION FLOW** ............................................................... **12**

    5.1    Device Behavior after Installation ........................................................... 12

    5.2    Installation Failure ................................................................................ 12

6 **DATA COLLECTION** ................................................................................. **13**

    6.1    Historical Data Extraction ...................................................................... 13

    6.2    Passive Monitoring ................................................................................ 14

    6.3    Active Collection .................................................................................... 14

           Manual Actions ...................................................................................... 14

    6.4    Time Limitation and Selective Collection ................................................ 15

    6.5    Collection Buffer ................................................................................... 15

    6.6    Description of Collected Data ................................................................. 15

7 **SECURE TRANSMISSION** ....................................................................... **19**

    7.1    Data-transmission Security .................................................................... 20

    7.2    Data Hashing ........................................................................................ 20

    7.3    Anonymizing Transmission Network ....................................................... 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY           NSO_WHATSAPP_00045593
NSO_WHATSAPP_00045591


Cyber Technologies

**8 MONITORING and INVESTIGATION** ........................................................... **21**

   **8.1 Data Export** ................................................................................22

**9 AGENT MAINTENANCE** ........................................................................ **23**

   9.1 Agent Upgrade .............................................................................23

   9.2 Agent Settings .............................................................................23

**10 OPERATIONAL SECURITY** .................................................................... **24**

   10.1 Self-destruct Mechanism ............................................................24

   10.2 Security Alerts Monitoring..........................................................24

**11 AUDITING** ....................................................................................... **25**

**12 ROLES, PERMISSIONS, and ENTITIES** ...................................................... **26**

   12.1 Roles.......................................................................................26

   12.2 Module Permissions..................................................................26

   12.3 Entity Relations........................................................................27

**13 SOLUTION ARCHITECTURE** ................................................................... **28**

   13.1 Client Site................................................................................28

   13.2 Public Networks .......................................................................29

   13.3 Target Devices .........................................................................29

**14 SYSTEM SETUP and TRAINING** ............................................................. **30**

   14.1 System Setup ..........................................................................30

   14.2 System Training .......................................................................30

   14.3 High-level Deployment Plan .......................................................30

   14.4 System Acceptance Test (SAT) ...................................................31

**15 MAINTENANCE, SUPPORT, and UPDATES** ................................................ **32**

   15.1 Maintenance and Support..........................................................32

   15.2 Upgrades ................................................................................32

**16 ABBREVIATIONS and ACRONYMS** ......................................................... **33**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045594
NSO_WHATSAPP_00045591


**Cyber Technologies**

# 1   OVERVIEW

Q Cyber Technologies—a world leader in the field of cyber product development—owns and develops Pegasus, a cutting-edge cyber-intelligence solution.

Pegasus enables law enforcement and intelligence agencies to remotely and covertly monitor, collect, extract, and analyze valuable intelligence resourced from the most widely-sold Android and BlackBerry smartphone devices.

This breakthrough solution, developed by veterans of elite intelligence agencies, enables governments to address the communication-interception challenges found on today's highly-dynamic, cyber battlefields.

Pegasus—using its capabilities to capture new types of information from mobile devices—bridges a substantial technology gap to deliver complete and accurate intelligence that furthers your security operations.

Since 2009, this system has been used by security and intelligence organizations around the globe—a rigorous vetting process ensures that Pegasus is only made available to organizations that fight crime and terror-related activities.

## 1.1   Overcoming Smartphone Data-interception Challenges

The rapidly growing and highly-dynamic mobile communications market—characterized by the introduction of new devices, operating systems (OS), and applications on an almost daily basis—necessitates rethinking traditional intelligence paradigms.

Changes in the communications landscape pose real obstacles that must be overcome by the world's intelligence and law enforcement agencies. Challenges include,

- **Encryption:** Now mainstream, most applications, services, and devices store and transmit data in an encrypted fashion.
- **Abundance of communication applications:** The communications market is bursting with messaging applications, all of which are IP-based and use proprietary protocols and encryption. Messaging applications are central to a target's personal and group communications as they offer easily-available and secured infrastructures.
- **Roaming targets:** Persons-of-interest are constantly moving between countries and networks.
- **Accessing personal and private data:** Targets carry their smartphones—which hold vast amounts of personal data—everywhere with them. Normally such data is not sent over networks; it is only available on an end-user's device and cannot be intercepted in traditional ways.
- **Masking:** Targets with multiple, virtual identities use any number of free services to hide their presence and activities—this approach makes them seemingly impossible to trace and track.
- **SIM replacement:** SIM are frequently replaced to avoid interception attempts.
- **Complex and expensive implementations:** Increasingly complex communications require more network interfaces—setting up interfaces with mobile network operators (MNO) is a lengthy and expensive process requiring regulation and standardization.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045595
                                                              NSO_WHATSAPP_00045591



## 1.2    Limitations of Standard Interception Solutions

Standard and legacy interception systems leave valuable *intel* unavailable to intelligence agencies. Since these systems only deliver partial results, organizations are left with substantial intelligence gaps. Commonly used systems are outlined below.

**Lawful Interception**

Lawful Interception (LI) requires in-depth relationships with local MNO—public-switched telephone network (PSTN), cellular, and Internet—who enable the legal monitoring of text messages and voice calls.

Today, however, most contemporary communications are comprised of IP-based traffic—characterized by encryption and proprietary protocols—which is extremely difficult to monitor using switch-based solutions.

IP-based traffic, even if intercepted, typically carries vast amounts of technical data unrelated to the content and metadata being communicated. Consequently, analysts spend much time going through irrelevant data that, at best, provides only a partial view of a target's communications.

The number of interfaces required to cover relevant MNO both increases costs and widens the circle of persons who might potentially leak sensitive information.

**Tactical Man-in-the-Middle Interception**

Tactical *Man-in-the-Middle* (MITM) interception solutions effectively monitor voice calls and text messages when targets are within range of MITM tactical teams.

Most of the available solutions only work on 2G GSM networks—they downgrade a target's device to a GSM-based network which, in turn, noticeably impacts user experience and functionality. However, since most communications are encrypted, even solutions that cover 3G and 4G networks are only capable of intercepting a small portion of a target's communications.

MITM solutions require that well-trained, tactical field teams be physically near their targets. On the other hand, sending tactical teams within range of a target can pose serious risks to both the team and the entire intelligence operation.

**Malicious Software (Malware)**

Malware is intended to enable access to a target's mobile device; however, it requires target involvement for successful installation.

Targets are increasingly sophisticated and well aware of the sensitivity of their communications —they are unlikely to fall into a malware trap particularly when multiple confirmations and approvals are needed before the malware becomes functional.

Malware is vulnerable to many commercially-available, anti-virus and anti-spyware packages. Further, the limitations of their security wireframe and protection, leads to transparency issues—visible traces are easily detected on a mobile device.

By addressing and resolving smartphone data-interception challenges, Q Cyber Technologies enables users to *draw back the curtain* behind which criminals and terrorists hide.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                      NSO_WHATSAPP_00045596
NSO_WHATSAPP_00045591

**Cyber Technologies**

# 2    CYBER INTELLIGENCE FOR THE MOBILE WORLD

Q Cyber Technologies' Pegasus is a globally-positioned, cyber-intelligence solution—it is unique in its ability to successfully infiltrate the market's most popular smartphones—those with Android, iOS, and BlackBerry operating systems.

Pegasus deploys an invisible software (SW) component (agent) on a target's device which extracts and securely transmits data for intelligence analysis.

The agent's installation vectors, which feature remote and tactical methodologies, require zero to minimal engagement with targets—one click at most!

The highly-secure installation mechanism and agent are completely transparent—NOT a trace exists on either device or network.

## 2.1    Benefits of Pegasus

Organizations that deploy Pegasus achieve unmatched intelligence collection from targeted mobile devices—the solution overcomes smartphone data-interception challenges, as well as the limitations associated with standard interception methods.

- **Global coverage:** Monitor targets' devices while they connect to the Internet—from any location.
- **Unlimited access to targets' mobile devices:** Remotely and covertly collect information about a target's relationships, locations, phone calls, plans, and activities.
- **Handle encrypted content and devices:** Overcome encryption, SSL, proprietary protocols, and other hurdles introduced by the complex communications world.
- **Bridge intelligence gaps:** Collect new and unique types of information—contacts, files, environmental wiretaps, and passwords—to build complete and accurate intelligence profiles.
- **Uncover virtual identities:** Ongoing device surveillance—regardless of whether or not a target switches between virtual identities and SIM cards.
- **Operate target devices:** Activate the microphone to listen in on a target's environment, turn on the camera to take snapshots, and take screenshots to collect non-communications data of high *intel* value.
- **Intercept calls:** Transparently monitor voice and VoIP calls in near real-time.
- **Monitor mobile applications:** Monitor a multitude of applications including Skype, WhatsApp, Viber, WeChat, Line, Facebook Messenger, Telegram, and Blackberry Messenger (BBM).
- **Pinpoint targets:** Obtain accurate positioning information and track targets using GPS, Cell ID (CID), and Wi-Fi.
- **MNO-independent:** Cooperation with local MNO is not required.
- **Reduce risks:** Eliminates any need for physical proximity to a target or their device during an operation.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



**Cyber Technologies**

## 2.2    Technology Highlights

The Pegasus solution uses cutting-edge technology—developed by experts coming from intelligence and LI agencies—to offer a rich set of advanced features and sophisticated intelligence-gathering capabilities that are unavailable in standard interception solutions.

- Penetrates Android┄┄┄ and BlackBerry-based mobile phones—whether or not password-protected
- Endures reboot and factory resets; OS upgrades are quickly handled
- Installs an agent with zero- to 1-click—minimal to no target engagement
- Unaffected by SIM card replacement
- Monitors smartphone applications
- Extracts encrypted content from the majority of popular instant-messaging (IM) applications and secured chats
- Remotely activates and controls phone functionalities—camera, microphone, GPS etc.
- Retrieves for detailed analysis:

  - passwords
  - files
  - messages
  - emails
  - processes list

  - locations
  - contacts
  - photos
  - calendar records
  - and more

- Target remains unaware—Pegasus is completely transparent
- Leaves no trace whatsoever on a target's mobile device
- User can choose to set an automatic self-destruct mechanism
- Minimal battery, memory, and data consumption

## 2.3    High-level Architecture

The Pegasus system features several mechanisms which, together, deliver a comprehensive cyber-intelligence collection and analysis solution. System layers and components are shown below.



## 2.4    System Modules

Pegasus' central functionalities are detailed below.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY


Cyber Technologies

| Acquire | This module is used for new agent installations, the upgrade and maintenance of installed agents, and the uninstallation of existing agents. |
|---|---|
| Investigate | As the main user interface, this layer presents collected data to operators and analysts who turn it actionable intelligence. The modules include,<br><br>• **Real-time monitoring:** The collected data of one or more targets is presented in near real-time—this is critical to decision making when dealing with sensitive targets or during operational activities.<br>• **Investigation:** Applies deep-analysis procedures to help analysts thoroughly investigate data, while investigation tools reveal crucial hidden connections and analyze events.<br>• **Rules and Alerts (Road Map feature):** Rules are defined—based on specific incoming data or occurring events—that, when met, trigger system alerts. |
| Cases | Presents all active cases and their target content. |
| Commands | Comprehensive intelligence gathering using these extraction methods:<br><br>• **Active collection:** Directs the agent to perform functions such as camera and microphone operation, screenshots, and/or retrieve files<br>• **Passive monitoring:** Monitors new data that a device syncs with, receives, and/or sends<br>• **Trigger-based collection (Road Map feature):** Defines scenarios that automatically trigger the activation and collection of specific types of data<br>• **Historical data extraction:** Extracts all data existing on a target's device |
| Transmit | Using the securest and most efficient pathways, collected data is transmitted back to the Command and Control (C&C) servers via cellular or Wi-Fi channels. |
| Administration | This layer manages all system administration tasks.<br><br>• **Permissions:** System administrators set up and manage users, define roles, and set permissions to data and modules. Based on this, user groups are defined on the basis of access levels as they relate to targets and cases.<br>• **Security:** Monitors system security to ensure collected and transmitted data is clean, authenticated, and secure before it enters the system.<br>• **Health:** Monitors the status of all hardware (HW) and software (SW) components to ensure healthy functioning—includes communication between system elements, system performance, storage availability, and fault-related alerts.<br>• **Auditing:** Tracks all user activities and operations in the system—from log in to log out. The integrity of all audited data is maintained—it cannot be deleted or changed in any way. |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045599<br>NSO_WHATSAPP_00045591

**Cyber Technologies**

## 3    TARGET ACQUISITION

A target's smartphone, and the cloud accounts connected to it, offer a deep well of intelligence. [Redacted – Export Controlled] agent and [_____] data extraction offer unlimited quantities of target-related data.

### 3.1    Agent Endpoint

Data collection begins following installation of a software-based component (agent) on your target's mobile device.

System users configure the type of data to be collected by the agent; it can be installed on smartphones that use today's most popular operating systems—Android [Redacted –Export Controlled] and BlackBerry.

Every agent is independently configured to collect and transmit specific types of information; this is achieved using a reliable Internet connection. The hidden, compressed, and encrypted data is transmitted to Pegasus servers along select channels at pre-defined times.

Once an agent is installed, a target's activities will no longer be hidden behind encryption protocols, the parallel use of multiple applications, and/or other communication-concealing methodologies.

### 3.2

# Redacted – Export Controlled

### Data Collection

Data is securely extracted from clouds—there is no impact, whatsoever, on the behavior of device applications and user accounts.

Data stored on mobile devices merely hints at the mass of available historical information—dating back months and even years—that can be retrieved. Cloud brings in a continual flow of information that can last months at a time.

Newly generated information is securely transmitted to the Pegasus system.

| | |
|---|---|
| – Instant messaging | – Email |
| – Location history | – Browsing history |
| – Account backups | – File-sharing storage |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045600
NSO_WHATSAPP_00045591

 Cyber Technologies

# 4 AGENT INSTALLATION VECTORS

Installing an agent on a target's device is the heart of any intelligence operation using Pegasus—each installation is carefully planned to ensure success.

The Pegasus system supports installation methods and vectors that are designed, as shown by high installation success rates, to satisfy varying operational scenarios. In the following sections, remote and [Redacted – Export Controlled] Pegasus [Redacted – Export Controlled] are described.

## Installation Vector Comparison Table

| Vector | Global | Home Country | Uses | No MNO | Field Team |
|--------|--------|--------------|------|--------|------------|
| Remote | ✓ | ✓ | Triggered / Covert | ✓ | ✕ |
| **Redacted – Export Controlled** | | | | | |
| Physical | ✕ | ✓ | Physical access to device | ✓ | ✓ |

## 4.1 Remote Installation (Unlimited range)

Remote installations include both covert and social-engineering methodologies. The Pegasus solution offers many tools for composing tailored, yet innocent-looking messages—this is crucial as content credibility greatly affects whether or not a target will click a link.

Using the below methods, only a target's phone number (MSISDN) is required for a successful installation.

### Covert

1. A covert message is sent to a mobile device; the target is not engaged—there is no need to click a link or open a message.
2. The message causes the smartphone to download and install the agent—the device shows no signs of change or interference.
3. The installation is completely invisible.

The Pegasus system's unique, remote installation capability gives our solution a vast advantage over other offerings found in the market.

- Covert installation process is invisible to the target and doesn't require their engagement.
- System is MNO independent.
- Activation is handled from a command and control center.
- Solution has an unlimited range and works using any MNO. Thus, the Pegasus agent can be installed on any supported device, anywhere in the world.

### Triggered (Social Engineering)

System operators can choose a different approach and craft an SMS, instant message (IM), or email. This approach prompts a target to click on a message link.

- One click, whether active or unintentional, leads to an agent installation.
- The process is completely covert and there is absolutely no sign that software is being installed on their smartphone.

## 4.2 [Redacted – Export Controlled] Field [Redacted – Export Controlled] (Within range)

Field [Redacted – Export Controlled] include a [Redacted – Export Controlled] or even physical access to a mobile device.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045601
NSO_WHATSAPP_00045591



## Tactical Network Element (PiXcell)

- Pegasus agent is covertly deployed once a mobile device is acquired by and connected to a tactical network solution (PiXcell)—whether it be native 3G/4G or Wi-Fi MITM.
- Pegasus solution leverages the capabilities of PiXcell to perform a covert agent installation while a target browses; there is no target engagement.
- Once installed, data is extracted and transmitted remotely—in the same manner and with the same capabilities of a remote installation.

## Physical

- If a team has physical access to a device, then the Pegasus agent can be installed within a few minutes.
- Once installed, data is extracted and transmitted remotely—in the same manner and with the same capabilities of a remote installation.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045602
                                                             NSO_WHATSAPP_00045591

**Cyber Technologies**

# 5    AGENT INSTALLATION FLOW

The remote installation of a Pegasus agent is outlined below.



To initiate an agent installation, the system operator only needs a target's MSISDN—the rest of the installation process is performed automatically by the system; see the below image.



## 5.1    Device Behavior after Installation

Introduction of an agent leaves a target's mobile device totally unaffected—there is no change in the phone's behavior. The agent is designed to be lightweight, yet extremely efficient; it compresses, stores, then transmits collected data in the most efficient and economical way. This ensures that device resources, such as its battery and data plan, are wisely utilized.

## 5.2    Installation Failure

If a system operator initiates a remote installation to an unsupported device, OS, or browser, then the installation will be aborted. However, the target's browsing experience remains unaffected—the target's device will present the URL defined by the system operator.

**Note:** The system and system operator don't need advance knowledge of the device, OS, and/or browser type; this information is automatically identified during the installation process.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Cyber Technologies**

# 6  DATA COLLECTION

Following the target acquisition stage, during which the agent is installed and the [____] Eye [____], the Pegasus system begins to monitor and collect a wide range of data from a target's mobile device.

The types of information include the following:

- **Text:** Textual information, which is usually structured and small in size, is easier to transmit and analyze; it includes text messages (SMS), emails, calendar records, call log history, instant messaging, contact list, and browsing history.
- **Audio:** Includes call recording (GSM & VoIP), environmental taps (microphone activation and recording), and other audio-recorded files.
- **Visual:** Includes photo and video retrieval, and new camera and screen shots.
- **Files:** Every mobile device contains hundreds of files such as databases, documents, and videos—some may contain vital intelligence.
- **Location:** Includes ongoing monitoring of a device's location (GPS and CID).

Data is collected by means of historical data extraction, passive monitoring, and active collection.

## 6.1  Historical Data Extraction

The types of historical data that can be extracted from a target's device, and sent to the C&C server, include the following:

| | |
|---|---|
| – SMS records | – Instant messaging |
| – Contact details | – Browsing history |
| – Call history (call log) | – Installed applications |
| – Calendar records | – Wi-Fi networks |
| – Emails | |

Pegasus enables the extraction of all data from a device—existing *intel* and real-time additions. Other market offerings are limited to data generated after the installation and partial monitoring.

Intelligence agencies greatly benefit from their ability to access historical data as it helps build a comprehensive and accurate intelligence picture of a target/s and their associates. Normally organizations devote months to collecting such information, with Pegasus this is achieved in minutes.

**Note:** Historical data extraction is a valuable option. If, however, an organization is not permitted to access and extract historical data, then this option can be disabled. The agent will only monitor newly-arrived data.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**○ Cyber Technologies**

## 6.2    Passive Monitoring

The agent, once installed, continuously monitors a device and retrieves—in near real time—all new data that becomes available. Data that is passively monitored includes the following:

- SMS records
- Contact details
- Call history (call log)
- Audio call recordings (GSM & VoIP)
- Calendar records

- Emails
- Instant messaging
- Target location (CID, network-based)
- Activity location; e.g., site from which a phone call originated
- Device location—monitoring a target's movements

## 6.3    Active Collection

In addition to passive monitoring, a wide range of active collection features are available. Active requests (actions) collect specified data based on orders issued by a system operator and/or system triggers.

Active collection allows near real-time actions to take place on a target's device—unique information is retrieved from both it and the surrounding area:

- Location (GPS and Wi-Fi-based)
- File retrieval
- Environmental tap (device microphone)

- Snapshots (front & back cameras)
- Screenshots

Pegasus' active collection capability sets it far above all other intelligence-collection solutions.

- System operators control information collection; they actively retrieve crucial data from a target's device. There is no passive waiting for *hopefully* relevant data to arrive.
- Your organization can access personal information never intended to leave a target's phone, or catch moments never meant to be captured.
- Pegasus accurately tracks a targets, takes photos, and/or records face-to-face meetings without the need for tactical teams.

### Manual Actions

Active data collection is initiated by a system operator. Actions are normally issued on the basis of pre-existing target information and the need to seek specific, related intelligence.

Example:

1. Target's calendar record shows s/he is currently in a face-to-face meeting.
2. Collected location data verifies this information.
3. System operator initiates an action that activates the microphone and camera on the target's mobile device.

Further, a system operator can actively retrieve any file found on a target's device—it can be an email attachment, video sent via a messaging application, or a document synced to the device from a cloud-storage service.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045605
NSO_WHATSAPP_00045591

 Cyber Technologies

## 6.4    Time Limitation and Selective Collection

Pegasus' capabilities enable the collection of historical, passive, and active data. A partial data collection can be performed in order to optimize resources, comply with a country's legal wireframe, or comply with a warrant issued for a target.

The following example shows how the agent collects and operates within time and data constraints.

- Data collection is only permitted during a time frame set by a warrant.
- Upon reaching the uninstall date, the agent stops sending data and removes itself from the target's device.
- If warrant conditions change, then the agent life cycle can be reconfigured.

## 6.5    Collection Buffer

The installed agent monitors device data and transmits it to the C&C servers.

Data transmission, on occasion, may not be possible for a number of reasons: no available data channels, device is roaming, or the agent is dormant. In such instances, the agent continues to collect new information; it is stored until a connection become available, and then transmitted.

Collected data is stored in a hidden, encrypted buffer; it is preset to hold no more than 5% of a device's free space.

Example:

Buffer can store up to 50 MB on a monitored device with 1 GB of free space.

If the buffer limit is reached, the oldest data is deleted and replaced with new data.

Transmitted data is immediately deleted from the buffer.

## 6.6    Description of Collected Data

The agent collects available data from supported applications found on the device—these include globally-popular applications.

Our developers understand that less popular and/or new applications can quickly come to the forefront of use—when requirements are raised, our company can choose to prioritize the development of new capabilities.

The types of data available for historical extraction, passive monitoring, and active collection are set out in the below table; they all have the potential to be collected by an agent.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

...nologies

| Collected Data | Agent Description | Historical Extraction | Passive Monitoring | Active Collection |
|---|---|---|---|---|
| SMS | • Extracts history<br>• Monitors all incoming & outgoing text messages (SMS) | ✓ | ✓ | N/A |

## Redacted –Export Controlled

| | | | | |
|---|---|---|---|---|
| Instant messages | • Extracts history<br>• Monitors incoming & outgoing messages sent to/from a device via a multitude of applications<br>• Covers leading IM services: WhatsApp, Telegram, Facebook Messenger, Signal, Viber and more<br>• Collects textual messages (including group chats)<br>• Indicates files transfers (which are retrievable) | ✓ | ✓ | Retrieval request: transferred files |
| Emails | • Extracts history<br>• Monitors all emails from Gmail application and native email application | ✓ | ✓ | Retrieval request: email attachments |
| Call log | • Extracts history<br>• Monitors all incoming & outgoing calls made to/from a device<br>• Collects Cellular phone call logs<br>• Collects call logs from applications such as WhatsApp, Telegram, and more | ✓ | ✓ | N/A |
| Call recording | • Records incoming & outgoing calls to/from a device<br>• Records regular Cellular calls<br>• Records VoIP calls made from various applications such as WhatsApp, Telegram and more | N/A | ✓ | N/A |

...'S EYES ONLY

NSO_WHATSAPP_00045607<br>NSO_WHATSAPP_00045591

## anologies

| Collected Data | Agent Description | Historical Extraction | Passive Monitoring | Active Collection |
|---|---|---|---|---|
| Contact details | • Extracts history<br>• Monitors all contacts on a device including assigned photos<br>• Includes contacts synced to the contact list from external services; e.g., Gmail, Facebook | ✓ | ✓ | N/A |
| Calendar | • Extracts history<br>• Monitors calendar events on a device, including those synced from multiple external accounts; e.g., MS Exchange, Gmail, and more | ✓ | ✓ | N/A |
| Browsing history | • Extracts history<br>• Monitors websites browsed via Chrome Redacted - Export Controlled | ✓ | ✓ | N/A |
| Installed applications | • Extracts a list of installed applications<br>• Monitors newly installed applications<br>• Monitors applications updates and deletions | ✓ | ✓ | N/A |
| Device & network information | • Monitors the following:<br>  - Device and network details<br>  - IMSI, IMEI, Wi-Fi networks, SSID, MNC, MCC<br>  - Battery level and more | N/A | ✓ | N/A |
| File retrieval | • Retrieve any file—whether on a target device's internal memory or SD card<br>• In addition, with the cloud solution, the user can retrieve files from cloud-based services such as Google Drive. (see Pegasus 3 Product Description section 3.2) | Retrieval request: historical files | ✕ | ✓ |

'S EYES ONLY

NSO_WHATSAPP_00045608

NSO_WHATSAPP_00045591

## nologies

| Collected Data | Agent Description | Historical Extraction | Passive Monitoring | Active Collection |
|---|---|---|---|---|
| Location | • Monitors a target's location<br>• Monitors sites where each activity was sent/received<br>• Passive location monitoring is based on CID<br>• Active collection is based on GPS | N/A | ✓ | ✓ |
| Camera snapshot | • Front and back cameras take photos<br>  – No indication appears on the device<br>  – Flash is never used<br>  – Images do not appear in the device gallery<br>  – **Note:** Images may be out of focus since the flash isn't used and the device may be in motion<br>• Photos are sent to the C&C servers<br>• Operator chooses the degree of image quality; size can be reduced to ensure faster transmission | N/A | ✕ | ✓ |
| Screenshot capture | • Screen capture is taken<br>• Image is sent to the C&C servers | N/A | ✕ | ✓ |
| Room tap<br>(mic recording) | • Microphone is activated to record surrounding sounds<br>  – No indication that a recording is in process<br>  – Recordings are not stored on the device<br>  – **Note:** Recording quality is affected by the device model, surrounding noise, and microphone sensitivity; the latter varies between phone models and is set by the device vendor<br>• Data is sent to the C&C for playback and analysis | N/A | ✕ | ✓ |

'S EYES ONLY

NSO_WHATSAPP_00045609
NSO_WHATSAPP_00045591


**Cyber Technologies**

# 7 SECURE TRANSMISSION

Collected data—historical data extraction, passive monitoring, and active collection—are, by default, sent in near real time to the C&C servers. The preferred transmission channel is Wi-Fi but, if unavailable, cellular data channels such as GPRS, 3G, and LTE are used.

The agent, which uses several compression and encryption methodologies, can exclude irrelevant, non-textual content from documents before transmitting them.

Due to Pegasus' tremendous capabilities, and the remarkable efforts invested in its design, the data usage is tiny—normally only a few hundred bytes. This guarantees that collected data is easily transmitted, and has minimal impact on a target's device and data plan.

Section *6.5 Collection Buffer* notes that if data channels are unavailable, then the agent continues to collect new information, stores it in a dedicated buffer and, when connectivity returns, transmits the data. Factors that can affect data transmission are noted below.

- **Low battery:** If a device's battery has only 5% remaining power, then all data transmission processes are stopped until the device is recharged.
- **Roaming device:**
  - Cellular data channels used by roaming devices are expensive; therefore, by default, data transmission is handled via Wi-Fi.
  - If Wi-Fi is unavailable, then transmission stops.
  - System operators can, however, choose to transmit data over cellular channels—though this can lead to high data-plan charges.
- **Dormant agent:**
  - The agent is set to dormant under the following circumstances:
    - Target enters a country whose expensive roaming charges could draw attention
    - Target enters a country with high with exposure risk.
    - There may be legal and/or contractual limitations on use in given countries
  - The agent continues to passively collect and then store data.  Upon departure from the country-of-risk, collected data is transmitted to the C&C servers.

Communication between the agent and the central servers is indirect—it is handled via an anonymizing network—thus trace-back is infeasible.

The below image shows the Pegasus system's data transmission process.



Channels and scenarios for transmitting collected data are set out below.



NSO_WHATSAPP_00045610
NSO_WHATSAPP_00045591

 Cyber Technologies

## 7.1    Data-transmission Security

The connection between agent and servers is encrypted with strong algorithms and also mutually authenticated; transmitted data is encrypted with a unique and asymmetric encryption.

The encryption of data and transmissions is pivotal, but attention must be given to data, battery, and memory use—the target must be kept unaware.

It is inconceivable that a target would discover an active agent. The agent, installed deep in the device, is well beyond OS privilege controls and is untraceable by antivirus and anti-spy software.

## 7.2    Data Hashing

The authenticity of collected data is guaranteed; it is sent in encrypted form and is digitally signed to prevent tampering. Data is timestamped as follows:

- At creation
- Upon arrival at the C&C servers

## 7.3    Anonymizing Transmission Network

Agent invisibility and source security are the guiding principles of the Pegasus solution. An Anonymizing Transmission Network (ATN)—a network of anonymizers—is deployed at every client's site to ensure that it is impossible to trace back to an operating organization thus ensuring full deniability.

ATN nodes are spread worldwide and enable agent connections to be redirected along separate paths before reaching the C&C servers. This ensures that the identity of the communicating parties is obscured.

**Note:** Our 24/7 Support Center monitors security alerts arriving from all client systems; however, while the Support Center can see security alerts, they cannot view any collected target or operational-related data. Should there be a security incident, the client must immediately follow Support Center guidance and directions.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045611
NSO_WHATSAPP_00045591

 **Cyber Technologies**

# 8   MONITORING AND INVESTIGATION

Collecting intelligence on hundreds of targets and devices generates vast amounts of data that require visualization, presentation, and investigation.

Collected data is displayed in an easy-to-use, intuitive user interface (UI).



- Collected data is organized per case
- Each case consists of related targets
- Target profiles show installed agents; e.g., devices with Pegasus agents

The Pegasus system includes a set of operational and collaborative tools that help organizations transform data into actionable intelligence. Tool functionalities include the following:

| | |
|---|---|
| **Timeline investigation** | Review and analyze activities in chronological order to best understand the flow of events. |
| **Geographical investigation** | Review target and case activities on a map:<br>• View their historical locations<br>• Investigate their routine<br>• Simultaneously view and compare multiple target trails |
| **Data enrichment** | Enrich collected data with user input to help retrieve, filter, and analyze data:<br>• Add comments and tags<br>• Write summaries and conclusions<br>• Add translations |
| **Entity management** | Manage targets that are tagged per case, location, and/or subjects. For example,<br>• Operation [name]          • Drugs<br>• Country [name]            • Terror<br>                                      • Serious crimes |
| **Advanced search and filters** | Search and filter to prove or strengthen a theory, or investigate events.<br>User categories such as case, target, topic, types of data (location, calendar records, email), terms, names, numbers, code words, dates and times, etc. |
| **Notification and action rules** | *Roadmap* feature that will define rules to,<br>• Generate notifications<br>• Issue actions |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045612
NSO_WHATSAPP_00045591


**Cyber Technologies**

# 8.1    Data Export

This section holds information on features, tools, and other systems used to export data from the Pegasus system.

**Third-party Systems**

Pegasus is an end-to-end system that provides its users with collection, presentation, and advanced investigation tools. Additionally, the system can export html files that may be integrated with compatible, third-party analysis systems.

**Export Authenticity**

Collected data maintains its integrity—it cannot be changed or altered by system users. Users can, however, add explanations and additional information by means of descriptions, tags, and comments. This leaves the data unchanged, but it does add a useful reference layer.

All exported data is 'sealed data'—including hashes—and is admissible in court.

**Report Generation**

Generated reports can be securely transferred to organization stakeholders. The system generates reports based on data filtered according to parameters:

- Timeframe
- Cases and targets
- Types and categories of collected data
- Tags
- Comments
- Free text
- Location

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                     NSO_WHATSAPP_00045613
NSO_WHATSAPP_00045591

 **Cyber Technologies**

# 9      AGENT MAINTENANCE

Installed agents require maintenance in order to support new features, bugs fixes, and changes to settings and configurations.

Agents can be uninstalled when a target is no longer a focus-of-interest for an organization.

## 9.1    Agent Upgrade

New agent versions are regularly released—for first time installation or as an upgrade to an existing agent. Latest versions provide new functionalities, bug fixes, support for new services, and/or improvements to the agent's overall behavior.

The time required for an upgrade is short and the process simple—there is no target engagement and the target's device is completely unaffected.

- A system operator requests the upgrade and, once initiated, it is completed within minutes.
- If the target's device is turned off or has a poor data connection then the upgrade is delayed until the device is reactivated and/or the data connection improves.

Updates are crucial—they keep the agent functioning and operational, and improve and repair security issues that can arise due to the ever-changing smartphone and communication environments.

## 9.2    Agent Settings

Agent settings are initially defined during installation:

- Data to be collected
- Preferred channels of communication with the C&C server
- Frequency with which the agent communicates with the server

**Agent Uninstall**

When an intelligence operation is completed, or a target is no longer of interest, then the agent can be uninstalled; this process is quick and has zero-to-minimal effect[1] on a target's device.

If an agent is operational on a device and communicates with the C&C servers, then—regardless of the initial installation vector—it is simply and **remotely** uninstalled. Under certain circumstances, a physical uninstall is also possible.

1. System operator issues a request for agent uninstallation.
2. Uninstall command is sent to the device.
3. No trace whatsoever will ever be found on a device.

Uninstalling an agent doesn't affect any data collected to date. Prior to the removal process, all collected data is transmitted to the C&C servers where it awaits investigation and analysis.

---

[1]    In some cases, uninstall may lead to device reboot; however, this will only occur after agent removal is completed.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045614
NSO_WHATSAPP_00045591

**Q** Cyber Technologies

# 10    OPERATIONAL SECURITY

Q Cyber Technologies devotes extensive resources towards keeping our clients and products secure and, equally important, invisible to targets. The Pegasus architecture ensures no client trace-back or agent detection.

## 10.1    Self-destruct Mechanism

The Pegasus agent carries an automatic self-destruct mechanism that the system operator can choose to activate due to specific operational considerations.

If there is a chance of agent exposure then the self-destruct mechanism is automatically activated; then, when the risk has been removed, the agent can be re-installed. The agent has sensors that help detect security risks such as those noted below:

- **Anti-debugging**—agent continuously monitors debugging activities; e.g., device rooting, connections to forensic tools, and/or connection to an emulator.
- **Agent manipulation**—agent endlessly monitors its own code and performs checks for changes and/or abnormalities.
- **Device mirroring**—agent ceaselessly monitors the environment on which it is running and will immediately detect device duplication or changes.
- **Unresponsive agent:** If an agent is unresponsive or doesn't communicate with the servers for a set period of time[2], then the agent automatically performs uninstall to avoid remaining on an unused or unsupervised device.

## 10.2    Security Alerts Monitoring

Our Network Operations Center (NOC) monitors Pegasus security logs 24/7—if there is any suspicious activity or an alert, an immediate investigation begins.

- Support Center updates the client and shares known information.
- Nagios, the security monitoring system, is transparent and also available on client premises.
- NOC follows a protocol:
    - Verify which type of security alert was triggered.
    - Actions to be taken by the support team and client.

---

[2] Default period is 21 days but can be reconfigured for a shorter period of time.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

 **Cyber Technologies**

# 11 AUDITING

Pegasus is a mission-critical system that supports covert, operational intelligence activities. System operators and analysts are well trained and understand the system's capabilities—especially the collection of highly-sensitive and critical data.

- System's auditing mechanism enables:
    - Compliance, where relevant, with country-specific regulations
    - Access to auditing tools that access correct system usage—from log in to log out

- Audited data is only available to persons who are designated as auditors by the system administrator.
    - They can review data and filter it according to date, user, or user action
    - Example: Review all actions performed by a given user on a specific date

- A user can only connect to one Pegasus workstation at a time.
    - Supports reliable and accurate auditing
    - Example: If a user connects to another workstation, then the initial connection automatically ends

- Audited information is stored in a protected database.
    - Data cannot be deleted or altered by any level of system user
    - This safeguards data integrity and viability
    - If required, audited information can be exported

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045616
NSO_WHATSAPP_00045591

 Cyber Technologies

# 12    ROLES, PERMISSIONS, AND ENTITIES

Pegasus is an intelligence system that collects, generates, and stores large volumes of critical data.

Q Cyber Technologies understands that gathered data can relate to high-profile and/or sensitive targets and, as such, our company provides a mechanism for managing the compartmentalization of data according to user permissions.

The system's highly-flexible permissions architecture makes organizational changes extremely easy to update. Users are allocated roles, tasks, and related permission levels. On the basis of these parameters, users can access permitted data and use specific sets of tools—all of which assist them in meeting both mission and organizational objectives.

## 12.1    Roles

Roles are characterized by predefined sets of activities, tools, modules, and permissions.  New and existing users smoothly transition into and within the Pegasus system. Roles include,

| | |
|---|---|
| **Administrator** | • Creates and manages system users, their roles, and assigned permissions<br>• Gives users access to system modules, and the ability to conduct operations and view data |
| **Supervisor** | • Manages acquirer, analyst, and operator roles<br>• Views all operations performed by subordinates<br>• Approves and conducts critical operations; e.g., agent uninstall & data deletion |
| **Acquirer** | Dedicated user who deals with the entire life cycle of an agent on a target's device—installation and maintenance to uninstallation |
| **Analyst** | • Runs investigations and can only read, query, and analyze collected data<br>• Analysts add comments, tags, and descriptions to the data to aid in interpretation |
| **Operator** | • Conducts installations, deploys new agents, and changes existing settings<br>• Views data and issues active data collection requests |
| **Auditor** | • Dedicated user with only auditing-section permissions<br>• Can audit system usage and all user operations—from log in to log out |

**Authentication and Authorization**

The security and integrity of your Pegasus system is ensured.

• System access requires authentication—the log-in process demands the use of both a username and password.
• These identifiers are stored and transmitted in an encrypted manner.

Following successful authentication, users can then access data permitted to them based on their role and associated teams and cases.

## 12.2    Module Permissions

**User permissions** are based on their **role**, as well as to the **team** and **cases** to which they are assigned.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045617
NSO_WHATSAPP_00045591



| | Agent Life Cycle | Monitor & Investigate | Data Enrichment | Archive, Delete, Uninstall | System Admin | Audit |
|---|---|---|---|---|---|---|
| Acquirer | ✓ | | | | | |
| Analyst | | ✓ | ✓ | | | |
| Operator | ✓ | ✓ | ✓ | | | |
| Supervisor | ✓ | ✓ | ✓ | ✓ | | |
| Auditor | | | | | | ✓ |
| Administrator | | | | | ✓ | |

## 12.3    Entity Relations

Pegasus organizes collected data according to mission cases—each case holds at least one target or person of interest.

A target may possess one or more devices. Your organization can collect data from all of them by installing an agent on each of a target's devices.

The system is designed to support compartmentalization. Access to case data is based on the roles held by the various team members—supervisor, operator, analyst, and acquirer.

The below diagram sets out the following situations:

- Team A investigates Case A.
- Team B investigates Case B.
- Both Teams A and B investigate Case C.



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045618
NSO_WHATSAPP_00045591


Cyber Technologies

## 13    SOLUTION ARCHITECTURE

The Pegasus system's major architectural components are shown in the below image.



## 13.1    Client Site

Q Cyber Technologies is responsible for the deployment and configuration of Pegasus hardware and software at your site—we ensure that all is functioning correctly.

The below table outlines the main components that will be installed at your site.

| System Component | Description |
|---|---|
| **Web server** | Responsible for,<br>• Agent installation and monitoring<br>• Agent maintenance: remote control, configure, and upgrade installed agents<br>• Data transmission: receive collected data transmitted from installed agents |
| **Communications module** | • Responsible for interconnectivity<br>• Handles Internet connection to the servers |
| **Permissions-management module** | • Defines and controls features and content<br>• User access is permitted based on predefined criteria |
| **Data storage** | • Agent-collected data is stored on an external storage device<br>• Data backup has full resiliency and redundancy to prevent failures and downtime |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY              NSO_WHATSAPP_00045619
NSO_WHATSAPP_00045591


Cyber Technologies

| System Component | Description |
|---|---|
| **Server security** | • All servers reside inside the client's trusted network<br>• Client deploys security measures<br>• Q Cyber Technologies also puts system-related security measures in place |
| **Hardware** | • System's standard hardware is housed in racks and installed on multiple, connected servers<br>• Responsible for advanced load balancing, content compression, connection management, encryption, advanced routing, and highly-configurable, server health monitoring |
| **Operator terminals (PC)** | • Main tool used by operators<br>• Used to activate the Pegasus system, initiate installations and commands, run investigations, and manage collected data |
| **Pegasus application** | • User interface that is installed on an operator's terminal<br>• Provides a range of tools—view, sort, filter, manage, and alerts—which are used to handle and analyze the volume of collected data |

## 13.2   Public Networks

The Pegasus system only requires hardware and software installations at your premises—there is no physical interface with local MNO.

However, since agent installations and data are transferred over public networks, Q Cyber Technologies ensures that the data is transferred efficiently and securely to your servers.

**Anonymizing Network**

The ATN is built from anonymized connectivity nodes spread over worldwide locations; they enable agent connections to be directed along varying paths before reaching the Pegasus servers. Anonymized nodes serve only a single client who can choose to manage their setup.

See Section 7.3 Anonymizing Transmission Network for more information.

## 13.3   Target Devices

Pegasus' architecture allows operators to issue new installations, and monitor, actively collect, and extract data from targets' devices.

**Note:** Pegasus is a mission-critical, intelligence system that maintains full redundancy in order to avoid malfunctions and failures. The system, which handles data and traffic on a 24/7 basis, is scalable to support client growth and future requirements.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045620<br>NSO_WHATSAPP_00045591

**Q Cyber Technologies**

# 14    SYSTEM SETUP and TRAINING

Q Cyber Technologies sets up the Pegasus system and trains your users before handing the system over to you.

## 14.1    System Setup

Pegasus is a turnkey solution whose system setup includes the following:

- Operating-environment
    - Client is provided with prerequisites that must be prepared
- Deployment:
    - Normally requires 15 work weeks
    - Q Cyber Technologies' personnel deploy Pegasus at the client's site
    - Setup includes hardware and software installations
    - Meeting end-user agreement particulars (e.g., adaptations) as well as client regulatory and technical environments

## 14.2    System Training

Once Pegasus is installed, Q Cyber Technologies personnel conduct a series of training sessions—these can take place at your site, another location, or at Q Cyber Technologies' headquarters.

The number of trainees in a session is in direct proportion to the number of operator stations.

Training content includes the following:

- Basic and advanced system usage
- Operational case management
- Web intelligence and social engineering
- System security
- Operational simulation exercises
- One-on-one, hands-on exercises

## 14.3    High-level Deployment Plan

The deployment process—at your site—involves three phases:

- Phase 1 (P1): Preparations
- Phase 2 (P2): Implementation
- Phase 3 (P3): Training and Commissioning

| P1 | Preparations | • Analyze system deployment requirements together with the client<br>• HW and SW acquisition, delivery, and arrival to the client's premises |
| --- | --- | --- |
| P2 | Implementation | • HW & SW installation and configuration per the client's contract<br>• System customization and adaptation to local networks and devices<br>• System testing |
| P3 | Training & Commissioning | • Detailed system training; including practicing real-life scenarios<br>• System Acceptance Test (SAT) by the client<br>• Onsite support for the first two working weeks of the system |

**Week**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

 **Cyber Technologies**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | Deploy Reqs | HW acquisition and delivery | | | | | | | | | | | | | |
| **Phase 2** | | | | | | | HW installation & configuration | | | System customization & testing | | | | | |
| **Phase 3** | | | | | | | | | | | | | System training | | |
| | | | | | | | | | | | | | | SAT | Onsite support |

## 14.4    System Acceptance Test (SAT)

Q Cyber Technologies has extensive experience installing and implementing our Pegasus system.

The System Acceptance Test (SAT) covers the following:

- Sets out the scope of work
- Describes the approach and tests to be performed to validate agreed-upon system functions
- Verifies the system is fully functioning
- Validates that agreed-upon functionalities have been delivered and received by the client

The tests are divided into the following stages:

1.    Functionality
2.    Network and provider
3.    Client-tailored

An official system hand over—from Q Cyber Technologies to you—is performed once the system has been deployed, tested, and used for demonstration checks.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

NSO_WHATSAPP_00045622
NSO_WHATSAPP_00045591



# 15   MAINTENANCE, SUPPORT, AND UPDATES

Q Cyber Technologies provides one year of maintenance, support, and upgrade services.

## 15.1   Maintenance and Support

Requests for an onsite support engineer to help troubleshoot and to take on greater responsibilities will be evaluated per client.

| | |
|---|---|
| **SW upgrades** | • Periodic SW releases add new features and capabilities, and fix bugs<br>• New upgrades are coordinated with the client to minimize system downtime |
| **SW hotfix** | • Dedicated SW package to fix critical bugs (unrelated to periodic SW upgrades)<br>• SW hotfixes are provided when a new OS version is introduced for a specific platform; |
| **Health-monitoring system** | • Connected 24/7 to the support team's NOC<br>• Monitored by a system configured to perform the following:<br>  – Connect all major HW components and provide system's health status in real time<br>  – Monitor SW components (e.g., tunnels and 3rd party services) and send alerts if a service is down or will be affected due to technical and/or white balance reasons<br>  – Alerts for all security incidents relating to the system |
| **NOC 24/7 tier support** | • Tickets are submitted by phone, secured website, or email<br>• NOC representatives follow support procedures to ensure each ticket is handled according to the SLA |

| Tier 1 | Tier 2 | Tier 3 |
|---|---|---|
| Company-trained engineer provides support.<br>• Support includes:<br>  – SW & HW installations<br>  – Upgrades<br>  – Basic troubleshooting<br>  – Configuration changes<br>  – Operation optimization | Field Service Engineer (FTE) provides proactive, best-effort support.<br>• Dedicated engineers inspect, examine, and resolve common technical issues<br>• If required, remote assistance is provided via remote desktop SW and a Virtual Private Network (VPN) | Technical support engineer provides support.<br>• Support activities include all those associated with Tier 1 and Tier 2 plus,<br>  – In-depth system instruction<br>  – Advanced diagnostics<br>  – R&D-level troubleshooting |

## 15.2   Upgrades

Our Company releases major upgrades approximately every quarter; these upgrades include,

- New features
- New devices/OS support
- Bug fixes
- Client-tailored features

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    NSO_WHATSAPP_00045623<br>NSO_WHATSAPP_00045591


**Cyber Technologies**

## 16    ABBREVIATIONS AND ACRONYMS

| Abbreviation | Description |
|---|---|
| ATM | Asynchronous Transfer Mode |
| ATN | Anonymizing Transmission Network |
| BBM | Blackberry Messenger |
| C&C | Command and Control (server) |
| CID | Cell ID |
| CSV | Comma Separated Value |
| dBm | Decibel (referenced to milliwatts) |
| ESEM | Enhanced Social Engineering Message |
| FSE | Field Service Engineer |
| GB | Gigabyte |
| GPRS | General Packet Radio Service |
| GPS | Global Positioning System |
| GSM | Global System for Mobile Communications |
| GUI | Graphical User Interface |
| HW | Hardware |
| ID | Identity |
| IM | Instant Messenger |
| IMEI | International Mobile Equipment Identity |
| IMSI | International Mobile Subscriber Identity |

> **Redacted –Export Controlled**

| Abbreviation | Description |
|---|---|
| IP | Internet Protocol |
| ISP | Internet Service Provider |
| JSON | Java Script Object Notation |
| LAN | Local Area Network |
| LI | Lawful Interception |
| LTE | Long-Term Evolution (3GPP/4G) |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY


**Cyber Technologies**

| Abbreviation | Description |
|---|---|
| MB | Megabyte |
| MCC | Mobile Country Code |
| MITM | Man In The Middle |
| MNC | Mobile Network Code |
| MNO | Mobile Network Operator |
| N/A | Not applicable |
| NOC | Network Operations Center |
| OS | Operating System |
| PBX | Private Branch Exchange |
| PSTN | Public Switched Telephone Network |
| R&D | Research and Development |
| SAML | Security Assertion Markup Language |
| SAT | System Acceptance Test |
| SD | Secure Digital |
| SIM | Subscriber Identity Module |
| SLA | Service Level Agreement |
| SMS | Short Message Service |
| SSID | Service Set Identifier |
| SSL | Secure Sockets Layer |
| SW | Software |
| UI | User Interface |
| URL | Uniform Resource Locator |
| VoIP | Voice over IP |
| VPN | Virtual Private Network |
| WAN | Wide Area Network |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    NSO_WHATSAPP_00045625
                                                             NSO_WHATSAPP_00045591